1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  OIL SPILL BY THE OIL RIG     *   MDL NO. 2179
              *DEEPWATER HORIZON* IN THE      *
6           GULF OF MEXICO ON              *   Section J
            APRIL 20, 2010                 *
7                                          *   August 20, 2010
                                           *
8   This Document Relates to All Cases    *   9:00 a.m.
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

9

10

11            STATUS CONFERENCE BEFORE THE
              HONORABLE CARL J. BARBIER
12            UNITED STATES DISTRICT JUDGE

13   <u>Appearances</u>:

14
     For the Plaintiffs:          Domengeaux Wright Roy
15                                   & Edwards, LLC
                                  BY:  JAMES P. ROY, ESQ.
16                                556 Jefferson Street, Suite 500
                                  Post Office Box 3668
17                                Lafayette, Louisiana 70502

18
     For the Plaintiffs:          Herman, Herman, Katz & Cotlar, LLP
19                                BY:  STEPHEN J. HERMAN, ESQ.
                                  820 O'Keefe Avenue
20                                New Orleans, Louisiana 70113

21
     For the Defendants:          Kuchler Polk Schell
22                                   Weiner & Richeson, LLC
                                  BY:  DEBORAH D. KUCHLER, ESQ.
23                                1615 Poydras Street, Suite 1300
                                  New Orleans, Louisiana 70112

24

25

1   <u>Appearances</u>:

2

3   For the Defendants:           Liskow & Lewis, APLC
                                  BY:  DON K. HAYCRAFT, ESQ.
4                                 701 Poydras Street, Suite 5000
                                  New Orleans, Louisiana 70139

5

6   For the Defendants:           Godwin Ronquillo, PC
                                  BY:  DONALD E. GODWIN, ESQ.
7                                 1201 Elm Street, Suite 1700
                                  Dallas, Texas 75270

8

9   For the Defendants:           Frilot, LLC
                                  BY:  KERRY J. MILLER, ESQ.
10                                1100 Poydras Street, Suite 3700
                                  New Orleans, Louisiana 70163

11

12  For the Defendants:           Stone Pigman Walther Wittmann, LLC
                                  BY:  PHILLIP A. WITTMANN, ESQ.
13                                    CARMELITE M. BERTAUT, ESQ.
                                  546 Carondelet Street
14                                New Orleans, Louisiana 70130

15  Also Participating:           David J. Beck, Esq.
                                  Joe W. Redden Jr., Esq.
16                                J. Andrew Langan, Esq.
                                  R. Michael Underhill, Esq.
17                                Lieutenant Commander Jeff Bray
                                  Silvia Murphy, Esq.

18

19  Official Court Reporter:      Toni Doyle Tusa, CCR, FCRR
                                  500 Poydras Street, Room HB-406
20                                New Orleans, Louisiana 70130
                                  (504) 589-7778

21

22

23
    Proceedings recorded by mechanical stenography; transcript
24  produced by computer.

25

## PROCEEDINGS

**(August 20, 2010)**

1
2
3          (WHEREUPON the following proceedings were held in
4    chambers with all parties participating by telephone.)
5          THE COURT:  Good morning everyone.
6          MR. WITTMANN:  Good morning, Your Honor.
7    Phil Wittmann.  We have a bunch of us on the line.  I think
8    Don Haycraft has a complete roll.
9          THE COURT:  Let's get the roll of who is on the line,
10   Mr. Haycraft.
11         MR. WITTMANN:  Don?
12         THE COURT:  Maybe everyone is here but Don.
13         UNIDENTIFIED SPEAKER:  Your Honor, he had indicated
14   he was borrowing a phone somewhere, so it may have dropped off.
15         MR. WITTMANN:  I'll tell you what I have so far,
16   Judge.  We have Mike Underhill representing the Department of
17   Justice.  Commander Jeff Bray is along, as well, with him.
18         THE COURT:  Wait, wait, wait.  Go slower, Phil.
19   Start over.  Mike Underhill --
20         MR. WITTMANN:  Mike Underhill.
21         THE COURT:  -- with Department of Justice?
22         MR. WITTMANN:  Yes, sir.
23         THE COURT:  Okay.
24         MR. WITTMANN:  Commander Jeff Bray.
25         THE COURT:  That's B-R-A-Y?

1          MR. WITTMANN:  Yes.

2          THE COURT:  Okay.

3          MR. WITTMANN:  Silvia Murphy also with DOJ.

4          THE COURT:  Okay.

5          MR. UNDERHILL:  Actually, Silvia is with Minerals

6   Management, or Department of Interior I should say.

7          MR. WITTMANN:  I'm sorry.  Then we did have Don on

8   for a while, but he is not there now.

9          MR. HAYCRAFT:  Hello?  Hello?  Y'all aren't hearing

10  me?

11         THE COURT:  There you are.  Now we hear you.

12         MR. WITTMANN:  Can you hear me, Don?

13         MR. HAYCRAFT:  Yes, I hear you fine.  All of the

14  sudden people started talking about me being gone.

15         THE COURT:  Well, you weren't responding when your

16  name was called.

17         MR. WITTMANN:  I'll continue the roll call, Don, and

18  correct me if I leave anybody out.

19         MR. HAYCRAFT:  Okay.

20         MR. WITTMANN:  We have David Beck, Joe Redden,

21  Phil Wittmann, and Carmelite Bertaut for Cameron.  We now have

22  Don on for BP.  For the plaintiffs we have Jim Roy and Steve

23  Herman.  For Halliburton we have Don Godwin.  For Anadarko we

24  have Deb Kuchler.  For Transocean we have Kerry Miller.  Is

25  there anyone else from BP on?  Andy, are you on?

