# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

_____

:
**IN RE: OIL SPILL BY THE OIL**    : **MDL NO. 2179**
**RIG "DEEPWATER HORIZON"**    :
**IN THE GULF OF MEXICO,**    : **SECTION: J**
**ON APRIL 20, 2010**    :
    : **JUDGE BARBIER**
**Applies only to:**    : **MAG. JUDGE SHUSHAN**
*Le, et al. v. BP, plc, et al.,*    :
**No. 10-CV-02114**    :
    :

# AMENDED COMPLAINT

Plaintiffs, by and through undersigned counsel, bring this action against the defendants identified below, and aver as follows:

## INTRODUCTION

1.      Plaintiffs are individuals who rely on the natural resources found in the Gulf of Mexico for their livelihood.  They bring this action against defendants for losses and damages arising out of the catastrophic and avoidable oil spill off the Gulf Coast caused by the April 20, 2010 explosions and fire aboard the *MODU Deepwater Horizon* oil rig ("*Deepwater Horizon*"), and the subsequent sinking of that rig and discharge of oil into the surrounding water.

2.      The *Deepwater Horizon* was an oil rig located about 40 miles southeast of the Louisiana coast in the Macondo Prospect oil field in the Gulf of Mexico.  On April 20, 2010, it exploded and caught fire.  The rig burned for two days before tipping into the sea, on its way bending and breaking a long riser pipe carrying oil to the surface from the

seafloor.  As the *Deepwater Horizon* sank, it broke off the riser, leaving the pipe leaking oil out of its opened end as well as through two breaks along its length.

3.     Although the investigation is ongoing, the immediate cause of the explosions on the rig appears to have been methane gas from the well which shot up and out of the riser under pressure, expanded onto the platform and exploded.

4.     On information and belief, several events leading up to the explosion could have caused or exacerbated the release of methane gas, including faulty materials and/or procedures used in the cementing process for the well, removal of drilling mud from the riser, leaks from or other defects relating to the blowout preventer valve ("BOP") at the wellhead and improper well depth.

5.     To make matters worse, the BOP, installed at the wellhead for just such a disaster, failed to seal the wellhead as it should have, leaving the well spewing oil into the Gulf waters.

6.     Until July 15, 2010, as a result of the catastrophic explosions, fires and sinking of the *Deepwater Horizon*, crude oil has leaked from the wellhead and broken riser drilled by the rig at a rate estimated between 35,000 and 60,000 barrels (1,470,000 to 2,520,000 gallons) of oil per day, spreading into a widening slick of oil on and below the Gulf's surface.

7.     The growing, fast-moving slick has been large enough to be visible from outer space and spreading with the wind and currents towards the Louisiana, Mississippi, Alabama, Florida and Texas coastlines.  To date, millions of gallons of oil have spilled into the Gulf and the oil has reached the coasts of the Gulf States. In fact, the U.S. government has determined that the Gulf of Mexico oil spill caused by the sinking of the

*Deepwater Horizon* is now the worst oil spill in U.S. history, and may be the worst environmental disaster ever experienced in our nation's history.

8.      The spilled oil has already caused damage to the Gulf of Mexico's marine, coastal and estuarine environments, which are used by plaintiffs or from which plaintiffs otherwise derive their livelihoods.   In fact, on May 19, 2010, heavy, black oil hit Louisiana wetlands and it continues to impact the coast and coastal waters. With the wellhead spewing hundreds of thousands of gallons of oil per day into the waters near Louisiana for a period of nearly three months, plaintiffs are suffering and will continue to suffer serious economic losses.

9.      As of July 12, 2010, the U.S. government has closed more than 84,000 square miles, or approximately 35 percent, of federal waters of the Gulf to commercial fishing, which has led to increased fishing in the waters that remain open. The waters will likely be closed to the plaintiffs for months, and potentially years, to come.

10.      The business season for the plaintiffs, lasting from April to October, is essentially ruined by the pollution and closure of Gulf waters.

## PARTIES

### I.      Plaintiffs

11.      Plaintiffs are citizens of the States of Louisiana, Alabama, Mississippi, Texas and Florida and all do business in or near the Gulf of Mexico.

12.      Plaintiffs are comprised of commercial shrimpers, crabbers, captains and owners of commercial vessels, restaurant and deli owners and employees, crab meat processing plant employees, seafood wholesalers and retailers and nail salon owners who

derive all or a substantial portion of their livelihoods from use of the Gulf waters and the tourist industry in the Gulf region.

