IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| In re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on April 20, 2010<br><br>This Document Relates to:<br>All Actions | MDL No. 2179<br><br>Section "J"<br><br>Judge Barbier<br>Magistrate Judge Shushan |

## CAMERON INTERNATIONAL CORPORATION'S
## BRIEF IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

Cameron International Corporation ("Cameron") files this brief in support of its motion for protective order and respectfully shows as follows:

Cameron is the original equipment manufacturer for the blowout preventer (commonly called a "BOP") on the Deepwater Horizon. It has been named as a defendant in hundreds of lawsuits alleging, among other things, that the BOP did not seal the Macondo well on April 20, 2010.

At the time the numerous lawsuits were filed, no one knew why the BOP was unable to seal the well. That remains true today. What is undisputed, however, is that the presence of cement, multiple tubulars, downhole equipment, or other debris inside the BOP bore had the potential to impair the functioning of the BOP – in particular, the shearing blind rams designed to sever certain tubulars under certain conditions and seal the well. Indeed, at the hearings conducted this past week in Houston by the Joint Investigation of the United States Coast Guard and the Bureau of Ocean Energy Management, Regulation and Enforcement, a Transocean Operations Manager-Performance, when asked what might have caused the BOP not to close,

- 1 -

1028728v.1

identified "[t]he possibility of having two joints of pipe across the shear rams" and also "[c]asing floating up, chunks of cement."[1]  Similarly, when asked to explain why he could not tell whether certain BOP shearing functions worked properly, a Transocean Senior Subsea Engineer explained that "[i]f they fired and there's debris in there where they could not close all the way, that's what I was thinking."[2]  Finally, when asked about recent reports that there are at least three pieces of drill pipe currently inside the BOP, BP's Vice President of Drilling and Completions Operations testified that he did not "know what the absolute capability of the rams is in that regard, but the BOP stack is clearly there to cut ***one*** piece of pipe."[3]

It is obvious, therefore, that any debris that may be in the BOP is material evidence in these proceedings.  While it is certainly possible, given the flow through the BOP for several months and numerous intervention attempts, that conditions inside the BOP today are not the same as they were on April 20, the current conditions and any debris should certainly be identified and recorded.

Prior to Friday, August 27, 2010, that had precisely been the plan.  As noted in the August 23, 2010 Unified Command Media Briefing:

> Starting on Saturday and through the day, we are conducting what we call fishing.  As the name alludes to, it is technically and actually putting a line down the BOP, first a camera to ascertain piping that might be in there, and then ascertaining its condition, and making preparations and doing diagnostics inside the blowout preventer, the best way to remove the pipe.  Our desire would be to remove those pipes before we proceed with the blowout preventer removal.
>
> To tell you what we found there, there are basically three sections of pipe.  There was a section of pipe that is suspended in the middle on the center line that we

---

[1] Ex. 1, excerpts of testimony of D. Winslow, Aug. 23-24, 2010.

[2] Ex. 2, excerpts of testimony of M. Hay, Aug. 25, 2010.

[3] Ex. 3, excerpts of testimony of H. Thierens, Aug. 25, 2010 (emphasis added).

believe goes down below the blowout preventer into the well some distance. There is a shorter piece of pipe that is sitting beside that pipe in the blowout preventer that was broken or cut about the length of the blowout preventer itself. And then there's a very small piece of pipe laying crosswise.[4]

After six days, however, none of the pipes had been recovered, and no cameras had been run below the top annular preventer in the BOP.[5] Accordingly, the inside of the BOP remains largely a mystery. Nevertheless, on August 27, 2010, the National Incident Commander, USCG Admiral Thad Allen (Ret.), authorized BP "to terminate the fishing procedure" and "to proceed with the removal of the capping stack followed by the removal of the Deepwater Horizon BOP."[6] Given the inability to retrieve the pipe pieces, Cameron understands the decision to terminate the

---

[4] http://www.deepwaterhorizonresponse.com/go/doc/2931/880787/ (last checked on Aug. 29, 2010).

