1

```
1                    UNITED STATES DISTRICT COURT
2                    EASTERN DISTRICT OF LOUISIANA

3     **********************************************************

4     IN RE:  OIL SPILL BY THE
      OIL RIG DEEPWATER HORIZON
5     IN THE GULF OF MEXICO ON
      APRIL 20, 2010
6                              MDL NO. 2179-1222 "J"
7                              NEW ORLEANS, LOUISIANA
                               FRIDAY, SEPTEMBER 3, 2010, 9:30 A.M.
8     THIS DOCUMENT RELATES TO
      ALL CASES
9
      **********************************************************
10

11                   TRANSCRIPT OF MOTION PROCEEDINGS
             HEARD BEFORE THE HONORABLE CARL J. BARBIER
12                   UNITED STATES DISTRICT JUDGE

13

14    APPEARANCES:

15
      FOR THE PLAINTIFFS:     LEWIS, KULLMAN, STERBCOW & ABRAMSON
16                            BY:  PAUL M. STERBCOW, ESQUIRE
                              PAN AMERICAN LIFE BUILDING
17                            601 POYDRAS STREET, SUITE 2615
                              NEW ORLEANS LA  70130
18

19                            WILLIAMS LAW GROUP
                              CONRAD S. P. WILLIAMS, ESQUIRE
20                            435 CORPORATE DRIVE, SUITE 101
                              HOUMA LA  70360
21

22                            MARTZELL & BICKFORD
                              BY:  SCOTT R. BICKFORD, ESQUIRE
23                            338 LAFAYETTE STREET
                              NEW ORLEANS LA  70130
24

25
```

EXHIBIT

18

| | | |
|---|---|---|
| 09:48AM | 1 | THE WITNESS:  My name is Daniel Farr, F-A-R-R. |
| 09:48AM | 2 | DIRECT EXAMINATION |
| 09:48AM | 3 | BY MR. MILLER: |
| 09:48AM | 4 | Q.   Good morning, Mr. Farr. |
| 09:48AM | 5 | Mr. Farr, for the record, please state your name, address |
| 09:48AM | 6 | and current employment situation. |
| 09:48AM | 7 | A.   My name is Daniel Farr, F-A-R-R.  My address is 2303 Lake |
| 09:48AM | 8 | Gardens Drive, Kingwood, Texas.  I'm employed by Transocean. |
| 09:48AM | 9 | Q.   Mr. Farr, just briefly, give the Court a quick summary of |
| 09:49AM | 10 | your relevant education and experience. |
| 09:49AM | 11 | A.   In this case, my education goes back to trade school days, |
| 09:49AM | 12 | where I had four years of metallurgy; Maritime Academy as a |
| 09:49AM | 13 | marine engineer; 10 years in the Coast Guard, marine inspector; |
| 09:49AM | 14 | University of Michigan as a naval architect; Coast Guard |
| 09:49AM | 15 | technical branch; and, working for drilling contractors from 1979 |
| 09:49AM | 16 | to present, with a four-year break where I worked for an |
| 09:49AM | 17 | environmental company. |
| 09:49AM | 18 | Q.   Mr. Farr, if you can tell the Court, I know lawyers |
| 09:49AM | 19 | attempted to summarize it in open court this morning, but what's |
| 09:49AM | 20 | your understanding of the current status of the BOP recovery? |
| 09:49AM | 21 | A.   The status of the BOP recovery is Q-4000 is over the BOP |
| 09:49AM | 22 | and, I understand, is latched on.  It should be in the process of |
| 09:49AM | 23 | pulling the BOP to the surface shortly. |
| 09:49AM | 24 | Q.   Mr. Farr, what has your involvement been, if any, in |
| 09:50AM | 25 | recovery of the BOP and short-term preservation of the BOP? |

09:50AM 1    A.    Myself and one other gentleman have worked with the

09:50AM 2    government and with BP to develop the short-term preservation

09:50AM 3    plan that would be accomplished on the Q-4000.

09:50AM 4         We attended a meeting approximately two weeks ago that was

09:50AM 5    supposed to be a preservation meeting, and preservation was not

09:50AM 6    discussed; at which time we were asked to provide information,

09:50AM 7    and we provided Transocean's short-term, long-term preservation

09:50AM 8    plans, plus Cameron's preservation plans for the HORIZON BOP.

