# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * | MDL No. 2179 |
| | * | |
| | * | SECTION J |
| | * | |
| | * | Honorable CARL J. BARBIER |
| This document relates to 2:10-cv-1926 | * | |
| | * | Magistrate Judge SHUSHAN |

---

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' RULE 59(e) MOTION TO ALTER OR AMEND JUDGMENT DENYING COPELAND'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The Court previously denied plaintiffs' motion for a TRO and preliminary injunction because "[p]laintiffs have not established their factual or legal burden of proving that a temporary restraining order or a preliminary injunction should be issued" on their claims. (7/23/2010 Order, Case No. 1156, Dkt. No. 377.)   That ruling was—and remains—entirely correct.  Plaintiffs cannot show any manifest error of fact or law in the Court's ruling, and thus are not entitled to the extraordinary remedy of relief from that judgment.  Their motion under Fed. R. Civ. P. 59(e) should be denied in its entirety.

*First*, this Court's decision to deny injunctive relief was not based on a factual error.  It is undisputed that the plaintiff restaurants did not allege in their original or First Amended Complaint that they filed a claim with BP under the federal Oil Pollution Act ("OPA").  *See* 33 U.S.C. § 2713(c).  Nor did plaintiffs contend in their motion for injunctive relief that they had filed such claims—and for good reason.

As their Rule 59(e) motion papers show, plaintiffs did not file OPA claims and no claim was submitted listing any plaintiff as the claimant. Instead, claims were filed by one of the law firms representing the plaintiffs, ***naming a lawyer at the firm as the "Claimant" and describing the "Claimant's occupation" as "Attorney"***. (Pl. Mem. Ex. A.1., at pp. 4-5, 8-9, 12, Case No. 2179, Dkt. No. 44-3.) Moreover, the claims forms did not set forth or describe any purported loss to plaintiffs or their businesses. These facts—which were known to plaintiffs long before they filed their motion for a TRO—were never raised or presented to this Court. Putting aside that the plaintiff restaurants are not the OPA claimants listed on the claim forms on which they now purport to rely, a party cannot obtain relief under Rule 59(e) based on evidence it had in hand but never presented to the Court. *See, e.g., Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004) (A Rule 59(e) motion "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment.").

Equally important, even assuming plaintiffs could be deemed to have filed OPA claims (which they did not), plaintiffs' Rule 59(e) motion papers show that they have not exhausted their OPA claims process remedy. As it stands, plaintiffs' purported claims could be paid by the GCCF, denied by the GCCF, or settled by plaintiffs. None of these potential events has happened. As a result, there is no emergency requiring injunctive relief, plaintiffs' claims are not ripe, and there is no case or controversy for this Court to decide.

***Second***, there is no legal error in this Court's prior decision. Regardless of whether plaintiffs have filed purported OPA claims, they still cannot establish any, much less all, of the requirements for a TRO or preliminary injunction.

- At the threshold, plaintiffs cannot demonstrate any irreparable harm and, indeed, have an adequate legal remedy. Whether they are actual or potential OPA claimants, plaintiffs

concede that they have an adequate remedy at law in the form of a lawsuit for money damages, which they may pursue after the OPA claims process is exhausted, as required by OPA itself. According to plaintiffs' complaint, "damages awarded under BP's ESIS-administered claims process or under the ICF [GCCF] program" are capable of being "determined according to standards of recoverability within OPA or under applicable state law...."  (Pl. First Am. Cplt. ¶ 30, Case No. 1156, Dkt. No. 327.)  The existence of an obvious and adequate legal remedy—money damages—precludes injunctive relief as a matter of law.

●       Plaintiffs have no likelihood of success (much less a substantial one) on the merits of their OPA claim.  Plaintiffs seek judicial "supervision over the procedures employed by BP and the GCCF in administering BP's claims responsibilities under the Oil Pollution Act…."  (Pl. Mot. at 1-2, Case. No. 02179, Dkt. No. 44.)  By its terms, however, OPA does not create or provide for a cause of action that attempts to challenge the extra-judicial claims presentment and exhaustion requirements under the statute.  Thus, there is no legal basis for this Court to insert itself into the OPA claims process, which was specifically designed by Congress to be extra-judicial in order to encourage private settlement and avoid litigation.  Nor is plaintiffs' purported harm—the "chilling of legitimate claims" or purported delay in plaintiffs' "right to seek judicial review"—the type of damage for which OPA allows recovery.  (Pl. Mem. at 16, Case. No. 02179, Dkt. No. 44-1.)

●       The balance of harms continues to weigh heavily in favor of the BP defendants and against these plaintiffs.  Court supervision of the development of the GCCF's claims protocols, and of the GCCF's administration of OPA claims generally, will only impede and disrupt the efficient functioning of the independent OPA claims process, which was established under the auspices of the Executive Branch.  This would harm not only BP (a responsible party

under OPA) and the GCCF, but OPA claimants themselves.  Plaintiffs, on the other hand, will suffer no harm whatsoever from a denial of their motion.

●      Plaintiffs' requested injunction plainly disserves the public interest.  The public interest is served by enforcing OPA as written—including the provisions relating to its extra-judicial claims process—not by disregarding the terms of the statute and obliterating the distinction established by Congress between the private claims process and the right to pursue damages in court once that process is exhausted or the claim denied.

●      Finally, this Court and every other federal judge to consider the issue have correctly rejected the type of injunction sought by plaintiffs.  OPA simply does not allow the relief requested by plaintiffs.  After all, plaintiffs contend they are pursuing OPA claims; in the event such claims are neither paid nor settled, plaintiffs are free to pursue damages claims in this Court once the claims process is exhausted.  Either way, there is no manifest legal error in this Court's prior ruling and no basis for the extraordinary remedy of injunctive relief.

