TESTIMONY OF MARY L. KENDALL
ACTING INSPECTOR GENERAL
FOR THE DEPARTMENT OF THE INTERIOR
BEFORE THE HOUSE COMMITTEE ON NATURAL RESOURCES
SUBCOMMITTEE ON ENERGY AND MINERAL RESOURCES
JUNE 17, 2010

Mr. Chairman and members of the committee, thank you for the opportunity to testify today about the proposed reorganization of the Minerals Management Service (MMS) and the regulatory structure that MMS has promulgated, governing not only its own operations, but those of the offshore energy industry that MMS regulates.

While the Office of Inspector General (OIG) has not, in the recent past, conducted any rigorous review of MMS' governing regulations, during the course of other work that the OIG has done we have gained an understanding of some of the regulatory challenges that face MMS.  We are also presently in the process of identifying gaps, weaknesses, and opportunities for improvement in MMS operations and regulations, with a focus on the permitting process, the inspections and enforcement programs, environmental and safety requirements, and the regulations governing post-incident review or investigation.

Let me begin with the latter.  MMS has five brief paragraphs of regulation to cover post-incident investigation.  As a result, in conducting the investigation into the Deepwater Horizon disaster, MMS is bound by the Coast Guard regulations, which are comprehensive, but in my view, completely backwards, gathering evidence via public hearing, rather than developing evidence to culminate in a public forum.

Generally, MMS regulations are heavily reliant on industry to document and accurately report on operations, production and royalties.  I am not prepared today to comment specifically on MMS' permitting, environmental or safety regulations, although given the April 20th disaster on the Deepwater Horizon and the circumstances in the Gulf of Mexico presently; I certainly believe that our review will find opportunities to strengthen the regulations in these areas.

We learned recently that MMS has a dearth of regulations governing their inspection program – four brief, general subsections.  Anecdotally, we have also learned that MMS inspectors, at least in the Gulf of Mexico region, operate relatively independently, with little direction as to what must be inspected, or how.  MMS inspectors are guided, generally, by instructions in a handbook on Potential Incidents of Non-Compliance, or PINCs.  This is not the least of the inspectors' challenges, however.  We have been told that MMS has approximately 60 inspectors for the Gulf of Mexico region to cover nearly 4,000 facilities.  This is juxtaposed with the Pacific Coast, which has 10 inspectors for 23 facilities.

MMS also has difficulty recruiting inspectors due to its grade and pay structure.  Industry tends to offer considerably higher wages and bonuses.

When they can be recruited, inspectors for MMS receive primarily on-the-job training.  The MMS Offshore Inspector Training program guidance and instructions appear to be considerably out of date, developed between 1984 and 1991, and credit individuals with industry experience.  During our investigative efforts, we have found indications that inspector training and training programs have not kept pace with the technological advancements occurring within the industry.  In any

reorganization effort, MMS should consider formalizing and updating its inspector training program and conduct periodic reviews of the program to ensure inspectors receive the proper and current training to keep pace with technological advancements and procedural changes.

We also have questions about MMS' enforcement programs.  In the royalties arena, we have been told repeatedly that, historically, the Office of Enforcement takes action to encourage compliance rather than take a stronger deterrent approach.  During the past year however, we have been told that the Office of Enforcement may be taking a more aggressive approach.  In the operations and safety arena, we question whether the civil penalty regulations are tied appropriately to the seriousness of the violation and the threat to human safety, property and the environment.  Again, the regulations are sparse.

We have also had questions about the influence of industry on MMS in developing regulations.  While industry clearly has influence, MMS appears to have followed the proper legal processes in finalizing its regulations.  Because MMS relies heavily on the industry that it regulates in so many areas, however, the possibility for, and perception of, undue influence will likely remain.

While there is ample opportunity to improve and strengthen the regulations that govern MMS and the industry that extracts valuable resources from federal lands, the greatest challenge in reorganizing and reforming MMS lies with the culture – both within MMS and within industry.  As you know, the OIG has issued a plethora of reports critical of various practices and misconduct.  While each report included troubling accounts of inappropriate behavior on the part of certain MMS employees, that conduct was, for the most part, enabled by industry.  Secretary

Salazar and MMS have taken action to address the misconduct of MMS employees, have implemented and reinforced a new ethics policy, and have indicated some additional steps they intend to take to address some of the conflicts unique to MMS, given its closeness to and reliance upon industry.  But how do we address the conduct of industry representatives?  Perhaps it is time to impose some ethics requirements on companies doing business with the government.

      Mr. Chairman and members of the committee, this concludes my prepared testimony.  I would be happy to answer any questions that you may have.