

United States Department of the Interior

OFFICE OF INSPECTOR GENERAL
Washington, DC 20240

MAY 24 2010

Memorandum

To: Secretary Salazar

From: Mary L. Kendall
Acting Inspector General

Subject: Investigative Report – Island Operating Company, et. al.

With this memorandum, I am forwarding our investigative report entitled "Island Operating Company, et. al" which addresses a number of allegations that Minerals Management Service (MMS) employees at the Lake Charles District Office had accepted gifts from oil and gas production companies.

At the outset, I want to note that all of the conduct chronicled in this report occurred prior to 2007, and pre-dating your tenure as Secretary and your January 2009 Ethics Guide. While this conduct is dated, it is more evidence that there was, indeed, a much-needed change to the ethical culture of MMS.

Initially, the Office of Inspector General issued this investigative report according to our routine protocol, providing a copy to MMS and requesting a formal response in 90 days; upon receipt of that response, we would then provide copies of the report to cognizant committees, and post it to our website. Unfortunately, given the events of April 20 of this year, this report had become anything but routine, and I feel compelled to release it now. We have, however, already received a preliminary response from MMS to this report.

Of greatest concern to me is the environment in which these inspectors operate – particularly the ease with which they move between industry and government. While not included in our report, we discovered that the individuals involved in the fraternizing and gift exchange – both government and industry – have often known one another since childhood. Their relationships were formed well before they took their jobs with industry or government. MMS relies on the ability to hire employees with industry experience. I am pleased that MMS has advised us that it will enhance ethics training specifically for its inspectors to address this unique industry/government dilemma, and will establish controls, like a two year waiting period, to minimize the potential for conflicts of interest.

We appreciate MMS' prompt and thoughtful response to our report even as it responds to the *Deepwater Horizon* disaster in the Gulf of Mexico, and your announcement to reorganize MMS into three distinct bureaus.

If you have any questions or wish to discuss this report further, please do not hesitate to contact me.

Attachments



United States Department of the Interior

OFFICE OF INSPECTOR GENERAL
Washington, D.C. 20240

APR 1 2 2010

Memorandum

To:       S. Elizabeth Birnbaum
          Director, Minerals Management Service

From:    John E. Dupuy
          Assistant Inspector General for Investigations

Subject:  Report of Investigation – Island Operating Company et al.
          Case No. PI-GA-09-0102-I

      The Office of Inspector General recently concluded an investigation based on allegations that Minerals Management Service (MMS) inspectors in the Lake Charles District had accepted gifts from oil and gas production company representatives. These gifts reportedly included hunting and fishing trips from the Island Operating Company (IOC), an oil and gas production company working on oil platforms regulated by the Department.

      During our investigation, a number of MMS employees at the Lake Charles District office admitted to attending sporting events prior to 2007 in which oil and gas production companies sponsored teams, as well as receiving lunches and accepting gifts. Through numerous interviews, we found a culture where the acceptance of gifts from oil and gas companies were widespread throughout that office, but appeared to have declined after the investigation and termination of Don Howard in January 2007 for his acceptance of a gift from one of these companies.

      Two employees at the Lake Charles office also admitted to using illegal drugs during their employment at MMS. We found that many of the inspectors had e-mails that contained inappropriate humor and pornography on their government computers. Finally, we determined that between June and July 2008, one MMS inspector conducted four inspections of IOC platforms while in the process of negotiating and later accepting employment with that company.

      We are providing this report to you for whatever administrative action you deem appropriate. Please send a written response to this office within **90 days** advising us of the results of your review and actions taken. Also enclosed is an Investigative Accountability Form that should be completed and returned with your response. Should you need additional information concerning this matter, please contact me at (202) 208-5351.

Attachment



# Investigative Report

*Island Operating Company et al*

Report Date:  March 31, 2010
Date Posted to Web:  May 25, 2010

This report contains information that has been redacted pursuant to 5 U.S.C. §§ 552(b)(6) and (b)(7)(C) of the Freedom of Information Act.  Supporting documentation for this report may be obtained by sending a written request to the OIG Freedom of Information Office.

## RESULTS IN BRIEF

We initiated this investigation after receiving an anonymous letter, dated October 28, 2008, addressed to the U.S. Attorney's office in New Orleans, LA, alleging that a number of unnamed Minerals Management Service (MMS) employees had accepted gifts from oil and gas production company representatives. The complainant specifically suggested that MMS employees be investigated for accepting gifts, including hunting and fishing trips, from the Island Operating Company (IOC), an oil and gas production company working on oil platforms regulated by the Department of the Interior (DOI).

