

**LEGAL LANGUAGE SERVICES**

A division of ALS International
8014 State Line Road
Suite 110
Leawood, KS 66208-3712

Telephone (913) 341-3167
Toll Free (800) 755-5775
Telefax (913) 341-3168
www.legallanguage.com

**July 30, 2010**
*30. Juli 2010*

**Certification:**
*Bestätigung:*

**This is to certify that the attached translation from English into German is an accurate representation of the document received by this office. This document is designated as:**
*Hiermit wird bestätigt, daß die beigefügte Übersetzung aus der englischen in die deutsche Sprache eine genaue Wiedergabe des von diesem Büro erhaltenen Schriftstücks ist. Das Schriftstück ist wie folgt bezeichnet:*

**Class Action Complaint**
*Gruppenklageschrift*

**I, Maria Victoria Portuguez, General Manager of this company, hereby certify that Eva Kafka, who translated this document, is fluent in German and standard North American English and qualified to translate. I attest to the following:**
*Ich, Maria Victoria Portuguez, Hauptgeschäftsführer/Hauptgeschäftsführerin von dieser Gesellschaft, hiermit bescheinige dass Eva Kafka, der/die dieses Schriftstück übersetzt hat, ist fließend in den deutschen und englischen Sprachen und qualifiziert für Übersetzungen. Ich attestiere das Folgende:*

**"To the best of my knowledge, the accompanying text is a true, full and accurate translation of the specified document."**
*"Nach meinem besten Wissen ist der beiliegende Text eine wahre, vollständige und genaue Übersetzung des angeführten Schriftstücks."*

**Signature of Maria Victoria Portuguez**
*Unterschrift von Maria Victoria Portuguez*

**Subscribed and sworn to before me this July 30, 2010.**
*Vor mir unterzeichnet und beeidigt am 30. Juli 2010.*

**Vicki Farron**
**Notary Public, State of Kansas**
**Qualified in Johnson County**
**Commission Expires December 9, 2012**

*Vicki Farron*
*Öffentlicher Notar des Staates Kansas*
*Qualifiziert in Bezirk Johnson*
*Ermächtigung läuft am 9.dezember 2012 ab*

**Sincerely,**
*Hochachtungsvoll,*

**Victor J. Hertz**
**President/***Präsident*

BEZIRKSGERICHT DER VEREINIGTEN STAATEN
BEZIRK FLORIDA-MITTE
ABTEILUNG FT. MYERS

THE CYNTHIA JOANNOU REVOCABLE
TRUST, VERTRETEN DURCH DIE
TREUHÄNDERIN CYNTHIA M. JOANNOU,
in eigenem Namen und und für alle in einer
ähnlichen Lage Befindlichen,

                    Kläger

gg.

BP, PLC, BP AMERICA, INC, BP PRODUCTS
NORTH AMERICA, INC., BP AMERICA
PRODUCTION COMPANY, BP EXPLORATION
& PRODUCTION INC., TRANSOCEAN, LTD.,
TRANSOCEAN OFFSHORE DEEPWATER
DRILLING, INC., TRANSOCEAN DEEPWATER,
INC., TRANSOCEAN HOLDINGS, LLC, TRITON
ASSET LEASING GMBH, HALLIBURTON
ENERGY SERVICES, INC., ANADARKO
PETROLEUM CORP., ANADARKO E&P COMPANY
LP, MOEX OFFSHORE 2007, LLC UND CAMERON
INTERNATIONAL CORPORATION,

                    Beklagte

Zivilklage Nr. _____

## GRUPPENKLAGESCHRIFT

Die Klägerin Cynthia Joannou Revocable Trust strengt diese Klage durch ihre Treuhänderin Cynthia M. Joannou („Klägerin") in eigenem Namen und für eine nachstehend definierte Gruppe gegen die nachstehend aufgeführten Beklagten (zusammenfassend die „Beklagten") an und behauptet wie folgt:

## ART DER KLAGE

1.        Dies ist eine gemäß Regel 23 der Bundeszivilprozessordnung im Namen aller Eigenheimbesitzer in Florida und aller Mieter bzw. Leasingnehmer von Immobilien in Florida, deren Genuss der Immobilie durch die Explosion der mobilen Bohrinsel *Deepwater Horizon* am 20. April 2010, deren Brand und das daraus resultierende Ölleck gestört wurde und/oder die in Folge des vorstehend Aufgeführten einen Wertverlust ihrer Immobilie erlitten haben (die „Gruppe"), angestrengte Gruppenklage. Als direkte Folge der Fahrlässigkeit der Beklagten wurde am Abend des 20. April 2010 die Ölplattform *Deepwater Horizon* durch eine Explosion und durch Brand auseinander gerissen, wobei elf Arbeiter ums Leben kamen. Das dadurch verursachte Ölleck hat schwerwiegenden Umwelt- und wirtschaftlichen Schaden verursacht, einschließlich der Entwertung und des Eindringens in Immobilien und persönlichen Besitz.

2.        Jüngsten Schätzungen zufolge beläuft sich das durch das Ölleck austretende Öl auf 35.000 bis 60.000 Barrel pro Tag, was nahezu 9,4 Millionen Liter (2,5 Millionen Gallonen) am Tag entspricht. Bei der *Exxon Valdez* Ölkatastrophe im Jahr 1989 traten schätzungsweise 40,8 Millionen Liter Öl (10,8 Millionen Gallonen) in den Prince William Sound in Alaska aus. Neue Schätzungen legen nahe, dass ungefähr alle vier Tage ein dem bei der *Exxon Valdez* Ölkatastrophe ausgetretenen Öl vergleichbares Ausmaß an Öl in den Golf von Mexiko fließen könnte.

3.        Wie nachstehend näher erläutert, haben die Klägerin und die Mitglieder der Klägergruppe in Folge des fahrlässigen Verhaltens der Beklagten, das zu der Explosion, dem Brand und Ölleck geführt hat und durch deren nicht angemessene Reaktion einen erheblichen Wertverlust ihrer Immobilien erlitten. Der Klägerin und den Mitgliedern der Klagegruppe ist in Folge des Gestanks und der Dämpfe, die durch das massive Ölleck und den Einsatz von Chemikalien an der Küste von Florida auftreten, auch ein erheblicher und unzumutbarer Eingriff in die Nutzung und den Genuss ihrer Immobilie entstanden.

4.        In den letzten zehn Jahren sind durch Umweltkatastrophen bei Anlagen von BP mindestens 26 Arbeitnehmer ums Leben gekommen, sie haben die größte durch Öl verursachte Umweltkatastrophe in der Region „North Slope" in Alaska verursacht und nun einige der besten Küstenlebensräume des Landes verschmutzt.

5.      Präsident Barack Obama betonte in seiner Rede vom 2. Juni 2010 in Pittsburgh PA seinen Verdacht, dass es sich bei dem Ölleck um einen Unfall handelte, der hätte vermieden werden können und erklärte, „dass die Katastrophe, die sich jetzt im Golf von Mexiko abspielt, möglicherweise auf menschliches Versagen zurückzuführen sein wird – oder auf die Tatsache, dass Unternehmen gefährliche nachlässige Verhaltensweisen praktizieren, die die Sicherheit aufs Spiel setzen.“

6.      Den Beklagten war Sicherheit wichtiger als Profit und sie sparten Millionen Dollar, indem sie das Erstellen notwendiger technischer Dokumente unterließen, keinen akustischen Sicherheitsschalter installierten, der auf zahlreichen anderen Bohrinseln eingesetzt wird, die Sicherheitsvorschriften ignorierten und den Zementierungsprozess beschleunigten, indem sie die Anzeichen ignorierten, die darauf hinwiesen, dass der Blowout Preventer („BOP“), ein wichtiger Sicherheitsmechanismus bei Offshore-Ölbohrungen, schwer beschädigt und nicht in der Lage war, ordnungsgemäß zu funktionieren und indem sie die Installation wichtiger Sensoren unterließen, mit denen der Motor der Bohrinsel hätte ausgeschaltet werden können, bevor er außer Kontrolle geriet und explodierte.

## ZUSTÄNDIGKEIT UND GERICHTSSTAND

7.      Dieses Gericht ist für alle hierin vorgebrachten Klagegründe gemäß 28 U.S.C. § 1332(d) zuständig, weil die Forderungen der Klägerin und der Gruppe insgesamt den Betrag bzw. einen Wert von $ 5.000.000 übersteigen und mindestens ein Mitglied der Gruppe Staatsbürger eines anderen Staates als des Staates ist, dessen Staatsbürgerschaft die Beklagten haben und gemäß 28 U.S.C. § 1332(a), weil zwischen den Parteien vollständige Verschiedenheit der Staatsangehörigkeit besteht und der Streitwert abzüglich Zinsen und Kosten höher als fünfundsiebzigtausend Dollar ($ 75.000,00) ist.

8.      Der Gerichtsstand fällt gemäß 28 U.S.C. § 1391(a)(2) ordnungsgemäß in diesen Bezirk, weil ein erheblicher Teil der Immobilien, die Gegenstand dieser Klage sind, in diesem Bezirk liegen.

## DIE PARTEIEN

9.      Die Klägerin The Cynthia Joannou Revocable Trust, vertreten durch die Treuhänderin Cynthia M. Joannou, ist Besitzerin einer direkt im Golf von Mexiko am Strand gelegenen Immobilie in Barefoot Beach im Bezirk Collier County, US-Bundesstaat Florida. Als Besitzerin einer an der Golfküste von Florida gelegenen Immobilie wird die Beklagte derzeit auf Grund des Gestanks des näher rückenden Öls daran gehindert, ungestört ihre Immobilie zu nutzen und in deren Genuss zu gelangen, wobei das Öl

in einigen Gebieten bereits die Strände von Florida erreicht hat. Als Besitzerin einer am Strand von Florida gelegenen Immobilie hat die Klägerin eine Wertminderung der Immobilie auf Grund des Öls erlitten, das in die Küstengebiete von Florida eingedrungen ist und weiter eindringen wird (gemäß der Definition in 43 U.S.C. § 1331(e)). Infolge der weiter oben und nachstehend geschilderten Ereignisse sind der Klägerin und den Mitgliedern der Klägergruppe Schäden entstanden, die nachstehend im Einzelnen weiter erläutert werden.

10.   Bei den Beklagten in dieser Angelegenheit handelt es sich um Folgende:

a)   BP, p.l.c., BP America, Inc., BP Products North America, Inc. BP America Production Company und BP Exploration & Production Inc. (zusammenfassend „BP") sind Unternehmen, die im Golf von Mexiko geschäftstätig sind. Die gerichtliche Zuständigkeit für eine Klage gegen diese Rechtsträger liegt gemäß einer oder mehreren Bestimmungen des Statuts des Bundesstaates Florida (Fla. Stat.) § 48.193 bei diesem Gericht, weil diese Unternehmen u.a. unerlaubte Handlungen zum Teil oder in Gänze in Florida begangen und der Klägerin und den Mitgliedern der Gruppe Schaden zugefügt haben:

i.   BP, p.l.c. ist ein internationales Unternehmen, das in den Vereinigten Staaten geschäftstätig ist und seinen Hauptsitz an der Adresse 1 St. James's Square, London, Großbritannien, hat. BP, p.l.c. unterhält eine Geschäftsstelle in den Vereinigten Staaten an der Adresse 501 Westlake Park Boulevard, Houston, Texas;

ii.   BP America Inc. ist ein Unternehmen mit Sitz in Delaware, das seinen Hauptsitz in Warrenville, Illinois hat.  BP America, Inc. ist zur Geschäftstätigkeit im Bundesstaat Florida zugelassen und ist dort geschäftstätig.

iii.   BP Products North America Inc. ist ein Unternehmen mit Sitz in Maryland, das seinen Hauptsitz in Houston, Texas hat. BP Products of North America, Inc. ist zur Geschäftstätigkeit im Bundesstaat Florida zugelassen und ist dort geschäftstätig.

     iv. BP America Production Company ist ein Unternehmen mit Sitz in Delaware und hat seinen Hauptsitz in Warrenville, Illinois. BP America Production Company ist zur Geschäftstätigkeit im Bundesstaat Florida zugelassen und ist dort geschäftstätig.

     v. BP Exploration & Production Inc. ist ein Unternehmen mit Sitz in Delaware und hat seinen Hauptsitz in Warrenville, Illinois. BP Exploration & Production Inc. ist zur Geschäftstätigkeit im Bundesstaat Florida zugelassen und ist dort geschäftstätig.

     vi. Die Beklagten BP America Inc., BP Products North America Inc., BP America Production Company und BP Exploration & Production Inc. sind hundertprozentige Tochtergesellschaften der globalen Muttergesellschaft BP p.l.c.;

     vii. BP ist Inhaberin eines Leasevertrags, der vom US-Innenministerium für Mineralverwaltungsdienste („Mineral Management Services") gewährt wurde, einer Regierungsbehörde, die den Meeresboden des Golfs von Mexiko in rechteckige „Blöcke" unterteilt und dann die Rechte für Öl- und Erdgasbohrungen auktioniert. BP war gemeinsam mit Anadarko und MOEX Inhaberin des Leasevertrags für den Mississippi Canyon Block 252, der ihr gestattete, Bohrungen zur Erschließung von Öl und mit der Ölförderung verbundene Aktivitäten in dem Pachtgebiet Macondo („Macondo") vorzunehmen. Am 20. April 2010 war BP eine Betreiberin von *Deepwater Horizon*.

