**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

|  |  |  |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG | : | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | : |  |
| GULF OF MEXICO, on | : |  |
| APRIL 20, 2010 | : |  |
|  | : | SECTION: J |
|  | : |  |
| THIS DOCUMENT RELATES TO: | : |  |
|  | : |  |
| ALL ACTIONS | : |  |
|  | : | JUDGE BARBIER |
|  | : | MAG. JUDGE SHUSHAN |
|  | : |  |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**PROPOSED CASE MANAGEMENT ORDER**

Defendants[1] respectfully submit this Memorandum in Support of the Defendants' Case Management Order (Exhibit A), scheduling order (Exhibit B) and time line for the Limitation action (Exhibit C).

## INTRODUCTION

Since the September 16 status conference, and the Court's September 16 minute entry (Doc. 312), Defendants' counsel have met with Plaintiffs' counsel on several occasions in an effort to reach a joint proposal regarding the  Case Management Order and have agreed on many of the terms and provisions.  For example, defendants agree with plaintiffs on the general schedule for a Limitation action trial and the events leading up to that trial (see Exhibits B and C), and that discovery must promptly commence as to the issues of the April 20, 2010 casualty's cause.

---

[1] BP America Inc., BP America Production Company, BP Company North America Inc., BP Corporation North America Inc., BP Exploration & Production Inc., BP Holdings North America Limited, BP Products North America Inc.  (collectively, the "BP Defendants"); Cameron International Corporation; Halliburton Energy Services, Inc., ("HESI"); Nalco Company;  Marine Spill Response Inc.; M-I L.L.C.; Weatherford U.S., L.P.; Dril-Quip, Inc.; Anadarko Petroleum Corporation, Anadarko E&P Company LP, MOEX USA Corporation and MOEX Offshore 2007 LLC, Seacor Marine, LLC, Seacor Marine, Inc. Seacor Marine International, Inc., and  O'Brien's Response Management, Inc..

However, the parties disagree on the following critical issues:  (1)  whether a phase 2 trial of the Limitation action (quantum and damages including potential punitive damages) can be set at a date certain now, long before the Court rules as to the result in the phase 1 trial that is to commence March 1, 2012, when the timing of that ruling is uncertain and the losing parties have a right to appeal the decision under 28 USC §  1292(a)(3), making any schedule set now entirely speculative; (2)  whether the Limitation action trial should include so-called *Robins Dry Dock* or economic loss "test" cases, when having those claims in the Limitation case will unduly complicate the Limitation action and increase the number of parties that would have to participate in that action far beyond those associated with the events of April of 20, 2010; and (3) whether the Court should have any other OPA test cases set for trial before the Limitation action trial in March 2012, when doing so will again distract the parties and the court from the primary task at hand and cause defendants to bring premature cross claims and new parties into such "test" cases.

Defendants are agreeable to a separate track of written discovery and other preparation of OPA and other economic loss cases, and spill related discovery, even while the parties prepare for the Limitation action trial. No OPA case should be set for trial, however, before the Limitation action is concluded.  Instead, the parties to the litigation should devote the majority of their resources to preparation of the Limitation action even as the BP Gulf Coast Claims Facility ("GCCF") undertakes to resolve thousands of claims for economic loss outside of court under OPA.  There are other areas of disagreement discussed below.

## **ARGUMENT**

Defendants are largely in agreement with plaintiffs' liaison counsel on the opening of merits discovery as to the April 20, 2010 casualty and the schedule leading up to a March 1, 2012 Limitation action trial that, according to this Court, will include a trial of relative

responsibility for the cause of the casualty.  As to the Limitation proceeding itself, defendants'

draft CMO is superior in that it provides for a more orderly process for handling of Rule 14(c)

crossclaims and third party practice and expert discovery (because it requires the parties seeking

to invoke limitation of liability to provide expert discovery before other defendants do).  *See*

exhibit B (defense proposed scheduling order) and Exhibit C (defense proposed time line).

Defendants' proposed CMO also has a superior presentment of the pleading bundle structure the

parties have adopted, as discussed at the September 16 status conference.  Apart from those

issues, the major areas of disagreement are set forth below.

