## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | § MDL NO. 2179 |
| | § |
| | § SECTION J |
| | § |
| THIS DOCUMENT RELATES TO 2:10-cv-03116-CJB-SS | § JUDGE BARBIER |
| | § |
| | § MAG. JUDGE SHUSHAN |

### PLAINTIFFS' FIRST AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, FLOYD, FLOYD, PEARCE OF BEAUMONT, L.P.; FLOYD, FLOYD & SONS, L.L.C., D/B/A FLOYD'S CAJUN SEAFOOD HOUSE; FLOYD'S RESTAURANTS OF PEARLAND, INC., D/B/A FLOYD'S CAJUN SEAFOOD & TEXAS STEAKHOUSE; BRET FLOYD; COASTLINE SEAFOOD INTERNATIONAL, L.L.C.; FLOYD LANDRY; CATFISH CABIN, INC.; TIM JAMES; JEREMY JOHNSON; NICHOLAS JOHNSON; BIG JOHNSON'S CHARTERS, INC.; TIM BERRYMAN D/B/A CATFISH CABIN; TIMOTHY GLEN BERRYMAN; and REBECCA A. BERRYMAN; RICKY LANE; RICKY LANE DBA LUCK IN A BUCKET BAIT SHOP; PAUL MALIN, SR; PAUL MALIN, SR. D/B/A PAUL'S SEAFOOD hereinafter referred to as "Plaintiffs," and complaining of BP, PLC; BP AMERICA, INC.; BP CORPORATION NORTH AMERICA, INC.; BP COMPANY NORTH AMERICA, INC.; BP PRODUCTS NORTH AMERICA, INC.; ANADARKO PETROLEUM CORP.; MOEX OFFSHORE 2007, LLC; TRANSOCEAN, LTD.; TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC.; TRANSOCEAN DEEPWATER,

INC.; HALLIBURTON ENERGY SERVICES, INC.; CAMERON INTERNATIONAL CORPORATION f/k/a COOPER CAMERON CORPORATION; and M-I, L.L.C., hereinafter referred to as Defendants, and for cause of action would show that this action is brought pursuant to the provisions of the Tex. Civ. Prac. & Rem. Code *§15.002 (a) (1)* because a substantial part of the events or omissions that give rise to the claim occurred in whole or in part in Jefferson County, Texas. Floyd, Floyd, Pearce of Beaumont, L.P. is located in Jefferson County, Texas and incurred substantial loss due to the negligence of the Defendants. Furthermore, Plaintiff's damages are within the jurisdictional limits of the Jefferson County District Court and therefore Plaintiffs filed their original petition in the District Court of Jefferson County, Texas.   The case was, however, subsequently removed by Defendants to the United States District Court for the Eastern District of Texas, Beaumont Division.

## I. PARTIES

1.     Plaintiff, **Floyd, Floyd, Pearce of Beaumont, L.P.** is properly before this Honorable Court.

2.     Plaintiff, **Floyd, Floyd & Sons, L.L.C., d/b/a Floyds Cajun Seafood House,** is properly before this Honorable Court.

3.     Plaintiff, **Floyds Restaurants of Pearland, Inc., d/b/a Floyd's Cajun Seafood and Texas Steakhouse** is properly before this Honorable Court.

4.     Plaintiff, **Coastline Seafood International, L.L.C.** is properly before this Honorable Court.

5.     Plaintiff, **Bret Floyd** is properly before this Honorable Court.

6.     Plaintiff, **Floyd Landry** is properly before this Honorable Court.

7.      Plaintiff, **Catfish Cabin, Inc.** is properly before this Honorable Court.

8.      Plaintiff, **Tim James** is properly before this Honorable Court.

9.      Plaintiff, **Nicholas Johnson** is properly before this Honorable Court.

10.     Plaintiff, **Jeremy Johnson** is properly before this Honorable Court.

11.     Plaintiff, **Big Johnson's Charters, Inc.** is properly before this Honorable Court.

12.     Plaintiff, **Tim Berryman, d/b/a Catfish Cabin** is properly before this Honorable Court.

13.     Plaintiff, **Timothy Glen Berryman** is properly before this Honorable Court.

14.     Plaintiff, **Rebecca A. Berryman** is properly before this Honorable Court.

15.     Plaintiff, **Ricky Lane, d/b/a Luck in a Bucket Bait Shop,** is a sole proprietorship in the State of Texas and with its principal place of business in Pt. Arthur, Jefferson County Texas.

