1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  OIL SPILL BY THE OIL RIG     *   10-MD-2179-CJB-SS
            *DEEPWATER HORIZON* IN THE    *
6           GULF OF MEXICO ON             *
            APRIL 20, 2010                *   November 1, 2010
7                                         *
                                          *
8   This Document Relates to All Cases    *   10:00 a.m.
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

9

10

11                DISCOVERY CONFERENCE BEFORE THE
                    HONORABLE SALLY SHUSHAN
12              UNITED STATES MAGISTRATE JUDGE

13  Appearances:

14
    For the Plaintiffs:          Domengeaux Wright Roy
15                                 & Edwards, LLC
                                  BY:  JAMES P. ROY, ESQ.
16                                556 Jefferson Street, Suite 500
                                  Post Office Box 3668
17                                Lafayette, Louisiana 70502

18
    For the Plaintiffs:          Herman, Herman, Katz & Cotlar, LLP
19                                BY:  STEPHEN J. HERMAN, ESQ.
                                  820 O'Keefe Avenue
20                                New Orleans, Louisiana 70113

21
    For the Defendants:          Liskow & Lewis, APLC
22                                BY:  DON K. HAYCRAFT, ESQ.
                                  701 Poydras Street, Suite 5000
23                                New Orleans, Louisiana 70139

24

25

1    Appearances:

2
      For the Defendants:              Kirkland & Ellis, LLP
3                                      BY:   J. ANDREW LANGAN, ESQ.
                                             WENDY L. BLOOM, ESQ.
4                                      300 N. Lasalle
                                       Chicago, Illinois 60654
5

6     For the Defendants:              Godwin Ronquillo, PC
                                       BY:   DONALD E. GODWIN, ESQ.
7                                            JENNY L. MARTINEZ, ESQ.
                                       1201 Elm Street, Suite 1700
8                                      Dallas, Texas 75270

9
      For the Defendants:              Kuchler Polk Schell
10                                        Weiner & Richeson, LLC
                                       BY:   DEBORAH D. KUCHLER, ESQ.
11                                     1615 Poydras Street, Suite 1300
                                       New Orleans, Louisiana 70112
12

13    For the Defendants:              Stone Pigman Walther Wittmann, LLC
                                       BY:   PHILLIP A. WITTMANN, ESQ.
14                                           CARMELITE M. BERTAUT, ESQ.
                                       546 Carondelet Street
15                                     New Orleans, Louisiana 70130

16
      Also Present:                    Duke Williams, Esq.
17                                     Anthony Irpino, Esq.
                                       William F. Lange, Esq.
18                                     Chris Zainey, Esq.
                                       Tad Tsekerides, Esq.
19

20    Official Court Reporter:         Toni Doyle Tusa, CCR, FCRR
                                       500 Poydras Street, Room HB-406
21                                     New Orleans, Louisiana 70130
                                       (504) 589-7778
22

23

24
      Proceedings recorded by mechanical stenography; transcript
25    produced by computer.

**PROCEEDINGS**

**(November 1, 2010)**

**THE DEPUTY CLERK:**  Court is in session.

**THE COURT:**  Good morning.  Can you hear us on the phone?

**MR. TSEKERIDES:**  Yes, we can.

**THE COURT:**  All right.  Has everybody signed the sign-in sheet?  Last time, we had about half of you sign.  So if you get a minute entry showing you were not present, that's your problem.

In any event, guys, I apologize for the mixup on my receiving the forms.  They went to Marie, they went to Mike, and I must have cleaned out my in-box on Friday.  Anyway, I have reviewed them this morning.  Let me tell you what I'm thinking and then you all can comment.

Judge Barbier, in Pretrial Order 11, leads me to believe that he does think the form should be a fairly simple form.  I've gone through the Gulf Coast Claims Facility claim form, and it appears to give the defendants most of the information I think they're looking for.  So my thought process is that we modify the one-page form that the plaintiffs have submitted and add a couple things to it.

It would be fairly simple to check off whether they are making a claim for damages due to:

(1) real estate;

1          (2) personal/business property;

2          (3) earnings/profits;

3          (4) natural resources subsistence; or

4          (5) personal injury/death.

5          Now, if we do that, then with the first four

6     categories, the information that I believe the defendants are

7     looking for is going to be in the Gulf Coast Claims Facility

8     information.  I would propose that we make that information

9     available to the defendants either by order of Judge Barbier,

10    which I think is doable, or by a release signed by the

11    attorneys for the plaintiffs, which I think is doable, either

12    way, whichever the parties would prefer.

13          Then you will have, defendants, all of the claim

14    information that they filled out in this multipage -- let's

15    see.  The Gulf Coast Claims Facility claim form is 12 pages not

16    including supporting exhibits.  So I think that in large part

17    will take care of that.

