Transcript of the Testimony of
# The Joint United States Coast Guard/Bureau of Ocean Energy Management Investigation

**Date taken: October 5, 2010
AM Session**

**USCG/BOEM Board of Investigation (Re: Deepwater Horizon)**

**\*\*Note\*\***
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
**Phone:   504-529-5255
Fax:   504-529-5257
Email:   reporters@psrdocs.com
Internet:   www.psrdocs.com**


EXHIBIT
D.

Page 1

USCG/BOEM BOARD OF INVESTIGATION

INTO THE MARINE CASUALTY, EXPLOSION, FIRE,
POLLUTION AND SINKING
OF MOBILE OFFSHORE DRILLING UNIT

DEEPWATER HORIZON, WITH LOSS OF LIFE

IN THE GULF OF MEXICO, 21-22 APRIL 2010

TUESDAY - OCTOBER 5, 2010

AM SESSION

\*    \*    \*    \*    \*    \*

The Transcript of the Joint United
States Coast Guard/Bureau of Ocean Energy
Management Investigation of the above
entitled cause before James T. Bradle, a
certified court reporter authorized to
administer oaths of witnesses pursuant to
Section 961.1 of Title 13 of the Louisiana
Revised Statute of 1950, as amended,
reported at the Holiday Inn, 2261 North
Causeway Boulevard, Metairie, Louisiana
70001, on Tuesday, October 5, 2010,
beginning at 8:00 a.m.

Page 2

```
 1    APPEARANCES:

 2
      MEMBERS OF THE BOARD:
 3

 4         CAPTAIN HUNG M. NGUYEN
           CO-CHAIR UNITED STATES COAST GUARD
 5

 6         DAVID DYKES
           CO-CHAIR MINERALS MANAGEMENT SERVICE
 7
           HON. JUDGE WAYNE R. ANDERSEN
 8
           CAPT. MARK R. HIGGINS
 9         UNITED STATES COAST GUARD

10         JASON MATHEWS
           MINERALS MANAGEMENT SERVICE
11

12         JOHN McCARROLL
           MINERALS MANAGEMENT SERVICE
13

14         LT. R. ROBERT BUTTS, COURT RECORDER
           UNITED STATES COAST GUARD
15

16

17    REPORTED BY:

18         JAMES T. BRADLE
           CERTIFIED COURT REPORTER
19

20

21

22

23

24

25
```

Page 90

1    District Command Center, it was coordinating

2    the Search and Rescue?

3        A    Yes.

4        CAPT. HIGGINS:

5            Thank you, sir.

6        HON. JUDGE ANDERSEN:

7            Any other questions?

8            Counsel, if we need your witness

9    to come back at another time, is that

10   possible?

11       MR. HENNESSY:

12           Yes, sir.  I don't see why not.

13       HON. JUDGE ANDERSEN:

14           Okay.  We want to thank you very

15   much.  Thank you for appearing today.

16       THE WITNESS:

17           Okay.

18       CAPT. NGUYEN:

19           Thank you, Mr. McKechnie.

20           We will go ahead and take about a

21   10-minute break and resume at 0930.  Thank

22   you very much.

23   (Discussion off the record.)

24       CAPT. NGUYEN:

25           Court reporter, let's go on the

1    record.

2              Over the course of these hearings,

3    you know, we have difficulties at times of

4    getting witnesses to appear before us and to

5    gather some of the documents that we have

6    subpoenaed, and we explore different avenues

7    to get them to provide necessary information

8    that we need.

9              Because of the last exchange here

10   from the Transocean attorneys with regard to

11   whether the right witness or, you know,

12   whether it's hearsay or lack of foundation,

13   I'm going to address this now.

14             As I indicated that, you know, in

15   investigating this casualty, there are four

16   areas that we look at:  The technical

17   aspect, whether it's well control, you know,

18   the vessel design.  We look at oversight in

19   terms of capability, capacity, whether the

20   government set proper conditions out there

21   for people to do things safely.  We're

22   looking at organizational decision-making,

23   and then safety culture.

