# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | * | **MDL NO. 2179** |
| DEEPWATER HORIZON" | * | |
| GULF OF MEXICO, APRIL 20, 2010 | * | **SECTION "J"** |
| | * | |
| **Pleading Applies to :** | * | **JUDGE BARBIER** |
| *All Cases in Pleading Bundle D1* | * | |
| * * * * * * * * * * * * * * * * * | * | **MAGISTRATE SHUSHAN** |

# MASTER COMPLAINT ("BUNDLE D1")

# CLAIMS FOR INJUNCTIVE RELIEF AGAINST PRIVATE PARTIES
*[PURSUANT TO PTO NO. 11, SECTION III(D1)]*

# GENERAL PROVISIONS

The Plaintiffs in the actions represented in this master complaint seek injunctive relief against BP Exploration and Transocean Drilling and their related companies to prevent further irreparable injury to Plaintiffs' interests, and the marine environment of the Gulf of Mexico, from the Deepwater Horizon oil spill. The claims in this master complaint are based on the Clean Water Act "CWA"), the Endangered Species Act ("ESA"), the Emergency Planning and Community Right to Know Act ("EPCRA"), the Comprehensive Environmental Restoration, Cleanup and Liability Act ("CERCLA") and maritime and state law.

## I.    INTRODUCTION

On April 20, 2010, an explosion on board the oil rig Deepwater Horizon in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States. The explosion resulted in an oil spill of unprecedented proportions and an oil slick that grew exponentially, depleting and destroying marine and coastal environments and estuarine areas in the Gulf of Mexico, Louisiana,

1

Mississippi, Alabama, Texas and Florida (the "Gulf States").  In an ill-conceived effort to contain and to clean up the spill, massive amounts of chemical dispersants were sprayed from the air, at the surface of the Gulf and beneath the surface of the water.  Vast quantities of oil and debris were burned at the surface of the Gulf or skimmed from the water.  Beaches, marshes and wetlands fouled by oil and chemicals have been the focus of a variety of remedial efforts to remove the hazardous materials from these fragile areas.  Although the leaking well is now capped, the disastrous effects of the spill on the public health, the environment and the income, businesses and property of the residents and property owners of the region are widespread and will likely remain so for decades.

Hundreds of individual and class actions were filed in state and federal courts on behalf of the thousands of victims of the spill.  By order entered on August 10, 2010, the Multi-district Litigation Panel (the "MDL Panel") transferred all actions then pending to this Court.  *See In re Oil Spill by the Oil Rig "Deepwater Horizon" In the Gulf of Mexico*, on April 20, 2010, MDL No. 2179, --- F. Supp. 2d ----, 2010 WL 3166434 (JPML, August 10, 2010) (the "Transfer Order").  On October 19, 2010, this Court entered its Case Management Order No. 1 (hereinafter "CMO No. 1"), wherein it directed the filing of Master Complaints on behalf of the Plaintiffs. This Master Complaint is filed pursuant to CMO No. 1, Paragraph III.D(1), on behalf of those Plaintiffs challenging regulatory action or activity and/or seeking injunctive relief, and who have filed their claims in this Court or whose claims have been transferred to this Court pursuant to the Transfer Order.

This Master Complaint does not include all claims asserted in all of the actions that have been transferred to this Court pursuant to the Transfer Order, nor is it intended to consolidate for any purposes the separate claims of the Plaintiffs.  Those claims are set forth in the individual

actions filed by each of the respective Plaintiffs.  This Master Complaint does not constitute a waiver or dismissal of any actions or claims asserted in the individual actions arising out of the Oil Spill, nor by it do the Plaintiffs relinquish the right to add or assert, or seek leave to add or assert, additional claims and parties defendant depending on further information learned through discovery or investigation.  Further, additional parties will likely join as Plaintiffs in this action after the filing of this Master Complaint, and those potential Plaintiffs will have the opportunity to join this action by completing an online form dedicated to that purpose.

Accordingly, pursuant to CMO No. 1, Paragraph III.D(1), Plaintiffs, by their undersigned counsel and other counsel identified herein, for themselves and all others similarly situated, submit this Master Complaint for declaratory and injunctive relief and other relief arising from the oil spill by the Deepwater Horizon oil rig in the Gulf of Mexico on April 20, 2010, and state as follows:

## JURISDICTION AND VENUE

1.     This court has federal question jurisdiction over this action under 28 U.S.C. § 1331. This Court has subject matter jurisdiction over claims specified in this Complaint pursuant to 33 U.S.C. § 1365(a), 42 U.S.C. § 9659(a), and 42 U.S.C. § 11046(a).  The effects of the oil spill have significantly impacted the people, wildlife, waters, coastal environment, and economy of the State of Louisiana.  The relief requested is authorized pursuant to 33 U.S.C. §§ 1319(d), 1321, 1365(a) and (d), 42 U.S.C. §§ 9609(c) and 9659(c), 42 U.S.C. §§ 11045(b) and 11046(c), and 28 U.S.C. §§ 2201 and 2202.

2.     The violations complained of in the notice and the suits already filed are continuing, are reasonably likely to continue, or were reasonably likely to continue at the time the original complaints were filed.  Defendants remain in violation of the CWA, CERCLA, ESA

and EPCRA.  Neither the EPA nor any other governmental entity has commenced or is diligently prosecuting a civil or criminal action in a court to redress the violations.

3.      Venue is appropriate in the Eastern District of Louisiana pursuant to 33 U.S.C. § 1365(c)(1), 42 U.S.C. § 9659(b)(1), and 42 U.S.C. § 11046(b)(1), because the sources of the violations complained of originated in the contiguous zone and exclusive economic zone of the United States and the impacts of the petroleum discharges have been felt so heavily by the people and State of Louisiana.

## PARTIES

### ORGANIZATIONAL PLAINTIFFS AND STANDING

4.      Numerous non-profit organizations filed suit or otherwise participated in measures designed to reform the organizational failures that led to the Deepwater Horizon explosion and resulting oil spill ("Oil Spill"), to address the removal effort and/or to restore the environment.  These organizations, and more that may yet join, are referred to collectively as "Organizational Claimants."

5.      All Organizational Plaintiffs have members who reside throughout the Gulf region, including the coastal areas of Louisiana especially impacted by the pollutants discharged as part of the oil spill from the Deepwater Horizon/Macondo facility.  Plaintiffs' members specifically use, recreate in and enjoy these areas in the following ways:

> a.      Their members live within the Gulf coastal zone impacted by discharges from Defendants' facilities;
>
> b.      Their members engage in economic and recreational activities – including but not limited to fishing, swimming, hiking, walking and boating – in and around the waters impacted by discharges from Defendants' facilities;
>
> c.      Their members observe and enjoy wildlife in the Gulf in the areas impacted by Defendants' discharges;

     d.     Their members have an aesthetic and health interest in keeping the waters in the Gulf free of oil and toxic and hazardous pollutants;

     e.     Their members swim and fish in the waters and breathe the air into which Defendants' release the oil and toxic pollutants which they have discharged and failed to properly report.  Such oil and toxic pollutants are known to cause deleterious effects to human health and wildlife and interfere with members' use and enjoyment of property.

6.     Organizational Plaintiffs, and their members, are irreparably injured as a result of the actions as set forth in this complaint and as more fully discussed below.  This harm is both present and real.  Members are injured by the Oil Spill's adverse impacts on their uses of the near-shore waters.  The Plaintiffs' use of these waters and of the Gulf of Mexico will be at further risk if declaratory and injunctive relief is not granted as prayed.

7.     Certain of the statutes at issue in this action require that at least 60 days written notice of the violations alleged and intent to sue be given to defendants prior to any lawsuit being filed.  To the extent any notice was required, at least one of the Organizational Plaintiffs joining in this Master Complaint provided a valid notice of intent to sue, setting out the violations specified in the complaint and all other necessary information.  The notices of intent to sue were served on the defendants named below, the Administrator of the U.S. Environmental Protection Agency ("EPA"), to the Regional Administrator of the EPA, and to all other required entities.

