**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE | * | |
| GULF OF MEXICO, on APRIL 20, 2010 | * | |
| | * | |
| THIS DOCUMENT RELATES TO: | * | JUDGE BARBIER |
| | * | |
| ALL CASES | * | MAG. JUDGE SHUSHAN |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

<u>**MEMORANDUM IN SUPPORT OF MOTION TO SUPERVISE *EX PARTE***
**COMMUNICATIONS BETWEEN DEFENDANT AND PUTATIVE CLASS MEMBERS**</u>

Plaintiffs respectfully submit the following Memorandum in Support of their Motion to

Supervise *Ex Parte* Communications Between the BP Defendants and Putative Class Members:

**MAY IT PLEASE THE COURT:**

This Motion does not ask the Court to dictate, enjoin or otherwise interfere with the

processing or payment of claims by BP thru the Gulf Coast Claims Facility ("GCCF"). Plaintiffs,

rather, simply seek to ensure that communications with putative classmembers are neither confusing

nor misleading. As set forth by Judge Fallon in the *Murphy Oil* case, a defendant's attempts to

secure releases from putative classmembers are subject to the supervision of the Court, pursuant to

FED. RULE CIV. PRO. 23(d)(1) and *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d

693 (1981). *See* Turner v. Murphy Oil, No.05-4206 (E.D. La. 11/14/05) (Fallon, J.) [Doc. 39].[1]  The primary *ex parte* communication at issue is the Release.[2]  For the reasons further outlined below, Plaintiffs submit that this Release and associated communications should be limited and/or clarified in the following particulars:

- Release only the BP entities providing payments thru the GCCF.

- Reserve General Maritime Law or other claims for punitive damages, which the GCCF does not consider, offer, or pay.

- Clearly define bodily injury claims to include (and therefore exclude from the Release) medical monitoring and mental anguish claims.

- Exclude spouses, minors, relatives, and business interests from the definition of "Claimant."

- Inform the putative class members of the MDL Litigation, the right to counsel, and the February 2012 trial date.

- Inform putative class members that the GCCF was created by BP, and that Mr. Feinberg is a lawyer hired and paid by BP to fulfill BP's legal obligations and to resolve BP's liabilities.

- Instruct BP, Mr. Feinberg and the GCCF to refrain from representations that Mr. Feinberg or the GCCF is "independent."

- Instruct BP, Mr. Feinberg and the GCCF to refrain from offering putative classmembers "free legal advice" or retaining the services of non-lawyer "respected local citizens" to provide legal advice to claimants regarding their claims.

- Instruct BP, Mr. Feinberg and the GCCF to refrain from advising putative class members that they should not retain counsel.

---

[1] EXHIBIT A; *see also,* FED. RULE CIV. PRO. 16; MANUAL FOR COMPLEX LITIGATION, FOURTH (Fed. Judicial Center 1995) §§ 21.12 and 21.22; Jones v. Jeld-Wen, Inc., 250 F.R.D. 554, 561 (S.D. Fla. 2008); Bublitz v. E.I. Dupont De Nemours & Co., 196 F.R.D. 545 (S.D. Iowa 2000).

[2] *See* EXHIBIT H.

While the Release is the principle communication at issue, it cannot be viewed in a vacuum. It is best understood within the larger context of BP and the GCCF's repeated public statements that (a) the GCCF is "independent," and (b) putative class members should not retain counsel.  While the consequences were relatively limited during the Emergency Claims Process, they are troubling when a putative class member is now being asked to execute a full release  –  of *all* defendants;  of claims for punitive damages and other relief not recognized by the GCCF;  subrogating or assigning their claims against other Defendants to BP; and releasing the claims of spouses, minors, and all of their business interests, whether separate or not.

Finally, this motion is proper against the BP Defendants because BP has control over the content of the Release.  The GCCF does not appear to be a juridical entity – not a trust, not a corporation, not a limited liability company.  The GCCF is either a d/b/a of the Feinberg Rozen law firm, or a d/b/a of BP, with Mr. Feinberg serving as BP's adjuster-in-chief.  In either case, BP is vested with the authority to direct its lawyer/adjuster and agents to perform the requested relief.

## I.      THE GULF COAST CLAIMS FACILITY

The Oil Pollution Act of 1990 requires BP, as the Responsible Party, to "establish a procedure for the payment or settlement of claims for interim, short-term damages" – (which "shall not preclude recovery by the claimant for damages not reflected in the paid or settled partial claim"). *See* 33 U.S.C. §2705(a).  On June 16, 2010, the White House issued a Press Release announcing that an "Independent Claims Facility" and $20 billion Escrow Fund would be established by BP to fulfill these and other legal obligations of the company.  The Claims Facility would develop and publish standards for recoverable claims, under the authority of Kenneth R. Feinberg, Esq., who would serve as an "independent" administrator.  It was represented that "dissatisfied claimants maintain all

Page 3

current rights under law, including the right to go to court," but that decisions by the Claims Facility would be binding on BP.  One of the original mandates for the Claims Facility is "transparency".[3]

While a formal Trust Agreement was eventually established regarding the Escrow Fund,[4] no formal trust agreement (or other document, to Plaintiffs' knowledge) defines or otherwise formally establishes the scope or limits of authority of Mr. Feinberg to act as an agent or fiduciary for BP or the claimants in establishing or administering the (separate and distinct) Claims Facility. Indeed, the GCCF appears to have no formal juridical status separate and apart from Feinberg Rozen LLP or BP.

## II.   FEINBERG ROZEN AS BP'S LAWYER / ADJUSTER-IN-CHIEF.

While the true extent of the relationship between the GCCF and BP is unclear, the GCCF is undoubtedly acting pursuant to a BP mandate: Settle as many claims as possible to avoid lawsuits. There is nothing inherently improper about this, and the opportunity to obtain emergency, interim or even final relief may be in the best interest of some claimants.[5]  However, the potential value of this effort is severely undermined when promoted through inaccurate, incomplete or incorrect communications and inducements which, intentionally or not, lead to class members' misapprehension of their alternatives and choices.

---

[3] *See* WHITE HOUSE PRESS RELEASE (June 16, 2010) (Exhibit "C"); *see also,* BP PRESS RELEASE (Exhibit "D").

