# DEBEVOISE & PLIMPTON LLP

919 Third Avenue
New York, NY 10022
Tel  212 909 6000
www.debevoise.com

**Michael B. Mukasey**
Partner
Tel  212 909 6062
Fax  212 909 7062
mbmukasey@debevoise.com

*Via Federal Express and e-mail*

October 7, 2010

Kenneth R. Feinberg, Esq.
Feinberg Rozen, LLP
1455 Pennsylvania Avenue, NW
Suite 390
Washington, DC  20004-1008

Dear Mr. Feinberg:

Enclosed please find one original and four copies of our memorandum reviewing the compensation arrangements between Feinberg Rozen, LLP and BP relating to the administration of the Gulf Coast Claims Facility.

Thank you for selecting us for this important project.

Very truly yours,

Michael B. Mukasey

EXHIBIT
G

New York  •  Washington, D.C.  •  London  •  Paris  •  Frankfurt  •  Moscow  •  Hong Kong  •  Shanghai

# DEBEVOISE & PLIMPTON LLP

| | |
|---|---|
| Date | October 8, 2010 |
| Memorandum to | Feinberg Rozen, LLP |
| From | Michael B. Mukasey[1] |

### Gulf Coast Claims Facility:
### Feinberg Rozen, LLP's Compensation

EXECUTIVE SUMMARY ..................................................................................1

I.      SCOPE OF ASSIGNMENT AND WORK PERFORMED ....................................3

II.     BACKGROUND ..........................................................................................4

      A.      The Oil Spill and Types of Injuries..............................................4

      B.      The Compensation Fund ................................................................5

      C.      Retention of Feinberg Rozen, LLP ...............................................5

      D.      Feinberg Rozen, LLP .....................................................................6

      E.      Current Compensation Agreement ................................................7

III.    WHETHER THE METHOD OF COMPENSATION IS REASONABLE............8

      A.      Flat Fees.........................................................................................8

      B.      Alternative Fee Arrangements ......................................................9

IV.     WHETHER THE AMOUNT IS REASONABLE................................................11

      A.      Factor 1:  The Time, Labor and Results Obtained by Counsel.................12

      B.      Factor 2:  The Novelty and Difficulty of the Assignment ........................13

      C.      Factor 3:  The Experience, Ability and Reputation of Feinberg
             Rozen ............................................................................................18

---

[1]  Partner, Debevoise & Plimpton LLP.  This memorandum has been written with the assistance of
Lorna G. Schofield, also a partner of Debevoise & Plimpton LLP, and of Marjorie J. Menza, David
W. Feder and John Nichols, associates of Debevoise & Plimpton LLP.

    D.    Factor 4:  The Preclusion of Other Employment Due to the Acceptance of the Project ........................................................................21

    E.    Factor 5:  The Undesirability of the Assignment ........................................22

    F.    Factor 6:  Comparable Compensation ........................................................23

V.    FUTURE WORK AND COMPENSATION ........................................................25

    A.    Nature and Extent of Future Work ........................................................25

    B.    Recommendation for Compensating Future Work ........................................26

## EXECUTIVE SUMMARY

We were retained by Feinberg Rozen, LLP ("Feinberg Rozen" or the "Firm") to review the reasonableness of compensation the Firm is receiving from BP for administering the $20 billion Gulf Coast Claims Facility ("GCCF" or the "Facility"), and to recommend what adjustments, if any, should be made for future compensation. As described more fully below, the monthly fee the Firm receives covers all salaries of the partners and employees of the Firm who are working on the matter, as well as the Firm's related overhead. We have concluded that the current arrangement – a flat fee of $850,000 per month – is within the range of reasonable compensation for the initial phase of the GCCF engagement. For future work, we recommend that the parties consider adjusting the amount of compensation at agreed-upon intervals to ensure that it reflects adequately the level of engagement and resources required of the Firm.

On June 16, 2010, the White House and BP appointed Kenneth R. Feinberg to administer the independent GCCF, with the mandate to work quickly, fairly, and transparently to review damages claims from people and businesses affected by the Deepwater Horizon oil spill. Feinberg was in many ways the obvious choice to manage the GCCF, given his national reputation for resolving complex, high-profile disputes. Feinberg has settled the claims of Vietnam veterans injured by Agent Orange, families of the victims of the September 11th attacks and hundreds of thousands of others in products liability and other high-profile matters. His leanly staffed firm – Feinberg Rozen – has a combined 60 years of claims administration experience. This singular combination of expertise in large-scale claims administration work, national credibility, and centralized, responsive staffing qualified the Firm uniquely for the GCCF engagement.

The Firm's work on the GCCF is largely unprecedented. The assignment is to allocate the largest claims fund in American history and to do so under both intense time pressure and

public scrutiny. Submitted claims often have been poorly documented, difficult to assess or both. The Firm's core team has been working grueling hours, often six or seven days a week. Drawing on past experience, in relatively short order they have prepared the emergency protocol for claims evaluation, canvassed potential claimants, consulted with government and industry officials, transitioned the existing BP claims process, trained a small army of claims reviewers and set about reviewing the most complicated and/or controversial claims. In the seven weeks since the Facility began operation, the Firm has received 128,100 claims and approved 54,056 claims for payment, disbursing $1,049,223,614.71. The engagement commands a substantial commitment of the Firm's personnel and other resources, such that the Firm is severely limited in other engagements it can accept.

Despite the highly unusual aspects of the GCCF engagement, the Firm's fees to date are consistent with its compensation for roughly analogous previous engagements, and less than amounts earned by attorneys who bring the largest securities and torts cases. The amount fairly compensates the Firm for efforts expended on the GCCF and offsets the significant distortion of the Firm's business.

I.     **SCOPE OF ASSIGNMENT AND WORK PERFORMED**

On August 24, 2010, we were retained by Feinberg Rozen, LLP ("Feinberg Rozen" or the "Firm") to make an independent review of the compensation arrangement between the Firm and BP relating to the Firm's services in administering the Gulf Coast Claims Facility ("GCCF" or the "Facility"). In particular, we were retained to (1) review the reasonableness of Feinberg Rozen's compensation for its services in the initial phase of the GCCF administration, and (2) recommend what changes, if any, should be made to the compensation arrangement for subsequent phases of that administration.

In preparing this report, we reviewed among other things materials regarding the professional qualifications and experience of Feinberg Rozen, the Firm's compensation practices in other matters, and its retention for, and time and labor spent on, the GCCF project. We also researched the history and operations of the GCCF as well as compensation practices for third-party neutrals, special masters, class action counsel and others. We interviewed the seven professionals affiliated with the Firm who have worked on the GCCF project. We also interviewed two BP representatives, primarily regarding the retention of the Firm for the GCCF project. Feinberg Rozen has agreed to compensate us for our time and expenses at our usual billing rates in connection with this review.

Below, we provide background on the establishment of the GCCF, including the Firm's engagement. Next, we assess the current compensation arrangement between the Firm and BP in light of other possible fee arrangements. We then address whether the amount of compensation is reasonable, as applied to completed work. Finally, we discuss the nature and extent of future work to be performed on the GCCF and evaluate whether the method and amount of future compensation should be amended to reflect future work.

II.   **BACKGROUND**

    A.   The Oil Spill and Types of Injuries

    On April 20, 2010, the off-shore drilling rig, Deepwater Horizon, located in the Gulf of Mexico (the "Gulf") exploded, resulting in the deaths of 11 men and an oil spill from the Macondo well that lasted more than 80 days and released an estimated 5 million barrels of crude oil into the Gulf. On July 14, 2010, the wellhead for the Macondo well was temporarily capped, and on September 19, 2010, the well was declared permanently sealed.

    The spill resulted in an immediate moratorium on commercial fishing in portions of the Gulf. That closure, still in effect for certain regions as of the date of this report, at one time affected the entire Eastern portion of the Louisiana coastline and all of the Mississippi and Alabama coastlines, reaching into a portion of the Florida panhandle. It is not known when areas that remain subject to the closure will be reopened for commercial fishing.[2] In Louisiana alone, an estimated 44,000 jobs depend on the fisheries. This includes crews on fishing boats, wholesalers and processing plant workers.

    The spill also resulted in the closure of beaches along the Louisiana, Mississippi, Alabama and Florida panhandle coastlines. These beach closures occurred as early as May 2010 and lasted through much of the summer. According to news reports, hoteliers, restaurateurs and other business owners at or near the affected Gulf beaches saw significant declines in business over the summer, possibly attributable to the oil spill and the diversion of tourism to unaffected areas. Other Gulf Coast businesses reliant upon summer tourism in unaffected areas, such as in

---

[2]   Shortly after the explosion, over 88,000 square miles of the Gulf were closed to fishing. As of October 5, 2010, 23,360 square miles of the Gulf remain closed. NOAA, Map of Closed Area, http://sero.nmfs.noaa.gov/sf/deepwater_horizon/BP_OilSpill_FisheryClosureMap_100510.pdf.

Southwest Florida, have reported cancellations by vacationers who anticipated the spill reaching those areas. Real estate agents in the Gulf region have reported decreased sales due to the spill.

In an effort to break up large oil slicks, chemical dispersant was released into the Gulf. The dispersant had its intended effect, but its long-term impact on the Gulf eco-system, in particular the fish, shrimp and mollusks harvested from the Gulf, are unknown. In addition, recent studies suggest that large underwater plumes of oil persist. The long-term effect of these plumes on the fisheries is also unknown.

