

**STATE OF ALABAMA**
**OFFICE OF THE ATTORNEY GENERAL**

TROY KING
ATTORNEY GENERAL

500 DEXTER AVENUE
MONTGOMERY, AL 36130
(334) 242-7300
WWW.AGO.STATE.AL.US

November 16, 2010

Mr. Kenneth R. Feinberg
Feinberg Rozen, LLP
The Willard Office Building
1455 Pennsylvania Avenue, Northwest
Suite 390
Washington, D.C. 20004-1008

**TRANSMITTED VIA E-MAIL**

Dear Mr. Feinberg:

I am in receipt of the working draft of your Gulf Coast Claims Facility Protocol for Interim and Final Claims dated November 1, 2010. This document, like previous versions of it, is far out of touch with the real world needs that you should be meeting. The startling revelations that you are being paid $850,000 a month by BP only serves to underscore the concerns I have repeatedly expressed publicly that you have every reason to act on behalf of BP and at the expense of those they have harmed.

After reviewing the latest draft of your protocol, I remain convinced that your protocol is unfair to Gulf Coast residents and businesses whose rights are being ignored, if not trampled, by it. You shamefully continue to cede the concessions won by Gulf Coast Attorneys General to your benefactor, BP. For example, whereas BP committed to the Attorneys General that they would pay 100% of any claim attributable to their Deepwater Horizon disaster, you have made public comments that change by the day regarding your intent to discount claims based on how far away from the water they arose. Such arbitrariness accrues to the detriment of those who are depending upon you to live up to your word as an "independent" administrator. The Attorneys *General* won a further concession from BP that they would not require anyone receiving a payment from them to execute a release. Inexplicably, you persist in requiring (and your current protocol appears to provide for) unsolicited final offers with a full release of legal rights to the benefit of BP and "other potentially responsible or liable parties."

EXHIBIT

T

November 16, 2010
Page Two

        Families and business claimants continue to find themselves in more and more desperate financial straits as a result of your delays.  It appears that they may ultimately be forced to accept under-compensation.  Perhaps that is the point.  Residents and business owners should not be asked, nor should they be forced by you, to settle their claims cheaply because your process failed them.  Moreover, the Gulf Coast Claims Facility and your protocol still fail to provide adequate transparency regarding the processing of claims.  It seems only reasonable that, if a claimant is being asked to forever waive his right to sue BP and other responsible parties, he should understand how and why his damages were calculated by the Gulf Coast Claims Facility.   With no published calculation formula, your protocol lacks transparency and legitimacy.

        Perhaps of even greater concern, your protocol is misleading.  Specifically, your protocol does not provide remedies for negligence, gross negligence, punitive damages, nuisance, trespass, or any other statutory or common law remedy outside the parameters of the Oil Pollution Act of 1990.  Yet, pursuant to paragraph two of the Release and Covenant Not to Sue document, your protocol attempts to waive all rights that a claimant might have to bring suit under any of these theories.  Claimants should not be led to believe that they are being compensated for damages which lie beyond the scope of your protocol.  Significantly, paragraph three attempts to release all other responsible or liable parties even though the full extent of their responsibility has not yet been determined.  Conveniently, while claimants give up their legal rights to these known or unknown parties, those parties still retain their rights or responsibilities of contribution, subrogation, indemnity, or "any other law."  It is incredible that your release would insist that a claimant agree that their payment is "made without any admission of liability or wrongdoing by BP or any other released party."  BP has repeatedly admitted on national television (and has even been formally designated by the federal government itself) to being a party responsible for this disaster.  It is incomprehensible why you have drafted a document to protect and benefit the reputation of the perpetrators of this tragedy at the expense of their victims' legal rights.

        There are a number of issues of concern that I call to your attention.  If there is any geographic scope or other restrictions which your staff will be instructed to use to uniformly deny claims, you should state this now.  It would be unconscionable to force a group of claimants who have already waited many

November 16, 2010
Page Three

months into a further ninety-day waiting period.  There is only one explanation for this attempt to delay justice and these claimants' entrance into the court system – to further compromise their claims.  I ask you to please confirm that the payments will not be delayed unnecessarily. Given that it is within your authority to shape the claims process as you alone see fit, please confirm that you are not going to rely on the ninety-day language as an excuse to delay the processing and payment of interim claims.  It is unacceptable that the Gulf Coast Claims Facility might take up to ninety days to make a determination on a final claim, thereby asking claimants to allow their bills to pile up for a period that is longer than the entire amount of time it took BP to plug their gushing well.  Please commit that you will not send unsolicited final offers only to delay sending an interim claim check.  Please verify that BP has no veto power over any GCCF payments. It is your responsibility to ensure that your staff understands and abides by the rules of ethical conduct in Alabama which prohibits contact with represented parties.  I ask that you not make requests for unnecessary and confidential information such as retainer agreements.  I ask you to confirm that your staff will not have direct contact with represented clients. I ask you to commit that it will not be necessary to apply for an emergency advance payment in order to receive an interim payment.  I also ask for your assurances that, whatever final protocols are promulgated by you, they will, in fact, be followed by your staff.

It is regrettable that you continue to exclude those with the greatest knowledge and interest in this process from the process. As Attorneys General, we have repeatedly offered to lend our legal and technical expertise in matters such as this to you.  However, you have not accepted our offers or our recommendations.  Instead, you have continued to work in isolation and your product shows it.  While I never believed you were sincere, initially Alabama Governor Bob Riley bought your line.  His Director of Homeland Security, Jim Walker, welcomed you to the Gulf Coast by assuring Alabamians that "[h]e doesn't work for BP … he works for the people of the Gulf Coast" – he even referred to you as "your attorney, your lawyer, your advocate, Mr. Ken Feinberg."  You, yourself, told Gulf Coast residents that you were their "fiduciary."  You have proved to be none of these.  Now, even Governor Riley has come to call your process and the way it is being implemented "extortion."

November 16, 2010
Page Four


        I call on you again to devise and implement a strategy and a protocol that is in the best interests of those you will be paying, not those who pay you.  If you would like to discuss this matter further, please do not hesitate to contact me.

