## Succeeding in the Gulf Coast Claims Facility Process

***For businesses with a Deepwater Horizon-related loss, the switch to the Gulf Coast Claims Facility might not have made it any easier to get whole again. Yet take some solace in the fact that lessons from "regular" first-party property losses can be applied.***

*By CHRISTOPHER HESS, a Pittsburgh, Pa.-based partner at **RWH Myers & Co.***

On August 23, the Gulf Coast Claims Facility (GCCF) took over the administrative burden of claims processing from BP. The independent administer of the GCCF is Kenneth Feinberg, known for administering the 9/11 Victim Compensation Fund. Feinberg has assembled professionals from the insurance claims world to assist in this daunting task--adjusters, forensic accountants and other technical experts with experience in processing claims for insurance companies. BP stated that this facility is set up to "provide a faster and more fair way to pay damage claims for individuals and businesses harmed by the Gulf Oil Spill."

But the question remains: Is the GCCF an improvement for those making claims or is it just for appearance?

In either case, many similarities and differences exist between these claims and those of your typical first-party property claim. It stands to reason then that lessons learned from the insurance claims process may help claimants through the GCCF process.

**INHERENT CONFLICTS**

The similarities in the processes are pretty plain to see. In each case there is a company that is obligated to pay a claimant: one by contract the other by moral obligation to take accountability for its actions. The company has to protect itself from paying claims that are not warranted. Each has layers of review to adjust the claims consistently and fairly among claimants and to only pay out what they are required.

Prior to the GCCF, BP had hired ESIS to manage the claims. ESIS is a part of ACE Group, a leading global insurance company. Essentially the same experts who are working for the GCCF were working for ESIS. So why the change? BP needed a front man to attract the attention (and ire) of claimants. By hiring Kenneth Feinberg and creating the GCCF, BP has somewhat shielded itself from the criticism of the claims process. The team that Feinberg has assembled is logical based on the task at hand. The hired experts in the field of insurance are trained in the process of evaluating and approving claims for their clients, the insurance companies. In this case, they will be looking out for the interests of BP.

The big difference in the process is that the unprecedented claims that will arise from the oil spill do not have a clearly defined set of guidelines. Unlike insurance claims, which rely on policies and precedent, oil spill claims are open to interpretation of what is legitimate. This is the responsibility of the GCCF and Feinberg. To date, these guidelines have not been clearly communicated to the public.

The GCCF website states that it "will apply industry-specific criteria in determining the appropriate amount of emergency compensation, including factors like seasonality. Every claim will receive individual consideration and be evaluated on case-specific facts."

The site goes on to say: "Economic losses which are more remote, or occurred at a location more distant from the spill, are less likely to be fully compensated. In determining eligibility, and how much compensation is appropriate for such eligible claims, the GCCF will take into account geographic proximity to the spill, the nature of the claimant's job or business, and the extent to which the claimant's job or business is dependent upon injured property or natural resources. Each of these factors will be weighed in the initial assessment of a claim."

In the most recent change, the website states "that geographic proximity to the BP oil spill would not prevent a legitimate individual or business claim from being processed."

This is a result of complaints about the fact that economic losses can occur anywhere, as long as it can be connected to events in the Gulf (i.e., seafood prices in Washington, D.C.).

These criteria offer very little direction as to what will be covered or denied. The GCCF's inability to clearly state the



rules has created an environment that will lead to confusion and frustration by entitled claimants.

The problem that is surfacing is that the system put in place by the GCCF encourages claims. This creates a volume of claims the GCCF struggles to respond to in a timely manner. Feinberg has no choice but to make changes as he goes, but the confusion of this process will have a multiplying effect on delays in processing claims. The message to the claimant is, "When in doubt, claim it!"

**NO BIG-BUSINESS PAYOUTS**

BP reported that it paid out $368 million before transferring its claims responsibilities to the GCCF. As of October 18, 2010, approximately 210,000 claims have been filed with the GCCF. Out of these, approximately 72,000 have been paid more than $1.4 billion in Emergency Advance Payments. In addition, there is a separate fund for real estate brokers and agents that have been paid $34.5 million.

These numbers are remarkable for such a short period of time, but they are unsustainable. The Emergency Advance Payment claims paid to date represent the "quick" money--claims paid to the most obvious victims of the oil spill, the small businesses and individuals who cannot absorb long periods without cash.

Big businesses have yet to submit the majority of their claims. They are much more likely to take their time and prepare their claim professionally--and these claims are likely to be much larger. Once these claims get into the system, you can imagine the review and approval process will slow down.

**THE FINAL CLAIM DILEMMA**

What's more, the GCCF is still processing the first round of Emergency Advance Payments. Claimants are required to make a final claim to get additional money. A final claim requires the claimant to sign away their right to sue BP. But how do you file this final claim when the long-term effects may not be known for years to come?

This puts the claimants in a real dilemma. While many of the Emergency Advance Payments have been made, they are usually for something less than claimed. Assuming the only way they will get more money is to file a final claim, claimants might be pressured into settling for something less than they deserve.

There is a time limit to file these final claims of three years however. Assuming the claimant can make it that long, the passage of this period of time will give a glimpse of the long-term effects. But those who cannot wait could be sunk--forced to either file an estimated final claim without sufficient information or sue BP, which could be a costly, time-consuming endeavor.

In the GCCF's defense, there will be many people and businesses looking to take advantage of this situation in a fraudulent way. The GCCF needs to be vigilant in processing these claims so as to only pay legitimate damages. Feinberg has said that applicants need to do more to back up their claims, and thousands of claims have no documentation at all. He added that the amount sought in some cases bears no resemblance to actual losses. For example, a fisherman's claim for $10 million "on what was obviously a legitimate claim of a few thousand dollars." But with an ever-changing set of guidelines, it is difficult to blame a claimant who does not know what is covered and what is not.

**THE HOW-TO**

So what can a claimant do? Here's where we can apply the experience with first-party property claims.

A formal, well-documented claim submission will be key. As with insurance claims, the bureaucracy of this system requires you follow their rules. Minimum documentation requirements are listed on the GCCF site--but in general all numbers in your claim should be supported with financial records or easy to understand schedules showing calculations and assumptions. The GCCF team will consist of an adjuster, forensic accountants and specific industry experts. Your claim will be reviewed by many people and should be easy to understand. Simplicity is the key.

Additionally, claimants should monitor the GCCF website to identify changes in policy that might affect them. As described above, these rules seem to be changing regularly so keeping up and understanding them will be the key

to success.

Finally, frequent and open communication between your claims team and the GCCF hired consultants processing your claim can only help. This will be difficult due to the workload of the adjustment team. Set expectations for your own claim presentation and require them to respond assuming those expectations are met.

The transfer of claims responsibilities from BP to the GCCF was mostly for appearances. The underlying process, whether through BP and ESIS or the GCCF, is modeled after first-party insurance claims but is far more complicated because of lack of precedent and guidelines that insurance policies offer. In addition, the rules seem to be changing on a daily basis. Lessons learned from dealing with the insurance claims process will help. Unfortunately, this process could be a long and unhappy one for most involved. The hope at the end of the day is that more often than not, people get treated fairly and made whole through this process.

**December 1, 2010**

Copyright 2010© LRP Publications