# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL No. 2179

SECTION J |
| This document relates to: all cases | * * * | Honorable CARL J. BARBIER

Magistrate Judge SHUSHAN |

## DECLARATION OF GEIR ROBINSON

I, Geir Robinson, declare as follows:

1. I am the Director—Claims for BP America Inc.'s Gulf Coast Restoration Organization.  My role within BP America Inc. gives me oversight capacity for administering BP's existing claims process under the Oil Pollution Act of 1990 ("OPA").  I also had authority for transitioning the individual and business claims in that process to the Gulf Coast Claims Facility ("GCCF") administered by Mr. Kenneth Feinberg.  In my position, I have personal knowledge of the matters set forth in this declaration, and if called upon to do so, I could testify to the same effect.  I am over 18 years of age.

2. As part of its commitment to pay all legitimate claims and meet all necessary response costs resulting from the *Deepwater Horizon* oil spill in the Gulf of Mexico pursuant to the OPA's requirements, BP Exploration & Production Inc. accepted designation under the OPA as a responsible party by the United States Coast Guard.  In accordance with its designation as a responsible party, BP established a claims process as required by the OPA.

3.      In June 2010, Mr. Kenneth Feinberg was jointly appointed by the White House and BP to administer the claims process.   In furtherance of that appointment, Mr. Feinberg established the GCCF, which has administered individual and business claims since August 23, 2010.

4.      As far as I am aware, neither Mr. Feinberg nor his law firm, Feinberg Rozen, LLP ("Feinberg Rozen"), has been retained by or acts as an attorney providing legal advice or assistance to BP America Inc., BP Exploration & Production Inc. or any other BP entity (collectively, "BP"), and it is my understanding and belief that there is no attorney-client relationship between Mr. Feinberg and/or his firm and BP—whether in an individual capacity or as an administrator of the GCCF.  This has been true since the beginning of Mr. Feinberg's and the GCCF's involvement in the claims process and remains true today.

5.      While Mr. Feinberg happens to be an attorney, he does not act in the capacity of an attorney providing legal advice or assistance to BP.  To my knowledge, BP does not consider or view Mr. Feinberg and/or his firm to be acting as its attorney.

6.      It is the practice within BP that only the BP Legal Department may retain an attorney to represent BP.  In my position as Director—Claims for BP America Inc.'s Gulf Coast Restoration Organization, I am authorized to retain Mr. Feinberg to provide claims administration services; however, I am not authorized to retain Mr. Feinberg or anyone else to represent BP as its attorney.

7.      The nature of the relationship between BP and Mr. Feinberg and his firm has been memorialized in a written agreement between Feinberg Rozen and BP Exploration & Production Inc., which was negotiated over a period of several months and was finalized and executed on

January 6, 2011.  Section 11 of the agreement, entitled **INDEPENDENT CONTRACTOR; NO AGENCY**, states:

> It is the express intention of the parties that Feinberg Rozen shall be an independent contractor throughout the Term of this agreement.  Except as otherwise agreed to by the parties, nothing in this Agreement shall in any way be construed to constitute Feinberg Rozen as an agent or representative of BP, and Feinberg Rozen shall otherwise perform the Services hereunder as an independent contractor.  The execution of this Agreement shall not be construed to create an attorney-client relationship between BP and Feinberg Rozen, and the provision of Services hereunder shall not constitute, or be otherwise construed to constitute, provision of legal advice from Feinberg Rozen, or any of its partners or employees, to BP.

8.      A true and correct copy of the agreement between Feinberg Rozen and BP Exploration & Production Inc. is attached hereto as Exhibit A.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the forgoing is true and correct.

Dated:  January 7, 2011

Geir Robinson

# EXHIBIT A

EXECUTION VERSION

## AGREEMENT

This Agreement (this *"Agreement"*) is made and entered into as of the 15th day of June, 2010 (the *"Effective Date"*) by and between BP Exploration & Production Inc., a Delaware corporation (*"BP"*), and Feinberg Rozen, LLP, a District of Columbia limited liability partnership (*"Feinberg Rozen"*).  Unless otherwise defined with their first use, capitalized terms used herein shall have the meanings ascribed to them in Section 15.

## RECITALS

A.      At the request of the White House and BP, Kenneth R. Feinberg (*"Feinberg"*), acting through and as a partner of Feinberg Rozen, has established the Gulf Coast Claims Facility (*"GCCF"*) to independently administer and where appropriate settle and authorize the payment of certain Claims asserted against BP as a result of the explosion at the Deepwater Horizon rig and consequent spillage of oil into the Gulf of Mexico (the *"Event"*).

B.      In connection therewith, BP desires to hereby engage Feinberg Rozen to operate the GCCF and provide the other services specified herein.

C.      This Agreement sets forth certain understandings, unrelated to decisions regarding the compensability of Claims, with respect to the services to be provided by Feinberg Rozen and the remuneration to be paid therefor.

## AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties, intending to be legally bound, agree as follows:

1.      **SERVICES AND COMPENSATION**

(a)      Feinberg Rozen shall perform the claims administration and settlement services described in <u>Exhibit A</u> attached hereto (collectively, the *"Services"*) in accordance with the terms of this Agreement, including the exhibits hereto.  In performing such Services, Feinberg Rozen agrees to make available the services of Feinberg.

(b)      Feinberg Rozen shall perform the Services in accordance with all applicable laws and regulations and the Claims Protocols set forth in <u>Exhibit B</u>.  Without limiting the generality of the foregoing, Feinberg Rozen shall follow OPA as it operates and administers the GCCF.

(c)      BP agrees to pay Feinberg Rozen the compensation set forth in <u>Exhibit C</u> for the performance of the Services.

(d)      Each employee or Subcontractor selected by Feinberg Rozen to perform a particular task shall be technically and professionally qualified to perform such task.  Each employee and Subcontractor of Feinberg Rozen shall be under Feinberg Rozen's supervision, direction and control, and Feinberg Rozen shall be responsible for the conduct of such employee

and Subcontractor.  Feinberg Rozen shall replace or remove from providing any of the Services any employee or Subcontractor if it determines that such employee or Subcontractor fails to meet the standards of performance set forth in this Agreement.

2. **REPRESENTATIONS AND WARRANTIES**

(a)     Feinberg Rozen represents, warrants, and covenants as follows:

(i)     it has the power and authority to enter into this Agreement and to perform all of its obligations hereunder;

(ii)     this Agreement does not violate or conflict with any other agreement to which Feinberg Rozen is a party or by which it is bound;

(iii)     all Services provided hereunder shall be performed by qualified personnel, in a timely, professional and workmanlike manner consistent with good and sound professional practices and in accordance with generally accepted industry practices;

(iv)     it and each of its employees and Subcontractors authorized to perform Services hereunder has not previously entered into any agreement that would restrict any of such persons in the performance of the Services;

(v)     it shall comply with all applicable foreign and United States federal, state and local laws, rules and regulations in its performance of this Agreement;

(vi)     it has the capacity and resources to perform the Services; and

(vii)     each of the employees of Feinberg Rozen performing Services is legally entitled to work in the United States and has all necessary visas and work permits.

(b)     BP represents, warrants, and covenants as follows:

(i)     it has the corporate power and authority to enter into this Agreement and to perform all of its obligations hereunder; and

(ii)     this Agreement does not violate or conflict with any other agreement to which BP is a party or by which it is bound.

3. **INDEMNITY**

(a)     BP shall indemnify, defend, and hold harmless Feinberg Rozen and its partners and employees (collectively, the *"Feinberg Rozen Indemnitees"*) from and against any and all threatened or commenced actions, causes of action, suits, claims, processes, proceedings, investigations, costs, damages, demands, expenses, fees and/or other liabilities ("*Indemnified Claims*") that are threatened, asserted, brought, commenced, or sought by any person or entity, whether public or private, governmental or non-governmental (other than BP, BP's Affiliates, the Feinberg Rozen Indemnitees, the Subcontractors and the Trust), relating to or arising from the operation of the GCCF, including reasonable fees and costs of counsel, chosen in accordance

with Section 3(b), incurred in connection with the foregoing, except that BP shall have no obligation to indemnify any Feinberg Rozen Indemnitee where the claim arose out of the gross negligence or intentional or willful misconduct, including fraud, of the Feinberg Rozen Indemnitees.  For purposes hereof, the term "employees" shall include certain persons who work with or for Feinberg Rozen but whose employment status is that of independent contractor rather than direct employee, the names of whom are set forth as <u>Exhibit F</u>.  Feinberg Rozen may, from time to time, notify BP of additional persons similarly hired or retained by Feinberg Rozen.  Upon BP's consent, which shall not be unreasonably withheld, <u>Exhibit F</u> will be amended to include such additional persons.  The inadvertent failure of Feinberg Rozen to notify BP of such hiring or retention of additional persons shall not preclude it from subsequently providing such notice to BP, and the fact of such subsequent notice by itself shall not be a ground for BP to withhold its consent.

(b)     A Feinberg Rozen Indemnitee shall give prompt written notice to BP of any Indemnified Claims, and BP shall assume the defense of such claim with counsel chosen by the Feinberg Rozen Indemnitee that is reasonably acceptable to BP.   The Feinberg Rozen Indemnitees, other than Feinberg Rozen, are third party beneficiaries of Sections 3(a) and (b).

(c)     BP shall also agree to indemnify, defend and hold harmless all Subcontractors hired or retained by Feinberg Rozen and their employees in connection with its operation of the GCCF, a current list of which Subcontractors is set forth as <u>Exhibit G</u>, *provided that* BP and such Subcontractors agree upon separate indemnification agreements after negotiating the terms and conditions thereof in good faith.

(d)     BP agrees that, in addition to its indemnification obligations to the Feinberg Rozen Indemnitees set forth above, to the maximum extent permissible by law, Feinberg and Feinberg Rozen shall incur no liability to BP or its Affiliates by reason of acts or things done, suffered or omitted in performing the Services in strict accordance with the terms and conditions of this Agreement, except where the liability arose out of the gross negligence or intentional or willful misconduct of the Feinberg Rozen Indemnitee.

4.     **CONFIDENTIALITY**

(a)     A party (each a *"Disclosing Party"*) may disclose its Confidential Information to the other party (a *"Receiving Party"*) in connection with the performance of their respective obligations under this Agreement.  For the purposes of this Agreement, *"Confidential Information"* shall mean all information revealed by or through the Disclosing Party which the Receiving Party either knows or reasonably should know to be proprietary and confidential in nature including without limitation: (i) information either expressly or implicitly identified as originating with or belonging to the Disclosing Party or marked or disclosed as confidential (including information disclosed to the Disclosing Party by a third party, including a Subcontractor, under an obligation of confidentiality); and  (ii) information traditionally recognized as proprietary or trade secrets of the Disclosing Party.

(b)     Confidential Information shall in no event include information which:  (i) was known to or in the possession of the Receiving Party at the time of first disclosure by the Disclosing Party; (ii) is or becomes generally known in the industry or becomes public

3

knowledge without default by the Receiving Party of its obligations hereunder; (iii) the Receiving Party can demonstrate, from written records, has been independently developed through the Receiving Party's employees, none of whom had access to the Confidential Information; or (iv) is generally furnished to third parties by the Disclosing Party without confidentiality restriction.

(c)     The Receiving Party may disclose Confidential Information pursuant to obligations imposed by a Governmental Authority or by statute, regulation or other law, provided that the Receiving Party provides to the Disclosing Party detailed written notice of such obligations in sufficient time (to the extent allowed by law) so as to permit the Disclosing Party to seek an appropriate protective order or otherwise intervene to protect the Confidential Information.

(d)     The Receiving Party shall not disclose or otherwise share the other party's Confidential Information with any third party.  A Receiving Party may use the Confidential Information for the sole purpose of performance of its obligations under this Agreement and for no other purpose and shall protect the Confidential Information in the same manner in which it would protect its own Confidential Information, which in no event shall be less than reasonable care.  The Receiving Party agrees not to disclose the Confidential Information except to its employees, authorized representatives, or Subcontractors who have a need to know such Confidential Information and who have agreed to confidentiality provisions at least as protective as the terms of this Agreement.

(e)     The Receiving Party agrees that, if there is a breach or threatened breach of the provisions of this Agreement, the Disclosing Party may have no adequate remedy in monetary damages and accordingly shall be entitled to seek injunctive relief in a court of competent jurisdiction, notwithstanding other remedies that may be available to it.

(f)     All Confidential Information shall remain the exclusive property of the Disclosing Party, and the Receiving Party shall have no rights to use the Confidential Information except as expressly provided herein.  Within ten (10) business days after receiving written instructions from the Disclosing Party, the Receiving Party shall return to the Disclosing Party all Confidential Information in tangible form that is in the Receiving Party's possession, custody or control (except as otherwise required by law or regulatory authority).  Notwithstanding the foregoing, (a) Feinberg Rozen shall, and shall cause its Subcontractors to, retain all Confidential Information of BP as required by applicable law or as directed by BP in writing from time to time, and (b) Feinberg Rozen shall, and shall cause its Subcontractors to, comply with the terms of any court orders or BP corporate policies relating to document retention or preservation that may be communicated and directed by BP in writing from time to time.

(g)     Within forty-eight (48) hours of becoming aware of any acquisition, access, use or disclosure of Confidential Information in violation of this Agreement including by (i) a party, its officers, directors, employees, representatives, subcontractors, or agents, (ii) a third party to whom the Receiving Party disclosed Confidential Information, or (iii) any other third party who may gain or attempt to gain access to such information, the Receiving Party shall report any such acquisition, access, use or disclosure to the Disclosing Party.  All reports

involving the acquisition, access, use or disclosure of Confidential Information shall include the following information:

> 1)   A brief description of what happened, including the date of the breach and the date of the discovery of the breach, if known;
>
> 2)   A description of the types of Confidential Information that were involved in the breach (such as whether full name, social security or employee identification number, date of birth, home address, account number, or other types of information were involved);
>
> 3)   Any steps Individuals or Businesses should take to protect themselves from potential harm resulting from the breach;
>
> 4)   A brief description of what the Receiving Party is doing to investigate the breach, to mitigate harm to the potentially affected Individuals or Businesses, and to protect against any further breaches; and
>
> 5)   Contact procedures for Individuals or Businesses to ask questions or learn additional information, which shall include a toll-free telephone number, an e-mail address, website, or postal address.

(h)   The Receiving Party's obligation to report the acquisition, access, use or disclosure of Confidential Information in violation of this Agreement to the Disclosing Party is required even where the acquisition, access, use or disclosure does not pose a significant risk of financial, reputational, or other harm to the Individual or Business to whom the information relates.

5.   **USE OF CERTAIN FACILITIES AND ASSETS; SECURITY REQUIREMENTS**

(a)   <u>Use of Certain Assets</u>.  BP, in its sole discretion, may, from time to time, allow Feinberg Rozen to use and access certain of its computers, equipment, furniture, properties, infrastructure and other assets (collectively, the *"BP Assets"*).  Feinberg Rozen shall at all times respect the BP Assets and retain them in its own custody and not permit the BP Assets to be moved from their location without the prior written consent of BP.  Feinberg Rozen shall operate and use the BP Assets with reasonable care and in accordance with any applicable instructions, and shall maintain reasonable insurance coverage for any loss or damage thereto. Feinberg Rozen shall not subject the BP Assets to abnormal, abusive, illegal, or hazardous use or conditions.  Feinberg Rozen shall not make any alterations, modifications or improvements to the BP Assets without the prior written consent of BP.  All BP Assets shall be operated in accordance with applicable federal, state or local law.  All such BP Assets shall be promptly returned to BP upon the conclusion of the Services, termination or expiration of this Agreement or the request of BP.

(b)   <u>Access to Certain Facilities</u>.  BP, in its sole discretion, may, from time to time, allow Feinberg Rozen to use and access certain facilities, properties and offices owned or leased by BP, its Affiliates or their service providers (collectively, *"BP Facilities"*).  Feinberg Rozen shall at all times respect the BP Facilities and comply with all applicable BP policies and

procedures related to the access or use of such BP Facilities, as provided by BP to Feinberg Rozen from time to time, including, without limitation, any instructions relating to security, and environmental, safety and health policies and procedures. Feinberg Rozen shall not make any alterations, modifications or improvements to the BP Facilities without the prior written consent of BP. All BP Facilities shall be accessed and operated in accordance with applicable federal, state or local law. Feinberg Rozen shall promptly vacate such BP Facilities upon the conclusion of the Services, or termination or expiration of this Agreement.

(c)  Compliance With IT and Security Requirements.

(i)  Security Requirements. Feinberg Rozen shall comply, and shall cause all Feinberg Rozen employees and Subcontractors to comply, with the information security and data protection requirements set forth in Exhibit D (the *"Security Requirements"*). As periodically requested by BP, Feinberg Rozen shall promptly complete BP's Third Party Service Provider Information Security Questionnaire and other documents or requests for information regarding Feinberg Rozen's information security practices (*e.g*., audits, summaries of test results, or other equivalent evaluations of Feinberg Rozen's information security practices).

(ii)  Information Handling Requirements. Feinberg Rozen hereby agrees that it shall comply, and shall cause all Feinberg Rozen employees and Subcontractors to comply, with all reuse, redisclosure and other personal information handling, processing, security, and protection requirements that are specifically required of a non-affiliated third-party processor or servicer (or subcontractor) under applicable federal, state and local laws, rules, and regulations, including all laws related to personal information and data and privacy and protection thereof. Without limiting the foregoing, Feinberg Rozen agrees that: (A) it is prohibited from disclosing or using any nonpublic personal information disclosed to it by BP or otherwise gathered by Feinberg Rozen during the Claims process, except solely to carry out the purposes for which it was disclosed; and (B) it has implemented and will maintain an information security program designed to meet applicable law (collectively, the *"Information Security Program Requirements"*).

(iii)  Security Audits. During the Term and thereafter for as long as Feinberg Rozen retains Claimant information or other personal information, BP and its representatives and agents shall be entitled to conduct audits of Feinberg Rozen's and its Subcontractors' relevant operations, facilities, and systems to confirm that Feinberg Rozen and its Subcontractors have complied with the Security Requirements and the Information Security Program Requirements (the *"Security Audits"*). Any Security Audit shall be scheduled and conducted during normal business hours and shall not unreasonably interfere with Feinberg Rozen's or its Subcontractors' business activities. In the event that any Security Audit results in the discovery of material security risks to an Individual's information resulting from a failure to comply with the Security Requirements, Feinberg Rozen shall (A) respond to BP in writing with Feinberg Rozen's plan to promptly take reasonable measures and corrective actions necessary to restore compliance with the Security Requirements, at no cost to BP, and (B) allow BP to review any system and transaction logs, including those of the Subcontractors, related thereto which pertain to information or data potentially compromised. Feinberg Rozen shall have five (5) business days to develop a remediation plan, unless the parties mutually agree in writing to a longer period of time for such cure. BP's right, and the right of its representatives and agents, to

6

conduct Security Audits, and any exercise of such right, shall not in any way diminish or affect Feinberg Rozen's duties and liabilities under this Agreement.

        (d)     Other.

        (i)     <u>Document Retention</u>.  Feinberg Rozen shall comply, and shall cause all Feinberg Rozen employees and Subcontractors to comply, with the court order (and any subsequent court orders) and other demands and requests regarding document retention attached hereto from time to time as <u>Exhibit E</u> regardless of whether such orders, demands, and requests apply by their terms to Feinberg Rozen.

        (ii)     <u>Code of Conduct</u>.  Feinberg Rozen shall perform its obligations hereunder in a manner that is consistent with the principles stated in BP's Code of Conduct, a copy of which has been provided to Feinberg Rozen, and any revised or successor code of conduct.  Feinberg Rozen shall cause all Feinberg Rozen Subcontractors to comply with the Code of Conduct, and any revised or successor code of conduct.

        (iii)     <u>ESH and Physical Security</u>.  Feinberg Rozen shall comply, and shall cause all Feinberg Rozen employees and Subcontractors to comply, with BP's standard environmental, safety and health policies and physical security policies that are communicated to Feinberg Rozen from time to time.

    6.    **REPORTING; ACCESS TO CLAIM FILES; COMMUNICATION; AUDITS AND COMPLIANCE**

        (a)     <u>Reporting</u>.  Feinberg Rozen shall report, and shall agree to certain other reasonable reporting obligations with respect to information sufficient for BP, among other things, to comply with OPA, report financial results, and pursue indemnification, contribution, subrogation, insurance and other claims attempting to recover costs, expenses, damages, liabilities or losses from third parties.  Except as set forth in Sections 6(b) and 10(d) hereto, or in connection with legal process, such reporting obligations shall not require Feinberg Rozen to disclose personally identifying information submitted by Claimants.

        (b)     <u>Access to Claim Files on Written Request</u>.  Where BP requests copies of Claim Files and all other Claim-related information (collectively, "***Claims Information***") to present claims to insurers and others in order to seek indemnification, contribution, subrogation, insurance or other recovery payments or other reimbursements for costs, expenses, damages, liabilities or losses in connection with the Event, Feinberg Rozen shall provide true and complete copies thereof upon BP's written request.  If Claims Information is provided to BP under this subparagraph, BP will use such Claims Information only for the purposes set forth in this subparagraph.

        (c)     <u>Communication</u>.    Feinberg Rozen shall establish a process of communicating with its employees and Subcontractors (as well as receiving communications from such parties) to ensure that all information is properly and accurately disseminated in accordance with applicable law.  If necessary, Feinberg Rozen shall coordinate collection of information and materials from such persons consistent with the terms of this Agreement and to facilitate the Services and its reporting obligations hereunder.  Without limiting the generality of the foregoing, Feinberg Rozen shall promptly communicate to such persons the terms and

conditions of any litigation "hold" or preservation court orders that may be communicated and directed by BP in writing from time to time.

(d)     Audit.  During the Term of this Agreement and for a period of three (3) years after the termination or expiration of this Agreement, BP, its representatives and agents shall be entitled to conduct audits of Feinberg Rozen's and its Subcontractors' relevant books, records, facilities and infrastructure to confirm that Feinberg Rozen has properly billed BP for fees and expenses incurred in connection with this Agreement, and has otherwise complied with its obligations under this Agreement.  Such audits shall be scheduled and conducted during normal business hours and shall not unreasonably interfere with Feinberg Rozen's business activities.  Feinberg Rozen agrees to provide access to the relevant records, facilities and infrastructure, including those of its Subcontractors, for purposes of the audit.  Prompt adjustment shall be made to compensate for any discrepancies disclosed by such audit (including interest on overcharges equal to the Prime Rate set forth in the *Wall Street Journal* from the date such overcharges were initially paid by BP until the date such overcharges are reimbursed to BP) and Feinberg Rozen agrees to otherwise promptly remedy any other nonconformance found as the result of the audit.  Any such audit shall be paid for by BP.

(e)     Compliance.  If the Services under this Agreement include either (i) an application that relates to BP's financial reporting obligations under rules and regulations of the United States Securities and Exchange Commission (***"SOX Application"***) or (ii) infrastructure (including without limitation, data centers) or networks supporting a SOX Application, Feinberg Rozen shall cooperate and work with BP and BP's auditors as requested by BP (at BP's sole cost and expense) in order to provide the necessary information to which Feinberg Rozen has lawful access, or within Feinberg Rozen's possession, that BP requires for its compliance obligations under the Sarbanes-Oxley Act of 2002, and otherwise support BP's financial reporting obligations in the manner reasonably requested by BP.

7.     **SUBCONTRACTORS**

Feinberg Rozen shall not subcontract any of its obligations under this Agreement to any third party without BP's prior written approval, which approval shall not be unreasonably withheld.  Feinberg Rozen shall not enter into any Subcontract without first giving an opportunity to BP to review the proposed Subcontract.  All such Subcontracts shall contain provisions that are consistent with, and as protective of BP as, the terms of this Agreement, including, without limitation, Sections 2(a), 4, 5, 6, 7, and 9 through 15, as well as provisions that allow transfer or assignment to BP or its designee in the event of termination or expiration of this Agreement.  With any proposed Subcontract submitted for BP's review, Feinberg Rozen shall provide BP with a list of all owners, shareholders, partners, members or other similar persons of such proposed subcontractors, unless such subcontractors are publicly held corporations listed on a major stock exchange.  Upon BP's approval of the Subcontract, the Subcontractor's name shall be added to the list of Subcontractors on Exhibit G, and an updated version of such exhibit shall be attached hereto.

8.      **RELATED TRANSACTIONS**

(a)      BP has entered into that certain Claims Services Agreement with Worley (the *"BP - Worley Claims Services Agreement"*), and Feinberg Rozen has entered into that certain GCCF - Worley Claims Services Agreement with Worley (the *"GCCF - Worley Claims Services Agreement"*).  Feinberg Rozen agrees that it shall not amend or modify the GCCF - Worley Claims Services Agreement in any manner that could reasonably be expected to have a material adverse effect on the claims services provided thereunder, without first notifying BP in writing, and cooperating with BP and Worley to minimize the impact such amendment or modification may have on such claims services.

(b)      Feinberg Rozen shall forward copies of invoices of its Subcontractors, within a reasonable time after it receives such invoices, to BP.  In addition, Feinberg Rozen shall use commercially reasonable efforts to verify the accuracy of any invoices submitted by a Subcontractor, including Worley, before forwarding such invoices to BP.

(c)      Feinberg Rozen agrees to promptly notify BP if it becomes aware of (i) any breach by a Subcontractor, including Worley, of its Subcontract with Feinberg Rozen, or (ii) any occurrences or circumstances that could have a material adverse effect on the claims processing or the Services provided hereunder.

(d)      Feinberg Rozen shall use commercially reasonable efforts to enforce the terms of its Subcontracts with its Subcontractors.

9.      **USE OF TRADEMARKS**

Feinberg Rozen may not use BP's trademarks, logos and domain names in any manner without BP's prior written consent.

10.      **TERM AND TERMINATION**

(a)      <u>Term</u>.  This Agreement shall commence as of the Effective Date and shall expire on August 31, 2013, unless earlier terminated in accordance with Sections 10(b) and 10(c) below (the *"Term"*).  Upon the termination or expiration of this Agreement for any reason, Feinberg Rozen agrees to provide Services for up to an additional twelve-month transitional period upon the written request of BP to wind down and transition the operations of the GCCF to a successor or to BP, as the case may be, all in accordance with the terms of this Agreement.

(b)      <u>Termination by BP</u>.  BP may terminate this Agreement as follows:

(i)      in the event Feinberg Rozen materially breaches its obligations under this Agreement, by providing thirty (30) calendar days prior written notice thereof to Feinberg Rozen, unless Feinberg Rozen cures such breach within such thirty (30) day period;

(ii)      in the event BP determines, in consultation with the Trustees, that Feinberg or Feinberg Rozen has breached his or its fiduciary obligations to expend funds, and administer and resolve Claims in accordance with the Claims Protocols, by providing ten (10) business days prior written notice thereof to Feinberg Rozen;

(iii)    in the event Feinberg ceases to devote a substantial portion of his time to operating, managing and administering the GCCF, by providing ten (10) business days prior written notice thereof to Feinberg Rozen; and

(iv)    in the event of a Governmental Termination Action, by providing five (5) business days prior written notice thereof to Feinberg Rozen.

