## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, on APRIL 20, 2010 | * * * * * * | MDL NO. 2179 |
| | * | JUDGE BARBIER |
| THIS DOCUMENT RELATES TO: | * * | MAG. JUDGE SHUSHAN |
| ALL CASES | * * * | |

**************************************

## DECLARATION OF GEOFFREY C. HAZARD, JR.

I, Geoffrey C. Hazard, Jr., declare under penalty of perjury as follows:

1.      I am Distinguished Professor of Law, Hastings College of the Law, University of California, Trustee Professor of Law, University of Pennsylvania, and a member of the bars of California and Pennsylvania.  For over 45 years I have studied, done research, taught and practiced in the fields of Civil Procedure and Professional Ethics. I am co-author of treatises and law school casebooks I n both fields. I was Reporter for the American Bar Association Model Rules of professional Conduct, on which the Louisiana Rules of Professional Conduct are

EXHIBIT 1

based, and was a member of the ABA Ethics2000 Commission which recommended various amendments to the Model Rules. I am a Consultant to the Standing Committee on Practice and Procedure of the Judicial Conference of the United States. I have often been accepted as an expert in matters of professional conduct, including acceptance in Louisiana.

2.     I have been engaged as an expert by counsel for Plaintiffs in this proceeding. I am being compensated on my usual terms.

3.     As the basis of these opinions, I have reviewed memoranda provided by Plaintiffs' counsel, The Oil Pollution Act of 1990 and Federal District Court Supervision of Communications, *etc.*, (attached hereto as Exhibits A and B), as well as the briefs and exhibits submitted in favor of and in opposition to the request for supervision over *ex parte* communications with putative class members submitted in this matter.

4.     The grievance concerning which Plaintiffs have sought the assistance of the Court is essentially that public statements by Mr. Feinberg, being received and possibly heeded by persons having potential Oil Spill claims, are inaccurate and misleading.

5.     An opinion of an expert cannot itself determine issues of law, which are for the Court to decide, such as that concerning the roles and relationships of

- 2 -

the Feinberg firm, GCCF and BP in this matter. However that issue is resolved, expert opinion can be proper as to the accuracy of the statements complained about, whether in application of the Rules of Professional Conduct or of the Court's authority under Rule 23.

6.    A recognized standard of accuracy is whether the statements are materially misleading considered as a whole, which is the modern definition of fraud. Another standard is that of the Federal Judicial Center's Plain Language Guide for Notice in federal class actions.  This Guide advises that communications to class members should give "sufficient information for a class member to make an informed decision," and avoid omitting "information that the lawyers may wish to obscure." The statements at issue are being disseminated in public media for the purpose of encouraging Oil Spill claimants (who are also putative class members in the MDL) to enter contract relationships through GCCF, on an informed basis.

7.    In my opinion the statements are inaccurate and misleading in the following respects:

> a.    The statements contrast the GCCF procedure with "the tort system." This is misleading because the Oil Pollution Act ("OPA") imposes duties on BP that are more exacting and beneficial to claimants than in the ordinary tort system.

908145.2

b.      The statements portray GCCF procedure as more just and fair than that in the ordinary tort system. The accurate contrast is with the OPA. The OPA requires a responsible party, such as BP, directly to receive claims, to make interim payments, and to fully compensate a claimant for loss caused.

c.      The statements portray GCCF as an independent mediator. GCCF is not entirely independent because its operating expenses, which are substantial, come from BP. The GCCF is not a mediator, according to ordinary understanding of that term, because it was established unilaterally by BP and not with agreement of opposing claimants.

d.      The statements say or suggest that claimants who proceed outside the GCCF will have to pay a large percentage of their recovery to legal counsel (40% being specifically mentioned). This is misleading because the claims prosecuted outside GCCF will or can be within the present class proceedings, in which the Court has authority to limit the fees accruing to claimants' counsel.

908145.2

e.  The GCCF procedure requires claimants, in order to receive final payment, to release BP from types of damages (such a punitive damages and claims preparation expenses) that are not being considered by the GCCF. The release also covers other possibly liable parties. If the release covered only BP, claimants could assert claims against these other parties, to recover amounts not obtained from BP.

f.  As I understand, the attorneys being hired by the GCCF to assist claimants are not working pro bono but are being paid by BP. If that is so, those attorneys have a professional duty to inform any claimant they may assist of that compensation arrangement.

8.  If the foregoing statements are attributable to BP, on the basis that GCCF is its agent, they should properly be evaluated by the Court through its inherent authority and under Rule 23.

a.  The Manual for Complex Litigation, Fourth (Federal Judicial Center 2004), §21.12 provides: "Rule 23(d) authorizes the court to regulate communications with potential class members, even before certification." That section also states: "...if class

908145.2

members have received inaccurate precertification communications, the judge can take action to cure the miscommunication and to prevent similar problems in the future." This is long-established law. *See, e.g., In re School Asbestos Litigation*, 842 F.2d 671, 680 (3d Cir. 1988): "Misleading communications to class members concerning the litigation pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally."

b.  These authorities are consistent with the First Amendment, *see, e.g., Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193, 1204-1205 (11th Cir. 1985), as are many other controls on statements about litigation..

c.  There are qualifications where the party opposing the class has a continuing relationship with the potential class members, such as that of employer-employee, or "in the ordinary course of business." Here there are no such relationships as to most of not all of the potential class members.

908145.2

9.    If the statements are attributed to Mr. Feinberg as a lawyer representing a different entity (the GCCF itself), they may also properly be evaluated under the Louisiana Rules of Professional Conduct and the counterpart professional rules of other jurisdictions. The relevant rules of all jurisdictions in substance are the same.

10.    Consideration of the grievances about the public statements has been short-circuited by questions concerning the role of the Feinberg law firm and GCCF and the relationship to BP. On one hand it is argued that the law firm and GCCF are independent. On the other hand it is implicitly affirmed that GCCF is an agent for BP, because otherwise there is no one fulfilling BP's responsibilities under OPA. It cannot be both ways.

   a.    It seems to be accepted that, if Mr. Feinberg and his firm are identified as "lawyer for BP," the Rules of Professional Conduct of Louisiana would apply. The statements complained of would be assessed in terms of Rules 4.1, 4.2, 4.3, 5.3, 7.2 and 8.4. If they were so assessed, some of them could be regarded as professionally improper. If Mr. Feinberg and GCCF were to be regarded as third-party neutrals, Rule 2.4(b) would apply.

908145.2

11. It is argued that the Feinberg law firm, and the GCCF entity it is managing, is not acting as a "lawyer for BP." That is arguable. But if that is not their role, the role is that of agent for BP. The law firm was engaged and GCCF was created in order to carry out BP's obligations under OPA.

      a. No other role is plausible. GCCF is not an agency of the Government, for example.

      b. The firm may be, as is argued, an "independent contractor." That term in ordinary usage contrasts with "employee," and it is not contended that the Feinberg firm is an employee of BP. The firm and GCCF's being an "independent contractor" is entirely consistent with their being an agent for BP. Agents include independent contractors, as indeed counsel for BP in this case are independent contractors but agents.

12. The Feinberg firm and GCCF can properly be considered agents for BP, even though they seek to be "fair and independent."

      a. Whether they are "fair" is the issue presented by Plaintiff's grievances. If the statements complained of are inaccurate, to that extent BP through its agents is not being fair.

908145.2

b.    It is a reasonable interpretation of OPA that a responsible party, such as BP, is required to be fair and to act in good faith in fulfilling its responsibilities, directly or through an agent, much as an insurer is required to do with respect to its insureds.

c.    In addition, Professional Rules 1.7 and 1.8(f) apply to lawyers assisting claimants but being compensated by BP.

Thus declared, under penalty of perjury, this 15th day of January, 2011.

Geoffrey C. Hazard, Jr.

STATE OF CALIFORNIA )
)ss
COUNTY OF _San francisco_ )

On _January 15, 2011_ before me, (here insert name and title of the officer), personally appeared _Geoffrey C. Hazard_

_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Melanie Hedani_ (SEAL)



- 10 -

908145.2

# **EXHIBIT A**

## The Oil Pollution Act of 1990

**1.     The Oil Pollution Act creates new remedies which previously did not exist.**

Congress enacted Oil Pollution Act of 1990 ("OPA") in response to the Exxon Valdez oil spill in Prince William Sound, Alaska. *Rice v. Harken Exploration Co.,* 250 F.3d 264, 266 (5th Cir.2001) (citing Senate Report No. 101-94, *reprinted in* 1990 U.S.C.C.A.N. 772, 723). Congress explicitly recognized that the existing federal and state laws presented substantial barriers to victims' recoveries such as legal defenses, corporate forms, and burdens of proof unfairly favoring those responsible for the spills. *Id.* at 652 (citing S.Rep. No. 94, 101st Cong., 1st Sess. (1989)).  Among the harshest of those barriers were the "proprietary interest rule" that originated from the case of *Robins Dry Dock and Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927) (interpreted as prohibiting recovery of purely economic claims absent physical injury to a proprietary interest in a maritime negligence suit),[1] and the Limitation of Liability Act of 1851 (allowing vessel owner to limit its liability to the amount of the vessel and its pending freight).

The OPA provides claims for various damages previously unavailable under *Robins Dry Dock* and its progeny; namely, claims for those sustaining economic losses due to an oil spill despite the fact that they did not have a proprietary interest in the property physically impacted by the spill. *See* 33 U.S.C. 2702(b)(2)(E); *see also,* 33 C.F.R. 136.231(a).  The OPA also preempts the Limitation of Liability Act.

---

[1]One of the few exceptions to *Robins Dry Dock*, recognized by most courts, is what has become known as the fisherman exception, allowing commercial fishermen, shrimpers, etc., to recover economic losses arising from damages to the natural resources, despite the fact that they do not have a proprietary interest in the seafood from which they make their living.

**2.    The OPA imposes strict liability.**

The OPA imposes strict liability upon "responsible parties," under which the absence of fault or the exercise of due care is not a defense. 33 U.S.C. § 2702(a); *Apex Oil Company, Inc. v. U.S.,* 208 F.Supp.2d 642, 651 -652 (E.D.La. 2002); *In Re Needham,* 354 F.3d at 345.  Prior to OPA, and in most other claims for economic damages, claimants would have had to bear the traditional burden of proof in negligence cases.

**3.    The Act mandates the quick and complete compensation of the claimant.**

One of the purposes behind OPA was to quickly compensate victims of oil spills without the typical delays faced by litigants in tort cases.  This purpose is reflected both throughout the Act and its legislative history.  The OPA was intended to streamline federal law and to "provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills with the petroleum industry." *Apex Oil Company, Inc. v. U.S.,* 208 F.Supp.2d at 651 (also noting Congress' goals in "facilitating access to funds to ensure prompt and complete recovery for damages arising from an oil spill")

**A.    The Responsible Party is Required to Establish a Claims Process**

Within fifteen (15) days of designation, the "responsible party" must advertise "the designation and the procedures by which claims may be presented to the responsible party or guarantor." 33 U.S.C. §2714(b).  The responsible party is the required under the Act to establish a process for the expeditious presentment and payment of spill-related claims. 33 U.S.C. §§ 2705(a) and 2713(a).  Such claims must generally be presented to the responsible party before a plaintiff can elect to assert his or her OPA rights either in a court of law or as against the Oil Spill Liability Trust Fund. 33 U.S.C. §2317(a).

