IN RE: OIL SPILL by the OIL RIG     *     **MDL NO. 2179**
     "DEEPWATER HORIZON" IN THE    *
     GULF OF MEXICO, on APRIL 20, 2010 *
                                         *

                                         *

**THIS DOCUMENT RELATES TO:**    *     **JUDGE BARBIER**
                                         *

**ALL CASES**                           *     **MAG. JUDGE SHUSHAN**
                                         *

******************************************

## SUPPLEMENTAL DECLARATION OF BASILE J. UDDO

**Before me, undersigned notary, came and appeared Basile J. Uddo, who did depose and say:**

1. That this declaration is submitted as a supplement to my prior declaration submitted in support of plaintiffs' "Motion to Supervise Ex Parte Communications between BP Defendants and Putative Class Members". That I hereby reassert all of my statements in my original Declaration. That this supplemental declaration is primarily intended to respond to BP's Opposition to the plaintiffs' motion and certain exhibits attached thereto.

2. That the substance of the BP Opposition is focused largely on the assertion that there is no attorney-client relationship between BP and Mr. Feinberg and/or his firm and that Mr. Feinberg is independent from BP. This assertion is also the substance of both the expert report and declaration of Dane S. Ciolino and the December 28th letter from Stephen Gillers, both of which are attached to the BP opposition.

   However, this assertion, as contained in the BP Opposition, the Ciolino report and the Gillers' letter is based almost exclusively upon the self-serving statements of BP, Mr. Feinberg or the Gulf Coast Claims Facility ("GCCF"). Numerous references are made in each document to the GCCF website and GCCF assurances that it is an "independent administrator" not answerable to BP. Other references are to statements made by Mr. Feinberg claiming independence. There is little to nothing that passes for objective confirmation of this alleged independence, including persistent references to the White House involvement.

   Every such reference is vaguely characterized as Mr. Feinberg being "jointly appointed by the White House" or that the "White House announced an agreement with BP to appoint Ken Feinberg". Yet, the only support is one, or another, White House press release. There are no Executive Orders appointing Mr. Feinberg. There is no legislation or regulation appointing Mr. Feinberg or establishing the

EXHIBIT 4

GCCF. Clearly, Mr. Feinberg was hired by BP and the White House accepted that decision. White House concurrence is not objective support for Mr. Feinberg's claimed independence.

The Declarant further states that the one document that might have constituted such objective confirmation is the agreement between BP and Mr. Feinberg ("Agreement") executed on January 6, 2011, one day before plaintiffs' motion was filed, which disclaims an attorney-client relationship between the two as a result of the agreement. However, the denial includes a gaping exception:

> It is the express intention of the parties that Feinberg Rozen shall be an independent contractor throughout the Term of this Agreement. **Except as otherwise agreed to by the parties,** nothing in this Agreement shall in any way be construed to constitute Feinberg Rozen as an agent or representative of BP, and Feinberg Rozen shall **otherwise** perform the Services hereunder as an independent contractor. **The execution of this Agreement shall not** be construed to create an attorney-client relationship between BP and Feinberg Rozen, and the **provision of Services hereunder** shall not constitute, or be otherwise construed to constitute, provision of legal advice from Feinberg Rozen, or any of its partners or employees, to BP.[1]

The highlighted passages create a sizeable exception to the disclaimer of an attorney-client relationship. Simply put, the Agreement says that the "execution" of the Agreement and the "provision of Services" under the Agreement do not by themselves create an attorney-client relationship. However, the parties may agree otherwise, apparently without limitation. Indeed, other agreements could already exist, which establish agent, representative or attorney relationships without violating the limited terms of the Agreement. The question of whether or not there is something more to the relationship between BP and Mr. Feinberg is not settled by this agreement. More telling are the facts and circumstances that militate against Mr. Feinberg's purported "independence".

3.  That while most judicial analysis of whether or not an attorney-client relationship exists involves a client claiming one exists while a lawyer seeks to deny it, the principles applied would also determine whether such a relationship exists for purposes of protecting third parties, such as the claimants and putative class members, who are affected by a *de facto* relationship denied by both the client and the attorney. The Louisiana Supreme Court recently revisited this issue in *In re Austin,* 943 So. 2d 341 (La. 2006). In explaining the appropriate analysis the Court said:

---

[1] Agreement attached to BP Opposition at 10-11 (emphasis added).

> ...we recognize that there can be a potential for confusion **when an attorney wears a multitude of hats**. To protect the client, this court has given great deference to the client's subjective belief whether an attorney-client relationship exists....**Nonetheless, the overarching question is whether there is a reasonable, objective basis to determine that an attorney-client relationship has formed**....[2]

Accordingly, a lawyer cannot avoid the important duties prescribed by the Louisiana Rules of Professional Conduct[3]by disclaiming an attorney-client relationship where objective data suggests otherwise. Even the BP/Feinberg Agreement imposes attorney obligations such as freedom from conflicts[4], confidentiality[5] and communication of information.[6] However, a great deal more "objective" information belies the claims of Feinberg's independence.

4.  That from the beginning of his involvement in the BP claims process Mr. Feinberg showed some concern about being paid $850,000 per month by BP. This concern can only be attributed to the fact that Mr. Feinberg perceived himself to be functioning as a lawyer representing a client. Why else be concerned? An "independent administrator" is not bound by any limitations on what he can charge for his services. He can charge whatever amount he can negotiate. An attorney, on the other hand, is professionally obligated to charge no more than a reasonable fee. Apparently, because Mr. Feinberg was concerned about this professional obligation, he commissioned an analysis of the propriety of his fees by the New York law firm, Debevoise & Plimpton, L.L.P. On October 7, 2010 their report was issued to Mr. Feinberg.[7]

The report is significant for two reasons: 1) it analyzes Mr. Feinberg's fee purely as a legal fee, subject to the constraints of a lawyer's ethical obligations, and 2) it makes several significant statements about the relationship between Feinberg ["the Firm"] and BP:

- "We also interviewed two **BP representatives**, primarily regarding the **retention** of the Firm for the GCCF project."
- "At the inception of the engagement, the Firm insisted that its fees and disbursements be paid from money separate from the [$20 billion] fund. This has been the practice thus far, and **payment to**

---

[2] 943 So.2d at 348 (emphasis added).
[3] While this analysis is focused on the Louisiana Rules of Professional Conduct the attorney discipline rules of the other Gulf States are substantially similar and would likely impose similar obligations.
[4] See Agreement, sec.2 (a) (ii).
[5] See Agreement, sec. 4.
[6] See Agreement, sec. 6.
[7] See Memorandum from Michael B. Mukasey to Feinberg Rozen, L.L.P., October 8, 2010, "GCCF-Feinberg Rozen, LLP's Compensation", attached to plaintiffs' original memorandum as Exhibit "G" ["Mukasey Report"].

> the Firm is not provided for in the Trust Agreement that governs the $20 billion."

- "Under the current agreement between BP and the Firm, BP has agreed to pay the Firm $850,000 per month prospectively at the beginning of each month, plus disbursements."
- "All disbursements, including the cost of subcontractors, are charged to BP at cost without any mark up."
- "A BP representative explained that the flat fee approach simplifies the relationship with the Firm and is consistent with BP's goal of preserving the administrator's independence."
- "For over 15 years, the Firm has advised companies facing mass tort litigation, including companies in the pharmaceutical and airline industries, on route to settlement. The Firm also counts among its clients major financial institutions, insurance companies and government agencies."
- "Since the Firm was retained by BP in mid-June 2010, it has turned away three mediations."[8]

While the report concludes that the compensation is currently reasonable under attorney fees analysis, it also says that "we recommend that the parties continue the fees at the current rate, but agree to revisit at intervals of 4 months or some other fixed period" (emphasis added). Accordingly, BP and Feinberg will renegotiate Mr. Feinberg's fees every four months or so for the term of the GCCF process, giving BP control over Mr. Feinberg's compensation.[9]

Although the fee analysis refers to the Feinberg role as an "administrator" it also makes clear that the role is largely that of a law firm:

> The Firm's engagement on the GCCF has necessitated hiring two additional attorneys—one to work exclusively on the GCCF, and the other to work on the GCCF as well as other matters. Each of these attorneys is compensated by Feinberg Rozen at rates comparable to what they would make at a large D.C. law firm…. The Firm anticipates hiring additional staff attorneys to work exclusively on the GCCF.[10]

5. That the close association between BP and Mr. Feinberg was also reflected at a status conference held before Judge Barbier on October 15, 2010. One topic addressed at that conference was plaintiffs' concerns over preservation of evidence by the GCCF. In response, BP counsel, Mr. Andy Langan, said:

---

[8] Emphasis added throughout.
[9] See Agreement, sec 1.
[10] Mukasey Report at 12-13 (emphasis added).

Your Honor, in chambers yesterday, and this was raised, the question was … [BP's] position on paragraph 14 of Pretrial Order No. 1 being extended to the GCCF.

And what we told Your Honor was we objected to that as a technical matter because GCCF is not a party here. Having said that, I think **BP is quite happy to take appropriate steps to assure the Court that we've given appropriate instructions to Mr. Feinberg and his organization.**

So they are well aware of their obligations to preserve evidence. We have no problem with that and **we intend to follow-up** in a way that is satisfactory to Your Honor and to the plaintiffs.[11]

Three days later, Mr. Feinberg wrote to Judge Barbier saying that "I have been apprised that a concern was raised… regarding the preservation [of documents] by the [GCCF]" and assuring the judge that the GCCF is in compliance with PTO #1.[12]

6. That in a related letter from Mr. Langan to Plaintiffs' Liaison Counsel the melding between BP and GCCF is more clearly pronounced. Mr. Langan's letter is responding to a letter sent by Liaison Counsel **to Mr. Feinberg** regarding discovery. BP's counsel mounts a spirited response **on behalf of GCCF, opposing the discovery request.** Mr. Langan carefully details what he sees as the limited information that GCCF must produce, concluding that "there is nothing in PTO # 1 or the form of PPF on which plaintiffs can seek GCCF **internal deliberative materials**…."[13]

It is not apparent why BP would be answering a letter to Mr. Feinberg and raising the "internal deliberative materials" matter on behalf of an entity that is supposed to be independent of, and not influenced by, BP.[14]

7. The question of Mr. Feinberg's "independence" is also implicated in other issues that have surrounded some of Mr. Feinberg's conduct. Initially, it appeared that

---

[11] See Transcript of Status Conference held 10/15/10 attached to plaintiffs' original memorandum as Exhibit "N" at 25-26. Interestingly, in the transcript the Court refers to Mr. Feinberg as "…sort of a subcontractor of BP…." Transcript at 27.

[12] See Letter from Mr. Feinberg to Judge Barbier dated October 18, 2010 attached as Exhibit "S-A".

[13] See November 23, 2010 letter from BP counsel (Langan) to Plaintiffs' Liaison Counsel (Roy and Herman) attached as Exhibit "S-B".

[14] Early on Mr. Feinberg committed to a level transparency about his relationship with BP that has not come to pass. Responding to a reporter's questions on August 22nd Mr. Feinberg said: "There is no document. I absolutely agree with the thrust of your questions that my contract and payment terms [with BP] be made public." This was never done by Mr. Feinberg. See "More Details on Feinberg's Oil Spill Compensation Process" by Andrew Restuccia (8/23/10) attached as Exhibit "S-C".

Mr. Feinberg intended to honor the BP commitment, forced though it might have been, to respect the attorney-client relationship of claimants. The GCCF "Frequently Asked Questions" posted on its web-site early-on said that while a claimant was not required to hire a lawyer "you do have the right to be represented by a lawyer of your choosing. If you are represented by a lawyer, the GCCF will communicate with your lawyer rather than directly with you."[15]

On the other hand, many of Mr. Feinberg's early statements discouraged representation and seemed even hostile to the idea:

> You will get money quicker. You will get money with a certainty. You don't have to give 40% to your lawyer. Come in and get a check.

> Should you litigate? Is it a good idea? Absolutely not, it's a mistake; it's a mistake to litigate, but that's your choice. If you litigate, years of litigation, years! You may not win in your litigation against BP, and if you do win, give forty percent to your lawyer.

> I would urge everybody to file with this program and get your emergency payments if you're eligible. If I'm not going to pay you, I am dubious that you'll go to court and get paid.

> Why litigate? If I won't pay you, I urge, no one will pay you—the law is much more rigorous than I will be.[16]

8. That these statements, and others like them by Mr. Feinberg, are themselves violations of the Louisiana Rules of Professional Conduct. Rule 7.2 governs all "communications conveying information about a lawyer, a lawyer's services or a law firm's services". Rule 7.2 (c) (1) provides examples of statements that would be considered "false, misleading or deceptive". Such examples include: statements that promise results, or fail to disclose material information necessary to prevent the information from being false, misleading or deceptive.

9. That these statements, and many others referred to in plaintiffs' original motion and memorandum, and Declarant's prior declaration, violate Mr. Feinberg's own ethics expert's advice. Professor Stephen Gillers advised Mr. Feinberg that in order to avoid confusion about his role the following language should be included on the GCCF website and in other GCCF documents:

---

[15] See GCCF "Frequently Asked Questions" attached to plaintiffs' original memorandum as Exhibit "E".
[16] See sampling of Feinberg Press Statements attached as Exhibit "S-D".

> The GCCF is not a law firm. No one at GCCF can give
> you personal legal advice or advise you regarding
> settlement of any claims, including **whether to file a**
> **claim with GCCF or the worth of any claim you may**
> **have....**[17]

Professor Gillers says "[t]he goal of this language (tracking the *policy* behind Rule 4.3) is to ensure that claimants understand the nature of the facility and do not mistakenly infer that its personnel can give them legal advice...."[18] Virtually all of Mr. Feinberg's statements, some noted above, violate Professor Gillers' advice. Mr. Feinberg has consistently stated that everyone with a claim **should** pursue it through GCCF. That they **should not litigate, and that he will get them more than they would get through litigation.**

10. That Mr. Feinberg has also discouraged claimants from seeking legal representation by making it a practice to post third-party anti-lawyer editorials and articles prominently on the GCCF web-site, a site that is intended to assist claimants in filing claims.[19]

11. That discouraging legal representation is not the work of a truly independent administrator. At the very least an independent administrator would be indifferent. To be hostile to the legal representation of claimants is an adversarial position. In this case a BP position that benefits BP.

12. That on November 22, 2010 Mr. Feinberg released his GCCF Protocol for Interim and Final Claims ["Protocol"].   The press release announcing the Protocol does not mention, much less encourage, legal representation.[20] However, the press release does reference a 49 page legal memorandum by Harvard Professor John C.P. Goldberg purporting to "analyze" the legal principles associated with recovering economic loss from the Deepwater Horizon oil spill. **The GCCF, in the press release, characterizes the Goldberg memo as follows:**

> The Goldberg Memorandum makes clear that proximity to
> the spill is a major requirement for a valid legal claim under
> the Federal Oil Pollution Control Act (OPA). But,
> according to Feinberg, 'the GCCF will be much more
> generous than current Federal and State law'. Proximity is

---

[17] Gillers letter to Kenneth Feinberg dated December 28, 2010 at 7 attached to BP Opposition (emphasis added).
[18] Id. (emphasis in original).
[19] See sample editorials from the GCCF website attached to plaintiffs' original memorandum as Exhibits "I" and "J".
[20] See GCCF Final Protocol Press Release (11/24/10) attached as Exhibit "S-E".

not a bar to a GCCF claim, but damage must still be proven.[21]

While the cover letter to the Goldberg opinion is addressed to Mr. Feinberg, the "Scope of Analysis" indicates that "the analysis is *not* provided to establish the terms on which GCCF funds should be distributed" (emphasis in original); rather the report is "intended to provide an assessment of the **legal liability that BP and/or subsidiaries can be expected to face** if certain claims are pursued against it in courts of law" (emphasis added).[22]

In addition, the Goldberg opinion includes a further disclaimer:

> This report provides an interpretation of certain federal and state laws **for informational purposes only**. It is not intended as legal advice. **The only reliable manner for obtaining legal advice is to consult with an attorney.** This report is being made available to the public and is not intended to create an attorney-client relationship with any individual.[23]

Therefore, potential claimants are discouraged from engaging their right to counsel, but they are provided legal advice by Mr. Feinberg through an adversarial, phantom legal opinion that just happens to support the GCCF/BP view, while at the same time disclaiming any professional responsibility. Moreover, claimants are not even alerted that the opinion that Mr. Feinberg cites in his press release to discourage legal representation says explicitly that the only way to assure reliable legal advice is to "consult with an attorney".

13. That Declarant understands there are many reasons why both BP and Mr. Feinberg would prefer to avoid the inconvenience of having their relationship properly characterized as attorney-client. However, the proper characterization is critical to advancing those duties that run to third-parties, such as the claimants and putative class members. The Court in the *Austin* opinion made it quite clear that the existence of an attorney-client relationship is fundamentally factual and not just a matter of how the parties describe it. As the Court said, the "**overarching question** is whether there is a reasonable, **objective** basis to determine that an attorney-client relationship has formed." The wisdom of this decision is evident in a contrary approach: a party and an attorney could circumvent many of the ethical rules simply by agreeing that they will not call their relationship that of an attorney and a client.

14. That it is a matter of no small concern that BP and Mr. Feinberg currently take the position that Mr. Feinberg is answerable to no one; no rules govern his

---

[21] See Exhibit "S-E" at 2.
[22] See Goldberg Memorandum attached as Exhibit "S-F" at 6.
[23] See Id. at 1 (emphasis added).

conduct. BP asserts the Court has no authority to supervise Mr. Feinberg or the GCCF. Professors Ciolino and Gillers assert that he is not governed by the Rules of Professional Conduct, unless perhaps he commits a crime. Mr. Feinberg is not answerable to the White House or Congress. He is not a court supervised special master, nor is he carrying out some legislative mandate. He is apparently, according to BP, totally unfettered!  Except of course for a provision in their Agreement with Mr. Feinberg, which says "Feinberg Rozen shall perform its obligations…in a manner consistent with…BP's Code of Conduct." Not subject to the Court, Congress, the President or the Office of Disciplinary Counsel, but to BP.

## CONCLUSION

15. That whether or not there is an attorney- client relationship between Mr. Feinberg and BP is determined by "reasonable, objective" indicia and not the self-serving disclaimers of BP, Mr. Feinberg or the GCCF website.

