UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, on APRIL 20, 2010 | * * * * * | MDL NO. 2179 |
| THIS DOCUMENT RELATES TO: | * * | JUDGE BARBIER |
| ALL CASES | * * | MAG. JUDGE SHUSHAN |

**************************************************

## DECLARATION OF EDWARD F. SHERMAN

I, Edward F. Sherman, declare under penalty of perjury, as follows:

1. I have been asked by the Plaintiffs' Steering Committee in the above-captioned case to review the background and documents concerning certain matters involving the operation of the Gulf Coast Claims Facility ("GCCF"). Specifically, I have been asked to consider the plaintiffs' "Motion to Supervise Ex Parte Communications Between the BP Defendants and Putative Class Members." This involves consideration of plaintiffs' requests that the court limit or clarify the GCCF's communication with putative class members and public announcements concerning its associations with the defendant British Petroleum. I have reviewed a wide range of documents relating to the GCCF, including pleadings, motions, and memoranda filed in the above-captioned case, press releases, news articles, websites, and other documents.

PERSONAL QUALIFICATIONS

2. I am the W.R. Irby Chair and Moise S. Steeg, Jr. Professor of Law at Tulane University Law School in New Orleans, Louisiana. From 1996 to 2001, I was Dean of Tulane Law School. From 1977 to 1996, I taught at the University of Texas School of Law, in Austin, Texas, where I was the Edward A. Clark Centennial Professor of Law. I have previously taught at Indiana University School of Law (1969-1977) and as a Teaching Fellow at Harvard Law School (1967-1969). Upon graduation from Harvard Law School in 1962, I clerked for a federal district judge in the Western District of Texas and practiced with a law firm in El Paso, Texas for a total of three years. I served two years in the U.S. Army from 1965 to 1967.

EXHIBIT 2

3.      My areas of teaching and research are Complex Litigation, Civil Procedure, and Alternative Dispute Resolution, and I have published a large number of books and articles on these subjects. My casebooks (Marcus, Sherman, & Erichson, Complex Litigation: Advanced Civil Procedure (West Group, 5th ed. 2010); Marcus, Redish, Sherman, & Pfander, Civil Procedure: A Modern Approach (West Group, 5th ed. 2009); and Rau, Sherman, & Peppet, Processes of Dispute Resolution: The Role of Lawyers (Foundation Press, 4th ed. 2006)) are used in law schools around the country.

4.      I have served as counsel, consulted with counsel, or served as an expert witness in a large number of class actions and complex litigations, in both federal and state courts. In keeping my casebook on complex litigation current, I have read many of the opinions concerning class action issues, including ethical issues, that have been published in the last twenty-five years, as well as a number of unpublished opinions. I have testified as an expert witness on class certification and professional responsibility issues in a number of cases, in both state and federal courts. Further information about my qualifications is contained in the attached Curriculum Vitae in the Appendix.

## THE OPERATION AND ROLE OF CLAIMS FACILITIES IN COMPLEX LITIGATION

5.      In making this review, I have drawn on my experience with the administration of claims facilities in a large number of complex cases, including class actions, consolidations, and multi-district litigation. It is my opinion that certain aspects of the GCCF's operations concerning communication with class members, public releases and comments, requirements for release, and method of payment to attorneys for claimants do not comport with the usual standards for transparency and fairness expected of a claims phase of complex litigation.

6.      Claims facilities are of relatively recent origin, but they have become a central institution in the resolution of complex litigation. Professor Francis McGovern, of Duke University School of Law, has described the development:

> "Claims resolution facility" is a generic term used to describe a wide range of entities that process and resolve claims made against a potential funding source. In the context of a natural disaster, for example, there might be facilities to process claims based upon insurance policies, federal or state statutory or administrative rights, international relief efforts, contractual obligations, or any other basis for receiving economic or noneconomic benefits. These facilities are generally characterized by a large number of claims that are in need of rapid and efficient resolution.[1]

7.      Claims facilities are frequently the product of a settlement to resolve litigation, but they may also arise out of regulatory or legislative enactments or of insurance, trust, or other

---

[1] Francis McGovern, The What and Why of Claims Resolution Facilities, 57 Stanford Law Review 1361-2 (2005).

