**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In Re: Oil Spill by the Oil Rig** | ) | |
| **"Deepwater Horizon" in the Gulf** | ) | **MDL No. 2179** |
| **of Mexico, on April 20, 2010** | ) | |
| | ) | **SECTION:  J** |
| **Pleading Applies To:** | ) | |
| *All Cases in Pleading Bundle B2* | ) | **JUDGE BARBIER** |
| | ) | |
| | ) | **MAGISTRATE SUSHAN** |

**CONSOLIDATED CLASS ACTION RICO COMPLAINT**
**IN ACCORDANCE WITH  PTO NO. 11 [CMO NO. 1] SECTION III(B2)**
**["B2 BUNDLE"]**

## TABLE OF CONTENTS

I.      INTRODUCTION......................................................................................1

II.     PARTIES ...................................................................................................4

        A.      Plaintiffs ........................................................................................4

        B.      Defendants .....................................................................................6

III.    JURISDICTION AND VENUE ...............................................................10

IV.     RICO ALLEGATIONS ...........................................................................11

        A.      Pertinent Background From The Presidential Oil Spill
                Commission Report ......................................................................13

        B.      The Offshore Drilling Statutory And Regulatory Regime ..................14

        C.      General Background Factual Allegations................................................17

        D.      BP's Scheme To Defraud – Applied To Deepwater Horizon .............21

                1.      The Macondo Lease, And BP's Exploration Plan
                        And Drilling Permit .........................................................21

                2.      The Deepwater Horizon's Poor Safety And
                        Maintenance Record ........................................................23

                3.      Macondo:  A Troublesome Well ................................................25

                4.      Careless Decision-Making In The Rush To
                        Complete The Well ...........................................................28

                5.      Cutting Corners On Well Design................................................28

                6.      Using Too Few Centralizers ......................................................31

                7.      Skipping Critical "Bottoms Up" Mud Circulation ..................32

                8.      Cementing:  No Full Returns ....................................................34

                9.      Despite Red Flags, BP Skips Crucial "Bond Log"
                        Test Of Cement Integrity ............................................34

|  | 10. | The Casing Hanger Lockdown Sleeve: Another Skipped Safety Precaution .......... 35 |
|---|---|---|
|  | 11. | Premature and Nonstandard Mud Displacement Begins .......... 36 |
|  | 12. | The Well Fails Key Pressure Tests, Yet BP Presses On .......... 37 |
|  | 13. | Unorthodox Spacer Fluid Mixture and Volume Potentially Interfered with Pressure Tests and BOP Functionality .......... 40 |
|  | 14. | Attempts At Well Control: Too Little, Too Late .......... 42 |
|  | 15. | Faulty Vessel Safety Equipment Exacerbates The Blowout, Causing Vessel Explosions, Fire And Sinking .......... 43 |
|  | 16. | The Failure Of The BOP .......... 44 |
|  | 17. | Poor Vessel Maintenance And Bypass Of Safety Systems .......... 51 |
|  | 18. | Defendants Misrepresent The Severity Of The Spill And Their Oil Spill Response Capabilities .......... 52 |
| E. | | BP's History Of Fraud And Complacency .......... 56 |
| F. | | The Spill's Impact On Plaintiffs, The Environment, And The Coastal Zone Economy .......... 63 |
| V. | | CLASS ACTION ALLEGATIONS .......... 70 |
| A. | | Numerosity Of The Class And/Or Subclasses – F.R.C.P. 23(a)(1) .......... 70 |
| B. | | Commonality – F.R.C.P. 23(a)(2) .......... 70 |
| C. | | Typicality – F.R.C.P. 23(a)(3) .......... 71 |
| D. | | Adequacy Of Representation – F.R.C.P. 23(a)(4) .......... 71 |
| E. | | Class Certification Under F.R.C.P. 23(b)(1), (b)(2), And (b)(3) .......... 72 |
| VI. | | CLAIMS FOR RELIEF .......... 73 |

**COUNT 1:** **By Plaintiffs Against BP For Violation Of 18 U.S.C. 1962(c)** .................................................................................**73**

    **The RICO Enterprise** ..............................................................**74**

    **The RICO Predicate Acts** .......................................................**75**

    **The Pattern Of Racketeering Activity** ...................................**78**

    **Relatedness And Continuity Of The Racketeering Activity** ...............**79**

**COUNT 2:** **By Plaintiffs Against BP For Violation Of 18 U.S.C. § 1962(d) By Conspiring To Violate 18 U.S.C. § 1962(c)** .................................**80**

**COUNT 3:** **By Plaintiffs Against BP For Violation of 18 U.S.C. § 1962(d) By Conspiring To Violate 18 U.S.C. § 1962(a)** .................................**80**

**COUNT 4:** **By Plaintiffs Against BP For Violation Of FLA. STAT. ANN. § 895.03(3)** .................................................................................**81**

**COUNT 5:** **By Plaintiffs Against BP For Violation Of FLA. STAT. ANN. § 895.03(4)** .................................................................................**82**

**COUNT 6:** **By Plaintiffs Against BP For Violation Of FLA. STAT. ANN. § 895.03(4)** .................................................................................**83**

**VII.**     **PRAYER FOR RELIEF** ..............................................................**83**

**CERTIFICATE OF SERVICE** ..........................................................**89**

# I.   INTRODUCTION

On April 20, 2010, a well blowout on the vessel Deepwater Horizon in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States. The blowout and subsequent explosions, fire, and sinking of the vessel resulted in an oil spill of unprecedented proportions that damaged, depleted and destroyed marine, estuarine, and coastal environments in the Gulf of Mexico, Louisiana, Mississippi, Alabama, Texas, and Florida (the "Spill"). Although the blown-out well is now capped, the disastrous environmental and economic effects of the Spill are widespread and will likely remain so for decades.

Hundreds of individual and class actions were filed in state and federal courts on behalf of the thousands of victims of the Spill. By order entered on August 10, 2010, the Multi-district Litigation Panel (the "MDL Panel") transferred many such actions then pending to this Court. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* MDL No. 2179, --- F. Supp. 2d ----, 2010 WL 3166434, 2010 AMC 1977 (JPML, August 10, 2010) (the "Transfer Order").  On October 19, 2010, this Court entered its Case Management Order No. 1 (hereinafter "CMO No. 1"), wherein it directed the filing of Complaints on behalf of the Plaintiffs.

This Consolidated Class Action RICO Complaint ("RICO Class Action Complaint") is filed pursuant to CMO No. 1, Paragraph III B (2), on behalf of those plaintiffs seeking damage for injury to business or property based on federal and Florida state RICO claims and who have filed and/or may hereinafter file their claims in this Court or whose claims have been and/or may hereafter be transferred to this Court pursuant to the Transfer Order.  This RICO Class Action Complaint consolidates actions

brought by Robert L. Rinke, Armand's Bistro LLC, Roland and Barbara Hingle, Alan Sheen, M.D., and Mid South Seafood, Inc.   The defendants are BP Exploration & Production, Inc., BP America Production Company, and BP p.l.c. (collectively "BP" or "Defendants").

Accordingly, pursuant to CMO No. 1, Paragraph III B (2), the RICO class action Plaintiffs in MDL No. 2179, by their undersigned counsel and other counsel identified herein, for themselves and all others similarly situated (the members of the proposed Class and any Subclasses) ("Plaintiffs"), submit this RICO Class Action Complaint for actual, compensatory, and treble damages for injury to business or property proximately caused by the unlawful conduct alleged herein that resulted in the well blowout, vessel explosions, and ensuing oil spill by the Deepwater Horizon oil vessel in the Gulf of Mexico on April 20, 2010, and state as follows:

1.      On April 20, 2010, at approximately 9:45 p.m. CST, a well blowout caused explosions on the Deepwater Horizon, an oil vessel in the Gulf of Mexico, igniting a raging, gas-fueled fire on the vessel. After burning for two days, the vessel sank to the ocean floor.

2.       As the Deepwater Horizon tipped into the sea, the long riser pipe connecting the vessel to the wellhead on the seafloor bent and broke, leaving the pipe spilling colossal amounts of oil into the Gulf waters out of its now-open end, as well as through two breaks along its length.

3.      Each day during the course of the Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out into a widening slick of oil, as well as spreading out in vast subsurface

plumes. On the surface, the shifting smear was large enough to be visible from outer space, at times covering tens of thousands of square miles, and spreading with the wind and currents towards the Gulf states' coastlines, where oil made landfall on white sand beaches and in ecologically sensitive marshes and estuaries, damaging the environment and real and personal property throughout the coastal zones of the Gulf states ("Coastal Zone"). Underwater, huge plumes of oil and dispersant chemicals swirled through the entire water column and came to rest on the seafloor at many different depths, damaging ecosystems and privately owned and leased seabeds throughout the Gulf of Mexico.

4.      The Deepwater Horizon's well blowout and the subsequent explosions, fire, sinking, and oil Spill were foreshadowed by a string of disastrous incidents and near misses in BP's operations on land and at sea. These incidents were brought on by acts and omissions that included unlawful conduct cutting corners and ignoring crucial safety issues to save time and money in favor of production and profit and at the expense of worker safety, environmental protection, and the Plaintiffs herein. The Spill was exacerbated by BP's misrepresentations and omissions regarding a variety of safety issues, in particular its ability to contain deepwater oil spills, the flow rate of the Spill, and the best method to "kill" the Spill.

5.      BP could have prevented this catastrophe by using deepwater drilling best practices, following required safety protocols and precautionary procedures, and properly maintaining equipment, as they claimed to have done.  BP could have minimized this catastrophe by utilizing claimed abilities to contain the Spill, or taking appropriate and timely methods to do so.  Instead, with little regard for the risk to the vessel workers, the environment or Plaintiffs, BP intentionally chose to violate the law and to conceal this

from regulators in order to save money and time at the expense of safety.  The policy was profits over safety.

6.      The Spill has caused, and continues to cause, devastating environmental and economic damage. For example, there have been thousands of square miles of waters closed to fishing, swimming and/or boating, and thousands of square miles of historic coastal marshes, delicate estuaries, cypress forests, barrier islands, and white sand beaches compromised. Fishermen and marine-related businesses have lost and continue to lose income and their businesses; the tourism industry and hotels, resorts, restaurants, and other tourism-reliant businesses have lost and continue to lose income; and real property owners have suffered the loss, damage, and/or diminution of the value of their properties throughout the Coastal Zone.

7.      This RICO Class Action Complaint makes allegations of, and places BP on notice that Plaintiffs may seek, certification of one or more classes and/or subclasses, as appropriate, for the classwide determination of common issues of law and/or fact relating to the RICO liability of BP to the members of such classes and/or subclasses for actual, compensatory, and treble damages for the economic harm and damage to business and property Plaintiffs have incurred as a result of BP's culpable knowledge, fraudulent conduct, acts and omissions as set forth herein, and for appropriate equitable relief. Plaintiffs will seek to maintain this action as a class action, and/or the class certification of particular issues herein, under Rule 23 of the Federal Rules of Civil Procedure, including, as appropriate, Rule 23(a)(1)-(4); (b)(1)(B); (b)(2); (b)(3); (c)(4); and (c)(5).

## II.  PARTIES

### A.      Plaintiffs

8.      Plaintiff, Robert L. Rinke owns and resides at the property located at 18

Via De Luna Drive, Beach Club Penthouse #6, Pensacola Beach, Florida 32561.  The Beach Club Resort and Spa is a 130 unit condominium complex located on the Gulf of Mexico, Pensacola Beach, Escambia County, Florida.  Due to the Spill, Plaintiff Rinke has suffered the loss, damage and diminution in value of his condominium property abutting the Gulf of Mexico.

9.     Plaintiff, Armand's Bistro LLC, is a domestic limited liability company domiciled and doing business in Louisiana. Armand's Bistro was a seafood restaurant located inside the Holiday Inn on Highway 51 in LaPlace, Louisiana.  Due to the Spill, it could not obtain the seafood it needed to operate, and had to close.

10.     Plaintiffs Roland and Barbara Hingle reside at 151 Bouson Lane, Buras, Louisiana.  The Hingles are commercial shrimpers in the Gulf of Mexico who have lost earnings and property from the Spill.

11.     Plaintiff Alan Sheen, M.D. is a resident of Louisiana who resides in this district and owns property in Florida—a condominium with the address of Sundunes 112, 7979 Gulf Blvd., Navarre Beach, Florida.  Dr. Sheen has owned the condominium for more than five years.  In 2010, his rental income was less than half the average of the prior two years, due to the Spill.

12.     Plaintiff Mid South Seafood, Inc. is a Mississippi corporation doing business throughout the state of Mississippi.  Plaintiff is a seafood business that buys seafood from the Gulf of Mexico on the Gulf Coast and sells the seafood throughout Mississippi.  Due to the Spill, Plaintiff Mid South Seafood has lost business and earnings.

13.     Plaintiffs and proposed class members are individuals and/or entities that have suffered injury to their business or property as a result of the Spill and the federal

and Florida state RICO violations described herein.

**B.**     **Defendants**

14.     Defendant BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration was a leaseholder and the designated operator in the lease granted by the former Minerals Management Service ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Spill originated. The U.S. Coast Guard designated BP Exploration as a "Responsible Party" under the Oil Pollution of 1990, 33 U.S.C. § 2714. This court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

15.     Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas. BP America was the party to the drilling contract with Transocean Ltd. for the drilling of the Macondo well by the Deepwater Horizon vessel. This Court has personal jurisdiction over BP America, because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

16.     Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. BP p.l.c. is one of the world's largest energy companies with over 80,000 employees and $239 billion in revenues in 2009. BP p.l.c. operates its various business divisions, such as the "Exploration and Production"

6

division in which BP Exploration and BP America fall, through vertical business arrangements aligned by product or service groups. BP p.l.c.'s operations are worldwide, including in the United States. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally.

17.     BP p.l.c. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development. A sampling of BP p.l.c.'s contacts with the U.S. are as follows: (a) BP p.l.c.'s American Depository Shares are listed on the New York Stock Exchange and BP p.l.c. is the largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP p.l.c. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP p.l.c.'s fixed assets are located in the U.S. or the European Union; and (e) BP p.l.c. reports having 2,100 U.S.-based employees in non-Exploration & Production, non-Refining & Marketing BP entities.

18.     This Court has general jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm general jurisdiction provision (La.R.S. 13:3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure. BP p.l.c. does business in Louisiana, has had continuous and systematic contacts with Louisiana (and the U.S. more generally), and has been served with a summons in individual complaints that are the subject of this RICO Class Action Complaint and will be served with a summons on this complaint.

19.     Alternatively, if BP p.l.c. contests that it is subject to jurisdiction under Louisiana's long-arm jurisdiction statute, then this Court may exercise personal jurisdiction over BP p.l.c. pursuant to Rule 4(k)(2) of the Federal Rules of Civil

Procedure, the federal long-arm jurisdiction provision, because claims in this action arise under federal law, the exercise of jurisdiction over BP p.l.c. is consistent with the United States Constitution and laws, and BP p.l.c. has been served with a summons in individual complaints that are the subject of this RICO Class Action Complaint and will be served with a summons on this complaint.

20.     This Court also has specific jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm specific jurisdiction provision (La.R.S. 13:3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure. Plaintiffs' causes of action arise out of wrongful conduct committed by BP p.l.c., directly or indirectly by its agents, that caused injury or damage in Louisiana by an offense or quasi offense committed through an act or omission outside of Louisiana, and BP, p.l.c. regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana. These acts or omissions involving unlawful conduct took place both before the blowout resulting in the oil spill and in BP, p.l.c.'s conduct after the blowout in attempting to contain the catastrophic damage and expense to BP caused by the oil spill.

21.     In addition, this Court also has personal jurisdiction over BP p.l.c. under agency principles because BP p.l.c.'s agents, BP America and BP Exploration, do business in Louisiana. BP America and BP Exploration are both wholly-owned subsidiaries of BP p.l.c. In BP p.l.c.'s Annual Report for 2009, in which it presents a consolidated financial statement that includes BP America and BP Exploration, BP p.l.c. states that it "controls" both BP America and BP Exploration, among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the

[subsidiary] so as to obtain benefit from its activities . . . ."

