### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG                                MDL-2179
"DEEPWATER HORIZON" in the GULF
OF MEXICO, on APRIL 20, 2010

THIS DOCUMENT RELATES TO:                                SECTION J

ALL ACTIONS                                                JUDGE BARBIER
                                                 MAG. JUDGE SHUSHAN

### MEMORANDUM OF AUTHORITIES IN SUPPORT OF
### STATEMENT OF INTEREST ON BEHALF OF THE STATE OF MISSISSIPPI

### INTRODUCTION

Jim Hood, Attorney General for the State of Mississippi, files the following supplemental

facts and memorandum of authorities in support of the Statement of Interest on Behalf of the

State of Mississippi (Rec. Doc. 1060), concerning the Plaintiffs' pending Motion to Supervise *Ex

Parte* Communications Between BP Defendants and Putative Class Members (Rec. Doc. 912),

("the PSC's Motion").  The Attorney General respectfully submits that court intervention and

action is needed to compel BP to cure its failure to provide a claims process that fulfills the

requirements of the Oil Pollution Act of 1990 ("OPA"), state law and prior public commitments

of BP, including the provisions of the June 16th Agreement between BP and the White House

("the June 16th Agreement").

### FACTUAL BACKGROUND AND STATISTICS

During the Court's January 28th Status Conference, the Court indicated that, because it

had been thoroughly briefed on the issues raised in the PSC's motion that is would rule regarding

supervision within the next week.  In fact, at the January 28th Status Conference, the Court sought

information regarding the claims paid and denied by the Gulf Coast Claims Facility ("GCCF");

however, no one provided the Court with the requested information.  The Attorney General,

therefore, feels compelled to provide the Court with the following background facts regarding the

sweeping deficiencies and violations of law that pervade the GCCF.

The Court' concern is well founded, because the GCCF's own statistics reveal why there

are so many people who are so frustrated by BP's claims process, as administered by the GCCF.

Although the number of claims paid and the aggregate amount paid out by the GCCF seem large

at first blush, the fact is that the number of victims is large, the amount of damages suffered is far

greater than what has been paid, and the number of claims not paid is staggering.

According to the GCCF's Overall Program Statistics Status Report for the Gulf Region,

as of January 29, 2011, the GCCF had paid a total of $1,388,120,893.18 to 189,005 individual

claimants and $1,934,895,934.30 to 61,455 business claimants.  Exhibit A.  GCCF Administrator

Kenneth Feinberg likes to recite these numbers *in the aggregate* because in the aggregate these

are very large sums that have been paid.  But when viewed *on an individual basis*, the sums paid

are only remarkable for how seemingly paltry they have been.  During the emergency advance

payment period, the GCCF paid an average individual award in the Gulf States of approximately

$8,574 and an average business award of approximately $33,727.  Assuming that these figures

represent payment for six months' worth of losses, the average individual was paid $1,429 per

month, and the average business was paid $5,621 per month.  These numbers seem quite low,

considering the unprecedented magnitude of the economic hardship and loss that has resulted

from the Deepwater Horizon disaster.[1]

---

[1] In sharp contrast, media reports on January 31st revealed that the one claimant that has received a
final claim payment from the GCCF is actually a "BP business partner" that negotiated directly
with BP to obtain a $10 million payment.  By Mr. Feinberg's own admission, the GCCF was

The number of claims that have been summarily denied is also striking.  Such denials are made with little or no explanation to and no viable recourse for claimants.  According to the January 29, 2011, GCCF Overall Report, Gulf-wide only roughly a third of individuals who filed emergency advance payment claims ever received *any* payment from the GCCF.  Of the 369,243 individuals who allegedly filed for an emergency advance payment claim, only 123,992 received *any* payment from the GCCF – that means that two-thirds of those individuals who sought relief were denied *any* compensation.  Businesses faired a bit better – of the 79,766 "emergency advance payment" business claimants, 44,533 received *some* payment.  Still, this means that, Gulf-wide, only about 56% of business claimants that filed a claim for "emergency" damages with the GCCF received *any* compensation from BP through the GCCF emergency advance payment process.

Of course, the question is whether those paid were paid what they were owed.  The lack of transparency in the BP claims process, as administered by the GCCF, makes such a determination impossible at this time.  The limited data available also prohibits the ability to determine the basis for the denial of two-thirds of all claims.  As a result, it is simply not feasible to evaluate the validity of BP's representation to this Court, that "more than half" of all denials resulted from a complete failure to provide "any supporting documentation."  These reports evidence a need for BP, through the GCCF, to provide the Court with accurate information on this point.

