## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

_____
)
)
**In Re:  Oil Spill by the Oil Rig**     )     **MDL No. 2179**
     **"Deepwater Horizon" in the**   )
     **Gulf of Mexico, on**         )
     **April 20, 2010**           )     **SECTION: J**
)
)
**This Document Relates to:**      )     **Judge Barbier**
*Case No. 2:10-cv-04536-CJB-SS*  )     **Mag. Judge Shushan**
)
_____)

## SIERRA CLUB, INC.'S MEMORANDUM OF LEGAL AUTHORITY
## IN SUPPORT OF MOTION TO INTERVENE

Eric E. Huber
La. Bar No. 23790
Sierra Club
1650 38th Street, Suite 102W
Boulder, CO 80301
tel (303) 449-5595
fax (303) 449-6520
eric.huber@sierraclub.org

Devorah Ancel
Ca. Bar No. 261038
Sierra Club
85 Second Street, 2nd Floor
San Francisco, CA 94105
tel (415) 977-5721
fax (415) 977-5793
devorah.ancel@sierraclub.org

# TABLE OF CONTENTS

Table of Authorities…………………….…………………………………………………………i

MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE……………………………...1

I.      INTRODUCTION………………………………………………………………………...1

II.     BACKGROUND………………………………………………………………………….1

III.    ARGUMENT……………………………………………………………………………...5

        A.      Sierra Club is Entitled to Intervention as of Right Pursuant to
                Fed. R. Civ. P. 24(a)(2)…………………………………………………………5

                1.  The Motion for Intervention is Timely…………………………………...6

                2.  Sierra Club has a Direct and Substantial Interest in this Litigation…………..6

                    a)  Sierra Club has Specific Interests in the Subject Matter of
                        this Action……………………………………………………....6

                    b)  This Action is Related to Other Sierra Club Litigation Arising
                        out of the BP Oil Spill………………………………………...…9

                    c)  Sierra Club's Interest in Potential Settlement…………………………...12

                3.  The Outcome of this Litigation May, as a Practical Matter,
                    Impair the Ability of Sierra Club to Protect its Interests……………………13

                4.  Sierra Club's Interests are not Adequately Represented by the
                    Parties to this Litigation……………………………………………….....15

                    a)  Sierra Club and the United States have Different Interests……………15

                    b)  Sierra Club and the United States have Adverse Interests…………….18

                    c)  The United States has Conflicts of Interest………… …………………21

                    d)  Sierra Club will Make Arguments in Support of Penalties
                        that the United States will Not Make…………………………………....22

        B.      In the Alternative, Sierra Club Should be Granted Permissive Intervention…….23

CONCLUSION………………………………………………………………………………..24

Certificate of Service

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Atlantis Development Corp. v. United States*, 379 F.2d 818 (5th Cir.1967)……………………20

*Clark v. Putnam County*, 168 F.3d 458 (11th Cir. 1999)………………………………………..18

*Coalition of Arizona/New Mexico Counties v. U.S. Dept. of Interior*,
100 F.3d 837 (10th Cir. 1996)……………………………………………………………………...15

*Edwards v. City of Houston*, 78 F.3d 983 (5th Cir. 1996)……………………………………..6, 15

*ENSCO Offshore Co. v. Salazar*, E.D. La. no. 10-1941 (August 20, 2010)……………………..10

*Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489 (9th Cir. 1995)………………13

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC) Inc.*,
528 U.S. 167 (2000)……………………………………………………………………………….8

*Fund for Animals v. Norton*, 322 F.3d 728 (D.C. Cir. 2003)……………………………………13

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49 (1987)………………4

*Hazardous Waste Treatment Council v. South Carolina*, 945 F.2d 776 (4th Cir. 1991)………...16

*Heaton v. Monogram Credit Card Bank of Ga.*, 297 F.3d 416 (5th Cir. 2002)…………………..5

*Hornbeck Offshore Services, LLC v. Salazar*, E.D. La. no. 10-1663 (June 18, 2010)…………...10

*John Doe No. 1 v. Glickman*, 256 F.3d 371 (5th Cir. 2001)……………………………………..6, 18

*Jones v. Prince George's County*, 348 F.3d 1014 (D.C. Cir. 2003)………………………….....9

*Kleissler v. U.S. Forest Serv.*, 157 F.3d 964 (3d Cir. 1998)…………………………..………22

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)……………………………………..…7

*Mausolf v. Babbitt*, 85 F.3d 1295 (8th Cir. 1996)………..……………………………7, 15

*Michigan State AFL-CIO v. Miller*, 103 F.3d 1240 (6th Cir. 1997)……………………..…8, 22

*Natural Res. Def. Council v. Nuclear Regulatory Comm'n*,
578 F.2d 1341 (10th Cir. 1978)……………………………………………………………...13

*Northwest Forest Res. Council v. Glickman*, 82 F.3d 825 (9th Cir. 1996)………………………22

*Ohio Valley Envtl. Coal., Inc. v. Hobet Min., LLC*,
723 F.Supp. 2d 886 (S.D.W. Va. 2010)……………………………………………………………12

*Olden v. Hagerstown Cash Register, Inc.*, 619 F.2d 271 (3rd Cir.1980)………………………....9

*Philadelphia Metal Trades Council, Mtd, AFL-CIO v. Allen*,
CIV.A.07-145, 2007 WL 1057027, 3 (E.D. Pa. Apr. 3, 2007)…………………………..………22

*Ross v. Marshall*, 426 F.3d 745 (5th Cir. 2005)……………..……………………………………5, 6

*Ruiz v. Estelle*, 161 F.3d 814 (5th Cir. 1998)……………………………………………………...9

*Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525 (9th Cir. 1983)…………………………………8

*San Juan County v. U.S.*, 503 F.3d 1163 (10th Cir. 2007)…………………………..…………….7

*Sanguine, Ltd. v. United States Department of Interior*, 736 F.2d 1416 (10th Cir. 1984)………...13

*Sierra Club v. Espy*, 18 F.3d 1202 (5th Cir. 1994)…………………………………….………10, 15

*Sierra Club v. Morton*, 405 U.S. 727 (1972)……………………………………….……….……7

*Smuck v. Hobson*, 408 F.2d 175 (D.C. Cir. 1969)……....………………………………………....9

*Southeast Alaska Conserv. Council v. Watson*, 701 F.2d 186 (9th Cir. 1983)…………………..14

