**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

_____

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **In Re:  Oil Spill by the Oil Rig** | ) | **MDL No. 2179** |
| **"Deepwater Horizon" in the** | ) | |
| **Gulf of Mexico, on** | ) | |
| **April 20, 2010** | ) | **SECTION: J** |
| | ) | |
| | ) | |
| **This Document Relates to:** | ) | **Judge Barbier** |
| ***Case No. 2:10-cv-04536-CJB-SS*** | ) | **Mag. Judge Shushan** |
| | ) | |

_____)

## COMPLAINT IN INTERVENTION

1.      Proposed Intervenor Sierra Club, Inc. (hereafter "Sierra Club") files this Complaint in Intervention pursuant to Fed. R. Civ. P. 24(c). Sierra Club hereby incorporates the Complaint of the United States filed in this matter on December 15, 2010. The Sierra Club is entitled to intervene under Fed. R. Civ. P. 24(a)(2), because (1) Sierra Club's motion to intervene is timely; (2) Sierra Club has direct, substantial and legally protected interests in this action; (3) the disposition of this action may, as a practical matter, impair or impede those interests; and (4) the present parties to the action do not adequately represent Sierra Club's interests. In the alternative, Sierra Club permissive intervention is appropriate pursuant to Fed. R. Civ. P. 24(b)(1)(B).  The claims and arguments that Sierra Club assert present questions of law and fact in common with the underlying suit and Sierra Club's motion to intervene is timely and would not delay or prejudice the litigation. In addition, the Sierra Club shows as follows:

## INTRODUCTION

2.      This civil action arises out of the explosion of the Deepwater Horizon Mobile Offshore Drilling Rig ("MODU") and resulting oil spill in the Gulf of Mexico. The spill began

on April 20, 2010 and continued to discharge hundreds of millions of gallons of oil into Gulf waters for nearly five months. Although the government declared the "Macondo Well" sealed on September, 19, 2010, the oil continues to saturate Gulf waters and adjoining shorelines, bays, estuaries and wetlands throughout the Gulf states of Louisiana, Mississippi, Alabama and Florida.

3.      The disaster took the lives of 11 crew members aboard the rig and has destroyed the livelihoods of innumerable residents throughout the Gulf states. The spill has caused and continues to cause grave harm to natural resources throughout the Gulf of Mexico. The Gulf is home to fragile and productive ecosystems, including wetlands that serve as shoreline barriers from severe storms and hurricanes and sensitive deepwater coral reefs. The ecosystems of the Gulf of Mexico provide habitat for diverse communities of fish and wildlife, including endangered whales, sea turtles and seabirds. Oil from the spill and the toxic chemical dispersants used in the response have inundated these ecosystems and habitat resulting in the death of hundreds of birds, sea turtles and dolphins, among other species. Oil and dispersants also have tainted fisheries and seafood. The Deepwater Horizon oil spill is the worst environmental disaster in United States history and its full scope and impact are not yet known.

4.      On December 15, 2010, the United States filed this civil action pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, the Clean Water Act, ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, and Section 1017(f)(2) of the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2717(f)(2). (Hereafter this is referred to as "the civil action.") United States' Complaint ¶ 6.

5.      In its First Claim for Relief the United States seeks civil penalties from the Defendants, pursuant to the Clean Water Act, for the unlawful discharge of oil into and upon the navigable waters of the United States and adjoining shorelines, into or upon the waters of the

contiguous zone, or in connection with activities under the Outer Continental Shelf Lands Act. As set forth in the United States' Complaint, under the Clean Water Act, polluters are strictly liable with penalties based in part on the number of barrels of oil discharged. The Defendants are each subject to a judicially assessed civil penalty of up to $4,300 per barrel of oil discharged, to the extent that the discharge of oil was the result of Defendants' gross negligence or willful misconduct.  In addition, in its Second Claim for Relief the United States seeks a declaration that Defendants are responsible and strictly liable for the United States' removal costs and damages under the Oil Pollution Act of 1990.

6.      The United States' civil action also seeks unspecified injunctive relief against Defendants as appropriate.  United States' Complaint Prayer for Relief ¶ 3.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (Federal question), 1333 (Admiralty), 1345 (United States as plaintiff), 1355 (fine, penalty, or forfeiture); 33 U.S.C. §§ 1321(b)(7)(E), 1321(n) (CWA); 33 U.S.C. § 2717(b) (OPA); and 28 U.S.C. § 2201-02 (declaratory judgment and other relief).

8.      Venue is proper in the Eastern District of Louisiana ("this District") pursuant to 28 U.S.C.  §§ 98(a) (Louisiana), 1391(b) (venue generally), and 1395(a) (fine, penalty, or forfeiture); 33 U.S.C. § 1321 (b)(7)(E) (CWA); and 33 U.S.C. § 2717(b) (OPA).

## PLAINTIFF-INTERVENOR

9.      Plaintiff Intervenor in this action is the Sierra Club.

10.     The Sierra Club was founded in 1892, and is the nation's oldest grassroots environmental organization. Headquartered in San Francisco, California, it has more than 700,000 members nationwide, including chapters with thousands of members in the Gulf of

Mexico states of Louisiana, Mississippi, Alabama, Texas and Florida. The Sierra Club's purpose is to explore, enjoy and protect the wild places on the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments. The Sierra Club is dedicated to the protection and preservation of the sensitive ecosystems and wildlife and endangered species of the Gulf of Mexico.

