

June 18, 2010

Andrew Inglis
Chief Executive
BP Exploration & Production, Inc.
501 Westlake Park Blvd.
Houston, Texas 77079

Tony Hayward
Chief Executive Officer
BP America, Inc.
501 Westlake Park Blvd
Houston, Texas 77079

J.H. Dupree
President
BP Exploration & Production, Inc.
4101 Winfield Road
Warrenfield, Illinois 60555

Lamar McKay
Chairman & President
BP America, Inc.
501 Westlake Park Blvd.
Houston, Texas 77079

Steven L. Newman
President and CEO
Transocean Ltd.
P.O. Box 2765
Houston, Texas 77252-2765

VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED

**RE:     Notice of Intent to Sue for Violations of the Clean Water Act for
          Discharges without a Permit and Violations of General NPDES
          Permit No. GMG 29000**

Dear Sirs:

The undersigned represents and gives this notice on behalf of the Sierra Club, 85 Second Street, Second Floor, San Francisco, CA 94105-3441, phone number (415) 977-5500. The Sierra Club is a non-profit environmental membership organization with approximately 750,000 members nationwide, including thousands of members in the Gulf of Mexico states. Sierra Club members own property, live, work, and recreate near the Gulf of Mexico and areas connected to the Gulf, such as shorelines, beaches, bays, estuaries, wetlands and tidal waters. Many of these areas are being degraded by the oil pollution being discharged into the Gulf as a result of the BP Deepwater Horizon disaster, including but not limited to the coastal areas of Louisiana, Mississippi, Alabama and the Florida panhandle, and more areas will be degraded as the oil continues to disperse and spread throughout the Gulf and potentially through the Florida Keys and into the Atlantic Ocean.



This letter is sent to you pursuant to Section 505(b) of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(b), to notify you of Sierra Club's intention to institute a civil lawsuit against BP Exploration & Production, Inc., and/or BP America Inc. (hereinafter jointly and severally "BP") as the lessee, owner, operator, managing agent and/or person in charge of the Deepwater Horizon drilling rig and the pipe from which the oil is being discharged; as well as Transocean Ltd. (and its relevant subsidiaries) as the owner and/or operator of the Deepwater Horizon drilling rig.

The Deepwater Horizon rig was located on the outer continental shelf off the coast of Louisiana in the Gulf of Mexico.  This site is known as the Macondo prospect site in Mississippi Canyon Block 252.  On April 20, 2010 this rig exploded, killing 11 crew members and spilling millions of gallons of oil into the water.  On or about April 22, 2010 the rig eventually sank, crumpling the pipe that connected it to the wellhead. On or about April 24, 2010 robotic subs discovered oil was leaking from the pipe inserted into the sea floor from the rig.  That pipe has since then been continuously discharging oil into the Gulf of Mexico.  Although the exact amount of the discharge is unknown, this discharge has consisted of thousands or millions of gallons of oil per day, and has occurred continuously on each day since it began, it is continuing to occur, and it will continue to occur in the future (hereinafter this is referred to as "the discharge").

Under 33 U.S.C. § 1311, the discharge of any pollutant into waters of the United States without permission under a National Pollution Discharge Elimination System ("NPDES") permit is illegal.  Thus, the Clean Water Act requires NPDES permits for all point source discharges of pollutants into waters of the United States.  The discharge described above constitutes an unauthorized discharge of pollutants from a point source into the Gulf of Mexico and ultimately to the connected bays, estuaries, wetlands and tidal waters, hence it is discharging into waters of the States of Louisiana, Mississippi, Alabama and Florida. These activities have discharged and will continue to discharge oil, as defined in 33 U.S.C. § 1321(a)(1), which is a "pollutant" under the CWA, 33 U.S.C. § 1362(6), from a point source without authorization under a NPDES permit as required by the CWA, 33 U.S.C. §§ 1311(a) and 1342.

In addition, the discharge has violated, is violating and will continue to violate effluent standards or limitations under the CWA.  Specifically, the discharge is violating the U.S. Environmental Protection Agency ("EPA") Region 6 NPDES general permit for the Western Portion of the Outer Continental Shelf of the Gulf of Mexico (No. GMG290000) for discharges from new sources, existing sources, and new dischargers in the Offshore Subcategory of the Oil and Gas Extraction Point Source Category (40 CFR Part 435, Subpart A).  BP operated pursuant to this general permit and on information and belief is a permittee under this permit, which authorizes discharges from exploration, development, and production facilities located in and discharging to Federal waters of the Gulf of Mexico seaward of the outer boundary of the territorial seas offshore of Louisiana and Texas, only in accordance with the effluent limitations, monitoring requirements, and other conditions set forth in the permit.  In accordance with the provisions of 40 C.F.R. § 122.41, *et. seq.*, the permit incorporates by reference all conditions and requirements applicable to NPDES

permits set forth in the CWA, as amended, as well as all applicable regulations. Among the requirements of 40 C.F.R. § 122.41 that have been and are being violated in this case are those pertaining to the "duty to mitigate" and "proper operation and maintenance," as defined in that subsection. In addition, the permit states that nothing in it shall be construed to preclude the institution of any legal action or to relieve the permittee from any responsibilities, liabilities, or penalties to which the permittee is or may be subject under section 311 of the Act.

