UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | : | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | : | |
| GULF OF MEXICO, on | : | SECTION:  J |
| APRIL 20, 2010 | : | |
| | : | JUDGE BARBIER |
| **THIS DOCUMENT RELATES TO ALL** | : | MAG. JUDGE SHUSHAN |
| **COMPLAINTS IN THE "A" BUNDLE** | | |
| **CASES NAMING CAMERON AS** | | |
| **DEFENDANT, IN PARTICULAR: 10-** | | |
| **1156, 10-1196, 10-1243, 10-1502, 10-1540,** | | |
| **10-1921, 10-3066, 10-3168, 10-3169, 10-** | | |
| **3184, 10-3815, 10-4211, 10-4226, 10-4227,** | | |
| **10-4229, 10-4252, 10-4360, 10-4427, 11-** | | |
| **261, 11-262, 11-263** | | |

. .   . .   . .   . .   . .   . .   . .   . .   . .   . .   . .   . .   . .   . .   . .   . .   . .   . .   . .   . .   . .   . .

**CONSOLIDATED MEMORANDUM OF DEFENDANT CAMERON
INTERNATIONAL CORPORATION IN SUPPORT OF ITS
<u>MOTIONS TO DISMISS THE PLEADINGS IN THE "A" BUNDLE</u>**

Defendant Cameron International Corporation ("Cameron") respectfully submits

this brief in support of its motions to dismiss the pleadings in the "A" Bundle, the claims for

personal injury or death based on the events of April 20, 2010 (the "A Pleadings"), for failure to

state a claim upon which relief may be granted and/or for judgment on the pleadings.[1]

---

[1]     Many of the A Pleadings were filed in state court and removed to federal court.  The operative
pleading in those cases, therefore, can be found generally as the first attachment to the Notice of Removal
in the file.  In addition, one of the Texas state court actions includes petitions in intervention.  Because the

## SUMMARY OF ARGUMENT

1.  The Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1333(a)(1), provides that "the subsoil and seabed of the outer Continental Shelf and . . . all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom" are "area[s] of exclusive Federal jurisdiction."   This case arises from oil and gas

---

Texas cases were answered prior to removal, Cameron moves for judgment on the pleadings in those cases.

The Bundle A Pleadings making claims against Cameron are the following:

Roshto Second Amended Complaint, 10-1156
Michelle Jones First Amending Complaint, 10-1196
Williams First Amended Complaint, 10-1243
Rhodes Complaint, 10-1502
Crawford Complaint, 10-1540
Taquino Complaint, 10-1921
Murray Amended Complaint, 10-2814
Becnel Complaint, 10-3066
Petitions in Intervention in *Kleppinger* case, 10-3168
       Stone Petition in Intervention
       Choy First Amended Petition in Intervention
       Ussin Petition in Intervention
       Mansfield Petition in Intervention
       Brown First Amended Petition in Intervention
       Francis Petition in Intervention
Davis Second Amended Petition, 10-3169
Brad Jones Original Petition, 10-3184
Roberts Complaint, 10-3815
Lavergne Petition, 10-4211
Benton Petition, 10-4226
Faulk Petition, 10-4227
John Petition, 10-4229
Reed Petition, 10-4252
Morales Petition, 10-4360
Kritzer Fifth Amended Petition, 10-4427
Coon Petition, 11-261
Seriale Petition, 11-262
Trahan Petition, 11-263

In the balance of this brief, these pleadings will be referenced by name, for example "Roshto ¶ __."

development activities in the subsoil of the outer continental shelf and from events on a mobile offshore drilling unit temporarily attached to the seabed; it therefore falls within the "area of exclusive Federal jurisdiction" defined by OCSLA.

2.   Under OCSLA, the law of the adjacent state, here Louisiana, is adopted "as the law of the United States" to the extent that it is "applicable and not inconsistent" with other federal law.  43 U.S.C. § 1333(a)(2)(A).  The A Pleadings, however, do not limit their claims to Louisiana law.  They also assert claims under general maritime law and the law of states other than Louisiana.  Neither maritime law nor the law of any state other than Louisiana applies in this case.

i.   In enacting OCSLA, Congress determined that drilling rigs attached to the seabed of the outer continental shelf are "not themselves to be considered within maritime jurisdiction."  *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 365-66 (1969).  Furthermore, "exploration and development of the Continental Shelf are not themselves maritime commerce."  *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 425 (1985).  Accordingly, as the Fifth Circuit has held, activities "connected with the development of the Outer Continental Shelf and an installation for the production of resources there . . . are insufficiently connected to traditional maritime activity to support the application of admiralty law."  *Texaco Exploration and Production, Inc. v. AmClyde Engineered Products Co., Inc.*, 448 F.3d 760, 771 (5th Cir.), *cert. denied*, 549 U.S. 1053 (2006).  Thus here, as in *AmClyde*, "OCSLA does not permit the application of substantive maritime law."  *Id.* at 772.

ii.   By making the subsoil and seabed of the outer continental shelf and all appurtenant devices an area of exclusive federal jurisdiction, OCSLA explicitly preempts all

1046270v.1

3

state law other than the law of the adjacent state adopted as surrogate federal law. *Rodrigue*, 395 U.S. at 355-58.

