However, if an Appraisal Operation is being conducted at the occurrence of either (a) or (b) above, Appraisal Operations for the ensuing Development Phase shall conclude when the well bore in which the Appraisal Operation is being conducted is either temporarily or permanently abandoned.

**11.6    Operations Before the Approval of the Development Plan**

After the occurrence of (a), (b), or (c) in Article 11.5 *(Conclusion of Appraisal Operations)* but before the approval of a Development Plan for the ensuing Development Phase, any Party may propose the drilling of an additional well as a Development Well.  Unless Article 16.4 *(Non-Consent Operations to Maintain Contract Area)* applies to the proposal of that well, that proposal shall require the unanimous agreement of the Parties.  Any substitute well for, and all operations at Objective Depth conducted in or through the well bore of that well shall be deemed Development Operations and shall be proposed, approved, and conducted accordingly.

# ARTICLE 12 – DEVELOPMENT PHASES

**12.1    Phased Development**

In view of the Costs and scope of developing and producing Hydrocarbons from the Contract Area, the Parties may agree to undertake an initial Development Phase and one or more subsequent Development Phases.  A separate Development Plan shall be prepared for each Development Phase, and each Development Plan shall be generated, approved, and implemented under this Article 12 *(Development Phases)*.  Each Development Phase may be comprised of as many as four stages – the Feasibility Stage, the Selection Stage, the Define Stage, and the Execution Stage.  For each stage undertaken, subject to the provisions of this Article 12 *(Development Phases)*, any Party may submit a proposal and an associated AFE for the Parties' approval.  Each stage AFE shall cover all of the estimated Costs to be incurred during that stage, except for the Costs of drilling Wells, including those of the Feasibility Team or Project Team.

**12.2    Feasibility Team Proposal**

The Feasibility Stage commences upon the approval of a proposal for the formation of a Feasibility Team and the Feasibility AFE.  No Party may propose the formation of a Feasibility Team for a Development Phase until such time as

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001676

any previously formed Feasibility Team for that Development Phase has terminated.  For a period of three hundred sixty (360) days from completion of the first appraisal well provided that the well reaches its objective depth, the Operator has the exclusive right to propose the formation of a Feasibility Team and submit to the Parties a Feasibility AFE accompanied by a memorandum describing in detail the anticipated scope of work to be undertaken by the Feasibility Team and third party contractors and/or consultants during the Feasibility Stage, the estimated type and number of staff required to complete that scope of work, the estimated duration of the Feasibility Stage, and the estimated Costs of the Feasibility Stage.  If the Operator does not propose the formation of a Feasibility Team and submit the Feasibility AFE during its exclusive period, any Party may propose the formation of a Feasibility Team and submit a Feasibility AFE.

The Feasibility Team will operate under the direction of the Operator.  The employees of the Operator and Non-Operators and the contractors and/or consultants, set forth in the Feasibility AFE, shall initially compose the Feasibility Team.  The Operator may, from time to time, revise the membership of the Feasibility Team, at its sole discretion, as long as the revisions are necessary to accomplish the scope of work set forth in the Feasibility AFE.  The Operator shall charge the Joint Account for the labor of the Feasibility Team members in the same manner in which it charges the Joint Account for the labor of the Project Team members.

Each Feasibility Team member remains an employee of its respective employer, and each employer remains responsible for its employee's salaries and benefits, as well as maintaining worker's compensation insurance for its employee. Accordingly, each employer will continue to administer the compensation, benefits, allowances, and careers of its employees on the Feasibility Team. However, Feasibility Team members will receive team assignments and general supervision from the Operator in connection with their day-to-day work.  An individual on a Feasibility Team will, insofar as it is possible and consistent with the needs of his or her employer, serve on the Feasibility Team for the duration of the Feasibility Team, unless that individual is designated a temporary Feasibility Team member by his or her employer or the Operator.  If a Feasibility

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001677

Team member is designated a temporary Feasibility Team member by his or her employer or the Operator, that Feasibility Team member will leave the Feasibility Team upon completion of (a) the term designated by his or her employer for his or her service on the team or (b) the specific task or portion of the Feasibility Team's work assigned to that member by the Operator.

The Feasibility Team shall prepare an in-depth report containing its analyses of all of the development scenarios it considered and its findings as to the existence of at least one development scenario for a Producible Well on the Contract Area, which is technologically and economically feasible, and shall present a copy of that report to each of the Participating Parties as soon as it is completed.

### 12.2.1 Feasibility AFE Approval

A Feasibility AFE requires approval by Election.

A Non-Participating Party in the Feasibility AFE is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, or Enhanced Recovery Project Team AFEs).*

### 12.2.2 Feasibility Team and Feasibility Stage Conclusion

The Feasibility Team and the Feasibility Stage terminate immediately after (a) the Feasibility Team has (i) completed the scope of work in the Feasibility AFE and its supplemental AFEs and (ii) presented to the Participating Parties the report referred to in Article 12.2 *(Feasibility Team Proposal)* or (b) the Participating Parties Vote to terminate the Feasibility Team prior to the occurrence of both of those events.

## 12.3 Commencement of the Selection Stage

The Selection Stage commences upon the approval of the Selection AFE.

### 12.3.1 Proposal of a Project Team

If a Feasibility AFE is approved, the Operator has the exclusive right for a period of one hundred eighty (180) days from the conclusion of the Feasibility Stage to submit a Selection AFE. That AFE may call for the

68

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001678

formation of a Project Team.   It shall be accompanied by a memorandum describing in detail the anticipated scope of work to be undertaken during the Selection Stage, the estimated type and number of staff required to complete that scope of work, the estimated duration of the Selection Stage, and the estimated Costs of the Selection Stage. If the Operator does not submit a Selection AFE during its exclusive period referred to in this paragraph, any Party may submit a Selection AFE.

If a Feasibility AFE is not approved, but the drilling of one Appraisal Well into a Producible Reservoir and its permanent or temporary abandonment have taken place, the Operator has an exclusive right for a period of three hundred sixty (360) days from the conclusion of those operations to submit the Selection AFE.   If the Operator does not submit a Selection AFE during its exclusive period referred to in this paragraph, any Party may submit a Selection AFE.  In response to any proposal made under this paragraph, a Party may propose the formation of a Feasibility Team and submit to the Parties a Feasibility AFE.   A Feasibility AFE and Feasibility Team proposal under this paragraph shall take precedence over a Selection AFE proposal under this paragraph, and the Parties shall proceed as if the Feasibility AFE and Feasibility Team proposal, made under this paragraph, had been made under Article 12.2 *(Feasibility Team Proposal).*  If the Feasibility AFE and Feasibility Team proposal made under this paragraph is approved, the Participating Parties shall proceed with the Feasibility Team scope of work as if the Selection AFE proposal had not been made.  If the Parties do not approve the Feasibility AFE and Feasibility Team proposal made under this paragraph, the Parties shall proceed with the Selection AFE proposal made under this paragraph as if the Feasibility AFE and Feasibility Team proposal, made under this paragraph, had not been made.

If the Selection AFE proposes the formation of a Project Team, the formation and administration of that Project Team shall be handled under Exhibit "G."

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001679

The Operator shall directly charge the Joint Account for all Costs associated with the Project Team, including those of Affiliates, for which the Operator is internally billed.  The components of those Costs may include, but are not limited to:

a)   Digital Business

b)   Accounting

c)   Building Services and Building and Grounds Maintenance

d)   Human Resources

e)   Procurement

f)   Government and Public Affairs

g)   Health, Safety, and Environment

h)   Security

i)   Audit

j)   Tax

k)   Crisis Management

l)   Environmental Compliance

m)  Security

All other Project Team Costs shall be handled under Exhibit "C."

Non operator has the right to audit certain Affiliate charges except specific costs included in the Affiliate rate per hour for Affiliate personnel.

No Party may propose the formation of a Project Team for a Development Phase until such time as a previously formed Project Team for that Development Phase has terminated.

70

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001680

**12.3.2** **Selection AFE Approval**

A Selection AFE requires approval by Election.

A Non-Participating Party in a Selection AFE is subject to Article 16.5.3 (*Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, or Enhanced Recovery Project Team AFEs*).

**12.4** **Proposal of a Development Plan**

The Operator has the exclusive right for a period of one hundred eighty (180) days from the commencement of the Selection Stage to submit a Development Plan for the Parties' review and approval.

**12.4.1** **Content of the Development Plan**

A Development Plan shall contain at a minimum the following information:

(a) **Development System**:   Description of the Development System including:

> (i)   the type of Production System proposed, for example, tension leg well jacket, floating production system, including the Production System's location, configuration (number of well slots or subsea tiebacks), and production capacity;

> (ii)   the Facilities and their daily processing capacity for Hydrocarbon production and the gathering system necessary to transport the Hydrocarbons from the well heads to the interconnect with the pipeline or offtake point servicing the Contract Area;

> (iii)   a projected time schedule for designing, contracting, fabricating, constructing, or otherwise acquiring, transporting, and installing the Development System;

> (iv)   the estimated date of initial Hydrocarbon production and the estimated initial daily rate of Hydrocarbon production;

71

CONFIDENTIAL

APC-HEC1-000001681

ACCESS RESTRICTED

(v)     the estimated Costs (not in the form of an AFE) of the Development System;

(vi)    all proposed hydrate or paraffin control systems or techniques, method of pressure maintenance, or enhanced recovery plan;

(vii)   a description of the proposed well completion techniques, that is, dual versus single; and

(viii)  The equipment and space on, and the weight and the buoyancy of, the Development System, which are required to make the enhanced recovery and pressure maintenance plans and objectives referred to in Article 12.4.1(j)(iii)(D) possible;

(b)  **Producible Reservoirs:**  A description of the Hydrocarbon-bearing geological formations expected to be developed under the Development Plan along with the area and depth of sands or reservoirs to be developed by the Production System;

(c)  **Recoverable Reserves and Production Profile:** An estimate of recoverable reserves for the proposed Development Plan and a schedule of the estimated daily rate of Hydrocarbon production thereafter;

(d)  **Pre-drilling Operations:**  A description of pre-drilling operations, if any, planned in support of later development, including an estimate of the timing, Cost, and location of each pre-drilling operation;

(e)  **Development Wells:**  A description of drilling plans for all Development Wells in the Development Plan and the completion plans for all temporarily abandoned Exploratory Wells or temporarily abandoned Appraisal Wells that are to be completed and all Development Wells in the Development Plan, including an estimate of the timing, Cost, and surface and bottomhole location of each well;

72

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001682

(f)   **Tieback Operations:**   If the Development Plan requires the tieback or use of Offsite Host Facilities, a commitment from the owner of that Offsite Host Facilities to handle or process Hydrocarbons, the amount of all tariffs, processing or other fees the owner of that Offsite Host Facilities will charge the Participating Parties to handle or process Hydrocarbons, and the guaranteed capacity on the Offsite Host Facilities for the Hydrocarbons;

(g)   **Define AFE:**   An AFE containing the estimated Costs of the Define Stage, accompanied by a memorandum describing in detail the anticipated scope of work to be undertaken during the Define Stage, the estimated type and number of staff required to complete that scope of work, the estimated duration of the Define Stage, and the estimated Costs of the Define Stage; if a Project Team was not formed during the Selection Stage, or if the scope of work of an existing Project Team is to be extended beyond its Selection Stage scope of work, the proposing Party may submit, along with the Define AFE, a proposal for the formation (or extension, as the case may be) of a Project Team accompanied by a memorandum similar to the one referred to in Article 12.3.1 *(Proposal of a Project Team)*;

(h)   **Field Operating Scheme:**   A description of the field operating scheme, its method, requirements, expected frequencies of intervention, and Costs;

(i)   **Field Abandonment:** A description of field abandonment plan (if applicable);

(j)   **Reservoir Plan:**   A reservoir plan that provides strategies, objectives, and methods for developing, managing, and depleting each Producible Reservoir during its producible life and that includes, but is not limited to:

   (i)   an estimate of the number of wells slots dedicated to each reservoir, including the planned number of producers and injectors;

73

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001683

(ii)    the planned bottomhole locations and timing of each anticipated well for each Producible Reservoir;

(iii)    a reservoir management and depletion strategy for each Producible Reservoir addressing issues that include, but are not limited to:

    (A)    estimates of oil and gas in place;

    (B)    reservoir rock and fluid characteristics;

    (C)    depletion mechanism;

    (D)    enhanced recovery and pressure maintenance plans and objectives;

    (E)    reservoir surveillance programs (for example, cased-hole logging, static pressures) and their objectives;

    (F)    well performance goals (for example, target production rates, target injection rates, maximum rates or drawdown limits, maximum GOR, maximum water cut, gas-lift targets);

    (G)    reservoir performance goals (for example, target pressures or pressure profiles, target voidage replacement ratios, gas cap maintenance goals); and

    (H)    other relevant information;

(k)    **Disposal Wells:**    The estimated Cost of disposal wells, if applicable;

(l)    **Hydrocarbon Transmission System:**    The type of Hydrocarbon transmission system to be made available to the Participating Parties (for example, pipeline versus barge); and

(m)    **Other Data:**    Provided such information is available, any other information reasonably necessary to perform an evaluation of the

74

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001684

technical and economic feasibility of the Development System provided for in the Development Plan.

### 12.5    Development Plan Approval

#### 12.5.1    Approval of Operator's Development Plan Submitted During its Exclusive Period

The Operator has one hundred twenty (120) days from the initial submittal of a Development Plan proposal to obtain the unanimous agreement of the Parties on (a) the Development Plan submitted during its exclusive period or (b) the latest amended version of that plan which has been the result of comments by, or discussions among, the other Parties or the Project Team, if one exists, and the Operator (the "Latest Amended Version of the Plan").

#### 12.5.2    Approval of a Development Plan After the Conclusion of the Operator's Exclusive Period

If:

(a)    the Operator fails within the one hundred twenty (120) day period in Article 12.5.1 (*Approval of Operator's Development Plan Submitted During its Exclusive Period*) to gain the unanimous agreement of the Parties on its Development Plan or Latest Amended Version of the Plan, whichever is applicable, or

(b)    the Operator fails to submit a Development Plan during its exclusive period,

any Party may submit a Development Plan and an AFE for the actual Costs it incurred in order to generate that Development Plan, and the Parties have sixty (60) days from such submittal in which to approve by Vote the Operator's Development Plan or Latest Amended Version of the Plan, whichever is applicable, or another Party's Development Plan or Latest Amended Version of the Plan, whichever is applicable, and its associated AFE. Unless otherwise unanimously agreed by the Parties, no new Development Plan may be submitted during the sixty (60) day period.

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001685

### 12.5.3   Approval of a Development Plan if One is Not Approved by Vote

If no Development Plan or Latest Amended Version of the Plan is approved by Vote during the sixty (60) day period in Article 12.5.2 *(Approval of a Development Plan After the Conclusion of the Operator's Exclusive Period)*, and if there is only one Development Plan or Latest Amended Version of the Plan, whichever is applicable, submitted and that Development Plan or the Latest Amended Version of the Plan, whichever is applicable, receives an affirmative Vote of at least fifty percent (50%) of the Voting interest, that Development Plan or the Latest Amended Version of the Plan, whichever is applicable, shall be deemed approved by the Parties.   If there are two (2) or more Development Plans or Latest Amended Version of the Plans, whichever is applicable, submitted and one Development Plan or the Latest Amended Version of the Plan, whichever is applicable, receives an affirmative Vote of at least fifty percent (50%) of the Voting interest and the other Development Plan or Latest Amended Version of the Plan, whichever is applicable, receives an affirmative Vote of less than fifty percent (50%) of the Voting interest, then the Development Plan or the Latest Amended Version of the Plan, whichever is applicable, receiving the affirmative Vote of at least fifty-one percent (51%) of the Voting interest shall be deemed approved by the Parties.   If two competing Development Plans or Latest Amended Version of the Plans, whichever is applicable, each receive an affirmative Vote of fifty percent (50%) of the Voting interest, then the Development Plan or Latest Amended Version of the Plan, whichever is applicable, for which the Operator affirmatively Votes, shall be deemed approved.

### 12.5.4   Approved Development Plan

By unanimously agreeing or Voting to approve a Development Plan or Latest Amended Version of the Plan, whichever is applicable, or subsequently Voting to Participate in an approved Development Plan, under Article 8.3 *(Second Opportunity to Participate)*, each Participating Party in an approved Development Plan also agrees or Votes to participate in its Define AFE, the AFE referred to Article 12.5.2 *(Approval of a Development Plan After the Conclusion of the Operator's Exclusive Period)*, if applicable, and the formation of a Project Team during the Define Stage, if applicable.   If the Parties do not approve a Selection

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001686

AFE and do not form a Project Team during the Selection Stage and if the Operator's Development Plan or Latest Amended Version of the Plan, whichever is applicable, is approved, the Operator shall directly charge the Joint Account the actual Costs it incurred in order to generate and submit the approved plan. Upon the approval of the Development Plan or Latest Amended Version of the Plan, whichever is applicable, the Selection Stage concludes and Appraisal Operations are deemed concluded; provided, however, if an Appraisal Operation is being conducted when the Development Plan is approved, Appraisal Operations shall be deemed concluded when the well bore in which the Appraisal Operation is being conducted is either temporarily or permanently abandoned. Any Non-Participating Party in the approved Development Plan's Define AFE is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, or Enhanced Recovery Project Team AFEs)*.

