"EXHIBIT 2"
(Comments of BP To Gulf Coast Claims Facility)     Business

COMMENTS OF

WITH RESPECT TO
THE GULF COAST CLAIMS FACILITY'S DRAFT PROPOSAL
GOVERNING PAYMENT OPTIONS, ELIGIBILITY AND
SUBSTANTIATION CRITERIA,
AND FINAL PAYMENT METHODOLOGY

February 16, 2011

## INTRODUCTION AND SUMMARY

On February 2, 2011, the Gulf Coast Claims Facility ("GCCF") issued for public review and comment a draft proposal governing eligibility, substantiation criteria and payment methodologies for Final and Interim Claims (the "Proposed GCCF Methodology").

respectfully submits comments on the Proposed GCCF Methodology.[1]

Pursuant to an agreement with the Obama Administration, the GCCF was established under the direction of a third-party administrator, Kenneth R. Feinberg, to perform this function.[2]  The GCCF is one of the largest claims facilities ever.  To date, almost 500,000 claimants have submitted claims.  Evaluating so many different claims is not an easy task.  The GCCF has achieved much in a very short amount of time, and has offered claimants a process that goes well beyond what is required by the law.

For example, between late August and late November 2010, the GCCF offered an emergency advance payment claims process that provided payments, including payments of potential prospective loss, in excess of $2.5 billion to more than 168,000 claimants.[3]  The GCCF emergency claims process required only limited supporting evidence of loss to be submitted by claimants.  This process provided benefits well beyond what is required under OPA, which

---

[1] comments focus on certain significant aspects of the Proposed GCCF Methodology. These comments are not an e   austive analysis of all aspects of the Proposed GCCF Methodology. The fact that    do   not comment on a particul   aspect of the Proposed GCCF Methodology does not mean that     concurs with that aspect.     specifically reserves, and does not waive, its right to assert any and all factual or legal defenses that may be applicable in any litigation arising out of or related to the Deepwater Horizon oil spill.

[2] GCCF Website, Frequently Asked Questions, <http://www.gulfcoastclaimsfacility.com/faq#Q1> (last visited 2/13/11).

[3] Prior to the transition of claims handling to the GCCF,     made claims payments in excess of $395 million.

2

requires claimants to substantiate their claims and, further, does not contemplate compensation for loss before it occurs. *See* Testimony of Craig Bennett, Director, National Pollution Funds Center, U.S. Coast Guard, before the United States Senate Committee on Homeland Security and Governmental Affairs, Ad Hoc Subcommittee on Disaster Recovery (Jan. 27, 2011) at 51 (stating that the GCCF has been "more inclusive than OPA requires" in paying for prospective losses).

Following the sunset of the emergency claims process, the GCCF implemented a flexible, multi-option interim and final claims settlement process that permits claimants to select one of three different options for pursuing claims. *First*, claimants who do not want to fully and finally resolve their claims at present may file Interim Payment Claims and recover for substantiated past loss on a quarterly basis. Interim claims do not require the signing of a release or waiver of liability. *Second*, claimants who qualified for an emergency payment, or who receive an Interim Payment, may file for a Quick Pay and receive a fixed amount ($5,000 for individuals and $25,000 for businesses) on an expedited basis with no further substantiation. Quick Pay is designed for those claimants who believe that their emergency payment (and/or Interim Payment) together with the Quick Pay amount fully and fairly resolves their claim. *Third*, every claimant has the right to file for a Full Final Review Payment Claim and have the GCCF perform an analysis of their claim and develop an offer of a payment in respect of actual documented loss and projected future loss.[4]

---

[4] Claimants dissatisfied with the GCCF's offer on a Full Final Review Payment Claim, which is valid for 90 days, also have several options. Claimants whose total payment offer exceeds $250,000 or whose claim the GCCF has deemed of precedential significance may, within 14 days of the offer, appeal to a three-judge panel. Claimants dissatisfied with the three-judge panel decision, or other claimants, may pursue their claims with the U.S. Coast Guard or the courts. *See* GCCF Website, Summary of Options for Submission of Final and Interim Payment Claims, <http://www.gulfcoastclaimsfacility.com/summary_options.pdf.> (last visited 2/14/11).

comments focus on the methodology for the Full Final Review Payment. In many respects, the Proposed GCCF Methodology is sound in its attempt to apply the law and reach a fair resolution. For example, with regard to 2010 loss, the GCCF correctly sets out to calculate actual, substantiated loss caused by the spill.

However,      believes that the draft methodology's key assumptions regarding risk of future loss are not supported by actual data or by the analysis of the GCCF's own consultants. There is simply no factual basis to assume, as the GCCF proposes, that, Gulf-wide, claimants will experience losses in 2011 equaling 70% of their 2010 losses and losses in 2012 equaling 30% of 2010 losses, so that final payments should be twice the amount of actual substantiated loss. The GCCF itself has found that "[t]here is evidence of a strong recovery underway"[5] – and for good reason. According to data published by the National Oceanic and Atmospheric Administration (NOAA) National Marine Fisheries Service, December 2010 was the best shrimping season in the last five years. Both landings and prices were high.[6] As the GCCF's experts have found, fall 2010 tourism indicators likewise were§§ comparable to or above 2009 levels.[7]

There is, therefore, no credible support for adopting an artificially high future loss factor based purely on the inherent degree of uncertainty in predicting the future and on the mere possibility that future harm might occur. That is particularly true where, as here, the Proposed GCCF Methodology provides claimants with choices that permit claimants to protect themselves against any such risk. Every claimant has the unilateral option to choose between a final offer and an interim offer. Accordingly, any claimants who believe their future losses are likely to be

---

[5] *See* Proposed GCCF Methodology at 4.

