# EXHIBIT A



# STATE OF FLORIDA

PAM BONDI
ATTORNEY GENERAL

February 16, 2011

**VIA U.S. MAIL AND E-MAIL**

Kenneth R. Feinberg, Esq.
Feinberg Rozen, LLP
The Willard Office Building
1455 Pennsylvania Avenue, NW
Suite 390
Washington, DC 20004-1008

Re: Gulf Coast Claims Facility ("GCCF")

Dear Mr. Feinberg:

As the State of Florida's chief legal officer, I have made improving the GCCF claims process a top priority. While traveling around Florida, I have heard firsthand the frustrations of Florida citizens and businesses regarding the unexpected delays, denials, lack of information, and inconsistencies in payments they have experienced when dealing with the GCCF. These frustrations have only increased due to the GCCF's refusal to process, much less pay, the more than fifty thousand (50,000) pending interim or final claims from Florida.

You have indicated that these claims were held in limbo in order to finalize a long-delayed payment methodology. I would urge you to promptly pay the tens of thousands of interim claims, not only due to the desperate financial situation faced by many Floridians but because such action is required by the Oil Pollution Act of 1990 ("OPA"). Paying these interim claims would also lessen the importance of an immediate implementation of a final payment methodology.

The purpose of this letter is to offer my comments on the "methodology" provided to my office (and the public) on February 2, 2011.[1] In summary, I find that the

---

[1] We will discuss my numerous other concerns with the GCCF, including those raised in my previous letter to you, in our meeting on Friday. I also plan to meet with BP in the near future on these issues, as it is ultimately responsible for providing a claims process that complies with OPA.

*PL-01, The Capitol, Tallahassee, Florida 32399-1050, Telephone (850) 414-3300 Fax (850) 487-2564*

draft document does not provide answers to the important issues surrounding the claims process – including the continuing lack of transparency. Moreover, the multiplier lacks scientific support, especially as the basis for resolving final claims that would require the execution of a broad release. Finally, the proposed burden of proof for claimants is unduly restrictive.

While I had hoped that any methodology would deliver some much-needed transparency, the draft document provides almost no useful information for claimants. I am particularly disappointed that Floridians still don't know if their claim will be paid, in what amount or by what time. The draft document, which you apparently intend to implement shortly, is a methodology only in name.

The three-year (100%-70%-30%) timetable set forth in the draft document is based on exceedingly optimistic assumptions about unknown environmental and economic conditions and doesn't match the longer experiences with the Exxon Valdez and other major oil spills. There has been (and apparently will be) no independent peer review of these assumptions, the standard operating procedure in the scientific community. In essence, the so-called methodology involves a fixed formula for determining a final payment offer, assuming the correctness of the initial payment for 2010 and the applicability of the timetables.

While you have made numerous public comments about consulting various "experts," the attachments to the draft document include information from only two sources, the Analysis.Research.Planning Corporation and Dr. John W. "Wes" Tunnell, Jr. of Texas A&M University - Corpus Christi. The ARPC website indicates that the company is a consulting firm with a focus on providing expert testimony and settlement administration services for corporate defendants in toxic tort matters. *See* http://www.arpc.com/AboutARPC/tabid/54/Default.aspx ("Our clients include nearly every major asbestos defendant and asbestos trust"). Moreover, Dr. Tunnell's report was specifically commissioned by you; it appears that he only had two weeks (over the holiday break) to prepare the "expert" report.

The Tunnell Report appears to be based largely on inconclusive research from prior oil spill cases and environmental studies, some of which are several decades old. The report is an opinion rather than a scientific study, as it does not propose any methodology by which its assumptions and predictions can be tested. This "report" is one professor's hastily drawn opinion on when four fishery categories from the Gulf (crabs, oysters, fin-fish, and shrimp) may return to pre-spill harvest status. The report is replete with limitations, including:

- "[E]stablishing a recovery date and time is more difficult than determining the impact from the spill itself. In fact, establishing an exact recovery time is essentially impossible."[2]
- "The Ixtoc I oil spill of 1979-80 was the world's largest accidental marine oil spill until the DWH spill, and it released 140 million gallons of oil into

---

[2] Tunnell Report, p. iii.

the Gulf over almost 10 months of time.[3] Although small remnants of Ixtoc tar mats can still be found today at a few remote Mexican localities, the majority of Gulf species and habitats seem to have recovered. Unfortunately, there were no long-term comprehensive studies done to confirm recovery, so we cannot be certain. In addition, it is unclear today whether the Gulf of Mexico is as resilient as it was 30 years ago, due to the many and continuing environmental impacts."[4]

- "Changes in feeding behavior or reproductive behavior could affect populations for years from re-oiling of submerged or hidden oil that was not removed. The unprecedented and unexpected crash in the herring fishery five years after the Exxon Valdez oil spill is a classic example of the unknown that can surprisingly appear years later."[5]

