# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE | * | |
| GULF OF MEXICO, on APRIL 20, 2010 | * | |
| | * | |
| | * | |
| THIS DOCUMENT RELATES TO: | * | JUDGE BARBIER |
| | * | |
| ALL CASES | * | MAG. JUDGE SHUSHAN |
| | * | |

**********************************************

### PLAINTIFFS' SUPPLEMENTAL MEMORANDUM
### CONCERNING BP'S FAILURE TO COMPLY WITH THE MANDATES OF OPA

NOW INTO COURT come Plaintiffs, through undersigned counsel, who submit the instant "Supplemental Memorandum Concerning BP's Failure to Comply with the Mandates of OPA." The Court has requested additional briefing on the question of whether and how BP as the responsible party is fully complying with the mandates of OPA, in particular in the processing of claims for "interim, short-term damages," or "final damages," methodologies for evaluation of claims, and the release forms required of claimants. (Rec. Doc. 1098.)

The GCCF has made it clear time and time again that when faced with the choice between honoring its OPA-mandate to openly and fairly pay interim claims and following the BP-mandate to obtain as many releases as possible, it will follow the BP-mandate. Rather than publish a transparent, fair, and functional protocol for paying interim claims as required by OPA since the beginning, the GCCF developed the "quick pay" option for putative class members to obtain a flat $5,000 or $25,000 final payment in exchange for a release. Rather than explain to putative class

members why the documentation and explanation supporting their claim resulted in a full or partial denial, the GCCF offered the "quick pay" option – in exchange for signing a release, no documents had to be submitted.

For the past three months, the <u>only</u> compensation coming out of the GCCF has been "quick payments" in exchange for release of all claims.  Claimants that do not want to sign a release have been cut off.  The new protocol is not any better and shows yet again that the GCCF will choose the BP-mandate to get final releases over the OPA-mandate to fairly and transparently pay interim claims.

Plaintiffs submit that the final releases obtained by GCCF should be voided, that GGCF should be ordered to provide detailed reasons for denial of any claims and an explanation on methodology for paid and partially paid claims, and that any and all future dealings with putative class members should include an accessible calculation of the value of their claim to date.  Finally, because "presentment" is inextricably tied to the process established by BP, the PSC requests the opportunity to participate in a Court-supervised process whereby the PSC and BP develop a joint methodology to satisfy interim claims.

## I.     PAST RELEASES SHOULD BE VOIDED.

The Releases represent a clear violation of the fundamental principles of OPA.  OPA provides, in no uncertain terms, that the responsible party must pay for the damage it caused.  BP is using OPA's presentment requirement as a means to take advantage of putative class members without telling them the true value of their claim.  The Releases were also obtained pursuant to error and duress.  Error resulted from the confusion and misrepresentations from Mr. Kenneth Feinberg's misleading drumbeat of "independence" and active deterrence of legal representation.  Duress

resulted from the putative class members' relentless economic turmoil from their inability to earn a living and the need for immediate income.

### A.      OPA Prohibits the Release of Unpaid Claims.

OPA unambiguously establishes the rule that a responsible party must pay all claims without limitation.  The requirement that a responsible party make continuing payment of interim damages without obtaining a release for more than it paid is woven throughout OPA and is an integral part of its goal of ensuring full compensation. Beginning at Section 1005(b), 33 U.S.C. § 2705(b), OPA mandates the "General Rule" regarding partial payment of claims:

> The responsible party shall establish a procedure for the payment or settlement of claims for interim, short-term damages.  Payment or settlement of a claim for interim, short-term damages <u>representing less than the full amount of damages to which the claimant</u> **<u>ultimately</u>** <u>may be entitled</u> **<u>shall not preclude recovery</u>** <u>by the claimant for damages not reflected in the paid or settled partial claim</u>."

33 U.S.C. § 2705(b) (emphases supplied.)

The provision for interim payment is so important that the responsible party is specifically required to advertise the exact statutory language above to all potential claimants. OPA § 1014(b)(2); 33 U.S.C. § 2714(b)(2).  The provision specifically contemplates that even <u>settlement</u> of a claim cannot prevent full recovery.  OPA contains no provision that authorizes a responsible party to obtain a release from a victim except for amounts it has already paid on the victim's claim.

The requirement for interim payment and the prohibition on broad release contained in Section 1005 are reinforced throughout the statute. For example, the presentment requirement of OPA only allows a claimant to sue or seek compensation from the Oil Spill Liability Trust Fund if the claim is denied or "not settled by any person <u>by payment</u> within 90 days." OPA § 1013(c)(2);

33 U.S.C. § 2713(c)(2) (emphasis supplied).  See Johnson v. Colonial Pipeline Co., 830 F.Supp. 309,

311 (E.D.Va.1993) ("The settlement is to be in the form of 'payment within 90 days after the date

upon which the claim was presented.'").

OPA's automatic subrogation clause provides further support that a responsible party cannot

obtain a release for oil spill claims.  OPA provides automatic subrogation as a matter of law to a

responsible party who pays a claimant, but if less than the total losses are paid, subrogation "shall

apply only with respect to the portion of the claim reflected in the paid interim claim." OPA §

1015(b)(1); 33 U.S.C. § 2715(b)(1) (emphasis supplied).  The subrogation provision specifically

emphasizes: "Payment of such a claim shall not foreclose a claimant's right to recovery of all

damages to which the claimant otherwise is entitled under this Act or under any other law."

