UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | | |
|---|---|---|---|
| In Re: | Oil Spill by the Oil Rig | : | MDL NO. 2179 |
| | "Deepwater Horizon" in the | : | |
| | Gulf of Mexico, on | : | SECTION: J |
| | April 20, 2010 | : | |
| | | : | JUDGE BARBIER |
| This Document Relates to All Cases | | : | MAG. JUDGE SHUSHAN |

## DECLARATION OF NANCY JONES

I, **Nancy Jones**, do state and declare, **under penalty of perjury, in accord with 28 U.S.C. 1746,** the following to be true and accurate to the best of my personal knowledge:

1. I, Nancy Jones, am an employee of the U.S. Environmental Protection Agency ("EPA"), Region 6, in Dallas, Texas. I have been continuously employed with the EPA since June, 1998, as an On-Scene Coordinator ("OSC") with the Response and Prevention Branch, Superfund Division, performing various assignments, duties and responsibilities pursuant to the Clean Water Act ("CWA"), as amended by the Oil Pollution Act ("OPA"), the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and the National Contingency Plan ("NCP"), 40 C.F.R. Part 300. Prior to that, I was employed with the EPA since April, 1995 as a RCRA Inspector/Enforcement Officer. With respect to my educational background, I earned a bachelor's degree in Government with a minor in Biology from University of Texas on December, 1991, a bachelor's degree in Emergency Administration and Planning from University of North Texas on December, 1992.

2. As an OSC with the EPA I direct and coordinate response efforts, including emergency response, associated with oil spills and discharges into navigable waters, threats of oil spills and discharges into navigable waters, releases or threats of releases of hazardous substances into the environment, proper

**Page 1**

disposal of debris and material resulting from removal responses, sampling and monitoring and ensuring preservation of samples and monitoring results from response actions, to name a few. Part of these duties include contracting and coordinating with EPA and private laboratories in charge of receiving and analyzing sampling and monitoring activities of soil, air and liquids. Coordination involves the funding of the laboratory activities and ensuring quality assurance and quality control ("QA/QC") and chain of custody policies and practices in these efforts.

3. I have been assigned as one of the OSCs to assist the U.S. Coast Guard in the Deepwater Horizon oil spill response pursuant to the National Contingency Plan. My duties in that regard include the contracting and coordination with certain laboratories to receive and analyze samples collected during the response. The coordination involves the preservation of samples collected and analyzed in accordance with QA/QC policies and practices.

4. During the response, EPA collected over 4,000 environmental samples (approximately 1200 water samples, 350 sediment samples and 2500 air samples) and transported them to environmental laboratories for various types of analyses.

5. On July 23, 2010, START-3, EPA's contractor, notified EPA that the laboratories were encountering storage capacity issues related to the preservation of samples taken during the response to the Deepwater Horizon oil spill.

6. EPA's contractor was tasked with conducting chemical analyses on water and sediment samples, including analyses for volatile organic compounds ("VOCs"), semi-volatile organic compounds ("SVOCs"), polycyclic aromatic hydrocarbons ("PAHs") by selective ion monitor (SIM), metals, total petroleum hydrocarbons (TPH), oil and gas ("O&G), and dispersants.

7. To ensure reliable results and consistent analyses, EPA regulations and laboratories established maximum holding times for samples, after which any analysis of the samples is no longer considered

**Page 2**

reliable. The longest holding time for samples being analyzed for the compounds identified in paragraph 6 is 180 days (for the metals analysis). However, all other analyses have holding times that are less than 30 days.

8. Because the samples were past their approved holding times and because the START-3 laboratories were encountering a shortage of storage place, on August 16, 2010, START-3 notified the laboratories to dispose of samples 30 days after the date of collection.

9. On October 14, 2010, EPA provided the laboratories with a written BP - Deepwater Horizon Document Preservation Notice dated September 28, 2010. Since receipt of this notice, the laboratories have been directed to cease disposing of samples and to perform an inventory of the sample containers that had not been disposed.

10. The sample containers being held have each been analyzed and the data reports have been received and validated by EPA's START 3 contractor, Weston Solutions for the analyses listed above. These analyses are documented in laboratory reports that include both sample results and laboratory quality control sample results. The data validation performed by START-3 included review of laboratory quality control results including method blanks, laboratory control samples, matrix spike/matrix spike duplicate samples, laboratory duplicates, and surrogate recoveries. The review also included evaluation of cooler temperatures, laboratory report completeness, and field quality control samples including field duplicates, field blanks, trip blanks, and equipment rinsate blanks. All supporting documentation of these analyses (including but not limited to instrument calibration data and raw sample data) is maintained at each of the analyzing laboratories.

11. The laboratories did not retain the air samples analysed for PAH because the air sample media is consumed during sample extraction.

12. The laboratories did not retain VOC air samples because they are collected in summa canisters that are recycled and re-used after approximately 30 days.

13. EPA has identified appropriate holding times for samples in 40 C.F.R. Part 136.3, Identification of Test Procedures. These test procedures provide that "[s]amples should be analyzed as soon as possible after collection. Holding times and preservation requirements are set to assure that contaminant concentrations do not change significantly between sampling and extraction because of intrinsic biogeochemical reactions, such as biotic and abiotic degradation, volitalization, oxidation/reduction, or irreversible sorption. EPA's manual Test Methods for Evaluating Solid Waste: Physical/Chemical Methods (SW-846, Second Edition) defines sample holding time as the storage time allowed between field collection of a sample and completion of analysis in a laboratory. Specific holding times are set for quality assurance and quality control purposes. Certain constituents, such as volatile organic compounds, can degrade or volatilize over time. When constituents in a sample are lost through these natural chemical processes, analytical measurements become inaccurate. To limit sample degradation, maximum holding times are developed based on the propensity of the constituents to degrade or volatilize. The times listed are the maximum times that samples may be held before the start of analysis and still be considered valid." 40 C.F.R. Part 136.3 Table II note 4.

14. Under these regulations, the hold times for the samples identified in paragraphs 4 and 6 include but are not limited to the following:

VOCs - 7 days for unpreserved samples; 14 days for preserved samples

SVOCs - 7 days until extraction; 40 days after extraction

PAHs - 7 days until extraction; 40 days after extraction

Metals (excluding mercury) - 180 days

Mercury - 28 days

**Page 4**

TPH - not specified

O&G - 28 days.

15. Based on the hold times listed above, the solid and aqueous samples currently being stored have exceeded hold times with the exception of the samples held for metals analysis. Any further analysis of these samples (with the exception of metals) would not be considered valid in accordance with 40 C.F.R. Part 136.3.

16. EPA paying its contractors to store approximately 1500 sample containers of various sizes plus numerous 40 mL glass vials as a result of the Deepwater Horizon Preservation Notice.

17. Each laboratory storing sample containers has notified EPA that there is an associated storage fee. Total monthly storage for the five laboratories combined is approximately $6500 per month.

18. After December 31, 2010, EPA will no longer have a funding mechanism to pay for the monthly sample storage currently required by the litigation hold. Further, since the sample holding times have been exceeded, there is no scientific reason to maintain these samples.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15 day of December, 2010, in Dallas, Texas,

*Nancy Jones* (signature)
Nancy Jones