UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | | |
|---|---|---|---|
| In Re: | Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : : | MDL NO. 2179 SECTION: J JUDGE BARBIER |
| This Document Relates to All Cases | | : | MAG. JUDGE SHUSHAN |

. .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  .

STATEMENT OF UNITED STATES REGARDING
THE COURT'S FEBRUARY 2, 2011 ORDER

COMES NOW the United States and submits its statement regarding the Court's February 2, 2011 order, seeking briefing on the mandates of the Oil Pollution Act ("OPA").

**THE OIL POLLUTION ACT**

The Oil Pollution Act, enacted following the Exxon Valdez disaster, was the culmination of years of deliberation by Congress. A fundamental purpose behind OPA is to compensate individuals, businesses, localities, States, and the Federal Government for removal costs and damages (collectively, "harm") as a result of an oil spill. Responsible Parties are held to a strict liability standard, thereby clearly establishing those entities who are responsible for providing compensation for such harm. In addition, however, OPA requires Responsible Parties to set up and advertise a claims process that, if successful, provides parties the opportunity to avoid lengthy litigation and ensures fair compensation to those harmed by the spill. 33 U.S.C. § 2714(b).

In turn, the OPA requires claimants to present their claims of harm to the Responsible Party before they can resort to litigation, *id.* § 2713(a), and provides 90 days during which the parties must seek to resolve their claims before they may go to court. *Id.* 2713(c). When a Responsible Party denies liability for a claim or the parties are unable to reach agreement within 90 days, the claimant may present his or her claim in federal court or to the National Pollution Funds Center ("NPFC") for payment from the Oil Spill Liability Trust Fund (Fund). *Id.* 2713(c), (d). If the claim is presented to the NPFC, the NPFC will determine whether the claimant has

provided sufficient evidence to establish harm within the meaning of the statute and implementing regulations and that the harm was caused as a result of the oil spill.  33 C.F.R. Part 136.  If the requirements are met, the NPFC itself will pay the claim from the Fund – and then refer the claim to the Department of Justice for recovery of the payment and related administrative costs from the Responsible Party. 33 U.S.C. §2715(c).  The Responsible Party thus has incentives to resolve claims through its claims process, because any valid claims that it fails to settle will be pursued by the United States.  Similarly, claimants have the incentive to seek reasonable settlements from the Responsible Party, armed with the knowledge that they have a subsequent opportunity to submit their claim to the NPFC or in court if their claim is not resolved.

The OPA leaves this extra-judicial claims settlement process largely in the parties' hands.  While regulations provide considerable detail about procedures for submission of claims to the NPFC, neither the OPA nor its implementing regulations provide similar requirements for private claims processes.  Rather than dictating how and what specific claims parties must resolve, the OPA relies on its incentives – strict liability on the Responsible Parties, the backstop of the NPFC/Fund and the courts where resolution was not reached, and the clear benefits of expeditious out-of-court settlements – to encourage Responsible Parties to fairly compensate those harmed by an oil spill.  The OPA does specifically contemplate that victims of an oil spill will be able to file interim claims, without being required to release their future damage claims in order to be compensated for past, interim damage.  33 U.S.C. § 2715.  But the OPA does not discuss releases in any detail; the NPFC generally obtains a release for the removal costs and damages it pays a claimant, and Responsible Parties in oil spills regularly seek releases as part of the claims process.

The most extensive governmental oversight provided by the statute is in the advertising procedures. Consistent with the overall structural goal of creating an opportunity for settlement as the parties deem appropriate, the OPA requires that a responsible party "advertise the . . . procedures by which claims may be presented, in accordance with regulations promulgated by the" NPFC. *Id.* § 2714(b). The NPFC thus reviews proposed advertisements of claims processes under this statute, both to ensure that the process is advertised adequately, so that claimants know about the opportunity to settle their claims, and to ensure that the process is advertised accurately, so that claimants are able to make informed decisions about whether to settle their claims. *See* 33 C.F.R. § 136.313.

