UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG | : | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | : | |
| GULF OF MEXICO, on | : | SECTION J |
| APRIL 20, 2010 | : | |
| | : | JUDGE BARBIER |
| This document relates to:  ALL ACTIONS | : | MAG. JUDGE SHUSHAN |

**BRIEF OF THE STATE OF ALABAMA
REGARDING THE GULF COAST CLAIMS FACILITY**

The State of Alabama responds to this Court's February 2, 2011 order (Doc. 1098) by addressing the methodology governing the GCCF's emergency, interim, and final payment processes—or, more correctly, the absence of a concrete methodology—and the GCCF's proposed final guidelines.  For the reasons outlined below, we ask the Court to supplement the six rules mandated by the Court in its February 2nd order (Doc. 1098 at 13-14) with the following:

The GCCF shall:

1. Apply the "as a result of" standard of OPA when determining whether a claimant is eligible for a payment from the Fund;

2. Publish its methodology for determining claim eligibility and value, including the documentation necessary to present a claim;

3. Provide a claimant with detailed reasoning why (a) his claim was denied or (b) the claimant was offered a payment that is less than the total requested by the claimant.  If the claimant was denied for insufficient documentation, then the claimant must be allowed to resubmit his claim on an expedited basis.

**I. INTRODUCTION: WIDESPREAD AGREEMENT ON THE GCCF'S PROBLEMS IN ALABAMA**

Rather than blindly pontificating on the problems plaguing the GCCF, we went straight to the source:  the mayors, businessmen, Congressman, and Governor who serve the citizens of

Mobile and Baldwin Counties and hear their GCCF-related complaints on a daily basis. We asked each to either (a) write the Attorney General a letter addressing the questions posed by this Court in its February 2, 2011 order or (b) grant us permission to present the Court with his comments on the GCCF's Proposed Final Guidelines. Attached are their responses:

| | |
|---|---|
| Exh A: | Representative Jo Bonner (1st District, Alabama) |
| Exh B: | Mayor Robert Craft (Gulf Shores) |
| Exh C: | Mayor Tony Kennon (Orange Beach) |
| Exh D: | Mayors Stan Wright (Bayou Le Batre) and Jeff Collier (Dauphin Island) |
| Exh E: | Governor Robert Bentley |
| Exh F: | John D. Harrison, State Superintendant of Banks |
| Exh G: | Bob Higgins, Chairman of the Coastal Resiliency Coalition |

Numerous concerns were voiced. But three were most prevalent, and the State therefore asks the Court to supplement the rules outlined in its February 2rd order to address these three concerns. *See infra* Part II.

Before we detail the reasons for our requests, however, Alabama makes it clear that these three concerns are by no means an exhaustive list. For example, Alabama agrees with (a) Louisiana's request that the Court require the GCCF to pay claimants interest as required by OPA and (b) Florida and Louisiana's requests to either prohibit or mandate revision of the GCCF's current release form. *See* Doc. 1308 at 5-6 (Louisiana's brief); Doc. 1312 at 7 (Florida's brief); *see also* Exh. C at 4 (Mayor Kennon expressing the same concern about the payment of interest). We do not address these and other concerns for a simple reason: to address *every* problem Alabamians have encountered when dealing with the GCCF would put a stranglehold on the Court's time and resources.

## II. ALABAMA'S PRIMARY CONCERNS WITH THE GCCF

### A. ELIGIBILITY: "AS A RESULT OF" VERSUS "DIRECT CAUSATION"

From its inception, Alabama's primary problem with the GCCF has been its use of the terms "direct harm", "direct link", "directly caused", etcetera to limit the number of claimants that are eligible to receive a payment. The term's continued use is also our primary complaint about the GCCF's proposed final guidelines. *See* Exh. I at 5 (§ III.1). In fact, six of our seven responders complained of the direct causation problem within their first two pages. *See* Exh. A at 1-3; Exh. B at 1; Exh. C at 1; Exh. D at 1; Exh. E at 2-3; and Exh. F at 2.

