# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * | MDL No. 2179 |
| | * | |
| | * | SECTION J |
| | * | |
| | * | Honorable CARL J. BARBIER |
| This document relates to: all cases | * | |
| | * | Magistrate Judge SHUSHAN |

## BP'S SUPPLEMENTAL MEMORANDUM REGARDING OPA AND THE GCCF

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Andrew B. Bloomer, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
312-862-2000 (Tel)
312-862-2200 (Fax)

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
202-662-5985

*Attorneys for BP Exploration & Production Inc.*

# TABLE OF CONTENTS

Page

I.   The Claims Process Established by BP and the GCCF Complies with OPA. .....................4

    A.   OPA Requires a Responsible Party to Establish and Advertise a Claims Process. ..........................................................................................................4

    B.   BP and the GCCF Have Fully Complied with OPA. ................................................6

II.  The Attorneys General's Arguments Have No Basis in OPA or Any Other Law..............8

    A.   Nothing in the Claims Process Is Inconsistent with OPA's Requirements. ...........8

    B.   The Release Forms Used by the GCCF Are Consistent with the Requirements of OPA and Applicable Law...........................................................10

        1.   Releases May Lawfully Include Additional Parties and Claims. ..............11

            a.   A release that applies to parties in addition to BP is lawful. .........11

            b.   A release of future and unknown claims is lawful.........................12

            c.   Section 2715(b) has no bearing whatsoever on the scope of a permissible release. ...................................................................13

        2.   There Can Be No Duress When the Release and Accompanying Instructions Describe, in Understandable Terms, the Key Provisions and Emphasize That Acceptance of A Final Payment in Exchange for A Release Is the Claimant's Choice. ...................................14

III. Neither OPA Nor Any Other Law Authorizes "Court Supervision" of OPA's Extra-Judicial Claims Process........................................................................................17

    A.   The Gulf State Attorneys General Are Not Parties and Lack Standing to Raise Any Issue or Seek Any Form of Relief in These Proceedings...................17

    B.   OPA Does Not Authorize a Court to "Supervise" the Extra-Judicial OPA Claims Process. .....................................................................................................19

    C.   Rule 23(d) Cannot Be Used to Supervise the OPA Claims Administration Process or Decide the Validity of the GCCF's Release.........................................20

IV.  BP and the GCCF Have Complied with the Court's February 2, 2011 Order..................24

Conclusion .................................................................................................................................25

The claims process BP initiated and then transferred to the GCCF fully complies with, and far exceeds, the requirements of the Oil Pollution Act of 1990 ("OPA").    OPA's requirements are few and purely procedural; it does not impose standards for how a responsible party evaluates a claim, whether the claim is paid, or whether or how the decision is explained to the claimant.   Instead, OPA only requires the responsible party to establish a process "by which claims may be presented" (including claims for "interim, short-term damages") and to publicize that process through advertisements approved by the Coast Guard.   33 U.S.C. §§ 2714(b)(1), 2705.   Claimants, in turn, must present their claims to the responsible party as a jurisdictional condition precedent to filing suit.   *Id.* § 2713(a).   If the responsible party denies the claim or does not pay it within 90 days, the claimant may either sue the responsible party or file a claim with the federal Oil Spill Liability Trust Fund (the "Fund").   *Id.* § 2713(c).   OPA, in short, provides the claimant and the responsible party an opportunity for resolving disputes without litigation.   It does not mandate how that process is conducted or concluded.

BP and the GCCF have fully satisfied, and exceeded, OPA's procedural requirements. The Attorneys General and the Plaintiffs' Steering Committee ("PSC") do not assert that the GCCF has failed to establish a process to receive and evaluate claims or that BP has neglected to advertise its process.   Instead, they complain about, among other things, the number and speed of claims being paid, the amounts being paid, the manner in which decisions are explained to claimants, and the release of liability used for final claims.   That there may be different ways to run a claims process does not mean that the GCCF's chosen methods fail to comply with OPA. OPA gives claimants a remedy if they object to the payment offered by the GCCF.   It does not give claimants (or the Attorneys General) any right to demand judicial involvement in or modification of the claims process.

Beyond this, the PSC and Attorneys General's arguments are unfounded.  **First**, the Attorneys General are mistaken when they assert that the GCCF has not paid any interim claims. In fact, the GCCF has paid more than $2.5 billion in interim claims to more than 168,000 claimants, as every single emergency claim was an interim claim in that no release of liability was required and claimants are free to bring additional claims.  Before that, BP paid an additional $395 million in interim claims.  As it stands, the GCCF has established a program offering multiple options for claimants to seek further interim payments or final payments. According to Mr. Feinberg's public testimony, the GCCF has been processing these claims, and, where appropriate, will commence payments in the very near future.[1]

**Second**, Quick Pay is a voluntary settlement permitted under OPA and entirely consistent with the well-established right of parties to resolve a dispute on terms they find acceptable.  That Quick Pay claims have been processed faster than other types of claims is unremarkable; unlike other claims, Quick Pays require no further substantiation or individualized assessment and thus can be processed more rapidly.  This expedited benefit for claimants who believe they have been fully compensated is entirely consistent with OPA.

**Third**, the GCCF has taken extensive steps to provide claimants with information, including multiple published protocols, a memo to claimants explaining the interim and final claims process, a two-week public comment period on its draft methodology for interim and final claims, and several town hall meetings and question and answer sessions.  And the GCCF, at the request of numerous stakeholders, has voluntarily agreed to do even more.  These efforts far exceed OPA's requirement of establishing a procedure "by which claims may be presented."  33

---

[1] *Gulf Coast Recovery: An Exam. of Claims and Social Servs: Hearing Before the Ad Hoc Subcomm. on Disaster Recovery of the S. Comm. on Homeland Sec. and Gov't Affairs* ("*Gulf Coast Recovery* Hearing"), 112th Cong. 17-18 (2011) (testimony of Kenneth Feinberg) (Ex. 1, Decl.of Andrew Bloomer, Tab A).

U.S.C. § 2714(b)(1).   By contrast, what the Mississippi Attorney General means by "transparency" amounts to a court-appointed "monitor" with access to the GCCF's claims files and the ability to micromanage the claims administration process.  Nothing in OPA or any other law allows that.  Moreover, it would only delay and frustrate the process, to the detriment of claimants.

*Fourth*, there can be no serious challenges to the enforceability of the release signed by claimants who receive final payments.  The exchange of payment for a release of liability is how claims are settled.  Settlement of a final claim and execution of the release are entirely voluntary, and no claimant is obligated to "trade" payment for a release that it does not wish to sign; the option of claiming interim payments without signing any release remains open to all.

The Attorneys General's assertion that OPA § 2715(b)(2) prohibits full resolution of claims and the execution of releases is unsupported by the cited provision (or anything else in the statute), and at odds with the goals of the OPA claims process.  Rather, § 2715(b)(2), which applies only to *interim* claims, provides that payment of an interim claim cannot release matters not covered by that claim.  It has nothing to do with final claims.

