# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * | MDL No. 2179 |
| | * | |
| | * | SECTION J |
| | * | |
| | * | Honorable CARL J. BARBIER |
| This document relates to: all cases | * | |
| | * | Magistrate Judge SHUSHAN |

---

## DECLARATION OF ANDREW B. BLOOMER

I, Andrew B. Bloomer, declare as follows:

1.      I am over twenty-one years of age and make this Declaration based on my own personal knowledge.

2.      I am a partner of the law firm of Kirkland & Ellis LLP, and one of the counsel for BP in these proceedings.

3.      I am submitting this Declaration in support of BP's Supplemental Memorandum Regarding OPA and the GCCF.

4.      Attached hereto as Exhibit A is a true and correct copy of testimony by Mr. Kenneth Feinberg and Mr. Craig Bennett, excerpted from *Gulf Coast Recovery: An Examination of Claims and Social Services in the Aftermath of the Deepwater Horizon Oil Spill: Hearing Before the Ad Hoc Subcomm. on Disaster Recovery of the S. Comm. on Homeland Security and Governmental Affairs*, 112th Cong. (2011).

5.      Attached hereto as Exhibit B are true and correct copies of an October 26, 2010 Letter from Mr. Kenneth R. Feinberg to the Hon. Jim Hood, Mississippi Attorney General (attachments omitted), and a December 21, 2010 Letter from Mr. Kenneth R. Feinberg to the Hon. Alex Sink, Chief Financial Officer, Florida Department of Financial Services, and the Hon. Bill McCollum, Florida Attorney General.

6.      Attached hereto as Exhibit C is a true and correct copy of the November 14, 2005 Order and Reasons in *Turner v. Murphy Oil*, No. 05-4206 (E.D. La.) (Dkt. No. 39).

7.      Attached hereto as Exhibit D is a true and correct copy of a February 3, 2011 Letter from Mr. J. Andrew Langan, Counsel for BP, to the Gulf Coast Claims Facility

I make this Declaration under penalties of perjury pursuant to 28 U.S.C. § 1746, and I state that the facts set forth herein are true.

_____
Andrew B. Bloomer

Dated:  February 18, 2011

2

# EXHIBIT A

1

1      GULF COAST RECOVERY:  AN EXAMINATION

2         OF CLAIMS AND SOCIAL SERVICES IN THE

3      AFTERMATH OF THE DEEPWATER HORIZON OIL SPILL

4                      - - -

5               THURSDAY, JANUARY 27, 2011

6                              United States Senate,

7           Ad Hoc Subcommittee on Disaster Recovery,

8      Committee on Homeland Security and Governmental Affairs,

9                              Washington, D.C.

10        The Subcommittee met, pursuant to notice, at 1:45 p.m.,

11   in Room 342, Dirksen Senate Office Building, Hon. Mary L.

12   Landrieu, Chairman of the Subcommittee, presiding.

13        Present:  Senators Landrieu, Carper, Nelson, Shelby,

14   and Vitter.

15             OPENING STATEMENT OF SENATOR LANDRIEU

16        Senator Landrieu.  The Subcommittee on Disaster

17   Recovery and Response will come to order.  I am pleased to

18   be joined by a colleague, Senator Shelby from Alabama, and

19   we are hoping to be joined by several other colleagues.  I

20   am expecting Senator Vitter and others to join us as the

21   afternoon goes on.

22        I want to thank our witnesses, particularly for making

23   the special effort to be here today because of the

24   challenges of weather and transportation, so I really thank

25   you, because we did not want to cancel this important

1           TESTIMONY OF KENNETH FEINBERG, ADMINISTRATOR, GULF

2           COAST CLAIMS FACILITY

3       Mr. Feinberg.  Thank you very much, Madam Chairman.  I

4   am testifying today before three Senators who I have known

5   for a while and who have been among my most vigorous

6   supporters in trying to get this program to work right and

7   have been, thankfully, some of my most constructive critics

8   in pointing out in good faith how we can improve the

9   program, and I am grateful for that criticism.

10      The program--just as Senator Vitter predicted, I go

11  right away to the statistics--the program is working.  We

12  have paid out in five months almost $3.5 billion to 170,000

13  people, businesses, individuals in the Gulf region.  Baldwin

14  County, I believe--I will check this--is the second county

15  in the Gulf that has received the most funds from the Gulf

16  Coast Claims Facility, due in part, I guess, to Senator

17  Shelby's insistence that we focus on Baldwin County, which

18  we are doing.

19      Also, it is true that in the last five weeks, as

20  Senator Vitter has pointed out, 85,000 people and businesses

21  have accepted the quick payment option.  We have paid out in

22  the last five weeks about $700 million to individuals and

23  businesses who either have already been compensated and feel

24  that this is additional compensation that they will accept

25  in return for releasing their claim or cannot document any

1   additional damage.  I do not know which, but 85,000 people

2   have taken the quick payment option.

3       Now, transparency, a big point with the three Senators

4   today.  We are taking steps on this.  First, on Tuesday,

5   February 2, about a month later than I promised, Senator

6   Shelby, but on February 2, we will post publicly the

7   criteria and the methodologies being used to calculate final

8   payments and interim payments.  We are going to give a two-

9   week public comment period for any business or any

10  individual before we implement it.  Before we start making

11  these final payments and interim payments, everybody in the

12  Gulf will have an opportunity, as will the Senators, to

13  comment on what we propose to do.  And if there are comments

14  that we should change it before we implement it, but the

15  final payments and the interim payments, I assure the

16  Senators, will commence in February to about 90,000

17  businesses and individuals requesting a final payment and

18  about 40,000 businesses and individuals requesting an

19  interim payment.

20      And, Senator Shelby, the reason it took longer than I

21  had promised you, I have got to get this right.  The Final

22  Payment Program requires a lump sum payment for all present

23  and future damage, and I am trying, talking with all the

24  experts, with the citizens of Alabama, with the businesses

25  in the Gulf, to find out from them, what are the long-term

1    implications of this bill.  Nobody knows for sure.  And it

2    has taken me longer than I had hoped to gather that

3    information together.  But it will be announced on Tuesday.

4    It will be a two-week public comment period.  And at the end

5    of that period, we will finalize that program and begin to

6    commence to make those payments.

7          I also want to pick up on a point.  Senator Landrieu

8    advised me to do this three months ago.  We have now put in

9    place in Alabama, in Louisiana, Florida, and elsewhere local

10   people, live bodies in the claims facility offices to meet

11   with claimants, to answer their questions.  They are not

12   representing them in a court of law.  They are not offering

13   legal advice.  But instead of people being frustrated by

14   calling 1-800 numbers or not getting answers or getting

15   inconsistent answers, we are trying to deal with that by

16   hiring local people who will address local individuals with

17   local problems.

18         We have received in the last five months--the Coast

19   Guard has been fabulous.  We have been working with the

20   Coast Guard since day one.  Craig is here.  I acknowledge

21   their support for this.

22         The Gulf Coast Claims Facility has received about

23   500,000 claims.  I have to get back to Senator Shelby in

24   writing.  When he says we have only processed X percent or

25   three claims, he--you take what Senator Shelby says with a

1   good deal of credibility.  I have got to check this.  It

2   does not ring true, except it is coming from Senator Shelby.

3   I will get an answer to you in writing on this, Senator.

4        Senator Landrieu.  Thirty seconds.  Thirty seconds, if

5   you could.

6        Mr. Feinberg.  So, in sum, just as an opening comment,

7   we are taking steps to deal with transparency.  We are

8   dealing closely with Catholic Charities, Madam Chairman, and

9   those other nonprofit service providers.  We have no

10  authority under the facility to pay them.  That is a BP

11  obligation, if anybody has that obligation.  And I look very

12  much forward to the questions where we can get into some of

13  this in more detail.

14       Thank you, Madam Chairman.

15       [The prepared statement of Mr. Feinberg follows:]

1    called this sort of a built-in appeals process.  I think

2    that is what--is that what you call it?

