## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig        MDL No. 2179
    "Deepwater Horizon" in the Gulf
    of Mexico, on April 20, 2010       SECTION J

Applies to: *All Cases*                 JUDGE BARBIER

                                     MAGISTRATE SHUSHAN


## BRIEF *AMICUS CURIAE* OF KENNETH R. FEINBERG AS CLAIMS ADMINISTRATOR OF THE GULF COAST CLAIMS FACILITY IN RESPONSE TO REQUEST FOR BRIEFING ON CLAIMS PROCESSING ISSUES


William F. Sheehan              David B. Pitofsky
Christiaan H. Highsmith        GOODWIN PROCTER LLP
GOODWIN PROCTER LLP         The New York Times Building
901 New York Avenue, NW       620 Eighth Avenue
Washington, DC 20001-4432     New York, NY 10018-1405
(202) 346-4000                (212) 813-8800


*Counsel for Kenneth R. Feinberg as Claims*
*Administrator of the Gulf Coast Claims Facility*

___Fee _____
___Process _____
_X_ Dktd _____
___CtRmDep _____
___Doc. No._____

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alexander v. Sandoval,*
    532 U.S. 275 (2001)......................................................................................................4, 6

*Bernard v. Gulf Oil Co.,*
    619 F.2d 459 (5th Cir. 1980) ...........................................................................................6

*Blessing v. Freestone,*
    520 U.S. 329 (1997).........................................................................................................5

*Boca Ciega Hotel, Inc. v. Bouchard Trans. Co.,*
    51 F.3d 235 ..............................................................................................................4, 22

*Casas v. American Airlines, Inc.,*
    304 F.3d 517 (5th Cir. 2002) .......................................................................................3, 4

*Cort v. Ash,*
    422 U.S. 66 (1975)......................................................................................................3, 4

*Davis v. Huskipower Outdoor Equipment Corp.,*
    936 F.2d 193 (5th Cir. 1991) .........................................................................................23

*Diabo v. Delisle,*
    500 F.Supp.2d 159 (N.D.N.Y. 2007)...............................................................................8

*In re Baldwin-United Corp.,*
    770 F.2d 328 (2d Cir. 1985)............................................................................................6

*Johnson v. Colonial Pipeline Company,*
    830 F. Supp. 309 (E.D. Va. 1993) .............................................................................4, 17

*Kleiner v. The First Nat'l Bank of Atlanta,*
    751 F.2d 1193 (11th Cir. 1985) ......................................................................................6

*Larach & Great Am. Corp. v. Standard Chartered Bank Int'l.,*
    724 F. Supp. 2d 1228 (S.D. Fla. 2010) ...........................................................................3

*Robin v. Binion,*
    469 F.Supp.2d 375 (W.D. La. 2007)..............................................................................23

*Suter v. Artist M,*
    503 U.S. 347 (1992)........................................................................................................5

*Till v. Unifirst Federal Sav. & Loan Ass'n,*
    653 F.2d 152 (5th Cir. 1981) ..........................................................................................3

*Touche Ross & Company v. Redington,*
   442 U.S. 560 (1979)......................................................................................................3

*Wright v. Allstate Insurance Co.,*
   500 F.3d 390 (5th Cir. 2007) ........................................................................................4

# TABLE OF CONTENTS

**Page**

**I. NEITHER OPA NOR ANY OTHER STATUTE OR RULE EMPOWERS A COURT TO REGULATE AN OPA CLAIMS PROCESS. ...........................2**

    A.    OPA Contains No Express Or Implied Cause Of Action For a Claim That a Responsible Party Has Adopted Improper Procedures, Methodologies, Or Releases. ....................................................................................................2

    B.    Rule 23 Gives a Court No Power To Regulate an OPA Claims Process.................6

    C.    Congress, the Federal Government, and the Attorneys General of the Gulf States, Among Others, Amply Monitor the GCCF Claims Process. .......................6

    D.    Summary. ...............................................................................................................7

**II. THE GCCF COMPLIES FULLY WITH OPA. ............................................................8**

    A.    The GCCF's Processing Of Claims Complies With OPA.......................................9

        1.    The procedures themselves ....................................................................... 9

        2.    Staffing.................................................................................................... 13

        3.    Transparency ........................................................................................... 14

        4.    Summary ................................................................................................. 16

    B.    The GCCF's Methodologies For Evaluating Claims Comply With OPA.............17

    C.    The GCCF Release Form Complies With OPA. ..................................................18

        1.    Settlements include releases .................................................................... 21

        2.    The Coast Guard requires a release ......................................................... 22

        3.    Given the structure of OPA, less than a full release would not result in the legislatively intended and judicially beneficial result of finality................................................................................................... 22

## Introduction

Kenneth R. Feinberg submits this brief *amicus curiae* as the Claims Administrator of the Gulf Coast Claims Facility (the "GCCF") in response to the Court's Order of February 2, 2011, which directed the parties to submit additional briefing "on the question of whether and how BP as the responsible party is fully complying with the mandates of OPA [the Oil Pollution Act of 1990], for example, in the processing of claims for 'interim, short-term damages,' or 'final damages,' methodologies for evaluation of claims, and the release forms required of claimants." Order and Reasons at 14-15 (Feb. 2, 2011).

Neither Mr. Feinberg nor the GCCF is a party herein but, as the Court noted (*id.* at 8), BP delegated to Mr. Feinberg, acting through the GCCF, its responsibility under OPA to establish a procedure for the consideration and payment of certain claims arising from the Deepwater Horizon oil spill, and Mr. Feinberg as the GCCF Claims Administrator, having created the procedures for the submission and receipt of those claims, as well as the methodologies for evaluating them and the pertinent release form, is particularly well-equipped to address the issues on which the Court has requested supplemental briefing. Accordingly, Mr. Feinberg respectfully submits this brief in the hope that it will aid the Court in its administration of this multi-district litigation.

## Discussion

The procedures and processes the GCCF has adopted for considering and paying claims arising out of the Deepwater Horizon oil spill have gone far beyond anything OPA requires, and the openness and transparency with which the GCCF has conducted itself is unparalleled in the history of the statute and nothing short of extraordinary. We make these points in greater detail in Part II below, addressing the GCCF's processing of claims, its methodologies for evaluating them, and the release form required of certain claimants. The facts regarding the GCCF's performance show that it should be the ideal against which future, large-scale OPA claims

1

handling should be measured.  First, however, this brief considers the Court's potential sources

of authority for regulating the GCCF's procedures, methodologies, and form of releases.

**I.**

**NEITHER OPA NOR ANY OTHER STATUTE OR RULE
EMPOWERS A COURT TO REGULATE AN OPA CLAIMS PROCESS.**

No complaint before the Court asserts any violation of any provision of OPA,[1] and no

plaintiff *could* assert a claim under OPA alleging unlawful claims procedures, methodologies, or

releases because OPA creates no private right of action for that claim.  Nor does the authority

conferred on courts by Federal Rule of Civil Procedure 23 to oversee communications between a

defendant and purported class members give a court power to oversee an OPA claims process.

Accordingly, we have found no legal basis for a court to exercise authority to prescribe the

procedures, methodologies, or releases a responsible party, or a party to whom it delegates its

claims processing responsibilities, must adopt under OPA.

> **A.**      **OPA Contains No Express Or Implied Cause Of Action For a Claim That a
> Responsible Party Has Adopted Improper Procedures, Methodologies, Or
> Releases.**

OPA contains several express provisions creating causes of action.[2]  No language in the

statute, however, creates a cause of action on behalf of anyone who asserts that the responsible

party has established an improper procedure for considering claims, or an improper methodology

for evaluating them, or an improper form of release.  Indeed, the Act provides no cause of action

even for the *denial* of a claim by a responsible party, regardless of how unfair or unjustified the

denial is alleged to have been.  Instead, Section 2713 provides that, where a claim has been fully

---

[1]     For example, the Bundle B1 and B3 Master Complaints filed on December 15, 2010 allege liability for damages
caused by the spill under § 2702 of OPA.  The Bundle D1 Master Complaint, also filed on that date and seeking
injunctive relief, asserts no claim under OPA.  The B1 and B3 Complaints allege (in ¶ 611 and ¶ 200) that
plaintiffs have complied or will comply with the OPA requirement that they present their claims first to BP.
But no claim exists that BP has violated any OPA mandate.

[2]     *See* OPA §§ 2702 (damages), 2707 (recovery by foreign plaintiffs), 2708 (recovery by responsible parties),
2713(c ) (election of remedies), 2706 (recovery of natural resources damages by certain persons), and 2717(a)
(judicial review for certain regulated parties).

2

denied or not settled within 90 days after it was presented to the responsible party, the claimant

has a choice of suing for damages in court or seeking recovery against the Oil Spill Recovery

Fund administered by the U.S. Coast Guard.  If the denial of a claim, no matter what the reason,

is not judicially reviewable, it is hard so see how Congress could have intended to create a cause

of action on behalf of anyone asserting that a responsible party has failed to establish a proper

claims procedure, or was using improper methods for resolving claims, or had adopted an

improper form of release.

 Given the absence of any language in the Act creating a cause of action, a prospective

plaintiff would bear "the relatively heavy burden of demonstrating that Congress affirmatively

contemplated private enforcement when it passed the statute.  In other words, he must overcome

the familiar presumption that Congress did not intend to create a private right of action."

*Casas v. American Airlines, Inc.*, 304 F.3d 517, 521-22 (5th Cir. 2002) (citing *Louisiana*

*Landmarks Society, Inc. v. City of New Orleans*, 85 F.3d 1119, 1123 (5th Cir. 1996)).

