**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | § § § § § | MDL NO. 2179<br><br>SECTION:  J |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS<br>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | § § § | JUDGE BARBIER<br>MAG. JUDGE SHUSHAN |

**BP'S MEMORANDUM IN SUPPORT OF THIRD
MOTION FOR CONFIRMATION OF NON-APPLICABILITY OF
PRESERVATION OF EVIDENCE OBLIGATIONS AS TO CERTAIN
SUBPOENAED ITEMS AND CERTAIN NON-EVIDENTIARY ITEMS**

BP America Inc., BP America Production Company, and BP Exploration & Production Inc. (collectively, the "BP Defendants" or "BP") submit this Memorandum in Support of BP's Motion, which respectfully seeks confirmation of the non-applicability of Pretrial Order No. 1's preservation-of-evidence obligations as applied to certain equipment items lacking evidentiary value.

On November 19, 2010, and January 28, 2011, this Court entered Orders granting BP's First and Second Motions for Confirmation of Non-Applicability of Preservation of Evidence Obligations as to Certain Subpoenaed Items and Certain Non-Evidentiary Items (Document Nos. 780 and 1081) (the "First Confirmation Order" and the "Second Confirmation Order" or the "First and Second Confirmation Orders"). The First and Second Confirmation Orders prescribed a common sense procedure for the disposition of equipment bereft of evidentiary value.

18406067.3

The First Confirmation Order released BP from its preservation-of-evidence obligations as to 104 specific systems and items that were used in the Macondo response, including systems that flowed hydrocarbons from the well to the surface. The Second Confirmation Order released BP from its preservation-of-evidence obligations as to several hundred items described on two exhibits. The items covered by the Second Motion included items and systems that were staged on shore but never deployed for the Macondo response, and it included installation aids, rigging, and tooling used to install and operate the systems that comprised the Macondo response. The Second Motion further extended legal hold relief to similar equipment items ─ that is, other tools, rigging and installation aids and other items staged but never used ─ that BP might later locate and notice for future inspection.

The procedure set out in the First and Second Confirmation Orders has proven effective in permitting disposition of non-evidentiary equipment without prejudice to any party. Specifically, the procedures permitted under the First and Second Confirmation Orders authorize the release of equipment items, provided that MDL parties are notified regarding the contemplated release; the items are photographed; and the items are made available for inspection by MDL parties for five (5) business days.

Accordingly, BP hereby moves for a Third Order permitting the release of equipment lacking evidentiary valve. Here again, as before, BP proposes using the "disclose, photograph, inspect" regime established by the First and Second Confirmation Orders. This Motion is limited in scope to seeking the immediate release of only the items described below; namely, 50 components associated with several response systems, tooling, and associated equipment. These items fall into the following categories: (1) "Top Hats;" (2) a "Light Duty Intervention System"

2

("LDIS") and its components; (3) a "Hydrate Inhibition System" ("HIS") and its components; (4) certain subsea connectors and hoses; and (5) various specialized tools.

Significantly, all 50 items, once released from legal hold status, will be provided to the Marine Well Containment Company ("MWCC"), except for two "Top Hats," which will be made available for North Sea spill response under direction of the Government of the United Kingdom. These equipment items are urgently needed by the MWCC, and once contributed to it, they will complete BP's MWCC response kit equipment contributions to be used for responding to future Gulf of Mexico oil spills. (Ex. B, Pabon Decl. ¶ 7.) Significantly, it is critical that this kit be available for use by MWCC by February 28, 2011. (*Id.* ¶ 8.) The MWCC has represented to BOEM that it will be prepared to respond to any well incident by February 28, 2011, and BP's contribution to MWCC's response kit will be incomplete until these critical and unique items are added to that kit. (*Id.*)

In advance of this filing, BP shared drafts of this Motion with the appropriate liaison counsel, including counsel for the United States, and as of this filing no party has objected to entry of the proposed Order releasing these items. BP will make these items available for inspection the week of March 7 to 11, 2011. Additionally, and as further explained below, should there be a Gulf spill incident any time after February 28, 2011, BP seeks this Court's prior approval for making these 50 items — as well as approximately 134 additional items that are in the process of being inspected and photographed and that are also bound for the MWCC — immediately available for spill response, notwithstanding their inspection or legal hold status at the time.

