## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL by the OIL RIG
            "DEEPWATER HORIZON" in the
            GULF OF MEXICO, on
            APRIL 20, 2010

THIS DOCUMENT RELATES TO:

*ALL CASES IN PLEADING BUNDLE*
*SECTION III.B(3)*

           :   MDL NO. 2179
           :
           :
           :
           :
           :   SECTION: J
           :
           :
           :
           :   JUDGE BARBIER
           :   MAG. JUDGE SHUSHAN
           :

. . . . . . . . . . . . . . . . . . . . . . . . . . . .   :   . . . . . . . . . . . . . . . . . . . . .

## <u>MEMORANDUM IN SUPPORT OF O'BRIEN'S RESPONSE MANAGEMENT, INC. AND NATIONAL RESPONSE CORPORATION'S MOTION TO DISMISS THE B3 BUNDLE MASTER COMPLAINT</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 3

    I.      FEDERAL AUTHORITY AND CONTROL OVER THE OIL SPILL
           RESPONSE ................................................................................................... 3

    II.     ROLE OF O'BRIEN'S AND NRC IN THE *DEEPWATER HORIZON*
           RESPONSE ................................................................................................... 6

    III.    PROCEDURAL POSTURE .......................................................................... 7

ARGUMENT ....................................................................................................................... 9

    I.      O'BRIEN'S AND NRC HAVE DERIVATIVE CLEAN WATER ACT
           IMMUNITY FOR ALL CLAIMS ASSERTED AGAINST THEM IN
           THE B3 BUNDLE MASTER COMPLAINT .................................................... 11

    II.     ALTERNATIVELY, O'BRIEN'S AND NRC HAVE DERIVATIVE
           DISCRETIONARY FUNCTION IMMUNITY UNDER THE FEDERAL
           TORT CLAIMS ACT FOR ALL CLAIMS ASSERTED AGAINST
           THEM IN THE B3 BUNDLE MASTER COMPLAINT ................................... 16

    III.    ALTERNATIVELY, THE CLAIMS AGAINST O'BRIEN'S AND NRC
           IN THE B3 BUNDLE MASTER COMPLAINT ARE PREEMPTED .............. 18

    IV.    ALTERNATIVELY, CERTAIN CLAIMS IN THE B3 BUNDLE
           MASTER COMPLAINT FAIL FOR SEPARATE AND INDEPENDENT
           REASONS .................................................................................................... 20

           A.     The Negligence *Per Se* Claim Fails To Satisfy the Minimum
                   Pleading Standards of *Twombly* and *Iqbal* ................................. 21

           B.     The Nuisance Claim Fails Because No Cause of Action Exists for
                   Public Nuisance Under the Applicable Law and, Alternatively,
                   Because Plaintiffs Lack Standing Under State Law ............................ 22

           C.     The Florida Medical Monitoring Claim Is Barred by the General
                   Maritime Law .................................................................................. 25

           D.     Neither O'Brien's Nor NRC Are "Responsible Parties" for Any
                   "Pollution" Under the Florida Pollutant Discharge Prevention and
                   Control Act ...................................................................................... 27

           E.     Any Claims for Economic Losses Absent Personal Injury or
                   Physical Damage to a Proprietary Interest Must Be Dismissed
                   Pursuant to the *Robins Dry Dock* Rule .................................................. 28

           F.     Request for Punitive Damages Must Be Dismissed ................................ 29

CONCLUSION .................................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ...........................................................................................10, 20, 21, 22

*Atlantic Sounding Co. v. Townsend*,
129 S. Ct. 2561 (2009) .........................................................................................................30, 31

*Augman v. Seacor Marine L.L.C.*,
No. 07-1508, 2007 WL 2726064 (E.D. La. Sept. 17, 2007) .................................................26

*Barasich v. Columbia Gulf Transmission Co.*,
467 F. Supp. 2d 676 (E.D. La. 2006) ....................................................................................21

*Bardwell v. George G. Sharp, Inc.*,
Nos. 93-3590 & 93-3591, 1995 WL 517120 (E.D. La. Aug. 30, 1995) ...............................30

*Bell Atl. Corp. v. Twombly*,
50 U.S. 544 (2007) ...........................................................................................10, 20, 21, 22

*Benefield v. Int'l Paper Co.*,
No. 2:09cv232-WHA, 2009 WL 2601425 (M.D. Ala. Aug. 21, 2009) .................................24

*Berkovitz v. United States*,
486 U.S. 531 (1988) .........................................................................................................16, 17

*Boyle v. United Technologies Corp.*,
487 U.S. 500 (1988) ..............................................................................................................15

*Canales Martinez v. Dow Chem. Co.*,
219 F. Supp. 2d 719 (E.D. La. 2002) .....................................................................................3

*Carden v. Gen. Motors Corp.*,
509 F.3d 227 (5th Cir. 2007) ...............................................................................................18

*Coastal Iron Works, Inc. v. Petty Ray Geophysical*,
783 F.2d 577 (5th Cir. 1986) ...............................................................................................25

*Dyer v. Merry Shipping Co.*,
650 F.2d 622 (5th Cir. 1981) ...............................................................................................30

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*E. Miss. Elec. Power Ass'n v. Porcelain Prods. Co.*,
    729 F. Supp. 512 (S.D. Miss. 1990)......................................................................................29

*Exxon Shipping Co. v. Baker*,
    554 U.S. 471 (2008)........................................................................................................31

*Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*,
    458 U.S. 141 (1982)..................................................................................................18, 19

*Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*,
    589 F.3d 778 (5th Cir. 2009) (en banc) ......................................................................22, 23

*Guevara v. Maritime Overseas Corp.*,
    59 F.3d 1496 (5th Cir. 1995) ............................................................................................30

*Harper v. Zapata Off-Shore Co.*,
    741 F.2d 87 (5th Cir. 1984) ..............................................................................................31

*Hayden v. Acadian Gas Pipeline Sys.*,
    No. 96-3612, 1997 WL 382059 (E.D. La. July 9, 1997) ..................................................30

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)............................................................................................................19

*Hufnagel v. Omega Serv. Indus., Inc.*,
    182 F.3d 340 (5th Cir. 1999) ............................................................................................23

*Hughes v. Gueydan Police Dep't*,
    No. CIV-A-6:10-1570, 2010 WL 5625661 (W.D. La. Dec. 30, 2010)...............................32

*Ill. Cent. R.R. Co. v. Harried*,
    No. 5:06cv160-DCB-JMR, 2010 WL 4553640 (S.D. Miss. Nov. 3, 2010) ..........................32

*In re Agent Orange Prod. Liab. Litig.*,
    517 F.3d 76 (2d Cir. 2008)...............................................................................................12

*In re Exxon Valdez*,
    1994 WL 182856 (D. Alaska Mar. 23, 1994) ...................................................................23

*In re Exxon Valdez*,
    1997 A.M.C. 940 (9th Cir. 1997).......................................................................................23

*In re Great Lakes Dredge & Dock Co.*,
    624 F.3d 201 (5th Cir. 2010) ............................................................................................21

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*In re Md. Marine, Inc.*,
  641 F. Supp. 2d 579 (E.D. La. 2009) ..................................................................31

*In re Oswego Barge Corp.*,
  664 F.2d 327 (2d Cir. 1981).............................................................................18

*In re Prempro Prod. Liab. Litig.*,
  230 F.R.D. 555 (E.D. Ark. 2005)......................................................................26

*In re S. Scrap Material Co.*,
  541 F.3d 584 (5th Cir. 2008) .....................................................................10, 22

*In re Taira Lynn Marine Ltd. No. 5, LLC*,
  444 F.3d 371 (5th Cir. 2006) .............................................................................28

*In re World Trade Ctr. Disaster Site Litig.*,
  521 F.3d 169 (2d Cir. 2008)...............................................................12, 13, 17

*J. Ray McDermott & Co. v. Vessel Morning Star*,
  457 F.2d 815 (5th Cir. 1972) (en banc) ........................................................25, 26

*Kadan v. Am. Contractors Ins. Co.*,
  No. 08-695, 2008 WL 5137259 (E.D. La. Dec. 5, 2008) ................................10, 12

*Legros v. Panther Servs. Group Inc.*,
  863 F.2d 345 (5th Cir. 1988) .............................................................................31

*Louisiana ex rel. Guste v. M/V TESTBANK*,
  752 F.2d 1019 (5th Cir. 1985) ......................................................................23, 28

*Lovelace v. Software Spectrum*,
  78 F.3d 1015 (5th Cir. 1996) ...............................................................................3

*Marquez-Colon v. Reagan*,
  668 F.2d 611 (1st Cir. 1981)..............................................................................23

*Mee Indus. v. Dow Chem. Co.*,
  608 F.3d 1202 (11th Cir. 2010) .........................................................................32

*Miles v. Apex Corp.*,
  498 U.S. 19 (1990)..............................................................................................30

*Miles v. Melrose*,
  882 F.2d 976 (5th Cir. 1989) .............................................................................31

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*O'Hara v. Celebrity Cruises, Inc.*,
   979 F. Supp. 254 (S.D.N.Y. 1997)....................................................................30

*Ramming v. United States*,
   281 F.3d 158 (5th Cir. 2001) .............................................................................9

*Robins Dry Dock & Repair Co. v. Flint*,
   275 U.S. 303 (1927)..................................................................................20, 28

*Rogers v. Coastal Towing, L.L.C.*,
   723 F. Supp. 2d 929 (E.D. La. 2010) ..........................................................25, 26

*Seaman v. Seacor Marine L.L.C.*,
   326 Fed. App'x 721 (5th Cir. 2009) ..................................................................25

*Sekco Energy, Inc. v. M/V MARGARET CHOUEST*,
   820 F. Supp. 1008 (E.D. La. 1993) ...................................................................23

*S. Pacific Co. v. Jensen*,
   244 U.S. 205 (1917)..................................................................................26, 27

