# EXHIBIT B

**Originally Released October 6, 2010**
**Updated January 11, 2011**

**National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling**

**DECISION-MAKING WITHIN THE UNIFIED COMMAND**

Staff Working Paper No. 2

*Staff working papers are written by the staff of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling for the use of members of the Commission. They do not necessarily reflect the views of the Commission or any of its members. In addition, they may be based in part on confidential interviews with government and non-government personnel.*

The response to the Deepwater Horizon spill continues to the present. As of July 15, 2010—the day the well stopped flowing—the response involved approximately 44,000 responders; more than 6,870 vessels (including skimmers, tugs, barges, and recovery vessels); approximately 4.12 million feet of boom; 17,500 National Guard troops from Gulf Coast states; five states; multiple corporations; and untold hours of work by federal, state, and local officials; employees or contractors of BP; and private citizens.[1] The spill response is governed by the National Contingency Plan (NCP), a set of federal regulations that prescribe how the government will respond to oil spills. In some respects, the response effectively implemented the provisions of the plan and helped to mitigate the most serious negative impacts of the spill. In other respects, the plan was inadequate to handle the scale of the spill—its magnitude, duration, and effects on many stakeholders. This working paper describes the structure of the spill response and the roles of various government and private actors within that structure. The paper identifies situations in which responders altered, or operated outside of, the National Contingency Plan structure and suggests possible recommendations for improvement of that structure in the future.

**Issues for the Commission To Consider:**

- ***Scale and Structure of the Response***: Was the structure of the response adequate for the nature of the spill, and was that structure put into place quickly enough?
- ***Role of the Responsible Party***: Did BP exercise too much control over the response? If not, what factors led to the public perception that BP, and not the government, was in charge of the response?
- ***Interaction with State and Local Officials***: Does the NCP appropriately integrate state and local officials in the response, and were such officials appropriately involved in this response? Should the NCP and existing contingency planning documents be changed to create a larger or clearer role for state and local officials in oil spill response?

## I.    Background: The National Contingency Plan and the Unified Command Structure

The National Oil and Hazardous Substances Pollution Contingency Plan, or National Contingency Plan (NCP), is the federal government's blueprint for responding to both oil spills

---

[1] Press Release, Deepwater Horizon Incident Joint Information Center, Operations and Ongoing Response (July 15, 2010), *available at* http://www.restorethegulf.gov/release/2010/07/15/operations-and-ongoing-response-july-15-2010.

and hazardous substance releases.[2]  Specifically, the NCP establishes the National Response System, a multi-tiered and coordinated national response strategy.  Key components of the National Response System include:

- National Response Team:  The National Response Team is the organization of sixteen federal departments and agencies[3] responsible for coordinating emergency preparedness and response to oil and hazardous substance pollution incidents.

- Regional Response Teams:  The Regional Response Teams are composed of regional representatives of each National Response Team member agency, state governments, and local governments.[4]  The two principal components of each Regional Response Team are (1) a standing team, which consists of designated representatives from each participating federal agency, state governments, and local governments (as agreed upon by the states); and (2) incident-specific teams formed from the standing team when the Regional Response Team is activated for a response.  The United States Coast Guard leads the Regional Response Teams during responses to oil spills in coastal waters.

- On-Scene Coordinator:  The On-Scene Coordinator directs the response efforts and coordinates all other efforts at the scene.  For spills of oil and hazardous substances in the inland zone, the Environmental Protection Agency (EPA) provides the On-Scene Coordinator.  For oil spills in the coastal zone, the Coast Guard provides the On-Scene Coordinator.  In general, Coast Guard Captains of the Port serve as On-Scene Coordinators for their particular area.  On-Scene Coordinators oversee the Unified Area Command.

- Unified Area Command:  The Unified Area Command is made up of the Federal On-Scene Coordinator, the State On-Scene Coordinator, and the responsible party.  The Unified Area Command, with support from the Regional Response Team, directs the majority of response operations as well as any Incident Command Posts established for front-line responders.[5]

- National Incident Commander:  Once an oil spill is classified as a Spill of National Significance, the Commandant of the Coast Guard designates a National Incident Commander to provide national-level support for the operational response.  (In this paper, the National Incident Commander will be referred to as such, and the National Incident Command post he directs will be referred to as the NIC.)  The On-Scene Coordinator maintains authority for response operations as directed in the NCP.

- Area Committees:  Area Committees are composed of personnel from federal, state, and local agencies.  The primary function of each Area Committee is to prepare an Area

---

[2] The NCP provisions specific to oil spill response are codified in 40 C.F.R. § 300, Subpart D.
[3] These agencies include the United States Coast Guard, the Environment Protection Agency (EPA), the National Oceanic and Atmospheric Administration (NOAA), the Department of the Interior, the Department of Justice, and the Federal Emergency Management Agency (FEMA), as well as other agencies.  40 C.F.R. § 300.175(b).
[4] In the spill-affected area there were two Regional Response Teams corresponding to the two "regions" involved: (1) Arkansas, Louisiana, New Mexico, Oklahoma, and Texas; and (2) Mississippi, Alabama, Florida, Georgia, Tennessee, North Carolina, South Carolina, Kentucky.
[5] For this spill, the Unified Area Command was first located in Robert, Louisiana and later moved to New Orleans, Louisiana.  Incident Command Posts were established in Houma, Louisiana; Mobile, Alabama; Miami, Florida; and Houston, Texas.

Contingency Plan for its designated area.  Each Coast Guard Captain of the Port zone is a separate area.  Area Contingency Plans are written to set a framework for joint response efforts in the event of a spill.[6]

Congress first established the NCP in 1968 after the 37-million gallon *Torrey Canyon* tanker spill off the coast of England.  The Federal Water Quality Act of 1970, which became the Clean Water Act in 1972, required the President to publish a NCP.[7]  Although a version of the NCP was in place at the time of the *Exxon Valdez* spill,[8] Congress responded to that spill by passing the Oil Pollution Act of 1990, which directed the President to expand the NCP.[9]  The authority to expand the NCP was later delegated to EPA,[10] which implemented this mandate with amendments to the NCP promulgated in 1994.[11]

The 1994 amendments to the NCP focused on expanding federal authority to coordinate effective communication and deployment of equipment—two problems that plagued the *Exxon Valdez* response.[12]  Specifically, the amendments prescribed additional responsibilities for the On-Scene Coordinators and strengthened their ability to direct the on-scene response.[13]  The amendments also called for the creation of Area Committees and Area Contingency Plans under the leadership of the On-Scene Coordinator.[14]  To ensure that contingency plans would help companies and responders undertake more realistic preparation for future spills than they had for the *Exxon Valdez* disaster, the 1994 amendments required contingency plans to consider a worst-case discharge scenario.[15]  Finally, the EPA compiled general oil discharge response requirements into a single document to aid responders.[16]

## II.    The Unified Command

The guiding concept of the NCP is a "unified command system" that "brings together the functions of the Federal Government, the state government, and the responsible party to achieve an effective and efficient response."[17]  The magnitude of the response to the Deepwater Horizon

---

[6] In the spill-affected states there are two "areas" designated for Louisiana, three areas designated for Texas, three areas designated for Northwest/West Florida, and one area designated for Mississippi/Alabama.  These areas are each a Captain of the Port zone, and each has its own Area Contingency Plan.

[7] *See* Clean Water Act, Pub. L. No. 92-500, § 311(j), 86 Stat. 816, 862 (1972).

[8] In fact, six applicable contingency plans were in place at the time of the *Exxon Valdez* spill.  The five other plans that operated along with the NCP were the Alyeska, Captain of the Port (OSC), Regional, Alaska, and Exxon contingency plans.  *See* NATIONAL RESPONSE TEAM, EXXON VALDEZ OIL SPILL: A REPORT TO THE PRESIDENT 6-8 (May 1989).

[9] Oil Pollution Act of 1990, Pub. L. No. 101-380, 104 Stat. 484, primarily codified at 33 U.S.C. 2701 *et seq.* [hereinafter OPA 90].

