UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | MDL NO. 2179 |
| | SECTION: J |
| **THIS PLEADING APPLIES TO ALL CASES IN PLEADING BUNDLE B1** | JUDGE BARBIER |
| | MAG. JUDGE SHUSHAN |
| **THIS PLEADING APPLIES TO:** **No. 10-2771** | |

**MEMORANDUM IN SUPPORT OF MOTION OF CAMERON INTERNATIONAL CORPORATION TO DISMISS THE FIRST AMENDED MASTER COMPLAINT, CROSS-CLAIM, AND THIRD-PARTY COMPLAINT FOR PRIVATE ECONOMIC LOSSES ("B1 BUNDLE") FOR FAILURE TO STATE A CLAIM**

Defendant Cameron International Corporation ("Cameron") respectfully submits this memorandum in support of its Motion to Dismiss the First Amended Master Complaint, Cross-Claim, and Third-Party Complaint for Private Economic Losses ("B1 Bundle") for Failure To State a Claim.

1047725v.1

## SUMMARY OF ARGUMENT

Two federal statutes govern this case:  the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C.A. §§ 1331-56a, and the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C.A. §§ 2701-20.

1.     OCSLA extends federal law "to the subsoil and seabed of the outer Continental Shelf and . . . all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom."  43 U.S.C. § 1333(a)(1).  In doing so, OCSLA denotes the outer continental shelf as an "area of exclusive Federal jurisdiction."  *Id*. This case, which arises from oil and gas development activities in the subsoil of the outer continental shelf, falls within this area of exclusive federal jurisdiction.

2.     OPA is the principal federal law made applicable to this case by OSCLA.  In addition, under OCSLA the law of the adjacent state, here Louisiana, is adopted "as the law of the United States" to the extent that it is "applicable and not inconsistent" with other federal law. *Id*. § 1333(a)(2)(A).  The B1 plaintiffs, however, do not limit their claims to OPA and Louisiana law; they also seek recovery under general maritime law and the laws of unidentified states other than Louisiana.  But in this archetypal OCSLA case, neither maritime law nor the law of any state other than Louisiana applies.

i.     In enacting OCSLA, Congress determined that drilling rigs attached to the seabed of the outer continental shelf are "not themselves to be considered within maritime jurisdiction."  *Rodrigue v. Aetna Casualty & Surety Co*., 395 U.S. 352, 365-66 (1969). Furthermore, "exploration and development of the Continental Shelf are not themselves maritime

2

commerce." *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 425 (1985).  Accordingly, as the Fifth

Circuit has held, activities "connected with the development of the Outer Continental Shelf and

an installation for the production of resources there . . . are insufficiently connected to traditional

maritime activity to support the application of admiralty law."  *Texaco Exploration and*

*Production, Inc. v. AmClyde Engineered Products Co., Inc.*, 448 F.3d 760, 771 (5th Cir.), *cert.*

*denied*, 549 U.S. 1053 (2006).  Thus here, as in *AmClyde*, "OCSLA does not permit the

application of substantive maritime law."  *Id.* at 772.

        ii.     By making the subsoil and seabed of the outer continental shelf and all

appurtenant devices an area of exclusive federal jurisdiction, OCSLA explicitly preempts all

state law other than the law of the adjacent state adopted as surrogate federal law.  *Rodrigue*, 395

U.S. at 355-58.  The OPA savings clause, 33 U.S.C. § 2718, does not change this result.  *See*

*United States v. Locke*, 529 U.S. 89 (2000).

        3.     The First Amended Master Complaint, Cross-Claim, and Third-Party Complaint

for Private Economic Losses in Accordance with PTO No. 11 ("B1 Bundle") (Document 1128;

"B1 Complaint") does not assert and the B1 plaintiffs do not have any cause of action against

Cameron under OPA.  Under that governing federal statute, claimants may pursue claims only

against persons designated as "responsible parties," 33 U.S.C. § 2713(c), and it is undisputed that

Cameron has not been designated a "responsible party."  *See* B1 Complaint ¶¶ 602-12.  The

central focus of the B1 case against Cameron, therefore, must be on the claims asserted by the

B1 plaintiffs under Louisiana law.

        4.     Taken together, OPA and OCSLA foreclose all claims asserted by plaintiffs

against Cameron under Louisiana law.  OPA establishes a comprehensive and exclusive statutory

procedure for the assignment of responsibility and payment of compensation for injuries that result from the discharge of oil from, *inter alia*, an outer continental shelf facility like the *Deepwater Horizon* and the Macondo well.  33 U.S.C. §§ 2701(22), (25), (32)(C) and 2702(a). This statutory procedure centers on the designation of "responsible parties," who are made liable for removal costs and damages of the kind claimed in the B1 Complaint.  *Id.* § 2702(a), (b), and 2701(32) (definition of "responsible party").

OPA mandates that "all claims . . . shall be presented first to the responsible party."  33 U.S.C. §§ 2713(a).  If a claim is either denied or not paid within 90 days, the claimant may sue "the responsible party."  *Id* § 2713(c).  If that suit does not result in full recovery, the claimant may present a claim for the amount of its uncompensated damages to the Fund.  *Id.* § 2713(d).  OPA does not authorize claimants to sue persons other than designated responsible parties or their guarantors.  Instead, when a responsible party pays compensation to a claimant, the responsible party becomes subrogated to "all" causes of action "that the claimant has under any other law."  *Id.* § 2715(a).

OPA thereby prescribes a streamlined remedial procedure pursuant to which claimants may recover specified removal costs and damages from responsible parties without proving fault, with ultimate financial responsibility to be determined later in subrogation actions brought by the responsible parties against any third parties who may have caused the harmful discharge of oil and thus may themselves be liable under other law – including, in this case, law borrowed from Louisiana as the adjacent state – for part or all of the resulting damages.  In this way, OPA prescribes a preclusive remedial process governing the handling of claims against both responsible parties and other potentially liable third parties.

OCSLA does not allow claimants to bypass this remedial process by litigating claims against not only the responsible parties but third parties like Cameron as well.  Litigation of claims against both responsible parties and third parties runs directly counter to the deliberate congressional determination that "litigation . . . over liability, defenses, or the propriety of claims **should be reserved for subrogation actions** against dischargers."  S. Rep. 101-94, 101st Cong., 1st Sess. 1989, 1990 U.S. Code Cong. & Admin. News 722, 732 (emphasis added).  Consequently, to the extent that Louisiana remedial law, standing alone, would permit such parallel claims to go forward in tandem, it is inconsistent with OPA and thus cannot be borrowed as surrogate federal law under OCSLA.

5.      In any event, the B1 Complaint fails to state viable claims under Louisiana substantive law.

i.      All of the counts of the B1 Complaint asserted against Cameron address its role as manufacturer of equipment that allegedly failed to perform as intended at the time of the accident.  But Louisiana law does not recognize any theory of liability in suits against a product manufacturer, save and except those specified in the Louisiana Products Liability Act, LA. REV. STAT. § 2800.51 et seq.  The plaintiffs' common law claims against Cameron for negligence, gross negligence, nuisance, and trespass are not specified in that Act and therefore fail as a matter of Louisiana law.

ii.      The Louisiana Act does recognize product liability claims based on specific theories of recovery relating to manufacturing defect, design defect, or inadequate warning -- the only product liability theories arguably advanced in the B1 Complaint against Cameron.  Under subsection 2800.54.D. of the Louisiana Act, however, plaintiffs have the

5

burden of establishing the elements of manufacturer's liability for each of these theories.  With respect to every such theory, plaintiffs have failed to allege sufficient facts to support their claims.

iii.    In addition, the claims of almost every B1 plaintiff are independently foreclosed by the "economic loss" rule applied by the Louisiana courts.  *PPG Industries, Inc. v. Bean Dredging, Inc.*, 447 So.2d 1057 (La. 1984).  To recover, a plaintiff must demonstrate that he has suffered injury to his own property, *Phillips v. G&H Seed Co.*, 10 So.3d 339 (La. App. 3 Cir. 2009), *writ denied*, 21 So.3d 284 (2009) (case under Louisiana Products Liability Act), and the B1 Complaint makes no general allegation to that effect.

