IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: **OIL SPILL by the OIL RIG** | * | |
| **"DEEPWATER HORIZON" in the** | * | **MDL No. 2179** |
| **GULF OF MEXICO, on** | * | |
| **APRIL 20, 2010** | * | **SECTION: J** |
| | * | |
| **This document applies to:** | * | **JUDGE BARBIER** |
| *All Cases in Pleading Bundle III.B(3).* | * | **MAGISTRATE SHUSHAN** |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *  *

**DEFENDANT MARINE SPILL RESPONSE
CORPORATION'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION TO DISMISS THE B(3)
PLEADING BUNDLE MASTER COMPLAINT**

BLANK ROME LLP
ATTORNEYS FOR PLAINTIFF
ALAN M. WEIGEL
405 LEXINGTON AVENUE
THE CHRYSLER BUILDING
NEW YORK, NY  10174
(212) 885-5000

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS .................................................................................... 3

    A.    The Federal Government's Control Over The *Deepwater Horizon* Oil Spill
Response ........................................................................................................... 3

            1.    The FOSC was Required to Direct all Spill Response Activities in this
Incident ................................................................................................ 5

            2.    Regulations And Decisions Governing the Use of Dispersants................. 7

    B.    MSRC's Role In The Deepwater Horizon Oil Spill Response ............................ 11

PROCEDURAL POSTURE ................................................................................... 13

ARGUMENT ......................................................................................................... 14

    I.    THE CLAIMS AGAINST MSRC IN THE B(3) MASTER COMPLAINT ARE
PREEMPTED BY FEDERAL LAW..................................................................... 14

    II.    MSRC HAS DERIVATIVE FEDERAL IMMUNITY FOR ALL CLAIMS
ASSERTED  AGAINST IT IN THE B(3) MASTER COMPLAINT ............................ 19

    IV.    MSRC IS EXEMPT FROM LIABILITY UNDER THE FLORIDA
POLLUTANT  DISCHARGE AND CONTROL ACT (COUNT XI) ............................ 27

    V.    THE B(3) MASTER COMPLAINT FAILS TO ALLEGE SUFFICIENT FACTS
TO SUPPORT ANY CLAIMS AGAINST MSRC ....................................... 28

    A.    Any B(3) Master Complaint Claims Based On Allegations Related To MSRC's
Operations Under The National Contingency Plan Must Be Dismissed As A
Matter Of Law (Counts III, IV, V, VII and VIII) ................................................. 30

    B.    The B(3) Master Complaint Fails To Allege Sufficient Facts To Support A Claim
Of Negligence Against MSRC (Count III) .......................................................... 31

    C.    The B(3) Master Complaint Fails To Allege Sufficient Facts To Support A Claim
Of Gross Negligence Against MSRC (Count IV)................................................. 35

    D.    The B(3) Master Complaint Fails To Allege Sufficient Facts To Support A Claim
Of Negligence Per Se Against MSRC (Count V)................................................. 39

    E.    The B(3) Master Complaint Fails To Allege Sufficient Facts To Support A Claim
Of Nuisance Against MSRC (Count VII)............................................................ 42

i

F.      The B(3) Master Complaint Fails To Allege Sufficient Facts To Support A Claim Of Battery Against MSRC (Count VIII)............................................................... 44

VI.     THE FLORIDA MEDICAL MONITORING CLAIM IS BARRED BY THE GENERAL MARITIME LAW....................................................................................... 45

VII.    THE PUNITIVE DAMAGES CLAIMS AGAINST MSRC IN THE B(3) MASTER  COMPLAINT ARE NOT LEGALLY VIABLE UNDER THE GENERAL MARITIME LAW ............................................................................................................. 48

CONCLUSIONS...................................................................................................................... 50

810517.00025/6998144v.1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alexander v. Sandoval,*
    532 U.S. 275 (U.S. 2001) ..................................................................................................31

*Ambrose v. New Orleans Police Department Ambulance Service,*
    639 So. 2d 216, 219-20 (La. 1994) ...................................................................................37

*Andrade Garcia v. Columbia Med. Ctr.,*
    996 F. Supp. 605 (E.D. Tex. 1998) ...................................................................................39

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ............................................................................................ passim

*Augman v. Seacor Marine L.L.C.,*
    No. 07-1508, 2007 WL 2726064 (E.D. La. Sept. 17, 2007) ..............................................48

*Azar v. Nat'l City Bank,*
    No. 09-16052, 2010 U.S. App. LEXIS 12184 (11th Cir. June 15, 2010) ...............................29

*Bagby Elevator Co., Inc. v. Schindler Elevator Corp.,*
    609 F.3d 768 (5th Cir. 2010) ...........................................................................................36

*Barasich v. Shell Pipeline Co.,*
    No. 05-4180, 2006 ...........................................................................................................30

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................................ passim

*Benefield v. Int'l Paper Co.,*
    No. 2:09cv232-WHA, 2009 U.S. Dist. LEXIS 75206 (M.D. Ala. Aug. 21, 2009) .....39, 40, 43

*Berry v. Armstrong Rubber Co.,*
    989 F.2d 822 (5th Cir. 1993) ...........................................................................................42

*Caillouet Land Corp. v. Chevron Pipe Line Co.,*
    No. 06-10533, 2007 U.S. Dist. LEXIS 48364 (E.D. La. Jul. 3, 2007) ...................................26

*Canales Martinez v. Dow Chem. Co.,*
    219 F. Supp. 2d 719 (E.D. La. 2002) ..................................................................................3

*Carden v. Gen. Motors Corp.,*
    509 F. 3d 227 (5th Cir. 2007) ...........................................................................................14

ii

*Carley v. Wheeled Coach*,
991 F.2d 1117 (3d Cir. 1993)........................................................................23

*Central State Transit & Leasing Corp. v. Jones Boat Yard, Inc.*,
206 F.3d 1373 (11th Cir. 2000) ...................................................................36

*Coastal Iron Works, Inc. v. Petty Ray Geophysical*,
783 F.2d 577 (5th Cir. 1986) .......................................................................47

*Complaint of Ballard Shipping Co.*,
772 F. Supp. 721 (D.R.I. 1991)....................................................................*30*

*Cox v. City of Dallas*,
256 F.3d 281 (5th Cir. 2001) .......................................................................42

*D.P. ex rel E.P. v. Sch. Bd.*,
483 F.3d 725 (11th Cir. 2007) .....................................................................30

*Dougherty v. Santa Fe Marine, Inc.*,
698 F.2d 232 (5th Cir. 1983) .......................................................................39

*Egorov, Puchinsky, Afanasiev, & Juring v. Terriberry, Carroll & Yancey*,
183 F.3d 453 (5th Cir. 1999) .......................................................................46

*Exxon Shipping Co. v. Baker*,
554 U.S. 471 (2008)....................................................................................48

*Ezell v. Bellsouth Telcoms.*,
961 F. Supp. 149 (S.D. Miss. 1997)............................................................37

*Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*,
458 U.S. 141 (1982)...........................................................................15, 16

*Fireman's Fund Insurance Co. v. City of Lodi*,
302 F.3d 928 (9th Cir. 2002) .......................................................................17

*First Commonwealth Corp. v. Hibernia Nat'l Bank*,
891 F. Supp. 290 (E.D. La. 1995)................................................................37

*Geidel v. City of Bradenton Beach*,
56 F. Supp. 2d 1359 (M.D. Fla. 1999).........................................................44

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000)...........................................................................14, 15

*Gray ex rel. Rudd v. Beverly Enterprises-Mississippi*,
390 F.3d 400 (5th Cir. 2004) .......................................................................39

iii

*Great Lakes Dredge & Dock Co. LLC v. La. State*,
   624 F.3d 201 (5th Cir. 2010) ...........................................................................29

*Gulf Refining Co. v. Mark C. Walker & Son Co.*,
   124 F.2d 420 (6th Cir. 1942) ...........................................................................23

*Harper v. Zapata Off-Shore Co.*,
   741 F.2d 87 (5th Cir. 1984) .............................................................................48

*Henderson v. Norfolk Southern Corp.*,
   55 F.3d 1066 (5th Cir. 1995) ...........................................................................36

*Hines v. Davidowitz*,
   312 U.S. 52 (1941).....................................................................................15, 16

*Hughes v. Boston Scientific Corp.*,
   No. 09-60925, 2011 U.S. App. LEXIS 1376 (5th Cir. Jan. 21, 2011).....................39

*In re Agent Orange Prod. Liab. Litig.*,
   517 F.3d 76 (2d Cir. 2008)..............................................................................19

*In re Cooper/T. Smith*,
   929 F.2d 1073 (5th Cir. 1991) .........................................................................32

*In re Dredging Limitation Actions Consol. Litig.*,
   No. 06-8676(K), 2008 U.S. Dist. LEXIS 46035 (E.D. La. June 12, 2008) .............34

*In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*,
   No. 07-md-1873, 2008 U.S. Dist. LEXIS 103249 (E.D. La. Dec. 12, 2008) ..........47

*In re Katrina Canal Breaches Consolidated Litig.*,
   533 F. Supp. 2d 615 (E.D. La. 2008) .................................................................3

*In re New River Shipyard, Inc.*,
   355 B.R. 894 (Bankr. S.D. Fla. 2006).................................................................37

*In re Prempro Prod. Liab. Litig.*,
   230 F.R.D. 555 (E.D. Ark. 2005).......................................................................47

*In re Southern Scrap Material Co., LLC*,
   541 F.3d 584 (5th Cir. 2008) ...........................................................................41

*In re World Trade Center Disaster Site Litig.*,
   521 F.3d 169 (2d Cir. 2008)........................................................................19, 20

*In re World Trade Ctr. Disaster Site Litig.*,
   456 F. Supp. 2d 520 (S.D.N.Y. 2006)...............................................................23

iv

*Irving v. Mazda Motor Corp.*,
  136 F.3d 764 (11th Cir. 1998) ......................................................................................15

*J. Ray McDermott & Co., Inc. v. Vessel Morning Star*,
  457 F.2d 815 (5th Cir. 1972) .......................................................................................47

*Jamail v. Stoneledge Condominium Owners Ass'n*,
  970 S.W.2d 673 (Tex. Ct. App. 1998) .........................................................................43

*Jebaco, Inc. v. Harrah's Operating Co.*,
  *587 F.3d 314 (5th Cir. 2009)* ....................................................................................29

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
  513 U.S. 527 (1995) .....................................................................................................46

*Jones v. Bock*,
  549 U.S. 199 (2007) .....................................................................................................30

*Kadan v. Am. Contractors Ins. Co.*,
  No. 08-695(4), 2008 U.S. Dist. LEXIS 110867 (E.D. La. Dec. 5, 2008) ...........19, 20

*Katrina Canal Breaches Litig. Steering Comm. v. Washington Group Int'l, Inc.*,
  620 F3d 455 (5th 2010) ................................................................................................23

*Kerstetter v. Pac. Scientific Co.*,
  210 F.3d 431 (5th Cir. 2000) .......................................................................................23

*Kitty Hawk Aircargo, Inc. v. Chao*,
  418 F.3d 453 (5th Cir. 2005) .........................................................................................3

*Landry v. Avondale Indus., Inc.*,
  864 So. 2d 117 (La. 2003) ...........................................................................................47

*Langbehn v. Public Health Trust*,
  661 F. Supp. 2d 1326 (S.D. Fla. 2009) ........................................................................40

*Legros v. Panther Servs. Group Inc.*,
  863 F.2d 345 (5th Cir. 1988) .......................................................................................48

*Lewis v. City of St. Petersburg*,
  260 F.3d 1260 (11th Cir. 2001) ...................................................................................31

*Lewis v. Continental Airlines, Inc.*,
  80 F. Supp. 2d 686 (S.D. Tex. 1999) ...........................................................................44

*Lloyd's Leasing Limited v. Conoco*,
  868 F.2d 1447 (5th Cir. 1989) .....................................................................................31

v

*Lormand v. U.S. Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ...................................................................................28

*Lovelace v. Software Spectrum*,
  78 F.3d 1015 (5th Cir. 1996) .....................................................................................3

*Lovell v. Hamp*,
  228 F. Supp. 2d 773 (N.D. Miss. 2001) ..................................................................44

*Marquez-Colon v. Reagan*,
  668 F.2d 611 (1st Cir. 1981) ....................................................................................42

*Matter of Oswego Barge Corp.*,
  664 F.2d 327 (2d Cir. 1981) .....................................................................................15

*Miles v. Melrose*,
  882 F.2d 976 (5th Cir. 1989) ...................................................................................49

*Moore v. Metropolitan Human Service District*,
  No. 09-6470, 2010 U.S. Dist. Lexis 34808 (E.D.La. Apr. 7, 2010) ........................29

*Oppen v. Aetna Ins. Co.*,
  485 F.2d 252 (9th Cir. 1973) ...................................................................................46

*Petito v. A.H. Robins*,
  750 So. 2d 103 (Fla. Dist. Ct. App. 1999) ..............................................................47

*Pro Image Installers, Inc. v. Dillon*,
  No. 08cv273, 2009 U.S. Dist. LEXIS 3777 (N.D. Fla. Jan. 15, 2009)...................34

*Procentury Ins. Co. v. Harbor House Club Condo. Ass'n, Inc.*,
  652 F. Supp. 2d 552 (D.N.J. 2009) ....................................................................32, 34

*Robinson v. Indianola Mun. Separate Sch. Dist.*,
  467 So. 2d 911 (Miss. 1985)....................................................................................43

*Rogers v. Coastal Towing, L.L.C.*,
  723 F. Supp. 2d 929 (E.D. La. 2010) ................................................................47, 48

