UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * * | MDL NO. 2179 SECTION J |
| THIS DOCUMENT RELATES TO: | * | JUDGE CARL J. BARBIER |
| *ALL CASES IN PLEADING BUNDLE SECTION III.B(3)* | * | MAG JUDGE SALLY SHUSHAN |
| *     *     *     *     *     *     *     * | | |

**MEMORANDUM ON BEHALF OF INTERNATIONAL AIR RESPONSE, INC. IN SUPPORT OF MOTION TO DISMISS CLAIMS AGAINST IT CONTAINED IN THE B3 BUNDLE MASTER COMPLAINT**

International Air Response, Inc. ("IAR") respectfully submits the following Memorandum in Support of its Motion to Dismiss the claims asserted against it in the Master Complaint in Accordance with PTO No. 11 Section IIIB.(3) (Doc. 881) (hereinafter, the "B3 Bundle Master Complaint" or "B-3 Bundle") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  In addition, IAR asserts Rule 12(b)(1) and 12(b)(2) defenses as well.

**Introduction**

The *Deepwater Horizon* drilling ship exploded in the Gulf of Mexico on April 20, 2010, causing, pursuant to the National Contingency Plan required by the Oil Pollution Act of 1990 ("OPA").

A National Contingency Plan was required by Congress in 33 U.S.C. § 1321(d)(2) which *includes* the "**dispersal**" of oil discharges.  The President, pursuant to the Congressional directive of § 1321(d)(1), issued Executive Order No. 12777 on October 18, 1991 (found at 33 U.S.C. § 1321 at p. 413) which (at § 1(a)(3)) amended October 18, 1991 (pocket part p. 68) placed the representative of the U.S. Environmental Protective agency and the representative of

the Coast Guard as Vice Chairman of the National Contingency Plan Committee. The Coast Guard was designated as Chairman for the Response Action for a coastal oil spill. (§ 1(a)(3)).

The Deepwater Horizon oil spill was quickly designated by the Coast Guard as the first "Spill of National Significance" under OPA and the Clean Water Act, 33 U.S.C. § 1321.. The President described it as "the worst environmental disaster America has ever faced."[1] IAR, however, did not cause the initial explosion or the resulting oil spill. According to the allegations, IAR first came in the scene as a subcontractor for one of BP's Oil Spill Removal Organizations ("OSRO"), who were integral parts of the National Contingency Plan. IAR, as plaintiff's allege, only acted to apply Corexit® as directed by BP and the Government. What it did was exactly what the OPA and CWA intended to occur.

No one alleges IAR played any role in causing the blowout, the fire, the sinking of the rig, or in any way caused a drop of some 200 million gallons of oil to spill as plaintiffs allege occurred as a result of the blowout. Nor is it alleged that IAR was involved with any efforts to cap the well. Rather, IAR was called in to follow directions to execute decisions to use dispersants as part of the contingency response to the oil spill, all pursuant to a federally mandated and approved Area Contingency Plan being overseen by the On-Scene Coordinator – the U.S. Coast Guard, all as part of the plan crafted not by IAR, but by BP and its partners. After the explosion, this plan was overseen by the Federal On-Site Coordinator as provided for by Congressional Act.

Now, IAR, in its role as one of the mere "hired help," is being sued in the B3 Bundle Master Complaint for alleged damages due to the presence of Corexit® in the water and related

---

[1] President Barack Obama, "Remarks by the President to the Nation on the BP Oil Spill" (June 15, 2010), *available at* http://www.whitehouse.gov/the-press-office/remarks-president-nation-bp-oil-spill. Much of this fact outline and description of the comprehensive federal scheme as to the response purposefully follow the arguments on derivative immunity and federal preemption made by O'Brien's Response Management and MSRC,, for which credit is duly given.

alleged general exposures to the Corexit® dispersants used on the oil spill that were approved for this use by the EPA, and desired for this use by the Coast Guard, and which were chosen by and supplied through BP, with full knowledge of their properties, and without seeking or receiving any advice or recommendations from IAR as to using them. Instead, IAR was directed where to apply the Corexit®, and acted solely as a means of mechanically applying the desired substances to reported oil slicks that were fouling the Gulf, all as a directed but small part of the complex response, mitigation and clean-up effort that was orchestrated by the federal government and BP after the spill. *See* B3 Bundle Master Complaint ¶¶ 59 (alleging that IAR "participated in the post-explosion Oil Spill remediation and response efforts"), with *one* plane.

Because the actions of IAR alleged in the B3 Bundle Master Complaint were authorized, directed, and ultimately controlled by the federal government pursuant to the Clean Water Act ("CWA") and the National Contingency Plan ("NCP") that Congress directed to be in place for just such events *not* of the contract responders' making, and which *specifically included* "dispersal" of spilled oil, IAR has derivative federal immunity for the activities alleged in the Master Complaint. In addition, conflict preemption protects IAR from liability as well. In short the CWA provides absolute immunity to the federal government in connection with oil spill response efforts and, in order to protect and enable the government's discretionary authority over this area of significant federal interest, IAR must share in such immunity for the benefit to the federal government sought by Congress to be effective. Consequently, the B3 Bundle Master Complaint should be dismissed in its entirety as against IAR. The claims against IAR in the B3 Bundle Master Complaint should also be dismissed for the separate or alternative reason that all of the claims asserted are preempted pursuant to the doctrine of implied conflict preemption in light of the CWA, OPA and the NCP.

Alternatively, and only if the claims against IAR are not dismissed in their entirety on derivative federal immunity and/or preemption grounds, several of the claims nevertheless fail as a matter of law for the additional and independent reasons discussed below.

## I.     Federal Authority and Control Over the Oil Spill Response[2]

The CWA, as amended by the Oil Pollution Act of 1990 ("OPA") following the *Exxon Valdez* spill, reflects the intent of Congress to ensure preparation for and thus a rapid response to oil spills, and, given the national interests involved, to have preapproved response modalities and to vest strong oversight and decision-making authority in the federal government over any large spills.  To that end, the CWA mandates that "[t]he President [of the United States] shall prepare and publish a National Contingency Plan for removal of oil and hazardous substances," and that the NCP "shall include … [a] schedule … identifying dispersants, other chemicals, and other spill mitigating devices and substances, if any, that may be used in carrying out the Plan."  33 U.S.C. § 1321(d)(1)-(2); *see also* B3 Bundle Master Complaint ¶ 109 ("[T]he United States Oil Spill National Contingency Plan permits spraying of chemical dispersants at least 3 miles offshore or where the water is at least 10 meters deep.").  Moreover, the CWA requires the pre-designation of a federal official for each of various geographical regions "who shall be the Federal On-Scene Coordinator" for that region in the event of a spill, to avoid the delay that would be associated with selecting an individual to fill this post after a spill occurs.  33 U.S.C. § 1321(d)(2)(K).

---

[2] This factual summary is based on federal statutes, federal regulations, and three public documents produced by the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (its Final Report and two Staff Working Papers).  In ruling on this motion to dismiss, the Court can consider "matters of which [it] may take judicial notice."  *Lovelace v. Software Spectrum*, 78 F.3d 1015, 1018 (5th Cir. 1996).  Accordingly, because "the Court is authorized to take judicial notice of the official government publications," it may properly consider the three public documents produced by the Commission.  *See Canales Martinez v. Dow Chem. Co.*, 219 F.Supp 2d 719, 734 n.24 (E.D. La. 2002).  As referenced below, those three documents are available on the internet and are also attached to O'Brien's motion as exhibits, which IAR, for space saving purposes, adopts and incorporates herein by reference.

In the event of a spill, the CWA provides that "[t]he President *shall*, in accordance with the National Contingency Plan and any appropriate Area Contingency Plan, ensure effective and immediate removal of a discharge … of oil … into or on the navigable waters." 33 U.S.C. § 1321(c)(1)(A) (emphasis added).  Pursuant to the NCP, if an oil spill "poses or may present a substantial threat to public health or welfare of the United States," the Federal On-Scene Coordinator "*shall direct all* federal, state, or *private actions* to remove the discharge."  40 C.F.R. § 300.322(b) (emphasis added); *see also* 40 C.F.R. § 300.120; 40 C.F.R. § 300.135. Finally, an oil spill may be designated a "Spill of National Significance" if, "due to its severity, size, location, actual or potential impact on the public health and welfare or the enfironment, or the necessary response effort," the spill is "so complex that it requires extraordinary coordination of federal, state, local and responsible party resources to contain and clean up."  40 C.F.R. § 300.5.  In the event a spill is designated a Spill of National Significance, the United States Coast Guard may appoint a "National Incident Commander' to "assume the role" of the Federal On-Scene Coordinator in "communicating with affected parties and the public, and coordinating federal, state, local, and international resources at the national level."  40 C.F.R. § 300.323(c). This is exactly what occurred after the *Deepwater Horizon* explosion and fire.

Following the explosion on the *Deepwater Horizon*, this comprehensive federal response structure was immediately put into action.  Captain Joseph Scott Paradis, the Commander of the Coast Guard's Marine Safety Unit at Morgan City, Louisiana, "became the first Federal On-Scene Coordinator" under the NCP as helicopters from his sector "searched for missing crew members … as the *Deepwater Horizon* burned."[3]  More and more Coast Guard personnel and

---

[3] *See* NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Report to the President:  Deep Water – The Gulf Oil Disaster and the Future of Offshore Drilling*, at 130 (Jan 2011), *available at* http://www.oilspillcommission.gov/.  Relevant excerpts from the Commission's Final Report are attached as Exh. A to O'Brien's memorandum.

resources became involved, and on April 21, Rear Admiral Mary Landry took over as Federal

On-Scene Coordinator."[4]   As is described in the National Commission's report, the

organizational structure mandated by federal law was described thusly:

> At 10:22 a.m. on April 22, the rig sank, taking with it the diesel fuel still on board.
> By that time, the Coast Guard had established an Incident Command Post in a BP
> facility in Houma, Louisiana.  BP had formed a command post in its corporate
> headquarters in Houston, Texas shortly after the explosion, and the Coast Guard
> established an Incident Command Post there as well.  These Incident Command
> Posts, along with one in Mobile, Alabama, and others established later, would
> become the centers of response operations, with their activities directed by the
> Federal On-Scene Coordinator as part of the government's Unified Command.[5]

On April 29, 2010, the Coast Guard designated the *Deepwater Horizon* spill a Spill of National

Significance, the first oil spill to ever be so designated.[6]   On May 1, 2010, Secretary of

Homeland Security Janet Napolitano "announced that Admiral Thad Allen, the outgoing

Commandant of the Coast Guard and then its only four-star Admiral, would serve as National

Incident Commander."[7]

"During the *Deepwater Horizon* spill response, the National Incident Commander

coordinated interagency efforts on the wide variety of issues responders faced, and dealt with

high-level political and media inquiries, while the Federal On-Scene Coordinator generally

retained oversight of day-to-day operations."[8]  Indeed, "[a]lthough the unified command system

is designed to bring together different stakeholders to make decisions, one individual needs to

---

[4] *Id.*  "On June 1, Admiral Landry returned to her Eighth District duties to prepare for hurricane season, and Admiral
James Watson became [the Federal On-Scene Coordinator].  He later transferred the position to Admiral Paul
Zukunft."  NATIONAL COMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE
DRILLING, *Staff Working Paper No. 2:  Decision-Making Within the Unified Command*, at 4 n.19 (Jan. 11, 2011),
*available at* http://www.oilspillcommission.gov/sites/default/files/documents/Updated%20Unified%20Command%2
0Working%20Paper.pdf, and attached as Exh. B to O'Brien's brief.

