# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

```
-------------------------------------------------------  x
IN RE: Oil Spill by the Oil Rig          :    MDL No. 2179
"Deepwater Horizon" in the Gulf of Mexico, :
on April 20, 2010                         :    SECTION: J
                                          :
                                          :
These Pleadings Apply to:                 :    JUDGE BARBIER
All Cases in Pleading Bundle              :
Section III.B(3)                          :    MAGISTRATE SHUSHAN
                                          :
                                          :
-------------------------------------------------------  x
```

## BP DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(1) & 12(B)(6) MASTER COMPLAINT IN ACCORDANCE WITH PTO NO. 11 [CASE MANAGEMENT ORDER NO. 1] SECTION III.B(3) ["B3 BUNDLE"]

## TABLE OF CONTENTS

PAGE

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................1

FACTUAL BACKGROUND.................................................................................................3

I.    STANDARD FOR MOTION TO DISMISS...................................................................5

II.   CHOICE OF LAW .................................................................................................6

III.  PLAINTIFFS MAY NOT SEEK MEDICAL MONITORING DAMAGES
      UNDER ANY LAW THAT MAY APPLY TO THEIR CLAIMS. ...............................7
      A.   The VoO Plaintiffs' Claim for Medical Monitoring Damages Under
           General Maritime Law Must Be Dismissed.....................................................8
           1.   Medical Monitoring Damages Are Not Allowed Under the Jones
                Act.........................................................................................8
           2.   If the Issue of Damages Is Unresolved Under Maritime Law,
                General Maritime Law Will Seek Uniformity Under and Apply the
                Jones Act Standard...................................................................10
      B.   Plaintiffs' Claims for Medical Monitoring Under Florida State Law Also
           Must be Dismissed........................................................................11

IV.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR NUISANCE. ...............13
      A.   Nuisance Is Not A Recognized Cause of Action Under Federal Maritime
           Law. ................................................................................14
      B.   Even if Nuisance Were a Cognizable Claim, It is Barred by the Economic
           Loss Doctrine.................................................................15

V.    PLAINTIFFS' CLAIM UNDER THE FLORIDA POLLUTANT
      DISCHARGE PREVENTION AND CONTROL ACT MUST BE
      DISMISSED.........................................................................................16
      A.   The Florida Pollutant Discharge Prevention and Control Act Does Not
           Apply to Pollutant Discharges or Cleanup Activities that Take Place
           Outside Florida's Territorial Limits........................................17
      B.   Even if BP Defendants' Cleanup Activities Took Place within Florida's
           Territorial Waters, Those Activities Are Not Subject to Strict Liability
           Under the Florida Pollutant Discharge Prevention and Control Act. ...................19

VI.   PLAINTIFFS' OPA CLAIMS THAT HAVE NOT BEEN PROPERLY
      PRESENTED MUST BE DISMISSED AT THIS TIME PENDING
      COMPLIANCE WITH THAT PRE-SUIT REQUIREMENT...................................20

VII.  PUNITIVE DAMAGES ARE NOT AVAILABLE FOR GROSS
      NEGLIGENCE UNDER MARITIME LAW.............................................21
      A.   Non-Pecuniary Damages, Including Punitive Damages, Are Not Available
           to Jones Act Plaintiffs. ...........................................................22

## TABLE OF CONTENTS
### (Continued)

PAGE

B.      Uniformity Required by the Supreme Court in *Miles* Demands that
        Punitive Damages are Likewise Unavailable Under General Maritime
        Law. ..................................................................................................................24
C.      Plaintiffs May Not Seek Punitive Damages for Alleged Property Damage. .........25

**VIII.  PLAINTIFFS HAVE NO FREE-STANDING CLAIM FOR PUNITIVE
DAMAGES. ....................................................................................................................26**

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Alcoa S.S. Co. v. Charles Ferran & Co.,*
   383 F.2d 46 (5th Cir. 1967) ............................................................................... 10

*Allen v. R & H Oil and Gas Co.,*
   63 F.3d 1326 (5th Cir. 1995) ............................................................................. 27

*Anderson v. Texaco, Inc.,*
   797 F.Supp. 531 (E.D. La. 1992) ................................................................. 23, 25

*Ashcroft v. Iqbal,*
   129 S.Ct. 1937 (2009) ......................................................................................... 5

*Askew v. Am. Waterways Operators,*
   *Inc.*, 411 U.S. 325 (1973) ................................................................................. 18

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (1955) ............................................................................................ 5

*Berthelot v. Big Brothers Constr. Co., L.L.C., et al.,*
   No. 05-4182, 2006 WL 2256995 (E.D. La. July 16, 2006) ................................ 21

*Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., Inc.,*
   51 F.3d 235 (11th Cir. 1995) ............................................................................. 21

*Bonnette v. Conoco, Inc.,*
   837 So.2d 1219 (La. 2003) ................................................................................. 11

*Byrne v. Nezhat,*
   261 F.3d 1075 (11th Cir. 2001) ......................................................................... 27

*California v. Sierra Club et al.,*
   451 U.S. 287 (1981) ..................................................................................... 14, 15

*Clausen v. M/V NEW CARISSA,*
   171 F.Supp. 2d 1127 (D. Ore. 2001) ................................................................. 26

*Conner v. Aerovox, Inc.,*
   730 F.2d 835 (1st Cir. 1984) ............................................................................. 15

*Cuvillier v. Taylor,*
   503 F.3d 397 (5th Cir. 2007) ............................................................................... 5

*Exxon Shipping Co. v. Baker,*
   554 U.S. (2008) .................................................................................................. 24

*Gabarick v. Laurin Mar.* (Am.) *Inc.,*
   623 F.Supp. 2d 741 (E.D. La. 2009) ................................................................. 25

*Geier v. American Honda Motor Co.,*
   529 U.S. 861 (2000) ............................................................................................. 7

*Gerling Global Reinsurance Corp. v. Gallagher*,
   267 F.3d 1228 (11th Cir. 2001) ........................................................................ 7

*Green v. McAllister Bros., Inc.*,
   No. 02 7588(FM), 03 1482(FM), 2005 WL 742624 (S.D.N.Y. Mar. 25, 2005) ...................... 9

*Guillory v. C.F. Bean Corporation*, No. 93-2643, 1994 WL 150738 (E.D. La. Apr. 12, 1994) .. 25

*Healy v. Bear Instit.*,
   491 U.S. 324 (1989) ......................................................................... passim

*International Paper Co. v. Ouellette*,
   479 U.S. 481 (1987) ...................................................................... 7, 12

*Kernan v. American Dredging Co.*,
   355 U.S. 426 (1958) .......................................................................... 9

*Metro-North Commuter Railroad Co. v. Buckley*,
   521 U.S. 424 (1997) .......................................................................... 9

*Middlesex County Sewerage Authority et al. v. National Sea Clammers Assoc. et al.*,
   453 U.S. 1 (1981) ........................................................................... 15

*Miles v. Apex Marine Corp.*,
   498 U.S. 19 (1990) ........................................................................ passim

*Murray v. Anthony J. Bertucci Constr. Co.*,
   958 F.2d 127 (5th Cir. 1992) ................................................................ 22

*Neal v. Barisich, Inc.*,
   707 F.Supp. 862 (E.D. La. 1992) ............................................................ 22

*Papasan v. Allain*,
   106 S.Ct. 2932 (1986) ........................................................................ 6

*Riegel v. Medtronic, Inc.*,
   552 U.S. 312 (2008) .......................................................................... 7

*S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*,
   234 F.3d 58 (1st Cir. 2000) ................................................................. 25

*Sanford v. Louisiana*,
   228 Fed.Appx. 492 (5th Cir. 2007) ........................................................... 6

*Seaman v. Seacor Marine LLC*,
   No. 07-3354, 2008 WL 360783 (E.D. La. Jan. 17, 2008) ......................................... 23

*Sekco Energy, Inc. v. M/V Margaret Chouest*,
   820 F.Supp. 1008 (E.D. La. 1993) ........................................................... 14

*State of La. ex rel. Guste v. M/V TESTBANK*,
   752 F.2d 1019 (5th Cir. 1985) ......................................................... 14, 15, 16

*Vasquez v. Bridgestone/Firestone, Inc.*,
   325 F.3d 665 (5th Cir. 2003) ................................................................. 6

*Williammette Iron Bridge Co v. Hatch,*
   125 U.S. 1 (1888) ................................................................................ 15