1        **MR. LANGAN:**  Yes.  Andy Langan is here, Your Honor.

2        **MR. WITTMANN:**  That's all I have on the list that I

3 heard.  Don, do you have anyone else that's on that I didn't

4 call out?

5        **MR. HAYCRAFT:**  No.  That was great, Phil.

6        **MR. WITTMANN:**  Okay.

7        **MR. HAYCRAFT:**  Judge, as the person who got the

8 status conference going, let me just start out by saying the

9 purpose of our letter yesterday was to get clarification from

10 the Court and perhaps suggest a modification on the language of

11 Pretrial Order 1, paragraph 14, where the defendants are

12 directed not to alter or modify any tangible thing in their

13 custody or control.

14        In view of an upcoming what is termed *fishing*

15 *expedition* to retrieve drill pipe from the BOP down on the

16 ocean floor, BP and other defendants involved in the unified

17 command expressed concern that the language of paragraph 14

18 might need to be clarified in order to make sure that no

19 defendant or, for that matter, the United States was in

20 violation of Your Honor's Pretrial Order 1.

21        **THE COURT:**  By the way, Mr. Haycraft, I'm sorry to

22 interrupt you, but I should have said at the beginning, after

23 everyone identified themselves, I do have a court reporter here

24 transcribing this conference.

25        **MR. HAYCRAFT:**  That's good.  Thank you, Your Honor.

1          **THE COURT:**  I didn't mean to interrupt you.  Go
2     ahead.
3          **MR. HAYCRAFT:**  Then yesterday evening Transocean and
4     Anadarko filed a motion for protective order that has to do
5     with the relative near future retrieval of the BOP (blowout
6     preventer), all of which is evidence in the case and evidence
7     for the United States and so forth and so on.
8               So the immediate purpose of the call is because
9     of the upcoming fishing expedition.  We just want to be sure
10    there's clarity on paragraph 14 of PTO 1.  That's our immediate
11    goal, Your Honor.
12         **THE COURT:**  All right.  Who wants to speak next?
13    Anyone?
14         **MR. MILLER:**  Your Honor, this is Kerry Miller on
15    behalf of Transocean.  What I would like to address with the
16    Court is the motion for protective order that was filed late
17    yesterday afternoon.  So if anybody else wants to address the
18    issue that Don brought up --
19         **THE COURT:**  I haven't actually seen that Kerry, but
20    go ahead.
21         **MR. MILLER:**  So if anybody else wants to address the
22    pipe section issue that's going to be fished out tomorrow,
23    maybe they ought to take that up next, and we can talk about
24    the motion for protective order.  I know the Court hasn't seen
25    it.  We knew James was out of town, so I didn't e-mail it to

1    him.  Maybe we can talk about it after we talk about the drill

2    pipe.

3            **MR. UNDERHILL:**  This is Mike Underhill, DOJ.  Can I

4    volunteer, gentlemen?  Thank you.

5            To make it clear, Your Honor, I'm here in my

6    capacity today representing the Coast Guard and Bureau of Ocean

7    Energy Management marine investigation board and also trying,

8    as best I can, to represent the interests of the Coast Guard

9    insofar as the unified command's interests in removal of the

10   BOP, and make sure that everything is done in a safe and secure

11   manner and doesn't create any more damage to the environment.

12   So that's my role here today.

13           If I could briefly sum up -- and, gentlemen, you

14   can feel free to correct me when I'm done if I'm wrong, if I

15   misstate this.  Admiral Allen has issued what I will call an

16   order, or a letter, or whatever you want to call it indicating

17   that in order to go forward with the bottom kill that's planned

18   in the future that he feels it's imperative to have a

19   replacement BOP stack in place in lieu of one that's on there

20   now, i.e., the one or at least part of the one that was there

21   on April 20.

22           So as part of that process to put the

23   replacement stack on, you first have to remove the old one.

24   Apparently there are pieces of drill pipe, 5½-inch string, that

25   go completely through the BOP down into the well, and

1    apparently there's a partial piece of drill string that appears

2    that may be lodged in the BOP stack sitting nestled next to the

3    one that falls 3,000 feet or down or so.

4                In order to remove the BOP stack, it's necessary

5    to get the drill string out.  If you are kind of picturing the

6    BOP sitting with a straw down it, the alternative would be to

7    lift the BOP 3,000 feet or so up and take it off that straw and

8    then bring it to the surface.  The alternative way and the

9    engineering way is instead to take the drill string out.

10   That's the fishing expedition that they are talking about

11   doing.

12                A, it's critical to well safety and control.

13   It's a physician saying, "I shall do no harm."  It's probably

14   looking at the worst case scenario that nobody hopes and I

15   don't even think expects would happen, but at this point nobody

16   is taking any chances.  So to make a long story short, it's

17   actually the Coast Guard unified command that wants the BOP

18   stack to be removed.  They want the fishing expedition to occur

19   so they can plan for the next evolution of keeping the well

20   secure and controlled.

21              THE COURT:  Okay.  Thank you.  Anybody else want to

22   weigh in on this and make any comments?

23              MR. WITTMANN:  I have a comment on the proposed order

24   that BP circulated.

25              THE COURT:  I haven't seen any proposed order, by the

1    way.  Mr. Haycraft, did --

2              **MR. HAYCRAFT:**  Judge, I just circulated it a few

3    minutes before the call.  I wanted everybody to have a chance

4    to look at it.  If we could perhaps have sort of a time line

5    for submitting an agreed upon order to circulate and then to

6    send to you, Judge, that would probably be the best fit.