13.     The following plaintiffs are owners of businesses:  Mi Kyong Chang; He Trinh Dang; Tina Hoang; Ngan Ngoc Huynh; Michael M. Le; Michelle H. Le; Tam V. Le; Thuan T. Le; Vinh Van Le; Bao Van Nguyen; Da Thi Nguyen; Duong Van Nguyen; Eric Oanh Nguyen; Jason Nguyen (D/B/A Nguyen TJ and TJ II); Joe Nguyen; Kha Hoang-Tran Nguyen; Kim-Thoa Thi Nguyen; Long Nguyen; Mary T. Nguyen; Thanh V. Nguyen; Thanh Van Nguyen; Thim Thi Nguyen; Tony Thai Nguyen; Trang Thi Nguyen; Vuong Nguyen (D/B/A Capt Kevin); Houng Hoai Nguyen; Chinh Van Pham; Van Thi Pham;  Hung Van Phan; Vui Phan; Khamphoy Senabandith; Ly Thanh Ta; Trinh Truong Ton; Binh Than Tran; Ha Van Tran; Manh Tran (D/B/A Rising Angel II); Micki Khanh Tran (D/B/A Capt Duyen); Nhan T. Tran; Tai Tran; Tu Tran; Minh Duc Hong Vo; John Quang Le; Tom Nguyen; Sang Thanh Bui; Kim L. Combs; Myha Thi Nguyen; Hoa Thi Bui; Vil Thach; and Phuong Nguyen Truong.

14.     The following plaintiffs are businesses:  C&J Seafood, Inc.; Captain John's Seafood, Inc.; D&T Marine, Inc.; Domino Seafood, Corporation; James D.Q., Inc. (D/B/A Jonathan Boy II); John's Seafood Restaurant #2, Inc.; Khamphoy Senabandith, Inc. (D/B/A John's Seafood Restaurant); L.V. Marine Corporation; Lady More, LLC; Le Seafood Enterprises, LLC (D/B/A Mid City Seafood and Deli);  Les Chicken, Inc.; Les Produce & Market, Inc.; M & Lorie, Inc. (D/B/A Petro Mart); MC Mart, LLC (D/B/A Greensburg Seafood & Deli); Mrs. Kay, Inc. (D/B/A D & K Food Mart); Natural Nine, LLC; Osaka Thai Corporation; Paul & Brian, LLC; Shinto Restaurant; Tu Do Vietnamese Restaurant, Inc.; T & T Food Mart, Inc.; and West Park Market & Deli, Inc.

15.     The following plaintiffs are captains of commercial vessels:  Mau Van Huynh; Duc Van Le; Liet An Lu; David Dieu Nguyen; Jennifer Quach; Che Van Tran; Duyen Van Tran; Liep Van Tran; Hoang Thanh Vu; and Quoc Minh Vo.

16.     The following plaintiffs are deckhands of commercial vessels:  Xuan Thi Dang; Mai Thi Do; Dong Van Duong; Lac Van Ho; Tommy Van Ho; Nhan T. Hoang; Anh D. Huynh; Duc Van Huynh; Tuoi Van Huynh; Chau Ngoc Le; Nhac Van Le; Phuong Thanh Le; Dung Ngoc Le; David Do Lu; Hien Van Nguyen; Hong Van Nguyen; Hung Nguyen; Duc Huu Van Nguyen; Thuan Nguyen; Canh N Nguyen; Chon Pham; Bien Van Tran; Canh Van Tran; Duong Van Tran; Kham Van Truong;  Kim Dung T. Tran; Thanh Tran; Si Van Pham; James D. Quach; Pat (Phuoc) Van Truong; Phuong Vo; Huong Kerry Le; Du Van Nguyen; Su Huu Nguyen; Teo Van Nguyen; Thanh John Nguyen; Thanh Tuan Nguyen; Tam Minh Thai; Thang M Tran; Loi Van Vo; Eric Phuc Pham; Billy V. Tran; Kia Cao Ly; Toan Minh Do; Hung Minh Nguyen; and Terry Hanh Pham.

17.     The following plaintiffs are employees of businesses:  Huong Thanh Bui; Theu Thi Bui; My Thanh Duong; Ret Thi Ho; Luu Thi Le; Neardey Long; Bang Xuan Nguyen; Chau Ho Nguyen; Chi V. Nguyen; Christina T. Nguyen; Dang Minh Nguyen; Jessica Nguyen; Oanh Hoang Nguyen; Ngoc Yen T. Nguyen; Tam Hong Nguyen; Thuy Thu Thi Nguyen; Diep Thi Pham; Hong Thi Pham; Ky Pham; Em Van Tran; Hoa T. Tran; Tho Thi Truong; Dung My Vo; Kim-Anh Thi Vu; Thuy-Ha Thi Lai; and Luot T. Vu.

## II.     Defendants

18.     Defendant BP, PLC is a British corporation, organized under the laws of the United Kingdom, does business in the State of Louisiana and this district and is one of the world's largest oil companies.

19.     Defendant BP America, Inc. is a Delaware corporation with its principal place of business in Warrenville, Illinois, does business in the State of Louisiana and this district and is a subsidiary of BP, PLC.

20.     Defendant BP Corporation North America, Inc. (formerly BP Amoco Corporation) is an Indiana corporation with its principal place of business in Houston, Texas, does business in the State of Louisiana and this district and is a subsidiary of BP America, Inc.