[5] Contrary to certain reports in the media, the Deepwater Horizon BOP is not a single valve. It is an equipment stack consisting of, among other things, (from top to bottom) two annular preventers, shearing blind rams, casing shear rams, two sets of variable bore rams, and test rams. The following diagram may be helpful:



[6] Ex. 4, letter from USCG Admiral Thad Allen (Ret.), Aug. 27, 2010.

fishing procedure. However, Cameron objects to the removal of the capping stack and BOP without any further attempt to photograph and record the inside of the BOP.

Cameron understands that by lifting the BOP stack, there is a very real possibility that the known sections of pipe along with any unknown other debris may be stripped from the BOP bore, dropped down the hole, or otherwise moved from its present location. In fact, from Admiral Allen's references to "raising the well central casing and casing hanger seal" and "hanging drill pipe,"[7] it is plain that the Unified Command also recognizes this possibility.

To avoid the potential loss or alteration of material evidence bearing on issues in all the lawsuits consolidated here, Cameron requests that any removal of the capping stack or BOP be delayed for a brief period of time to enable photographing and recording, to the extent possible, of the present conditions inside the BOP. To perform this task, it will be necessary to open the BOP's annular preventers. The annulars were closed during the post-casualty intervention. As a result, opening these devices at this time will not be altering a condition that existed at the time of the incident.[8] With the annulars open, the shearing blind rams can be examined. It will then be possible to record the position of the rams and to identify any debris that may be across them. A decision can then be made as to whether the shearing blind rams should also be opened to allow further inspection into lower cavities in the BOP stack where additional material evidence may be present.

Cameron believes that this course of action will allow the maximum preservation and recording of evidence that might still exist. Of course, Cameron understands that it may be

---

[7] *Id.*

[8] Cameron notes that opening the annulars may have the effect of shifting pipe or other debris inside the BOP. However, it believes that the potential impact of opening the annulars is less than the potential impact of lifting the entire BOP stack.

necessary for this concern to take a back seat to well control and safety. However, Cameron believes that both concerns can be addressed. At the very least, they should be discussed, with relevant input from all interested parties, before the capping stack and the BOP are removed and material evidence is lost.

                Respectfully submitted,

                David J. Beck, T.A.
                  *dbeck@brsfirm.com*
                Joe W. Redden, Jr.
                  *jredden@brsfirm.com*
                David W. Jones
                  *djones@brsfirm.com*
                Geoffrey Gannaway
                  *ggannaway@brsfirm.com*
                BECK, REDDEN & SECREST, L.L.P.
                One Houston Center
                1221 McKinney St., Suite 4500
                Houston, TX 77010
                Phone: (713) 951-3700
                Fax: (713) 951-3720

                Howard L. Murphy, 9844
                  *hmurphy@dkslaw.com*
                Bertrand M. Cass, Jr., 3984
                  *bcass@dkslaw.com*
                Francis J. Barry, Jr., 2830
                  *fbarry@dkslaw.com*
                Jonathan M. Walsh, 25922
                  *jwalsh@dks.com*
                Paul D. Hale, 30539
                  *phale@dkslaw.com*
                DEUTSCH, KERRIGAN & STILES
                755 Magazine Street
                New Orleans, Louisiana 70130
                Phone: 504-581-5141
                Fax: 504-566-4039

1028728v.1

and

*/s/ Phillip A. Wittmann*
Phillip A. Wittmann, 13625
  *pwittmann@stonepigman.com*
Carmelite S. Bertaut, 3054
  *cbertaut@stonepigman.com*
Keith B. Hall, 24444
  *khall@stonepigman.com*
Jared Davidson, 32419
  *jdavidson@stonepigman.com*
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax: 504-581-3361

*Attorneys for Cameron International Corporation*

## **CERTIFICATE**

I hereby certify that on August 29, 2010 a copy of the foregoing Motion for Recusal Under 28 U.S.C. 455(B) and Motion for Judicial Disclosure was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to the Panel Attorney Service List pursuant to this Court's Pretrial Order No. 1, Rec. d. 2.

*/s/ Phillip A. Wittmann*

1028728v.1