09:50AM 9         We have since worked on summarizing a short-term

09:50AM 10   preservation plan that has been agreed by all parties.

09:50AM 11   Q.    Mr. Farr, Mr. Underhill, for the government, put up a

09:50AM 12   schematic of the BOP -- or of a BOP.  I'd like to go ahead and

09:51AM 13   approach and hand the witness a couple of pictures.

09:51AM 14        Actually, I'll put them on the ELMO, keep things moving.

09:51AM 15   And these are the exhibits that were identified by Transocean in

09:51AM 16   its submissions to the Court.

09:51AM 17        Mr. Farr, if you can, go ahead and identify what has been

09:51AM 18   put up on the screen.

09:51AM 19   A.    This is the DEEPWATER HORIZON BOP when it was being

09:51AM 20   assembled at Cameron's facility in Berwick.

09:51AM 21   Q.    So, Mr. Farr, just to be clear, this is the actual BOP

09:51AM 22   that's being recovered this morning?

09:51AM 23   A.    This is the actual BOP when it was new at the --

09:51AM 24   approximately 10 years ago.

09:51AM 25   Q.    And, Mr. Farr, if you --

09:56AM 1    called a shuttle valve, and that will direct the fluid from
09:56AM 2    whichever pod the hydraulic fluid is coming from, blue or yellow.
09:56AM 3    Q.   I'm just going to place on top a new exhibit.  This was
09:56AM 4    actually attached to BP's opposition.
09:56AM 5        Mr. Farr, if you can, are you familiar with -- I know I'm
09:56AM 6    just showing you the cover page, but the document that's been
09:56AM 7    placed on the screen?
09:56AM 8    A.   I am familiar with the document.
09:56AM 9    Q.   And what is it, Mr. Farr?
09:56AM 10   A.   It is the recovery of the BOP on the Macondo wellhead with a
09:57AM 11   drill pipe inside.
09:57AM 12   Q.   Flip to page 2, as they say, Mr. Farr.  And have you signed
09:57AM 13   off on this document?
09:57AM 14   A.   I have signed off on the care, custody and prevention
09:57AM 15   portion of this document.  It's a document that was developed by
09:57AM 16   a series of parties, and the responsible parties have signed off
09:57AM 17   on their various parts that they fully understand.
09:57AM 18   Q.   Now, Mr. Farr, we referenced the short-term preservation
09:57AM 19   plan for the BOP aboard the Q-4000.  Is that plan contained
09:57AM 20   within this document?
09:57AM 21   A.   There is a preservation plan contained in this document.
09:57AM 22   We're calling it short-term.  In the early days of the
09:57AM 23   development of this document, it was also called short-term, and
09:57AM 24   it's since been changed to preservation plan.
09:57AM 25   Q.   Does the preservation plan, as you call it, Mr. Farr, is

24

09:58AM 1   that set forth in attachment 15 to the document?

09:58AM 2   A.    Yes, it is.

09:58AM 3   Q.    And that, as I read it, Mr. Farr, is a 50-step plan?

09:58AM 4   A.    Yes, it is.

09:58AM 5   Q.    And that would be the last text page of the plan, Mr. Farr?

09:58AM 6   A.    Number 50 is the last number, yes.

09:58AM 7   Q.    So you see a reference to item 50; and, what does it state,

09:58AM 8   Mr. Farr?

09:58AM 9   A.    It says, "Preserve BOP and LMRP for transportation to

09:58AM 10  onshore location" -- or, "Prepare BOP and LMRP for transportation

09:58AM 11  to onshore location."

09:58AM 12  Q.    So is it true, Mr. Farr, that this plan ends at the point of

09:58AM 13  the BOP being transported?

09:58AM 14  A.    That's correct.  Once it is lifted from the Q-4000 to be put

09:58AM 15  onto the barge, yes, that's where this plan ends.

09:59AM 16  Q.    And is there any current plan in place for preservation of

09:59AM 17  the BOP after step 50 is identified on attachment 15?

09:59AM 18  A.    There is a draft plan that has been submitted for the

09:59AM 19  interim preservation that has not been vetted by any parties.