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs' recitation of the background facts is inaccurate in several respects and omits key facts.  Accordingly, BP restates the background and procedural history as follows:

**A.      The Plaintiff Restaurants Did Not Allege That They Filed OPA Claims And, Indeed, Had Not Themselves Filed Any Such Claims.**

Plaintiffs filed their original complaint on July 8 and their First Amended Complaint on July 20.  (Case No. 01926, Dkt. No. 1; Case No. 1156, Dkt. No. 327.)  In neither pleading did plaintiffs allege that they had filed any OPA claims with BP.  Plaintiffs' motion for a TRO and preliminary injunction also made no such claim.  (Case No. 1156, Dkt. Nos. 328.)

As plaintiffs' Rule 59(e) motion papers show, none of the plaintiff restaurants filed an OPA claim and no claims were filed designating any plaintiff as an OPA claimant.  Instead, on

June 24, a paralegal for one of the law firms representing plaintiffs filed claims with BP, naming one of the firm's lawyers (Robert Kutcher) as the "Claimant" and listing the "Claimant's occupation" as "Attorney."  (Pl. Mem. Ex. A.1., at pp. 4-5, 8-9, 12, Case. No. 02179, Dkt. No. 44-3.)  Although the claim form asks for "a description of any property damage and/or bodily injury and/or loss of income," this portion of the form is left blank in each case.  (*Id.* at pp. 5, 9, 13.)  The only place on the claim forms where the names of the plaintiff restaurants appear is in response to the "Loss location name"; however, there is nothing on any of the forms to indicate that the claim is being made by or for any of the plaintiffs.  (*Id.* at pp. 3, 7, 11.)  And in response to the question "Have you previously reported this claim," the paralegal answered "No" on each form.  (*Id.* at pp. 5-6, 9-10, 13.)

On June 25, the day after filing the claims, the paralegal received an email informing her that "[y]our BP claim has been received and registered for Robert Kutcher," as opposed to the plaintiff restaurants.  (*Id.* at pp. 15-17.)  Rather than file claims for the plaintiffs themselves, the paralegal on July 9 wrote to inform the BP Oil Spill Service Center that the paralegal's law firm represents the plaintiff restaurants in connection with the OPA claims designating Robert Kutcher as the claimant.  (*See id.* at pp. 21-23.)

Plaintiffs filed their motion for a TRO and preliminary injunction on July 20 without mentioning any of these facts or claiming that they had filed OPA claims.  Instead, plaintiffs argued that "the rights of the plaintiffs—indeed, of all potential claimants against BP—require immediate injunctive relief."  (Pl. Mem. for TRO at 9, Case No. 1156, Dkt. No. 328-1.)

The Court denied plaintiffs' motion for a TRO and preliminary injunction on July 23, ruling that "[p]laintiffs have not established their factual or legal burden of proving that a temporary restraining order or a preliminary injunction should be issued…."  (7/23/2010 Order,

Case No. 1156, Dkt. No. 377.)  Almost a month later, plaintiffs filed their Rule 59(e) motion, asserting for the first time that they "have been pursuing claims through BP's claims process since prior to May 24, 2010," and that the claims process is ongoing.  (Pl. Mem. at 5.)

      **B.**    **The Gulf Coast Claims Facility Is Currently Administering Individual And Business Claims Presented To BP Under OPA.**

As of August 23, the Gulf Coast Claims Facility ("GCCF") assumed day-to-day administration of individual and business claims presented to BP under OPA.  (Pl. Mem. Ex. C at 3, § 1.5, Case. No. 02179, Dkt. No. 44-4.)  The GCCF is administered by Mr. Kenneth Feinberg, "a neutral fund administrator responsible for all decisions relating to the administration and processing of claims by the GCCF."  (*Id.* § 1.1.)

"The GCCF (and the protocols under which it operates) are structured to be compliant with OPA."  (Gulf Coast Claims Facility Protocol for Emergency Advance Payments, August 23, 2010, § I.A, Exhibit ("Ex.") A to Declaration of Andrew B. Bloomer, attached hereto as Ex. 1.) The GCCF website includes sections devoted to, among other things, "Important Notices and Information," "Frequently Asked Questions," "Protocol and Eligibility Criteria," "Claiming Filing Instructions," and "GCCF Program Statistics."  (Welcome to the Gulf Coast Claims Facility Website, Bloomer Decl. Ex. B.)

All OPA claims filed before August 23, 2010 have been transferred to the GCCF for independent review and determination according to the GCCF's procedures.  (*See id.*; *see also* Pl. Mem. Ex. C at 3, § 1.5.)  The GCCF's claim protocols provide for both "Emergency Advance Payment" and "Final Payment" of OPA claims.  (*See* Understanding the GCCF's Eligibility Criteria for Emergency Advance Payments, August 23, 2010, § I., Bloomer Decl. Ex. C; *see also* Pl. Mem. Ex. C at 11-14, § 5.)  An Emergency Advance Payment is "a payment available to Individuals and Businesses that are experiencing financial hardship resulting from damages

incurred by the [Gulf of Mexico] Spill," and is an advance on the payment of a Final Claim.  (Pl. Mem. Ex. C at 11, §§ 5.1, 5.5.)  Claims for Emergency Advance Payments must be filed as of November 23, 2010.  (*See id.*, § 5.4.)