During the course of our investigation, a number of MMS employees at the Lake Charles, LA district office admitted to attending sporting events prior to 2007 in which oil and gas production companies sponsored teams, as well as receiving lunches and accepting gifts. Through numerous interviews, we found that a culture of accepting gifts from oil and gas companies was prevalent throughout the MMS Lake Charles office; however, when MMS supervisor Don Howard, of the New Orleans office, was investigated and later terminated in January 2007 for his gift acceptance, this behavior appears to have drastically declined.

During our investigation, two MMS employees at the Lake Charles office admitted to using illegal drugs during their employment at MMS.  We also found that many of the inspectors had e-mails that contained inappropriate humor and pornography. Finally, we determined that between June and July 2008, an MMS inspector conducted four inspections on IOC platforms while in the process of negotiating and later accepting employment with the company. We presented our findings to the U.S. Attorney's Office for the Western District of Louisiana, which declined prosecution. We are providing a copy of this report to the MMS Director for any administrative action deemed appropriate.

## BACKGROUND

MMS has leased areas in the Gulf of Mexico to about 130 qualified oil and gas companies such as Shell, Exxon, Chevron, British Petroleum, Apache Corporation, and Newfield Exploration Company. Approximately 4,000 offshore platform facilities are located in the Gulf of Mexico throughout four MMS districts in Louisiana – Lake Charles, Lafayette, New Orleans, and Houma – and one in Lake Jackson, Texas. The IOC is one of many companies contracting with oil and gas platform owners in the Gulf of Mexico to ensure that they operate in compliance with all applicable federal regulations. The Outer Continental Shelf Act requires that MMS inspect these platforms for safety and operational compliance and, if necessary, issue violations known as incidents of non-compliance to the owners of the facilities to correct deficiencies. Between 2004 and 2009, platform owners contracting with the IOC were fined $572,500 because of violations.

MMS also issues "safe awards" to both oil and gas companies and production companies with the lowest number of violations and civil penalties in each district. The safe awards are highly sought by production companies because they help demonstrate they are operating safely. The companies who receive these awards use them to promote and market their businesses. The IOC received the safe award for the Lake Charles district in 2004 and the Lafayette, LA district in 2006.

This investigation follows an investigation by our office into the activities of Don Howard, the former regional supervisor at the MMS office in New Orleans, who was terminated in January 2007 for accepting gifts from an offshore drilling contractor (Case No. PI-PI-06-0153-I). On November 5, 2008, Howard pled guilty to making false statements for failing to report those gifts on an OGE Form 450

(Office of Government Ethics Confidential Financial Disclosure Report). Prior to our investigation of Howard, receiving gifts such as hunting trips, fishing trips, and meals from oil companies appears to have been a generally accepted practice by MMS inspectors and supervisors in the Gulf of Mexico region. After 2007, the MMS Southern Administrative Service Center Human Resource Office in New Orleans began sending e-mails reminding employees that they were not allowed to accept gifts from prohibited sources.

## DETAILS OF INVESTIGATION

We initiated this investigation after receiving an anonymous letter, dated October 28, 2008, addressed to the U.S. Attorney's office in New Orleans, LA, alleging that a number of MMS district office personnel had accepted gifts, including admission to sporting events and hunting and fishing trips, from oil and gas production companies . The complainant specifically suggested that MMS employee interactions with the Island Operating Company should be investigated.

During our investigation, we reviewed hundreds of e-mails and financial disclosure reports from MMS employees. We also interviewed 15 MMS inspectors and supervisors. We developed confidential sources during our investigation, who provided additional information pertaining to MMS employees at the Lake Charles District Office, including acceptance of a trip to the 2005 Peach Bowl game that was paid for by an oil and gas company; illicit drug use; misuse of government computers; and inspection report falsification. During our review of MMS employee e-mails, we also obtained information that an MMS employee was negotiating for employment with the IOC while he was still performing inspections on platforms operated by the company.

*Gifts and Gratuities*

According to a confidential source, a number of Lake Charles office employees participated in shooting contests sponsored by offshore production companies. The source said these shooting activities happened in the past but were no longer occurring. The source also said that in approximately late 2005, an offshore operating company provided a former MMS inspector at the Lake Charles office who now works for the IOC with air transportation on a company plane to a college football game. The source thought the company also provided game tickets to this inspector but did not know for sure.