b)  Transocean, Ltd. („Transocean Ltd.") ist ein Schweizer Unternehmen. Transocean Ltd. unterhält wichtige US-Niederlassungen an der Adresse 4 Greenway Plaza, Houston, Texas 77046. Transocean, Ltd. ist Inhaberin, geschäftsführende Inhaberin, Inhaberin nur für diese Angelegenheit („pro hac vice") und/oder Betreiberin der *Deepwater Horizon* und beteiligte sich an den Offshore-Ölbohrungen der *Deepwater Horizon* im Ölfeld Macondo. Die *Deepwater Horizon* war eine $ 560.000.000,00 Halbtauchkonstruktions-Ölplattform für extrem tiefe Gewässer. Zu den

hierfür relevanten Zeiten stand die *Deepwater Horizon* im Besitz von Transocean, war jedoch für einen Zeitraum bis einschließlich September 2013 an BP verleast;

c) Transocean Offshore Deepwater Drilling, Inc. („Transocean Offshore") ist ein Unternehmen mit Sitz in Delaware, das seinen Hauptsitz in Houston, Texas hat. Transocean Offshore ist Inhaberin, geschäftsführende Inhaberin, Inhaberin nur für diese Angelegenheit („pro hac vice") und/oder Betreiberin der *Deepwater Horizon* und beteiligte sich an den Offshore-Ölbohrungen der *Deepwater Horizon* im Ölfeld Macondo;

d) Transocean Deepwater, Inc. („Transocean Deepwater") ist ein Unternehmen mit Sitz in Delaware, das seinen Hauptsitz in Houston, Texas hat. Transocean Deepwater ist Inhaberin, geschäftsführende Inhaberin, Inhaberin nur für diese Angelegenheit („pro hac vice") und/oder Betreiberin der *Deepwater Horizon* und beteiligte sich an den Offshore-Ölbohrungen der *Deepwater Horizon* im Ölfeld Macondo;

e) Transocean Holdings, LLC („Transocean Holdings") ist eine Gesellschaft mit beschränkter Haftung mit Sitz in Delaware, die ihren Hauptsitz in Houston, Texas hat. Transocean Holdings ist Inhaberin, geschäftsführende Inhaberin, Inhaberin nur für diese Angelegenheit („pro hac vice") und/oder Betreiberin der *Deepwater Horizon* und beteiligte sich an den Offshore-Ölbohrungen der *Deepwater Horizon* im Ölfeld Macondo;

f) Triton Asset Leasing GmbH („Triton") ist ein verbundenes Unternehmen von Transocean Ltd. und ist eine Schweizer Gesellschaft mit beschränkter Haftung, die ihren Hauptsitz in Zug in der Schweiz hat. Triton ist Inhaberin, geschäftsführende Inhaberin, Inhaberin nur für diese Angelegenheit („pro hac vice") und/oder Betreiberin der *Deepwater Horizon* und beteiligte sich an den Offshore-Ölbohrungen der *Deepwater Horizon* im Ölfeld Macondo;

g) Die Beklagten Transocean Ltd., Transocean Deepwater, Transocean Offshore, Transocean Holdings und Triton werden im Folgenden zusammenfassend als „Transocean" bezeichnet. Die gerichtliche Zuständigkeit für eine Klage gegen Transocean liegt gemäß einer oder mehrerer Bestimmungen des Statuts des Bundesstaates Florida § 48.193 bei diesem Gericht, weil diese u.a. unerlaubte Handlungen teilweise oder zur Gänze in Florida begangen und der Klägerin und den Mitgliedern der Gruppe Schaden zugefügt hat. Nach Information und Glauben betrieb Transocean, beteiligte sich an und stellte Arbeitskräfte, Ausrüstung und Unterstützung zum Betrieb der mit den Bohrungen verbundenen Aktivitäten an der Offshore-Ölplattform *Deepwater Horizon* sowie für die auf dem Festland betriebenen Aktivitäten und Unterstützung zu allen relevanten Zeiten bereit.

h) Die US-Küstenwache hat offiziell sowohl BP als auch Transocean als verantwortliche Parteien bei diesem Unfall bezeichnet;

i) Halliburton Energy Services, Inc. („Halliburton") ist ein Unternehmen mit Sitz in Delaware, das seinen Hauptsitz in Houston, Texas hat. Halliburton ist zur Geschäftstätigkeit im Bundesstaat Florida zugelassen und ist dort geschäftstätig. Halliburton befasste sich mit Aktivitäten und Unterstützung im Zusammenhang mit den Ölbohrungen für die *Deepwater Horizon* sowohl vor der Küste wie auch auf dem Festland. Die gerichtliche Zuständigkeit für eine Klage gegen die Beklagte Halliburton liegt gemäß einer oder mehrerer Bestimmungen des Statuts des Bundesstaates Florida § 48.193 bei diesem Gericht, weil diese u.a. unerlaubte Handlungen teilweise oder zur Gänze in Florida begangen und der Klägerin und den Mitgliedern der Gruppe Schaden zugefügt hat.

j) Anadarko Petroleum Corp. und Anadarko E&P Company LP (zusammenfassend „Anadarko") sind Rechtsträger mit Sitz in Delaware und haben ihren Hauptsitz in The Woodlands, Texas. Anadarko ist eine Erdöl- und Erdgasexplorations- und –förderungsgesellschaft, die gemeinsam eine Beteiligung von 25% am Leasing des Macondo-Ölfeldes besitzt. Die gerichtliche Zuständigkeit für eine Klage gegen Anadarko liegt gemäß einer oder mehrerer Bestimmungen des Statuts des Bundesstaates Florida §

48.193 bei diesem Gericht, weil diese u.a. unerlaubte Handlungen teilweise oder zur Gänze in Florida begangen und der Klägerin und den Mitgliedern der Gruppe Schaden zugefügt hat;

    i)   Anadarko Petroleum Corp. ist ein Unternehmen mit Sitz in Delaware;

    ii)  Anadarko E&P Company LP ist eine Gesellschaft mit beschränkter Haftung mit Sitz in Delaware;

k)  Die Beklagte MOEX Offshore 2007, LLC („MOEX") ist ein Unternehmen mit Sitz in Delaware, das seinen Hauptsitz in Houston, Texas hat. MOEX besitzt eine Beteiligung von 10% an dem Leasing des Macondo-Ölfelds. Die gerichtliche Zuständigkeit für eine Klage gegen MOEX liegt gemäß einer oder mehreren Bestimmungen des Statuts des Bundesstaates Florida § 48.193 bei diesem Gericht, weil diese u.a. unerlaubte Handlungen teilweise oder zur Gänze in Florida begangen und der Klägerin und den Mitgliedern der Gruppe Schaden zugefügt hat.

l)  Cameron International Corporation, auch bekannt als Cooper-Cameron Corporation („Cameron"), ist ein Unternehmen mit Sitz in Delaware, das seinen Hauptsitz in Houston, Texas hat. Die Beklagte Cameron ist zur Geschäftstätigkeit im Bundesstaat Florida registriert und ist dort geschäftstätig. Die Beklagte Cameron fertigte, konstruierte, lieferte, installierte und/oder wartete die als „BOP" (Blowout Preventer) bekannte Untersee-Vorrichtung, die in der Ölquelle Macondo installiert war und verwendet wurde und die bei der Explosion versagte, unsachgemäß konstruiert war, nicht zum Einsatz in dem beabsichtigten Umfeld geeignet war und/oder mit Produktmängeln behaftet war. Die gerichtliche Zuständigkeit für eine Klage gegen Cameron liegt gemäß einer oder mehreren Bestimmungen des Statuts des Bundesstaates Florida § 48.193 bei diesem Gericht, weil diese u.a. unerlaubte Handlungen teilweise oder zur Gänze in Florida begangen und der Klägerin und den Mitgliedern der Gruppe Schaden zugefügt hat.

11.    BP ist Hauptinhaberin eines 34 Mio.-Leasingvertrags, der BP erlaubt, am Ort des Öllecks Bohrungen zur Suche nach Öl vorzunehmen, d.h. dem Ölfeld Macondo im Mississippi Canyon Block 252, der ungefähr 45 Meilen (72 km) von der Küste von Louisiana entfernt ist und auf dem äußeren Kontinentalschelf im Golf von

Mexiko liegt. BP leaste die Ölbohrinsel *Deepwater Horizon* am 20. April 2010 von Transocean, um die Bohrung von Explorationsquellen im Ölfeld Macondo vorzunehmen. Als Teil ihres Vertrags mit BP stellte Transocean Mitarbeiter, Auftragnehmer und andere Angestellte bereit, die die Beklagten BP, Anadarko und MOEX bei ihren Ölexplorations- und Produktionsaktivitäten am Standort Macondo unterstützten. Der Brand und die Explosion auf der *Deepwater Horizon*, deren Sinken und das dadurch entstandene Ölleck wurden durch die Fahrlässigkeit der Beklagten verursacht, die daher gegenüber der Klägerin und den Mitgliedern der Gruppe gesamtschuldnerisch für deren gesamten Schaden haftet.

**WICHTIGE BEHAUPTUNGEN**
**HINTERGRUND**

**Den Beklagten waren die mit Bohrungen in extrem tiefen Gewässern verbundenen Gefahren im Golf von Mexiko bekannt**

      12.    Bei Offshore-Bohrungen in extremer Tiefe werden Bohrungen in einer Tiefe von mehreren Tausend Meter im Meeresboden vorgenommen, um zu Hochdruck-Erdöllagern zu gelangen, die voller potenziell explosivem Erdgas sind. Daher sollten die Gefahren von Bohrungen in extremer Tiefe an und für sich im Allgemeinen nicht unterschätzt werden. Die geologischen Gegebenheiten des an Ölvorkommen reichen Golfgebiets – und der hohe Druck in extremer Tiefe – erschweren die Bohrungen und das Eindämmen von Öllecks. Die *Deepwater Horizon* befand sich 1.520 m (5.000 Fuß) unter Wasser und drang noch um weitere 13.000 Fuß um insgesamt 4,8 km weiter in die Tiefe vor. In diesen Tiefen befinden sich die Erdöl- und Erdgasvorkommen unter enorm hohem Druck.

      13.    Am Meeresboden des Golfs befinden sich riesige Salzlagen, die bei der Ölförderung eine zusätzliche Gefahr darstellen. Die Salzablagerungen bildeten sich, als der Golf von Zeit zu Zeit im Lauf der Äonen austrocknete. Die Salzlagen trockneten langsam und wurden gefaltet und durch die Einwirkung tektonischer Kräfte verbogen, so dass eine zerklüftete Salzlandschaft entstand, in der sich Öl- und Erdgasvorkommen verfingen. Da das Salz undurchdringlich ist, kann es Erdöl- und Erdgasvorkommen bei gefährlich hohem Druck verschließen. Ähnlich der Explosionskraft bei Vulkanen, die durch umfangreiche Gasvorkommen ausgelöst wird, die sich bei hohem Druck in flüssiges Gestein auflösen, quillt das Erdgas, oftmals mit gewaltigen Konsequenzen, heraus, wenn das unter dem Salz

9

eingeschlossene Gas anfängt, an die Oberfläche zu dringen. Viele Ölquellen des Golfgebiets in extrem tiefen Lagen sind voller Erdgas.

      14.    Zu dem Zeitpunkt, zu dem der regionale Plan von BP für das Ölleck im Golf von Mexiko vom MMS genehmigt wurde, war das MMS an einem Projekt zur Bewertung und Forschung zur Technik („TA&R") zur mechanischen Eindämmung und Beseitigung von Öllecks beteiligt. Es war bekannt, dass Bohrungen in tiefen Gewässern, die als Bohrungen in Gewässern mit einer Tiefe von über 300 m definiert werden, die Risiken einer Explosion (bei der das Öl in ein Rohr aus der Ölquelle hineinschießt und dabei die Ausrüstung zerstört) auf Grund der Schwierigkeiten beim Erkennen von Gasblasen und der Kontrollverfahren in tiefen Gewässern erhöht hatten.

      15.    Laut Angaben auf der MMS-Website wird das Eindämmen und Beseitigen von Öl im Meer (wo die Tiefseebohrungen stattfinden) zudem durch rauhen Seegang erschwert, der ein großes Ölleck, bei dem das Öl eine geringe Viskosität besitzt, wie z.B. leichtes oder mittelschweres Rohöl, „im Verlauf weniger Stunden über eine Fläche von vielen Quadratkilometern verbreiten kann. Systeme zum Beseitigen des Öls haben üblicherweise nur eine Breite von ein paar Metern und bewegen sich beim Entfernen des Öls nur langsam voran. Selbst wenn das Personal bei einem Unfall innerhalb von ein paar Stunden einsatzbereit sein kann, ist es diesem Personal daher unmöglich, mehr als nur einen Bruchteil des über eine große Fläche verbreiteten Schlicköls zu erreichen. Dies ist der Hauptgrund dafür, dass Eindämmung und Beseitigung auf hoher See selten zum Entfernen von mehr als nur einem relativ geringen Teil eines großen Öllecks führt, bestenfalls von 10 – 15 % des ausgetretenen Öls und oft erheblich weniger."

      16.    Historisch betrachtet ist der Einsatz von Dispergiermitteln nur bei 33% des auf diese Weise behandelten Öls wirksam.