**1.      The Court Should Not Set a Date for Phase 2 of the Limitation Action Trial until
        After it Rules on the Phase 1 Trial.**

In plaintiffs' draft CMO, besides setting a March 1, 2012 trial date for Phase 1 of the

Limitation Action, plaintiffs go further and would have the court set -- now --- a date for a Phase

2 trial on issues such as quantum of damages and availability and amount of punitive damages.

(Plaintiffs' proposed scheduling order para. 1)  Defendants understand the desire by the Court

and parties to move these cases along and in trying to set aspirational dates in this important

litigation.    However, we respectfully submit that it is entirely unrealistic and not appropriate

case management to do so in these circumstances, for several reasons.

First, although the Court has set a March 1, 2012 trial date (actually February 27, 2012

per Doc. 473 issue today) for Phase 1 of the Limitation action, and has estimated its length at 8

weeks, no one knows for certain how long the evidence will take to present, and when the

evidence will close.  Those issues depend on what parties are actually participating in the

Limitation action, how many claimants there are, how many defendants are brought into the

case, and what issues will in fact be tried.   A Phase 1 Limitation trial might indeed take 8 weeks;

but it might take 3 months;  or it might even as much as 6 months.   Second, even after the

evidence is closed, there will presumably be a period for submission of proposed findings and conclusions.  Third, the Court will need a period of time to render its decision following submission of proposed findings.   And fourth, after the Court renders its Phase 1 decision, there is the strong possibility of post trial motion practice and the very real prospect of an appeal by one or more parties under 28 U.S.C. § 1292(a)(3), which provides for appeals as of right in cases like this  -- "interlocutory decrees of such district courts … determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed."

For this reason, defendants' proposed CMO (Exhibit A) and related papers (Exhibits B and C) do not contain a suggestion of a Phase 2 trial date for the Limitation action.  Defendants instead suggest that the Court set a status conference for 45 days after its ruling on Phase 1 to discuss further proceedings and the schedule for same.  Given 28 U.S.C § 1292(a)(3) and the other factors identified above, this approach is far more sensible than selecting an artificial and inherently speculative Phase 2 trial date now.

2.    **The Limitation Action Should Not Include any Economic Loss or *Robins Dry Dock* Issues or Test Cases[2]**

Defendants submit that any alleged "test case" or other claims for economic loss related to oil pollution filed in the Limitation proceeding should ***not*** be tried at the same time as or in overlapping fashion with the initial trial in the Limitation proceeding that will resolve liability and comparative fault with respect to certain selected claims for injury or death.  A combined trial of economic loss claims with injury or death claims in the initial Limitation trial does not make sense.

---

[2] Defendants are not of a single mind on the analysis of these legal issues. The issues discussed herein are submitted as examples of the arguments to be expected regarding these issues.

A trial of liability for injury or death claims is standard for Limitation actions. Defendants understand the Court's desire that the injury and death claims be resolved as expeditiously as possible consistent with fairness to all parties.

On the other hand, a trial of economic loss claims in Limitation proceedings is, to the knowledge of defendants, unprecedented.  Furthermore, defendants submit that conducting a trial of economic loss claims on the same schedule as selected injury or death claims would raise complex case management and legal issues that would threaten to interfere with prompt resolution of injury and death claims.

Serious practical complexities would be involved in any test case trial of economic loss claims in the limitation proceeding.  First, the potential causal mechanisms for the injury and death claims – culminating with the explosions on the *Deepwater Horizon* – are prior in time and distinct from many of the potential causal mechanisms for the ultimate release of oil from the subsurface and are especially distinct from alternative causes for alleged economic injury.  The proximate causation case for injury and death claims is thus much simpler than, and separate from, the proximate causation case for economic damage claims.   A broader range of defendants (including third party defendants) than those involved in the April 20, 2010 casualty would almost certainly be involved in any case that involves not only the allocation of fault for the casualty, but also seeks to allocate responsibility for the spill, its extent and alleged lack of containment.

Furthermore, any bench trial of comparative fault in the Limitation action could raise serious issues concerning the third-party defendants' rights to jury trial.  The Limitation action is well-suited to a prompt and efficient disposition in a bench trial for the benefit of the injured and deceased plaintiffs and their families.  By contrast, the economic damage cases are (or will be)

subject to jury demands and will involve much more complicated presentations of proof and comparative responsibility.