16.     Plaintiff, **Ricky Lane** is a Texas citizen and a resident of Pt. Arthur, Jefferson County, Texas who owns and operates Ricky Lane d/b/a Luck in a Bucket Bait Shop.

17.     Plaintiff, **Paul Malin, d/b/a Paul's Seafood,** is a sole proprietorship in the State of Texas and with its principal place of business in Vidor, Jefferson County Texas.

18.     Plaintiff, **Paul Malin,** is a Texas citizen and a resident of Orange, Orange County, Texas who owns and operates Paul Malin d/b/a Paul's Seafood.

19.     Defendant, **BP, P.L.C.** is properly before this Honorable Court.

20.     Defendant, **BP America, Inc** is properly before this Honorable Court.

21.     Defendant, **BP Corporation North America, Inc.** is properly before this Honorable Court.

22.     Defendant, **BP Company North America, Inc** is properly before this Honorable Court.

23.     Defendant, **BP Products North America, Inc**. is properly before this Honorable Court.

Defendants, **BP America, Inc., BP Corporation North America, Inc., BP Company North America, Inc. and BP Products North America, Inc.** are wholly owned subsidiaries of the global parent corporation, BP, PLC, and they shall be referred to herein collectively as "BP".

Defendant, BP holds the lease granted by the U.S. Minerals Management Service ("MMS") that allows BP to drill for oil and perform oil-production-related operations at the Macondo site in Mississippi Canyon Block 252 section of the outer continental shelf in the Gulf of Mexico. As of April 20, 2010, BP operated the Macondo oil well that is the source of the current oil spill.

24.     Defendant, **Anadarko Petroleum Corp. ("Anadarko")** is properly before this Honorable Court.

25.     Defendant, **MOEX Offshore 2007, L.L.C. ('MOEX")** is properly before this Honorable Court.

26.     Defendant, **Transocean Ltd.** is properly before this Honorable Court.

27.     Defendant, **Transocean Deepwater, Inc.** is properly before this Honorable Court.

28.     Defendant, **Transocean Offshore Deepwater Drilling, Inc.** is properly before this Honorable Court.

Defendants, **Transocean Deepwater, Inc. and Transocean Offshore Deepwater Drilling, Inc.** are wholly owned subsidiaries of the global parent corporation, Transocean Ltd., and they shall be referred to herein collectively as "Transocean".

Transocean owned, and BP was leasing and operating, the Deepwater Horizon as it performed production well completion operations on the Macondo well on the outer continental shelf off the Gulf Coast, at the site from which the oil spill now originates.

At all times material hereto, the Deepwater Horizon was owned, manned, possessed, managed, controlled, chartered and/or operated by Transocean and/or BP.

29.     Defendant, **Halliburton Energy Services, Inc. ("Halliburton")** is properly before this Honorable Court.

30.     Defendant, **Cameron International Corporation f/k/a Cooper Cameron Corporation ("Cameron")** is properly before this Honorable Court.

31.     Defendant, **M-I, L.L.C. ('M-I")** is properly before this Honorable Court.

## II. JURISDICTION

This complaint was originally filed in the District Court of Jefferson County, Texas as Plaintiffs allege that court has jurisdiction over the subject matter of this lawsuit and within the jurisdictional limits of that court. However, Defendants filed

Notice of Filing Notice of Removal of this case to the United States District Court for the Eastern District of Texas, Beaumont Division on July 29, 2010.

Pursuant to Tex. Civ. Prac. & Rem. Code § 15.002 (a) (1), venue is proper in Jefferson County, Texas.