18          Now, let's talk about the personal injury/death

19    claims.  Not all of the people who are personal injury/death

20    claimants have filed with the Gulf Coast Claims Facility; is

21    that right?

22          MR. HERMAN:  I think that's correct.  In fact,

23    probably very few of them have.

24          THE COURT:  That's what I thought.  So we are going

25    to have to handle them a little differently.  Obviously, we are

1　going to need identification of medical providers.  We are

2　going to need medical release forms, which I do believe are

3　going to have to be signed by the individual claimant because I

4　don't think HIPAA will allow the attorneys to file those.  So

5　if they check off personal injury/death claimant, we will need

6　to go a step further with them.

7　　　　　　　　MR. HERMAN:  Okay.

8　　　　　　　　THE COURT:  That's my initial thought of how we

9　probably can modify the claim form to take care of your

10　concerns and let you see the underlying information that

11　Mr. Feinberg is custodian of.

12　　　　　　　　Good morning, Mr. Haycraft.

13　　　　　　　　MR. HAYCRAFT:  Good morning.  First, I want to

14　introduce Wendy Bloom and once again Andy Langan.  Wendy will

15　be taking the lead on this argument, but I do want to mention

16　in the several categories of extra information to be checked

17　off, there's also cleanup and removal costs.  I think Ms. Bloom

18　will want to address what about the claimants who haven't filed

19　with the GCCF, what about the need for a signed authorization

20　to get the GCCF records, but I will let her address that.

21　　　　　　　　THE COURT:  We'll let her address it, but what about

22　having Judge Barbier tell Mr. Feinberg that he is to honor

23　requests for the following claimants or something along those

24　lines?

25　　　　　　　　MR. HAYCRAFT:  Well, somebody would have to provide

1   Mr. Feinberg with a list of all plaintiffs and then some order

2   or some written authorization that Mr. Feinberg can release

3   that information because otherwise it's confidential.

4           **THE COURT:**  Oh, absolutely.  I read the

5   confidentiality provision and I'm with you.

6           **MR. HAYCRAFT:**  Let Ms. Bloom address the legal

7   arguments.

8           **THE COURT:**  Okay.  By the way, I agree cleanup and

9   removal costs should be in the listing.  It's now six.

10          **MR. LANGAN:**  Your Honor, it's Andy Langan.  My

11  partner, Wendy Bloom, is going to cover some of this as well.

12          Just a couple thoughts on behalf of BP.  I think

13  Your Honor understands one issue that we are having and that is

14  BP and the GCCF are not the same thing.

15          **THE COURT:**  I'm with you.

16          **MR. LANGAN:**  It isn't like we get every piece of

17  paper; in fact, quite the contrary.  So we do have to have some

18  manner of making sure we have the authority to obtain the

19  material from the GCCF.  The GCCF is not a party to the

20  litigation and so there might be some question about

21  Judge Barbier's ability, at least at this time, to order this.

22          It's solvable by the claimants themselves or

23  perhaps their attorneys making clear that we have the authority

24  to provide their information, to go to the GCCF and say we have

25  these authorities.  I guess that's part of Your Honor's

1   protocol there.

2        **THE COURT:**  It is.  There's no question that I

3   understand it's a separate entity, that it's highly

4   confidential information, and it seems to me there's a couple

5   of ways we could handle it.

6             We could speak to Mr. Feinberg and see if he

7   will agree.  We can ask Judge Barbier to enter an order, which

8   I haven't spoken to him about but I'm sure he would be open to.

9   We can provide the plaintiff's counsel's signature on the

10  authorization on behalf.  It seems to me counsel of record, if

11  they certify they have got authority to act on behalf of the

12  plaintiff, then we are going to hold them to it.

13       **MR. LANGAN:**  Of the options you have mentioned,

14  especially since the GCCF is not a party to MDL 2179 and I

15  can't speak for them but I would assume has no interest in

16  becoming same, the latter proposal seems to be the most

17  promising from BP's perspective.

18       **THE COURT:**  I'm very comfortable with that.  If you

19  all discuss it and feel comfortable with that, we are going to

20  hold the plaintiff group accountable on behalf of their

21  clients.  If they certify they have got their clients'

22  authority to release these records, then so be it.  So I'm

23  willing to rely on their signature, provide that to

24  Mr. Feinberg and ask him to release all claims files on those

25  people.

 1          **MR. HERMAN:**  Just to make clear, at least in the

 2   first instance, the information would be confidential under the

 3   protective order?