24             And as I indicated, you know, some

25   of the things I'm seeing, I have significant

Page 92

1    concern about the safety culture aspect as

2    is related to this casualty.

3              This is relating to Transocean.

4    Over the last couple of months or so, we

5    have been requesting witnesses to testify on

6    Transocean's compliance with the

7    International Safety Management Code and

8    also producing documents.

9              The Board issued a subpoena to

10   Transocean on August 4th, and one of the

11   items that we asked for was the last ISM

12   Code audit reports for the Transocean office

13   and all its vessels subject to ISM Code

14   operating in the Gulf of Mexico.

15             And then on the 18th of August, we

16   received a response back from Transocean

17   that -- the response was "we object to this

18   request as overly broad.  We are producing

19   the last ISM audit reports for the

20   Transocean office," and it was signed by

21   Mr. Christopher Groves.

22             Since we didn't get the report

23   that was indicated in that response on

24   September 2nd, we -- I'm sorry.  On

25   September 2nd, the co-chair, Mr. Dykes,

Page 93

1    issued another subpoena, and in that

2    subpoena, we asked for, again, the most

3    recent ISM Code company audit report for

4    Transocean, most recent ISM Code audit for

5    all Transocean vessels operating in the Gulf

6    of Mexico within the past 12 months, and we

7    received a response back from Transocean on

8    September 15th.

9            The request was most recent ISM

10   Code company audit report for Transocean,

11   and the response was "Transocean objects to

12   this request, saying it is overly broad and

13   unduly burdensome, irrelevant, and not

14   reasonably calculated to lead to admissible

15   evidence in this proceeding."

16           And the other item request was

17   most recent ISM Code audit for all

18   Transocean vessels operating in the Gulf of

19   Mexico within the past 12 months, and again,

20   the response was, "Transocean objects to

21   this request, saying it's overly broad,

22   unduly burdensome, irrelevant and not

23   reasonably calculated to lead to admissible

24   evidence in this proceeding."

25           Now, the reason that we requested

Page 94

1    these documents, as you can see in this one

2    exhibit here, again, my discussion with

3    Mr. McKechnie about having plans on the

4    shelf and not using them, the impression

5    that I got, if you look at this document

6    here, which we did not receive from

7    Transocean, we received from DNV, the

8    organization that did the audit, I believe,

9    for Transocean, and in the first paragraph,

10   it's cited that the Transocean DISCOVERER

11   DEEP SEAS was operating with an overdue

12   intermediate safety management code

13   certificate audit.

14          So again, the impression that I

15   have is that the company, again safety

16   culture here, that they have an overdue

17   regulatory certificate and they're still

18   operating without it.

19          Would you bring up the next

20   exhibit, please.  And the next exhibit, on

21   the left poster board, they have a

22   nonconformity severity, and it was relating

23   to compliance with mandatory rules and

24   regulations and implementation of corrective

25   action.

Page 95

1              In the paragraph, you see in the

2    top table there, it talks about that DNV

3    discovered eight nonconformities and two

4    observations, and what Transocean did was

5    provide corrective action, they imposed

6    corrective action.

7              And then DNV come back and found

8    that those nonconformities were corrected in

9    Transocean's system, but they actually were

10   not corrected.

11             Then what DNV did was they issued

12   a major nonconformity.  Then Transocean

13   proposed another plan, and then DNV

14   downgraded a major nonconformity down to a

15   nonconformity.

16             So it's telling me that, you know,

17   yes, you know, a measure was issued, a

18   measure that had to do with a severe hazard

19   on board a vessel, and again, it was brought

20   to the attention of Transocean and was not

21   acted on.

22             Not only Transocean, but looking

23   at this, the documentation right here, I am

24   concerned with DNV's willingness to hold a

25   vessel operator to the rule, and it makes me

Page 96

1    wonder whether a classification society

2    should be authorized to issue International

3    Safety Management Code on behalf of the

4    administrations.  That's what it's telling

5    me up there.