## INDIVIDUAL PLAINTIFFS AND STANDING

8.     Commercial Fisherman Plaintiffs, Processing and Distributing Plaintiffs, Recreational Business Plaintiffs, Commercial Business Plaintiffs, Recreation Plaintiffs, Plant and Dock Worker Plaintiffs, Real Property/Tourism Plaintiffs, Banking/Retail Business Plaintiffs, and Real Property Owner/Lessee Plaintiffs ("Private Plaintiffs") all have sufficient pecuniary and

other interests in the claims set forth below.  The claimants rely on the Gulf to earn a living or are otherwise dependent on a clean environment and use the coast, its waters, and/or the nearshore and offshore waters of the Gulf of Mexico for commercial, recreational and cultural activities.  The coastal zone is inextricably linked to Plaintiffs, their families, and communities, as well as their histories, languages and cultures.

9.      The private Plaintiffs have a direct interest in ensuring that a spill like this never happens again, that this spill is properly remediated, that the environment, natural resources and claimants' private properties are as fully restored as possible, that information regarding the spill be provided to the relevant property owners and made public, and that all of these processes happen in a transparent manner, with an opportunity for full public participation.

10.     These obligations arise under federal law and under state common and civil law. Both sources of obligation allow for both declaratory and injunctive relief as set forth below.

DEFENDANTS

11.     Defendant BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" ("MC252") where the Spill originated. BP Exploration and the affiliated entities named below are collectively referred to in this complaint as "BP."

12.     On April 28, 2010, the U.S. Coast Guard named BP Exploration and Production, Inc. as a "Responsible Party" under the Oil Pollution Act ("OPA") for the Oil

Spill resulting from the explosion aboard the Deepwater Horizon and the subsequent uncontrolled blowout of the MC252.

13.     Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas. BP America was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the Deepwater Horizon rig.

14.     Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo, including BP Exploration and BP America.

15.     Defendant Transocean Ltd. ("Transocean Ltd.") is a Swiss corporation that maintains substantial U. S. offices in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. According to its Complaint and Petition for Exoneration from or Limitation of Liability, Transocean Ltd. was an owner, managing owner, owner *pro hac vice,* and/or operator of the Deepwater Horizon.  Defendant Transocean Ltd. and the affiliated entities named below are collectively referred to in this complaint as "Transocean."

16.     Defendant Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice,* and/or operator of the Deepwater Horizon.

17.     Defendant Transocean Deepwater, Inc. ("Transocean Deepwater"), is a Delaware corporation with its principal place of business in Houston, Texas, and that at all

pertinent times was doing business in the State of Louisiana and within this district. Transocean Deepwater is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice,* and/or operator of the Deepwater Horizon.

18.     Defendant Transocean Holdings, LLC ("Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Holdings is affiliated with Transocean Ltd. and is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings is an owner, managing owner, owner *pro hac vice,* and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. More specifically, Transocean Holdings is party to the contract with BP regarding the lease of the Deepwater Horizon for drilling operations in the Gulf of Mexico.

19.     On April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the OPA for the surface oil spill resulting from the explosion aboard the Deepwater Horizon.

## STATUTORY AND REGULATORY BACKGROUND

20.     Congress required that exploration be conducted in a safe manner by well-trained personnel using technology, precautions, and techniques sufficient to prevent or minimize the likelihood of blowouts, loss of well control, fires, spillages, physical obstruction to other users of the waters or subsoil and seabed, or other occurrences which may cause damage to the environment or to property, or endanger life or health.

21.     Before engaging in drilling activities, lessees must file an Exploration Plan ("EP") with the Department of Interior.  That plan is supposed to ensure that the proposed activities will

not: (1) cause serious harm or damage to the marine, coastal, or human environment, (2) result in pollution; (3) create hazardous or unsafe conditions; (4) unreasonably interfere with other uses of the area; (5) interfere with or endanger operations on other leases; (6) result in pollution; or (7) disturb any site, structure, or object of historical or archaeological significance.

22.    The Department of Interior's regulations require analysis of a blowout scenario and a worst case oil spill scenario.

23.    The regulations also required the Defendants to "design, install, maintain, test, and use the BOP system and system components to ensure well control."  30 C.F.R. § 250.440, *et seq*.

24.    Defendants represented to the United States that they had performed these important risk analyses and fulfilled the operational pre-requisites before and during drilling.

25.    Likewise, before engaging in drilling activities, the OPA required Defendants to prepare and submit plans "for responding, to the maximum extent practicable, to a worst case discharge, and to a substantial threat of such a discharge, of oil or a hazardous substance." 33 U.S.C. § 1321(j)(5)(A).

26.    A facility response plan required under the OPA "shall . . . identify, and ensure by contract or other means approved by the President the availability of, private personnel and equipment necessary to remove to the maximum extent practicable a worst case discharge (including a discharge resulting from fire or explosion), and to mitigate or prevent a substantial threat of such a discharge."  33 U.S.C. § 1321(j)(5)(C)(iii).

27.    "Remove" or "removal" is defined to mean not simply the removal of oil from the water or shorelines but also "containment" of the oil and any other action "necessary to prevent,

minimize, or mitigate damage" to public health or welfare including natural resources. 33 U.S.C. § 1321(a)(7).

28.     Defendants are under a statutory obligation to avoid spills, and if one occurs, to follow their own facility oil spill response plan.  33 U.S.C. § 1321(c)(3)(B).

29.     Despite these obligations, Defendants illegally induced the government to approve the MC252 lease and exploration plan by submitting a plan they knew or should have known grossly underestimated risk and overstated their capacity to respond, lulling regulators to trust that industry had both the technology and resources necessary to deal with any problems that could occur.

30.     Defendants violated their obligations under the statutes cited above and of the regulations implementing the provisions outlined above.  30 C.F.R. §§ 254.20, *et seq*.

31.     These regulatory and statutory violations, as well as the Deepwater Horizon's own deficient Regional Oil Spill Response Plan, constituted gross negligence for purposes of the OPA, the CWA, Transocean's limitation of liability proceeding and for purposes of assessing punitive damages.

**The Federal Water Pollution Control Act ("Clean Water Act")**

32.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into the contiguous zone, ocean, exclusive economic zone and navigable waters of the United States, unless in compliance with a National Pollution Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

33.     Defendants have discharged, continue to discharge, are reasonably likely to continue to discharge, or were reasonably likely to continue to discharge at the time of the

original complaints, pollutants, including oil, natural gas, methane, drilling muds, and other toxic pollutants, from one or more point sources in the Gulf of Mexico into the contiguous zone, ocean, exclusive economic zone, and waters of the United States in violation of the CWA. The Defendants' discharges are not permittable under the CWA and violate national policy. 33 U.S.C. § 1251(a)(3).

34.     By discharging oil, natural gas, methane, drilling muds, and toxic pollutants into the Gulf of Mexico, as described herein, Defendants have violated, continue to violate, or are or were reasonably likely to continue to violate section 301(a) of the CWA, 33 U.S.C. § 1311(a).

35.     Section 311(b) of the CWA, 33 U.S.C. § 1321(b), prohibits the discharge of oil or hazardous substances into navigable waters of the United States, into the waters of the contiguous zone, the ocean or the exclusive economic zone.

36.     Defendants have discharged, continue to discharge, are reasonably likely to continue to discharge, or were reasonably likely to continue to discharge at the time of the original complaints, oil, natural gas, methane, drilling muds, and hazardous substances into the Gulf of Mexico. By discharging oil, methane, drilling muds and hazardous substances into the Gulf of Mexico, as described herein, Defendants have violated, continue to violate, or are, or were, reasonably likely to continue to violate section 311(b) of the CWA, 33 U.S.C. § 1321(b).

37.     Section 307(a) of the CWA, 33 U.S.C. § 1317(a), requires EPA to publish a list of toxic pollutants. Each toxic pollutant published by EPA is subject to effluent limitations established by EPA. *Id*. After the effective date of any effluent standard or limitation established for a toxic pollutant, it is unlawful for any owner or operator to violate such effluent standard. 33 U.S.C. § 1317(d).