[4] *See* TRUST AGREEMENT (Aug. 6, 2010) (Exhibit "F").

[5] Public policy favors settlements.  The Federal Rules value and promote procedures that save time and money. *See* FED. RULE CIV. PRO. 1.  But all such procedures, even informal settlement procedures employed by or on behalf of parties to a suit, must be conducted fairly as well as informally and expeditiously, and some level of judicial supervision may be necessary to secure procedural fairness.

**A.      BP Created the GCCF, Pays Mr. Feinberg $850,000 a Month to Administer the Facility, and Delegated its Responsibilities under OPA to the Claims Facility.**

Plaintiffs respectfully submit that the Court can order BP to make changes to the Release based upon BP's authority to direct the GCCF and/or Feinberg Rozen to perform certain acts. Although BP has refused to provide the formal documents (if any) pertaining to Feinberg Rozen's authority and responsibility, two other documents have been released to the public: the Deepwater Horizon Oil Spill Trust Agreement and the Mukasey Report.  Both of these documents strongly suggest that BP is calling the shots and that the GCCF is doing BP's bidding.

The Trust Document defines the grantor, (BP Exploration & Production Inc.), two individual trustees, and one corporate trustee.[6]   The Escrow Fund is separate and distinct from the Claims Facility, and neither Mr. Feinberg nor the law firm of Feinberg Rozen is appointed as either an individual or a corporate trustee.   Yet the Trust Agreement provides a glimpse of the Facility:

> The Grantor has established the Gulf Coast Claims Facility (the "GCCF") to be administered by Kenneth R. Feniberg (Mr. Feinberg and any successor administrator of the GCCF, the "GCCF Administrator") for the purpose of administering, mediating, and settling certain of the Damage Claims (as defined below).[7]

As shown above, the "Grantor" is BP, and BP established the GCCF.  Not Mr. Feinberg, not the Court, not Congress, and not even the Fund.  The GCCF is BP's creation.

As for the GCCF's principle task of "administering, mediating, and settling certain of the damage claims," the Trust Document defines damage claims to include, among other things, "claims

---

[6] Trust Agreement, (Exhibit "F"), p.1.

[7] Trust Agreement, ¶2.

resolved and settled by the GCCF."[8]   The Trust Agreement also speaks to who has a say in whether the larger figure of "estimated claims amount" is due:

> "Estimated Claims Amount" means any good faith estimate of the amount of funds reasonably necessary to satisfy remaining Damage Claims, which estimate is made by the Individual Trustees after consultation with the GCCF Administrator, the Natural Resource Trustees, appropriate governmental entities, the Grantor, and after review of pending litigation that is reasonably anticipated to result in claims that could be presented to the Trust under this Agreement.[9]

This demonstrates that BP has a role in determining the value of claims on a global scale. By being one of the parties providing input, BP maintains control over the funding which, in turn, creates a significant measure of influence (or, at least, the appearance of same) over the claims process itself.

The second public document that sheds light on BP's control over the GCCF is the Mukasey Report.  Apparently because Mr. Feinberg (or BP) was concerned about the issue of compensation, he (or BP) commissioned an analysis of the propriety of his compensation by the New York law firm, Debevoise & Plimpton, L.L.P. On October 7, 2010 their report was issued.  The Report confirms that, from June thru October, the Feinberg Rozen law firm was to be paid a flat fee of $850,000 per month, and that the arrangement was to be re-visited in October.[10]

It is also important to note that while the report refers to Mr. Feinberg's role as an administrator, the services are legal in nature.  Mukasey, for example, employs the same criteria set

---

[8] TRUST AGREEMENT, ¶3.

[9] TRUST AGREEMENT, at 19.

[10] MUKASEY REPORT, (Exhibit "G"), pp.7-8.

forth in the Professional Rules of Conduct for attorneys,[11] and notes that the firm had hired and would be employing additional lawyers to work exclusively on the Claims Facility.[12]

In this litigation, just one example of the connection between the GCCF and BP surfaced during the Court's November 19, 2010 Status Conference.  Mr. Langan, counsel for BP, informed the Court that GCCF intends to have an attorney review each plaintiff's claim file in an effort to withhold or redact documents that could be determined "internal deliberative material."[13]

While Plaintiffs are mindful of the Court's comments regarding the question of relevance, it is telling that BP's counsel spoke for the GCCF, both at the Status Conference and in subsequent correspondence with Plaintiffs' Counsel.  Why, moreover, (irrespective of the questions of relevance or "responsiveness"), would a purportedly "independent" disinterested, neutral, objective and "transparent" administrator undertake the time, burden and expense of hiring additional attorneys to review, redact and withhold information regarding the nature, scope, merits, presentment or status of a plaintiff's claims?   While unclear what exactly BP or the GCCF considers to be "internal" "deliberative" material, it provides insight into how BP and the GCCF view the GCCF's role – namely, a role adverse to the plaintiffs and putative class members.

This is especially curious where the named plaintiffs in this case are the purported beneficiaries of the Escrow Fund established by BP.  The Trust Agreement explicitly states its purpose is to pay damage claims for the "benefit of the holders of resolved Damage Claims (the

---

[11] *Compare* Mukasey Report, p.11, *with,* Professional Rule of Conduct 1.5(a).

[12] Mukasey Report, pp.12-13.

[13] Transcript (11/19/10) (Exhibit "O"), p.14.

'beneficiaries')."[14]  Although "resolved" is not defined in the Trust Agreement, "damage claims" are. "Damage claims" include amounts owed by BP and paid pursuant to the GCCF.[15]   Where a plaintiff has received money from the Fund, he becomes a "beneficiary" to the trust.  By the Fund's own terms, as a beneficiary, he has the right to obtain Trust Information which "is reasonably related to such Beneficiary's resolved Damage Claim."[16]

Finally, the obvious should not be overlooked or underestimated.  The GCCF was created with the stated purpose of paying claims from the Escrow Fund in satisfaction of BP's legal obligations to the plaintiffs.  The Fund was not established by the Federal Government, by any Statute, or pursuant to any Court Settlement.  This is a purely private endeavor designed to resolve a purely private obligation in hopes of limiting lawsuits.