B.       The Compensation Fund

On June 16, 2010, representatives of BP met with President Obama and agreed to establish a claims process, funded with $20 billion, to operate through 2013 to settle all Oil Pollution Act ("OPA") and tort claims arising out of the spill.[3]  BP agreed to contribute $3 billion to the fund in the third quarter of 2010, with an additional $2 billion in the fourth quarter. Thereafter, BP will contribute $1.25 billion per quarter until $20 billion has been reached. The fund does not limit BP's liability, and BP has publicly committed to provide further funds should claims exceed $20 billion. In accordance with OPA, no claimant may obtain double recovery as against BP. It is expected that the Facility will accept claims for three years from the date on which the final protocol becomes operative.

C.       Retention of Feinberg Rozen, LLP

The same day the fund was announced, the White House and BP selected Kenneth R. Feinberg to serve as the administrator of what was called the claims facility. Prior to the White House announcement, Feinberg had risen to the top of a short list of independent claims

_____

[3]   Press Release, BP, BP Establishes $20 Billion Claims Fund for Deepwater Horizon Spill and Outlines Dividend Decisions (June 16, 2010), *available at* http://www.bp.com/genericarticle.do?categoryId=2012968&contentId=7062966.

administrators under consideration by BP. Feinberg has a national reputation in claims settlement dating back to 1984, when he was appointed the Special Settlement Master in the Agent Orange product liability litigation. Among other engagements, he has since served as the Special Settlement Master in the federal and state DES cases and as the Trustee administering the Dalkon Shield Claimants' Trust. More recently, he administered the $7 billion September 11th Victim Compensation Fund and the Hokie Spirit Memorial Fund established for those affected by the Virginia Tech shooting in April 2007.

D.     Feinberg Rozen, LLP

The White House Fact Sheet released the day Feinberg was appointed stated that "a new, independent claims process will be created with the mandate to be fairer, faster, and more transparent in paying damage claims by individuals and businesses" than the one quickly put in place by BP just after the spill began.[4] With this mandate, Feinberg assembled at his firm – Feinberg Rozen – a team of legal and business professionals with a combined 60 years of experience in claims administration. Although Feinberg was named administrator, Feinberg Rozen was actually retained to administer the GCCF. Feinberg Rozen is a small firm with a substantial practice in alternative dispute resolution or "ADR," broadly defined as bringing parties together to resolve contentious, high-stakes disputes. The Firm's GCCF team comprises most of its professionals: the Firm's two law partners, Kenneth R. Feinberg and Michael Rozen; a senior consulting attorney, Jacqueline E. Zins; a project manager, Camille S. Biros; and a director of special projects, David L. Feinberg. Because of the demands of the BP matter, the

---

[4]     Press Release, The White House, FACT SHEET: Claims and Escrow (June 16, 2010), *available at* http://www.whitehouse.gov/the-press-office/fact-sheet-claims-and-escrow.

Firm also has hired two additional attorneys. Like the rest of the team working on the GCCF, their compensation is paid by the Firm, not by BP.

Feinberg Rozen's ADR practice is unique. The Firm has been appointed to administer the most high-profile claims processes this nation has seen. As part of this work, the Firm has drafted dozens of complex claims protocols, trained claims adjudicators – including administrative law judges – in hearing claims, and has heard thousands of claims ranging from property damage from Hurricane Katrina to the wrongful death claims resulting from the September 11th attacks. The Firm's work also has involved in-depth compensation analysis, as with Feinberg's appointment as the Special Master for TARP Executive Compensation, a review of compensation paid to certain executive officers of firms that received extraordinary TARP (Troubled Asset Relief Program) relief, and Feinberg Rozen's recent engagement to assess the professional fees charged to the Lehman Brothers estate in U.S. Bankruptcy Court in New York.

Kenneth R. Feinberg and Michael Rozen also are sought out to help parties reach global settlements and fairly allocate settlement proceeds in matters involving numerous claimants. The Firm works with banks and insurance companies to assist claimants in obtaining their funds on a timely basis, particularly from defendant corporations with liquidity constraints.

E.    Current Compensation Agreement

At the inception of the engagement, the Firm insisted that its fees and disbursements be paid from money separate from the fund. This has been the practice thus far, and payment to the Firm is not provided for in the Trust Agreement that governs the $20 billion fund.

Under the current agreement between BP and the Firm, BP has agreed to pay the Firm $850,000 per month prospectively at the beginning of each month, plus disbursements, beginning in mid-June and ending October 1, 2010. All disbursements, including the cost of

subcontractors, are charged to BP at cost without any mark-up.  BP and the Firm agreed to revisit this compensation arrangement beginning as of October 1, 2010.

III.   **WHETHER THE METHOD OF COMPENSATION IS REASONABLE**

      A.    Flat Fees

The current compensation arrangement between the Firm and BP is for a flat fee payable monthly.  Methods of compensation for arbitrators and mediators vary by engagement.  For longer or more complex proceedings, arbitrators typically charge a flat daily rate, and mediators usually charge a daily or monthly rate, or a single negotiated fee for the entire matter.  Claims administrators also customarily charge a flat monthly fee.  These fees typically are billed on a prospective basis, at the outset of an assignment, representation or hearing.

Feinberg Rozen's usual practice is no different.  The Firm usually negotiates at the outset of an engagement a flat fee for the work it performs, sometimes with a success fee payable at the end depending on the outcome.[5]  For its mediation work, the Firm may negotiate a monthly fee or a flat fee for the entire matter.  The Firm's strategic settlement work on behalf of particular clients is also charged on a flat fee basis.  The Firm's special master work necessarily is performed under court supervision, but is generally billed on a flat fee basis.  The Firm's claims administration practice is usually billed on a flat fee basis, with the amount typically subject to change over time.  Depending on the matter, the initial stage of the Firm's work on a claims administration matter may be billed at a higher rate than later work.  Although lawyers at the Firm keep time sheets reflecting the time they spend daily on a matter, this practice is usually for

---

[5]    The Firm sometimes charges hourly or daily rates for its arbitration practice, where fees tend to adhere to those of the arbitration associations.

records purposes only and is not the basis for billing for the particular matter in which the time sheets are kept.

   B.   Alternative Fee Arrangements

   Besides a flat fee, other possible fee arrangements include hourly billing, contingency fees and success fees. Many law firms that provide traditional legal advice (rather than ADR services) charge for their time by imposing hourly rates that vary depending on the lawyer and, sometimes, the nature of the matter. Certain aspects of hourly billing make it unsuitable here. *First*, charging for hours could lead to suggestions that delays in claims review are motivated by compensation concerns. *Second*, fees based on time spent may not adequately value the full array of expertise and services the Feinberg Rozen team brings to the GCCF, many of which have no generally accepted market rate. The group's experience, expertise and reputation are critical aspects of the value that the Firm brings to this unique engagement – not the sheer number of hours worked (although, at peak times, Firm employees have logged in excess of 75 hours per week on the GCCF project); and not the ability to mobilize on a moment's notice a large number of highly qualified lawyers, as is often demanded of large law firms. The Firm is able to staff the GCCF leanly with each core member possessing a depth of expertise and experience in precisely the kind of work required by the Facility. *Finally*, hourly billing invites a level of scrutiny and management by the party paying the fee that is incompatible with the independence that is a hallmark of this engagement. A BP representative explained that the flat fee approach simplifies the relationship with the Firm and is consistent with BP's goal of preserving the administrator's independence.

   Another billing arrangement, the contingency fee, is common for compensating plaintiffs' lawyers. The lawyer receives an agreed percentage of a monetary judgment or

settlement, but receives nothing if the case is unsuccessful. A contingency fee provides the lawyer with a strong incentive to obtain a large award for the claimant by the quickest and most efficient means. That incentive makes a contingency fee inappropriate here where the administrator should have no incentive except to provide a fair award.

Finally, success fees are sometimes paid in addition to a flat fee or hourly fee. In the past, the Firm sometimes has earned a success fee, usually for engagements on behalf of a client (rather than when the Firm is acting as a neutral), where it has achieved a resolution of claims in a particular matter for an amount that the client views as reasonable. No success fee is contemplated in the current agreement between the Firm and BP, and such a fee could potentially distort the GCCF process. Here, where the Firm is acting as a neutral, success should not be defined by the amount awarded or paid out, because giving the administrator a stake in the outcome could compromise the administrator's neutrality and independence. Similarly, basing a success fee on the level of claimant participation could give the administrator a financial incentive to make overly generous awards to attract as many participants as possible to the claims process.

*     *     *     *     *

In sum, we have concluded that a flat fee payable periodically is the most appropriate form of compensation here. It best addresses potential criticisms that the Firm's claims decisions are motivated by compensation concerns, a key consideration in an administration subject to intense public scrutiny. It also best measures the variety of skills and efforts the Firm brings to this engagement.

IV.   **WHETHER THE AMOUNT IS REASONABLE**

Next, we evaluated whether the amount of the agreed upon flat fee is reasonable, as applied to both completed and future work.  By analogy, we did so using criteria developed by courts for assessing the reasonableness of class action attorneys' fees.  Such fees are evaluated using two different approaches, neither of which is suitable here.[6]  But both approaches apply similar criteria to adjust the fee to account for the specifics of a particular engagement.[7]  These factors, condensed into a single test and adjusted for application in this case, provide a useful framework to review the Firm's compensation:  (1) the time, labor and results obtained by counsel; (2) the novelty and difficulty of the assignment; (3) the experience, ability and reputation of Feinberg Rozen; (4) the preclusion of other employment due to acceptance of the project; (5) the undesirability of the assignment; and (6) comparable compensation.  Each is analyzed in turn below.