                                        Sincerely,

                                        Troy King
                                        Attorney General

TK:oi

cc:     Honorable Bob Riley, Governor of Alabama
        Honorable Jim Hood, Attorney General of Mississippi
        Honorable Buddy Caldwell, Attorney General of Louisiana
        Honorable Bill McCollum, Attorney General of Florida
        Honorable Greg Abbott, Attorney General of Texas



**Email Address:**
replyVAVLC@googlegroups.com

**Mailing Address:**
1570 The Alameda Suite 212
San Jose, CA 95126

August 13, 2010

Kenneth R. Feinberg
Feinberg Rosen, LLP
1455 Pennsylvania Avenue, N.W.
Suite 390
Washington, DC 20004-1008

      RE:    Gulf Coast Claims Facility Draft Protocol

Dear Mr. Feinberg,

      We are writing on behalf of the Vietnamese American Volunteer Law Corps ("Law Corps") to offer comments to your draft protocol for the Gulf Coast Claims Facility ("GCCF"), dated July 9, 2010 ("Draft Protocol").[1]  We hope that this letter will be implemented in establishing a claims process that is more equitable, transparent and just than the existing BP claims process while being compliant with the statutory mandates of the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701 *et seq.*

      As you may know, the Vietnamese American community is one of the most severely and disproportionately affected ethnic communities by the Deepwater Horizon Oil Incident (or "BP Oil Spill").  Of the 40,000 Vietnamese in Louisiana, Mississippi, and Alabama, one in five works in a seafood factory.  Vietnamese and Southeast Asian fishers make up one-third of all shrimping vessels in the Gulf.   Many also work catching oysters, crabs, and other seafood.   In all, as much as 80 percent of all Vietnamese Americans in this region are affected by the oil spill due to their connections to the seafood industry.  The BP Oil Spill has threatened this way of life for an indeterminate period.  The effects of the Exxon Valdez spill have shown that recovery may not come for 20 plus years.

---

[1] Currently, the Vietnamese American Volunteer Law Corps comprises over 30 bilingual lawyers and law students from over seven different states.  Our membership continues to grow as have our partnerships with legal bar associations, legal aid, and other non-profit organizations from across the country.



1

Given the devastating nature of the BP Oil Spill, the resulting high number of unemployed people in the region, the Gulf Vietnamese American community faces significant legal needs that remain unmet by BP, government agencies and existing community or legal aid organizations in the region.   Our Law Corps was organized to address these concerns and provide services to the Gulf Vietnamese American community affected by the BP Oil Spill on an entirely pro bono basis.

As you already know, the OPA,  unlike other environmental laws such as the Clean Water Act ("CWA"), 33 U.S.C. 1251 *et seq.*, creates a right for private party claimants[2] to directly recover from BP, the responsible party, for certain injuries resulting from the oil spill.[3]  A central part of our Law Corps' mission is to ensure fairness, transparency and justice for affected victims in the claims process mandated by the statute.  With these goals in mind, we have evaluated the GCCF Draft Protocol against the requirements of the OPA. The current Draft Protocol is defective because: in some areas, it contains procedures that are contrary to the OPA; and in other areas, fails to address BP's obligations under OPA altogether.  Specifically, we point out the following:

- The GCCF steps into the shoes of BP, and therefore its claims procedure must meet all applicable requirements of the OPA.

- Under the OPA, the 90-day period for BP to honor a claim began to run when a claimant first submitted its claim to BP, and cannot reset by the GCCF.

- As an agent of BP, the GCCF is not in a position to advise a potential claimant whether or not to file a claim.

- A claimant is entitled under the OPA to make a claim for a sum certain, and any acceptance for a lesser amount does not preclude the claimant from pursuing future recovery for unrecovered amounts with the NPFC or through litigation.

- The requirement that a claimant sign a general release of all rights and claims the claimant may have is contrary to the OPA.

- The Draft Protocol's absolute limitations period is inconsistent with the OPA's limitations period, which incorporates the "discovery rule."

- Advance Emergency Payments under the Draft Protocol do not equate to Interim Payments under the OPA, which allows a claimant to make successive Interim Claims.

---

[2] A "claimant" is "any person or government who presents a claim for compensation under [the OPA]".  33 U.S.C. § 2701(4).

[3] Under the OPA, BP is liable for direct and indirect damages resulting from the spill and the costs of cleaning up the spill. 33 U.S.C. § 2702(a).  Among other things, the OPA allows private parties to recover damages for lost revenues, profits, and earning capacity due to injury, destruction, or loss of real or personal property and nature resources caused by an oil spill.  33 U.S.C. § 2702(b)(2)(D),(E).  Damages also include injuries to real or personal property and economic losses resulting from property damage caused by the spill.  33 U.S.C. § 2702(b)(2)(B).

- A claimant is not required to make non-OPA claims to the GCCF, and settlement of OPA claims have no preclusive effect on non-OPA claims.

- Under the OPA, a claimant is entitled to interest on late paid claims.

- The OPA is a strict liability statute that does not require that a claimant show "proximate cause" in order to recover damages.

- The OPA allows a claimant to submit non-traditional alternative documentation to prove a claim.

Each of these eleven (11) points is explained in more detail below.

1. **The GCCF steps into the shoes of BP, and therefore its claims procedure must meet all applicable requirements of the OPA.**

While the GCCF is funded by an escrow account payable with BP dollars, the GCCF cannot, in any way, abrogate BP's statutory obligations under the OPA or other laws.  The OPA expressly prohibits BP from transferring its liabilities to any other entity or person.  33 U.S.C. § 2710(b).[4]   Moreover, the OPA *requires* that *BP*, as the responsible party, "establish a procedure for payment or settlement of claims for interim, or short term damages."  33 U.S.C. § 2705(a).  The Draft Protocol acknowledges that the GCCF was created to fulfill BP's obligations under the OPA:

> *The GCCF fulfills BP's obligations as a designated Responsible Party to establish a claims procedure*; presentation of a claim to the GCCF satisfies a claimant's obligation to present a claim to the responsible party before the claimant presents a claim to the Coast Guard for payment.