BP shall not exercise the foregoing termination rights without first seeking the concurrence of the United States Department of Justice.

(c)    Termination by Feinberg Rozen.  Subject to Section 10(a) with respect to the provision of Services during a transition period, Feinberg Rozen may terminate this Agreement for any reason whatsoever upon giving thirty (30) calendar days' prior written notice of such termination to BP.

(d)    Return of Claims Information.  Within thirty (30) days after the termination or expiration of this Agreement, Feinberg Rozen shall return, and shall cause its Subcontractors to return, to BP any and all Claims Information in its and their possession or control as to which Feinberg Rozen has concluded making all independent judgments regarding the processing of Claims.  The Claims Information shall be delivered to BP in such format as BP reasonably specifies.  BP shall thereafter not be subject to any restrictions or limitations whatsoever with respect to any such Claims Information, including in connection with the use, storage, handling, processing or administration thereof.

(e)    Survival.  Upon such termination, all rights and duties of the parties toward each other shall cease except:

(i)    that BP shall be obliged to pay, within thirty (30) days of the effective date of termination, all amounts owing to Feinberg Rozen and any of Feinberg Rozen's Subcontractors for Services performed prior to the termination date and related expenses, if any, in accordance with the provisions of Section 1 (Services and Compensation) hereof; and

(ii)    Sections 2 (Representations and Warranties), 3 (Indemnity), 4 (Confidentiality), 5(d)(i) (Document Retention Policy), 6(a) (Reporting), 6(b) (Access to Claim Files), 6(d) (Audit) and 6(e) (Compliance), 9 (Use of Trademarks), 10(d) (Return of Claims Information), 11 (Independent Contractor; No Agency), 14 (General), 15 (Definitions), and this Section 10(e) (Survival) shall survive termination or expiration of this Agreement in accordance with their terms.

11.    **INDEPENDENT CONTRACTOR; NO AGENCY**

It is the express intention of the parties that Feinberg Rozen shall be an independent contractor throughout the Term of this Agreement.  Except as otherwise agreed to by the parties, nothing in this Agreement shall in any way be construed to constitute Feinberg Rozen as an agent or representative of BP, and Feinberg Rozen shall otherwise perform the Services hereunder as an independent contractor.  The execution of this Agreement shall not be construed to create an attorney-client relationship between BP and Feinberg Rozen, and the provision of

Services hereunder shall not constitute, or be otherwise construed to constitute, provision of legal advice from Feinberg Rozen, or any of its partners or employees, to BP.

12.    **INSURANCE**

Feinberg Rozen represents that it currently has, and covenants that it will maintain during the Term, the following types and amounts of insurance policies:  General Liability - $1,000,000 each occurrence/$2,000,000 general aggregate; Umbrella - $5,000,0000 limit; and Workers Compensation - $500,000 each accident/$500,000 policy limit/ $500,000 each employee.  The current issuer of the General Liability and Umbrella policies is OneBeaconAmerica Insurance Company, and the current issuer of the Workers Compensation policy is Employers' Fire Insurance Company.

13.    **EQUAL OPPORTUNITY**

As a federal government contractor, BP complies with the equal opportunity and affirmative action provisions of 41 C.F.R. §§ 60-1.4, 60-250.4, and 60-741.5, which collectively prohibit discrimination in employment on the basis of race, color, religion, sex, national origin, mental or physical disability, or status as a veteran of the Vietnam era.  Feinberg Rozen is hereby put on notice Feinberg Rozen may have obligations under these same provisions.

14.    **GENERAL**

(a)    Governing Law.  This Agreement shall be governed and construed in accordance with the laws of the State of New York, without reference to its choice of law rules.  Any dispute, controversy or claim arising out of or relating to this Agreement shall be settled by binding arbitration in the manner described in this Section 14(a).  The arbitration shall be conducted pursuant to the Commercial Rules of the American Arbitration Association ("*Rules*") then in effect.  Notwithstanding those Rules, the following provisions shall apply to such arbitration:  The arbitration shall be conducted by a panel of three arbitrators, with one arbitrator chosen by each of the parties and the third appointed by the other two arbitrators.  If the two arbitrators are unable to agree on the third arbitrator, such third arbitrator shall be appointed in accordance with the Rules.  The arbitrators selected in accordance with this Section 14(a) are referred to herein as the "*Panel*."  The parties and the arbitrators shall use reasonable, diligent efforts to complete the arbitration within 60 days after the appointment of the Panel.  The Panel shall, in rendering its decision, apply New York law, without reference to its choice of law rules, except that the interpretation and enforcement of this Section 14(a) shall be governed by the U.S. Federal Arbitration Act.  The proceedings shall be in the English language and shall take place in New York, New York.  The Panel shall issue its decision in writing, with an explanation of the bases for its decision.  The fees of the Panel shall be shared equally by the parties.

(b)    Assignment.  Neither this Agreement nor any right or obligation hereunder or interest herein may be assigned, delegated or otherwise transferred by either party without the prior written consent of the other party, except that BP shall have the right to assign its rights and obligations hereunder to an Affiliate or in connection with a Loss Transfer Transaction (as defined below) without such consent.

(c)     Entire Agreement.  This Agreement is the entire agreement of the parties and supersedes any prior agreements between them, whether written or oral, with respect to the subject matter hereof.  No waiver, alteration, or modification of any of the provisions of this Agreement shall be binding unless in writing and signed by duly authorized representatives of the parties hereto.

(d)     Attorneys' Fees.  In any court action, suit or proceeding at law or equity which is brought by one of the parties pursuant to Section 14(a), the prevailing party shall be entitled to reasonable attorneys' fees, in addition to any other relief to which such party may be entitled.

(e)     Severability.  The invalidity or unenforceability of any provision of this Agreement, or any terms thereof, shall not affect the validity or enforceability of this Agreement as a whole, which shall at all times remain in full force and effect.

(f)     Waiver.  Any waiver of the provisions of this Agreement or of a party's rights or remedies under this Agreement must be in writing to be effective.  Failure, neglect, or delay by a party to enforce the provisions of this Agreement or its rights or remedies at any time shall not be construed and shall not be deemed to be a waiver of such party's rights under this Agreement and shall not in any way affect the validity of the whole or any part of this Agreement or prejudice such party's right to take subsequent action.

(g)     Headings.   The article, section and subsection headings used in this Agreement are intended for reference purposes only and shall not affect the interpretation or construction of any provision of this Agreement.

(h)     Remedies Cumulative.   Unless expressly provided otherwise in this Agreement, all rights and remedies granted to each party hereunder are cumulative and in addition to, and not in lieu of, any other rights or remedies otherwise available to such party at law or in equity.

(i)     Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

(j)     Third Party Payment Processing and Loss Transfer Transactions. Feinberg Rozen agrees to cooperate in good faith with BP, provide all relevant information or records, and take all reasonable actions necessary for BP to (i) appoint a third party administrator of any Claims Payments or settlements that require more than one payment of funds to any Claimant, or (ii) to transfer its rights, obligations, and commitments related to the Claims (including this Agreement) to a third party in connection with a sale, transfer or assignment of the liabilities associated with the Claims, including a securitization transaction (a *"Loss Transfer Transaction"*).

(k)     Notices.  All notices and correspondence required to be given by this Agreement shall be delivered by hand or certified mail, return receipt requested and postage pre-paid, or by a nationally recognized courier service, or by facsimile transmission, and be addressed as follows:

If to BP:

> Mark Holstein, Esq.
> c/o Tara Lindsey
> BP Legal
> 501 Westlake Park Boulevard
> Houston, Texas 77079
> Tel.:  281-366-8895
> FAX: 281-366-5901

With a copy to:

> Thomas H. Milch, Esq.
> Arnold & Porter LLP
> 555 Twelfth Street, N.W.
> Washington, D.C.  20004
> Tel.:  202-942-5030
> FAX:  202-942-5999

If to Feinberg Rozen:

> Camille Biros
> Feinberg Rozen, LLP
> 1455 Pennsylvania Avenue, N.W., Suite 390
> Washington, D.C.  20004-1008
> Tel.:  202-371-1110
> FAX:  202-962-9290

With a copy to:

> David B. Pitofsky, Esq.
> Goodwin Procter LLP
> The New York Times Building
> 620 Eighth Avenue
> New York, New York 10018-6149
> Tel.:  212-813-8972
> FAX:  212-355-3333

15.   **DEFINITIONS**

The following words and phrases have the following special meanings.  Other words and phrases appearing in capital letters throughout this Agreement shall have the special meanings they are given with their first operative use.

"*Affiliate*" means a company or entity in which a party, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such party.  "*Control*" and, with correlative meanings, the terms "*controlled by*" and "*under*

13

*common control with*" means (a) the power to direct the management or policies of an entity, whether through ownership of voting securities or by contract relating to voting rights or corporate governance, resolution, regulation or otherwise, (b) to own twenty percent (20%) or more of the outstanding voting securities or other ownership interest of such entity, or (c) if not meeting the preceding, the owning or controlling entity owns or holds (directly or indirectly) at the maximum control or ownership right permitted in the country where such entity exists.

"***BP Administered Claim***" means Governmental Claims, Vessel of Opportunity Claims and any other Claim administered, settled or otherwise resolved by BP other than through the GCCF Claims Process.

"***Business***" means any entity, company, corporation, partnership, limited liability company or other organization that conducts business operations (whether or not for profit) and is incorporated, organized, or otherwise existing under the laws of any state.

"***Claim***" means a separate monetary demand or claim made by any Individual or Business against BP or its Affiliates as relief for each alleged bodily injury or death, damage to real or personal property, removal and cleanup costs, lost profits and lost earning capacity, or loss of subsistence use of natural resources suffered or sustained by such Individual or Business as a result of the Event. Notwithstanding the foregoing, Claim does not mean any worker's compensation claims, claims relating to criminal proceedings, Governmental Claims, Vessel of Opportunity Claims, or fines and penalties assessed by a Governmental Authority.

"***Claim File***" means a compilation of information regarding a Claim in electronic, paper or other form.

"***Claim Fund***" means the trust fund established by BP pursuant to the Trust Agreement from which Claims Payments shall be made.

"***Claimant***" means an Individual or Business that has made a Claim against BP or any of its Affiliates related to or arising out of the Event.

"***Claims Payment***" means a payment from the Claim Fund, or an account or subaccount thereof, to a Claimant for any GCCF Administered Claim.

"***Claims Protocols***" means the protocols adopted by the GCCF with respect to the administration and settlement of Claims. The Protocol for Interim and Final Claims is set forth in Exhibit B hereto.

"***GCCF Administered Claim***" means a Claim administered or settled through the GCCF Claims Process. Such Claims shall not include BP Administered Claims.

"***GCCF Claims Process***" means the process for the administration and settlement of Claims by GCCF, established, in part, through the Claims Protocols.

"***Governmental Authority***" means (a) a United States federal or state government (including agencies or entities of any such government, such as the United States Coast Guard and Environmental Protection Agency), (b) a federal or state legislative body, (c) a state or

federal court, including administrative court, (d) a special master or mediator, appointed or approved by a federal or state court, government, governmental agency or entity, or federal or state legislative body, with power or authority over the processes and performance of BP in connection with the Event, and (e) successors to the foregoing.

"*Governmental Claim*" means a monetary demand or claim made by a Governmental Authority against BP or its Affiliates as relief for removal and clean up costs, lost government revenues, increased costs of public services, and damage to real or personal governmental property, or otherwise, in each case suffered or sustained by such Governmental Authority as a result of the Event.

"*Governmental Termination Action*" means (i) a formal or official recommendation, action, order, decree, ruling, or decision of a Governmental Authority, communicated in writing to BP, (x) recommending, requiring, ordering, decreeing, ruling or deciding that this Agreement be terminated, or (y) the terms of which materially adversely affect the performance of the Services hereunder, and (ii) a statute, regulation, rule or other law promulgated by a state or United States federal legislative body that mandates termination of the Agreement, or that otherwise materially adversely affects the performance of the Services hereunder.

"*Individual*" means a natural person.

"*OPA*" means the Oil Pollution Act of 1990, as amended.

"*Subcontract*" means a contract between Feinberg Rozen and a Subcontractor.

"*Subcontractor*" means an independent contractor, subcontractor, vendor or service provider retained by Feinberg Rozen to perform a portion of the Services hereunder, which contractor, subcontractor, vendor or service provider has been approved by BP, which approval shall not be unreasonably withheld.   Such authorized Subcontractors shall be set forth on Exhibit G, as it may be amended from time to time by the parties.   "Subcontractor" does not include any experts retained by Feinberg Rozen to provide advice to Feinberg Rozen, as opposed to Services hereunder.

"*Trust*" means the trust established pursuant to the Trust Agreement.

"*Trust Agreement*" means the Trust Agreement, dated as of August 6, 2010, between BP, as grantor, John S. Martin, Jr. and Kent D. Syverud, as individual trustees, and Citigroup Trust - Delaware, N.A., as corporate trustee.

"*Trustee*"  means a trustee of the Trust.

"*Vessel*" means a boat, vessel, ship, hovercraft or other watercraft used principally at sea or on a waterway.

"*Vessel of Opportunity Claim*" means a separate monetary demand or claim made by an Individual or Business against BP or its Affiliates as relief for damage to a Vessel owned or leased by an Individual or Business, suffered or sustained as a result of use of such Vessel for

removal, clean up or containment efforts, on a "first responder" basis, in connection with the Event, as directed by BP.

**"*Worley*"** means Worley Catastrophe Response, LLC, Worley Catastrophe Services, LLC, and Worley Claims Services, LLC, collectively.

[*SIGNATURE PAGE FOLLOWS*]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**BP Exploration & Production Inc.**

By: _____

Title: __Director of Claims_____

Address: __501 Westlake Park Blvd__
_____Houston, Texas  77079_____

**Feinberg Rozen LLP**

By: _____

Title: _____

Address: _____

17

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**BP Exploration & Production Inc.**

By: _____

Title: _____

Address: _____

**Feinberg Rozen LLP**

By: _____

Title: _____

Address: _____

17

**EXHIBIT A**

**SERVICES**

Subject to the terms and conditions of the Agreement, Feinberg Rozen shall perform the following Services:

- **Claim intake services**, including maintenance of a call center, website and information technology systems to log, process and administer such intake.

- **Claim review services**.

- **Claim evaluation services**, including services of evaluators and other experts to determine losses and appropriate adjustments thereto.

- **Claim settlement and payment services**, including settlement of Claims and payments in settlement of Claims. Feinberg Rozen shall independently determine whether a given Claim is compensable and, if so, the appropriate amount of compensation. Feinberg Rozen's determinations with respect to OPA Claims will be guided by OPA and federal law. Determinations with respect to non-OPA Claims will be guided by applicable law. As the decisions of Feinberg Rozen regarding compensability of GCCF Administered Claims are independent, methodologies applied and decisions made by Feinberg Rozen in connection therewith shall not be deemed endorsed or concurred in by BP. All Claims Payments shall be made from the Claim Fund.

- **Claim administration services**, including maintenance of appropriate databases and information technology systems therefor.

**EXHIBIT B**

**CLAIMS PROTOCOLS**

# Gulf Coast Claims Facility Protocol
# for Interim and Final Claims
# November 22, 2010

## I. PURPOSE

This Protocol sets forth the procedure for the submission and resolution by the Gulf Coast Claims Facility ("GCCF") of Interim and Final Claims by Individuals and Businesses for costs and damages incurred as a result of the oil discharges from the April 20, 2010 Deepwater Horizon incident ("the Spill"). Claims for Emergency Advance Payments are governed by a separate protocol.

### A. Role

The United States Coast Guard ("USCG") has designated BP Exploration & Production, Inc. ("BP") as a Responsible Party under the Oil Pollution Act of 1990 ("OPA") for oil discharges from the Deepwater Horizon facility. Under OPA, Responsible Parties must establish a claims process to receive certain claims by eligible claimants. BP accepted the USCG designation as a Responsible Party and established and advertised a single claims facility for all claimants.

The GCCF is intended to replace BP's claims facility for Individuals and Businesses. The GCCF (and the protocols under which it operates) are structured to be compliant with OPA. Whether or not a claim has been presented shall be governed by OPA and applicable law. All documentation submitted by Individuals or Businesses in support of claims filed with the BP Claims Process have been transferred to the GCCF. BP has also authorized the GCCF to process certain non-OPA claims involving physical injury or death. Acceptance of payments offered pursuant to this Protocol shall be wholly voluntary, and participation in the GCCF shall not affect any right that the Claimant would have had absent such participation unless final resolution of the claim is achieved.

### B. Approach

The following non-exclusive principles apply to the operation of the GCCF:

- The GCCF will evaluate all claims in a prompt and fair manner guided by applicable law.
- The establishment of the GCCF does not diminish any right of any Individual or Business that existed prior to the creation of the GCCF; Claimants have all of the same rights with respect to their various claims that they had prior to the creation of the GCCF and shall not be forced to relinquish any rights for the opportunity to seek compensation through the GCCF, provided that acceptance of a Final Payment will require the execution of a release of liability, as discussed below.
- The GCCF claims process is structured to comply with OPA and apply the standards of OPA.
- Under OPA a claimant must file a claim with BP or the GCCF for OPA damages prior to seeking payment from the National Pollution Fund Center or commencing an action in court.

The GCCF is administered by Kenneth R. Feinberg ("the Claims Administrator"), a neutral fund administrator responsible for all decisions relating to the administration and processing of claims by the

GCCF. While the GCCF is an independent facility, it is important that the views of all stakeholders be considered. All stakeholders, including claimants, government entities, and BP, may provide input and comments regarding the GCCF process.

## II. ELIGIBILITY

### A. Removal and Clean Up Costs

1. Who may make a claim?

   Any Individual[1] or Business that incurred costs, as a result of the Spill for the removal of oil or to prevent, minimize, or mitigate oil pollution.

2. Required Proof

   o The actions taken were necessary for removal of oil discharged due to the Spill or to prevent, minimize, or mitigate oil pollution from the Spill;
   o The removal costs incurred as a result of these actions are reasonable and necessary; and
   o The actions taken to remove, prevent, minimize, or mitigate oil pollution were directed or approved by the Federal On-Scene Coordinator or are otherwise determined to be consistent with the National Contingency Plan.

3. What information should the Claimant submit?

   o Information or documentation (e.g., bills) showing the costs incurred after the Spill for removal of oil discharged as a result of the Spill or incurred after the Spill to prevent, minimize, or mitigate oil pollution from the Spill.
   o Information or documentation explaining how the actions taken to remove oil discharged as a result of the Spill were necessary to prevent, minimize, or mitigate the effects of the Spill.
   o Information or documentation showing that the actions taken were approved by the Federal On-Scene Coordinator or were consistent with the National Contingency Plan.
   o Information or documentation explaining why the costs were reasonable.

### B. Real or Personal Property

1. Who may make a claim?

   Any Individual or Business that owns or leases real or personal property physically damaged or destroyed as a result of the Spill.

   In order to avoid duplication of claims, an owner or lessee of the property must provide notice to all others with an ownership or lease interest in the property of the intent to file a claim. If duplicate claims are received, the GCCF will determine the appropriate claimant or claimants and their appropriate shares.

2. What information should the Claimant submit?

   o Information or documentation showing an ownership or leasehold interest in the property.
   o Information or documentation showing the property was physically damaged or destroyed.
   o Information or documentation showing the damages claimed were incurred as the result of the physical damage to or destruction of the property.
   o Information or documentation showing the cost of repair or replacement of the property, or economic losses resulting from destruction of the property.

  o Information or documentation showing the value of the property both before and after
     damage.

## C. Lost Profits and Lost Earning Capacity

1. Who may make a claim?

   An Individual or Business that incurred a loss in profits or earning capacity due to the injury,
   destruction, or loss of real property, personal property or natural resources as a result of the Spill.
   The Individual or Business need not be the owner of the injured property or resources to recover
   for lost profits or earnings.

2. What information should the Claimant submit?

   o Identification of injury, destruction, or loss to a specific property or natural resource.
   o Information concerning the Claimant's lost profits or earnings that were caused by the
      injury, destruction, or loss of specific property or natural resource as a result of the Spill
      (such as lost earnings by a fisherman whose fishing grounds have been closed or a hotel or
      rental property that has had decreased profits because beaches, swimming, or fishing areas
      have been affected by the oil from the Spill).
   o Reduction of earnings or profits, or increase in expenses resulting from such damage.
   o Amount of profits and earnings or expenses in comparable time periods.
   o Earnings received from alternative employment or business during the period when the loss
      was suffered, and expenses incurred in generating the alternative earnings.
   o Savings to overhead and other normal expenses not incurred as a result of the Spill.

## D. Subsistence Use of Natural Resources

1. Who may make a claim?

   Any Individual who uses the natural resources that have been injured, destroyed, or lost as a result
   of the Spill to obtain food, shelter, clothing, medicine, or other subsistence use.

2. What information should the Claimant submit?

   o Identification of the specific natural resources that have been injured, destroyed or lost as a
      result of the Spill for which compensation for loss of subsistence use is being claimed. The
      Claimant need not own the affected natural resource.
   o Description of the actual subsistence use made of each specific natural resource.
   o Description of how and to what extent the subsistence use was affected by the injury to or
      loss of each specific natural resource as a result of the Spill.
   o Description of expenditures made to replace or substitute for the subsistence use including
      any documentation verifying such expenditures.

## E. Physical Injury or Death

1. Who may make a claim?

   A claim may be made by an injured Individual or the representative of a deceased Individual for
   economic and non-economic damages for a physical injury or death proximately caused by the
   Spill or the explosion and fire associated with the Deepwater Horizon incident, or by the clean-up
   of the Spill.

Submitting a physical injury or death claim to the GCCF is entirely voluntary; a Claimant is not required to submit their physical injury or death claim to the GCCF in order to obtain a Final Payment for Removal and Clean up Costs, Real or Personal Property Damage, Lost Profits and Lost Earning Capacity, or Subsistence Use of Natural Resources. However, unlike claims under the Oil Pollution Act, claims for physical injury or death cannot be submitted to the National Pollution Funds Center.

2.  What information should the Claimant submit?

    o   Medical records or death certificate demonstrating physical injury or death.
    o   Medical records reflecting diagnosis by a medical practitioner.
    o   Information concerning the cause of physical injury or death.
    o   Information concerning the circumstances of the physical injury or death and the location where the physical injury or death occurred.
    o   Information concerning any total or partial disability of the Claimant.
    o   Records showing expenditures for medical care.
    o   Proof of lost income, if the Claimant seeks compensation for such lost income.
    o   Information and documentation regarding health care insurance or disability insurance.

F. Costs of Estimating Damages Claimed

Damages for claims for Removal and Clean Up Costs, Damage to Real or Personal Property, Lost Profits and Lost Earning Capacity, and Subsistence Use of Natural Resources, include the reasonable cost of estimating the damages claimed, but not attorney's fees or other administrative costs associated with preparation of the claim.

G. Causation

The GCCF will only pay for harm or damage that is proximately caused by the Spill. The GCCF's causation determinations of OPA claims will be guided by OPA and federal law interpreting OPA. Determinations of physical injury and death claims will be guided by applicable law.

III. FILING FOR COMPENSATION

A. Equal Access and Fair Adjudications in the Claims Process

All potential Claimants will be treated with respect, dignity, and fairness, without regard to race, color, sexual orientation, national origin, religion, gender, or disability. The GCCF shall strive to ensure that all Claimants can equally access the GCCF process, and that claims will be adjudicated fairly. Individuals with disabilities will be able to effectively communicate their claims and problems to the GCCF. Individuals with language barriers will have meaningful access to the process and to the GCCF. Individuals with low literacy will have documents and forms explained to them plainly and in a simple manner they understand.

B. Claim Form

1.  The Claimant will fill out a Claim Form for an Interim Claim or a Final Claim.
2.  Claimants shall submit the documentation requested on the Interim or Final Claim Form or other similar information sufficient both to substantiate the claim and for the GCCF to review and process the Interim or Final Claim.
3.  Legal Representatives of decedents, minors, incompetent or legally incapacitated persons may file on behalf of such claimants but will be required to show proof that the legal representative has

been duly appointed.

C. Process for Filing a Claim

An Interim or Final Claim Form may be obtained and submitted in any one of the following ways:

1. Via the Internet – Claimants may submit an Interim or Final Claim online by visiting the GCCF website: www.gulfcoastclaimsfacility.com. Claimants will be instructed to follow simple steps for completing an Interim or Final Claim Form. Interim and Final Claim Forms and Instructions will be available in English, Spanish, Vietnamese and Khmer. Claimants who have previously filed a claim for an Emergency Advance Payment will not be required to resubmit previously submitted documentation, but will be required to submit additional documentation necessary to substantiate the Interim or Final Claim. A Claim Form submitted via the Internet will require the electronic signature of the Claimant.

2. By Visiting a GCCF Claims Site Office – Claimants may visit one of the 35 Claims Site Offices established to assist Claimants with the claims submission process. The locations of the Claims Site Offices are posted on the GCCF website, www.gulfcoastclaimsfacility.com. If a visitor requires an interpreter and an interpreter is not available on site, the Claims Evaluator will make arrangements to provide these services either via conference call or a scheduled return trip to the Claims Site Office. A Claims Evaluator will assist the Claimant in completing an Interim or Final Claim Form. The Claimant will not be required to resubmit previously submitted documentation but will only be required to submit additional documentation necessary to substantiate the Interim or Final Claim. The Claim Form must be signed by the Claimant.

3. Via U.S. Postal Service – Claimants may call the toll free, dedicated telephone line to request that an Interim or Final Claim Form be mailed via U.S. Postal Service. The Interim or Final Claim Form will be mailed via U.S. Postal Service to the Claimant. The Claimant will not be required to resubmit previously submitted documentation but will only be required to submit additional documentation necessary to substantiate the Interim or Final Claim. The Claim Form must be signed by the Claimant. The Claimant may return the completed form via:

   o U.S. Postal Service:
     Gulf Coast Claims Facility
     P. O. Box 9658
     Dublin, OH 43017-4958
   o Overnight, Certified or Registered Mail:
     Gulf Coast Claims Facility
     5151 Blazer Parkway, Suite A
     Dublin, OH 43017-4958
   o Fax:
     1-866 682-1772
   o Email:
     info@gccf-claims.com
   o The toll-free telephone lines are as follows:

     ▪ Toll Free Number: 1-800 916-4893
     ▪ Multilingual Telephone Line: 1-800 916-4893
     ▪ TTY Telephone Line: 1-866 682-1758

All submitted Claim Forms, regardless of the method of submission, will be automatically forwarded to the Central Processing Database and integrated into a comprehensive GCCF Database.

# IV. APPLICATIONS FOR PAYMENT

Claimants have the option of submitting a claim for an Interim Payment or a Final Payment.

## A. Applications for Interim Payment

An Interim Payment covers only substantiated, past damages. An Interim Payment does not cover any future damages.