2

**B.     The Responsible Party is Required to Pay Interim Claims**

The Act provides that "the responsible party shall establish a procedure for the payment

or settlement of claims for interim, short-term damages," and, similar to the obligations of an

insurer to make unconditional tenders to an insured, the OPA expressly states that:

> Payment or settlement of a claim for interim, short-term damages representing
> less than the full amount of damages to which the claimant ultimately may be entitled
> shall not preclude recovery by the claimant for damages not reflected in the paid or settled
> partial claim.

33 U.S.C. §2705(a); *see also,* 22 U.S.C. 2714(b)(2) (requiring the responsible party to advertise

same).  The Act further encourages quick (and unconditional) payment to the affected parties by

imposing legal interest commencing 30 days from the time that the claim is presented. 33 U.S.C.

2705(b).

**C.     The OPA provides *only* three defenses for the "responsible party"; the third
        party defenses is much more limited than in traditional negligence cases.**

The OPA provides only three defenses to its strict liability: (1) an act of God, (2) an act of

war, or (3) fault of a third party.  Furthermore, the acts of a third party defense is much more

limited than that in the traditional tort setting.

In most tort actions, the tortfeasor can seek to transfer liability to a third party prior to

compensating the claimant and even if doing so may cause a delay in compensating the claimant.

This does not appear to be the case under OPA.  Instead, while the Act does permit the

responsible party to recover the monies that it has paid to the oil spill victims, it seems to prohibit

the responsible party from transferring its liability to a third-party *prior* to compensating the

3

victims.

The Act's subrogation provisions prohibits the responsible party from exercising subrogation rights until *after* it is has compensated the claimant. 33 U.S.C. §2702(d)(1)(B).  In addition, the responsible party cannot assert a claim against a third party (even one that it could establish is solely at fault for the spill) if it has a contractual relationship with that third party.  33 U.S.C. §§ 2702(d)(1)(A) and 2703(a)(3).

As in most tort schemes, the Oil Pollution Act allows indemnification agreements between a responsible party and a third party.  However, unlike other tort settings, OPA prohibits the responsible party from using an indemnification agreement in order to transfer liability. 33 U.S.C. §2710(b).  Instead, the Act again demands that the responsible party *first* compensate the claimant before it can seek to recoup its losses via the indemnification agreement.

**D.      The Act applies joint and several liability.**

While there can be more than one responsible party under OPA, when there is more than one responsible party, their liability is joint and several, thereby entitling the claimant to seek and obtain complete compensation from any one of the responsible parties. *In re Petition of Settoon Towing LLC,* 722 F.Supp.2d at 713, *citing* 3 Benedict on Admiralty § 112(a)(2) (7th ed. rev.2004) (citing H.R. Conf. Rep. No. 101653, at 102 (1990), 1990 U.S.C.C.A.N. 779, 780).  The burden then shifts to the responsible party to recoup those portions that it believes were owed by another party responsible for the spill.

4

## EXHIBIT B

## MEMORANDUM

**DATE:**   January 9, 2011

**RE:**   <u>Federal District Court Supervision of Communications with Putative Class Members</u>
<u>During the Pre-Class Certification Stage</u>

The *Manual for Complex Litigation, Fourth* (Federal Judicial Center 2004)

("*MCL 4th*") discusses, in § 21.12 *Precertification Communications with the Proposed Class*, the

issues that can arise when either plaintiffs' counsel, or a defendant's representatives, seek to

communicate with putative class members.[1]   As the *MCL 4th* recognizes, "Rule 23(d) authorizes

the court to regulate communications with potential class members, even before certification."

*MCL 4th*, § 21.12.   This authority is part of Rule 23's specific empowerment of district courts to

issue orders to prevent the abuse, and preserve the integrity, of the class action process.   *See In*

*re: School Asbestos Litigation*, 842 F.2d 671, 680 (3rd Cir. 1988).

The attorneys bringing the class action, whether or not they have been appointed

as interim class counsel or otherwise designated to serve court-appointed roles to promote and

protect the common interest of class members (such as, *e.g.*, appointment as Liaison Counsel or

members of a Plaintiffs Steering Committee ([*see MCL 4th*, § 10.22]) have the duty to protect

the class members' procedural interests, and may need to communicate with class members

prior to the class certification stage to do so.

Defendants, their counsel, or other defendants' representatives may wish to

communicate with class members as well.   In an employment-related case, for example, the

defendants and class members may have an ongoing employer-employee relationship.   A

blanket prohibition on all communications could implicate, and violate, the First Amendment

rights of the parties.   *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101-02 (1981).   The *MCL 4th*

---

[1] The text of *MCL 4th* § 21.12 is attached as Appendix 1.

907426.1

provides several examples of direct communications with class members, that can, however, lead to abuse and that courts should supervise. A prominent example is that "defendants might attempt to obtain releases from class members without informing them that a proposed class action complaint has been filed." *Id.* As the *MCL 4th* notes, "Rule 23 and the case law make clear that, even before certification or a formal attorney-client relationship, an attorney acting on behalf of a putative class must act in the best interests of the class as a whole," citing Fed. R. Civ. P. 23(g)(2)(A) committee note; 2 Hazard and Hodes, *supra note 749*, § 38.4 at 38-7 (lawyers for the proposed class have a fiduciary obligation and owe class members "duties of loyalty and care"). For this reason, putative class counsel have the right, and may have a duty, to bring to the court's attention potentially problematic or prejudicial communications with the members of the class they have undertaken to represent and protect.

The first step in judicial supervision and control is that of ensuring the class members have accurate information affecting their legal rights. For this to occur, the plaintiffs' counsel, and the court, must be apprised of communications with the class. Accordingly, the *MCL 4th* recommends that "if defendants are in an ongoing business relationship with members of a putative class, the court might consider requiring production of communications relating to the case," and, "in appropriate cases, courts have informed counsel that communications during an ongoing business relationship, including individual releases or waivers, must be accompanied by notification to the members of the proposed class that the litigation is pending." *MCL 4th*, § 21.12, citing *Ralph Oldsmobile, Inc. v. General Motors Corp.*, 2001 WL 1035132, at *7 (S.D.N.Y. 2001); Geoffrey C. Hazard and W. William Hodes, *The Law of Lawyering*, § 384, at 38-6 (3rd Ed. 2002).

Judicial intervention with communications requires a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties, resulting in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances. *MCL 4th* § 21.12,

citing *Rankin v. Board of Education of Wichita Public Schools*, 174 F.R.D. 695, 697 (D. Kan. 1997).[2]

 The *MCL 4th*'s discussion of the scope of pre-certification judicial supervision orders focuses on practical, curative solutions to problems that can arise from incomplete, misleading, unclear, or potentially prejudicial communications to class members by an adversary or its representatives.  For example, "if class members have received inaccurate precertification communications, the judge can take action to cure the miscommunication and to prevent similar problems in the future." *Id.*

 The court may require that proposed communications by a defendant or its agents or representatives with putative class members be submitted for court review and approval before dissemination, and/or that such communications be submitted to putative class counsel before sent, so that class counsel can bring any problems with the communications to the court for action if informal resolution is unsuccessful.

 In weighing the concerns for free speech, practicality, the fiduciary obligations of the court and proposed class counsel toward putative class members, and the need to ensure fairness and integrity in the conduct of cases brought as class actions, the *MCL 4th* concludes:

> Defendants and their counsel generally may communicate with potential class members in the ordinary course of business, including discussing settlement before certification, but may not give false, misleading, or intimidating information, conceal material information, or attempt to influence the decision about whether to request exclusion from a class certified under Rule 23(b)(3).

§ 21.12.

 As examples of the practical application of these principles, the *MCL 4th* includes citations to *Ralph Oldsmobile, supra*, in which the court found the defendant's failure to inform its independent dealers about the pendency of class actions was misleading, and ordered the

---

[2] This is *not* the equivalent of a request for injunctive relief under Rule 65, but typically takes the form of a case management order, as discussed below.

defendant to send corrective notice to the potential members of the proposed class which provided the missing information; *Hampton Hardware v. Cotter and Co.*, 156 F.R.D. 630, 634-35 (N.D. Tex. 1994), in which the district court found an abuse and issued a protective order limiting communications after the defendant contacted potential class members and encouraged them not to participate in the class action by stating that such participation would negatively impact the class members' ongoing business relationship with the defendant; and the leading decision of *Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985), in which the court took action to prohibit and correct communications from the bank to class members during the opt-out period that it determined to be coercive, encouraging or intimidating class members to opt out of the class.

The importance of ensuring clear and accurate communications with class members has been of ongoing concern to the federal judiciary, having its most frequent expression in judicial insistence on and refinement of standards for the format and content of class action notices and other judicially-approved communications with class members. A contemporary example of these standards is the Federal Judicial Center's recent publication of its 2010 *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*.[3] The FJC *Guide* takes federal judges through every stage of a class action at which notice or other communications might be called for, from initiation to settlement, and emphasizes the utilization of "clear, concise, easily understood language", and communications which "contain sufficient information for a class member to make an informed decision" that affects his or her rights and options. This FJC *Guide* supplements the *MCL 4th* as an additional source of guidance, information, and standards that judges may apply to test the fairness, accuracy, and completeness not only of class notices that are submitted for their approval, but other

---

[3] The FJC *Guide* is attached as Appendix 2.

- 4 -

communications by or on behalf of the parties before them with putative class members.  A copy of the *Guide* is attached.

      The fairness, accuracy, and integrity of communications between parties and the members of a not-yet-certified class was an early, and has been an ongoing, concern of the federal courts. "Notice to class members is crucial to the entire scheme of Rule 23(b)(3).  It sets forth an impartial recital of the subject matter of the suit, informs members that their rights are in litigation, and alerts them to take appropriate steps to make certain their individual interests are protected." *Erhardt v. Prudential Group. Inc.*, 629 F.2d 843, 846 (2d Cir. 1980); *see In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1125 (9th Cir. 1977); *In re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d 1088, 1097 (5th Cir. 1977).  As the *Erhardt* Court advised:

> *It is the responsibility of the court to direct the 'best notice practicable' to class members, Rule 23(c)(2), and to safeguard them from unauthorized, misleading communications from the parties or their counsel.  <u>Unapproved notices to class members which are factually or legally incomplete lack objectivity and neutrality, or contain untruths will surely result in confusion and adversely affect the administration of justice</u>.*

*Erhardt v. Prudential Group. Inc.*, 629 F.2d at 846 (emphasis added).  The Third Circuit warned that, "*Misleading communications to class members concerning the litigation pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally.*"  *In re School Asbestos  Litigation*, 842 F.2d at 680; *see also Waldo v. Lakeshore Estates, Inc.*, 433 F. Supp. 782, 790-91 (E.D. La. 1977), *appeal dismissed without op.*, 579 F.2d 642 (5th Cir. 1978).