16. That, as noted above, and in Declarant's original declaration, and as noted in plaintiffs' motion, there is abundant evidence that Mr. Feinberg is not independent from BP and that a relationship exists that would be governed by the Rules of Professional Conduct of Louisiana and other Gulf States.

17. That Mr. Feinberg's conduct implicates numerous duties owed to third parties, the Court and to the administration of justice.

**Signed this _____ day of December, 2010.**

**Basile J. Uddo**

Notary _Soren C. Sleson_

Bar No. _2630_

**GCCF**        Gulf Coast Claims Facility

October 18, 2010

Judge Carl J. Barbier
500 Poydras Street, Room C 256
New Orleans, LA  70130

Dear Judge Barbier:

      I have been apprised that a concern was raised in the conference before the Court on October 15, 2010 regarding the preservation by the Gulf Coast Claims Facility of evidence that may be relevant to the civil actions transferred to the Court by order of the Judicial Panel on Multi District Litigation pursuant to its order of August 10, 2010. I have reviewed the Court's Pretrial Order #1 dated August 10, 2010, including the Court's mandate regarding Preservation of Evidence (August 10, 2010, Pretrial Order # 1, Paragraph 14) and I hereby assure the Court that the GCCF is in full compliance with the Court's order regarding preservation of evidence.

Sincerely,

Kenneth R. Feinberg
Claims Administrator
Gulf Coast Claims Facility

EXHIBIT

A

Uddo Ex. S-A

# KIRKLAND & ELLIS LLP

**AND AFFILIATED PARTNERSHIPS**

300 North LaSalle Street
Chicago, Illinois 60654

J. Andrew Langan, P.C.
To Call Writer Directly:
(312) 862-2064
andrew.langan@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

November 23, 2010

**Via E-Mail**

James Parkerson Roy
Domengeaux Wright Roy & Edwards LLC
556 Jefferson Street, Suite 500
Lafayette, LA 70501

Stephen J. Herman
Herman Herman Katz & Cotlar LLP
820 O'Keefe Avenue
New Orleans, LA 70113-1116

Re: *IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON,"*
*MDL No. 2179 -- GCCF*

Dear Jim and Steve:

Your November 22 letter to Kenneth R. Feinberg calls for a response by BP Exploration & Production Inc., because the letter is based on several flawed premises.

First, GCCF is not a party to MDL 2179 and is not responding to discovery requests in that proceeding. According, the premise of your letter that GCCF is somehow "withholding" information otherwise due to be produced by GCCF as part of discovery in the litigation is wrong.

Second, Judge Barbier has already denied the MDL 2179 plaintiffs' efforts to take discovery of GCCF:

> THE COURT: . . .The next item is the discovery related to the Gulf Coast Claims Facility. I know there are, and I know this just from speaking with liaison counsel and from reading the newspapers and watching the TV/media reports, that there have been a lot of concerns by certain people in the public, by certain attorneys about the Gulf Coast Claims Facility and how that's operating and so forth. **But I don't see the relevance of discovery — how the discovery of contracts or other communications between BP**



EXHIBIT
B

Uddo Ex. S-B

# KIRKLAND & ELLIS LLP

November 23, 2010
Page 2

> and Mr. Feinberg's firm or his internal guidelines, protocols,
> other documents, those sorts of things, really are relevant to
> any claims involved in this litigation

(10/15/10 Tr. at 22)  And then the Judge stated:

> THE COURT: Okay. Very well. So I'm going to deny the
> plaintiff's request for discovery on the GCCF.

(10/15/10 Tr. at 24).

Plaintiffs' November 22 letter presumes that this October 15 ruling never happened.

Third, the process by which GCCF plans to make relevant parts of files available arises from plaintiffs' own discovery obligations under CMO #1 (PTO #11).  That is, at your request, so plaintiffs and plaintiffs' counsel could avoid reproducing information that some of them had provided to GCCF, the parties have been discussing allowing access to information those plaintiffs may have provided to GCCF, to be provided through authorizations on the PPF form approved by Magistrate Judge Shushan.  It was never the defendants or the Court's intention that by accommodating plaintiffs in this way, that process would be a back door to GCCF's internal files -- the very discovery that Judge Barbier refused to allow.

The only material that might properly be accessed from GCCF are materials submitted by plaintiffs to GCCF, plus (where applicable) any communication from GCCF to plaintiff about the state of a GCCF claim.  No other materials are responsive or relevant.  This is evident from the language of PTO #11 (CMO #1), which states in relevant part:

> "Plaintiffs' Liaison Counsel may confer with BP Liaison counsel
> and the Administrators of the Gulf Coast Claims Facility
> ("GCCF") regarding the feasibility and/or desirability of making
> relevant information and/or documentation submitted by
> Plaintiffs who have filed actions in the MDL to the GCCF
> available to Defendants, (subject to appropriate confidentiality
> and privacy considerations), in order to complete the PPF
> and/or to facilitate other additional discovery as may be
> required over the course of the litigation." (PTO #11, V(C).)

# KIRKLAND & ELLIS LLP

November 23, 2010
Page 3

Further, the PPF form approved by the Court contemplates a narrow band of information to be produced by GCCF, as the court-approved form of authorization states:   GCCF is "hereby authorized to release to the Defendants ... all information and documents submitted by above-named Plaintiff and information regarding the status of any payment on the claim ..."

There is no basis in PTO #11 or the form of PPF on which plaintiffs can seek GCCF internal deliberative materials; and the Court has already denied this sort of discovery in any event.

Sincerely,

J. Andrew Langan, P.C.

cc      Liaison Counsel
        Kenneth R. Feinberg

**The Washington Independent**

http://washingtonindependent.com/95489/more-details-on-feinbergs-oil-spill-compensation-process

# More Details on Feinberg's Oil Spill Compensation Process

By Andrew Restuccia 8/23/10 11:31 AM

Yesterday afternoon, Kenneth Feinberg, who takes over as independent administrator of BP's $20 billion oil spill compensation fund, briefed reporters on how the claims process will work.

I wrote a story today on that process, but there were a number of things Feinberg said during the briefing that didn't fit into the story.

**Right to sue.** Feinberg will require all claimants who accept a final, lump-sum payment (not the interim emergency payments) to waive their right to sue BP, but he has not yet decided whether he will require claimants to also waive their right to sue the other parties involved with the spill, including Transocean and Halliburton.

"That issue has not been resolved. The question of whether or not a final payment will release one defendant, BP, or all defendants has not yet been resolved by me," Feinberg said. "You hear arguments on both sides. The simple answer is that the issue has not been resolved."

**Compensation for realtors.** Feinberg said he has negotiated an agreement with the National Association of Realtors to set aside no more than $60 million to compensate Gulf realtors' for losses from the spill.

"I do not believe that it will be necessary to set aside that much money," he said, adding that he plans to finalize the agreement today. The money will be distributed outside of Feinberg's compensation process by real estate associations in the Gulf.

**His own compensation.** Feinberg said **there is no written contract between him and BP laying out his responsibilities and compensation.** Responding to a question from a reporter, Feinberg said, "There is no document. I absolutely agree with the thrust of your questions that my contract and payment terms be made public." He said he would be releasing in the coming weeks a "fully transparent, open budget" that will outline the how the program will be run, the amount of money required to run the program and how much he is being paid.

**Volume.** He expects a "flood of early emergency claims" now that he has taken over the process and has hired additional staff to handle process the filings.



EXHIBIT

C

Uddo Ex. S-C

# BP Fund Official: 'No Need for Individuals to Sue'

http://www.local15tv.com/news/local/story/BP-Fund-Official-No-Need-for-Individuals-to-Sue/3bhyJYiMDEq7qysfB5-82w.cspx

Reported by: Associated Press
Email: local15@local15tv.com

Published: 7/12 5:35 pm
Updated: 7/12 6:13 pm

(PENSACOLA BEACH, Fla.) (AP) - The head of the $20 billion Gulf oil spill compensation fund urged individuals and businesspeople not to sue BP - at least not yet - and said emergency payments would soon be increased.

Fund administrator Kenneth Feinberg said those who've suffered losses from the spill should wait and see how much he could settle their claim for before suing.

"There's no reason to litigate. Don't file a lawsuit, at least not yet," he said. "Take the emergency payments to stay in business, consider the final check that I will offer. If you think it's reasonable, it's fair, take it and then and only then sign off."

He added: "You will not get a better deal filing a lawsuit and litigating for five years."

More than 200 lawsuits have been filed by fisherman and others against BP PLC and Transocean Ltd., which leased the Deepwater Horizon drilling rig that exploded April 20.

Feinberg, appearing at a beachside restaurant with Gov. Charlie Crist and a host of local officials, said emergency payments, which are being issued in monthly checks, would begin to be handed out in six-month sums in the next couple weeks.

"The oil's still spilling. It doesn't make any sense to make people come back a second month and a third month," he said.

In the hour long meeting, Feinberg sought to clear up confusion among those filing claims. He said claims can still be filed even if businesses are not located directly on the beach.

Corroboration of losses is needed, but he said he would "bend over backwards to find corroboration." And once the amount of loss was determined by him, he said, it would be paid out at 100 percent.

Feinberg said his biggest challenge is getting people to file claims. He said many worry their information would be turned over to the IRS or immigration officials.

"I don't work for BP and I don't work for the Obama administration," he said. "I work for the people of the Gulf."

(Copyright 2010 by The Associated Press. All Rights Reserved.)



EXHIBIT

D

Uddo Ex. S-D

# Feinberg: BP 'Trying to Do the Right Thing' But Claims Need Expedited

http://www.pbs.org/newshour/bb/politics/jan-june10/oil2_06-18.html

PBS Interview in Baton Rouge, LA - June 18 2010

"We have got to get quick money out to eligible claimants much quicker, with a minimum amount of bureaucracy and corroboration. BP started to do that. I give them credit. We have got to do it quicker. And then we have got to develop over the next couple of week, not months, a claim form and a system to come up with a comprehensive amount, a certain amount, that will be paid promptly to all eligible claimants."

"...one way we may do this is look and see, what would the state courts of Louisiana say about the legitimacy of that claim?

But I don't want to get hung up on just those claims. They may be in the thousands. Much more importantly right away is the president's admonition to me, prompt payment on an emergency basis to individuals and small businesses that have legitimate claims."

"I make the same argument I do with all of these claims facilities: You will get money quicker. You will get money with a certainty. You don't have to give 40 percent to your lawyer. Come in and get a check."

**14:46** – "But if you want this check, here it is and in return, now unlike the emergency payments, now you sign you will not sue."

## BP Claims - Are BP Claims Promises Being Kept? Pt 2/3

http://www.youtube.com/watch?v=mOvdywgsVJ0&list=UL&playnext=1

Note: The first part of this video is duplicated from the BP Claims – Are BP Claims Promises Being Kept? (Pt1/3)

**9:10** – "My objective here is to convince everybody to enter the fund. There is no obligation, get emergency funding. There is no obligation, ultimately, down the road, sixty, ninety days, one hundred twenty days, six months from now, take this check. We think it is fair. Think it over. Talk to your lawyer, your accountant, your priest, your rabbi. Take the check and only then give up your right to litigate."

**10:05** – "Should you litigate? Is it a good idea? Absolutely not, it's a mistake; it's a mistake to litigate, but that's your choice. If you litigate, years of litigation, years! You may not win in your litigation against BP, and if you do win, wonderful, give forty percent to your lawyer."

**10:57** – "I believe what BP has done, with this administration, is absolutely the right way to go."

## BP - Kenneth Feinberg - BP Claims - Promises & Praise - Pt 3/3

http://www.youtube.com/watch?v=SwlUiguw3Hk&list=UL&playnext=2

**2:20** – Develop a methodology for determining loss that is applicable to all fishermen, all shrimpers, all motels. Come up with a cluster, an approach that would include all of a type of a profession.

**4:21** – "Wanted to provide everyone with some degree of certainty as to how this program, in the next thirty days, is likely going to work."

**4:40** – "There would be no sense at all driving BP into bankruptcy. That would be a disaster, a disaster."

# Claims to BP Fund Attract Scrutiny - Summary

**The New York Times _ Published: October 2, 2010**

http://www.nytimes.com/2010/10/03/us/03feinberg.html?pagewanted=2&_r=1&ref=kenneth_r_feinberg

JOHN SCHWARTZ

Kenneth R. Feinberg spent part of his summer barnstorming towns near the Gulf of Mexico, urging people who felt they had suffered financial hardship because of the oil spill to apply for a share of the $20 billion BP fund he was overseeing. **The point of the fund was to pay claims rather than litigate them in court.**

Enlarge This Image



Kenneth R. Feinberg is overseeing the $20 billion BP fund to compensate victims of the oil spill.

**"It's my opinion you are crazy if you don't participate,"** Mr. Feinberg told a crowd at one stop in Louisiana.

"They're not just sitting there," he said. "We can't pay them without more documentation — **minimal documentation, but enough to process the claim."**

Some plaintiffs' lawyers are rankled by complaints about claims because they lack documentation. **Stephen J. Herman, a New Orleans lawyer, called it "kind of ironic" to have Mr. Feinberg complaining about lack of documentation when he all but discouraged people from using lawyers to pursue their claims.**

**"If you'd had lawyers helping people fill out their claims forms, you'd probably have better documentation,"** he said.

**"I don't want to chill people from applying,"** he said.

# Kenneth Feinberg talks about the oil spill claim process: see the video

http://www.nola.com/news/gulf-oil-spill/index.ssf/2010/09/kenneth_feinberg_talks_about_t.html

**Times - Picayune**      **9-29-10**

**2:55** - No eligible claim is more than four days from being approved and paid -- emergency payment "no brainer"

**10:50** - After November 23rd 2010 - all payments final - no lawsuits - final release may include all potential defendants - BP - Halliburton - TransOcean - etc

**17:00** - 80 - 90,000 emergency claims and expects the same amount of final claims (same people)

**25:38** - Not working for BP

**26:00** - Paid business claims to 10M - 85% of individual claims are 50K or less 95% of business claims are 200K or less

**28:15** - Proximity claims discussion - says law would limit claims

**30:40** – "*Parking*" hotel claims -- thinking about settling with BP later

**34:10** – "Will not supply info to IRS other than sending a 1099 " information is proprietary and sealed with me"

**35:50** - Indian Tribes - loss of subsistence because of damaged area in Gulf    **
"absolutely I will pay a loss of subsistence"



**37:56** - "*let's corral the claims*" - "*why litigate*" - "*If I won't pay you, I urge, no one will pay you*" - "*the law is much more rigorous than I will be*"

**45:10** - "right now it's found money"

**46:00** - explains the 20B$ fund - saying BP has already spent 4B on cleanup which leave 16B that is also supposed to include government claims

Case 2:10-md-02179-CJB-DPC   Document 990-6   Filed 01/17/11   Page 20 of 72    E

# Fw: BP Oil - GCCF Final Protocol / Release / Memo from Goldberg at Harvard / Press Release

| | |
|---|---|
| **From:** | Basile Uddo <buddo@earthlink.net> |
| **To:** | uddolaw |
| **Subject:** | Fw: BP Oil - GCCF Final Protocol / Release / Memo from Goldberg at Harvard / Press Release |
| **Date:** | Nov 24, 2010 9:36 AM |
| **Attachments:** | GCCF Protocol for Interim and Final Claims 2010.pdf Goldberg Memorandum of Law 2010.pdf |

-----Forwarded Message-----
From: Steve Herman
Sent: Nov 24, 2010 8:19 AM
To: Basile Uddo
Cc: jimr@wrightroy.com
Subject: BP Oil - GCCF Final Protocol / Release / Memo from Goldberg at Harvard / Press Release

FYI - See attached and below.

FOR IMMEDIATE RELEASE
November 24, 2010

**Gulf Coast Claims Facility Releases Final Protocol**
**Outlining Final & Interim Payment Stage**
*Report by Renowned Harvard Professor on Proximity & OPA Also Released*

Kenneth R. Feinberg, Administrator of the Gulf Coast Claims Facility (www.gulfcoastclaimsfacility.com
<http://www.gulfcoastclaimsfacility.com/> ) today released the final protocol for payments for the victims of the BP oil spill.
"Claimants will have a choice. They can accept a lump sum final payment for all present and future damage and surrender
their right to sue by signing a full release, or they can continue to receive quarterly interim payments based upon documented
past damage for that three month period; however, there is no guarantee that, in the future, a lump sum Final Payment will be
as generous as it will be currently," stated Feinberg.

With the Emergency Payments ending yesterday with approximately $2 billion paid to 125,000 individuals and businesses in the
Gulf, today begins the Final Payment stage which will last until August 23, 2013.  Because of a huge flood of last
minute emergency claim submissions, the GCCF will need until December 15 to handle all emergency claims that were filed.
The GCCF will then turn its attention to the Final Payment phase.

In order to receive a final or interim payment, claimants must complete an interim or Final Payment Form. Claimants do not
need to resubmit documentation. Claim forms can be submitted via the internet through the website at
www.gulfcoastclaimsfacility.com <http://www.gulfcoastclaimsfacility.com/> , or by visiting one the 35 claims offices in the
gulf, or by US Postal Service: GCCF, P.O. Box 9658, Dublin, OH 43017-4958 or by overnight, certified or registered mail:
GCCF, 5151 Blazer Parkway, Suite A, Dublin, OH, 43017-4958 or by fax: 1-866-682-1772, or by email: info@gccf-
claims.com
<http://vocuspr.vocus.com/vocuspr30/LocalTemp/80020700036/1026/10752/JSComponents/FCKeditor243/editor/info@gccf
-claims.com> or by phone: 1-800-916-4893; multilingual line: 1-800-916-4893 or TTY: 1-866-682-1758.

In order to receive a final payment  which is completely voluntary, claimants must sign a release (a copy is available at
www.gulfcoastclaimsfacility.com <http://www.gulfcoastclaimsfacility.com/> ) which, according the Final Protocol
(available at: http://www.gulfcoastclaimsfacility.com/proto_4): "will waive any rights the claimant may have against BP and
any other potentially liable parties to assert additional claims, to file an individual legal action, to participate in other legal
actions associated with the Spill, or to submit any claim for payment by the National Pollution Funds Center."