Page 2 of 5

contractual obligations. There are a number of common threads that are critical to their acceptance by parties and claimants and to their success in fulfilling the objectives of the fund. Professor McGovern, for example, mentions several accepted standards for the establishment and approval of a claims facility scheme. First is "independence, neutrality, and experience." Whether a claims facility is created and overseen by a court, or functions pursuant to administrative or legislative standards, or operates only under the terms of a private agreement or contract, the features of independence and neutrality are essential. Another accepted standard identified by Professor McGovern is "judicial supervision." While not all claims facilities operate under court supervision, where, as here, a claims facility operates as a pre-litigation device, an MDL court having jurisdiction over cases in which claimants are parties or potential parties can exercise supervisory or remedial authority to insure fairness in the litigation before it.

8. Claims resolution may be accomplished in litigation through appointment of a special master to serve as claims administrator. The special master rule permits a court to incorporate a claims phase into court resolution of the case, making the special master a court surrogate and allowing for apportionment of the costs among the parties. That the special master must be independent and neutral as regards the parties goes without saying, and is further insured by the fact that they judge has the final decision-making authority.

## THE GULF COAST CLAIMS FACILITY

9. On June 16, 2010, British Petroleum announced the appointment of Kenneth Feinberg as administrator of an "independent claims process" for individuals and businesses injured by the oil spill. The agreement between Mr. Feinberg and British Petroleum was not memorialized in detailed contractual terms. Either BP or the law firm of Feinberg Rozen LP, (or some combination thereof), established the Gulf Coast Claims Facility ("GCCF") under Mr. Feinberg's control and supervision, which in turn assumed the duties of administering the claims process, on behalf of BP. British Petroleum, in this regard, was acting pursuant to its legal duties as a "responsible party" under the Oil Pollution Act[2] to establish a claims process and pay interim and other claims arising from the spill.

10. Mr. Feinberg and British Petroleum repeatedly stated that Feinberg was independent, but Mr. Feinberg appears to have worked closely with BP officials in designing the structure and procedures of the GCCF. He apparently consulted with British Petroleum concerning both the substantive and procedural standards for the payment of claims. Although Mr. Feinberg would not draw a salary, his law firm would be paid $850,000 a month, in addition to expenses and the possibility of further compensation. This fee arrangement was not publicized, and most claimants would not have been aware of it.

11. The fee arrangement here contrasts with the usual method of payment of special masters, who are paid on an hourly basis according to the prevailing market rates in the community. The sizable fee arrangement is not objectionable in itself; however, the fee

---

[2] 33 U.S.C. §§2705(a), 2713, & 2714(b).

arrangement does reveal a relationship which claimants who are encouraged to go through an "independent" claims process should be aware of. Knowledge of the arrangement may or may not make a difference to any particular claimant, but it could be a factor in a claimant's decision as to whether to accept an offer by the GCCF.

12. It is appropriate for this MDL court to issue limitations and guidelines as to communications with claimants in order to insure that claimants have adequate information as to the nature of the claims facility in deciding whether to accept its offer or pursue litigation.

13. Statements by Mr. Feinberg quoted on page 11 of plaintiff's memorandum are to the effect that claimants would be better off by not litigating and instead resolving their claims through the GCCF. It is certainly Mr. Feinberg's right to have these views, but when he gives such advice in his capacity as an "independent" administrator, (as well as a lawyer), they carry special weight with claimants. This becomes more important when the statements suggest that claimants do not need an attorney, and that an attorney is a waste of money.