22.     BP p.l.c.'s direct, joint and/or assumed responsibility and/or liability for safety and well control, reporting and disclosure, both before and/or after the explosions and blowout on April 20, 2010, is further evidenced by the announcement of the Macondo Project on the BP website hosted and copyrighted by BP p.l.c., the publication of information concerning the casualty and spill on the BP website hosted and copyrighted by BP, the express and/or implied acceptance of responsibility for the safety and reporting and disclosure of BP operations in North America and the Gulf of Mexico in statements by officers of BP p.l.c., the presence (upon information and belief) of a BP p.l.c. officer or employee on the Deepwater Horizon for the celebration that occurred shortly before the explosions and fire, the direct participation of BP p.l.c. employees in the post-casualty investigation, the direct participation of BP p.l.c. officers and employees in the Governmental post-casualty investigations, the direct participation of BP p.l.c. officers and employees in the post-casualty well-control efforts, reporting and disclosure, and the direct participation of BP p.l.c. in the establishment and/or funding of the Escrow Fund and/or Gulf Coast Claims Facility.

23.     As lease operator of the Macondo prospect site, BP was responsible for truthfully reporting and disclosing the safety of its offshore drilling operations, including assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and truthfully reporting, disclosing, retaining and overseeing the drilling operations of the operators, contractors and subcontractors working on the various aspects of the well and the drilling operations.  Similarly, BP was responsible for reporting, disclosing and being truthful with government regulatory

authorities on its capability of responding to and containing such a deepwater oil spill, and was responsible for effectively and truthfully reporting, disclosing, responding to and containing the Spill.

24.    To the extent necessary, Plaintiffs specifically reserve the right to amend this RICO Class Action Complaint to name additional parties defendant, pursuant to future conduct, further information learned through discovery or investigation, or any other reason.

## III.   JURISDICTION AND VENUE

25.    Jurisdiction in this action is predicated upon Title 18, United States Code, Section 1964, Title 28, United States Code, Sections 1331 and 1332(d)(2), and Title 43, United States Code, Sections 1331, 1333, 1349, and 1367(a).  This Court has jurisdiction under the federal civil RICO statute, 18 U.S.C. § 1964, since the case is brought by and on behalf of persons injured in their business or property by reason of Defendants' conduct of the affairs of the RICO enterprise described herein through a pattern of acts constituting mail and wire fraud, and other conduct constituting RICO violations under 18 U.S.C. § 1962, as alleged herein. This Court has jurisdiction of the pendent Florida state RICO claims pursuant to United Mine Workers v. Gibbs, 383 U.S. 715 (1966) and 28 U.S.C. § 1367(a), because those claims are so related to the claims arising under the laws of the United States that they form part of the same case or controversy.

26.    This Court has jurisdiction under 28 U.S.C. § 1331 since the claims asserted herein arise under the laws of the United States and the State of Louisiana, which have been declared under 43 U.S.C.  §§ 1331(f)(1) and 1333(a)(2) to be the law of the United States for that portion of the outer Continental Shelf from which the oil spill

10

originated. This Court has jurisdiction under 28 U.S.C. § 1332(d)(2) since the matter in controversy is in excess of $5,000,000, exclusive of interest and costs, and is brought as a class action by citizens of a State that is different from the State where at least one of the Defendants is incorporated or does business. This Court has jurisdiction under 43 U.S.C. § 1333(a)(1), which extends exclusive Federal jurisdiction to the outer Continental Shelf. This Court has jurisdiction under 43 U.S.C. § 1349(b)(1) since this case arises out of, or in connection with, operations conducted by Defendants on the outer Continental Shelf for the exploration, development, or production of oil, a mineral of the subsoil and seabed of the outer Continental Shelf.

27.     Venue for this action is proper under Title 18, United States Code, Section 1965 and Title 28, United States Code, Section 1391(b)(2) and (3), because a substantial part of the events giving rise to this action occurred in this District and because some of the Defendants reside, are found or transacted their affairs in this District and the ends of justice require that the other Defendants be brought before this Court.  Plaintiffs invoke the expanded service of process provisions of Title 18, United States Code, Section 1965(b).

## IV.  RICO ALLEGATIONS

28.     This is a class action lawsuit filed pursuant to Rule 23 of the Federal Rules of Civil Procedure, to recover damages and other relief for Plaintiffs and all others similarly situated.  Plaintiffs and the class were injured in their business or property by reason of BP's ongoing, systematic and fraudulent scheme to maximize financial gain at the expense of human and environmental safety, accomplished by the conduct of the BP-Transocean association-in-fact enterprise through a pattern of acts indictable as mail

fraud and wire fraud, and conspiracies to effect those acts.  The object of the Defendants'
unlawful scheme was to obtain oil and billions of dollars in proceeds and profits from
offshore drilling by engaging in a pattern of mail and wire fraud, particularly: (1)
fraudulently deceiving federal and state regulators that BP would safely conduct their oil
drilling operations to prevent oil spills; (2) fraudulently deceiving federal and state
regulators that BP could safely and effectively respond to and contain any oil spill,
including worse case scenario oil spills like the Deepwater Horizon disaster; (3)
hampering containment and cleanup responses by fraudulently deceiving federal and state
regulators regarding the oil spill flow rate; and (4) fraudulently deceiving federal and
state regulators regarding the quickest and safest method to kill the Macondo well and
stop the Spill.

29.    This RICO action is brought under the federal civil RICO statute, 18
U.S.C. § 1964.  Plaintiffs allege that Defendants unlawful conduct is in violation of the
federal RICO statute, in particular 18 U.S.C. §§ 1962(c) and 1962(d).  This RICO action
is also brought under FLA. STAT. ANN. § 895.01-895.06 (commonly referred to as
"Florida RICO Act" or "Florida RICO"), in particular §§ 895.05(1), (6).

30.     The enormous economic injury to the Plaintiffs' and class members'
business and property was proximately caused by reason of these RICO violations that
resulted in one of the largest environmental and economic catastrophes in history.

31.    Plaintiffs seek treble monetary damages under the federal RICO statutes,
as well as temporary, preliminary and permanent injunctive relief to which they are
entitled under both federal and Florida state RICO statutes.

A.      **Pertinent Background From The Presidential Oil Spill**
        **Commission Report**

32.      On May 21, 2010, President Obama established the National Commission
on the BP Horizon Oil Spill and Offshore Drilling (the "Commission").  The purpose of
the Commission was in part to examine relevant facts and circumstances concerning the
root causes of the Deepwater Horizon explosion.  The Commission held meetings from
July through December of 2010, taking statements, reports and presentations from
numerous individuals and experts.  On January 11, 2011, the Commission released its
Final Report to the President, entitled *Deep Water:  The Gulf Oil Disaster and the Future
of Offshore Drilling.*  ("Report"; *see* http://www.oilspillcommission.gov.).

33.      A key finding of the Commission was that BP repeatedly placed profits
over safety, implementing procedures that greatly increased risk, primarily in order to
avoid the expense of delay.  Report, Chapter 4, page 125, Figure 4.10: Examples of
Decisions That Increased Risk at Macondo While Potentially Saving Time.   The Report
states in Chapter 4: "[m]any of the decisions that increased the risk of the Macondo
blowout clearly saved the companies significant time (and money).  There is nothing
inherently wrong with choosing a less-costly or less-time-consuming alternative—as long
as it proves to be equally safe.  The problem is that, at least in regard to BP's Macondo
team, there appears to have been no formal system for ensuring that alternative
procedures were in fact equally safe. None of BP's (or other companies') decisions in
Figure 4.10 appear to have been subject to comprehensive and systematic risk-analysis,
peer-review, or management of change process. The evidence now available does not
show that the BP team members (or other companies' personnel) responsible for these
decisions conducted any sort of formal analysis to assess the relative riskiness of

13

available alternatives."

34.     The Commission Report echoes the gist of this complaint, as did the evidence presented in the numerous Congressional hearings, and as did the assertion in a complaint filed by the United States Department of Justice on December 15, 2010 that BP failed to use the best available and safest drilling technologies at Macondo.  *See* DOJ Complaint, ¶ 50.

### B.     The Offshore Drilling Statutory And Regulatory Regime

35.     The Outer Continental Shelf Lands Act ("OCSLA") enacted in 1953 laid the foundation for federal regulation of offshore oil and gas development. OCSLA authorizes the Department of Interior ("DOI") to lease defined offshore areas for development and to formulate regulations pertaining offshore drilling and drilling safety as necessary.  The statute provides federal duties and responsibilities for maintaining the Outer Continental Shelf ("OCS") subject to environmental and safety concerns. The OCSLA remains the cornerstone of offshore oil drilling legislation and regulation today, and the statute was amended six times between 1978 and 1998 to account for changing issues. 43 U.S.C. §§ 1131-1356, P.L. 212, Ch. 345, Aug. 7, 1953, 67 Stat. 462, as amended by P.L. 93-627, Jan. 3, 1975, 88 Stat. 2130; P.L. 95-372, Sept. 18, 1978, 92 Stat. 629; and P.L. 98-498, Oct. 19, 1984, 98 Stat. 2296.

36.     During the relevant time period, under the OCSLA, the Secretary of the Interior, through the MMS, managed and regulated leasing, exploration, development, and production of resources on the OCS. The regulations are a combination of prescriptive and performance-based measures.  Prescriptive regulations specify rules or courses of action that the oil industry has a duty to follow explicitly in order to comply

with the regulations.  A prescriptive approach sets clear rules for the industry to follow. As similarly recognized by Chapter 4 of the Presidential Oil Spill Commission report, "[f]rom its inception until the Macondo well blowout, MMS was the federal agency primarily responsible for leasing, safety, environmental compliance, and royalty collections from offshore drilling. In carrying out its duties, MMS subjected oil and gas activities to an array of prescriptive safety regulations: hundreds of pages of technical requirements for pollution prevention and control, drilling, well-completion operations, oil and gas workovers (major well maintenance), production safety systems, platforms and structures, pipelines, well production, and well-control and–production safety training. As required by the 1978 Act, MMS also attempted to conduct both annual and periodic unscheduled (unannounced) inspections of all offshore oil and gas operations to try to assess compliance with those requirements. Agency officials have tried to meet the requirement for annual inspection of the operations to prevent blowouts, fires, spills, and other major accidents."

37.    The regulations in 30 C.F.R. § 250 govern important drilling operations on the OCS.  These regulations are mainly prescriptive in nature, and convey the minimum duties and requirements for safe offshore drilling operations.   Subpart D, for example, covers all aspects of the drilling operations including permitting, casing requirements, cementing requirements, diverter systems, BOP systems, drilling fluids requirements, equipment testing, and reporting. The minimum requirements for BOPs, for example, are stated in detail, including system components, surface and subsea BOP stacks, associated systems and equipment, choke manifolds, kelly valves, drilling-string safety valves, maintenance and inspections, pressure tests and additional testing, and recordkeeping.  30

C.F.R. § 250.440 requires, for example, that "You must design, install, maintain, test, and use the BOP system and system components to ensure well control. The working-rating of each BOP component must exceed anticipated surface pressures. The BOP system includes the BOP stack and associated BOP systems and equipment."

38.     Similarly, Subpart B, for example, provides for the plans and information that must be submitted and reported to MMS before any drilling activities may be conducted on the offshore lease. 30 C.F.R. § 250.202, for example, provides the oil company must submit an Exploration Plan ("EP"), a Development and Production Plan ("DPP"), and a Development Operations Coordination Document ("DOCD"). The regulation also requires "these plans must demonstrate that you have planned and are prepared to conduct the proposed activities in a manner that:…(b) Is safe…." Even after MMS approval of the EP the oil company must still secure approval of its application for its permit to drill and approval of production safety systems. 30 C.F.R. §§ 250.281, 250.410 and 250.800.

39.     Likewise, for example, 30 C.F.R. § 250.300, relating to pollution prevention, requires: "(a) [d]uring the exploration, development, production…the lessee shall take measures to prevent unauthorized discharge of pollutants into the offshore waters.  The lessee shall not create conditions that will impose unreasonable risk to public health, life, property, aquatic life, wildlife, recreation, navigation, commercial fishing, or other uses of the ocean."

40.     The Subpart D regulatory requirements and duties for drilling operations specifically "apply to lessess, operating rights owners, operators, and their contractors and subcontractors." 30 C.F.R. § 250.400.

16

41.     All lease activities must be conducted according to approved plans. 30 C.F.R. § 250.280.

42.     Of critical importance, to protect "health, safety, property, and the environment:" 1) all operations must be performed in a safe and workmanlike manner; 2) all equipment and work areas must be maintained in a safe condition; 3) any hazardous oil or gas accumulations or other health, safety or fire hazard must be immediately controlled, removed, or otherwise corrected; and 4) best available and safest technology (BAST) must be used whenever practical on all exploration, development and production operations.  30 C.F.R. § 250.107.

### C.     General Background Factual Allegations

43.     On April 20, 2010, BP workers on the Deepwater Horizon drilling vessel lost control of the subsea oil well they had almost completed. When highly pressurized hydrocarbons leaked into the well, the vessel's emergency equipment failed to stop the oil and gas from blowing out of the well, which led to explosions and a fire on the Deepwater Horizon, and ultimately the sinking of the vessel and the resulting Spill.

44.     After the Deepwater Horizon sank, oil and gas gushed out of the damaged well and into the Gulf of Mexico for 12 weeks, fouling the environment, damaging and contaminating real and personal property, and doing immense and long-lasting damage to the environment and economy of Plaintiffs and the Gulf of Mexico. Meanwhile, BP downplayed the severity of the Spill and was, contrary to their prior claims to regulators, unprepared for the massive clean up effort required.

45.     Deepwater offshore drilling for hydrocarbons such as oil and natural gas is

an immensely complex, technical process, and a relatively new one that has only developed over the last five years. The first challenge is finding the hydrocarbons. Seismic and/or magnetic surveys are taken of the geological formations deep in the Earth's crust below the sea floor, in the hopes of finding "traps:" rock formations that have trapped a reservoir of hydrocarbons beneath an impermeable layer, preventing them from migrating to the surface and escaping.

46.     Upon locating a promising trap of hydrocarbons, drilling vessels such as the Deepwater Horizon are positioned on the sea surface above the proposed well site, and from there begin drilling an "exploratory" well to investigate the viability of the trap. Once the trap is determined to be a worthwhile source of hydrocarbons, the drilling vessel performs "completion" operations to transform the exploratory well into a "production" well that will extract oil or gas from the trap. At this point, wells are sometimes temporarily abandoned — sealed with cement so they are secure against any influx of hydrocarbons from the reservoirs they have penetrated — so they can be reopened by a production vessel at some later date, when the well owner is ready to begin extracting hydrocarbons for production. At the time of the April 20, 2010, blowout, the Deepwater Horizon crew was in the process of preparing the Macondo well for temporary abandonment.

47.     An exploratory well begins with a wide-diameter "pilot" hole drilled into the seabed, generally to a depth of about 300 to 400 feet. The pilot hole is then "cased," or lined with pipe. "Casing" describes both the actual pipe lining a well, in addition to the act of lining the drilled hole — the well bore — with such pipe.

48.     The first section of casing pipe lowered into the pilot hole generally

anchors a safety device known as a blowout preventer ("BOP"), which is an appurtenance of the drilling vessel and a part of the vessel's equipment. The BOP is an assembly of hydraulically-operated rams that can be used to partially or totally seal the well during routine drilling activities as well as in the event of a well control emergency. In the event of an influx of hydrocarbons into the well, closure of the BOP rams can prevent a "kick" — a small leak of hydrocarbons into the well — from escalating into a "blowout" — the uncontrolled release of hydrocarbons from a well into the surrounding environment. A BOP can be activated manually from the drilling vessel, or automatically via the automatic mode function ("AMF"), also known as a "deadman switch," which closes the device's most secure rams if both electrical and hydraulic connections to the drilling vessel are severed. BOP functions can also be activated by using remotely operated vehicles ("ROVs") on the sea floor via the "hot stab" or autoshear functions, which are explained more fully below.

49.     The risk of a blowout is one of the most dangerous but common risks in deepwater drilling, hence the installation of the BOP so early in the well drilling process. The reservoirs of hydrocarbons trapped in the rock formations miles beneath the sea floor are often highly pressurized, and managing the pressures in a well is a vital — and often volatile — task during drilling operations. Proper well monitoring will catch small hydrocarbon influxes early, so a kick can be contained and the source of the leak repaired before well control is jeopardized. All workers on a drilling vessel have the authority to call for work on a well to stop if they have a safety concern, including any indication that hydrocarbons are leaking into the well. The BOP is then a crucial last line of defense for a drilling vessel and its workers if all other attempts to balance well pressure and counter

an influx fail, and the well begins to flow out of control.