---

"not privy to the settlement negotiations between BP and that party," and "never reviewed the claim."  At the direction of BP and its business partner, the GCCF just paid the $10 million out of the $20 billion compensation fund created by the June 16th Agreement. http://www.nola.com/newsflash/index.ssf/story/91000-gulf-oil-spill-claims-just-1-final-payment/ 4fe693ba31fc4747afa8d5f39f84bb18

## SUMMARY OF ISSUES REQUIRING COURT RELIEF

The briefing on the GCCF provided to the Court at and before the January 28th Status Conference has failed to adequately address all of the deficiencies with the GCCF – including deviations from the mandates of OPA that have come to the Attorney General's attention since the filing of his Statement of Interest on Behalf of the State of Mississippi.  Specifically, BP, through the GCCF, is violating OPA by failing to implement an interim claims process, declining to pay claimants interest on their damage awards, and securing from claimants accepting final payments an overly-broad release of claims and parties with excessive subrogation rights.  The release being presented to GCCF claimants is also contrary to state law.  In addition, the GCCF has recently announced a new "methodology" to be used in evaluating interim and final claims that this Court should consider in deciding whether to grant the PSC's Motion.  Accordingly, the Attorney General of Mississippi respectfully requests that the Court consider the following deficiencies and violations by BP, thru the GCCF claims process, requiring the Court's attention.

I. **The Court should include the final payment "methodology" in its considerations regarding the need for supervision.**

On January 27, 2011, Mr. Feinberg announced through a press release provided to the States by the Department of Homeland Security that the GCCF would be releasing its "methodology" for processing and payment of interim and final claims on February 2, 2011. Exhibit B.  The GCCF will then take two (2) weeks to accept comments on its proposed methodology.  Clearly, this methodology – which purportedly includes the scientific assumption on which the GCCF will rely in making "final payment" offers to claimants – will have a profound and significant impact on the claims process and the rights of all claimants (and

4

putative class members), and on the people and economy of the Gulf States for many years to come. Accordingly, this methodology should be finalized and included in any consideration by the Court on the question of the justification for Court supervision of the GCCF. In addition, the experts relied upon by the GCCF in formulating its methodology, and the affiliation of those experts with BP and other responsible parties, should be publicly revealed.

## II.    By failing to pay interim claims, BP, through the GCCF, is violating OPA.

In a January interview with Bloomberg uncovered after the date on which Mississippi filed its Statement of Interest, Mr. Feinberg expressly stated that the "interim claims program has not been implemented yet."[2] Further, this video suggests that the GCCF is steering claimants toward the quick payment process. In exchange for signing a release, claimants may accept a quick payment offer ($5,000 for individuals and $25,000 for businesses), based on the average of prior GCCF payments (which, as noted above, are seemingly very low), *not* based on the amount of actual future damages that claimants will suffer or the amount of damages that claimants have actually incurred.

This statement regarding the lack of a functioning interim claims process does not appear to be a misstatement. Indeed, a review of the GCCF's most recent statistics supports the conclusion that virtually *no interim claims are being processed*. According to the Overall Program Statistics Status Report from the GCCF website, for claims filed through January 29, 2011, of the 32,691 individual interim claimants submitted, *none* have been paid. Of the 9,464 business claimants that have filed for interim payments, only *one* has been paid. Exhibit A. In contrast, of the 85,741 claimants who have filed a quick pay claim, 81,933 claimants have been

---

[2]http://www.bloomberg.com/video/65253264/

paid a total of $747,825,000.  BP, through the GCCF, has paid $747,825,000 to secure releases

from more than 81,000 financially desperate claimants who are being provided no viable option

but accepting the quick payment and relinquishing their legal rights.  This quick payment scheme

is thwarting the remedial purposes of OPA and violating public policy by using economic duress

to secure impermissibly broad releases of BP and of all other responsible parties.

      In relevant part, OPA provides as follows:

> **§ 2705. Interest; partial payment of claims**
> (a) General rule
> The responsible party or the responsible party's guarantor is liable to a claimant
> for interest on the amount paid in satisfaction of a claim under this Act for the
> period described in subsection (b) of this section.  The responsible party shall
> establish a procedure for the payment or settlement of claims for interim, short-
> term damages.  *Payment or settlement of a claim for interim, short-term damages
> representing less than the full amount of damages to which the claimant
> ultimately may be entitled shall not preclude recovery by the claimant for
> damages not reflected in the paid or settled partial claim.*

33 U.S.C. § 2705(a) (emphasis added).  Further, the advertising requirements of OPA mandate

that the responsible party notify claimants of the availability of this interim claim procedure and

its non-preclusive effect.  33 U.S.C. § 2714(b)(2).  The responsible party is also

liable to a claimant for interest on the amount paid in satisfaction of a claim under OPA.  33

U.S.C. § 2705(b).