*Trbovich v. United Mine Workers*, 404 U.S. 528 (1971)……………………………………...9, 15

*United States v. Carpenter*, 298 F.3d 1122 (9th Cir. 2002)……………………………………...12

*United States v. Hudson Foods, Inc.*, 1998 WL 279168……………………………………………12

*United States v. Pflueger*,
CIV. 06-00140 BMK, 2007 WL 1876028 (D. Haw. June 27, 2007)……………………………12

*Utah Association of Counties v. Clinton*, 255 F.3d 1246 (10th Cir. 2001)……………………7, 15

**FEDERAL STATUTES**

33 U.S.C. § 1251…………………………………………………………………………………4

33 U.S.C. § 1311……………………………………………………………………………………3

33 U.S.C. § 1321(a)(13)…………………………………………………………………………..4

33 U.S.C. § 1321(b)(7)………………………………………………………………...1, 4, 10

33 U.S.C. § 1321(b)(7)(A)………………………………………………………………………...4

33 U.S.C. § 1321(b)(7)(D)…………………………………………………………….................4

33 U.S.C. § 1321(b)(8)……………………………………………………………………10, 23

33 U.S.C. § 1321(s)…………………………………………………………………………………4

33 U.S.C. § 1321(j)………………………………………………………………………………21

33 U.S.C. § 1342……………………………………………………………………………………3

33 U.S.C. § 1365……………………………………………………………………………………3

33 U.S.C. § 2701……………………………………………………………………………………4

33 U.S.C. § 2702(a)………………………………………………………………………………1

33 U.S.C. § 2704(a)(3)…………………………………………………………………………...14

**FEDERAL RULES**

Fed. R. Civ. P. 24(a)…………………………………………………………………...…23

Fed. R. Civ. P. 24(a)(2)……………………………………………………....…5, 7, 9, 10, 12, 13

Fed. R. Civ. P. 24(b)(1)(B)…………………………………………………………….....23

Fed. R. Civ. P. 24(b)(3)…………………………………………………………………24

**FEDERAL REGULATIONS**

30 C.F.R. § 250.219(a)(2)…………………………………………………………..…10

40 C.F.R. § 19.4……………………………………………………………………...4

**MISCELLANEOUS**

76 A.L.R. Fed. 762 § 5[a]…………………………………………………………..14

David L. Shapiro, *Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators,* 81 Harv. L.Rev. 721, 726 (1968)……………………………………………9

*Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling*, Report to the President by the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, January, 2011……………………………………………………………2

Moore's Federal Practice 3D § 24.03[2][c]……………………………………………7

## MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE

### I.      INTRODUCTION

On December 15, 2010 the United States of America filed this lawsuit against Defendants BP *et. al.* arising out of the oil spill into the Gulf of Mexico that began on April 20, 2010.  The United States' Complaint [Doc. 1] alleges *inter alia* that the spill was caused by the negligence, gross negligence, willful misconduct, and/or breach of federal safety and/or operating and/or construction regulations of Defendants BP, Andarko Exploration, Andarko Petroleum, MOEX and one or more of the Transocean Defendants (hereafter referred to jointly and severally as "Defendants"). The United States' Complaint asserts two claims for relief: 1) for the imposition of civil penalties under Clean Water Act ("CWA") § 311(b)(7), 33 U.S.C. § 1321(b)(7); and 2) for a declaratory judgment that Defendants are liable under Section 1002(a) of the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2702(a), for the United States' recovery costs and damages.[1] The United States' Prayer for Relief also seeks "injunctive relief as appropriate."

Sierra Club seeks to intervene as a plaintiff in this lawsuit to protect its members' recreational, aesthetic, scientific and economic interests in the lands and waters impacted by the oil spill, as well as to protect Sierra Club's interests in the imposition and disposition of maximum civil penalties, which are available to be used for remedial projects and which serve to deter similar conduct and events in the future.

### II.      BACKGROUND

The facts giving rise to this case have been extensively reported and are summarized in the United States' Complaint. Briefly, on April 20, 2010 the Deepwater Horizon oil rig exploded,

---

[1] The United States' Second Claim for Relief seeks recovery costs and damages under OPA from Lloyd's as a guarantor  for one or more of the Transocean Defendants up to the amount of its Certificate of Financial Responsibility. U.S. Complaint ¶¶ 23, 88-89, 91.

killing 11 crew members and spilling millions of gallons of oil into the waters of the Gulf of Mexico. For nearly five months, oil flowed continuously into the Gulf and upon its shorelines, causing grave environmental harm. More than 200 million gallons of oil were illegally discharged into Gulf waters during this time. In addition, the response efforts included the application of an unprecedented 1.8 million gallons of toxic chemical dispersants exposing ecosystems and communities to health risks. [2]

Although nearly five months have passed since the Macondo well was plugged, the Gulf is still reeling from the disaster. The disaster has taken a significant toll on thousands of species in the Gulf, killing birds, sea turtles, and marine mammals. Hundreds of miles of shoreline were oiled, causing destruction to the region's wetland ecosystems that buffer the coast from the impacts of severe storms and hurricanes. The loss of these natural resources has devastated the region's fishing and tourism industries. The magnitude of the disaster is unprecedented in United States history and the full extent of the damages from the spill will not be known for many years.

Proposed Plaintiff-Intervenor Sierra Club is a non-profit public-benefit corporation incorporated under the laws of California. Sierra Club is one of the oldest and largest conservation groups in the country, with over 700,000 members nationally, and chapters in all 50 states, the District of Columbia and Puerto Rico. Sierra Club's mission is to explore, enjoy, and protect the wild places of the earth and educate and enlist humanity to protect and restore the quality of the natural and human environment. Sierra Club represents the interests of its members in state and federal litigation, public policy advocacy, administrative proceedings, and before

---

[2] For a detailed description of the oil spill event, impacts and response see *Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling,* Report to the President by the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, January, 2011. Available at http://www.oilspillcommission.gov/final-report.

state, local, and federal lawmakers. For further description of Sierra Club and its actions see the Declaration of Jill Mastrotataro, Exhibit A hereto.