11.     The Sierra Club has members who own property, live, work, and recreate in or near the Gulf of Mexico and in areas connected to the Gulf, such as shorelines, beaches, bays, estuaries, wetlands and tidal waters. These areas include, but are not limited to, the Gulf coast areas. Many of these areas have been, are being, and will continue to be degraded by the oil pollution discharged into the Gulf as a result of the Deepwater Horizon oil spill disaster. More areas will be degraded as the oil continues to disperse throughout the Gulf and beyond. Sierra Club members use the natural resources of the Gulf of Mexico for recreational boating, swimming and fishing, for wildlife observation, study and photography, commercial fishing and tourism, and aesthetic, scientific and business purposes. The loss of these natural resources resulting from the oil spill in the Gulf of Mexico has diminished their use and enjoyment of this area.

12.     Sierra Club sent a 60-day Notice of Intent to Sue to Defendant BP Exploration & Production Inc. (hereafter "BP") and Transocean, Ltd. and its subsidiaries on June 18, 2010, for violations of the Clean Water Act for discharges without a permit and violations of General NPDES Permit No. GMG290000, for civil penalties against Defendants for these violations, for injunctive relief, and for costs and attorneys' and expert witness' fees and expenses. Sierra Club and its members also have submitted numerous letters to the federal government, participated in

public meetings, and filed or intervened in several legal actions arising out of the oil spill disaster.

13.     Sierra Club and its members have been injured by Defendants' violations of the CWA and OPA and will continue to be adversely affected and irreparably injured by the continuing spread of oil pollution in the waters and natural resources of the Gulf of Mexico resulting from Defendants' actions. The relief sought in this action, if awarded, will redress this harm by ensuring that the natural resource damages are adequately compensated and mitigated, and by assessing a penalty against Defendants that will deter future violations of this magnitude.

## PLAINTIFF

14.     The Government Plaintiff in this action is the United States of America, by authority of the Attorney General of the United States, acting at the request of the U.S. EPA Administrator and the trustees of the natural resources.

## DEFENDANTS

15.     At all times material herein, Defendant BP is believed to have been incorporated in the State of Delaware and to have had a place of business and/or to have been doing business within this District and within the jurisdiction of this Court with respect to the matters sued upon herein. Furthermore, actions of BP have had direct impacts within the State of Louisiana and within this District, including, but not limited to, direct impacts resulting from the fire, explosion, sinking, and oil spill associated with the Deepwater Horizon.

16.     At all times material herein, Defendant Anadarko Exploration & Production LP is believed to have been incorporated in the State of Delaware and to have had a place of business and/or to have been doing business within this District and within the jurisdiction of this Court with respect to the matters sued upon herein. Furthermore, actions of Anadarko Exploration have

had direct impacts within the State of Louisiana and within this District, including, but not limited to, direct impacts resulting from the fire, explosion, sinking, and oil spill associated with the Deepwater Horizon.

17.     At all times material herein, Defendant Anadarko Petroleum Corporation is believed to have been incorporated in the State of Delaware and to have had a place of business and/or to have been doing business within this District and within the jurisdiction of this Court with respect to the matters sued upon herein. Furthermore, actions of Anadarko Petroleum have had direct impacts within the State of Louisiana and within this District, including, but not limited to, direct impacts resulting from the fire, explosion, sinking, and oil spill associated with the Deepwater Horizon.

18.     At all times material herein, Defendant MOEX Offshore 2007 LLC is believed to have been incorporated in the State of Delaware and to have had a place of business and/or to have been doing business within this District and within the jurisdiction of this Court with respect to the matters sued upon herein. Furthermore, actions of MOEX have had direct impacts within the State of Louisiana and within this District, including, but not limited to, direct impacts resulting from the fire, explosion, sinking, and oil spill associated with the Deepwater Horizon.

19.     At all times material herein, Defendant Triton Asset Leasing GMBH is believed to have been a foreign corporation and/or entity headquartered in Switzerland and to have had a place of business and/or to have been doing business within this District and within the jurisdiction of this Court with respect to the matters sued upon herein, including, but not limited to, through its ownership and/or operation and/or demise charter of the Deepwater Horizon. Furthermore, actions of Triton have had direct impacts within the State of Louisiana and within

this District, including, but not limited to, direct impacts resulting from the fire, explosion, sinking, and oil spill associated with the Deepwater Horizon.

20.    At all times material herein, Defendant Transocean Holdings LLC is believed to have been incorporated in the State of Delaware and to have had a place of business and/or to have been doing business within this District and within the jurisdiction of this Court with respect to the matters sued upon herein, including, but not limited to, through its ownership and/or operation and/or demise charter of the Deepwater Horizon. Furthermore, actions of Transocean Holdings have had direct impacts within the State of Louisiana and within this District, including, but not limited to, direct impacts resulting from the fire, explosion, sinking, and oil spill associated with the Deepwater Horizon.

21.    At all times material herein, Defendant Transocean Offshore Deepwater Drilling Inc. is believed to have been incorporated in the State of Delaware and to have had a place of business and/or to have been doing business within this District and within the jurisdiction of this Court with respect to the matters sued upon herein, including, but not limited to, through its ownership and/or operation and/or demise charter of the Deepwater Horizon. Furthermore, actions of Transocean Offshore have had direct impacts within the State of Louisiana and within this District, including, but not limited to, direct impacts resulting from the fire, explosion, sinking, and oil spill associated with the Deepwater Horizon.