The discharge violates the permit, which states in Part I section B para. 10(a) and numerous other paragraphs: "No free oil shall be discharged."  In addition, BP and/or Transocean have violated and are violating Part II section (B)(1): "The permittee is responsible for maintaining adequate safeguards to prevent the discharge of untreated or inadequately treated wastes during electrical power failure either by means of alternate power sources, standby generators or retention of inadequately treated effluent"; Part II section (B)(2): "Duty to Mitigate [ ] The permittee shall take all reasonable steps to minimize or prevent any discharge in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment"; and Part II section (B)(3): "Proper Operation and Maintenance [ ] a. The permittee shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by permittee as efficiently as possible and in a manner which will minimize upsets and discharges of excessive pollutants and will achieve compliance with the conditions of this permit. Proper operation and maintenance also includes adequate laboratory controls and appropriate quality assurance procedures. This provision requires the operation of backup or auxiliary facilities or similar systems which are installed by a permittee only when the operation is necessary to achieve compliance with the conditions of this permit."

In addition, Part II section (C)(6) provides: "Flow Measurements [ ] Appropriate flow measurement devices and methods consistent with accepted scientific practices shall be selected and used to ensure the accuracy and reliability of measurements of the volume of monitored discharges. The devices shall be installed, calibrated, and maintained to insure that the accuracy of the measurements is consistent with the accepted capability of that type of device. Devices selected shall be capable of measuring flows with a maximum deviation of less than 10% from true discharge rates throughout the range of expected discharge volumes."  According to news accounts, estimates of the flow of the discharge have varied widely over time, indicating that it has not been properly or accurately monitored.

Please be advised that the discharge does not constitute a legal upset inasmuch as the noncompliance was caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation. 40 CFR § 122.41(n)(1).  The continuing unauthorized discharge described in this letter is the result of inadequate operation and/or maintenance, including but not limited to taking all necessary actions to protect against broken pipes, a faulty blowout preventer, inadequate casing and cement, and/or other avoidable conditions that may have caused or contributed to the catastrophic well failure and discharge.

Wherefore, Sierra Club hereby gives you sixty (60) days notice, pursuant to Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), of Sierra Club's intention to file a citizen suit based on the violations identified above, under Section 505 of the Clean Water Act, 33 U.S.C. § 1365. Sierra Club will allege that BP and Transocean have violated and will continue to violate the Clean Water Act and that there is a reasonable likelihood that these violations will continue in the future. This will include all such violations, known and presently unknown, and similar violations occurring after the date of this letter. This notice letter is intended to include all unauthorized discharges of these types that may occur in the future.

Sierra Club will seek civil penalties against BP and/or Transocean up to the statutory maximum penalty of $32,500 per day per violation for each of the violations or discharges described above, as well as those which may be currently unknown and those occurring subsequently, plus costs, and attorneys' and expert witness' fees and expenses. Please note that these are strict liability offenses and fault is not required to support liability in cases such as this.

Sierra Club will also seek an order enforcing the effluent standards and limitations, including but not limited to an injunction to halt the discharge as soon as possible, and will seek all injunctive relief necessary to protect human health and prevent further harm and to restore, rehabilitate or replace the natural resources damaged or destroyed as a result of the discharge.

If you have reason to believe that your facility or any of these discharges are exempt from the requirements of the law, permit, and regulation, have complied with all such statutes, permits, and regulations, or otherwise have a defense to liability, please advise us of the specific basis for your exemption, compliance, or defense.

The undersigned is available to discuss the possibility of resolving this matter without litigation, as well as any facts you believe are incorrectly set forth in this notice letter and other relevant facts not itemized above. You may contact me at (303) 449-5595 ext. 101.

Thank you for your time and consideration in this important matter.

Very truly yours,

Eric E. Huber
Senior Staff Attorney

cc:     Lisa P. Jackson, Administrator
        U.S. Environmental Protection Agency
        Ariel Rios Building
        1200 Pennsylvania Ave. N.W.
        Washington, D.C. 20460

Al Armendariz,
EPA Region VI Regional Administrator
U.S. Environmental Protection Agency
1445 Ross Avenue
Dallas, Texas 75202

Peggy Hatch,
Secretary
Louisiana Department of Environmental Quality
602 N. Fifth Street
Baton Rouge, Louisiana 70802

CT Corporation System
5615 Corporate Blvd. Suite 400B
Baton Rouge, Louisiana 70808
(Registered agent for BP)

C.T. Corporations System
5615 Corporate Blvd. Suite 400B
Baton Rouge, Louisiana 70808
(Registered agent for Transocean Offshore Ventures Inc.)

Eric Holder, Attorney General
U.S. Dept. of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530-0001

Jim Letten
U.S. Attorney for the E.D. La.
Hale Boggs Federal Bldg.
500 Poydras St.  Suite B-210
New Orleans, LA  70130