      3.  The A Pleadings fail to state viable claims against Cameron under Louisiana law. All the claims in the A Pleadings address Cameron's role as manufacturer of the *Deepwater Horizon* blowout preventer. But Louisiana law does not recognize any theory of liability against a product manufacturer save and except those specified in the Louisiana Products Liability Act. LA. REV. STAT. §§ 2800.51-59. That statute "establishes the exclusive theories of liability for manufacturers for damage caused by their products." *Id*. § 2800.52. The A Pleadings, however, make no meaningful attempt to allege the required elements of any of the statutorily exclusive theories of product liability set out in the Louisiana Act.

## ARGUMENT

      Under OCSLA, the law of Louisiana, as surrogate federal law, governs the A Pleadings' claims against Cameron. Neither maritime law nor the law of any state other than Louisiana applies in this case. Louisiana law limits claims against product manufacturers to the specific theories of liability recognized in the Louisiana Product Liability Act. The A Pleadings fail to allege the necessary elements of product liability under that Act. Accordingly, Cameron's motions to dismiss the A Pleadings, or for judgment on the pleadings in the Bundle A cases, should be granted.

**A. This Case Falls Within The Scope of Exclusive Federal Jurisdiction Defined By OCSLA**

      OCSLA is the legislative outgrowth of executive and judicial orders and rulings affirming national sovereignty over coastal waters and the outer continental shelf. *See Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 479 n. 7 (1981). In Presidential Proclamation

1046270v.1

2667, issued on September 8, 1945, President Truman asserted the sovereignty of the United States over the natural resources of the subsoil and seabed of the entire continental shelf off the nation's coast.  To implement this proclamation, the United States brought original actions against the coastal states in the Supreme Court, now known as the Tidelands Cases, to establish the national government's authority, power, and control over the continental shelf.  *See, e.g.*, *United States v. California*, 332 U.S. 19 (1947). The states responded by asserting sovereignty over marginal belts of the shelf lying immediately seaward of their coasts, but the Supreme Court rejected these state claims.  *See Gulf Offshore*, 453 U.S. at 479 n.7 (citing cases).   In the *California* case, for example, where the state had asserted sovereignty over a marginal three-mile belt off its coast, the Supreme Court held "that the Federal Government rather than the state has paramount rights in and power over [the three-mile] belt, an incident to which is full dominion over the resources of the soil under that water area, including oil."  332 U.S. at 38-39.

In response, Congress enacted the Submerged Lands Act in 1953, in effect quitclaiming to the coastal states a three-mile marginal belt lying seaward of the coast, 43 U.S.C. § 1311 (*see* definition of covered lands in 43 U.S.C. § 1301(a)), but confirming the sovereignty of the United States and its control over resources lying seaward of the three-mile belt.  *Id*. § 1302.  In addition, Congress enacted OCSLA, declaring that "the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control and power of disposition."  43 U.S.C. § 1332(1), quoted as originally enacted in *Rodrigue*, 395 U.S. at 356 & n.2.  The "outer" continental shelf was (and still is) defined generally as the continental shelf lying seaward of the coastal states' three-mile marginal belt.  43 U.S.C. § 1331(a).

OCSLA serves "to define a body of law applicable" to oil and gas activities on the outer continental shelf. *Rodrigue*, 395 U.S. at 356. As originally enacted, the statute extended federal law to the outer continental shelf and, in particular, to oil and gas development activities from "artificial islands and fixed structures." 43 U.S.C. § 1333(a)(1). To the extent "not inconsistent with" federal law, the law of the adjacent state was adopted as surrogate federal law also applicable to those same activities. 43 U.S.C. § 1333(a)(2).

OCSLA was amended in 1978. Following those amendments, its key provisions read as follows:

> (1)    The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing or producing resources therefrom, . . . to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a state.

> (2) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary [of Interior] now in effect or hereafter adopted, the civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf, . . .

43 U.S.C. § 1333(a).

As can be seen, when OCSLA was amended in 1978 Congress clarified the description of the area of exclusive federal jurisdiction, changing the phrase "fixed structures" that had been used originally to the phrase "all installations and other devices permanently or temporarily attached to the seabed." H. CONF. REP. NO. 95-1471, 95th Cong., 2nd Sess., 1978 U.S. Code Cong. & Admin. News 1674, 1679. The congressional conferees took care to explain

1046270v.1

that this change was "technical and perfecting and is meant to restate and clarify and not change existing law."  *Id.*  In other words, the earlier phrase "fixed structures" was understood to include all "attached devices" in the context of contemporary oil and gas development on the outer continental shelf.

The 1978 legislative history explains the meaning and significance of this clarification.  "Federal law is to be applicable to all activities on all devices in contact with the seabed for exploration, development, and production."  H. CONF. REP. NO. 95-1471, 1978 U.S. Code Cong. & Admin. News at 1679.  "Federal law is, therefore, to be applicable to activities on drilling ships, semi-submersible drilling rigs, and other water-craft, when they are connected to the seabed by drillstring, pipes or other appurtenances, on the OCS for exploration, development, or production purposes."  H. REP. NO. 95-590, 95th Cong., 1st Sess., 1978 U.S. Code Cong. & Admin. News 1450, 1534.  A crucial test for applying OCSLA, therefore, is whether the activities in question involved exploration, development, or production equipment that was in contact with the seabed.