**12.6**   **Long Lead Development System AFEs**

After commencement of the Define Stage, in order to facilitate the early and orderly commencement of the Execution Stage, the Operator has the right, prior to the approval of the Execution AFE, to submit AFEs ("Long Lead Development System AFEs") for (a) the acquisition of long lead-time items for the Development System, (b) preliminary activities related to the fabrication, transportation or installation of the Development System, or (c) any other activity necessary to assist the Operator in the implementation of the Development Plan. A Long Lead Development System AFE, whose total estimated Cost when combined with the estimated Cost of all approved Long Lead Development System AFEs, does not exceed one hundred million dollars ($100,000,000.00), requires approval by Vote of the Participating Parties in the Development Plan. A Long Lead Development System AFE, whose total estimated Cost when combined with the estimated Cost of all approved Long Lead Development System AFEs equals or exceeds one hundred million dollars ($100,000,000.00), requires approval by the unanimous agreement of the Participating Parties in the Development Plan. Any Non-Participating Party in a Long Lead Development System AFE is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead*

77

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001687

*Development System AFEs, Post-Production Project Team AFEs, or Enhanced Recovery Project Team AFEs).*

**12.7    Define Stage and Execution Stage**

The Define Stage commences upon the approval of the Development Plan.

**12.7.1    Execution AFE**

The Operator has an exclusive period of one hundred eighty (180) days from the commencement of the Define Stage to submit an Execution AFE, which conforms with the Development Plan approved during the Selection Stage to all Parties for approval by Election. The Execution AFE shall not include any Cost estimates or AFEs for Development Wells. If the Operator does not submit the Execution AFE during its exclusive period, any Party may submit an Execution AFE, which conforms with the approved Development Plan, and an AFE for the actual Costs it has incurred to generate the Execution AFE. If a Project Team was not formed during the Selection Stage or the Define Stage, the proposing Party may submit as a part of the Execution AFE a proposal for the formation of a Project Team accompanied by a memorandum similar to the one referred to in Article 12.3.1 *(Proposal of a Project Team).*

**12.7.2    Approval of an Execution AFE and Commencement of the Execution Stage**

By Electing to participate in an Execution AFE, each Participating Party in an approved Execution AFE also Elects to participate in (a) the AFE for the actual Costs incurred by the proposing Party in order to generate the approved Execution AFE, referred to in Article 12.7.1 *(Execution AFE),* if applicable, and (b) the formation of a Project Team during the Execution Stage, if applicable. If the actual Costs the Operator has incurred to generate an Execution AFE are not recovered as part of a Project Team's Costs and if the Operator's Execution AFE is approved, the Operator shall directly charge the Joint Account the actual Costs it incurred in order to generate and submit the Execution AFE. The Define Stage concludes and the Execution Stage commences upon the approval of the Execution AFE. A Non-

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001688

Participating Party in the Execution AFE for the initial Development System is subject to Article 16.2 *(Acreage Forfeiture Provisions)*.

### 12.7.3 Minor Modifications to Development Plans

In implementing a Development Plan, the Operator shall advise the Participating Parties of its own progress and that of the Project Team, if one exists. As additional information becomes available, the Operator may, prior to the installation of the Development System, make minor modifications to the Development Plan without the approval of the Participating Parties if those minor modifications are both reasonable and prudent. For purposes of this paragraph, a minor modification is

(a)   a modification, which (i) is proposed prior to the commencement of the Execution Stage and does not cause the estimated Cost of the Define AFE to increase by more than twenty percent (20%) and (ii) is not a major modification as defined in Article 12.7.4 *(Major Modifications to Development Plans)*; or

(b)   a modification that is necessary for health, safety, or environmental reasons or regulatory requirements and does not exceed twenty percent (20%) of the dollar amount provided in 12.7.3(a), even if that modification constitutes a major modification as defined in Article 12.7.4 *(Major Modifications to Development Plans)*.

The "estimated Cost of the Execution AFE" is the total dollar amount of the Execution AFE and all approved Long Lead Development System AFEs. If the Operator exercises its discretionary right to make a minor modification for health, safety, or environmental reasons or regulatory requirements, the Operator shall give each Participating Party in the Development Plan written notice of that fact. A minor modification shall not materially change the risk or timing of the Development Plan and is binding on all the Participating Parties in the Development Plan.

### 12.7.4 Major Modifications to Development Plans

A major modification shall be deemed to have occurred when:

79

CONFIDENTIAL                                         APC-HEC1-000001689

ACCESS RESTRICTED

(a)  the type of Production System, for example, tension leg well jacket floating production system, is to be changed; or

(b)  the number of well slots of the Production System is to be changed by at least twenty-five percent (25%); or

(c)  the type of Hydrocarbon transmission system is changed (for example, pipeline versus barge); or

(d)  the initial daily production processing capacity of the Facilities is to be changed by at least twenty-five percent (25%); or

(e)  the number of Development Wells is to be increased or decreased by at least twenty percent (20%); or

(f)  in the case of a tieback to an Offsite Host Facility or a pre-existing Development System, the gathering and pipeline system necessary to transport the Hydrocarbons from the wellheads to an Offsite Host Facility or a pre-existing Development System, as provided in the Development Plan, is to be changed.

**12.7.5    Major Modifications to Development Plans Prior to the Approval of the Execution AFE**

Whenever a major modification to a Development Plan is proposed during the Define Stage (prior to the approval of the Execution AFE), the Operator shall furnish the Participating Parties in the Development Plan with the proposed modification to the Development Plan (and associated AFEs).  That major modification shall require approval by unanimous agreement of the Participating Parties in the Development Plan.  If that major modification is approved, the Operator shall immediately provide the modified Development Plan (and associated AFEs) to each Non-Participating Party in the Development Plan.  That Non-Participating Party has the right for a period of ninety (90) days, after receipt of the modified Development Plan (and associated AFEs), in which to notify the Operator in writing that it will participate in the modified Development Plan (and associated AFEs).  If that Non-Participating Party participates in the modified Development Plan, it shall be an Underinvested Party in an amount equal to its Non-

80

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001690

Participating Interest Share of the actual Costs incurred on activities associated with the original Development Plan (and associated AFEs).

**12.7.6** **Major Modifications to Development Plans After the Approval of the Execution AFE**

Whenever a major modification to a Development Plan is proposed during the Execution Stage (after the approval of an Execution AFE) and prior to the installation of the Development System, the Operator shall furnish the Participating Parties in the Execution AFE with the proposed modification to the Development Plan (and associated AFEs). That major modification shall require unanimous agreement of the Participating Parties in the Execution AFE. If that major modification is as provided in Article 12.7.4, and is approved, the Operator shall immediately provide the modified Development Plan (and associated AFEs) to each Non-Participating Party in the Execution AFE. For a period of thirty (30) days after receipt of the modified Development Plan (and associated AFEs), the Non-Participating Party may notify the Operator in writing that it will participate in the modified Development Plan (and associated AFEs). If that Non-Participating Party participates in the modified Development Plan, it shall be an Underinvested Party in an amount equal to its Non-Participating Interest Share of the actual Costs incurred on activities associated with (a) the Execution AFE and (b) the original Development Plan (and associated AFEs) if it did not participate in that Development Plan. Within thirty (30) days of the elimination of the Underinvestment, the Participating Parties in the Execution AFE for the initial Development Phase shall deliver to that Non-Participating Party an assignment of one hundred percent (100%) of its former Working Interest in the Contract Area, the wells therein and production therefrom. If the Execution AFE was for a Subsequent Development Phase, the Non-Participating Party shall not be subject to Article 16.2 (Acreage Forfeiture Provisions) in regard to that AFE.

**12.7.7** **Approval of Major Modifications**

If the major modification of the Development Plan is approved, the Development Plan (and associated AFEs) shall be deemed modified, and the Operator shall carry out the modified Development Plan. If a major modification is not approved, the Operator shall continue to

81

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001691

implement the Development Plan as it was before the proposed major modification.

### 12.7.8   Termination of a Development Plan

A Development Plan terminates if (a) the Execution AFE for that Development Plan (or any supplemental AFE thereto) is not approved by Election, (b) the Participating Parties in the Define Stage or in the Execution AFE unanimously agree to terminate the Development Plan, or (c) the fabrication or acquisition of the Development System is not commenced within the time frame provided in Article 12.7.9 *(Timely Operations for Development Systems)*.

#### 12.7.8.1   Termination Prior to Execution AFE Approval

The Costs, risks, and liabilities of generating and implementing a Development Plan that is terminated before its associated Execution AFE has been approved by Election shall be borne by the Parties who participated in the Define AFE and its supplemental AFEs, if any.

#### 12.7.8.2   Termination After Execution AFE Approval

The Costs, risks, and liabilities of generating and implementing a Development Plan that is terminated after its associated Execution AFE has been approved by Election shall be borne by the Participating Parties in the Execution AFE and its supplemental AFEs, if any.

### 12.7.9   Timely Operations for Development Systems

The Operator shall commence or cause to be commenced the fabrication or acquisition of a Development System (a) within one hundred eighty (180) days after the end of the period for Elections of the Execution AFE or (b) ninety (90) days prior to the date the Operator is required to commence that fabrication or acquisition under an SOP or Unit Plan, whichever is earlier.  If the Operator, except for failure attributable to Force Majeure, fails to commence the fabrication or acquisition of a Development System within the applicable time period set forth above in this Article 12.7.9, the Non-Operating Parties may then select a successor Operator under Article 4.5 *(Selection of Successor Operator)*.  Within ninety (90) days of the selection of the

82

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001692

successor Operator, the successor Operator shall commence the fabrication or acquisition of a Development System in the approved Development Plan.  The fabrication or acquisition of a Development System commences on the date the first major fabrication contract for the Development System is awarded or the date the purchase contract for a Development System is executed.

**12.8**   **Post-Production Project Team AFEs**

The Execution Stage concludes upon the first production of Hydrocarbons from the Development System.  At least sixty (60) days, but not more than one hundred twenty (120) days, prior to the first production of Hydrocarbons from the Development System, the Operator may propose for approval by Vote of the continuance of the Project Team, if one exists, on such smaller scale, which is reasonable considering the scope of the work involved or the formation of the Project Team, if one does not exist, in order to assist the Operator in the drilling of additional Development Wells approved by the Parties, de-bottlenecking the Development System, ramping up Hydrocarbon production, maximizing the recovery of Hydrocarbons during the Development Phase and activities related thereto.  With its proposal, the Operator shall include an initial Post-Production Project Team AFE accompanied by a memorandum similar to the one described in Article 12.3.1 *(Proposal of Project Team)*.

At least forty-five (45) days, but not more than ninety (90) days, prior to the date on which the Operator anticipates the scope of work set forth in its original proposal for the continuance or formation of the Project Team and its associated AFE and memorandum to be completed, the Operator may propose for approval by Vote of the Parties the further continuance of the Project Team to assist the Operator in reservoir management and production optimizing activities other than contemplated under Article 12.11 *(Enhanced Recovery and/or Pressure Maintenance Program Proposals)*.  With that proposal, the Operator shall include a second Post-Production Project Team AFE accompanied by a memorandum similar to the one described in Article 12.3.1 *(Proposal of Project Team)*.  The administration of the Project Team during the period that it carries out the scope of work referred to in this Article 12.8 shall be handled under Exhibit "G."  The Costs of the Project Team will be handled as they are under Article 12.3.1 *(Proposal of Project Team)*.  A Non-Participating Party in either or both of the two Post-Production Project Team AFEs is subject to Article 16.5.3 *(Non-Consent*

83

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001693

*Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, or Enhanced Recovery Project Team AFEs).*

**12.9    Subsequent Development Phases**

At any time after the installation of the initial Development System for the initial Development Phase, any Participating Party may propose a subsequent Development Phase and the installation of a subsequent Development System. That proposal shall require approval by Vote except as provided in Article 16.4 *(Non-Consent Operations to Maintain Contract Area).*

**12.9.1    Proposal of a Subsequent Development Phase**

If a subsequent Development Phase is approved, the procedures specified in this Article 12 *(Development Phases)* shall apply to the proposal of the subsequent Development Phase.

**12.9.2    Execution AFE in a Subsequent Development Phase**

Each Non-Participating Party in an Execution AFE for a subsequent Development Phase is subject to the non-consent provisions in Article 16.5.5 *(Non-Consent Subsequent Development System and Additional Facilities),* not Article 16.2 *(Acreage Forfeiture Provisions).* Although a Non-Participating Party in an Execution AFE for a subsequent Development Phase will retain its Working Interest in the Contract Area, that Party will only be entitled to Hydrocarbon production from the subsequent Development Phase, in which it did not participate, after it has satisfied the non-consent provisions in Article 16.5.5 *(Non-Consent Subsequent Development System and Additional Facilities).* A Non-Participating Party in a subsequent Development Phase shall not unreasonably interfere with any activities or operations in that subsequent Development Phase. In all events, the Participating Parties in the Execution AFE for a subsequent Development Phase shall control the sequence of, and shall conduct, all activities and operations in that subsequent Development Phase.

**12.10   Access to Existing Facilities**

A Participating Party in a subsequent Development Phase may propose to access the Facilities installed for a previous Development Phase in accordance with Article 14 *(Facilities and Gathering Systems).* The proposal shall require

84

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001694

approval by Vote of the Participating Parties in the previous Development Phase and shall include the basic terms under which the access is to be granted. If the proposal is approved, it shall be incorporated into a formal "Facilities Use and Production Handling Agreement" and shall bind all Parties.

**12.11**     **Enhanced Recovery and/or Pressure Maintenance Program Proposals**

Any Party may propose the formation of a Project Team separate and apart from any Project Team already in existence for the purpose of assisting the Operator in designing an enhanced recovery and/or pressure maintenance program for a particular Development Phase by submitting to the Parties for approval by Election an Enhanced Recovery Project Team AFE accompanied by a memorandum similar to the one described in Article 12.3.1 *(Proposal of Project Team)*. Any Non-Participating Party in that Enhanced Recovery Project Team AFE is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, or Enhanced Recovery Project Team AFEs)*. The formation and administration of a Project Team for an enhanced recovery and/or pressure maintenance program will be handled under Exhibit "G." The Costs of the Project Team will be handled as they are under Article 12.3.1 *(Proposal of Project Team)*. After the Operator has designed the enhanced recovery and/or pressure maintenance program with the assistance of that Project Team, the Operator may submit an enhanced recovery and/or pressure maintenance program proposal and AFE to the Parties for approval by Vote. The program proposal and AFE shall contain sufficient detail to allow the Parties to adequately evaluate the scope, timing, Costs, and benefits of the proposed program and AFE. If approved, that proposal and AFE will be binding on all of the Participating Parties in the Execution AFE for that Development Phase, and the Operator shall commence the program at the Cost and risk of those Parties.

## ARTICLE 13 – DEVELOPMENT OPERATIONS

**13.1   Proposal of Development Wells and Development Operations**

It is the intent of the Parties to proceed with the development of the Contract Area under an approved Development Plan. Each Development Well shall be

85

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001695

subject to a separate AFE unless a Development Plan calls for a number of Development Wells to be drilled together in order to set conductor casing or to be pre-drilled together prior to the installation of the Development System, in which case those wells may be included in a single AFE.

Once a Development Well has been completed and placed on production, the Participating Parties in that well must unanimously agree to allow any Party to conduct a Non-Consent Operation in that well, unless that well becomes incapable of producing in paying quantities.  A proposal to conduct Development Operations in a Producible Reservoir requires the unanimous agreement of the Parties, unless the proposing Party designates the Producible Reservoir as an Objective Depth or completion zone in the proposal.

### 13.1.1   Proposal of Development Wells Included in a Development Plan

Subject to Article 13.1 *(Proposal of Development Wells and Development Operations)*, any Participating Party in a Development Plan and Execution AFE may propose drilling a Development Well that was included in the Development Plan by giving notice of the proposal (along with the associated AFE and Well Plan) to the other Parties. Each proposed Development Well that was included in the Development Plan requires approval by Election.   Each Non-Participating Party in a Development Well will be subject to either acreage forfeiture or Hydrocarbon Recoupment as provided in Article 16 *(Non-Consent Operations)*.

#### 13.1.1.1  Revision of Well Plan

Unless otherwise provided for in the Development Well proposal and AFE, any revisions of the Well Plan or AFE for a Development Well shall take place under the same terms and conditions as those set forth for an Exploratory Well in Article 10.1.1 *(Revision of Well Plan)*.

#### 13.1.1.2  Automatic Revision of the Well Plan

The Well Plan for a Development Well shall automatically be revised under the same terms and conditions as those set forth for an Exploratory Well in Article 10.1.2 *(Automatic Revision of the Well Plan)*.