[6] See below pp. 12-13, 17.

[7] See below pp. 14-15.

greater than those predicted by the GCCF's future loss factor can choose to decline a final payment offer at this time and, instead, to receive interim payments as provided by OPA. Moreover, the proposed future loss factor is subject to revision if that is warranted by new data. The GCCF plans to review the future loss factor every four months in light of new data and to revise it if necessary.

recognizes that predicting the future is an inherently difficult and uncertain task, and that no one can say – with respect to the oil spill or any other event – that there is absolutely no risk of future harm.      also recognizes the benefits to all parties of a settlement process that will enable them to avoid the burden, expense, uncertainty and delay of litigation. Therefore, notwithstanding the current data regarding recovery, should the GCCF conclude that a future factor is appropriate for purposes of claims resolution,      believes that, solely for purposes of the GCCF settlement process, it would be appropriate for the GCCF to use a future factor in the range of 0.25 – 0.50 (or 25% - 50%) of a claimant's actual 2010 substantiated loss.

The Proposed GCCF Methodology also should be clarified with respect to claims of alleged damage to oyster beds. The methodology proposes to use an enhanced future loss multiplier for oyster beds that have been damaged by MC252 oil or by the fresh water diversion implemented by the State of Louisiana.      does not oppose the use of a higher multiplier for those oyster beds, if any, that a claimant establishes have been oiled with MC252 oil and will require reseeding. However, alleged damage to oyster beds caused by the State of Louisiana's fresh water diversion, which may have reduced water salinity, is not compensable under OPA because it was not caused by the oil spill. *See* 33 U.S.C. §§ 2702(a), (b). Moreover, it is important to note that some senior Gulf state regulatory officials are reporting that damage to oyster beds in 2010 was not caused by the spill or the fresh water diversion; rather, it was caused by increased water temperature and lower levels of dissolved oxygen.      believes that the

Proposed GCCF's Methodology should be revised to provide that the GCCF will award compensation for damage to oyster beds only where the damage was caused by MC252 oil.

also submits that the $500,000 threshold for applying an individualized evaluation of the proper future factor is too high.  The threshold should be set at $100,000.      understands the administrative desire to increase efficiencies in the GCCF claims settlement process where possible, including addressing the risk of potential future losses by applying a single multiplier to many claims.  It must be recognized, however, that not all claimants will face the same – or indeed, any – risk of future loss.  A lower threshold providing for individualized review in more cases will help assure that any payment in respect of the risk of future loss is properly calibrated to the actual risk, if any.

In short,     respectfully recommends that the Proposed GCCF Methodology be revised in accordance with the comments set forth below.

## SPECIFIC COMMENTS

### I.     THE IMPORTANCE OF SUBSTANTIATION.

As the Proposed GCCF Methodology correctly recognizes, substantiation is a core principle of OPA's compensation system.  *See* Proposed GCCF Methodology at 2-3.  OPA authorizes lost income and lost profits compensation only for losses that are due to injury, destruction, or loss of real property, personal property, or natural resources that resulted from the oil spill.  33 U.S.C. §§ 2702(a), (b).  The Coast Guard regulations governing claims to the federal Oil Spill Liability Trust Fund provide that "[t]he claimant bears the burden of providing all evidence, information, and documentation deemed necessary by the Director, NPFC to support the claim."  33 C.F.R. § 136.105(a).

Under the Coast Guard regulations, a claimant seeking lost income or lost profits must prove the following:

6

(a) That real or personal property or natural resources have been injured, destroyed, or lost.

(b) That the claimant's income was reduced as a consequence of injury to, destruction of, or loss of the property or natural resources, and the amount of that reduction.

(c) The amount of the claimant's profits or earnings in comparable periods and during the period when the claimed loss or impairment was suffered, as established by income tax returns, financial statements, and similar documents. In addition, comparative figures for profits or earnings for the same or similar activities outside of the area affected by the incident also must be established.

(d) Whether alternative employment or business was available and undertaken and, if so, the amount of income received. All income that a claimant received as a result of the incident must be clearly indicated and any saved overhead and other normal expenses not incurred as a result of the incident must be established.

*Id.* § 136.233.

The Coast Guard regulations further provide:

The amount of compensation allowable is limited to the actual net reduction or loss of earnings or profits suffered. Calculations for net reductions or losses must clearly reflect adjustments for—

(a) All income resulting from the incident;

(b) All income from alternative employment or business undertaken;

(c) Potential income from alternative employment or business not undertaken, but reasonably available;

(d) Any saved overhead or normal expenses not incurred as a result of the incident; and

(e) State, local, and Federal taxes.

*Id.* § 136.235.

understands that, for purposes of the emergency payment program, the GCCF did not

require robust substantiation. *See* Proposed GCCF Methodology at 2. That was a reasonable

decision given the goals of the emergency program. However, it also means that some claimants

whose alleged losses were not caused by the spill may have received emergency payments and/or that claimants received payments that exceeded their actual losses in total or as of the date of payment. Still further, claimants received emergency payments for six months of loss, notwithstanding that many claimants in fact did not incur six months of loss.

The Proposed GCCF Methodology correctly provides that, when evaluating interim and final claims, the GCCF cannot rely on presumptions made during the emergency claims process:

> The GCCF will not presume that a given loss was or was not caused by the Oil Spill, regardless of whether or not the claimant received an Emergency Advance Payment. Each claim stands on its own merits, and the GCCF will evaluate each submission to determine whether a loss was caused by the Oil Spill. In all cases, there must be an identifiable link between an actual loss and the Oil Spill. Evidence establishing this connection is required.