- "In addition to the obvious and direct death of biota or habitats that can occur during an oil spill, there are many possible sublethal effects which can occur, and they can be quite insidious and are very difficult to detect or measure. These effects might include reduced reproductive capacity, or sizes of individual organisms might be smaller as a result of exposure to oil components, or a result of reduced amounts of food or habitat. The effects of oil on plankton (food for larvae of fish and invertebrates) are currently unknown, and may never be known. ... Unfortunately, there are few published field studies on the impact of an oil spill on Gulf shrimp."[6]

- "In areas where oysters died as a result of freshwater diversion and flooding, oyster reefs should be recolonized by young oysters in 2011 (assuming there are no large scale flooding events in 2011), but they will not likely be of harvestable size until late 2012 or 2013. In areas where oyster reefs were heavily oiled, oyster reefs may not recover for 6-8, or even 10 years."[7]

- "Realistically, the true loss to the ecosystem and fisheries may not be accurately known for years, or even decades ... In conclusion, making an exact call for the time of recovery of any fishery group after a major oil spill is impossible."[8]

The Tunnell Report does nothing to predict the short-term or long-term impact of the Deepwater Horizon oil spill on the tourism industry or on the demand for any Gulf seafood products, including the four fishery categories. Further, the GCCF has offered no justification for attempting to extrapolate these timetables or multipliers to non-fishing

---

[3] The report states that the Deepwater Horizon oil spill released "over 200 million gallons of oil into the Gulf of Mexico from 20 April to 15 July 2010, a period of 87 days." *Id.*, p. 1.

[4] *Id.*, pp. 7-8.

[5] *Id.*, p. 15.

[6] *Id.*, pp. 22, 24.

[7] *Id.*, pp. 32-33.

[8] *Id.*, pp. 37-38.

industries, like tourism.

It is particularly inappropriate to use the Tunnell Report to make crucial decisions for final claims (where the GCCF has insisted upon the execution of a broad release form, including for unknown claims) given the existence of other, more scientific processes. As set forth in 33 U.S.C. § 2706(e), OPA mandates a thorough and scientifically-based natural resource damages assessment involving all interested parties, including the responsible parties. The goal of OPA is to make the environment and public whole for natural resource injuries resulting from an oil spill, either through restoration or compensation. That process is already well under way. BP has also set aside $500 million to establish a Gulf of Mexico Research Initiative to conduct a 10-year study of the effects of the Deepwater Horizon incident and the potential associated impacts on the environment and public health, acknowledging the need for scientifically-based, and peer-reviewed analysis of sampling results, impact modeling, and studies. Thus, even BP believes that a long-term analysis is necessary in light of the uncertainty over the impacts from the Deepwater Horizon oil spill.

The fact of the matter is that the environmental impacts to the Gulf Coast cannot be neatly packaged into a one-size-fits-all model that fails to take into account the unique situation that each individual or business claimant may face. The criteria established in the methodology may be beneficial to some claimants, but not to others. Each claim should be evaluated to determine the most accurate recovery period, which may vary from case-to-case. A recovery period of five years or longer may be appropriate in some situations.

Moreover, I am troubled that the calculation of any final payment offer would be based upon only the eight months of losses incurred in 2010 after the Deepwater Horizon blowout. At the very least, any calculation of a final payment offer should be annualized, especially since some businesses depend on the early part of the year for much of their profits. It is also misleading to say that a final payment offer represents two times the actual documented losses in 2010. The payment for 2011 and 2012 is approximately equal to the payment for 2010, although 2010 is only a partial year. The calculation of a final payment offer should also consider changes in future earning capacity and be sufficiently generous to encompass the level of uncertainty faced by that claimant.

I am also very concerned about the heavy burden of proof ("direct connection") that the GCCF is seeking to impose on claimants through this methodology. For example, how would you suggest a business effectively document and quantify the lost business from tourists that never showed up? It appears that each time a claimant files a claim, even if his claims have been paid in the past, he will be required to prove once again that the damages were the result of the oil spill, but with an increasing level of scrutiny. This suggests a process that imposes an unreasonable burden and cost on claimants, especially where the nature of a claim is recurring in nature (*e.g.*, a seafood processor whose plant has laid off workers due to a lack of demand for Gulf seafood). At the very least, the GCCF could assume that the business would have had at least the same level of income as the prior year.

    The economic impact of this environmental disaster will be felt for many years to come by Florida's businesses and its people if the GCCF claims process is not made both fair and efficient, including through the payment of interim claims. I look forward to continuing our discussions in person on Friday.

                       Sincerely,

                       Pam Bondi
                       Attorney General

cc:    John E. "Jack" Lynch Jr., Esq.