This point is further supported in Section 1017 authorizing a responsible party to file suit

based upon subrogation: "No action based on rights subrogated pursuant to this Act by reason of

payment of a claim may be commenced under this Act more than 3 years after the date of payment

of such claim." OPA 1017(f)(4); 33 U.S.C. § 2717(f)(4) (emphasis supplied). OPA's automatic

subrogation provisions represent a clear balance of interests. The victims cannot be forced to release

more than they are compensated, but, on the other side of the ledger, a responsible party does not

have to negotiate a release and subrogation agreement, and does not have to obtain the victim's

consent or signature; the victim cannot extract further conditions or money in exchange for a right

of subrogation. All the responsible party must do is pay what is owed, and it gains full release and

subrogation rights by that act to the full extent that it has paid.

Even more support for the intent to protect vulnerable victims from broad contractual

releases is found in the provisions dealing with contribution. A responsible party is specifically

4

allowed to seek contribution from other liable parties, but only in accordance with Section 1017. OPA § 1009; 33 U.S.C. § 2709.  Section 1017 provides: "No action for contribution for any removal costs or damages may be commenced more than 3 years after—(A) the date of <u>judgment</u> in any action under this Act for recovery of such costs or damages, or (B) the date of entry of a <u>judicially approved settlement</u> with respect to such costs or damages." OPA § 1017(f)(3); 33 U.S.C. § 2717(f)(3) (emphasis supplied).  <u>See also General Elec. Co. v. U.S. Dept. of Commerce</u>, 128 F.3d 767, 778 (D.C. Cir. 1997) (holding that OPA authorizes a claimant to make a claim for further restoration costs even after judgment is entered on a prior claim).

As the legislative history makes clear, one of the goals of OPA is to fully compensate victims and to place the costs of an oil spill on the polluter. <u>See Rice v. Harken Exploration Co.</u>, 250 F.3d 264, 266 (5th Cir. 2001) (stating that the goals of OPA are "to streamline federal law and 'provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills within the petroleum industry'") (citing Senate Report No. 101-94, <u>reprinted in</u> 1990 U.S.C.C.A.N. 772, 723).

Congress set out to ensure that victims of oil spills would not be short-changed and that parties responsible for spills would bear the full cost of the damage resulting from their actions. The legislative history excerpts emphasized by BP in prior briefing to show the mandatory nature of presentment further bear out this intent.  "As Representative Hammerschmidt explained in urging passage of OPA, "[t]he system of liability and compensation provided for in the bill … is intended to allow for quick and complete payment of reasonable claims without resort to cumbersome litigation." 135 Cong. Rec. H7965 (daily ed. Nov. 2, 1989) (emphasis added).  <u>See also</u> 135 Cong. Rec. H7962 (daily ed. Nov. 2, 1989) ("The thrust of this legislation is to eliminate, to the extent

possible, the need for an injured person to seek recourse through the litigation process.") (Rep. Lent)."  Congress intended complete payment, which would eliminate the need for litigation; it did not intend, and OPA does not provide, a process whereby BP can limit a victim's right to obtain complete compensation by withholding payment subject to a full and final release.  Two significant points high-light this:

- **Nowhere in OPA is there authorization for a responsible party to secure a "final" release from a claimant by any mechanism other than payment of the full amount ultimately owed.**  Noticeably absent is the right to seek contribution after a responsible party extracts a contractual release from the victim without court approval. And OPA repeatedly emphasizes that any settlement or payment cannot prevent a victim from claiming further damages beyond what is paid.

- **Coast Guard Regulations do not allow the sort of broad release and subrogation that the GCCF is obtaining on BP's behalf.**  The Coast Guard is the federal agency charged with administration of the Oil Spill Liability Trust Fund. While an appeal to the Trust Fund differs in several respects from a formal lawsuit, in this narrow instance, the Coast Guard Regulations are instructive. Pursuant to OPA and 33 C.F.R. § 136.115, payment by the Fund "constitutes a release of the Fund for the claim" and "precludes the claimant from filing any subsequent action against any person to recover costs or damages which are the subject of the compensated claim."  See e.g., 33 CFR § 136.115(a) (emphasis supplied).  The Coast Guard does not require a claimant to release the responsible party, or others, from any and all damages, known or unknown, and all theories of liability. Under OPA it cannot. The Coast Guard obtains an automatic release for a compensated claim, just as OPA provides.

The requirement for complete compensation of claimants does not as a matter of course impose endless or unforeseeable liability on a responsible party.  OPA balances the victims' need for complete compensation with the responsible party's potentially vast exposure by capping liability on a responsible party, and steering victims whose damages would exceed the cap to the Oil Spill Liability Trust Fund. OPA § 1004; 33 U.S.C. § 2704.  However, where a responsible party's own fault rises to a certain level, Congress has determined that the liability cap should not apply. Id.  BP has expressly waived the application of OPA's liability cap (Rec. Doc. 559), and so, having

admitted it is not eligible for the protections of the statute, it should not be heard to complain that the law requires it to completely compensate victims.

The unprecedented scale and potential duration of long-term effects emanating from the Deepwater Horizon spill warrant heightened scrutiny of these provisions and the entire claims process.  OPA requires victims to approach the responsible party and negotiate compensation with it, but OPA also protects victims, who are perforce in a vulnerable position, from getting short changed in that negotiation.