Finally, the OPA does not envision court management of a claims process. Rather, the OPA claims process is intended as a mechanism by which parties may avoid litigation – not a mechanism that will generate litigation or open up new forum for disputes. Indeed, the OPA envisions a court's coming into play only if a claimant invokes it after failing to receive a satisfactory resolution from the Responsible Party.

## THE GULF COAST CLAIMS FACILITY

As the Court knows, the size and scope of the Deepwater Horizon oil spill was unprecedented; not surprisingly, its claims process required a massive undertaking. In the days after the oil spill, the Coast Guard's NPFC designated the source of the discharge and identified several Responsible Parties and guarantors. BP accepted the designation and advertised and began a claims process. To avoid the confusion that could be caused by multiple claims processes run by multiple responsible parties the NPFC did not further require other Responsible Parties or the guarantors to advertise and begin other claims processes. Under the process set out in the OPA, decisions regarding those claims – whether they should be paid, and for how much – would be made by the settling parties.

In the days after the Deepwater Horizon tragedy, BP began paying claims and made a number of very public commitments that it would pay all legitimate claims. The scope of such commitments was imprecise, and there were significant concerns about whether BP would fulfill its commitments and would continue to pay claims – let alone pay them in full – after the cameras had gone away. Moreover, questions arose concerning whether any process run and controlled by BP would be viewed by the people of the Gulf as a fair and legitimate one.

In response to these concerns, the Administration called on BP, as a Responsible Party for the oil spill, to take action to address these immediate and significant public concerns. Following a meeting with the President on June 16, 2010, BP agreed to take actions to ensure that it could not renege on its commitments, that funds would be available to pay legitimate claimants, and that the people of the Gulf would have the opportunity to have their claims decided by an arbiter who was not controlled by BP. Thus, BP agreed to establish a fund of $20 billion, backed by collateral to ensure the availability of such funds, and to hand over the keys to its claims process to a third-party claims administrator, Kenneth Feinberg, authorized to spend BP's funds with independent decision-making authority. This agreement was the genesis of the Gulf Coast Claims Facility.

The role of the GCCF and the $20 billion trust fund have been often confused in public discussion. The $20 billion trust fund is separate and distinct from the GCCF. The trust fund is established by a separate trust document and is overseen by three independent trustees, not Mr. Feinberg. The fund provides neither a ceiling nor a floor on the Responsible Parties' liability. If, ultimately, the liability of the Responsible Parties is greater than $20 billion, they must either replenish the trust or pay additional liability over and above payments into the trust. The trust has multiple purposes. It is available to pay, *inter alia*, individual and business claims under OPA (which are overseen by the GCCF), and claims of local and state governments (currently

being handled by BP), and claims for natural resource damages that are held by Federal, state, and tribal trustees.  By its terms, the trust is not to be used to pay the federal government's response costs or to pay civil or criminal penalties that may arise from the spill.

The GCCF is a claims administrator that substitutes for BP's claims-handling obligations as a Responsible Party under the OPA.  The GCCF, including all of Mr. Feinberg's salary and costs, are borne by BP, not by the taxpayer or by claimants.  Although, as this Court has held, Mr. Feinberg is under contract with BP and has some responsibilities to BP – indeed the role of the GCCF is to fulfill BP's obligations under OPA – Mr. Feinberg operates as an independent decision-maker. 2/1/11 Order at 11 (noting that "BP does not control Mr. Feinberg's evaluation of individual claims").  He is not a government official of any sort, and his decisions are neither controlled by the government nor BP.  As noted above, the intent of the GCCF was to create a claims facility that would not be susceptible to the criticism that BP was biased against claimants.

Since the announcement that BP had relinquished control of its statutorily mandated claims process, the United States has worked closely with its state partners, stakeholders throughout the region, and BP itself to ensure that the GCCF fulfills BP's statutory obligations and its other commitments.  The United States has advocated numerous times for changes in the protocols or approach of the GCCF, either to ensure compliance with the OPA or to address perceived problems of fairness, lack of transparency, or failure of customer service.  As with any independent claims administrator – albeit to a lesser degree than would be expected of a Responsible Party charged with spending *its own* money – there have been some suggestions that the GCCF has rejected.  In addition, however, the GCCF has taken a number of actions not contemplated by the OPA (but not inconsistent with the OPA) in an attempt to deal with the massive impact of the Deepwater Horizon tragedy.  For example, the GCCF implemented an

5

Emergency Advance Payment program, which is not specifically delineated in the OPA, that provided many individuals and some businesses with much needed funds on an expedited basis, and has made its claims process available for claimants who wish to resolve physical injury claims that are not covered by the OPA. To date, the GCCF has paid out over $3.3 billion in 6 months to over 168,000 claimants, significant numbers by any measure.