In a nutshell, the GCCF has dictated that, to be eligible for reimbursement, a claimant's damage must have been "directly" caused by the Oil Spill. The question, of course, is what does "directly" caused by the oil spill mean? We have asked Mr. Feinberg and/or his representatives point-blank on multiple occasions, as have most of Alabama's coastal leaders. As relayed by one of Mr. Feinberg's representatives (Jim Walker) to the undersigned (Deputy AG Maze) and another Deputy AG on February 9, 2011, Mr. Feinberg initially interpreted "direct" causation to mean that oil literally had to touch the claimant's business. If it did not, then the damage was "indirect" and thus ineligible for recovery from the Fund. Mr. Walker then informed us that Mr. Feinberg had come around "175 degrees" on the issue, but when pressed, could not articulate the remaining five degrees that Mr. Feinberg was holding on to when deeming claims unworthy of payment due to their "indirect" status.

The reason is simple: The GCCF has enforced—and we believe will continue to enforce—an interpretation of "direct" that requires physical proximity to the oiled beach itself, if and when the GCCF sees fit.

We see three primary problems with the GCCF mandating proof of "direct causation" to achieve eligibility, rather than a simple "but-for" test. First, a direct causation requirement ignores the symbiotic relationship of Gulf Coast businesses with beach-related tourism: As tourists go, so go coastal businesses. If the oil spill drives tourists away, then the oil has "damaged" the business via lost profits, regardless of whether a drop of oil touched the business. By requiring business to show a "direct" link to the oil, however, the GCCF has been able to deem entire industries with documented lost profits as ineligible: daycare services (Exh. D at 1), veterinarians (Exh. D at 1), health care professionals (Exh. C at 1, D at 1), title companies (Exh. A at 1-2), local musicians (Exh. C at 1), and banks (Exh. F at 2) to name a few.

Second, OPA requires payment of damages that occurred "as a result of" the oil spill, regardless of whether the damage was "direct" or "indirect". If a business can document that it lost profits "as a result of" the oil spill, even if that business is one step removed from the beach/oil, it is entitled to be compensated under OPA. And the Court need not take our word for it. The United States Department of Justice recently told Mr. Feinberg the same thing:

> [T]he Oil Pollution Control Act requires BP and other responsible parties to pay for damages that arise 'as a result of' the oil spill. Notwithstanding the terminology concerning causation used in the various GCCF protocols, you must apply OPA's standards.
>
> In resolving claims, it is important to note that OPA does not create categories of eligible and ineligible claims. Rather, in determining whether a particular damage resulted from the spill, the GCCF must examine the facts and circumstances of each claim and ascertain whether the harm asserted by the claimant occurred "as a result of" the oil spill and is a type of harm, such as lost profits, covered by OPA.

Exh. H at 1-2. Yet, despite Alabamians pleading *ad naseum* with Mr. Feinberg and the GCCF to replace direct causation with an "as a result of" or "but-for" test, the direct causation requirement remains in the GCCF's proposed final guidelines. *See* Exh. I at 5 (§ III.1); *see also* Exh. A at 1 (Congressman Bonner to Mr. Feinberg: "Why is it that you and your team appear to be the only

ones who do not clearly see the economic interdependence of each and every business in a tourism economy such as that along Alabama's coast?  It is not rocket science, yet we continue to argue the point that there are individuals and businesses who are suffering because they have undoubtedly been damaged 'as a result of' the oil spill, yet you have ruled them ineligible.").

We fear that the answer to Representative Bonner's question above highlights our third concern:  The GCCF (and BP by proxy) possesses the sole discretion of choosing which damages were, or were not, "directly" caused by the oil spill.  Leaving that choice in the hands of the GCCF/BP is like asking an accused arsonist to determine at trial whether he intended to damage a house he engulfed in flames or whether he knew that people were inside.  *See* Ala. Code § 13A-7-41 (outlining Alabama's elements for first degree arson).  Obviously, the responsible party will answer the question in whichever way best limits his liability, as the GCCF has done time after time to BP's benefit.