Nor is there anything improper about the release applying to parties other than BP.  The release seeks to completely resolve the claim, which can only be accomplished if all potentially liable parties are released.  Otherwise, the claimant can settle with BP and then sue another potentially liable party, which in turn will file a third-party complaint or cross-claim against BP. As the Fifth Circuit has held, such a result would render the release meaningless. *See, e.g., Davis v. Huskipower Outdoor Equip. Corp.,* 936 F.2d 193, 197 (5th Cir. 1991).

*Finally*, as its February 2, 2011 Order makes clear, "[t]he Court recognizes and appreciates the enormity of the undertaking of Mr. Feinberg and does not intend to impede or

3

interfere with his ability to fairly and efficiently process claims."  (Dkt. #1098, Order at 8.)
Despite the PSC's and Attorneys General's arguments, judicial supervision of OPA's claims
process would not promote, but instead would undermine, the fair and efficient administration of
that process.  Similarly, Rule 23(d)—which permits the Court to enter purely *procedural* orders
relating to the administration of a class action—does not permit judicial supervision or the re-
writing of the GCCF's release.  There is no claim before this Court by a plaintiff challenging his
or her release, let alone any class claim to that effect.  The claims administration process
properly belongs in the hands of the GCCF, not the Court.

## I.     THE CLAIMS PROCESS ESTABLISHED BY BP AND THE GCCF COMPLIES WITH OPA.

### A.     OPA Requires a Responsible Party to Establish and Advertise a Claims Process.

"Congress believed that lawsuits against parties are appropriate only 'where attempts to
reach a settlement with the responsible party...were unsuccessful.'"  *Johnson v. Colonial
Pipeline Co.*, 830 F. Supp. 309, 310 (E.D. Va. 1993) (quoting H.R. Rep. No. 242, 101st Cong.,
1st Sess., pt. 2, at 66 (1989)); *see also Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., Inc*., 51
F.3d 235, 238-39 (11th Cir. 1995) (same); *Turner v. Murphy Oil USA*, Civ.A. No. 05-4206, 2007
WL 4208986, at *2 (E.D. La. Nov. 21, 2007).  OPA accomplishes this by requiring that (i) the
designated responsible party establish a procedure for receiving claims and (ii) claimants present
their claims to the responsible party.  *See* 33 U.S.C. § 2714(b)(1); 33 C.F.R. § 136.309.[2]

---

[2] By any measure the GCCF's programs are consistent with BP's commitment to pay legitimate claims.  The
GCCF's efforts at providing a "faster, fairer and more transparent" process that decides claims "as expeditiously as
possible" (*see* Fla. Statement n.1), are laudable, particularly given the enormity of its task.  And consistent with the
statement in the June 16, 2010 White House press release cited by the Florida Attorney General, the GCCF's three-
judge appeal process goes beyond OPA appeal rights, providing an independent check binding *only on BP*.  The
Florida Attorney General acknowledges the volume of potential appeals under an expanded appeal process but
ignores the costs of providing review on that scale.  And she provides no authority whatsoever for the suggestion
that some "independent auditor" should screen the nearly 500,000 claims and identify bellwether cases.

Claimants cannot sue or seek compensation from the Fund without first presenting their claim to the responsible party.  33 U.S.C. § 2713(a); 33 C.F.R. § 136.103.[3]  If the claim is denied or "not settled by … payment within 90 days," a claimant may sue the responsible party or may present the claim to the Fund  33 U.S.C. § 2713(c); 33 C.F.R. § 136.103(c)(2).

In 1996, OPA was amended and now expressly requires interim claims.  *See* 33 U.S.C. § 2705(a).  Interim claims have certain limitations, for example, claimants retain the right to assert damages not covered by an interim claim, and a responsible party's OPA subrogation rights are limited to the amount paid on that claim.  *Id.* § 2715(b).  But contrary to the PSC's suggestions, nothing in Sections 2705 or 2715, or elsewhere in OPA, bars final claims or forbids payment of final claims in exchange for a release.  (*See, e.g.*, Plfs.' Supp. Memo. at 3 (citing 33 U.S.C. § 2705([a])).)  The fact that Congress added specific sections addressing "interim claims" by name, *see* 33 U.S.C. §§ 2705(a), 2714(b)(2), 2715(b), and did not repeal other sections that do not refer to interim claims, *see, e.g., id.* §§ 2714(b)(1), 2715(a)*,* confirms that interim claims are simply one kind of permissible claim under OPA.

OPA imposes very limited, purely procedural requirements.  It requires only the existence of some process whereby claims are presented to the responsible party, as set forth in Coast Guard regulations.  Those regulations address how a responsible party must advertise its claims process, but not what that process should or must be.  33 C.F.R. § 136.311(d).  In short, OPA does not prescribe how a responsible party must implement the required claims "procedure."

---

[3] Courts have held that the failure to comply with the "presentment" requirement in § 2713(a) is a jurisdictional defect that precludes the court from entertaining an OPA damages claim under OPA.  *See, e.g.*, *Boca Ciega Hotel*, 51 F.3d at 240 (dismissing for lack of subject matter jurisdiction on the basis of lack of presentation); *Marathon Pipe Line Co. v. LaRoche Indus., Inc.*, 944 F. Supp. 476, 477 (E.D. La. 1996) ("The Court agrees that § 2713's presentation requirement is jurisdictional and mandates dismissal when that provision is applicable and not complied with by the claimant.").

### B.      BP and the GCCF Have Fully Complied with OPA.

From the inception of the claims process in April 2010 until the transition to the GCCF on August 23, 2010, BP made payments to individuals and businesses totaling nearly $400 million.[4]  *All* of these payments were interim payments and claimants were not required to execute releases.   Thus, having established a claims procedure to receive and pay claims, including interim claims, BP complied with OPA.

The Coast Guard actively provided oversight of BP's establishment of its claims procedure.  It reviewed and approved the content and placement of BP's OPA advertisements and held numerous meetings with BP regarding its claims process.   The Coast Guard also engaged with BP and the GCCF regarding the transition of the claims process, and the Coast Guard official charged with monitoring its OPA compliance acknowledged BP's efforts:

> "OPA…requires us to require the responsible party to advertise and collect claims.  B.P. has been very responsive beyond the law…as we oversee and make sure that they are complying with — taking claims."[5]

The GCCF immediately implemented, after it assumed control on August 23, 2010, a program for claimants to file interim, emergency claims and receive payment for up to six months of damages *without releasing any claims.*  The GCCF made over $2.5 billion in interim, emergency claims payments to over 168,000 individual and business claimants.[6]  By maintaining a procedure for receiving and paying claims, including interim claims, the GCCF, like BP before it, has fully complied with the mandates of OPA.  33 U.S.C. §§ 2714(b); 2705(a).