3        Mr. Feinberg.  There are two appeals processes.  There

4    is the one that you have just described and then there is an

5    additional appeals process that the Gulf Coast Claims

6    Facility has created independent of the Coast Guard.

7        Senator Carper.  Okay.  Mr. Bennett, I am told that

8    over 500 claims have been received by your office thus far,

9    but of those reviewed, none have been paid.  Let me just

10   ask, what do you believe the chances are that this will

11   continue?  That is my first question.  What do you believe

12   the chances are that this will continue?  And secondly, is

13   your office able to handle what I understand are an ever-

14   increasing number of claims that are being submitted to your

15   office every month?

16       Mr. Bennett.  Thank you, Senator.  That is a good

17   question.  You are correct.  My office has received to date

18   507 claims that have all been presented previously to the

19   Gulf Coast Claims Facility and either denied, or in some

20   cases paid before we got to it, or the payment did not meet

21   the claimant's satisfaction, so they brought it to us.  So

22   that is 507 out of the hundreds of thousands that are on

23   there.  We have finished adjudicating--

24       Senator Carper.  So in a case where they submit their

25   claim to Mr. Feinberg's folks for like, say, $200, they got

1   $100, but they are not satisfied.  So they come to you for

2   the second $100?  Is that right?

3       Mr. Bennett.  That is correct, Senator.  They can bring

4   it to us.  It is not really an appeal of his decision

5   because it is sort of an arm's length relationship between

6   the two of us.  But we are an alternate source for

7   adjudicating.  So as long as it has been properly presented

8   to the responsible party, in this case the Gulf Coast Claims

9   Facility, if after 90 days or denial, then they can bring it

10  to us and we will take a re-look at it.  We have an arm's

11  length relationship, so we try to understand what it was

12  that they did.  We want to make sure they have not already

13  paid it, which we found in about ten percent of the cases

14  the claimant has been paid, so we end up sending a denial.

15  And then we adjudicate it in our own process and get back to

16  the claimants.

17      We have adjudicated 200 and all of those have been

18  denials to date.  I cannot predict that it will continue to

19  go at that rate.  I think that is primarily an indication of

20  the fact that the protocols that are out there that BP and

21  GCCF have been able to do have actually been more inclusive

22  than OPA requires.  They can pay for personal injury.  They

23  can pay emergency advance payments.  I cannot pay advance

24  payments.  Their final claims protocol will include

25  prospective losses.  I cannot pay for speculative losses.

# EXHIBIT B



October 26, 2010

Attorney General Jim Hood
State of Mississippi
Walter Sillers Building
PO Box 220
Jackson, MS   39205-0220

RE:      Gulf Coast Claims Facility

Dear Attorney General Hood:

I thank you for your letter of October 21 as part of our ongoing dialogue to make sure that the Gulf Coast Claims Facility ("GCCF") serves the citizens of Mississippi.  I share your interest in that objective.

In your letter, you request additional information concerning Mississippi claimants in order "to effectively evaluate claims handling practices without disclosing any otherwise confidential data."  As you know, the latter is of great concern to me, but I am prepared to try to meet your legitimate concerns by providing you the information you request.  I must redact names, social security numbers/tax ID numbers, addresses, etc., but would be prepared to provide you the specific data which, I believe, you are requesting.  I attach an overall GCCF Program Statistics Report and GCCF Program Statistics Summary for the State of Mississippi.  In addition, I attach details of payments by claimants from the State of Mississippi.  Please advise as how we should move this process forward in an efficient and expedited manner.

You also state that the GCCF "is understaffed to adequately handle the number and complicated nature of claims being filed."  I disagree.  In just the past eight weeks, the GCCF has processed and made payment to 85,286 claimants totaling $1,586,327,890.88.  In Mississippi alone, we have approved payment to 7,907 claimants totaling $144,558,936.50.   True, there are currently 12,045 claims that have been deemed deficient, and an additional 8,700 claims are currently in the evaluation queue to be processed.  But, as to the former, you will note that 7,407 claims have been submitted <u>with no documentation whatsoever accompanying the claim form</u>.  This is not a problem of a lack of GCCF resources.  One may reasonably presume to question

whether such claims will ever be documented and whether they will ever be eligible for payment. We have, nevertheless, requested additional documentation, or other proof, from these claimants. As to the claims currently being processed, this is the result of a recent flood of undocumented filings with the GCCF (with some 50% of the total volume such filings arriving since October 1). Obviously, the citizens of Mississippi and the rest of the Gulf see some value in submitting their claims to the GCCF in the hope of receiving compensation. The filing rate and payment amounts speak for themselves. (I note that 86% of eligible claimants have received either the amount requested in the individual claim forms, or an amount in excess of that requested, clear evidence of GCCF generosity).

Finally, you seek more information concerning media reports "that only twenty-five reviewers are available for ultimate decision-making on all claims submitted to the GCCF." This is incorrect. I offer the following information to assist you in better understanding the design and administration of the GCCF:

1)   My Law Firm, Feinberg Rozen, LLP, makes the policy and management decisions underlying the GCCF, and supervises all other subcontractors regarding the GCCF. The intake, review, analyses, determinations and payments of all claims is handled by a large team of specialists including lawyers, technical staff, claims analysts and accountants. This team is responsible, under direction of Feinberg Rozen, LLP, to review every one of the 271,773 claims received to date by the GCCF. Feinberg Rozen, LLP has contracted, and has direct supervision of, the subcontractors listed below to fulfill the responsibility of claims intake, processing, reviewing, evaluating, and distributing payments to eligible claimants.

2)   A subcontractor, Brown Greer of Richmond, Virginia, employs approximately 500 people (programmers, senior claims analysts and lawyers) in working for the GCCF. It is Brown Greer that conducts the first round of eligibility review; it employs three shifts of workers who make these eligibility findings seven days a week.

3)   A second subcontractor, The Garden City Group, employs approximately 500 people working from regional offices in Melville, New York, Seattle, Washington and Dublin, Ohio. This group is responsible for responding to hundreds of thousands of claimant calls, electronic claims intake, receipt and management of all data, programming, staffing the 1-800 call center (responding to hundreds of thousands of call per day), data processing, document control and payment processing.

4)   A third subcontractor, The Worley Company in Hammond, Louisiana, employs approximately 1,300 individuals and is responsible for staffing the 36 claims offices located throughout the five state Gulf region. These

offices assist claimants with in person documentation claim intake and data entry into the system.

5)      A fourth subcontractor, PriceWaterhouse Coopers, employs approximately 15 accountants in assisting Feinberg Rozen, LLP in Washington, DC.

6)      Additional subcontractors, Cowheard and Assurance Accounting Companies together employ a staff of approximately 50 accountants working in the Worley facility in Hammond, Louisiana.

7)      We have also subcontracted with Guidepost, which provides us investigative services designed to discover fraudulent claims which are then referred to the Department of Justice in Washington, DC.

I trust that this detailed information provides you and your staff with a better understanding of the massive infrastructure that is the GCCF. Media reports that a very small group of individuals are making decisions impacting thousands of claimants, resulting in extended delays, are wildly exaggerated. Of course, there will always be isolated instances of delay or inconsistency in the evaluation of specific claims; this is inevitable when you establish a program that must respond to over 271,773 claims submissions to date encompassing a 90-day filing window. But I remind you that this entire emergency program does not require any claimant to waive any rights that may exist in court against BP or any other defendant.

Mr. Attorney General, I look forward to continuing to work with you in a timely fashion. With this thought in mind, I will shortly be sending you a draft Final Protocol for your review and constructive suggestions.   And, I thank you for your interest in the GCCF.

Sincerely,

Kenneth R. Feinberg
Administrator
Gulf Coast Claims Facility

KRF:shs

Attachments



December 21, 2010

The Honorable Alex Sink
Chief Financial Officer
State of Florida
Department of Financial Services
The Capitol
Tallahassee, FL 32399

The Honorable Bill McCollum
Attorney General
Office of Attorney General
State of Florida
The Capitol PL-01
Tallahassee, FL 32399

Re:  Gulf Coast Claims Facility (GCCF) Process

Dear Ms. Sink and Attorney General McCollum:

I am in receipt of your letter dated December 15.  As usual, I very much appreciate your constructive advice and input when it comes to the Gulf Coast Claims Facility ("GCCF") and its administration.  Both of you have offered me valuable advice as to how to make the GCCF more efficient and effective.  I take your letter in that spirit.