 *Cort v. Ash*, 422 U.S. 66 (1975), sets out the four-factor test for determining whether a

federal statute implies a right of action.[3]  *Touche Ross & Company v. Redington*, 442 U.S. 560,

568 (1979), then effectively focused the *Cort* analysis "down to one 'central inquiry' of

determining congressional intent.  The question is one of statutory interpretation, and a court's

'task is limited solely to determining whether Congress intended to create [a] private right of

action.'"  *Larach & Great Am. Corp. v. Standard Chartered Bank Int'l.*, 724 F. Supp. 2d 1228,

1234 (S.D. Fla. 2010) (quoting *Touche Ross*, 442 U.S. at 568); see also *Casas, supra*, 304 F.3d at

522 ("The touchstone of the *Cort* analysis is its second factor:  Congressional intent."); *Wright v.*

*Allstate Insurance Co.*, 500 F.3d 390, 395 (5th Cir. 2007) ("Cases subsequent to *Cort* have

---

[3] They are:  "(1) whether the plaintiff is one of a class for whose especial benefit the statute was enacted;
(2) whether there is an indication of legislative intent to create or deny such a remedy; (3) whether such a
remedy would be inconsistent with the underlying legislative purpose; and (4) whether the cause of action is
traditionally relegated to state law."  *Till v. Unifirst Federal Sav. & Loan Ass'n*, 653 F.2d 152, 157 (5th Cir.
1981) (citing *Cort*, 422 U.S. at 78).

recognized that all four factors may be important, but the determinative question is whether Congress intended to create a private right of action in favor of the plaintiff.").

Here, both the statute on its face and its legislative history reveal no intent to create a cause of action on behalf of a plaintiff unhappy with a responsible party's claim procedures, methodology, or release. That silence would be fatal to any would-be plaintiff's claim because "affirmative evidence of congressional intent must be provided *for* an implied remedy, not against it." *Alexander v. Sandoval*, 532 U.S. 275, 293 n.8 (2001) (emphasis in original). No plaintiff could point to anything in the statutory language or its legislative history that could remotely be described as an affirmative indication of a congressional intent to create a cause of action under OPA regarding a responsible party's claims procedures, methodologies, or releases.

Moreover, Congress's express authorization of causes of action elsewhere in the statute (see note 2, *supra*) adds force to the conclusion that it did not intent to create enforceable rights to specific procedures, methodologies, or releases. *See Wright, supra*, 500 F.3d at 397 ("That Congress expressly authorized private causes of action in other sections of the [Act] weighs against Wright's theory that Congress implicitly intended the courts to fashion additional causes of action."). Quite to the contrary, Congress clearly intended the OPA presentment requirement and the responsible party claims process to function as a form of alternative dispute resolution that would *minimize* the involvement of the judiciary.[4]

Finally, there are no standards in the statutory language or the legislative history to guide a court in enforcing an implied private right of action under OPA. *Cf. Suter v. Artist M*, 503 U.S.

---

[4]    *See Boca Ciega Hotel, Inc. v. Bouchard Trans. Co.*, 51 F.3d 235, 240 (11th Cir. 1995 (OPA reflects "a congressional desire to encourage settlement and avoid litigation.") (citing 135 Cong. Rec. at H7962, 7965 (statements of Rep. Hammerschmidt ["The system of liability and compensation * * * is intended to allow for quick and complete payment of reasonable claims without resort to cumbersome litigation."] and Rep. Lent ["The thrust of this legislation is to eliminate, to the extent possible, the need for an injured person to seek recourse through the litigation process, which – as we all know – can take years."]; *Johnson v. Colonial Pipeline Company*, 830 F. Supp. 309, 310-11 (E.D. Va. 1993) ("The purpose of the claim presentation procedure is to promote settlement and avoid litigation.").

347, 359-60 (1992) (refusing to recognize a private cause of action to enforce state welfare agencies to make "reasonable efforts" to prevent a child from being removed from the home even though the Adoption Assistance and Child Welfare Act requires participating states to provide a plan including such "reasonable efforts," because *inter alia* "no further statutory guidance was given as to how to measure 'reasonable efforts.'"); *see also Blessing v. Freestone*, 520 U.S. 329, 345 (1997) (children entitled to receive support from the states under the Social Security Act had no enforceable right to require the states to ensure the statutorily required "sufficient staff" to fulfill specified functions because neither the statute nor its implementing regulations provided any guidance on how large a staff would be "sufficient" and therefore "[e]nforcement of such an undefined standard would certainly 'strain judicial competence.'").

In this case, because OPA only mandates an undefined claims process, and provides for a judicial alternative only where a settlement is not reached within a defined period, to proscribe particular claims procedures, methodologies, or releases would "strain judicial competence." *See id.* The Court would essentially be prescribing, without any reference to any standard established by Congress, its own subjective preferences – a point that will become vivid as the Court reviews, in Part II below, the myriad of issues that arise in creating a claims process of the size of the GCCF, and in weighing the competing claims for fairness advanced by different stakeholders in the process.[5]

In sum, neither OPA nor its legislative history reveals any congressional intent to create a private remedy to enforce certain procedures, methodologies, or release forms, and therefore "a

---

[5] One State Attorney General, for example, reviewing an early draft of a GCCF protocol, submitted a 16-point recommendation for the GCCF claims process, including recommendations relating to the number of claims handlers, the review and approval of claims forms by each of the Gulf State Attorneys General, the announcement of the wait time for the next available claims assistant receiving telephonic claims, the availability of translators, the availability of claims managers at each claim center, the availability of "online 'chat' mechanisms," the appropriate forms of documenting income loss, compensation for the time and expense of submitting claims, and monitoring by a panel appointed by the Attorneys General.  While GCCF incorporated many of these recommendations into the final draft of the protocol, OPA contains no standard for judging the suitability (much less the mandatory nature) of any of them.

cause of action does not exist and courts may not create one." *Alexander v. Sandoval*, 532 U.S. at 286-87.

**B.**    **Rule 23 Gives a Court No Power To Regulate an OPA Claims Process.**

The Manual for Complex Litigation states that a court's power under Rule 23(d) of the Federal Rules of Civil Procedure, governing class actions, includes the power to "regulate communications with potential class members, even before certification." Manual for Complex Litigation §§ 21, 21.12 (4th ed. 2004). While the scope of a court's power to regulate such communications consistent with a defendant's First Amendment rights may be unsettled,[6] Rule 23(d) is clearly not a general grant of judicial power over defendants in class actions. The Plaintiffs themselves styled their motion in this action as one "To Supervise *Ex Parte* Communications Between BP Defendants And Putative Class Members," not to supervise the claims process itself. No court in any case of which we are aware has ever cited Rule 23 as conferring authority to oversee and regulate a party's compliance with a federal statute. *Cf. In re Baldwin-United Corp.*, 770 F.2d 328, 334 (2d Cir. 1985) (Rule 23(d) "is a rule of procedure and creates no substantive rights or remedies enforceable in federal court") (citing *Piambino v. Bailey*, 610 F.2d 1306, 1331 (5th Cir. 1980).

Accordingly, Rule 23 does not confer on a court authority to regulate the OPA claims procedure – especially when nothing in OPA itself confers authority on a court to do so.

**C.**    **Congress, the Federal Government, and the Governors and Attorneys General of the Gulf States, Among Others, Amply Monitor the GCCF Claims Process.**

No one suggests that Mr. Feinberg should not be held publicly accountable for his work as GCCF Claims Administrator, nor that he need not be vigilant about soliciting, welcoming, and incorporating recommendations regarding possible enhancements to the GCCF's protocols and

---

[6]    *Compare Bernard v. Gulf Oil Co.*, 619 F.2d 459 (5th Cir. 1980) (striking down Rule 23 order as an unconstitutional prior restraint), *with Kleiner v. The First Nat'l Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985) (rejecting First Amendment objection to Rule 23 order).

procedures. Indeed, as set forth in detail in the accompanying Declaration of Kenneth R.

Feinberg ("Feinberg Decl."), Mr. Feinberg's work in connection with his administration of the

GCCF has been and continues to be actively monitored by, among others, multiple committees

of the United States Congress, the Department of Justice, the National Pollution Funds Center

("NPFC") of the United States Coast Guard,[7] and the Governors and Attorneys General of the

five Gulf States. *See* Feinberg Decl. ¶¶ 19-20.[8]  Mr. Feinberg has sought input from each of

these governmental constituencies and from various claimant advocacy groups, has consistently

provided them with notice and an opportunity to comment on important facets of the GCCF

process, and has regularly incorporated suggestions from each about how to enhance the GCCF's

performance. *Id.* at ¶¶ 13-22.

### D.    Summary.

OPA creates no judicially-enforceable rights to any particular claims procedure,

methodology, or release, and Federal Rule 23 cannot be read to fill an OPA gap and empower a

court to regulate an OPA claims process. If a court were to undertake to prescribe OPA's

procedures, methodology, and form of release, it would in all practical and legal respects be

acting as though it were an administrative agency charged with fleshing out a statute through

notice-and-comment rulemaking. That constitutionally-prohibited delegation of legislative

---

[7]  Appropriately, the GCCF has probably communicated with the NPFC more than any other governmental agency or body. *See* Feinberg Decl. ¶ 20.