## ARGUMENT

BP has gone to substantial lengths and incurred significant costs to retain physical items of equipment relating to the *Deepwater Horizon* incident and associated response efforts. These

3

preservation efforts can potentially be costly to the Gulf Region's citizens, however, if they hinder BP's efforts to contribute equipment kits to the MWCC for potential use in responding to future Gulf of Mexico oil spills. For this reason, BP is making every effort to make the parties and Court aware of instances where, out of an excess of caution, equipment lacking evidentiary value is being subjected to a legal hold notwithstanding that it is needed for potential future Gulf spill responses or potential future use by BP.

This Motion is exclusively concerned with such equipment. It is specifically concerned with equipment needed for potential spill responses, either in the Untied States or the United Kingdom. All of the equipment whose release is now being sought will be made available to the MWCC or to a similar British authority for future oil spill responses. Ensuring the availability of the Exhibit A equipment for potential use by MWCC as of February 28, 2011, is crucial for BP, and MWCC, to be able to fulfill the MWCC's statements regarding the spill response capability that will be in place as of that date. (Ex. B, Pabon Decl. ¶ 8.)

Attached to this Motion as Exhibit A is a list of equipment systems and their associated components totaling approximately 50 items that BP used or staged near the Gulf of Mexico during the response to the Macondo well incident. These items are similar and indeed nearly identical in character to the items discussed previously in BP's First Confirmation Motion (and its associated Order). Accordingly, these items lack evidentiary value, even though they are urgently needed for purposes of spill response. In brief, these systems are as follows:

**Top Hats**

Top Hats are containment devices designed to be landed on to a BOP or subsea pipe, and to provide a flowpath via a riser to a surface processing/oil collection vessel. Top Hats allow for and direct a flow of hydrocarbons to the surface, while also allowing access to the well through a

4

connection at the top of the device. Top Hats also typically contain a variety of connections for Hydrate Inhibition Systems and dispersant systems.

This Motion seeks release of Top Hats 2, 3, 7, 8, and 10. Top Hats 8 and 10 currently are staged in the United Kingdom, for a potential North Sea spill response, and the British government has asked BP to test them and potentially to modify their design to meet particular needs posed by North Sea conditions. The remaining Top Hats are currently stored at the ASCO warehouse in Houston, Texas.

All five Top Hats were deployed to the Gulf during the response to the April 20, 2010 accident. In some cases they were deployed on ships, and in others they were "wet parked" on mud mats located on the sea floor near the Macondo Well. But in no case were any of these five Top Hats connected with the Macondo well. And in no case did any hydrocarbons flow through these pieces of equipment. Top Hat 2 was modified for horizontal capture of a hydrocarbon flow (for use, for example, on riser pipe), while the other Top Hats were designed for vertical capture of a hydrocarbon flow. (Ex. B, Pabon Decl. ¶ 12.)

**LDIS or Light Duty Intervention System**

The Light Duty Intervention System is part of a riser system for connecting to a subsea manifold and flexible jumper system to form a flow path for moving hydrocarbons from the well to the surface, or for moving fluids associated with well control operations (e.g., mud or cement) from the surface to the well. An LDIS may also connect directly with a specific point of a hydrocarbon leak.

This particular LDIS was used in a variety of design configurations during the Macondo response. For one period at time, it was connected from the Macondo well to the surface through the drill string from the well up to the Q4000 vessel. This LDIS was used for the initial dynamic

top kill operation; it was used for the static kill operation; and in a different configuration it was used for the period between the top kill and static kill to capture hydrocarbons flowing from the Macondo well for ultimate containment on the Q4000. In a future response for the MWCC, the LDIS likely would be put to similar uses. (Ex. B, Pabon Decl. ¶ 10.)

**Hydrate Inhibition System**

HIS inhibits the formation of hydrates, which are solid forms of hydrocarbon crystals that can hamper emergency response subsea containment systems. HIS systems are comprised of a combination of vessel-based and subsea components. This particular HIS uses surface chemical pumps and IWOCS umbilical and subsea flying leads to deliver methanol and glycol to subsea injection points on various response systems. (IWOCS stands for installation workover control system.) Various HIS system configurations are possible based on the use of distribution systems and flying leads. In addition to the primary purpose of preventing hydrate formation, HIS was used in various roles during the Macondo response, including to flush seawater out of the flexible pipe prior to flowing hydrocarbons to the surface, to flush hydrocarbons from the flexible pipe prior to their recovery, and to flush the BOP and capping stack prior to their retrieval. (Ex. B, Pabon Decl. ¶ 11.)