*Trevino v. Gen. Dynamics Corp.*,
   865 F.2d 1474 (5th Cir. 1989) .....................................................................15, 17

*TS & C Investments, L.L.C. v. Beusa Energy, Inc.*,
   637 F. Supp. 2d 370 (W.D. La. 2009)................................................................29

*United States v. Varig Airlines*,
   467 U.S. 797 (1984)........................................................................................17

*Weggeman v. AshBritt, Inc.*,
   No. 106CV1256, 2007 WL 2026820 (S.D. Miss. July 6, 2007)..............................10

*Who Dat Yat LLC v. Who Dat? Inc.*,
   Nos. 10-1333 & 10-2296, 2011 WL 39043 (E.D. La. Jan. 4, 2011)........................10

*Wicker v. City of Galveston*,
   944 F. Supp. 553 (S.D. Tex. 1996) ...................................................................32

*Williamson v. Tucker*,
   645 F.3d 404 (5th Cir. 1981) .............................................................................9

*Yearsley v. W.A. Ross Construction*,
   309 U.S. 18 (1940)...........................................................................12, 13, 14, 17

iv

# TABLE OF AUTHORITIES
## (continued)

Page(s)

### STATE CASES

*Aramark Unif. & Career Apparel, Inc. v. Easton*,
  894 So. 2d 20 (Fla. 2005)............................................................................................27

*Carbajal v. Vivien Ice Co.*,
  104 So. 715 (La. 1925) ...............................................................................................24

*Cunningham v. Anchor Hocking Corp.*,
  558 So. 2d 93 (Fla. Dist. Ct. App. 1990) ....................................................................24

*Fla. Power & Light Co. v. Westinghouse Elec. Co.*,
  510 So. 2d 899 (Fla. 1987)..........................................................................................29

*Jamail v. Stoneledge Condo. Owners Ass'n*,
  970 S.W.2d 673 (Tex. Ct. App. 1998) ........................................................................24

*Landry v. Avondale Indus., Inc.*,
  864 So. 2d 117 (La. 2003) ...........................................................................................26

*Liberty Nat'l Life Ins. Co. v. Sanders*,
  792 So. 2d 1069 (Ala. 2000)........................................................................................32

*La. Crawfish Producers Ass'n-West v. Amerada Hess Corp.*,
  935 So. 2d 380 (La. Ct. App. 2006).............................................................................29

*Petito v. A.H. Robins*,
  750 So. 2d 103 (Fla. Dist. Ct. App. 1999) ..................................................................26

*PPG Indus., Inc. v. Bean Dredging*,
  447 So. 2d 1058 (La. 1984) .........................................................................................29

*Pugh v. Gen. Terrazzo Supplies, Inc.*,
  243 S.W.3d 84 (Tex. Ct. App. 2007) ..........................................................................29

*Robinson v. Indianola Mun. Separate Sch. Dist.*,
  467 So. 2d 911 (Miss. 1985)........................................................................................24

*Transp. Ins. Co. v. Moriel*,
  879 S.W.2d 10 (Tex. 1994)..........................................................................................33

*Vesta Fire Ins. Co. v. Milam & Co. Constr., Inc.*,
  901 So. 2d 84 (Ala. 2004)............................................................................................29

v

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Warren v. Derivaux,*
    966 So. 2d 729 (Miss. 2008)...................................................................................32

### FEDERAL STATUTES & REGULATIONS

28 U.S.C. § 2680(a) ...................................................................................15, 16

33 C.F.R. § 155.1035(i)(6)...........................................................................7

33 U.S.C. § 1321(c)(1)(A) ...........................................................................3

33 U.S.C. § 1321(c)(4) .................................................................................15

33 U.S.C. § 1321(d)(1)-(2) ..........................................................................3

33 U.S.C. § 1321(d)(2)(K) ...........................................................................3

33 U.S.C. § 1321(j)(8) ..................................................................................11, 15

40 C.F.R. § 300.5 ........................................................................................4

40 C.F.R. § 300.120 .....................................................................................4

40 C.F.R. § 300.135 .....................................................................................4

40 C.F.R. § 300.322(b) .................................................................................4, 19

40 C.F.R. § 300.323(c)..................................................................................4

42 U.S.C. § 5148 ..........................................................................................15

43 U.S.C. § 1332(2) ......................................................................................23

### STATE STATUTES

ALA. CODE § 6-5-332.2(c) ............................................................................15

ALA. CODE § 6-11-20(a) ...............................................................................32

FLA. STAT. § 376.09(5) .................................................................................16

FLA. STAT. § 376.031(5) ...............................................................................28

FLA. STAT. § 376.031(16) .............................................................................27

FLA. STAT. § 376.031(20) .............................................................................28

TABLE OF AUTHORITIES
(continued)

Page(s)

FLA. STAT. § 376.205 ......................................................................................27

FLA. STAT. § 768.72(2) ...................................................................................32

LA. CIV. CODE ANN. arts. 2315.3, 2315.4, 2315.7, and 3546 .........................32

LA. REV. STAT. ANN. § 30:2466B ...................................................................15

MISS. CODE ANN. § 11-1-65 ............................................................................32

MISS. CODE ANN. § 49-18-5 ............................................................................16

TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a).............................................33

TEX. NAT. RES. CODE ANN. § 40.104(b) ........................................................16

OTHER AUTHORITIES

Guidelines for the U.S. Coast Guard Oil Spill Removal Organization Classification
    Program, *available at*
    http://www.uscg.mil/hq/nsfweb/nsfcc/ops/ResponseSupport/RRAB/OSRODoc/
    OSROGuidelines2007draft.pdf ............................................................................7

NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE
    DRILLING, *Report to the President: Deep Water – The Gulf Oil Disaster and the
    Future of Offshore Drilling* (Jan. 2011), *available at*
    http://www.oilspillcommission.gov/...................................................4, 5, 6, 13, 16

NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE
    DRILLING, *Staff Working Paper No. 2: Decision-Making Within the Unified
    Command* (Jan. 11, 2011), *available at*
    http://www.oilspillcommission.gov/sites/default/files/documents/
    Updated%20Unified%20Command%20Working%20Paper.pdf ...................................4, 5, 13

NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE
    DRILLING, *Staff Working Paper No. 4: The Use of Surface and Subsea Dispersants
    During the BP Deepwater Horizon Oil Spill* (Jan. 11, 2011), *available at*
    http://www.oilspillcommission.gov/sites/default/files/documents/
    Updated%20Dispersants%20Working%20Paper.pdf.........................................................6, 14

President Barack Obama, "Remarks by the President to the Nation on the BP Oil Spill"
    (June 15, 2010), *available at* http://www.whitehouse.gov/the-press-office/remarks-
    president-nation-bp-oil-spill .........................................................................................1

RESTATEMENT (SECOND) OF TORTS § 821C (1979) .....................................................24

O'Brien's Response Management, Inc. ("O'Brien's") and National Response Corporation ("NRC") respectfully submit the following Memorandum in Support of their Motion to Dismiss the claims asserted against them in the Master Complaint in Accordance with PTO No. 11 Section III.B(3) (Rec. Doc. 881) (hereinafter, the "B3 Bundle Master Complaint") pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[1]

## **INTRODUCTION**

On April 20, 2010, an explosion on board the *Deepwater Horizon* in the Gulf of Mexico resulted in an oil spill that President Barack Obama described as "the worst environmental disaster America has ever faced."[2]  Neither O'Brien's nor NRC, however, caused the initial explosion or the resulting oil spill.  Indeed, they had nothing to do with the construction or operations of the *Deepwater Horizon*, and no one alleges that these two companies played any role in causing the blowout, the fire, the sinking of the rig, or the resulting oil spill.  Nor is it alleged that O'Brien's or NRC were involved with any efforts to cap the well.  Rather, O'Brien's and NRC responded to this environmental disaster as part of the federally mandated and controlled clean-up effort.  Now, these companies are being sued in the B3 Bundle Master Complaint for their role in the complex clean-up effort that the federal government orchestrated in the days, weeks, and months after the spill.  *See* B3 Bundle Master Complaint ¶¶ 61-62 (alleging that O'Brien's and NRC "participated in the post-explosion Oil Spill remediation and response efforts").

Because the federal government authorized, directed, and ultimately controlled the actions of O'Brien's and NRC alleged in the B3 Bundle Master Complaint pursuant to the Clean

---

[1]  O'Brien's is incorrectly identified in the B3 Bundle Master Complaint as "O'Brien Response Management, Inc."

[2] President Barack Obama, "Remarks by the President to the Nation on the BP Oil Spill" (June 15, 2010), *available at* http://www.whitehouse.gov/the-press-office/remarks-president-nation-bp-oil-spill.

Water Act ("CWA") and the National Contingency Plan ("NCP"), O'Brien's and NRC have derivative CWA immunity for such activities.  In short, the CWA provides absolute immunity to the federal government in connection with oil spill response efforts and, to protect the government's discretionary authority over this area of significant federal interest, O'Brien's and NRC must share in such immunity.  Consequently, this Court should dismiss all claims in the B3 Bundle Master Complaint against O'Brien's and NRC for lack of subject matter jurisdiction and failure to state a claim.

Alternatively, the claims against O'Brien's and NRC in the B3 Bundle Master Complaint should also be dismissed in their entirety for lack of subject matter jurisdiction and failure to state a claim because O'Brien's and NRC have derivative discretionary function immunity under the Federal Tort Claims Act.  Additionally, because O'Brien's and NRC performed the actions that are the subject of the B3 Bundle Master Complaint pursuant to the authorization, direction, and ultimate control of the federal government, the claims against O'Brien's and NRC should be dismissed in accordance with the doctrine of implied conflict preemption.  Finally, and only if the claims against O'Brien's and NRC are not dismissed in their entirety on derivative federal immunity and/or conflict preemption grounds, several of the claims against O'Brien's and NRC in the B3 Bundle Master Complaint nevertheless fail as a matter of law for the additional and independent reasons discussed below.