[10] *See* Exec. Order No. 12,777, 56 Fed. Reg. 54,757 (1991).

[11] *See* Rules and Regulations, Environmental Protection Agency, 40 C.F.R. Parts 9 and 300, National Oil and Hazardous Substances Pollution Contingency Plan, 59 Fed. Reg. 47,384 (Sept. 15, 1994).

[12] *See id*.

[13] *See id*.

[14] *See id.* at 47,384 ("These committees and plans are designed to improve coordination among the national, regional, and local planning levels and to enhance the availability of trained personnel, necessary equipment, and scientific support that may be needed to adequately address all discharges.").

[15] *See id.*

[16] *Id.* at 47,414; 40 C.F.R. Part 300 Appendix E.  This appendix is simply a concise restatement of the regulations set forth throughout 40 C.F.R. Part 300; it does not add any substantive regulations.

[17] 40 C.F.R. § 300.105.

spill necessitated the build-out of an elaborate organizational structure with accompanying delegation of responsibilities.

## A. Setting the Structure

The NCP vests the Federal On-Scene Coordinator with authority over the command system.  Although the unified command system is designed to bring together different stakeholders to make decisions, one individual needs to have ultimate decision-making power in the event of a conflict.  Under the NCP, that individual is the Federal On-Scene Coordinator. The Coast Guard pre-designates the official who will serve as Federal On-Scene Coordinator, and that individual has responsibilities for contingency planning and coordination even before a spill occurs.  For example, the Captain of the Port for the coastal zone where a spill occurs will generally be the Federal On-Scene Coordinator.  The Federal On-Scene Coordinator is required to oversee the development of the Area Contingency Plan, which is coordinated through the Regional Response Team and designated state and local representatives.[18]  The Federal On-Scene Coordinator can change as the nature of the event changes to require a larger response. The NCP gives the Federal On-Scene Coordinator the authority to oversee the incident command structure and to expand it as she sees necessary.

In this case, the first Federal On-Scene Coordinator was the Commander of the Marine Safety Unit at Morgan City, Louisiana, Captain Joseph Scott Paradis, because the incident occurred in his Captain of the Port zone and his sector was already responding to the fire and conducting search and rescue missions.  Once the response called for a Unified Area Command to be stood up, Admiral Mary Landry, as commander of the Eighth Coast Guard District, became the Federal On-Scene Coordinator.[19]  In the first days of the spill, responders established a Unified Area Command post at Robert, Louisiana in a Shell training facility, and set up an Incident Command Post in Houma, Louisiana.[20]  BP had immediately set up a command post in Houston, and Coast Guard responders went there to set up a full Incident Command Post as well. Responders established an Incident Command Post at Mobile by the end of April as well.

The response was also supervised at a national level by a National Incident Commander. On April 29, 2010, the Coast Guard designated the disaster a "Spill of National Significance" and Secretary of Homeland Security Janet Napolitano announced that Admiral Thad Allen, then Commandant of the Coast Guard, would serve as National Incident Commander.[21]  This disaster marked the first time the "Spill of National Significance" designation was used.  A spill of national significance is defined as "a spill which due to its severity, size, location, actual or potential impact on the public health and welfare or the environment, or the necessary response effort, is so complex that it requires extraordinary coordination of federal, state, local, and responsible party resources to contain and cleanup the discharge."[22]  The National Incident Command (NIC) can only be established, and the National Incident Commander named, after a

---

[18] 40 C.F.R. § 300.120(e).

[19] On June 1, Admiral Landry returned to her Eighth District duties to prepare for hurricane season, and Admiral James Watson became FOSC.  He later transferred the position to Admiral Paul Zukunft.

[20] Captain Paradis became the leader of the incident command post at Houma; he was assisted by Captain Edwin Stanton, who would formally take command on May 28.

[21] 40 C.F.R. § 300.323; Campbell Robertson, *White House Takes a Bigger Role in the Oil Spill Cleanup*, N.Y. TIMES (Apr. 29, 2009).

[22] 40 C.F.R. § 300.5.

spill of national significance is declared.  The NCP provision creating the position of National Incident Commander provides that the Commander "will assume the role of the [Federal On-Scene Coordinator] in communicating with affected parties and the public, and coordinating federal, state, local, and international resources at the national level."  The NCP is otherwise silent on the role of the National Incident Commander, who can serve in the position, or what tasks the he or she will handle instead of the Federal On-Scene Coordinator.

Because of this lack of regulatory guidance, the NIC set up during the Deepwater Horizon response was based largely on the National Incident Commander's view of what his role and the role of his staff should be.  The NIC, as envisioned by Admiral Allen, primarily functioned as a national coordination and communications center to deal with high-level political and media inquiries so that the Unified Area Command and the Incident Command Posts could focus on response efforts.  The goal was for the NIC not to direct tactics or response operations, but to deal with political and high-level strategy issues associated with the response.  Similarly, the goal of the Federal On-Scene Coordinator and the Unified Area Command was not to direct all response operations, but rather to coordinate resources, communications, and the relationship with the responsible party.  Most tactical and operational decisions were intended to be made at the Incident Command Post level.

## B.  Speed of Establishing Command

Though some of the command structure was put in place very quickly, in other respects the mobilization of resources to combat the spill seemed to lag.  For about nine days, Deepwater Horizon response efforts continued with the Federal On-Scene Coordinator at the top of the command structure.  High-level conversations regarding whether a spill of national significance declaration and a National Incident Commander appointment were necessary occurred in the first week of the spill, but the declaration was only made on April 29, 2010.[23]

For the first ten days of the spill, it appears that a sense of over-optimism affected responders.[24]  Responders almost uniformly noted that, while they understood that they were facing a major spill, they believed that BP would get the well under control.  At least one high-level Coast Guard official thought that the oil would not come ashore and hesitated to open additional command posts.[25]  Responders viewed the event as an "incident" rather than a "campaign," which is what it became.[26]  While it is not clear that this misplaced optimism affected any individual response effort, it may have affected the scale and speed with which national resources were brought to bear.  In hindsight, some Coast Guard responders thought that their initial approach was too slow and unfocused.[27]

It is impossible to separate an evaluation of the speed with which the response progressed in its early days from the misunderstanding of the actual flow of the well.  Responders insist that they were responding to a worst-case discharge and would have not acted differently had they

---

[23] Interview with Coast Guard official.
[24] Interviews with Coast Guard officials.
[25] Interview with Coast Guard official.
[26] Interviews with Coast Guard officials.
[27] Interviews with Coast Guard officials.

known the true flow rate earlier on.[28]  They uniformly reported that long-held Coast Guard policy was to assume the worst-case discharge.  They said they did not believe the flow-rate estimates they were hearing and assumed the worst.  However, it is possible that a better understanding of the quantity of oil may have resulted in designating a National Incident Commander faster, beginning to move personnel and resources faster, and establishing more and better communications with affected stakeholders earlier on.  The early estimate that the riser was leaking 1,000 barrels per day lasted until April 28, 2010, when Admiral Landry, the Federal On-Scene Coordinator, announced an estimated flow rate of 5,000 barrels per day.[29]  It was only after this five-fold escalation in the flow-rate estimate that the NIC structure was added to the spill response framework.

Though the response may have been slow to escalate in the first ten days, by at least mid-May, 2010, the Coast Guard was fighting a war against the oil.  They built out the organizational structure for the response, and they moved resources into the area from all over the country.[30]  To accomplish these tasks they needed more personnel.  The spill happened at precisely the worst time for the Coast Guard, at the beginning of transfer season, when members are reassigned to new posts.[31]  People were moving around and required new training.  Coast Guard officials wanted to call up reservists and National Guard members to supplement their active duty ranks.  This was not without difficulty.  Reservists can only be called up for a certain period of time, and officials had concerns that they would quickly deplete the reserve numbers, especially if the spill lasted into the fall.  High-level Coast Guard officials were also unsure of their authority to call on the National Guard, which required coordination with the states.[32]  This maneuvering took time.