## ARGUMENT

### The B1 Complaint Should Be Dismissed For Failure To State A Claim Against Cameron For Which Relief Can Be Granted

**A.    This Case Falls Within The Area Of Exclusive Federal Jurisdiction Defined By OCSLA**

OCSLA is the legislative outgrowth of executive and judicial orders and rulings affirming national sovereignty over coastal waters and the outer continental shelf.  *See Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 479 n. 7 (1981).  In Presidential Proclamation 2667, issued on September 8, 1945, President Truman asserted the sovereignty of the United States over the natural resources of the subsoil and seabed of the entire continental shelf off the nation's coast.  To implement this proclamation, the United States brought original actions against the coastal states in the Supreme Court, now known as the Tidelands Cases, to establish the national government's authority, power, and control over the continental shelf.  *See, e.g., United States v. California*, 332 U.S. 19 (1947). The states responded by asserting sovereignty over marginal belts of the shelf lying immediately seaward of their coasts, but the Supreme Court

6

rejected these states claims.  *See Gulf Offshore*, 453 U.S. at 479 n.7 (citing cases).   In the *California* case, for example, where the state had asserted sovereignty over a marginal three-mile belt off its coast, the Supreme Court held "that the Federal Government rather than the state has paramount rights in and power over [the three-mile] belt, an incident to which is full dominion over the resources of the soil under that water area, including oil."  332 U.S. at 38-39.

In response, Congress enacted the Submerged Lands Act in 1953, in effect quitclaiming to the coastal states a three-mile marginal belt lying seaward of the coast, 43 U.S.C. § 1311 (*see* definition of covered lands in 43 U.S.C. § 1301(a)), but confirming the sovereignty of the United States and its control over resources lying seaward of the three-mile belt.  *Id*. § 1302.  In addition, Congress enacted OCSLA, declaring that "the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control and power of disposition."  43 U.S.C. § 1332(1), quoted as originally enacted in *Rodrigue*, 395 U.S. at 356 & n.2.  The "outer" continental shelf was (and still is) defined generally as the continental shelf lying seaward of the coastal states' three-mile marginal belt.  43 U.S.C. § 1331(a).

OCSLA serves "to define a body of law applicable" to oil and gas activities on the outer continental shelf.  *Rodrigue*, 395 U.S. at 356.  As originally enacted, the statute extended federal law to the outer continental shelf and, in particular, to oil and gas development activities from "artificial islands and fixed structures."  43 U.S.C. § 1333(a)(1).  To the extent applicable and not inconsistent with federal law, the law of the adjacent state was adopted as surrogate federal law also applicable to those same activities.  43 U.S.C. § 1333(a)(2).

OCSLA was amended in 1978.  Following those amendments, its key provisions read as follows:

(1)     The Constitution and laws and civil and political jurisdiction of the

7

United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing or producing resources therefrom, . . . to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a state.

(2)     To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary [of Interior] now in effect or hereafter adopted, the civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf, . . .

43 U.S.C. § 1333(a).

As can be seen, when OCSLA was amended in 1978, Congress clarified the description of the area of exclusive federal jurisdiction, changing the phrase "fixed structures" that had been used originally to the phrase "all installations and other devices permanently or temporarily attached to the seabed." H. CONF. REP. NO. 95-1471, 95th Cong., 2nd Sess., 1978 U.S. Code Cong. & Admin. News 1674, 1679. The congressional conferees took care to explain that this change was "technical and perfecting and is meant to restate and clarify and not change existing law." *Id.* In other words, the earlier phrase "fixed structures" was understood to include all "attached devices" in the context of contemporary oil and gas development on the outer continental shelf.

The 1978 legislative history explains the meaning and significance of this clarification. "Federal law is to be applicable to all activities on all devices in contact with the seabed for exploration, development, and production." H. CONF. REP. NO. 95-1471, 1978 U.S. Code Cong. & Admin. News at 1679. "Federal law is, therefore, to be applicable to activities on drilling ships, semi-submersible drilling rigs, and other water-craft, when they are connected to

8

the seabed by drillstring, pipes or other appurtenances, on the OCS for exploration, development, or production purposes."  H. REP. NO. 95-590, 95th Cong., 1st Sess., 1978 U.S. Code Cong. & Admin. News 1450, 1534.   A crucial test for applying OCSLA, therefore, is whether the activities in question involved exploration, development, or production equipment that was in contact with the seabed.

This case unquestionably passes that test.  The oil development project at the heart of this case, as this Court already has determined, is subject to federal jurisdiction by reason of OCSLA.  *See* Document # 470 (order denying State of Louisiana motion to remand).  The B1 Complaint confirms in many particulars that this case falls within the exclusive federal jurisdiction defined by OCSLA.

At its core, the B1 Complaint addresses oil drilling and completion activities permitted by a federal oil lease covering hydrocarbon reservoirs in the subsoil of the outer continental shelf known as the "Macondo" prospect.  B1 Complaint ¶ 272; *see id.* ¶ 210.  Pursuant to a permit from the U.S. Department of Interior, BP drilled what the B1 Complaint calls the "Macondo well" to a depth in excess of 18,000 feet into the subsoil of the Northern Gulf of Mexico.  *Id.* ¶¶ 280, 291.

Fundamentally, the B1 Complaint alleges an accident arising from loss of control of this "subsea oil well."  *Id*. ¶ 258.  "When highly pressurized hydrocarbons leaked into the well," appurtenant "emergency equipment failed to stop the oil and gas from blowing out of the well, which led to explosions and a fire on the Deepwater Horizon, and ultimately the sinking of the [rig] and the resulting spill."  *Id.*  This accident took place during "completion" operations prior to "production."  *See id.* ¶ 263.  The spill at issue occurred, therefore, in the course of

operations of the kind specifically identified as "development" in OCSLA, i.e., "activities which take place following discovery of minerals in paying quantities, including . . . drilling . . . and which are for the purpose of ultimately producing the minerals discovered."  43 U.S.C. § 1331(l).

According to the B1 Complaint, this "loss of well control was due to the failure of mechanical and cement barriers to seal off the well against the influx of highly pressurized hydrocarbons from the reservoirs surrounding the bottom of the well."  B1 Complaint ¶ 259. Most important for the claims against Cameron, the B1 Complaint also alleges failures in the "subsea BOP," or blowout preventer.  *Id.*  It is evident that the case as a whole and the claims against Cameron in particular involve oil and gas development activities in the subsoil and seabed of the outer continental shelf, as described in OCSLA sections 1333(a)(1) and (a)(2).

To be sure, the oil and gas drilling and completion operations associated with these events in the subsoil and on the subsea of the Outer Continental Shelf were conducted by personnel situated on the *Deepwater Horizon* mobile offshore drilling unit.  When not attached to the subsoil and seabed, the drilling unit can and does operate as a vessel.  This point has no significance here, however, for the B1 Complaint itself alleges that the *Deepwater Horizon* was connected to the seabed by the marine riser during the development operations at issue in this case.  B1 Complaint ¶ 267.  In short, at all times relevant to this case the *Deepwater Horizon* was "connected to the seabed by drillstring, pipes or other appurtenances" in the manner contemplated by Congress when amending OCSLA in 1978.  H. REP. NO. 95-590, 95th Cong., 1st Sess., 1978 U.S. Code Cong. & Admin. News at 1534.

Indeed, the B1 Complaint alleges in elaborate and exhaustive detail facts that demonstrate that the activities in question were subject to and governed by OCSLA.  The

Complaint alleges that for deepwater offshore drilling like that conducted at the Macondo prospect, construction of a well begins with the drilling of a "pilot hole" into the seabed." *Id.* ¶ 264.  "The pilot hole is then 'cased,' or lined with pipe." *Id.*  "The first section of casing pipe lowered into the pilot hole generally anchors a safety device known as a blowout preventer ("BOP")." *Id.* ¶ 265.  The BOP is "positioned and secured over the pilot hole." *Id.* ¶ 267.  A "pipe called a 'marine riser' connects the wellhead to the drilling" rig on the surface. *Id.*  "As the well bore is drilled deeper" into the subsoil, each "casing section is secured with a plug of cement." *Id.* ¶ 270.  Well control is also sought through the use of "drilling fluid" called "mud" that is "pumped down the center of the drill pipe. *Id.* ¶ 268.  Mud is circulated "through the entire length of the well before beginning the cementing job." *Id.* ¶ 327.  There is a "float collar installed on the final section of casing." *Id.* ¶ 318.  A "casing hanger lockdown sleeve ties down the seal assembly at the top of the well." *Id.* ¶ 363.