*Sadler v. Int'l Paper Co.*,
  No. 09-cv-1254, 2010 U.S. Dist. LEXIS 130562 (W.D. La. Sept. 29, 2010) .........40

*Saville v. Houston County Healthcare Auth.*,
  852 F. Supp. 1512 (M.D. Ala. 1994) ......................................................................44

*Seaman v. Seacor Marine L.L.C.*,
  326 Fed. App'x 721 (5th Cir. 2009) ........................................................................46

*Sekco Energy v. M/V Margaret Chouest*,
    820 F. Supp. 1008 (E.D. La. 1993)............................................................30, 42

*Southern Pacific Co. v. Jensen*,
    244 U.S. 205 (1917)...........................................................................47, 48

*Straughter v. Hodnett*,
    975 So. 2d 81 (La. Ct. App. 2008)...........................................................43

*Swope v. Columbian Chems. Co.*,
    281 F.3d 185 (5th Cir. 2002) ...................................................................44

*Tenn. Coal, Iron & R. Co. v. Hartline*,
    11 So. 2d 833 (Ala. 1943)......................................................................42

*Todd Shipyards Corp. v. Turbine Serv., Inc.*,
    674 F.2d 401 (5th Cir. 1982) ...................................................................35

*Trevino v. Gen. Dynamics Corp.*,
    865 F.2d 1474 (5th Cir. 1989) .................................................................23

*Witty v. Delta Air Lines, Inc.*,
    366 F.3d 380 (5th Cir. 2004) ...................................................................15

*Wood v. Briarwinds Condo. Ass'n Bd. of Dirs.*,
    No. 09-12704, U.S. App. LEXIS 4450 (11th Cir. Mar. 3, 2010) ...........................29

*Yearsley v. W.A. Ross Construction*,
    309 U.S. 18 (1940)...............................................................19, 20, 21

**STATUTES**

28 U.S.C. § 2680(a) ...................................................................................21

33 U.S.C. §1321...................................................................................... passim

33 U.S.C. §2717(b) ...................................................................................40

42 U.S.C. § 5148 ......................................................................................21

ALA. STAT. § 6-5-332.2 (2010)......................................................................25

FLA. STAT. § 376.011. ...........................................................................14, 27

FLA. STAT. § 376.09(5)...............................................................................25

FLA. STAT. § 376.031(5)..........................................................................27, 28

FLA. STAT. § 376.205 ..................................................................................27

vii

LA. REV. STAT. § 30:2466 ................................................................................24, 26

MISS. CODE ANN. § 49-18-5 .....................................................................................25

TEX. NAT. RES. CODE ANN. §40.104 (b) ..................................................................26

**FEDERAL REGULATIONS**

40 C.F.R. Part 300..............................................................................7, 17, 30, 31, 41

40 C.F.R. Part 300 Appendix..........................................................................23, 40

40 C.F.R. § 300.5 ........................................................................................................6

40 C.F.R. §300.105 ....................................................................................................4

40 C.F.R. § 300.120 ...................................................................................................5

40 C.F.R. § 300.135 ...................................................................................................5

40 C.F.R. §300.150 ..................................................................................................31

40 C.F.R. §30.155 ....................................................................................................31

40 C.F.R. § 300.322(b) ..........................................................................................5, 16

40 C.F.R. § 300.323(c)................................................................................................6

**OTHER AUTHORITIES**

59 Fed. Reg. 47,384, 47,399-400 (Sept. 15, 1994) ...............................................17

*Black's Law Dictionary* 1062 (8th ed. 2004)...........................................................36

BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Report to the President: Deep Water – The Gulf Oil Disaster and the Future of Offshore Drilling*, *at* http://www.oilspillcommission.gov (last visited Feb. 18, 2011) ...........................3, 6, 7, 10, 20

BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Staff Working Paper No. 2: Decision-Making Within the Unified Command* (Jan. 11, 2011), *at* http://www.oilspillcommission.gov (last visited February 18, 2011)...................................4, 20

BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Staff Working Paper No. 4: The Use of Surface and Subsea Dispersants During the BP Deepwater Horizon Oil Spill* (Jan. 11, 2011), *at* http://www.oilspillcommission.gov (last visited Feb. 18, 2011) .....................................................................................................................10

U.S. Environmental Protection Agency, Conference Call with Paul T. Anastas, USEPA Assistant Administrator (Aug. 2, 2010), *available at* www.epa.gov/bpspill/...........................11

Deepwater Horizon Incident Joint Information Center, *Transcript – Press Briefing by National Incident Commander Admiral Thad Allen, August 1, 2010, at* http://www.restorethegulf.gov/news/transcripts-docs (last visited Feb. 18, 2011) .................10

Fed. R. Civ. P. 8 ........................................................................................................................34

Fed. R. Civ. P. 12(b)(6).......................................................................................... passim

U.S. Coast Guard, *Summary Report for Sub-Seas and Sub-Surface Oil and Dispersant Detection: Sampling and Monitoring* (Dec. 17, 2010) .....................................................11, 35

U.S. Environmental Protection Agency, *EPA Response to BP Spill in the Gulf of Mexico – Dispersants*, at http://www.epa.gov/bpspill/dispersants (last visited Feb. 18, 2011) ............................................................................................................................11

U.S. Environmental Protection Agency, *The Federal Government Response: Dispersant Use In BP Oil Spill*, at http://www.restorethegulf.gov/release/2010/09/09/ (last visited Feb. 18, 2011)........................................................................................10

Defendant Marine Spill Response Corporation ("MSRC") respectfully submits this memorandum of law in support of its motion for an order, pursuant to Fed. R. Civ. P. 12(b)(6), dismissing the claims asserted against it in the Section III.B(3) Master Complaint for failure to state a claim upon which relief can be granted.  As an oil spill responder, MSRC is exempt from liability for its actions or omissions in responding to the oil spill resulting from the April 20, 2010 sinking of the MODU *Deepwater Horizon* (the "Oil Spill").  This "responder immunity" is essential to encouraging emergency responders to vigorously respond to spill incidents.  In any event, MSRC's actions were directed by the federal government, using resources mandated by federal regulation and using dispersants approved by the government.  Plaintiffs can be fully compensated by looking to the responsible parties for any damages proven.

<u>PRELIMINARY STATEMENT</u>

There is no doubt that the Oil Spill is indeed an unprecedented disaster.  But the reason it is a disaster is due to the unprecedented quantities of oil that were spilled into the waters of the Gulf of Mexico — not because of the response effort undertaken by MSRC and hundreds of other responders.  The liability for this incident should fall on the parties that caused the Oil Spill – not the parties that were called on to assist in the cleanup and removal in order to minimize damage to the environment.

Absent extraordinary circumstances, only responsible parties for the Oil Spill (as defined by Federal and State law) are subject to potential liability.  BP and Transocean are responsible parties.  MSRC is not a responsible party.  Indeed, MSRC's sole involvement in the Oil Spill has been to render care, assistance, and advice in the Oil Spill response efforts consistent with the National Contingency Plan ("NCP") or as otherwise directed by the Federal On-Scene Coordinator ("FOSC").

Because its response to the Oil Spill was performed under the direction and control of the FOSC and its response actions were consistent with the requirements of the NCP, all state and maritime claims against MSRC in the B(3) Master Complaint are pre-empted by Federal law.  As a response organization, MSRC also is entitled to derivative federal immunity for all claims asserted against it in the B(3) Master Complaint.  Further, because MSRC is simply a response organization, its liability for damages under Federal and State law is limited solely to damages resulting from acts or omissions of gross negligence or willful misconduct; mere negligence is not an actionable claim.  MSRC also is exempt from liability under the Florida Pollutant Discharge and Control Act because this Act limits private causes of action to claims against responsible parties.

Even if the claims against MSRC are not pre-empted or if MSRC is not entitled to immunity, the B(3) Master Complaint should still be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).  As a matter of law, Plaintiffs cannot maintain causes of action against MSRC for any tort claim based on allegations related to any response actions taken under the NCP because there is no private cause of action under the regulations authorizing the NCP or controlling the response.  The B(3) Master Complaint also should be dismissed because Plaintiffs' factual allegations are not sufficient to support any claims against MSRC.  Plaintiffs do not sufficiently allege any facts supporting any tort claim against MSRC that is plausible on its face.  Indeed, Plaintiffs make little effort to distinguish their conclusory assertions against MSRC from the generic conclusions asserted as to the various defendants as a group.  Accordingly, Plaintiffs have failed to state any cause of action upon which relief can be granted and the B(3) Master Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

## STATEMENT OF FACTS

The facts of the Oil Spill are well known to this Court.   The fire, explosion, and subsequent sinking of the Deepwater Horizon resulted in the discharge of oil from the well. (B)(3) Master Compl. ¶¶ 1 - 2.)[1]  As a result of the discharge, the Coast Guard designated BP and Transocean as "responsible parties" (or "RPs").  (*Id.* at ¶313.)  *See also* NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Report to the President: Deep Water – The Gulf Oil Disaster and the Future of Offshore Drilling*, at 131 (Jan. 2011), *at* http://www.oilspillcommission.gov (last visited Feb. 18, 2011).[2]  The Coast Guard did not designate MSRC a "responsible party" and it cannot legally be a "responsible party" because it was not the lessee or permittee of the Macondo Well area and it was not the owner, operator, or demise charterer of the Deepwater Horizion from which the oil was discharged.  *See* 33 U.S.C. §§ 2701(32) and 2702(a).   Instead, following the explosion, sinking, and discharge of oil from the Macondo well and  the *Deepwater Horizon*, MSRC responded to the Gulf of Mexico incident under the direction and control of the Federal government in order to attempt to mitigate the damage caused by the Oil Spill, along with many other response organizations.

## A.    The Federal Government's Control Over The *Deepwater Horizon* Oil Spill Response

In the aftermath of the *Exxon Valdez* oil spill, Congress passed the Oil Pollution Act of 1990 ("OPA90"), in part amending the Federal Water Pollution Control Act (commonly referred

---

[1] MSRC takes no position in respect of the B(3) Master Complaint's factual allegations concerning the cause of the Oil Spill, as such facts are not relevant to the issues the Court needs to consider on MSRC's motion to dismiss.

[2] In ruling on a 12(b)(6) motion to dismiss, the Court may consider facts not specifically alleged in the Complaint "of which [it] may take judicial notice."  *Lovelace v. Software Spectrum*, 78 F.3d 1015, 1018 (5th Cir. 1996); *In re Katrina Canal Breaches Consolidated Litig*., 533 F. Supp. 2d 615, 632 (E.D. La. 2008) (a court may take judicial notice of fact that are "'not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to resources whose accuracy cannot be questioned'") (quoting Fed. R. Evid. 201(a) and (b)).  Thus, in ruling on MSRC's motion to dismiss, the Court may take judicial notice of public documents produced by the Presidential Commission, *Canales Martinez v. Dow Chem. Co.*, 219 F. Supp. 2d 719, 734 n.24 (E.D. La. 2002), or of documents or statements posted on governmental websites.  *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005).

3

to as the Clean Water Act ("CWA")) to revise the federal government's approach to planning for and responding to oil spills. *See* 33 U.S.C. §1321. Specifically, OPA 90 and its implementing regulations created a new national planning and response system known as the National Response System ("NRS"). 33 U.S.C. §1321(j); 40 C.F.R. §300.105. *See also* NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Staff Working Paper No. 2: Decision-Making Within the Unified Command*, at 4 (Jan. 11, 2011), *at* http://www.oilspillcommission.gov (last visited February 18, 2011)(discussing the components of the NRS). This system consists of Coast Guard and District Strike Teams, Area Committees, Area Contingency Plans ("ACPs"), and vessel and facility response plans to respond to a variety of spills including a Worst Case Discharge ("WCD"). This planning and response regime requires non-profit entities (such as MSRC) and commercial entities to provide most of the equipment and personnel to respond to spills. This system gave rise to new Oil Spill Removal Organizations ("OSROs"), such as MSRC, with which vessel and facility owners and operators may contract to provide the resources and personnel (as an alternative to each owner or operator maintaining its own response resources) the government mandates to handle responses to oil spills of any size or nature up to a WCD.

The establishment of standards for private entities to provide adequate response equipment and personnel did not, however, give the ultimate authority to private entities to direct response efforts. To the contrary, one of the primary purposes of OPA 90 was to establish federal removal authority providing a full range of authority to the FOSC, including the requirement to ensure effective and immediate removal of an oil spill, whatever its size.[3]

---

[3] According to the OPA90 Conference Report, the federal removal authority provision was designed to eliminate the confusion that occurred in pre-OPA90 responses where the lack of clear delineation of command and management responsibility impeded prompt and effective responses. H.R. CONF. REP. 101-653 (Aug. 1, 1990) at 146.

4

### 1.    The FOSC was Required to Direct all Spill Response Activities in this Incident

Pursuant to the CWA, under the "General Removal Requirement," the President must, in accordance with the NCP and the applicable ACP, ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge of oil or a hazardous substance.  33 U.S.C. § 1321(c)(1)(A).  The President delegated this authority to the Coast Guard for discharges occurring seaward of the U.S. coastline whether from a facility, vessel, or offshore platform located on the Outer Continental Shelf (*i.e.* the coastal zone).  40 C.F.R. §§ 300.5, 300.120.   In addition, under the NCP, the Coast Guard has designated FOSC's by geographic area (*i.e.* Captain of the Ports) charged with directing response efforts and coordinating all other efforts at the scene of a discharge or release.  *Id.* at §§ 300.120, 300.135.