[5] NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING,
*Report to the President:  Deep Water – The Gulf Oil Disaster and the Future of Offshore Drilling, supra* note 4, at
131.

[6] *See Id.* at 136.

[7] *Id.*

[8] *Id.*

have ultimate decision-making power in the event of a conflict," and "that individual is the Federal On-Scene Coordinator."[9]   For example, "[a]t the direction of the Federal On-Scene Coordinator, responders first sprayed dispersants on the surface oil slick on April 22" and, "[w]ith the permission of the Federal On-Scene Coordinator, BP and its contractors applied 14,654 gallons of the dispersant Corexit® on the surface during the week of April 20 to 26."[10] Dispersant use increased as the response continued, but "[a]fter the well was capped on July 15, 2010, there was virtually no further use of dispersants."[11]   Ultimately, "a total of 1.84 million gallons" of dispersant were applied, "of which 1.07 million gallons were applied on the surface and 771,000 gallons were [applied] subsea."[12]

"The effect of pre-approval" of dispersants in the NCP "is to eliminate the need for approvals and consultations during the response and to allow the Federal On-Scene Coordinator to act unilaterally."[13]   Indeed, in an August 1, 2010 press conference, "Admiral Allen noted that the decision to use the dispersants did not rest with BP [or, its contractors or subcontractors for that matter].   Rather, he said, 'it's a decision by the Federal on-scene coordinator' through a 'very disciplined doctrinal process.'"[14]

As is outlined in great detail in Nalco's 12(b)(6) submission, the Coast Guard expressly asked Nalco to manufacture and supply Corexit® for use in large oil spills.   (Letter, Admiral

---

[9] NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Staff Working Paper No. 2: Decision-Making Within the Unified Command, supra* note 5, at 4.

[10] NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON IL SPILL AND OFFSHORE DRILLING, *Report to the President: Deep Water – The Gulf Oil Disaster and the Future of Offshore Drilling, supra* note 4, at 143-44.   Although EPA Administrator Lisa Jackson "ultimately gave EPA's approval for subsea dispersant use," IAR was not involved in the subsea application of dispersants. *Id.* at 145.

[11] NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Staff Working Paper No. 4: The Use of Surface and Subsea Dispersants During the BP Deepwater Horizon Oil Spill*, at 12 (Jan. 11, 2011), *available at* http://www.oilspillcommission.gov/sites/default/files/document s/Updated%20Dispersants%20Working%20Paper.pdf, and attached as Exh. C to the O'Brien brief, which is incorporated herein by reference for that purpose.

[12] *Id.*   For purposes of this brief, all references to Corexit® use the term as a recognized registered trademark of Nalco, and in the two versions identified by plaintiffs.

[13] *Id.* at 5.

[14] *Id.* at 12.

Paul Zukunft, 7/12/10). The product was pre-approved by the USEPA for the exact sue complained of in the Master Complaint, as of "invaluable benefit to our country." *Id.*

As Nalco further points out, Corexit® was part of all the Gulf States' Area Contingency Plans ("ACP"), consistent with EPA's prelisting of use of Corexit® as an approved response modality as part of the National Contingency Plan authorizations made by the President under 33 U.S.C. § 1321(c)(1). The use of Corexit® for the *Deepwater Horizon* oil spill response was decided and approved as an integral part of the National Contingency Plan and the Area Contingency Plans, all wholly without any involvement by IAR.

The public record cited by Nalco shows that Corexit® 9527 was listed long before this oil spill as a National Contingency Plan Product and in the ACP's of Louisiana, Florida, Alabama, Mississippi and Texas. It is for this reason, and the approval of the On-Scene Coordinator that these dispersants were available for immediate use.

The Department of Homeland Security officially designated the spill as a Spill of National Significance by April 29, 2010, about a week after the blowout. Use of dispersants was a critical part of the anticipated, desired and approved response, a decision that cannot by this lawsuit be overturned or questioned.

The B-3 Master Complaint does *not* suggest that IAR had anything to do with crafting, overseeing or having any input into the Response Plan, and in particular, as to the decisions and approvals to apply dispersants by air, surface application and by sub-sea application at the well site. For this reason, the complaint does not state a claim against IAR for any alleged damage or injury resulting from Corexit® being present in the water or on the oil.

8

**II.    Role of IAR In the *Deepwater Horizon* Response**

IAR's alleged aerial application to floating crude oil was performed solely within the context of acting, as hired help, to execute, with one plane, a small part of the response that was authorized, directed, and ultimately controlled by the federal government, as part of the response to the oil spill of others' making, as mandated by the Clean Water Act and OPA.  *See* B3 Bundle Master Complaint ¶ 92 ("The U.S. Coast Guard is responsible for ... responding to oil spills and supervising and/or coordinating response actions."); *id.* ¶ 109 ("The Coast Guard's Federal On-Scene Coordinator ... must approve BP's requests to use chemical dispersants.").

The Government and BP necessarily relied on contractors to actually execute the physical tasks that the Contingency Plan anticipated would be needed.  None of these "hired hands" like IAR, were responsible for a drop of spilled oil.  They were hired to help accomplish what BP and the Government directed – nothing more.  Use of dispersants was anticipated by Congress to be necessary in order to effectuate the National Contingency Plan and respond to large spills as a means to reduce the ultimate damage to the environment, the Congressional end result under the CWA.

**III.   The Claims At Issue**

In Pretrial Order No. 11 (Case Management Order No. 1) (Rec. Doc. 569), the Court established eight separate "pleading bundles" for different categories of cases and claims in this multidistrict litigation.  The B3 pleading bundle was initially designated the "Post-Explosion Clean-Up Claims" bundle in Pretrial Order No. 11, but was subsequently renamed the "Clean-Up, Medical monitoring, and Post-April 20 Personal Injury Claims" bundle and revised to include "all claims, of any type, relating to post-explosion clean-up efforts asserted against Defendants not named in the B1 Master Complaint, as well as all claims for personal injury

and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 20, 2010." Pretrial Order No. 25 (Rec. Doc. 983).[15]

Specifically, the B3 Bundle Master Complaint asserts the following claims against IAR:

- Negligence (Third Claim for Relief - ¶¶ 219-28)

- Gross Negligence (Fourth Claim for Relief - ¶¶ 229-36)

- Negligence *Per Se* (Fifth Claim for Relief - ¶¶ 237-42)

- Nuisance (Seventh Claim for Relief - ¶¶ 259-71)

- Battery (Eighth Claim for Relief - ¶¶ 272-77)

- "Florida Plaintiffs'" Medical Monitoring Claim (Ninth Claim for Relief - ¶¶ 278-88)

- Strict Liability Pursuant To The Florida Pollutant Discharge Prevention And Control Act Fla. Stat. § 376.011, *et seq* (Eleventh Claim for Relief - ¶¶ 307-20)

The five categories of plaintiffs identified in the B3 Bundle Master Complaint include (a) boat captains and crew involved in the Vessels of Opportunity program ("VoO"), (b) workers involved in decontaminating vessels that came into contact with oil and/or chemical dispersants, (c) vessel captains and crew who were not involved in the Vessels of Opportunity program but who were exposed to harmful chemicals, odors and emissions during post-explosion clean-up activities, (d) clean-up workers and beach personnel who were involved in clean-up activities along shorelines and intercoastal zones, and (e) residents who live and work in close proximity to coastal waters. *See* B3 Bundle Master Complaint ¶ 21.

---

[15] The B1 pleading bundle includes non-governmental economic loss and property damage claims. Paragraph 18 of Pretrial Order No. 25 also deleted the second sentence of paragraph 18 of the B3 Bundle Master Complaint such that no causes of action from the B1 Bundle Master Complaint are incorporated into the B3 Bundle Master Complaint. Neither O'Brien's nor NRC are named as defendants in the B1 Bundle Master Complaint.

### 12(b)(6) The Pleading Standard

In recent years, the United States Supreme Court has clarified and tightened the minimum pleading standards for a complaint to survive a motion to dismiss. *See, e.g., Bell Atl. Corp. v. Twombly*, 50 U.S. 544 (2007); *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009). To avoid dismissal under Rule 12(b)(6), a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," and must be, at a minimum, "plausible" in the circumstances presented. *Twombly*, 550 U.S. at 555, 570. "A claim is facially plausible when the plaintiff pleads facts that allow the court to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Who Dat Yat LLC v. Who Dat? Inc.*, Nos. 10-1333 & 10-2296, 2011 WL 39043, at *5 (E.D. La. Jan 4, 2011) (quoting *Iqbal*, 129 S.Ct. at 1949); *see also In Re Southern Scrap Material Co., LLC*, 541 F.3d 584, 587 (5th Cir. 2008) (explaining that a complaint must state "'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements") (quoting *Twombly*, 550 U.S. at 556).

A complaint must contain either direct or inferential allegations with respect to all of the material elements of each claim, particularly as to heightened liability thresholds. Mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 129 S.Ct. at 1949. "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should … be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (internal quotation omitted).

**Argument – Rule 12 Motions**

I.      **Failure of Article III Case and Controversy**

IAR first objects under Rule 12(b)(1) and 12(b)(6) to the absence of an Article III "case of controversy."  There must be specific plaintiffs who make specific, fact-based claims that they specifically suffered an injury at a specific place and time, due to the acts of IAR.  There is no "group liability allowed."  *See, e.g.,* Judge Vance's opinion in *Barasich v. Columbia Gas Transmission Co.*, 467 F.Supp.2d 676 (E.D. La. 2006), on which Judge Duval relied in rejecting group liability in the Dredging Limitation Action, No. 06-8676, Doc. No. 193, opinion and reasons 6/12/08 at p. 16, affirmed *sub non Great Lake Dredge and Dock Co. v. Louisiana*, 624 F.3d 201, 214-15 (2008).  IAR respectfully objects to the Plaintiffs' Steering Committee having filed a "master complaint" on behalf of nameless plaintiffs who have yet to be identified.  FRCP Rule 18(a) requires every claim to be prosecuted in the name of the real party in interst.  Along with several other defendants, the B3 Bundle Master Complaint refers to IAR as an otherwise undifferentiated "Dispersant Defendant," which is insufficient under Article III given the circumstances presented and the claim being made.