**Statutes**

33 U.S.C. § 2701 .................................................................................... 2

33 U.S.C. § 2702 .................................................................................... 25

43 U.S.C. § 1312 .................................................................................... 6

43 U.S.C. § 1331 .................................................................................... 6

46 U.S.C. § 3030 .................................................................................... 10

Fed. R. Civ. P. 12(b)(1) ......................................................................... 6

Fed. R. Civ. P. 12(b)(6) ......................................................................... 6

FLA. STAT. § 376.09 ............................................................................... 20

FLA. STAT. § 376.12 ............................................................................... 19

FLA. STAT. §376.041 .............................................................................. 18

**Other Authorities**

Presidential Proclamation No. 5030, 48 Fed. Reg. 10,605 (Mar. 10, 1983) ................................. 7

**Treatises**

United Nations Convention on the Law of the Sea, arts.
   56-57, 1833 U.N.T.S. 397 (Dec. 10, 1982) ...................................... 7

**Regulations**

40 C.F.R. § 300.105 ............................................................................... 4

40 C.F.R. § 300.323 ............................................................................... 4

**Constitutional Provisions**

U.S. CONST. art. I, § 8, cl. 3 .................................................................. 12, 17

The BP Defendants respectfully submit this Memorandum in support of their Motion to Dismiss Plaintiffs' B3 Master Complaint (the "B3 Master Complaint") for Personal Injuries and Medical Monitoring related to the Response to the *Deepwater Horizon* oil spill.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The unprecedented nature of the *Deepwater Horizon* oil spill has required a response effort equally unprecedented in scope.  Led by the U.S. Coast Guard (the Federal On-Scene Coordinator and the National Incident Commander) and conducted pursuant to a Unified Command structure, the response effort is the largest oil spill response in U.S. history.  Pursuant to the National Contingency Plan ("NCP"), the BP Defendants (with supervision and direction from the Coast Guard) launched, participated in, and sustained a multi-faceted disaster response designed to contain and remove oil released from the Macondo well.  The response has required a coordinated effort among tens of thousands of workers applying dispersants, conducting controlled burns of oil on the open sea, skimming oil from the water surface, containing oil with boom, and cleaning beaches and marshes.  Throughout the spill response, the BP Defendants have steadfastly maintained the dual goals of restoring the Gulf of Mexico and ensuring the health and safety of response workers and Gulf Coast residents.  While no undertaking of this magnitude is without flaws, BP is proud of its efforts and those of its contractors and the standards it has maintained throughout the cleanup.

The B3 Master Complaint filed in accordance with PTO No. 11 Section III.B(3) is a full scale attack on the cleanup and response effort undertaken by the BP Defendants and others, including Federal and State governments, under the Unified Command structure.  The B3 Master Complaint was filed "on behalf of those plaintiffs seeking damages for physical injuries, cost of future medical screening and monitoring, the implementation of a medical screening and monitoring program and/or property damage resulting from cleanup efforts after the explosion at

issue." B3 Master Complaint ("Compl.") at 3. Plaintiffs include response workers performing cleanup activities on vessels, those working on the coastline, and residents living on or near the coastal waters of the Gulf of Mexico. Compl. ¶ 21. Plaintiffs have adopted a "kitchen sink" approach to the drafting exercise, alleging a hodge-podge of 11 different causes of action under both federal and state law, and claims that are duplicative of those in the B1 Master Complaint. In order to streamline these proceedings and allow the parties and the Court to concentrate their resources on the Plaintiffs' core allegations, a number of the Plaintiffs' claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

*First*, Plaintiffs' claim for medical monitoring damages under general maritime law fails because damages for medical monitoring are simply not an available remedy under general maritime law. *Second,* Plaintiffs' claim for medical monitoring under Florida state law fails as well, as Plaintiffs acknowledge that no alleged negligent acts took place within Florida's territorial waters, making Florida law inapplicable. *Third,* Plaintiffs' nuisance claim must also be dismissed because no such cause of action exists under federal maritime law. *Fourth,* Plaintiffs' claim for damages under the Florida Pollutant Discharge Prevention and Control Act cannot succeed as a matter of law, since Florida state law does not apply in this case and the statute is inapplicable on its face. *Fifth*, because the Plaintiffs agreed in Pre-trial Order No. 25 that all Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701 *et seq.* (1990), claims against BP would be brought in the B1 Master Complaint, the Court should dismiss the first cause of action. *See* Pre-trial Order No. 25 ("PTO 25") ¶ 1 [Doc. 983]. To the extent Plaintiffs' OPA claims are properly brought in the B3 Master Complaint, they must be dismissed because Plaintiffs have not met the presentment requirement contained in OPA. *Sixth*, non-pecuniary damages are not available under general maritime law and, therefore, Plaintiffs' claim for punitive damages for

gross negligence should be dismissed.  And *finally*, there is no stand-alone cause of action for punitive damages, and to the extent Plaintiffs purport to establish their entitlement to punitive damages independent from any particular cause of action, that effort must be rejected.

One key purpose of the MDL is to make litigation more efficient that might otherwise prove unmanageable.  One way to harness the cases is to streamline the pleadings by dismissing the causes of actions that are not properly pled, allowing the parties to focus on the Plaintiffs' core allegations.  At base in the B3 Master Complaint, Plaintiffs allege that their health may have been affected by the oil spill and cleanup effort, and they seek to hold BP and the other Defendants liable for their alleged negligence.  The other causes of action are merely "noise" and clutter the B3 Master Complaint with duplicative, inapplicable claims.

So that the Court and the Parties may focus their efforts on identifying those Plaintiffs who may have claims for actual physical injuries, BP respectfully requests that the Court dismiss Plaintiffs' state law claims, as well as its claims for medical monitoring, nuisance and its claims under OPA.  BP also requests that the Court dismiss Plaintiffs' stand-alone claim for punitive damages, and Plaintiffs' claim for punitive damages under general maritime law.

## FACTUAL BACKGROUND

The *Deepwater Horizon* drilling rig was owned and operated by Transocean Ltd. and/or its affiliates.  Compl. ¶¶ 48–51.  BP hired Transocean to use the *Deepwater Horizon* to drill an exploration well on the seabed at Mississippi Canyon Block 252 ("MC 252"), which is located in the Gulf of Mexico approximately 130 miles southeast of New Orleans and 50 miles southeast of Venice, Louisiana.  On April 20, 2010, a fire and explosion occurred onboard the *Deepwater Horizon*.  Compl. ¶ 80.  The rig sank on April 22, 2010.

Within hours of the explosion of the *Deepwater Horizon* on April 20, 2010, BP began to mobilize a massive spill response, as mandated by OPA.  Pursuant to the terms of that Act and its

implementing regulations (including the National Contingency Plan[1]), the response was led by the Coast Guard—the Federal On-Scene Coordinator ("FOSC" or "OSC") and the National Incident Commander—and conducted pursuant to a Unified Command structure. *See* 40 C.F.R. § 300.105(c)(3) ("The OSC . . . [is] primarily responsible for directing response efforts and coordinating all other efforts at the scene of a discharge or release.");[2] 40 C.F.R. § 300.323 (explaining that for a Spill of National Significance ("SONS"), a National Incident Commander may be appointed to "assume the role of the OSC in communicating with affected parties and the public, and coordinating federal, state, local, and international resources at the national level."); 40 C.F.R. § 300.105(d) ("The basic framework for the response management structure is a system (e.g., a unified command system) that brings together the functions of the Federal Government, the state government, and the responsible party to achieve an effective and efficient response, where the OSC maintains authority.").[3]   The Macondo spill response is the largest response to an oil spill in U.S. history.

The response effort has been a carefully coordinated, multi-faceted approach that included innovative application of oil dispersants at the subsea site of the blowout, aerial use of dispersants, controlled burns on the surface of the Gulf, and the deployment of millions of feet of boom to contain as much oil as possible for removal by vessels equipped with skimmers.   At the height of the response effort in July 2010, over 45,000 responders were involved.   Teams of workers and equipment were mobilized across the four states of Louisiana, Alabama, Mississippi and Florida.   A key component of the response was the use of commercial and charter fishing

---

[1]   *See generally* National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. pt. 300 (2010).

[2]   *Accord* 40 C.F.R. § 300.120; 40 C.F.R. § 300.135; 40 C.F.R. § 300.305; 40 C.F.R. § 300.320; 40 C.F.R. § 300.322.

[3]   *Accord* 40 C.F.R. § 300.305(c).

vessels from communities along the Gulf Coast as part of the "Vessels of Opportunity" program. Thousands of independent vessel owners throughout the Gulf Coast contracted their boats in a variety of recovery activities, including towing and deploying boom, supporting skimming operations, and transporting supplies and personnel.