7              **MR. WITTMANN:**  That's fine.

8              **THE COURT:**  Okay.

9              **MR. UNDERHILL:**  This is Mike Underhill.  I want to

10   add one more thing for the benefit of Your Honor and all the

11   parties.  This goes to any evidence that's removed from the

12   seafloor.

13             The drill string, assuming it's able to be

14   removed -- that and anything else, for that matter, that is

15   removed from the bottom -- is going to undergo strict

16   chain-of-custody controls designed to benefit all the parties'

17   interests to make sure that it's tagged, it's collected, it's

18   logged appropriately, it's preserved appropriately, it's stored

19   appropriately.  That's going to be for the benefit of all

20   parties, whatever their interests might be, so the evidence

21   will be what the evidence will be.

22             Furthermore, video documentation is going to

23   take place of the entire process so all parties that even

24   aren't on the rig will later have an opportunity to observe

25   what was actually done.

1        **THE COURT:**  Would the protocol be similar to what was

2   used back in June, I think, on June 21 or thereabouts, to

3   recover the kinked riser section?

4        **MR. UNDERHILL:**  I think we have all gotten a little

5   better at the job since then, Your Honor.  I don't have the

6   final protocol.  I understand that it has been signed, but I

7   only have a previous draft of it.  The board has undertaken to

8   draft a very detailed evidence protocol that will specify the

9   steps that will occur, how the evidence is to be put under

10  chain of custody, tagged, marked, stored, etc., etc.

11              To jump a little ahead of the game -- this

12  really goes to Transocean's motion that we will address in a

13  moment, I suppose.  This would apply to the blowout preventer

14  itself whenever it is removed.  The plans are -- and in fact

15  contracts, if not in place, they are being put in place.  The

16  equipment, including the string, including the BOP when it's

17  removed, will be taken to the NASA Coast Guard facility at

18  Michoud, where it's a secure facility, actually a NASA facility

19  the Coast Guard has.

20        **THE COURT:**  Did you say at Michoud?

21        **MR. UNDERHILL:**  That's correct.  I'm just informed

22  the BOP is not going there, but the string would go there.  So

23  the string they intend to remove on this fishing expedition --

24  poor choice of words, I have to say.  In any event, it's going

25  to be taken to Michoud, put under a secure lock and key, and

1  the Michoud facility is so secure that I think that NASA needs

2  all kind of superspecial stuff for anybody to get in.

3          **THE COURT:**  What about the BOP?  What's the plan for

4  that?

5          **MR. UNDERHILL:**  I'm looking at a note being handed to

6  me by my Coast Guard colleague.

7          **LT. CMDR. BRAY:**  It's not final, but it was close to

8  finalized --

9          **THE COURT:**  Who is this speaking?

10          **LT. CMDR. BRAY:**  I'm sorry.  It's Jeff Bray with the

11  Coast Guard.

12          **MR. UNDERHILL:**  Lieutenant Commander Jeff Bray,

13  Your Honor.

14          **THE COURT:**  What were you saying?  I'm sorry.

15          **LT. CMDR. BRAY:**  They were trying to finalize with

16  Stennis.  The NASA facility at Stennis has the capability that

17  Michoud doesn't for the size and weight of the BOP.

18          **UNIDENTIFIED SPEAKER:**  I'm sorry, are you saying

19  "Bennett"?

20          **THE COURT:**  Stennis.

21          **LT. CMDR. BRAY:**  Stennis, S-T-E-N-N-I-S.

22          **THE COURT:**  Stennis near Waveland or Bay St. Louis,

23  Mississippi.

24          **LT. CMDR. BRAY:**  Correct.  Yes, sir.

25          **MR. HERMAN:**  Your Honor, this is Steve Herman for the

1    plaintiffs.

2              **THE COURT:**  All right.

3              **MR. HERMAN:**  I just wanted to make a little bit of a

4    clarification which might be helpful.  Mr. Miller and/or

5    Mr. Haycraft can correct me.

6              When we did the order for bringing up the riser,

7    which looks very similar to the order that Mr. Haycraft

8    circulated to counsel this morning, what we were really

9    concerned with, from the Court's point of view, were the

10   documentation and preservation aspects.  On the actual

11   protocol, we -- and under the Court order, the protocol is

12   pretty much deferred to unified command, and that might be

13   appropriate for the fishing expedition.

14             Mr. Miller can speak to this better than I can,

15   but I think the distinction is that with respect to the BOP, I

16   think the parties would want a little bit more input into the

17   protocol itself and not just the documentation and preservation

18   aspects.

19             **MR. MILLER:**  This is Kerry Miller.  Steve, that's

20   right.

21             Your Honor, I know you haven't seen it yet, but

22   that's really the subject of our motion for protective order.

23   We think that with respect to the blowout preventer, which is

24   according to the newspapers -- if you can believe what you see

25   there -- a pretty critical piece of physical evidence, that

1   instead of having a testing protocol drafted by the Department

2   of Interior and thrust upon us, that the testing protocol, the

3   transport, the handling of the BOP ought to be the subject of

4   this Court's jurisdiction and ought to be a product of input

5   from all interested parties, including the litigants before the

6   Court, and that's really the subject of our motion for

7   protective order.

8           We understand the BOP is going to come up,

9   decisions are going to be made as to how to transport it, where

10  to transport it.  I would say that this is the first I'm

11  hearing about Stennis Space Center in Bay St. Louis.  For the

12  last several days, what we heard was that the BOP was going to

13  Michoud, no questions asked.  Now we have heard it's going to

14  Stennis Space Center.

15          It's been Transocean's position, as well as a

16  number of other interested parties, that Michoud did not have

17  the capacity to hold the BOP.  Your Honor, it's 50 feet high.