21.     Defendant BP Company North America, Inc. is a Delaware corporation with its principal place of business in Warrenville, Illinois, does business in the State of Louisiana and this district and is a subsidiary of BP Corporation North America, Inc.

22.     Defendant BP Products North America, Inc. is a Maryland corporation with its principal place of business in Houston, Texas, does business in the State of Louisiana and this district and is a subsidiary of BP Corporation North America, Inc.

23.     Defendant BP Exploration & Production, Inc. is a Delaware corporation with its principal place of business in Warrenfield, Illinois and does business in the State of Louisiana and this district.

24.     Defendants BP America, Inc., BP Corporation North America, Inc., BP Corporation North America, Inc. and BP Products North America, Inc. are subsidiaries of

the global parent corporation, BP, PLC, and are referred to in this Complaint collectively as "BP."

25.     BP holds the lease granted by the United States Minerals and Management Service ("MMS") that allows BP to drill for oil and to perform oil-production-related operations at the Macondo site in the Mississippi Canyon Block 252 section of the outer Continental Shelf in the Gulf of Mexico ("Macondo oil well").   As of April 20, 2010, BP operated the Macondo oil well that is the source of the current oil spill. BP owns a 65% interest in the Macondo oil well.

26.     Defendant Anadarko Petroleum Corp. ("Anadarko") is a Delaware corporation with its principal place of business in The Woodlands, Texas, does business in the State of Louisiana and this district and is an oil and gas exploration and production company that owns a 25% interest in the Macondo oil well.

27.     Defendant MOEX Offshore 2007, LLC ("MOEX") is incorporated in Delaware and has its principal place of business in Houston, Texas.

28.      Defendant MOEX holds a 10% interest in the Macondo oil well.

29.     Defendant Transocean Ltd. is a Swiss corporation doing business in the State of Louisiana and this district and is the world's largest offshore drilling contractor and leading provider of drilling management services worldwide.

30.     Defendant Transocean Deepwater, Inc. is a Delaware corporation with its principal place of business in Houston, Texas, does business in the State of Louisiana and this district and is a subsidiary of Transocean Ltd.

31.     Defendant Transocean Offshore Deepwater Drilling, Inc. is a Delaware corporation with its principal place of business in Houston, Texas, does business in the

State of Louisiana and this district, is a subsidiary of Transocean Ltd. and is the world's largest offshore drilling contractor.

32.     Defendants Transocean Deepwater, Inc. and Transocean Offshore Deepwater Drilling, Inc. are wholly owned subsidiaries of the global parent corporation, Transocean Ltd., and are referred to in this Complaint collectively as "Transocean."

33.     Transocean owned, and BP was leasing and operating, the *Deepwater Horizon* as it performed production well completion operations on the Macondo oil well on the outer Continental Shelf off the Gulf Coast, at the site from which the oil spill now originates.

34.     At all relevant times, the *Deepwater Horizon* was owned, manned, possessed, managed, controlled, chartered and/or operated by Transocean and/or BP.

35.     Defendant Halliburton Energy Services, Inc. ("Halliburton") is a Delaware corporation with two headquarters, one in Houston, Texas, and one in Dubai, United Arab Emirates, and does business in the State of Louisiana and this district. Halliburton is one of the world's largest providers of products and services to the energy industry. Aboard the *Deepwater Horizon*, Halliburton was engaged in the cementing operations of the well and well cap.

36.     Defendant Cameron International Corporation, f/k/a Cooper Cameron Corporation ("Cameron"), is a Delaware corporation with its principal place of business in Houston, Texas, and does business in the State of Louisiana and this district. Cameron is a global provider of pressure control, processing, flow control and compression systems as well as project management and aftermarket services for the oil and gas process industries. Cameron manufactured and/or supplied the *Deepwater Horizon*'s

blowout preventer valve ("BOP") that may have failed to activate at or after the time of the explosions.

37.     Defendant M-I, LLC ("M-I") is a Texas corporation with its principal place of business in Houston, Texas.  M-I, also known as M-I SWACO, supplies drilling and completion fluids and additives to oil and gas companies, providing pressure control, rig instrumentation and drilling waste management products and services.  M-I provided the drilling fluids for the *Deepwater Horizon* at the time of the explosion.

38.     Defendant Weatherford International Ltd. ("Weatherford") is a Swiss corporation with its principal place of business in Houston, Texas, does business within the State of Louisiana and this district and was involved with the casing process for the well drilled by the *Deepwater Horizon*.

39.     Defendant Hyundai Heavy Industries Co. Ltd., Inc. is a Swiss corporation with U.S. offices in Orlando, Florida, does business within the State of Louisiana and this district and manufactured the *Deepwater Horizon*.