09:59AM 20  Q.    So there is no plan that's been approved by any of the other

09:59AM 21  parties with respect to what happens to the BOP after step 50?

09:59AM 22  A.    That's correct.

09:59AM 23  Q.    So now that we're here, Mr. Farr, what is your involvement

09:59AM 24  in the crafting of attachment 15?

09:59AM 25  A.    I've been in meetings with our subject matter expert

09:59AM 1    developing this plan.  Attending that meeting was representatives
09:59AM 2    from BP and the government.
09:59AM 3    Q.   Mr. Farr, the short-term preservation plan, I'm sorry,
10:00AM 4    that's up on the screen and which we have been discussing, can
10:00AM 5    that adequately preserve the BOP indefinitely while it sits out
10:00AM 6    in the environment at Michoud, either in a dock or on a yard?
10:00AM 7    A.   No, it cannot, not indefinitely.
10:00AM 8    Q.   Based on your experience, knowledge and expertise, Mr. Farr,
10:00AM 9    how long do you think the short-term preservation plan can
10:00AM 10   preserve the BOP without evidenced deterioration if the BOP is
10:00AM 11   sitting outside on a dock or in a yard at Michoud?
10:00AM 12   A.   There are two parts to be addressed to answer your question.
10:00AM 13   The short-term preservation plan addressed the BOP pods and the
10:00AM 14   hydraulic system of the BOP, and it is being preserved along the
10:01AM 15   lines for what is known as a long-term preservation plan with
10:01AM 16   Stack-Guard fluid.  And that portion of the preservation plan
10:01AM 17   that will be done on the Q-4000 is good for six months to a year.
10:01AM 18        The part that is to be discussed or the part that we're here
10:01AM 19   for is the wellbore portion of the BOP, which has not been, I'll
10:01AM 20   say, adequately preserved.  And it has been filled with
10:01AM 21   Stack-Guard fluid, but the areas behind the ram preventers and
10:01AM 22   the areas of the -- inside the annular preventers have not been
10:01AM 23   preserved at all.
10:01AM 24        The concern is that the hydrocarbons, water and other
10:02AM 25   substances that the BOP has been exposed to are acidic in nature;

10:02AM 1   and, while they will be somewhat diluted per the procedure that

10:02AM 2   has been agreed, they are still a diluted substance, and we're

10:02AM 3   worried about deterioration of those particular sections in the

10:02AM 4   wellbore.

10:02AM 5   Q.   And is that the concern you have, deterioration of the

10:02AM 6   wellbore sections while it sits at a yard or in a dock?

10:02AM 7   A.   The concern is that we have an acidic solution sitting now

10:02AM 8   exposed to air, in the heat, with saltwater, which that is a

10:02AM 9   position where it will have further corrosion.

10:02AM 10  Q.   And the environment in which it will be sitting, it will

10:02AM 11  be -- if it's at Michoud, it will be the New Orleans climate in

10:02AM 12  September, correct?

10:02AM 13  A.   For the purpose of this procedure, we were told by the

10:03AM 14  government that Michoud was the facility, and it is assumed that

10:03AM 15  it will be sitting on the barge in the sun, in the environment,

10:03AM 16  without any protection.

10:03AM 17  Q.   What information do you have on Michoud's capacity to store

10:03AM 18  the BOP if, in fact, it is delivered at Michoud on

10:03AM 19  September 8 or 9?

10:03AM 20  A.   Transocean has had one individual visit the Michoud yard,

10:03AM 21  and it has been described as an open facility with power and

10:03AM 22  water available.  That's all the information we have.

10:03AM 23  Q.   It may be known in engineering circles, but forgive me, I'm

10:03AM 24  not.  What does an open facility mean in laymen's terms?