The GCCF has published its claims protocol for Emergency Advance Payments. (Bloomer Decl. Exs. A, C; *see also* Pl. Mem. Ex. C at 11-13, § 5.)  This protocol includes a detailed explanation of the methodology used by the GCCF to evaluate and calculate Emergency Advance Payments.  (*See* Bloomer Decl. Exs. A, C.)

Among other things, claimants may file more than one claim for Emergency Advance Payment and seek compensation for up to six months of losses.  (*See* Pl. Mem. Ex. C at 11, § 5.6 ("You may apply for an Emergency Advance Payment on a monthly basis or for six months of losses.").)  If an OPA claimant disagrees with the GCCF's determination of any claim for Emergency Advance Payment, the claimant can submit a claim for Final Payment seeking the same amounts.  (*See* Explanation of Claim Payments, § 1 ("If you disagree with the amount of your Emergency Advance Payment, you can submit a claim for Final Payment and will have the opportunity to present all your arguments and any materials that you feel support your position. We will consider all of these materials when determining your Final Payment."), Bloomer Decl. Ex. D; *see also* Pl. Mem. Ex. C at 13, § 5.14.)

Claimants may submit claims for Final Payment at any time that the GCCF is receiving claims.  (*See* Bloomer Decl. Ex. A, § I.A.)  The GCCF has not yet established or published the protocol for a claim for Final Payment.  (*Id.* § I.B ("a subsequent Protocol will deal with all Final Claims"); *see also* Pl. Mem. Ex. C at 14, § 6.)  However, the GCCF has published the information and documentation that will support a claim for Final Payment.  (*See* Required Information/Documentation for a Claim for Final Payment, Bloomer Decl. Ex. E.)  Finally, while

claims information filed with BP prior to August 23 has been transferred to the GCCF, claimants must complete a GCCF Claim Form to receive Emergency Advance Payments or a Final Payment through the GCCF.  (*See* Pl. Mem. Ex. C at 3, § 1.4.)

## ARGUMENT

**I.      The Legal Standard.**

A Rule 59(e) motion is "an extraordinary remedy and should be used sparingly."  *In re Pequeño*, 240 Fed. Appx. 634, 636 (5th Cir. June 20, 2007) (internal quotation marks omitted). Legal treatises describe the same point as well-established law.  *See* Charles Alan Wright, *et al.*, 11 FED. PRAC. & PROC. CIV. § 2810.1 (2d ed. current through 2010).  The Wright & Miller treatise summarizes Rule 59(e) law as follows:

> "There are four basic grounds upon which a Rule 59(e) motion may be granted. First, the movant may demonstrate that the motion is necessary to correct manifest errors of law or fact upon which the judgment is based.  Second, the motion may be granted so that the moving party may present newly discovered or previously unavailable evidence.  Third, the motion will be granted if necessary to prevent manifest injustice.  Serious misconduct of counsel may justify relief under this theory.  Fourth, a Rule 59(e) motion may be justified by an intervening change in controlling law."

*Id.* (footnotes omitted).  In adjudicating a Rule 59(e) motion, the district court must look not only to "the need to render just decisions on the basis of all the facts," but must also balance such considerations against "the need to bring litigation to an end."  *Templet*, 367 F.3d at 479 (5th Cir. 2004) (citation omitted).

Of the four potential grounds for granting Rule 59(e) relief, two can quickly be dispensed with here.  The fourth ground can be ignored because plaintiffs are not alleging that the law has changed in some way favorable to them.  The second ground can also be ignored because plaintiffs are presenting evidence that they ***knew about and could have presented*** on July 20, when they filed their motion for a TRO and preliminary injunction.  However, a Rule 59(e)

motion "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Id*.

Hence, the plaintiffs are left with arguing that their Rule 59(e) motion is necessary to correct a manifest error of law or fact so as to avoid a manifest injustice. They cannot meet these demanding tests, as this Court made no manifest error of law or fact in denying plaintiffs' request for injunctive relief. Plaintiffs cannot establish any basis for relief under Rule 59(e) because they cannot satisfy any—much less all—of the requirements for obtaining a TRO or a preliminary injunction.

Finally, plaintiffs cannot overcome the fact that their Rule 59(e) motion is based entirely on evidence and arguments they could have presented to the Court previously, but chose not to. Plaintiffs could have pleaded submission of claims to the BP claims process in their complaints (as defective as that submission was). They could have highlighted their submissions to BP and to the Court in their motion for a TRO and preliminary injunction. But plaintiffs did none of those things, and should not be heard now to complain about the strategic choice they made to keep silent about facts they could have presented to the Court. Evidence that was available to plaintiffs before the Court denied their request for an injunction simply cannot be used to obtain Rule 59(e) relief. *See Lostumbo v. Bethlehem Steel, Inc.*, 8 F.3d 569, 570 (7th Cir. 1993) ("Rule 59 requires that the factual matter at issue in the motion previously have been unavailable.").

## II.     There Is No Manifest Error Of Fact.

It is settled that "a civil litigant may not use Rule 59(e) to raise new claims that could have been raised prior to the district court's entry of a final judgment." *Worrell v. Houston Can! Academy*, 287 Fed. Appx. 320, 327 (5th Cir. July 16, 2008) (internal quotation marks omitted). Here, the plaintiff restaurants did not file OPA claims and never alleged in their complaints or in

their motion for injunctive relief that they filed such claims.  For this reason alone, their request for Rule 59(e) relief is improper and should be denied.  *See Williams v. Thaler*, 602 F.3d 291, 310 (5th Cir. 2010) (habeas petitioner not entitled to Rule 59(e) relief where "he could have developed the factual predicate for his actual innocence claim earlier through the exercise of due diligence").