E-mails for MMS inspectors from the Lake Charles office revealed that in 2005, 2006, and 2007, various offshore companies invited MMS personnel to events such as skeet-shooting contests, hunting and fishing trips, golf tournaments, crawfish boils, and Christmas parties. Some e-mails confirmed that MMS inspectors attended these events.

In an e-mail dated January 3, 2006, to other MMS employees, the former MMS inspector at the Lake Charles office stated, "The 40 to 3 ass whipping LSU put on Miami was a lot more impressive in person. My daughter and I had a blast". The next day, the inspector sent another e-mail attaching pictures, including the plane on which he, and an oil and gas production company official, and others flew to Atlanta for the 2005 Peach Bowl game.

Confidential financial disclosure reports from 2005 through 2009 for Gulf of Mexico region employees document that only one individual reported receiving gifts and reimbursement for travel. We confirmed that all Gulf of Mexico region employees received annual ethics training.

**2**

Federal regulations and agency ethics rules prohibit employees from directly or indirectly soliciting or accepting gifts, including meals, over $20 at one time and $50 per year from a prohibited source. Federal employees are also prohibited from accepting gifts given in association with their official position. They are required to declare gifts and travel reimbursements aggregating over $335 during the reporting period, from any one source, as well as the identity of the source, in an annual financial disclosure report. For travel-related gifts in association with their official position, employees must document the travel itinerary, including dates, and the nature of the expenses.

We showed MMS Lake Charles District Manager Larry Williamson nine photos named, "LSU football pictures," that we discovered on a former MMS inspector's computer. Williamson identified two MMS inspectors in the pictures, which showed tailgating festivities at the Peach Bowl game.

According to Williamson, many of the MMS inspectors had worked for the oil and gas industry and continued to be friends with industry representatives. "Obviously, we're all oil industry," he said. "We're all from the same part of the country. Almost all of our inspectors have worked for oil companies out on these same platforms. They grew up in the same towns. Some of these people, they've been friends with all their life. They've been with these people since they were kids. They've hunted together. They fish together. They skeet shoot together ….They do this all the time."

Williamson said MMS began providing additional ethics training to employees regarding acceptance of gifts shortly after the Don Howard investigation. He said MMS made it clear that even having lunch with an industry representative would not be allowed. Williamson explained that MMS employees now leave meetings when meals are provided.

Williamson admitted to receiving a Casio watch that he valued at $20 from "PennEnergy" as a ceremonial remembrance gift approximately 5 or 6 years ago. According to Williamson, the watch stopped working after about 6 or 8 months.

Marcus Mouton, an MMS supervisory inspector, admitted that he participated in skeet-shooting fundraisers sponsored by nonprofit organizations and charities in the past. He said various offshore companies sponsored a five-person team at the events, which would cost the production companies about $500, or $100 per person, and he attended less than 10 over his career. He said he had thought participating in the events was acceptable because many MMS employees, including senior managers, attended and participated in them. He explained that he did not think offshore companies received any favors in exchange for inviting MMS inspectors to these events. According to Mouton, he stopped attending these events after the investigation of Howard and the appointment of a new regional manager.

We showed the photos of the Peach Bowl trip to Mouton, who identified Carlos Kibodeaux, a former foreman from Production Management Incorporated, an offshore production company that formerly operated in the Gulf of Mexico, and his wife; a MMS inspector and his wife; and another MMS inspector and his daughter.

When we interviewed one of the inspectors, he admitted that he had traveled to Atlanta, GA, for the 2005 Peach Bowl football game between Louisiana State University and the University of Miami. He said he attended the game with his wife, and another inspector attended with his daughter, and Kibodeaux and his wife.

**Agent's Note**: *Pictures of the tickets show that they each cost $70.*

This inspector claimed that he reimbursed Kibodeaux for the Peach Bowl tickets, gave the private pilot $100 to $200, and bought his own meals. He said he was not sure who paid for the hotel or ground transportation. He said he never thought to report the trip as a gift on his confidential financial disclosure report.

During a second interview with this inspector he told investigators that he had paid for his hotel room and gave the pilot a $100 tip but did not pay for the Peach Bowl tickets. He admitted that he should not have accepted the trip from Kibodeaux, even though they were friends, because of how others might perceive this. He explained that he was a "big LSU fan," and he could not refuse the tickets.