**Der schlechte Ruf von BP in Bezug auf Sicherheitsmaßnahmen und die Unternehmenskultur, bei der Profit wichtiger als Sicherheit ist, führen zur Katastrophe**

      17.    Der Ruf von BP in Bezug auf Sicherheitsmaßnahmen ist seit Jahren Gegenstand kritischer Untersuchungen. Laut Angaben eines Berichts von *ProPublica*, der gemeinsam mit der Tageszeit *Washington Post* im Oktober 2000 veröffentlicht wurde, erklärte sich die Tochtergesellschaft von BP in Alaska, BP

Exploration Alaska, nachdem sie wegen der Entleerung von Giftmüll in ein Bohrloch, um dadurch Kosten zu sparen, eines Verbrechens verurteilt wurde, mit einer fünfjährigen Probezeit und einem Vergleich mit der Umweltbehörde „Environmental Protecton Agency" (EPA) bereit, um dadurch eine Ausschließung zu vermeiden, d.h. die Kündigung der Verträge von BP mit der Bundesregierung. Die Vereinbarung lief Ende 2005 aus. BP erklärte sich bereit, Schutzmaßnahmen für Mitarbeiter einzuführen, die sich zu Problemen bei Sicherheitsvorkehrungen äußerten und seinen Ansatz im Umgang mit Gefahren und Einhaltung von aufsichtsbehördlichen Vorschriften zu überholen. Als Mitarbeiter sich später gegenüber einem unabhängigen Schiedsrichter beklagten, dass die Ausrüstung und Sicherheitssysteme von kritischer Bedeutung viel zu wünschen übrig ließen, stellte BP unabhängige Experten zur Überprüfung dieser Behauptungen ein. Im Oktober 2001 brachten diese Experten den internen Bericht „Review of Operational Integrity Concerns At Greater Prudhoe Bay" (Überprüfen von Bedenken wegen der Betriebssicherheit am Standort Greater Prudhoe Bay) heraus und fanden heraus, dass die Dokumentaton von zentraler Bedeutung zum Status der Ausrüstung („as-built documentation"), eine wesentliche Sicherheitskomponente, die zur abschließenden Überprüfung eingesetzt wird, um sicherzugehen, dass die Ausrüstung ordnungsgemäß funktioniert, im Betrieb des Unternehmens am Standort Prudhoe Bay nicht gewartet wurde. Von besonderer Bedeutung war, dass laut Angaben der Experten die Sensoren zur Wahrnehmung von Gas und Feuer und die Abstellventile, die bei einem Unfall die Sensoren aktivieren, nicht angebracht waren. Diese Sensoren sind zum Abstellen des Motors einer Bohrinsel von ausschlaggebender Bedeutung, bevor diese auf Grund eines Erdgaslecks oder durch Zerplatzen explodiert.

18.      Im Mai 2002 erließen die staatlichen Aufsichtsbehörden von Alaska eine gerichtliche Anordnung, in der BP gewarnt wurde, dass sie die Wartung ihrer Pipelines unterlassen hatte.

19.      2004 warnte eine weitere interne Studie, diesmal von der Kanzlei Vinson & Elkins erstellt, dass die Korrosion der Pipeline eine Gefahr für die Betriebe von BP im Gebiet North Slope in Alaska darstelle und deckte ein Verhaltensmuster von BP zur Einschüchterung von Arbeitnehmern auf, die ihre Sicherheits- oder Umweltbedenken äußerten. Die Studie berichtete weiter, dass die Manager Wartungskosten durch die Praxis „Run to Failure" (Geräte solange ohne Wartung im Einsatz behalten, bis sie versagen) einsparten, bei der alternde Ausrüstung so lange wie möglich im Einsatz behalten wurde.

20.      Am 23. März 2005 kamen bei einer Explosion in der BP-Raffinerie in Texas City 15 Menschen ums Leben, nachdem ein Unfallwarnsystem versagt hatte. Nach der Explosion ergab der Befund von Experten, dass der Unfall möglicherweise durch routinemäßige Wartung hätte verhindert werden können, die jedoch durch den Druck zum Kostenabbau aufgeschoben worden war. Die

Untersuchung ergab, dass das Unternehmen einen Ölturm ohne Warnsystem wieder in Betrieb genommen hatte und BP wurde schließlich mit einer Geldstrafe von über $ 62 Millionen belegt und wegen eines kriminellen Verstoßes gegen das Gesetz zur Bekämpfung der Luftverschmutzung („Clean Air Act") verurteilt. BP Products North America Inc., die verantwortliche Tochtergesellschaft, wurde als von der Geschäftstätigkeit ausgeschlossenes Unternehmen gelistet und die Raffinerie in Texas City wurde als unzulässig für staatlich finanzierte Verträge betrachtet.

21.     2006 platzte eine schlecht gewartete Öl-Pipeline von BP und 757.000 l (200.000 Gallonen) Rohöl ergossen sich über die gesamte Region „North Slope" in Alaska. Dies war die gleiche Pipeline, für die im Jahr 2002 BP Anordnungen zur Überprüfung erhalten hatte und bei der das Unternehmen diese Warnung ignoriert hatte. Das Ölleck wurde darüber hinaus erst fünf Tage nach seinem Eintritt entdeckt. Ein Kongressausschuss befand später, dass BP alle Gelegenheiten zur Verhinderung des Öllecks ignoriert hatte und dass „drakonische" Kosteneinsparungsmaßnahmen zu nachlässigen Wartungspraktiken geführt hatten. Die Tochtergesellschaft des Unternehmens in Alaska wurde auf Grund eines Vergehens unter Verstoß gegen das Gesetz zur Bekämpfung der Wasserverschmutzung verurteilt und erneut als unzulässig für stattliche Verträge an ihrem Standort Prudhoe Bay erklärt. Diese Ausschließung ist nach wie vor in Kraft.

22.     Lauf Berichten von Regierungsbeamten hinkt BP in Bezug auf Sicherheitsmaßnahmen weiter hinter anderen Ölgesellschaften her. 2007 gelangte ein unabhängiges Prüfungsgremium zu dem Schluss, dass bei der Unternehmenskultur von BP Profit Vorrang vor Sicherheit hat.

23.     Am 30. Oktober 2009 kündigte das US-Ministerium für Sicherheit und Gesundheit am Arbeitsplatz („OSHA") eine Geldstrafe in Höhe von $ 87.430.000 für BP an, weil das Unternehmen es unterlassen hatte, potenzielle Gefahren für die Angestellten in der Raffinerie in Texas zu beheben, bei der es 2005 zu der Explosion gekommen war.  Dies ist die größte in der Geschichte des OSHA jemals verhängte Geldstrafe. Die größte in der Geschichte des OSHA zuvor verhängte Geldstrafe waren die $ 21 Millionen, mit denen BP im Jahr 2005 belegt worden war. Trotz dieser außerordentlichen Geldstrafen erklärte ein OSHA-Beamter im Jahr 2009, dass BP nach wie vor ernsthafte systemische Sicherheitsprobleme im gesamten Unternehmen habe.

24.       Ebenfalls im Oktober 2009 wurde ein Erdgasleck in einem Gasförderbetrieb von BP in Alaska übersehen, weil eine Zündflamme nicht gezündet war. Im Januar 2010 sandte der Energieausschuss („House and Energy Committee") BP ein Schreiben, in dem ausdrücklich auf die schwerwiegenden Sicherheitsprobleme und Produktionsunfälle in den vergangenen zwei Jahren im BP-Ölfeld Prudhoe Bay hingewiesen wurde.

25.       Im März 2010 wurde eine weitere Raffinerie von BP in Toledo, Ohio wegen „rücksichtsloser" Verstöße gegen Sicherheitsvorschriften einschließlich der Verwendung eines Ventils, das dem ähnelte, das zu der Explosion in Texas City beitrug, mit einer Geldstrafe von $ 3 Millionen belegt. BP hat in den vergangenen fünf Jahren allein in den USA Geldstrafen von $ 485 Millionen gezahlt.

26.       Aufsichtsbeamte stellen derzeit Nachforschungen zu Behauptungen eines Beschwerdeführers wegen Verstößen gegen Sicherheitsmaßnahmen bei einer anderen Offshore-Ölplattform von BP im Golf von Mexiko an. Ken Abbott wurde 2008 von BP zur Verwaltung Tausender technischer Zeichnungen eingestellt, die als Baupläne für die Ölplattform *Atlantis* von BP dienen. Diese Zeichnungen dienen auch als Bedienungsanleitung zum Abschalten der Plattform bei einem Unfall. Abbott behauptet, dass 89 Prozent dieser extrem wichtigen Zeichnungen von den Ingenieuren von BP nicht überprüft und genehmigt worden waren und dass 95 Prozent der Pläne für Untersee-Schweißungen ebenfalls niemals genehmigt worden waren. Die Anschuldigungen von Abbott werden durch interne E-Mails von BP unternauert. Der BP-Manager Barry Duff schrieb 2008, dass der Mangel an genehmigten Zeichnungen zu „katastrophalen Betriebsfehlern führen könnte". Dies ist das gleiche Problem, über das sich unabhängige Experten im Jahr 2001 beschwert hatten und das Problem ist nach wie vor von kritischer Bedeutung.  Abbott schätzt, dass BP durch das Verschlanken des Entwurfs-Prozesses$ 2 bis $ 3 Millionen gespart hat. Abbotts Vertrag wrude kurz nachdem er seine Beschwerden über den Mangel an Dokumentation von kritischer Bedeutung geäußert hatte, gekündigt.

27.       BP hat sich auch aggressiv gegen neue Sicherheitsbestimmungen gewehrt, die vom MMS, das zur Überwachung von Offshore-Bohrungen zuständig ist, vorgeschlagen wurden. So schlug das MMS zum Beispiel 2009 eine Bestimmung vor, nach der die Betreiber mindestens einmal im Jahr eine Überprüfung ihres Sicherheitsprogramms anstelle des selbstverwalteten Sicherheitsprogramms vornehmen lassen, das derzeit besteht. Der stellvertretende Geschäftsführer von BP für die Produktion im

Golf von Mexiko schickte als Antwort am 14. September 2009 ein Schreiben an das MMS, in dem er ausdrücklich erklärte, dass er die Bestimmungen nicht unterstütze und diese als „umfangreich" und „anordnungsmäßig" bezeichnete.

28.     Obwohl BP auf ihrer Website für ihr Sicherheitsprogramm wirbt und die Geschichte ihrer Sicherheitsmaßnahmen nach der Explosion öffentlich verteidigt hat, hat das Unternehmen in Wirkichkeit gegen die OSHA-Bestimmungen und die Statuten und Bestimmungen des US-Marinecorps verstoßen und hat sich geweigert, potenziell lebensrettende technische Einrichtungen zu installieren, die von zwei anderen bedeutenden ölproduzierenden Staaten zwingend vorgeschrieben sind. Erdöl- und Erdgasunternehmen dieser beiden Staaten verwenden einen akustischen Schalter als letztes Hilfsmittel zum Schutz gegen Unterwasserlecks. Mit einer Fernsteuerung kann eine Crew versuchen, ein Unterwasserventil zu aktivieren, mit dem die Bohrquelle auch dann abgestellt wird, wenn die Bohrinsel selbst beschädigt oder bereits evakuiert ist. Mit dieser Vorrichtung können BOP von einem Rettungsboot aus aktiviert werden, wenn die elektrischen Leitungen, die die Ventile mit der Bohrinsel verbinden, beschädigt sind. Weder die USA noch Großbritannien, wo BP seinen Hauptgeschäftssitz hat, schreiben die Verwendung eines akustischen Schalters vor, eine Sprecherin der norwegischen Behörde für Erdölsicherheit erklärte jedoch, dass die Schalter sich beim Einsatz in der Nordsee gut bewährt haben und bezeichnete diese als erfolgreiche und wirksame Option. Darüber hinaus verwenden einige Ölgesellschaften wie z.B. Royal Dutch Shell PLC und Total SA diese Vorrichtungen in manchen Fällen an Standorten, an denen deren Verwendung von den Aufsichtsbehörden nicht vorgeschrieben ist. In den USA wurde eine Vorschrift zum Einsatz des Mechanismus erwogen, aber die Bohrgesellschaften setzten sich gegen die neuen Bestimmungen ein, hinterfragten die Kosten und Wirksamkeit. Wenn BP sich wirklich für Sicherheit einsetzte, würde das Unternehmen neu vorgeschriebene Sicherheitsbestimmungen begrüßen und sich nicht gegen diese wehren.

29.     Sogar vor der Explosion am 20. April 2010 und der unzulänglichen Reaktion von BP auf das daraus herrührende Ölleck hatten Beamte der Umweltschutzbehörde EPA erwogen,  BP von der Annahme staatlicher Verträge auszuschließen. Die EPA hat seither Verhandlungen mit BP eingestellt, bis sie mehr über die Verantwortung wissen, die BP bei der Golfkatastrophe zukommt. Die EPA kann den Ausschluss von BP bei künftigen Verträgen in Betracht ziehen, nachdem „die Häufigkeit und das Muster der Unfälle , das Verhalten des Unternehmens sowohl vor wie nach den Unfälleen, Änderungen der

Richtlinien, Verfahren und Praktiken" in Betracht gezogen werden. Laut Auskünften aus Quellen von *ProPublica* wird die Behörde wahrscheinlich prüfen, ob der jüngste Unfall im Golf ein Beweis eines institutionellen Problems bei BP ist, eine Maßnahme, die einem Ausschluss vorangeht.

30.     Am 14. Juni 2010 sandte der Unterausschuss des US-Kongresses für Überwachungsmaßnahmen und Ermittlungen ein Schreiben an den Firmenchef von BP, Tony Hayward, in der im Einzelnen schwerwiegende Fragen zu den von BP in den Tagen und Stunden vor der Explosion getroffenen Entscheidungen auf der Deepwater Horizon aufgeworfen wurden. Das Schreiben erklärt im Einzelnen wie folgt:

> Am 15. April, fünf Tage vor der Explosion, bezeichnete der Bohringenieur von BP Macondo als „Alptraum-Ölquelle". Trotz der Probleme der Ölquelle scheint es, dass BP zahlreiche Entscheidungen aus wirtschaftlichen Gründen getroffen hat, die die Gefahr eines katastrophalen Versagens der Ölquelle verstärkten. Es scheint mehrfach der Fall zu sein, dass diese Entscheidungen gegen Industrierichtlinien verstoßen und trotz Warnungen der eigenen Angestellten und Auftragnehmer von BP erfolgten. Es scheint, dass BP sich wiederholt für risikoreiche Verfahren entschied, um Kosten und Zeit zu sparen und sich nur minimal um eine Eindämmung des zusätzlichen Risikos bemühte.