Finally, the economic damage claims could implicate the indemnities for pollution costs in the Drilling Contract between Transocean and BP and the related indemnities for pollution costs in the contracts between Transocean and Cameron. The indemnity issues in the Drilling Contract, moreover, may be subject to mandatory arbitration under the terms of the Drilling Contract. In the interest both of fairness and of judicial efficiency, these indemnity issues should be resolved before the economic damage claims are tried. [3]

The personal injury claims can be tried in the Limitation action without the need for delay while the Court resolves unsettled and controversial legal issues. On the other hand, any test case trial of economic damage claims could not proceed until the Court has resolved a series of complex, and likely controversial, questions about the law governing such claims. The parties will need substantial time to brief these issues and the Court will need substantial time to analyze them and render its decision. Even then, it is likely that some of these legal issues will be candidates for interlocutory review under 28 U.S.C. §§ 1292(a)(3) or (b) (and potentially even pursuant to Fed. R. Civ. P. 54(b)), because they resolve rights of parties in an admiralty case or involve unsettled and important questions whose resolution will materially advance the termination of the litigation. Therefore, economic damage claims cannot be tried expeditiously in the limitation case.

Without belaboring the point, here is a brief overview of these legal questions:

The Oil Pollution Act of 1990 ("OPA") establishes the liability of designated "responsible parties" for certain categories of economic damages and removal costs occasioned by an oil spill in navigable waters. 33 U.S.C. § 2702. As a designated "responsible party" under

---

[3] Other indemnity obligations among the parties may be implicated as well.

OPA, BP has established an independently administered Gulf Coast Claims Facility ("GCCF") to administer OPA claims for economic loss filed by individuals and businesses.  Payments to claimants by the GCCF are funded from the $20 billion escrow account established by BP pursuant to an agreement with the White House to satisfy legitimate claims arising from the *Deepwater Horizon* incident and the resulting oil and gas spill.  To date, between BP and the GCCF over $1.0 billion in claims have been paid.

http://www.gulfcoastclaimsfacility.com/GCCF_Overall_Status_Report_10-05-2010.pdf

Most important, OPA provides unequivocally that (except for claims submitted to the federal oil spill liability Fund) "***all claims for removal costs or damages shall be presented first to the responsible party or guarantor***."  33 U.S.C. § 2713(a) (emphasis added).

There are two necessary consequences of OPA § 2713.  First, claims against responsible parties for damages covered by OPA § 2702(b) should be dismissed if they have not been presented first to the responsible party.  *Boca Ciega Hotel Inc. v. Bouchard Transportation, Inc.*, 51 F.3d 235, 240 (11th Cir. 1995).  Second, because of the structure of the OPA remedial system, which permits suit only against responsible parties and allows responsible parties to pursue claims against defendants who are not OPA responsible parties (OPA §§ 209, 213(c), 214), claims by injured parties directly against defendants who are not OPA responsible parties should be dismissed without prejudice.  *Gabarick v. Laurin Maritime (America) Inc.*, 623 F. Supp.2d 741, 750-51 (E.D. La. 2009).

An early trial of claims covered by OPA, without submission of those claims to the GCCF, would frustrate this comprehensive Congressional scheme.  At the very least, it would be an unwise use of judicial resources.  This Court will instead be well served by allowing the GCCF substantial time to do its job, build on the over $1.0 billion in claims already paid,  and

seek the settlement of the vast majority of legitimate claims arising from the April 20, 2010 incident and the resulting oil spill.

Even if one looks beyond the exclusive OPA scheme, a trial of an economic damage test case could not proceed until a myriad of complex threshold issues have been resolved that are not implicated in a straightforward limitation trial of injury and death claims.

First, some plaintiffs seem to assume that they can pursue a claim for economic loss under state law. But that assumption is incorrect. The *Deepwater Horizon* incident unquestionably occurred on the federal Outer Continental Shelf. State jurisdiction, regulatory power, and tort law does not extend to the Shelf of its own force. Certain defendants have been designated OPA responsible parties precisely because they were lessees of federal OCS property. *See* 33 U.S.C. § 2701(32) (definition of "responsible party"). In that context, the Outer Continental Shelf Lands Act establishes "exclusive Federal jurisdiction" over the oil drilling "installations and devices . . . attached to the seabed," and extends exclusively federal law to govern those installations and devices for development of natural resources. 43 U.S.C. § 1333(a)(1), (2). "It is evident from this that federal law is 'exclusive' in its regulation of this area." *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 357 (1969). OCSLA, therefore, generally provides that state law will not apply with respect to the *Deepwater Horizon* casualty.