### III. FACTS RELATED TO PLAINTIFF'S CLAIMS

Deepwater Horizon was an ultra-deepwater dynamic positioned semi-submersible oil rig built in 2001.  It was owned by Transocean Ltd. and leased to BP through September 2013.  It was one of the largest rigs of its kind.

BP leased the Deepwater Horizon to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252 off the coast of Louisiana.

On April 20, 2010, the Deepwater Horizon was creating a cement seal and plug of the wellhead as part of the final phases of turning the Macondo well from an exploratory well into a production well.  "Cementing" is delicate work that carries the risk of a blowout, which is the uncontrolled release of oil from the well.

During the course of this cementing work, an explosion occurred on the Deepwater Horizon and it caught fire.  Investigators believe the explosion was a blowout, likely caused by the cementing work the Deepwater Horizon had been performing.  The fire burned for two days, and the rig began to list progressively more until it finally sank on April 22, 2010.

The Deepwater Horizon had been connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser.  As the Deepwater Horizon sank to the seafloor, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely.  The riser, bent into a crooked shape

underwater, now extends from the well to 1,500 feet above the seabed and then buckles back down.  Oil is flowing out from the open end of the riser and from two places along its length.

Although the now-leaking wellhead is fitted with a blowout preventer, known as a BOP, a stack of hydraulically activated valves at the top of the well designed to pinch the pipe closed, cut it, and seal off the well in the event of a sudden pressure release exactly like the one that occurred during the Deepwater Horizon blowout, the response teams have been unable to activate the Deepwater Horizon's BOP.

If the BOP on the wellhead had been functional, it could have been manually or automatically activated right after the explosion, cutting off the flow of oil at the wellhead, limiting the spill to a minute fraction of its current severity and thereby sparing Plaintiffs millions of dollars in losses and damage.

At the time of this filing, the wellhead has not been capped and the flow of oil continues unabated into the Gulf waters.  The ever-expanding oil slick made landfall on the fragile coastline on Friday morning, April 30, 2010, and will continue to affect more and more Gulf coastline as it is driven landward by currents and winds. Although BP has begun drilling a relief well to stop the flow to the leaking well, the relief well may take months to complete, while oil continues to flow out of the leaking well.

While the media has compared this spill to the 1989 Exxon Valdez disaster, one crucial difference is that the Valdez was a tanker with a limited

supply of oil. Experts estimate that the volume of this continuous gush of oil will eclipse that of the Valdez spill within 50 days.  In contrast, the relief well will most likely take 60 to 90 days to complete, virtually ensuring this spill's classification as the worst oil spill in history.

What is worse, the floating booms BP has set out to block the oil from reaching the coastline may be too low and/or be placed too far out to sea to be useful.  Experts report that anything higher than a three-foot wave will clear the boom, lifting the oil slick over the barriers with it.  Over the past days, the Gulf has been experiencing seven to ten foot swells, diminishing the usefulness of the booms.

As the oil continues to make landfall along the Gulf Coast, it will cause severe damage to the delicate wetlands and intertidal zones that line the coast of, destroying the habitats where fish, shellfish and crustaceans breed, spawn, and mature.

The timing of this disaster makes it even more damaging, as May is spawning season for some sea life and migration time for the young of some species of shrimp and various pelagic fish.

Such devastation at the literal source of life for so many species will severely damage and perhaps even destroy the livelihoods of the Plaintiffs who rely on this sea life for their livelihoods. Plaintiffs are businesses and individuals who rely on the natural resources found in the Gulf of Mexico, including fish, shellfish, shrimp, oysters and other aquatic life, for their livelihood.

On May 2, 2010 the National Oceanographic and Atmospheric Administration ("NOAA") restricted fishing for a minimum of ten days in waters between Louisiana state waters at the mouth of the Mississippi River to the waters off Florida's Pensacola Bay, an area of 6,800 square miles. The NOAA may soon declare a "fisheries disaster" in the area.