 4          **THE COURT:**  The information will be maintained as

 5   confidential under the protective order.  As I understand it,

 6   the Gulf Coast Claims Facility will release information for

 7   legitimate purposes in administering the fund.  This goes a

 8   little bit further than that, but I think it's a legitimate

 9   purpose.  As long as it's under the protective order entered in

10   this proceeding, I don't have a problem with it.  So that being

11   said, that's kind of where I'm heading, but let me hear from

12   the parties.

13          **MR. WITTMANN:**  Your Honor, Phil Wittmann representing

14   Cameron.

15          **THE COURT:**  Come on up to the mic.

16          **MR. WITTMANN:**  If the file maintained by Mr. Feinberg

17   comes back with no information in it, what do we do about that?

18          **THE COURT:**  Well, we will have to cross that bridge.

19   It seems to me that that's something we are going to have to

20   look at on a case-by-case basis.  Most of the information,

21   Phil, that you-all were looking for on your claim file seems to

22   be information that is in the Gulf Coast claim packet.

23   Obviously, if it's blank --

24          **MR. WITTMANN:**  I understand there are a lot of

25   blanks.  That's why I'm addressing it this morning.

1          **THE COURT:**  I expect we are going to have that.  I
2    expect that Mr. Feinberg is going to reject those claims, and
3    the people will either supplement or have their claims
4    rejected, huh?
5          **MR. HERMAN:**  I think if, as they contend, the purpose
6    of the plaintiff profile form -- most of this really is an
7    issue of timing and scope because if they are plaintiffs in the
8    lawsuit a year from now, they're probably going to be entitled
9    to much greater discovery, maybe even bigger plaintiff profile
10   forms.
11          At this limited time period, where they are
12   still trying to settle cases in the GCCF and their position is
13   "We need this information because we need to evaluate the test
14   trials that are going to happen next fall," it's going to be a
15   self-correcting problem because if you have claimants that have
16   filed suit in the MDL but haven't presented to the GCCF, their
17   information is blank, so to speak.  Then BP counsel is going to
18   be arguing to Judge Barbier that their cases aren't ripe for
19   trial, so they won't be test trials.  And if they are, then we
20   can cross that bridge when we get there.
21          **MR. WITTMANN:**  I'm addressing a little different
22   point.  Suppose they don't have all the information they would
23   otherwise have on the GCCF claims form.  How do we fill in the
24   blanks?
25          **THE COURT:**  Let's see what the universe is once we

1   get production from the Gulf Coast Claims Facility.  It seems

2   to me that if a claimant has not provided the Gulf Coast Claims

3   Facility with a full and complete claim form, Mr. Feinberg is

4   going to kick them out.  They will be given an opportunity to

5   supplement their claim form.  Mr. Feinberg is doing that, isn't

6   he?  If they don't supplement by a date certain, they're out of

7   the claims facility.  So what does that do with their claim

8   here?

9            I don't want to make you commit to anything that

10  you are not prepared to commit to, but I believe you guys will

11  say if they didn't make a proper claim in the claims process,

12  they cannot be plaintiffs here, and certainly they would not be

13  good claimants to use as bellwether examples.  Is that true?

14       **MR. WITTMANN:**  Well, they might be good prospects for

15  a bellwether from our standpoint.

16       **THE COURT:**  Well, that's true.  That's true.

17       **MR. HERMAN:**  Mr. Roy reminds me that when we had a

18  meeting in chambers with Judge Barbier the day before the

19  status conference, Judge Barbier's question to the defendants

20  was:  Why do you need any of this information unless and until

21  the people are selected for test trials?  Then the fallback

22  position was:  Okay.  Well maybe just a one-page to get very

23  rudimentary stuff.

24            Now we have kind of pretended that that

25  conversation never took place.  I remember it.  Mr. Roy

1    remembers it.

2         **MR. LANGAN:**  I need to rise to address this

3    revisionist history.

4         **MR. WITTMANN:**  I yield the floor.

5         **MR. LANGAN:**  Let's be clear about one thing.  This is

6    something that was in my notes.  We would be perfectly happy,

7    and have been from the beginning, to let the Gulf Coast Claims

8    Facility run its course and people to go through that.  We

9    didn't want OPA test trials.  We objected to OPA test trials.

10   We objected to them in our pleadings on October 6.  We objected

11   to them in open court on October 15.  This is not of our

12   making.

13            If the plaintiffs want to join us in going to

14   the Court and saying this is a bad idea and -- but I don't know

15   that we have that option.  So we absolutely need to have

16   appropriate discovery to make appropriate bellwether

17   selections, and I think our brief spells this out in

18   considerable detail.  The revisionist history that somehow we

19   never wanted it or we changed position, absolutely not the

20   case.

21         **THE COURT:**  Okay.  Good.  History has been corrected.

22         **MS. BLOOM:**  If I can just speak for a few minutes

23   here.  One thing I would like to address is just really the

24   actual statistics at the Gulf Coast Claims Facility because I

25   think the lack of documentation is something that we really

1    need to address right now.