6              Now, under the right portion

7    there, on the bottom, and it's something

8    that we have talked about, is item No. 8,

9    and I will read it.

10              "As previously observed, the

11   statement of the master authority is still

12   not clearly and completely stated within the

13   company's safety management system.

14   Although there are various statements of the

15   master's authority, there is no clear and

16   absolute indication of the master's

17   overriding authority and responsibility.

18   The company is requested to address this,"

19   and they reference ISM Code 5.2 --

20              So again, Transocean have the

21   knowledge, they were told about it, and it's

22   not done.  The ISM code was implemented in

23   July, 1998, 12 years, and Transocean is a

24   major corporation.

25              Now, bring up the exhibit, the

Page 97

1    next exhibit, please.  This is a QHSE

2    executive authority held in safety executive

3    steering committee meeting minutes, and the

4    date as October 19th, 2009, and the poster

5    board on the left-hand side on the bottom,

6    and it's item 3.B, and it's ISM, which is

7    International Safety Management, and ISPS,

8    which is the International Security, Port

9    and Security code audits, and in there

10   Mr. J. Hamilton, which if I look on the left

11   poster, he is the ISM/ISPS manager, and they

12   say that "J. Hamilton reported that meeting

13   flag state minimum safe manning requirements

14   continued to be an issue.  Records

15   management of required ISM/ISPS documents

16   and certificates remain to be a challenge,

17   and overall understanding of ISM and ISPS

18   requirements is beginning to improve as a

19   result of the audit process, but further

20   improvement is still needed."

21        Now, if you look at the document,

22   the poster board on the left, you can see

23   the name of Mr. S. Newman.  I would assume

24   that's the CEO and President of Transocean.

25        So the problem with not full

Page 98

1    compliance with the ISM Code is the top

2    management of Transocean knew about it, from

3    what I see in front of me, and these various

4    documents right here that come from DNV, it

5    didn't come from Transocean, it came from

6    DNV through the flag state.

7              So, again, not only subpoena, and

8    some of the information we have here, these

9    things are not hearsay.  These are reports

10   by third parties here.

11             In addition, in terms of

12   witnesses, at the last hearing in Houston,

13   we requested an ISM manager to testify, and

14   it was Mr. Jimmy Moore.

15             During the hearings in Houston, in

16   the middle of the week, we were notified

17   that he was not the right man, it was

18   Mr. Canducci is the right man, and then last

19   week, on Wednesday, we also got a

20   notification that Mr. Canducci just got a

21   personal lawyer and that personal lawyer is

22   not available until next week.

23             So to me, Transocean has not been

24   responsive to the requests of this Board,

25   this Joint Board, and unless we have other

Page 99

1    information from Transocean, that's the

2    information that we're going to have to base

3    our conclusion and recommendation on.

4            So I would like to provide

5    Transocean an opportunity, you know, to

6    provide to us by close of business tomorrow

7    information that shows that, you know,

8    Transocean is in compliance with the

9    International Safety Management Code.

10   Otherwise, this is what we have.  Okay?

11           I know Mr. Kohnke is going to have

12   a comment, but this is what I'm presented

13   here that has to deal with do we have the

14   right witness, do we have the basis to ask

15   the question that we asked, so I just want

16   to present what we have here, for the PIIs

17   to see what we have, and these documents

18   have been provided to you.

19           Thank you.  Mr. Kohnke?

20       MR. KOHNKE:

21           Captain, let me respond to --

22       HON. JUDGE ANDERSEN:

23           You might want to turn your

24   microphone on.

25       MR. KOHNKE:

Page 100

1           I'm trying to find out how.

2     HON. JUDGE ANDERSEN:

3           Right on top.  That's it.  Thanks.

4     MR. KOHNKE:

5           Captain, there are rules that

6     apply to these proceedings, and Transocean

7     has followed those rules.  I understand that

8     your background is not in law, but you

9     mentioned subpoenas.