38.     Defendants' discharge of oil, natural gas, methane, and toxic pollutants into the Gulf of Mexico violated, continues to violate, or was reasonably likely to continue to violate at the time of the original complaints, the effluent standards and limitations for a number of toxic pollutants; including, but not limited to, benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons, arsenic, cadmium, mercury, haloethers, halomethanes, and nickel, in violation of the CWA.  33 U.S.C. § 1317(d).

39.     Section 306(b) of the CWA, 33 U.S.C. § 1316(b), requires EPA to develop national standards of performance for certain new sources, including offshore oil drilling operations.  After the effective date of such standards of performance, the owner or operator of any new source is prohibited from operating such source in violation of any standard of performance applicable to such source.  33 U.S.C. § 1316(e).

40.     Defendants discharge of oil, natural gas, methane, drilling muds, and other pollutants into the Gulf of Mexico violates the national standards of performance for offshore oil drilling operations.  By discharging pollutants in violation of national standards of performance for offshore facilities into the contiguous zone, ocean, exclusive economic zone and waters of the United States as detailed herein, Defendants have violated, continue to violate, are reasonably likely to continue to violate, or were reasonably likely to continue to violate at the time of the original complaints, section 306 of the CWA, 33 U.S.C. § 1316.

41.     Section 311(b)(7)(D) of the CWA, 33 U.S.C. § 1321(b)(7)(D), provides that if the defendants' actions that caused the spill were the result of gross negligence or willful misconduct that the civil penalties per barrel of hydrocarbon or unit of reportable quantity of hazardous substance discharged shall be up to $4,300 per barrel or unit.

42.     Defendants' actions in the exploration and operation of the Deepwater Horizon well constituted gross negligence or willful misconduct.

**Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA")**

43.     Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), requires any person in charge of a "facility" to report any release of a hazardous substance in a quantity equal to or greater than the established reportable quantity to the National Response Center.

44.     By releasing numerous hazardous substances in excess of the applicable reportable quantities into the Gulf of Mexico and failing to report, or failing to adequately report, such releases to the National Response Center as detailed herein, Defendants have violated their duties under CERCLA, 42 U.S.C. § 9603(a).

**Emergency Planning and Community Right-to-Know Act ("EPCRA")**

45.     Section 304 of EPCRA, 42 U.S.C. § 11004, requires emergency notification of any release of a reportable quantity of a hazardous substance subject to the notification requirement of CERCLA to the emergency coordinator for the local emergency planning committee.

46.     By releasing numerous hazardous substances in excess of the applicable reportable quantities into the Gulf of Mexico, and failing to report, or failing to adequately report, such releases to local and State emergency planning committees as detailed herein, Defendants have violated their duties under EPCRA, 42 U.S.C. § 11004.

**Endangered Species Act**

47.     Congress enacted the ESA, in part, "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to

provide a program for the conservation of such endangered species and threatened species. . . ." 16 U.S.C. § 1531(b).

48.     Under the ESA, a species is listed as "endangered" when it is "in danger of extinction throughout all or a significant portion of its range," 16 U.S.C. § 1532(6), and listed as "threatened" when it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," 16 U.S.C. § 1532(20).  Once listed, a species is entitled to a number of protections, including prohibitions on harm and harassment and affirmative duties to promote the species' conservation and recovery.

49.     Section 9(a)(1) of the ESA makes it "unlawful for any person subject to the jurisdiction of the United States to" . . . "take any such [endangered] species within the United States or the territorial sea of the United States"  or to "take any such species upon the high seas." 16 U.S.C.  §1538(a)(1)(B)–(C).  It is a violation of the ESA for "any person subject to the jurisdiction of the United States to attempt to commit, solicit another to commit, or caused to be committed" any such offense.  Id. § 1538(g).

50.     The ESA defines the term "take" as meaning "to harass, harm, pursue… wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."   16 U.S.C. § 1532(19).

51.     The Services have defined the term "harm" to mean "an act which actually kills or injures fish or wildlife.  Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering."   50 C.F.R. § 222.102 (NMFS definition); see also 50 C.F.R. § 17.3 (FWS definition).

52. NMFS has extended Section 9's prohibitions on take to threatened sea turtles. 50 C.F.R. § 223.205.

53. FWS has extended Section 9's prohibitions to most threatened species, including piping plovers. 50 C.F.R. §§ 17.21, 17.31, 17.44(v).

54. The prohibitions against take apply equally to persons engaged in activities that are not intended or designed to take species listed under the ESA. See 16 U.S.C. §§ 1536(a), 1539(a)(1)(B).

RELEVANT FACTUAL BACKGROUND

55. The factual allegations pleaded in the Master Complaint for the B1 Pleading Bundle are incorporated into and made a part of this Master Complaint.

56. In March 2008 BP acquired mineral rights to drill for oil within the Mississippi Canyon Block 252, which is located in the United States sector of the Gulf of Mexico, about 41 miles off the Louisiana coast.

57. In February 2010, the Deepwater Horizon drilling rig began drilling an exploratory well in the Mississippi Canyon Block 252, also known as the Macondo well. On April 20, 2010, the well blew out and the Deepwater Horizon exploded.

58. The Deepwater Horizon sank two days after the explosion.

59. On or about April 20, 2010, the uncontrolled MC252 wellhead began to discharge crude oil and other hazardous substances into navigable waters of the United States, into extremely cold waters under the high pressure environment found one mile below the sea surface, at the Gulf of Mexico seafloor at that location.

60. The discharge consisted of an admixture of petroleum products, including crude oil, natural gas and methane, drilling fluids, hazardous wastes injected into the well with no

production value, as well as massive amounts of Corexit® dispersant, which was intentionally mixed into the admixture flowing from the uncontrolled seafloor MC252 wellhead.

61.     BP gave assurances to both the Coast Guard and the public that Defendants would control the spill by application of BP's Regional Oil Spill Response Plan, an adaptation of a response plan used throughout the industry in the Gulf of Mexico, as promised prior to the start of drilling at the MC252 well.

62.     Volume assessment is critical in oil response and an obligation under both law and BP's own Oil Spill Response Plan.

63.     BP initially told the United States and the public that the well was leaking at a rate of 1000 barrels per day.  Immediately, or at least within days, Defendants knew or should have known the estimated per day spill volume was drastically wrong.  Drilling Defendants did nothing to correct this vital statistic.

64.     During this time, Defendants failed to implement their Regional Oil Spill Response Plan and failed to recover the oil admixture as promised.  BP could only muster a seriously undermanned response fleet to collect and contain the oil as it topped the waters of the Gulf of Mexico.

65.     BP's Oil Spill Response Plan proved to be a massive misrepresentation of its capabilities to control and remove the oil.  Defendants knew or should have known, even before the spill, that the available equipment was ill suited to recover the amount of oil spewing from the uncontrolled well.

66.     As a direct result of these material misrepresentations, containment failed and more oil physically impacted Plaintiffs' properties, harming natural resources and the economies upon which Plaintiffs rely.

67.     As a direct result of misrepresenting the spill volume and their ability to contain and remove, BP induced a response which was not suited to the worst case scenario the Deepwater Horizon spill presented, delaying the government in both allocating response resources and in deciding a course of action.

68.     BP's notification of the United States Coast Guard triggered the National Incident Management System; specifically, National Response Framework 10, which contains plans for responding to oil spills.   NRF-10, and the Clean Water Act, invokes the National Contingency Plan, a tiered system of response structures and national, regional and area contingency plans for mitigating and remediating oil spills and hazardous waste spills.

69.     Under this system, a Unified Incident Command was established, with its principal members, BP, the designated Responsible Party, representatives from each of the affected States and the Federal On Scene Coordinator, in this case, an officer in the United States Coast Guard.

70.     As BP and the oil response industry was struggling to control the spill, the Coast Guard was establishing a National Incident Command and National Response Team, Regional Response Teams and Regional Incident Command Posts, as well as sub-regional Forward operating Bases, as outlined in contingency plans.