The GCCF is clearly BP's agent for the purpose of satisfying BP's role as Responsible Party under OPA.  BP has stipulated that presenting a claim to the GCCF is as good as presenting a claim to BP.[17]   Where, if anywhere, does this agency cease?  If BP is willing to stand up in Court and state that performing the jurisdictional requirement of presentment is satisfied by submitting the claims to the GCCF, then this Court has the authority to order BP to appropriately modify the GCCF Release.

The reality is that BP has been playing a "Shell Game" with the GCCF from the very

---

[14]  TRUST AGREEMENT, ¶ 4.

[15]  TRUST AGREEMENT, ¶ 3.

[16]  TRUST AGREEMENT, at 21-22.

[17]  LETTER TO COURT FROM DON K. HAYCRAFT (Oct. 22, 2010) [Doc 594-1]; *see also,* TRANSCRIPT, Status Conference (Oct. 15, 2010) (attached as Exhibit "N"), pp.22-29.

beginning.  When BP wants to rely on the GCCF's presentation process, or take credit for what the GCCF is doing, then BP freely invokes and adopts the activities of the Claims Facility.[18]  When, on the other hand, BP wants to avoid responsibility for the GCCF, or to shield the GCCF from legal or professional responsibilities, then the Claims Facility becomes "independent" from BP.[19]

They can't have it both ways:  The GCCF should either be a truly separate and independent trust or other juridical entity, with full access and transparency, and attendant fiduciary or other duties to a defined set of beneficiaries, based on a defined set of criteria;  or, if, in the alternative, the GCCF is nothing more than an *alter ego* of the BP Defendants, Mr. Feinberg and the Claims Facility should be required to operate under the attendant legal, ethical and professional duties and responsibilities.

Stated another way, while BP can voluntarily delegate to the GCCF its authority as Responsible Party to pay OPA claims, BP can not delegate its responsibility to the Court to refrain from confusing, misleading or other inappropriate communication with putative class members by getting them to sign a Release which is contrary to the law, the trust document, and common sense.

**B.      The GGCF's Campaign to Misinform Putative Class Members and Actively Deter Them from Seeking Counsel.**

The GCCF has repeatedly endangered the rights of the putative class members to be properly informed of the facts surrounding the oil spill and the manner in which their rights will be affected. The GCCF has initiated a campaign of misinformation by cloaking itself as an "independent" actor

---

[18] *See, e.g.,* STATUS REPORT [Doc 875] (Dec. 14, 2010), Section 6, p.5.

[19] *See, e.g.,* Hess, "Succeeding in the GCCF Process" *Risk and Insurance Online* (Dec. 1, 2010) (Exhibit "BB").

which urges putative class members to refrain from hiring counsel.[20]  If the Release demonstrates anything, it is that the GCCF is on BP's team.

Mr. Feinberg has frequently described himself, and been described in GCCF communications, as "independent," both of BP, and of any other person or entity.  However, in seeking and obtaining releases of BP and assignment to BP of claims against other defendants, Mr. Feinberg and GCCF are clearly operating as the agents of BP.  This may not be improper, in and of itself; but the law recognizes a material difference in communicating with friends, neutrals, or adversaries,[21] and the putative class members are entitled to know within which of these categories the GCCF truly falls.

Indeed, Mr. Feinberg and the GCCF are now offering to provide "free legal advice" to the plaintiffs and putative class members.[22]  Who is providing this legal advice?  Who is paying for the legal advice?  What are the attorneys' qualifications?  Are there any conflicts of interest?  Where are the responsibilities and loyalties?

As established in the Exhibits submitted herewith, BP and the GCCF have repeatedly

---

[20] The Court may recall that, prior to the establishment of the GCCF, the original BP Claims Process discouraged claimants from hiring counsel, and encouraged them to fire counsel, by, among other things, discriminating against plaintiffs who were represented by counsel.  Under pressure from Plaintiffs, BP agreed not to discriminate.  *See* STATUS REPORT, Section X [No.10-1156, Doc 127] (June 16, 2010).  Since establishing the GCCF, Mr. Feinberg and the Claims Facility have continued (perhaps even escalated) the efforts to encourage plaintiffs and putative classmembers to communicate with them directly, without seeking the independent advice or representation of an attorney.  *See generally,* EXHIBITS I, J, K, L, M, P, Q, R, S, T, X, Z and AA.

[21] *See generally,* RULES OF PROFESSIONAL CONDUCT 2.4, 4.2, 4.3; (*see also* RULE 7.2(c)).  *See also,* DECLARATION OF BASILE UDDO (Exhibit "B").

[22] The GCCF Press Release also advises that **Mr. Feinberg is "retaining the services of respected local citizens throughout the Gulf region to assist claimants."** *See* EXHIBIT K. (*See also,* EXHIBIT AA.)

discouraged claimants from hiring counsel or engaging in litigation.  Now that BP, thru the GCCF, is actively soliciting the assignment of putative class members' claims so that BP can pursue them against other Defendants within the MDL, the GCCF activities can no longer be characterized by BP as separate and independent of these MDL proceedings, or beyond this Court's jurisdiction.

Mr. Feinberg, in this regard, has made numerous comments to the putative class concerning the merits of the case, professing his "independence," and urging putative class members not to seek advice from an attorney:

- "If I've done my job, and the number one objective is let's corral the claims and pay them, I've got the money, why litigate? Why flood the federal and state courts of Louisiana? You'll litigate for years.  You'll be paying all sorts of expenses. Who says you'll win? If I won't pay you, I urge, no one will pay you. The law is much more rigorous than I will be."

- "Should you litigate?  Is it a good idea?  Absolutely not, it's a mistake; it's a mistake to litigate, but that's your choice.  If you litigate, years of litigation, years!  You may not win in your litigation against BP, and if you win, wonderful, give forty percent to your lawyer."

- "You will not get a better deal filing a lawsuit and litigating for five years."

- "I would urge everybody to file with this program and get your emergency payments if you're eligible.  If I'm not going to pay you, I am dubious that you'll go to court and get paid."

- "I don't suspect that the scientists will ever agree, that there will ever be a uniform consensus.  It will not happen and I think we'll have to do the best we can with the most credible scientific assessment moving forward with the final payments."