---

[6]   The two approaches are the lodestar method and the percentage method.  Under the lodestar method, the court multiplies the reasonable number of hours expended by counsel by a reasonable hourly rate.  *See generally* Manual for Complex Litigation (Fourth) § 14.122 (2004).  Under the percentage method, the court multiplies the amount recovered on behalf of the class by a percentage, rewarding counsel for the size of the recovery obtained.  *See generally id.* § 14.121.  Neither approach is a good fit for this matter.  The lodestar method, which is fundamentally based on hours worked, has the same draw-backs identified above in the discussion of the hourly rate billing method.  The percentage of the fund method is essentially a contingency fee, and is inappropriate because the Firm had no role in establishing the BP fund and should not be rewarded for its size.

[7]   Courts applying the lodestar method may in certain cases adjust the lodestar figure.  *See Perdue v. Kenny A. ex rel. Winn*, 130 S. Ct. 1662, 1669, 1671-73 (2010); *Hensley v. Eckerhart*, 461 U.S. 424, 434 & n.9 (1983).  Some courts have done so using the factors identified in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974): (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  Courts applying the percentage method similarly consider a range of case-specific factors that varies slightly by circuit.  *See generally* 2 Joseph M. McLaughlin, McLaughlin on Class Actions § 6:23 (6th ed. 2010).

11

A.     Factor 1:  The Time, Labor and Results Obtained by Counsel

The Firm has established what Feinberg described as "the most sophisticated and efficient claims process ever assembled."  Reviewing claims is a full-time endeavor, and the Facility is reviewing approximately 1,500 claims per day.  Many claims that were filed with BP before August 23, 2010, were not reviewed, pending the transition to the Facility.  The Facility has had to review this backlog of claims, as well as those claims filed with the Facility since it went live.

Although it is still early in the process, the results to date are worth noting.  As of October 6, 2010, the Facility has received 128,100 claims.  It has approved 54,056 claims, paying claimants a total of $1,049,223,614.71.

The Feinberg Rozen team members working on the GCCF describe the engagement as the busiest of their professional lives.  The Firm's time records for June 16, 2010, when the Firm was first retained, to October 4, 2010, show that four attorneys working full time on the matter together spent 2,777 hours on the GCCF.  This includes Feinberg's time, which according to these records, has been as many as 20 hours per day, often six or seven days a week.  These time records do not include hours worked by Camille Biros, who has principal responsibility for the logistics of the claims facility.  Biros typically has worked over 12 hours a day, seven days a week on the GCCF since the Firm's engagement.  These sustained increased workloads result in not solely a human cost, but also a substantial financial cost to the Firm that is covered by the flat monthly fee and is not billed separately to BP.  The Firm's overhead, including rent and utilities, also is covered by the flat monthly fee and is not billed separately to BP.

The Firm's engagement on the GCCF has necessitated hiring two additional attorneys – one to work exclusively on the GCCF, and the other to work on the GCCF as well as other

12

matters.  Each of these attorneys is compensated by Feinberg Rozen at rates comparable to what they would earn at large D.C. law firms.  Their salaries are covered by the flat fee and are not billed separately to BP.  The Firm anticipates hiring additional staff attorneys to work exclusively on the GCCF.

The GCCF work also has forced those already at the Firm who are not working exclusively on the GCCF to work longer hours to attend to the Firm's other matters.  In addition, due to the Firm's high level of activity on the GCCF, an additional employee has been hired to work on non-GCCF matters and another employee has increased hours worked on non-GCCF matters.  Both are paid at market rates.

B.      Factor 2:  The Novelty and Difficulty of the Assignment

The GCCF project presents unique challenges.  *First*, the size of the BP fund, $20 billion, is unprecedented; it is the largest fund ever administered by the Firm, indeed the largest fund in American history.  It is anticipated that the total number of claims will exceed 200,000, more than those filed in all but a few of the Firm's claims administrations.  *Second*, the claims received to date have been diverse and without suitable precedents on which the Firm can rely, in part because BP's prior facility was established with speed in mind, not consistent treatment of comparable claims.  Particularly challenging has been the development of a consistent, and yet individualized manner of determining settlement amounts suited to the circumstances of each case using an algorithm that assures fair, justifiable and consistent treatment.  It is also expected that long latency periods will exacerbate the difficulty of determining harms suffered.

*Third*, all of the work to date has proceeded against a backdrop of intense pressure from diverse stakeholders – including but by no means limited to the White House and BP – to work quickly.  Consistent with his mandate from the White House, Feinberg's goal has been to

provide claimants compensation as soon as possible.  Thus, the Firm set aggressive deadlines for establishing the Facility and reviewing claims, while still meeting meticulous standards.  For instance, the Facility was open to receive claims on August 23, 2010, little more than two months after the Firm was retained.  The Firm set a target of reviewing documented individual claims within 48 hours of submission, and documented business claims within 7 days of submission, but has found this deadline difficult to meet because of numerous unanticipated challenges and complications, not the least of them generated by the need to bring order to claims filed when BP's hastily established system was in place.

Members of the Feinberg Rozen GCCF team found it a daunting task to establish the Facility under this intense logistical and time pressure.  This pressure has not abated in the weeks following the establishment of the Facility, as the focus has shifted to reviewing claims and supervising the systems in place.  Team members told us that the GCCF project is the most intensive project they have ever undertaken, and that it requires attention at all hours of the day and night.  They do not expect the pressure to relent for at least a year.

The Firm's work on the GCCF will engage every aspect of its practice:  working with various stakeholders, including state and federal governments, to inform them about the nature of damages claimed and appropriate expectations; drafting comprehensive claims protocols; training administrators to ensure that claims are properly filed, and uniformly decided and tracked; working with banks to ensure claims are properly and timely paid; and personally reviewing large numbers of claims to ensure that the process is consistent and fair.

Much of the Firm's work to date can be segregated into five broad categories:  (1) preparation of the emergency advance payment protocol; (2) meeting third parties such as community leaders, claimants and government officials; (3) redesign of and oversight over the

14

claims process and data gathering; (4) review of claims; and (5) preparation of the final settlement protocol and appeals panel.

Preparation of the Emergency Advance Payment Protocol. The emergency advance payment protocol was described as the "foundational" document for the initial phase of the GCCF. Based on the OPA and state tort law, it sets forth the administrative and procedural guidelines and eligibility criteria for emergency claims, which will be accepted until November 23, 2010. The protocol is the key to the Facility's transparency. Many of the hours dedicated to the protocol reflect the Firm's independent legal research and drafting. Before late August when the Facility became operational, there was no protocol for claims in place.

After a draft version of the protocol was circulated, the Firm received comments from State Governors and Attorneys General in the Gulf region, various persons and entities within the executive and legislative branches of the federal government (including the Department of Justice, Department of Homeland Security, Coast Guard and House Judiciary Committee), plaintiffs' lawyers and other private attorneys, non-profit organizations and certain private citizens. The Firm processed 50 to 60 different sets of comments and determined which to incorporate into the protocol and how. The protocol was completed and published in time for the August 23, 2010 commencement of the GCCF.

Third-Party Consultation. Contemporaneous with the drafting of the emergency claims protocol, the Firm expended considerable effort in an attempt to convince various stakeholders to participate in the GCCF and to canvass potential claimants in an attempt to make the GCCF claimant-friendly. This task fell primarily to Feinberg, who, as the public face of the GCCF, consulted with numerous parties before the GCCF went live. These have included federal and state officials both in Washington, D.C., and locally in the Gulf region, existing and potential

15

claimants, chambers of commerce, hotelier associations, real estate associations and not-for-profit groups. Feinberg communicates how the GCCF is performing and what claimants can expect from the GCCF, and listens to criticisms and concerns.

Biros, too, frequently communicates with a broad array of government officials, including those organized into a government interagency group called the Integrated Services Team. That team monitors the claims process, and comments frequently on various aspects of the Facility. Biros also distributes daily updates with claims statistics, and the Facility publishes summary information from these reports on the GCCF website.

Redesign of the Facility. Contemporaneous with the emergency protocol and outreach involved in establishing the Facility, the Firm also focused its efforts on transitioning the earlier BP program to the GCCF. In an effort to get relief into the hands of claimants as soon as possible, BP had quickly instituted its own claims payment process, which naturally suffered from certain inefficiencies. Under that early process, there were no claims forms in place; instead, claims were managed on an ad hoc basis by telephone or through a claims site operator. The data tracking each claimant, the nature of the claim and the determination of that claim was decentralized, which allowed for, on the one hand, substantial fraud, and on the other, the potential for improper claims evaluation.

Biros led the Firm's overhaul of the prior facility. She identified which systems to retain, and which to abandon, and oversaw the transition of those retained elements into the GCCF. This required a migration of BP claims data to the GCCF, with remaining data points to be completed. With a network of subcontractors with whom the Firm has worked in the past, the Firm designed a claims form and a claims submission system that allows centralized tracking of claims, their adjudication, payment and receipt of payment. The same system generates regular

16

reports which the Firm reviews. Biros also organized a large-scale training effort for claims processors in the new Facility.

Reviewing Claims. Once the protocol was set and the GCCF went live on August 23, 2010, the Firm's focus shifted to claims evaluation. Through Biros, the Firm coordinates a network of subcontractors to assist the claims process. The Garden City Group administers the call center, performs data processing and payment functions, and provides some claims analysts. Worley Catastrophe Response staffs the on-site claims centers and handles initial claims intake. BrownGreer PLC also provides claims analysts, and provides field accountants who develop damages models for business claims, which typically show a business's pre-spill profit and loss, post-spill profit and loss, and 2009 and 2010 earnings. A team of accountants provides analysis for more complex claims. The costs of these subcontractors are not covered by the flat fee to the Firm, but are passed through dollar for dollar to BP.