Draft Protocol, FN1 (*emphasis added*).

The Draft Protocol further requires that "[a] Claimant asserting a claim under OPA must first present the claim to the GCCF for consideration and potential resolution (33 U.S.C. §§ 2702, 2713)."  Draft Protocol, ¶III.B.1.  Because GCCF essentially "fulfills" and assumes BP's obligations, it is also bound by the strictures of the OPA, including but not limited to providing the full scope of recovery required by the statute.[5]

---

[4] The OPA has no provisions for transferring BP's obligations to an "independent" third party for establishing a claims procedure.  We also understand that BP is paying your salary and the salaries of your GCCF staff, including all claims processors.   Moreover, based on your statements at the Congressional hearing on July 21, 2010, BP approves the hiring of the GCCF staff and has the right to fire escrow administrator of the GCCF. Based on these facts, the GCCF is not an independent third party.

[5] We agree that the GCCF is non-governmental, and thus its procedures are not necessarily bound by the Administrative Procedures Act ("APA").  5 U.S.C. § 701, et. seq.[5]  However, the OPA establishes a claimant's scope of liability and recovery, which applies to the NPFC Fund, the existing BP claims process, the successor GCCF

Based on these indicia, we cannot but conclude that the GCCF steps into the shoes of BP, as an agent of BP.  As such **no claimant should receive any less compensation in the GCCF claims process than they are entitled to under the OPA.**  In addition, as is consistent with the OPA, no claimant should be required to waive or relinquish any rights that they are otherwise entitled to under the law.[6]

2.  **Under the OPA, the 90-day period for BP to honor a claim began to run when a claimant first submitted its claim to BP, and cannot reset by the GCCF.**

The Draft Protocol states, "[f]or the purposes of presentment requirements under the OPA, the GCCF shall deem a claim presented when a Claim Form is submitted and the Claim Form is sufficiently complete for consideration."  Draft Protocol, ¶ III.B.2.  This provision suggests that the approximately 138,000 claimants who have already submitted a claim to BP, must resubmit their claims to the GCCF, and wait *another* 90 days for the GCCF to pay their claims before their the right to appeal vests.  This is contrary to the OPA.

What the OPA *does* require is that a claimant first presents his claim to *BP*, the responsible party.  33 U.S.C. § 2713(a).  If BP denies liability, or the claim is not settled after either 90 days of presentment of the claim to BP or BP's initial advertisement of the claims process (whichever is later), the claimant has a right to appeal the uncompensated portions of his claim to the National Pollution Funds Center ("NPFC") or in court.  33 U.S.C. § 2713(c)(1)-(2).  BP first published and advertised its claims process in May 2010.  The statute does not allow the responsible party to "re-advertise" a claim through its agent or any other entity, for the purposes of "resetting" this period.

Most have already waited for months without payment.   Any requirement to re-present a claim to the GCCF which has the effect of delaying an appeal to the NPFC or the courts is in clear violation of the OPA.  33 U.S.C. § 2713(a) & (c)(1)-(2).   If, as you say, the GCCF "fulfills BP's obligations as the responsible party," one of these key responsibilities is to pay a claim within 90 days of presentment to BP.  Id; Draft Protocol, FN1.

Also, for those bringing claims to the GCCF for the first time, we request that you clarify that the Draft Protocol's seven (7) day GCCF "Appeals  Board"  period and fourteen (14) day "Payment of Claims" period is folded into the overall 90-day period to settle a claim.[7]  Under the OPA, a claim is settled only "by *payment* within 90 days"—not by agreement on a cash amount.

_____

claims process or any other claims process BP seeks to establish or fund directly or indirectly.  In other words, a claimant's scope of recovery from the GCCF must be the same as the scope of recovery had the claimant made a claim to BP or the NPFC Fund.  For example, appeals from BP or the GCCF are heard by the NPFC to determine whether the costs recovered were consistent with the OPA. [Citation]

[6] These rights include but are not limited to common law claims for nuisance, trespass, negligence, strict liability or citizen suits under the CWA.

[7] *See* Draft Protocol, V.A.2 (90-day time-to-settle procedure), V.D.1 (7-day GCCF appeals procedure), V.E (14-day payment provision).

33 U.S.C. § 2713(c)(2)(*emphasis added*). In other words, if a claimant does not have a check *in hand* after 90 days, he may appeal his action to the NPFC or in court.  This statutory requirement is absolute, and *any* extension of the 90-day period violates the OPA.

Finally, we also bring to your attention that interest on payments starts to accrue *30 days* after a claimant's presents his claim to BP.  33 U.S.C. § 2705(b)(1).  BP, and now the GCCF, is liable for interest on these payments.  A claimant's entitlement to interest on late claims is discussed further in item 9 of this letter.

Memories fade with each passing delay, but the economic needs of the Gulf community do not.  On the contrary, every delay is cumulative, and the economic stress faced by the injured community only becomes more acute with the passage of time.  Thus, we hope that you will make good on your promise to assure claimants speedy payment to the damages for which they are entitled.  In order to do so, the GCCF final protocol must clearly show that the OPA 90-day waiting period for appeals began to run when claimants first presented their claims to BP.

3.   **As an agent of BP, the GCCF is not in a position to advise a potential claimant whether or not to file a claim.**

The Draft Protocol encourages a claimant to visit a GCCF claims office to "seek advice as to whether or not to file a claim."  Draft Protocol, ¶III.C.2 .  This is a clear conflict of interest.  As we stated above, the GCCF steps into the shoes of BP, and is in no position to provide advice to an injured party whether or not to file a claim.  In fact, we cannot contemplate any advice by the GCCF to a claimant *not* to file a claim as legitimately serving a claimant's interest.  This provision should be stricken from GCCF final protocol.