The following principles will apply to claims for an Interim Payment:

- In order to receive an Interim Payment, a Claimant shall not be required to execute a release or waive any rights to assert additional claims, to file an individual legal action, or to participate in other legal actions associated with the Spill.
- A Claimant who seeks an Interim Payment may make a subsequent claim for an additional Interim Payment or a Final Payment.
- An Interim Claim may not be submitted more frequently than once per quarterly period, unless the Claimant is able to demonstrate the presence of exigent circumstances, in which case an Interim Claim may be submitted more than once per quarterly period. An Interim Claim for the first quarterly period may be submitted up to and including December 31. An Interim Claim for the second quarterly period may be submitted up to and including March 31. An Interim Claim for the third quarterly period may be submitted up to and including June 30. An Interim Claim for the fourth quarterly period may be submitted up to and including September 30.
- When evaluating an Interim Claim, the GCCF will take into account and offset prior payments by BP, the GCCF, and collateral sources.
- In the event that the Claimant has submitted an eligible, substantiated claim, the GCCF will provide the Claimant with a payment determination for both an Interim Payment and Final Payment so that the Claimant can select which form of payment the Claimant desires.
- If the Claimant elects to receive an Interim Payment, should the Claimant make a subsequent claim for a Final Payment, GCCF's valuation of the Final Payment may change to reflect additional information and less uncertainty regarding damages.
- Any Interim Payment or Emergency Advance Payment made to a Claimant will be deducted from that Claimant's Final Payment.

## B. Applications for Final Payment

By applying for a Final Payment, an applicant is seeking to resolve all claims including any claims for future damages resulting from the Spill. A Final Payment constitutes a complete and final resolution of all claims for any past, current, or future losses that a Claimant has or may have with regard to the Deepwater Horizon incident and oil spill against BP and all other potentially liable parties, except as otherwise noted in paragraph V.C. of this Protocol. Accepting a Final Payment requires the Claimant to sign a release of past and future claims. The Release is attached to this Protocol as Tab A. In determining the Final Payment, the GCCF will take into account and offset prior payments by BP, the GCCF, and collateral sources.

# V. REVIEW PROCEDURES

## A. Determination of Claims

1. After an Interim Claim or a Final Claim is presented, the GCCF shall determine within 90 days

whether to make a payment to the Claimant and if so the amount of such payment.

2. Determinations of claims asserted under OPA will be guided by OPA. Determinations of physical injury or death claims will be guided, as applicable, by other federal law and pertinent state law.

3. If the GCCF determines that more information is necessary in order to resolve a claim, it will advise the Claimant promptly.

## B. Notification of GCCF Decision

The Claimant will be sent in writing: (1) the GCCF's decision regarding the claim, including the reason for any denial, reduction or increase to the claimed amount; (2) the amount of the determined compensation; and (3) in the case of an eligible claim for Final Payment, a Release to be signed by the Claimant. Offers of Final Payment shall be valid for 90 days, after which they are null and void.

## C. Acceptance of Final Payment

Claimant acceptance of a Final Payment is voluntary. Claimants who accept a Final Payment must sign a Release. A copy of the main Release is attached as Tab A. The Release will waive any rights the Claimant may have against BP and any other potentially liable parties to assert additional claims, to file an individual legal action, to participate in other legal actions associated with the Spill, or to submit any claim for payment by the National Pollution Funds Center. However, except where the Claimant accepts a Final Payment for physical injury or death, the Release will not waive the Claimant's rights with regard to a physical injury or death claim. If the Claimant elects to accept a Final Payment for a claim for physical injury or death, the Claimant will return to the GCCF a Release specifically waiving the Claimant's rights with regard to the Claimant's physical injury or death claim.

## D. Rejection of Interim or Final Payment Determination

A Claimant may elect to reject an Interim or Final Payment determination and, as permitted by law, either present the claim to the National Pollution Funds Center or commence an action in court. A claim for physical injury or death is not a claim under OPA and therefore cannot be submitted to the National Pollution Funds Center.

## E. Denial of Interim or Final Claim

If an Interim or Final Claim is denied, the Claimant may, as permitted by law, either present the claim to the National Pollution Funds Center or commence an action in court.

## F. Payment of Final Claims

Within fourteen (14) days of the receipt of the signed Release, the GCCF will issue payment to the Claimant.

## G. Collateral Source Compensation

The amount of compensation will be reduced by collateral source compensation that the Claimant has received due to the Spill where such collateral source compensation would be duplicative of payments by the GCCF.[2]

1. Payments that constitute collateral source compensation.

      o  Collateral source compensation includes, but is not limited to, insurance payments including health insurance payments, and payments by federal, state, or local governments related to the Spill, including unemployment benefits.

2. Payments that do not constitute collateral source compensation.

      o  Charitable donations and the value of services or in-kind charitable gifts such as provision of emergency housing, food, or clothing distributed to the Claimant.

## VI. APPEAL PROCEDURES

### A. No Waiver of Rights

Appeal by a Claimant or BP of a Final Payment determination under this section is voluntary. Such appeal shall not waive any rights the Claimant has under OPA or other applicable law.

### B. The Right to Appeal Pursuant to this Protocol

1. The Claimant may appeal a Final Claim determination of the GCCF if a total monetary award (including any Emergency, Interim or Final Payment made by BP or the GCCF) is in excess of $250,000. BP may appeal a Final Claim Determination of the GCCF if a total monetary award (including any Emergency, Interim or Final Payment made by BP or the GCCF) is in excess of $500,000.
2. If either the claimant or BP asserts that the Final Claim: a) presents an issue of first impression under OPA; or b) that the determination of the GCCF is inconsistent with prior legal precedent under OPA and that the Final Claim is likely to be representative of a larger category of claims to be considered by the GCCF, then a right to appeal may be granted by the Claims Administrator in his sole discretion.

### C. Timing of Filing of Appeal

Any appeal pursuant to this Section must be made within fourteen (14) days of notification of the GCCF's determination of the Final Claim.

### D. Selection of Appeals Judges

1. The Claims Administrator shall select one distinguished member of the legal profession (e.g., a retired federal or state judge, respected legal academic, professional mediator or arbitrator) who will identify distinguished members of the legal community (e.g., retired federal or state judges, respected legal academics, professional mediators or arbitrators) to serve as impartial GCCF Appeals Judges.
2. When an appeal is certified, the Claims Administrator will assign the appeal to a panel of three approved GCCF Appeals Judges for decision.

### E. Claim File

For any claim that is appealed by a Claimant, the Claimant will approve disclosure of the complete claim file to both BP and the assigned Panel of Appeals Judges. For any claim that is appealed by BP, the Claims Administrator will release only such information from the claim file as is necessary for BP to evaluate the decision and a decision by the Panel of Appeals Judges.

F. Timing of Appeal Decision

The Panel of Appeals Judges will decide the appeal within fourteen (14) days after receiving the claim file.

G. Applicable Law Governing Appeals

Appeals of claims asserted under OPA will be guided by OPA. Appeals of non-OPA claims (physical injury or death) will be guided by applicable federal and state law.

H. Tolling Period

Once an appeal commences, a Claimant may not file a claim against the Oil Spill Liability Fund, or file a claim in court, until the appeal pursuant to this Section is either decided or withdrawn.

I. Impact of the Appeal Decision

Any decision of the Panel of Appeals Judges shall be deemed final as to BP only. If the Claimant does not agree with the decision of the Panel of Appeals Judges, the Claimant may reject the GCCF determination and pursue a claim in the courts or as otherwise permitted under OPA.

## VII. REPORTING

The GCCF shall provide reports of non-personally identifiable information to state, local, and federal government officials and to BP to permit an evaluation of the claims process. The GCCF shall submit to interested parties, including BP, periodic reports of non-personally identifiable information regarding claims made and claims determinations.

## VIII. PERIOD FOR SUBMISSION OF CLAIMS

Claims for an Emergency Advance Payment will not be accepted after November 23, 2010. Claims for an Interim or Final Payment may be submitted to the GCCF through August 23, 2013. After that date, BP will continue to receive claims as required by OPA; under OPA, any action in court to recover damages must be filed within three (3) years after the date on which the injury and its connection with the discharge in question were reasonably discoverable with the exercise of due care. The time limitations do not begin to run against: (1) a minor until the earlier of the date when the minor reaches 18 years of age or the date on which a legal representative is duly appointed for the minor; or (2) an incompetent person until the earlier of the date on which such incompetent's incompetency ends or the date on which a legal representative is duly appointed for the incompetent. Claimants should be aware of this limitation period in determining whether to present their claims to GCCF or BP.

## IX. PRIVACY

Information submitted by a Claimant to the GCCF will be used and disclosed for purposes of: (1) processing the Claimant's claim for compensation and any award resulting from that claim; (2) legitimate business purposes associated with administering the GCCF, including the prevention of fraud and the determination of collateral source payments; and/or (3) as otherwise required by law, regulation or judicial process.

## X. QUALITY CONTROL AND PROCEDURES TO PREVENT AND DETECT FRAUD

A. Review of Claims

For the purpose of detecting and preventing the payment of fraudulent claims and for the purpose of accurate and appropriate payments to Claimants, the GCCF shall implement procedures to:

1. Verify and authenticate claims.
2. Analyze claim submissions to detect inconsistencies, irregularities, and duplication.
3. Ensure the quality control of claims review procedures.

B. Quality Control

The GCCF shall institute periodic quality control audits designed to evaluate the accuracy of submissions and the accuracy of payments.

C. False or Fraudulent Claims

Each Claimant will sign an Interim or Final Claim Form at the time of application, stating that he or she certifies that the information provided in the Claim Form is true and accurate to the best of his or her knowledge, and that he or she understands that false statements or claims made in connection with that application may result in fines, imprisonment, and/or any other remedy available by law, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution. Claims filed via the Internet will require an electronic signature which shall be equally as binding upon the Claimant as a physical signature. The GCCF shall refer all evidence of false or fraudulent claims to appropriate law enforcement authorities.

---

[1] For purposes of this Protocol, the term "Individual" includes the representative of a minor or incompetent individual.

[2] The offset of collateral source compensation will be used to prevent duplicative payments to a Claimant. The rights, if any, of the entity that made the initial payment to the claimant will be determined by the applicable law.

Case 2:10-md-02179-CJB-DPC   Document 963-2   Filed 01/10/11   Page 36 of 139

**EXHIBIT C**

**COMPENSATION**

1.      Feinberg Rozen's fees for performing the Services shall be Eight Hundred and Fifty-Thousand Dollars ($850,000.00) per month from the Effective Date through and including January 15, 2011.  The parties agree that the fees for Feinberg Rozen's performance of the Services after January 15, 2011 shall be mutually agreed to by the parties on a quarterly basis in advance of the first day of each successive calendar quarter, except that the fees for the period after January 15, 2011 during the first calendar quarter of 2011 shall be agreed upon by the parties prior to January 16, 2011.

2.      Feinberg Rozen's fees and costs shall be payable monthly in arrears, with the fees and costs for Services rendered during a particular month being payable on or before the last day of the following month.

3.      In addition to the foregoing fees for the Services, BP agrees to reimburse Feinberg Rozen for reasonable and normal business expenses required for Feinberg Rozen to perform the Services, including attorneys' fees and costs, which expenses have been approved by BP.  To receive reimbursement, Feinberg Rozen must provide BP with an expense report, in a timely manner, detailing the date, nature and business reason for each of Feinberg Rozen's expenditures, which report shall be supported by copies of receipts evidencing the costs and expenses incurred.

4.      Any Services performed by Feinberg Rozen or its Subcontractors as GCCF Paying Agents (as that term is defined in the Trust Agreement), or similar paying agent services performed prior to the selection of the GCCF Paying Agent pursuant to the Trust Agreement, shall be paid from the Claim Fund, and not directly by BP.

**EXHIBIT D**

**SECURITY REQUIREMENTS**

**Purpose:**

The purpose of this policy is to ensure that all information gathered in connection with the Services is treated appropriately, with regard for confidentiality and privacy and in compliance with all applicable laws.

**Policy Statement**

All persons who are entrusted with information gathered in connection with the Services must treat the information with due regard for confidentiality and the privacy interests associated with the information in accordance with this Agreement and with all applicable laws and regulations.  All disclosures of information must be restricted to the minimum disclosure necessary or required for the business needs of claims processing.

**Professionals Procedure**

All persons shall comply with all applicable laws and regulations, and with the following standards, in collecting, using, maintaining and disclosing information:

- Information shall be obtained only by ethical and lawful means.

- Every reasonable effort shall be made to ensure that the information collected, maintained, and acted upon is accurate, complete, timely, and relevant to the specific business purpose.

- Nonpublic personal financial and health information ("**NPI**") may include an individual's name, address, age, telephone number, social security number, assets, income, beneficiaries, employment and other personally-identifying information.

- Any loss, misuse, unauthorized access to or unauthorized use of confidential information or other violation of this Exhibit shall be reported immediately to the appropriate information security officer (or equivalent personnel) and to counsel set forth in the "Notices" section.

- Failure to treat confidential information in accordance with these policies and procedures will result in appropriate disciplinary action, including loss of access privileges and possible termination of employment.

- The responsibility to maintain the confidential nature of confidential information continues indefinitely after employment.

**Security, Integrity and Accessibility**

- Feinberg Rozen shall comply with BP's Data Security Policy (provided to Feinberg Rozen from BP from time to time) in order to protect the confidentiality, security, integrity and accessibility of NPI and other confidential data. Such Data Security Policy includes administrative, technical and physical policies, procedures and safeguards for the protection of all confidential information and shall be in addition to all other provisions, requirements and standards of this Exhibit.

- Logical access to the relevant networks and systems is limited to authorized persons. All users will have unique login accounts; no shared accounts will be used. Authentication is handled over secure, encrypted connections using enforced password complexity.

- Claims centers established for BP are secured areas and are used only for the processing of BP Claims.

- Network firewalls and intrusion detection/prevention devices must be implemented and operational.

- All Claims files and supporting documentation are stored in filing cabinets or other secure storage areas and the Claims centers are locked at the end of the business day.

- Any documentation that does not require retention is disposed of in a secure manner such as shredding.

- Desktops and laptops must have:  current and operational anti-virus/malware software; installation of personal firewalls where applicable; password-protected screen savers must have a wait period not to exceed thirty (30) minutes; critical security patches (i.e. O/S and applications) must be reasonably current; and disposal of any desktop/laptop must ensure the complete destruction of all hard drive contents, subject, always, to the requirements of any court orders or BP policies relating to document retention and preservation. Additionally, laptops must have full disk encryption.

**Digital Security**

Feinberg Rozen shall ensure that security management in connection with the Services is implemented in accordance with the "Controls" and "Implementation guidance" as defined and laid down in ISO 27002:2005.  In performing its obligations under this Agreement, Feinberg Rozen shall comply with the BP's Digital Security Standards, BP's Digital Security Operating Practices and all other applicable BP policies related to security management and information management and protection (*"BP IT Policies"*), copies of which shall be provided by BP to Feinberg Rozen from time to time.  The parties acknowledge that BP is currently undertaking a security and information technology audit of Feinberg Rozen's systems, networks and infrastructure to ensure that the Feinberg Rozen is in compliance with the BP IT Policies.  In the event that any deficiencies, gaps or other inconsistencies between the Feinberg Rozen IT Security Policy and the BP IT Policies are identified by such audit, the parties shall cooperate to take all reasonable actions necessary as soon as reasonably practicable (but in no event later than sixty (60) days) in order to remedy such

deficiencies, gaps or inconsistencies and determine the appropriate actions and standards that need to be implemented, provided that such remediation shall not relieve Feinberg Rozen of its obligations hereunder.

### Viruses Protection

Feinberg Rozen shall ensure that no virus is knowingly or intentionally introduced into any BP computer systems or networks and any Feinberg Rozen systems and shall take precautions to prevent any virus from being introduced including by ensuring that virus protection software is used and kept up to date.  If a virus has been introduced into BP's computer systems or networks and any Feinberg Rozen systems as a result of Feinberg Rozen's act or omission, Feinberg Rozen shall, at its own cost: (i) immediately notify BP; (ii) provide all necessary assistance to BP to minimize the effects of the virus; (iii) promptly take steps necessary to eliminate the virus from the affected system or network and prevent re-introduction of such virus; and (iv) if the presence of the virus results in a loss of data or has a negative impact on the operation of the affected system, mitigate the loss, restore the data and ensure the operation of the affected system is remedied.

### Access by Feinberg Rozen Personnel to BP's Systems

The parties currently do not contemplate that Feinberg Rozen will have access to any BP systems or networks.  In the event that access is required or contemplated, Feinberg Rozen shall comply with BP's policies related thereto, including its Digital Systems Use Practice, a copy of which shall be provided by BP to Feinberg Rozen.

### Penetration Testing

1. BP may, from time to time upon reasonable notice to Feinberg Rozen, carry out security and penetration tests of the systems and infrastructure and any devices directly connected thereto that form part of the Services provided by Feinberg Rozen under this Agreement (*"Target Systems"*).  All references in this clause to a *"Tester"* shall include the party which carries out the security assessment and test or a third party tester engaged to carry out security assessments and tests.

2. Tests may be performed from time to time with the intent of evaluating and testing the measures that are in place to protect the Target Systems against unauthorized access, and to identify security weaknesses in the Target Systems (the *"Tests"*).  Feinberg Rozen consents, and shall obtain the consent of the security officer of BP (and, where relevant, any required third party consents), to the Tester performing the Tests, such consent not to be unreasonably withheld or delayed.

3. The Tests shall be performed only during the times notified by BP at least seven days in advance, provided that this notice period shall not be applicable where the deployment of emergency changes to the Target Systems is required to remove security vulnerabilities.

4. The Tester will use reasonable care to carry out the Tests in a manner which aims to identify security weaknesses but not to take undue advantage of found weaknesses to cause damage. Where the Tester is BP, the Tester shall inform the appropriate security contacts that there is a risk that some damage to the Target Systems may occur, especially if security weaknesses exist in the Target Systems and if the Tester is a third party, the relevant instructing party shall ensure that the Tester gives such a warning.

5. Prior to the commencement of the Tests, the parties shall agree to a list of authorized persons for the purpose of notices during the Tests and shall specify contact numbers for such authorized persons. The Tester will immediately stop the Tests upon notice from any one of the authorized persons of a party. Notice to stop shall be given first by telephone and immediately confirmed by email to the relevant party's authorized persons. The Tester will also stop the Tests if it has reason to believe that such Tests are causing damage or are about to cause damage to or access the Target Systems or any systems not part of the Target Systems.

6. If, contrary to the provisions of paragraph 5 above of this Exhibit, the Tester continues to perform the Tests, the Tester or, where the Tester is a third party, the relevant instructing party (as the case may be), shall be responsible for damage caused to the Target Systems or third party property as a result of continuing the Tests. Feinberg Rozen shall indemnify BP against all losses, damages, liabilities, expenses and costs (including reasonable legal costs) which BP may incur or suffer as a result of any damage to their property or a third party's property caused by the negligence of Feinberg Rozen in the carrying out of the Tests.

7. Both parties acknowledge that the Tests carried out in accordance with this Exhibit are authorized, provided that they are carried out strictly in accordance with the provisions of this Exhibit. Both parties shall put in place adequate measures internally to ensure that, in the event of activity under this Exhibit being detected by its personnel or contractors, they do not notify the police or other authorities, but report the matter internally in the first instance. In the event that the police or other authorities are advised of activities under this Exhibit, both parties shall promptly advise them that such activities have been carried out with the other party's full knowledge and permission. Where required, Feinberg Rozen shall obtain the agreement of the owners of the systems it manages that such owners will comply with this clause.

8. The parties agree that the work performed under this Exhibit and any results of the work will be treated as Confidential Information.

9. Feinberg Rozen acknowledges that the Tester's work will be carried out, and the deliverables will be prepared, on the specific instructions of one of the parties and for such party's own use. Each party shall provide the other with a report of the findings of the assessment to be used in the remedy of security weaknesses found. This report shall be treated as Confidential Information.

10. At no time, including during the period of Tests, is either party relieved of its responsibilities under the Agreement in terms of security monitoring and incident reporting, save as explicitly set out in this Exhibit.

**Data Protection**

1. For the purposes of this Exhibit:

    1.1    *"personal data"* means any information relating to an identifiable individual that is processed by Feinberg Rozen as a result of, or in connection with, the provision of the Services; an identifiable individual is one who can be identified, directly or indirectly, in particular by reference to an identification number or to one or more factors specific to his physical, physiological, mental, economic, cultural or social identity; and

    1.2    *"BP personal data"* means personal data provided to Feinberg Rozen by BP in connection with the provision of the Services.

2. Feinberg Rozen agrees that it shall (and shall require that each of its employees and Subcontractors shall):

    2.1    ensure that the technical and organizational measures shall be appropriate to the harm which might result from any unauthorized or unlawful processing and accidental loss, destruction or damage to the personal data and having regard to the nature of the personal data which is to be protected;

    2.2    ensure the reliability of any employees who have access to personal data and that all employees involved in the processing of personal data have undergone adequate training in the care, protection and handling of personal data;

    2.3    promptly refer to BP any queries from individuals, any data protection authority or any other law enforcement authority, for BP to resolve;

    2.4    notify BP of any unauthorized or unlawful processing or any accidental loss, destruction, damage, alteration or disclosure of personal data as soon as it becomes aware and keep BP informed of any related developments;

    2.5    not process or permit the processing of personal data outside the country in which Feinberg Rozen is established other than with the prior written consent of BP and, where such consent is granted, Feinberg Rozen undertakes to enter into a suitable agreement with BP and/or any relevant parties and/or adopt any necessary measures in order to ensure an adequate level of protection with respect to the privacy rights of individuals; and

    2.6    if any part of BP's personal data ceases to be required by Feinberg Rozen for the performance of its obligations under this Agreement, or on termination or expiration of the Agreement (whichever is earlier), Feinberg Rozen shall return to BP all of BP's personal data that has been obtained or collected in providing the Services under this Agreement, subject to the requirements of any court orders relating to document retention, and certify to BP that it has done so, unless legislation imposed upon Feinberg Rozen prevents the return of all or part of the personal data.  In that case,

Feinberg Rozen shall continue to ensure the confidentiality of BP's personal data in its possession and will not actively process such data any further.  At the termination or expiration of this Agreement, Feinberg Rozen shall (a) continue to ensure the confidentiality of the personally identifying information received from Claimants, (b) not actively process such data any further, and (c) not destroy any such data.

3. To safeguard the security of information interests of employees, contractors and customers in respect to privacy and data protection, Feinberg Rozen agrees that (in addition to its other obligations under this Agreement) adequate technical and organizational measures for the protection of the data must be in place:

    3.1    to prevent unauthorized persons from gaining access to data processing systems with which the data are processed or used.

    3.2    to prevent data processing systems from being used without authorization.

    3.3    to ensure that persons entitled to use a data processing system have access only to the data to which they have a right of access, and that the data cannot be read, copied, modified or removed without authorization in the course of processing or use and after storage.

    3.4    to ensure that the data cannot be read, copied, modified or removed without authorization during electronic transmission or transport, and that it is possible to check and establish to which bodies the transfer of data by means of data transmission facilities is envisaged.

    3.5    to ensure that it is possible to check and establish whether and by whom the data have been input into data processing systems, modified or removed.

    3.6    to ensure that the data are processed strictly in accordance with data controller's given instructions.

    3.7    to ensure that the data are protected from accidental destruction or loss.

    3.8    to ensure that data collected for different purposes can be processed separately.

**<u>EXHIBIT E</u>**

**<u>DOCUMENT RETENTION</u>**

See attached.

CAUSE NO. 2010-25245

**FILED**
Loren Jackson
District Clerk

**Stone**

APR 3 0 2010

Time: ———————
Harris County, Texas

v.

By ——————————
Deputy

| | | |
|---|---|---|
| | § | **IN THE DISTRICT COURT OF** |
| | § | |
| | § | **HARRIS COUNTY, T E X A S** |
| | § | |
| **Transocean Offshore Deepwater** | | |
| **Drilling, Inc., et al.** | § | **157th JUDICIAL DISTRICT** |

### TEMPORARY RESTRAINING ORDER

The application of Plaintiffs for a temporary restraining order has been presented to me on this 30th day of April, 2010.

Defendants TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., DEEPWATER HORIZON, BP PRODUCTS NORTH AMERICA, INC., HALLIBURTON ENERGY SERVICES, CAMERON INTERNATIONAL CORPORATION D/B/A CAMERON SYSTEMS CORPORATION and MI SWACO are ORDERED:

(1)     to reasonably refrain and resist from any changing, alteration and/or destruction of any documents pertaining to the April 20, 2010, explosion, including all information stored, held or maintined in electronic format or via the internet.

(2)     to reasonably refrain and resist from any changing, alteration and/or destruction of any and all tools, instrumentalities, and/or devices which may have been used by workers, in any capacity as well any work authorizations or other documents indicating status of work at the time of the event in question as well as any and all physical evidence of any kind in any way connected with the accident and/or accident scene in question.

This Order applies to TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., DEEPWATER HORIZON, BP PRODUCTS NORTH AMERICA, INC., HALLIBURTON ENERGY SERVICES, CAMERON INTERNATIONAL CORPORATION D/B/A CAMERON SYSTEMS CORPORATION and MI SWACO and their attorneys, agents, servants, and employees.

THE COURT RECOGNIZES THE ONGOING RESCUE, RECOVERY, WELL CONTROL, REMEDIAL AND INVESTIGATION EFFORTS.  THIS ORDER DOES NOT RESTRICT THE DIRECTION OR ACTIVITIES OF ANY OF THE DEFENDANTS OR ANY LOCAL, STATE OR FEDERAL GOVERNMENTAL ENTITY OR AGENCY IN THEIR INVESTIGATION, RECOVERY, WELL CONTROL, REMEDIAL OR RESCUE EFFORTS.

It is ORDERED ADJUDGED, and DECREED that a hearing on the temporary injunction and application be, and it is hereby set for the _10th_ day of _May_, 2010, at _9_ o'clock, _P.m._.

This Temporary Restraining Order shall become effective immediately upon the posting of a bond in the amount of $100.00 DOLLARS or deposit of $100.00 DOLLARS with the Clerk of the Court.

It is ORDERED, ADJUDGED and DECREED that notice issue to the Defendants, TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., DEEPWATER HORIZON, BP PRODUCTS NORTH AMERICA, INC., HALLIBURTON ENERGY SERVICES, CAMERON INTERNATIONAL CORPORATION D/B/A CAMERON SYSTEMS CORPORATION and MI SWACO, commanding them to appear and show cause, if any, why the Temporary Injunction to preserve and maintain all documents and tangible evidence pertaining to the April 20, 2010 explosion at the Deepwater Horizon, including all information stored, held or maintained in electronic format or via the internet as prayed for in Plaintiffs' Application should not be granted.

SIGNED on this _30th_ day of _April_, 2010.