      The fact that a court has not yet determined whether a case may proceed as a class action does not impact its authority to control communications to absent class members. "*It would be a strange rule, indeed, where a court would be powerless to deal with what it considered abuses because the litigation had not reached a certain stage.  To adopt such a rule would be little more than inviting counsel to engage in a race to complete questionable practices before the court acquires power to prevent such abuses.*"  *Weight Watchers of*

*Philadelphia v. Weight Watchers International*, 53 F.R.D. 647, 651 (E.D.N.Y. 1971), *appeal dismissed*, 455 F.2d 770 (2d Cir. 1972).  In *Impervious Paint*, the court held that, because

> *Unapproved communications to class members that misrepresent the status or effect of the pending action also have an obvious potential for confusion and/or adversely affecting the administration of justice, . . .*
>
> *It is essential that the class member's decision to participate or to withdraw be made on the basis of independent analysis of its own self-interest.  It is the responsibility of the Court as a neutral arbiter, and of the attorneys in their adversary capacity, to insure this type of free and unfettered decision.*
>
> *The mechanism selected for accomplishing this is the class notice, which is designed to present the relevant facts in an unbiased format."*

*Impervious Paint Indus. Inc. v. Ashland Oil, Inc.*, 508 F. Supp. 720, 723 (W.D. Ky.), *appeal dismissed without op.*, 659 F.2d 1081 (6th Cir. 1981).

In *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 S.Ct. 2193 (1981) ("*Bernard*") the Supreme Court made it clear that, where there is a sufficient evidentiary record of abuse, a court overseeing a class action has the authority to enter appropriate orders prohibiting further communications with class members by the offending party, and directing that other remedial measures be undertaken.

Subsequent to *Bernard*, a number of courts have entered such orders.  For example, in *Kleiner v. First National Bank of Atlanta*, 102 F.R.D. 754, 767 (N.D. Ga. 1983), *aff'd in relevant part rev'd in part on other grounds*, 751 F.2d 1193 (11th Cir. 1985), the court enjoined a defendant's telephone campaign to solicit opt-outs.  In *Erhardt v. Prudential Group, Inc.*, 629 F.2d at 845, the court enjoined a secret letter writing program by the CEO of one of the defendants.  In *Impervious Paint Indus. Inc. v. Ashland Oil*, 508 F. Supp. at 723, defendant's efforts to sabotage the class notice through direct communications with class members were held to be precisely the "exceptional circumstances" which would justify the imposition of a prior restraint on communications with class members under *Bernard v. Gulf Oil Co*.  In *In re*

*School Asbestos Litigation*, 842 F.2d 671, 679-83 (3d Cir. 1988), the court held that an order under Rule 23(d) requiring defendants' affiliate to prominently display a prescribed notice when it communicated directly with members of the class was within the district court's discretion.

Defendants' commercial speech/contacts with class members may properly be regulated by the trial court even if such communications precede the determination of class certification, and thus even if they do not compete with or seek to distract from a court-approved notice. Pre-notice contacts may be restricted as a matter of case management, as the MDL courts did in *Alert* and *Silicone Gel*.

Other recent examples of judicial supervision of communications with putative class members include the order in *Jones v. Jeld-Wen, Inc.*, 250 F.R.D. 554 (S.D. Fla. 2008), which placed the following limits on defendant's communications with putative class members: (1) communications concerning settlement were required to be in writing and copied to plaintiffs' counsel within 24 hours of being made; (2) defendant was required to identify, for plaintiffs' counsel, the recipients of all previous settlement communications; (3) putative class members were required to be given ten days to respond to any settlement offers; and (4) all settlement-related communications were required to advise the recipient of the pendency of the class action. In issuing its supervisory order, the *Jones v. Jeld-Wen* court observed:

> Communications that have been found to be violative of the principles of Rule 23 include misleading communications to class members regarding the litigation, communications that misrepresent the status or effect of the pending action, communications that coerce prospective class members into excluding themselves from the litigation, and communications that undermine cooperation with or confidence in class counsel.[4]

250 F.R.D. at 561.

MDL Courts' Rule 23(d)(1) orders are typically issued as case management orders, not as classic injunctions under Fed. R. Civ. P. 65. They can thus be requested and

---

[4] *See also Hampton Hardware, Inc. v. Cotter and Co., Inc.*, 156 F.R.D. 630, 632 (N.D. Tex. 1994).

obtained expeditiously, without the full evidentiary panoply that attends injunction practice. As recognized by the Eleventh Circuit in *Kleiner v. First National Bank of Atlanta, supra,* a more relaxed standard applies with respect to findings where the order is issued pursuant to Rule 23(d) rather than on a Rule 65 injunction, and where the order takes the form of a directive to counsel as the defendant's agent, and binds defendant in its capacity as the attorneys' principal. 751 F.2d at 1201. See, for example, the Rule 23(d) notice ordered by Judge Weinshienk early in the pre-certification stage in *Alert Income Partners Securities Litigation,* MDL No. 915 (D. Colo. 1992). In her *Supplemental Case Management Order,* Judge Weinshienk ordered defendants to give putative class members corrective notice to neutralize previous misinformation disseminated by one of the defendants. Judge Weinshienk also provided that all questions concerning the litigation could be directed to class counsel. Judge Weinshienk issued this order prior to class certification, in an effort to preserve, from the outset, the integrity of the prospective class certification process by ensuring that the class members had access to accurate information about the suit.

In *In Re Silicone Gel Breast Implants Products Liability Litigation,* MDL No. 926 (N.D. Ala., Pointer, C.J.), the court issued a case management order, *Order No. 8* (10-14-92), which specified a precise protocol governing defendants' communications with all unrepresented putative class members who contacted them, in order to preclude disadvantageous or unfair settlements coerced from unrepresented claimants during the pendency of MDL proceedings. *Order No. 8* and its follow-up, *Order No. 9,* did not invoke Rule 23(d), but relied simply on the court's inherent authority, and were entered prior to the MDL court's class certification decision, made later in the context of settlement class certification.

In *Turner v. Murphy Oil U.S.A., Inc.,* No. 05-4206 (E.D. La. 2005), Judge Eldon Fallon of the Eastern District of Louisiana issued a case management *Order and Reasons,* early in the litigation, to supervise and restrict communications made by or on behalf of the

- 8 -

defendant. Specifically, the content of defendant's communications was required to include advice to putative class members that they should seek independent legal advice prior to settling or waiving their legal rights; that they had the right to consult with an attorney to do so. Additionally, *Turner v. Murphy Oil* ordered that the defendant should not communicate directly with persons already represented by counsel, and that the defendant should not initiate contact with any individual who had not previously contacted it. This *Turner v. Murphy Oil* supervising *Order* was issued on November 14, 2005, prior to the class certification of the litigation and its ultimate classwide settlement.

   Where a defendant has improperly communicated with or solicited the class members in an effort to disparage the class litigation and to subvert the relationship between plaintiffs' counsel and the class, the courts have regularly held that an order restraining defendants from further such communication is fully appropriate under *Bernard* and does not conflict with the First Amendment. *E.g.*, *Kleiner v. First National Bank of Atlanta*, 751 F.2d at 1203-07; *Haffer v. Temple University of the Commonwealth System of Higher Education*, 115 F.R.D. 506, 513 (E.D. Pa. 1987); *Tedesco v. Mishkin*, 629 F. Supp. 1474, 1484 (S.D.N.Y. 1986); *Impervious Paint Indus. Inc. v. Ashland Oil*, 508 F. Supp. at 723.

   First Amendment considerations are of far less import in cases involving economic losses and claims, since a defendant's communications with putative class members in cases alleging monetary damages are made strictly for its own pecuniary gain, and the speech involved is thus solely "commercial" speech. Because it has no political or "pure" speech content, it receives far more limited First Amendment protection than that involved in *Bernard*. *See, e.g., Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456, 98 S. Ct. 1912, 1918 (1978). Accordingly, *Impervious Paint Indus. Inc. v. Ashland Oil*, *supra*, held that there was no First Amendment bar to an injunction against defendant's effort to sabotage the class notice where the court found no "hint of advancement of political beliefs and ideas, and we find that the

- 9 -

contacts were made solely to protect pecuniary interests." 508 F. Supp. at 723. In *Kleiner v. First National Bank of Atlanta, supra*, the Eleventh Circuit stated:

> As a threshold matter, untruthful or misleading speech has no claim on first amendment immunity. *Central Hudson Gas Co. v. Public Service Commission*, 447 U.S. 557, 556 . . . (1980); *Virginia Pharmacy Board*, 425 U.S. at 771, 96 S.Ct. at 1830.

751 F.2d at 1204.[5]

In *Kleiner*, the Eleventh Circuit recognized that the *Bernard* Fifth Circuit decision was predicated on the fact that *Bernard* involved protected political speech, rather than commercial speech:

> *Bernard* was a classic case of noncommercial speech which directly implicated the doctrine of prior restraint. In the domain of commercial speech, as discussed, the Supreme Court had issued repeated admonitions against the wholesale incorporation of the law of prior restraint. *Athena Products*, 654 F.2d at 367. We therefore judge petitioners' prior restraint argument under a relaxed standard of scrutiny better suited to the hardiness of commercial speech. *(Footnote omitted.)*

*Id.* at 1205.[6]

After an exhaustive analysis of both the Fifth Circuit *en banc* decision and the subsequent Supreme Court decision in *Bernard*, the Eleventh Circuit in *Kleiner* held that

> In general, an order limiting communications regarding ongoing litigation between a class and class opponents will satisfy first amendment concerns if it is grounded in good cause and issued with a heightened sensitivity for first amendment concerns.

*Id.* at 1205. *Accord, Haffer v. Temple University*, 115 F.R.D. at 513. These concerns include the procedural rights of potential class members to clear, accurate and complete information on

---

[5] The Eleventh Circuit also stated in *Kleiner*: "In the realm of litigation, a fair and just result often presupposes restraints on the speech of the parties. *Seattle Times Co. v. Rhinehart*, 104 S.Ct. 2199, 2207 n. 18 . . . (1984). Inroads on the principle forbidding the solicitation of exclusion requests in 23(b)(3) class actions could spell the ultimate extinction of that form of relief." *Id.* at 1206.

[6] As stated in *Kleiner*: "The *Bernard* case qualified as protected political expression under *NAACP v. Button*, 371 U.S. 415 . . . (1963), and *In re Primus*, 436 U.S. 412 . . . (1978), because counsel for plaintiffs had no direct financial stake in the case and because the case was a vehicle for expressing the political beliefs of the NAACP. 619 F.2d at 472-73." 751 F.2d at 1205 n.24.

907426.1

matters that may affect their legal claims or procedural rights.  Where commercial speech on behalf of or for the benefit of a defendant clashes with the due process rights of putative class members, the latter, as the FJC *Guide* indicates, become the primary concern of the courts.

907426.1

Appendix 1

*Manual for Complex Litigation, Fourth* (Federal Judicial Center 2004)

## 21.12   Precertification Communications with the Proposed Class

Rule 23(d) authorizes the court to regulate communications with potential class members, even before certification.[745] Such regulations, however, could[248] implicate the First Amendment.[746] Moreover, restrictions of this type may be difficult to implement given the ease and speed of communicating with dispersed groups. For example, many class actions attorneys establish Internet Web sites for specific class actions, in addition to using conventional means of communication, such as newspapers. Most judges are reluctant to restrict communications between the parties or their counsel and potential class members, except when necessary to prevent serious misconduct.[747]

Direct communications with class members, however, whether by plaintiffs or defendants, can lead to abuse.[748] For example, defendants might attempt to obtain releases from class members without informing them that a proposed class action complaint has been filed. If defendants are in an ongoing business relationship with members of a putative class, the court might consider requiring production of communications relating to the case. In appropriate cases, courts have informed counsel that communications during an ongoing business relationship, including individual releases or waivers, must be accompanied by notification to the members of the proposed class that the litigation is pending.[749]

Judicial intervention is generally justified only on a clear record and with specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties. Such intervention "should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances."[750] Even if the court finds that there has been

---

745. *In re* Sch. Asbestos Litig., 842 F.2d 671, 680 (3d Cir. 1988) ("Rule 23 specifically empowers district courts to issue orders to prevent abuse of the class action process.").