Interim payments cover only substantiated, past damages. An Interim Payment does not cover any future damages. An
interim claim may not be submitted more frequently than once per quarterly period, unless the claimant can demonstrate the
presence of pressing circumstances, in which case an Interim Claim may be submitted more than once every quarter. An
interim claim for the first quarter may be submitted up to and including December 31. An Interim Claim for the second
quarter may be submitted up to and including March 31, third quarter submitted up to and including June 30 and fourth
quarter, up to and including September 30.

**EXHIBIT**

**E**

Uddo Ex. 5

There will be a limited nonbinding GCCF appeals process for those claimants who receive compensation in excess of $250,000 but believe it was inadequate. All claimants will be able to appeal their GCCF awards, regardless of amount, to the Coast Guard and the Federal Court pursuant to existing law.

Also released today is a comprehensive Memorandum of Law by noted Harvard Professor John C.P. Goldberg (available at www.gulfcoastclaimsfacility.com <http://www.gulfcoastclaimsfacility.com/> ). The Goldberg Memorandum makes clear that proximity to the spill is a major requirement for a valid legal claim under the Federal Oil Pollution Control Act (OPA). But, according to Feinberg, "the GCCF will be much more generous than current Federal or State Law. Proximity is not a bar to a GCCF claim, but damage must still be proven."



###

```
Basile J. Uddo
Attorney at Law
Suite 724
3445 N. Causeway Blvd.
Metairie, LA 70002
(504) 834-1819
(504) 832-7208 FAX
```



# HARVARD LAW SCHOOL
CAMBRIDGE • MASSACHUSETTS • 02138

JOHN C. P. GOLDBERG
*Professor of Law*

November 22, 2010

Kenneth R. Feinberg, Esq.
Feinberg Rozen, LLP
The Willard Office Building
1455 Pennsylvania Ave., N.W.
Suite 390
Washington, D.C. 20004-1008

Dear Mr. Feinberg:

Attached please find, as per your request, a report on liability for economic loss in connection with the Deepwater Horizon oil spill.

Sincerely Yours,

John C. P. Goldberg

Enc.



Uddo Ex. S-F

TEL: 617-496-2086 • FAX: 617-496-4866 • jgoldberg@law.harvard.edu

Liability for Economic Loss in Connection with the Deepwater Horizon Spill

John C. P. Goldberg[*]

Nov. 22, 2010

[*] Professor, Harvard Law School.  The author gratefully acknowledges the invaluable research assistance of Deepa Alagesan, Morgan Goodspeed, Andrew Kaufman, Kostya Lantsman, and Benjamin Mundel.  The views expressed in this report are the author's — they do not necessarily represent the views of Harvard Law School or Harvard University. This report provides an interpretation of certain federal and state laws for informational purposes only.  It is not intended as legal advice.  The only reliable manner for obtaining legal advice is to consult with an attorney.  This report is being made available to the public and is not intended to create an attorney-client relationship with any individual.

TABLE OF CONTENTS

EXECUTIVE SUMMARY ...................................................................... 3

I.    THE DEEPWATER HORIZON SPILL AND THE GULF COAST CLAIMS FACILITY ... 4
      A.  The Spill ..................................................................... 4
      B.  The Gulf Coast Claims Facility ............................................. 4

II.   SCOPE OF ANALYSIS ................................................................ 6

III.  LIABILITY FOR ECONOMIC LOSS UNDER THE OIL POLLUTION ACT ........... 6
      A.  OPA's Liability Provisions................................................ 7
          1.  Liability Trigger ..................................................... 7
          2.  Recoverable Costs and Damages ...................................... 8
          3.  Scope of Liability.................................................... 9
          4.  Summary of Key Features of OPA's Liability Scheme ................ 10
      B.  OPA Liability for Economic Loss: The "Due To" Requirement............ 11
          1.  Distinguishing Economic Loss Parasitic on Harm to One's Own Property............ 11
          2.  The Universe of Potential Pure Economic Loss Claimants............................ 12
          3.  Proof of Economic Loss and Actual Causation ...................... 15
          4.  Section 2702(b)(2)(E)'s "Due To" Clause ........................... 16
      C.  Scope of Liability under Section 2702(b)(2)(E) ...................... 25
          1.  Common Law Background............................................... 25
          2.  Legislative History.................................................. 33
          3.  Judicial Interpretation............................................... 34
          4.  Policy Considerations ............................................... 35
      D.  Application of Section 2702(b)(2)(E) .............................. 39

IV.   LIABILITY FOR ECONOMIC LOSS UNDER STATE LAW .............................. 42
      A.  OPA's Savings Clause ................................................. 42
      B.  Scope of Liability Under Gulf-State Statutes ....................... 44

CONCLUSION............................................................................ 48

APPENDIX: KEY PROVISIONS OF THE OIL POLLUTION ACT OF 1990 ...................... 49

### EXECUTIVE SUMMARY

This report provides an assessment of the scope of liability under federal and state law for economic loss in connection with the 2010 Deepwater Horizon oil spill.  In this context, the term "economic loss," refers specifically to lost profits and earning capacity unrelated to any injury to one's person or property.  For example, an oil spill that contaminates a fishery might cause economic loss to commercial fishermen who rely on it, even though neither the fishermen nor their property is harmed.

Admiralty law and state tort law have traditionally set strict limits on liability for economic loss.  The Federal Oil Pollution Act of 1990 ("OPA") has expanded this domain of liability by imposing strict liability on responsible parties for certain kinds of economic loss resulting from oil spills onto navigable waters and shorelines.  Under OPA, a person may obtain compensation for economic loss from a party responsible for a spill if she can prove that her loss is "due to" harm to property or resources that "result[s] from" the spill, irrespective of whether she owns that property or those resources.  This statutory language is best understood to allow recovery only by those economic loss claimants who can prove that they have suffered economic loss because a spill has damaged, destroyed or otherwise rendered physically unavailable to them property or resources that they have a right to put to commercial use.  Thus, if a spill were to deprive commercial fishermen of expected profits by killing fish they ordinarily would catch and sell, or by causing authorities to bar the fishermen from accessing those fish for a period of time, the fishermen would be entitled to recover.  By contrast, operators of beach resorts in areas physically unaffected by a spill, but that nonetheless suffer economic loss because of a general downturn in tourism resulting from the spill, are among those who are not entitled to recover under OPA.

Liability for economic loss under the laws of the Gulf States appears to be no broader than liability under OPA, and in most instances narrower.

3

## I. The Deepwater Horizon Oil Spill and the Gulf Coast Claims Facility

### A. The Spill

On April 20, 2010, an explosion and fire occurred on the Deepwater Horizon drilling rig, located approximately 50 miles off the Louisiana coast.  The rig was owned by Transocean Ltd., and was operated under a lease by BP Exploration and Production, Inc., a subsidiary of BP, plc. ("BP").  Tragically, 11 workers were killed and 17 others injured.  The rig sunk two days later.  It soon became apparent that the well being drilled by the rig was leaking oil.  That leak was not staunched until almost three months later – July 15, 2010.[1]

Between April 20 and July 15 an estimated 5 million barrels of oil – over 200 million gallons – entered Gulf waters.[2]  The Deepwater Horizon spill ("the Spill") was thus the largest ever to have occurred in U.S. waters.[3]  How much of the released oil has been removed by a combination of natural processes and human intervention is unclear, with estimates varying widely.  Oil sludge and tar balls thought to be associated with the spill have been found on Gulf Coast beaches as far east as the Florida Panhandle and as far west as Texas.

### B. The Gulf Coast Claims Facility

On June 16, 2010, following a meeting between BP officials and President Obama, BP agreed to create a fund to compensate victims of the Spill.  BP pledged to contribute a total of $20 billion to the fund over a 40-month period, and further agreed to set aside $20 billion in U.S. assets

---

[1] In September, 2010, Retired Coast Guard Admiral Thad Allen, appointed by the Obama administration to coordinate efforts to stop the leak, deemed the well "effectively dead."  *See, e.g.,* Henry Fountain, *U.S. Says BP Well is Finally 'Dead,'* N.Y. Times, Sept. 19, 2010, at A14.

[2] *See, e.g.,* Jane Lubchenco, *et al.,* BP *Deepwater Horizon Oil Budget: What Happened to the Oil?,* http://www.noaanews.noaa.gov/stories2010/PDFs/OilBudget_description_%2083final.pdf (last visited November 16, 2010).

[3] By comparison, it is estimated that between 11 and 32 million gallons of oil were released in the *Exxon Valdez* disaster.  The *Exxon Valdez* spill involved a heavier form of oil than did the Deepwater Horizon spill, which might have implications for the harm caused by the respective spills, and the relative difficulty and expense of removal efforts.

4

to ensure the availability of adequate funds.[4]  BP further indicated that the funds would be disbursed through a claims facility now known as the Gulf Coast Claims Facility ("GCCF").

The GCCF is described by BP as "an independent claims facility for submission and resolution of claims of Individuals and Businesses for costs and damages incurred as a result of the oil discharges due to the Deepwater Horizon incident on April 20, 2010."[5]  BP has designated Kenneth R. Feinberg, Esq. to act as the Claims Administrator for the fund.  According to BP, Mr. Feinberg acts independently of BP and is fully responsible for the administration and disbursement of funds via the GCCF.[6]

Claims filed with the GCCF are *not* claims that seek to establish BP's liability under federal or state law.  The validity of these claims will instead be determined in accordance with the rules and procedures specified by the Claims Administrator.  Those who file claims with the GCCF are permitted separately to initiate or continue legal actions.  However, in order to obtain a final payment of GCCF funds, a claimant will be required by GCCF to waive any legal right she might have against BP for harms suffered in connection with the Spill.  Under the rules thus far specified by the Claims Administrator, eligible claimants include: "Individuals and Businesses that have incurred damages as a result of the Spill for Removal and Clean Up Costs, Damage to Real or Personal Property, Lost Earnings or Profits, Loss of Subsistence Use of Natural Resources, or Physical Injury or Death."[7]

---

[4] *See* Jonathan Weisman & Guy Chazan, *BP Agrees to $20 Billion Fund*, WALL STREET JOURNAL, Jun. 17, 2010, at A1; Press Release, BP, BP Forms Gulf of Mexico Oil Spill Escrow Trust (Aug. 9, 2010), *available at* http://www.bp.com/genericarticle.do?categoryId=2012968&contentId=7064316 (last visited Nov. 10, 2010).

[5] Gulf Coast Claims Facility, http://www.gulfcoastclaimsfacility.com/faq (last visited Nov. 10, 2010).

[6] *Id.*

[7] *Id.*

## II. Scope of Analysis

The analysis that follows is *not* provided to establish the terms on which GCCF funds ought to be distributed.  The GCCF was voluntarily established by BP and the criteria for distribution of its funds will be determined by the Claims Administrator.  This report is instead intended to provide an assessment of the legal liability BP and/or its subsidiaries can be expected to face if certain claims against it are pursued in courts of law – specifically, claims seeking compensation for economic loss not predicated on personal injury or physical damage to the claimant's property.  As explained below, although federal and state law provide substantial guidance on the resolution of such claims, courts have not fully specified the rules that would apply to such claims.  As a result, this analysis – like any analysis of partially open legal questions – requires judgments that are to some degree debatable.  The focus will be on the federal Oil Pollution Act, which was enacted by Congress in part to provide relief to persons suffering certain forms of economic harm as a result of the release of oil into navigable waters.  In addition, liability for economic losses under the laws of Gulf states will be discussed briefly.

## III. Liability for Economic Loss Under the Oil Pollution Act

On August 18, 1990, President George H.W. Bush signed into law the Oil Pollution Act of 1990 ("OPA" or "Act").[8]  The Act aims both to reduce the incidence of oil spills and to provide for remediation and compensation for spills that do occur.

The immediate impetus for the adoption of OPA was the March, 1989 *Exxon Valdez* oil spill in Prince William Sound, Alaska.  However, Congress had for the preceding fifteen years been attempting to fashion a law for oil spills to replace the patchwork regulation provided by other

---

[8] 33 U.S.C. §2701, *et seq.* (2004).

federal laws, including the Clean Water Act ("CWA")[9] and the Trans-Alaska Pipeline Authorization Act ("TAPAA"),[10] and to ensure that federal oil pollution control law would mesh appropriately with other environmental laws, especially the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"),[11] as well as state laws. Prior to 1990, these efforts had failed to produce enacted legislation, in part because of disputes within Congress as to whether the envisioned law would coexist with state oil pollution laws or supersede them.

## A. OPA's Liability Provisions

### 1. Liability Trigger

OPA's basic liability scheme is set out in Section 1002(a) of the statute, codified at 33 U.S.C. § 2702(a). It is then refined in subsequent sections. In relevant part, Section 2702(a) reads as follows:

> [E]ach responsible party for ... a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines ... is liable for the removal costs and damages specified in [Section 2702(b)] that result from such incident.[12]

The term "responsible party" includes any lessee or permittee of an area in which an "offshore facility" is located.[13] "Offshore facility" is defined to include any "facility"[14] that is "located in, on, or under any of the navigable waters of the United States."[15] Oil leaking from a facility counts as oil

---

[9] Federal Water Pollution Control Act (commonly known as the Clean Water Act), codified as amended at 33 U.S.C. §§ 1251–1387 (2000).

[10] Trans-Alaska Pipeline Authorization Act of 1973, codified as amended at 43 U.S.C. §§ 1651–1656 (2000).

[11] Comprehensive Environmental Response, Compensation, and Liability Act of 1980 and Superfund Amendments and Reauthorization Act of 1986, codified as amended at 42 U.S.C. §§ 9601–9675 (2002).

[12] 33 U.S.C. § 2702(a).

[13] Id. § 2701(32)(C).

[14] "Facility" includes "any structure ... equipment, or device (other than a vessel) which is used for ... exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil." Id. § 2701(9).

[15] Id. § 2701(22).

7

being "discharged" under the statute.[16]  The phrase "navigable waters" is defined as "waters of the United States, including the territorial sea."[17]

Responsible-party liability for recoverable costs and damages that result from an oil discharge is *strict* – an eligible claimant can obtain compensation without having to prove that the discharge resulted from carelessness or other wrongdoing on the part of the responsible party or its employees.[18]  However, liability is not absolute: OPA recognizes a narrow set of defenses.[19]  A responsible party can avoid liability altogether by proving that the discharge of oil and resulting damages or removal costs were "caused solely by" an act of God, an act of war, or an act or omission of certain third parties.[20]  OPA also bars particular claims that would otherwise be valid if the incident giving rise to the claim "is caused by the gross negligence or willful misconduct of the claimant."[21]

## 2. *Recoverable Costs and Damages*

As noted above, a party that is responsible for a spill under OPA section 2702(a) is required to compensate fully certain *removal costs* and *damages* incurred as a result of the spill.[22]  These costs and damages are specified in Section 2702(b).  Removal costs – the costs of clean-up – are recoverable by governmental entities, and by any person who takes actions consistent with the National Contingency Plan.  Section 2702(b)(2) sets out six types of damages that are recoverable.  Three can only be recovered by, or on behalf of, governmental entities: natural resources damages, lost tax and

---

[16] *Id.* § 2701(7).
[17] *Id.* § 2701(21).
[18] Rice v. Harkin Exploration Co., 250 F.3d 264, 266 (5th Cir. 2001).
[19] All of the following complete defenses are lost if the responsible party does not comply with certain reporting requirements. 33 U.S.C. § 2703(c).
[20] *Id.* § 2703(a).  Even if a "third party" is the sole cause of a discharge and resulting costs and damages, the responsible party is not spared from liability if the third party was acting pursuant to a contractual relationship with the responsible party.  Moreover, even when a fully independent third party is the sole cause of a discharge and resulting costs and damages, the responsible party cannot escape liability unless it proves that it exercised due care to prevent a release of oil, and took precautions against foreseeable acts of third parties. *Id.* § 2703(a)(3).
[21] *Id.* § 2703(b).
[22] OPA does not provide for punitive damages.

8

other revenues traceable to damage to real or personal property, and costs associated with the provision of public services during or after removal activities.[23] The remaining three subsections of Section 2702(b)(2) set out distinct types of recoverable damages and identify different classes of claimants who may recover them, as follows:

- Under Section 2702(b)(2)(B) "injury to, or economic losses resulting from destruction of, real or personal property" is recoverable by a claimant who "owns or leases that property."[24]

- Under Section 2702(b)(2)(C) a person who uses natural resources for subsistence may recover for damage to, or loss or destruction of, those natural resources.[25]

- Under Section 2702(b)(2)(E) "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources" are recoverable by "any claimant."[26]

### 3.  *Scope of Liability*

OPA places caps on responsible party liability, though the caps can be forfeited, as explained below.  For offshore facilities other than deepwater ports, the cap is $75 million per responsible party per incident.[27]  Any damages for which the responsible party is responsible, as well as removal costs incurred by the responsible party itself, count toward the cap.  Removal costs incurred by government actors do not.[28]  Under Section 2704(c)(1), the cap does not apply

if the incident was proximately caused by—
(A) gross negligence or willful misconduct of, or
(B) the violation of an applicable Federal safety, construction, or operating regulation by,
the responsible party, an agent or employee of the responsible party, or a person acting pursuant to a contractual relationship with the responsible party ....[29]

---

[23] *Id.* § 2702(b)(2)(A), (D), (F).
[24] *Id.* § 2702(b)(2)(B).
[25] *Id.* § 2702(b)(2)(C).
[26] *Id.* § 2702(b)(2)(E).
[27] *Id.* § 2704(a)(3).
[28] *Id.* § 2704(a), (c)(3).
[29] *Id.* § 2704(c)(1).

For all incidents to which a damages cap applies, there is a possibility, depending on the amount of harm associated with the relevant incident, that total recoverable damages will exceed the cap. Likewise, there is also the possibility that a responsible party will not have sufficient assets to cover all removal costs and compensate all claimants to whom it is liable for damages. In either case, a person with a valid claim can obtain reimbursement from the federal Oil Spill Liability Trust Fund ("the Fund").[30] OPA specifies that the Fund can pay out up to a maximum of $1 billion per incident, and is to be financed primarily by taxes on crude oil received at U.S. refineries, and on petroleum products imported into, consumed in, or warehoused in the United States.[31] OPA sets out procedures that claimants must follow to recover from the Fund, and also specifies that, with certain exceptions, moneys in the fund will be available only as provided for in the annual appropriations acts of Congress.[32]

### 4. Summary of Key Features of OPA's Liability Scheme

- A responsible party is liable under OPA for removal costs and certain types of damages that "result from" an actual or threatened discharge of oil into navigable waters or onto adjoining shorelines without regard to whether the responsible party was at fault for the discharge.