14. A development since the filing of plaintiffs' motion adds to the concern – the hiring by BP of private law firms to provide representation for claimants. This may have been prompted by a concern that all claimants may not be able to obtain an attorney.[3] The retained firms maintain that they are independent, and the fact that they are paid by BP does not mean that they would abrogate their ethical responsibilities to the client. However, having a defendant pay for representation of claimants against it is far from the best way to insure legal representation, and raises questions about the adversaries of attorneys who counsel claimants about whether to accept an offer. Additional questions arise regarding the prior or current representation of BP, or other potentially released parties, by such law firms. At the very least, claimants should be informed as to how an attorney provided them is being paid, and other potential conflicts of interest.

15. The kind of release required by the GCCF in order for a claimant to receive a final payment also raises questions as to how independent the GCCF is. The requirement is that claimants release all claims against BP (not just those which are being considered or paid by the GCCF), and all potentially liable parties (not just BP). In addition, the claimants are required to provide a contractual subrogation or assignment against third parties in favor of BP. As a private claims facility, the GCCF may have a right to impose such restrictions on payouts, but this is a position that is heavily weighted in favor of the interests of defendants, particularly BP. This points up the fact that claimants should have adversarial legal advice before accepting a GCCF offer, given the scope of the release. This MDL court's concern that the litigation process not be

---

[3] In fact, based on my understanding, many attorneys are representing claimants in litigation on a pro bono basis or on a contingent fee, and claimants who want to consider their litigation alternatives, have not had difficulty in obtaining a lawyer. There appears to be willingness in the bar to take cases without a fee arrangement with the hope that a global settlement will be made that will include payment of attorney fees.

Page 4 of 5

adversely affected by unfair adversarial behavior in getting releases is very real.[4]

## CONCLUSION

16.   For the reasons given above, I am of the opinion that this court has the authority, as an MDL court with jurisdiction over litigation involving claimants before the GCCF, (and in many cases this Court), to insure fairness in the pre-litigation and/or pre-certification stages of the claims and litigation process. To that end, it is appropriate for the Court to limit or clarify the GCCF's communications with putative class members and public announcements concerning its associations with the defendant, BP.

Thus declared, under penalty of perjury, this 17th day of January, 2011.

_____
Edward F. Sherman

_____
SOREN E. GISLESON, ESQ., NOTARY

26302
BAR NO.

---

[4] Judge Fallon, in the *Murphy Oil* litigation, granted a motion by class counsel to supervise communications between the defendant and putative class members, based on informational statements and settlement offers. Turner v. Murphy Oil USA, Inc., No. 0504206 (E.D. La. 11/14/05). He ordered that the settlement and release agreement should contain a statement that the individual should seek independent legal advice prior to signing and any communications with class members should begin with the statement that the individual has a right to consult with an attorney. See also Kleiner v. First Nat'l Bank of Atlanta, 751 F.2d 1193, 1204 n. 22 (11th Cir. 1985)(prohibiting oral, unsolicited communications by the bank with potential class members to encourage opt out).

CURRICULUM VITAE

EDWARD F. SHERMAN

W.R. Irby Chair and Moise F. Steeg, Jr. Professor of Law
Tulane Law School

ADDRESS:

Tulane Law School
6329 Freret Street
New Orleans, LA 70118-5670
(504) 865-5979

PERSONAL INFORMATION:

    Born:      July 5, 1937, El Paso, Texas
    Family:   Married, two children

EDUCATION:

    High School:  El Paso High School, El Paso, Texas

    College:      Georgetown University, Washington, D.C.
                  A.B., Philosophy, 1959

    Graduate:    University of Texas at El Paso
                  M.A., History, 1962
                  M.A., English, 1967

    Law School:  Harvard Law School, Cambridge, Mass.
                  J.D., 1962
                  S.J.D., 1981

LEGAL AND ACADEMIC EXPERIENCE:

Legal Aide to Governor of Nevada, 1962 (Ford Foundation Fellowship in State & Local Government)