50.     Once the BOP is properly positioned and secured over the pilot hole, the drilling apparatus and additional casing sections are lowered down through the BOP into the well, while a pipe called a "marine riser" connects the wellhead to the drilling vessel at the surface.

51.     As the drilling apparatus moves downward drilling out the well bore hole, drilling fluid called "mud" is pumped down the center of the drill pipe. Drilling mud is a thick mixture of barite, water, clay, and chemicals that cools and lubricates the drill bit and suspends and carries rock fragments and other drilling debris to the surface as the mud circulates.

52.     Drilling mud is carefully formulated so that its hydrostatic pressure slightly exceeds that of the ambient pressure conditions in the various rock formations encountered during the drilling process. The weight of the mud pushes back against the pressure of the hydrocarbons in those formations, helping to control against the ever-present risk of kicks and blowouts in the well.

53.     As the well bore is drilled deeper and deeper, additional sections of casing are added to line each newly-drilled open hole section with pipe. Each casing section is secured with a plug of cement. If a well is to be temporarily abandoned before production, then when drilling reaches the hydrocarbon reservoir, the cementing contractor temporarily seals the well off from the hydrocarbon reservoir it has penetrated, isolating the oil and gas to prevent it from leaking into the well, and then places a temporary cement plug below the BOP at the top of the well.

54.     Assuming the design of the well is stable, and proper testing and analysis

confirm the integrity of the cement plugs, casing string, and other well components, the drilling vessel can disconnect from the well, temporarily abandoning it until a permanent oil production platform is put into place on the sea surface above the well to begin extracting oil or gas.

   **D.**   **BP's Scheme To Defraud – Applied To Deepwater Horizon**

   55.  BP engaged in a pattern of fraudulent conduct directed at regulators from the inception of the Macondo project, continuing through and after the Spill and to this day.  BP's fraudulent actions and omissions were part of a broader pattern of unlawful conduct that it has employed over the years to place profits over safety.

   **1.**  **The Macondo Lease, And BP's Exploration Plan And Drilling Permit**

   56.  As previously described, the oil industry is subject to an MMS permitting and regulatory regime through which offshore drilling companies must assure the safety of the offshore drilling operations, as well as the drilling companies' ability to effectively respond to and contain any oil spills, including worst-case scenario oil spills.

   57.  On June 1, 2008, BP acquired a ten-year lease from the MMS to search for and exploit hydrocarbon reservoirs at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf 48 miles off the coast of Louisiana.

   58.  Before BP could begin operations at the Macondo site, federal regulations required BP to submit its EP demonstrating that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservation practices, and would not cause undue or serious harm or damage to human or marine health, or the coastal environment. 30 C.F.R. §§ 250.201, 250.202.

   59.  Federal regulations also required that the EP be accompanied by "oil and

hazardous substance spills information" and "environmental impact analysis information." 30 C.F.R. §§ 250.212, 250.219, 250.227.

60.     Among the information required to accompany the EP was a "blowout scenario," described as follows:

> A scenario for the potential blowout of the proposed well in your EP that you expect will have the highest volume of liquid hydrocarbons. Include the estimated flow rate, total volume, and maximum duration of the potential blowout. Also, discuss the potential for the well to bridge over, the likelihood for surface intervention to stop the blowout, the availability of a rig to drill a relief well, and rig package constraints. Estimate the time it would take to drill a relief well.

30 C.F.R. § 250.213(g).

61.     The oil and hazardous spills information accompanying the EP was also required to include an oil spill response plan providing the calculated volume of BP's worst-case discharge scenario (*see* 30 C.F.R. § 254.26(a)), and a comparison of the appropriate worst-case discharge scenario in [its] approved regional [Oil Spill Response Plan] with the worst-case discharge scenario that could result from [its] proposed exploration activities; and a description of the worst-case discharge scenario that could result from [its] proposed exploration activities (*see* 30 C.F.R. §§ 254.26(b), (c), (d), and (e)); 30 C.F.R. § 250.219.

62.     Federal regulations required BP to conduct all of its lease and unit activities according to its approved EP, or suffer civil penalties or the forfeiture or cancellation of its lease. 30 C.F.R. § 250.280.

63.     Upon information and belief, in February 2009 BP filed by mail, and/or wire or interstate carrier, its 52-page Initial EP for the Macondo prospect site with the MMS. In the Environmental Impact Analysis section, BP repeatedly and falsely asserted

that it was "unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities." BP falsely estimated a worst-case discharge scenario of 162,000 gallons of oil per day, an amount it falsely assured the MMS that it was prepared to respond to. BP also claimed the well's distance from the nearest shoreline would preclude any significant adverse impacts from a spill.

64.     The MMS approved BP's Initial EP for the Macondo prospect on April 6, 2009, including the approval of a "categorical exclusion" from the full environmental analysis normally required under the National Environmental Policy Act. As detailed more fully below, the MMS' approval of BP's Initial EP and the categorical exclusion from environmental analysis were predicated on BP's flagrant misrepresentations and omissions.   The MMS Approval letter, dated April 6, 2009 and sent from Michael Tolbert to Ms. Scherie Douglas of BP, stated in part: "Exercise caution while drilling due to indications of shallow gas and possible water flow."

## 2.     The Deepwater Horizon's Poor Safety And Maintenance Record

65.     Transocean Ltd. ("Transocean Ltd.") is a Swiss corporation that maintains substantial U. S. offices in Houston, Texas, and is an owner and operator of deep sea rigs. Transocean Ltd.'s 2009 Annual Report filed with the SEC lists BP as its only "significant customer," and states that in 2009 BP accounted for 12% of Transocean total operating revenues.   At all pertinent times Transocean Ltd. was an owner and/or operator of the Deepwater Horizon. The Deepwater Horizon was a $560,000,000 dynamically-positioned, semi-submersible deepwater drilling vessel put into service in February 2001.

66.     The Deepwater Horizon was leased to BP for drilling exploratory wells at the Macondo prospect site, pursuant to the December 9, 1998, Drilling Contract between

Vastar Resources, Inc. and R&B Falcon Drilling Co. for RBS-8D Deepwater Horizon ("Drilling Contract"), and later amendments to that agreement.[1]

67.     Prior to the Spill, BP was on notice that Transocean's safety performance during offshore drilling operations was deficient. Transocean CEO Steven L. Newman admitted prior to the Spill that "we have to improve our safety performance." Just a month before the Spill, in response to "a series of serious accidents and near-hits within the global organization," Transocean commissioned a broad review of the safety culture of its North American operations, including the Deepwater Horizon.

68.     Also prior to the Spill, BP was on notice of significant problems related to the Deepwater Horizon's equipment and maintenance, including problems with the vessel's BOP, electronic alarm systems, ballast systems used to stabilize the vessel in the water, and other significant deficiencies that could "lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment." In September 2009, a BP audit team concluded an audit of Deepwater Horizon, and found excessive overdue maintenance totaling 390 jobs and 3,545 man hours.  Many were high priority.   Thirty-one included findings that were related to well control system maintenance, and six related to BOP maintenance.  All findings were outstanding as of December 2009.  These equipment and maintenance problems are discussed more fully below.

---

[1] The parties to the 1998 Drilling Contract, Vastar Resources, Inc. and R&B Falcon Drilling Co., are now BP and Transocean entities, respectively. The Deepwater Horizon, formerly known as RBS-8D, was in the process of being built for R&B Falcon Corp. between 1998 and 2001, during which time Transocean purchased R&B Falcon Corp. Upon completion, the Deepwater Horizon was delivered to Transocean. BP America is a successor-in-interest to Vastar Resources, Inc. Amendments to the Drilling Contract were subsequently signed by representatives of Transocean and BP.

69.     Even if BP's equipment and operations inspection reports were ostensibly in compliance with MMS regulations, investigations have revealed that oil companies like BP often fraudulently authored their own inspection reports, only submitting them to MMS for a final rubber-stamp approval. Thus, any seeming compliance with MMS inspection report regulations lacks credibility.

### 3.     Macondo: A Troublesome Well

70.     The Macondo prospect site is in the Northern Gulf of Mexico, an area notorious in the industry for high temperature, high pressure, highly gaseous hydrocarbon reservoirs trapped in weak, brittle rock formations.

71.     BP was even warned by the MMS about the difficult drilling conditions at the Macondo site.  The MMS letter approving BP's EP for Macondo, dated April 6, 2009, and sent from Michael Tolbert to Ms. Scherie Douglas of BP, stated in part: "Exercise caution while drilling due to indications of shallow gas and possible water flow."

72.     At the Macondo site, the Deepwater Horizon was conducting drilling operations in excess of 18,000 feet. BP knew that the threat of blowouts increases as drilling depths increase, especially in an area with such troublesome geology as the Northern Gulf of Mexico.

73.     After its EP was approved, BP sought a permit from the MMS authorizing it to drill up to a total depth of 19,650 feet at the Macondo site.  After the Spill, a BP crewman admitted that this depth had been misrepresented to MMS, and that BP had in fact been drilling in excess of 22,000 feet, in violation of its permit.

74.     BP had been struggling with the Macondo well even before the catastrophic events of April 20, 2010. In emails weeks before the blowout, BP employees

25

referred to it as a "crazy," "nightmare" well (Email from Mark E. Hafle to Richard A. Miller sent over an interstate wire on April 14, 2010 at 23:09 p.m.; Email from Brian P. Morel to Richard A. Miller sent over an interstate wire on April 14, 2010 at 1:31 p.m.). At depths almost 3.5 miles below the sea floor, the pressures within and strengths of the various formation layers the Deepwater Horizon was drilling through varied widely and changed often, requiring constant adjustments to drilling fluid density and other factors. In some places, the subsea rock formations were so brittle that they fractured, letting gallons of expensive drilling mud escape into the cracked and porous rock around the drill.

75.     On March 8, 2010, BP experienced serious problems with the well, including a hydrocarbon influx into the well and loss of well control. The hydrocarbons leaking into the well went unnoticed for about 33 minutes, allowing 40 barrels of hydrocarbons to flow into the well before it was shut in to restore well control — a "near miss" of what could have been a lethal blowout. The formation damage from the March 8, 2010, incident was so severe that a length of drilling pipe became stuck in the open hole of the well bore, and BP was forced to abandon the lower part of the well bore, plug it with cement, and begin drilling anew in a different direction, setting well progress back several days and $25 million. Pursuant to their Drilling Contract, BP was paying Transocean approximately $500,000 per day to lease the Deepwater Horizon, not including contractors' fees. BP had planned for the drilling work at Macondo to take 51 days, at a cost of approximately $96,000,000.

76.     At the time of the blowout, drilling at Macondo was already months behind schedule, costing BP over $1 million per day in vessel lease and contractor fees

and putting them increasingly over budget. This excess cost put the Macondo project in conflict with BP's recent mandate of a 7% reduction in costs for all of its drilling operations in the Gulf of Mexico. In spite of the difficult and dangerous nature of the Macondo well, BP made multiple decisions about the drilling plan for economic reasons, even though those decisions increased the risk of the catastrophic failure of the "nightmare" well, and were contrary to representations made to regulators.

77.     After investigating the disaster, Robert Bea, an oil industry expert leading the Deepwater Horizon Study Group, wrote: "Pressures to complete the well as soon as possible and minimize costs as much as possible are evident in the cascade of decisions and choices that led to the blowout."

78.     BP repeatedly chose to violate industry guidelines and government regulations they falsely claimed to be in compliance with, and ignore warnings from their own employees and contractors on the Deepwater Horizon, all in order to reduce costs and save time on the behind-schedule and over-budget Macondo well. Testimony of employees on the drilling vessel highlights the time pressure BP was putting on workers as it rushed them to double up on tasks and finish quickly so the well could be sealed and the Deepwater Horizon moved to another well prospect site to begin searching for even more oil.

79.     This emphasis on speed and thrift over safety led to actions that were non-compliant with prior representations, false at the time they were made by BP to regulators (upon information and belief, by mail, interstate wire or interstate carrier) and that, in turn, directly and/or proximately caused the blowout, the subsequent Spill, and the ensuing damage to the business and property of Plaintiffs and others.

4.      **Careless Decision-Making In The Rush To Complete The Well**

80.      By April 9, 2010, BP had finished drilling the last part of the well bore, after which only casing and cementing the final open-hole section remained. In their rush to complete the well, BP made decisions about well design, cementing, and well integrity testing that prioritized speed and cost-savings over safety and industry best practices—practices they falsely claimed (upon information and belief by mail, interstate wire or interstate carrier) to be following.

5.      **Cutting Corners On Well Design**

81.       For the behind-schedule and over-budget Macondo well, BP chose a vulnerable well design with relatively few barriers against the ever-present risk of hydrocarbon blowouts because the safer option — which had been part of their original well design and was recommended by their contractors — would have taken longer to complete and would have cost up to an additional $10 million.

82.      In keeping with Macondo's intractable nature, the last section of the well had been difficult to drill because of the narrow margin between the minimum pressure needed to keep the hydrocarbons in the surrounding reservoirs from leaking into the well, and the maximum pressure the rock formations themselves could take before fracturing and causing damage, delay, or loss of well control.  The limited range of safe operating pressures in this last open-hole section of the well required careful choices to maintain well integrity and safety during the drilling and cementing processes.

83.      In order to strengthen the well design and provide multiple barriers against blowouts, drilling companies often use a redundant casing design called a "liner/tieback," which provides four barriers against blowouts, while the "long string" casing design

chosen by BP only provided two: the cement sealing off the hydrocarbons in the reservoirs from entering the well and, more than 18,000 feet above that, the seal assembly at the top of the well.

84.     Although the liner/tieback design is more expensive and takes more time to install, it provides four barriers against hydrocarbons leaking into the well and causing blowouts: (1) the cement at the bottom of the well; (2) the hanger that attaches the liner pipe to the existing casing in the well; (3) the cement that secures the tieback pipe on top of the liner; and (4) the seal assembly at the wellhead.

85.     BP was aware that the long string design was the riskier option. An undated BP "Forward Plan Review" recommended against the long string option because of the risks: "Long string of casing *was* the primary option" but a "Liner/Tieback … is now the recommended option."

86.     The BP Forward Plan Review identified several arguments against using the long string casing design, including the high risk of a failed cement job, the inability to comply with MMS regulations, and the need to verify the cement job with a cement bond log test and most likely perform remedial cement job(s).

87.     The BP Forward Plan Review also noted a number of advantages to using the liner/tieback design, including the liner hanger acting as an additional barrier against influxes, a higher chance for a successful cement job on the first try, and the flexibility to postpone a remedial cement job, if it was found that one was required.

88.     The long string casing design was especially inappropriate for a difficult and kick-prone well like Macondo. BP had originally planned to use the safer liner/tieback design, but rewrote the drilling plan just weeks before the disaster — against

29

the advice of its contractors and its own employees – because the project was behind schedule and over budget. Internal BP emails from late March 2010 acknowledged the risks of the long string design but chose it as the primary option because it "saves a lot of time…at least 3 days," "saves a good deal of time/money," and is the "[b]est economic case." (Email from Brian Morel, BP Drilling Engineer, to Allison Crane, Materials Management Coordinator, March 25, 2010; Email from Brian Morel, BP Drilling Engineer, to Sarah Dobbs, Completion Engineer, March 30, 2010).

89.     Despite the known and documented operational risks and advantages to the respective well design options, BP chose to install the long string casing instead of the safer liner/tieback design. The decision was made apparently on nothing other than the desire to save time and cut costs on the behind-schedule and over-budget well.

90.     BP then misrepresented this last-minute change-of-heart to the MMS.  As late as mid-April, a BP Forward Plan Review recommended against the long string casing for a variety of reasons, and BP had come to the conclusion that the result of using a long string casing was that there was "unlikely to be a successful cement job" and the well design would be "unable to fulfill MMS regulations."  Yet on April 15, 2010, BP mailed a request to MMS asking for a permit to use long string casing, apologizing for not having mentioned its use earlier and falsely stating that they had "inadvertently" failed to include its use in earlier submitted plans.

91.     BP also made a choice for the casing pipe material itself, using metal well casings, that raised concerns from its own engineers. Internal documents showing that as early as 11 months prior to the blowout, BP engineers worried that the metal casings BP wanted to use might collapse under the high pressure at the bottom of the well. Senior

drilling engineer Mark E. Hafle warned other BP employees that "I have seen it happen so know it can occur." Using the metal casings also violated BP's own safety policies and design standards. Nevertheless, the riskier metal casings were used after BP supervisors granted special permission. The internal reports do not explain why BP allowed for such a risky departure from its own safety standards.