      Here, BP, through the GCCF, is refusing to process any interim claims in direct

contravention of the mandates of OPA.  Moreover, according to the GCCF's November 22,

2010, Interim and Final Claims Protocol, Exhibit C, even those claimants who have made the

deliberate choice to file for an interim payment will be made a final payment offer at the same

time the GCCF makes them an offer on their interim claim.  This scheme is yet another device

for BP, through the GCCF, to entice claimants to sign a release and to improperly leverage those releases by intentionally underpaying interim claims and then luring financially desperate claimants to accept a higher final payment, thereby releasing their rights to any additional future relief.

Because BP and the GCCF have not finalized their methodology and are not yet making final payment offers, BP is withholding all interim claim payments to increase the financial hardship on claimants.  This is a direct violation of OPA.  In addition, because BP, through the GCCF, is failing to pay claimants interest on their damage awards, in violation of 33 U.S.C. § 2705(b), there is no downside to BP for its delay in paying these interim claims.

Court intervention and action is needed immediately to compel BP, through the GCCF to comply with OPA by:  (1) paying all interim claims; (2) paying interest to all claimants for the delays they have endured in receiving all prior interim payments, including emergency advance payments;[3] and (3) paying the currently due portions of any pending "final" claims petitions as interim claim payments without any release required.

### III.     OPA prohibits the GCCF payment scheme of foreclosing a claimant's right to recover all damages to which the claimant otherwise is entitled in exchange for payment of "*final*" damages.

In relevant part OPA states as follows:

**§ 2715. Subrogation**
(a) In general
Any person, including the Fund, who pays compensation pursuant to this Act to any claimant for removal costs or damages shall be subrogated to all rights, claims, and causes of action that the claimant has under any other law.

---

[3] Footnote 1 of the Emergency Advance Payment Protocol, Exhibit D, expressly states that *"*[a] claim for an Emergency Advance Payment is an interim claim under OPA."

(b) Interim damages
(1) In general
If a responsible party, a guarantor, or the Fund has made payment to a claimant for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled, subrogation under subsection (a) of this section shall apply only with respect to the portion of the claim reflected in the paid interim claim.
(2) *Final damages*
*Payment of such a claim shall not foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under this Act or under any other law.*

(Emphasis added).

Section 2715(a) entitles *any person* (including, presumably, a responsible party), who pays compensation under OPA, to subrogation rights to all rights, claims, and causes of action that the claimant has under any law *other than OPA*.  However, Section 2715(b)(1) limits the subrogation rights that a Responsible Party may obtain.  A responsible party that has made a payment to a claimant for interim, short term damages (representing less than the full amount of damages to which the claimant is ultimately entitled under OPA), is entitled to subrogation rights under 2715(a) *only* with respect to the *portion* of the claim reflected in the *paid interim claim*.  In other words, the amount a responsible party has paid to a claimant for an interim claim defines and establishes the limits of the amount of the responsible party's subrogation rights.

Here, the Release and Covenant Not to Sue ("the Release"), Exhibit E, imposed upon Claimants by BP, through the GCCF, purports to give BP subrogation rights far beyond claims under OPA and far beyond the limits of the amount paid.  The Release is thus in direct contravention of he subrogation limits contained in Section 2715(b)(1).  The notion of a Release that relinquishes a claimant's right to any and all legal rights, whether under OPA or under any other law, in exchange for payment of "Final damages" conflicts with the express intent of

Section 2715(b)(2).  Section 2715(b) is titled "Interim damages" but, by its terms, Section 2715(b)(2) concerns "Final Damages" and states that: "[p]ayment of *such a claim* shall not foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under OPA or under any other law."  (Emphasis added).