Sierra Club has been involved in advocacy related to oil drilling in the Gulf of Mexico and is involved specifically in responding to the impacts of the BP oil spill. Sierra Club has thousands of members who are residents of Louisiana, Mississippi, Alabama, Texas and Florida, including members who own property, live, work and recreate near the estuaries, wetlands, tidal waters and beaches that have been degraded by the oil pollution and dispersants. These areas are at risk of further degradation as the oil continues to disperse. The adverse impacts of the oil spill hinder Sierra Club members' use and enjoyment of these areas, and impacts their recreational, business, scientific and aesthetic interests. For example, members of Sierra Club use and enjoy these areas for fishing, shellfish harvesting, swimming, wading, walking, canoeing, kayaking, sailing, sport boating, wildlife observation, photography, personal and commercial research. Members of Sierra Club intend to continue engaging in all of these activities in the future, however their ability to do so is diminished by the oil spill impacts. For descriptions of how the oil spill has affected Sierra Club members directly and of Sierra Club's many actions to address the impacts of the oil spill, see Sierra Club declarations filed herewith as  Exhibits A - G.

To protect the interests of its members, on June 18, 2010 Sierra Club gave notice of its intent to file a citizen suit under Clean Water Act ("CWA") §505, 33 U.S.C. § 1365,  against BP as the lessee, owner, operator, managing agent and/or person in charge of the Deepwater Horizon drilling rig, as well as against Transocean Ltd. (and its relevant subsidiaries) as the owner and/or operator of the rig. (A copy of Sierra Club's "Notice Letter" is Exhibit H hereto).  The Notice Letter alleges violations of CWA §§ 301 and 402, 33 U.S.C. §§ 1311 and 1342, for the unlawful discharge of oil without a permit and violations of the U.S. Environmental Protection Agency

Region 6 NPDES general permit for the Western Portion of the Outer Continental Shelf and the Gulf of Mexico. The Notice Letter set forth Sierra Club's intent to seek injunctive relief and maximum civil penalties against the responsible parties.[3]

On December 15, 2010, the United States instituted this civil action against Defendants pursuant to the CWA, 33 U.S.C. §§ 1251 *et seq*., and the OPA, 33 U.S.C. § 2701 *et. seq.* In its First Claim for Relief, the United States alleges that under CWA § 311(b)(7), 33 U.S.C. § 1321(b)(7), Defendants are each subject to a judicially assessed civil penalty of up to $4,300 per barrel of oil discharged, to the extent that the discharge of oil was the result of gross negligence and willful misconduct.[4] In its Second Claim for Relief, the United States alleges that it has "sustained 'damages,' … for *inter alia*, injuries to, destruction of loss of, or loss of use of natural resources … far exceeding $75,000,000," and that Defendants are liable for this under OPA. U.S. Complaint at 21, 23.

Sierra Club members' interests will be affected by the outcome of this litigation. For example, civil penalties recovered by the United States under CWA § 311 go to the federal government's Oil Spill Liability Trust Fund. 33 U.S.C. § 1321(s). Those penalties are in addition to any funds recovered by the United States for its recovery costs under the OPA. Because civil penalties serve the purpose of specific as well as general deterrence, Sierra Club has an interest

---

[3] Because the discharge of oil has stopped, Sierra Club cannot bring an action of its own under the CWA citizens' suit provision. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49 (1987).

[4] Under 33 U.S.C. § 1321(b)(7)(A) the maximum civil penalties are $25,000 per day or $1,000 per barrel of oil discharged. Under § 1321(b)(7)(D) in any case where the discharge "was the result of gross negligence or willful misconduct" the civil penalty shall be "not more than $3,000 barrel of oil" discharged. Under 40 C.F.R. § 19.4, that maximum has been adjusted to $4,300 per barrel. A barrel of oil is 42 United States gallons at 60 degrees Fahrenheit. 33 U.S.C. § 1321(a)(13). Based on estimates of 4.9 million barrels discharged, "U.S. Scientific Teams Refine Estimates of Oil Flow from BPs Well Prior to Capping," August 2, 2010, found at http://www.restorethegulf.gov/release/2010/08/02/, the potential maximum penalty in this case is $21.07 billion.

in seeing the civil penalties maximized. Also, because the CWA civil penalty funds can be used to remediate the impacts of the spill, Sierra Club has an interest in seeing that they are used to address the specific environmental harms in the Gulf areas where its members are located. Sierra Club has longstanding expertise and local contacts that would enable the identification of and management of effective projects to mitigate and remediate the environmental impacts of the oil spill, and hence has an interest in this litigation as well as any potential settlement.

### III.   ARGUMENT

**A.     Sierra Club is Entitled to Intervention as of Right Pursuant to Fed. R. Civ. P. 24(a)(2)**

Fed. R. Civ. P. 24(a)(2) provides that "[o]n timely application, the court *must* permit anyone to intervene," who:

> claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2)(emphasis added).   The Fifth Circuit has set forth a four-part test to establish whether a party is entitled to intervention by right:

> Intervention as of right under Rule 24(a)(2) is based on four requirements: (1) the applicant must file a timely application; (2) the applicant must claim an interest in the subject matter of the action; (3) the applicant must show that disposition of the action may impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by existing parties to the litigation.

*Heaton v. Monogram Credit Card Bank of Ga.*, 297 F.3d 416, 422 (5th Cir. 2002) (quotation marks and citation omitted). "[T]he inquiry under subsection (a)(2) is a flexible one, which focuses on the particular facts and circumstances surrounding each application" and that "intervention of right must be measured by a practical rather than technical yardstick." *Ross v. Marshall*, 426 F.3d 745, 753 (5th Cir. 2005) (quotation marks and citation omitted).

### 1.  The Motion for Intervention is Timely

Sierra Club's motion to intervene is timely. The United States filed its complaint on December 15, 2010. Upon obtaining a copy of the Complaint, Sierra Club analyzed the government's case, researched the facts and law, contacted the parties and had numerous conferences with the United States over several weeks regarding its position, and subsequently filed this motion to intervene within two months of the U.S. Complaint. To Sierra Club's knowledge, Defendants and Lloyd's have yet to file their Answers, and there are no motions pending in this case. Although depositions are already proceeding in the multi-district litigation, Sierra Club will not seek to re-take any depositions or duplicate discovery that applies to this litigation, if any.  Intervention at this early stage will not delay this action, nor will it otherwise prejudice the parties. In cases such as this, the facts strongly support intervention. *See e.g. John Doe No. 1 v. Glickman*, 256 F.3d 371, 375-79 (5th Cir. 2001).