22.    At all times material herein, Defendant Transocean Deepwater Inc. is believed to have been incorporated in the State of Delaware and to have had a place of business and/or to have been doing business within this District and within the jurisdiction of this Court with respect to the matters sued upon herein, including, but not limited to, through its ownership and/or operation and/or demise charter of the Deepwater Horizon. Furthermore, actions of

Transocean Deepwater have had direct impacts within the State of Louisiana and within this District, including, but not limited to, direct impacts resulting from the fire, explosion, sinking, and oil spill associated with the Deepwater Horizon.

23.    At all times material herein, Defendant QBE Underwriting Ltd., Lloyd's Syndicate 1036 ("Lloyd's") is believed to have been doing business within the United States of America and within this District and within the jurisdiction of this Court, including, but not limited to, by insuring and/or providing a Certificate of Financial Responsibility ("COFR") and certain guarantees pertaining to liabilities incurred by or pertaining to the Deepwater Horizon.

## STATUTORY FRAMEWORK

24.    In the wake of the 1989 Exxon Valdez Oil Spill, which discharged approximately 11 million gallons of oil into Alaska's Prince William Sound, Congress enacted the Oil Pollution Act of 1990 ("OPA") and amended the Clean Water Act ("CWA") to establish a penalty and liability scheme and to establish procedures to respond to oil spill events. 33 U.S.C. §§ 2701-2761; 33 U.S.C. § 1321.

25.    OPA sets forth, *inter alia*, an extensive liability scheme that is designed to ensure that, in the event of a spill or release of oil or other hazardous substance, the responsible parties are liable for the removal costs and damages that result from the incident. 33 U.S.C. § 2702(b).

26.    Responsible parties include a "lessee or permittee of an offshore facility or the holder of a right of use and easement granted under applicable State law or the Outer Continental Shelf Lands Act for the area in which the facility is located," and in the case of a vessel, "any person owning, operating, or demise chartering the vessel." 33 U.S.C. §§ 2701(32)(A),(B).

27.    Under OPA, "responsible part[ies] for a vessel or facility from which oil is discharged, … into or upon the navigable waters [of the United States] or adjoining shorelines or

the exclusive economic zone is liable for the removal costs and damages" caused by the spill event. 33 U.S.C. § 2702(a). "Damages," as defined in 33 U.S.C. § 2702(b)(2), include "damages for injuries to, destruction of, loss of or loss of use of, natural resources, including the reasonable costs of assessing the damage…" and damages to real or personal property, subsistence use, revenues, profits and earning capacity, and public services.

28.     OPA limits liability for an offshore facility to the total of all removal costs plus $75,000,000 unless the incident was proximately caused by "gross negligence or willful misconduct," or if the incident was proximately caused by the "violation of an applicable Federal safety, construction, or operation regulation by the responsible party, an agent or employee of the responsible party, or a person acting pursuant to a contractual relationship with the responsible party," in which case there is no cap on liability for damages. 33 U.S.C. § 2704(a)(3),(c). Defendant BP has waived the OPA $75,000,000 cap in this case.

29.     Like OPA, CWA § 311 prohibits the discharge of oil into navigable waters, on the waters of the exclusive economic zone, on adjoining shorelines, or affecting natural resources belonging to the United States "in such quantities as may be harmful." 33 U.S.C. § 1321(b)(3). The EPA has determined that a "harmful quantity" of oil is an amount that, when discharged, violates state water quality standards, causes a film or sheen on the surface of the water, or causes a sludge to be deposited beneath the surface. 40 C.F.R. § 110.3.

30.     CWA § 311 imposes strict, joint and several liability on any party that is responsible for an oil spill in quantities that may be harmful to public health or the environment. Under CWA § 311, the responsible parties are subject to civil penalties of $1,100 per barrel of oil discharged. However, if the violation "was the result of gross negligence or willful

misconduct," the responsible party is subject to a civil penalty of up to $4,300 per barrel of oil discharged. 33 U.S.C. § 1321(b)(7), 40 C.F.R. § 19.4.

31.    "Gross negligence" is "willful, wanton and reckless conduct that falls between intent to do wrong and ordinary negligence;" when one "has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." *Houston Exploration Co. v. Halliburton Energy Services, Inc.*, 269 F.3d 528, 531-32 (5th Cir. 2001).

32.    A judicially assessed civil penalty under CWA § 311 "shall consider the seriousness of the violation or violations, the economic benefit to the violator … the degree of culpability involved, any other penalty for the same incident, any history of prior violations, the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require." 33 U.S.C. § 1321(b)(8).

33.    Under CWA § 301, the discharge of any "pollutant," as defined in 33 U.S.C. § 1321(a)(1) and under 33 U.S.C. § 1362(6), from a point source into waters of the United States without permission under a National Pollution Discharge Elimination System ("NPDES") permit is illegal. 33 U.S.C. §§ 1311(a) and 1342. Thus, the Clean Water Act requires NPDES permits for all point source discharges of pollutants into waters of the United States.