This case unquestionably passes that test.  The oil development project at the heart of this case, as this Court already has determined, is subject to federal jurisdiction by reason of OCSLA.  *See* Document # 470 (order denying State of Louisiana motion to remand). The A Pleadings are all based on an "explosion" from "drilling" or completion operations being conducted approximately 50 miles off the coast of Louisiana.[2]   The explosion and the A

---

[2] Roshto ¶ 7; *see* Michelle Jones ¶ 4; Williams ¶ 3; Rhodes ¶¶ 4, 8; Crawford ¶¶ 16, 17; Taquino ¶ 7; Murray ¶ 6; Becnel ¶¶ 5, 6, 11; Stone ¶¶ 12, 15; Choy ¶ 13; Ussin ¶¶ 18, 22; Mansfield ¶¶ 17, 21; Brown ¶¶ 17, 21; Francis ¶ 7; Davis ¶ V; Brad Jones ¶ VII; Roberts ¶¶ 4-6; Lavergne ¶¶ 7, 14; Benton ¶ VII; Faulk ¶ VII; John ¶ VII; Reed ¶¶ 6, 8, 15; Kritzer ¶¶ 27, 28; Coon ¶¶ 14, 18; Seriale ¶¶ 16, 20; Trahan ¶¶ 12, 24, 25.

1046270v.1

Plaintiffs' injuries allegedly resulted from alleged deficiencies in well control activities and equipment during those drilling and completion operations.[3]

These common allegations make manifest that the A Plaintiffs' claims are governed by OCSLA.  The Macondo oil well, a fixed structure in the subsoil, was being drilled on the outer continental shelf outside the jurisdiction of any state.  The explosion and oil discharge occurred in the course of development operations of the kind specifically identified in OCSLA, i.e., "activities which take place following discovery of minerals in paying quantities, including . . . drilling . . . and which are for the purpose of ultimately producing the minerals discovered."  43 U.S.C. § 1331(l).  The explosion is alleged to have emanated from a release of hydrocarbons from "the subsoil and seabed of the outer Continental Shelf" and is alleged to have resulted from drilling and well control activities conducted from an "artificial island" drilling rig through the use of "fixed structures," i.e., "installations and other devices attached to the seabed," all of which were "erected [on the seabed] for the purpose of . . . developing resources [from the subsoil]" as described in OCSLA.  *Id.* § 1333(a)(1), (2).  One Bundle A complaint explicitly asserts OCSLA jurisdiction.  Crawford ¶ 14.  In short, this is precisely the sort of factual situation that OCSLA is designed to cover.

**B.  Louisiana Law Governs This Case; Neither General Maritime Law Nor The Law Of Any State Other Than Louisiana Applies**

---

[3] Roshto ¶¶ 7b-7e, 12; Michelle Jones ¶¶ 7, 8, 9A, 9I; Williams ¶¶ 3, 13, 18, 23, 28, 36; Rhodes ¶¶ 8, 9D, F, I, L, 12; Crawford ¶¶ 17, 19, 21, 22, 25, 26, 28; Taquino ¶ 12, 14, 17-24; Murray ¶¶ 8, 9; Becnel ¶¶ 11-16, 18, 30, 33; Stone ¶¶ 13-15, section G; Choy ¶ 15, 16, 18, 21-26; Ussin ¶¶ 19, 20, 22, 25-30; Mansfield ¶¶ 18, 19, 21, 24-29; Brown ¶¶ 18, 19, 21, 24-29; Francis Preamble; Davis ¶¶ V-VII; Brad Jones ¶¶ VI-VIV [sic]; Shivers ¶¶ 14-31, 36-50; Roberts ¶¶ 10, 12-14; Lavergne ¶¶ 7-10, 14-16; Benton ¶ VII; Faulk ¶ VII; John ¶ VII; Reed ¶¶ 7, 8, 15-18, 22; Kritzer ¶¶ 27, 30-32; Coon ¶ 17; Seriale ¶ 19; Trahan ¶¶ 14, 25.

1046270v.1

In enacting OCSLA, Congress was aware that existing federal law was not fully comprehensive and that it would be expedient to use "state law . . . to fill federal voids." *Rodrigue*, 395 U.S. at 358.  OCSLA therefore provides that "[t]o the extent that they are applicable and not inconsistent with . . . other Federal laws . . . the civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf . . . which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf."  43 U.S.C. § 1333(a)(2).

In this case Louisiana is the pertinent "adjacent State" within the meaning of OCSLA.  Under Federal Rule of Evidence 201(b) and (d), the Court may take judicial notice from the NOAA map attached as Exhibit 1 that, in the language of 43 U.S.C. § 1333(a)(2), the Macondo well "would be within the area of [Louisiana] if its boundaries were extended seaward to the outer margin of the outer Continental Shelf."  *See Snyder Oil Co. v. Samedan Oil Co.*, 208 F.3d 521 (5th Cir. 2000).