86

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001696

### 13.1.2 Proposal of Development Operations Not Included in a Development Plan

Subject to Article 13.1 *(Proposal of Development Wells and Development Operations)*, any Participating Party in an Execution AFE may propose drilling a Development Well that was not included in the Development Plan associated with that Execution AFE by giving notice of the proposal (along with the associated AFE and Well Plan) to the other Parties. The proposal shall specify that the well was not included in the Development Plan. Each proposed Development Well that was not included in the Development Plan requires approval by Vote. Each Non-Participating Party in a Development Well will be subject to either acreage forfeiture or Hydrocarbon Recoupment, as provided in Article 16 *(Non-Consent Operations)*.

### 13.1.3 Timely Operations

Except as provided below, drilling operations on a Development Well shall be commenced within one hundred twenty (120) days after the end of the period for the approval of the Development Well. If the Operator, except for an occurrence of Force Majeure, does not commence drilling operations on the Development Well within that one hundred twenty (120) day period, the approved Development Well proposal shall be deemed withdrawn, with the effect as if the Development Well had never been proposed and approved.

If a Party submits an identical Development Well proposal (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the Operator) within sixty (60) days after the deemed withdrawal of the approved original Development Well proposal and if that identical Development Well proposal is approved and if the Operator is a Participating Party in the identical Development Well proposal, the Operator shall commence drilling operations on that well within ninety (90) days after the end of the response period for that proposal. If the Operator, except for an occurrence of Force Majeure (excluding the inability to secure materials or a drilling rig), fails to commence drilling operations on the identical Development Well within that ninety (90) day period, the approved identical Development Well proposal shall be deemed withdrawn, with the effect as if the identical

87

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001697

Development Well proposal had never been proposed and approved, and the Non-Operating Parties may then select a substitute Operator under Article 4.2.2 *(Substitute Operator if Operator Fails to Commence Drilling Operations)*.   Within sixty (60) days of the selection of the substitute Operator, the substitute Operator shall propose the drilling of an identical Development Well (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the substitute Operator), and it shall commence drilling operations on that well within ninety (90) days after the end of the period for the approval of that Well.

If a Party submits an identical Development Well proposal (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the Operator) within sixty (60) days after the deemed withdrawal of the approved original Development Well proposal and if that identical Development Well proposal is approved and if the Operator is not a Participating Party in the identical Development Well proposal, the approved identical Development Well proposal shall be deemed withdrawn, with the effect as if the identical Development Well proposal had never been proposed and approved, and the Non-Operating Parties may then select a substitute Operator under Article 4.2.1 *(Substitute Operator if Operator is a Non-Participating Party)*. Within sixty (60) days of the selection of the substitute Operator, the substitute Operator shall propose the drilling of an identical Development Well (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the substitute Operator), and it shall commence drilling operations on that well within ninety (90) days after the end of the period for the approval of that Well.

If an approved original or identical Development Well proposal is deemed withdrawn due to a failure to timely commence drilling operations on that well, all Costs incurred, which are attributable to the preparation for, or in furtherance of, that Development Well, will be chargeable to the Participating Parties.   Drilling operations for a Development Well under this Article 13.1.3 shall be deemed to have commenced on the date the rig arrives on location or, if the rig is

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001698

already on location, the date when actual drilling operations for the approved Development Well are undertaken.

**13.1.4**   <u>AFE Overruns and Substitute Well</u>

Once a Development Well is commenced, the Operator shall drill the well with due diligence to its Objective Depth, subject to:

(a)   all supplemental AFEs required under Article 6.2.2 *(Supplemental AFEs)*,

(b)   the Operator encountering mechanical difficulties, excessive temperature, uncontrolled influx of subsurface water, loss of well control, abnormal well or formation pressures, pressured or heaving shale, granite or other practicably impenetrable substances, or other similar conditions in the well bore or damage to the well bore that render, in the Operator's sole opinion, further well operations impractical, and

(c)   the unanimous agreement of the Participating Parties to cease drilling a Development Well before reaching Objective Depth.

If a Development Well is abandoned due to the conditions described under Article 13.1.4(b), then any Participating Party in the abandoned Development Well may, within thirty (30) days after abandonment of that Development Well, propose the drilling of a substitute well for the abandoned Development Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Participating Parties in the abandoned Development Well, and that proposal requires approval by Election of the Participating Parties in the abandoned Development Well. The Well Plan for the substitute Development Well shall be substantially the same as the abandoned Development Well's Well Plan and shall also take into account those conditions that rendered further drilling of the abandoned Development Well impractical.

Each Non-Participating Party in a substitute Development Well or an approved supplemental AFE for a Development Well will be subject to

89

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001699

either an acreage forfeiture or Hydrocarbon Recoupment, as provided in Article 16 *(Non-Consent Operations)*.

**13.2   Development Operations at Objective Depth**

After a Development Well has been drilled to its Objective Depth, all operations in the controlling AFE have been conducted or terminated (except temporary abandonment and permanent plugging and abandonment), and all logs and test results have been distributed to the Participating Parties, the Operator shall promptly notify the Parties entitled to make an Election on an operation proposed under this Article 13.2, of its proposal to conduct subsequent operations in the well.   Except for a proposal to permanently plug and abandon the well, the Operator's proposal shall include an associated AFE and a plan for the operation.   The Parties entitled to make an Election under this Article 13.2 are:

(a)   the Participating Parties, and

(b)   the Non-Participating Parties in the original well proposal, if (1) the subsequent Development Operation proposal is made at the well's Objective Depth and is for a Sidetrack or Deepening and (2) Article 16.4 *(Non-Consent Operations to Maintain Contract Area)* was not applicable to the drilling of that Development Well.

The Operator's proposal shall be for one of the following operations:

(a)   conduct Additional Testing, Sidewall Coring, or Logging of the formations encountered prior to setting production casing;

(b)   complete the well at the Objective Depth in the objective zone or formation;

(c)   Sidetrack the well;

(d)   plug back the well and attempt a completion in a shallower zone or formation;

(e)   Deepen the well to a new Objective Depth;

(f)   conduct other operations on the well not listed;

(g)   temporarily abandon the well; or

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001700

(h)    permanently plug and abandon the well.

If the Operator fails to submit its proposal to the Participating Parties within twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) after receipt of all logs and test results from a Development Well, then any Participating Party may make a proposal.  In that event, the procedures in this Article 13.2 *(Development Operations at Objective Depth)* shall apply to that proposal, and any reference in this Article 13.2 to the "Operator's proposal" shall include a proposal made by a Participating Party.

### 13.2.1   Response to Operator's Proposal

A Participating Party may, within twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) of its receipt of the Operator's proposal, make a separate proposal (along with an associated AFE and a plan for the operation), except if the proposal is to permanently plug and abandon the well) for one of the operations in Article 13.2 *(Development Operations at Objective Depth)*, and the Operator, immediately after the expiration of the twenty-four (24) hour period for making a separate proposal shall provide the Parties entitled to make an Election with a copy of all separate proposals so made.  If no separate proposal is made, the Parties entitled to make an Election shall, within forty-eight (48) hours (inclusive of Saturdays, Sundays, and federal holidays) of its receipt of the Operator's proposal, make an Election on the Operator's proposal (except for a proposal to permanently plug and abandon).  If a separate proposal is made, the Parties entitled to make an Election shall make an Election under the procedure in Article 13.2.2 *(Response to Highest Priority Proposal)*.  If a proposal to permanently plug and abandon the well is the only operation proposed, then the approval and Cost allocation provisions of Article 13.5 *(Permanent Plugging and Abandonment and Cost Allocation)* shall apply to the proposal. If Article 8.3 *(Second Opportunity to Participate)* or Article 8.4 *(Participation by Fewer Than All Parties)*, or both, apply to an Election, then the response period in those articles shall be twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) instead of forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays). Notwithstanding any contrary provision of this Agreement, if one or

91

CONFIDENTIAL

APC-HEC1-000001701

ACCESS RESTRICTED

more operations are proposed before the distribution of information from the previous approved operation, then the response periods provided above shall not begin until the Parties entitled to make an Election in Article 13.2 *(Development Operations at Objective Depth)* have received the information from the previous approved operation.

**13.2.2** **Response to Highest Priority Proposal**

If a separate proposal is made, each Party entitled to make an Election shall, within twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) after its receipt from the Operator of a complete copy of all separate proposals, make its Election on the highest priority proposal (except a proposal to permanently plug and abandon the well). Article 13.2(a) has the highest priority, and Article 13.2(h) has the lowest priority. If different depths or locations are proposed for the same type of operation, priority shall be given to the deepest depth.

If the proposal with the highest priority is approved, then the lower priority proposals shall be deemed withdrawn. Once the approved operation is completed, the Parties shall follow the procedure provided in this Article 13.2 *(Development Operations at Objective Depth)* for all other proposals for operations in the well bore until such time as the well is temporarily abandoned or permanently abandoned.

**13.2.3** **Response on Next Highest Priority Proposal**

If the proposal with the highest priority is not approved, then the next highest priority proposal shall be deemed the highest priority proposal, and it shall be subject to the approval procedure in Article 13.2.2 *(Response to Highest Priority Proposal)*. This process will continue until a proposal is approved to complete the Development Well, temporarily plug and abandon the Development Well, or permanently plug and abandon a Development Well.

**13.2.4** **Non-Participating Parties in Development Operations at Objective Depth**

A Non-Participating Party in a Development Operation conducted on a Development Well after it has reached its Objective Depth [except as provided for in this Article 13.2 *(Development Operations at Objective Depth)*] is subject to Article 16.5.4 *(Non-Consent Development*

92

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001702

*Operations)* and is relieved of the Costs and risks of that Development Operation, except that a Non-Participating Party in that Development Operation remains responsible for its Participating Interest Share of the Costs of plugging and abandoning a Development Well, less and except all Costs of plugging and abandoning associated solely with the subsequent Development Operation in which it was a Non-Participating Party.

**13.2.5** **Participation in a Sidetrack or Deepening by a Non-Participating Party in a Development Well at Initial Objective Depth**

If a Development Well is drilled to its Objective Depth and a Non-Participating Party in that Development Well becomes a Participating Party in an approved Sidetracking or Deepening under Article 13.2 (c) or (e), that former Non-Participating Party shall become an Underinvested Party in an amount equal to its Non-Participating Interest Share of the Costs of that Development Well to its Objective Depth prior to that Sidetracking or Deepening.  The original Participating Parties in a Development Well are Overinvested Parties in that amount.  A former Non-Participating Party in a Development Well that becomes a Participating Party in an approved Sidetracking or Deepening remains a Non-Participating Party in that Development Well to initial Objective Depth until (a) its Underinvestment is eliminated under Article 16.9 *(Settlement of Underinvestments)* and (b) the Hydrocarbon Recoupment recoverable under Article 16.5.4 *(Non-Consent Development Operations)* less the Underinvestment, has been recovered by the original Participating Parties. If a former Non-Participating Party becomes a Participating Party in more than one approved Sidetracking or Deepening in the same Development Well, that former Non-Participating Party shall become an Underinvested Party only with regard to the first Sidetracking or Deepening it approves; however, that Underinvestment shall not be relieved by an Underinvested Party's subsequent participation.

**13.3** **Development Well Proposals That Include Drilling Below the Deepest Producible Reservoir**

Any Party may propose a Development Well with an Objective Depth below the Deepest Producible Reservoir, and in response to that well proposal each Party

93

APC-HEC1-000001703

may, in writing, limit its participation in the drilling of that Development Well to the base of the Deepest Producible Reservoir to be penetrated by that Development Well. A Party who limits its participation in a Development Well to the base of the Deepest Producible Reservoir shall bear its Participating Interest Share of the Cost and risk of drilling that Development Well to the base of the Deepest Producible Reservoir (including abandonment), and it shall be a Non-Participating Party for the Deeper Drilling and shall be subject to Article 16.5.4 (*Non-Consent Development Operations*) in regard to the Deeper Drilling.

### 13.3.1   Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir

If a Party Electing to limit its participation in a well to the base of the Deepest Producible Reservoir to be penetrated by the well under Article 11.3 (*Appraisal Well Proposals That Include Drilling Below the Deepest Producible Reservoir*) or Article 13.3 (*Development Well Proposals That Include Drilling Below the Deepest Producible Reservoir*) considers the well to be capable of producing at or above the Deepest Producible Reservoir and has notified the Participating Parties down to Objective Depth of its desire to complete the well at or above the Deepest Producible Reservoir, the well will be drilled subject to the following provisions:

(a)   **Multiple Completion:** If before drilling of the well commences, all Participating Parties in the well agree that multiple well completions are possible and practicable and that those completions will involve (i) a completion at or above the Deepest Producible Reservoir and (ii) a completion below the Deepest Producible Reservoir, the Participating Parties in the Deeper Drilling will bear one hundred percent (100%) of the Costs of drilling the well to an Objective Depth below the Deepest Producible Reservoir that are in excess of the original Costs to drill and complete the well in the Deepest Producible Reservoir.

(b)   **Single Completions:** If prior to the commencement of the drilling of the well, the Participating Parties do not unanimously agree that multiple well completions are possible, then the first completion shall be at the objective deeper than the Deepest

94

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001704

Producible Reservoir. A Non-Participating Party in the Deeper Drilling is an Overinvested Party in the well in an amount equal to its Participating Interest Share of the Costs of drilling the well to the Deepest Producible Reservoir, and the Participating Parties in the Deeper Drilling on the well are Underinvested Parties for that amount upon the first of the following events to occur:

(i)   the well is not a Producible Well at a depth deeper than the Deepest Producible Reservoir and the well is plugged back to a zone at or above the Deepest Producible Reservoir;

(ii)  the well is completed as a Producible Well at a depth deeper than Deepest Producible Reservoir, but Hydrocarbon production from that depth is later depleted prior to Complete Recoupment (in regard to Deeper Drilling) and the well is plugged back to a zone at or above the Deepest Producible Reservoir;

(iii) the well is completed as a Producible Well at a depth deeper than the Deepest Producible Reservoir and the Participating Parties have achieved Complete Recoupment (in regard to the Deeper Drilling) from Hydrocarbon production from a zone deeper than the Deepest Producible Reservoir;

(iv)  the well is plugged and abandoned prior to an attempted completion at or above the Deepest Producible Reservoir.

The Underinvestment will be depreciated at the rate of one half of one percent (0.5%) per month from the date the Deeper Drilling commences to the date the Non-Participating Party is entitled to share in the Hydrocarbon production from zones deeper than Deepest Producible Reservoir, but that depreciation will not reduce the Underinvestment below seventy-five percent (75%) of the original Underinvestment.

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001705

### 13.3.2   Completion Attempts At or Above the Deepest Producible Reservoir

If a Development Well in which Deeper Drilling is conducted is not completed for production below the Deepest Producible Reservoir, then the Participating Parties in that well down to the Deepest Producible Reservoir may use the well for completion in a zone at or above the Deepest Producible Reservoir. The Parties who paid their proportionate share of the drilling Costs to the base of the Deepest Producible Reservoir under Article 13.3 *(Development Well Proposals That Include Drilling Below the Deepest Producible Reservoir)* may participate in the completion attempt in the zone at or above the Deepest Producible Reservoir.  The Participating Parties in the Deeper Drilling operation shall bear the Costs (including plugging back Costs) necessary to place the well in proper condition for its completion in the zone at or above the Deepest Producible Reservoir.  If a well drilled below the Deepest Producible Reservoir is damaged to the extent that it is rendered incapable of being completed and produced at or above the Deepest Producible Reservoir, the Participating Parties in the Deeper Drilling are obligated to reimburse the Non-Participating Parties in the Deeper Drilling for their Participating Interest Share of the Costs of drilling the well to the base of the Deepest Producible Reservoir.

### 13.4   Recompletions and Workovers

Any of the Participating Parties in the subsequent Development Operation, Recompletion, or Workover that resulted in the most recent Hydrocarbon production from a Development Well may propose a Recompletion in or Workover of that Development Well.  Each Recompletion or Workover, including the permanent plugging and abandonment of a Producible Reservoir, requires approval by Vote of those Participating Parties.  A Non-Participating Party in a Recompletion or Workover is subject to Article 16.5.4 *(Non-Consent Development Operations)* and is relieved of the Costs and risks of the Recompletion or Workover but remains responsible for its Participating Interest Share of the Costs of plugging and abandoning the Development Well, less and except any Costs of plugging and abandoning associated solely with a Recompletion or Workover in which it is a Non-Participating Party.

96

CONFIDENTIAL

ACCESS RESTRICTED

**13.5   Permanent Plugging and Abandonment and Cost Allocation**

The permanent plugging and abandonment of a Development Well that:

(a)   is to be plugged due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth under Article 13.1.4 (b),

(b)   is to be plugged under Article 13.2 (*Development Operations at Objective Depth*), or

(c)   has been previously temporarily abandoned under Article 13.2 (*Development Operations at Objective Depth*)

and has not produced Hydrocarbons (other than as a result of Production Testing), requires the approval of the Participating Parties by Vote. Approval to plug and abandon a Development Well that has produced Hydrocarbons (other than as a result of Production Testing) shall be governed by Article 18.1 (*Abandonment of Wells*). If a proposal to plug and abandon a Development Well receives approval by Vote, the approved proposal binds all Parties. If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon a Development Well, that Participating Party shall be deemed to have approved the plugging and abandonment of that Development Well. If a rig is on location and a proposal to plug and abandon a Development Well under either Article 13.5 (a) or 13.5 (b) does not receive approval by Vote, and if within twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) after receipt of that proposal no other operation is proposed (and subsequently approved) for the well by a Party entitled to make a proposal, the Operator may nevertheless proceed to plug and abandon the Development Well, and shall give each Participating Party notice of that fact. If the proposal to plug and abandon a Development Well that has not produced Hydrocarbons (other than as a result of Production Testing) does not receive approval by Vote, but the Operator deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nevertheless proceed to plug and abandon that Development Well and shall give each Participating Party notice of that fact.