Proposed GCCF Methodology at 2-3. This statement makes two important points, both of which agrees with.

First,        agrees that the GCCF must determine, based on the evidence submitted, whether the loss claimed actually was caused by injury to property or a natural resource resulting from the spill, and must also determine the amount of actual loss. If it was not, but was instead caused by some other separate factor – such as, for example, alleged adverse public perceptions – then the claim is not covered by OPA and no payment is warranted.

Second, assuming a claimant can substantiate a covered loss, if the amount paid during the emergency program is greater than the actual substantiated loss, the GCCF must use the actual substantiated loss for purposes of applying the future factor. Failure to do so would be inconsistent with the theory underlying the future factor, would result in a payment for losses not shown to be likely to occur, and would result in inconsistent treatment of claimants.

Comments posted on the GCCF website concerning the Proposed GCCF Methodology suggest that there is some confusion regarding the GCCF's proposal to substantiate the amount

8

of actual loss by comparing the claimant's actual net income from April 20 – December 31, 2010 to the claimant's actual net income during the same period in prior years. Proposed GCCF Methodology at 5.      believes that the GCCF's proposed approach is logical, consistent with applicable law and administratively manageable.[8] The Coast Guard, when adjudicating claims filed with the Oil Spill Liability Trust Fund, looks to the claimant's earnings in prior years to calculate actual loss. 33 U.S.C. § 136.233. This type of methodology is widely accepted by courts. *See, e.g.*, *Lavigne v. J. Hofert Co.*, 431 So. 2d 74, 76 (La. Ct. App. 1983) ("A commonly accepted method of proving lost profits is by calculating profits for similar sales during other periods of time and using such calculations as a basis for estimating lost profits for the period in question."). It is also consistent with the well-established legal principle that lost profits must be shown with "reasonable certainty." *See, e.g.*, *MKR Svcs., L.L.C. v. Dean Hart Constr., L.L.C.*, 16 So. 3d 562 (La. Ct. App. 2009); *Holt v. Bethany Land Co.*, 843 So. 2d 606 (La. Ct. App. 2003).[9] *See also, e.g.*, *S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58 (1st Cir. 2000) (OPA case applying comparable standard); *In re Seaboats, Inc. v. Alex C Corp.*, Nos. 01-12184-DPW, 01-12186-DPW, 00-12500-DPW, 2003 WL 203078 (D. Mass. Jan. 30, 2003) same). Mere speculation or conjecture will not support an award. *See Miller Indus. v. Caterpillar Tractor Co.*, 733 F.2d 813, 822 (11th Cir. 1984) (applying federal maritime common law); *In re Discount Cigarette, Cigars, Etc., Inc.*, 399 B.R. 605, 617-18 (M.D. La. 2009).

---

[8] The April 20 - December 31 period, rather than an entire year, is appropriate, because only losses resulting from and due to the oil spill, which began on April 20, are compensable. Moreover, to the extent a claimant's income during the period January 1 - April 19, 2010 exceeded their income in the same period in prior years, the proposed methodology does not harm them. In fact, it benefits them: by comparing only the relevant time periods, rather than entire years, it avoids reducing a claimant's demonstrated loss by the amount of their relatively higher income during early 2010.

[9] The law of other Gulf states is in accord with Louisiana law regarding the standards for proof of actual damages. *See, e.g.*, *Levitt-Ansca Towne Park P'ship v. Smith & Co.*, 873 So. 2d 392, 396 (Fla. Dist. Ct. App. 2004); *Sostchin v. Doll Enters., Inc.*, 847 So. 2d 1123, 1128 (Fla. Dist. App. Ct. 2003); *Morris Concrete. v. Warrick*, 868 So. 2d 429, 440 (Ala. App. 2003).

The Proposed GCCF Methodology meets the "reasonable certainty" standard insofar as it relies on objective, past data to determine actual losses. In contrast, using anything other than actual experience for a baseline – such as projected revenues – would risk violating the "reasonable certainty" requirement and significantly complicating the claims review process. Any projection or adjustment of actual data inevitably introduces elements of judgment and subjectivity into the analysis. Courts require that the reliability and reasonableness of such judgments and assumptions must be rigorously scrutinized, typically through an adversarial process that includes examination of such factors as: "(1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community." *Gallagher & Co. v. Babcock*, No. 08-185, 2011 WL 121889, at *2 (E.D. La. Jan. 10, 2011) (relying on *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)). The required rigorous analysis would open an administrative Pandora's box, adding needless delay and complexity to claims processing as the GCCF sought to avoid payment of speculative damages by undertaking a thorough and individualized evaluation of the reliability of the data and methodology underlying any projection for each and every claimant. Moreover, undertaking such a complex, uncertain process would inevitably create the risk of inconsistent standards or treatment of claimants.

For these reasons, the GCCF's proposed general approach for most claimants of comparing 2010 income for the period from April 20, 2010 through December 31, 2010 to income for the same period in prior years is appropriate. To the extent the GCCF may be willing to permit claimants to present evidence establishing that a comparison to similar periods in prior years does not substantiate their actual losses with "reasonable certainty," and that an alternative

methodology does so, the GCCF would have to review rigorously the alternative methodology and apply it only if the GCCF concludes that the methodology estimates compensable losses with "reasonable certainty."