The victims are not typically OPA experts and do not understand or appreciate the extent to which the Release is at odds with OPA.  They cannot be expected to negotiate their claims at such a sophisticated level (especially given the GCCF's repeated mantra that claimants do not need lawyers).  In fact, claimants have no real opportunity to negotiate around BP's Release demand at all.  The Release is a quintessential, non-negotiable contract of adhesion, drafted to favor BP, to prejudice claimants, and to be unalterable.  See Iberia Credit Bureau, Inc. v. Cingular Wireless, L.L.C., 379 F.3d 159, 168 (5th Cir. 2004) (stating that where a party had no power to negotiate a contract, courts may disregard a particular clause when it is unduly burdensome or extremely harsh).

   **B.    Releases Obtained To Date (At Least from Unrepresented Parties) Are Also Invalid Due To The Misleading Representations Found By This Court.**

This Court has previously found that  "the hybrid role of Mr. Feinberg and the GCCF has led to confusion and misunderstanding by claimants, especially those who are unrepresented by their own counsel" and that the clear record in this case demonstrates that any claim of the GCCF's neutrality and independence is misleading to putative class members and is a direct threat to this ongoing litigation, as claimants must sign a full release against all potential defendants before obtaining final payments."  (Rec. Doc. 1098 at 12-13.)

Error, fraud, and duress are universally recognized as legal grounds for invalidating a contract, and may well be found to justify the invalidation of numerous releases which may have been executed by unrepresented and misinformed parties.[1]   At least one lawsuit has been filed in hopes of voiding the release by a claimant who accepted the quick pay option.  See Petition, Knotty Girl Fishing, LLC, v. Worley Catastrophe Services, LLC et al., No. 2011-508 (Tangipahoa Parish), attached as Exhibit "1."  Such concerns warrant, at the very least, monitoring by the Court, with an opportunity to challenge the releases in appropriate circumstances at the appropriate time.

> ### C.   In the Alternative, the Court Should Limit the Release as Argued in Plaintiffs' Memorandum in Support of Motion to Supervise.

In the event that the Court decides not to strike the Release, Plaintiffs re-urge as alternative relief the changes to the Release raised in their Memorandum in Support of Motion to Supervise Ex parte Communications, such as limiting the Release only to BP entities, releasing only OPA claims (not punitive damages or state law claims), clearly excluding mental anguish damages, and/or informing claimants of this litigation and their right to counsel.  (Rec. Doc. 912-1.)

## II.   BP AND THE GCCF'S FIRST NINE MONTHS OF CLAIM PAYMENTS HAVE VIOLATED OPA'S MANDATE OF ESTABLISHING A FAIR AND OPEN INTERIM CLAIMS PROTOCOL BY FOLLOWING THE BP-MANDATE OF OBTAINING RELEASES.

Some of the problems with the BP claims process are directly contrary to OPA. Other problems touch upon the need for basic fairness in handling a disaster of such magnitude.  To date, there has been no discernible methodology for paying individual claims. Individual results appear to be dictated by caprice or luck of the draw regarding adjusters.  The United States, through the

---

[1] The State of Mississippi has already provided the Court with a cogent argument that the releases GCCF have obtained are tainted by duress. (Rec. Doc. 1085.)

Department of Justice, itself has urged more transparency in the GCCF's processes and has stated unequivocally that "[f]or the GGCF to fulfill its mission, the interim payment process must be efficient, fair, and straight forward." 2/4/11 LTR from Thomas Perrelli to Kenneth Feinberg, at 2, attached as Exhibit "2."  The overall result of the GCCF process, however, has been all too clear: attempt to limit access to courts while minimizing compensation.

OPA's mandate is clear:  "The responsible party shall establish a procedure for the payment or settlement of claims for interim, short-term damages." OPA § 1005(b), 33 U.S.C. § 2705(b) (emphasis supplied). As Courts have consistently noted: "'Shall' means shall. The Supreme Court and this circuit have made clear that when a statute uses the word "shall," Congress has imposed a mandatory duty upon the subject of the command. See United States v. Monsanto, 491 U.S. 600, 607, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) (by using "shall" in civil forfeiture statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied")." Forest Guardians v. Babbitt, 174 F.3d 1178, 1187 (10th Cir. 1999).[2]

OPA does not impose a specific procedure or methodology for evaluating claims. However, OPA does require that whatever procedures the responsible party implements must enable presentment, must pay interim damages, and must compensate claimants for all that they are ultimately entitled.  In order to give effect to, rather than emasculate, the mandatory command of the statute, the claims procedure must be reasonably designed to achieve these purposes.  See, e.g.,

_____

[2] An equally familiar canon of statutory construction holds that the courts have a "duty to give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section".  United States v. Menasche, 348 U.S. 528, 538-39 (1955) (internal quotation marks omitted). "It is well established that a statute should be construed so that each of its provisions is given its full effect..." Quarles v. St. Clair, 711 F.2d 691, 701 n.32 (5th Cir. 1983).

Loeffler v. Staten Island University Hosp., 582 F.3d 268, 274 -76 (2nd Cir. 2009) (holding that the Rehabilitation Act's mandate that hospitals "shall establish a procedure" to communicate with the hearing impaired requires meaningful access, such that a general procedure that does not actually provide an interpreter when needed violates the statute).