The Court has asked for briefing concerning whether the GCCF is satisfying its obligations under OPA. The United States is not in a position to comment on specific claims or their treatment by the GCCF. In response to statements made by the GCCF, the United States has repeatedly emphasized that OPA compels compensation to all individuals and businesses harmed "as a result of" the oil spill. The GCCF has repeatedly confirmed that, notwithstanding the language used, it is applying the OPA standard. As noted above, parties dissatisfied with the GCCF can file in court or file a claim with the NPFC. As of February 14th the NPFC reports it has received 547 claims and, applying the OPA standards, has denied 309 of them. The remaining 259 claims are pending adjudication.

The Court also sought comment on the interim claims process, the final damages methodology, and releases. As noted above, the OPA does not specify any particular methodology for assessing future damages for final claims and does not address the issue of releases in any detail. From the perspective of the United States, it has been critical that claimants have a true choice: under the GCCF process they can either file interim claims, for which the OPA requires Responsible Parties to provide, receive payments for damages as they accrue, and not sign any release; or they can, with appropriate legal counsel available, finally settle their claims – past and future – by agreeing to an appropriate release. Among other things, the United States has strongly argued that the interim claim process must be a real one, not a disfavored afterthought, and that it is in the best interests of all parties for the GCCF to process

6

any pending interim claims before – or well before – the 90-day claims period expires and claimants are forced to go to the NPFC or to court

The United States will continue to take whatever actions it can to ensure that the GCCF fairly and efficiently responds to and compensates claimants harmed as a result of the Deepwater Horizon tragedy. As the United States has said from the outset, the success of the GCCF can only be measured by whether the people of the Gulf feel fairly treated. It is in the interest of all parties – the United States, claimants harmed by the oil spill, BP, and the Court – that the GCCF be successful and be able to fulfill its role as a mechanism to resolve claims for full and fair compensation without litigation.

Dated: February 18, 2011

Respectfully submitted,

| | |
|---|---|
| IGNACIA S. MORENO<br>Assistant Attorney General<br>Environment & Natural Resources<br>  Division | TONY WEST<br>Assistant Attorney General<br>Civil Division |
| JAMES NICOLL<br>  Senior Counsel<br>NANCY FLICKINGER<br>  Senior Attorney<br>SARAH HIMMELHOCH<br>  Senior Attorney<br>DEANNA CHANG<br>  Trial Attorney<br>SCOTT CERNICH<br>  Trial Attorney<br>A. NATHANIEL CHAKERES<br>  Trial Attorney<br>JUDY HARVEY<br>  Trial Attorney<br>MATT LEOPOLD<br>  Trial Attorney | PETER F. FROST<br>Director, Torts Branch, Civil Division<br>Admiralty and Aviation<br>STEPHEN G. FLYNN<br>Assistant Director<br>MICHELLE DELEMARRE<br>Trial Attorney<br>SHARON SHUTLER<br>Trial Attorney<br>JESSICA SULLIVAN<br>Trial Attorney<br>JESSICA MCCLELLAN<br>Trial Attorney<br>DAVID PFEFFER<br>Trial Attorney<br>Torts Branch, Civil Division<br>P.O. Box 14271<br>Washington, D.C. 20044-4271<br>Telephone: 202-616-4000<br>Facsimile: 202-616-4002 |

/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-514-2779
Facsimile: 202-514-2583
E-mail: steve.o'rourke@usdoj.gov

/s/ R. Michael Underhill
R. MICHAEL UNDERHILL
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Bldg., Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone: 415-436-6648
Facsimile: 415-436-6632
E-mail: mike.underhill@usdoj.gov