Our fear is justified.  In its response to the GCCF's proposed final guidelines, BP asked the GCCF to continue its disregard of OPA's "as a result" standard, in favor of a direct causation standard:

> [BP] agrees that the GCCF must determine, based on the evidence submitted, whether the loss claimed actually was caused by injury to property or a natural resource resulting from the spill, and must also determine the amount of actual loss.  If it was not, but was instead caused by some other separate factor—such as, for example, alleged adverse public perceptions—then the claim is not covered by OPA and no payment is warranted.

Exh. J at 7.[1]  Accordingly, if a souvenir shop or hotel across the street from a soiled beach lost 90% of its revenue in 2010 because beachgoers fled due to "adverse public perceptions"—but neither the shop or hotel was touched/damaged by the oil itself—then BP would have the GCCF categorically deny the claim as ineligible.  And that's exactly what the GCCF has done on

---

[1] The GCCF has acknowledged that the attached comment (Exh. J) was submitted by BP.  *See* http://www.charlotteobserver.com/2011/02/17/2070477/oil-spill-claims-methodology-called.html.

numerous occasions, and what the GCCF will continue to do as long as it is accountable only to BP.

In summary, the GCCF has used the various incarnations of the limiting term "direct" to deny thousands of claimants who are rightfully entitled to recover damages that occurred "as a result of" the Oil Spill. Furthermore, the GCCF is poised to continue using the term adversely to claimants because (a) the GCCF included it in their proposed final guidelines and (b) BP has asked them to leave it in. Accordingly, this Court should force the GCCF to require only a showing that damages arose "as a result of" the oil spill—*i.e.* the standard levied by OPA and the interpretation the USDOJ has requested from the GCCF.

### B. EXPLICIT REASONS FOR DENIAL OR PARTIAL PAYMENT OF CLAIMS

Countless Alabamians have been frustrated by the GCCF's practice of denying claims without offering any explanation as to why. To date, Alabama's calls for detailed reasons for denials and partial recovery have fallen on deaf ears:

- "It is imperative the GCCF include information on how payments are calculated, and if a denial is rendered, a reason must be offered. Ken, how many times do we need to make this request?" Exh. A at 2 (Representative Bonner)

- "In most situations, notification of denied claims have been delivered with no justification or explanation as to why the claims were denied, nor how the decisions were made." Exh. D at 2 (Mayors Wright and Collier)

- "Though individuals and businesses have submitted what they believed would justify their claim, they have simply been told that their documentation was insufficient, without any explanation of what about it was insufficient. They were left to speculate as to why their claim was denied." Exh. E at 2 (Governor Bentley)

In line with Governor Bentley's concerns, Alabama's leaders have seen and heard of countless examples of Alabamians who presented detailed documentation to the GCCF but were denied with a one-page rejection letters that offer no explanation for the rejection.

We offer two examples. The first is the form rejection letter, of which we have multiple examples from rejected claimants[2]:

> Dear Claimant:
>
> You submitted a claim to the Gulf Coast Claims Facility ("GCCF") for an Emergency Advance Payment for damages relating to the Deepwater Horizon Incident on April 20, 2010 (the "Spill"). After review of your claim, we have determined that your claim does not meet the criteria established for Emergency Advance Payments from the GCCF.
>
> Your claim was denied for the following reason(s):
>
> In determining eligibility, the GCCF applies the same factors to every claim. The GCCF takes into account evidence of the connection between the asserted loss and the Spill, the nature of the claimant's job or business, and the extent to which the claimant's job or business is dependent upon injured property or natural resources. In weighing these factors, the GCCF has determined that you did not demonstrate that you lost profits or income as a direct result of the Spill.
>
> This decision is based on criteria that apply to all claimants seeking payments from the GCCF. This denial applies to your request for an Emergency Advance Payment and does not affect your right to submit a Final Claim for any damages or losses you sustained. However, in preparing any Final Claim, you should review the reasons set forth above for the denial of your claim for an Emergency Advance Payment. If you have any questions about the denial of your claim, contact the GCCF [contact info omitted]. For more efficient service, have this notice and your GCCF Claimant Identification Number with you when you call.