---

[4] *See* Press Release, BP Reports Nearly $400 million In Claims Payments as Program Transitions to GCCF (Aug. 23, 2010), available at http://www.bp.com/genericarticle.do?categoryId=2012968&contentId=7064597 (last visited Feb. 18, 2011).

[5] *Offshore Drilling Liab.: Hearing Before S. Comm. on Energy and Natural Res.,* 111th Cong., 2010 WL 2060087, at *9 (2010) (testimony of Craig Bennett, Director, National Pollution Funds Center, United States Coast Guard).

[6] *See* Overall Status Report, available at http://gulfcoastclaimsfacility.com/GCCF_Overall_Status_Report.pdf (last visited Feb. 18, 2011).

After the emergency payments program expired, the GCCF commenced its interim and final claims program, which provides claimants with three different claims options:

(1) **Interim Claims**: Any claimant can submit quarterly interim claims for documented past damages, and accept payment of such a claim without executing a release; or

(2) **Full Final Claims**: Any claimant can submit a final claim for all documented past, present, and future damages; a claimant that accepts a final payment must release its right to sue BP and other potentially responsible parties; or

(3) **"Quick Pay" Claims**: Claimants that have previously received an emergency payment from the GCCF are eligible for a one-time "Quick Pay" amount of $5,000 for individuals or $25,000 for businesses. No further documentation need be submitted by any eligible claimant choosing this option, but a full release is required.

Nothing in the expanded claims process obligates a claimant to choose any particular option. Any claimant may seek interim relief without executing a release, and those interested in fully resolving their claims are free to pursue one of the final claims options.[7]

That BP and the GCCF have met and indeed exceeded the requirements of OPA has not gone unnoticed. In recent testimony before Congress, Craig Bennett, the Director of the National Pollution Funds Center of the U.S. Coast Guard, explicitly recognized that the claims processes established by BP and the GCCF are offering claimants benefits beyond those covered by OPA and in excess of what the Coast Guard would itself pay:

"I think that is primarily an indication of the fact that the protocols that are out there that BP and GCCF have been able to do have actually been more inclusive than OPA requires. They can pay for personal injury. They can pay emergency

---

[7] Although not required by OPA, on February 2, 2011, the GCCF released a proposed methodology for handling interim and final claims, including valuing the risk of future loss in final settlements, and invited any other interested parties to comment. BP submitted its own comments, which criticized the draft methodology on the grounds that the estimates used by the GCCF greatly overestimate the potential for future losses. (*See* Comments of BP Exploration & Prod., Inc., available at http://www.gulfcoastclaimsfacility.com/public_comments.pdf (last visited Feb. 18, 2011).) BP's disagreement with the GCCF's approach further demonstrates that, in making claims decisions and establishing claims protocols, the GCCF acts independently of BP and not as BP's agent.

advance payments.  I cannot pay advance payments.  Their final claims protocol will include prospective losses.  I cannot pay for speculative losses."[8]

## II.     THE ATTORNEYS GENERAL'S ARGUMENTS HAVE NO BASIS IN OPA OR ANY OTHER LAW.

The Attorneys General of the States of Mississippi, Florida, and Louisiana raise a host of criticisms about the GCCF claims process.  These criticisms have no basis in fact or law, and the Attorneys General do not and cannot identify any violations of OPA.  Simply put, OPA does not provide for the sort of judicial intervention they seek.

### A.     Nothing in the Claims Process Is Inconsistent with OPA's Requirements.

The Attorneys General express concern about denied claims.  (*See, e.g.*, Miss. Mem. at 3.)  But the statute *contemplates* that claims will be denied, and when they are, OPA gives the claimant the right to sue the responsible party or file a claim with the Fund.  *See* 33 U.S.C. § 2713(c); 33 C.F.R. § 136.103(c)(1).  What OPA does not provide for is judicial or state law enforcement oversight of the claims process.[9]  Moreover, the great majority of denials have been for lack of documentation.[10]  Documentation and substantiation are, of course, core requirements of OPA.  33 C.F.R. §§ 136.105(a), 136.233.

The Attorneys Generals' complaints of alleged delay are likewise misplaced.  (*See, e.g.,* Miss. Mem. at 7.)  To the contrary, approximately $3.7 billion dollars have been paid to more

---

[8] *Gulf Coast Recovery* Hearing at 51 (testimony of Craig Bennett, Director, National Pollution Funds Center, United States Coast Guard) (Ex. 1, Bloomer Decl. Tab A).

[9] It does bear noting, however, that to date the Coast Guard does not share the Attorneys Generals' views regarding the denial of claims.  Of the 200 claims denied by the GCCF and subsequently filed with and reviewed by the Coast Guard, the Coast Guard has concurred with the GCCF and also denied every single one.  (*See Gulf Coast Recovery* Hearing at 51 (testimony of Bennett) ("We have adjudicated 200 and all of those have been denials to date.") (Ex. 1, Bloomer Decl. Tab. A).)

[10] Letter from Kenneth R. Feinberg to Jim Hood, Mississippi Attorney General (Oct. 26, 2010); Letter from Kenneth R. Feinberg to Alex Sink, Chief Financial Officer, Florida Department of Financial Services, and Bill McCollum, Florida Attorney General (Dec. 21, 2010) (Ex. 1, Bloomer Decl. Tab B).

than 170,000 claimants (including those paid directly by BP) in just over 8 months.[11]  The GCCF
is currently processing non-emergency interim claims (none pending for more than 90 days) and
will begin paying qualified claims in the very near future.  (Gulf Coast Recovery Hearing at 17-
18 (testimony of Feinberg) (Ex. 1, Bloomer Decl. Tab A).)  But even if there were any delay,
OPA provides the remedy, and it is not the judicial intervention the Attorneys General seek.
Rather, if the responsible party does not pay a claim within the statutory period, the claimant is
free to sue the responsible party or file a claim with the Fund.  33 U.S.C. § 2713.

     The Attorneys Generals' complaints about an alleged lack of transparency fare no better.
The GCCF has provided claimants with substantial information and access, and has agreed, at
the request of numerous stakeholders, to provide even more.  For example, the GCCF has
published multiple protocols, issued a memo explaining the interim and final claims process,
conducted a two-week public comment period on its draft methodology for interim and final
claims, conducted numerous town hall meetings and question-and-answer sessions, and offered
claimants an opportunity to seek a "true up" of emergency claims payments if they believe they
are entitled to a higher amount.[12]  BP supports the GCCF's efforts to increase transparency.  But
it is important to separate laudable, voluntary efforts from questions of compliance.  OPA does
not address the manner in which the responsible party interacts with claimants.  It instead gives
dissatisfied claimants the right to exit the claims process and seek other remedies.[13]

---

[11]  See Overall Status Report, available at http://www.gulfcoastclaimsfacility.com/GCCF_Overall_Status_
Report.pdf (last visited Feb. 18, 2011).