I respond as follows to your criticisms:

1.  You are incorrect when you state that there are "25,000 plus Floridians who are still waiting for an emergency claim to be paid ..." In fact, there are only 254 Floridians who have not yet had their emergency claims processed; this is due either to the fact that the individual claim is suspicious and might be fraudulent or that the claim was received by the GCCF hours prior to the November 23 deadline.  I remind you that the GCCF processed 155,464 emergency claims from Floridians in less than four months, and paid $975,411,076 to citizens of Florida.  You might want to consider these facts in reviewing the overall performance of the GCCF.

2.  It is true that we denied over 79,024 emergency claims from Floridians.  Of this number 70,389 can be traced directly to the absence of the minimal documentation necessary to process the claim.

3.  You state that your review of GCCF procedures "reveals a claims process that is not operating in an efficient manner.  It is a process carried out without meaningful communication between claimants and the GCCF."  I remind you that the GCCF received over 450,000 claims in less than four months!  It paid out approximately $2.5 billion dollars to some 170,000 claimants.  We can disagree over what constitutes "efficiency" and "meaningful communications," but, overall, I believe that the GCCF is performing its mission with skill and effectiveness.  However, I do agree with you that there is always

room for improvement. As we enter the Final Payment/Interim Payment phase of the Program, I want to assure both of you of steps we will be taking to improve the GCCF process. First, we will be posting on the GCCF website and in the 35 GCCF claims offices the methodologies being used to calculate Final and Interim payments. Second, we have already added additional personnel in the various claims offices in Florida so that Floridians can communicate directly with GCCF officials in their locale, without resorting to telephone calls or email communication. These additional local GCCF hires are Floridians, who have an understanding and appreciation of the needs of their fellow citizens in Florida. These two steps will hopefully go a long way in responding to your constructive criticism.

4. You state that "of the 150,000 plus claims that have been filed by Floridians, only 40 percent have been paid. Over 33 percent have been denied. Over 20 percent are either under review or awaiting the filing of additional information." Once again, your information is incorrect. The more accurate statistics are as follows:

Of the 85,954 claimants not eligible for Emergency Payments:

- 6,530 claimants submitted for Final Claims only (i.e., claimants who did not file an Emergency Advance Benefit Claim); these Final Claims will be fully evaluated and determined within the next 90 days.
- 12,109 claimants did not submit any documentation;
- 58,280 claimants filed with insufficient documentation;
- 400 claimants were referred to the government, real estate or moratorium funds;
- 8,635 were determined to be ineligible.

5. In your letter you state that "now that the Final phase of the claims process has begun, we expect to see significant improvements in efficiency and operational results." As already indicated, there is always room for improvement and I share your concern; but, remember, we are discussing a process which is unprecedented, involving over 450,000 claims received and processed in less than four months.

6. You state that "we have also heard from many claimants who say they do not receive any reasonable explanation for denial of an emergency claim or for partial payment of a claim." We can disagree over what constitutes a "reasonable explanation" but I agree with you that more transparency is required. The steps already mentioned in this letter should go a long way in improving the transparency of the GCCF Program.

7. I agree with you that the 90 day limitation for processing claims as part of the Final Payment/Interim Payment Program is only a maximum time limitation; we have every expectation that we will process claims more quickly. Also, I note that the Quarterly Interim Payment Option also includes an "exigent circumstances" provision which will be triggered in appropriate cases, permitting quicker payments to those claimants in

especially dire financial circumstances.  Hopefully, this will deal with the concerns expressed in your letter.

8. The Final Payment Option – requiring a full release and including all anticipated future damage arising out of the spill – is but one of three voluntary options being made available by the GCCF.  Each of over 170,000 claimants will have the opportunity to choose the correct option and will not be bound by the selected option until he/she knows exactly the amount of that option.  This is fair.  Each claimant will decide what is best for the claimant based upon the circumstances surrounding the individual claim.

9. You state that the GCCF appeals process "is tantamount to having no appeals process at all."  You are wise to point out that claimants always have the right to appeal to the Coast Guard and to file a court action if they remain aggrieved.  Hardly, "no appeals process at all."  The GCCF has, nevertheless, added an additional appeal process which is not required by law but is designed to advance due process in the GCCF.  You are correct that a claimant's right to appeal is limited.  This is because, with the volume of claims confronting the GCCF, I share your concern about speed and efficiency.  I have concluded that an open-ended appeals process will likely delay the efficient and effective processing of claims, and the distribution of badly needed financial assistance to claimants.  Since each claimant already has an existing right to appeal, I view the new GCCF appeals process as an additional safeguard in a limited number of cases.


Once again, I thank both of you for your constructive advice and guidance over the past few months.  Both of you have helped assure the success of the GCCF by suggesting certain improvements which we have implemented.  I do hope you will continue to express your views as the GCCF moves forward to the next stage of the claims process.

Sincerely,

Kenneth R. Feinberg
Administrator
Gulf Coast Claims Facility


cc:    Thomas J. Perrelli
       Office of the Associate Attorney General
       US Department of Justice
       950 Pennsylvania Avenue, NW
       Washington, DC  20530

# EXHIBIT C

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 NOV 14  AM 10: 46

LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| PATRICK JOSEPH TURNER, ET AL. | * | CIVIL ACTION |
| VERSUS | * | NO. 05-4206 |
| | | CONSOLIDATED CASE |
| MURPHY OIL USA, INC. | * | SECTION "L" (2) |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

THIS DOCUMENT RELATES TO ALL CASES

## ORDER AND REASONS

Before the Court is the Plaintiffs' Motion to Supervise Ex Parte Communications Between Defendant and Putative Class Members. This motion came on for hearing before the Court with oral argument on November 3, 2005. For the following reasons, the motion is hereby GRANTED IN PART.

## I.     Factual and Procedural Background

These consolidated cases arise from one of the more unfortunate events that occurred after Hurricane Katrina struck southeastern Louisiana earlier this year. Sometime in the first few days of September 2005, a day or so after Katrina struck, a crude oil tank at the refinery owned by Defendant Murphy Oil USA, Inc. ("Murphy Oil") in Meraux, Louisiana discharged an unknown quantity of crude oil into the surrounding area in St. Bernard Parish. The exact number is unknown at this point, but it is contended that several thousand homes received some oil from the spill.

Plaintiffs are residents of St. Bernard Parish who allege that the oil spill damaged their properties. Plaintiffs have filed nineteen class action lawsuits which have been consolidated

-1-

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

before this Court. On September 27, 2005, Plaintiffs' counsel in *Tommy Duckert, et al. v. Murphy Oil USA, Inc.*, Civil Action Number 05-4210, filed a Motion to Enjoin Any and All Ex Parte Communication Between Murphy Oil and Putative Class Members. Plaintiffs alleged that representatives of Murphy Oil were issuing inaccurate and overreaching statements to residents of St. Bernard Parish. That motion came on for expedited hearing on October 4, 2005, and was denied on that date. The Court held that there was no need for a blanket order prohibiting all communication between the Defendant and residents of St. Bernard Parish based upon the record at that time. The Court determined that such an order would unduly infringe upon Murphy Oil's First Amendment rights and was not justified by any specific evidence of coercion or duress. However, Plaintiffs retained their rights to challenge individual communications by Murphy Oil.

Thereafter, Murphy Oil has continued to issue informational communiques and have undertaken to make settlement proposals to residents who have contacted Murphy Oil and expressed an interest in amicably resolving their damage. On October 25, 2005, Plaintiffs filed the present Motion to Supervise Ex Parte Communications Between Defendant and Putative Class Members. The motion was set for expedited hearing with oral argument on November 3, 2005.