[8]  Mr. Feinberg, and others working on the GCCF project, have personally met with numerous Federal, State and local elected officials, including but not limited to Senator Thad Cochran (Mississippi), Senator Thomas R. Carper (Delaware), Senator Mary Landrieu (Louisiana), Senator Bill Nelson (Florida), Senator Jeff Sessions (Alabama), Senator Richard Shelby (Alabama), Senator David Vitter (Louisiana), Senator Roger Wicker (Mississippi), Governor Haley Barbour (Mississippi), Governor Robert Bentley (Alabama), Governor Rick Scott (Florida), former Governor Charlie Crist (Florida), former Governor Bob Riley (Alabama), Congressman Jo Bonner (Alabama), Congressman Jeff Landry (Louisiana), Congressman Steven Palazzo (Mississippi), Congressman Cedric Richmond (Louisiana), Congressman Steve Scalise (Louisiana), Attorney General Pam Bondi (Florida), Attorney General Buddy Caldwell (Louisiana), Attorney General Jim Hood (Mississippi), Attorney General Luther Strange (Alabama), former Attorney General Troy King (Alabama), former Attorney General Bill McCollum (Florida), Mayor Tony Kennon (Orange Beach, Alabama), Mayor Robert Craft (Gulf Shores, Alabama), Mayor John Koniar (Foley, Alabama), Councilmember Kristen Gisleson Palmer (New Orleans, Louisiana), multiple New Orleans parish presidents and many other local elected officials throughout the Gulf States. *See* Feinberg Decl. ¶ 19(b).

power to the judiciary would be doubly inappropriate here, where the agency actually charged with implementing OPA, the Coast Guard, has elected not to prescribe any rules governing a responsible party's claims procedures or decision making or releases; on the contrary, it has left those matters to the responsible party.[9]

Hence, we respectfully submit that the Court must acknowledge that it has neither the responsibility in this case, nor the authority, to ensure that the GCCF is implementing the mandates of OPA.[10]

## II.
## THE GCCF COMPLIES FULLY WITH OPA.

If the Court disagrees with what we have said so far, and undertakes to review the GCCF's procedures, methodologies, and release, it will find that the GCCF is faithfully observing – and indeed substantially exceeding – all of OPA's requirements.

With respect to the issues on which the Court has directed further briefing – the processing of claims, methods for evaluating them, and releases – OPA *has no mandates*. Its one express command relevant to these issues is that "[t]he responsible party shall establish a procedure for the payment or settlement of claims for interim, short-term damages." 33 U.S.C. § 2705(a). Indeed, the Act even lacks an express requirement for the establishment of procedures for the payment or settlement of final claims, even though it is clearly contemplated by the

---

[9]   The Coast Guard has published a guide for submitting claims to the Oil Spill Liability Trust Fund (discussed *infra*). National Pollution Funds Center, Claimant's Guide, A Compliance Guide for Submitting Claims Under the Oil Pollution Act of 1990 (April 2003) (Updated Nov. 2009), available at http://www.uscg.mil/npfc/claims/ claims_docs.asp. It refers to OPA's presentment requirement and advises claimants to submit their claims first to the responsible party ("RP"). It then states: "This guide does not address procedures for submitting claims to the RP. The RP must establish and advertise those procedures." *Id.* at 4. No other Coast Guard regulation says anything about the procedures to be adopted by the responsible party.

[10]  Apart from the legal restraints just discussed, as a practical matter the Court should not get involved in the OPA claims settlement process because courts are vigilant in distancing themselves from settlement discussions or structuring in cases in which they are the ultimate decision maker. *See, e.g.,* Indianapolis Fruit Co., Inc. v. SCI, Inc., No. 3:08-CV-46-TS, 2008 WL 2626671, at *2 (N.D. Ind. June 26, 2008) ("This Court is generally not … involved in settlement agreements. Those are private contracts between parties."); *Diabo v. Delisle,* 500 F.Supp.2d 159, 166 (N.D.N.Y. 2007) ("Because a determination on the merits was to be made in this case, the Court was not involved in settlement negotiations.").

statute, as reflected in its many provisions that refer to final claims.[11]  It says nothing about the *kind* of procedures or methodologies a responsible party should adopt for resolving *any* claim, interim or final.  And it says nothing about releases.

Because OPA is silent, a responsible party is left to establish its own procedures.  Congress' approach was wise, given the wide variety of possible oil spill scenarios and the accordingly disparate procedural approaches that might be warranted.

**A.    The GCCF's Processing Of Claims Complies With OPA.**

The procedures adopted by the GCCF, set out at length on the GCCF's website[12] and in literature widely distributed to potential claimants and available at the 35 GCCF claims sites throughout the Gulf States, have been a matter of public record for many months.  Their consideration and promulgation were accompanied by a public, open, and transparent effort by Mr. Feinberg to consult with potential claimants, their communities, and their governmental representatives.  The procedures themselves are eminently reasonable, practical, and highly accommodating and generous to claimants.

**1.    The procedures themselves.**  Beginning on August 23, 2010, the day the GCCF opened, the GCCF provided the Emergency Advance Payment ("EAP") program, which allowed claimants to receive emergency relief payments with a minimum of substantiating documentation.  *See* Feinberg Decl., ¶¶ 24-28.  As its name indicates, an EAP is an advance on a claimant's Final Payment.  Claimants had the ability to request either multiple EAPs or a single payment representing six months of losses.  The GCCF paid approximately 170,000 EAP Claims totaling about $2.57 billion, for which no releases were required.  *See id.* ¶¶ 27-28.  While some

---

[11]    *See* OPA §§ 2713(a) ("Claims procedure:  …  [A]ll claims for removal costs or damages shall be presented first to the responsible party…."), 2713(d) and 2715(b)(1) (referring to a claim against the Fund for "short-term damages representing less than the full amount of damages to which the claimant may ultimately be entitled"), and 2715(b)(2) ("Subrogation; … Final Damages:  … Payment of such a claim [for interim damages] shall not foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled….").

[12]    www.gulfcoastclaimsfacility.com.

have suggested that the GCCF has failed to expeditiously process "interim, short-term claims" under OPA, this critique fails to recognize that the EAP program *was an interim claims process* that was designed to respond expeditiously to the nature of the circumstances and the massive number of claimants seeking emergency relief.  The Gulf Coast Claims Facility Protocol for Emergency Advance Payments expressly stated that "[a] claim for an Emergency Advance Payment is an interim claim under OPA."  See *id.* ¶ 24, n.1 (and Exhibit A thereto).[13]

After the close of the EAP program, individuals and businesses had the option of filing an Interim Claim and/or Final Claim.[14]  An Interim Claim may seek only past, substantiated damages.  A claimant seeking an Interim Payment is not required to execute a release.  Claimants may submit Interim Claims every calendar quarter (or more frequently than once per quarter if exigent circumstances are shown) until the end of the GCCF program on August 22, 2013.[15]  The option to file multiple Interim Claims is available to claimants who prefer to see what actual damages they incur over the life of the GCCF program, as opposed to accepting in the near term a final, lump-sum payment based on an estimate of future damages.[16]

It has been asserted that the GCCF has made statements designed to coerce claimants into not pursuing Interim Claims,[17] but the statements at issue simply explain the potential effect of the future damages estimates on the calculation of final, lump-sum payments.  For example, the GCCF has explained:

---

[13]   The State of Mississippi has asserted to this Court that the GCCF is violating OPA by failing to implement a process for the payment of interim claims.  *See* Mem. of Authorities in Support of Statement of Interest on Behalf of the State of Mississippi, filed Feb. 2, 1011, at 5-7.  In the same brief, however, it expressly acknowledges that "[f]ootnote 1 of the Emergency Advance Payment Protocol . . . expressly states that "[a] claim for an Emergency Advance Payment is an interim claim under OPA."  *Id.* at 7, n.3.

[14]   Claimants have been able to submit a Final Claim at any point in the program.

[15]   After August 22, 2013, BP will receive claims as required by OPA.

[16]   Indeed, the GCCF has clearly stated that "[*i]f any claimant believes that the future of the Gulf continues to be uncertain and is not yet prepared to file a Final Claim, that Claimant may continue to file Interim Claims with the GCCF.*"  *See* Feinberg Decl., Exhibit C, p. 6 (emphasis in original).

[17]   *See* Mem. of Authorities in Support of Statement of Interest on Behalf of the State Of Mississippi, filed Feb. 2, 1011, at 13-14.

> The future losses factor [used to calculate final, lump-sum payments], as determined by the GCCF, may be modified going forward as more information becomes available about the future of the Gulf Coast economy.  It is, therefore, entirely possible that the future losses factor for determining the future impact of the Oil Spill in the Gulf will be increased or reduced as more information becomes available.  Claimants should take this possibility into account in deciding whether to file an Interim Claim or a Final Claim.[18]

Thus, statements by the GCCF that future final, lump-sum payments may be lower if a determination is made that conditions in and around the Gulf are improving – warranting lower future loss estimates – are not coercive but are instead accurate statements of fact intended to assist claimants in understanding the potential risks and benefits of the claim options available to them.

A Final Payment claim can seek both past and future damages.[19]  The GCCF provides two options for Final Payment claims, both of which require the claimant to sign a release.  The first is a Quick Payment Final Claim, which provides the option to any claimant who has been paid an EAP or an Interim Payment to receive an additional $5,000 per eligible individual or $25,000 per eligible business without additional documentation.[20]  As explained by Mr. Feinberg in his Declaration, he designed this option – which is not required by OPA – to address the needs of those claimants who are satisfied with the EAP compensation they received and/or who lack further documentation to support additional claims.  *Id.* ¶ 33.  The GCCF currently has under review 52,271 Interim Claims and 89,860  Full Review Final Claims.  *Id.* ¶ 37.  The Quick Payment Final Claim option was created to allow claimants the opportunity, if they choose, to expedite and finally resolve claims with which they are satisfied or which they cannot further

---

[18]   *See* Feinberg Decl., Exhibit C, p. 7.

[19]   *See* Summary Of Options For Submission Of Final And Interim Payment Claims, at 1.

[20]   Quick Payment Final Claims may be submitted at any time before August 22, 2013. As of February 16, 2011, 92,557 individuals and businesses have taken advantage of this option, and received a total of $819,255,000. *See* Feinberg Decl. at ¶ 34.

document.  Claimants receive Quick Payments within 14 days of the receipt of the signed release by the GCCF.  *Id.* ¶ 35.

Some have suggested that the GCCF is purposefully delaying the processing of Interim Claims with the intent of coercing claimants into taking Quick Payments.  This speculation is false (*see id.* ¶ 31) , and is made without factual support of any kind.  The size of the GCCF program, the need to maintain consistency in the payment of claims, and Mr. Feinberg's unwavering commitment to transparency (which recently included providing all stakeholders with a two-week public comment period on the payment options, eligibility and substantiation criteria and final payment methodology that will apply to the next phase of the claims process) inevitably impacts the speed with which payments can be made; however, the opportunity that stakeholders have had to comment on the protocol dealing with Interim Claims has been necessary and appropriate to ensure the efficacy and fairness of the process, and the Quick Payment option has proven to be an enormously beneficial option to the tens of thousands of claimants who have chosen to receive expeditious payment of their claims.