**Subsea Connectors and Hoses**

Components including goosenecks and jumpers are used to form connections permitting the flow of fluids between various subsea system components. These particular components were used or staged offshore during the Macondo response. It is likely that none of the connectors and hoses described on Exhibit A had hydrocarbons flow through them during the response. (Ex. B, Pabon Decl. ¶ 13.)

**Specialized Tools**

Specialized tools include various flange and riser insertion and tube tools or "RITT tools." These particular tools were staged offshore for the Macondo response, but not used for any operations. These tools are specialized tools used to aid in the connection (or disconnection) of various other devices including risers and various capping devices. (Ex. B, Pabon Decl. ¶ 14.)

### RELEASES OF EXHIBIT A AND EXHIBIT C EQUIPMENT

BP is photographing the Exhibit A items, and BP plans to produce the great majority these photos to MDL counsel no later than Thursday, February 24, 2011. Furthermore, BP plans to make the Exhibit A items available for inspection by any party to this litigation beginning on March 7, 2011, and up through March 11, 2011. If for any reason, however, the MWCC should urgently require one or more Exhibit A items in order to respond to a Gulf emergency at any time after February 28, 2011, BP respectfully requests that it be permitted to release the needed Exhibit A items to the MWCC immediately ― regardless of their inspection status at time they become urgently needed for a spill response.

Relatedly, in addition this process for obtaining the release of the 50 Exhibit A items, BP also seeks prior approval for an emergency release of 134 additional items that BP recently noticed for inspection ― once again in the unlikely event such an emergency release should become necessary.

On February 18, BP sent the inspection notice attached as Exhibit C to this Memorandum to all MDL parties. This Notice, provided pursuant to the Court's January 28, 2011 Order, made available for inspection by MDL parties approximately 134 additional items BP plans to release to MWCC pursuant to the Court's January 28, 2011 Order. These items fall within the terms of that order and lack evidentiary value because they constitute either equipment that was staged but not deployed offshore, or rigging, tooling, or installation aids. BP is hoping to produce

7

photographs of the vast majority of these items by February 24. BP will make these 134 items available for inspection during the week of February 28, 2011.

Significantly, however, like the 50 Exhibit A items, these 134 Exhibit C items are urgently needed by the MWCC for purposes of a possible Gulf spill response. Accordingly, should there be a Gulf spill emergency during the week of February 28, 2011, or while the legal hold status of one or more of these items still had not been lifted, BP seeks this Court's approval for BP's early release of the relevant Exhibit C item in response to that pressing spill-response need.

*Wherefore*, BP respectfully requests that, because no party has raised an objection to the release of these systems and items; and because the items are urgently needed for future spill response by the MWCC (or in the North Sea), the items listed on Exhibit A shall be confirmed and consented-to as falling outside the scope of BP's preservation of evidence obligations set forth in Paragraph 14 of Pretrial Order No. 1, and the items listed on Exhibit C shall be confirmed as available for emergency spill response, in the unlikely event they should be immediately required for that purpose.

## CONCLUSION

BP respectfully requests that the Court grant this Third Confirmation Motion and enter the proposed Order submitted herewith.

Respectfully submitted,

/s/ Don K. Haycraft

Don K. Haycraft (Bar #14361)
(dkhaycraft@liskow.com)
R. Keith Jarrett (Bar #16984)
(rkjarrett@liskow.com)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana  70139-5099
Telephone:   (504) 581-7979
Facsimile:    (504) 556-4108

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200

Robert R. Gasaway
(robert.gasaway@kirkland.com)
Joseph A. Eisert
(joseph.eisert@kirkland.com)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
Telephone:   (202) 879-5000
Facsimile:    (202) 879-5200

*Attorneys for BP America Inc.,
BP America Production Company, and
BP Exploration & Production Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 22nd day of February, 2011.

                                    /s/ Don K. Haycraft
                                    Don K. Haycraft