# FACTUAL BACKGROUND[3]

## I.    FEDERAL AUTHORITY AND CONTROL OVER THE OIL SPILL RESPONSE

The CWA, as amended by the Oil Pollution Act of 1990 ("OPA") following the *Exxon Valdez* spill, reflects the intent of Congress to ensure a rapid response to oil spills and to vest decision-making authority over response efforts in the federal government.   To that end, the CWA mandates that "[t]he President [of the United States] shall prepare and publish a National Contingency Plan for removal of oil and hazardous substances," and that the NCP "shall include . . . [a] schedule . . . identifying dispersants, other chemicals, and other spill mitigating devices and substances, if any, that may be used in carrying out the Plan."   33 U.S.C. § 1321(d)(1)-(2); *see also* B3 Bundle Master Complaint ¶ 109 ("[T]he United States Oil Spill National Contingency Plan permits spraying of chemical dispersants at least 3 miles offshore or where the water is at least 10 meters deep.").   Moreover, the CWA requires the pre-designation of a federal official for each of various geographical regions "who shall be the Federal On-Scene Coordinator" for those regions in the event of a spill, to avoid the delay that would be associated with selecting an individual to fill this post after a spill occurs.   33 U.S.C. § 1321(d)(2)(K).

In the event of a spill, the CWA provides that "[t]he President *shall*, in accordance with the National Contingency Plan and any appropriate Area Contingency Plan, ensure effective and immediate removal of a discharge . . . of oil . . . into or on the navigable waters."   33 U.S.C. § 1321(c)(1)(A) (emphasis added).   Pursuant to the NCP, if an oil spill "poses or may present a

---

[3] This factual summary is based on federal statutes, federal regulations, and three public documents produced by the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (its Final Report and two Staff Working Papers).   In ruling on this motion to dismiss, the Court can consider "matters of which [it] may take judicial notice."   *Lovelace v. Software Spectrum*, 78 F.3d 1015, 1018 (5th Cir. 1996).   Accordingly, because "the Court is authorized to take judicial notice of official government publications," it may properly consider the three public documents produced by the Commission.   *See Canales Martinez v. Dow Chem. Co.*, 219 F. Supp. 2d 719, 734 n.24 (E.D. La. 2002).   As referenced below, those three documents are available on the internet and are also attached to this motion as exhibits.

substantial threat to public health or welfare of the United States," the Federal On-Scene Coordinator "*shall direct all* federal, state, or *private actions* to remove the discharge."  40 C.F.R. § 300.322(b) (emphasis added); *see also* 40 C.F.R. §§ 300.120, 300.135.  Finally, an oil spill may be designated a "Spill of National Significance" if, "due to its severity, size, location, actual or potential impact on the public health and welfare or the environment, or the necessary response effort," the spill is "so complex that it requires extraordinary coordination of federal, state, local, and responsible party resources to contain and clean up."  40 C.F.R. § 300.5.  If a spill is designated a Spill of National Significance, the United States Coast Guard may appoint a "National Incident Commander" to "assume the role" of the Federal On-Scene Coordinator in "communicating with affected parties and the public, and coordinating federal, state, local, and international resources at the national level."  40 C.F.R. § 300.323(c).

Following the explosion on the *Deepwater Horizon*, this comprehensive federal response structure was immediately put into action.  Captain Joseph Scott Paradis, the Commander of the Coast Guard's Marine Safety Unit at Morgan City, Louisiana, "became the first Federal On-Scene Coordinator" under the NCP as helicopters from his sector "searched for missing crew members . . . as the *Deepwater Horizon* burned."[4]  "As the search and rescue continued on April 21, the oily sheen grew, more Coast Guard personnel and resources became involved, and Rear Admiral Mary Landry took over as Federal On-Scene Coordinator."[5]  Thereafter, the organizational structure mandated by federal law began to take shape:

---

[4] *See* NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Report to the President: Deep Water – The Gulf Oil Disaster and the Future of Offshore Drilling*, at 130 (Jan. 2011), *available at* http://www.oilspillcommission.gov/.  Relevant excerpts from the Commission's Final Report are attached as Ex. A to this motion.

[5] *Id.*  "On June 1, Admiral Landry returned to her Eighth District duties to prepare for hurricane season, and Admiral James Watson became [the Federal On-Scene Coordinator].  He later transferred the position to Admiral Paul Zukunft."  NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Staff Working Paper No. 2: Decision-Making Within the Unified Command*, at 4

At 10:22 a.m. on April 22, the rig sank, taking with it the diesel fuel still on board. By that time, the Coast Guard had established an Incident Command Post in a BP facility in Houma, Louisiana.  BP had formed a command post in its corporate headquarters in Houston, Texas shortly after the explosion, and the Coast Guard established an Incident Command Post there as well.  These Incident Command Posts, along with one in Mobile, Alabama, and others established later, would become the centers of response operations, with their activities directed by the Federal On-Scene Coordinator as part of the government's Unified Command.[6]

On April 29, 2010, the Coast Guard designated the *Deepwater Horizon* spill a Spill of National Significance—the first oil spill to ever be so designated.[7]   On May 1, 2010, Secretary of Homeland Security Janet Napolitano "announced that Admiral Thad Allen, the outgoing Commandant of the Coast Guard and then its only four-star Admiral, would serve as National Incident Commander."[8]

"During the *Deepwater Horizon* spill response, the National Incident Commander coordinated interagency efforts on the wide variety of issues responders faced, and dealt with high-level political and media inquiries, while the Federal On-Scene Coordinator generally retained oversight of day-to-day operations."[9]   Indeed, "[a]lthough the unified command system is designed to bring together different stakeholders to make decisions, one individual needs to have ultimate decision-making power in the event of a conflict," and "that individual is the Federal On-Scene Coordinator."[10]   For example, "[a]t the direction of the Federal On-Scene Coordinator, responders first sprayed dispersants on the surface oil slick on April 22" and,

---

n.19 (Jan. 11, 2011), *available at* http://www.oilspillcommission.gov/sites/default/files/documents/Updated%20Unified%20Command%20Working%20Paper.pdf, and attached as Ex. B to this motion.

[6] NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Report to the President: Deep Water – The Gulf Oil Disaster and the Future of Offshore Drilling*, *supra* note 4, at 131.

[7] *See id.* at 136.

[8] *Id.*

[9] *Id.*

[10] NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Staff Working Paper No. 2: Decision-Making Within the Unified Command*, *supra* note 5, at 4.

"[w]ith the permission of the Federal On-Scene Coordinator, BP and its contractors applied 14,654 gallons of the dispersant Corexit on the surface during the week of April 20 to 26."[11] Dispersant use increased as the response continued, but "[a]fter the well was capped on July 15, 2010, there was virtually no further use of dispersants."[12]   Ultimately, BP and its contractors applied "a total of 1.84 million gallons" of dispersant, "of which 1.07 million gallons were applied on the surface and 771,000 gallons were [applied] subsea."[13]

"The effect of pre-approval" of dispersants in the NCP "is to eliminate the need for approvals and consultations during the response and to allow the Federal On-Scene Coordinator to act unilaterally."[14]   In an August 1, 2010 press conference, "Admiral Allen noted that the decision to use the dispersants did not rest with BP [or, its contractors or subcontractors for that matter].   Rather, he said, 'it's a decision by the Federal on-scene coordinator' through a 'very disciplined doctrinal process.'"[15]

## II.   ROLE OF O'BRIEN'S AND NRC IN THE *DEEPWATER HORIZON* RESPONSE

As alleged in the B3 Bundle Master Complaint, and as mandated by the CWA, OPA, and the NCP, the federal government authorized, directed, and ultimately controlled the various functions that O'Brien's and NRC performed within the federal response structure created to

---

[11] NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Report to the President: Deep Water – The Gulf Oil Disaster and the Future of Offshore Drilling*, *supra* note 4, at 143-44.  Although EPA Administrator Lisa Jackson "ultimately gave EPA's approval for subsea dispersant use," neither O'Brien's nor NRC were involved in the subsea application of dispersants.  *Id.* at 145.

[12] NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Staff Working Paper No. 4: The Use of Surface and Subsea Dispersants During the BP Deepwater Horizon Oil Spill*, at 12 (Jan. 11, 2011), *available at* http://www.oilspillcommission.gov/sites/default/files/documents/ Updated%20Dispersants%20Working%20Paper.pdf, and attached as Ex. C to this motion.

[13] *Id.*

[14] *Id.* at 5.

[15] *Id.* at 12.

respond to the *Deepwater Horizon* spill.  *See* B3 Bundle Master Complaint ¶ 92 ("The U.S. Coast Guard is responsible for . . . responding to oil spills and supervising and/or coordinating response actions."); *id.* ¶ 109 ("The Coast Guard's Federal On-Scene Coordinator . . . must approve BP's requests to use chemical dispersants.").

O'Brien's is largely a shore-based team that provides regulatory compliance, emergency preparedness, response management, disaster services, and crisis management for the maritime, petrochemical, and energy industries and various government agencies.  O'Brien's provided personnel to fill various positions within the federal structure that was established to respond to the *Deepwater Horizon* oil spill.  NRC is a classified oil spill removal organization pursuant to the Coast Guard's Oil Spill Removal Organization program[16] and has clients engaged in every aspect of the transportation, storage, transfer, processing, exploration, and production of oil and petroleum products.  Pursuant to Coast Guard regulations, NRC maintains certain mandatory equipment (such as containment booms and other oil-skimming equipment) and trained personnel to operate this equipment.  *See* 33 C.F.R. § 155.1035(i)(6).  NRC utilized such equipment and personnel to assist with the cleaning of the surface of the Gulf of Mexico in the aftermath of the *Deepwater Horizon* spill.