The majority of Coast Guard personnel interviewed insisted that they had thrown everything they had at the spill.  By around the end of May, it seems that most responders believed they had the equipment they needed—they had skimmers, for example, that were adequate for the operating environment of the Gulf of Mexico, and they had enough of them.  The American public, however, believed that the government could be doing more.  When President Obama first visited the Gulf on May 3, 2010, the president of St. Bernard Parish in Louisiana was already suggesting that the government was not moving quickly enough.[33]  A Pew research poll conducted from May 6 to 9, 2010, found that only 38% of Americans approved of

---

[28] These statements relate only to response and clean-up efforts, not efforts to stop or contain the flow of oil at the wellhead.  Whether a lack of accurate information regarding flow rate impacted containment efforts is explored more fully in other work by the Commission and its staff.

[29] Press conference, Admiral May Landry, United States Coast Guard, Federal On-Scene Coordinator, in New Orleans, LA (Apr. 28, 2010), http://cgvi.uscg.mil/media/main.php?g2_itemId=843309.  The source of this estimate is discussed more fully in other work by the Commission and its staff.

[30] Coast Guard documents.

[31] Interviews with Coast Guard officials.

[32] Interviews with Coast Guard officials.  The National Guard in a state can be mobilized by the governor when a state of emergency is declared, and the Secretary of Defense can call on the National Guard during war or a during declared national emergency.  National Guard members cannot be individually involuntarily recalled.  United States Code Title 32 describes state use of the National Guard in peacetime, while Title 10 establishes the federal government's authority to call on the National Guard.  32 U.S.C. § 101 *et seq.*; 10 U.S.C. § 12301.  There was some debate as to the applicable statutory authority.

[33] Robin Bravender, *Gulf Coast Residents Send SOS to Obama*, N.Y. TIMES (May 3, 2010).

the President's handling of the spill, compared to 36% who disapproved.[34]  By May 27, 2010, polls showed that 60% of adults thought that the government was doing a poor job of responding to the spill.[35]

The government did not take any major steps to respond to this perception until the end of May, when President Obama announced that he would triple the federal manpower and resources responding to the spill.[36]  Coast Guard responders believed they were already throwing every resource they had at fighting the spill, but they dutifully tripled personnel and tracked their progress, at least for the state of Louisiana, in a regular report titled "Status on Tripling."[37]  Responders noted that "tripling" taxed the Coast Guard's ability to respond and to conduct its other missions and may not have been the most effective use of a thin-spread force in a lengthy campaign.[38]  Tripling, or at least the arguable overreaction to the public perception of a slow response, resulted in resources being thrown at the spill in general rather than being targeted in an efficient way.  For example, NIC staff believed they needed to buy every skimmer they could find, even though they were hearing that responders on the ground had enough skimmers.[39]  It was also around this time that responders began deploying boom everywhere they could, even though they believed that some areas were not likely to encounter oil and boom could be more efficiently directed elsewhere (discussed in greater depth in "The Boom Wars" section below).  It is not clear whether all resources in all states were actually tripled or merely increased.  At the very least, tracking the "status on tripling" was probably not the most important task for front-line responders to be undertaking.

Adding personnel also meant using resources that the Coast Guard believed they needed to keep elsewhere or save for a potentially long campaign.  This particularly applied to reservists.  Coast Guard reservists can be recalled for only 60 days of any four-month period and 120 total days of every two years.[40]  Coast Guard officials were concerned that they would deplete available reserves for the next two years.[41]  In July 2010, before the well was capped, NIC staff began to approach other agencies to determine if they could send additional responders.  Some agencies, such as EPA and NOAA, were already moving people from their home missions and sending them to the Gulf.  Other agencies, such as the Department of Defense, did not have a strong presence and were willing to send some people to assist.  The well was capped and the point became moot before the federal government had to implement this strategy.

---

[34] SURVEY REPORT, THE PEW RESEARCH CENTER FOR THE PEOPLE AND THE PRESS, OIL SPILL SEEN AS ECOLOGICAL DISASTER; GOVERNMENT, BP RESPONSES FAULTED (May 1, 2010), http://people-press.org/report/612/oil-spill.
[35] Mimi Hall, et al., *Is oil spill becoming Obama's Katrina?*, USA TODAY  (May 27, 2010), http://www.usatoday.com/news/washington/2010-05-27-Spill-poll_N.htm (reporting results of USA Today/Gallup poll).
[36] *See, e.g.*, *Obama Pledges to Triple Oil Response Manpower in Gulf*, BBC NEWS (May 28, 2010), http://www.bbc.co.uk/news/10179369; Paul Rioux, *President Barack Obama Promises No Retreat from Gulf of Mexico Oil Spill Response*, TIMES-PICAYUNE (May 28, 2010).
[37] Interviews with Coast Guard officials; Coast Guard documents.
[38] Interviews with Coast Guard officials.
[39] Interviews with Coast Guard officials.
[40] 14 U.S.C. § 712(a).
[41] Interviews with Coast Guard officials.

### C.  Decision-Making Outside the Command Structure

As discussed above, the Deepwater Horizon spill was the first time a spill of national significance was declared and a National Incident Commander was named.  The spill was also unprecedented in terms of size and the technology required to address it.  As a result of these factors, and of the intense political interest in the spill response, decision-making structures outside the unified command, and thus outside the regulatory framework of the NCP, evolved.

The NCP envisions the Coast Guard as the lead agency for oil spill response in the coastal zone, anticipating that it will provide the Federal On-Scene Coordinator and a large percentage of the responders.  Other agency partners, however, have roles under the NCP as well.  The National Response Team and the Regional Response Team are established inter-agency and inter-jurisdictional partnerships that can be convened in an emergency to make decisions and to utilize each member agency's expertise to provide support to the Federal On-Scene Coordinator.  The Regional Response Team may be activated when a spill exceeds the response capability of the Federal On-Scene Coordinator, transects state boundaries, poses a substantial threat to public health, or involves a worst-case discharge.  Similarly, the National Response Team may be activated when a spill exceeds the response capability of the region in which it occurs, transects regional boundaries, or involves a substantial threat to public health.[42]

During the Deepwater Horizon response, these inter-agency groups were activated but later marginalized when issues were taken out of their hands and decided by agency heads rather than through the established decision-making structure.  When the first National Response Team conference call was held, instead of the designated team members, the principals of the agencies were on the line, and Secretary Napolitano chaired the call.  The principals or their deputies remained very involved in the response and took over addressing key issues.  While this was valuable in showing how seriously the government was taking the spill and the response, it also injected political involvement at the highest levels.  Such involvement may have increased accountability, and helped to make controversial decision-making more transparent, but it also made the decisions more subject to criticism and delay on political grounds.

For example, the NCP provides that the Regional Response Team shall make decisions on the use of dispersants.  During the earliest days of the response, acting Federal On-Scene Coordinator Captain Paradis directed the application of surface dispersants, as pre-approved in the Area Contingency Plan.[43]  Sub-sea application was a novel use, and Coast Guard officials sought permission from the Regional Response Team, which elected to allow tests of the technique.[44]  As the issue of dispersant application became more and more prominent in the media, the decisions to apply both surface and sub-sea dispersants were taken out of hands of the Federal On-Scene Coordinator and the Regional Response Team and given to EPA Administrator Lisa Jackson.[45]  Administrator Jackson elected to bypass the Regional Response Team structure and instead issue decisions regarding dispersant policy through directives, which Coast Guard representatives co-signed.[46]

---

[42] 40 C.F.R. § 300.110.
[43] Interviews with Coast Guard officials.
[44] Interview with Coast Guard official.
[45] The use of dispersants is explored more fully in other work by the Commission and Commission staff.
[46] Interviews with Coast Guard officials.

As explained by a senior official, the National Response Team and the Regional Response Team became "report-to" bodies rather than "decision-making" bodies.[47]  This circumvention of the NCP structure made it unclear to the public and to responders who actually had authority over decisions on important issues such as dispersants.  Responders, who often viewed surface dispersants as a powerful response tool that they needed to deploy to protect the coastline, and who understood the analysis that went into the decisions during the planning process to pre-approve use of surface dispersants, wondered why that advance work was suddenly being supplanted by a process led by political appointees who had not been involved in prior planning efforts.