In these various particulars, the B1 Complaint affirmatively alleges facts demonstrating that the Macondo well casing, cement, wellhead, float collar, lockdown sleeve, and BOP constituted "fixed structures" in the "subsoil" or on the "seabed" of the outer continental shelf within the meaning of 43 U.S.C. § 1333(a)(2).  The allegations further demonstrate that the well and appurtenant well control equipment and systems were correspondingly installations and other devices "attached to the seabed" within the meaning of the operative language clarified in 43 U.S.C. § 1333(a)(1).

Most of the underlying substantive factual allegations of the B1 Complaint raise issues with the Macondo well in the subsoil. *Id.* ¶¶ 291-477.  These issues include the well casing design (¶¶ 308-17); possible problems with the well's float collar (¶¶ 318-22); the

cementing operation to secure and center the casing and seal the annulus between the casing and the well bore (¶¶ 323-26, 333-361); mud circulation and mud displacement, including use of spacer fluid (¶¶ 327-32, 365-68, 381-86); tests of pressure "in the casing string" (¶¶ 369-80); the casing hanger lockdown sleeve (¶¶ 362-64); hydrocarbon influx into the well (¶¶ 387-402); and the operation of certain components of the BOP attached to and fixed onto the subsea (¶¶ 415-49). The B1 Complaint also raises issues concerning operational policies and procedures, maintenance of safety systems other than the BOP, decision-making, and general management. *Id.* ¶¶ 403-14, 450-77. But these allegations all concern well drilling and well control – well control policies and procedures, maintenance of well control systems like the BOP and otherwise, decision-making concerning well control, and management of the drilling and well control process by "Drilling Defendants." *Id.* These are all "development" matters under OCSLA. 43 U.S.C. § 1331(l).

The theories of liability asserted in the B1 Complaint, like its factual allegations, are premised entirely on the drilling and control of the Macondo well in the subsoil with the fixed structures placed in the subsoil and with equipment affixed to the seabed. The negligence and gross negligence causes of action concern "drilling" operations by Drilling Defendants. B1 Complaint ¶¶ 571, 579-80, 583, 595. These negligence and gross negligence causes of action are based on unsuccessful efforts to contain hydrocarbons from the well. *Id.* ¶¶ 581, 583-15, 590-21, 595, 597-602, 610-11. The nuisance and trespass causes of action asserted against the "Drilling Defendants" are based on these same allegations of negligence and gross negligence. *Id.* ¶¶ 693, 699, 704-06, 711. The five causes of action asserted against Cameron are all based on design or manufacture of well control equipment, the BOP, which at the time of the accident was a fixed

structure on the seabed that allegedly did not operate as intended.  *Id.* ¶¶ 572, 603-06, 636, 638-57, 693, 699, 704-06, 711.

The allegations of the B1 Complaint make manifest that this case falls within the area of exclusive federal jurisdiction defined by OCSLA.  Indeed, the B2 RICO Complaint [Doc. 1059] affirmatively asserts OCSLA jurisdiction in Paragraph 26.  Furthermore, more than 140 of the complaints filed by B1 plaintiffs – the complaints listed in Exhibit A – invoked federal jurisdiction under OCSLA.  This is, in short, an archetypal OCSLA case.

**B.      Under OCSLA, The Bodies Of Law Actually Or Potentially Governing This Case Are OPA And The Law Of Louisiana; Neither General Maritime Law Nor The Law Of Any State Other Than Louisiana Applies**

OCSLA extends the "laws . . . of the United States . . . to the subsoil and seabed of the outer Continental Shelf."  43 U.S.C. § 1333(a)(1).  This means, of course, that OPA, like all other federal laws, is extended to cover the area of exclusive federal jurisdiction defined by OCSLA.   In turn, OPA provides a comprehensive regime assigning liability and providing remedies with respect to claims arising from the discharge of oil "into or upon the navigable waters or adjoining shorelines."  33 U.S.C. § 2702(a).  OPA squarely governs this case.

In enacting OCSLA, Congress was aware that existing federal law was not fully comprehensive and that it would be expedient to use "state law . . . to fill federal voids." *Rodrigue*, 395 U.S. at 358.   OCSLA therefore provides that "[t]o the extent that they are applicable and not inconsistent with . . . other Federal laws . . . the civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf . . . which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf."  43

13

U.S.C. § 1333(a)(2).

In this case Louisiana is the pertinent "adjacent State" within the meaning of OCSLA.  The Macondo well is located "on the Outer Continental Shelf 48 miles off the coast of Louisiana."  B1 Complaint ¶ 272.  Under Federal Rule of Evidence 201(b) and (d), the Court may take judicial notice from the NOAA map attached as Exhibit B that, in the language of 43 U.S.C. § 1333(a)(2), the Macondo well "would be within the area of [Louisiana] if its boundaries were extended seaward to the outer margin of the outer Continental Shelf."  *See also Snyder Oil Co. v. Samedan Oil Co.*, 208 F.3d 521 (5th Cir. 2000).  The Plaintiffs' Steering Committee concedes this point in the B2 RICO complaint, affirmatively alleging that Louisiana law has "been declared under 43 U.S.C. §§ 1331(f)(1) and 1333(a)(2) to be the law of the United States for that portion of the outer Continental Shelf from which the oil spill originated."  Document 1059 ¶ 26.

In resolving the issues raised by the B1 Complaint, therefore, the Court must look first to OPA and then, to the extent that it is not inconsistent with OPA or other federal law, the law of Louisiana.  Yet the B1 Complaint asserts claims against Cameron sounding in negligence, gross negligence, and product liability under general maritime law, and nuisance and trespass under the common law of one or more unidentified states.  Those claims are not viable.  Neither maritime law nor the law of any state other than Louisiana applies here.

### 1.    General Maritime Law Does Not Apply

It should be noted at the outset that the B1 plaintiffs have correctly chosen not to invoke federal common law.  In providing for the adoption of the law of the adjacent state as surrogate federal law, "Congress made clear provision for filling in the 'gaps' in federal law; it

did not intend that federal courts fill in those 'gaps' themselves by creating new federal common law." *Chevron Oil Co. v. Huson*, 404 U.S. 97, 104-05 (1971).  Thus there is no room here for federal common law.  General maritime law, which the B1 plaintiffs do seek to invoke, is similarly inapplicable.

Although the lower federal courts have sometimes struggled with this issue, the Supreme Court has long made it known that OCSLA, where it applies, preempts general maritime law.  Indeed, even before OCSLA's enactment the Court "specifically held that drilling platforms are not within admiralty jurisdiction." *Rodrigue*, 395 U.S. at 360, citing *Phoenix Construction Co. v. The Steamer Poughkeepsie,* 212 U.S 558 (1908).  With the *Phoenix* ruling before it, in enacting OCSLA "Congress assumed that the admiralty law would not apply unless Congress made it apply, and then Congress decided not to make it apply." *Id*. at 361.  The Supreme Court reiterated this conclusion in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 101 (1971): "comprehensive admiralty law remedies [do not] apply under § 1333(a)(1)."

The decision in *Rodrigue* was based on "careful scrutiny" of OCSLA's legislative history.  395 U.S. at 363.  This history revealed that Congress had considered at length what body of law should govern the facilities described in the statute and had concluded that "maritime law was inapposite." *Id*.  Congress chose instead to borrow the law of the adjacent state, in part because of "the close relationship between the workers on the island and the adjacent States." *Id*.  Congress intended the law of the adjacent state "to be used when Federal statutes or regulations of the Secretary of the Interior are inapplicable." *Id*. at 357-58.  It was not necessary even to mention maritime law in this context, for it was understood that the exploration and production facilities identified in OCSLA "were not themselves to be considered

15

within maritime jurisdiction."  *Id*. at 366.  Following the precept that "[e]ven in admiralty . . . where the federal judiciary's lawmaking power may well be at its strongest, it is our duty to respect the will of Congress," *Northwest Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 96 (1981), the Court, ever since its decision in *Rodrigue*, has steadfastly refused to permit maritime law to encroach upon the area of exclusive federal jurisdiction defined by OCSLA.