In the event of a spill, the CWA provides that "[t]he President *shall*, in accordance with the National Contingency Plan and any appropriate Area Contingency Plan, ensure effective and immediate removal of a discharge . . . of oil . . . into or on the navigable waters."  33 U.S.C. § 1321(c)(1)(A) (emphasis added).  In order to ensure effective and immediate removal in these circumstances, the FOSC may choose to monitor or direct response actions, as deemed appropriate.  Importantly, pursuant to the NCP, if an oil spill "poses or may present a substantial threat to public health or welfare of the United States," the FOSC "*shall direct all* federal, state, or *private actions* to remove the discharge."  33 U.S.C. 1321(c)(2)(A)(emphasis added); *see also* 40 C.F.R. § 300.120; 40 C.F.R. § 300.135 and B(3) Master Compl. ¶92 ("The U.S. Coast Guard is responsible for . . . responding to oil spills and supervising and/or coordinating response actions.").

Accordingly, in cases of a "Substantial Threat Spill" pursuant to 33 U.S.C. 1321(c)(2)(A), which was clearly the case in the *Deepwater Horizon* incident, the FOSC must

5

take complete charge and direct all response actions involving such an incident.  The NCP provides specific guidance with regard to the FOSC's responsibilities under such circumstances. When a FOSC receives a report of a discharge, the FOSC is required to investigate the report and determine pertinent information and classify the spill, including whether it constitutes a Substantial Threat Spill.  If the FOSC determines that the incident should be classified as a Substantial Threat Spill, the FOSC is required to direct all federal, state or private actions in relation to the removal or mitigation or prevention of the threat of a discharge.  40 C.F.R. §§ 300.320, 300.322.  Finally, an oil spill may be designated a "Spill of National Significance" if, "due to its severity, size, location, actual or potential impact on the public health and welfare or the environment, or the necessary response effort," the spill is "so complex that it requires extraordinary coordination of federal, state, local, and responsible party resources to contain and clean up."  40 C.F.R. § 300.5.  In the event a spill is designated a Spill of National Significance, the United States Coast Guard may appoint a "National Incident Commander" ("NIC") to "assume the role" of the FOSC in "communicating with affected parties and the public, and coordinating federal, state, local, and international resources at the national level."  40 C.F.R. § 300.323(c).

Following the explosion on the *Deepwater Horizon*, the NCP response structure was immediately triggered and the Coast Guard began to direct all response activities because the magnitude of the spill required it to be classified a "Substantial Threat Spill."  Captain Joseph Scott Paradis, the Commander of the Coast Guard's Marine Safety Unit at Morgan City, Louisiana, became the first FOSC under the NCP.  *See* NATIONAL COMMISSION, *Report to the President,* at 130.  Rear Admiral Mary Landry, Commander of Coast Guard District Eight, eventually took over as FOSC.  *Id.*  She was later relieved by Admiral James Watson.  Admiral

6

Watson was subsequently relieved by Admiral Paul Zukunft.  NATIONAL COMMISSION, *Staff Working Paper No. 2,* at 4 n.19.

On April 29, 2010, the Coast Guard designated the *Deepwater Horizon* spill a Spill of National Significance, the first oil spill to ever be so designated.  NATIONAL COMMISSION, *Report to the President*, at 136.  On May 1, 2010, Admiral Thad Allen, the outgoing Commandant of the Coast Guard, was named as the NIC.  *Id.*

In short, as evidenced by the CWA and the NCP, the FOSC, not the RP, is unquestionably the "person in charge" of the response.  Furthermore, in a Substantial Threat Spill, the law requires the FOSC to direct, not just monitor, all aspects of the spill response.  As stated by the EPA in the preamble in the Final Rule updating the NCP following the enactment of OPA 90, "[i]t is clear that the FOSC has the authority to direct state or private actions" and that the FOSC "remains the ultimate decision-making authority for spill response."  Moreover, "it is clear that the FOSC, rather than the RP, determines the appropriate course of action for response."  59 Fed. Reg. 47384, 47390 & 47399.  (Sept. 15, 1994).[4]

2.      **Regulations And Decisions Governing the Use of Dispersants**

Pursuant to the CWA, the NCP "shall include . . . [a] schedule . . . identifying dispersants, other chemicals, and other spill mitigating devices and substances, if any, that may be used in carrying out the Plan. . . the waters in which such dispersants . . . may be used. . . and the quantities of such dispersants . . . which can be used safely in such waters."  33 U.S.C. § 1321(d)(2)(G); 40 C.F.R. §300 Subpart J.  Dispersants may not be used unless listed on the NCP

---

[4] This process was confirmed by the National Commission Report.  "During the Deepwater Horizon spill response, the National Incident Commander coordinated interagency efforts on the wide variety of issues responders faced, and dealt with high-level political and media inquiries, while the Federal On-Scene Coordinator generally retained oversight of day-to-day operations."  *Id.*  Indeed, "[a]lthough the unified command system is designed to bring together different stakeholders to make decisions, one individual needs to have ultimate decision-making power in the event of a conflict," and "that individual is the Federal On-Scene Coordinator."  NATIONAL COMMISSION, *Staff Working Paper No. 2,* at 4.

7

Product Schedule approved by the EPA.[5]  The dispersant used in this response (Corexit) is so approved, and remains today on the NCP Product Schedule.

As a general rule, representatives to the Regional Response Team ("RRT") and, as appropriate, the concurrence of the RRT representatives from the states with jurisdiction over the navigable waters threatened by the release or discharge, and in consultation with the Department of Commerce and Department of Interior natural resource trustees, when practicable, may authorize the use of dispersants provided that the dispersants are listed on the NCP Product Schedule.  40 C.F.R. § 300.910(b).  The CWA also specifically authorizes the development of pre-authorization plans for the use of dispersants when and where appropriate.  33 USC § 1321(j)(4)(B)(iii).   Specifically, pre-authorization plans are developed through the Area Committee and RRT process and are subsequently approved by RRT representatives, along with the States with jurisdiction over the waters of an area, the Department of Commerce and Department of the Interior natural resources trustees.  40 C.F.R. §300.910(a).   Following approval, these pre-authorization plans are included in the applicable ACPs and Regional Response Plans for use at the time of a spill incident.  Pre-authorization plans approved through this process, are agreements, adopted by the parties in coordination with the Area Committees, authorizing the use of dispersants at the discretion of the FOSC, without obtaining further approval of other Federal or State authorities.  33 C.F.R. § 300.910(a).

Pre-approval parameters vary depending on the particular area, but they generally limit the quantity and type of information the FOSC must confirm (*e.g.* particular geographic zone,

---

[5] The NCP Product Schedule is mandated by the CWA and the NCP, which requires the EPA to prepare a "schedule of dispersants, other chemicals, and other oil spill mitigating devices and substances, if any, that may be authorized for use on oil discharges…"  33 U.S.C. §1321(d)(2)(G); 40 C.F.R. §300.905.  The regulations include the data requirements and toxicity and effectiveness protocol that are required in order for a product to be included on the approved product schedule.  Each dispersant on the NCP Product Schedule is tested for acute toxicity before it is listed in the NCP Product Schedule.  40 C.F.R. §300.905.

distance from shore, depth of water, or season within a given area or region) in order to approve the use of dispersants and limits the time agencies may take prior to approving or disapproving use.   In some cases agency or state approval/concurrence is not required.  40 C.F.R. §300.910. In this case, the RRT Region VI Regional Contingency Plan (RCP") was the pre-authorization plan applicable to the waters in which the spill occurred.  This plan could be followed for discharges occurring in water not less than 10 meters in depth and at least three nautical miles from the nearest shoreline.  *See* FEDERAL REGION VI REGIONAL RESPONSE TEAM, *FOSC Dispersant Pre-Approval Guidelines and Checklist, Version 4.0* (Jan. 24, 2001), *at* http://www.losco.state.la.us/regulations.htm (last visited Feb. 18, 2011).

On a daily basis, BP, the Coast Guard, and representatives of the States affected by the Oil Spill, as a standard practice under the Incident Command System ("ICS") adopted for use in spill responses,[6] prepared a daily Incident Action Plan ("IAP") which is approved by the FOSC to carry out response actions each day.  Dispersant approval is included in the IAP.  *See* U.S. COAST GUARD OFFICE OF RESPONSE (G-MOR-3), *Field Operations Guide, Incident Command System (ICS)*, Chapter 14 (2000 ed.), *at* http://www.losco.state.la.us/regulations.htm (last visited Feb. 18, 2011).  Specifically, as part of the IAP, BP was required to get permission daily from the Coast Guard, in consultation with the appropriate agencies, for any surface application of dispersants.  Coast Guard permission was obtained for each surface application of dispersant. (B(3) Master Compl. ¶ 109 ("The Coast Guard's Federal On-Scene Coordinator . . . must approve BP's requests to use chemical dispersants.").)  These dispersants were then applied by many parties, including the U.S. Air Force and other contractors.  MSRC did not own or operate any of the aircraft used in applying dispersants.

---

[6] The ICS has been adopted by the National Response Team for use in oil spill response incidents.  *See* http://www.nrt.org/production/NRT/NRTWeb.nsf/AllAttachmentsByTitle/SA-52ICSUCTA/$File/ICSUCTA.pdf.

At the direction of the FOSC, responders first sprayed dispersants on the surface oil slick on April 22.  NATIONAL COMMISSION, *Report to the President,* at 143-44.  Dispersant use continued with the permission of the FOSC until the well was capped on July 15, 2010. NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Staff Working Paper No. 4: The Use of Surface and Subsea Dispersants During the BP Deepwater Horizon Oil Spill*, at 12 (Jan. 11, 2011), *at* http://www.oilspillcommission.gov (last visited Feb. 18, 2011).  In an August 1, 2010 press briefing, Admiral Allen noted that the decision to use the dispersants did not rest with BP (or, its contractors or subcontractors for that matter).  Rather, he said,

> It's a decision by the FOSC whether to approve the incident commander's recommendation to use dispersants once they've been located by surveillance aircraft and has an opportunity to use them.  It's a very disciplined doctrinal process on how this works. In the end, it may be executed by BP through a contractor.  But these decisions are all made by the FOSC because that's where the responsibility rests.

Deepwater Horizon Incident Joint Information Center, *Transcript – Press Briefing by National Incident Commander Admiral Thad Allen, August 1, 2010*, *at* http://www.restorethegulf.gov/news/transcripts-docs (last visited Feb. 18, 2011).

It should be noted that dispersant use is closely monitored, both during use and afterward. *See, e.g.,* U.S. COAST GUARD, ET AL., *Special Monitoring of Applied Response Technologies*, at 3 (Apr. 2001), *at* http://www.losco.state.la.us/regulations.htm (last visited Feb. 18, 2011).  During the Oil Spill response, various federal agencies conducted extensive testing of the waters of the Gulf of Mexico in the vicinity of the Oil Spill.  For example, EPA's testing for dispersants near the shore has "detected no dispersant compounds."  *See* U.S. ENVIRONMENTAL PROTECTION AGENCY, *The Federal Government Response: Dispersant Use In BP Oil Spill*, at

10

http://www.restorethegulf.gov/release/2010/09/09/ (last visited Feb. 18, 2011); *see also* Conference Call with Paul T. Anastas, USEPA Assistant Administrator (Aug. 2, 2010), *available at* www.epa.gov/bpspill/ ("monitoring has not found dispersant chemicals in water or sediment near coasts or wetlands")(last visited Feb. 18, 2011); U.S. ENVIRONMENTAL PROTECTION AGENCY, *EPA Response to BP Spill in the Gulf of Mexico – Dispersants*, at http://www.epa.gov/bpspill/dispersants (last visited Feb. 18, 2011).

The Unified Command's most recent study, summarized by the FOSC as an "assessment of data from tens of thousands of water and sediment samples taken from over 25 different ocean-going research sips on more than 125 separate cruises and representing over 850 ship-days at sea," discovered "no exceedances of dispersant-related chemicals benchmarks" in the nearshore, offshore or deep-water environments. *See* U.S. Coast Guard, RADM P.F. Zukunft Memorandum (Dec. 17, 2010) and UNIFIED COMMAND, OPERATIONAL SCIENCE ADVISORY TEAM ("OSAT"), *Summary Report for Sub-Seas and Sub-Surface Oil and Dispersant Detection: Sampling and Monitoring*, at 6, 7, 35, 44-45 (Dec. 17, 2010).

## B.    MSRC's Role In The Deepwater Horizon Oil Spill Response

One of the key planning aspects of OPA 90 was the requirement for the President to issue regulations requiring owners/operators of tank vessels, onshore facilities, and offshore facilities to submit for approval vessel or facility response plans for responding to oil spills.  33 U.S.C. § 1321(j)(5).   This authority was delegated to certain agencies which issued response plan requirements.  Response plans for offshore facilities are submitted to the Bureau of Offshore Energy Management ("BOEM"), formally the Minerals Management Service, for approval.  30 C.F.R. part 254.

11

As part of these response plan requirements, owners/operators contract with Oil Spill Removal Organizations ("OSROs") to assist them in meeting government planning criteria to respond to potential spills, up to and including a WCD.  As an OSRO, MSRC maintains certain equipment (such as containment and protective booms, storage capacity, and oil-skimming equipment) and trained personnel to operate this equipment to assist a planholder in meeting its response planning requirements.   In this case, MSRC utilized such equipment and personnel to assist BP with the cleanup efforts in the aftermath of the *Deepwater Horizon* spill.  MSRC did not own or operate any of the dispersant aircraft, however.  It had contracts with independent contractors for the provision of such services.  It entered into these contracts in anticipation of new federal regulations (effective February 22, 2011) that <u>mandate</u> that such capability be available to vessel and facility planholders. These new federal regulations <u>require</u> planholders and their OSROs to have the exact same capability that is now being questioned.

MSRC performed various functions within this federal response structure, all of which were authorized, directed, and ultimately controlled by the FOSC because under the CWA the FOSC  was required to direct all federal, state, and private spill response actions in this case due to the classification of the spill as a Substantial Threat Spill.