The specific claims and allegations are separately discussed below, where they are made the subject of 12(b)(6) challenges.  Being beyond the scope of this Rule 12 motion, IAR notes the patent inappropriateness of the class action status sought herein, but reserves its challenge to any class certification for another day.[16]

---

[16] Although the claims asserted in the B3 Bundle Master Complaint are patently inappropriate for class treatment, and present fatal flaws as pleaded in light of the stay on Rule 23 motion practice on class certification issues imposed by Paragraph VIII of Pretrial Order No. 11, IAR does not address such issues here, but rather specifically preserves all objections to the requests for certification of class actions contained in the B3 Bundle Master Complaint.  *See* B3 Bundle Master Complaint ¶¶ 176-93.

## II.    Rule 12(b)(2) Defense of Lack of Personal Jurisdiction

IAR is a company organized in and located near Phoenix, Arizona.   The Bundle B-3 Master Complaint purports to describe generally the claims, but does not contain or describe the claims of any particular persons, or outline any facts on which a *particular* claim is founded, so the identity and circumstances of any particular plaintiff's situation, much less that of *all* of the plaintiffs, are, for the purposes of this motion, unknown to IAR.   Because the Master Complaint fails to allege and establish the personal jurisdictional facts as to any claimant, or allow IAR to assess them, and particularly any land-side claimants, IAR pleads and preserves herein its defense that as to each and all of the particular plaintiffs, it had not "(1) purposefully availed itself of the benefits and protections of the forum state by establishing 'minimum contacts' with that state; and (2) that the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice.'"   *See, e.g., Mink v. AAA Development, L.L.C.*, 190 F.3d 333, 336 (5ᵗʰ Cir. 1999); *Choice Healthcare Inc. v. Touro Infirmary*, 615 F.3d 364, 368 (5ᵗʰ Cir. 2010).   IAR may *not* be haled into court here as to claims filed or to be filed in other states' courts as a result of random fortuitous events, or unilateral actions of third parties.   *Burger King Corp. v. Rudzewicz*, 471·U.S. 462, 475 (1985).

IAR, without first being provided the specifics of each claimant's case, cannot possibly respond further at this time, when the February 28, 2011 deadline to file Rule 12 motion expires. The resolution of the issue must be accomplished on a case to case basis for each claim.   As such, IAR asserts and preserves its rights of due process against the improper extension of personal jurisdiction against it until each and every claimant's claim is specifically pleaded and disclosed.

III.   **IAR Has Derivative Federal Immunity For All Claims Against It In the B3 Bundle Master Complaint**

    A.   <u>12(b)(1)</u>

Plaintiffs' claims against IAR must be dismissed under the derivative federal immunity. IAR was a mere contractor who acted to mechanically apply dispersants in execution of parts of the National Response program approved by Congress as a critical part of OPA and CWA. This Court has no jurisdiction to challenge Congress' decision to set up the Response Program, with the Coast Guard as On-Scene Coordinator by holding those who executed it liable for use of dispersants that the Congressionally-appointed decision makers decided to use. *C.f, Firemen's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 951 (9th Cir. 2002) (imposing additional expense dissuades the future participation and thus impairs the program). In the position it occupies as pleaded by plaintiffs, for IAR to be liable, the Court would inherently be contradicting and undermining the Congressionally-mandated National Response to this oil spill of National importance, by allowing IAR, a contractor, to be held liable for claims based simply upon the contractor performing its assigned function to support or execute a Response that it did not design or direct. This would directly undermine Congress's scheme to have effective response capabilities. In addition, it would contradict Congressional policy that the response be carried out as the On-Scene Coordinator desired, which is impossible if the contractors hired to simply apply the dispersants are to face causes of action for having applied the approved and selected dispersant.

    1.   **Standard of Review on Rule 12(b)(1)**

Plaintiffs bear the burden of proof to convince the Court that jurisdiction extends to the specific claims made. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). When deciding a Rule 12(b)(1) motion, a court may rely upon the complaint, undisputed facts in the

record, and disputed facts resolved by the Court. *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981); *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993). The Court is free to weigh the evidence in order to satisfy itself that it has power to hear the claim. No presumption of truthfulness attaches to plaintiffs' allegations, and the existence of disputed facts will not preclude the trial court from evaluating the merits of the jurisdictional claims. *Id.*, 645 F.2d at 412-13.

The Court lacks jurisdiction to entertain plaintiffs' claims against IAR and similar contractors whose sole role was to follow the directions emanating from those who Congress empowered to control, design and oversee the National Response to this Oil Spill of National Importance. This is because their role was exactly what Congress required, so to hold them liable for doing what Congress desired is nothing less than attack on Congress' will as was expressed in a statute that has not been attached as or found to be unconstitutional. The National Contingency Plan, and the Area Response Plan thereunder specifically included the use of dispersants in order to lessen the environmental impact of the oil on the coast. Their use was *Congress'* will, and in executing or carrying out that will, IAR cannot be held liable herein as a matter of law..

### 2.      Argument on 12(b)(1)

In *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18, 20-21 (1940), the Supreme Court found that where "the authority to carry out the project was validly confined, that is, if what was done was within the Constitutional power of Congress, there is no liability on the part of the contractor for executing its will. *See also, Ackerman v. Bean Dredging, LLC*, 589 F.3d 196 (5th Cir. 2009).

Plaintiffs admit in ¶ 92 that "the U.S. Coast Guard is responsible for implementing many aspects of OPA, including ... responding to oil spills and supervising/coordinating response actions."

As plaintiffs have pleaded the case, IAR operated as a small, one-aircraft contractor for MSRC who in turn operated on behalf of BP. We know from public records the role of the Coast Guard as the On-Scene Coordinator. *See* pp. 5-8 above. As for BP, plaintiffs allege at ¶ 220 (p. 50 of Doc. 881) that

> "BP has taken control of all aspects of the recovery and relief effort to attempt to contain the Oil Spill, prevent damaging the Gulf of Mexico and the shoreline, and to clean up the damage caused to date. BP owed a duty to plaintiffs, as well as to all persons who might foreseeably be harmed, to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures."

The Clean Water Act "(CWA")" provides *absolute immunity* to the federal government in connection with oil spill response efforts. See 33 U.S.C. § 1321(j)(8) ("The United States Government is not liable for any damages arising from its actions or omissions relating to any response plan required by this section."

The scope of OPA and CWA is patent as is the Congressional objective and policies behind the emergency response objectives. The Government oversight here of the response is uncontested. The role of IAR as a mere one-aircraft application contractor is expressly pleaded. That BP and the government directed the response is expressly pleaded, as is the absence of *any* involvement by IAR as a designer of the response or having *any* involvement in the release of the oil into the sea or coordinating the response efforts is patent on the face of the complaint.

All claims against IAR should be dismissed pursuant to Rule 12(b)(1) as being outside the Court's subject matter jurisdiction based on *Yearsley.*

B.     Rule 12(b)(6) Alternative Grounds for *Yearsley*-Based Dismissal

The allegations contained in the B3 Bundle Master Complaint are insufficient as a matter of law to sustain any of the seven causes of action alleged against IAR.  Because all of IAR's activities challenged by the B3 Bundle Master Complaint were authorized, directed and ultimately controlled by the federal On-Scene Coordinator and/or the National Incident Commander (including any use of dispersants), IAR has derivative federal immunity for such activities and all causes of action against IAR should be dismissed on the basis of 12(b)(6).  *E.g., Yearsley.*  Similarly, for the same reason, the claims against IAR in the B3 Bundle Master Complaint are preempted pursuant to the doctrine of implied conflict preemption.  Alternatively, and only if the claims against IAR are not dismissed in their entirety on derivative immunity and/or preemption grounds, those claims nevertheless fail to state a claim for which relief can be granted as a matter of law on additional grounds.

### 1.     Derivative Immunity

For the same reasons set forth above, IAR is entitled to dismissal of the claims against it arising out of or based upon its participation in executing the part of the Response Plan which involved the use (application) of dispersants, including Corexit®.

The Fifth Circuit in *Ackerson v. Bean Dredging*, 589 F.3d 196 (5th Cir. 2009), found that a *with-prejudice* dismissal based on the above immunity was appropriate under Rule 12(b)(6).  IAR is in an equivalent, if not stronger position than was Bean Dredging, as it was merely the physical means of applying the dispersant that had been chosen by sophisticated response supervisors, including the Coast Guard as the On-Site Coordinator, to be applied to the floating oil in order to moderate the effects of the spill on the coastline.  That decision is part of the discretionary authority over an issue of great national interest and cannot be undermined via tort

suits against persons like IAR.  Regardless of whether it is via lack of jurisdiction because of shared sovereign immunity, or via the substantive defense provided by *Yearsley* (or conflict preemption as is discussed later), the result is the same – there should be a dismissal of the claims against IAR and those like it.

If the decision to use Corexit® to disperse the crude oil residues falls within the "discretionary function exception" of liability for the federal government under 28 U.S.C. § 2680(a), then IAR, as the mere tool of the government's discretionary call, cannot, consistent with the doctrine, be held liable.  In particular, it cannot be held liable for any alleged damage or injury allegedly resulting from the presence of the Corexit® on the water or in the oil.

First, IAR is not alleged to have possessed, much less exercised discretion as to choosing to employ dispersants generally, and the Corexit® dispersant specifically.  If the Coast Guard is not liable for having made the judgment call,[17] IAR certainly cannot be held to stand in its place as a sacrificial lamb.  The ability to obtain help to execute the Response Plan would be rendered nugatory.  Moreover, the costs of the liability would inevitably make their way back to the U.S. should contractors like IAR be allowed to be pursued as they are herein.  *E.g., Dolphen Gardens v. United States*, 243 F.Supp 824, 827 (D. Conn. 1965).