The health and safety of response workers and Gulf Coast residents was a top priority at all times during the response effort for BP and for the U.S. Coast Guard and other federal agencies and officials overseeing the cleanup effort.  Response workers were required to complete mandatory safety training before being dispatched to perform cleanup work and were supplied with the appropriate personal protective equipment.  Air monitoring on vessels used in the response was conducted to ensure that exposure levels were kept within safe occupational exposure limits.  Care was also taken to ensure that aerial application of dispersants did not come within the vicinity of any boats in the Vessels of Opportunity program, and air monitoring on those vessels again ensured that exposure levels were kept within safe occupational exposure limits.  Extensive air monitoring has also occurred along the Gulf Coast shoreline in order to ensure the safety of the public.  To date, the EPA has not detected any harmful levels of dispersant components in the air or any increase in volatile chemicals associated with the oil spill along the coastline.

## I.     STANDARD FOR MOTION TO DISMISS

To survive a motion to dismiss, Plaintiffs must plead enough facts "to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (1955)).  In assessing the merits of a Rule 12(b)(6) motion to dismiss, the Court must assume that all of the well-pleaded factual allegations set forth in the complaint are true.  *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007).  However, the Court need not assume the truth of Plaintiffs' conclusory allegations, nor are the Plaintiffs

entitled to the benefit of having the Court view unwarranted deductions of fact or argumentative inferences in their favor. *Papasan v. Allain*, 106 S.Ct. 2932 (1986). Thus, to avoid dismissal, a complaint must contain either direct or inferential allegations respecting all of the material elements of a claim to sustain a recovery under some viable legal theory. *Sanford v. Louisiana*, 228 Fed.Appx. 492 (5th Cir. 2007). A cause of action may also be dismissed where it is determined that a plaintiff has brought its claim under inapplicable law. *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 680 & n.26 (5th Cir. 2003).

## II.  CHOICE OF LAW

A threshold issue for the Court to determine is what law applies to the allegations asserted by the Plaintiffs in the B3 Master Complaint. The Plaintiffs refer to their Complaint as a "Complaint in Admiralty" and assert that "the claims presented herein are admiralty claims within the meaning of Rule 9(h) of the Federal Rule of Civil Procedure." Compl. ¶ 76. Plaintiffs nonetheless assert causes of action under both federal and state law, but it is clear that only federal statutes that apply on their own terms and general maritime law control the claims that are the subject of this Motion to Dismiss.[4]

The Mississippi Canyon Block (including the Macondo well), which is located approximately 50 miles (or roughly 44 nautical miles) off the coast of Louisiana, falls exclusively within the federal government's jurisdiction and outside the bounds of any Gulf State's jurisdiction. The Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et. seq.* (West 2011), and other sources of law generally limit state sovereignty to three nautical miles from a state's coastline. *See id.* § 1312; United Nations Convention on the Law of the Sea,

---

[4]  To make matters even more complicated, Plaintiffs also assert a claim under the Oil Pollution Act ("OPA"). As discussed at length in the BP Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) & 12(b)(6) the First Amended Master Complaint for Private Economic Losses, Filed in Accordance with PTO No. 11 (CMO No. 1), Section III.B1 (the "B1 Motion to Dismiss"), OPA provides the exclusive set of remedies for economic loss in the event of an oil spill. *See* B1 Motion to Dismiss at Section I.A.

arts. 56–57, 1833, Dec. 10, 1982, 1833 U.N.T.S. 397; Presidential Proclamation No. 5030, 48

Fed. Reg. 10,605 (Mar. 10, 1983) (proclaiming U.S. sovereign rights and jurisdiction within the

EEZ).  As held in *International Paper Co. v. Ouellette*, 479 U.S. 481 (1987), a State may not

apply its tort laws to water pollution originating in a different source State.  *See* B1 Motion to

Dismiss at Section III.B.

Moreover, under the Constitution, states cannot regulate extraterritorially: "[T]he

Commerce Clause precludes the application of a state statute to commerce that takes place

wholly outside of the state's borders, whether or not the commerce has effects within the state."

*Healy v. Bear Inst., Inc.*, 491 U.S. 324, 336 (1989) (internal quotation omitted); *see also Gerling*

*Global Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1235 (11th Cir. 2001).

Common-law duties are no different, and the Supreme Court has repeatedly rejected staFte

arguments that the common law is different than affirmative regulation by the states in the form

of statutes or agency regulations.  *See, e.g.*, *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 323–24

(2008); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 871–72 (2000).  Accordingly, federal law

and general maritime law apply exclusively to Plaintiffs' claims for personal injury arising from

the *Deepwater Horizon* oil spill.

## III.  PLAINTIFFS MAY NOT SEEK MEDICAL MONITORING DAMAGES UNDER ANY LAW THAT MAY APPLY TO THEIR CLAIMS.

Plaintiffs seek medical monitoring damages in two forms in the B3 Master Complaint: on

behalf of all VoO Plaintiffs[5] under general maritime law (Second Claim for Relief) and on behalf

of all Florida residents under Florida state law (Ninth Claim for Relief).  Compl. ¶¶ 202, 278.

---

[5] The "VoO Plaintiffs," as defined by the Plaintiffs in the B3 Master Complaint, are boat captains and crew involved in the Vessels of Opportunity Program ("VoO Program").  Compl. ¶ 21(a).  The VoO Program was created by BP after the Deepwater Horizon and has been a key component of the response through the use of local commercial and charter owner/operated fishing crews of the Gulf Coast.

Both causes of action fail as a matter of law and must be dismissed, albeit for different reasons. The VoO Plaintiffs' cause of action under general maritime law must be dismissed because medical monitoring in the absence of a physical injury is not recognized under the Jones Act— which likely applies to some VoO Plaintiffs—or federal maritime law.  The Florida Plaintiffs' cause of action under Florida state law for medical monitoring must be dismissed because Florida state law is inapplicable to disputes arising from the *Deepwater Horizon* oil spill and, as admitted in Plaintiffs' Complaint, no allegedly negligent acts took place in Florida's waters.

### A.    The VoO Plaintiffs' Claim for Medical Monitoring Damages Under General Maritime Law Must Be Dismissed.

The VoO Plaintiffs' claim for medical monitoring damages arises from their alleged exposure to "oil, dispersants, and/or other hazardous chemicals."  Compl. ¶ 207.  Importantly, the VoO Plaintiffs allege that this exposure "may lead to serious health problems, diseases, and medical conditions" in the future; there is no specific allegation that the VoO Plaintiffs currently suffer from a physical injury.  Compl. ¶ 209.  Indeed, the VoO Plaintiffs concede that their claim for medical monitoring relates only to latent diseases.  Compl. ¶¶ 209–12.  Equally important, Plaintiffs seek "medical monitoring as an element of damages" rather than injunctive or equitable relief to establish a medical monitoring program.  Compl. at 47.  These two features are fatal to Plaintiffs' claim, as Plaintiffs cannot recover a lump sum damages award for medical monitoring in the absence of physical injury under the Jones Act or federal maritime law.

### 1.    Medical Monitoring Damages Are Not Allowed Under the Jones Act.

The Jones Act provides an action in negligence for the injury of a seaman.  *Miles v. Apex Marine Corp.*, 498 U.S. 19, 29 (1990).  The Jones Act is the applicable federal law for all VoO Plaintiffs who were seamen and allegedly were exposed to "oil, dispersants, and/or other

hazardous chemicals" as a result of the alleged negligence of the Defendants.[6]  Compl. ¶ 207.

The Jones Act incorporates the Federal Employers Liability Act ("FELA"), as the Supreme

Court has held that the Jones Act adopts "the entire judicially developed doctrine of liability"

under FELA.  *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 439 (1958).[7]  By incorporating FELA

into the Jones Act, "Congress must have intended to incorporate the pecuniary limitation on

damages [in FELA] as well."  *Miles*, 498 U.S. at 32.  As described below, under FELA, the VoO

Plaintiffs may not recover a lump sum award for medical monitoring damages unless the

individual plaintiff suffers from a manifest injury.

The United States Supreme Court was asked to address whether FELA allows for

recovery for medical monitoring damages in *Metro-North Commuter Railroad. Co. v. Buckley*,

521 U.S. 424 (1997). There, after canvassing state law cases and considering competing

considerations, the U.S. Supreme Court held that lump sum medical monitoring costs are not

recoverable under FELA in the absence of a manifest injury.[8]  *Id.* at 440–441.  The Court held

that allowing such relief would "threaten both a 'flood' of less important cases (potentially

absorbing resources better left available to those more seriously harmed . . . ) and the systemic

harms that can accompany 'unlimited and unpredictable liability'. . . ."  *Id.* at 442; *see also*

*Green v. McAllister Bros., Inc.*, No. 02 7588(FM), 03 1482(FM), 2005 WL 742624 at *23

(S.D.N.Y. Mar. 25, 2005) (denying as a matter of law Jones Act plaintiffs' claim to recover

---

[6]    To the extent the VoO Plaintiffs are not deemed seamen, the issue of medical monitoring damages is governed
by federal maritime law.