18  It's 350 tons.  You have to bring it to the right place.  It

19  has to be transported right.  The evidence has to be preserved.

20  This is not a piece of pipe.  This is a large sophisticated

21  piece of equipment.  It's critical evidence in the case.

22          We would be happy to have our motion for

23  protective order set on a expedited basis so that the Court can

24  look at it and get involved, but that in essence is the

25  substance.  It is input from all interested parties into the

1  handling, transport, and to the testing and analysis that's

2  going to be done on the BOP.

3          **THE COURT:**  Well, I would have assumed that all the

4  interested parties would have had input.  Mr. Underhill,

5  there's been no input on any of the protocol by any of the

6  interested parties?

7          **MR. UNDERHILL:**  I'm looking at a note here,

8  Your Honor.  I've been handed a note by my DOI representative

9  saying that the marine board engaged the parties in interest in

10 the testing protocols and intends to do so.  Can I make a

11 suggestion --

12         **THE COURT:**  Sure.

13         **MR. UNDERHILL:**  -- that may simplify some of what we

14 are dealing with today?

15         **THE COURT:**  All right.

16         **MR. UNDERHILL:**  What I would respectfully suggest,

17 Your Honor, is that we split this discussion into two separate

18 issues.  Let's take the issue of Transocean's concern about the

19 testing protocol and, for that matter, the private plaintiffs'

20 concern.  We see that as being step two.  Step two.  That's not

21 what we are talking about now.

22              Any testing that goes forward, my best ballpark,

23 what I'm being told, is probably not going to happen for

24 probably at least a month and probably even way outside that.

25 I shouldn't say "way outside," but at least for a month.  The

1    contract is trying to be let to the consultant that will do the

2    engineering teardown.  There aren't really many people that can

3    do it, frankly.  There are only a few out there that are

4    qualified to do it.  They don't even have a contract yet, so

5    that's down the road.

6              We fully expect and fully expected Your Honor --

7    assuming you got the MDL and you did.  We fully expected

8    Your Honor to be telling the parties, including the board and

9    the government, that you approve of any testing protocols that

10   are done.

11             I think in your pretrial order it says that the

12   parties are to confer and try to work things out.  If they do,

13   that's a great thing.  If they can't, then we will have a

14   conference like we are having right now.  So that's step two.

15   We are not talking about testing.  Nobody is going to test the

16   BOP.  Nobody is going to test the fish removed from the well,

17   the drill string.

18             All we are talking about now is step one, which

19   is to get it out of the water, put it under safe and secure

20   control, where it's free from the elements, where it's free

21   from any party's ability to try and meddle with the evidence,

22   everybody is safe, everybody is secure.

23             On that note, once I get a copy that I know is

24   the final draft, I will be very happy to provide that to the

25   Court and have it distributed to the parties in interest.

1  There's absolutely no problem.  The only reason I'm not doing
2  it now is I don't have a final draft with me.  I think that
3  will give Your Honor something to actually look at and judge
4  whether the evidence protocols that we are really talking about
5  this morning are sufficient in Your Honor's mind.
6           That would be my suggestion.  We split it up
7  into retrieval, step one.  Testing is down the road.  We'll
8  deal with that once we actually get somebody contracted in
9  place to do the testing and tell the parties what the proposed
10 protocols are.  Then if the parties want to try to shoot
11 bullets at it, we will do that.
12          THE COURT:  Let me ask this.  Don Haycraft or whoever
13 can address this.  What is the time line now that we are
14 looking at in terms of the attempt to retrieve the drill string
15 first and then the blowout preventer?
16          MR. HAYCRAFT:  Judge, Mike probably has details too,
17 but my understanding as early as tomorrow, when this ambient
18 testing place is completed, then Admiral Allen will give the
19 go-ahead to begin the fishing expedition and retrieve the drill
20 pipe.  That's why we wanted the status conference today because
21 it may well be this weekend that the fishing operations start.
22          THE COURT:  Well, why don't we talk about that first.
23 That would not involve retrieving or removing the blowout
24 preventer.
25          MR. HAYCRAFT:  Right.

1          **MR. ROY:**  Your Honor, may I make a point?

2          **THE COURT:**  Yes.

3          **MR. ROY:**  This is Jim Roy, along with Steve Herman,

4    interim co-liaison counsel for the plaintiffs.  First, I'm not

5    sure that the MDL plaintiffs are considered by the

6    unified command, the Coast Guard, or the MMS as parties of

7    interest.  I know neither Steve nor I have ever been consulted

8    directly by any of the foregoing in connection with this

9    removal.

10          The first notice we had was actually

11    Mr. Langan's filing in the record and Mr. Haycraft's and

12    Mr. Miller's heads-up about it, for which we are deeply

13    appreciative.  For the record, we would like for Commander Bray

14    to put down Steve Herman and Jim Roy's name, at least as long

15    as we are serving in the capacities we are, or whoever replaces

16    us, to involve the plaintiffs in any discussion on these type

17    things so we can have the same heads-up coming to the Court.