## JURISDICTION AND VENUE

40.     Jurisdiction is appropriate under 28 U.S.C. § 1331 because the claims asserted by plaintiffs arise under the laws of the United States of America, including the laws of the State of Louisiana which have been declared, pursuant to 43 U.S.C. § 1331(f)(1) and 1333(a)(2), to be the law of the United States for that portion of the outer Continental Shelf from which the oil spill originated.  Title 43 U.S.C. § 1331(1) extends exclusive federal jurisdiction to the outer Continental Shelf.

41.     Venue is proper in this district under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims of plaintiffs occurred in this district.

## FACTUAL ALLEGATIONS

I.     **Overall Economics of Gulf Fisheries and Tourism**

42.     Most of the plaintiffs derive all or a substantial portion of their livelihoods from use of the Gulf waters and the tourist industry in the Gulf region.

43.     According to the National Oceanic and Atmospheric Administration ("NOAA"), in 2008, commercial fishermen in the Gulf of Mexico harvested 1.27 billion pounds of finfish and shellfish that earned $659 million in total landings revenue.  There were 3.2 million recreational fishermen who took fishing trips in the Gulf of Mexico region, and they took 24 million fishing trips in 2008.

44.     According to NOAA, major shrimp species in the Gulf of Mexico include white shrimp, pink shrimp and brown shrimp. These species are mainly located in coastal areas.  During the spring, the young, or postlarvae, migrate from coastal areas. Impacts on these shrimp will increase as the oil slick approaches nearshore areas.  Shrimp species will be impacted due to mortality of adults, as well as postlarvae. In particular, brown shrimp postlarvae will be migrating out of inshore waters from February to April, while white shrimp began migration in May and will continue through November. The spill could have impacts not only on shrimp catches this year, but also next year if postlarvae mortality is high.

45.     According to NOAA, the economic impact of the oil spill on shrimp could be extensive. The Gulf region landings of shrimp are the nation's largest with 188.3

million pounds or 73 percent of the national total.  Louisiana led all Gulf states in landings with 89 million pounds with a dockside value of $130.6 million in 2008, followed by Texas (63.8 million pounds, dockside value of $157.2 million), Alabama (17 million pounds, dockside value of $38.4 million), Florida's West Coast (9.9 million pounds, dockside value of $23.3 million) and Mississippi (8.6 million pounds, dockside value of $17.1 million).

46.     According to NOAA, there are three species of crabs in the Gulf of Mexico area: blue crab, Gulf stone crab, and stone crab.  Blue crab occurs almost exclusively in state waters with peak spawning occurring in August and September.  Eggs and larvae develop and settle in the estuaries until crabs reach harvestable size in April or May. The Gulf stone crab is relatively abundant in the Louisiana, Mississippi and Alabama nearshore areas in the spring period.  The stone crab distribution is relatively limited.  Blue crabs are the most economically valuable crab species for the region. Louisiana lands approximately 26 percent of the total blue crabs for the nation or 41.6 million pounds in 2008, with a dockside value of $32 million. Landings and dockside values for the other Gulf states were: West Florida, 2.7 million pounds, $3.3 million; Texas, 2.6 million pounds, $2.3 million; Alabama, 1.8 million pounds, $1.5 million; and Mississippi, 450,000 pounds, $447,000.

47.     According to NOAA, in federal waters, the surface-oriented fish species will be most impacted by the early stages of the oil spill.  As the crude oil sinks, the bottom oriented fish community may be impacted. As the oil slick reaches the bottom or nearshore/inshore areas, the majority of the 42 reef fish species managed in the Gulf of Mexico will be impacted.

48.     The oil spill has not only had a potentially severe impact on fisheries in the Gulf, but it has also dealt a devastating blow to tourism in the region and the individuals and businesses that ordinarily thrive on tourism and tourism-related business, which accounts for about 46 percent of the Gulf Coast economy.

49.     The oil spill may become the worst disaster in the history of Florida tourism.  Some analysts have preliminarily estimated that the impact on tourism along Florida's Paradise Coast could reach $3 billion.

50.     Because of the oil spill, the Mississippi coast has had a 50 percent cancellation rate on reservations generally.

51.     In a nationwide survey, 26 percent of people who had planned to visit Louisiana stated they were no longer planning to visit after the spill.

52.     In addition, Alabama has seen a dramatic drop in tourism, including a 60 percent drop in visitations and an 80 percent drop in home rentals.

## II.     The *Deepwater Horizon* Catastrophe

53.     The *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible oil rig built in 2001.  It was owned by Transocean and leased to BP through September 2013.  It was one of the largest rigs of its kind.

54.     BP leased the *Deepwater Horizon* to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252, a location on the outer Continental Shelf off the coast of Louisiana.

55.     Upon information and belief, Cameron manufactured and/or supplied the Deepwater Horizon's BOP that failed to operate upon the explosion, which should have prevented the oil spill.  The BOP was defective because it failed to operate as intended.

As such, Cameron is liable to plaintiffs pursuant to the Louisiana Products Liability Act in addition to being liable for its negligence.