10:03AM 25  A.   It's a slab of cement with power and water.  That's all we

```
10:58AM  1   Q.   Based on your education and experience, the opening of the
10:58AM  2   ram bore subsea, could that have disturbed the forensic evidence?
10:58AM  3   A.   That could have disturbed the forensic evidence.
10:58AM  4   Q.   The opening of the ram bores aboard the Q-4000, could that
10:58AM  5   disturb the forensic evidence?
10:58AM  6   A.   The ram bores will not be opened.  They are talking about
10:59AM  7   cycling or functioning them.
10:59AM  8   Q.   What about the functioning of the ram bores aboard the
10:59AM  9   Q-4000, could that disturb forensic evidence?
10:59AM 10   A.   That could, and that is being discussed now that we're
10:59AM 11   onboard as part of the team.
10:59AM 12   Q.   But as I recall, you've signed off on the short-term
10:59AM 13   preservation plan, correct?
10:59AM 14   A.   I have not signed off.  We've just now been contracted as of
10:59AM 15   yesterday for the forensic investigation work, and we were
10:59AM 16   contracted a few days -- about a week ago to be part of the
10:59AM 17   preservation team from the standpoint of just overseeing and
10:59AM 18   documenting the procedures that are being performed.
10:59AM 19   Q.   So is the preservation plan that's been signed off by the
10:59AM 20   government subject to change now; is that what I'm hearing?
10:59AM 21   A.   No, because there are parts of that preservation document
10:59AM 22   that says a decision will be made as to whether and just how
11:00AM 23   those functions will occur.
11:00AM 24   Q.   Attachment 15 that we showed in open court, have you studied
11:00AM 25   that document before?
```

11:00AM 1    A.    I have read through it, yes, but fairly recently.

11:00AM 2    Q.    Let's focus in on what starts at -- this is attachment 15 --

11:01AM 3    or a portion of attachment 15 that I have up on the screen,

11:01AM 4    correct?

11:01AM 5    A.    Again, I've only looked at it one time, but I think it is,

11:01AM 6    yes.

11:01AM 7    Q.    And I'm looking at paragraph 30, and in particular 30B.

11:01AM 8    Does that paragraph contemplate functioning the bore rams?

11:01AM 9    A.    It contemplates functioning the rams, yes.

11:01AM 10   Q.    Can you tell us -- can you quantify for the Court how much

11:01AM 11   forensic disturbance is going to be caused by the operation of

11:01AM 12   paragraph 30 and the following subsections to the bore rams of

11:01AM 13   the BOP?

11:01AM 14   A.    I cannot quantify that.  That's why it's critical to collect

11:02AM 15   that information, as much information on site that you can, and

11:02AM 16   which this procedure does.  And then -- but quantifying any --

11:02AM 17   any compromise of forensic evidence, you cannot do unless you're

11:02AM 18   there and you see what's going on.

11:02AM 19   Q.    Can you compare the amount of disturbance to forensic

11:02AM 20   evidence that might occur if you were to compare the functioning

11:02AM 21   that's going to be done under paragraph 30 compared to the

11:02AM 22   functioning of the bore rams on dry land pursuant to an interim

11:02AM 23   preservation plan?

11:02AM 24   A.    You know, what we're talking about on the intermediate

11:02AM 25   preservation plan is dismantling those rams.  And that can

11:02AM 1    compromise significantly more data or more forensic information

11:02AM 2    than just the cycling of them.  As you said, they've been cycled

11:03AM 3    before.

11:03AM 4    Q.   Have you quantified the amount of forensic disturbance that

11:03AM 5    might occur by virtue of minimum preservation?

11:03AM 6    A.   We have not.

11:03AM 7    Q.   Is DNV's contract with the government to build out the

11:03AM 8    Michoud facility?

11:03AM 9    A.   The contract includes the ability to rent/purchase any

11:03AM 10   equipment necessary to perform the testing.

11:03AM 11   Q.   So you have a provision in the contract for procurement of

11:03AM 12   equipment, correct?

11:03AM 13   A.   Yes.

11:03AM 14   Q.   Has DNV started that process?

11:03AM 15   A.   Have not.  The contract was just written yesterday.

11:03AM 16   Q.   And are you aware that the planned site at Michoud is an

11:03AM 17   open slab?

11:03AM 18   A.   I am aware -- I am aware of that.

11:03AM 19   Q.   Is DNV going to be charged with building out that open slab

11:03AM 20   to accommodate the equipment that you must procure and the

11:04AM 21   personnel to preserve and do the forensic analysis of the BOP?

11:04AM 22   A.   DNV will be working in conjunction with the Coast Guard to

11:04AM 23   be sure that the facility -- whatever facility is required will

11:04AM 24   be built out there at the Michoud facility.

11:04AM 25   Q.   Are you aware of any plans or specifications that have been