Moreover, the evidence that plaintiffs now purport to rely on to assert that they did file OPA claims with BP was clearly known to plaintiffs long before they moved for a TRO and preliminary injunction.  Despite this, plaintiffs never raised or presented this evidence to the Court.  A party cannot hope to obtain Rule 59(e) relief based on material the party had in its possession (such as copies of Internet print-outs from BP's Internet claims site), but never bothered to provide to the Court.  "[U]nder traditional Rule 59(e) standards, motions to alter or amend are granted … if … new material evidence has been discovered *that was unavailable previously*."  *Corretjer Farinacci v. Picayo*, 149 F.R.D. 435, 437 (D.P.R. 1993) (emphasis added).  Plaintiffs' purported evidence is neither new, nor was it previously unavailable to them.

Finally, plaintiffs assume that if such evidence had been presented earlier, the Court would have had no choice but to issue a TRO and preliminary injunction against BP and/or the GCCF.  This ignores not only the stringent requirements for obtaining injunctive relief but also that the filing of OPA claims with a responsible party or its agent is a *necessary condition* to satisfy OPA's presentment or exhaustion requirement, but it is *not a sufficient condition*.  The mere filing of a request for payment by the responsible party does not equate to satisfaction of OPA's exhaustion requirement.  As the Eastern District of Virginia has explained:

> "The purpose of the claim presentation procedure is to promote settlement and avoid litigation.  Congress believed that lawsuits against parties are appropriate only 'where attempts to reach a settlement with the responsible party . . .  were

unsuccessful.'  H.R. Rep. No. 242, 101st Cong., 1st Sess., pt. 2, at 66 (1989).  It therefore mandated a 90-day period in which the parties would attempt to resolve monetary disputes arising from oil spills prior to commencing litigation.  The hope was to avoid costly and cumbersome litigation.  See 135 Cong. Rec. at H 7962, 7965 (statements of Rep. Hammerschmidt and Rep. Lent) . . . .  In order to accomplish this purpose, ***the claim presented must inform the responsible party with some precision of the nature and extent of the damages alleged and of the amount of monetary damages claimed***.  Otherwise, the responsible party will be unable to make an informed offer of its own, unable to engage in meaningful substantive negotiations, and thus unable to settle the matter by agreeing to a final amount."

*Johnson v. Colonial Pipeline Co.*, 830 F. Supp. 309, 310-11 (E.D. Va. July 14, 1993) (emphasis added); *see also Gabarick v. Laurin Mar. (America) Inc.*, No. 08-4007, 2009 WL 102549, *3 (E.D. La. Jan. 12, 2009); *Abundiz v. Explorer Pipeline Co.*, No. 300CV2029H, *et al.*, 2003 WL 23096018, *3-5 (N.D. Tex. Nov. 25, 2003); *Turner v. Murphy Oil USA, Inc.*, No. 05-4206, 2007 WL 4208986, *2 (E.D. La. Nov. 21, 2007).

Here, plaintiffs do not claim—and have not shown—that they provided to BP or to the GCCF so much as a description of their purported claims and losses, let alone all information necessary for the purported claims to be administered.  *See* 33 U.S.C. § 2713(c).  Indeed, the claim forms on which plaintiffs rely do not describe any purported loss to plaintiffs or even the amount of their alleged claims.  (*See supra* Part A.)

Finally, plaintiffs' purported claims could still be paid by the GCCF, denied by the GCCF, or settled by plaintiffs.  Their resolution is inherently uncertain.  As a result, there is no emergency requiring the extraordinary remedy of an injunction and plaintiffs' claims are unripe, leaving nothing for this Court to decide.  Judge Rodgers's analysis on June 17, 2010, applies with full force to plaintiffs' claims in this case:  "[It] would be pure speculation at this point for the court to try to predict how the new process [under the GCCF] will work for claimants," and "[t]he court is without authority to issue such an advisory opinion" involving predictions about

11

the success or failure of the GCCF and individual claims.  (BP's TRO Mem. in Opp., Ex. C

(quoting *Destin, et al. v. BP, plc, et al.*, Case No. 10-141, N.D. Fla., Pensacola Div., Order at 4).)

Because there is no error of fact, plaintiffs' motion should be denied.

### III.   There Is No Manifest Error Of Law Because Plaintiffs Cannot Satisfy Any Of The Requirements For Injunctive Relief.

As the party seeking injunctive relief, plaintiffs must demonstrate each and every one of

the following: (1) a substantial likelihood that they will prevail on the merits of their claim; (2) a

substantial threat that irreparable harm will result if an injunction is not granted; (3) the

threatened injury to plaintiffs outweighs the threatened harm to the defendants; and (4) the

granting of an injunction will not disserve the public interest.  *See, e.g., Ridgely v. Fed.

Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008); *accord Clark v. Prichard*, 812

F.2d 991, 993 (5th Cir. 1987).  Failure to establish even one of these factors requires denial of

plaintiffs' motion.  *See Cotton Co-op. Ass'n v. Goodpasture Computer Serv., Inc.*, 807 F.2d

1256, 1261 (5th Cir. 1987) ("[P]reliminary injunctions will be denied based on a failure to prove

separately each of the four elements of the four prong test for obtaining the injunction.").

Plaintiffs cannot establish any of the prerequisites for an injunction, let alone all of them, and

since nothing in their Rule 59(e) motion alters that conclusion, there is no manifest error of law.