*Agent's Note*: *The inspector later sent an e-mail to the Office of Inspector General admitting to participating in several skeet-shooting events, including the 2009 "Evangeline Tournament". He said, however, that he paid his own entrance fee. He also admitted to winning two shotguns in drawings at two of the events between 2002 and 2005.*

An MMS clerical employee informed investigators that one inspector at the MMS Lake Charles Office, had told her "everyone has gotten some sort of gift before at some point" from an oil and gas company representative. She said that on a number of occasions, two former MMS inspectors frequently took most of the Lake Charles Office to lunch.

We interviewed one of the former MMS inspectors and he said that during his tenure at MMS, no offshore company or company official paid fees for him to hunt or fish. He admitted, however, to participating in five sport- and skeet-shooting fundraiser tournaments in which an oil and gas company paid the entrance fees for his team. He explained that participating in those tournaments "used to be an accepted practice," and "everybody was doing it." The inspector said he also remembered playing in a golf tournament sponsored by Baker Energy, but there was no entrance fee. In addition, he said that from 2000 through 2007, about six or seven times a year, various oil and gas companies paid for his meals. He stopped participating in many of these events, however, around the time the Office of Inspector General started investigating Howard, he said, and a once-accepted practice quickly became unaccepted.

This former inspector said he did not consider the trip to the 2005 Peach Bowl game to be a gift from an oil and gas company. He viewed it as three friends going to a football game. According to him, another MMS inspector called him and asked if he wanted to go to the game. He explained that Kibodeaux, a friend who worked for Production Management Incorporated, had an acquaintance or client who had scheduled the trip but could not make it. The inspector explained that no airfare was associated with the trip because Kibodeaux's acquaintance was already scheduled to go to Atlanta for a business meeting. He said he contributed $200 to $300 for fuel and gave the pilot another $200. In addition, the former MMS inspector declared that he gave another $100 to $150 for ground transportation and paid for his own meals. He could not provide any receipts to substantiate these costs.

After we showed the nine pictures to the former MMS inspector that we recovered from his computer, he identified Kibodeaux and his wife, another MMS inspector and his wife, his daughter, and himself.

We showed this former MMS inspector an e-mail dated April 6, 2006, in which he told an employee with Conoco Phillips, that he had accepted gifts from certain "good friends" in the oil and gas industry. The e-mail chain began with the inspector sending the Conoco Phillips employee an e-mail with the

4

subject line, "Civil Penalty Case recaps – 1st quarter 2006." He stated, "These are the fines that we assessed to different companies for breaking the rules." The Conoco Phillips employee responded, "[E]ver get bribed for some of that?" He replied, "They try all the time." The Conoco Phillips employee responded back, "[E]ver take em?" the inspector said, "I accept 'gifts' from certain people. But we have VERY strict ethic standards as you could imagine." The Conoco Phillips employee replied, "[C]ertain people, meaning women?" the inspector said, "No. meaning good friends that I wouldn't write up anyway."

When we asked the former MMS inspector to explain this e-mail, he replied, "Maybe I was referring to a skeet shoot. I don't know." He said admissions to skeet-shooting events were the only gifts he received from companies, which cost about $100 per person. He denied that he ever received a gift in exchange for not carrying out his official duties. He said he did, however, receive smaller gifts from production companies, including jackets, baseball caps, and pocket knives.

He admitted that after resigning from MMS in August 2008, he had taken MMS employees to lunch on about five occasions. Although the same employees did not attend every time, he explained that he had taken the majority of inspectors, and on one occasion two engineers were present as well. He claimed that he paid for those employees' lunches with his own personal funds, however, and the lunches did not exceed $10 per person.

Carlos Kibodeaux, owner of Contract Operator Production Services, an offshore production service company, told investigators that he had been the offshore manager of Production Management Incorporated from 2004 through 2006. He acknowledged that an MMS inspector and his daughter and another MMS inspector and his wife had accompanied him and his ex-wife to the 2005 Peach Bowl game. He said two of his friends had six tickets to the game but could not go, so they offered him the tickets. Since his friends owned the plane, they also told him they would drop him off in Atlanta and pick him up after a planned trip to Miami. Kibodeaux said he accepted the tickets and invited the two inspectors, the two biggest "LSU" fans he knew. Contrary to the inspector's statements, Kibodeaux indicated that collectively, he and the two inspectors gave the pilot $150 for fuel. Kibodeaux also said everyone paid for their own rooms, and he paid a total cab fare of $30 for the group.