> Als es zum Platzen kam, war der Zeitplan bei der Ölquelle Macondo erheblich verspätet. Es scheint, dass dadurch Druck ausgelöst wurde, Verfahren zu vereinfachen, um den Abschluss der Ölquelle voranzutreiben. Ins besondere befasst sich der Ausschuss mit fünf Entscheidungen, die von BP getroffen wurden: (1) die Entscheidung, eine Konstruktion für die Ölquelle zu verwenden, bei der nur wenige Barrieren zum Gasfluss bestehen; (2) das Unterlassen, eine hinlängliche Anzahl von „Zentralisiervorrichtungen" zu verwenden, um die Bildung von Kanälen während der Zementierung zu verhindern; (3) das Unterlassen, einen Zementverbundbalken zum Bewerten der Zementierung einzusetzen; (4) das Unterlassen, potenziell erdgashaltigen Bohrschlamm aus der Ölquelle zu entfernen; (5) das Unterlassen, das Bohrloch mit einer feststellbaren Auskleidung zu sichern, bevor Druck aus der Tiefe auf die Abdichtung zugelassen wird. Diese fünf Entscheidungen haben alle das Merkmal gemeinsam, dass sie einen Kompromiss zwischen Kosten und Sicherheit der Ölquelle darstellten.

## Überblick über Probleme von Transocean im Zusammenhang mit BOPn und Verstößen gegen Sicherheitsvorschriften

31.     Interne Berichte von Transocean ergeben, dass dem Unternehmen die Probleme mit dem BOP mindestens seit 2003 bekannt waren. 2003 wies ein interner Bericht von Transocean mit dem Titel „BOP Kontrollsysteme in tiefen Gewässern" gezielt auf Probeme auf Grund mangelnder Zuverlässigkeit der Bowout Preventer und übereilt zum Einsatz gebrachte BOP, die nur beschränkt getestet worden waren, hin. 2008 verwies ein interner Bericht von Transocean zu Bohrungen in tiefen Gewässern ausdrücklich auf Probleme mit BOPn im Zusammenhang mit Bohrungen in tiefen Gewässern hin. Insbesondere wurde gezeigt, dass auf Grund der besonders starken, besonders widerstandsfähigen

Bohrleitungen, die in solchen Tiefen verwendet werden, die BOP oftmals die Leitungen nicht durchtrennen konnten, was eine wesentliche Voraussetzung für die Wirksamkeit eines BOPs ist.

32.     Transocean hat eine lange Geschichte von Problemen im Zusammenhang mit BOPn. Vor der *Deepwater Horizon* Katastrophe im April 2010 hatte sich die weltweit schlimmste Ölkatastrophe am 3. Juni 1997 bei der Ixtoc I Ölquelle im Golf von Mexiko ereignet. Die Ölquelle war von Sedco gebohrt worden, einer Vorgängerin von Transocean zur Zeit des Unfalls. Wie bei dem *Deepwater Horizon* Ölleck hing das Ölleck bei der Ixtoc I auch mit dem Versagen eines BOPs zusammen. Ebenfalls ähnlich wei bei der aktuellen Ölkatastrophe waren Metallkuppeln, die über der Ölquelle angebracht wurden, ebenfalls nicht in der Lage, die Lecks zu unterbinden. Bei dem Leck trat neun Monate lang Öl aus, durch das Meeres- und Küstenlebensräume und Fauna zerstört wurde und das die Küste von Texas und Mexiko mit Rohölklumpen übersähte.

33.     Im Jahr 2000 sandte BP eine „Standardmitteilung" an Transocean wegen Problemen mit einem BOP auf der Bohrinsel *Discover Enterprise* von Transocean zukommen. 2005 hatte ein britischer Gesundheis- und Sicherheitsbeamter berichtet, dass die Fernsteuerungskonsole des Blowour Preventers auf einer von BP in der Nordsee geleasten Bohrinsel nicht „in einem funktionsfähigen und bedienungsfähigen ordnungsgemäßen Zustand erhalten wurde und sich in keinem guten Zustand befand". 2006 erhielt Transocean von den britischen Aufsichtsbehörden einen Verweis auf Grund der Werkzeuge, die zu Drucktests für den BOP verwendet wurden. Die Aufsichtsbeamten gaben an, dass das Testwerkzeug für den BOP nicht „für den ihm zugedachten Zweck geeignet war und beim Einsatz versagte, *wodurch Personen Gefahren ausgesetzt wurden, die deren Sicherheit gefährdeten*" [mit besonderem Nachdruck].

34.     Transocean hatte auch zahlreiche Sicherheitsprobleme. Im Jahr 2000 fiel ein acht Tonnen schwerer Anker von einer Transocean Bohrinsel in den Golf von Mexiko und beschädigte eine Unterwasser-Pipeline, wodurch ein Ölleck von nahezu 100.000 Gallonen (378.500 l) ausgelöst wurde. 2003 kam es zu einem Brand auf einer Bohrinsel des Unternehmens vor der texanischen Küste, bei der ein Arbeiter ums Leben kam und mehrere weitere Arbeiter verletzt wurden. 2009 strich das Unternehmen Prämienzahlungen für Führungskräfte auf Grund einer Reihe von tödlich verlaufenen Unfällen in Betrieben des Unternehmens.

**Die vor Kurzem von Halliburton bei der Ölquelle Macondo vorgenommen Zementarbeiten**

35.      Halliburton oblag die Zementierung für die *Deepwater Horizon*, ein Prozess, bei dem Löcher in der Abdichtung der Pipeline gestopft werden, indem von der Bohrinsel Zement in diese gepumpt wird. Am Tag vor der Explosion hatten die Arbeiter von Halliburton gerade die Auskleidung der Ölquelle mit Zement fertig gestellt, wobei ein vorläufiger Zementverschlusspfropfen am unteren Ende der Leitung die Ölquelle verschloss. Aufsichtsbeamte haben Probleme beim Zementierungsprozess als Hauptursache bei Ölquellenexplosionen identifiziert. Wenn sich im Zement Risse bilden oder wenn der Zement sich nicht richtig verfestigt, können Erdöl und Erdgas austreten und letztendlich außer Kontrolle geraten. Laut Berichten des MMS waren 18 von 39 Explosionen im Golf von Mexiko seit 1996 auf schlechte Qualität bei den Arbeiten zum Einspritzen des Zements um die Metallleitung herum zurückzuführen. Nach Angaben des *Wall Street Journals* sind sich Bohrungsexperten darüber einig, dass Mängel beim Zementierungsprozess der *Deepwater Horizon* die ursprüngliche wahrscheinliche Ursache für an die Oberfläche gelangendes Gas waren. Robert MacKenzie, Geschäftsführer für Energie und Bodenschätze bei FBR Capital Markets und ehemaliger Zementierungsingenieur in der Erdölbranche, ließ verlauten, dass ein defekter Zementverschlusspfropfen am Boden der Ölquelle oder aber dass der zwischen der Leitung und den Wänden der Ölquelle befindliche Zement nicht richtig fest wurde und dadurch Gas austreten konnte, möglicherweise die Ursache des Problems war. Auf ähnliche Weise wurde festgestellt, dass die mangelhafte Zementierung von Halliburton der Grund für einen Brand im Jahr 2009 auf einer Bohrinsel war, der ein Ölleck vor der australischen Küste verursachte, bei dem zehn Wochen lang hunderttausende Liter Öl ins Mehr verströmten. Die Klägerin behauptet daher nach Information und Glauben, dass Halliburton die Zementierung bei der Ölquelle Macondo unsachgemäß und auf fahrlässige Weise durchführte und dadurch auf fahrlässige Weise die Explosion, den Brand und das daraus resultierende Ölleck verursachte.

36.      MacKenzie hat auch die Frage aufgeworfen, ob BP einen Zementverbundtest anordnete, der zur Beurteilung der Zementierung notwendig ist und um festzustellen, ob an der Zementierung Korrekturarbeiten vorgenommen werden müssen. Verfahren zur erneuten Zementierung sind auf Grund

der täglichen Leasing-Kosten für die Bohrinsel in Höhe von $ 500.000 kostspielig, sie hätten aber möglicherweise diese Katastrophe verhindern können.

**Der defekte BOP war von Cameron hergestellt worden**

37.     Ein Blowout Preventer („BOP") ist ein großes Ventil oben auf einer Ölquelle, das geschlossen werden kann, wenn die Bohrmannschaft die Kontrolle über die Formationsflüssigkeiten verliert. Durch Schließen dieses Ventils (gewöhnlich durch Fernsteuerung mittels hydraulischem Auslöser) erlangt die Bohrmannschaft wieder Kontrolle über das Reservoir und anschließend können Verfahren eingeleitet werden, um wieder die Kontrolle über den Druck der Formation zu erlangen und dadurch eine potenzielle Katastrophe durch Zerbersten zu vermeiden. Da BOP von kritischer Bedeutung für die Sicherheit der Mannschaft, der Bohrinsel, der Ölquelle und der Umgebung des Bohrstandorts sind, müssen BOP in regelmäßigen Abständen überprüft, getestet und erneuert werden, wobei die Abstände durch eine Kombination aus Risikoeinstufung, lokalen Gepflogenheiten, Art der Ölquelle und rechtlichen Auflagen bestimmt werden.

38.     BP hat öffentlich eingestanden, dass ihr BOP versagt hat und die Vorrichtung hat nicht auf wiederholte Versuche zu seiner Aktivierung unter Einsatz von U-Booten angesprochen. Laut der Tageszeitung *Houston Chronicle* hat BP berichtet, dass die hydraulischen Kontrollvorrichtungen des BOPs einige Lecks aufweisen.Nach Information und Glauben stellte Cameron die BOP für *Deepwater Horizon* her und/oder lieferte diese, und diese BOP waren defekt, weil sie nicht wie beabsichtigt funktionierten. Cameron haftet somit gegenüber der Klägerin und den Mitgliedern der Gruppe.

39.     Die Klägerin behauptet daher nach Information und Glauben, dass Cameron die bei der *Deepwater Horizon* verwendeten BOP auf unsachgemäße und fahrlässige Weise konstruiert hat und dadurch fahrlässig die Explosion, den Brand und das daraus resultierende Ölleck verursacht hat.

## DIE FAHRLÄSSIGKEIT DER BEKLAGTEN VERURSACHT MASSIVES ÖLLECK

40.     Nach dem Gesetz über Ölverschmutzung aus dem Jahr 1990 („OPA 90"), das nach der *Exxon-Valdez* Ölkatastrophe in Kraft trat, müssen staatliche Offshore-Leasingnehmer ihre Aktionspläne für den Fall eines Öllecks genehmigen lassen, bevor das MMS ihre Ölexplorationspläne genehmigen und Bohrlizenzen vergeben darf. Ein nach dem OPA 90 zwingend vorgeschriebener Aktionsplan für den Fall eines Öllecks „muss . . . die Verfügbarkeit von privatem Personal und der zur Beseitigung des größtmöglichen Ausmaßes  an Öl im Falle einer denkbar schlimmsten Ölkatastrophe erforderlichen Ausrüstung (einschließlich eines Öllecks durch Brand oder Explosion) identifizieren und vertraglich oder auf andere vom Präsidenten genehmigte Art und Weise gewährleisten und eine ernsthafte Bedrohung durch ein solches Ölleck abmildern oder verhindern." 33 U.S.C. § 1321(j)(5)(C)(iii). Regionale Aktionspläne für den Fall eines Öllecks müssen eine Beschreibung der „denkbar schlimmsten Ölkatastrophe" enthalten, wobei von einem unkontrollierten Austritt ausgegangen wird, der sich über 30 Tage hinzieht. 30 C.F.R. § 254.26. Ein Leasingnehmer muss den Umfang des „denkbar schlimmsten Öllecks" ermitteln und dann eine Beschreibung der Ausrüstung zu dessen Bekämpfung liefern, die zum Eindämmen und Beseitigen des ausgetretenen Öls „im größtmöglichen Umfang" eingesetzt wird. 30 C.F.R. § 254.26(a)&(d).  Der Leasingnehmer muss auch „die tägliche effektive Beseitigungskapazität" der Ausrüstung zur Bekämpfung des Öllecks berechnen, die zur Beseitigung des Öls eingesetzt wird. 30 C.F.R. § 254.26(d)(l). Die „tägliche effektive Beseitigungskapazität" der Summe der aufgelisteten Ausrüstung zur Beseitigung des Öls stellt den Gesamtbetrag des Öls dar, den der Leasingnehmer nach seinen Schätzungen bei einer unkontrollierten Explosion beseitigen kann.

41.     Der regionale Plan von BP im Falle eines Öllecks im Golf von Mexiko im Jahr 2009 war am 21. Juli 2009 von dem Regionalbüro des MMS für die äußere Kontinentalschelfregion im Golf von Mexiko genehmigt worden. Unter Zugrundelegung der erwarteten Größe und Ergiebigkeit des Öllagers, dessen Förderung BP anstrebte, schätzte BP, dass „das Volumen der höchsten Ölquellenkapazität für die Explorationsquelle" sich auf 250.000 Barrel Öl am Tag belaufen würde. BP gab an, dass die Ausrüstung für den Fall eines Öllecks, die sie in diesem Plan auflistete, bei Schlechtwetterbedingungen in der Lage

sein würde, 491.721 Barrel Öl am Tag abzufangen. BP gab auch an, dass sie ungefähr 5.500 bis 7.600 Barrel Öl am Tag durch Einsatz chemischer Dispersionsmittel dispergieren könne, wobei von der Annahme ausgegangen wurde, dass die Dispersionsmittel zu 90 Prozent wirksam sein würden.