It is, however, possible for an adjacent State's law to apply as ***surrogate*** federal law on the Shelf, if certain conditions can be met, such as showing that there is a gap in federal law and that applying state law as surrogate federal law would not prove inconsistent with federal law. *See Tennessee Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 153-54 (5th Cir. 1996). The relevant issues are complex, however, and the Court should also expect them to be contentious, including over the issue of which State in the Gulf is the adjacent State for OCSLA purposes.

Some economic loss claimants will presumably make arguments based on the provisions of OPA § 2718.  The Supreme Court in *Geier v. American Honda Motor Co.*, 529 U.S. 861, 869 (2000) (emphasis in original), declared that singly or together, an express preemption provision and saving clause "d[id] ***not*** bar the ordinary working of conflict preemption principles." Indeed, earlier the same term, the Supreme Court applied the same approach to its reading of Section 2718 of OPA in an OPA case.  *See United States v. Locke*, 529 U.S. 89, 106 (2000).  The Court held that, despite § 2718, certain state regulations concerning vessel safety were nevertheless pre-empted by portions of the federal Ports and Waterways Safety Act.  *Id.* at 112-16.  OPA § 2718, therefore, has no bearing on the fact that OCSLA makes the Shelf an area of "exclusive federal jurisdiction." *Gulf Offshore Co. v. Mobil Oil Co.,* 453 U.S. 473, 479 (1981). *See also In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* MDL No. 2179 (E.D. La. Oct. 5, 2010) (noting in the course of rejecting a State of Louisiana remand motion to state court that OCSLA's "expansive substantive reach" goes hand in hand with a "broad reading of the jurisdictional grant of [OCSLA] section 1349").  In order for a plaintiff or a State to assert that its law is not preempted, it must first establish that its law applies to the relevant dispute.  And pursuant to OCSLA, state law simply does not extend of its own force to Shelf operations.

Other economic loss claimants might look to maritime law as a source of law to pursue a non-OPA claim in the Limitation proceeding.  It is well settled, however, that OPA displaces maritime claim for recovery of economic loss damages included in OPA § 2702(b).  *See South Port Marine LLC v. Gulf Oil Ltd.*, 234 F.3d 58, 65-66 (1st Cir. 2000); *Gabarick v. Laurin Maritime (America) Inc.*, 623 F. Supp.2d 741, 746-50 (E.D. La. 2009); *Tanguis v. M/V Winchester*, 153 F. Supp.2d 859, 867 (E.D. La. 2001).  *See also National Shipping Co. v. Moran*

*Mid-Atlantic Corp*, 924 F. Supp. 1436, 1453-54 (E.D. Va. 1996), *aff'd w/o opinion*, 122 F.3d 1062 (4th Cir. 1997) (oil spill damage claims governed by OPA; collision damage claims governed by maritime law).  In short, there are numerous threshold legal questions that must be resolved before the economic damage claims can proceed to trial.  The personal injury claimants should not be slowed by the resolution of those issues, and the defendants' right to a considered decision on those issues should not suffer from a rush to judgment.

At bottom, OPA and the Limitation Act are distinct proceedings; they should be kept so.  As the First Circuit explains, "OPA repealed the Limitation Act as to oil spill pollution claims arising under OPA."  *In re Metlife Capital Corp.*, 132 F.3d 818, 822 (1st Cir. 1997).  By contrast, the Limitation Act remains applicable to "non-OPA claims."  *Id.* at 823.  It would not be a wise use of judicial resources, nor would it be in the best interests of the claimants, to inject economic damage claims into the limitation proceeding.

For all these reasons, Defendants respectfully submit that these various complexities and difficulties counsel in favor of trying only injury and death claims in the Limitation proceeding.  In fact, Defendants believe that it makes most sense from a case management perspective to focus on resolving the Limitation issues in the Limitation proceeding, along with any injury or death cases selected for resolution in that proceeding, before making any attempt to design any type of trial of economic loss claims covered by OPA § 2702.