The Gulf region accounts for about one-fifth of the total U.S. commercial seafood production and nearly three-quarters of the nation's shrimp output, in total harvesting more than one billion pounds of finfish and shellfish per year. Nearly a third of all marine recreational fishing trips, including those part of the $1 billion per year sport fishing industry, take place on Gulf waters, according to the NOAA. In 2008, the 3.2 million recreational fishermen in the Gulf of Mexico region took 24 million fishing trips. All of these activities and businesses will be severely impacted or destroyed by this catastrophic spill.

The risks of offshore drilling are well known to Defendants, and are especially high in the Gulf of Mexico, where floating rigs are used, unlike the permanent rigs used in other seas such as the North Sea. Permanent rigs are anchored to the ocean floor and cannot sink, while floating rigs are far more precarious and subject to disastrous results like this incident.

Moreover, Defendants knew the work the Deepwater Horizon was performing was especially risky. In 2007, the MMS raised concerns about oil rig blowouts associated with the exact type of cementing work the Deepwater Horizon was doing when it exploded.

Although blowouts due to other causes were on the decline, the MMS study noted that blowouts during cementing work were continuing with regularity, and most frequently in the Gulf of Mexico.  Cementing problems were associated with 18 of 39 blowouts between 1992 and 2006, and 18 of 70 from 1971 to 1991. Nearly all the blowouts examined occurred in the Gulf of Mexico.

Defendants were aware of the recent August 2009 blowout in the Timor Sea, which was found to have been caused by careless cementing work.  During that incident, which bears a strong resemblance to the Deepwater Horizon blowout, oil leaked from the site for ten weeks, spreading damage over 200 miles from the well site.

The threat of blowouts increases as drilling depth increases.  Deepwater Horizon was drilling in 5,000 feet of water, to a total depth of 18,000 feet below the sea floor. Defendants were aware of the high risk of blowouts from such deep drilling.

In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanism, the BOP. Defendants were aware of the risk of the BOP failing at greater depths, yet did not install a backup BOP activation system or a backup BOP.

A 2004 study by federal regulators showed that BOPs may not function in deep-water drilling environments because of the increased force needed to pinch and cut the stronger pipes used in deep-water drilling. Only three of 14 rigs studied in 2004 had BOPs able to squeeze off and cut the pipe at the water

pressures present at the equipments' maximum depth. "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a blowout," the study said. Moreover, the study singled out Cameron, the manufacturer of the Deepwater Horizon's BOP, for relying on faulty calculations to determine the needed strength for its BOP equipment to function properly at greater depths.

Defendants could have installed a back up trigger to activate the BOP in the event of the main trigger failing to activate it. Although the backup trigger is a common drill-rig requirement in other oil-producing nations, including other areas where BP operates, the Deepwater Horizon was not equipped with this backup remote BOP trigger.

Nor was the Deepwater Horizon equipped with a second, backup BOP, as newer rigs increasingly are. The Deepwater Horizon only had one BOP installed, leaving the wellhead vulnerable to disaster if the single BOP fails, as it may have done in this case.

Defendants' failure to take precautionary backup measures when drilling at depths they knew to be especially risky is made all the worse by the fact that Defendants were drilling so close to an extremely delicate and important natural resource: the Gulf Coast marshes, wetlands, and estuaries that are a wellspring of marine life, and the source of Plaintiffs' livelihoods.

Defendant BP has a history of cutting corners on safety to reduce operating costs. In 2005, a blast at a Texas refinery killed 15 people and injured

more than 170; federal investigators found the explosion was in part due to cost-cutting and poor maintenance. Also in 2005, a large production platform in the Gulf of Mexico began listing severely due to a defective control system.  And in 2006, four years after being warned to check its pipelines, BP had to shut down part of its Prudhoe Bay oilfield in Alaska after oil leaked from a corroded pipeline.

Nevertheless, BP continues to fight for less regulation of the oil exploration and production industry. In 2009, Defendant BP spent $16 million lobbying the federal government on issues including encouraging removing restrictions on drilling on the continental shelf, despite its history of spills and explosions and its knowledge of the high risks involved in such drilling.