2              So right there on the Gulf Coast Claims Facility

3    Web site, you can see how many claims that we are dealing with.

4    They have posted that of the 314,913 claims that have been

5    filed, 147,911 require additional information or documentation.

6    90,075 of them have no documentation whatsoever.  We have

7    currently 7,000 claims for final payment under review.

8              If we are to have a meaningful way, as BP and

9    other defendants, to assess what would make an appropriate test

10   case from our perspective by June of 2011, we need this

11   information immediately that these claimants who are saying

12   that they are ready to be in court are going to have, and we

13   don't know who those plaintiffs are.

14             Are the plaintiffs taking the position that it's

15   only folks that have gone through and sought a final payment

16   and have rejected Ken Feinberg's offer?  We don't know.  If

17   they are not in line with that point of view, well, then it

18   could be that we would want for a test case somebody that has

19   not fully submitted their information or something like that,

20   and we don't have the time to wait and figure that out.

21             The other thing is I think from the

22   *Tulane Law Review* article that Judge Fallon authored, there's a

23   clear process that's contemplated when you do test cases.  The

24   first step is that you get some basic information on all the

25   plaintiffs.  All these forms that have been used in the

1    Eastern District of Louisiana have included a provision for the

2    plaintiffs to authorize that what is said on there is true and

3    correct, they have all included a provision for plaintiffs to

4    authorize that it has fully completed that form, and they have

5    all provided for documentation to substantiate the claim to be

6    provided.

7              At the moment, defendants are in the position of

8    not having any assurance that we will have information

9    available to pick the test cases that would make meaningful

10   sense in 2011.  We have no way to know that because we don't

11   know what's filed with the GCCF either.

12             THE COURT:  But you're getting ready to.

13             MS. BLOOM:  The purpose of these forms is for us to

14   be able to get a census of every plaintiff that's in the case,

15   and it's not that complicated of a form.  It's just asking

16   people to check off how much they are seeking in damages.  What

17   if they are coming to court seeking more in damages than they

18   filed with Ken Feinberg?  What if they have changed their mind?

19   What if they submitted to Ken Feinberg only information for a

20   time period of May to September and now they are coming to

21   court seeking full and complete damages?

22             The form just provides a way to ensure that we

23   get everything up front and that we have a fair and meaningful

24   way to select the test cases.  I don't think we are going to

25   get that just getting the GCCF information.

1    **THE COURT:**  Okay.  Let's talk about the two issues
2    that she has raised, which is:  Do you agree that if they have
3    not gone through Mr. Feinberg's process, they are not
4    plaintiffs in this case?
5    **MR. HERMAN:**  I don't necessarily agree with that.  I
6    agree that one of the issues, if not the primary issue, for an
7    OPA test case that is contemplated by the Court and by the
8    parties in CMO 1 is that those claimants -- and I'm sure BP is
9    going to take this position -- have to have made presentment to
10   the GCCF first, if not before they can be in court because I
11   don't know whether it's jurisdictional or condition precedent,
12   and we can brief that.  In fact, under the PTO there is a
13   provision for the parties to submit briefs on this, I think, in
14   December or January, but there won't be a trial.
15              So the question is going to be:  What is
16   sufficient presentment?  I would imagine the plaintiffs' view
17   of presentment is going to be somewhat different from the
18   defendants' view, but I think I could probably admit, for lack
19   of a better word, that some presentment has to be made.
20              This is a completely different situation than
21   *Vioxx*, *Chinese Drywall*, all of those cases, because those cases
22   did not have an administrative claims process as a
23   pre-condition, whether it's jurisdictional or
24   nonjurisdictional, to filing suit and pursuing claims in court.
25   So whether they do it through Feinberg, whether they do it

1   through the GCCF, or whether they do it themselves, whatever

2   they call it, BP has the chance to collect the information, to

3   prescreen the information before it ever gets to court.

4              Secondly, this argument to some extent was made

5   to Judge Barbier and lost.  What is a little bit frustrating, I

6   think, to the plaintiffs is that you have a situation where

7   they're kind of playing a shell game with Feinberg.  Sometimes

8   he's BP.  Sometimes he's independent.

9              What they have done, and what they have done

10  from the very beginning, is they have treated people with

11  lawyers different than people who don't have lawyers.  In fact,

12  we had a stipulation, an agreement at one of the early status

13  conferences with BP that they wouldn't do that.  Then they hire

14  Mr. Feinberg, and Mr. Feinberg goes all over the place and

15  makes all these statements, "You don't need a lawyer.  Come to

16  me.  I'll treat you better than your lawyer," and they treat

17  people with lawyers differently.