10          The way this Board operates, it

11    has subpoena power and it has issued

12    subpoenas, and it is the duty and

13    responsibility of attorneys representing

14    Parties In Interest, including Transocean,

15    to object when a subpoena is overly broad.

16          Those objections have been

17    properly made and they are contemplated by

18    the rules under which we operate.

19          The Board then has an option to

20    traverse that objection, to essentially

21    enforce its subpoena or to issue a new

22    subpoena, and what you have described is a

23    process in which the Board has not followed

24    up in the wake of an objection, a properly

25    made objection as to the overly broad

Page 101

1    aspects of the Board's subpoena.

2           I can't answer for why the Board

3    did not follow up.  I know that the Board

4    has counsel in the form of Lieutenant

5    Commander Bray, and he has been in touch

6    with us and presumably other Parties In

7    Interest, and we are cooperating fully.  But

8    we make an objection because there is an

9    objection, a legal objection to a subpoena,

10   and it is then the Board's option to either

11   issue a new subpoena or to go to court and

12   to try to enforce the original subpoena.

13          You have not done that, and I

14   can't explain why you haven't done it.

15   That's not my responsibility to explain.  It

16   is our responsibility to object when an

17   objection lies, and we have done so.

18          Now, with regard to DNV and its

19   reports, I will note that the Board has

20   presumably served a subpoena on DNV, because

21   one of its representatives testified in this

22   case early on, and if there was information

23   that you wished to develop through DNV, you

24   have that option.  You have that option to

25   come back to us and to subpoena any one of

Page 102

1    our employees.

2           I will note for the record that

3    although I don't represent the various

4    Transocean employees, I'm not aware of a

5    single one who has asserted their Fifth

6    Amendment privilege against

7    self-incrimination, and I do believe that

8    any and all witnesses who are employed by

9    Transocean will testify if they are properly

10   asked to do so via subpoena or otherwise

11   informally.  And most of the witnesses that

12   have testified on behalf of Transocean have

13   done so voluntarily, without the need for a

14   subpoena.

15          Now, with respect to Ms. -- I

16   think it's Ms. Canducci.  I can't answer as

17   to why he or she, and I'm not even familiar

18   with who the witness is, can't appear, but

19   you have said that his or her attorney was

20   unavailable.

21          That is something beyond

22   Transocean's control, but certainly the

23   availability of that witness can be

24   determined through subpoena.  And once

25   again, these are the rules under which we

Page 103

1    operate.

2            What I do object to is some of the

3    conclusions that you have drawn from

4    documents that have not been fully vetted

5    through testimony, and it is proper for the

6    Board to solicit that testimony, and I would

7    ask that you do so before drawing any

8    conclusions.

9            You referred to these documents as

10   not being hearsay.  You're wrong.  It is

11   hearsay.  Under the rules under which we

12   operate, those documents are hearsay.  They

13   are not admissions against interests.  They

14   don't come in under some exception.  There

15   is a rule against hearsay, and you're saying

16   they're not hearsay.  You're wrong.  And I

17   suspect, with all due respect, Captain

18   Nguyen, you have been wrong in other

19   regards.

20           But with respect to Transocean, I

21   want to conclude by simply saying we are

22   here cooperating.  We have cooperated at

23   every level.  Lieutenant Commander Bray has

24   asked us for documents.  We have given him

25   documents.

Page 104

1          And when the Board has subpoenaed

2     someone, such as the last witness,

3     Mr. McKechnie, who is not the proper witness

4     to go forward with those questions, all we

5     can do is point out to the Board that he is

6     not the best witness.

7          It didn't stop you from asking all

8     of the questions you were going to ask

9     anyway, and then when there was a

10    disconnect, I don't believe it's proper to

11    be blaming Transocean, because if you had

12    gotten the proper witness, you would have

13    had those answers.

14         So my point here is that we will

15    fully cooperate, we have always fully

16    cooperated, and in terms of what you are

17    asking for by tomorrow, if it can be

18    physically done, it will happen.

19         But I ask once again that these

20    rules under which we operate be followed,

21    and if they are followed, this hearing will

22    proceed as it should.