71.     On or about April 28, 2010, the National Oceanic and Atmospheric Administration ("NOAA") estimated that the leak was likely 5,000 barrels a day.  That same day, BP and Transocean were designated as responsible parties under the Oil Pollution Act.

72.     On or about April 30, 2010, oil began washing ashore in Louisiana.

73.     On or about May 7, 2010, BP attempted to lower a "containment dome" over the largest of the oil leaks, which was unsuccessful.

74.     On May 12, 2010, BP released the first public video of the leak.  Based on the footage, a number of outside experts estimated that the leak was significantly higher than previous estimates by BP and NOAA.  According to a mechanical engineering expert, the leak may be 70,000 or more barrels a day.

75.     That same day, Louisiana emergency operations reported oil landing in copious amounts on shorelines throughout Louisiana from the mouth of the Mississippi through Whiskey Island, south of Terrebonne Bay.  On one beach, biologists measured 25 nickel sized pieces of broken oil per square foot, covering an area miles long.

76.     On or about May 16, 2010, BP inserted a mile-long tube to divert some of the leaked oil.  By this time, oil had impacted areas east of the Mississippi River, including the Breton National Seashore.

77.     On or about May 20, 2010, BP claimed to be capturing 5,000 barrels of oil per day.

78.     On or about May 21, 2010, BP began releasing the live underwater video broadcasts of the oil leak.

79.     On May 22, 2010, reporters observed heavy oil coating a pelican colony near North Breton Island off the Louisiana coast.  Oil was observed as far west as the Terrebonne Basin.

80.     On or about May 29, 2010, BP attempted its "top kill" plan, which was unsuccessful.

81.     On or about June 1, 2010, oil began washing up on the beaches of Gulf Islands National Seashore.

82.     By June 7, 2010, heavy oil had soaked the Queen Bess Island pelican rookery, a nesting site that has been essential to the recovery of the brown pelican population.  Experts worry that the spill could set back the Louisiana state bird's recovery from near-extinction.

83.     On or about June 11, 2010, federal estimates of the size of the leak increased to 20,000 to 40,000 barrels a day.  Since June 11, 2010, estimates of the size of the leak have ranged from 20,000 to 100,000 barrels a day.

84.     On or about July 6, 2010, tar balls reached the shore of Lake Pontchartrain.

85.     On or about July 12, 2010, BP installed a new cap on the leak.

86.     On or about July 15, 2010, BP claimed that the new cap halted the flow of oil into the Gulf for the first time since April.

87.     On or about July 18, 2010, oil and natural gas were discovered seeping into the Gulf of Mexico near the well.  Upon information and belief, methane gas has also been detected near the well.

88.     BP drilled relief wells for a number of weeks, which it hoped would eventually shut the well permanently.  On or about July 21, 2010, BP temporarily ceased drilling the relief wells due to an expected tropical storm.

89.     On July 23, 2010, the tropical storm whose winds had largely dissipated was in fact a tidal event that brought in waves of fresh oil from the MC252 well into beaches and marshes all along the Gulf Coast.

90.     BP considered an attempt to plug the ruptured well with a procedure called "static kill," which is similar to the earlier and unsuccessful "top kill" procedure.  Drilling mud (which itself includes toxic compounds), cement, and other materials would be pumped in from the top

of the well, in an attempt to force the gas and oil downward.  BP also continued to drill the relief

wells, in which it intended to inject drilling mud and cement.

91.     According to federal estimates, between 93.5 million and 184.3 million gallons of

oil have been discharged into the Gulf of Mexico from the BP spill since April 20, 2010.  Based

on the range of daily estimates, over 215 million gallons of oil may have discharged into the Gulf

of Mexico from the BP spill since April 20, 2010.

92.     According to spill response personnel at Unified Command, all the samples of oil

taken from beaches and marshes between the panhandle of Florida to the Atchafalaya delta

originated at the MC252 well site and are thus associated with the Deepwater Horizon spill.

93.     Including other hydrocarbon gases, a total of 6.9 million barrels, or 289,000,000

gallons, of petroleum product was discharged into the Gulf of Mexico from the MC252 well.

94.     Of an estimated 5.2 million barrels of oil discharged into the Gulf since April 20,

2010, some estimates indicate that about 1.2 million barrels have been siphoned, burned or

skimmed.  This would mean that 4 million barrels or more of oil may remain in the Gulf of

Mexico.

95.     Satellite images show that the various surface oil slicks and sheens believed to be

associated with the BP spill have covered as much as 23,140 square miles.

96.     Scientists have reported large plumes of oil below the sea's surface.  Scientists

from Woods Hole Oceanographic Institution documented an undersea oil plume 35 kilometers

long, 200 meters thick, and 2 kilometers wide at a depth of approximately 1100 meters.  The

Woods Hole team determined that the Deepwater Horizon well was the source of the plume.

97.     Plumes of oil have been spreading beneath the surface of the Gulf, which is feared

to have devastated zooplankton and invertebrate communities at the base of the aquatic food

chain.   Researchers from the University of South Florida and NOAA have released studies confirming that the plumes of oil are the result of the Deepwater Horizon well.  Initial tests show that some of the most toxic components of the oil are not rising to the surface where they could evaporate, but rather are drifting through the deep water in underwater plumes or layers.

98.     Large "clouds" of oil were discovered in the Gulf miles away from the well site. Small globs of oil have also been discovered underwater.   One researcher from Tulane University has found baby crabs with orange blobs of oil or dispersant within their shells, and has found droplets of oil everywhere sampled, from Galveston Bay, Texas to Pensacola, Florida. Researchers have also measured extremely high levels of methane, which also spewed from the gushing BP well, at up to 10,000 times background levels in Gulf waters.

99.     According to BP, it has applied more than 1.8 million gallons of chemical dispersants to waters in the Gulf of Mexico in an attempt to break up and dilute the oil.  The environmental effects of using chemical dispersants at such depths and in such enormous quantities have never been tested.

100.    Bacteria have and are breaking down some of the oil's hydrocarbons in the underwater plumes, which has resulted in the severe depletion of oxygen levels.  Oxygen levels have plunged close to what is considered "dead zone" conditions, at which most marine life suffocate for lack of dissolved oxygen.

101.    The BP spill is having devastating impacts on fish and wildlife.  As of July 16, 2010, over 2,500 dead animals have been collected in areas affected by the Gulf spill, including over 2,000 birds, over 450 sea turtles, and over 60 dolphins and other mammals.

**CONTINUING IMPACTS OF THE OIL SPILL ON PRIVATE LANDOWNERS**

102.    At least 650 miles of Gulf Coast shoreline property, both private and public, were physically impacted by fresh crude oil and oil emulsion, including more than 380 miles in Louisiana, 110 miles in Mississippi, 75 miles in Alabama, and 90 miles in Florida.

103.    Tropical systems in May, June, July and again in August in particular brought large amounts of spill material ashore.

104.    These fresh oil and emulsions, admixed with hazardous substances and wastes, drilling mud and dispersant, mixed with sands or were quickly covered by sands or sank into marsh sediments across the Gulf coast.

105.    Unless removed, these deposits will remain in place for years to come.  Residual oil from these deposits, in the form of tar balls and tar mats, continue to be observed just offshore in Gulf waters and continue to be picked up and re-deposited on Gulf beaches and shorelines, particular after wind and tide events.

106.    On September 10 and 11, 2010, new and weathered oil, including tar balls and tar mats, contaminated beaches and marshes in Plaquemines Parish, Louisiana, and oil sheen was present on the water surface offshore.   On September 22, 2010, the Shoreline Coastal Assessment Teams ("SCAT") documented tar balls washing ashore at Bon Secour National Wildlife Refuge and oil buried under clean sand on the beach and in nearshore waters.

107.    In Jefferson and Lafourche Parish, Louisiana, tar balls and sheen continue to wash up on beaches in areas thought cleaned.  In many areas on the Gulf coast, SCAT teams and private landowners have documented large tar mats, one to three inches thick, covering large sub-surface areas.