- "I am now seeking the very best independent science I can find on the likely future of the Gulf."[23]

So, an attorney hired and paid by a Defendant – who is neither appointed by a Court,

---

[23] *See* Exhibit M (*in globo*).  (*See also,* Exhibits I, J, K, L, Z.)

mutually selected by the Parties, nor confined to the fiduciary responsibilities of a Trustee – is telling both represented and unrepresented parties adverse to the Defendant: **(i)** Don't seek the advice of a lawyer: **(ii)** If you litigate, it will take years; **(iii)** If you hire a lawyer, he or she will take 40% of your recovery, **(iv)** I will give you more money than you will get from another lawyer, in litigation, and **(v)** My offer will be based upon the best available independent scientific evidence; while, at the same time, ***not*** making it clear that **(vi)** I am paid by BP; **(vii)** You should get independent legal advice; **(viii)** I am paying you what I think you will take to release BP, (*not* making an independent, objective, legal decision regarding the merits of your claim); **(ix)** There is a trial date in the MDL of February 2012; **(x)** You could get significantly more in litigation than I am offering you; **(xi)** You may have the right to punitive damages, claims preparation expenses and/or attorneys' fees, (which we are *not* considering, offering or paying); **(xii)** Many scientists and other experts disagree with our assessment regarding the lack of long-term environmental and/or economic effects; or **(xiii)** You may have a claim for additional damages from Transocean, Halliburton or the other Defendants, which BP wants to take from you so that BP can use for its own purposes.  As once court provided:

> Communications that have been found to be violative of the principles of Rule 23 include misleading communications to class members regarding the litigation, communications that misrepresent the status or effect of the pending action, communications that coerce prospective class members into excluding themselves from the litigation, and communications that undermine cooperation with or confidence in class counsel. *See Hampton Hardware, Inc., v. Cotter & Company, Inc.,* 156 F.R.D. 630, 632 (N.D. Tex. 1994); *Cox,* 214 F.R.D. at 698.

Jones v. Jeld-Wen, Inc., 250 F.R.D. 554, 561 (S.D. Fla. 2008) (placing the following limits on defendant's communications with putative class members:(1) communications concerning settlement must be in writing and copied to the plaintiffs within 24 hours of being made; (2) defendant had to

identify for plaintiffs the recipient of all previous settlement communications; (3) the protocol had to provide ten days for putative class members to respond to any settlement offers; and (4) all settlement offers had to advise the recipient of the class action).

But nothing demonstrates an attempt to get the upper hand in the informational control game than trying to dissuade putative class members from seeking advice of counsel. Such as:

- "You will get money quicker.  You will get money with a certainty.  You don't have to give 40 percent to your lawyer.  Come in and get a check."[24]

- "...what have I done but drive you into the court system? – Which is something that the Claims Facility is designed to avoid."[25]

In order for Mr. Feinberg's message to persuade the putative class members that he will pay more than this Court, he needs to persuade the putative class that he is credible.  Hence, the GCCF and Mr. Feinberg have shrouded themselves in a cloak of "transparency"  –  despite administering a BP claims process; despite being paid $850,000 per month; despite employing traditional negotiation tactics and strategies; despite the procurement of full releases; and despite the absence of any trust document, or articles of incorporation, or other juridical act establishing an independent fiduciary or entity.

- "I am not a government official.  I am not a BP official."[26]

- "I don't work for BP and I don't work for the Obama administration. I work

---

[24] EXHIBIT M.

[25] "Feinberg: BP Trying to Do the Right Thing But Claims Need to Be Expedited" PBS INTERVIEW IN BATON ROUGE, LA (6/18/10), http://www.pbs.org/newshour/bb/politics/jan-jun10/oil2 06-18.html.

[26] EXHIBIT M.

for the people of the Gulf."[27]

- What is the Gulf Coast Claims Facility?
  Answer:   "The Gulf Coast Claims Facility ("GCCF") is an <u>independent</u> claims facility for submission and resolution of claims…"[28]

- The Claims Administrator is being paid by BP, can I trust him to be fair?
  Answer: "The Claims Administrator is an <u>independent,</u> <u>neutral</u> fund administrator…The Claims Administrator <u>does</u> <u>not</u> <u>report</u> <u>to</u> <u>BP</u> and <u>BP</u> <u>does</u> <u>not</u> <u>control</u> <u>his decisions</u> in any way."[29]

- Will BP decide my claim?
  Answer:   "No.  The GCCF, an <u>independent,</u> <u>neutral</u> administrator, will decide your claim. BP will have no input on the decision."[30]

The fact that a putative class member must generally present his or her OPA claim to BP does not mean that an attorney being paid by BP can provide legal advice, assurances or guarantees about the merits or the success of his or her claim.[31]

At the same time, neither Mr. Feinberg generally, nor the proposed Release, advises the plaintiffs and putative class members that they may get *more* in litigation; that they may be entitled to punitive damages (which are not being recognized by the GCCF); that they may be entitled to claims preparation expenses or attorneys' fees (which are not being recognized by the GCCF); that there is a trial date in the MDL of February 2012.

---

[27] "Gulf Coast Claims Facility – Are Promises About BP Claims Process Being Kept?" (Pt 1/3) (6/25/10), http://www.youtube.com/watch?v=wGWtyRyTgs&feature=mfu in order&list=UL.

[28] Gulf Coast Claims Facility: Frequently Asked Questions (Exhibit "E"), ¶1.1.

[29] Frequently Asked Questions, ¶1.2.

[30] Frequently Asked Questions, ¶1.3.

[31] While Mr. Feinberg's role as counsel for BP remains somewhat unclear, the situation would seem to raise, at the very least, an appearance of impropriety. *See generally,* Declaration of Basile Uddo; Rules of Professional Conduct 2.4, 4.2, 4.3, 5.3 and 7.2(c).

This creates a one-sided, biased flow of information from BP to the putative class member. This is exactly the type of misconduct and coercion Rule 23(d)(1) is intended to protect against.