Claims review and adjudication is handled by different administrators, according to claim amount. Garden City and BrownGreer adjudicate certain claims, with accountants from major accounting firms determining higher tiered claims. The Firm's employees personally review three types of claims before determinations are made and dispatched: (1) high-dollar-amount claims; (2) lower-value claims where the recommended payout is below the requested amount; and (3) rejected claims. The Firm has decided that no claim will be rejected or valued at zero without the Firm first reviewing it.

Preparation of the Final Settlement Protocol and Appeals Panels. The Facility will begin reviewing claims for final settlement on November 23, 2010. Work has already begun on a final settlement protocol, akin to the emergency protocol. As with the emergency protocol, the Firm expects to receive comments from many stakeholders. The Firm will set up the procedures and

substantive standards and select an appeals panel to hear claimant appeals.  The Firm expects to

have the final protocol in place within the next month, and in any event before November 23,

2010.

      C.     Factor 3:  The Experience, Ability and Reputation of Feinberg Rozen

          1.     Experience and Ability.

Successful administration of the GCCF requires the ability to perform several different

and challenging tasks:  (1) encouraging claimant participation; (2) developing a global settlement

strategy that reflects consistency and transparency; (3) developing a fair and consistent protocol

for emergency and final settlement of claims; (4) training claims officers for consistent and fair

adjudication despite significant variation in the nature and proof of claims; (5) hiring and

supervising subcontractors; (6) reviewing claims for fairness and accuracy; and (7) designing an

appellate process.

Encouraging Claimant Participation.  The Firm has achieved a high percentage of

participation in several high visibility and high stakes settlements.  In 1984, Judge Jack B.

Weinstein of the United States District Court for the Eastern District of New York asked

Feinberg to settle the Agent Orange products liability suits following nearly eight years of

litigation; Feinberg was able to settle claims brought on behalf of 250,000 war veterans.  Under

the Firm's management, the September 11th Victim Compensation Fund achieved 97%

participation.  More recently, the Firm worked with Eli Lilly to settle nearly 96% of the suits

related to Zyprexa.  Because of its reputation, the Firm has been called on – by courts, plaintiffs'

attorneys, defense attorneys and the government – to assist in the settlement of high-profile

matters.  These include large mass tort litigations relating to asbestos, heart valves, and tobacco,

as well as large scale settlements in the financial and insurance industries, including securities litigation and coverage disputes.

Global Settlement Strategy.  Both Firm partners, Feinberg and Rozen, have deep experience in devising global settlement strategies in a variety of industries.  For over 15 years, the Firm has advised companies facing mass tort litigation, including companies in the pharmaceutical and airline industries, on routes to settlement.  The Firm also counts among its clients major financial institutions, insurance companies and government agencies.  The Firm's expertise in mediation and arbitration is also highly relevant to devising fair results acceptable to claimants.

Developing a Claims Protocol.  Over the past decade, the Firm has handled more than a dozen major claims administrations.  For each of those engagements, the Firm has drafted and implemented a protocol and allocation formula tailored to the specific injury.  Among others, those include the Hokie Spirit Memorial Fund, SEC v. AIG, the September 11th Victim Compensation Fund, New York City Homeless Litigation and the Dalkon Shield Claimants' Trust.

Training Claims Officers.  For each of the matters in which the Firm has designed, implemented or administered a settlement, it has engaged hearing officers to evaluate individual claims.  Notably, the Firm was retained by Liberty Mutual Insurance Company and Zurich N.A. Insurance Company to develop a comprehensive ADR program for mediators handling claims related to property damage from Hurricane Katrina.  This engagement involved the training of between 15 and 20 mediators in the Gulf region.  Similarly, the Firm trained and supervised more than 70 hearing officers, including 52 administrative law judges, hearing and reviewing claims related to the September 11th Victim Compensation Fund.

Hiring and Supervising Subcontractors.  Over the years, the Firm has worked closely

with a small handful of claims processors, such as Garden City and BrownGreer, banking

institutions, economics experts and forensic accountants.  The Firm is able to draw upon its prior

relationships with subcontractors, with reference to prior preferences and results, to achieve its

desired outcomes quickly.

Reviewing Claims for Fairness and Accuracy.  For all of the claims administration work

in which the Firm has engaged, Firm employees have personally reviewed claims for fairness

and accuracy.

Designing an Appellate Process.  For many of its mass tort claims administrations, the

Firm designed appellate processes whereby claimants could have fund decisions reversed or

revised, before seeking review in a state or federal court.  The Firm typically has handled appeals

in-house, without the involvement of a subcontractor.

2.      Reputation.

The Firm – and in particular, Feinberg – has developed a reputation for expertise in

resolving mass torts through its regular engagement in high-profile cases involving

pharmaceuticals, airplanes and asbestos.[8]  After the Agent Orange litigation, Feinberg went on to

serve as special master in many mass tort cases, such that "[r]are was the large, high-profile

settlement that Feinberg was not involved in."[9]  For this work, articles in the press have

described Feinberg as the "Special Master of America,"[10] and the "the über-administrator,

---

[8]      Elizabeth Kolbert, *The Calculator: How Kenneth Feinberg Determines the Value of Three Thousand Lives*,
The New Yorker, Nov. 25, 2002, at 42.

[9]      *Id.*

[10]     Ashby Jones, *Spotlight on Ken Feinberg: The Special Master of America*, The Wall Street Journal Law Blog,
Jan. 14, 2010, http://blogs.wsj.com/law/2010/01/14/spotlight-on-ken-feinberg-the-special-master-of-america/.

mediator, and overall justice-dispenser."[11]  Over the years, Feinberg has been a lecturer and adjunct professor at top law schools, including those affiliated with Columbia University, New York University, Duke University and Georgetown University.

Feinberg drew national attention with his three-year-long *pro bono* administration of the September 11th Victim Compensation Fund, a position for which Feinberg volunteered shortly after the attacks.  Despite early criticism from some, including victims' families, Feinberg eventually won praise for his handling of the fund, especially in light of the emotionally charged atmosphere in which it was administered.  Its success was later described as "a tribute to the industry and the adaptability of Kenneth Feinberg."[12]  More recently, Feinberg was selected by the White House to serve as Special Master for TARP Executive Compensation.  For more on Feinberg's reputation, see generally the articles attached as Exhibit A.

D.   Factor 4:  The Preclusion of Other Employment Due to the Acceptance of the Project

Since the Firm was retained by BP in mid-June 2010, it has turned away three mediations.  The Firm likely will have to decline administering any other claims facility during the operation of the GCCF.  Currently, Feinberg estimates that he spends at least 95% of his time each day working on the GCCF, which is more intensive than other claims administration projects.

The Firm was being considered for two large, high-profile matters – neither involving claims administration – but apparently was no longer a candidate after it accepted the BP

---

[11]   Ashby Jones, *Ken Feinberg (Who Else?) To Handle Oil-Spill Escrow Fund*, The Wall Street Journal Law Blog, June 16, 2010, http://blogs.wsj.com/law/2010/06/16/ken-feinberg-who-else-to-handle-oil-spill-escrow-fund/.

[12]   Editorial, *9/11 Fund Closes Its Doors*, The New York Times, June 18, 2004, at A1; *see also* Editorial, *The Odyssey of the Sept. 11 Fund*, The Chicago Tribune, July 5, 2004, at 18.

engagement. It is assumed that the Firm also has lost out on other business that it does not know about because of widespread knowledge about the heavy demands of the GCCF matter.

Feinberg also has notified the various law schools where he is an adjunct professor that he will not be able to teach during the 2010-2011 academic year due to the Facility's demands on his time. This is the first time in 30 years that Feinberg will not teach a law school course during the year.

     E.     <u>Factor 5: The Undesirability of the Assignment</u>

Part of the value the Firm brings to the GCCF project is its reputation for even-handed distribution of payments in claims administration matters. At the same time, agreeing to administer the Facility has put the Firm, and particularly Feinberg, at the center of intense controversy, which is expected to continue.

Claimants are understandably eager to receive swift compensation even when documentation of losses may be wanting, and they have criticized the Firm and Feinberg for failing to review claims as they would like. In addition, and perhaps as a result, the GCCF project is charged politically, and some public officials have responded by criticizing Feinberg and the Firm regarding various aspects of the Facility.[13] Feinberg identified consulting with elected officials and candidates, or other public officials who may function as their surrogates, as among the most difficult and important aspects of his work on the GCCF. False rumors have circulated in the media to the effect that the Firm's compensation is contingent on denial of claims, or that the Firm is receiving payment from the fund.

---

[13]    *See, e.g.,* Letter from Thomas J. Perrelli, Assoc. Attorney Gen., DOJ, to Kenneth Feinberg, Partner, Feinberg Rozen, LLP (Sept. 17, 2010), *available at* http://media.nola.com/2010_gulf_oil_spill/other/perrelli-to-feinberg-letter.pdf.

The high profile nature of the matter creates potential risks and benefits for the Firm. Failure to administer the Facility successfully could lead to significant reputational damage, but successful administration could bolster the Firm's reputation.  It may well be argued that when it comes to reputation, the risks are greater than the benefits because the Firm already enjoys a peerless reputation that would be easier to damage than to improve.

F.      Factor 6:  Comparable Compensation

Past Firm Compensation.  The fee charged to BP during the interim retention period is the highest flat fee the Firm has ever earned, but does not include a success fee, a common feature in other Firm engagements.  It is not, however, the Firm's highest revenue earning matter on a monthly basis, when the success fees from other engagements are factored into the monthly fees for those engagements.