4.   **A claimant is entitled to make a claim for a sum certain, and any acceptance for a lesser amount does not preclude the claimant from future recovery from the NPFC or through litigation.**

The OPA defines a "claim" as "a request, made in writing, *for a sum certain*, for compensation for damages or removal costs resulting from the incident."  33 U.S.C. § 2701(3)(*emphasis added*).  Under the Draft Protocol, it's unclear whether the GCCF claims processor first assesses what amounts the claimant is entitled to, or whether the claimant is entitled to make a claim "for a sum certain," as is claimant's right under the OPA.  Id.  This distinction has important legal ramifications.

If payment or settlement of claims is less than the full amount of damages which the claimant is entitled, the settlement "*shall* not preclude recovery by the claimant for damages not reflected in the paid or settled claim." 33 U.S.C. § 2705(a).  In other words, if a claimant makes a claim for an sum certain, and the GCCF responds to the claim with a settlement offer less than the full amount, the claimant is still entitled under the OPA to accept the settlement and

pursue the unpaid amounts in court or with the federally-sponsored NPFC.  The OPA, in relevant part, states that for uncompensated damages:

> [A] claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled, and full and adequate compensation is unavailable, a claim for the uncompensated damages and removal costs may be presented to the [NPFC] Fund.

33 U.S.C. § 2713(d).[8]

In addition, the claimant may instead elect to pursue a claim for uncompensated damages in court.  33 U.S.C. § 2713(c).  The Draft Protocol should be amended to clearly identify a claimant's right to make a claim for a "sum certain."

### 5. The requirement that a claimant sign a general release of all rights and claims the claimant may have is contrary to the OPA.

The Draft Protocol is inconsistent with the OPA because it requires a general release upon settlement of a claim:

> If the Claimant decides to accept the Final Decision, the Claimant shall return to the GCCF a signed Release. The Release will waive any rights the Claimant may have against BP to assert additional claims, to file an individual legal action, to participate in other legal actions associated with the Spill, or to submit that claim for payment by the National Pollution Funds Center.

Draft Protocol, V.C.

This take-it-or-leave-it release provision is both unconscionable and inconsistent with the OPA, which assures due process for full recovery by a claimant.  The full scope of injury to the Gulf communities is yet to be determined, and waiver of future claims is contrary to the OPA's statute of limitations.  *See* item 6 below.  Specifically, the OPA allows a claimant to bring a series of interim claims for continuing damages.  *See* items 6 & 7 below.   Moreover, the Draft Protocol's release appears to require that the claimant waive his non-OPA claims in order to recover damages for he is entitled to under the statute.  *See* item 8 below.  Because the proposed general release is contrary to the OPA, we ask that you strike it from the GCCF final claims procedure.

### 6. The Draft Protocol's absolute limitations period is inconsistent with the OPA's limitations period, which incorporates the "discovery rule."

---

[8] When these uncompensated portions of the claim are paid by the NPFC Fund, the claimant's right to the uncompensated portion of damages is subrogated to the NPFC and the Attorney General may pursue the responsible party for those damages.  33 U.S.C. § 2715(a)-(b).

The Draft Protocol states that "no claim may be submitted to the GCCF more than three years after [sic] this Protocol becomes operative." This limitations period violates the OPA. The period of limitations for *damages* under the OPA is within three (3) years after "the date on which the loss and the connection of the loss with the discharge in question are reasonably discovered with the exercise of due care." 33 U.S.C. § 2717(f)(1)(A). In other words, a claimant is entitled to submit successive interim claims for damages so long as it is made within three (3) years within *discovery* of the injury. Not only is the OPA's limitations period appropriate in this case—where the long-term effects of the oil spill on the fisheries is yet to be determined--it is mandated by the OPA statute. The GCCF has no authority to set an absolute three (3) year limitations period. As such, we request that the GCCF final claims procedure adopts the statute of limitations periods mandated by the OPA.

**7.   Advance Emergency Payments under the Draft Protocol do not equate to Interim Payments required under the OPA, which allows a claimant to make successive Interim Claims.**

Under the OPA, BP is required to "establish a procedure for the payment or settlement of claims for interim, short-term damages." 33 U.S.C. § 2705(a). Although your proposal to make emergency payments of up to six (6) months to injured parties will help to relieve the claimants of the burdens of having to file claims more frequently, the Draft Protocol's Advance Emergency Payment does *not* equate to Interim Claims as defined by the OPA.[9] Both the proposed Advance Emergency Payments and Interim Claims do not require waiver of further claims, but that is where the similarity ends. Moreover, there appear to be significant differences that have substantial impact a claimant's entitlements to recovery. For example, it appears that the Draft Protocol limits the Advance Emergency Payment to a single payment to a claimant and purports to replace Interim Claims allowable under the statute. In contrast, the OPA allows a claimant to make successive claims for interim damages beyond 90 days subject only to the statute of limitations and built in discovery rule described in item 6 above. 33 U.S.C. §§ 2705, 2717(f)(1)(A). Thus, we request that the final protocol clearly reflect a procedure for interim claims as required by the OPA. However, we would agree with an approach that an interim claim should cover a six (6) month, rather than a month-to-month period.

**8.   A claimant is not required to make non-OPA claims to the GCCF, and settlement of OPA claims should have no preclusive effect on non-OPA claims.**

The Draft Protocol states that "[a] Claimant asserting a non-OPA claim, such as a claim for death or physical injury, *may* also submit a claim to the GCCF for consideration and potential

---

[9] The Draft Protocol states, in error, that '[a]n Advance Emergency Payment is an "interim" payment under OPA.' Draft Protocol, FN1.

resolution." Draft Protocol, ¶II.B.1. (*Emphasis added*).   We note appropriate use of permissive language here.  While we recognize that BP is not required to pay non-OPA claims through the GCCF claims process, neither is the claimant required to bring such a claim to the GCCF.  In other words, a claimant who has both economic damages and death or physical injury claims need not submit these latter non-OPA claims to the GCCF.  The claimant must be able to reserve the right to make a non-OPA claim in another forum, such as in federal court, without the threat of waiving his rights by accepting an OPA claim settlement.  This is contrary to the expansive release language contained in paragraph V.C. of the Draft Protocol (requiring claimants to release BP from "any rights the Claimant may have against BP to assert additional claims" when accepting final settlement).  As written, the Draft Protocol release provision has a preclusive effect on non-OPA claims, which is inconsistent with the OPA.