_____
Judge Presiding



**U.S. Department of Justice**

May 3, 2010

Robert Bondy
General Counsel
BP plc
501 Westlake Park Boulevard
Houston, TX 77079

Eric B. Brown
General Counsel
Transocean Ltd.
4 Greenway Plaza
Houston, TX  77046

Bert Cornelison
General Counsel
Halliburton Co.
3000 N. Sam Houston Pkwy E.
Houston, TX 77032

Re:  Preservation of Potentially Relevant Information
Fire and Explosion at Deepwater Horizon, April 20, 2010

Dear Counsel:

As you know, on or about April 20, 2010, a fire and explosion occurred on a mobile offshore drilling unit, the "Deepwater Horizon," located in the Gulf of Mexico about 50 miles from the Louisiana shore.  Lives were lost.  The resulting oil spill is causing massive and potentially unprecedented environmental damage.  The oil leak is ongoing.  An important priority is protection of human health and the environment and minimization of damage resulting from the spill.

We believe it prudent to note the ongoing requirement that your respective clients as well as their respective employees, officers, directors, agents, affiliates, contractors, and subsidiary and parent companies take all steps necessary to identify, retain, and preserve "potentially relevant information" relating to the fire and explosion at the Deepwater Horizon and resulting spill including, but not limited to, for any events leading up to and subsequent to this fire, explosion and spill, and any release or threatened release of oil or other substances, costs and damages.

"Potentially relevant information" includes any tangible thing such as physical materials, documents and electronically stored information. Electronically stored information must be maintained and preserved in its original "native" format. The preservation obligation should be interpreted broadly, because the knowing destruction of records even in anticipation of a federal investigation could result in obstruction of justice pursuant to 18 U.S.C. §§ 1505 and 1519.

Among the potentially relevant information that must be preserved is all such information related to any potential claim or defense pursuant to the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 et seq., the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 et seq., the Clean Water Act, 33 U.S.C. §§ 1251 et seq., and any other applicable law relating to this matter, including without limitation information relating to:

a.  The events leading up to and causes of and responses to the fire, explosion, discharges, releases, damages, as well as any other aspects of this subject;

b.  The steps necessary to abate the discharges, releases and damages, and the costs associated with such steps;

c.  The damages caused by the discharges and releases, including damages to natural resources;

d.  Any violation of federal law associated with the fire, explosion, discharges, releases or other aspects of this subject;

e.  Any economic benefit derived from any violation of federal law associated with the fire, explosion, discharges, releases or other aspects of this subject;

f.  The financial status of any party who committed any such violation;

g.  The efforts of any such party to comply with the law;

h.  Any other factor that might be relevant to determining liability, damages, penalties or cost recovery related to the fire, explosion, discharges, releases or other aspects of this subject;

i.  Any potential defense in any potential action pursuant to the statutes listed above or others; and

j.  Any information or communications relating to (i) the federal lease including seeking the lease; and (ii) installation, operation and maintenance of the Deepwater Horizon including safety measures.

Consistent with the Sedona Principles, the following persons are points of contact from our offices for potential discussions about retention obligations:

Sarah Himmelhoch
Senior Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
(202) 514-0180
sarah.himmelhoch@usdoj.gov

Stephen G. Flynn
Assistant Director
Aviation and Admiralty Litigation Section
Torts Branch, Civil Division
(202) 616-4070
stephen.flynn@usdoj.gov

Thank you for your immediate attention to this important matter.

Sincerely,

John C. Cruden
Deputy Assistant Attorney General
Environment & Natural Resources Division

Ann Ravel
Deputy Assistant Attorney General
Civil Division

cc:    Thomas H. Milch
       Joel M. Gross



U.S. Department of
Homeland Security

United States
Coast Guard

Commandant
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-0001
Staff Symbol: CG-5451
Phone: (202) 372-1029
Fax: (202) 372-1907

May 4, 2010

Antonio J. Rodriguez, Esq. as Counsel for BP
Fowler Rodriguez Valdez-Fauli
400 Poydras Street, 30th Floor
New Orleans, Louisiana

The United States Coast Guard (USCG) and Minerals Management Service (MMS) have
convened a Joint Investigation to investigate the explosion, fire, pollution and sinking of the
Mobile Offshore Drilling Unit DEEPWATER HORIZON. The Joint Investigation Team
understands that the Department of Justice sent a letter to counsel for, among others, BP and
Transocean noting records preservation requirements. The instant letter addresses preservation
requirements specifically related to the Joint Investigation.

For purposes related to the Joint Investigation, the Joint Investigation Team formally requests
that your respective clients as well as their respective employees, officers, directors, agents,
affiliates, contractors, and subsidiary and parent companies take all steps necessary to identify,
retain, and preserve "potentially relevant information" relating to the fire and explosion at the
DEEPWATER HORIZON including any events leading up to and subsequent to this fire,
explosion and spill.

"Potentially relevant information" includes any tangible thing such as physical materials,
documents and electronically stored information. Electronically stored information must be
maintained and preserved in its original "native" format. The preservation obligation should be
interpreted broadly. The potentially relevant information that must be preserved is all
information related to this matter, including without limitation information relating to:

    -- the events leading up to and causes of the fire, explosion, discharges, releases,
damages, as well as any other aspects of this occurrence;

    -- any violation of federal law associated with the fire, explosion, discharges, releases or
other aspects of this subject; and

    -- any efforts of any such party to comply with the law;

    -- any information or communications relating to (i) the federal lease including seeking
the lease; and (ii) installation, operation and maintenance of the DEEPWATER HORIZON
including safety measures.

Thank-you, and if you have any questions concerning this matter please contact Lieutenant
Commander Jeff Bray of my staff at (202) 309-9559, or E-mail at jeff.r.bray@uscg.mil.

Sincerely,

Hung M. Nguyen
Co-Chair, Marine Board of Investigation
Captain, U.S. Coast Guard
By direction of the Commandant

    

**Gulf Coast State Attorneys General**

| Troy King | James D. "Buddy" Caldwell | Bill McCollum | Jim Hood | Greg Abbott |
|---|---|---|---|---|
| Attorney General | Attorney General | Attorney General | Attorney General | Attorney General |
| State of Alabama | State of Louisiana | State of Florida | State of Mississippi | State of Texas |

Rupert Bondy
Group General Counsel
BP P.L.L.C.
International Headquarters
1 St James's Square
London, SW1Y 4PD
UK

Stephen R. Winters, Esq.
Associate Group General Counsel
Refining and Marketing, Global
BP America Inc.
4101 Winfield Road – 4W
Warrenville, Illinois 60555

Mr. Doug Suttles
Chief Operating Officer
BP Exploration & Production Inc.
200 Westlake Park Boulevard
Houston, Texas 77079

Dear Messrs. Bondy, Winters & Suttles:

As the Attorneys General for the five Gulf Coast states, we write concerning the Deepwater Horizon oil spill that threatens our coasts and shared natural resources—as well as the livelihood of our coastal citizens and communities.

In the wake of the tragic loss of human life that has already occurred, our top concern now must be the well-being of the precious environmental and wildlife resources of our states. Protecting the fragile coastal ecologies and economies is critical to preserving the ongoing sustainability of our coastal communities. From the fisherman and shrimpers who rely directly upon the Gulf for their income, to the local businesses that are sustained by our fishing communities, and the small businesses that thrive on coastal tourism, this oil spill threatens the health and safety of our coastal communities. In addition, if the oil spill is not fully remediated, it could be an ecological and economic disaster for all of our states.

At a time when local communities are struggling with budget shortfalls, coastal towns and cities cannot afford to fund the necessary mitigation and clean-up efforts. The same is true for each of our states. Yet without the necessary financial resources it will be impossible to both protect and restore the Gulf. As a result, we are focused on working—hopefully cooperatively—with BP and others to ensure that our state and local governments, as well as our citizens and communities, have access to the financial resources necessary to prevent further environmental degradation, mitigate future ecological damage, and fully

restore the Gulf to its natural state, as well as to compensate for any economic losses suffered on an individual, corporate, and governmental level.

BP has extensive liability for the consequences of this spill, including but not limited to under the Oil Pollution Act of 1990. Indeed, Mr. Tony Hayward, your Chief Executive, has publicly accepted responsibility for the oil spill on BP's behalf.

With that in mind, we appreciate the statement that BP issued recently reaffirming its commitment to "pay all necessary and appropriate clean-up costs" and detailing claims procedures for those seeking reimbursement. Further, we understand that yesterday morning BP provided $25 million each to Louisiana, Florida, Alabama, and Mississippi to pay for mitigation and remediation efforts. These up-front payments—in addition to the payments that BP has already begun making to reimburse expenses incurred by state and local governments—reflect an important step in the right direction and show that BP has begun to make good on its promise to fully fund the protection and clean-up of our coastline. While we appreciate BP's demonstrated commitment thus far, the Mississippi Canyon #252 site is still releasing oil into the Gulf and clean-up efforts are expected to last for months or longer—so additional resources will undoubtedly be necessary before our coast has been properly remediated.

We must consider all appropriate measures to preserve taxpayer dollars and maximize the financial resources available to fund this massive clean-up and recovery effort. Because current indications suggest that the magnitude of the damage inflicted and losses expected will very likely exceed the total amount of money currently in the Oil Spill Liability Trust Fund, we request that BP memorialize its public statements and provide further assurances going forward as to paying all legitimate claims that stem from this oil spill —which will allow us to advise our states on how best to plan for the future.

Additionally, to help facilitate the flow of accurate and timely information between our offices and BP, we request that you assign an individual to serve as our point of contact on this matter. Doing so will ensure that each of our offices can quickly and effectively communicate with BP about any problems, concerns or questions that arise during the clean-up effort.

Finally, although we appreciate BP's commitment to cooperation thus far, there are multiple outstanding questions about the cause and ultimate effect of the oil spill. Thus, while all of our efforts are concentrated on the environmental impact of this disaster, it is certainly possible that there may be governmental investigations at some point in the future. Accordingly, we would ask that BP and any of your affected employees or affiliated organizations preserve any documents, data compilations (including electronically recorded and stored data), tangible objects or other information relevant to the explosion of the Deepwater Horizon oil rig, the resulting oil spill or the clean-up effort in the form in which they currently exist until further notice. Regardless of BP's current retention policy, please ensure that the appropriate person within each entity takes all necessary measures to avoid the destruction or modification of any such records.

We look forward to your prompt response on this important matter.

Sincerely,

| Troy King | James D. "Buddy" Caldwell | Bill McCollum | Jim Hood | Greg Abbott |
|---|---|---|---|---|
| Attorney General | Attorney General | Attorney General | Attorney General | Attorney General |
| State of Alabama | State of Louisiana | State of Florida | State of Mississippi | State of Texas |

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ACY J. COOPER, JR. AND RONNIE LOUIS ANDERSON, ETC. | CIVIL ACTION |
| VERSUS | NO. 10-1229 |
| BP, plc, ET AL | SECTION "N" (1) |

# <u>O R D E R</u>

Subject to further orders of the Court, **IT IS ORDERED** that Plaintiffs' request for a Protective Order is hereby **GRANTED** in the following respects:

## I.  PRESERVATION ORDER

1.     The Defendants, Transocean Offshore Deepwater Drilling, Inc., Deepwater Horizon, BP Products North America, Inc., Halliburton Energy Services, Cameron International Corporation d/b/a Cameron Systems Corporation and MI SWACO, through their officers, agents, employees, and subcontractors,  are ordered:

(a)  To reasonably refrain and resist from any changing, alteration and/or destruction of any documents pertaining to the April 20, 2010 explosion or subsequent efforts expended in connection with such event, including all information stored, held or maintained in electronic format or via the internet; and to take immediate action to prevent the automatic and/or systematic programmed deletion or discarding of such documents.

1

(b)  To reasonably refrain and resist from any changing, alteration and/or destruction of any and all tools, instrumentalities, and/or devices which may have been used by workers, in any capacity, as well as any work authorizations or other documents indicating status of work at the time of the event in question as well as any and all physical evidence of any kind in any way connected with the accident and/or accident scene in question.

2.    This order shall **not** be construed in any way to restrict the direction or activities of any of the Defendants or any local, state or federal governmental entity or agency in their investigation, recovery, well control, remedial or rescue efforts.

3.    Except for good cause shown, each Defendant shall create and maintain and promptly update a confidentiality/privilege log in a searchable electronic format that can be used with commercially available database software (e.g., Microsoft Access) identifying the following information for each document produced or made available in this litigation: the documents (a) beginning and ending Bates numbers; (b) date; (c) title; (d) document type; (e) author(s); (f) recipient(s); and (g) confidentiality status (e.g., Confidential, Highly Confidential, or Non-Confidential, as defined hereinbelow).  Each Defendant shall update the confidentiality/privilege log on the first business day of each month. Each confidentiality/privilege log shall reflect all documents produced or declared confidential by the Defendant by the fifteenth day of the prior month. Documents designated "Confidential-Subject to Protective Order" or "Highly Confidential-Subject to Protective Order" that inadvertently do not appear on the confidentiality/privilege log are nonetheless "Confidential" or "Highly Confidential Information" under this Order.

4.    Such confidentiality/privilege log shall be subject to prompt production at a future date and time pursuant to further Order of the Court.  Production of such confidentiality/privilege log shall be made within seven (7) days of any such order, and the confidentiality/privilege log produced shall be complete up through the fifteenth day of the month prior to that in which it is produced.

5.    It is expressly understood by and between the parties that in identifying and designating Confidential Information or Highly Confidential-Restricted Information in this litigation, the parties shall be relying upon the terms and conditions of this Protective Order.

6.    No provisions of this Protective Order shall restrict any party's counsel from rendering advice to its clients with respect to this Action and, in the course thereof, relying upon Confidential or Highly Confidential Information, provided that in rendering such advice, counsel shall not disclose any other party's Confidential or Highly Confidential Information other than in a manner provided for in this Protective Order.

7.    By written agreement of the parties, or upon motion and order of the Court, the terms of this Protective Order may be amended, modified, superseded or vacated.  This Protective Order shall continue in force until amended or superseded by express order of the Court, and shall survive any final judgment or settlement in this Action.

## II.  PROTECTIVE ORDER

8.    **IT IS FURTHER ORDERED** that, for purposes of this Order, the Designation of Confidential or Highly Confidential-Restricted Information are defined and treated as follows:

3

(1)    *"Confidential Information"* as used herein means any information that the Producing Party believes in good faith constitutes, reflects, discloses, or contains information subject to protection under Fed. R. Civ. P. 26(c) or other applicable law, whether it is a document (electronic or otherwise), information contained in a document, information revealed during a deposition or other testimony, information revealed in an interrogatory response, or information otherwise revealed.  In designating discovery materials as Confidential Information, the Producing Party shall do so in good faith consistent with the provisions of this Protective Order and the rulings of the Court, and shall not be overly broad in designating information as Confidential Information under this Protective Order.

Specific documents and discovery responses produced by a Producing Party shall be designated as Confidential Information by marking the pages of the document that contain Confidential Information as follows: "CONFIDENTIAL  —  SUBJECT TO PROTECTIVE ORDER."

(2)    *"Highly Confidential-Restricted Information"* as used herein means any information that the Producing Party believes in good faith constitutes, reflects, discloses, or contains information subject to protection under Fed. R. Civ. P. 26(c) or other applicable law, and that contain highly sensitive and competitive information, the disclosure of which to persons other than those designated in this Protective Order would pose a substantial risk of serious harm, economic or otherwise, to the Producing Party.  In designating discovery materials as Highly Confidential-Restricted Information, the Producing Party shall do so in good faith consistent with

the provisions of this Protective Order and the rulings of the Court, and shall not be overly broad in designating information as Confidential Information under this Protective Order.

Specific documents and discovery responses produced by a Producing Party shall be designated as Highly Confidential-Restricted Information by marking the pages of the document that contain Confidential Information as follows: "HIGHLY CONFIDENTIAL — RESTRICTED — SUBJECT TO PROTECTIVE ORDER."

(3)   Where the Producing Party is a defendant, "Competitor" as used herein shall mean any other defendant that provides the same or similar services as the Producing Party.

(4)   Information, other than .tiff images, produced in electronic form (including but not limited to electronic files, databases, programs, tapes, discs or other electronic information) ("Electronic Material") not physically marked as otherwise required under Paragraphs (1) and (2) above, may be designated as Confidential or Highly Confidential-Restricted by marking the outside of the storage medium on which the information is produced or by making the designation in writing. The Receiving Party shall mark any hard copy print-outs and the storage medium of any permissible copies of Electronic Material designated as Confidential or Highly Confidential-Restricted with the appropriate "CONFIDENTIAL  —  SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL-RESTRICTED  —  SUBJECT TO PROTECTIVE ORDER" legend.

(5)   Information disclosed at a deposition taken in connection with this Action may be designated by the Producing Party as Confidential Information or Highly Confidential-Restricted Information by designating the portions of the transcript in a letter to be served on the court reporter and all counsel within seven (7) business days of the date the court reporter makes the transcript

5

available for the Producing Party's review. The letter shall direct the court reporter to indicate the portions designated as Confidential Information or Highly Confidential-Restricted Information and segregate them as appropriate. Designations of transcripts will apply to audio, video, or other recordings of the testimony. The court reporter shall clearly mark any transcript released prior to the expiration of the seven (7) day period as "Confidential-Subject to Further Confidentiality Review" or "Highly Confidential-Restricted Information." Such transcripts will be treated as Confidential Information or Highly Confidential-Restricted Information and shall be fully subject to this Protective Order, until the expiration of the seven (7) days after the transcript was made available by the court reporter. If the Producing Party does not serve a designation letter within the seven (7) day period, then the entire transcript will be deemed not to contain Confidential Information or Highly Confidential-Restricted Information. The parties may agree to a reasonable extension of the seven (7) day period for serving the designation letter.

(6) A party in this Action may designate as Confidential or Highly Confidential-Restricted any document or information produced, or testimony given, by any other person or entity that the party reasonably believes qualifies as such party's Confidential or Highly Confidential Information pursuant to this Protective Order. If any third party produces information that any party in good faith believes constitutes its Confidential or Highly Confidential-Restricted Information, the party claiming confidentiality shall designate the information as such within seven (7) days of its receipt of such information. Any party receiving information from a third party shall treat such information pursuant to this Protective Order during this seven (7) day period while all parties have an opportunity to review the information and determine if it should be designated as Confidential or

Highly Confidential-Restricted Information. Any party designating third party information as Confidential or Highly Confidential-Restricted shall have the same rights as a Producing Party under this Order with respect to such information.

(7) Subject to Paragraph (11) below, the Receiving Party may disclose Confidential Information only to the following people:

(a) Counsel for the Receiving Party, including any in-house counsel employed by such party, and the attorneys, paralegals, stenographic, and clerical staff employed by such counsel who are working on the Action under the direction of such counsel and to whom it is necessary that the Confidential Information be disclosed for purposes of the Action;

(b) With respect to any Confidential Information produced by any plaintiff or third party with respect to plaintiff, any employee of the Defendants to whom it is necessary to disclose such information for the purpose of assisting in, or consulting with respect to, the preparation of this Action;

(c) Stenographic employees, court reporters, and videographers recording or transcribing testimony in this Action;

(d)　The Court, any Special Master appointed by the Court, and any members of their staffs to whom it is necessary to disclose the Confidential Information;

(e)　Subject to Paragraph (5), any witness during a deposition;

(f)　Counsel for claimants in other pending litigation alleging property damage, personal injury, or any economic loss arising from the alleged contamination: (i) already operating under a protective order governing the use of confidential information, or (ii) agrees to be bound by this Order and signs the certification described in Paragraph (9) below;

(g)　Any outside consultant or expert who has signed the certification described in Paragraph (9) below; and

(h)　Any representative of any of the Receiving Party's insurance carriers who has signed the certification described in Paragraph (9) below.

(8)　The Receiving Party may disclose Highly Confidential-Restricted Information only to the following people:

(a)　Outside Counsel for Defendants in this Action, including attorneys, paralegals, stenographic and clerical staff employed by such counsel who are working on the Action under the direction of such counsel and to whom it is necessary that the Highly Confidential-Restricted Information be disclosed for purposes of the Action;

8

(b)     In-house attorneys for Plaintiffs who are primarily responsible for the litigation and prosecution of the Action. In-house attorneys for Plaintiffs who are not responsible for the litigation and prosecution of the Action, including any in-house attorneys with business relationships with any Plaintiff or Defendants or with any other day-to-day interactions with any Plaintiff or Defendants shall not have access to Highly Confidential Documents outside of those produced by the individual Plaintiff;

(c)     In-house attorneys for Defendants who are primarily responsible for the litigation and defense of the Action. In-house attorneys for Defendants who are not responsible for the litigation and defense of the Action, including any in-house attorneys with business relationships with any Co-Defendant or with any other day-to-day interactions with any Co-Defendant shall not have access to Highly Confidential Documents outside of those produced by Defendants;

(d)     The Court, provided that the Highly Confidential-Restricted documents are filed under seal as set forth in Paragraph (20)(a) below;

(e)     Stenographic employees, court reporters, and videographers recording or transcribing testimony in this Action;

(f)     Any outside consultant or expert that has signed the certification described in Paragraph (9) below;

9

(g)     Subject to Paragraph (10) below, any witness during a deposition. Where a witness was a former employee, consultant, or agent of a Producing Party, and a current employee, consultant, or agent of a "Competitor" as defined in Paragraph (3), the parties shall meet and confer on an appropriate deposition protocol that protects "Highly Confidential" information;

(h)     Counsel for claimants in other pending litigation alleging property damage, personal injury, or any economic loss arising from the alleged contamination, provided that the proposed recipient is: (i) already operating under a protective order governing the use of confidential information, or (ii) agrees to be bound by this Order and signs the certification described in Paragraph (9) below; and

(i)     Any representative of any of the Receiving Party's insurance carriers who has signed the certification described in Paragraph (9) below.

(9)  Before disclosing any Confidential Information or Highly Confidential-Restricted Information to any person as permitted by this Order (other than the Court and its staff), such person shall be provided with a copy of this Protective Order, which he or she shall read.  Upon reading this Protective Order, such person shall sign a Certification, in the form annexed hereto as Exhibit A, acknowledging that he or she has read this Protective Order and shall abide by its terms.  A file of all executed Certifications shall be maintained by outside counsel for the party obtaining them and shall be made available, upon request, for inspection by the Court *in camera*.  Persons who come into

10

contact with Confidential Information for clerical or administrative purposes, and who do not retain copies or extracts thereof, are not required to execute Certifications.

(10)  Before disclosing Confidential or Highly Confidential-Restricted Information to any person who is, independent of this litigation, a current director, officer, employee of, consultant to, or counsel for a "Competitor" as defined in Paragraph (3) above, the party wishing to make such disclosure shall give at least ten (10) days advance notice in writing to the counsel for the party who designated such information as confidential, providing the counsel who designated such information as Confidential with information concerning the proposed recipient that does not identify the proposed recipient but is sufficient to permit an informed decision to be made with respect to any potential objection.  If there is no consent to the disclosure within ten (10) days, the party wishing to make the disclosure may submit the information to the Court for a determination of whether the disclosure may be made.  The objecting party will have opportunities to (1) request that the Court direct the party wishing to make disclosure to produce additional information about the proposed recipient and (2) submit such papers and argument as it may feel necessary to allow the Court to make an informed decision.  If a motion is filed objecting to the proposed disclosure, the designated document or item shall not be disclosed unless and until ten days have elapsed after the appeal period from a Court order denying the motion.  Because only the party seeking to make the disclosure may know who the proposed recipient is, it is the responsibility of the party seeking to make the disclosure to determine prior to making any disclosure whether the proposed recipient is a person described in this Paragraph.

11

(11)   Disclosure of Confidential Information or Highly Confidential-Restricted Information beyond the terms of this Protective Order may be made only if the Producing Party designating the material as Confidential or Highly-Confidential-Restricted consents in writing to such disclosure, or if the Court, after reasonable notice to all affected parties, orders such disclosure.

(12)   The Receiving Party, and any other persons having knowledge of Confidential Information or Highly Confidential-Restricted Information by virtue of their participation in this action, or by virtue of obtaining documents produced or disclosed in this Action pursuant to this Protective Order, shall use such Confidential Information or Highly Confidential-Restricted Information only as permitted herein.

(13)   This Protective Order does not address the offering of Confidential Information or Highly Confidential-Restricted Information in evidence at trial or any court hearing, but nothing contained in this Protective Order shall preclude any party from moving the Court at an appropriate time for an order that the evidence be received *in camera* or under other conditions to prevent unnecessary disclosure.

(14)   Nothing contained in this Protective Order shall preclude any party from using its own Confidential or Highly Confidential-Restricted Information in any manner it sees fit, without prior consent of any party or the Court.

12

(15)   Counsel shall take all reasonable and necessary steps to assure the security of any Confidential or Highly Confidential-Restricted Information and limit access to those persons authorized by this Order.

(16)   Any party that is served with a subpoena, formal written request from any state or federal government agency, or court order compelling the production of discovery materials produced by another party, which discovery materials have been designated as Confidential or Highly Confidential-Restricted Information, must immediately give written notice of such subpoena, formal written request from any state or federal government agency, or court order to the original Producing Party.  Upon receiving copies of such requests, the original Producing Party shall bear the burden of opposing, if it deems appropriate, the subpoena or other request on grounds of confidentiality.

(17)   If a Receiving Party learns of any unauthorized disclosure of Confidential or Highly Confidential-Restricted Information, it shall immediately upon learning of such disclosure (a) inform the Producing Party in writing of all pertinent facts relating to such disclosure, (b) make all reasonable efforts to prevent disclosure by each unauthorized person who received such information, and (c) make its best efforts to retrieve copies of the Confidential or Highly Confidential-Restricted Information.

(18)   Upon the conclusion of any attorney's last case in this Action, including any appeals related thereto, at the written request and option of the Producing Party, all discovery materials produced by the Producing Party and any and all copies, summaries, notes, compilations (electronic or otherwise), and memoranda related thereto, shall be returned within thirty (30) calendar

13

days to the Producing Party, provided, however, that counsel may retain their privileged communications, work product, certifications pursuant to Paragraph (9), and all court-filed documents even though they contain discovery materials produced by the Producing Party, but such retained privileged communications and work product and court-filed documents shall remain subject to the terms of this Protective Order. At the written request of the Producing Party, any person or entity having custody or control of recordings, notes, memoranda, summaries or other written materials, and all copies thereof, relating to or containing discovery materials produced by the Producing Party shall deliver to the Producing Party an affidavit certifying that reasonable efforts have been made to assure that all such discovery materials produced by the Producing Party and any copies thereof, any and all records, notes, memoranda, summaries, or other written material regarding the discovery materials produced by the Producing Party (except for privileged communications, work product and court-filed documents as stated above) have been delivered to the Producing Party in accordance with the terms of this Protective Order.

(19)    Changes in Designation of Information shall be treated as follows:

(a)    Inadvertent production of any document or information without a designation of confidentiality will not be deemed to waive a later claim to its Confidential or Highly Confidential-Restricted nature or preclude the Producing Party from designating such document or information as Confidential or Highly Confidential-Restricted at a later date.