746. *See* Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626 (1985).

747. Gulf Oil Co. v. Bernard, 452 U.S. 89, 101-02 (1981).

748. *See id.* at 99-100 & n.12; Kleiner v. First Nat'l Bank, 751 F.2d 1193 (11th Cir. 1985); Keystone Tobacco Co. v. U.S. Tobacco Co., 238 F. Supp. 2d 151 (D.D.C. 2002), *reconsideration denied,* [217 F.R.D. 235] (2003); Hampton Hardware Inc. v. Cotter & Co., 156 F.R.D. 630 (N.D. Tex. 1994).

749. Ralph Oldsmobile, Inc. v. Gen. Motors Corp., No. 99 Civ. 4567, 2001 WL 1035132, at *7 (S.D.N.Y. Sept. 7, 2001); *see also* 2 Geoffrey C. Hazard & W. William Hodes, The Law of Lawyering § 38.4, at 38-6 (3d ed. 2002) (copies of communications sent by defendants who have ongoing business relationships with potential class members relating to pending litigation should be given to opposing counsel).

750. *Gulf Oil,* 452 U.S. at 101-02. For an example of a limited ban on communications between a defendant and class members, see *Rankin v. Board of Education of Wichita Public Schools,* 174 F.R.D. 695, 697 (D. Kan. 1997) (ordering that "defendants and their counsel shall not make any contact or communication with [prospective class members] which expressly refers to this litigation"). Generally, more than just the potential for abuse is required to support issuance of a protective order. Basco v. Wal-Mart Stores, Inc., No. CIV.A.00-3184, 2002 WL 272384, at 3-4 (E.D. La. Feb. 25, 2002).

363

907426.1

**21.12**                                    Manual for Complex Litigation, Fourth

an abuse, less burdensome remedies may suffice, such as requiring parties to initiate communication with potential class members[249] only in writing or to file copies of all nonprivileged communications with class members.[781] If class members have received inaccurate precertification communications, the judge can take action to cure the miscommunication and to prevent similar problems in the future.[782] Rule 23 and the case law make clear that, even before certification or a formal attorney–client relationship, an attorney acting on behalf of a putative class must act in the best interests of the class as a whole.[783]

Misrepresentations or other misconduct in communicating with the class may impair the fairness and adequacy of representation under Rule 23(a)(4), may affect the decision whether to appoint counsel under proposed Rule·23(g), and may be prohibited and penalized under the court's Rule 23(d)(2) plenary protective authority. Defendants and their counsel generally may communicate with potential class members in the ordinary course of business, including discussing settlement before certification,[784] but may not give false, misleading, or intimidating information, conceal material information, or attempt to influence the decision about whether to request exclusion from a class certified under Rule 23(b)(3). Ethics rules restricting communications with individuals represented by counsel may apply to restrict a defendant's communications contract with the named plaintiffs.[785] [250]

Appendix 1-2

Appendix 2

*Judges' Class Action Notice and Claims Process Checklist*
*and Plain Language Guide 2010*

# Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide | 2010

## Major Checkpoints

☐ **Will notice effectively reach the class?**
The percentage of the class that will be exposed to a notice based on a proposed notice plan can always be calculated by experts. A high percentage (e.g., between 70–95%) can often reasonably be reached by a notice campaign.

☐ **Will the notices come to the attention of the class?**
Notices should be designed using page-layout techniques (e.g., headlines) to command class members' attention when the notices arrive in the mail or appear on the Internet or in printed media.

☐ **Are the notices informative and easy to understand?**
Notices should carry all of the information required by Rule 23 and should be written in clear, concise, easily understood language.

☐ **Are all of the rights and options easy to act upon?**
There should be no unnecessary hurdles that make it difficult for class members to exercise their rights to opt out, object, submit a claim, or make an appearance.

## Before Certification/Preliminary Settlement Approval

☐ **Can any manageability problems from notice issues be overcome?**
Consider potential problems in reaching and communicating with class members—e.g., language barriers, class size, geographic scope—and whether a notice plan will be able to overcome such problems.

☐ **Can a high percentage of the proposed class be reached (i.e., exposed to a notice)?**
Consider the breakdown of known and unknown class members, the age of any mailing lists, and the parties' willingness to spend necessary funds to fully reach the class.

☐ **Is it economically viable to adequately notify the class?**
If the cost to reach and inform a high percentage of the class is not justified by a proposed settlement, an opt-out class may not be appropriate. Inability to support proper notice may also be evidence that the settlement is weak.

☐ **Will unknown class members understand that they are included?**
If a well-written notice will leave class members in doubt as to whether they are included, consider whether the class definition, or the class certification, is appropriate.

## Upon Certification/Preliminary Settlement Approval

☐ **Do you have a "best practicable" notice plan from a qualified professional?**
A proper notice plan should spell out how notice will be accomplished, and why the proposed methods were selected. If individual notice will not be used to reach everyone, be careful to obtain a first-hand detailed report explaining why not. See "Notice Plan" section below.

Appendix 2-1

907426.1

Judges' Class Action Notice and Claims Process Checklist
and Plain Language Guide | 2010

❑ *Do you have unbiased evidence supporting the plan's adequacy?*
Be careful if the notice plan was developed by a vendor who submitted a low bid and might have incentives to cut corners or cover up any gaps in the notice program. In order to find the "best practicable" notice as Rule 23 requires, your own expert report may be advisable. This is especially true in the diminished adversarial posture in which settlement places the parties. It is also true at preliminary approval, before outsiders are aware of the proposed notice plan, which itself may limit the parties' awareness, in turn impacting your final approval decision.

❑ *Have plain language forms of notice been created?*
Draft forms of the notices should be developed, in the shape, size, and form in which they will actually be disseminated, for your approval before authorizing notice to the class. See "Notice Documents" below.

❑ *Will a qualified firm disseminate notice and administer response handling?*
There are many experienced firms that compete for administration of notice dissemination and claims and response handling. Appointing a qualified firm is important because errors may require re-notification, drain funds, delay the process, and threaten recognition of your final judgment.

*Notice Plan*

❑ *Is the notice plan conducive to reaching the demographics of the class?*
The notice plan should include an analysis of the makeup of the class. There may be more women than men; it may skew older; it may be less educated than average. Each audience can be matched with the most efficient and effective methods of notice for reaching those people.

❑ *Is the geographic coverage of the notice plan sufficient?*
Notice for a class action should take steps to reach people wherever they may be located, and also take into account where most class members reside.

   ○ *Is the coverage broad and fair? Does the plan account for mobility?*
   Class members choose to live in small towns as well as large cities. Be careful with notice exclusively targeted to large metropolitan newspapers. Class members move frequently (14–17% per year according to the U.S. Census Bureau), so purchasers in one state may now reside in another.

   ○ *Is there an extra effort where the class is highly concentrated?*
   Evidence may show that a very large portion of class members reside in a certain state or region, and notice can be focused there, while providing effective, but not as strong, notice elsewhere.

❑ *Does the plan include individual notice?*
If names and addresses are reasonably identifiable, Rule 23(c)(2) requires individual notice. Be careful to look closely at assertions that mailings are not feasible.

   ○ *Did you receive reliable information on whether and how much individual notice can be given?*
   Consider an expert review of the information you have been provided regarding the parties' ability to give individual notice. The parties may have agreed to submit a plan that does not provide sufficient individual notice in spite of the rule.

Federal Judicial Center                                                                                     Page 2

Appendix 2-2

# Judges' Class Action Notice and Claims Process Checklist
## and Plain Language Guide | 2010

○ **Will the parties search for and use all names and addresses they have in their files?**
If the parties suggest that mailings are impracticable, look to distinguish between truly unreasonable searches (e.g., the defendant has nuggets of data that could be matched with third-party lists by a new computer program and several man-years) and situations where a search would be difficult but not unreasonably burdensome (e.g., lists reside directly in the defendant's records but are outdated or expensive to mail to because of the volume). Rule 23 generally requires the latter.

○ **Will outdated addresses be updated before mailing?**
The plan should detail steps to update addresses before mailing, including postal service change-of-address records, and third-party address databases if the list is very old. Watch out for potentially ineffective "last known address" mailings.

○ **Has the accuracy of the mailing list been estimated after updating efforts?**
Look for information that indicates how accurate the mailing addresses will be after the planned address updating effort.

○ **Has the percentage of the class to be reached by mail been calculated?**
The parties should be able to indicate how great a percentage of the overall class will be reached by individual notice, so that the extent of any necessary additional notice can be determined.

○ **Are there plans to re-mail notices that are returned as undeliverable?**
Even after updating addresses before mailing, mail will be returned as undeliverable. Further lookup tactics and sources are often available, and it is reasonable to re-mail these notices.

○ **Will e-mailed notice be used instead of postal mailings?**
If available, parties should use postal mailing addresses, which are generally more effective than e-mail in reaching class members: mail-forwarding services reach movers, and the influx of "SPAM" e-mail messages can cause valid e-mails to go unread. If e-mail will be used—e.g., to active e-mail addresses the defendant currently uses to communicate with class members—be careful to require sophisticated design of the subject line, the sender, and the body of the message, to overcome SPAM filters and ensure readership.

❑ **Will publication efforts combined with mailings reach a high percentage of the class?**
The lynchpin in an objective determination of the adequacy of a proposed notice effort is whether all the notice efforts together will reach a high percentage of the class. It is reasonable to reach between 70–95%. A study of recent published decisions showed that the median reach calculation on approved notice plans was 87%.

❑ **Are the reach calculations based on accepted methodology?**
An affiant's qualifications are important here. Reach calculation methodology is commonly practiced in advertising and media-planning disciplines. Claims administrators are often accountants by training and may lack personal knowledge or the training to conduct reach analyses.

○ **Is the net reach calculation thorough, conservative, and not inflated?**
Circulation figures for separate dissemination methods cannot simply be added to determine reach. Total audience must be calculated for each publication and the net must be calculated for a combination of publications. Be sure the reach calculation removes overlap between those people exposed to two or more dissemination methods (e.g., a person who receives a mailing may also be exposed to the notice in a publication).

---

Judges' Class Action Notice and Claims Process Checklist
and Plain Language Guide | 2010

○ *Do the reach calculations omit speculative reach that only might occur?*
Watch for estimated reach calculations that are based in part on speculative notice that
might occur, e.g., news coverage about the lawsuit or settlement. Often, these news articles
do not ultimately explain class members' rights, and the content is not in the court's control.

○ *Is any Internet advertising being measured properly?*
Audiences of Internet websites are measured by "impressions." Total, or "gross,"
impressions of the entire website do not reveal how many people will view the notice "ad"
appearing periodically on a particular page. Inflated audience data via Internet ads is
common. It is very expensive to reach a significant percentage of a mass audience with
Internet banner ads. Watch for suggestions that Internet ads and social network usage can
replace all other methods. Reach, awareness, and claims will likely be very low when such a
program is complete.

❑ *Is non-English notice necessary?*
Consider the demographics of the class to determine whether notice is necessary in Spanish or
another language. The number of class members whose native language is not English should
guide you on whether to actively disseminate notice in other languages, or to simply make foreign
language notices available at a website.

❑ *Does the notice plan allow enough time to act on rights after notice exposure?*
Class members need time to receive a notice by mail or in a publication. A minimum of 30 days is
necessary from completed dissemination before deadlines, with 60–90 days preferred. This
allows for re-mailings, fulfillment of requests for more information, and consideration of rights
and options.