- Among the types of damages resulting from a discharge recoverable under OPA are lost profits or impaired earning capacity "due to" damage, destruction, or loss of property or natural resources.

---

[30] Id. § 2712(a)(4).

[31] 26 U.S.C. § 9509(c)(2) (1990). The Fund can be used to cover both removal costs and to provide compensation for damages, although no more than $500 million per incident can be paid out for natural resources damages. Id. § 9509(c)(2)(A)(ii). OPA defines "incident" as "any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil." 33 U.S.C. § 2701(14).

[32] 33 U.S.C. § 2713(b); Id. § 2752(a). In the event that a spill generates removal costs and damages that exceed any limits set by OPA for responsible party liability, as well as the per-incident $1 billion cap on the fund, uncompensated claims can in principle be pursued under state law, though – as discussed below – state laws tend to define spill-related liability more narrowly than OPA, and thus may not permit recovery by claimants who might have recovered under OPA had the caps not been reached.

- A responsible party can avoid liability altogether only by showing that the discharge and resulting costs and damages were "caused solely by" an act of God, an act of war, or certain independent third party acts.  It can also avoid liability to a particular claimant if the incident that generated the discharge is "caused by" the gross negligence or willful misconduct of the claimant.

- For certain offshore facilities, the total cost to a responsible party of its liability for damages and its own removal costs is subject to an aggregate cap of $75 million.  However, this and other statutory caps are lifted if the incident that generates the discharge is "proximately caused by" gross negligence or willful misconduct by the responsible party and its agents, employees, and those acting pursuant to a contractual relationship with it, or by the violation of an applicable Federal safety, construction, or operating regulation.

## B.  OPA Liability for Economic Loss: The "Due To" Requirement

This report will assume for purposes of analysis that the Spill falls within Section 2702(a)'s definition of a discharge, such that BP and/or one or more of its subsidiary companies are subject to liability under the terms of that section.[33]   The question to be addressed is the scope of that liability.

### 1.  Distinguishing Economic Loss Parasitic on Harm to One's Own Property

Section 2702(b)(2)(B) makes clear that owners and lessees of property can recover damages from a responsible party for physical injury to, or physical destruction of, their property.   For example, the owner of a beachfront hotel whose beach is actually contaminated with oil can recover compensation for the harm to his property, and can also recover economic losses associated with that harm – such as lost revenues resulting from potential customers cancelling reservations or

---

[33] BP Exploration and Production, Inc., a BP subsidiary, has accepted the U.S. Coast Guard's designation of it as a responsible party with respect to the Spill.   http://www.uscg.mil/foia/docs/DWH/2094.pdf (last visited, Nov. 10, 2010).  It is further assumed that BP and/or any subsidiaries will not be able to take advantage of any complete defense to liability recognized by the statute.

11

deciding not to stay at the hotel because of the polluted beach.  Likewise, if oil from a discharge were to gum up the engines of a boat that has been leased by a commercial fisherman, that fisherman stands to recover damages including lost profits caused by the damage to the boat.[34]

### 2.  *The Universe of Potential Pure Economic Loss Claimants*

Section 2702(b)(2)(E) makes equally clear that Congress also contemplated recovery by some persons who, because of a release of oil, suffer lost profits or impaired earning capacity but neither own nor lease property that has been damaged or lost.  The question is *who among this class of persons is entitled to recover*.  On this question, it will be helpful to imagine a range of hypothetical claimants who might claim lost profits or earning capacity based on a large discharge of oil in the Gulf region.  For purposes of these hypothetical claims, the responsible party is a fictitious entity named "Oil Co.," which is assumed to be a U.S. corporation.

- C is a commercial fisherman who relies for his business on fisheries in the Gulf of Mexico.  C claims that oil from a spill for which Oil Co. is responsible has polluted the waters in which he fishes, and that he has been and will be unable to fish for a period of time, resulting in lost profits.

- H owns and operates a beachfront hotel in the Gulf area.  Oil from the Oil Co. spill has not reached the beachfront that is owned by H and reserved for use by guests at H's hotel.  However, oil has been found in the immediate vicinity of H's hotel, including in waters that H's guests frequently use, and neighboring beaches that H's guests routinely visit.  H claims to have suffered a loss of business because tourists, in light of the effects of the spill on the immediate area in which his hotel is situated, have decided to vacation elsewhere.

- E is an employee at H's hotel.  Because the hotel has lost business, its managers have reduced staff hours by 25%, as a result of which E has suffered and will suffer a 25% reduction in his wages for a certain period.

---

[34] *See* South Port Marine, LLC v. Gulf Oil Ltd. P'ship, 234 F.3d 58, 66-67 (1st Cir. 2000) (reinstating jury award of damages for lost profits resulting from damage to plaintiff's property caused by defendant's release of oil into harbor); *In re Alex C Corp.*, Nos. 01-12184, 01-12186, 00-12500, 2003 WL 203078, at *5 (D. Mass. Jan. 30, 2003) (allowing recovery for economic loss parasitic on damage to claimant's boats caused by spill).

- B owns a barge that is used to haul equipment and supplies up and down a small navigable river that runs to the Gulf. Oil from the spill reaches the river, threatening migratory birds that live there. Authorities close the river to boat traffic for three weeks to permit clean-up. B is unable to operate his barge during this time and seeks recovery of profits he would have made.

- R operates a dockside restaurant located in a Gulf seaport. Its regular customers are dockworkers, fishermen, and others whose jobs are connected with maritime commerce. R claims that, because of the spill, the restaurant has lost profits because many of the restaurant's regular customers have not been frequenting it.

- A is a real estate agent whose listings are made up primarily of beachfront properties in an area of the Gulf that has been contaminated by the spill. She claims that the market for property sales and rentals has collapsed because of the spill, depriving her of commissions she otherwise would have made.

- W is a woodworker who owns a small furniture store located three miles inland in a town that relies on beach tourism as a major source of revenue. W claims that, because some of the town's beaches have been polluted by the spill, orders for his furniture are down and that he has lost profits as a result.

- O owns a beachfront inn located on the Gulf. No oil from the spill has come within 100 miles of the waters or the stretch of coastline on which the inn sits, and, at that location, the spill has had no other discernable adverse physical effects (such as noxious odors). However, given prevailing currents and winds, government officials and scientists have concluded that oil might reach those waters and beaches within a month. O claims to have suffered cancelled reservations and lost profits because of the credible threat of oil pollution to the water and beaches adjacent to the inn.

- F owns and operates a fireworks store that is situated along the main interstate highway that leads to a set of Gulf beaches, 150 miles north of those beaches. F relies on tourists traveling to and from the beaches for much of his business. F claims to have lost profits because of reduced tourist traffic resulting from the Oil Co. spill.

- T runs a tour boat that takes passengers along scenic Gulf shoreline. No oil from the spill has come, or threatened to come, within 400 miles of the area in which T's tours takes place. T claims that, because of popular misimpressions about the scope of the spill, the spill has depressed tourism in the entire Gulf region, in turn causing T to lose business and profits.

- D owns an amusement park in a land-locked portion of central Florida. Many of D's patrons are families that combine a trip to D's park with a beach vacation on Florida's Atlantic Coast, which was never at risk of suffering pollution because of the spill. D claims that consumer unease about traveling to Florida because of the spill has caused D to suffer lost profits.

13

- N owns and operates a resort in Nevada. Each year for the past decade, an association of Gulf-area fishermen has held its annual meeting at N's facility. N claims that the spill's economic effects have caused the association to cancel its plans to hold their convention at N's facility, in turn causing N lost profits.

- M, a company incorporated and operated in Hartford, Connecticut imports snorkeling equipment manufactured in China. M claims that, because of the spill, snorkeling equipment sales are down, resulting in lost profits.

- S runs a seafood restaurant in Phoenix, Arizona. Although the seafood it serves is not from the Gulf, S claims that it has lost profits because of general consumer fears about contaminated seafood caused by the spill.

- G owns a gas station in Boise, Idaho that sells Oil Co.-brand gasoline. Although G owns and operates the station as an independent franchise, his station becomes the target of a boycott by a local environmental group demanding greater corporate accountability. G claims lost income resulting from the boycott.

- L runs a catering company based in New York City, which is also the location of Oil Co.'s U.S. headquarters. L claims that a substantial portion of her profits had previously come from catering events at Oil Co. headquarters, but that she has lost revenues because Oil Co. has substantially cut back on catered events in the aftermath of the spill.

Given the interdependent nature of modern economies, this list of imagined claimants could easily be extended, and dramatically so. This is because each claimant who suffers an economic setback because of a spill will probably pass on a portion of that setback to other persons and entities dependent on that claimant for business. For example, if commercial fishermen suffer lost profits because of a spill that renders them unable to fish in Gulf waters, retail stores at which those fishermen regularly shop can expect to experience a loss of revenue. In turn, this might cause those stores to make smaller purchases from wholesalers. In turn, this might cause wholesalers to cut employee hours or wages. The key question is how far OPA means for liability to extend along this sort of economic chain reaction.

### 3. *Proof of Economic Loss and Actual Causation*

To recover under OPA, each of the foregoing imagined claimants would have to offer adequate proof that she actually suffered lost profits or diminished earning capacity (proof of economic loss) and that this loss resulted from the spill (proof of a causal connection between the spill and the economic loss). These are distinct requirements. Even a claimant with compelling documentation of economic loss still needs to prove that she probably would not have experienced that loss had the spill not occurred. In other words, she must show that the loss was more likely to have been caused by the oil spill than by other possible causes such as an economic recession, or, in the case of a beachfront resort, an algal bloom that happened to occur in nearby waters, was unrelated to the spill, and on its own may have deterred vacationers from vacationing there.

Were each of the imagined claimants to pursue their claims in court, it is realistic to expect that some would have sufficient evidence of actual loss and actual causation, whereas others would not. However, there is no particular reason to think that claimants more closely connected to the spill in time and space will, as a class, be in a better position to offer such evidence, or that claimants farther removed from the spill will be less well-positioned to offer such evidence. The requirements of proof of economic loss and proof of causation do not draw categorical lines between classes of claimants. They set standards of proof that any particular claimant may or may not be able to meet. For example, even though it is intuitive to think of R, the local restaurant owner, as someone who was more immediately harmed by the spill than L, the New York City caterer, it is entirely possible that L will have better documentation of lost profits and their connection to the hypothesized Oil Co. spill than R.

### 4. Section 2702(b)(2)(E)'s "Due To" Clause

With respect to liability for economic loss that does not arise out of damage to property or resources that the claimant herself owns or leases, the key issue is whether OPA contains an additional requirement beyond: (1) proof of responsibility for a discharge under Section 2702(a); (2) proof of actual economic loss; and (3) proof of actual causation, or whether these are the only requirements. This is an issue of statutory interpretation. The search for an answer must therefore begin with the plain terms of the statute.[35]  In particular, the focus must be on the intersection of Section 2702(a) – OPA's liability trigger – and Section 2702(b)(2)(E) – the provision that specifies when a triggering event will generate liability for lost profits or impaired earning capacity.

As noted above, Section 2702(a) imposes liability for types of damages that "result from" a discharge that falls within the terms of that section, albeit only those types of damages identified in Section 2702(b). The latter in turn identifies, as one type of recoverable damages, "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources ...." These kinds of damages can be recovered by "any claimant" – that is, irrespective of whether the person seeking recovery owns the property or resources that have been damaged or lost.

By its plain terms, OPA limits the universe of valid claims for lost profits and impaired earning capacity to those "due to" the injury, loss or destruction of property or resources. To be sure, OPA decouples the right to bring a claim for lost profits or impaired earning capacity from an ownership or lease interest in the property or resources that are damaged or lost. Non-owners have standing to bring claims under Section 2702(b)(2)(E) – they are *eligible* to recover. But OPA does not decouple the right to bring a claim for lost profits or impaired earning capacity from the

---

[35] *See* Hardt v. Reliance Standard Life Ins. Co., 130 S. Ct. 2149, 2156 (2010) ("[W]e begin by analyzing the statutory language, 'assum[ing] that the ordinary meaning of that language accurately expresses the legislative purpose.'") (second alteration in original) (quoting Gross v. FBL Financial Services, Inc., 129 S. Ct. 2343, 2350 (2009))

16

occurrence of damage to, or loss of, property or natural resources.   Quite the opposite, Section

2702(b)(2)(E)'s "due to" clause imposes a second-layer causation requirement on top of the initial

"result from" requirement set by Section 2702(a).   A claimant relying on these sections must prove

damage to, or loss of, property or natural resources that "result[s] from" a discharge,[36] *and* lost

profits or impaired earning capacity "due to" that damage or loss.

To appreciate the significance of Section 2702(b)(2)(E)'s "due to" clause, one need only

consider the reach of that section had the clause been omitted.   If Congress had sought to impose

liability for all provable economic loss resulting from a discharge, it could quite easily have written

Section 2702(b)(2)(E) to read as follows: "damages equal to the loss of profits or impairment of

earning capacity are recoverable by any claimant."   This hypothetical provision, when read in

conjunction with the "result from" language of Section 2702(a), would require only proof of

responsibility for an actual (or threatened) discharge, economic loss, and actual causation.   As such,

it would entail liability for all lost profits and impaired earning capacity resulting from a discharge or

---

[36] Section 2702(a)'s "result from" language thus precludes recovery for economic losses connected to property or resource damage where that damage happens coincidentally to a discharge of oil. For example, suppose a vessel carrying oil collides with a fishing boat, spilling a small amount of oil, but also causing structural damage to the fishing boat. The damage requires the boat to be taken in for repairs, thereby inflicting economic losses on the crew of the boat, which remains idle during the repair period. The economic losses suffered by the crew might well be "due to" the physical damage to the fishing boat, but that damage did not "result from" the discharge of oil – the fishing boat would have required repair even if there had been no discharge. Instead, the damage to property resulted from the collision, which collision only coincidentally happened to generate a discharge.

At least one federal court decision has provided an interpretation of Section 2702(a)'s "result from" language. In *Gatlin Oil Co. v. United States*, 169 F.3d 207 (4th Cir. 1999), the judges disagreed among themselves as to whether the destruction of property by a fire fueled by a spill could be deemed to have resulted from a discharge or threatened discharge of oil. The majority reasoned, somewhat obscurely, that, because the fire itself did not cause a discharge or threatened discharge, the property damage caused by the fire could not be deemed to have resulted from a discharge. *Id.* at 212. A dissenting judge reasoned that the damage should be deemed to have resulted from the spill because the spill was a necessary condition for the fire that caused the damage. *Id.* at 214-15 (Niemeyer, J., concurring in part and dissenting in part).

The House Bill that eventually gave rise to OPA would have limited Section 2702(a)'s "result from" language by adding the adjective "directly." H.R. 1465, 101st CONG. § 102(a)(1) (1989). That proposed modifier, obviously, was omitted from the final bill. Whatever significance this omission might have for the precise contours of Section 2702(a)'s "result from" requirement, it does not entail that Congress intended no limits on liability for economic loss beyond proof of actual loss and actual causation. This is because the "due to" clause of Section 2702(b)(2)(E) stands separate and apart from 2702(a)'s "result from" clause and, as such, explicitly states an independent limitation on such liability.

threatened discharge.  But of course this is not what Section 2702(b)(2)(E) says.[37]  To read OPA to extend to any and all lost profits and impaired earning capacity caused by a discharge in violation of Section 2702(a) would be to ignore the "due to" clause – to treat it as mere surplusage.  It is a fundamental tenet of statutory construction that statutory terms are presumed not to be superfluous.[38]

The "due to" clause thus sets an additional requirement for recovery for economic loss under OPA.  Any reading of the statute that does not recognize this requirement disregards its plain text.  However, at least in the abstract, the requirement set by the "due to" clause is susceptible to different interpretations.  For example, the clause, taken on its own, could conceivably be read to set a threshold for economic loss liability that treats the fact of *any* harm to *any* property or natural resources as a trigger for the recovery of economic losses by any claimant.  On this interpretation, the statute, for purposes of claims for economic loss, would draw a sharp distinction between two scenarios: (1) discharges that cause no property or resource damage or loss whatsoever, yet still cause lost profits or impaired earnings capacity, and (2) discharges that cause *some* property or resource damage or loss, as well as lost profits or impaired earnings capacity.  The "due to" clause, according to this reading of OPA, would specify that recovery for economic losses is unavailable to anyone who suffers such losses as a result of a spill that is physically harmless, but that recovery is available to anyone who suffers any sort of economic loss because of a spill that is physical harmful: the fact of *some* property or resource damage would be treated as an on-off switch that, once flipped,

---

[37] In fact, the first two damages provisions of Section 2702(b) authorize claims that are defined without reference to a second layer of causation analysis, which strongly suggests that the insertion of Section 2702(b)(2)(E)'s "due to" requirement was a considered decision.  *See* 33 U.S.C. § 2702(b)(2)(A), (B) (authorizing recovery for natural resources damages and real or personal property damages, respectively, without requiring any connection to a discharge beyond the "result from" requirement of Section 2702(a)).

[38] *See* Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992).  Note that this reading of OPA does not purport to find buried within the statute an implicit, unstated limitation on liability for economic loss.  Rather, it identifies the "due to" clause as an *expressly stated* limitation on such liability.

allows all claims for economic loss, irrespective of the nature of the linkage between those claims and the property or resource damage that has occurred.

Although intelligible in the abstract, this rendering of the "due to" clause is unsound. OPA arguably does not even permit a distinction between discharges that do not result in *any* damage to, or loss of, property or natural resources, and discharges that result in some harm or loss to property or resources. The statute defines "natural resources" to include "land" and "water" generically.[39] Given that, under Section 2702(a), liability for a discharge of oil can only be incurred when there is a release of oil "into or upon ... navigable waters, or adjoining shorelines," it might follow that every discharge actionable under OPA is by definition a discharge that results in at least some natural resources damage or loss. On this reading, there is no such thing, under OPA, as a spill that fails to cause damage to, or loss of, *some* property or natural resources.