Law Clerk to U.S. District Judge for the Western District of Texas, Honorable R.E. Thomason, 1963

Law Practice: Mayfield, Broaddus, MacAyeal & Perrenot, El Paso, Texas, 1963-1965

1

U.S. Army, Captain, Military Police Corps, 1965-1967; U.S. Army Reserve, Judge Advocate General's Corps, 1968-1990 (to Lt. Colonel)

Harvard Law School, Teaching Fellow, 1967-1969

Indiana University School of Law, Bloomington, Indiana, Professor, 1969-1977

Fulbright Lectureship (in International and Constitutional Law), Trinity College, Dublin, Ireland, 1973-1974

American Bar Foundation Fellowship in Legal History, 1975

University of Texas School of Law, Austin, Texas
Edward Clark Centennial Professor of Law, 1977-1996

University of London, Visiting Professor, 1989

Krajowa Szkola Administracji Publicznej (School of Public Administration), Warsaw, Poland, Visiting Professor, January-February 1995.

Institute of Comparative Law, Chuo University School of Law, Tokyo, Japan, Visiting Professor, spring, 1995.

Tulane Law School, Dean and Professor of Law, 1996-2001; Professor of Law, 2001-present.

University of New South Wales, Sydney, Australia, Visiting Professor, 2002.

University of Maine School of Law, Godfrey Distinguished Visiting Professor of Law, fall, 2003.

Humboldt University-Tulane University, Summer Program on Intercultural Dispute Resolution, Berlin, Germany, 1999, 2004, 2005, 2006, 2008.

SUBJECTS TAUGHT:

    Civil Procedure
    Complex Litigation
    Alternative Dispute Resolution
    International Law, International Arbitration
    Constitutional Law, Civil Rights, Government Liability
    Law of War, Military Law, National Security Law
    Jurisprudence, Law and Literature

SELECTED ACTIVITIES:

American Association of University Professors, General Counsel, 1986-1988

American Bar Association

    Chair, Task force on Federal Preemption of State Tort Law (2009)

    Reporter, Task Force on Disaster Insurance Coverage (2006-2009)

    Reporter, Task Force on Asbestos Reform (2003-2005)

    Chair & Reporter, Task Force on Class Action Legislation (2001-2003)

    Reporter, Summit on Civil Justice System Improvements (1993); Task Force on Offer of Judgment Rule (1995)(TIPS).

    Member, Task Force on the Public Perception of the Litigation System, 1999-2001; Task Force on State of Justice System & Federal Initiatives, 1993-1996; Standing Committee on Pro Bono & Public Service, 1998-2001; Subcommittee on Computerization, Committee on Discovery, 1982-1983.

    Section of Dispute Resolution, Co-chair & member, Arbitration Committee, 1999-2005).

    2004 Dean Robert McKay Award "in recognition of a law professor's commitment to the advancement of justice, scholarship and the legal profession" and 2008 Special Achievement Award for contributions to ABA confernces on understanding and improving class actions.

American Law Institute, 1988-present

    Complex Litigation Project, Members Consultative Group, 1989-1995
    Transnational Civil Procedure, Members Consultative Group, 2001-present
    Principles of the Law of Aggregate Litigation, Members Consultative Group, 2005-present

Arbitrator

    Expedited Arbitration Panel, Aluminum Co. of America and United Steel Workers of America, 1984-1996

    American Arbitration Association, Labor Law Panel, 1989-1996

    International Centers for Arbitration, International Arbitrator Panel, 1993-1996; director of training, 1993-1996.