### 6.     Using Too Few Centralizers

92.     BP also cut corners — again despite multiple warnings from its employees and contractors — with the number of centralizers used on the last piece of casing pipe. Centralizers ensure that the casing pipe is centered in the well bore; if the pipe is not centered, the cement placed around it often fails to create a secure seal against the highly-pressurized hydrocarbons surrounding the well.  The cement around the casing is intended to seal the space (the "annulus") between the rock walls of the drilled out well bore hole and the casing that runs through the well bore.  If the casing is not centered within the wellbore, the pipe can lay near or against the sides of the bore hole, creating too narrow of a space for the cement to set properly and leaving "channels" of empty space or weak areas in the cement.  Those channels and imperfections can allow hydrocarbons to escape out of the formations and into the well, causing a kick or a blowout.  An email from shore-based BP Operations Vice President Brett Cocales to rig-based BP drilling engineer Brian Morel acknowledged the importance of centralizers, noting that "[e]ven if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it."

93.     The American Petroleum Institute ("API") Recommended Practice 65 explains:  "If casing is not centralized, it may lay [sic] near or against the borehole

wall….It is difficult if not impossible to displace mud effectively from the narrow side of the annulus if casing is poorly centralized.  This results in bypassed mud channels and inability to achieve zonal isolation."

94.     On or about April 5, 2010, BP decided to use only six centralizers on the final casing section at the Macondo well.  Halliburton engineer Jesse Gagliano spent a day running models to determine if six centralizers would be enough to prevent channeling that gaseous hydrocarbons could seep through.   Halliburton's analysis concluded that 21 centralizers was the recommended number to ensure a secure cement job; using ten would result in a "moderate" gas flow problem and using only six would result in a "severe" gas flow problem.  This information was provided to BP.  Additional centralizers were available on the Deepwater Horizon, but BP well site leaders erroneously believed they were the wrong type, and did not want to wait for more.  In the same email that had recognized the risks of proceeding with insufficient centralizers, BP official Brett Cocales shrugged off using only six, flippantly concluding, "who cares, it's done, end of story, will probably be fine."

### 7.     Skipping Critical "Bottoms Up" Mud Circulation

95.     Another decision approved by BP was the failure to fully circulate the drilling mud through the entire length of the well before beginning the cementing job.  This procedure, known as "bottoms up," cleans the well bore and prepares the annular space for cementing by completely circulating the drilling fluids from the bottom of the well all the way to the surface.  A bottoms up circulation also ensures the removal of well cuttings and other debris from the bottom of the well, preventing contamination of the cement, permits a controlled release of gas pockets that may have entered the mud during

the drilling process, and allows workers on the drilling vessel to test the mud for influxes of gas. Given that gaseous hydrocarbons leaking into the well was what ultimately caused the blowout, a bottoms up circulation could have revealed the severity of the situation at Macondo before it was too late.

96.     The API guidelines recommend a full bottoms up circulation between installing the casing and beginning a cementing job. The recommended practice states that "when the casing is on bottom and before cementing, circulating the drilling fluid will break its gel strength, decrease its viscosity and increase its mobility. The drilling fluid should be conditioned until equilibrium is achieved. At a minimum, the hole should be conditioned for cementing by circulating 1.5 annular volumes or one casing volume, whichever is greater."

97.     Halliburton technical advisor Jesse Gagliano told BP that Halliburton's "recommendation and best practice was to at least circulate one bottoms up on the well before doing a cement job." (House Subcommittee on Energy and Commerce, Transcribed Interview of Jessie Marc Gagliano, at 57 (June 11, 2010)).   Even BP's own April 15, 2010 operations plan for the Deepwater Horizon called for a full "bottoms up" procedure to "circulate at least one (1) casing and drill pipe capacity, if hole conditions allow."

98.     But a full bottoms up circulation would have taken up to 12 hours on the deep Macondo well, so against the recommendations of the API and Halliburton, and against industry standards and its own operations plan, BP chose to save time and money at the expense of safety by circulating only a small fraction of the drilling mud before beginning cementing.  This too put the cement job further at risk.

### 8.      Cementing: No Full Returns

99.      Given the extremely narrow range of safe operating pressures BP was faced with in this last section of the well, it was all the more important to monitor well flow during the cementing process, to ensure there were no indications of fluid loss or fracturing of the formations around the bottom of the well. By monitoring the flow of drilling fluid out of the well as the cement is pumped in, it can be confirmed that every barrel of injected cement is associated with a barrel of drilling fluid flowing out of the well. These "full returns" indicate that the cement is displacing mud from the annulus as planned. If less mud flows out of a well than the amount of cement that is pumped in, fluid is being lost, most likely into fractures in the brittle formations.

100.     Although BP claimed there were full returns during the last cementing job at Macondo, Halliburton cementer Nathaniel Chaisson stated that there was no monitoring system in place that could have confirmed full returns during cementing operations. Moreover, Halliburton cementer Vincent Tabler told congressional investigators that about 80 more barrels of cement were pumped into the well than barrels of mud that flowed out. This fluid loss would indicate that the brittle formations at the bottom of the well had fractured during the cementing process, allowing fluids and cement to escape into the fissures in the rock, and ruining the cement job.

### 9.      Despite Red Flags, BP Skips Crucial "Bond Log" Test Of Cement Integrity

101.     BP also made the unfathomable decision to cancel the "cement bond log" test, which would have checked the integrity of the completed cement job by using an imaging tool to gauge the thickness of the cement, and to determine if the cement was properly bonded to the casing and the rock formations surrounding the well.

102.    This decision was again contrary to BP's own original drilling plan presented to regulators, which included the cement bond log test. Skipping the cement bond log was also contrary to BP's own internal standards, which do not consider full fluid returns a "proven cement evaluation technique," and furthermore require a cement bond log test if a well's cement design provides for less than 1000 feet of cement above the highest hydrocarbon layer — BP's Macondo plan only provided for 500 feet.

103.    But despite its own drilling plan, internal standards, and the simulations predicting cement failure, and despite warnings from its contractors and its employees regarding the risk of cement failure due to well design and insufficient centralizers, BP canceled the cement bond log test and turned back the team from Schlumberger Ltd. that had arrived on the drilling vessel specifically and solely to perform the test.

104.    BP's only reasoning for skipping this absolutely critical and required test seems to have been a savings of approximately $128,000 and less than 12 hours of work. Moreover, skipping the test was a violation of MMS regulations, which require that a cement bond log test be conducted if there are indications of an inadequate cement job. 30 C.F.R. § 250.428.

## 10.    The Casing Hanger Lockdown Sleeve: Another Skipped Safety Precaution

105.    As discussed above, the long string well design BP chose for Macondo meant that there were only two barriers to a hydrocarbon blowout: the cement job isolating the hydrocarbon reservoirs from the well and the seal assembly at the wellhead on the sea floor.   Given the insufficient number of centralizers, the failure to run a bottoms up mud circulation prior to cementing, and the results of BP's own simulations, the risk of a failed cement job at Macondo was already high, making the strength and

integrity of the seal assembly at the wellhead — the second and final barrier against a blowout — paramount.  Yet here again BP made a decision based on time and money rather than well, worker, and environmental safety: it did not deploy the casing hanger lockdown sleeve that would have prevented the wellhead seal from being broken by pressure from below, as it likely was on April 20, 2010.

106.    A casing hanger lockdown sleeve ties down the seal assembly at the top of a well, providing an extra layer of protection against a blowout, much like the wire cage over the cork on a champagne bottle.  During drilling, heavy mud counters the pressure from the hydrocarbons around the well, preventing their influx into the annulus and the casing.  Once the well is properly sealed, with the cement isolating the pressurized hydrocarbons from the well, the heavy mud is pumped out and replaced by less dense seawater.  Usually the casing hanger lockdown sleeve is deployed before the heavy drilling mud is pumped out of the well, so that it can offer an extra shield against any problems during and after the mud displacement process.

107.    Contrary to industry standard, BP's plan was to deploy the casing hanger lockdown sleeve after the heavy mud had been displaced with seawater.  A well design expert at another major oil company expressed surprise at BP's choice to displace the mud before deploying the casing hanger lockdown sleeve, saying it was "not the norm." BP had chosen to shake the champagne bottle with only a faulty cork — the unsound cement job — standing in the way of disaster.

### 11.    Premature and Nonstandard Mud Displacement Begins

108.    BP was so focused on speed that it could not even wait the 72 hours required for the cement job to fully set before pressing forward with the mud

displacement.  Without the heavy drilling mud to counter the reservoir pressure, any hydrocarbon influx into the well could turn dangerous very quickly, with only comparatively light seawater blocking the path up through the well and the riser to the surface.

109.    On the morning of April 20, 2010, the day of the blowout, BP informed M-I drilling fluid specialist Leo Lindner that the mud displacement would be more substantial than usual, displacing the top 8,367 feet of mud in the riser and drilling string, instead of the typical 300 feet.  In his congressional testimony, Lindner did not mention why BP had instructed him to displace almost 28 times the usual amount of heavy mud.

110.    The mud displacement plan was calculated according to BP's unusual specifications, including displacement of an unusually large amount of mud from the well, without the added safety of the casing hanger lockdown sleeve, and beginning before the cement had even fully set.  Also atypical was the plan to suspend the displacement procedure partway through to allow for pressure testing of the recently completed cement job.

### 12.    The Well Fails Key Pressure Tests, Yet BP Presses On

111.    Two types of pressure tests are used to confirm the integrity of a well. The integrity of the casing pipes and assembly is assessed with a "positive pressure" test, which involves increasing pressure in the casing string and observing the pressure response. If the increase in pressure bleeds off, it indicates a problem with the pressure integrity of the casing: the pumped-in pressure is escaping through a leak somewhere along the line. However, if the increased pressure stays constant, it does not necessarily mean the casing assembly is secure — the external pressure from the hydrocarbons

around the well can be sufficient to maintain the increased pressure reading in the casing string even if there is a breach.  Thus, a negative result (where the pressure leaks off) is useful because it is diagnostic of a leaky casing string.  A positive result (where the pressure remains constant), is not diagnostic of a secure casing string or a leaky casing string, and basically tells workers nothing about the integrity of a well's casing and pipe assembly.

112.    On April 20, 2010, the Macondo well had a positive result to its positive pressure test, which neither confirmed nor denied the integrity of its casing string.

113.    At around noon on April 20, 2010, after the completion of the positive pressure test, drilling vessel workers began the mud displacement process.  According to the mud displacement plan, the displacement would proceed until the spacer fluid had been pumped down to a level 12 feet above the BOP, after which the displacement would be suspended for the negative pressure test.

114.    The BOP's annular preventer was closed to seal casing string for the negative test, but for some reason did not form a secure seal, which allowed about 50 barrels of spacer fluid to leak through the BOP and into the well.  This meant that dense, viscous spacer fluid was across the inlets to several small-bore pipes that were to be used for the negative pressure test, rather than the plain seawater that should have been across the pipe inlets.  BP was aware of this spacer fluid leakage and the potential for the viscous fluid to be blocking the small-bore pipes necessary for the negative pressure test, yet authorized no steps to remedy the situation.

115.    The negative pressure tests were intended to assess the security of Halliburton's cement job at the bottom of the Macondo well.  With the casing string

38

sealed, pressure was bled off from inside the well, "underbalancing" it by reducing the pressure in the casing until the external pressure from the hydrocarbon reservoirs surrounding the well was greater than the internal pressure within the casing itself.  If Halliburton's cement job had securely sealed the hydrocarbon reservoirs off from the well, there would be little to no fluid flow out of the well and the pressure in the casing would remain at the reduced, underbalanced level.  An increase in pressure or flow would indicate that the cement job was not secure, and was allowing hydrocarbons to flow into the well and repressurize the casing string.

116.    The two negative pressure tests on the Macondo well both yielded abnormal results.  In one instance, over four times the expected fluid returns spurted out of the well after the pressure was reduced to an underbalanced state. In the other test, the pressure in the well *increased* from 50 psi to 1,400 psi – a highly diagnostic "red flag" result indicating that Halliburton's cement job had failed to seal off the well from the surrounding hydrocarbon reservoirs.  The 1,400 psi pressure response and the excess fluid returns were indications that hydrocarbons were flowing into the well, re-pressurizing it after it had been underbalanced for the negative pressure test.  BP and Transocean misrepresented this critical finding.

117.    The pressure tests themselves may have further damaged and weakened the cement in the well.  Not only were the tests performed before the cement had a full 72 hours to set completely, but contrary to common practice, the drill string was 10,000 feet above the bottom of the well during the tests.

118.    In May 2010, BP admitted that these pressure test results were clear warning signs of a "very large abnormality" in the well.

119.    In their November 16, 2010, interim report, the NAE panel wrote that "it is clear that pressure buildup or flow out of a well is an irrefutable sign that the cement did not establish a flow barrier" against the entry of hydrocarbons into the well. At Macondo, there was both pressure buildup to 1400 psi and unexpected flow out of the well during the negative pressure tests.

120.    There was only one appropriate response to these abnormal negative pressure test results: remedial cement work to correct Halliburton's obviously-flawed cement job and shore up the seal against the highly pressurized hydrocarbon reservoirs. BP, however, elected to ignore the "red flag" results of these, the only cement integrity tests they had even bothered to perform, and continue with their well completion plan as if Halliburton's cement job had been a success.

### 13.    Unorthodox Spacer Fluid Mixture and Volume Potentially Interfered with Pressure Tests and BOP Functionality

121.    During the mud displacement process, BP used an unconventional fluid mixture — and an unusually large volume of it — as "spacer" fluid. This novel composition and amount of fluid may have interfered with the negative pressure test results and/or caused damage or clogging in the BOP.

122.    In oil wells, a "spacer" is a fluid used to create a division between two other fluids, with the spacer fluid physically preventing the two other fluids from coming into contact and mixing with or contaminating one another. In the mud displacement process at Macondo, the spacer was intended to separate the synthetic drilling mud from the seawater displacing it.

123.    Spacer fluid is usually water-based mud, but according to testimony from

M-I drilling fluid specialist Leo Lindner, an uncommon mixture of fluids was used as a spacer during the Macondo well's mud displacement process.  Instead of mixing a batch of the usual water-based mud spacer fluid, BP instructed Lindner to combine two "pills" of lost circulation material ("LCM") that had been previously prepared for use in the event of any fluid loss during the cementing job.  Unlike the water-based mud typically used as spacer, LCM pills are highly viscous fluid that coagulates to create an extremely thick, stringy mass intended to fill the lost circulation zone, clogging fractures in the rock so that other drilling fluids can no longer escape into the formation.  Lindner testified that it was "not common" to use LCM as a spacer, and that he had never done so before, but that BP employees on the Deepwater Horizon were aware of the unorthodox LCM-based spacer and either approved the use or allowed it to occur without comment.

124.    In addition to the atypical composition of spacer Drilling Defendants used in the Macondo well, the volume of that fluid used was also nonstandard.  Lindner testified that normally a spacer is around 200 barrels of fluid, but in the Macondo well, the two LCM pills that BP used as spacer had a combined volume over twice as large: 450 barrels.

125.    Upon information and belief, BP used this aberrant fluid composition and volume as spacer in the Macondo well solely to skirt environmental regulations that would have required more costly and time-consuming hazardous waste disposal procedures for the two unused LCM pills.

126.    As discussed above, the LCM used as a spacer leaked past the annular preventer through the BOP and into the well before the negative pressure test was run.  BP's unusual use of LCM as spacer fluid could have confounded the negative pressure

test results by blocking the small-bore pipes used for the tests, and could have negatively affected the functionality and effectiveness of the BOP itself.

## 14.   Attempts At Well Control: Too Little, Too Late

127.   While the Deepwater Horizon's crew was distractedly working miles above, highly-pressurized hydrocarbons leaked through the faulty, channeled cement at the bottom of the well and into the casing string.  Several investigations have concluded that the hydrocarbons flowed into the well through the bottom of the last section of casing pipe, flowing up the casing string, and through the BOP and riser to the surface.

128.   Because of their inattention to proper well monitoring during the mud displacement process, the first sign of this hydrocarbon influx Deepwater Horizon workers seemed to notice was the mud that began spilling out of the riser onto the vessel deck at about 9:41 p.m., 49 minutes after the leak had started at the bottom of the well.

129.   Soon high volumes of gas were spewing out of the well onto the Deepwater Horizon, spreading across and under the vessel decks, effectively enveloping the Deepwater Horizon in a highly flammable cloud of gas.