If, as used in this provision, "such a claim" refers to a claim for "Final damages" – as the title to this subsection expressly states – this provision *prohibits* the process for payment of "final" claims outlined in the GCCF Interim and Final Claims Protocol and the Release, because that process and Release, by their express terms, would foreclose a claimant's right to recovery of *all damages* to which the claimant otherwise is entitled under OPA or under any other law in exchange for a payment characterized as a "final payment" under OPA alone.  *See, e.g. Almendarez-Torres v. United States,* 523 U.S.224, 118 S.Ct. 1219, 1226 (quoting *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R. Co.,* 331 U.S. 519, 528-29 (1947))("'[T]he title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute."); *accord, U.S. v. Norris*, 159 F.3d 926, 931 (5th Cir. 1998).  *See also, U.S. v. Kay*, 359 F.3d 738, 742-743 (5th Cir. 2004) (citing *United States v. Marek*, 238 F.3d 310, 321 (5th Cir. 2001) ("[I]t is 'appropriate to consider the title of a statute in resolving putative ambiguities.'").

In light of the remedial purpose of OPA and the historical back-drop for enactment of OPA – the Exxon Valdez oil spill – the Attorney General respectfully submits that this statute can and should be read to proscribe the use of any artifice that would "foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under OPA or under any other law," including the use of the Release imposed upon GCCF claimants.  Claimants

9

should not and must not be required to relinquish their non-OPA federal and state law rights and remedies in exchange for a partial, inadequate or speculative payment, which purports to predict future OPA damages only.  By withholding the ability to receive interim OPA damage awards in an effort to leverage or steer claimants into signing the Release and accepting a "final damage" award from the GCCF, BP is violating the express requirements in Section 2715(b)(2).  Further, by conferring upon itself unprecedented subrogation rights in this same release document, BP is violating the express provisions to Section 2715(b)(1), which limits the subrogation rights of responsible parties.

The Attorney General respectfully submits that Section 2715(b)(2) was included in OPA to prevent the very abuses and coercion in which BP, through the GCCF, is engaging.  Because the OPA claims process is a condition precedent to suit, requiring often unrepresented, economically injured and vulnerable individuals and businesses to seek compensation for the entity responsible for a spill, greater protections against coercive settlements are needed.  Section 2715(b)(2) provides that protection by expressly prohibiting the kind of final payment schemes that BP, through the GCCF, is employing now to attempt to extract releases from claimants through economic duress.

Accordingly, Court intervention and action is needed to mandate BP, through the GCCF, cease and desist from using the GCCF claims process to extract impermissible Releases from claimants.

IV.     **The Release violates state law which requires consent to a contract be obtained in the absence of duress.**

"The validity and effect of a settlement and release are governed by contract law." *Travelers Ins. Co. v. Horton,* 366 So.2d 1204, 1205 (Fla. 3d DCA 1979); *In re Colony Beach & Tennis Club Ass'n, Inc.*, 423 B.R. 690 (Bkrtcy.M.D. Fla. 2010).  Consent to the terms of a contract may be vitiated by error, fraud, or duress.  *Worley v. Chandler,* 7 So.2d 38, 42 (La. App. 2nd Cir. 2009), *citing,* LSA-C.C. art. 1948.  *Accord, Degravelles v. Hampton,* 652 So.2d 647, 649 (La. App. 1st Cir. 1995); *Smith v. Remodeling Service, Inc.,* 648 So.2d 995, 998 (La. App. 5th Cir. 1994).  Duress strikes at whether a party actually consented to a contract.  *Estate of Davis v. O'Neill*, 42 So.3d 520, 525 (Miss. 2010).  Duress which would vitiate consent, legal duress, is determined by applying subjective as well as objective standards; the subjective element is a party's personal reaction to circumstances, and the objective elements are the reasonableness of the fear and unjustness of the injury based on how reasonable persons would react to the circumstances.  *Averette v. Industrial Concepts, Inc.* 673 So.2d 642, 644 (La. App. 1st Cir. 1996), *citing,* LSA-C.C. art. 1959.  Circumstances to be considered in determining whether consent to contract was freely given is assistance of legal counsel in evaluation of the contract and determination of options available.  *Id.* at 645-646.

Provisions in contracts contrary to public policy or where obtained by overreaching duress or undue influence are unenforceable.  *Estate of Davis v. O'Neill*, 42 So.3d at 525 (quoting *First Nat'l Bank of Vicksburg v. Caruthers,* 443 S.2d 861, 864 n. 3 (Miss. 1983).  A contract may be invalid or unenforceable by reason of economic duress if undue or unjust advantage has been taken of a person's economic necessity or distress to coerce him into making the agreement.