### 2.  Sierra Club has a Direct and Substantial Interest in this Litigation

#### a)  Sierra Club has Specific Interests in the Subject Matter of this Action

"To demonstrate an interest relating to the property or subject matter of the litigation sufficient to support intervention of right, the applicant must have a direct, substantial, legally protectable interest in the proceedings." *Edwards v. City of Houston*, 78 F.3d 983, 1004 (5th Cir. 1996) (quotation marks and citation omitted). To meet this requirement, the applicant should have an interest "which the *substantive law* recognizes as belonging to or being owned by the applicant." *Ross*, 426 F.3d at 757 (quotation marks and citation omitted).  This test is "primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Id.* (quotation marks and citation omitted). Additionally, courts may judge the interest requirement by a lenient standard if the case involves

a substantial public interest. *See San Juan County v. U.S., 503 F.3d 1163, 1201 (10th Cir. 2007) (en banc)*("[T]he requirements for intervention may be relaxed in cases raising significant public interests."); Moore's Federal Practice 3D § 24.03[2][c].

Here, Sierra Club has a legally protectable interest in protecting, restoring, and improving water quality and the health of the impacted ecosystems. The specific interests of representative Sierra Club members are described in the attached declarations, and include canoeing, kayaking, protecting and restoring wildlife habitat and the lands and waters impacted by the oil and dispersants for their aesthetic and recreational enjoyment. These Sierra Club members also describe how the oil spill has affected them, *e.g.* by diminishing their enjoyment of these activities, causing them to avoid certain areas, to avoid seafood, to clean their boats of oil and to refrain from swimming.

The Supreme Court has long recognized that aesthetic and environmental interests are cognizable, "legally protected interests." *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 563-64 (1992)* (*citing Sierra Club v. Morton, 405 U.S. 727, 734, 740-41 (1972)*). These interests are sufficient to meet the direct and substantial interest requirement for intervention. *See e.g., San Juan County, 503 F.3d 1163* ("it [is] indisputable that [the environmental organization's environmental concern is a legally protectable interest.") and *id.* at 1200 (noting that Rule 24(a)(2) requires the applicant to have an interest *relating to* the property, not an interest in the property itself); *Utah Association of Counties v. Clinton, 255 F.3d 1246 (10th Cir. 2001)*(granting environmental groups' motion to intervene of right in a suit regarding the President's designation of a national monument); *Mausolf v. Babbitt, 85 F.3d 1295, 1302 (8th Cir. 1996)*(citizen groups had legally protectable interest in wildlife to support intervention); *Sagebrush Rebellion, Inc. v. Watt, 713 F.2d 525, 527-28 (9th Cir. 1983)* (wildlife organizations

entitled to intervene as a matter of right in an action challenging a government decision to establish a conservation area). Similarly, Sierra Club has economic, aesthetic, and recreational stakes in ensuring the continuing viability of the land, waters and wildlife in and around the Gulf of Mexico. Since the oil spill and recovery affect that ecosystem, Sierra Club has an interest sufficiently related to this litigation to warrant intervention as of right.

Sierra Club also has an interest in ensuring that the responsible parties are held fully accountable for the damages to these natural resources and assessing maximum penalties that will deter future acts by these Defendants and others that would have unlawful and deleterious effects on the environment. *See generally, Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC) Inc.*, 528 U.S. 167, 194 (2000) (discussing civil penalties' deterrent effect on future violations of the CWA); and *id.* at 197 (Stevens concurring) (equating civil penalties under the CWA with punitive damages). Conversely, if the natural resources are not adequately compensated and Defendants are not forced to pay fines that will reform their future conduct and serve as an example to others, Sierra Club's interests in environmental protection and the interests of its members in the resources of the Gulf of Mexico would be threatened.

An organization such as Sierra Club also has a right to intervene to ensure that a law is properly enforced, particularly where the proposed intervenor has a demonstrated and long-standing interest in that law. *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1245-47 (6th Cir. 1997). Sierra Club has years of experience enforcing the Clean Water Act through citizen suit enforcement litigation and advocacy, and, as described in the attached declarations, has participated in numerous public meetings and administrative functions related to the oil spill.

Finally, the Fifth Circuit has held that parties seeking to intervene as of right need not satisfy Article III standing requirements. In *Ruiz v. Estelle*, 161 F.3d 814, 830 (5th Cir. 1998),

the court stated: "....we hold that Article III does not require intervenors to independently possess standing where the intervention is into a subsisting and continuing Article III case or controversy and the ultimate relief sought by the intervenors is also being sought by at least one subsisting party with standing to do so." Nor must intervenor-plaintiffs have an independent cause of action. *See id.* at 832, quoting David L. Shapiro, *Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators,* 81 Harv. L.Rev. 721, 726 (1968): "Perhaps it should go without saying, but it must be understood that there is a difference between the question whether one is a proper plaintiff or defendant in an initial action and the question whether one is entitled to intervene." [5]

### b)  This Action is Related to Other Sierra Club Litigation Arising out of the BP Oil Spill

Sierra Club is a co-plaintiff in *Gulf Restoration Network (GRN) and Sierra Club v. Dep't of Interior*, E.D. La.  no. 10-1156, which is a challenge to the U.S. Mineral Management Service's (MMS's) approval of BP's 2009 Gulf of Mexico Regional Oil Spill Response Plan (A copy of the complaint is attached as Exhibit K.) BP's Deepwater Horizon rig and at least five other current BP Exploration Plans rely upon the Plan in order to fulfill the regulatory

---

[5] *See also Jones v. Prince George's County*, 348 F.3d 1014, 1017-18 (D.C. Cir. 2003), stating: "In a motion to intervene under Rule 24(a)(2), the question is not whether the applicable law assigns the prospective intervenor a cause of action. Rather, the question is whether the individual may intervene in an already pending cause of action. *See Smuck v. Hobson,* 408 F.2d 175, 179 (D.C. Cir.1969) (en banc) ('[I]n the context of intervention the question is not whether a lawsuit should be begun, but whether already initiated litigation should be extended to include additional parties.'). As the Rule's plain text indicates, intervenors of right need only an 'interest' in the litigation-not a 'cause of action' or 'permission to sue.' *See* Fed.R.Civ.P. 24(a)(2). In *Trbovich v. United Mine Workers of America,* 404 U.S. 528 (1972), the Supreme Court concluded that the lack of a cause of action does not, in and of itself, bar a party from intervening. *Id.* at 537, 92 S.Ct. at 635-36. . . . *see also Olden v. Hagerstown Cash Register, Inc.,* 619 F.2d 271, 274 (3rd Cir.1980) (per curiam) (assuming that the lack of a private right of action did not bar an insurer from intervening in a wrongful death action to protect its subrogation right)."