34.    The U.S. Environmental Protection Agency ("EPA") Region 6 NPDES general permit for the Western Portion of the Outer Continental Shelf of the Gulf of Mexico (No. GMG290000) sets effluent standards or limitations under the CWA for discharges from new sources, existing sources, and new dischargers in the Offshore Subcategory of the Oil and Gas

Extraction Point Source Category (40 CFR Part 435, Subpart A). The permit authorizes discharges from exploration, development, and production facilities located in and discharging to Federal waters of the Gulf of Mexico seaward of the outer boundary of the territorial seas offshore of Louisiana and Texas, only in accordance with the effluent limitations, monitoring requirements, and other conditions set forth in the permit. In accordance with the provisions of 40 C.F.R. § 122.41, *et. seq.*, the permit incorporates by reference all conditions and requirements applicable to NPDES permits set forth in the CWA, as amended, as well as all applicable regulations. Among the requirements of 40 C.F.R. § 122.41 violated in this case are those pertaining to the "duty to mitigate" and "proper operation and maintenance," as defined in that subsection. In addition, the permit states that nothing in it shall be construed to preclude the institution of any legal action or to relieve the permittee from any responsibilities, liabilities, or penalties to which the permittee is or may be subject under section 311 of the Act.

35.     The permit states in Part I section B para. 10(a) and numerous other paragraphs: "No free oil shall be discharged." Part II section (B)(1) states: "The permittee is responsible for maintaining adequate safeguards to prevent the discharge of untreated or inadequately treated wastes during electrical power failure either by means of alternate power sources, standby generators or retention of inadequately treated effluent;" Part II section (B)(2) states: "Duty to Mitigate [ ] The permittee shall take all reasonable steps to minimize or prevent any discharge in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment;" and Part II section (B)(3) states: "Proper Operation and Maintenance [ ] a. The permittee shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by permittee as efficiently as possible and in a manner which will minimize upsets and discharges of excessive pollutants and

will achieve compliance with the conditions of this permit. Proper operation and maintenance also includes adequate laboratory controls and appropriate quality assurance procedures. This provision requires the operation of backup or auxiliary facilities or similar systems which are installed by a permittee only when the operation is necessary to achieve compliance with the conditions of this permit."

36.     In addition, Part II section (C)(6) provides: "Flow Measurements [ ] Appropriate flow measurement devices and methods consistent with accepted scientific practices shall be selected and used to ensure the accuracy and reliability of measurements of the volume of monitored discharges. The devices shall be installed, calibrated, and maintained to insure that the accuracy of the measurements is consistent with the accepted capability of that type of device. Devices selected shall be capable of measuring flows with a maximum deviation of less than 10% from true discharge rates throughout the range of expected discharge volumes."

37.     Defendant BP operated pursuant to general permit No. GMG290000 and is a permittee under this permit.

38.     The discharge of oil from the well blowout constitutes an unauthorized discharge of pollutants from a point source into the Gulf of Mexico and ultimately to the connected bays, estuaries, wetlands and tidal waters; hence, the Deepwater Horizon spill discharged oil into waters of the States of Louisiana, Mississippi, Alabama and Florida.

39.     Defendants are responsible parties pursuant to the CWA and OPA. Defendants have violated the above described laws and regulations and are subject to penalties and damages under the CWA and OPA.

## FACTS

### The Deepwater Horizon Spill and Ongoing Damages

40.     The Deepwater Horizon rig was located on the outer continental shelf, approximately 40 miles off the coast of Louisiana in the Gulf of Mexico. This site is known as the Macondo prospect site in Mississippi Canyon Block 252. On April 20, 2010, this rig exploded, killing 11 crew members and causing the release of approximately 200 million gallons of oil from the Macondo Well, which continually discharged during the course of five months.

41.     The spill also caused the release of methane gas at up to 10,000 times the background levels in Gulf waters and released other toxic pollutants at levels that exceed the reportable quantities of hazardous substances required to be reported under the CWA, 33 U.S.C. § 1321(b)(2)(A), the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9603(a), and the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11004.

42.     In addition, oil spill response efforts included the application of an unprecedented 1.8 million gallons of toxic chemical dispersants to the surface waters and into the water column. The environmental effects of using chemical dispersants in such enormous quantities and at such depths have never been tested.

43.     The Deepwater Horizon spill discharged oil from a point source without authorization under a NPDES permit as required by the CWA, 33 U.S.C. §§ 1311(a) and 1342, "in such quantities as may be harmful," within the meaning of the CWA, 33 U.S.C. § 1321(b)(3). In addition, the discharge from the Deepwater Horizon violated the Region 6 NPDES general permit for the Western Portion of the Outer Continental Shelf of the Gulf of Mexico (No. GMG290000). These general permit violations and violations of 33 U.S.C. §§

1311(a) and 1342 constitute aggravating factors that contribute to the assessment of penalties pursuant to 33 U.S.C. § 1321(b)(8).

44.     To date, the oil pollution and chemical dispersants have impacted more than 88,000 square miles of federal waters and more than 630 miles of shoreline.

45.     As a result of the Deepwater Horizon spill, "natural resources," as that term is defined in OPA, 33 U.S.C. § 2701(20), have been injured, destroyed, or lost. The spill has caused fragile tidal marsh ecosystems to die-off and has killed thousands of species of birds, sea turtles, dolphins and other marine and terrestrial organisms that depend on the Gulf for habitat and other important life functions. Many organisms will continue to be threatened by the spill as the oil and other toxic pollutants make their way up the food chain. Oil and tar balls continue to wash ashore once pristine beaches, some of which are designated as national seashore areas. Thirty-two (32) National Wildlife Refuges were affected by the spill.