In resolving the issues raised by the A Pleadings, therefore, the Court must look to the law of Louisiana.  Many of the A Pleadings, however, attempt to invoke general maritime law or assert claims that could be construed as implicating the law of states other than Louisiana.  Those claims are not viable.  Neither maritime law nor the law of any state other than Louisiana applies here.

## 1.  General Maritime Law Does Not Apply

It should be noted at the outset that the A Pleadings have correctly chosen not to invoke federal common law.  In providing for the adoption of the law of the adjacent state as

1046270v.1

surrogate federal law, "Congress made clear provision for filling in the 'gaps' in federal law; it did not intend that federal courts fill in those 'gaps' themselves by creating new federal common law." *Chevron Oil Co. v. Huson*, 404 U.S. 97, 104-05 (1971).  Thus there is no room here for federal common law.  General maritime law, which the A Pleadings do seek to invoke, is similarly inapplicable.

Although the lower federal courts have sometimes struggled with this issue, the Supreme Court has long made it known that OCSLA, where it applies, preempts general maritime law.  Indeed, even before OCSLA's enactment the Court "specifically held that drilling platforms are not within admiralty jurisdiction."  *Rodrigue*, 395 U.S. at 360, citing *Phoenix Construction Co. v. The Steamer Poughkeepsie,* 212 U.S 558 (1908).  With the *Phoenix* ruling before it, "Congress assumed" in enacting OCSLA "that the admiralty law would not apply unless Congress made it apply, and then Congress decided not to make it apply."  *Rodrigue*, 395 U.S. at 361.  The Supreme Court reiterated this conclusion in *Chevron v. Huson*, 404 U.S. at 101: "comprehensive admiralty law remedies [do not] apply under § 1333(a)(1)."

The decision in *Rodrigue* was based on "careful scrutiny" of OCSLA's legislative history.  395 U.S. at 363.  This history revealed that Congress, after considering at length what body of law should govern the facilities described in the statute, had concluded that "maritime law was inapposite." *Id*.  Congress chose instead to borrow the law of the adjacent state, in part because of "the close relationship between the workers on the island and the adjacent States."  *Id*.  Congress explained that the law of the adjacent state was "to be used when Federal statutes or regulations of the Secretary of the Interior are inapplicable."  *Id*. at 357-58.  Congress deemed it unnecessary even to mention maritime law in this context, for it was understood that the

exploration and production facilities identified in OCSLA "were not themselves to be considered within maritime jurisdiction." *Id*. at 366.  Following the precept that "[e]ven in admiralty . . . where the federal judiciary's lawmaking power may well be at its strongest, it is our duty to respect the will of Congress," *Northwest Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 96 (1981), the Court, ever since its decision in *Rodrigue*, has steadfastly refused to permit maritime law to encroach upon the area of exclusive federal jurisdiction defined by OCSLA.

> The accident in *Rodrigue* occurred on "fixed structures" in the nature of "artificial island drilling rigs located on the outer Continental Shelf," and the Court concluded that OCSLA "deliberately eschewed the application of admiralty principles to these novel structures."  395 U.S. at 352, 355.  The facts in *Chevron Oil* were similar.  404 U.S. at 98-99.  Both *Rodrigue* and *Chevron Oil* were decided before OCSLA was amended in 1978 to clarify that the phrase "fixed structures" refers to "all installations and other devices permanently or temporarily attached to the seabed."  But this amendment had no substantive significance; it did not open the door for the intrusion of general maritime law into the OCSLA domain.  The amendment made no change in "the operative assumption underlying the statute:  that admiralty jurisdiction generally should not be extended to accidents in areas covered by OCSLA."  *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 218 (1985).

> Furthermore, as later decisions demonstrated, the inapplicability of general maritime law stems not only from the physical connection between drilling platforms and the seabed – a connection highlighted by the statute both before and after its amendment – but also, and independently, from the non-maritime nature of the activities of "exploring for, developing,

1046270v.1

or producing resources" that lie at the heart of the area of "exclusive Federal jurisdiction" that OCSLA defines.  43 U.S.C. § 1333(a)(1).  A case in point is *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 421 (1985), where the Court explicitly disapproved the lower court's erroneous determination that "offshore drilling is maritime commerce."  The Court reiterated the reasoning of *Phoenix* ("drilling platforms [are] not even suggestive of traditional maritime affairs") and reaffirmed its earlier determination in *Rodrigue* that "exploration and development of the Continental Shelf are not themselves maritime commerce."  *Id*. at 422, 425.

The Supreme Court discussed the proper reach of maritime law outside the OCSLA context in *Sisson v. Ruby*, 497 U.S. 358 (1990), and *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995).  The availability of maritime law, the Court explained, depends on satisfying "conditions both of location and of connection with maritime activity."  *Grubart,* 513 U.S. at 534.  The requirement that both such conditions be met further emphasizes the unavailability of maritime law in cases like this.  Cases involving "devices permanently or temporarily attached to the seabed, . . . erected thereon for the purpose of exploring for, developing or producing resources," 33 U.S.C. § 1333(a)(1), do not satisfy either condition identified in *Grubart* and thus cannot implicate maritime law.  They do not satisfy the condition of location, because Congress "deliberately eschewed the application of admiralty principles to these novel structures."  *Rodrigue*, 395 U.S. at 355.  Neither do they satisfy the condition of connection with maritime activity.  That condition is met only "if the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity," *Grubart*, 513 U.S. at 534, and as the Court has repeatedly stated, "exploration and development of the Continental Shelf are not themselves maritime commerce."  *Herb's*

*Welding*, 470 U.S. at 425.  General maritime law simply does not apply in archetypal OCSLA cases such as this.