The Participating Parties in a Development Well proposal shall pay all Costs of plugging and abandoning that Development Well, except all increased plugging

97

CONFIDENTIAL

APC-HEC1-000001707

ACCESS RESTRICTED

and abandoning Costs associated solely with a Non-Consent Operation approved under Article 13.2 *(Development Operations at Objective Depth)* or Article 6.2.2 *(Supplemental AFEs)*.   The Participating Parties in that Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to that Non-Consent Operation.

## ARTICLE 14 – FACILITIES AND GATHERING SYSTEMS

### 14.1   Facilities as a Part of Development Plan

The Development Plan shall provide for the installation of all Facilities necessary to handle or service Hydrocarbons produced pursuant to that Development Plan. If the approved Development Plan provides that Hydrocarbon production can most efficiently be processed and handled by Offsite Host Facilities, the Development Plan shall provide for a Development System designed to use Offsite Host Facilities.

### 14.2   Use of Offsite Host Facilities

In the event the approved Development Plan provides that Hydrocarbon production can most efficiently be processed and handled by Offsite Host Facilities, the Participating Parties shall use reasonable efforts to secure a formal "Facilities Use and Production Handling Agreement" from the owners of the Offsite Host Facilities under the terms submitted to the Parties by the Operator under Article 12.4.1 (f) *(Tieback Operations)*, but no Participating Party shall have a duty (fiduciary or otherwise) to secure capacity in the Offsite Host Facilities on behalf of any other Participating Party.   However, any capacity secured by that "Facilities Use and Production Handling Agreement" to Offsite Host Facilities shall be shared proportionately by the Participating Parties, who executed the "Facilities Use and Production Handling Agreement," on the basis of their Participating Interest Share in the Development System, unless those Parties agree to a different proportionate share of the capacity.   This Agreement shall govern all operations and activities regarding Hydrocarbon production, which are not specifically addressed in the "Facilities Use and Production Handling Agreement."   This Article 14.2 shall not constitute a limit on a Party's right to install its own facilities under Article 15 *(Disposition of Hydrocarbon Production)*.

98

CONFIDENTIAL

APC-HEC1-000001708

ACCESS RESTRICTED

**14.3   Use of Development Systems**

The Participating Parties in a Development System have priority access to and utilization of the Facilities associated with the Development System in order to operate and develop the Contract Area under an approved Development Plan.

**14.4   Processing Priorities**

The Participating Parties in a Development System jointly own all processing and handling capacity associated with that Development System. The use of excess processing or handling capacity in that Development System is subject to the following priority of usage:

(a)   First priority to Hydrocarbon production from the Development Phase during which the existing processing Facilities were fabricated and installed;

(b)   Second priority to Hydrocarbon production from a Development Phase during which the existing processing Facilities were not fabricated and installed;

(c)   Third priority to hydrocarbon production from outside the Contract Area that is owned one hundred percent (100%) by all Participating Parties in the Development System in the same percentage as their ownership in that Development System;

(d)   Fourth priority to hydrocarbon production from outside the Contract Area that is owned one hundred percent (100%) by all of the Participating Parties in the Development System but not in the same percentage as their ownership in the Development System;

(e)   Fifth priority to hydrocarbon production from outside the Contract Area that is owned by all Participating Parties in the Development System and a third party;

(f)   Sixth priority to hydrocarbon production from outside the Contract Area that is owned by one or more Participating Parties in the Development System, but not by all of them, and a third party; and

(g)   Seventh priority to hydrocarbon production from outside the Contract Area that is owned one hundred percent (100%) by a third party.

99

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001709

Any hydrocarbon production processing and handling capacity offered to parties under (d), (e), (f), and (g) of this Article 14.4 shall be processed and handled under a "Facilities Use and Production Handling Agreement" unanimously agreed to by the Participating Parties in the Execution AFE for that Development System and, if applicable, the Participating Parties in any additional Facilities which are to be used for the processing or handling of those hydrocarbons.

**14.5    Approval of Additional Facilities**

This Article 14.5 shall only apply to Facilities that were not included in an approved Development Plan and are to be utilized for Hydrocarbon production. Any Participating Party in an Execution AFE for a Development System may propose the installation of additional Facilities beyond those specified in the Development Plan associated with that Development System by giving notice to the other Participating Parties (along with an associated AFE), together with information adequate to describe the proposed Facilities.  Except as provided in Article 15.2 *(Facilities to Take In Kind)*, the installation of additional Facilities beyond the scope of a Development Plan requires the approval by Vote of the Participating Parties in the Execution AFE (and all supplemental AFEs) for the Development System that is to receive the additional Facilities.  Upon approval of such a proposal, the Operator shall proceed to install the additional Facilities, provided that, in the judgment of the Operator, the additional Facilities do not interfere with continuing operations on the Contract Area and there is sufficient deck space and buoyancy available to support the proposed additional Facilities. A Non-Participating Party in a proposal for additional Facilities shall be subject to Article 16.5.5 *(Non-Consent Subsequent Production System and Additional Facilities)*. If the Facilities proposal is for a disposal well, that Facilities proposal shall contain the same information provided in a Development Well proposal.

**14.6    Expansion or Modification of Existing Production System**

This Article 14.6 shall only apply to expansions or modifications of a Production System that are to be utilized for activities or operations on the Contract Area. After installation of a Production System described and approved in a Development Plan, any Participating Party in that Production System may propose the expansion or modification of that Production System by written notice (along with its associated AFE) to the other Participating Parties in that Production System.   That proposal requires the approval by Vote of the Participating Parties in that Production System.  If approved, that proposal will be

100

CONFIDENTIAL

APC-HEC1-000001710

ACCESS RESTRICTED

binding on all Participating Parties in that Production System, and the Operator shall commence that expansion or modification at the sole Cost and risk of all of the Participating Parties in that Production System unless otherwise agreed.

**14.7** **Additions, Expansion, or Modification of Production System or Facilities for Health, Safety, or Environmental Reasons**

If a proposal for additional Facilities or a proposal for the expansion or modification of a Production System does not receive approval by Vote of the Participating Parties in the Execution AFE (and all supplemental AFEs) for the Development System that is to receive additional Facilities or have its Production System expanded or modified, whichever is applicable, and that proposal is necessary for health, safety, or environmental reasons and has been mandated by governmental authority or judicial process, the Operator may, at its discretion, install those additional Facilities or make those expansions or modifications to the Production System.  If the Operator elects to exercise its discretionary right to make those installations, modifications, or expansions, the Operator shall provide written notice of its decision to each Participating Party in the Execution AFE (and all supplemental AFEs) for the Development System that is to receive additional Facilities or have its Production System expanded or modified, whichever applies.

## ARTICLE 15 – DISPOSITION OF HYDROCARBON PRODUCTION

**15.1** **Duty to Take in Kind**

Each Party has the right and duty to take in kind or separately dispose of its share of the Hydrocarbons, excluding (i) Hydrocarbons that are unavoidably lost and (ii) Hydrocarbon production that the Operator uses in production or Development Operations or in preparing and treating Hydrocarbons for marketing or transportation in an Export Pipeline.

**15.2** **Facilities to Take in Kind**

Each Participating Party in the Execution AFE for a Development System has the right, at its sole cost and risk, to construct and install facilities on and connect pipelines to the Development System for purposes of taking its share of Hydrocarbon production in kind, provided that, in the judgment of the Operator,

101

APC-HEC1-000001711

ACCESS RESTRICTED

the installation and operation of those facilities and pipelines will not unreasonably interfere with continuing operations on the Development System or the Contract Area.

**15.3   Failure to Take Oil or Condensate in Kind**

If a Party fails to take in kind or dispose of its share of the oil or condensate produced from the Contract Area, the Operator may, but is not obligated to, purchase for its own account, sell to others, or otherwise dispose of all or part of that oil or condensate at the same price at which the Operator calculates and pays lessor's royalty on its oil or condensate, or if lessor takes its royalty in kind, sell that oil or condensate to others at the price prevailing in the area for oil or condensate of the same kind, gravity, and quality reasonably obtainable by the Operator under the circumstances, subject to revocation by the non-taking Party upon thirty (30) days written notice to the Operator but shall not take effect until the Operator's sales contract with a third party terminates.  The Operator is not obligated to obtain a price equal to the price at which its oil or condensate is sold.  The Operator's right to take in kind or dispose of a non-taking Party's share of the oil or condensate is subject to the non-taking Party's right, at any time and from time to time, to take in kind or dispose of its share of the oil or condensate.  All contracts of sale by the Operator for another Party's oil or condensate shall be only for such reasonable periods not to exceed one year. Proceeds of all sales by the Operator under this Article 15.3 shall be paid by the end of the calendar month so that the Parties entitled to those proceeds will be able to make timely payments, without penalty, of lessor's royalty on the oil or condensate, which generated the proceeds.

Unless required by governmental authority or judicial process, no Party shall be forced to share an available market with a non-taking Party.

**15.4   Gas Balancing Provision**

If for any reason a Party fails to take or market its full share of gas as produced, the gas balancing and accounting between the Parties shall be handled under Exhibit "D."

**15.5   Expenses of Delivery in Kind**

All Costs incurred by the Operator in making delivery of a Party's share of Hydrocarbon production or disposing of same shall be borne by that Party.

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001712

# ARTICLE 16 – NON-CONSENT OPERATIONS

## 16.1  Conduct of Non-Consent Operations

Any activity or operation that invokes this Article 16 *(Non-Consent Operations)* must be proposed by a Party in good faith, using Cost estimates and Objective Depths that are reasonable for the Contract Area.  Non-Consent Operations shall not unreasonably interfere with activities or operations conducted by all Parties, unless the Non-Consent activity or operation will maintain all or a portion of the Contract Area under Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*.

### 16.1.1  Costs

The Costs of a Non-Consent Operation shall be borne by the Participating Parties in accordance with their Participating Interest Share in the Non-Consent Operation (unless otherwise agreed by the Participating Parties).  Within ninety (90) days after a Non-Consent Operation has been conducted, the Operator shall furnish all other Parties with either (a) an itemized statement of the Cost of the Non-Consent Operation and an inventory of the pertinent equipment or (b) a detailed statement of monthly billings.  The Operator shall furnish the Parties a monthly statement showing operating, maintenance, and other expenses attributable to the Non-Consent Operation together with a statement of the quantity of Hydrocarbons produced, and the revenues from the sale of Hydrocarbon production for the preceding month from operations subject to Hydrocarbon Recoupment under this Article 16.  In accounting for the revenues from Non-Consent Operations, Hydrocarbon production need not be separately metered, but may be determined upon the basis of monthly well tests, or as otherwise permitted in the MMS Surface or Subsurface Commingling Approval.  Operating expenses shall be allocated under Article 16.8.3 *(Operating and Maintenance Charges)*.  If a Party takes its share of production in kind under Article 15 *(Disposition of Hydrocarbon Production)*, that Party shall advise the Operator (in writing on or before the tenth day of the month following the month in which the Hydrocarbon production is sold or used off the premises) of the volumes of Hydrocarbons sold or used off the premises and the prices

103

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001713

received for those Hydrocarbons so that the Operator may calculate the balance of any Hydrocarbon Recoupment amounts.

To calculate the balance of Hydrocarbon Recoupment each Party, who bears a portion of the Non-Participating Interest Share, shall maintain the balance of the Hydrocarbon Recoupment attributable to the Non-Participating Interest Share borne by that Party and shall advise the Operator and Non-Participating Parties when Complete Recoupment has been reached.

### 16.1.2   Multiple Completions

Non-Consent Operations shall not be conducted in a well having multiple completions unless:

(a)   each of the multiple completions are owned by the same Parties in the same proportion;

(b)   none of the previous well completions are capable of producing in paying quantities; or

(c)   the Participating Parties in the well containing the multiple completions unanimously agree to those Non-Consent Operations.

## 16.2   Acreage Forfeiture Provisions

In view of the significantly greater risks associated with the first Exploratory Well and the Execution AFE for the initial Development System, the Participating Parties in the first Exploratory Well or that Execution AFE are entitled to an assignment of all of the right, title, and interest (including operating rights) in the Contract Area of the Non-Participating Parties in that well or AFE as provided below.

### 16.2.1   First Exploratory Well

If a Participating Party proceeds with the timely commencement of the drilling of the first Exploratory Well as a Non-Consent Operation and

(a)   the first Exploratory Well is drilled to its Objective Depth;

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001714

(b)   the first Exploratory Well is drilled to a depth shallower than its Objective Depth and eighty percent (80%) or more of the total amount of the AFE for that Exploratory Well is expended; or

(c)   the first Exploratory Well is abandoned under Article 10.1.4 *(AFE Overruns and Substitute Well)* prior to reaching its Objective Depth and prior to the Participating Parties expending at least eighty percent (80%) or more of the AFE for that Exploratory Well, but the Participating Parties timely commence the drilling of a substitute well, and the cumulative Costs of that Exploratory Well and its substitute well equal or exceed eighty percent (80%) of the total amount of the AFE for the original first Exploratory Well;

then within thirty (30) days after notice of the occurrence of an event described in clause (a), (b), or (c), a Non-Participating Party in the first Exploratory Well or its substitute well, as applicable, shall execute and deliver an assignment of all of its right, title, and interest in the Contract Area, free of all Lease Burdens as defined in Article 19.1 *(Burdens on Hydrocarbon Production)*, effective on the date actual drilling operations for the well are commenced, to the Participating Parties in the first Exploratory Well or its substitute well, as applicable, with no reimbursement by and at no Cost to those Participating Parties.  If an assignment is made under this Article 16.2.1, then each Participating Party shall accept its Participating Interest Share, as determined under Article 8.4 *(Participation by Fewer Than All Parties)*, of the Non-Participating Party's assigned interest.  The Non-Participating Party's Election or Vote not to participate in the first Exploratory Well shall be deemed a withdrawal under Article 17 *(Withdrawal From Agreement)*, and the Parties shall be subject to Article 17 *(Withdrawal From Agreement)*.  After the satisfaction of Article 16.2.1(a), (b), or (c), a Non-Consent Operation performed in the first Exploratory Well's well bore or its substitute's well bore, as applicable, shall not be subject to this Article 16.2.1 but shall be subject to the Hydrocarbon Recoupment premium provided in Article 16.5.1.1 *(Non-Consent Exploratory Operations at Objective Depth)*, except as provided in Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*.

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001715

### 16.2.2  Execution AFE

Within thirty (30) days of notice of the timely commencement of the activities or operations associated with the Execution AFE for the initial Development System, a Non-Participating Party in that Execution AFE shall execute and deliver an assignment of all of its right, title, and interest in the Contract Area to the Participating Parties in that Execution AFE, free of all Lease Burdens as defined in Article 19.1 *(Burdens on Hydrocarbon Production)*, effective on the date the construction or acquisition of the initial Development System is commenced, with no reimbursement by and at no Cost to those Participating Parties.  If an assignment is made under this Article 16.2.2, then each Participating Party shall accept its Participating Interest Share, as determined under Article 8.4 *(Participation by Fewer Than All Parties)*, of the Non-Participating Party's assigned interest. The Non-Participating Party's Election not to participate in the Execution AFE for the initial Development System shall be deemed a withdrawal under Article 17 *(Withdrawal From Agreement)*, and the Parties shall be subject to Article 17 *(Withdrawal From Agreement)*.

### 16.3  Costs and Liabilities of Prior Operations

Subject to Article 6.2.2 *(Supplemental AFEs)*, a Non-Participating Party subject to a non-consent provision remains liable for its share of previously incurred Costs and liabilities for activities and operations in which it was a Participating Party, and there shall be no re-allocation of Costs for activities and operations in which it was a Participating Party, except as provided in Article 13.3.1 *(Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir)*.

### 16.4  Non-Consent Operations to Maintain Contract Area

If a proposal is made for

(a)  an activity or operation required under a governmental agency order, notice, regulation, or Lease to maintain all or part of the Contract Area; or

(b)  an activity or operation

    (i)  within the final one hundred eighty (180) days of the primary term of a Lease, and if the Lease is not held by any means and will expire under its own terms, or

106

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001716

(ii)     within sixty (60) days prior to the deadline for an activity or operation required under an SOO or SOP activity schedule or a unit plan of operation,

and the proposal requires approval by Vote or Election or unanimous agreement and that approval or agreement is not obtained within the applicable response period, then, notwithstanding any contrary provision of Article 8 *(Approvals and Notices)*, the proposed activity or operation shall be deemed to have been approved, and all Parties that Voted or Elected or agreed by written statement to participate in the proposed activity or operation may proceed with the proposed activity or operation at their sole Cost and risk. However, before those Parties commence that activity or operation, they shall give written notice to the other Parties of their intention to commence that activity or operation. The other Parties shall have a second opportunity to participate in that activity or operation, under Article 8.3 *(Second Opportunity to Participate),* except that the response period for that second opportunity to participate shall be fifteen (15) days after receipt of that notice.