**II.    THE GCCF'S PROPOSAL TO PAY MOST CLAIMANTS AN ADDITIONAL AMOUNT OF 100 PERCENT OF ACTUAL DEMONSTRATED 2010 LOSSES, IN ORDER TO TAKE ACCOUNT OF POTENTIAL FUTURE LOSSES, IS NOT SUPPORTED BY PUBLICLY AVAILABLE ECONOMIC DATA AND SHOULD BE REDUCED.**

**A.    Relevant Legal Standards Require That Any Final Payment Including Compensation For Expected Future Losses Must Be Based On A Reliable Methodology That Is Well-Supported By Data And Not Speculative.**

OPA § 2702 provides for recovery of actual "loss," not speculative future losses.  As the Coast Guard's regulations make clear, compensation under OPA "is limited to the *actual* net reduction or loss of earnings or profits suffered."  33 C.F.R. § 136.235 (emphasis added).  Future losses, like past losses, must be proven with reasonable certainty.  *See, e.g.*, *White Haute, LLC v. Mayo*, 38 So. 3d 944, 953 (5th Cir. 2010).[10]  To achieve such reasonable certainty, any methodology for projecting likely future losses, including the future losses factor, must be solidly grounded in the relevant data to produce a "sufficiently reliable" projection.  *See, e.g.*, *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009); *Vekic v. Wood Energy Corp.*, No. 03-1906, 2004 WL 2367732, at *3-4 (E.D. La. Oct. 20, 2004) (finding future loss evidence on oyster leases unreliable because it was not based on sufficient facts or data or reliable principles and methods); *see also, e.g.*, *R & R Int'l, Inc. v. Manzen, LLC*, No. 09-60545, 2010 WL 3605234, at *8, *11 (S.D. Fla. Sept. 12, 2010) (holding that under the *Daubert* standard, proffered expert's analysis of future lost profits was unreliable); *Young v. Brand Scaffold Svcs., LLC*, No. 1:07-CV-917, 2009 WL 4674053, at *4-5 (E.D. Tex. Mar. 16, 2009).

---

[10] *See also Whitby LLC v. Infinity Radio Inc.*, 951 So. 2d 890, 899-900 (Fla. Ct. App. 2007) (reversing award of lost future profits where five-year time horizon was selected arbitrarily).

**B.     The Sources Relied Upon By The GCCF
          And Other Available Reliable Data Do Not Support
          The Proposed Factor Presuming A Two- To Three-Year Recovery.**

The GCCF's Proposed Methodology adopts a future loss factor for most claims of 1.0

times actual demonstrated 2010 losses, assuming future losses in 2011 equal to 70% of actual

demonstrated 2010 losses and future losses in 2012 equal to 30% of actual demonstrated 2010

losses.  Thus, the proposed methodology assumes both (1) that full economic recovery will not

occur until the end of 2012, and (2) that the GCCF's proposed future loss factor is a reasonable

measure of the likely future loss to claimants.

But the available economic data do not support either of these assumptions.  To the

contrary, as explained below, both data cited in the report of the GCCF's own expert, ARPC, and

other publicly available data indicate a strong recovery.[11]  There is, therefore, no factual support

for the GCCF's proposed future loss factor.

**1.     Currently Available Data Evidence
          A Strong Recovery In The Gulf Region.**

The recovery period projected by the GCCF is at odds with its own finding that a "[t]here

is evidence of a strong recovery underway" and the currently available data concerning

economic performance in the Gulf.[12]  Much of the current data are acknowledged and set forth in

the appendices to the Proposed GCCF Methodology but is not actually reflected in the

methodology itself.

---

[11]       references to the ARPC Rep     below are not intended as, and do not reflect, an
endorsement of all of its findings.       point simply is that the GCCF's proposed future loss
factor is not supported by the data and analysis provided by the GCCF's own experts.

[12] Proposed GCCF Methodology at 4.  None of the comments submitted to the GCCF and posted
to the GCCF's website as of February 14 cited any analytical data calling into question the
GCCF's finding of "evidence of a strong recovery underway."

With regard to fishing, approximately 99.6% of previously closed federal fishing grounds have been reopened.[13] All state waters are reopened except for 1.5% in Louisiana.[14] The federal government has concluded that Gulf seafood is safe. For example, when NOAA reopened certain fishing grounds in November 2010, it reported:

> NOAA sampled this area between August 31 and November 1 for finfish and shrimp, including tuna, swordfish, escolar, and royal red shrimp. Sensory analyses of 286 finfish samples and 55 shrimp samples and chemical analyses of 207 finfish samples in 33 composites and 50 shrimp samples in nine composites followed the methodology and procedures in the reopening protocol, with sensory analysis finding no detectable oil or dispersant odors or flavors, and results of chemical analysis for oil-related compounds and dispersants well below the levels of concern.[15]

According to data published by NOAA's National Marine Fisheries Service, December 2010 was the most successful December in the last five years in terms of the volume of Gulf shrimp harvested:

**Shrimp Landings (All Species, Headless, Thousands of Pounds)**

|  | FL (W.C.) | AL | MS | LA | TX | Total |
|---|---|---|---|---|---|---|
| December 2010 | 519.3 | 888.0 | 354.8 | 5,175.2 | 3,776.8 | 10,714.2 |
| December 2009 | 371.3 | 771.0 | 424.6 | 1,707.5 | 3,487.7 | 6,762.0 |
| December 2008 | 721.1 | 776.0 | 236.9 | 2,584.5 | 2,620.2 | 6,938.7 |
| December 2007 | 477.5 | 792.0 | 251.1 | 3,160.1 | 3,592.1 | 8,272.8 |
| December 2006 | 485.0 | 696.0 | 218.0 | 3,236.0 | 3,916.0 | 8,551.0 |

Not only were shrimp landings at historic levels, prices were also high, showing that there is a demand for Gulf seafood. December 2010 prices for shrimp were as follows relative to December prices in the previous four years:

---

[13] For shrimping, the figure is approximately 98.3%.