The same principle applied in Loeffler applies to the GCCF's obligation to establish a procedure for processing interim claims. By establishing a procedure that (a) compensates people on a random basis, (b) creates uncertainty and confusion, (c) leaves a lot of people uncompensated after many months, (d) completely lacks transparency, and (e) pushes people away from interim payments in favor of a "quick payment", GCCF violates OPA's mandate that it establish an interim claim procedure and that it actually work.

GCCF proposes to offer claimants three choices: quick payment claims, full final claims, and interim claims.  Of the three types of claims paid by GCCF, only the interim claim process is contemplated by OPA. However, the GCCF has in various ways discouraged the use of the interim claim process in favor of the submission of "quick payment" or final claims.  As of February 16, 2011, **89,206** quick payment final claims have been processed, with the mandatory broad contractual releases.[3]  See GCCF Overall Program Statistics, attached as Exhibit "3."  In contrast, and despite the fact that the most prominent command in OPA regarding compensation is to pay interim damages, only **1** interim claim has been paid. Id.  In violation of OPA's requirement that a process

_____

[3] Perhaps tellingly, when the GCCF's unsolicited claims package arrives to claimants, the quick payment claim form is the only one with the information pre-completed and ready to sign, despite the fact that the same information could just as easily be pre-completed on the interim claim package. Couple this fact with the fact that the claim is called "quick payment", and it is the same uniform $5,000 that BP was initially advancing to many claimants last summer, and the potential for confusion is apparent.

for paying interim claims be up and running within 15 days, the GCCF will not process interim claims until sometime after February 16, 2011, nearly ten months after the spill.[4]

### A.      Past OPA-Violating Problems With the GCCF Claims Protocol.

The GCCF focus on the BP-mandate of settling claims to avoid lawsuits has created (intentionally or otherwise) a system where the OPA-mandated interim claim is ignored in favor of payment options that have no basis in science, no consistent or transparent methodology, and no consideration of the specific  situations of the individual claimants.  "[The interim claims protocol] cannot be a disfavored fallback from the final claims process"  2/4/11 LTR from Thomas Perrelli to Kenneth Feinberg, at 2.

Inconsistency and secrecy are the source of many of the problems with the claim process. The GCCF requires the interim claimant to document past losses, but if the adjustor deems some information missing he or she will not inform the claimant.[5]  Instead of telling the claimant what information it deems lacking, thereby allowing the person to engage in meaningful negotiation, the GCCF will, after taking up to 90 days to review the claim, tender to the claimant an unexplained lower amount.[6]  Examples abound of restaurant workers being paid claims while the claim of their employer the restaurant itself are denied; of one deck hand being paid, while the other deck hand from the same boat who submitted the same documents is denied; of desperate claimants who are quickly paid following media exposure of their situation, despite no change in their claim documentation.  Such inconsistent results cannot be the outcome of a reasonable claim process.

---

[4] See Proposed Methodology, attached as Exhibit "4."

[5] See Final protocol, at 8, attached as Exhibit "5."

[6] FAQ 57, attached as Exhibit "6."

Below are a number of the larger problems with the claims process thus far and how they work to violate OPA by not paying claimants there interim claim.

- It has been nine months since the oil spill began and there has not been any interim claim process with any published methodology.

- Rejection letters are provided without any explanation as to the basis for the rejection.

- Hundreds of thousands of insufficient documentation letters have been sent out without identifying which documents were not submitted and how the claimant could fix the problem.

- The GCCF has not identified any eligibility requirements.

- The GCCF has failed to identify whether it is using some type of "proximity" requirement (such as only Gulf South residents and business will be eligible) in reviewing claims.

- The GCCF has inappropriately set up a different, smaller fund for real estate agent claims, implying that once that fund is exhausted there will be no more payments for this type of lost revenue.

- The GCCF has refused to pay for loss of property value claims and has been indecisive about paying lost profits claims from the sale of real estate at a loss.

- The GCCF has refused to pay lost income for "moratorium claims" despite many of these claims' direct connection to the oil spill.

- The GCCF, until very recently, utilized its own Claim Form that was over 13 pages long, but did not anywhere request a "sum certain" (as is arguably required under OPA in order to present a claim).[7]

- The GCCF has not paid any interest on any claim in the last nine months despite OPA's requirement that interest be paid on any payments past 30 days.  OPA § 1005(b); 33 U.S.C. § 2705(b).

---

[7] Plaintiffs maintain that filing any claim with the GCCF for any amount satisfies "presentment" under OPA but notes the inequity with the GCCF not providing any "sum certain" entry on its own claim form which it will presumably use as a basis for arguing that OPA presentment has not been made.

- As of December 14, 2010, over 31,000 subsistence use claims had been submitted to GCCF, and only 5 had been paid.[8]  OPA § 1002(b)(2)(C); 33 U.S.C. § 1002(b)(2)(c).

OPA's mandate to pay interim claims is intended to keep individuals and businesses afloat as the ongoing damages they are suffering continue to emerge and manifest, thereby protecting victims from the coercive pressure of financial hardship. The able point is to protect claimants from "selling out" quickly to avoid instant ruin.  No true economic recovery for individual claimants or for the Gulf Coast itself can occur if such a Hobson's choice is all the GCCF offers.  The OPA system protects claimants from immediate privation without requiring them to foreclose on their economic futures.  All along the Gulf Coast this protective system is failing. As noted by the State of Mississippi's Attorney General: "This quick payment scheme is thwarting the remedial purposes of OPA and violating public policy by using economic duress to secure impermissibly broad releases of BP and of all other responsible parties." (Rec. Doc. 1085 at 6.)