Two issues jump out. First, the claimant is not informed *how* or *why* he was unable to demonstrate that his lost profits or income were recoverable. Instead, he is left to guess when preparing his interim or final payment claim, which as we detail later, will apparently be subject to documentation requirements that are "more rigorous and exacting than the minimal documentation requirements that governed administration of the Emergency Advance Payment Program." Exh. I at 2 (§II.2). Second, the rejection letter demonstrates the GCCF's use of the previously discussed "direct result of the Spill" standard to reject a claim outright.

---

[2] The State does not submit a copy of these rejection letters as attachments, in part to protect the identity of the claimants. The undersigned has copies on file, which he can promptly submit to the Court upon request.

The second example is a rejection letter for insufficient documentation:

Dear Claimant:

You submitted a Claim Form to the Gulf Coast Claims Facility ("GCCF") relating to the Deepwater Horizon Incident on April 20, 2010. Your claim is missing information that is necessary to complete the review of your claim. No further action can be taken on your claim until you complete the missing information and return this letter to the GCCF.

Again, the GCCF offered no explanation as to what "missing information" was necessary "to complete the review of your claim." Because the claimant believed he had provided all necessary documentation, and had not been told what he left out, he was left utterly in the dark as to what steps were necessary to achieve review of his claim.

Frustrated claimants throughout the coastal region have received similar rejection letters, letters that leave them with no guidance as to how to remedy their allegedly deficient claims. The GCCF has effectively barred these persons from ever receiving relief based on technicalities the claimants have no idea how to overcome. We ask the Court to remedy this problem by requiring the GCCF to (a) give explicit reasons for any outright denial of a claim, (b) give explicit reasons (including the GCCF's calculations) for offering less than a claimant's requested recovery, and (c) give claimants an expedited opportunity to correct any perceived deficiencies in documenting a claim.

### C. LACK OF DETAILED GUIDELINES FOR ELIGIBILITY AND REQUIRED DOCUMENTATION

Our third concern is intertwined with the second: The GCCF has never provided explicit guidelines as to how a claimant proves his damages or sufficiently establishes the required "direct" link to the oil spill. *See*, *e.g.*, Exh. A at 3; Exh. C at 1-2; Exh. E at 2. This lack of clarification has rightfully led to accusations of "arbitrary decisions about eligibility" made by

the GCCF—*e.g.* denying a claim in one instance while fully compensating a nearly identical claim in another instance. Exh. C at 1.

The GCCF's proposed final guidelines perpetuate the problem. The proposed guidelines state that "[f]inal and interim payments are available for those claimants who can prove their damages due to the Oil Spill." Exh. I at 2 (§ II.2). Yet, the proposed guidelines offer no clarification on *how* to prove damages are directly linked to the Oil Spill. Documentation seems to be the obvious answer, but the Proposed Guidelines offer only that

- "Documentation requirements . . . are more rigorous and exacting than the minimal documentation requirements that governed administration of the Emergency Advance Payment Program," Exh. I at 2 (§II.2), and

- "There must be an identifiable link between an actual loss and the Oil Spill. Evidence establishing this connection is required . . . Providing financial information about losses in 2010 is but one form of proof, and will not be sufficient documentation." Exh I. at 2-3 (§ II.4).

As we showed earlier, the GCCF was already stingy and vague regarding the requisite documentation under the Emergency Advance Payment Program. How much worse will it be for claimants now that the GCCF will require "*more rigorous and exacting*" documentation under the final guidelines, which offer zero guidance as to what the required documents are?