[12]  Mississippi's Attorney General criticizes BP's settlement of a claim submitted by a purported "business partner,"
(Miss. Mem. at 2 n.1.), but that settlement was entirely proper.  (*See* Ex. 2, Decl. of Geir Robinson ¶¶ 3-8.)

[13]  The PSC's and Attorneys General's arguments concerning interest for interim claims are misplaced and
premature.  To BP's knowledge, the GCCF has never stated that it will not pay interest where interest is owed under
OPA, and many individualized, factual questions must be resolved before it can be determined whether any interest
is owed.  For example, no interest is ever due under OPA unless a claim is not paid within 30 days (and sometimes
longer) of the claimant having fully satisfied OPA's presentment requirement.  33 USC 2705(b)(1).  Moreover, even

**B.     The Release Forms Used by the GCCF Are Consistent with the Requirements of OPA and Applicable Law.**

The State Attorneys General and the PSC ask this Court to negate and re-write the GCCF's release form.  There is no basis in law or fact to do so.  The terms of voluntary settlements between private parties are routinely upheld by the courts.  Releases that waive any and all claims, known and unknown, are valid and enforceable, and indeed promote the public policy favoring settlement of disputes.  *See, e.g., Ingram Corp. v. J. Ray McDermott & Co., Inc.*, 698 F.2d 1295, 1312 (5th Cir. 1983) ("When a release provides that 'any and all claims,' 'past, present, or future' are to be extinguished, a court [must] enforce its provisions both as to known and unknown claims. "); *Robin v. Binion*, 469 F.Supp.2d 375, 386-87 (W.D. La. 2007) (release of "any and all claims" "known or unknown" should be enforced).  Moreover, a general release serves OPA's purpose of providing an extra-judicial claims process "to encourage settlement and avoid litigation."  *Boca Ciega*, 51 F.3d at 238-39.  OPA itself contemplates releases; in fact, the Fund's release is written into the implementing regulations.  *See* 33 C.F.R. § 136.115.[14]

As discussed above, the GCCF gives claimants a range of payment options from which to choose.  It is up to each claimant to determine which of these options (if any) will work best for that claimant's individual circumstances.  Moreover, a release is required for final claims only.  If claimants do not wish to execute a release, they may opt to continue with the interim claims process until they are ready to do so; or, after fulfilling the presentment requirement, they may bring a lawsuit or file a claim with the Fund.  But there is no legal basis for the claimant to ask the Court to re-write the terms of the GCCF's release.

---

if interest would otherwise accrue, an analysis is required as to whether advance payments made by the GCCF during the emergency process offset any interest payment obligation, as those payments placed money in the hands of claimants before a loss, if any, was incurred.  Claimants who believe they are entitled to but denied interest on interim claims have the right to sue BP for such interest after satisfying the presentment requirement.

[14] The Fund's release is different than the GCCF release as the Fund does not compensate for future loss.

1.      <u>Releases May Lawfully Include Additional Parties and Claims.</u>

a.      <u>A release that applies to parties in addition to BP is lawful.</u>

The GCCF release defines the term "Released Parties" as "anyone who is or could be responsible or liable in any way for the Incident or any damages related thereto" and provides a list, at Attachment A, of parties other than BP who could potentially be responsible or liable (making clear that the list is not all inclusive).  Accordingly, there can be no confusion about the scope of the parties being released.

Such a broad scope is not prohibited by OPA.  Indeed, failure to release all other potentially liable parties would render a release of BP illusory.  Section 2709 of OPA provides that those other potentially responsible parties would be entitled to bring a civil action for contribution against BP if claimants who had received a full and final payment from BP were to assert a claim against them.  Thus, absent a release preventing such a contribution action, BP would have no reason to reach a final settlement—or indeed any settlement with claimants—since it could end up paying over and over again in multiple contribution actions.

Releases that include all potentially liable parties are routinely upheld by courts, which recognize that a settlement would otherwise be a nullity.  *See, e.g., Davis v. Huskipower Outdoor Equip. Corp.,* 936 F.2d 193, 197 (5th Cir. 1991) (upholding release of third parties because "[u]nless [plaintiff] released all possible defendants, the settlement agreement would abysmally fail to protect the named parties from liability" as the plaintiff could "later sue an unnamed party…and the unnamed party could then drag all the named parties back into the suit").  Accordingly, the GCCF release is fully valid, and not only consistent with OPA, but vital to achieving OPA's goal of out-of-court resolution of claims.

b.      A release of future and unknown claims is lawful.

The laws of the affected Gulf States likewise make clear that claimants can be asked to release future—indeed, even unknown—claims provided that there is adequate disclosure of which claims are being released.  For example, in *American Homes & Land Corp. Inc. v. C.A. Murren & Sons Co.*, 990 So.2d 871, 873-74 (Ala. 2008), the Alabama Supreme Court upheld a "full and complete" release of "any and all claims that the undersigned may have, may have had, or may claim in the future to have" for all injuries "of every kind sustained or which may be hereafter accrued or sustained."  Similarly, the Supreme Court of Mississippi enforced the plain language of a settlement agreement in which the plaintiff agreed to release his employer from "any and all rights, claims, causes of action, liens, or remedies of whatever kind or nature which he or she now has or hereinafter acquired for damages or expenses."  *Houser v. Brent Towing Co., Inc.*, 610 So.2d 363, 364 (Miss. 1992).[15]

Here, there is no ambiguity that the claimant is giving up all currently known, as well as potential future claims (known or unknown), against the Released Parties.  The release expressly states that the claimant is releasing any claims the claimant "has or may have, whether known or unknown, whether present or future, whether direct or indirect, whether legal or equitable…."[16] The instructions provide, "By signing the attached Release, you are forever giving up and discharging any rights which you may have for any costs, damages or other relief related to or arising from the Incident…even if you are not currently aware of such costs or damages and even

---

[15] *See also Dunlap v. Regions Fin. Corp.*, 983 So.2d 374, 378 (Ala. 2007) (upholding general release clause in severance agreement); *Carey-All Transp., Inc. v. Newby,*, 989 So.2d 1201, 1205-06 (Fla. Dist. Ct. App. 2008) (upholding unambiguous general release language in settlement agreement); *Spencer v. Howard, Weil, Labouisse, & Friedrichs, Inc.*, 543 So.2d 547, 551 (La. Ct. App. 1989) (upholding a general release clause as covering "all present and future causes of action" arising out of parties' relationship); *Ysasaga v. Nationwide Mut. Ins. Co.*, 279 S.W.3d 858, 867-68 (Tex. App. 2009) (upholding general release clause in settlement with insurance company).

[16] GCCF Sample Release and Covenant Not to Sue, available online at http://gulfcoastclaimsfacility.com/sample_release.pdf (last visited Feb. 18, 2011).

if such costs or damages arise in the future…or do not manifest themselves until the future."