## II.    Plaintiffs' Motion to Supervise Ex Parte Communications Between Defendant and Putative Class Members

Plaintiffs' present motion is somewhat different from their previous motion in that it asks the Court to supervise, rather than completely prohibit, communications between Murphy Oil and putative class members. In particular, Plaintiffs seek the following relief: 1) prohibition of

communications between Murphy Oil and putative class members unless the communications are recorded or transcribed; 2) filing of all written communications and oral transcripts between Murphy Oil and putative class members with the Court; 3) requirement that all settlement offers be in writing and provide for a 14-day cooling-off period; 4) requirement that all settlement offers give notice to the putative class member of the present litigation; 5) requirement that all settlement offers warn putative class members to seek legal advice prior to settlement; and 6) requirement that all settlement offers contain a statement that the agreement waives all rights to pursue litigation in the future.

In their motion, Plaintiffs argue that Murphy Oil's communications with residents of St. Bernard Parish threaten to undermine the purpose of the class. Moreover, putative class members may be unduly influenced by Murphy Oil's strategies due to the severe financial hardships many face, Plaintiffs argue. In addition, Plaintiffs suggest that Murphy Oil's communications are misleading and require the Court's monitoring. Plaintiffs point to Murphy Oil's communications in mass media, their use of settlement offices and a toll-free number, their use of independent consultants, and their settlement process as areas in which Murphy Oil is engaging in problematic speech.

However, Defendant argues that there is no legitimate reason for restricting Murphy Oil's communications with residents of St. Bernard Parish. Primarily, Defendant argues that there is no clear evidence of abuse in the communications at issue here. There is no evidence of threats or coercion, and the Defendant is in no position of control over putative class members. Moreover, Plaintiffs' counsel equally have used mass media and other marketing tools to contact putative class members about the litigation. Defendant argues that the supervision requested by

-3-

Plaintiffs would constitute a prior restraint on Murphy Oil's and St. Bernard Parish residents'
First Amendment rights to free speech and free association, and as such should be denied.

### a. Law and Analysis

As stated in the Court's October 4, 2005 Minute Entry in this matter, district courts enjoy
broad discretion under Rule 23 of the Federal Rules of Civil Procedure to make appropriate
orders imposing conditions upon the parties in class actions. Fed. R. Civ. P. 23(d). However,
because orders limiting the communication of defendants impinges upon a defendant's First
Amendment right to free speech, "an order limiting communications must be based upon a clear
record and specific findings that reflect a weighing of the need for a limitation and the potential
interference with the rights of the parties." *Lee v. American Airlines, Inc.*, 2002 WL 226347 *2
(N.D.Tex. Jun. 19, 2001), *citing Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981).

A defendant's speech to putative class members is considered commercial speech,
because the defendant's economic interest in reducing its litigation costs is involved. *Kleiner v.
First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1204 n.22 (11th Cir. 1985). Because this speech is
commercial speech, a defendant's communications with potential class members does not enjoy
heightened First Amendment protection. *Id.* at 1204. Also, a district court may freely prohibit
false or misleading speech by a defendant, and may restrict a defendant from using methods of
speech that are inherently coercive or prone to abuse, like oral solicitation. *Id.* at 1204 & 1206.
As the Eleventh Circuit has stated, "[u]nsupervised, unilateral communications with the plaintiff
class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided
presentation of the facts, without opportunity for rebuttal. The damage from misstatements could
well be irreparable." *Id.* at 1203.

-4-

In other cases, district courts have limited a defendant's communications with putative class members in situations in which defendants engaged in speech that was clearly coercive or threatening. For example, in *Kleiner*, the defendant, a bank, called its customers, the putative class members, in a massive telephone solicitation and demanded that they opt out of a potential class action. *Id.* at 1198. The district court and Eleventh Circuit found that the oral, unsolicited communication by the bank was inherently coercive and threatening both because of the way it was conducted (by telephone) and because of the ongoing business relationship between the bank and its customers. *Id.* at 1206-07.

Similarly, in *Hampton Hardware, Inc. v. Cotter & Company,* the defendant, a hardware wholesaler, had an ongoing business relationship with the putative class members, individual stores that received supplies from the wholesaler. 156 F.R.D. 630, 631 (N.D. Tex. 1994). The defendant sent letters to putative class members that specifically mentioned the litigation and its possible financial costs to the class members. *Id.* at 631. The district court held that these letters were threatening due to the parties' ongoing relationship, and prohibited the defendant from discussing the litigation with putative class members. *Id.* at 632.

However, in *Burrell v. Crown Central Petroleum, Inc.*, the district court determined that an order prohibiting communication between the defendant and putative class members was not appropriate. 176 F.R.D. 239, 245 (E.D. Tex. 1997). In that case, a group of employees sued their employer for sexual and racial discrimination. *Id.* at 241. The employer sent a mass email to its employees informing them of the litigation, and posted this email at the workplace. *Id.* Also, the employer held two informational meetings with employees to discuss the litigation. *Id.* None of these communications threatened the employees or asked them to opt out of the litigation. *Id.*

-5-

The district court found that the putative class members could not show specific instances of harm from these communications; thus, an order prohibiting the defendant's speech was inappropriate. *Id.* at 244-45.

In the present motion, Plaintiffs have challenged a range of different communications between Murphy Oil and residents of St. Bernard Parish. The Court finds it useful to address each type of communication individually to determine whether a potential for serious abuse exists. If such potential exists, restriction or supervision of Murphy Oil's communications would be appropriate. *Kleiner*, 751 F.2d at 1206.

### 1. Open Letters and Advertisements in Local Media; Settlement Offices

According to Plaintiffs, Murphy Oil has published at least two "open letters" and one full-page advertisement in local newspapers in New Orleans and Baton Rouge in September and October 2005. In these advertisements, Murphy Oil discusses the oil spill and offers a toll-free number for residents to call who have been affected by the spill. Murphy Oil states in several of these advertisements that the most of the oil has been recovered or has evaporated. In the October 24, 2005 advertisement, Murphy Oil states that it will contact residents who have previously called Murphy Oil for the purposes of settlement of their claims. Although the details have not been presented to the Court, counsel allege that similar advertisements have been posted on the Internet as well.

In addition, it has been well-publicized that Murphy Oil has set up five offices for settlement of claims regarding the oil spill. Plaintiffs object to the opening of these offices for the same reasons that they object to Murphy Oil's use of a toll-free number: Plaintiffs allege that there is inherent potential for coercion and abuse in an oral, in-person, unsupervised meeting

-6-

between a putative class member and representatives of the Defendant.

Plaintiffs argue that these communications should be prohibited because Murphy Oil is using the ads and settlement offices to shrink the size of the class. Plaintiffs contend that this effort is at odds with the purposes of Rule 23 of the Federal Rules of Civil Procedure. In addition, Plaintiffs argue that the use of the toll-free number and settlement offices creates oral, unsupervised communication between the defendant and putative class members that is particularly problematic.

The Court agrees with Plaintiffs in principle that oral, unsupervised solicitations by counsel are a type of communication that is particularly subject to abuse. However, in this case, the danger of abuse appears to be low. Murphy Oil is not making targeted, oral solicitations to individuals for settlement: any oral communication that occurs between the defendant and a resident of St. Bernard Parish is initiated by the *resident*, not by Murphy Oil. Plaintiffs also underestimate their own media access and the media access of the residents of St. Bernard Parish. The present cases have been well-publicized, and Plaintiffs' counsel have taken out their own advertisements regarding the oil spill. In addition, local government and federal agencies have made much information available about the oil spill and its effects. This is not a case in which a defendant has a monopoly on the information available to putative class members.

Moreover, Murphy Oil set up these claims offices two months after Hurricane Katrina: claimants have had time to deliberate and consider what to do with their properties. In addition, Murphy Oil has no ongoing relationship with the putative class members, except in that both are residents of St. Bernard Parish. Murphy Oil is not in a position to force individuals into settlement. Plaintiffs have not presented evidence of threats or coercion.