The second Final Payment option is the Full Review Final Payment Claim, which covers all past and future losses or injuries and requires the claimant to submit both the claim form and supporting documents.  The GCCF will rely upon the documentation the claimant submits and analyses and documentation provided to the GCCF by its experts retained to determine the proper amount of damages.  Claimants may choose this option at any time before August 22, 2013, even if they previously submitted a claim for and received one or more Interim Payments or an EAP from the GCCF. See *id.* ¶ 35.[21]

---

[21]    It has been asserted that the GCCF is violating OPA by not paying interest to claimants to under OPA.  *See*
        Mem. of Authorities in Support of Statement of Interest on Behalf of the State Of Mississippi, filed Feb. 2,
        1011, at 4.  In fact, the GCCG has been calculating interest and intends to pay interest to claimants to whom
        interest is due by the end of the first quarter of 2011.  *See* Feinberg Decl. ¶ 35.

The GCCF has established a voluntary appeal procedure for Final Payment determinations – another feature that benefits claimants but is not required by OPA, and that was adopted based on a recommendation received after the GCCF protocol was distributed in draft for review. Among other things, a claimant may appeal the GCCF's Final Claim determination if the total monetary award exceeds $250,000; BP may appeal if the total monetary award exceeds $500,000. Appeals are decided by a three-judge panel and are binding only on BP; a claimant dissatisfied with the appeal decision may reject the GCCF's determination and pursue the claim in the courts or with the Coast Guard.

**2.    Staffing.** OPA says nothing about staffing. The Court may be reassured, however, that the GCCF claims procedure is administered by a phalanx of overseers, front-line claims handlers, reviewers, and other personnel hired to handle the vast number of claims and inquiries that the GCCF receives on a daily basis. The GCCF operates 35 claims sites throughout the States of Louisiana, Alabama, Mississippi, Florida and Texas. In 25 claim sites, Spanish-language translators are available to assist claimants; in 15, Vietnamese translators are available; in one, a Khmer translator is available. See *id.* ¶ 10. Moreover:

> – Subcontractor Brown Greer employs 800 persons devoted to this program, working in three shifts seven days a week. The Brown Greer staff includes software application developers, programmers, claims reviewers, senior claims analysts and lawyers who conduct the first round of eligibility review and quality control reviews on claims.

> – Subcontractor The Garden City Group employs approximately 1,500 people responsible for responding to hundreds of thousands of claimant calls, electronic claims intake, receipt and management of all data, programming, staffing the 1-800 call center, data processing, document control and payment processing.

> – Subcontractor The Worley Company employs approximately 800 people responsible for staffing the 35 claims offices located throughout the five state Gulf region assisting claimants with in person documentation claim intake and data entry into the system.

> – Subcontractor PricewaterhouseCoopers employs approximately 20 accountants in assisting Feinberg Rozen, LLP in Washington, DC and will be adding 10 accountants to the project beginning next week.

13

– Subcontractor Cowheard and Assurance Accounting Companies together employ a staff of approximately 70 accountants working in the Worley facility in Hammond, Louisiana.

– Subcontractor Guidepost Partners employs a staff of approximately 230 investigators, case managers and administrative staff to provide GCCF with investigative services designed to discover fraudulent claims which are then referred to the Department of Justice in Washington, DC.

*See id.* ¶ 12.

Moreover, responding to suggestions that it provide enhanced explanations to claimants regarding its processing and analysis of claims, the GCCF has retained six Gulf-based firms (legal and non-legal) to assist claimants in the most heavily trafficked GCCF offices throughout the Gulf. These firms have 42 professionals working on the program. They do not provide legal advice to claimants but instead answer claimant questions and assist claimants in either supplementing their claims or understanding the way in which the GCCF has analyzed the claim. *See id.* ¶ 21(c). Here again the GCCF has gone far beyond any OPA requirement.

3. **Transparency.** OPA says nothing about transparency or the participation of anyone other than the responsible party in the formulation of the claims process. Nonetheless, while the foregoing procedures were being established, Mr. Feinberg made extensive, widespread public and private efforts to consult with interested parties, to seek their input, and to explain the GCCF's intentions and operations in implementing OPA's claims process.

For example, on July 12, 2010, the GCCF circulated a draft of its Protocol setting forth its then-contemplated policies and claims procedures to Federal officials, the Governors and Attorneys General of the Gulf States, individual attorneys from the plaintiffs' bar, and various other interested parties. This circulation resulted in a host of comments from the U.S. Department of Justice, the various Gulf State Governors and Attorneys Generals, the staff of the House Judiciary Committee, the American Association for Justice, individual attorneys from the ABA Sections of Administrative Law & Regulatory Reform, Dispute Resolution , Litigation, and Tort Trial and Insurance Practice, as well as the ABA Special Committee on Disaster Response

14

and Preparedness and individual attorneys from the plaintiffs' bar. The GCCF incorporated many of the recommendations and requests that this process generated.[22] The GCCF then circulated second and third drafts incorporating still more suggestions, including applying the initial Protocol only to EAP claims and requiring no releases from those claimants. On November 1, 2010, the GCCF distributed its draft Protocol for Interim and Final Claims and provided its many recipients with an extended comment period. Again, numerous suggestions were adopted, including many from the Gulf States Attorneys General and the Department of Justice. *See id.* ¶¶ 14-17.

In addition, Mr. Feinberg has, among other things, participated in 35 town-hall style meetings throughout Louisiana, Mississippi, Alabama and Florida to explain and answer claimant questions regarding the GCCF and its various payment options; met with numerous industry associations and claimant advocates to discuss and address questions and concerns relating to the GCCF and its processes; testified at multiple Congressional hearings; met on numerous occasions with Department of Justice, Department of Homeland Security and Coast Guard officials, as well as numerous Federal, State and local elected officials. *See id.* ¶¶ 19-21. Since the GCCF began accepting claims on August 23, 2010, it has also provided daily, detailed reports to Federal and State officials (and others) regarding the status and processing of claims. *See id.* ¶ 18 [23]

---

[22] Some of the recommendations received by the GCCF during this process included (a) taking security measures to protect confidential claimant information; (b) providing claimants with the opportunity to submit claims and supporting documentation at claims centers, via telephone and online; (c) making claim forms, claims protocols or manuals, and FAQs available in each claim site and on the internet; (d) making translators available by phone and at claim sites; and (e) providing claimants with secure online access to check the status of their claims and submit additional documentation. Each of these measures, and many others recommended or requested by the Gulf States Attorneys General and others, have been incorporated in whole or in part into the GCCF's procedures. *See id.* ¶ 14.

[23] The GCCF received several complaints that governmental officials were not given access to the GCCF's claims database. The GCCF respectfully declined to provide that access because it would jeopardize the privacy and confidentiality rights of the claimants, who would presumably not want the GCCF to give their confidential financial information to multiple governmental agencies. If a State governmental agency is trying to assist a

The GCCF's website provides claimants with a wealth of information in English, Spanish, Vietnamese and Khmer.  (GCCF Claim Forms are available in Spanish, Vietnamese and Khmer.)  It currently provides Important Notices and Information; a lengthy set of Frequently Asked Questions; information regarding Town Hall Meetings/Events; Press and New Releases; a copy of the Protocol for Interim and Final Claims; Summary of Options for Filing Claims; the opportunity to file claims and check the status of claims online; a list of Claim Site Offices; GCCF Program Statistics; information regarding Free Legal Assistance available to claimants; and information regarding how to report fraud.  *See id.* ¶ 9.

None of these extensive efforts at transparency is required by OPA.  They were undertaken in good faith by an individual with vast experience in administering claim funds in the public interest.  Mr. Feinberg has solicited, welcomed, and frequently incorporated countless recommendations from countless sources about how the GCCF should most effectively conduct the OPA claims process.  However, while the Federal and State governments, as well as claimants and their advocates, may be in a position make excellent recommendations regarding enhancements to the GCCF process, ultimately it is Mr. Feinberg's responsibility and duty as Claims Administrator to be the decision-maker with regard to the GCCF's processes and to judge which procedures will most effectively meet the simultaneous, complex, and sometimes competing goals of fairness, speed, and consistency.

**4.**      **Summary.**  Given the absence from OPA of any requirements for the claim procedures to be adopted by responsible parties, and given the reasonable, practical, and innovative procedures adopted by the GCCF as described above, the Court should conclude that the GCCF has complied with OPA's requirements for the processing of claims.

---

claimant who consents to his/her/its confidential information being disclosed, the GCCF will cooperate.  *See id.* ¶ 18.

**B.      The GCCF's Methodologies For Evaluating Claims Comply With OPA.**

The Court asked for briefing on the GCCF's "methodologies for evaluation of claims,"

which presumably means the criteria GCCF uses in deciding whether to pay (in full or in part) or

reject a claim.  On that issue, again, OPA has no mandates.  Nor has anyone asserted that the

GCCF's methodologies to date violate any OPA command.

Because "[t]he purpose of the claim presentation procedure is to promote settlement and

avoid litigation,"[24] the statute obviously assumes that it is in the best interests of the responsible

party and the claimant to come to terms and avoid litigation, and there is no reason to believe

that GCCF has adopted or will adopt criteria that would defeat that expectation.  The GCCF's

record to date – payment of nearly $3.5 billion in claims – belies any suggestion to the contrary.

That conclusion is vividly supported by the testimony of Craig Bennett, the NPFC Director,

before the Senate Committee on Homeland Security and Governmental Affairs, Subcommittee

On Disaster Recovery, on January 27, 2011, to the effect that the Coast Guard had, as of the date

of his testimony, received 507 "appeals" from GCCF decisions and, of the 200 it had to that

point adjudicated, it did not disagree with the GCCF determination *on a single one*.  Mr. Bennett

further testified that the GCCF has been *more generous* than the Coast Guard would be, since the

GCCF pays EAPs (that include prospective losses) and future damages.