## III.   PROCEDURAL POSTURE

In Pretrial Order No. 11 (Case Management Order No. 1) (Rec. Doc. 569), the Court established eight separate "pleading bundles" for different categories of cases and claims in this multidistrict litigation.  The Court initially designated the B3 pleading bundle as the "Post-Explosion Clean-Up Claims" bundle in Pretrial Order No. 11, but subsequently renamed the B3

---

[16] *See generally* Guidelines for the U.S. Coast Guard Oil Spill Removal Organization Classification Program, *available at* http://www.uscg.mil/hq/nsfweb/nsfcc/ops/ResponseSupport/RRAB/OSRODoc/ OSROGuidelines2007draft.pdf

7

pleading bundle the "Clean-Up, Medical Monitoring, and Post-April 20 Personal Injury Claims" bundle and revised it to include "all claims, of any type, relating to post-explosion clean-up efforts asserted against Defendants not named in the B1 Master Complaint, as well as all claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 20, 2010."  Pretrial Order No. 25 (Rec. Doc. 983).[17]

Prior to the filing of the B3 Bundle Master Complaint, O'Brien's was named as a defendant in only one individual action in this MDL and NRC had not been named in any individual actions.[18]  Although it does not specifically identify a single plaintiff, the B3 Bundle Master Complaint purports to assert eleven "claims for relief" on behalf of five categories of nameless plaintiffs.[19]  Only seven of these claims, however, are asserted against O'Brien's and NRC.  Specifically, the B3 Bundle Master Complaint asserts the following claims against O'Brien's and NRC:

- Negligence (Third Claim for Relief - ¶¶ 219-28)

- Gross Negligence (Fourth Claim for Relief - ¶¶ 229-36)

---

[17] The B1 pleading bundle includes non-governmental economic loss and property damage claims. Paragraph 18 of Pretrial Order No. 25 also deleted the second sentence of paragraph 18 of the B3 Bundle Master Complaint such that no causes of action from the B1 Bundle Master Complaint are incorporated into the B3 Bundle Master Complaint.  Neither O'Brien's nor NRC are named as defendants in the B1 Bundle Master Complaint.

[18] O'Brien's was named as a defendant in *John Wunstell, Jr., et al. v. BP, PLC, et al.*, No. 10-2543. Pursuant to paragraph 8 of Pretrial Order No. 25, the *Wunstell* matter is "stayed until further order of the Court."  Moreover, pursuant to paragraph 5 of Pretrial Order No. 25, "the allegations, claims, theories of recovery and/or prayers for relief contained within" the *Wunstell* matter "are deemed to be amended, restated, and superseded by the allegations, claims, theories of recovery, and/or prayers for relief" in the B3 Bundle Master Complaint.

[19] The five categories of plaintiffs identified in the B3 Bundle Master Complaint include (a) boat captains and crew involved in the Vessels of Opportunity program, (b) workers involved in decontaminating vessels that came into contact with oil and/or chemical dispersants, (c) vessel captains and crew who were not involved in the Vessels of Opportunity program but who were exposed to harmful chemicals, odors and emissions during post-explosion clean-up activities, (d) clean-up workers and beach personnel who were involved in clean-up activities along shorelines and intercoastal and intertidal zones, and (e) residents who live and work in close proximity to coastal waters.  *See* B3 Bundle Master Complaint ¶ 21.

- Negligence *Per Se* (Fifth Claim for Relief - ¶¶ 237-42)

- Nuisance (Seventh Claim for Relief - ¶¶ 259-71)

- Battery (Eighth Claim for Relief - ¶¶ 272-77)

- Florida Medical Monitoring Claim (Ninth Claim for Relief - ¶¶ 278-88)

- Strict Liability Pursuant To The Florida Pollutant Discharge Prevention And Control Act Fla. Stat. § 376.011, *et seq* (Eleventh Claim for Relief - ¶¶ 307-20)

Along with several other defendants, the B3 Bundle Master Complaint refers to O'Brien's and NRC as the "Dispersant Defendants."  With respect to the Dispersant Defendants, the B3 Bundle Master Complaint generally alleges that such defendants "failed to use reasonably safe dispersant chemicals or other chemicals in their attempts to respond to the Oil Spill, and thereby exacerbated the pollution of the Gulf of Mexico and injury to Plaintiffs," and "ignored worker safety concerns."  B3 Bundle Master Complaint ¶¶ 162, 167.[20]

## **ARGUMENT**

"Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case."  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  Notably, "[t]he burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction" and, thus, "the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist."  *Id.*  Moreover, "[i]n examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may be in dispute."  *Id.* (citing *Williamson v. Tucker*, 645 F.3d 404, 413 (5th Cir. 1981)).  The existence of derivative federal immunity will divest the Court of subject matter jurisdiction.

---

[20] Although the claims asserted in the B3 Bundle Master Complaint are patently inappropriate for class treatment, O'Brien's and NRC will not address such issues here in light of the stay on Rule 23 motion practice on class certification issues imposed by Paragraph VII of Pretrial Order No. 11.  Rather, O'Brien's and NRC specifically preserve all objections to the requests for certification of class actions contained in the B3 Bundle Master Complaint.  *See* B3 Bundle Master Complaint ¶¶ 176-93.

*See, e.g., Kadan v. Am. Contractors Ins. Co.*, No. 08-695, 2008 WL 5137259, at *2 (E.D. La. Dec. 5, 2008) (examining derivative federal immunity argument under Rule 12(b)(1)); *Weggeman v. AshBritt, Inc.*, No. 106CV1256, 2007 WL 2026820 (S.D. Miss. July 6, 2007) (granting Rule 12(b)(1) motion to dismiss on derivative federal immunity grounds).

In recent years, the United States Supreme Court has clarified the minimum pleading standards for a complaint to survive a Rule 12(b)(6) motion to dismiss. *See, e.g., Bell Atl. Corp. v. Twombly*, 50 U.S. 544 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). To avoid dismissal under Rule 12(b)(6), a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," and must be, at a minimum, "plausible." *Twombly*, 550 U.S. at 555, 570. "A claim is facially plausible when the plaintiff pleads facts that allow the court to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Who Dat Yat LLC v. Who Dat? Inc.*, Nos. 10-1333 & 10-2296, 2011 WL 39043, at *5 (E.D. La. Jan. 4, 2011) (quoting *Iqbal*, 129 S. Ct. at 1949); *see also In re S. Scrap Material Co.*, 541 F.3d 584, 587 (5th Cir. 2008) (explaining that a complaint must state "'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements") (quoting *Twombly*, 550 U.S. at 556). A complaint must contain either direct or inferential allegations with respect to all of the material elements of each claim, and mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 129 S. Ct. at 1949. "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (internal quotation omitted).

The allegations contained in the B3 Bundle Master Complaint are insufficient as a matter of law to sustain any of the seven causes of action asserted against O'Brien's and NRC. Because

the Federal On-Scene Coordinator and/or the National Incident Commander authorized, directed, and ultimately controlled all of O'Brien's and NRC's activities challenged by the B3 Bundle Master Complaint (including any use of dispersants and any burning of oil off the surface of the water), O'Brien's and NRC have derivative CWA immunity for such activities and all causes of action against O'Brien's and NRC should be dismissed for lack of subject matter jurisdiction and failure to state a claim.

Alternatively, the claims against O'Brien's and NRC in the B3 Bundle Master Complaint should also be dismissed in their entirety for lack of subject matter jurisdiction and failure to state a claim because O'Brien's and NRC have derivative discretionary function immunity under the Federal Tort Claims Act.  Additionally, because O'Brien's and NRC performed the actions that are the subject of the B3 Bundle Master Complaint pursuant to the authorization, direction, and ultimate control of the federal government, the claims against O'Brien's and NRC should be dismissed in accordance with the doctrine of implied conflict preemption.  Finally, and only if the claims against O'Brien's and NRC are not dismissed in their entirety on derivative federal immunity and/or conflict preemption grounds, several of those claims nevertheless fail as a matter of law for the additional and independent reasons discussed below.

I.   **O'BRIEN'S AND NRC HAVE DERIVATIVE CLEAN WATER ACT IMMUNITY FOR ALL CLAIMS ASSERTED AGAINST THEM IN THE B3 BUNDLE MASTER COMPLAINT**

Because O'Brien's and NRC performed the actions that are the subject of the B3 Bundle Master Complaint pursuant to the authorization, direction, and ultimate control of the federal government, O'Brien's and NRC must share in the federal government's broad immunity for such actions under the CWA.  *See* 33 U.S.C. § 1321(j)(8) ("The United States Government is not liable for any damages arising from its actions or omissions relating to any response plan

required by this section.").  Accordingly, all of the claims asserted against O'Brien's and NRC in the B3 Bundle Master Complaint should be dismissed for lack of subject matter jurisdiction and failure to state a claim.

Over seventy years ago, the United States Supreme Court established the concept of derivative immunity for parties acting under the direction and control of the federal government in the exercise of legitimate federal authority.  *See Yearsley v. W.A. Ross Construction*, 309 U.S. 18 (1940).  The purpose of such derivative immunity is not to protect private parties *per se*, but "solely as a means of protecting the government's discretionary authority over areas of significant federal interest."  *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 89-90 (2d Cir. 2008); *see also Kadan v. Am. Contractors Ins. Co.*, No. 08-695, 2008 WL 5137259, at *2 (E.D. La. Dec. 5, 2008) (explaining that such immunity is "necessary to preserve a uniquely federal interest") (internal quotations omitted).

In holding that derivative immunity was available for actions taken by private parties in response to the 9/11 terrorist attacks on the World Trade Center, the United States Court of Appeals for the Second Circuit held "that the rationale for the government contractor defense would extend to the disaster relief context due to the unique federal interest in coordinating federal disaster assistance and streamlining the management of large-scale disaster recovery projects."  *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 197 (2d Cir. 2008). Although the Second Circuit recognized derivative immunity under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, which was invoked in response to the terrorist attacks (just as it was in response to Hurricane Katrina), the court's reasoning applies with even greater force in this case.