On the one hand, it speaks well of the command structure and the NCP that the structure could be flexible enough to incorporate new interagency partnerships and new decision-making structures.  On the other hand, the seeming rejection of the interagency groups specifically established by the NCP speaks to a larger issue of the failure of the advance planning required to adequately prepare responders for a spill of this magnitude.  The National Response Team and the Regional Response Teams are institutional structures with membership and responsibilities designated before a spill occurs.  They are organizations that can plan, train, and generally be ready to respond in an emergency.  It is not clear if the choices to route decision-making around those bodies were based on specific demands from politicians or high-level appointees, or simply on the scale and exigencies of the situation.  Much of the unified command structure is designed to push issues down to the most local level at which they can be addressed.  Having strong agency head participation tended to elevate decisions that might have otherwise been addressed closer to the source of the question.

The scientific advisor agencies—EPA, the National Oceanic and Atmospheric Agency (NOAA), and the United States Geological Survey—seem to have possessed the expertise most implicated by the spill and were therefore also the agencies most involved in ad hoc decision-making taking place outside the command structure.  In addition to the issue of dispersants, this ad hoc decision-making occurred with regard to fishery closures and flow rate estimates.  NOAA, the United States Department of Agriculture, and the NIC-created Interagency Solutions Group were in control of fishery closures.  The Flow Rate Technical Group, also a part of the Interagency Solutions Group, and the federal scientific team led by Secretary of Energy Steven Chu spoke for the government on flow rate.  These issues, and the decision-making structures that were created to address them, are discussed more fully in other work by the Commission and its staff.

In contrast with the National Response Team and the Regional Response Team, the Department of Energy took on a large role during the spill.  The NCP does not create any sort of role for the Department of Energy in an oil spill response, and yet the Department team was integral in the steps to contain the well, eventually directing and exercising what amounted to veto power over BP's actions with regard to source control.  Because the Department of Energy team was focused on containment rather than response, the role of the Department is explored more fully in other work by the Commission and its staff.

---

[47] Interview with Coast Guard official.

Problems with setting up the command structure quickly enough, and with making lines of authority clear, arguably contributed to problems explored in the next two sections:  public perceptions that BP was in charge and that state and local concerns were being ignored.

**Suggestions for the Commission's consideration:**

- The response structure was established more slowly than it should have been, in part because of a perception that the well would be quickly controlled and because the geographic scope, scale, and duration of the spill were unprecedented for responders.
- The National Response Team and the Regional Response Teams did not play the role envisioned by the NCP, with substitute, ad hoc structures being created in their place.  The Commission may wish to recommend changes to the mission or composition of the National Response Team and the Regional Response Teams to make them more useful in the future, particularly in creating a framework to provide interagency scientific expertise.
- The Commission may wish to recommend the addition of distinct plans and procedures to the NCP to better scale the response to a Spill of National Significance and to account for the more prominent role that high-level federal and state officials will likely play in the response to such a spill.

## III.    The Role of BP

Very early in the response, the media and the public began to question whether the federal government or BP was truly directing the response.  While all on-scene government officials with whom we have spoken have asserted that the federal government was fully in charge of the response from the outset, the government struggled to control messaging regarding who was directing containment and response efforts.

### A.  The Role of the Responsible Party under the Oil Pollution Act

For oil spills from offshore rigs, the NCP defines the "lessee or permittee of the area in which the facility is located" as the "responsible party."  Under the Oil Pollution Act framework, a responsible party will be liable for damages resulting from the oil spill and costs incurred by the government in responding to the spill.[48]

The NCP does not sort out these liability issues—it is a structure for response, not a vehicle for assigning blame.  However, the NCP does direct that the responsible party play a role in the response.  One of the principles of the unified command structure the NCP establishes is that the responsible party must be included in order to "achieve an effective and efficient response."[49]

The NCP provides that "cleanup responsibility for an oil discharge immediately falls on the responsible party," and notes that "in a large percentage of oil discharges, the responsible party shall conduct the cleanup."[50]  Though the NCP directs the Federal On-Scene Coordinator

---

[48] OPA 90 § 1002(b)(2); 33 U.S.C. § 2702.
[49] 40 C.F.R. § 300.105.
[50] 40 C.F.R. Part 300, Appendix E § 2.3(b).

to "monitor[] or direct[] all federal, state, local, and private removal actions," the Federal On-Scene Coordinator may "allow the responsible party to voluntarily and promptly perform removal actions" if the [Federal On-Scene Coordinator] determines that having the responsible party perform such actions will "ensure an effective and immediate removal of the discharge." In this situation, the Federal On-Scene Coordinator supervises the responsible party's actions. The NCP expresses a preference for setting up the response in this manner—"[w]here practicable, continuing efforts should be made to encourage response by responsible parties."[51] In a spill that "results in a substantial threat to the public health or welfare of the United States . . . the [Federal On-Scene Coordinator] must direct all response efforts."[52]

There are policy choices behind this preference.  First, the responsible party may be in the best position to respond because of its knowledge or technical expertise related to the processes involved in its own facility.  Second, the responsible party bears the ultimate costs of removal under the Oil Pollution Act.[53]  Rather than expending further resources on collecting response costs in a later civil action, it is more efficient to let the responsible party bear those costs up front.

The interests of the responsible party and the public are generally aligned with respect to stopping an ongoing spill.  Under the Clean Water Act, the responsible party can be liable for a civil penalty determined by the amount of oil that was spilled,[54] so it shares the public's interest in cutting off the oil flow as quickly as possible.  On other issues, the incentives of the public and the responsible party may diverge. For instance, the responsible party may, at least in theory, have an interest in using dispersants even if they cause ecological harm.  Environmental damage caused by low concentrations of widely dispersed oil may be harder to document than concentrated surface harm in coastal areas.  Moreover, public opinion may be more likely to be influenced by easily visible harm to wetlands, beaches, birds, and terrestrial animals.  Hence, the responsible party may have an incentive to favor greater use of dispersants than is in the public interest.  Similarly, the public may have an interest in knowing the rate of flow from the well, while the responsible party may benefit from obfuscating or underestimating the rate of flow because high flow means higher liability.[55]  Moreover, a responsible party has a fiduciary duty to its shareholders to minimize costs incurred.  This fiduciary duty can be at odds with the public's interest in maximizing cleanup efforts.

The Oil Pollution Act does not address the responsible party's ability to "conduct" the cleanup by issue, though it does mandate stronger authority for the government in a catastrophic spill, where the Federal On-Scene Coordinator "directs" the response.  Similarly, although the Oil Pollution Act requires that operators name a "qualified individual" who has full authority to implement removal actions," the Act is silent about circumstances where that individual's responsibility for cleanup conflicts with her duties to shareholders as a corporate officer.[56]  One possibility that has been suggested is to provide for appointment of a "qualified individual"

---

[51] 40 F.C.R. § 300.305.
[52] Id.
[53] 33 U.S.C. § 2702.
[54] 33 U.S.C. § 1321(b)(7).
[55] See 33 U.S.C. § 1321(b)(7)(A), (D) (establishing civil liability for spills and increasing the penalty in cases of gross negligence or willful misconduct); see also 40 C.F.R. § 19.4.
[56] See 33 U.S.C. § 1321(j)(5)(D)(ii).

under the Oil Pollution Act that is an independent third party, rather than a corporate officer, with authority to deploy the responsible party's resources.  Such an arrangement might be akin to the compensation scheme set up by BP in the wake of the Deepwater Horizon spill, with corporate funds disbursed by an independent administrator.