The accident in *Rodrigue* occurred on "fixed structures" in the nature of "artificial island drilling rigs located on the outer Continental Shelf," and the Court concluded that OCSLA "deliberately eschewed the application of admiralty principles to these novel structures."  395 U.S. at 352, 355.  The facts in *Chevron Oil* were similar.  404 U.S. at 98-99.  Both *Rodrigue* and *Chevron Oil* were decided before OCSLA was amended in 1978 to clarify that the phrase "fixed structures" refers to "all installations and other devices permanently or temporarily attached to the seabed."  But this amendment had no substantive significance; it did not open the door for the intrusion of general maritime law into the OCSLA domain.  The amendment made no change in "the operative assumption underlying the statute:  that admiralty jurisdiction generally should not be extended to accidents in areas covered by OCSLA."  *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 218 (1985).

Furthermore, as later decisions demonstrated, the inapplicability of general maritime law stems not only from the physical connection between drilling platforms and the seabed – a connection high-lighted by the statute both before and after its amendment – but also, and independently, from the non-maritime nature of the activities of "exploring for, developing, or producing resources" that lie at the heart of the area of "exclusive Federal jurisdiction" that

OCSLA defines.  43 U.S.C. § 1333(a)(1).  A case in point is *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 421 (1985), where the Court explicitly disapproved the lower court's erroneous determination that "offshore drilling is maritime commerce."  The Court reiterated the reasoning of *Phoenix* ("drilling platforms [are] not even suggestive of traditional maritime affairs") and reaffirmed its earlier determination in *Rodrigue* that "exploration and development of the Continental Shelf are not themselves maritime commerce."  *Id*. at 422, 425.

The Supreme Court discussed the proper reach of maritime law outside the OCSLA context in *Sisson v. Ruby*, 497 U.S. 358 (1990), and *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995).  The availability of maritime law, the Court explained, depends on satisfying "conditions both of location and of connection with maritime activity."  *Grubart,* 513 U.S. at 534.  The requirement that both such conditions be met further emphasizes the unavailability of maritime law in cases like this.  Cases involving "devices permanently or temporarily attached to the seabed, . . . erected thereon for the purpose of exploring for, developing or producing resources," 33 U.S.C. § 1333(a)(1), do not satisfy either condition identified in *Grubart* and thus cannot implicate maritime law.  They do not satisfy the condition of location, because Congress "deliberately eschewed the application of admiralty principles to these novel structures."  *Rodrigue*, 395 U.S. at 355.  Neither do they satisfy the condition of connection with maritime activity.  That condition is met only "if the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity," *Grubart*, 513 U.S. at 534, and as the Court has repeatedly stated, "exploration and development of the Continental Shelf are not themselves maritime commerce."  *Herb's Welding*, 470 U.S. at 425.  General maritime law simply does not apply in archetypal OCSLA

17

cases such as this.

Subsequent decisions of the federal appellate courts further confirm this conclusion. In *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990), the Fifth Circuit sought to synthesize Supreme Court precedent into a three-part test, where it looked to (1) whether the controversy arose on a situs covered by OCSLA, (2) whether maritime law applied of its own force, and (3) whether state law was consistent with federal law. *See also Grand Isle Shipyard, Inc. v. Seacor Marine, L.L.C.*, 589 F.3d 778, 783-89 & n.9 (5th Cir. 2009) (en banc). It is apparent that the first two parts of this test derive from the conditions of location and connection identified in *Sisson* and *Grubart*.

*PLT Engineering* itself involving the construction of a gathering line on the seabed of the outer continental shelf, an OCSLA situs. The court understood that *Rodrigue* "precludes the application of maritime law except in those cases where the subject matter of the controversy bears [a] significant relationship to traditional maritime activities." *Id.* at 1048, quoting *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1231 (5th Cir. 1985). The court determined that the "significant relationship" test had not been met:

> While some maritime operations were undoubtedly contemplated, the principal obligation of PLT and the subcontractors was to build the gathering line and connect it to the platform and the transmission line. These activities are not traditionally maritime. Rather they are the subjects of oil and gas exploration and production.

*Id.* at 1049.

The Fifth Circuit's more recent decision in *Texaco Exploration and Production, Inc. v. AmClyde Engineered Products Co.*, 448 F.3d 760 (5th Cir.), *cert. denied*, 549 U.S. 1053 (2006), is similar. That case involved an accident that occurred during construction of a tower for a drilling rig. Because the accident happened on a vessel that was not itself attached to the

18

seabed, the parties apparently assumed that maritime law governed.  The court determined, however, that it would "not rely upon the parties' bare conclusion that substantive maritime law applies because OCSLA provides its own choice of law rules."  *Id.* at 772.  The court closely analyzed the facts in light of the relevant authorities and concluded that maritime law did not apply.  With respect to location, the court noted that although the accident may have occurred on a vessel "the claims are inextricably linked to the construction of a platform permanently fixed to the Shelf for the purposes of development and would not have arisen but for such development."  *Id.* at 774.  With respect to connection, the court determined that activities "connected with the development of the Outer Continental Shelf and an installation for the production of resources there . . . are insufficiently connected to traditional maritime activity to support the application of admiralty law."  Id. at 771.  In these circumstances, the court concluded that "OCSLA does not permit the application of substantive maritime law."  *Id*. at 772.  In particular, the court noted that the involvement of a vessel "in the accident and other elements of maritime activity that precede or surround the compliant tower's construction on the Shelf are insufficient to support either admiralty jurisdiction or the application of substantive maritime law."  *Id.* at 775.

If general maritime law did not apply in *AmClyde*, and it did not, *a fortiori* it does not apply here.

(1) *Situs*.  The explosion and discharge of oil on which the B1 plaintiffs' claims are based, unlike the accident in *AmClyde*, occurred at a situs explicitly identified in OCSLA.  The *Deepwater Horizon*, as the B1 plaintiffs affirmatively allege, B1 Complaint ¶ 234, indisputably was attached to the subsoil and seabed "through drilling mechanisms."  *Diamond Offshore Co. v. A&B Builders, Inc*., 302 F.3d 531, 545 (5th Cir. 2002).  The discharge of oil

19

proceeded from the Macondo well located in the subsoil.  B1 Complaint ¶¶ 253-439.

(2) *Activities*.  This tragedy occurred, moreover, in the course of activities – oil and gas exploration and production – that have repeatedly been held to have no substantial relationship to traditional maritime activity.  The facts here do not satisfy either, let alone both, of the *Grubart* conditions of location and of connection with maritime activity.  To the extent that the B1 plaintiffs rely on general maritime law, therefore, they have failed to state a claim against Cameron for which relief can be granted.

To be sure, *Grubart* recognized that the condition of connection with maritime activity has a second component – "whether the incident has a potentially disruptive impact on maritime commerce," 513 U.S. at 534 – that concededly was met in this case.  But that does not change the result here, for three independent reasons.  *First*, the fundamental meaning of *Rodrigue* is that OCSLA has identified and carved out a domain in which maritime law has no application; Congress determined that structures attached to the seabed for the purpose of exploration and development, "though surrounded by the high seas, were not themselves to be considered within the maritime jurisdiction."  395 U.S. at 365-66.  *Second*, disruption of maritime commerce is only suggestive, not determinative, of maritime jurisdiction; for example, the negligent demolition of a bridge during highway construction may disrupt navigation but nonetheless raise no issue of maritime law.  In determining the applicability of maritime law the core inquiry is whether the activity in question had a "substantial relationship" with "traditional maritime activity," *Sisson*, 497 U.S. at 365, and that inquiry here must be answered in the negative.  *See, e.g., Herb's Welding*, 470 U.S. at 422 ("drilling platforms [are] not even suggestive of traditional maritime affairs").  *Third*, where maritime commerce is disrupted by a

20

discharge of oil into or upon navigable waters, Congress has chosen a different, non-maritime, means of resolving controversy; the "very specific treatment of oil pollution in the OPA . . . supplanted general admiralty and maritime law." *South Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65-66 (1st Cir. 2000) ("Congress intended the OPA to be the exclusive law governing oil spills"). *Accord, Gabarick v. Laurin Maritime (America) Inc.*, 623 F.Supp.2d 741, 746 (E.D. La. 2009); *Clausen v. M/V New Carissa*, 171 F.Supp.2d 1127, 1133 (D. Or. 2001); *Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp*, 924 F.Supp. 1436, 1447 (E.D. Va.), *aff'd w/o published opinion*, 122 F.3d 1064 (4th Cir. 1997), *cert. denied*, 523 U.S. 1021 (1998). This is not a maritime case.