As part of this cleanup effort, independent contractors hired by MSRC applied EPA-approved dispersants side-by-side with U.S Air Force planes, relying on the same FOSC approvals on a daily basis.  The scope of each of these approvals included they type, amount, and geographical area approved for dispersants.  These independent contractors did not spray any dispersant without the specific approval of the FOSC.  All of the dispersants applied by these contractors are listed on the current NCP Product Schedule, and are therefore approved by the EPA in accordance with the CWA and the NCP.  MSRC, however, had no involvement in either

the selection or application of dispersants subsea near the wellhead.  MSRC was only involved with the applications of dispersants to the surface of the water through its independent contractors, and in that case these contractors were among many parties applying the surface dispersants.

## **PROCEDURAL POSTURE**

Pretrial Order No. 11 (Case Management Order No. 1) (Rec. Doc. 569) established eight separate "pleading bundles" for different categories of cases and claims consolidated in this multidistrict litigation.  The B(1) pleading bundle includes non-governmental economic loss and property damage claims.  MSRC is not named as a defendant in the B(1) Master Complaint.  The B(3) pleading bundle includes "all claims, of any type, relating to post-explosion clean-up efforts asserted against Defendants not named in the B(1) Master Complaint, as well as all claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 20, 2010."  Pretrial Order No. 25 (Rec. Doc. 983).

Prior to the filing of the B(3) Master Complaint, MSRC was named as a defendant in only two individual actions in this MDL:  *Walsh v. BP plc, et al.*, No. 2:10-cv-02669 and *Lavigne v. BP, plc, et al.*, No. 2:10-cv-02654.  Both actions have subsequently been dismissed.

The B(3) Master Complaint purports to assert eleven "claims for relief" on behalf of five categories of unnamed plaintiffs:  (a) boat captains and crew involved in the Vessels of Opportunity program, (b) workers involved in decontaminating vessels that came into contact with oil and/or chemical dispersants, (c) vessel captains and crew who were not involved in the Vessels of Opportunity program but who were exposed to harmful chemicals, odors and emissions during post-explosion clean-up activities, (d) clean-up workers and beach personnel who were involved in clean-up activities along shorelines and intercoastal and intertidal zones,

and (e) residents who live and work in close proximity to coastal waters.  (*See* B(3) Master

Compl. ¶ 21.)[7]  Only seven claims are asserted against MSRC: Negligence; Gross Negligence;

Negligence *Per Se*; Nuisance; Battery; Florida Medical Monitoring and Strict Liability Pursuant

To The Florida Pollutant Discharge Prevention And Control Act.

    Along with several other defendants, the B(3) Master Complaint refers to MSRC as a

"Dispersant Defendant."  (B(3) Master Compl. ¶65.)  With respect to the Dispersant Defendants,

the B(3) Master Complaint generally alleges that such defendants "failed to use reasonably safe

dispersant chemicals or other chemicals in their attempts to respond to the Oil Spill, and thereby

exacerbated the pollution of the Gulf of Mexico and injury to Plaintiffs," (B(3) Master Compl. ¶

162) and "ignored worker safety concerns," (B(3) Master Compl. ¶ 167).[8]

## ARGUMENT

## I.     THE CLAIMS AGAINST MSRC IN THE B(3) MASTER COMPLAINT ARE PREEMPTED BY FEDERAL LAW

    "Under the Supremacy Clause, federal law will preempt state law when Congressional

intent to preempt may be inferred from the existence of a pervasive federal regulatory scheme, or

when state law conflicts with federal law or its purpose."  *Carden v. Gen. Motors Corp.*¸ 509 F.

3d 227 (5th Cir. 2007).   Preemption applies to lawsuits as well as to state statutes and

regulations.  *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 886 (2000) (holding tort action

brought under state law preempted by federal automobile safety standard).   Preemption also

---

[7] MSRC specifically reserves all objections to the Court's decision to allow the Plaintiffs' Steering Committee to file a "master complaint" on behalf of nameless plaintiffs who have yet to be identified.

[8] The B(3) Master Complaint purports to bring a class action.  (*See* B(3) Master Compl. ¶¶ 176-93.)  While defendants normally are able to move to dismiss class action claims, *see John v. Nat'l Sec. Fire and Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007), MSRC has not done so here because the Court has stayed Rule 23 class action motion practice and deadlines.  (See Pre-Trial Order No. 11 at 12.)   MSRC specifically reserves all objections to the requests for certification of class actions and all arguments that the class action allegations in the B(3) Master Complaint are insufficient as a matter of law.

applies to claims made pursuant to maritime law.  *See, e.g.*, *Matter of Oswego Barge Corp.*, 664 F.2d 327, 337-38 (2d Cir. 1981) (maritime claims preempted by CWA).

A conflict exists either "when compliance with both federal and state regulations is a physical impossibility," *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982), or when there is "field preemption" when a plaintiff's claims "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); s*ee also Geier*, 529 U.S. at 881 (applying conflict preemption to plaintiff's defective design claim where allowing lawsuit to proceed would undermine federal goal of encouraging car manufacturers to develop a variety of passive restraint systems); *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 385 (5th Cir. 2004) (state law claim based on airline's failure to warn passengers about deep vein thrombosis preempted by the "pervasive regulatory scheme covering air safety concerns" and because it conflicted with a federal determination that passengers should remain seated); *Irving v. Mazda Motor Corp.*, 136 F.3d 764, 768 (11th Cir. 1998) (state law defective design claim based on car maker's use of passenger restraint system preempted because system was permitted under federal law).

In the present case, Plaintiffs' maritime and state law claims are preempted by the CWA and the NCP because both conflict circumstances are present:  the impossibility of complying with both state and federal statutes and regulations governing how MSRC was to respond to the spill, as well as the obstacles created by Plaintiffs' claims that run counter to the national interest in promoting an effective and efficient federal response to oil spills under the field preemption doctrine.

First, to the extent that the B(3) Master Complaint alleges that MSRC's actions in responding to the *Deepwater Horizon* spill violated state or maritime law, it would have been

15

physically impossible for MSRC to have complied with such laws without violating the CWA and the NCP.  *See De la Cuesta*, 458 U.S. at 153.  Federal law requires the President to "ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge of oil" in accordance with the NCP and ACP, which includes   the "procedures and techniques" for  dispersing the oil, and the quantities of such dispersants which can be used safely.  Federal law also provides that the FOSC "shall direct all federal, state, or private actions to remove the discharge."  40 C.F.R. § 300.322(b).  Thus, federal law imposed a duty on MSRC to obey the directives of the FOSC and NIC, even if those directive were in violation of state or maritime law.  If MSRC had refused to obey such federal directives in order to conform to their purported duties under state or maritime law, they would have violated the CWA and the NCP.  With this potential conflict and in the face of mandatory federal law, it cannot be unlawful under maritime or state law to comply with the directions of the FOSC, including the application of dispersants at locations and in quantities deemed safe and directed by the FOSC and federal agencies.

Second, the B(3) Master Complaint's state and maritime claims against MSRC "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in promoting an effective and efficient federal response to significant oil spills.  *Hines*, 312 U.S. at 67.  By asserting that MSRC's actions in responding to the spill violated various state and general maritime laws, the Complaint suggests that the FOSC should be required to consider the tort law of various states, maritime law and federal common law in deciding how to respond to a spill.  Indeed, the B(3) Master Complaint seeks to substitute the after-the-fact judgment of this Court about appropriate response activities for the expert real time judgment of the FOSC and the other federal agencies that authorized, directed, and controlled the

16

actions of MSRC in responding to the *Deepwater Horizon* spill.  This is a patently improper task for this Court.

The CWA and the NCP set forth a comprehensive regime which squarely placed the responsibility for the clean-up effort upon the federal government pre-empting the field from other state and local regulation in this area.  Permitting the B(3) Master Complaint to proceed against MSRC and the other responders would undermine the federal government's decisions and careful balancing of the public interest in responding to the *Deepwater Horizon* spill, would create clear "obstacles" to the purposes and objectives of the CWA and the NCP, and would directly conflict with Congressional intent that decisions regarding response efforts must be governed by the procedures and criteria set forth in the CWA and NCP.  *Cf.* National Oil and Hazardous Substances Pollution Contingency Plan, 59 Fed. Reg. 47,384, 47,399-400 (Sept. 15, 1994) (rejecting "view that a state could initiate more stringent measures than the [F]OSC when the latter is directing the response" and explaining that the FOSC "has specific legal authority to guide the activities of all parties responding to a discharge, and all actions would have to be authorized or approved by the [F]OSC") (codified at 40 C.F.R. Part 300).  The B(3) claims also conflict with Congress' goal of providing a rapid and effective response to discharges.  *See* 33 U.S.C. § 1321(c)(1)(A) ("The President shall . . . ensure effective and immediate removal of a discharge . . . of oil or a hazardous substance . . . .").

The Complaint also threatens the effectiveness of future federal response efforts. Allowing Plaintiffs to maintain their action against MSRC and other emergency responders would create uncertainty as to the potential liability of individuals and entities that assist NCP response activities at the direction of the President, the USCG, the NIC, and the FOSC.  *Cf. Fireman's Fund Insurance Co. v. City of Lodi*, 302 F.3d 928, 951 (9th Cir. 2002) (holding

17

provision of municipal ordinance was preempted to the extent it allowed city to impose more stringent requirements than the NCP because allowing the provision to stand would foster uncertainty about potential liability and frustrate the underlying statutory goal of encouraging cleanup of contaminated sites).   Moreover, a finding of liability would effectively dissuade future responders from coming forward.   Last summer, the United States was desperately seeking response assistance from responders around the world, and these responders came to our aid.   These responders would seriously hesitate to respond (or delay their response while seeking legal protections) if these types of claims are allowed to proceed against responders instead of responsible parties.

The saving clauses in the Oil Pollution Act, 33, U.S.C. §2718, do not preserve Plaintiffs claims from pre-emption.   As the Supreme Court confirmed in *United States v. Locke*, 529 U.S. 89 (2000), the OPA saving clauses are limited to regulations governing liability and compensation for oil pollution, and do not extend to other types of rules not found in Title I of OPA90 (33 U.S.C §2701, et seq.), such as those regulating vessel operation, design, or manning in which there is felid preemption.   *Id.* at 105 – 116 (*citing Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978) and H. R. CONF. REP. No. 101-653, 101, p. 122 (1990)).   Here, the regulations governing the procedures for responding to oil spills are not part of Title I to OPA90.   Thus, the savings clauses are inapplicable.   Additionally, by the plain language of the statute, the savings clauses only apply to Chapter 40 of Title 33 and not to Chapter 26 (33 U.S.C. 1251, et seq.) containing the oil spill response rules.

Accordingly, because the claims asserted against MSRC in the B(3) Master Complaint conflict with federal law and there is field preemption in this area, the Complaint should be dismissed in its entirety.

## II.    MSRC HAS DERIVATIVE FEDERAL IMMUNITY FOR ALL CLAIMS ASSERTED AGAINST IT IN THE B(3) MASTER COMPLAINT

Derivative federal immunity provides a government contractor with immunity from liability for performing its functions in conformity with specifications established by the government. *Yearsley v. W.A. Ross Construction*, 309 U.S. 18 (1940)(establishing the concept of derivative immunity for parties acting under the direction and control of the federal government in the exercise of legitimate federal authority).   The purpose of such derivative immunity is not to protect private parties *per se*, but "solely as a means of protecting the government's discretionary authority over areas of significant federal interest."   *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 89-90 (2d Cir. 2008).

In *In re World Trade Center Disaster Site Litig.*, 521 F.3d 169, 197 (2d Cir. 2008), the Second Circuit discussed derivative immunity for actions taken by private parties in response to the 9/11 terrorist attacks on the World Trade Center, and held "that the rationale for the government contractor defense would extend to the disaster relief context due to the unique federal interest in coordinating federal disaster assistance and streamlining the management of large-scale disaster recovery projects."   Although the Second Circuit was discussing derivative immunity under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, which was invoked in response to the terrorist attacks (just as it was in response to Hurricane Katrina), the court's reasoning applies with even greater force in this case.

As the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling explained, the federal government plays a "fundamentally different role" when responding to an oil spill disaster under the CWA and NCP than it does when it responds to a disaster under the Stafford Act:   "Instead of a state-run response supplemented with federal resources and financing, the NCP demands that the federal government direct the response

19

through a Federal On-Scene Coordinator." *See* NATIONAL COMMISSION, *Staff Working Paper No. 2* at 17. Indeed, the NCP "gives the Federal On-Scene Coordinator the power to direct all response actions." NATIONAL COMMISSION, *Report to the President* at 138. Although the NCP also gives the FOSC the authority to monitor response actions under certain circumstances to ensure the RP is carrying out a response adequately, in the case of a Substantial Threat Spill, such as was the case in this incident, the FOSC was required to "direct" all federal, state, and private actions. "Thus, while the Stafford Act envisions a state-directed (though in part federally funded) response, the National Contingency Plan puts federal officials in charge." *Id.* As a result, the need for derivative immunity is even more compelling here than it was in the 9/11 litigation. Accordingly, private entities, such MSRC, are entitled to derivative federal immunity when they perform work pursuant to the direction and control of the federal government and the acts of which plaintiffs complain fall within the scope of those government directives. *See Yearsley*, 309 U.S. at 20-21; *In re World Trade Center*, 521 F.3d at 196.

For this defense to be available, as a threshold matter, the government must be immune from liability as if it was the entity performing the activity giving rise to the action. *Kadan v. Am. Contractors Ins. Co.*, No. 08-695 "J"(4), 2008 U.S. Dist. LEXIS 110867, at *6 (E.D. La. Dec. 5, 2008) This threshold requirement is met here because the Clean Water Act ("CWA") provides <u>absolute immunity</u> to the federal government in connection with oil spill response efforts. See 33 U.S.C. § 1321(j)(8)("The United States Government is not liable for any damages arising from its actions or omissions relating to any response plan required by this section.")