Because the actions of IAR that are the subject of the B3 Bundle Master Complaint were actions performed pursuant to the authorization, direction and ultimate control of the federal government, IAR must share in the federal government's broad immunity for such actions under the CWA and NCP.  *See* 33 U.S.C. § 1321(j)(8) ("The United States Government is not liable for

---

[17] For example, in *Payne v. United States*, 730 F.2d 1434 (11th Cir. 1984), the court held that redesign and dredging of the Tombigee River, to the alleged damage of an adjacent landowner, was a discretionary function.  Similarly, in *Mocklin v. Orleans Levee District*, 690 F.Supp. 527 (E.D. La. 1988), the decision to employ flotation channels was held to be a discretionary function.  The same result occurred in *Dolphen Gardens v. United States*, 243 F.Supp. 824, 826 (D. Conn. 1965) with respect to fumes that resulted from the decision to employ dredging.  The "failure to take precautions to prevent escape of fumes" was not negligence, but merely an inseparable part of the decision to employ the dredging modality, the decision to use it being part of the discretionary function.  *Id.* at 826-27.

any damages arising from its actions or omissions relating to any response plan required by this section."). This is absolute immunity.

The concept of derivative immunity for parties acting under the direction and control of the federal government in the exercise of legitimate federal authority was established over seventy years ago in *Yearsley v. W.A. Ross Construction*, 309 U.S. 18 (1940). The purpose of such derivative immunity is not to protect private parties *per se*, but "solely as a means of protecting the government's discretionary authority over areas of significant federal interest." *In Re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 89-90 (2d Cir. 2008).

In discussing derivative immunity for actions taken by private parties in response to the 9/11 terrorist attacks on the World Trade Center, the United States Court of Appeals for the Second Circuit held "that the rationale for the government contractor defense would extend to the disaster relief context due to the unique federal interest in coordinating federal disaster assistance and streamlining the management of large-scale disaster recovery projects." *In Re World Trade Center Disaster Site Litig.*, 521 F.3d 169, 197 (2d Cir. 2008). Although the Second Circuit was discussing derivative immunity under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, which was invoked in response to the terrorist attacks (just as it was in response to Hurricane Katrina), the court's reasoning applies with even greater force in this case, and to IAR. As the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling recently explained, the federal government plays a "fundamentally different role" when responding to an oil spill disaster under the CWA and NCP than it does when it responds to a disaster under the Stafford Act: "Instead of a state-run response supplemented with federal resources and financing, the NCP demands that the federal government direct the

response through a Federal On-Scene Coordinator."[18]   Congress demanded this direct role in order to avoid problems perceived from the lack of such oversight powers after the Exxon Valdez spill.  Indeed, the NCP "gives the Federal On-Scene Coordinator the power to direct all response actions."[19]   "Thus, while the Stafford Act envisions a state-directed (though in part federally funded) response, the National Contingency Plan puts federal officials in charge."[20]   As a result, the need for derivative immunity for IAR is even more compelling here than it was for contractors in the 9/11 litigation.

Private entities such as IAR are entitled to derivative federal immunity when they perform work pursuant to the authorization and direction of the federal government and the acts of which plaintiffs complain fall within the scope of those government directives.  *See Yearsley*, 309 U.S. at 20-21; *In Re World Trade Center*, 521 F.3d at 196.  In assisting with the clean-up of the *Deepwater Horizon* spill, IAR was acting pursuant to the authorization, direction, and ultimate control of the federal government.  *See* B3 Bundle Master Complaint ¶ 92 ("The U.S. Coast Guard is responsible for … responding to oil spills and supervising and/or coordinating response actions."); *Id.* ¶ 109 ("The Coast Guard's Federal On-Scene Coordinator … must approve BP's requests to use chemical dispersants."); *see also supra* Statement of Facts, Parts I-II.  In responding to the *Deepwater Horizon* spill, the federal government did not simply issue directions for IAR, and the other responders to follow, but was – making the defense here stronger than it was in *Yearsley* – itself present in the Gulf region performing its own lead-agency role by managing, directing and approving all aspects of the response in real time and

---

[18] *See* NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Staff Working Paper No. 2, Decision-Making Within the Unified Command, supra* note 5, at 17.
[19] NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, *Report to the President:  Deep Water – The Gulf Oil Disaster and the Future of Offshore Drilling, supra* note 4, at 138.
[20] *Id.*

making decisions regarding how best to conduct the containment and clean-up efforts. This included, among other things, decisions about the use of dispersants.

The availability of derivative federal immunity in this case is reinforced by Congress' desire, reflected in the CWA and OPA, to promote effective and efficient responses to oil spills. In order for the federal government to achieve these dual goals, it is a "given" that private parties are called upon to implement the directives of the Federal On-Scene Coordinator and/or National Incident Commander, and they should not have to evaluate whether it is worth the risk of being subjected to litigation before deciding to faithfully execute such federal directives. Indeed, denying derivative immunity to entities such as IAR risks underminng the entire federal response structure set forth in the CWA and NCP. Application of the dispersants was a mandatory and critical part of the Response that IAR merely helped execute.

Moreover, unlike the federal government's "discretionary function" immunity under the Federal Tort Claims Act, 28 U.S.C. § 2680(a), and the Stafford Act, *see* 42 U.S.C. § 5148, the CWA provides <u>absolute immunity</u> to the federal government in connection with oil spill response efforts: "The United States Government is not liable for any damages arising from its actions or omissions relating to any response plan required by this section." 33 U.S.C. § 1321(j)(8). Therefore, because the federal government enjoys full immunity for its actions or omissions relating to its response to the *Deepwater Horizon* spill, and because its actions included approving, directing, and ultimately controlling the activities as to which IAR, as pleaded, was only "hired help" in physically flying one aspect of the response, the dispersant, as directed, to oil slicks found on the sea by BP operatives, the B3 Bundle Master Complaint should

be dismissed in its entirety as against IAR and similar defendants because IAR shares derivatively in the federal government's absolute immunity under the CWA.[21]

## 2. Discretionary Function Immunity

Alternatively and/or additionally, the "discretionary function" immunity granted the U.S. Government under the Federal Tort Claims Act, 28 U.S.C. § 2680(a), also supports derivative immunity for IAR under the pleaded and judicially noticed facts. The Federal On-Scene Coordinator was entitled and required to make quick policy decisions that qualified as discretionary calls under the FTCA. *See, e.g., Berkovitz v. United States*, 486 U.S. 531, 536 (1988), which are not to be undermined or "second guessed" "through the medium of an action in tort." *Id.*, 486 U.S. at 537-8, *quoting United States v. Varig Airlines*, 467 U.S. 797, 814 (1984).

The discretionary function immunity filters down to protect persons like IAR who simply carry out those discretionary decisions. *See, e.g., In Re World Trade Center Disaster Site Litigation*, 456 F.Supp.2d 520, 560 (S.D.N.Y. 2006); *Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1478 (5th Cir. 1989); *Gulf Refining Co. v. Mark C. Walker & Son Co.*, 124 F.2d 420, 425 (6th Cir. 1942).

Derivative discretionary function immunity is available in the emergency-response context where: (i) that the government approved reasonably precise specifications; (ii) that the

---

[21] To the extent that the claims against IAR are not dismissed in their entirety on derivative federal immunity grounds based on the overwhelming federal direction and control of the response efforts, IAR, like O'Brien's, respectfully moves in the alternative for dismissal of applicable claims under 33 U.S.C. § 1321(c)(4) for all claims that derive from the use of Corexit® as a dispersant by IAR short of a *direct* personal injury caused by *direct* application to a captain or crew while located on the sea. The responder immunity provision contained in 33 U.S.C. § 1321(c)(4) was added to the CWA by OPA and generally provides that responders are not liable for "removal costs or damages" resulting from "actions taken or omitted to be taken" in responding to oil spills. The *Deepwater Horizon* spill was the first oil spill to ever be designated a Spill of National Significance, resulting in unprecedented involvement of the federal government in authorizing, directing, overseeing, permitting, and controlling the response results in the availability of additional immunity protection for responders, namely derivative federal immunity under 33 U.S.C. § 1321(j)(8) for all claims against IAR in *this* case.

government supervised and controlled the implementation of those specifications; and (iii) that the contractor was not aware of reasons not known to the government that would make implementation of the specifications unsafe or unreasonable. *In Re World Trade Center Disaster Site Litigation*, 456 F.Supp.2d at 563; *see also Kerstetter v. Pac. Scientific Co.*, 210 F.3d 431, 435 (5th Cir. 2000). Specifications are reasonably precise if the government exercised discretion over all significant details and all critical choices. *Katrina Canal Breaches Litig. Steering Comm. V. Washington Group Int'l, Inc.*, 620 F.3d 455, 461 (5th 2010).

There can be no dispute that the cleanup actions in the Gulf of Mexico were governed by the NCP, 33 U.S.C. § 1321(d) and 40 C.F.R. Part 300 Appendix E. (*See* B(3) Master Complaint at ¶ 94, 109.) The NCP was prepared by the Federal Government and provides detailed and comprehensive procedures and standards for the "efficient, coordinated and effective action to minimize damage from oil and hazardous substance discharges, including containment, dispersal, and removal of oil and hazardous substances." *Id.* IAR had no role in preparing the NCP. There also can be no doubt that in responding to the Oil Spill, IAR acted, as the mere applicator, pursuant to the authorization, direction, and ultimate control of the federal government. (*See* B3 Bundle Master Complaint ¶ 92 ("The U.S. Coast Guard is responsible for ... responding to oil spills and supervising and/or coordinating response actions.".) Accordingly, IAR has derivative discretionary function immunity under the FTCA, and the claims against IAR in the B(3) Master Complaint should be dismissed in their entirety.

C.    The Claims Asserted Against IAR In the B3 Bundle Master Complaint are Preempted

Under the Supremacy Clause of the U.S. Constitution, federal law impliedly preempts claims made under both state law and the general maritime law when such state or maritime law "conflicts with federal law or its purpose." *Carden v. Gen. Motors Corp.*, 509 F.3d 227, 230 (5th

23

Cir. 2007); *Matter of Oswego Barge Corp.*, 664 F.2d 327, 337-38 (2d Cir. 1981). Such a conflict exists either "when compliance with both federal and state regulations is a physical impossibility," *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982), or when a plaintiff's claims "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Both circumstances exist in this case.

First, to the extent that the B3 Bundle Master Complaint alleges that the actions of IAR in responding to the *Deepwater Horizon* spill violated state or maritime law, it would have been physically impossible for IAR to have complied with such laws without violating or undermining the CWA, OPA, and the National Contingency Plan, which included use of the dispersants at issue herein. *See De la Cuesta*, 458 U.S. at 153. As explained above, federal law provides that the Federal On-Scene Coordinator "shall direct all federal, state, or private actions to remove the discharge." 40 C.F.R. § 300.322(b). Thus, federal law, in effect, imposed a duty on IAR to obey the directives of the Federal On-Scene Coordinator and National Incident Commander. If IAR had refused to obey such federal directives in order to conform to their purported duties under state or maritime law, they would have impaired the very response decision-making structure imposed by Congress and thus violated the CWA, OPA, and the NCP. To *accomplish* any response requires someone to *execute* the decision made by those to whom Congress delegated the authority. No such persons, if made liable for applying dispersants or other measures that were decided by those in charge, would ever participate, as it would never be worth the risk. Nothing could safely be accomplished, even when decided by the On-Scene Coordinator in complete compliance with the NCP and ARP, thus thwarting the very process Congress desired.