[7]    The statute provides, in relevant part:  "A seaman injured in the course of employment or, if the seaman dies
from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right
of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or
death of, a railway employee apply to an action under this section."  46 U.S.C.A. § 30104.

[8]    While the Court left open whether other types of medical monitoring relief might be appropriate in the absence
of physical symptoms, the VoO Plaintiffs are seeking a lump sum payment as "an element of damages."
Compl. at 47; *see also* Compl. ¶ 215 ("Defendants BP . . . have denied such payment and/or have paid benefits
in an insufficient amount.").

damages for "medical monitoring costs that they have incurred or will in the future incur" as a result of alleged exposure). Because the B3 Complaint seeks medical monitoring damages solely to address latent diseases, the VoO Plaintiffs who are deemed seamen cannot recover medical monitoring damages as dictated by the Jones Act.

> **2.**      If the Issue of Damages Is Unresolved Under Maritime Law, General Maritime Law Will Seek Uniformity Under and Apply the Jones Act Standard.

As to those VoO Plaintiffs who are not seamen under the Jones Act, general maritime law is unresolved as to the issue of medical monitoring damages. In the absence of any general maritime law rule on an issue, the Court must look to the Jones Act as a guide to protect the uniformity of federal maritime law. *Miles v. Apex Marine Corp.*, 498 U.S. 19, (1990). In *Miles*, the Court addressed the issue of whether non-pecuniary damages (loss of society) are available under the general maritime law. Both the Jones Act and the Death on the High Seas Act ("DOHSA"), 46 U.S.C. § 3030–30306 (2006), limit recovery for wrongful death to actual pecuniary loss. The Court concluded that because Congress had determined not to allow a remedy under a maritime statute, allowing that same remedy under general maritime law would undermine Congressional intent and thus was prohibited. *Miles*, 111 S.Ct. at 328 ("Because [Plaintiff] cannot recover for his lost future income under the Jones Act, it cannot do so under general maritime law.").

Further, even if the Court were to decide not to rely on the principles of the Jones Act in determining whether non-seamen may recover medical monitoring damages, the non-seamen Plaintiffs still may not recover medical monitoring damages, as the Court must next look to Louisiana law, which likewise does not allow medical monitoring damages. When maritime law is silent on an issue, state law from the state where the Court sits may fill in the gap in a manner not destructive of the uniformity that maritime law seeks. *Alcoa S.S. Co. v. Charles Ferran & Co.,* 383 F.2d 46, 50 (5th Cir. 1967). In this instance, Louisiana law is clear that damages for

medical monitoring of unmanifested diseases, as sought by the VoO Plaintiffs, are not permitted. LA. CIV. CODE ANN. art. 2315 (2010), *Bonnette v. Conoco, Inc.*, 837 So.2d 1219, 1230 n.6 (La. 2003) ("The [1999] amendment effectively eliminated medical monitoring as a compensable item of damage in the absence of a manifest physical or mental injury or disease.").  Application of Louisiana law is also consistent not only with federal maritime law, but with all of the states in the Gulf region save Florida, as damages for future medical treatment are permitted only for treatment directly related to a manifest physical or mental injury or disease causally related to the fault of the defendant in Alabama, Mississippi, and Texas.[9]  Thus, whether under the Jones Act, general maritime law, or Louisiana state law to fill any "gap" in general maritime law, damages for medical monitoring are not available to the VoO Plaintiffs as pleaded in the B3 Complaint for seamen and non-seamen alike.[10]

### B. Plaintiffs' Claims for Medical Monitoring Under Florida State Law Also Must be Dismissed.

Plaintiffs' Ninth Claim for Relief is brought on behalf of "Florida Plaintiffs" for establishment of a medical monitoring program under Florida law.  Florida Plaintiffs allege that they were "exposed to greater than normal background levels of oil, dispersants, and/or other hazardous chemicals as a result of the Oil Spill."  Compl. ¶ 281.  As a result of their alleged

---

[9]  *Hinton ex rel. Hinton v. Monsanto Co.*, 813 So.2d 827, 831–32 (Ala. 2001) ("[Alabama] law provides no redress for a plaintiff who has no present injury or illness."); *Paz v. Brush Eng'rd Materials, Inc.*, 949 So.2d 1, 5–6 (Miss. 2007) (no medical monitoring cause of action for "mere exposure to a harmful substance without proof of current physical or emotional injury from that exposure."); *Norwood v. Raytheon Co.*, 414 F.Supp.2d 659, 665 (W.D. Tex. 2006) (applying Texas state law and finding that a Texas court would likely not recognize a medical monitoring claim without a physical injury).  Florida arguably is the sole exception, and is addressed below.

[10]  Without citing any specific contractual provisions, the VoO Plaintiffs also purport to base their theory of recovery of medical monitoring damages on the existence of the Charter Agreement between BP and the VoO Plaintiffs and "various statements and representations in the press, in court proceedings, on BP's website, and/or otherwise, in which BP recognized and/or voluntarily assumed responsibility for the safety and protection of workers engaged in the VoO program."  Compl. ¶ 206.  The B3 Complaint does not contain a breach of contract claim, and a medical monitoring claim is not an available means of seeking to enforce either the Charter Agreement or any subsequent statements BP allegedly made.

exposure, Florida Plaintiffs claim they "have developed a significantly increased risk of contracting a serious latent disease."  Compl. ¶ 286.  Accordingly, the Florida Plaintiffs demand injunctive and equitable relief, including continued environmental, water supply, food supply, and air monitoring, and creation of a medical monitoring program.  Compl. ¶¶ 279–280. Plaintiffs' Ninth Claim for Relief must be dismissed because Florida state law is inapplicable to this dispute.

As explained in more detail in Section IV.A. *supra*, the Jones Act and general maritime law apply to claims for medical monitoring that originate in federal waters, and no such remedy is available.  Plaintiffs admit that "the immediate discharge from the Oil Spill, and the application of chemical dispersants, occurred in waters outside the territorial limits of Florida." Compl. ¶ 315.  As a result, applying Florida law to cover an incident outside Florida's territorial waters would violate the Supreme Court's interpretation of the Clean Water Act[11] in *International Paper Co. v. Ouellette*, 479 U.S. 481 (1987) (holding that plaintiff's common law suit filed in Vermont court under Vermont law was pre-empted under the Clean Water Act because the ***source*** of the alleged injury was not in Vermont) (emphasis added); *see also* B1 Motion to Dismiss at Section III.B.

Such application also would be an unconstitutional extraterritorial application of state law to regulate interstate commerce.  Interstate commerce, including the discovery, production, and transportation of oil through federal water, is governed solely by Congress.  *See* U.S. CONST. art. I, § 8, cl. 3; *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) ("[T]he Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the

---

[11]   The Clean Water Act prohibits discharges from point sources to "navigable waters," defined as "the waters of the United States, including territorial seas."  33 U.S.C. § 1362(7).  The Oil Spill and the application of dispersants both took place in navigable waters.  Compl. ¶ 315.  As a result, the acts underlying Plaintiffs' B3 Complaint fall squarely within the scope of the Clean Water Act.

state's borders, whether or not the commerce has effects within the state.") (internal quotation omitted).  Plaintiffs attempt to invoke Florida law by alleging that "oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill" reached residents in Florida, even if the immediate discharge from the Oil Spill, and the application of chemical dispersants, occurred in waters outside the territorial limits of Florida.   Compl. ¶ 282.  Such attempt, however, is incompatible with the Commerce Clause, as a state law that is applied in a manner that has the "practical effect" of regulating commerce outside the state's borders violates the Commerce Clause.  *Healy*, 491 U.S. at 336.  In the instant case, it is undisputed that the BP Defendants' drilling operations and cleanup efforts in federal waters were part of interstate commerce.  Applying Florida medical monitoring law to BP Defendants' drilling operations or cleanup efforts in federal waters would have the practical effect of regulating commerce outside the state.  As a result, the Commerce Clause precludes application of Florida state law to the oil spill.  For this reason as well, Plaintiffs' Ninth Claim for Relief should be dismissed.[12]

## IV.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR NUISANCE.

The claim for nuisance (Seventh Claim for Relief) alleges that "BP's oil disaster has significantly interfered with the public's right to use and enjoy the Gulf of Mexico without oil slicks, chemical dispersants, tar balls, and other associated pollution."   Compl. ¶ 260.  Accordingly, Plaintiffs seek damages "for the creation of a public nuisance and a judgment for injunctive relief to abate the nuisance."[13]  Compl. ¶ 271.   Plaintiffs' claim fails because under

---

[12]   Because, as detailed above, Plaintiffs cannot recover damages for medical monitoring under any applicable law, they cannot attempt an end-run around this result by seeking medical monitoring damages as a remedy for nuisance.  *See* Compl. ¶ 271.  Damages for medical monitoring are unavailable whether pled as a stand-alone cause of action or as an element of damages for another cause of action.