18    That's number one.

19          The second thing is our concern with the removal

20    of the pipe, and we by no means want to interfere or anything

21    like that.  All we want to do is preserve evidence.  Our

22    concern is our understanding -- and you gentlemen on the phone

23    can correct us.  Our understanding is that the pipe that is in

24    the blowout preventer, that there was a partial closure of the

25    rams or shears, as the case may be, and that the pipe is

1    actually pinched and held in place.  Is that correct right now?
2    Does anybody know that?  Does anybody believe that to be true?
3            **THE COURT:**  Mr. Haycraft?  Anybody want to respond to
4    that?
5            **MR. HAYCRAFT:**  Well, I would guess that
6    Lieutenant Commander Bray would be the best person.  My
7    understanding would be that the rams and the shears would have
8    been released, but I don't know that.
9            **THE COURT:**  Lieutenant Commander Bray.
10           **LT. CMDR. BRAY:**  Yes, sir.  I think the issue is
11   nobody knows for sure, which is why this plan is to try to run
12   an ROV and take a look first before anything happens and see
13   where we stand after we get them pictures of what's in there.
14           **MR. ROY:**  The reason why I ask that is because if
15   these rams are, in fact, partially engaged and you are going to
16   attempt to pull the pipe through the BOP, much less 3,000 feet
17   of it, you're going to be pulling a lot of joints through
18   there.  It would seem that whatever damage has already been
19   sustained internally through operations prior to the blowout,
20   as well as since the blowout, is merely going to be further
21   aggravated through what will inevitably be further destruction
22   of the internal mechanism of that BOP.
23               I'm not the expert.  This is new to us in terms
24   of being aware of this procedure being contemplated right now,
25   so we have not had a chance to consult experts or what not,

1    much less see whatever expert analysis the Coast Guard and BP
2    have addressing that issue.
3                  If indeed those rams are closed around the pipe,
4    if indeed the pipe is pinched in there, it would seem that
5    trying to pull that pipe out is going to cause a lot of
6    evidence destruction, a possibility, and in fact they may have
7    to very well disengage the blowout preventer to begin with and
8    lift it up, like somebody alluded to earlier, at least high
9    enough to cut the pipe off underneath the BOP and lift that out
10   of the way and separately lift the pipe out.
11                 I don't make any pretense of suggesting what's
12   best.  In an ideal world, you would raise the BOP high enough
13   to cut the pipe out from underneath it and bring the whole
14   thing with the pipe ashore without further destruction.  That's
15   just an observation.  I don't have any expert testimony to back
16   it up at this point because we haven't had a time --
17             THE COURT:  Well, let me ask either Commander Bray or
18   whoever else, Mr. Underhill.  I'm assuming that those kinds of
19   concerns, which are legitimate concerns, have been or will be
20   taken into account in this operation.
21             MR. UNDERHILL:  The answer is yes, Your Honor.  I've
22   been representing the Coast Guard for a long time and it's
23   something I have always told them, and that's that I won't tell
24   them how to run a ship if they don't tell me how to run a
25   lawsuit.

 1            What I think at least I would bring to the
 2   Court's attention is that we are really talking about now there
 3   are legitimate concerns over evidence preservation.  Trust me,
 4   we all have those.  Everybody on every which way/side of the
 5   fence has those same concerns.  What we are talking about now
 6   what they're doing is an engineering issue and it's a safety
 7   issue and it's a pollution issue.  What I greatly fear is that
 8   suddenly litigation concerns are driving Admiral Allen's
 9   process, which has nothing to do with litigation and it has all
10   to do with making sure that this well doesn't blow out again
11   through anything that anybody might do to try to cap it and
12   totally kill it.
13            In order to do that, he -- and that's his
14   role -- has made the determination, with a lot of input from a
15   lot of scientists and a lot of engineers, that that BOP needs
16   to be replaced, a new stack put in place before they can do the
17   bottom kill that completely secures that well.
18            His further concern is that they now have a
19   window of opportunity with weather.  We have a lot of ships.
20   We have a lot of personnel out there.  We have the window to do
21   it.  We can lose that window, and we then potentially lose the
22   ships, who have to scatter to get out of the way.  This is
23   hurricane season.  He wants to get this done as soon as safely
24   and humanly possible.  That's the overriding concern and,
25   frankly, it overrides my personal litigation concerns long term

1  on behalf of my civil clients.

2                    So that's where I would like to put that focus,

3  that the focus should be on making sure that we don't have

4  another oil spill rather than the sole purpose and the primary

5  purpose of worrying about whether a drill string might harm an

6  annulus, which we don't think it will.  But even if it did,

7  I'll trade my evidence long term to make sure that we don't

8  have another oil spill in the Gulf.  I would rather have that.

9           THE COURT:  Well, I think we all understand that.  I

10  don't think anybody is suggesting that we should engage in

11  something that is likely to cause another oil spill.  I think

12  all Mr. Roy was suggesting is that is a concern; that if

13  there's a way to avoid further damaging the BOP, as part of the

14  evidence preservation concern, that should be done.

15           MR. HAYCRAFT:  Judge, this is Don Haycraft here.

16  Admiral Allen's letter is posted on the unified command Web

17  site.  It basically says, and I'm quoting:

18                    "The drill pipe and any other material that

19  might interfere with the BOP replacement can be fished out of

20  the well without causing any further damage to the existing

21  plug, hanger, or seal."

22                    So that sentence suggests to me exactly what

23  Mike is saying is that the unified command, the engineers for

24  many parties and the government and the Secretary, that

25  Jim Roy's considerations have been taken into account in the

1    public interest.  All BP is asking is to make sure that

2    paragraph 14 of Pretrial Order 1 is not a barrier or causes

3    undue fear on the part of litigants before the Court.