56.     Halliburton was engaged in cementing operations of the well and well cap and, upon information and belief, improperly and negligently performed these duties, increasing the pressure at the well and contributing to the fire, explosion and resulting oil spill.

57.     Weatherford was engaged in the casing operations of the well and, upon information and belief, improperly and negligently performed these duties, contributing to the fire, explosion, and resulting oil spill.

58.     Anadarko and MOEX are non-operating investors who maintain 25% and 10% respective ownership in the well and are solidarily liable with co-defendants pursuant to the Operating Agreement with the BP defendants.

59.     On April 20, 2010, the *Deepwater Horizon* was creating a cement seal and plug of the wellhead as part of the final phase of turning the Macondo well from an exploratory well into a production well.  "Cementing" is delicate work and carries a risk of a blowout, which is the uncontrolled release of oil and/or gas from the well.

60.     During the course of the cementing work, an explosion occurred on the *Deepwater Horizon* and it caught fire, causing the deaths and injuries of many workers on the rig.  The fire burned for two days, and the rig began to list progressively more until it finally sank on April 22, 2010.

61.     The *Deepwater Horizon* had been connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser.  As the *Deepwater Horizon* sank to the seafloor, it pulled the riser down with it, bending and breaking the pipe before finally

13

tearing away from it completely.  The riser, bent into a crooked shape under water, now extended from the well to 1,500 feet above the sea bed and then buckled back down.  Oil was flowing out from the open end of the riser and from two places along its length. As part of BP's containment efforts, the riser was cut just above the blowout preventer and oil thereafter flowed from essentially the top of the blowout preventer.

62.     Although the leaking wellhead was fitted with a blowout preventer – known as a BOP and consisting of a stack of hydraulically activated shears at the top of the well designed to pinch the pipe closed, cut it and seal off the well in the event of a sudden pressure release exactly like the one that occurred during the *Deepwater Horizon* blowout – the response teams were unable to activate the *Deepwater Horizon*'s BOP.

63.     The malfunctioning, faulty design, modifications, improper maintenance and/or improper use of the BOP are potential causes of the BOP's failure to cut off leakage of oil after the rig exploded and sank.

64.     If the BOP on the wellhead had been functional, it could have been manually or automatically activated following the explosions, cutting off the flow of oil at the wellhead, limiting the spill to a minute fraction of its current severity and thereby sparing plaintiffs millions of dollars in losses and damages.

65.     The oil spill made landfall on April 30, 2010, and will continue to affect greater areas of the Gulf coastline as it is driven landward by currents and winds.

66.     As the oil continues to make landfall along the Gulf Coast, it will cause severe damage to the delicate wetlands and intertidal zones that line the coast of Louisiana, destroying the habitats where fish, including menhadens, breed, spawn and mature.

67.     Such devastation at the literal source of life for sea life will severely damage and perhaps even destroy the livelihoods of the plaintiffs, who rely on sea life and tourism for their livelihoods, for many years to come.

68.     On May 2, 2010, the National Oceanographic and Atmospheric Administration ("NOAA") restricted fishing for a minimum of 10 days in federal waters between Louisiana State waters at the mouth of the Mississippi River and the waters off Florida's Pensacola Bay, a total area of 6,800 square miles.

69.     Since then, the U.S. government has closed more than 84,000 square miles, or about more than one-third of the Gulf of Mexico. As a result, plaintiffs are currently barred from or significantly restricted in their seasonal business activities.

70.     On July 15, 2010, BP was successful in capping the runaway well, at least temporarily.   While BP has begun drilling relief wells as a permanent solution to the situation, it is estimated that the relief wells will take until September 2010 to complete.

71.     In the meantime, surficial oil slicks and deep underwater plumes of oil will continue wreaking havoc on the environment.

72.     Plaintiffs' livelihoods have been and will be severely impacted or destroyed by this catastrophic spill.

**III.     Defendants' Knowledge Of The Risks**

73.     The risks of offshore drilling are well known to defendants, and are especially high in the Gulf of Mexico, where floating rigs are used, unlike the permanent rigs used in other areas such as the North Atlantic.  Permanent rigs that are anchored to the ocean floor cannot sink, while floating rigs are far more precarious and subject to disastrous results like this incident.

74.     Moreover, defendants knew the work the *Deepwater Horizon* was performing was especially risky.   In 2007, the MMS raised concerns about oil rig blowouts associated with the exact type of cementing work the *Deepwater Horizon* was doing when it exploded.   The MMS study noted that blowouts during cementing work were continuing with regularity, and most frequently in the Gulf of Mexico.   Cementing problems were associated with 18 of 39 blowouts between 1992 and 2006, and 18 of 70 from 1971 to 1991.   Nearly all the blowouts examined occurred in the Gulf of Mexico.