### A.   Plaintiffs Cannot Demonstrate Irreparable Harm And Have An Adequate Legal Remedy.

As defendants explained in their opposition to plaintiffs' motion for a TRO and

preliminary injunction, the existence of an adequate legal remedy bars plaintiffs' claim for

injunctive relief.  (BP's TRO Mem. in Opp. at 12-13, Case No. 1156, Dkt. No. 368.)  Here,

where all of plaintiffs' alleged injuries are economic, they have such a remedy in the form of

monetary damages.  Nothing in plaintiffs' Rule 59(e) motion changes that conclusion.

According to plaintiffs' own pleading, their purported damages are calculable and capable of being redressed by an award of money damages.  Plaintiffs allege in their complaint that they are entitled to more than $75,000, with the specific amount capable of being "determined at trial."  (Pl. First Am. Cplt. ¶¶ 35a, 41a, 54a & at p. 19.)  They likewise concede in their OPA declaratory judgment claim that "damages awarded under BP's ESIS-administered claims process or under the ICF program" are capable of being "determined according to standards of recoverability within OPA or under applicable state law…."  (*Id.* ¶ 30 & at p. 18.)

Plaintiffs' complaint, in short, is not only devoid of any allegation that plaintiffs' purported injuries are irreparable, it alleges exactly the opposite.  The existence of an obvious and adequate legal remedy—money damages—precludes injunctive relief as a matter of law. *See, e.g., Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 849 (5th Cir. 2004) ("Damages capable of being measured afford [plaintiff] an adequate remedy at law, thus precluding injunctive relief."); *see also* Charles Alan Wright, *et al.*, 11A FED. PRAC. & PROC. CIV. § 2948.1 ("[A] preliminary injunction usually will be denied if it appears that the applicant has an adequate alternate remedy in the form of money damages or other relief"); *Howard v. Town of Jonesville*, 935 F. Supp. 855, 859 (W.D. La. 1996) (similar).

Plaintiffs' argument, without citation to any authority, that monetary damages are inadequate because plaintiffs seek relief related to "the standards and procedures employed in the BP claims process," is devoid of merit.  (Pl. Mem. at 15; *see id.* at 16.)  Putting aside plaintiffs' admissions that their purported injuries are compensable in money damages, even if BP's or the GCCF's claims procedures were somehow "unfair" to plaintiffs (and they are not), plaintiffs have not explained how that results in irreparable harm, given that OPA expressly permits claimants unsatisfied with the results of the claims process to pursue their claims for damages in

court.  Courts have consistently rejected such arguments including, for example, where parties are unwilling to submit to allegedly unfair arbitral forums.  *See Siag v. King & Spalding LLP*, No. H-10-367, 2010 WL 2671580, at *2 (S.D. Tex. June 30, 2010) (denying injunctive relief to stay arbitration when movant claimed, inter alia, that arbitrator was biased; "'An injury is 'irreparable' only if it cannot be undone through monetary remedies.'" (quoting *City of Meridian v. Algernon Blair, Inc.*, 721 F.2d 525, 529 (5th Cir. 1983)); *Pompano-Windy City Partners, Ltd. v. Bear, Stearns & Co.*, 698 F. Supp. 504, 519 (S.D.N.Y. 1988) ("Even if the eventual arbitration turned out to be unfair, any resultant injury would not be 'irreparable.'  If the arbitration were in fact biased, plaintiffs could challenge that award and, if successful, it will have no effect."); *Trustees of Plumbers Local Union No. 1 Welfare Fund v. Riverdale Assocs., LLC*, No. 07-CV-1740, 2007 WL 1876593, at *4 (E.D.N.Y. June 28, 2007) (rejecting allegations of irreparable harm from being forced to participate in an allegedly biased arbitration forum, because "[t]he fact that there is a legal remedy which Movants can pursue if the arbitration process proves biased or unfair undercuts Movants' claim of irreparable harm.").

Finally, plaintiffs cannot show any "chilling of legitimate claims" that could possibly establish irreparable harm.  (Pl. Mem. at 16.)  Plaintiffs' Rule 59(e) motion papers confirm that ***their*** claims have not been chilled and that they are well aware of the OPA claims process.  Plaintiffs' suggestion that the claims of ***other*** unidentified claimants could be chilled is entirely speculative and unsupported.  *See Winter v. Natural Res. Def. Council, Inc.*, __U.S. __, 129 S. Ct. 365, 375 (2008) (plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction"; the mere "possibility" of such harm is insufficient) (emphasis in original).  Plaintiffs can make no such showing.

**B.**   **Plaintiffs Still Have No Likelihood Of Success—Much Less A Substantial One—On The Merits Of Their OPA Claim.**

    **1.**   **OPA does not provide a cause of action to review the GCCF's claims procedures.**

Plaintiffs seek judicial oversight of the "procedures employed by the GCCF in administering BP's claims responsibilities under OPA."  (Pl. Mem. at 3.)  OPA, however, provides for no such cause of action.  Nothing in OPA's text, structure, or legislative history reveals any congressional intent to create a cause of action that would allow courts to supervise the extra-judicial claims process.  Indeed, such a cause of action would be anathema to the core intent of Congress in establishing OPA's claim exhaustion requirement:  to encourage voluntary settlement *out of court*.  *See Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*, 51 F.3d 235, 238-39 (11th Cir. 1995) ("[P]assages from the legislative history support Appellees' claim that one goal of the claims presentation provision was to temper the Act's increased liability with a congressional desire to encourage settlement and avoid litigation.  *See also, e.g.,* H.R. Rep. No. 242, 101st Cong., 1st Sess., pt. 2, at 66 (1989); 135 Cong. Rec., 101st Cong., 1st Sess. H7962 (Nov. 2, 1989) (remarks of Rep. Lent)).").  Interjecting the courts into a pre-litigation process that was expressly designed to operate as a salutary form of alternative dispute resolution would subvert clear congressional intent.