Michael Saucier, the Regional Supervisor of Field Operations for MMS in New Orleans, LA, said he did not believe MMS employees could attend skeet-shooting events and fishing tournaments sponsored by oil and gas companies; however, he added that prior to the Howard investigation, many thought their attendance at those types of events was acceptable.

Another MMS lead inspector, said that with the exception of Howard, he had no knowledge of anyone else at MMS doing anything wrong. He claimed that he did not know many of the inspectors on a personal level and would not know about any instances of ethical lapses.

Another MMS inspector at the Lake Charles office, said he had no knowledge of anyone receiving entrance to skeet-shooting events, hunting trips, or gifts of any sort from offshore oil and gas companies. According to this inspector, after their departure from MMS, the two inspectors bought lunch for Lake Charles office inspectors, on a few occasions.

Another inspector at the MMS Lake Charles office, admitted that he participated in 12 different events paid for by offshore oil and gas companies, including production companies, such as golf tournaments, skeet-shooting events, and hunting and fishing tournaments during the course of his employment with MMS. He said he received a shotgun as a "door prize" at one of the events in 2002. He also said that

since his employment at MMS began in 2000, oil and gas company representatives bought him lunch about three or four times a year. He indicated, however, that "everything came to an end" after the investigation of Howard. An MMS inspector said MMS management told the inspectors, "If you all are going to shoot, pay your own way; don't accept any more invitations."

According to this MMS inspector, what the oil and gas companies received for paying inspectors' entrance fees and buying their lunch was a "better working relationship." He said the companies were not "buying the inspectors off" by hunting, fishing, or being friends with them. He claimed that he had never ignored his duties as an inspector by not writing a violation or incident of noncompliance because of friendship or gifts.

### *Illegal Drug Use*

In addition to providing information about the Peach Bowl trip, the confidential source claimed that an MMS inspector had used drugs, including crystal methamphetamine. The source claimed to have heard that this inspector might have used these drugs offshore on the platforms.

An MMS clerical employee told investigators that she began using cocaine and methamphetamine with an inspector when she started working at MMS approximately 2 years ago. According to the clerical employee, the inspector recently told her that he had not used crystal methamphetamine in the past 3 or 4 months. While the clerical employee said she had no knowledge of the inspector's use of drugs while at work, she said that in the past, he had used crystal methamphetamine the night prior to coming to work at MMS.

During his interview, the MMS inspector initially denied using crystal methamphetamine, but he later admitted to it. He claimed that the last time he used crystal methamphetamine was the weekend of the 2009 Super Bowl, in February. He explained that he had never possessed or used crystal methamphetamine while at work but admitted that he might have been under the influence of the drug at work after using it the day before.

### *Inappropriate Use of Government E-Mail*

The confidential source also informed us that some of the MMS Lake Charles inspectors had pornography or other improper materials saved on their MMS computers.

Federal and department regulations prohibit the use of government office equipment for activities that are illegal, inappropriate, or offensive to coworkers or the public. This includes the use of e-mail to either send or receive sexually explicit or discriminatory material, gambling, or communications that ridicule others on the basis of race, creed, religion, color, gender, disability, age, national origin, or sexual orientation.

We reviewed the e-mail accounts of MMS employees at the Lake Charles and New Orleans offices from 2005 to 2009. We found numerous instances of pornography and other inappropriate material on the e-mail accounts of 13 employees, six of whom have resigned**.** We specifically discovered 314 instances where the seven remaining employees received or forwarded pornographic images and links to Internet websites containing pornographic videos to other federal employees and individuals outside of the office using their government e-mail accounts.

*Falsification of Inspection Forms*

Another confidential source told investigators that some MMS inspectors had allowed oil and gas production company personnel located on the platform to fill out inspection forms. The forms would then be completed or signed by the inspector and turned in for review. According to the source, operating company personnel completed the inspection forms using pencils, and MMS inspectors would write on top of the pencil in ink and turn in the completed form.

We reviewed a total of 556 files to look for any alteration of pencil and ink markings, notations, or signatures. We found a small number with pencil and ink variations; however, we could not discern if any fraudulent alterations were present on these forms. According to a lead MMS inspector, MMS inspectors often used pencil to complete inspection forms. He said that anyone from MMS involved in the platform inspections could author the inspection form, and inspectors routinely signed each other's names on the forms.