42.      Wie oben angegeben war zum Zeitpunkt der Genehmigung bekannt, dass die Eindämmung und Beseitigung von Öl auf hoher See (wobei davon ausgegangen wird, dass sich die denkbar schlimmste Ölkatastrophe dort ereignen würde) bestenfalls 10 bis 15 Prozent des ausgetretenen Öls abdeckt und schlimmstenfalls „erheblich weniger". Trotzdem erklärte BP, dass sie 197 [sic] Prozent des täglich austretenden Öls bei einer unkontrollierten Explosion von 250.000 Barrel am Tag beseitigen könne. Zum Zeitpunkt der Genehmigung war ebenfalls bekannt, dass chemische Dispersionsmittel nur zu 33 Prozent wirksam sind. Und trotzdem unterbreitete BP einen Aktionsplan für den Fall einer Ölkatastrophe, der von einer Wirksamkeitsquote von 90 Prozent ausging.

43.      Der Aktionsplan des Unternehmens aus dem Jahr 2009, der erläuterte, was das Unternehmen im Fall eines Öllecks im Golf von Mexiko unternehmen würde, wies ernsthafte Mängel und mangelndes Verständnis des Umfelds auf, in dem die Bohrungen stattfanden.  Einer der Experten für wildlebende Tiere, den das Unternehmen in dem Plan als potenziellen Berater anführt, verstarb im Jahr 2005. Unter der Überschrift „anfällige biologische Ressourcen" werden in dem 528 Seiten schweren Dokument im Meer lebende Tiere einschließlich Walrossen, Seeottern, Seelöwen und Seehunden aufgeführt, wobei keine dieser Tiergattungen auch nur in der Nähe des Golfs anzutreffen sind. Die Namen und Telefonnummern mehrerer Meeresbiologen, an die sich das Unternehmen angeblich wenden würde, wenn es Unterstützung brauchte, sind veraltet und Hilfsdienste für im Meer lebende Tiere, die angeführt werden, existieren nicht mehr. Laut dem Dokument „ist BP Exploration and Production Inc. in der Lage, im größtmöglichen Umfang auf ein Ölleck des denkbar schlimmsten Ausmaßes bzw. auf eine ernsthafte Drohung eines solchen Öllecks, das durch die in unserem Explorationsplan vorgesehen Aktivitäten ausgelöst wird, zu reagieren".

44.      Am 10. März 2009 reichte BP einen 52 Seiten starken Explorationsplan für die *Deepwater Horizon* Ölquelle beim MMS ein, die eine Erklärung zu Umweltauswirkungen enthielt. Das

Unternehmen erklärte abschließend, dass es unwahrscheinlich bzw. buchstäblich unmöglich sei, dass ein durch seine Aktivitäten verursachter Unfall ernsthaften Schaden für die Strände, den Fischbestand, Tiere und die Fischerei hervorrufen könne. In dem von ihr eingereichten Plan hob BP wiederholt ausdrücklich hervor, dass es „unwahrscheinlich sei, dass durch die geplanten Aktivitäten ein durch einen Unfall hervorgerufenes Ölleck an der Oberfläche oder unter der Wasseroberfläche eintreten würde". Obwohl das Unternehmen einräumte, dass ein Ölleck sich auf alle vorgenannten Bereiche auswirken würde, vertrat BP die Ansicht, dass „auf Grund der Entfernung zum Festland (77 km bzw. 48 Meilen) und der Auffangkapazitäten, die in diesem Fall eingesetzt würden, mit keinen schwerwiegenden negativen Konsequenzen zu rechnen sei." Im Gegenzug gewährte das MMS BP die Erlaubnis, die Bohrungen mit der *Deepwater Horizon* aufzunehmen, obwohl BP nicht die gemäß dem Umweltschutzgesetz („National Environmental Policy Act") vorgeschriebene Studie zu Umweltauswirkungen eingereicht hatte. BP erklärte auch, dass Erdgas, das durch die Bohrleitungen an die Oberfläche dringen kann, wahrscheinlich nur eine nicht nennenswerte Gefahr darstellen würde. Die Regierung warnte BP jedoch, dass die Ansammlung von Gas ein ernsthafter Grund zu Bedenken sei und dass BP vorsichtig vorgehen solle. In den Wochen vor der Explosion gelangte soviel Gas an die Oberfläche, dass die Arbeiter jegliche Aktivitäten einstellen mussten, bei denen eine Flamme vorhanden war, einschließlich Rauchen, Kochen und Schweißen.

**Sicherheitsprobleme im Vorfeld der Katastrophe**

45.       Wie vor Kurzem in der Sendung *60 Minutes* berichtet, war Mike Williams der leitende Elektroniktechniker, der für die Computer und elektrischen Systeme auf der *Deepwater Horizon* zuständig war. Williams war für die Besitzerin der Bohrinsel, Transocean, tätig.

46.       Nach Angaben von Williams war eine frühere Macondo Ölquelle aufgegeben worden, weil ein Manager von BP den Bohrer zur Eile gedrängt hatte, was zum Bersten der Ölquelle führte. Der Zeit- und Geldverlust erhöhte den Druck, die Dinge schnell zu erledigen, während die zweite Ölquelle gebohrt wurde.

47.       Williams berichtete auch, dass während des Tests eines BOPs ein an Deck befindliches Mitglied der Crew versehentlich einen Steuerknüppel bewegte, während die Dichtung des BOPs geschlossen war und dadurch hunderttausende Pfund Druck ausübte und eine 4 m lange Bohrleitung durch den geschlossenen BOP zog.

Später entdeckte ein Arbeiter, der an die Oberfläche dringende Bohrflüssigkeit überwachte, „Gummiklumpen in der Bohrflüssigkeit. Er nahm an, dass es wichtig genug sei, um diese zwei Handvoll Gummiklumpen zusammenzutragen und sie zur Bohrhütte zu bringen. Ich erinnere mich, dass ich den zuständigen Vorgesetzten [von Transocean] fragte, ob dies ungewöhnlich sei. Er antwortete, „oh, das ist ohne Bedeutung".

48.     BP stellte eine renommierte Ölfeld-Dienstleistungsgesellschaft zum Testen der Widerstandsfähigkeit der Zementauskleidung der Ölquelle der *Deepwater Horizon* ein, schickte die Mitarbeiter der Firma jedoch elf Stunden vor der Explosion der Bohrinsel am 20. April nach Hause, ohne eine abschließende Prüfung durchzuführen, ein 9 bis 12-stündiges Verfahren, das als Zementverbundbalken bezeichnet wird und das von einem leitenden Mitarbeiter einer renommierten Zementierungsfirma als „der einzige Test, mit dem die tatsächliche Effizienz der Dichtung der Ölquelle wirklich festgestellt werden kann" bezeichnet wurde.

49.     Am Morgen vor der Explosion bestand laut Angaben von Williams bei dem Interview auf *60 Minutes* ein BP-Manager darauf, dass der „Schlamm", *der nötig ist, um den Druck in der Ölquelle zu dämmen*, vor dem Anbringen des dritten Zementverschlusspfropfens in der Ölquelle enetfernt werden solle, um die anschließenden Schritte zu beschleunigen. Bei der Fertigstellung der Ölquelle war geplant, dass ein Subunternehmer, Halliburton, drei Zementverschlusspfropfen wie Korken in der Säule anbringen sollte. Der Manager von Transocean wollte dies vornehmen, während die Säule voll mit schwerer Bohrflüssigkeit, sogenanntem „Schlamm" gefüllt war, um den Druck zu dämmen. Der Manager von BP wollte jedoch mit dem Entfernen des Schlamms beginnen, bevor der letzte Verschlusspfropfen eingesetzt worden war. Die Folge dieser Entscheidung war ein verminderter Druck zur Kontrolle der Ölquelle bevor alle Verschlusspfropfen angebracht worden waren.

50.     Um dieses verkürzte Verfahren erfolgreich vorzunehmen, war es von ausschlaggebender Bedeutung zu ermessen, ob die ersten beiden Verschlusspfropfen in der Lage sein würden, den Druck niedrig zu halten. Der BOP, der nach Angaben von Williams eine schadhafte Dichtung hatte, wurde zum Testen dieses Drucks verwendet. Ermittlungsbeamte haben auch herausgefunden, dass der Bowout Preventer ein Hydraulikleck und eine absterbende Batterie hatte. Obwohl Mitarbeiter von Transocean und BP entsprechende Informationen hatten, um die Zuverlässigkeit des BOPs in Frage zu stellen, ignorierten die Manager die warnenden Anzeichen und setzten die Verfahren fort.

51.    Gemäß den Anweisungen des Managers von BP begannen die Arbeiter mit dem Entfernen des Schlamms, bevor der letzte Verschlusspfropfen eingesetzt worden war. Die beiden anderen Verschlusspfropfen waren nicht in der Lage, dem unwahrscheinlich starken Druck einer in extremer Tiefe gebohrten Ölquelle standzuhalten und es kam zum Bersten.

52.    In der Nacht, in der sich die Katastrophe ereignete, befand sich Williams in seiner Werkstatt, als er hörte, wie Motoren der Bohrinsel außer Kontrolle gerieten. Entzündliches Gas, das aus der 4,8 km in der Tiefe befindlichen Ölquelle nach oben schnellte, schoss quer über die Decks und wurde in die Motoren hineingesogen, die die Generatoren der Bohrinsel antrieben. „Ich höre Zischen. Die Motoren sind am Überdrehen. Und auf einmal wurde die Beleuchtung in meiner Werkstatt immer heller und heller. Ich hörte ein entsetzliches Zischgeräusch. Und als das Zischgeräusch am lautesten war eine riesige Explosion."

53.    Ermittlungsbeamte haben jetzt in Erfahrung gebracht, dass Sensoren – und die Abschaltsysteme, die an diese angeschlossen gewesen wären – im Maschinenraum der *Deepwater Horizon* Bohrinsel nicht in Betrieb waren. Wie *ProPublica* in einer eidlichen Zeugenaussage vor einem vereinten *Deepwater Horizon* Ermittlungsgremium letzten Monat In New Orleans berichtete, gab der Deepwater-Mechaniker Douglas Brown an, dass der Gegenhalter-Mechanismus, der das Überdrehen der Motoren hätte verhindern sollen, anscheinend versagte, ebenso wie die Luftaufnahmeventile, die sich bei Eindringen von Gas in den Maschinenraum schließen sollten. Der Zustrom von Gas aus der Ölquelle gab den Motoren eine „stärker volatile Brennstoffmischung", erklärte er, und führte dazu, dass ihre Umdrehungen außer Kontrolle gerieten. Ein anderes System sollte aktiviert werden und die Motoren abstellen, aber dieses System versagte ebenfalls. Er erklärte, dass der Maschinenraum nicht mit einem Alarmsystem für Gas ausgestattet war, das den Strom hätte abschalten können. Wenn Gas aus einer geplatzten Stelle einer Pipeline austritt oder in der Nähe eines laufenden Motors herausplatzt, ist das so, als ob man bei einem Auto aufs Gaspedal tritt: „Der Motor saugt die Brennstoffdämpfe ein und gerät kreischend außer Kontrolle. Gas-Sensoren sind von kritischer Bedeutung zum Verhindern einer Explosion, weil sie den Motor einer Bohrinsel abschalten können, bevor es soweit kommt."

54.    Das Schreiben des Unterausschusses des US-Kongresses für Überwachungsmaßnahmen und Ermittlungen vom 14. Juni 2010 an den Firmenchef von BP, Hayward, geht im Einzelnen auf mehrere weitere nachlässige Vereinfachungen von Sicherheitsmaßnahmen seitens BP in den Stunden vor der Explosion ein. Durch Installieren des letzten Abschnitts der Stahlrohre in der Macondo Ölquelle am 19. April 2010 sparte BP schätzungweise $ 7 bis $ 10 Millionen ein, indem sie sich gegen eine sicherere Option entschied, die mehr Barrieren zwischen dem Gasstrom und der Ölquelle geschaffen hätte. Diese Entscheidung wurde trotz einer Überprüfung des Plans von BP Mitte April getroffen, in der empfohlen wurde, sich gegen die risikoreichere Opton zu entscheiden. Auf ähnliche Weise entschied BP, nur sechs „Zentralisiervorrichtungen" anstelle der empfohlenen einundzwanzig zu verwenden, obwohl Auftragnehmer davor gewarnt hatten, dass die Ölquelle ohne die empfohlene Anzahl von Zentralisiervorrichtungen ernsthafte Probleme wegen Gaszustrom haben könnte. Und schließlich verwendete BP keine „feststellbare Futterrohr-Auskleidung", die verhindert hätte, dass die Dichtung aus der Tiefe herausgedrückt wurde.

**Das Ölleck und die fahrlässige Reaktion von BP**

55.    Der durch die Explosion am 20. April verursachte Brand kam am Donnerstag, den 22. April 2010 zum Erlöschen, als die *Deepwater Horizon* um 15.21 Uhr Greenwhicher Zeit (10:21 a.m. CDT) ungefähr 68 km (42 miles) vor der Küste von Louisiana unter die Wasseroberfläche sank und das Öl auszutreten begann. Am Nachmittag desselben Tages hatte sich eine acht km lange Ölschlickspur vom Unfallort ausgebreitet.

56.    Unbemannte Unterseeboote, die Stunden nach der Explosion eintrafen, konnten das Abschaltventil des BOPs am Meeresboden nicht aktivieren.