**3.      While a Separate Discovery Track on Spill Extent and Containment Can be Set, The Court Should Not Set any OPA "Test Cases" for Trial Before the Conclusion of the Limitation Action Trial.**

Defendant's draft CMO not only provides for merits discovery on the Limitation action, it provides for early discovery on spill extent, response and containment on a separate track.[4]

---

[4] Defendant Nalco Company, Marine Spill Response Inc. and O'Brien's Response Management take the position that they are situated differently than the other defendants, and the claims against them should be administered

The defense proposed CMO calls for the parties to promptly discuss appropriate written discovery related to spill issues, with discovery on those matters proceeding in early 2011, and with the parties directed to submit another CMO in early July 2011 for the scheduling of designated OPA and economic loss cases for resolution.  Defendants' approach is a reasonable, phased approach for a separate discovery track, given the full blown merits discovery to occur for the Limitation action starting in late 2010 and into 2011.

At the same time, it makes no case management sense to set an early OPA "test case" for trial, before the Limitation action is resolved.  (See Plaintiffs' proposed CMO §VI.A)   As an initial matter, important legal issues will be presented in Defendants' motions to dismiss, and rulings will affect the parameters for and nature of any economic loss "test-case" trials.  These issues include interpretation of OPA's presentment requirement, what law applies to interpret plaintiffs' economic loss claims, and whether plaintiffs are entitled to recover punitive damages.  Efficient litigation management suggests some of these issues likely will be appropriate for interlocutory appeal because they would involve "a controlling question of law as to which there is substantial ground for difference of opinion and [where] immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  *See also* Fed. R. Civ. P. 54(b); *Manual for Complex Litigation* (Fourth), § 11.32, § 15.11 ("Adopted with complex litigation in mind, 28 U.S.C. § 1292(b) provides a mechanism for obtaining early review of crucial orders where an appellate ruling may simplify or shorten the litigation.")

---

differently in some respects.  Each has been named only in a small number of lawsuits, and their involvement in MDL 2179 arises from allegations peripheral to the core allegations common to the vast majority of lawsuits.  For these defendants, their only involvement was as a responder after the events of April 20, 2010.  None of these peripheral defendants is a "responsible party" under the Oil Pollution Act, for example, and most have not been involved in government investigations or produced documents.  Their meritorious legal defenses, which they expect to invoke in motions to dismiss, include defenses that are separate and distinct from those of the other defendants.  Engaging in full master discovery (and related potential disputes) while those motions to dismiss are pending could be extremely burdensome, time consuming and a waste of judicial resources.  Accordingly, the CMO should provide that for these defendants the current stay of discovery should continue through the pendency of such motions.

(footnotes omitted).  Deciding at this time that no interlocutory appeals will be permitted may result in the failure of any such "test cases" to provide meaningful information for more global resolution of economic loss claims to the extent any such claims are not resolved through the Gulf Coast Claims Facility.

Additionally, any trial of an economic loss case is premature because assessment of OPA damages involves ongoing scientific assessment of complex ecological systems and economic conditions.  BP is working closely with over a dozen federal and state agencies responsible for natural resources to assess potential damages from the oil to Gulf Coast fisheries and other natural resources. This process -- under OPA, called a Natural Damages Resource Assessment (NRDA) -- necessarily takes time since some ecological injuries may not be quantifiable until a full round of seasons have passed.  On October 5, 2010, President Obama issued an Executive Order establishing a Gulf Coast Ecosystem Task Force coordinating the work of seven Cabinet agencies and four Executive Office departments on NRDA issues, and even early work of this Task Force will not be complete until late 2011.  As the Executive Order notes, restoration efforts in the Gulf "must be science-based and well-coordinated to minimize duplication and ensure effective delivery of services."  EO, Section 1, *available at* http://www.whitehouse.gov/briefing-room/presidential-actions/executive-orders.   Also, BP is funding independent research the results of which will be relevant to economic loss claims.  For example, BP is funding a $13 million fisheries monitoring program to be administered by the Louisiana Department of Wildlife and Fisheries focusing on potential effects of the oil spill on Louisiana's commercial fisheries, including brown and white shrimp, oysters, blue crab, red drum, red snapper, menhaden, and tuna. Likewise, economic data for 2011 will be informative for resolution of claims for future economic loss relating to tourism in Gulf Coast communities.