Moreover, Defendants have actively opposed MMS rules requiring oil rig lessees and operators to develop and audit their own Safety and Emergency Management Plans, insisting that voluntary compliance will suffice. The Deepwater Horizon incident is a tragic example to the contrary.

The fire and explosion on the Deepwater Horizon, its sinking and the resulting oil spill were caused by the negligence of Defendants, which renders them liable jointly and severally to Plaintiffs for all their damages.

Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Plaintiffs, and the Gulf of Mexico's marine and coastal environments and estuarine areas, where Plaintiffs work and earn a living.  Moreover, additional safety mechanisms, technologies, and precautions were known and available to Defendants, but Defendants chose not to employ them on the Deepwater Horizon.

After the explosion, Defendants attempted to downplay and conceal the severity of the oil spill. Their initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of the actual leak amount of 5,000 barrels of oil per day. Moreover, Defendants were slow and incomplete in their announcements and warnings to Gulf Coast residents and business people about the severity, forecast, and trajectory of the oil spill.

The oil spill and the resulting contamination have caused and will continue to cause loss of revenue to Plaintiffs, Individually and to their businesses, because Plaintiffs cannot use the Gulf of Mexico shore to work and to earn a living.

There are many other potential effects from the oil spill that have not yet become known, and Plaintiffs reserve the right to amend this petition once additional information becomes available.

## IV. COUNT I- NEGLIGENCE

The Defendants owed a legal duty to the Plaintiffs. Specifically, the Defendants owed a duty to all Plaintiffs to exercise reasonable care in the manufacture, maintenance and operation of the Deepwater Horizon. Defendants breached their duty in the following ways:

(a) Failing to properly maintain and/or operate the Deepwater Horizon;

(b) Operating the Deepwater Horizon in such a manner that an explosion and fire occurred onboard, causing it to sink and resulting in an oil spill;

(c) Failing to properly inspect the Deepwater Horizon to assure that all equipment and personnel were fit for their intended purpose;

(d) Acting in a careless and negligent manner;

(e) Failing to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the Deepwater Horizon, which would have prevented the disaster;

(f) Failing to take appropriate action to avoid or mitigate the accident;

(g) Negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

(h) Failing to ensure that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

(i) Failure to timely warn;

(j) Failure to timely bring the oil release under control;

(k) Failure to provide appropriate disaster preventative equipment;

(l) Acting in a manner that justifies imposition of punitive damages; and

(m) Such other acts and omissions as will be shown at the trial of this matter.

The blowout explosion, fire and resulting oil spill and the disastrous results are the Plaintiffs' damages which were proximately caused by Defendants' negligence.

The injuries and damages to Plaintiffs were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

Furthermore, the disaster would not have occurred had the Defendants exercised a high degree of care. Plaintiffs, therefore, plead the doctrine of *res ipsa loquitur*.

## COUNT II-GROSS NEGLIGENCE

The Defendants' acts and/or omissions constitute conscious-indifference malice or gross negligence. The Defendants' acts and/or omissions involved an extreme degree of risk and the Defendants had actual, subjective awareness of the risk but proceeded with a conscious indifference to the rights, safety or welfare of others, including the Plaintiffs.

Defendants owed a duty to all Plaintiffs to exercise reasonable care in the manufacture, maintenance, and operation of the Deepwater Horizon.

Defendants had a heightened duty of care to all Plaintiffs because of the great danger associated with deep drilling from floating platforms, and the especially high risk of blowouts during cementing work such as that Deepwater Horizon was performing at the time of the explosion.

Defendants breached their legal duty to Plaintiffs, failed to exercise reasonable care, and acted with reckless, willful, and wanton disregard for the business and livelihood of others, including Plaintiffs in the negligent manufacture, maintenance, and/or operation of the Deepwater Horizon.

Defendants knew or should have known that their wanton or reckless conduct would foreseeably result in a disastrous blowout and oil spill, causing damage to the economic interests of individuals and businesses in the area affected by the oil spill.