18             So plaintiff lawyers who have done the right

19  thing, who have been professional and ethical and told their

20  clients -- first of all, they are not taking fees on any of

21  these emergency payments, and they have said to their clients

22  in a lot of cases, "You may be better off making this claim

23  yourself than allowing me to make it for you," and that was the

24  right thing because the clients are getting treated better.

25  Now BP or Feinberg or GCCF has more information about our

1   clients' claims than in many cases we do.

2             So to come and make us do all of this kind of

3   busywork and waste a lot of time and energy putting together

4   information that they already have and in many cases may become

5   moot because they're still trying to settle the cases in the

6   GCCF, in which case they will go away and they will never be

7   test cases -- and that was another point Judge Barbier made in

8   the conference -- it seems like a little bit of a way to harass

9   the plaintiffs and their attorneys, to drive a wedge between

10  the plaintiffs and their attorneys to make it easier for

11  Feinberg to settle claims and to make people jump through a lot

12  of hoops.

13            Now, maybe that's a little harsh, maybe that's a

14  little unfair, but that's kind of the way we see it.

15  Superficially, okay, plaintiff profile form, no big deal, it

16  happens in every MDL, but there's lots of things in this case

17  historically and procedurally that make it a little bit

18  different.

19            My esteemed co-lead counsel, Mr. Roy, is going

20  to address the Court, if that's okay.

21            THE COURT:  He wrote you a note that you cannot read?

22  Is that what you're telling me?

23            MR. HERMAN:  That's the problem.  That's the

24  difficulty.

25            THE COURT:  Mr. Roy, when you pass notes, try to make

1   them legible.

2           **MR. ROY:**  Absolutely, Your Honor.  No, what I was

3   going to say, just to clarify on something Steve earlier said,

4   was that when he made the comment that some form of presentment

5   in these cases may have to be made, that's only for the pure

6   OPA cases that we believe that to be true, the pure OPA cases

7   which are going to be test trials this coming summer next, not

8   the *Robins Dry Dock* variant and not the PI and maritime

9   variant.

10          **THE COURT:**  Right.  It seems to me that what we need

11  to do is modify the plaintiffs' proposed fact sheet to include

12  information about which type of claim it is out of those six

13  categories.  Then with regard to, for instance, personal

14  injury/death cases, you will need to provide further

15  information as to treating physicians, a signed medical

16  authorization form -- what am I forgetting?

17          **MS. BLOOM:**  There are some employer forms.

18          **THE COURT:**  Some employer forms.  I don't disagree

19  with that.  What else is on the list?

20          **MR. WITTMANN:**  Military service.

21          **MS. BLOOM:**  We would use the standard forms in *Vioxx*,

22  I would think.

23              If I could just return for a moment, though, to

24  the claims we have to decide in 2011, which I presume are

25  primarily going to be economic loss claims.

1          **THE COURT:**  Uh-huh.

2          **MS. BLOOM:**  The one thing that Judge Barbier was

3     clear about at the hearing was that he contemplated that the

4     clients would complete the form, and that's at the hearing

5     transcript at page 13, lines 8 to 11.  He said, "And I think I

6     said that I thought we could accomplish that by some simplified

7     procedure like develop maybe a one-page information or profile

8     form that the plaintiffs' counsel could have their clients

9     complete."

10              So I think Judge Barbier was thinking the same

11    way as Judge Fallon, that if somebody is coming to court they

12    now ought to sign that form and say, "I represent that the

13    amount I am seeking here today in court is this amount and it's

14    true and correct."

15              I also would like to return to the economic loss

16    claims because if you heard the plaintiffs' counsel, he did not

17    say that he agrees with BP that everybody coming into court are

18    only going to be final claim people.  So we don't know what we

19    are going to get and what the forms are going to say.  What I

20    would suggest is that if it needs to be a one-page form, we can

21    revise the form so that for business claims for lost profits,

22    we have a one-page form.

23              And you know what?  If the business happened to

24    have submitted their financial statements, well, then fine.

25    They can sign the authorization and we'll get them from Ken

1  Feinberg.  But what if they didn't?  Then we get them because
2  the form has now asked for them to provide them.
3              So I think the defendants are saying we are
4  happy to have the information from the GCCF if it is there, but
5  we don't have the time to wait to figure that out in order for
6  us to be able to evaluate the test cases because then the
7  plaintiffs get to cherrypick.  They know what their plaintiff
8  information is.  We don't get it until we get this form, and we
9  have to figure out what all is missing, and then by January we
10  are supposed to be in a position to try to meet with the
11  plaintiffs and identify a pool of cases.  We are at a
12  disadvantage.
13              **THE COURT:**  Okay.  Steve, two things.  What about any
14  change in claim, that is, since an OPA plaintiff filed with
15  Mr. Feinberg, they decide that in addition to the five months
16  they were seeking, they have claimed going forward?  Let's
17  answer that issue.
18              **MR. HERMAN:**  Well, that seems like something that
19  would be developed over time anyway.  If time is of the essence
20  and we are trying to get them the information as fast as
21  possible -- look, if I have one client in Marrero, it's no big
22  deal.  But if I have 100 clients that are all over the
23  Gulf Coast, or 1,000 clients, or in one case 23,000 clients, to
24  go back once I have already gotten their information, once they
25  already have the information in the claims facility, to go back

1   and meet with those clients individually and have them sign off

2   on things is a huge burden, which they know.