23         Thank you, sir.

24    HON. JUDGE ANDERSEN:

25         Captain?

Page 105

1       CAPT. HIGGINS:

2           Sir, I think we probably have a

3    fundamental difference with regard to what

4    the role of the Parties In Interest in this

5    hearing is, in that the Parties In Interest

6    are supposed to assist in the fact-finding

7    evolution.

8           What we have found is that it has

9    become somewhat adversarial with regard to

10   the availability of witnesses.

11          As Captain Nguyen and I spoke the

12   other day, we indicated that we have a very

13   small window into Transocean and very

14   limited information, and what we are

15   providing you is the opportunity to see

16   things through our small window, that we

17   have these documents that indicate to us

18   certain factors.  We have subpoenaed and

19   have sought certain witnesses to explain

20   these documents and certain factors, and

21   have been thwarted to some extent in a

22   number of different ways in getting those

23   witnesses, be it Mr. Canducci, be it

24   Mr. Wright, and we understand that there are

25   a number of reasons that they were unable to

Page 106

1    attend, but there were not witnesses

2    available to go through these documents and

3    not the other documents that might have

4    disclosed or rebutted our view of the

5    culture.

6             So really I would encourage you to

7    look at this as an opportunity for

8    Transocean to assist us in disproving what

9    we have seen through this small window of

10   culture at Transocean.

11      MR. FANNING:

12            May I say something, Captain?

13   First, I would break Captain Nguyen's

14   remarks into two categories.  The first is

15   it seems to me that Captain Nguyen felt an

16   obligation, and I certainly respect the

17   captain and the Board, to admonish

18   Transocean publicly, and he has done so for

19   what he believes to be a lack of

20   cooperation, which we, of course, would

21   disagree entirely.

22            But the thing that truly I find to

23   be objectionable is when Captain Nguyen

24   gives testimony as to these documents and

25   what they say and what they mean and give

Page 107

1    import to them, that should come from a

2    witness who takes an oath and testifies and

3    we have an opportunity to cross-examine.

4              And so while I totally respect

5    Captain Nguyen's right to come in and say,

6    "We don't think we have been getting enough

7    cooperation.  We want you to do so," I

8    really think it's improper to put documents

9    on the board and to read excerpts from them

10   and to make statements and draw conclusions

11   from them without anyone having an

12   opportunity to examine a witness.

13             Surely someone from the flag

14   state, if that's who provided the documents,

15   the maritime authorities, whoever it is

16   could have come in here.  But there's a lot

17   of lawyers here who take these documents and

18   prepare them and find rebuttal documents and

19   go to that lectern and ask questions I think

20   that shed light on it.

21             We are deprived of that

22   opportunity in this instance.  So I don't

23   think that any weight should be given to the

24   remarks with respect to these documents that

25   have been presented.

Page 108

1          We have to have them in advance

2     and be given an opportunity to respond to

3     them, and that doesn't happen when Captain

4     Nguyen gives his testimony.

5        CAPT. HIGGINS:

6          I couldn't agree with you more,

7     and we sought to do that, and we sought to

8     do that through the designated ISM person at

9     Transocean, which was Jimmy Moore, who was

10    under subpoena at our hearing in Houston,

11    and that's who we wanted to use to admit

12    these documents.

13         We sought to do that a second

14    time, when Transocean identified who that

15    witness would be, and that would be a

16    Mr. Canducci, who was not here to do that.

17         We sought to do that a third time

18    through Mr. Wright.  And again, each time

19    that we have sought to enter these issues

20    through a witness, we have been thwarted by

21    the activities, largely by Transocean.

22    MR. KOHNKE:

23         Captain, I am reliably informed

24    that Jimmy Moore was at the last hearing in

25    Houston and was released by the Board, and I

Page 109

1   believe, if I'm correct, that

2   Mr. Canducci -- I'm informed that it is a

3   "Mr." -- Mr. Canducci is the correct

4   witness.