108. As of October 13, 2010, 98 miles of Gulf Coast shoreline were still experiencing moderate to heavy oil impacts, and 458 miles of Gulf Coast shoreline were experiencing light to trace oil impacts.

109. Oceanographer Ian MacDonald from Florida State University testified to the President's National Oil Spill Commission on September 27, 2010, that more than 50% of the total discharge of oil from the Deepwater Horizon blowout remains in the Gulf ecosystem, much of it in coastal and marine sediments.

110. The impacts of the Deepwater Horizon oil spill on coastal property are not limited to the impacts of the oil itself. BP hired many companies, called OSRO's in the industry, to assist it with its removal obligations. BP personnel, and their contractors' personnel, frequently caused damage to the environment and to private property.

111. Immediately after the sinking of the Deepwater Horizon, response teams known as SCAT teams and FRAT teams spread out across the coastal zone, looking for signs of oil. These teams moved in airboats, marsh buggies, motor boats and all terrain vehicles, often crossing sensitive dune and marsh complexes. The weight of the vehicle and the spinning of tires dislodged sands and sediments and caused harm.

112. Booming operations, both onshore and offshore, made use of miles of absorbent and hard boom. Large quantities of this material broke free from where it was tethered and, especially during tidal events, floated onto sensitive marsh environments. These materials caused damage. Retrieval teams caused even more damage.

113. Absorbent "pom-pom's" floated behind fishing vessels tried to capture oil in the open water. Often these absorbent "pom-pom's" broke free from their lines and floated ashore.

They were subsequently covered by sand and remain buried to date.  These synthetic materials will persist for decades.

114.    Beach crews used heavy equipment and shovels to physically remove the oil strata from beaches across the Gulf Coast.  These activities, while necessary, impact beach stability by first removing sand material and by decreasing the beach's resistance to erosion.  These removal activities have caused significant damage to an already threatened coastline and actually diminished both private and public properties.

115.    Defendants placed many permanent or semi-permanent hard structures such as berms, bridges, sandbags, walls and barges on private property to prevent oil intrusion.  They then abandoned these structures during periods of high winds and failed to retrieve them quickly.  These structures themselves harm the coastal environment and acted to trap the oil floating ashore in tidal events behind the beach in sensitive marsh areas, further damaging both private and public property.

116.    Heavy equipment, often in an excessive and unnecessarily damaging manner, moved and removed sand and earth to expose oil mats and oil debris.  Moving this equipment across sensitive environments caused additional harm.  The use of this equipment deconsolidated sands.  Defendants have failed to use additional means to re-compact deconsolidated sands.  This has caused additional damage.

117.    Although as pled above, oil remains in the offshore environment as well as in marshes and on beaches, defendants have not undertaken the testing and characterization necessary to determine how much oil remains, its characteristics and how to address its cleanup.

118.    The impacts of the Deepwater Horizon spill on wildlife and the Gulf's marshes, beaches and coastal waters are expected to continue for months or years.

DISCHARGE OF POLLUTANTS REGULATED BY THE CLEAN WATER ACT FROM THE
DEEPWATER HORIZON OIL SPILL

119.    Upon information and belief, BP has analyzed and knows the concentrations of

each of the toxic pollutants present in the oil that came from its wells.   Defendants have

discharged, continue to discharge, or are, or were, continuing to discharge at the time of the

original complaints, toxic pollutants in large quantities.   The pollutants discharged and the likely

ranges of discharges are as follows:

| Chemical | Range of presence (in pounds per million gallons of oil) | | |
|---|---|---|---|
| | Low | high | average |
| Benzene | 1,595 | 19,216 | 7,643 |
| Toluene | 7,209 | 45,909 | 23,056 |
| Ethylbenzene | 5,509 | 9,569 | 6,698 |
| Arsenic | -- | -- | 14 |
| Nickel | -- | -- | 8 |
| Fluoranthene | 22 | 26 | 24 |
| Benz(a) anthracene | 12 | 39 | 21 |
| Benzo(b) fluoranthene | 3 | 15 | 10 |
| Benzo(k) fluoranthene | 1 | 5 | 3 |
| Benzo(e) pyrene | 8 | 29 | 17 |
| Benzo(a) pyrene | 2 | 4 | 3 |
| Indeno(1, 2, 3) cd pyrene | 0 | 5 | 1 |
| Dibenzo(a, h) anthracene | 0 | 2 | 2 |
| Naphthalene (total) | 2,321 | 71,497 | 36,169 |
| Chrysene (total) | 61 | 1,689 | 894 |
| TOTALS | 16,765 | 146,316 | 73,669 |
| | | | |

120.    Upon information and belief, other pollutants, which include drilling muds and

toxic pollutants listed in 40 C.F.R. § 401.15, were present at and discharged from the Deepwater

Horizon facility when it exploded on April 20, 2010.

121.    Scientists have documented oil and associated pollutants as described above

matting the seafloor in the Gulf of Mexico.   These oiled sediments and mats are believed to

preclude marine bottom life of all forms where present.

BP'S CONTINUING FAILURE TO REPORT ITS DISCHARGE OF HAZARDOUS
SUBSTANCES UNDER CERCLA AND EPCRA

122.    The EPA establishes reporting requirements for releases of threshold quantities of hazardous substances pursuant to Section 102 of CERCLA, 42 U.S.C. § 9602.  Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), requires any person in charge of a "facility" to report any release of a hazardous substance in a quantity equal to or greater than the established reportable quantity to the National Response Center.  Defendants' operations are "facilities" as defined under CERCLA.  42 U.S.C. § 9601(a)(9).

123.    Section 304 of EPCRA, 42 U.S.C. § 11004, requires emergency notification of any release of a reportable quantity of a hazardous substance subject to the notification requirements of CERCLA to the emergency coordinator for the local emergency planning committee and the State emergency planning commission.

124.    Upon information and belief, and depending on variations in the components in the earth's crust, Defendants' operations have released reportable quantities of benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (PAHs)(including, but not limited to, phenanthrene, benzanthracenes, benzopyrenes, benzofluoranthene, chrysenes, dibenzanthracenes, and indenopyrenes), fluoranthene, haloethers, halomethanes, methane, arsenic, cadmium, copper, mercury, and nickel under CERCLA.  Consequently, under EPCRA and its implementing regulations, defendants are required to provide notice of reportable releases to the appropriate federal, state and local emergency response officials.

125.    The release of these toxic pollutants also exceeds the reportable quantities of hazardous substances required to be reported under the CWA, 33 U.S.C. § 1321(b)(2)(A), CERCLA, 42 U.S.C.§ 9603(a), and EPCRA, 42 U.S.C. § 11004.  BP failed to provide notice of

the release of reportable quantities of hazardous substances associated with the discharge from the well and platform in the first instance.

126.    Upon information and belief, BP knows the quantities, or at least the range of quantities, of toxic pollutants released into the environment associated with the Oil Spill. While BP did provide some reports of releases of benzene and ethylbenzene to water and air associated with prescribed surface oil burns of slicks created by the well and platform discharges, even those reports failed to provide the level of detail necessary to comply with CERCLA and EPCRA reporting requirements.

ENDANGERED SPECIES HARMED BY THE OIL SPILL

127.    There are least 27 animal species listed as endangered or threatened that utilize habitat in the Gulf.  This list includes reptiles, birds, fish, and marine and land mammals. On June 29, 2007, the National Marine Fisheries Service issued its Biological Opinion on the effects of the Minerals Management Service's ("MMS") 2007-2012 Five-Year Outer Continental Shelf Oil and Gas Leasing Program in the Central and Western Planning Areas of the Gulf of Mexico (hereafter, the "NMFS Biological Opinion").   Subsequent to the Oil Spill, the Minerals Management Service was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement.  All references to this bureau relate to actions taken before the reorganizing and therefore MMS will be used.

128.    As part of its analysis in the Biological Opinion, NMFS relied on MMS's expectation that over the 40-year lifespan of the proposed leases "approximately one major oil spill could occur . . . ." Id. at 78.  To assess the potential impacts on endangered and threatened species from a "major oil spill," NMFS reviewed the effects of the Ixtoc I oil spill which occurred in the western Gulf of Mexico in 1979.  Id.  The Ixtoc I oil spill resulted in the release

of an estimated 140 million gallons of oil between June 1979 and March 1980 and, until the Oil Spill, was considered the largest offshore accidental oil spill.