## III.   THIS COURT HAS "BOTH THE DUTY AND THE BROAD AUTHORITY" TO PROTECT THE PUTATIVE CLASS.

These MDL proceedings include numerous cases, filed in this district and transferred here pursuant to 28 U.S.C. § 1407, which were initiated as class actions.  The Master Complaints filed herein pursuant to CMO No. 1 likewise include class action allegations.  These MDL proceedings are thus operating under the auspices of FED R. CIV. PROC. 23.

The Court's authority to issue appropriate orders supervising communications between the parties and overseeing the Release of putative class members is firmly rooted in the Federal Rule of Civil Procedure 23(d)(1), Rule 16, the United States Supreme Court, the Manual for Complex Litigation, and even orders from this U.S. District Court.

### A.   Rule 23(d), Rule 16, the United States Supreme Court, and The Manual for Complex Litigation.

Rule 23(d)(1) empowers the district court to issue a broad range of orders to protect putative class members as well as certified class members.  The Rule provides for the issuance of orders required "to protect class members and fairly conduct the action," "impose conditions on represented parties," require the amendment of pleadings to reflect or exclude absent class members, and any other procedural matters. FED. RULE CIV. PRO. 23(d)(1)(B), (C), (D) & (E); *see also,* RULE 16.

The United States Supreme Court has recognized the authority granted to a district court pursuant to Rule 23(d)(1) at any stage of the litigation.  A District Court has "both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the

Page 15

conduct of counsel and parties." <u>Gulf Oil Co. v. Bernard</u>, 452 U.S. 89, 100, 101 S.Ct. 2193, 2200, 68 L.Ed.2d 693 (1981).  The Supreme Court found that "this authority includes the imposition of an order limiting communications between parties and potential class members." <u>Burford v. Cargill, Inc.</u>, No.05-0283, 2007 WL 81667, at p.*1 (W.D.La. Jan. 9, 2007).

The Manual for Complex Litigation further confirms the duty and broad authority conferred upon a district court pursuant to Rule 23(d)(1):  "The court must protect the interests of absent class members, and Rule 23(d) gives the judge broad administrative powers to do so, reflecting the equity origins of class action." MANUAL FOR COMPLEX LITIGATION, FOURTH, § 21, at 244.  The Manual makes the Court's authority to protect putative class members abundantly clear: "Rule 23(d) authorizes the court to regulate communications with potential class members, even before certification." COMPLEX MANUAL, § 21.12, at 247.

The chief reason a district court can enter such an order is to safeguard against the possibility of abuses in potential class actions when putative class members receive confusing, misleading, intimidating or simply inaccurate communications from counsel and parties to the suit. <u>Gulf Oil</u>, 452 U.S. at 99.  "Communications which are misleading or misrepresent the status or effect of a pending class action suit have been found to have a potential for confusion or to adversely affect the administration of justice may be prohibited by the court." <u>United States v. Ashbritt, Inc.</u>, No.07-94, 2008 WL 4861921, at p.*2 (S.D.Miss. Nov. 10, 2008); <i>citing</i>, <u>Gulf Oil, Inc.</u>, 452 U.S. at 99.  This duty and concomitant broad authority applies at all stages of actions brought as class actions, including and often most necessarily at the pre-certification stage.

The Manual strongly supports judicial supervision when the defendants communicate "false, misleading, or intimidating information, conceal material information, or attempt to influence the

decision about whether to request exclusion from a class certified under Rule 23(b)(3)." COMPLEX MANUAL, §21.12.  The Manual is particularly concerned with communications by an adverse party used to obtain releases from class members without advising them of the status of litigation on their behalf, or other information pertinent to their legal or procedural rights.  The Manual is specific on this point: "Direct communications with class members, whether by plaintiffs or defendants, can lead to abuse.  For example, defendants might attempt to obtain releases from class members without informing them that a proposed class action complaint has been filed.....  If class members have received inaccurate precertification communications, the judge can take action to cure the miscommunication and to prevent similar problems in the future." COMPLEX MANUAL, §21.22.

In addition to these established precedents, this Court has ordered similar relief in an effort to protect the putative class and ensure that the putative class is not being manipulated.

### B.       Judge Fallon's Decision in *Turner v. Murphy Oil USA, Inc.*

In the *Murphy Oil* litigation,  Judge Fallon ruled on a very similar motion. Turner v. Murphy Oil USA, Inc., No. 05-4206 (E.D. La. 11/14/05) [Rec. Doc. 39] (Exhibit "A").  Class counsel asked the Court to supervise communications between the defendant Murphy Oil and the putative class members, based upon numerous informational communiques and settlement offers issued to individual putative class members.  Id. at *2.  Judge Fallon analyzed that analogous situation as follows drawing upon the leading decision in the field, *Kleiner*:

> A defendant's speech to putative class members is considered commercial speech, because the defendant's economic interest in reducing its litigation costs is involved.  *Kleiner v. First Nat'l Bank of Atlanta,* 751 F.2d 1193, 1204 n.22 (11th Cir. 1985).  Because this speech is commercial speech, a defendant's communications with potential class members does not enjoy heightened first amendment protection.

Page 17

Id. at 1204.  Also, a district court may freely prohibit false or misleading speech by a defendant, and may restrict a defendant fro using methods of speech that are inherently coercive or prone to abuse, like oral solicitation.  Id. at 1204 & 1206.  As the Eleventh Circuit has stated "[u]nsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal.  The damage from misstatements could well be irreparable."  Id. at 1203.

In other cases, district courts have limited a defendant's communications with putative class members in situations in which defendants engaged in speech that was clearly coercive or threatening.  For example, in *Kleiner,* the defendant, a bank, called its customers, the putative class members, in a massive telephone solicitation and demanded that they opt out of a potential class action.  Id. at 1198.  The district court and the Eleventh Circuit found that the oral, unsolicited communication by the bank was inherently coercive and threatening both because of the way it was conducted (by telephone) and because of the on-going business relationship between the bank and its customers.  *Id.* at 1206-07.

Similarly, in *Hampton Hardware, Inc v. Cotter & Company,* the defendant, a hardware wholesaler, had an ongoing business relationship with the putative class members, individual stores that received supplies from the wholesaler.  156 F.R.D. 630, 631 (N.D. Tex. 1994).  The defendant sent letters to putative class members that specifically mentioned the litigation and its possible financial costs to the class members.  *Id.* at 631.  The district court held that these letters were threatening due to the parties' ongoing relationship, and prohibited the defendant from discussing the litigation with putative class members.  *Id.* at 632.