Fees Recovered in Large Class Action Settlements.  A 2004 study of class action settlements with fee awards from 1993 to 2002 shows that, for the largest 10 percent of settlements, which averaged $929 million, lawyers received an average of 12 percent, and attorneys' fees in cases classified as "mass tort" or "tort" (including products liability actions) averaged 18 percent of the overall recovery.  A separate report submitted to the U.S. District Court for the District of Connecticut documents fees in "mega-fund" cases involving very large securities class action settlements as follows:[14]

---

[14]     *Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400, 405 (D. Conn.), *aff'd*, 355 F. App'x 523 (2d Cir. 2009).

| Rank | Name | Settlement ($) | % of Fund | Fee ($) |
|------|------|----------------|-----------|---------|
| 1 | Enron | 7,227,390,000 | 9.52 | 688,047,528 |
| 2 | WorldCom | 6,133,000,000 | 5.48 | 336,088,400 |
| 3 | Tyco | 3,200,000,000 | 14.50 | 464,000,000 |
| 4 | Cendant (2000) | 3,166,000,500 | 1.73 | 54,771,808.65 |
| 5 | AOL/Time Warner | 2,500,000,000 | 5.90 | 147,500,000 |
| 6 | Nortel I | 1,142,775,308 | 3.00 | 34,283,259.24 |
| 7 | Royal Ahold | 1,100,000,000 | 11.88 | 130,680,000 |
| 8 | Nortel II | 1,074,265,298 | 7.74 | 83,148,134.07 |
| 9 | McKesson | 1,042,500,000 | 7.64 | 79,647,000 |
| 10 | Cardinal Health | 600,000,000 | 18.00 | 108,000,000 |

Of course, here the Firm had no role in obtaining the funds in the escrow account, which is more than twice as large as the largest class action settlement to date, and its fee will not be paid from the fund. Nonetheless, data regarding class action settlement fees provide context for assessing the size of the Firm's fee, and are readily available. In particular, the data show that, if the Firm were to work on the GCCF project for the anticipated three-and-one-half years, its total fee would be a far smaller percentage than the average fees in large class action settlements (including torts cases), as well as in the largest 10 settlements. The Firm's total fee would be 0.176% of the escrow fund, while the smallest "mega-fund" fee to date was 1.73%. In terms of amounts, the Firm's engagement on the GCCF at current compensation (totaling $35,275,000) would be less than the fee obtained in all but one of the largest 10 securities settlements listed above, the smallest of which is $34,283,259.24.

24

\*   \*   \*   \*   \*

We have concluded that a flat fee of $850,000 per month for the period of June 16, 2010, to September 30, 2010, is eminently reasonable because it reflects fair compensation for the value provided and work expended on the GCCF. The Firm's singular combination of expertise in large-scale claims work, national credibility, and lean, responsive staffing positioned it uniquely to execute as quickly and as fairly as the engagement demands. The project has required an unprecedented allocation of the Firm's manpower, and the flat fee accounts for the significant distortion of the Firm's business. The amount is also consistent with the Firm's past compensation for similar engagements, but still less than fees for the most comparable labor-intensive, common fund litigation work.

## V.   FUTURE WORK AND COMPENSATION

### A.   Nature and Extent of Future Work

Whether the previously agreed amount continues to be reasonable once the final settlement protocol is in place depends largely on the volume of claims, whether the administration has become fully routine and the time and skills required of the Firm and Feinberg personally.

Claims administration projects tend to require a considerable amount of Firm time at their early phases because the Firm must design and implement claim protocols and criteria. Firm employees, including Feinberg, said that the GCCF project will continue to require their intensive attention for at least another year. In particular, Firm employees identified the drafting and implementation of a protocol for final claims as an important task that, in addition to the regular review of claims, would continue to require dedication of substantial Firm resources. Indeed, it may be that pressure for accelerated claims determinations may require further

expansion of the Firm's resources, although care would have to be taken in that circumstance lest quality be degraded in the process.

The typical claims administration project eventually enters an "administration" phase during which claims are being filed and reviewed at a steady pace, even though the volume of claims and necessary resources may fluctuate. In the Firm's experience, the volume of claims tends to be highest at the beginning, to decline during the life of the facility and to peak at or near the filing deadline at the end. This administration phase continues to require intensive attention from Firm team members who are actively involved in overseeing that process, and those who are involved in the review of claims that require special scrutiny. It does not tend to require as intensive engagement by other team members. It is difficult to know at this point when the administration phase will occur, and what Firm resources will be required.

B.     Recommendation for Compensating Future Work

When it is difficult to project accurately the time and effort necessary to complete a task, an inflexible fixed-fee arrangement will impose unfair risks on both the payor and payee in the event that the work does not proceed in the same way and at the same pace over time. Here, for example, it may be necessary for the Firm to expand the human and other resources dedicated to the GCCF in order to process claims promptly. In the longer term, it is difficult to predict how the need for the Firm's resources will change, but it is certain that over the course of the next three years it will change.

One way of mitigating the risk is to quote particular fees now that would apply at various stages during the expected life cycle of the Facility, with the ability to renegotiate if the claims process does not proceed as expected. Another approach would be to continue the current fee arrangement but agree to renegotiate if certain contingencies arise.

26

Our recommendation is a variation of this second approach.  Because of the uncertainties, the relatively long duration of the Facility, and the need to ensure that fee payments are consistent with efforts expended as well as the other factors discussed above, we recommend that the parties continue the fees at the current rate, but agree to revisit the issue at intervals of 4 months or some other fixed period.  This flexible approach is consistent with the Firm's practice in like matters and with the parties' current agreement to revisit the compensation after the first few months of the engagement.

# EXHIBIT A

# The Washington Post

## Special master Kenneth Feinberg is a mediator's mediator

By Liza Mundy
Thursday, January 14, 2010; C01

The special master is sitting in a chair in his Pennsylvania Avenue law office, periodically crossing one leg over the other, relaxed if somewhat restless. Bespectacled, a fringe of hair surrounding his bare crown of head, he does not cut the Olympian figure you might expect of a man engaged in seemingly every modern American crisis.

But that's what he is. Partly through his volition and partly as an accident of history, Washington lawyer Kenneth Feinberg has become a ubiquitous personage when it comes to national emergency. Beginning in 2001, Feinberg was the U.S. government's special master tasked with setting compensation for injured victims and the families of those who died in the Sept. 11 attacks, a job he describes as "the most harrowing experience of my professional life."

In 2007 he distributed the money donated to victims of the mass shooting at Virginia Tech and to bereaved families.

And just now, in response to the nation's worst economic crisis since the Great Depression, Feinberg is the Obama administration's special master for executive compensation -- the pay czar -- charged with capping salaries at firms receiving the biggest chunks of bailout money under the Troubled Asset Relief Program, or TARP.

In his career, he has had a role in resolving controversies involving the JFK assassination, the Vietnam War, Hurricane Katrina, the Catholic Church's sexual abuse scandal. Where there is death and suffering, or merely bankruptcy and financial ruin, there, oddly enough, is Kenneth R. Feinberg. Calamity Jane comes to mind. So does Zelig, recurrent in a striking number of American dramas.

"That's cute," the special master says, when this notion is introduced. "If you mean by Zelig quality, like if there's a national challenge and a national crisis, bring in Feinberg, and he'll put on whatever veneer is needed for that crisis, I guess I wear that as a badge of honor."

In his 64 years, the special master has confronted human nature in its most extreme conditions, had every sort of existential question put to him. "Mr. Feinberg, why don't you bring these companies down to a level of compensation that's more commensurate

with their value to society?" offers the special master for example, echoing a question he hears a lot these days.

Or: "My wife, she was an angel, Mr. Feinberg. Why her? Why not me?" he recalls being asked after 9/11.

Or, from the parent of a Virginia Tech victim: "Mr. Feinberg, I sent my daughter to school in *Blacksburg, Virginia*, not New York City. My daughter died in Blacksburg, Virginia, at the hands of a deranged gunman. Where is the justice in this, Mr. Feinberg?"

Emotionally, the questions are easier this time around. Angry bankers and outraged citizens are nothing compared with the spiritual devastation of families struggling against sudden, violent loss.

"Both communities are emotional," he says, asked to parse the difference between the grieving families he confronted then and the irritated executives he is engaged with now. "But it's different. Nine-eleven and Virginia Tech, my goodness, the human tragedy, the horror and pathos of those incidents, and their impact on American history -- there's no comparison. . . . In my job that I'm doing now, I have to be an accountant, I have to be a Treasury official. Nine-eleven and Virginia Tech you had to be a rabbi and a priest. It was altogether different."

* * *

The special master did some acting in college, thought for a while about pursuing a career in theater. But his dad, who owned a tire store in working-class Brockton, Mass., suggested he apply his dramatic flair to the more lucrative venue of the courtroom. After graduating from the University of Massachusetts, Feinberg went to law school at NYU.

But he retains a histrionic streak. The special master still has the trial lawyer's knack of modulating his voice to hold a courtroom's interest, and the raconteur's affinity for reenacting conversations. He has also cultivated a lifelong interest in opera and classical music, inculcated at age 9 by a cantor at his synagogue. Asked if he was unusual among Brockton boys in his eagerness to attend opera performances, Feinberg -- who is now president of the Washington National Opera and has a massive music collection -- laughs. You think?

After law school Feinberg clerked for the chief judge of the state of New York, Stanley H. Fuld, then worked as a federal prosecutor and later as chief of staff for Sen. Edward M. Kennedy. Married, by then, to his wife, Dede, with whom Feinberg has three children, he found that starting a family prompted "considerations of financial security." He left public service for private practice, where he did well but -- as he would write in a 2005 book, "What Is Life Worth?" -- he felt "restless."

Enter injury and suffering.

In 1984, Jack Weinstein, a federal district judge in Brooklyn, invited Feinberg to help settle a long-standing dispute between thousands of Vietnam War veterans claiming injury from exposure to Agent Orange, and chemical companies that were involved with manufacturing the herbicide. Weinstein says he was impressed by Feinberg's ability to grasp "how people acted and why they did what they did." Feinberg, who had no mediating experience, worked with both sides and a settlement of $180 million was reached. It was then that he discovered the peculiar satisfaction of mediation: mastering the material, finding the middle ground, getting two antagonistic parties "to yes."