Any release a claimant is asked to sign upon acceptance of a "Final Claim" from the GCCF should clearly indicate that the releasing party is not releasing any non-OPA claims if such claims are not reflected in the Final Claim.  Claimants must be adequately informed of the distinction between OPA-covered claims and non-OPA claims before signing any release.

For those who opt to submit both OPA and non-OPA claims to the GCCF for settlement, we request that the GCCF final protocol contains procedures which delineate and separately account for these distinct OPA and non-OPA claims.

### 9.   Under the OPA, a claimant is entitled to interest on late paid claims.

The Draft Protocol fails take into a claimant's entitlement to accrued interest on late-paid claims.  Under 33 U.S.C. § 2705(b)(1), BP is required to pay interest on claims not paid within thirty (30) days of presentation.  33 U.S.C. § 2705(b)(3) contains the only exception, where payment is "not paid due to reasons beyond the control of the interest  of the responsible party or because it would no serve the interests of justice, no interest shall accrue under this section during that period." 33 U.S.C. § 2705(b)(3).  Due to the obvious conflict, the GCCF is not in the position to independently make this assessment for when this exception applies.  Thus, we request that the GCCF final procedures reflect claimant's entitlement to interest on claims not paid within thirty (30) days as mandated by the OPA.

### 10. The OPA is a strict liability statute that does not require that a claimant show "proximate cause" in order to recover damages.

The Draft Protocol states that "[t]he GCCF will only pay for harm or damage that is proximately caused by the spill."  Draft Protocol, ¶II.F.  The Draft Protocol further states that "causation determinations will be guided, as applicable, by OPA and other federal law, and the law of the state that would be applicable to a tort claim brought by the Claimant."  Draft Protocol, II.F  These causation requirements are inconsistent with the OPA, which like most environmental statutes is a strict liability statute.  Under the OPA, a claimant need only

8

demonstrate that damages were incurred as a result of the oil spill.  33 U.S.C. §2702(a), (b)(2)(B)-(E).

The Draft Protocol also states that the customer or supplier to a business that is injured cannot make a claim to the GCCF.  Draft Protocol, ¶ II.F. The OPA has no such limitation and permits any claimant who suffers loss revenues from the destruction or loss of natural resources to make a damages claim to the responsible party. 33 USC § 2702(b)(2)(D).

Finally, you had stated in town hall discussions and other media that you intend to employ state law concepts on "business interruption" as a model to structure final settlements.   The majority of state law business interruption claims generally reflect the period of recovery as the period required to restore damaged property back to productive use.  In this case, the individual fisherman's economic loss is tied to damage to a natural resource—the fisheries in the Gulf themselves--rather than privately-held real or personal property.[10]  Currently, the period of restoration of the Gulf waters and fisheries is yet to be determined.  As a result, we ask that you detail in the GCCF final protocol how the GCCF will calculate the period of recovery in a final lump sum settlement procedure.


### 11. The OPA regulations allow a claimant to submit non-traditional alternative documentation to prove a claim.

The standard of evidence required in our justice system of the courts is that of a "totality of the circumstances." Many of those affected have endured horrific losses due to BP Oil Spill and are not engaged in a profession where a detailed document/record keeping system is a necessary component of their job description.  As such, many of the requested documents which the BP claims process requires are either impractical or non-existent.

Our organization understands that you are grappling with complex issues, but time is of the essence. Mortgages, boat payments, car payments, and supporting the livelihood of real families are realities which those on the ground face. Currently, the current BP claim's process requires documentation to support loss. These documents include tax records, trip tickets, wage loss statements, deposit slips, boat registrations, copies of current fishing licenses, business-specific records, photographs, replacement/cleaning receipts, and bookkeeping records. As of July 31, 2010, pursuant to the BP website, there were a total of 138,000 claims, with only 38,000 (or 28%) of those claims paid with at least one payment.  That leaves 72% of claimants unpaid months after the spill without a single payment from BP.

With such an urgent need, an alternative and more flexible means of documentation should be utilized to ensure recovery to which the claimant is entitled under the law.  Declarations, statements, videos, appraisals, valuation reports, and the like should be utilized as this is the

---

[10] The OPA allows a claimant to recover "damages equal to the loss of profits or impairment of earning capacity due the injury, destruction, or loss of real property, personal property, *or natural resources*…"  33 U.S.C. § 2707(b)(2)(E) (*Emphasis added*).

9

standard of proof utilized in our court system. A totality of the circumstances requires that a combination of supporting documents, not only those documents specifically requested by the current claims process, be used to prove economic loss.

You could also decide to create a presumptive award based on governmentally held catch records and industry wide expense ratios and catch splits rates between owner/captain and crew, based on the size of the vessel.  That measure would require no individual determinations at all and would have the additional benefit of extreme ease of application and speed.  We note this concept is supported by the NPFC regulations which take into account "comparative figures for profits or earnings for the same or similar activities outside of the area affected by the incident" for calculating loss profits.  33 CFR § 136.233(c).  This presumptive award can be structured as a claimant "option" that would run in conjunction with a more traditional claims process.


**Concluding Remarks**

This may be the breaking point for the Vietnamese American community in the Gulf if immediate solutions are not in place.  However, we are hopeful that future iterations of the GCCF claims procedures will provide the remuneration to the Gulf communities for which they are entitled to under the law.  While the devastation wrought from the BP Oil Spill may never be reversed, through your work with the GCCF, BP has every opportunity to fulfill its obligations under OPA to make these communities whole.

We invite further discussion on the issue and eagerly await your response.