14

(b)     Any Producing Party may designate as Confidential or Highly Confidential-Restricted, or withdraw such a designation from, any material that it has produced. Such redesignation shall be accomplished by notifying counsel for each party in writing of such redesignation. Upon receipt of any re-designation that designates material as Confidential or Highly Confidential-Restricted, the Receiving Party shall (a) treat such material in accordance with this Order, (b) take reasonable steps to notify any persons known to have possession of any such material of the re-designation under this Protective Order, and (c) promptly endeavor to retrieve all copies of such material from any persons known to have possession of such material who are not authorized to receive it under this Order.

(c)     Any party may object to the propriety of the designation (or re-designation) of specific material as Confidential or Highly Confidential-Restricted by serving a written objection upon the Producing Party's counsel. The Producing Party or its counsel shall thereafter, within ten (10) calendar days, respond to such objection in writing by either: (i) agreeing to remove the designation; or (ii) stating the reasons for such designation. If the Objecting Party and the Producing Party are subsequently unable to agree upon the terms and conditions of disclosure for the material(s) in issue after meeting and

15

conferring, the Objecting Party may move the Court for an order striking the designation within ten (10) days after written notice that the parties meet and confer efforts have ended. Counsel may agree to reasonable extensions or reductions of the ten (10) day period, if necessary, and nothing herein shall prevent a party from requesting expedited consideration by the Court. On such a motion, the Producing Party shall have the burden of proving that good cause exists for the designation at issue and that the material is entitled to protection as Confidential or Highly Confidential-Restricted Information under applicable law. The material(s) in issue shall continue to be treated in the manner as designated by the Producing Party until the Court orders otherwise. A Receiving Party does not waive its right to challenge a Confidential or Highly Confidential-Restricted Information designation by electing not to raise a challenge promptly after the original designation is disclosed and may challenge a designation at such time as the Receiving Party deems appropriate.

(20) **IT IS FURTHER ORDERED** Service and Filing of Papers With Confidential or Highly-Confidential-Restricted Information is as follows:

(a)    The Parties will use the following procedure for submitting to the Court papers consisting of, relating to, containing, incorporating, reflecting, describing or attaching Confidential or Highly Confidential-Restricted Information: any such material shall be filed in a sealed envelope, labeled with the case name, case number, the motion to which the documents relate, and a listing of the titles of the documents in the envelope, and shall bear the legend: THIS DOCUMENT CONTAINS CONFIDENTIAL OR HIGHLY CONFIDENTIAL-RESTRICTED INFORMATION COVERED BY A PROTECTIVE ORDER OF THE COURT AND IS SUBMITTED UNDER SEAL PURSUANT TO THAT PROTECTIVE ORDER. THE CONFIDENTIAL CONTENTS OF THIS DOCUMENT MAY NOT BE DISCLOSED WITHOUT EXPRESS ORDER OF THE COURT. Such material shall be kept under seal until further order of the Court; however, such materials shall be available to the Court and counsel of record, and to all persons entitled to receive such information under the terms of this Order.

(b)    Within seven (7) business days of the submission of any material under seal, the parties shall confer to determine if the Producing Party objects to the filing of the subject Confidential or Highly Confidential Information in unsealed form. To the extent of the parties agreement

17

concerning the treatment of the subject Confidential or Highly Confidential Information, the filing party may file the subject materials in unsealed form.  To the extent the parties are unable to reach agreement, either party may file a motion to address the appropriate treatment of the subject materials.  On such a motion, the Supplying Party shall have the burden of proving the material is Confidential or Highly Confidential Information.  The material shall remain sealed unless the Court orders otherwise.

(c)     When submitting deposition testimony pursuant to the previous Paragraph that has been designated as Confidential or Highly Confidential-Restricted, the submitting party shall submit, to the extent reasonably possible, only those pages of the deposition transcript that are cited, referred to, or relied on by the submitting party.

Considering the foregoing, **IT IS ORDERED** that the **Motion for Protective Order and Request for Status Conference (Rec. Doc. No. 3)** is **GRANTED IN PART** and **DENIED IN PART**, as set forth herein.  At this stage, the Court concludes that a status conference on this issue is unnecessary.

New Orleans, Louisiana, this 5th day of May, 2010.

**KURT D. ENGELHARDT**
**United States District Judge**

18

# EXHIBIT "A"

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ACY J. COOPER, JR. AND RONNIE LOUIS ANDERSON, ETC. | CIVIL ACTION |
| VERSUS | NO. 10-1229 |
| BP, plc, ET AL | SECTION "N" (1) |

# CERTIFICATION

I hereby certify that I have read the Protective Order entered in the above-captioned action and that I understand the terms thereof.

I agree to be bound by the Protective Order.

I further agree to submit to the jurisdiction of this Court for purposes of enforcing the Protective Order, and I understand that the Court may impose sanctions on me for any violation of the Protective Order.

19

I understand that these certifications are strictly confidential, that counsel for each party are maintaining the certifications without giving copies to the other side, and that the parties expressly agreed and the Court ordered that except in the event of a violation of this Order, the parties will make no attempt to seek copies of the certifications or to determine the identities of persons signing them. I further understand that if the Court finds that any disclosure is necessary to investigate a violation of this Order, the disclosure will be limited to outside counsel only and outside counsel shall not disclose any information to their clients that could tend to identify any certification signatory unless and until there is specific evidence that a particular signatory may have violated the Order, in which case limited disclosure may be made with respect to that signatory.

**Date:** _____

_____

**(Signature)**

**Name:** _____

**(Typed or Printed)**



ROMANO
Law Group

——————— A voice for the people. A vision for the future. ———————

May 6, 2010

CERTIFIED MAIL - No. 7009 2820 0000 5425 2035
RETURN RECEIPT REQUESTED

BP, PLC
28100 Torch Parkway
Warrenville, IL   60555-3938

Re:  Deepwater Horizon Gulf of Mexico Oil Leak Disaster - Demand
     for Preservation of Evidence and Prohibition of Spoliation
     of Evidence

Dear Sir or Madam:

The purpose of this letter is to place British Petroleum (BP)
and its subsidiaries, affiliated companies, employees, agents
and representatives on notice not to destroy, conceal, or alter
any paper or electronic files; video, audio or photographic
recordings; equipment used on or recovered from the Deepwater
Horizon rig or drilling site; other data generated by, and/or
received by, and/or stored on any of your computers or storage
media (e.g., hard disks, floppy disks, backup tapes); or any
other electronic data, such as voicemail.  Your failure to
comply with this notice can result in severe sanctions being
imposed by a court of law - and liability in tort - for spolia-
tion of evidence or potential evidence.

In order to avoid spoliation, you will need to provide the data
which will be eventually requested and utilized for discovery
purposes and evidentiary purposes in a court of law on the
original media.  Do not reuse any media to save or provide this
data.  Shortly, we will be filing a motion in court for an order
demanding the preservation of evidence and of documents and
things.  You should not destroy or alter any potential evidence.

John F. Romano, *Board Certified Civil Trial Lawyer*  |  Eric Romano, *Board Certified Criminal Trial Lawyer*  |  Todd A. Romano, *Attorney at Law*
Joseph M. Lee, P.A., *Attorney at Law – Real Estate, Probate & Guardianship*  |  Robert J. Hewitt, III, *Investigator*
Joel S. Cronin, M.D., *Of Counsel, Attorney at Law*  |  Michael D. Eriksen, *Of Counsel, Board Certified Civil Trial Lawyer*  |  John M. Kops, *Of Counsel, Attorney at Law*

EcoCentre, *The Living Building*, 1005 Lake Avenue, Lake Worth, Florida 33460-3709  |  MAILING ADDRESS: P.O. Box 21349, West Palm Beach, Florida 33416-1349
OFFICE: 561.533.6700  |  TOLL FREE: 866.533.6700  |  FAX: 561.533.1285  |  WEB: romanolawgroup.com
Romano Law Group is proud to print on recycled paper

BP, PLC
Page 2
May 6, 2010

It is your obligation to preserve documents and things for
discovery and for future evidentiary purposes in any litigation
matters.

Electronic documents and the storage media on which they reside
contain relevant, discoverable information beyond that which may
be found in printed documents.  Therefore, even where a paper
copy exists, we will seek all documents in their electronic form
along with information about those documents contained on the
media.  We also will seek paper printouts of only those docu-
ments that contain unique information after they were printed
out (such as paper documents containing handwriting, signatures,
marginalia, drawings, annotations, highlighting and redactions)
along with any paper documents for which no corresponding elec-
tronic files exist.  Our discovery requests will ask for certain
data on the hard disks, floppy disks, and backup media used in
your computers, some of which data are not readily available to
an ordinary computer user, such as "deleted" files and "file
fragments."  As you may know, although a user may "erase" or
"delete" a file, all that is really erased is a reference to
that file in a table on the hard disk; unless overwritten with
new data, a "deleted" file can be as intact on the disk as any
"active" file you would see in a directory listing.

Additionally, you must preserve all electronic storage data
whether readily readable ("active") or "deleted" but recover-
able.  You are to preserve all raw information in computer
banks, as well as all computers, servers, hard drives, disk
drives and other equipment or media on which such electronic
information is stored.  Please make certain that, as a part of
the preservation of this evidence, no representatives, agents,
or employees take any steps to try to destroy or hide items,
such as the orchestration of an illegal "sick-out" regarding the
Internet.

BP, PLC
Page 3
May 6, 2010

Further, it is necessary that you and BP's agents, board
members, representatives, committee members, and employees
preserve all of the following items: hard drives utilized on
computers and all backup media, including backup tapes,
cartridges, CDs or DVDs; all e-mails, both sent and received
whether internally or externally; all word-processed files,
including drafts and revisions; all spreadsheets, including
drafts and revisions; all databases; all CAD (computer-aided
design) files, including drafts and revisions; all presentation
data or slide shows produced by presentation software (such as
Microsoft PowerPoint or Mac Keynotes); all graphs, charts, and
other data produced by project management software; all data
generated by calendaring, task management, and personal informa-
tion management (PIM) software (such as Microsoft Outlook); all
data created with the use of personal data assistants (PDAs);
all data created with the use of document management software;
all data created with the use of paper and electronic mail
logging and routing software; all Internet and Web-browser-
generated history files, caches and "cookies" files generated at
the workstation of each person or representative or agent or
employee involved in any manner whatsoever with respect to
matters involving BP's oil exploration and drilling activities
in the Gulf of Mexico or involving the Deepwater Horizon oil
well explosion; all voice mail messages and recordings; all
audio, video and photographic recordings; all equipment used on
or recovered from the Deepwater Horizon oil rig platform and
drilling site; and any and all other files generated by users
through the use of computers and/or telecommunications, includ-
ing but not limited to voicemail. Further, you are to preserve
any log or logs of network use by employees or agents or repre-
sentatives or otherwise, whether kept in paper or electronic
form, and to preserve all copies of your backup tapes and the
software necessary to reconstruct the data on those tapes, so
that there can be made a complete, bit-by-bit "mirror" eviden-
tiary image copy of the storage media of each and every personal
computer (and/or workstation) and network server in your control

BP, PLC
Page 4
May 6, 2010

and custody, as well as image copies of all hard drives retained
by you and no longer in service, but in use at any time during
the last 36 months and which in any manner whatsoever relate,
directly or indirectly, to the Deepwater Horizon oil well explo-
sion, or to any of the other companies involved in exploration,
drilling, collecting and transporting oil, gas or other
resources in the Gulf of Mexico.

You are not to pack, compress, purge, or otherwise dispose of
files and parts of files.  You are further requested to preserve
and not destroy all passwords, decryption procedures, network
access codes, ID names, manuals, tutorials, written instruc-
tions, decompression or reconstruction software, and any and all
other information and things necessary to access, view, and, if
necessary, reconstruct the electronic data we will request
through discovery during the litigation which will be forth-
coming.

You are hereby requested to retain the following information:

1.   **Business Records:**  All documents and information about
     documents containing backup and/or archive policy and/or
     procedure, document retention policy, names of backup
     and/or archive software, names and addresses of any offsite
     storage provider.

     a.   All e-mail and information about e-mail (including
          message contents, header information and logs of
          e-mail system usage) sent or received by the following
          persons:

          Any BP agent, representative, employee, or other
          person including people who were involved in any
          manner whatsoever in any matters involving the
          Deepwater Horizon oil well.

BP, PLC
Page 5
May 6, 2010

   b.   All other e-mail and information about e-mail (includ-
        ing message contents, header information and logs of
        e-mail system usage) containing information about or
        related to the Deepwater Horizon oil well, or anything
        relating to the April 20, 2010 explosion on the
        Deepwater Horizon oil well.

   c.   All databases (including all records and fields and
        structural information in such databases), containing
        any reference to and/or information about or related
        to the Deepwater Horizon oil well, or anything relat-
        ing to the April 20, 2010 explosion on the Deepwater
        Horizon oil well.

   d.   All logs of activity (both in paper and electronic
        formats) on computer systems and networks that have or
        may have been used to process or store electronic data
        containing information about or related to the
        Deepwater Horizon oil well, or anything relating to
        the April 20, 2010 explosion on the Deepwater Horizon
        oil well.

   e.   All word processing files, including prior drafts,
        "deleted" files and file fragments, containing infor-
        mation about or related to the Deepwater Horizon oil
        well, or anything relating to the April 20, 2010
        explosion on the Deepwater Horizon oil well.

   f.   With regard to electronic data created by application
        programs which process financial, accounting and bill-
        ing information, all electronic data files, including
        prior drafts, "deleted" files and file fragments,
        containing information about or related to the
        Deepwater Horizon oil well, or anything relating to
        the April 20, 2010 explosion on the Deepwater Horizon
        oil well.

   g.   All files, including prior drafts, "deleted" files and
        file fragments, containing information from electronic
        calendars and scheduling programs regarding or related
        to the Deepwater Horizon oil well, or anything

BP, PLC
Page 6
May 6, 2010

> relating to the April 20, 2010 explosion on the
> Deepwater Horizon oil well.

> h.   All electronic data files, including prior drafts,
> "deleted" files and file fragments about or related to
> the Deepwater Horizon oil well, or anything relating
> to the April 20, 2010 explosion on the Deepwater
> Horizon oil well.

2.   **Online Data Storage on Mainframes and Minicomputers:**   With
regard to online storage and/or direct access storage
devices attached to your mainframe computers and/or mini-
computers: you are not to modify or delete any electronic
data files, "deleted" files, and file fragments existing at
the time of this letter's delivery, which meet the defini-
tions set forth in this letter, unless a true and correct
copy of each such electronic data file has been made, and
steps have been taken to assure that such a copy will be
preserved and accessible for purposes of this litigation.

3.   **Offline Data Storage, Backups and Archives, Floppy
Diskettes, Tapes and Other Removable Electronic Media:**
With regard to all electronic media used for offline
storage, including magnetic tapes and cartridges and other
media that, at the time of this letter's delivery,
contained any electronic data meeting the criteria listed
in paragraph 1 above:  You are to stop any activity that
may result in the loss of such electronic data, including
rotation, destruction, overwriting, and/or erasure of such
media in whole or in part.  This request is intended to
cover all removable electronic media used for data storage
in connection with your computer systems, including
magnetic tapes and cartridges, magneto-optical disks,
floppy diskettes, and all other media, whether used with
personal computers, minicomputers or mainframes or other
computers, and whether containing backup and/or archive

BP, PLC
Page 7
May 6, 2010

data sets and other electronic data, for all of your
computer systems.

4.  **Replacement of Data Storage Devices:**  You are not to
dispose of any electronic data storage devices and/or media
that may be replaced due to failure and/or upgrade and/or
other reasons that may contain electronic data meeting the
criteria listed in paragraph 1 above.

5.  **Fixed Drives on Stand-Alone Personal Computers and Network
Workstations:**  With regard to electronic data meeting the
criteria listed in paragraph 1 above, which existed on
fixed drives attached to stand-alone microcomputers and/or
network workstations at the time of this letter's delivery:
You are not to alter or erase such electronic data, and not
to perform other procedures (such as data compression and
disk de-fragmentation or optimization routines) that may
impact such data, unless a true and correct copy has been
made of such active files and of completely restored
versions of such deleted electronic files and file frag-
ments, copies have been made of all directory listings
(including hidden files) for all directories and subdirec-
tories containing such files, and arrangements have been
made to preserve copies during the pendency of this
litigation.

6.  **Programs and Utilities:**  You are to preserve copies of all
application programs and utilities which may be used to
process electronic data covered by this letter.

7.  **Log of System Modifications:**  You are to maintain an
activity log to document modifications made to any elec-
tronic data processing system that may affect the system's
capability to process any electronic data meeting the
criteria listed in paragraph 1 above, regardless of whether
such modifications were made by employees, contractors,

BP, PLC
Page 8
May 6, 2010

vendors, and/or any other third parties. The activity log
should reflect what action was taken, who took the action,
and the day and time when the action was taken.

8. **Personal Computers Used by Your Employees and/or Their
Secretaries and Assistants:** The following steps should
immediately be taken in regard to all personal computers
used by your employees and/or their secretaries and
assistants.

   a. As to fixed drives attached to such computers: (i) a
   true and correct copy is to be made of all electronic
   data on such fixed drives relating to this matter,
   including all active files and completely restored
   versions of all deleted electronic files and file
   fragments; (ii) full directory listings (including
   hidden files) for all directories and subdirectories
   (including hidden directories) on such fixed drives
   should be written; and (iii) such copies and listings
   are to be preserved until this matter reaches its
   final resolution.

   b. All floppy diskettes, magnetic tapes and cartridges,
   and other media used in connection with such computers
   prior to the date of delivery of this letter contain-
   ing any electronic data relating to this matter are to
   be collected and put into storage for the duration of
   this lawsuit.

9. **Evidence Created Subsequent to This Letter:** With regard to
electronic data created after the date of delivery of this
letter, no materials or evidence at all are to be destroyed
or altered, and it is necessary that you and BP's repre-
sentatives and agents and employees and medical staff take
whatever steps are appropriate and necessary to avoid any
destruction or altering of any materials or evidence.

BP, PLC
Page 9
May 6, 2010

In order to assure that you and BP's executives, board members,
agents, employees, and representatives fully appreciate and
understand your obligation to preserve these documents and
evidence, and to make certain that no spoliation or altering or
destruction of any evidence occurs, it is incumbent upon you to
provide a copy of this letter to all persons and entities with
any responsibility for the documents or materials or evidence
previously referred to in this letter.

Finally, please make certain that all materials related in any
way to the Deepwater Horizon oil well, or anything relating to
the April 20, 2010 explosion on the Deepwater Horizon oil well,
including any internal meetings, committee meetings, and all
documents, notes, memoranda, e-mails, computer-generated data,
correspondence, notes, or other data, be fully and completely
preserved.

Sincerely,

JOHN F. ROMANO

JFR:bl
cc:  United States Coast Guard
     United States Environmental Protection Agency
     Secretary Ken Salazar, United States Department
        of the Interior

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SHANE ROSHTO, ET AL.                    CIVIL ACTION

VERSUS                                  NO: 10-1156 C/W 10-1196

TRANSOCEAN, LTD., ET AL.                SECTION: "A" (3)

<u>ORDER</u>

For the reasons given on the record in open court,

Accordingly;

**IT IS ORDERED** that Plaintiffs' **Objection to Magistrate's April 27, 2010, Denial of Motion for Protective Order to Preserve Evidence (Rec. Doc. 23)** is **GRANTED IN PART AND DENIED IN PART**. The motion is **GRANTED** insofar as,

**IT IS ORDERED** that the BP Defendants shall maintain a log/summary of each action relating to the destruction, disposal, or modification of any evidence or equipment, along with the date and reason therefor, this to be done in a reasonable fashion;

**IT IS FURTHER ORDERED** that Plaintiffs' experts will be allowed to be present whenever any of the various defendants' litigation experts examine equipment or visit the scene of the incident;

**IT IS FURTHER ORDERED** that no documents or records of any nature related to this incident shall be destroyed.

The motion is **DENIED** in all other respects.

May 18, 2010

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE

1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

FRAN HOPKINS, et al.,                    :

      Plaintiffs,                      :

vs.                                      :    CA 10-0221-WS-C

TRANSOCEAN, LTD, et al.,                 :

      Defendants.                      :

## **ORDER**

This cause is before the Court on plaintiffs' motion for accelerated discovery (Doc. 15) and the BP defendants' response in opposition (Doc. 49). As recognized by plaintiffs, whether to allow expedited discovery is solely within the discretion of this Court. (*See* Doc. 15, at ¶ 8) The undersigned **DECLINES** to exercise the Court's discretion in the manner requested by plaintiffs prior to the defendants in this action joining the complaint, *compare* SD ALA LR 26.1(c) ("Unless otherwise stipulated in writing by the parties or ordered by the court in a particular action, formal discovery under Fed.R.Civ.P. 30, 31, 33, 34, and 36 may not be commenced before the meeting of the parties under Fed.R.Civ.P. 26(f)[.]") *with* SD ALA LR 26.1(d)(2) ("Unless otherwise ordered by the court in a particular action, the meeting must be held within forty-five (45) days from the first appearance (answer or Rule 12(b) motion) of a defendant[.]"), not only because of the BP defendants' representation that shortly after the Deepwater Horizon incident they "instituted document and evidence

preservation protocols in anticipation of government investigations and litigations[]" (Doc. 49, at 5)[1] but also because this Court hereby specifically **ORDERS** all defendants to preserve all evidence related to the subject incident. Accordingly, plaintiffs' motion for expedited discovery (Doc. 15) is **DENIED**.

      **DONE** and **ORDERED** this the 8th day of June, 2010.

       s/WILLIAM E. CASSADY
       **UNITED STATES MAGISTRATE JUDGE**

---

[1]    Presumably, all other defendants instituted similar protocols.

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| National Vietnamese American Fishermen Emergency Association, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| *versus* | § § | Civil Action H-10-1607 |
| BP Products North America, Inc., *et al.*, | § § § | |
| Defendants. | § | |

## Preservation Order

In connection with the blowout on the *Deepwater Horizon* on April 20, 2010, BP Products North America, Inc., BP America, Inc., Halliburton Energy Services, Inc., Cameron International Corporation, Transocean Offshore Deepwater Drilling, Inc., Transocean Deepwater, Inc., and the plaintiffs must:

1. Alter electronic data only (a) in the use of the documents in the ordinary course of business, (b) in copying electronic data for back-up, or (c) in overwriting back-up media;

2. Except to the extent required in the recovery, capping, or remedy, preserve all documents and other physical evidence, including (a) tools and other equipment in use on this location by the *Deepwater Horizon* in every capacity, (b) authorizations, crew lists, and other documents indicating status of work as the well was drilled, (c) recovered parts and parts of parts, and (d) audio and visual recordings; and

3. Notify their agents, affiliates, contractors, and employees of this order.

This order does not restrict the companies from reasonable efforts to control the well, remedy the lost oil, and investigate the cause or from responding to governmental direction.

Signed on June 18, 2010, at Houston, Texas.

Lynn N. Hughes
United States District Judge

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: DEEPWATER HORIZON | * | CIVIL ACTION |
| | * | NO.  10-CV-1156 |
| | * | SECTION "J" |
| | * | DIVISION "3" |
| | * | JUDGE CARL J. BARBIER |
| | * | MAGISTRATE SHUSHAN |
| | * | **Applies to 10-CV-1156, 10-CV-1196,** |
| | | **10-CV-1222, 10-CV-1249, 10-CV-** |
| | * | **1250, 10-CV-1295, 10-CV-1324,** |
| | | **10-CV-1339, 10-CV-1346,** |
| | * | **10-CV-1352, 10-CV-1411, 10-CV-** |
| | | **1446, 10-CV-1452, 10-CV-1472, 10-** |
| | * | **CV-1472, 10-CV-1482, 10-CV-1484,** |
| | | **10-CV-1499, 10-CV-1502, 10-CV-** |
| | * | **1515, 10-CV-1540, 10-CV-1542, 10-** |
| | | **CV-1561, 10-CV-1574, 10-CV-1613,** |
| | * | **10-CV-1630** |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## <u>ORDER</u>

On June 18, 2010, BP Exploration and Production, Inc. ("BPXP") provided notice of an operation planned for June 21, 2010, to recover and inspect the kinked riser section, under the direction and with the approval of Unified Command.  BPXP advised in the notice that the riser section, once recovered and brought to the deck of the recovery vessel, would be measured, inspected and photographed, but that no destructive testing will be conducted and no experts retained specifically for

litigation purposes would be present. At the conclusion of the operation, the riser section would be delivered to the USCG Base Support Unit in New Orleans, subject to the custody and supervision of the Marine Board of Investigation ("MBI").

In response, Plaintiffs Interim Co-Liaison Counsel contacted Interim Defense Liaison Counsel (who is also Counsel for BPXP) to request that Plaintiffs be permitted to send an expert to observe the recovery and inspection. Plaintiffs' Interim Co-Liaison Counsel further requested the written protocol for the recovery and inspection, as well as information regarding the creation of and access to independent photographs, videotape or other documentation of the recovery and inspection. Finally, counsel wanted to ensure that Plaintiffs' experts or consultants would have access to the riser section prior to any chemical cleaning, x-ray, metallurgical analysis, or other potentially destructive testing.

BPXP objects to the presence of an attorney or expert representing the plaintiffs for safety, logistical and other reasons. BPXP advises that the proposed action is solely for operational purposes and that no attorneys or experts for BPXP will be present. Subject to a protocol approved by the Responsible Party Incident Commander, the U.S. Coast Guard, and MMS, wall thickness will be determined; a boroscope inspection will be conducted; rubber molds will be used to take impressions of the holes (and all such rubber molds will be preserved); still photographs will be taken of the entire riser joint in order to subsequently create a 3-D rendering; the Surveyor will conduct the marking of the riser; all steps will be supervised by Custody Observers; and a Chain of Custody Record will be maintained by the U.S. Coast Guard Commanding Officer. BPXP also points to a previous order by Judge Zainey in *Roshto,* (Civil Action No. 10-1156) (May 19, 2010), declining to require BPXP to provide Plaintiffs access (or even notice) to operations performed at the direction and/or with the approval of Unified Command, (subject to the limitation that Plaintiffs will be provided access whenever any of the defendants' various litigation experts examine the equipment or visit the scene). Finally,

Page 2

BPXP represents that any motion by Plaintiffs to MBI to inspect the riser section at the Coast Guard facility will not be opposed

On June 20, 2010, the Court held a Status Conference with Plaintiffs' and Defendants' Interim Liaison Counsel; based on the record and the argument of counsel:

**IT IS HEREBY ORDERED** that:

1.    All physical evidence recovered will be preserved;

2.    No metallurgical analysis or other potentially destructive testing will be conducted on the riser section (or any other physical evidence which may be recovered) without first providing Plaintiffs (or other interested parties) access to inspect the riser section (or other evidence) and without an agreed or Court-approved protocol;

3.    Shall prying of a bent portion be necessary to accomplish the operational objectives under the Unified Command protocol, such portion shall be comprehensively measured, photographed and otherwise documented in an appropriate way prior to such prying or other modification;

4.    BPXP shall, consistent with Judge Zainey's previous Order, maintain a log/summary of each action relating to the recovery, inspection, modification and/or transport of the equipment;

5.    Any and all such logs/summaries, as well as any and all photographs, measurements, videotape, film, diagrams, 3-D analysis, wall thickness readings, and/or other documentation of the removal, inspection and/or chain of custody shall be produced to Interim Plaintiffs Liaison Counsel on or before July 15th; and,

6.    In light of BPXP's representations that no attorneys or litigation experts will be present for the removal / inspection, any claims of privilege or work product over the documents and information described in Paragraph 5 are deemed waived.