❑ *Will key documents be available at a neutral website?*
Class members should have access to information beyond the notice. Besides the summary notice
and detailed notice (following the FJC examples at www.fjc.gov), it is reasonable to post the
following documents at a neutral administrator's website dedicated to the case: the plaintiffs'
complaint, the defendants' answer, your class-certification decision (in the event of a class
certified for trial), and the settlement agreement and claim form (in the event of a settlement).
Other orders, such as your rulings on motions to dismiss or for summary judgment, should
ordinarily be made available as well.

❑ *Can the class get answers from a trained administrator or from class counsel?*
Even the best notice will generate questions from class members. A toll-free number call center,
an interactive website staffed by trained administrators, and class counsel who are accessible to
the people they represent are reasonable steps to help class members make informed decisions.

*Notice Documents (also see Plain Language Notice Guide, below)*

❑ *Have you approved all of the forms of the notices?*
Before authorizing the parties to begin disseminating notices, you should ask for and approve all
forms of notice that will be used. This includes a detailed notice; a summary notice; and
information that will appear at the website and in any other form, such as an Internet banner, TV
notice, and radio notice. See www.fjc.gov for illustrative notice forms for various cases. It is best
to see and approve the forms of notice the way they will be disseminated, in their actual sizes and
designs.

Appendix 2-4

907426.1

## Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide | 2010

❑ **Are the notices designed to come to the attention of the class?**
The FJC's illustrative notices, as also described in the accompanying **"Plain Language Notice Guide,"** explain how to be sure the notices are "noticed" by the casual-reading class member. With "junk mail" on the rise, and the clutter of advertising in publications, legal notices must stand out with design features long-known to communications pros.

○ **Does the outside of the mailing avoid a "junk mail" appearance?**
Notices can be discarded unopened by class members who think the notices are junk mail. A good notice starts with the envelope design, examples of which are at www.fjc.gov.

○ **Do the notices stand out as important, relevant, and reader-friendly?**
It is important to capture attention with a prominent headline (like a newspaper article does). This signals who should read the notice and why it is important. The overall layout of the notice will dictate whether busy class members will take time to read the notice and learn of their rights.

❑ **Are the notices written in clear, concise, easily understood language?**
Required by Rule 23 since 2003, it is also simply good practice to recognize that communicating legal information to laypeople is hard to do.

❑ **Do the notices contain sufficient information for a class member to make an informed decision?**
Consider the amount of information provided in the notice. Watch for omission of information that the lawyers may wish to obscure (such as the fee request) but that affects class members nonetheless.

❑ **Do the notices include the Rule 23 elements? Even the summary notice?**
Summary notices, whether mailed or published, encourage readership, and the FJC illustrative notices show that even summary notices can include all elements required by Rule 23(c)(2)(B). But an overly short summary notice, one that mostly points interested readers to a detailed notice, can result in most class members (who read only the summary notice) being unaware of basic rights.

❑ **Have the parties used or considered using graphics in the notices?**
Depending on the class definition or the claims in the case, a picture or diagram may help class self-identify as members, or otherwise determine whether they are included.

❑ **Does the notice avoid redundancy and avoid details that only lawyers care about?**
It is tempting to include "everything but the kitchen sink" in the detailed notice. Although dense notices may appear to provide a stronger binding effect by disclosing all possible information, they may actually reduce effectiveness. When excess information is included, reader burnout results, the information is not communicated at all, and claims are largely deterred.

❑ **Is the notice in "Q&A" format? Are key topics included in logical order?**
The FJC illustrative notices take the form of answers to common questions that class members have in class action cases. This format, and a logical ordering of the important topics (taking care to include all relevant topics) makes for a better communication with the class.

❑ **Are there no burdensome hurdles in the way of responding and exercising rights?**
Watch for notice language that restricts the free exercise of rights, such as onerous requirements to submit a "satisfactory" objection or opt-out request.

Appendix 2-5

907426.1

# Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide | 2010

☐ **Is the size of the notice sufficient?**
Consider the balance between cost efficiency and effectiveness. A smaller publication notice will save money, but too small and it will not afford room for a noticeable headline, will not fit necessary information, and will not be readable if using fine print.

## Claims Process

☐ **Is a claims process actually necessary?**
In too many cases, the parties may negotiate a claims process which serves as a choke on the total amount paid to class members. When the defendant already holds information that would allow at least some claims to be paid automatically, those claims should be paid directly without requiring claim forms.

☐ **Does the claims process avoid steps that deliberately filter valid claims?**
Close attention to the nature of a necessary claims process may help eliminate onerous features that reduce claims by making claiming more inconvenient.

☐ **Are the claim form questions reasonable, and are the proofs sought readily available to the class member?**
Watch for situations where class members are required to produce documents or proof that they are unlikely to have access to or to have retained. A low claims rate resulting from such unreasonable requirements may mean that your eventual fairness decision will overstate the value of the settlement to the class and give plaintiff attorneys credit for a greater class benefit than actually achieved.

☐ **Is the claim form as short as possible?**
A long, daunting claim form is more likely to be discarded or put aside and forgotten by recipients. Avoid replicating notice language or injecting legalistic terminology into the claim form which will deter response and confuse class members.

☐ **Is the claim form well-designed with clear and prominent information?**
Consider whether the claim form has simple, clearly worded instructions and questions, all presented in an inviting design. The deadlines and phone numbers for questions should be prominent.

☐ **Have you considered adding an online submission option to increase claims?**
As with many things, convenience is of utmost importance when it comes to claims rates. Today, many class members expect the convenience of one-click submission of claims. Technology allows it, even including an electronic signature. Claim forms should also be sent with the notice, or published in a notice, because many will find immediate response more convenient than going to a website.

☐ **Have you appointed a qualified firm to process the claims?**
You will want to be sure that the claims administrator will perform all "best practice" functions and has not sacrificed quality in order to provide a low price to win the administration business.

907426.1

## Judges' Class Action Notice and Claims Process Checklist
### and Plain Language Guide | 2010

❏ *Are there sufficient safeguards in place to deter waste, fraud, and/or abuse?*
The claims process, the claim form itself, and the claims administrator all play roles in ensuring that approved claims are valid claims, so that payments go to class members who meet the criteria. Closely monitoring the process, perhaps through a special master—or at least by requiring the parties to file full reports of claims made—is a good idea.

*After Notice/Before Trial or Final Settlement Approval*

❏ *Did the notice plan achieve what it promised?*
Look for evidence that the notice plan reached the class members as well as anticipated.

❏ *What is the reaction of the class?*
You will want to look at the number and nature of any objections, as well as the number of opt-outs and claims. Special note: waiting for the claims deadline to expire before deciding on final approval ensures that you can look at a full picture of the fairness of the settlement. By so doing you will be able to judge the actual value of the settlement to the class and calculate attorney fees in relation to that value.

❏ *Have you made sufficient findings in the record?*
Consider, based on the evidence, making detailed findings so as to inhibit appellate review or to withstand a subsequent collateral review of your judgment.

❏ *Is any subsequent claims-only notice necessary?*
If you find the settlement fair, reasonable, and adequate, but the number of claims is low, you may consider additional notice to the class after final approval.

Federal Judicial Center                                                          Page 7

Appendix 2-7

907426.1

## Federal Judicial Center Plain Language Notice Guide
*"Thumbnail" representations of illustrative notices at www.fjc.gov (click on "Class Action Notices Page")*

### Detailed Notice—First Page

• Page one is an overall summary of the notice. The objective is to use the fewest words to say the most. It is a snapshot of the case, of the reasons for the notice, and of the rights that class members have.

• The court's name at the top conveys the importance of the notice.

• A headline in a large font captures attention. It conveys what the notice is about and who is included, and it suggests a benefit to reading the entire notice.

• The words in italics below the headline communicate the official nature of the notice and provide a contrast from a lawyer's solicitation. Be sure to avoid a traditional legalistic case caption.

• Short bullet points highlight the nature of the case and the purpose of the notice. Bullet points also communicate who is included, the benefits available (if it is a settlement), and steps to be taken—identifying deadlines to observe. The first page should pique class members' interest and encourage them to read the entire notice.

• The table of rights explains the options available. These are deliberately blunt. Be careful to avoid redundancy with the information inside the notice.

• The first page should prominently display a phone number, e-mail address, or website where the class can obtain answers to questions.

• If appropriate for the class, include a non-English (e.g., Spanish) language note about the availability of a copy of the notice in that language.

### Detailed Notice—Table of Contents

• Organize the topics into different sections and place the information in a logical order.

• A "Q&A" or "Answers to Common Questions" format helps class members find the information that is important to their decision-making process.

• Customize the topics to the facts of the case, but keep the overall notice short: 8–11 pages should be plenty even for complex matters.

• Don't avoid obvious questions (or answers) that class members will have.

Appendix 2-8

907426.1

### Federal Judicial Center Plain Language Notice Guide

*"Thumbnail" representations of illustrative notices at www.fjc.gov (click on "Class Action Notices Page")*



#### Detailed Notice—Inside Content

• Short answers are best. Be sure that the text answers the question being asked and does not "spin" the information in a way to achieve a desired result—e.g., do not use language that encourages class members to accept a proposed settlement.

• Watch for redundant and lengthy information, but also substantive omissions. Be frank and open for better reader comprehension and, as a result, a stronger binding effect.

• Every detail does not belong in the notice, but all rights and options do. Explain settlement benefits and state the fees that the lawyers will seek. Watch for burdensome requirements that might inhibit objections, opt outs, or claims.

• Use plain language. You may closely follow the illustrative models at www.fjc.gov.

#### Summary Notice

• The summary notice should be short but comprehensive. Refer to all of the requirements of Rule 23 in a simple and clear summary fashion. Follow the FJC models wherever possible.

• The "Legal Notice" banner at the top helps stop a publisher from typesetting the word "advertisement" at the top, which would create a perception that the notice is a solicitation. Do not use the legal case caption style.

• The headline in large font captures the attention of readers who glance at the page. It flags what the notice is about, who is included, and it signals a benefit to be derived by reading the notice.

• The initial paragraphs provide a snapshot of all key information.

• Be sure to explain class membership in a simple way. Consider a graphic to help readers understand that they are included.

• Make a brief but clear reference to the substance of the case and the claims involved.

• Identify clearly what class members could get and how they would get it. These are the most common questions from class members.



• Be sure to include clear references to opt out, objection, and appearance rights. State the amount of the lawyers' fee request.

• Include a prominent reference to the call center and website.

---

Appendix 2-9

907426.1

## Federal Judicial Center Plain Language Notice Guide

*"Thumbnail" representations of illustrative notices at www.fjc.gov (click on "Class Action Notices Page")*

### Outside of Mailing

• Design the notice to make it distinguishable from "junk mail."

• A reference to the court's name (at the administrator's address) ensures that the class recognizes the notice's legitimacy.

• "Call-outs" on the front and back encourage the recipient to open and read the notice when it arrives with other mail.

Notice Administrator for U.S. District Court
P.O. Box 00000
City, ST 00000-0000

Notice to those who bought XYZ Corp. Stock in 1999.

Jane Q. Class Member
123 Anywhere Street
Anytown, ST 12345-1234

• The call-out on the front (shown on example above) identifies what the notice is about and who is affected. On the back you may highlight the settlement benefits, or the rights involved.