Even if there could in theory be a harmless-to-property-and-resources spill under OPA, it would be exceedingly odd to suppose that Congress meant to build the statute's liability provisions for economic loss around the theoretical but vanishingly small probability of a spill that causes economic loss while causing no harm to, or loss of, property or resources. Nothing in the language or structure of Section 2702(b) suggests a recognition of this esoteric distinction. Quite the opposite, each of the section's six separate damages provisions purport to apply to any type of discharge that violates Section 2702(a). The "due to" clause of Section 2702(b)(2)(E) cannot and should not be understood as drawing, obliquely, a practically insignificant distinction between discharges that cause some property or resource damages and those that cause none whatsoever.[40]

---

[39] 33 U.S.C. § 2701(20).

[40] A variant on this reading of OPA would link the "due to" clause to Section 2702(a)'s recognition of liability for *threatened* discharges and actual discharges. *See id.* § 2702(a) (imposing liability on parties responsible for a facility "which poses the substantial threat of a discharge of oil" into navigable waters). On this reading, the "due to" clause would function to deny recovery of economic losses only in those cases where the OPA violation consists of a threatened discharge that never materializes, and to allow recovery for all such losses for all cases in which there has been an actual discharge. Again, nothing in the language or structure of Section 2702(b) suggests that Congress meant to set actual discharge (as opposed to threatened discharge) as a threshold for recovery of lost profits. As noted in the text, the

By contrast, it is entirely natural to read Section 2702(b)(2)(E)'s "due to" clause as requiring as a condition of recovery for lost profits or impaired earning capacity a nexus beyond bare causation between the lost profits or impaired earning capacity (on the one hand) and the damage to, or loss of, property or natural resources (on the other).  No interpretive gymnastics are required.  Rather, one need only treat the phrase "due to" as refining the actual causation requirement already specified by the "result from" language of Section 2702(a).

Such a reading of OPA's economic loss provisions is perfectly consonant with judicial readings of highly comparable statutes.  Indeed, even when confronted with statutory liability provisions that use variants on the phrase "result from" as a *stand-alone* causation requirement, courts have read into that phrase both an actual causation requirement and a proximate cause limitation – the latter excluding liability for certain kinds of 'remote' consequences.[41]  They have done so because it has long been commonplace for lawyers and courts to use these sorts of phrases to encompass notions of both actual and proximate cause.[42]

---

various damages provisions of Section 2702(b) are written generically to cover all violations of Section 2702(a), regardless of whether they involve a threatened or actual discharge.  If Congress meant for Section 2702(b)(2)(E) – alone among Section 2702(b)'s six damages provisions – to incorporate a distinction between threatened and actual discharges, it easily could have, and presumably would have, explicitly limited its applicability to cases of actual discharges.  Denying recovery for economic losses resulting from threatened discharges would also exclude recovery for lost profits in situations in which Congress seems to have contemplated recovery.  For example, suppose a threatened discharge that does not materialize were to induce authorities to close an area to commercial fishing for a month.  It seems likely that OPA is intended to authorize recovery by any adversely affected fishermen.  Their lost profits, after all, would be "due to" a (temporary) "loss" of "natural resources" that has "result[ed] from" a "substantial threat of discharge of oil" into navigable waters.

[41] In legal usage, the modifier "proximate" in the phrase "proximate cause" has a specialized meaning that takes account of, but is not exhausted by, notions of physical or temporal distance.  Under the heading of "proximate cause," one inquires whether a legally wrongful act that has actually caused harm to another has caused it in a haphazard, unexpected, or attenuated manner, such that the actor should be relieved of responsibility for the harm notwithstanding that his act caused it.  RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 29 (2010) (advocating use of the phrase "scope of liability" in place of the traditional phrase "proximate cause" to emphasize that negligence law contains a separate filter for liability beyond actual causation, by which liability is excluded for harms that are so haphazardly caused as to not count as the realization of any of the risks that rendered the actor's conduct careless).  The mere fact that a careless act happens to cause harm hundreds of miles away from the place of the act, or years after the act takes place, does not automatically entail the conclusion that the actor should not be held responsible.  Physical and temporal distance are relevant to this determination, but are not necessarily dispositive.

[42] *See* United States v. Wells, 519 U.S. 482, 491 (1997) (Congress is presumed to incorporate the common-law meaning of familiar legal terms).  It is true that another OPA provision – Section 2704(c)(1) – employs the phrase "proximately caused" in specifying the limited circumstances in which a responsible party can disclaim liability for damages.  In some contexts, the fact that a statute uses the modifier "proximately" in one provision dealing with liability

CERCLA – the federal "Superfund" law – is a statute that, like OPA, imposes liability for harms caused by the release of hazardous materials. Moreover, it served as one of the models for OPA's strict-liability approach to oil spills.[43]   Under CERCLA a responsible party is strictly liable for, among other things, "damages for injury to, destruction of, or loss of natural resources … resulting from [a release of hazardous substances]."   Interpreting CERCLA's "resulting from" language, the Court of Appeals for the D.C. Circuit endorsed as entirely reasonable the U.S. Interior Department's interpretation of that phrase as incorporating requirements of both actual and proximate cause,[44] thereby upholding a regulation requiring claimants who sought recovery for natural resource damage to prove not only that a release of hazardous materials was an actual cause of the damage, but also that the damage was not "predominantly caused" by other factors.[45]

Even more telling are judicial interpretations of TAPAA, another statutory predecessor of OPA. TAPAA is directly concerned with liability for oil spills, and is in important respects written more broadly than OPA. A party that is responsible for the discharge of oil from a vessel carrying oil from the Trans-Alaska pipeline is subject to liability for "*all damages … sustained by any person or entity … as the result of* discharge of oil from such vessel."[46]   Notwithstanding the facial breadth of this language, the Ninth Circuit Court of Appeals concluded that Congress did not thereby "intend

---

for harms and does not use it in another nearby clause dealing with liability for harms might give rise to the inference that Congress did not intend for the latter to be limited by a notion of proximity.   *See* Russello v. United States, 464 U.S. 16, 23 (1983) (noting the general presumption that Congress's use of particular language in one statutory provision and its omission of that language from another provision is intentional).   However, as explained above, the interpretation of OPA provided here does *not* rest on finding in Section 2702(b)(2)(E) an implicit proximate cause limitation of a sort that might run afoul of the *Russello* inference of intentional exclusion.   Rather, it rests on the fact that OPA explicitly sets two distinct causation-related requirements for claims seeking recovery for economic loss: (1) harm to, or loss of, property or resources that results from a spill, and (2) economic loss due to that harm or loss.   The statute's economic loss provisions are in this respect formulated in a fundamentally different manner than its provisions recognizing certain defenses to liability.   *See* City of Columbus v. Ours Garage & Wrecker Service, Inc., 536 U.S. 424, 435 (2002) (noting inapplicability of the *Russello* presumption where provisions in the same statute are distinctly formulated).

[43] *See* Russell V. Randle, *The Oil Pollution Act of 1990: Its Provisions, Intent, and Effects, in* OIL POLLUTION DESKBOOK 3, 4 (Envtl. Law Reporter ed., 1991) (noting that OPA's liability provisions were "modeled closely on those of CERCLA and of … the Clean Water Act").

[44] Ohio v. U.S. Dep't of Interior, 880 F.2d 432, 470-72 (D.C. Cir. 1989).

[45] *Id.* at 469; *see also* United States v. Montrose Chem. Corp. of Cal., No. 90-3122, 1991 WL 183147, at *1 (C.D. Cal. Mar. 29, 1991) (interpreting CERCLA's "resulting from" language to require proof that the defendant's release was a "sole or substantially contributing cause" of natural resource damages).

[46] 43 U.S.C. § 1653(c)(1) (2000) (emphasis added).

to abrogate all principles of proximate cause."[47]   Denying outright claims alleging that the *Exxon Valdez* spill had caused consumers to suffer economic losses in the form of higher gasoline prices, the Court interpreted TAPAA to be focused on:

> damages arising out of the physical effects of oil discharges.   The remote and derivative damages of the type claimed by plaintiffs here fall outside the zone of dangers against which Congress intended to protect when it passed TAPAA.[48]

The Court thus concluded that TAPAA's "result of" language should instead be read to incorporate common law notions of proximate cause.[49]

The courts that rendered these decisions were interpreting statutory forbearers of OPA that impose liability on facially broader terms than does OPA.   Neither CERCLA nor TAPAA contains a second-layer causation requirement comparable to Section 2702(b)(2)(E)'s "due to" clause.[50]   If

---

[47] Benefiel v. Exxon Corp., 959 F.2d 805, 807 (9th Cir. 1992); *see also* Slaven v. BP America, Inc., 786 F. Supp. 853, 858 (C.D. Cal. 1992) (while TAPAA was meant to eliminate admiralty law's bright-line rule barring liability in cases alleging negligence causing only economic loss, "it is beyond dispute that in such a case the common law requirement of proximate cause is implicitly incorporated").   In *re Glacier Bay*, 746 F. Supp. 1379, 1388 (D. Alaska 1990) – decided prior to *Benefiel* and *Slaven* – the district judge asserted that "all provable damages sustained by any person as a result of [an oil spill in violation of TAPAA] are compensable ...." 746 F. Supp. at 1386.  However, this statement was not made in the face of suits seeking to recover damages for economic losses remotely related to an oil spill, but rather was issued in the early stages of litigation over claims brought by fishermen, fish processors, and other "shoreside businesses." *Id.* at 1382.  Accordingly, the statement is dictum.  In any event it was subsequently rejected by the Court of Appeals in *Benefiel.*

[48] 959 F.2d at 807.

[49] *Id.; see also* Heppner v. Alyeska Pipeline Serv. Co., 665 F.2d 868, 873 (9th Cir. 1981) (finding TAPAA liability implicitly limited to harms relating to environmental damage resulting from pipeline-related activities).

There is nothing anomalous about a scheme that combines strict (no-fault) liability with categorical limitations on that liability.  In fact, standard common law instances of strict liability have always incorporated such limitations.  For example, "abnormally dangerous activities" subject to strict liability do not give rise to claims for pure economic loss – such losses are excluded entirely from the ambit of strict liability.  RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 20(a) (2010) (strict liability limited to instances of physical harm).  And even for physical harms resulting from abnormally dangerous activities, strict liability is limited by proximate cause principles. *Id.* § 29 cmt. l (observing that the Restatement's "scope-of-liability limits" for claims of negligence also apply to common law strict liability claims; an actor is subject to liability only for those harms that amount to the realization of the risks of the activity that lead the law to regard the activity as appropriately subject to a rule of strict liability); *see also* Foster v. Preston Mill Co., 268 P.2d 645, 649 (Wash. 1954) (although a person engaged in blasting is ordinarily held strictly liable for physical harms actually caused by the blasting, no liability attaches where vibrations from blasting happened to unnerve minks living on plaintiff's mink farm, in turn causing mother minks to destroy their offspring).

[50] To observe that courts have read *some* proximate cause limitations into CERCLA and TAPAA is not to conclude that the scope of liability under these statutes is identical to the scope of liability under OPA.  In particular, because TAPAA does not link recovery of economic loss to property or resource damage or loss, it may permit recovery in situations in which OPA would not. *See, e.g., In re Glacier Bay*, 746 F. Supp. 1379, 1385-86 (D. Alaska 1990) (permitting claims by buyers, spotters, and processors of fish as falling within the scope of TAPAA's "resulting from" language); *In re Exxon Valdez*, Nos. A89-095, A91-102, A91-103, A91-137, 1993 WL 787392, at *3 n.15 (D. Alaska Dec. 23, 1993) (noting that TAPAA contains a proximate cause limitation, but leaving undecided whether a taxidermist and a seller of

these statutes are properly read to contain a proximate cause limitation, the implication that OPA includes a categorical limit on liability for economic loss is irresistible. As we have seen, the only function that can possibly be ascribed to the "due to" clause is that of setting an additional filter on liability beyond actual cause – one that requires as a condition of recovery for lost profits or impaired earning capacity a more substantial connection between the happening of those losses and the happening of harm to property or resources.

That OPA would contain some such requirement also makes sense in light of the overall design of the statute. OPA aims to ensure that a wide array of persons who suffer various forms of injury obtain prompt and full compensation. Yet the very fact that OPA has this aim undermines the notion that Congress could have intended it to extend to the entire universe of economic losses flowing from a discharge of oil into navigable waters. OPA's $1 billion trust fund was set up to ensure reimbursement of all damages claims contemplated by the statute that are not reimbursed by a responsible party: "the Fund backstops the [responsible party's] limited liability and ensures that *every valid claim* will be paid in full."[51] And it was and is expected to play this role even for "catastrophic" spills.[52]

Had Congress envisioned OPA to extend liability to all provable economic losses actually caused by a spill, it could not reasonably have supposed that the $1 billion fund, even coupled with responsible party payments, would be sufficient to provide adequate compensation to claimants.[53]

refrigeration units doing business in the area of Prince William Sound can recover under TAPAA for loss of profits resulting from the *Exxon Valdez* spill).

[51] Bouchard Transp. Co. v. Updegraff, 147 F.3d 1344, 1350 (11th Cir. 1998) (emphasis added), *cert. denied*, 525 U.S. 1140 (1999).

[52] Representative Jones, House sponsor of the bill that became OPA, described the law as "activat[ing] [the] trust fund, increas[ing] its size to $1 billion and increas[ing] its borrowing authority to handle catastrophic spills." 136 CONG. REC. 22131, 22286 (1990); *see also id.* at 22292 (statement of Rep. Shumway) ("The most important provision in this bill is the $1 billion oilspill fund which will now be available to deal with even the largest of oil transportation accidents."); *id.* at 22296 (statement of Rep. Sharp) (noting that the fund will "allow us to tackle big spills").

[53] Deep-pocketed responsible parties may have sufficient assets to cover spill-related costs and damages that run into the billions. However, it is important to recall that OPA contains liability caps, such as the $75 million cap on compensation for damages claims that applies to releases from offshore facilities not proximately caused by gross negligence or a statutory violation. For this sort of spill, the $1 billion fund might well be the only source of

Already in 1990 there was plenty of reason to believe that harms resulting from a major spill – if one were to include all of its adverse economic consequences – would vastly exceed that amount. As Representative Nowak observed in 1989, some early estimates for the *Exxon Valdez* spill put the cost of removal by itself (without regard to damages claims) at more than $2 billion.[54]  A contemporaneous front-page article in a prominent newspaper contemplating the potential economic impact of a major spill off the cost of Florida observed that such a spill could seriously curtail tourism, "which attracted 37 million people and $22 billion to Florida last year ...."[55] Considered without regard to their connection to actual property or resource damage, the economic losses flowing from a major spill could have been expected to generate billions in lost profits for businesses in any state reliant on coastal resources to attract tourism, not to mention the additional billions in secondary and tertiary losses that would be suffered, nationwide, by other businesses dealing with those businesses.  In light of numbers such as these, it is simply not plausible to believe that Congress supposed that the liability provisions of OPA, backed by the Fund, would be sufficient to handle all the adverse economic ripple-effects flowing from a catastrophic spill.  Rather, legislators' expectation of full compensation for valid claims must have rested on a more circumscribed conception of the type of claims that are eligible for compensation.

---

compensation for losses above the cap.  Even for instances of uncapped liability, the responsible party or parties could lack assets sufficient to cover the removal costs and compensable damages for which they are responsible, again resulting in the bulk of costs and damages being drawn from the trust fund.   Oil-carrying vessels are required by Coast Guard regulations to demonstrate that they have sufficient assets to cover the cost of a spill, but only up to the liability caps set by OPA.  33 C.F.R. § 138.30 (2010).  Department of Interior regulations likewise specify proof of financial responsibility as a condition of being permitted to operate facilities on the Outer Continental Shelf, but only up to a maximum of $150 million.  30 C.F.R. § 253.13 (2010).

[54] 135 CONG. REC. 26904, 26939 (1989).

[55] Lisanne Renner, *Oil Fears Flourish in Florida: Spill Could Strangle Ecology, Economy*, ORLANDO SENTINEL (April 9, 1989, at A1).

## C. Scope of Liability Under Section 2702(b)(2)(E)

Section 2702(b)(2)(E)'s "due to" clause clearly sets a limitation on claims for lost profits or impaired earning capacity. What remains to be determined is how best to understand it. On this issue, guidance can be found from a variety of sources, including: the common law regimes from which OPA departs, the statute's legislative history, judicial decisions interpreting OPA, and policy considerations.

### 1. Common Law Background

Historically, and still today for claims arising from oil spills not governed by statutes such as TAPAA and OPA, liability is determined primarily by federal admiralty law and state law. Admiralty law applies to accidents that occur on navigable waters and involve traditional maritime activities (e.g., shipping), even when those sorts of activities cause injuries on land. For example, if a commercial boat being towed into a harbor catches fire, and the fire spreads to and destroys a nearby dock, a claim by the dock owner against the owner or operator of the vessel will be governed by admiralty law.[56] Accidents that occur on land, or on navigable waters but not from traditional maritime activities, are typically governed by state tort law. Unlike OPA, admiralty law and state common law generally require proof of *fault* as a condition of liability for harms resulting from the accidental discharge of oil.

Substantive admiralty law is for the most part a body of common law – that is, a set of rules formulated by federal courts in the course of deciding particular disputes. One such rule of long standing is the so-called "pure economic loss" rule, first announced by Justice Holmes for the

---

[56] The substantive liability rules of federal admiralty law have been developed primarily by federal courts. In many instances, those courts have chosen to flesh out the content of admiralty law by adopting rules of state tort law that have received widespread acceptance. In addition, if in a given case for which there is no admiralty-law rule, and no need for national uniformity with respect to the matter that would be governed by the rule, federal courts will apply a particular state's tort law. *E.g.*, Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 314 (1955).

Supreme Court in the 1927 decision *Robins Dry Dock & Repair Co. v. Flint*.[57]  Flint had chartered a steamship from the ship's owner.  Under the terms of the charter, Flint was required to take the steamship for periodic servicing.  During a service call, employees of the defendant's dry dock carelessly damaged the ship, causing the plaintiff-charterer to lose use of the ship for two weeks, and to suffer lost profits that he would have made had it been available during that time.  The Supreme Court ruled that, notwithstanding the evidence of fault on the part of the dry dock owner, admiralty law did not provide Flint, as charterer of the boat, with a remedy against the dry dock owner.  It reasoned that the dry dock owner's duty to be careful not to damage the ship was owed only to the owner of the boat.