Association of American Law Schools

  Chair, Section on Litigation, 1999-2000
  Chair, Section on Dispute Resolution, 1995-96
  Board, Section on Civil Procedure, 1994-95
  Committee on Clinical Education, 1999-2003

Expert Witness on Class Action Certification and Management (cases in state and federal courts)

Law & Economics Center, summer program for law professors, 1981, advanced course, 1991

Louisiana Bar Foundation, Judicial Liason Committee, 1999-present

Louisiana State Law Institute, 1996-2002

Louisiana State Bar Association

  Board of Governors, 1997-99
  Board, ADR Section, 1997-present
  Committee on Codes of Lawyer and Judicial Conduct, 1999-present

Mediator

  Basic Mediation Training Course, 1985; volunteer mediator, Travis County Dispute Resolution Center, 1985-1996; court-appointed mediator, Texas state & federal court cases, 1985-1996

  Professor, courses in mediation and arbitration, U. of Texas School of Law, 1986-1996; Tulane Law School, 1996-present; Hamline Law School Summer Mediation Program, 1994; Tulane-Humboldt Universities Intercultural Negotiation/Mediation Summer Program, Berlin, Germany, 1999-2001, 2005, 2007.

National Institute for Military Justice, Board of Directors (2000-present)

Texas Bar Association

  Chair, Committee on Pattern Jury Instructions (Vol. I), 1982-1994

  Board & Member, Alternative Dispute Resolution Section, 1984-96

  1998 Judge Frank Evans Award "for exceptional and outstanding efforts in promoting and furthering Alternative Dispute Resolution methods in Texas."

Texas Center for Public Policy Dispute Resolution, Chair of Board, 1993-1996.

Texas Civil Liberties Union, General Counsel, 1992-1996

4

Travis County Jail Litigation, Court-Appointed Attorney, U.S. District Court for the Western District of Texas, 1981-1990

Travis County Dispute Resolution Center, Board and Vice-President, 1986-1988

Texas Resource Center (for Post-Conviction Capital Representation), Board, 1988-1993, Chair of Board, 1993-1994.

U.S. AID "Stars Project – Vietnam" on drafting new Vietnamese Code of Civil Procedure, 2003

Who's Who in:
- America
- American Education
- American Law
- South & Southwest
- International

SELECTED PUBLICATIONS:

BOOKS:

Civil Procedure: A Modern Approach (with Marcus & Redish)(West Pub. Co. 1988, 1995, 2000, 2005, 5th ed. 2009).

Complex Litigation: Cases and Materials on Advanced Civil Procedure (with Marcus)(Thomson/West Pub. Co. 1985, 1992, 1998, 4th ed. 2004)

Processes of Dispute Resolution: The Role of Lawyers (with Rau & Peppet)(Foundation Press 1989, 1996, 2002, 4th ed. 2006).

Rau, Sherman, and Shannon's Texas ADR and Arbitration: Statutes and Commentary (with Rau & Shannon))(Shepard's McGraw-Hill 1994, West Group 1998, 3d ed. 2000).

Dispute Resolution: Materials for Continuing Legal Education (with Murray and Rau)(National Institute for Dispute Resolution 1991).

Cases and Materials on Military Law: The Scope of Military Authority in a Democracy (with Zillman & Blaustein)(Matthew Bender 1978).

Civil Procedure (Federal and Indiana) (Josephson's Bar Review Center of America 1977).

CHAPTERS IN BOOKS:

"Management Techniques and Devices for Segmenting Aggregate Litigation," in American Bar Association, A Practitioner's Guide to Class Actions (2010).

5

"Military Tribunals" and "Civil Rights in the Military," in Encyclopedia of Civil Rights and Liberties" (2006)

"Sources and Bibliography for Alternative Dispute Resolution," in Alternative Dispute Resolution Handbook 499 (State Bar of Texas 2003).

"Class Actions," in Oxford Companion to American Law 118 (2002).

Volume 3 (Federal Rules 13 & 15), Moore's Federal Practice (1997).

"Applications of Dispute Resolution Processes in the Israeli-Palestinian Conflict," in The Struggle for Peace: Israelis and Palestinians (ed. E. Fernea & M. Hocking 1992)

"Local Court Rules on ADR" and "ADR References," in Handbook of Alternative Dispute Resolution, Chap 23, Appendix B (State Bar of Texas, A. Greenberg, ed.)(2d ed. 1990).