130.   The blowout worsened as the high pressure gas flow caused the failure of surface equipment on the drilling vessel, most of which was rated to withstand only 60 – 100 psi.  As each of these seals and systems gave way under the immense pressure, additional flow paths were opened and the blowout gained strength.

131.   The drilling vessel workers attempted to control the blowout by closing two of the BOP's non-shearing rams, which eventually sealed around the drill pipe at 9:47 p.m.  At this point, all flow paths from the well to the drilling vessel were sealed off except for the drill pipe.  Flow up the drill pipe was prevented by pressure in that pipe.

With the BOP rams now blocking hydrocarbons from entering the riser along the sides of the drill pipe, the blowout could have been contained at this point, had the gas on the drilling vessel not exploded.

**15.    Faulty Vessel Safety Equipment Exacerbates The Blowout, Causing Vessel Explosions, Fire And Sinking**

132.    The initial explosion on the Deepwater Horizon on the night of April 20, 2010, was caused by an engine on the vessel deck that sucked in the gas blasting down on the decks from the mud-gas separator vents.

133.    Gas sensors, designed to shut down vessel engines when dangerous vapors are present, are critical to preventing explosions in such situations. Testifying before investigators in May 2010, Transocean rig mechanic Douglas Brown said gas sensors — and the emergency engine shutdown systems connected to them — were not operational aboard the Deepwater Horizon on the night of the blowout. Moreover, the automated feature that should have closed the engine's air intake valves upon sensing gas entering the engine room also failed.  Brown further said that the Deepwater Horizon's engine room was not equipped with a gas alarm system that could have shut off the power.

134.    At approximately 9:48 p.m., the gas sucked into one of the Deepwater Horizon's engines caused it to begin to overspeed. The vessel lost power less than a minute later, almost immediately followed by two explosions, which ignited the gas enveloping the vessel. The blaze intensified as damage from the explosions and fire opened new flow paths for the flammable gaseous hydrocarbons spewing out of the well. Investigators found potential flow paths through the mud pumps and through the top of the drill string, as well as the possibility that movement of the drill pipe broke the seal

43

that the BOP rams had made around the drill pipe, re-opening the direct flow path from the casing into the riser. Via all or some of these flow paths, gaseous hydrocarbons poured onto the vessel, feeding the inferno that engulfed the Deepwater Horizon and ultimately killed 11 crew members, injured 17 others, and destroyed the vessel.

## 16.    The Failure Of The BOP

135.    Immediately after the explosion, desperate vessel workers tried in vain to activate the emergency disconnect sequence on the Deepwater Horizon's blowout preventer ("BOP"). Problems and failures with each of the BOP's emergency activation methods prevented the use of the Deepwater Horizon's BOP to seal the well, paralyzing its powerful shear rams that should have slammed shut, severing the drill pipe, and quelling the blowout.  BP knew of these problems well before the Spill, but did nothing to ensure that the BOP was in compliance with federal regulations, and omitted to alert regulators to the lack of compliance.

136.    The Macondo well's BOP had several emergency activation methods: the high-pressure closure of the blind shear ram, the emergency disconnect sequence ("EDS"), the automatic mode function ("AMF"), and activation via remotely operated vehicles (ROVs) on the seafloor using the "hot stab" or autoshear functions. None of these were able to activate the BOP to seal the well.

137.    The explosions and fire on the Deepwater Horizon disabled the only two emergency activation methods available to workers on the vessel: the high-pressure closure of the blind shear ram and the EDS. From the BOP control panels on the vessel, workers could push buttons for either of these functions, but both required communication with the BOP itself via multiplex cables running from the vessel to the

BOP on the seafloor. On the vessel, these multiplex cables were not protected against explosions or fire. They were likely damaged during or immediately after the first explosion, effectively disabling the vessel workers' ability to communicate with the BOP.

138.    Transocean subsea supervisor Christopher Pleasant pressed the EDS button after the explosions. "Everything in the [BOP control] panel did like it was supposed to at the panel, but it never left the panel," Pleasant says, which supports the likelihood that damage to the multiplex cables on the vessel severed communication between the vessel and the BOP after the explosions.

139.    The AMF sequence initiates when electrical power, communications, and hydraulic pressure are lost to both control pods on the BOP, circumstances that were certainly satisfied once the multiplex cables and the also-unprotected hydraulic conduit hose on the Deepwater Horizon were damaged by the explosions and/or fire. But failure to maintain the BOP according to plan prevented the completion of the AMF sequence to close the blind shear ram.

140.    The Deepwater Horizon's BOP had two independent control pods, a redundancy intended to reduce the risk that control pod failure would jeopardize BOP functionality, but BP's knowing failure to require necessary maintenance prevented either of the two pods from completing the AMF sequence on the night of the blowout. The control pods after the disaster had a faulty solenoid valve and one battery with low charge in one pod, and two dead batteries in the other pod. These problems existed prior to April 20, 2010, and were significant enough to prevent either control pod from completing the AMF sequence to close the BOP's blind shear ram.

141.    BP was aware of Transocean's infrequent and inadequate maintenance of

the BOP.  Moreover, the faulty solenoid valve on one of the control pods would have shown up on the BOP control diagnostic system on board the drilling vessel, which was accessible to all and must have alerted BP to the problem.

142.    Transocean's BOP maintenance records from 2001 to 2010, which were also available to BP at all times, indicate that the control pod batteries were changed far less frequently than the manufacturer's recommended annual replacement.  As BP knew, Transocean had neglected the BOP batteries before – a November 2007 activity report recorded that when the BOP was brought to the surface, all of the batteries in one of the pods were dead.  Yet BP did not insist that Transocean frequently and proactively change the batteries on the BOP.

143.    During the entire duration of operations at Macondo, the Deepwater Horizon's BOP was out of certification and long overdue for extensive maintenance and repair. Although the BOP's manufacturer, Cameron, required manufacturer testing of the device every five years, the Deepwater Horizon's BOP had not been sent to Cameron for inspection since 2000.

144.    The BOP had not undergone a thorough series of maintenance checks since 2005, despite the significant problems uncovered within the device during that inspection. According to Transocean maintenance documents from the 2005 inspection, the BOP's control panels gave unusual pressure readings and flashed inexplicable alarm signals, while a "hot line" connecting the vessel to the BOP was leaking fluid badly. An independent engineering company was hired to assess the BOP, but could not perform all of its examinations — including verification that the Deepwater Horizon's BOP could effectively shear drill pipe and seal off wells in high pressure, deepwater conditions —

because the BOP was in use and inaccessible on the sea floor, and BP would not stop work to bring it up.

145.   BP was well aware of Transocean's poor maintenance of the Deepwater Horizon and its appurtenant BOP.  BP well site leader Ronald Sepulvado testified in August 2010 that he had raised concerns about Transocean's maintenance of the BOP, reporting that several pieces of equipment had been out of service for extended periods of time, but that Transocean "always told me that they didn't have the parts" to make the necessary repairs.

146.   BP was also aware that Transocean had failed to recertify the Deepwater Horizon's BOP, as required by federal regulations, because recertification would require a full disassembly of the device and more than 90 days of downtime.

147.   After the explosions, as the Deepwater Horizon was burning on the surface, emergency responders sent ROVs to the sea floor to attempt to close the blind shear ram using the "hot stab" or autoshear functions.  Several hot stab attempts to close the blind shear ram failed due to insufficient hydraulic pressure.  Over the course of these events, a number of leaks were discovered in the BOP's hydraulic system, as well as incorrect hydraulic plumbing from the ROV intervention panel to the pipe rams, which was likely the result of BP-approved aftermarket modifications to the BOP.

148.   Hydraulic system integrity is critical to the proper functioning of a BOP. Hydraulic pressure supplies the force used to close the various rams in the device — if there is insufficient hydraulic pressure due to leaks, the system will not be powerful enough to close the rams with enough pressure to create a seal against highly pressurized hydrocarbons in the well.

149.    Ultimately six leaks were discovered in the hydraulic system of the Macondo well's BOP. From investigation and testimony, BP was aware of at least two, but likely almost all, of these leaks prior to April 20, 2010. One leak was discovered as early as February 2010, but was never repaired or otherwise addressed by BP. Vessel workers testified to awareness of other leaks during their congressional testimony. At the very least, the weekly BOP function tests would have made BP aware of the other hydraulic system leaks.

150.    BP was also aware of the aftermarket modifications that hindered the emergency responders' ability to activate the BOP via hot stab procedures. In addition to incorrectly installed aftermarket hydraulic plumbing, one of the Deepwater Horizon's variable bore rams had been switched out with a non-functional test ram. But after the blowout, emergency responders spent a day futilely trying to close that missing variable bore ram, not knowing it had been replaced with a useless test part, because BP hadn't updated the BOP's schematic diagram to reflect the aftermarket changes – an omission in violation of 29 C.F.R. § 1910.119, which requires, *inter alia,* up-to-date process and safety system equipment drawings as a part of basic process safety management.

151.    BP officials were aware of the faulty solenoid valve, poor battery maintenance, hydraulic fluid leaks, and aftermarket modifications on the Deepwater Horizon's BOP long before the April 20, 2010, but no action was ever taken to address the problems, or to report its actions or omissions to MMS, perhaps because additional delays and costs would accrue as all well work stopped and the BOP was raised from the sea floor for repairs. In addition to posing a significant safety risk, BP's choice to continue drilling with a faulty hydraulic system violated federal regulations, which

require companies to disclose problems to the MMS and to stop drilling if either of a BOP's two control systems is not working properly.

152.    Despite vessel workers' efforts just after the blowout, and emergency engineers' efforts in the weeks after the blowout and sinking, the Deepwater Horizon's blind shear ram never successfully sealed the well. Although tests determined that the ROVs had activated the high-pressure blind shear ram close function by cutting the autoshear rod, the well continued to spew oil into the Gulf of Mexico. The blind shear ram failed to seal the well, with possible causes including insufficient hydraulic power to shear the drill pipe and seal the well, or seal failure due to the high pressure flow of hydrocarbons gushing through the BOP at the time the blind shear ram was attempting to close.

153.    At the time of this pleading, the official investigation of the BOP retrieved from the seafloor at the Macondo well is still ongoing. Thus Plaintiffs reserve the right to amend this RICO Class Action Complaint once further information from that and any other future investigations becomes available. At the time of the disaster, BP was certainly aware that in addition to increasing the risk of blowouts, deep-sea drilling also increases the risk of BOP failure. BP was also aware that the industry and government had major concerns about the reliability of BOPs like the one installed on the Deepwater Horizon. A 2004 study by Federal regulators (WEST Engineering Services, Shear Ram Capabilities Study for U.S. Mineral Management Services, Requisition No. 3-402501001, September 2004, at 3-1) showed that BOPs may not function in deep-water drilling environments because of the increased force needed to pinch and cut the stronger pipes used in deep-water drilling. Only three of 74 vessels studied in 2004 had BOPs strong

enough to squeeze off and cut the pipe at the water pressures present at the equipment's maximum depth. "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a Blowout," the study said.

154.    A June 1, 2009 MMS Notice, NTL No. 2009, G11, stated in part that "the Mineral's Management Service ("MMS") Gulf of Mexico OCS Region ("GOMR") considers a backup BOP actuation system to be an essential component of a deepwater drilling system and, therefore, expects you to have reliable back-up systems in place for actuating the BOP in the event that the marine riser is damaged or accidentally disconnected."   Despite this warning, and despite being aware of the risk of the BOP failing at greater depths, BP did not install backup BOP activation systems, backup BOPs or other secondary redundant precautionary measures available to protect the vessel, its workers, Plaintiffs, and the environment from the catastrophic results of a well blowout. BP omitted to tell regulators of this critical failure.

155.    The Deepwater Horizon's BOP was outfitted with only one blind shear ram. But blind shear rams are vulnerable to a "single-point failure" — if just one of the small shuttle valves that carry hydraulic fluid to the ram malfunctions, the BOP cannot seal the well. A 2000 report on the Deepwater Horizon's BOP concluded that the shuttle valve was the BOP's weak spot — consultants attributed 56 percent of the BOP's "failure likelihood" to this one small valve — and indeed, evidence suggests that when the Deepwater Horizon crew attempted to activate the BOP's blind shear ram, the ram's blades could not cut through the drill pipe because one or more of the shuttle valves leaked hydraulic fluid.   BP did not report any of these actions or failures to the MMS.

### 17.    Poor Vessel Maintenance And Bypass Of Safety Systems

156.    BP workers on the Deepwater Horizon had first-hand knowledge of the vessel's poor maintenance and state of disrepair.  In the weeks before the blowout, the Deepwater Horizon suffered power outages, computer glitches, and a balky propulsion system.  In some cases, vital safety mechanisms and alarms were purposely overridden or disabled.   When the Macondo well blew out, the Deepwater Horizon's shoddy maintenance facilitated a cascade of failures of multiple emergency systems, exacerbating the disaster.

157.    An equipment assessment commissioned by Transocean in April 2010, just before the blowout, revealed many key components on the Deepwater had not been fully inspected since 2005, and at least 36 components and systems on the vessel were in "bad" or "poor" condition, which "may lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment." The equipment assessment also found problems with the vessel's ballast system that they noted could directly affect the stability of the ship. The assessment found a malfunctioning pressure gauge and multiple leaking parts, and also faulted the decision to use a type of sealant "proven to be a major cause of pump bearing failure."

158.    The findings of the Transocean-commissioned equipment assessment echoed the results of a similar BP-commissioned audit that had been conducted in September 2009, which found that Transocean had "overdue planned maintenance considered excessive — 390 jobs amounting to 3,545 man hours [of needed maintenance work]."

159.    BP failed to ensure that necessary maintenance work was performed, and
failed to report this faulty or non-existent maintenance to the MMS.

### 18.    Defendants Misrepresent The Severity Of The Spill And Their Oil Spill Response Capabilities

160.    On the night of April 20, after the explosions ignited the vessel, the
resulting gas-fueled fire on the Deepwater Horizon raged for two days, as the vessel
listed progressively and finally sank on April 22, 2010. On the sea surface, the Deepwater
Horizon had been connected to the wellhead at the seafloor by a 5,000-foot marine riser
pipe, and as the vessel sank to the seafloor, it dragged the riser down with it, bending and
breaking the pipe before finally tearing away from it completely. The riser, bent into a
crooked shape underwater, now extended 1,500 feet up from the wellhead and buckled
back down. Immediately oil and natural gas began to gush from the open end of the riser
and from at least two places along its twisted length.

161.    For 87 days, the surge of oil and gas from the gushing well continued
unabated, and the Spill's fast-growing oil slick made landfall on April 30, 2010, affecting
increasingly larger areas of the Coastal Zone as it was driven landward by currents and
winds. Once the oil reached the coasts, it damaged the pristine beaches and delicate
wetlands, marshes, and estuaries that line the coasts of the Gulf States, destroying the
habitats and spawning sites of marine life, as well as the tourism industry and property
values in the Coastal Zone.

162.    From the outset, BP attempted to downplay and conceal the severity of the
Spill from regulators. BP's initial leak estimate of 1,000 barrels per day was found by
government investigators to be a fraction of its actual measured leakage amount of
50,000 barrels per day.  Various experts maintain that BP had the technology all along to

accurately estimate the rate of oil flow from the uncontrolled spill within twenty-five percent of actual oil flow.  Nevertheless, BP continued to fraudulently misrepresent and conceal from regulators the actual flow rate of the oil spill, hampering appropriate containment and cleanup responses and further damaging Plaintiffs. On or about June 20, 2010, Congressman Edward Markey released an internal BP document showing that the company's own analysis had shown that the rate of oil spillage could reach as high as 100,000 barrels, or 4,200,000 gallons, per day. BP presumably misrepresented the Spill size because certain pollution-related fines against BP will ultimately be calculated based on the volume of oil and other pollutants spilled.

163.    BP's obstructionist behavior regarding accurate data continued as the Spill progressed; BP did not provide complete and timely announcements and warnings about the severity, forecast, and trajectory of the Spill, and stymied scientists' efforts to gauge the scope of the disaster on land and at sea. *The New York Times* reported on May 16, 2010, that "BP has resisted entreaties from scientists that they be allowed to use sophisticated instruments at the ocean floor that would give a far more accurate picture of how much oil is really gushing from the well."