*Brown v. Cain Chemical, Inc.,* 837 S.W.2d 239, 244 (Tex. App.-Hous. 1st Dist. 1992).  To invalidate a contract on the grounds of economic duress, the complaining party must establish: that the dominant party threatened to do something which he or she had no legal right to do, and that the wrongful threat overrode the volition of the victim and caused him or her to enter an agreement against his or her free will.  *See Kelso v. McGowan*, 604 So.2d 726 (Miss. 1992).

"Duress" is a condition of mind produced by an improper external pressure or influence that practically destroys the free agency of a party and causes him to do an act or make a contract not of his own volition.  *See Williams v. Williams*, 939 So.2d 1154 (Fla. 2nd DCA 2006); *Cooper v. Cooper*, 69 So.2d 881 (Fla. 1954); *Herald v. Hardin,* 116 So. 863 (Fla. 1928).  "Duress involves a step beyond mere illegality and implies that a person has been unlawfully constrained or compelled by another to perform an act under circumstances which prevent the exercise of free will."  *McLaughlin v. Fla., Dep't of Natural Res.,* 526 So.2d 934, 936 (Fla. 1st DCA 1988).  To state a cause of action for duress, a plaintiff must demonstrate "(1) that one side involuntarily accepted the terms of another, (2) that circumstances permitted no other alternative, and (3) that said circumstances were the result of coercive acts of the opposite party."  *Woodruff v. TRG-Harbour House, Ltd.*, 967 So.2d 248, 250 (Fla. 3d DCA 2007); s*ee also Penick v. Most Worshipful Prince Hall Grand Lodge F & A M of Alabama, Inc.*, 46 So.3d 416 (Ala. 2010); *Stephens v. Alabama State Docks Terminal Ry.*, 723 So.2d 83 (Ala.Civ.App. 1998) ("Economic duress consists of: (1) wrongful acts or threats; (2) financial distress caused by the wrongful acts or threats; and (3) the absence of any reasonable alternative to the terms presented by the wrongdoer."); *Kalyanaram v. Burck*, 225 S.W.3d 291 (Tex.App.-El Paso 2006) ("To establish a claim for duress, a claimant must show the following elements: (1) a threat or action was taken

12

without legal justification; (2) the threat or action was of such a character as to destroy the other party's free agency; (3) the threat or action overcame the opposing party's free will and caused it to do that which it would not otherwise have done and was not legally bound to do; (4) the restraint was imminent; and (5) the opposing party had no present means of protection.").

Consent to a contract is vitiated when it has been obtained by duress of such nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property, or reputation; in determining reasonableness of the fear, age, health, disposition, and other personal circumstances of a party must be taken into account. *Grezaffi v. Smith,* 641 So.2d 210, 213-214 (La. App. 1st Cir. 1994), *citing,* LSA-C.C. art. 1959. *See also Wolf v. Louisiana State Racing Commission,* 545 So.2d 976, 980 (La. 1989); *Cagle v. Loyd,* 617 So.2d 592, 598 (La. App. 3rd Cir.), *writs denied,* 620 So.2d 877 (La. 1993); *Adams v. Adams,* 503 So.2d 1052, 1057 (La. App. 2nd Cir. 1987).

Here, the press release accompanying the issuance of the GCCF's Interim and Final Claims Protocol and Release included a warning from Mr. Feinberg indicating a possibility that he would be less "generous" with those who continue to avail themselves of the OPA-mandated interim claims process. "Claimants will have a choice," Feinberg said in a news release. "They can accept a lump sum final payment for all present and future damage and surrender their right to sue by signing a full release, or they can continue to receive quarterly interim payments based upon documented past damage for that three-month period; however, there is no guarantee that, in the future, a lump sum final payment will be as generous as it will be currently."[4]

---

[4]http://www.fox10tv.com/dpp/news/gulf_oil_spill/final-protocol-for-claims-payments-released

This press release and its not-so-veiled threat to claimants, already in significant financial distress, provides strong evidence that the Release is void or voidable because the claimants who are executing it, many of whom are of limited means and unrepresented by counsel, have been subjected to improper economic duress from Mr. Feinberg, who is administering the GCCF on behalf of BP.  Mr. Feinberg controls *what* compensation a claimant receives for his damages, *when* he receives it, and *if* he receives it; the claimant has no ability to challenge the compensation paid, or not paid.