requirements of 30 C.F.R. § 250.219(a)(2). Exhibit K at pp. 8-9. Sierra Club contends, *inter alia,* that the plan grossly exaggerated BP's oil spill response capabilities in the event of a major blow-out. Sierra Club also contends that MMS approved the Oil Spill Response Plan that assumed that chemical dispersants have a 90 percent effectiveness rate, even though the agency knew or should have known that chemical dispersants were only 33 percent effective.  The preparation and adequacy of the Oil Spill Response Plan, and the reasonableness of Defendants' reliance on it, may be an issue in the instant case in regards to whether Defendants were negligent or grossly negligent, and in determining the amount of civil penalties that should be assessed. *See* 33 U.S.C. § 1321(b)(7) setting a rate for civil penalties at a greater amount for "gross negligence" and 33 U.S.C. § 1321(b)(8) setting forth the factors to be considered in determining the civil penalty amount.[6]

In *Hornbeck Offshore Services, LLC v. Salazar*, E.D. La. no. 10-1663, and *ENSCO Offshore Co. v. Salazar*, E.D. La. no. 10-1941, Sierra Club intervened as a defendant *on behalf of* the federal government in an industry challenge to the six-month deep water drilling moratorium issued by the government after the BP oil spill. In each of these cases Magistrate Judge Wilkinson held that Sierra Club was entitled to intervention of right under Rule 24(a)(2). *See Hornbeck v. Salazar*, no. 10-1663 (E.D. La. June 18, 2010 at 2) ("[a]s in *Sierra Club v. Espy*, weighing the foregoing factors, it appears that their intervention is one of right and must be permitted."); and *ENSCO v. Salazar*, no. 10-1941 (E.D. La. August 20, 2010 at 2)("the proposed intervention in this case appears to meet all factors to qualify as an intervention of right. It is

---

[6]  A judicially assessed civil penalty under CWA § 311 "shall consider the seriousness of the violation or violations, the economic benefit to the violator … the degree of culpability involved, any other penalty for the same incident, any history of prior violations, the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require." 33 U.S.C. § 1321(b)(8).

timely. The intervenors assert a substantial interest in the subject moratoria. Their interest may be impeded if they cannot protect it in this case, and no other party adequately represents their particular interests.") These orders are Exhibits I and J hereto.

And, in *GRN and Sierra Club v. Salazar*, Case No. 10-60417 (5th Cir. 2010), Sierra Club is challenging the MMS approval of oil drilling Exploration Plans without conducting environmental reviews mandated by NEPA. The government approved each plan through the use of a "categorical exclusion," which is an exemption to NEPA's requirements that is only applicable when there is no possibility of significant environmental effects. And, in *Sierra Club v. Dep't of Interior*, Case No. 10-60411 (5th Cir. 2010), Sierra Club is challenging the federal agency for failing to conduct an Environmental Assessment of five drilling exploration plans, each of which are proposed in areas of relatively untested deep water in the Central Gulf of Mexico, again under the auspices of a "categorical exclusion." This agency practice may come up in the instant lawsuit as well.

Sierra Club has also submitted a petition to the U.S. Environmental Protection Agency requesting that it rewrite the regulations governing the approval of dispersants. The petition requests that the agency develop and implement approval criteria that considers the short and long-term impacts of chemical dispersants on the environment, and that the agency require manufacturers to disclose the chemical ingredients of dispersants. In conjunction, Sierra Club filed a CWA Notice of Intent to file suit because the government failed to identify the waters in which the dispersants can be applied and the quantities at which dispersants can be applied safely. The issue of the harm from dispersants and Defendants' reliance on the government's approval of their use may also become an issue in regards to BP's negligence, gross negligence and the amount of penalties that are in order in this case.

### c)   Sierra Club's Interest in Potential Settlement

Sierra Club also has a substantial interest in any settlement that may result from this litigation, and that provides a basis for intervention of right under Rule 24(a)(2). *See e.g., United States v. Carpenter*, 298 F.3d 1122 (9th Cir. 2002) (reversing the district court's denial of an environmental group's motion to intervene as a plaintiff in an action brought by the U.S., and holding that the group was entitled to intervene as of right to object to a proposed settlement that was contrary to the group's interests and was a substantial departure from the position that the government maintained throughout litigation).

Clean Water Act civil penalty actions are often settled with consent decrees that involve Supplemental Environmental Projects ("SEPs"). These typically are environmental mitigation projects that defendants agree to undertake in addition to paying penalties. *See e.g., Ohio Valley Envtl. Coal., Inc. v. Hobet Min., LLC*, 723 F.Supp. 2d 886, 898 (S.D.W. Va. 2010)(consent decree involving civil penalties and Defendants funding SEPs related to the pollution); *United States v. Hudson Foods, Inc.*, 1998 WL 279168, 3 (D. Md.)(consent decree in United States enforcement action that required Defendants to spend $2 million on SEPs, including projects to reduce water pollution); and *United States v. Pflueger*, CIV. 06-00140 BMK, 2007 WL 1876028 (D. Haw. June 27, 2007)(consent decree in United States action that included penalties, remediation work, and a SEP designed to prevent future pollution).   Although Sierra Club does not seek any SEP funds for itself in this case, it believes that any SEPs should address comprehensive restoration of the damaged coastal and marine ecosystems and the future protection of these sensitive resources. As described in the attached declarations, Sierra Club is uniquely qualified and situated to identify potential SEPs in the communities impacted by the oil spill, by virtue of its organizing work in these communities, participation in the public forums

addressing the government and non-governmental organization responses to the spill, and its work with scientists on issues pertaining to the spill.

### 3. The Outcome of this Litigation May, as a Practical Matter, Impair the Ability of Sierra Club to Protect its Interests

An intervenor as of right must be "so situated that the disposition of the action *may* as a practical matter impair or impede the intervenor's ability to protect that interest. Fed. R. Civ. P. 24(a)(2) (emphasis added). The Court should "look to the 'practical consequences' of denying intervention …." *Fund for Animals v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003). Such an inquiry "is not limited to consequences of a strictly legal nature." *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1498 (9th Cir. 1995) (*quoting* *Natural Res. Def. Council v. Nuclear Regulatory Comm'n*, 578 F.2d 1341, 1345 (10th Cir. 1978)).  Sierra Club meets this standard in several respects.

For starters, Sierra Club is a plaintiff or intervenor-defendant in several other pending lawsuits related to the oil spill disaster, including actions against the United States.  Intervening as a plaintiff in the instant lawsuit will enable Sierra Club to coordinate this litigation with its other cases, and ensure that conflicting or inconsistent results are not reached in the litigation. Because of the adverse interests of Sierra Club, the United States and Defendants, Sierra Club's interests may be impaired by this litigation. *See* *Sanguine, Ltd. v. United States Department of Interior*, 736 F.2d 1416, 1419 (10th Cir.1984) (an applicant may meet burden of showing inadequate representation by showing that the representative has an interest adverse to the applicant); 7C Wright & Miller § 1909 (3rd ed.)("if all existing parties are adverse to the absentee, then there is no adequate representation.").