46.     Oil continues to spread beneath the surface of the Gulf waters. Scientists have reported sightings of underwater oil plumes extending 15 miles wide, 3 miles long, and 600 feet thick. Layers of crude oil blanket the ocean floor, smothering organisms that make their habitat on the seafloor, including sensitive species of coral.

47.     The full extent of the damages to the Gulf of Mexico's natural resources far exceed $75,000,000 and will not be know for years. Already, the United States has expended and/or sustained and/or will expend or sustain, *inter alia*, "removal costs" and "damages," within the meaning of OPA, 33 U.S.C. § 2702(b).

48.     The spill has devastated local communities. The spill caused the closure of approximately 88,000 square miles of federal fisheries, leaving commercial fisherman out of work and adversely impacting Louisiana's $2.4 billion seafood industry. The spill also has

devastated the region's $20 billion tourism industry. Gulf residents and clean up workers exposed to the oil and chemical dispersants have suffered from health problems; many individuals have been hospitalized for these conditions.

### Defendants' Management of the Well and Failure to Control the Pollution Discharge

49.     The Deepwater Horizon rig was owned by Defendant Transocean Ltd. BP was the principle lessee of the rig. The Deepwater Horizon was an ultra-deepwater facility. The Deepwater Horizon rig commenced drilling in February 2010 at a water depth of 5,000 feet, with plans to drill the well to a depth of approximately 18,000 feet.

50.     Drilling in ultra-deep waters with low-temperature and high pressure conditions significantly increases the risks and hazards associated with offshore drilling. These variables increase the likelihood that, among other things, gas hydrates will form, which can cause malfunctions in drilling operations and blowout prevention procedures. Likewise, these riskier conditions present a heightened probability that an extreme blowout scenario could occur.

51.     Defendants did not have in place strict policies requiring rigorous analysis and proof that less-costly alternatives that Defendants chose to implement in the days leading up to the disaster were in fact equally safe in light of the inherent dangers of deepwater drilling.

52.     On April 20, 2010, the Macondo Well experienced an uncontrolled well event and an uncontrolled blowout of, *inter alia*, oil and methane gas.

53.     The April 20, 2010 uncontrolled well event and uncontrolled blowout of oil and methane gas was not prevented by Defendants, or by the Deepwater Horizon or its equipment and appurtenances, including, but not limited to, the Blowout Preventer ("BOP") stack.

54.     Defendants (other than Lloyd's) failed, *inter alia*, to comply with applicable federal regulations at 30 C.F.R. Part 250, including but not limited to 30 C.F.R. §§ 250.107,

250.198 (and industry standards expressly incorporated therein), 250.300, 250.401, 250.420, 250.440, 250.442, 250.446, and 250.451.

55.    The April 20, 2010 uncontrolled well event and uncontrolled blowout was proximately caused by the gross negligence or willful misconduct of one or more of the Defendants.

56.    The following actions and decisions by Defendants (other than Lloyd's) led to the Deepwater Horizon's explosion and subsequent oil spill:

57.    BP's decision-making processes on the Deepwater Horizon did not ensure that personnel fully considered the risks created by time- and money-saving decisions. Many decisions made by Defendants increased the risk of the Macondo blowout in order to save the companies significant time and money. BP's Macondo team failed to ensure that alternative procedures employed as a result of implementing *ad hoc* cost-saving measures were equally safe as its standard procedures. Cost-saving decisions implemented by BP were never subject to comprehensive and systematic risk-analysis, peer-review, or management of change process.

58.    BP's management process did not adequately identify or address risks created by late changes to well design and procedures. BP did not have adequate controls in place to ensure that key decisions in the months leading up to the blowout were safe or sound from an engineering perspective. In the weeks and days before drilling commenced, changes in drilling procedures were made by BP's Macondo team in an *ad hoc* fashion without any formal risk analysis or internal expert review.

59.    BP did not share important information with its contractors, or sometimes internally even with members of its own team. As a result, individuals often made critical decisions without a full appreciation for the context in which they were being made. For

example, many BP employees were aware of the difficulty of the primary cement job, the inadequacy of which is described in more detail below, but those issues were not communicated to the rig crew that conducted the negative-pressure test and monitored the well. BP did not even communicate many of the problematic issues to its own personnel, including the Well Site Leader on the Deepwater Horizon.

60.     The temporary abandonment procedure was changed dramatically and repeatedly during the week leading up to the blowout without any thorough or rigorous vetting earlier in the design process. In particular, BP decided to remove drilling mud and replace it with seawater in advance of the cementing job.

61.     Transocean failed to communicate to the Deepwater Horizon crew lessons from an earlier near-miss blowout in the North Sea just four months prior to the Macondo well blowout.

62.     Defendants (other than Lloyd's) failed, *inter alia*, to use the best available and safest drilling technology to monitor and evaluate the Macondo Well's conditions and to minimize the potential for the Macondo Well to flow or kick.

63.     Defendants (other than Lloyd's) failed, *inter alia*, at times relevant herein to maintain continuous surveillance on the rig floor.

64.     Defendants (other than Lloyd's) failed, *inter alia*, to maintain equipment and materials, including, but not limited to, the Blowout Preventer ("BOP") stack, that were available and necessary to ensure the safety and protection of personnel, equipment, natural resources, and the environment.

65.     Defendants (other than Lloyd's) failed, *inter alia*, to take necessary precautions to keep the Macondo Well under control, including, but not limited to, on April 20, 2010.