Subsequent decisions of the federal appellate courts further confirm this conclusion.  In *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990), the Fifth Circuit sought to synthesize Supreme Court precedent into a three-part test, where it looked to (1) whether the controversy arose on a situs covered by OCSLA, (2) whether maritime law applied of its own force, and (3) whether state law was consistent with federal law.  *See also Grand Isle Shipyard, Inc. v. Seacor Marine, L.L.C.*, 589 F.3d 778, 783-89 & n.9 (5th Cir. 2009) (en banc).  It is apparent that the first two parts of this test derive from the conditions of location and connection identified in *Sisson* and *Grubart*.

*PLT Engineering* itself involved the construction of a gathering line on the seabed of the outer continental shelf, an OCSLA situs.  The court understood that *Rodrigue* "precludes the application of maritime law except in those cases where the subject matter of the controversy bears [a] significant relationship to traditional maritime activities."  *Id*. at 1048, quoting *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1231 (5th Cir. 1985).  The court determined that the "significant relationship" test had not been met:

> While some maritime operations were undoubtedly contemplated, the principal obligation of PLT and the subcontractors was to build the gathering line and connect it to the platform and the transmission line. These activities are not traditionally maritime.  Rather they are the subjects of oil and gas exploration and production.

*Id*. at 1049.

The Fifth Circuit's more recent decision in *Texaco Exploration and Production, Inc. v. AmClyde Engineered Products Co.*, 448 F.3d 760 (5th Cir.), *cert. denied*, 549 U.S. 1053

1046270v.1

13

(2006), is similar.  That case involved an accident that occurred during construction of a tower for a drilling rig.  Because the accident happened on a vessel that was not itself attached to the seabed, the parties apparently assumed that maritime law governed.  The court determined, however, that it would "not rely upon the parties' bare conclusion that substantive maritime law applies because OCSLA provides its own choice of law rules."  *Id.* at 772.  The court closely analyzed the facts in light of the relevant authorities and concluded that maritime law did not apply.  With respect to location, the court noted that although the accident may have occurred on a vessel "the claims are inextricably linked to the construction of a platform permanently fixed to the Shelf for the purposes of development and would not have arisen but for such development." *Id.* at 774.  With respect to connection, the court determined that activities "connected with the development of the Outer Continental Shelf and an installation for the production of resources there . . . are insufficiently connected to traditional maritime activity to support the application of admiralty law."  Id. at 771.  In these circumstances, the court concluded that "OCSLA does not permit the application of substantive maritime law."  *Id.* at 772.  In particular, the court noted that the involvement of a vessel "in the accident and other elements of maritime activity that precede or surround the compliant tower's construction on the Shelf are insufficient to support either admiralty jurisdiction or the application of substantive maritime law."  *Id.* at 775.

        If general maritime law did not apply in *AmClyde*, and it did not, *a fortiori* it does not apply here.

        (1) The "situs requirement is met if the tort occurs on a platform or other OCSLA covered situs."  *Grand Isle*, 589 F.3d at 784.  The explosion and discharge of oil on which the A Pleadings' claims are based, unlike the accident in *AmClyde*, occurred at a situs explicitly

1046270v.1

identified in OCSLA.  The *Deepwater Horizon* indisputably was attached to the subsoil and seabed "through drilling mechanisms."  *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 (5th Cir. 2002).  The release of explosive hydrocarbons proceeded from the Macondo well located in the subsoil.

(2) It also is plain that general maritime law does not apply here of its own force. The Macondo well tragedy occurred in the course of activities – oil and gas exploration and production – that have repeatedly been held to have an insufficient relationship to traditional maritime activity to permit the application of maritime law.  *See, e.g., Herb's Welding*, 470 U.S. at 421; *Rodrigue*, 395 U.S. at 425; *PLT Engineering*, 895 F.2d at 1049.  The facts here do not satisfy either, let alone both, of the *Grubart* and *PLT Engineering* conditions of location and of connection with maritime activity.  To the extent that the A Pleadings rely on general maritime law, therefore, they have failed to state a claim against Cameron for which relief can be granted.