### 16.4.1    Acreage Forfeiture in the Entire Contract Area

If it is necessary to conduct an activity or operation referred to in Article 16.4 *(Non-Consent Operations to Maintain Contract Area)* in order to maintain the entire Contract Area, then each Non-Participating Party in that activity or operation shall relinquish and permanently assign, effective on the date the operation is commenced, to the Participating Parties one hundred percent (100%) of the Non-Participating Party's Working Interest in the entire Contract Area, including property and equipment acquired under this Agreement, within thirty (30) days of the commencement of that activity or operation. Failure to participate in that activity or operation is deemed a withdrawal, and the Parties will be subject to Article 17 *(Withdrawal From Agreement).*

### 16.4.2    Acreage Forfeiture in a Portion of a Contract Area

If it is necessary to conduct an activity or operation referred to in Article 16.4 *(Non-Consent Operations to Maintain Contract Area)* in order to maintain a portion of the Contract Area, then each Non-Participating Party in that activity or operation shall relinquish and permanently assign, effective on the date the operation is commenced, to the

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001717

Participating Parties one hundred percent (100%) of the Non-Participating Party's Working Interest in the affected portion of the Contract Area, including property and equipment acquired under this Agreement, within thirty (30) days of the commencement of that activity or operation.  That assignment shall be conveyed to the Participating Parties in proportion to their Participating Interest Share in that activity or operation. The Non-Participating Party shall bear all expenses associated with that assignment and shall be subject to Article 17.3.1 (*Prior Expenses*), Article 17.3.2 (*Confidentiality*) and Article 17.3.3 (*Emergencies and Force Majeure*) with respect to the assigned acreage.  If a Development System does not exist at the time of the forfeiture assignment or if the Non-Participating Party, who forfeited its interest under this Article 16.4, was a Non-Participating Party in the Development System which is located in the non-forfeited portion of the Contract Area, upon MMS approval of that assignment, the assigned acreage shall be expunged from Exhibit "A," and it shall no longer be included in the Contract Area.  If that assignment is to two or more Participating Parties in that activity or operation, then (a) the assigned acreage shall be deemed to be governed by an operating agreement incorporating identical provisions as the provisions in this Agreement, except to the extent they are clearly inappropriate, (b) the execution of the operating agreement by those Participating Parties shall be considered a mere formality only, (c) the Operator of the assigned acreage shall promptly prepare that operating agreement, and (d) the Participating Parties shall promptly execute it.   If a Development System is located on the non-forfeited portion of the Contract Area and if the Participating Parties in the operation or activity, which were conducted in order to save the forfeited portion of the Contract Area, are Participating Parties in that Development System, the Parties shall amend this Agreement to provide for a separate operational area for the forfeited portion of the Contract Area and a separate operational area for the non-forfeited portion of the Contract Area, and this Agreement shall apply separately to each operational area; provided however, the Participating Parties in the Development System located on the non-forfeited portion of the Contract Area, who participated in the operation or activity, which were conducted in order to save the forfeited portion of

108

APC-HEC1-000001718

the Contract Area, shall have the same priority of access to that Development System as the Parties in the separate operational area for the non-forfeited portion of the Contract Area.

### 16.4.3 Limitations on Acreage Forfeiture

Notwithstanding the foregoing, if more than one activity or operation is conducted under Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*, any one of which would maintain the entire Contract Area or the affected portion of the Contract Area, a Participating Party in any one of those activities or operations shall not be required to make an assignment under Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*.

## 16.5 Percentage Hydrocarbon Recoupment for Non-Consent Operations

Except as provided in Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain Contract Area)*, upon the timely commencement of a Non-Consent Operation, each Non-Participating Party's Working Interest and leasehold operating rights in the Non-Consent Operation along with its title to that portion of future Hydrocarbon production provided in this Article 16.5, if any, shall be owned by and vested in each Participating Party in accordance with its Participating Party Interest Share in the Non-Consent Operation under Article 8.4 *(Participation by Fewer Than All Parties)*. A third-party cash contribution made for Confidential Data from a Non-Consent Operation shall be deducted from the Non-Participating Interest Share of the Costs of the well operation or of drilling and completing the well, as applicable, prior to computation of the Hydrocarbon Recoupment amount.

### 16.5.1 Non-Consent Exploratory Operations down to Objective Depth in the First Exploratory Well

Since the Participating Parties in the first Exploratory Well are entitled to an assignment of all of the right, title, and interest (including operating rights) in the Contract Area of the Non-Participating Parties in that well as provided in Article 16.2.1 *(First Exploratory Well)*, there is no Hydrocarbon Recoupment for Non-Consent Exploratory Operations conducted in the first Exploratory Well down to its Objective Depth.

109

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001719

**16.5.1.1 <u>Non-Consent Exploratory Operations at Objective Depth</u>**

The Hydrocarbon Recoupment amount for all non-consent Exploratory Operations conducted after the first Exploratory Well has reached its Objective Depth, be they non-consent Exploratory Wells other than the first Exploratory Well or operations conducted subsequent to an Exploratory Well, including the first Exploratory Well reaching its Objective Depth, is the Non-Participating Interest Share of the Costs of that Non-consent Operation multiplied by eight hundred percent (800%).

**16.5.2 <u>Non-Consent Appraisal Operations</u>**

The Hydrocarbon Recoupment amount for all Appraisal Operations conducted as Non-Consent Operations is the Non-Participating Interest Share of the Costs of the Appraisal Operation multiplied by six hundred percent (600%).

**16.5.3 <u>Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, or Enhanced Recovery Project Team AFEs</u>**

If a Non-Participating Party in a Proprietary Geophysical Operation pursuant to Exhibit "L", Feasibility AFE, Define AFE, Long Lead Development System AFE, Post-Production Project Team AFE, or Enhanced Recovery Project Team AFE takes, or is deemed to have taken, the steps set forth in Article 16.9 *(Settlement of Underinvestments)*, that Party is an Underinvested Party in an amount equal to two hundred percent (200%) of the amount it would have paid had it participated in that activity, operation, or AFE until the Underinvestment is eliminated under Article 16.9 *(Settlement of Underinvestments)*. If a Non-Participating Party in a Selection AFE takes, or is deemed to have taken, the steps set forth in Article 16.9 *(Settlement of Underinvestments)*, that Party is an Underinvested Party in an amount equal to two hundred percent (200%) of the amount that the it would have paid had it participated in that AFE until the Underinvestment is eliminated under Article 16.9 *(Settlement of Underinvestments)*.

110

APC-HEC1-000001720

ACCESS RESTRICTED

**16.5.4    Non-Consent Development Operations**

The Hydrocarbon Recoupment amount for all Development Operations conducted as Non-Consent Operations is the Non-Participating Interest Share of the Costs of the Development Operation multiplied by four hundred percent (400%).

**16.5.5    Non-Consent Subsequent Development System and Additional Facilities**

The Hydrocarbon Recoupment amount for a non-consent Execution AFE for a subsequent Development System or additional Facilities not included in an Execution AFE is the Non-Participating Interest Share of the Cost incurred with respect to that Execution AFE or those additional Facilities not included in an Execution AFE multiplied by three hundred percent (300%).

**16.5.6    Additional Hydrocarbon Recoupment**

In addition to the percentage Hydrocarbon Recoupment for the various Non-Consent Operations set forth above, the Participating Parties are entitled to recoup:

(a)    one hundred percent (100%) of the Non-Participating Interest Share of the Cost of using an existing Development System that is needed to serve a Production System or Facilities installed as a Non-Consent Operation, in which the Non-Participating Party has a Participating Interest; plus

(b)    one hundred percent (100%) of the Non-Participating Interest Share of the Cost of operating expenses, maintenance Costs, royalties, and severance, gathering, and production taxes and other governmental fees based on production.

**16.5.7    Hydrocarbon Recoupment From Production**

Hydrocarbon Recoupment for a Non-Consent Operation shall be made from the Hydrocarbon production as follows:

**16.5.7.1 Non-Consent Exploratory Operations, Non-Consent Appraisal Operations, and Non-Consent Development**

111

CONFIDENTIAL                                          APC-HEC1-000001721

ACCESS RESTRICTED

**Operations That Discover or Extend a Producible Reservoir**

For

(a)    an Exploratory Operation,

(b)    an Appraisal Operation, or

(c)    a Development Operation,

that is conducted as a Non-Consent Operation and discovers a new Producible Reservoir or extends an existing Producible Reservoir (as the Producible Reservoirs existed at the time the Development Operation was proposed), each Non-Participating Party shall satisfy Hydrocarbon Recoupment from

(i)    one hundred percent (100%) of its Non-Participating Interest Share of all Hydrocarbons produced and saved from the Non-Consent Operation, if the Non-Consent Operation results in Hydrocarbon production, and

(ii)   fifty percent (50%) of its Participating Interest Share of all Hydrocarbons produced and saved from operations conducted after the Non-Consent Operation that result in Hydrocarbon production from the same Producible Reservoir discovered or extended by the Non-Consent Operation.

**16.5.7.2   Non-Consent Development Operations in an Existing Producible Reservoir**

If a Development Operation is conducted as a Non-Consent Operation and does not discover a new Producible Reservoir and also does not extend an existing Producible Reservoir (as the Producible Reservoirs existed at the time the Development Operation was proposed), each Non-Participating Party shall satisfy Hydrocarbon Recoupment from one hundred percent (100%) of its Non-Participating Interest Share of Hydrocarbons produced and saved from the

112

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001722

Non-Consent Operation, if the Non-Consent Operation results in Hydrocarbon production.

### 16.5.7.3 Non-Consent Subsequent Development Systems

If the construction and installation of a subsequent Development System is conducted as a Non-Consent Operation, each Non-Participating Party shall satisfy Hydrocarbon Recoupment from:

(a)  one hundred percent (100%) of its Non-Participating Interest Share or its Participating Interest Share (whichever applies) of Hydrocarbons produced and saved from all Development Operations that are conducted from that subsequent Development System, and

(b)  one hundred percent (100%) of its Non-Participating Interest Share or its Participating Interest Share (whichever applies) of Hydrocarbons produced and saved from all wells that benefit from injection or disposal wells drilled and/or operated from that subsequent Development System.

### 16.6 Restoration of Interests to Non-Participating Party

Except as provided in Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain Contract Area)*, a Non-Participating Party's Working Interest and leasehold operating rights revert to the Non-Participating Party, effective at 7:00 a.m. of the day after the occurrence of the first of the following events:

(a)  the well bore of the Non-Consent Operation is not a Producible Well on the date the permanent plugging and abandonment of the well concludes;

(b)  Hydrocarbon production recouped under Article 16.5.7 *(Hydrocarbon Recoupment From Production)* as result of a Non-Consent Operation ceases prior to Complete Recoupment;

113

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001723

(c)   the Participating Parties Sidetrack or Deepen an Exploratory Well, Appraisal Well, or Development Well and that well does not qualify as a Producible Well; or

(d)   upon Complete Recoupment.

However, only upon Complete Recoupment does a former Non-Participating Party become a Participating Party in the Non-Consent Operation.

### 16.6.1   Dry Hole Reversion

If a Non-Consent Operation, other than a Non-Consent Operation under Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain Contract Area)*, results in an event provided in Article 16.6 (a) or (b) and a Non-Participating Party's Working Interest and leasehold operating rights revert back to the Non-Participating Party, all well equipment in place as a result of that Non-Consent Operation and all Development Systems fabricated and installed as a result of that Non-Consent Operation and rights to future Hydrocarbon production from a Producible Reservoir discovered or extended by that Non-Consent Operation as described in Article 16.5.7 *(Hydrocarbon Recoupment From Production)* remain vested in the Participating Parties.  Any salvage value in excess of Complete Recoupment will be credited to all Parties according to their Working Interest and without regard to their participation status.

### 16.6.2   Sidetracking or Deepening a Non-Consent Well

If a Non-Participating Party participates in a Sidetracking or Deepening as provided in Article 10.2.5 *(Participation in Sidetrack or Deepening by a Non-Participating Party in an Exploratory Well at Initial Objective Depth)*, Article 11.2.5 *(Participation in Sidetrack or Deepening by a Non-Participating Party in an Appraisal Well at Initial Objective Depth)*, or Article 13.2.5 *(Participation in Sidetrack or Deepening by a Non-Participating Party in a Development Well at Initial Objective Depth)*, and if the Participating Parties have recouped the Cost of the original well down to its Objective Depth at the time the Sidetrack or Deepening is approved by Election, then the Non-Participating Party shall not be an Underinvested Party in the Sidetracking or Deepening of that well, and the Participating Parties in the original well shall achieve Complete

114

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001724

Recoupment under Article 16.5.7.1 *(Non-Consent Exploratory Operations, Non-Consent Appraisal Operations, and Non-Consent Development Operations That Discover or Extend a Producible Reservoir)* or Article 16.5.7.2 *(Non-Consent Development Operations in an Existing Producible Reservoir)*, whichever applies.

**16.7   Operations From a Subsequent Non-Consent Development System**

A Party who Elected not to participate in a subsequent Development System may participate in Development Operations from that subsequent Development System.   If that Non-Participating Party participates in such a Development Operation, then the Non-Participating Party shall make to the Operator a lump sum payment of any remaining Hydrocarbon Recoupment and Underinvestment under Article 16 *(Non-Consent Operations)* for which it is still liable.   The Operator shall then distribute to the Participating Parties in the subsequent Development System their Participating Interest Share of the payment.   Upon that payment, the Non-Participating Party will become an owner and a Participating Party in the subsequent Development System.

**16.8   Allocation of Development System Costs to Non-Consent Operations**

In the event a well is drilled from or produced through a Production System or is produced through Facilities whose Participating Parties are different from the Participating Parties in that well or if the Participating Parties' Participating Interest Shares in that Production System or Facilities are different from their Participating Interest Shares in that well, the rights of the Participating Parties in that well and the Costs to use the Production System or Facilities for that well shall be determined as follows:

**16.8.1   Investment Charges**

(a)   The Participating Parties in that well shall pay to the Operator a one-time slot usage fee for the use of a slot on the Production System equal to two percent (2%) of the Cost of the Production System; provided, however, each Non-Participating Party's share of the slot usage fee shall be included in the calculation of any Hydrocarbon recoupment to which it is subject as a result of the Non-Consent Operation's utilizing that slot.   Within fifteen (15) days of its receipt of that fee, the Operator shall distribute to the Participating Parties in the Production System their Participating

115

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001725

Interest Share of that payment.  For purposes of calculating the slot usage fee, the total Cost of the Production System shall be reduced by (0.41667%) per month, commencing on the date the Production System was installed and continuing every month thereafter until the month actual drilling operations on that well is commenced; however, the total Cost of the Production System shall not be reduced by more than twenty-five percent (25%) of the total Production System's costs.  The Cost of additions to the Production System shall be reduced in the same manner commencing the first month after the addition is installed.

If that well is abandoned, having never produced Hydrocarbons, the right of the Participating Parties in that well to use the Production System slot through which the well was drilled shall terminate unless those Parties commence drilling a substitute well for the abandoned well through the same slot within ninety (90) days of the abandonment.  If that substitute well is abandoned, having never produced Hydrocarbons, the right of the Participating Parties in that well to use the Production System slot through which the well was drilled shall terminate.

The slot usage fee shall not apply to a slot deemed to be "surplus."  A slot may be deemed surplus only by the unanimous agreement of the owners of the Production System.

(b)    The Participating Parties in that well shall pay to the owners of the Facilities a sum equal to that portion of the total Cost of those Facilities that the throughput volume of the Non-Consent Operation bears to the total design throughput volume of the Facilities.  Throughput volume shall be estimated by the Operator in barrels produced per day (5.8 mcf of gas determined at a pressure of 14.73 pounds per square inch atmospheric and a temperature of sixty (60) degrees Fahrenheit equaling one barrel of oil and one barrel of water equaling one barrel of oil), using an average daily volume of the first three months of Hydrocarbon and water production from the Non-Consent Operation.  For purposes of calculating the Facilities usage fee, the total Cost of

116

CONFIDENTIAL

APC-HEC1-000001726

ACCESS RESTRICTED

the Facilities shall be reduced by (0.41667%) per month, commencing from the date when the Facilities were installed and continuing every month thereafter until the first month during which production from the Non-Consent Operation commences, but the total Cost of the Facilities shall not be reduced more than twenty-five percent (25%) of the total Facilities' Cost.   If a modification, expansion, or addition to the Facilities is made after commencing first production and before connection of the Non-Consent Operation to the Facilities, the Facilities investment shall be reduced in the same manner described above, from the month in which the Facilities modification, expansion, or addition is completed until the first month during which production from the Non-Consent Operation is commenced.

**16.8.2**   **Payments**

Payment of a usage fee shall not be deemed to be a purchase by the Participating Parties of an additional interest in the Production System or Facilities.  Payments under Article 16.8.1 *(Investment Charges)* shall be due and payable on commencement of initial production from the Non-Consent Operation.