[14] See ARPC Report (Att. C to Proposed GCCF Methodology) at 3, 5.

[15] Press Release, NOAA Reopens More Than 8,000 Square Miles in the Gulf of Mexico to Fishing (Nov. 15, 2010), *available at* http://www.noaanews.noaa.gov/stories2010/20101115_reopening.html (last accessed Feb. 7, 2011).

Shrimp Ex-Vessel Price (Average Dollars Per Pound, Headless)[16]

| | Eastern Gulf (Florida West Coast Ports) | | | | |
|---|---|---|---|---|---|
| | December 2006 | December 2007 | December 2008 | December 2009 | December 2010 |
| UN/15 | 7.00 | 6.55 | 7.00 | 6.75 | 7.80 |
| 15/20 | 5.80 | 5.60 | 6.70 | 5.10 | 6.85 |
| 21/25 | 4.45 | 4.10 | 4.00 | 3.80 | 5.05 |
| 26/30 | 3.80 | 3.40 | 3.10 | 2.85 | 4.30 |
| 31/35 | 3.15 | 2.80 | 2.45 | 2.50 | 3.50 |
| 36/40 | 2.60 | 2.00 | 2.00 | 2.40 | 3.10 |
| 41/50 | 2.00 | 1.45 | 1.45 | 2.00 | 2.30 |

| | Northern Gulf (Alabama, Louisiana, and Mississippi) | | | | |
|---|---|---|---|---|---|
| | December 2006 | December 2007 | December 2008 | December 2009 | December 2010 |
| UN/15 | 4.30 | 5.65 | 5.65 | 3.85 | 6.35 |
| 15/20 | 3.30 | 4.40 | 4.05 | 3.30 | 5.60 |
| 21/25 | 3.10 | 3.75 | 3.00 | 2.75 | 4.40 |
| 26/30 | 2.85 | 3.10 | 2.60 | 2.20 | 3.80 |
| 31/35 | 2.30 | 2.35 | 2.40 | 1.85 | 3.00 |
| 36/40 | 2.10 | 2.15 | 2.30 | 1.70 | 2.50 |
| 41/50 | 2.00 | 2.00 | 2.20 | 1.45 | 2.10 |

| | Western Gulf (Texas Ports) | | | | |
|---|---|---|---|---|---|
| | December 2006 | December 2007 | December 2008 | December 2009 | December 2010 |
| UN/15 | 4.45 | 5.70 | 5.25 | 5.70 | 7.45 |
| 15/20 | 3.20 | 4.95 | 3.90 | 2.95 | 5.85 |
| 21/25 | 2.85 | 4.10 | 3.30 | 2.40 | 5.00 |
| 26/30 | 2.70 | 3.45 | 2.80 | 2.35 | 4.30 |
| 31/35 | 2.25 | 2.65 | 2.65 | 1.85 | 3.35 |
| 36/40 | 1.85 | 2.35 | 2.50 | 1.45 | 2.35 |
| 41/50 | 1.50 | 2.10 | 2.25 | 1.35 | 2.15 |

---

[16] *See* NOAA Fisheries Service December 2010 Shrimp Statistics,
http://www.st.nmfs.noaa.gov/st1/market_news/doc45.txt (last accessed Feb. 7, 2011).

And, still further, imports of foreign shrimp to the United States are in the same range as in past years, thereby dispelling speculation that Gulf shrimpers might lose market share to their foreign competitors as result of the oil spill:

U.S. Shrimp Imports by Type of Preparation (Thousands of Pounds)[17]

|  | January - November 2006 | January - November 2007 | January - November 2008 | January - November 2009 | January - November 2010 |
|---|---|---|---|---|---|
| Shell-On, Headless | 515,058.5 | 477,567.1 | 500,197.3 | 450,102.2 | 454,282.1 |
| Peeled | 60,550.4 | 564,853.8 | 555,471.0 | 574,207.9 | 575,349.9 |
| Canned | 3,941.8 | 3,392.9 | 2,544.1 | 3,137.1 | 3,024.7 |
| Breaded | 98,040.8 | 73,148.6 | 77,015.5 | 74,288.4 | 82,945.9 |
| Total | 1,177,591.5 | 1,118,962.4 | 1,135,227.9 | 1,101,735.6 | 1,115,602.6 |

In short, these data support the conclusion that shrimpers are not as a general matter incurring continuing losses as a result of the spill.

The actual economic data regarding tourism likewise supports the conclusion of a significant recovery in those areas that were impacted in the first instance. ARPC, the GCCF's consultant, concluded that, where spill-related impact had occurred, during the fall of 2010 there was a "significant recovery" for both lodging and tourism. ARPC Report at 9 (Att C to Proposed GCCF Methodology). For example, ARPC ordered Smith Travel Data for all Smith Travel-reporting hotels within one mile of the Gulf, which ARPC defined as "beachfront." ARPC concluded that, during the September - October 2010 period, reporting hotels within a mile of the Gulf experienced an increase in revenues across the Gulf as compared to September - October 2009.

---

[17] *See* NOAA Fisheries Service December 2010 Shrimp Statistics,
http://www.st.nmfs.noaa.gov/st1/market_news/doc45.txt (last accessed Feb. 7, 2011).