These concerns are not limited to the claimants and their advocates.  The U.S. Department of Justice has written Mr. Feinberg at the GCCF to reiterate the federal government's view that "it is essential that the individuals and businesses most affected by the Deepwater Hoizon Oil Spill are fairly treated by the Gulf Coast Claims Facility."    2/4/11 LTR from Thomas Perrelli to Kenneth Feinberg, at 2.  The federal government also requested several specific changes and urged the GCCF to meet OPA requirements.  Id.

     **B.**     **By Failing to Provide Any Methodology for Interim Claims and By Hiding the Bases for Past Payments and Past Denials, GCCF Has Violated OPA and Upset the "Presentment" Requirement.**

---

[8] 12/14/10 Gulf Coast Claims Facility Status Report, attached as Exhibit "7."

OPA requires that "all claims for removal costs or damages shall be presented first to the responsible party." OPA § 1013(a); 33 U.S.C. § 2713(a).  The term "present" is not defined in OPA, but OPA is explicit that "'claim' means a request, made in writing for a sum certain, for compensation for damages or removal costs resulting from an incident." OPA § 1001; 33 U.S.C. § 2701. Therefore, under the plain terms of the statute, the "presentment" requirement is satisfied when a written request for a sum certain for covered damages is made to the responsible party. Presentment must inform the responsible party "of the nature and extent of the damages alleged and of the amount of monetary damages claimed." Johnson v. Colonial Pipeline Co., 830 F. Supp. 309, 311 (E.D. Va. 1993). The responsible party must publish the procedures by which a victim may present a claim within 15 days after designation as such.  OPA § 1014(b); 33 U.S.C. § 2714(b). However, the responsible party is not given the authority to define what "presentment" means for purposes of OPA.

BP suggests in its Memorandum in Opposition to the Motion to Supervise that it believes that no OPA claims have been presented. (Rec. Doc. 963 at 13.)  BP's suggestion underscores a serious flaw in its ever-shifting claims process. The ability of a claimant to present a claim is in some sense dependent upon the claims procedure set up by the responsible party.  BP and its "Facility" have frustrated the ability of victims to present their claims by delaying and repeatedly changing the claims procedure, by refusing to establish and/or disclose the calculations by which claims are evaluated, by refusing to inform denied or underpaid claimants of the reasons for denial, and by demanding specific documents while refusing to consider other valid sources of proof.

BP's argument before this Court indicates that it will seek to use the procedural deficiencies inherent in its own claims process as a litigation tool to deny the substantive claims of spill victims. For one thing, BP cannot simply restart the 90 day window of OPA § 1013 by issuing new claims procedures every few months. OPA requires that the claims procedure be in place and advertised within 15 days.  All of those who presented a claim (as defined by OPA) to BP according to the initial advertised procedures this past summer have satisfied presentment. The same applies to all of those who first presented a claim according to the GCCF procedure first available on August 23, 2010, and to those who are first presenting a claim according to the revised GCCF procedure following November 23, 2010. Successive revisions of the advertised claims procedure cannot serve to invalidate the presentment or reset the clock of those claims that relied on prior procedures and complied with OPA.

Perhaps more importantly, the GCCF methodology for claims analysis has been so secretive that BP cannot be heard to complain that deficient supporting documentation (to the extent that is even required of claimants under OPA) is a jurisdictional bar to a claimant filing suit. GCCF has set up a system wherein they demand submission of a large amount of information from victims (including many admissions, signed statements, protectable confidential information, business plans, profit models, analyses on valuation, etc.), yet they provide no information in return – no reason for denial, no identification of which documents were not provided, and no explanation as to how payments were calculated.

For example, as the GCCF website statistics attest, only about 27% of the Texas claimants are being compensated.[9]  If the GCCF has drawn lines of eligibility, whether geographic or based

---

[9]  See Texas Status Report, attached as Exhibit "8."

on industry or any other criteria, it should make that fact known so that claimants are aware at the outset that the GCCF will not pay their claims.

As U.S. Representative Jo Bonner wrote to Mr. Feinberg:

> [I]t is imperative the GCCF include information on how payments are calculated, and if a denial is rendered, a reason must be offered. Ken, how many times do I need to make this request? Also, there appears to be far too much discretionary reasoning on behalf of the GCCF team. Decisions continue to be rendered by individuals who seem to be unfamiliar with the dynamics of a tourism economy and who appear to know nothing about the geography of our area. The proposed guidelines are extremely vague and leave a great deal of room for arbitrary decision-making.

2/15/11 LTR from Representative Jo Bonner to Kenneth Feinberg, at 2, attached as Exhibit "9."

When GCCF refuses to explain to claimants during its evaluation process what BP considers to be lacking in a claim or how it arrived at an amount, BP frustrates the presentment process by failing to "engage in meaningful substantive negotiations" that the presentment process was intended to foster. Johnson v. Colonial Pipeline Co., 830 F.Supp. 309, 311 (E.D.Va.1993).

GCCF cannot frustrate the Court's jurisdiction by providing an inadequate claims process. Neither can it claim on the one hand that it has sufficient information to determine a claimant's final damages, while on the other hand arguing that insufficient information has been "presented" to satisfy the jurisdictional condition precedent. The claim process must not be perverted from its intended function as a protective device into a trap for injured victims.