Furthermore, the proposed rule that "financial information about losses in 2010 . . . will not be sufficient documentation" to prove damages is damning to entire industries. Take our previously mentioned "hotel across the street" for example. The hotel can provide certified financial documentation establishing the difference between 2010's projected and actual profits, clearly proof of its oil-spill-related damages. But under the Proposed Rules, that is not enough. What else does the GCCF require, and just as troubling, what else can the hotel provide? Sworn affidavits from every traveler that decided *not* to frequent the Alabama-based hotel in 2010, instead choosing to move east to Florida or the Carolinas? This proposed rule ignores the

reality of a tourism-based economy: The primary damage to businesses results from lost profits due to persons fleeing the oil spill, not spending money to clean oil off of their buildings.

Simply put, the GCCF's refusal to offer explicit eligibility guidelines and a documentation checklist for claimants has resulted in an unwinnable game of whack-a-mole. Each time a claimant resolves one deficiency of which he had no notice, the CGGF can choose to pop up another one to stymie his chances of recovery. And until someone forces the GCCF to establish and publish explicit guidelines for claimants to follow, the GCCF (and BP by proxy) gets to control which moles stymie claimants' recoveries.

### III. ALABAMA'S COUNTER-CONCERN: EXPEDIENT RECOVERY

At this point, it should be obvious that Alabama needs and seeks help in holding the GCCF's feet to the fire. To date, our repeated cries for assistance from the GCCF on the issues outlined above have resulted in little more than Mr. Feinberg's labeling of Alabama as his "problem child." Exh. A at 1. So, we are expressly asking for this Court's assistance on these three issues. *See infra* Part IV.

But before the Court crafts its remedy, we must express our counter concern. The GCCF process has already taken far too long for far too many people. We have one primary objective: Ensuring that Alabamians are made whole as quickly as possible. We have long hoped that the GCCF would fulfill that goal. We still do. But our belief in the Fund process is flailing.

In short, we have competing interests: Our need for (a) the Court to ensure a properly functioning GCCF and (b) a GCCF that works expeditiously. Accordingly, if the Court decides to exercise some modicum of supervision/jurisdiction over the GCCF (the appointment of a special master to monitor the GCCF, for instance), we ask that the Court's order be crafted in a

way that is mindful of the potential of slowing down the already-stagnant claims process confronted by many Alabamians. As the spring and summer tourist seasons approach, our tourism-based businesses cannot stand for any further delays in receiving their damage payments, which are vital in allowing many of our coastal businesses to survive another year.

### IV.   CONCLUSION

For the reasons stated above, Alabama respectfully requests the Court supplement the rules outlined in its February 2, 2011 order with the following rules:

The GCCF shall:

1. Apply the "as a result of" standard of OPA when determining whether a claimant is eligible for a payment from the Fund;

2. Publish its methodology for determining claim eligibility and value, including the documentation necessary to present a claim; and,

3. Provide a claimant with detailed reasoning why (a) his claim was denied or (b) the claimant was offered a payment that is less than the total requested by the claimant. If the claimant was denied for insufficient documentation, then the claimant should be allowed to resubmit his claim on an expedited basis.

Furthermore, we ask the Court be mindful of the effect on the timely payment of claims by the GCCF when crafting any additional relief.

    Respectfully submitted,

    **/s/Luther Strange**
    Luther Strange (ASB-0036-G42L)
    *Attorney General, State of Alabama*

    **/s/Corey L. Maze**
    Corey L. Maze (ASB-0286-E67M)
    *Special Deputy Attorney General,*
    *State of Alabama*

                                           Office of the Attorney General
                                           501 Washington Avenue (P O Box 300152)
                                           Montgomery, Alabama  36130
                                           334-242-7300 Main Telephone
                                           334-353-4336 Direct Telephone
                                           Luther.strange@ago.state.al.us
                                           cmaze@ago.state.al.us

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Brief of the State of Alabama Regarding The Gulf Coast Claims Facility has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of February, 2011.

                                           /s/Corey L. Maze            _____