Requiring such a release is proper and wholly consistent with OPA's preference for resolution

without litigation.  Public policy strongly favors the settlement of cases.  *Ho v. Martin Marietta*

*Corp.*, 845 F.2d 545, 547 n.2 (5th Cir. 1988); *see also Boca Ciega*, 51 F.3d at 238-39

(congressional goal to encourage settlements through OPA's claims process).  Releases that

extinguish all claims, like those at issue here, are critically important in facilitating this policy.

*Robin*, 469 F.Supp.2d at 384-85; *Carey-All Transp., Inc. v. Newby*, 989 So.2d 1201, 1206 (Fla.

Dist. Ct. App. 2008).

> c.   <u>Section 2715(b) has no bearing whatsoever on the scope of a permissible release.</u>

The Mississippi Attorney General argues that OPA § 2715(b) somehow prohibits a

release of parties other than BP or a release of all claims, suggesting that § 2715(b)(2) means that

a claimant who receives a "Final Damages" payment may still go on to seek full damages

recovery from other parties or for other claims.  This is incorrect.  Section 2715(b) is entitled

"Interim Damages."  It contains two important provisions with respect to the payment of interim

damages: first, if a responsible party has made only a payment for interim (rather than final)

damages, its right to subrogation (pursuant to § 2715(a)) is limited to the amount of the interim

damages; and second, payment of interim damages to a claimant does not foreclose the

claimant's right to seek final damages.  These provisions, which were added as part of a 1996

amendment to OPA to require a procedure for interim, short-term claims, have absolutely no

bearing on the terms of a release where a final payment is made.

      2.     <u>There Can Be No Duress When the Release and Accompanying Instructions Describe, in Understandable Terms, the Key Provisions and Emphasize That Acceptance of A Final Payment in Exchange for A Release Is the Claimant's Choice.</u>

There is no merit to the Mississippi Attorney General's claim that claimants are executing releases under duress. First, claimants receive complete and easily understandable notice of what rights are being released. The instructions accompanying the release state in plain language that by executing the release, the claimant is giving up all present and future claims "against BP or any other party," with the exception of claims for bodily injury or securities law violations. Specifically:

- "you are forever waiving and releasing all claims that you may have against BP or any other party…"

- "you are forever giving up and discharging any rights which you may have for any costs, damages, or other relief related to or arising from the Incident…even if you are not currently aware of such costs or damages and even if such costs or damages arise in the future…or do not manifest themselves until the future."

- "If you want to file a lawsuit regarding the Incident or make a claim against the Oil Spill Liability Trust Fund, do not sign this release."

The instructions accompanying the Release also make abundantly clear that the claimant is under no obligation to take a final payment offered by the GCCF and sign the Release.

- "You are under no obligation to accept the final payment offered to you by the [GCCF]. You are free to reject the final payment offered by the [GCCF] and to pursue other means of compensation."

- "By signing the attached Release, you acknowledge that you have read and understand the terms of the Release and that you execute the Release voluntarily and without being pressured or influenced by and without relying upon any statement or representation made by any person acting on behalf of BP or any other released party."

Further, claimants are instructed to consult with counsel if they are represented before signing the release.

14

While this language could not more clearly express that acceptance of a final payment in exchange for a release is voluntary, the Mississippi Attorney General argues that claimants are being forced to sign the release under "duress."  (Miss. Mem. at 11-15.)  This argument is meritless.  A successful duress claim—were one ever to be brought by a releasor—must meet an extraordinarily high legal standard.  To prove duress, the complainant must demonstrate that another party has taken some threat or action against complainant that overcomes complainant's free will by forcing him or her into some action that he or she would not otherwise have taken. *See Stephens v. Ala. State Docks Terminal Ry.*, 723 So.2d 83, 85 (Ala. Civ. App. 1998) (citing *Int'l Paper Co. v. Whilden*, 469 So.2d 560, 562 (Ala. 1985)).[17]

It is "never duress to threaten to do that which a party has a legal right to do." *Kelso v. McGowan*, 604 So.2d 726, 732 (Miss. 1992) (quoting *McGehee v. McGehee*, 85 So.2d 799, 804 (Miss. 1956)); *see also Allied Bruce Terminix Co. v. Guillory*, 649 So.2d 652, 653 (La. Ct. App. 1994) ("the threat of doing a lawful act does not constitute duress").  Rather, the threat must override the volition of the complainant and cause him to enter into the undesirable agreement. *Kelso*, 604 So.2d at 732.  Indeed, the threat must rise to the level of an "unlawful[] constrain[t]." *Woodruff v. TRG-Harbour House, Ltd.*, 967 So.2d 248, 250 (Fla. Dist. Ct. App. 2007) (quoting *McLaughlin v. Fla. Dep't of Natural Res.*, 526 So.2d 934, 936 (Fla. Dist. Ct. App. 1988)).  Financial necessity is insufficient to constitute duress without such unlawful actions by the other party. *Brown*, 837 S.W.2d at 244.  Moreover, economic duress is not a doctrine to be used by parties simply because they are dissatisfied with the terms of a contract. *Int'l Paper*, 469 So.2d

---

[17] *See also Kelso v. McGowan*, 604 So.2d 726, 732 (Miss. 1992) (The complainant must prove "(1) that the dominant party threatened to do something which he had no legal right to do; and (2) that the wrongful threat overrode the volition of the victim and caused him to enter an agreement against his free will."); *Brown v. Cain Chem., Inc.*, 837 S.W.2d 239, 244 (Tex. App. 1992).

at 563 (quoting *Bd. of School Comm'rs of Mobile County v. Wright*, 443 So.2d 35, 38-39 (Ala. Civ. App. 1983), *rev'd on other grounds*, 443 So.2d 40 (Ala. 1983)).

The Mississippi Attorney General provides no evidence of alleged duress. He points to a press release from Mr. Feinberg informing claimants that they may choose either interim or final payments and noting that "there is no guarantee that, in the future, a lump sum final payment will be as generous as it is currently." (Miss. Mem. at 13-14.) But merely stating the fact that it is not possible to know today how final payments will be calculated at some point in the future—as calculations are obviously dependent on the pace of recovery and levels of continued losses—in no way unlawfully forces any claimant into accepting a final payment and signing the release.[18]

Likewise, the fact that the "Quick Pay" option exists and that, as its name indicates, it is being paid quickly to the tens of thousands of claimants who chose this option does not mean that they were unlawfully coerced into accepting it. The GCCF payment structure is designed to provide options to claimants—with full disclosure of the benefits and risks inherent in each option. At all times, it is the claimant's decision to choose the best option for its particular situation.