-7-

However, given the potential for abuse inherent in any unsupervised oral communication in this context, IT IS ORDERED that Defendant Murphy Oil shall begin any communication with a putative class member with the statement that the individual has a right to consult with an attorney prior to any settlement or waiver of legal rights. The Court specifically finds that such a statement will not unduly burden Defendant's First Amendment right to speak on its own behalf. Communication can continue, while the interests of putative class members in receiving independent information is protected.

In addition, Murphy Oil shall not initiate contact with any individual who has not previously contacted Murphy Oil. The Defendant shall comply with Rule 4.2 of the Louisiana Rules of Professional Conduct and not communicate with persons already represented by counsel.

### 2. Communication Regarding Murphy Oil's Use of the Center for Toxicology and Environmental Health

Plaintiffs further argue that Murphy Oil is misleading residents of St. Bernard Parish about its relationship with the Center for Toxicology and Environmental Health ("CTEH"), a private consulting and testing firm. Murphy Oil has hired CTEH to perform testing of public and private property in the area of the oil spill, and CTEH has published its preliminary results on the St. Bernard Parish government Web site and Murphy Oil's Web site. Murphy Oil has stated in mailings to parish residents that CTEH has determined that there will be no long- or short-term health or safety hazards from the spill. Plaintiffs object to these communications for two reasons. First, Murphy Oil does not clearly state that the CTEH is a paid consultant of Murphy Oil, and not an independent agency. Second, Plaintiffs allege that Murphy Oil

-8-

deliberately presents CTEH as a quasi-official agency by placing it on equal footing with agencies like the Environmental Protection Agency and Louisiana Department of Environmental Quality. Plaintiffs argue that Murphy Oil's communications about CTEH may mislead putative class members into believing they are receiving objective, unbiased information from the firm. Defendants argue that CTEH is a reputable organization that is conducting unbiased testing, and that there is no intent to deceive residents. Defendants further contend that CTEH's test results are similar to those issued by the EPA.

The Court finds that Murphy Oil's public representations regarding the Center for Toxicology and Environmental Health can be misleading. Accordingly, IT IS ORDERED that, if the CTEH has been retained by Murphy Oil, Murphy Oil shall disclose its relationship with the CTEH in all public communications regarding the CTEH. If the CTEH is not a governmental regulatory agency, Murphy Oil shall disclose that fact as well in all public communications involving the CTEH.

### 3. Claimant Intake Forms

Plaintiffs also object to the format and content of intake forms used by Murphy Oil to process claims from residents of St. Bernard Parish. When a claimant calls the toll-free number or visits one of Murphy Oil's settlement offices, the claimant is asked to complete an intake form, which asks questions regarding ownership of the property, and requests information regarding the claimant's insurance coverage. The form also asks whether the claimant will consent to testing on his or her property; however, the form also states that by signing it, the claimant consents to testing on his or her property. Plaintiffs argue that the form is misleading in a number of respects. The form seeks information on insurance coverage, ostensibly for proof of

ownership of the property, but Plaintiffs argue that this information could also be used to "low-ball" a claimant for settlement. Also, there is no disclaimer that this information could be used in future litigation. Plaintiffs also argue that the question regarding consent to testing is confusing, in that a claimant automatically consents to testing by signing the form. Again, there is no disclaimer that any information gathered during testing could be used in future litigation.

Murphy Oil argues that it requests insurance coverage from claimants for the same reason that FEMA and other government agencies have been requesting this information: insurance coverage is solid evidence of ownership. Murphy Oil alleges that the mortgage and conveyance office in St. Bernard Parish has been destroyed, and that it is difficult to establish ownership without this information. In addition, Murphy Oil contends that the consent to testing on the intake form is harmless, in that the testing itself is beneficial.

The Court finds that the intake form used by Murphy Oil can be misleading. If claimants wish to consent to testing of their properties, Murphy Oil should offer that option to them clearly because there could be evidentiary issues that arise from the testing. Accordingly, IT IS ORDERED that the final sentence of the intake form shall be deleted in all future versions of the form. This sentence reads, "By signing and returning this form you consent to testing on your property by environmental specialists hired by Murphy Oil Corporation."

### 4.    Settlement and Release Agreement

Plaintiffs also object to the template that Murphy Oil is using for settlement of claims. Plaintiffs argue that the Settlement and Release Agreement contains numerous waivers using technical legal language, and that a claimant or lay person would not understand the consequences of these waivers without independent legal advice. Moreover, Plaintiffs object to

-10-

Addendum A to the agreement, which Plaintiffs allege requires homeowners to remove their oil-damaged belongings and to gut their houses of drywall prior to Murphy Oil's cleanup of the properties. Plaintiffs argue that under Louisiana law Murphy Oil may have an absolute duty to cleanup the entire property, and that an agreement requiring a homeowner to cleanup these materials is premature. Defendants counter that the Agreement speaks for itself and is clear about what rights an individual is surrendering through settlement.

The Court considers the Settlement and Release Agreement to be a communication with a putative class member by Murphy Oil. As such, the Settlement and Release Agreement should contain a statement that the individual signing the agreement should seek independent legal advice prior to any settlement or waiver of his or her legal rights. This statement should be adequate to protect the interests of putative class members.

### III. Conclusion

Accordingly, the Plaintiffs' Motion to Supervise Ex Parte Communications should be and hereby is GRANTED IN PART. IT IS ORDERED that Defendant Murphy Oil shall begin any communication with a putative class member with the statement that the individual should consult with an attorney prior to any settlement or waiver of legal rights. Murphy Oil's settlement agreements with putative class members should also contain this statement. In addition, Murphy Oil shall not initiate contact with any individual who has not previously contacted Murphy Oil. The Defendant shall comply with Rule 4.2 of the Louisiana Rules of Professional Conduct and not communicate with persons already represented by counsel.

In addition, IT IS ORDERED that, if the Center for Toxicology and Environmental Health has been retained by Murphy Oil, Murphy Oil shall disclose that the CTEH is a paid

-11-

consultant of Murphy Oil in all public communications regarding the CTEH. If the CTEH is not a governmental regulatory agency, Murphy Oil shall disclose that fact as well in all public communications involving the CTEH.

Regarding the claimant intake forms used by Murphy Oil, IT IS ORDERED that the final sentence of the intake form shall be deleted in all future versions of the form. This sentence reads, "By signing and returning this form you consent to testing on your property by environmental specialists hired by Murphy Oil Corporation."

New Orleans, Louisiana, this /0 day of November, 2005.

UNITED STATES DISTRICT COURT

# EXHIBIT D

# KIRKLAND & ELLIS LLP

**AND AFFILIATED PARTNERSHIPS**

300 North LaSalle Street
Chicago, Illinois 60654

J. Andrew Langan, P.C.
To Call Writer Directly:
(312) 862-2064
andrew.langan@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

February 3, 2011

Gulf Coast Claims Facility
c/o Feinberg Rozen, LLP
The Willard Office Building
1455 Pennsylvania Avenue, NW
Suite 390
Washington, DC 20004-1008

Re:     MDL 2179 - February 2, 2011 Order by Judge Barbier

Dear Sirs:

At the request of BP Exploration & Production Inc., I am transmitting to the Gulf Coast Claims Facility a copy of the order of Judge Barbier dated February 2 in the MDL 2179 litigation. We specifically direct your attention to pages 13-14 including footnote 4 of the order. BP requests that you take appropriate steps to implement the directives of Judge Barbier in your management of the Gulf Coast Claims Facility. If you have any questions about this, we will arrange a discussion with an appropriate representative of BP. Thank you very much.

Sincerely,

J. Andrew Langan, P.C.

JAL/cs
Attachment

cc:     David B. Pitofsky

Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco      Shanghai      Washington, D.C.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | **MDL No. 2179** **SECTION J** |
| Applies to: *All Cases* | **JUDGE BARBIER** **MAGISTRATE SHUSHAN** |

## ORDER AND REASONS

Before the Court is Plaintiffs' **Motion to Supervise Ex Parte Communications with Putative Class (Rec. Doc. 912)**, as well as several responses including BP Defendants' **Opposition (Rec. Doc. 963)**, Plaintiffs' **Reply in Support (Rec. Doc. 1021)**, Plaintiffs' **Supplement (Rec. Doc. 1061)**, BP Defendants' **Supplemental Memorandum in Opposition (Rec. Doc. 1071)**, the State of Mississippi's **Statement of Interest (Rec. Doc. 1060 & 1085)**, the State of Louisiana's **Notice of Joinder in Motion to Supervise (Rec. Doc. 1091)**, and the State of Florida's **Statement of Interest (Rec. Doc. 1095)**.