During the Status Conference of January 28, 2011, the Court observed (at p. 25):

"[H]earing in the media reports, the two complaints I seem to be seeing made or hearing made

are I filed a claim, I can't get an answer, or I got denied, but somebody next door has the same

type of claim I have seem to be getting paid, I'm not getting paid with no explanation for it."

It is of course inevitable in an undertaking of the size and scope operated by the GCCF that some

claimants will not receive payments as quickly as they would like.  In a period of just several

---

[24]   *Johnson v. Colonial Pipeline Company*, 830 F. Supp. 309, 310-11 (E.D. Va. 1993).

months, the GCCF has put thousands of people to work reviewing hundreds of thousands of claims. The process has proceeded with remarkable dispatch and has already alleviated some $3.5 billion in harm to affected individuals and businesses. The GCCF cannot assure that there will never be an inconsistent result in the hundred of thousands of claims it will handle. But *different* results are by no means inconsistent. For example, two crew members on the same fishing vessel may submit claims at the same time seeking identical damages, yet receive different payments from the GCCF – but that may simply reflect a difference in the supporting documentation each claimant submitted, not a failure of the GCCF to treat similarly documented claims similarly. In any case, the GCCF is aware of the complaints of inconsistency and makes every reasonable effort to apply its protocols even-handedly to all claims.

In sum, OPA has no mandates regarding claim-deciding methodologies. Nothing in the record of this proceeding or in the statute itself would support a conclusion that the GCCF's methodology does not comply with OPA.

### C.     The GCCF Release Form Complies With OPA.

Claimants who choose to accept payment on a Quick Payment Final Claim or Full Review Final Claim must sign a Release and Covenant not to Sue ("Release") that waives all claims (other than for bodily injury or mental health or securities claims) the claimant has or may have against BP and all other potentially responsible parties, and waives any right to submit a claim to the NPFC or a court. A sample of the Release (which is attached as Exhibit D to the Feinberg Declaration) is included with the claim form and is posted on the GCCF website, and the GCCF provides full disclosure regarding the nature of the Release. For example, potential Quick Payment claimants are advised: **"Do not elect the Quick Payment Final Claim process unless you are willing to accept the fixed payment of $5,000 for individuals and $25,000 for businesses and to sign a full release of liability. If you sign a release of liability, you will not**

18

be able to seek further compensation from the GCCF, the Coast Guard, or in court."[25]

Claimants are also instructed to **"Read the release and cover information page to the release carefully.  Do not sign the release unless you fully understand and agree to all of its terms."**[26]  Similar disclosures are repeated on the cover page of the Release itself, which states:

> You are under no obligation to accept the final payment offered to you by the Gulf Coast Claims Facility.  You are free to reject the final payment offered by the Gulf Coast Claims Facility and to pursue other means of compensation.  If you want to file a lawsuit regarding the Incident or make a claim against the Oil Spill Liability Trust Fund, do not sign this Release.

The Release also states:  **"If you are represented by an attorney in connection with your claim, do not submit this Form or Sign the Release until you have conferred with your attorney about the decision to submit it and sign the Release."**[27]

The Plaintiffs and several States or State Attorneys General have objected to the GCCF Release on several grounds; however, with one exception, none has cited any OPA provision to show that their objections are grounded in the statute.  The exception is the contention by the States of Florida and Mississippi that the Release is inconsistent with OPA § 2715(b)(2).[28]  According to these States, that section provides that payment of a *final* claim "shall not foreclose a claimant's right to recovery of all damages to which the claimant is entitled under this Act or under any other law."  The States then conclude that a release exchanged for a final payment may not bar recovery of other damages for the claim.  That argument fundamentally and

---

[25]   Summary Of Options For Submission Of Final And Interim Payment Claims, available at www.gulfcoastclaimsfacility.com, at 1 (emphasis in original).

[26]   *Id.* at 2, ¶ A(3) (emphasis in original); *see also id.* at 3, ¶ B(8).)

[27]   *Id* .  Claimants who accept a Final Payment Offer for a physical injury or death claim must sign a separate Release of Bodily Injury Claims.

[28]   *See* State of Louisiana's Notice of Joinder In Motion To Supervise, filed  February 1, 2011, at 4; Memorandum of Authorities in Support of Statement of Interest on Behalf of The State Of Mississippi, filed Feb. 2, 1011, at 8.

demonstrably misconstrues the statute, for § 2715(b)(2) refers to the payment of interim, not final claims.

Section 2715 is entitled "Subrogation." It provides in subsection (a) that anyone who pays a claimant's claim "for removal costs or damages shall be subrogated to all rights, claims, and causes of action that the claimant has under any other law." Subsection (b) is entitled "Interim damages." It provides:

> (b) Interim damages
>
> (1) In general
>
> If a responsible party * * * has made payment to a claimant for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled, subrogation under subsection (a) of this section shall apply only with respect to the portion of the claim reflected in the paid interim claim.
>
> (2) Final damages
>
> Payment of such a claim shall not foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under this Act or under any other law.

The phrase "such a claim" in subsection (b)(2) plainly refers to a claim for interim damages, not final damages. That is so for two reasons. First, subsection (b) is entitled "Interim damages," meaning that both subsections (b)(1) and (b)(2) deal with payment of interim damages. Second, it would not make sense to read "such a claim" in subsection (b)(2) to mean a final claim, because once a final claim for damages is paid a claimant is not entitled to additional damages and therefore cannot have any right to recovery of damages under the Act to which he "otherwise is entitled." The receipt of an interim claim, however, does not foreclose the claimant's right to recover damages "to which the claimant otherwise is entitled under th[e] Act"– that is, the claimant's right to "final damages." Hence the statutory language and context shows that the reference to "Final damages" in subsection (b)(2) refers to what is being

preserved to a claimant upon payment of interim damages.  It does not mean that a responsible party may not require a full release on the payment of final damages.

Accordingly, no provision in OPA bars the GCCF Release.  On the contrary, the Release fully complies with OPA because (1) OPA encourages settlements and settlements routinely include full releases; (2) the Coast Guard in administering claims against the Oil Spill Liability Fund requires releases; and (3) leaving claimants able to pursue other responsible parties for damages could lead to claims by those parties against BP, which would thwart OPA's intent that the responsible party claims process avoid protracted litigation.

1.    **Settlements include releases.**  As we have seen, OPA's presentment requirement reflects "a congressional desire to encourage settlement and avoid litigation."  *Boca Ciega Hotel*, 51 F.3d at 240.  A settlement is clearly the goal of the process; the statute actually mentions "settlement" in at least two places.  *See* 33 U.S.C. §§ 2705(a), 2713 (c)(2).  Needless to say, settlements are designed to put an end to controversy and preclude further litigation.  *See* Black's Law Dictionary (definition of "settlement" includes an act "[t]o fix or resolve conclusively; to make or arrange for a final disposition.").  Accordingly, nothing in OPA – which never mentions the word "release" – can be read to suggest that Congress intended to preclude a release that would, in fact, finally settle all of the claimant's claim for damages caused by an oil spill.

Moreover, quite apart from the OPA presentment requirement, nothing would prevent a person damaged by an oil spill from presenting a claim to the responsible party outside of the OPA context and settling that claim on any terms the parties agreed to – including the provision of a full release by the claimant in return for satisfaction of his claim.  That is just another way of saying that settlements are voluntary agreements that parties may structure as they please, and nothing in OPA suggests that the settlements it encourages are any different.

21

2.      **The Coast Guard requires a release.**  The Coast Guard in administering the Act's Oil Pollution Fund requires a release.[29]  The Coast Guard's regulations implementing OPA appear at 33 C.F.R. 136, *et seq.*  Regulation 136.115, "Settlement and notice to claimant," addresses payment and denial of claims.  Subpart (a) provides that a claimant's acceptance of any compensation from the Fund acts as a release of the Fund and *"precludes the claimant from filing any subsequent action against any person to recover costs or damages which are the subject of the compensated claim."*[30]  In keeping with that Regulation, the Coast Guard's "Sample Damage Claim" includes a claimant acceptance/release form representing "full and final release and satisfaction of" the claimant's claim.  The Coast Guard does not require a general release of all potential claims, because, unlike the GCCF, the Coast Guard only pays for past damages, not future damages, and thus requiring a release of all claims would be unfair to claimants.

3.      **Given the structure of OPA, less than a full release would not result in the legislatively intended and judicially beneficial result of finality.**  As Mr. Feinberg explains in his Declaration, he determined that a broad Release was essential to fulfilling the legislative intent of OPA that the responsible party claims process fully and finally resolve claims and thereby minimize the chances that oil spills would be followed by protracted, slow and costly litigation.  After soliciting the views of various constituencies, Mr. Feinberg concluded that, as a

---

[29]  As the Court is aware, if the responsible party denies liability or fails to pay a claim within 90 days, "the claimant may elect to commence an action in court against the responsible party * * * or to present the claim to the [Oil Spill Liability Trust] Fund."  OPA § 1013 (c).  The Fund was established by Section 9509 of the Internal Revenue Code of 1986.  It is administered by the Coast Guard through the NPFC.  *See* U.S. Dep't of Homeland Security, U.S. Coast Guard, Report on Implementation of the Oil Pollution Act of 1990, p. 5.