As the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling recently explained, the federal government plays a "fundamentally different role" when responding to an oil spill disaster under the CWA and NCP than it does when it responds to a disaster under the Stafford Act:  "Instead of a state-run response supplemented with federal resources and financing, the NCP demands that the federal government direct the response through a Federal On-Scene Coordinator."[21]  Indeed, the NCP "gives the Federal On-Scene Coordinator the power to direct all response actions."[22]  "Thus, while the Stafford Act envisions a state-directed (though in part federally funded) response, the National Contingency Plan puts federal officials in charge."[23]  As a result, the need for derivative immunity is even more compelling here than it was in the 9/11 litigation.

Private entities such as O'Brien's and NRC are entitled to derivative federal immunity when they perform work pursuant to the authorization and direction of the federal government and the acts of which plaintiffs complain fall within the scope of those government directives. *See Yearsley*, 309 U.S. at 20-21; *In re World Trade Ctr.*, 521 F.3d at 196.  There can be no doubt that, in performing their functions and assisting with the clean up of the *Deepwater Horizon* oil spill, O'Brien's and NRC acted pursuant to the authorization, direction, and ultimate control of the federal government.  *See* B3 Bundle Master Complaint ¶ 92 ("The U.S. Coast Guard is responsible for . . . responding to oil spills and supervising and/or coordinating response actions."); *id.* ¶ 109 ("The Coast Guard's Federal On-Scene Coordinator . . . must approve BP's requests to use chemical dispersants."); *see also supra* Statement of Facts, Parts I-II.

---

[21] *See* NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Staff Working Paper No. 2, Decision-Making Within the Unified Command*, *supra* note 5, at 17.

[22] NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Report to the President: Deep Water – The Gulf Oil Disaster and the Future of Offshore Drilling*, *supra* note 4, at 138.

[23] *Id.*

In responding to the *Deepwater Horizon* spill, the federal government did not assume a passive role and simply issue directions for O'Brien's, NRC, and the other responders to follow. To the contrary, federal officials were—unlike in *Yearsley*—present in the Gulf region performing the federal government's lead role by actively managing, directing, and controlling all aspects of the response in real time and deciding how best to conduct the containment and clean-up efforts. Indeed, as noted above, the Federal On-Scene Coordinator "retained oversight of day-to-day operations."[24] This daily federal oversight included decisions about the use of dispersants and the burning of oil off the surface of the water. Admiral Allen, the National Incident Commander, "noted that the decision to use the dispersants did not rest with BP [or, its contractors or subcontractors for that matter]. Rather, he said, 'it's a decision by the Federal on-scene coordinator' through a 'very disciplined doctrinal process.'"[25]

The availability of derivative immunity in this case is reinforced by Congress' desire, reflected in the CWA and OPA, to promote effective and efficient responses to oil spills. In order for the federal government to achieve these dual goals, private parties that are called upon to implement the directives of the Federal On-Scene Coordinator and/or National Incident Commander should not have to evaluate whether it is worth the risk of being subjected to litigation before deciding to faithfully execute such federal directives. Indeed, denying derivative immunity to entities such as O'Brien's and NRC in the context of a Spill of National Significance risks undermining the entire federal response structure set forth in the CWA, OPA, and the NCP.

---

[24] *Id.* at 136.

[25] NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Staff Working Paper No. 4: The Use of Surface and Subsea Dispersants During the BP Deepwater Horizon Oil Spill*, *supra* note 12, at 12.

14

Finally, unlike the federal government's "discretionary function" immunity under the Federal Tort Claims Act, 28 U.S.C. § 2680(a), and the Stafford Act, 42 U.S.C. § 5148, the CWA provides <u>absolute immunity</u> to the federal government in connection with oil spill response efforts:  "The United States Government is not liable for any damages arising from its actions or omissions relating to any response plan required by this section."   33 U.S.C. § 1321(j)(8). Accordingly, because the three-part test established in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), is designed to "locate the exercise of discretion in the government" to determine whether, as an initial matter, the government enjoys immunity under the "discretionary function" exception, that test has no applicability in the context of derivative immunity under the CWA.  *Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1481 (5th Cir. 1989).  In short, because the federal government enjoys broad immunity for its actions or omissions relating to its response to the *Deepwater Horizon* spill, and because its actions included approving, directing, and ultimately controlling the activities of O'Brien's and NRC in responding to the *Deepwater Horizon* spill, the B3 Bundle Master Complaint should be dismissed in its entirety as against these defendants for lack of subject matter jurisdiction and failure to state a claim because O'Brien's and NRC share derivatively in the federal government's absolute immunity under the CWA.[26]

---

[26] In the case of the *Deepwater Horizon* spill—which, as noted above, was the first oil spill to ever be designated a Spill of National Significance—the unprecedented involvement of the federal government in authorizing, directing, and controlling the response results in the availability of broad derivative immunity protection for responders under 33 U.S.C. § 1321(j)(8) for all claims related to the response.  In addition, the CWA, as amended by OPA, also includes a responder immunity provision that generally provides that responders are not liable for "removal costs or damages" resulting from "actions taken or omitted to be taken" in responding to oil spills.  *See* 33 U.S.C. § 1321(c)(4).  This responder immunity provision typically applies in the case of smaller or more routine oil spills, where derivative federal immunity under § 1321(j)(8) may not be applicable.  But to the extent the claims against O'Brien's and NRC in the B3 Bundle Master Complaint are not dismissed in their entirety on derivative federal immunity or conflict preemption grounds based on the overwhelming federal direction and control of the response efforts, O'Brien's and NRC respectfully move in the alternative for dismissal of applicable claims under § 1321(c)(4) and similar state statutes.  *See* LA. REV. STAT. ANN. § 30:2466B; ALA. CODE § 6-5-332.2(c);

## II.  ALTERNATIVELY, O'BRIEN'S AND NRC HAVE DERIVATIVE DISCRETIONARY FUNCTION IMMUNITY UNDER THE FEDERAL TORT CLAIMS ACT FOR ALL CLAIMS ASSERTED AGAINST THEM IN THE B3 BUNDLE MASTER COMPLAINT

Because O'Brien's and NRC performed the actions that are the subject of the B3 Bundle Master Complaint pursuant to the authorization, direction, and ultimate control of the federal government, O'Brien's and NRC are also entitled to derivative discretionary function immunity under the Federal Tort Claims Act ("FTCA").  *See* 28 U.S.C. § 2680(a) (barring claims against the federal government "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused").  Therefore, all of the claims asserted against O'Brien's and NRC in the B3 Bundle Master Complaint should be dismissed for lack of subject matter jurisdiction and failure to state a claim.

As an initial matter, there can be no doubt that the federal government would enjoy discretionary function immunity for its actions in responding to the *Deepwater Horizon* spill. First, the decisions made by the Federal On-Scene Coordinator and National Incident Commander concerning the manner in which the clean-up operations would be conducted clearly "involve[d] an element of judgment or choice."  *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).  Second, as illustrated by the decision to use dispersants, those decisions were "based on considerations of public policy."  *Id.* at 537.  As recounted by the National Commission on the BP Deepwater Horizon Oil Spill, the Coast Guard was faced with a "tradeoff of bad choices between spraying chemicals on the water or watching more oil reach the shore."[27]  These are

---

MISS. CODE ANN. § 49-18-5; FLA. STAT. § 376.09(5); TEX. NAT. RES. CODE ANN. § 40.104(b).

[27] NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Report to the President: Deep Water – The Gulf Oil Disaster and the Future of Offshore Drilling*, *supra* note 4, at 143 (internal quotations omitted).

precisely the types of governmental decisions that discretionary function immunity is designed to insulate from judicial review:  "The basis for the discretionary function exception was Congress' desire to 'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'"  *Id.* at 537-38 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)).

Private entities such as O'Brien's and NRC are entitled to derivative discretionary function immunity when they perform work pursuant to the authorization and direction of the federal government and the acts of which plaintiffs complain fall within the scope of those government directives.  *See Yearsley*, 309 U.S. at 20-21; *see also In re World Trade Ctr.*, 521 F.3d at 197 (relying on the Fifth Circuit's decision in *Trevino* to hold that derivative discretionary function immunity is available in the emergency-response context where "(1) the agency, in its discretion, approved reasonably precise specifications regarding the management of a recovery site; (2) the agency supervised and controlled an entity charged with implementing those specifications; and (3) the entity warned the agency about any dangers known to it but not to the agency").  There can be no doubt that, in performing their functions and assisting with the clean up of the *Deepwater Horizon* oil spill, O'Brien's and NRC acted pursuant to the authorization, direction, and ultimate control of the federal government.  *See* B3 Bundle Master Complaint ¶ 92 ("The U.S. Coast Guard is responsible for . . . responding to oil spills and supervising and/or coordinating response actions."); *id.* ¶ 109 ("The Coast Guard's Federal On-Scene Coordinator . . . must approve BP's requests to use chemical dispersants."); *see also supra* Statement of Facts, Parts I-II.  Accordingly, O'Brien's and NRC have derivative discretionary function immunity under the FTCA and the B3 Bundle Master Complaint should be dismissed in

its entirety as against these defendants for lack of subject matter jurisdiction and failure to state a claim.

## III.    ALTERNATIVELY, THE CLAIMS AGAINST O'BRIEN'S AND NRC IN THE B3 BUNDLE MASTER COMPLAINT ARE PREEMPTED

Because O'Brien's and NRC performed the actions that are the subject of the B3 Bundle Master Complaint pursuant to the authorization, direction, and ultimate control of the federal government, the claims against O'Brien's and NRC should also be dismissed in accordance with the doctrine of implied conflict preemption under the unique circumstances of this case.  In short, the claims asserted against O'Brien's and NRC in the B3 Bundle Master Complaint conflict with the comprehensive federal response scheme set forth in the CWA, OPA, and the NCP because O'Brien's and NRC were compelled by federal law to obey the daily directives issued by the Federal On-Scene Coordinator in responding to the *Deepwater Horizon* oil spill—the only spill ever to be designated a Spill of National Significance.