## B.  BP's Control in the Command Structure

During the Deepwater Horizon response, BP had decision-makers in multiple locations within the command structure.  The Incident Command Post at Houston was set up in BP headquarters.  In the Unified Area Command, most Coast Guard responder positions had a BP counterpart, and Coast Guard members and BP employees worked side by side.  BP executive Doug Suttles was at Unified Area Command.  Federal On-Scene Coordinator Watson viewed Suttles as his counterpart and the set-up as similar to that of other spill responses he had handled in the past.  The organizational charts from the Unified Area Command and the Incident Command Posts show BP employees scattered through the command structure, in roles ranging from waste management to environmental assessment.  In some command chains, a BP employee was at the top and a Coast Guard member would report up to the BP employee.[57]

Most critically, BP controlled access to the wellhead at all times from Houston.  BP had control of the remotely operated vehicles (ROVs) operating 5,000 feet below the surface of the water at the riser pipe and wellhead, as well as control of all vessel traffic in the area above.  BP used ROVs to coordinate nearly every element of the containment response, including gathering data, carrying out mechanical containment procedures, and applying subsea dispersants.[58]

In its *Lessons Learned* report, BP details the complexity of coordinating its response to the spill.[59]  BP's Simultaneous Operations unit managed ships moving in and out of the area. There may have been good reasons for BP's control of this issue.  Too much traffic over the wellhead was dangerous, particularly when large, unproven containment devices such as the cofferdam were being tested.[60]  Also, some of the operations that the containment ships carried out required extreme precision—movement by even a few feet could lead to failure of the operation.

BP's control over the wellhead region, however, also limited scientists' access.  As government and independent scientists began to become involved with determining the flow rate of the well and with developing containment solutions, some grew frustrated with what they perceived as BP's total control over access to the source, and ultimately information about the leaking well.[61]  Scientists with whom Commission staff have spoken reported that they needed some type of access to the source—either to take pictures with an ROV, or to acquire samples, or to obtain some other source data for determining flow rate.  Given that its potential liability

---

[57] Coast Guard documents.

[58] BP, DEEPWATER HORIZON CONTAINMENT AND RESPONSE:  HARNESSING CAPABILITIES AND LESSONS LEARNED 15-16 (Sept. 1, 2010) [hereinafter LESSONS LEARNED].

[59] LESSONS LEARNED.

[60] *See* Clifford Krauss et al., *Acrimony Behind the Scenes of Gulf Oil Spill*, N.Y. TIMES (Aug. 26, 2010).

[61] Interview with non-governmental officials; Interview with government official (explaining that government scientists were initially able to collect flow-rate information only when doing so did not interfere with other source-control operations).

under the Clean Water Act depended directly on the flow rate, BP had real incentives to maintain exclusive control over the ability to estimate that rate. [62]

### C. Public Perception of Control

At the beginning of the spill, BP and the government would hold joint press conferences. This was consistent with the Coast Guard view—shaped by its experience implementing the NCP under a unified command system—of the responsible party as a co-combatant in the fight against the oil. This was not a view shared by either large segments of the public or by high-ranking officials in other government agencies, who viewed the relationship as a far more adversarial one. On April 29, 2010, at a press conference involving senior Administration officials such as Carol Browner, Assistant to the President for Energy and Climate Change; Administrator Jackson; Deputy Secretary Hayes, and Secretary Napolitano, Coast Guard Rear Admiral Sally Brice O'Hara referred to BP as "our partner," prompting Secretary Napolitano to quickly correct the record, saying, "They are not our partner!"[63] Secretary of the Interior Ken Salazar said the government would keep its "boot on the neck" of BP.[64] These statements seemed to have a two-fold purpose—to provide reassurance that BP would be held accountable and to show that government was in control of BP and the situation. With much of the country believing that the government had lost control and was managing the response badly, the joint press conferences with BP stopped, and Admiral Allen instead began holding a solo daily press briefing.[65]

When Rear Admiral James Watson took over as Federal On-Scene Coordinator on June 1, 2010, at around the time of the "tripling" announcement, he contributed to the move to a stronger and more visible federal presence. On June 8, 2010, Admiral Watson directed BP to "establish system(s) capable of safely collecting the oil and gas flowing" from the well and to provide a plan for doing so in 72 hours.[66] Though this directive related to source control, the intent was to increase the participation and visibility of the government in the response.[67]

Another factor that may have affected the public perception of control was the number of front-line responders from the federal government versus the number of front-line responders either employed directly by BP or employed through a BP subcontractor or oil spill response operator. The responders that local citizens saw operating skimming vessels, picking up tarballs, or deploying boom were private hired workers and not Coast Guard or other government

---

[62] As originally drafted, this paper contained a preliminary discussion of BP's role in the effort to contain the well. The discussion is omitted here because BP's role in containment is discussed fully in other work by the Commission and its staff.

[63] Tim Dickinson, *The Spill, the Scandal, and the President*, ROLLING STONE (June 24, 2010).

[64] *See, e.g.*, Matthew Bigg, *U.S. keeps "boot on neck" of BP over spill*, REUTERS (May 24, 2010), http://www.reuters.com/article/idUSTRE6430AR20100524; Frank James, *BP Will Feel Either 'Boot on Throat' or 'Feet to Fire'*, NPR THE TWO-WAY NEWS BLOG (May 2, 1010), http://www.npr.org/blogs/thetwo-way/2010/05/bp_will_feel_either_boot_on_th.html.

[65] Mike Allen, *Gulf commander to begin solo briefings*, POLITICO (May 31, 2010), http://www.politico.com/news/stories/0510/37965.html.

[66] Letter from Admiral James A. Watson, Federal On-Scene Coordinator, United States Coast Guard, to Doug Suttles, Chief Operating Officer, Exploration & Production, BP America Inc. (June 8, 2010), *available at* http://www.restorethegulf.gov/sites/default/files/imported_pdfs/posted/2931/FOSC_letter_to_BP_2008_June_Final.621367.pdf.

[67] Interview with Coast Guard official.

personnel.[68]  BP was providing the money and a large part of the equipment, and BP was providing the contractors and response personnel out on the beaches.

### D.  Funding Projects Outside the Unified Command

BP may have heightened the perception that it was running the show by distributing money for response costs directly to state and local governments.  There is a procedure in the NCP by which state governments can seek up to $250,000 from the Oil Spill Liability Trust Fund for removal costs.[69]  The Federal On-Scene Coordinator must approve and then manage the request, which must comply with the NCP.[70]

Funds started flowing from BP to states and communities early in the response.  On May 5, 2010, BP gave $25 million each to Florida, Alabama, Mississippi, and Louisiana to "accelerate the implementation of Area Contingency Plans."[71]  Two weeks later, BP gave Louisiana another $25 million and the other three states $15 million each to promote tourism. BP also gave smaller sums of around $500,000 to $1 million directly to Louisiana parishes.[72] These sums, provided completely outside of the unified command structure and without any requirement that the monies be used in a manner consistent with the NCP, gave states and communities reason to believe that BP controlled the means and the methods of the response. This money may also have had a detrimental effect on the overall response efforts.  For example, some of the money was spent by states and parishes to purchase boom directly, limiting the overall supply of boom available to the unified command and making it difficult for the unified command to make sure that the boom got to locations where it would be most helpful and not cause any additional environmental damage.[73]

### E.  Appropriate Role of a Responsible Party

It is politically problematic for the government to work with the party responsible for the disaster, because it seems inappropriate for the party who created the problem to have a large role in deciding how to fix it.  However, at the responder level, government and the responsible party must work together to have the means to stop the spill.  Responders accept this fundamental tension between political preferences and practical realities; here, the public did not. Admiral Allen referred to the public's resistance to BP playing a role in the response as the social or political nullification of the NCP.[74]  The Commission may wish to consider making

---

[68] Private oil spill response operators turned out in force for skimming and shoreline cleanup efforts.  Jia Lynn Yang, *Aftermath spawning profits for many contractors*, WASH. POST (June 12, 2010).

[69] 40 C.F.R. Part 133.

[70] 40 C.F.R. §§ 133.13, 133.15.

[71] Press Release, BP, BP Announces Tourism Grants to Four Gulf States (May 17, 2010), *available at* http://www.bp.com/genericarticle.do?categoryId=2012968&contentId=7062187.