2.      **The Laws Of States Other Than Louisiana Do Not Apply**

The B1 Complaint does not identify the source of state law on which it bases the claims for nuisance and trespass. In ¶ 582, it does make oblique reference to the product liability laws of the Gulf States. This suggests that the B1 plaintiffs may seek to avoid Louisiana law by contending, for example, that any individual plaintiff's claim is governed by the law of his domiciliary state, on the ground that oil from the spill physically reached coastal property, or alternatively, that under appropriate choice of law rules the law of some state other than Louisiana should control. But no state law as such can be invoked to support these claims. Oil and gas development on the outer continental shelf is subject to exclusive federal jurisdiction under OCSLA, and federal law alone (including, however, the law of the adjacent state borrowed as surrogate federal law) governs claims arising from the discharge of oil from the subsoil and seabed of the outer continental shelf and the installations and structures thereon. 43 U.S.C. § 1333(a); *Gulf Offshore Co. v. Mobil Oil Corp*, 453 U.S. 473, 480-81(1981); *Chevron v. Huson*,

404 U.S. at 101-05; *Rodrigue*, 395 U.S. at 355 ("federal law is 'exclusive," so that "state law is adopted only as surrogate federal law").  The statute leaves no room in this case for application of state law as such.

It makes no difference that the discharged oil may have reached a plaintiff's property.  It has long been understood that state common law does not govern interstate oil pollution, even when the pollution migrates into state waters and onto state land.  *Illinois v. Milwaukee*, 406 U.S. 91 (1972) (*Milwaukee I*); *see also International Paper Co. v. Ouellette*, 491 U.S. 481, 488 (1987) ("the implicit corollary of [*Milwaukee I*] was that state common law was pre-empted").  Instead, "regulation of interstate water pollution is a matter of federal, not state law."  *Ouellette*, 491 U.S. at 488, citing *Milwaukee I*, 406 U.S. at 102 n.3.

Similarly, it is well settled that OCSLA "supersede[s] the normal choice of law rules that the forum would apply."  *Gulf Offshore*, 453 U.S. at 482 n.8, citing *Chevron v. Huson*, 404 U.S. 97 at 102-03.  Choice of law is governed by OCSLA, and its choice of law provision calls only for the application of the law of the adjacent state borrowed as surrogate federal law; OCSLA does not permit the application or borrowing of the law of any other state.  43 U.S.C. § 1333(a)(2).

The OPA savings clause, 33 U.S.C. § 2718, does not alter this conclusion.  The savings clause provides that OPA itself does not preempt various state laws, but preemption here is prescribed not by OPA but by OCLSA; section 2718 does not disturb the exclusivity of federal law mandated by OCSLA.  This is made clear both by the statutory text and by the Supreme court's definitive construction and application of that text in *United States v. Locke*, 529 U.S. 89 (2000).

The OPA savings clause contains three subsections. Subsection (a) provides that "nothing in this chapter," and also "nothing in" the maritime Limitation of Liability Act, precludes states from imposing additional liability. 33 U.S.C. § 2718(a). Similarly, subsection (b) provides that "nothing in this chapter," and nothing in a specified provision of the federal tax code, precludes the creation of state compensation funds; and subsection (c) provides that "nothing in this chapter," the maritime Limitation of Liability Act, or the same provision of the tax code, bars either the states or the federal government from imposing additional liability or fines or penalties. *Id*. §§ 2718(b), (c). By its terms, therefore, section 2718 limits the preclusive reach only of OPA, the maritime Limitation of Liability Act, and a specific provision of the tax code; it does not speak to OCSLA or purport to curb OCSLA's preemptive force. Section 2718 does preserve the operation of certain state laws with respect to discharges originating "within" state territorial waters; but it leaves the outer continental shelf, which Congress has expressly determined to be an "exclusive Federal jurisdiction," 43 U.S.C. § 1333(a)(1), subject solely to federal law in the manner prescribed by OCSLA. The OPA savings clause does not resuscitate state law that OCSLA has preempted.

This reading of the statute is confirmed by the Supreme Court's analysis of a similar savings clause in *Ouellette* and also by its definitive ruling with respect to section 2718 in *Locke*. The decision in *Ouellette* demonstrates that statutory savings clauses like section 2718 must be strictly construed: the Court held that a savings clause in the Clean Water Act providing that "[n]othing in this section" preempts state law "does not purport to preclude pre-emption of state law by other provisions of the Act." 479 U.S. at 493.

By the same token, a savings clause like OPA § 2718, providing that "nothing in

23

this chapter" preempts state law, does not preclude preemption of state law by other federal statutes, specifically including OCSLA.  This was, in essence, the holding in *Locke*.  In that case, the state of Washington argued that section 2718 had the effect of depriving the Port and Waterways Safety Act of preemptive effect.  The Supreme Court explicitly rejected that argument, holding that the savings clause means only what it says and nothing more, *i.e.*, that only "nothing ***in this chapter***" is preemptive, and therefore "the pre-emptive effect of the [Port and Waterways Safety Act] and regulations promulgated under it are not affected by OPA."  529 U.S. at 107.  It follows in this case that OCSLA, like the Port and Waterways Safety Act in *Locke*, is not affected by the OPA savings clause.  OCSLA applies here in accordance with its terms, foreclosing both the application of state law of its own force and the use of state conflict of law rules.  To the extent that the B1 plaintiffs' common law or product liability causes of action are based on the law of a state other than Louisiana, therefore, they fail to state a claim for which relief can be granted.

**C.      The B1 Plaintiffs Assert No Cause Of Action Against Cameron Under OPA**

The B1 Complaint does not assert a cause of action against Cameron based upon OPA.  There is good reason for this.  OPA makes only the "responsible party" liable for removal costs and damages, and it authorizes suit only against "the responsible party or guarantor."  33 U.S.C. § 2702(a), 2713 (c).  The term "responsible party" is defined as, "[i]n the case of a vessel, any person owning, operating, or demise chartering the vessel" and, "[i]n the case of an offshore facility . . . the lessee or permittee of the area in which the facility is located or the holder of a right of use and easement."  *Id*. § 2701(32)(A), (C).  The responsible parties in this case are Macondo prospect lessees BP, Anadarko, and MOEX, and *Deepwater Horizon* owner or

24

operator Transocean, each of whom has been identified as a responsible party by the federal government.  *See* B1 Complaint ¶ 680.  It is undisputed, and indeed the B1 plaintiffs concede, that Cameron is not a responsible party under the statute.  *See id.* ¶¶ 678-90.  Nor is Cameron a "guarantor," *i.e.*, "any person . . . who provides evidence of financial responsibility for a responsible party," 33 U.S.C. § 2701(13), and no one contends otherwise.

In short, OPA confers causes of action only against statutorily designated responsible parties and guarantors.  It does not create a cause of action against Cameron in this case.  The focus of this case, therefore, must be on the claims asserted by the B1 plaintiffs under Louisiana law.

**D.      Taken Together, OPA And OCSLA Foreclose The B1 Plaintiffs' Claims Against Cameron Under Louisiana Law**

OCSLA provides for the adoption of Louisiana substantive law as surrogate federal law in this case.  It does not, however, allow the implementation of Louisiana remedial law if and to the extent such law would permit immediate prosecution of claims against persons other than statutorily designated responsible parties.  Such state remedial law is inconsistent with the comprehensive and preclusive remedial provisions of OPA and thus ineligible for adoption as federal law under OCSLA.

**1.      OPA Establishes A Comprehensive And Preclusive Remedial Process For The Resolution Of Claims Arising From The Discharge Of Oil In The Area Of Exclusive Federal Jurisdiction Defined by OCSLA**

OPA was enacted in the wake of the *Exxon Valdez* oil spill to provide a coherent set of federal rules to affix responsibility and provide compensation for injuries resulting from oil discharges "into or upon the navigable waters or adjoining shorelines or the exclusive economic

25

zone."  33 U.S.C. § 2702(a).  OPA is therefore one of the federal laws – indeed, the principal federal law – that OCSLA extends to activities relating to oil development facilities attached to the subsoil and seabed of the outer continental shelf.  43 U.S.C. § 1333(a)(1).