There can be no doubt that, in assisting with the clean-up of the *Deepwater Horizon* spill, MSRC was acting pursuant to the direction, and control of the federal government. (*See* B(3)

Master Complaint ¶ 92 ("The U.S. Coast Guard is responsible for . . . responding to oil spills and supervising and/or coordinating response actions."); *id.* ¶ 109 ("The Coast Guard's Federal On-Scene Coordinator . . . must approve BP's requests to use chemical dispersants.").)  The FOSC directed, on a daily basis, specific actions to be taken by MSRC and the other responders pursuant to the approval of daily Incident Action Plans.  NATIONAL COMMISSION, *Report to the President* at 136.   Moreover, in responding to the *Deepwater Horizon* spill, the federal government did not simply issue directions for MSRC and the other responders to follow, but was—unlike in *Yearsley*— required to direct   all federal, state, and private response actions because the spill was a Substantial Threat Spill requiring the FOSC to direct and control all aspects of the response in real time and making decisions regarding how best to conduct the containment and clean-up efforts.  This included, among other things, decisions about the use of dispersants.  *Id.* at 143.

The availability of derivative federal immunity in this case is reinforced by Congress' desire, reflected in the CWA and OPA, to promote effective and efficient responses to oil spills. In order for the federal government to achieve these dual goals, private parties that are called upon to implement the directives of the Federal On-Scene Coordinator and/or National Incident Commander should not have to evaluate whether it is worth the risk of being subjected to litigation before deciding to faithfully execute such federal directives.   Indeed, denying derivative immunity to entities such as MSRC risks undermining the entire federal response structure set forth in the CWA and NCP.

Moreover, unlike the federal government's "discretionary function" immunity under the Federal Tort Claims Act, 28 U.S.C. § 2680(a), and the Stafford Act, *see* 42 U.S.C. § 5148, the CWA provides <u>absolute immunity</u> to the federal government in connection with oil spill

response efforts.  33 U.S.C. § 1321(j)(8).  Therefore, because the federal government enjoys immunity for its actions or omissions relating to its response to the *Deepwater Horizon* spill, and because its actions included, as mandated by law in circumstances involving a Substantial Threat Spill, approving, directing, and ultimately controlling the activities of MSRC in responding to the *Deepwater Horizon* spill, MSRC shares derivatively in the federal government's absolute immunity under the CWA.

Alternatively, MSRC is also entitled to derivative discretionary function immunity under the Federal Tort Claims Act ("FTCA").  28 U.S.C. § 2680(a) (barring claims against the federal government "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused").

There can be no doubt that the federal government would enjoy discretionary function immunity for its actions in responding to the *Deepwater Horizon* spill.  The decisions made by the FOSC concerning the manner in which the clean-up operations would be conducted clearly "involve[d] an element of judgment or choice," *Berkovitz v. United States*, 486 U.S. 531, 536 (1988), and those decisions were "based on considerations of public policy."  *Id.* at 537.  As the National Commission on the BP Deepwater Horizon Oil Spill found, in deciding on how and when to use dispersants, the Coast Guard was faced with a "tradeoff of bad choices between spraying chemicals on the water or watching more oil reach the shore."  NATIONAL COMMISSION, *Report to the President* at 143.  These are precisely the types of governmental decisions that discretionary function immunity is designed to insulate from judicial review:  "The basis for the discretionary function exception was Congress' desire to 'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy

22

through the medium of an action in tort.'" *Berkovitz* at 537-38 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)).

Discretionary derivative immunity extends to private contractors, such as MSRC, the immunity traditionally afforded to the government when the government engages in a discretionary governmental function. *In re World Trade Ctr. Disaster Site Litig.*, 456 F. Supp. 2d 520, 560 (S.D.N.Y. 2006). The Fifth Circuit has recognized that the purpose of derivative immunity "is to prevent the contractor from being held liable when the government is actually at fault." *Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1478 (5th Cir. 1989). Discretionary government contractor immunity is applicable to service contracts with the government, *Carley v. Wheeled Coach*, 991 F.2d 1117, 1119 (3d Cir. 1993), and to a sub-contractor doing Federal Government work. *See, e.g., Gulf Refining Co. v. Mark C. Walker & Son Co.*, 124 F.2d 420, 425 (6th Cir. 1942).

Derivative discretionary function immunity is available in the emergency-response context where: (i) that the government approved reasonably precise specifications; (ii) that the government supervised and controlled the implementation of those specifications; and (iii) that the contractor was not aware of reasons not known to the government that would make implementation of the specifications unsafe or unreasonable. *In re World Trade Center Disaster Site Litigation*, 456 F. Supp. 2d at 563; *see also Kerstetter v. Pac. Scientific Co.*, 210 F.3d 431, 435 (5th Cir. 2000). Specifications are reasonably precise if the government exercised discretion over all significant details and all critical choices. *Katrina Canal Breaches Litig. Steering Comm. v. Washington Group Int'l, Inc.*, 620 F3d 455, 461 (5th 2010).

There can be no dispute that the cleanup actions in the Gulf of Mexico were governed by the NCP, 33 U.S.C. §1321(d) and 40 C.F.R. Part 300 Appendix E. (*See* B(3) Master Complaint

at ¶¶94, 109.)  The NCP was prepared by the Federal Government and provides detailed and comprehensive procedures and standards for the "efficient, coordinated and effective action to minimize damage from oil and hazardous substance discharges, including containment, dispersal, and removal of oil and hazardous substances."  *Id.*  MSRC had no role in preparing the NCP.  There also can be no doubt that in responding to the Oil Spill, MSRC acted pursuant to the authorization, direction, and ultimate control of the federal government. ( *See* B3 Bundle Master Complaint ¶ 92 ("The U.S. Coast Guard is responsible for . . . responding to oil spills and supervising and/or coordinating response actions.").)   Accordingly, MSRC has derivative discretionary function immunity under the FTCA.

Accordingly, claims in the B(3) Master Complaint against MSRC should be dismissed in their entirety.

## III.   MSRC IS EXEMPT FROM LIABILITY FOR NEGLIGENCE UNDER FEDERAL AND STATE LAW

Under the CWA, a person who is not a responsible party[9] is exempt from liability for "damages which result from actions taken or omitted to be taken in the course of rendering care, assistance, or advice . . . relating to a discharge or a substantial threat of a discharge of oil or a hazardous substance . . . [unless] the person is grossly negligent or engages in willful misconduct."  33 U.S.C. § 1321(c)(4)(2011).  The exemption from liability does not apply "with respect to personal injury or wrongful death."  *Id.*

State law in Texas, Louisiana, Mississippi, Alabama, and Florida all provide similar qualified immunity for persons involved in responses to oil spills.  The Louisiana Oil Spill

---

[9] For purposes of this subsection, the term "responsible party" has the meaning given that term under section 1001 of the Oil Pollution Act of 1990, 33 USCS § 2701:  "In the case of an offshore facility . . . the lessee or permittee of the area in which the facility is located."

24

Prevention and Response Act, LA. REV. STAT. § 30:2466 (2011) provides "qualified immunity for response actions."  The Louisiana Act provides:

> Notwithstanding any other provision of law, and except for the responsible person, no person, including any discharge cleanup organization, that . . . renders care, assistance, or advice in abating, containing, removing, cleaning up, or otherwise responding to pollution from an unauthorized discharge or threat of discharge of oil . . . is liable for . . . damages . . . whether under this Chapter or other laws of this state, resulting from acts or omissions committed in rendering such care, assistance, or advice.  This Section shall not apply to actions for personal injury or wrongful death or for acts or omissions of gross negligence or willful misconduct.

The Mississippi Liability Of Persons Responding To Oil Spills Act, MISS. CODE ANN. § 49-18-5 (2011), provides standards for "liability of persons for oil spill response consistent with National Contingency Plan or on-scene directions."  The Mississippi Act provides,

> (1) Notwithstanding any other provision of law, a person is not liable for removal costs or damages which result from actions taken or omitted to be taken in the course of rendering care, assistance or advice consistent with the National Contingency Plan or as otherwise directed by the federal on-scene coordinator or by the state official with responsibility for oil spill response.
>
> (2) Subsection (1) does not apply: (a) To a responsible party; (b) To personal injury or wrongful death; or (c) If the person is grossly negligent or engages in willful misconduct.

The Alabama Act Regarding Liability for Persons Responding to Oil Spills, ALA. STAT. § 6-5-332.2(c)(2010), governing persons involved in responses to Oil Spills, is worded identically to the Mississippi Act.

The Florida Pollutant Discharge Prevention and Removal Act, FLA. STAT. § 376.09(5)(2010), provides that:

> [A]ny person who is authorized by the department or the Federal Government or the person alleged to be responsible for the discharge, or by a designee thereof, to render assistance in containing or removing pollutants shall not be liable for costs, expenses, and damages, unless such costs, expenses, and damages

25

are a proximate result of acts or omissions caused by gross negligence or willful misconduct of such authorized person.

The Texas Oil Spill Prevention and Response Act of 1991, TEX. NAT. RES. CODE ANN. §40.104 (b) provides that:

> No person or discharge cleanup organization that voluntarily, or pursuant to the national contingency plan, or pursuant to any discharge response plan required under this chapter, or pursuant to the request of an authorized federal or state official, or pursuant to the request of the responsible person, renders assistance or advice in abating, containing, or removing pollution from an unauthorized discharge of oil is liable for response costs, damages, or civil penalties resulting from acts or omissions committed in rendering such assistance or advice, except for acts or omissions of gross negligence or willful misconduct.

While the Mississippi, Alabama, Texas and Florida statutes have not been construed in any court in the Fifth or Eleventh Circuits, this Court analyzed the Louisiana statute in the context of a remand motion. In *Caillouet Land Corp. v. Chevron Pipe Line Co.*, No. 06-10533, 2007 U.S. Dist. LEXIS 48364, at *6-8 (E.D. La. Jul. 3, 2007), plaintiff's petition did not assert any allegations of gross negligence, willful misconduct, or personal injury against the defendant clean-up contractors. Instead, the only claims asserted were claims of general negligence for property damage and for trespass. The court found that, even if proven true, these allegations were insufficient to overcome the immunity granted by law. *Id.* at *8. Thus, the court held that claims of "negligence and trespass against the clean-up contractors [were] not actionable in light of the provisions of La. Rev. Stat. § 30:2466." *Id.* at *10.

In the present case, the United States Coast Guard has already named BP and Transocean as the responsible parties. (B(3) Master Compl. ¶¶ 26, 51, 313.) Plaintiffs do not aver that MRSC is a responsible party. Instead, Plaintiffs admit that MSRC is a response organization that "participated in the post-explosion Oil Spill remediation and response efforts." (B(3) Master Compl. ¶54.) Because MSRC is a response organization, not a responsible party, and not a

26

person causing the discharge or discharging pollutants, the only way that MSRC could be found liable would be for actions taken or omissions related to its response to the *Deepwater Horizon* incident.  The plain wording of the Federal and state statutes, however, makes MSRC immune from liability for all damages caused by negligence.  Therefore, even if the Court accepts all of Plaintiff's pleaded facts as true, which MRSC strongly denies, and views them in a light most favorable to Plaintiff, Plaintiffs' negligence allegations do not raise a claim of entitlement to relief against MSRC for any Texas or Florida Plaintiff.  Further, as stated below, there are no factual allegations in the B(3) Complaint that support a claim that MSRC was grossly negligent or committed willful misconduct.  Accordingly, because Plaintiffs fail to state a claim upon which relief can be granted, any B(3) Master Complaint claims for property damage or economic losses also should be dismissed pursuant to Rule 12(b)(6).  (*See* B(3) Master Compl. ¶175.)

## IV.   MSRC IS EXEMPT FROM LIABILITY UNDER THE FLORIDA POLLUTANT DISCHARGE AND CONTROL ACT (COUNT XI)

Under the Florida Pollutant Discharge Prevention and Control Act, § 376.011, *et seq.* (the "Florida Act"), ". . . any person may bring a cause of action against a <u>responsible party</u> in a court of competent jurisdiction for damages . . . resulting from a discharge or other condition of pollution."  FLA. STAT. § 376.205 9 (emphasis added).  Under the Florida Act, a "responsible party" is defined to mean:

> In the case of a vessel, any person owning, operating, or demise-chartering the vessel . . . In the case of an offshore facility . . . the lessee or permittee of the area in which the facility is located or the holder of a right of use and easement granted under applicable . . . law . . . for the area in which the facility is located . . . "

FLA. STAT. § 376.031(20).  "Damages" are defined to mean: "the documented extent of any destruction to or loss of any real or personal property, or the documented extent . . . of any

destruction of the environment and natural resources, including all living things except human beings, as the direct result of the discharge of a pollutant." FLA. STAT. § 376.031(5).

MSRC cannot be a responsible party under Florida law as a result of this incident. Therefore, under the plain language of the statute, MSRC cannot be held liable as result from the Oil Spill.  Accordingly, Plaintiffs' claim for relief for strict liability under the Florida act against MSRC should be dismissed as a matter of law.

## V.  THE B(3) MASTER COMPLAINT FAILS TO ALLEGE SUFFICIENT FACTS TO SUPPORT ANY CLAIMS AGAINST MSRC

Fed. R. Civ. P. 12(b)(6) permits dismissal where the claimant fails "to state a claim upon which relief can be granted."  Thus, a complaint may be dismissed pursuant to Rule 12(b)(6) where it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible on its face when the plaintiff has pled facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Indeed, a complaint must state "sufficient facts to raise a reasonable expectation that discovery will reveal evidence that supports the plaintiff's claim." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232-33 (5th Cir. 2009).