Second, the claims against IAR in the B3 Bundle Master Complaint "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in promoting an effective and efficient federal response to significant oil spills. *Hines*, 312 U.S. at 67. The President shall ... ensure effective and immediate removal of a discharge ... of oil[.]" 33 U.S.C. § 1321(c)(1)(A)  The whole purpose of the B3 Bundle Master Complaint is to have the Court or a jury second guess the response activities that were the subject of real-time and on-scene expert judgments of the Coast Guard and the other federal agencies that authorized, directed, and controlled the Response, and directly led to the directions given to IAR to apply Corexit® to oil slicks in responding to the *Deepwater Horizon* spill.  As described in detail above, the CWA, OPA, and the NCP set forth a comprehensive regime which squarely placed the responsibility for the clean-up effort upon the federal government.  To allow IAR to face financial obliteration as a result of having merely participated as a contractor to execute response decisions of those that Congress put in charge will ensure no such further assistance by any contractor in the future.  By second-guessing the federal government's decisions and careful balancing of the public interest in responding to the *Deepwater Horizon* spill, the claims set forth in the B3 Bundle Master Complaint are clear "obstacles" to the purposes and objectives of the CWA, OPA, and the NCP, all as a matter of law.  Accordingly, such claims should be dismissed pursuant to the doctrine of implied or conflict preemption.

## IV.    Alternatively, Certain Claims In the B3 Bundle Master Complaint Fail To State a Claim

If the Court does not dismiss the B3 Bundle Master Complaint in its entirety on derivative federal immunity or conflict preemption grounds, several of the claims against IAR nevertheless must be dismissed for separate and independent reasons.  First, the negligence *per se* claim fails to satisfy the minimum pleading requirements established in *Twombly* and *Iqbal*,

25

and is contrary to federal law that preempts all other laws. Second, the nuisance claim fails as a matter of law because there is no federal common law cause of action for public nuisance, because the plaintiffs do not have standing to assert this claim under state law, and because it, too, is preempted as to IAR. Third, the Florida medical monitoring claim is barred by the general maritime law and is inconsistent with federal law. Fourth, the claim under the Florida Pollutant Discharge Prevention and Control Act fails because it does not apply to the claims against IAR under the facts pleaded and is inconsistent with federal law. Fifth, any claims for economic losses absent physical damage to a proprietary interest must be dismissed under the economic loss doctrine. Finally, the claim for punitive damages must be dismissed because the complaint fails to state facts that could plausibly allow recovery against IAR.

A.   The Negligence *Per Se* claim Fails to Satisfy the Minimum Pleading Standards of *Twombly* and *Iqbal*

The negligence *per se* claim in the B3 Bundle Master Complaint fails to satisfy the minimum pleading requirements as set forth in *Twombly* and *Iqbal* and, therefore, must be dismissed. *See* B3 Bundle Master Complaint ¶¶ 237-42. This claim is premised on the allegation that "Defendants' (undifferentiated) conduct with regard to the manufacture, maintenance and/or operation of drilling operations and oil vessels such as the *Deepwater Horizon*, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by numerous state and federal laws and permits issued under the authority of these laws." B3 Bundle Master Complaint ¶ 238. However, the B3 Bundle Master Complaint then makes the vague, conclusory, and implausible allegation *as to IAR* that "[o]ne or more of Defendants violated these statutory and/or regulatory standards" and, thus, that "Defendants' violations of these statutory and/or regulatory standards constitute negligence *per se*." B3 Bundle Master Complaint ¶¶ 239-40.

26

The Complaint cites four statutes or regulations that Defendants are alleged to have violated: the Clean Water Act Section 311, 33 U.S.C. § 1321, 40 C.F.R. Part 300 Appendix E, "General Oil Spill Response Requirements," 30 C.F.R. Part 254, "Oil-Spill Response Requirements For Facilities Located Seaward Of The Coast Line," and the Oil Pollution Act, 33 U.S.C. § 2717(b).  (*Id.* at ¶ 238.)  Each of these statutes and regulations contain multiple parts and sub-parts and run for dozens of pages.  But Plaintiffs fail to allege, as is required for a negligence *per se* claim, which part or subpart of any statute or regulation allegedly violated protects a class of persons which is narrower than the general public.

Moreover, none of these statutes or regulations can form the basis of a negligence *per se* claim against IAR.  As discussed, *supra*, the Clean Water Act and corresponding regulations, 40 C.F.R. Part 300, do not establish the right to a private cause of action.  Thus, neither the CWA nor the implementing regulations can form the basis for a cause of action for negligence *per se*.

The Oil Pollution Act also does not establish a private cause of action for claims relating to oil spill clean-up.  Nor does the Oil Pollution Act establish any standards or regulations relating to spill response.  Further, the regulations requiring response plans for off-shore facilities cited in the Complaint, 30 C.F.R. Part 254, are not on their face not applicable in any way to IAR.  Thus, even if the Oil Pollution Act provided for a private cause of action, it and its implementing regulations cannot form the basis for a cause of action for negligence *per se* against IAR.

Finally, even if these statutes and regulations established some standard governing the response to the oil spill and gave Plaintiffs a private cause of action, the Complaint does not identify which Defendants are alleged to have violated which statutory or regulatory standard. But more importantly, there are no factual allegations that IAR violated any statutory or

regulatory standards.  Indeed, the anticipated and approved Response including dispersant use, IAR's narrow role in applying them would fail to state a claim under this ground.

The B3 Bundle Master Complaint does not even attempt to identify which defendants are alleged to violate which statutory or regulatory standards.  But more importantly, there is no allegation that IAR violated any statutory or regulatory standards.

IAR had nothing to do with selecting Corexit® for use, and the substance *was* EPA approved for use as a dispersant of oil in the sea.  In short, the B3 Bundle Master Complaint simply sets forth "labels and conclusions" and a "formulaic recitation" of the elements of a negligence *per se* claim.  *Twombly*, 550 U.S. at 555.  It does not "nudge" the claim "across the line from conceivable to plausible." *Id.* at 570; *see also In Re Southern Scrap Material Co., LLC*, 541 F.3d 584, 587 (5th Cir. 2008) (explaining that a complaint must state "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements") (internal quotation omitted).  Therefore, in accordance with *Twombly* and *Iqbal*, the negligence *per se* claim must be dismissed as against IAR.

B.      The Negligence Claim Against IAR Must Fail

The VoO captains and crew, the decontamination crews, vessel captains and cleanup workers were hired, organized, overseen and directed by BP who, for example, according to ¶ 206 of the Master Complaint, "assumed responsibility for the safety and protection of workers engaged in the VoO program."  To seek to hold IAR liable for any alleged damages or injuries allegedly flowing from the existence of Corexit® on or in the water as negligence (¶¶ 221-228) fails to state a cause of action, particularly given that "BP has taken control and directs all aspects of the recovery and relief effort to attempt to contain the Oil Spill, prevent oil from damaging the Gulf of Mexico and the Shoreline, and to clean up the damage caused to date ...

28

[and was obligated to] exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures" (Master Complaint at ¶¶ 220); and

What plaintiffs allege in ¶ 220 is exactly what the Clean Water Act and Oil Pollution Act are intended to accomplish.  Of course, the direct government involvement and oversight is part of the Congressional intent to have a determined response accomplished, thus preempting via conflict preemption any causes of action in tort against those helpers like IAR, whose only role was to execute the discretionary calls of the On-Scene Coordinator in consultation with the Responsible Party to respond to the Oil Spill to mitigate its effect on the environment using the modalities, *including dispersants*.

That dispersants were chosen and the modality of application was sub-sea (not involving IAR at all), and on-surface (as to which IAR was hired to help, as alleged, as one of several aircraft used to apply the dispersants to oil slicks located across the far reaches of the Gulf), resulting in the presence of dispersants in the Gulf and on or in the oil, *cannot as a matter of law* be placed at IAR's doorstep as "negligence" for purposes of personal injury or property damages claims, much less as "gross negligence" (¶¶ 229-236), "negligence per se" (¶¶ 237-242), "nuisance" (¶¶ 259-271), "battery" (¶¶ 272-277), "strict liability") (¶¶ 289-306 and 307-320), or "punitive damages" (¶¶ 321-346, particularly with respect to ¶¶ 341-343 which are the only ones referencing "the Dispersant Defendants").

Under the CWA, a person who is not a responsible party is exempt from liability for "damages which result from actions taken or omitted to be taken in the course of rendering care, assistance, or advice ... relating to a discharge or a substantial threat of a discharge of oil or a hazardous substance ... [unless] the person is grossly negligent or engages in willful

misconduct." 33 U.S.C. § 1321(c)(4)(2011).  The exemption from liability does not apply "with

respect to personal injury or wrongful death." *Id.*

State law in Louisiana, Mississippi and Alabama provides similar qualified immunity for

persons involved in responses to oil spills.  The Louisiana Oil Spill Prevention and Response

Act, La. Rev. Stat. § 30:2466 (2011) provides "qualified immunity for response actions."  The

Louisiana Act provides:

> Notwithstanding any other provision of law, and except for the responsible
> person, no person, including any discharge cleanup organization, that ... renders
> care, assistance, or advice in abating, containing, removing, cleaning up, or
> otherwise responding to pollution from an unauthorized discharge or threat of
> discharge of oil ... is liable for ... damages ... whether under this Chapter or
> other laws of this state, resulting from acts or omissions committed in rendering
> such care, assistance, or advice.  This Section shall not apply to actions for
> personal injury or wrongful death or for acts or omissions of gross negligence or
> willful misconduct.

The Mississippi Liability Of Persons Responding To Oil Spills Act, Miss. Code Ann. §

49-18-5 (2011), provides standards for "liability of persons for oil spill response consistent with

National Contingency Plan or on-scene directions."  The Mississippi Act provides,

> (1)      Notwithstanding any other provision of law, a person is not liable for
> removal costs or damages which result from actions taken or omitted to be taken
> in the course of rendering care, assistance or advice consistent with the National
> Contingency Plan or as otherwise directed by the federal on-scene coordinator or
> by the state official with responsibility for oil spill response.
>
> (2)      Subsection (1) does not apply:  (a) To a responsible party; (b) To personal
> injury or wrongful death; or (c) If the person is grossly negligent or engages in
> willful misconduct.