[13]   Plaintiffs' request for "injunctive relief to abate the nuisance" is puzzling.  Comp. ¶ 271.  While there is no case precisely on point because a cause of action for public nuisance does not exist under maritime law, when state law is applicable, courts will enjoin conduct that is ***continuing*** in nature if irreparable injury is shown.  *See, e.g., Parish of East Feliciana ex rel. East Feliciana Parish Police Jury v. Guidry*, 923 So.2d 45, 53–54 (La. Ct.

federal maritime law, which Plaintiffs concede applies, there is no cognizable claim for public nuisance.  Compl. ¶ 76.  Moreover, even if such a claim did exist under federal maritime law, Plaintiffs' claim still fails, because it runs afoul of the *Robins Dry Dock* rule established by the Fifth Circuit, which bars claimants from recovering economic losses in the absence of physical injury to a proprietary interest.

### A.   Nuisance Is Not A Recognized Cause of Action Under Federal Maritime Law.

Under federal maritime law, claims for public nuisance fail as a matter of law; in fact no such cause of action exists.  *Louisiana ex rel. Guste v. M/V TESTBANK,* 752 F.2d 1019, 1030 n.13 (5th Cir. 1985) (concluding that the Supreme Court foreclosed a federal cause of action for public nuisance claims); *Sekco Energy, Inc. v. M/V Margaret Chouest,* 820 F.Supp. 1008, 1014 (E.D. La. 1993) (rejecting public nuisance claim under maritime law against party who allegedly polluted a navigable waterway with oil because the court "searched in vain for case law which recognizes a federal cause of action for public nuisance.").[14]  In *California v. Sierra Club*, 451 U.S. 287 (1981), relied upon by *TESTBANK* and *Sekco* for the proposition that a claim for public nuisance cannot be asserted under maritime law, the Supreme Court considered whether a private party could sue under a provision of the Rivers and Harbors Appropriation Act that prohibited

---

App. 2005) (enjoining motorcross track from operating where operation would necessarily result in ongoing noise violations) (emphasis added).  Here, Plaintiffs do not allege that BP continues to release oil or dispersants into the Gulf of Mexico and have failed to identify any continuing nuisance.  Thus, it is unclear what action Plaintiffs' request for injunctive relief is directed towards.

[14]   Although *Sekco* has not been overruled and remains good law for the proposition cited, the Fifth Circuit has expressly repudiated the *Sekco* court's approach to the economic loss doctrine.  *See, e.g., Reserve Mooring Inc. v. Am. Commercial Barge Line, LLC*, 251 F.3d 1069, 1071 &  n.5 (5th Cir. 2001) (reversing district court because it had followed *Sekco* by allowing plaintiffs to recover damages in the absence of physical injury to a proprietary interest in violation of the 'bright line' rule established by *TESTBANK*)*; In re Taira Lynn Marine Ltd. No. 5, LLC,* 444 F.3d 371, 379 (5th Cir. 2006) ("While other jurisdictions may have abandoned or relaxed the bright line rule of *Robins* and *TESTBANK,* this circuit has not retreated from *TESTBANK*'s physical injury requirement.") (internal citations omitted); *Sanko S.S. Co. Ltd. v. United States of America*, No. 98-1667, 2002 WL 1880745 at *5 (N.D. Cal. Aug. 12, 2002) ("The district court's reasoning in *Sekco* has been expressly rejected by the Fifth Circuit.").

obstructions in navigable waters.  In concluding that the Act did not allow for a private cause of action, the Court noted that prior to the Act "there was no federal law which empowered anyone to contest obstructions to navigable rivers," *id*. at 296 n.7, and "no federal common law which prohibits obstructions and nuisances in navigable waters."  *Id.* at 295 (citing *Williamette Iron Bridge Co. v. Hatch*, 125 U.S. 1 (1888)).  Because the Act failed to affirmatively establish a private right of action, the Court concluded that Congress only intended to "empower the Federal Government to respond to obstructions in navigable rivers."  *Id.* at 296 n.7.

Shortly thereafter, the Supreme Court dismissed common-law nuisance claims for ocean pollution because "the federal common law of nuisance in the area of water pollution is entirely pre-empted by the more comprehensive scope of the FWPCA [Federal Water Pollution Control Act]."  *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n.*, 101 S.Ct. 2615, 2627 (1981).  The First Circuit agreed and held that "the federal common law of nuisance in the area of water pollution is entirely pre-empted by the more comprehensive scope of the FWPCA," and that *Sea Clammers* encompassed "all federal **judge-made** law of nuisance whether maritime or general federal law."  *Conner v. Aerovox, Inc.*, 730 F.2d 835, 842 (1st Cir. 1984) (emphasis in original).  In short, an action for public nuisance is not permitted under maritime or federal common law.  *TESTBANK*, 752 F.2d at 1030 n.13.

### B.    Even if Nuisance Were a Cognizable Claim, It is Barred by the Economic Loss Doctrine.

Moreover, the Fifth Circuit has provided another basis to dismiss Plaintiffs' public nuisance claim.  To the extent Plaintiffs bring this nuisance claim to recover economic losses in the absence of physical injury to a proprietary interest, they "cannot recover whether or not they have a substantive claim for nuisance under federal law."  *TESTBANK*, 752 F.2d at 1030.  *See also* B1 Motion to Dismiss at Sections I.B. and III.D.2.  Plaintiffs suggest that when a defendant

unreasonably interferes with public rights by negligently polluting a waterway, it creates a public nuisance for which recovery is available to all who are affected to a greater degree than the general public. Compl. ¶¶ 259–265, 271.  Plaintiffs allege that they "have been unable to fish or boat, and many have lost their livelihoods."  Compl. ¶ 262.  *TESTBANK* expressly rejected such transparent attempts to plead around the economic loss doctrine.  As in *TESTBANK*, Plaintiffs "seek to avoid the *Robins Dry Dock* rule by characterizing their claims as damages caused by a public nuisance."  *TESTBANK*, 752 F.2d at 1030.  But nuisance "is not a separate tort subject to rules of its own [and] instead is a type of damage."  *Id.*  "[R]ephrasing the claim as a public nuisance does not change its essential character."  *Id.* at 1030–31.  Accordingly, the *TESTBANK* court concluded that "plaintiffs may not recover for pure economic losses under a public nuisance theory in maritime tort."  *Id.* at 1031.  The same is true here, and accordingly, Plaintiffs' claim for nuisance must be dismissed.

## V.   PLAINTIFFS' CLAIM UNDER THE FLORIDA POLLUTANT DISCHARGE PREVENTION AND CONTROL ACT MUST BE DISMISSED.

In their Eleventh Claim for Relief, Plaintiffs again attempt to apply the law of the state of Florida, this time alleging that the BP Defendants "breached their statutory duty to Plaintiffs" by violating the Florida Pollutant Discharge Prevention and Control Act ("PDPCA" or "the Act").[15] Compl. ¶ 310.  In particular Plaintiffs claim that the BP Defendants breached their statutory duty "by discharging, or allowing to be discharged, crude oil into the Gulf of Mexico and allowing the Oil Spill and/or chemical dispersants to migrate into Florida's marine and coastal areas."  Compl. ¶ 310.  Plaintiffs argue that, as a result of the alleged breach, the BP Defendants are strictly liable

---

[15]   The PDPCA was designed both to minimize the damage from pollutant discharges and accelerate cleanup efforts. FLA. STAT. § 376.09(1)–(2).  In particular, the PDPCA (1) prohibits the "discharge of pollutants into or upon . . . coastal waters, estuaries, tidal flats, beaches, and lands adjoining the seacoast of [Florida]," FLA. STAT. § 376.041; (2) apportions cleanup costs and places limits on liability, FLA. STAT. § 376.12, and; (3) outlines both removal requirements and protections from suits related thereto, FLA. STAT. § 376.09.

to Plaintiffs for damages sustained as a result of the oil spill and post-explosion cleanup activities and are entitled to compensatory and punitive damages from BP Defendants.  Compl. ¶¶ 311–316, 320.[16]  Yet, Plaintiffs concede that "the immediate discharge from the Oil Spill, and the application of chemical dispersants, occurred in waters outside the territorial limits of Florida." Compl. ¶ 315.  Because Florida law does not apply in this case, and the PDPCA does not apply on its face, Plaintiffs' claim must be dismissed.