4              **THE COURT:**  Well, as you pointed out in your letter,

5    Mr. Haycraft, it is certainly not my intention to try to

6    interfere with the ongoing operation to finally kill this well

7    and whatever is necessary to retrieve or remove to accomplish

8    that.

9                   I don't sense that there should be a great deal

10   of controversy or dispute among all the parties to come up with

11   some agreed upon proposed order similar to the order that I

12   entered at the request of the parties on or about June 21 with

13   regard to the removal of the kinked portion of the riser pipe.

14   Then we can deal separately with Mr. Miller's motion, which

15   deals separately, as I understand it, with the BOP.  Is that

16   right, Mr. Miller?

17             **MR. MILLER:**  Kerry Miller.  It does deal with the

18   BOP.  I think that's right.  I agree with what you said, with

19   what Mike said for the Department of Justice.  This is a

20   two-phase issue.  Our motion is directed at the second part of

21   the phase.  Really, it's focused in on once the BOP is removed

22   from the ocean floor --

23             **THE COURT:**  What happens with it.

24             **MR. MILLER:**  -- but it kicks in at that point.  It

25   kicks in how it's transported, how it's protected, how it's

1    preserved, where it goes, and most importantly that all parties

2    have input into the testing that goes on with that BOP.

3              THE COURT:  Sure.

4              MR. MILLER:  I understand we may be some weeks down

5    the road, but as Your Honor knows, we are not going to come up

6    with a protocol in a day or two.

7              THE COURT:  No.

8              MR. MILLER:  We don't want to wait until the thing is

9    at Stennis and the engineers are contracted and they are ready

10   to go and then we get a protocol and we have two days to

11   comment on it.  That's the real focus of why we did what we

12   did.

13             THE COURT:  Let me ask this.  You have circulated

14   some sort of proposed order with regard to your motion?

15             MR. HAYCRAFT:  Yes, I have, but not to Mike.  So I

16   need to get it to him, and then perhaps you can tell us

17   something like get an agreed upon order by 1:00 today.

18             THE COURT:  Well, that's fine.  My question, I was

19   really addressing that one to Mr. Miller regarding the BOP.

20   When is the earliest date that it would be anticipated the BOP

21   removal would begin?

22             MR. MILLER:  Your Honor, we are hearing that the BOP

23   may come up a week from today.

24             THE COURT:  So we have a little time to deal with

25   that.  We don't have to resolve that today.  Mr. Miller, have

1    you circulated some sort of proposed order among all the

2    parties?

3              MR. MILLER:  Yes, Your Honor.  We have a paragraph on

4    the relief we request in our motion for protective order, and

5    there is a proposed order that goes along with it.  It's fairly

6    generic.  What it calls for is party input into the protocols

7    with respect to the transport and the handling and the forensic

8    testing.

9              MS. KUCHLER:  Your Honor, this is Deb Kuchler for

10   Anadarko and MOEX.  We also joined in Transocean's motion.

11             We believe the most efficient way to go about

12   having parties' input into the protocol would be for the

13   third-party contractor who is going to do the work to be

14   selected first and have that expert company put together a

15   proposed protocol for which we all give input, rather than

16   asking all of us eventually to develop a complete protocol each

17   individually and then, I suppose, try to merge them.

18             So our suggestion would be that the third-party

19   contractor whose expertise is going to be relied upon to do the

20   work come up with the initial draft of a proposed protocol and

21   that all interested parties be allowed to comment after that's

22   circulated.

23             THE COURT:  Well, I think Mr. Miller has a more

24   immediate concern about removing it, preserving it,

25   transporting it, storing it, all of that, before any testing is

1   even begun.

2        **MS. KUCHLER:**  That's true, and we share in those

3   concerns.

4        **THE COURT:**  That's what we are talking about right

5   now.  Again, I'm assuming that the government, the unified

6   command, or the Coast Guard, whoever is in charge here, is

7   going to be working with the contractor to do just what you

8   said, to get a testing protocol at some point.  Is that right,

9   Mr. Underhill?

10        **MR. UNDERHILL:**  That's correct, Your Honor.  It's

11   part of the plan.  They felt the most expeditious way to do it

12   was to have the expert contractor submit the protocols, put it

13   out for comment.  Listen, if the protocols can be strengthened,

14   then everybody is better off, but put that out there rather

15   than have ten plans that compete.  I think that the lady

16   from -- I think it was Anadarko --

17        **THE COURT:**  Right.

18        **MR. UNDERHILL:**  What she suggests was, in fact, the

19   plan.

20        **THE COURT:**  Right.  What has been drafted so far with

21   regard to the BOP?  Do you have a protocol for removing it,

22   preserving it, transporting it, storing it, and all that?  Do

23   you have a protocol for all of that yet?

24        **MR. UNDERHILL:**  We do, and that's what I said,

25   Your Honor.  I'm actually down the hall from you in the witness

 1  room.  What I have, I think this is the final language, but it

 2  has "Draft" written on it.  I'm hesitant to give it to

 3  Your Honor until I know it's actually the final.

 4          THE COURT:  Well, I don't necessarily want you to

 5  give it to me, but I would like you to maybe share it with the

 6  interested parties here who are on this phone call.  That's

 7  what Mr. Miller is asking for so that they can have some input

 8  and it's not just presented to them as a fait accompli.

 9          MR. UNDERHILL:  Are we talking now about the evidence

10  protocol or the BOP testing phase?

11          THE COURT:  Well, we are talking about both, but my

12  thinking is that the final drafting of the testing will have to

13  wait until it is drafted or finalized by the contractor and

14  then put out, as you said, for comment.  We just want to make

15  sure it's not issued and then they say, "The testing is going

16  to occur tomorrow and here's the protocol," that there's some

17  reasonable opportunity for input from the interested parties.