75.     Defendants were aware of the recent August 2009 blowout in the Timor Sea, which was found to have been caused by careless cementing work.   During that incident, which bears a strong resemblance to the *Deepwater Horizon* blowout, oil leaked from the site for 10 weeks, spreading damage over 200 miles from a well site.

76.     The threat of blowouts increases as drilling depth increases.   Under its permit, the *Deepwater Horizon* was supposed to be drilling in 5,000 feet of water, to a total depth of 18,000 feet below the seafloor.   Defendants were aware of the high risk of blowouts from such deep drilling.   As it turns out, defendants were drilling a few thousand feet below the maximum depth allowed under the permit.

77.     In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanism, the BOP.   Defendants were aware of the risk of the BOP failing at greater depths, yet they did not install backup BOP activation systems, backup BOPs or other redundant precautionary measures.

78.     A 2004 study by federal regulators showed that BOPs may not function in deep-water drilling environments because of the increased force needed to pinch and cut the stronger pipes used in deep-water drilling.   Only three of 14 rigs studied in 2004 had

BOPs able to squeeze off and cut the pipe at the water pressures present at the equipment's maximum depth.  "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a blowout," the study said.  Moreover, the study singled out Cameron, the manufacturer of the *Deepwater Horizon*'s BOP, for relying on faulty calculations to determine the needed strength for its BOP equipment to function properly at greater depths.

79.     The *Deepwater Horizon* was not equipped with a second, backup BOP, as newer rigs increasingly are.  The *Deepwater Horizon* had only had one BOP installed, leaving the wellhead vulnerable to disaster if the single BOP fails, as it is believed to have done in this case.

80.     The *Deepwater Horizon* was also not equipped with a remote-control shut-off switch.  The countries of Norway and Brazil require such shut-off switches, and many oil companies of comparable size to BP voluntarily use such shut-off switches even when not required.  Such a device, costing $500,000, would have allowed the crew to trigger the BOP to shut down the well even if the oil rig itself is damaged or evacuated.  On information and belief, BP paid $500,000 per day to Transocean for the lease of the *Deepwater Horizon*.

81.     Defendants' failure to take precautionary backup measures while drilling at depths they knew to be especially risky is made all the worse by the fact that defendants were drilling so close to the delicate and important natural resource of the Gulf Coastal marshes, wetlands and estuaries, a wellspring of marine life and the source of plaintiffs' livelihoods.

82.     Defendant BP has a history of cutting corners on safety to reduce operating costs.  In 2005, a blast at a Texas refinery killed 15 people and injured more than 170. Federal investigators found the explosions were in part due to cost-cutting and poor facility maintenance.  Also in 2005, a large production platform in the Gulf of Mexico began listing severely due to a defective control system.  And in 2006, four years after being warned to check its pipelines, BP had to shut down part of its Prudhoe Bay oilfield in Alaska after oil leaked from a corroded pipeline.

83.     Nevertheless, BP continues to fight for less regulation of the well exploration and production industry.  In 2009, defendant BP spent more than $16 million lobbying the federal government on issues including encouraging removing restrictions on drilling on the Continental Shelf, despite its history of spills and explosions and its knowledge of the high risks involved in such drilling.

84.     The fire and explosions on the *Deepwater Horizon*, its sinking and the resulting oil spill were caused by the negligence of defendants, which renders them jointly, severally and solidarily liable to plaintiffs for all their damages.

85.     Defendants knew the dangers associated with *Deepwater Horizon's* drilling and failed to take appropriate measures to prevent damage to plaintiffs and the marine, coastal and estuarine areas of Louisiana and the Gulf Coast where plaintiffs work and earn a living.  Moreover, additional safety mechanisms, technologies and precautions were known and available to defendants, but defendants chose not to employ them on the *Deepwater Horizon*.

86.     After the explosions, defendants attempted to downplay and conceal the severity of the oil spill.  Their initial leak estimates of 1,000 barrels per day and later

5,000 barrels per day were found by government investigators to be a fraction of the actual leakage amount of 35,000 to 60,000 barrels of oil per day.  Moreover, defendants did not, in the aftermath of the explosions or since that time, provide complete and/or timely announcements and warnings about the severity, forecast and trajectory of the oil spill.

87.     The oil spill and the resulting contamination have caused and will continue to cause loss of revenue to individuals and businesses that cannot use the Gulf of Mexico and the shores of the Gulf States to work and to earn a living.

88.     Because investigations are ongoing, there are many other potential effects from the oil spill that have not yet become known, and plaintiffs reserve the right to amend this Complaint after additional information becomes available.