Plaintiffs argue that they have a cause of action to obtain any form of relief so long as the issues involved have a nexus to OPA and a defendant party disagrees with them about how that issue should be resolved.  Thus, according to plaintiffs, "[w]hile *the substance* of claims for damages pursuant to OPA may be subject to OPA's presentment requirement, questions as to whether *the procedure* employed by or on behalf of BP in administering the claims scheme is

fair and comports with all statutory and Constitutional requirements are well within this Court's jurisdiction." (Pl. Mem. at 10 (emphasis in original).)

This is not the law. The existence of a cause of action and the existence of jurisdiction are two very different things. To obtain judicially ordered relief, it is axiomatic that a plaintiff must demonstrate to a federal court of limited jurisdiction not only that the court possesses subject matter jurisdiction, but also that a valid cause of action duly created by Congress has made that specific form of relief available. "The Judicial Code, in vesting jurisdiction in the District Courts, *does not* create causes of action, but only confers jurisdiction to adjudicate those arising from other sources which satisfy its limiting provisions." *Montana-Dakota Utilities Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 249 (1951) (emphasis added).

Plaintiffs contend that 33 U.S.C. § 2717(b) provides a cause of action to resolve "all controversies" under OPA, but this misreads and distorts the statute. (Pl. Mem. at 10-11.) Section 2717(b) is purely a jurisdictional provision. It provides jurisdiction over most of the causes of action created in OPA—"all controversies" (with the exception of a special cause of action that can be brought only in the D.C. Circuit)—but it does not tell the District Courts which controversies may result in affirmative orders of relief or the form of relief that may be awarded. The federal courts have repeatedly rejected similar arguments based on broadly worded jurisdictional provisions in other federal statutes. In *Kaiser v. U.S. Postal Serv.*, 908 F.2d 47 (6th Cir. 1990), for example, the Sixth Circuit was faced with an argument that a new cause of action was inherent in 28 U.S.C. § 1339, which provides that the "district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to the postal service." The court concluded that Section 1339 did *not* mean that plaintiffs could complain about any act

of the Postal Service and thereby secure whatever form of relief in law or equity they and the

District Courts might think just:

> "Appellant also argues that 28 U.S.C. § 1339 gives district courts original jurisdiction to hear civil cases arising under 'any Act of Congress relating to the postal service.' From this he contends that private causes of action exist side-by-side with the remedies provided in the Postal Reorganization Act, since it would be inconsistent for Congress to eliminate private causes of action without modifying section 1339. This reasoning is flawed in several respects. ***First***, the presence of congressionally-conferred federal jurisdiction does not evidence an intent to provide a right to be heard in federal court. *See National Ass'n of Postal Supervisors v. United States Postal Serv.*, 602 F.2d 420, 429 (D.C. Cir. 1979) ('[t]he existence of a jurisdiction-conferring statute does not alone create a right of action for judicial review . . . .'). ***Second***, the broad grant of jurisdiction for suits arising from 'any Act of Congress relating to the postal service' does not imply that Congress intended there to be a private right of action with regard to section 1006. ***Saying that federal courts have jurisdiction to hear civil actions arising under any act relating to the postal service in no way means that all acts relating to the postal service give rise to a civil right of action***."

*Kaiser*, 908 F.2d at 51-52 (emphasis added). Similarly, plaintiffs' claim in this case that they

have a private right of action to seek judicial relief as to any and all "controversies" under OPA

has no basis in law. *See also Consolidated World Housewares, Inc. v. Finkle*, 831 F.2d 261, 265

(Fed. Cir. 1987) ("[T]he mere presence of a patent issue cannot of itself create a cause of action

arising under the patent laws."); *Louisville & Nashville R.R. Co. v. M/V Bayou Lacombe*, 597

F.2d 469, 472 (5th Cir. 1979) ("The Act, however, does not create new causes of action; it

merely expands the locality rule of admiralty jurisdiction to encompass 'ship-to-shore' torts.");

*B. F. Goodrich Co. v. Northwest Indus., Inc.*, 424 F.2d 1349, 1354 (3d Cir. 1970) ("Although

[the statute] creates jurisdiction it does not create a cause of action.").

     The causes of action created by OPA are few and definite, not infinite and malleable.

Most of OPA's causes of action are held by private parties, but a few are limited to governmental

use. In either case, the statue does not state or even suggest that a party has a cause of action and

judicial remedy for any and "all controversies" that could conceivably arise under OPA.

*First*, OPA's main cause of action is to allow recovery of certain specified "damages." *See* 33 U.S.C. § 2702 (defining elements of damages liability), § 2703 (providing defenses to liability), § 2704 (establishing limits on liability), § 2705 (covering interest awards and making provisions for the partial payment of claims), § 2707 (special provisions for recoveries by foreign plaintiffs), § 2708 (special provisions for recovery by responsible parties), and § 2713(c) (offering claimants an election of remedies). *Second*, OPA also creates a special administrative regime superintended by the National Oceanic and Atmospheric Administration for the recovery of natural resource damages by a particular class of plaintiffs called "trustees." *See* 33 U.S.C. § 2706. *Third*, OPA creates a broad contribution right that allows responsible parties to seek to recover from other parties for the fair share of any damages they have paid out to claimants. *See* 33 U.S.C. § 2709. *Fourth*, OPA creates public rights for federal enforcers. *See* 33 U.S.C. 1321 (providing graduated monetary penalty regime for releases of oil), and 33 U.S.C. § 2716a (providing penalty regime for violation of financial responsibility requirements established in the statute). *Fifth*, regulated parties are given a cause of action to seek judicial review (exclusively in the United States Court of Appeals for the District of Columbia Circuit) of any regulations issued under the auspices of OPA. *See* 33 U.S.C. § 2717(a).