*Seeking Employment*

During our review of MMS employee e-mails, we found several referencing employment discussions between a former MMS inspector and the IOC. According to the Ethics Guide for DOI Employees, federal employees are required to receive a written waiver from an ethics counselor before participating in any particular matter at DOI that affects the financial interest of a prospective employer. The Office of Government Ethics interprets any form of communication regarding prospective employment with a nonfederal source to be seeking employment, other than requesting a job application.

In a June 12, 2008 e-mail, an IOC employee, told a former MMS inspector the IOC would like to hire him in the compliance department. In an e-mail dated June 16, 2008, the inspector discussed his excitement about coming back to work for the business with another IOC employee. The inspector said, "I'm excited about coming back to work with IOC. Do you think [an IOC official] would go with $65,000 a year? And all the trimmings you told me about." The IOC employee replied on June 17, 2008, "Yes I think [he] will. When you hire on you will talk to him". On June 19, 2008, the IOC employee urged the inspector to come to the IOC and meet with "[an IOC official]" regarding potential employment.

**Agent's Note**: *The inspector resigned from MMS on August 8, 2008, to work for the IOC.*

After discovering that the MMS inspector had engaged in employment negotiations with the IOC and later accepted a position, we conducted a review of inspections in the New Orleans district from 2005 through 2009 to determine if he conducted any of the inspections of the IOC. We discovered that the inspector, who was employed by MMS from July 2, 2007, through August 8, 2008, and had previously worked for the IOC, conducted 51 inspections of IOC platforms, 47 of them between October 1, 2007, and May 19, 2008, resulting in 16 incidents of noncompliance. After his employment negotiations began on June 12, 2008, the inspector conducted four inspections of IOC platforms, none of which resulted in an incident of noncompliance.

## DISPOSITION

On October 15, 2009, the U.S. Attorney's Office for the Western District of Louisiana declined this case for prosecution. This case is being referred to the Director of the Minerals Management Service for any action deemed appropriate.



# Investigative Report

*Donald C. Howard*

Report Date:  February 16, 2009
Date Posted to Web:  May 25, 2010

This report contains information that has been redacted pursuant to 5 U.S.C. §§ 552(b)(6) and (b)(7)(C) of the Freedom of Information Act.  Supporting documentation for this report may be obtained by sending a written request to the OIG Freedom of Information Office.

This investigation was initiated in 2006 based on allegations made by Chris Oynes, Regional Director, Gulf of Mexico Region (GOMR), Minerals Management Service (MMS), U.S. Department of the Interior (DOI), New Orleans. Oynes alleged that Donald C. Howard, Regional Supervisor, GOMR, had attended one or more hunting trips with officials of offshore oil and gas companies.

The investigation disclosed that between August 2004 and July 2006, Howard accepted an offshore fishing trip, two hunting trips involving transportation on a company airplane, meals, and other gifts from Rowan Drilling Company, Inc. (Rowan), an offshore drilling contractor affected by MMS regulations and decisions. These gifts were valued at approximately $6,678. Howard failed to report at least one of these gifts as required on a Confidential Financial Disclosure Report (Form OGE-450) he submitted to MMS in October 2005. Subsequent to receiving these gifts, and at the apparent request of Rowan, Howard improperly issued a letter directing Rowan to salvage the *Rowan Halifax*, a Rowan-operated, offshore drilling rig that sank in the GOMR during Hurricane Rita in September 2005. At the time, this letter appeared to be integral to Rowan's efforts to collect $90 million in insurance proceeds related to the sinking of the *Rowan Halifax* and other Rowan drilling rigs.

MMS terminated Howard's employment in January 2007 based on information provided to them by the OIG. On October 28, 2008, an information was filed against Howard in U.S. District Court for the Eastern District of Louisiana, charging him with one count of false statements (18 U.S.C. §1001). The charge stemmed from Howard's failure to report gifts he received from Rowan on the Form OGE-450 he submitted to MMS in October 2005. Howard pleaded guilty to the information on November 5, 2008. On February 3, 2009, Howard was sentenced to one year of probation. He was also ordered to pay a $3,000 fine and a $100 special assessment. In addition, he was ordered to perform 100 hours of community service at the "Rebuild Homeless Center" in New Orleans.

Based on the above, no additional investigation will be conducted and this case will be closed.