57.    Die Reaktion von BP auf die Katastrophe war auf kritische Weise säumig und BP spielte von Anfang an die Schwere des Problems gegenüber den Gemeinden der Golfküste herunter. Tagelang nach Eintritt des Öllecks versicherte BP gegenüber der US-Küstenwache, dass das Leck unter Kontrolle gebracht werden könne und keine Katastrophe darstelle. In Folge dessen nahm die Küstenwache bis eine Woche nach der Explosion keine Unfallmaßnahmen in vollem Umfang vor. Bis zum Abend des 28. April 2010 verließ sich die Küstenwache bei der Einstufung und Reaktion auf BP. In Folge der falschen

Zusicherungen und unwahren, von BP angegebenen Informationen gab die Küstenwache ursprünglich bekannt, dass weder aus dem Bohrloch am Meeresboden noch an der Oberfläche Öl austrete.

58.     Als es offensichtlich wurde, dass ein Ölleck vorhanden war, schätzte BP, dass das Leck sich auf nur 1.000 Barrel (195.000 l) am Tag belief und spielte dadurch die Katastrophe drastisch herunter und erklärte durch die Küstenwache, dass ausreichend Zeit zum Schutz anfälliger Gebiete und Vorbereitungen zur Säuberung sei. Am 28. April fanden bundesstaatliche Experten heraus, dass die Ölleckquote mindestens bei 5.000 Barrel am Tag lag. Ausgehend von diesen Informationen starteten das Weiße Haus und die Küstenwache am 29. April, sieben Tage nach der Explosion, eine vollumfängliche Reaktion auf die Katastrophe. Aktuellen Schätzungen zufolge liegt das Leck bei 35.000 bis 60.000 Barrel Öl am Tag (bis zu 9 Mio. Liter am Tag), möglicherweise sogar 100.000 Barrel am Tag. Durch das Verhalten von BP wurde somit die kritische Reaktion auf die Katastrophe, die die Gemeinden an der Golfküste dringend benötigten, bewusst verzögert.

59.     Laut Nachforschungen des Kongresses versuchten Ingenieure von BP in den Tagen nach der Explosion, den BOP zu aktivieren, waren dazu jedoch nicht in der Lage, weil die Vorrichtung so stark abgeändert worden war, dass Abbildungen, die BP von Transocean erhielt, nicht mit der Vorrichtung übereinstimmten. Nach Angaben des demokratischen Abgeordneten Bart Stupak aus Michigan, Vorsitzender des Unterausschusses für Überwachungsmaßnahmen und Ermittlungen des Ausschusses für Energie und Gewerbe „wurde die wertvolle Zeit eines ganzen Tages darauf verwendet, Rammen zu betätigen, die sich in die falsche Richtung schlossen", weil die Vorrichtung abgeändert worden war. BP und Transocean beschuldigen sich gegenseitig, diese Abänderung vorgenommen zu haben.

60.     Seit der Explosion hat BP ohne Erfolg mehrere Taktiken ausprobiert, um das herausschießende Öl abzustellen, einschließlich des „Top Kill" Verfahrens, mit dem das Öl wieder in das Bohrloch zurückgedrängt werden sollte, damit dieses dann verschlossen werden konnte und eine Metallkuppel („top hat"), mit der das Öl nicht nach oben in Tankschiffe befördert werden konnte. Nach Angaben von Dr. Ira Leifer, einem Forscher am Marine Science Institute der Universität von Kalifornien und Mitglied

der Flow Rate Group von Präsident Obama, scheint es, dass der „Top Kill" Versuch das Ölleck noch beschleunigt hat.

61.     BP untertreibt sogar jetzt noch das Ausmaß des Öllecks im Golf. Der Firmenchef von BP, Tony Hayward, äußerte gegenüber dem Guardian, „Der Golf von Mexiko ist ein riesiger Ozean [sic]. Der Umfang des Ölvolumens und der Dispergiermittel, die wir ins Wasser geleitet haben, ist winzig im Vergleich zu dem Gesamtvolumen des Wasssers." Und die letzten Bemühungen, das Ausfließen des Öls zum Stillstand zu bringen, haben möglicherweise das Austreten des Öls noch um 20 Prozent *erhöht*, im Gegensatz zu der von BP geäußerten Behauptung, dass jetzt der „Großteil" des Öls abgefangen und in einen Tanker geleitet wird. Auch wenn die neue Vorrichtung zur Erfassung des Öls 15.000 Barrel Öl pro Tag in ein an der Oberfläche befindliches Schiff leitet, schießt das Öl nach wie vor aus der Ölquelle heraus. Bei den jüngsten Bemühungen wurde u.a. versucht, am 2. Juni 2010 ein Steigrohr zu durchtrennen, wodurch der Umfang des austretenden Öls erhöht wurde.

62.     Mit Stand vom 14. Juni 2010 sind schätzungsweise 60 bis 90 Millionen Gallonen Öl in das Meeresökosystem am Golf eingeströmt. Es könnte Monate dauern, bis eine Entlastungsbohrung vorgenommen wird, um das Leck zu schließen. Bei der derzeitigen Ausflussgeschwindigkeit des Lecks könnten durch dieses Leck weitere 100 Millionen Gallonen oder mehr ausfließen.

63.     BP hat sich nicht dazu geäußert, wieviel Öl sich unter dem Meeresboden des Golfs befindet, in dem die *Deepwater Horizon* die Bohrung vornahm, ein leitender Angestellter des Unternehmens hat jedoch unter Zusicherung seiner Anonymität Berichte bestätigt, denen zufolge dort zehnfache Millionen Barrel Öl lagern.

**Erwartungen zufolge wird die Verschmutzung durch das Ölleck und die Dispergiermittel für die Gemeinden am Golfküste katastrophale Auswirkungen haben**

64.     Der Gouverneur von Florida, Crist, hat gewarnt, dass das Ölleck „für den Bundesstaat Florida eine verheerende Katastrophe darstellt." In Folge der Ölkatastrophe an der Golfküste erklärte Gouverneur Crist in neunzehn Bezirken des Bundesstaates Florida den Ausnahmezustand.

65.     Staatliche Gesundheitsbehörden überwachen die Luftqualität, den Trinkwasserbestand und die Fischverarbeitungsfabriken und erteilen Anweisen zu Vorsichtsmaßnahmen. Die Liste der potenziellen Gefahren reicht von geringfügigen Problemen wie Kopfschmerzen bis zu langfristigen

Gefahren wie Krebs durch verseuchten Fisch. Bereits jetzt verursacht der Gestank des Öllecks Übelkeit und Augenbrennen bei einer Entfernung von 480 km.

66.      Einige der Mittel, die eingesetzt werden, um das Ölleck unter Kontrolle zu bringen, können weiteren Schaden verursachen. Um das Öl zu zerteilen, verwendete BP 956.00 l Dispergiermittel und nach Angaben von BP sind 1.200.000 l Dispergiermittel verfügbar.  Die zusätzliche Umweltbelastung durch diese potenziell toxischen Dispergiermittel wurde nicht untersucht.

## WERTMINDERUNG VON IMMOBILIEN UND DER ÖLGESTANK

**Durch das Ölleck und die Fahrlässigkeit der Beklagten kam es zu erheblichen Wetminderungen von Immobilien in Florida**

67.      Einbrechende Immobilienwerte sind eine Folge der schlimmsten Umweltkatastrophe in der Geschichte der Vereinigten Staaten, und das Öl schießt weiter aus der BP-Ölquelle Macondo heraus. Der Klägerin und den Mitgliedern der Gruppe ist eine Wertminderung ihrer Immobilien in Folge des Öls entstanden, das in den Küstengebieten von Florida angespült wurde und weiter angespült wird. Das Öl ist bereits in der „Panhandle"-Küstenregion von Florida angespült worden und an der ganzen Küste von Florida bereiten sich Anlieger auf das unvermeidbare Anspülen von Rohöl vor.

68.      Käufer von an der Küste gelegenen Eigenheimen in Florida behalten den wachsenden Ölschlamm am Golf im Auge und fordern Garantien, bevor sie ein Eigenheim am Strand kaufen. Immobilienmakler und -händler berichten, dass Eigenheimkäufer sich entweder von Eigenheimen an der Küste abwenden oder eine 60-tägige Garantie verlangen, dass das Öl keine Auswirkungen auf die Strände haben wird, bevor sie einen Immobilienvertrag unterzeichnen. Einige Immobilienmakler bieten einen Nachtrag im Zusammenhang mit dem Ölleck an, der potenziellen Eigenheimkäufern in Florida gestattet, vom Vertrag zurückzutreten oder den Vertragsschluss bis zu 30 Tagen aufzuschieben, falls das Öl bis zu 48 Stunden vor dem Datum des Vertragsschlusses an einem der Strände in dem Bezirk auftreten sollte, in dem die Immobilie liegt.

69.      Immobiliengutachter in Florida haben dem Gouverneur von Florida, Charlie Crist, ein Schreiben vorgelegt, in dem erklärt wird, dass Immobilienbesitzer dieses Jahr vermutlich aufgrund des

Öllecks einen Wertverlust erleiden werden, und haben Bedenken geäußert, dass Steuerzahlern infolgedessen eine Berichtigung ihrer Steuerlast gewährt werden sollte. Gouverneur Crist hat angkündigt, dass er dieses Problem gern im Rahmen einer Sondersitzung des Parlaments von Florida besprechen werde, die er hofft, bereits im kommenden Monat einzuberufen.

70.      BP hat bereits eingestanden, dass die Katastrophe sich negativ auf die Nachfrage nach am Golf gelegenen Immobilien ausgewirkt hat. Nach offiziellen Angaben des Bundesstaates Florida hat BP mit Stand vom 3. Juni 2010 Zahlungen für 446 Forderungen wegen Verlust von Einnahmen aus zu vermietenden Immobilien geleistet und BP hat weitere Forderungen zur Abdeckung von Verlusten bei Immobilienverkäufen befriedigt.

**Dämpfe und Gestank des Öllecks und der Dispergiermittel stören Eigentumsrechte und führen zu Erkrankung und Übelkeit bei Einwohnern des Bundesstaates Florida**

71.      Einwohner der Küstengebiete berichten auch, dass der Ölgeruch ihnen Übelkeit verursacht. manche Einwohner haben wegen des Gestanks die Notrufnummer 911 angerufen. Ärztliche Notdienste haben bestätigt, dass der Geruch tatsächlich durch den Ölschlamm im Golf verursacht wird, der vom Westwind an die Küste von Florida getragen wird. Viele Einwohne sind wegen des Gestanks um ihre Gesundheit und Sicherheit besorgt. Einwohner haben berichtet, dass sie an Übelkeit und Reizungen im Nasenbereich leiden. Die Luft ist mit Öldämpfen getränkt und Strandbesucher haben mehrfach berichtet, dass es nach Abgasen wie von einem Jet auf einer Landebahn riecht, Nasenbrennen verursacht und dass sie die Strandluft überhaupt nicht riechen können.

72.      Die Klägerin ist in ihrer am Strand gelegenen Immobilie auch widerwärtigen und unerträglichen Gerüchen und Dämpfen durch das Öl ausgesetzt, die nachhaltig und auf unangemessene Weise ihre ruhige Nutzung und den Genuss ihrer Immobilie stören. Die Klägerin berichtet, dass Dämpfe, die nach heißem Öl riechen, aus dem Wasser steigen.

73.      Um das Ausmaß des an der Küste angespülten Öls zu reduzieren, wurden beinahe 3.785.000 l eines Dispergiermittels mit der Bezeichnung Corexit in die Gewässer am Golf geleitet. Die dadurch in den warmen Gewässern des Golfs entstandene Mischung ist ein toxisches Gemisch aus Rohöl, Chemikalien und Salzwasser.

74.     Fischer und andere von BP eingestellte Personen, die bei den Säuberungsmaßnahmen zur Beseitigung des Öls im Golf helfen sollten, haben zahlreiche Berichte zu Erkrankungen erstattet, die in Folge ihrer Teilnahme bei den Säuberungsbemühungen aufgetreten sind. Selbst ein Beamter der Umweltschutzbehörde EPA erklärte, dass eine Person unmöglich in dieser toxischen Suppe arbeiten könne, ohne dadurch einem Übermaß an schädlichen Chemikalien ausgesetzt zu sein. Chemikalien und Dämpfe, die sowohl vom Öl wie von den Dispergiermitteln verursacht werden, können ernsthafte Gefahren für die Gesundheit darstellen. Sie können Entzündungen der Nase, des Rachens und der Lungen hervorrufen und Asthmabescherden verschlimmern. Wenn Ölverbindungen wie Benzol oder Toluol in den Blutkreislauf absorbiert werden, können sie Kopfschmerzen und Schwindelgefühl verursachen und können nach längerem direktem Kontakt langfristig eine toxische Wirkung auf das Gehirn, die Leber und die Nieren haben.

75.     Diese toxische Mischung, die bei Arbeitern zu Erkrankungen führt, verdampft und ist mit dem Risiko verbunden, von Seitenwinden in Florida erfasst zu werden, die schließlich die Dämpfe oder Sprühdämpfe über einen Großteil der Halbinsel Florida verbreiten. Wenn dies eintritt, entsttehnt dadurch ein sehr reales Risiko gesundheitsschädigender Auswirkungen für die Bevölkerung an der Küste und im Inland, das dem Risiko ähnelt, dem die Arbeiter für die Säuberungsarbeiten ausgesetzt sind.

76.     Der Brand und die Explosion auf der *Deepwater Horizon*, ihr Sinken, das dadurch entstandene Ölleck und die unzulängliche Reaktion auf das Ölleck wurden durch die Fahrlässigkeit der Beklagten verursacht, die daher gesamtschuldnerisch gegenüber der Klägerin und der Gruppe für ihren gesamten Schaden haften.

77.     Die Klägerin und die Gruppe haben Verletzungen und Schaden erlitten, die durch die Verstöße der Beklagten gegen Statuten und Vorschriften verursacht wurden, einschließlich ohne darauf beschränkt zu sein, von der OSHA und der US-Küstenwache erlassenen Statuten und Vorschriften.