Any "test case" trial will necessarily involve expert environmental and economic testimony, and sufficient time must be built into the schedule for reliable data to develop, opinions to be formed, and for *Daubert* challenges to be evaluated.  If "test case" trials are meant to inform broader resolution of individual and business claims, it would be prudent to await the emergence of actual ecological and economic data.  Allowing sufficient time for this data to emerge is consistent with OPA's mandate barring "double recovery under this Act for natural resource damages, including with respect to the costs of damage assessment or restoration, rehabilitation, replacement, or acquisition for the same incident and natural resource."  33 U.S.C. § 2706(d)(3).  In light of this mandate, private parties must not be permitted to recover for harms to natural resources that will be restored pursuant to the NRDA process.

Finally, any such OPA test case would not be a streamlined trial involving a few plaintiffs and BP, with contribution claims decided in separate, subsequent proceedings.  In fact, any economic loss "test case" will necessarily involve many defendants and implicate resolution of the allocation of liability issues to be separately decided in the Limitation action, thereby frustrating the schedule already worked out for addressing these issues.  Pursuant to Fed. R. Civ. 14(a), any defendant in an economic loss test case may bring in all other potentially liable parties as defendants.  Thus, the implication of Rule 14 under OPA is that any "test case" trial will include not only BP as a defendant, but, at a minimum, each and every potentially "responsible party" under the statute. *See* 33 U.S.C. § 2702.  If non-OPA theories of liability remain viable after motions to dismiss, pursuant to Rule 14, a test case would include all potentially liable parties, not only OPA responsible parties.  Rule 14(a)(b) and 14(c)(1) also make clear

contribution actions implicating "admiralty or maritime jurisdiction" would necessarily become part of the same test case.[5]

Thus, defendants possess a substantive right to avoid being burdened with the entirety of a total amount of liability that cannot be abrogated.  Moreover, to the extent recovery of punitive damages is possible, each defendant will need to present evidence relating to its conduct and the conduct of others as it relates to the Deepwater Horizon Incident.  Any early OPA "test case" would therefore run the serious  risk of being a separate, full blown trial relating to allocation of fault of all parties involved in the casualty and its aftermath -- not just a simple streamlined case with narrow issues and a single defendant.

**4.      Other Issues Raised by the Competing CMOs.**

**(a)      Crossclaims and Third Party Practice should be Deferred .**  Plaintiffs' proposed order would require any crossclaims among defendants and third-party complaints, at least for certain claims in Pleading Bundle A, be filed by February 15, 2011.  (Plaintiffs' proposed CMO § IV.B)    In its September 16 minute entry, the Court refused to set such a deadline and it should once again deny this request.  Such an early deadline is contrary to Rules 13 and 14.  Crossclaims are not compulsory under the Federal Rules and in particular Rule 13(g).  Further, given the likelihood of motions to dismiss directed at the upcoming Consolidated and Master Complaints, and because Answers (including Master Answers) may not be filed for many months in many of the MDL 2179 cases, there is no need for seeking to override the time period

---

[5] *See* Advisory Committee Note to Fed. R. Civ. P. 14 (1966 amendment) (emphasis added) ("Rule 14 was modeled on Admiralty Rule 56 . . . .  The importance of this provision was that ***the defendant was entitled to insist that the plaintiff proceed to judgment against the third-party defendant***.  In certain cases this was a valuable implementation of a ***substantive right***.  For example, in a case of ship collision where a finding of mutual fault is possible, one shipowner, if sued alone, faces the prospect of an absolute judgment for the full amount of the damage suffered by an innocent third party; but if he can implead the owner of the other vessel, and if mutual fault is found, the judgment against the original defendant will be in the first instance only for a moiety of [i.e., only its own proportion of] the damages; liability for the remainder will be conditioned on the plaintiff's inability to collect from the third-party defendant.").

set forth in Rule 14(a)(1) for third party complaints.  In addition, the Court has not yet resolved

what law might govern the claims that may govern any crossclaims.  The Defendants submitting

this brief have agreed that crossclaims and third party practice are best deferred, except as is

required by the schedule for the Limitation action.  The Court should in its discretion defer the

setting of any deadlines for crossclaims and third party complaints until a future date (except as

required for the Limitation action).