As a direct and proximate result of Defendants wanton or reckless conduct, Plaintiffs have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, loss of livelihood, loss of income, and other economic loss.

Defendants' wanton or reckless conduct, as described herein, entitles Plaintiffs to punitive damages.

## COUNT III- NEGLIGENCE *PER SE*

Defendants' conduct with regard to the manufacture, maintenance, and/or operation of drilling operations and oil rigs such as the Deepwater Horizon is governed by numerous state  laws, and permits issued under the authority of these laws.

These laws and permits create statutory standards that are intended to protect and benefit Plaintiffs.

Defendants' violations of these statutory standards constitute negligence *per se* under Texas law.

Defendants' violations of these statutory standards proximately caused Plaintiffs' injuries, warranting compensatory and punitive damages.

## V. DAMAGES

As a result of all acts and/or omissions set forth herein, the Defendants are liable for all of Plaintiffs' damages that are reasonable, which damages consist of but are not limited to the following:

a.   Past, present and future economic and compensatory damages in amounts to be determined at trial;

b.   Past, present and future lost earnings;

c.  Past, present and future lost profits;

d.  Past, present and future earning capacity;

e.  General damages cognizable by the laws of the United States of America; and

f.  Any and all other damages to be shown at the trial of this matter.

Each and all of the foregoing acts of negligence proximately caused or contributed to the personal injuries and damages sustained by Plaintiffs.

## VI. <u>CLAIM FOR ATTORNEY'S FEES AND COSTS</u>

Defendants' negligence, gross negligence and negligence *per se* necessitated Plaintiffs hiring of the undersigned attorneys and their agreeing to pay a reasonable fee therefore and Plaintiff's seek to recover attorney's fees, and other necessary expenses incurred by them in prosecuting these claims, all to such extent and in such amounts as the evidence may show proper at the time of trial.

## VII. <u>CLAIM FOR PUNITIVE DAMAGES</u>

Plaintiffs further make a claim for punitive damages. Plaintiffs' claims for punitive damages are based on Defendants' willful violation of their duty to maintain safety, rights and/or welfare of others, including the Plaintiffs and will show that Defendants' acts or failures to act recklessly increased the likelihood that Plaintiffs would be injured by a dangerous and safe condition of the Deepwater Horizon.  Furthermore, Plaintiffs seek to recover punitive damages as a result of Defendants' bad faith conduct, by their willful and callous failure to

provide appropriate manufacture, maintenance and operation of the Deepwater Horizon.

## VIII. PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs pray that the Defendants be cited to appear and answer herein as the law directs, and that upon final hearing hereof, Plaintiffs do have and recover judgment of and from the Defendants in such amounts, pursuant to the foregoing allegations, as the evidence may show proper, together with interest thereon at the legal rate, costs of court, and for such other and further relief, general and special, at law and in equity, to which Plaintiffs may be justly entitled.

a.  All actual earnings and compensatory damages permitted by law, including, but not limited to past, present and future economic and compensatory damages, lost earnings, lost profits, lost earning capacity, and for pain and suffering associated with Plaintiffs' injuries in an amount greater than the federal arbitration limit of $150,000.00 (exclusive of interest and costs);

b.  Pre-judgment and post-judgment interest at the highest legal rate;

c.  Litigation expenses and costs of suit;

d.  Reasonable attorneys fees;

e.  Punitive damages;

f.  Such other and further relief as this Court finds necessary and proper.

Respectfully submitted,

By:

Walter Umphrey
State Bar No. 20380000
Jacqueline Ryall
State Bar No. 17469445
PROVOST*UMPHREY LAW FIRM, L.L.P.
490 Park Street
P.O. Box 4905
Beaumont, TX  77701
Telephone:  (409) 835-6000
Facsimile:  (409) 813-8626
**ATTORNEY FOR PLAINTIFFS**

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2010, we electronically filed Plaintiffs' First Amended Complaint using the CM/ECF system which will automatically send email notification of such filing to the listed attorneys of record. Plaintiff's have also served copies by CM/RRR to each attorney of record.