3           There's no real legitimate reason why they need

4   those signatures.  There is no way that there is going to be a

5   test case where they are not going to be able to take a

6   deposition first.

7           THE COURT:  I'm not worried about the signatures.  I

8   am worried about the change in possible claim so that they know

9   that instead of a three-month claim for lost fishing revenue,

10  indeed that claimant is looking not only for six or nine months

11  of lost revenue but possibly into the future.  I guess that's

12  part of the duty to supplement, huh?

13          MR. HERMAN:  I think it's part of the duty to

14  supplement.  Realistically, these, I think, were intended

15  originally to take the place of initial disclosures.  Maybe I

16  haven't done a sufficient job, but in every initial disclosure

17  I have ever seen, anybody knew with economic loss they would

18  always say "will be provided when expert reports are due."

19  Unless they have specific medical expenses that they have

20  tallied up, people almost never put their actual claim in the

21  initial disclosures.

22          It seems to me that they have a good amount of

23  information from the GCCF.  If not, they can certainly follow

24  up with us.  If and when they're selected as test cases, they

25  are clearly going to have the opportunity to take depositions,

1    to get all the documents, to do all of the other discovery.

2                    We are not saying that they are not entitled to

3    it.  We are saying that there should be an order to this and at

4    this point, with this pool of claimants, many of whose cases

5    may be resolved by Mr. Feinberg before the end of the year,

6    there's no need to spend the time, money, and effort at this

7    time, not that they are not entitled to it later.

8            **THE COURT:**  What about those claimants who are not

9    making claims with Mr. Feinberg?

10           **MR. HERMAN:**  Well, the defendants would certainly get

11   the information that's on the form.  If it came back that they

12   didn't have enough information from the fund, again, I think

13   this is kind of a self-correcting problem because I'm sure we

14   are going to hear from BP's counsel that those people should

15   not be in court because they haven't made presentment.  If they

16   have no information, then they probably haven't made

17   presentment.

18                   So we are going to have to go through the

19   process, whether it's through the GCCF and/or through these

20   court proceedings, to get the defendants the information that

21   they need, whether it's part of the presentment process or

22   whether it's part of the litigation process.  I think as

23   Your Honor said earlier, we can cross that bridge when we get

24   to it.

25           **THE COURT:**  Other than personal injury/death

1    claimants, the other five categories are required to go through

2    Mr. Feinberg.

3           **MR. HERMAN:**  Well, at least as to BP under OPA, which

4    is what the initial test cases are for.  We are going to take

5    the position, I would assume, that as to the other defendants,

6    if the plaintiffs have what we have been calling *Robins Dry*

7    *Dock* general maritime standing, they don't need to make

8    presentment to BP to go against the other defendants.

9           I'm sure the other defendants are going to

10   vociferously object to that and that's going to be the

11   substance of some Rule 12 motions, I assume, next February.

12          **THE COURT:**  How do you propose providing the

13   plaintiff forms as to those people?

14          **MR. HERMAN:**  Well, I think a lot of those people are

15   probably making claims in the GCCF because there's a certain

16   overlap there.  For economic loss against BP, you're under OPA.

17   Against the other defendants, you're under *Robins Dry Dock*.  So

18   in a lot of cases, they will have that information.  Where they

19   don't, we can certainly work with the defendants to get them

20   the information that they need.

21          **THE COURT:**  Did you, meaning the plaintiffs, have any

22   problem with the authorization for release of documents from

23   the claims facility, that is, other than the plaintiff's

24   signature?

25          **MR. HERMAN:**  We don't have any problem with them

1   getting information from the GCCF as long as it's treated
2   confidentially under the protective order.  I would question
3   whether the clients have to sign it themselves.  I would think
4   counsel could.

5           Mr. Roy is reminding me -- and I should have
6   probably made this clear -- that we are probably going to take
7   the position that plaintiffs may not need to present under OPA
8   even to BP if they have *Robins Dry Dock* standing.  Again, those
9   wouldn't be the test cases that are going to come up next
10  spring, so we have time to deal with those.