5           So how you can say we are

6   thwarting is beyond me.  Mr. Canducci has --

7   Transocean can only as an employer make

8   someone available.  If his attorney is

9   unavailable and Mr. Canducci and his

10  attorney determine between them that it

11  wouldn't be appropriate for him to testify

12  without his attorney being present, we have

13  no control over that.  To use the word

14  "thwart" is inappropriate.  It's not what's

15  taking place.

16          Maybe it's appropriate to

17  Mr. Canducci's attorney, but not as to

18  Transocean.  But in respects to Jimmy Moore,

19  I am informed that Jimmy Moore was at the

20  last hearing and the Board released him

21  because it did not have time.  We ran out of

22  time.

23          Now, please, someone tell me that

24  that's incorrect.

25          CAPT. HIGGINS:

Page 110

1        The reason that Jimmy Moore was

2   released at the last hearing was because we

3   were informed by Transocean that he was not

4   the right witness.

5        MR. KOHNKE:

6            And Mr. Canducci was the right

7   witness; am I correct? That's what you were

8   told?

9        CAPT. HIGGINS:

10            We were told that Mr. Canducci was

11   the right witness and we sought to have him

12   present to admit these documents.

13            Really what I would ask that

14   Transocean do is if we are unable to get the

15   right person to admit the right documents,

16   we request your assistance to achieve that

17   goal.

18        MR. KOHNKE:

19            And, Captain Higgins, I appreciate

20   that.  I think we are on the same page.  And

21   we have done that.  That's why Mr. Canducci

22   is on the witness list for today or was on

23   for today.  Transocean did everything we

24   could to get Mr. Canducci here, but he does

25   have his own attorney.  Many of the

Page 111

1   witnesses have their own attorneys, whether

2   they're employed by Transocean or not.

3            And if he made a decision because

4   of his attorney's availability, I have no

5   control over that.  But I believe he is the

6   correct witness, we have helped you identify

7   him as the correct witness, and we have done

8   everything we can and will continue to do

9   everything we can.

10           I don't know what follow-up the

11  Board had with his attorney.  I wasn't part

12  of that discussion.  But I would very much

13  like Mr. Canducci to be here on behalf of

14  Transocean.  They want him here to help

15  explain these things.

16           So I hope you will withdraw the

17  words that you used about Transocean

18  thwarting anything.  That's simply not

19  correct.  It's just not accurate.

20      MR. HYMEL:

21           Captain Higgins, Richard Hymel

22  with Transocean.  I probably had the most

23  conversations with Commander Bray regarding

24  this issue.

25           I approached Mr. Bray at the last

Page 112

 1    hearing and told him that Mr. Canducci was

 2    the appropriate person for the Gulf of

 3    Mexico.  Mr. Moore was an ISM person.  We

 4    were told at that point that they still

 5    wanted Mr. Moore.  They would get

 6    Mr. Canducci at the next hearing, but they

 7    still wanted Mr. Moore.

 8            We were then told late in the

 9    afternoon one night that Mr. Moore was

10    released because we ran out of time.

11            Mr. Canducci's lawyer is Tim

12    Johnson, who is facilitating the Board by

13    being in Los Angeles right now, so that

14    Ms. Fleytas can testify today.  So he cannot

15    be in two places at one time, and so that's

16    the reason he gave the Board for not being

17    able to be with Mr. Canducci today.

18            So those are the clear facts

19    before this Board.  Mr. Bray probably knew

20    those facts, and we knew them and they were

21    expressed last week.

22            The witness list in this case did

23    not come out until about a week before this

24    hearing, 10 days at the most, the Friday

25    before, a Friday 10 days or so ago.  So then

Page 113

1    at that point we're looking at a witness

2    list, and Commander Bray was advised by

3    Mr. Johnson last week that he had a conflict

4    and that's the issue.

5         CAPT. NGUYEN:

6              In terms of following what

7    Mr. Kohnke is saying, we did issue two

8    subpoenas for the same thing.  Two

9    subpoenas.  And each time we were told that

10   this would be irrelevant, burdensome.