129.    Based on the assumption that "[w]ith new technological advances and oil spill prevention and response plans, a major oil spill in the [Gulf of Mexico] would not likely be as large as Ixtoc I," NMFS used "one-half estimates of the approximate maximum spill area from Ixtoc I to estimate potential impacts from a major oil spill" on endangered and threatened species in the Gulf.  Id.

130.    The amount of oil released from the Deepwater Horizon well exceeds the amount of oil released in the Ixtoc I spill by more than 30 million gallons.

131.    NMFS acknowledged in it Biological Opinion that "[o]il spills are rare events, but they have the potential to be devastating to the listed species in the area affected when they occur."  Id. at 77.  NMFS recognized that adverse effects to endangered and threatened species from chronic exposure would persist long after the oil has dispersed.  See id. at 79-80.

132.    NMFS did not authorize any anticipated take – that is, harm or harassment to listed species - resulting from a major oil spill because "those takings . . . would result from an unlawful activity (i.e., oil spills)" and may not lawfully be granted "protective coverage under section 7(o)(2) of the ESA."  Id. at 101.

133.    In its exploratory plan, BP stated that it did "not anticipate that any protected species might be incidentally taken during operations proposed in this plan."

    i.    Sea Turtles

134.    Five species of threatened or endangered sea turtle use the waters and shores of the Gulf of Mexico at some stage of their development: green (*Chelonia mydas*; Florida colonies are endangered; all others are threatened); hawksbill (*Eretmochelys imbricata*; endangered);

leatherback (*Dermochelys coriacea*; endangered); loggerhead (*Caretta caretta*; threatened); and Kemp's ridley (*Lepidochelys kempii*; endangered).

135.    Oil spills harm sea turtles in multiple ways, including:

Exposure to toxic vapors

Disruption of the ability to navigate

Contamination of food sources

Ingestion of tarballs, causing disruption of digestive functions

Reduction in nesting success

Reduction in hatchling survival

Reduction in marine habitat, including  sargassum

Long-term chronic health effects

136.    NMFS predicted that a major oil spill in the Gulf as a result of MMS's oil and gas leasing program on the Outer Continental Shelf would cause "up to 42 lethal and 111 non-lethal takes of loggerheads; 2 lethal and 7 non-lethal takes of a leatherback sea turtles; 9 lethal and 16 non-lethal takes of Kemp's ridley sea turtles; [and] 13 lethal and 36 non-lethal takes of green sea turtles."  NMFS Biological Opinion at 101.

137.    On October 14, 2010, the Deepwater Horizon Unified Area Command reported that 605 dead sea turtles and 456 alive but visibly oiled sea turtles have been recovered in the Gulf since the Deepwater Horizon explosion.

138.    It is reasonably certain that the release of oil into the Gulf of Mexico as a result the Deepwater Horizon blowout has caused and will continue to cause the take of endangered and threatened sea turtles.

ii.   Whale species

139.   Four endangered whale species reside in the Gulf: blue (*Balaenoptera musculus*); fin (*Balaenoptera physalus*); sei (*Balaenoptera borealis*); and sperm (*Physeter macrocephalus*).

140.   Exposure to crude oil harms whales in multiple ways, including:

Irritation of skin and eyes

Increased susceptibility to infection

Neurological damage and associated disorientation

Organ dysfunction

Emphysema

Disruption and contamination of food sources

141.   The sperm whale population in the Gulf of Mexico is small, approximately 1665 individuals, and distinct from sperm whale populations elsewhere in the Atlantic Ocean.  As a result, the species' long-term survival in the Gulf is extremely vulnerable to any disruption of the natural environment.  A 2009 NMFS stock assessment report estimated that the human-caused death of just three sperm whales would jeopardize the species' long-term survival in the Gulf.

142.   Sperm whales in the Gulf aggregate in the deeper waters beyond the continental shelf, especially where depths exceed 3000 feet, and forage over wide geographic areas.  Sperm whales cluster offshore of the Mississippi River Delta and at Mississippi Canyon, known nursery areas for the species and where the Oil Spill occurred.

143.   The harmful effects of a major oil spill on Gulf sperm whales are known to BP and federal regulators.  In NMFS's Biological Opinion on the effects of MMS's leasing program for the Gulf of Mexico, the agency determined that the potential effects to sperm whales from a major oil spill include "physical injury and irritation, respiratory stress from inhalation of toxic

fumes, food reduction or contamination, direct ingestion of oil and/or tar, and temporary displacement from preferred habitats." NMFS predicted "11 non-lethal takes of sperm whales over the 40-year lifetime of the proposed lease sales." NMFS Biological Opinion at 76, 101.

144.   On October 14, 2010, the Office of Protected Resources, NOAA Fisheries reported that one dead sperm whale has been recovered in the Gulf since the Deepwater Horizon explosion. On June 16, 2010, the Deepwater Horizon Unified Area Command noted in a press release that, in addition to the discovery of a single dead sperm whale, its Wildlife Branch had received numerous reports of sperm whales swimming in oil. Other reports indicate that a second sperm whale, a juvenile, was found dead in Plaquemines Parish, Louisiana, on September 12, 2010.

145.   It is reasonably certain that the release of oil into the Gulf of Mexico as a result of the Oil Spill has caused and will continue to cause the take of endangered whales.

iii.   Birds

146.   The coast of the Gulf of Mexico is a critical wintering ground for the piping plover (*Charadrius melodus*; Great Lakes population endangered, all others threatened). The Gulf coast also provides an important stopover point for numerous species of endangered or threatened migratory birds.

147.   The most visible impact of an oil spill on birds is the oiling of the feathers, which reduces the birds' buoyancy and insulation. Oiled birds may also suffer from other harm directly caused by exposure to oil, including:

Hypothermia

Disruption of nutrient absorption

Reduction of food sources

Decreased reproductive success

148.    Approximately 90% of the total U.S. population of piping plovers over-winters along the Gulf coast.  Piping plovers begin arriving on the Gulf coast in early July where they forage for invertebrates on beaches and in marshes.

149.    On October 14, 2010, the Deepwater Horizon Unified Area Command reported that 4343 visibly oiled birds, of which 2263 were dead, have been recovered in the Gulf since the Deepwater Horizon explosion. Deepwater Horizon Response Consolidated Fish and Wildlife Collection Report (Oct. 14, 2010), *available at* http://www.restorethegulf.gov/fish-wildlife/fish-wildlife-reports.  The FWS reported that one piping plover has been among the dead birds recovered.  It is reasonably certain that more piping plovers have likely been killed and injured by the spill, but their bodies have not been recovered.

150.    Based on the location of the oil spill in relation to the habitat of the piping plover, it is reasonably certain that the release of oil into the Gulf of Mexico as a result of the Oil Spill has caused and will continue to cause the take of piping plovers.

    iv.    Manatees

151.    Florida manatees (*Trichechus manatus latirostris*) are a federally listed endangered species.  Although there is no precise estimate of the number of manatees using the Gulf waters affected by the oil spill, dozens of manatees move from Florida waters into nearshore and coastally connected waters in Texas, Louisiana, Mississippi, and Alabama during non-winter months.  Manatees forage, rest, and cavort in a variety of habitats and likely also carry out reproductive activities in these areas.

152.    Manatees regularly surface to breathe and are vulnerable to direct oil exposure and inhalation of toxic vapors associated with the oil.  Manatees are at risk from the ingestion of

oil while foraging, which would seriously disrupt their digestion and cause acute ailments and chronic impairment of fitness and reproduction.

153.    Because the oil spill occurred when manatees are most widely distributed in the coastal waters of the northern Gulf, it is reasonably certain that the release of oil into the Gulf of Mexico as a result of the Oil Spill has caused the take of endangered manatees.  Furthermore, it is reasonably certain that take of endangered manatees will continue to occur as manatees migrate to and from Florida waters.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Discharge of Pollutants Into the Gulf of Mexico**
**33 U.S.C. § 1311**

154.    Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 153 as if fully restated here.