Turner v. Murphy Oil, at **4-5.   Judge Fallon ultimately granted Plaintiffs' motion, in part, and

ordered the following restrictions on the communications by or on behalf of defendant:

- "[T]he Settlement and Release Agreement should contain a statement that the individual signing the agreement should seek **independent legal advice** prior to any settlement or waiver of his or her legal rights."  Id. at *11 (emphasis supplied).

- "Defendant Murphy Oil shall begin any communication with a putative class member with the statement that the individual has a right to consult with an attorney prior to any settlement or waiver of legal rights."  Id. at *8.

- "Murphy Oil shall not initiate contact with any individual who has not previously contacted Murphy Oil." Id. at. *11.

- "The Defendant shall comply with Rule 4.2 of the Louisiana Rules of Professional Conduct and not communicate with persons already represented by counsel." Id.

- "If the [consulting firm] has been retained by Murphy Oil, Murphy Oil shall disclose its relationship with the [consulting firm] in all public communications regarding the [consulting firm].  If the [consulting firm] is not a governmental regulatory agency, Murphy Oil shall disclose the fact as well in all public communications involving the [consulting firm]." Id. at *9.

As Judge Fallon's decision demonstrates, proper restrictions can be placed on permissible communications between defendants and putative class members, even (and especially) when those communications concern an invitation or inducement to class members to settle their claims outside the formal litigation process.[32]

## IV.     THE RELEASE FAILS THE LAW, FAILS THE TRUST AGREEMENT, AND FAILS COMMON SENSE.

On November 23, 2010, the GCCF issued the Protocol for Final Claims as well as the Release and Covenant Not to Sue.[33]

---

[32] See also, In re Potash Antitrust Litig., 896 F.Supp. 916 (D. Minn. 1995) (directing defendants who intend to communicate with putative class members on the merits of the litigation to provide a copy of the writing to the Court and to plaintiffs' class counsel); Burford v. Cargill, Inc., 2007 WL 81667 (W.D.La. 2007) (ordering defendant to place a "notification or cautionary statement concerning the pending litigation above the signature line" on the Release); Hilton v. Atlas Roofing Corp. Of Miss., No. 05-4204 (E.D. La. 8/28/06) (Africk, J.) (Rec. Doc. 61) (ordering defendants to provide notice of the lawsuit before settlement and ordering defendants to inform all putative class members who signed a release about their right to apply to the Court to have the release voided); Abdallah v. Coca-Cola Company, 186 F.R.D. 672, 678 (ordering restrictions on communications with putative class members given the inherent danger of coerciveness between the defendant and the putative class); Howard v. Securitas Sec. Services, USA, Inc., 630 F.Supp.2d 905, 909 (N.D. Ill. 2009) (directing plaintiffs to correct website statements about lawsuit "presented as proven facts rather than allegation").

[33] See Exhibit H.

Page 19

A.      **The Only Released Party Should be BP.**

The Release (if any) should be limited to the BP entity or entities that have been designated a Responsible Party under OPA, have established the Escrow Fund, or are paying the claims.  The Trust Agreement specifically designates all payments to satisfy the liability of BP Exploration and Production.  Moreover, the Trust Document specifically excludes payment for any damage claims that were the result of any BP affiliates or customers, operators, or suppliers.

As the Release currently reads, all BP entities would be released, as well as every other defendant in this case.  "Released Parties" is defined as follows:

> Released Parties means anyone who is or could be responsible or liable in any way for the Incident or any damages related thereto, wether a person, company or governmental entity, including (but not limited to) BP, other potentially responsible or liable parties, the federal Oil Spill Liability Trust Fund and any state or local fund, and each of their respective Affiliates as defined above.[34]

However, the Trust Document contains two crucial limitations.  First, the Trust Document provides that the Trust is being established to address only the "Grantor's" "unknown personal liabilities under federal, state, and local law" related to the Deepwater Horizon explosion and resulting oil spill.[35]  Second, the Trust Document limits the claim payments to damage claims of the Grantor, and excludes any possible payments for claims or damages caused by the other defendants:

> "Damage Claims" shall be limited to amounts owed by the Grantor pursuant to: (I) claims resolved and settled by the GCCF ("GCCF Clamis"); (ii) amounts owed by the Grantor pursuant to final judgments or settlement

---

[34] RELEASE AND COVENANT NOT TO SUE, (Exhibit "H"), ¶3.

[35] TRUST AGREEMENT, (Exhibit "F"), ¶1.

agreements that are resolved outside of the GCCF process and relate to the Oil Spill ("Other Resolved Claims"); (iii) natural resource damage costs (including assessment costs) pertaining to the Oil Spill ("NRD Claims"); and (iv) state and local government response costs pertaining to the Oil Spill ("Governmental Response Costs"). Notwithstanding the foregoing, <u>Damage Claims shall not include</u> the amounts for any fines and penalties or <u>the amounts of any claims by partners, subsidiaries, affiliates, shareholders, noteholders, customers, operators, or suppliers of the Grantor or its affiliates in their capacity as such.</u>[36]

These two provisions of the Trust Agreement demonstrate that the funds from the Trust that are being paid to settle these claims can not, by the terms of this agreement, include any funds to pay for any misconduct from the other defendants. The Transocean, Halliburton, Cameron, Anadarko, and Mistui Entities squarely qualify as customers, operators, suppliers or partners.[37]

##### B.    In the Alternative, the Release Should Clearly Identify the Released Parties.

Should this Court allow BP to release other defendants, then the Court should ensure that the putative class members clearly understand it. The only named party that the Release identifies is BP Exploration & Production Inc., which is later referred to in the Release as "BP." The Release purports to resolve any and all "legal and equitable" claims against BP and any other "Released Parties." Plaintiffs submit that the Release should be corrected to identify by name each and every defendant named in the Master Complaint to be filed in these proceedings, in addition to the general catch-all language.

---

[36] TRUST AGREEMENT, ¶3 (emphasis supplied).

[37] The inclusion of the other Defendants in the Release – particularly when coupled with the assignment in favor of BP – belies the claims of "independence". Why would an independent adjudicator of the claims and interests as between Plaintiffs and BP require the release of Third Parties?