"That one case, Agent Orange, changed my entire professional career," says Feinberg, who found himself negotiating claims involving asbestos, breast implants, heart valves and other products. He launched a firm devoted to dispute resolution, work that was challenging and lucrative.

In 1999, he was called to rule on the value of the original film that captured the assassination of John F. Kennedy. "Abe Zapruder was there. And he caught it. By accident! So the government seized it as a historical treasure. . . . What's it worth?" says the special master animatedly, doing a vivid imitation of the whirring noise of an old 8mm projector. Feinberg was part of an arbitration panel that ruled the Zapruder heirs should be compensated $16 million, thereby giving him a role in even that 20th-century tragedy, albeit years afterward.

* * *

On the day of the 2001 terrorist attacks, Feinberg was at the University of Pennsylvania law school, teaching a class. His older son was in law school at NYU and his daughter at Georgetown, so his first concern was to make sure the two were safe, which they were. A week or so later, he came across an article describing the idea of a victim compensation fund. Moved, as many Americans were, to service, he called a Capitol Hill contact and volunteered to administer it, and to work without pay. He felt it would be wrong -- and would detract from his credibility -- if he were paid.

Once appointed, Feinberg embarked on town-hall-type meetings with families stunned and paralyzed by loss, approaching them head on, brisk and direct. "The communication style I'd developed over the years proved less than ideal for this new challenge," he would later acknowledge in his memoir. He was criticized as cold, unfeeling, arrogant and worse. "Verbally he would get abused: 'Who are you? Get the hell out of here,' " recalls his law partner, Michael Rozen, saying that Feinberg was "completely unfazed."

"There's nobody I've ever come across who is as truly unflappable as he is."

The criticism did hurt, though -- Feinberg acknowledges this in his book -- and he learned to moderate his approach. "What happened through this whole process was a sensitizing and softening," says Dede Feinberg. He changed minds as he knocked on doors, "begging" survivors to apply for the money.

Then, as now, he was charged with enforcing a law hastily passed by Congress in response to crisis. The purpose of the victim compensation fund was twofold: assuage the financial needs of families, and forestall lawsuits against the airlines. To satisfy the second purpose, Feinberg had to assign a compensation amount based on the victim's likely lifetime earnings, meaning that families of bankers and traders typically got more than families of busboys and cooks, an inequity he disliked enforcing.

In the course of setting dollar figures for lives, Feinberg also met privately with survivors. If they wanted to replay the last phone call their loved one had placed, he listened. If they wanted to reminisce or rage, he listened.

During these encounters -- he would sometimes walk around the block to clear his head -- he was struck by how people react to tragedy in varied ways, some losing faith in God, some gaining it. He was also struck that a predominant emotion expressed -- along with anger and grief -- was love.

After 33 months of meeting with families, securing 98 percent participation in the fund, Feinberg writes that he is still reluctant to probe how the experience altered him, because revisiting it is so painful. Dede Feinberg says it was not his nature to talk about what he was hearing and seeing. "He certainly did not come home and just unburden to me," but would "sit in his chair and just listen to his music."

Feinberg will say that he has become skeptical about planning for the future, aware, now, that life's vagaries -- a casual decision to get to work late, or hurry in early -- can change everything. He felt he could not continue practicing law in the same way; giving employees and colleagues a lot of notice, he and Rozen downsized the firm. He wasn't taking a vow of poverty, but he wanted to focus on cases with some public service component.

Then in April 2007, when a deranged gunman killed 32 students and faculty members, then himself, at Virginia Tech, Feinberg was asked to set up a system to dispense the money pouring in for the families of those victims. "There's no way you immunize yourself from the emotional trauma" of meeting with people who have lost children and spouses to violent attack, says Feinberg, who found himself doing it all again: travel, grief, meetings, money. Catherine Read, whose stepdaughter, Mary, was killed, attended a meeting with Feinberg and felt he was "very good about letting people say their piece." She recalls that he made a point of explaining that each life would be valued equally, that

"everybody counted the same." To Feinberg, it was a great relief that he "didn't have to explain why somebody was worth more than their next-door neighbor."

\* \* \*

When he was asked by the Obama administration to set executive pay at bailed-out companies, Feinberg once again faced a constricting and even conflicting legal mandate. Once again he was tasked with estimating the value of an individual, though in this case, "I'm not deciding the value of a work *life* -- of a work life -- I'm deciding the value of one person's compensation for one year."

The statute requires him to rein in pay and avoid short-term rewards that encourage risk-taking, while making sure that companies can compete in the hiring marketplace. This is why he cannot slash executive pay to, say, nothing, or even to levels commensurate with what most Americans earn. The fear is that if pay is cut too drastically, executives will go "across the street" to a competitor, and the taxpayer-supported firms will founder.

Assuming his duties last June, Feinberg asked companies to submit proposed pay structures. In virtually all cases, according to a report he released in October, companies came in with figures higher than he was willing to accept. "What surprised me most is the gap between perceptions on Wall Street and perceptions on Main Street," Feinberg says. "It's not a gap. It's a chasm."

What followed were still more meetings: with government officials, with firms. Feinberg reduced cash salaries and further compensated many execs with stock that could only be redeemed, in three annual installments, beginning two years after it was awarded, ensuring a more long-term stake in company performance.

His cuts drew varying reactions. He says the public is supportive and often would like to see them go deeper: He hears from citizens "constantly," getting letters and e-mails saying things like, "I'm unemployed, my whole community is devastated by the economy and they're asking for millions." Some commentators have pointed out that cutting salaries at a handful of bailed-out firms isn't going to alter the bonus culture on Wall Street, and that even with pay restrictions, many executives will still receive millions.

Alternately, employees at AIG accused him of hurting company morale; Vice President and General Counsel Anastasia Kelly quit in response to pay reduction. When Feinberg talked outgoing Bank of America chief executive Ken Lewis into forgoing his salary for 2009, a spokesman said Lewis thought it wasn't in the best interest of Bank of America to get into "a dispute with the paymaster," a word that carried a whiff of derision. Two of the seven, Bank of America and Citigroup, scrambled to pay back TARP and escape the pay limits in 2010.

Feinberg, as before, is not taking any pay for his work. A framed opinion piece in his office pointedly notes that financiers have not been nearly so willing to forgo income while working to fix the economic mess. Feinberg himself is reluctant to criticize the executives whose worth he is assessing (he now must look at 2010 pay): "Do not underestimate the emotions associated with arguments over pay. It is not greed alone. Maybe there's some greed. I don't deny that. But there is a much deeper argument about a person looking in the mirror and saying to herself: What am I worth?" To him, compensation, in our country, is a "surrogate for worth." That was true during 9/11 and it's true now.

Asked whether negotiations have been congenial, he hesitates.

"I wouldn't say congenial. They've been cooperative. Congenial, no. They've been cooperative. There's a good deal of internal unhappiness . . . but I think everybody agrees we've got to get by this and move on."

Move on to what? One hesitates to ask. One shudders to think. Please, let the special master move on to routine paid work; let the special master have plenty of time with his family. Let nothing else happen. please, that would require the special master to occupy yet another public role in yet another crisis. "I agree with that!" exclaims the special master. "I keep saying that. I hope this is the last emergency."

# THE NEW YORKER

OUR LOCAL CORRESPONDENTS

## THE CALCULATOR

*How Kenneth Feinberg determines the value of three thousand lives.*

by Elizabeth Kolbert

NOVEMBER 25, 2002

A little more than a year after September 11th, Kenneth Feinberg, who holds the title of special master of the Victim Compensation Fund, met with a group of firefighters in his midtown office. Feinberg, who is fifty-seven, has a long face, a prominent forehead, and an abrupt manner. Standing, he appears to be straining forward, and even when he is sitting down he leans in, as if about to get up again. That morning, Feinberg had taken off his jacket, and he greeted the firefighters in his shirtsleeves. His gold cufflinks—a gift to himself—were embossed with the scales of justice.

The first of the men to speak was a burly firefighter with a ruddy complexion. He had spent four weeks at the World Trade Center site, initially trying to rescue victims and then to recover remains. He told Feinberg that whatever he had breathed in during that time—pulverized glass, concrete, lead, traces of asbestos; "I call it a bunch of crap," he said—had reduced his lung capacity by more than fifty per cent. He coughed throughout the session.

"Sleeping's tough," he said. "When I'm getting depressed, my wife calls it 'the mood.' She takes the kids out." The fireman told Feinberg that he had recently had to quit the F.D.N.Y. and had taken a job monitoring security cameras at a school. "I can't play street hockey, can't play ball—my son, he can't understand why Daddy can't do nothing."

"This is what I take every day," he announced, holding up a freezer bag filled with medications. "There's a bunch of pills, there's nasal sprays, there's steroids, there's inhalers." He extracted some more medicines from a fanny pack. "This is what I keep on me all the time: albuterol, epinephrine—it's a self-stick. If it gets really bad, I've got to hit this and go to the hospital."