Sincerely,


THE VIETNAMESE AMERICAN VOLUNTEER LAW CORPS

cc: Vietnamese Bar Association of Northern California (VABANC)
   Vietnamese Bar Association of DC (VABA-DC)
   Louisiana Asian Pacific American Bar Association (LAPABA)
   Vietnamese American Young Leaders of New Orleans (VAYLA)
   National Asian Pacific American Bar Association (NAPABA)
   Mississippi Center for Justice
   Southeast Louisiana Legal Services
   Boat People SOS
   Asian Americans for Change
   Mary Queen of Vietnam CDC
   National Association of Vietnamese Services Agency (NAVASA)
   Honorable Zoe Lofgren
   Honorable Loretta Sanchez
   Honorable Joseph Cao
   Honorable Jo Bonner
   Honorable Gene Taylor
   Honorable Mike Honda
   Honorable Charlie Melancon
   Honorable Charles Boustany, Jr.
   White House Initiative on Asian Americans and Pacific Islanders



1600 20th Street, NW • Washington, D.C. 20009 • 202/588-1000 • www.citizen.org

## Concerns With the Deepwater Horizon Oil Spill Trust

**Tyson Slocum**
**Director, Energy Project**
**Aug. 12, 2010**

On the day before BP p.l.c. CEO Tony Hayward was set to testify for the first time before Congress on his company's role in the Deepwater Horizon Gulf of Mexico oil disaster, the administration hastily announced a voluntary agreement with BP to establish a $20 billion escrow fund to compensate victims.[1]

Nearly two months later, Public Citizen acquired a copy of the contract[2] and we have identified five broad problems with the agreement that require significant modification if the public interest is to be adequately served and BP is to be held properly accountable:

1. The Trust agreement is with BP Exploration & Production, Inc. BP Exploration & Production, Inc. is a wholly-owned subsidiary of BP America Production, which in turn is a subsidiary of BP Company North America, which is a subsidiary of BP Corporation North America, which is a subsidiary of BP America, Inc., which is a subsidiary of the ultimate parent company BP p.l.c..[3] There are three areas of concern on this issue:

    a. This agreement with a subsidiary five-parts removed from the parent corporation provides the government with limited access to assets with which to secure adequate collateral for the BP Oil Spill Victim Compensation Fund. Public Citizen research indicates that BP Exploration & Production, Inc. seems to be involved only in Gulf of Mexico offshore oil and gas exploration and production.

    b. BP Exploration & Production Inc is the subsidiary that was operating the Deepwater Horizon exploration rig at the Macondo prospect in the Gulf of Mexico. Therefore, the Department of Justice and other federal and state agencies most likely will focus criminal and civil proceedings against this subsidiary. Public Citizen forecasts likely conflicts arising if the Department of Justice seeks to bring criminal charges with the threat of potential sanctions – including revocation of BP Exploration & Production leasing rights in the Gulf of Mexico – with the government's interest in enforcing the terms of the Trust agreement.

---

[1] www.whitehouse.gov/the-press-office/fact-sheet-claims-and-escrow
[2] www.citizen.org/documents/2010-8-9TrustAgreement.pdf
[3] www.citizen.org/documents/BP-Subsidiaries-Chart.pdf



Enforcing the Trust agreement necessitates continued access to Gulf leases by BP Exploration & Production, Inc.

    c.   Numerous safety problems have been identified at BP as being the cause of the explosion and resulting oil gusher at BP's Macondo site. The government's Trust agreement requires that BP maintain a robust and possibly expanded presence in the Gulf of Mexico despite these managerial safety issues. Public Citizen envisions potential conflicts of interest where regulatory concerns with BP's offshore drilling operations may conflict with the government's interest in continuing to allow BP offshore oil production to continue in order to provide the collateral for the Trust agreement. While the Trust agreement allows for Trustees to negotiate additional collateral, the agreement is only with a subsidiary quite distant from the parent company – one that the parent company failed to include on its list of "more important subsidiaries."[4]

2.   The definition of "Damage Claims" includes: a) claims by victims processed through the fund, b) financial settlements and judgments reached outside the fund process, such as through private civil litigation, c) financial claims associated with damages to natural resources, and d) reimbursements to state and local governments associated with spill-response cleanup. This broad definition of damage claims likely will leave substantially less than $20 billion available to compensate individuals and businesses for economic losses associated with the spill, which most likely will leave payments (and monies needed for coastal and marine restoration) shortchanged.

3.   The Trust agreement provides no mechanism to require BP to provide additional financing should the $20 billion be inadequate to meet all damage claims. Given the fact that the $20 billion fund must cover claims from victims and local and state governments, *and* be used for coastal and marine restoration, it is probable that the amounts in the fund will be prematurely exhausted.

4.   Article VI C renders the administration and operations of the Trust non-transparent. This section explicitly states that the Trustees "shall not be required to render any annual or other periodic accounts . . ." The Trust agreement lacks any requirements to timely report to the public the number of claims filed, the number processed, aggregate amounts in settlements paid, and breakouts of the four separate categories of payments allowed by the fund.

5.   There is a "scheduled expiration date" (defined in Article IX) of April 30, 2016, with limited opportunities for the Trustees to extend the deadline beyond this date. Public Citizen is concerned that such a relatively short expiration date precludes adequate assessment of long-term health, economic and natural resource damages from the oil gusher.

---

[4] See Note 43 at www.sec.gov/Archives/edgar/data/313807/000095012310021364/u08439e20vf.htm



**AMERICAN
ASSOCIATION *for*
JUSTICE**

Formerly the Association of Trial Lawyers of America (ATLA®)

# Gulf Coast Oil Spill Victims Compensation Fund
# AAJ's List of Principles

**Purpose**:  The White House has announced an agreement with British Petroleum to create an independent claim process and $20 billion escrow account funded by British Petroleum, which in this document shall be referred to as British Petroleum Deepwater Horizon BP-DH Fund ("BP-DH Fund").  The administration will create an Independent Claims Facility (hereinafter " ICF") that will facilitate all payments from the BP-DH Fund in order to fulfill British Petroleum's obligations under the Oil Pollution Act of 1990 ("OPA") and other applicable law.

In light of this agreement and AAJ's extensive experience in creating and navigating compensation funds, AAJ recommends that the administration establish the BP-DH Fund with the following general principles.  These principles were created with the understanding that standards and procedures of the ICF are intended to accomplish two goals:

(i)     facilitate interim payments required under 33 U.S.C. §2705(a) quickly, fairly and transparently, and

(ii)    efficiently resolve all claims against British Petroleum arising out of the Deepwater Horizon explosion, fire, resulting oil spill and cleanup resulting from the spill.