This order shall apply only to the proposed recovery of the kinked riser section, and shall not be construed to in any way restrict the direction or activities of the Unified Command in their investigation, recovery, well control, remedial or rescue efforts.

Page 3

**SIGNED** New Orleans, Louisiana, this <u>21st</u> day of <u>June</u>, <u>2010</u>.

United States District Judge

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: DEEPWATER HORIZON** | * | **CIVIL ACTION** |
| | * | **NO.  10-CV-1156** |
| | * | **SECTION "J"** |
| | * | **DIVISION "3"** |
| | * | **JUDGE CARL J. BARBIER** |
| | * | **MAGISTRATE SHUSHAN** |
| | * | **Applies to 10-CV-1156, 10-CV-1196, 10-CV-1222, 10-CV-1249, 10-CV-** |
| | * | **1250, 10-CV-1295, 10-CV-1324, 10-CV-1339, 10-CV-1346,** |
| | * | **10-CV-1352, 10-CV-1411, 10-CV-1446, 10-CV-1452, 10-CV-1472, 10-** |
| | * | **CV-1472, 10-CV-1482, 10-CV-1484, 10-CV-1499, 10-CV-1502, 10-CV-** |
| | * | **1515, 10-CV-1540, 10-CV-1542, 10-CV-1561, 10-CV-1574, 10-CV-1613,** |
| | * | **10-CV-1630** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>ORDER</u>

On June 18, 2010, BP Exploration and Production, Inc. ("BPXP") provided notice of an operation planned for June 21, 2010, to recover and inspect the kinked riser section, under the direction and with the approval of Unified Command.  BPXP advised in the notice that the riser section, once recovered and brought to the deck of the recovery vessel, would be measured, inspected and photographed, but that no destructive testing will be conducted and no experts retained specifically for

litigation purposes would be present. At the conclusion of the operation, the riser section would be delivered to the USCG Base Support Unit in New Orleans, subject to the custody and supervision of the Marine Board of Investigation ("MBI").

In response, Plaintiffs Interim Co-Liaison Counsel contacted Interim Defense Liaison Counsel (who is also Counsel for BPXP) to request that Plaintiffs be permitted to send an expert to observe the recovery and inspection. Plaintiffs' Interim Co-Liaison Counsel further requested the written protocol for the recovery and inspection, as well as information regarding the creation of and access to independent photographs, videotape or other documentation of the recovery and inspection. Finally, counsel wanted to ensure that Plaintiffs' experts or consultants would have access to the riser section prior to any chemical cleaning, x-ray, metallurgical analysis, or other potentially destructive testing.

BPXP objects to the presence of an attorney or expert representing the plaintiffs for safety, logistical and other reasons. BPXP advises that the proposed action is solely for operational purposes and that no attorneys or experts for BPXP will be present. Subject to a protocol approved by the Responsible Party Incident Commander, the U.S. Coast Guard, and MMS, wall thickness will be determined; a boroscope inspection will be conducted; rubber molds will be used to take impressions of the holes (and all such rubber molds will be preserved); still photographs will be taken of the entire riser joint in order to subsequently create a 3-D rendering; the Surveyor will conduct the marking of the riser; all steps will be supervised by Custody Observers; and a Chain of Custody Record will be maintained by the U.S. Coast Guard Commanding Officer. BPXP also points to a previous order by Judge Zainey in *Roshto,* (Civil Action No. 10-1156) (May 19, 2010), declining to require BPXP to provide Plaintiffs access (or even notice) to operations performed at the direction and/or with the approval of Unified Command, (subject to the limitation that Plaintiffs will be provided access whenever any of the defendants' various litigation experts examine the equipment or visit the scene). Finally,

BPXP represents that any motion by Plaintiffs to MBI to inspect the riser section at the Coast Guard facility will not be opposed

On June 20, 2010, the Court held a Status Conference with Plaintiffs' and Defendants' Interim Liaison Counsel; based on the record and the argument of counsel:

**IT IS HEREBY ORDERED** that:

1.  All physical evidence recovered will be preserved;

2.  No metallurgical analysis or other potentially destructive testing will be conducted on the riser section (or any other physical evidence which may be recovered) without first providing Plaintiffs (or other interested parties) access to inspect the riser section (or other evidence) and without an agreed or Court-approved protocol;

3.  Shall prying of a bent portion be necessary to accomplish the operational objectives under the Unified Command protocol, such portion shall be comprehensively measured, photographed and otherwise documented in an appropriate way prior to such prying or other modification;

4.  BPXP shall, consistent with Judge Zainey's previous Order, maintain a log/summary of each action relating to the recovery, inspection, modification and/or transport of the equipment;

5.  Any and all such logs/summaries, as well as any and all photographs, measurements, videotape, film, diagrams, 3-D analysis, wall thickness readings, and/or other documentation of the removal, inspection and/or chain of custody shall be produced to Interim Plaintiffs Liaison Counsel on or before July 15th; and,

6.  In light of BPXP's representations that no attorneys or litigation experts will be present for the removal / inspection, any claims of privilege or work product over the documents and information described in Paragraph 5 are deemed waived.


This order shall apply only to the proposed recovery of the kinked riser section, and shall not be construed to in any way restrict the direction or activities of the Unified Command in their investigation, recovery, well control, remedial or rescue efforts.

**SIGNED** New Orleans, Louisiana, this 21st day of June, 2010.

_____
United States District Judge

**U.S. Chemical Safety and Hazard Investigation Board**

**Office of Investigations**
**Don Holmstrom**
**Investigation Supervisor**

2175 K Street, NW • Suite 400 • Washington, DC 20037-1809
Phone: (202) 261-7600 • Fax: (202) 261-7650www.csb.gov



July 7, 2010

<u>By Email</u>

David Ogden
Partner
WilmerHale
1875 Pennsylvania Avenue NW
Washington, DC 20006
David.Ogden@wilmerhale.com

Dear Mr. Ogden:

The U.S. Chemical Safety and Hazard Investigation Board (CSB) is conducting an investigation, pursuant to the authority of 42 U.S.C. § 7412(r)(6)(C)(i), of the incident that occurred at the BP/Transocean Deepwater Horizon oil rig on April 20, 2010. The CSB has been informed that WilmerHale will be the point-of-contact legal counsel representing BP PLC. As such, this letter serves as notice to BP PLC that the facilities, equipment, records, remnants of the Deepwater Horizon rig, and all debris are relevant to the CSB's investigation and will be inspected and/or tested by the CSB, under the authority of 42 U.S.C. § 7412(r)(6)(L)(ii).

Federal law authorizes the CSB to enter BP PLC property and "do all things therein necessary for a proper investigation," including inspecting "records, files, papers, processes, controls, and facilities" and taking relevant samples. 42 U.S.C. § 7412(r)(6)(L)(ii). In lieu of the CSB seeking custody of certain evidence at this time, BP PLC, and its agents will ensure that relevant evidence (defined in part below) is preserved from alteration or destruction, so that the CSB has the opportunity to exercise its statutory investigative authority.

BP PLC will take special care to preserve: tangible objects, including equipment, machinery, controls, debris, remnants of the rig and facilities; samples of substances; and records, data, files, and papers (regardless of format), that were involved in the April 20 incident or are potentially relevant to the CSB's investigation thereof. This includes, but is not limited to the 50-foot section of the marine riser pipe cut from the top of the damaged blowout preventer of the well. Without limiting the preceding general obligation, the CSB specifically understands that BP PLC will preserve, in as-found condition, the equipment, tools, samples, materials, electronic data, and records associated with and relevant to the incident on April 20, 2010.

The CSB recognizes that BP PLC is taking or may take actions ("immediate incident response activities") it deems reasonably necessary to place the facility in a condition safe from threat of serious harm to life, property, or the environment. Henceforth, the CSB expects that BP PLC will notify the CSB contacts designated in this letter, at least 24 hours in advance whenever possible,

of all such actions. If such actions require that the facilities and/or equipment described in the preceding paragraph, which would otherwise be preserved, be changed from their as-found conditions, BP PLC will document all such changes and provide the documentation of changes to the CSB. When BP PLC, its contractors, or any other governmental entity physically locates and removes materials, equipment, tools, instruments, or piping and other remnants found from the Deepwater Horizon rig from their as-found locations, CSB expects to be notified by BP PLC of the location of the equipment, debris or remnant. BP PLC must then document all such changes and provide the documentation of changes as described below, to the CSB. If removal is necessary, BP PLC must document, with, at a minimum, photographs or videotape, location coordinated, the pre- and post-removal conditions of the items; retain the removed items in a secure location; and provide the documentation, and access to the items, to the CSB.

Following the cessation of immediate incident response activities, the CSB understands that BP PLC will notify the CSB contacts designated in this letter of any further plans to alter the facility and/or equipment described in this letter from their as-found condition or to remove equipment or other objects from their location at the time of the incident. Before any such plans are carried out, BP PLC will obtain the CSB's approval of a protocol for, and the date and time of, the alteration/removal. BP PLC will also permit CSB personnel to witness and document any alteration or removal. If exigent circumstances require further alterations/removal under conditions that make advance notice to and coordination with the CSB impossible, BP PLC should document, with, at a minimum, photographs or videotape, the pre-alteration/removal condition and notify the designated CSB contacts as soon as possible.

For any items already altered or removed from the incident site, please provide all records pertaining to the retrieval and secure storage of the evidence, including all procedures, chain-of-custody forms, storage location information, and contact information for the current custodian of the evidence.

Henceforth, if any post-incident activities by BP PLC, its contractors, or any other entity or governmental agency, have in any way altered or removed equipment, tools, samples, materials, electronic data, and records associated with the incident on April 20, the CSB requests that BP PLC document the changes, provide all evidence of those activities, and act to preserve the evidence from further changes from the time of receipt of this letter.

In addition, the CSB understands that all physical evidence collected during this investigation will be stored in a secure location made known and accessible to the CSB. The secure location and chain of custody procedures will be developed by mutual agreement between the parties. Access by any parties to the physical evidence stored in such locations shall be documented in an evidence control log, with annotations of who accessed what evidence, what (if any) alterations to the evidence occurred, and the duration of each visit. That log shall be made available to the CSB at the agency's request. Before accessing the stored physical evidence, the CSB, BP PLC, and all other involved parties will notify the others and offer the opportunity to be present at the time the evidence is accessed.

The designated CSB contacts for all notifications described in this letter are as follows:

Primary Contact:        Donald Holmstrom
                        CSB Investigator-in-Charge
                        (202) 413-2690 (cell)
                        don.holmstrom@csb.gov


Alternate Contact:      Cheryl MacKenzie
                        Chemical Incident Investigator
                        (202) 299-6011 (cell)
                        Cheryl.MacKenzie@csb.gov


As the CSB investigation continues, the agency may identify additional specific tangible objects, substances, or records that it intends to inspect and/or test. The CSB will notify the parties of such items and expects that those items will be preserved in the manner described in this letter.


Thank you for your anticipated cooperation with the CSB's investigation.


Sincerely,

*Donald D. Holmstrom*

Donald Holmstrom
CSB Investigator-in-Charge

cc.     Raphael Moure-Eraso, CSB Board Chair and CEO
        Christopher Warner, CSB General Counsel
        Ray Porfiri, Deputy General Counsel
        Cheryl MacKenzie, CSB Investigator
        Daniel Horowitz, CSB Director Office of Congressional, Public, and Board Affairs
        Carol Clayton, Partner, WilmerHale

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: DEEPWATER HORIZON | * | CIVIL ACTION |
| | * | NO. 10-CV-1156 |
| **APPLIES TO ALL CASES** | * | SECTION "J" |
| | * | DIVISION "1" |
| | * | JUDGE CARL J. BARBIER |
| | * | MAGISTRATE SHUSHAN |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORDER MODIFYING PROTECTIVE
ORDER OF JUNE 21, 2010, REGARDING RECOVERY OF RISER

The Court has reviewed the consent motion regarding the proposed operation to take place at the United States Coast Guard Integrated Support Base at 1790 Saturn Boulevard, New Orleans, LA. The Court finds that it is necessary to do further photography and examination of the riser section, in which portions of drill pipe string remain, and that it would be useful to the development of additional containment strategy to obtain more information about the internal, otherwise inaccessible structures within the riser section, including the serial numbers of the drill

1

pipe joints remaining inside the riser section. As is explained in the Memorandum, the Declaration of John Nyholt, and the Macondo Technical Note, the following benefits will occur with the allowance of this further inspection, including the intrusive activities:

- Clearly identifying the pipe and obstructions upstream of the kink;
- Confirming drill pipe sizes and obtaining tool joint serial numbers;
- Identifying and mapping the locations of "junk" within the riser and drill pipe, which was deposited during the junk shot operation;
- Further investigating the probable cause of one specific hole of the six that occurred in the vicinity of the kink.

Accordingly, and with the understanding that this operation must be approved by the Marine Board of Inquiry, it will be necessary to cut some "windows" in the riser pipe to reveal and "uncover" the serial numbers of the drill pipe string otherwise hidden within the riser. In addition, the engineers need to retain the decision-making authority to section the riser in as many as five locations and use a boroscope. Further follow-up inspection methods would be similar to those employed offshore last week, including, but not limited to, radiography, remote visual, ultrasonics, and possibly photogrammetry. This supplemental inspection, plus the cutting operation, however, will occur in a large space that offers safety for observation, and it will therefore be possible to allow a number of litigation-related observers, including retained experts, to witness the supplemental inspection and cutting operation. Upon these representations, the Court modifies the Protective Order of June 21, 2010 (Record Doc. No. 133) as follows:

1. The physical evidence will continue to be preserved subject to the terms herein;

2. The Marine Board of Inquiry must also approve the operation and upon such determination, this Court shall be promptly notified by email;

3. All cutting operations shall be appropriately logged and photographed/filmed in order to document properly such modification to the physical evidence.

4. Subject to appropriate security and safety precautions, parties to the litigation will be permitted to be present for observation, photography, and to have litigation experts present for observation of the supplemental inspection and the cutting operation. Should the parties not be able to work out reasonable limitations on numbers of witnesses permitted, the parties may contact Magistrate Judge Shushan to resolve any such disputes.

Counsel will provide notice to the United States District Court for the Southern District of Texas, the Honorable Judge Ellison, which has jurisdiction of Transocean's Limitation Action, of this Court's entry of this Order..

New Orleans, Louisiana, this _7th_ day of July, 2010.


_____
United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | : : : : : : : : | MDL NO. 2179 <br><br> SECTION: J <br><br> JUDGE BARBIER <br> MAG. JUDGE SHUSHAN |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. ..

**THIS DOCUMENT RELATES TO ALL CASES**

**PRETRIAL ORDER #1**
**Setting Initial Conference**

It appearing that civil actions listed on Schedule A, attached hereto, which were transferred to this Court by order of the Judicial Panel on Multi District Litigation pursuant to its order of August 10, 2010, merit special attention as complex litigation, it is, therefore, **ORDERED** that:

1. **INTRODUCTION** — It is not yet known how many attorneys will eventually join this litigation, but we can assume it will be a large number. As attorneys involved in a multi-district case, you will probably be laboring together for some time in the future with work progressively becoming more complicated and exacting. Some of you know each other and some are complete

strangers.  Undoubtedly each has a different style and
personality.  It is likely that during the course of this
litigation your working relationship will occasionally be
strained, communication derailed, and mutual trust questioned.
The just and efficient resolution of this litigation will depend
in large measure on the way you as attorneys comport yourselves
and overcome the temptations and trepidations inherent in a case
of this magnitude.  The Manual for Complex Litigation recognizes
that judicial involvement in managing complex litigation does not
lessen the duties and responsibilities of the attorneys.  To the
contrary, the added demands and burdens of this type of
litigation place a premium on professionalism and require counsel
to fulfill their obligations as advocates in a manner that will
foster and sustain good working relations among fellow counsel
and the Court.  The Court expects, indeed insists, that
professionalism and courteous cooperation permeate this
proceeding from now until this litigation is concluded.  The
court record should never be the repository of ill-chosen words
arising out of a sense of frustration over real or imagined
issues.  Because of the high level of competence and experience
of attorneys who are generally involved in multi-district
litigation, this Court is confident that this objective will be
achieved without judicial intervention.

2. **APPLICABILITY OF ORDER** — Prior to the initial pretrial
conference and entry of a comprehensive order governing all
further proceedings in this case, the provisions of this Order
shall govern the practice and procedure in those actions that
were transferred to this Court by the Judicial Panel on Multi
District Litigation pursuant to its order of August 10, 2010
listed on Schedule A. This Order also applies to all related
cases filed in all sections of the Eastern District of Louisiana
and will also apply to any "tag-along actions" later filed in,
removed to, or transferred to this Court.

3. **CONSOLIDATION** — The civil actions listed on Schedule A
are consolidated for pretrial purposes. Any "tag-along actions"
later filed in, removed to or transferred to this Court, or
directly filed in the Eastern District of Louisiana, will
automatically be consolidated with this action without the
necessity of future motions or orders. This consolidation,
however, does not constitute a determination that the actions
should be consolidated for trial, nor does it have the effect of
making any entity a party to any action in which he, she or it
has not been named, served or added in accordance with the
Federal Rules of Civil Procedure.

4. **DATE OF INITIAL CONFERENCE AND AGENDA FOR CONFERENCE** —
Matters relating to pretrial and discovery proceedings in these
cases will be addressed at an initial pretrial conference to be
held on **Friday, September 17, 2010 at 9:30 a.m.** in Judge Carl J.
Barbier's courtroom, Room C-268, United States Courthouse, 500
Poydras Street, New Orleans, Louisiana.  Counsel are expected to
familiarize themselves with the *Manual for Complex Litigation,
Fourth* ("MCL 4th") and be prepared at the conference to suggest
procedures that will facilitate the expeditious, economical, and
just resolution of this litigation.  The items listed in MCL 4th
Sections 22.6,  22.61, 22.62, and 22.63 shall, to the extent
applicable, constitute a tentative agenda for the conference.
Counsel shall confer and seek consensus to the extent possible
with respect to the items on the agenda, including a proposed
discovery plan, amendment of pleadings, and consideration of any
class action allegations and motions, and be prepared to select
trial dates.  Parties shall also submit an initial proposed case
management order and, if necessary, shall submit suggestions for
any other agenda items.  As part of this proposed case management
order, the parties shall suggest whether and how the consolidated
cases should be grouped into separate tracks for purposes of
pretrial discovery, motion practice, etc.

These documents shall be delivered to the Court **three full
work days prior to the initial conference** by fax to (504) 589-

-4-

4536, or in person to Judge Carl J. Barbier's Chambers, Room C-256, United States Courthouse, 500 Poydras Street, New Orleans, Louisiana.

5. **POSITION STATEMENT** — **Three full work days prior to the initial conference**, plaintiffs and defendants shall submit a brief written statement indicating their preliminary understanding of the facts involved in the litigation and the critical factual and legal issues. These statements will not be filed with the Clerk, will not be binding, will not waive claims or defenses, and may not be offered in evidence against a party in later proceedings. The parties' statements shall list all pending motions, as well as all related cases pending in state or federal court, together with their current status, including any discovery taken to date, to the extent known. The parties shall be limited to one such submission for all plaintiffs and one such submission for all defendants.

6. **APPEARANCE AT INITIAL CONFERENCE** — Each party represented by counsel shall appear at the initial pretrial conference through their attorney who will have primary responsibility for the party's interest in this litigation. Parties not represented by counsel may appear in person or through an authorized and responsible agent. To minimize costs

and facilitate a manageable conference, parties with similar
interests may agree, to the extent practicable, to have an
attending attorney represent their interest at the conference.  A
party, by designating an attorney to represent the party's
interest at this initial conference, will not be precluded from
personally participating or selecting other representation during
the future course of this litigation, nor will attendance at the
conference waive objections to jurisdiction, venue, or service.


7.  **SERVICE** — Prior to the initial pretrial conference,
service of all papers shall be made on each of the attorneys on
the Panel Attorney Service List attached hereto and designated as
Schedule B.  Any attorney who wishes to have his/her name added
to or deleted from such Panel Attorney Service List may do so
upon request to the Clerk of this Court and notice to all other
persons on such service list.  The parties shall present to the
Court at the initial conference a list of attorneys, their office
addresses, phone and fax numbers, and e-mail addresses.


8.  **EXTENSION AND STAY** — Each defendant is granted an
extension of time for responding by motion or answer to the
complaint(s) until a date to be set by this Court.  Pending the
initial conference and further orders of this Court, all
outstanding discovery proceedings are stayed, and no further

-6-

discovery shall be initiated.  Moreover, all pending motions must
be renoticed for resolution on a motion day or days after the
Court's initial conference herein.

9.  **MASTER DOCKET FILE** — Any pleading or document which is
to be filed in any of these actions shall be filed with the Clerk
of this Court and not in the transferor court.  The Clerk of this
Court will maintain a master docket file under the style "In Re:
Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of
Mexico, on April 20, 2010" and the identification "MDL No. 2179."
When a pleading is intended to be applicable to all actions, this
shall be indicated by the words: "This Document Relates to All
Cases."  When a pleading is intended to apply to less than all
cases, this Court's docket number for each individual case to
which the document number relates shall appear immediately after
the words "This Document Relates to."  The following is a sample
of the pleading style:

          In Re: Oil Spill by the Oil Rig          MDL No. 2179
                "Deepwater Horizon" in the
                Gulf of Mexico, on
                April 20, 2010                     SECTION: J

          This Document Relates to: _____         Judge Barbier
                                                   Mag. Judge Shushan

10.  **FILING** — All documents filed in this Court must be
filed electronically pursuant to Local Rule 5.7E and this Court's
Administrative Procedures for Electronic Filing.  Attorneys may

-7-

register at www.laed.uscourts.gov/cmecf/ecf.htm.  An attorney
who, due to exceptional circumstances, is unable to comply with
the requirements of electronic filing, may apply to the Court for
an order granting an exemption.  The application shall be in
writing, filed with the Clerk of Court, and shall state the
reason for the attorney's inability to comply.  Pro se litigants
who have not been authorized to file electronically shall
continue to file their pleadings with the Clerk of Court in the
traditional manner, on paper.  The Clerk of Court is directed to
make all entries on the master docket sheet with a notation
listing the cases to which the document applies, except that a
document closing a case will also be entered on the individual
docket sheet.  All documents shall be filed in the master file.


     11.  **DOCKETING** — When an action that properly belongs as a
part of In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in
the Gulf of Mexico, on April 20, 2010 is hereinafter filed in the
Eastern District of Louisiana or transferred here from another
court, the Clerk of this Court shall:

          a.   File a copy of this Order in the separate file for
               such action;

          b.   Make an appropriate entry on the master docket
               sheet;

          c.   Forward to the attorneys for the plaintiff in the

            newly filed or transferred case a copy of this
Order;

d.    Upon the first appearance of any new defendant,
forward to the attorneys for the defendant in such
newly filed or transferred cases a copy of this
Order.


    12.  **APPEARANCES IN LITIGATION** — Counsel who appeared in a
transferor court prior to transfer need not enter an additional
appearance before this Court.  Moreover, attorneys admitted to
practice and in good standing in any United States District Court
are admitted *pro hac vice* in this litigation, and the
requirements of Local Rules 83.2.6E and 83.2.7 are waived.
Association of local counsel is not required.


    13.  **REMAND STIPULATIONS** — In the event that a case is
remanded, the parties shall furnish to the Clerk of Court a
stipulation or designation of the contents of the record and
furnish all necessary copies of any pleadings filed so as to
enable the transferee clerk to comply with the order of remand.


    14.  **PRESERVATION OF EVIDENCE** — All parties and their
counsel are reminded of their duty to preserve evidence that may
be relevant to this action.  The duty extends to documents, data,

and tangible things in possession, custody and control of the
parties to this action, and any employees, agents, contractors,
carriers, bailees, or other nonparties who possess materials
reasonably anticipated to be subject to discovery in this action.
"Documents, data, and tangible things" is to be interpreted
broadly to include writings, records, files, correspondence,
reports, memoranda, calendars, diaries, minutes, electronic
messages, voice mail, e-mail, telephone message records or logs,
computer and network activity logs, hard drives, backup data,
removable computer storage media such as tapes, discs and cards,
printouts, document image files, Web pages, databases,
spreadsheets, software, books, ledgers, journals, orders,
invoices, bills, vouchers, check statements, worksheets,
summaries, compilations, computations, charts, diagrams, graphic
presentations, drawings, films, charts,  digital or chemical
process photographs, video, phonographic, tape or digital
recordings or transcripts thereof, drafts, jottings and notes,
studies or drafts of studies or other similar such material.
Information that serves to identify, locate, or link such
material, such as file inventories, file folders, indices, and
metadata, is also included in this definition.  Preservation
includes the obligation not to alter any such  thing as to its
form, content or manner of filing.  Until the parties reach an
agreement on a preservation plan or the Court orders otherwise,

each party shall take reasonable steps to preserve all documents, data and tangible things containing information potentially relevant to the subject matter of this litigation. Each counsel is under an obligation to the Court to exercise all reasonable efforts to identify and notify parties and nonparties, including employees of corporate or institutional parties of the contents of this paragraph. Failure to comply may lead to dismissal of claims, striking of defenses, imposition of adverse inferences or other dire consequences.

Before any devices, tangible things, documents, and other records which are reasonably calculated to lead to admissible evidence are destroyed, altered, or erased, counsel shall confer to resolve questions as to whether the information should be preserved. If counsel are unable to agree, any party may apply to this Court for clarification or relief from this Order upon reasonable notice.

15. **FILING OF DISCOVERY REQUESTS** — In accordance with Rule 5(d) of the Federal Rules of Civil Procedure, discovery requests and responses are not to be filed with the Clerk nor sent to the Judge's Chambers, except when specifically ordered by the Court to the extent needed in connection with a motion.

16.  **LIAISON COUNSEL** — __Prior__ to the initial conference,
counsel for the plaintiffs and counsel for the defendants shall,
to the extent they have not already done so, confer and seek
consensus on the selection of a candidate for the position of
liaison counsel for each group who will be charged with
essentially administrative matters.  For example, liaison counsel
shall be authorized to receive orders and notices from the Court
on behalf of all parties within their liaison group and shall be
responsible for the preparation and transmittal of copies of such
orders and notices to the parties in their liaison group and
perform other tasks determined by the Court.  Liaison counsel
shall be required to maintain complete files with copies of all
documents served upon them and shall make such files available to
parties within their liaison group upon request.  Liaison counsel
are also authorized to receive orders and notices from the
Judicial Panel on Multi District Litigation pursuant to Rule
5.2(e) of the Panel's *Rules of Procedure* or from the transferee
court on behalf of all parties within their liaison group and
shall be responsible for the preparation and transmittal of
copies of such orders and notices to the parties in their liaison
group.  The expenses incurred in performing the services of
liaison counsel shall be shared equally by all members of the
liaison group in a manner agreeable to the parties or set by the
Court failing such agreement.  Proposals for the designation of

liaison counsel shall be submitted to the Court no later than
**three full work days prior to the initial conference**.
Appointment of liaison counsel shall be made by the Court after
full consideration of the proposals.  At the first conference,
liaison counsel and/or the parties should be prepared to discuss
any additional needs for an organizational structure or any
additional matters consistent with the efficient handling of this
matter.