• Use these techniques even if the mailed notice is designed as a self-mailer, i.e., a foldover with no envelope.



### Cover Letter (when compliance with PSLRA is needed)

• Identify the court's administrator as the sender — this conveys legitimacy.

• The content should be very short. Remember that this is not the notice.

• A reference in bold type to the security involved flags the relevance of the letter.

• The bullet points track each PSLRA cover letter requirement. Avoid lengthy explanations that are redundant with the notice. Be blunt for clarity.

• The content in the FJC's PSLRA cover letter can simply be customized for the case at hand. The design encourages interest, reading, and action.

Appendix 2-10

## CURRICULUM VITAE

6/1/10

### GEOFFREY C. HAZARD, JR

Miller Distinguished Professor of Law, University of California,
        Hastings  College of the Law
Trustee Professor of Law, University of Pennsylvania Law School
Director Emeritus, American Law Institute

Address:   2263 California Street
           San Francisco, CA 94115
           Tel:415-292-6535(home);415-565-4800(office)
           Fax: 415-292-2304
           Email: hazardg@uchastings.edu

           Hastings College of the Law
           200 McAllister St.,San Francisco, CA 94102


                          EDUCATION

Swarthmore College, B.A. 1953 (Phi Beta Kappa)
Columbia University, LL.B. 1954 (Columbia Law Review)

                  PROFESSIONAL APPOINTMENTS

Member, California State Bar, Pennsylvania Bar
Admitted to practice: Oregon, 1954; California, 1960;
Connecticut, 1982; Pennsylvania, 1994
Practiced in Oregon, 1954-57; Deputy Legislative Counsel, State
of Oregon, 1956-57; Executive Secretary, Oregon Legislative
Interim Committee on Judicial Administration, 1957-58
Executive Director, American Bar Foundation, 1964-70
Consultant, American Bar Association Special Committee on Code
        of Judicial Conduct, 1970-72
Reporter, American Bar Association Special Commission on
        Standards of Judicial Administration, 1971-77
Reporter, American Law Institute, Restatement of Judgments,
        Second, 1973-81
Reporter, American Bar Association Special Commission on
        Evaluation of Professional Standards, 1978-83
Reporter, Committee on Ethical Standards, National Association of
        Bond Counsel, 1983-84
Director, American Law Institute, 1984-1999

-+

Geoffrey C. Hazard, Jr.
Page 2

Reporter, American Law Institute and International Organization
    for Unification of Private Law, Principles of Transnational
    Civil Procedure, 1999-2005
Member and Consultant, Standing Committee on Rules of
    Practice and Procedure, Judicial Conference of the United
    States, 1994-
Member, Judicial Conference Ad Hoc Committee on Mass Torts,
    1997-99
Member, American Bar Association Resource Team for High Profile
    Trials 1996-1998
Member, American Bar Association Commission on Ethics2000,
    1997-2002
Member, Associazione Italiana fra gli Studiosi del Processo
    Civile, 1998-
Member, American Bar Association Task Force on Federal Preemption
    2008-2010
Senior Adviser, American Bar Association, Section of Business
    Law,2007-09; Emeritus 2009-

ACADEMIC APPOINTMENTS

Miller Distinguished Professor of Law, University of California
    Hastings College of the Law, 2005-
Trustee Professor of Law, University of Pennsylvania, 1994-
Professor of Law, Yale University, 1971-94; Sterling Professor of
    Law Emeritus 1994-
Associate Professor of Law, University of California,
    Berkeley, 1958-61; Professor of Law, 1961-64
Visiting Professor, University of Michigan, 1963
Professor of Law, University of Chicago, 1964-71
Visiting Professor, Stanford University, 1974
Acting Dean, Yale School of Organization and Management,
    1980-81; Associate Dean, 1979-80; Deputy Dean, 1981-82
Visiting Professor, Universite d'Aix-Marseille, 1982
Visiting Professor, Harvard University, 1983
Visiting Professor, University of Arizona, 1997-2001

TEACHING SUBJECTS

Civil Procedure, Legal Ethics, Federal Jurisdiction

BOARD MEMBERSHIPS

Board of Trustees, Supreme Court Historical Society, 1989-2004

-+

Geoffrey C. Hazard, Jr.
Page 3

Board of Directors, Avatar Holdings, Inc., 1980-94
Board of Directors, Smyth, Sanford & Gerard Professional
        Liability, L.L.C. 1995-97
Member, Board of Directors, Friends of the Library of the Supreme
        Court of Israel 1998-
Board of Governors, International Insolvency Institute, 2004-


## PROFESSIONAL ACTIVITIES


Member, Administrative Conference of United States, 1972-78
Adviser, American Bar Association, Standing Committee on Ethics and
        Professional Responsibility, Subcommittee on Code of
        Judicial Conduct, 1988-89
Member, Board of Overseers, Institute for Civil Justice, RAND
        Corp.,1985-90
Advisory Council, Trinity Church (New York) Center for Ethics and
        Corporate Policy, 1983-1990
Legal Advisory Committee, New York Stock Exchange,1989-92
Member, American Bar Association Committee on Professional
        Discipline, 1985-91
Member, American Bar Association, Committee on Lawyers'
        Responsibility for Client Protection, 1991-1994
Member, National Association of Corporate Directors, Blue
        Ribbon Commission, 2005
Member, Pennsylvania Bar Ass'n, California State Bar, American
Bar Ass'n, American Law Institute, National Legal Aid and
Defender Ass'n, Fellows of American Bar Foundation, American
Academy of Arts and Sciences, American Philosophical Society


## PROFESSIONAL AWARDS

American Bar Foundation, Research Award, 1985
American Bar Foundation, William Keck Foundation Award,1997
Columbia University School of Law Association, Medal for
        Excellence, 1999
American Judicature Society, Outstanding Contributions to
        Promoting Effective Administration of Justice. 1999
Ceremony of Salute, Superior Court of Pennsylvania, 1999
Gold Medal, International Insolvency Institute, 2004
American Bar Association Section of Legal Education, Kutak Award,
        2005
American Bar Association, Michael Franck Award, 2008

-+

Geoffrey C. Hazard, Jr.
Page 4

HONORARY DEGREES

M.A., Yale University 1971
LL.D., Gonzaga University, 1985
LL.D., University of San Diego, 1985
LL.D., Swarthmore College, 1988
LL.D., Illinois Institute of Technology, 1990
LL.D., Nova University, 1992
LL.D., Republica Italiana (faculta di Urbino), 1998
Reconocimiento, Universidad National Autónoma de
    Mexico, 2006

BOOKS

RESEARCH IN CIVIL PROCEDURE (1963; Walter E. Meyer Research
    Institute of Law).
LAW IN A CHANGING AMERICA (1968; editor).
QUEST FOR JUSTICE (1973; editor, American Bar Association).
GOING TO LAW SCHOOL? (1974; editor, with Thomas Ehrlich).
CIVIL PROCEDURE (5th ed. 2001, with Fleming James, Jr. and
    John Leubsdorf).
ETHICS IN THE PRACTICE OF LAW (1978).
PLEADING & PROCEDURE, STATE & FEDERAL (10th ed. 2009; with
    Colin Tait, Wm. Fletcher and Stephen Bundy).
MANAGING COMPLEX LITIGATION:  A PRACTICAL GUIDE TO THE USE OF
    SPECIAL MASTERS (1983; with Wayne Brazil and Paul Rice).
THE LEGAL PROFESSION: RESPONSIBILITY AND REGULATION (Concepts
    and Insights Series 2nd ed. 2007; with Deborah Rhode).
THE LEGAL PROFESSION: RESPONSIBILITY AND REGULATION (Anthology
    3d ed. 1994; editor, with Deborah Rhode).
THE LAW OF LAWYERING:  A Handbook on the Model Rules of
    Professional Conduct (3d ed. 2004 with William Hodes).
PERSPECTIVES ON CIVIL PROCEDURE (1987; editor, with Jan Vetter).
BOARD GAMES: The Changing Shape of Corporate Power (1988; with
    Arthur Fleisher, Jr. and Miriam Z. Klipper).
THE LAW AND ETHICS OF LAWYERING (5th ed. 2009; with Susan Koniak,
    Roger Cramton, George Cohen and Bradley Wendel)
LA GUISTA CIVIL NEGLI STATI UNITI (1993; with Michele Taruffo)
AMERICAN CIVIL PROCEDURE:  AN INTRODUCTION (1993, with Michele Taruffo)
AMERICAN CIVIL PROCEDURE: AN INTRODUCTION (Japanese ed., Tanabe
    Tr. 1997)
LA JUSTICIA CIVIL IN LOS ESTADOS UNIDOS (Spanish ed., Gascón
    Inchausti Tr. 2006)

-+

Geoffrey C. Hazard, Jr.
Page 5

POKUS`ENI` SPRA `NI` CHI RAD (Prague, 1996; translation of
      BOARD GAMES, with Arthur Fleisher, Jr. and Miriam Z.
      Klipper)
PROFESSIONAL RESPONSIBILITY AND REGULATION (Foundation Press,
      2002) (with Deborah Rhode)
LEGAL ETHICS: A COMPARATIVE STUDY (Stan. U. Press. 2004)(with
      Angelo Dondi)
ETICHE della PROFESSIONE LEGALE (il Mulino 2005) (with Angelo
Domdi)


REPORTS
(as reporter or draftsman)

Oregon Legislative Interim Commission on Judicial Administration,
      Vol. I (Judicial Administration), Vol. II (Juvenile Code)
      (1958)
California Special Legislative Commission on the Insanity
      Defense, Report (1962).
American Bar Association, Code of Judicial Conduct (1972).
American Bar Association, Standards of Judicial Administration
      (3 vol., 1974-77).
Legal Services for the Average Citizen, Report of A.B.A.
      Consortium on Legal Services (1977).
American Law Institute, Restatement Second of Judgments (1982).
American Bar Association, Model Rules of Professional Conduct
      (1983).
National Association of Bond Lawyers, Function and Professional
      Responsibilities of Bond Counsel (1984).
American Law Institute and International Organization for
      Unification of Private Law, Principles of Transnational
      Civil Procedure (2005).


ARTICLES

May v. Anderson:  Preamble to Family Law Chaos,
      45 Va. L. Rev. 379 (1959)

Oregon Administrative Procedure Act -- Status and Prospects,
      39 Ore. L. Rev. 97 (1960).

Indispensable Party:  The Historical Origin of a Procedural
      Phantom, 61 Colum. Law Rev. 1254 (1961).

Insanity as a Defense:  The Bifurcated Trial,
-+

Geoffrey C. Hazard, Jr.
Page 6

49 Calif. L.Rev. 805 (1961) (with D. W. Louisell).

Death, the State, and the Insane:  Stay of Execution,
9 U.C.L.A. Rev. 381 (1962) (with D. W. Louisell).

Early Evolution of the Common Law Writs:  A Sketch,
6 Am. J. Legal Hist. 114 (1962).

An Historical and Critical Analysis of Interpleader,
52 Calif. L. Rev. 706 (1963) (with Myron Moskovitz).

The Research Program of the American Bar Foundation,
51 A.B.A.J. 539 (1965).

Reflections on Four Studies of the Legal Profession, in
Law and Society, A Supplemental to Social Problems
(Summer, 1965).

After the Trial Court -- The Realities of Appellate Review,
in Jones, Harry W., ed., The Courts, the Public and the
Law Explosion (1965).