Although *Robins* was decided more than eighty years ago, federal courts applying admiralty law have consistently upheld it since then.  Thus, it is today still the rule in admiralty that careless conduct causing pure economic loss – as opposed to negligence causing physical damage to one's property – is not actionable.  For example, in *Louisiana ex rel. Guste v. M/V Testbank*, a ship collision caused by a careless pilot resulted in the release of toxins that in turn caused a harbor to close for several weeks.[58]  The Fifth Circuit Court of Appeals, reaffirming *Robins*, ruled that businesses in the immediate area, including restaurants and suppliers who depended on maritime activity at the harbor for customers, could not recover from the careless pilot or the company that employed him.  Rather, liability extended only to those who owned property physically damaged by the accident.[59]

In contrast to admiralty law, state tort law is developed primarily by state-court judges.  And although there is no requirement that state tort law adopt the rules of federal admiralty law, most

---

[57] 275 U.S. 303 (1927).

[58] 752 F.2d 1019 (5th Cir. 1985) (en banc), *cert. denied*, 477 U.S. 903 (1986); *see also In re* Taira Lynn Marine Ltd. No. 5, LLC v. Jays Seafood, Inc., 444 F.3d 371, 378-79 (5th Cir. 2006); Barber Lines A/S v. M/V Donau Maru, 764 F.2d 50, 57 (1st Cir. 1985) (Breyer, J.); Getty Refining and Mktg. Co., v. MT Fadi B, 766 F.2d 829, 833 (3d Cir. 1985); Hercules Carriers, Inc. v. Florida, 720 F.2d 1201, 1202 (11th Cir. 1983), *cert. denied*, 469 U.S. 835 (1984); Federal Commerce & Navigation Co. v. M/V Marathonian, 528 F.2d 907, 908 (2d Cir. 1975), *cert. denied*, 425 U.S. 975 (1976).

[59] The Court of Appeals had no occasion to consider the propriety of the district court's decision to exempt from the *Robins* rule claims by commercial fishermen.  752 F.2d at 1021 n. 2.

26

state courts have in fact adopted the pure economic loss rule.[60]  Suppose a tanker-truck driver were carelessly to crash, causing the release of a toxic chemical, which in turn causes authorities to close the road on which the truck was traveling.  Because of the closure, nearby stores, to which the road provides direct access, experience a downturn in business and lost profits.  In the vast majority of states – perhaps every state – the careless truck driver will not be held liable to the store owners even though the truck driver's carelessness actually caused the store owners to suffer losses.  As did the U.S. Supreme Court in *Robins*, state high courts have reasoned that the driver's duty to avoid injury through careful driving is a duty to avoid causing personal injury or property damage, not a duty to avoid causing economic loss, even when such loss is a foreseeable consequence of careless

---

[60] General Elec. Co. v. Lowe's Home Centers, Inc., 608 S.E.2d 636, 638 (Ga. 2005); Nebraska Innkeepers, Inc. v. Pittsburgh-Des Moines Corp., 345 N.W.2d 124, 128 (Iowa 1984); PPG Indus., Inc. v. Bean Dredging, 447 So.2d 1058, 1059-60 (La. 1984); FMR Corp. v. Boston Edison Co., 613 N.E.2d 902, 903 (Mass. 1993); Local Joint Exec. Bd. of Las Vegas, Culinary Workers Union v. Stern, 651 P.2d 637, 638 (Nev. 1982); Border Brook Terrace Condo. Ass'n v. Gladstone, 622 A.2d 1248, 1253 (N.H. 1992); 532 Madison Ave. Gourmet Foods Inc. v. Finlandia Ctr. Inc., 750 N.E.2d 1097, 1102-03 (N.Y. 2001); Vogel v. Reed Supply Co., 177 S.E.2d 273, 279 (N.C. 1970); Queen City Terminals, Inc. v. General American Transp. Corp., 653 N.E.2d 661, 667 (Ohio 1995); Oregon Steel Mills, Inc. v. Coopers & Lybrand, 83 P.3d 322, 328 (Or. 2004); Duquesne Light Co. v. Pa. Am. Water Co., 850 A.2d 701, 703-04 (Pa. Super. Ct. 2004); United Textile Workers of America, AFL-CIO v. Lear Siegler Seating Corp., 825 S.W.2d 83, 87 (Tenn. Ct. App. 1990); Coastal Conduit & Ditching, Inc. v. Noram Energy Corp., 29 S.W.3d 282, 288 (Tex. Ct. App. 2000); O'Connell v. Killington, Ltd., 665 A.2d 39, 43 (Vt. 1995); Aikens v. Debow, 541 S.E.2d 576, 589 (W. Va. 2000); *see also* Sawyer v. Bailey, 413 A.2d 165, 168 (Me. 1980).

Courts also invoke a variant on the pure economic loss rule when holding that parties to a contract, including a contract for the sale of a product, cannot invoke negligence or products liability law in place of contract law to recover for a breach of contract that results in economic loss to the non-breaching party.  For non-product cases, see, e.g., Flagstaff Affordable Hous. Ltd. P'ship v. Design Alliance, Inc., 223 P.3d 664, 670 (Ariz. 2010); Grynberg v. Agri Tech, Inc., 10 P.3d 1267, 1271 (Colo. 2000); Ass'n of Apartment Owners v. Venture 15, Inc., 167 P.3d 225, 288 (Haw. 2007); Tusch Enter. v. Coffin, 740 P.2d 1022, 1026 (Idaho 1987).  For product cases, see, e.g., Danforth v. Acorn Structures, Inc., 608 A.2d 1194, 1198 (Del. 1991); Moorman Mfg. Co. v. Nat'l Tank Co., 435 N.E.2d 443, 448 (Ill. 1982); Gunkel v. Renovations, Inc., 822 N.E.2d 150, 153 (Ind. 2005); Rinaldo's Constr. Corp. v. Mich. Bell Tel. Co., 559 N.W.2d 647, 658 (Mich. 1997); Franklin Grove Corp. v. Drexel, 936 A.2d 1272, 1275 (R.I. 2007); SME Indus., Inc. v. Thompson, Ventulett, Stainback and Assoc., Inc., 28 P.3d 669, 681-82 (Utah 2001).  The U.S. Supreme Court has incorporated a version of the economic loss rule for products into federal admiralty law.  East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858 (1986).

For treatise acknowledgements of the continuing recognition of the economic loss rule, *see* DAN B. DOBBS, THE LAW OF TORTS § 452, at 1282 (2000) ("When commercial or economic harm stands alone, divorced from injury to person or property, courts have not imposed a general duty of reasonable care."); 4 FOWLER V. HARPER, ET AL., HARPER, JAMES & GRAY ON TORTS § 25.18A, at 766 (3d ed. 2007) ("Under the prevailing rule in America a plaintiff may not recover in negligence for economic loss not resulting from bodily harm or from physical damage to property in which the plaintiff has no proprietary interest."); W. PAGE KEETON, ET AL., PROSSER & KEETON ON TORTS § 129, at 100 (5th ed. 1984) (noting virtual absence of authority for the imposition of liability for negligence causing economic loss apart from physical damage to person or property).

driving.[61]  Other courts express this same idea in the language of proximate cause.  The causal pathway from carelessness to loss, they maintain, is too indirect to support liability, in part because, in a case like the one just described, it turns on the autonomous decisions of consumers to refrain from frequenting the stores.[62]  The economic loss rule, therefore, is as much a part of state tort law as federal admiralty law.[63]

Various rationales have been offered for the economic loss rule.  It is defended as necessary to fend off excessive or disproportionate liability.  Practically any accident will have economic ripple-effects that extend broadly over time and space.  There is thus a need to set limits on liability, especially when the basis for liability is negligence, which sets a relatively low culpability threshold. A momentary lapse can count as "negligence" in the eyes of the law, and yet might cause an economic catastrophe: a simple mistake by an employee at a power plant could conceivably cause a blackout in a major city that results in hundreds of millions of dollars of lost revenues.  Another rationale is that a person's ongoing prospects for profits, though surely of great importance to her, are already vulnerable to an array of forces, including lawful economic competition, technological innovation, and changes in consumer preferences.  As such, this interest warrants less fulsome legal protection than does the interest of a person in the physical integrity of her person or possessions. Also, because accidents promise to affect adversely the economic well-being of a broad universe of potential claimants, and because proof of economic loss and causation for economic loss claims will often be speculative, such claims arguably raise special concerns about the costs and reliability of

---

[61] *Aikens*, 541 S.E.2d at 583-87 (denying recovery on similar facts).

[62] *E.g.*, Petitions of Kinsman Transit Co., 388 F.2d 821, 824-25 (2d Cir. 1968); Rickards v. Sun Oil Co., 41 A.2d 267, 268 (N.J. Sup. Ct. 1945).

[63] Liability for economic loss often will attach, however, when there is a particular undertaking by the defendant to take care against causing an economic loss to a particular beneficiary or set of beneficiaries.  For example, in most states, an accounting firm (A) that is hired by a company (C) to audit C's books to re-assure a particular potential investor (P) of C's economic soundness can face liability to P if the audit is performed carelessly so as to cause P to lose money on the investment that P would not have lost had A used appropriate care in performing the audit.  RESTATEMENT (SECOND) OF TORTS § 552 (1977).

28

civil litigation.[64]  In cases in which the resources available to provide compensation to the injured are limited, there is in addition reason to prioritize claims for physical injury and property damage over claims for lost profits.[65]

Although the pure economic loss rule is thus well-entrenched as a matter of both federal admiralty law and state tort law, in a handful of decisions it has been adjusted to permit relief to certain claimants whose claims arguably should be barred by the rule, strictly construed.   In admiralty law, the most notable example of this sort of adjustment is the allowance of claims by commercial fishermen alleging lost profits resulting from negligence causing harm to fishing stocks.[66]  Commercial fishermen do not own fish that they have yet to catch – they cannot claim that harm to uncaught fish amounts to harm to *their property*.  They would therefore seem to fall within the class of persons whose claims, if brought under admiralty law, would be barred by the *Robins* rule.  Yet some courts applying admiralty and state law have granted them an exemption, reasoning, that they "lawfully and directly make use of a resource of the sea, viz. its fish, in the ordinary course of their business.  This type of use is entitled to protection from negligent conduct ...."[67]

---

[64] *See Barber Lines A/S,* 764 F.2d at 54-55; *see generally* Dan B. Dobbs, *An Introduction to Non-Statutory Economic Loss Claims,* 48 ARIZ. L. REV. 713, 715-17 (2006) (reviewing rationales for the pure economic loss rule).

[65] *Cf.* Metro-North Commuter R.R. Co. v. Buckley, 521 U.S. 424, 435-36 (1997) (noting that claimants seeking recovery for the cost of future medical monitoring are often competing for limited resources with claimants seeking recovery for personal injuries).

[66] THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 12-7, at 795 (4th ed. 2004) ("A longstanding line of cases grants recovery for lost profits to commercial fishermen whose activities are disrupted as a result of pollution or other casualty.").  The leading modern decision is probably *Union Oil Co. v. Oppen,* 501 F.2d 558, 570 (9th Cir. 1974).  In the *Testbank* decision, noted in the text above, the Fifth Circuit Court of Appeals observed that the trial court had applied the commercial fisherman exception, but neither endorsed nor rejected it.  752 F.2d at 1021 n. 2.

[67] *Oppen,* 501 F.2d at 570.  For a state-law counterpart to *Oppen, see Curd v. Mosaic Fertilizer,* 39 So.3d 1216, 1227-28 (Fla. 2010).  In *Oppen,* the Ninth Circuit emphasized that "[n]othing said in this opinion is intended to suggest, for example, that every decline in the general commercial activity of every business in the Santa Barbara area following the [oil spill] of 1969 constitutes a legally cognizable injury for which defendants may be responsible." *Id.*  Courts have followed *Oppen* in resisting efforts to extend recovery more generally to persons who suffer losses because of damage to property that they do not own.  *See, e.g.,* General Foods Corp. v. United States, 448 F. Supp. 111 (D. Md. 1978) (no liability for economic losses caused by defendants' careless damaging of railroad bridge on which plaintiff relied for transportation of goods to and from its plant).  Indeed, some courts have not even allowed the commercial fishermen exception to apply if the particular fishermen claiming economic loss do not hold a commercial fishing license. SCHOENBAUM, *supra* note 66, at 795 n. 15.

One can argue that the allowance of claims by commercial fisherman on the ground that they have a legally protected interest in appropriating uncaught fish for commercial use runs counter to the immediate holding of *Robins,*

29

In a similar fashion, a handful of state courts have provided relief from the strictures of the pure economic loss rule to claimants that have suffered economic losses because of a careless interference with a legally protected interest in the use of certain property that falls short of outright ownership.[68]  In *People Express Airlines, Inc. v. Consolidated Rail Corp.*, the New Jersey Supreme Court famously permitted recovery by an airline for lost bookings that occurred when the airline's employees were forced to evacuate their business offices, located in a Newark Airport terminal, because of the defendant's careless release of toxic gases.[69]  Similarly, in *J'aire Corp. v. Gregory*, the California Supreme Court permitted a restaurant operating in leased space in an airport to recover for lost business resulting from the defendant's careless delay in repairing the airport's HVAC system, which rendered the tenant's space unusable during the period of delay.[70]

In allowing recovery at or just beyond the margins of the economic loss rule, the New Jersey and California courts purported to reject the rule outright.  In its place, they called for a context-specific inquiry into whether a duty of care to avoid causing economic loss was owed to a given claimant or class of claimants on the ground that economic loss to that claimant or class was an especially foreseeable consequence of the defendant's carelessness.[71]  In their results, however, these cases do not so much replace the rule as relax it by granting to persons with use-rights in certain property the power to sue for economic losses caused by careless acts that damage the property or

---

which, after all, declined to treat the plaintiff charterer's legally protected interest in use of the chartered boat as a basis for allowing recovery for economic loss.  Two federal courts of appeals have in fact qualified *Robins'* particular application of the pure economic loss rule to charterers, though they have not questioned the rule itself.  Venore Transp. Co. v. M/V Struma, 583 F.2d 708 (4th Cir. 1978) (permitting recovery for the cost of chartering a boat, but not lost profits, suffered during the period that the boat was rendered unusable by defendant's carelessness); National Steel Corp. v. Great Lakes Towing Co., 574 F.2d 339 (6th Cir. 1978) (same).

[68] *Curd*, 39 So.3d at 1227-28; Mattingly v. Sheldon Jackson Coll., 743 P.2d 356, 361 (Alaska 1987); J'Aire Corp. v. Gregory, 598 P.2d 60, 65-66 (Cal. 1979); People Express Airlines, Inc. v. Consolidated Rail Corp., 495 A.2d 107, 116 (N.J. 1985); *see also* Edward F. Heimbrock Co., Inc. v. Marine Sales and Serv., Inc., 766 S.W.2d 70, 71-72 (Ky. Ct. App. 1989) (citing *People Express*, but distinguishing it).

[69] 495 A.2d at 118; *see also* Robert L. Rabin, *Respecting Boundaries and the Economic Loss Rule in Tort*, 48 ARIZ. L. REV. 857, 858 (2006) (noting that *People Express* "stands as a lonely outpost" and that its invitation to expand liability for economic loss has not been embraced by courts in other states).

[70] *J'aire*, 598 P.2d at 61, 66.

[71] *People Express*, 495 A.2d at 115-16.

render it unavailable.  In other words, what renders these claimants 'especially foreseeable' is precisely that they enjoy a particular right to use certain property, but are prevented from exercising it by the defendant's carelessness.  Thus, even in the handful of states with a relatively expansive approach to liability for negligently caused economic loss, the pattern of actual liability, as opposed to some of the abstract language of judicial pronouncements, overwhelmingly limits liability to instances in which careless conduct renders particular property unusable by persons who have a right and a commercial need to use it, which right is exclusive to those persons, or at least held only by a limited class of right-holders.  And again, even these adjustments to the economic loss rule are not firmly established.  The U.S. Supreme Court has yet to endorse the lower-court decisions that recognize the right of commercial fishermen to recover for lost profits caused by harm to uncaught fish.[72]  Likewise, the vast majority of state courts have not adopted the rationales or even the results in cases such as *People Express* and *J'aire*.

A longstanding canon of statutory construction holds that when statutes depart from common law (including admiralty law), those departures should be construed narrowly.[73]  To be sure, where Congress clearly indicates an intention to depart dramatically from common law, that intention controls.[74]  And Section 2702(b)(2)(E)'s use of the phrase "any claimants" does indicate that OPA is designed to eliminate the existence of an ownership or lease interest in property or resources damaged by a spill as a prerequisite to recovery of economic losses.[75]  However, the same section's "due to" clause equally clearly indicates that not all such claimants are permitted to recover.

---

[72]  *See* Barasich v. Shell Pipeline Co., L.P., Nos. 05-4180, 05-4197, 05-4199, 05-4212, 05-4512, 06-5102, 2006 WL 3913403, at *6 & n.1 (E.D. La. Nov. 20, 2006) (denying commercial fisherman recovery for spill-related economic losses under admiralty and Louisiana tort law, and noting that the commercial fishermen's exception "has never been formally recognized by the Fifth Circuit or the United States Supreme Court.").

[73]  Shaw v. Railroad Co., 101 U.S. 557, 565 (1879) ("No statute is to be construed as altering the common law, farther than its words import.  It is not to be construed as making any innovation upon the common law which it does not fairly express.").

[74]  Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783 (1952).

[75]  Representative Jones, the House sponsor of the bill that became OPA, used the phrase "standing" to explain the significance of the "any claimant" language.  135 CONG. REC. 26788, 26851 (Nov. 1, 1989).  So too did Representative Stangeland.  136 CONG. REC. 22131, 22289 (Aug. 3, 1990) (identifying fishermen and beachfront property owners as having "standing" to bring economic loss claims).