"In-Service Conscientious Objection," in Selective Conscientious Objection: Accommodating Conscience and Security 117 (M. Noone, ed.)(Westview Press 1989).

"Texas Tort Claims Act" (Chap. 60), in Texas Torts and Remedies (H. Edgar & J. Sales, ed.)(Matthew Bender 1987).

"Military Law," in Encyclopedia of the American Judicial System, Vol. 1 (McMillan Pub. Co. 1987).

"Contemporary Challenges to Traditional Limits on the Role of the Military in American Society," in Rowe & Whelan, Military Intervention in Democratic Societies 216 (Croom Helm 1985).

"Responsiveness and Accountability in the Military," in People Versus Government Power 226 (L. Rieselbach, ed.)(U. of Indiana Press 1975).

"Domestic Law and the Military Establishment," in Modules in Security Studies (A. Williams & D. Tarr. ed.)(U. Press of Kansas 1974).

"Bertrand Russell and the Peace Movement: Liberal Consistency or Radical Change," in Bertrand Russell's Philosophy 253 (G. Nakhnikian, ed.)(Indiana U. Press 1974).

"Amnesty and the Military Offender," in When Can I Come Home? A Debate on Amnesty for Exiles, Anti-War Prisoners and Others 92 (M. Polner, ed.)(Doubleday & Co. 1972).

"The Civilianization of Military Law," in With Justice for Some 65 (B. Wasserstein & M. Green, ed.)(Beacon Press 1971).

"Justice in the Military," in Conscience and Command 21 (J. Finn, ed.)(Random House 1971).

"Rights of Servicemen," in <u>The Rights of Americans</u> 621 (N. Dorsen, ed.)(Random House Pantheon 1971).

"Military Justice and Individual Liberty," in A. Yarmolinsky, <u>The Military Establishment: Its Impacts on American Society</u> (A Twentieth Century Fund Study)(Harper & Row 1971).

### SELECTED ARTICLES

"Analysis & Perspective: Tulane Law Review Conference on Multidistrict Litigation," 9 <u>Class Action Litigation Report</u> (BNA) 213 (March 14, 2009).

"The MDL Model for Resolving Complex Litigation If a Class Action is Not Possible," 82 Tulane L. Rev. 2205 (2008).

"Dean Pound's Dissatisfaction with the 'Sporting Theory of Justice': Where Are We a Hundred Years Later?" (Symposium on 100th Anniversary of Pound's "Popular Dissatisfaction with the Administration of Justice)), 48 <u>So. Tx. L. Rev</u>. 683 (2007).

"Decline and Fall?: Consumer Class Actions," 93 <u>ABA Journal</u> 51 (June 2007).

"Class Action Fairness Act and the Federalization of Class Actions," 238 <u>Federal Rules Decisions</u> 504 (2007).

"Transnational Perspectives Regarding the Federal Rules of Civil Procedure," 57 <u>J. Legal Education</u> 510 (2006).

"Class Actions After the Class Action Fairness Act of 2005," 80 <u>Tulane L. Rev</u>. 1593 (2006).

"Segmenting Aggregate Litigation: Initiatives and Impediments for Reshaping the Trial Process," 25 <u>Review of Litigation</u> 691 (2006).

"Compensation under a Trust Fund Solution to Asbestos Claims: Is It Really Fair?" 34 <u>The Brief</u> 48 (ABA Tort Trial & Insurance Practice Section, Winter 2005).

"Consumer Class Actions: Who are the Real Winners?" (Godfrey Distinguished Visiting Professor Lecture), 56 <u>Maine. L. Rev</u>. 223 (2004).

"Introduction to the Symposium on Complex Litigation: Plagued by Concerns over Federalism, Jurisdiction and Fairness," 37 <u>Akron L. Rev</u>. 589 (2004).