164.    Just as BP was now misrepresenting and understating the severity of the Spill, it soon became clear that BP had previously misrepresented and overstated to regulators its ability to respond to a spill.   BP submitted its original Oil Spill Response Plan assurances to MMS in 2000, and BP revised the plan in June of 2009.   Upon information and belief, these plans were submitted by mail, and/or interstate wire or interstate carrier.  The Response Plan addressed the entire Gulf of Mexico area, including the area drilled by the Deepwater Horizon.  According to former MMS Director Elizabeth

Birnbaum, each Response Plan is to be thoroughly and meticulously reviewed by MMS personnel to ensure that the company can indeed respond to a worst-case scenario oil spill.

165.    In its Initial EP, submitted prior to beginning work at Macondo, BP had assured the MMS that it could effectively contain any spill of up to 162,000 barrels of oil per day, using "proven equipment and technology."   This initial EP was, upon information and belief, submitted by mail, and/or interstate wire or interstate carrier.   In its Response Plan, BP claimed it could effectively contain any spill up to 250,000 barrels of oil per day.  The submission was a fraud.  In reality, BP was not at all prepared for an oil spill of any size. The spill-prevention plan BP had submitted to the MMS was an obvious cut-and-paste job that had not been updated to current conditions – not only did it reference Arctic wildlife not indigenous to the Gulf of Mexico, such as walrus, it also listed incorrect and out-of-date contact information for oil spill engineers and experts, including one wildlife expert who died in 2006.

166.    BP Chief Operating Officer Doug Suttles acknowledged on May 10, 2010, that BP did not actually have a response plan with "proven equipment and technology" in place that could contain the Deepwater Horizon Spill. Later, BP p.l.c. CEO Tony Hayward admitted that "BP's contingency plans were inadequate," and that the company had been "making it up day to day." In its official statement, BP made essentially the same admission: "All of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."  Similarly, on May 12, 2010, President of BP America Lamar McKay reluctantly admitted in testimony to the House of Representatives Subcommittee

on Oversight and Investigations, Committee on Energy and Commerce, that BP did not

have the capability and technology to respond to the Deepwater Horizon oil spill:

> Mr. McKay.    We are using the best technology at scale. This is the
> largest effort that has ever been put together. So we believe
> we are using the best technology and if we have any other
> ideas—
>
> Mrs. Capps.    But you never had any until it happened.
>
> Mr. McKay.    Well, we have been drilling with the Coast Guard for years.
>
> Mrs. Capps.    Did you develop technologies for dealing with this?
>
> Mr. McKay.    Not individual technologies for this, no.
>
> Mr. Capps.    I rest my case.
>
> (Congressional Hearing Transcript, at 137).

167.    Despite the constant risk of a spill at any one of its many Gulf of Mexico

wells, BP did not have a realistic response plan, a containment barge, skimming vessels, a

response crew, or recovery material like containment boom ready and available to deploy

immediately in an emergency. On the contrary, the Spill response could not begin until

the U.S. government, including the Coast Guard and the Navy, brought in skimmers,

boom, and other materials, and volunteers were found to assist with the clean up.

168.    On May 17, 2010, U.S. Senators Barbara Boxer, Ben Cardin, Frank

Lautenberg, Kirsten Gillibrand, Bernie Sanders, Amy Klobuchar, Tom Carper, and Jeff

Merkely contacted U.S. Attorney General Eric Holder to specifically request that the U.S.

Department of Justice "open an inquiry into whether British Petroleum (BP) made false

and misleading statements to the federal government regarding its ability to respond to oil

spills in the Gulf of Mexico," noting:

> In the wake of the Deepwater Horizon oil spill, it does not in any way

appear that there was "proven equipment and technology" to respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico. Much of the response and implementation of spill control technologies appears to be taking place on an ad hoc basis.

169.    Upon information and belief, BP also hindered efforts to kill the Macondo well and stop the flow of oil and gas into the Gulf waters. Engineers knowledgeable about blowout responses told BP how to kill the well as early as June 2010, but BP chose to ignore the engineers' well-kill procedure, because BP did not want to damage the well – or its chance to make a profit at Macondo.  Because BP hoped to retap the Macondo well and the large, valuable reservoirs beneath it, it ignored expert well-kill information that could have stopped the Spill many weeks earlier.

### E.    BP's History Of Fraud And Complacency

170.    All the evidence of BP's misguided priorities and imprudent decisions regarding the Macondo well and the Deepwater Horizon described above is part of a pattern of cocksure behavior — "a culture of complacency," as the chairmen of the presidential commission investigating the Spill called it during a hearing on November 10, 2010.  In essence, "[l]eaders did not take serious risks seriously enough and did not identify a risk that proved to be fatal," the commission chairmen said.

171.    This complacency was especially deplorable considering the fact that BP workers and leaders on the Deepwater Horizon had just survived a near miss – the March 8, 2010, influx that went unnoticed for 33 minutes, allowing 40 barrels of hydrocarbons to leak into the well before it was shut in.  That brush with disaster should have been a lesson learned for BP, but to the contrary, just six weeks later their haste and carelessness again led them to miss signs of an influx, this time for even longer – 49 minutes – not

noticing the breach until it was too late.

172.    An independent group of scientists singled out BP for its "lack of discipline" in its operations at Macondo, in an interim report released November 17, 2010.  "Numerous decisions to proceed toward abandonment [well completion] despite indications of hazard, such as the results of repeated negative-pressure tests, suggest an insufficient consideration of risk and a lack of operating discipline," according to the 15-member panel of National Academy of Engineering scientists.

173.    Moreover, the panel found that BP suffered from a lack of "management discipline" and problems with "delegation of decision making" on board the Deepwater Horizon.  Workers aboard the drilling vessel were often unsure about who was actually in charge, and there was a "lack of on board expertise and of clearly defined responsibilities," the NAE report said.

174.    As the Deepwater Horizon Study Group put it: "It is the underlying 'unconscious mind' that governs the actions of an organization and its personnel."  In the case of the Deepwater Horizon, the cultural influences permeating the Macondo teams – both on the vessel and on the beach – reflected "gross imbalances between production and protection incentives" and manifested in "actions reflective of complacency, excessive risk-taking, and a loss of situational awareness."

175.    BP's desultory approach to its responsibilities regarding the Deepwater Horizon Macondo well was in direct violation of federal regulations intended to maintain public safety. Pursuant to 30 C.F.R. § 250.107, BP was required to protect health, safety, property, and the environment by (1) performing all operations in a safe and workmanlike manner; and (2) maintaining all equipment and work areas in a safe condition. They were

further required to immediately control, remove, or otherwise correct any hazardous oil and gas accumulation or other health, safety, or fire hazard and use the "best available and safest technology" whenever practical on all exploration, development, and production operations. BP fraudulently violated these regulatory mandates, causing the Macondo well blowout and the subsequent explosions, fire, sinking, and Spill, with ensuing damage to Plaintiffs and others.

176.    This culture of disregard was not limited to BP's fraudulent actions and heedless decisions on the Deepwater Horizon at the Macondo well. In fact, BP has a history of fraudulent behavior across their operations on land and at sea – a record littered with accidents, spills, regulatory violations, fines, and lawsuits.

177.    BP has a history of cutting corners on safety to reduce operating costs. It is its regular way of doing business.  In 2005, a blast at a Texas refinery killed 15 people and injured more than 170; Federal investigators found the explosions were in part due to cost-cutting. BP pled guilty to criminal charges and paid $50 million in fines.  It was then placed on three years probation following the blast while the Occupational Health and Safety Administration ("OSHA") conducted its investigation.  Despite the tragic deaths of 15 workers, the resulting criminal charges, and millions of dollars in fines, BP still failed to correct safety problems at the re-built Texas City refinery.  It could not give up its regular way of doing business.  A post-disaster reinspection of the facility revealed little improvement: many violations were found—many of them left over violations that had not been corrected since the prior inspection  In October 2009, this resulted in an additional $87 million fine, the largest fine in OSHA history.

178.    And in 2006, four years after being warned to check its pipelines, BP had

to shut down part of its Prudhoe Bay oilfield in Alaska after oil leaked from a corroded pipeline.  BP again faced criminal fines when 200,000 gallons of crude oil was released into the Alaskan wilderness from a BP pipeline.  Criminal investigators determined that the company was aware of corrosion along the pipeline where the leak occurred.  BP was forced to pay $12 million in criminal fines for the spill in addition to another $4 million to the state of Alaska.   BP pled guilty to a criminal violation of the Clean Water Act on October 25, 2007.  Apparently, BP is a serial offender.  The court found at sentencing that BP's oil spills were a "serious crime" that could have been avoided if BP had placed more emphasis on investing in pipeline safety upgrades and "less emphasis on profit," again demonstrating BP's regular way of doing business.   Congressional committees later found that BP had ignored opportunities to prevent the Alaskan oil spill, instead adopting "draconian" cost cutting measures that led to shortcuts involving the felony Clean Water Act violations.

179.    More recently, Kenneth Abbott, a former BP Project Control Lead on the BP Atlantis Project, a sister rig to the Deepwater Horizon, testified on June 17, 2010 before Congress that a review on the BP Atlantis indicated that almost 90% of the drawings had never received engineering approval, contrary to the requirements of BP and regulators.  These failures in safety and the lack of full disclosure to MMS comprise the regular way of doing business for BP.

180.    Despite this history of catastrophes and close calls, BP has been chronically unable or unwilling to learn from its many mistakes or to give up its regular way of doing business. The company's dismal safety record and disregard for prudent risk management are the results of a corporate safety culture that has been repeatedly

called into question by government regulators. BP has consistently demonstrated that it will choose profit before safety at the expense of human lives and the environment. Moreover, the company's actions imply that it would rather pay fines than comply with U.S. law, as paying those fines — if and when its malfeasance is actually discovered — is ultimately a cheaper long-term strategy than regulatory compliance. This deficient corporate culture is a crucial contributor to previous disasters at BP facilities, and is ultimately to blame for BP's decisions concerning the Macondo well, decisions made with indifference to the foreseeably tragic results to the workers aboard the drilling vessel, the environment, and Plaintiffs.

181.    Many of BP's workers at various facilities have voiced complaints about their employer's actions and policies, sometimes in the face of harsh retaliation from supervisors. Former employees, contractors, and oil field workers who worked for and with BP have reported that BP regularly cheated on pressure tests and failed to report leaks and spills to the regulatory authorities. For example, a BP subsidiary in Carson, California, submitted falsified inspection results to air quality regulators for eight years before it was revealed that the refinery was in a frightening state of disrepair. Instead of running at 99% compliance with regulations, as the falsified reports from BP had indicated, the refinery was actually operating with 80% *non*compliance, establishing once again beyond serious doubt BP's regular way of doing business. Workers at BP's Alaskan oilfield accused the company of allowing "pencil whipping," or falsifying inspection data, as well as pressuring workers to skip key diagnostics, including pressure testing, cleaning of pipelines, and corrosion checks, in order to cut costs. Workers on the Deepwater Horizon also described "a corporate culture of …ignoring warning signs

ahead of the [April 20th] blast," saying that "BP routinely cut corners and pushed ahead despite concerns about safety." After all, as one Alaska worker was pointedly told when he raised a safety concern: "Safety doesn't make money."

182.    Prior incidents, investigations and testimony from Congressional hearings have shown that BP actively discourages workers from reporting safety and environmental problems. Honesty is not in its playbook.   Reports from multiple investigations of the Texas City and Alaska disasters all indicate a pattern of intimidating — and sometimes firing — workers who raise safety or environmental concerns. In Alaska, pressure for increased production with fewer safety reports created "an environment where fear of retaliation [for reporting problems] and intimidation did occur." Also in Alaska, a pipeline safety technician working for a BP contractor was scolded, harassed, and ultimately fired for reporting a crack in a pipe that was dangerously close to an ignition source, despite that other reports indicated he was one of the top-performing employees in his position. "They say it's your duty to come forward," he said of BP's official corporate policies, "but then when you do come forward, they screw you."  In a more extreme example, in the 1990s a BP executive was involved in a scandalous scheme involving spies hired to track down a whistleblower who had leaked information about BP spills to the press.

183.    According to the Occupational Safety and Health Administration ("OSHA"), over the past three years BP has committed 872 safety violations, most categorized by OSHA as "egregious willful." This number is made even more shocking when compared to BP's competitors, who average about five violations each. Two refineries owned by BP account for 97 percent of all "flagrant" violations found in the

refining industry by government safety inspectors over the last three years. According to a former EPA lawyer involved in the Spill investigations, "none of the other supermajors have an environmental criminal record like they do."

184.    BP's marginal ethics are well known to its competitors and others in the oil and gas industry, particularly Transocean.  As previously stated, in 2009 BP was listed as Transocean's "significant customer."   BP had an exclusive, more than $963 million contract for Transocean's Deepwater Horizon, which it controlled from the moment it was placed in operation in September 2001, until it sank on an April 22, 2010.  BP has also had an exclusive, $1.129 billion contract for operation of the Transocean Discoverer Enterprise, which, among other things, was brought in drill one of the two relief wells in the wake of the Macondo catastrophe. Other contracts with Transocean have included:  an exclusive, $1.26 billion contract for operation of the Development Driller II, which drills at the problem-plagued Atlantis project; a seven-year contract for the newly built Development Driller III; and a four-year, $561 million contract for the Transocean Marianas, all of which operated or currently operate in the Gulf of Mexico, as well as a five-year, more than $193 million contract for the Sedco Express and a seven-year, $430,000/day contract for the Discoverer Luanda, which has operated or will operate in waters off the coast of Luanda, Angola.

185.    As Transocean noted in its August 4, 2010 (for the period ending June 30, 2010) 10-Q: "Our relationship with BP p.l.c. and its affiliates (collectively, "BP"), one of which was the operator on the Macondo well, could also be negatively impacted by the Macondo well incident.  For 2009, BP was our most significant customer.  As of July 15, 2010, the contract backlog associated with our contracts with BP and its affiliates was

$3.4 billion."

186.    Clearly, Transocean values the preservation of its lucrative relationship with BP over its obligations to the MMS, the environment, its employees, Plaintiffs and all the many others plainly within the scope of the foreseeable risk when disaster inevitably struck at Macondo.

187.    BP's corporate culture of trading safety for speed, production, and profit, and encouraging its employees to do the same, sped the inevitable approach of catastrophe.  Its regular way of doing business has finally caught up with it. Sadly, it was the Gulf of Mexico environment, economy, as well as Plaintiffs and class members that ultimately suffered the consequences from BP's disregard of the law and prescribed regulatory policies.

188.    The recent Presidential Oil Spill Commission report observed that one expert stated that BP's assessment of what went wrong essentially started with the explosion and ensuing catastrophe when in reality the unfolding of the catastrophe and tragic event all actually started much earlier with the Defendants' fraudulent failure to adhere to safety requirements in the interest of time and money.   And BP's scheme to mislead the government regarding its ability to safely obtain oil and to effectively contain any spills has gone on for many years.

### F.    The Spill's Impact On Plaintiffs, The Environment, And The Coastal Zone Economy

189.    Since the Spill began, unprecedented amounts of raw crude oil, emulsified and weathered oil, natural gas, chemical dispersants, and other toxic pollutants have contaminated the Gulf of Mexico and the Coastal Zone – a total petroleum discharge of 6.9 million barrels, not including the million gallons of chemical dispersants and any

other toxic pollutants that were also released as a result of the Spill.

190.    The oil released during the Spill contains benzene, toluene, polyaromatic hydrocarbons, and other compounds (collectively referred to as Total Petroleum Hydrocarbons, or "TPH"), all of which are known carcinogens. Discharge of the toxic pollutants, as identified in 40 C.F.R. § 401.15, likely includes, but is not limited to, benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (including, but not limited to, phenanthrene, benzanthracenes, benzophyrenes, benzofloranthene, chrysenes, dibenzanthracenes, and idenopyrenes), fluoranthene, arsenic, cadmium, copper, mercury, and nickel, all of which are hazardous to the health of humans and marine life. Upon information and belief, BP has analyzed and knows the exact concentrations of each of the toxic pollutants present in the oil coming from its wells.

191.    Moreover, the chemical dispersants used by BP during the Spill response may be harmful to the health of humans and marine life. Over two million gallons of chemical dispersants were released into Gulf waters to disperse the oil coming from the damaged well. According to environmental experts in the Deepwater Horizon Study Group, oil recovery (such as skimming) is preferable to chemical dispersion because recovery actually removes the oil from the environment, rather than simply spreading it through the water column and sinking it to the sea floor, where it can continue to cause environmental damage to the Gulf ecosystem while no longer causing public relations damage to BP. The environmental effects of using chemical dispersants in such magnitude and at such depths have never been tested.