Issuance of the threat of less "generous" payments in the press release accompanying the Interim and Final Claims Protocol and Release was a wrongful act.  It was intended to overcome the will of claimants by using their economic distress (caused by BP in creating the oil spill disaster and failing to uphold its obligations to fairly and adequately pay claimants) to coerce compliance with the final payment scheme and relinquishment of their rights.  Moreover, these claimants have no adequate legal remedy to protect their interests.  The Interim and Final Claims Protocol has stripped them of their right to compensation without a release, conferred by law, by giving BP's agent, the GCCF, sole discretion over the amount claimants will receive with no viable or timely opportunity to challenge those decisions.  As a result, the Release is invalid and unenforceable by reason of economic duress.

Adding to BP's exploitation of the economic desperation of the people in the Gulf region is GCCF's "quick payment" option.  Under this scheme, BP pays individuals and businesses an arbitrary, fixed amount in exchange for the release of their legal rights to any future economic relief from BP or any other responsible party.  Individuals get a check of $5,000 and businesses

get $25,000.  These payments were even characterized in some press statements as "bonuses" from the GCCF.[5]

Adding insult to injury, Mr. Feinberg presented this scheme to the public on December 12th – just prior to Christmas and the year's end – when claimants who had been long delayed in receiving the full measure of their damages were the most vulnerable and desperate to provide for their families.[6]  As a result, tens of thousands of Gulf residents applied for quick payments in the first few weeks of this process.  *See* Exhibit A.  The quick payment option is the *only* type of payment that the GCCF is even processing and paying now, meaning that claimants are unable to obtain relief except through relinquishment of all legal rights.  This system exacerbates the coercive affect of the final payment scheme and Release that BP, through the GCCF, has contrived.

## CONCLUSION

For the foregoing reasons, the Attorney General for the State of Mississippi respectfully submits, pursuant to the authorities provided herein and the exhibits attached hereto and incorporated herein, that:  (1) the BP claims process, as administrated by the GCCF and Kenneth Feinberg on behalf of BP, violates OPA, state law, and basic principles of fairness and due process; and (2) the "Release and Covenant Not to Sue" ("the Release"), that the GCCF is

---

[5]http://www.nytimes.com/2010/12/13/us/13fund.html?pagewanted=all
"Kenneth Feinberg who administers the $20 billion fund formed by BP to compensate people for losses from the gulf oil spill, is offering what amounts to a signing bonus to entice more victims to give up their right to sue BP or other companies involved in the disaster."

[6]http://www.palmbeachpost.com/news/state/oil-spill-victims-lawmakers-irate-as-claims-remain-1219202.html?printArticle=y
"Critics say some people took the one-time payments that Feinberg instituted a few weeks before Christmas out of sheer desperation."

requiring claimants to sign as a condition of paying them the compensation they are owed,

violates the spirit and letter of OPA and essential requirements of law.  Accordingly, the

Attorney General respectfully requests that the Court intervene and take all necessary steps to

bring the BP claims process, as administered by the GCCF, into compliance with all

requirements in OPA and state law, as well as the prior public commitments of BP regarding the

payment of claims, including those commitments contained in the June 16th Agreement.

Included in this relief, the Court should direct that all GCCF claims be processed immediately,

and all damages which are presently owed under OPA should be immediately paid.  Consistent

with OPA, no claim should be treated as a final claim, all claims should be treated and paid as

"interim" claims, interest should be paid to compensate claimants for delays in processing their

claims, and BP and the GCCF should immediately cease and desist from using the Release as

drafted.

Respectfully submitted, this the 1st day of February, 2011.

_____

JIM HOOD, ATTORNEY GENERAL FOR THE STATE OF
MISSISSIPPI, *EX REL*. THE STATE OF MISSISSIPPI

_____

MARY JO WOODS, MSB NO. 10468
SPECIAL ASSISTANT ATTORNEY GENERAL

Office of the Attorney General
Post Office Box 220
Jackson, Mississippi 39205
Telephone No. (601) 359-3680
Facsimile: (601) 359-2003
E-mail: mwood@ago.state.ms.us

## CERTIFICATE OF SERVICE

I, Mary Jo Woods, Special Assistant Attorney General of the State of Mississippi, do hereby certify that on this date, I filed the foregoing document using the Court's ECF system which will send notification of such filing to all counsel of record in this proceeding.

THIS the 1st day of February, 2011.

/s Mary Jo Woods
MARY JO WOODS, MS BAR NO. 10468
SPECIAL ASSISTANT ATTORNEY GENERAL

Office of the Attorney General
Post Office Box 220
Jackson, Mississippi 39205
Telephone:  (601) 359-3680
Facsimile:  (601) 359-2003
E-mail:  mwood@ago.state.ms.us