The outcome of this action could also impact Sierra Club's interests if Defendants prevailed on the gross negligence issue, on the number of gallons discharged, or on other

grounds that led the Court to assess a lesser amount of penalties under § 311. That would mean less penalty funds would be available in the Oil Spill Liability Trust Fund for remedial projects that will benefit the natural resources in which Sierra Club members have a significant interest.[7]

In addition, absent participation in this case, Sierra Club's ability to "bring [its] particular knowledge and expertise to bear on the statutory issue" may be impaired. *See* 76 A.L.R. Fed. 762 § 5[a] (citing *Southeast Alaska Conserv. Council v. Watson*, 701 F.2d 186 (Table) (9th Cir. 1983) (unpublished)). Indeed, Sierra Club brings to this case decades of knowledge and experience in working to enforce the Clean Water Act and legal limitations related to unlawful discharges into navigable waters of the United States. It is therefore in a special position to contribute significantly to the disposition of the United States' claims.

Sierra Club also has an interest in ensuring that any resolution of this matter, including settlement, adequately protects Sierra Club's interests, holds the responsible parties fully accountable for the injuries to the natural resources of the Gulf of Mexico, and assesses penalties at a level that will deter any future illegal discharges of oil into the Gulf of Mexico. The outcome of this action, and in particular the amount of civil penalties and the nature of any injunctive relief, will determine whether there is sufficient general and specific deterrence of similar actions in the future. If the relief obtained is not sufficient, this may impair Sierra Club's interest in enjoying and protecting these ecosystems and others throughout the country that are potentially

---

[7] Whether BP and its affiliates were grossly negligent may not be an issue in the OPA claims since BP waived the $75 million cap on those claims that would apply in the absence of gross negligence. 33 U.S.C. § 2704(a)(3) and (c)(1); *Order re Applicability of Limit of Liability under Oil Pollution Act of 1990 to BP Exploration & Production Inc. (and its Affiliates)*, MDL no. 2179, Dec. 23, 2010 [doc. 925]. However, that order does not affect any other Defendant's defenses on OPA liability and it does not mean BP and its affiliates have admitted anything about their conduct. Order at pp. 1-2.  Thus, to Sierra Club's knowledge, there has been no waiver of the "gross negligence" element of civil penalties under § 311(b)(7)(D) by any defendant and that will be an issue in the § 311 claims.

impacted by deep water drilling.

### 4. Sierra Club's Interests are not Adequately Represented by the Parties

Under Rule 24(a)(2), an intervenor as a matter of right must show that the existing parties to the litigation do not adequately represent its interests. An intervenor's burden of showing inadequacy of representation is "minimal." *Trbovich*, 404 U.S. at 538 n.10; *Sierra Club v. Espy*, 18 F.3d 1202, 1207 (5th Cir. 1994). Although a presumption of adequate representation arises when the putative representative is a governmental body, that presumption is overcome when the applicant shows "that its interest is in fact different from that of the [governmental entity] and that the interest will not be represented by [it]." *Edwards*, 78 F.3d at 1005. A presumption of adequate representation also arises when the would-be intervenor has the same ultimate objective as a party to the lawsuit, but that is overcome when the applicant shows "adversity of interest, collusion, or nonfeasance on the part of the existing party to overcome the presumption." *Id*. Applying these standards shows that the United States does not adequately represent Sierra Club in this case.

### a) Sierra Club and the United States have Different Interests

Because the government is required to represent the interest of the public in general, a governmental party is often not able to adequately represent the specific interests of an environmental or other type of advocacy group. *See, e.g.*, *Mausolf*, 85 F.3d at 1303 (finding intervention of right for environmental group where "the Government must inevitably favor some uses over others."); *Utah Association of Counties*, 255 F.3d at 1255-56 (granting environmental organization's intervention of right because the government's obligation to represent the public interest generally may not be coextensive with the intervenor's particular interest, and the government is subject to unanticipated policy shifts); *Coalition of Arizona/New*

*Mexico Counties for Stable Economic Growth v. U.S. Dept. of Interior*, 100 F.3d 845 (10th Cir. 1996) (United States' representation of the public interest generally may differ from intervenor's particular interest in endangered species); *Hazardous Waste Treatment Council v. South Carolina*, 945 F.2d 776, 780-81 (4th Cir. 1991) (granting Sierra Club intervention as of right because the organization represents a subset of citizens represented by the State agency and would offer a different perspective than the government on issues in the litigation).

Although Sierra Club and the United States both seek enforcement of the Clean Water Act, these entities have inherently different overall interests. Sierra Club is a non-profit organization dedicated to protecting the environment and human health through environmental advocacy. Sierra Club members have localized and focused interests. By contrast, the U.S. in this case represents all of the interests of the country, including economic and political interests that must be balanced against the environmental interests that Sierra Club represents. This division of interests is not just theoretical, it is described in Sierra Club declarations. For example, Sierra Club members have dedicated their lives to opposing offshore oil drilling, which the U.S. is charged with permitting. Exhibit E at 2. To support these efforts, Sierra Club has initiated several lawsuits on behalf of its members. Exhibit A at 5. Sierra Club members have a strong interest in curtailing oil production in the Gulf of Mexico and advocate for transition to a clean energy economy and job market in the region. Exhibit A at 3-4; Exhibit B at 3. Sierra Club members are concerned about the end to the moratorium on offshore drilling in the Gulf and the oil industry's influence on the U.S. government to resume business-as-usual drilling operations. Exhibit E at 2; Exhibit B at 2, 4. Sierra Club members have a heightened interest in the U.S. government's management of cleanup efforts, including concerns over harmful and deficient cleanup activities, and are concerned that the U.S. has failed to meet its promises that will help

ensure the Gulf fully recovers. Exhibit B at 2-4; Exhibit C at 3; Exhibit G at 3; Exhibit F at 3-4. Sierra Club members are also deeply concerned about the short and long-term safety of Gulf seafood and the adequacy of the U.S. government's toxicity testing and consumption advisories in the aftermath of the spill. Exhibit E at 3; Exhibit D at 3; Exhibit G at 2-3; Exhibit F at 3.