66.     Defendants (other than Lloyd's) caused and/or contributed to the Deepwater Horizon spill by failing to assure well control of the Macondo Well through, *inter alia:* actions, corporate actions, and/or corporate practices of disregarding federal regulations, as evidenced by various safety and other audits of the Deepwater Horizon, reflecting the known failure, prior to the Deepwater Horizon Spill, to properly design, install, maintain, repair, and operate equipment intended to prevent personal injury, loss of life, harm to the environment, and disasters like the Deepwater Horizon Spill. Defendants (other than Lloyd's) caused and/or contributed to the Deepwater Horizon Spill by failing to assure well control of the Macondo Well through, *inter alia*:

(a) Failing to assure that well control was maintained by proper and adequate cementing of the Macondo Well. BP management decided to install only six centralizers rather than the recommended 21 centralizers for its cement job. Centralizers are a critical component to ensuring a good cement job. Without a centralized casing, a primary cement job can be severely compromised. BP did not ensure that cement was adequately tested. BP did not secure test results showing the Macondo slurry was stable until after the job had been pumped. BP made final changes to the cement design to accommodate concerns about lost returns even though the changes increased the risks of foam instability. In addition, BP did not have foam stability tests completed before ordering primary cementing to begin. On April 20, 2010, BP cancelled a recommended cement bond log test because conducting the test would have taken 9 to 12 hours and cost the company $128,000.

(b) Failing to assure that well control was maintained by mechanical barriers, including, but not limited to, the BOP stack;

(c) Failing to assure that well control was maintained by proper and adequate

inspection and maintenance of the BOP stack;

(d) Failing to assure that well control was maintained by proper and adequate pressure testing;

(e) Failing to assure that well control was maintained by the use of appropriate fluids to maintain hydrostatic pressure on the wellbore;

(f) Failing to assure that well control was maintained by proper and adequate well monitoring;

(g) Failing to assure that, once well control initially was lost, well control was regained by proper and adequate well control response;

(h) Failing to assure that, once well control initially was lost, well control was regained by proper and adequate surface containment and overboard discharge and diversion of hydrocarbons; and

(i) Failing to assure that, once well control initially was lost, well control was regained by proper and adequate BOP stack emergency operations.

67.    More than likely, the Macondo Well blowout would not have happened had BP and the other Defendants (other than Lloyd's) handled the above described actions and procedures with greater care and communication.

## **BP's Response to the Oil Discharge was Grossly Inadequate**

68.    For more than a month after the Macondo Well began gushing oil into the Gulf of Mexico, BP communicated inaccurate estimates of the oil discharge rate that were significantly lower than the actual rate.

69.    BP submitted an Oil Spill Response Plan ("OSRP") to the federal government for its operations in the Gulf of Mexico, which covered BP's drilling activities at the Macondo Well

site. The OSRP grossly underestimates the magnitude of a potential worst case discharge. BP's OSRP falsely assures that within hours of an oil spill incident, including a worst case discharge scenario, BP would have the recovery capacity, including the personnel, equipment, and materials, in sufficient quantities to respond effectively. In addition, the OSRP was inadequate on its face for a multitude of reasons. For example, identifying species that don't exist in the Gulf  - sea lions, seals, sea otters and walruses - as "sensitive biological resources" in the region; providing an internet link to a Japanese home shopping website as one of the primary equipment providers for BP in the Gulf of Mexico Region that would provide rapid spill response resources 24 hours a day, 7 days a week; lacking any information about tracking sub-surface oil plumes from deepwater blowouts; failing to include essential, site specific data for effective oil spill response in the Gulf, *e.g.* information about currents, tides, prevailing winds, possible hurricanes or other oceanographic or meteorological conditions; and lacking any information addressing the prevention of disease transmission to captured animals in rehabilitation facilities (which was identified as a serious risk after the Exxon Valdez oil spill in 1989). The chapter evaluating a "worst case discharge" offers assurances that within hours of any incident, regardless of size, BP would deploy "personnel, equipment, and materials in sufficient quantities and recovery capacity to respond effectively to oil spills from the facilities and leases covered by the plan, including the worst case discharge scenarios," which did not occur. Moreover, the OSRP failed to discuss altogether how to stop a deepwater blowout.   As a result of the inadequate OSRP, the oil continued to spew into the Gulf for approximately four months, totaling approximately 200 million gallons, before the combined efforts of the government and BP could finally devise a way to shut it off.

70.    BP did not halt its use of the toxic chemical dispersant Corexit after the U.S. Environmental Protection Agency ordered the company to stop using it on May 20, 2010.  The environmental and human health impacts of dispersants are largely unknown, yet BP applied an unprecedented amount of dispersant in response to the spill. These dispersants may have caused more harm than benefit to the Gulf's ecosystems, exacerbating natural resource damages to sensitive deep-water ecosystems, causing adverse health effects to cleanup workers and coastal residents, and causing uncertainty over the safety of Gulf seafood.

71.    On May 7, 2010, BP maneuvered a 98-ton steel containment dome over the discharging oil in an attempt to funnel the oil through a pipe to the surface, where it would be collected by a drill ship. This procedure failed when the dome's opening was clogged with gas hydrates. The dome was moved to the side of the wellhead and is resting on the sea floor.