To be sure, *Grubart* recognized that the condition of connection with maritime activity has a second component – "whether the incident has a potentially disruptive impact on maritime commerce," 513 U.S. at 534 – that was arguably met in this case.  But that cannot change the result here, for three independent reasons.  *First*, the fundamental meaning of *Rodrigue* is that OCSLA has identified and carved out a domain in which maritime law has no application; Congress determined that structures attached to the seabed for the purpose of exploration and development, "though surrounded by the high seas, were not themselves to be considered within the maritime jurisdiction."  395 U.S. at 365-66.  *Second*, disruption of maritime commerce is only suggestive, not determinative, of maritime jurisdiction; for example, the negligent demolition of a bridge during highway construction may disrupt navigation but

1046270v.1

15

nonetheless raise no issue of maritime law.  In determining whether maritime law can apply of its own force, the core inquiry is whether the activity in question had a "substantial relationship" with "traditional maritime activity."  *Sisson*, 497 U.S. at 365.  That inquiry here must be answered in the negative.  *See, e.g., Herb's Welding*, 470 U.S. at 422 ("drilling platforms [are] not even suggestive of traditional maritime affairs").  *Third*, where maritime commerce is disrupted by a discharge of oil into or upon navigable waters, Congress has chosen a different, non-maritime, means of resolving any controversy arising from that disruption; the "very specific treatment of oil pollution in the [Oil Pollution Act of 1990 ("OPA"), 33 U.S.C.A. §§ 2701-20] . . . supplanted general admiralty and maritime law."  *South Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65-66 (1st Cir. 2000) ("Congress intended the OPA to be the exclusive law governing oil spills").  *Accord, Gabarick v. Laurin Maritime (America) Inc.*, 623 F.Supp.2d 741, 746 (E.D. La. 2009); *Clausen v. M/V New Carissa*, 171 F.Supp.2d 1127, 1133 (D. Or. 2001); *Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp*, 924 F.Supp. 1436, 1447 (E.D. Va.), *aff'd w/o published opinion*, 122 F.3d 1064 (4th Cir. 1997), *cert. denied*, 523 U.S. 1021 (1998).

In short, this is not a maritime case.  The A Pleadings' effort to invoke general maritime law simply cannot "be reconciled with the operative assumption underlying the statute: that admiralty jurisdiction generally should not be extended to accidents in areas covered by OCSLA."  *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 218 (1986).

### 2.  The Laws Of States Other Than Louisiana Do Not Apply

The A Plaintiffs may not invoke any state law other than that of Louisiana.  Oil and gas development on the outer continental shelf is subject to exclusive federal jurisdiction

1046270v.1

under OCSLA, and federal law alone (including the law of the adjacent state borrowed as surrogate federal law) governs claims arising from the discharge of oil from the subsoil and seabed of the outer continental shelf and the installations and structures thereon.  43 U.S.C. § 1333(a); *Gulf Offshore Co. v. Mobil Oil Corp*, 453 U.S. 473, 480-81(1981); *Chevron v. Huson*, 404 U.S. at 101-05; *Rodrigue*, 395 U.S. at 355 ("federal law is 'exclusive," so that "state law is adopted only as surrogate federal law").  OCSLA leaves no room in this case for application of state law as such.

Similarly, it is well settled that OCSLA "supersede[s] the normal choice of law rules that the forum would apply."  *Gulf Offshore*, 453 U.S. at 482 n.8, citing *Chevron v. Huson*, 404 U.S. 97 at 102-03.  Choice of law is governed by OCSLA, and its choice of law provision calls only for the application of the law of the adjacent state borrowed as surrogate federal law; OCSLA does not permit the application or borrowing of the law of any other state.  43 U.S.C. § 1333(a)(2).

## C. The A Plaintiffs Have Not Asserted Claims Against Cameron For Which Relief Can Be Granted Under Louisiana Law

None of the A Pleadings makes allegations sufficient to state a valid claim against Cameron under Louisiana law.

### 1. Negligence and Other Claims Not Based on the Louisiana Product Liability Act Cannot Be Sustained

To the extent that they give any factual basis for naming Cameron as a defendant, the A Pleadings seek to impose liability on Cameron in its capacity as manufacturer of the

*Deepwater Horizon* blowout preventer.[4]   But Louisiana law does not subject product manufacturers to liability on the grounds the A Plaintiffs have generally chosen to assert.  The Louisiana Products Liability Act provides that "[t]his Chapter establishes the exclusive theories of liability for manufacturers for damage caused by their products."  LA. REV. STAT. § 2800.52. The Act further enjoins that "[a] claimant may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability that is not set forth in this Chapter." *Id.*

Some A Plaintiffs purport to invoke the Louisiana Act,[5] but their pleadings make no attempt to satisfy the Act's requirements.  The Act does not set forth any theory of liability sounding in negligence, the theory routinely advanced in the A Pleadings.[6]  Nor does the Act permit recovery under the separate terms of the Texas products liability statute, which is invoked by some A Plaintiffs.[7]  To the contrary, under applicable Louisiana law, the A Plaintiffs "may not recover from" Cameron under any theory of liability other than a product liability theory authorized by the Louisiana Act itself.  To the extent that the A Pleadings assert claims for negligence or gross negligence or for product liability under other law, without reference to the specific requirements of the Louisiana Act, they are unavailing and must be dismissed.  *Stahl v.*

---

[4] Roshto ¶ 7d; Michelle Jones ¶ 8; Williams ¶ 22; Rhodes ¶ 12; Crawford ¶ 19; Taquino ¶ 14; Murray ¶ 12; Becnel ¶ 12; Stone section G4; Choy ¶ 25; Ussin ¶ 29; Mansfield ¶ 28; Brown ¶ 28; Davis ¶ VI; Brad Jones ¶ VIII; Shivers ¶¶ 41-42; Roberts ¶ 12; Lavergne ¶ 9; Benton ¶ VII; Faulk ¶ VII; John ¶ VII; Reed ¶ 16; Kritzer ¶ 30; Coon ¶ 17; Seriale ¶ 19; Trahan ¶ 14.