**16.8.3**   **Operating and Maintenance Charges**

The Participating Parties in a well drilled as a Non-Consent Operation shall pay all Costs necessary to connect the well to the Production System.  The Costs of operating and maintaining the Facilities and the Production System shall be allocated equally among all active completions served.   Subsea Production System operating and maintenance Costs shall be allocated equally among all subsea well completions served by the Subsea Production system.  Operating and maintenance Costs for the Facilities shall be allocated to each well served in the proportion that the volume throughput of the well bears to the total volume throughput of all wells handled by the Facilities.

**16.9**   **Settlement of Underinvestments**

A Non-Participating Party shall become an Underinvested Party and become liable for settling an Underinvestment if it (a) makes a revised Election or Vote to become a Participating Party in an AFE, activity, or operation in which it originally

117

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001727

Elected or Voted not to participate, (b) Elects to participate (i) in the Sidetracking or Deepening of a wellbore in which it did not participate to Objective Depth or (ii) in a Sidetracking or Deepening thereafter, (c) Elects to participate in a Development Plan after a Major Modification of that plan has been approved, or (d) Elects to participate in Development Operations from a subsequent Development System in which it did not participate. A Non-Participating Party in a Selection AFE, who elects to participate in the Define AFE, which follows it, shall automatically be deemed to have submitted to the Operator a written statement memorializing its subsequent Election to (a) participate in that Selection AFE, in which it originally Elected not to participate, and (b) become an Underinvested Party in regard to that AFE. A Non-Participating Party in a Define AFE, who elects to participate in the Execution AFE, which follows it, shall automatically be deemed to have submitted to the Operator a written statement memorializing its subsequent Election to (a) participate in the Define AFE in which it originally Elected not to participate and (b) become an Underinvested Party in regard to that AFE. A Non-Participating Party in a Long Lead Development System AFE, who elects to participate in the activity or operation for which the long lead item in the Long Lead Development System AFE was procured, shall automatically be deemed to have submitted to the Operator a written statement memorializing its subsequent Election to (a) participate in that Long Lead Development System AFE, in which it originally Elected not to participate, and (b) become an Underinvested Party in regard to that AFE. Except as provided in Article 16.9.1 *(Cash Settlement of Underinvestment)*, an Underinvested Party shall settle its Underinvestment through Disproportionate Spending.   The Underinvested Party shall be responsible for and pay one hundred percent (100%) of the Overinvested Parties' share of the Costs (or if there are two or more Underinvested Parties, a proportion of those Costs based on each Party's Underinvestment) in subsequent activities or operations or AFEs under this Agreement in which that Underinvested Party and one or more Overinvested Parties participate until the amount of the Underinvestment is eliminated, except under Article 13.3.1 *(Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir)* the Underinvested Party shall be responsible for and pay one hundred percent (100%) of the Overinvested Parties' share of the Costs (or if there are two or more Underinvested Parties, a proportion of those Costs based on each Party's Underinvestment) in subsequent activities or operations or AFEs within the Contract Area in which

118

APC-HEC1-000001728

one or more Overinvested Parties participate until the amount of the Underinvestment is eliminated.

### 16.9.1    Cash Settlement of Underinvestment

If the Parties do not plan or propose further activities or operations under this Agreement (for which Costs would be allocated to the elimination of an Underinvestment), the Underinvested Party shall pay the Overinvested Parties the remaining Underinvestment amount in cash under Exhibit "C." If Disproportionate Spending in the Contract Area does not eliminate an Underinvestment within two (2) years after the date the Underinvestment is incurred, or upon final accounting and settlement under this Agreement, or before the Underinvested Party withdraws from the Contract Area under Article 17 *(Withdrawal From Agreement)*, whichever comes first, the Underinvested Party shall pay the Overinvested Parties the remaining Underinvestment in cash under Article 17 *(Withdrawal From Agreement)* and Exhibit "C."

## ARTICLE 17 – WITHDRAWAL FROM AGREEMENT

### 17.1    Right to Withdraw

Subject to this Article 17.1, any Party may withdraw from this Agreement (the "Withdrawing Party") by giving prior written notice to all other Parties stating its decision to withdraw ("the withdrawal notice"). The withdrawal notice shall specify an effective date of withdrawal that is at least sixty (60) days, but not more than ninety (90) days, after the date of the withdrawal notice. Within thirty (30) days of receipt of the withdrawal notice, the other Parties may join in the withdrawal by giving written notice of that fact to the Operator ("written notice to join in the withdrawal") and upon giving written notice to join in the withdrawal are "Other Withdrawing Parties." The withdrawal notice and the written notice to join in the withdrawal are unconditional and irrevocable offers by the Withdrawing Party and the Other Withdrawing Parties to convey to the Parties who do not join in the withdrawal ("the Remaining Parties") the Withdrawing Party's and the Other Withdrawing Parties' entire Working Interest in all of the Leases, Hydrocarbon production, and other property and equipment owned under this Agreement.

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001729

**17.2   Response to Withdrawal Notice**

Failure to respond to a withdrawal notice is deemed a decision not to join in the withdrawal.

**17.2.1   Unanimous Withdrawal**

If all the other Parties join in the withdrawal,

(a)   no assignment of Working Interests shall take place;

(b)   subject to Article 18.4 *(Abandonment Operations Required by Governmental Authority)*, no further operations may be conducted under this Agreement unless agreed to by all Parties;

(c)   the Parties shall abandon all activities and operations within the Contract Area and relinquish all of their Working Interests to the MMS within fifteen (15) days of the conclusion of the thirty (30) day joining period; and

(d)   notwithstanding anything to the contrary in Article 18 *(Abandonment and Salvage),* the Operator shall:

(i)   furnish all Parties a detailed abandonment plan, if applicable, and a detailed cost estimate for the abandonment within sixty (60) days after the conclusion of the thirty (30) day joining period; and

(ii)   cease operations and begin to permanently plug and abandon all wells and remove all Production Systems and Facilities in accordance with the abandonment plan.

**17.2.2   No Additional Withdrawing Parties**

If none of the other Parties join in the withdrawal, then the Remaining Parties must accept an assignment of their Participating Interest Share of the Withdrawing Party's Working Interest.

**17.2.3   Acceptance of the Withdrawing Parties' Interests**

If one or more but not all of the other Parties join in the withdrawal and become Other Withdrawing Parties, then within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) of the

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001730

conclusion of the thirty (30) day joining period, each of the Remaining Parties shall submit to the Operator a written rejection or acceptance of its Participating Interest Share of the Withdrawing Party's and Other Withdrawing Parties' Working Interest.   Failure to make that written rejection or acceptance shall be deemed a written acceptance.  If the Remaining Parties are unable to select a successor Operator, if applicable, or if a Remaining Party submits a written rejection and the other Remaining Parties do not agree to accept one hundred percent (100%) of the Withdrawing Party's and Other Withdrawing Parties' Working Interest within thirty (30) days of the conclusion of the forty-eight (48) hour period to submit a written rejection or acceptance, the Remaining Parties will be deemed to have joined in the withdrawal, and Article 17.2.1 *(Unanimous Withdrawal)* will apply.

**17.2.4    Effects of Withdrawal**

Except as otherwise provided in this Agreement, after giving a withdrawal notice or a written notice to join in the withdrawal, the Withdrawing Party and Other Withdrawing Parties are not entitled to approve or participate in any activity or operation in the Contract Area, other than those activities or operations for which they retain a financial responsibility.  The Withdrawing Party and Other Withdrawing Parties shall take all necessary steps to accomplish their withdrawal by the effective date referred to in Article 17.1 *(Right to Withdraw)* and shall execute and deliver to the Remaining Parties all necessary instruments to assign their Working Interest to the Remaining Parties.    A Withdrawing Party and Other Withdrawing Parties shall bear all expenses associated with their withdrawal and the transfer of their Working Interest.

**17.3   Limitation Upon and Conditions of Withdrawal**

**17.3.1    Prior Expenses**

The Withdrawing Party and Other Withdrawing Parties remain liable for their remaining Underinvestments and their Participating Interest Share of the Costs of activities, operations, rentals, royalties, taxes, damages, Hydrocarbon imbalances, or other liability or expense accruing or relating to (i) obligations existing as of the effective date of the withdrawal, (ii) activities or operations conducted before the effective

121

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001731

date of the withdrawal, (iii) activities or operations approved by the Withdrawing Party and Other Withdrawing Parties before the effective date of the withdrawal, or (iv) activities or operations commenced by the Operator under one of its discretionary powers under this Agreement before the effective date of the withdrawal.   Before the effective date of the withdrawal, the Operator shall render a statement to the Withdrawing Party and Other Withdrawing Parties for (1) their respective shares of all identifiable Costs under this Article 17.3.1 and (2) their respective Participating Interest Shares of the estimated current Costs of plugging and abandoning all wells and removing all Production Systems, Facilities, and other materiel and equipment serving the Contract Area, less their respective Participating Interest Shares of the estimated salvage value of the assets at the time of abandonment, as approved by Vote.   This statement of expenses, Costs, and salvage value shall be prepared by the Operator under Exhibit "C."   Before withdrawing, the Withdrawing Party and Other Withdrawing Parties shall either pay the Operator, for the benefit of the Remaining Parties, the amounts allocated to them in the statement or provide security satisfactory to the Remaining Parties for all obligations and liabilities they have incurred and all obligations and liabilities attributable to them before the effective date of the withdrawal.   All liens, charges, and other encumbrances, including but not limited to overriding royalties, net profits interest, and production payments, which the Withdrawing Party and Other Withdrawing Parties placed (or caused to be placed) on their Working Interest shall be fully satisfied or released prior to the effective date of its withdrawal (unless the Remaining Parties are willing to accept the Working Interest subject to those liens, charges, and other encumbrances).

**17.3.2    Confidentiality**

The Withdrawing Party and Other Withdrawing Parties will continue to be bound by the confidentiality provisions of Article 7 *(Confidentiality of Data)* after the effective date of the withdrawal but will have no further access to technical information relating to activities or operations under this Agreement.   The Withdrawing Party and Other Withdrawing Parties are not required to return to the Remaining Parties Confidential Data acquired prior to the effective date of the withdrawal.

122

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001732

### 17.3.3   Emergencies and Force Majeure

No Party may withdraw during a Force Majeure or emergency that poses a threat to life, safety, property, or the environment but may withdraw from this Agreement after termination of the Force Majeure or emergency. The Withdrawing Party and Other Withdrawing Parties remain liable for their share of all Costs and liabilities arising from the Force Majeure or emergency, including but not limited to the drilling of relief wells, containment and cleanup of oil spills and pollution, and all Costs of debris removal made necessary by the Force Majeure or emergency.

## ARTICLE 18 – ABANDONMENT AND SALVAGE

### 18.1   Abandonment of Wells

Any Participating Party may propose the permanent plugging and abandonment of a well that has produced Hydrocarbons (other than as a result of Production Testing) by notifying the other Participating Parties. Any Participating Party that fails to respond within the applicable response period shall be deemed to have approved the permanent plugging and abandonment of the well. If the permanent plugging and abandonment proposal is unanimously agreed to by the Participating Parties in that well, the well shall be permanently plugged and abandoned under the applicable regulations at the Cost and risk of the Participating Parties. If the Participating Parties do not unanimously agree to permanently plug and abandon the well, the Operator shall prepare an estimate of the Costs of the permanent plugging and abandonment of the well less the estimated salvage value of the well, as determined under Exhibit "C," and the Participating Party desiring to permanently plug and abandon the well shall pay the Operator, for the benefit of the non-abandoning Participating Parties, its share of that estimate within thirty (30) days of its receipt of the estimate. If an abandoning Participating Party's respective share of the estimated salvage value is greater than its share of the estimated Costs of the permanent plugging and abandonment, the Operator, on behalf of the non-abandoning Participating Parties, shall pay to the abandoning Participating Party a sum equal to the deficiency within thirty (30) days of the abandoning Participating Party's receipt of the estimate. Each Participating Party desiring to abandon a well shall assign to each non-abandoning Participating Party in that well a portion of its Working

123

CONFIDENTIAL

APC-HEC1-000001733

ACCESS RESTRICTED

Interest in that well and the equipment therein and the Hydrocarbon production therefrom equal to the non-abandoning Party's Participating Interests in that well divided by the entire Participating Interests of the non-abandoning Parties in that well. That assignment shall be effective as of the date of the abandoning Party's response to the well abandonment proposal. The abandoning Party shall assume and be liable for all obligations pertaining to that well, except liability for payments under this Article 18.1, prior to the effective date of its assignment to the non-abandoning Parties. The abandoning Party shall not assume and be liable for any obligations pertaining to that well, except liability for payments under this Article 18.1, as of the effective date of its assignment to the non-abandoning Parties.

**18.2    Abandonment of Equipment**

Any Participating Party in a Production System or Facilities or an enhanced recovery and/or pressure maintenance program described in Article 12.11 *(Enhanced Recovery and/or Pressure Maintenance Program Proposals)* (the "Equipment") may propose the abandonment and disposition of that Equipment. If that proposal is unanimously agreed to by the Participating Parties, the Operator shall abandon and dispose of that Equipment at the Cost and risk of the Participating Parties. If a Participating Party fails to respond within the applicable response period, that Participating Party shall be deemed to have approved the abandonment and disposal of the Equipment. If all Participating Parties do not approve abandoning and disposing of the Equipment, the Operator shall prepare an estimate of the Costs of abandonment, removal, site clearance, and disposition of the Equipment, less the estimated salvage value of the Equipment, as determined under Exhibit "C," and the Participating Party desiring to abandon and dispose of the Equipment shall pay the Operator, for the benefit of the non-abandoning Participating Parties, its share of that estimate within thirty (30) days of its receipt of the estimate. If an abandoning Participating Party's respective share of the estimated salvage value is greater than its share of the estimated costs, the Operator, on behalf of the non-abandoning Participating Parties, shall pay to the abandoning Participating Party a sum equal to the surplus within thirty (30) days of the abandoning Participating Party's receipt of the estimate. Each Participating Party desiring to abandon the Equipment shall assign to each non-abandoning Participating Party in the Equipment a portion of its Working Interest in the Equipment equal to the non-abandoning Party's Participating Interests in the Equipment divided by the entire

124

CONFIDENTIAL

ACCESS RESTRICTED

Participating Interests of the non-abandoning Parties in the Equipment. That assignment shall be effective as of the date of the abandoning Party's response to the Equipment abandonment proposal. The abandoning Party shall assume and be liable for all obligations pertaining to the Equipment, except liability for payments under this Article 18.2, prior to the effective date of its assignment to the non-abandoning Parties. The abandoning Party shall not assume and be liable for any obligations pertaining to the Equipment, except liability for payments under this Article 18.2, as of the effective date of its assignment to the non-abandoning Parties.

### 18.3   Disposal of Surplus Materiel

The Operator may classify materiel acquired under this Agreement as surplus when the Operator deems it is no longer needed in present or foreseeable activities or operations. The Operator shall determine the value and Cost of disposing of the materiel under Exhibit "C." If the materiel is classified as junk or if the value, less the Cost of disposal, is less than or equal to five hundred thousand dollars ($500,000.00), the Operator may dispose of the surplus materiel in a manner it deems appropriate. If the value, less the Cost of disposal of the surplus materiel, is greater than five hundred thousand dollars ($500,000.00), the Operator shall give written notice thereof to the Parties owning the materiel, and the surplus materiel shall be disposed of in accordance with the method of disposal approved by the Parties owning the materiel. Proceeds from the sale or transfer of surplus materiel shall be promptly credited to each Party in proportion to its ownership of the materiel at the time of the retirement or disposition of the materiel.

### 18.4   Abandonment Operations Required by Governmental Authority

The Operator shall conduct the abandonment and removal of any Equipment [as defined in Article 18.2 *(Abandonment of Equipment)*] required by a governmental authority, and the Costs, risks, and net proceeds of that abandonment and removal will be shared by the Participating Parties in that Equipment [as defined in Article 18.2 *(Abandonment of Equipment)*] according to their Participating Interest Share.

125

APC-HEC1-000001735

ACCESS RESTRICTED

## ARTICLE 19 – RENTALS, ROYALTIES, AND MINIMUM ROYALTIES

### 19.1  Burdens on Hydrocarbon Production

If a Party has previously created or hereafter creates an overriding royalty, production payment, carried or reversionary working interest, net profits interest, mortgage, lien, security interest, or other type of burden on Hydrocarbon production, including, but not limited to, agreements affecting the marketing, processing, or transportation of Hydrocarbon Production, other than the lessor's royalty stipulated in a Lease (a "Lease Burden"), the Party creating the Lease Burden shall assume and bear all liabilities and obligations of the Lease Burden regardless of that Party's participation status and notwithstanding an assignment under this Agreement of all or part of that Party's Working Interest to another party.  The Party creating the Lease Burden shall indemnify, release, defend, and hold all other Parties harmless from all claims and demands for payment asserted by the owners of the Lease Burden.