**Percentage Change In Revenue
For Smith Reporting Beachfront Hotels in September-October 2010
As Compared to September-October 2009[18]**

| Region | Revenue Growth Rate |
|---|---|
| Florida Panhandle | 1.0% |
| Florida West Coast | 8.9% |
| Alabama | 15.1% |
| Mississippi | 8.1% |

A review of Smith Travel Research hotel data reporting the standard revenue-per available room (RevPAR) metric on a county-by-county basis similarly shows recovery. The following chart shows, for hotels reporting to Smith Travel, the percentage change in revenue per available hotel room for September – December 2009 compared to the same period in 2010.



Other data further illustrate that the Gulf tourist economy remains strong. For example, sales tax receipts in Gulf coastal counties during the fall 2010 months for which data are available[19] are generally at the same level or higher than the same period in 2009:

---

[18] ARPC Report at 10 (Att. C to Proposed GCCF Methodology).

[19] As reflected in the charts, the fall months for which data are available differ by state.

Florida Sales Tax Percentage Change Between 2009 and 2010[20]

|  | January-April 2010 | May-August 2010 | Sep.-Nov. 2010 |
|---|---|---|---|
| **Panhandle Coast Counties** | 1.4% | 3.7% | 7.4% |
| **West Coast Counties** | -0.3% | 1.6% | 4.0% |
| **East Coast Counties** | 1.2% | 1.6% | 5.3% |

Alabama Sales Tax Percentage Change Between 2009 and 2010[21]

|  | Jan.-April 2010 | May-Aug. 2010 | Sep. 2010 |
|---|---|---|---|
| **Coastal Counties** | 4.7% | 2.2% | 9.9% |

Mississippi Sales Tax Percentage Change Between 2009 and 2010[22]

|  | Jan.-April 2010 | May-Aug. 2010 | Sep.-Oct. 2010 |
|---|---|---|---|
| **Coastal Counties** | -6.6%[23] | -1.4% | 2.5% |

Louisiana Sales Tax Percentage Change Between 2009 and 2010[24]

|  | Jan.-April 2010 | May-Aug. 2010 | Sep.-Oct. 2010 |
|---|---|---|---|
| **Coastal Parishes (Counties)** | -9.66 | 1.40% | 8.23 |

The economic performance of Gulf coast counties in recent months evidences a strong recovery that can be expected to continue. For example, the Mobile, Alabama *Press-Register* has reported that Gulf Shores, Alabama officials believe that their strong "snowbird" winter

---

[20] Source: Florida Department of Revenue (http://dor.myflorida.com/dor/taxes/colls_from _7_2003.html). Months refer to dates when taxable sales took place.

[21] Source: Alabama Department of Revenue (Sales Tax Statistics). Months refer to dates when taxable sales took place.

[22] Source: Mississippi Department of Revenue (http://www.dor.ms.gov/info/stats/ salestaxcol.html). Months refer to dates when taxable sales took place.

[23] The decline in tax revenues for Mississippi coastal counties for the period January - April 2010 all is attributable to declines in the first quarter of 2010, before the oil spill starting on April 20, 2010, and therefore is not attributable to the spill.

[24] Source: Louisiana Department of Revenue. Months refer to dates when taxable sales took place.

season will result in healthy tourism later in 2011, as snowbirds return north and report on favorable beach conditions.[25]

The data also show that some areas of the Gulf actually experienced increased economic performance following the oil spill by comparison to prior years, a fact that is at odds with presuming ongoing spill-related loss.

This economic uptick in New Orleans is borne out by the data. Hotel revenues per available room in Orleans Parish for the fourth quarter 2010 were 17% higher than for the same period in 2009. *See supra* p. 15. Likewise, the *Times-Picayune* article reports that tourism sales tax receipts for Orleans Parish during the fall of 2010 were over 30 percent higher than in 2009.[27]

ARPC also found that Mississippi coastal counties experienced increased economic performance following the spill. During the period June-August 2010, hotel, restaurant, and bar gross sales were for the most part higher than for similar periods in 2009.[28] ARPC Report at 13 (Att. C to Proposed GCCF Methodology). Similarly, according to ARPC, sales tax generation in the Mississippi Coast Counties increased in the months following the spill. *Id.* at 8.

---

[25] David Ferrara, "Counting on Snowbirds: Winter Visitors Key test at Gulf," *Mobile Press-Register* (Dec. 31, 2010).

[27] Hammer, *supra* n. 26. The same article reports that nearby Plaquemines Parish also experienced a sizeable increase in sales tax revenue.

[28] In the one instance where there was a decrease – Jackson County bars – a similar decrease occurred during the pre-spill period of 2010.

A recent report released by the federal government's Operational Science Advisory Team ("OSAT") reported favorably regarding water quality in the Gulf.  It found that:

- There were no exceedances of EPA Human Health Benchmark in water samples (>5000 samples);

- There were no exceedances of dispersant benchmarks in water samples (>4500 samples; very few detects);

- There were no exceedances of PAHs post 3 August in water/sediment that were consistent with MC252 oil (>5000/>1000 samples); and

- No deposits of liquid-phase MC252 oil were identified in sediments beyond the shoreline.[29]

### 2.    The Report Of The GCCF's Fisheries Expert Supports The Conclusion Of A Prompt Recovery.

The report of the GCCF's fisheries expert, Dr. John W. Tunnell, Jr. of Texas A&M University, while recognizing the inherent difficulty of predicting the future and potential unknown risks, is consistent with the conclusion of recovery of Gulf fisheries in 2011, with the limited exception of certain oyster beds destroyed by oil or fresh water.