> **C.     In Order to Comply With OPA (and Out of Simple Fairness), the GCCF Must Inform Putative Class Members of All Reasons for Past Denials, All Bases for Past Payments, All Manner of Prior Calculations, and Identify What, if any, Additional Documentation May Be Lacking.**

Only transparency of past claim activities followed by an objective, open interim claim methodology can fairly meet BP's obligations under OPA. OPA requires that the responsible party

pay interim claims within 90 days and that interest will accrue after 30 days. It has now been over nine months since the oil spill and hundreds of thousands of people have been denied claims either unfairly or without an adequate explanation. Those that have received some payments do not know how they were calculated. In order to ensure that each putative class member will not be forced into a coercive situation, BP should be ordered to provide each person whose claim was denied with a written detailed explanation for the basis of denial. For every putative class member who received payment, BP should be ordered to provide a written explanation as to how that payment was calculated. To the extent that the GCCF used some type of formula and/or eligibility guidelines as to which claims should be paid, these should also be produced to each individual claimant and advertised on the GCCF's website and all public media outlets.

Only transparency of the past decisions will ensure that the interim claims in the future are fair. See 2/4/11 LTR from Thomas Perrelli to Kenneth Feinberg, at 2 ("It is similarly important that claimants have an understanding of why their claims are handled as they are, and I ask that the GCCF find ways to provide additional information about its decisions."). Payment of the interim claims in the future will likely be based in some part on how the past interim claims were calculated. In fact, the GCCF has stated that past payments will be deducted from any final offer. To determine whether any future final offers are fair, there should be full disclosure as to the factors and information on which past payments were based.

**III.  THE NEW PROTOCOL IS AS DECEPTIVE AND MANIPULATIVE AS THE REPORTS USED TO SUPPORT IT AND DEMONSTRATES THAT THE GCCF IS PRIMARILY CONCERNED WITH THE BP-MANDATE OF OBTAINING RELEASES, NOT THE OPA-MANDATE OF FAIRLY CALCULATING INTERIM CLAIMS.**

On February 2, 2011, the GCCF, for the first time, announced a payment methodology for public comment. The GCCF stated that when the public comment period elapses on February 16, 2011, it may incorporate any suggestions it believes are warranted at some point afterwards. The new protocol was ostensibly based upon a scientific report and an economic report.

After a review of the interim claims protocol and the final claim protocol, only one conclusion can be made – the GCCF is motivated by the BP-mandate to obtain as many releases as possible. The GCCF has once again subverted its OPA-mandate to fairly and transparently pay interim claims. Nothing makes this clearer than the two reports the GCCF has touted as its justification for the final claims protocol. The GCCF's latest posturing also makes it clear that if this Court does not exercise control over the process now, it will be faced with potentially hundreds of thousands of lawsuits that could have been avoided if the GCCF had focused on paying what is due, not leaving before the full check is paid and the full cost of BP's disaster is calculable.

### A.   The New Protocol Is Fundamentally Flawed.

The problems with the proposed methodology are legion. The following list is merely a sampling of fundamental flaws in the methodology that serve to undercut compensation, thereby increasing the hardship on victims and the pressure to sign whatever document GCCF requires to stay afloat.[10]

- The protocol's one (or two) size(s) fits all approach to calculating damages may be expedient, but highly inaccurate. The lumping of virtually all businesses into a single category, standard formula, and methodology for damages calculation ignores a significant number of factors that would materially affect individual claimants' actual losses (such as

---

[10] See also 2/16/11 LTR from State of Florida Chief Financial Officer to Kenneth Feinberg, at 1 ("In short, the proposed methodology lacks transparency, fails to provide clear guidelines, and continues to play with the emotions of victims who simply want to be compensated for their financial losses."), attached as Exhibit "10."

nature of specific business, its size, geographic location, industry, or other circumstances that may apply to a particular claimant).

- The protocol fails to acknowledge that each region, to date, was exposed to a different quantity of oil and for different lengths of time.  The structure of these economies varies significantly.  Different industries felt different impacts and to varying degrees.

- The protocol fails to recognize that size, business type, age of the business, its customer base, the individual business' history, location in the county, cost structure and other factors will influence the individual claims that are forthcoming.

- Future losses are based upon actual losses for an approximately 8 month period (April 20 – December 31, 2010) and by multiplying this loss by a factor of 2 and reducing by payments made to date, the claimant is only actually compensated for a total of 16 months – not a 2 year period which would be 24 months.

- The Proposed methodology will under-compensate those claimants that were not impacted immediately by the Oil Spill. For example, if a claimant began to experience losses in October 2010 as a result of the Oil Spill, such a claimant would be limited to a recovery of only six months of loss (the three post Oil Spill months in 2010 times two).

- The protocol's geographic focus on coastal counties only arbitrarily limits the damages to a subset of the total damages. If there were billions of dollars of economic damage in coastal counties in Texas Louisiana, Mississippi, Alabama and Florida how can the ripple effect (indirect and induced impacts) to the rest of the non-coastal counties in these states not merit compensation?  Does the GCCF just assume that they are negligible?

- The protocol does not account for the likelihood of future re-oiling events. GCCF interprets the data to indicate that there is evidence of a strong recovery underway which is uncertain and fails to account for the possibility of any re-oiling event due to hurricanes or other resurfacing of oil from the bottom of the Gulf, etc.