Having options is the opposite of duress. There is no basis for the Court to rewrite any portion of the release.[19]

---

[18] In a February 2, 2011, statement, Mr. Feinberg reiterated the uncertainties surrounding prediction of losses:

> "[P]redicting the future of the Gulf is not an exact science. There is obviously some unknown risk in attempting to determine the future recovery period. That is why all claimants have the option of accepting a Final Payment for all future damage or, if uncertain of the future, deciding to wait and accept an Interim Payment for documented quarterly past damage. The choice is up to each claimant.

(GCCF on Final and Interim Payments, available at http://www.publicmediaexchange.org/ index.php/treatment/gccf_on_final_and_interim_payments (last visited 2/18/11).)

[19] The Florida Attorney General's speculation that the release "may lead" to a claimant's spouse or heirs failing to file their own separate claims is unfounded. (See Florida Statement of Interest at 7.) As the Attorney General acknowledges, the claimant releases claims of those who might claim an interest in *his claim*. (Id.) ("only derivative

## III.   NEITHER OPA NOR ANY OTHER LAW AUTHORIZES "COURT SUPERVISION" OF OPA'S EXTRA-JUDICIAL CLAIMS PROCESS.

The Attorneys General for Florida, Louisiana, and Mississippi contend claimants "would benefit from judicial supervision of the GCCF claims process."  (*See*, *e.g.*, Statement of Interest by the State of Florida ("Fla. Statement") ¶ 2; *see also* Louisiana Notice of Joinder ("La. Notice") at 2.)  They also argue that the Court should rewrite the GCCF's Release or void it altogether.  (*See*, *e.g.*, Miss. Mem. at 14 ("[T]he Release is invalid and unenforceable by reason of economic duress."); Fla. Statement ¶ 2.)  These arguments lack merit as a matter of law and fact, and are at odds with the Court's statement that it "does not intend to impede or interfere with [Mr. Feinberg's] ability to fairly and efficiently process claims."  (Dkt. #1098, Order at 8.)

### A.   The Gulf State Attorneys General Are Not Parties and Lack Standing to Raise Any Issue or Seek Any Form of Relief in These Proceedings.

Whatever standing the Attorneys General may have to bring an action in federal court as *parens patriae* on behalf of OPA claimants, they have not done so.  (*See*, *e.g.*, Fla. Statement ¶ 1.)  Thus, Louisiana, Mississippi, and Florida have no claims seeking relief under OPA on behalf of their citizens,[20] and neither Mississippi nor Florida have any claims whatsoever before this Court.[21]  Nor have the Attorneys General sought to intervene in any case seeking relief under

---

claims are being released).  The GCCF's Frequently Asked Questions and the release itself make this clear.  (GCCF FAQ, § 4, ¶ 25, 1/7/2011 Bloomer Decl. (BP's Opp'n Br.) Tab C ("Your signature on the [your spouse's] Release applies to your spouse's claim … not to a separate claim you might have."); GCCF Full Review Final Payment Claim Form, Sample Release § 2, 1/7/2011 Bloomer Decl. (BP's Opp'n Br.) Tab I; ("Claimant also, on behalf of Claimant's spouse, heirs, …hereby releases and forever discharges, and covenants not to sue…for any Claims released by Claimant pursuant to Paragraph 1") (emphasis added).)

[20] Although eight cases filed by Parish District Attorneys in the name of the State of Louisiana are pending before this Court, those cases seek to recover the value of injured or lost fish or wildlife under state law alone, expressly declining any federal remedy.  (*See, e.g., State of Louisiana v. BP Exploration & Prod. Inc., et al.* (by New Iberia Parish), E.D. La. Dkt. No. 2:10-cv-2996, Cmplt. ¶ 16; *see also* Oct. 6, 2010 Orders, Dkt. Nos. 470, 471 (denying motions to remand).)

[21] The Alabama Attorney General filed a complaint under OPA seeking remedies for *injuries to the State of Alabama*, such as natural resource damages and lost tax revenue, and not in his capacity as *parens patriae* for Alabama OPA claimants.  (*Alabama ex rel. King v. BP p.l.c., et al.*, E.D. La. Dkt. No. 2:10-cv-4182 ¶ 26.)

OPA.  Instead, they remain nonparties, requesting affirmative relief while asserting a continuing right to object to this Court's jurisdiction over any claims "that may be filed as a result of the Deepwater Horizon oil spill."  (*See, e.g.,* Fla. Statement ¶ 6; *see also* La. Notice at 1 n. 1.)

The Attorneys General have not explained how, as nonparties, they have standing to participate in these proceedings, let alone to seek positive relief.  Nor can they.  The participation of these nonparties in this private civil litigation is wholly without legal support.  *See Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291, 294 (2d Cir. 1979) (holding that the government could not, by letter to the court, "insinuate itself into a private civil lawsuit" for purpose of obtaining access to deposition transcripts; "[t]he proper procedure … [was to subpoena the records or] seek permissive intervention…pursuant to Rule 24(b)….Otherwise, *as a non-party* who would not be affected by the outcome of the action…, *the Government would neither have the right to seek relief in the action*,…nor the right to appeal from a decision in the action") (emphasis added); *AET Inc. Ltd. v. C5 Commc'ns LLC*, Civ.A. No. G-06-487, 2007 WL 2362949, at *1 (S.D. Tex. Aug. 14, 2007) (movant "not listed on the Complaint as a Party to this litigation…has no standing to object to the Order"); *see also In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 250-51 (5th Cir. 2009) (denying motion to intervene as of right; Texas could intervene to protect its own interest in unclaimed settlement funds, but not that of individual owners of the funds).[22]

The Attorneys General cannot insist on avoiding federal jurisdiction while at the same time asking the Court to grant relief on behalf of prospective class members—all without filing

---

[22] Furthermore, although individual OPA claimants may have interests antagonistic to other claimants and to the relief proposed by the Attorneys General, the Attorneys General propose no procedure for sorting out those interests as due process requires.  For example, the Attorneys General express concern for claimants who might accept the Quick Pay option because of strained financial or other circumstances, but interference with the release or otherwise changing the terms of the final quick pay settlement may be contrary to the interests of claimants whose losses have already been fully compensated by emergency payments but who would nevertheless receive an additional lump sum payment under the Quick Pay option.

any claim or making any attempt to meet the requirements of Rule 23 (class actions) or Rule 24 (intervention). They lack standing to raise any issue or seek affirmative relief from this Court.

### B.    OPA Does Not Authorize a Court to "Supervise" the Extra-Judicial OPA Claims Process.

The Attorneys General and the PSC ask the Court to "supervise" the OPA claims process. But the injunctive relief they seek—managing how the GCCF processes OPA claims, rewriting or invalidating releases—would subvert OPA's very purpose, which is to provide an opportunity to resolve claims without litigation.  While BP has great respect for this Court, such relief would convert the extra-judicial claims process specified by Congress into a judicially "supervised" process that provides parties and nonparties alike the opportunity to review and second guess claims decisions and subject every aspect of the process to litigation, delay, and disruption— precisely what Congress sought to *avoid* under that Act.  *See* 135 Cong. Rec. H7965 (daily ed. Nov. 2, 1989) ("The system of liability and compensation provided for in the bill…*is intended to allow for quick and complete payment of reasonable claims without resort to cumbersome litigation.*") (Statement of Rep. Hammerschmidt) (emphasis added).