## PROCEDURAL HISTORY AND BACKGROUND

This multi-district litigation consists of hundreds of consolidated cases, with thousands of claimants, presently pending before this Court. These cases arise from the April 20, 2010 explosion, fire and capsizing of the "Deepwater Horizon" mobile offshore drilling unit, which resulted in the release of millions of gallons of oil into the Gulf of Mexico before it was finally capped approximately three months later. The consolidated cases include claims for the death of eleven individuals, numerous claims for personal injury, and various claims for environmental and economic damages.

The Oil Pollution Act of 1990 ("OPA") requires BP, as the designated "responsible

party" for the Deepwater Horizon oil spill, to "establish a procedure for the payment or

settlement of claims for interim, short-term damages." 33 U.S.C. § 2705(a). In the initial months

after the casualty, BP began to directly receive and pay interim claims arising from the oil spill.

To assist in handling claims, BP contracted with one or more claims adjusting firms.

Subsequently, on June 16, 2010, the White House issued a Press Release announcing that an

"Independent Claims Facility" and a $20 billion escrow fund would be established by BP to

fulfill these and other legal obligations of the company. The Claims Facility was to be

responsible for developing and publishing standards for recoverable claims, under the authority

of Ken Feinberg, who would serve as an independent administrator. BP announced that effective

August 23, 2010, the Gulf Coast Claims Facility ("GCCF"), spearheaded by Mr. Feinberg and

his law firm, would replace the original BP claims process and perform BP's obligations under

OPA with respect to private economic loss claims. Although a formal Trust Agreement was

executed to establish the escrow fund, the nature of the relationship between BP and the GCCF

and Mr. Feinberg remains a disputed issue.

In their instant Motion, Plaintiffs request that the Court oversee or supervise

communications between the GCCF and putative class members to ensure that communications

are neither misleading nor confusing.

## PARTIES' ARGUMENTS

First, Plaintiffs argue that the GCCF is indistinguishable from BP–explaining, for example,

that BP created the GCCF, that BP still retains some level of control over the GCCF, and that the

GCCF is BP's agent for the purpose of satisfying BP's role as the "responsible party" under OPA.

Accordingly, Plaintiffs argue that the Court should require changes to the GCCF communications

2

that Plaintiffs perceive to be misleading and confusing. Specifically (in their most recent submission, Rec. Doc. 1061), Plaintiffs argue that the Court should order that BP Defendants, Mr. Feinberg, the GCCF, or their representatives:

- Refrain from contacting directly any claimant that BP and/or the GCCF knows or reasonably should know is represented by counsel, including, but not limited to, any person or entity who has filed a lawsuit or submitted a PPF, a Short-Form Joinder, a GCCF Claim, or a BP Claim that reflects representation by an attorney.

- Refrain from referring to the GCCF, Mr. Feinberg, or Feinberg Rozen, LLP (or their representatives), as "independent" or "neutral," and should further:

  - Affirmatively state (on the website, Release, and in all communications–written, oral, and electronic) that a lawyer of the claimant's choice should be consulted before accepting a final offer or signing a Release;

  - Affirmatively state that punitive damages (and/or additional damages) may be available in litigation, but are not being recognized or paid by the GCCF;

  - Affirmatively state (on the website, Release, and in all communications) that they cannot advise as to the value of the claim, merits of the claim, or any legal consequences of the settlement;

  - Affirmatively state (on the website, Release, and in all private and public communications) that Mr. Feinberg, Feinberg Rozen, LLP, and the GCCF are BP's agents in performing BP's statutory duties under the Oil Pollution Act of 1990;

  - Affirmatively advise claimants (on the website, Release, and in all communications) of the pendency of the MDL 2179 litigation, the availability of Short-Form Joinders (without the need of an attorney or the payment of a filing fee), and the existence of the Liability/Limitation/Test Case Trial in February 2012 in New Orleans;

  - Affirmatively advise (on the website, Release, and in all communications) the putative class and claimants that pro bono attorneys or community leaders retained to assist claimants in the GCCF process are being compensated directly or indirectly by BP, and are not "independent."

- Every communication with a putative class member should be prefaced to inform them of the above.

- Further if any communication, public or private, from the GCCF, Mr. Feinberg, or Feinberg Rozen, LLP purports to inform claimants/plaintiffs/putative class members of their right to seek relief from the Oil Spill Trust Fund, such communication shall also advise: (a) that they can also elect to seek relief in a court of law using a Short-Form Joinder in MDL 2179 that can be filed without an attorney and without the payment of a filing free; (b) that some damages or other remedies available in a court of law may not be available from the Oil Spill Trust Fund; (c) that the total funds available from the Oil Spill Trust Fund are limited; and (d) that the Coast Guard (not a court) may determine that they have not satisfied the Coast Guard's presentment requirements.

Plaintiffs maintain that this Court has the duty and the authority to protect members of the putative class, citing Federal Rule of Civil Procedure 23, Federal Rule of Civil Procedure 16, the Manual for Complex Litigation, and Turner v. Murphy Oil, No. 05-4206 (E.D. La. Nov. 14, 2005). Because MDL 2179 includes cases which were initiated as putative class actions, Plaintiffs argue that these proceedings are subject to Rule 23, which allows courts to issue orders "to protect class members and fairly conduct the action" and "impose conditions on represented parties." The Manual for Complex Litigation explains that "[t]he court must protect the interests of absent class members, and Rule 23(d) gives the judge broad administrative power to do so, reflecting the equity origins of class action" which includes the ability to "regulate communications with potential class members, even before certification." § 21, at 244, and § 21.12, at 247.

Plaintiffs also urge the Court to adopt analogous reasoning to that of Judge Fallon in Turner v. Murphy Oil, No. 05-4206 (E.D. La. Nov. 14, 2005) (Rec. Doc. 39). There, Judge Fallon decided to supervise communications between defendant Murphy Oil and the putative class members, concluding that Murphy Oil's communications with putative class members was commercial speech

not fully protected by the First Amendment (because defendant's economic interest in reducing litigation costs were involved). Accordingly, Judge Fallon ordered certain restrictions on communications by or on behalf of the defendant, Murphy Oil, including (1) the requirement that the Release contain language about seeking independent legal advice, (2) the requirement that Murphy Oil not initiate contact with any individual who had not previously contacted Murphy Oil, and (3) the requirement that Murphy Oil comply with Rule 4.2 of the Louisiana Rules of Professional Conduct and not communicate with persons already represented by counsel.

BP counters that Plaintiffs' requested relief contravenes the extra-judicial process statutorily mandated by OPA. Because Plaintiffs do not contend that they have exhausted the OPA's claims process (by fulfilling the presentment requirement), BP argues that Plaintiffs cannot bring a valid court action. Next, BP takes the position that Plaintiffs' requested relief is an unconstitutional prior restraint on speech protected by the First Amendment and authorized by OPA. Citing Bernard v. Gulf Oil Co., 619 F.2d 459, 473 (5th Cir. 1980), BP explains that prior restraints are justified only in "exceptional circumstances" and require a showing that judicial intervention is necessary to prevent "direct, immediate and irreparable harm," a standard BP contends Plaintiffs cannot meet. BP argues that Plaintiffs have not provided any evidence that putative class members misunderstood GCCF publications or felt coerced. BP also argues that Mr. Feinberg's and the GCCF's speech is non-commercial expression entitled to full protection under the First Amendment–as Mr. Feinberg and the GCCF are implementing public policy established by Congress and the President and are not acting on behalf of a client. BP draws a distinction between cases that Plaintiffs cite for the proposition that courts can interfere with communications to members of a putative class–in Plaintiffs' cases, defendants were in ongoing business relationships with the defendants; whereas,

5

the GCCF has had no prior relationship with claimants. Rather than monitor Mr. Feinberg's speech, BP urges Plaintiffs to exercise their own First Amendment rights–a step that BP explains Plaintiffs are already taking by airing their concerns through the local and national media.