[30]  OPA provides that the "United States Government" becomes subrogated to the rights against responsible parties of claimants paid by the Fund, and that, upon request of the Secretary of Homeland Security, the Attorney General "shall commence an action on behalf of the Fund to recover any compensation paid by the Fund to any claimant pursuant to this Act.  OPA §§ 1012(f) and 1015(c).

result of the subrogation and contribution provisions of OPA,[31] as well as various contractual and common law contribution and indemnity rights and obligations among the potentially responsible parties other than BP, a final settlement of a GCCF claim that did not include a broad Release would, in fact, not be final.  Such a claimant, operating individually or on behalf of a class of claimants, could subsequently sue another potentially responsible party, who if found liable might seek recompense from BP.  This would require BP to <u>again</u> litigate the matter it had previously settled.   Feinberg Decl. ¶ 40; *see also Davis v. Huskipower Outdoor Equipment Corp.*, 936 F.2d 193, 197 (5th Cir. 1991) (upholding release of defendant as well as "all other persons, firms, or corporations liable or claimed to be liable"; "[u]nless [plaintiff] released all possible defendants, the settlement agreement would abysmally fail to protect the named parties from liability" as the plaintiff could "later sue an unnamed party * * * and the unnamed party could then drag all the named parties back into the suit."); *Robin v. Binion*, 469 F.Supp.2d 375, 386-87 (W.D. La. 2007) (release of "any and all claims" "known or unknown" should be enforced because not doing so would undermine the strong public policy favoring settlement).

Finally, the Court should refuse, for any number of reasons, the invitation of the State of Mississippi to hold the Release invalid under that State's law of economic duress.[32]  Among other things, the State is not a party to this case and has no complaint on file seeking such relief; the State offers no jurisdictional basis for this Court's enforcement of state contract law; the State has no standing to assert a duress claim on behalf of any individual or business; and the

---

[31] Section 2715 of OPA ("Subrogation") provides that any person "who pays compensation pursuant to this chapter to any claimant for removal costs or damages shall be subrogated to all rights, claims, and causes of action that claimant has under any other law."  OPA § 2702(d)(1)(b) ("Subrogation of responsible party") provides that, "If the responsible party alleges that the discharge or threat of discharge was caused solely by an act or omission of a third party, the responsible party * * * shall pay * * * damages to any claimant; and * * * shall be entitled by subrogation to all right of the * * * claimant to recover * * * damages from the third party or the Fund * * *."

[32] Mem. of Authorities in Support of Statement of Interest on Behalf of the State Of Mississippi, filed Feb. 2, 1011, at 11-15.

State asserts that duress "is a condition of mind",[33] yet it has produced no evidence that any particular individual or business has signed or will sign a release in a proven condition of duress.

* * * * *

In sum, the GCCF Release complies fully with OPA (which says nothing about releases), and the Court has no ground upon which it may direct the GCCF to alter its terms.

**Conclusion**

We respectfully submit that the Court should hold that it has no authority to supervise the GCCF claims procedures, methodology, or form of release.  Alternatively, it should hold that the GCCF claims procedures, methodology, and form of release are in full compliance with OPA's mandates.

Respectfully submitted,

David B. Pitofsky
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 813-8800

William F. Sheehan
Christiaan H. Highsmith
GOODWIN PROCTER LLP
901 New York Avenue, NW
Washington, DC 20001-4432
(202) 346-4000

*Counsel for Kenneth R. Feinberg as Claims Administrator of the Gulf Coast Claims Facility*

February 18, 2011

---

[33] *Id.* at 12.

## **CERTIFICATE OF SERVICE**

I hereby certify that this document has been served by email to plaintiffs' (including government) liaison counsel and to defendants' liaison counsel on February 18, 2011 and that I have requested that liaison counsel distribute this document.

David B. Pitofsky

February 18, 2011

**4**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In re:  Oil Spill by the Oil Rig                    MDL No. 2179
        "Deepwater Horizon" in the Gulf
        of Mexico, on April 20, 2010             SECTION J

Applies to: *All Cases*                             JUDGE BARBIER

                                         MAGISTRATE SHUSHAN

### DECLARATION OF KENNETH R. FEINBERG
### IN SUPPORT OF BRIEF *AMICUS CURIAE* OF KENNETH R. FEINBERG
### AS CLAIMS ADMINISTRATOR OF THE GULF COAST CLAIMS FACILITY IN
### RESPONSE TO REQUEST FOR BRIEFING ON CLAIMS PROCESSING ISSUES

I, Kenneth R. Feinberg, declare as follows:

#### Background

1.      I am the Founder and Managing Partner of Feinberg Rozen, LLP ("Feinberg Rozen"), a law firm focused on mediation, arbitration, other forms of alternative dispute resolution ("ADR"), and negotiation strategy.  Feinberg Rozen is also retained by governmental and private entities to design, implement, and operate claims administration facilities.

2.      Among other engagements, I served as the Special Master of the Federal September 11th Victim Compensation Fund of 2001, in which my team and I reached out to all who qualified to file a claim, evaluated applications, determined appropriate compensation, and disseminated awards to the victims and their families.  I served as Fund Administrator for the Hokie Spirit Memorial Fund following the tragic shootings at Virginia Tech University.  I served as Special Master in Agent Orange, asbestos personal injury, wrongful death claims, Dalkon shield, and DES (pregnancy medication) cases.  I was retained by Liberty Mutual Insurance Company and Zurich N.A. Insurance Company to design, implement and administer ADR

settlement programs for victims of Hurricane Katrina and other Gulf Hurricane insureds, and in connection with this assignment hired, trained and assigned mediators in the Gulf Region to participate in the program and resolve thousands of insurance claims. Finally, I recently served as the Special Master for Executive Compensation for TARP Executive Compensation at the Department of the Treasury.

3.      I am currently serving as the Claims Administrator of the Gulf Coast Claims Facility (the "GCCF"), which is described in greater detail hereinafter.

4.      I am personally involved in almost every aspect of the administration of the GCCF. I have personal knowledge of the matters set forth in this Declaration, and if called upon to do so, I could testify to the same effect. I am over 18 years of age.

### The Deepwater Horizon Spill

5.      On April 20, 2010, an explosion occurred on the "Deepwater Horizon," an offshore oil drilling rig owned by Transocean Ltd., which resulted in, among other things, the deaths of 11 crewmen, a fire that could not be extinguished, and a damaged well at the sea floor that gushed oil into the Gulf of Mexico for several months.

6.      Shortly after the incident, BP Exploration & Production, Inc. ("BP") was designated by the United States Coast Guard as a "responsible party" under the Oil Pollution Act of 1990 ("OPA"). Pursuant to OPA, a responsible party for a vessel or facility from which oil is discharged is liable for certain costs and damages enumerated in Section 2702 of Title 33 of the United States Code. Pursuant to Section 2713(a) of Title 33, "all claims for removal costs or damages shall be presented first to the responsible party." Pursuant to Section 2705(a) of Title 33, "[t]he responsible party shall establish a procedure for the payment or settlement of claims for interim, short-term damages." Although it is not expressly stated in OPA, it is my

2

understanding that the requirement that the responsible party establish a claims procedure includes claims for final damages as well as interim, short-term damages.

7.      After it was designated as a responsible party, BP established a claims process as required by OPA.  Subsequently, on June 16, 2010, President Barack Obama announced an agreement by which BP would (a) contribute $20 billion over three years to a claims fund which would satisfy legitimate claims for costs and damages, and (b) create a new claims process to be "administered by an impartial, independent third party." *See* Statement by the President After Meeting with BP Executives, available at http://www.whitehouse.gov/the-press-office/statement-president-after-meeting-with-bp-executives (last viewed on February 16, 2011).  President Obama also announced that it had been mutually agreed between the White House and BP that I would run the independent claims process.  *Id.*  In its own press release on June 16, 2010, BP announced the creation of an "Independent Claims Facility (ICF)" which would adjudicate claims, and that I would administer the ICF.  *See* BP Establishes $20 Billion Claim Fund for Deepwater Horizon Spill and Outlines Dividend Decisions, available at http://www.bp.com/genericarticle.do?categoryId=2012968&contentId=7062966 (last viewed on February 16, 2011).

### The GCCF

8.      I thereafter established the GCCF, which assumed responsibility for establishing, maintaining, and supervising claim intake, review, evaluation, settlement, and payment services relating to claims of individuals and businesses for costs and damages arising from the Deepwater Horizon oil spill.  Claims that had been submitted directly to BP prior to the establishment of the GCCF were transferred to the GCCF.

3

9. The GCCF maintains a website, www.gulfcoastclaimsfacility.com, and provides claimants with a wealth of information in English, Spanish, Vietnamese and Khmer. (GCCF Claim Forms are available in Spanish, Vietnamese and Khmer.) Among other things, the website currently provides Important Notices and Information; a lengthy set of Frequently Asked Questions ("FAQs"); information regarding Town Hall Meetings/Events; Press and News Releases; a copy of the Protocol for Interim and Final Claims; a Summary of Options for Filing Claims; the opportunity to file claims and check the status of claims online; a list of Claim Site Offices; GCCF Program Statistics; information regarding Free Legal Assistance available to claimants; and information regarding how to report fraud. In addition, claimants can go online to a secure site and access information relating to their claim including status, payment explanation form, and letters mailed to them, including any offers.

10. The GCCF currently operates 35 claims sites throughout the States of Louisiana, Alabama, Mississippi, Florida and Texas (the "Gulf States"). Spanish-language translators are available in 25 claim sites to assist claimants; Vietnamese translators are available in 15; and a Khmer translator is available in one.