Under the Supremacy Clause of the U.S. Constitution, federal law impliedly preempts claims made under both state law and the general maritime law when such state or maritime law "conflicts with federal law or its purpose."  *Carden v. Gen. Motors Corp.¸* 509 F.3d 227, 230 (5th Cir. 2007) (discussing preemption of state law); *In re Oswego Barge Corp.*, 664 F.2d 327, 337-38 (2d Cir. 1981) ("Though judge-made maritime law has thus been less easily displaced by statutory preemption than non-maritime federal common law, preemption of maritime law has occurred both as to prior judge-made law and the authority to fashion new law.").  Such a conflict exists either "when compliance with both federal and state regulations is a physical impossibility," *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982), or when a plaintiff's claims "stand[] as an obstacle to the accomplishment and execution of the full

purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).  Both circumstances exist in this case.

First, to the extent that the B3 Bundle Master Complaint alleges that the actions of O'Brien's and NRC in responding to the *Deepwater Horizon* spill violated state or maritime law, it would have been physically impossible for O'Brien's and NRC to have complied with such laws without violating the CWA, OPA, and the NCP.  *See De la Cuesta*, 458 U.S. at 153.  As explained above, federal law provides that the Federal On-Scene Coordinator "shall direct all federal, state, or private actions to remove the discharge."  40 C.F.R. § 300.322(b).  Thus, federal law imposed a duty on O'Brien's and NRC to obey the directives of the Federal On-Scene Coordinator and National Incident Commander.  If O'Brien's and NRC had refused to obey such federal directives in order to conform to their purported duties under state or maritime law, they would have violated the CWA, OPA, and the NCP.

Second, the claims against O'Brien's and NRC in the B3 Bundle Master Complaint "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in promoting an effective and efficient federal response to significant oil spills. *Hines*, 312 U.S. at 67.  Indeed, the B3 Bundle Master Complaint seeks to substitute the decision of this Court about appropriate response activities for the expert judgment of the Coast Guard and the other federal agencies that authorized, directed, and controlled the actions of O'Brien's and NRC in responding to the *Deepwater Horizon* spill.  As described in detail above, the CWA, OPA, and the NCP set forth a comprehensive regime which squarely placed the responsibility for the clean-up effort upon the federal government.  By second-guessing the federal government's decisions and careful balancing of the public interest in responding to the *Deepwater Horizon* spill, the claims asserted against O'Brien's and NRC in the B3 Bundle Master Complaint are

clear "obstacles" to the purposes and objectives of the CWA, OPA, and the NCP.  Accordingly, such claims should be dismissed in their entirety pursuant to the doctrine of implied conflict preemption.

## IV.   ALTERNATIVELY, CERTAIN CLAIMS IN THE B3 BUNDLE MASTER COMPLAINT FAIL FOR SEPARATE AND INDEPENDENT REASONS

If the Court does not dismiss the claims asserted against O'Brien's and NRC in the B3 Bundle Master Complaint in their entirety on derivative federal immunity or conflict preemption grounds, the Court should nevertheless dismiss several of those claims for separate and independent reasons.  First, the negligence *per se* claim fails to satisfy the minimum pleading requirements established in *Twombly* and *Iqbal*.  Second, the nuisance claim fails because there is no cause of action for public nuisance under the applicable law and, alternatively, because the plaintiffs do not have standing to assert this claim under state law.  Third, the Florida medical monitoring claim is barred by the general maritime law.  Fourth, the claim under the Florida Pollutant Discharge Prevention and Control Act fails because neither O'Brien's nor NRC are "responsible parties" for any "pollution" as those terms are defined by the Florida statute.  Fifth, any claims for economic losses absent personal injury or physical damage to a proprietary interest must be dismissed pursuant to the *Robins Dry Dock* rule.  Finally, the request for punitive damages must be dismissed because punitive damages are not available under the general maritime law in this case and, regardless, the B3 Bundle Master Complaint fails to allege that O'Brien's or NRC engaged in any "outrageous" or "malicious" conduct as would be required under any conceivably applicable law.

## A. The Negligence *Per Se* Claim Fails To Satisfy the Minimum Pleading Standards of *Twombly* and *Iqbal*

The negligence *per se* claim in the B3 Bundle Master Complaint fails to satisfy the minimum pleading requirements as set forth in *Twombly* and *Iqbal* and, therefore, must be dismissed. *See* B3 Bundle Master Complaint ¶¶ 237-42. This claim is premised on the allegation that "Defendants' conduct with regard to the manufacture, maintenance and/or operation of drilling operations and oil vessels such as the *Deepwater Horizon*, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by numerous state and federal laws and permits issued under the authority of these laws." B3 Bundle Master Complaint ¶ 238. However, the B3 Bundle Master Complaint then makes the vague, conclusory, and implausible allegation that "[o]ne or more of Defendants violated these statutory and/or regulatory standards" and, thus, that "Defendants' violations of these statutory and/or regulatory standards constitute negligence *per se*." B3 Bundle Master Complaint ¶¶ 239-40.

The B3 Bundle Master Complaint does not even attempt to identify which defendants are alleged to have violated which statutory or regulatory standards. Instead, the B3 Bundle Master Complaint essentially relies on a theory of "group liability" to support its generic allegation that the defendants were collectively negligent *per se*. The Fifth Circuit recently reaffirmed, however, that it has "never recognized or applied" the theory of "group liability." *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 213-14 (5th Cir. 2010) (rejecting group liability under the maritime law); *see also Barasich v. Columbia Gulf Transmission Co.*, 467 F. Supp. 2d 676, 694-95 (E.D. La. 2006) (rejecting group liability under Louisiana law). More importantly, there is no allegation that O'Brien's or NRC violated any statutory or regulatory standards.

In short, the B3 Bundle Master Complaint simply sets forth "labels and conclusions" and a "formulaic recitation" of the elements of a negligence *per se* claim. *Twombly*, 550 U.S. at 555. It does not "nudge[]" this claim "across the line from conceivable to plausible." *Id.* at 570; *see also In re S. Scrap Material Co., LLC*, 541 F.3d 584, 587 (5th Cir. 2008) (explaining that a complaint must state "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements") (internal quotation omitted). Therefore, in accordance with *Twombly* and *Iqbal*, the negligence *per se* claim should be dismissed as against O'Brien's and NRC.

**B.     The Nuisance Claim Fails Because No Cause of Action Exists for Public Nuisance Under the Applicable Law and, Alternatively, Because Plaintiffs Lack Standing Under State Law**

The B3 Bundle Master Complaint asserts a claim for "nuisance," but does not identify the governing law or whether this is a public or private nuisance claim. As an initial matter, however, it is clear from the nature of the allegations that the nuisance claim is a claim for public nuisance. *See* B3 Bundle Master Complaint ¶ 260 ("BP's oil disaster has significantly interfered with the *public's right* to use and enjoy the Gulf of Mexico without oil slicks, chemical dispersants, tar balls, and other associated pollution.") (emphasis added). Moreover, it is also clear that the claims in the B3 Bundle Master Complaint must be pursued under the general maritime law (assuming that the claims are not preempted in their entirety, as argued above). *See Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 781 (5th Cir. 2009) (en banc) ("The law is clear that when a tort occurs on navigable water on the [Outer Continental Shelf], as opposed to, for example, a stationary platform, . . . maritime law applies to the ensuing tort action."). This is so because "if the tort occurs on navigable water instead of a fixed platform (or other structure attached to the seabed), the [Outer Continental Shelf Lands Act

("OCSLA")] situs requirements is not met."  *Grand Isle*, 589 F.3d at 784; *see also* 43 U.S.C. §

1332(2) ("[T]his subchapter shall be construed in such a manner that the character of the waters

above the outer Continental Shelf as high seas and the right to navigation and fishing therein

shall not be affected.").  Lest there be any doubt as to the governing law in this case, the title

page of the B3 Bundle Master Complaint announces that it is a "Complaint in Admiralty"

pursuant to "Rule 9(h)."[28]

Therefore, in light of these realities, the nuisance claim must be dismissed because there

is no cause of action for public nuisance under maritime law (or federal common law for that

matter, to the extent there is any relevant distinction between those two bodies of law in this

context).  *See Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019, 1030 n.13 (5th Cir.

1985); *Marquez-Colon v. Reagan*, 668 F.2d 611, 614 n.2 (1st Cir. 1981); *see also In re Exxon

Valdez*, 1994 WL 182856, at *3 (D. Alaska Mar. 23, 1994) ("[I]t is doubtful whether a claim for

public nuisance can be asserted under federal common law or maritime law."); *Sekco Energy,

Inc. v. M/V MARGARET CHOUEST*, 820 F. Supp. 1008, 1013-14 (E.D. La. 1993) ("This Court

likewise has searched in vain for case law which recognizes a federal cause of action for public

nuisance.  We decline to create such a cause of action.").

But even if the Court looks to state law, the nuisance claim still fails.  A private litigant

cannot recover for a public nuisance under state law unless he or she can show a "special injury

different in kind from that suffered by the general public."  *In re Exxon Valdez*, 1997 A.M.C. 940

(9th Cir. 1997); *see also M/V TESTBANK*, 752 F.2d at 1030 (recognizing the need "in public

---

[28] Indeed, none of the allegations against O'Brien's and NRC in the B3 Bundle Master Complaint involve activities on an OCSLA situs.  Even if the Court were to conclude that OCSLA conferred original federal *jurisdiction* for the claims asserted in the B3 Bundle Master Complaint, "substantive maritime law continues to govern" because "OCSLA does not displace general maritime law."  *Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 350 (5th Cir. 1999).

nuisance theory of determining when private damages are sufficiently distinct from those suffered by the general public so as to justify recovery"); *Benefield v. Int'l Paper Co.*, No. 2:09cv232-WHA, 2009 WL 2601425, at *3 (M.D. Ala. Aug. 21, 2009) ("In order for an individual to maintain an action to enjoin a public nuisance, the individual must have sustained a 'special injury' which is different in degree and kind from the injury suffered by the public at large.") (citations omitted); *Cunningham v. Anchor Hocking Corp.*, 558 So. 2d 93, 97 (Fla. Dist. Ct. App. 1990) ("[W]hen a party 'has suffered no "particular damage" in the *exercise of a right common to the general public*, . . . it lacks standing to sue for public nuisance.'") (citation omitted) (emphasis in original); *Robinson v. Indianola Mun. Separate Sch. Dist.*, 467 So. 2d 911, 918 (Miss. 1985) (to enjoin a public nuisance plaintiff must have sustained different kind of harm than that suffered by the general public); *Jamail v. Stoneledge Condo. Owners Ass'n*, 970 S.W.2d 673, 676 (Tex. Ct. App. 1998) ("special injury" required to maintain public nuisance action).