[72] Doug Suttles, statement at Commission hearing, in Washington, D.C. (Sept. 27, 2010).

[73] This problem is one the Joint Industry Task Force observed in its evaluation of the spill response.  The Task Force recommended that government "establish clear-well understood protocols to discourage shoreline protection and cleanup response operations outside scope of [unified command] planning, review, and direction."  JOINT INDUSTRY OIL SPILL PREPAREDNESS AND RESPONSE TASK FORCE, DRAFT INDUSTRY RECOMMENDATIONS TO IMPROVE OIL SPILL PREPAREDNESS AND RESPONSE viii (Sept. 3, 2010).

[74] Interview by Melissa Block, NPR with Adm. Thad Allen, (Aug. 5, 2010), http://www.npr.org/templates/transcript/transcript.php?storyId=129005047; *see also* Joel Achenbach, *With BP's Know-How and U.S. Authority, the Macondo Well was Plugged*, WASH. POST (Aug. 21, 2010).

recommendations regarding the proper role of the responsible party and the proper way to communicate that role in the context of a major response effort.

Specifically, three issues deserve mention.  First, the oil and gas industry has significant expertise that the federal government lacks, so the responsible party can and likely must play a substantial role in containment and response efforts.  Second, the government may need to consider the extent to which the interests of the public and the interest of the responsible party in minimizing liability diverge with respect to particular issues, and to consider more detailed oversight on issues where divergence is more likely.  For example, because the volume of oil released directly affects BP's liability under the Clean Water Act, the government may have had particular reason to have its own or independent scientists determine the flow rate, rather than relying on estimates created by scientists employed by the responsible party.  Third and finally, the government's position needs to be explained to the public:  the fact that a responsible party continues to assist with containment and cleanup does not mean that the government will not also hold it responsible via mechanisms such as the Clean Water Act.  Continuing to work closely with the responsible party while clarifying the nature and extent of government oversight would likely require significant effort by all governmental entities involved, but it is crucial to maintaining public confidence in the containment and response efforts.

**Suggestions for the Commission's consideration:**

- Consider distinctions in the NCP framework between issues where the responsible party may have greater operational expertise, such as source control, and issues with respect to which the government possesses equivalent or superior operational expertise, such as other response techniques.
- Consider clarifying the extent and nature of government oversight with respect to different classes of issues, including issues where the responsible party's interests in minimizing liability and the interests of the public may be more likely to diverge.
- Clarify the role of the responsible party both for the public and for other agencies when operating within the NCP structure.
- Consider changing the NCP to provide for greater government direction and oversight during the response to a Spill of National Significance.

### IV.    The Role of State and Local Governments

Significant differences of opinion existed between the affected states and the federal responders regarding each other's role and appropriate response tactics.  Federal responders were employing the NCP, a response structure with which state and local elected officials were unfamiliar.  That unfamiliarity led to conflicts that hampered the response.  The Commission may want to consider recommendations that increase awareness of the NCP on the part of state governments and that alter spill response contingency planning to expand the role of existing state and local emergency response structures.

### A.    The Stafford Act

State and local elected officials, and perhaps particularly those in the hurricane-stricken Gulf states, are familiar with the Robert T. Stafford Disaster Relief and Emergency Assistance

Act.[75]  The Stafford Act describes how the federal government may provide aid to an overwhelmed state during an emergency.[76]  The organizing principle of the Act is the funding and coordinating, not directing or controlling, role of the federal government.

    When a governor determines that local and state resources are insufficient to handle an emergency response, the governor may ask the President to contribute federal aid pursuant to the Stafford Act by declaring an emergency or major disaster.[77]  When requesting such a declaration a governor must describe what the state will do to implement its emergency response plan and detail the type and extent of federal assistance needed.  The Act broadly defines an emergency as any instance where federal assistance is needed to supplement state efforts to avert a catastrophe, or to save lives and protect property, health, and safety.  Specific forms of aid the government may provide during an emergency are:  to direct federal agencies to use their resources to *support* state and local efforts;[78] to coordinate all disaster relief *assistance* provided by federal agencies, private organizations, and state and local governments;[79] and to *assist* state and local governments in the distribution of medicine, food, and other consumable supplies.[80]  The emphasized terms indicate that Congress intended a supportive, not a preeminent role for the federal responders.[81]  The Federal Emergency Management Agency (FEMA) administers the bulk of the aid provided under the Stafford Act.[82]  The Administrator of FEMA appoints a federal coordinating officer tasked with determining the types of relief most needed, establishing field offices, coordinating the administration of relief among organizations that agree to operate under his direction, and taking any other action necessary to assist citizens and officials.[83]  For example, the Stafford Act was invoked during Hurricane Katrina to provide aid to the same states affected by the Deepwater Horizon spill.  Governors of the Gulf States requested and received declarations of emergency and major disaster.  Admiral Allen was named the Principal Federal Officer in that situation, and his role was to provide federal resources and coordinate state responders, not to actually direct the response.[84]

---

[75] *See* 42 U.S.C. §§ 5121-5206; 44 C.F.R. §§ 206.1-206.440.

[76] *See* Ross C. Paolino, *Is it Safe to Chevron "Two-Step" in a Hurricane? A Critical Examination of how Expanding the Government's Role in Disaster Relief Will Only Exacerbate the Damage*, 76 GEO WASH. L. REV. 1392, 1394 (2008).

[77] *See* 42 U.S.C. § 5170 (major disaster); § 5191 (emergency).

[78] *See id.* § 5192(a)(1).

[79] *See id.* § 5192(a)(2).

[80] *See id.* § 5192(a)(7).

[81] *See id.* § 5192(a)(2) provides that the President may "coordinate all disaster relief assistance (including voluntary assistance) provided by Federal agencies, private organizations, *and State and local governments*" (emphasis added).  This could be read as granting the President the authority to coordinate the entire response.  In light of the clearly supportive role for federal responders evinced throughout the Act, this provision probably grants authority to coordinate assistance from other state governments.

[82] *See* 44 C.F.R. § 206.1; *see also id.* § 206.62 (delegating emergency response authority to the Administrator of FEMA).  The Administrator of FEMA serves as the chairperson of the interagency task force created by the president to coordinating the implementation of pre-disaster hazard mitigation programs.  *See* 42 U.S.C. § 5134 (2006).

[83] *See* 42 U.S.C. § 5143; 44 C.F.R. § 206.41.  The federal coordinating officer also leads the emergency support and response teams.  *See* 42 U.S.C. § 5144.

[84] The use of the Stafford Act during Hurricane Katrina response and the role of the federal government within the response was not without problems.  *See* SELECT BIPARTISAN COMMITTEE TO INVESTIGATE THE PREPARATION FOR AND RESPONSE TO HURRICANE KATRINA, 109TH CONG., A FAILURE OF INITIATIVE:  FINAL REPORT OF THE SELECT BIPARTISAN COMMITTEE TO INVESTIGATE THE PREPARATION FOR AND RESPONSE TO HURRICANE KATRINA, U.S.

### B.  Oil Spill Response Under the NCP

The NCP provides a fundamentally different role for the federal government.  Instead of a state-run response supplemented with federal resources and financing, the NCP demands that the federal government direct the response through a Federal On-Scene Coordinator with the participation of the state through the Unified Command structure.  The state then provides a State On-Scene Coordinator to represent the state at the Unified Command, and also provides personnel to implement the response decisions reached by the Federal On-Scene Coordinator or the unified command.  Because states and local governments cannot spend funds from the Oil Spill Liability Trust Fund without an authorization agreement from the Federal On-Scene Coordinator, they are limited in their ability to respond as they may like to the threat of encroaching oil.