OPA prescribes a streamlined, comprehensive, and exclusive remedial process pursuant to which designated responsible parties compensate claimants for the amount of their verifiable damages without requiring proof of fault.  Ultimate financial responsibility is then determined in separate litigation between the responsible parties who have paid compensation and any third parties who may be liable under other federal law, including law borrowed from the adjacent state, for having caused the discharge of oil.

The OPA remedial process focuses, first and foremost, on the statutorily designated responsible parties.  OPA makes these responsible parties liable, without proof of fault, for prescribed costs and damages: "Notwithstanding any other provision or rule of law, and subject to the provisions of this chapter, each responsible party for a vessel or a facility from which oil is discharged, . . . into or upon the navigable waters . . . is liable for [specified] removal costs and damages . . . that result from such incident."  *Id*. § 2702(a).  There are six such categories of removal costs and damages for which the responsible parties are liable, including damages for injury to natural resources, economic loss for injury to property, and increased costs due to injury to property.  *Id*. § 2702(b).

OPA sets forth an administrative claims procedure that claimants must follow before bringing suit: "all claims for removal costs or damages shall be presented first to the responsible party or guarantor" (or, alternatively, to the Oil Spill Liability Trust Fund ("Fund") established pursuant to 26 U.S.C. § 9509).  33 U.S.C. § 2713(a) and 2701(11) (definition of

26

"Fund").  If the claim is not paid within 90 days, "the claimant may elect to commence an action in court against the responsible party or guarantor or to present the claim to the Fund."  *Id*. § 2713(c).  Such lawsuits must be brought within three years.  *Id*. § 2717(f)(1).  In the event of litigation, the responsible party is entitled to assert only very narrowly circumscribed statutory defenses – specifically, that the discharge was "caused solely by" an act of God, an act of war, or certain independent acts of third parties.  *Id*. § 2703.  The responsible party also may assert statutory limits on liability, *id.* § 2704, but BP, indisputably the principal responsible party here, has waived those limits.  *See* Document # 559.

Once the responsible party or guarantor or the Fund "pays compensation pursuant to this chapter to any claimant for removal costs or damages," whether pursuant to the administrative claims procedure or litigation, the person paying such compensation "shall be subrogated to all rights, claims, and causes of action that the claimant has under any other law." 33 U.S.C. § 2715(a).  Actions on such subrogated claims must be brought within three years after payment of compensation.  *Id.* § 2717(f)(4).

OPA does not authorize claimants to sue persons other than statutory responsible parties.  Instead, OPA interposes the responsible party between the claimant and any such third parties.  "If the responsible party alleges that the discharge . . . was caused solely by the act or omission of a third party, the responsible party . . . shall pay removal costs and damages to any claimant; and shall be entitled to subrogation to all rights of . . . the claimant to recover [from the third party the amount of] removal costs or damages . . . [so] paid."  33 U.S.C. § 2702(d)(1)(B). If the third party is alleged to be only partially and not solely liable, the responsible party remains fully liable to the claimant but may bring a civil action for contribution against the third

27

party.  *Id.* § 2709.  Any such claim for contribution must be brought within three years after entry of judgment or court-approved settlement establishing the responsible party's liability to the claimant.  *Id.* at § 2717(f)(3).

This comprehensive and carefully crafted remedial structure is straightforward and unambiguous: responsible parties are subject, for all practical purposes, to strict liability and must pay compensation to claimants who can prove that they incurred removal costs or damages covered by OPA.  Then, in separate litigation, the responsible parties may sue potentially liable third parties under other law to recover all or some of the compensation they paid to claimants.  This statutory scheme does not allow claimants to pursue competing litigation against persons, like Cameron, who are not statutorily designated responsible parties.

The OPA legislative history confirms this understanding of the statute and makes clear that Congress deliberately chose to establish an exclusive statutory remedial procedure for the resolution of claims arising out of discharges of oil on the outer continental shelf.  OPA was consciously designed "to create a single Federal law providing cleanup authority, penalties, and liability for oil pollution."  S. REP. 101-94, 101st Cong., 1st Sess. 1989 ("S. REP."), 1990 U.S. CODE CONG. & ADMIN. NEWS 722, 730.  "[F]ollowing enactment, liability and compensation for oil pollution removal costs and damages caused by a discharge from a vessel or facility (as defined in this [bill]) will be determined in accordance with this [legislation]."  CONF. REP. 101-653, 101st Cong., 2nd Sess. 1990 ("CONF. REP."), 1990 U.S.C.C.A.N. 779, 802, repeating the language of S. REP., 1990 U.S.C.C.A.N. at 746-47.  "Wherever possible, the burden is to be on the discharger to first bear the costs of removal and provide compensation for any damages."  S. REP. at 732.  In particular, and most tellingly, the Senate Report admonishes that "litigation or

lengthy adjudicatory proceedings over liability, defenses, or the propriety of claims **should be reserved for subrogation actions** against dischargers." *Id.* This means that the liability of third parties like Cameron is to be adjudicated not in litigation brought directly by claimants but in subrogation actions brought by responsible parties after they have satisfied the claimants' claims for specified recovery compensable under OPA.

> **2.** **To The Extent That Louisiana Law Would Permit The B1 Plaintiffs To Pursue Claims Against Both Responsible Parties And Third Persons Like Cameron, It Is Inconsistent With OPA And Thus Cannot Be Adopted As Surrogate Federal Law Under OCSLA**

Congress plainly understood and intended that OPA mandates payment by statutorily designated responsible parties "first," without the need for complex and burdensome litigation over liability, and that OPA requires the resolution of more problematic issues under other law, including law adopted as surrogate federal law under OCSLA, in separate subrogation or contribution actions initiated by the responsible parties. Congress left no room for lawsuits seeking to bypass this carefully crafted remedial procedure. Neither the statutory text nor the legislative history allows claimants like the B1 plaintiffs to pursue litigation against both responsible parties and third parties who, like Cameron, are not responsible parties under the statute.

The litigation of actions against both responsible parties and third parties like Cameron does not square with the comprehensive remedial scheme established by OPA. Such concurrent litigation would impermissibly "interfere with the methods by which" OPA "was designed" to achieve the stated goals of Congress, *Ouellette*, 471 U.S. at 491-92, and would directly undermine the litigation-saving efficiencies that Congress intended to achieve when it imposed strict liability "first" on responsible parties "[n]otwithstanding any other provision or

29

rule of law," 33 U.S.C. § 2702(a), and provided that more complex issues arising under other law were to be resolved in subrogation or contribution actions brought by the responsible parties, *id.* §§ 2715(a), 2709.

OPA's language and history unquestionably reflect "a congressional desire to encourage settlement and avoid litigation." *Boca Ciega Hotel, Inc. v. Bouchard Transportation Co.*, 51 F.3d 235, 238-39 (11th Cir. 1995); *Gabarick v. Laurin Maritime (America) Inc.*, 623 F. Supp.2d 741, 747-48 (E.D. La. 2009). The proliferation of multiple-party litigation that would follow from allowing claimants to pursue two tracks of litigation -- one against responsible parties for relief under OPA, and a second seeking the same relief against other parties under other law—runs directly counter to that congressional desire. This Court is witness to the myriad oil spill lawsuits filed by literally tens of thousands of claimants within the first months after the accident – lawsuits brought, moreover, without regard to the statutory requirement that claims first be presented administratively. 33 U.S.C. § 2713(a). This chaotic mass of multi-party lawsuits asserting multiple legal theories can be rationally managed only by following the streamlined procedure prescribed by OPA, *i.e.*, by ignoring everything other than the resolution of the statutory claims filed against responsible parties under OPA. Allowing claimants to sue persons other than responsible parties is inconsistent with OPA at the most fundamental level; it results in a massive proliferation of litigation in direct contravention of the congressional purpose of simplifying and streamlining the procedure for determining financial responsibility for oil spills and ensuring prompt payment of claims. This wastes scarce judicial resources and threatens to produce different and conflicting rulings on both liability and damages.

Litigation of claims against both responsible parties and third parties directly

would make a hash of the OPA remedial process, and especially of its provisions for subrogation and contribution. OPA explicitly contemplates that responsible parties will pay compensation to claimants first, after which they may bring subrogation actions against potentially liable third parties asserting "all" of the satisfied claimants' "causes of action."  Permitting claimants to interject themselves into this process by prosecuting cases against third parties would raise unnecessary doubts about which defendant, the responsible party or the third party, is to be deemed primarily liable – that is, about who must pay what and when – and could wholly confound, disrupt, and undermine the subrogation procedure.