The courts' application of *Twombly* and *Iqbal* proceeds in two steps. First, the court determines which allegations in the complaint are not entitled to the assumption of truth. *Id.* at 1950. Courts reject attempts by plaintiffs to simply recite the elements of a cause of action or to "dress up" legal conclusions as factual allegations in determining whether a complaint contains sufficient factual information to "state a claim to relief that is plausible on its face." *See Twombly*, 550 U.S. at 555-56 ("[A] formulaic recitation of the elements of a cause of action will not do.").  Thus, "conclusory allegations, unwarranted deductions of facts, or legal conclusions

28

masquerading as facts will not prevent dismissal." *Wood v. Briarwinds Condo. Ass'n Bd. of Dirs.*, No. 09-12704, U.S. App. LEXIS 4450, at *1-2 (11th Cir. Mar. 3, 2010)(internal quotations omitted); *see also Iqbal*, 129 S.Ct. at 1940 ("While legal conclusions can provide the complaint's framework, they must be supported by factual allegations.").

Second, the court considers the remaining factual allegations that are entitled to the assumption of truth to determine whether they plausibly suggest an entitlement to relief. *See Iqbal*, 129 S. Ct. at 1951.

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it stops short of the line between possibility and plausibility of "entitlement to relief."

*Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 557). A court must accept all well-pleaded facts, excluding legal conclusions and "naked assertions," as true and view them in the light most favorable to the plaintiff. *Azar v. Nat'l City Bank*, No. 09-16052, 2010 U.S. App. LEXIS 12184, at *7 (11th Cir. June 15, 2010). A complaint need not aver detailed factual allegations, but a party must show "more than a 'sheer possibility' that plaintiff's claim is true." *Moore v. Metropolitan Human Service District*, No. 09-6470, 2010 U.S. Dist. Lexis 34808, at *6 (E.D.La. Apr. 7, 2010)(internal citations omitted). Where the "wellpleaded facts" do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not shown -- that the pleader is entitled to relief. *Iqbal* at 1949. In such cases, the complaint should be dismissed pursuant to Rule 12(b)(6).

Although a court must draw all inferences in favor of the pleader, dismissal pursuant to Rule 12(b)(6) is appropriate "if there are insufficient factual allegations to raise a right to relief above the speculative level," *Jebaco, Inc. v. Harrah's Operating Co., 587 F.3d 314, 318 (5th*

*Cir. 2009) (quoting Twombly,* 550 U.S. at 555)(internal quotations omitted), or "if it is apparent from the face of the complaint that there is an insuperable bar to relief," *Jones v. Bock*, 549 U.S. 199, 215 (2007), or "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *D.P. ex rel E.P. v. Sch. Bd.*, 483 F.3d 725, 728-29 (11th Cir. 2007)(internal citation omitted).  In the latter two circumstances, which fully apply here, a plaintiff "pleads himself out of court by 'admitting all the ingredients of an impenetrable defense.'" *Barasich v. Shell Pipeline Co.*, No. 05-4180, 2006 U.D. Dist. LEXIS 84389, at *2 (E.D. La. Nov. 20, 2006) (Barbier, J.)(internal citations omitted)(granting Rule 12(b)(6) dismissal in part).

Applying this pleading standard to the B(3) Master Complaint requires dismissal of all claims against MSRC.  First, as discussed in detail below, Plaintiffs' assertions of negligence and other torts are at best dressed-up legal conclusions and are not entitled to the assumption of truth. As such, the Court should disregard those conclusory assertions in its application of the *Twombly/Iqbal* standards.  Second, the only remaining factual allegations entitled to the assumption of truth do not plausibly suggest an entitlement to relief and are not sufficient for the Court to draw any reasonable inference that MSRC is liable for Plaintiffs' alleged injuries.  *See Iqbal* at 1951.

A.   **Any B(3) Master Complaint Claims Based On Allegations Related To MSRC's Operations Under The National Contingency Plan Must Be Dismissed As A Matter Of Law (Counts III, IV, V, VII and VIII)**

The Clean Water Act, 33 U.S.C. §1321, does not provide for private causes of action. *Sekco Energy v. M/V Margaret Chouest*, 820 F. Supp. 1008, 1014 (E.D. La. 1993).  *See also Complaint of Ballard Shipping Co.*, 772 F. Supp. 721 (D.R.I. 1991) (holding that the CWA does not give individual states a cause of action).  The National Contingency Plan, 40 C.F.R. Part 300,

is prepared by the President under the authority of the CWA.  Area Contingency Plans are also prepared under the authority of the CWA.  Therefore, because there is no private cause of action under the enabling act for the NCP and the ACP, there can be no private cause of action under the corresponding regulations themselves.  *Alexander v. Sandoval*, 532 U.S. 275, 291 (U.S. 2001)(language in a regulation cannot "conjure up" a private cause of action not authorized by Congress).

Plaintiffs' tort claims are based entirely on allegations that MSRC and other Dispersant Defendants used dispersants, including by way of aerial spraying, failed to properly train or equip Plaintiffs working with dispersants, and failed to warn Plaintiffs working with dispersants and other Plaintiffs in the Gulf coast region about the potential hazards of dispersant exposure. (*See, e.g.,* B(3) Master Compl. ¶¶ 222 – 23, 238, 263 – 64, 273 – 76.)  The NCP and ACP, however, contain specific requirements governing each of these issues.  The NCP and ACPs contain provisions governing the use of dispersants, including aerial spraying, *see* 40 C.F.R. Part 300 Subpart J; worker health and safety, 40 C.F.R. §300.150; and public notification of health hazards.  40 C.F.R. §30.155.  Therefore, as a matter of law, Plaintiffs cannot maintain causes of action for any torts based on allegations related to any actions governed by or taken under the NCP or ACPs.  Accordingly, any claims based on allegations related to any of MSRC's operation under the NCP or ACPs must be dismissed.

**B.      The B(3) Master Complaint Fails To Allege Sufficient Facts To Support A Claim Of Negligence Against MSRC (Count III)**

The elements of a cause of action for negligence are well established. "A plaintiff must establish that (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached the duty; (3) the plaintiff suffered damages; and (4) the breach of the duty proximately caused the damages." *Lloyd's Leasing Limited v. Conoco*, 868 F.2d 1447, 1449 (5th Cir. 1989); *Lewis v.*

31

*City of St. Petersburg*, 260 F.3d 1260, 1262 (11th Cir. 2001). The same standard for negligence applies to claims asserted under general maritime law. *See, e.g., In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991).

To survive a Rule 12(b)(6) challenge to a negligence claim, the "complaint must contain sufficient factual material, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 570). This standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 570) (emphasis added). The pleading standard under *Twombly*/*Iqbal* also necessarily "requires some articulation of the duty owed in these circumstances and how, as a factual matter, it was breached." *See Procentury Ins. Co. v. Harbor House Club Condo. Ass'n., Inc.*, 652 F. Supp. 2d 552, 560 (D.N.J. 2009).

The negligence claim in the B(3) Master Complaint against MSRC, even if not dismissed as a matter of law, as discussed, *supra*, should be dismissed because it fails to plead sufficient facts supporting all of the elements of negligence as required by *Twombly* and *Iqbal*. (See B(3) Master Compl. ¶¶ 219 – 228.) The negligence claim is based on Plaintiffs' assertions that "Defendants breached their duties owned to the Plaintiffs" by failing to warn Plaintiffs of the harmful effects of crude oil and dispersants; failing to properly train and equip Plaintiffs to avoid exposure to hazardous substances encountered in connection with relief efforts; failing to abide by the provisions of the NCP relating to the use of aerial chemical dispersants in the proximity of vessels and in shallow waters; failing to conduct aerial spraying of dispersant in a manner so as to eliminate the risk to vessels and crewmembers; and failing to exercise reasonable care in the conduct of response efforts to avoid harming Plaintiffs. (*Id.* at ¶¶ 222 – 223.) The complaint

32

does not identify, however, which Defendants owned which Plaintiffs any of these duties or which Defendants breached any of these duties, or how any of these duties may have been breached.  This is especially true of MSRC, which did not own or operate any aircraft.

More importantly, the Complaint does not allege that MSRC either owned or breached any of these duties.  The Complaint does not allege any facts showing that MSRC owed or breached any duty to warn, train or equip VoO Plaintiffs.  Nor can Plaintiffs make such allegation because Plaintiffs do not allege that MSRC was involved in the VoO Program.  (*See* B(3) Master Compl. ¶¶94 – 104.)  Further, there is no factual support for the allegation that MSRC was involved in vessel decontamination and on-shore clean-up.  (*See* B(3) Master Compl. ¶¶106, 107.)  In fact, Plaintiffs have not identified a single individual who was allegedly employed by MSRC for vessel decontamination or on-shore clean-up, or who MSRC directed to conduct any vessel decontamination or on-shore clean-up.  Therefore there is no basis for alleging that MSRC owed or breached any duty to the Decontamination Plaintiffs or the On-Shore Plaintiffs to warn, train or equip them.

The Complaint also does not allege any facts showing that MSRC owned or breached any duties to Vessel Plaintiffs or Resident Plaintiffs.  Nor is there any basis for such allegations.  Vessel Plaintiffs and Resident Plaintiffs are members of the general public.  Any duty to warn them about the hazards of oil or dispersants was owed by the Federal Government entities directing the spill response or possibly the RP, but not by MSRC.  See, e.g., 40 C.F.R. §300.155.

The Complaint also does not allege that MSRC owed or breached any duty to any of the five categories of Plaintiffs to avoid conducting aerial dispersant spraying near vessels and in shallow water.  Moreover, there is no basis for alleging that MSRC breached these duties because MSRC did not own or operate any aircraft and there is no factual allegation that at any

33

time MSRC conducted or directed aerial spraying near any vessel or anywhere near shallow water.

In sum, Plaintiffs vaguely allege that they sustained personal injuries from the clean-up effort, and that one or more of the Dispersant Defendants did something unspecified to cause it. Plaintiffs factual assertions do not differentiate among specific Defendants, do not state where any of MSRC's or any other Defendants' activities took place, do not state which activities conducted by MSRC or any Defendants were negligent.   Those generalized, undifferentiated allegations fail to satisfy the notice pleading requirement of Federal Rule of Civil Procedure 8. *See Pro Image Installers, Inc. v. Dillon*, No. 08cv273, 2009 U.S. Dist. LEXIS 3777, at *6 (N.D. Fla. Jan. 15, 2009) (dismissing complaint that inadequately distinguished between the separate defendants); *Procentury Ins. Co.*, 652 F. Supp. 2d at 560-61 (holding that plaintiff did not sufficiently plead claims under *Twombly/Iqbal* where it simply lumped the defendants together with no factual allegations as to specific defendant); *Lane v. Capital Acquisitions & Mgmt. Co.*, No. 04-60602, 2006 U.S. Dist. LEXIS 96422, at *5 (S.D. Fla. Apr. 14, 2006) ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, the Lane's Complaint fails to satisfy the minimum standard of Rule 8") (citation omitted).

Plaintiffs also do not assert any facts showing a causal connection linking MSRC's or any other particular Defendant's operations to a particular Plaintiff's injury. Instead, the B(3) Master Complaint makes sweeping, conclusory allegations referencing causation.   (*See, e.g.*, B(3) Master Complaint ¶224.)    To recover on such a sweeping theory, however, would obviate proof of individual causation and is therefore fatally flawed.   *In re Dredging Limitation Actions Consol. Litig.*, No. 06-8676(K), 2008 U.S. Dist. LEXIS 46035, *50-52 (E.D. La. June 12, 2008) ("group liability theory" not recognized under the law).   Although the B(3) Master Complaint

34

alleges that VoO Plaintiffs and Vessel Plaintiffs were exposed to dispersants from aerial spraying (B(3) Master Compl. ¶¶133, 135), they do not allege facts showing that any Plaintiff was exposed to dispersants sprayed from a spray plane owned or operated by MSRC (which they cannot, as no planes were owned or operated by MSRC.)  Nor do they even allege any facts showing specifically when or where in the Gulf of Mexico any VoO Plaintiffs or Vessel Plaintiffs were exposed to dispersants.  The allegations in the B(3) Master Complaint concerning On-Shore Plaintiffs' and Resident Plaintiffs' exposure to dispersants are similarly lacking in facts showing that MSRC was the cause of the exposure.  (B(3) Master Compl. ¶¶136, 137, 139, 141.)[10]

Accordingly, because the Plaintiffs' negligence allegations fail to state a claim upon which relief can be granted, the cause of action in the B(3) Master Complaint against MSRC for negligence should be dismissed pursuant to Rule 12(b)(6).

## C.     The B(3) Master Complaint Fails To Allege Sufficient Facts To Support A Claim Of Gross Negligence Against MSRC (Count IV)

Whether a defendant's conduct amounts to gross negligence as opposed to ordinary negligence is dependent on the particular circumstances of the case.  *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 411 (5th Cir. 1982), *aff'd in part, rev'd in part* 763 F.2d 745 (5th Cir. 1985).  Although neither the Fifth nor the Eleventh Circuit have considered what standard for gross negligence applies to claims under the CWA, it is generally understood that gross negligence amounts to "[a] lack of slight diligence or care . . . [a] conscious, voluntary act

---

[10]  The lack of factual allegations documenting On-Shore and Resident Plaintiffs' exposure to dispersants is underscored by the report by the Deepwater Horizon Unified Area Command Operational Science Advisory Team ("OSAT") which explains that dispersants were not used near shore as part of the oil spill response and that none of the major constituent chemicals found in the dispersants used on the spill were found near shore in levels hazardous to human health.  *See* U.S. COAST GUARD, *OSAT Summary Report*, at 25.

or omission in reckless disregard of a legal duty and of the consequences to another party . . . ."
*Black's Law Dictionary* 1062 (8th ed. 2004).