The Alabama Act Regarding Liability for Persons Responding to Oil Spills, Ala. Stat. §

6-5-332.2(c)(2010), governing persons involved in responses to Oil Spills, is worded identically

to the Mississippi Act.

State law in Florida and Texas also provides qualified responder immunity, but extends such immunity to claims for personal injury. The Florida Pollutant Discharge Prevention and Removal Act, Fla. Stat. § 376.09(5)(2010), provides that:

> [A]ny person who is authorized by the department or the Federal Government or the person alleged to be responsible for the discharge, or by a designee thereof, to render assistance in containing or removing pollutants shall not be liable for costs, expenses, and damages, unless such costs, expenses, and damages are a proximate result of acts or omissions caused by gross negligence or willful misconduct of such authorized person.

The Texas Oil Spill Prevention and Response Act of 1991, Tex. Nat. Res. Code Ann. § 40.104(b) provides that:

> No person or discharge cleanup organization that voluntarily, or pursuant to the national contingency plan, or pursuant to any discharge response plan required under this chapter, or pursuant to the request of an unauthorized federal or state official, or pursuant to the request of the responsible person, renders assistance or advice in abating, containing, or removing pollution from an unauthorized discharge of oil is liable for response costs, damages, or civil penalties resulting from acts or omissions committed in rendering such assistance or advice, except for acts or omissions of gross negligence or willful misconduct.

While the Mississippi, Alabama, Texas and Florida statutes have not been construed in any court in the Fifth or Eleventh Circuits, this Court analyzed the Louisiana statute in the context of a remand motion. In *Caillouet Land Corp. v. Chevron Pipe Line Co.*, No. 06-40533, 2007 U.S. Dist. LEXIS 48364, at *6-8 (E.D. La. Jul. 3, 2007), plaintiff's petition did not assert any allegations of gross negligence, willful misconduct, or personal injury against the defendant clean-up contractors. Instead, the only claims asserted were claims of general negligence for property damage and for trespass. The court found that, even if proven true, these allegations were insufficient to overcome the immunity granted by law. *Id.* at *8. Thus, the court held that claims of "negligence and trespass against the clean-up contractors [were] not actionable in light of the provisions of La. Rev. Stat. § 30:2466." *Id.* at *10.

31

In the present case, the United States Coast Guard has already named BP and Transocean as the responsible parties.  (B(3) Master Complaint ¶¶ 26, 51, 313.)  Plaintiffs do not aver that IAR is a responsible party.  Instead, plaintiffs admit that IAR is a mere contractor who helped apply dispersants to on-sea oil slicks as part of the Response Effort directed by the Responsible Party and the government.  Because IAR was only an executor of response decisions, not a responsible party, and not a person causing the discharge or discharging pollutants, the plain wording of the Texas and Florida statutes makes IAR immune from liability for all damages caused by negligence, which should be held to be the case under maritime law as well.  Therefore, even if the Court accepts all of plaintiffs' pleaded facts as true, and views them in a light most favorable to plaintiffs, plaintiffs' negligence do not raise a claim of entitlement to relief against IAR for any Texas or Florida Plaintiff.  Further, as stated below, there are no factual allegations in the B(3) Complaint that support a claim that IAR was grossly negligent or committed willful misconduct as to use of Corexit® in the response, as IAR did not make the decision to use it, and it was an EPA and Coast-Guard approved dispersal agent for oil spill response on the seas.  Accordingly, because plaintiffs fail to state a claim upon which relief can be granted, the B(3) Master Complaint should be dismissed as to all Texas and Florida plaintiffs pursuant to Rule 12(b)(6).

Further, under the plain wording of the Federal statute and the Louisiana, Mississippi and Alabama oil spill response statutes, IAR is immune from liability for negligence causing damages other than personal injury.  Accordingly, because there are no factual allegations supporting a claim of gross negligence or willful misconduct against IAR, as discussed below, any B(3) Master Complaint claims for property damage or economic losses also should be dismissed.  And the general use of Corexit® or its presence in the matters should be held to not

state a claim for negligence against IAR, *period.* IAR cannot, as a matter of law, be negligent for applying Corexit® to spilled oil consistent with the National Contingency Plan, which anticipated and approved in advance the use of the dispersant for oil spills in the Gulf. Nor can it be held to a duty to warn responders who were part of the response organized and overseen by the very governmental entities who decided to use Corexit® with full knowledge of its properties and risks.

C.      The Nuisance Claim Fails

IAR, in simply assisting the execution of one of the many response measures determined by those in charge, is not subject to liability for "nuisance."

Plaintiffs proceed under maritime law here, which does not recognize this cause of action. In addition, there is no federal common law cause of action for public nuisance. *See Marquez-Colon v. Reagan*, 668 F.2d 611, 614 n.2 (1st Cir. 1981) (noting that the Supreme Court held in *Milwaukee v. Illinois*, 451 U.S. 304 (1981) and *Sea Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 22 (1981) "that the federal common law of nuisance for interstate and coastal water pollution has been entirely preempted by [the Federal Water Polluntion Control Act]"); *Sekco Energy, Inc. v. M/V MARGARET CHOUEST*, 820 F.Supp. 1008, 1014 (E.D. La. 1993) (recognizing that federal common law does not recognize a cause of action for public nuisance in a water pollution case). Therefore, to the extent the nuisance claim is premised on federal law, it must be dismissed.

But even if the Court looks to state law, the nuisance claim still fails. A private litigant cannot recover for a public nuisance under state law unless he or she can show a "special injury different in kind from that suffered by the general public." *In Re Exxon Valdez*, 1997 A.M.C. 940 (9th Cir. 1997); *see also Benefield v. Int'l Paper Co.*, No. 2:09cv232-WHA, 2009 WL

2601425, at *3 (M.D. Ala. Aug. 21, 2009) ("In order for an individual to maintain an action to enjoin a public nuisance, the individual must have sustained a 'special injury' which is different in degree and kind from the injury suffered by the public at large.") (citations omitted); *Cunningham v. Anchor Hocking Corp.*, 558 So.2d 93, 97 (Fla. Dist. Ct. App. 1990) ("[W]hen a party 'has suffered no "particular damage" in the *exercise of a right common to the general public,* ... it lacks standing to sue for public nuisance.'") (citation omitted) (emphasis in original); *Robinson v. Indianola Mun. Separate Sch. Dist.*, 467 So.2d 911, 918 (Miss. 1985) (to enjoin a public nuisance plaintiff must have sustained different kind of harm than that suffered by the general public); *Jamail v. Stoneledge Condominium Owners Ass'n,* 970 S.W.2d 673, 676 (Tex. Ct. App. 1998) ("special injury" required to maintain public nuisance action).

Here, the B3 Bundle Master Complaint fails to allege facts suggesting that if the alleged nuisance is not abated, plaintiffs "will suffer a special damage therefrom different from that which is common to all." *Carbajal v. Vivien Ice Co.*, 104 So. 715, 716 (La. 1925). Although the B3 Bundle Master Complaint alleges that plaintiffs have been unable to fish and boat in the Gulf of Mexico due to the presence of oil and chemical dispersants and that "all Plaintiffs are subject to foul and harmful odors emanating from the crude oil soaked booms and/or the chemical dispersants," these are the same type of damages suffered by the general public. *See* B3 Bundle Master Complaint ¶¶ 262, 265; *Restatement (Second) of Torts* § 821(c) (1979). Thus, the nameless plaintiffs on whose behalf the B3 Bundle Master Complaint is purportedly filed lack standing to bring a public nuisance claim.

D.      Battery Claims of VoO Captains and Vessel Plaintiffs Fail to State a Claim
        Against IAR

The master complaint, in a wholly conclusory fashion, with not one specific fact scenario with a particular person, date, place and time, characterizes an across-the-board claim of battery

against IAR.  This claim deserves special discussion in the context of IAR's Rule 12 motion, as follows.

As this memorandum has established conclusively, given the particular circumstances surrounding this catastrophe, and the Congressionally imposed framework to set up pre-event planning and quick response execution to any spill of national significance like this one, there is no cause of action arising from the mere use of dispersants against a mere "hired hand" who helped to execute the decisions to employ dispersants.  With *one* aircraft (¶ 123), IAR's only role was to carry out the orders of those in charge to apply the dispersant.

Plaintiffs may argue that battery is a special cause of action pleaded only on behalf of VoO captains and crews that *does* apply to someone like IAR because it involves (once it is actually alleged) an *intentional* application of dispersants to and on human beings with the constructive intent to harm them.  Let us look carefully at that proposition.

The "battery" claims appear at ¶¶ 272-277 of the B-3 Bundle Master Complaint.  These paragraphs allege that dispersants were sprayed "in the immediate vicinity of VoO Plaintiffs or Vessel Plaintiffs," (¶ 274) "causing *some VoO Plaintiffs* to be exposed to harmful chemicals and resulted in headaches, rashes, chemical burns, nausea and vomiting."  ¶¶ 275-276.  The complaint does *not* say that IAR sprayed dispersants directly onto any plaintiffs, and thus seeks to impose liability on IAR merely because Corexit® was on the waters in which they worked.

The Master Complaint does *not* identify a single person, or any particular place, time or date on which IAR purposefully applied dispersants *on* any of the VoO or Vessel plaintiffs, as they define themselves.  The suggestion on its face is implausible to begin with.  Battery is a particularized tort – indeed, it is the civil counterpart of a crime.  It requires the *intent* of the

perpetrator to unlawfully touch the victim in a harmful way. *E.g., Garcia v. United States*, 776 F.2d 116 (5th Cir. 1985).

Given the *Twombly* requisites that apply particularly to heightened-threshold torts such as ones based on intentional acts or requiring scienter, the Master Complaint fails to state a cause of action against IAR. ¶¶ 272-277 are merely a conclusory characterization as a "battery" that dispersants were used at all in the Response – which IAR has established above to fail to state a legally cognizable ground upon which to impose liability on IAR given its non-decisional and limited role here, contrasted with the decisional roles of Congress via the Coast Guard, EPA, and of BP, with regard to choice and direction as to the Response modalities.