A.   **The Florida Pollutant Discharge Prevention and Control Act Does Not Apply to Pollutant Discharges or Cleanup Activities that Take Place Outside Florida's Territorial Limits.**

Plaintiffs' PDPCA claim must be dismissed for the same reason that the Florida medical monitoring claim should be dismissed: Florida state law simply has no application in this case. *First*, as previously discussed, applying Florida law to cover an incident outside Florida's territorial waters would violate the Supreme Court's interpretation of the Clean Water Act[17] in *Ouellette*, 479 U.S. 481 (1987) (holding that plaintiff's common law suit filed in Vermont court under Vermont law was pre-empted under the Clean Water Act because the *source* of the alleged injury was not in Vermont) (emphasis added); *see also* B1 Motion to Dismiss at Section III.B.

*Second*, such applications would also be an unconstitutional extraterritorial application of state law to regulate interstate commerce, which is solely governed by Congress.  *See* U.S. CONST. art. I, § 8, cl. 3; *Healy*, 491 U.S. at 336.  Plaintiffs admit that "the immediate discharge from the Oil Spill, and the application of chemical dispersants, occurred in waters outside the territorial limits of Florida," but maintain that "lands and waters within the territorial limits of

---

[16]   Plaintiffs' claim under the PDPCA is wholly duplicative of the claim made by Plaintiffs against the BP defendants in the B1 Master Complaint.

[17]   The Clean Water Act prohibits discharges from point sources to "navigable waters," defined as "the waters of the United States, including territorial seas."  33 U.S.C. § 1362(7).  The Oil Spill and the application of dispersants both took place in navigable waters.  As a result, the acts underlying Plaintiffs' B3 Complaint fall squarely within the scope of the Clean Water Act.

Florida have been directly affected." Compl. ¶ 315. Plaintiffs' attempt to invoke the PDPCA on the basis of effects within Florida's boundaries, however, is incompatible with the Commerce Clause. A state law that is applied in a manner that has the "practical effect" of regulating commerce outside the state's borders violates the Commerce Clause. *Healy*, 491 U.S. at 336. In the instant case, it is undisputed that the BP Defendants' drilling operations and cleanup efforts in federal waters were part of interstate commerce. Applying the PDPCA to BP Defendants' drilling operations or cleanup efforts in federal waters would have the practical effect of regulating commerce outside the state. As a result, the Commerce Clause precludes application of the PDPCA to the oil spill.

*Third and finally*, even assuming that Florida law could apply to certain claims in this case, the PDPCA *by its own terms* does not apply to the oil spill or the cleanup activities. Part I of Chapter 376 of the PDPCA, for example, (spanning §§ 376.011–376.21) does not embrace discharges occurring outside Florida's territorial waters.[18] Specifically, the PDPCA states, "[t]he discharge of pollutants *into or upon* any coastal waters, estuaries, tidal flats, beaches, and lands adjoining the seacoast of the state in the manner defined by §§376.011–376.21 is prohibited." FLA. STAT. §376.041 (emphasis added); *see Askew v. Am. Waterways Operators, Inc.*, 411 U.S. 325, 327 (1973) ("The Florida Act imposes strict liability for any damage incurred by the state or private persons as a result of an oil spill *in the State's territorial waters* from any waterfront

---

[18] Part II of Chapter 376 of the PDPCA (spanning §§ 376.30–376.317, 376.70, and 376.75) even more clearly excludes discharges occurring outside Florida's jurisdiction. *See* Wade L. Hopping & William D. Preston, *The Water Quality Assurance Act of 1983—Florida's "Great Leap Forward" into Groundwater Protection and Hazardous Waste Management*, 11 FLA. STATE UNIV. L. REV. 599, 601, 610 (1983–84); FLA. STAT. § 376.3071 (establishing the Inland Protection Trust Fund); *id.* at § 376.3075 (establishing Inland Protection Financing Corporation). Unlike Part I of the Act, which relates to Florida's coastal waters, Part II relates to Florida's surface and ground waters or lands. Specifically, Part II prohibits pollutant or hazardous substance discharges "into or upon [Florida's] surface, [] ground waters" or lands. FLA. STAT. § 376.302(1)(a). Part II of Chapter 376 was thus purposely designed to address in-state water pollution and has no bearing on discharges that occur outside Florida's territorial waters.

facility used for drilling for oil or handling the transfer or storage of oil (terminal facility) and from any ship destined for or leaving such facility.") (emphasis added); *see also* FLA. STAT. § 376.12(1) (responsible parties made liable for discharges that "take place within state boundaries").  Since Plaintiffs have admitted that the discharge from the Oil Spill and the use of dispersants did not take place within Florida's territorial waters, the PDPCA does not govern the Oil Spill or BP Defendant's cleanup activities, and the Eleventh Claim for Relief should be dismissed.  Compl. ¶ 315.

**B.      Even if BP Defendants' Cleanup Activities Took Place within Florida's Territorial Waters, Those Activities Are Not Subject to Strict Liability Under the Florida Pollutant Discharge Prevention and Control Act.**

Even assuming that the Court finds that the PDPCA applies to any cleanup activities that might have taken place within the state of Florida, Plaintiffs' Eleventh Claim for Relief still must be dismissed because the PDPCA does not hold parties liable for acts or omissions committed during cleanup activities in the absence of allegations of gross negligence or willful misconduct. While Plaintiffs have alleged that the PDPCA contains a strict liability standard, Compl. ¶ 311, citing section 376.205, they have failed to reveal to the Court that the strict liability standard applies only to claims for damages resulting from the initial discharge of pollutants; that is, the actual spill.[19]  The Plaintiffs, however, are seeking damages under the PDPCA "as a result of the post-explosion cleanup activity."  Compl. ¶ 316.   The PDPCA contains a separate section that addresses the standard of proof regarding cleanup activities.  Section 376.09(4) of the PDPCA

---

[19]   The section relied upon by Plaintiffs states:  "any person may bring a cause of action against a responsible party in a court of competent jurisdiction for damages, as defined in § 376.031, resulting from a discharge or other condition of pollution covered by §§ 376.031–376.21.  In any such suit, it shall not be necessary for the person to plead or prove negligence in any form or manner.  Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it occurred."  FLA. STAT. § 376.205

states that with respect to acts in containing or removing pollutants a person[20] is only liable **"for acts or omissions amounting to gross negligence or willful misconduct."** FLA. STAT. § 376.09(4).[21]  Thus, to state a claim under the PDPCA based on cleanup, Plaintiffs must allege gross negligence or willful misconduct with respect to cleanup operations occurring **in Florida**.[22] Because Plaintiffs have not even attempted to satisfy this pleading requirement, their claim must be dismissed.

## VI. PLAINTIFFS' OPA CLAIMS THAT HAVE NOT BEEN PROPERLY PRESENTED MUST BE DISMISSED AT THIS TIME PENDING COMPLIANCE WITH THAT PRE-SUIT REQUIREMENT.

Plaintiffs' First Claim for Relief alleges a claim under OPA's sections 2701 and 2702, which imposes liability for damages and removal costs upon a "responsible party for a . . . vessel or a facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines." Compl. ¶ 195.  The OPA cause of action in the B3 Master Complaint is wholly duplicative of the first cause of action in Plaintiffs' B1 Master Complaint, which seeks private economic losses.  The Plaintiffs agreed in paragraph 1 of Pre-Trial Order No. 25 to bring all OPA claims against the BP Defendants through the B1 Pleading Bundle.  *See* Pre-trial Order No. 25 ("PTO 25") ¶ 1 [Doc. 983].  To the extent PTO 25 is not binding on the Plaintiffs and such claims are properly asserted in the B3 Complaint, BP incorporates by reference Section II of the

---

[20]   Section 376.031(14) defines "person" as "any individual partner, joint venture, corporation; any group of the foregoing, organized or united for a business purpose; or any governmental entity." FLA. STAT. § 376.031(14)

[21]   The entire provision states: "[n]o person who, voluntarily or at the request of the [Florida Department of Environmental Protection] or its designee, renders assistance in containing or removing pollutants shall be liable for any civil damages to third parties resulting solely from acts or omissions of such person in rendering such assistance, *except for acts or omissions amounting to gross negligence or willful misconduct*." Fla. Stat. § 376.09(4) (emphasis added).