18          MR. UNDERHILL:  No, we are totally on board with

19  that.  All I was trying to make clear, Your Honor, is we have

20  the evidence.  I'm talking about the retrieval and the storage

21  protocol --

22          THE COURT:  Right.  Right.  That's what I'm talking

23  about too.

24          MR. UNDERHILL:  -- and the chain of custody protocol,

25  and I think that's in the form that -- well, let's put it this

1    way.  Hopefully that's the final form because in order to --
2    this was the approach that was taken, in order to satisfy the
3    highest level of chain of custody, that we would do it in
4    accordance with even a criminal protocol because that would
5    satisfy any potential civil parties' concerns about chain of
6    custody.  In other words, that's the highest common
7    denominator.
8             **THE COURT:**  When can you give that to all the
9    interested parties who are on this call?
10            **MR. UNDERHILL:**  I can probably do it within the hour.
11            **THE COURT:**  Okay.
12            **MR. UNDERHILL:**  I've got nods from the heads over
13   there.  They said that's possible.
14            **THE COURT:**  Okay.  Why don't we agree that that's
15   what you will do.  As Mr. Roy or Mr. Herman pointed out, they
16   are not technically interested parties perhaps in the context
17   of the marine board of investigation, but they certainly are
18   interested parties in this litigation, so I want them to be
19   included on that.  Okay?
20            **MR. UNDERHILL:**  I understand.  Just to try to make it
21   even clearer that we are taking the chain of custody and
22   evidence preservation requirements very seriously, there's an
23   FBI evidence recovery team that is going to be a part of this.
24   If I'm not mistaken, it's probably already a part of it.  So
25   these are people that are experienced in chain of custody,

1  making sure that everything is done by the book --

2     **THE COURT:**  Okay.

3     **MR. UNDERHILL:**  -- so nobody has a problem later

4  about anything being done to the evidence that was improper

5  once it's removed from the seafloor and until it's put under

6  lock and key.

7     **THE COURT:**  Anybody else want to weigh in on any of

8  the things we just talked about?

9     **MR. GODWIN:**  Your Honor, Don Godwin for Halliburton.

10  We join Transocean's motions as well as Kerry's and Deb's

11  comments this morning.

12     **THE COURT:**  Okay.  Very well.  Well, it sounds like

13  this is what we have agreed to do.  Mr. Haycraft, you have

14  already circulated a proposed order?

15     **MR. HAYCRAFT:**  Right, and I want to get it to Mike.

16     **THE COURT:**  Okay.  Get it to Mr. Underhill.  I don't

17  know if there are any remaining issues relating to your

18  proposed order.  If there are, we can hear them now if anybody

19  wants to voice them.

20     **MR. WITTMANN:**  We have a couple, Your Honor.

21     **THE COURT:**  Okay.  Mr. Wittmann.

22     **MR. WITTMANN:**  In paragraph 2, Don, of your order you

23  say, "No metallurgical analysis or other potential destructive

24  testing on the recovered physical evidence will be conducted

25  without first providing plaintiffs . . . ."  I would say

1   "plaintiffs and other interested parties" instead of "or."

2        **MR. HAYCRAFT:**  All right.

3        **MR. WITTMANN:**  Then at the end of that sentence, at

4   "in addition to the notice," "with an opportunity to attend."

5   That's not clear in here that we would have an opportunity to

6   attend.

7        **THE COURT:**  What paragraph?

8        **MR. WITTMANN:**  Paragraph 2.

9        **MR. HAYCRAFT:**  I'll tweak that paragraph 2.

10       **MR. WITTMANN:**  That's the only comment I had.  David,

11  did you have any in Houston?

12       **MR. BECK:**  No.  You hit the exact two that I had.

13       **MR. HAYCRAFT:**  I'll recirculate a draft with those

14  proposed edits and then make sure Mike is in the loop so he can

15  sign off on it, as well, and then I will get that to you by

16  1:00 this afternoon as an agreed upon order.

17       **THE COURT:**  Great.  Then, Mr. Underhill, you're going

18  to get your draft protocol regarding the retrieval and storage

19  preservation of the BOP to all interested parties within the

20  hour.  As soon as you-all circulate that, I'm hoping that

21  you-all can work out some agreed upon --

22            If there are any remaining concerns, Mr. Miller,

23  that you or anyone else have, then we'll have to hold another

24  conference or hearing.  If we need to, we can do that on short

25  order.

1          **MR. MILLER:**  Thank you, Your Honor.

2          **THE COURT:**  Anybody have anything else?

3          **MR. UNDERHILL:**  One final thing while I've got them

4     on the line.  I don't have the contact information for a lot of

5     the folks on the line.  Perhaps the simplest way:  Don, you

6     have my cell phone number.  If you could call me, I'll try to

7     figure out a way to hopefully get through you, if you agree,

8     the people I need to send this to.

9          **THE COURT:**  Mr. Underhill, let me just ask you:  Is

10    the DOJ or anybody you are representing a party of record yet

11    in any of the cases that I have now in the MDL?

12         **MR. UNDERHILL:**  Negative, Your Honor.

13         **THE COURT:**  Well, we need to find a way to put you on

14    our e-mail list if we need to contact you too.  Could you send

15    something to my law clerk for now.  The law clerk who has been

16    working on this is out, but you can send it to

17    irina_fox@laed.uscourts.gov.  Send her any contact information

18    for you and anyone else that we need in terms of your end.