## IV.   Damages

89.     As a result of defendants acts or omissions, plaintiffs have suffered the following damages:

   a.   Loss of the right of use of the Gulf of Mexico and Louisiana saltwater areas because of the existence of the oil released by the sinking of the *Deepwater Horizon*;

   b.   loss of the right of use of the Gulf of Mexico and Louisiana saltwater areas because of the existence of booms in various areas which have been placed on the surface of the waters to block the oil released by the sinking of the *Deepwater Horizon*;

   c.   costs incurred and inconvenience sustained by the closure of Gulf water areas, harbors, marinas, boat launches, docks and waterways;

   d.   loss of the right to catch, keep and process for commercial purposes the sea life caught during fishing, crabbing and shrimping;

   e.   loss of the prorated amount of the saltwater permits issued by the Gulf States for fishing;

f.     loss associated with unusable costs of boats, planes, docks, insurance and other items purchased to engage in the fishing and dockworks;

g.     costs and inconvenience of arranging for the storage of boats and other equipment moved from the areas affected by the oil spill; and

h.     loss of wages and business profits.

## FIRST CLAIM FOR RELIEF

### Negligence

90.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

91.     The fire and explosion on the Deepwater Horizon, its sinking and the resulting oil spill were caused by the negligence of Defendants Halliburton and Cameron, which renders them liable jointly, severally and in-solido to plaintiffs for all their damages pursuant to the General Maritime Law, or, alternatively, under La. Civ. Code arts. 2315, 2316, 2317, 2317.1, 2320 and/or 2322.

92.     Defendants owed a duty of reasonable care to plaintiffs in the operation and maintenance of the *Deepwater Horizon*.

93.     The blowout explosions, fires and resulting oil spill were caused by the joint and concurrent negligence and fault of the defendants.

94.     Defendants breached their duty of care owed to plaintiffs by:

a.     Failing to maintain and/or operate properly the *Deepwater Horizon*;

b.     manufacturing or operating the *Deepwater Horizon* in such a manner that an explosion and fire occurred onboard, causing it to sink and resulting in an oil spill;

c.      failing to use safe and proper materials for the manufacture or operation of the *Deepwater Horizon* and its related equipment, the well and its related casings, seals and cementing, the risers, the wellhead and the BOP and its related equipment;

d.      failing to inspect and test properly the *Deepwater Horizon* and its related equipment, the well and its related casings, seals and cementing, the risers, the wellhead and the BOP and its related equipment to assure that all equipment and personnel were fit for their intended purpose;

e.      acting in a careless and negligent manner;

f.      failing to promulgate, implement and enforce proper rules, procedures and regulations to ensure the safe manufacture, operations, testing and inspections of the *Deepwater Horizon* and its related equipment, the well and its related casings, seals and cementing, the risers, the wellhead and the BOP and its related equipment, which would have prevented the disaster;

g.      failing to take proper action to avoid or mitigate the incident;

h.      negligently implementing policies and procedures to conduct safely offshore operations in the Gulf of Mexico;

i.      failing to ensure that the *Deepwater Horizon* and its related equipment, the well and its related casings, seals and cementing, the risers, the wellhead and the BOP and its related equipment were free from defects and/or in proper working order;

j.      failing to properly train and hire appropriate and licensed personnel;

k.      employing untrained, poorly trained and unlicensed employees;

l.      failing to provide proper supervision of employees and operations;

m.      failing to observe and read gauges and other indicators that would have warned of excessive pressures in the well;

n.      failing to react in a timely manner to signs of danger;

o.      providing a BOP and related equipment that were not designed properly and/or did not operate properly;

p.      failing to provide backup equipment and systems capable of securing the well and preventing releases of oil in the absence of a properly functioning BOP;

q.      conducting well and well cap cementing operations improperly;

r.      failing to warn in a timely manner;

s.      failing to bring the oil release under control in a timely manner;

t.      failing to provide and maintain appropriate disaster prevention equipment;

u.      acting in a manner that justifies imposition of punitive damages; and

v.      such other acts and omissions as will be shown at the trial of this matter which are in violation of the laws of the State of Louisiana and federal law applicable to the outer Continental Shelf.

95.      In addition, the disaster and resulting damage to plaintiffs were caused by defective, malfunctioning and improperly designed or improperly used equipment and materials, including but not limited to the *Deepwater Horizon* and its related equipment, the well and its related casings, seals and cementing, the risers, the wellhead and the BOP and its related equipment, which were in the care, custody and control of the defendants and over which they had *garde*.  Defendants knew or should have known of these defects and defendants are, therefore, liable for them.

96.      The injuries to plaintiffs were also caused by or aggravated by the fact that defendants failed to take necessary actions to mitigate the dangers associated with their manufacturing or operations.

97.      Plaintiffs are entitled to judgment finding defendants liable to plaintiffs for damages suffered as a result of defendants' acts and omissions.

## SECOND CLAIM FOR RELIEF

### Gross Negligence

98.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

99.     Defendants owed a duty to plaintiffs to exercise reasonable care in the manufacture, maintenance, operation, testing and inspection of the *Deepwater Horizon* and its related equipment, the well and its related casings, seals and cementing, the risers, the wellhead and the BOP and its related equipment.

100.    Defendants had a heightened duty of care to all plaintiffs because of the great danger associated with deep drilling from floating platforms, and the especially high risk of blowouts during cementing work such as that *Deepwater Horizon* was performing at the time of the explosions.