Hence, OPA put in place a highly detailed set of remedial provisions. It is unthinkable that Congress intended these explicitly defined causes of action to be supplemented by implied rights of action that courts could create at their own discretion. *See, e.g., Blaze v. Payne*, 819 F.2d 128, 129 (5th Cir. 1987) ("We are authorized to imply private rights of action only if Congress can be fairly said to have intended them. To determine Congressional intent, '[w]e look first, of course, to the statutory language, particularly to the provisions made therein for enforcement and relief.'" (quoting *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers*, 453

U.S. 1, 13 (1981)).  The intricate set of remedial tools Congress expressly created in OPA mirrors the depth and precision of remedial tools that Congress established in the Clean Water Act, which the Supreme Court held in *National Sea Clammers* did not authorize courts to create new private rights of action.  *See Nat'l Sea Clammers*, 453 U.S. at 22 ("[W]e also dismiss the claims under the MPRSA [Marine Protection, Research, and Sanctuaries Act] and the FWPCA [Federal Water Pollution Control Act, otherwise known as the Clean Water Act] because respondents lack a right of action under those statutes.").  Indeed, part of OPA (33 U.S.C. § 1321), as enacted, was codified with the Clean Water Act.  *National Sea Clammers*, as applied to the extensive remedial regime in OPA, clearly bars its supplementation by judicially created causes of action of any kind.  *See Nat'l Sea Clammers*, 453 U.S. at 13-14 ("These Acts contain unusually elaborate enforcement provisions, conferring authority to sue for this purpose both on government officials and private citizens…. In view of these elaborate enforcement provisions it cannot be assumed that Congress intended to authorize by implication additional judicial remedies for private citizens suing under MPRSA and FWPCA.").

Against all of this, plaintiffs neither cite OPA cases construing the statute in a different fashion nor, as a matter of general law, do they cite any cases that support the creation of newly minted causes of action in a situation like this one.  Of the OPA causes of action listed above, the only one that would appear to apply to the plaintiff restaurants would be the private cause of action against responsible parties for damages caused by oil spills, as established in 33 U.S.C. §§ 2701-2705, 2713(c).  But these sorts of private claims are exactly the ones that are subject to OPA's presentment/exhaustion requirements.

Hence, if plaintiffs are unhappy with the GCCF process, the only right they possess is to work through that process and to come to court only when it has been exhausted or the OPA

19

claim denied, as required by 33 U.S.C. § 2713(c).  Plaintiffs' only other option is to seek to amend OPA in the halls of Congress.  *See Boca Ciega Hotel,* 51 F.3d at 239 ("If Appellants perceive a policy shortcoming caused by OPA's claims presentation requirement, that shortcoming arises as a result of the balance struck by Congress, and is properly remedied by congressional action.") (internal citation and quotation marks omitted).  Indeed, the need for a court to uniformly police the OPA presentment/exhaustion requirement was a key factor in the Judicial Panel on Multidistrict Litigation's decision to consolidate pre-trial proceedings to this Court.  *See In re Oil Spill by the Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* __ F. Supp. 2d __, 2010 WL 3166434, *2 (J.P.M.L. Aug. 10, 2010) ("To the extent that non-compliance with the OPA's presentment requirement becomes an issue, failure to include OPA claims in centralized proceedings would raise the prospect of multiple inconsistent rulings on that issue.").  Plaintiffs' attempt to create a vague, judicially crafted cause of action covering any and "all controversies" should be soundly rejected.

> **2.    OPA does not provide a cause of action to require the GCCF to advertise its claims procedures.**

Plaintiffs also argue that the Court should direct BP and/or the GCCF to "publicize and advertise immediately any 'zone of eligibility' standards or any other categorical determination that certain classes of potential claims will be denied . . . ."  (Pl. Mem. at 3.)  There is no such publication requirement in OPA.  Moreover, to create one would run afoul of the legislative history indicating that the virtue of private claims processes is precisely that they are to be conducted free of litigation and that court actions cannot commence (with certain exceptions, *see* 33 U.S.C. § 2713(c)) before those private, non-judicial processes have run their course.

Beyond this, there is no basis or reason to grant the form of advertising relief plaintiffs seek.  The GCCF has already published its protocol for claims for Emergency Advance

Payments, which does not contain a "zone of eligibility" standard for the categorical denial of claims.  Instead, with respect to "Claims for Lost Profits and Impairment of Earning Capacity," the GCCF's protocol for Emergency Advance Payment provides that "geographic proximity to the Spill" is one of numerous factors to be weighed in the GCCF's "initial assessment of a claim."  (Understanding the GCCF's Eligibility Criteria for Emergency Advance Payments, August 23, 2010, § II., Bloomer Decl. Ex. C.)

Moreover, the GCCF's Emergency Advance Payment protocol provides that, "If you disagree with the amount of your Emergency Advance Payment, you can submit a claim for Final Payment and will have the opportunity to present all your arguments and any materials that you feel support your position.  We will consider all of these materials when determining your Final Payment."  (Bloomer Decl. Ex. D, § 1; *see also* Pl. Mem. Ex. C at 13, § 5.14.)  In sum, there are no "predeterminations of eligibility for certain categories of claimants," as plaintiffs contend.  (Pl. Mem. at 17.)