78.     Den Beklagten waren die mit Bohrungen in tiefen Gewässern verbundenen Gefahren und die Auswirkung von Aushubarbeiten in tiefen Gewässern auf das Funktionieren des BOPs bekannt, und sie versäumten, angemessene Maßnahmen zur Verhinderung des der Klägerin, der Gruppe und den Gemeinden an der Golfküste entstandenen Schadens zu ergreifen.

79.      Den Beklagten war bekannt, dass der BOP schadhaft war und sie unterließen es, angemessene Maßnahmen zu ergreifen, um der Klägerin, der Gruppe und den Gemeinden an der Golfküste entstandene Schäden zu verhindern.

80.      Die Beklagten ergriffen unnötige vereinfachte Maßnahmen, vor deren Ergreifen sie gewarnt wurden und opferten dadurch die Sicherheit und Eigentumsrechte der Klägerin, der Gruppe und der Gemeinden an der Golfküste.

81.      Die Beklagten unterließen es, angemessene Explorations- und Aktionspläne einzureichen, die angemessene Aktionspläne für die mit Bohrungen in tiefen Gewässern verbundenen Gefahren und die außerordentlichen Schäden, die durch ein Ölleck im Golf von Mexiko entstehen konnten, enthielten.

82.      Die Beklagten unterließen es, die US-Küstenwache angemessen über das Ölleck zu informieren und verhinderten dadurch eine vollumfängliche Reaktion zum Abfangen des durch die Ölkatastrophe verursachten Schadens. Die Beklagten untertreiben nach wie vor den Schweregrad der Geschwindigketi, mit der das Öl aus dem Bohrloch herausschießt und haben den Zugang zur Ölquelle eingeschränkt, wodurch eine exakte Beurteilung verhindert wird, die für eine angemessene Planung und Reaktion auf die Ölkatastrophe notwendig ist.

83.      Durch die unzulängliche Reaktion der Beklagten und deren Einsatz von wahrscheinlich toxischen Chemikalien zur Bekämpfung (des Öllecks) sind die Klägerin, die Gruppenmitglieder und die Gemeinden an der Golfküste geschädigt worden.

84.      Das vorsätzliche, rücksichtslose, fahrlässige und/oder abnormal gefährliche Verhalten der Beklagten hat das Ölleck und die Verschmutzung verursacht, die Immobilien geschädigt haben und weiter schädigen werden, die Störung der Eigentumsrechte und einen nachhaltigen und unzumutbaren Eingriff in die Nutzung und den Genuss von Grund und Boden verursacht.

## BEHAUPTUNGEN DER GRUPPENKLAGE

85.      Die Klägerin strengt diese Klage gemäß Regel 23(a) und (b)(3) der Bundeszivilprozessordnung im Namen der Gruppe, die aus allen Eigenheimbesitzern in Florida und Mietern von Immobilien in Florida besteht, deren Genuss der Immobilie durch die Explosion der *Deepwater Horizon* Ölbohrinsel am 20. April 2010, deren Brand und das dadurch entstandene Ölleck

gestört wurden und/oder die einen Wertverlust ihrer Immobilie auf Grund des vorstehend Angeführten erlitten haben, als Gruppenklage an. Von der Klägergruppe ausgeschlossen sind die hierin angeführten Beklagten, direkte Familienmitglieder jeder einzelnen Beklagten, jeder Rechtsträger, an denen eine Beklagte eine Kontrolle ausübende Beteiligung besitzt und die rechtmäßigen verbundenen Gesellschaften, Vertreter, Erben, Kontrolle ausübenden Personen, wirtschaftlichen Nachfolger und Vorgänger oder Übertragungsempfänger einer solchen ausgeschlossenen Partei.

86.     Die vorgesehene Klägergruppe ist so umfangreich, dass eine Klageverbindung aller Mitglieder nicht möglich ist.  Obwohl die genaue Anzahl der Mitglieder der Klägergruppe derzeit nicht bekannt ist, glaubt die Klägerin, dass sich die Anzahl mindestens auf Tausende von Mitgliedern beläuft und dass diese geografisch über die Gemeinden an der Golfküste in Florida verstreut sind.

87.     Die Forderungen der Klägerin sind typisch für die Forderungen der Mitglieder der Klägergruppe, weil die Klägerin und alle Mitglieder der Klägergruppe Schäden erlitten haben, die durch das gesetzwidrige Verhalten der Beklagten ausgelöst wurden, das Gegenstand dieser Klage ist und das zu einer einzigen Katastrophe und einer einzigen Verschmutzungsquelle geführt hat.

88.     Die Klägerin wird die Interessen der Mitglieder der Klägergruppe auf faire und angemessene Weise schützen und hat Rechtsanwälte verpflichtet, die in Gruppenklagen erfahren sind und über die entsprechenden Qualifikationen verfügen. Es sollte betont werden, dass Milberg LLP ein Mitglied des Koordinationsausschusses der Kläger und Mitvorsitzender des Rechtsausschusses der Kläger bei einem umfangreichen Rechtsstreit war, der sich aus der *Exxon Valdez* Ölkatastrophe im März 1989 in Alaska ergab. Die Klägerin verfolgt keine Interessen, die den Interessen anderer Mitglieder der Klägergruppe, die die Klägerin vertreten möchte, widersprechen oder mit diesen kollidieren.

89.     Eine Gruppenklage ist allen anderen zur Verfügung stehenden Vorgehensweisen zur gerechten und effizienten Entscheidung dieses Rechtsstreits überlegen, da eine Klageverbindung aller Mitglieder nicht möglich ist. Darüber hinaus machen es die Kosten und die Belastung einzelner Rechtsstreite vielen Mitgliedern der Klägergruppe unmöglich, das erlittene Unrecht als Einzelperson wieder gut zu machen. Außerdem würden Einzelklagen für dieses Gericht angesichts der Tausenden betroffener Hauseigentümer eine ungebührliche Belastung darstellen. Das Verfolgen von Einzelklagen

seitens einzelner Mitglieder der Klägergruppe schafft zudem die Gefahr nicht übereinstimmender und von einander abweichender Urteile, während die Entscheidung gemeinsamer rechtlicher und faktischer Punkte den Zeit- und Kostenaufwand aller Parteien stark senken kann.

90.      Rechtliche und faktische Fragen, die allen Mitgliedern der Klägergruppe gemeinsam sind, haben insofern Vorrang vor Fragen, die ggf. nur einzelne Mitglieder betreffen, als die Beklagten aus Gründen gehandelt haben, die allgemein die gesamte Klägergruppe betreffen. Rechtliche und faktische Fragen, die die Klasse gemeinsam betreffen, sind u.a.:

a.      ob die bundes- und einzelstaatlichen Gesetze und Bestimmungen durch die Handlungen der Beklagten auf die hierin beschriebene Art und Weise verletzt wurden:

b.      ob die Handlungen der Beklagten die Explosion, den Brand und das daraus resultierende Ölleck auslösten oder zu diesen beitrugen:

c.      ob allgemeine Beweise für die Handlungen der Beklagen zum Nachweis des Schadens, der Verursachung und des kompensatorischen Schadenersatzes ausreichen;

d.      ob die Beklagen fahrlässig oder grob fahrlässig handelten;

e.      ob das daraus resultierende Ölleck und zur Bekämpfung des Öllecks verwendeten Chemikalien Immobilien entwertet haben;

f.      ob die durch das Ölleck und die zur Bekämpfung des Öllecks verwendeten Chemikalien hervorgerufenen Gerüche und Dämpfe drastisch und/oder auf unzumutbare Weise die Nutzung und den Genuss von Grund und Boden verhindert haben und

g.      ob die Mitglieder der Gruppe Schaden erlitten haben und wenn ja, wie dieser Schaden angemessen bemessen werden kann.

## I.KLAGEPUNKT
## FAHRLÄSSIGKEIT

91.     Die Klägerin wiederholt die in allen oben stehenden Abschnitten vorgebrachten Behauptungen als wären sie hierin vollständig aufgeführt.

92.     Die Beklagten waren gegenüber der Klägerin und den Mitgliedern der Klägergruppe verpflichtet, den gefahrlosen Betrieb der *Deepwater Horizon* sicher zu stellen und den Brand, die Explosion und das Ölleck, die sich am 20. April 2010 ereigneten, zu vermeiden und angemessen auf das daraus resultierende Ölleck zu reagieren und dieses einzudämmen.

93.     Der Brand und die Explosion auf der *Deepwater Horizon*, deren Sinken, das daraus resultierende Ölleck und die toxische und unangemessene Reaktion auf das Ölleck wurden durch die Fahrlässigkeit der Beklagten ausgelöst, wodurch diese gesamtschuldnerisch gegenüber der Klägerin und der Klägergruppe für deren gesamten Schaden haftbar sind.

94.     Nach Information und Glauben behaupten die Kläger, dass der Brand, die Explosion, das daraus resultierende Ölleck und die unzulängliche Reaktion durch die gemeinsame Fahrlässigkeit und das Verschulden der Beklagten verursacht wurden, die u.a. ohne darauf beschränkt zu sein, Folgendes umfassen:

(a)     Die Beklagten unterließen es, die *Deepwater Horizon* sachgemäß zu bedienen;

(b)     Die Beklagten unterließen es, die *Deepwater Horizon* ordnungsgemäß einer Inspektion zu unterziehen, um sicher zu gehen, dass deren Ausrüstung und Personal für den ihr zugedachten Zweck geeignet waren;

(c)     Die Beklagten betrieben die *Deepwater Horizon* auf solch eine Art und Weise, dass es zu einem Brand und einer Explosion an Bord kam, die zu deren Sinken und dem daraus resultierenden Ölleck führten:

(d)     Die Beklagten handelten auf achtlose und fahrlässige Art und Weise ohne Rücksicht auf die Sicherheit anderer Personen;

(e)     Die Beklagten unterließen die Bekanntgabe, Einführung und Durchsetzung von Verfahren für den gefahrlosen Betrieb der *Deepwater Horizon*, die, wären sie bekannt gegeben, eingeführt und durchgesetzt worden, den Brand, die Explosion, das Sinken der Bohrinsel und das daraus resultierende Ölleck verhindert hätten;

  (f)  Die Beklagten unterließen es, angemessene Maßnahmen zum Vermeiden oder Abmildern des Brandes, der Explosion und/oder dem Austreten des Öls zu ergreifen;

  (g)  Die Beklagten führten auf fahrlässige Weise Richtlinien und Verfahren zum sicheren Betreiben von Offshore-Unternehmen im Golf von Mexiko ein;

  (h)  Die Beklagten unterließen es, sich zu vergewissern, dass die *Deepwater Horizon* und deren Ausrüstung frei von Mängeln waren und/oder ordnungsgemäß funktionierten;

  (i)  Die Beklagten unterließen es, das Ölleck rechtzeitig unter Kontrolle zu bringen;

  (j)  Die Beklagten unterließen es, eine angemessene Ausrüstung zur Verhinderung von Unfällen bereit zu stellen;

  (k)  Die Beklagten unterließen es, auf Anzeichen von Gefahren zu reagieren;

  (l)  Die Beklagten stellten BOP bereit, die nicht ordnungsgemäß funktionierten;

  (m)  Die Beklagten nahmen die Zementierungsarbeiten an der Ölquelle und dem Verschluss der Ölquelle auf unsachgemäße Weise vor;

  (n)  Die Beklagten unterließen es, die *Deepwater Horizon* sachgemäß zu konstruieren;

  (o)  Die Beklagten unterließen es, auf angemessene Weise vor dem Ölleck und dem Ausmaß des ausgetretenen Öls zu warnen

  (p)  Die Beklagten haben es versäumt, das Ölleck schnell und auf sachgemäße Art und Weise unter Kontrolle zu bringen und versäumen dies weiter;

  (q)  Die Beklagten unterließen es, einen akustischen Schalter zu installieren und/oder einzusetzen, um den Ölfluss bei einem Unfall zu stoppen und

  (r)  Die Beklagten begingen anderweitige fahrlässig Handlungen und Unterlassungen, die bei der Verhandlung zu dieser Sache geschildert werden.

95.     Der Klägerin und der Klägergruppe sind als direkte und unmittelbare Folge der Fahrlässigkeit der Beklagten Schäden entstanden, einschließlich ohne jedoch darauf beschränkt zu sein, einer Schädigung der Immobilienwerte und ein Eindringen in die Immobilie, in Höhe eines von einer vom Gericht als Prüfer des Tatbestands bestellten Person zu ermittelnden Betrags.

96.     Der Brand, die Explosion und das daraus resultierende Ölleck wurden durch defekte Geräte, einschließlich des BOPs, ausgelöst, die der Pflege, Verwahrung und Kontrolle der Beklagten unterstellt waren. Den Beklagten waren diese Defekte bekannt bzw. sie hätten ihnen bekannt sein müssen, und daher sind die Beklagten für diese haftbar.

97.     Die Beklagten wussten auch bzw. hätten auch wissen müssen, dass die Zementierung nicht ordnungsgemäß vorgenommen wurde.

98.     Darüber hinaus wussten die Beklagten bzw. hätten wissen müssen, dass auf Grund der Explosion und des Brandes vom 20. April 2010 Öl in erheblichem Umfang aus der gesunkenen Bohrinsel *Deepwater Horizon* austrat.

99.     Als direkte und unmittelbare Folge des fahrlässigen Verhaltens der Beklagten haben die Beklagten der Klägerin das Erleiden einer Störung ihrer Eigentumsrechte sowie eine Wertminderung ihrer Immobilie verursacht, die diese auch weiter erleidet.