      **(b)**     **Defendants Should be Entitled to Take Discovery of Plaintiffs.**  Plaintiffs

naturally want to open merits discovery, but their CMO does not provide that the lifting of the

stay on discovery is a two way street.  Plaintiffs' CMO is one sided and unfair.  Despite making

significant demands on the defendants for the production of documents as part of the defendants'

initial Discovery obligations, plaintiffs apparently object to having to produce *any* information as

part of their own initial disclosures, in contradiction to the Federal Rules of Civil Procedure.

Fed. R. Civ. P. 26(a)(1)(A)(iii) requires plaintiffs to provide, unless otherwise stipulated or

ordered by the court, "a computation of each category of damages claimed by the disclosing

party — who must also make available for inspection and copying as under Rule 34 the

documents or other evidentiary material, unless privileged or protected from disclosure, on

which each computation is based, including materials bearing on the nature and extent of injuries

suffered."  Even if the Court is not inclined to require ordinary Rule 26(a)(1) disclosures,

defendants' proposed CMO allows properly defendants to serve discovery on plaintiffs

beginning in November 2010.

      **(c)**     **Class certification issues.**  Plaintiffs' proposed CMO purports to table class

certification issues for the foreseeable future.  (Plaintiffs' CMO VII)  Defendants do not

necessarily object to tabling class certification issues at present, pending the settlement of the

pleadings and other proceedings. But on the assumption that the Master complaints will indeed contain class action allegations, defendants reserve the right to seek to have the Court address class certification issues, and certainly have those issues addressed before any "test case" of OPA or other economic loss case goes to trial.

        **(d)**     **Discovery of GCCF and Extending Preservation Order to GCCF.**  Several of the categories of discovery the plaintiffs propose in their proposed CMO are particularly inappropriate.  A prime example is the requests for communications between the BP Defendants and the Gulf Coast Claims Facility.  (Plaintiffs' Proposed CMO § V.B.4.)  Communications between the BP Defendants and the GCCF have no relevance to any claim properly in court. Such communications do not bear on liability, causation, injury or damages.   In fact, as previously discussed, no plaintiff with a claim subject to the Oil Pollution Act should be in court in the first instance, before claim presentment and denial, much less serving and receiving discovery from an independent facility administered by the neutral GCCF administrator, Kenneth R. Feinberg.  Likewise, as GCCF is not a party to any case in MDL 2179, there is no basis for the provision of plaintiffs' proposed CMO purporting to extend the preservation requirements of PTO #1 to GCCF.  (Plaintiffs' CMO § VIII.)

## CONCLUSION

        Defendants respectfully request that the Court enter Defendants' proposed CMO (Exhibit A) and Scheduling Order (Exhibit B).

Dated:  October 6, 2010

Respectfully submitted,

/s/Don K. Haycraft (Bar #14361)
(dkhaycraft@liskow.com)
R. Keith Jarrett (Bar #16984)
(rkjarrett@liskow.com)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana  70139-5099
Telephone:  (504) 581-7979
Facsimile:  (504) 556-4108
***Attorneys for BP America Inc., BP America
Production Company, BP Company North
America Inc., BP Corporation North
America Inc., BP Exploration & Production
Inc., BP Holdings North America Limited,
BP Products North America Inc.***

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone: (312) 862-2000

Deborah D. Kuchler, T.A. (La. Bar No.
17013)
Janika D. Polk, (La. Bar No. 27608)
Robert E. Guidry (La. Bar No. 28064)
KUCHLER POLK SCHELL
WEINER & RICHESON, LLC
1615 Poydras Street, Suite 1300
New Orleans, Louisiana 70112
Telephone (504) 592-0691
            and
Of Counsel:
James J. Dragna
Bingham McCutchen
355 South Grand Avenue, Suite 4400
Los Angeles, California  90071-3106
Telephone (213)  680-6436
Facsimile (213) 680-8636

Warren Anthony Fitch
Ky E. Kirby
Michael B. Wigmore
Bingham McCutchen
2020 K Street, NW
Washington, DC  20006-1806
Telephone (202) 373-6000
Facsimile (202) 373-6001
***Attorneys for Defendants,***
***Anadarko Petroleum Corporation,***
***Anadarko E&P Company LP,***
***MOEX USA Corporation,***
***and MOEX Offshore 2007 LLC***