11          **THE COURT:**  Okay.  Then let's go ahead and do this,
12  guys.  I would like the plaintiff fact sheet to be revised to
13  accommodate the six types of claims we have, so that the
14  plaintiff can check off which of those six or presumably more
15  than one of those six type claims.  All will sign
16  authorizations for release of records from the Gulf Coast
17  Claims Facility.  Those records will be subject to the Court's
18  protective order.

19          I've got to think about whether or not
20  Mr. Feinberg is going to have an issue with that.  If he does,
21  we will ask Judge Barbier to perhaps intervene or get the
22  special master to intervene on production of those records to
23  you.

24          In the case of the personal injury/death
25  claimants, you-all will provide medical care providers.  You

1    will provide a signed authorization for release of all medical

2    records and employment records so that we can get that going.

3                 **MR. HERMAN:**  One point of clarification, Your Honor.

4                 **THE COURT:**  Yes.

5                 **MR. HERMAN:**  I just wanted to note for the record

6    that in PTO 11, which is the CMO -- I think it's Section 5, but

7    I know the subsection is C on page 10, where it talks about

8    plaintiffs' initial disclosure -- it says "one-page plaintiff

9    profile form to be provided by counsel for plaintiffs."

10                **THE COURT:**  No, this is all going to be signed by

11   counsel for plaintiffs.  The claims documents maintained by the

12   Gulf Coast Claims Facility are signed by the plaintiffs.  So

13   the release for records from the Gulf Coast Claims Facility and

14   the plaintiff fact sheet will be signed by counsel for

15   plaintiffs.

16                **MR. HERMAN:**  Then the plaintiffs themselves who have

17   personal injury or death cases need to sign the authorizations

18   themselves?

19                **THE COURT:**  That's right because of HIPAA.

20                **MR. HAYCRAFT:**  Another point of clarification is that

21   the GCCF came on line in August.  From May to August 23, it was

22   the BP Claims Facility, same separation, same confidentiality,

23   but we also need it to be signed by the attorney for the

24   claimant to get those records as well.

25                **THE COURT:**  Why don't you make it one authorization

1  covering the BP Claims Facility as well as the Gulf Coast

2  Claims Facility.

3          **MR. HERMAN:**  Okay.

4          **THE COURT:**  Does Mr. Feinberg maintain those records

5  from the earlier one?

6          **MS. BLOOM:**  No.

7          **THE COURT:**  Who maintains the BP Claims Facility?

8          **MS. BLOOM:**  BP.

9          **THE COURT:**  BP.  Okay.  So the one authorization will

10  be applicable to both claims facilities and processes.  So that

11  when you-all get those authorizations, BP is authorized to

12  release them subject to the protective order and Mr. Feinberg

13  is authorized pursuant to the protective order.

14          **MS. BLOOM:**  Two points of clarification.  Can we get

15  the employer authorization, as well, for the economic loss

16  claims for folks that are requesting lost wages so that we can

17  verify employment or lack of employment?

18          **THE COURT:**  Is Mr. Feinberg not doing that?  I

19  assumed he was.

20          **MS. BLOOM:**  He may or may not be.

21          **THE COURT:**  Do you-all know?

22          **MS. BLOOM:**  He is in a different posture than us.  He

23  is, I believe, mostly seeking information from the claimants

24  themselves.

25          **MR. HERMAN:**  Well, I would assume that that's part of

1   the process.  This sounds very far-reaching.  You are talking
2   about a lot of people --
3           **THE COURT:**  Let's see what we get back from
4   Mr. Feinberg.  If, indeed, it's not as broad as I think it is,
5   then we will certainly entertain that.  Let's see what we get.
6           **MS. BLOOM:**  What will we do when we get back
7   information and the claim form submitted is incomplete and the
8   information that was requested to be submitted is not there?
9   What will we do?
10          **THE COURT:**  Well, we will have to look at it.  Why
11  don't we do this.  Why don't we look at some exemplars once you
12  get them, but it seems to me that you're going to get a lot of
13  claimants who have properly filled out their claim forms.
14  Let's cross that bridge when we get to it.  We'll defer that
15  issue, see how big it is.
16          **MR. ROY:**  Your Honor, is there any reason, in the
17  effort to be as simple and killing as few forests as possible,
18  that this one-page PPF could not also suffice as the omnibus
19  release that they seek so only one signature --
20          **THE COURT:**  If you change the size of your font, if
21  you add your six categories of claims, and if you put in some
22  release language, I see no reason why it cannot be.
23          **MR. ROY:**  Thank you, ma'am.
24          **MR. WILLIAMS:**  One other question.  Your Honor, the
25  information that they obtained from BP and/or the claims

1    facility, they will send us a copy of it as in the normal

2    course of any litigation, I assume, correct?  Anything they

3    obtain with an authorization that we give them, we should get a

4    copy of.