11             Now, these reports, if I can count

12   them, it's probably about 33 reports, and

13   each report is probably about between three

14   to five pages, so if they are burdensome,

15   that means that something is going on with

16   your safety management system.  I mean,

17   these things you're supposed to track, to

18   get audited and audited and audited, and you

19   can't just go in and pull them out and make

20   copies of 33 of these reports?  I just don't

21   understand.  Or 23 reports.

22        MR. KOHNKE:

23             Captain, if I were to make an

24   engineering statement, it would be all

25   wrong, and I would expect you to correct me,

Page 114

1    and I have to correct you.

2            The objection that something is

3    burdensome is an objection that is lodged

4    properly.  It doesn't mean anything more

5    than it is a burden on Transocean to respond

6    to the subpoena.

7            It is then the Board's option, and

8    you need to understand this, it is then the

9    Board's option to enforce its own subpoena,

10   and there is a vehicle for doing so set

11   forth in the rules.

12           By making the objection, we don't

13   stop the Board.  The Board stopped itself,

14   and your conclusions to the contrary are in

15   error.

16   CAPT. NGUYEN:

17           I think my statement is that we're

18   going to make a conclusion and

19   recommendation based on what we have, and

20   we're giving you an opportunity to

21   supplement the records of what we have so

22   far.  In terms of did we stop the process?

23   No, we have not.  We sent you two subpoenas,

24   and again, you point out that we have other

25   options to pursue, and we will pursue the

Page 115

1    options as we deem necessary, but what I'm

2    looking at here is, you know, in terms of

3    burdensome again, you know, this is 12

4    years.  From July, 1998 until now, I think

5    that's 12 years, so at most it would be 12

6    reports for Transocean's company, and

7    probably in April, probably 11 vessels that

8    were operating in the Gulf of Mexico.  We're

9    asking for that last report.  So, simply, we

10   were asking for no more than 23 reports, of

11   each report of three to five pages from what

12   I can see, but I don't know.  If it's more

13   than three to five pages, that means there

14   are a number of nonconformities or

15   observations or whatever it is, then we

16   still have an issue.  So that's what I'm

17   asking.

18          So we believe it's relevant based

19   on, for example, the DISCOVERER DEEP SEAS

20   and other issues, we believe that it's

21   relevant.  That's why we're asking for them.

22   And we don't believe that it's burdensome to

23   produce them.  Because we got binders and

24   binders of manuals on equipment that was

25   produced and, you know, I wouldn't say they

Page 116

1    have great value to us, but it was produced,

2    and items that we think, that someone

3    believed that it's relevant to this

4    investigation, we're not getting them, and

5    that's why we're providing you what we have,

6    letting you know what we have, and for you

7    to supplement the record, and it simply is

8    that.

9         MR. HYMEL:

10             Excuse me, Judge.

11        HON. JUDGE ANDERSEN:

12             I just have one thought, and

13   that's this.  The objections that obviously

14   I have seen thousands of times are

15   relatively easy to handle within an ordinary

16   court context, because that triggers a

17   hearing before the judge, who discusses it

18   with the parties, and then decides what has

19   to be produced.

20             For the Board to go into court,

21   particularly in a hearing which is not

22   intended to be adversarial, is kind of an

23   adversarial move, and so the Board has

24   elected, I think, not to resort to court to

25   try to get information.

USCG/BOEM Board of Investigation (Re: Deepwater Horizon)                    The Joint United States Coast Guard/Bureau of Ocean Energy Management Investigation

Page 117

1          And what the captain I think here

2    is saying is that it doesn't appear that it

3    would be unduly burdensome to get this

4    information and it really would assist the

5    Board in doing it.

6          And so if there's a way in the

7    immediate future that we can discuss with

8    Transocean's attorneys the obtaining of this

9    material or find out really why it is too

10   burdensome, because it doesn't actually look

11   too burdensome, then we can draw conclusions

12   based on the full information.