155.    Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into the contiguous zone, ocean, exclusive economic zone and navigable waters of the United States, unless in compliance with a NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.  The Deepwater Horizon rig and wells constitute new source offshore oil exploration and production facilities subject to national effluent standards, as authorized by statute and defined by federal regulations.  33 U.S.C. § 1316; 40; 40  C.F.R. Part 435.  Offshore facilities are considered point sources under the CWA.  33 U.S.C. § 1362(14).

156.    Defendants' discharges are not permitted in any NPDES permit and are prohibited in their entirety by 40 C.F.R. Part 435.  No free oil or associated toxic pollutants are allowed to

be discharged under any circumstances.  Any NPDES general permit does not, and cannot, allow such discharges.

157.    Upon information and belief, Plaintiffs allege that Defendants' point sources include but are not limited to the rig itself, and all pipes associated with the well construction, operation and production of the Deepwater Horizon facility, as well as any cracks and fissures caused by the operation, including attempts to stop the flow of the oil and associated toxic pollutants.  The exact point sources, in addition to the well itself, are known to BP.

158.    Defendants have discharged, continue to discharge, are reasonably likely to continue to discharge, or were reasonably likely to continue to discharge at the time of the original complaints, pollutants, including oil, methane, drilling muds, and other toxic pollutants, from one or more point sources in the Gulf of Mexico into the contiguous zone, ocean, exclusive economic zone, and waters of the United States in violation of the CWA.  The Defendants' discharges are not permittable under the CWA and violate national policy.   33 U.S.C. § 1251(a)(3).

159.    By discharging oil, methane, drilling muds, and toxic pollutants into the Gulf of Mexico, as described herein, Defendants have violated, continue to violate, or are or were reasonably likely to continue to violate section 301(a) of the CWA, 33 U.S.C. § 1311(a).

### SECOND CLAIM FOR RELIEF
### Discharge of Oil and Hazardous Substances Into the Gulf of Mexico
### 33 U.S.C. § 1321

160.    Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 153 as if fully restated here.

161.   Section 311(b) of the CWA, 33 U.S.C. § 1321(b), prohibits the discharge of oil or hazardous substances into navigable waters of the United States, into the waters of the contiguous zone, the ocean or the exclusive economic zone.

162.   Defendants have discharged, continue to discharge, are reasonably likely to continue to discharge, or were reasonably likely to continue to discharge at the time of the original complaints, oil, methane, drilling muds, and hazardous substances into the Gulf of Mexico.  By discharging oil, methane, drilling muds and hazardous substances into the Gulf of Mexico, as described herein, Defendants have violated, continue to violate, or are reasonably likely to continue to violate section 311(b) of the CWA, 33 U.S.C. § 1321(b).

**THIRD CLAIM FOR RELIEF**
**Discharge of Toxic Pollutants Into the Gulf of Mexico**
**33 U.S.C. § 1317**

163.   Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 153 as if fully restated here.

164.   Section 307(a) of the CWA, 33 U.S.C. § 1317(a), requires EPA to publish a list of toxic pollutants.  Each toxic pollutant published by EPA is subject to effluent limitations established by EPA.  *Id*.   After the effective date of any effluent standard or limitation established for a toxic pollutant, it is unlawful for any owner or operator to violate such effluent standard.  33 U.S.C. § 1317(d).

165.   Defendants discharge of oil, methane, and toxic pollutants into the Gulf of Mexico violated, continues to violate, or was reasonably likely to continue to violate at the time of the original complaints, the effluent standards and limitations for a number of toxic pollutants, including but not limited to, benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons,

arsenic, cadmium, mercury, haloethers, halomethanes, and nickel, in violation of the CWA. 33 U.S.C. § 1317(d).

## FOURTH CLAIM FOR RELIEF
### Discharge of Pollutants in Violation of National Standards of Performance
### 33 U.S.C. § 1316

166.    Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 153 as if fully restated here.

167.    Section 306(b) of the CWA, 33 U.S.C. § 1316(b), requires EPA to develop national standards of performance for certain new sources, including offshore oil drilling operations.  After the effective date of such standards of performance, the owner or operator of any new source is prohibited from operating such source in violation of any standard of performance applicable to such source.  33 U.S.C. § 1316(e).

168.    Defendants discharge of oil, methane, drilling muds, and other pollutants into the Gulf of Mexico violates the national standards of performance for offshore oil drilling operations.  By discharging pollutants in violation of national standards of performance for offshore facilities into the contiguous zone and waters of the United States as detailed herein, Defendants have violated, continue to violate, are reasonably likely to continue to violate, or were reasonably likely to continue to violate at the time of the original complaints, section 306 of the CWA, 33 U.S.C. § 1316.

## FIFTH CLAIM FOR RELIEF
### Gross Negligence or Willful Misconduct
### 33 U.S.C. § 1321(b)(7)(D)

169.    Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 153 as if fully restated here.

170.     Section 311(b)(7)(D) of the CWA, 33 U.S.C. § 1321(b)(7)(D), provides that if the Defendants' actions that caused the spill were the result of gross negligence or willful misconduct that the civil penalties per barrel of oil or unit of reportable quantity of hazardous substance discharged shall be up to $4,300 per barrel or unit.

171.     Defendants' actions in the exploration and operation of the Deepwater Horizon well constituted gross negligence or willful misconduct.

**SIXTH CLAIM FOR RELIEF**
**Violations of CERCLA**
**42 U.S.C. § 9603**

172.     Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 153 as if fully restated here.

173.     Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), requires any person in charge of a "facility" to report any release of a hazardous substance in a quantity equal to or greater than the established reportable quantity to the National Response Center.

174.     By releasing numerous hazardous substances in excess of the applicable reportable quantities into the Gulf of Mexico and failing to report, or failing to adequately report, such releases to the National Response Center as detailed herein, Defendants have violated their duties under CERCLA, 42 U.S.C. § 9603(a).

**SEVENTH CLAIM FOR RELIEF**
**Violations of EPCRA**
**42 U.S.C. § 11004**

175.     Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 153 as if fully restated here.

176.     Section 304 of EPCRA, 42 U.S.C. § 11004, requires emergency notification of any release of a reportable quantity of a hazardous substance subject to the notification

requirement of CERCLA to the emergency coordinator for the local emergency planning committee.

177.    By releasing numerous hazardous substances in excess of the applicable reportable quantities into the Gulf of Mexico, and failing to report, or failing to adequately report, such releases to local and State emergency planning committees as detailed herein, Defendants have violated their duties under EPCRA, 42 U.S.C. § 11004.

### EIGHTH CLAIM FOR RELIEF
### Violations of the Endangered Species Act
### 16 U.S.C. § 1538

178.    Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 153 as if fully restated here.

179.    Section 9 of the ESA prohibits the "take" of endangered and threatened species. See 16 U.S.C. §§ 1538(a)(1); 50 C.F.R. §§ 17.21, 17.31, 17.44(v), 223.205, 223.208.  BP has violated and continues to violate Section 9 of the ESA through its actions related to the explosion of the Deepwater Horizon drilling platform and the resulting massive oil spill.

### NINTH CLAIM FOR RELIEF
### Injunctive Relief for Trespass and Nuisance
### Under General Maritime and State Law

180.    Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 153 as if fully restated here.

181.    As outlined above, the gross negligence of Drilling Defendants caused a vast oil spill that soaked properties owned and leased by Plaintiffs with hazardous substances, including crude oil, oil emulsion, weathered oil, natural gas, methane, mixed hazardous and toxic substances and waste and dispersant.

182.    The unauthorized occupation of Plaintiffs' property with these substances constitutes a civil trespass.

183.    Subsequently, often without notice to or the knowledge and consent of Plaintiffs, Defendants or their contractors entered Plaintiffs' property for purposes of removing oil that had washed ashore and covered same.

184.    In carrying out these efforts, Defendants often caused considerable damage to property, by placing hard structures on the property, by excessive and imprudent use of their vehicles, by removal of earth, by inattention to boom and absorbent materials and by loosening the land by mechanical means.

185.    Defendants tested, inspected, photographed, and otherwise measured and collected evidence from Plaintiffs' lands without notice and without gaining the owners' or lease holders' consent.

186.    Defendants have had the opportunity to notify owners and lessees and to seek their permission through agreements, but did not.  This conduct also constitutes a civil trespass.

187.    For adjacent and nearby property owners and lease holders, the contamination and subsequent removal effort constitutes a nuisance.

188.    Plaintiffs are entitled to injunctive relief to abate the trespass and the nuisance, to require sharing of all information gathered from Plaintiffs' properties and to fully remove the offending substances and restore the property to pre-spill conditions.

### TENTH CLAIM FOR RELIEF
### Injunctive Relief Regarding Removal to More Stringent Risk Based Standards Under State Law

189.    Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 153 as if fully restated here.

190.     The President of the United States issued a finding under NIMS NSF10 Oil Spill that the Oil Spill constituted a Spill of National Significance.  Under the President's direction, Defendant BP, the federal and state governments created a Unified Command to respond to the spill and to undertake removal are required by the Clean Water Act, Section 321.  This command continues until certain standards created by the Unified Command are met.

191.     Unified Command has issued No Further Treatment standards (NTF) in part to determine the limits of the emergency response.  These standards, upon information and belief, will allow residual oils to pepper Plaintiffs' properties in large quantities and concentrations.

192.     Under the Oil Pollution Act of 1990, such response standards do not preempt more stringent cleanup standards that may apply.  "Nothing in this Act… shall—(1) affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to—(A) the discharge of oil or other pollution by oil within such State; or (B) any removal activities in connection with such a discharge;"  Oil Pollution Act, Section 1018.

193.     Regardless of when Unified Command decides the mission will be complete, BP and the other Drilling Defendants have a responsibility to continue to clean Plaintiffs' lands and leasehold interests to Plaintiffs' satisfaction, to meet all more stringent state standards.

194.     Each state has legal standards that govern the degree to which private property must be cleaned and remediated after a trespass of this nature.

195.     Regardless of current use, Drilling Defendants must be enjoined to clean Plaintiffs' properties to protect all rights of future development for all purposes, to Plaintiffs' satisfaction, and at Plaintiffs' election.

**PRAYER FOR RELIEF**

196.    WHEREFORE, Plaintiffs respectfully request that this Court grant Plaintiffs the following relief:

a)  Declare that Drilling Defendants violated the OPA, as well as OPA's implementing regulations, and the response requirements of the National Contingency Plan, as well as the Deepwater Horizon's own Regional Oil Spill Response Plan; that said statutory and regulatory violations was a significant contributing factor in the blowout, the Oil Spill response; that said violations constituted gross negligence for purposes of caps on liability under the OPA, for purposes of Transocean's limitation of liability proceeding and for purposes of assessing punitive damages under general maritime law.

b)  Declare that Defendants violated, continue to violate, are reasonably likely to continue to violate, or were reasonably likely at the time of the filing of the original complaints to violate, the CWA, as alleged in claims for relief one through five, CERCLA, as alleged in claim for relief six, and EPCRA, as alleged in claim for relief seven;

c)  Enjoin Defendants from operating their offshore facility in such manner as will result in further violation of the CWA, CERCLA, and EPCRA.  In particular, Plaintiff seeks an order enjoining Defendants from discharging any further pollutants to the contiguous zone, ocean or exclusive economic zone and other waters of the United States, from releasing any hazardous substance without full and complete reporting as required under CERCLA and EPCRA, and requiring full and complete reporting for all hazardous substances already released;

d)  Order Defendants to immediately divulge the complete list and amounts of oil and toxic pollutants contained in the oil and other releases from the Deepwater Horizon and wells;

e) Authorize the Plaintiffs, for the period beginning on the date of the Court's order and running for at least ten years thereafter, depending upon the results of the sampling, to sample or arrange sampling of any discharged pollutants from the wells in question, with the costs of the sampling to be borne by Defendants;

f) Order Defendants to provide Plaintiffs, for a period beginning on the date of the Court's order and running for five years thereafter, with a copy of all reports and other documents which Defendants submit to appropriate regulatory authorities concerning the allegations set forth herein;

g) Issue a remedial injunction ordering Defendants to remove the oil and constituents from the water, sediments of the ocean, and affected coastal areas of the Gulf, as well as pay the cost of any environmental restoration or remediation deemed necessary and proper by the Court to ameliorate the degradation caused by Defendants' violations;

h) Declare that Defendants have violated and continue to violate section 9 of the ESA, 16 U.S.C.§ 1538(a)(1)(B), by unlawfully taking endangered and threatened species as the result of its conduct and actions concerning the Oil Spill and related clean-up efforts;

i) Issue appropriate injunctive and other equitable relief to remedy Defendants' ongoing violations of the ESA;

j) Issue injunctive relief requiring Defendants to abate the trespass and the nuisance as specified by Plaintiff Landowners/Lessees;

k) Issue injunctive relief to require BP to produce to each specific landowner all remediation plans, data, information, tests, photographs and other information gathered from or concerning each Plaintiffs' property;

l) Issue injunctive relief to mandate full removal of all offending substances;

m) Issue injunctive relief to restore all affected properties to pre-spill conditions, specifically preserving onto Plaintiffs all rights of future development;

n) Issue injunctive relief prohibiting the practice of tilling or land farming on Plaintiffs' properties without specific individual notice and fully informed consent;

o) Award Plaintiffs their reasonable attorneys' fees and costs for these actions as authorized by law; and

p) Grant Plaintiffs such other and further relief as may be just and proper.


Dated: December 15, 2010

Respectfully submitted,


    /s/   Stephen J. Herman                           /s/ James Parkerson Roy
Stephen J. Herman, La. Bar No. 23129        James Parkerson Roy, La. Bar No. 11511
HERMAN HERMAN KATZ & COTLAR LLP             DOMENGEAUX WRIGHT ROY & EDWARDS LLC
820 O'Keefe Avenue                          556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113                Lafayette, Louisiana 70501
Telephone: (504) 581-4892                   Telephone: (337) 233-3033
Fax No. (504) 569-6024                      Fax No. (337) 233-2796
E-Mail: sherman@hhkc.com                    E-Mail: jimr@wrightroy.com

*Plaintiffs Liaison Counsel*                *Plaintiffs Liaison Counsel*
*MDL 2179*                                  *MDL2179*

## PLAINTIFFS' STEERING COMMITTEE

| | |
|---|---|
| Brian H. Barr<br>LEVIN, PAPANTONIO, THOMAS, MITCHELL,<br>ECHSNER & PROCTOR, PA<br>316 South Baylen St., Suite 600<br>Pensacola, FL 32502-5996<br>Office:  (850) 435-7045<br>Telefax: (850) 436-6187<br>E-Mail: bbarr@levinlaw.com | Robin L. Greenwald<br>WEITZ & LUXENBERG, PC<br>700 Broadway<br>New York, NY  10003<br>Office:  (212) 558-5802<br>Telefax: (212) 344-5461<br>E-Mail:  rgreenwald@weitzlux.com |
| Jeffrey A. Breit<br>BREIT DRESCHER & IMPREVENTO<br>999 Waterside Drive, Suite 1000<br>Norfolk, VA 23510<br>Office:  (757) 670-3888<br>Telefax: (757) 670-3895<br>E-Mail: jbreit@bdbmail.com | Rhon E. Jones<br>BEASLEY, ALLEN, CROW, METHVIN, PORTIS &<br>MILES, P. C.<br>218 Commerce St., P.O. Box 4160<br>Montgomery, AL 36104<br>Office:  (334) 269-2343<br>Telefax: (334) 954-7555<br>E-Mail:  rhon.jones@beasleyallen.com |

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW & ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax: (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on December 15, 2010.


      /s/   Stephen J. Herman and James Parkerson Roy