**C.      Punitive Damage and Other Claims Not Recognized by GCCF Should Be Reserved**

As noted, the Trust Agreement specifically excludes "any fines and penalties."[38] Consequently, or otherwise, Mr. Feinberg has made it clear that punitive damages, attorneys fees and claims preparation expenses are not considered, offered or paid in the GCCF process. So why should they be subject to the Release?

**D.      The Release Fails to Clearly Exclude Mental Anguish and Medical Monitoring Claims.**

The Release is confusing because it does not distinguish between "injuries" and "bodily injury" and fails to mention medical monitoring.  In the first paragraph of the Release, the language releases "injuries" and then turns around and excludes "bodily injury" from being released.[39]  Does it mean that all injuries are not being released?  Is the release trying to separate mental anguish from "physical injury"?  What if the Claimant develops physical injuries in the future and suffers mental anguish as a result – are the mental anguish damages somehow released?

**E.      The Release Improperly Releases More Than The Named Claimant.**

The Release is confusing because "Claimant" is defined to include the spouse, family member, and any other business interests that the Claimant (or business partner) may have.  The pertinent part of the Release reads as follows:

> In consideration of payment in the amount of [insert], Claimant individually and on behalf of Claimant's spouse, heirs, beneficiaries, agents, estates, executors, administrators, personal representatives,

---

[38] TRUST AGREEMENT, ¶3.

[39] RELEASE AND COVENANT NOT TO SUE, ¶1.

Page 22

> subsidiaries, parents, affiliates, partners, limited partners, members, joint ventures, shareholders, predecessors, successors, assigns, insurers, and attorneys (collectively "Affiliates") . . . .[40]

Many shrimpers and oystermen employ their spouses (and other family members) as deckhands or general assistants in the harvesting and selling of their catch. Even during the claims process, the GCCF and BP treated the spouses, family members, and business interests of separate entities differently by allowing them to file separate claims on their behalf. It will be confusing for these putative class members to Release their claims jointly when their claims have been separate for the duration of the claims process.

Moreover, many shrimpers and oystermen own multiple companies in addition to paying themselves directly. Some also own restaurants. The Release reads as though if the shrimper settles his individual claim, then he will release all of his claims as well as those of any other businesses. The Release even reads as though it would release the interests of those who did not sign it, namely, partners in the Claimant's businesses.

Plaintiffs submit that the aforementioned language should be clarified by defining "Claimant", in part, by the party that files a tax return and erasing the confusing string of "Affiliates." This would clarify when the release of claims only applies to the individual, when it would include spouse (if the spouses filed jointly), and when it applies to a separate business. The Release should also include a clarifying sentence for those who may not file a tax return to apply only to that person.

---

[40] RELEASE AND COVENANT NOT TO SUE, ¶1.

**F.      The Release Fails to Identify the MDL or the Right to Seek Counsel.**

The Release does not identify the existence of the above captioned litigation, nor does it identify the Claimant as a putative class member.  Because Claimants are members of a putative class, the following safeguards should be inserted into the Release and Final Claims Protocol: (1) the Release should identify that the Claimant is a member of the putative class in *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010,* MDL No. 2179 (Eastern District of Louisiana) (Judge Carl J. Barbier); (2) the Release should include the address of this Court's MDL 2179 website and the identities and contact information for Plaintiffs' Co-Liaison Counsel;  (3) the Release should include language above the signature line that "Claimant should seek advice of counsel before signing;" and (4) there should be a fourteen day cooling off period between BP's final offer and the Claimant's acceptance to allow the Claimant an opportunity to calmly review all of his options and seek advice of counsel should he so desire.[41]

This Court's setting of the limitation trial to determine and allocate the relative fault of BP and the other defendants for February 27, 2012 in these MDL Proceedings, a trial that will commence only fourteen months from now, is as important fact that putative class members should be aware of when considering whether to release BP and assign any of their rights and claims against other defendants who may also have substantial fault.  The GCCF can easily communicate this fact and should be required to do so.

---

[41]      *See, e.g.,* Jones v. Jeld-Wen, Inc., supra, 250 F.R.D. at 561; Turner v. Murphy Oil, supra, at **4-5; Bublitz v. E.I. Dupont De Nemours & Co., 196 F.R.D. 545 (S.D. Iowa 2000) (allowing direct communication of settlement offers with putative class members as long as they are made in writing, filed with the court, copied to plaintiffs, and allow the putative class member at least ten days for the plaintiff to respond).

Additionally, there should be an effective mechanism for ongoing supervision and correction of the language of the Release and other written and internet communications from GCCF to putative class members.  Plaintiffs submit that this is an appropriate function for the Court-appointed Special Master, Professor Francis McGovern.

## V.    BP, MR. FEINBERG AND THE GCCF SHOULD BE ORDERED TO REFRAIN FROM REPRESENTING MR. FEINBERG AND THE GCCF AS "INDEPENDENT"

Based on the available body of evidence, Plaintiffs do not believe that a legal basis exists for referring to Mr. Feinberg or the GCCF as "independent".  Indeed:

- •    The GCCF is not an independent juridical entity.

- •    BP is paying Mr. Feinberg and his law firm.

- •    Mr. Feinberg has not been appointed by any Court, by mutual agreement of the Parties, or by any official Government Act or authority.

- •    Neither Mr. Feinberg nor the law firm of Feinberg Rozen LLP is a Trustee.

- •    By all appearances, Mr. Feinberg – in his approach towards the timing and nature of settlement offers;  in the protection of his deliberative process from disclosure;  and in securing full releases and assignments in BP's favor – seems indistinguishable from a defense attorney attempting to settle cases on behalf of BP.[42]

The protestations of "independence" are accordingly, at the very least, confusing, and, at most, misleading, to plaintiffs and putative class members who are being encouraged to accept the GCCF's determination (*i.e.* offer) in exchange for a full assignment and release..

---

[42] *See, e.g.,* EXHIBIT Z (Feinberg claims he is making "generous" offers and paying a "premium" in connection with one-size-fits-all offers designed to "clear a lot of claimants"); *and,* EXHIBIT BB (recognizing that the transfer from BP to GCCF was "mostly for appearances";  that GCCF personnel "will be looking out for the interests of BP"; and that the "ever-changing guidelines" with ill-defined criteria "offer very little direction" and "have not been clearly communicated to the public").

## Conclusion

For the above and foregoing reasons, and for the reasons further provided in the Motion and

Exhibits submitted herewith, Plaintiffs' Motion should be granted.

This 21st day of December, 2010.


Respectfully submitted,


   /s/   Stephen J. Herman                    /s/ James Parkerson Roy      

**Stephen J. Herman**, La. Bar No. 23129       **James Parkerson Roy**, La. Bar No. 11511

**HERMAN HERMAN KATZ & COTLAR LLP**    **DOMENGEAUX WRIGHT ROY & EDWARDS LLC**

820 O'Keefe Avenue                       556 Jefferson Street, Suite 500

New Orleans, Louisiana 70113           Lafayette, Louisiana 70501

Telephone: (504) 581-4892             Telephone: (337) 233-3033

Fax No. (504) 569-6024                Fax No. (337) 233-2796

E-Mail: sherman@hhkc.com           E-Mail: jimr@wrightroy.com

*Plaintiffs Liaison Counsel*             *Plaintiffs Liaison Counsel*

### PLAINTIFFS' STEERING COMMITTEE

| | |
|---|---|
| Brian H. Barr<br>LEVIN, PAPANTONIO, THOMAS, MITCHELL,<br>ECHSNER & PROCTOR, PA<br>316 South Baylen St., Suite 600<br>Pensacola, FL 32502-5996<br>Office: (850) 435-7045<br>Telefax: (850) 436-6187<br>E-Mail: bbarr@levinlaw.com<br><br>Jeffrey A. Breit<br>BREIT DRESCHER & IMPREVENTO<br>999 Waterside Drive, Suite 1000<br>Norfolk, VA 23510<br>Office: (757) 670-3888 | Robin L. Greenwald<br>WEITZ & LUXENBERG, PC<br>700 Broadway<br>New York, NY 10003<br>Office: (212) 558-5802<br>Telefax: (212) 344-5461<br>E-Mail: rgreenwald@weitzlux.com<br><br>Rhon E. Jones<br>BEASLEY, ALLEN, CROW, METHVIN, PORTIS &<br>MILES, P. C.<br>218 Commerce St., P.O. Box 4160<br>Montgomery, AL 36104<br>Office: (334) 269-2343 |

Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Office: (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL 36660
Office: (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA 70726
Office: (225) 664-4193
Telefax: (225) 664-6925
E-Mail: calvinfayard@fayardlaw.com

Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW & ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA 70130
Office: (504) 588-1500
Telefax: (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Office: (214) 521-3605
Telefax: (214) 599-1172
E-Mail: ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail: mcwatts@wgclawfirm.com

| | |
|---|---|
| Ervin A. Gonzalez<br>COLSON HICKS EIDSON<br>255 Alhambra Circle, Penthouse<br>Coral Gables, FL 33134<br>Office: (305) 476-7400<br>Telefax: (305) 476-7444<br>E-Mail:  ervin@colson.com | |

**SOREN E. GISLESON**

**KEVIN R. DEAN**

**GARY E. MASON**

**KEVIN GOLDBERG**

**JULIA LEMENSE**

*On Brief.*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Memorandum will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, and will be provided as a courtesy to Kenneth R. Feinberg, Esq., *via* E-Mail and by U.S. Mail, this 21st day of December, 2010.

Kenneth R. Feinberg, Esq.
FEINBERG ROZEN LLP
1455 Pennsylvania Ave., NW
Washington, DC 20004
E-Mail: kfeinberg@feinbergrozen.com

/s/  James Parkerson Roy and Stephen J. Herman

## Exhibits

A. *Turner v. Murphy Oil,* No.05-4206, ORDER AND REASONS [Doc 39] (E.D. La. Nov. 14, 2005).

B. DECLARATION OF BASILE UDDO (Dec. 15, 2010)

C. White House Press Release (June 16, 2010)

D. BP Press Release: Establishment of Escrow Fund and Claims Facility (June 16, 2010)

E. GCCF: Frequently Asked Questions

F. Deepwater Horizon Oil Spill Trust (Aug. 6, 2010) ("TRUST AGREEMENT")

G. Letter from Michael Mukasey to Kenneth Feinberg (Oct. 7, 2010) ("MUKASEY REPORT")

H. RELEASE AND COVENANT NOT TO SUE

I. GCCF Website: "Claims Racket"

J. GCCF Website: New York Times Editorial

K. GCCF Press Release: Providing Free Legal Advice to Claimants (Dec. 13, 2010)

L (*in globo*) Feinberg Media Quotes

M (*in globo*) Video Clips of Ken Feinberg regarding the GCCF

N. TRANSCRIPT, Status Conference (Oct. 15, 2010), pp.22-29.

O. TRANSCRIPT, Status Conference (Nov. 19, 2010), p.14.

P. GARSIDE AFFIDAVIT [No.10-1324, Doc 45-4] (May 20, 2010).

Q. GOLDBERG DECLARATION (Dec. 13, 2010).

R. GREEN AFFIDAVIT (Nov. 16, 2010).

S (*in globo*) CORRESPONDENCE AND AFFIDAVITS REGARDING COMMUNICATIONS WITH CLAIMANTS

T. Letter from Attorney General Troy King to Kenneth Feinberg (Nov. 16, 2010).

U. Vietnamese American Volunteer Law Corporation Letter to Feinberg (Aug. 13, 2010).

V. Public Citizen Concerns (Aug. 12, 2010)

W. AAJ List of Principles (June 22, 2010)

X. BP GOOGLE AD: Learn How to Make a Claim Without a Lawyer (Dec. 16, 2010)

Y. LEE HUDSON AFFIDAVIT (Dec. 13, 2010)

Z. Murtaugh, "Playing the Oil Spill Claims Game" *Press-Register* (Dec. 20, 2010)

AA. GCCF Website: Information Regarding *Pro Bono* Assistance

BB. Hess, "Succeeding in the GCCF Process" *Risk and Insurance Online* (Dec. 1, 2010)