Eventually, a second firefighter—a slight man who sat slumped in his chair—spoke up. He explained that he had spent the afternoon of the attack sifting through the ruins of the World Trade Center concourse. "We were trying to dig this person out of the dirt and the debris and the dust and the smoke. You saw the astronauts on the moon, that dust surface? That was what was coming into your face. Three weeks later, I was coughing up blood, dirt, debris. Since then, I've been in the hospital three times. It's affecting my liver, my pancreas, my stomach, and nobody can really

give me a definite answer why. My eleven-year-old son, he asks his mother, 'Is Daddy going to die now?' "

The Victim Compensation Fund, or V.C.F., as it is known, expires a year from next month. Between now and then, it is expected to issue checks to some three thousand families. The fund is the first of its kind, and, to the extent that it has a logic, Feinberg, as special master, has imposed it. It is Feinberg who drafted the rules for disbursing the fund, Feinberg who is determining how the rules are administered, and Feinberg who will hear appeals from people unhappy with the way the rules have been applied. In the case of victims like the firefighters, whose ailments did not manifest themselves until days, or even weeks, after the disaster, Feinberg has the authority to decide not just how much compensation they will receive but whether they will get any at all. By most estimates, the bill for the fund will eventually run to five billion dollars, though it is possible that it could be a good deal higher. How much higher is, once again, entirely up to Feinberg, who has been granted what amounts to a blank check on the federal Treasury.

Anyone in Feinberg's position would have found himself at odds with some of the victims' families; Feinberg has managed to infuriate just about all of them. "I've heard you say that you couldn't put yourselves in our shoes," a widow told him publicly a few months ago. "I think if you could feel our pain for one hour your tone and your mannerisms would be so drastically different than what they are." At the same meeting, a man who had lost his wife and niece said, "You have an arrogance about you that is so painful, you can't possibly believe." Feinberg, who is a lawyer by training, has spent most of his adult life immersed in disaster, and during that time has priced almost every imaginable form of human suffering, from birth defects and infertility to asbestosis and death. If the anger upsets him, he doesn't show it. "Everybody rants and raves," he told me.

The day Feinberg met with the firefighters, he listened, apparently unmoved. While they related their symptoms and fears, he jiggled his knee. He consumed two Halloween-size packages of Necco wafers, then stuffed the wrappers into a plastic cup. When the men were done, they asked him if he had any questions. He shook his head and showed them to the door.

Congress created the Victim Compensation Fund just ten days after September 11th. During the hurried negotiations, several candidates to manage it had been mentioned, including John Danforth, the former senator from Missouri, and George Mitchell, the former senator from Maine. Feinberg took a look at the legislation and decided, as he put it to me, "I've been trained for the last twenty years to do this." He rang up Senator Chuck Hagel, of Nebraska, an old friend of his. "The minute I called, he said, 'I know why you're calling,' " Feinberg told me. " 'You're the man.' And he took it from there."

Feinberg grew up in Brockton, Massachusetts, where his father sold tires, and he still speaks—usually emphatically—in an unreconstructed Boston accent. As a kid, he performed in amateur theatricals, and even considered becoming an actor, but after attending the University of Massachusetts he decided, on the advice of his father, to go to N.Y.U. Law School instead. Feinberg clerked for the then chief judge of New York, Stanley Fuld, and later served as Edward Kennedy's chief of staff. He now lives in Bethesda, Maryland—he and his wife, Diane, have three grown children—in a house with a specially designed sound room where he keeps six thousand classical-music CDs. Before September 11th, he routinely got up at 5 A.M.; these days, he is often awake at three. He is in the office by six.

Oddly enough, Feinberg arrived at his current specialty in large part thanks to a talent for burlesque. In the early nineteen-seventies, at a birthday party for Fuld, Feinberg delivered a roast that impressed Judge Jack Weinstein, of the federal district court in Brooklyn. Weinstein and Feinberg became friendly, and a decade later, when Weinstein took over the Agent Orange case, he asked Feinberg if he would try to persuade the two sides to settle, so that the case wouldn't have to go to trial.

At the point that Weinstein brought Feinberg into it, the Agent Orange case was in its eighth year. It pitted hundreds of thousands of Vietnam veterans who had been exposed to the defoliant, and who had contracted diseases ranging from skin ailments to abdominal cancer, against the federal government and the herbicide's manufacturers, including Dow and Monsanto. Virtually no one on either side believed that an agreement could be reached. Nevertheless, Feinberg threw himself into the project, producing an eighty-page proposal in a few weeks. Both sides rejected it. They remained separated by a host of issues, most significantly money—the veterans were demanding a billion dollars, while the chemical companies refused to pay more than a few hundred thousand—and it appeared that a trial could not be avoided. At 3 A.M. on the day that jury selection was set to begin, they finally settled.

"Ken revealed himself as a superb negotiator," Judge Weinstein, who is eighty-one and still serving on the bench, told me. "He was very tough. He understood the case completely, better than either side's lawyers." The night the

settlement was reached—the sum ultimately agreed upon was a hundred and eighty million dollars—Weinstein had taken a hotel room in Manhattan, and, just before dawn, he informed Feinberg that he could announce the deal. Weinstein recalls him bouncing on the bed: "He was very excited."

The Agent Orange case was precedent setting. It greatly expanded the possibilities of class-action lawsuits—some would argue disastrously so—and it was followed by a string of other so-called mass-tort cases. Rare was the large, high-profile settlement that Feinberg was not involved in. He was the special master in the DES case, which had a thousand plaintiffs, and he played a similar role in the case of the Dalkon Shield I.U.D., which had two hundred and fifty thousand. Feinberg served as the negotiator for Dow Corning when it was sued by four hundred and fifty thousand women over breast implants, and successfully negotiated the resolution to hundreds of asbestos cases. In the process, he earned a reputation of being highly effective and unusually abrasive.

"He had a style which conveyed a great sense of displeasure at your stubbornness or lack of understanding," Judith Vladeck, an attorney who represented Long Island Lighting Company ratepayers in another case that Feinberg mediated, told me. "It wasn't 'I don't agree with you.' It was 'What's wrong with you, how dumb can you be?' There was a firmness which I can appreciate now, but which I didn't enjoy being a victim of." In 1993, Feinberg left the law firm of Kaye, Scholer, Fierman, Hays & Handler, where he had been a partner, and formed his own firm, the Feinberg Group, with offices in New York and Washington.

Over the years, Feinberg has worked out a method for dealing with sprawling, complex cases, the key element of which he describes as stripping away the complexities. Under this method, individual circumstances are reduced to numbers, so that the whole settlement can be expressed in a set of tables. "The way you divvy up the money is to come up, to the extent you can, with an objective allocation formula," Feinberg told me. He offered the Dalkon Shield case as an example: "We had a matrix—here's what you get. A hysterectomy's worth this, pelvic inflammation's worth this, cervical cancer's worth this, migraine headaches are worth this. Demonstrate medically you've had any of this, and we'll pay you."

Numerically speaking, September 11th is much less daunting than most of the other cases Feinberg has been called upon to settle. "I mean, thirty-three hundred dead and injured is almost quantitatively not a mass tort," he observed. But the rawness of the emotion is something that Feinberg acknowledges he has never before experienced. "I made a very wise decision when I took this job," he told me. "I'm doing this for nothing. I love it when senators or congressmen come up to me and go, 'Ken, what a sacrifice that you're doing this for nothing, in the public interest, that's fabulous,' when of course the real reason I did it in the public interest— It *is* fabulous, if I do say so, it *is* a sacrifice. But, as a Machiavellian matter, can you imagine if these families knew I was getting paid for this, on the blood and bodies of the dead? 'You're only giving me three million, what did you make?' As a Machiavellian matter, I just completely undercut that whole line of criticism by telling people, 'I'm not getting paid for this, you know.' "

During the past year, Feinberg has held several dozen question-and-answer sessions with victims' families, mostly in the New York area but also in Boston, Washington, and Los Angeles. At these sessions, Feinberg explains the workings of the fund and listens to families' concerns, a process that often involves taking a good deal of abuse. On a recent sleety night, I drove out with him and his oldest son, Michael, to a session he was holding on Staten Island. Feinberg had already been out to Staten Island twice; the first time, a man had made what Feinberg, who is Jewish, considered to be an anti-Semitic remark. Michael, an N.Y.U. law student, was accompanying him to the third session to lend moral support.

"Staten Island, that's a Third World country," Feinberg told me, more than once, on the drive out. The meeting, at the Staten Island Hilton, was set for seven o'clock, and Feinberg hadn't had dinner, so before heading into the session he stopped at the hotel gift shop to buy a package of Chuckles for himself and a Snickers bar for Michael. In the lobby, he ran into several people he knew—there are some family members who follow him around from session to session—and he greeted them with wry heartiness. I sat down next to two men, both of whom had lost sons who were firefighters.

"You'll hear it said many times here that people don't care about the money, and it's true, we don't," one of them told me. "But somehow the higher the amount, the more value then put on your loved one's life, the more meaning it has. So I would like them to say we all get a trillion dollars, just so I know my son was worth a trillion dollars, not that I would ever want it."

"That's right," the other man said. "You can't put a value on your son's life, but then they come out with these

astronomical figures, and—well, you're not going to get that because of this, that, and the other reason. They kind of promise you something, but they don't deliver." A lot of families, the man added, "feel that this program is just a coverup to bail out the airlines, to bail out the Port Authority, to bail out New York City. It's for them, it's not really for us."

The Victim Compensation Fund was in fact created not for the victims' sake but for the airlines', and, more specifically, for protecting the airlines *from* the victims. In the days after September 11th, the country's major carriers were facing not just billions of dollars in immediate losses but tens of billions of dollars in potential legal claims, and lawmakers were worried that the nation's entire transportation system could collapse. They responded with the Air Transportation Safety and System Stabilization Act, which granted the carriers five billion dollars in cash and ten billion in loan guarantees. The act also limited the airlines' liability for the disaster to the amount of insurance that had been carried by the four hijacked flights. (This is generally believed to be a total of six billion dollars.) It was in a subsection of the bill that Congress created the V.C.F. Families who accept the payments from the fund relinquish the right to sue the airlines, the Port Authority, which owned the World Trade Center, and any other domestic entity; in return, they are supposed to receive from the government compensation for their pain and suffering and for their economic losses.

At the Staten Island meeting, the first few questions put to Feinberg were technical ones. Under the law, payments from the V.C.F. are supposed to be reduced by the amount of compensation that families have received from other sources, and one woman wanted to know whether a certain type of death benefit would count as an offset. (Feinberg has defined offsets to include life insurance and Social Security, but not the sums—in many cases, considerable—that families received from charity.) A man asked who should file a claim with the fund in the case of a family whose members were feuding.

Soon, however, the tenor of the questions shifted. A woman stood up at the microphone, holding a large photograph. "I'm the parent of a single firefighter," she said. "This is my son. Before he became a probationary firefighter, he served his country for five years in the United States Marine Corps, making sub-poverty-level wages. He then joined the Fire Department as a probationary firefighter and he graduated to making poverty-level wages. I would like to know why someone in his category is really being discriminated against regarding what you and the Victim Compensation Fund consider his life was worth?"

A few minutes later, a second woman, who had lost her sister, declared, "I just want to say that it's really a disgrace that a year and some months after the tragedy happened we're still all fighting." Addressing herself to Feinberg, she went on, "We've suffered enough. Why are you making our lives even more complicated? Make something easy, make everyone happy. I know you're all about the numbers, and the statute, and the regulations, and this computation, and this deduction, and 'This doesn't count,' and 'Please come to me and make your plea to me.' We don't need to make a plea. We're not begging for money. We want our people back."

Feinberg told the woman he could not bring people back, and he could not make them happy.

"Yes, you can," she insisted.

"No, I can't," he repeated. "I can't make you happy."

"But your children are alive and breathing, right?" someone called out.

"Thank God," Feinberg said, casting a glance in Michael's direction.

❝ Explanation of Process for Computing Presumed Economic Loss" is one of a series of papers that Feinberg has posted on the V.C.F. Web site. In it, he provides the formula that he will be using for compensating families, as well as an explanation of the assumptions underlying it. Much of the document is abstruse—at points, it seems, even deliberately so. At the end, however, Feinberg, in keeping with his usual practice, resolves these complexities into a set of tables. Using them, anyone can plug in a few basic facts about a victim—his or her age, income, and number of children—and derive an estimate of what the fund can be expected to offer the family.

At first glance, the tables defy most notions of equity; the more needs a family is likely to have, the less well it fares. For example, the tables show that the widow of a twenty-five-year-old who had no children and was earning a hundred and twenty-five thousand dollars a year can anticipate a payment, before any offsets, of nearly four and a half million dollars. The widow of a man who was earning the same salary and was similarly childless but was forty can expect half that amount, while the widow of a forty-year-old who was making fifty thousand dollars and had one child can expect a quarter of it. Finally, the widow of a forty-year-old with two dependent children who was making twenty

thousand dollars does worst of all. She can expect about a fifth, or slightly more than nine hundred thousand dollars.

When Feinberg is questioned about these sorts of inequities, he responds, invariably, that his hands are tied. "What you're really asking is: All lives are equal, why isn't everybody getting the same amount of money?" he told the mother with the photograph on Staten Island. "A very fair question, ladies and gentlemen. The answer is: Congress told me that is not the way to compute these awards. Congress said you must take into account the economic loss suffered by the victim's death." This claim is a useful one for Feinberg, and, up to a point, also accurate.

Aside from the inequities, what is most striking about Feinberg's tables is that a lot of numbers are missing. In those rows where the economic losses would be the greatest—low age crossed with high salary—instead of posting numbers Feinberg has put rows of "X"s. Moreover, he has declined to publish any figures at all for victims who earned more than two hundred and twenty-five thousand dollars a year.

It is unclear exactly how many victims Feinberg has left off his tables, but because the World Trade Center housed several large financial firms, where relatively young men and women routinely earned hundreds of thousands of dollars a year, the number is almost certainly a high one. Following a strict economic-loss calculation, some of these victims' families would be entitled to payments of ten, twenty, and, in a few cases, even thirty million dollars from the government. This, apparently, is what lawmakers mandated when they created the V.C.F., but it is not, it seems clear, what they—or just about anybody else—actually want to see happen now. Feinberg noted to me that both Senator Kennedy, a Democrat, and Senator Hagel, a Republican, had offered him the same advice on this point, which he summed up as "Don't let twenty per cent of the people get eighty per cent of the money." Exactly how Feinberg intends to treat what he calls the "high-end" families is not known—he keeps putting off resolving this issue—but he has indicated that, except in extremely rare cases, he is not going to give out awards of more than six million dollars.

Not surprisingly, Feinberg's position has infuriated the families of the most highly paid victims, who accuse him of acting arbitrarily, unfairly, and, finally, illegally. One day, I was sitting in Feinberg's office when a man whose wife had earned nearly four hundred thousand dollars a year came in to appeal his award. After several million dollars in offsets because of a life-insurance policy, the man was set to receive two million dollars. He felt he deserved at least another million. Feinberg asked the man whether he thought payments ought to be made solely on the basis of income, even if this meant that some already affluent families would receive ten million dollars in taxpayer money.

"Yes, absolutely," the man responded. "The idea is to compensate me so my life style doesn't change, and my life style is different from a guy washing dishes. I don't live in a two-hundred-and-fifty-dollar-a-month apartment. I live in a place that costs me five thousand dollars a month in mortgage payments."

Cantor Fitzgerald, the bond-trading firm that lost six hundred and fiftyeight people in the attack, has issued an eighty-page critique of Feinberg's handling of the fund, which notes that Congress instructed him "to determine economic loss—not to make value judgments about different groups of income earners." Stephen Merkel, the firm's general counsel, told me that Feinberg had sought "the power to make awards on whatever basis he feels like" and that his actions demonstrated "a complete disregard for the law itself." When confronted with criticism of this sort, Feinberg offers precisely the opposite defense from the one he gave the mother on Staten Island.

"The law gives me unbelievable discretion," he says. "It gives me discretion to do whatever I want. So I will."

Perhaps because of this discretion, a number of conspiracy theories swirl around Feinberg: that he has cut a nefarious deal with the Bush Administration, that he is secretly taking orders from Attorney General John Ashcroft, that—and this is really a subset of the first two—he is using the Victim Compensation Fund to advance the cause of tort reform. Although Feinberg is an outspoken, Teddy Kennedy-style Democrat, he was appointed special master by Ashcroft, a conservative Republican, who also—theoretically, at least—has the power to un-appoint him. At every opportunity, Feinberg praises Ashcroft, calling him his "No. 1 ally." When I asked him how he and the Attorney General had managed to bridge their not inconsiderable political differences, he smiled and said, "It's either a tribute to bipartisanship or very Machiavellian, or a little bit of both."

Feinberg uses the word "Machiavellian" to refer to his own actions surprisingly often. The first time I heard him do so, I was puzzled; by the third or fourth time, I realized that he didn't mean it as self-criticism. During the weeks that I followed Feinberg around, I attended half a dozen meetings at his conference table, at which a total of about thirty cases were discussed. Feinberg was by turns gentle and hostile, confiding and withholding, depending on what seemed most efficacious. With awards below the average—currently about $1.5 million—he was almost always willing to add

a few hundred thousand; on one occasion, I heard him promise to give a widow an additional half million dollars for no other reason than that she had come in with her two small children and asked for it. As far as I could make it out, Feinberg's reasoning in these cases amounted to: Let's do what seems to work, and worry about how to justify it afterward. With awards in the very upper reaches, by contrast, he was staunchly, even theatrically, recalcitrant. One lawyer told Feinberg that he had calculated the proper payment for his client to be between sixteen and seventeen million dollars.

"You've lost your fucking mind!" Feinberg exclaimed. "This guy should file a suit."

"He might—you're giving him every reason to," the lawyer replied, calmly.

"I want him to!" Feinberg said. "And do me a favor—hold a press conference. Say I wouldn't give the guy sixteen million dollars—tax free!"

So far, only about eight hundred families, or a quarter of those eligible, have submitted claims to the fund, a proportion that is lower than Feinberg would like, but one that he maintains he is not, at this point, particularly concerned about. Feinberg's stated goal is to have ninety per cent of the families accept payment from the fund, and so relinquish the right to sue the airlines, the Port Authority, or the City of New York. Accepting the payment doesn't necessarily mean being happy with it, or even feeling that it is fair; it just means recognizing that it is better than the alternative, which is years of litigation and a high risk of getting nothing. "Who's going to fight?" Feinberg told me. "No one's going to fight."

One evening after a series of meetings with victims' families, I stayed behind to talk to Feinberg. We sat in the empty conference room, which offered a view of several lanes of rush-hour traffic and a sliver of the East River. I asked him for his own views on the fund and whether it was structured fairly. Was it right for some families to receive huge payments while others, who needed help much more, received comparatively little? This was, he said, an "interesting and debatable" question, but by no means the most difficult one, which, in his opinion, was whether the fund should exist at all.

"I'll show you e-mails from people that'll break your heart," he told me. " 'Dear Mr. Feinberg, my son died in Oklahoma City. Why not me?' 'Dear Mr. Feinberg, my son died in the first World Trade Center bombing, in '93, why not me?' Anthrax—why not me? African Embassy bombing—why not me? U.S.S. Cole—why not me? And then you get even beyond terrorism. 'My husband died last year saving three little girls in a Mississippi flood—why not him?' " If there was an essential distinction between September 11th and these other tragedies, Feinberg didn't offer it. "Where do you stop?" he asked. We talked for a while longer, and then Feinberg told me, politely but firmly, that he had to leave. He was meeting Michael, and they were going to the opera. ♦