As with all successful compensation funds, there should be one overriding principle: neither these standards, nor participation in the ICF process, nor receipt of payment from the BP-DH Fund shall narrow, limit, eliminate or release substantive rights which may exist under OPA, general maritime law, or other applicable State, Federal, Admiralty or International law. However, in the event that a lawsuit or other proceeding is initiated in connection with the Deepwater Horizon incident, any payments made by the BP-DH Fund pursuant to these standards and procedures will act as a credit or set-off in favor of British Petroleum against any further recovery.

**AAJ recommends that the ICF be established with the following principles:**

**1.  Preserving Every Claimants Substantive Legal Rights**
*WH Position*:  *"Dissatisfied claimants maintain all current rights under law, including the right to go to court or to the Oil Spill Liability Trust Fund."*

- It is extremely important that all substantive legal rights remain intact and that this compensation fund remain an adjunct to our civil justice system and the Oil Spill Liability Trust Fund (hereinafter "Trust Fund").
- The ICF should readily acknowledge that its proceedings have no effect on the legal rights of any claimant or the liability of British Petroleum and other defendants under OPA, General Maritime Law, or other applicable State, Federal, Admiralty or International Law.
- A claimant's prior or pending participation in either a lawsuit or the Trust Fund should not bar a claimant from seeking compensation under the claim facility.  However, any payment from the BP-DH Fund will be credited in British Petroleum's favor in any subsequent lawsuit or proceeding.

EXHIBIT
__W__

- Participation in the ICF must remain voluntary.  A claimant should have a choice, at any time, to seek compensation from the ICF, the Trust Fund or in court.  The ICF should not be a prerequisite to a claimant's ability to seek compensation in court or through the Trust Fund.

## 2.  Holding British Petroleum Responsible for All Costs

*WH Position:  "This account is neither a floor nor a ceiling on liability." "Decisions under current law by the independent claims facility shall be binding on BP."*

- While AAJ is encouraged by the creation on a BP-HD account, there is nothing to make British Petroleum's commitment legally binding.  At any time, British Petroleum can stop its participation, or seek protection under OPA's $75 million liability cap.  We have no tools to enforce British Petroleum's stated promises or payments into the BP-DH Fund.
- Therefore, it's of utmost importance to preserve the existing rights of all claimants.

## 3.  Uses of the BP-HD Fund

*WH Position: "All claim adjudicated under this facility have access to the escrow account for payment." "The escrow account is to be used to pay claims adjudicated by independent claims facility, as well as judgment and settlements"*

- We are encouraged by the White House's position.  It is important that all claimants, even those who choose not to go through the ICF, have access to the BP-HD fund.  This will ensure that all legitimate claims are paid, and provide a sense of security to all claimants when deciding whether to use the ICF, Trust Fund or try their case in court.

## 4.  Satisfaction of Presentment Under the Oil Pollution Act

- Under OPA's provisions, a claimant must first present their claim to the responsible party before seeking compensation in court or through the Trust Fund.  This requirement is known as "presentment."
- The possibility exists that a claimant will first seek relief in the ICF process and later elect to pursue claims for additional relief either in a court or from the Trust Fund. British Petroleum could argue that such a claimant did not meet the presentment requirements of OPA and have such case dismissed.
- Therefore, a claimant that files with the ICF should be deemed to have complied with any and all "presentment" requirements under the Oil Pollution Act of 1990.

## 5.  Quick Compensation, Quicker for Interim Payments

*WH Statement: "The facility will decide all claims as expeditiously as possible"*

- Many government run compensation programs, such as the Vaccine Injury Compensation Program, are very slow.  The whole idea of a direct claims process is to provide compensation quickly.  If this cannot be done, then the program is not worth pursuing.
- There should be strict, dependable waiting periods between the time a claim is filed, and the date of payment.  To make the ICF appealing, the time period should be substantially shorter than the Trust Fund or litigation.
- The need for timeliness is particularly vital for immediate, interim payments.  While interim payments are required under the OPA, a claimant must file their claim with the responsible party and may have to wait up to 90 days before they are entitled to seek compensation in court or under the Trust Fund.  It is unacceptable to expect these residents to go 90 or more

days without any income.  Many of these residents are completely out of work and need immediate relief now.

- In recognizing the importance of immediate, interim payments, we recommend that the ICF recognize at least two different processes.  One process is for immediate, interim relief.  For this process, the claimant should have a minimal burden of proving eligibility and financial hardship. Since we do not know how long it will take for the Gulf Coast to recover, claimants should be able to use this claims process multiple times for as long as they are without their normal income.  There would be a different, more exacting process for claimants seeking non-interim or final compensation amounts.

## 6. Ensuring Compensation for the Full Extent of Damages

- For many claimants, OPA will be their only legal remedy.  However, OPA never conceived of a long-term, continuing spill.  OPA was not designed for spills that require multiple payments over a long period of time to a single claimant.  For most claimants harmed by the Gulf Coast oil spill, their initial claim will not encompass the total damages they are entitled to.  For that reason, it should not be expected that a claimant will know the full extent of their harm at the time of filing their first claim.
- It is important that a claimant's acceptance of interim or immediate payments does not preclude a claimant from subsequently seeking compensation for the full extent of their damages.  Of course, the claimant's total compensation should be discounted by any interim payments from the BP-DH Fund.
- The costs of putting together documentation of losses should be deemed a recoverable expense.  For example, many businesses will need accounting, banking and other financial services in order to prove business interruption and business lost.  Additionally, individuals as well as businesses may need to secure estimates for future medical care, property appraisals or land surveys, to name a few common methods to document losses.

## 7.  Standard of Proof – Strict Liability

- Under OPA, a claimant only has to prove that he or she was injured in the oil spill and the amount of the damages.  The claimant does not have to prove negligence or that British Petroleum specifically acted with the intent to cause harm.  Any new method for collecting or making OPA-based claims should continue to follow the strict liability standard.
- Any proof or documentation of damages must be lenient.  This is especially important for small business and individual claimants.  Many residents of the Gulf Coast lost everything in previous hurricanes and due not possess the documents that would help them prove their claims.  This information should be considered non-recoverable.  Information provided by locals, including other claimants similarly situated, should be considered sufficient.
- To avoid administrative burdens and delays, AAJ recommends the use of presumption for certain categories of claimants (i.e. commercial fisherman, oysterman, shrimpers).  For example, there could be a baseline presumption for amount of damages for similarly situated claimants.  Only if a claimant seeks damages beyond that baseline level, should they have the requirement of proving the additional amount of damages.

## 8.  Personal Injury Caused from Disbursements and Other Chemicals

- British Petroleum should not be allowed to distort or narrow its responsibility based on the fact that a certain injury was not directly related to the oil spill.  British Petroleum should be

legally responsible for workers or residents who suffered health problems as a result of exposure to the oil or to the chemical used to clean up the oil. Despite receiving hundreds of claims based on personal injury/illness to date, British Petroleum has yet to pay or even admit responsibility for these sick workers.

- Costs associated with dispersants and other chemicals used to clean up the spill should not be transferred to the federal government, but should remain with British Petroleum and other negligent parties.
- Sick workers or residents should also be able to participate in the ICF to seek compensation for their injuries.

## 9. Neutral, Unbiased, and Fair Decision-Makers

*WH Position: "To assure independence, Kenneth Feinberg, who previously administered the September 11th Victim Compensation Fund, will serve as the independent claims administrator"*

- One of the fundamental flaws of OPA is that a clamant needs to submit their claims to the responsible party, the same party who caused the harm and has a direct adverse interest to their own. It is important for the claims processor to be impartial.
- Claimants need to believe that the ICF process is fair and impartial otherwise, the BP-DH fund will not work and claimants will exercise other legal options for seeking compensation.
- There must be qualified translators available for non-English speaking claimants. These translators must be able to explain the claims process and assist with the translation of documents for claimants in any language necessary for the claimant to understand the process and his or her legal rights.
- Assuming that hearing officers are used to carry out the claims process, standard protocols should be developed so that similarly situated plaintiffs are treated similarly even if their claims are before different hearing officers in different states. Hearing officers must receive the same training and education in order to be qualified to hear claims.

## 10. Granting Claimant's Right to Appeal

*WH Position: "A panel of three judges will be available to hear appeals of administrator's decision."*

- Only a legitimate right to appeal ensures that the claims process remains fair and transparent. We recommend that there be a guaranteed right of any claimant to appeal a claim and strict procedures and time tables for an appellate review. We also believe that the responsible party should have no right to appeal a claim.
- This right must include the ability to pursue claims that have been partially denied. Under OPA as currently drafted, a claimant may only seek compensation after British Petroleum denies "all liability." This leads to the perverse incentive of partially denying a claim, resulting in both a lesser amount of compensation and no right of appeal under OPA.

## 11. Right to Counsel

- The right to counsel must always be preserved and protected. If the claims process is designed correctly, then the need for counsel will only focus on calculating the correct amount of damages, making the system more efficient.
- Unfortunately, the British Petroleum claims process currently in place treats claimants differently on the basis of whether they are represented or not. Claimants with legal counsel

must bear extra burdens.  Claimants should not be extraordinarily burdened merely because they sought legal advice.

- Hearing officers would have discretion to award attorneys' fees in appropriate cases. Without this incentive, claimants who need representation because their claims are complex and multifaceted may choose to forego representation, and thus, lessen the likelihood that they will receive fair compensation for their losses.

## 12. Statute of Limitations
- Claimants should not be penalized for seeking compensation from the BP-DH Fund. Therefore, statute of limitations for applicable federal and state laws should be tolled and not be a bar to recovery in a later lawsuit.
- The state of Louisiana does not recognize tolling agreements.  Accommodation should be made to ensure that the no rights are extinguished for those claimants seeking compensation from the ICF.
- Many claimants will likely have already filed a claim or claims against British Petroleum.  If a claimant subsequently decides to bring a claim through the ICF, the court action against British Petroleum should be stayed until the claims process is final.

## 13.  Interaction of ICF and Claims Against other Defendants
- The ICF only applies to claims against British Petroleum, but there are other corporations that may be responsible for this disaster.  A claimant may initiate a lawsuit against Transocean and other defendants and simultaneously file their claim against British Petroleum through the ICF.   If that same claimant later withdraws from the ICF and files their claim against British Petroleum in court, the fact that they did not initially name British Petroleum as a defendant in court should not bar recovery against British Petroleum.

## 14.  Transparency and Privacy
*WH Position:*  *"The facility will develop standards for recoverable claims that will be published."*
- While the standard for recovery should be publicly available, other information should also be readily available to ensure transparency in the ICF.  The numbers and amounts of awards for each types of harm (i.e. fisherman vs. marina), as well as the timeliness of payment should be publicly and readily available.  As well, the balance of the BP-DH Fund should regularly be made public.  Knowing this information will be useful for claimants in deciding whether to use the ICF, go to the Trust Fund or initiate a legal action.
- While transparency of standards is important, it is also important for the ICF to respect a claimant's right to privacy in regards to personal financial information and business practices.  Thus, there needs to be a process for confidential information, unrelated to the claims process, to remain confidential in order to protect the privacy of claimants.

## 15.  Protecting Against Fraud
- There will be fraudulent claims.  The ICF should have basic requirements for proving eligibility that will deter fraudulent claims without being burdensome on claimants with legitimate, meritorious claims.

## 16. Open Dialogue

- In order to ensure that the ICF is working to support the compensation goals articulated by the President, AAJ recommends that a liaison from the ICF to the plaintiffs bar be appointed by the Special Master.  The liaison would meet or confer with a small group of lawyers selected by the AAJ President and would include representatives of the affected Gulf Coast States as well as one or more lawyers with expertise from the 9/11 Fund.