    Until this Court names liaison counsel for MDL 2179, those
individuals who served as liaison counsel in the consolidated
action, In Re: Deepwater Horizon, No. 10-CV-1156 (E.D. La. 2010),
(James Roy and Stephen Herman for Plaintiffs, and Don K. Haycraft
for Defendants) will continue to serve in that capacity.


    17.  **PLAINTIFFS' STEERING COMMITTEES** — It is the Court's
intent to appoint a Plaintiffs' Steering Committee ("PSC") to
conduct and coordinate the discovery stage of this litigation
with the defendant's representatives or committee.
Applications/nominations for the PSC positions must be filed with
the Eastern District of Louisiana's Clerk's Office electronically
on or before **Monday, September 27, 2010**.  A copy must also be
served upon counsel named in the attached list on the day of
filing.  The main criteria for membership in the PSC will be: (a)
willingness and availability to commit to a time-consuming

-13-

project; (b) ability to work cooperatively with others; and (c) professional experience in this type of litigation. Applications/nominations should succinctly address each of the above criteria as well as any other relevant matters.  No submissions longer than four (4) pages will be considered.  The Court will only consider attorneys who have filed a civil action in this litigation.

Objections may be made to the appointment of a proposed applicant/nominee.  Nevertheless, the Court will entertain only written objections to any application/nomination.  These must be filed electronically with the Clerk on or before **Monday, October 4, 2010**.  The objections, if there be any, must be short, yet thorough, and must be supported by necessary documentation.  As with the application/nomination, any objection must be served on all counsel appearing on the attached list on the day of filing.

The PSC will have the following responsibilities:

**Discovery**

1.  Initiate, coordinate, and conduct all pretrial discovery on behalf of plaintiffs in all actions which are consolidated with the instant multi-district litigation.

2.  Develop and propose to the Court schedules for the commencement, execution, and completion of all discovery on behalf of all plaintiffs.

-14-

3.   Cause to be issued in the name of all plaintiffs the
     necessary discovery requests, motions, and subpoenas
     pertaining to any witnesses and documents needed to
     properly prepare for the pretrial discovery of relevant
     issues found in the pleadings of this litigation.
     Similar requests, notices, and subpoenas may be caused
     to be issued by the PSC upon written request by the
     individual attorney in order to assist him/her in the
     preparation of the pretrial stages of his/her client's
     particular claims.

4.   Conduct all discovery in a coordinated and consolidated
     manner on behalf and for the benefit of all plaintiffs.

**Hearings and Meetings**

1.   Call meetings of counsel for plaintiffs for any
     appropriate purpose, including coordinating responses
     to questions of other parties or of the Court.
     Initiate proposals, suggestions, schedules, or joint
     briefs, and any other appropriate matters pertaining to
     pretrial proceedings.

2.   Examine witnesses and introduce evidence at hearings on
     behalf of plaintiffs.

3.   Act as spokesperson for all plaintiffs at pretrial
     proceedings and in response to any inquiries by the
     Court, subject of course to the right of any

-15-

plaintiff's counsel to present non-repetitive
individual or different positions.

**Miscellaneous**

1.   Submit and argue any verbal or written motions
     presented to the Court or Magistrate on behalf of the
     PSC as well as oppose when necessary any motions
     submitted by the defendants or other parties which
     involve matters within the sphere of the
     responsibilities of the PSC.

2.   Negotiate and enter into stipulations with Defendants
     regarding this litigation.  All stipulations entered
     into by the PSC, except for strictly administrative
     details such as scheduling, must be submitted for Court
     approval and will not be binding until the Court has
     ratified the stipulation.  Any attorney not in
     agreement with a non-administrative stipulation shall
     file with the Court a written objection thereto within
     ten (10) days after he/she knows or should have
     reasonably become aware of the stipulation.  Failure to
     object within the term allowed shall be deemed a waiver
     and the stipulation will automatically be binding on
     that party.

3.   Explore, develop, and pursue all settlement options
     pertaining to any claim or portion thereof of any case

-16-

filed in this litigation.

4.     Maintain adequate files of all pretrial matters, including establishing and maintaining a document or exhibit depository, in either real or virtual format, and having those documents available, under reasonable terms and conditions for examinations by all MDL Plaintiffs or their attorneys.

5.     Prepare periodic status reports summarizing the PSC's work and progress.  These reports shall be submitted to the Plaintiff's Liaison Counsel who will promptly distribute copies to the other plaintiffs' attorneys.

6.     Perform any task necessary and proper for the PSC to accomplish its responsibilities as defined by the Court's orders, including organizing subcommittees compromised of plaintiffs' attorneys not on the PSC and assigning them tasks consistent with the duties of the PSC.  Membership on these subcommittees shall be subject to the approval of the Court.  Compensation for work performed by these subcommittees and the approved cost will be paid by common benefit funds.

7.     Perform such other functions as may be expressly authorized by further orders of the Court.

8.     Reimbursement for costs and/or fees for services will be set at a time and in a manner established by the

-17-

Court after due notice to all counsel and after a
hearing.

18. **DEFENDANTS' STEERING COMMITTEES** — This Court will
consider the recommendations of the defendants for membership on
the defendants steering committee.  Defendants Steering Committee
will have the duties and responsibilities described in Paragraph
17 of this order as it pertains to this respective group.

19. **MDL 2179 WEBSITE** — A website particular to MDL 2179
will be created and will be accessible by going to this Court's
website located at www.laed.uscourts.gov and clicking on the link
for MDL Cases.  The website will contain forms, court orders,
minute entries, a calendar of upcoming events, and other relevant
information.  Once the website is created, the court will issue
an order containing the direct link to the website.

20. **COMMUNICATION WITH THE COURT** — Unless otherwise ordered
by this Court, all substantive communications with the Court
shall be in writing, with copies to opposing counsel.
Nevertheless, the Court recognizes that cooperation by and among
plaintiffs' counsel and by and among defendants' counsel is
essential for the orderly and expeditious resolution of this
litigation.  The communication of information among and between

plaintiffs' counsel and among and between defendants' counsel shall not be deemed a waiver of the attorney-client privilege or the protection afforded attorney's work product, and cooperative efforts contemplated above shall in no way be used against any plaintiff by any defendant or against any defendant by any plaintiff. Nothing contained in this provision shall be construed to limit the rights of any party or counsel to assert the attorney-client privilege or attorney work product doctrine.

New Orleans, Louisiana, this ___10th___ day of ___August___, 2010.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

-19-

**IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON"**
**IN THE GULF OF MEXICO, ON APRIL 20, 2010**          MDL No. 2179

## SCHEDULE A

Northern District of Alabama

Ben Chenault, etc. v. Transocean, Ltd., et al., C.A. No. 2:10-1139

Southern District of Alabama

James F. Mason, Jr., etc. v. Transocean, Ltd., et al., C.A. No. 1:10-191
Peter Burke v. BP Corporation of North of America, Inc., et al., C.A. No. 1:10-195
Shannon Trahan v. BP, PLC, et al., C.A. No. 1:10-198
Jud Smith, et al. v. BP, PLC, et al., C.A. No. 1:10-200
Billy Wilkerson, et al. v. Transocean Holdings, Inc., et al., C.A. No. 1:10-201
Fishtrap Charters, LLC, et al. v. Transocean Holdings, Inc., et al., C.A. No. 1:10-202
Fort Morgan Sales, Rentals & Development, Inc., et al. v. Transocean
      Holdings, Inc., et al., C.A. No. 1:10-203
Bon Secour Fisheries, Inc., et al. v. BP, PLC, et al., C.A. No. 1:10-206
George C. Simpson v. Transocean, Ltd., et al., C.A. No. 1:10-210
Gulf Shores West Beach Investments, LLC v. Transocean Holdings, Inc., et al.,
      C.A. No. 1:10-213
Billy's Seafood, Inc. v. Transocean Holdings, Inc., et al., C.A. No. 1:10-215
David Meyer, et al. v. BP America, et al., C.A. No. 1:10-216
Orange Beach Marina, Inc., et al. v. Transocean Holdings, Inc., et al., C.A. No. 1:10-217
Robert V. Pendarvis, et al. v. BP, PLC, et al., C.A. No. 1:10-218
Fran Hopkins, et al. v. Transocean, Ltd., et al., C.A. No. 1:10-221
Steven Lavigne, et al. v. British Petroleum, PLC, et al., C.A. No. 1:10-222
Original Oyster House, Inc., et al. v. Transocean Holdings, Inc., et al., C.A. No. 1:10-223
Blue Water Yacht Sales & Services, Inc., et al. v. Transocean Holdings, Inc., et al.,
      C.A. No. 1:10-224
Marine Horizons, Inc., et al. v. BP, PLC, et al., C.A. No. 1:10-227
George Jett v. BP, PLC, et al., C.A. No. 1:10-228
Captain Edward Lockridge v. BP, PLC, et al., C.A. No. 1:10-233
Terry Drawdy, et al. v. Transocean, Ltd., et al., C.A. No. 1:10-235
Sea Eagle Fisheries, Inc., et al. v. BP, PLC, et al., C.A. No. 1:10-238

- A2 -

**MDL No. 2179 Schedule A (Continued)**

Northern District of Florida

John T. Harris v. Transocean, Ltd., et al., C.A. No. 3:10-129
Ocean Reef Realty, Inc. v. Transocean Holdings, Inc., et al., C.A. No. 3:10-132
Michael Salley v. Transocean Holdings, Inc., et al., C.A. No. 3:10-133
Nicholas Harris, et al. v. Transocean, Ltd., et al., C.A. No. 3:10-134
Charles Douglass, et al. v. Transocean Holdings, Inc., et al., C.A. No. 3:10-136
Joe Patti Seafood Co., et al. v. Transocean, Ltd., et al., C.A. No. 3:10-137
Dewey Destin, et al. v. BP, PLC, et al., C.A. No. 3:10-141
Stacey P. Walsh v. British Petroleum, PLC, et al., C.A. No. 3:10-143
George Weems Ward, et al. v. BP, PLC, et al., C.A. No. 4:10-157
Water Street Seafood, Inc., et al. v. BP Products North America Inc., et al.,
    C.A. No. 4:10-162

Eastern District of Louisiana

Shane Roshto, et al. v. Transocean, Ltd., et al., C.A. No. 2:10-1156
Michelle Jones, etc. v. Transocean, Ltd., et al., C.A. No. 2:10-1196
Troy Wetzel, et al. v. Transocean, Ltd., et al., C.A. No. 2:10-1222
Acy J. Cooper, Jr., et al. v. BP, PLC, et al., C.A. No. 2:10-1229
Michael Williams v. Transocean, Ltd, et al., C.A. No. 2:10-1243
Darleen Jacobs Levy v. Transocean, Ltd., et al., C.A. No. 2:10-1245
James J. Friloux, et al. v. BP, PLC, et al., C.A. No. 2:10-1246
Ben Robin, et al. v. BP, PLC, et al., C.A. No. 2:10-1248
Michael Ivic, et al. v. BP, PLC, et al., C.A. No. 2:10-1249
Felix Alexie, Jr. v. BP, PLC, et al., C.A. No. 2:10-1250
Ray Vath, et al. v. BP, PLC, et al., C.A. No. 2:10-1273
Charles Robin, III, et al. v. BP, PLC, et al., C.A. No. 2:10-1295
Bill's Oyster House, LLC, et al. v. BP, PLC, et al., C.A. No. 2:10-1308
Nova Affiliated, S.A. v. BP, PLC, et al., C.A. No. 2:10-1313
Robin Seafood Co., Inc., et al. v. BP, PLC, et al., C.A. No. 2:10-1314
Bryan C. Carrone, et al. v. BP Products North America, Inc., et al., C.A. No. 2:10-1315
George Barisich, et al. v. BP, PLC, et al., C.A. No. 2:10-1316
Eugene B. Dugas, et al. v. BP, PLC, et al., C.A. No. 2:10-1322
George Barisich, et al. v. BP, PLC, et al., C.A. No. 2:10-1324
Brent J. Rodrigue, Sr., et al. v. BP, PLC, et al., C.A. No. 2:10-1325
T&D Fishery, LLC, et al. v. BP, PLC, et al., C.A. No. 2:10-1332
Fish Commander, LLC v. BP, PLC, et al., C.A. No. 2:10-1339
Cajun Offshore Charters, LLC v. BP, PLC, et al., C.A. No. 2:10-1341
Gulf Crown Seafood, Inc. v. BP, PLC, et al., C.A. No. 2:10-1344
Joseph Kunstler, et al. v. Transocean, Ltd., et al., C.A. No. 2:10-1345

- A3 -

**MDL No. 2179 Schedule A (Continued)**

<u>Eastern District of Louisiana</u> (Continued)

Isadore Crepple v. BP, PLC, et al., C.A. No. 2:10-1346
Eric Dumas, etc. v. BP, PLC, et al., C.A. No. 2:10-1348
William D. Gregoire, et al. v. Transocean, Ltd., et al., C.A. No. 2:10-1351
Robroy J. Terrebonne v. BP, PLC, et al., C.A. No. 2:10-1352
Curtis Silver, et al. v. BP, PLC, et al., C.A. No. 2:10-1387
Tom Garner v. BP, PLC, et al., C.A. No. 2:10-1482

<u>Western District of Louisiana</u>

Matthews Gaskins, Jr. v. BP, PLC, et al., C.A. No. 2:10-738
Ellis Schouest, III, et al. v. BP Products North America, Inc., et al., C.A. No. 6:10-727

<u>Southern District of Mississippi</u>

Paul Hopper, et al. v. Cameron International Corp., et al., C.A. No. 1:10-173
Cajun Maid, LLC, et al. v. BP, PLC, et al., C.A. No. 1:10-176
Hiep Trieu, et al. v. BP Exploration & Production, Inc., et al., C.A. No. 1:10-177
Michael D. Sevel, et al. v. BP, PLC, et al., C.A. No. 1:10-179
Jessica Staley v. Cameron International Corp., et al., C.A. No. 1:10-181
Ronnie Daniels v. Cameron International Corp., et al., C.A. No. 1:10-182
Stacey Van Duyn, et al. v. Cameron International Corp., et al., C.A. No. 1:10-183
Aleen Grieshaber, et al., v. BP Products North America, Inc., et al., C.A. No. 1:10-185

<u>Southern District of Texas</u>

Ben Nelson, et al. v. Transocean, Ltd., et al., C.A. No. 3:10-172
National Vietnamese American Fisherman Emergency Association, et al. v.
        BP, PLC, et al., C.A. No. 4:10-1607

Case 2:10-md-02179-CJB-DPC Document 963-2 Filed 01/10/11 Page 122 of 139
Case 2:10-md-02179-CJB-SS Document 2-2 Filed 08/10/10 Page 122 of 139
Printed on 08/10/2010

SCHEDULE B

# Judicial Panel on Multidistrict Litigation - Panel Service List
## for
## MDL 2179 - IN RE: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico,

### *** Report Key and Title Page ***

Please Note: This report is in alphabetical order by the last name of the attorney. A party may not be represented by more then one attorney. See Panel rule 5.2(c).

**Party Representation Key**
   * Signifies that an appearance was made on behalf of the party by the representing attorney.
   # Specified party was dismissed in some, but not all, of the actions in which it was named as a party.
   All counsel and parties no longer active in this litigation have been suppressed.

**This Report is Based on the Following Data Filters**
   Docket: 2179 - Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico - 4/20/10
   For Open Cases

Judicial Panel on Multidistrict Litigation MDL No. 2179    Page 1
Case 2:10-md-02179-CJB-SS   Document 962-2   Filed 01/10/11   Page 123 of 139
Case 2:10-md-02179-CJB-SS   Document 2-2   Filed 08/10/10   Page 12 of 9

Docket:  2179 - IN RE: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010

Status:  Transferred on 08/10/2010

Transferee District:  LAE    Judge:  Barbier, Carl J.

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|

**Arsenault, Richard J.**
NEBLETT BEARD & ARSENAULT
2220 Bonaventure Court
Post Office Box 1190
Alexandria, LA 71309-1190

=>**Phone: (318) 487-9874  Fax: (318) 561-2591  Email: r.arsenault@nbalawfirm.com**
Dudenherer's Fishing Charters, Inc.*; Titeline Charter Service, LLC*

**Barnett, Ryan M.**
WHIBBS & STONE PA
801 West Romana Street
Pensacola, FL 32502

=>**Phone: (850) 434-5395  Fax: (850) 469-0043  Email: ryan@whibbsandstone.com**
Bryant, III, Edward R.; Douglass, Annette; Loupe, John Chandler; Loupe, Mary P.

**Barr, Brian H.**
LEVIN PAPANTONIO THOMAS ET AL
316 South Baylen Street
Suite 600
Pensacola, FL 32502

=>**Phone: (850) 435-7000  Fax: (850) 436-6187  Email: bbarr@levinlaw.com**
Bay Breeze Aquatics & Dive Center, LLC; Joe Patti Seafood Co.; Mega-Bite Inshore Charters; Nichols, Benjamin Marvin; Phan Tran; Premier Island Management Group LLC; Reel Eazy Charters, LLC; Rooks Marina, Inc.; Southern Seafood of Pace, Inc.

**Beck, David J.**
BECK REDDEN & SECREST LLP
1221 McKinney Street
Suite 4500
Houston, TX 77010

=>**Phone: (713) 951-3700  Fax: (713) 951-3720  Email: dbeck@brsfirm.com**
Cameron International Corp.*

**Berman, Steve W.**
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue
Suite 3300
Seattle, WA 98101

=>**Phone: (206) 623-7292  Fax: (206) 623-0594  Email: steve@hbsslaw.com**
Brian Howard's Charter Fishing LLC*; Walker, Jr., Laurence Emory*

**Bracken, Geoffrey H.**
GARDERE WYNNE SEWELL LLP
1000 Louisiana
Suite 3400
Houston, TX 77002

=>**Phone: (713) 276-5739  Fax: (713) 276-6739  Email: gbracken@gardere.com**
M-I, L.L.C.*

**Bradford, Bobby J.**
AYLSTOCK WITKIN KREIS & OVERHOLTZ PLLC
803 North Palafox Street
Pensacola, FL 35201

=>**Phone: (850) 916-7450  Fax: (850) 916-7449**
Chiodo, Kristi; Harris, John T.; Harris, Nicholas

**Braud, S. Jacob**
BALLAY BRAUD & COLON PLC
8114 Highway 23
Belle Chasse, LA 70037

=>**Phone: (504) 394-9841  Fax: (504) 394-9945  Email: JacobBraud@bbc-law.net**
Taliancich, Sr., Bartol John*

**Brown, Eric B.**
P.O. Box 2765
Houston, TX 77252-2765

=>
Transocean, Ltd.; Transocean, Ltd. (Transocean Entity)

---

Note: Please refer to the report title page for complete report scope and key.

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|
| Buzbee, Anthony G.<br>BUZBEE LAW FIRM<br>JP Morgan Chase Tower<br>600 Travis<br>Suite 7300<br>Houston, TX 77002 | **=>Phone: (713) 223-5393 Fax: (713) 223-5909 Email: tbuzbee@txattorneys.com**<br>Baron, Ned*; Davis, Matthew*; Davis, Stephen*; Haire, Christopher*; Hearn, Robert*; Martinez, Dennis DeWayne*; Moss, Eugene DeWayne*; Nelson (dba Jeri's Seafood, Inc.), Ben*; Nelson (dba Jeri's Seafood, Inc.), Jeri*; Pigg, Samuel Wade*; Sandell, Micah Joseph*; Tipps, Roy* |
| Cabraser, Elizabeth J.<br>LIEFF CABRASER HEIMANN & BERNSTEIN LLP<br>275 Battery Street<br>29th Floor<br>San Francisco, CA 94111-3339 | **=>Phone: (415) 956-1000 Fax: (415) 956-1008 Email: ecabraser@lchb.com**<br>Barnett, Robert*; Bates, Harley D.*; Burger (dba H2O Outfitters), Eddie*; Cajun Maid, LLC*; Gulf Shores Sea Products, Inc.*; Integrity Fisheries, Inc.*; Kirkland, Morgan*; Ladner, Keath*; Le Discount Seafood, Inc.*; Le, Namthi*; Phasadovong, Souksavanh*; Rodriguez, Sr., Charles V.*; Sea Eagle Fisheries, Inc.*; Tom Wade, Inc. dba Nautical Yacht* |
| Chiepalich, C. S.<br>P.O. Box 6505<br>Mobile, AL 36660 | **=>Phone: (205) 478-1666 Email: csc@birch.net**<br>Jett, George |
| Clark, Lange<br>LAW OFFICE OF LANGE CLARK PC<br>301 19th Street North<br>Suite 550<br>Birmingham, AL 35203 | **=>Phone: (205) 939-3933 Fax: (205) 939-1414 Email: langeclark@mindspring.com**<br>Carbullido, Jesse*; Gams, Robert Stephen*; Marine Horizons, Inc.* |
| Coleman, Alice W.<br>BRENT COON & ASSOCIATES<br>6360 I-55, North<br>Suite 340<br>Jackson, MS 39211 | **=>Phone: (601) 957-6177 Fax: (601) 957-6507 Email: alice@bcoonlaw.com**<br>Grieshaber, Aleen; Grieshaber, James |
| Coumanis, Christ N.<br>COUMANIS & YORK PC<br>2101 Main Street<br>Daphne, AL 36526 | **=>Phone: (251) 990-3083 Fax: (251) 928-8665 Email: coumanis@c-ylaw.com**<br>Drawdy Crab Co., Inc.*; Drawdy, Jessica*; Drawdy, Terry*; Handsome Crab, Inc.*; T&J's Last Minute Seafood Express, Inc.*; United Seafood, Inc. dba D&M Crabs* |
| Crump, Martin D.<br>DAVIS & CRUMP<br>1712 15th Street<br>Suite 300<br>Gulfport, MS 39501 | **=>Phone: (228) 863-6000 Fax: (228) 864-0907 Email: martincrump@daviscrump.com**<br>Barker, Daniel* |
| Cutter, C. Brooks<br>KERSHAW CUTTER & RATINOFF LLP<br>401 Watt Avenue<br>Sacramento, CA 95864 | **=>Phone: (916) 448-9800 Fax: (916) 669-4499 Email: bcutter@kcrlegal.com**<br>Contegni, Jr. (dba Chips Shrimp, Inc.), Charles J.* |
| Dampier, M. Stephen<br>LAW OFFICES OF M STEPHEN DAMPIER PC<br>55 North Section Street<br>Farirhope, AL 36532 | **=>Phone: (251) 929-0800 Fax: (251) 929-0900 Email: stevedampier@dampierlaw.com**<br>Ferguson, Constance*; Ferguson, James* |
| Deshazo, Michael<br>KINNEY & ELLINGHAUSEN | **=>Phone: (504) 524-0206 Fax: (504) 525-6216 Email: michaeld@kinneylaw.com**<br>Bayouside Drive Seafood, LLC*; Blanchard, Eric*; Cajun Crab, LLC* |

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|

1250 Poydras Street
Suite 2450
New Orleans, LA 70113

Dreher, Jr., William W.
DREHER LAW FIRM PA
P.O. Box 968
2224 - 24th Avenue
Gulfport, MN 39502

=>**Phone: (228) 822-2222  Fax: (228) 822-2626  Email: wwdlaw@bellsouth.net**
Baker, Cliff*; Bosarge, Robert*; Hormanski, A.D.*; Jacobs, Lester*; Necaise, J.C.*; Papania, Leonard*; Rowell, Jimmie*; Sevel, Michael D.*; Ship Island Excursions, Inc.*; Townsend, Johnny*; Ware USA, LLC*; Wolcott, Robert*

Dunne, Carey R.
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017

=>**Phone: (212) 450-4000  Fax: (212) 450-3800  Email: carey.dunne@davispolk.com**
Hyundai Heavy Industries Co., Ltd.*

Friedman, Jeffrey E.
FRIEDMAN LEAK DAZZIO ZULANAS & BOWLING PC
3800 Corporate Woods Drive
Birmingham, AL 35242

=>**Phone: (205) 278-7000  Fax: (202) 278-7001  Email: jfriedman@friedmanleak.com**
Barnes III, Harry M.*; Ben-Rip-J, Inc.*; LP Properties, LLC*; McLeod, Ben*; Necessity Sport Fishing, LLC*; Smith, Jud*; Smith, Sherri*

Garrison, Jr, W. Lewis
HENINGER GARRISON DAVIS LLC
2224 1st Avenue North
P.O. Box 11310
Birmingham, AL 35203

=>**Phone: (205) 326-3336  Fax: (205) 326-3332  Email: wlgarrison@hgdlawfirm.com**
B&B Properties, Inc.*; Caldwell, William*; Fran's On Fifty Nine*; Hopkins, Fran*; Imagine Enterprises I, LLC*; Imagine Enterprises, LLC*; Isbell, Melissa*; Overton Joseph*; Overtstreet, Jr., John*; Robertson, Joni*; Salter, Stephen*; Smeraglia, Claude*; Spina, Johnnie*; Spina, Thomas*

Gibbs, Darryl M.
CHHABRA & GIBBS PA
120 North Congress Street
Suite 200
The Plaza Building
Jackson, MS 39201

=>**Phone: (601) 948-8005  Fax: (601) 948-8010  Email: dgibbs@cglawms.com**
Brame, Margaret Ann*; Daniels, Ronnie*; Duyn, Stacey Van*; Knight, Charles*; Staley, Jessica*

Godfrey, Richard C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654

=>**Phone: (312) 862-2064  Fax: (312) 861-2200  Email: Richard.Godfrey@kirkland.com**
BP Corp. North America, Inc.; British Petroleum, PLC

Godwin, Donald E.
GODWIN RONQUILLO PC
Renaissance Tower
1201 Elm Street
Suite 1700
Dallas, TX 75270

=>**Phone: (214) 939-4400  Fax: (214) 760-7332  Email: dgodwin@godwinronquillo.com**
Halliburton Co.*; Halliburton Energy Services, Inc.*

Greenwald, Robin L.
WEITZ & LUXENBERG PC
700 Broadway
New York, NY 10003

=>**Phone: (212) 558-5802  Fax: (212) 344-5461  Email: rgreenwald@weitzlux.com**
Abshire, Brad*; Allen, Scotty*; Arratt, Jeffrey*; Arrington, Sr., Kenneth*; Baily, Willis*; Baker, Tyree*; Ball, Clarence*; Ball, Darryl S.*; Ball, Jr., William*; Ball, William H.*; Bell, Danny*; Bell, Jerry*; Bell, Joseph*; Bessard, Sr., Chris*; Besteda, Alex*; Betancourt, Enrique A.*; Blevins, Thomas*; Blue, Leroy*; Bonner, Tyrone*; Bosarge, Michael A.*; Mitchell, James Kirk*; Tony Lynn, LLC

Hawkins, John F.
HAWKINS STRACENER & GIBSON PLLC

=>**Phone: (601) 969-9692  Fax: (601) 914-3580  Email: john@hsglawfirm.net**
Hopper (Ind./dba Hopper Seafood & Grand Bature Seafood), Paul*

Note: Please refer to the report title page for complete report scope and key.

(Panel Attorney Service List 2-1053-1780297794 v13) Case 2:10-md-02179-CJB-DPC Document 963-2 Filed 01/10/11 Page 126 of 139

Case 2:10-md-02179-CJB-SS Document 2-2 Filed 08/10/10 Page 5 of 9   Page 4

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|

P.O. Box 24627
Jackson, MS 39225-4627

**Herman, Russ M.**
HERMAN HERMAN KATZ & COTLAR LLP
820 O'Keefe Avenue
New Orleans, LA 70113

=>**Phone: (504) 581-4892  Fax: (504) 561-6024  Email: rherman@hhkc.com**
321 Arabella, LLC. dba Franky and Johnny's Restaurant*; 3401 N. Hullen, LLC. dba Tello's Bistro*; A Bar & Grill with a Bite, Inc. dba Crazy Lobster New Orleans LA*; Hambone, Inc. dba Zeke's Restaurant*; Harborwalk II, LLC. dba Poppy's Dancin' Iguana*; LACRIOLLO, Inc. dba Poppy's Time Out Sports Bar & Grill*; New Orleans Fish House, LLC*; Orlando Village Restaurant LLC dba Poppy's Crazy Lobster Destin*; P.A. Menard, Inc.*; Tumolo Enterprises, Inc. dba Poppy's Seafood Factory*; We Too Inc. dba Eleven 79 Restaurant*

**Holland, Eric D.**
HOLLAND GROVES SCHNELLER & STOLZE LLC
300 North Tucker Boulevard
Suite 801
St. Louis, MO 63101

=>**Phone: (314) 241-8111  Fax: (314) 241-5554  Email: eholland@hgsslaw.com**
Lavigne, Paul*; Lavigne, Steven*

**Hornsby, Jr., Ernest C.**
MORRIS HAYNES INGRAM & HORNSBY
3500 Colonnade Parkway
Suite 100
Birmingham, AL 35243

=>**Phone: (256) 329-2000  Fax: (256) 329-2015  Email: chornsby@mhhlaw.net**
Simpson, George C.

**Howard, Phillip Timothy**
HOWARD & ASSOCIATES PA
8511 Bull Headley Road
Suite 405
Tallahassee, FL 32312

=>**Phone: (850) 298-4455  Fax: (850) 216-2537  Email: ptim@aol.com**
Crawford, Constance; Galloway, Jeff; Ward, George Weems

**Huey, Michael G.**
HUEY LAW FIRM LLC
1059 Dauphin Street
Mobile, AL 36604

=>
Gonzales, Dr. John; Trahan, Shannon

**Irvine, III, George R.**
STONE GRANADE & CROSBY PC
7133 Stone Drive
Daphne, AL 36526

=>**Phone: (251) 626-6696  Fax: (251) 626-2617  Email: gri@sgclaw.com**
Billy's Seafood, Inc.; Elkins (Ind./Trustee-Terry L. & Janice M.), Janice M.; Elkins (Ind./Trustee-Terry L. & Janice M.), Terry L.; Goldsworthy, Richard; Goldsworthy, Susan Elkins; Gulf Shores West Beach Investments, LLC; Pendarvis, Gracie; Pendarvis, Robert V.

**Jackson, III, Sidney W.**
JACKSON FOSTER & RICHARDSON LLC
P.O. Box 2225
Mobile, AL 36652

=>
Mason, Jr. (Ind./Behalf-K&J, Inc.), James F.

**Jones, III, Gladstone N.**
JONES SWANSON HUDDELL & GARRISON LLC
Pan-American Life Center
601 Poydras Street
Suite 2655
New Orleans, LA 70130

=>**Phone: (504) 523-2500  Fax: (504) 523-2508  Email: gjones@jonesswanson.com**
Phillips, John F.*

**Jones, Rhon E.**
BEASLEY ALLEN CROW METHVIN PORTIS & MILES PC

=>**Phone: (334) 269-2343  Fax: (334) 954-7555  Email: rhon.jones@beasleyallen.com**
Bon Secour Boats, Inc.*; Bon Secour Fisheries, Inc.*; Cotton Bayou Marina, Inc. dba Tacky Jacks Restaurant*; Deupree Outdoor Guide Services, Inc.*; Relax On The Beach, Inc.*; Sandcastle

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|
| 218 Commerce Street<br>Montgomery, AL 36104 | Escapes, L.L.C.*; Sunrise Rentals Enterprises* |
| Kennedy, Richard R.<br>309 Polk Street<br>P.O. Box 3243<br>Lafayette, LA 70502-3243 | =>**Phone: (337) 232-1934  Fax: (337) 232-9720  Email: ken309@richardkennedy.com**<br>Rhodes, Karl W.* |
| Laborde, III, Cliffe E.<br>LABORDE & NEUNER<br>One Petroleum Center<br>1001 W. Pinhook Road<br>Suite 200<br>Lafayette, LA 70503 | =>**Phone: (337) 237-7000  Fax: (337) 233-9450  Email: cliffe@ln-law.com**<br>Tidewater Marine, LLC* |
| Lane, Joseph D.<br>COCHRAN CHERRY GIVENS & SMITH<br>163 West Main Street<br>Dothan, AL 36301 | =>**Phone: (334) 793-1555  Fax: (334) 793-8280  Email: jlane@cochranfirm.com**<br>Barber, Peter J.* |
| Langan, J. Andrew<br>KIRKLAND & ELLIS LLP<br>300 North LaSalle Street<br>Chicago, IL 60654 | =>**Phone: (312) 862-2064  Fax: (312) 862-2200  Email: andrew.langan@kirkland.com**<br>BP America Inc.*; BP Exploration & Production, Inc.*; BP Products North America Inc.*; BP, PLC; BP, PLC aka BP |
| Lovelace, DeWitt M.<br>LOVELACE LAW FIRM PA<br>12870 U.S. Highway 98 West<br>Suite 200<br>Miramar Beach, FL 32550 | =>**Phone: (850) 837-6020  Fax: (850) 837-4093  Email: dml@lovelacelaw.com**<br>Le (dba Bluewater Seafood), Hao Van* |
| Lucado, M. Shane<br>LUCADO LAW FIRM<br>1 Perimeter Park South<br>Suite 125 South<br>Birmingham, AL 35243 | =>**Phone: (205) 278-0025  Fax: (205) 278-0030  Email: slucado@lucadolaw.com**<br>Chenault (Ind./For CMCO, LLC), Ben*; Creech, Dacien Thane*; Douglass, Charles*; Kilgore Realty, LLC* |
| Mason, Angela Joy<br>COCHRAN FIRM<br>163 W. Main Street<br>Dothan, AL 36302 | =>**Phone: (205) 793-1555**<br>Bratt (Ind./dba Chaise N'Rays), Gary; Bridges (Ind./dba H.R. Bridges Seafood), Randolf; Collier, Sr. (Ind./dba P.J. Seafood), Richard M.; Hodas (Ind./dba Island Times Mountain Time), Carrie; Hodas (Ind./dba Island Times Mountain Time), Kier; Meyer, David; Miller (Ind./Dba The Island Rainbow & The Trading Post) Dennis Benjamin; Ponder (Ind./dba Deer River Seafood, LLC), John Samuel |
| McDole, Keith C.<br>JONES DAY<br>2727 North Harwood Street<br>Dallas, TX 75201-1515 | =>**Phone: (214) 220-3939  Fax: (214) 969-5100**<br>Transocean Holdings, Inc.; Transocean, Ltd.; Transocean, Ltd. (Transocean Entity) |
| McKee, Robert J.<br>KRUPNICK CAMPBELL MALONE BUSER SLAMA ET AL<br><br>12 Southeast 7th Street | =>**Phone: (954) 763-8181  Fax: (954) 763-8292  Email: mckee@krupnicklaw.com**<br>Griffitts Investments LP* |

Note: Please refer to the report title page for complete report scope and key.

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|

Suite 801
Ft. Lauderdale, FL 33301

Meunier, Gerald E.
GAINSBURGH BENJAMIN DAVID MEUNIER &
WARSHAUER LLC
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2800

**=>Phone: (504) 522-2304  Fax: (504) 528-9973  Email: gmeunier@gainsben.com**
Bass, Frederick*; Eckert, Darryl*; Elmer, Charles C.*; Hayes, Michael*; Neumeyer, Jr., Rodney*;
Nunez, Lena T.*

Miller, Kerry J.
FRILOT LLC
1100 Poydras Street
Suite 3700
New Orleans, LA 70163

**=>Phone: (504) 599-8194  Fax: (504) 599-8145  Email: kmiller@frilot.com**
Transocean Deepwater, Inc.*; Transocean Offshore Deepwater Drilling, Inc.*

Mitsui & Co., U.S.A., Inc,
200 Park Avenue
New York, NY 10166

**=>**
Mitsui & Co. U.S.A., Inc.

Morrow, Patrick C.
MORROW MORROW RYAN & BASSETT
Post Office Drawer 1787
Opelousas, LA 70570

**=>Phone: (337) 948-4483  Fax: (337) 942-5234  Email: pmorrow@mmrblaw.com**
James, Jr., Joseph George*; Schouest, III, Ellis*

Moskowitz, Adam M.
KOZYAK TROPIN & THROCKMORTON PA
2525 Ponce de Leon Boulevard
9th Floor
Miami, FL 33134

**=>Phone: (305) 372-1800  Fax: (305) 372-3508  Email: AMM@kttlaw.com**
Destin, Dewey*; Edgewater Beach Owner's Association, Inc.*; Key West Tiki Charters, Inc.*

Murray, Stephen B.
MURRAY LAW FIRM
650 Poydras Sreet
Suite 2150
New Orleans, LA 70130

**=>Phone: (504) 525-8100  Fax: (504) 584-5249  Email: smurray@murray-lawfirm.com**
Dinet, Nicholas J.*

Neger, Peter C.
BINGHAM MCCUTCHEN LLP
399 Park Avenue
New York, NY 10075

**=>Phone: (212) 705-7226  Fax: (212) 702-3616  Email: peter.neger@bingham.com**
Anadarko E&P Co., L.P.*; Anadarko Petroleum Corp.*

Nicholas, Steven L.
CUNNINGHAM BOUNDS LLC
1601 Dauphin Street
Mobile, AL 36604

**=>Phone: (251) 471-6191  Fax: (251) 479-1031  Email: sln@cunninghambounds.com**
Action Outdoors, LLC*; Alabama Gulf Coast Investments, LLC*; Blue Water Yacht Sales &
Services, Inc.*; Country, Inc.*; Deep Sea Foods, Inc.*; Fishtrap Charters, LLC*; Fort Morgan Sales,
Rentals & Development, Inc.*; Gumbo Properties, LLC*; Happy Harbor, LLC*; Ingram, Jon B.*;
Jubilee Seafood, Inc.*; Long, John Forrest*; Malay, Inc.*; Margaritaville, LLC*; Ocean Reef
Realty, Inc.*; Orange Beach Marina, Inc.*; Original Oyster House II, Inc.*; Original Oyster House,
Inc.*; Oyster Bay Marina, LLC*; Pass Chateau Properties, LLC dba Dauphin Island Marina*;
Premium Properties, Inc.*; Prickett Properties, LLC*; Romar Marina Club, LLC*; Salley (dba Sure
Shot Charters), Micheal*; Southern Coastal Restaurants, LLC*; Sportsman Fish House, LLC*;
Superb Food, Inc.*; T&E Seafood, Inc.*; TNT, LLC*; Wilkerson, Billy*; Wilkerson, Tessa*

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|

**Norris, John E.**
DAVIS & NORRIS LLP
The Bradshaw House
2154 Highland Avenue South
Birmingham, AL 35205

=>**Phone: (205) 930-9900  Fax: (205) 930-9989  Email: jnorris@davisnorris.com**
Burke, Peter*; Junghann, Brenda S.*; Junghann, Jorg M.*; Lykins, Ryan*

**Poynter, Scott E.**
EMERSON POYNTER LLP
500 President Clinton Avenue
Suite 305
Little Rock, AR 72201

=>**Phone: (501) 907-2555  Fax: (501) 907-2556  Email: scott@emersonpoynter.com**
Charter Boat Seascape Inc.*; Charter Boat Sunrise Inc.*; Destin Fishing Fleet Inc.*; First Light Enterprises Inc.*; L&H Enterprises, Inc. dba Tackle This Shoot That*; Paul, Gary*

**Price, Donald W.**
DUE PRICE GUIDRY PIEDRAHITA & ANDREWS
8201 Jefferson Highway
Baton Rouge, LA 70809

=>**Phone: (225) 929-7481  Fax: (225) 924-4519  Email: dprice@dueprice.com**
Duet, Deanna G.*; Duet, Raymond*

**Quin, II, William M.**
MCCRANEY MONTAGNET & QUIN PLLC
602 Steed Road
Suite 200
Ridgeland, MS 39157

=>**Phone: (601) 707-5725  Fax: (601) 510-2939  Email: wquin@mmqlaw.com**
Montagnet, Monica C.*

**Rash, David C.**
ALTERS LAW FIRM PA
4141 Northeast 2nd Avenue
Suite 201
Miami, FL 33137

=>**Phone: (305) 571-8550  Fax: (305) 571-8558  Email: david@alterslaw.com**
Blue Parrott OceanFront Cafe, Inc.*; Captain Salty, Inc.*; G.A. Fish, Inc.*; Grant, John S.*; Greg Abrams Seafood, Inc.*; Lima (aka Captain Shelley Seafood), Steve*; Motor Vessel Captain Carl, Inc.*; Motor Vessel Fishermans Pride, Inc.*; Motor Vessel Lady Evelyn, Inc.*; Motor Vessel Three Brothers, Inc.*; Raffield Fisheries Inc.*; SGI Rentals Inc.*; Tarpon Dock Seafood Market*; Water Street Seafood, Inc.*; WJ2 LLC*

**Rifkin, Mark C.**
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016

=>**Phone: (212) 545-4600  Fax: (212) 545-4653  Email: Rifkin@whafh.com**
Brondum Jr., Richard C.*; Bundy, Jr., Bill R.*; Johnson, Cynthia*; Richard (dba Richard's Seafood Patio), Calvin J.*

**Sexton, II, K. Edward**
GENTLE TURNER & SEXTON
2 North 20th Street
Suite 1200
Birmingham, AL 35203

=>**Phone: (205) 716-3000  Email: esexton@gtandslaw.com**
Lockridge, Captain Edward

**Strange, Brian R.**
STRANGE & CARPENTER
12100 Wilshire Boulevard
Suite 1900
Los Angeles, CA 90025

=>**Phone: (310) 207-5055  Fax: (310) 826-3210  Email: lacounsel@earthlink.net**
Gaskins, Jr., Matthews*

**Tran, Minh Tam**
TAMMY TRAN ATTORNEYS AT LAW LP
2915 Fannin Street
Houston, TX 77002

=>**Phone: (713) 655-0737  Fax: (713) 655-0823  Email: ttran@tt-lawfirm.com**
National Vietnamese American Fisherman Emergency Association*; Nguyen, Nam; Tran, Hung

---

Note: Please refer to the report title page for complete report scope and key.

*(Panel Attorney Service List - TRANSITED)* Case 2:10-md-02179-CJB-DPC Document 963-2 Filed 01/10/11 Page 130 of 139    Page 8

Case 2:10-md-02179-CJB-SS    Document 2-2    Filed 08/10/10    Page 9 of 9

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|

Verras, Spiro J.
BILIRAKIS LAW GROUP LLC
4538 Bartelt Road
Holiday, FL 34690

=>**Phone: (727) 937-3226  Fax: (727) 934-5069  Email: sverras@bilirakislaw. com**
Calhoun, Jeffery*; Coratella, Vincent*; East Shore Land Development, LLC dba Blue Wave Motel Suites Of Clearwater Beach, Florida*; Galaris, James*; Gionis, Athanasios*; Gionis, Evdokia*; Gold Fingers Jewelers & Gift Shop, Inc.*; J.J.S. Properties, Inc. dba Post Corner Pizza Restaurant*; Moreira, Carlos*; Narcosis, Inc.*; Venette, Desire*

Wiygul, Robert B.
WALTZER & ASSOCIATES
1011 Iberville Drive
Ocean Springs, MS 39564

=>**Phone: (228) 872-1125  Fax: (228) 872-1128  Email: robert@waltzerlaw.com**
Dinh, Khuyen; Huynh, Tai; Nguyen, Son; Pan Isles, Inc.; Trieu, Hiep

Zatzkis, Lanny R.
ZATZKIS MCCARTHY & ASSOCIATES LLC
650 Poydras Street
Suite 2750
New Orleans, LA 70130

=>**Phone: (504) 523-2266  Fax: (504) 593-9921  Email: Lanny@Zatzkis.com**
Black, Kevin*; Canty, IV, John B.*; Conzonere, Chad*; Crain, Michael Troy*; Crawford, Brad*; Crawford, William J.*; Efferson, Alvery L.*; Efferson, Charles*; Evans, Jr., Robert*; Ferrier, Michael*; Gagliano, Wayne*; Jackson, Kevin M.*; Knecht, Jr., Dennis*; Knecht, Jr., Frederick H.*; Kreger, Jr., Ronald A.*; Kreger, Robert*; Kreger, Ryan A.*; Kreger, Sr., Ronald A.*; Kreger, Sr., Roy*; Lyncker, Williams H.*; Moragas, Shannon D.*; Pomes, Christopher*; Raimer, Allen J.*; Roberts, John C.*; Sander, Jr., Gerald J.*; Schmalz, Charles*; Segrave, Jr., David A.*; Segrave, Michael A.*; Segrave, Sr., David A.*

MINUTE ENTRY
BARBIER, J.
AUGUST 20, 2010

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


                                    :    MDL NO. 2179
IN RE: OIL SPILL by the OIL RIG     :
       "DEEPWATER HORIZON" in the   :
       GULF OF MEXICO, on           :
       APRIL 20, 2010               :    SECTION: J
                                    :
                                    :
                                    :    JUDGE BARBIER
                                    :    MAG. JUDGE SHUSHAN
.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. ..


        The Court held a status conference this date via telephone.

The following were in attendance: James Roy and Stephen Herman,

representing the Plaintiffs; Deborah Kuchler, representing

Defendant Anadarko Petroleum Corporation; Don Haycraft and Andrew

Langan, representing BP Exploration & Production, Inc.; Donald

Godwin, representing Defendant Halliburton Energy Services, Inc.;

Kerry Miller,  representing Defendant Transocean, Ltd., Phillip

Wittmann, Joe W. Redden, David J. Beck, and Carmelite M. Bertaut,

representing Defendant Cameron International Corporation; Mike

Underhill of the DOJ, representing the U.S. Coast Guard and

Unified Command; Lieutenant Commander Jeff Bray, for the U.S.

Coast Guard; and Sylvia Murphy, representing MMS.

        A court reporter, Toni Tusa, was present and transcribed the

conference. Counsel may contact Ms. Tusa directly at (504)589-

7778 to obtain a copy of the transcript.

During the conference, the Court discussed with counsel the planned removal and subsequent preservation of the drill string and the blowout preventer (BOP). The Court was advised that it was anticipated that the retrieval of the drill string may begin as early as tomorrow, but that the removal of the BOP will not start until some time next week.

The Court encouraged the parties to continue to confer so as to facilitate agreement upon protocol for the drill string removal. The proposed order shall be presented to the Court later today.

Mr. Underhill has agreed to furnish all liaison counsel with a draft protocol concerning the retrieval, storage, and preservation of the BOP, and to allow the liaison counsel's input before the final protocol is issued.

* * * * * * * * * * * * * * *

JS-10:50 mins.

-2-

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the GULF OF | * | |
| MEXICO, on APRIL 20, 2010 | * | SECTION:     J |
| | * | |
| | * | JUDGE BARBIER |
| | * | MAG. JUDGE SHUSHAN |
| | * | |
| | * | THIS DOCUMENT RELATES |
| | * | TO ALL CASES |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## ORDER

**WHEREFORE**, in its Order of August 20th (Docket No. 56), the Court recognized the ongoing well control, remedial, and physical evidence recovery efforts associated with Macondo Well 252 and made clear that it does not intend to restrict or direct activities of any of the Defendants or the Unified Command in those ongoing well control efforts, remedial activities, and physical evidence recovery efforts associated with Macondo Well 252;

**WHEREFORE**, the Court has been advised that to secure final and complete well control of Macondo Well 252, the Unified Command has determined a "bottom kill" shall proceed by techniques that will involve injecting cement into the well under pressure;

**WHEREFORE**, the Court has been further advised that in order to provide maximum environmental safety and security for operations related to the bottom kill, the Unified Command has determined that it is necessary to have in place a tested and fully functioning Blowout Preventer (BOP) securing the wellhead;

**WHEREFORE**, the Court has been further advised that the Unified Command has determined the BOP presently in place, the *Deepwater Horizon's* BOP, is not considered sufficiently adequate in its present condition to provide the appropriate level of environmental safety and security for the operations related to the bottom kill and, instead, that *Deepwater Horizon's* BOP must be removed and replaced with another BOP that presently is on site and ready for latching onto Macondo Well 252;

**WHEREFORE**, the Court has been further advised that the Unified Command has determined that the "Bottom kill" of Macondo Well 252 will not be permitted to proceed until the replacement BOP is deemed securely in place, such that removal of the *Deepwater Horizon's* BOP from the well is imperative;

**WHEREFORE**, the Court has been further advised that once the *Deepwater Horizon's* BOP has been unlatched, the Unified Command has determined that it shall be brought aboard the Q-4000, thereafter transferred *via* another vessel to a dock at the NASA facility at Port Michoud for temporary storage;

**WHEREFORE**, the Court and Plaintiffs' and Defendants' Interim Liaison Counsel have been provided with an evidence protocol concerning the BOP and other physical evidence, the protocol titled "Physical Evidence Collection," said protocol setting out the procedures which shall apply to chain of custody procedures and evidence collection pertaining to the BOP and related equipment;

**WHEREFORE**, the Court has been provided with drafts of various technical procedures pertaining to the unlatching and removal of the *Deepwater Horizon's* BOP, and the Court has been further advised that unlatching and removal of the BOP will not be allowed until final approval of these technical procedures by the Unified Command;

**WHEREFORE**, the Court has been advised that removal of the *Deepwater Horizon's* BOP shall proceed in accordance with such final technical procedures that the Unified Command approves, and that chain of custody and evidence collection procedures shall proceed in accordance with the "Physical Evidence Collection" protocol referred to above;

**WHEREFORE**, the Court having been advised that the foregoing procedures for removal of the *Deepwater Horizon's* BOP are consistent with the priority of environmental protection; and

**WHEREFORE**, the Court having been advised that all reasonable steps, consistent with the priorities of safety of life and minimizing risk of environmental harm, will be taken to preserve the BOP during its recovery, transportation, and storage,

**IT IS HEREBY ORDERED** that to preclude delay in the bottom kill of Macondo Well 252, and to the extent necessary to amend and modify Paragraph 14 of the Court's Pretrial Order No. 1 to permit the removal, transportation, and immediate storage of the Deepwater Horizon's BOP and related appurtenances in accordance with the foregoing "Physical Evidence Collection" protocol, and in accordance with such final technical procedures approved by the Unified Command, Paragraph 14 of the Court's Pretrial Order No. 1 shall be, and the same is, so amended and modified;

**IT IS FURTHER ORDERED** that all reasonable steps, consistent with the priorities of safety of life and minimizing risk of environmental harm, will be taken to preserve the *Deepwater Horizon's* BOP and related appurtenances from further damage or deterioration during recovery,

transportation, and storage;

**IT IS FURTHER ORDERED** that no destructive testing or metallurgical analysis on the *Deepwater Horizon's* BOP and related equipment and appurtenances will be conducted without further order of the Court;

**IT IS FURTHER ORDERED** that BP Exploration & Production Inc. shall, consistent with the Court's earlier Order in *Roshto*, 10-1156 c/w 10-1196, maintain a log/summary of each action relating to the recovery and transport of the *Deepwater Horizon's* BOP and related appurtenances in accordance with the written procedures approved by the Unified Command ;

**IT IS FURTHER ORDERED** that should any modification or repair of the *Deepwater Horizon's* BOP and related appurtenances be necessary to accomplish the operational objectives under the Unified Command's protocol(s), such evidence shall be appropriately measured, photographed and otherwise documented in accordance with written procedures approved by the Unified Command in an appropriate way prior to any such alteration, modification, or repair to the extent practicable under the operational circumstances;

**IT IS FURTHER ORDERED** to the extent any parties retain possession, custody or control of relevant logs/summaries, photographs, measurements, videotape, film, diagrams, 3-D analysis, wall thickness readings, and/or other documentation of the recovery and/or chain of custody upon completion of the BOP retrieval operation such parties will make such data and information available, upon request, to all other parties to these proceedings, and, certain Expro and Oceaneering digital imagery in raw format will be provided to Transocean for distribution to interim liaison counsel;

**IT IS FURTHER ORDERED** that the preceding paragraphs shall not limit federal authorities with respect to establishment and maintenance of chain of custody and/or evidence

–4–

documentation procedures maintained by federal authorities pursuant to the "Physical Evidence Collection" protocol referred to above; and

**IT IS FURTHER ORDERED** that the Court recognizes the ongoing well control, remedial, and physical evidence recovery efforts, and does not intend by this Order to restrict or direct activities of any of the Defendants or the Unified Command in the well control efforts, all remedial activities, and physical evidence recovery from Macondo Well 252.

**IT IS FURTHER ORDERED** on or before August 31, 2010, interim liaison counsel shall meet and confer regarding longer-term preservation and storage protocol order(s), with a hearing to be held on this issue, if necessary, at 9:30 a.m. on Wednesday, September 1, 2010, and further, without prejudice to the right of any federal entity or authority to object on any basis, including, but not limited to, subject matter jurisdiction.

**IT IS SO ORDERED** this _26th_ day of August, 2010, at New Orleans, Louisiana.

_____
THE HONORABLE CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

−5−

## **EXHIBIT F**

## **INDEPENDENT CONTRACTORS TREATED AS EMPLOYEES OF FEINBERG ROZEN**

1. Bruce Eisen

2. Mary Pat Fox

3. Krista Friedrich

4. Bill Mulvey

5. Mark Weinstein

6. Jacqueline Zins

**EXHIBIT G**

**SUBCONTRACTORS**

1.      The Garden City Group, Inc.
        105 Maxess Road
        Melville, New York 11747-3836

2.      BrownGreer PLC
        Canal Crossing I – Suite 400
        115 South 15th Street
        Richmond, Virginia  23219