A General Theory of State-Court Jurisdiction,
1965 Sup. Ct. Rev. 241.

Rationing Justice, 8 J. Law & Econ. 1 (1965).

Limitations on the Uses of Behavioral Science in the Law,
19 Case Western L. Rev. 71 (1967).

The Ombudsman:  Quasi-Legal and Legal Representation in Public
Assistance Administration, in Sherrard, ed.,Social
Welfare and Urban Problems (1968).

Challenges to Legal Education, in Sutherland, ed.
The Path of the Law from 1967 (1968), pp. 185-194.

Epilogue to the Criminal Justice Survey, 55 A.B.A.J. 1048 (1969).

Social Justice Through Civil Justice, 36 U. Chi. L. Rev. 699
(1969).

Law Reforming in the Anti-Poverty Effort, 37 U. Chi. L. Rev. 242
(1970).

-+

Geoffrey C. Hazard, Jr.
Page 7

Legal Problems Peculiar to the Poor, 26 J. Social Issues 47
    (1970).

Securing Courtroom Decorum, 80 Yale L. J. 433 (1970)(book
    review).

Res Nova in Res Judicata, 44 So. Calif. L. Rev. 1036 (1971).

Court Finance and Unitary Budgeting, 81 Yale L. J. 1286
    (1972)(with Martin B. McNamara and Irwin F. Sentilles, III)

Attorneys' Responsibilities and Duties Under the Securities Laws,
    in Goldberg, Stuart C., ed., Expanding   Responsibilities
    Under the Securities Laws (1973).

The Effect of the Class Action Device Upon the Substantive Law,
    58 F.R.D 299 (1973).

Legal Services in the U.S.A., 2 Internat'l J.of Crim. and
    Pen. 43 (1974).

Chancery Procedure and the Seventh Amendment: Jury Trial of
    Issues in Equity Cases before 1791, 83 Yale L. J.  999 (1974)
    (with Harold Chesnin).

Law School "Law" and Sociolegal Research,
    50 Denver L. J. 403 (1974).

Rethinking Legal Ethics, 26 Stan. L. Rev. 1227 (1974).

Conscience and Circumstance in Legal Ethics, in Hodges, ed.,
    Social Responsibility: Journalism, Law, Medicine
    (Wash. & Lee Univ., 1975).

Administration of Supporting Services in the Trial Court,
    1 Justice System Journal 3 (1975).

Representation in Rule-Making, in Schwartz, ed.,
    Law and the American Future (1975).

The Tennessee Administrative Procedure Act:  An Outsider's
    Perspective, 6 Memphis State U. L. Rev. 143 (1976).

Standards of Judicial Administration:  Appellate Courts,
    62 A.B.A.J. 1015 (1976).

-+

Geoffrey C. Hazard, Jr.
Page 8

The Jurisprudence of Juvenile Deviance, in Rosenheim, ed.,
    Pursuing Justice for the Child (1976).

Requisites of a Valid Judgment, 24 Practical Lawyer 35 (1978).

The Supreme Court as Legislature, 64 Cornell L. Rev. 1 (1978).

An Historical Perspective on the Lawyer-Client Privilege,
    66 Calif. L. Rev. 1061 (1978).

Talking to Your Lawyer, MBA, May 1978, 17.

The Legal and Ethical Position of the Code of Professional
    Ethics, V Social Responsibility: Journalism, Law, Medicine
    (Wash. & Lee Univ., 1979).

Interstate Venue, 64 Nw. L. Rev. 711 (1979).

Proposed Revision of the Rules of Legal Ethics in the United States,
    in Am. Bar Ass'n, American/Australian/New Zealand
    Law: Parallels and Contrasts (1980)

Guidelines for Claims of Privilege, United States v. Am. Tel.
    & Tel. Co., 86 F.R.D. 603 (1980) (with Paul Rice).

Rules of Legal Ethics: The Drafting Task, 36 The Record 77
    (1981).

Revisiting the Second Restatement of Judgments: Issue Preclu-
    sion and Related Problems, 66 Cornell L. Rev. 564
    (1981).

The Lawyer's Obligation to be Trustworthy When Dealing with
    Opposing Parties, 33 South Carolina L. Rev. 181 (1981).

How Far May a Lawyer Go in Assisting a Client in Legally
    Wrongful Conduct?, 35 U. of Miami L. Rev. 669 (1981).

Will the ABA Draft Model Rules of Professional Conduct Change the
    Concept of the Lawyer's Role?, Association of the Bar    of
    the City of New York (Third Orison Marden Memorial
    Lecture,1981).

The Lawyer's Pro Bono Obligation, in ABA Proceedings of the
    Second National Conference on Legal Services and the Public
    (1981).

-+

Geoffrey C. Hazard, Jr.
Page 9

Do Lawyers <u>Really</u> Need New Disciplinary Rules?,
53 <u>Cleveland Bar J.</u> 1 (1981).

Legal Ethics: Legal Rules and Professional Aspiration,
30 <u>Cleveland State L. Rev.</u> 4 (1982).

Liability of Attorneys Involved in the Preparation of
Disclosure Statements, in Fleischer, et al. eds.,
Thirteenth Annual Institute on Securities Regulation
(1982).

Arguing the Law: The Advocate's Duty and Opportunity,
16 <u>Georgia L. Rev.</u> 821 (1982).

Judicial Management of the Pretrial Process in Massive Litiga-
tion: Special Masters as Case Managers, 1982 <u>Am. Bar
Found. Res. J.</u> 375 (with Paul R. Rice).

The Criminal Justice System: Overview, in Encyclopedia of
Criminal Justice (1982).

Competing Aims in Legal Education, 59 <u>No. Dakota L. Rev.</u>
533 (1983).

Why Lawyers Should be Allowed to Advertise: A Market Analysis
of Legal Services, 58 <u>N.Y.U.L. Rev.</u> 1084 (1983), (with
Russell Pearce and Jeffrey Stempel) republished in Italian,
Perche Agli Avvocati Dovrebbe Essere Consentito L'Uso Della
Pubblicita, 32 Rivista Di Diritto Civile 277 (1986).

Preclusion as to Issues of Law:  The Legal System's Interest,
70 <u>Iowa L. Rev.</u> 81 (1984).

A Question of Scale, Harvard Law School Bulletin, Winter, 1984
(review of Bok report on legal education).

The Technical Expert in Procedure: U.S. National Report, in
Nicklisch, ed., Der Technische Sachverstandige im Prozess,
VII.Internationaler Kongress fur Prozessrecht, p. 207    (1984).

Legal Ethics, in Gillers, ed., Looking At Law School
(1984, 3d ed. 1990).

Rectification of Client Fraud: Death and Revival of a
Professional Norm, 33 <u>Emory L.J.</u> 271 (1984).

-+

Geoffrey C. Hazard, Jr.
Page 10

Reflections on the Substance of Finality, 70 Cornell L. Rev. 642 (1985).

Curriculum Structure and Faculty Structure, 35 J. Legal Ed, 326 (1985).

The Position of the Supreme Court in the Contemporary Constitutional System of the United States, in Lombardi, Constituzione e Giustizia Constituzionale nel Diritto Comparato (Centro Italiano per lo Sviluppo della Ricerca, 1985).

Ethical Considerations in Withdrawal, Expulsion, and Retirement [from a Firm], in Berger, ed., Withdrawal, Retirement & Disputes, Am. Bar Ass'n Section of Economics of Law Practice (1986).

Court Delay: Toward New Premises, 5 Civil Justice Q. 236 (1986), republished in Italian, Costo e Durata del Processo in Italia e in U.S.A., 32 Rivista di Diritto Civile 271 (1986).

Quis custodiet ipsos custodes?, 95 Yale L.J. 1523 (1986) (book review).

Principles in Legislation, 41 The Record 685 (1986) (Cardozo Lecture).

Rising Above Principle, 135 U.Penn.L.Rev. 153 (1986) (Roberts Lecture).

A Lawyer's Privilege Against Self-Incrimination in Professional Disciplinary Proceedings, 96 Yale L.J. 1060 (1987) (with Cameron Beard).

Triangular Lawyer Relationships: An Exploratory Analysis, 1 Georgetown J. Legal Ethics 15 (1987).

Permissive Affirmative Action for the Benefit of Blacks, 1987 U.Illinois L.Rev. 379 (David C. Baum Memorial Lecture).

Professional Ethics, Rules and Conduct, in Conference Papers, ALI-ABA Arden House III National Conference on the Continuing Education of the Bar (November 13, 1987), reprinted 34 CLE Journal and Register 5 (1988).

-+

Geoffrey C. Hazard, Jr.
Page 11

The Public Nature of Private Adjudication, 6 Yale L. & Pol'y
Rev. 42 (1988) (with Paul D. Scott).

Communitarian Ethics and Legal Justification, 59 U. of Colo. L.
Rev. 721 (1988).

Forms of Action Under The Federal Rules of Civil Procedure,
63 Notre Dame L. Rev. 628 (1988).

Four Portraits of Law Practice, 57 UMKC L. Rev. 1 (1988).

Ethics and Politics in the Corporate World, 6 Yale J. on
Regulation 155 (1989) (book review).

Discovery Vices and Trans-Substantive Virtues in the Federal
Rules of Civil Procedure, 137 U. Penn. L. Rev. 2237 (1989).

Authority in the Dock, 69 Boston U. L. Rev. 469 (1989).

My Station as a Lawyer, 6 Georgia State U. L. Rev. 1 (1989).

Per un approcio manageriale al problema dei ritardi
nell'amministrazione della guistizia, 43 Rivista
Trimestrial di Diritto e Procedura Civile, No. 4, p. 960
(Dicembre 1989), translated by Dttr. Angelo Dondi.

After Professional Virtue, 1989 Supreme Court Rev., 213.

Law and Business Ethics, in Reitzel, et al. Contemporary
Business Law (4th ed. 1990).

The Role of the Legal System in Response to Public Risk, Fall 1990
Daedalus, 229.

Ethical Opportunity in the Practice of Law, 27 San Diego L.Rev.
127 (1990).

It Smacks of Elitism, Am. Law Inst. Remarks and Addresses,
May 15-18, 1990.

The Future of Legal Ethics, 100 Yale L.J. 1239 (1991).

Il processo con giuria come modello processuale," 45 Rivista
Trimestrial di Diritto e Procedura Civile,

-+

Geoffrey C. Hazard, Jr.
Page 12

No. 2, p. 479(Giugno, 1991), translated by Dttr.
Angelo Dondi.

Swimwear for the Ethics Goldfish Bowl, 26 Int'l Soc'y of
    Barristers Quarterly 297 (1991).

Equality in Civil Litigation, In Kojima, ed., America no
    Daishihou Shisutemu ("Grand Justice System: American
    Style"), Chiou University Institute of Comparative Law (1992).

L'avvocato e l'etica professionale: gli aspetti giuridici,
    Il Foro Italiano, June, 1992, V, 215, translated by
    Dttr.Angelo Dondi

Justice Marshall in the Medium of Civil Procedure: Portrait of a
    Master, 80 Georgetown L.J. 2063 (1992).

Doing the Right Thing, 70 Washington U.L.Q. 691 (1992).

Alvin B. Rubin: Man of the Law, 52 Louisiana L. Rev. 1481
    (1992).

Lawyers and Client Fraud: They Still Don't Get It,
    6 Georgetown J. of Legal Ethics 701 (1993).

Sources of Delays, Motions to Disqualify Could be Handled
    Promptly Through ADR, July 1993 Alternatives to the
    High Cost of Litigation (Center for Public Resources).

The Role of the Legal System in Responses to Public Risk, in
    E. Burger, ed., Risk (U. Michigan Press 1993).

Dimensions of Ethical Responsibility: Relevant Others,
    54 U.Pittsburgh L. Rev. 965 (1993).

Lawyer Liability in Third Party Situations:  The Meaning of
    the Kaye Scholer Case, 26 U. Akron L. Rev. 395.

Reflections on Judge Weinstein's Ethical Dilemmas in Mass Tort
    Litigation, 88 Northwestern U. L. Rev. 569 (1994).

The American Law Institute: What it is and What it Does,
    Centro do Studi e Ricerche di Diritto Comparato e
    Straniero,Saggi, Conferenze e Seminari, (1994).

Azioni di Responsabilita Verso gli Amministratori di Societa
-+

Geoffrey C. Hazard, Jr.
Page 13

Commerciali nel Diritto Statunitense, 39 Rivista delle
Societa 441 (1994).

Conflict of Interest in Estate Planning for Husband and Wife,
20 The Probate Lawyer 1 (1994).

Equality and Selectivity in American Civil Litigation, in
T. Kojima, T. Atsumi, H. Hokama, and M. Shimuzu, eds.,
The Grand Design of America's Justice System, Institute of
Comparative Law in Japan (1995).

Law, Morals, and Ethics, 19 So. Illinois U.L.J. 447 (1995).

La Nozione di "Substantial Evidence" nel Processo Civile
Statunitense, 1-1996 Rivista Trimestrale di Diritto
e Procedura Civil 251 (1996).

Conflict of Interest in the Classic Professions, in R. Spece, D.
Shimm and A. Buchanan, Conflicts of Interest in Clinical
Practice and Research (1996).

The Settlement Black Box, 75 Boston Univ. Law Review. 1257
(1996).

The Client Fraud Problem: A Justinian Quartet, 1 J. Institute for
Study of Legal Ethics 43 (1996)

The Privity Requirement Reconsidered, 37 So. Texas L. Rev. 967 (1996).

Commentary: Policy Implications [of Lawyers Problems with
Alcohol], 10 J. Law and Health 79 (1995-96).

Un Codice di Etica Professionale per gli Avvocati Italiani?
Rivista Trimestrale di Diritto e Procedura Civile,
Anno L. Fasc. 4-1996.

An Examination Before and Behind the "Entire Controversy"
Doctrine, 28 Rutgers L.J. 7 (1996).

A Lawyer's Moral and Ethical Discretion, 8 Researching Law No.2 (1997).

Transnational Rules of Civil Procedure, 30 Cornell Int'l. L.F. 495
(1997, with M. Taruffo).

State Supreme Court Regulation of Professional Ethics, 72 Notre Dame
L. Rev. 1177 (1997).

-+

Geoffrey C. Hazard, Jr.
Page 14

Protecting the Environment: Finding the Balance Between *Delaney*
and Free Play, 18 U. Penna. J. Of Int'l Economic Law 487
(with H. Kunreuther, 1997).

Ethical Dilemmas of Corporate Counsel, 46 Emory L.J. 1011, 1053
(1997).

Professional Legal Education and Citizen Education, 25 J.
Japanese Institute of Int'l Bus. Law 1181 (1997) (in
Japanese, translation by Professor Koichi Miki).

Harmonization of Procedural Law, 44 J. Of Civil Procedure 70
(Japanese Ass'n of the Law of Civil Procedure) (translated
into Japanese by Professor Koichi Miki).

Non-Silences of Professor Hazard on "The Silences of the
Restatement": A Response to Professor Menkel-Meadow." 10
Georgetown L. Legal Ethics 1997).

Per L'Indipendenza Professionale Dell'Avvocatura, 1997 Rivista
Trimestrale di Diritto e Procedura Civile 407.

Discovery and the Role of the Judge in Civil Law Jurisdictions,
73 Notre Dame L. Rev. 1017 (1998).

The American Law Institute is Alive and Well, 26 Hofstra L. Rev.
661 (1998).

From Whom No Secrets are Hid, 76 Texas L.Rev. 1665 (1998).

The Duty or Option of Silence, 23 Law & Social Inquiry 139
(1998).

Reflections on Self-Study [of the American Law Institute], 23 Law
& Social Inquiry 641 (1998).

The County Courthouse No Longer Looms Over the Community, 51 SMU
L. Rev. 1559 (1998).

Foreward, Symposium, The Legal Profession: The Impact of law and
Legal Theory, 67 Fordham L. Rev. 239 (1998).

Substance, Procedure and Practice in Comparative Law, in T.
Shiibashi, ed., Toward Comparative Law in the 21st Century
(Chuo Univ. Press 1998).

-+

Geoffrey C. Hazard, Jr.
Page 15

Preliminary Draft of the ALI Transnational Rules of Civil
    Procedure, 33 Texas Int'l L.J. 489 (1998)

An Historical Analysis of the Binding Effect of Class Suits,
    146 U. Penna L. Rev. 1849 (1998) (with John L. Gedid and
    Stephen Sowle)

The Underlying Causes of Withdrawal and Expulsion of Partners
    from Law Firms,55 Washington and Lee Rev. 1073 (1998)

Individual Justice in a Bureaucratic World, 7 Tulane J. of Int'l
    and Comparative Law 73 (1999)

From Whom No Secrets are Hid [Segretezza e Ricerca della verita
    nel Processo Civile], Rivista Trimestrale di Diritto e
    Procedura Civile, Anno LIII Fasc. 2 - 1999

Responsibility, Professional and Otherwise, 31 Connecticut L. Rev
    1139 (1999)

Regulation of Banking in the United States, in F. Riolo and D.
    Maschiandaro, Il Governe delle Banche in Italia (Fondazione
    Rosselli, Rome 1999).

Abuse of Procedural Rights: A Summary View of the Common Law
    Systems, and Abuse of Procedural Rights: Regional Report
    for the United States, in M. Taruffo, ed. Abuse of
    Procedural Rights:  Comparative Standards of Procedural
    Fairness(1999).

Under Shelter of Confidentiality, 50 Case Western Law Rev. 1
    (1999).

Tribute to Harvey Perlman, 78 Nebraska L.Rev. 744 (1999).

Litigio civil sin fronteras: armonizacion y unificacion del
    derecho procesal, Derecho PUC (Revista de la Facultad de
    Derecho del la Pontoficia Universidad Catolica del Peru),
    No. 52, 583 (Abril 1999)

The Future of the Legal Profession, in American Bar Association,
    Common Law, Common Values, Common Rights 357-365 (2000)

The Futures Problem, 148 U.Penn.L.Rev. 1901 (2000).
-+

Foreword: The Future of the Profession, 84 Minn.L.Rev. 1083 (2000).

The Future of the Legal Profession, in American Bar Ass'n, Common Law, Common Values, Common Rights, 357-363 (2000).

Globalization, National States, and the Rule of Law, in Jose Ciprut, ed., Of Fears and Foes: Security and Insecurity in an Evolving Global Political Economy (2000).

Law Practice and the Limits of Moral Philosophy, in Deborah Rhode, ed., Ethics in Practice (2000).

Tribute in Memory of Herbert Wechsler, 100 Columbia L. Rev. 1362 (2000).

Changing Structure in the Practice of Law, 62 Louisiana L.Rev.167 (2000).

Equality and Affiliation as Bases for Ethical Responsibility, 61 Louisiana L.Rev.173 (2000).

Environmental Contracts in the United States (with Eric Orts), in E. Orts and K. Dekelelaere, Environmental Contracts: Comparative Approaches to Regulatory Innovation in the United States and Europe (Kluwer 2001)

Transnational Rules of Civil Procedure: A Challenge to Judges and Lawyers, 68 Estratto Studi Urbinati, Nuova Serie A-N. 51,3 247 (1999/2000)

Introduction to the Principles and Rules of Transnational Civil Procedure, 33 N.Y.U. J. of International Law and Politics 769 (with M. Taruffo. R. Sturner and A. Gidi (2001)

Conflicts of Interest in Representation of Public Agencies in Civil Matters, 9 Widener J. Public Law 211 (2000).

Globalization, National States and the Rule of Law, in J. Ciprut, ed., Of Fears and Foes: Security and Insecurity in an Evolving Global Political Economy at 209 (2001)

Whistleblowing is a Non-issue, Legal Intelligencer (of Philadelphia), Feb. 25, 2002, p. 9.

-+

Humanity and the Law, 16 Yale J. Law and the Humanities 79
    (2004).

"Announcement" by Federal Judicial Nominees, 32 Hofstra L. Rev.
    1281 (2004)

Lawyer for the Situation, 39 Valparaiso U. L. Rev. 377 (2004).

Advertising and Intermediaries in Provision of Legal Services:
    *Bates* in Retrospect and Prospect, 37 Ariz. State L. J. 309
    (2005).

Lawyers for Lawyers: The Emerging Role of Law Firm Legal Counsel,
    23 Kans. L. Rev. (2005).

Harmonization of Civil Procedure, 4 Washington U. Global Studies
    Law Review 639 (2005)(with Michele Taruffo).

Law, Ethics and Mystery, 82 U. Detroit Mercy L. Rev. 509 (2005).

Two Valuable Treatises on Civil Procedure, 37 New York U. J. of
    International Law and Politics 611 (2005).

Responsibilities of Judges and Advocates in Civil and Common Law:
    Some Lingering Misconceptions Concerning Civil Lawsuits,
    (with Angelo Dondi) 39 Cornell Int'l L.J. 59 (2006)

The Rhetoric of Disputes in Courts, the Media, and the
    Legislature, 40 Georgia L. Rev. 559 (2006).

Challenges in Law Making in Mass Societies, 67 Louisiana L. Rev.
    1105 (2007)

Jury Trial and the Principles of Transnational Civil Procedure, 2
    Penn State Int'l L.Rev. 499 (2006)

Has the *Erie* Doctrine Been Repealed by Congress?, 156 U.Penn. L.
    Rev. 1629 (2008)

Remarks upon Acceptance of Michael Franck Award May 29, 2008,
    2008 Journal of the Professional Lawyer 389 *2008)

Not the City of God: The Multiplicity of Wrongs and Rules, 42
    Akron L. Rev. 1 (2009).
-+

Geoffrey C. Hazard, Jr.
Page 19

Toward a Revised 4.2 No-Contact Rule, 60 Hastings L. J. 797
(2009)(with Dana Remus Irwin)


Legal and Managerial "Cultures" in Corporate Representation, 46
     Houston L. Rev. 1 (2009); reprinted, 51 Corporate Practice
     Commentator 571 (2009)

Civil Procedure in Comparative Perspective, Int'l Ass'n
     Procedural Law, 2009 Toronto Conference (2009)

El Rol Constitucional del American Law Institute, in Conferencia
     De Cortes Supremas de las Americas, "El Estado de Drecho,"
     Buenos Aires 3 & $ September 2009 (with Anthony Scirica)

Quasi-Preemption: Nervous Breakdown in Our Constitutional System,
     84 Tulane L. Rev. 1143 (2110)

Civil Procedure in Comparative Perspective, in Janet Walker and
     Oscar Chase, eds., Common Law and Civil Law and the Future
     of Categories (2010), reprinted, 29 Sup. Ct. L. Rev.
     2d) 657 (2010)

Various Newspaper Articles, National Law Journal, 1987-2001

-+