31

A reading of the section in light of the presumption favoring narrow derogation is thus appropriate. It suggests that Congress's aim in enacting Section 2702(b)(2)(E) was to extend liability along the lines tentatively identified by judicial decisions that have pushed the boundaries of the economic loss rule. To say the same thing: OPA's economic loss provisions are best understood as expanding liability for economic loss beyond owners and lessees of property that has been damaged to any person whose business's profitability depends on his or her ability to exercise a right physically to obtain or use property or resources that are damaged or lost because of an oil spill. This would include, most obviously, commercial fishermen who are deprived of physical access to fishing stocks, or deprived of the use of boats and other equipment that they do not own or lease but that they use to fish. It would also extend liability to owners of commercial beachfront property that is not itself contaminated with oil, but is located in the immediate vicinity of coastal waters or shorelines that have suffered pollution, and thus interferes with actual use of their properties as hotels, resorts, and the like.

Reading OPA in this manner makes sense of the "due to" clause's linkage of recovery for economic loss to property or resources being damaged or made physically unavailable. Economic loss is "due to" property or resource damage, or loss, when profits or earnings suffer because the damage, or loss, prevents or hinders the claimant from putting that property or those resources to commercial use, as is her right. Any claimant who has such a use-right – regardless of whether the right amounts to an ownership or lease interest – stands to recover.

It could be argued that OPA, so read, accomplishes very little because it merely replicates schemes of liability already in place under admiralty law and state tort law. This objection is misguided. As mentioned above, only a few decisions allow liability for economic losses caused to persons with a right to use particular property or resources for commercial purposes, and even they have tended to recognize only claims by persons who enjoy an *exclusive* right to use particular

32

property, such as the leaseholders in *People Express* and *J'aire*. The Supreme Court likewise has never signed off on the exception in admiralty law, recognized by some lower federal courts, for commercial fishermen who are licensed to fish in certain waters. In giving decisions such as these a firm statutory basis, OPA did not merely tweak the existing liability landscape. It firmly established a large domain of liability for economic loss. Moreover, although it seems likely that OPA was meant primarily to benefit persons with exclusive or near-exclusive rights to use particular property or resources damaged or rendered unavailable by a spill, there is an argument to be made – discussed below – that liability extends to certain additional claimants, again suggesting that the statute's economic loss provisions have real bite as compared to liability under common law.

### 2. *Legislative History*

The case for interpreting Section 2702(b)(2)(E) as designed primarily to protect actual rightful *users* of property and resources that are damaged or lost because of a spill is strengthened by attention to OPA's legislative history. Members of Congress on several occasions specifically identified these first-line users of property and resources, such as commercial fishermen and owners of beachfront properties, as the primary beneficiaries of that section. Here are the comments from the provision-by-provision analysis contained in the House Conference Report:

> Subsection (b)(2)(E) provides that any claimant may recover for loss of profits or impairment of earning capacity resulting from injury to property or natural resources. The claimant need not be the owner of the damaged property or resources to recover for lost profits or income. For example, a fisherman may recover lost income due to damaged fisheries resources, even though the fisherman does not own those resources.[76]

A 1990 Senate Report likewise focused on claims by fishermen, explicitly linking recovery under Section 2702(b)(2)(E) to a claimant's inability to *use* property and resources:

---

[76] H.R. Conf. Rep. No. 101-653, at 104 (1990).

> [The damages provisions of subsection (b)(2)] are intended to provide compensation
> for a wide range of injuries and are not so narrowly focused as to prevent victims of
> an oil spill from receiving reasonable compensation.   For example, economic
> damages include both *loss of use* and loss of subsistence use of natural resources.
> Under this provision, fishermen, for example, would not only receive the equivalent
> of unemployment compensation, but would also receive compensation to prevent
> loss of a boat.  Lost wages are of limited value if the means of earning wages, such as
> a boat, go uncompensated.[77]

As is plainly suggested by this excerpt, Section 2702(b)(2)(E) was meant to operate as the *commercial use* counterpart to Section 2702(b)(2)(C)'s provision of compensation for interferences with *subsistence use* of natural resources.

Other comments on the House bill further demonstrate the sort of economic loss claimant Congress aimed to empower to recover compensation.  Representative Stangeland emphasized that Section 2702(b)(2)(E) would hold polluters liable for "government cleanup costs, natural resource damages, and economic damages to third parties such as fishermen and beachfront property owners."[78] Citing the inadequacies of pre-OPA law, Representative Schneider decried the fact that, one year after the *World Prodigy* spill in Narragansett Bay, "[t]he economic losses incurred by shell fishermen and related business are still being felt."[79]  Representative Studds advocated for OPA as a guarantee "that our fishermen and beachfront property owners will be compensated promptly and in full for any oil spill damages they might suffer."[80]

### 3. Judicial Interpretation

The few extant judicial applications of Section 2702(b)(2)(E) are entirely consistent with the understanding of OPA offered here, though at least two courts have adopted arguably narrower

---

[77] S. REP. NO. 101-94, at 12 (1990) (emphasis added).

[78] 136 CONG. REC. 22131, 22289 (Aug. 3, 1990).

[79] 136 CONG. REC. 15077, 15368 (June 21, 1990).

[80] 135 CONG. REC. 26904, 26934 (Nov. 2, 1989).  Representative Jones, the sponsor of the House bill (H.R. 1465), described the economic loss provisions contained in it – which were eventually displaced by the economic loss provision contained in the Senate bill – as entailing "that a worker at a coastal hotel might have standing to bring a claim for damages even though he owns no property which has been injured as a result of a discharge from oil.  In addition, the loss of earnings from seasonal activities is included."  H. REP. NO. 101-242, Pt. 2, at 57 (1989).

interpretations of the statute's provisions for economic loss liability.[81]  In *Sekco Energy, Inc. v. M/V Margaret Chouest*, the defendant chartered a boat to tow cable containing mineral oil.[82]  While being towed, the cable collided with plaintiff's stationary offshore drilling platform.  The platform suffered no damage, but some mineral oil was released, causing the platform to be shut down while the spill was investigated.  The district court allowed the plaintiff's claim for compensation for lost profits incurred during the shutdown, reasoning that the spill had temporarily caused the plaintiff to lose the use of its property.  As the court emphasized, the defendant's interference with the plaintiff's right to operate its platform is exactly the sort of interference-with-use-rights that Section 2702(b)(2)(E) addresses.[83]  Likewise, in *In Re Settoon Towing, LLC* the district court refused to dismiss claims for economic losses suffered "as a result of [claimant's] alleged inability to access its production platform" because of a release of oil that resulted from a collision between a ship and a well owned by someone other than the claimant.[84]  *Dunham-Price Group, LLC v. Citgo Petroleum Corp.* permitted recovery for losses resulting from a spill that caused the closure of a river, in turn causing the claimant "'loss of use, increased expense, business interruption and related damages.'"[85]

### 4.  *Policy Considerations*

The question of OPA's proper interpretation – of what liability scheme Congress actually put into place – is distinct from the question of whether OPA's liability provisions are optimally designed to realize certain goals or principles.  However, it would presumably count against an

---

[81] *See In re* Taira Lynn Marine Ltd. No. 5, LLC, 444 F.3d 371 (5th Cir. 2006) (no recovery under admiralty law or OPA for businesses that suffer economic losses when defendants' release of airborne gases resulted in officials ordering the closure of the sole public access route to the area in which the plaintiff-businesses operated); *In re* Cleveland Tankers, 791 F. Supp. 669 (E.D. Mich. 1992) (denying recovery for economic loss under admiralty law and OPA for the sinking of tanker that partially blocked a channel that plaintiffs used to transport goods).
[82] 820 F. Supp. 1008 (E.D. La. 1993).
[83] *Id.* at 1012.
[84] No. 07-1263, 2009 WL 4730969, at *2 (E.D. La. Dec 4, 2009).
[85] No. 2:07 CV 1019, 2010 WL 1285446, at *1 - *2 (W.D. La. Mar. 31, 2010) (quoting claimant's complaint); *see also* FGDI, LLC v. M/V Lorelay, 193 Fed. Appx. 853, 2006 WL 2351835 (11th Cir. Aug. 15, 2006) (presuming OPA liability for a spill that deprived a grain elevator operator use of that facility).

interpretation of OPA's liability scheme if, on that interpretation, the scheme were to draw irrational or entirely arbitrary distinctions among classes of possible claimants. No such problem is raised by the present interpretation of OPA's economic loss provisions. There are plausible reasons for limiting recovery for economic loss to persons who can establish that their losses resulted from harm to property or resources that interferes with their right to put that property or those resources to commercial use. That there are such reasons supports the validity of an interpretation that has already been shown to comport with OPA's text, the common law background against which the statute was enacted, and extant judicial interpretations of its economic loss provisions.

OPA's limitations on liability for economic loss share with the common law's pure economic loss rule the idea that, as between claims for personal injury and property damage (on the one hand) and economic loss (on the other), the former are generally to be prioritized. For a major spill, it is entirely possible, perhaps likely, that the compensation of the entire universe of provable economic loss claims would come at the expense of victims who have suffered personal injuries and property damage. It might also come at the expense of those seeking reimbursement for clean-up costs. For both of these reasons, as well as the reasons generally said to support the pure economic loss rule, it is sensible to read the statute as drawing limits on the set of economic loss claims that are compensable.

Furthermore, within the class of economic loss claimants, the "due to" clause, as interpreted here, ensures that compensation will flow primarily to certain members of the communities most immediately and tangibly affected by a spill. Losses from a spill are likely to be particularly concentrated – and therefore cumulative and particularly devastating – in communities populated heavily by persons whose livelihoods depend on the use of resources, land, structures, and equipment that have been physically harmed or rendered unusable by a spill.

In addition, certain other forms of economic loss, even grave loss, generate less compelling claims to a remedy. Consider, for example, what might be termed "second-order" claims, such as a claim for lost profits by a big-box retail store, located several miles inland, that relies heavily on the patronage of workers whose jobs involve the use of coastal and marine resources. Insofar as a spill has interfered with the ability of these workers to work and collect their wages, it will also tend to harm the store owner's bottom-line. And yet, by the same token, the provision of relief through OPA to these workers should redound to the benefit of second-order victims such as the retailer, as well as third- and fourth-order victims such as suppliers of the retailer and suppliers of the suppliers. Of course, one can hardly expect the compensation of first-order victims to fully compensate more remote victims. Even first-line users of property and resources who are promptly and fairly compensated for lost profits and lost wages might change their spending habits or frequent different stores in response to a spill that has caused them economic loss. The point is merely that, economic recovery, like economic loss, will tend to flow from immediate to more remote victims, and it would have been perfectly sensible for Congress to take this into account in devising a liability regime for economic loss resulting from oil spills.

Finally, in drawing the line at recovery by immediate users of damaged property and resources, OPA precludes from recovery a potentially large class of claimants who arguably are less in need of a legal remedy because of their ability to respond in other ways to economic losses resulting from an oil spill. These are claimants who suffer economic loss because of *misinformation* about the scope or severity of an accidental spill – for example, tourist destinations that lose business because of unwarranted public fears of pollution in that location, or seafood restaurants that lose business because of unfounded fears of contaminated seafood.[86] In many respects, these claimants resemble individuals and businesses who sue for economic losses caused by the careless

---

[86] David Segal, *Should BP's Money Go Where Oil Didn't?*, N.Y. TIMES (Oct. 24, 2010, at BU1) (suggesting that public misapprehension as to the scope of the spill has played a significant role in expanding the Spill's economic impact).

37

dissemination of false, defamatory information – for example, a prominent local restaurant that loses

customers because a website has carelessly misidentified it as having served contaminated food.  In

both of these situations, the economic loss suffered is most immediately caused by reputational

harm resulting from the circulation of misinformation.  With respect to losses caused in this manner,

as opposed to losses caused by physical damage to property or resources, state and local

governments, as well as business and civic associations, are well-situated to respond through

advertising campaigns and other means.  Their need for a legal remedy is thus arguably weaker.[87]  It

is true that individual small business owners and perhaps even small communities might lack the sort

of resources and access that would permit them to respond effectively with a media campaign.   But

they are almost certainly in a position to benefit from the ability of other actors, including state and

local governments, to do so.

---

[87] In a related context, the U.S. Supreme Court has set severe limits on recovery for even devastating economic loss flowing from misinformation.  Indeed, no recovery at all is permitted for economic loss caused by the accidental defamation of "public figures" – a category including governmental officials, prominent businesspersons, and, in some cases, businesses themselves – even defamation that results from gross carelessness.  Gertz v. Robert Welch, Inc., 418 U.S. 323, 336 n. 7 (1974); N.Y. Times Co. v. Sullivan, 376 U.S. 254, 285-86 (1964).  The Court has justified this categorical liability limitation on several grounds.  One is that public figures can effectively respond to misinformation about them through the spread of true information.  Gertz, 418 U.S. at 344 ("Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements then private individuals normally enjoy.").  While conceding that "an opportunity for rebuttal seldom suffices to undo harm of defamatory falsehood," the Court nonetheless has concluded that public figures' greater ability to combat misimpressions that have harmed them, and that threaten to continue to harm them, provides a reason to deny them a right to recover damages through a defamation suit.  Id. at 344 n. 9.

It is important not to overstate this analogy.  The limits on defamation liability set by the Supreme Court are animated by a concern to protect free speech rights.  No equivalent concern is at stake when it comes to the imposition of liability for the indirect economic effects of oil spills.  The point is not to equate public-figure defamation claimants with claimants who suffer economic losses because of misinformation about the effects of an oil spill.  It is to observe that there is something distinctive about the latter class of claimants, as compared to those who suffer economic loss because of harm to their property or to property or resources they are entitled to use for commercial purposes.  It is also to observe that this distinctiveness – their ability to respond to misinformation through the spread of accurate information – would support a decision by Congress to treat them differently.  Like the other policy considerations discussed above, this one is highlighted not because it decisively favors limiting liability for economic loss, but because it demonstrates the intelligibility of the limits that OPA has established.

### D. Application of Section 2702(b)(2)(E)

The application of legal rules to particular claims generally requires detailed fact-finding and close scrutiny of those facts, which is, of course, the province of judges and juries. Indeed, although OPA does not specifically provide for jury trials, claimants seeking recovery in federal court for economic losses resulting from a spill may enjoy a Seventh Amendment right to have those claims tried before a jury.[88] Still, even assuming that OPA claims do come with jury-trial rights, there will be occasion for judges to rule out, categorically, certain kinds of claims on the ground that they cannot reasonably be understood to fall within the orbit of liability established by OPA. Doing so is an appropriate job for judges,[89] and will help ensure that the statute is applied predictability and consistently across cases and jurisdictions.

Returning to the list of imagined claimants set out in Part III.B.2, above, one can place them into three categories: (1) those for whom the right to recover under OPA is clear, assuming they have adequate proof of damages and actual causation; (2) those for whom there is clearly no right to recover, and (3) those for whom there is probably no right to recover, but who could be deemed eligible to recover on a particular generous reading of OPA.[90]

---

[88] The Seventh Amendment right to a jury trial in federal court does not extend to suits that would have been brought in admiralty at the time of the Amendment's ratification. Whether an OPA claim for damages would be such a suit, or would instead be the sort of suit that, at that time, would have been brought under the common law, depends on the facts and theory of the particular case. At least two lower courts have concluded that claims for damages under OPA do give rise to a right to a jury trial. South Port Marine, LLC v. Gulf Oil Ltd. P'ship, 234 F.3d 58, 64 (1st Cir. 2000); Clausen v. M/V New Carissa, 171 F.Supp.2d 1127, 1135 (D. Or. 2001).

[89] As noted above, the common law's economic loss rule has primarily been fashioned as a judge-made and judge-applied rule of "no duty" rather than as a matter appropriate for case-by-case determination by juries. That it is so conceived supports the conclusion – already adopted in judicial practice – that judges are charged with the task of determining, at a general level, which categories of economic loss claimants ought to be able to recover under OPA. It is true that, at common law, "proximate cause" has traditionally been regarded as a question for juries. And yet insofar as the proximate cause inquiry calls for the setting categorical limits on responsibility, it is arguably better suited to judges. See Benefiel v. Exxon Corp., 959 F.2d 805, 808 (9th Cir. 1992) (observing, in the context of ruling that certain categories of economic loss claims are not recoverable under TAPAA, that "[w]hile proximate or legal causation normally presents an issue for the trier of fact to resolve, both California and federal law recognize that where causation cannot reasonably be established under the facts alleged by a plaintiff, the question of proximate cause is one for the court.").

[90] The following application of OPA's rules to a set of imagined claims will provide some guidance on the scope of liability for economic loss under the statute. However, the set of imagined claims obviously cannot hope to capture all the different sorts of economic loss claims that might be brought in the aftermath of a major oil spill. Nor can the

Those who clearly stand to recover upon an adequate showing of loss and actual causation include C, H, and E – the commercial fisherman deprived of access to fish because of a spill, the hotel owner who loses profits because neighboring beaches and waters that his customers tend to use are polluted, and the employee of that hotel who loses wages because of the hotel's loss of business.  Each of these claimants seeks compensation for economic loss due to damage to, or loss of, property or resources to which the claimant has a right of access or use, and on which right the claimant's economic well-being depends.  Each is also specifically identified in OPA's legislative history as the kind of claimant who has suffered economic loss "due to" property or resource damage or loss.[91]

Claimant B – the barge owner denied access to the river on which the barge normally operates – probably also falls in the foregoing category.  On the other hand, B is not among those specifically mentioned in legislative history as entitled to recover.  Moreover, one could argue that access to navigable waters is a right enjoyed generally by the public rather than the particular right of persons whose businesses happen to require use of navigable waters.  That fact which could distinguish B's claim from that of, for example, commercial fishermen who possess a license to catch and sell fish.[92]

---

application of the statute to the imagined set of claims resolve in advance all legal questions pertaining to the resolution of the claims that are actually brought.

[91] That commercial fishermen are licensed to catch fish provides a particularly clear basis for concluding that they enjoy a use-right of the sort that Section 2702(b)(2)(E) is designed to protect and vindicate.  It does not follow that a formal license is required to establish liability for economic loss under OPA.  Nor does it follow that everyone who engages in licensed activity that is adversely affected by an oil spill can recover.  Under the reading of OPA offered here, a licensed cab driver who sees business drop because a spill has suppressed tourist demand for rides between a locality's airport and its resorts has no claim for those losses.  The critical question, again, is whether the claimant has a right physically to access or use property or resources, which right has been interfered with because a spill has caused damage to or the loss of that property or those resources.

[92] This line of reasoning may be lurking behind two decisions, cited above, that deny recovery to actual OPA claimants who suffered economic losses in circumstances similar to those faced by imaginary claimant "B".  *In re* Taira Lynn Marine Ltd. No. 5, LLC, 444 F.3d 371 (5th Cir. 2006) (no recovery under admiralty law or OPA for businesses that suffer economic losses when defendants' careless release of airborne gases resulted in officials ordering the closure of the sole public access route to the area in which the businesses operated); *In re* Cleveland Tankers, 791 F. Supp. 669 (E.D. Mich. 1992) (denying recovery for economic loss under admiralty law and OPA for the sinking of tanker that partially blocked a channel that plaintiffs used to transport goods).

Turning from the category of those who are clearly eligible to recover from those who clearly are not, the latter includes all listed claimants from "O" through "L" (inclusive). None of these claimants can establish that they have suffered economic losses "due to" property or resource damage or loss. O, the innkeeper whose business suffers only because of a threat of imminent pollution damage that has not yet occurred, has not suffered losses because of his inability to access or use that property or those resources. (If authorities had, in light of the threat, barred access to beachfront and waters routinely used by O's customers, then the situation would be different.) The same is true for F – who operates a fireworks store located 150 miles from any property and resources that have been lost or damaged. Likewise for T, the tour boat operator who operates in waters that have not been polluted; D, the inland amusement park owner; N, the Nevada resort operator; M, the snorkeling equipment importer; S, the owner of the Phoenix seafood restaurant; G, the gas station owner in Boise; and L, the New York caterer. Again, some of these claimants might well be able to prove that they have suffered economic loss because of the hypothesized spill. They are nonetheless ineligible to recover because they cannot show that their right and ability to put certain property or resources to commercial use has been hindered by the spill's having damaged, or deprived them of the use of, that property or those resources.

Finally, there are claimants R, A, W – the restaurant owner, real estate agent, and the furniture store operator whose businesses reside in the immediate vicinity of a spill. None of them are as-of-right commercial users of property that has been damaged or lost, or of resources that have been damaged or lost, because of the imagined spill. Hence it would be entirely appropriate to conclude that they should not recover in light of OPA's "due to" requirement.[95] On the other hand, their commercial activities are very closely bound up with local economies that revolve around the

---

[95] *Cf.* Phillips v. G & H Seed Co., Inc., 10 So.3d 339 (La. Ct. App.) (denying recovery under state law of lost profits suffered by would-be buyers and processors of crawfish that were killed or sterilized as a result of exposure to pesticide manufactured and sold by the defendant), *writ denied*, 21 So.3d 284 (La. 2009).

use of resources and property that have been damaged.  And there is some reason to suppose that Congress, acting with the *Exxon Valdez* spill very much in mind, was especially focused on the adverse economic effects of spills on the residents of shoreline communities physically affected by a spill.  We also have seen that the common law tradition has been to allow for marginal expansions of liability to claims that, strictly speaking, fall outside the liability limits set by case law, yet constitute a reasonably well-defined and limited class.   Given these considerations, it could conceivably be appropriate to interpret OPA generously to permit these claims.[94]

## IV.  LIABILITY FOR ECONOMIC LOSS UNDER STATE LAW

The analysis thus far has focused on potential liability under OPA for economic loss caused by an oil spill on navigable waters.  The federal statute, however, is not necessarily the only body of law that will govern such claims.  This is because OPA contemplates that, at least to some extent, states can enact and enforce liability rules in addition to OPA's.  A detailed analysis of individual states' liability rules for pollution-related economic losses is beyond the scope of this report.  Nonetheless, it can offer some pertinent general observations.  Because the bulk of economic loss claims are likely to be asserted by businesses operating in the Gulf States, the focus will be on the laws of those states.[95]

### A.  OPA's Savings Clause

Section 2718 of OPA contains a savings clause.  In relevant part, it reads as follows:

---

[94] Although it is sometimes claimed that environmental statutes are "remedial" in nature, and therefore ought to be interpreted liberally, such claims remain contentious, at a minimum.  *See* Blake A. Watson. *Liberal Construction of CERCLA Under The Remedial Purpose Canon: Have the Lower Courts Taken a Good Thing Too Far?*, 20 HARV. ENVTL. L. REV. 199 (1996) (noting a split between the U.S. Supreme Court and lower federal courts as to whether the canon of statutory interpretation that favors a liberal reading of "remedial" legislation applies to environmental protection statutes).

[95] Because state laws differ as to the scope of liability for economic loss resulting from an oil spill, a court entertaining a state-law claim for economic loss resulting from a spill may be required to apply choice-of-law rules to determine which state's law will govern the resolution of that claim.  This report takes no position on choice-of-law issues.

(a) ... Nothing in this [statute] ... shall –

   (1) affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to –
      (A) the discharge of oil or other pollution by oil within such State; or
      (B) any removal activities in connection with such a discharge; or
   (2) affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under ... State law, including common law.

....

(c) Nothing in this [statute] ... shall in any way affect, or be construed to affect, the authority of the United States or any State or political subdivision thereof –
   (1) to impose additional liability or additional requirements; or
   (2) to impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law;
relating to the discharge, or substantial threat of a discharge, of oil."[96]

In *United States v. Locke*, the Supreme Court had occasion to interpret Section 2718.[97]   Faced with a conflict between Washington state law and federal laws concerning the safe operation of oil tankers, the Court concluded that the former were preempted by the operation of the Supremacy Clause of the U.S. Constitution.[98]   The Court further concluded that Section 2718's savings clause – which appears in the portion of OPA specifying rules for the recovery of clean-up costs and damages (Title I), and not in the part of the statute setting out vessel safety requirements – did not spare Washington's laws because the latter involved "substantive regulation of a vessel's primary conduct."[99]   Instead, said the Court, the savings clause is designed to leave states with room to "establish liability rules and financial requirements relating to oil spills."[100]   *Locke* therefore makes clear that OPA does not, as a general matter, preclude states from adopting alternative liability rules for oil spills on navigable waters, including rules that might call for more expansive liability for economic loss than those set by Section 2702(b)(2)(E).

---

[96] 33 U.S.C. § 2718(a), (c).
[97] 529 U.S. 89 (2000).
[98] *Id.* at 94.
[99] *Id.* at 105.
[100] *Id.*

## B. Scope of Liability Under Gulf-State Statutes

Overwhelmingly, state common law liability for economic loss is less expansive than OPA liability. As noted above, it typically requires *proof of fault* as a condition of liability for harms caused by accidental releases of oil. And of course the very point of Section 2702(b)(2)(E) was to eliminate the common law's economic loss rule as an automatic bar to recovery. Even high courts that have purported to abandon the rule, including those of California, Florida and New Jersey, have not actually imposed liability that is more expansive than the liability called for under Section 2702(b)(2)(E). Thus, if liability under state law for economic loss caused by a release of oil into navigable waters is going to be broader than it is under OPA, that outcome will almost certainly have to be accomplished by operation of state statute.

Three states bordering the Gulf have enacted statutes that impose liability for harms related to oil spills: Florida, Louisiana and Texas.[191] Provisions for recovery in both the Louisiana and Texas statutes are worded in ways that seem to render their reach either less extensive or comparable to the reach of Section 2702(b)(2)(E). The Texas Oil Spill Prevention and Response Act of 1991 indicates by its plain terms that recovery for stand-alone economic loss is limited to *users* of lost or damaged property or resources, authorizing compensation to:

> persons, including but not limited to holders of an oyster lease or permit; persons owning, operating, or employed on commercial fishing, oystering, crabbing, or shrimping vessels; persons owning, operating, or employed by seafood processing concerns; and others similarly economically reliant on the use or acquisition of natural resources for any direct, documented loss of income, profits, or earning

---

[191] Alabama and Mississippi have not adopted statutes that impose liability specifically for oil spills. In addition, neither state's high court appears to have issued an opinion clearly specifying the contours of common law liability for negligent conduct causing pure economic loss. *Cf.* Public Bldg. Auth. v. St. Paul Fire & Marine Ins. Co., 2010 WL 3937962, at *13 (Ala., Oct. 8, 2010) (reaffirming the version of the economic loss rule that prevents the buyer of a faulty product from invoking negligence law to impose liability for economic loss on the seller beyond the terms specified in the sales contract, but declining to apply that doctrine to a commercial construction contract); Flying J Fish Farm v. Peoples Bank of Greensboro, 12 So.3d 1185, 1195 (Ala. 2008) (bank owes no duty to take care to make sure that the recipient of a commercial loan will be in a position to repay it).

capacity from the inability of the claimant to use or acquire natural resources arising solely from injury to the natural resources from an unauthorized discharge of oil.[102]

Louisiana's Oil Spill Prevention and Response Act was likewise enacted on the heels of OPA, and indeed is modeled on it. However, unlike OPA and the Texas statute, it does not appear to authorize any claims for economic loss divorced from harms to the claimant's own property. Instead, the only damages identified as recoverable by a non-governmental entity are "damages for injury to, or economic loss resulting from destruction of, immovable or corporeal movable property, which shall be recoverable by a person who owns or leases that property."[103]

Florida law contains two anti-pollution laws. The Pollutant Discharge Prevention and Control Act ("PDPCA"),[104] enacted in 1970, addresses the pollution of coastal waters and lands. The Water Quality Assurance Act ("WQAA"),[105] enacted in 1983, deals specifically with pollution of ground and surface waters.

The PDPCA prohibits "[t]he discharge of pollutants into or upon any coastal waters, estuaries, tidal flats, beaches, and lands adjoining the seacoast of the state in the manner defined by [an earlier provision of the statute] ...."[106] It specifies that a party responsible for a discharge in violation of this prohibition is "liable to any affected person for all damages as defined in s. 376.031, excluding natural resource damages, suffered by that person as a result of the discharge."[107] Section 376.031 in turn defines damage in terms that seems to exclude economic loss, specifying it as: "the

---

[102] TEX. NAT. RES. CODE ANN. § 40.003(7)(a)(iii) (West 2009). The underlying liability provision states that "any person responsible for an actual or threatened unauthorized discharge of oil from an offshore drilling or production facility is liable for all such damages *from* the actual or threatened discharge." *Id.* § 40.202(b)(2) (emphasis added). The provision quoted in the text is part of the statute's definition of what counts as "damages."

[103] LA. REV. STAT. ANN. § 30:2454(5)(b) (1990). In *Barasich v. Shell Pipeline Co.*, No. 05-4180, 2006 WL 3913403 (E.D. La. Nov. 20, 2006) the federal district court noted that, as a matter of Louisiana law, commercial fisherman do not own or lease uncaught fish, whereas oyster farmers do have a property interest in oysters in leased oyster beds. Interestingly, although the Louisiana statute initially permitted recovery for lost profits and impaired earning capacity on the same terms as OPA, that provision was deleted by the state legislature in 1995. LA. REV. STAT. ANN. § 30:2454(5) (historical note) (stating that Acts 1995, No. 740 § 2, repealed sub-sections 30:2454(5)(e) and (f)).

[104] FLA. STAT. §§ 376.011-376.21 (2010).

[105] *Id.* §§ 376.30-376.319.

[106] *Id.* § 376.041.

[107] *Id.* § 376.12(5).

45

documented extent of any destruction to or loss of any real or personal property, or the documented extent, pursuant to § 376.121, of any destruction of the environment and natural resources, including all living things except human beings, as the direct result of the discharge of a pollutant."[108]

WQAA, for its part, prohibits the discharge of pollutants and hazardous substances into or upon Florida surface water or groundwater.[109]  With respect to liability for such discharges, Florida Statutes Section 376.313(3) states as follows: "nothing contained in [WQAA] prohibits any person from bringing a cause of action in a court of competent jurisdiction for *all damages* resulting from a discharge or other condition of pollution covered by [WQAA]."[110]

In *Curd v. Mosaic Fertilizer, LLC* the Florida Supreme Court recently had occasion to interpret both laws.[111]  The case involved claims by commercial fishermen who alleged that they suffered lost profits because of a spill of chemicals from a land-based storage facility into Tampa Bay.  The spill resulted in harm to fish, crabs, and other marine life.  Reading WQAA's "nothing contained" provision (section 376.313(3)) in conjunction with PDPCA's definition of "damage" (section 376.121), the Court concluded, somewhat cryptically, that the Florida legislature had provided for "private causes of action to any person who can demonstrate damages as defined under the statute."[112]

At a minimum, *Curd* stands for the proposition that there are *some persons* who, under Florida law, can recover for economic loss without having to demonstrate that the discharge caused physical harm to property that they own or lease.  Who among these persons stands to recover is as yet unclear.  In a separate opinion, Justice Polston interpreted the Court to have decided for the fishermen only because they could make out a claim under WQAA, the statute that governs surface-

---

[108] *Id.* § 376.031(5).  The preface to Section 376.031 states that its definitions apply to the entirety of the PDPCA – i.e., Section 376.011-376.21 of the Florida Statutes – unless the context clearly requires otherwise. *Id.* § 376.031.

[109] *Id.* § 376.302(1)(a).

[110] *Id.* § 376.313(3) (emphasis added).

[111] 39 So.3d 1216 (Fla. 2010).

[112] *Id.* at 1222.  The court's reference to "the statute" is cryptic because it appears to intermingle portions of two different statutes – PDPCA and WQAA – that contain different liability triggers and damages provisions.

water and groundwater releases.[113]  That statute – unlike PDPCA, which would govern liability for an offshore spill – does not have a provision that limits recoverable "damage" to harm to property or natural resources.[114]  As Justice Polston also observed, the majority opinion declined to take up the invitation in the plaintiffs' complaint to authorize recovery not just for commercial fisherman, but also for "distributors, seafood restaurants, fisheries, fish brokers, or the like, whose incomes might have been affected by [the] pollution."[115]  Likewise, he stressed that "the majority only addresses economic harm that resulted from the depletion of marine life and the resulting inability to harvest the commercial fishermen's usual yield – not from harm to reputation as alleged in the petitioner's complaint and mentioned by the Second District Court of Appeal."[116]  On this plausible reading of the court's opinion – one which again sets as a condition of liability for economic loss the deprivation of physical access to property or resources that the claimant enjoys a legal right to use – *Curd* renders Florida law consistent with OPA.  Regardless, it is clear that the Florida Supreme Court did not take *Curd* to be an occasion on which to flesh out fully what sort of nexus between economic losses and property or resource damage will be required to support a finding of liability for economic loss as the result of a discharge of oil from an offshore facility.[117]

---

[113] *Id.* at 1229 (Polston, J., concurring in part and dissenting in part).

[114] *Id.* at 1230 & n. 9.

[115] *Id.* at 1229.

[116] *Id.*

[117] As noted above, OPA's savings clause indicates that states can adopt broader schemes of liability than are found in OPA.  However, even granted that OPA explicitly allows for such schemes, it is still possible that a particular state scheme of liability could be so broad as to conflict with the operation of OPA and hence be subject to preemption.  *See* Geier v. Am. Honda Motor Co., 529 U.S. 861, 869 (2000) (although the savings clause in a federal motor vehicle safety statute blocks the inference that Congress meant generally to block states from adopting different safety requirements through common law liability, the clause does not bar the ordinary working of conflict preemption principles).  Such a conflict might arise, for example, if a state were to adopt a law that permits unbounded liability for economic loss, or for punitive damages, as a result of which a responsible party under OPA was put at risk of being unable to meet its OPA obligations to pay for removal costs and recoverable damages.

47

APPENDIX:

KEY PROVISIONS OF THE OIL POLLUTION ACT OF 1990

(C)(i) with respect to a vessel greater than 3,000 gross tons that is--

(I) a vessel described in subparagraph (A), $22,000,000; or

(II) a vessel described in subparagraph (B), $16,000,000; or

(ii) with respect to a vessel of 3,000 gross tons or less that is--

(I) a vessel described in subparagraph (A), $6,000,000; or

(II) a vessel described in subparagraph (B), $4,000,000;

(2) for any other vessel, $950 per gross ton or $800,000, whichever is greater;

(3) for an offshore facility except a deepwater port, the total of all removal costs plus $75,000,000; and

(4) for any onshore facility and a deepwater port, $350,000,000.

(b) Division of liability for mobile offshore drilling units

(1) Treated first as tank vessel

For purposes of determining the responsible party and applying this Act and except as provided in paragraph (2), a mobile offshore drilling unit which is being used as an offshore facility is deemed to be a tank vessel with respect to the discharge, or the substantial threat of a discharge, of oil on or above the surface of the water.

(2) Treated as facility for excess liability

To the extent that removal costs and damages from any incident described in paragraph (1) exceed the amount for which a responsible party is liable (as that amount may be limited under subsection (a)(1) of this section), the mobile offshore drilling unit is deemed to be an offshore facility. For purposes of applying subsection (a)(3) of this section, the amount specified in that subsection shall be reduced by the amount for which the responsible party is liable under paragraph (1).

(c) Exceptions

(1) Acts of responsible party

Subsection (a) of this section does not apply if the incident was proximately caused by--

(A) gross negligence or willful misconduct of, or

(B) the violation of an applicable Federal safety, construction, or operating regulation by,

the responsible party, an agent or employee of the responsible party, or a person acting pursuant to a contractual relationship with the responsible party (except where the sole contractual arrangement arises in connection with carriage by a common carrier by rail).

(2) Failure or refusal of responsible party

Subsection (a) of this section does not apply if the responsible party fails or refuses--

(A) to report the incident as required by law and the responsible party knows or has reason to know of the incident;

(B) to provide all reasonable cooperation and assistance requested by a responsible official in connection with removal activities; or

(C) without sufficient cause, to comply with an order issued under subsection (c) or (e) of section 1321 of this title or the Intervention on the High Seas Act (33 U.S.C. 1471 et seq.).

(3) OCS facility or vessel

Notwithstanding the limitations established under subsection (a) of this section and the defenses of section 2703 of this title, all removal costs incurred by the United States Government or any State or local official or agency in connection with a discharge or substantial threat of a discharge of oil from any Outer Continental Shelf facility or a vessel carrying oil as cargo from such a facility shall be borne by the owner or operator of such facility or vessel.