"American Class Actions: Significant Features and Developing Alternatives in Foreign Legal Systems," 215 <u>Federal Rules Decisions</u> 130 (2003).

"Evolving Military Justice," 67 <u>J. of Military History</u> 999 (July 2003).

"Courting Controversy: Class Action Practice in the United States," 2 Legal Week Global (United Kingdom) 22 (April 2003).

"Group Litigation Under Foreign Legal Systems: Variations and Alternatives to American Class Actions," 52 DePaul Law Review 401 (2002).

"The Disposition of Afgan War and Al Quaeda Prisoners," Tulane Lawyer 8 (Fall/Winter 2002).

"Who, Where and How Should the Guantanamo Detainees Be Tried?," New Orleans Times-Picayune, March 4, 2002.

"Military Commissions Aren't the Only Option," New Orleans Times-Picayune, December 3, 2001.

"Amendments to Rule 11 Have Cut Number of Sanction Motions," (interview), 26 ABA Litigation News 8, July 2001.

"Class Action Practice in the Gulf South," 74 Tulane L. Rev . 1603 (2000).

"Implications for the Future of Legal Education in Response to NAFTA and Growing Global Trade Relations," 47 Louisiana Bar J. 391 (2000).

"Response to Professionalism," 47 Louisiana Bar J. 324 (2000).

"The Evolution of American Civil Trial Process Towards Greater Congruence with Continental "Dossier Trial" Practice," 7 Tulane J. of Int'l & Compar. Law 125 (1999).

"A Tribute to Professor Athanassios Yiannopoulos," 73 Tulane L. Rev. 1017 (1999).

"From Loser Pays to Modified Offer of Judgment Rules: Reconciling Incentives to Settle with Access to Justice," 76 Texas L. Rev.1863 (1998).

"Good Faith Participation in Mediation: Aspirational, Not Mandatory," 4 Dispute Resolution Mag. (ABA Section of Dispute Resolution) 14 (Winter 1997).

"Confidentiality in ADR Proceedings: Policy Issues Arising from the Texas Experience," 38 South Texas L. Rev. 541 (1997).

"The Impact on Litigation Strategy of Integrating Alternative Dispute Resolution into the Pretrial Process, " 15 Review of Litigation 503 (1996), reprinted, 168 Federal Rules Decisions 75 (1996).

"Complex Litigation: Aggregating Related Cases for Unitary Disposition," 30 Comparative Law Review 57 (Institute of Comparative Law in Japan, Chuo University, Tokyo, 1996).

"Antisuit Injunctions and Notice of Intervention and Preclusion: Complementary Devices to Prevent Duplicative Litigation," in Symposium on the American Law Institute's Complex Litigation Project, 1995 Brigham Young Law Review 925.

"Standards of Professional Conduct in Alternative Dispute Resolution," Symposium from AALS, 1995 Journal of Dispute Resolution 95.

"Policy Issues for State Court ADR Reform," Alternatives 142 (Nov. 1995).

"Tradition and Innovation in International Arbitration Procedure" (with Rau), 30 Texas Int'l Law J. 89 (1995).

"A Process Model and Agenda for Civil Justice Reforms in the States," 46 Stanford Law Review, 1553 (July 1994).

"Managing Complex Litigation: Procedures and Strategies for Lawyers and Courts," 57 Texas Bar Journal 149 (Feb. 1994)(Book Review).

"Court-Mandated Alternative Dispute Resolution: What Form of Participation Should Be Required?" 46 S.M.U. Law Review 2079 (1993).

"Judge Jerre Williams: A Worthy Academic Career," 72 Texas Law Review ix (Nov. 1993).

"Aggregate Disposition of Related Cases: The Policy Issues," 10 Review of Litigation 231 (1991).

"A Social Psychology of Citizens' Obligations to Authority: A Review of Crimes of Obedience," 17 American Journal of Criminal Law 287 (1990).

"The Immigration Laws and the 'Right to Hear' Protected by Academic Freedom," 66 Texas Law Review 1547 (1988).

"Reshaping the Lawyer's Skills for Court-Supervised Alternative Dispute Resolution," 51 Texas Bar Journal 47 (1988).

"The Role of Religion in School Curriculum and Textbooks," 74 Academe 17 (1988).

"Class Actions and Duplicative Litigation," 62 Indiana Law Journal 507-559 (Symposium on Class Actions)(1987).

"Prisoners' Rights" (Fifth Circuit Survey), 19 Tex. Tech Law Review 797 (1988), 18 Tex. Tech L. Rev. 655 (1987).

"Implementing the New Preference for Broad Issues in Texas Special Issues Practice," 4 The Advocate 2 (Oct. 1985).

9

"Relationship Between Issues and Instructions in Texas Special Issues Practice," Institute on Jury Submission (State Bar of Texas 1985).

"Restructuring the Trial Process in the Age of Complex Litigation," 63 Texas Law Review 721 (1984).

"The Role of the Judge in Discovery," 3 Review of Litigation 89 (1982).

"Federal Court Discovery in the 80's - Making the Rules Work," 2 Review of Litigation 9 (1981), reprinted in 95 Federal Rules Decisions 245 (1982).

"Evolution of the Laws of War," 110 USA Today 54 (May, 1982).

"Traditional and Developing Concepts of Governmental Liability," Institute on Public Law Liability of Public Officials and Employees (State Bar of Texas 1981).

"The Development, Discovery, and Use of Computer Support Systems in Achieving Efficiency in Litigation," 79 Columbia Law Review 267 (1979).

"Military Unions and the Soldier 'Employee'," Washington Post, March 4, 1978, A.17.

"A Special Kind of Justice," 84 Yale Law Journal 373 (1974).

"Legal Inadequacies and Doctrinal Restraints in Controlling the Military," 49 Indiana Law Journal 538 (1974).

"After Sunningdale: Is Ireland on the Mend?," The Nation 456 (April 13, 1974).

"Military Justice Without Military Control," 82 Yale Law Journal 1398 (1973).

"The Military Courts and Servicemen's First Amendment Rights," 22 Hastings Law Journal 325 (1971).

"Congressional Proposals for Reform of Military Law," 10 American Criminal Law Review 25 (1971).

New York Times Articles (Week in Review Section):

"Exit Black: New Chance for Nixon to Push the Court to the Right," Sept. 19, 1971, E.4.

"Critical Look at Military Prison System," June 21, 1970, E.6.

"Military Justice is to Justice as Military Music is to Music," (Book Review), May 3, 1970, BR.1.

"Duffy Case: Preview of the My Lai Trials?," April 5, 1970, E.2.

"My Lai: Army Blow the Lid on Its Own Cover-Up," March 22, 1970, E.1.

"Pretrial Jousting Over My Lai Massacre," Feb. 1, 1970, E.3.

"My Lai: Some Knotty Legal Questions," Dec. 7, 1969, E.3.

"The Civilianization of Military Law," 22 Maine Law Review 3 (1970).

"Judicial Review of Military Determinations and the Exhaustion of Remedies Requirement," 55 Virginia Law Review 483 (1969), reprinted in 48 Military Law Review 91 (1970).

"The Right to Representation by Out-of-State Attorneys in Civil Rights Cases," 4 Harvard Civil Rights-Civil Liberties Law Review 65 (Fall 1968).

"The Great Draft Debate, " New Republic 36 (May 18, 1968).

"The Right to Competent Counsel in Special Courts Martial," 54 American Bar Assoc. Journal 866 (Sept. 1968).

"Nevada Faces the End of the Casino Era," Atlantic 112 (Oct. 1966).

"The Use of Public Opinion Polls in Continuance and Venue Hearings," 50 American Bar Association Journal 357 (April 1964).

11