192.    The Spill has impacted and continues to impact Plaintiffs and the shorelines, beaches, shores, marshes, harbors, estuaries, bayous, bays, and waters of the

Coastal Zone.

193.   The Spill and the resulting contamination of the Coastal Zone have caused and will continue to cause a loss of revenue for individuals and entities that rely on the use of the Gulf of Mexico and/or its marine life, including Plaintiffs.

194.   There are a wide variety of commercially valuable fish species in the Gulf of Mexico that have been and will continue to be harmed by the Spill, including, but not limited to, shrimp, crabs, oysters, menhaden, and pelagic fish.

195.   The Spill caused the National Oceanographic and Atmospheric Administration ("NOAA") to restrict commercial and recreational fishing across large areas of the Gulf of Mexico – up to 88,552 square miles at the restriction's greatest extent – causing damage to some Plaintiffs' livelihoods. Fishing of certain species and in certain areas of the Gulf is currently still restricted until further notice from NOAA.

196.   According to the National Marine Fisheries Service, commercial fishermen harvested 1.4 billion pounds of fish from the Gulf of Mexico in 2009, resulting in $614.5 million in total landings revenue for the region.

197.   Major shrimp species in the Gulf of Mexico, including, but not limited to, white, pink, Red Royal, and brown shrimp, are mainly located in coastal areas. During the Spill, the Gulf's various shrimp species were harmed due to mortality of adults, as well as that of postlarval shrimp, whose migrations out of the inlets, shallows, and estuaries where they were born coincided precisely with the timing of the Spill, devastating current as well as future shrimp catches.

198.   In 2009, Gulf of Mexico shrimp landings were the nation's largest at 241 million pounds, which was 80 percent of the national total and worth $313.8 million,

according to NOAA sources. Louisiana led all Gulf states with nearly 109.8 million pounds, worth $89.2 million; followed by Texas, almost 89.7 million pounds, worth $72.9 million; Alabama, almost 21.7 million pounds, worth $17.6 million; Mississippi, 10.1 million pounds, worth $8.2 million; and Florida's Gulf Coast, 9.7 million pounds, worth $7.8 million.

199.     According to NOAA, the Gulf region also leads the nation in the production of oysters in 2009, harvesting 22.1 million pounds of meats, a catch worth almost $85 million and making up over 62 percent of the nation's total.

200.     Several valuable crab species live in the Gulf of Mexico, including, but not limited to, blue crab, Gulf stone crab, and stone crab. As with shrimp, crab spawning and larval seasons coincided disastrously with the Spill, putting future harvests at risk for years to come.

201.     In 2009, the Gulf region harvested almost 40% of the nation's blue crab catch: 59.1 million pounds of hard blue crab landings worth $57.3 million, according to the National Marine Fisheries Service. Louisiana alone landed approximately 33 percent of the total national blue crab catch: 50.78 million pounds, a catch worth $49.17 million.

202.     According to NOAA, surface-oriented marine life was most harmed by the early stages of the Spill, especially near-shore species and/or species that were spawning when the oil reached the shore. But as the crude oil weathered, sank, or was dispersed throughout the water column, reef- and bottom-oriented fish (such as snappers and groupers) were also threatened. In November and December 2010, scientists found evidence that thick swaths of sunken oil bearing the unique hydrocarbon signature of the Macondo well are covering large areas of the seafloor in the Gulf, killing deep-water

coral reefs and sediment-dwelling organisms that play major roles at the base of the Gulf food chain.

203.    Moreover, as sunken and dispersed oil resurfaces, additional harm to marine ecosystems will occur and continue. As noted by Dr. Lisa Kaplowitz of the U.S. Department of Health and Human services, in her June 15, 2010 testimony before Congress: "Oil can remain toxic in the environment for years."

204.    The Spill has also harmed marine species at the top of the Gulf food chain, such as the Atlantic Bluefin tuna. The Gulf of Mexico is one of only two major spawning grounds for this endangered tuna species; each year from March to June the fish converge there between latitudes 25-28°N to breed. Not only did the Spill's timing coincide precisely with the peak of the Bluefin's Gulf of Mexico spawning season, but NOAA maps show that the Spill and its underwater plumes of oil and dispersants spread across latitudes 25-28°N, directly polluting the tuna's limited spawning area.

205.    During the spawning season, Bluefin tuna release their eggs near the surface of the water, meaning oil and dispersants from the Spill likely coated and destroyed millions of tuna eggs. Oil skimming activities could also have physically damaged the eggs, or broken surface water tension, allowing the eggs to sink too deep to properly develop.

206.    The effects of the Spill will continue to threaten the Bluefin species for years to come. Bluefin tuna are large, slow-growing fish that take ten years to reach sexual maturity. The destruction of, or severe damage to, an entire generation of fish in 2010 will therefore continue to affect the tuna population for at least a decade; if next year's spawning season is also affected by resurfacing oil or the remaining underwater

plumes, the damage to the species will be catastrophic. Already severely overfished, the Atlantic Bluefin tuna may not survive this massive disruption to an entire spawning season, let alone the potentially long-term devastation of one of its annual spawning sites.

207.    The Spill has not only had a severe impact on fisheries in the Gulf of Mexico, but it has also dealt a devastating blow to tourism in the Coastal Zone and the individuals and entities that ordinarily rely on tourism for their livelihood. Tourism accounts for about 46 percent of the Gulf Coast economy annually. The Spill will result in at least $7.6 billion in lost tourism revenue in 2010, according to a study done for the U.S. Travel Association.

208.    The Spill may become the worst disaster in the history of Florida tourism. Some analysts have preliminarily estimated that the impact on tourism along Florida's Paradise Coast could reach $3 billion.

209.    During the Spill, the Mississippi coast had a 50 percent cancellation rate on reservations generally.

210.    Twenty-six percent of Americans who had planned to visit Louisiana stated they were no longer planning to visit after the Spill, according to a nationwide survey taken by the Louisiana Tourism Commission in May 2010. Prior to the Spill, Louisiana hosted 24.1 million visitors per year, whose purchases fueled a $9.4 billion tourism industry and sustained more than 200,000 direct and indirect jobs for Gulf residents, according to the Louisiana Tourism Commission.

211.    Alabama has also seen a dramatic drop in tourism, including a 60 percent drop in visitations and an 80 percent drop in home rentals. Overall, the combination of tourism and fishing losses in Alabama in 2010 will probably yield adverse impacts of

$1.7 billion in economic output, $498.9 million in earnings, and 24,880 jobs, according to a report by the Center for Business and Economic Research at the University of Alabama.

212.    The Spill and the Spill response have also caused damage to real property owned and/or leased by Plaintiffs in the Coastal Zone, resulting in physical damage and diminution of property values. Not only have oil and other contaminants polluted real and private properties throughout the Coastal Zone, but pieces of the destroyed Deepwater Horizon vessel have come ashore in some places, damaging real and private property. The Spill response has also resulted in intrusion on and damage to property, including the annoyance, disruption and physical damage caused by vehicles, heavy machinery, boom, staging areas, and other materials and activities on or near potential class members' properties.

213.    The Spill has also damaged submerged oyster beds that are the leased property of some potential class members. The contamination of these submerged oyster beds has interfered with leaseholding class members' ability to use their leased property as intended, damaging those class members' livelihoods as well as the value of their leased oyster bed properties.

214.    Because of the size and nature of the surface oil slick, the subsurface oil plumes, and weathered oil on shorelines, and the toxic effects of the oil and other substances released during the Spill on humans, marine life, and the Coastal Zone environment, there have been and will continue to be further injury to business or property to individuals and entities owning and/or leasing residential or investment properties in the Coastal Zone.

215.    Because investigations are ongoing, there are many other potential effects

from the Spill that have not yet become known, and Plaintiffs reserve the right to amend this RICO Class Action Complaint, after additional information becomes available.

## V.  CLASS ACTION ALLEGATIONS

216.    Plaintiffs seek certification of the following class ("the Class"):

> All individuals and entities residing or owning property in the United States who claim economic losses, or damages to their occupations, businesses, and/or property as a result of the April 20, 2010 explosions and fire aboard, and sinking of, the Deepwater Horizon, and the resulting Spill.

217.    This action is brought and may properly be maintained as a class action on behalf of the proposed Class described above, and such other additional classes or subclasses as Plaintiffs may propose and/or the Court may designate, pursuant to the applicable and appropriate provisions of Rule 23(a)(1)-(4), (b)(3), (b)(1), (b)(2), (c)(4) and/or (c)(5).

### A.    Numerosity Of The Class And/Or Subclasses — F.R.C.P. 23(a)(1)

218.    The Class consists of tens of thousands of individuals and businesses who have been economically damaged by the spill, making joinder impracticable. Class members can be informed of the pendency of this action by print, internet, and broadcast notice.

### B.    Commonality — F.R.C.P. 23(a)(2)

219.    Common questions of law and fact exist as to all members of the Class. Because Defendants' behavior here is governed by federal regulations, the Class members will be subject to common questions of law.

220.    These common questions of fact and law predominate over the questions affecting only individual class members.  The common questions include, but are not

limited to:

  a.   Whether Defendants defrauded regulators regarding their assurances that they would safely conduct offshore drilling and regarding their ability to effectively contain any oil spills that might occur from their offshore drilling operations;

  b.   Whether Defendants engaged in a pattern of mail and wire fraud in direct violation of RICO statutes;

  c.   Whether Defendants have violated federal and state RICO laws;

  d.   Whether Plaintiffs have been injured in their business or property as a result of Defendants' acts, misrepresentations and omissions that constitute RICO violations.

### C.   Typicality — F.R.C.P. 23(a)(3)

221.   The claims in this RICO Class Action Complaint are typical of the claims of the Class in that they represent the various types of injury to business or property caused by the Spill. Each Class member's claim arises from the same course of planning, decisions, and events, and each Class member will make similar legal and factual arguments to prove Defendants' federal and state RICO violations.

### D.   Adequacy Of Representation — F.R.C.P. 23(a)(4)

222.    Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting environmental, mass tort, and RICO class actions, including actions involving environmental contamination and, specifically, catastrophic oil spills. Among the undersigned counsel for Plaintiffs are counsel who represent claimants from each of the affected Gulf states and claimants with each type of claim (fishery-related, property-related, and business-related), and counsel with experience in complex class action litigation and trials, including the Exxon Valdez litigation. Plaintiffs and their counsel are

71

committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

### E.   Class Certification Under F.R.C.P. 23(b)(1), (b)(2), And (b)(3)

223.   Class certification pursuant to Rule 23(b)(1) is appropriate because the prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications with respect to individual members of the class, and could substantially impede the ability of other members to protect their interests.

224.   Class certification pursuant to Rule 23(b)(2) is also appropriate because Plaintiffs and all members of the proposed class seek injunctive relief under federal or state law, as applicable.

225.   Class certification pursuant to Rule 23(b)(3) is also appropriate because class action treatment is a superior method for the fair and efficient adjudication of the controversy. Common issues predominate over individual issues, and there is no interest by members of the class in individually controlling the prosecution of separate actions. The size of the class renders joinder impracticable, and failure to certify the class will likely prevent individuals who have been damaged by BP's fraudulent scheme from pursuing their claims.  Without a class action, individual class members would face burdensome litigation expenses, deterring them from bringing suits that would adequately protect their rights.  Whatever difficulties may exist in the management of the class action are greatly outweighed by the class action procedure that would provide claimants with a method for the redress of claims that they may not otherwise be capable of pursuing.  The class action device is superior to individual litigation under the circumstances of this case

because it provides the benefits of unitary adjudication, judicial economy and economies of scale. The class action device in this civil RICO action provides access to the courts and a measure of justice and accountability for the individual and business claimants whose incomes, business and properties have been damaged by BP's fraudulent and unlawful conduct.

226.    The Plaintiffs and all Class members seek treble damages for their injury under the federal civil RICO provisions of 18 U.S.C. § 1964(c)**,** including but not limited to economic damages for injury to their income, business, and property (including diminution of property values), cost of the suit, attorney's fees, injunctive relief and any other relief to which they may be entitled in law and/or equity. The Plaintiffs and all Class Members also seek equity relief under FLA. STAT. ANN. § 89.01-895.06 (commonly referred to as "Florida RICO Act" or "Florida RICO"), in particular § 895.05(1)(6) (Civil Remedies)**.**   The Plaintiffs and the Class members do not seek damages for personal injury.

## VI.  CLAIMS FOR RELIEF

**COUNT 1:  By Plaintiffs Against BP For Violation Of 18 U.S.C. § 1962(c)**

227.    Plaintiffs reallege and incorporate by reference all previous paragraphs.

228.    The Racketeering Influenced and Corrupt Organizations Act ("RICO") provides:

> It shall be unlawful for any persons employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.  18 U.S.C. § 1962(c).

229.    The relevant time period for BP's pattern of racketeering stems from at

least the year 2000, and likely earlier but at this point in discovery as yet unknown, and continues to the filing of this RICO Class Action Complaint.

230.    Defendant BP, is and was at all times relevant to this action, a RICO "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

### The RICO Enterprise

231.    BP has used an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), to carry out its pattern of racketeering activity.  This enterprise consists of BP itself along with Transocean ("Enterprise").   This Enterprise possessed and continues to possess a common purpose and goal, a membership, organizational structure, and ongoing relationships between BP and Transocean with sufficient longevity to permit and enable pursuit of the Enterprise's purpose and long-term objective through a continuous course of conduct that affected and continues to affect interstate and foreign commerce.

232.    The Enterprise exists separate and apart from its pattern of racketeering activity, inasmuch as BP and the Enterprise have multiple goals, not all of which are fraudulent.   The lawful activity engaged in by the Enterprise includes ongoing partnerships to explore and develop oil reserves.  But BP has, since at least 2001, used this enterprise to conduct the related acts of mail and wire fraud comprising the pattern of racketeering.

233.    BP is a "person" under the civil RICO statute because it knowingly and fraudulently conducted and participated in the conduct, the management and the operation of the Enterprise's affairs, directly or indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  BP engaged in such unlawful

conduct by using the Enterprise to conduct lawful activities as well as to further its fraudulent scheme of causing false and misleading information to be disseminated to regulators by mail, interstate wires or interstate carriers that BP would safely conduct oil operations and that BP could effectively respond to and contain any environmental incident, such as a deepwater oil spill. It also caused regulators to communicate by mail, interstate wires or interstate carriers with it, such as by approving BP's fraudulent plans.  Pursuit of profit is not per se violative of the mail and wire fraud statutes or civil RICO.  BP violated RICO and injured Plaintiffs and class members in their business or property by reason of its conduct of the Enterprise not to pursue gain, but to do so by unlawful means: to maximize its gain and profit through a pattern and practice of misrepresentation and concealment of the systematic decisions that placed financial goals above safety considerations, that was conducted in violation of applicable laws and regulations, that made such operation perilous to human and environmental health and safety, and that rendered BP and the Enterprise unable to prevent, contain and respond to the resulting disaster.  As the direct, proximate and foreseeable result of this violative pattern and the Gulf disaster it caused, Plaintiffs and the class have been injured in their Gulf-located, Gulf-related, and/or Gulf-dependent businesses and property.

**The RICO Predicate Acts**

234.    BP engaged in a fraudulent scheme to defraud government regulators into believing it would safely conduct offshore drilling and that it was able to effectively respond to and contain any oil spill, including the Deepwater Horizon oil spill.

235.    For the purpose of devising and carrying out their scheme and artifice to defraud the government regulators by means of false and fraudulent pretenses,

representations and promises, BP did place in an authorized depository for mail, or did deposit or cause to be deposited with private commercial interstate carriers and knowingly caused to be delivered by the United States postal service, letters, memoranda, and other matters, in violation of 18 U.S.C. § 1341, or aided and abetted in such criminal acts, as previously described, under 18 U.S.C. § 2.

236.    For the purpose of devising and carrying out their schemes and artifice to defraud the government regulators by means of false and fraudulent pretenses, representations and promises, BP caused to be transmitted by means of wire communication in interstate commerce, writings, signals and sounds, to wit, interstate electronic mail messages and/or facsimile in violation of 18 U.S.C. § 1343, or aided and abetted in such criminal acts, as previously described, under 18 U.S.C. § 2.

237.    Examples of these predicate acts of mail and wire fraud include, but are not limited to (upon information and belief, numerous others will be identified in the process of discovery), the following:

a.    Upon information and belief, on December 1, 2000, BP submitted by mail and/or interstate wire or interstate carrier to MMS a Regional Oil Response Plan addressing the entire Gulf of Mexico area, including the area later drilled by the Deepwater Horizon. This plan falsely stated that BP could contain an oil spill of up to 250,000 barrels per day.   This plan included other blatant misrepresentations, such as: an ability to haul out sea lions, seals and walruses; links to a Japanese home shopping website as being one of the "primary equipment providers for BP in the Gulf of Mexico region [for] rapid deployment of spill response resources." BP Regional Oil Response Plan – Gulf of Mexico.

b.    Upon information and belief, on June 30, 2009, BP submitted by mail and/or interstate wire or interstate carrier to MMS a revised Regional Oil Response Plan addressing the Gulf of Mexico, that included the same misrepresentations as the prior plan. It also added new misrepresentations, such as references to a professor listed as a consultant for responding who had died in 2005.

c.    Upon information and belief, on February 23, 2009, BP submitted by mail and/or interstate wire or interstate carrier to MMS an Initial Exploration Plan for Mississippi Canyon Block 252 – the document covering the Macondo project.  In this document, BP falsely minimized the prospect of any serious damage associated with a spill, saying there would be only "sub-lethal" effects on fish and marine mammals, and "birds could become oiled."  BP further misrepresented that "[i]n the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using *proven equipment and technology* for such responses, implementation of BP's Regional Oil Spill Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill." [emphasis added].  BP falsely stated that it was prepared to handle a worst-case discharge of 162,000 barrels of oil per day.

d.    Interstate wires were used on March 25, 2010 and March 30, 2010 to further BP's scheme to defraud the MMS.  Emails on those dates were sent among BP personnel, and concluded that the long string casing design would "save a lot of time…at least 3 days," "saves a good deal of time/money," and is the "[b]est economic case."  Email from Brian Morel, BP Drilling Engineer, to Allison Crane, Materials Management Coordinator, March 25, 2010; Email from Brian Morel, BP Drilling Engineer, to Sarah Dobbs, Completion Engineer, March 30, 2010.  Despite the fact the BP itself had concluded that it would not use the long string casing design because of the high risk of a failed cement job and the inability to comply with MMS regulations, BP then on April 15, 2010 sent by mail and/or interstate wire or interstate carrier a request to MMS asking for a permit to use long string casing, apologizing for not having mentioned its use earlier and falsely stating that they had "inadvertently" failed to include its use in earlier submitted plans.

e    Similarly, interstate wires were used on March 25, 2010 to further BP's scheme to defraud the MMS when Brian Morel of BP sent an email to Heather Powell, copied to Scherie Douglas, Senior Regulatory Compliance Team Lead at BP, stating in part with respect to obtaining a bypass permit:  "I have attached what I feel is pertinent data, only thing missing from the documents we submitted for the bypass permit is the engineering calculations, as they don't completely pertain to this liner, hopefully they will not ask for them.  However if they do want them I can provide."  This email reflects an intent to knowingly provide insufficient

documentation to MMS and then, if caught with respect to the insufficient documentation, provide incorrect documentation.

f.    BP used the interstate wires in furtherance of its scheme, in particular as the scheme was implemented to place profit above safety with respect to the use of pipe centralizers. BP knowingly chose an insufficient number of "centralizers" to prevent channeling of gas during the cementing process. Halliburton, the contractor hired by BP to cement the well, warned BP that the well could have a "SEVERE gas flow problem" if BP lowered the final string of casing with only six centralizers instead of 21 recommended by Halliburton. BP rejected Halliburton's advice to use additional centralizers, solely because the delay it would entail. In an April 16, 2010 email, a BP executive involved in the decision-making explained: "it will take 10 hours to install them…I do not like this." Later that day, another BP official knowingly acknowledged the increased risk of proceeding without a sufficient number of centralizers, but carelessly commented with lethal disregard for the people and the environment that could be seriously injured: "who cares, it's done, end of story, will probably be fine. . . ." (Email from Brett W. Cocales to Brian P. Morel, April 16, 2010).

## The Pattern Of Racketeering Activity

238.    BP's previously alleged RICO predicate acts in furtherance of its scheme to defraud governmental regulators constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) because the predicate acts are related and continuous. Each predicate act had the same or similar purpose: the predicate acts involved material misrepresentations, omissions and concealment in a scheme to defraud the regulators into believing BP would conduct oil operations safely and that BP could effectively respond to and contain any oil spill, all so BP could fraudulently obtain oil and billions of dollars in proceeds and profits at the expense of safety. Included in these predicate acts are those situations where BP caused MMS to communicate with it by mail, interstate wire or interstate carrier giving approval for BP's various actions. This pattern of racketeering is separate from and distinct from the legitimate oil exploration and drilling operations of

the Enterprise alleged herein.

239.   BP is associated with the Enterprise and did conduct or participate, directly or indirectly, in the management or operation of its conduct of the affairs of the Enterprises through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1961(5) and 1962(c), to wit:

      a.   Multiple instances of mail fraud in violation of 18 U.S.C. § 1341;

      b.   Multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

240.   Plaintiffs have sufficiently alleged these predicate acts and pattern of racketeering to state a claim under 18 U.S.C. § 1962.  As a proximate result of the pattern of racketeering activity and RICO violations engaged in by BP, Plaintiffs and the Class members have suffered injury to their business and property.

**Relatedness And Continuity Of The Racketeering Activity**

241.   All of the predicate acts alleged above are related to the scheme of BP – defrauding regulators with regard to safety of oil operations and BP's ability to resolve containment problems arising from such operations.  The acts are all related to BP's premise that safety costs money, and that safety should give way to profit.  Continuity is demonstrated by the predicate acts alleged above because the pattern of racketeering involves multiple predicate acts and related predicate acts that have taken place over many years.  These predicate acts in furtherance of its scheme illustrate a threat of continued racketeering activity and evince that the predicate acts constitute the regular way that BP conducts business.

242.   As a proximate result of the pattern of racketeering activity and RICO violations engaged in by BP, Plaintiffs and the Class members have suffered injury to

their business and property.

**COUNT 2:**   **By Plaintiffs Against BP For Violation Of 18 U.S.C. § 1962(d) By Conspiring To Violate 18 U.S.C. § 1962(c).**

243.   Plaintiffs reallege and incorporate by reference all previous paragraphs.

244.   The Racketeering Influenced and Corrupt Organizations Act ("RICO")

provides:

It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section. 18 U.S.C. § 1962(d).

245.   BP violated 18 U.S.C. § 1962(d) by conspiring with Transocean to engage in the predicate acts alleged to form the violation of 18 U.S.C. § 1962(c), as described above.  BP and Transocean both agreed to the objective of this conspiracy.  BP took overt acts, along with Transocean, in furtherance of that conspiracy.

246.   The relevant time period for BP's conspiracy stems from at least the year 2000, and likely earlier but at this point in discovery as yet unknown, and continues to the filing of this RICO Class Action Complaint.

247.   As a proximate result of the overt acts taken by BP, Plaintiffs and the Class Members have suffered injury to their business and property.

**COUNT 3:**   **By Plaintiffs Against BP For Violation Of 18 U.S.C. § 1962(d) By Conspiring To Violate 18 U.S.C. § 1962(a).**

248.   Plaintiffs reallege and incorporate by reference all previous paragraphs.

249.   BP violated 18 U.S.C. § 1962(d) by conspiring with Transocean to engage in the predicate acts alleged to form the violation of 18 U.S.C. § 1962(a). That is, BP received income, directly or indirectly, from the pattern of racketeering activity previously described, and has used or invested such income, directly or indirectly, in the

establishment or operation of its association-in-fact enterprise with Transocean.  BP and Transocean both agreed to the objective of this conspiracy.  BP took overt acts, along with Transocean, in furtherance of that conspiracy.

250.    The relevant time period for BP's conspiracy stems from at least the year 2000, and likely earlier but at this point in discovery as yet unknown, and continues to the filing of this RICO Class Action Complaint.

251.    As a proximate result of the overt acts taken by BP, Plaintiffs and the Class Members have suffered injury to their business and property.

**COUNT 4:    By Plaintiffs Against BP For Violation Of FLA. STAT. ANN. § 895.03(3).**

252.    Plaintiffs reallege and incorporate by reference all previous paragraphs.

253.    FLA. STAT. ANN. § 895.03(3) provides

> It is unlawful for any person . . . employed by, or associated with, any enterprise to conduct or participate, directly or indirectly in such enterprise through a pattern of criminal activity or the collection of an unlawful debt.

254.    The BP and Transocean association-in-fact enterprise was and is an "enterprise" within the meaning of FLA. STAT. ANN. § 895.02(3), and at all relevant times existed separate and apart from the racketeering activity.

255.    As previously alleged herein, throughout the period relevant to this action BP was associated with and participated, directly or indirectly, in conducting the enterprise through a pattern of racketeering activity including mail fraud and wire fraud in violation of FLA. STAT. ANN. § 895.03(3).

256.    The Defendants' predicate acts constitute a pattern of racketeering activity within the meaning of FLA. STAT. ANN. § 895.02(4) because the predicate acts are related and continuous.  Each predicate act had the same or similar purpose.

257.    Continuity is demonstrated by the predicates and related predicates alleged above.  BP has engaged in these predicate acts for many years.  The unlawful conduct constitutes the regular manner in which BP conducts business and constitutes a threat of continued racketeering activity.

258.    Plaintiffs are and continue to be injured by reason of the BP's commission of predicate acts of racketeering and RICO violations.

259.    Since Plaintiffs have been injured by reason of BP's violation they are entitled to equity relief under FLA. STAT. ANN. §§ 895.05(1), (6).

**COUNT 5:    By Plaintiffs Against BP For Violation Of FLA. STAT. ANN. § 895.03(4).**

260.    Plaintiffs reallege and incorporate by reference all previous paragraphs and the allegations of Count 4 above.

261.    FLA. STAT. ANN. § 895.03(4) provides that it shall be unlawful "to conspire or endeavor to violate" FLA. STAT. ANN. § 895.03(3).

262.    BP violated FLA. STAT. ANN. § 895.03(4) by conspiring or endeavoring with Transocean to engage in the predicate acts alleged to form the violation of FLA. STAT. ANN. § 895.03(3), as described above.  BP and Transocean both agreed to the objective of this conspiracy.  BP took overt acts, along with Transocean, in furtherance of that conspiracy.

263.    The relevant time period for BP's conspiracy stems from at least the year 2000, and likely earlier but at this point in discovery as yet unknown, and continues to the filing of this RICO Class Action Complaint.

264.    Since Plaintiffs have been injured by reason of BP's violation they are entitled to equity relief under FLA. STAT. ANN. §§ 895.05(1), (6).

**COUNT 6:**     **By Plaintiffs Against BP For Violation Of FLA. STAT. ANN. § 895.03(4).**

265.     Plaintiffs reallege and incorporate by reference all previous paragraphs.

266.     FLA. STAT. ANN. § 895.03(4) provides that it shall be unlawful "to conspire or endeavor to violate" FLA. STAT. ANN. § 895.03(1).

267.     BP violated FLA. STAT. ANN. § 895.03(4) by conspiring or endeavoring with Transocean to engage in the predicate acts alleged to form the violation of FLA. STAT. ANN. § 895.03(1).   That is, BP received income, directly or indirectly, from the pattern of racketeering activity previously described, and has used or invested such income, directly or indirectly, in the establishment or operation of its association-in-fact enterprise with Transocean.   BP and Transocean both agreed to the objective of this conspiracy.   BP took overt acts, along with Transocean, in furtherance of that conspiracy.

268.     The relevant time period for BP's conspiracy stems from at least the year 2000, and likely earlier but at this point in discovery as yet unknown, and continues to the filing of this RICO Class Action Complaint.

269.     Since Plaintiffs have been injured by reason of BP's violation they are entitled to equity relief under FLA. STAT. ANN. §§ 895.05(1), (6).

## VII.  PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, and for the wrongs cited factually and legally in this Complaint, judgment should be rendered in Plaintiffs and the Class members' favor against BP, as follows:

a.     An award of compensatory damages that will fairly represent the economic injuries to the Plaintiffs and Class members' business and property;

b.      An award of treble damages herein pursuant to 18 U.S.C. § 1964(c);

c.      An award of attorneys' fees pursuant to 18 U.S.C. § 1964(c);

d.      Pre-judgment interest on all awards;

e.      Appropriate injunctive relief;

f.      An order certifying the Class and any appropriate subclasses as set forth herein under the appropriate provisions of F.R.C.P. 23, appointing Plaintiffs as Class Representatives, and appointing the undersigned counsel as counsel for the Class; and

g.      All further relief as the Court and/or the jury may deem appropriate, legal or equitable, in any form to which Plaintiffs may be entitled.

Plaintiffs demand a trial by jury on all issues so triable.

Dated: January 24, 2011.

Respectfully submitted,


___/s/   Stephen J. Herman_____           ___/s/ James Parkerson Roy_____
Stephen J. Herman, La. Bar No. 23129       James Parkerson Roy, La. Bar No. 11511
HERMAN HERMAN KATZ & COTLAR LLP            DOMENGEAUX WRIGHT ROY & EDWARDS LLC
820 O'Keefe Avenue                          556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113                Lafayette, Louisiana 70501
Telephone: (504) 581-4892                   Telephone: (337) 233-3033
Fax No. (504) 569-6024                      Fax No. (337) 233-2796
E-Mail: sherman@hhkc.com                    E-Mail: jimr@wrightroy.com

*Plaintiffs Liaison Counsel*                *Plaintiffs Liaison Counsel*


**PLAINTIFFS' STEERING COMMITTEE**

| | |
|---|---|
| Brian H. Barr<br>LEVIN, PAPANTONIO, THOMAS,<br>MITCHELL, ECHSNER & PROCTOR, PA<br>316 South Baylen St., Suite 600<br>Pensacola, FL 32502-5996<br>Office: (850) 435-7045<br>Telefax: (850) 436-6187<br>E-Mail: bbarr@levinlaw.com | Robin L. Greenwald<br>WEITZ & LUXENBERG, PC<br>700 Broadway<br>New York, NY  10003<br>Office: (212) 558-5802<br>Telefax: (212) 344-5461<br>E-Mail: rgreenwald@weitzlux.com |

Jeffrey A. Breit
BREIT DRESCHER & IMPREVENTO
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Ervin A. Gonzalez

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail:  rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

| | |
|---|---|
| COLSON HICKS EIDSON<br>255 Alhambra Circle, Penthouse<br>Coral Gables, FL 33134<br>Office: (305) 476-7400<br>Telefax: (305) 476-7444<br>E-Mail:  ervin@colson.com | |

## RICO MASTER COMPLAINT
## WORKING GROUP

Hiram Eastland
EASTLAND LAW OFFICES, PLLC
307 Cotton Street
Greenwood, MS 38930
Telephone:  (662) 453-1227
Facsimile:  (662) 453-2808
Email:  eastlandlaw@bellsouth.net

Wanda J. Edwards
FAYARD & HONEYCUTT, APC
519 Florida Avenue SW
Denham Springs, LA 70726
Telephone:  (225) 664-4193
Facsimile:  (225) 664-6925
Email:  wandaedwards@fayardlaw.com

Keith D. Jones
8480 Bluebonnet Blvd., Suite F
Baton Rouge, LA 70810
Telephone:  (225) 763-6900
Facsimile:  (225)
Email:  keith@kjones-law.com

W. B. Markovits
WAITE, SCHNEIDER, BAYLESS &
CHESLEY CO., L.P.A.
1513 Fourth & Vine Tower
1 West Fourth Street
Cincinnati, OH  45202
Telephone:  (513) 621-0267
Facsimile:  (513) 621-0262
Email:  billmarkovits@wsbclaw.com

Peter Prieto
PODHURST ORSECK P.A.
25 West Flagler Street, Suite 800
Miami, FL 33130
Telephone:  (305) 358-2800
Facsimile:  (305) 358-2382
Email:  PPrieto@podhurst.com


**Of Counsel:**

G. Robert Blakey
Notre Dame Law School *
Notre Dame, IN 36556
Telephone:  (574) 631-5717
Facsimile:  (574) 631-4197
Email:  G.R. Blakey.1@nd.edu
*  Notre Dame Law School is used solely for purposes of address.


## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Complaint has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 24th day of January, 2011.

 /s/  James Parkerson Roy and Stephen J. Herman