Sierra Club and the government also have different interests in the Natural Resources Damages Assessment process under OPA, and in fact, Sierra Club members have been excluded from that process. The Natural Resource Damages Assessment is the process through which the governmental trustees assess the damages and injuries to the natural resources and develop a plan for restoration. This damage assessment and the cost of natural resource restoration is the basis of the United States' second claim for relief in this action. Because Sierra Club members' livelihoods and specific interests depend on the comprehensive restoration of the natural resources, Sierra Club has a heightened interest in this process, and in furtherance of that interest, Sierra Club has urged the U.S. to establish a committee of environmental community leaders to formally engage in the long-term restoration planning process. This would advance the use of independent science (which has differed from the U.S. assessment of the oil's persistence in the Gulf), to ensure long-term monitoring and toxicity testing of waters, fisheries and wildlife, as well as to ensure the assessment and restoration of damages caused by harmful clean-up activities. Sierra Club's interest in this process is underscored by the mismanagement of federal money distributed during the 2005 Hurricane Katrina recovery process, in which, for example, monies targeted for community development grants were redirected to expand the infrastructure of local ports. *See* the Mastrotataro Declaration, Exhibit A at 6-7.

Finally, the United States may be more open to settling the suit or less likely to appeal any decision than would Sierra Club. This too overcomes any presumption of adequate

representation. *See Clark v. Putnam County*, 168 F.3d 458, 462 (11th Cir. 1999) ("A greater willingness to compromise can impede a party from adequately representing the interests of a nonparty."). The existence of such differences is sufficient to establish that representation of an intervenor's interest by the governmental agency may be inadequate. *See id.*

### b. Sierra Club and the United States have Adverse Interests

As set forth above, Sierra Club and the United States are adversaries in related litigation. The Fifth Circuit has held that the existence of other overlapping lawsuits indicates a lack of representation by the government, and the government's representation of the broad public interest is not enough. *See Glickman*, 256 F.3d at 380-81 (finding intervention of right in a federal Freedom of Information Act case because the government's representation was inadequate due to its contrary position to the environmental group in another related lawsuit; concluding that the government's representation was inadequate given the organization's minimal burden of showing inadequate representation and the government's duty to represent the broad public interest, not just that of the environmental group).

This adversity of interests in this case is especially acute given Sierra Club is suing the United States for its approval of BP's Oil Spill Response Plan.[8]  Because of that inadequate Plan, the oil continued to spew into the Gulf for nearly *five months, totaling approximately 200 million gallons,* before the combined efforts of the government and BP could finally devise a way to shut it off.  That Plan was woefully inadequate on its face for a multitude of reasons, such as identifying species that don't exist in the Gulf  - sea lions, seals, sea otters and walruses - as "sensitive biological resources" in the region; providing an internet link to a Japanese home shopping website as one of the primary equipment providers for BP in the Gulf of Mexico Region that would provide rapid spill response resources 24 hours a day, 7 days a week; lacking

---

[8] BP's Oil Spill Response Plan is at: http://info.publicintelligence.net/BPGoMspillresponseplan.pdf.

any information about tracking sub-surface oil plumes from deepwater blowouts; failing to include essential, site specific data for effective oil spill response in the Gulf, *e.g.* information about currents, tides, prevailing winds, possible hurricanes or other oceanographic or meteorological conditions; and lacking any information addressing the prevention of disease transmission to captured animals in rehabilitation facilities (which was identified as a serious risk after the Exxon Valdez oil spill in 1989). The chapter evaluating a "worst case discharge" offers assurances that within hours of any incident, regardless of size, BP would deploy "personnel, equipment, and materials in sufficient quantities and recovery capacity to respond effectively to oil spills from the facilities and leases covered by the plan, including the worst case discharge scenarios," which did not occur. Moreover, the Plan failed to discuss altogether how to stop a deepwater blowout. At the time the Plan was approved, the government knew that oil containment and recovery was at best 10 to 15 percent of the estimated spilled oil and at worst considerably less. Nonetheless, the United States approved the plan, which claimed it could recover 197 percent of the daily discharge from an uncontrolled blowout estimated at 250,000 barrels per day. In addition, the government knew that chemical dispersants were only 33 percent effective, yet it still approved the Plan, which assumed a 90 percent effectiveness rate (Ex. K).

Thus it appears that the United States was complicit in this inadequate plan and is culpable with BP for its failure. At a minimum, it was arbitrary and capricious for the United States to approve it, and this exhibits negligence or indifference by the federal agency charged with overseeing it. Therefore, it is very unlikely that the United States will raise the issue of improper conduct by BP or others in the preparation, review or approval of the plan, despite the relevance of this process to assessing civil penalties against BP to penalize it for its lack of planning and response to the largest oil spill in U.S. history.

19

In addition, Sierra Club is in an adversarial position to the U.S. regarding dispersants. The environmental and human health impacts of dispersants are largely unknown, yet the U.S. approved, and BP applied, an unprecedented amount of dispersant in response to the spill. In fact, the U.S. Coast Guard waived the requirements of a government order seeking to limit the use of dispersants to rare cases by granting 74 requests by BP over 59 days. Reports indicate the dispersants may have caused more harm than benefit to the Gulf's ecosystems, exacerbating natural resource damages to sensitive deep-water ecosystems, causing adverse health effects to cleanup workers and coastal residents, and causing uncertainty over the safety of Gulf seafood. This is described in Sierra Club's declarations. *See* Ex. A at 5; Ex. B at 3; Ex. C at 2; Ex. D at 3; Ex. E at 2-3; Ex. F at 3; Ex. G at 2-3. However, due to its role in this, the United States is unlikely to raise or press the improper use of dispersants in assessing civil penalties against BP to penalize it for its lack of planning and response.

Rulings in this case on the preparation and adequacy of the Oil Spill Response Plan, and on the use and impacts of dispersants, would potentially have a preclusive effect on Sierra Club's claims in Sierra Club's other litigation set forth above. This supplies additional practical impairment of Sierra Club's interests warranting intervention as of right. *Cf. Atlantis Development Corp. v. United States,* 379 F.2d 818, 826-29 (5th Cir.1967); 7A C. Wright & A. Miller, *supra,* § 1908 at 515-17 (issues of fact and law that are common to the instant case and others and potential *stare decisis* effect support intervention of right). Overall, the adversarial posture of Sierra Club, the United States and BP in this and related litigation strongly supports Sierra Club's intervention of right in this case.

### c.   The United States has Conflicts of Interest

The U.S. government is a party to numerous contracts with oil companies, including BP, that provide the government with a significant portion of its fuel supply. Thus, the United States has a conflict of interest in this prosecution in seeking the maximum civil penalties against its business partners. The U.S. Department of Defense ("DOD") and specifically the DOD's Defense Logistics Agency (DLA) procures petroleum-based mobility fuels for the U.S. military and supplies fuels to the military and U.S. Coast Guard bases throughout the United States, including in the Gulf of Mexico. The U.S. DOD has entered into numerous ongoing contracts with BP for fuel totaling in the billions of dollars. *See* Exhibit L. A conflict of interest exists, because, fundamentally, these contracts rely on the continued operation and productivity of facilities like the Deepwater Horizon rig and the Macondo well. Moreover, the U.S. Coast Guard, an agency of the DOD that benefits from these contracts by supplying fuel to its air and vessel fleets, also has primary authority over oil spill response and cleanup in maritime waters of the United States. 33 U.S.C. § 1321(j). As such, the U.S. Coast Guard, on the one hand, must coordinate response and cleanup activities, including the approval of dispersant application, to minimize the damages to the natural resources, and, on the other hand, it must protect its own business relationships with BP. Thus, because of its business interests, worth billions of dollars, the government has a disincentive to maximize penalties against BP that could have the effect of adversely impacting the company's business operations.

Sierra Club, on the other hand, is a national environmental organization that has a "Beyond Oil Campaign," the goal of which is to end United States' dependence on oil and transition to cleaner energy sources with less environmental risks, such as wind, solar and natural

gas.[9] The government's continuing support for off-shore oil drilling is incompatible with this long-term goal.

Sierra Club's interests also differ from the United States as a plaintiff, and the Department of Justice representing it, since they are subject to changes inherent in electoral politics, from which Sierra Club is immune. *See Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 967 (3rd Cir. 1998) ("it is not realistic to assume that the agency's programs will remain static or unaffected by unanticipated policy shifts.").  Because the government has "'numerous, complex and conflicting interests' in this matter and [has] dynamic policy objectives and incentives," the government cannot be said to adequately represent the interests of the proposed private party intervenor. *Philadelphia Metal Trades Council, Mtd, AFL-CIO v. Allen*, CIV.A.07-145, 2007 WL 1057027 at 3 (E.D. Pa. Apr. 3, 2007), *quoting Kleissler*, 157 F.3d at 974.

### d.  Sierra Club will Make Arguments in Support of Penalties that the United States will Not Make

In determining whether there is adequate representation courts also consider:

(1) whether the interest of a present party is such that it will *undoubtedly* make *all* the intervenors' arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether the would-be intervenor would offer any necessary elements to the proceedings that other parties would neglect and evidence related to permit violations that may not be made by the government.

*Northwest Forest Res. Council v. Glickman,* 82 F.3d 825, 838 (9th Cir. 1996) (emphasis added). Even where the proposed intervenor and an existing party have the same general goal in the litigation, inadequate representation can be found if the intervenor may seek to raise arguments that the existing party would not. *Miller*, 103 F.3d at 1247.

In this case, the United States will not "undoubtedly make all" of Sierra Club's arguments, nor is it willing to, and Sierra Club plans to present additional arguments and

---

[9] Exhibit A at 3-4; http://www.sierraclub.org/energy/

evidence pertaining to the elements of assessing civil penalties against Defendants. Many examples are set forth above, particularly in connection with BP's Oil Spill Response Plan and dispersants. In addition, Sierra Club's Complaint in Intervention (attached hereto) alleges BP's discharge and inadequate spill response violated the prohibition on discharges without a permit in Clean Water Act § 301 and violated the applicable EPA Region 6 NPDES general permit. It did so by failing to maintain adequate safeguards to prevent the discharge of oil; failing to take all reasonable steps to minimize or prevent any discharge that has a reasonable likelihood of adversely affecting human health or the environment; failing to maintain adequate controls and appropriate quality assurance procedures, including backup or auxiliary facilities, to prevent a discharge; and failing to use devices and methods to ensure the accuracy and reliability of measurements of the volume of monitored discharges. These violations of law by BP are aggravating factors in support of higher civil penalties under 33 U.S.C. § 1321(b)(8); however, CWA § 301 and the permit violations are not mentioned in the government's complaint.

**B.      In the Alternative, Sierra Club Should be Granted Permissive Intervention**

For the reasons stated above, Sierra Club is entitled to intervene as a matter of right pursuant to Rule 24(a). However, if for any reason this Court determines otherwise, Sierra Club requests that it be permitted to intervene pursuant to Fed. R. Civ. P. 24(b)(1)(B). Under this rule, the Court may allow permissive intervention by anyone who "has a claim or defense that shares with the main action a common question of law or fact." "In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

Sierra Club's claims have questions of law and fact in common with the instant litigation. The facts on these claims are described above and plead in Sierra Club's Complaint in

Intervention.  Given Sierra Club's unique perspective with respect to the oil spill and the parties' response to it, Sierra Club's intervention would very likely aid and enhance the Court's understanding of the underlying legal and factual issues and thereby assist the efficient resolution of this action.  Further, Sierra Club's intervention will not unduly delay or prejudice the adjudication of the rights of the original parties.  Therefore, allowing permissive intervention would be appropriate.

<u>**CONCLUSION**</u>

For the reasons set forth above, Sierra Club respectfully requests that the Court grant this motion to intervene as a matter of right, or in the alternative, allow Sierra Club to permissively intervene in this action.

Respectfully submitted,

**s/ Eric E. Huber**
Eric. E. Huber
La. Bar No. 23790
Sierra Club
1650 38th St. Ste. 102W
Boulder, CO 80301
(303) 449-5595
(303) 449-6520 (fax)
eric.huber@sierraclub.org

**s/ Devorah Ancel**
Devorah Ancel
Ca. Bar No. 261038
Sierra Club
85 Second Street, 2nd Floor
San Francisco, CA 94105
tel (415) 977-5721
fax (415) 977-5793
devorah.ancel@sierraclub.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and the foregoing was also electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 7th day of February, 2011.

I HEREBY CERTIFY that the above and foregoing was served on Defendant QBE Underwriting Ltd., Lloyds Syndicate 1036  via first class U.S. Mail, postage prepaid, on this 7th day of February, 2011, to George Gilly and Marty McLeod at Phelps Dunbar LLP Canal Place 365 Canal Street, Suite 2000 New Orleans, Louisiana 70130-6534.


**s/ Eric E. Huber**
Eric E. Huber