72.    On May 12, 2010, BP abandoned plans for a second, smaller containment dome or "top hat" cofferdam, a 5-foot-tall, 4-foot-diameter structure that weighs less than 2 tons and that would be injected with alcohol to act as an antifreeze to keep its outlet clear of gas hydrates.

73.    From May 17 to May 25, 2010, BP unsuccessfully attempted to siphon the oil using a Riser Insertion Tube Tool (RITT).

74.    On May 26, 2010, BP proceeded with a "top kill" operation, which injects heavy drilling fluids through the BOP on the seabed into the well to stop the flow of oil from the damaged well. On May 29, 2010, BP declared the "top kill" technique a failure.

75.    BP also attempted a "junk shot" method, which involves shooting debris such as shredded tires, golf balls and similar objects under extremely high pressure into the BOP in an attempt to clog it and stop the discharge. The process was carried out a number of times before BP concluded that it had failed.

76.     BP made a failed attempt to plug the well with a custom-built cap known as the Lower Marine Riser Package (LMRP) Cap Containment System, which involved cutting and removing the damaged riser from the top of the failed BOP to leave a cleanly-cut pipe at the top of the BOP's LMRP. The cap is designed to be connected to a riser from a drillship and placed over the LMRP in order to capture the oil and gas flowing from the well.

77.     On July 15, 2010, 86 days after the well began discharging oil into the Gulf of Mexico uncontrolled, BP announced they had maintained control of the flow of oil.

78.     On September 19, 2010, after "static kill" was completed and a relief well was drilled, the government declared the well capped.

79.     The Deepwater Horizon spill was proximately caused by one or more of the following acts: acts, joint acts, omissions, fault, negligence, gross negligence, willful misconduct, and/or breach of federal safety and/or operating and/or construction regulations by Defendants BP, Anadarko Exploration, Anadarko Petroleum, MOEX, one or more of the Transocean Defendants, and/or their respective agents, servants, employees, crew, contractors and/or subcontractors with whom said Defendants had contractual relationships.

### FIRST CLAIM FOR RELIEF

### (Civil Penalties Under Section 311(b) of the Clean Water Act)

80.     The allegations of paragraphs 1 - 79 are incorporated by reference as if repeated verbatim herein.

81.     At all times material herein, Defendant BP was an owner, an operator, and/or a person in charge of, *inter alia*, the well, the well casing, the well head, and the *Deepwater Horizon,* including the BOP stack, the marine riser and associated piping, and other equipment, with respect to the matters sued upon herein. BP was an owner, operator, and/or person in charge

of an offshore facility and, additionally, an operator and/or person in charge of a vessel within the meaning of the CWA, 33 U.S.C. § 1321(b)(7).

82.     At all times material herein, the Anadarko Defendants were each an owner, operator, and/or a person in charge of, *inter alia*, the well, the well casing, and the well head, with respect to the matters sued upon herein. The Anadarko Defendants were each an owner, operator, and/or person in charge of an offshore facility within the meaning of the CWA, 33 U.S.C. § 1321(b)(7).

83.     At all times material herein, defendant MOEX was an owner, operator, and/or a person in charge of, *inter alia*, the well, the well casing, and the well head, with respect to the matters sued upon herein. Defendant MOEX was an owner, operator and/or person in charge of an offshore facility within the meaning of the CWA, 33 U.S.C. § 1321(b)(7).

84.     At all times material herein, the Transocean Defendants were each an owner, operator, and/or person in charge of the *Deepwater Horizon,* including the BOP stack, the marine riser and associated piping, and other equipment, with respect to the matters sued upon herein. The Transocean Defendants were each an owner, operator, and/or person in charge of a vessel and/or an offshore facility within the meaning of the CWA, 33 U.S.C. § 1321(b)(7).

85.     Pursuant to 33 U.S.C § 1321(b)(7) and 40 C.F.R. § 19.4, Defendants BP, Anadarko Exploration, Anadarko Petroleum, MOEX, Triton, Transocean Holdings, Transocean Offshore, and Transocean Deepwater are each subject to a judicially assessed civil penalty of up to $1,100 per barrel of oil that has been discharged or up to $4,300 per barrel of oil that has been discharged, to the extent that the discharge of oil was the result of gross negligence or willful misconduct by such Defendant.

86. Pursuant to 33 U.S.C. § 1321(b)(7), Defendants BP, Anadarko Exploration, Anadarko Petroleum, MOEX, Triton, Transocean Holdings, Transocean Offshore, and Transocean Deepwater are each liable to the United States for a judicially assessed civil penalty in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF

**(Declaratory Judgment That All Defendants Are Liable Under the Oil Pollution Act)**

87. The Allegations of paragraphs 1 - 86 are incorporated by reference as if repeated verbatim herein.

88. At all times material herein, Defendant BP was and is a lessee or permittee with respect to the leased area known as "All of Block 252, Mississippi Canyon, OCS Official Protraction Diagram, NH 16-10." In addition, BP was an operator of the *Deepwater Horizon* with respect to the matters sued upon herein.

89. At all times material herein, Defendant Anadarko Petroleum was and is a lessee or permittee with respect to the leased area known as "All of Block 252, Mississippi Canyon, OCS Official Protraction Diagram, NH 16-10."

90. At all times material herein, at least until April 28, 2010, Defendant Anadarko Exploration was a lessee or permittee with respect to the leased area known as "All of Block 252, Mississippi Canyon, OCS Official Protraction Diagram, NH 16-10."

91. At all times material herein, Defendant MOEX was and is a lessee or permittee with respect to the leased area known as "All of Block 252, Mississippi Canyon, OCS Official Protraction Diagram, NH 16-10."

92. As a result of the various agreements amongst the Defendants (except Lloyd's) and the "Assignment(s) of Record Title Interest in Federal OCS Oil and Gas Lease" pertaining to

Lease No. OCS-G 32306, BP became and remains a "responsible party" for an "offshore facility" within the meaning of OPA, 33 U.S.C. §§ 2701 *et seq*., and BP has admitted that it is a "responsible party" within the meaning of OPA.

93.    As a result of the various agreements amongst the Defendants (except Lloyd's) and the "Assignment(s) of Record Title Interest in Federal OCS Oil and Gas Lease" pertaining to Lease No. OCS-G 32306, the Anadarko Defendants became and remain "responsible parties" for an "offshore facility" within the meaning of OPA, 33 U.S.C. §§ 2701 *et seq.*

94.    As a result of the various agreements amongst the Defendants (except Lloyd's) and the "Assignment(s) of Record Title Interest in Federal OCS Oil and Gas Lease" pertaining to Lease No. OCS-G 32306, MOEX became and remains a "responsible party" for an "offshore facility" within the meaning of OPA, 33 U.S.C. §§ 2701 *et seq.*

95.    At all times material herein, the Transocean Defendants were the owners and/or operators and/or owners *pro hac vice* and/or demise charterers of the *Deepwater Horizon*, and have been and remain "responsible parties" for a "vessel" and/or "offshore facility" within the meaning of OPA, 33 U.S.C. §§ 2701 *et seq.*

96.    The United States has sustained "damages," as that term is defined in 33 U.S.C. § 2702(b)(2), for, *inter alia*, injuries to, destruction of, loss of, or loss of use of natural resources and net loss of taxes, royalties, rents, fees, and net profit shares due to the injury to, destruction of, and loss of real property, personal property, and natural resources, said damages far exceeding $75,000,000.

97.    An actual controversy exists between the United States and Defendants BP, Anadarko Exploration, Anadarko Petroleum, MOEX, Triton, Transocean Holdings, Transocean Offshore, and Transocean Deepwater.

98.     Lloyd's has provided evidence of financial responsibility and certain guarantees pertaining to one or more of the Transocean Defendants and *Deepwater Horizon.* Pursuant to Section 1016(f) of OPA, 33 U.S.C. § 2716(f), this action may be brought directly against Lloyd's, in its capacity as a guarantor providing evidence of financial responsibility for one or more of the Transocean Defendants, for removal costs and damages available under OPA, 33 U.S.C. § 2702.

99.     While denying that it acted improperly, through its filings with the Court and other public statements by its high-ranking officers, BP has, through binding waivers, estoppels, admissions, and judicial admissions, waived any potential limit of its strict liability that it otherwise may have attempted to assert pursuant to, *inter alia*, Section 1004 of OPA, including 33 U.S.C. § 2704.

100.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and OPA, 33 U.S.C. § 2717(f)(2), Sierra Club seeks a declaratory judgment that is binding in this action and any subsequent action or actions against Defendants BP, Anadarko Exploration, Anadarko Petroleum, MOEX, Triton, Transocean Holdings, Transocean Offshore, and Transocean Deepwater, jointly and severally and without any limitation, and Lloyd's, the latter up to the amount of its COFR guarantee, that said Defendants are liable to the United States for removal costs and damages in this action and in any such subsequent action or actions.

## PRAYER FOR RELIEF

**WHEREFORE**, the Sierra Club prays that the Court:

1.     Assess a civil penalty, under Section 311(b)(7) of the Clean Water Act, 33 U.S.C. § 1321(b)(7), against each Defendant (except Lloyd's) in an amount to be determined by the Court;

2.      Enter a declaratory judgment that all Defendants are jointly and severally liable to the United States without limitation under Section 1002(a) of OPA, 33 U.S.C. § 2702(a), for all removal costs and damages resulting from the Deepwater Horizon Spill (except that Lloyd's be declared liable only to the limit of its COFR), which will be binding on this action and on any subsequent action or actions to recover removal costs or damages;

3.      Award injunctive relief against the Defendants as appropriate; and

4.      Grant such other relief as the Court deems just and proper.

Respectfully submitted,

**s/ Eric E. Huber**
Eric E. Huber
La. Bar No. 23790
Sierra Club
1650 38th St. Ste. 102W
Boulder, CO 80301
(303) 449-5595
(303) 449-6520 (fax)
eric.huber@sierraclub.org

**s/ Devorah Ancel**
Devorah Ancel
Ca. Bar No. 261038
Sierra Club
85 Second Street, 2nd Floor
San Francisco, CA 94105
tel (415) 977-5721
fax (415) 977-5793
devorah.ancel@sierraclub.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and the foregoing was also electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 7th day of February, 2011.

I HEREBY CERTIFY that the above and foregoing was served on Defendant QBE Underwriting Ltd., Lloyds Syndicate 1036  via first class U.S. Mail, postage prepaid, on this 7th day of February, 2011, to George Gilly and Marty McLeod at Phelps Dunbar LLP Canal Place 365 Canal Street, Suite 2000 New Orleans, Louisiana 70130-6534.

s/ Eric E. Huber
Eric E. Huber