[5] Michelle Jones ¶ 11; Crawford ¶ 19; Becnel ¶ 12; Reed ¶ 16.
[6] Roshto ¶ 15; Michelle Jones ¶ 11; Williams ¶ 22; Rhodes ¶ 9; Crawford ¶ 19; Taquino ¶ 30; Murray ¶ 9; Becnel ¶ 12; Stone section G4; Choy ¶ 25; Ussin ¶ 29; Mansfield ¶ 28; Brown ¶ 28; Davis ¶ VI; Brad Jones ¶ VIV [sic]; Roberts ¶ 12; Lavergne ¶ 16; Benton ¶ VII; Faulk ¶ VII; John ¶ VII; Reed ¶ 16; Kritzer ¶ 32; Coon ¶ 19; Seriale ¶ 21; Trahan ¶ 26.
[7] Brad Jones ¶ VIII; Benton ¶ VII; Faulk ¶ VII; John ¶ VII.

1046270v.1

18

*Novartis Pharmaceuticals Corp.,* 283 F.3d 254, 260 (5th Cir. 2002) (noting district court's dismissal of negligence claims); *In re Air Bag Products Liability Litigation*, 7 F. Supp.2d 792, 802 (E.D. La. 1998) (dismissing Louisiana tort claims not based on Louisiana Act).

 2.   The A Pleadings Fundamentally Fail to Allege an Actionable Product Defect
       Under the Louisiana Act

The A Pleadings that do allege more than negligence still allege nothing more than a product "defect" or that the BOP was "defectively" designed or manufactured, based at best on the bare notion that the BOP somehow failed to operate to prevent the explosion.[8] Notably, others (including the Plaintiffs' Steering Committee) allege that the BOP failed to operate only "after" or "upon" the explosion.[9]

Under the Louisiana Act, however, absent unique circumstances not alleged by any A1 Complaint, a product defect is actionable only if it existed "**at the time the product left its manufacturer's control**." LA. REV. STAT. §§ 2800.55, 2800.56 (emphasis added). Because the A Plaintiffs make no attempt to allege, even in conclusory fashion, that the blowout preventer was defective when it left Cameron's control (an event that occurred some ten years before the *Deepwater Horizon* explosion and spill), the A Pleadings fail to state a viable claim for product defect under the Louisiana Act.

 3.   The A Pleadings Fail to Allege the Necessary Elements of a Claim Under Any
       Provision of the Louisiana Act

---

[8] Roshto ¶ 7d; Michelle Jones ¶ 11; Williams ¶ 22; Taquino ¶ 27; Murray ¶ 12; Stone section G4; Choy ¶ 25; Ussin ¶ 29; Mansfield ¶ 28; Brown ¶ 28; Davis ¶ VI; Brad Jones ¶ VII; Roberts ¶ 12; Lavergne ¶ 16; Benton ¶ VII; Faulk ¶ VII; John ¶ VII; Reed ¶ 16; Kritzer ¶ 30; Coon ¶ 17; Seriale ¶ 19; Trahan ¶¶ 29-31.
[9] Crawford ¶ 19; Becnel ¶ 12; *see* B1 Master Complaint (Document 1128) ¶ 410 (the BOP would have contained the blowout "had the gas on the drilling vessel not exploded"). No A Pleading alleges any fact showing that the BOP failed to work before the explosion. No A Pleading alleges any fact showing that Cameron was responsible for any failure of the BOP to work on the day of the explosion.

1046270v.1

This fundamental flaw in the A Pleadings is not the sole reason under the Louisiana Act that those pleadings fail to state a claim upon which relief can be granted.  The Louisiana Act does recognize product liability claims based on four defined theories. LA. REV. STAT. §§ 2800.55-58.  However, under subsection 2800.54.D. of the Act, plaintiffs bear the burden of showing that, with respect to any such theory, "a characteristic of the product" is "unreasonably dangerous" as set out respectively in sections 2800.55, 2800.56, 2800.57, and 2800.58 of the Act.  *Jefferson v. Lead Indus. Ass'n*, 930 F. Supp. 241, 244-45 (E.D. La. 1996). The A Pleadings do not make sufficient allegations to carry that burden in any respect.  For this independent reason, therefore, the A Pleadings fail to state a claim against Cameron under Louisiana law for which relief can be granted.

    a.   *Construction or Composition*

Under section 2800.55, a claimant may obtain relief for damages caused by a product that was "unreasonably dangerous in construction or composition," but only "if at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer."  *Broussard v. Procter Gamble Co.*, 463 F. Supp.2d 596, 610 (W.D. La. 2006).  The A Pleadings do not allege that the BOP deviated at all, let alone in any material way, from Cameron's specifications or performance standards. Indeed, not one addresses Cameron's specifications or performance standards in any respect.

Even if the A Pleadings had recited all the elements of the "construction or composition" theory of liability under section 2800.55, that allegation would not have sufficed under the Federal Rules to state a claim under that section and survive dismissal.  *Ashcroft v.*

1046270v.1

20

*Iqbal*, 129 S. Ct. 1937, 1948 (2009), quoting *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 500 (2007) ("A pleading that offers 'labels and conclusions' or a formulaic recitation of the elements of a cause of action will not do.'")  No A Pleading goes even that far, however, because no A Pleading alleges, in conclusory fashion or otherwise, certain of the key elements of the cause of action for unreasonably dangerous construction under section 2800.55.  Therefore, even under the most liberal standard applicable to 12(b)(6) dismissal, the A Pleadings fall woefully short of making the allegations required by the Federal Rules to show that any A Plaintiff is entitled to relief against Cameron for construction or composition of the BOP under section 2800.55 of the Louisiana Act.  *See Broussard,* 463 F. Supp.2d at 610.

> b.   *Design*

Under section 2800.56, a claimant may obtain relief for damages caused by a product that was "unreasonably dangerous in design," but only "if at the time the product left its manufacturer's control," (1) there was "an alternative design for the product that was capable of preventing the claimant's damage" and (2) the "likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product."  *Morgan v. Gaylord Container Corp.*, 30 F.3d 586, 590 (5th Cir. 1994).  No A Pleading alleges any alternative design of the BOP that would have prevented the injurious explosion.  Nor does any A Pleading make any allegations purporting to weigh the likelihood of damage against the potential burden and lack of utility of alternative designs.  The A Pleadings thus fail to allege a design defect actionable under the Louisiana Act.  *See Morgan*, 30 F.3d at 590-91; *Broussard*, 463 F. Supp.2d at 610-11.

c.   *Warning*

Under section 2800.57, a claimant may obtain relief for damages caused by a product that is "[u]nreasonably dangerous because of inadequate warning," but only if the product contained a potentially damaging "characteristic" about which the manufacturer did not provide a warning.  *Stahl*, 283 F.3d at 261.  Subsection B(2) of this section, moreover, provides that a "manufacturer is not required to provide an adequate warning about his product when" the "user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic." *Morgan*, 30 F.3d at 591. No A Pleading identifies any dangerous characteristic of the BOP; no A Pleading alleges both that Cameron did not warn about such a characteristic and that the users of the BOP did not know or could not have been reasonably expected to know about the characteristic.  To the contrary, one A Pleading (as does the B1 Master Complaint) alleges that BP and Transocean were fully aware of alleged vulnerabilities in the BOP used by the *Deepwater Horizon*.[10]  No A Pleading alleges any fact to the contrary.  Once again, therefore, the A Pleadings fail to make sufficiently specific allegations, as required by the Federal Rules, to show that any A Plaintiff is entitled to relief against Cameron for inadequate warning under section 2800.57 of the Louisiana Act.  *See Morgan*, 30 F.3d at 591-92.

d.   *Express Warranty*

Under section 2800.58 of the Louisiana Act, a claimant may obtain relief for damage caused by breach of an express product warranty.  Even though the terms and conditions

---

[10] Crawford ¶¶ 20, 42, 53; *see also* Murray ¶ 12 (all Defendants knew or should have known of equipment defects); B1 Master Complaint (Document 1128) ¶¶ 435-38 (detailed allegations that BP and Transocean knew or should have known about BOP vulnerabilities).

of the sale of Cameron equipment have been a matter of public record, no A Pleading alleges the content of any express warranty issued by Cameron.  Consequently, no A Pleading makes any factual allegation that the BOP violated any such express warranty.  The A Pleadings, therefore, fail to state a claim upon which relief may be granted under section 2800.58 of the Louisiana Act.  *See Broussard*, 463 F. Supp.2d at 611.

## CONCLUSION

The Bundle "A" pleadings should be dismissed as to Cameron for failure to state a claim upon which relief can be granted.

Respectfully submitted,

David J. Beck, T.A.
    dbeck@brsfirm.com
Joe W. Redden, Jr.
    jredden@brsfirm.com
David W. Jones
    djones@brsfirm.com
Geoffrey Gannaway
    ggannaway@brsfirm.com

BECK, REDDEN & SECREST, L.L.P.
One Houston Center
1221 Mckinney, Suite 4500
Houston, TX  77010-2010
713-951-3700
713-951-3720 (fax)

Howard L. Murphy, 9844
    hmurphy@dkslaw.com
DEUTSCH, KERRIGAN & STILES
755 Magazine Street
New Orleans, Louisiana 70130
504-581-5141
504-566-4039

/s/ Phillip A. Wittmann
Phillip A. Wittmann, 13625
    pwittman@stonepigman.com
Carmelite S. Bertaut, 3054
    cbertaut@stonepigman.com
Keith B. Hall, 24444
    khall@stonepigman.com
Jared Davidson, 32419
    jdavidson@stonepigman.com

STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
504-581-3200
504-581-3361 (fax)

**ATTORNEYS FOR CAMERON
INTERNATIONAL CORPORATION**

1046270v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Consolidated Memorandum of Defendant Cameron International Corporation in Support of its Motion to Dismiss the Pleadings in the "A" Bundle has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 11th day of February, 2011.


*/s/ Phillip A. Wittmann*

1046270v.1