### 19.1.1  Subsequently Created Lease Burdens

Notwithstanding any contrary provision of this Agreement, if a Party, after executing this Agreement, creates a Lease Burden, that Lease Burden shall be made specifically subject to this Agreement.  If the Party owning the Working Interest from which a Lease Burden is created (a) fails to pay when due its share of Costs, (b) withdraws from this Agreement, or (c) Elects to abandon a well under Article 18.1 *(Abandonment of Wells)*, then the beneficiary of the Lease Burden will be chargeable with Costs equal to its fractional interest in gross production and the security rights created in Exhibit "F" will be applicable against that Lease Burden.  The Operator has the right to enforce the security rights (and all other rights granted under this Agreement) against the beneficiary of a Lease Burden for the purpose of collecting Costs chargeable to the Lease Burden.  The rights of the beneficiary of a Lease Burden are subordinate to the rights of the Parties granted by Exhibit "F."

### 19.2  Payment of Rentals and Royalties

The Operator shall make all rental payments for the Leases on behalf of the Parties.  The Operator shall use reasonable care to make proper and timely

126

APC-HEC1-000001736

payment of the rental payments, all minimum royalties, and all other similar payments accruing under the Leases.  Upon receipt of proper evidence of those payments and the Operator's invoice for its proportionate share of those payments, each Non-Operating Party shall reimburse the Operator for the Non-Operating Party's Working Interest share of those payments.  In the event the Operator fails to make proper payment of a rental, minimum royalty, or other similar payment accruing under a Lease through mistake or oversight where that payment is required to continue that Lease in force and effect, the Operator will not be liable to the other Parties for any resulting damages or any loss that results from the non-payment, unless that non-payment is due to the gross negligence or willful misconduct of the Operator.  The loss of a Lease or interest therein that results from the Operator's failure to pay, or the Operator's erroneous payment of, a rental, minimum royalty, or other similar payments is a joint loss, and there will be no readjustment of Working Interests as a consequence thereof.  For production delivered in-kind by the Operator to a Non-Operating Party or to a third party for the account of a Non-Operating Party, the Non-Operating Party shall provide the Operator with information about the proceeds or value of the production in order for the Operator to make payments of all minimum royalties due.

### 19.2.1   Non-Participation in Payments

If a Party notifies the other Parties, in writing at least sixty (60) days before the date the payment is due of its intention not to pay its share of a rental, minimum royalty, or other similar payment, that Party shall be deemed to have given a withdrawal notice under Article 17 *(Withdrawal From Agreement)*, and must withdraw from the entire Contract Area, not just the Lease on which the payment is due.  Upon this occurrence, the Operator shall make the payment solely for the benefit of the Remaining Parties, as defined in Article 17 *(Withdrawal From Agreement)*, and the Remaining Parties shall reimburse the Operator for their respective shares of the payment, based on the procedures in Article 17.2 *(Response to Withdrawal Notice)*.

### 19.2.2   Royalty Payments

Each Party shall pay or cause to be paid all royalty and other amounts payable, which are based on its share of Hydrocarbon production.  Adjustments to those payments shall be made among the Parties in

127

APC-HEC1-000001737

accordance with Exhibit "D" (Gas Balancing Agreement). When the Participating Parties are recouping their Costs from a Non-Consent Operation and an applicable premium under Article 16.5 (*Percentage Hydrocarbon Recoupment for Non-Consent Operations*), each of the Participating Parties shall pay or cause to be paid the Lease royalty on the portion of the Hydrocarbon Recoupment to which it is entitled.


## ARTICLE 20 – TAXES

**20.1   Internal Revenue Provision**

Notwithstanding any provision in this Agreement to the effect that the rights and liabilities of the Parties are several, not joint or collective, and that the Agreement and the activities and operations under this Agreement do not constitute a partnership under state law, each Party elects to be excluded from the application of all or any part of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, as amended, or similar provisions of applicable state laws. regardless of whether for federal income tax purposes this Agreement and the activities and operations under this Agreement are regarded as a partnership.

**20.2   Other Taxes and Assessments**

The Operator shall file all tax returns and reports required by law and pay all applicable taxes [other than income or other taxes provided in Article 20.2.2 (*Production and Severance Taxes*)] and assessments levied with respect to activities and operations conducted under this Agreement. The Parties shall promptly furnish the Operator with copies of all notices, assessments, and statements received pertaining to taxes to be paid by the Operator. The Operator will charge each Party its Working Interest share of all taxes and assessments paid [other than income or other taxes provided in Article 20.2.2 (*Production and Severance Taxes*)] and, upon written request from a Non-Operating Party, provide copies of all tax returns, reports, tax statements, and receipts for the taxes. The Operator shall not allow any taxes to become delinquent unless unanimously agreed to by the Parties.

128

APC-HEC1-000001738

### 20.2.1  Property Taxes

The Operator shall render for ad valorem property tax purposes all personal property and/or real property covered by this Agreement as may be subject to that taxation and shall pay those property taxes for the benefit of each Party.  The Operator shall timely and diligently protest a valuation of the Leases for tax purposes it deems unreasonable.  Pending final determination of the valuation of the Leases for tax purposes, unless unanimously agreed to by the Parties to the contrary under Article 20.2 *(Other Taxes and Assessments)*, the Operator shall, on or before the due date, pay under protest taxes on the Leases at the assessed value of the Leases.  If upon final determination, additional taxes are due or if interest or a penalty has accrued as a result of the protest, the Operator shall pay the taxes, interest, and penalty and shall charge each Party its Working Interest share of the taxes, interest, and penalty under Exhibit "C."

### 20.2.2  Production and Severance Taxes

Each Party shall pay, or cause to be paid, all production, excise, severance, and other similar taxes due on its share of Hydrocarbon production.  Each Party shall, upon a written request from the Operator, provide evidence that those taxes have been paid.

## ARTICLE 21 – INSURANCE AND BONDS

### 21.1  Insurance

The Operator shall provide and maintain the insurance coverage specified in Exhibit "B" and charge those Costs to the Joint Account.  No other insurance shall be carried for the benefit of the Parties under this Agreement unless otherwise agreed by the Parties.

### 21.2  Bonds

The Costs of those bonds or financial guarantees acquired exclusively for the conduct of activities and operations under this Agreement shall be charged to the Joint Account, including an amount equivalent to the reasonable cost of that bond or financial guarantee if the Operator provides that bond or guarantee itself and does not engage a third party to do so.  The Operator shall require all

129

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001739

contractors to obtain and maintain all bonds required by an applicable law, regulation, or rule.

## ARTICLE 22 – LIABILITY, CLAIMS, AND LAWSUITS

### 22.1   Individual Obligations

The obligations, duties, and liabilities of the Parties under this Agreement are several and not joint or collective, and, except as otherwise provided in Article 20 *(Taxes)*, nothing in this Agreement shall be construed to create a partnership, joint venture, association, or other form of business entity recognizable in law for any purpose.  In their relations with each other under this Agreement, the Parties are not fiduciaries, but rather are free to act at arm's length in accordance with their own respective interests.

### 22.2   Notice of Claim or Lawsuit

If, on account of a matter involving activities or operations under this Agreement, or affecting the Leases or the Contract Area, a claim is made against a Party, or if a party outside of this Agreement files a lawsuit against a Party, or if a Party files a lawsuit, or if a Party receives notice of a material administrative or judicial hearing or other proceeding, that Party shall give written notice of the claim, lawsuit, hearing, or proceeding ("Claim") to the other Parties as soon as reasonably practicable.

### 22.3   Settlements

The Operator may settle a Claim, or multiple Claims, arising out of the same incident, involving activities or operations under this Agreement or affecting the Leases or the Contract Area, if the aggregate expenditure does not exceed five hundred thousand dollars ($500,000.00) and if the payment is in complete settlement of these Claims.  If the amount required for settlement exceeds this amount, the Parties shall determine the further handling of the Claims under Article 22.4 *(Defense of Claims and Lawsuits)*.

### 22.4   Defense of Claims and Lawsuits

The Operator shall supervise the handling, conduct, and prosecution of all Claims involving activities or operations under this Agreement or affecting the Leases or the Contract Area.  Claims may be settled in excess of the amount specified in Article 22.3 *(Settlements)* if the settlement is approved by Vote of the

130

CONFIDENTIAL

ACCESS RESTRICTED

Participating Parties in the activity or operation out of which the Claim arose, but a Party may independently settle a Claim or the portion of a Claim which is attributable to its Participating Interest Share alone as long as that settlement does not directly and adversely affect the interest or rights of the other Participating Parties. No charge shall be made for services performed by the staff attorneys of a Party, but all other expenses incurred by the Operator in the prosecution or defense of Claims for the Parties, together with the amount paid to discharge a final judgment, are Costs and shall be paid by the Parties in proportion to their Participating Interest Share in the activity or operation out of which the Claim arose. The employment of outside counsel, but not the selection of that counsel, requires approval by Vote of the Participating Parties in the activity or operation out of which the Claim arose. If the use of outside counsel is approved, the fees and expenses incurred as a result thereof shall be charged to the Parties in proportion to their Participating Interest Share in the activity or operation out of which that Claim arose. Each Party has the right to hire its own outside counsel at its sole cost with respect to its own defense.

**22.5   Liability for Damages**

Unless specifically provided otherwise in this Agreement, liability for losses, damages, Costs, expenses, or Claims involving activities or operations under this Agreement or affecting the Leases or the Contract Area which are not covered by or in excess of the insurance carried for the Joint Account shall be borne by each Party in proportion to its Participating Interest Share in the activity or operation out of which that liability arises, except that when liability results from the gross negligence or willful misconduct of a Party, that Party shall be solely responsible for liability resulting from its gross negligence or willful misconduct. **UNDER NO CIRCUMSTANCES WILL A PARTY BE LIABLE TO ANOTHER PARTY FOR PUNITIVE DAMAGES, CONSEQUENTIAL, INDIRECT, UNFORSEEN, LOSS OF PROFIT, OR OTHER INDIRECT OR PENALTY DAMAGES EITHER IN LAW OR EQUITY.**

**22.6   Indemnification for Non-Consent Operations**

**TO THE EXTENT ALLOWED BY LAW, THE PARTICIPATING PARTIES WILL HOLD THE NON-PARTICIPATING PARTIES (AND THEIR AFFILIATES, AGENTS, INSURERS, DIRECTORS, OFFICERS, AND EMPLOYEES) HARMLESS AND RELEASE, DEFEND, AND INDEMNIFY THEM AGAINST ALL CLAIMS, DEMANDS, LIABILITIES, REGULATORY DECREES, AND**

131

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001741

LIENS FOR ENVIRONMENTAL POLLUTION AND PROPERTY DAMAGE OR PERSONAL INJURY, INCLUDING SICKNESS AND DEATH, CAUSED BY OR OTHERWISE ARISING OUT OF NON-CONSENT OPERATIONS, AND ANY LOSS AND COST SUFFERED BY A NON-PARTICIPATING PARTY AS AN INCIDENT THEREOF, EXCEPT WHERE THAT LOSS OR COST RESULTS FROM THE SOLE, CONCURRENT, OR JOINT NEGLIGENCE, FAULT, OR STRICT LIABILITY OF THAT NON-PARTICIPATING PARTY, IN WHICH CASE EACH PARTY SHALL PAY OR CONTRIBUTE TO THE SETTLEMENT OR SATISFACTION OF JUDGMENT IN THE PROPORTION THAT ITS NEGLIGENCE, FAULT, OR STRICT LIABILITY CAUSED OR CONTRIBUTED TO THE INCIDENT.   IF AN INDEMNITY IN THIS AGREEMENT IS DETERMINED TO VIOLATE LAW OR PUBLIC POLICY, THAT INDEMNITY SHALL THEN BE ENFORCEABLE ONLY TO THE MAXIMUM EXTENT ALLOWED BY LAW.

## 22.7   Damage to Reservoir and Loss of Reserves

NOTWITHSTANDING ANY CONTRARY PROVISION OF THIS AGREEMENT, NO PARTY IS LIABLE TO ANY OTHER PARTY FOR DAMAGE TO A RESERVOIR OR LOSS OF HYDROCARBONS, EXCEPT IF THAT DAMAGE OR LOSS ARISES FROM A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, NOR DOES A PARTY INDEMNIFY ANY OTHER PARTY FOR THAT DAMAGE OR LOSS.

## 22.8   Non-Essential Personnel

UNLESS OTHERWISE MUTUALLY AGREED BY THE PARTIES IN WRITING, IN THE EVENT A PARTY REQUESTS TRANSPORTATION OR ACCESS TO ANY DRILLING RIG, PRODUCTION SYSTEM, VESSEL, OR OTHER FACILITY USED FOR ACTIVITIES OR OPERATIONS UNDER THIS AGREEMENT FOR ANY PERSON WHO IS NOT EMPLOYED BY, CONTRACTED BY, OR REPRESENTING SUCH PARTY IN CONNECTION WITH AN ACTIVITY OR OPERATION CONDUCTED PURSUANT TO THIS AGREEMENT, OTHER THAN GOVERNMENTAL OFFICIALS OR REPRESENTATIVES OF GOVERNMENTAL OR REGULATORY AGENCIES ("NON-ESSENTIAL PERSONNEL"), THE PARTY REQUESTING SUCH TRANSPORTATION OR ACCESS AGREES TO PROTECT, INDEMNIFY, RELEASE, DEFEND, AND HOLD HARMLESS THE OTHER PARTIES AND THEIR RESPECTIVE OFFICERS,    DIRECTORS,    MANAGERS,    EMPLOYEES,    AGENTS,

132

CONFIDENTIAL

ACCESS RESTRICTED

CONTRACTORS, SUBCONTRACTORS, INVITEES, INSURERS, AND REPRESENTATIVES FROM AND AGAINST ALL CLAIMS, DEMANDS, CAUSES OF ACTION, JUDGMENTS, LIABILITIES, CONTRACTUAL LIABILITIES, AND OTHER COSTS (INCLUDING, WITHOUT LIMITATION, COURT COSTS, INTEREST, PENALTIES, LITIGATION EXPENSES, AND REASONABLE ATTORNEYS' FEES) FOR DAMAGE TO, DESTRUCTION OR LOSS OF PROPERTY, AND FOR PERSONAL INJURY OR DEATH OF PERSONS, AND FOR DAMAGE OR HARM TO THE ENVIRONMENT (INCLUDING WITHOUT LIMITATION, SPILL RESPONSE, ENVIRONMENTAL POLLUTION AND CONTAMINATION AND CLEAN-UP COSTS) ARISING OUT OF OR RELATED IN ANY WAY TO THE NEGLIGENCE, FAULT, OR LIABILITY WITHOUT FAULT OF THE NON-ESSENTIAL PERSONNEL BROUGHT BY OR ON BEHALF OF ANY PARTY WHOMSOEVER (INCLUDING, WITHOUT LIMITATION, ALL THIRD PARTIES AND GOVERNMENTAL AGENCIES), WITHOUT REGARD TO THE CAUSES THEREOF, INCLUDING PRE-EXISTING CONDITIONS, THE UNSEAWORTHINESS OF ANY VESSEL, THE STRICT LIABILITY, NEGLIGENCE, OR OTHER FAULT OF ANY PARTY, REGARDLESS OF WHETHER THE NEGLIGENCE BE SOLE, JOINT, OR CONCURRENT, ACTIVE OR PASSIVE, EXCEPT IF CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE PARTY SO INDEMNIFIED AND PROTECTED.

**22.9   Dispute Resolution Procedure**

Any claim, controversy, or dispute arising out of, relating to, or in connection with this Agreement or an activity or operation conducted under this Agreement shall be resolved under the Dispute Resolution Procedure in Exhibit "H" to this Agreement.

## ARTICLE 23 – CONTRIBUTIONS

**23.1   Contributions from Third Parties**

A "Contribution" means a bottom hole cash contribution, dry hole cash contribution, or acreage contribution from third parties as consideration for data from wells or well operations on the Contract Area.  This Article 23 does not apply to the following:

133

APC-HEC1-000001743

(a) Trades of Confidential Data for other similar geophysical, geological, geochemical, drilling, or engineering data from third parties. Those trades of Confidential Data are subject to Article 7.2.1 *(Trades of Confidential Data)*;

(b) Contributions received as consideration for entering into a contract for the sale of Hydrocarbon production, as proceeds of loans, or as proceeds of other financial arrangements:

(c) A farmout of all or a portion of a Party's Working Interest, which is subject to Article 24 *(Transfer of Interest and Preferential Right to Purchase)*.

## 23.2   Methods of Obtaining Contributions

The Operator shall negotiate all Contributions on behalf of the Participating Parties in the well or well operation.   A Contribution may be obtained in the following ways:

(a) Any Participating Party in a well or well operation may propose that the Participating Parties in that well or well operation seek a Contribution from a third party towards that well or well operation.

(b) If a Participating Party in a well or well operation receives a Contribution offer for that well or well operation from a third party, that Party shall notify all other Participating Parties in that well or well operation of the terms of that offer within five (5) days of its receipt of that offer.

## 23.3   Counteroffers

If a third party makes a Contribution counteroffer to the Participating Parties' Contribution offer, or if a Participating Party proposes to make a Contribution counteroffer to a third party Contribution offer, the Operator shall submit the Contribution counteroffer to the other Participating Parties.

## 23.4   Approval of Contributions

A Contribution proposal, a Contribution counteroffer to a third party Contribution offer, an acceptance of a Contribution offer from a third party, or a Contribution counteroffer from a third party requires the unanimous agreement of the Participating Parties in the well or well operation affected by the Contribution. Within fifteen (15) days of their receipt of a notice of a Contribution proposal,

134

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001744

Contribution offer, or Contribution counteroffer, those Participating Parties shall respond to the Operator.

**23.5   Cash Contributions**

If a bottom hole or dry hole cash Contribution is offered and accepted, that cash Contribution shall be paid to the Operator, and the Operator shall credit the amount of the cash Contribution against the Costs of that well or well operation to each Participating Party in proportion to its Participating Interest Share.

**23.6   Acreage Contributions**

Any acreage Contribution, which is offered and accepted under this Article 23 *(Contributions)*, shall be conveyed to the Participating Parties in the well or well operation in proportion to their Participating Interest Share therein.  The leases or portions of leases included in the acreage Contribution shall not be added to Exhibit "A" or included in the Contract Area.

**23.6.1   Two or More Parties Own One Hundred Percent of the Acreage Contribution**

If two or more Parties participate in the acreage Contribution and the conveyances to effectuate it, and if, after the conveyances are approved by the MMS, those Parties own one hundred percent (100%) of the ownership interest in the contributed acreage, then (a) the contributed acreage shall be deemed to be governed by an operating agreement incorporating identical provisions as the provisions in this Agreement, except to the extent they are clearly inappropriate, (b) the execution of the operating agreement by the Parties participating in the acreage Contribution shall be considered a mere formality only, (c) the designated operator shall promptly prepare the operating agreement, and (d) the Parties participating in the acreage Contribution shall promptly execute the operating agreement once it is prepared.

**23.6.2   Two or More Parties Own Less Than One Hundred Percent of the Acreage Contribution**

If two or more Parties participate in the acreage Contribution and the conveyances to effectuate it, and if, after the conveyances are approved by the MMS, those Parties own less than one hundred percent (100%) of the ownership interest in the contributed acreage, then those Parties shall use reasonable efforts to negotiate and

135

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001745

execute with the other Working Interest owners in the contributed acreage an operating agreement covering the contributed acreage, which is as close in form to this Agreement as possible.

## ARTICLE 24 – TRANSFER OF INTEREST AND PREFERENTIAL RIGHT TO PURCHASE

### 24.1   Transfer of Interest

Except as provided in 24.1.1 *(Exceptions to Transfer Notice)*, a Transfer of Interest shall be preceded by written notice to the Operator and the other Parties ("the transfer notice").   Any Transfer of Interest shall be made to a party financially capable of assuming the corresponding obligations under this Agreement.  No Transfer of Interest shall release a Party from its obligations and liabilities under this Agreement, which are incurred prior to the effective date of that Transfer of Interest, or from debts or obligations incurred prior to the effective date of that Transfer of Interest, except to the extent expressly assumed by the transferee, and the security rights under Article 6.3 *(Security Rights)* shall continue to burden the Working Interest transferred and to secure the payment of any retained obligations and liabilities.   Once a Transfer of Interest becomes effective under Article 24.1.2 *(Effective Date of Transfer of Interest)*, the transferor shall not be responsible for any obligations, debts, or liabilities under this Agreement, which are incurred by the Parties on or after the effective date of that Transfer of Interest.

### 24.1.1   Exceptions to Transfer Notice

Notwithstanding any contrary provision of this Agreement, the transfer notice is not required when a Party proposes to mortgage, pledge, hypothecate, or grant a security interest in all or a portion of its Working Interest (including Assignments of Hydrocarbon production executed as further security for the debt secured by that security device); any Production Systems, Facilities, or equipment; or when any interest is conveyed in accordance with Articles 16 *(Non-Consent Operations)*, 17 *(Withdrawal From Agreement)*, and 18 *(Abandonment and Salvage)*. However, an encumbrance arising from the financing transaction shall be expressly made subject and subordinated to this Agreement.

136

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001746

**24.1.2**   **Effective Date of Transfer of Interest**

The effective date of a Transfer of Interest shall be at least sixty (60) days, but not more than one hundred eighty (180) days, after the date of the receipt of the transfer notice.  A Transfer of Interest, other than those provided in Article 17.1 (*Right to Withdrawal*) and Article 24.1.1 (*Exceptions to Transfer Notice*), is effective and shall be binding upon the Parties at the latest date of occurrence of all of the following:  (i) the transferor or transferee provides all remaining Parties with a photocopy of a fully executed Transfer of Interest and an executed MMS Form 1123, "Designation of Operator," and an "Application for Certification of Oil Spill Responsibility" form and (ii) evidence of receipt of all necessary approvals by the MMS.   The Parties shall promptly undertake all reasonable actions necessary to secure those approvals and shall execute and deliver all documents necessary to effectuate that Transfer of Interest.  All costs attributable to a Transfer of Interest are the sole obligation of the assigning Party.

**24.1.3**   **Minimum Transfer of Interest**

Except as otherwise provided in this Agreement, a Transfer of Interest shall cover an undivided Working Interest in the entire Contract Area. Prior to the approval of the Execution AFE for the initial Development System, no Transfer of Interest shall be made that is not at least an undivided ten percent (10%) Working Interest, unless the Parties unanimously agree to a different minimum Transfer of Interest. After the Execution AFE Election on the initial Development System, a Transfer of Interest to a third party shall be limited to a minimum Working Interest of ten percent (10%), unless the Parties unanimously agree to a different minimum Transfer of Interest.

**24.1.4**   **Form of Transfer of Interest**

Any Transfer of Interest shall incorporate provisions that the Transfer of Interest is subordinate to and made expressly subject to this Agreement and provide for the assumption by the assignee of the performance of all of the assigning Party's obligations under this Agreement.   Any Transfer of Interest not in compliance with this provision is voidable by the non-assigning Parties.

137

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001747

**24.1.5** **Warranty**

Any Transfer of Interest, vesting, or relinquishment of Working Interest between the Parties under this Agreement shall be made without warranty of title.

**24.2** **Preferential Right to Purchase**

Any Transfer of Interest shall be subject to the following provisions:

**24.2.1** **Notice of Proposed Transfer of Interest**

The transfer notice shall provide full information about the proposed Transfer of Interest, including, but not limited to, the name and address of the prospective assignee (who must be ready, willing, and able to acquire the interest and deliver the stated consideration therefor), the full consideration for the Transfer of Interest, and all other terms of the offer.

In the case of a package sale of oil and gas interests that includes all or part of the assigning Party's Working Interest, or if the proposed Transfer of Interest is structured as a like-kind exchange, the Working Interest that is subject to the Transfer of Interest shall be separately valued and the transfer notice shall state the monetary value attributed to the Working Interest by that prospective assignee. Article 24.2 *(Preferential Right to Purchase)* shall apply only to the Working Interest that is subject to the Transfer of Interest.

**24.2.2** **Exercise of Preferential Right to Purchase**

Within sixty (60) days from receipt of the transfer notice, each non-assigning Party may exercise its preferential right to purchase its Participating Interest Share of the Working Interest offered (on the same terms and conditions, or on equivalent terms for a non-cash transaction as stated in the notice) without reservations or conditions by written notice of that fact to all of the Parties. If a non-assigning Party does not exercise its preferential right to purchase its Participating Interest Share of the Working Interest offered and the non-assigning Parties, who wish to exercise their preferential right to purchase, do not agree to pay the full consideration for the Transfer of Interest and accept all of the other terms of the third party offer within fifteen (15) days of the sixty (60) day period in which the non-assigning Parties

138

APC-HEC1-000001748

may exercise their preferential right to purchase, the assigning Party shall be free to complete the proposed conveyance on the terms disclosed in the notice.  If the other non-assigning Parties agree to pay the full consideration for the Transfer of Interest and accept all of the other terms of the third party offer, the assigning Party shall transfer the Working Interest to the non-assigning Parties who exercised their preferential right to purchase under this Article 24 *(Transfer of Interest and Preferential Right to Purchase)*.  The Transfer of Interest shall be concluded within a reasonable time, but no later ninety (90) days after the applicable period in which the non-assigning Parties may exercise their preferential right to purchase.

**24.2.3**  **Transfer of Interest Not Affected by the Preferential Right to Purchase**

Article 24.2 *(Preferential Right to Purchase)* shall not apply when a Party proposes to:

(a)  mortgage, pledge, hypothecate, or grant a security interest in all or a portion of its Working Interest (including assignments of Hydrocarbon production executed as further security for the debt secured by that security device), or

(b)  grant an overriding royalty, a net profits interest, or a production payment, or

(c)  dispose of its Working Interest by:

    (i)  merger, reorganization, or consolidation;

    (ii)  a Transfer of Interest of all or substantially all of a Party's exploration and production properties in the Gulf of Mexico;

    (iii)  a Transfer of Interest to an Affiliate, provided that there is included in the Transfer of Interest a provision that if for any reason the assignee ceases to be an Affiliate of the Transferring Party within one (1) year after Transfer of Interest, those rights shall be immediately reassigned to the original Party before the assignee ceases to be an Affiliate, and that all rights of the assignee in the Contract

139

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001749

Area shall terminate if the re-assignment does not take place; or

(iv)   a Transfer of Interest pursuant to Articles 16 *(Non-Consent Operations)*, 17 *(Withdrawal From Agreement)*, and/or 18 *(abandonment and Salvage)*.

### 24.2.4   Completion of Transfer of Interest

If the proposed Transfer of Interest is not executed and filed of record with the MMS within one-hundred fifty (150) days after receipt of the transfer notice by the non-assigning Parties, or if the terms of the proposed Transfer of Interest conveyance are materially altered, the proposed Transfer of Interest shall be deemed withdrawn, and the Working Interest included in the proposed Transfer of Interest shall again be governed by this Article 24.2 *(Preferential Right to Purchase)*.

## ARTICLE 25 – FORCE MAJEURE

### 25.1   Force Majeure

If a Party is unable, wholly or in part because of a Force Majeure, to carry out its obligations under this Agreement, other than the obligation to make money payments, that Party shall give the other Parties prompt written notice of the Force Majeure with full particulars about it.  Effective upon the date notice is given, the obligations of the Party, so far as they are affected by the Force Majeure, shall be suspended during, but no longer than, the continuance of the Force Majeure.  Time is of the essence in the performance of this Agreement, and every reasonable effort will be made by the Party to avoid delay or suspension of any work or acts to be performed under this Agreement.  The requirement that the Force Majeure be remedied with all reasonable dispatch shall not require a Party to settle strikes or other labor difficulties.

## ARTICLE 26 – ADMINISTRATIVE PROVISIONS

### 26.1   Term

This Agreement shall remain in effect so long as a Lease remains in effect and thereafter until (a) all wells have been abandoned and plugged or turned over to

140

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001750

the Parties owning an interest in the Lease on which the wells are located; (b) all Production Systems, Facilities, and equipment have been disposed by the Operator in accordance Article 18 (*Abandonment and Salvage*); (c) all Claims as defined in Article 22 (*Liability, Claims, and Lawsuits*) have been settled or otherwise disposed of; and (d) there has been a final accounting and settlement. In accordance with Article 4.5 (*Selection of Successor Operator*), this Agreement will also terminate if no Party is willing to become Operator, effective after all conditions in clauses (a) through (d) above have been completed. Termination of this Agreement shall not relieve a Party of a liability or obligation accrued or incurred before termination and is without prejudice to all continuing confidentiality obligations or other obligations in this Agreement.

**26.2   Waiver**

A term, provision, covenant, representation, warranty, or condition of this Agreement may be waived only by written instrument executed by the Party waiving compliance. The failure or delay of a Party in the enforcement or exercise of the rights granted under this Agreement shall not constitute a waiver of said rights nor shall it be considered as a basis for estoppel. Time is of the essence in the performance of this Agreement, and all time limits shall be strictly construed and enforced.

**26.3   Waiver of Right to Partition**

Each Party waives the right to bring an action for partition of its interest in the Contract Area, Production System, Facilities, and equipment held under this Agreement, and covenants that during the existence of this Agreement it shall not resort at any time to an action at law or in equity to partition any or all of the Leases and lands or personal property subject to this Agreement.

**26.4   Compliance With Laws and Regulations**

This Agreement, and all activities or operations conducted by the Parties under this Agreement, are expressly subject to, and shall comply with, all laws, orders, rules, and regulations of all federal, state, and local governmental authorities having jurisdiction over the Contract Area. No Party shall suffer a forfeiture or be liable in damages for failure to comply with any of the provisions of this Agreement if such compliance is prevented by or if such failure results from compliance with any applicable law, order, rule, or regulation.

141

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001751

### 26.4.1   Applicable Law

THIS AGREEMENT AND THE RELATIONSHIP OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY AND INTERPRETED UNDER FEDERAL LAWS AND LAWS OF THE STATE OF LOUISIANA, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD OTHERWISE REFER THE MATTER TO THE LAWS OF ANOTHER JURISDICTION.

### 26.4.2   Severance of Invalid Provisions

If, for any reason and for so long as, a clause or provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid, unenforceable, or unconscionable under a present or future law (or interpretation thereof), the remainder of this Agreement will not be affected by that illegality or invalidity. An illegal or invalid provision will be deemed severed from this Agreement, as if this Agreement had been executed without the illegal or invalid provision. The surviving provisions of this Agreement will remain in full force and effect unless the removal of the illegal or invalid provision destroys the legitimate purposes of this Agreement, in which event this Agreement shall be null and void.

### 26.4.3   Fair and Equal Employment

Each of the Parties is an Equal Opportunity Employer, and the equal opportunity provisions of 30 CFR 270 and 41 CFR 60-1 are incorporated in this Agreement by reference. The affirmative action clauses concerning disabled veterans and veterans of the Vietnam era (41 CFR 60-250) and the affirmative action clauses concerning employment of the handicapped (41 CFR 60-741) are also incorporated in this Agreement by reference. In performing work under this Agreement, the Parties shall comply with (and the Operator shall require each independent contractor to comply with) the governmental requirements in Exhibit "E" that pertain to non-segregated facilities.

## 26.5   Construction and Interpretation of this Agreement

### 26.5.1   Headings for Convenience

Except for the definition headings in Article 2 *(Definitions)*, all the table of contents, captions, numbering sequences, and paragraph headings

142

APC-HEC1-000001752

in this Agreement are inserted for convenience only and do not define, expand, or limit the scope, meaning, or intent of this Agreement.

26.5.2    **Article References**
Except as otherwise provided in this Agreement, each reference to an article of this Agreement includes all of the referenced article and its sub-articles.

26.5.3    **Gender and Number**
The use of pronouns in whatever gender or number is a proper reference to the Parties to this Agreement though the Parties may be individuals, business entities, or groups thereof.   Reference in this Agreement to the singular of a noun or pronoun includes the plural and vice versa.

26.5.4    **Joint Preparation**
This Agreement shall be deemed for all purposes to have been prepared through the joint efforts of the Parties and shall not be construed for or against one Party or the other as a result of the preparation, submittal, drafting, execution, or other event of negotiation hereof.

26.5.5    **Integrated Agreement**
This Agreement contains the final and entire agreement of the Parties for the matters covered by this Agreement and, as such, supersedes all prior written or oral communications and agreements, less and except the following: that certain Lease Exchange Agreement among BP and MOEX dated effective October 1, 2009 ("LEA").  If there is a conflict between this Agreement and the LEA, the LEA will prevail.    This Agreement may not be modified or changed except by written amendment signed by the Parties.

26.5.6    **Binding Effect**
To the extent it is assignable, this Agreement shall bind and inure to the benefit of the Parties and their respective successors and assigns, and shall constitute a covenant running with the land comprising the Contract Area.  This Agreement does not benefit or create any rights in a person or entity that is not a Party to this Agreement.

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001753

### 26.5.7 Further Assurances

Each Party will take all actions necessary and will sign all documents necessary to implement this Agreement.  Except as otherwise provided in this Agreement, within (30) days after their receipt of a valid written request for those documents from a Party, all other Parties shall prepare and execute the documents.

### 26.5.8 Duplicate Counterpart Execution

This Agreement may be executed by signing the original or a counterpart. If this Agreement is executed in duplicate counterparts, all counterparts taken together shall have the same effect as if all Parties had signed the same agreement. No Party shall be bound to this Agreement until all Parties have executed a counterpart or the original of this Agreement.  This Agreement may also be ratified by a separate instrument that refers to this Agreement and adopts by reference all provisions of this Agreement.  A ratification shall have the same effect as an execution of this Agreement.

### 26.5.9 Currency

Any amounts due or payable under this Agreement shall be paid in United States currency.

### 26.5.10 Future References

A reference to a Party includes such Party's successors and assigns and, in the case of governmental bodies, persons succeeding to their respective functions and capacities.

## 26.6 Restricted Bidding

If more than one Party is ever on the list of restricted joint bidders for OCS lease sales, as issued by the MMS under 30 CFR 256.44, as amended, the Parties shall comply with all statutes and regulations regarding restricted joint bidders on the OCS.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

144

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001754