- The Tunnell Report states that scientists recorded "an increase in abundance of four times for shrimp" after the Oil Spill and that "shrimp are not only present but very abundant during fall 2010."  Tunnell Report (Att. D to Proposed GCCF Methodology) at 25.  It concludes that "if potential impact scenarios stated above have not significantly impact[ed] 2010 shrimp populations, it is believed that shrimp catches for the brown, white, and pink shrimp in the northern Gulf of

---

[29] Operational Science Advisory Team, *Summary Report for Sub-Sea and Sub-Surface Oil and Dispersant Detection:  Sampling and Monitoring* (Dec. 17, 2010).

Mexico will likely continue along the same harvest trends in recent years by 2011, and even more likely by 2012." *Id.* at 25-26.

- The Tunnell Report states that "blue crab populations do not appear to have been significantly impacted by the [Deepwater Horizon] oil spill, and because they are a highly reproductive species with widespread distribution throughout the region, it is believed that their population levels will likely continue along the same harvest trends in recent years in 2011." *Id.* at 28.[30]

- The Tunnell Report concludes that "oysters in most areas of the northern Gulf will likely continue along the same harvest trends in recent years in 2011." *Id.* at 38. Only reefs affected by freshwater diversion and flooding, or oiling, are likely to experience a longer recovery period. *Id.*

- The Tunnell Report concludes that "commercial finfish are not believed to have been significantly impacted by the [Deepwater Horizon] oil spill, except with the possibility of those in the floating fish egg stage. . . . If recruitment classes were normal in 2010 [i.e., if eggs were not negatively affected for some species], then, the fishery will likely continue along the same harvest trends in recent years during 2011." *Id.* at 38.

### 3. The Oxford Economics Report Does Not Provide A Credible Basis For The GCCF's Proposed Future Losses Factor.

The report of the GCCF's consultant, ARPC, makes clear that it relies heavily on an analysis of purported recovery patterns for other major disasters prepared by Oxford Economics

---

[30] With respect to both crabs and shrimp, the Tunnell Report notes the possibility that some local populations may be reduced temporarily to the extent nursery ground coastal marshes were affected by oil or dispersants; but it does not conclude either that this is likely or that these local impacts will affect the overall population trends. *Id.* at 26, 28.

for the U.S. Travel Association. *See* ARPC Report at 31 (Att. C to Proposed GCCF Methodology). However, the Oxford Report does not provide a reliable basis for predicting economic recovery in the Gulf region. The Oxford Report is an advocacy document, written as part of a marketing effort by the U.S. Travel Association to obtain from       a $500 million "emergency marketing fund to counter misperceptions and encourage travel to the affected regions." Oxford Report at 2. That express advocacy purpose, standing alone, undermines the objectivity and reliability of the report.

Moreover, there are many other reasons why the Oxford Report does not provide a reliable basis for predicting how long economic recovery in the Gulf region has required and will require. The most significant among these are that:

- The undated Oxford Report, which was likely prepared in July 2010, prior to the end of the oil spill, relies on incomplete and outdated information and speculation about the scope of the spill that has proven incorrect.

- The Oxford Report does not identify the data sources upon which it relies, nor explain its methodology.

- To the extent the Oxford Report cites to sources purporting to support its assertions, their reliability is questionable. For example, the Report relies in part upon page view counts for TripAdvisor, a website containing traveler reviews of dining, lodging, and tourist attractions, to support the assertion that "travel intentions are down significantly for the Gulf." *Id*. at 6. But TripAdvisor is not considered a reliable source within the hospitality industry because it is not a reliable indicator of *actual* travel.

- The Oxford Report relies on selective, unsuitable comparisons to predict a recovery period for the Gulf.

  - <u>Inappropriate and selective oil spill comparisons.</u> Oxford states that the average recovery period for tourism revenues to reach prior visitor spending peaks after prior spills was <u>18 months, with a range of 12-28 months</u>. Thus, even if one credited the accuracy of the Oxford analysis (and we do not), and even if one assumes that the spending "peak," rather than average spending, is the proper benchmark, it does not support a three-year recovery period. Moreover, the Ixtoc and *Exxon Valdez* oil spills cited in the Report are not comparable. Ixtoc occurred more than 30 years ago, when spill handling technology was far less advanced, and continued unabated for 10 months. It covered a far larger area of the Gulf

than the Deepwater Horizon and oiled more than three times as many linear miles of shoreline.[31] *Exxon Valdez*, unlike the Deepwater Horizon spill, involved heavy crude and a cold-water remote location that hindered clean-up -- and, even then, the purported recovery period was two, not three years. Not only have there been numerous technological advances since those spills occurred, but today's consumers have access to the internet and other media, allowing them instant and regular updates on local conditions. The Oxford Report also ignores other oil spills, including the 1993 Tampa Bay spill and the 2000 Port Sulfur, LA spill that did not result in significant long-term impacts on tourism or recreation.

- Other comparisons. Hurricane Katrina is an inapposite comparison because it involved extreme damage to infrastructure, such as roads and buildings, that is absent here. The Oxford Report indicates that all of the other hurricanes cited by Oxford had much shorter recovery periods. *Id.* at 12. Terrorism and the SARS pandemic flu outbreak similarly are unsuitable comparisons, as they involve ongoing concerns about personal safety that do not exist months after the Oil Spill. Moreover, even if they were comparable, the Oxford Report reflects average impact duration of 10 months, with a range of 9-12 months.

These flaws, taken together, undermine the Oxford Report's projected recovery period of 15 to 36 months set forth on page 14.

### C.    If The GCCF Adopts A Future Losses Factor, It Should Be Lower.

A fair reading of the publicly available data and the GCCF's own expert reports supports the GCCF's finding that "[t]here is evidence of a strong recovery underway." It does not support the GCCF's view that the risk of potential future loss is great enough to support a future loss factor of 1.0. Currently available data suggest that most claimants will not continue to incur spill-related loss. For example, nearly all fishing grounds are open, and December 2010 shrimping data show a successful industry with high landings and high prices. Dr. Tunnell's report supports likely recovery for most fisheries during 2011. Similarly, hotel data show that, on both a beachfront and county-wide basis, the Gulf hospitality industry is strong. Some whole

---

[31] *See* Tunnell Report at 19-20.

regions, such as the City of New Orleans, appear to have experienced a net economic gain following the spill.

The mere possibility that – contrary to current indications – recovery from the Oil Spill's impact may proceed more slowly than expected cannot justify adoption of an artificially inflated future loss factor. The Proposed GCCF Methodology incorporates mechanisms that protect claimants against any such risk. It provides that the GCCF will review newly available data every four months and adjust the proposed future losses factor as necessary. Proposed GCCF Methodology at 4, 7. It further provides that the GCCF will apply any such revised factor to final claims submitted from the date the new factors are announced and also to any pending, fully documented but not yet evaluated final claim if the new future losses factor is higher than the factor applicable at the time the claim was submitted and fully documented. *Id.* Moreover, since the Proposed GCCF Methodology permits claimants to seek Interim Payments rather than Final Payments, claimants who believe that the future losses factor is low may pursue the Interim Payment option.[32] Thus, for example, if fishing industry claimants believe that the possibility of harm to certain fish spawning grounds identified by Dr. Tunnell creates a likely, significant risk to fishing stocks and revenues – a conclusion he does not reach – they may protect against this risk by electing to seek Interim Payments. Taken together, these mechanisms amply protect claimants against any risk that the future losses factor may ultimately turn out to have underestimated the time to full recovery.

recognizes that predicting the future is an inherently difficult and uncertain task, and that no one can say – with respect to the oil spill or any other event – that there is absolutely no risk of future harm. also recognizes the benefits to all parties of a settlement process that will

---

[32] Claimants dissatisfied with the GCCF's final claims offer also retain the options to appeal, file a claim with the Coast Guard, and/or pursue litigation. *See* note 4 above.

enable them to avoid the burden, expense, uncertainty and delay of litigation.  Therefore, notwithstanding the current data regarding recovery, should the GCCF conclude that a future factor is appropriate for purposes of claims resolution,      believes that, solely for purposes of the GCCF settlement process, it would be appropriate for the GCCF to use a future factor in the range of 0.25 – 0.50 (or 25% -50%) of a claimant's actual 2010 substantiated loss.

### D.    The Proposed Factor For Certain Oyster Harvesters Improperly Assumes That      Is Responsible For Alleged Impacts to Oyster Beds.

The Proposed GCCF Methodology states that

> The experts anticipate that individuals and businesses engaged in harvesting oysters destroyed as a result of the Oil Spill, or due to the diversion of fresh water into the Gulf in reaction to the Oil Spill, will likely require a longer recovery period than that experienced by other claimants . . .. <u>Accordingly, the Final Payment Offer for those claimants will be equal to an amount four times the actual documented losses in 2010.</u>[33]

      does not oppose the use of an enhanced multiplier if it is established that a given oyster bed was oiled with MC252 oil and as a result must be reseeded.  However, alleged damage to oyster beds caused by the State of Louisiana's diversion of fresh water from the Mississippi River into the Gulf is not compensable under OPA because it was not caused by the oil spill.  *See* 33 U.S.C. §§ 2702(a), (b).  Such damage was not caused by MC252 oil, and thus is not compensable by the GCCF.[34]

Importantly, some senior Gulf state environmental officials have determined that oyster bed damage in certain areas of the Gulf was caused by unusually high water temperatures, not by MC252 oil or by the fresh water diversion.  Specifically, Dr. Bill Walker, the Executive Director

---

[33] Proposed GCCF Methodology at 6 (underlining in original).

[34] Even if damage caused by the fresh water diversion were compensable, it is important to note that the diversion had a limited zone of impact.  Thus, no claimant in Florida or Alabama could qualify for the enhanced multiplier.  And any other claimant in Louisiana and Mississippi would have to establish that the reef in question was destroyed by the fresh water diversion.

of the Mississippi Department of Environment, testified before the National Oil Spill

Commission: "Oysters in Mississippi have suffered above normal mortalities, we think

primarily due to extended periods of very hot water and depressed dissolved oxygen levels. We

have no scientific evidence to support oyster mortalities due to the presence of oil material."

Testimony of Dr. Bill Walker, National Oil Spill Commission at 152 (Sept. 28, 2010). It goes

without saying that      is not liable for, and the GCCF may not compensate for, oyster damage

caused by higher water temperatures. The fact that there are multiple potential causes of

damages to oyster beds highlights the need for careful assessment of the issue of causation for

each and every claim.

## III.    THE $500,000 THRESHOLD FOR INDIVIDUALIZED EVALUATION OF FUTURE LOSS RISK IS TOO HIGH.

also submits that the $500,000 threshold for applying an individualized evaluation of

the proper future factor is too high. The threshold should be set at $100,000.      understands the

administrative desire to increase efficiencies in the GCCF claims settlement process where

possible, including addressing the risk of potential future losses by applying a single multiplier to

many claims. It must be recognized, however, that not all claimants will face the same – or

indeed, any – risk of future loss. A lower threshold providing for individualized review in more

cases will assure that any payment in respect of the risk of future loss is properly calibrated to the

actual risk, if any.

## CONCLUSION

For all of these reasons,      respectfully requests that the GCCF revise the Proposed

GCCF Methodology consistent with the comments set forth above.