- The protocol appears to require unrealistic documentation of causation which should be obvious in many cases and where specific documentation may not always be available or exist.

- GCCF will not presume that a given loss was or was not caused by the Oil Spill even if an Emergency Advance Payment was made, evidencing yet another shift in the GCCF's shift of what is acceptable causation proof.

- GCCF will undertake a renewed evaluation of available data every 4 months, thus the final payment factors published today could decrease.

- GCCF does not provide any protocol for claims greater than $500,000.

- GCCF will determine Final Payments for claimants with losses greater than $500,000 on an individualized basis; thus there is no guidance at all that is proposed in the protocol for many claimants who have been significantly impacted and no assurances as to how those claims will be assessed and paid.

- The protocol offsets prior period Oil Spill losses with future profits even though those future profits may reflect growth unconnected to a "recovery" from oil spill losses.

- The protocol utilizes undefined terms in its calculation examples. "Other Offsets" and "Loss of Income (LOI) %" are not defined and could give the GCCF significant leeway in its determination of payments.

- The protocol does not account for the public perception of the leisure tourist and how future re-oiling events may extend public perception of the "perceived risk" as it applies to the beach, the water, and the seafood.

- The new protocol turns the interim claim into an alternative of the final claim to be bid against, rather than an amount that a claimant is due without limitations: "[i]n the event that the Claimant has submitted an eligible, substantiated claim, the GCCF will provide the Claimant with a payment determination for both an Interim Payment and Final Payment so that the Claimant can select which form of payment the Claimant desires."[11]

The above problems also demonstrate the pressure, subtle and overt, that the GCCF is exerting on putative class members to accept final claims.  The subtle pressure includes misrepresenting the calculations of the 2010 losses as a "year's loss" and by presenting the putative class member with the option of selecting either an interim claim or a final claim – when OPA requires the GCCF to pay that interim claim.  The subtle pressure also includes BP's failure to provide any methodology for interim claims in the first nine months of the spill and paying only six months worth of lost income for the past nine months.  It is no coincidence that right when the putative class members are hurting the most (from being paid only six months of lost income for the last nine months), the GCCF presents the final claims process.

---

[11] See Final Protocol § IV.A..

The GCCFs' overt pressure is memorialized in the two reports that it commissioned to support its final claims protocol.  Noticeably absent is any report (expert or otherwise) that purports to support the interim claims process as fair, objective, and transparent.  Nonetheless, as seen below, the two reports are little more than the GCCF ignoring its OPA-mandate to pay what is owed in favor of its BP-mandate to get as many releases as possible.

### B.    The Reports Behind the New Protocol Unequivocally Demonstrate that the GCCF is following the BP-Mandate.

In addition to showing the lengths to which the GCCF will undergo to follow the BP-mandate, the two GCCF Reports that purport to provide the purportedly scientific, factual, and economic basis for making final claims based on two years again demonstrate the need for this Court's oversight.  These reports are transparently results oriented and are a product of the BP directive to settle claims now before suit is filed.  Because these reports are being presented to putative class members as an "objective" "expert" bases for settling their litigious rights, this Court should step in and put an end to these representations and order the GCCF to produce all information and the bases for its position that the spill's effects will last only two years.

The "scientific" foundation for the GCCF's future payment methodology is a single report[12] from Dr. Wes Tunnell commissioned by Mr. Feinberg in mid-December for $225/hour with a two week deadline.[13]  Dr. Tunnell's analysis is based on a review of literature, not empirical analysis of actual data.  Ian MacDonald, professor of oceanography at Florida State University and a member

---

[12]  Report of Dr. Wes Tunnell, attached as Exhibit "11."

[13]  "On Gulf Oil Spill's Effects, Doing Science with a Deadline," THE NEW YORK TIMES, John Schwartz and Mark Schrope, (2/2/11), attached as Exhibit "12."  See also "Report Foresees Quick Gulf of Mexico Recovery," THE NEW YORK TIMES, John Schwartz and Mark Schrope, (2/2/11), attached as Exhibit "13."

of the National Wildlife Federation's Gulf Oil Disaster Science Advisory Panel, noted that "[t]his is not a scientific report - it's an opinion. There's just no data here. It doesn't propose any methodology by which its assumptions and predictions could be tested." Id.

Dr. Tunnell's report itself repeatedly acknowledges that there is no way to accurately assess the long term impact of the spill.  Dr. Tunnell candidly admits the true impetus behind his opinions: "In conclusion, making an exact call for the time of recovery of any fishery group after a major oil spill is impossible. However, it is realized that it is very important to settle claims with individuals and businesses on a timely basis, so the expert opinions for the four fishery groups given in this report are as reasonable as possible at this time." Id. (emphasis supplied). See also id. at 14 ("[N]ear impossibility in accurately predicting the environmental impact or time of recovery"); id. at 15 ("[D]etermining recovery to a certain endpoint may be ill-conceived"); id. ("Changes in feeding behavior or reproductive behavior could affect populations for years from re-oiling of submerged or hidden oil that was not removed.  The unprecedented and unexpected crash in the herring fishery five years after the Exxon Valdez oil spill is a classic example."); id. at 22 ("The effects of oil on plankton (food for larvae of fish and invertebrates) are currently unknown, and may never be known. The effects of oil on trophic cascades and ecological interactions are also unknown"); id. at 37 ("Realistically, the true loss to the ecosystem and fisheries may not be accurately known for years, or even decades."); id. at 38 ("In conclusion, making an exact call for the time of recovery of any fishery group after a major oil spill is impossible.").  These are remarkably unabashed statements that his report is not science but the result of a client directing him to put something together to achieve the purpose of getting putative class members to release their litigation rights.

The second basis for the final payment calculation methodology, ARPC's economic recovery analysis, is equally suspect and result driven.[14]   Some of the problems include the following: (1) Louisiana is largely left out of the calculation; (2) the Gulf Coast market is largely an auto-based market, but ARPC relies exclusively on airport arrivals to find little or no effect on the economy; (3) the Fall/Winter "recovery" claimed by ARPC reflects an entirely different type of tourism and is not indicative of the summer beach/leisure tourist season of the Gulf Coast; (4) the STR data used to support the methodology over-samples national chains whereas tax data, which include all businesses, show much larger declines and a longer recovery period; (5) the study assumes that the oil spill and its impact can be modeled as a spike in 2010 that rapidly decays eschewing any possibility that sub-surface or settled oil could be stirred up due to tropical storms or hurricanes in the Gulf of Mexico; (6) re-oiling could cause hysteria for these regions and lead to long lasting or permanent damage, changing the pattern of recovery and thus the possible damages caused by the spill; (7) the 2010 County Business Study used by ARPC only looks at four different industries – hotels, restaurants, retail and fishing; (8) the 2010 County Business Patterns are based on data from 2008 and would largely reflect the impact of the recession on the number of businesses and employees in these sectors – comparing payments made in 2010 to Census data from 2008 would bias the percentages upward making compensation rates appear more generous than they are; (9) GCCF relies upon a set recovery rate for the tourism industry and general Gulf economy when this set rate may not apply in a blanket fashion to all claimants. (i.e. puts all claimants in one formula without consideration for each specific business, industry, location); and (10) all indicators cited are

---

[14] See ARPC Report, attached as Exhibit "14."

on supply side of the ledger with no discussion of oil spill impact on the beach visitor or sport

fishing visitor.[15]

C.    **The Court Should Oversee the Creation of a Legitimate, Transparent Interim Claims Protocol as Required by OPA.**

Given the crucial need for transparency, fixing the past claim errors, and the significant

public interest, this Court should appoint a special master to oversee the creation of an interim

claims protocol.  Now is the time to fulfill the mandate of OPA, the promise of BP, and the

legitimate expectations of the federal government, the Gulf States, and the residents, businesses, and

workers of the Gulf for a fair, open, and effective claims system.  The special master will bring BP,

the GCCF, the PSC, the Gulf South States, and a cadre of experts to help develop the fastest, fairest,

most open protocol for interim claims.  Disputes or impasses can first be brought to the special

master for resolution and, if necessary, appealed to this Court.

## CONCLUSION

Plaintiffs respectfully request that the Court order BP and the GCCF to perform the

following in furtherance of their OPA mandated responsibilities:[16]

1.    Retrospectively void all final releases entered into between unrepresented putative class members and the GCCF – or, in the alternative, hold the issue open for further discovery, hearing and consideration;

---

[15] See also The University of W. Florida Dep't of Marketing & Econ. Comments on Methodology, attached as Exhibit "15."

[16] Plaintiffs reserve their right to address BP and the GCCF's potential violations of this Court's order that they cease engaging in misleading communications.  The GCCF website appears to violate the spirit, if not the letter, of the Court's order, and BP's public posturing that the GCCF's claim calculations are "too generous" are intended to do nothing less than coerce putative class members into taking as many quick checks and sign as many releases as possible.

2.      Prospectively prohibit BP, the Feinberg Rozen Law Firm, and the GCCF from requiring a release or subrogation of claims beyond the amount that BP pays;

3.      Provide an interim payment calculation to each unrepresented putative class member who signed a release;

4.      Disclose all eligibility requirements in effect to date;

5.      Explain the bases for all previous denials.

6.      For all denials based on lack of documentation, inform the individual claimant which documentation was lacking;

7.      For all past payments, disclose to the claimant the calculation and all reasons thereof; and

8.      Appoint a special master to oversee the creation of an interim claims protocol with input from the PSC and BP.

Respectfully submitted,

___/s/_Stephen J. Herman_____      ___/s/ James Parkerson Roy_____
Stephen J. Herman, La. Bar No. 23129      James Parkerson Roy, La. Bar No. 11511
HERMAN HERMAN KATZ & COTLAR LLP      DOMENGEAUX WRIGHT ROY & EDWARDS LLC
820 O'Keefe Avenue      556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113      Lafayette, Louisiana 70501
Telephone: (504) 581-4892      Telephone: (337) 233-3033
Fax No. (504) 569-6024      Fax No. (337) 233-2796
E-Mail: sherman@hhkc.com      E-Mail: jimr@wrightroy.com
*Plaintiffs Liaison Counsel*      *Plaintiffs Liaison Counsel*

**SOREN E. GISLESON**
**CLAY GARSIDE**
**ELIZABETH CABRASER**
**KEVIN DEAN**
**GARY E. MASON**
**RHON JONES**
**JULIA LeMENSE**

*On Brief.*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Memorandum has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of February, 2011.

/s/  James Parkerson Roy and Stephen J. Herman