OPA's text confirms this purpose.  Although OPA includes a limited number of narrowly defined causes of action, including for recovery of specified "damages," 33 U.S.C. § 2702, it provides no cause of action for challenging the claims process.[23]   That OPA contains no such cause of action confirms that courts have no basis to hear such challenges.

---

[23] *See* 33 U.S.C. § 2703 (providing defenses to liability); § 2704 (establishing limits on liability); § 2705 (interest awards and partial payments); § 2706 (natural resources damages ); § 2707 (special provisions for recoveries by foreign plaintiffs); § 2708 (special provisions for recovery by responsible parties); § 2709 (contribution rights); § 2713(c) (offering claimants an election of remedies); § 1321 (providing graduated monetary penalty regime for releases of oil); § 2716(a) (providing penalty regime for violation of financial responsibility requirements); § 2717(a) (regulated parties given a limited cause of action to seek judicial review).

Although the *claims process* is extra-judicial, Congress also specified a role for the courts.  If the "responsible party" does not settle a claim to claimant's satisfaction *and* a 90 day period has elapsed, the claimant may either sue the responsible party (or bring a claim against the Fund).  *See* 33 U.S.C. § 2713(c).  That is the only judicial relief Congress afforded to claimants.

The Attorneys General and the PSC seek relief requiring interference with the GCCF on a massive scale; they cannot, however, meet the demanding standard for such sweeping mandatory injunctive relief.  (*See* BP's Mem. in Opp'n to Plaintiffs' Motion to Supervise *Ex Parte* Communications, Part IV (incorporated here by reference).)  As BP explained in its earlier brief, their arguments fail on the merits because no showing can be made that the GCCF process or the release violates OPA or any other law.  (*Id.*, *see also* Part II.B, *supra*.)  Potential class members cannot possibly be "irreparably harmed" by voluntarily settling their claims out of court; this is precisely what Congress hoped to encourage.  (*See* BP's Mem. in Opp'n, Part IV.)[24]  Equally important, a mandatory injunction that would disrupt and delay the GCCF's process does not serve the public interest.  (*Id.*)  Finally, the Attorneys General and the PSC have provided no competent evidence to satisfy the Rule 65 requirements, such as evidence of irreparable injury, and consequently have failed to make the clear showing the law requires.  (*Id.*).

### C.     Rule 23(d) Cannot Be Used to Supervise the OPA Claims Administration Process or Decide the Validity of the GCCF's Release.

Notwithstanding the PSC's arguments, Rule 23 provides no basis for the relief requested.  At the threshold, there is no claim before the Court by a plaintiff who has entered into a Release and now seeks to challenge that Release on the basis of purported "duress."  And even assuming such a claim by an individual plaintiff could pass muster under Rule 12(b)(6), it could not be

---

[24] Moreover, even if a claimant could eventually show that he or she only accepted the GCCF's settlement as a result of legally actionable duress or coercion (and they almost certainly could not as discussed in Part II.B.2), the claimant would have an entirely adequate remedy at law in the form of money damages.

properly certified and adjudicated on a class-wide basis, as numerous federal courts have held. *See, e.g., Hall v. Burger King Corp.*, No. Civ.A. No. 89-0260-CIV-KEHOE, 1992 WL 372354 at *8-9 (S.D. Fla. Oct. 26, 1992) (denying class certification when "[e]ach plaintiff [would] necessarily need to address the unique questions pertaining to the validity of these releases," necessitating "examination of the circumstances under which each release was executed").[25]

Rule 23, under which a " court may issue" certain specified orders and other orders that "deal with similar ***procedural*** matters," also does not help the PSC. Fed. R. Civ. P. 23(d)(1)(E) (emphasis added).[26] "Rule 23(d) is a rule of procedure and it creates neither a right nor a remedy enforceable in a federal court of equity." *Piambino v. Bailey*, 610 F.2d 1306, 1331 (5th Cir. 1980) (rejecting argument that injunction against enforcement of state court judgment was "'expressly authorized' by Fed. R. Civ. P. 23(d)"); *see also In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 335 (2d Cir. 1985) (Rule 23(d) "is a rule of procedure and creates no substantive rights or remedies enforceable in federal court.").

Rule 23(d) therefore provides no authority for a court to oversee a pre-certification settlement process, such as the OPA claims process, or to rule on the substance and validity of a release in such a process. In *Sorrentino v. ASN Roosevelt Center LLC*, 584 F. Supp. 2d 529, 532 (E.D.N.Y. 2008), for example, the defendant landlord made settlement proposals to putative class members who were former tenants of the landlord's luxury apartment complex. The

---

[25] *See also Plekowski v. Ralston Purina Co.*, 68 F.R.D. 443, 451 (M.D. Ga. 1975) (denying class certification because "questions of whether a release has been executed, whether it is valid and whether it covers the subject matter of this lawsuit would require an analysis of each releasor's particular circumstances."); *Ingenito v. Bermec Corp.*, 376 F. Supp. 1154, 1171 (S.D.N.Y. 1974) (denying certification; "plaintiffs' attack on the settlements or releases executed by them would clearly present individual issues as to the circumstances surrounding the obtaining of the release").

[26] BP previously briefed the demanding requirements for any order under Rule 23(d) restraining a defendant's communications with putative class members, which are protected by the First Amendment. (*See* Dkt. No. 963, BP's Mem. in Opp'n to Plaintiffs' Mot. to Supervise, at 14-24.) BP incorporates those arguments here.

plaintiffs argued that the proposals—which included an offer to return to the apartment complex but stated that the landlord would not lease "'to former…residents who have active or potential legal claims pending against the company'"—"created the possibility of coercion" because the termination of the residents' leases was unlawful and putative class members thus had the legal right to return to their apartments regardless of the landlord's settlement proposal. *Id.* at 531-32.

Given "the relationship between the parties, Rule 23(d)(1), and the plaintiffs' position that [the landlord] is still bound by the original leases," the court ordered that "a contemporaneous position letter" by plaintiffs be mailed with the defendant's settlement proposals, "to ensure that the parties make an informed decision." *Id.* at 533. Beyond this, however, the court held that "it cannot regulate the content of the defendant's offer" and "is without authority to review the content of the [settlement] proposal." *Id.* The reason is that Rule 23 only authorizes federal courts to review settlements in a *certified* class action, not settlements with putative members of an *uncertified* class:

> "[A] putative class action plaintiff has no legally protected right to sue on behalf of others and is without authority to prevent negotiation of settlements between the defendant and potential [class] members,…[as] 'it is only the settlement of the class action itself without court approval that [Rule 23] prohibits.' … Indeed, the proposed settlement offer and notices here are directed to individual members of a yet uncertified class. ***This is not a class settlement as contemplated by Rule 23 and would have no binding effect on members of the class who reject the settlement offer. Accordingly, the Court cannot re-write the terms of the defendants' proposal***."

*Id.* at 534 (quoting *Weight Watchers of Philadelphia, Inc. v. Weight Watchers Int'l, Inc.*, 455 F.2d 770, 773, 775 (2d Cir. 1972) (emphasis added)). The court thus concluded that it "will not attempt to restructure the defendants' offer." *Id.*

Likewise, in *Turner v. Murphy Oil*, No. 05-4206 (E.D. La. Nov. 14, 2005) (Dkt. #39) (Ex. 1, Bloomer Decl. Tab C), the plaintiffs challenged the defendant's "Settlement and Release Agreement" offered to putative class members, arguing that it "contains numerous waivers using

technical legal language" that claimants would not understand "without independent legal advice," and also was "premature" because the agreement required putative class members to clean up their properties even though Murphy Oil may have had an "absolute duty" to do so itself.  *Id.* at 10-11.  Judge Fallon declined to rule on the validity of the Agreement, holding simply that "the Settlement and Release Agreement should contain a statement that the individual signing the agreement should seek independent legal advice prior to any settlement or waiver of his or her legal rights."  *Id.* at 11.  Such a statement—which is included in the GCCF's release—"should be adequate to protect the interests of putative class members."  *Id.*; *see also Rothe v. Wayzata Nissan LLC*, No. Civ. 02-3233, 2003 WL 21181343, at *1 (D. Minn. May 14, 2003) (Boylan, M.J.) (rejecting motion seeking, among other things, "nullification" of releases obtained by defendant from members of a putative class in exchange for settlement payments of $1,000; where no class had been certified, "[e]ach prospective plaintiff was at the time, and still is, a free agent who should be entitled to settle with the defendant.").

Here, no lawsuit (to say nothing of a class action) asserting an OPA claim is permissible until OPA's presentment requirement is met.  *See* 33 U.S.C. § 2713(c).  That requirement is not satisfied for putative class members generally, let alone on a scale that would satisfy Rule 23's certification requirements.  Moreover, Rule 23(d) cannot be used to alter parties' substantive rights, let alone avoid OPA's exhaustion requirement.  *See Coffin v. Bowater Inc.*, 224 F.R.D. 524, 525, 527 (D. Me. 2004) (denying motion for order that putative class members "do not need to pursue or exhaust their internal ERISA plan remedies as long as the named Plaintiffs do so"; "The Court has no authority under Rule 23(d), or otherwise, to take such action, and in any event, such action is wholly unwarranted at this time on the merits of the case.").

There is no claim before the Court based on the GCCF's Release and no class claim under OPA; indeed, all class proceedings in MDL 2179 have been stayed at plaintiffs' behest. (Dkt. #569, PTO 11 (CMO 1), § VII.)  At this point, such a hypothetical dispute is premature, unripe, and non-justiciable.  *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-581 (1985) (A claim is not ripe for adjudication where it rests upon "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'") (quoting 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3532, p. 112 (1984)); *see also Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003) ("A court should dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical."); *Coffin*, 224 F.R.D. at 526 (Rule 23(d) is "not intended…to reach out subliminally to touch and alter the rights and relationships between non-parties and parties to the case in respect to issues that exist between them that are not yet ripe to be addressed by litigation in court.").

## IV.   BP AND THE GCCF HAVE COMPLIED WITH THE COURT'S FEBRUARY 2, 2011 ORDER.

On February 3, 2011, BP transmitted a copy of the Court's February 2, 2011 Order to Mr. Feinberg, and requested that the GCCF promptly comply with all provisions of the Order. (Letter from J. Andrew Langan to GCCF (Feb. 3, 2011), Ex. 1, Bloomer Decl. Tab D.)  BP understands that the GCCF has reviewed and, where necessary, updated its claims materials and procedures to comply with the Order including, among other things, the GCCF website, the GCCF Frequently Asked Questions page, GCCF claims posters in claims offices, GCCF flyers, and protocols for communications by GCCF personnel.

A review of the GCCF's website and its Frequently Asked Questions page confirms that the GCCF has complied with the Order.  The home page of the GCCF website contains the following statement:

24

"Consistent with an order issued by the court in the multidistrict litigation pending before the United States District Court for the Eastern District of Louisiana, titled, <u>In re Oil Spill by the Oil Rig 'Deepwater Horizon' in the Gulf of Mexico, on April 20, 2010</u>, MDL No. 2179, please note that changes were made to this website effective February 8, 2011. The court's order is posted under the tab <u>Important Notices and Information</u>.

The Gulf Coast Claims Facility ('GCCF') is the official way for Individuals and Businesses to file claims for costs and damages incurred as a result of the oil discharges due to the Deepwater Horizon Incident on April 20, 2010 ('the Spill'). The GCCF is administered by Kenneth R. Feinberg ('the Claims Administrator'), who is responsible for all decisions relating to the administration and processing of claims submitted to the GCCF. Mr. Feinberg and the GCCF are acting for and on behalf of BP Exploration & Production Inc. in fulfilling BP's statutory obligations as a 'responsible party' under the Oil Pollution Act of 1990.

You have the right to consult with an attorney of your choosing before accepting any settlement or signing a release of legal rights. See the Frequently Asked Questions for additional information."

(Welcome to The Gulf Coast Claims Facility Website, available at http://www.gulfcoastclaims facility.com/ (last visited Feb. 18, 2011) (emphasis in original).)

In addition, the GCCF's Frequently Asked Questions page specifically addresses the six issues ordered by the Court.  (*Compare* Dkt. #1098, Order at 14, *with* GCCF Frequently Asked Questions, Nos. 1, 6, 9, 12, 13, 25, 46, 53, 85, and 113, available at http://www.gulfcoastclaimsfacility.com/faq (last visited Feb. 18, 2011).)

Finally, the Motion to Supervise *Ex Parte* Communications was specifically addressed to the GCCF's communications with putative class members, not BP's communications.  So, too, was the Court's Order on plaintiffs' motion.  (*See* Dkt. #1098, Order at 2, 14.)  Nevertheless, out of an abundance of caution, BP's website has recently been reviewed and references to Mr. Feinberg as "neutral" or completely "independent" from BP have been removed.

**CONCLUSION**

For the foregoing reasons, the relief sought by the PSC and the Attorneys General for Mississippi, Louisiana, and Florida should be denied.

Respectfully submitted,


/s/ Don K. Haycraft
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Andrew B. Bloomer, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
312-862-2000 (Tel)
312-862-2200 (Fax)

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
202-662-5985

*Attorneys for BP Exploration & Production Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of February, 2011.

/s/ Don K. Haycraft
Don K. Haycraft