Furthermore, BP maintains that Mr. Feinberg and the GCCF are independent decision-makers as to OPA claims. Although the GCCF is funded by BP and has a contract with BP, Feinberg Rozen, LLP makes OPA claims decisions subject to the legal parameters of OPA. BP insists that Mr. Feinberg is solely responsible for administering the GCCF, that he developed the protocols and Release, and that he does not report to BP. BP argues that these facts more than satisfy the definition of an independent contractor under Newcomb v. North East Ins. Co., 721 F.2d 1016, 1017 (5th Cir. 1983) (which provides that an independent contractor works according to his own methods and without direct supervision).

Additionally, BP insists that Plaintiffs seek a mandatory injunction directing speech by the GCCF on matters either already disclosed on the GCCF website and in its claims and releases or that, under BP's perspective, is clearly inappropriate or untrue. Specifically, BP points to GCCF materials that already inform claimants that: (1) if a claimant has an attorney, he or she should confer with the attorney before submitting a GCCF claim or signing a reslese; (2) the GCCF is not a law firm and does not give legal advice; (3) claimants have the right to be represented by lawyers of their own choosing; (4) Mr. Feinberg does not report to BP and BP does not control the GCCF in any way–the decisions of Mr. Feinberg are only subject to the GCCF limited appeal authority in the protocol for interim and final claims; and (5) the free legal services program is paid for by a pre-paid grant funded by BP.

6

## DISCUSSION

The Court has the responsibility to ensure that the mandates of OPA are implemented. A responsible party's use of a third party to fulfill its statutory obligations is not only consistent with the intent of OPA but also highly commendable if those claims can be resolved even more efficiently and fairly. The existence of the GCCF does, however, raise issues concerning both its role and its relationship to BP. Is the GCCF completely independent of BP and a neutral arbiter of claims? Is the GCCF actually BP or an agent of BP? Or, is the GCCF another type of hybrid mixture of the traditional plaintiff-defendant adversarial model of dispute resolution and the use of a third party?

OPA contemplates that the responsible party will "establish a procedure for the payment or settlement of claims for interim, short-term damages." 33 U.S.C. § 2705(a). If the responsible party decides to have a third party accomplish this obligation, the assumption is that the third party is an extension or agent of the responsible party–as was the situation prior to the creation of the GCCF when BP used claims-adjusting firms to handle claims. If, however, the responsible party decides that an "independent" and "neutral"or other hybrid entity is to fulfill its OPA claims obligation, it is incumbent on the responsible party to disclose the nature of its relationship to this entity and the precise role of the entity. Otherwise, the default assumption applies that the claims are being handled by the responsible party itself.

Full disclosure concerning the relationship between the responsible party and the third party acting in accordance with OPA is consistent with the policy underlying other court-overseen claims-resolution facilities–such as class actions or other settlement funds and bankruptcy trusts–and is consistent with the transparency policies of many defendants. The legitimacy of a third-party claims-resolution facility is derived in no small part from the claimants' ability to learn, comprehend, and

7

appreciate how that facility is operated so that the claimants can fully evaluate the rationale behind the communications made to them by the facility. Full disclosure and transparency can insure that the reality of the operation of a third party will be consistent with any publicity concerning that entity. Full disclosure can also give protection to the responsible party from possible future legal attacks on the validity of the evaluation, payment, and release of claims.

This Court encourages and commends any claims process that will fairly, quickly, and efficiently resolve claims in this litigation. Innovative and thoughtful procedures are to be encouraged. Those procedures must, however, be fully transparent so that claimants can evaluate them appropriately. The Court recognizes and appreciates the enormity of the undertaking of Mr. Feinberg and does not intend to impede or interfere with his ability to fairly and efficiently process claims.

### Mr. Feinberg, Feinberg Rozen, LLP and GCCF Are Not Fully "Independent" of BP

BP argues that since Feinberg Rozen, LLP is not providing legal advice to BP, they are not subject to the ethical rules restricting contact by lawyers with unrepresented persons. But, this argument misses the larger point. As the designated "responsible party" under OPA, it is BP's responsibility to "establish a procedure for the payment or settlement of claims for interim, short-term damages." 33 U.S.C. § 2705(a). To fulfill its statutory obligations, BP has created the GCCF, which is administered by Mr. Feinberg and his law firm, Feinberg Rozen, LLP. The fact that BP in this instance has chosen to delegate this responsibility cannot relieve BP of its statutory obligations.

After reviewing the facts and submissions by the parties, the Court finds that BP has created a hybrid entity, rather than one that is fully independent of BP. While BP may have delegated to Mr. Feinberg and the GCCF independence in the evaluation and payment of individual claims, many

8

other facts support a finding that the GCCF and Mr. Feinberg are not completely "neutral" or independent from BP. For example, Mr. Feinberg was appointed by BP,[1] without input from opposing claimants or the Plaintiffs' Steering Committee ("PSC"), and without an order from the Court.  Mr. Feinberg is not a true third-party neutral such as a mediator, arbitrator, or court-appointed special master.

BP pays Mr. Feinberg and his law firm a flat fee each month, pursuant to a written contract which outlines his duties and responsibilities in great detail. (Defs.' Br. Ex. 2A, "BP-Feinberg Contract.") This Contract is a private one between only BP and Feinberg Rozen, LLP–the United States is not a party to this Contract. Mr. Feinberg and Feinberg Rozen, LLP provide claim intake, claim review, claim evaluation and claim settlement and payment services. (See, e.g., id.; Pls.' Br. Ex. G at 15-18, "Mukasey Statement.")[2] BP decided the amount and manner in which it funded the GCCF through this trust agreement. (See Pls. Br. Ex. F, "Trust Agreement" at 1, ¶ 4; 19.) BP is given monthly reports regarding distributions made to GCCF beneficiaries (id. at 6, ¶ D.1), and Mr. Feinberg states that in administering the fund, the GCCF has no conflicts of interest (BP-Feinberg Agreement at 10-11); that it will hold all client information in confidence (id. at 3-5); that it cannot reveal any confidential information relating to the GCCF without giving BP prior notice so that BP can seek a protective order (id.); that all information gathered from claimants will be turned over

---

[1] It has been suggested by several non-PSC attorneys that Mr. Feinberg is a Presidential appointee and therefore a part of the Executive Branch. There is no evidence of such an appointment to support this contention. Apparently, Mr. Feinberg was initially selected by BP, with the approval of the White House, which then issued a Press Release announcing that an independent claims facility was being created, and would be run by Mr. Feinberg. This does not make Mr. Feinberg or the GCCF government agents.

[2] On October 2, 2010, Michael Mukasey, partner at Debevoise & Plimpton LLP, sent Mr. Feinberg a memorandum reviewing the compensation agreements between Feinberg Rozen, LLP and BP relating to the administration of the GCCF.

9

to BP, with no restrictions as to its use (id. at 7).

Additionally, the Contract provides that BP will "indemnify, defend, and hold harmless" Feinberg Rozen, LLP "from and against any and all threatened or commenced actions . . . that are threatened, asserted, brought, commenced, or sought by any person or entity . . . relating to or arising from the operation of the GCCF." (BP-Feinberg Contract at 2.) BP may choose to allow Feinberg Rozen, LLP to "use and access certain of its computers, equipment, furniture, [and] properties" (id. at 5), as well as "use and access certain facilities, properties, and offices owned or leased by BP" (id.). Under the Contract, BP retains the ability to audit Feinberg Rozen, LLP as long as the firm retains information about claimants. (Id. at 6.) In administering the GCCF, Feinberg Rozen, LLP agrees to comply with BP's Code of Conduct (id. at 7) and to refrain from subcontracting its obligations without prior written approval from BP (id. at 8).

Although the Contract has an expiration date of August 13, 2013, the Contract may be terminated earlier: by BP, if Feinberg Rozen, LLP materially breaches its obligations and fails to cure, if Feinberg Rozen, LLP breaches its fiduciary obligations, or if Feinberg Rozen, LLP ceases to devote substantial time to running the GCCF; and by Feinberg Rozen, LLP for any reason whatsoever. (Id. at 9-10.) The Contract also provides that Feinberg Rozen, LLP's fees will be evaluated after January 15, 2011, and that thereafter the parties will mutually agree on fees in advance of the first day of each successive quarter. (Id. at Ex. C.)

The GCCF is settling claims against BP under OPA, but also attempting to settle claims that fall outside of OPA, such as personal injury and death claims. (Id. at Ex. B, "Gulf Coast Claims Facility Protocol for Interim and Final Claims November 22, 2010," available at http://www.gulfcoastclaimsfacility.com/proto_4 (last visited Feb. 2, 2011).) In their releases of BP,

the GCCF requires claimants to release and assign all rights or claims not only against BP, but against any other potentially liable party. (Id.) Whether or not seeking such broad releases is appropriate, the GCCF is clearly acting to benefit BP in doing so. BP may appeal an award of the GCCF if it exceeds $500,000; appeals are decided by a three-judge panel and are binding only on BP. (Id.)

Under these circumstances, while Mr. Feinberg appears "independent" in the sense that BP does not control Mr. Feinberg's evaluation of individual claims,[3] Mr. Feinberg and the GCCF cannot be considered "neutral" or totally "independent" of BP.

## Supervision of Communications with Putative Class Members

BP is not only the designated OPA "responsible party," but also a primary Defendant in this MDL and the consolidated putative class actions. Even prior to certification of a class, this Court has both the inherent authority and the responsibility under Rule 23 to supervise or control certain communications with potential class members, especially those who are unrepresented by their own counsel. Manual for Complex Litigation § 21.12 (4th ed. 2004). If potential class members have received inaccurate, confusing or misleading communications, the Court may take action to cure the mis-communication and to prevent similar problems in the future. Id. This is long-established law:

> Misleading communications to class members concerning the litigation pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally.

---

[3] BP does retain some degree of control of payments from the GCCF fund, as evidenced by recent media reports that the GCCF was ordered by BP to pay a $10 million business claim which had never been reviewed by the GCCF for merit. 91,000 Gulf Oil Spill Claims, Just 1 Final Payment, Times Picayune, Jan. 31, 2011, available at http://www.nola.com/newsflash/index.ssf/story/91000-gulf-oil-spill-claims-just-1-final-payment/4fe693b a31fc4747afa8d5f39f84bb18 (last visited Feb. 2, 2011).

In re School Asbestos Litigation, 842 F.2d 671, 680 (3d Cir. 1988). This authority is consistent with

the First Amendment, as are many other controls on statements about litigation. See, e.g., Kleiner

v. First Nat'l Bank of Atlanta, 751 F.2d 1193, 1204-06 (11th Cir.1985); Hampton Hardware, Inc.

v. Cotter & Co., 156 F.R.D. 630 (N.D. Tex. 1994) (prohibiting defendant's letters to putative class

members regarding the litigation and possible financial costs to class members). In Kleiner, the

Eleventh Circuit explained that:

> In general, an order limiting communications regarding ongoing litigation between a class and class opponents will satisfy First Amendment concerns if it is grounded in good cause and issued with a "heightened sensitivity" for First Amendment concerns. In ascertaining the existence of good cause, four criteria are determinative: the severity and likelihood of the perceived harm; the precision with which the order is drawn; the availability of a less onerous alternative; and the duration of the order.

Id. at 1205-06 (internal citations omitted). Furthermore, the Kleiner court noted that district courts

are free to prohibit false or misleading speech by a defendant and may restrict a defendant from

using methods of speech that are inherently coercive or prone to abuse. Id. at 1204 & 1206.  BP

attempts to distinguish this line of cases by the fact that in several cases there was an ongoing

business relationship between the claimants and the defendant. In this case, OPA itself mandates that

claimants must first present their claims to BP as the responsible party, thereby requiring ongoing

contact between the parties.

    Because the Court finds that the hybrid role of Mr. Feinberg and the GCCF has led to

confusion and misunderstanding by claimants, especially those who are unrepresented by their own

counsel, the Court finds that certain precautions should be taken to protect the interests of

claimants–narrowly tailored in accordance with the First Amendment. Gulf Oil Co. v. Bernard, 452

U.S. 89, 101-02 (1981). The clear record in this case demonstrates that any claim of the GCCF's

12

neutrality and independence is misleading to putative class members and is a direct threat to this ongoing litigation, as claimants must sign a full release against all potential defendants before obtaining final payments. Compare In re School Asbestos Litigation, 842 F.2d at 683 (concluding that the district court was justified in imposing a disclosure requirement after finding that the communication was "misleading," and "may convince members of the plaintiff class to forego asbestos removal in their buildings"). For example, in this case Mr. Feinberg has been quoted on a number of occasions as publicly advising potential claimants that they do not need to hire a lawyer and will be much better off accepting what he offers rather than going to court. A full disclosure of the relationship between Mr. Feinberg, the GCCF, and BP will at least make transparent that it is BP's interests as the OPA responsible party that are being promoted.

The Court finds that not all of Plaintiffs' requested measures are appropriate or necessary, and will tailor a more narrowly focused remedy. The Court finds that the following precautions represent a narrowly-tailored approach, and that "an order any less restrictive would not effect the purposes of Rule 23." Hampton Hardware, 156 F.R.D. at 634. Further, the Court specifically finds that this will not unduly burden BP's, Mr. Feinberg's and the GCCF's ability to speak on their own behalf. "Communication can continue [with potential claimants], while the interests of putative class members in receiving independent information is protected." Turner v. Murphy Oil, No. 05-4206 at 8 (E.D. La. Nov. 14, 2005).

Accordingly, **IT IS ORDERED** that the Motion to Supervise Ex Parte Communications with Putative Class (Rec. Doc. 912) is **GRANTED IN PART**, as follows:

**IT IS ORDERED that Defendant BP, through its agents Ken Feinberg, Feinberg Rozen LLP, and the Gulf Coast Claims Facility, and any of their representatives, in any of their oral**

13

**or written communications[4] with claimants**, **shall:**

(1)  Refrain from contacting directly any claimant that they know or reasonably should know is represented by counsel, whether or not said claimant has filed a lawsuit or formal claim;

(2)  Refrain from referring to the GCCF, Ken Feinberg, or Feinberg Rozen, LLP (or their representatives), as "neutral" or completely "independent" from BP.  It should be clearly disclosed in all communications, whether written or oral, that said parties are acting for and on behalf of BP in fulfilling its statutory obligations as the "responsible party" under the Oil Pollution Act of 1990.

(3)  Begin any communication with a putative class member with the statement that the individual has a right to consult with an attorney of his/her own choosing prior to accepting any settlement or signing a release of legal rights.

(4)  Refrain from giving or purporting to give legal advice to unrepresented claimants, including advising that claimants should not hire a lawyer.

(5)  Fully disclose to claimants their options under OPA if they do not accept a final payment, including filing a claim in the pending MDL 2179 litigation.

(6)  Advise claimants that the "pro bono" attorneys and "community representatives" retained to assist GCCF claimants are being compensated directly or indirectly by BP.

Further, in light of the Court's responsibility to ensure full compliance with the Oil Pollution Act of 1990, and to address various additional concerns that have been raised,

**IT IS FURTHER ORDERED** that the parties shall submit additional briefing on the

---

[4] Including but not limited to websites, telephone scripts, personal contacts, release documents, correspondence, etc.

14

question of whether and how BP as the responsible party is fully complying with the mandates of OPA, for example, in the processing of claims for "interim, short-term damages," or "final damages," methodologies for evaluation of claims, and the release forms required of claimants.  Said briefing shall be filed not later than February 11, 2011.

      New Orleans, Louisiana, this 2nd day of February, 2011.

**CARL J. BARBIER**
**United States District Judge**