11. As an alternative to the website and the claim sites, claimants can get assistance by calling a toll-free helpline (1-800-916-4893) or emailing questions or comments to info@gccf-claims.com

12. The work of the GCCF is carried out by thousands of employees. With the support of my team at Feinberg Rozen, I perform the executive functions of the GCCF, including making the policy and management decisions underlying the GCCF and supervising the work of all subcontractors. The day-to-day claims intake, review, analysis, determinations and payments

are handled by a large team of specialists including lawyers, technical staff, claims analysts and accountants.

a.     A subcontractor, Brown Greer PLC, has a staff of approximately 800 persons devoted to the GCCF program, working in three shifts seven days a week. The Brown Greer staff includes software application developers, programmers, claims reviewers, senior claims analysts and lawyers who conduct the first round of eligibility review and quality control reviews on claims.

b.     A second subcontractor, the Garden City Group, which employs approximately 1,500 people who work on matters relating to the GCCF, is responsible for responding to hundreds of thousands of claimant calls, electronic claims intake, receipt and management of all data, programming, staffing the toll-free call center, data processing, document control, payment processing, bank reconciliation of payments made, and communications with various state agencies regarding liens and garnishments.

c.     A third subcontractor, the Worley Company, employs approximately 800 individuals and is responsible for staffing the 35 claims sites, at which claimants are provided with assistance with respect to claims intake, and data entry is conducted.

d.     A fourth subcontractor, PricewaterhouseCoopers, employs approximately 20 accountants who support the work of the GCCF, and will be adding 10 accountants to the project beginning next week.

e.     Two additional subcontractors, Cowheard and Assurance Accounting Companies, together employ a staff of approximately 70 accountants who work in the claim sites.

   f.  A seventh subcontractor, Guidepost Partners, employs approximately 230 investigators, case managers and administrative staff to provide the GCCF with investigative services designed to discover fraudulent claims which are then referred to the Department of Justice in Washington, DC.  To date, the GCCF has referred to Guidepost Partners 8,123 potentially fraudulent claims for investigation.

   g.  Six companies, including law firms and non-lawyer service providers with offices throughout the Gulf States, namely Burke Blue Hutchison; Walters & Smith; Hammerman & Gainer, Inc.; Long Law Firm; Triton Group, LLC; Watkins Ludlam Winter & Stennis, and former Congressmen Anh Quang Cao (who focuses on communications with Vietnamese claimants), have been retained to act as liaisons to meet with claimants and help them understand the GCCF process, and have 42 professionals working on the GCCF project.

### Transparency to Governmental Officials

13.  From its inception, the GCCF has provided a high degree of transparency with respect to its protocols and procedures to Federal, State and local officials.  The GCCF has been both transparent and collaborative, repeatedly soliciting and welcoming suggestions for improvements and making changes in response.

14.  For example, on July 12, 2010, the GCCF circulated a draft of its then-contemplated Protocol setting forth its claims procedures to Federal officials and the Governors of Louisiana, Florida, Mississippi and Alabama and the Attorneys General of the Gulf States, individual attorneys from the plaintiffs' bar, and various other interested parties.  This circulation resulted in a host of comments from the U.S. Department of Justice, the various Governors and Attorneys Generals, the staff of the House Judiciary Committee, the American Association for Justice, individual attorneys from the ABA Sections of Administrative Law & Regulatory

Reform, Dispute Resolution, Litigation, and Tort Trial and Insurance Practice, as well as the

ABA Special Committee on Disaster Response and Preparedness and individual attorneys from

the plaintiffs' bar.  Some of the recommendations received by the GCCF during this process

included (a) taking security measures to protect confidential claimant information; (b) providing

claimants with the opportunity to submit claims and supporting documentation at claims centers,

via telephone and online; (c) making claim forms, claims protocols or manuals, and FAQs

available in each claim site and on the internet; (d) making translators available by phone and at

claim sites; and (e) providing claimants with secure online access to check the status of their

claims and submit additional documentation.  Each of these measures, and many others

recommended or requested by the Department of Justice and the Gulf States Attorneys General

and others, have been incorporated in whole or in part into the GCCF's procedures.

     15.     After receiving comments on the July 12, 2010 draft Protocol, the GCCF

circulated, on August 8, 2010 and August 13, 2010, second and third drafts, which incorporated

many of the recommendations of the Department of Justice and the Gulf States Attorneys

General, including limiting the initial Protocol to Emergency Advance Payment Claims (*see* ¶¶

24-28 below) and requiring no releases from those claimants.  The final draft of what became the

GCCF's Protocol for Emergency Advance Payments incorporated still more recommendations.

     16.     Similarly, on November 1, 2010, the GCCF distributed its draft Final Protocol,

which covered its then-contemplated procedures with respect to Interim and Final Payment

Claims (*see* ¶¶ 29-38 below), and provided the many recipients of the draft with an extended

comment period.  Some of the recommendations received by the GCCF during this stage of the

notice-and-comment process included (a) providing claimants with the ability to receive interim

claims more frequently than every calendar quarter; (b) providing claimants with access to

volunteer counsel so that they could be fully advised of their rights; and (c) implementing an appeals process for dissatisfied claimants. Each of these measures, and many others recommended or requested by the Department of Justice and the Gulf States Attorneys General, have been incorporated in whole or in part into the GCCF's procedures.

17.    On January 27, 2011, the GCCF announced that, beginning February 2, 2011, its revised, proposed Protocol for Interim and Final Claims would be available for public comment for two weeks. A page was created on the GCCF's website that allowed the public to post comments and allowed all members of the public to view all posted or mailed comments. At the conclusion of the two-week period on February 16, 2011, 1,440 comments had been posted on the GCCF's website.

18.    The GCCF's efforts to be transparent with respect to its process have not been limited to providing notice and an opportunity to be heard with respect to draft claims protocols and procedures. For example, since the GCCF began accepting claims on August 23, 2010, it has provided daily, detailed reports to Federal and State officials (and others) regarding the status and processing of claims. The GCCF subsequently received complaints that governmental officials were not being given direct access to the GCCF's claims database. The GCCF respectfully declined to provide that access because it would jeopardize the privacy and confidentiality rights of the claimants, who would presumably not want the GCCF to give their confidential financial and other information to multiple governmental agencies. If, however, a State or federal governmental agency or official is trying to assist a claimant with a complaint against the GCCF, and the claimant consents to his/her/its sensitive confidential information being disclosed, the GCCF will cooperate.

19.     Throughout the period the GCCF has been in operation, in addition to providing a wide range of governmental officials with notice and an opportunity to comment on important protocols and policies, and substantial claims data, the GCCF has received and responded to countless letters, emails and telephone calls from government officials, and I have made myself available for in-person meetings.  For example:

a.     I, and others working on the GCCF project, have personally met with numerous U.S. Department of Justice, Department of Homeland Security and Coast Guard officials on multiple occasions.

b.     I, and others working on the GCCF project, have personally met with numerous Federal, State and local elected officials, including but not limited to Senator Thad Cochran (Mississippi), Senator Thomas R. Carper (Delaware), Senator Mary Landrieu (Louisiana), Senator Bill Nelson (Florida), Senator Jeff Sessions (Alabama), Senator Richard Shelby (Alabama), Senator David Vitter (Louisiana), Senator Roger Wicker (Mississippi), Governor Haley Barbour (Mississippi), Governor Robert Bentley (Alabama), Governor Rick Scott (Florida), former Governor Charlie Crist (Florida), former Governor Bob Riley (Alabama), Congressman Jo Bonner (Alabama), Congressman Jeff Landry (Louisiana), Congressman Steven Palazzo (Mississippi), Congressman Cedric Richmond (Louisiana), Congressman Steve Scalise (Louisiana), Attorney General Pam Bondi (Florida), Attorney General Buddy Caldwell (Louisiana), Attorney General Jim Hood (Mississippi), Attorney General Luther Strange (Alabama), former Attorney General Troy King (Alabama), former Attorney General Bill McCollum (Florida), Mayor Tony Kennon (Orange Beach, Alabama), Mayor Robert Craft (Gulf Shores, Alabama), Mayor John Koniar (Foley, Alabama), Councilmember Kristen Gisleson

Palmer (New Orleans, Louisiana), multiple New Orleans parish presidents and many other local elected officials throughout the Gulf States.

        c.      I have testified at multiple Congressional hearings conducted by the House Committee on Small Business, the House Committee on the Judiciary, the Senate Committee on the Environment & Public Works, and the Senate Committee on Homeland Security and Governmental Affairs, Subcommittee on Disaster Recovery.

       20.    The GCCF has probably communicated with the National Pollution Funds Center of the United States Coast Guard ("NPFC") more than any other governmental agency or body.

        a.      From the beginning, the GCCF has kept the NPFC advised of the GCCF's work and has consistently coordinated with the NPFC on its efforts. This communication began with the GCCF's publication efforts announcing the opening of the GCCF in late-August 2010. The GCCF provided a draft of its publication notice to the NPFC for its review and approval. Since then the senior members of the GCCF have been in regular contact with members of the NPFC so as to assist claimants and assure that the GCCF process fully informs claimants of their rights under OPA.

        b.      On several occasions, the NPFC has requested that the GCCF provide certain information on its website, in letters to claimants, and in its FAQs relating to claimants' right to go the NPFC or a court after their claim has been denied or has been pending for 90 days without a resolution. The GCCF has complied with these requests.

        c.      Members of the GCCF provide weekly reporting to the NPFC. In addition, the NPFC provides the GCCF with a list of all OPA claims that have been presented to the NPFC relating to the Deepwater Horizon spill. Although the NPFC and the GCCF do not coordinate with respect to evaluation of claims or payments to claimants, the GCCF does provide

information, status of claims and documentation where it is requested by the NPFC and the claimant permits that document sharing to take place, and vice versa.

21.     The GCCF coordinates regularly with the Criminal Division of the Department of Justice regarding calls made to the DOJ anti-fraud hotline.  In that process, the Department of Justice provides the GCCF with a list of people who are the subject of calls (often anonymous) and who are alleged to be committing a fraud on the GCCF.  The GCCF in turn checks its database to see if that person is in fact a GCCF claimant and, if so, provides the DOJ with the status of the claim along with any claim documentation, upon request.  The GCCF monitors the database and updates those responses on a weekly basis.  In addition, the GCCF refers to Guidepost Partners (*see supra*, ¶12(f)) those claims that the GCCF has reason to believe may be fraudulent.  Guidepost Partners reports to GCCF its findings regarding each of these claims.  The GCCF thereafter reviews these reports and refers those claims that appear to be fraudulent to the Department of Justice.

### Transparency to Claimants

22.     From its inception, the GCCF has provided a high degree of transparency with respect to its protocols and procedures to potential claimants and their representatives.  For example:

a.     From June 18, 2010 to the present, I have participated in more than 35 town-hall style meetings throughout Louisiana, Mississippi, Alabama and Florida to explain and answer questions regarding the GCCF and its various payment options.

b.     I have met with many industry associations and claimant advocates to discuss and address questions and concerns relating to the GCCF, including the National Association of Realtors, the Alabama, Mississippi, Louisiana, Florida, and Texas Associations of

Realtors, the National Alliance of Vietnamese American Service Agencies, the Japanese American Citizens' League, the League of Southeastern Credit Unions, the Shrimp Association, the International Longshoremen's Association, the Vietnamese Asian American Restaurant Association, the National Fisheries Institute, and the Gulf Oyster Industry Council.

        c.     In order to further enhance and improve claimant outreach, claims facilitation, and claimant understanding of the GCCF process, the GCCF has recently implemented, or is in the process of implementing, the following enhanced practices:

        i.     As mentioned above, six companies, including law firms and non-lawyer service providers with offices throughout the Gulf States (Burke Blue Hutchison; Walters & Smith; Hammerman & Gainer, Inc.; Long Law Firm; Triton Group, LLC; and Watkins Ludlam Winter & Stennis), and former Congressmen Anh Quang Cao (who focuses on communications with Vietnamese claimants) have been retained to act as liaisons to meet with claimants and help them understand the GCCF process. Individuals from these firms are present in the more heavily-trafficked claims sites, and the GCCF intends to roll out the program to additional claim sites. They will not be providing claimants with legal advice, but will be available to answer claimant questions and assist claimants in either supplementing their claims or understanding the way in which the GCCF has analyzed their claim.

        ii.     The GCCF is in the process of indentifying accounting firms that will agree to advise claimants – at the claimant's expense, which can be passed through to the GCCF as claim preparation costs – about how their payment offers are calculated.

        iii.     The GCCF is enhancing information provided online regarding each claimant's claim status. Claimants can obtain information about their individual claim online, including the status of the claim and will be able to obtain the reasons for determinations

12

made by the GCCF (claim acceptances or denials; calculation of compensation and the reasons related thereto).

                iv.     The GCCF has arranged to make free legal help available for the GCCF Interim or Final Claims Process, through a network of nonprofit civil legal service organizations in the Gulf States. The program is being administered by the Mississippi Center for Justice, a nonprofit, public interest law firm. The funding for this program comes from BP; however, the Mississippi Center for Justice and the nonprofit civil legal service organizations providing the free legal help have no other connection to BP or GCCF. The funding does not affect the advice that a lawyer at any of the legal services organizations gives a claimant. Neither GCCF nor BP will interfere with the independent, professional judgment of any of the legal services attorneys.

### Claim Types

23.     Consistent with the mandates of OPA, the GCCF will provide compensation to qualifying claimants for the following claim types: removal and clean up costs; damages to real or personal property; lost earnings or profits; and loss of subsistence use of natural resources.

### Interim Claims/Emergency Advance Payments

24.     In order to expedite the payment of interim, short-term damages to claimants, from August 23, 2010, through November 23, 2010, all claimants (both individuals and businesses) could submit claims to the GCCF for an Emergency Advance Payments ("EAP") to receive emergency relief.[1] A request for an EAP required less documentation than one for

---

[1] A copy of the Gulf Coast Claims Facility Protocol for Emergency Advance Payments (August 23, 2010) is attached hereto as Exhibit A. As it noted at footnote 1, "[a] claim for an Emergency Advance Payment is an interim claim under OPA." Attached as Exhibit B hereto is a copy of *Gulf Coast Recovery: An Examination of Claims and Social Services in the Aftermath of the Deepwater Horizon Oil Spill: Hearing Before the S. Ad Hoc Subcomm. on Disaster Recovery, Committee on Homeland Sec. and Government Affairs*, 112th Cong. 50-52 (Jan. 27, 2011). Attached as Exhibit C is a copy of the Gulf Coast Claims Facility Announcement of Payment Options, Eligibility and Substantiation Criteria, and Final Payment Methodology.

Interim Claims and Final Claims.  As its name indicates, an EAP is an advance on the payment of a claimant's Final Claim.

25.     At the outset of the program, the GCCF mailed 142,865 EAP claim packets to potential claimants who were identified by BP as individuals or businesses who filed a claim with them prior to August 23, 2010.  Those mailings occurred between August 20, 2010 and August 27, 2010.  After the initial mailing, the GCCF continued to mail EAP claim packets as requested by claimants until the end of the EAP program on November 23, 2010.  In total, the GCCF mailed 178,165 of these packets.

26.     Claimants had the ability to request multiple EAPs.  Claimants could apply for EAPs on a monthly basis or for six months of losses (including future losses).  If they submitted a claim for an EAP for six months, claimants were required to show that they would incur loss for the six-month period.  If they applied for a one-month EAP and subsequently applied for an EAP for another month, claimants were required to submit a Supplemental Request Form for each additional month for which they sought an EAP.  Claimants could only seek payment for six months of losses if their claim was for Lost Earnings or Profits, Loss of Subsistence Use of Natural Resources, or loss of income due to Physical Injury or Death.

27.     Claimants were not required to sign a release in return for an EAP.

28.     As of February 16, 2011, the GCCF had received 448,972 EAP claims and paid 168,983 EAP Claims (from 168,839 EAP claimants) for a total of $2,570,554, 541.  Although new EAP Claims are not being accepted, a limited number of EAP Claims are still being processed; therefore, these numbers will increase before the completion of the GCCF's work.  Thus, the GCCF has already paid in excess of $2.5 billion in interim, short-term claims to victims of the Spill.

14

### Interim Claims/Interim Payment Claim

29.     A non-EAP Interim Payment Claim is a claim only for documented past damages caused by the spill.

30.     Claimants may request multiple Interim Payments. Claimants may submit an Interim Claim once each quarter of each calendar year throughout the duration of the GCCF Program (or more frequently than once per quarter if exigent circumstances are shown), which concludes on August 22, 2013, or until the submission of either a Quick Payment Final Claim or a Full Review Final Payment Claim.

31.     The option to file multiple Interim Claims is available to claimants who decide that they prefer to see what actual damages they incur over the life of the GCCF program, as opposed to accepting in the near term a lump-sum Final Payment based on an estimate of future damages. Contrary to certain allegations that have been made, the GCCF has not intentionally delayed the processing of Interim Claims to coerce claimants to accept Final Payments.

32.     Claimants are not required to sign a release in return for an Interim Payment.

### Final Claims/Quick Payment Final Claim

33.     In order to expedite the payment of Final Claims to claimants who are satisfied with the EAP compensation they received and/or lack further documentation of additional loss to support an additional claim, the GCCF provides any claimant who has been paid an EAP or an Interim Payment with the option of requesting a Quick Payment Final Claim. This option permits such claimants to sign a Release and Covenant not to Sue and within 14 days be paid $5,000, if an individual, or $25,000, if a business, without having to submit any more documents or go through any more claims review.

34.     Claimants receive Quick Payments on an expedited basis, within 14 days of the receipt of the signed release by the GCCF.  As of February 16, 2011, 92,557 individuals and businesses have taken advantage of this option, and received a total of $819,255,000.

### Final Claims/Full Review Final Claim

35.     All claimants can file a Full Review Final Payment Claim to receive a lump-sum single payment for all damages, both past documented losses and estimated future losses, caused by the Spill.  The Full Review Final Payment Claim evaluation and determination will include a review of the calculation of any previous EAPs.  If appropriate, the GCCF will adjust the calculation and include any additional compensation due as part of the Final Payment Offer.  A Full Review Final Payment Claim requires complete substantiation and documentation of all damages sustained in the past.  The GCCF will analyze all existing and newly submitted documentation to compute, determine and pay all past and future damages.  The GCCF has been calculating interest (on all types of claims) and intends to pay interest to claimants by the end of the first quarter of 2011.  The GCCF will rely upon any documentation the claimant submits and analyses and documentation provided to the GCCF by experts retained by the GCCF to estimate future damages.

36.     The GCCF will deduct from any Full Review Final Payment: (a) any prior payments made to the claimant by BP, the NPFC, or the GCCF for losses due to the Spill; (b) if the claim is for lost individual earnings, any amounts received by the claimant as unemployment compensation, as severance pay, or any other employment benefit since the Spill; (c) any amounts received by the claimant from any insurance or other program as replacement income; and (d) amounts needed to pay any liens, garnishments or other attachments against the claimant that the GCCF has received.

16

37.   The GCCF currently has under review 52,271 Interim Claims and 89,860 Full Review Final Claims.

38.   Claimants who request a Full Review Final Payment must sign a Release and Covenant Not to Sue.

### Release and Covenant Not to Sue

39.   The Release and Covenant Not to Sue (a copy of which is attached hereto as Exhibit D) releases and waives any claims that the claimant has or may have in the future against BP and all other potentially responsible parties with regard to the Deepwater Horizon incident.

40.   After soliciting the views of various constituencies, I determined that a broad Release and Covenant Not to Sue was essential to fulfilling the legislative intent of OPA that the responsible party claims process fully and finally resolve claims and thereby minimize the chances that oil spills would be followed by protracted, slow and costly litigation.  As a result of the subrogation and contribution provisions of OPA, as well as various contractual and common law contribution and indemnity rights and obligations among the parties other than BP that may also ultimately be deemed legally responsible for damages arising from the Deepwater Horizon incident, a final settlement with a GCCF claim that did not include a broad Release and Covenant not to Sue would, in fact, not be final.  Operating individually or on behalf of a class of claimants, the claimant could subsequently sue another potentially responsible party, who if found liable might seek recompense from BP, which would in effect require BP to again litigate the matter it had previously settled.

I make this Declaration under the penalties of perjury pursuant to 28 U.S.C. § 1746, and I state that the facts set forth herein are true.

Kenneth R. Feinberg

Dated:   February 17, 2011