Here, the B3 Bundle Master Complaint fails to allege facts suggesting that plaintiffs have suffered or "will suffer a special damage . . . different from that which is common to all." *Carbajal v. Vivien Ice Co.*, 104 So. 715, 716 (La. 1925).  Although the B3 Bundle Master Complaint alleges that plaintiffs have been unable to fish and boat in the Gulf of Mexico due to the presence of oil and chemical dispersants and that "all Plaintiffs are subjected to foul and harmful odors emanating from the crude oil soaked booms and/or the chemical dispersants," these alleged damages are the same types damages suffered by the general public.  *See* B3 Bundle Master Complaint ¶¶ 262, 265; *see also* RESTATEMENT (SECOND) OF TORTS § 821C (1979) (explaining that "invasions of rights common to all of the public should be left to be remedied by action by public officials").  Thus, the nameless plaintiffs on whose behalf the B3

Bundle Master Complaint is purportedly filed lack standing to bring a public nuisance claim under state law.

### C.    The Florida Medical Monitoring Claim Is Barred by the General Maritime Law

Although the B3 Bundle Master Complaint attempts to assert a cause of action under Florida's law of medical monitoring on behalf of "Florida Plaintiffs," this claim must be dismissed because the general maritime law governs under these circumstances and Florida medical monitoring law cannot be used to "fill in the gaps" of maritime law.

As noted above, the claims in the B3 Bundle Master Complaint must be pursued under the general maritime law.  *See supra* Argument, Part III.B.  Moreover, it appears that medical monitoring has never been awarded under the general maritime law—and that such relief would only be available under the maritime law when it is mandated by statute.  *See, e.g.*, *Seaman v. Seacor Marine L.L.C.*, 326 Fed. App'x 721, 730-31 & n.52 (5th Cir. 2009) (discussing statute that requires vessels carrying benzene to provide medical monitoring to "employees expected to be exposed to a specific quantity of benzene in a given year").

Nevertheless, a court in admiralty may "occasionally" use state law to "fill [in] the gaps in an incomplete and less than perfect maritime system."  *J. Ray McDermott & Co. v. Vessel Morning Star*, 457 F.2d 815, 818 (5th Cir. 1972) (en banc); *see also Coastal Iron Works, Inc. v. Petty Ray Geophysical*, 783 F.2d 577, 582 (5th Cir. 1986); *Rogers v. Coastal Towing, L.L.C.*, 723 F. Supp. 2d 929, 933 (E.D. La. 2010) (noting that state law may be applied "where it serves to supplement, but not contravene, the general maritime law by filling a 'gap' therein.").  There are, however, "limits to such supplementation" or gap-filling.  *Rogers*, 723 F. Supp. 2d at 933.  State law may not fill in the gaps in the general maritime law if state law (1) conflicts with an applicable act of Congress, (2) works material prejudice to a characteristic feature of the general

maritime law, or (3) interferes with the proper harmony and uniformity of the general maritime law in its international and interstate relations.  *See S. Pacific Co. v. Jensen*, 244 U.S. 205, 216 (1917); *J. Ray McDermott & Co.*, 457 F.2d at 818.

Here, the B3 Bundle Master Complaint invokes Florida's medical monitoring law, which permits relief even when a plaintiff has yet to develop any identifiable physical injuries or symptoms.  *See Petito v. A.H. Robins*, 750 So. 2d 103 (Fla. Dist. Ct. App. 1999).  This approach to medical monitoring differs greatly from the approaches taken by other States.  For example, Louisiana does not allow medical monitoring claims "unless said medical monitoring is directly related to a manifest physical or mental injury or disease."  *Landry v. Avondale Indus., Inc.*, 864 So. 2d 117, 123 n.2 (La. 2003).  Judge Wilson provided further examples of the discrepancies among different states' medical monitoring laws in the *Prempro* MDL:

> States differ greatly on their approach to medical monitoring both as a cause of action and as a remedy. . . .  For example, Arizona and New York allow stand-alone medical monitoring claims absent proof of injury; Michigan, Missouri and Nevada allow stand-alone medical monitoring claims, but require proof of injury; Arkansas has rejected medical monitoring as a cause of action, and questions its availability as a remedy; California and Vermont permit medical monitoring as a damages claim only; and Indiana, Maryland, and Puerto Rico have not addressed medical monitoring either as a cause of action or as relief.

*In re Prempro Prod. Liab. Litig.*, 230 F.R.D. 555, 569 (E.D. Ark. 2005).  Given that "medical monitoring is not treated uniformly throughout the United States," *id.*, an application of Florida law in this case would impair the uniformity and simplicity favored by the general maritime law and produce precisely the sort of discord "*Jensen* sought to avoid."  *Rogers*, 723 F. Supp. 2d at 936.  Accordingly, because using Florida state law on medical monitoring to supplement the general maritime law would undermine the "strong federal maritime policy favoring national uniformity," *Augman v. Seacor Marine L.L.C.*, No. 07-1508, 2007 WL 2726064 (E.D. La. Sept.

17, 2007), and run afoul of the third limitation articulated in *Jensen*, the Florida medical monitoring claim in the B3 Bundle Master Complaint should be dismissed.

### D.  Neither O'Brien's Nor NRC Are "Responsible Parties" for Any "Pollution" Under the Florida Pollutant Discharge Prevention and Control Act

The B3 Bundle Master Complaint asserts a claim under § 376.205 of the Florida Pollutant Discharge Prevention and Control Act. *See* B3 Bundle Master Complaint ¶¶ 307-20. That claim fails as a matter of law as against O'Brien's and NRC for two separate reasons, however, and should be dismissed.

First, a plaintiff may bring a claim under the Florida statute only for "damages . . . resulting from a discharge or other condition of *pollution*." FLA. STAT. § 376.205 (emphasis added); *see also Aramark Unif. & Career Apparel, Inc. v. Easton*, 894 So. 2d 20, 27-28 (Fla. 2005) (stating that "[t]he main purpose of a private suit [under the statute] is to compensate the innocent victim of pollution"). As noted above, neither O'Brien's nor NRC caused the initial explosion on board the *Deepwater Horizon* or the resulting oil spill. Rather, O'Brien's and NRC participated in the effort to clean up the oil spill. Moreover, the dispersants that O'Brien's and NRC are alleged to have used in the clean-up effort do not fit within the statute's definition of "pollutants." *See* FLA. STAT. § 376.031(16) (defining "pollutants" as "oil of any kind and in any form, gasoline, pesticides, ammonia, chlorine, and derivatives thereof, excluding liquefied petroleum gas"). Accordingly, because neither O'Brien's nor NRC are responsible for any "pollution" as defined by the statute, the claim under Florida's Pollutant Discharge Prevention and Control Act should be dismissed.

Second, the Florida statute only authorizes a private right of action against "a responsible party." FLA. STAT. § 376.205. The term "responsible party" is narrowly defined, however, to include only owners, lessees, or licensees of vessels, onshore facilities, offshore facilities,

deepwater ports, and pipelines.  *See* FLA. STAT. § 376.031(20).  Private companies like O'Brien's and NRC that are hired to clean up oil spills simply do not fall within the statute's definition of a "responsible party."  Accordingly, that reality also compels dismissal of this claim.[29]

**E.     Any Claims for Economic Losses Absent Personal Injury or Physical Damage to a Proprietary Interest Must Be Dismissed Pursuant to the *Robins Dry Dock* Rule**

Although the failure of the B3 Bundle Master Complaint to identify any single plaintiff on whose behalf it is filed makes it difficult—if not impossible—to determine whether it contains claims for economic losses absent personal injury or physical damage to a proprietary interest, in an abundance of caution O'Brien's and NRC hereby move for dismissal of any such claims under the rule announced in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927). *See In re Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d 371, 377 (5th Cir. 2006) ("It is unmistakable that the law of this circuit does not allow recovery of purely economic claims absent physical injury to a proprietary interest in a maritime negligence suit."); *Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019, 1031-32 (5th Cir 1985) (en banc) (affirming summary judgment in favor of defendants pursuant to *Robins Dry Dock* where boat operators, seafood enterprises, tackle and bait shops, and recreational fishermen brought general maritime law claims seeking purely economic damages resulting from chemical spill).

But even if the Court looks to state law, the same rule applies under Louisiana, Mississippi, Alabama, Florida, and Texas law.  For example, Louisiana state law generally prohibits the recovery of purely economic damages without accompanying physical damage to a

---

[29] At an absolute minimum, any claims for personal injury under the Florida statute must be dismissed because personal injury damages are not available under the statute.  *See* FLA. STAT. § 376.031(5) (defining "damage" to be "the documented extent of any destruction to or loss of any real or personal property, or the documented extent . . . of any destruction of the environment and natural resources, including all living things except human beings, as the direct result of the discharge of a pollutant").

proprietary interest. *See TS & C Investments, L.L.C. v. Beusa Energy, Inc.*, 637 F. Supp. 2d 370, 380-81 (W.D. La. 2009); *PPG Indus., Inc. v. Bean Dredging*, 447 So. 2d 1058, 1062 (La. 1984); *La. Crawfish Producers Ass'n-West v. Amerada Hess Corp.*, 935 So. 2d 380, 385 (La. Ct. App. 2006). Likewise, Mississippi, Alabama, Florida, and Texas do not allow recovery in tort for economic loss absent personal injury or physical damage to a proprietary interest. *See, e.g.*, *E. Miss. Elec. Power Ass'n v. Porcelain Prods. Co.*, 729 F. Supp. 512, 515 (S.D. Miss. 1990) (finding it "unlikely that the Mississippi Supreme Court would decide to join the 'steadily dwindling minority of jurisdictions that permit tort-based actions for economic loss'") (citation omitted); *Vesta Fire Ins. Co. v. Milam & Co. Constr., Inc.*, 901 So. 2d 84, 106-07 (Ala. 2004) (explaining that the economic loss rule bars tort recovery where product does not cause personal injury or property damage); *Fla. Power & Light Co. v. Westinghouse Elec. Co.*, 510 So. 2d 899, 902 (Fla. 1987) (holding that plaintiff could not recover in tort for "economic loss without an accompanying physical injury or property damage"); *Pugh v. Gen. Terrazzo Supplies, Inc.*, 243 S.W.3d 84, 91 (Tex. Ct. App. 2007) (noting that the economic loss doctrine bars tort claims seeking economic losses where the plaintiff does not allege personal injury or property damage). Accordingly, any claims for economic losses absent personal injury or physical damage to a proprietary interest must be dismissed.

### F.  Request for Punitive Damages Must Be Dismissed

The B3 Bundle Master Complaint concludes with a request for punitive damages. *See* B3 Bundle Master Complaint ¶¶ 321-46. As noted above, the claims in the B3 Bundle Master Complaint must be pursued under the general maritime law. *See supra* Argument, Part III.B. Because punitive damages are not available under the general maritime law in this type of case, the request for punitive damages in the B3 Bundle Master Complaint must be dismissed.

Alternatively, even if the Court concludes that punitive damages are available under the general maritime law (or state law for that matter), the alleged conduct of O'Brien's and NRC does not rise to the level required to impose punitive damages.

Following the Supreme Court's decision in *Miles v. Apex Corp.*, 498 U.S. 19 (1990), Courts in this District held that "the only damages recoverable under the general maritime law are pecuniary losses" and that because "punitive damages are not pecuniary losses, they are not recoverable post-*Miles* under the general maritime law."  *Hayden v. Acadian Gas Pipeline Sys.*, No. 96-3612, 1997 WL 382059, at *2-3 (E.D. La. July 9, 1997).  Indeed, Judge Fallon held that "[p]unitive damages claims under the general maritime law are no longer supported by the law of this circuit" because the Fifth Circuit's decision in *Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496 (5th Cir. 1995) overruled its prior decision in *Dyer v. Merry Shipping Co.*, 650 F.2d 622 (5th Cir. 1981), and "*Merry Shipping* was the first case to provide for punitive damages under the general maritime law in this circuit and has furnished the legal foundation for all punitive damages claims in maritime cases ever since."  *Bardwell v. George G. Sharp, Inc.*, Nos. 93-3590 & 93-3591, 1995 WL 517120, at *2 (E.D. La. Aug. 30, 1995); *see also O'Hara v. Celebrity Cruises, Inc.*, 979 F. Supp. 254, 255 (S.D.N.Y. 1997) ("[P]unitive damages are not available in personal injury negligence cases brought under general maritime law.").

The Supreme Court's recent decision in *Atlantic Sounding Co. v. Townsend*, 129 S. Ct. 2561 (2009), that a seaman can seek punitive damages against his employer for the willful and wanton disregard of the maintenance and cure obligation, should have no application to the claims in the B3 Bundle Master Complaint.  Indeed, O'Brien's and NRC suggest that Judge Fallon's reasoning in *Bardwell* remains sound and that *Atlantic Sounding*'s holding in the maintenance and cure context should not be read to allow punitive damages in this case.

But even if the Court finds that punitive damages may be available under the general maritime law in this context, it should nevertheless dismiss the request for punitive damages as against O'Brien's and NRC because the alleged conduct of O'Brien's and NRC as set forth in the B3 Bundle Master Complaint does not rise to the level necessary to impose such an award. For punitive damages to be awarded under the general maritime law, "gross negligence, or actual malice or criminal indifference which is the equivalent of reckless and wanton misconduct[,] is required." *Miles v. Melrose*, 882 F.2d 976, 989 (5th Cir. 1989); *see also Legros v. Panther Servs. Group Inc.*, 863 F.2d 345, 353 (5th Cir. 1988) (noting that punitive damages are appropriate when the conduct in question is "callous and recalcitrant, arbitrary and capricious, or willful, callous, and persistent"). Indeed, the Fifth Circuit has explicitly noted that punitive damages are only appropriate if the defendant's conduct exhibits bad faith. *Harper v. Zapata Off-Shore Co.*, 741 F.2d 87, 90 (5th Cir. 1984). This is precisely in line with the common law tradition of awarding punitive damages only "for particularly reprehensible conduct"—a tradition that has been extended to the general maritime law. *In re Md. Marine, Inc.*, 641 F. Supp. 2d 579, 584 (E.D. La. 2009) (citing *Atlantic Sounding Co. v. Townsend*, 129 S. Ct. 2561, 2566-68 (2009)); *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 492 (2008) ("[T]he consensus today is that punitives are aimed not at compensation but principally at retribution and deterring harmful conduct."). Here, the clean-up activities performed by O'Brien's and NRC under the authorization, direction, and ultimate control of the federal government cannot be, as a matter of law, "the type of outrageous conduct that justifies imposing punitive damages." *Miles*, 882 F.2d at 989.

The same principles apply even if the Court looks to state law. For example, "[i]t is well settled Louisiana law that punitive damages are not allowed in civil cases unless specifically

provided for by statute," *Hughes v. Gueydan Police Dep't*, No. CIV-A-6:10-1570, 2010 WL 5625661, at *3 (W.D. La. Dec. 30, 2010), and no statute would allow such damages in this case. *See* LA. CIV. CODE ANN. arts. 2315.3, 2315.4, 2315.7, and 3546. Moreover, Mississippi, Alabama, Florida, and Texas all apply the same "willful and wanton" standard articulated above. *See, e.g.*, *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1220-21 (11th Cir. 2010) (recognizing that "[u]nder Florida law, '[a] defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence'" and that "[i]n order to demonstrate gross negligence, the plaintiff must show 'the defendant's conduct was so reckless and so wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct'") (quoting FLA. STAT. § 768.72(2)); *Ill. Cent. R.R. Co. v. Harried*, No. 5:06cv160-DCB-JMR, 2010 WL 4553640, at *3 (S.D. Miss. Nov. 3, 2010) ("Under Mississippi law, punitive damages may not be awarded unless the plaintiff proves by clear and convincing evidence 'that the defendant . . . acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.' . . . '[There must be] some element of aggression of some coloring of insult, malice or gross negligence evincing a ruthless disregard for the rights of others' . . . .") (quoting MISS. CODE ANN. § 11-1-65 and *Warren v. Derivaux*, 966 So. 2d 729, 738 (Miss. 2008)); *Liberty Nat'l Life Ins. Co. v. Sanders*, 792 So. 2d 1069, 1078 (Ala. 2000) (noting that under Alabama law, "[p]unitive damages must be supported by clear and convincing evidence 'that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff'") (quoting ALA. CODE § 6-11-20(a)); *Wicker v. City of Galveston*, 944 F. Supp. 553, 560 (S.D. Tex. 1996) ("Under Texas law, punitive damages are levied against a defendant to

punish the defendant for outrageous, malicious, or otherwise morally culpable conduct.") (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 16 (Tex. 1994) and TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a)).  Accordingly, because the B3 Bundle Master Complaint fails to allege that O'Brien's or NRC engaged in any "outrageous" or "malicious" conduct in assisting with the clean-up efforts that the federal government authorized, directed, and ultimately controlled, the Court should dismiss the request for punitive damages.

## <u>CONCLUSION</u>

For the foregoing reasons, O'Brien's and NRC respectfully request that all of the claims asserted against them in the B3 Bundle Master Complaint be dismissed.


Dated: February 28, 2011


                    Respectfully submitted,

                    /s/ Michael J. Lyle
                    Michael J. Lyle (DC Bar #475078, IL Bar #6199227)
                    Eric C. Lyttle (DC Bar #482856)
                    WEIL, GOTSHAL & MANGES LLP
                    1300 Eye Street, NW, Suite 900
                    Washington, D.C. 20005
                    Telephone: (202) 682-7157
                    Facsimile: (202) 857-0940

                    Theodore E. Tsekerides (NY Bar #2609642)
                    Jeremy T. Grabill (NY Bar #4501755)
                    Sylvia E. Simson (NY Bar #4803342)
                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York  10153
                    Telephone: (212) 310-8218
                    Facsimile: (212) 310-8007

Patrick E. O'Keefe
Philip S. Brooks, Jr.
MONTGOMERY BARNETT
3300 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-3300
Telephone: (504) 585-3200
Facsimile: (504) 585-7688

*Attorneys for O'Brien's Response Management, Inc.*


Michael J. Lyle (DC Bar #475078, IL Bar #6199227)
Eric C. Lyttle (DC Bar #482856)
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 682-7157
Facsimile: (202) 857-0940

Theodore E. Tsekerides (NY Bar #2609642)
Jeremy T. Grabill (NY Bar #4501755)
Sylvia E. Simson (NY Bar #4803342)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone: (212) 310-8218
Facsimile: (212) 310-8007

*Attorneys for National Response Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum in Support of O'Brien's Response Management, Inc. and National Response Corporation's Motion to Dismiss the B3 Bundle Master Complaint has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 28th day of February, 2011.

/s/ Michael J. Lyle
Michael J. Lyle