State and local elected officials were unfamiliar with this structure and were uncomfortable with a federally directed response.  Whether the cause was political demands, concern that the federal government was ineffective, or genuine confusion about the applicable legal framework, state and local elected officials closest to the affected areas complained that they were shut out from decision-making, as described in the next section on the boom conflict.  Meanwhile, federal responders reported their feeling that the message they were hearing from the states was "give us the money and go away."[85]

This unfamiliarity and discomfort with the federal response manifested itself in competing state structures, which undercut the efficiency of response efforts. This was particularly true in Louisiana.  Governor Jindal's advisors reportedly spent days determining whether the Stafford Act or the NCP applied.[86]  Louisiana declared a State of Emergency on April 29, 2010, authorizing the director of the Governor's Office of Homeland Security and Emergency Preparedness to undertake any legal activities deemed necessary to respond.[87]  Roland Guidry, the Louisiana Oil Spill Coordinator and the state's pre-designated State On-Scene Coordinator, had reported to the Unified Command when summoned at the beginning of the spill.  He and other experienced career oil spill responders were marginalized, however, and he eventually left Unified Area Command.  Governor Jindal himself acted as the State On-Scene Coordinator.[88]  No one else had the authority to speak for the state, so all decisions had to flow through the Governor's office, which slowed decision-making and caused problems in the response efforts.  Louisiana was not the only state where the governor stepped in and removed the designated State On-Scene Coordinator.  However, based on interviews with Coast Guard and state personnel, the conflicts between federal responders and state government appear to have been most severe in Louisiana.

---

HOUSE OF REPRESENTATIVES 146 (Comm. Rep. 2006) *available at* http://katrina.house.gov/.  Some critics felt that the federalism concerns embodied in the Stafford Act system contributed to the slow response.  *See* Stephen M. Griffin, *Stop Federalism Before it Kills Again: Reflections on Hurricane Katrina*, 21 ST. JOHN'S J. LEGAL COMMENT 527, 531-32 (2007).

[85] Interviews with Coast Guard officials.

[86] Interview with government official.

[87] Press Release, Office of the Governor, Governor Jindal Issues State Declaration of Emergency for Oil Leak (Apr. 29, 2010), *available at* http://www.gov.state.la.us/index.cfm?md=newsroom&tmp=detail&catID=2&articleID=2137&navID=3.

[88] Interview with government official.

Federal responders improved their relationship with state and local officials as the response progressed.  Senior Coast Guard officials were assigned to parishes in Louisiana and coastal counties in the other affected states to serve as liaisons.[89]  Had this system been in place earlier, the relationship between the federal responders and local leaders may have been stronger and more productive in the early days of the spill response.

### C.  The Boom Wars

Boom became one of the most visible manifestations of state and local dissatisfaction with federal response efforts.  Boom is a physical barrier between oil and water or shoreline.  Ocean boom is placed in the water to try to keep oil in a contained area where it can then be skimmed or burned.  Absorbent boom is placed along beaches or in marshes to absorb oil before it can enter and damage sensitive shoreline environments.  Boom is a measurable, physical object that visibly stops oil from moving into areas to be protected.  In this way it is different from source control efforts or skimming far out at sea—efforts that cannot be seen by residents in towns waiting for oil to hit.

In part for this reason, boom became a symbol of how responsive the government was to local communities.[90]  Each state wanted the entire shoreline boomed, and each state wanted as much or more boom than the next state.  This translated down to the parish and town levels as well.  Federal responders thought that local people complaining about the lack of boom were missing the big picture; local people thought that federal responders were not paying attention to local needs.[91]  As a result, boom was eventually distributed according to political imperatives, not operational ones, in part because of distrust from state and local officials as to whether the federal government was adequately considering and addressing their needs during the response.

Responders were frustrated with the time they spent laying what was, in their view, unnecessary boom.[92]  The Area Contingency Plan does not lay out a specific booming map, as the marshy coastal ecosystem frequently changes and any boom plan would be quickly out of date.  Responders wanted to be able to direct the boom where they thought it most efficient and felt hampered by pressure to place boom everywhere.  When the oiling risk was highest in Louisiana, the Coast Guard directed boom to Louisiana.  They then heard complaints from the other states:  Alabama Governor Bob Riley contended that the decision to move boom from the Alabama coast to the Louisiana cost left his shoreline in danger of oiling, and Mississippi and Alabama felt that they were being ignored as they had been during the Hurricane Katrina response.[93]

Governor Jindal in Louisiana said at a press conference in mid-May 2010 that the supplies, including containment boom, provided by the Coast Guard and BP were inadequate.

---

[89] Interview with Coast Guard official; Coast Guard documents.
[90] Interviews with Coast Guard officials.
[91] Interviews with Coast Guard officials.
[92] One responder deemed this activity laying "political boom."  Interview with Coast Guard official.
[93] Holbrook Mohr, Justin Pritchard, Tamara Lush, *BP's gulf oil spill response plan lists the walrus as a local species. Louisiana Gov. Bobby Jindal is furious.*, CHRISTIAN SCIENCE MONITOR (June 9, 2010); Interview with Coast Guard official.

At the same time, local officials held up pictures of oil-coated birds.[94]  Governor Jindal said that he had requested 5 million feet of hard boom but had received only 786,185 feet, also referencing 143,000 feet of boom he said sat idle in staging areas.[95]  Florida Department of Environmental Protection Secretary Mike Sole told reporters, "A lot of the decisions about Florida are being made in Mobile," by Admiral Landry and the Coast Guard-led command.  "I told [Admiral Landry], 'Florida is important.  We have 770 miles of shoreline to protect.  I'm concerned that we're not getting enough focus on Florida.'"[96]

Local officials expressed similar views.  Billy Nungesser, President of Plaquemines Parish, was a vocal critic of the response.  President Nungesser deplored the lack of available boom, wanting enough material to create a second line of defense along the coast.[97]  From the early days of the spill, he sought funds to enlist local fisherman to deploy boom and complained of the minimal boom that was available for use.[98]

The NIC was not deaf to these concerns.  Directions went out to "keep the parishes happy," which resulted in operational decisions that may have been politically motivated.[99]  Boom was placed everywhere, including in passes where swift tidal currents rendered it ineffective, and in places where it was unlikely to encounter oil.

In addition to worries about unnecessary boom, responders had concerns about environmentally damaging boom.  Boom is not a perfect solution.  For example, boom can harm environmentally sensitive areas such as marshes if severe weather conditions blow it around and onto delicate grasses and habitat.  Responders were in a difficult position as they boomed places based on local pressures, pulled boom away during bad weather, and then put it out again.[100]

Once parishes had boom, they did not want to let it go.  On July 22, 2010, President Nungesser, opposed the Coast Guard's decision to began removing boom in preparation for Hurricane Bonnie.[101]  He threatened to slash the tires of trucks carrying away protective boom.  He later explained that his statement was only a joke.[102]  Other parish presidents, either believing they had the authority or hoping to take that authority upon themselves, issued orders prohibiting

---

[94] Campbell Robertson, *Louisiana Officials Threaten Action is Spill Response Proves Inadequate*, N.Y. TIMES (May 23, 2010).

[95] David Hammer, *Frustration mounting over BP delays, lack of progress in Gulf of Mexico oil spill*, TIMES-PICAYUNE (May 23, 2010).

[96] Craig Pittman and Rebecca Catalanello, *BP plan to protect Florida from oil spill inadequate, officials say*, ST. PETERSBURG TIMES (May 3, 2010).

[97] Dan Murtaugh, *Gulf Coast Prepares Oil Defenses, Rallies Volunteers*, PRESS-REGISTER (Apr. 30, 2010).

[98] *BP's Gulf oil spill response plans severely flawed*, ASSOCIATED PRESS (June 9, 2010).

[99] Interviews with Coast Guard officials.

[100] Interview with Coast Guard official.

[101] "Oren Dorell, *Storm Forces Evacuation of Well Site BP Official Says Break Will be 10-12 Days After Federal Overseer Halts Gulf Work*, USA TODAY (July 23, 2010).

[102] *See* Liz Robbins and Campbell Robertson, *Tension Among Officials Grows as Storm Nears*, N.Y. TIMES (July 23, 2010).

response equipment from being moved out of the parish.[103]  Coast Guard responders were threatened with arrest if they moved equipment.[104]

These problems were also a serious distraction that took time away from responders' ability to focus on the spill.  For example, because state and local officials wanted to be able to evaluate the response on their own terms, they measured the "feet of boom deployed," a measurement that took time to compile but was of very little value in evaluating the effectiveness of response efforts.

The boom wars never reached a resolution.  In many instances, responders knew that in deploying boom they were responding to the politics of the spill rather than the spill itself.  They deployed boom along miles and miles of shoreline, and it was still not sufficient to prevent oil from washing up on the beaches.[105]

### D.  Potential Problems with the NCP

In addition to the structural issue of differences between Stafford Act and the NCP, another factor at the root of the federal-state and federal-local conflicts was likely the failure of the contingency plans to adequately involve state and local officials.  Coast Guard responders were well-connected to career state responders such as the designated State On-Scene Coordinators, but not well connected with local officials or political officials at the state level.

#### a.  State Officials

Even though the various planning documents required by the NCP, including the Area Contingency Plans, had been signed by state officials, higher-level state officials did not appear to have participated in the planning process such that they understood what the plans called for.  When confronted with a contingency plan, a state official reportedly told a Coast Guard responder, "I didn't sign that."  In the opinion of the Coast Guard responder, the state official was not denying that his signature appeared on the document; he meant that no one had ever properly explained the content of the plan to him.[106]  When the time came to implement the plans as the State On-Scene Coordinator understood them, the governors largely rejected the plans and opted to run the response operations in different ways.[107]  This set of circumstances at the state

---

[103] *See id.*; Angel Gonzalez, *Locals to BP:  Don't Leave Town Yet*, WALL ST. J. (Aug. 1, 2010); *St. Bernard Leader: Keep All Spill Equipment Here*, ASSOCIATED PRESS (July 30, 2010); *Parishes Move to Block Movement of Oil Protection*, ASSOCIATED PRESS (July 22, 2010).

[104] Interview with Coast Guard official.

[105] As originally drafted, this paper contained a preliminary discussion of the Louisiana berms project, which also created significant federal-state conflict.  The discussion is omitted here because the berms project is discussed fully in other work by the Commission and its staff.

[106] Interview with Coast Guard official.

[107] The governors of Louisiana, Mississippi, Alabama, and Florida all declared a state of emergency.  Press Release, Governor Jindal Issues State Declaration of Emergency (Apr. 29, 2010), http://www.gov.state.la.us/index.cfm?md=newsroom&tmp=detail&catID=2&articleID=2137&navID=3; Press Release, Gov. Riley Declares State of Emergency to Prepare for Oil Approaching Alabama Coast (Apr. 30, 2010), http://governorpress.alabama.gov/pr/pr-2010-04-30-04-emergency.asp; State of Florida, Office of the Governor, Executive Order 10-99 (Apr. 30, 2010), http://www.dep.state.fl.us/deepwaterhorizon/files/authorizations/043010_eo1.pdf; State of Mississippi, Office of the Governor, Executive Order No. 1038 (Apr. 30, 2010), http://www.governorbarbour.com/news/2010/apr/Orders%20for%20Coast.pdf.

level may change as a result of this spill; we can expect that high-level state officials will now be more involved in contingency planning under the NCP. Though lesser spills had occurred in the region before and career state responders had been integral in the associated spill responses, for many high-level officials, this was the first large-scale NCP response they had encountered. The Area Contingency Plans also did not appear to take state contingency plans into account. A Coast Guard responder with responsibility for pre-spill planning indicated that he knew that the states had contingency plans but was not familiar with them.[108] A requirement that planning documents be consistent and incorporate each other might help to ensure the engagement of responders at all levels.

### b.  Local Officials

The failure of the planning process to adequately involve state governments was magnified at the local level. Local communities were not involved in the contingency planning process, nor were they anticipated to play a large role in the response. The applicable Regional Contingency Plan, called the One Gulf Plan, has no reference to the role of local officials or local communities in general. Two of the Area Contingency Plans included in the One Gulf Plan do include a section instructing planners to coordinate with state and local officials. The New Orleans Area Contingency Plan, for example, instructs the Area Committee planner to work "with state and local officials to pre-plan for joint response efforts, including appropriate procedures for mechanical recovery, dispersant use, shoreline cleanup, protection of sensitive environmental areas, and protection, rescue, and rehabilitation of fisheries and wildlife. The Area Committee is required to work with state and local officials to expedite decisions for the use of dispersants and other mitigating substances and devices."[109] The Captain of the Port for Morgan City, Louisiana reported that he had consistently invited parish representatives to area committee planning meetings, but that they did not often attend. Before the Deepwater Horizon spill, when there had been an incident, Coast Guard responders would telephone parish representatives to provide information, but did not seem to expect the parishes to provide information in return.[110] Parish representatives, for their part, said that they had not been invited to participate in spill planning exercises, in contrast with the annual hurricane drills in which they do participate. Overall, the pre-Deepwater Horizon level of parish involvement in spill planning or spill response was low.

In other regions, local officials are sometimes involved through a Local On-Scene Coordinator. Area contingency plans in Alaska and in San Francisco both provide for such a position.[111] Planners in San Francisco realized they needed to incorporate a way to address local concerns after the *Cosco Busan* oil spill in San Francisco Bay in November 2007.

Because local officials did not have a clear role in the Deepwater Horizon response, many felt ignored by federal responders. This contributed to their empowerment, as discussed above, to go directly to BP for response funding. This problem seemed to be exacerbated in

---

[108] Interview with Coast Guard official.

[109] SECTOR NEW ORLEANS, LOUISIANA, GEOGRAPHIC RESPONSE PLAN 8 (1999).

[110] Interview with Coast Guard official.

[111] *See* ALASKA REGIONAL RESPONSE TEAM (1999), http://www.akrrt.org/plans.shtml; Meeting Notes from California Emergency Management Agency meeting (Aug. 12, 2009), http://www.calema.ca.gov/WebPage/oeswebsite.nsf/ClientOESFileLibrary/Coastal%20Region%20Branch/$file/2009.08.12.pdf.

Louisiana, where the unique parish structure and home rule provisions gave a great deal of autonomy to local governments.  In Mississippi and Alabama, though there were local issues and local mayors expressed concerns about the response, the unified command was able to work more directly with the State On-Scene Coordinator, who in turn worked with county and town governments.[112]  Planning did not take into account the differing governance structures of the Gulf states.

Better incorporation of existing local emergency response structures in spill response planning may help to build trust between the federal government and local officials and to utilize local expertise and resources.  The creation of emergency response structures is currently a high priority for many states and local governments, and the federal government has grant programs in place to support this priority.[113]  Incorporating some of these structures would potentially require changing the NCP to direct that the Area Contingency Planning process involve local leaders in the unified command, either as principal players or on a consulting basis.  The regions that currently have local on-scene coordinators are very different from the Gulf of Mexico in terms of the diversity and sheer number of shoreline communities potentially affected by a spill.  However, there may be ways in which the federal government can use the local on-scene coordinator model to access local government emergency response structures.  Greater participation by a local representative in the planning process could facilitate the inclusion of local resources and concerns in contingency plans.  A Local On-Scene Coordinator, or Coordinators for many communities, could participate in spill response by organizing local volunteers, cataloging response resources, and serving as a point of contract for local concerns.

**Suggestions for the Commission's consideration:**

- Consider clarifying at the national, state, and local level the differences between the Stafford Act and the NCP.
- Consider recommending higher-level state involvement in the contingency planning process, potentially including political in addition to career officials.
- Establish liaisons between the unified command and affected local communities early in the spill response process.
- Consider recommending ways to incorporate local emergency response structures into contingency planning, and consider adding a Local On-Scene Coordinator position in the Unified Command structure.

---

[112] Interviews with Coast Guard officials.
[113] *See, e.g.*, FEMA, FY2010 EMERGENCY MANAGEMENT PERFORMANCE GRANTS (EMPG), http://www.fema.gov/government/grant/empg/index.shtm; Emergency Management; Interview with Coast Guard official.