Responsible parties cannot be subrogated to "all claims and causes of action" if those claims already have been satisfied, and claimants plainly are not entitled to recover twice, once from responsible parties under OPA and a second time from third parties under other law. OPA resolves this apparent dilemma by making the responsible party primarily liable and leaving third parties subject only to subrogation actions or suits for contribution.  Permitting claimants to pursue litigation against both responsible parties and third parties would conflict with the carefully orchestrated step-by-step claim procedure deliberately fashioned by Congress. As the Supreme Court said with respect to a similar issue in *Ouellette*, "it would be extraordinary for Congress, after devising a" comprehensive remedial scheme for providing relief for offshore oil spills, "to tolerate common-law suits that have the potential to undermine" that remedial scheme.  479 U.S. at 497.  State law purporting to allow the assertion of claims against both "responsible parties" and third parties undermines the comprehensive remedial process prescribed by OPA; such state law is literally inconsistent with OPA and thus cannot be applied as surrogate federal law under OCSLA, which permits the adoption only of state law that is "not

31

inconsistent with" other federal law, such as OPA.  43 U.S.C. § 1333(a)(2).

### 3.      The Appropriate Remedy Is Dismissal Without Prejudice

In a thorough and well-reasoned decision, Judge Lemelle specifically concluded from the structure of OPA and its legislative history that claimants "should pursue claims covered under OPA *only* against the responsible party."  *Gabarick v. Laurin Maritime (America) Inc.*, 623 F. Supp.2d 741, 750 (E.D. La. 2009) (emphasis added).  Judge Lemelle thereupon dismissed, without prejudice, "all claims covered under 33 U.S.C. § 2702" asserted against defendants who were not statutorily designated responsible parties.  *Id.* at 751.  This Court should do the same.

Dismissal without prejudice would be fair to all parties and would not impair the B1 plaintiffs' legitimate interest in securing prompt and full compensation.  If the responsible parties satisfy the B1 plaintiffs' allowable claims, as the B1 Plaintiffs' OPA allegations contemplate they will, the B1 plaintiffs will be spared any need to expend resources in litigation with Cameron and other third parties.  The responsible parties then will be subrogated to "all" the claims dismissed here without prejudice, and may proceed against Cameron and other third parties if they conclude that any such subrogated claims are viable.  33 U.S.C. § 2715(a).  On the other hand, in the extremely unlikely event that the OPA remedial process does not fully compensate B1 plaintiffs for all recovery due under OPA, due to the responsible parties' insolvency or for other reasons, then any uncompensated B1 plaintiffs may present their claims to the Fund.  *Id.* § 2713(d).  In that event, the Fund would bear ultimate responsibility for all removal costs and damages not "caused by the gross negligence or willful misconduct of [the] claimant," *id.* § 2712(b), and upon payment would also become subrogated to "all" of the causes

32

of action in the B1 Complaint, *id*. § 2715(a).  Under either scenario, dismissal without prejudice would pave the way for an orderly determination of the B1 plaintiffs' claims and Cameron's liability, if any.

**E.      The B1 Plaintiffs' Claims Are Not, In Any Event, Viable Under Louisiana Law**

In the unlikely event that the Court does not dismiss the B1 claims against Cameron without prejudice to future subrogation or contribution claims, then the Court must address the B1 claims on their underlying merits.   As explained above, under OCSLA, substantive Louisiana law governs questions concerning Cameron's liability, if any, with respect to the *Deepwater Horizon* and Macondo well oil spill.   Under the applicable Louisiana law of product liability, the B1 claims are not viable; and, in any event, the vast and overwhelming majority of the B1 plaintiffs would not be entitled to recover against Cameron under the "economic loss" rule applied under Louisiana law.

**1.      The B1 Complaint Fails To State A Viable Claim Against Cameron As Product Manufacturer**

The B1 Complaint asserts four "common law" theories of liability against Cameron other than manufacturers' liability: negligence, gross negligence, nuisance, and trespass.  *Id.* §§ 572, 604, 629, 636, 699, 711.   But Louisiana law does not subject product manufacturers to liability on these grounds.  The Louisiana Products Liability Act provides that "[t]his Chapter establishes the exclusive theories of liability for manufacturers for damage caused by their products."  LA. REV. STAT. § 2800.52.   The Act further enjoins, "[a] claimant may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability that is not set forth in this Chapter."  *Id.*   The Act does not set forth theories of

liability sounding in negligence, trespass, public nuisance, or private nuisance. Under applicable Louisiana law, therefore, B1 plaintiffs may not recover from Cameron under any of those four theories of liability. *Stahl v. Novartis Pharmaceuticals Corp.,* 283 F.3d 254, 260 (5th Cir. 2002) (noting district court's dismissal of negligence claims); *In re Air Bag Products Liability Litigation*, 7 F. Supp.2d 792, 802 (E.D. La. 1998) (dismissing Louisiana tort claims not based on Louisiana Act).

The B1 Complaint does attempt to state claims under general maritime law for recovery based on manufacturing defect, design defect, or inadequate warnings. *See* B1 Complaint ¶¶ 638, 644. As has been discussed, the applicable body of law here is not maritime law but the law of Louisiana adopted as surrogate federal law under OCSLA. Section 2800.54.B(1)-(3) of the Louisiana Act does recognize product liability claims based on these theories. However, under subsection 2800.54.D. of the Act, plaintiffs bear the burden of showing that, with respect to any such theory, "a characteristic of the product" is "unreasonably dangerous" as set out respectively in sections 2800.55, 2800.56, and 2800.57 of the Act. *Jefferson v. Lead Indus. Ass'n*, 930 F. Supp. 241, 244-45 (E.D. La. 1996). The B1 Complaint does not make sufficient allegations to carry that burden. The B1 Complaint therefore fails to state a claim against Cameron under Louisiana law for which relief can be granted.

a.    *Construction or Composition*

Under section 2800.55, a claimant may obtain relief for damage caused by a product that was "unreasonably dangerous in construction or composition" only "if at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer." *Broussard v. Procter Gamble Co.*,

34

*463 F. Supp.2d 596, 610 (W.D. La. 2006).*

The B1 Complaint makes repeated but vague and unsubstantiated references to the alleged "defective manufacture" of Cameron's BOP. B1 Complaint ¶¶ 638, 646-48, 651, 657. However, the B1 Complaint does not address Cameron's specifications or performance standards in any respect. In fact, the B1 Complaint does not even allege that the Cameron BOP was constructed in accordance with Cameron's own specifications. This is important, because Cameron would be expressly excluded from liability under Louisiana law if it built the BOP in accordance with a design specified by BP or Transocean. LA. R.S. § 9:2771. In addition, the B1 Complaint does not allege that the BOP deviated at all, let alone in a material way, from Cameron's specifications or performance standards. These lapses are fatal to the B1 plaintiffs' effort to allege a "construction or composition" theory of liability under section 2800.55. *See Broussard,* 463 F. Supp.2d at 610.

> b. *Design*

Under section 2800.56 of the Louisiana Act, a claimant may obtain relief for a product that was "unreasonably dangerous in design" only "if at the time the product left its manufacturer's control" (1) there was "an alternative design for the product that was capable of preventing the claimant's damage" and (2) the "likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product." *Morgan v. Gaylord Container Corp.*, 30 F.3d 586, 590 (5th Cir. 1994). The B1 Complaint obliquely discusses what appear to be alternative designs and, in an offhand manner, refers to the elements of section 2800.56. B1 Complaint ¶¶ 643, 644. But the B1 Complaint does not make any factual allegation specifying any alternative design that was

35

capable of preventing the B1 plaintiffs' damages.  To the contrary, the B1 Complaint alleges that Cameron's BOP functioned as intended to seal the annulus:  "With the BOP rams now blocking hydrocarbons from entering the riser along the sides of the drill pipe, the blowout could have been contained at this point, had the gas on the drilling vessel not exploded." *Id.* ¶¶ 372.

Indeed, the B1 Complaint specifically attributes the alleged failure of the BOP to the explosion itself and to alleged failures of a solenoid valve and a dry battery after the explosion.  *Id.* ¶¶ 417, 418 (explosion disabled the emergency activation methods available to rig workers); 419, 420 (the automatic mode function sequence allegedly did not operate because of a "faulty solenoid valve" in one independent pod and "two dead batteries" in another such pod).  In other words, the B1 Complaint specifically and affirmatively alleges that the BOP, as designed, functioned properly to seal the annulus, and that it was the explosion and poor maintenance which disabled the redundant systems for automatic operation of the BOP.  There is no countervailing factual allegation that an alternative design could have prevented the spill after the explosion. In addition, the B1 Complaints makes no allegation whatsoever purporting to weigh the "likelihood that the product's design would cause the [plaintiffs'] damage" against "the burden on the manufacturer of adopting such alternative design," the second requirement of section 2800.56.

The B1 Complaint's offhand reference to or recitation of the elements of section 2800.56 does not suffice under the Federal Rules.  "A pleading that offers 'labels and conclusions' or a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009), quoting *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 500 (2007).  Moreover, the complaint's attempt to invoke section 2800.56 is directly contradicted

36

by its own specific factual allegations concerning how the accident occurred. Considered in its entirety, the B1 Complaint fails to allege sufficient facts to support a finding that any B1 plaintiff is entitled to relief against Cameron for unreasonably dangerous design under section 2800.56. *See Morgan*, 30 F.3d at 590-91; *Broussard*, 463 F. Supp.2d at 610-11.

c.     *Inadequate Warning*

Under section 2800.57 of the Louisiana Act, a B1 plaintiff may obtain relief for a product that is "[u]nreasonably dangerous because of inadequate warning," but only if the product contained a potentially damaging "characteristic" about which the manufacturer did not provide a warning. *Stahl*, 283 F.3d at 261. Subsection B(2) of this section, however, provides that a "manufacturer is not required to provide an adequate warning about his product when" the "user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic." *Morgan*, 30 F.3d at 591.

The B1 Complaint refers obliquely to insufficient warnings. B1 Complaint ¶¶ 643, 651(h). But it does not specify any potentially problematic characteristics of the BOP that were the subject of inadequate warnings. Moreover, the B1 Complaint affirmatively alleges in significant detail facts demonstrating that the "Drilling Defendants" using the BOP knew about the danger and potential for damage associated with the BOP. *Id.* ¶¶ 435, 436 ("certainly aware of" increased BOP failure during deep-sea drilling); ¶¶ 437, 438 (vulnerabilities of single blind shear ram design "were well understood"); 448 (backup trigger "is a common" requirement). These allegations acknowledge that the BOP users were reasonably expected to know of the potential for damage and the danger of any allegedly problematic characteristics of the BOP. There is no allegation to the contrary. The affirmative allegations of the B1 Complaint

37

therefore foreclose entitlement to relief under section 2800.57 for all B1 plaintiffs.  *See Morgan*, 30 F.3d at 591-92.

> 2.     **The Vast Majority of B1 Plaintiffs Do Not Satisfy The "Economic Loss" Rule**

Even if the B1 Complaint did state otherwise viable claims against Cameron under Louisiana law, and it does not, the claims nonetheless would fail as to most if not all of the B1 plaintiffs, due to individual plaintiffs' failure to satisfy the longstanding "economic loss" rule of tort law.   Under the "economic loss" rule, liability for the economic consequences of an accident extends only to those who suffer bodily injury or who own property physically damaged as a proximate result of the accident.  *See Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927) (Holmes, J.).  The Fifth Circuit adheres to the rule as a matter of maritime tort law:  "We are asked to abandon physical damage to a proprietary interest as a prerequisite to recovery for economic loss in cases of unintentional maritime tort.   We decline the invitation."   *State of Louisiana v. M/V Testbank*, 752 F.2d 1019, 1020 (5th Cir. 1986) (en banc).  Both the Fifth Circuit and other Circuits have explained the many reasons for adherence to the rule.  *See id.* at 1028-29; *Barber Lines A/S v. M/V Donau Maru*, 764 F.2d 50, 53-55 (1st Cir. 1985) (Breyer, J.).

As the Fifth Circuit has observed, courts applying the tort law of "Louisiana have consistently denied recovery for economic losses" in tort actions "where there was no physical damage to a proprietary interest."  *Testbank*, 752 F.2d at 1027.  In the leading case, the Supreme Court of Louisiana denied recovery to the plaintiff, the direct customer of a pipeline damaged by the defendant, because the customer had no proprietary interest in the pipeline.  *PPG Industries, Inc. v. Bean Dredging, Inc.*, 447 So.2d 1057 (La. 1984).  Anticipating the conclusions reached by the Fifth and First Circuits, the Supreme Court of Louisiana likewise held that there were valid

reasons for adhering to the rule denying recovery for "economic loss" without physical injury to owned property. *Id.* at 1060-61. *See also TS&C Investments, L.L.C. v. Beusa Energy, Inc.*, 637 F. Supp.2d 370 (W.D. La. 2009).

The Louisiana Courts of Appeals have therefore adhered to the rule and denied tort recovery of economic losses to plaintiffs with no proprietary interest in damaged property, and the Supreme Court has not thought it necessary to revisit the issue. *See, e.g., Louisiana Crawfish Producers Ass'n – West v. Amerada Hess Corp.*, 935 So.2d 380 (La. App. 3 Cir.2006), *writ denied*, 943 So.2d 1094 (La. 2006); *Dempster v. Louis Eymard Towing Co.*, 503 So.2d 99 (La. App. 5 Cir. 1987), *writ denied*, 505 So.2d 1136 (La. 1987). *See also Barisich v. Shell Pipeline Co.*, 2006 WL 3913403 (E.D. La. 2006) (J. Barbier). Most importantly, the rule applies in cases brought under the Louisiana Products Liability Act. *Phillips v. G&H Seed Co.*, 10 So.3d 339 (La. App. 3 Cir. 2009), *writ denied*, 21 So.3d 284 (2009).

Very few of the B1 plaintiffs have alleged physical damage to property that they own. The complaints of the B1 plaintiffs that fail to allege any physical damage to any property owned by any named plaintiff are listed on Exhibit C. The additional B1 plaintiffs named in other complaints that allege no physical damage to property that they own are listed on Exhibit D. The complaints and claims on Exhibits C and D should all be dismissed under the "economic loss" rule as applied in Louisiana product liability cases.

## CONCLUSION

The B1 plaintiffs' claims sounding in general maritime law and the laws of states other than Louisiana should be dismissed with prejudice because those bodies of law do not apply here. The plaintiffs' claims should be dismissed without prejudice because prosecution of

those claims is inconsistent with OPA.  If the claimant's pursuit of those causes of action is not dismissed without prejudice, those claims should be dismissed with prejudice under Lousiana product liability law, the adjacent-state law made applicable by OCSLA as surrogate federal law.

Respectfully submitted,


/s/ Phillip A. Wittmann
Phillip A. Wittmann, 13625
  pwittmann@stonepigman.com
Carmelite M. Bertaut, 3054
  cbertaut@stonepigman.com
Keith B. Hall, 24444
  khall@stonepigman.com
Jared A. Davidson, 32419
  jdavidson@stonepigman.com
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax: 504-581-3361


David J. Beck, T.A.
  dbeck@brsfirm.com
Joe W. Redden, Jr.
  jredden@brsfirm.com
David W. Jones
  djones@brsfirm.com
Geoffrey Gannaway
  ggannaway@brsfirm.com
Beck, Redden & Secrest, L.L.P.
One Houston Center
1221 McKinney St., Suite 4500
Houston, TX 77010
Phone: (713) 951-3700
Fax: (713) 951-3720

Howard L. Murphy, 9844
  *hmurphy@dkslaw.com*
Bertrand M. Cass, Jr., 3984
  *bcass@dkslaw.com*
Francis J. Barry, Jr., 2830
  *fbarry@dkslaw.com*
Jonathan M. Walsh, 25922
  *jwalsh@dks.com*
Paul D. Hale, 30539
  *phale@dkslaw.com*
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, Louisiana 70130
Phone: 504-581-5141
Fax: 504-566-4039

*Attorneys for Cameron International Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum In Support of Motion of Cameron International Corporation To Dismiss the First Amended Master Complaint, Cross-Claim, and Third-Party Complaint for Private Economic Losses (B1 Bundle") for Failure to State a Claim  has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 28th day of February, 2011.

*/s/ Phillip A. Wittmann*

1047725v.1