For example, in *Henderson v. Norfolk Southern Corp.*, 55 F.3d 1066, 1070 (5th Cir. 1995), the court held that under Texas law, the act or omission complained of, when "viewed objectively from the standpoint of the actor," must involve an extreme degree of risk, "considering the probability and magnitude of the potential harm to others," and that the actor "must have actual, subjective awareness of the risk involved, but nevertheless proceed with conscious indifference to the rights, safety, or welfare of others." *Id.* (quoting *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 23, 37 Tex. Sup. Ct. J. 883 (Tex. 1994)(internal quotations omitted)). *See also Bagby Elevator Co., Inc. v. Schindler Elevator Corp.*, 609 F.3d 768, 773 (5th Cir. 2010) (evidence supported gross negligence finding "as the jury could have reasonably concluded that Schindler acted with conscious indifference to Bagby's rights despite being aware of an extreme risk that it was causing Bagby significant harm").

In *Central State Transit & Leasing Corp. v. Jones Boat Yard, Inc.*, 206 F.3d 1373 (11th Cir. 2000), the court held that, "to hold a party liable for gross negligence, the district court must find that the defendant had knowledge of the existence of circumstances which constitutes a clear and present danger and yet still undertakes a conscious, voluntary act or omission which is likely to result in injury." *Id.* at 1377 (shipyard grossly negligent in allowing use of faulty dry dock because serious defects known and use continued despite risk of injury).

Under Louisiana law, gross negligence has been described as the "entire absence of care," "want of even slight care and diligence," "the want of that diligence which even careless men are accustomed to exercise," the 'utter disregard of the dictates of prudence amounting to complete neglect of the rights of others," or the "extreme departure from ordinary care or the

36

want of even scant care." *First Commonwealth Corp. v. Hibernia Nat'l Bank*, 891 F. Supp. 290, 294 (E.D. La. 1995) (quoting *Ambrose v. New Orleans Police Department Ambulance Service*, 639 So. 2d 216, 219-20 (La. 1994)(internal quotations and citations omitted)).

Similarly, under Florida and Mississippi law, a showing of gross negligence requires that the act or omission complained of must occur "in a manner which evinces a conscious disregard of consequences." *In re New River Shipyard, Inc.*, 355 B.R. 894, 905 (Bankr. S.D. Fla. 2006)(quoting *Tran v. Waste Management, Inc.*, 290 F.Supp.2d 1286, 1294 (M.D. Fla. 2003)); *Ezell v. Bellsouth Telcoms.*, 961 F. Supp. 149, 152 (S.D. Miss. 1997) (gross negligence is "a reckless indifference to consequences without the exertion of any substantial effort to avoid them")(citing *Dame v. Estes*, 101 So. 2d 644 (Miss. 1958)).

No matter what standard the Court applies, however, it is not enough for Plaintiff to simply aver in conclusory fashion that some unspecified act of MSRC was "grossly negligent," or that it operated in an otherwise improper manner, without alleging sufficient facts to support the plausibility of these legal conclusions.  Rather, to survive a Rule 12(b)(6) challenge, the complaint must contain sufficient factual material, accepted as true, to state a claim for gross negligence that is plausible on its face.

In this case, Plaintiffs do not aver even a single fact supporting their claim that MSRC was grossly negligent or guilty of willful or reckless misconduct.  Plaintiffs base their gross negligence claim on Defendants' alleged breach of their duty to Plaintiffs ". . . to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures."  (B(3) Master Compl. ¶¶ 230-31.)  The only facts alleged in support of this claim are that Dispersant Defendants (which includes MSRC) used and continues to use dispersants on the surface of the Gulf of Mexico; that MSRC and other defendants own or

operate aircraft that spot oil slicks and spray dispersants on the Gulf; and that various Plaintiffs came into contact with dispersants sprayed from aircraft or found along the shore.  (*See* B(3) Master Compl. ¶¶ 105, 120 121, 150, 170.)  Even if taken as true, these assertions do not begin to establish that MSRC was grossly negligent or guilty of wanton or reckless conduct.  Although Plaintiffs sweepingly assert that "Defendants recklessly, willfully and/or wantonly failed to use reasonably safe dispersant chemicals or other chemicals" in the spill response (*id.* ¶ 162), these are nothing more than Plaintiff's conclusions; they are not factual averments that support an allegation of gross negligence by MSRC.  Moreover, these conclusions are inconsistent with the Plaintiffs' acknowledgment that the NCP permits the use of chemical dispersants (*id.* at 109) and the fact that federal regulations <u>require</u> planholders to place dispersant planes and other dispersant resources under contract and available to respond in the event of future oil spills.

Furthermore, MSRC did not decide what dispersant would be used, how much, or where it would be sprayed during the spill response.  Indeed, the Complaint does not allege that MSRC played any role in deciding whether, the type, the amount, or where dispersants should be used in the Gulf.  And, of course, MSRC did not make any of those decisions as those are decisions delegated to the President by the CWA and NCP and were ultimately made **a**nd approved every day by the FOSC as documented in the daily IAP .

Merely alleging that MSRC used a dispersant with potentially hazardous components falls far below the standard for a showing of gross negligence.  The Complaint avers no facts demonstrating that MSRC undertook a conscious, voluntary act or omission which was likely to result in injury — as would be required to properly plead gross negligence.  Further, none of the facts alleged by Plaintiffs suggest that MSRC acted willfully or recklessly or was grossly negligent.  To the contrary, the dispersants used were approved by the EPA.  Thus, none of the

alleged facts, even if assumed to be true, rise above even a speculative level that MSRC is potentially liable for acting in a manner in responding to the Oil Spill which it knew was likely to result in injury.

Plaintiffs simply have not pled facts sufficient for this Court to draw any inference that MSRC would be liable for gross negligence.  Accordingly, because Plaintiffs' gross negligence allegations fail to state a claim upon which relief can be granted, the cause of action in the B(3) Master Complaint for gross negligence against MSRC should be dismissed pursuant to Rule 12(b)(6).

**D.**    **The B(3) Master Complaint Fails To Allege Sufficient Facts To Support A Claim Of Negligence Per Se Against MSRC (Count V)**

"Negligence per se . . . is a theory by which statutes are used to establish the appropriate standard of care."  *Gray ex rel. Rudd v. Beverly Enterprises-Mississippi*, 390 F.3d 400, 407 (5th Cir. 2004).  "When the doctrine of negligence per se applies, [the legal] standard of care . . . is replaced by a specific rule of conduct established in a statute or regulation."  *Dougherty v. Santa Fe Marine, Inc.*, 698 F.2d 232, 235 (5th Cir. 1983) (internal citations omitted).

To establish negligence *per se*, a plaintiff must prove: (1) that the statute the defendant is charged with violating was enacted to protect a class of persons to which the plaintiff belonged; (2) that the plaintiff's injury was the kind of injury contemplated by the statute; (3) that the defendant violated the statute; and (4) that the defendant's violation of the statute proximately caused the plaintiff's injury.  *Benefield v. Int'l Paper Co.*, No. 2:09cv232, 2009 U.S. Dist. LEXIS 75206, *13-16 (M.D. Ala. Aug. 21, 2009)(citing Alabama law); *Hughes v. Boston Scientific Corp.*, No. 09-60925, 2011 U.S. App. LEXIS 1376, *22, n.6 (5th Cir.. Jan. 21, 2011)(citing Mississippi law); *Andrade Garcia v. Columbia Med. Ctr.*, 996 F. Supp. 605, 611 (E.D. Tex.

1998)(citing Texas law)[11]   Negligence *per se* is not applicable, however, where the laws allegedly violated are intended to protect the public at large.  *Benefield*, at *16; *Langbehn v. Public Health Trust*, 661 F. Supp. 2d 1326, 1342 (S.D. Fla. 2009)(citing Florida law).

The negligence *per se* claim in the B(3) Master Complaint should be dismissed because it fails to satisfy the minimum pleading requirements as set forth in *Twombly* and *Iqbal*.  (*See* B(3) Master Compl. ¶¶ 237-42.)  This claim alleges that "Defendants' conduct with regard to the manufacture, maintenance and/or operation of drilling operations and oil vessels such as the *Deepwater Horizon*, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by numerous state and federal laws and permits issued under the authority of these laws."  (B(3) Master Compl. ¶ 238.)  The Complaint then makes the vague, conclusory, and implausible allegation that "[o]ne or more of Defendants violated these statutory and/or regulatory standards" and, thus, that "Defendants' violations of these statutory and/or regulatory standards constitute negligence *per se*."  (B(3) Master Compl. ¶¶ 239-40.)

The Complaint cites four statutes or regulations that Defendants are alleged to have violated:  the Clean Water Act Section 311, 33 U.S.C §1321, 40 C.F.R. Part 300 Appendix E, "General Oil Spill Response Requirements," 30 C.F.R. Part 254, "Oil-Spill Response Requirements For Facilities Located Seaward Of The Coast Line," and the Oil Pollution Act, 33 U.S.C. §2717(b).  (*Id.* at ¶238.)  Each of these statutes and regulations contain multiple parts and sub-parts and run for dozens of pages.  But Plaintiffs fail to allege, as is required for a negligence *per se* claim, which part or subpart of any statute or regulation allegedly violated protects a class of persons which is narrower than the general public.

---

[11] Louisiana "does not recognize negligence *per se* as a cause of action."  *See Sadler v. Int'l Paper Co.*, No. 09-cv-1254, 2010 U.S. Dist. LEXIS 130562, *21 (W.D. La. Sept. 29, 2010)(quoting *BellSouth Telecommunications, Inc. v. Eustis Engineering Co., Inc.*, 974 So. 2d 749, 752 (La. App. 4th Cir. 2007)).

Moreover, none of these statutes or regulations can form the basis of a negligence *per se* claim against MSRC.  As discussed, *supra*, the Clean Water Act and corresponding regulations, 40 C.F.R. Part 300, do not establish the right to a private cause of action.  Thus, neither the CWA nor the implementing regulations can form the basis for a cause of action for negligence *per se*.

The OPA 90 also does not establish a private cause of action for claims relating to oil spill clean-up.  Moreover, under the federal and state responder immunity regimes, MSRC cannot be found liable for negligent actions or omissions – gross negligence must be proven.  Thus, even if the Oil Pollution Act provided for a private cause of action, it and its implementing regulations cannot form the basis for a cause of action for negligence *per se* against MSRC.

Finally, even if these statutes and regulations established some standard governing the response to the oil spill and gave Plaintiffs a private cause of action, the Complaint does not identify which Defendants are alleged to have violated which statutory or regulatory standard.  But more importantly, there are no factual allegations that MSRC violated any statutory or regulatory standards.

In short, the B3 Bundle Master Complaint simply sets forth "labels and conclusions" and a "formulaic recitation" of the elements of a negligence *per se* claim.  *Twombly*, 550 U.S. at 555.  It does not "nudge" this claim "across the line from conceivable to plausible."  *Id.* at 570; *see also In re Southern Scrap Material Co., LLC*, 541 F.3d 584, 587 (5th Cir. 2008) (explaining that a complaint must state "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements") (internal quotation omitted).  Therefore, in accordance with *Twombly* and *Iqbal*, the negligence *per se* claim must be dismissed as against MSRC.

**E.     The B(3) Master Complaint Fails To Allege Sufficient Facts To Support A Claim Of Nuisance Against MSRC (Count VII)**

As an initial matter, although Count VII of the B(3) Master Complaint asserts a nuisance claim against all defendants, it does not identify the governing law.  To the extent the nuisance claim is based on Federal law it must be dismissed because there is no federal common law cause of action for public nuisance.  *See Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1030 n.13 (5th Cir. 1985)(the Supreme Court has apparently foreclosed a federal cause of action for public nuisance claims regarding obstruction of navigable waterways); *Marquez-Colon v. Reagan*, 668 F.2d 611, 614 n.2 (1st Cir. 1981) (noting that "the federal common law of nuisance for interstate and coastal water pollution has been entirely preempted by [the Federal Water Pollution Control Act]"); *Sekco Energy, Inc. v. M/V MARGARET CHOUEST*, 820 F. Supp. 1008, 1014 (E.D. La. 1993) (recognizing that federal common law does not recognize a cause of action for public nuisance in a water pollution case).

To the extent Plaintiffs' nuisance claim is based on state law, this claim also fails.  A public nuisance "involves an unreasonable interference with a right common to the general public" and "[i]n determining whether *conduct* amounts to a public nuisance, courts consider, inter alia, whether the *conduct* involves a significant interference with public health, safety, peace, comfort, or convenience."  *Cox v. City of Dallas*, 256 F.3d 281, 289 (5th Cir. 2001) (citing Restatement (Second) of Torts § 821B).  *See also Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 829 (5th Cir. 1993) (under Mississippi law, "[a] cause of action for public nuisance is predicated on a showing that the defendant's activities have injured a public right"); *Tenn. Coal, Iron & R. Co. v. Hartline*, 11 So. 2d 833, 837 (Ala. 1943) ("The injurious consequences or nuisance complained of should be the natural, direct and proximate cause of defendant's acts to render him liable for maintaining a public nuisance . . . .") (internal quotation marks and citation

42

omitted); *Straughter v. Hodnett*, 975 So. 2d 81, 92 (La. Ct. App. 2008) (upholding trial court's dismissal of nuisance claim because plaintiff failed to sufficiently allege that defendant "was the cause of the alleged public nuisance"); *Jamail v. Stoneledge Condominium Owners Ass'n*, 970 S.W.2d 673, 676 (Tex. Ct. App. 1998) (public nuisance is an "unreasonable interference" with a public right) (citation omitted).

A private litigant cannot recover for a public nuisance under state law unless he or she can show a special injury different in kind from that suffered by the general public. *Benefield,* 2009 U.S. Dist. LEXIS 48364, at *3 ("In order for an individual to maintain an action to enjoin a public nuisance, the individual must have sustained a 'special injury' which is different in degree and kind from the injury suffered by the public at large.") (citations omitted); *Robinson v. Indianola Mun. Separate Sch. Dist.*, 467 So. 2d 911, 918 (Miss. 1985) (to enjoin public nuisance, plaintiff must have sustained different kind of harm than that suffered by general public); *Jamail v. Stoneledge Condominium Owners Ass'n*, 970 S.W.2d 673, 676 (Tex. Ct. App. 1998) ("special injury" required to maintain public nuisance action).

Plaintiffs' nuisance claim is predicated on the Oil Spill's interference "with the public's right to use and enjoy the Gulf of Mexico without oil slicks, chemical dispersants, tar balls, and other associated pollution."  (B(3) Master Compl. ¶ 160.)  Yet, Plaintiffs have not alleged any conduct by MSRC that unreasonably interfered with a public right.  Accordingly, because Plaintiffs have not alleged that MSRC's conduct interfered with a public right, Plaintiffs' nuisance claim against MSRC must be dismissed.

In addition, the nuisance claim must be dismissed because Plaintiffs have failed to allege facts suggesting that if the alleged nuisance is not abated, they will suffer a special damage different from that which is common to Gulf residents.  Plaintiffs do not allege any facts

43

suggesting they have sustained a "special injury" different from that suffered by the general public living and working along the Gulf of Mexico.  Similarly, although Plaintiffs allege that they have been unable to fish and boat in the Gulf of Mexico due to the presence of oil and chemical dispersants, (B(3) Master Compl. ¶ 262), and that "all Plaintiffs are subjected to foul and harmful odors emanating from the crude oil soaked booms and/or the chemical dispersants," (*id.*. ¶ 265), they fail to allege facts suggesting they have suffered an injury different in degree and kind from that suffered by the general public.  Accordingly, the un-named Plaintiffs on whose behalf the B(3) Master Complaint is purportedly filed lack standing to bring a public nuisance claim.

**F.     The B(3) Master Complaint Fails To Allege Sufficient Facts To Support A Claim Of Battery Against MSRC (Count VIII)**

The intentional tort of battery is a harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact.  *Swope v. Columbian Chems. Co.*, 281 F.3d 185, 195-196 (5th Cir. 2002)(quoting *Caudle v. Betts*, 512 So. 2d 389, 391 (La. 1987)).  *See also Lovell v. Hamp*, 228 F. Supp. 2d 773, 777 (N.D. Miss. 2001)(citing *Webb v. Jackson*, 583 So. 2d 946, 951 (Miss. 1991)); *Geidel v. City of Bradenton Beach*, 56 F. Supp. 2d 1359, 1367 (M.D. Fla. 1999)(quoting *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d Dist. Ct. App. 1996).

Under Texas, Louisiana, Mississippi and Florida law, the intention to cause contact need not be malicious nor need it be an intention to inflict actual damage.  *See, e.g., Swope*, 281 F.3d at 196; *Lewis v. Continental Airlines, Inc.*, 80 F. Supp. 2d 686, 695 (S.D. Tex. 1999).  To establish a claim for battery under Alabama law, however, a Plaintiff must show that she was subjected to "the touching of the person of another in rudeness or anger." *Saville v. Houston*

44

*County Healthcare Auth.*, 852 F. Supp. 1512, 1542 (M.D. Ala. 1994) (citing *Allen v. Walker*, 569 So. 2d 350, 351 (Ala. 1990)).

Plaintiffs' battery claim should be dismissed as to MSRC because Plaintiffs fail to allege sufficient facts on all of the elements of battery as required by *Twombly* and *Iqbal*. Plaintiffs' batter claim is based, in part, on the allegation that "Defendants place VoO Plaintiffs on VoOs without adequate training, warning of risks, or safety equipment." (B(3) Master Compl. ¶ 273.) Although elsewhere in the Complaint, Plaintiffs assert that BP directed the VoO program (*see id.* ¶ 95), nowhere do they claim that MSRC played any role in placing Plaintiffs on VoOs. Therefore, there is no basis for the VoO Plaintiffs to allege a battery claim against MSRC.

Plaintiffs' battery claim also is based on their broad assertion that Defendants sprayed or directed the spraying of chemical dispersants "in the immediate vicinity of VoO Plaintiffs or Vessel Plaintiffs." (*Id.* ¶¶ 274-76.) But MSRC did not own or operate any aircraft and the B(3) Master Complaint is devoid of any factual allegation that MSRC intended that such spraying should cause VoO Plaintiff and Vessel Plaintiffs to come in contact with dispersant, as is required to support a cause of action for battery.

Therefore, because Plaintiffs have not alleged that MSRC intended that Plaintiffs come in contact with dispersants, Plaintiffs have failed to state a claim for battery. Accordingly, the cause of action in the B(3) Master Complaint for battery against MSRC should be dismissed pursuant to Rule 12(b)(6).

## VI.   THE FLORIDA MEDICAL MONITORING CLAIM IS BARRED BY THE GENERAL MARITIME LAW

Although the B(3) Master Complaint attempts to assert a cause of action under Florida's law of medical monitoring on behalf of "Florida Plaintiffs," this claim must be dismissed because the general maritime law governs under these circumstances and Florida medical

monitoring law cannot be used to "fill in the gaps" of maritime law in light of the fact that different states' medical monitoring law is far from uniform.

Admiralty jurisdiction over torts may properly be invoked when: (1) the tort occurred on navigable waters (called the locus test), and (2) the tort bore a substantial relationship to traditional maritime activity (called the nexus test). *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 538 (1995). In determining whether the tort occurred on navigable water, the court looks to "where the alleged wrong took effect rather than to the locus of the allegedly tortious conduct." *Egorov, Puchinsky, Afanasiev, & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453, 456 (5th Cir. 1999). In determining whether the tort bore a substantial relationship to traditional maritime activity, the Court must first evaluate the "general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce," *Grubart* at 538, and then must determine whether "the 'general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'" *Id.* at 534.

The claims alleged in the B(3) Master Complaint satisfy both the locus test and the nexus test. The oil spill clearly occurred on navigable waters. An oil spill on navigable waters has a substantial relationship to traditional maritime activities. *See Oppen v. Aetna Ins. Co.*, 485 F.2d 252, 257 (9th Cir. 1973) (oil spill in Santa Barbara Channel bore a significant relationship to the traditional maritime activity). Accordingly, the general maritime law applies to Plaintiffs medical monitoring claims.

The general maritime law, however, does not provide for medical monitoring damages. *See, e.g.*, *Seaman v. Seacor Marine L.L.C.*, 326 Fed. App'x 721, 730-31 & n.52 (5th Cir. 2009) (medical monitoring relief only available when mandated by statute). Nevertheless, a court in

46

admiralty may "occasionally" use state law to "fill [in] the gaps in an incomplete and less than perfect maritime system." *J. Ray McDermott & Co., Inc. v. Vessel Morning Star*, 457 F.2d 815, 818 (5th Cir. 1972) (en banc); *see also Coastal Iron Works, Inc. v. Petty Ray Geophysical*, 783 F.2d 577, 582 (5th Cir. 1986); *Rogers v. Coastal Towing, L.L.C.*, 723 F. Supp. 2d 929, 933 (E.D. La. 2010) (noting that state law may be applied "where it serves to supplement, but not contravene, the general maritime law by filling a 'gap' therein."). There are, however, "limits to such supplementation" or gap-filling. *Rogers*, 723 F. Supp. 2d at 933. State law may not fill in the gaps in the general maritime law if state law (1) conflicts with an applicable act of Congress, (2) works material prejudice to a characteristic feature of the general maritime law, or (3) interferes with the proper harmony and uniformity of the general maritime law in its international and interstate relations. *See Southern Pacific Co. v. Jensen*, 244 U.S. 205, 216 (1917); *J. Ray McDermott & Co., Inc.*, 457 F.2d at 818.

Here, the B(3) Master Complaint seeks to invoke Florida's medical monitoring law, which permits relief even when a plaintiff has yet to develop any identifiable physical injuries or symptoms. *See Petito v. A.H. Robins*, 750 So. 2d 103 (Fla. Dist. Ct. App. 1999). This approach to medical monitoring differs greatly from the approaches taken by other States. For example, Louisiana, Alabama, Mississippi and Texas do not allow medical monitoring claims "unless said medical monitoring is directly related to a manifest physical or mental injury or disease." *Landry v. Avondale Indus., Inc.*, 864 So. 2d 117, 123 n.2 (La. 2003); *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, No. 07-md-1873, 2008 U.S. Dist. LEXIS 103249, *62-68 (E.D. La. Dec. 12, 2008).

Given that "medical monitoring is not treated uniformly throughout the United States," *In re Prempro Prod. Liab. Litig., 230 F.R.D. 555, 569 (E.D. Ark. 2005)*, an application of Florida

law in this case would impair the uniformity and simplicity favored by the general maritime law and produce precisely the sort of discord "*Jensen* sought to avoid."  *Rogers*, 723 F. Supp. 2d at 936.   Accordingly, because using Florida state law on medical monitoring to supplement the general maritime law would undermine the "strong federal maritime policy favoring national uniformity," *Augman v. Seacor Marine L.L.C.*, No. 07-1508, 2007 U.S. Dist. LEXIS 68557, *7 (E.D. La. Sept. 17, 2007), and run afoul of the third limitation articulated in *Jensen*, the Florida medical monitoring claim in the B(3) Master Complaint must be dismissed.

## VII.   THE PUNITIVE DAMAGES CLAIMS AGAINST MSRC IN THE B(3) MASTER COMPLAINT ARE NOT LEGALLY VIABLE UNDER THE GENERAL MARITIME LAW

As a threshold matter, MSRC submits that Plaintiffs' punitive damages claims should be dismissed as a matter of law because under the general maritime law punitive damages are not supported by the law of this circuit.  *Bardwell v. George G. Sharp, Inc.*, No. 93-3590, 1995 U.S. Dist. LEXIS 12624, *7 (E.D. La. Aug. 29, 1995).

Even if the Court concludes that punitive damages may be available under the general maritime law in this context, Plaintiff's claims for punitive damages should be dismissed because Plaintiffs' factual allegations are not legally sufficient to impose such an award.   Under the general maritime law, punitive damages are limited to cases where the defendant's conduct is outrageous owing to gross negligence; willful, wanton and reckless indifference; or behavior even more deplorable.  *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 586 (2008).  *see also Legros v. Panther Servs. Group Inc.*, 863 F.2d 345, 353 (5th Cir. 1988) (punitive damages appropriate when conduct in question is "callous and recalcitrant, arbitrary and capricious, or willful, callous, and persistent"); *Harper v. Zapata Off-Shore Co.*, 741 F.2d 87, 90 (5th Cir. 1984)(punitive damages only appropriate if defendant's conduct exhibits bad faith).   Here,

48

MSRC's response to the Oil Spill under the authorization, direction, and ultimate control of the federal government cannot be, as a matter of law, "the type of outrageous conduct that justifies imposing punitive damages."  *Miles v. Melrose*, 882 F.2d 976, 989 (5th Cir. 1989).

Plaintiffs fail to allege any facts sufficient to establish that MSRC was in any way grossly negligent.  *See* Point V.C., *supra*.  Plaintiffs also fail to allege any facts sufficient to establish that MSRC acted with malice, or even callousness, leading to Plaintiffs' injuries.  Plaintiffs' vague allegations that Dispersant Defendants acted "recklessly, willfully and/or wantonly" by their use of chemical dispersants (B(3) Master Compl. ¶341), or that Dispersant Defendants "recklessly, willfully and/or wantonly failed to ensure that Plaintiffs would be adequately protected from exposure to harmful chemicals in oil, chemical dispersants" (*id*. at 342) are conclusory assertions, not factual allegations, which even if true, which MSRC denies, plausibly support a claim that MSRC was willfully, wantonly or recklessly indifferent to causing or contributing to Plaintiffs alleged injuries.  Further, Plaintiffs' allegations that Defendants' conduct was "motivated by financial gain" or "financial advantage" (*id*. at ¶345), or that attempts to clean up the Oil Spill were "focused primarily on profit while disregarding public and environmental health and safety" (*id*. at ¶159) is illogical when applied to MSRC because MSRC is a non-profit corporation.  (*Id*. at ¶54.)  For these reasons, Plaintiffs have no legally viable claim for punitive damages and the Court should dismiss all such claims in the B(3) Master Complaint against MSRC as a matter of law.

## <u>CONCLUSIONS</u>

For the foregoing reasons, MSRC respectfully requests that the Court enter an order pursuant to Fed. R. Civ. P. 12(b)(6) dismissing all claims in the B(3) Master Complaint against MSRC.

Dated:   New York, New York
      February 28, 2011

          Respectfully submitted,

          **BLANK ROME LLP**
    By: <u>/s/ Alan M. Weigel   </u>
          Alan M. Weigel, Esq.
          Attorneys for Marine Spill Response Corporation
          The Chrysler Building
          405 Lexington Avenue
          New York, NY 10174
          Telephone: 212-885-5000
          Facsimile: 917-332-3836
          E-mail: aweigel@blankrome.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Memorandum of Law in Support of Motion to Dismiss has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, on this 28th day of February 2011.

/s/ Alan M. Weigel
Alan M. Weigel

51