In particular, there is no allegation that IAR purposefully and *directly* sprayed dispersant onto the body of any of the VoO or Vessel Plaintiff crews. If this occurred, then *only* a case-specific pleading of facts would suffice to state a cause of action against IAR for battery. This tort especially cannot be generalized into some sort of "group liability." Indeed, there must be allegations and proof that a particular defendant *particularly caused* a *particular* plaintiff's injury on a particular day. *Great Lakes Dredge and Dock Co. v. Louisiana*, 624 F.3d 201, 214-215 (5th Cir. 2008); *Donaghey v. Ocean Drilling of Exploration Co.*, 974 So.2d 646, 649 (5th Cir. 1992); *see also, Jefferson v. Lead Industries Association, Inc.*, 106 F.3d 1245, 1247 (5th Cir. 1997) (the LPLA rule being the same in this respect as general maritime law, as Judge Duvall held in his 6/12/08 decision, Doc. No. 193, p. 16, in 06-08676, *citing* the *In Re Fibreboard Corp.*, 893 F.2d 706, 710-11 (5th Cir. 1990) rejection of group liability and the need for *individual* fault and causation determination; *Thompson v. Johns-Manville Sales Corp.*, 714 F.2d 581, 583 (5th Cir. 1983).

The only way a battery claim could be pleaded against IAR, is for a *particular* plaintiff to state the specific location, time, date and circumstances, something the Master Complaint does not attempt to do, and until it does, the Complaint fails to state a claim for battery, and that "cause of action" should be dismissed as to IAR.

E.      The Florida Medical Monitoring Claim Is Barred By the General Maritime Law

Aside from the immunity outlined above, and the uniform nature of maritime law, which applies to prohibit reliance on Florida law here, the B3 Bundle Master Complaint attempts to assert a cause of action under Florida's law of medical monitoring on behalf of "Florida Plaintiffs."  This claim must be dismissed also because the general maritime law otherwise governs under these circumstances and Florida medical monitoring law cannot be used to "fill in the gaps" of maritime law in light of the fact that different states' medical monitoring law is far from uniform.  Plaintiffs pick the most liberal state medical monitoring law (from Florida) and seek to cram it down IAR's throat even though IAR's operations, as alleged, were conducted over the seas pursuant to the Congressionally outlined National Response.  Plaintiffs plead no facts to suggest IAR had any contact with or operated in Florida, or how it could supplant maritime law.

Louisiana and Mississippi law are similar to federal common law in rejecting medical monitoring claims as are broadly asserted in the B-3 Bundle Master Complaint.  In *Metro-North Commuter Railroad Co. v. Buckley*, 521 U.S. 424, 117 S.Ct. 2113 (1997), the Supreme Court, in FELA, which incorporates much federal common law (117 S.Ct. at 2117) held that the mere exposure to a toxic substance (there, asbestos) that might cause a disease at a later time, did *not* give rise to a cause of action for either mental distress *or* for the cost of medical monitoring. Federal common law simply excludes certain categories of claims for valid policy reasons, so

that the mere exposure is insufficient. The claimant must suffer from a disease caused by the exposure. For the same reason, the court held that absent an actual disease process occurring that creates a recognized and specific need for *extra* monitoring beyond that otherwise helpful. *See* 521 U.S. at 440-444, 117 S.Ct. at 2122-2124; *Seaman v. Seacor Marine, L.L.C.*, Fed. Appx. 721, 730-31 (5th Cir. 2009). *See also, e.g., Landry v. Avondale Indus., Inc.*, 864 So.2d 117, 123 n.2 (La. 2003); *Paz v. Brush Engineered Materials, Inc.*, 949 So.2d 1 (Miss 2007); *Norwood v. Raytheon Co.*, 414 F.Supp 659 (W.D. TX 2006) (Texas law).

Here, the B3 Bundle Master Complaint seeks to invoke Florida's medical monitoring law, which permits relief even when a plaintiff has yet to develop any identifiable physical injuries or symptoms. *See Petito v. A.H. Robins*, 750 So.2d 103 (Fla. Dist. Ct. App. 1999). This approach to medical monitoring is an outlier and is inappropriate for inclusion into maritime law for the reasons stated in Metro-North and the Louisiana, Mississippi and Texas cases cited above.

An application of Florida law in this case would impair the uniformity and simplicity favored by the general maritime law and produce precisely the sort of discord "*Jensen* sought to avoid." *Rogers v. Coastal Towing, LLC*, 723 F.Supp. 2d 929, 936 (E.D. La. 2010), *citing S. Pacific Co. v. Jensen*, 244 U.S. 205, 216 (1917). Accordingly, because using Florida state law on medical monitoring to supplement the general maritime law would undermine the "strong federal maritime policy favoring national uniformity," *Augman v. Seacor Marine L.L.C.*, No. 07-1508, 2007 WL 2726064 (E.D. La. Sept. 17, 2007), and run afoul of the third limitation articulated in *Jensen*. The Florida medical monitoring claim in the B3 Bundle Master Complaint should be dismissed as failing to state a cause of action.

F.   Florida Pollutant Discharge Prevention and Control Act Claim Fails As a Matter of Law

For the same reasons stated in the proceeding section, a Florida pollutant law cannot be used to impose liability on IAR under the situation as pleaded. There is no statement of a claim against IAR to which a Florida law on pollution would apply to IAR's alleged actions over the high seas, none of which took place in Florida. *Twombly* commands its dismissal as to IAR.

In addition, no facts pleaded plausibly allow a conclusion that IAR's application of Corexit® as alleged, constitutes "pollution" or that IAR was a "Responsible Party" under the Florida statute cited. *See* Fla. Stat. § 376.031(16) and § 376.205. Indeed, the pollution was only the crude oil, which the complaint does not and cannot blame IAR for. Moreover, the application of Corexit® being ordered by those in charge was for the purpose of *reducing* the pollution to Florida beaches and waters.

Finally, the Florida statute does not apply to personal injuries (§ 376.031(5)), nor does it properly apply in lieu of or as part of maritime law.

G.   Any Claims For Economic Losses Absent Physical Damage to a Proprietary Interest Must Be Dismissed

Although the failure of the B3 Bundle Master Complaint to identify any single plaintiff on whose behalf it is filed makes it difficult – if not impossible – to determine whether it contains claims for economic losses absent physical damage to a proprietary interest, in an abundance of caution IAR hereby moves for dismissal of any such claims under the rule announced in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927). *See In Re Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d 371, 377 (5th Cir. 2006) ("It is unmistakable that the law of this circuit does not allow recovery of purely economic claims absent physical injury to a proprietary interest in a maritime negligence suit."); *Louisiana ex rel. Guste v. M/V TESTBANK,*

752 F.2d 1019, 1031-32 (5th Cir. 1985) (en banc) (affirming summary judgment in favor of defendants pursuant to *Robins Dry Dock* where boat operators, seafood enterprises, tackle and bait shops, and recreational fisherman brought general maritime law claims seeking purely economic damages resulting from chemical spill).

Even if the plaintiffs' claims are found to be governed by state law, the same rule applies under Louisiana, Mississippi, Alabama, Florida, and Texas law.  For example, Louisiana state law generally prohibits the recovery of purely economic damages without accompanying physical damage to a proprietary interest. *See TS & C Investments, L.L.C. v. Beusa Energy, Inc.*, 637 F.Supp. 2d 370, 380-81 (W.D. La. 2009); *PPG Indus., Inc. v. Bean Dredging*, 447 So.2d 1058, 1062 (La. 1984); *Louisiana Crawfish Producers Ass'n-West v. Amerada Hess Corp.*, 935 So.2d 380, 385 (La. Ct. App. 2006).  Likewise, Mississippi, Alabama, Florida and Texas do not allow recovery in tort for economic loss absent personal injury or physical damage to a proprietary interest. *See, e.g., East Miss. Elec. Power Ass'n v. Porcelain Prods. Co.*, 729 F.Supp. 512, 515 (S.D. Miss. 1990) (finding it "unlikely that the Mississippi Supreme Court would decide to join the 'steadily dwindling minority of jurisdictions that permit tort-based actions for economic loss'") (citation omitted); *Vesta Fire Ins. Co. v. Milam & Co. Const., Inc.*, 901 So.2d 84, 106-07 (Ala. 2004) (explaining economic loss rule bars tort recovery where product does not cause personal injury or property damage); *Florida Power & Light Co. v. Westinghouse Electric Co.*, 510 So.2d 899, 902 (Fla. 1987) (holding plaintiff could not recover in tort for "economic loss without an accompanying physical injury or property damage"); *Pugh v. Gen. Terrazzo Supplies, Inc.*, 243 S.W.3d 84, 91 (Tex. Ct. App. 2007) (noting economic loss doctrine bars tort claims seeking economic losses where the plaintiff does not allege personal

injury or property damage).  Accordingly, any claims for economic losses absent physical damage to a proprietary interest must be dismissed.

H.    The Master Complaint Fails to State A Claim Against IAR For Punitive Damages

The complaint alleges punitive damages are due for IAR's participation in dispersant application using one aircraft over the open sea.  The complaint asserts maritime jurisdiction because the alleged activities of IAR took place on navigable waters and allegedly injured crewmen located on vessels plying the navigable waters as part of the response efforts.  *See, e.g., Jerome B. Grubart v. Great Lakes Dredge and Dock Co.*, 513 U.S. 527, 534, 115 S.Ct. 1043 (1995); *Ruby v. Sisson*, 497 U.S. 358, 363, 110 S.Ct. 2892 (1990).  Any and all of the alleged application of Corexit® took place on the open seas.

As such, under plaintiff's own allegations, maritime law controls the issue of punitive damages under the complaint as pleaded.  Plaintiffs will likely suggest that the Supreme Court's allowance of punitive damages in *Atlantic Sounding Co. v. Townsend*, 129 S.Ct. 2561 (2009) for outrageous, wanton and willful refusal to provide maintenance and cure allows them to recover here against IAR in a context far beyond the context of maintenance and cure.  Given the policies behind the Clear Water Act generally, in combination with the rule of *Miles v. Apex Corp.*, 498 U.S. 19 (1990) with respect to enforcing Congressional policies from encroachment or nullification by maritime law, no punitive damages ought to be allowed generally, in the context of this Bundle.  Assuming for argument's sake that plaintiffs are correct as to a general availability of punitive damages, and the OPA, Clean Water Act and other cleanup-related Congressional schemes do not preclude punitive damages against helpers like IAR, then the *best* case scenario for the plaintiffs in judging this 12(b)(6) is whether they properly and persuasively allege IAR to be guilty of "lawless misconduct," or "wanton, willful or outrageous conduct."

41

*See Atlantic Sounding Co., Inc. v. Townsend*, 129 S.Ct. 2561, 2566-67, 174 L.Ed. 382 (2009).[22] But the pleaded and undeniable context of the Corexit® application following its approval and selection by those in charge of the Response, and *not* IAR, does not allow recognition here of a cause of action for punitive damages *against IAR*.

IAR reurges here the arguments made above as to the battery claims, because the factual context of this punitive damages claim remains the same. Under the requirements of *Twombly*, 550 U.S. at 555, 570 and *Iqbal*, 129 S.Ct. at 1949 that sufficient facts be pleaded to set forth a facially "plausible" claim, especially where there is a heightened threshold standard for liability, the Master Complaint utterly fails to state a claim for punitive damages against IAR – the operator of one application aircraft for and through the instructions of BP, all under and pursuant to the oversight of the Federal On-Site Coordinator via OPA.

While waxing eloquently and persuasively in ¶¶ 321-340 about the drilling operator's horrible decisions that led to the blowout and huge oil spill and necessary response as rendering them liable for punitive damages, plaintiffs then engage in a *Twombly*-precluded slight of hand in ¶¶ 341-42 by suddenly, and only then, "throwing in" the "Dispersant Defendants" along with BP as having been "reckless, willful and/or wanton" in "the operation and use of chemical dispersants." This manner of conclusory pleading wholly fails to state a claim for punitive damages against IAR, even if punitive damages are generally available in maritime law for outrageous misconduct.

Mere conclusory recitation of adjectives like "willful, wanton or reckless disregard" (¶ 159, 162, 163) in IAR's application of Corexit® as a dispersant chosen by those to whom

---

[22] However, to the extent the plaintiffs are Jones Act seamen, the limitations of the Jones Act would apply. *See, e.g., Miles v. Apex Marine Corps*, 498 U.S. 19, 36, 11 S.Ct. 317 (1990); *Scarborough v. Clemco Industries, Inc.*, 391 F.3d 660 (5th Cir. 2004). *See also* the maritime law restriction of emotional distress recovery discussed in *Gough v. Natural Gas Pipeline Co. of America*, 996 F.2d 763, 765 (5th Cir. 1993).

Congress entrusted the decision-making and oversight is exactly what *Twombly* and *Iqbal* disapprove of. Under the known scenario at hand, which includes direct Federal oversight pursuant to an approved plan involving use of Corexit®, these bald conclusions are rendered implausible by other allegations contained within the same Master Complaint, and those contextual facts which are properly the subject of judicial notice.

As the Master Complaint states at ¶ 92 "The U.S. Coast Guard is responsible for implementing many aspects of the OPA, including responding to oil spills and supervising and/or coordinating response actions." At ¶ 94, plaintiffs allege that "BP began implementing a disaster response plan … to disperse oil in the water using Nasco's chemical dispersants."

At ¶ 109, plaintiffs state:

> "Generally, the United States Oil Spill National Contingency Plan permits spraying of chemical dispersants at least 3 miles offshore or where the water is at least 10 meters deep. The Coast Guard's Federal On Site Coordinator (the "On Site Coordinator") must approve B.P.'s requests to use chemical dispersants."

At ¶¶ 113-117, plaintiffs allege that BP and the EPA addressed permissions or adjustments as to use of Corexit®, thus showing that IAR had nothing to do with the decisions *and* that the government was in fact directly involved.

At ¶ 132, plaintiffs allege that the Vessels of Opportunity radio in to BP coordinates of oil slicks, and BP

> "dispatches a spray plane from an airfield to the coordinates given [for an oil slick spotted] and instructs the pilot to spray the chemical dispersant from its cargo hold."

At ¶ 95, plaintiffs allege that

> "BP coordinates and directs aircraft owned or operated by … IAR … that fly out over the Gulf to spot oil slicks and to spray chemical dispersants to oil on the surface of the Gulf."

At ¶ 123, plaintiffs allege

"IAR owns and operates at least one spray plane used in connection with *B.P.'s* aerial spraying of chemical dispersants." (¶ 123, Emphasis supplied.)

*Nowhere* in the Master Complaint is there any allegation of fact that IAR participated at all in selecting the dispersant, or had anything to do with organizing or coordinating the response, much less in giving advice as to whether Corexit® should be used. Indeed, the opposite is alleged, including the *direct oversight* of BP *and* the government. No allegation is or could be made that the Coast Guard On-Scene Coordinator and BP, who plaintiffs correctly aver *were* making all the response decisions, were not aware of the MSDS-supplied information on Corexit®, including its properties and effects on humans, or not fully aware of all aspects of the response, unlike IAR who only flew *one plane* to apply dispersants as directed. No allegations are made that IAR participated in the BP/Coast Guard/EPA approvals or discussions or was aware of any disapprovals of the government, or had any reason to think that the decision makers were not aware of the constituent chemicals of Corexit® and of all of the information from the MSDS for Corexit® that plaintiffs quote at ¶¶ 110-112, or that information reflected in ¶¶ 146-158. To the contrary, plaintiffs allege that those in control *had* this information, so IAR had no plausible duty or acted in a way that could possibly satisfy the high standard for punitive damages set in *Atlantic.*

Thus, on the face of the complaint, then, the punitive damages claims against IAR are implausible. IAR should not be faced with financial annihilation based on this complaint, under *these* circumstances. Plaintiffs wholly fail to state a claim given the high threshold standard in maritime law for punitive damages, and the claim for such against IAR should be dismissed. IAR, as a mere contractor hired to fly one aircraft for one small part of a huge and multi-lateral response effort designed, determined, coordinated and implemented by BP and the Coast Guard, cannot be held liable for punitive damages for being hired to do what the response designers

44

decided was needed.  This is what the complaint claims and it is fatally defective.  The punitive damages claims against IAR are a non-starter and must be dismissed.

**V.      12(b)(6) Failure to State a Claim By Any Plaintiffs Who Presented Claims Covered By OPA**

Given the generality of the Master Complaint, IAR moves to dismiss the claims contained therein and filed or suggested against IAR by persons seeking any type of property damage for which they have sought or are entitled to seek recovery under OPA, 33 U.S.C. § 2702 against the responsible parties.  Doc. No. 1128 filed on February 9, 2011 in No. 10-2771 (the limitation action), at *e.g.*, ¶¶ 678-690 and other individual actions unknown to mover, assert such claims on behalf of Alabama, Florida, Mississippi, Louisiana and Texas subclasses, and seeking punitive damages as well.  At ¶ 89, plaintiffs alleged that 200 million *gallons* of crude oil were released into the Gulf by the disaster, none of which was due to any actions of IAR. Plaintiffs recently pleaded in the limitation answer (Doc. No. 1128 in No. 10-02179) at ¶ 489, specific references that speak to BP's use of dispersants" as part of the spill.  As in the instant Master Complaint, plaintiffs therein also allege at ¶ 510 that "BP recognized and/or voluntarily assumed responsibility for the safety and protection of the workers engaged in the VoO program."  Obviously, IAR had no role in organizing, directing or coordinating the various segments of the response and thus no responsibility with respect to how the segments interacted *vis-à-vis* the presence of crude oil, and the dispersants on the water that those in charge decided should be there.

33 U.S.C. § 2715(a) specifically provides that those who make a claim and recover under OPA, the responsible party becomes subrogated to "all" causes of action "that the claimant has under any other law."  OPA then does *not* authorize plaintiffs to simultaneously sue under the strict liability regime of OPA against the responsible parties, and *also* pursue third parties like

IAR for alleged spill response damages. Plaintiffs pursue the "Responsible Parties," of which BP is the clearest of all, and who has waived any limits of liability. *See*, Doc. No. 559. Such claims against IAR for any oil related damages, including property damages, to the extent contained in the Master Complaint, fail to state a claim under Rule 12(b)(6).

OPA's above provisions in this respect would preempt general maritime law. *South Port Marine, LLC v. Gulf Oil Ltd. Partnership*, 234 F.3d 58, 65 (1st Cir. 2000); *Gabarick v. Laurin Maririme (America), Inc.*, 623 F.Supp.2d 741, 746 (E.D. La. 2009); *See also*, Conf. Rep. 101-653, 101st Congress, 2d Sess. 1990 (Conf. Report), 1990 U.S.C.C.A.N. 746-47, 779, 802.

As Judge Lamelle ruled in *Gabarick v. Laurin Maritime (America), Inc.*, 623 F.Supp. 2d 741, 750 (E.D. La. 2009) damages covered by OPA must be pursued only against the responsible party, which plaintiffs are in fact doing.

## VI.   The Attorney's Fees Claims Must Be Struck

Plaintiffs throw in a claim for attorney's fees in the prayer for relief on page 73 at subpart 7. This Court operates here under the "American Rule," where attorney's fees are not recoverable by the plaintiff. *See, e.g., Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616 (1975); *Galveston County Nav. Distr. V. Hopson Towing Co.*, 92 F.3d 353, 356 (5th Cir. 1996); *Texas A&M Research Foundation*, 338 F.3d 394, 406 (5th Cir. 2003).

The attorney's fee demand is not backed by the pleading of a cognizable basis, and should be dismissed.

## Conclusion

All the claims against IAR in the B-3 Bundle Master Complaint should be dismissed on the basis of shared or derivative immunity and conflict preemption. IAR can have no liability imposed on it for having merely assisted in carrying out response decisions made or approved by the Coast Guard and/or pursuant to the National Contingency Plan. In particular, it can have no liability arising from the presence of Corexit® in the Gulf waters or on the spilled oil.

Alternatively and additionally, each of the claims ("causes of action") against IAR should be individually dismissed pursuant to Rule 12(b)(6). The negligence, nuisance and Florida statute claims should be dismissed as failing to state a cause of action under the pleaded circumstances. The battery, gross negligence and punitive damages claims do not state a claim against IAR under the *Twombly* standards, given the content of the Master Complaint and the context of the aerial application of Corexit® pursuant to the approved National Contingency Plan, Area Response Plan and federal government oversight of the On-Scene Coordinator. IAR, simply stated, cannot be guilty of gross negligence or wanton and willful misconduct by engaging in aerial application of EPA approved and dispersants that the CWA expressly lists as being part of the response plan, all under the pleaded emergency circumstances, where all

decisions as to the authority to use Corexit® and its appropriateness for use were made by others to whom that decision was delegated by Congress in the manner set forth above.

Finally, no basis for the claim for attorney's fees has been stated.

Respectfully, submitted,

DARRELL K. CHERRY (#4036 T.A.)
MARC J. YELLIN (#13741)
Deutsch, Kerrigan & Stiles, L.L.P.
755 Magazine St.
New Orleans, LA 70130
Telephone: (504) 581-5141
Email: dcherry@dkslaw.com
             myellin@dkslaw.com
*Attorneys for International Air Response, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on the ____ day of _____, 2011 the foregoing pleading was electronically filed with the Clerk of Court by using the CM/ECF system pursuant to the rules and procedures of the United States District Court for the Eastern District of Louisiana and served in accordance therewith to all counsel of record.

DARRELL K. CHERRY