[22]   The only allegations in the B3 Complaint that might arguably be characterized as gross negligence or willful misconduct relate to the use of dispersants, however Plaintiffs have conceded that no chemical dispersants were applied in Florida.  Compl. ¶ 315 (Plaintiffs admit that "the immediate discharge from the Oil Spill, *and the application of chemical dispersants*, occurred in waters outside the territorial limits of Florida.").

B1 Motion to Dismiss.

For all of the reasons articulated in the B1 Motion to Dismiss, the vast majority of the OPA claims must be dismissed as premature pursuant to Rule 12(b)(1) or Rule 12(b)(6).  *See* B1 Motion to Dismiss at Section II.  While many plaintiffs within this multidistrict litigation may well have valid OPA claims under sections 2701 and 2702, the overwhelming majority have yet to satisfy OPA's presentment requirement, making a damages claim against the BP Defendants premature.  *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., Inc.*, 51 F.3d 235, 240 (11th Cir. 1995); *see also Berthelot v. Big Bros. Constr. Co., L.L.C.*, No. 05-4182, 2006 WL 2256995 at *6 (E.D. La. July 16, 2006).  Because, consistent with PTO 25, the BP Defendants believe that all OPA claims against them should be brought in a single Master Complaint, the OPA cause of action in the B3 Master Complaint should be dismissed.  Even if properly brought, however, consistent with the arguments fully briefed in the BP Defendants' B1 Motion to Dismiss, the vast majority of the Plaintiffs have failed to satisfy the statutory presentment requirements of OPA and therefore their claims must be dismissed as premature pursuant to Rule 12(b)(1) or Rule 12(b)(6).

## VII.  PUNITIVE DAMAGES ARE NOT AVAILABLE FOR GROSS NEGLIGENCE UNDER MARITIME LAW.

Plaintiffs bring a gross negligence claim under maritime law (Fourth Claim for Relief) and seek punitive damages for injuries resulting from BP's alleged willful and wanton disregard in its negligent failure to contain the Oil Spill.  Compl. ¶¶ 229–36.  Plaintiffs assert that the manner in which BP contained and dispersed the oil resulted in Plaintiffs' exposure to chemical dispersants and crude oil, causing present and future injury.  Compl. ¶¶ 5–12, 94–96, 129–169.  Under federal maritime law, Plaintiffs may not recover punitive damages for personal injury claims even if they could prove that BP engaged in willful and wanton conduct and that such

conduct caused their alleged injuries.  Accordingly, this part of Plaintiffs' gross negligence claim should be dismissed.

### A.    Non-Pecuniary Damages, Including Punitive Damages, Are Not Available to Jones Act Plaintiffs.

The prohibition on punitive damages in general maritime law for certain causes of action finds its roots in *Miles v. Apex Marine Corp.,* 498 U.S. 19 (1990).  In *Miles*, the Court held that loss-of-society damages (a form of non-pecuniary damages) are not available in a general maritime law action for the wrongful death of a seaman.  Desiring to "restore a uniform rule applicable to all actions for the wrongful death of a seaman, whether under the Death on the High Seas Act, the Jones Act, or general maritime law" the Court held that, because the Jones Act "limits recovery to pecuniary loss . . . [w]e must conclude that there is no loss of society in a general maritime action for the wrongful death of a Jones Act seaman."  *Miles*, 498 U.S. at 32–33.

Shortly after the Supreme Court issued the opinion, the Fifth Circuit applied *Miles*, determining that the Court's "reasoning applies with equal force to a seaman's claims for injuries" under general maritime law and holding that "the Jones Act limits a seaman's recovery for injury to pecuniary losses and precludes any recovery for nonpecuniary losses."  *Murray v. Anthony J. Bertucci Constr. Co.*, 958 F.2d 127, 131 (5th Cir. 1992).  Punitive damages are non-pecuniary in nature and are therefore not recoverable under the Jones Act.  *Neal v. Barisich, Inc.*, 707 F.Supp. 862, 873 (E.D. La. 1992) ("Punitive damages are non-pecuniary").  As one court has noted:

> The crux of *Miles* is that a Jones Act seaman . . . cannot circumvent the limitations that the Jones Act places on damages by seeking to recover them under general maritime law.  In reaching this conclusion the [Supreme] Court was moved by concerns that admiralty courts not craft expansive remedies for seamen that Congress had declined to adopt when enacting the Jones Act.

*Seaman v. Seacor Marine LLC*, No. 07-3354, 2008 WL 360783, at *1–2 (E.D. La. Jan. 17, 2008).   Indeed, in the wake of *Miles*, the overwhelming majority of courts in the Eastern District of Louisiana have recognized that personal injury plaintiffs may no longer recover punitive damages under general maritime law for gross negligence or willful and wanton misconduct.[23]

The Supreme Court's recent decisions related to the availability of punitive damages for certain causes of action in maritime law do not contradict this well-established case law.   In *Atlantic Sounding Co., Inc. v. Townsend*, the Court held that recovery of punitive damages for the willful refusal to pay maintenance and cure benefits was available because prior case law "explicitly acknowledged a seamans right to choose among overlapping statutory and common-law remedies for injuries sustained by the denial of maintenance and cure."   129 S.Ct. 2561, 2574 (2009).   Indeed, the Court specifically distinguished *Townsend* from *Miles* by stating that the Jones Act "does not address maintenance and cure or its remedy," *id.* at 2572, a distinction long recognized in the Eastern District of Louisiana.   *See, e.g.*, *Anderson v. Texaco, Inc.*, 797 F.Supp. 531, 535–36 (E.D. La. 1992) (holding that general maritime law prohibited punitive damages for gross negligence or unseaworthiness but that punitive damages for willful failure to pay maintenance and cure were recoverable).   *Townsend* thus stands simply for the proposition

---

[23]   *See, e.g., Seaman,*   2008 WL 360783 at *1–2 (Jones Act seaman allegedly injured as a result of employer's wanton and reckless disregard in storage, handling and transportation  of hazardous or toxic substances could not recover punitive damages under general maritime law); *Anderson v. Texaco Inc.*, 797 F. Supp. 531 at 534–36 (seamen injured as a result of explosion aboard a drilling rig could not recover punitive damages because plaintiffs can no longer recover punitive damages for "lawless misconduct" that amounts to "gross and wanton outrage," under the general maritime law of negligence); *Butcher v. Superior Offshore Int'l, LLC*, No. 07-8136, 2008 WL 754811 at *1 (E.D. La. Mar. 19, 2008) (dismissing punitive damage claim of personal injury plaintiff alleging gross, wanton, and willful negligence because "[a] party bringing a claim under the Jones Act or general maritime law cannot recover punitive damages"). *Hayden v. Acadian Gas Pipeline Sys.*, 1997 WL 382059 at *1, *3 (E.D. La. July 9, 1997) (disallowing personal injury plaintiffs' claims for punitive damages where defendants allegedly "acted willfully, wantonly, and with callous disregard for the rights and safety of the plaintiffs" because "the clear import of *Miles* and its progeny is that the only damages recoverable under the general maritime law are pecuniary losses); *Williams v. Texaco Inc.*, No. Civ.A 97-1211, 1997 WL 250009, at *1 (E.D. La. May 8, 1997) (dismissing personal injury plaintiff's punitive damages claims for "alleged egregious fault" in negligence and intentional tort suit because "the only damages recoverable under the General Maritime Law are pecuniary losses" and "[p]unitive damages are not pecuniary losses").

that where the Jones Act (and by extension Congress) as to available remedies is silent—such as is the case with maintenance and cure—a plaintiff may pursue punitive damages under general maritime law.

*Exxon Shipping Co. v. Baker*, 554 U.S. 471, 475–77 (2008), also addresses punitive damages in the context of maritime law.  There, however, the Supreme Court—dealing with economic loss claims—did not consider whether plaintiffs could recover punitive damages for personal injury claims under general maritime law    and the Court did not consider the availability of punitive damages in the context of maritime law more broadly.  *Id.* at 490. (Defendant, "[o]ther than [making a] preemption argument [under the Clean Water Act did] not offer a legal ground for concluding that maritime law should never award punitive damages. . .").  Neither *Baker* nor *Townsend* undermines the central contention of *Miles* that where a statute specifically speaks to the remedies available in general maritime law, a plaintiff may not seek additional remedies under common law.  For this reason, seamen Plaintiffs may only seek relief available under the Jones Act for personal injury negligence claims, which excludes punitive damages.

### B.      Uniformity Required by the Supreme Court in *Miles* Demands that Punitive Damages are Likewise Unavailable Under General Maritime Law.

Courts have also made it clear that the principle of uniformity established by *Miles* bars punitive damages under general maritime law regardless of whether plaintiffs are Jones Act seamen.[24]  Any other result would be contrary to the principles of uniformity set forth in *Miles*,

---

[24]   *See, e.g., Earhart v. Chevron U.S.A., Inc.*, 852 F. Supp. 515, 516 (E.D. La. 1993) (concluding that punitive damages are not recoverable by nonseamen under general maritime law and dismissing punitive damage claims of nonseamen passengers who sustained personal injuries while on a vessel)]; *Hunter v. Seabulk Offshore, Ltd.*, 993 F. Supp. 973, 975–76 (E.D. La. 1998) (adopting "trend within the lower courts of this Circuit [ ] to deny nonpecuniary recovery to nonseaman plaintiffs for personal injuries under the general maritime law" and dismissing personal injury plaintiff's claims for "all punitive and exemplary damages allowed by admiralty law and general maritime law based on the defendants' conduct, willful and wanton behavior and wanton disregard for the safety of others."); *Scarborough v. Clemco Indus.*, 391 F.3d 660, 668 (5th Cir. 2004) ("It would be

which were designed to bolster Congressional intent.  Courts in the Fifth Circuit have adopted this interpretation of *Miles* and have stated that "the general maritime law will not expand the available damages when Congress has spoken to the relief it deems appropriate or inappropriate." *Anderson v. Texaco Inc.*, 797 F.Supp. 531 at 534–36; *accord Guillory v. C.F. Bean Corp.*, No. 93-2643, 1994 WL 150738 (E.D. La. Apr. 12, 1994).  For this reason, nonseamen may not recover punitive damages for gross negligence under general maritime law, as such damages are not available under the Jones Act.

### C.      Plaintiffs May Not Seek Punitive Damages for Alleged Property Damage.

To the extent Plaintiffs seek punitive damages for alleged property damage, Compl. ¶ 235, this claim also fails as a matter of law.  OPA displaces all federal-common-law claims to which it applies, which includes property damage.  *See, e.g., Gabarick v. Laurin Mar.* (Am.) *Inc.*, 623 F.Supp. 2d 741, 750–51 (E.D. La. 2009) (refusing to apply general maritime law because "all claims that are recoverable under OPA, specifically those covered damages enumerated in 33 U.S.C. § 2702, are preempted by OPA."); *S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 64 (1st Cir. 2000) (noting that 33 U.S.C. § 2702(b) provides "a comprehensive list of recoverable damages, including . . . [r]eal or personal property."); *see also* B1 Motion to Dismiss at Section I.A.[25]  The comprehensive list of remedies recoverable under OPA expressly does not include punitive damages.  *See* 33 U.S.C. § 2702.  OPA's silence as to punitive damages means such damages are not available.  More importantly, as explained in more detail in the B1 Motion to Dismiss, OPA expressly addresses "gross negligence and willful

---

improper for this court to allow the  nonseamen spouse and heirs of a Jones Act seaman to recover nonpecuniary damages . . . when Congress has disallowed the recovery of identical damages in a Jones Act suit.").

[25]   Any laws of non-adjacent states that might allow for punitive damages are not applicable either under their own terms or OPA's savings clauses.  *See* Section V, *supra*.

misconduct" by a responsible party by lifting the caps on liability found in OPA section 1004, **not** by providing for private recovery of punitive damages.[26]   *See* B1 Motion to Dismiss at Section IV.B.   As a result, courts addressing the issue have concluded that punitive damages cannot be awarded under OPA.   *See, e.g.*, *S. Port Marin*, 234 F.3d at 65−66 (punitive damages are not available under OPA because "Congress's very specific treatment of oil pollution in the OPA, which does not provide for punitive damages, supplanted general admiralty and maritime law."); *see also Clausen v. M/V NEW CARISSA*, 171 F.Supp. 2d 1127, 1133 (D. Ore. 2001) (holding that "OPA has precluded an award of punitive damages under general maritime or admiralty law theory for any claim for which the OPA could provide relief.").

In sum, Eastern District of Louisiana courts have established a uniform system whereby personal injury plaintiffs cannot recover punitive damages for gross negligence under general maritime law irrespective of a plaintiff's status as a Jones Act seaman.   Plaintiffs themselves characterize this as a "Complaint in Admiralty" and assert that "[t]he claims herein are admiralty or maritime claims."   Compl. ¶ 76.   In keeping with the great weight of authority, BP respectfully asks the Court to strike the Plaintiffs' claim for punitive damages in connection with their gross negligence cause of action.

## VIII.   PLAINTIFFS HAVE NO FREE-STANDING CLAIM FOR PUNITIVE DAMAGES.

At the end of the B3 Master Complaint, Plaintiffs request punitive damages as a stand-alone claim, unconnected to any cause of action.   Compl. ¶¶ 321−346.   This request is improper and must be dismissed.

---

[26]   While *South Port Marine* recognized that punitive damages were traditionally recoverable under maritime law pre-*Miles*, it did not address whether punitive damages may still be awarded under maritime law.   As discussed above, Louisiana courts have concluded that they cannot be.

To the extent that the claim for punitive damages purports to allege a free-standing cause of action for punitive damages, such a claim is meritless. Simply put, Plaintiffs have no independent claim for punitive damages. *Byrne v. Nezhat*, 261 F.3d 1075, 1093 n.34 (11th Cir. 2001) ("We note that a prayer for punitive damages is not an independent cause of action."); *Allen v. R & H Oil and Gas Co.*, 63 F.3d 1326, 1333 (5th Cir. 1995) ("In other words, a claim for punitive damages is not by itself an independent tort.").[27]

The claim for punitive damages should, therefore, be dismissed.

## CONCLUSION

For these reasons, BP respectfully requests that this Court dismiss the First, Second, Fourth, Seventh, Ninth and Eleventh Claims for Relief and the cause of action for punitive damages filed against BP in the B3 Master Complaint.

---

[27] Indeed, the lack of an independent cause of action for punitive damages is black-letter law in States both outside the Gulf Coast, *see, e.g.*, 22 Am. Jur. 2d Damages § 551 (2010) ("[A]s a rule, there is no cause of action for punitive damages by itself; a punitive damages claim is not a separate or independent cause of action."); *Rocanova v. Equitable Life Assur. Soc'y of the United States*, 634 N.E.2d 940, 945 (N.Y. 1994) (punitive damages "possess[] no viability absent [their] attachment to a substantive cause of action."); and States on the Gulf Coast, *see, e.g.*, *Mosing v. Domas*, 830 So.2d 967, 973 (La. 2002) ("Under Louisiana law, exemplary or other 'penalty' damages are not allowable unless expressly authorized by statute."); *Life Ins. Co. of Georgia v. Smith*, 719 So.2d 797, 806 (Ala. 1998) ("We now require, therefore, that a jury's verdict specifically award either compensatory damages or nominal damages in order for an award of punitive damages to be upheld."); *Hopewell Enters., Inc. v. Trustmark Nat'l Bank*, 680 So.2d 812, 820 (Miss. 1996) ("Mississippi law is clear that punitive damages are not recoverable absent an award of actual damages."); *Ault v. Lohr*, 538 So.2d 454, 456 (Fla. 1989) ("We believe an express finding of a breach of duty should be the critical factor in an award of punitive damages."); *id.* at 457 (Ehrlich, C.J., concurring) ("The crucial element in determining whether punitive damages may be awarded absent an award of compensatory damages is proof of the underlying cause of action."); *Nabours v. Longview Sav. & Loan Ass'n*, 700 S.W.2d 901, 904 (Tex. 1985) ("Punitive damages are recoverable only after proof of a distinct, willful tort."); *Kaplan v. Harco Nat'l Ins. Co.*, 708 So.2d 89, 96 (Miss. Ct. App. 1998) ("[P]unitive damages are a remedy, not a cause of action. A claim for punitive damages is not itself a chose in action. It is not free-standing.").

27

Respectfully submitted,

/s/ *Don K. Haycraft*
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Il. 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
(202) 662-5985

Lee Ann Stevenson
Christopher Coulston
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

**Attorneys for BP p.l.c., BP America
Production Company and BP Exploration
& Production Company**

28

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 28th day of February, 2011.

/s/ *Don K. Haycraft*
Don K. Haycraft