19    Okay?

20         **MR. UNDERHILL:**  Yes.  Your Honor, my Coast Guard

21    colleague, Lieutenant Commander Bray, passed me a note, and

22    it's a good question.  They're going forward with this

23    evolution as we speak.  It's a detailed engineering process

24    that's spec'd out in probably a 30 or 40-page engineering

25    design.  I'm not there so I don't know exactly what they are

1  doing right now, but are we good to go ahead with the process

2  that Admiral Allen is in charge of, which is doing whatever

3  they need to do out there to try to get this process ready so

4  they can switch out the BOPs?

5  THE COURT:  Well, I certainly haven't issued any

6  orders interfering with what he is doing that I'm aware of.

7  Would that include retrieving the pipe?  Is that what you are

8  talking about?

9  MR. UNDERHILL:  I think that's tomorrow, so I think

10  we have time to try to work on a stipulated order for that.

11  They are doing steps to get that ready to do tomorrow.  I just

12  wanted to make sure nobody is going to go south on any order

13  Your Honor has signed.

14  THE COURT:  I don't see that as a problem.  Does

15  anybody else?

16  MR. HAYCRAFT:  No, Your Honor.  That's why we wanted

17  to have this conference, just because of the potential

18  ambiguity of paragraph 14.

19  THE COURT:  Right.  I understand.

20  MR. ROY:  Your Honor, from the plaintiffs'

21  standpoint -- and I would suspect from everyone's standpoint --

22  it would be a lot easier to have all of the cards on the table

23  when we are being called upon to evaluate these things.  If

24  there's a 30 or 40-page engineering protocol that's done and

25  they are following it, with all due respect, it would seem

 1    that's what we need to be looking at to be able to make an

 2    informed judgment as to whether or not we have any problem with

 3    it, rather than just the generalities of the situation.

 4              **MS. KUCHLER:**  This is Deb Kuchler.  We agree with

 5    that from Anadarko's point of view because with some of the

 6    inspection that was done of the riser, we were told there was a

 7    protocol, we requested it, but we never did get it.  So we

 8    would like to prevent that by the very thing that Mr. Roy is

 9    suggesting; that whatever protocol is in place, we do need to

10    see them in advance.  While we don't have any objection to the

11    admiral going forward today with prefatory actions, we would

12    like for the order to be in place and the protocols to have

13    been circulated before that drill pipe is removed.

14              **MR. ROY:**  And the BOP, both protocols.

15              **THE COURT:**  Is there any problem with that,

16    Mr. Underhill?

17              **MR. UNDERHILL:**  I will have that protocol to the

18    parties as soon as I can get it in my hands.

19              **THE COURT:**  Today.

20              **MR. UNDERHILL:**  Lieutenant Commander Bray says that

21    the engineering protocol --

22              **LT. CMDR. BRAY:**  What I'm going to send out is the

23    evidence protocols that we have.  That's separate from what the

24    UAC has been working on and plans on operating under over the

25    next however many days to do the fishing expedition, remove the

1    drill string, the BOP, all that.  That's a separate document.

2    So is the question that people want to review --

3          **THE COURT:**  They want both.  They want both.  Is

4    there any problem with that?

5          **MR. UNDERHILL:**  I would only offer this up for

6    consideration, Your Honor.  I represent a litigant or a

7    potential litigant, too, so I look at it from a lawyer's

8    perspective.  But it causes me deep concern when we have

9    counsel -- good counsel, don't get me wrong, good, skilled

10   counsel -- starting to make engineering decisions that they're

11   not qualified to do when these files -- the engineering plans,

12   we are talking 30, 40, 50-page plans.  We are not talking

13   lawyerese.

14         **THE COURT:**  I don't think any lawyer is going to try

15   to do engineering.  I think they just want to be able to see it

16   and have input, if they think it's necessary, or know what's

17   going on or what's planned.  I think they are entitled to that.

18         **MR. UNDERHILL:**  Can I ask you to hold one second?  I

19   have a question for Lieutenant Commander Bray.

20               Jeff, do you know if once the engineering plans

21   are finalized, whether they're available through the unified

22   command as public documents?

23               We can try to find that out, Your Honor.  That

24   might be the simple way to do it.

25         **THE COURT:**  All right.  I think the interested

1    parties are entitled to have access to that one way or the

2    other, so see if we can facilitate that the easiest way.  Okay?

3              MR. UNDERHILL:  Sure.

4              THE COURT:  Anybody have anything else?

5              MR. ROY:  That's for both the pipe recovery and the

6    BOP procedures that are anticipated for removal; correct?

7              THE COURT:  Correct.  Correct.

8              MR. UNDERHILL:  Understood.

9              THE COURT:  Anything else from anyone?

10             MS. BERTAUT:  Judge, it's Carmelite Bertaut.  Can we

11   have the name of the court reporter?

12             THE COURT REPORTER:  Toni Tusa.

13             THE COURT:  Anybody have anything else?

14             MR. HAYCRAFT:  Nothing here, Judge.

15             THE COURT:  Everyone have a great weekend.

16             (WHEREUPON the Court was in recess.)

17                            * * *

18                         **CERTIFICATE**

19        I, Toni Doyle Tusa, CCR, FCRR, Official Court
     Reporter for the United States District Court, Eastern District
20   of Louisiana, do hereby certify that the foregoing is a true
     and correct transcript, to the best of my ability and
21   understanding, from the record of the proceedings in the
     above-entitled and numbered matter.

22

23

24                         s/ Toni Doyle Tusa
                           Toni Doyle Tusa, CCR, FCRR
25                         Official Court Reporter