101.    Defendants breached their legal duty to plaintiffs, failed to exercise reasonable care and acted with reckless, willful and wanton disregard for the business and livelihood of others, including plaintiffs, in the negligent manufacture, maintenance and/or operation of the *Deepwater Horizon* and its related equipment, the well and its related casings, seals and cementing, the risers, the wellhead and the BOP and its related equipment.

102.    Defendants knew or should have known that their wanton or reckless conduct would result in a disastrous blowout, causing an oil spill and damage to the economic interests of individuals and businesses in the area affected by the oil spill.

103.    As a direct and proximate result of defendants' wanton or reckless conduct, plaintiffs have suffered injury in damages in an amount to be proven at trial, including, but not limited to, loss of livelihood, loss of income and other economic loss.

104.    Defendants' wanton or reckless conduct, as described above, entitles plaintiffs to punitive damages.

### THIRD CLAIM FOR RELIEF

### Negligence *Per Se*

105.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

106.    Defendants' conduct with regard to the manufacture, maintenance and/or operation of drilling operations and oil rigs such as the *Deepwater Horizon* is governed by numerous state and federal laws and regulations, and permits issued under the authority of these laws.

107.    These laws and permits create statutory standards that are intended to protect and benefit plaintiffs.

108.    The injuries and damages suffered by plaintiffs were caused by defendants' violations of numerous statutes and regulations, including, but not limited to, statutes and regulations issued by OSHA and the United States Coast Guard, including the requirement to test the sub-sea BOP's at regular intervals.

109.    Defendants' violations of the statutory standards constitute negligence *per se* under state law.

110.    Defendants' violations of these statutory standards proximately caused plaintiffs' injuries, warranting compensatory and punitive damages.

## FOURTH CLAIM FOR RELIEF

### Products Liability

111.    In addition, and in the alternative, the fire, explosion, sinking and resulting oil spill were caused by defective equipment, including the BOP's, which were manufactured, designed, and/or installed by defendants Cameron in violation of the Louisiana Products Liability Act, LA. REV. STAT. § 9.2800.54, et. seq.  The defective BOP proximately caused plaintiffs' injuries, was unreasonably dangerous, and caused Plaintiff's injuries while in its reasonably anticipated use.

112.    The injuries to plaintiffs were also caused by or aggravated by the fact that defendants failed to take necessary actions to mitigate the danger associated with their operations.

113.    In addition, and in the alternative to the aforementioned causes of action, these acts of negligence render the defendants liable to plaintiffs pursuant to the general maritime law for negligence.

114. In addition to the negligent actions described above, and in the alternative thereto, the injuries and damages suffered by plaintiffs were caused by the acts and/or omissions of the defendants that are beyond proof by the plaintiffs, but which were within the knowledge and control of the defendants, there being no other possible conclusion than that the fire, explosion, sinking and oil spill resulted from the negligence of defendants.  Furthermore, the fire, explosion, sinking and the resulting oil spill would not have occurred had the defendants exercised the high degree of care imposed on them and plaintiffs, therefore, plead the doctrine of *res ipsa loquitur*.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs demand judgment against the defendants jointly, severally and solidarily, as follows:

1.  Economic and compensatory damages in amounts to be determined at trial;

2.  punitive damages;

3.  pre-judgment and post-judgment interest at the maximum rate allowable by law;

4.  attorneys' fees and costs of litigation;

5.  any other and further relief available under all applicable state and federal laws; and

6.  any other and further relief the Court deems just and proper.

Dated: August 27, 2010

WEITZ & LUXENBERG, P.C.

By:     */s/ Curt D. Marshall*
Perry Weitz
Robert J. Gordon
Robin L. Greenwald
Curt D. Marshall
Julia A. LeMense
Weitz & Luxenberg, P.C.
700 Broadway
New York, New York 10003
Tel.:  (212) 558-5500
Fax:  (212) 344-5461
Email:  pweitz@weitzlux.com
Email:  rgordon@weitzlux.com
Email:  rgreenwald@weitzlux.com
Email:  cmarshall@weitzlux.com
Email:  jlemense@weitzlux.com

Tammy Tran, TX Bar No. 20186400
Tammy Tran Law Firm
2915 Fannin Street
Houston, Texas 77002
Tel:   (713) 655-0737
Fax:   (713) 655-0823
Email:    alamtran@yahoo.com
Website: http://www.tammytranlaw.com

Russ Herman, La. Bar No. 6819
Stephen J. Herman, La. Bar No. 23129
James C. Klick, La. Bar No. 7451
Soren Gisleson, La. Bar No. 26302
Herman Herman Katz & Cotlar LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Tel.: (504) 581-4892
Fax: (504) 569-6024
Email: Sherman@hhkc.com
Email: sgisleson@hhkc.com

***Attorneys for Plaintiffs***