      **C.**    **The Balance Of Harms Continues To Weigh Heavily In Favor Of Defendants And Against Plaintiffs.**

Plaintiffs cannot show any harm, particularly when they have not exhausted the OPA claims process and their purported claims have not been denied or rejected by the GCCF. Moreover, court supervision of the development of the GCCF's claims protocols, and of the GCCF's administration of OPA claims generally, will only delay and disrupt the efficient functioning of the independent OPA claims process, which was established under the auspices of the Executive Branch.  Such delay and disruption would harm not only BP (a responsible party under OPA) and the GCCF, but OPA claimants themselves, as every standard and decision of the GCCF will be subject to time-consuming litigation and a series of mini-trials.  Plaintiffs, on the other hand, will suffer no harm whatsoever from a denial of their motion.

**D.     Plaintiffs' Requested Injunction Disserves The Public Interest.**

Congress expressly intended the mandatory OPA claims process to facilitate and encourage the resolution of claims arising from an oil spill without court intervention or oversight.  *See*, *e.g.*, 135 Cong. Rec. H7965 (daily ed. Nov. 2, 1989) (statement of Rep. Hammerschmidt) ("The system of liability and compensation provided for in the bill…is intended to allow for ***quick and complete payment of reasonable claims without resort to cumbersome litigation***.") (emphasis added); *see also* BP's TRO Mem. in Opp. at 19-20.

Plaintiffs' requested injunction contravenes this clear Congressional intent and disserves the public interest by attempting to convert what is intended to be an extra-judicial claims process into one in which every aspect of the OPA claims process would be subject to litigation and decision by the court—even though the plain language of OPA is to the contrary.  The public interest is served by enforcing OPA as written, including the provisions related to its extra-judicial claims process, not disregarding the terms of the statute and obliterating the distinction established by Congress between the private claims process and the right to pursue damages in court once that process is exhausted or the claim denied.  *See United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) ("[A] court sitting in equity cannot 'ignore the judgment of Congress, deliberately expressed in legislation.'") (citation omitted); *Avmed Inc. v. BrownGreer PLC*, 300 Fed. Appx. 261, 265 (5th Cir. 2008) (injunction denied in part because requested relief would disserve public interest "by stalling and disrupting" the resolution of case and payments to claimants).

Finally, plaintiffs' assertion that "BP is shutting down its claim process, even knowing that its August 18 shut-down will leave a gap before the 'independent' GCCF will begin accepting claims on August 23," is simply incorrect.  (Pl. Mem. at 18.)  As the GCCF has made

clear, "[i]f you have previously filed a claim with BP, your information will be transferred to the GCCF."  (Pl. Mem. Ex. C at 3, § 1.4; *see also* Bloomer Decl. Ex. B ("All claims filed before August 23, 2010 have been transferred to the GCCF for ongoing review and determination.").) While claimants must complete a GCCF Claim Form in order to receive an Emergency Advance Payment or a Final Payment from the GCCF, there was no "gap" before the GCCF began reviewing previously filed claims or accepting new ones.[1]

## CONCLUSION

For the reasons set forth above, the BP Defendants respectfully request that the Court deny Plaintiffs' Rule 59(e) Motion to Alter or Amend Judgment Denying Copeland's Motion for a Temporary Restraining Order and Preliminary Injunction in its entirety.

---

[1] In the absence of any manifest error of law or fact, plaintiffs cannot show manifest injustice.  *See, e.g., Mata v. Cameron County, Tex.*, No. C.A.B-04-92, 2005 WL 2146078, *2 (S.D. Tex. Sept. 2, 2005) ("Justice is served…by emphasizing the need for finality," where "[t]here is no manifest error of fact or law in need of correction.").  Although plaintiffs contend that claimants represented by counsel are not allowed to use BP's toll-free claims line (Pl. Mem. at 19), the GCCF's protocols make clear that claimants have a right to counsel of their choosing and, in that event, the GCCF will communicate with counsel rather than directly with the represented claimants—for obvious ethical reasons.  (Pl. Mem. Ex. C at 5, § 2.4.)  As the GCCF's protocols also show, there is no "unpublished categorical treatment to effectively deny classes of claims," and plaintiffs offer no evidence to support that assertion.  (Pl. Mem. at 19.)  Finally, plaintiffs' argument that there is "no role for the courts" to protect against purported "abuses" in the claims process simply ignores OPA's regime as carefully crafted by Congress, under which claimants unhappy with the results of the claims process are free to pursue their claims in court once that process is concluded.  (*Id.* at 20.)

Respectfully submitted,

/s/Don K. Haycraft
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
**LISKOW & LEWIS**
701 Poydras Street, Suite 5000
New Orleans, LA  70139-5099
Telephone:     (504) 581-7979
Facsimile:     (504) 556-4108

*Attorneys for BP America Production
Company and
BP Exploration & Production Inc.*

Jeffrey Bossert Clark                          Richard C. Godfrey, P.C.
**KIRKLAND & ELLIS LLP**            J. Andrew Langan, P.C.
655 Fifteenth Street, N.W.                Andrew B. Bloomer, P.C.
Washington, DC  20005                  **KIRKLAND & ELLIS LLP**
Telephone:     (202) 879-5960       300 North LaSalle Street
Facsimile:     (202) 879-5200         Chicago, IL  60654
                                                        Telephone:     (312) 862-2000
                                                        Facsimile:     (312) 862-2200

                                                        *Of Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September, 21 2010, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the court's electronic filing system.  I also certify that I have mailed this filing by United States Postal Service to all counsel of record who are not registered to receive electronic service by operation of the court's electronic filing system.

                    /s/ Don K. Haycraft