100.    Außer den oben beschriebenen fahrlässigen und rücksichtslosen Handlungen und alternativ dazu wurden die von der Klägerin und der Klägergruppe erlittenen Schäden durch die Handlungen und/oder Unterlassungen der Beklagten verursacht, die sich derzeit einem Beweis durch die Klägerin und die Klägergruppe entziehen, die jedoch den Beklagten bekannt waren und deren Kontrolle unterstanden, so dass kein anderer Schluss möglich ist als dass die Explosion und das Ölleck eine Folge der Fahrlässigkeit der Beklagten waren.

101.    Es wäre des Weiteren nicht zu der Explosion und dem Ölleck gekommen, wenn die Beklagten den hohen Grad an Sorgfalt hätten walten lassen, der ihnen oblag, und die Klägerin beruft sich daher auf die Doktrin *res ipsa loquitur* (widerlegbare Vermutung, dass die Beklagte fahrlässig handelte).

## II. KLAGEPUNKT
## GESETZLICH VERMUTETE FAHRLÄSSIGKEIT

102.   Die Klägerin nimmt hiermit durch Bezugnahme jede einzelne oben angeführte Behauptung als Bestandteil auf.

103.   Zu allen hierfür wesentlichen Zeiten handelten die Beklagten mit gesetzlich vermuteter Fahrlässigkeit, indem sei es unterließen, die bundes- und einzelstaatlichen Gesetze und gesetzlichen Normen einzuhalten, die u.a. dem Schutz der Klägerin und der Klägergruppen dienen und diesen zugute kommen sollen.

104.   Die Statuten, gegen welche verstoßen wurde, sind u.a. ohne jedoch darauf beschränkt zu sein, das US-amerikanische Abfallbeseitigungsgesetz aus dem Jahr 1989 (33 U.S.C. § 407), das jegliche Entsorgung von Industrieabfällen in Gewässer verbietet, das Gesetz gegen Verschmutzung von Gewässern (Clean Water Act) (33 U.S.C. § 1251 ff.), das die Entsorgung mehrerer giftiger Chemikalien, die in Erdöl enthalten sind, verbietet, und das Gesetz des Bundesstaates Florida zur Verhinderung und Kontrolle der Entsorgung von verschmutzenden Substanzen (Pollutant Discharge Prevention and Control Act) (Gesetze des Bundesstaats Florida, Kap. 376), das die Entsorgung von verschmutzenden Substanzen in allen Küstengewäässern, Deltas, Meeresfeuchtgebieten, an Stränden und in Gebieten, die an die Küste des Bundesstaates angrenzen, verbietet.

105.   Als direkte und unmittelbare Folge ihrer gesetzlich vermuteten Fahrlässigkeit sind die Beklagten für den Brand, die Explosion und Freisetzung des Öls haftbar, durch welche der Klägerin und den Mitgliedern der Klägergruppe Verletzungen und Schaden zugefügt wurden.

## III. KLAGEPUNKT
## BESITZSTÖRUNG EINZELNER

106.   Die Klägerin wiederholt die in allen oben stehenden Abschnitten vorgebrachten Behauptungen als wären sie hierin vollständig aufgeführt.

107.   Die Klägerin und die Mitglieder der Klägergruppe haben ein Interesse daran, eine direkt am Strand der Golfküste von Florida gelegene Immobilie zu besitzen.

108.   Die hierin beschriebenen Handlungen der Beklagten störten und stören weiter nachhaltig und/oder auf unzumutbare Weise das Recht der Klägerin und der Mitglieder der Klägergruppe auf den Genuss und/oder die Nutzung ihrer Immobilie und verursachten der Klägerin und den Mitgliedern der Klägergruppe Beschwerden, Belästigungen und/oder Schäden.

109.     Die Störung der Rechte der Klägerin und der Mitglieder der Klägergruppe auf den Genuss und/oder die Nutzung ihrer Immobilie wurde durch die Beklagten durch die unangemessene Nutzung der Immobilie der Beklagten verursacht.

110.     Die Beklagten handelten auf fahrlässige Art und Weise, indem sie eine solche Besitzstörung Einzelner herbeiführten.

111.     Diese Besitzstörung Einzelner ist alternativ das Ergebnis von abnormal gefährlichen Aktivitäten der Beklagten.

112.     Die Klägerin und die Mitglieder der Klägergruppe haben Anspruch auf ein Urteil, nach dem die Beklagten der Klägerin gegenüber für den als direkte und unmittelbare Folge der Besitzstörung erlittenen Schaden haften und welches der Klägerin dafür eine angemessene Entschädigung in Höhe eines von der vom Gericht als Prüfer des Tatbestands bestellten Person zu ermittelnden Betrags zusprechen soll.

## IV. KLAGEPUNKT
## BESITZSTÖRUNG/EINGRIFF IN EIGENTUMSRECHTE

113.     Die Klägerin nimmt hiermit durch Bezugnahme jede einzelne oben angeführte Behauptung als Bestandteil auf.

114.     Die Beklagten ließen auf fahrlässige und/oder vorsätzliche Weise das Austreten von Öl ins Wasser zu, wodurch der Eintritt von übelkeiterregenden Dämpfen und/oder Gerüchen in die Immobilie der Klägerin (und der Mitglieder der Klägergruppe) verursacht wurde. Das Verhalten der Beklagten, durch welches diese das Austreten des Öls ins Wasser und/oder die Öllecks zuließen, war nicht nur rücksichtslos und empörend, sondern wurde auch zu einem vorsätzlichen Verhalten, als die Beklagten es unterließen, angemessene Vorsichtsmaßnahmen zur Verhinderung der Lecks zu ergreifen.

115.     Das Austreten von Öl ins Wasser war die Folge von vorsätzlich ordnungswidrigem Verhalten und/oder bewusster Fahrlässigkeit bei Mitwisserschaft und Kenntnis der Beklagten und wurde primär durch Verstöße gegen die geltenden Umweltschutz-, Sicherheits- oder Betriebsstandards, -bestimmungen oder -gesetze verursacht.

116.     Als direkte und unmittelbare Folge der fortwährenden Besitzstörung der Beklagten und durch Begehen der oben erwähnten Aktivitäten haben die Klägerin und die Mitglieder der Klägergruppe Schaden in Höhe eines Betrags erlitten, der die Zuständigkeitsgrenzen dieses Gerichts überschreitet.

## V.KLAGEPUNKT

## STRENGE HAFTUNG NACH DEN STATUTEN DES BUNDESSTAATS FLORIDA § 376.313

117.     Die Klägerin nimmt hiermit durch Bezugnahme jede einzelne oben angeführte Behauptung als Bestandteil auf.

118.     Zu allen relevanten Zeiten besaßen, betrieben und/oder warteten die Beklagten die mobile Offshore-Ölplattform *Deepwater Horizon*.

119.     Zu allen relevanten Zeiten oblag den Beklagten eine gesetzliche Pflicht gegenüber der Klägerin und den Mitgliedern der Klägergruppe, die *Deepwater Horizon* so zu warten und zu betreiben, dass keine gefährlichen Bedingungen durch die Entsorgung von verschmutzenden Substanzen im Sinne der Definition des Gesetzes des Bundesstaates Florida § 376.301(10), § 376.301(11) und § 376.301(13) geschaffen oder fortgeführt wurden.

120.     Die Beklagten verletzten zu allen Zeiten ihre gesetzliche Pflicht gegenüber der Klägerin und den Mitgliedern der Klägergruppe, indem sie Erdöl in den Golf von Mexiko entsorgten oder zuließen, dass Öl in den Golf von Mexiko entsorgt wurde und zuließen, dass sich ein massives Ölleck in die Küstengebiete, den Golf von Mexiko, den Golfstrom und/oder die Hoheitsgewässer des Bundesstaates Florida unter Verstoß gegen die Statuten des Bundesstaates Florida § 376.313(3) ausbreitete.

121.     Als direkte und unmittelbare Folge des Verstoßes der Beklagten gegen diese gesetzlichen Pflichten gegenüber der Klägerin und den Mitgliedern der Klägergruppe hat das Ölleck zu katastrophalen Schäden für die Küstengebiete, den Golf von Mexiko, den Golfstrom und/oder die Hoheitsgewässer des Bundesstaates Florida geführt.

122.     Als direkte und unmittelbare Folge der Handlungen und Unterlassungen der Beklagten haben die Klägerin und die Mitglieder der Klägergruppe Verletzungen und Schäden erlitten.

123.     Die Beklagten unterliegen einer strengen Haftung für den oben angeführten Schaden, der direkt aus ihrem Begehen von abnormal gefährlichen und/oder extrem gefahrvollen Aktivitäten entstand.

## VI.KLAGEPUNKT

## STRENGE HAFTUNG FÜR ABNORMAL GEFÄHRLICHE UND EXTREM GEFAHRVOLLE AKTIVITÄTEN

124.     Die Klägerin nimmt hiermit durch Bezugnahme jede einzelne oben angeführte Behauptung als Bestandteil auf.

125.    Die Beklagten beteiligten sich an Bohraktivitäten in extrem tiefen Gewässern am Standort der *Deepwater Horizon*.

126.    Die oben beschriebenen Handlungen und Aktivitäten der Beklagten einschließlich, ohne darauf beschränkt zu sein, von Bohrungen und dem Transport von Erdöl und anderen verschmutzenden Substanzen in extrem tiefen Gewässern im Golf von Mexiko stellen eine abnormal gefährliche und extrem gefahrvolle Aktivität dar, die mit einer großen Gefahr von Schäden für die Klägerin und die Klägergruppe sowie die Gemeinden an der Golfküste verbunden ist.

127.    Die von der Klägerin und den Mitgliedern der Klägergruppe erlittenen Verletzungen und Schäden waren die Art von Schaden, durch deren mögliches Entstehen die Aktivitäten der Beklagten abnormal gefährlich und/oder extrem gefahrvoll werden.

128.    Die oben beschriebenen, der Klägerin und den Mitgliedern der Klägergruppe entstandenen Verletzungen und Schäden wurden unmittelbar durch die besagte abnormal gefährliche und/oder extrem gefahrvolle Aktivität verursacht.

129.    Die Aktivitäten der Beklagten, d.h. die Vornahme von Eröldexploration in extrem tiefen Gewässern und deren Folgen, die Verschmutzung des Golfs von Mexiko und der Gewässer des Golfs von Mexiko, sind für den dafür verwendeten Standort ungeeignet und ungewöhnlich für diese Region.

130.    Das abnormale  Risiko und der Eintritt und die fortgesetzte Entstehung des von der Klägerin, den Mitgliedern der Klägergruppe und den Gemeinden an der Golfküste erlittenen Schadens hebt jeden Wert der Betriebe der Beklagten für die betroffenen Gemeinden in Florida auf.

131.    Zu allen für diese Klage relevanten Zeiten hatten die Beklagten die Kontrolle über die *Deepwater Horizon* und die mit ihr verbundenen Bohraktivitäten sowie deren Personal.

132.    Die Bohrungen in extrem tiefen Gewässern wurden von den Beklagten zu ihrem eigenen Vorteil vorgenommen und sie schufen ein Risiko für die Klägerin und die Mitglieder der Klägergruppe, das kein normalerweise von der Klägerin und den Mitgliedern der Klägergruppe erwartetes Risiko war und ist auch keine Aktivität, die normalerweise in deren Leben oder geschäftlichem Umgang vorkommt.

133.    Die Beklagten unterliegen strenger Haftung für den oben angeführten Schaden, der direkt aus ihrem Verstoß gegen die Statuten des Bundesstaates Florida § 376-313(3) entstand, einschließlich Strafe einschließenden Schadenersatz, um das Verhalten der Beklagten zu bestrafen und von diesem abzuschrecken.

## KLAGEBEGEHREN

DAHER ersucht die Klägerin in eigenem Namen und für die Klägergruppe um ein gesamtschuldnerisches Urteil gegen die Beklagten wie folgt:

a.    Eine Verfügung, die die Klägergruppe bestätigt, damit jeder bzw. alle hierin angeführten Klagegründe vorgebracht werden können und in der die Klägerin zur Vertreterin der Klägergruppe ernannt und der unterzeichnete Rechtsanwalt als Anwalt für die Klägergruppe ernannt wird;

b.    Wirtschaftlichen und kompensatorischen Schadensersatz in Höhe von Beträgen, die bei der Verhandlung festgesetzt werden sollen, jedoch nicht geringer als die im „Class Action Fairness Act" vorgeschriebenen $ 5.000.000,00;

c.    Strafe einschließenden Schadenersatz;

d.    Zinsen für die Zeit vor und nach dem Urteil sowie in angemessenem Umfang ihre Anwaltskosten und Kosten für Aussagen von sachverständigen Zeugen und

e.    Solch anderweitige Rechtsmittel, die dieses Gericht für angemessen erachtet, einschließlich Rechtsmittel, die gemäß allen geltenden bundes- und einzelstaatlichen Gesetzen zur Verfügung stehen.

## FORDERUNG EINER VERHANDLUNG MIT GESCHWORENEN

Die Klägerin fordert eine Verhandlung mit Geschworenen.

Datum: 16. Juni 2010            Hochachtungsvoll eingereicht

                                **MILBERG LLP**


                    Gez.:    _____
                             Christopher Polaszek
                             Florida-Anwaltsnr. 0116866
                             cpolaszek@milberg.com
                             Corporate Center One
                             2202 N. Westshore Blvd.
                             Suite 200
                             Tampa, FL 33607
                             Tel.: (813) 639-4248
                             Fax.: (561) 692-8164

                             -    und –

                             Andrei V. Rado
                             Elizabeth S. Metcalf
                             MILBERG LLP
                             One Pennsylvania Avenue
                             48th Floor
                             New York, NY 10119-0165
                             Tel.: (212) 594-5300
                             Fax: (212) 868-1229

                             *Anwälte für die Klägerin*