David J. Beck, T.A.
  *dbeck@brsfirm.com*
Joe W. Redden, Jr.
  *jredden@brsfirm.com*
David W. Jones
  *djones@brsfirm.com*
Geoffrey Gannaway
  *ggannaway@brsfirm.com*
BECK, REDDEN & SECREST, L.L.P.
One Houston Center
1221 McKinney St., Suite 4500
Houston, TX 77010
Phone: (713) 951-3700
Fax: (713) 951-3720

Howard L. Murphy, 9844
  *hmurphy@dkslaw.com*
Bertrand M. Cass, Jr., 3984
  *bcass@dkslaw.com*
Francis J. Barry, Jr., 2830
  *fbarry@dkslaw.com*
Jonathan M. Walsh, 25922
  *jwalsh@dks.com*
Paul D. Hale, 30539
  *phale@dkslaw.com*
DEUTSCH, KERRIGAN & STILES
755 Magazine Street
New Orleans, Louisiana 70130
Phone: 504-581-5141
Fax: 504-566-4039
         and
Phillip A. Wittmann, 13625

*pwittmann@stonepigman.com*
Carmelite S. Bertaut, 3054
  *cbertaut@stonepigman.com*
Keith B. Hall, 24444
  *khall@stonepigman.com*
Jared Davidson, 32419
  *jdavidson@stonepigman.com*
STONE PIGMAN WALTHER WITTMANN
L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax: 504-581-3361
***Attorneys for Defendant Cameron
International Corporation***

Don Jackson
donjackson@warejackson.com
C. Dennis Barrow, Jr.
dennisbarrow@warejackson.com
Ware, Jackson, Lee & Chambers, L.L.P.
2929 Allen Parkway, 42nd Floor
Houston, Texas 77019-7101
Telephone: (713) 659-6400
Facsimile: (713) 659-6262
***Attorneys for Dril-Quip, Inc.***

Donald E. Godwin
*Attorney in Charge*
dgodwin@godwinronquillo.com
Bruce W. Bowman, Jr.
bbowman@godwinronquillo.com
Jenny L. Martinez
jmartinez@godwinronquillo.com
Floyd Hartley
fhartley@godwinronquillo.com
Gavin Hill
ghill@godwinronquillo.com
GODWIN RONQUILLO PC
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
Telephone: 214.939.4400
Facsimile: 214.760.7332
          and
R. Alan York
ayork@godwinronquillo.com

1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone:  713.595.8300
Facsimile:  713.425.7594
*Attorneys for Defendant*
*Halliburton Energy Services, Inc.*

Hugh E. Tanner
htanner@morganlewis.com
Denise Scofield
dscofield@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana St., Suite 4000
Houston, TX  77002
Telephone:  (713) 890-5000
*Attorneys for M-I L.L.C.*

Mary Rose Alexander
mary.rose.alexander@lw.com
LATHAM & WATKINS
233 South Wacker Drive, Suite 5800
Chicago IL  60606
Telephone: (312) 876-7700
*Attorneys for Nalco Company*

Glenn G. Goodier
ggoodier@joneswalker.com
JONES WALKER
201 St. Charles Avenue
New Orleans, LA  70170-5100
Telephone:  (504) 582-8174
*Attorney for Defendant Weatherford U.S.,*
*L.P*

**Alan M. Weigel**
**Blank Rome LLP**
The Chrysler Building 405 Lexington Avenue
| New York, NY 10174-0208
Phone: 212.885.5350 | Fax: 917.332.3836 |
Email: AWeigel@BlankRome.com
*Attorney for Marine Spill Response*
*Corporation*

Michael J. Lyle
Weil, Gotshal & Manges LLP
1300 Eye Street, N.W., Suite 900
Washington, D.C.  20005
Phone: (202) 682-7157
*Fax: (202) 857-0940*
***Attorney for Seacor Marine, LLC, Seacor
Marine, Inc. Seacor Marine International,
Inc., and  O'Brien's Response Management,
Inc.***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 6, 2010, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the court's electronic filing system.  I also certify that I have mailed this filing by United States Postal Service to all counsel of record who are not registered to receive electronic service by operation of the court's electronic filing system.

_____/s/ Don K. Haycraft_____
Don K. Haycraft