5              **THE COURT:**  Let me speak before they do.  What about

6    costs?

7                   Is that the next word coming out of your mouth?

8              **MR. LANGAN:**  Very likely, Your Honor.

9              **THE COURT:**  They will share with you.  That goes

10   without saying.  What about costs?

11             **MR. WILLIAMS:**  It's going to be electronic anyway, I

12   would think.

13             **THE COURT:**  I don't know that.  Do you-all know

14   whether all those records are maintained electronically or not?

15             **MR. LANGAN:**  I don't know.

16             **MS. BLOOM:**  I don't know.

17             **THE COURT:**  Don't know.

18             **MR. HERMAN:**  Well, I kind of loathe to keep speaking

19   because we seem to be doing okay.  One of the other things that

20   was addressed by actually both parties at different times in

21   the various CMO submissions and what was incorporated into the

22   actual PTO 11 is that we were supposed to confer to see whether

23   BrownGreer -- well, it may not be BrownGreer, but whoever is

24   administering the GCCF.  I understand that it's BrownGreer.  I

25   assume that whoever it is has a massive database and could

1   electronically provide all of this information very easily to
2   all of the parties.
3                   We had one phone call with BP's counsel about
4   that so that they could understand what we were thinking.  In
5   sum and substance, that's about it, and we haven't really heard
6   back from them.  If we could call or have the authority to call
7   BrownGreer directly, maybe we will try to do that.
8                   Sometimes they take the position that they are
9   settling cases.  Sometimes they take the position they are
10  independent.  I don't want to be accused of contacting an
11  adverse party without proper authority, whatever they allow us
12  to do.  It would seem to me that all of this stuff is probably
13  in the database, it's electronic, and it could be provided to
14  all of the parties, I would think.
15          THE COURT:  Okay.  Well, look, let's do this.
16  Definitely, we are going to share everything that we get with
17  everybody so that everybody has got the information.  How soon
18  can the plaintiffs do their fact seats?
19          MR. HERMAN:  I think we can circulate one this
20  afternoon.
21          THE COURT:  Well, how soon can you provide the
22  authorizations, the one-page "everything you ever wanted the
23  know" about this claimant?
24          MR. HERMAN:  You mean the actual information or just
25  the form?

1          **THE COURT:**  No, the actual information.

2          **MR. HERMAN:**  Well, I think we are ordered to do it by

3     November 22, so that's three weeks.

4          **THE COURT:**  Okay.  If you can do it on a rolling

5     basis, would you all prefer that?

6          **MS. BLOOM:**  Yes.

7          **MR. HERMAN:**  One issue.  One of the members of the

8     PSC has filed suit for about 23,000 clients.  I think all of

9     the information that's on the form is going to be in the

10    database that he maintains.  He wanted me to ask is there some

11    way that he can provide to the defendants all of the

12    information from his database in some way that he doesn't have

13    to waste weeks trying to fit it into this specific form, as

14    long as they get all of the same fields and underlying

15    information?

16         **THE COURT:**  Do you guys care?

17         **MR. LANGAN:**  It's kind of hard to answer that, isn't

18    it?

19         **MS. BLOOM:**  Yes, without seeing the fields.

20         **MR. HERMAN:**  Maybe we could put this attorney in

21    direct touch with --

22         **THE COURT:**  Who wants to take the lead?  Have him get

23    in touch and provide an example of what he would be providing.

24         **MR. HERMAN:**  Okay.  Great.

25         **THE COURT:**  Importantly, the authorizations from

1  their point of view.  I assume these are all fishermen?

2          **MR. HERMAN:**  I don't know.  I think a lot of them

3  are.

4          **THE COURT:**  If you can get the authorizations done on

5  a rolling basis, why don't you provide them as you get them

6  done, and let them start providing them to Mr. Feinberg and the

7  BP Claims Facility, which would be helpful to everybody.  If

8  you want to get us the revisions to the one-pager, I will take

9  a look at it and approve it.

10         **MR. HERMAN:**  Thank you very much.

11         **THE COURT:**  Okay, guys.  Thanks very much.

12         (WHEREUPON the Court was in recess.)

13                    * * *

14                  <u>CERTIFICATE</u>

15         I, Toni Doyle Tusa, CCR, FCRR, Official Court

16  Reporter for the United States District Court, Eastern District

17  of Louisiana, do hereby certify that the foregoing is a true

18  and correct transcript, to the best of my ability and

19  understanding, from the record of the proceedings in the

20  above-entitled and numbered matter.

21

22

23                         s/ Toni Doyle Tusa
                           Toni Doyle Tusa, CCR, FCRR
24                         Official Court Reporter

25