13          And the other constraint we have

14   that's not normal is that we only have a

15   limited time period within to work.  The

16   original convening order asked that we

17   report by January 16th, and we hope that

18   we're not going to have more than, say, one

19   more week of hearings before the Board makes

20   its recommendations to the various

21   departments.

22          So there isn't time, and I don't

23   think it's in anybody's interest for us to

24   be running to and from court to work out

25   these things.

Page 118

```
 1            So I'm going to assume, as Captain

 2    Higgins did, that it's a statement that if

 3    the Board can't get more information to work

 4    on, the Board will obviously listen to what

 5    people have to say, but may well draw the

 6    conclusions that the co-chair has drawn

 7    based on the limited information that he

 8    has.

 9            So as we go into other witnesses,

10    maybe during the break, at lunchtime, and/or

11    at the end of the day, we can figure out the

12    best way to get information that Transocean

13    has that might assist the Board as well as

14    Transocean.  If we see conflicts in

15    schedules, perhaps we can work those things

16    out.  So that's what I would invite you to

17    do.

18    MR. HYMEL:

19            Judge, Richard Hymel again with

20    Transocean.  I got an e-mail from Commander

21    Bray last week asking for my availability to

22    discuss these objections, as lawyers do in

23    normal court proceedings, and I told him

24    that I was available all day Sunday and all

25    day Monday.  I was in the office all day
```

Page 119

1    Sunday working, and we never got a call.

2              He said he would send me an

3    e-mail.  We would set that up.  That

4    conversation never took place.  And we had

5    communications throughout the week about

6    different issues, and that issue never came

7    up.

8              So we have made ourselves

9    available and we will make ourselves

10   available to discuss this issue.  We made

11   the objections and we're going to stand by

12   them or we will work through them with you

13   as well.

14             To discuss another issue which you

15   brought up, the hearings, we were told that

16   this set of hearings was for the parties to

17   present cases and present positions that

18   they wanted to present.

19             When the witness list came out, we

20   looked at the witness list and I asked

21   Commander Bray via e-mail whether these were

22   all witnesses chosen by the PIIs or

23   witnesses chosen by the Board, and he told

24   me it was a mixture.

25             So once again, the parties, the

Page 120

1    PIIs have not had a full week of hearings to

2    present the witnesses they want to present

3    and present the positions they want to

4    present and to address issues like Captain

5    Nguyen has brought up.

6              We requested over 30 witnesses for

7    this set of hearings and we got three.  So

8    we requested the Board to reconsider the

9    hearings going forward and give the PIIs a

10   full week of hearings to present their cases

11   and address things like Captain Nguyen

12   brought up today, so that we are not faced

13   with, as Mr. Fanning said, someone

14   presenting evidence that the Board picks up

15   and the media picks up that's not truly

16   evidence, and that can then be out there and

17   unrebutted.

18        HON. JUDGE ANDERSEN:

19              Okay.  Well, with the permission

20   of both the chairs, I would be pleased to

21   work with Commander Bray and Captain

22   Higgins, who is really an expert on maritime

23   proceedings, which this is in part, to see

24   if we can facilitate this, as well as

25   Ms. Murphy, who's the attorney at BOEM.

Page 121

1          And I have been working on Sundays

2     on it, too, and I have been copied on lots

3     of their e-mails.  So thank you very much

4     for your cooperation, and on a

5     forward-looking basis, if I can help with

6     some of this stuff and add my time to the

7     efforts that the staff attorneys and the

8     other Board members have been putting in, I

9     would be happy to do that.  So thanks for

10    that encouragement.

11         CAPT. NGUYEN:

12              We will go ahead and move on and

13    call our next witness, please.

14         HON. JUDGE ANDERSEN:

15              Thank you for coming back.  I

16    should have done it before the first witness

17    as part of the witness' testimony.

18              Counsel, would you state your name

19    for the record?

20         MR. HENNESSY:

21              My name is Matt Hennessy, Your

22    Honor.

23         HON. JUDGE ANDERSEN:

24              And you represent Mr. Keplinger?

25         MR. HENNESSY: