# IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL No. 2179 |
| | | SECTION: J |
| Applies to: *All Cases in Pleading Bundle Section III.B(3).* | * * | JUDGE BARBIER |
| | * | MAGISTRATE SHUSHAN |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## NALCO COMPANY, NALCO HOLDINGS LLC, NALCO FINANCE HOLDINGS LLC AND NALCO HOLDING COMPANY'S MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS MASTER COMPLAINT "B3 BUNDLE"

Thomas J. Heiden
Mary Rose Alexander
LATHAM & WATKINS LLP
233 South Wacker Dr.
Suite 5800
Chicago, IL 60606-6401
Phone: (312) 876-7700

February 28, 2011

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................1

II.     FACTUAL & REGULATORY BACKGROUND.............................................7

        A.      The Federal Government Directed The Use Of Dispersants In Response
                To The Spill ...................................................................................7

        B.      The Use Of Dispersants Was Required By Federal Law And Pre-
                Approved By The Gulf States ............................................................10

        C.      The Dispersants Worked As Intended .................................................13

III.    LEGAL ARGUMENT ..................................................................................15

        A.      The B-3 Master Complaint Is Preempted By Federal Law (All Counts) ..............15

        B.      Nalco Is Immune From Suit Pursuant To The CWA And State Law (All
                Counts)........................................................................................21

        C.      The Economic Loss Doctrine Bars Portions Of The Master Complaint
                Against Nalco (All Counts) ...............................................................23

        D.      The Master Complaint Fails To Properly Plead Claims For Gross
                Negligence, Negligence, Nuisance, Battery And Strict Liability (Counts
                IV, V, VI, VII, VIII, X)....................................................................25

        E.      Medical Monitoring Is Unavailable To Plaintiffs (Count IX) .............35

        F.      Plaintiffs Fail To State A Claim Against Nalco Under The Florida
                Pollution Discharge Prevention And Control Act (Count XI)...............36

        G.      Plaintiffs Are Not Entitled To Punitive Damages..............................36

        H.      The Master Complaint Fails To State A Claim For Relief Against Nalco
                Holdings LLC, Nalco Finance Holdings LLC And Nalco Holding
                Company  (All Counts) .....................................................................37

IV.     CONCLUSION.............................................................................................38

i

# TABLE OF AUTHORITIES

**Page**

## CASES

*Am. Bell Inc. v. Fed'n of Tel. Workers of Pa.,*
   736 F.2d 879 (3d Cir. 1984) ....................................................................... 37

*Ashcroft v. Iqbal,*
   129 S. Ct. 1937 (2009) ................................................................ 26, 29, 30, 33

*Bagby Elevator Co., Inc. v. Schindler Elevator Corp.,*
   609 F.3d 768 (5th Cir. 2010) ...................................................................... 27

*Bay Point High & Dry, L.L.C. v. New Palace Casino, L.L.C.,*
   46 So. 3d 821 (Miss. Ct. App. 2010) .......................................................... 29

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ................................................. passim

*Benefield v. Int'l Paper Co.,*
   Civil Action No. 2:09cv232-WHA, 2009 WL 2601425 (M.D. Ala. Aug. 21, 2009)............... 32

*Berry v. Armstrong Rubber Co.,*
   989 F.2d 822 (5th Cir. 1993) ...................................................................... 31

*Burks v. Abbott Labs.,*
   Civil Action No. 08-3414 (JRT/JSM), 2010 WL 1576779 (D. Minn. Apr. 20, 2010).............. 34

*Burns v. CLK Invs. V, L.L.C.,*
   45 So. 3d 1152 (La. Ct. App. 2010) ............................................................ 29

*Caillouet Land Corp. v. Chevron Pipe Line Co.,*
   Civil Action No. 06-10533, 2007 U.S. Dist. LEXIS 48364 (E.D. La. July 3, 2007) .......... 22, 23

*Carbajal v. Vivien Ice Co.,*
   104 So. 715 (La. 1925) ............................................................................. 32

*Carden v. Gen. Motors Corp.,*
   509 F. 3d 227 (5th Cir. 2007), *overruled in part by Williamson v. Mazda Motor of Am.,*
   *Inc.,* Case No. 08-1314,  2011 U.S. LEXIS 1711 (U.S. Feb. 23, 2011)..................... 15

*Cent. State Transit & Leasing Corp. v. Jones Boat Yard, Inc.,*
   206 F.3d 1373 (11th Cir. 2000) ................................................................. 28

*Coleman v. Dretke,*
   409 F.3d 665 (5th Cir. 2005) (per curiam) ..................................................... 8

*Columbia Venture, LLC v. Dewberry & Davis, LLC,*
    604 F.3d 824 (4th Cir. 2010) ................................................................ 16

*Cook's Pest Control, Inc. v. Rebar,*
    28 So. 3d 716 (Ala. 2009) .................................................................... 29

*Cox v. City of Dallas,*
    256 F.3d 281 (5th Cir. 2001) ................................................................ 31

*Cunningham v. Anchor Hocking Corp.,*
    558 So. 2d 93 (Fla. Dist. Ct. App. 1990) ............................................... 32

*Dempster v. Louis Eymard Towing Co.,*
    503 So. 2d 99 (La. Ct. App. 1987) ....................................................... 24

*E. Miss. Elec. Power Ass'n v. Porcelain Prods. Co.,*
    729 F. Supp. 512 (S.D. Miss. 1990) ..................................................... 25

*Fireman's Fund Ins. Co. v. City of Lodi,*
    302 F.3d 928 (9th Cir. 2002) ................................................................ 20

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
    373 U.S. 132, 142-43 (1963) ................................................................ 16

*Fla. Power & Light Co. v. Westinghouse Elec. Co.,*
    510 So. 2d 899, 902 (Fla. 1987) ........................................................... 25

*Frey v. Novartis Pharms. Corp.,*
    642 F. Supp. 2d 787 (S.D. Ohio 2009) ................................................. 34

*Geier v. Am. Honda Motor Co.,*
    529 U.S. 861 (2000) .............................................................. 16, 18, 21

*Gomez v. Pfizer, Inc.,*
    675 F. Supp. 2d 1159 (S.D. Fla. 2009) ............................................ 33, 34

*Harper v. Del. Valley Broadcasters, Inc.,*
    743 F. Supp. 1076 (D. Del. 1990) ........................................................ 38

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) .............................................................................. 16

*Houston Exploration Co. v. Halliburton Energy Servs., Inc.,*
    269 F.3d 528 (5th Cir. 2001) ................................................................ 27

*In re Complaint of Oswego Barge Corp.,*
    664 F.2d 327 (2d Cir. 1981) ................................................................ 16

*In re Katrina Canal Breaches Consol. Litig.*,
   533 F. Supp. 2d 615 (E.D. La. 2008) ................................................................ 3, 8

*In re M/V Danielle Bouchard*,
   164 F. Supp. 2d 794 (E.D. La. 2001) ..................................................................... 33

*In re S. Scrap Material Co.*,
   541 F.3d 584 (5th Cir. 2008) ............................................................................ 5, 26

*In re Settoon Towing LLC*,
   Civil Action No. 07-1263, 2009 WL 4730969 (E.D. La. Dec. 4, 2009) ................... 24

*In re Taira Lynn Marine Ltd. No. 5, LLC*,
   444 F.3d 371 (5th Cir. 2006) .................................................................................. 23

*Jamail v. Stoneledge Condo. Owners Ass'n*,
   970 S.W.2d 673 (Tex. Ct. App. 1998) ............................................................... 31, 32

*Kerr v. Phillip Morris USA, Inc.*,
   Civil Action No. 1:09cv482-LG-RHW, 2010 WL 1177311 (S.D. Miss. Mar. 25, 2010)......... 34

*Kingston Shipping Co. v. Roberts*,
   667 F.2d 34 (11th Cir. 1982) (per curiam) .............................................................. 24

*Kitty Hawk Aircargo, Inc. v. Chao*,
   418 F.3d 453 (5th Cir. 2005) .................................................................................... 8

*La. Crawfish Producers Ass'n-West v. Amerada Hess Corp.*,
   935 So. 2d 380 (La. Ct. App. 2006) ........................................................................ 24

*Laborers' Pension Fund v. Lay-Com, Inc.*,
   580 F.3d 602 (7th Cir. 2009) ................................................................................... 37

*Lingle v. Dion*,
   776 So. 2d 1073 (Fla. Dist. Ct. App. 2001)............................................................. 29

*Louisiana ex rel. Guste v. M/V TESTBANK*,
   752 F.2d 1019 (5th Cir 1985) (en banc) ............................................................ 23, 30

*Lovelace v. Software Spectrum*,
   78 F.3d 1015 (5th Cir. Tex. 1996)............................................................................. 2

*Marquez-Colon v. Reagan*,
   668 F.2d 611 (1st Cir. 1981)................................................................................... 30

*Martinez v. Dow Chem. Co.*,
   219 F. Supp. 2d 719 (E.D. La. 2002) ........................................................................ 4

*Mayes v. Moore*,
   419 F. Supp. 2d 775 (M.D.N.C. 2006) ............................................................. 38

*Mobil Oil Corp. v. Linear Films, Inc.*,
   718 F. Supp. 260 (D. Del. 1989) ..................................................................... 37

*PPG Indus., Inc. v. Bean Dredging*,
   447 So. 2d 1058 (La. 1984) ............................................................................ 24

*Pugh v. Gen. Terrazzo Supplies, Inc.*,
   243 S.W.3d 84 (Tex. Ct. App. 2007)............................................................... 25

*R2 Invs. LDC v. Phillips*,
   401 F.3d 638 (5th Cir. 2005) .......................................................................... 26

*Robins Dry Dock & Repair Co. v. Flint*,
   275 U.S. 303 (1927) ................................................................................ 5, 23

*Robinson v. Indianola Mun. Separate Sch. Dist.*,
   467 So. 2d 911 (Miss. 1985) .......................................................................... 32

*Sekco Energy, Inc. v. M/V MARGARET CHOUEST*,
   820 F. Supp. 1008 (E.D. La. 1993) ................................................................ 30

*Shandong Yinguang Chem. Indus. Joint Stock Co. v. Potter*,
   607 F.3d 1029 (5th Cir. 2010) (per curiam) .................................................... 26

*Smith v. Louisville Ladder Co.*,
   237 F.3d 515 (5th Cir. 2001) .......................................................................... 35

*Straughter v. Hodnett*,
   975 So. 2d 81 (La. Ct. App. 2008) .................................................................. 31

*Tenn. Coal, Iron & R. Co. v. Hartline*,
   11 So. 2d 833 (Ala. 1943)............................................................................... 31

*Todd Shipyards Corp. v. Turbine Serv., Inc.*,
   674 F.2d 401 (5th Cir. 1982), *aff'd in part, rev'd in part* 763 F.2d 745 (5th Cir. 1985) .......... 27

*Torralba v. Napolitano*,
   Civil Action No. L-08-83, 2010 WL 4812971 (S.D. Tex. Nov. 18, 2010) ................................. 8

*Trujillo v. Carrasco*,
   318 S.W.3d 455 (Tex. App. 2010) .................................................................. 29

*TS & C Invs., L.L.C. v. Beusa Energy, Inc.*,
   637 F. Supp. 2d 370 (W.D. La. 2009) ............................................................ 24

*United States v. Jon-T Chems., Inc.*, 768 F.2d 686 (5th Cir. 1985)........................................ 37, 38

*Vesta Fire Ins. Co. v. Milam & Co. Constr., Inc.*,
   901 So. 2d 84 (Ala. 2004) ......................................................................... 25

*Vickers v. Chiles Drilling Co.*,
   822 F.2d 535 (5th Cir. 1987) ..................................................................... 33

*Viera v. Chehaiber*,
   Civil Action No. ED CV:08-00182 JRG (JCRx), 2010 WL 960347 (C.D. Cal. Mar. 16,
   2010) ............................................................................................................ 37

*Witty v. Delta Air Lines, Inc.*,
   366 F.3d 380 (5th Cir. 2004) ..................................................................... 18

## STATUTES

33 U.S.C. § 1321(c) .................................................................................... passim

33 U.S.C. § 1321(d) .................................................................................... passim

33 U.S.C. § 1321(o) ............................................................................................ 21

33 U.S.C. § 2701 ................................................................................................. 21

Ala. Code § 6-5-332.2(c) ................................................................................... 22

Fla. Stat. § 376.011, *et seq.* ............................................................................. 36

Fla. Stat. § 376.031 ........................................................................................... 36

Fla. Stat. § 376.09 ............................................................................................. 22

La. Rev. Stat. Ann. § 30:2466 .......................................................................... 22

Miss. Code Ann. § 49-18-5 ............................................................................... 22

Tex. Nat. Res. Code Ann. § 40.104(b) ............................................................. 22

## OTHER AUTHORITIES

47 Fed. Reg. 31,180 (July 16, 1982) ................................................................ 13

58 Fed. Reg. 54,702 (proposed Oct. 22, 1993) ................................................ 19

59 Fed. Reg. 47,384 (Sept. 15, 1994) ............................................................... 19

*Black's Law Dictionary* 1062 (8th ed. 2004) ................................................... 27

H.R. Rep. No. 101-653, at 145 (1990) (Conf. Rep.),
   *reprinted in* 1990 U.S.C.C.A.N. 779, 824 .................................................. 11

## RULES

Fed. R. Civ. P. 12(b) ................................................................................ passim

## REGULATIONS

40 C.F.R. § 300.135(d) ................................................................................ 12

40 C.F.R. § 300.310(a) ................................................................................ 12

40 C.F.R. § 300.905(a) ................................................................................ 13

40 C.F.R. § 300.910(a) ................................................................................ 13

40 C.F.R. § 300.915(a) ................................................................................ 13

40 C.F.R. § 300.920 ................................................................................ 13

Defendants Nalco Company, Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company (collectively, the "Nalco Entities") respectfully state as follows in support of their motion to dismiss the Master Complaint "B3 Bundle" (the "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6):[1]

## I.   INTRODUCTION

When the call went out for help after April 20, 2010 to respond to the explosion onboard the *Deepwater Horizon* and resulting oil spill (the "Spill"), Nalco Company ("Nalco"), along with many others, responded. Nalco provided dispersants that were previously listed as approved for use by the United States Environmental Protection Agency ("USEPA") on the National Contingency Plan ("NCP"), were pre-approved for use in the Gulf by the Regional Response Teams ("RRTs") and Area Committees and were used as directed by the Federal On-Scene Coordinator ("FOSC"), under authority vested in the President of the United States, to help safely disperse the oil and protect the Gulf of Mexico. Environmentalists, scientists, industry leaders and the United States Coast Guard ("USCG") – the agency that supplied the FOSC entrusted with fighting the Spill – agree that the use of Nalco's dispersants was the right decision in response to this disaster and did indeed help prevent damage to the Gulf.

Nalco did not cause the blowout or explosion on the *Deepwater Horizon*. Nalco did not cause the resulting Spill. Nalco had absolutely nothing to do with these events and no one contends that it did. To the contrary, when Nalco was asked to supply dispersants to help clean

---

[1]        Pursuant to Pre-Trial Order No. 25, Nalco's Motion to Dismiss is deemed to be a motion to dismiss all claims pending against Nalco in this multi-district litigation proceeding, including: *Ezell v. BP, plc, et al.*, Case No. 10-cv-01920; *Harris, et al. v. BP, plc, et al.*, Case No. 10-cv-02078; *Wright, et al. v. BP, plc, et al.*, Case No. 10-cv-03263; *Capt Ander, Inc. v. BP, plc, et al.*, Case No. 10-cv-04205; *Petitjean, et al. v. BP, plc, et al.*, Case No. 10-cv-04201; *Monroe v. BP, plc, et al.*, Case No. 10-cv-04194; *Hill v. BP, plc, et al.*, Case No. 10-cv-04193; *Hudley v. BP, plc, et al.*, Case No 10-cv-04200; *Trehern v. BP, plc, et al.*, Case No. 10-cv-04213; *Brooks v. Tidewater Marine, L.L.C., et al.*, Case No. 11-cv-00365; and any and all clams identified as being part of the B3 Bundle. (Pre-Trial Order No. 25 ¶ 5.)

up the Gulf, Nalco employees worked around the clock for months, reallocated resources to manufacture product and orchestrated a massive logistical effort to get the product where it was needed when it was needed.  Nalco's product, COREXIT®, was used to disperse oil and keep it off the beaches, wetlands and wildlife habitats.  Nalco did not decide to use dispersants in the Gulf.  Nalco did not decide to use COREXIT®.  Nalco did not decide where to use dispersants.  Nalco did not decide when to use dispersants.  Nalco did not decide in what quantities to use dispersants.  Nalco did not decide for how long dispersants should be used.  Nalco had no voice or role in any of that.  It was "a time of great national need" and the USCG expressly asked Nalco and its suppliers to make COREXIT®.  (Letter from Paul F. Zukunft, Rear Admiral, U.S. Coast Guard, Fed. On-Scene Coordinator, to The Nalco Company and Providers of Surfactant Supplies to the Nalco Company (July 12, 2010) ("July 12, 2010 FOSC Letter") (Exh. A hereto).) Nalco did nothing more than provide the product it was asked to provide – a product pre-approved by the USEPA for this exact use.  According to the USCG, its efforts were "of invaluable benefit to this country." (*Id.*)

Pursuant to a long-established federal regulatory scheme – promulgated in the Clean Water Act ("CWA") (as amended by the Oil Pollution Act ("OPA")) and the NCP – the Gulf Coast RRTs, which included representatives of the States of Louisiana, Texas, Alabama, Mississippi and Florida, had pre-approved the use of dispersants, like COREXIT®, in the Gulf. (Nat'l Comm'n on the BP Deepwater Horizon Oil Spill and Offshore Drilling, *Report to the President: Deep Water – The Gulf Oil Disaster and the Future of Offshore Drilling* 143 (Jan. 2011), *available at* http://www.oilspillcommission.gov/. ("Commission Report") (relevant excerpts attached as Exh. B hereto).)[2] Pursuant to that same federal scheme, the USEPA (with

---

[2]     Courts may consider facts not specifically alleged in the Complaint when considering a 12(b)(6) motion. *See, e.g.*, *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996) (in ruling

authority delegated by the United States President) pre-listed COREXIT® on the NCP's Product List. These preparations allow the President to exercise the mandate vested in him to "ensure effective and immediate removal of a discharge" in a manner consistent with the NCP and the Area Contingency Plan ("ACP"). 33 U.S.C. § 1321(c)(1). In exercising that mandate, the President "shall" prepare and publish an NCP, including a schedule identifying (a) dispersants that may be used, (b) the waters in which such dispersants may be used, (c) the procedures and techniques for dispersing the oil, and (d) the quantities of such dispersants that can be used safely in such waters. *Id.* § 1321(d)(2)(F)-(G). In response to the Spill, the President's delegates – along with representatives from the States of Louisiana, Texas, Alabama, Mississippi and Florida – decided to use dispersants in the Gulf of Mexico consistent with the NCP and the RRTs' dispersant policies. They decided to use Nalco's dispersants (COREXIT®) in the Gulf of Mexico. They decided how and where and when to use dispersants. They decided for how long to use dispersants. They decided the quantities of dispersants that could be used safely in those waters. They made these decisions every day for months as they were mandated to do by federal law.

The Complaint nonetheless alleges in conclusory fashion that the Nalco Entities were somehow negligent and grossly negligent under the laws of the very States that authorized the use of dispersants. (Compl. ¶¶ 229-258.) Plaintiffs allege that the Nalco Entities violated general principles of maritime law and that, notwithstanding its pre-listing on the NCP Product

---

on a motion to dismiss, court may consider, in addition to facts alleged in the pleadings, "matters of which [it] may take judicial notice"); *In re Katrina Canal Breaches Consol. Litig.*, 533 F. Supp. 2d 615, 632 (E.D. La. 2008) (a court may take judicial notice of facts that are "'not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to resources whose accuracy cannot be questioned'") (quoting Fed. R. Evid. 201(a) and (b)). Because "the Court is authorized to take judicial notice of official government publications," it may consider the Commission's Final Report and its

List by the USEPA, COREXIT® was somehow "unreasonably dangerous" and contained a "design defect." (*Id.* ¶¶ 248, 255.) Plaintiffs complain about the use of dispersants, the type of dispersant used, the waters where dispersants were applied and the quantities of dispersants used in those waters. (*Id.* ¶¶ 115-118, 150, 162, 168-169.) While none of these allegations are sufficiently pled under basic federal standards, and many are independently flawed, the Complaint in its entirety directly conflicts with the federal regulatory scheme pursuant to which the President, his delegates and representatives decided to use dispersants in the Gulf, to choose COREXIT® as the dispersant used, and decided the locations, procedures and quantities to safely use COREXIT® in such waters.

Nalco's product cannot be "unreasonably dangerous" and "defective" under maritime or state law and also be mandated and directed for use in these waters, in this manner, safely in these quantities, by the Federal Government and the very States whose laws the Nalco Entities allegedly violated. It cannot be unlawful to use COREXIT® in the Gulf in response to the Spill, in the amounts and locations used, when such use was lawful – pre-approved by the RRTs, directed by the NCP and required by the President and his delegates on a daily basis. Indeed, each and every allegation made against Nalco, if unlawful under state or maritime law, directly conflicts with the federal regulatory scheme promulgated (indeed mandated) to respond to an oil spill. Accordingly, under well-settled principles of conflict preemption, the Complaint must fail in its entirety as to Nalco. Nalco cannot be liable under maritime or common law for supplying its pre-approved product for use at the direction of the President of the United States and the Gulf States in the Gulf of Mexico.

---

working paper referenced below. *See Martinez v. Dow Chem. Co.*, 219 F. Supp. 2d 719, 735 n.24 (E.D. La. 2002).

Moreover, even if such claims were not completely preempted by federal law, which they are, they are independently barred for the following alternative reasons:

- *First,* the CWA (as amended by the OPA), and the laws of each Gulf Coast state, provide immunity to Nalco, and other responders, for many of the claims asserted in the Complaint. Only responsible parties for the Spill are subject to potential liability for property damage and response costs. Nalco is not a responsible party. Because Nalco is a responder, its liability for damages is limited solely to personal injury or damages resulting from acts or omissions of gross negligence or willful misconduct; mere negligence is not actionable. Nalco did not engage in conduct outside of that for which it is immune.

- *Second*, even if state and maritime law are not preempted (which they are) and Nalco were not immune (which it is), under maritime law, the bright-line rule set forth by the United States Supreme Court in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 309 (1927), bars recovery for tort claims for purely economic losses absent physical injury to a proprietary interest. All such claims asserted in the Complaint should be dismissed on this independent basis.

- *Third,* even if state and maritime law are not preempted (which they are) and Nalco were not immune from such claims (which it is), the Complaint fails to properly plead claims for gross negligence, negligence, nuisance, battery and strict liability. Under well-recognized standards of pleading, a complaint must state "'enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." *In re S. Scrap Material Co.*, 541 F.3d 584, 587 (5th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The Complaint utterly fails to do so.

- ***Fourth,*** "Florida Plaintiffs'" claim for medical monitoring damages fails because Florida law does not apply to this dispute.

- ***Fifth,*** Plaintiffs' strict liability claim under the Florida Pollutant Discharge Prevention and Control Act must be dismissed because the Act does not apply to this dispute.  Even if it applied (which it does not), the Act creates a strict liability cause of action only against responsible parties and only for damages resulting from a discharge of pollution.  Nowhere in the Complaint do Plaintiffs allege that any of the Nalco Entities is a "responsible party" or that any of the Nalco Entities contributed in any way to the Spill.

- ***Sixth,*** Plaintiffs' punitive damages claim fails because punitive damages are unavailable under maritime law and because Plaintiffs have no freestanding claim for punitive damages.

- ***Finally,*** Plaintiffs purport to bring claims against Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company, as parent entities of Nalco Company.  (Compl. ¶ 66.)  Yet, nowhere in the Complaint do Plaintiffs allege any conduct on the part of Nalco Company's parent entities, much less any conduct that could conceivably give rise to liability against them for any of Plaintiffs' claims.  All claims made against these parent entities should be dismissed for this independent and alternative reason.

Congress delegated authority to respond to this Spill to the President.  He did so.  Congress required coordination with the States.  That happened.  The President, his delegates and the States chose to apply Nalco's product to help save the Gulf.  They asked Nalco to supply COREXIT® "in a time of great national need." (July 12, 2010 FOSC Letter (Exh. A hereto).)  The law encourages people and companies, like Nalco, to respond to human and environmental

accidents and emergencies.  The law protects people and companies, like Nalco, who step up, respond and assist when faced with such accidents and emergencies.  To allow later claims against such responders would discourage such responders from stepping up in times of need.  If Nalco can be held liable for simply responding to the government's call to supply a product, then companies such as Nalco would have little reason or incentive to do so in future crises.  For these numerous independent reasons, discussed in more detail below, the Complaint does not and cannot assert a claim upon which relief can be granted against the Nalco Entities.  It should be dismissed in its entirety against the Nalco Entities.[3]

## II.      FACTUAL & REGULATORY BACKGROUND

### A.      The Federal Government Directed The Use Of Dispersants In Response To The Spill

Long before the April 20 Spill, the COREXIT® products were listed for use on the NCP Product Schedule.  Indeed, one COREXIT® product has been on the NCP Product Schedule since 1978.  (USEPA, National Contingency Plan Product Schedule (Jan. 31, 2011) (reflecting that COREXIT® EC9527A has been listed since March 1978) (relevant excerpts attached as Exh. C hereto).)  Moreover, dispersants have long been approved for use in the Gulf by the States of Louisiana, Texas, Alabama, Mississippi and Florida via the RRTs' dispersant policies. (Commission Report at 143 (Exh. B hereto).)[4]  As a result, dispersants were available for use in the Gulf immediately after the Spill.

---

[3]      The Complaint purports to bring a class action.  (Compl. ¶¶ 176-193.)  Nalco has not moved to dismiss the class action claims because the Court has stayed Rule 23 class action motion practice and deadlines.  (Pre-Trial Order No. 11 at 12.)  Nalco specifically reserves all objections to the requests for certification of class actions and all arguments that the class action allegations in the Complaint are insufficient as a matter of law.

[4]      For details on dispersant pre-approvals for Region IV, which includes Mississippi, Alabama and Florida, *see* Region IV Reg'l Response Team Response and Tech. Comm. Dispersant Workgroup, *Use of Dispersants in Region IV* 3 (1996) (dispersants approved since October 1996), *available at* http://www.nrt.org/production/NRT/RRTHome.nsf/Resources/DUP/$file/1-RRT4DISP.PDF.  For details

On April 21, 2010, the FOSC, Rear Admiral Mary Landry, was put in place and the RRT (including representatives from the States of Louisiana, Texas, Alabama, Mississippi and Florida) was activated.  Dispersants pre-approved for use were available for deployment by April 22, 2010:

> Despite a lack of apparent leak, 100,000 gallons of dispersants are already pre-positioned between Stennis, Miss., Houma and Lake Charles, La., and *pre-approved for use by EPA Regions VI and IV Regional Response Teams*.

(The Blog @ Homeland Security, http://blog.dhs.gov/2010/05/ongoing-administration-wide-response-to.html (May 5, 2010) (Exh. D hereto).)[5]

On April 29, 2010, the USCG designated the Spill as a Spill of National Significance ("SONS"), pursuant to the CWA, allowing for the deployment of the full resources of the federal government and enabling the appointment of the National Incident Commander ("NIC") to coordinate resources at the national level.  (*See* Commission Report at 136 (Exh. B hereto).) USCG Commandant Admiral Thad Allen was appointed to serve as the NIC on May 1, 2010.  *Id.* In the days and months that followed, the NIC ordered the use of dispersants to help save the Gulf shoreline.

Indeed, on a daily basis, the NIC met with the USCG, the USEPA, BP Exploration & Production ("BP") and representatives of the States of Louisiana, Texas, Alabama, Mississippi

---

on dispersant pre-approvals for Region VI, which includes Louisiana and Texas, *see* RRT-6, *FOSC Dispersant Pre-Approval Guidelines and Checklist* ii-iii (2001) (dispersants approved since July 1996), *available at* http://www.losco.state.la.us/pdf_docs/RRT6_Dispersant_Preapproval_2001.pdf.

[5]     The Court may take judicial notice of statements and documents posted on agency websites.  *See In re Katrina Canal Breaches Consol. Litig.*, 533 F. Supp. 2d at 632 ("The Fifth Circuit has determined that courts may take judicial notice of governmental websites.") (quoting *Hyder v. Quarterman*, Civil Action No. C07-291, 2007 WL 4300446, at *3 (S.D. Tex. Oct. 10, 2007)); *see also Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005) (taking judicial notice of National Mediation Board approval published on agency's website); *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (per curiam) (on denial of petition for rehearing en banc) (explaining court could take judicial notice of state agency website); *Torralba v. Napolitano*, Civil Action No. L-08-83, 2010 WL 4812971, at *4 n.8 (S.D.

and Florida, among others, to prepare an Incident Action Plan ("IAP"), which included the use of dispersants.  As part of the IAP, daily permission was given by the USCG, in consultation with federal and state agencies, for each application of dispersants.  (*See* USEPA, Dispersant Monitoring and Assessment Directive – Addendum 3 (May 26, 2010), http://www.epa.gov/bpspill/dispersants/directive-addendum3.pdf (stating BP must seek written approval from the USCG FOSC for surface application of dispersants and for subsurface application exceeding 15,000 gallons in a single day) (Exh. E hereto)); Nat'l Comm'n on the BP Deepwater Horizon Spill and Offshore Drilling, *Staff Working Paper No. 4: The Use of Surface and Subsea Dispersants During the BP Deepwater Horizon Oil Spill* 12 (Jan. 11, 2011) ("Commission Working Paper No. 4") (Exh. F hereto).)  Each and every application of dispersants was approved by the USCG in consultation with federal and state agencies.

During the months that followed, numerous national statements were issued by the President's delegates regarding their daily decisions to use dispersants.  Admiral Allen, for example, stated:

> Let me clear it up.  It's not a decision by BP on whether or not to use dispersants.  *It's a decision by the [FOSC] whether to approve the incident commander's recommendation to use dispersants* once they've been located by surveillance aircraft and has [sic] an opportunity to use them.  It's a very disciplined doctrinal process on how this works.  In the end it may be executed by BP through a contractor. *But these are all decisions made by the [FOSC] because that's where the responsibility rests.*

(Transcript, Press Briefing by National Incident Commander Admiral Thad Allen 2 (Aug. 1, 2010), http://www.restorethegulf.gov/release/2010/08/01/transcript-press-briefing-national-incident-commander-admiral-thad-allen-0) (emphasis added) (Exh. G hereto).)

Moreover, the FOSC wrote directly to Nalco's suppliers on May 9, 2010 to seek their

---

Tex. Nov. 18, 2010) (taking judicial notice of "Management Directive" on federal agency's website that explained the responsibilities of a "Contracting Officer's Technical Representative").

assistance "in a time of great national need" to provide the materials necessary for Nalco to make

dispersants.  (Letter from Mary E. Landry, Rear Admiral, U.S. Coast Guard, Commander, Eighth

Coast Guard District, to Providers of Surfactant Supplies to the Nalco Company (May 9, 2010)

(Exh. H hereto).)  And in July 2010, the USCG wrote directly to both Nalco and its suppliers "in

a time of great national need" to make dispersants available for use in the Gulf.  (July 12, 2010

FOSC Letter (Exh. A hereto).)  Knowing that Nalco was the only dispersant manufacturer that

could produce the quantities of dispersants required by the FOSC and stating that "chemical

dispersants are essential to the oil spill response and clean-up effort," the FOSC asked Nalco and

its suppliers to provide dispersants:

> Specifically, **we are asking Nalco Company** and companies that provide the
> Nalco Company with surfactant supplies to continue to assist by making
> available, to the greatest extent possible, dispersant and the surfactant material to
> this response and clean-up effort.  We understand that dispersant and surfactant
> material may be in short supply or otherwise already designated for contracts with
> other companies.  *We appreciate the commercial realities involved and
> respectfully ask that, as suppliers, you make whatever efforts you can to allot
> surfactant supply to the Nalco Company's production so that it can
> manufacture dispersant for BP EPI's oil spill response, knowing that whatever
> efforts you are undertaking in this regard are of invaluable benefit to this
> country.*

(*Id.*)  Nalco did no more than respond to the call of duty from the United States "in a time of

great national need."  Its efforts were of "invaluable benefit to this country."  (*Id.*)

**B.      The Use Of Dispersants Was Required By Federal Law And Pre-Approved
         By The Gulf States**

The use of dispersants in the Gulf, at the direction of the FOSC and the NIC, was

required by and consistent with a well-established federal regulatory scheme.  The CWA (as

amended by the OPA) and the NCP create a comprehensive scheme for responding to oil spills

and hazardous substance releases.  The CWA reflects Congress' intent to ensure a rapid response

to oil spills and hazardous discharges and to vest decision making authority in the President.

Indeed, prior to passage of the OPA, the CWA merely allowed the President to exercise federal

removal authority in the event of an oil discharge. *See* 33 U.S.C. § 1321(c)(1) (1990) (amended

1990) (in the event of an oil spill, "the President is authorized to act to remove or arrange for the

removal of such oil"). When Congress enacted the OPA in 1990, it revised the CWA to

"establish[] a general requirement under new section 311(c) . . . that the President ensure

effective and immediate removal of a discharge."[6] H.R. Rep. No. 101-653, at 145 (1990) (Conf.

Rep.), *reprinted in* 1990 U.S.C.C.A.N. 779, 824. As a result, the President's actions in response

to an oil spill are **mandatory**. In particular, under the CWA:

> The President **shall**, in accordance with the National Contingency Plan and any
> appropriate Area Contingency Plan, ensure effective and immediate removal of a
> discharge, and mitigation or prevention of a substantial threat of a discharge, of
> oil or a hazardous substance – (i) into or on the navigable waters; (ii) on the
> adjoining shorelines to the navigable waters; (iii) into or on the waters of the
> exclusive economic zone; or (iv) that may affect natural resources belonging to,
> appertaining to, or under the exclusive management authority of the United
> States.

33 U.S.C. § 1321(c)(1) (emphasis added). When responding to a substantial threat to public

health or welfare, "the President **shall** direct all Federal, State, and private actions to remove the

discharge or to mitigate or prevent the threat of the discharge." *Id.* § 1321(c)(2)(A) (emphasis

added). Moreover, "[e]ach Federal agency, State, owner or operator, or other person

participating in efforts under this subsection shall act in accordance with the National

Contingency Plan or as directed by the President." *Id.* § 1321(c)(3). And, "[t]he President shall

prepare and publish a National Contingency Plan for removal of oil and hazardous substances."

*Id.* § 1321(d)(1). The NCP:

> *[S]hall* provide for efficient, coordinated, and effective action to minimize
> damage from oil and hazardous substance discharges, including containment,
> *dispersal,* and removal of oil and hazardous substances, and **shall** include, but not

---

[6]     Section 311 of the CWA is codified at 33 U.S.C. § 1321.

be limited to, the following:

. . . .

(F) ***Procedures*** and ***techniques*** to be employed in identifying, containing, ***dispersing***, and removing oil and hazardous substances.

(G) A schedule, prepared in cooperation with the States, identifying –

(i) ***dispersants***, other chemicals, and other spill mitigating devices and substances, if any, that may be used in carrying out the Plan,

(ii) ***the waters in which such dispersants***, other chemicals, and other spill mitigating devices and substances ***may be used***, and

(iii) ***the quantities of such dispersant***, other chemicals, or other spill mitigating device or substance which ***can be used safely in such waters*** . . . .

*Id.* § 1321(d)(2)(F)-(G) (emphasis added).

"After publication of the National Contingency Plan, the removal of oil and hazardous substances and actions to minimize damage from oil and hazardous substance discharges ***shall***, to the greatest extent possible, ***be in accordance with the National Contingency Plan***." *Id.* § 1321(d)(4) (emphasis added). According to the NCP, "[d]efensive actions ***shall begin as soon as possible*** to prevent, minimize, or mitigate threat(s) to the public health or welfare of the United States or the environment." 40 C.F.R. § 300.310(a) (emphasis added). Importantly, the NCP requires the emergency action to be coordinated by all interested parties. The NCP states:

The basic framework for the response management structure is a system (*e.g.*, a unified command system), that brings together the functions of the federal government, the state government, and the responsible party to achieve an effective and efficient response, where the [FOSC] maintains authority.

*Id.* § 300.135(d). In doing so, the NCP requires that decisions regarding the application of dispersants be made as soon as practicable. *See id.* § 300.310(a) ("The ACP prepared under § 300.210(c) should be consulted for ***procedures to be followed for obtaining an expedited decision regarding the use of dispersants*** and other products listed on the NCP Product

12

Schedule.") (emphasis added).  To expedite decisions regarding the use of dispersants, the

President, in cooperation with the States, *must prepare a schedule identifying dispersants to be*

*used in carrying out the NCP, the waters in which the dispersants may be used, and the*

*quantities in which the dispersants may be used*.  *See* 33 U.S.C. § 1321(d)(2)(G); 40 C.F.R. §

300.905(a) ("EPA *shall* maintain a schedule of dispersants and other chemical or bioremediation

products that may be authorized for use on oil discharges . . . .") (emphasis added).  Moreover,

RRTs and Area Committees are required to have preauthorization plans identifying whether

dispersants are appropriate for use in a particular area.  40 C.F.R. § 300.910(a) ("RRTs and Area

Committees *shall* address . . . the desirability of using appropriate dispersants . . . listed on the

NCP Product Schedule . . . .") (emphasis added).  Before adding a dispersant, like COREXIT®,

to the NCP Product Schedule, the USEPA reviews detailed data submitted by the dispersant

manufacturer.  *See id*. §§ 300.915(a), 300.920.  The data includes worker precautions for storage

and field application, toxicity data, and the dispersant's components.  *Id*. § 300.915(a).[7]  Only

after reviewing the required data does the USEPA (under authority delegated by the President)

determine whether to list a particular dispersant, like COREXIT®, on the NCP Product

Schedule.  *Id*. §§ 300.900-300.920.

### C.     The Dispersants Worked As Intended

In responding to the Spill, the President of the United States and the States of Louisiana,

Texas, Alabama, Mississippi and Florida acted precisely as the federal mandatory regulatory

---

[7]     Pre-listing of dispersants is important to ensure that dispersants are readily available to address an oil spill.  Indeed, in revising the NCP in 1982, the USEPA decided to vest authority regarding dispersant use with the FOSC in order to facilitate prompt decisions as to whether dispersants should be used and if so, which dispersants should be used.  *See* National Oil and Hazardous Substances Contingency Plan, 47 Fed. Reg. 31,180, 31,201 (July 16, 1982) (noting "[m]ost commenters urged that the decision making authority should not be with the Administrator or a designee in Headquarters but rather should be with the [F]OSC in order to enable rapid decision making" and that in response, the USEPA revised the NCP to allow the FOSC to authorize use of dispersants on oil discharges) (codified at 40 C.F.R. pt. 300).

scheme dictates.  They decided to use dispersants (as authorized by the RRTs).  They decided to use COREXIT® (which was listed on the NCP Product Schedule).  They set up procedures and techniques to be employed in dispersing the oil.  The FOSC, in consultation with federal and state agencies, determined in which waters to use COREXIT®.  They decided in what quantities to use COREXIT® safely in those waters.  They did so daily, together, under the direction of the FOSC.  Nalco had no role in this process other than to manufacture and transport the dispersant.  Plainly, the mandatory federal regulatory scheme worked.

Moreover, by keeping the oil off the shoreline and reducing the damages to the Gulf, Nalco's dispersants worked exactly as intended by that mandatory federal regulatory scheme.  The USEPA concluded that "dispersant use has been an essential tool in mitigating this spill's impact, preventing millions of gallons of oil from doing even more damage to sensitive marshes, wetlands and beaches and the economy of the Gulf coast."  (Commission Working Paper No. 4, at 12-13 (Exh. F hereto).)

Not only have government-sponsored studies revealed that Nalco's dispersants helped to save the Gulf shoreline, they also demonstrate that this was accomplished without dispersants reaching the shoreline in any significant amount.  In fact, the Unified Area Command's most recent study, summarized by the FOSC as an "assessment of data from tens of thousands of water and sediment samples taken from over 25 different ocean-going research ships on more than 125 separate cruises and representing over 850 ship-days at sea," discovered "no exceedances of [] dispersant-related chemical benchmarks" in the nearshore, offshore or deep-water environments.  (Memorandum from P. F. Zukunft, USCG, to R. C. Parker, USCG (Dec. 17, 2010), *in* Operational Science Advisory Team (OSAT), Unified Area Command, *Summary Report for Sub-Sea and Sub-Surface Oil and Dispersant Detection:  Sampling and Monitoring*

14

(Dec. 17, 2010) ("OSAT Report") (relevant excerpts attached as Exh. I hereto); OSAT Report at 6-7, 25, 31, 44-45.))  Indeed, the constituents of COREXIT® that were detected are commonly found in other products and in no event exceeded exposure thresholds.  (*Id.* at 13, 25, 31, 44-45.)

### III.   LEGAL ARGUMENT

As to each of the Nalco Entities, the Complaint directly conflicts with and is completely preempted by federal law and must be dismissed in its entirety.  Independently and in the alternative, the Complaint fails because:  (1) Nalco is immune from suit to the extent the Complaint seeks property damages for negligent acts and all of the claims made against Nalco fall within its immunity; (2) the law prohibits the recovery of purely economic damages and any such claims are barred; (3) the Complaint does not and cannot properly plead gross negligence, negligence, nuisance, battery or strict products liability under maritime or state law; (4) "Florida Plaintiffs'" medical monitoring claim fails because Florida law does not apply to this dispute; (5) the Florida Pollution Discharge Prevention and Control Act does not apply to this case; (6) Plaintiffs have no claim for punitive damages under maritime law nor do they have a freestanding punitive damages claim; and (7) as to Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company, the Complaint fails to allege sufficient facts to support any claim for relief.  For all of these independent reasons, the Complaint should be dismissed as to the Nalco Entities.

### A.   The B-3 Master Complaint Is Preempted By Federal Law (All Counts)

"Under the Supremacy Clause, federal law will preempt state law when Congressional intent to preempt may be inferred from the existence of a pervasive federal regulatory scheme, or when state law conflicts with federal law or its purposes." *Carden v. Gen. Motors Corp.*, 509 F.3d 227, 230 (5th Cir. 2007), *overruled in part by Williamson v. Mazda Motor of Am., Inc.*, Case No. 08-1314, 2011 U.S. LEXIS 1711 (U.S. Feb. 23, 2011).  Preemption applies to lawsuits

as well as to state statutes and regulations. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 886 (2000) (holding tort action brought under state law preempted by federal automobile safety standard). Preemption applies to claims made under state law as well as those made pursuant to maritime law. *See, e.g.*, *In re Complaint of Oswego Barge Corp.*, 664 F.2d 327, 337-38 (2d Cir. 1981) (maritime claims preempted by the CWA). Conflict preemption exists where, as here, a party cannot comply with both state/maritime and federal law or if the state/maritime law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *See Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963); *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). As the Fourth Circuit has explained, "[a] decision about [obstacle preemption] requires a court independently to consider national interests and their putative conflict with state interests," and involves considerations of national policy as well as "strict statutory construction." *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 830 (4th Cir. 2010) (citation omitted) (alterations in original). In this case, statutory and regulatory construction, as well as the national interest in promoting an effective and efficient federal response to oil spills, make clear that Plaintiffs' maritime and state law claims are preempted by Section 311 of the CWA and the NCP. Plaintiffs assert only maritime and state law claims and, thus, the entire Complaint is preempted by federal law.

As set forth above, the President was expressly required to "ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge, of oil" in accordance with the NCP and ACP. *See* 33 U.S.C. § 1321(c)(1)(A). Under the NCP, such actions ***shall*** include identifying dispersants that may be used, the waters in which such dispersants may be used, the procedures and techniques for dispersing the oil, and the quantities of such dispersants that can be used safely in such waters. *Id*. § 1321(d)(2)(F)-(G).

The RRTs for the Gulf approved the use of dispersants in the Gulf. COREXIT® was listed on the NCP Product List. On a daily basis, the FOSC, in consultation with federal and state agencies, exercised her mandatory duties under the CWA and decided to apply dispersants. These authorities decided to use the pre-approved COREXIT®. They decided to apply COREXIT® in the Gulf on the surface and subsea. They did so daily in quantities and locations that they – not Nalco – decided were safe for these waters.[8]

Nonetheless, the Complaint alleges that Nalco's product was "unreasonably dangerous" and "defective," rendering Nalco negligent and strictly liable under common law. (*Id.* ¶¶ 248, 255, 294, 302.) The Complaint further alleges that COREXIT® has the "ability to cause physical injury, health hazards, and damage to property because of its toxicity." (*Id.* ¶¶ 255, 302.) It complains that dispersants were used in the Gulf. It complains that COREXIT® was used in the Gulf. It complains about the waters in which COREXIT® was used. It complains about the quantities of COREXIT® used. It invokes general maritime law in claiming the "defective design of COREXIT®" and its "ability to cause physical injury, health hazards, and damage to property because of its toxicity." (*Id.* ¶¶ 290, 302.) It alleges that the use of COREXIT® in the Gulf caused property damage and personal injury. (*Id.* ¶ 305.)

The Complaint directly conflicts with the federal regulatory scheme that was followed in response to the Spill:

- The President ***shall*** decide whether to use dispersants to help save the Gulf – and the President did so.

- The President ***shall*** decide which dispersants to use – and the President decided to use COREXIT®.

---

[8]   COREXIT® 9527 was obtained from product stockpiles around the world. Nalco did not make it to respond to the Spill. Nalco did manufacture COREXIT® 9500, at the request of the USCG, directly to respond to the Spill.

- The President was *required* to use a dispersant on the NCP Product Schedule – and the USEPA listed COREXIT® on the NCP Product Schedule.

- The President was *required* to act in coordination with the States – and the States of Louisiana, Texas, Alabama, Mississippi and Florida had previously *decided* to use dispersants in the Gulf through their RRT dispersant policies.

- The President *shall* decide the procedures and techniques for dispersing the oil – and the President did decide how the dispersants were to be used.

- The President *shall* decide in which waters to use dispersants – and the President did decide to apply COREXIT® on the surface and subsea in the Gulf.

- The President *shall* decide how much COREXIT® could be used safely in such waters – and the President did decide COREXIT® was safe to use in the Gulf.

Maritime and state law cannot declare these mandatory decisions unlawful. In the face of this mandatory federal law, it cannot be unlawful under maritime or state law to: (a) supply a pre-listed product, (b) at the direction of the USCG, (c) for use in the Gulf, (d) at locations directed by the FOSC, (e) through procedures and techniques directed by federal and state agencies, and (f) in quantities determined by the FOSC and federal and state agencies as safe in such waters.

Plaintiffs' state and maritime claims pose a clear obstacle to the accomplishment of the objectives of the CWA and the NCP. *See Geier*, 529 U.S. at 881 (applying conflict preemption to plaintiff's defective design claim where allowing lawsuit to proceed would undermine federal goal of encouraging car manufacturers to develop a variety of passive restraint systems); *see also Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 385 (5th Cir. 2004) (plaintiff brought state law claim based on airline's failure to warn passengers that there is a risk of developing deep vein thrombosis where passengers are seated during long flights; court held claim was preempted by the "pervasive regulatory scheme covering air safety concerns" and because it conflicted with a federal determination that passengers should remain seated). Here, the conflict is clear:

18

Plaintiffs' claims are founded on the theory that COREXIT® is too dangerous to have been used in the Gulf on the Spill, while the USEPA and the FOSC decided that it was not.  Allowing Plaintiffs' claims against Nalco to proceed would frustrate the CWA's purpose of centralizing responsibility with the President for determining what dispersants are listed on the NCP Product Schedule, where the dispersants may be used, how they may be used and in what quantities they may be used.  *See* 33 U.S.C. § 1321(d)(2)(G); *cf.* National Oil and Hazardous Substances Pollution Contingency Plan, 58 Fed. Reg. 54,702, 54,704 (proposed Oct. 22, 1993) (emphasizing the primary role of the FOSC in coordinating national response and explaining that "requiring implementation of the national response system ensures there will be one individual who makes decisions and provides instructions.  This system should result in reduced confusion, improved safety, better organized and coordinated response actions, and more effective management of the incident.") (to be codified at 40 C.F.R. pt. 300).

By asserting that the use of COREXIT® violated various state and general maritime laws, the Complaint suggests that the FOSC and the USEPA should be required to consider the tort law of various states as well as federal common law and maritime law in deciding how to respond to a spill.  Plaintiffs' allegations directly conflict with Congressional intent that decisions regarding response efforts must be governed by the procedures and criteria set forth in the CWA and NCP.  *Cf.* National Oil and Hazardous Substances Pollution Contingency Plan, 59 Fed. Reg. 47,384, 47,399-400 (Sept. 15, 1994) (rejecting "view that a state could initiate more stringent measures than the [F]OSC when the latter is directing the response" and explaining that the FOSC "has specific legal authority to guide the activities of all parties responding to a discharge, and all actions would have to be authorized or approved by the [F]OSC") (codified at 40 C.F.R. pt. 300).  It further conflicts with Congress' goal of providing a rapid and effective

response to discharges. *See* 33 U.S.C. § 1321(c)(1)(A) ("The President shall . . . ensure **effective and immediate** removal of a discharge . . . of oil or a hazardous substance . . . .") (emphasis added).

Moreover, the very States whose laws allegedly makes Nalco's conduct unlawful:

- Pre-approved the use of dispersants in the Gulf through the RRTs;

- Were involved in decisions to use COREXIT® in the Gulf; and

- Were involved in decisions regarding how much COREXIT® was safe to use in those waters.

To allow the Complaint to proceed leads to absurd results. Nalco complied with state law (and federal statutory law) by supplying a product for use as approved by such States (and the President) and in doing so somehow allegedly violated state law (and federal statutory law).

The Complaint also threatens the effectiveness of future federal response efforts. Allowing Plaintiffs to maintain their action against Nalco would create uncertainty as to the potential liability of individuals and entities that assist NCP response activities at the direction of the President, the USCG, the NIC and the FOSC. *Cf. Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 951 (9th Cir. 2002) (holding provision of municipal ordinance was preempted to the extent it allowed city to impose more stringent requirements than the NCP because allowing the provision to stand would foster uncertainty about potential liability and frustrate the underlying statutory goal of encouraging cleanup of contaminated sites). Even worse, a finding of liability could threaten the viability of these responders and effectively dissuade any future responders from coming forward. Third parties could simply refuse to provide goods or services that the USEPA and the FOSC deem safe and necessary to the response for fear of incurring liability under various tort regimes. Indeed, had Nalco not responded to the Spill by providing required dispersants (working around the clock to do so), the Gulf shoreline may not have been

saved.

Federal law encourages people and companies like Nalco to respond to human and environmental accidents and emergencies – to respond "in a time of great national need." (July 12, 2010 FOSC Letter (Exh. A hereto).)  This Court cannot allow the fear of future state and maritime claims to trump federal law.[9]  The Complaint conflicts with federal law.  All state and maritime law claims should be dismissed.  As no other claims are asserted, the Complaint should be dismissed in its entirety as to the Nalco Entities.[10]

**B.     Nalco Is Immune From Suit Pursuant To The CWA And State Law (All Counts)**

Under the CWA, 33 U.S.C. § 1321(c)(4)(A), a person who is not a responsible party[11] is exempt from liability for:

> removal costs or damages which result from actions taken or omitted to be taken in the course of rendering care, assistance, or advice consistent with the National

---

[9]     The CWA does not preclude the application of conflict preemption principles.  The CWA states that Section 1321 shall not "be construed as preempting any State or political subdivision thereof from imposing any requirement or liability with respect to the discharge of oil or hazardous substance into any waters within such State, or with respect to any removal activities related to such discharge." 33 U.S.C. § 1321(o)(2).  The CWA also states, however, that it shall not "be construed as affecting or modifying any other existing authority of any Federal department, agency, or instrumentality, relative to onshore or offshore facilities under this chapter or any other provision of law, *or to affect any State or local law not in conflict with this section.*" *Id.* § 1321(o)(3) (emphasis added).  The United States Supreme Court has held that a savings clause does not "foreclose or limit the operation of" implied conflict preemption principles. *Geier*, 529 U.S. at 869.  The Court noted that it "has repeatedly 'declined to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.'" *Id.* at 870 (quoting *United States v. Locke*, 529 U.S. 89, 106 (2000)).  Moreover, "[w]hy, in any event, would Congress not have wanted ordinary pre-emption principles to apply where an actual conflict with a federal objective is at stake?" *Id.* at 871.  Here, of course, the very States whose laws Nalco allegedly violated participated in the mandatory federal regulatory scheme to clean up the Gulf, which included using COREXIT® safely in those waters.

[10]    The BP Defendants independently argue that only federal law applies to claims asserted in the Complaint pursuant to the Outer Continental Shelf Lands Act. *See* BP Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(1) & 12(B)(6) Master Complaint in Accordance with PTO No. 11 [Case Management Order No. 1] Section III.B(3) ["B3 Bundle"] ("BP Defendants' Motion") § II.  To the extent applicable, the Nalco Entities adopt the BP Defendants' choice of law analysis.

[11]    "Responsible party" means, "[i]n the case of an offshore facility . . . [,] the lessee or permittee of the area in which the facility is located." 33 U.S.C. § 2701(32).

Contingency Plan or as otherwise directed by the President relating to a discharge or a substantial threat of a discharge of oil or a hazardous substance.

The exemption does not apply "with respect to personal injury or wrongful death [,] or [ ] if the person is grossly negligent or engages in willful misconduct." *Id.* § 1321(c)(4)(B). To the extent Plaintiffs seek to recover damages other than damages for personal injury or wrongful death or due to gross negligence, Nalco is exempt under § 1321(c)(4). Moreover, Nalco did not engage in any conduct for which it is not immune.

Alabama, Florida, Louisiana, Mississippi and Texas have similar statutory provisions that provide immunity for those who assist oil spill response efforts, except for acts of gross negligence or willful misconduct.[12] While some of these provisions have not been construed by any court, the United States District Court for the Eastern District of Louisiana analyzed the Louisiana provision in *Caillouet Land Corp. v. Chevron Pipe Line Co.*, Civil Action No. 06-10533, 2007 U.S. Dist. LEXIS 48364, at *6-8 (E.D. La. July 3, 2007). In that case, the court examined Louisiana's qualified immunity for responders. The plaintiff did not assert any allegations of gross negligence, willful misconduct or personal injury against the defendant clean-up contractors. Instead, the only claims asserted were claims of general negligence for property damage and for trespass. The court found that, even if proven true, these allegations were insufficient to overcome the immunity granted by law. *Id.* at *8. Thus, the court held that

---

[12]    *See* Ala. Code § 6-5-332.2(c) (person not liable for damages resulting from actions taken in the course of rendering assistance "consistent with the National Contingency Plan or as otherwise directed by the Federal On-Scene Coordinator"); Fla. Stat. § 376.09(5) (person who is authorized by the federal government or responsible party to assist in removing pollutants not liable for damages); La. Rev. Stat. Ann. § 30:2466B (immunity for those who provide assistance consistent with national or state contingency plan, at the request of federal or state officials or consistent with the request of a potentially responsible person); Miss. Code Ann. § 49-18-5 (party not liable for damages resulting from actions taken in the course of rendering assistance "consistent with the National Contingency Plan or as otherwise directed by the federal on-scene coordinator"); Tex. Nat. Res. Code Ann. § 40.104(b) (no liability for persons who provide assistance consistent with national contingency plan, at the request of federal or state officials or pursuant to the request of a responsible person).

claims of "negligence and trespass against the clean-up contractors [were] not actionable in light of the provisions of La. Rev. Stat. § 30:2466." *Id.* at *10.

Here, Nalco provided assistance consistent with the NCP by supplying the dispersant that the USEPA, the NIC and the FOSC, acting pursuant to the NCP and the RRTs' dispersant policies, approved and directed for use in response to the Spill. Thus, Nalco's actions fall well within the scope of the federal and state immunity provisions for responders set forth above. Although in Counts V and VI Plaintiffs assert in conclusory fashion that Defendants' actions were grossly negligent and willful and that Nalco somehow caused personal injury, they fail to allege any facts in the Complaint suggesting these claims are plausible. Nalco did nothing more than provide a product "in a time of great national need" that was pre-listed on the NCP Product Schedule by the USEPA and used in the Gulf at the direction of the President and in consultation with the States of Louisiana, Texas, Alabama, Mississippi and Florida. *See supra* at 7-13. Nalco did not engage in any conduct for which it is not immune.

**C.     The Economic Loss Doctrine Bars Portions Of The Master Complaint Against Nalco (All Counts)**

Under maritime law, the bright-line rule set forth by the United States Supreme Court in *Robins Dry Dock* bars recovery for tort claims for purely economic losses absent physical injury to a proprietary interest. 275 U.S. at 309. It is well established that the Fifth and Eleventh Circuit Courts of Appeals apply the *Robins Dry Dock* rule. *See In re Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d 371, 377 (5th Cir. 2006) ("It is unmistakable that the law of this circuit does not allow recovery of purely economic claims absent physical injury to a proprietary interest in a maritime negligence suit."); *Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019, 1031-32 (5th Cir. 1985) (en banc) (affirming summary judgment in favor of defendants pursuant to *Robins Dry Dock* where boat operators, seafood enterprises, tackle and bait shops, and

recreational fishermen brought general maritime claims seeking purely economic damages

resulting from chemical spill); *Kingston Shipping Co. v. Roberts*, 667 F.2d 34, 35 (11th Cir.

1982) (per curiam) (applying *Robins Dry Dock* to affirm dismissal of negligence claims alleging

purely economic damages, and rejecting attempts to question the rule's validity); *In re Settoon*

*Towing LLC*, Civil Action No. 07-1263, 2009 WL 4730969, at *3 (E.D. La. Dec. 4, 2009)

(noting that under general maritime law, *Robins Dry Dock* would bar recovery for purely

economic damages relating to oil well owner's inability to access oil platform due to a spill).

Plaintiffs allege that they are entitled to economic damages, including loss of income and

damages to compensate them for diminution of the value of real and/or personal property.

(Compl. ¶¶ 257, 305.)  To the extent any Plaintiffs seek to recover for purely economic losses

under maritime law, those claims fail as a matter of law.

   In addition, any claims Plaintiffs raise to recover purely economic losses would likewise

fail under state law.  For example, Louisiana state law generally prohibits the recovery of purely

economic damages without accompanying physical damage to a proprietary interest.  *See TS & C*

*Invs., L.L.C. v. Beusa Energy, Inc.*, 637 F. Supp. 2d 370, 380-81 (W.D. La. 2009) (holding

plaintiffs could not recover on their state law claims for economic damages resulting from the

closure of a highway after an oil well blowout); *PPG Indus., Inc. v. Bean Dredging*, 447 So. 2d

1058, 1061-62 (La. 1984) (disallowing recovery of economic losses of downstream users of gas

from a damaged pipeline); *La. Crawfish Producers Ass'n-West v. Amerada Hess Corp.*, 935 So.

2d 380, 382-85 (La. Ct. App. 2006) (refusing to allow commercial crawfishermen who claimed

that oil and gas exploration activities had damaged their fishing grounds to recover economic

damages); *Dempster v. Louis Eymard Towing Co.*,  503 So. 2d 99, 100-02 (La. Ct. App. 1987)

(holding fishermen have no proprietary interest in unharvested fish in state waters and are not

entitled to recover economic damages from loss of a fishing site).

Likewise, Mississippi, Alabama, Florida and Texas do not allow recovery in tort for economic loss absent personal injury or physical damage to a proprietary interest. *See, e.g., E. Miss. Elec. Power Ass'n v. Porcelain Prods. Co.*, 729 F. Supp. 512, 515 (S.D. Miss. 1990) (finding it "unlikely that the Mississippi Supreme Court would decide to join the 'steadily dwindling minority of jurisdictions that permit tort-based actions for economic loss'") (citation omitted); *Vesta Fire Ins. Co. v. Milam & Co. Constr., Inc.*, 901 So. 2d 84, 106-07 (Ala. 2004) (explaining economic loss rule bars tort recovery where product does not cause personal injury or property damage); *Fla. Power & Light Co. v. Westinghouse Elec. Co.*, 510 So. 2d 899, 902 (Fla. 1987) (holding plaintiff could not recover in tort for "economic loss without an accompanying physical injury or property damage"); *Pugh v. Gen. Terrazzo Supplies, Inc.*, 243 S.W.3d 84, 91 (Tex. App. 2007) (noting economic loss doctrine bars tort claims seeking economic losses where the plaintiff does not allege personal injury or property damage). Plaintiffs are thus barred from recovering purely economic losses absent personal injury or property damage.

### D.     The Master Complaint Fails To Properly Plead Claims For Gross Negligence, Negligence, Nuisance, Battery And Strict Liability (Counts IV, V, VI, VII, VIII, X)

Even if Plaintiffs' state and maritime claims are not completely preempted (as they are) and even if Nalco is not immune from suit (as it is), the Complaint utterly fails to comport with the basic pleading requirements of the federal rules and Counts IV, V, VI, VII, VIII and X should be dismissed for this independent and alternative reason.

Fed. R. Civ. P. 12(b)(6) permits dismissal where the claimant fails "to state a claim upon which relief can be granted." A complaint may be dismissed pursuant to Rule 12(b)(6) where it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550

U.S. at 570.  A claim is plausible on its face if the plaintiff has shown enough facts to allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Indeed, a complaint must state "'enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." *In re S. Scrap Material Co., LLC*, 541 F.3d at 587 (quoting *Twombly*, 550 U.S. at 556).

Although all well-pleaded facts are taken as true in evaluating a Rule 12(b)(6) motion to dismiss, a court "will not strain to find inferences favorable to the plaintiffs." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (internal quotations and citations omitted).  A complaint need not aver detailed factual allegations, but it must establish more than a sheer possibility of unlawful activity. *See Shandong Yinguang Chem. Indus. Joint Stock Co. v. Potter*, 607 F.3d 1029, 1034 (5th Cir. 2010) (per curiam) (citing *Iqbal*, 129 S. Ct. at 1949).  That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  A party's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotation marks and alteration omitted).  "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Id.* at 558 (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216, at 233-34 (3d ed. 2004)).  As set forth below, many of Plaintiffs' counts fail to plead sufficient facts as to the Nalco Entities to survive a motion to dismiss.

      1.    <u>Gross Negligence</u>

Whether a defendant's conduct amounts to gross negligence as opposed to ordinary

negligence is dependant on the particular circumstances of the case. *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 411 (5th Cir. 1982). It is generally understood that gross negligence amounts to "[a] lack of slight diligence or care . . . [a] conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party." *Black's Law Dictionary* 1062 (8th ed. 2004). Plaintiffs base their gross negligence claim on Defendants' alleged breach of several duties: the "duties of ordinary and reasonable care to Plaintiffs in connection with the manufacture, maintenance and operation of the *Deepwater Horizon*, . . . duties to Plaintiffs to guard against and/or prevent the risk of the Oil Spill which occurred herein . . . . [and] a duty to Plaintiffs . . . to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures." (Compl. ¶¶ 230-231.) Although Plaintiffs allege that Nalco manufactured the dispersants used in the Spill remediation efforts, (*id.* ¶ 67), the Complaint does not allege any facts that, if taken as true, suggest Nalco was involved in the operations of the *Deepwater Horizon* or in the "operation, maintenance, handling, design, implementation and execution" of the oil spill response measures. Nor could they make such allegations, as Nalco was not involved in any of those activities.

Further, gross negligence requires a plaintiff to show that the defendant was aware of an extreme risk of significant harm to the plaintiff and acted with conscious indifference to the plaintiff's rights. *See, e.g.*, *Bagby Elevator Co. v. Schindler Elevator Corp.*, 609 F.3d 768, 773 (5th Cir. 2010) (evidence supported gross negligence finding "as the jury could have reasonably concluded that Schindler acted with conscious indifference to Bagby's rights despite being aware of an extreme risk that it was causing Bagby significant harm"); *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 532 (5th Cir. 2001) ("[O]ne is grossly negligent

when he 'has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.'") (citation omitted); *Cent. State Transit & Leasing Corp. v. Jones Boat Yard, Inc.*, 206 F.3d 1373, 1377 (11th Cir. 2000) ("To hold a party liable for gross negligence, the district court must find that the defendant had knowledge of the existence of circumstances which constitutes a clear and present danger and yet still undertakes a conscious, voluntary act or omission . . . which is likely to result in injury.") (internal quotations and citation omitted).

Here, Plaintiffs allege that Nalco manufactured the dispersants that BP purchased for use in the Spill response efforts and that Nalco "knew or should have known" that its dispersants would be applied to the Spill.  (Compl. ¶¶ 67, 128.)  Even if taken as true, these assertions do not begin to allege that Nalco was grossly negligent or guilty of wanton or reckless conduct. Although Plaintiffs sweepingly assert that "Defendants recklessly, willfully and/or wantonly failed to use reasonably safe dispersant chemicals or other chemicals" in the Spill response, (*id.* ¶ 162), Nalco did not decide what dispersant would be used on the Spill.  Indeed, the Complaint does not allege that Nalco played any role in deciding whether dispersants should be used in the Gulf, let alone which dispersants should be used, where they should be applied or in what quantities they should be applied.  And, of course, it did not do so, as those are decisions delegated to the President by the CWA and NCP.  Nalco did not make any decisions or take any actions or inactions that could possibly support a claim of gross negligence.

It is not enough for Plaintiffs to simply aver in conclusory fashion that some unspecified act of Nalco was "grossly negligent," or that it operated in an otherwise improper manner, without alleging sufficient facts to support the plausibility of these legal conclusions.  Rather, to

28

survive a Rule 12(b)(6) challenge, the "complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). This standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555). The Complaint's failure to allege any facts in support of the conclusory allegation that Nalco engaged in wanton or reckless acts that injured Plaintiffs compels dismissal. *See id.* (plaintiff must allege facts to allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged").

> 2.    Negligence

Plaintiffs' negligence *per se* claim should be dismissed because it completely fails to provide any notice as to the statutes or regulations the Nalco Entities allegedly violated. To prevail on a negligence *per se* theory of liability, Plaintiffs must show that the Nalco Entities violated a statute that was designed to prevent the type of injury Plaintiffs suffered, and that the violation caused Plaintiffs' injuries. *See, e.g.*, *Cook's Pest Control, Inc. v. Rebar*, 28 So. 3d 716, 726 (Ala. 2009); *Lingle v. Dion*, 776 So. 2d 1073, 1077 (Fla. Dist. Ct. App. 2001); *Bay Point High & Dry, L.L.C. v. New Palace Casino, L.L.C.*, 46 So. 3d 821, 826 (Miss. Ct. App. 2010); *Trujillo v. Carrasco*, 318 S.W.3d 455, 458 (Tex. App. 2010).[13] Plaintiffs fail to provide any notice whatever as to the "'grounds' of [their] 'entitlement to relief,'" (*Twombly*, 550 U.S. at 555) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)), leaving the Nalco Entities to guess as to what unidentified state or federal statutes or regulations may form the basis of Plaintiffs' claim. Because the Complaint provides no notice as to the basis of Plaintiffs' negligence *per se*

---

[13]    Louisiana does not recognize the doctrine of negligence *per se*. *See Burns v. CLK Invs. V, L.L.C.*, 45 So. 3d 1152, 1158 (La. Ct. App. 2010) ("The doctrine of negligence *per se* has been rejected in Louisiana . . . .") (citation omitted).

claim against the Nalco Entities, it must be dismissed. *See Iqbal*, 129 S. Ct. at 1949.

Likewise, Plaintiffs' negligence claim against Nalco fails. Although the Complaint makes the cursory and conclusory allegation that Nalco was negligent "with respect to the design, manufacture, marketing, sale and/or distribution of Corexit®," (Compl. ¶ 244), it fails to plead facts as to the Nalco Entities' manufacture, marketing, sale or distribution that would support this assertion. *See Iqbal*, 129 S. Ct. at 1949 (complaint must contain "sufficient factual matter" to render the claim plausible). As for their defective design theory of negligence, Plaintiffs' bare assertion that COREXIT® is defective because it is "toxic" fails for the reasons set forth *infra* at 33-34.

### 3.   Nuisance

In Count VII, Plaintiffs purport to assert a nuisance claim against all Defendants. Because there is no federal common law cause of action for public nuisance, Count VII should be dismissed. *See M/V TESTBANK*, 752 F.2d at 1030 n.13 (the Supreme Court has apparently foreclosed a federal cause of action for public nuisance claims regarding obstruction of navigable waterways); *Marquez-Colon v. Reagan*, 668 F.2d 611, 614 n.2 (1st Cir. 1981) (noting that the Supreme Court held in *City of Milwaukee v. Illinois*, 451 U.S. 982 (1981) and *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1 (1981) "that the federal common law of nuisance for interstate and coastal water pollution has been entirely preempted by the Federal Water Pollution Control Act"); *Sekco Energy, Inc. v. M/V MARGARET CHOUEST*, 820 F. Supp. 1008, 1014 (E.D. La. 1993) (federal common law does not recognize a cause of action for public nuisance in a water pollution case).[14]

---

[14]      Plaintiffs cannot circumvent the economic loss doctrine by asserting a nuisance claim. *See M/V TESTBANK*, 752 F.2d at 1031 ("[P]laintiffs may not recover for pure economic losses under a public nuisance theory in maritime tort."). To the extent Plaintiffs raise their nuisance claim to recover economic losses absent a physical injury to a proprietary interest, the claim must be dismissed.

To the extent Plaintiffs purport to assert a nuisance claim against the Nalco Entities under state law, such a claim also fails. Plaintiffs' nuisance claim is predicated on the Spill's interference "with the public's right to use and enjoy the Gulf of Mexico without oil slicks, chemical dispersants, tar balls, and other associated pollution." (Compl. ¶ 260.) Yet, Plaintiffs fail to allege that any of the Nalco Entities participated in either the events leading up to the *Deepwater Horizon* explosion and subsequent Spill or in the spraying of dispersants on the Spill. Indeed, Plaintiffs have not alleged any conduct on the Nalco Entities' part that unreasonably interfered with a public right. *See Cox v. City of Dallas*, 256 F.3d 281, 289 (5th Cir. 2001) (explaining that a public nuisance "involves an unreasonable interference with a right common to the general public" and "[i]n determining whether **conduct** amounts to a public nuisance, courts consider, inter alia, whether the **conduct** involves a significant interference with public health, safety, peace, comfort, or convenience") (citing Restatement (Second) of Torts § 821B) (emphasis added); *Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 829 (5th Cir. 1993) (under Mississippi law, "[a] cause of action for public nuisance is predicated on a showing that the defendant's activities have injured a public right"); *Tenn. Coal, Iron & R.R. Co. v. Hartline*, 11 So. 2d 833, 837 (Ala. 1943) ("The injurious consequences or nuisance complained of should be the natural, direct and proximate cause of defendant's acts to render him liable for maintaining a public nuisance . . . .") (internal quotation marks and citation omitted); *Straughter v. Hodnett*, 975 So. 2d 81, 92 (La. Ct. App. 2008) (upholding trial court's dismissal of nuisance claim because plaintiff failed to sufficiently allege that defendant "was the cause of the alleged public nuisance"); *Jamail v. Stoneledge Condo. Owners Ass'n*, 970 S.W.2d 673, 676 (Tex. App. 1998) (public nuisance is an "unreasonable interference" with a public right) (citation omitted).

Because Plaintiffs have not alleged that the Nalco Entities engaged in conduct that interfered with a public right, Plaintiffs' nuisance claim against the Nalco Entities must be dismissed.[15]

> 4.   Battery

Plaintiffs' battery claim should be dismissed as to the Nalco Entities because Plaintiffs fail to allege that the Nalco Entities participated in any of the conduct on which their claim is based. Plaintiffs allege that "Defendants placed VoO Plaintiffs on VoOs without adequate training, warning of risks, or safety equipment." (Compl. ¶ 273.) Although elsewhere in the Complaint they assert that BP directed the VoO program, (see id. ¶ 95), nowhere do they claim that the Nalco Entities played any role in placing Plaintiffs on VoOs. Plaintiffs also predicate their battery claim on their assertion that Defendants sprayed or directed the spraying of dispersants on the Spill. (Id. ¶¶ 274-276.) While Plaintiffs assert that other Defendants were involved in spraying dispersants on the Spill, (see id. ¶ 105), they do not allege that the Nalco Entities played any role in spraying activities. Nor could they, because Nalco was not involved in such activities. Because Plaintiffs have failed to "plead[] factual content that allows the court

---

[15]   In addition, Plaintiffs' nuisance claim must be dismissed because they have failed to allege facts suggesting that if the alleged nuisance is not abated, they "will suffer a special damage therefrom different from that which is common to all." *Carbajal v. Vivien Ice Co.*, 104 So. 715, 716 (La. 1925). Resident Plaintiffs do not allege any facts suggesting they have sustained a "special injury" different from that suffered by the general public living and working along the Gulf of Mexico. Similarly, although Plaintiffs allege that they have been unable to fish and boat in the Gulf of Mexico due to the presence of oil and chemical dispersants, (Compl. ¶ 262), and that "all Plaintiffs are subjected to foul and harmful odors emanating from the crude oil soaked booms and/or the chemical dispersants," (*id.* ¶ 265), they fail to allege facts suggesting they have suffered an injury different in degree and kind from that suffered by the general public. Thus, Plaintiffs lack standing to bring a public nuisance claim. *See Benefield v. Int'l Paper Co.*, Civil Action No. 2:09cv232-WHA, 2009 WL 2601425, at *3 (M.D. Ala. Aug. 21, 2009) ("In order for an individual to maintain an action to enjoin a public nuisance, the individual must have sustained a 'special injury' which is different in degree and kind from the injury suffered by the public at large.") (citation omitted); *Cunningham v. Anchor Hocking Corp.*, 558 So. 2d 93, 97 (Fla. Dist. Ct. App. 1990) ("[W]hen a party 'has suffered no "particular damage" in the *exercise of a right common to the general public*, . . . it lacks standing to sue for public nuisance.'") (citation omitted) (emphasis in original); *Robinson v. Indianola Mun. Separate Sch. Dist.*, 467 So. 2d 911, 918 (Miss. 1985) (to enjoin a public nuisance plaintiff must have sustained a different kind of harm than that suffered by the general public); *Jamail*, 970 S.W.2d at 676 ("special injury" required to maintain public nuisance action).

to draw the reasonable inference that [the Nalco Entities are] liable for the misconduct alleged,"

Count VIII should be dismissed. *See Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at

556).

### 5.    Strict Liability

In reviewing strict products liability claims under maritime law, the Fifth Circuit has

applied the Restatement (Second) of Torts. *See Vickers v. Chiles Drilling Co.*, 822 F.2d 535, 538

(5th Cir. 1987). Under the Restatement, "(1) one who sells any product in a defective condition

unreasonably dangerous to the user . . . is subject to liability for physical harm thereby caused to

the ultimate user . . . if (a) the seller is engaged in the business of selling such a product, and (b)

[the product] is expected to and does reach the user . . . without substantial change in the

condition in which it is sold." *Id.* (quoting Restatement (Second) of Torts § 402A) (alteration in

original). A defective design claim requires a plaintiff to show that a product was "defective and

unreasonably dangerous for its 'normal' use." *Id.*; *see also In re M/V Danielle Bouchard*, 164 F.

Supp. 2d 794, 798 (E.D. La. 2001).

In Count X, Plaintiffs assert that "Nalco's dispersants were unreasonably dangerous to

Plaintiffs for its [sic] intended purpose," (Compl. ¶ 294), but Plaintiffs fail to identify a defect,

instead summarily labeling COREXIT® as "toxic." (*Id.* ¶ 302.) The word "toxic" alone is not

enough to identify a product defect. Indeed, anything is "toxic" at some dose and duration of

exposure. Courts applying *Twombly* have dismissed defective design claims where, as here, a

plaintiff fails to particularly allege a defect in the design of the product.

For example, in *Gomez v. Pfizer, Inc.*, 675 F. Supp. 2d 1159 (S.D. Fla. 2009), the plaintiff

brought a strict products liability claim against the defendants after she was diagnosed with

medication-induced Steven-Johnson syndrome. The court dismissed the complaint, holding that

the plaintiff had failed to adequately allege a design defect where the complaint stated the

33

medications were "defectively designed and/or manufactured because [their] intended use resulted in a substantial and unreasonable likelihood of causing Stevens-Johnson syndrome, which rendered [them] unreasonably dangerous for [their] intended use." *Id.* at 1163 (alterations in original); *see also Frey v. Novartis Pharms. Corp.*, 642 F. Supp. 2d 787, 792, 795 (S.D. Ohio 2009) (rejecting plaintiffs' assertion that they "cannot particularly allege that the scientific makeup of the drug is defective for a specific reason without conducting discovery, which requirement would exceed *Twombly*'s plausibility standard" and dismissing design defect claim because plaintiffs "have not alleged any facts that would permit the Court to conclude that there was a defect in the design or formulation of Trileptal").

Plaintiffs' cursory attempt to plead state law strict liability claims likewise fails, as Plaintiffs have not only failed to adequately identify a design defect, but have failed to allege facts supporting other required elements of a design defect claim under various state laws. For example, Plaintiffs fail to allege any facts suggesting the existence of feasible design alternatives or the burdens that adopting such alternatives would impose on the Nalco Entities. *See Burks v. Abbott Labs.*, Civil Action No. 08-3414 (JRT/JSM), 2010 WL 1576779, at *5 (D. Minn. Apr. 20, 2010) (applying Louisiana Products Liability Act and granting defendants' motion to dismiss where the plaintiffs had "not pled any facts describing the burden on defendants of adopting the alternative designs or the adverse effect any such alternative design would have on the product").

Plaintiffs have also failed to include even a conclusory allegation that COREXIT® failed to function as expected. *See Kerr v. Phillip Morris USA, Inc.*, Civil Action No. 1:09cv482-LG-RHW, 2010 WL 1177311, at *2 (S.D. Miss. Mar. 25, 2010) (applying Mississippi law and granting defendant's motion to dismiss where plaintiff failed to allege that product did not function as expected). Under Texas law, a "safer alternative design" is one that not only "would

34

have prevented or significantly reduced the risk of the claimant's personal injury, property

damage, or death without substantially impairing the product's utility" but was also

"economically and technologically feasible at the time the product left the control of the

manufacturer." *Smith v. Louisville Ladder Co.*, 237 F.3d 515, 518 (5th Cir. 2001) (quoting

Section 82.005(b) of the Texas Civil Practice and Remedies Code).  Plaintiffs fail to plead any

facts regarding the economic or technological feasibility of any purported alternative designs.  Of

course, COREXIT® worked exactly as it was required to do – it dispersed the oil to prevent it

from washing ashore.  (Transcript, USEPA and Coast Guard Press Conference on Dispersant

Use in the Gulf of Mexico 15 (May 24, 2010) (noting that a significant amount of oil would have

reached the shores of the Gulf of Mexico had dispersants not been used),

http://www.epa.gov/bpspill/dispersants/transcript-may24.pdf (Exh. J hereto).)

 Far from being "defective" or "unreasonably dangerous," the USEPA, as part of the NCP

approval process, expressly determined after review of relevant formula, safety and efficacy

data, that COREXIT® was appropriate for its intended purpose.  COREXIT® was thereafter

used only at the direction of the President and federal and state agencies.

### E. Medical Monitoring Is Unavailable To Plaintiffs (Count IX)

 "Florida Plaintiffs" allege that they "have been exposed to greater than normal

background levels of oil, dispersants, and/or other hazardous chemicals," and that this exposure

may eventually cause "serious health problems, diseases, and medical conditions." (Compl. ¶¶

281, 284.) As a result, they claim, they are entitled to medical monitoring damages. (*Id.* ¶¶ 280,

287-288.) Florida Plaintiffs' medical monitoring claim fails because, as set forth in the BP

Defendants' Motion, Florida law does not apply to this dispute.  Plaintiffs' Ninth Claim for

Relief should be dismissed. *See* BP Defendants' Motion § III.B.

**F.     Plaintiffs Fail To State A Claim Against Nalco Under The Florida Pollution Discharge Prevention And Control Act (Count XI)**

Plaintiffs allege in their Eleventh Claim for Relief that in the course of responding to the Spill, Defendants violated the Florida Pollutant Discharge Prevention and Control Act, Fla. Stat. § 376.011, *et seq.* (the "PDPCA"), and that under the PDPCA, Defendants are strictly liable for Plaintiffs' damages. (Compl. ¶¶ 309-311.)  As an initial matter, Plaintiffs' claim fails because, as set forth in the BP Defendants' Motion, Florida law does not apply in this case. *See* BP Defendants' Motion § V.  Further, Plaintiffs' claim against the Nalco Entities fails because the strict liability provision on which they rely creates a cause of action only against a "responsible party" and only for damages resulting from the Spill.  (Compl. ¶¶ 311-312.)  Plaintiffs do not assert that any of the Nalco Entities is a "responsible party," and indeed, none of the Nalco Entities meets the definition of a "responsible party" under the PDPCA. *See* Fla. Stat. § 376.031(20) ("responsible party" in the case of an offshore facility is "the lessee or permittee of the area in which the facility is located or the holder of a right of use and easement granted under applicable state law or the Outer Continental Shelf Lands Act").  Nor do Plaintiffs assert that any of the Nalco Entities contributed to the Spill.  As a result, Plaintiffs' claim under the PDPCA should be dismissed.

**G.     Plaintiffs Are Not Entitled To Punitive Damages**

Plaintiffs claim they are entitled to recover punitive damages under their maritime law gross negligence claim (Fourth Claim for Relief) based on Nalco's allegedly "wanton or reckless conduct" in connection with the Spill response efforts.  (Compl. ¶¶ 231-236.)  As set forth in the BP Defendants' Motion, Plaintiffs cannot recover punitive damages under maritime law. *See* BP Defendants' Motion § VII.  Further, for the reasons set forth in the BP Defendants' Motion, Plaintiffs' freestanding claim for punitive damages also fails. *Id.* § VIII.

36

**H.    The Master Complaint Fails To State A Claim For Relief Against Nalco Holdings LLC, Nalco Finance Holdings LLC And Nalco Holding Company (All Counts)**

Plaintiffs purport to bring claims against Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company, as parent entities of Nalco Company.[16] (*Id.* ¶ 66.) Yet, nowhere in the Complaint do Plaintiffs allege any conduct on the part of Nalco Company's parent entities, much less any conduct that could conceivably give rise to liability against them for any of Plaintiffs' claims. All claims against these defendants should be dismissed.

It is well settled under both federal and Delaware law[17] that the corporate form may be disregarded to impose liability on parent entities only where the facts show that the corporate form was abused to perpetrate a fraud or similar wrong, or where the two companies effectively operated as a single entity. *See, e.g., Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989) (in order to disregard the corporate form under either federal or Delaware law, "[f]raud or something like it is required"); *see also United States v. Jon-T Chems., Inc.*, 768 F.2d 686, 691 (5th Cir. 1985) (noting most common exception to limitation on liability under

---

[16]    None of these companies were named in any complaint relating to these matters that is part of this MDL or otherwise. They are named only in the B3 Master Complaint. The B3 Master Complaint has never been served on any of these Nalco Entities. These Nalco Entities, accordingly, reserve their rights to claim that they have not been properly named or served. Because the allegations in the Complaint are substantively flawed, however, they should be dismissed outright.

[17]    The Complaint alleges that all four of the Nalco Entities named as defendants are organized under Delaware law. (Compl. ¶ 66.) Federal courts are divided on whether to apply federal common law or state law to veil-piercing attempts where the underlying cause of action is based on federal question jurisdiction rather than diversity jurisdiction. Some courts have held that in federal question cases, federal law applies to veil-piercing claims. *See, e.g., Am. Bell Inc. v. Fed'n of Tel. Workers of Pa.*, 736 F.2d 879, 886 (3d Cir. 1984) (finding "[f]ederal [common] law governs liability" based on veil piercing under a federal cause of action); *Viera v. Chehaiber*, Civil Action No. ED CV:08-00182 JRG (JCRx), 2010 WL 960347, at *3 (C.D. Cal. Mar. 16, 2010) ("Because jurisdiction is based on a federal question, federal common law, rather than state law, controls."). Others have applied state law to determine whether parties have disregarded the corporate form in federal question cases. *See, e.g., Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009) ("Veil-piercing is an equitable remedy governed by state law, here the law of Illinois because that is where all of the corporations at issue were incorporated. We have jurisdiction by virtue of the funds' original claim for relief under ERISA . . . .").

federal law is for fraud and explaining that "[a]nother exception arises where . . . a parent company totally dominates and controls its subsidiary, operating the subsidiary as its business conduit or agent"); *Harper v. Del. Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1085 (D. Del. 1990) (under Delaware law, standard for disregarding corporate form is whether parent and its subsidiary "operated as a single economic entity such that it would be inequitable for this Court to uphold a legal distinction between them") (internal quotations and citation omitted).[18]

Plaintiffs have not alleged – and cannot allege – any facts even remotely suggesting that Nalco Company was "established for a fraudulent purpose" or that any of its parent entities "totally dominate[] and control[]" it. *Jon-T Chems., Inc.*, 768 F.2d at 691. Accordingly, the Complaint cannot support the potential liability of Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company. Plaintiffs' claims against those defendants should be dismissed for this independent reason. *See Twombly*, 550 U.S. at 570 (to avoid dismissal, plaintiff must plead "enough facts to state a claim to relief that is plausible on its face").

## IV.   CONCLUSION

For all of these independent and alternative reasons, the Complaint should be dismissed in its entirety as to the Nalco Entities.

Dated:  February 28, 2011                    Respectfully submitted,

By: /s/ Thomas J. Heiden
Thomas J. Heiden (IL # 6281563)
(thomas.heiden@lw.com)
Mary Rose Alexander (IL # 6205313)
(mary.rose.alexander@lw.com)
LATHAM & WATKINS LLP
233 South Wacker Dr., Suite 5800
Chicago, IL 60606-6401

---

[18]    "No reason supports deciding definitively whether federal or state law governs the veil-piercing claim when no conflict exists between the federal and state law." *Mayes v. Moore*, 419 F. Supp. 2d 775, 782, n.5 (M.D.N.C. 2006).

Phone: (312) 876-7700
Facsimile: (312) 993-9767

*Attorneys for Nalco Company, Nalco Holdings
LLC, Nalco Finance Holdings LLC and Nalco
Holding Company*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing NALCO COMPANY, NALCO HOLDINGS LLC, NALCO FINANCE HOLDINGS LLC AND NALCO HOLDING COMPANY'S MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS MASTER COMPLAINT "B3 BUNDLE" has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 28th day of February, 2011.

/s/ Thomas J. Heiden
Thomas J. Heiden (IL # 6281563)
(thomas.heiden@lw.com)
Mary Rose Alexander (IL # 6205313)
(mary.rose.alexander@lw.com)
LATHAM & WATKINS LLP
233 South Wacker Dr.
Suite 5800
Chicago, IL 60606-6401
Phone: (312) 876-7700
Facsimile: (312) 993-9767

*Attorneys for Nalco Company, Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company*

**EXHIBITS TO
NALCO COMPANY, NALCO HOLDINGS LLC, NALCO FINANCE HOLDINGS LLC
AND NALCO HOLDING COMPANY'S  MEMORANDUM IN SUPPORT OF THEIR
MOTION TO DISMISS MASTER COMPLAINT "B3 BUNDLE"**

| Description | Date | Exhibit No. |
|---|---|---|
| Letter from Paul F. Zukunft, Rear Admiral, U.S. Coast Guard, Federal On-Scene Coordinator, to The Nalco Company and Providers of Surfactant Supplies to the Nalco Company | July 12, 2010 | A |
| National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, *Report to the President: Deep Water – The Gulf Oil Disaster and the Future of Offshore Drilling* (Relevant Excerpts) | Jan. 2011 | B |
| USEPA, National Contingency Plan Product Schedule (Relevant Excerpts) | Jan. 31, 2011 | C |
| The Blog @ Homeland Security, http://blog.dhs.gov/2010/05/ongoing-administration-wide-response-to.html | May 5, 2010 | D |
| USEPA, Dispersant Monitoring and Assessment Directive – Addendum 3 | May 26, 2010 | E |
| National Commission on the BP Deepwater Horizon Spill and Offshore Drilling, *Staff Working Paper No. 4: The Use of Surface and Subsea Dispersants During the BP Deepwater Horizon Oil Spill* | Jan. 11, 2011 | F |
| Transcript, Press Briefing by National Incident Commander Admiral Thad Allen | Aug. 1, 2010 | G |
| Letter from Mary E. Landry, Rear Admiral, U.S. Coast Guard, Commander, Eighth Coast Guard District, to Providers of Surfactant Supplies to the Nalco Company | May 9, 2010 | H |
| Operational Science Advisory Team (OSAT), Unified Area Command, *Summary Report for Sub-Sea and Sub-Surface Oil and Dispersant Detection:  Sampling and Monitoring* (Relevant Excerpts) | Dec. 17, 2010 | I |
| Transcript, USEPA and Coast Guard Press Conference on Dispersant Use in the Gulf of Mexico | May 24, 2010 | J |

# EXHIBIT A



**U.S. Department of**
**Homeland Security**

**United States**
**Coast Guard**

Federal On-Scene Coordinator
Unified Area Command

Unified Area Command
1250 Poydras Street
New Orleans, LA 70113

5080
July 12 2010

To:  The Nalco Company and Providers of Surfactant Supplies to the Nalco Company

Ladies and Gentlemen:

This is a follow-on to my May 9, 2010 letter.  We again write to you in a time of great national need.  On April 20, 2010, an incident on the mobile offshore drilling unit Deepwater Horizon resulted in an oil spill in the Gulf of Mexico which has since been designated a "spill of national significance."  The Coast Guard supports the efforts of BP Exploration & Production Inc. (BP EPI) to contain and eliminate this oil spill and minimize and prevent its effects, both at sea and onshore.

Given the circumstances of the oil spill, including its size and proximity to the shoreline of the United States, chemical dispersants are essential to the oil spill response and clean-up effort.  At this time, the supply of dispersant available to BP EPI remains extremely limited.  The Nalco Company, a dispersant manufacturer, is manufacturing additional dispersant for BP EPI to use in the Deepwater Horizon response but cannot produce at full capacity due to a shortage of surfactant supplies and will soon deplete what remaining surfactant supply it has.  If BP EPI cannot source additional dispersant very soon, its current supply of dispersant will be exhausted.  The consequences of such a dispersant exhaustion will be widespread, and we write to you today to ask for your continued assistance in helping all of us avoid those consequences.

Specifically, we are asking Nalco Company and companies that provide the Nalco Company with surfactant supplies to continue to assist by making available, to the greatest extent possible, dispersant and the surfactant material to this response and clean-up effort.  We understand that dispersant and surfactant material may be in short supply or otherwise already designated for contracts with other companies.  We appreciate the commercial realities involved and respectfully ask that, as suppliers, you make whatever efforts you can to allot surfactant supply to the Nalco Company's production so that it can manufacture dispersant for BP EPI's oil spill response, knowing that whatever efforts you are undertaking in this regard are of invaluable benefit to this country.

We ask that suppliers of materials contact Nalco directly to arrange reasonable terms for your surfactant supply.

Please do not hesitate to contact us should you have any questions.  We thank you for your time and consideration of this request.

Sincerely,

PAUL F. ZUKUNFT
Rear Admiral, U.S. Coast Guard
Federal On-Scene Coordinator

# EXHIBIT B



# DEEP WATER

## The Gulf Oil Disaster and the Future of Offshore Drilling

**Report to the President**

National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling

# Dedication

This report is dedicated to the 11 men who lost their lives on the *Deepwater Horizon* rig on April 20, 2010 and to their families, in hope that this report will help minimize the chance of another such disaster ever happening again.

Jason Anderson

Aaron Dale Burkeen

Donald Clark

Stephen Curtis

Gordon Jones

Roy Wyatt Kemp

Karl Dale Kleppinger, Jr.

Blair Manuel

Dewey Revette

Shane Roshto

Adam Weise

ii

# Acknowledgements

We wish to acknowledge the many individuals and organizations, government officials and agencies alike that offered their views and insights to the Commission. We would especially like to express our gratitude to the Coast Guard's Incident Specific Preparedness Review (ISPR) for allowing Commission staff to participate in its interviews and discussions, which was invaluable to the preparation of this report. (A copy of the Coast Guard's ISPR report can be found at the Commission's website at www.oilspillcommission. gov). We would also like to thank Chevron for performing the cement tests that proved so critical to our investigation into the Macondo well blowout.

We also thank the Department of Energy, which served as our supporting agency, and all of the Department employees whose assistance was so essential to the success and functioning of the Commission. In particular, we would like to thank Christopher Smith, Deputy Assistant Secretary for Oil and Natural Gas, who acted as the Commission's Designated Federal Officer, as well as Elena Melchert, Petroleum Engineer in the Office of Oil and Gas Resource Conservation, who served as the Committee Manager.

But most importantly, we are deeply grateful to the citizens of the Gulf who shared their personal experiences as Commissioners traveled in the region, providing a critical human dimension to the disaster and to our undertaking, as well as the many people who testified at the Commission's hearings, provided public comments, and submitted statements to our website. Together, these contributions greatly informed our work and led to a better report. Thank you one and all.

## Copyright, Restrictions, and Permissions Notice

Except as noted herein, materials contained in this report are in the public domain. Public domain information may be freely distributed and copied. However, this report contains illustrations, photographs, and other information contributed by or licensed from private individuals, companies, or organizations that may be protected by U.S. and/or foreign copyright laws. Transmission or reproduction of items protected by copyright may require the written permission of the copyright owner.

When using material or images from this report we ask that you credit this report, as well as the source of the material as indicated in this report.] Permission to use materials copyrighted by other individuals, companies or organizations must be obtained directly from those sources.

This report contains links to many Web sites. Once you access another site through a link that we provide, you are subject to the use, copyright and licensing restrictions of that site. Neither the Government nor the National Commission on the BP/Deepwater Horizon Oil Spill and Offshore Drilling (Commission) endorses any of the organizations or views represented by the linked sites unless expressly stated in the report. The Government and the Commission take no responsibility for, and exercise no control over, the content, accuracy or accessibility of the material contained on the linked sites.

*Cover Photo: © Steadfast TV*

ISBN: 978-0-16-087371-3

iii

# Deep Water

## The Gulf Oil Disaster and the Future of Offshore Drilling

## Report to the President

National Commission on the BP Deepwater Horizon
Oil Spill and Offshore Drilling

January 2011

iv

## Commission Members

Bob Graham, Co-Chair

William K. Reilly, Co-Chair

Frances Beinecke

Donald F. Boesch

Terry D. Garcia

Cherry A. Murray

Fran Ulmer

# Table of Contents

*Foreword* .................................................................................................... **vi**

**PART I: The Path to Tragedy** ................................................................ **xiii**

**Chapter 1** ......................................................................................... **1**
"Everyone involved with the job...was completely satisfied...."
The *Deepwater Horizon,* the Macondo Well, and Sudden Death on the Gulf of Mexico

**Chapter 2** ......................................................................................... **21**
"Each oil well has its own personality."
The History of Offshore Oil and Gas in the United States

**Chapter 3** ......................................................................................... **55**
"It was like pulling teeth."
Oversight—and Oversights—in Regulating
Deepwater Energy Exploration and Production in the Gulf of Mexico

**PART II: Explosion and Aftermath:**

**The Causes and Consequences of the Disaster** ......................... **87**

**Chapter 4** ......................................................................................... **89**
"But, who cares, it's done, end of story, [we] will probably
be fine and we'll get a good cement job."
The Macondo Well and the Blowout

**Chapter 5** ......................................................................................... **129**
"You're in it now, up to your neck!"
Response and Containment

**Chapter 6** ......................................................................................... **173**
"The worst environmental disaster America has ever faced."
Oiling a Rich Environment: Impacts and Assessment

**Chapter 7** ......................................................................................... **197**
"People have plan fatigue . . . they've been planned to death"
Recovery and Restoration

**PART III: Lessons Learned:**

**Industry, Government, Energy Policy** ....................................... **215**

**Chapter 8** ......................................................................................... **217**
"Safety is not proprietary."
Changing Business as Usual

**Chapter 9** ......................................................................................... **249**
"Develop options for guarding against, and mitigating the impact of, oil spills associated
with offshore drilling." Investing in Safety, Investing in Response, Investing in the Gulf

**Chapter 10** ....................................................................................... **293**
American Energy Policy and the Future of Offshore Drilling

**Endnotes** .......................................................................................... **307**

**Appendices**
*Appendix A: Commission Members* ..................................................... **356**
*Appendix B: List of Acronyms* ............................................................ **358**
*Appendix C: Executive Order* .............................................................. **359**
*Appendix D: Commission Staff and Consultants* ............................... **362**
*Appendix E: List of Commission Meetings* ......................................... **365**
*Appendix F: List of Staff Working Papers* .......................................... **366**

**Index** ................................................................................................. **368**

times the expertise that MMS could bring to bear on the complex problem of deepwater spill containment. Another pointed out that MMS had trouble attracting the most talented personnel, who are more likely to work in industry where salaries are higher. A third MMS employee stated that he could count on one hand the people from the agency whom he would trust to make key decisions in an effort of this magnitude. Perhaps most revealingly, two different MMS employees separately recalled being asked—one by Secretary Salazar, and the other by Assistant Secretary Tom Strickland—what they would do if the U.S. government took over the containment effort. Both said they would hire BP or another major oil company.

Though the Coast Guard and MMS believed they had to work closely with BP, others in government did not share this view of the relationship with the responsible party. At an April 29 press conference with several senior administration officials, Coast Guard Rear Admiral Sally Brice O'Hara referred to BP as "our partner," prompting Secretary Napolitano to emphasize, "They are not our partner."[37] Secretary Salazar later said on *CNN* that the government would keep its "boot on the neck" of BP.[38]

While struggling to explain its oversight role to the public, the federal government increased its commitment to the spill response. On April 29, a week after the rig sank and a day after the flow-rate estimate rose to 5,000 barrels per day, the Coast Guard designated the disaster a "Spill of National Significance"[39]—the first time the government had used that designation. A Spill of National Significance is one "that due to its severity, size, location, actual or potential impact on the public health and welfare or the environment, or the necessary response effort, is so complex that it requires extraordinary coordination of federal, state, local, and responsible party resources to contain and clean up the discharge."[40] The designation permitted a National Incident Commander to "assume the role of the [Federal On-Scene Coordinator] in communicating with affected parties and the public, and coordinating federal, state, local, and international resources at the national level."[41] Other than the quoted sentence, the National Contingency Plan is silent on the role of the National Incident Commander, who can fill the position, and what tasks he or she will handle. As a result, there is no clear line between the National Incident Commander's responsibilities and those of the Federal On-Scene Coordinator. During the *Deepwater Horizon* spill response, the National Incident Commander coordinated interagency efforts on the wide variety of issues responders faced, and dealt with high-level political and media inquiries, while the Federal On-Scene Coordinator generally retained oversight of day-to-day operations. More than anyone else, the National Incident Commander became the face of the federal response. When President Obama visited the Gulf on May 2, a fisherman asked who would pay his bills while he was out of work; the President responded that the National Incident Commander would take care of it.[42]

On May 1, Secretary Napolitano announced that Admiral Thad Allen, the outgoing Commandant of the Coast Guard and then its only four-star Admiral, would serve as National Incident Commander.[43] Admiral Allen was well known in the Gulf. He had previously overseen the ocean rescue and return to Cuba of Elian Gonzalez in 1999; the Coast Guard's work securing harbors along the Eastern Seaboard after the attacks of September 11, 2001; and the federal response to Hurricanes Katrina and Rita, after the



Surrounded by orange containment boom, National Incident Commander Admiral Thad Allen speaks to the press in Venice, Louisiana. The outgoing Coast Guard Commandant postponed his retirement to assume the post, drawing on his experience leading the federal response to Hurricane Katrina and overseeing oil-spill readiness exercises in the Gulf.

*Steven Johnson/Miami Herald/MCT via Getty Images*

Bush Administration asked him to replace the stumbling director of the Federal Emergency Management Agency, Michael Brown, as the lead federal official.[44] His leadership during Katrina was widely considered a success. A Baton Rouge *Advocate* editorial published near the end of his time in the Gulf highlighted his local popularity and thanked him for his service.[45] Less celebrated in the media, but no less important for the task facing him as National Incident Commander, was Admiral Allen's role overseeing a 2002 simulation that tested the readiness of the Coast Guard and other agencies to respond to a Spill of National Significance off the coast of Louisiana.[46] As Commandant, Admiral Allen was already participating in the response, and he put off his scheduled retirement when he became National Incident Commander.

As the National Incident Command took shape in early May, BP's efforts to stop the flow of oil continued to focus on actuating the BOP, which BP still believed was the best chance of quickly shutting in the well. These efforts were plagued by engineering and organizational problems. For instance, it took nearly 10 days for a Transocean representative to realize that the stack's plumbing differed from the diagrams on which BP and Transocean were relying, and to inform the engineers attempting to trigger one of the BOP's rams through a hydraulic panel that they had been misdirecting their efforts.[47] (Without properly recording the change, Transocean had reconfigured the BOP; the panel

that was supposed to control that ram actually operated a different, "test" ram, which could not stop the flow of oil and gas.[48] BP Vice President Harry Thierens, who was BP's lead on BOP interventions, stated afterward that he was "quite frankly astonished that this could have happened."[49] While this and other problems delayed BP's efforts, the flow of oil and sand continued to wear down the BOP's parts, making closure more difficult.[50]

BP stopped trying to close the BOP on May 5.[51] By May 7, it had concluded that "[t]he possibility of closing the BOP has now been essentially exhausted."[52] In mid-May, at the suggestion of Secretary of Energy Steven Chu, BP undertook gamma-ray imaging of the BOP, which lacked instrumentation to show the position of its rams.[53] The imaging indicated that, although the blind shear ram had closed at least partially, oil continued to flow past it.

### The "Social and Political Nullification" of the National Contingency Plan (April 29–May 1)

The hurricane-stricken Gulf states are all too familiar with emergency response; all are among the top dozen states in number of declared major disasters.[54] State and local officials in the Gulf are accustomed to setting up emergency-response structures pursuant to the Stafford Act, under which the federal government provides funding and assists state and local governments during a major disaster.[55] In contrast, the National Contingency Plan, which governs oil spills, gives the Federal On-Scene Coordinator the power to direct all response actions.[56] Thus, while the Stafford Act envisions a state-directed (though in part federally funded) response, the National Contingency Plan puts federal officials in charge.

State and local officials chafed under federal control of the response. Louisiana Governor Bobby Jindal's advisors reportedly spent days trying to determine whether the Stafford Act or the National Contingency Plan applied.[57] On April 29, Governor Jindal declared a state of emergency in Louisiana, authorizing the director of the Governor's Office of Homeland Security and Emergency Preparedness to undertake any legal activities deemed necessary to respond and to begin coordinating state response efforts.[58] These efforts took place outside of the Unified Command framework. The Governors of Mississippi, Alabama, and Florida followed suit, declaring states of emergency the next day.[59]

At the outset of the spill, the pre-designated State On-Scene Coordinators for Louisiana, Alabama, and Mississippi participated in Unified Command.[60] These individuals were career oil-spill responders: familiar with the National Contingency Plan, experienced in responding to spills, and accustomed to working with the Coast Guard. Some had participated in the 2002 spill exercise run by Admiral Allen. They shared the Coast Guard's view that the responsible party is an important ally, not an adversary, in responding to a spill.

During this spill, however, the Governors and other state political officials participated in the response in unprecedented ways, taking decisions out of the hands of career oil-spill responders. These high-level state officials were much less familiar with spill-response

planning. In addition to the National Contingency Plan, each Coast Guard sector is an "Area" with an Area Contingency Plan created by relevant state and federal agencies. When confronted with a contingency plan setting out how the federal and state governments were supposed to run an oil-spill response, one high-level state official told a Coast Guard responder that he never signed it. According to the Coast Guard officer, the state official was not questioning whether his signature appeared on the document, but asserting that he had not substantively reviewed the plan.[61] State and local officials largely rejected the pre-spill plans and began to create their own response structures.

Because the majority of the oil would come ashore in Louisiana, these issues of control mattered most there. Louisiana declined to empower the officials that it sent to work with federal responders within Unified Command, instead requiring most decisions to go through the Governor's office. For example, the Louisiana representative at Unified Area Command could not approve the daily agenda of response activities.[62] Responders worked around this problem, but it complicated operations.

Local officials were even less familiar with oil-spill planning, though they had robust experience with other emergencies. Under Louisiana law, Parish Presidents exercise substantial authority—mirroring that of the Governor—during hurricanes and other natural disasters.[63] The parishes wanted to assert that same control during the spill, and many used money distributed by BP to purchase their own equipment and establish their own operating centers outside of Unified Command. Eventually, the Coast Guard assigned a liaison officer to each Parish President, who attempted to improve relationships with the parishes by providing information and reporting back to Unified Command on local needs.

Local resentment became a media theme and then a self-fulfilling prophesy. Even those who privately thought the federal government was doing the best it could under the circumstances did not say so publicly.[64] Coast Guard responders watched Governor Jindal—and the TV cameras following him—return to what appeared to be the same spot of oiled marsh day after day to complain about the inadequacy of the federal response, even though only a small amount of marsh was then oiled. When the Coast Guard sought to clean up that piece of affected marsh, Governor Jindal refused to confirm its location.[65] Journalists encouraged state and local officials and residents to display their anger at the federal response, and offered coverage when they did. Anderson Cooper reportedly asked a Parish President to bring an angry, unemployed offshore oil worker on his show. When the Parish President could not promise the worker would be "angry," both were disinvited.[66]

As the media coverage grew more frenzied, the pressure increased on federal, state, and local officials to take action and to avoid being seen as in league with BP. What Admiral Allen would later call "the social and political nullification" of the National Contingency Plan, which envisions "unity of effort" between the federal government, state governments, and the responsible party, was well underway.[67]

## Spill Impacts and Efforts To Help

Effects on the Gulf economy, environment, and way of life increased as the spill dragged on and oil crept closer to shorelines. Concerns about fisheries took hold immediately. The

Gulf of Mexico is home to crab, shrimp, oyster, and finfish fisheries, all of which were affected by the oil. The Louisiana Department of Wildlife and Fisheries and the Department of Health and Hospitals began closing fisheries and oyster grounds in state waters— three miles or less from shore—on April 30. State fishery closures continued piece by piece, beginning on June 2 in Alabama, June 4 in Mississippi, and June 14 in Florida.[68] NOAA's Office of Response and Restoration began conducting flyovers and modeling the movement of the oil beginning April 23.[69] Responders used these daily trajectory forecasts to anticipate where oil would be over the next 24- and 48-hour periods. Based on the forecasts, as well as sampling in or near affected areas, the federal fishery closures began on May 2. Through an emergency rule, NOAA's National Marine Fisheries Service first closed an area spanning approximately 6,817 square miles, or 3 percent of the Gulf federal fishing zone.[70] On May 7, NOAA increased the closed area to 4.5 percent of that zone.[71] A week later, it extended the closures indefinitely.[72] NOAA continued to close additional areas, and on June 2—at the peak of the closures—it prohibited all fishing in nearly 37 percent of the Gulf zone.[73]

Although unable to fish, many fishermen were not content to lay idle. As contractors and subcontractors set up camp in towns across the Gulf to carry out response activities, residents viewed them with suspicion. People in Lafourche Parish, for example, worried about the out-of-state oil-spill-response contractors who took over their shores bringing crime and taking away spill-related job opportunities.[74] Parish Presidents pushed BP and Unified Command to give clean-up jobs to residents and, in the newly out-of-work fishermen, saw a fleet of experienced captains who were more familiar with the intricate shoreline than any out-of-state oil-spill responders.

The Vessels of Opportunity program was BP's answer, and a way for BP to provide some income to affected residents outside of the formal claims process. Through the program, BP employed private vessels to conduct response efforts such as skimming, booming, and transporting supplies. Vessels of opportunity made between $1,200 and $3,000 per day, depending on the size of the boat. Individual crew members made $200 for an eight-hour day.[75] But the program had delays and problems. BP and the Coast Guard were slow to develop eligibility requirements (such as an operable VHF-FM radio) for boats.[76] Initially, there was not enough work. Later, residents and Parish Presidents complained that BP was not sufficiently targeting out-of-work fishermen at whom the program was ostensibly directed, and that wealthy or non-local boat owners were taking advantage of poor oversight to gain spots in the program. Eventually, BP established a verification process that prioritized boats registered with the state before March 2010 and that accepted only one boat per owner.[77] The group that may have lost out the most on the program was the large population of Vietnamese-American fishermen. Many had arrived in the region as refugees and struggled with the lack of Vietnamese-language training.[78] (Chapter 6 discusses the impacts of the spill on minority fishing communities.)

Angry that BP was deploying non-local boats in his parish waters, Craig Taffaro, President of St. Bernard Parish, started his own program using the commercial fishing fleet based there. He submitted invoices to BP, which it paid. The State of Louisiana also began its own program, as did Plaquemines and Jefferson Parishes.[79] Unified Command struggled

to coordinate this floating militia of independent vessels and to give them useful response tasks. Having hundreds of vessels look for oil did not contribute significantly to the response, because aircraft were more effective at spotting oil.[80] Placing boom requires skill and training, and responders differed in their judgments of how much the vessels contributed.

In addition to overseeing the Vessels of Opportunity program, Unified Command needed to ensure that all workers, whether on boats or on shore, were adequately trained and taking safety precautions. The Occupational Safety and Health Administration (OSHA) began working with Unified Command at the end of April; under the National Contingency Plan, all response actions must comply with OSHA's training and safety requirements.[81] OSHA established rules regarding protective equipment and, because the response relied in part on untrained workers, a shortened training course.[82] Residents were eager to take on clean-up jobs, but some worried that, notwithstanding OSHA's involvement, response-related work would affect their health.[83] (Chapter 6 discusses the impacts of response activities on health.)

Health issues for non-workers were thornier. The Centers for Disease Control and Prevention represents the Department of Health and Human Services on the National Response Team and had participated in recent spill training exercises. The Centers for Disease Control, however, had not foreseen that an oil spill could affect the health of the broader population and had not fully considered the role health agencies might play in a spill response.[84] Others in the Department, including the Assistant Secretary for Preparedness and Response, had not either.[85] Consequently, the Department had to consider during the disaster how it would fund spill-related activities, because BP would have to pay only for those deemed response measures by Unified Command. The Department was concerned that neither the Oil Spill Liability Trust Fund nor BP would reimburse it for activities such as long-term health surveillance, and negotiations over what costs qualified for reimbursement took time.[86] At the request of Unified Command, Health and Human Services eventually, in June, sent a Senior Health Policy Advisor to support the National Incident Commander on public health issues.[87]

The spill affected wildlife health as well. On April 30, the *Times-Picayune* reported the recovery of the first oiled bird.[88] From then on, crude-covered animals were a fixture in the media coverage and public perceptions of the disaster. The U.S. Fish and Wildlife Service, NOAA's Fisheries Service, state wildlife agencies, and academic organizations oversaw animal response and rehabilitation efforts.[89] Wildlife responders took recovered animals to one of several treatment centers, washing, monitoring, and then releasing them.[90] According to the Audubon Society, more than 12,000 volunteers signed up to help with these efforts during a single week in early May.[91] Not all offers of assistance were accepted. Some groups that could have provided skilled wildlife responders, such as the National Wildlife Federation, felt discouraged from helping; in their view, there was no effective process for integrating skilled volunteers into the response structure.[92] Would-be volunteers worried that animal mortality was greater than it would have been had more rescuers been out looking for oiled animals.[93] (Chapter 6 discusses impacts on wildlife in detail.)



Free once more, a pair of pelicans test their wings in Aransas National Wildlife Refuge after being de-oiled and nursed back to health. Taking part in the release are veterinarian Sharon Taylor and Refuge manager Dan Alonso. Over a thousand birds affected by the spill were rehabilitated; thousands of others were not so fortunate.

*U.S. Coast Guard photo/Petty Officer 3rd Class Robert Brazzell*

Along with volunteering for wildlife rescue, members of the general public submitted to BP and the Coast Guard numerous ideas for how to clean up the oil or plug the well. For instance, movie star Kevin Costner argued for the use of his oil-water separator, and BP eventually purchased 32 units.[94] Citizens without Costner's resources had more trouble getting their ideas reviewed. On June 4, the Coast Guard established the Interagency Alternative Technology Assessment Program to receive, acknowledge, and evaluate ideas.[95] The program received about 4,000 submissions.[96] Most of the proposals were not viable or required too much time for development into operational response tools.* As ideas came in, the Coast Guard screened them and sent the most promising to the Federal On-Scene Coordinator, who ended up testing about a dozen during the course of the spill. None was implemented on a large scale, but the Coast Guard plans to use some of the proposals in its spill-response research.[97]

Foreign companies and countries also offered assistance in the form of response equipment and vessels. The Coast Guard and National Incident Command accepted some of these offers and rejected others.[98] News reports and politicians alleged that the federal government turned away foreign offers of assistance because of the Jones Act, a law preventing foreign vessels from participating in trade between U.S. ports.[99] While decisionmakers did decline to purchase some foreign equipment for operational reasons—

---

* Although intellectual property concerns prohibit the Coast Guard from disclosing the proposals actually submitted, news outlets reported that individuals suggested ideas like dumping popcorn from airplanes; soaking up the oil with packing peanuts, sawdust, kitty litter, and air conditioning filters; and using liquid nitrogen to freeze the oil. Julie Schmit, "After BP Oil Spill, Thousands of Ideas Poured in for Cleanup," *USA Today*, November 15, 2010; John W. Schoen, "BP's Suggestion Box is Spilling Over," MSNBC, May 14, 2010.

for example, Dutch vessels that would have taken weeks to outfit and sail to the region, and a Taiwanese super-skimmer that was expensive and highly inefficient in the Gulf—they did not reject foreign ships because of Jones Act restrictions.[100] These restrictions did not even come into play for the vast majority of vessels operating at the wellhead, because the Act does not block foreign vessels from loading and then unloading oil more than three miles off the coast.[101] When the Act did apply, the National Incident Commander appears to have granted waivers and exemptions when requested.[102]

In the end, the response technology that created the most controversy was not a mechanical tool like a skimmer or oil–water separator, but a chemical one.

### Initial Dispersant Decisions (April 30–May 10)

Even before they were certain that oil was spilling into the Gulf, responders had readied planes full of dispersants to use in a potential response. Dispersants include surfactants that break down oil into smaller droplets, which are more likely to dissolve into the water column.[103] On April 24, once Unified Command knew a leak existed and coastal impacts were possible, Admiral Landry told reporters: "We have one-third of the world's dispersant resources on standby. . . . Our goal is to fight this oil spill as far away from the coastline as possible."[104] Faced with what one Coast Guard captain called a "tradeoff of bad choices" between spraying chemicals on the water or watching more oil reach the shore,[105] responders would wield dispersants in the battle against oil for the next 12 weeks, using novel methods and unprecedented volumes.

Dispersants do not remove oil from the water altogether. Energy from wind and waves naturally disperses oil, and dispersants accelerate this process by allowing oil to mix with water. Dispersed oil is diluted as it mixes vertically and horizontally in the water column.[106] Using dispersants has several potential benefits. First, less oil will reach shorelines and fragile environments such as marshes.[107] Second, animals and birds that float on or wade through the water surface may encounter less oil.[108] Third, dispersants may accelerate the rate at which oil biodegrades.[109] Finally, responders to an oil spill can use dispersants when bad weather prevents skimming or burning. But dispersants also pose potential threats. Less oil on the surface means more in the water column, spread over a wider area, potentially increasing exposure for marine life. Chemically dispersed oil can be toxic in both the short and long term. Moreover, some studies have found that dispersants do not increase biodegradation rates—or may even inhibit biodegradation.[110]

At the direction of the Federal On-Scene Coordinator, responders first sprayed dispersants on the surface oil slick on April 22.[111] Long before the spill, interagency "Regional Response Teams" had evaluated and preauthorized the use of specific dispersants in the Gulf of Mexico, with limits as to geographic areas where the chemicals could be applied, but not on overall volume or duration of use.[112] The teams included representatives from relevant state governments and from federal agencies with authority over oil spills, including the Coast Guard, EPA, the Department of the Interior, and NOAA. Preauthorization, requiring the concurrence of the Team, allows the Federal On-Scene Coordinator to employ dispersants immediately following a spill.[113] Timing matters, because the chemicals

are most effective when oil is fresh, before it has weathered and emulsified.[114] Without preauthorization, responders can still use dispersants during a spill if EPA and state authorities approve.[115] With the permission of the Federal On-Scene Coordinator, BP and its contractors applied 14,654 gallons of the dispersant Corexit on the surface during the week of April 20 to 26.[116]

Under the terms of the preauthorization, Corexit was a permissible dispersant because EPA listed it on the National Contingency Plan Product Schedule. EPA obtains toxicity data from the manufacturer before placing a dispersant on that schedule.[117] Some toxicologists have questioned the reliability and comparability of the testing by manufacturers.[118] Moreover, the required testing is limited to acute (short-term) toxicity studies on one fish species and one shrimp species;[119] it does not consider issues such as persistence in the environment and long-term effects.

Dispersant use increased during the first weeks of the spill. From April 27 to May 3, responders applied 141,358 gallons to the surface. The following week, they applied 168,988 gallons. The Coast Guard and other responders had often deployed dispersants to respond to spills, but never in such volumes; during the *Exxon Valdez* spill, responders sprayed about 5,500 gallons, and that use was controversial.[120]

Faced with high-volume dispersant use, Gulf residents became concerned that the chemicals were just as bad as the spilled oil itself. Some workers reported nausea and headaches after coming into contact with dispersants.[121] However, OSHA found no evidence of unsafe dispersant exposure among responders.[122] Environmental groups pressured Nalco, the company that manufactures Corexit, to disclose its formula. Although it had given the formula to EPA during the pre-listing process, Nalco declined to make the formula public, citing intellectual property concerns.[123] This decision did not reassure the citizens of the Gulf.

As the volume of dispersants sprayed on the surface grew, BP raised the idea of applying dispersants directly at the well, rather than waiting for the oil to reach the surface a mile above.[124] Responders had never before applied dispersants in the deep sea. Within Unified Command, some scientists were cautiously optimistic. They hoped that, in addition to reducing shoreline impacts, subsea application would mean less dispersants used overall, because they would be more effective in the turbulent subsea environment. Responders would later conclude that subsea dispersant application also helped to protect worker health by lowering the concentrations of volatile organic compounds at the surface.[125]

But responders were concerned about the absence of information on the effects of dispersants in the deepwater environment. No federal agency had studied subsea dispersant use and private studies had been extremely limited.[126] BP's Hayward was less than helpful; he told a British newspaper, "The Gulf of Mexico is a very big ocean. The amount of volume of oil and dispersant we are putting into it is tiny in relation to the total water volume."[127] While federal officials did not possess the scientific information they needed to guide their choices, they had to make choices nevertheless.

From April 30 to May 10, scientists within Unified Command worked intensively to create a monitoring protocol for subsea dispersant use that would detect adverse environmental effects and provide criteria for when the use was appropriate. It was unclear whether the preauthorizations by the Regional Response Teams covered subsea dispersant use. EPA believed they did not and wanted to make decisions about such use at a high level within the agency.  But it had trouble establishing clear and rapid communication, both internally and outside the agency.[128] This slowed creation and review of the testing protocols, while Coast Guard responders and NOAA scientists chafed at the delay.

On May 10, after several rounds of testing and revision, EPA adopted a testing protocol created by NOAA and BP scientists as its directive regarding subsea dispersant use. The directive, as later amended by EPA, limited subsea application to 15,000 gallons per day and required monitoring and compliance with environmental toxicity guidelines.[129] Administrator Lisa Jackson ultimately gave EPA's approval for subsea dispersant use and would later call it the hardest decision she ever made.[130] Observed toxicity levels never exceeded the guidelines in EPA's directive, and responders continued to apply dispersants at the source until BP capped the well.

### Deploying the Containment Dome (May 6–8)

While scientists tried to determine if subsea dispersant use was even possible, BP engineers simultaneously worked to contain and recover oil until they could kill the well. Within days of discovering the leaks from the broken riser on the sea floor, they began to consider use of a large containment dome. The idea was to place the dome, also known as a cofferdam, over the larger of the two leaks, with a pipe at the top channeling oil and gas to the *Discoverer Enterprise*, a ship on the surface. BP already had several cofferdams, which it had used to provide safe working space for divers repairing leaks from shallow-water wells following Hurricanes Katrina and Rita.[131] By May 4, BP had finished modifying for deep-sea use and oil collection a preexisting dome that was 14 feet wide, 24 feet long, and 40 feet tall.[132] Following an MMS inspection of the *Discoverer Enterprise*, BP began to lower the 98-ton dome to the sea floor late in the evening of May 6.[133]

The likelihood of collecting oil with the cofferdam was uncertain. BP's Suttles publicly cautioned that previous successful uses had been in much shallower water.[134] BP recognized that chief among potential problems was the risk that methane gas escaping from the well would come into contact with cold sea water and form slushy hydrates, essentially clogging the cofferdam with hydrocarbon ice.[135] Notwithstanding the uncertainty, BP, in a presentation to the leadership of the Department of the Interior, described the probability of the containment dome's success as "Medium/High."[136] Others in the oil and gas industry were not so optimistic: many experts believed the cofferdam effort was very likely to fail because of hydrates.[137]

The effort did fail, for that reason. Although BP had a plan to deal with hydrates once the cofferdam was in place, it had not planned to mitigate hydrate formation during installation.[138] When crews started to maneuver the cofferdam into position on the evening of May 7, hydrates formed before they could place the dome over the leak, clogging the

# EXHIBIT C

# ENVIRONMENTAL PROTECTION AGENCY

# NATIONAL CONTINGENCY PLAN

# PRODUCT SCHEDULE

## JANUARY 2011
## (1/31/2011)



Prepared by:

U.S. Environmental Protection Agency
Office of Emergency Management (OEM)
Regulation and Policy Development Division
Ariel Rios Building
1200 Pennsylvania Avenue, NW (Room 6450EE, Mail Code 5104A)
Washington, DC  20460

For Information Contact:

NCP Information Line, at (202) 260-2342

*Disclaimer: [Product Name] is on the U.S. Environmental Protection Agency's NCP Product Schedule. This listing does NOT mean that EPA approves, recommends, licenses, certifies, or authorizes the use of [Product Name] on an oil discharge. The listing means only that data have been submitted to EPA as required by subpart J of the National Contingency Plan, Section 300.915. (Source: 40 CFR §300.920 (e)).*

Abbreviations of Product Types:

| | |
|---|---|
| D | Dispersant |
| SW | Surface Washing Agent |
| S | Surface Collecting Agent |
| B | Bioremediation Agent |
| MC | Microbiological Culture |
| EA | Enzyme Additive |
| NA | Nutrient Additive |
| M | Miscellaneous Oil Spill Control Agent |

## PRODUCTS THAT HAVE BEEN REMOVED FROM THE NCP PRODUCT SCHEDULE:

### DISPERSANTS
ANTECO OIL SPILL DISPERSANT
BIOGENESIS BG-CLEAN 401
COLD CLEAN 500
COREXIT 8667
COREXIT 9550
COREXIT 9554
DISPERSANT 11
EC.O ATLAN'TOL AT7
ECO/+
ENERGY III
ENERSPERSE 700
ENERSPERSE 1100
FINASOL OSR-7
FORMULA 98
GOLD CREW DISPERSANT
HAZCLEAN-ER
INIPOL IP 90
INPROVE COLLOIDAL
M.C. #1 DISPERSANT
MAGNOTOX
MICRO-BLAZE OUT
NAXCHEM DISPERSANT K
NK-3
NURTURE BIO-EMULSIFIER
OFC D-609
OIL SPILL ELIMINATOR
OSD/LT OIL SPILL DISPERSANT
PETROMEND MP-900-W
PETROTECH PTI-25
PETROTECH II
PROFORM-POLLUTION
SDS-300
SEA MASTER NS-555
SEACARE ECOSPERSE
SEACARE OSD
SLICKGONE NS
SLIK-A-WAY
TOXIGON-2000
VALUE 100
VECLEAN OIL DISPERSANT
WELLAID 3316
WITCOMUL 4016
WITCOMUL 4078

WITCOMUL 3234
WITCOMUL 3235
YCC BLUECLEAN

### SURFACE WASHING AGENTS
CRUDEX (SW-5)
EDF EMULSA FIRE (SW-6)
FM-186-2SW (SW-29), Voluntary
Removal
GRANCONTROL-O (SW-14)
JANSOLV-60 (SW-3)
OMNI-CLEAN OSD (SW-13)
PETRO TITE M.M.E. (SW-7)
RUFFNEK (SW-4)
SX-100 (SW-27), Voluntary Removal

### SURFACE COLLECTING AGENT
COREXIT OC-5 (S-1)
OIL COMPRESS/BINDER (S-2)
OIL HERDER (S-3)
OIL SPILL REMOVER (S-4)

### BIOREMEDIATION AGENT
ABR BI-CHEM PETROLEUM BLEND
(B-20)
ADVANCED BIO CULTURES L-103
(B-25)
ADVANCED BIO CULTURES L-104
(B-26)
AE-BIOSEA PROCESS (B-15)
BACTOZYME (B-9)
BIOGEE HC (B-35)
BIO-ZYME 1000-HC (B-11)
BIOMAX (B-49)
BR (B-37)
DBC PLUS TYPE R-5 (B-8)
DBC PLUS TYPE L (B-7)
EEC BIOLOGICAL MEDIA (B-14)
EN-2000 CONCENTRATE (B-27)
ENZYT (LIQUID/CRYSTAL) (B-52)
HYDROBAC (B-1)
KBC 100 (B-46)
LRC-1 (B-50)
LRC-4 (B-51)

MAX BAC CUSTOMBLEN (B-13)
MEDINA MICROBIAL ACTIVATOR (B-44)
MICROPRO D (B-22)
MICROPRO NOW BAC (B-21)
MICROPRO SUPER CEE (B-23)
MICROPRO G (B-24)
MUNOX 212 (B-17)
MUNOX 512 (B-18)
MUNOX 112 (B-16)
NO-SCUM (B-2)
NUTRI-BIO 1000 (B-30)
PES-31 (B-39)
PETROBAC (B-3)
PETRODEG-100 (B-5)
PETRODEG-200 (B-6)
PETROVORE (B-47)
PHENOBAC (B-4)
PRP (B-29)
PUTIDOIL (B-40)
WOODACE BRIQUETTES (B-12)
WST BIOBLEND H-JM (B-31)
WST BIOBLEND M-B4W (B-32)
WST BIOBLEND M-B4C (B-34)
WST BIOBLEND M-5 (B-38)
WST BIOBLEND M-4 (B-33)

### MISCELLANEOUS OIL SPILL CONTROL AGENTS
ENVIRO-BOND 403 (M-11)
LIQUID OIL BOND-200 (M-3)
NOCHAR'S A610/A650 (M-9)
OIL BOND-100 (M-2)
OMNI-ZORB #8000 (M-16)
OMNI-ZORB #4000 (M-15)
OMNI-ZORB #2000 (M-14)
RE-ENTRY KNI (M-7)
RE-ENTRY D SOLVENT (M-8)
SEE-JELL (M-1)
SPILCAT (M-13)
WASTE-SET
AGGLOMERATE (M-21)

*Listing maintained per requirements of the
revised Subpart J, Federal Register, Volume 59,
Number 17, September 15, 1994

U.S. Environmental Protection Agency
NCP Product Schedule
JANUARY 2011

Currently Listed Products by Category:

| | |
|---|---|
| Dispersants | 14 |
| **Surface Washing Agents** | **43** |
| Surface Collecting Agents | 0 |
| **Bioremediation Agents** | **20** |
|    **Biological Additives (15)** | |
|      **--Microbiological Cultures (14)** | |
|      --Enzyme Additives (1) | |
|    Nutrient Additives (5) | |
| Miscellaneous Oil Spill Control Agents | 13 |
|    Solidifiers (8) | |
| | |
| **Total Products** | **90** |

| | |
|---|---|
| <u>Note changes to the Schedule:</u> | TXCHEM HE-1000™ (SW-37), added POC; BIOGRASS® EXTRA (SW-46), new E-mail and Web site listing; BIOREM-2000 OIL DIGESTER™ (B-63), new aka BIOREM-2000 SC |
| <u>Note new listings to the Schedule:</u> | NATURAMA G3 A-5 (SW-53); DRYLET™ MB BIOREMEDIATION (B-64) |
| <u>Note deletions from the Schedule:</u> | None for this update |
| <u>Note no longer manufactured:</u> | INIPOL EAP (B-10) and PRISTINE SEA II (B-54) |
| <u>Note contact information not Verified, as of 12/08/08:</u> | NEOS AB3000 (D-2); MARE CLEAN (D-3); INIPOL EAP (B-10); BET BIOPETRO (B-48); PRISTINE SEA II (B-54); and LAND AND SEA RESTORATION PRODUCT 001 (VELITE) (B-55) |

**All updates and additions to the NCP Product Schedule are indicated in bold.**

**Updated: 1/31/2011**

*Listing maintained per requirements of the
revised Subpart J, Federal Register, Volume 59,
Number 17, September 15, 1994

U.S. Environmental Protection Agency
NCP Product Schedule
JANUARY 2011

| BULLETIN NUMBER | PRODUCT TYPE LISTED | PRODUCT NAME | SUBMITTER | DATE LISTED; RELISTED*; REMOVED# |
|---|---|---|---|---|
| | | DISPERSANTS | | |
| D-1 | D | COREXIT® EC9527A (formerly COREXIT 9527) | Nalco Energy Services, L.P. 7705 Highway 90-A Sugar Land, TX 77487 PRODUCT MANAGEMENT: OFFICE: (281) 263-7336 MOBILE: (281) 202-8126 E-MAIL: kapreston@nalco.com WEB SITE: www.nalco.com (Ms. Kathryn Preston) | 03/10/78 12/18/95* |
| D-2 | D | NEOS AB3000 (Hydrocarbon Solvent Based) *EPA HAS NOT RECEIVED UPDATED INFORMATION FOR THIS PRODUCT AS OF 12/01/08* | NEOS Company Limited Daisan Kendai Building 1-2, 3-chome Isobedori Chuo-ku, Kobe, Japan 651-0084 PHONE: (81) 78-331-9384 FAX: (81) 78-272-4649 (Mr. T. Ishii, Manager) | 04/22/85 01/26/96* |
| D-3 | D | MARE CLEAN 200 (formerly MARE CLEAN 505) *EPA HAS NOT RECEIVED UPDATED INFORMATION FOR THIS PRODUCT AS OF 12/01/08* | Taiho Industries Co., Ltd. 21-44, 2-chome, Takanawa Minatoku, Tokyo, Japan PHONE: (81) 33-445-8111 FAX: (81) 33-443-6333 (Mr. Y. Abe) | 02/23/88 01/26/96* |
| D-4 | D | COREXIT® EC9500A (formerly COREXIT 9500) | Nalco Energy Services, L.P. 7705 Highway 90-A Sugar Land, TX 77487 PRODUCT MANAGEMENT: OFFICE: (281) 263-7336 MOBILE: (281) 202-8126 E-MAIL: kapreston@nalco.com WEB SITE: www.nalco.com (Ms. Kathryn Preston) | 04/13/94 12/18/95* |
| D-5 | D | DISPERSIT SPC 1000™ (aka, SEACARE E.P.A. (ECOSPERSE™ POLLUTION ABATEMENT)) | U.S. Polychemical Corp. 584 Chestnut Ridge Road Chestnut Ridge, NY 10977 PHONE: (845) 356-5530 FAX: (845) 356-6656 E-MAIL: bruceg@uspoly.com (Mr. Bruce Gebhardt) | 04/22/99 |
| D-6 | D | JD-109 | GlobeMark Resources Ltd. 1205 Pine Heights Drive Atlanta, GA 30324 MOBILE: (254) 231-2251 E-MAIL: joannie@globemarkresources.com or mikeclmail@gmail.com WEB SITE: www.globemarkresources.com (Ms. Joannie Docter or Mr. Mike Peterson) | 09/20/00 |

*Listing maintained per requirements of the
revised Subpart J, Federal Register, Volume 59,
Number 17, September 15, 1994

U.S. Environmental Protection Agency
NCP Product Schedule
JANUARY 2011

| BULLETIN NUMBER | PRODUCT TYPE LISTED | PRODUCT NAME | SUBMITTER | DATE LISTED; RELISTED*; REMOVED# |
|---|---|---|---|---|
| | | | DISPERSANTS (continued) | |
| D-7 | D | JD-2000™ | GlobeMark Resources Ltd. 1205 Pine Heights Drive Atlanta, GA 30324 MOBILE: (254) 231-2251 E-MAIL: joannie@globemarkresources.com or mikeclmail@gmail.com WEB SITE: www.globemarkresources.com (Ms. Joannie Docter or Mr. Mike Peterson) | 08/06/01 |
| D-8 | D | NOKOMIS 3-F4 | Mar-Len Supply, Inc. 23159 Kidder Street Hayward, CA 94545 PHONE: (510) 782-3555 FAX: (510) 782-2032 (Mr. Frank Winter) | 03/04/02 |
| D-9 | D | BIODISPERS (formerly PETROBIODISPERS) | Petrobiotech LLC P.O. Box 813 Newport, NH 03773 PHONE: (203) 966-4573 FAX: (561) 966-0920 (Mr. Frances Sullivan) | 06/28/02 |
| D-10 | D | SEA BRAT #4 | Alabaster Corp. 6921 Olson Lane Pasadena, TX 77505 PHONE: (281) 487-5482 PHONE: (800) 609-2728 FAX: (281) 487-9014 E-MAIL: alabastercorp@aol.com (Mr. Charles A. Sheffield) | 11/26/02 |
| D-11 | D | FINASOL® OSR 52 (aka, SEACARE ECOSPERSE 52) | TOTAL FLUIDES 51, Esplande de Général de Gaulle 92907 Paris La Défense France PHONE: +33-141-356-101 PHONE U.S.: (713) 483-5712 24-HOUR EMERGENCY NUMBER: +33-1-41-35-65-00 E-MAIL: abdallah.bouhlassi@total.com WEB SITE: www.totalspecialfluids.com (Mr. Abdallah Bouhlassi) | 01/30/03 |

*Listing maintained per requirements of the revised Subpart J, Federal Register, Volume 59, Number 17, September 15, 1994

U.S. Environmental Protection Agency
NCP Product Schedule
JANUARY 2011

| BULLETIN NUMBER | PRODUCT TYPE LISTED | PRODUCT NAME | SUBMITTER | DATE LISTED; RELISTED*; REMOVED# |
|---|---|---|---|---|
| | | | DISPERSANTS (continued) | |
| D-12 | D | SAF-RON GOLD (aka, SF-GOLD DISPERSANT) | Sustainable Environmental Technologies, Inc. P.O. Box 30516 Mesa, AZ 85275 CUSTOMER SERVICES: PHONE: (877) 853-2947 / (800) 347-8950 FAX: (877) 853-2947 / (480) 461-8798 24-HOUR EMERGENCY NUMBER: PHONE: (877) 853-2947 E-MAIL: info@sustainable-corp.com or bruce@sustainable-corp.com WEB SITE: www.sustainable-copr.com or www.saf-ron.com (Mr. Bruce Richards) | 01/03/05 |
| D-13 | D | ZI-400 (aka, ZI-400 OIL SPILL DISPERSANT) | Z.I. Chemicals 8605 Santa Monica Boulevard, #38201 Los Angeles, CA 90069 PHONE: (818) 827-1301 E-MAIL: sales@zichemicals.com WEB SITE: www.zichemicals.com (Mr. Barnaby Zelman) | 06/16/05 |
| D-14 | D | NOKOMIS 3-AA | Mar-Len Supply, Inc. 23159 Kidder Street Hayward, CA 94545 PHONE: (510) 782-3555 FAX: (510) 782-2032 (Mr. Frank Winter) | 07/31/08 |
| | | | SURFACE WASHING AGENTS | |
| SW-1 (formerly D-4) | SW | COREXIT® EC7664A (formerly COREXIT 7664) | Nalco Energy Services, L.P. 7705 Highway 90-A Sugar Land, TX 77487 PRODUCT MANAGEMENT: OFFICE: (281) 263-7336 MOBILE: (281) 202-8126 E-MAIL: kapreston@nalco.com WEB SITE: www.nalco.com (Ms. Kathryn Preston) | 11/01/78 05/02/10* |

*Listing maintained per requirements of the revised Subpart J, Federal Register, Volume 59, Number 17, September 15, 1994

U.S. Environmental Protection Agency
NCP Product Schedule
JANUARY 2011

# EXHIBIT D

Home / Leadership Journal / Main Homeland Security Site

**WEDNESDAY, MAY 5, 2010**

## The Ongoing Administration-Wide Response to the Deepwater BP Oil Spill

*Cross-posted from the White House Blog*

Since the Deepwater Horizon explosion the night of April 20, federal authorities, both military and civilian, have been working onsite and around the clock to respond to and mitigate the impact of the resulting BP Oil Spill in the Gulf of Mexico.

We have compiled this chronology in the spirit of transparency so the American people can have a clear understanding of what their government has been and is doing to respond to the massive and potentially unprecedented environmental disaster.

*Heidi Avery is White House Deputy Homeland Security Advisor*

### NIGHT OF TUESDAY, APRIL 20

**Search and Rescue**

The U.S. government response to the BP Oil Spill began immediately after the explosion on the night of April 20 as an emergency search-and-rescue mission. At approximately 10:30 p.m. that night, notification was received that Mobile Offshore Drilling Unit (MODU) Deepwater Horizon had exploded and was on fire. The rig was located 45 miles southeast of Venice, La.

**Establish Command Center to Address Potential Environmental Impacts**

Concurrently, the administration also quickly establishes a command center on the Gulf Coast to address the potential environmental impact of the event and to coordinate with all state and local governments. Since this point, the administration has continuously anticipated and planned for a worst-case scenario.

**NOAA Mobilizes to Provide Trajectory Support**

The National Oceanic and Atmospheric Administration (NOAA) mobilizes within three hours of the explosion and started to provide trajectory support and coordinated scientific weather and biological response services. The NOAA weather forecast office in Slidell, La., also provided weather information to the Coast Guard at its request shortly after the explosion to support initial search-and-rescue operations.

**The President is Alerted**

The President is alerted to the event and he begins actively monitoring the situation. At the time, it was known that 126 people were on the rig when the explosion occurred.

**Assets Deployed To Date**

*Total response vessels: Two Coast Guard cutters*

*Total response aircraft: Four helicopters and one rescue plane*

### WEDNESDAY, APRIL 21

**Deputy Secretary of Interior David Hayes is Deployed to the Gulf Coast**
The morning after the explosion, Secretary of the Interior Ken Salazar deployed Deputy Secretary David J.

---

The Blog @ Homeland Security provides an inside-out view of what we do every day at the U.S. Department of Homeland Security. The Blog lets us talk about how we secure our nation, strengthen our programs, and unite the Department behind our common mission and principles. It also lets us hear from you.

Sign up to get an e-mail when The Blog @ Homeland Security is updated.

**Tweets from @dhsjournal**

RT @FEMA - Latest update on the #winterstorm - cold temps moving into southern U.S. Are you prepared? http://go.usa.gov/YvD #snomg #blizzard 7 days ago

DHS, DOJ, DOL join forces for President's Interagency Task Force to Monitor and Combat Trafficking in Persons http://bit.ly/dHn02R 8 days ago

follow the Department on Twitter

**Previous Posts**

Underscoring Strong Public-Private Partnership
A Discussion on U.S.-Mexico Cooperation
DHS Hosts Sports Leagues Conference and Table-Top ...
Announcing FEMA Mobile
Report: Violence on College Campuses
New URL for The Blog
Combating the Cartels
The Nuclear Security Summit
Open Government: The Plan
DHS Efficiency Review Turns One: TSA Takes Travel ...

Hayes to the Gulf Coast to assist with coordination and response to the event, and provide hourly reports to Secretary Salazar and other administration officials.

U.S. Department of Homeland Security, Washington, D.C.
(2009)

**Interagency Coordination Begins Across the Government, Federal On-Scene Coordinator is Named and Regional Response Team is Stood Up**

Interagency coordination begins immediately among federal partners—including the Coast Guard; the Departments of Homeland Security (DHS), Commerce (DOC), Interior (DOI); and the Environmental Protection Agency (EPA)—providing federal assets and overseeing BP's response. Pursuant to the National Contingency Plan, Rear Admiral Mary Landry was named the Federal On-Scene Coordinator and a Regional Response Team was stood up that included the U.S. Coast Guard, DHS, DOC/NOAA, DOI and the EPA, as well as state and local representatives. The Regional Response Team immediately began developing plans, providing technical advice and access to resources and equipment from its member agencies, and overseeing BP's response.

**The Administration Oversees BP's Response**

The administration begins holding meetings and regular calls with BP leadership to discuss BP's response effort, as well as federal oversight and support, and urged BP to leverage additional assets to help respond to this event.

**Interagency Joint DHS-DOI Investigation Begins**

Secretary Salazar and Secretary Napolitano direct that a joint investigation begin into the cause of the event. The investigation, jointly led by the U.S. Coast Guard and the Minerals Management Service (MMS), are given subpoena power, will hold public hearings, and call witnesses. MMS and USCG begin interviewing rig personnel.

**National Park Service Plans Contingencies to Protect Vulnerable Parks Along Gulf Coast**

The National Parks Service (NPS) Spill Response Coordinator, Regional Emergency Services Coordinator, and Deputy Chief of Emergency Services begin strategic planning of contingencies to protect potentially vulnerable national parks along the Gulf Coast.

**MMS Establishes Ops Center and Deploys Staff to BP and Transocean Command Posts**
MMS establishes an Emergency Operations Center at its Gulf of Mexico Regional Office in New Orleans, and deployed employees to the BP Incident Command Post (ICP) and the Transocean ICP in Houston.

**NOAA Selects Scientific Support Coordinator and Deploys Him to USCG Command Post**
NOAA Environmental Scientist Charlie Henry arrive on site at the Coast Guard's Command Post in Morgan City, La., to serve as NOAA's Scientific Support Coordinator. NOAA issued the initial trajectory advice and began providing them twice daily.

**The President is Briefed**
The President monitors the response and is briefed throughout the day by the White House Situation Room

**Search and Rescue Continues**

Of the 126 total people on the rig at the time of the event, 115 crew members were accounted for. The Coast Guard continued to actively search for all 11 individuals still missing through the night, with multiple units, vessels and aircraft responding.

**Daily Response On-Site Press Briefing Begins**

The first in a daily series of press briefings was conducted between the Minerals Management Service (MMS), the Coast Guard, BP and Transocean.

**Assets Deployed To Date**

*Total response vessels: Two Coast Guard cutters*

*Total response aircraft: Four helicopters and one rescue plane*

**Response Photos:**

http://cgvi.uscg.mil/media/main.php?g2_itemId=836364

http://cgvi.uscg.mil/media/main.php?g2_itemId=836361

http://cgvi.uscg.mil/media/main.php?g2_itemId=835864

Case 2:10-md-02179-CJB-DPC   Document 1408-1   Filed 02/28/11   Page 79 of 193

http://cgvi.uscg.mil/media/main.php?q2_itemId=837369

**THURSDAY, APRIL 22**

**Deepwater Horizon Oil Rig Sinks**

At approximately 10:22 a.m., the oil rig sank with approximately 700,000 gallons of diesel fuel on board.

**The National Response Team (NRT) is Activated**

On the afternoon of April 22, the National Response Team (NRT) convenes its first daily meeting with leadership from across the federal government, including the White House, U.S. Coast Guard, the Department of Defense, DHS, DOC, DOI and EPA, among others. The NRT is an organization of 16 federal departments and agencies responsible for coordinating emergency preparedness and response to oil and hazardous substance pollution events. During this event, NRT meetings have been run by Secretary Napolitano.

**The President Convenes a Principal Level Meeting: "Treat This Response as The Number One Priority"**

The President convenes a meeting in the Oval Office with principals across the government to discuss the situation and ongoing response efforts, and ordered that the administration use every single available resource at its disposal to respond to the event and investigate its cause. A readout was issued to press stating: "The President made sure that the entire federal government was offering all assistance needed in the rescue effort as well as in mitigating and responding to the environmental impact and that this response was being treated as the number one priority. The President asked the responding departments to devote every resource needed to respond to this incident and investigate its cause."

**The NRT Holds Second Meeting of the Day to Implement President Obama's Instructions**

Following the Oval Office meeting, the NRT holds a second evening meeting—again including the Coast Guard, the Department of Defense, DHS, DOC, DOI and EPA, among others.

**No Apparent Leak**

Air and sea restriction zones are established around the sink site for safety purposes. The Coast Guard conducted overflights and multiple unsuccessful dives were made with remote operated marine vehicles to find the wellhead. No leak was apparent.

**Dispersants Are Pre-Positioned In Case Situation Worsens**

Despite a lack of apparent leak, 100,000 gallons of dispersants are already pre-positioned between Stennis, Miss., Houma and Lake Charles, La., and pre-approved for use by EPA Regions VI and IV Regional Response Teams.

**NOAA Begins to Provide Marine Pollution Surveillance Reports**

NOAA Satellite and Information Service provides the first experimental marine pollution surveillance report using satellite data, and began providing daily updates.

**Search and Rescue Continues**

Coast Guard continues to actively search for all 11 missing individuals from the rig through the night, with multiple units responding.

**Intergovernmental Calls with Potentially Impacted Gulf Coast Communities Begin**

Intergovernmental calls update potentially impacted gulf coast communities the response are communicated to potentially impacted Gulf Coast communities

**Daily Response On-Site Press Briefing is Conducted**

The next in a daily series of press briefings was conducted between the Minerals Management Service (MMS), the Coast Guard, NOAA, BP and Transocean.

**Assets Deployed To Date**

*Total response vessels: Two Coast Guard cutters*

*Total response aircraft: Four helicopters and one rescue plane*

Response Photos:

http://www.flickr.com/photos/uscgd8/4551846015/in/set-72157623940838176/

http://www.flickr.com/photos/39955793@N07/4545746887/

http://cgvi.uscg.mil/media/main.php?g2_itemId=838790

FRIDAY, APRIL 23

**No Apparent Leak**

The rig was found—sunken and upside down approximately 1,500 feet northwest of the blowout preventer. An oil sheen was reported with approximately 8,400 gallons estimated on the water and there was no apparent leak discovered.

**White House Convened Principal Level Meeting to Discuss Response and Planning In Case Situation Worsens**

White House convenes principal level meeting with top officials from across the government including Secretary Napolitano and the NRT in the White House Situation Room to review actions underway and discuss policy considerations and planning in case the situation worsens.

**U.S. Government Continues to Mobilize and Move More Resources In Case Situation Worsens**

The U.S. government continues to mobilize and move more resources into the gulf to support BP, the responsible party, and apply federal resources to mitigate environmental damage, including moving 8 more vessels to the area

**EPA Prepares To Deploy Staff to the Region for Air Monitoring**

EPA begins preparations to deploy staff to the region to support the Coast Guard with air monitoring and other activities.

**MMS Shuts Down Two Pipelines In the Area To Do Inspection**

MMS reports that two pipelines in the vicinity of the sunken rig were shut down until they could be inspected.

**Sunken Rig Assessments Continue**

Four remote operated marine vehicles continue to monitor the stack, conduct surveys of the riser and pipelines, and assess the stability of the sunken rig.

**Unified Area Command is Formally Stood Up**

The Unified Area Command is formally and fully stood up in Robert, La., after three days of informal operations and planning.

**The President is Briefed**

The President monitors the response and is briefed throughout the day by the White House Situation Room

**NOAA's National Weather Service Begins Coordinated Scientific Weather Reports**

NOAA's National Weather Service begins providing coordinated scientific weather and biological response services to federal, state and local organizations.

**Search and Rescue Suspends at 5p.m**

The Coast Guard continues to actively search for all 11 missing individuals until approximately 5 p.m., when the search was suspended.

**Daily Legislative Calls Begin and Daily Response On-Site Press Briefing and Intergovernmental Calls Are Conducted, Deepwaterhorizonresponse.com is Launched**

The Coast Guard conducts the next in a daily series of press briefings and intergovernmental calls. A response website with consolidated information was established at http://www.deepwaterhorizonresponse.com/.

**Assets Deployed To Date—8 More Vessels Arrive**

*Total response vessels: approximately 10*
*Oily water recovered: 7,600 gallons*
*Dispersant used: 1,900 gallons*

**SATURDAY, APRIL 24**

**First Oil Leaks Discovered and USCG Elevates Response**

For the first time, oil was found to be leaking—one leak from the riser and one leak from the drill pipe. The Coast Guard elevated the response and established a Regional Command Center and Joint Information Center in Robert, La., inviting all partners in the response to join.

**NPS Prepares for Potential Oil Spill on national park land along the Gulf Coast**

NPS begins cataloging resources and sampling pre-landfall conditions of resources in order to prepare for potential impact of the oil spill on national park land along the Gulf Coast.

**MMS Begins to Review BP Applications for Permit to Drill Two Relief Wells**

MMS reports that they expected to receive and begin reviewing BP Applications for Permit to Drill (APD) for two relief wells. Four remote operated marine vehicles continued to monitor the stack, conduct surveys of the riser and pipelines, and assess the stability of the sunken rig.

**The President is Briefed**

The President monitors the response and is briefed throughout the day by the White House Situation Room

**Daily On-Site Press Briefing, Legislative and Intergovernmental Calls are Conducted**

The next in a daily series of press briefings is conducted between the Minerals Management Service (MMS), the Coast Guard, NOAA, BP and Transocean—this time at the newly-formed Joint Information Center in Robert, La., as well as daily legislative and intergovernmental calls.

**Assets Deployed To Date**

*Total response vessels: approximately 10*
*Oily water recovered: approximately 40,000 gallons*

**Response Photos:**

http://www.flickr.com/photos/uscgd8/4549418892/

**SUNDAY, APRIL 25**

Overflights indicated the oil spill size was approximately 48 miles wide by 39 miles long.

**Outreach to Potentially Impacted Gulf Coast States, Response Equipment Staging Areas Established**

All potentially impacted Gulf Coast states are notified and invited to participate in the command center located in Robert, La. Response equipment staging areas were established in Venice, La., Biloxi, Miss., and Pensacola, Fla.

**U.S. Naval Air Station Serves as Staging Facility**

At the request of the Coast Guard, the U.S. Navy provides Naval Air Station Pensacola as a staging facility for BP-contractor provided equipment (i.e. containment booms, recovery barges, tractor trailer trucks, various pumps and other related oil response equipment).

**20 More Vessels and 500 Responders Are Deployed In Case Situation Worsens**

The response continues to mobilize and move more resources into the gulf to support BP, the responsible party, and apply federal resources to mitigate environmental damage, including moving 20 more vessels to the area and deploying 500 responders

**MMS Approves Resumption of One of the Two Pipelines Previously Shut Down and Works With BP on Exploration Plan to Drill Relief Wells**

MMS approves resumption of one of the two pipelines that were previously shut down to allow for inspection, and continued to work with BP on an exploration plan to drill the two relief wells.

**The President is Briefed**

The President monitors the response and is briefed throughout the day by the White House Situation Room

**Daily On-Site Press Briefing, Legislative and Intergovernmental Calls are Conducted**

The next in a daily series of press briefings is conducted between the Minerals Management Service (MMS), the Coast Guard, NOAA, BP and Transocean at the Joint Information Center in Robert, La., as well as daily legislative and intergovernmental calls.

**Assets Deployed To Date-20 More Vessels and 500 Responders**

*Total response vessels: more than 30*
*Boom deployed: 21,340 feet*
*Oily water recovered: approximately 42,000 gallons*
*Dispersant used: 12,600 gallons*

*Dispersant available: approximately 100,000 gallons*
*Overall personnel responding: approximately 500*

**Response Photos:**

http://cgvi.uscg.mil/media/main.php?g2_itemId=841178

http://www.flickr.com/photos/uscgd8/4552485336/

**MONDAY, APRIL 26**

**Secretary Salazar Announces Physical Inspections of All Deepwater Rigs**

Secretary Salazar directs MMS to commence physical inspections of all deepwater rigs to be concluded with two weeks, followed by physical inspections of all deepwater platforms.

**U.S. Fish and Wildlife Service Begin Identifying High Priority National Resources for Booming Operations**

The U.S. Fish and Wildlife Service begin working with the Coast Guard and other partners to identify high-priority natural resources (national wildlife refuges) for booming operations along potentially affected Gulf Coast areas.

**The President is Briefed**

The President monitors the response and is briefed throughout the day by the White House Situation Room

**BP Submits Application for Preliminary Drilling**

MMS reports that the Application for Preliminary Drilling (APD) for the Development Driller III had been submitted by BP and was currently under review. A total of 15 MMS personnel were deployed to support event response.

**Daily On-Site Press Briefing, Legislative and Intergovernmental Calls are Conducted**

The next in a daily series of press briefings is conducted between the Minerals Management Service (MMS), the Coast Guard, NOAA, BP and Transocean at the Joint Information Center in Robert, La., as well as daily legislative and intergovernmental calls.

**Assets Deployed To Date- 500 More Responders Deploy**

*Total response vessels: more than 30*
*Boom deployed: 21,340 feet*
*Oily water recovered: 48,384 gallons*
*Dispersant used: 14,654 gallons*
*Dispersant available: 119,734 gallons*
*Overall personnel responding: more than 1,000*

**Response Photos:**

http://www.flickr.com/photos/uscgd8/4557684643/in/set-72157623940838176/

http://www.flickr.com/photos/uscgd8/4558317388/in/set-72157623940838176/

http://www.flickr.com/photos/uscgd8/4558215118/

**TUESDAY, APRIL 27**

**DOI-DHS Announce Formal Investigation Next Steps**

Secretary Salazar and Secretary Napolitano announce the formal next steps to their joint investigation underway into the causes of the explosion that left 11 workers missing, three critically injured, and an ongoing oil spill that the responsible party and federal agencies are working to contain and clean up. It is proceeding under a Joint Statement of Principles and Convening Order, which convenes the formal joint investigation, and a Memorandum of Agreement, which lays out roles and responsibilities that relate to each agency's area of expertise.

**White House Meets with BP to Discuss Response Efforts**

Numerous top administration officials, including Secretary Napolitano, Secretary Salazar, White House Senior Advisor Valerie Jarrett and Assistant to the President for Energy and Climate Carol Browner hold meetings in Washington with BP executives and received briefings on company efforts to stop the oil flow.

**The President is Briefed**

The President monitors the response and is briefed throughout the day by the White House Situation Room

**Controlled Burn Plans Are Approved**

Plans for a controlled burn of contained oil were approved late at night for the following day. Burns of this type are heavily dependent on weather conditions.

**Daily On-Site Press Briefing, Legislative and Intergovernmental Calls are Conducted**

The next in a daily series of press briefings is conducted between the Minerals Management Service (MMS), the Coast Guard, NOAA, BP and Transocean at the Joint Information Center in Robert, La., as well as daily legislative and intergovernmental calls.

**Assets Deployed To Date-20 Additional Vessels Arrive**

*Total response vessels: approximately 50*
*Boom deployed: 29,280 feet*
*Boom available: 80,900 feet*
*Oily water recovered: 260,652 gallons*
*Dispersant used: 29,140 gallons*
*Dispersant available: 119,734 gallons*
*Overall personnel responding: more than 1,000*

**Response Photos:**

http://www.flickr.com/photos/uscgd8/4563748656/in/set-72157623940838176/

http://www.flickr.com/photos/uscgd8/4563118299/in/set-72157623940838176/

http://www.flickr.com/photos/uscgd8/4558745875/
http://governor.alabama.gov/gallery/images_detail.aspx?ID=995

**WEDNESDAY, APRIL 28**

**Controlled Burn Is Conducted**

A successful controlled, on-location burn is conducted for approximately 30 minutes—a strategy designed to minimize environmental risks by removing large quantities of oil in the Gulf of Mexico following the April 20 explosion. Burns of this type are heavily dependent on weather conditions.

**Secretary Salazar Travels to BP Command Center in Houston**

Secretary Salazar travels to the BP command center in Houston to review BP's operations and response efforts.

**MMS Approves First Drilling Permit for First Relief Well**

MMS reports that the drilling permit for the first relief well had been approved, and that the application for the second relief well was under review.

**U.S. Navy Sends Additional Assets**

In direct support of the Coast Guard under an existing pollution clean-up and salvage operations agreement, the Navy provides a variety of oil pollution control equipment. The Navy sent thousands of feet of inflatable oil boom with mooring equipment, several skimming systems, related support gear, and personnel to support oil spill response efforts. Naval Air Station Pensacola is serving as a staging facility for Coast Guard contractor-provided equipment.

**Daily On-Site Press Briefing, Legislative and Intergovernmental Calls are Conducted**

The next in a daily series of press briefings is conducted between the Minerals Management Service (MMS), the Coast Guard, NOAA, BP and Transocean at the Joint Information Center in Robert, La., as well as daily legislative and intergovernmental calls.

**Additional Breach Discovered, President is Briefed and Response Escalates**

Late in the day, BP alerted the U.S. government to an additional breach. As soon as the additional breach was discovered, senior officials from across the government already convened in the White House Situation Room immediately briefed the President on Air Force One, and Rear Admiral Landry is sent back out for the second time that day to brief press, this time on the additional breach and the steps the administration is taking to respond, including that the President urged – out of an abundance of caution, and mindful of the new information – that we must continue to pre-position resources to continue to aggressively confront this incident.

**Assets Deployed To Date**

*Total response vessels: approximately 50*
*Boom deployed: 147,100 feet*
*Oily water recovered: 400,080 gallons*
*Dispersant used: 56,000 gallons*
*Dispersant available: 119,734 gallons*
*Overall personnel responding: more than 1,000*

**Response Photos:**

http://www.flickr.com/photos/uscgd8/4563719473/in/set-7215762394083 8176/

http://www.flickr.com/photos/39955793@N07/4566316896/

THURSDAY, APRIL 29

**Oil Spill Update During the PDB**

The President receives another in depth briefing of the escalating situation in his morning PDB session

**Spill of National Significance is Declared and White House Holds Briefing for White House Reporters on The Additional Breach and Corresponding Response Efforts**

Senior officials from across the government, including Secretary Napolitano, EPA Administrator Jackson and NOAA Administrator Lubchenco and White House Press Secretary Robert Gibbs brief White House reporters in the White House briefing room on the change in the event: the additional breach.

Secretary Napolitano announces that the event would now become designated a Spill of National Significance (SONS), which built on the efforts already underway from day one to leverage the full resources of the federal government to be brought to bear in response to this further escalating event. The SONS designation enabled the appointment of a National Incident Commander to coordinate response resources at the national level. The designation does not provide additional funding or authority—nor was it needed, as that authority already existed and resources were mobilized in case the situation worsened from day one. This is why the day DHS announced the SONS designation, there were already more than 70 vessels in the Gulf of Mexico responding to the spill and approximately 1,100 personnel already deployed and on scene to assist.

**The President Orders Secretary Salazar to Deliver Report on Additional Safety Measures for Offshore Operations to be Completed Within 30 Days**

Secretary Salazar receives direction from the President to deliver in 30 days a report with recommendations on what, if any, additional safety measures should be required for offshore operations. He then announced that inspections of all deepwater rigs and platforms were underway.

**The President Makes Remarks on the Oil Spill's Escalated Situation**

The President updates the American people on the worsening situation in the Gulf of Mexico and states that his administration will continue to use every single available resource at our disposal, including potentially the Department of Defense, to address the incident.

**White House Convenes Deputy's Committee Meeting in Situation Room**

The White House convenes a meeting at the deputy secretary level with senior officials from across the government to discuss the escalating situation, the response and to continue planning for worsening situations

**DoD Designates Mississippi's Kessler Air Force Base as Base Support Installation**

DOD designates Keesler Air Force Base in Mississippi as a base support installation. The installation will serve as a location where military units conduct logistical operations.

**DOI Secretary Salazar Hosts Meeting of Oil and Gas Companies to Urge Them To Help**

Secretary Salazar spends the day in Houston reviewing BP's operations and response efforts. Upon his return from Houston, Secretary Salazar hosts a meeting of oil and gas companies in his office and urged them to make available all available resources to the response.

**Daily On-Site Press Briefing, Legislative and Intergovernmental Calls are Conducted**

The next in a daily series of press briefings was conducted between the Minerals Management Service (MMS), the Coast Guard, NOAA, BP and Transocean at the Joint Information Center in Robert, La., as well as daily legislative and intergovernmental calls.

**Assets Deployed To Date-Additional 25 Vessels Arrive**

*Total response vessels: approximately 75*
*Boom deployed: 174,060 feet*
*Boom available: 243,260 feet*
*Oily water recovered: 763,560 gallons*
*Dispersant used: 98,361 gallons*
*Dispersant available: 75,000 gallons*
*Overall personnel responding: more than 1,000*

**Response Photos:**

http://cgvi.uscg.mil/media/main.php?g2_itemId=844167

http://cgvi.uscg.mil/media/main.php?g2_itemId=844164

http://www.nasa.gov/images/content/449676main_gulf-spill-full.jpg

**FRIDAY, APRIL 30**
**The President Dispatches Senior Administration Officials to the Gulf Coast**

The President dispatches Secretary Napolitano, Secretary Salazar, EPA Administrator Lisa Jackson, Assistant to the President for Energy and Climate Change Policy Carol Browner, and NOAA Administrator Jane Lubchenco to the Gulf Coast.

**The President Makes Remarks on the Oil Spill's Escalating Situation**

The President updates Americans on the ongoing federal response to the worsening BP oil spill

**National Guard Activation**

In response to the BP oil spill, the Secretary of Defense authorizes under Title 32 the mobilization of the Louisiana National Guard to help in the ongoing efforts to assist local communities in the cleanup and removal of oil and to protect critical habitats from contamination.

**Secretary of Defense Approves Request for Two C-130 Aircrafts To Respond**

The Secretary of Defense approves a request for two C-130 aircraft with Modular Aerial Spray Systems (MASS), which are currently en route to the affected area. The Coast Guard requested assistance from the Department of Defense for these aircraft. These aircraft dispense the same dispersant chemical being used by BP and the federal responders. Each system is capable of covering up to 250 acres per flight with three flights per aircraft per day.

**Response Crews Begin Testing New Dispersant Technique**

Response crews begin testing a new technique to break up the oil before it reaches the surface—a remotely operated underwater vehicle dispensing sub-surface dispersant at a rate of nine gallons per minute. Nearly 3,000 gallons of subsea dispersants were applied, and BP and NOAA evaluated these tests to determine the feasibility of continued use of subsea dispersants.

**EPA Begins Monitoring Water Quality, Administrator Jackson Remains On The Ground**

EPA begins monitoring water quality in the Gulf Coast region. EPA Administrator Jackson remains on the ground in the region for the following three days, visiting sites in Louisiana and Mississippi and meeting with community leaders, local industry and elected leaders at the state and local level.

**The President is Briefed**

The President monitors the response and is briefed throughout the day by the White House Situation Room

**DOI Establishes Outer Continental Shelf Safety Oversight Board**

DOI establishes the Outer Continental Shelf (OCS) Safety Oversight Board to provide recommendations regarding interim measures that may enhance OCS safety, as well as improving and strengthening the Department's overall management, regulation and oversight of OCS operations. Secretary Salazar will provide a report to President Obama within 30 days on what, if any, immediate additional precautions and technologies should be required

**Senior Federal and State Officials Hold Joint Press Briefing On-Site**

Secretary Napolitano, Secretary Salazar, EPA Administrator Jackson, Louisiana Governor Bobby Jindal and BP Chief Operating Officer Doug Suttles conducted a press briefing. Daily legislative and intergovernmental calls were also conducted.

**NOAA Provides Additional Resources To Protect Critical Wildlife**

Personnel from NOAA's National Marine Sanctuaries program provided additional resources for both response and assessment efforts to protect critical wildlife.

**Sixth Staging Area Stood Up**

A sixth staging area is set up in Port Sulphur, La., joining five others in Venice, La., Biloxi, Miss., Pascagoula, Miss., Theodore, Ala., Pensacola, Fla.

**Assets To Date—1,000 More Responders Arrive**

*Total response vessels: approximately 75*
*Boom deployed: 217,000 feet*
*Boom available: 305,760 feet*
*Oily water recovered: 853,146 gallons*
*Dispersant used: 139,459 gallons*
*Dispersant available: 51,000 gallons*
*Overall personnel responding: approximately 2,000*

**Response Photos:**

http://www.flickr.com/photos/usnavynvns/4574068993/

http://www.flickr.com/photos/usnavynvns/4574069413/

http://cgvi.uscg.mil/media/main.php?g2_itemId=844563

http://www.flickr.com/photos/uscgd8/4566787948/

**SATURDAY, MAY 1**

**Secretary Napolitano Names U.S. Coast Guard Commandant Admiral Thad Allen to Serve as National Incident Commander**

As part of the designation of the BP Oil Spill as a Spill of National Significance, Secretary Napolitano announces that Coast Guard Commandant Admiral Thad Allen will serve as the National Incident Commander for the administration's continued, coordinated response— providing additional coordinated oversight in leveraging every available resource to respond to the BP oil spill and minimize the associated environmental risks. Admiral Allen has overseen Coast Guard efforts since the moment this event began, when the agency responded quickly to the April 20 explosion in a search and rescue capacity in order to

save lives. With this formal designation Admiral Allen is able to continue to lead and coordinate ongoing federal actions to mitigate the oil spill, for which BP is responsible and required to pay response and cleanup costs.

**The President is Briefed**

The President monitors the response and is briefed throughout the day by the White House Situation Room

**White House Convenes Deputy's Committee Meeting in Situation Room**

The White House convenes a meeting at the deputy secretary level with senior officials from across the government to discuss the escalating situation and the response

**White House Homeland Security Advisor and U.S. Coast Guard commandant Brief Reporters Via Conference Call on the Ongoing Response Efforts**

White House Homeland Security Advisor John Brennan and Admiral Allen brief media via conference call about ongoing efforts to contain the spill and minimize associated environmental risks.

**DoD Airlifts Additional Booms To Better Protect Gulf Coast**

To prepare for the possible spreading of the oil slick across the Gulf Coast and in support of the 2nd Unified command Center in Mobile, Ala., the Department of Defense airlifted additional boom materials to Mobile, located on four tractor trailers to expedite transportation on the receiving end.

**Eight Staging Areas Begin Operating**

Eight staging areas were operating in Venice, La., Biloxi, Miss., Pascagoula, Miss., Theodore, Ala., Pensacola, Fla., Port Sulphur, La., Gulfport, Miss., and Port Fourchon, La.

**Assets To Date**

*Total response vessels: approximately 75*
*Boom deployed: 275,580 feet*
*Boom available: 316,470 feet*
*Oily water recovered: more than 1 million gallons*
*Dispersant used: 142,914 gallons*
*Dispersant available: 68,300 gallons*
*Overall personnel responding: approximately 2,000*

**Response Photos:**

http://cgvi.uscg.mil/media/main.php?g2_itemId=847276

SUNDAY, MAY 2

**President Obama Visits Gulf Coast to Inspect Response Effort**

President Obama visits the Gulf Coast to inspect response operations firsthand, underscoring the administration's all-hands-on-deck response to protect the coastline of potentially affected Gulf Coast states.

**EPA Posts First Air Monitoring Data Results**

EPA posts on its dedicated response website the first air monitoring data it has collected in the area—with no red flags.

**NOAA Announces Fishing Restriction**

NOAA announces a fishing restriction for a minimum of ten days in federal waters most affected by the BP oil spill, largely between Louisiana state waters at the mouth of the Mississippi River to waters off Florida's Pensacola Bay. The closure was effective immediately. This order balances economic and health concerns and only closes those areas affected by oil. Details can be found here.

**Secretaries Napolitano and Salazar Host Gulf Coast States Conference Call**

Secretaries Janet Napolitano and Ken Salazar spoke by conference call to Governors Haley Barbour (MS), Bob Riley (AL), Rick Perry (TX), Charlie Crist (FL) and the Deputy Chief of Staff to Gov. Bobby Jindal (LA). Gov. Jindal was with President Obama. They briefed the Governors on the ongoing response to the BP oil spill in the gulf. They spoke specifically about efforts to stop the oil leaks and about mitigating the oil's impact on the shorelines of their states. Additionally, they spoke about ways to enhance what has been

strong cooperation between the federal government and the states.

**30 More Vessels and Additional 1,000 Responders Are Deployed to the Gulf Coast**

The response continues to mobilize and move more resources into the gulf to support BP, the responsible party, and apply federal resources to mitigate environmental damage, including moving 30 more vessels to the area and deploying an additional 1,000 responders

**BP Begins Accepting Claims**

BP begins accepting claims for the Gulf Coast oil spill via BP's helpline at 1-800-440-0858. A BP fact sheet with additional information is available here. Those who have already pursued the BP claims process and are not satisfied with BP's resolution can call the Coast Guard at 1-800-280-7118. More information about what types of damages are eligible for compensation under the Oil Pollution Act as well as guidance on procedures to seek that compensation can be found here.

**Additional DoD Assets Arrive**

Two Modular Aerial Spray System (MASS) aircraft were deployed in support of the event. Both aircraft have multiple missions scheduled daily, contingent on weather. These aircraft can dispense the same dispersant chemical being used by BP and the federal responders. Each system is capable of covering up to 250 acres per flight with three flights per aircraft per day—building on existing dispersant capabilities.

A C-17 aircraft carrying pollution response boom components for support flew from Travis AFB in California and arrived at Mobile International Airport.

**MMS Reports that BP Begins Drilling First Deep-Water Intercept Relief Well**

MMS reported that BP began drilling the first deep-water intercept relief well. This action is expected to take approximately 90 days.

**Assets To Date—30 More Vessels and Additional 1,000 Responders Arrive**

*Total response vessels: 104*
*Boom deployed: 243,200 feet*
*Boom available: 522,821 feet*
*Oily water recovered: more than 1 million gallons*
*Dispersant used: 156,012 gallons*
*Dispersant available: 75,124 gallons*
*Overall personnel responding: approximately 3,000*

**MONDAY, MAY 3**

**The President Dispatches Senior Cabinet Officials Back to the Gulf Coast**

The President dispatches the secretaries of Commerce, Interior and Homeland Security, the EPA Administrator and the NOAA Administrator to return to the Gulf Coast this week. Specific details on their travel will come from their departments and agencies, but collectively they will be inspecting the ongoing, coordinated response efforts to mitigate the impact of the spill on public health, the environment and the economy. They will meet with business owners to discuss potential economic impacts of this spill across the Gulf Coast region.

**Senior Administration Officials Meet with BP Senior Leadership**

Secretary Salazar, Secretary Napolitano, EPA Administrator Jackson and other members of the Obama administration met with BP CEO Tony Hayward and BP America Chairman and President Lamar McKay at the Department of the Interior to discuss ongoing, coordinated response efforts and receive an update on BP's mitigation plans for potentially impacted Gulf Coast states. This was the most recent in a series of meetings that have taken place between administration leadership and BP leadership.

**White House Convenes Deputy's Committee Meeting in Situation Room**

The White House convenes a meeting at the deputy secretary level with senior officials from across the government to discuss the escalating situation, the response and to continue planning for worsening situations

**More Than 2,000 Volunteers Are Trained To Assist**

More than 2,000 volunteers receive training to assist in the response effort to that date. Volunteer recruitment efforts include outreach to local fishermen with boats, which can be used as vessels of opportunity to assist contractors in deploying boom.

**OSHA Ensures Cleanup Workers Receive Necessary Protection**

Assistant Secretary of Labor for Occupational Safety and Health Dr. David Michaels visits Louisiana with a team of experienced hazardous materials professionals leading an effort to ensure that oil spill cleanup workers receive necessary protections from the hazards of this work. OSHA is consulting with BP, as well as federal agency partners, to ensure that workers receive appropriate training and protective equipment.

**Assets To Date—80 More Vessels Arrive**

*Total response vessels: 183*
*Boom deployed: 156,703 feet*
*Boom available: 530,061 feet*
*Oily water recovered: more than 1 million gallons*
*Dispersant used: 156,012 gallons*
*Dispersant available: 230,138 gallons*
*Overall personnel responding: approximately 3,000*

**TUESDAY, MAY 4**

**Cabinet Officials Brief Members of Congress**

Secretary Salazar, Secretary of Commerce Gary Locke, Administrator Jackson, DHS Deputy Secretary Jane Holl Lute and Admiral Allen provided a bi-partisan and bi-cameral briefing to Congress on the administration's all-hands-on-deck response to the spill. They updated members of Congress on the status of ongoing, coordinated response efforts in the Gulf coast states and delivered an update on BP's mitigation plans for potentially impacted Gulf Coast states.

**Cabinet Officials Host Daily Coordination Calls with the Gulf Coast State Governors**

To ensure consistent coordination with the Gulf Coast states, Admiral Thad Allen, Secretaries Janet Napolitano and Ken Salazar, Administrator Lisa Jackson and NOAA Deputy Under Secretary Monica Medina began daily calls with the Governors from the five Gulf Coast states to provide updates on the response to the BP oil spill and answer any questions that arise. Governors Barbour, Crist, Jindal, Perry and Riley have been invited to participate in the daily calls moving forward. These daily calls are a follow up to the calls last Friday and Sunday between the Governors and the agencies involved in the federal response, as well as the calls last week between the President and the Governors and the President's visit to the region on Sunday. These calls are intended to further the already unprecedented cooperation and focused effort between state and local officials and the federal government in response to this situation.

**National Guard Activation**

Secretary Gates has authorized use of Title 32 status for up to 17,500 National Guard members in four states: Alabama (3,000), Florida (2,500), Louisiana (6,000) and Mississippi (6,000).

The state of Louisiana has activated approximately 1,200 National Guard members under Title 32 for command and control and sandbagging operations in St Bernard and Plaquemines parishes. Louisiana National Guard personnel are actively manning the Joint Operations Center and Tactical Aviation Cell.

**20 More Vessels and 4,500 Responders Are Deployed to the Gulf Coast**

The response continues to mobilize and move more resources into the gulf to support BP, the responsible party, and apply federal resources to mitigate environmental damage, including moving 20 more vessels to the area and deploying an additional 4,500 responders

**Air Quality Monitoring**

EPA's Air Quality Index (AQI) tracks levels of particulate matter and ozone along the Gulf Coast—data available publicly daily at http://www.airnow.gov/ and http://gulfcoast.airnowtech.org/. In addition to these monitors, EPA's emergency response teams have put up multiple monitoring stations to track larger particulate matter. The location of these monitoring stations is flexible as conditions change during this response.

The next in a daily series of press briefings was conducted between the Minerals Management Service (MMS), the Coast Guard, NOAA, BP and Transocean at the Joint Information Center in Robert, La., as well as daily legislative and intergovernmental calls.

**Assets To Date—20 More Vessels and 4,000 Responders Arrive**

*Total response vessels: nearly 200*
*Boom deployed: 367,881 feet*

*Boom available: more than 1 million feet*
*Oily water recovered: more than 1 million gallons*
*Dispersant used: nearly 160,000 gallons*
*Dispersant available: 230,000 gallons*
*Overall personnel responding: approximately 7,500*

*\*\*\* This is a general narrative of key actions the U.S. government took to save lives and mitigate the BP oil spill's impact on public health, the environment and the economy. (Detailed and specific after-action information is still being collected, as with any major event.) \*\*\**

Labels: Oil Spill

posted by DHS @ 12:14 PM

**Share** |

## 4 Comments:

At May 5, 2010 1:42 PM , Anonymous

i feel that the bombings in NY was a step in wrong direction in the world of terrier so i hope soon that our president will fine a way to fix milisheas acts against innocent people. i hope that our NY finest find the perpetrators soon and broth to Justice in the us Ty the sake of the future.

At May 5, 2010 2:10 PM , Robert B. Ryan

I am a retired scientist, who, at one point, was involved in Hovercraft Operations and applications. Approximately 20 years ago, I was involved in response to an RFP issued by the US Coast Guard to study of the use of Hovercraft in control of oil spills. At that time, there were only three Vietnam-era hovercraft available to carry out the proposed study. My Company did not prevail in the Proposal, and, based of subsequent developments, I believe it did not take place.

Based on studies by my firm and others, there are now, I believe, some 87 Military Hovercraft in the United States Marine Corps, now called "Landing Craft, Air-Cushion (LCAC).

I suggest that, without fanfare or publicity, FEMA requests the loan of, (for example), four USMC-crewed LCAC to be deployed in various areas of the area oil-slick to investigate the utility and suitably in the control of the slick. LCACz can, for example operate effectively in zero-depth of water, and over oil-soaked marsh and wetlands. Their speed would be valuable as they could rapidly deploy to areas of the slick area which may significantly differ in physical characteristics such as Sea, Current, Wind, and Wave Conditions. A unique ability of LCACs is their use at zero water depths, and in shallow vegetated land waters of land.

At May 10, 2010 2:50 PM , OSHA 10

This is alot of information. It feels like information overload. This is all I needed.

OSHA Ensures Cleanup Workers Receive Necessary Protection

Assistant Secretary of Labor for Occupational Safety and Health Dr. David Michaels visits Louisiana with a team of experienced hazardous materials professionals leading an effort to ensure that oil spill cleanup workers receive necessary protections from the hazards of this work. OSHA is consulting with BP, as well as federal agency partners, to ensure that workers receive appropriate training and protective equipment.

Thanks.

At May 12, 2010 7:03 AM , Patricia

when making vegatable soup you can skim the grease, (oil), off the top of the soup with an ice cube wrapped in a clean cloth.
Could we use a glacier or two to skim oil off the top of the ocean?

## Post a Comment

Thank you for leaving a comment at the Blog @ Homeland Security. Submitted Comments will be reviewed before posting. **See more about our Comment Policy.**

Case 2:10-md-02179-CJB-DPC Document 1408-1 Filed 02/28/11 Page 91 of 193

**Comment as:** Select profile... ▼

**Post Comment**    Preview

Subscribe to Post Comments [Atom]

**Links to this post:**

**Should We Nationalize the Response to Deepwater Horizon?**

**Create a Link**

<< Home

**More About The Department**

- The Press Room
- The Leadership Journal
- Department Home
- Department Social Media

**Authors**

- The Team

**Important Notices**

- Comment Policy
- Privacy Policy
  Terms of Use

# EXHIBIT E

**May 26, 2010**

**Dispersant Monitoring and Assessment Directive - Addendum 3**

<u>Reduction in Use of Dispersants</u>.  BP shall implement measures to limit the total amount of surface and subsurface dispersant applied each day to the minimum amount possible. BP shall establish an overall goal of reducing dispersant application by 75% from the maximum daily amount used as follows:

　　a.　<u>Surface Application.</u>  BP shall eliminate the surface application of dispersants. In rare cases when there may have to be an exemption, BP must make a request in writing to the FOSC providing justification which will include the volume, weather conditions, mechanical or means for removal that were considered and the reason they were not used, and other relevant information to justify the use of surface application. The FOSC must approve the request and volume of dispersant prior to initiating surface application.

　　b.　<u>Subsurface Application</u>. BP shall be limited to a maximum subsurface application of dispersant of not more than 15,000 gallons in a single calendar day.

Application of dispersant in amounts greater than specified in this Addendum 3 shall be in such amounts, on such day(s) and for such application (surface or subsurface) only as specifically approved in writing by the USCG Federal On-Scene Coordinator (FOSC).

# EXHIBIT F

Originally Released October 6, 2010
Updated January 11, 2011

## National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling

### THE USE OF SURFACE AND SUBSEA DISPERSANTS DURING THE

### BP DEEPWATER HORIZON OIL SPILL

Staff Working Paper No. 4

*Staff working papers are written by the staff of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling for the use of members of the Commission. They do not necessarily reflect the views of the Commission or any of its members. In addition, they may be based in part on confidential interviews with government and non-government personnel.*

This working paper examines the issues raised by the use of dispersants in the Deepwater Horizon spill. Dispersants change the distribution, not the amount, of oil within a marine environment. They are chemicals typically applied directly to oil on the water surface in order to break the oil into small droplets that can then mix with water below the surface. The dispersed oil is rapidly diluted, mixing both vertically and horizontally in the water column.[1] While this alleviates high concentrations at the surface, it may expose organisms to lower, but more widespread, concentrations of oil.

The use of dispersants in the aftermath of the Macondo deepwater well explosion was controversial for three reasons.[2] First, the total amount of dispersants used was unprecedented: 1.84 million gallons. Second, 771,000 of those gallons were applied at the wellhead, located 5,067 feet below the surface. Little or no prior testing had been done on the effectiveness and potential adverse environmental consequences of subsea dispersant use, let alone at those volumes.[3] Third, the existing federal regulatory system pre-authorized dispersant use in the Gulf

---

[1] Press Conference with Lisa P. Jackson, EPA Administrator (May 24, 2010), *available at* http://www.epa. gov/bpspill/dispersants/statement-dispersant-use-may24.pdf [hereinafter Jackson Press Conference]. For further information about dispersants, see Committee on Understanding Oil Spill Dispersants: Efficacy and Effects, National Research Council of the National Academies, UNDERSTANDING OIL SPILL DISPERSANTS: EFFICACY AND EFFECTS 9 (2005), *available at* http://www.nap.edu/catalog/11283.html [hereinafter NRC Report].

[2] The day after the Macondo well was capped and the amount of daily dispersant use dropped precipitously, a group of marine scientists opposed to the high volume use of dispersants issued a statement calling for an immediate end to their use. *See* Susan D. Shaw et al., *Consensus Statement: Scientists Oppose the Use of Dispersant Chemicals in the Gulf of Mexico* (July 16, 2010), *available at* http://www.meriresearch.org/Portals/0/Documents/CONSENSUS%20STATEMENT%20ON%20DISPERSANTS% 20IN%20THE%20GULF%20updated%20July%2017.pdf.

[3] BP's "Lessons Learned" report refers to "limited trials" and "some discussion in technical papers of applying dispersant to the source." BP, DEEPWATER HORIZON CONTAINMENT AND RESPONSE: HARNESSING CAPABILITIES AND LESSONS LEARNED 26 (2010), *available at* http://www.boemre.gov/ooc/PDFs/NarrativeFinal.pdf. BP also claims that "EPA has permitted use of dispersants subsea to remediate oil spills since the 1990s." *Id.* None of the experts (whether from EPA, from BP, or independent) with whom Commission staff spoke in researching this paper was aware of prior subsea use of dispersants, which suggests that any such use or approval was not well-known. On September 7, 2010, we requested information from BP's counsel regarding the trials, papers, and EPA actions to which BP refers. On September 27, 2010, BP's counsel confirmed in an email to Commission staff that "the reference on page 26 of the report to EPA's approval of subsea dispersant use in the 1990s is an error. Although dispersants have been on the Product Schedule since the 1970s, we understand that only surface uses were contemplated in the 1990s." BP's counsel also provided the Commission staff with references to two technical papers discussing the application of subsea dispersants. *See, e.g.*, NRC Report at 138.

of Mexico without any limits or guidelines as to amounts or duration. Faced with an emergency, the government had to make decisions about high-volume and subsea dispersant use within time frames that denied officials the opportunity to gather necessary information. The resulting uncertainty even fueled unfounded suspicions that BP was using dispersants without authorization from the government in an effort to mask the oil and to limit its ultimate liability.

This paper considers two issues. The first is how well the government handled the dispersant issues it faced in the absence of necessary scientific information and pursuant to a regulatory regime that had failed to anticipate this kind of problem. The second is how, in light of lessons learned from this recent experience, government procedures and existing laws might be improved to allow for sounder decisions regarding the use of dispersants in the future.

The paper is divided into three parts. Part I provides background information on dispersants and their potential authorization for use in responses to oil spills. It then recaps the chronology of the use of dispersants following the Macondo well explosion. This chronology includes the volume of dispersants used, where they were used, the types of dispersants used, and the role of various government agencies in making relevant decisions regarding dispersant use. Part I also describes some of the contemporaneous public controversy concerning the use of dispersants, including the debate, still ongoing, regarding their potentially adverse impacts. Part II considers the distinct questions of whether the government's decisions were reasonable at the time; and whether, regardless of their reasonableness or unreasonableness when made, preliminary scientific research since undertaken suggests those decisions may, in fact, have been sensible. Finally, Part III describes some possible implications for changes in agency procedures and regulations arising out of the use of dispersants in the Deepwater Horizon spill response that Commissioners may wish to consider.

## I.      Background on Dispersants

### A.  The Trade-offs of Dispersant Use

When an oil spill occurs, responders have several tools to manage potential environmental impacts. Mechanical means are generally preferred, but they cannot always be used and do not recover all of the spilled oil.[4] Non-mechanical methods such as *in-situ* burning and chemical dispersants can contribute to the elimination or breakdown of the oil. In response to the Deepwater Horizon oil spill, BP used large amounts of the dispersant Corexit 9500 and some Corexit 9527.[5]

Dispersants function like detergents to break up oil into small droplets that mix easily with water. They contain a combination of surfactants and solvents. Surfactants are compounds that have lipophilic groups, which mix with non-polar substances like oil, and hydrophilic

---

[4] *See* NRC Report at 9 ("The effectiveness of mechanical response techniques is variable and highly influenced by the size, nature, and location of the spill as well the environmental conditions under which the response is carried out. Essentially, mechanical response works satisfactorily under a finite subset of all possible spill scenarios.").

[5] *See* David Biello, *Is Using Dispersants on the BP Gulf Oil Spill Fighting Pollution with Pollution?*, SCI. AM. (June 18, 2010), *available at* http://www.scientificamerican.com/article.cfm?id=is-using-dispersants-fighting-pollution-with-pollution. Toxicity information on these dispersants can be found in Anita George-Ares & James R. Clark, *Aquatic Toxicity of Two Corexit Dispersants*, 40 CHEMOSPHERE 897 (2000).

Originally Released October 6, 2010
Updated January 11, 2011

groups, which mix with polar substances like water.  By combining lipophilic and hydrophilic groups, surfactants can lower surface tension to allow water and oil to mix more easily.[6]  The solvents help the surfactants pass through the oil to reach the oil-water boundary where the surfactants operate.[7]

The resulting oil/water mixture takes the form of small droplets of dispersant-covered oil, which, because of their small size, can remain suspended in water rather than rising to the surface.[8]  These droplets can move into and through the water column from the water's surface.[9]  This process depends on outside forces to disperse the oil droplets through the top of the water column.  For that reason, dispersants applied to surface oil slicks are more effective in areas with high wave energy.[10]

The toxicity of available dispersants has diminished substantially over the past several decades.[11]  Generally, dispersants are less toxic than oil.  Chemically dispersed oil, however, can be toxic in both the short and long term, and less oil on the surface means more elsewhere in the water, spread over a wider area.

Using dispersants to remove oil from the water surface has several potential benefits.  First, less oil will float ashore to adversely affect shorelines and fragile estuarine environments.  Second, animals and birds that float on or wade through the water surface may be less exposed to oil.[12]  Third, dispersants may accelerate the rate at which oil biodegrades.  Smaller droplets have a larger surface-area-to-volume ratio, which in theory should allow microorganisms greater access to the oil, and speed their rate of consumption.  The expected acceleration of this biodegradation is often cited as a major reason to use dispersants.

There are uncertainties regarding both the actual realization of some of these benefits, especially in the subsea, and potential offsetting costs.  For instance, less oil on the surface means more in the water column, increasing exposure for subsurface marine life.  And, while the smaller droplets may accelerate biodegradation, their smaller size increases the dissolution of potentially toxic compounds and exposure to aquatic organisms.  Moreover, according to at least some scientific literature, the assumption of increased biodegradation may not always be accurate.  Some studies have found that dispersants have no effect on the biodegradation rate or may even inhibit biodegradation.[13]  It is also only largely in the aftermath of the Macondo well explosion that scientists have begun to research the extent to which oil-eating bacteria are present

---

[6] *See* Coastal Response Research Center, RESEARCH & DEVELOPMENT NEEDS FOR MAKING DECISIONS REGARDING DISPERSING OIL 1 (Apr. 2006), http://www.crrc.unh.edu/dwg/dispersant_workshop_report-final.pdf [hereinafter CRRC Report].
[7] *See* International Tanker Owners Pollution Federation Ltd, *Dispersants*, http://www.itopf.com/spill-response/clean-up-and-response/dispersants/.
[8] *See* CRRC Report at 7.
[9] *See* NRC Report at 10.
[10] *See* Merv Fingas, A REVIEW OF LITERATURE RELATED TO OIL SPILL DISPERSANTS 1997-2008 5 (Sept. 2008), *available at* http://www.pwsrcac.org/docs/d0053000.pdf.
[11] NRC Report at 207.
[12] The NRC Report, however, suggests that the effect of dispersants on the fur and feathers of animals and birds— *e.g.*, potential negative effects on waterproofing—requires further study.  *See* NRC Report at 196, 274.
[13] *See* Fingas at 22.

at the low temperatures of deepwater.[14] Finally, there is no reason to suppose that all dispersants act in the same manner. They may, depending upon their chemical makeup, have strikingly dissimilar impacts. For example, some evidence indicates that the ionic surfactant in Corexit 9527 and 9500 inhibits biodegradation while their non-ionic surfactants increase biodegradation.[15]

## B. Regulation of the Use of Dispersants in Oil Spill Response

The Clean Water Act expressly contemplates the use of dispersants in response to oil spills. Section 311(d)(2)(G) of the Act requires that the federal National Contingency Plan for oil spill response contain a schedule identifying:

> (i) dispersants . . . , if any, that may be used in carrying out the Plan,
>
> (ii) the waters in which such dispersants . . . may be used, and
>
> (iii) the quantities of such dispersant . . . which can be used safely in such waters . . . .[16]

In addition, subsection (G) requires each schedule to provide for use of other, non-listed dispersants: "[T]he President, or his delegate, may, on a case-by-case basis, identify the dispersants, other chemicals, and other spill mitigating devices and substances which may be used, the waters in which they may be used, and the quantities which can be used safely in such waters."[17]

The National Contingency Plan under the Clean Water Act and Oil Pollution Act of 1990 further provides for the establishment of regional and area-wide contingency plans, which may expressly pre-authorize the use of dispersants:

> In meeting the provisions of this paragraph, preauthorization plans may address factors such as the potential sources and types of oil that might be spilled, the existence and location of environmentally sensitive resources that might be impacted by spilled oil, available product and storage locations, available equipment and adequately trained operators, and the available means to monitor product application and effectiveness . . . . Approved preauthorization plans shall be included in the appropriate RCPs and ACPs [regional and area contingency plans].[18]

When dispersants have *not* been pre-authorized in an oil spill response contingency plan, they can still be approved after a spill has occurred. Federal regulations require the Federal On-Scene Coordinator to obtain "concurrence" in this circumstance from EPA and applicable state authorities, but require only "consultation" with the Department of Commerce (through the National Oceanic and Atmospheric Administration [NOAA]) and the Department of the Interior:

---

[14] *See, e.g.*, Richard Camilli et al., *Tracking Hydrocarbon Plume Transport and Biodegradation at Deepwater Horizon*, SCIENCE (Aug. 19, 2010), http://www.sciencemag.org/cgi/content/abstract/science.1195223; Terry C. Hazen et al., *Deep-Sea Plume Enriches Indigenous Oil-Degrading Bacteria*, SCIENCE (Aug. 24, 2010), http://www.sciencemag.org/cgi/content/abstract/science.1195979.
[15] *See* Fingas at 22.
[16] 33 U.S.C. § 311(d)(2)(G).
[17] *Id.*
[18] 40 C.F.R. § 300.910(a).

[T]he OSC [On-Scene Coordinator], with the concurrence of the EPA representative to the RRT [Regional Response Team] and, as appropriate, the concurrence of the RRT representatives from the states with jurisdiction over the navigable waters threatened by the release or discharge, and in consultation with the DOC [Department of Commerce, *i.e.*, NOAA] and DOI [Department of the Interior] natural resource trustees, when practicable, may authorize the use of dispersants, surface washing agents, surface collecting agents, bioremediation agents, or miscellaneous oil spill control agents on the oil discharge, provided that the products are listed on the NCP [National Contingency Plan] Product Schedule.[19]

The effect of pre-approval, accordingly, is to eliminate the need for approvals and consultations during the response and to enable the Federal On-Scene Coordinator to act without delay.

The National Contingency Plan also establishes "Area Committees"[20] under the direction of a Federal On-Scene Coordinator[21] that are charged with "work[ing] with State and local officials to expedite decisions for the use of dispersants and other mitigating substances and devices."[22]

The decision whether to approve the use of dispersants can be difficult, whether it occurs through the pre-approval process in developing a contingency plan or, in the absence of pre-approval, once a spill has occurred. As described by the National Research Council of the National Academies of Sciences, "[g]iven the potential impacts that dispersed oil may have on water-column and seafloor biota and habitats, thoughtful analysis is required prior to the spill event so that decision makers understand the potential impacts with and without dispersant application."[23] The trade-offs are complex:

Decisions to use dispersants . . . involve trade-offs between decreasing the risk to water surface and shoreline habitats while increasing the potential risk to organisms in the water column and on the seafloor. This trade-off reflects the complex interplay of many variables, including the type of oil spilled, the volume of the oil, sea state and weather, water depth, degree of turbulence (thus mixing and dilution of the oil), and relative abundance and life stages of resident organisms.[24]

---

[19] 40 C.F.R. § 300.910(b).

[20] "There is established for each area designated by the President an Area Committee comprised of members appointed by the President from qualified personnel of Federal, State, and local agencies." Clean Water Act § 311(j)(4)(A); 40 C.F.R. § 300.5. In the spill-affected area there are two "areas" (and thus Area Committees) for Louisiana, three for Texas, two for Northwest/West Florida, and one for Mississippi/Alabama.

[21] "On-scene coordinator (OSC) means the federal official pre-designated by EPA or the USCG [U.S. Coast Guard] to coordinate and direct responses under subpart D, or the government official designated by the lead agency to coordinate and direct removal actions under subpart E of the NCP." 40 C.F.R. § 300.5. Rear Admiral Mary Landry was the Federal On-Scene Coordinator until June 1, 2010, when Rear Admiral James Watson assumed that role. On July 12, 2010, Rear Admiral Paul Zukunft replaced Admiral Watson as the Federal On-Scene Coordinator.

[22] Clean Water Act § 311(j)(4)(B); *see also* 40 C.F.R. § 300.910(a) ("RRTs Area Committees shall address, as part of their planning activities, the desirability of using appropriate dispersants, surface washing agents, surface collecting agents, bioremediation agents, or miscellaneous oil spill control agents listed on the NCP Product Schedule, and the desirability of using appropriate burning agents.").

[23] *See* NRC Report at 3.

[24] *Id.* at 2.

Under the National Contingency Plan, EPA is responsible for obtaining dispersant toxicity data from industry before placing a dispersant on the product schedule, which then serves as the basis for listing particular dispersants for pre-approved use in oil spill response contingency plans. The accuracy and consistency of pre-listing testing by manufacturers has been questioned, with toxicologists suggesting that the results of industry testing vary more widely than they should.[25]

Moreover, the required pre-authorization testing is limited to acute toxicity studies (48 and 96 hours) on two species: a fish species and a mysid shrimp species, *Menidia beryllina* and *Mysidopsis bahia,* respectively. EPA commonly uses these species in laboratory tests, and they are useful in providing comparative acute toxicity information, but the tests are not designed as proxies for all possible adverse ecosystem impacts. The pre-testing of dispersants did not include other important matters such as environmental persistence, effectiveness with multiple varieties of oil and at multiple temperatures, byproducts, and endocrine effects.

## C. The Use of Dispersants in Response to the Deepwater Horizon Spill[26]

The federal government's response to the oil spill began immediately after the Macondo well explosion on the night of April 20, 2010. In addition to the emergency search-and-rescue mission, efforts to address the released oil were soon underway. Pursuant to the National Contingency Plan, the Coast Guard Captain of the nearest port, Morgan City, Louisiana, served as the Federal On-Scene Coordinator, in charge of the government's response action, until a few days later when the District (Eight) Commander, Rear Admiral Mary Landry, took over the Coordinator role.

The oil spill response contingency plans applicable to the Gulf (Regions 4 and 6 within the National Response Plan framework) pre-authorized the use of a list of specific dispersants. Neither of the plans limited the overall volume or duration of such pre-authorized use.[27] With

---

[25] *See* Biello, *Fighting Pollution with Pollution.* Discrepancies between the pre-approval tests and EPA's post-spill toxicity testing results suggest that there were potential flaws in the earlier testing, although it may not be possible to resolve that question definitively at this late date. The pre-approval tests found differences in toxicity between dispersants that did not appear in the EPA test. *Gulf Coast Oil Spill: Small Business and the Cleanup Effort Before the S. Subcomm. On Small Business and Entrepreneurship,* 111th Cong. (June 18, 2010) (statement of Carys Mitchelmore) ("Noteworthy is that the reference toxicant LC50s for the different dispersants listed on the NCPPS differ by orders of magnitude, up to nearly 300-fold. For example, in Table 2 reference toxicant data for the mysid shrimp tests range from an LC50 (ppm, 96-hr) from 0.98 (for Sea Brat #4) to 267.7 (for Nokomis 3-F4). One product (Nokomis 3-AA) used copper sulfate as a reference toxicant instead of the EPA-required SDS reference toxicant. These issues are of concern if you are trying to compare the relative toxicity of the dispersants. Indeed, this currently, cannot be accurately assessed given the data presented on the NCPPS. These toxicity tests should be repeated.").

[26] The working relationship between the Coast Guard and EPA with respect to dispersant-related decisions during the spill is discussed further in the Commission's final report.

[27] The Region 6 dispersant guidelines pre-authorize use of any dispersant on the National Product Schedule in water at least ten meters deep and at least three miles from shore. Region 4's dispersant guidelines give the same general pre-authorization, but exclude certain geographic areas. Both sets of guidelines also provide the Federal On-Scene Coordinator with a checklist of factors to consider—not including overall volume or duration —in determining whether to permit dispersant use. RRT-6, FOSC DISPERSANT PRE-APPROVAL GUIDELINES AND CHECKLIST (2001), *available at* http://www.losco.state.la.us/pdf_docs/RRT6_Dispersant_Preapproval_2001.pdf; REGION IV REGIONAL RESPONSE TEAM RESPONSE AND TECHNOLOGY COMMITTEE DISPERSANT WORKGROUP, USE OF DISPERSANTS IN

the permission of the Federal On-Scene Coordinator, BP applied 14,654 gallons of the dispersant Corexit, which was on the approved list, on the surface during the week of April 20-26, 2010.[28] On April 29, 2010, the Coast Guard formally designated the Gulf spill a "Spill of National Significance" pursuant to the Oil Pollution Act.[29] Based on that designation, the Commandant of the Coast Guard, Admiral Thad Allen, became the "National Incident Commander" in charge of coordinating interagency efforts on the wide variety of issues responders faced, and dealing with high-level political and media inquiries related to the response.

During May, dispersants were applied both to the surface and subsea, and the volume used increased rapidly. During the week of April 27 to May 3, 2010, responders applied 141,358 gallons to the surface, and that amount grew to 168,988 by the following week.[30] The week of May 11 to May 17, 2010, the amount of surface dispersants used reached 255,000 gallons.[31]

On May 1, 2010, Admiral Thad Allen reported that response crews had begun testing the subsurface application of dispersants to oil escaping from the broken riser.[32] Nearly 3,000 gallons of subsea dispersants were applied.[33] At the time, it was unclear whether the National Contingency Plan's pre-approval of the use of dispersants in the Gulf applied to subsea use in addition to surface use, and therefore whether additional EPA approval and NOAA consultation were required.[34] Notwithstanding those uncertainties regarding governing law, on May 7, 2010, "having deployed test applications of subsea dispersants, EPA halted subsea dispersant operations, awaiting additional test results."[35]

Testing and monitoring, however, presented substantial logistical and organizational problems. BP itself performed three tests, based on protocols established by EPA and the Coast Guard.[36] On May 15, 2010, the testing for effectiveness and toxicity that had been completed prompted EPA and the Coast Guard to announce their joint approval of subsea dispersant use

---

REGION IV (1996), *available at*
http://ocean.floridamarine.org/acp/mobacp/PDF/ANNEXES/RRT%20IV%20Dispersant%20Policy.pdf.
[28] Figures on the volume of dispersant use are either taken directly from, or calculated based on data in, the *Operations and Ongoing Response* daily reports for the Deepwater Horizon Response, *available at* www.restorethegulf.gov [hereinafter Restore the Gulf Estimates].
[29] Campbell Robertson, *White House Takes a Bigger Role in the Oil Spill Cleanup*, N.Y. TIMES (Apr. 29, 2009).
[30] Restore the Gulf Estimates.
[31] *Id.*
[32] *See* Transcript from Press Briefing, Coast Guard Commandant Thad Allen and Assistant to the President for Homeland Security John Brennan (May 1, 2010), *available at* http://coastguardnews.com/gulf-oil-spill-press-conference-transcript/2010/05/01/; Deepwater Horizon Response, *The Ongoing Administration-Wide Response to the Deepwater Horizon Oil Spill* (May 3, 2010), *available* at
http://www.restorethegulf.gov/release/2010/05/03/ongoing-administration-wide-response-deepwater-horizon-oil-spill [hereinafter May 3, 2010 Release].
[33] May 3, 2010 Release.
[34] Interview with Coast Guard official.
[35] *See* H.R. Committee on Energy and Commerce, 111th Cong., CHRONOLOGY OF DEEPWATER HORIZON EVENTS. *available at* http://energycommerce.house.gov/documents/20100615/EE.Attachment.A.2010.6.12.pdf.
[36] *See* Conference Call with Lisa P. Jackson, EPA Administrator (May 12, 2010), *available at* http://www.epa.gov/bpspill/dispersants/may12transcript-final.pdf; *see also* Joel Achenbach & Steven Mufson, *Engineers draw battle lines in effort to plug gulf oil well: 'Top hat,' 'hot tap' among tactics pursued; uncertainties still loom*, WASH. POST (May 11, 2010).

with the condition that BP conduct further monitoring.[37] The EPA Administrator, Lisa Jackson, made the approval decision on behalf of EPA herself and has since publicly acknowledged the difficulty of making this decision with the limited amount of scientific information then available. Considerations related to response worker health and ease of application—subsea application would minimize the necessary human contact with dispersants, and could occur at night and in foul weather—reportedly played a role in the decision to approve the method.[38] By May 17, 2010, BP had made extensive use of dispersants. The cumulative totals by this time were 580,000 gallons on the surface and 45,000 gallons subsea.

On May 20, 2010, in the wake of continuing media reports relating public concern about the potential toxicity of the high volumes of dispersants being used,[39] the Coast Guard and EPA issued a joint directive requiring BP to identify and use a less toxic and more effective dispersant than Corexit 9500 from the list of dispersants authorized by the National Contingency Plan.[40] According to the data in the National Contingency Plan Product Schedule, some of the pre-approved dispersants were both less toxic and more effective on South Louisiana crude oil than Corexit 9500.[41] Based on the Plan, the federal directive required BP to identify a less toxic alternative to be used both on the surface and subsea at the source of the oil leak within 24 hours, and to begin using the less toxic dispersant within 72 hours of submitting the alternative. Specifically, the directive called for toxicity levels $LD_{50}$ "at or below" 23 parts per million (ppm) for *Menidia* or 18 ppm for *Mysidopsis*.[42] If BP was unable to identify acceptable alternative dispersant products, BP had to provide the Coast Guard and EPA with a detailed description of

---

[37] *See* EPA, DISPERSANT MONITORING AND ASSESSMENT DIRECTIVE FOR SUBSURFACE DISPERSANT APPLICATION (May 10, 2010); *available at* http://www.epa.gov/bpspill/dispersants/subsurface-dispersant-directive-final.pdf; EPA, DISPERSANT MONITORING AND ASSESSMENT DIRECTIVE FOR SUBSURFACE DISPERSANT APPLICATION– ADDENDUM 1 (May 14, 2010), *available at* http://www.epa.gov/bpspill/dispersants/subsurface-dispersant-addendum-final.pdf; Press Release, Deepwater Horizon Incident Joint Information Center, *Coast Guard and EPA Approve Use of Dispersant Subsea in Further Effort to Prevent Oil From Reaching U.S. Shoreline* (May 15, 2010), *available at* http://www.restorethegulf.gov/release/2010/05/15/coast-guard-and-eps-approve-use-dispersant-subsea-further-effort-prevent-oil-reac.

[38] Jeff Goodell, *The Poisoning*, ROLLING STONE (July 21, 2010). Administrator Jackson gave a wide-ranging and candid interview to *Rolling Stone*, in which she stated that she had told her aides that the approval decision was among the hardest she had ever made. She also reportedly said that BP argued for subsea application as a method that would reduce the overall volume of chemicals discharged into the marine ecosystem. *Id.*

[39] *See, e.g.*, Elizabeth Rosenthal, *In Gulf of Mexico, A Huge Experiment with Chemical Dispersants*, N.Y. TIMES (May 6, 2010) (characterizing "BP and federal officials [as] engaging in one of the largest and most aggressive experiments with chemical dispersants in the history of the country, and perhaps the world.").

[40] *See* EPA, DISPERSANT MONITORING AND ASSESSMENT DIRECTIVE FOR SUBSURFACE DISPERSANT APPLICATION– ADDENDUM 2 (May 20, 2010), *available at* http://www.epa.gov/bpspill/dispersants/directive-addendum2.pdf [hereinafter EPA ADDENDUM 2]. BP had used Corexit 9500 and 9527, though it discontinued use of the latter early on during the spill because Corexit 9527 contained 2-butoxyethanol, which had allegedly created health problems for *Exxon Valdez* workers. *See* Elana Schor, *Ingredients of Controversial Dispersants Used on Gulf Spill Are Secret No More*, N.Y. TIMES (June 9, 2010).

[41] *See* EPA, NATIONAL CONTINGENCY PLAN PRODUCT SCHEDULE TOXICITY AND EFFECTIVENESS SUMMARIES, *available at* http://www.epa.gov/emergencies/content/ncp/tox_tables.htm#dispersants.

[42] *See* EPA ADDENDUM 2. $LD_{50}$ is the dose that is lethal to 50% of the test population. *Menidia* is a genus of silverside fish found in the Gulf of Mexico. *Mysodopsis* are a type of shrimp used for toxicity testing. The reference to toxicity levels "at or below" designated $LD_{50}$ levels was confusing, because a higher $LD_{50}$ actually means a safer substance.

the alternative dispersants investigated, and the reasons it believed those products did not meet the required standards.[43]

BP responded to the directive the day it was issued.[44]  BP contended that only five products on the National Contingency Plan Product Schedule (which lists acceptable dispersants) met the criteria in the directive and that Corexit 9500A was the "best alternative."[45]  BP noted that one of these five acceptable dispersants "contains a small amount of a chemical that may degrade to a nonylphenol," a class of chemicals that have been identified as potential endocrine disruptors and may persist in the environment for a period of years.[46]  Unfortunately, BP said, neither the manufacturer nor BP had had the opportunity to test the product for these potential effects.[47]

BP said that it would be prudent to obtain the chemical formulas for the other dispersants to evaluate their potential to degrade to a nonylphenol, but indicated that it had not been able to do so.[48]  BP noted that "there may be only limited information on the constituents of the dispersants, since the dispersants typically contain proprietary substances whose identities are not publicly available."[49]  In contrast, BP explained, the manufacturer of Corexit had said that it reached "maximum biodegradability" within one month and was not persistent in the environment.[50]  In short, BP concluded, Corexit "appears to have fewer long term effects than the other dispersants evaluated."[51]  BP also made clear that the company did not, in any event, then have a sufficient stockpile of any dispersants other than Corexit and Sea Brat #4, and that the Sea Brat #4 supply might not be sufficient for both surface and subsea use.[52]  Corexit 9500 was the only dispersant used during the remainder of the spill.

In a May 24, 2010 press conference, EPA Administrator Jackson stressed three points, while generally acknowledging that federal regulators remained "deeply concerned about the things we don't know" such as the "long-term effect on aquatic life."[53]  First, she said, the government was instructing BP to "take immediate steps to significantly scale back the overall

---

[43] *See id.*
[44] *See* Letter from Douglas J. Suttles of BP to Rear Admiral Mary Landry, Commander, Eighth Coast Guard District, and Samuel Coleman, Director, Superfund Division EPA Region 6 (May 20, 2010), *available at* http://www.epa.gov/bpspill/dispersants/5-21bp-response.pdf [hereinafter Suttles Letter].  This letter refers to the directive (EPA Addendum 2) as having a May 19, 2010 date.
[45] Corexit is a product of the Nalco Company, headquartered in Napier, Illinois.  Corexit 9500A contains petroleum distillates, propylene glycol, and a proprietary organic sulfonate (a type of detergent).  *See* Safety Data Sheet, Nalco Company, Corexit EC 9527A (May 11, 2010), *available at* http://www.restorethegulf.gov/sites/default/files/imported_pdfs/external/content/document/2931/539295/1/Corexit%20EC9527A%20MSDS.pdf.
[46] *See* Suttles Letter.
[47] *See id.*  The manufacturer tests were also conducted by different laboratories and on dispersants mixed with No. 2 fuel oil, not Louisiana sweet crude.  *See* EPA, DISPERSANTS TOXICITY TESTING–PHASE II QUESTIONS AND ANSWERS (Aug. 2, 2010), *available at* http://www.epa.gov/BPSpill/dispersants/qanda-phase2.pdf [hereinafter DISPERSANTS TOXICITY Q&A] (explaining in answer to question seven that No. 2 fuel oil is not the oil in the Gulf).
[48] *See* Suttles Letter.
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *See id.*
[53] Jackson Press Conference.

use of dispersants" and expressed EPA's belief that "we can reduce the amount of dispersant applied by as much as half, and I think probably 75%, maybe more."[54]  Second, she expressed dissatisfaction with BP's efforts to analyze other dispersant options.[55]  Third, she announced, EPA would perform its own tests to verify BP's data and to "determine the least toxic, most effective dispersant available in the volumes necessary for a crisis of this magnitude."[56]

Two days later, Administrator Jackson sent a letter to David Rainey of BP criticizing BP's inadequate compliance with the May 20, 2010 directive, which had instructed BP "to analyze alternative dispersants for toxicity and effectiveness and report back within 24 hours."[57]  "Because we believe your analysis of potential alternative dispersants was insufficient," she wrote, "the EPA is performing its own scientific verification of the data BP presented."[58]  EPA said it would make laboratory comparisons with Gulf of Mexico species, including a silverside fish and a mysid shrimp.[59]  EPA would also identify a test for endocrine disrupters.[60]  Administrator Jackson's letter continued:  "Furthermore, as we discussed, the federal government, led by the Coast Guard, is reiterating its instructions to BP to take immediate steps to significantly scale back the overall use of dispersants."[61]  A May 26, 2010 directive provided that "BP shall eliminate the surface application of dispersants" except in "rare cases where there may have to be an exemption."[62]

On June 30, 2010, EPA released results of its own testing of eight dispersants.[63]  EPA had conducted acute toxicity tests with two Gulf of Mexico aquatic species, and *in vitro* cytotoxicity (cell damage) and endocrine screening assays using human cell lines.  EPA's results indicated that none of the eight dispersants displayed significant endocrine disrupting activity.  It also suggested that Corexit 9500 was not overall more toxic than alternatives:  "While the dispersant products alone—not mixed with oil—have roughly the same impact on aquatic life, JD-2000 and Corexit 9500 were generally less toxic to small fish and JD-2000 and SAF-RON GOLD were least toxic to mysid shrimp."[64]

The effort to scale back use of dispersants had some effect.  During the week of May 18, 2010, BP applied 190,000 gallons total.[65]  The following week, it applied roughly two-thirds as

---

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] Letter from Lisa P. Jackson, EPA Administrator, to David Rainey, V.P. of Gulf of Mexico Exploration, BP Exploration and Production (May 26, 2010), *available at* http://www.epa.gov/bpspill/dispersants/Rainey-letter-052610.pdf.

[58] *Id.*

[59] *See id.*

[60] *See id.*

[61] *Id.*

[62] *See* EPA, DISPERSANT MONITORING AND ASSESSMENT DIRECTIVE FOR SUBSURFACE DISPERSANT APPLICATION–ADDENDUM 3 (May 26, 2010), *available at* http://www.epa.gov/bpspill/dispersants/directive-addendum3.pdf.

[63] *See* Press Release, Deepwater Horizon Incident Joint Information Center, *EPA Releases First Round of Toxicity Testing Data for Eight Oil Dispersants* (July 1, 2010), *available at* http://www.restorethegulf.gov/release/2010/07/01/epa-releases-first-round-toxicity-testing-data-eight-oil-dispersants. The dispersants were Corexit 9500A, Dispersit SPC 1000, JD-2000, Nokomis 3-AA, Nokomis 3-F4, SAF-RON GOLD, Sea Brat #4 and ZI-400.

[64] *Id.*

[65] *See* Restore the Gulf Estimates.

much (135,000 gallons).[66]  Surface use fell from 120,000 gallons the week of May 18, 2010, to 40,000 gallons the week of May 25, 2010, although it then rose again and remained steady for several weeks at 80-90,000 gallons per week.  By the end of May, BP had used a total of 950,000 gallons of dispersants, of which 740,000 were applied on the surface and 210,000 subsea.[67]  As the following table shows, use of dispersants remained at a roughly constant level through most of June, but then began to decline again later in the month through early July:

**Table 1: Weekly Use of Dispersants June 1-July 12[68]**

| Week | Weekly Use of Dispersants (gallons) | Total Use of Dispersants to Date (gallons) (lower bound)[69] |
| --- | --- | --- |
| June 1 – June 7 | 171,000 (total): 50,000 (surface) 121,000 (subsea) | 1.12 million (total): 790,000 (surface) 331,000 (subsea) |
| June 8 – June 14 | 163,000 (total): 92,000 (surface) 71,000 (subsea) | 1.28 million (total): 882,000 (surface) 402,000 (subsea) |
| June 15 – June 21 | 169,000 (total): 88,000 (surface) 80,000 (subsea) | 1.45 million (total): 970,000 (surface) 482,000 (subsea) |
| June 22 – June 28 | 112,000 (total): 30,000 (surface) 83,000 (subsea) | 1.56 million (total): 1 million (surface) 565,000 (subsea) |
| June 29 – July  5 | 145,000 (total): 40,000 (surface) 92,000 (subsea) | 1.71 million (total): 1.06 million (surface) 645,000 (subsea) |
| July 6 – July 12 | 90,000 (total) 10,000 (surface) 90,000 (subsea) | 1.8 million (total) 1.07 (surface) 735,000 (subsea) |

Despite the joint Coast Guard-EPA directive that BP "eliminate the surface application of dispersants" except in "rare cases where there may have to be an exemption," the use of surface dispersants was not eliminated after May 26, 2010.  The "rare cases" were not very rare.  Until late June, surface use in most weeks remained at about 40% of the pre-directive rate.  The directive remained in effect despite suggestions that it be modified as responders became aware that the oil flow was much larger than previously believed.[70]

---

[66] *Id.*

[67] *Id.*

[68] *Id.*  Note that "totals" may not exactly correspond to the sum of components, apparently due to rounding, use of different data sources, or minor calculation errors in the original source.  Weekly totals in the table are calculated by subtracting the government figures for cumulative use between weeks; the results do not always correspond to the amounts reported separately for subsea and surface use.  The discrepancies in the government figures appear to be relatively minor, however.

[69] The "lower bound" refers to the fact that, according to the source, use was "more than" these amounts.

[70] Letter from Rear Admiral James A. Watson, Federal On-Scene Coordinator, to Regional Response Team, Federal Region VI (June 22, 2010), *available at* http://markey.house.gov/images/DISPERSANTDOCUMENTSJUNE22-24.pdf.

- 11 -

Originally Released October 6, 2010
Updated January 11, 2011

After the well was capped on July 15, 2010, there was virtually no further use of dispersants.  By that time, BP had applied a total of 1.84 million gallons, of which 1.07 million gallons were applied on the surface and 771,000 gallons were subsea.[71]  As Table 1 indicates, the amounts injected underwater became larger than the amounts applied to the surface during the last three weeks.  The week before the well was capped, only about 10% of dispersants used were applied to the surface.  NOAA estimated in a November 23, 2010 report that approximately 16% of the oil emanating from the well was chemically dispersed, either subsea or on the surface, while 23% evaporated or dissolved, and 13% was dispersed naturally at the wellhead.[72]

Although the use of dispersants had ended earlier in the month, debate about the use of dispersants surfaced again at the end of July.  On July 12, 2010, Admiral Allen's Chief of Staff informed Rep. Edward Markey that dispersants were used "only when absolutely necessary to preserve the health and safety of workers at the well site and to minimize shoreline impacts."[73]  On July 30, 2010, Rep. Markey sent a letter to Admiral Allen pointing to more than 74 BP exemption requests in 48 days, of which all but ten were fully approved by the Coast Guard.  Rep. Markey alleged "these applications appear to be rubber stamped by the Coast Guard."[74]

The next day, in a conference call, Admiral Allen and Administrator Jackson replied that they had cooperated closely and nearly attained the goal of a 75% reduction in dispersant use.[75]  On August 1, 2010, Admiral Allen said in a press conference that field commanders on a case-by-case basis decided to use dispersants where surveillance aircraft spotted oil and no other method of cleaning it up was available in the area.  Admiral Allen noted that the decision to use the dispersants did not rest with BP.  Rather, he said, "it's a decision by the Federal on-scene coordinator" through a "very disciplined doctrinal process."[76]

In a *CNN* interview the following day, Admiral Allen elaborated upon the working relationship between Coast Guard and EPA regarding the use of dispersants.  According to the Admiral, he and Administrator Jackson "talk daily about dispersant use," the Coast Guard "ha[s]n't ignored EPA's guidelines," and he was "satisfied" with dispersant use in the Deepwater Horizon disaster.[77]  Relatedly, *CNN* quoted an EPA spokesman as saying that, "[w]hile EPA may not have concurred with every individual waiver granted by the federal on-scene coordinator, the agency believes dispersant use has been an essential tool in mitigating this spill's impact, preventing millions of gallons of oil from doing even more damage to sensitive marshes,

---

[71] *Id.*

[72] *See infra* note 95 and text accompanying.

[73] Letter from Peter Gautier, Chief of Staff, National Incident Command, to Rep. Edward J. Markey (July 12, 2010), *available at* http://markey.house.gov/docs/07-15-10cgtoejmdispersants.pdf.

[74] Letter from Rep. Edward J. Markey to Admiral Thad W. Allen, National Incident Commander, United States Coast Guard (July 30, 2010), *available at* http://markey.house.gov/docs/07-30-10ejmtocgdispersants.pdf.

[75] Matthew L. Wald, *Despite Directive, BP Used Dispersant Often, Panel Finds,* N.Y. TIMES (Aug. 1, 2010). Commission staff has learned from EPA staff that this claim was based on a comparison to the highest daily rate of use, rather than a comparison of amounts used on a weekly basis.  *See* Table 1.

[76] Press Conference with Thad Allen, National Incident Commander, U.S. Coast Guard (Aug. 1, 2010), *available at* http://www.restorethegulf.gov/release/2010/08/01/transcript-press-briefing-national-incident-commander-admiral-thad-allen-0.

[77] *Allen 'satisfied' with dispersant use in Gulf oil disaster,* CNN (Aug. 2, 2010), http://edition.cnn.com/2010/US/08/01/gulf.oil.spill/index.html#fbid=CAHE69XH089.

wetlands and beaches and the economy of the Gulf coast."[78]  These statements suggested that
coordination with EPA did not mean that the Federal On-Scene Coordinator heeded EPA's
advice on all occasions.  Given the pre-approval of dispersant use, the Federal On-Scene
Coordinator was not required to do so.

## II.   Assessing the Federal Government's Use of Dispersants During the Deepwater Horizon Spill

It is too early to assess many aspects of the federal government's use of dispersants in
response to the Deepwater Horizon spill between the explosion on April 20, 2010, and the
containment of the well on July 15, 2010.  In making any assessment, moreover, it is important
to distinguish between three inquiries:  (1) whether the federal government adequately prepared
in advance for the possible use of dispersants to address such a spill; (2) whether, once the spill
occurred, the government's decisions regarding the use of dispersants were reasonable in light of
the resources and the information then available; and (3) whether, with the benefit of hindsight,
those government decisions, regardless of their reasonableness or unreasonableness when made,
resulted in benefits that outweighed harms.

### A. The Adequacy of the Government's Contingency Planning

The first of these three questions is the one most easily answered.  The government was
not adequately prepared for the use of dispersants to address such a large oil spill.
Notwithstanding the National Contingency Plan's express requirements for planning regarding
the use of dispersants, including pre-authorization to deal with emergencies, EPA clearly did not
anticipate the potential demands of an oil spill of the kind the nation faced after the Macondo
well explosion.  In particular, EPA did not consider, in its roles on the National Response Team
and the relevant Regional Response Teams, the possibility that dispersants might have to be used
in the massive volumes required in the Gulf.  And EPA did not consider the distinct possibility
that massive volumes of dispersants might be needed at the subsea level.

Neither omission can be justified on the ground that a major subsea spill was wholly
unforeseeable.  The oil and gas industry has been extracting high volumes of oil from reservoirs
in the Gulf for twenty years.  This is not a new, unanticipated development.  Nor is deepwater
drilling.  Yet, just as the Minerals Management Service and industry failed to plan adequately for
a blowout of this magnitude and duration (topics discussed in other work by the Commission and
its staff), EPA did not consider adequately the challenges of dispersant use flowing from large-
scale drilling operations, especially operations in deepwater.  EPA did not require studies or
testing that took account of the likely amounts or locations of dispersant use necessary in the
event of a well blowout, in particular a deepwater blowout.

Nor had NOAA adequately planned for such an event.  NOAA has significant
responsibility to provide scientific support for national response and contingency planning
pursuant to the Clean Water and Oil Pollution Acts.[79]  Its related expertise arises out of its work

---

[78] *Id.*
[79] 40 C.F.R. §§ 300.145, 300.175, 300.210.

in many areas, including its duties under the Endangered Species Act,[80] Marine Mammal Protection Act,[81] and Magnuson-Stevens Fishery Conservation and Management Act[82] to protect endangered and threatened species of marine life, marine mammals, and the nation's fisheries in U.S. waters.  Yet NOAA had also not previously evaluated the potential impacts of voluminous and extended use of dispersants on marine life and the nation's fisheries.

As a result, the National Incident Commander, the EPA Administrator, and the NOAA Administrator were seriously handicapped when the Macondo well explosion occurred and decisions had to be made immediately in the absence of adequate contingency planning.  These officials had to make difficult choices with insufficient information about the critical trade-offs identified by the National Academy of Sciences for the use of dispersants:  the value of the dispersants in reducing the harm caused by released oil versus the potential risks of harm from the dispersants themselves.  The limited toxicity data they possessed was questionable and limited to acute lethal effects on two estuarine species.[83]  It did not consider potential environmental persistence resulting from repeated or continuous sublethal effects, such as endocrine disruption.

The absence of adequate contingency planning had a further negative impact on the effectiveness of the government's response.  It made unclear the lines of authority between various federal agencies in determining whether dispersants should be used.  In particular, there was uncertainty regarding the extent to which the Coast Guard needed to secure EPA's approval before permitting the use of dispersants.  Notwithstanding the lack of any requirement that the Federal On-Scene Coordinator defer to EPA on the use of dispersants at the surface (given EPA's pre-approval), and the lack of a clear requirement with regard to the subsea, EPA decided to exercise substantial control over both types of dispersant use, which at times led to delays in necessary decision-making (and, according to Coast Guard responders, to some avoidable shoreline impacts from oil as a result of the inability to use dispersants quickly).[84]

## B. The Reasonableness of the Government's Decision To Authorize the Use of Dispersants at the Time It Was Made

As described above, the reasonableness of the federal government's decision to authorize the use of dispersants is distinct from the questions of whether there was adequate contingency

---

[80] 7 U.S.C. §§ 1531 *et seq.*

[81] 16 U.S.C. §§ 1361 *et seq.*

[82] 16 U.S.C. §§ 1801 *et seq.*

[83] *See supra* note 25; Biello, *Fighting Pollution with Pollution* (quoting toxicologist Carys Mitchelmore's statement that "[i]f you think the data on COREXIT is bad, try to find any decent toxicology data on the alternatives").

[84] In interviews with Commission staff, responders stated that EPA representatives on the scene, unlike representatives from other government agencies, were not empowered to make binding decisions notwithstanding EPA's claims of authority over the use of dispersants.  Instead, those EPA representatives had to relay information to agency superiors, which inevitably delayed decisions that needed to be made quickly.  In addition, these response participants from other federal agencies stated that the EPA on-scene representatives sometimes lacked the necessary experience in oil spill response and that EPA scientists with such experience were not being adequately consulted in EPA's decision-making process.  Finally, these individuals expressed an overall concern that EPA's internal decision-making procedures were simply not organized to make the kind of rapid decisions necessary in the oil spill context, which are quite different from the lengthier deliberative processes that mark the kind of long-term regulatory rulemakings in which EPA more routinely engages.

planning (which there was not) and whether the decision ultimately turned out to be prudent. This inquiry instead focuses on whether the government acted reasonably given the limited knowledge and resources that it possessed at the time. Based on the information currently available to the Commission staff, we cannot conclude that the government acted unreasonably in deciding to approve the use of massive volumes of dispersants at the subsea and surface.

Because federal agencies had failed to plan adequately, they did not possess the scientific information that officials most certainly would have wanted to guide their choices. They had to make choices nevertheless: Millions of gallons of oil were flowing from the Macondo well into the Gulf of Mexico every day, imperiling the responders who worked in the immediate vicinity of the spill, residents living along the Gulf Coast, the Gulf marine ecosystem, and the fishing and tourism industries.

Given the conditions under which officials like Admiral Allen and EPA Administrator Jackson were acting, there is no clear evidence that their decision to authorize high volumes of dispersants, including at the subsea, were unreasonable. They instead appear to have acted reasonably in the difficult circumstances in which they were placed. For instance, officials directed the Regional Response Teams to seek input as quickly as possible from fifty expert scientists.[85] On June 4, 2010, the experts reported a consensus that "use of dispersants and the effects of dispersing oil into the water column has generally been less environmentally harmful than allowing the oil to migrate on the surface into the sensitive wetlands and near shore coastal habitats."[86] In the experts' view, though gaps in relevant information existed, the environmental trade-off between the deep-ocean ecosystem and the shoreline made dispersants an acceptable choice.

There are, however, three caveats regarding the decision-making process. First, Commission staff heard repeated reports that EPA could have done a better job of ensuring that its on-scene representatives had both the expertise and the authority to make decisions regarding the use of dispersants, so as to avoid the delays that reportedly occurred because of the absence of such authority and expertise. For example, the Commission staff has heard from two sources that EPA waited until late June to permanently install one of the Agency's most senior officials at the Unified Command headquarters located in Robert and then New Orleans, Louisiana.[87]

The second caveat relates to implementation of the planned approach for decision-making regarding dispersants. The planning documents for the area require the Regional Response Teams to make decisions about novel uses of dispersants, upon request from the Federal On-Scene Coordinator. Here, as the issue of dispersant application became more and

---

[85] In May, the Regional Response Teams asked for scientific input to direct their future dispersant use and, to that end, fifty experts met together on May 26 and 27, 2010, at Louisiana State University for the "Deepwater Horizon Dispersant Use Meeting." Coastal Response Research Center, DEEPWATER HORIZON DISPERSANT USE MEETING REPORT 5 (June 4, 2010) *available at* http://www.crrc.unh.edu/dwg/dwh_dispersants_use_meeting_report.pdf. In the meeting, the experts split into four breakout groups: (1) efficacy and effectiveness of surface and deep ocean dispersants use; (2) physical transport and chemical behavior of dispersants and dispersed oil; (3) exposure pathways and biological effects resulting from deep ocean application of dispersants; and (4) exposure pathways and biological effects resulting from surface application of dispersants. *Id.*
[86] *Id.* at 4.
[87] Interviews with government officials.

more prominent in the media and for the public, the decisions to apply both surface and subsea dispersants were taken out of hands of the Regional Response Teams. Admiral Allen and Administrator Jackson to a large extent bypassed the National and Regional Response Team structures and instead issued decisions regarding dispersant policy through joint directives. Though this reflected the high level at which the issues were being evaluated, it was outside of the process that responders were supposed to implement.

These two caveats aside, the Commission staff has reason to believe that there was generally a sound and cooperative working relationship between the federal agencies on the question of dispersants.[88] While the National and Regional Response Teams did not play the coordinating and decision-making role envisioned under the National Contingency Plan, the Federal On-Scene Coordinators worked directly with EPA and NOAA on dispersant policy. That coordination resulted in, among other things, the specific designation of subsea dispersants as an appropriate response technology subject to stringent limits on amounts as well as expansive testing and monitoring guidelines. In addition, the Federal On-Scene Coordinators and EPA worked together to reduce significantly the application of surface dispersants and to resolve the disagreements between the two agencies.

The third caveat relates to the role of BP. The fact that BP itself (or its oil spill response contractors) directly applied the dispersants authorized by the federal government led to the impression that BP rather than federal officials was in charge of decisions regarding dispersant use. Commission staff has not discovered any evidence that such a usurpation of government authority occurred. Nor could Commission staff conclude, based on interviews with Coast Guard responders, that BP or its contractors ever intentionally violated government directives regarding dispersant use (*e.g.*, regarding the permitted locations for such use). Yet, the impression remained and fueled public distrust of the decision to use dispersants.

### C. The Prudence, in Hindsight, of the Federal Government's Decision To Permit Use of High Volumes of Dispersants at the Surface and Subsea

It is too soon to answer this final question with the degree of certainty necessary for scientific analysis. The gap between what federal government officials should know prior to the use of high volumes of dispersants at the surface and subsea and what they in fact know has begun to narrow. But closing that gap will require rigorous scientific inquiry based on years of data collection and analysis, followed by the essential process of peer review, before any conclusions can be drawn upon which future government officials can safely rely.

With this crucial limitation in mind, EPA's preliminary analyses do not suggest that the government's use of dispersants caused major problems. Just the opposite, they support the possibility that the benefits of dispersant use outweighed the costs.

First, it appears that the subsea use of dispersants served an important function by increasing the safety of the working conditions faced by responders in the immediate vicinity of

---

[88] The Unified Command's working relationship with the state of Louisiana on the issue of dispersant use may not have been as cooperative. Commission staff heard in multiple interviews with state and federal government officials that Louisiana disagreed with the Unified Command's decision to apply dispersants subsea.

the spill. That group included individuals working on containment efforts—to cap the well—and those seeking to recover, burn, and skim oil. The very real concern had been that high concentrations of volatile organic compounds within the oil would be a serious safety and health hazard to response workers. The use of subsea dispersants, by reducing the volume and concentration of the oil reaching the surface, likewise reduced those associated risks.[89]

Second, EPA's subsequent toxicity tests, while still preliminary, have not revealed major problems. On August 2, 2010, EPA released the results of additional tests on the toxicity of dispersants, which the Agency contended "confirm that the dispersant used in response to the oil spill in the gulf, Corexit 9500A, is no more or less toxic than the other available alternatives."[90] The EPA report itself concluded:

> Overall, the dispersants/L[ouisiana] S[weet] C[rude]mixtures were classified as being highly toxic to moderately toxic depending on the test species and dispersant. The ZI-400/ L[ouisiana] S[weet] C[rude] mixture was the exception and would be considered only slightly toxic to *Menidia*. Corexit 9500A, the dispersant that has been applied offshore at the surface and in the deep ocean, falls into the moderately toxic category for both species. For all eight dispersants in both test species, the dispersants alone were less toxic than the dispersant-oil mixture.[91]

Finally, EPA also reported on August 2, 2010, that the dispersants seemed to have succeeded in protecting the coastal area from greater contamination from the oil spill. The Agency referred to "fluorescence data that indicated the dispersants are working to keep the oil away from the shore. . . . [T]he dispersants are working to keep oil off our precious shorelines and away from sensitive ecosystems."[92] The Agency further noted that "EPA monitoring has not found dispersant chemicals in water or sediment near coasts or wetlands."[93]

On August 4, 2010, experts from NOAA, the National Institute of Standards and Technology, and the United States Geological Survey released two reports that lent support to the claim that dispersants decreased the harms that might have otherwise resulted from the oil spill, by indicating that a significant percentage (8%) of the oil was chemically dispersed: *BP Deepwater Horizon Oil Budget: What Happened to the Oil?* and a supporting document entitled *Deepwater Horizon MC252 Gulf Incident Oil Budget* (collectively, the Oil Budget).[94] On

---

[89] Interviews with government officials. EPA staff has told Commission staff that, while decreasing volatile organic compounds at the surface was not a primary justification for permitting subsea dispersant use, it was an important benefit that became apparent after use commenced, even without conclusive proof of a causal link between subsea use and the reduction.

[90] *See* DISPERSANTS TOXICITY Q&A.

[91] EPA, COMPARATIVE TOXICITY OF LOUISIANA SWEET CRUDE OIL (LSC) AND CHEMICALLY DISPERSED LSC TO TWO GULF OF MEXICO AQUATIC TEST SPECIES (July 31, 2010), *available at* http://www.epa.gov/BPSpill/reports/phase2dispersant-toxtest.pdf.

[92] Conference Call with Paul T. Anastas, EPA Assistant Administrator (Aug. 2, 2010), *available at* www.epa.gov/bpspill/dispersants/conference-call-transcript-08022010.pdf [hereinafter Anastas Conference Call]. Later data supports this conclusion about oxygen levels. *See* Paul Voosen & Katie Howell, *Gulf Spill Roundup: Subsurface Oil Increasingly Difficult to Detect—NOAA*, E& E NEWS (Sept. 2, 2010).

[93] *See* Anastas Conference Call.

[94] Dr. Jane Lubchenco et al., BP DEEPWATER HORIZON OIL BUDGET: WHAT HAPPENED TO THE OIL? (Aug. 4, 2010), *available at* http://www.noaanews.noaa.gov/stories2010/PDFs/OilBudget_description_%2083final.pdf; DEEPWATER

Originally Released October 6, 2010
Updated January 11, 2011

November 23, NOAA released a new version of the Oil Budget: *Oil Budget Calculator Technical Documentation*, a peer-reviewed report of over 200 pages that gave the formulas used and updated the percentages in the original budget.[95] The new version's biggest change was its estimate of the amount of oil chemically dispersed, which doubled from 8 to 16%. Outside scientists continue to debate the fate of the oil and the merits of the government's Oil Budget. One major focal point of criticism has been the failure of the Oil Budget to analyze and take account of biodegradation, which chemical dispersants are intended in part to promote. Several peer-reviewed reports have offered differing perspectives on how quickly subsurface Macondo oil is biodegrading.[96]

The ongoing debate regarding the fate of subsurface Macondo oil underscores the futility of trying now to evaluate conclusively the government's decision to use high volumes of dispersants. Even without application of dispersants subsea, the turbulent mixing of oil and gas from the wellhead could have created the deepwater plume of dispersed oil. According to the Oil Budget, subsea dispersant use only added to the amount of oil in the plume.[97] As more scientific research occurs, a better understanding of the degradation and impacts of this naturally and chemically dispersed oil will undoubtedly emerge.[98] It will also take time and research to

---

HORIZON MC252 GULF INCIDENT OIL BUDGET (Aug. 4, 2010), *available at* http://www.noaanews.noaa.gov/stories2010/PDFs/DeepwaterHorizonOilBudget20100801.pdf.

[95] NOAA, OIL BUDGET CALCULATOR TECHNICAL DOCUMENTATION (Nov. 2010), *available at* http://www.restorethegulf.gov/sites/default/files/documents/pdf/OilBudgetCalc_Full_HQ-Print_111110.pdf.

[96] These include: A report from a team at Woods Hole Oceanographic Institution, which discovered a deep sea "oil plume" and suggested that rapid biodegradation might not be occurring (Richard Camilli et al., *Tracking Hydrocarbon Plume Transport and Biodegradation at* Deepwater Horizon, SCIENCE EXPRESS (Aug. 19, 2010)); an article published by a team from the Lawrence Berkeley National Laboratory, which found evidence of increased microbial respiration in the plume and concluded that biodegradation rates were "faster than expected" (Terry C. Hazen et al., *Deep-Sea Oil Plume Enriches Indigenous Oil-Degrading Bacteria*, SCIENCE EXPRESS (Aug. 24, 2010)); a report by Valentine et al., which suggested that, while most of the initial degradation was of natural gas rather than liquid oil, this could prime bacteria to degrade other hydrocarbons in the aging plume (David L. Valentine et al., *Propane Respiration Jump-Starts Microbial Response to a Deep Oil Spill*, SCIENCE EXPRESS (Sept. 16, 2010)); and a government report concluding that oxygen levels were not decreasing because the oxygen depleted by biodegradation was being replenished through the mixing of plume water with surrounding waters (JOINT ANALYSIS GROUP, REVIEW OF PRELIMINARY DATA TO EXAMINE OXYGEN LEVELS IN THE VICINITY OF MC252#1 (Aug. 16, 2010), *available at* http://ecowatch.ncddc.noaa.gov/JAG/files/JAG_Oxygen_Report%20FINAL%20090410.pdf).

[97] *See* OIL BUDGET CALCULATOR TECHNICAL DOCUMENTATION at 21, 30.

[98] On August 13, 2010, Admiral Allen issued a directive calling for an extensive study to better understand how much oil remains in the Gulf and its impacts on the marine ecosystem. Press Briefing, Admiral Thad Allen (Aug. 13, 2010), http://www.restorethegulf.gov/release/2010/08/13/transcript-press-briefing-national-incident-commander-admiral-thad-allen. After several months of subsea sampling and analysis, the government issued its report on December 17. Operational Science Advisory Team, Unified Area Command, SUMMARY REPORT FOR SUB-SEA AND SUB-SURFACE OIL AND DISPERSANT DETECTION: SAMPLING AND MONITORING (Dec. 17, 2010). The report concludes that: (1) after August 3, the amount of hydrocarbons in the Gulf from the Macondo well (as opposed to other sources, like natural seeps) has not exceeded EPA benchmarks for human health and aquatic life; (2) the application of dispersants to combat the spill did not cause levels of the chemical compounds found in dispersants to exceed EPA benchmarks in the nearshore and offshore environments; (3) hydrocarbon levels in deep-water sediments within 3 kilometers of the wellhead did exceed the established benchmark for aquatic life; and (4) there were "tar mats"—essentially oil mixed with sediment—in nearshore "shallow sub-tidal areas," *id.* at 48. In addition, the report considered peer-reviewed studies discussing biodegradation (including those cited in note 96, *supra*) and concluded that "[t]he degradation rates for the complete mixture of compounds that characterize [Macondo] oil have not yet been determined." *Id.* at 47.

determine whether the dispersants themselves, used in such high volumes and subsea, have any longer-term detrimental effects on marine life or public health. For now, there has not been compelling evidence of harmful effects to indicate that decision-makers misjudged the risks versus the benefits of applying dispersants.

## III.   Issues for Commission Consideration

This final part describes policy implications for Commissioner consideration that arise from possible lessons learned from the use of dispersants during the Deepwater Horizon spill response. These lessons and related policy implications are not intended as exhaustive of those that may flow naturally from the above analysis, but merely illustrative of the possibilities.

### A.   Further Research

Perhaps more than anything, the Deepwater Horizon experience with dispersants reveals the paucity of the kind of information that government officials need to make intelligent decisions about dispersant use in response to an oil spill. Although the absence of such information was well known before April 20, 2010, its practical effect had not been so glaringly realized.

As of 1999, EPA reported, "few long-term environmental effects tests have been conducted after a dispersant application."[99] In 2005, the National Research Council noted that U.S. research funding to support oil spill response was "extremely limited and declining" (with an annual total below $10 million).[100] The Council called on the relevant federal agencies to develop an integrated research plan focusing on peer-reviewed information.[101] Only a quarter of the $40 million in proposed research funding on dispersants and chemically dispersed oil ever materialized.[102]

The Deepwater Horizon oil spill confirms the urgency of these prior funding requests and suggests additional needs as well, including, for example, studies about the impacts of high volumes of dispersants, subsea impacts, and the long-term fate and effects of dispersants and dispersed oil—none of which appear to have been meaningfully addressed or at least addressed to the extent that now seems essential.[103] Efforts are ongoing to learn more about dispersant impacts in the Gulf. On August 3, 2010, the National Incident Commander recommended a detailed monitoring strategy, with NOAA as the operational lead, to evaluate the "distribution of indicators of break-down products of dispersants used in oil spill response activities."[104]

---

[99] EPA, UNDERSTANDING OIL SPILLS AND OIL SPILL RESPONSE 13 (1999).

[100] NRC Report at 4.

[101] *Id.*

[102] *Id.* at 5-8; *see* Elana Schor, *Oil Spill Dispersants Shifting Ecosystem Impacts in Gulf, Scientists Warn*, N.Y. TIMES (July 30, 2010) ("[Dr. Nancy] Kinner said the National Research Council's report outlined a $40 million plan for dispersant research, but a quarter of the money materialized over the past five years.").

[103] *See* CRRC Report at 7 (confirming need for research into "chemical dispersion," including understanding "the long-term fate of chemically dispersed oil" and "investigating...multiple oil (including heavy) and dispersant types.").

[104] Memorandum from Admiral Thad. Allen, National Incident Commander, Deepwater Horizon Response, to Rear Admiral Paul Zukunft, Federal On-Scene Coordinator (Aug. 3, 2010), *available at*

The development of dispersant alternatives should also be a priority.  So-called "green chemistry" carries promise.  Dispersants would seem to be a potentially important market for efforts to find new chemical products that are effective, less toxic, and more readily biodegradable.

Research and development, of course, requires funding.  Offshore drilling provides a context within which substantial funding should be in reach.  The nation's need for oil and gas from the outer continental shelf is undeniable.  But so too are the massive revenues those reserves yield in the market and the harm, as recent events demonstrate, if drilling goes awry.  The smallest fraction of those revenues, whether charged directly to industry or originating in what the government already receives, would provide a major benefit in terms of potential to mitigate the impact of oil spills from offshore drilling.

## B.  Government Contingency Planning and Decision-Making Procedures

Government contingency planning for the use of dispersants was, as described, lacking.  The federal agencies charged with planning did not adequately anticipate the need for dispersants in high volumes and at subsea locations.  Federal officials must now survey existing and future offshore facilities and locations and consider systematically the particular challenges they present for spill response.  In the future, officials should not find themselves similarly faced in the future with the need to make immediate decisions in the absence of adequate information.

Contingency planning reform should extend to rethinking both testing requirements and the use of pre-approved lists of dispersants.  Plainly, the pre-approval process has significant advantages in the immediate aftermath of an oil spill and for that reason should not be abandoned.  Indeed, it should be more rigorously applied by ensuring that those dispersants that are pre-approved are subject to more comprehensive testing.

There is clearly a need for expanded testing and greater information regarding dispersants placed on the National Contingency Plan Product Schedule, to include characteristics such as effectiveness and persistence under different environmental conditions.  Testing should also be based on the use of higher volumes, including subsea.  Moreover, current EPA protocols for industry testing may not be adequate to yield reliable and consistent results.[105]  Given the ever-changing nature of the underlying science, periodic updating of testing and testing protocols is essential.

The Deepwater Horizon spill also suggests the possibility of including temporal, spatial, and/or volumetric limits on the pre-approval of dispersants for use in a geographic area.  It is one thing to pre-approve based on the frequently reliable assumption that the response action will be

---

http://app.restorethegulf.gov/sites/default/files/documents/pdf/NIC-Sub-surface-memo.pdf; *see also* Press Conference with Admiral Thad Allen, National Incident Commander, Deepwater Horizon Response, and Dr. Jane Lubchenco, NOAA Administrator (July 27, 2010), *available at* http://www.restorethegulf.gov/release/2010/07/27/transcript-press-briefing-national-incident-commander-admiral-thad-allen-and-noaa.
[105] *See, e.g.*, Biello, *Fighting Pollution with Pollution*.

limited in time, space, and dispersant volume. But, as the Deepwater Horizon spill dramatically illustrated, where those assumptions no longer hold, the force of a pre-approval is diminished. In particular, there is more reason to allow for federal officials other than the On-Scene Coordinator, such as EPA officials who possess particular expertise, to play a role in decision-making during the actual response. To that end, contingency planning for the use of dispersants during oil spill response should consider distinguishing between types of oil spills, based on their temporal duration, spatial reach, and volume.

With greater authority comes greater responsibility. During the Deepwater Horizon spill, there were reports that on-scene EPA representatives lacked the expertise and authority essential in a response action. Any enhancement of EPA's authority therefore must be coupled with assurances that EPA has the resources and clear lines of decision-making authority necessary for effective spill response. Ultimately, any recommendations for changes in the unified command structure should turn not just on the recent experience with the use of dispersants, but on a more cross-cutting inquiry, which is the subject of separate work by the Commission and its staff. The issues surrounding dispersant use should inform that broader set of recommendations.

Finally, federal officials must from the outset leave no question in the public's mind regarding who is in charge during an emergency response, especially when, as happened with dispersants, public concern with the wisdom of the government's decisions is great. Here, a mistaken impression was created in the minds of too many that BP was making the decisions based on its own interests. That misimpression fueled the controversy over the potentially harmful impacts of dispersants, which itself harmed the public, creating real fears that had economic consequences to the extent they affected tourism and other consumer choices. In the future, government officials must leave no doubt that they, and not private industry, are making difficult decisions.

# EXHIBIT G

An Official Website of the United States Government

Follow us.   Join Mailing List  About Us  Contact Us  Site Map

Search

Home › Transcript Press Briefing by National Incident Commander Admiral Thad Allen ·

## Transcript Press Briefing by National Incident Commander Admiral Thad Allen

August 1, 2010 | 8:00:00 PM EDT

0 tweets

tweet

Below is a transcript from today's teleconference press briefing by Admiral Thad Allen, National Incident Commander for the Deepwater Horizon/BP oil spill.

A downloadable audio file of the conference is available here.

**August 1, 2010**

**2:30 p.m. CT**

Thad Allen: Good afternoon. First of all the current pressure in the capping stack is 6,980 pounds. It continues to rise and give indications of the same type of pattern we would expect with a well with integrity.

As you know we are in the process right now of laying the final casing run for the relief well and with that casing has now been placed at the bottom of the well bore. It is – they are circulating fluids just to make sure it's clean and ready to go.

And probably in the next four to five hours they will begin cementing the relief well in. As you know following that we are making preparations to do the hydrostatic or static kill as we have talked about. That could start as early as Monday night into Sunday depending on the steps that are taking.

They have to do what's called an injectivity test to make sure that all the systems are operating properly. And there is a sequence of events that has to be followed before they can actually start pumping mud into the capping stack itself.

The mud boats, the pumping boats and the Q4000 are online and all the systems have been tested and they are ready to go. We continue to survey the entire area for tar balls, any type of oil. We continue to replace boom that was damaged during the recent storm and pick up absorbent boom that has oil on it and replace that with clean boom and we'll continue to do that.

Our forces are standing by to attack oil wherever it may be located. I was on – at Tyndall Air Force Base last Friday, got a brief from our air coordination command. It's doing a great job in vectoring us in to where there is oil. As we've stated before there is lots of oil out there but we are assiduously looking for it and where we find it attacking it offshore and continuing to work with the clean up onshore.

With that I'd be glad to answer any questions you may have for me. Operator?

Operator: Yes, sir. At this time I'd like to remind you listeners, excuse me, in order to pose any questions or comments press star one on your telephone keypad. We'll pause just a moment to compile this roster.

First you have the line of Vivian Kuo with CNN.

Vivian Kuo: Hi there Admiral I was just checking to see what your response was to Representative Markey's letter asking about the EPA's usage and allowance of BP's dispersants?

Thad Allen: Sure, we'll answer Representative Markey's letter in detail. I have had numerous discussions with Lisa Jackson and continue to have numerous discussions regarding dispersant use. This is something that we have worked together as leaders.

It was determined back in late May that we needed to reduce the amount of dispersant but we also understand that sometimes there is no other way to attack than to use dispersant if it's not a situation where you can skim or do an in-situ burn or the weather conditions might preclude those two.

We established a goal to reduce dispersant use by 75 percent. At the time the capping stack went on we reduced that to 72 percent. There are times when our leaders have to make decisions on-scene based on oil that's sighted by aircraft and we may have a window of opportunity to try and deal with it there rather than take the impact into the marshes or the beaches.

And on those occasions there's a deviation from the plan for that day. But overall we've been pretty much on the same line. We intended to reduce the overall amount and we were at 72 when the capping stack got put on.

There is no disagreement between Lisa Jackson and I regarding what we want to do with dispersants. It really is an issue of just trying to make decisions day to day based on where the oil is at out there.

Operator: Next you have the line of Kater Klee with Bloomberg News.

Kater Klee: Hi, I'm here. Thank you for taking my question. I'm sorry I missed the beginning of the conference. Could you repeat when to expect the static kill to begin and maybe would you already have an estimated date of when the bottom kill may begin? Thank you.

Thad Allen: Sure. They have finished putting the casing pipe into the well bore. They will be circulating fluids to make sure the entire casing is clean. At that point they will start cementing the casing in place. That will be about four or five hours from now.

Following that we will be in a position to start with the static kill. That could come as early as tomorrow night or into Tuesday. It will depend on the final testing. But the Q 4000 and the systems are going to be needed actually to inject the mud in there.

They're testing all those systems now and everything is in place. So I would say late tomorrow, earliest next Tuesday most likely for the static kill. Regarding the bottom kill, it will have to take place probably five to seven days at a minimum after the static kill.

But I'm not sure I want to lock in a date right now because we've had some issues. As you know we had to move 40 feet of debris from the relief well before we could move it out with the casing run.

So I think once we understand where we're at with the static kill we'll be able to give you a better estimate. But I would say at a minimum, most optimistic five to seven days after the static kill.

Operator: Next sir you have that line of Jim Acosta with CNN.

Jim Acosta: Yes, Admiral Allen. I was just curious getting back to the issue of the dispersants, when the decision was made to grant an exception to BP to use dispersants on any given day, did you or your command staff have supervision over how much dispersant was used and how can you be sure that you know were able to curtail the use of dispersants by 72 percent?

Did BP present numbers to you that led you to draw that conclusion? Where do these numbers come from?

Thad Allen: The basis for the numbers are EPA's own numbers. And they are in agreement with it, that those are the numbers. These are decisions that are being made by the Federal on-scene coordinator.

Let me clear it up. It's not a decision by BP on whether or not to use dispersants. It's a decision by the Federal on-scene coordinator whether to approve the incident commander's recommendation to use dispersants once they've been located by surveillance aircraft and has an opportunity to use them.

It's a very disciplined doctrinal process on how this works. In the end it may be executed by BP through a contractor. But these are all decisions made by the Federal on-scene coordinator because that's where the responsibility rests.

And those are closely supervised and on several occasions. I've been privy to those briefs in New Orleans when the decision's being made for the following day. And I'm satisfied that we only use them when they're needed.

Operator: You now have the line of Greg Bluestein with the Associated Press.

Greg Bluestein: Hi Admiral. If the static kill does not work, what does that mean for the relief well process and will it delayed or put in danger in any way if the static kill does not work?

Thad Allen: Well the static kill is not the end all be all. In fact kill may even be a misnomer. What we're really doing is, we're going to be conducting a static test and see if the well can have mud pumped into it at a very low rate.

That could result in us filling the entire well up, bringing the pressure to zero. And if that's the case then we've taken away about half the job we will need to do from the bottom. Ultimately, to kill this well, we're going to have to inject mud into the annulus which is the area outside the pipe and between the well bore and then fill the well up itself, the pipe and the drill pipe in the middle.

Doing the static test or static kill first allows us to advance the ability to try and bring the pressure down which is what we want to do, bring it to zero ultimately. Also it will tell us right away based on the pressure readings if we have an integrity problem in the well bore or the casing itself

We've always said if we see a precipitous drop in pressure during the injection in the mud that we'll know – that will inform how we're going to have to handle the bottom kill, the ultimate relief well kill, which is going to be the final solution. Was that responsive?

Greg Bluestein: Yes, thank you, sir.

Thad Allen: OK.

Operator: And now you have the line of David Mattingly also with CNN.

David Mattingly: Hi, Admiral, we're triple teaming you today.

Thad Allen: Go ahead, David.

David Mattingly: Just some more detail regarding the static kill, at what point will you deem it a success and how much mud are you using and how much cement are you using? Is it all going in at one time, do you put them in at separate intervals. How does that work?

Thad Allen: Well it will start out with just mud going in and a decision whether to put cement in will be based on the pressure readings and the performance we get with the mud. We have the option to put the cement in but we also have the option just to put the mud in and hold off on the cement and do that when we come in with the bottom kill.

And that will be a decision that will be made as we go through the process. The final steps for this entire process were gone over by the science team over the last two days. They've had a lot of meetings in Houston making sure they understand every step of the process moving forward.

I think – we should probably know right away. We're going to be talking – this is not going to be days. This will be hours until we know that something is going on and we'll be passing on updates and in fact I'll be in Houston myself.

David Mattingly: Thank you.

Operator: You now have John Pope from the Times Picayune.

John Pope: Admiral, hi, I just have one small question. You said the current – when you started this briefing the current pressure is how much and what exactly does that mean?

Thad Allen: Six thousand, nine hundred and eight pounds per square inch in the capping stack. It's been moving anywhere between 10 and 20 pounds per 24 hour period. It's slowly increasing and that's the type of performance we would expect out of a well that has integrity as the pressure slowly builds inside of it which it has since the well was capped. Is that responsive?

John Pope: Yes, that's fine. Thank you.

Thad Allen: OK.

Operator: We have time for one more question and that is from George Altman with The Press Register.

George Altman: Hi, thanks for taking my question. Here is what I'd like to know, is there any possibility that the static kill process itself could increase the pressure and threaten the integrity of the well?

What I'm thinking is you know maybe you've got oil pushing up and then mud pushing back down. Can that process threaten the integrity of the well bore?

Thad Allen: That's a great question and that's exactly what the science team was discussing over the last few days with the BP engineers. What they're going to go do is put the mud in at a very slow rate and I think it's going to be like several barrels per minute and I think during – and I don't have the numbers in front of me right now but I think at the maximum point I think we're approaching 80 barrels per minute and putting mud down during the top kill we were trying to overcome the pressure of the oil coming up.

We've taken a look at putting the mud in very slowly so if there is a rise in pressure, we would expect there is some, that we could monitor that very, very closely. And we've established 8,000 PSI as the upper limit for pressure inside the capping stack as we put the mud into it. So we'll be monitoring that.

George Altman: Thank you very much.

Thad Allen: Yes, I could – we can take a couple more questions, operator.

Operator: OK, another moment to compile this roster. Again with any questions or comments press star one on your telephone keypad. We have a follow up from Kater Klee with Bloomberg News.

Kater Klee: Hi, thank you. So I just wanted to follow up on this last question. So does this mean that if the pressure rises to 8,000 or above you will stop the static kill and what will happen?

Thad Allen: Right, well see the pressure right now is 6,980. It will increase slightly when we put the mud in and we will be monitoring it. And they've established 8,000 pounds per square inch as a safety margin. And they don't think that it will come near that.

But that's what they've established as a limit just to make sure that based on what they know about the blow out preventer and everything else we don't want to inadvertently do damage so that's the reason the put a cap on it.

Kater Klee: Thank you.

Operator: You now have Rich Braham with ABC News.

Rich Braham: Apologies Admiral because I missed the top of the call. But the allegations that the Coast Guard has been ignoring the EPA guidelines how do you address that?

Thad Allen: I did but I'm happy to address it again. We haven't ignored the EPA guidelines. Lisa Jackson and I talk daily and sometimes more on dispersant issues. We established jointly back in May that we would seek a reduction of 75 percent in dispersant use. By our joint accounting we at the time the capping stack went on had achieved a 72 percent reduction.

So the effect we were trying to achieve were generally met. Our field commander is on a case-by-case basis when oil is spotted by a surveillance aircraft and there is no other method to control it, rather than have that end up on a marsh or on a beach we have authorized on a case-by-case basis for them to use dispersant in those areas. There is a very strict doctrinal process that's followed

The incident commanders go to the unified area command and seek permission and that guidance is provided back to them. It is a decision made by the federal on-scene coordinator, not BP but then is executed by BP through one of their sub contractors.

There is obviously a tension here in trying to reduce the amount of dispersants and still deal with the (inaudible) and the fact that when we use dispersant that's a de facto decision and we're going to accept some impact in the water column in leiu of having that oil reach a marsh area or a beach.

So I have worked very closely with Lisa Jackson on this. On the 22nd of June I actually convened a meeting and we put one additional step in to make sure that EPA had total visibility on how this was going on. We put EPA into the clearance process down at the unified command so they would have visibility on it.

But in the end they're going to times when our field commanders have to make a decision based on the best information that's available. And sometimes that's not all the information you need but they're in the position to make the decisions and they're authorized to do that.

Operator: You now have the line of Laurie Wiggler with Examiner.com.

Laurie Wiegler: Hi, Admiral, thank you for taking my question. This may be a little off point but I'm wondering if this entire experience has given you pause with such enormous effort on everyone's part to clean this up and the impact to wildlife in the area and the community what's your feeling on offshore drilling these days?

Thad Allen: Well issues related to offshore drilling and the policy and the moratorium and those things are policy issues and without trying to be flippant or glib it's really above my pay grade. My responsibility is on the response.

And make sure that we get this oil cleaned up, that we're there and we do our job and we hold BP accountable. Regarding long-term energy issues and energy policy I'll leave that to the policy makers.

Laurie Wiegler: OK, very good. Thank you very much.

Meghan Maloney: And operator at this point. We'll take our final call.

Operator: Thank you, one moment. Your last question is a follow up from Vivian Kuo with CNN.

Vivian Kuo: Hey, Admiral. Sorry about the mass dog pile but it was my understanding in the past that BP had the initial go-ahead to do preps for the static kill but needed to go back to you for a final green light.

Is that the case or has the static kill be effectively given thumbs up here?

Thad Allen: Well there's been some time inserted between because of the storm and everything like that. So what we've decided is I will issues a letter later on this evening that will actually formalize it again.

I think we all agreed that we're going to be moving forwarded. But given the time that's been inserted and some of the meetings we have with the science teams and making sure that we had looked at all the procedures associated with it include the injectivity test we thought it would be a good idea if I went ahead and issued a letter. So that will happen later this evening.

Vivian Kuo: Thank you so much.

Megan Maloney: Thank you everyone for participating in our call today. That concludes the call from Washington.

END

| Home | Task Force | Assistance | Health & Safety | Fish & Wildlife | Environment | News |
|---|---|---|---|---|---|---|
| | About Task Force | File a Claim | Boating | Birds | Air | Press Releases |
| | Joint Info Center | Other Assistance | Drinking Water | Fish | Beaches | Response Updates |
| | Education Resources | Small Business | Health Matters | Turtles | Coral | Transcripts & Docs |
| | Federal Partners | | Mental Health | Other Wildlife | Waste | Events |
| | Recovery Plan | | Seafood Safety | Fish & Wildlife Reports | Water | Features |
| | Investigation | | Workers and Volunteers | | | FOIA Library |
| | Response | | | | | Maps & Data |
| | State and Local | | | | | Multimedia |

Follow us

Cambodian   Croatian   Español   Français   Korean   Kreyòl ayisyen   Lao   Russian   Thai   Vietnamese

Site Map   Site Notices & Plug-Ins

# EXHIBIT H



**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Commander
Eighth Coast Guard District

Hale Boggs Federal Building.
500 Poydras Street
New Orleans, LA 70130
Staff Symbol (dl)
Phone: (504) 671-2331

5080
May 9, 2010

To:  Providers of Surfactant Supplies to the Nalco Company

Ladies and Gentlemen:

We write to you in a time of great national need.  On April 20, 2010, an incident on the mobile
offshore drilling unit Deepwater Horizon resulted in an oil spill in the Gulf of Mexico which has
since been designated a "spill of national significance."  The Coast Guard supports the efforts of
BP Exploration & Production Inc. (BP EPI) to contain and eliminate this oil spill and minimize
and prevent its effects, both at sea and onshore.

Given the circumstances of the oil spill, including its size and proximity to the shoreline of the
United States, chemical dispersants are essential to the oil spill response and clean-up effort.  At
this time, the supply of dispersant available to BP EPI is extremely limited.  The Nalco
Company, a dispersant manufacturer, is manufacturing additional dispersant for BP EPI to use in
the Deepwater Horizon response but cannot produce at full capacity due to a shortage of
surfactant supplies and will soon deplete what remaining surfactant supply it has.  If BP EPI
cannot source additional dispersant very soon, its current supply of dispersant will be exhausted.
The consequences of such a dispersant exhaustion will be widespread, and we write to you today
to ask for your assistance in helping all of us avoid those consequences.

Specifically, we are asking companies that provide the Nalco Company with surfactant supplies
to assist by making available, to the greatest extent possible, their surfactant material to this
response and clean-up effort.  We understand that this material may be in short supply or
otherwise already designated for contracts with other companies.  We appreciate the commercial
realities involved and respectfully ask that you make what efforts you can to allot surfactant
supply to the Nalco Company's production so that it can manufacture dispersant for BP EPI's oil
spill response, knowing that whatever efforts you are undertaking in this regard are of invaluable
benefit to this country.

We ask that you contact Nalco directly to arrange reasonable terms for your surfactant supply.

Please do not hesitate to contact us should you have any questions.  We thank you for your time
and consideration of this request.

Sincerely,

MARY E. LANDRY
Rear Admiral, U.S. Coast Guard
Commander, Eighth Coast Guard District

# EXHIBIT I

**Operational Science Advisory Team (OSAT)**

**UNIFIED AREA COMMAND**



# Summary Report for Sub-Sea and Sub-Surface Oil and Dispersant Detection:

## Sampling and Monitoring

*Prepared for*

**Paul F. Zukunft, RADM, U. S. Coast Guard**

**Federal On-Scene Coordinator**

**Deepwater Horizon MC252**

**December 17, 2010**



**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Federal On-scene Coordinator
U.S. Coast Guard

Unified Area Command
1250 Poydras Street
New Orleans, LA  70113

16461
17 Dec 2010

# MEMORANDUM

From:   RADM P. F. Zukunft, USCG
Unified Area Command, New Orleans

To:     VADM R.C. Parker, USCG
LANT - 00

Subj:   OPERATIONAL SCIENCE ADVISORY TEAM REPORT


On 18 August, 2010 I chartered the Operational Scientific Advisory Team (OSAT) to provide me with situational data and analysis for use in directing the on-going response operations. The team developed a strategy to assimilate available data as well as to identify areas where additional sampling was necessary to guide oil removal activities and assess the presence of dispersants. This sub-sea and sub-surface monitoring assessment effort was comprehensive and culminated in a rigorous set of analytical data.

These data sets were gathered and integrated based upon the 13-step Unified Area Command Strategy promulgated on 18 August 2010. The resulting assessment has guided the oil removal phase of the Deepwater Horizon spill response. This report includes assessment of data from tens of thousands of water and sediment samples taken from over 25 different ocean-going research ships on more than 125 separate cruises and representing over 850 ship-days at sea. This report focuses on information needed to guide response actions and does not draw conclusions about the long-term environmental impacts of the spilled oil. Trustee agencies will continue to study the impacts of this oil spill on the Gulf of Mexico and make assessments under other authorities. The sampling and assessment data in this OSAT report are available to support restoration and research objectives including, but not limited to, the Natural Resource Damage Assessment.

As described in the National Incident Commander's Directive of 13 August, 2010 and the Sub-Sea and Sub-Surface Monitoring Strategy dated 18 August, 2010, the goals of this data collection and analysis were to:
   a. Monitor and assess the distribution, concentration, and degradation of the portion of the oil that remains in the water column and/or bottom sediments;
   b. Evaluate the distribution of indicators of dispersant or break-down products of dispersants used in oil spill response activities;
   c. Identify any additional response requirements that may be necessary to address any remaining sub-surface oil.

Subj: OPERATIONAL SCIENCE ADVISORY TEAM
REPORT

16461

17 DEC 2010

In leading the largest pollution response effort in United States history, I established decision points on which to base oil removal actions. These decision points were tied to the following indicators:

a. The presence of oil and/or dispersants. Indicators to evaluate the presence and extent of oil and/or dispersants were established for each zone.

   (1) In nearshore waters, indicators included comparisons of oil and dispersant concentrations to human health and aquatic life benchmarks, fishery closures, and qualitative indications of oil presence. In nearshore sediments, indicators included results of toxicity testing and comparisons to reference locations and pre-impact sampling.

   (2) In the offshore waters, water quality was evaluated using human health and aquatic life benchmarks and fishery closures. Offshore sediment oil and dispersant concentrations were evaluated using aquatic life benchmarks and comparisons to reference locations and pre-impact sampling.

   (3) In the deep water environments, the indicators included dissolved oxygen concentrations, comparisons to aquatic life benchmarks, and fishery closures. In deep water sediments, indicators included comparisons to aquatic life benchmarks and comparisons to sampling at reference locations.

These indicators were chosen as the basis for the most aggressive oil and dispersant removal activities possible to return the impacted environment to pre-spill condition. Toxicity studies on water and sediment samples were conducted, and will be the subject of a separate toxicity addendum to this report which will be released in early 2011.

b. Whether oil and/or dispersants are "actionable"

   OPA 90 defines a removal action as "containment and removal of oil or a hazardous substance from water and shorelines or the taking of other actions as may be necessary to minimize or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife and public and private property, shorelines and beaches."

c. Whether oil removal actions are feasible and consistent with net environmental benefit.

   (1) The recovery/removal/treatment action does not present an undue safety risk to response personnel.

   (2) The recovery/removal/treatment actions will not cause or increase injury to adjacent habitat or resources.

   (3) The recovery/removal/treatment action will decrease the recovery time of the threatened resource or habitat over natural attenuation of the contaminant.

2

Subj: OPERATIONAL SCIENCE ADVISORY TEAM                16461
REPORT

17 DEC 2010

**Based on the robust sampling effort, the expert analysis of the data provided in this report and the decision criteria summarized above, I have determined that there is no actionable oil in the water or sediments of the deep water or offshore zones.  Ongoing removal operations will continue where oil remains in nearshore sediments and shorelines.**

The Coast Guard was fortunate to have had enormous assistance in this effort from public and private scientists representing the National Oceanic and Atmospheric Administration, the United States Geological Survey, the Bureau of Ocean Energy Management Regulation and Enforcement, United States Fish and Wildlife Service, the Environmental Protection Agency and numerous academic and oceanographic research institutes and chemical laboratories.

#

3

## Executive Summary

*The purpose of this report is to provide the Federal On-Scene Coordinator for the Deepwater Horizon MC252 Spill of National Significance with sufficient information to determine the presence or absence of sub-surface oil and dispersants amenable to removal actions[1] under the provisions of the Clean Water Act, the Oil Pollution Act of 1990, and the National Oil and Hazardous Substances Pollution Contingency Plan.*

Response to the Deepwater Horizon MC252 Spill of National Significance (DWH oil spill) resulted in an unprecedented amount of sampling in Gulf of Mexico waters by multiple federal, state, and academic entities, as well as by BP (a responsible party). To transition sub-surface monitoring out of the response phase of the oil spill, the National Incident Commander (NIC) directed that the Unified Area Command (UAC) develop a comprehensive plan to implement the detection, sampling, and monitoring strategy for sub-surface oil and dispersants, as a removal action in accordance with the Clean Water Act.

The subsequent UAC plans in response to this directive established specific factors to be considered by the Federal On-Scene Coordinator (FOSC) in making the determination about when to transition offshore activities from the emergency response phase to the long term recovery and restoration phase. This decision will be based on: (1) monitoring and assessing the distribution and degradation of the portion of oil that remains in the water column, (2) evaluating the distribution of dispersant indicators used in oil spill response activities, and (3) identifying any additional response requirements that may be necessary to address remaining sub-surface oil.

The Operational Science Advisory Team (OSAT) was formed by the UAC as a small, interagency team (see Appendix H) to assess near real-time data collected by the response relative to specific indicators and to identify sampling gaps as part of an adaptive sampling strategy. This report provides an assessment of the distribution of actionable (i.e. amenable to removal actions) oil and dispersant-related chemicals that remain in the water column and/or bottom sediments and provides a summary of sampling results to inform decision makers on further oil removal operations. Where appropriate, the report also includes results from independent scientific investigations into the DWH oil spill. Assessing non-response questions, including quantitative estimates of remaining oil and the long-term environmental impacts of the DWH oil spill, are beyond the scope of this report. Additional monitoring and assessment efforts will be conducted in accordance with Natural Resources Damage Assessment (NRDA) processes.

---

[1] The Oil Pollution Act of 1990 (OPA 90) defines a removal action as "containment and removal of oil or a hazardous substance from water and shorelines or the taking of other actions as may be necessary to minimize or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines and beaches."

1

## Specific Report Indicators

The following specific indicators were established by the UAC to define the presence or absence of potentially actionable oil:

- Qualitative observations of oil.
- Environmental risks associated with oil-related organic compounds.
- Human health risks from exposure to oil-contaminated water.
- Environmental risks related to dispersant component chemicals.
- Fishery closures.
- Toxicity to benthic invertebrates.
- Comparison of analytical chemistry measurements to reference stations and measurements from earlier in the year.
- Indicators of hypoxia in deep water seaward of the continental shelf.

A discussion of uncertainties associated with applying these indicators across the entire response dataset is presented in relevant sections throughout the document and is described in detail in Appendix C.

## Key Findings

1. No deposits of liquid-phase[1] MC252 oil were identified in sediments beyond the shoreline.

2. No exceedances of EPA's Human Health benchmark were observed.

3. No exceedances of EPA's dispersant benchmarks were observed.

4. Since 3 August 2010, <1% of water samples and ~1% of sediment samples exceeded EPA's Aquatic Life benchmarks for polycyclic aromatic hydrocarbons (PAHs). Analysis of individual samples indicated that none of the water sample exceedances were consistent with MC252. Of the sediment exceedances, only those within 3 km of the wellhead were consistent with MC252.

5. Published research indicates that MC252 oil is weathering and biodegrading under natural conditions. Estimates of weathering and degradation rates vary, precluding the use of simple empirical models to assess the persistence of residual MC252 oil.

6. Of the previously closed fisheries, 87,481 mi² (state and federal) have been reopened; 1041 mi² around the wellhead remain closed. In addition, 4,213 mi² were closed to royal red shrimping on 24 November.

---

[1] The presence of liquid-phase oil is highlighted here (as contrasted to oil in the form of tar mats or sediment-entrained oil) for its relevance to decisions regarding recovering oil from the environment

7. Quantitative results indicate that deposits of drilling mud-entrained oil remain near the wellhead. Seven sediment samples within 3 km of the wellhead collected since 3 August 2010 exceed aquatic life benchmarks for PAHs, with oil concentrations of 2000-5000 parts per million.

8. The study of tar mats in shallow nearshore waters was identified as a sampling gap. The sampling methods previously used did not sufficiently address tar mats. A focused group (OSAT II) has been chartered by the UAC to address this issue.

Based on the analysis of extensive data collected in the nearshore, offshore, and deep-water zones, the OSAT concludes that sampling was adequate to address the presence or absence of sub-surface oil and dispersants (with the exception of the nearshore sampling gap identified in Key Finding 8 above).

Based on the data collected as part of this sampling effort, the OSAT identified sediments within 3 km of the wellhead as one area of concern with respect to the chronic Aquatic Life Benchmarks considered. Some sediment locations near the wellhead have concentrations of oil-related compounds that exceed the aquatic life benchmark, as well as associated quantities of drilling mud, likely from source control efforts. The decision on whether or not this oil is actionable lies with the FOSC. Long-term chronic effects to the benthic environment are being assessed as part of the injury assessment conducted through the Natural Resources Damage Assessment (NRDA) process.

Observations from qualitative programs in the nearshore sampling zone indicate tar mats are present in some sub-tidal nearshore areas. These subsurface tar mats could potentially be remobilized and become a source of shoreline re-oiling. Due to logistical constraints associated with sampling in the shallow nearshore zone, the sub-surface sampling plans did not entirely address this region. Current efforts to address this issue within the UAC include continued monitoring by shoreline assessment teams and the formation of a specialized group at the UAC (OSAT II) to evaluate existing data and make recommendations for any additional sampling.

## Table of Contents

Executive Summary ............................................................................................................. 1

Table of Contents ............................................................................................................... 4

Section 1: Introduction ...................................................................................................... 6

Section 2: Explanation of Indicators ................................................................................ 9

   2.1    Fisheries Closures ............................................................................................. 10

   2.2    Concentrations Measured at the Same Station Earlier in the Year ................ 10

   2.3    Reference Stations ............................................................................................ 10

   2.4    Qualitative Observations of Oil ....................................................................... 11

   2.5    Significant Toxicity .......................................................................................... 11

   2.6    Human Health Benchmarks ............................................................................. 11

   2.7    Aquatic Life Benchmarks for PAHs ................................................................. 12

   2.8    Dispersant Benchmarks ................................................................................... 13

   2.9    Hypoxia ............................................................................................................ 14

Section 3: Nearshore Sampling Results .......................................................................... 15

   3.1    Description of Sampling and Monitoring Activities in the Nearshore Zone ... 15

   3.2    Fisheries Closures ............................................................................................. 16

   3.3    Reference Stations and Pre-Impact Data ....................................................... 17

   3.4    Qualitative Observations of Oil ....................................................................... 18

   3.5    Comparison to Human Health Benchmarks ................................................... 19

   3.6    Comparison to Aquatic Life Benchmarks ....................................................... 19

   3.8    Comparison to Dispersant Benchmarks ......................................................... 25

Section 4: Offshore Sampling Results ............................................................................. 26

   4.1    Description of Sampling and Monitoring Activities in the Offshore Zone ..... 26

   4.2    Fisheries Closures ............................................................................................. 27

   4.3    Reference Stations ............................................................................................ 28

   4.4    Qualitative Observations of Oil ....................................................................... 28

   4.5    Comparison to Aquatic Life Benchmarks ....................................................... 29

   4.6    Comparison to Dispersant Benchmarks ......................................................... 31

Section 5: Deep-Water Sampling Results ........................................................................ 33

   5.1    Description of Sampling and Monitoring Activities in the Deep-water Zone ... 33

   5.2    Fisheries Closures ............................................................................................. 35

   5.3    Reference Stations ............................................................................................ 35

   5.4    Qualitative Observations of Oil ....................................................................... 35

   5.5    Hypoxia ............................................................................................................ 38

   5.6    Comparisons to Aquatic Life Benchmarks ..................................................... 39

5.7    Comparison to Dispersant Benchmarks ................................................................ 44

5.8    Biodegradation .......................................................................................................... 46

Section 6: Conclusions ..................................................................................................... 48

Section 7: Maps ................................................................................................................. 50

Map 7.1: Sampling Zones ............................................................................................. 51

Map 7.2a: Sample Locations in Nearshore Zone Houma AOR ............................... 52

Map 7.2b: Sample Locations in Nearshore Zone Mobile AOR ............................... 53

Map 7.3: Sample Locations in Offshore and Deep-Water Zones .......................... 54

Map 7.4a: PAH Aquatic life Benchmark Analyses (Water Column) All Samples ................. 55

Map 7.4b: PAH Aquatic life Benchmark Analyses (Water Column) Samples post 3 August 56

Map 7.5a: PAH Aquatic Toxicity Benchmark Analyses (Sediment) All Samples ................. 57

Map 7.5b: PAH Aquatic Toxicty Benchmark Analyses (Sediment) Samples post 3 August 58

Map 7.6: Human Health Benchmark Analyses ........................................................... 59

Map 7.7: Dispersant Benchmark Analyses (Water Column) ................................... 60

Map 7.8: Dispersant Benchmark Analyses (Sediment) ........................................... 61

Section 8: References ....................................................................................................... 62

Appendices ......................................................................................................................... 68

## Section 1: Introduction

*The purpose of this report is to provide the FOSC with sufficient information to determine the presence or absence of sub-surface oil and dispersants amenable to removal actions[1] under the provisions of the Clean Water Act, the Oil Pollution Act of 1990, and the National Oil and Hazardous Substances Pollution Contingency Plan.*

During the Deepwater Horizon MC252 Spill of National Significance (DWH oil spill), oil and gas were discharged from the wellhead approximately 5,000 feet below the sea surface for 87 days until the well was successfully capped on 15 July 2010[2]. The last overflight observation of potentially recoverable oil on the ocean surface was made on 3 August. However, both naturally occurring physical processes and the use of dispersants as a response option led to substantial quantities of dissolved and dispersed oil in the sub-surface environment of the Gulf of Mexico ("sub-surface" refers in this report to both the water column and the bottom sediments). Of the total volume spilled,[3] approximately 1.4 million barrels were estimated to be naturally (630 k bbl) or chemically (770 k bbl) dispersed, the majority of that amount at the wellhead[4] (U.S. Coast Guard et al., 2010). During the DWH oil spill response, a total of 1.84 million gallons of dispersants were applied both at the surface (1.06 million gallons, primarily COREXIT 9500A and some 9527) and directly at the wellhead on the seafloor (0.78 million gallons COREXIT 9500A) during the DWH oil spill response (National Commission, 2010b). This sub-surface oil and the dispersant compounds presented potential public health and ecological concerns.

Beginning in early May, sampling and monitoring operations were conducted in both surface and sub-surface environments of the Gulf of Mexico to locate any oil and/or dispersant-related chemicals from the DWH oil spill and the associated response. A multitude of state and federal agencies performed pre-impact (the period between the rig explosion and shoreline oiling) sampling and numerous extensive sampling programs continued throughout the response.

On 3 August, the National Incident Commander (NIC) directed that the Unified Area Command (UAC) develop a comprehensive sampling plan to assess the presence of actionable sub-surface oil and dispersant-related chemicals remaining in the environment (hereafter referred to as the NIC directive). In response, the Unified Area Command (UAC) implemented the largest sampling and monitoring program ever conducted during an oil-

---

[1] The Oil Pollution Act of 1990 (OPA 90) defines a removal action as "containment and removal of oil or a hazardous substance from water and shorelines or the taking of other actions as may be necessary to minimize or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines and beaches." See The Implementation Plan, Section 3 for a more complete description of a removal action.

[2] All subsequent dates in this report are 2010 unless otherwise noted.

[3] The National Incident Command Flow Rate Technical Group estimated that 4.93 million barrels of oil ±10% were released from the well.

[4] Deepwater Horizon MC252 Gulf Incident Oil Budget Government Estimates through August 1, 2010 (Day 104) were generated using an application operated by the USCG and provided by the USGS in cooperation with the NOAA; see USCG, USGS and NOAA (2010).

spill response. The details of that program were initially set forth by the Federal On-Scene Coordinator (FOSC) in "The Implementation Plan for Sub-Sea and Sub-surface Oil and Dispersant Detection, Sampling and Monitoring," 13 September, hereafter referred to as the Implementation Plan (UAC, 2010a). This direction was further superseded by the Operational Annex for Execution and Management of Sub-Sea and Sub-Surface Detection, Sampling, and Monitoring Missions, 1 October, hereafter referred to as the Operational Annex (UAC, 2010b) and the 13 November Strategic Plan For Sub-Sea and Sub-Surface Oil And Dispersant Detection, Sampling, and Monitoring, hereafter referred to as the Strategic Plan (UAC, 2010c). These documents provide critical context to evaluate the data presented in this report. They describe (1) the overall sampling plan and rationale, (2) procedures to enable adaptive additional sampling, (3) approaches to sharing of data, and (4) the role of the Operational Science Advisory Team (OSAT) in the implementation of the sampling plan and production of this report.

During the course of the response, over 17,000 samples were collected for the purpose of environmental review (numerous other samples were collected for a diverse spectrum of applications, including waste characterization, forensic analysis etc.). Sampling and monitoring efforts initiated prior to 3 August 2010 were conducted to inform a number of response decisions. After the NIC directive of 3 August (which approximately coincided with the last visual observations of oil on the ocean surface), the response initiated a comprehensive sampling and monitoring program to locate and identify potentially actionable oil in the sub-surface environment. The transport of oil in the environment can result in highly patchy patterns of deposition to the seafloor. The sampling and monitoring program detailed in the Implementation Plan and the Annex was designed with this in mind using a statistically based approach where practicable for nearshore and offshore areas. The final samples in that program were collected on 23 October. Analytical chemistry and toxicity test results collected by multiple agencies throughout the response were published to Scribe, a data management tool developed by the US Environmental Protection Agency (EPA) for managing environmental data (Appendix B.1). The analytical chemistry data used in this report were retrieved from Scribe on 6 December. Complete results from toxicity tests conducted as part of this response were not available when this report was written. A complete report on toxicity tests will be published at a later date as an addendum to this report. The NOAA National Oceanographic Data Center (NODC) served as the official database and archive for oceanographic data (Appendices B.2, B.6). Data management protocols were established by the Sub-surface Monitoring Unit (SMU) or the data originator (Appendices B.3-B.6).

In mid-August, the Operational Science Advisory Team (OSAT) was formed by the UAC as a small, interagency team to assess near real-time data collected by the response and to identify sampling gaps as part of an adaptive sampling strategy. The team was tasked with making timely recommendations to inform response decisions. Therefore, OSAT recommendations (and this report) include some data that is still being finalized and validated. In addition, in attempting to include all analytical data collected by numerous agencies during the response, inconsistencies in methodologies and data reporting led to numerous issues (not all of which were entirely resolved at the time of this report; see Appendix C). These inconsistencies do not affect the overall conclusions of this report.

7

However, the underlying dataset should be considered preliminary and subject to future modification.

The OSAT reviewed 1) the results of the sampling and monitoring efforts conducted by the response to monitor sub-surface oil and dispersants, 2) observations from activities designed to inform other response decisions (e.g. Shoreline Cleanup Assessment Teams [SCAT]), 3) available reference data from sampling programs in existence before the DWH oil spill, and 4) results provided by independent researchers within the academic community. These data were reviewed by the OSAT in order to:

- Inform and guide the adaptive nature of the Implementation Plan (Appendix E.4).
- Make recommendations for filling sampling gaps.
- Compare results to specified indicators.
- Provide an assessment regarding the presence of oil and/or dispersants related chemicals.

This report summarizes the key data reviewed and presents the recommendations and supporting analyses provided by the OSAT to the FOSC.

The indicators used in this report were chosen specifically to assess the presence of oil and dispersant-related compounds and not for assessing long-term ecological impacts in all sub-surface environments. A significant amount of additional work will be necessary to fully evaluate the acute and chronic impacts of this incident. These investigations are currently underway as part of the Natural Resource Damage Assessment (NRDA) process. BP has also established the Gulf Coast Restoration Organization (GCRO) to manage long term response and restoration activities and the Gulf Research Institute (GRI), which will fund independent research to study the impact of the incident on the environment and/or public health in the Gulf of Mexico.

## Section 2: Explanation of Indicators

The Strategic Plan established a suite of sediment and water-quality indicators to determine whether or not oil and/or dispersant-related chemicals have been "detected." These indicators (see Table 2.1) were designed to assess impacts on public health and aquatic life in the immediate context of a removal action. The benchmarks utilized are intended to identify conditions that may pose an immediate threat to the environment; adverse effects (sub-lethal and long-term) could also occur at concentrations lower than these benchmarks.

*Table 2.1. Indicators used in the evaluation of sub-surface sampling data*
*(after Table 3.1, The Strategic Plan).*

| INDICATORS | | | |
|---|---|---|---|
| Observations and measurements will be compared to: | | | |
| | **Nearshore** (shoreline to 3 nmi) | **Offshore** (3 nmi to 200 m depth) | **Deep-water** (beyond 200-m depth) |
| **Water** | 1. Public Health Taskforce Human Health Benchmark for Child Swimmer<br><br>2. Fishery closures<br><br>3. Observations using qualitative methods (VIPERS,[1] snares, sorbent pads)<br><br>4. EPA acute and chronic aquatic benchmarks for PAHs[2]<br><br>5. Aquatic benchmarks for dispersant compounds | 1. EPA acute and chronic aquatic benchmarks for PAHs<br><br>2. Fishery closures<br><br>3. Aquatic benchmarks for dispersant compounds | 1. Indicators of hypoxia (dissolved oxygen concentration of ≤2.0 mg/L)<br><br>2. Fishery closures<br><br>3. EPA acute and chronic aquatic benchmarks for PAHs |
| **Sediment** | 1. EPA acute and chronic sediment benchmarks for PAHs<br><br>2. Observations using qualitative methods (ponar grabs)<br><br>3. Significant toxicity to benthic invertebrates<br><br>4. Concentrations measured at the same station earlier in the year<br><br>5. Average concentrations at reference stations | 1. EPA acute and chronic sediment benchmarks for PAHs<br><br>2. Average concentrations at reference stations | 1. EPA acute and chronic sediment benchmarks for PAHs<br><br>2. Average concentrations at reference stations |

---

[1] Vessels with Petroleum Ensnaring and Recovery Systems
[2] polycyclic aromatic hydrocarbons

9

These indicators do not represent injuries to natural resources under NRDA authorities in Oil Pollution Act of 1990 (OPA 90), which may occur at lower concentrations. The natural resource damage assessment will evaluate the nature and extent of injuries from the DWH oil spill and is still in the process of collecting and analyzing relevant data for this purpose.

The areas of the Gulf of Mexico affected by this incident were divided geographically into three zones, and each zone has specific indicators (Map 7.1). In general, sampling locations from the shoreline out to 3 nautical miles (nmi) are grouped as the "nearshore" sampling zone. Sampling locations between 3 nmi offshore and the 200 m bathymetry contour are grouped as the "offshore" zone. Sampling locations seaward of the 200 m bathymetric contour are grouped as the "deep-water" zone. However, there were some nearshore sampling programs that included stations seaward of the 3 nmi state waters boundary (the state waters boundary is 9 nmi offshore in Florida). These stations are considered as part of the nearshore sampling zone.

Comparisons of sub-surface data to indicators in this report consider both the entire sampling period (from early May onward) and the period after 3 August alone; i.e. the date of the NIC directive to assess remaining sub-surface oil and dispersant compounds in the environment. This date also coincides with the last observations of surface oil by trained aerial observers. Surface oil observed after 3 August is presumed to be due to remobilization of stranded oil or from a source other than MC252.

## 2.1    Fisheries Closures

During the DWH oil spill, concerns over seafood contamination from oil and dispersant compounds led to a closure of over 88,500 mi$^2$ in the Gulf of Mexico to fishing on 2 June 2010 (National Marine Fisheries Service [NMFS], 2010). The UAC determined that the status of these fisheries closures was one of the indicators to be used in the evaluation of sub-surface sampling data.

## 2.2    Concentrations Measured at the Same Station Earlier in the Year

In the nearshore sampling zone, a number of stations were sampled before oil from the DWH oil spill was transported into this zone. Many of these stations were re-sampled in September and/or October. Hence, comparison of results from these pre- and post-impact stations was included as an indicator to be used in the evaluation of sub-surface sampling data for the nearshore zone.

## 2.3    Reference Stations

Historical sediment chemistry data obtained from several sampling programs (Mussel Watch and MMS[1] studies) were used to provide context for observed concentrations associated with response sediment sampling results. Information from reference stations (Fig. 2.1) was used to provide historical data for comparison. These reference datasets will be discussed and referenced in the subsequent sampling zone sections.

---

[1] Now the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE)

These reference concentrations do not represent "background" conditions. Concentrations of PAHs in reference samples do not represent clean or pristine conditions, but represent average concentrations in the zone of interest before the spill. Other sources of PAHs, including seeps may be represented in these comparisons.

*Figure 2.1. Location of sediment chemistry reference stations for nearshore, offshore, and deep-water zones.*



## 2.4     Qualitative Observations of Oil

The potential presence of oil in nearshore waters was evaluated using snares and sorbent pads deployed along areas of the coast. These qualitative methods were used continuously in some regions and for periodic screening in other areas. Generally, when oil was observed using these qualitative methods, samples were collected for further chemical analyses. The comprehensive extent of these nearshore qualitative programs makes them an important indicator of potential oil contamination in that sampling zone.

## 2.5     Significant Toxicity

Toxicity tests were conducted on various benthic and pelagic species. Complete results of those tests were not all available at the time this report was produced. An addendum to this report presenting those results will be produced at a later date.

## 2.6     Human Health Benchmarks

Human health benchmarks developed by the EPA in coordination with the U.S. Department of Health and Human Services are used to assess potential human health risks from

exposure to oil-contaminated water.[1] These benchmarks are based on potential cancer and non-cancer health risks. Where applicable, the benchmarks account for both skin contact and incidental ingestion of water by a child swimmer, assuming 90 hours of exposure (or 1 hour per day for 90 days). The benchmark consists of screening levels for a number of compounds, including volatile organic compounds (VOC), polycyclic aromatic hydrocarbons (PAHs), and metals; see Appendix 1.

## 2.7    Aquatic Life Benchmarks for PAHs

PAHs are among the most toxic and persistent components of crude oil. PAHs can exhibit both chronic and acute toxicological effects, and several are suspected carcinogens. Accordingly, aquatic life benchmarks for PAHs were selected by the UAC as "indicators" to be monitored.

The EPA established benchmark levels of concern for PAHs in water and sediment to screen for potential adverse impacts to aquatic life.[2, 3] For these benchmarks, a total of 41 oil-related organic compounds are assessed jointly through a mixture approach because they have a cumulative effect on aquatic organisms (Appendix A.3). These compounds include 7 volatile organic compounds, 16 parent PAHs and 18 alkylated homologues of the parent PAHs. The individual compounds are given potency divisors, which are used in calculating the cumulative toxicity of the mixture of compounds in each sample – hereafter referred to as the acute or chronic aquatic life ratio. Aquatic life benchmarks are established based on a suite of laboratory toxicity evaluations using contaminated water and various species, life stages, endpoints, and exposure durations. Sediment benchmarks are based on equilibrium partitioning theory to calculate dissolved concentrations in interstitial pore water and compare them to the same thresholds intended to protect organisms from water column exposures. The amount of total organic carbon (TOC) in the sediment is factored into the calculation because organic matter binds PAHs reducing their availability. To assess the potential hazard to aquatic organisms, the aquatic life ratio is compared to a hazard index of 1. A value >1 indicates that the sample exceeds concentrations calculated to protect aquatic organisms from acute or chronic effects. Appendix A.3 describes the calculation in more detail and includes a complete list of these compounds with their divisors.

Some samples were analyzed only for the parent PAH compounds (this will be noted where applicable in the following sampling sections). When evaluating a sample in which the alkylated PAHs were not measured, it is necessary to compensate for their contribution by using "alkylation multipliers" (Appendix A.3). See Appendix C.3 for a complete discussion of the development of the multipliers and the uncertainty associated with their use with regard to the response sub-surface data.

In addition, some samples collected early in the response were not analyzed for all 16 parent PAHs. These samples are included in this report only for the determination of the

---

[1] http://www.epa.gov/bpspill/health-benchmarks.html
[2] http://www.epa.gov/bpspill/water-benchmarks.html
[3] http://www.epa.gov/bpspill/sediment-benchmarks.html

human health benchmark or if they exceeded the aquatic life benchmark. Samples with less than 16 analytes and did not exceed the benchmark, were not included in the total count of non-exceedances for the aquatic life benchmark.

Samples that exceeded EPA aquatic life benchmarks were reviewed to assess the likelihood that contamination resulted from MC252 oil. This was necessary since there are numerous other potential sources for oil related compounds within the Gulf of Mexico. For example, the National Research Council (2003) estimated that 140,000±60,000 tonnes (approximately one million barrels) of petroleum hydrocarbons enter the Gulf of Mexico from natural seeps each year. On an average annual basis the Gulf also receives an additional 10,400 tonnes (approximately 74,000 barrels) of oil spilled from oil production operations, transportation accidents such as tanker leaks, and other sources such as unburned fuel through engines. A three-year study of the source of PAH compounds detected along the Louisiana coast determined that approximately 50% of sources were from petrogenic (crude oil) sources, 36% were from pyrogenic (e.g. combustion or engine exhaust) sources, and 14% were from biogenic or diagenetic sources (Iqbal et al., 2008). To assess the source of the oil related compounds in exceedance samples, the OSAT followed methods described by Bence, et al. (1993) , Boehm (2006) , Overton et al. (2004) , Page et al. (1995) , and Wang (1999). Appendix D details the methodology for this assessment. If enough information was available, a determination was made that the sample was "consistent" or "inconsistent" with MC252 oil. If examination of the sample yielded insufficient data to make the determination, the sample was included as "consistent" in all plots and tabulations of exceedances, i.e. no distinction was made between samples consistent with MC252 and indeterminate samples.

## 2.8    Dispersant Benchmarks

A total of 1.84 million gallons of dispersants were applied both at the surface (1.06 million gallons, primarily COREXIT 9500A and some 9527) and directly at the wellhead on the seafloor (0.78 million gallons COREXIT 9500A) during the DWH oil spill response (National Commission, 2010b).

These dispersants break down rapidly in seawater; therefore, water samples were analyzed for individual dispersant constituents. Benchmarks (based on dissolved seawater concentrations) for the individual compounds are used to explain the relevance of measured concentrations of individual compounds, i.e., concentrations above benchmark levels are "levels of concern." These benchmarks are based on available biological effects data and are conservatively designed to protect aquatic life (see Appendix A). Four dispersant constituents were analyzed during the DWH oil spill response:

- 2-Butoxyethanol
- Dipropylene Glycol n-Butyl Ether (DPnB)
- Propylene Glycol
- Dioctylsulfosuccinate (DOSS)

These compounds represent major constituents of COREXIT, including those with known toxicology data, and also those with newly established analytical methods. Each of these

13

compounds is also subject to wide commercial use in other products beyond COREXIT. If a benchmark was exceeded, then the potential for other sources of the chemical were also evaluated.

## 2.9   Hypoxia

Dissolved oxygen was measured in the deepwater zone as part of the sub-surface sampling program beginning in early May. Concern was raised early in the spill that biodegradation of hydrocarbons in the deep dispersed plume would consume dissolved oxygen, potentially decreasing concentrations to levels that could threaten aquatic life (i.e., hypoxia). Hypoxic conditions are generally agreed to occur when dissolved oxygen falls below 2 mg/L (1.4 ml/L).

## Section 3: Nearshore Sampling Results

### 3.1    Description of Sampling and Monitoring Activities in the Nearshore Zone

The nearshore sampling zone is defined as waters inshore of the 3-nmi state waters boundary (Strategic Plan). Qualitative and quantitative data were analyzed to evaluate the distribution and concentration of 1) any remaining oil and oil-related compounds, 2) dispersant-related chemicals, and 3) any associated by-products in this zone.

A number of qualitative observational programs were designed to identify and delineate sub-surface oil in nearshore areas. Water column detection tactics included snare sentinels, sorbent pads, VIPERS (Vessel with Intrinsic Petroleum Ensnaring and Recovery Systems), and snare drag trawls. The snare sentinel and sorbent pad drop programs provided observations at discrete locations at multiple water column depths. Conversely, the VIPERS and snare drag trawl programs were dynamic, and the observations were reported along a cumulative trawl distance. Ponar[1] samples were used to qualitatively assess the presence or absence of oil in sediment samples. When potential oil was encountered using these investigative methods, samples were collected for further laboratory chemical analysis. These observational programs are described in more detail in the Strategic Plan and in Section 3.4.

Water and sediment samples were collected (Maps 7.2a/b; Fig. 3.1) in the nearshore zone at multiple sites for quantitative analysis of oil and oil-related compounds, dispersants, or by-products. The main nearshore sampling efforts were conducted by the EPA, the U.S. Geological Survey (USGS), and the Center for Toxicology and Environmental Health (CTEH; a BP contractor), with additional samples provided by other federal and state agencies. The nearshore sampling plan was designed to determine if the spill had contaminated the sediments and surface waters with oil-related products and/or dispersant-related chemicals. A full description of the derivation of the sampling plan can be found in the Strategic Plan (or see Appendix E.4 for a brief description).

---

[1] A sediment grab sampler

*Figure 3.1. Total number of nearshore water samples collected between 30 April and 18 October, plotted by state and month.*



## 3.2    Fisheries Closures

Fishery closures and re-openings in the nearshore zone are controlled by state agencies. States relied on federal and state testing and FDA recommendations to determine whether fisheries should re-open.

*Florida*[1] – On 16 June, Florida Fish and Wildlife Commission (FL-FWC) closed all fisheries (except oysters) located between the FL-AL state line and Pensacola Beach as a precautionary response to the DWH oil spill. FL-FWC re-opened the finfish fishery on 31 July, the shrimp fishery on 17 August, and all remaining fisheries on 15 September.

*Alabama*[2] – Alabama Marine Resource Division (AL-MRD) of the Alabama Department of Conservation and Natural Resources (AL-DCNR) closed both recreational and commercial fisheries when visible oil moved into coastal waters within the nearshore zone. On 1 June, state waters south of Dauphin Island between Mobile Pass and the AL-MS state line out to 3 nmi were closed. On 4 June, waters east to the AL-FL state line were also closed. Mississippi Sound waters were closed between Dauphin Island Bridge and AL-MS state line on 10 June. As of 6 September, all commercial and recreational fisheries in AL state waters were re-opened with the exception of public oyster reefs, which were closed for rehabilitation purposes.

---

[1] http://myfwc.com/OilSpill/index.htm
[2] http://www.dcnr.state.al.us/fishing/saltwater/dh/Timeline.cfm

*Mississippi*[1] – Mississippi Department of Marine Resources (MDMR) closed both recreational and commercial fisheries when visible oil moved into coastal waters within the nearshore zone. On 1 June, MDMR closed all recreational and commercial fisheries in state waters in Mississippi Sound as a pre-cautionary measure. By 1 July, MDMR had closed all state coastal waters to both recreational and commercial fisheries. On 30 July, MDMR re-opened all intra-coastal waters to recreational and commercial finfishing and shrimping. By 21 August, all finfish, shrimp, and blue crab fisheries were re-opened. FDA declared oyster tissue from Mississippi state waters safe to eat on 25 August. MDMR opened oyster beds to harvesting in select waters on 8 and 20 November.

*Louisiana*[2] – Louisiana Department of Wildlife and Fisheries (LA-DWF) began closing fisheries on the 28 – 29 April as precautionary measures to prevent the harvesting of oil-tainted or oiled finfish, shrimp, or crabs. The delineation of fisheries closures in LA was complex due to the geomorphology of the coastline and the numerous back-barrier and open-water bays. Many of the fisheries were closed between May and August. Re-openings also occurred during this period; detailed time-series maps of opening and closures are provided at the LA-DWF website. As of 8 November, 98.5% of state waters have been reopened for commercial fishing.

## 3.3    Reference Stations and Pre-Impact Data

The OSAT reviewed sample data from the Mussel Watch program to establish reference conditions for oil-related compounds that may have been present prior to the MC252 spill. Since 1986, NOAA's Mussel Watch program has consistently studied and monitored 300 sites around the country for over 100 organic and inorganic pollutants in sediments, oysters, and mussels. The Mussel Watch dataset that the OSAT used for the Gulf coast included data from 1989 - 2007 at 98 unique locations (Fig. 2.1). Only 1 of the 163 total Mussel Watch sediment samples considered exceeded the chronic aquatic life benchmark. This sample was collected offshore of Pensacola and had a classic pyrogenic signature (Appendix D). The chronic aquatic life ratios for Mussel Watch ranged from $1.4 \times 10^{-5}$ to 1.26, with an average ratio of 0.020.

Pre-impact sediment samples were collected in the nearshore zone at multiple locations before landfall of oil associated with the DWH oil spill. Pre-impact samples refer to samples collected before 15 May for LA and 1 June for AL/MS/FL. These dates approximate the point in time when visible oil reached the shoreline in these different areas. A total of 239 pre-impact sediment samples were collected in April and May, of which 96 samples had detected oil-related organic compounds. The chronic aquatic life ratios for pre-impact data ranged from 0 to 8.5, with an average of 0.13 across all samples. For comparison to post-impact data, an average chronic aquatic life ratio equal to 0.084 is used, which was computed from all Mussel Watch and pre-impact data for the Gulf coast.

---

[1] http://www.dmr.state.ms.us/
[2] http://www.wlf.louisiana.gov/oilspill/actions

## 3.4     Qualitative Observations of Oil

Various qualitative methods were used to determine if oil was present in the sub-surface environment. These activities were conducted by the two primary Incident Command Posts (ICPs) in Mobile, AL and Houma, LA; the two ICPs had defined areas of responsibility (AORs). With respect to the nearshore sampling zone, the Mobile ICP conducted qualitative sampling programs in MS, AL and FL, whereas the Houma ICP conducted programs in LA.

Several qualitative programs were designed to detect the presence of oil in the water column. In the Mobile AOR, VIPERS trawled 266 nmi along the 3 nmi state waters boundary from Cat Island, Mississippi, to Bay County, Florida between 22 August and 9 September. Only one small tar ball was recovered near Panama City, FL, on the 24 August and source characterization analysis indicated it was inconsistent with MC252 (Appendix D).

Sorbent probes were also utilized at 5,880 sites in MS, AL and FL to identify potential oil in the water column. Potential oil presence was noted at six sites in the MS Sound. Follow-up (analytical) water samples collected in these areas did not detect oil. Oil was observed on 4 poms from a total of 108 snare drag trawls along 164 nmi in Breton Sound on 14–15 August. The 4 poms were collected from the same general area, and analytical results indicated weathered MC252 oil equivalent to a total of 10 mg/L of oil. No oil was detected during snare drag trawls conducted in Barataria Bay on 18–30 August.

Between 25 August and 12 September, 148 snare sentinels were deployed along the shorelines of Mississippi, Alabama, and Florida; 16 snares were reported as "very lightly oiled". The snares along with 36 water samples and 5 sediment samples collected near these snares were submitted for analysis. Forensic fingerprinting results from all 16 snare samples were interpreted as "unlikely Macondo (MC252 oil) derived" (Snare Sentinel Summary Report, 25 September). Analyses of Oil Range Organics (OROs), Volatile Organic Compounds (VOCs), Semi-Volatile Organic Compounds (SVOCs), Nickel, and dispersant indicators in water samples were below minimum detection limits. Diesel Range Organics (DROs) were detected in 2 of 36 water samples at concentrations ranging from 49.7 to 56.0 µg/L. Vanadium was present in 31 of 36 water samples at a maximum concentration of 76 µg/L, well below the 5400 µg/L USEPA Human Health Benchmark for a Child Swimmer. Fingerprint analyses determined that 1 of the 5 sediment samples was identified as MC252 oil. The remaining four sediment samples were determined to be "unlikely Macondo (MC252 oil) derived." The Mobile ICP Operations Unit concluded that no recoverable amounts of oil were identified using this procedure.

Within the Houma AOR, 449 locations were occupied using a similar snare sentinel program between 28 July and 2 October (UAC Snare Summary Report, 30 November). Sites spanned the nearshore region from Caillou Bay east to Chandeleur Sound. Oiled surface snares were recovered from four regions: Timbalier Bay, Barataria Bay, Chandeleur Sound and off the Mississippi River Delta. Oiled bottom snares were recovered from Barataria Bay and Timbalier Bay. Out of 6,911 observations, 40 snare sentinel at 32 unique locations were reported as oiled (26 top, 12 middle and 21 bottom). The most recent surface detection was 31 July in Barataria Bay, and the most recent sub-surface detection was 20 September in Barataria Bay. All observations of sub-surface oiling were located off

previously oiled shorelines. Based on these data, the OSAT inferred that future detection of sub-surface MC252 oil by Snare Sentinels would most likely be due to remobilization of oil already present in the nearshore environment (i.e., in known regions of heavily oiled shoreline), and on 18 October recommended phasing out the Louisiana Snare Sentinel program (Appendix F.10).

To assess oil presence in bottom sediments, samples were collected at 2066 sites using a stainless steel Ponar grab sampler in the Mobile AOR. The bottom material was visually inspected for the presence of oil. If oil presence was suspected, then a representative sample was sent for laboratory analysis. Based on visual inspection, 32 sediment samples were sent for laboratory analysis. Three samples collected on the back side of barrier islands near Pensacola, FL contained detectible oil concentrations.

The three sites confirmed to have oil present in sediments by Ponar surveys, are consistent with one of the regions identified by SCAT teams as potentially having submerged tar mats. Early on during the response, the possible formation of tar mats (i.e. submerged sedimented oil) in the nearshore region was recognized (see NOAA-ORR, 2010 for a description of how they form). The OSAT noted that a data gap may exist since the assessment programs were generally unable to monitor in waters shallower than ~10 feet. Submerged tar mats have been identified in some areas from the lower intertidal zone out to the super low tide zone by SCAT teams. Tar mat locations have been directly observed by SCAT teams using snorkeling equipment. Location of tar mats have also been inferred from observations of shoreline tar ball re-oiling. Currently, SCAT teams are monitoring these known sites and operational clean-ups will occur if shoreline re-oiling is observed.

## 3.5    Comparison to Human Health Benchmarks

A total of 6090 water samples were considered for comparison to the Human Health Benchmarks. (Table 3.1, Map 7.6). None of samples exceeded the EPA benchmark for human health (child swimmer scenario).

## 3.6    Comparison to Aquatic Life Benchmarks

Chronic and acute aquatic life ratios were calculated for all samples (water and sediment) from the nearshore zone in which PAH compounds were analyzed. Of total 6701 samples, the full suite of analytes was quantified for 511 samples (7.6%). In most of the samples only the parent PAHs were quantified. The OSAT recognized this issue soon after they began reviewing the dataset and made a recommendation that all future samples be analyzed for the complete set of analytes (20 September, Appendix F). Therefore, many of the more recent samples were analyzed for the full suite of PAHs. These samples are the most essential for determining post-impact environmental conditions. However, where only the 16 parent PAHs were reported, mulitpliers were used to account for the missing alkylated PAHs (Appendices A.3, C.3).

A total of 41 nearshore water benchmark exceedances were observed throughout the incident (Maps 7.4a/b. Fewer benchmark exceedances were observed in EPA Region 6 (LA and TX; Fig. 3.2) than in EPA Region 4 (AL, MS, and FL; Fig. 3.3). Of these exceedances, 13

19

samples were of indeterminate origin, 19 were considered not consistent with MC 252 oil, and 9 were deemed consistent with MC252. No water benchmark exceedances measured after 3 August were consistent with MC252 oil (Table 3.2).

*Figure 3.2. Temporal distribution of chronic aquatic life ratios for PAHs in Region 6 (LA and TX) nearshore water samples. Red circles indicate samples that exceeded the chronic aquatic life benchmark and yellow circles indicate exceedance samples that were not consistent with MC252 oil. The blue dotted line corresponds to the aquatic life benchmark of 1. The date tick mark in all figures corresponds to the first of the month.*



Figure 3.3. Temporal distribution of chronic aquatic life ratios for PAHs in Region 4 (AL, MS, and FL) nearshore water samples. Symbols are the same as in Fig. 3.2.



A total of 24 nearshore sediment benchmark exceedances were observed throughout the incident (Maps 7.5a/b). As with water, fewer sediment benchmark exceedances were observed in EPA Region 6 (TX and LA; Fig. 3.4) than in EPA Region 4 (AL, MS, and FL; Fig. 3.5). In EPA Region 4, some of the samples indicating pre-impact sediment benchmark exceedances did not have enough information to determine oil source since only the 16 parent PAHs were measured. In the absence of additional information, these were included as MC252 exceedances, although they occurred before MC252 oil was observed to have been present in the nearshore zone in this region (red dots prior to 1 June in Fig. 3.5). Of the total exceedances, 9 samples were of indeterminate origin, 11 were considered not consistent with MC252, and 4 were consistent with MC252. All exceedances after 3 August were inconsistent with MC252 oil (Table 3.2).

Chronic aquatic life ratios for sediments were also compared to the average ratio for pre-impact and reference samples. This average ratio, which will be referred to here as the "reference ratio", equaled 0.084 (Section 3.3). After 3 August, all sediment samples collected in both Regions 4 and 6 (Figs. 3.4 and 3.5) had ratios that were, on average, below the reference ratio. By the end of sampling in October, all sediment samples were below the reference ratio, indicating that pre-impact average concentrations had been reached.

Figure 3.4. Temporal distribution of chronic aquatic life ratios for PAHs in Region 6 (LA and TX) nearshore sediment samples. Symbols are the same as in Fig. 3.2. The green line corresponds to the average chronic aquatic life ratio in reference and pre-impact samples.



*Figure 3.5. Temporal distribution of chronic aquatic life ratios for PAHs in Region 4 (AL, MS, and FL) nearshore sediment samples. Symbols are the same as in Fig. 3.2. The green line corresponds to the average chronic aquatic life ratio in reference and pre-impact samples.*



Table 3.1. Summary of water and sediment analytical chemistry results in the nearshore zone. Datasets were compared to human health benchmarks, aquatic life benchmarks, and dispersant screening levels. For each benchmark (or screening level), total numbers of samples that were non-detect, below benchmark, or exceeded the benchmark were computed. The total number of samples is not the same for the human health, aquatic life, or dispersant categories because not all samples were analyzed for all analytes.

| | | | | |
|---|---|---|---|---|
| **Water Column** | Non-detect | 3405 | 5337 | 4790 |
| | Below Benchmark | 2685 | 395 | 60 |
| | **Exceed Benchmark** | 0(0)* | 41(22)* | 0 |
| **Sediment** | Non-detect | n/a | 671 | 406 |
| | Below Benchmark | n/a | 441 | 6 |
| | **Exceed Benchmark** | n/a | 24(13)* | n/a |
| **Total Samples** | | 6090 | 6909 | 5262 |
| **Total Exceedances** | | 0 | 65(35) | 0 |
| **Percent of Exceedances** | | 0% | 0.94% | 0% |
| **Total Exceedances After 3 August** | | 0 | 11(0) | 0 |

*The number in parentheses refers to exceedances consistent with MC252 oil or indeterminate.

*Source characterization of exceedances*

Any water or sediment sample that exceeded the aquatic life benchmark was examined in detail to assess the likelihood that the exceedance was due to MC252 oil (Table 3.2; see Appendix D for source characterization process). The majority of samples that were not consistent with MC252 were from pyrogenic sources (combustion related).

24

*Table 3.2. List of aquatic life benchmark exceedances for water and sediments in the nearshore zone after 3 August. Details are listed for each exceedance including the source of the oil, identified as follows: (1) consistent with MC252 oil, (2) not consistent with MC252 oil, and (3) indeterminate. Highlighted rows indicate sediment samples; non-highlighted rows indicate water samples.*

| | | | | | |
|---|---|---|---|---|---|
| 8/7/10 | Chronic | 29.41648 | -90.04369 | T007-1331-100807-SD-1 | 2 |
| 8/12/10 | Chronic | 29.65621 | -92.82204 | T008-0029-100812-SD-1 | 2 |
| 8/16/10 | Acute | 29.68642 | -84.78892 | BCH11-SW-201008 | 2 |
| 8/23/10 | Chronic | 29.31747 | -94.79753 | SL-20100823-SR3-002 | 2 |
| 9/5/10 | Chronic | 29.72568 | -88.98950 | T001-R678-100905-SD-1 | 2 |
| 9/5/10 | Chronic | 29.87817 | -88.88842 | T001-R680-100905-SD-1 | 2 |
| 9/11/10 | Acute | 30.37534 | -88.60680 | WPR1-SW-09112010 | 2 |
| 9/12/10 | Chronic | 30.60264 | -87.94630 | UpMB-SW | 2 |
| 10/4/10 | Acute | 30.31314 | -86.12028 | SBFL1004SW0103 | 2 |
| 10/4/10 | Acute | 30.32568 | -87.17510 | PEL1004SW0103 | 2 |
| 10/7/10 | Chronic | 28.99191 | -89.14442 | SW-20101007-USGSLA1-LA-35-003_LLI | 2 |

*Source = "consistent with MC252 oil (1), "not consistent with MC252 oil" (2), "indeterminate" (3)

## 3.8    Comparison to Dispersant Benchmarks

While dispersants were not used in the nearshore sampling zone as part of the response, there were concerns that dispersant-related chemicals could be transported into the nearshore zone. Sediment and water samples collected in the nearshore zone were analyzed for a number of dispersant-related chemicals, including, but not limited to DPnB, Propylene glycol, and DOSS (Appendix A.1). Between 13 May and 20 October, 4850 water and 412 sediment samples were collected in the nearshore zone (Table 3.1). None of the concentrations of dispersant-related chemicals found in water samples collected during the response exceeded the benchmarks. Only 66 samples (60 water and 6 sediment) had detectable levels of dispersant-related chemicals. DPnB was the most common detectable dispersant-compound and was found in 57 of the 60 water samples; however, concentrations never exceeded 3 µg/L (cf. EPA screening level 1 mg/L). Presence of dispersant-related chemicals in water occurred all along the Gulf coast; however, a majority of the nearshore detects were encountered around LA (Map 7.7). The most recent detect for the water samples was 18 October. Propylene glycol was the only dispersant-related chemical detected in the sediments (Map 7.8). Unfortunately, no benchmark for dispersant indicator compounds in sediment exists, thus the significance of these concentrations is unknown. The most recent detect for sediments occurred in a sample collected on 28 September.

25

## Section 4: Offshore Sampling Results

### 4.1    Description of Sampling and Monitoring Activities in the Offshore Zone

The offshore sampling zone is defined as the geographic region between the state water's boundary and the 200 m bathymetric contour, which delineates the continental shelf break (Map 7.1). This region was identified as a sampling gap (particularly for sediments) in the Strategic Plan: prior sub-surface sampling had primarily been conducted in the deep-water and nearshore zones.

This zone was targeted for sampling by two main programs (see Map 7.3 for stations with analytical data available for this report). The first sampling program, the Fate of Oil Research Team (FORT) conducted water sampling (CTD rosette) and sediment sampling (grab sampler) on 15 cross-shelf transects from east of the Mississippi River Delta (offshore of Breton Sound) west to Port Arthur, TX (alongshore spacing of the transects increased west of Houma, LA. FORT resulted in 240 water samples and nearly 60 sediment samples from late August through mid-October.

The second sampling program was the offshore component of the response's sub-surface monitoring program (Operational Annex). This sampling program collected 93 sediment samples. Water sampling at discrete depths was co-located with a subset of the sediment sites (40 water samples were taken). The sampling strategy identified sampling locations with the highest potential for oil to be found in sediments based on the intersection with the freshwater convergence zone of the Mississippi River, the locations of aerial dispersant applications, and the movement of oil based on currents. Once targeted sample locations were determined, additional statistically based samples were added to ensure statistical rigor (see the Strategic Plan and Operational Annex). Most of the sediment samples were taken with a multi corer. Shallow areas and areas with sand or shell bottom were sampled with a sediment grab or a box corer.

In addition to the response sampling, NOAA also provided samples for analysis that were collected during a cruise for "The Regional Assessment of Ecosystem Condition and Stressor Impacts" along the Northeastern Gulf of Mexico Shelf aboard the NOAA Ship R/V *Nancy Foster* (August 12–22). This cruise sampled for a variety of parameters, but only the data applicable to the response were analyzed. Included in this dataset were 50 sediment samples taken during the cruise.

At the time of this report approximately 700 water and 250 sediment samples in the offshore sampling zone had been analyzed and published to Scribe (see Table 4.1 for the sample count breakdown by indicator; Map 7.3 shows the geographic coverage). The distribution of the water sampling with depth is detailed below (Fig 4.1). Most of the sampling was in the upper 50 m of the water column and occurred after 3 August, i.e. as a component of the comprehensive sub-surface sampling efforts stemming from the NIC directive.

Figure 4.1 Offshore water sample locations as a function of depth. The black dot in the top panel denotes the wellhead location.



## 4.2    Fisheries Closures

At its peak, 37% of Gulf waters (88,522 mi$^2$) were closed to fishing on 2 June due to the DWH oil spill. Prior to re-opening, fish samples in all areas went through sensory testing and analysis for PAH chemical contaminants. After an extensive consultation with the FDA, NOAA re-opened approximately 26,388 mi$^2$ on 22 July at the southern extent of the federal closed area (Fig. 4.2). Additional shelf areas were re-opened in August and early September, extending from western Louisiana through the Florida panhandle. On 21 September, NOAA re-opened 7,970 mi$^2$ of Gulf waters to recreational and commercial fishing along the southern boundary of the federal closed area. Most remaining areas were re-opened during October and November as per the order shown in Fig. 5.2. However, on 24 November one of the re-opened areas was closed again when tarballs were found in nets with Royal Red Shrimp. Currently, 4,213 mi$^2$ remain closed to Royal Red shrimping in an area covering portions of the OSAT's offshore and deep-water zones. Several vessels have been investigating this region further, performing trawls of the seafloor. Findings thus far have been of a few tarballs from several of the grids, generally less than 2 inches in diameter. Tarballs were described as not-sticky (in that they did not adhere to the nets). The origin of these tarballs has not yet been determined.

*Figure 4.2. A square region around the wellhead remains closed to all fishing (red box), and another region north and west of the wellhead was closed on 24 November to Royal Red shrimping (gray area).*



## 4.3    Reference Stations

An MMS study by Turner et al. (2003) focused on the Louisiana Bight region west of the Mississippi River Delta of the Mississippi River. Concentrations of PAHs in sediment cores ranged from 5.5 ng/g to 1200 ng/g (average 154 ng/g). The acute and chronic aquatic life ratios were calculated for the samples taken from the top 1 to 5 cm of each core (a TOC value of 1% was used in the calculation). No samples exceeded the acute or chronic aquatic life benchmarks. The average value of the chronic aquatic life ratios from these cores was used as the reference level in the figures below.

## 4.4    Qualitative Observations of Oil

Sediment cores and grabs collected in the offshore sampling zone were initially inspected for visual or olfactory indications of oil. These qualitative sensory inspections gave real-time preliminary indications of where oil contamination of sediments might have occurred. These results were used to inform the sampling plan and to make any adaptations to address areas of potential concern. Several cores from stations in the vicinity of the Mississippi River freshwater convergence zone showed qualitative indications of oil. The OSAT recommended additional sediment sampling in this region to ensure adequate coverage in the event that analytical results confirmed presence of MC252 oil in these samples (OSAT Recommendation, 19 October, Appendix F.11).

28

## 4.5   Comparison to Aquatic Life Benchmarks

Chronic and acute aquatic life ratios were calculated for all samples in which PAH compounds were analyzed (Maps 7.4a and 7.4b; Table 4.1). In the offshore sampling zone, the majority of the samples (~70% of water samples and 90% of sediment samples) were analyzed for the full suite of analytes (parent PAHs and alkylated PAHs). However, the analyses for the volatile organic compounds (e.g. benzene, toluene, ethylbenzene and xylene) were given a different sample name and it was not possible to match up the samples within Scribe and hence they were not included in the aquatic life ratio calculation (for more information on this problem and its implications see Appendices C.1 and C.5, respectively). Any water or sediment sample that exceeded the aquatic life benchmark was examined in detail to assess the likelihood that the exceedance was due to MC252 oil (see Appendix D for source characterization process).

*Figure 4.3 Chronic aquatic life ratio in water samples as a function of time. Red dots above the dashed line exceed the chronic aquatic life benchmark. The six exceedances are near surface (~1 m) samples.*



Six water samples in the offshore sampling zone exceeded the EPA chronic aquatic life benchmark. One of these six also exceeded the acute aquatic life benchmark. All six were near-surface samples (~1 m) collected in May and June (Fig. 4.3). Five of these samples were collected in association with the Dispersant Environmental Effects Project (DEEP;

29

Appendix C.11) which targeted regions of observed surface oil before and after dispersant application. No samples exceeded the benchmark after 3 August.

In sediment samples, none of the samples exceeded the EPA chronic aquatic life benchmark in the offshore zone (Maps 5a and 5b; Fig. 4.4; Table 4.1). There were very few sediment samples in this zone prior to the sub-surface sampling efforts that occurred in late-August through October, however, comparison with the average chronic aquatic life ratio calculated from the reference dataset (Section 4.3), indicates most of the samples have ratios that are below this level.

*Figure 4.4 Chronic aquatic life ratio in sediment samples as a function of time. There were no exceedances of the chronic aquatic life benchmark. The green line corresponds to the average chronic ratio at offshore reference stations.*



*Table 4.1. Summary of water and sediment analytical chemistry results in the offshore zone. Datasets were compared to benchmarks for human health, aquatic life, and dispersant chemicals. For each benchmark, total numbers of samples that were non-detect, below benchmark, or that exceeded the benchmark were computed. The total number of samples is not the same for the human health, aquatic life, or dispersant analyses because not all samples were analyzed for all analytes.*

|  |  |  |  |  |
|---|---|---|---|---|
| **Water Column** | Non-detect | 508 | 192 | 241 |
|  | Below Benchmark | 242 | 283 | 199 |
|  | **Exceed Benchmark** | 0(0)* | 6(6)* | 0 |
| **Sediment** | Non-detect | n/a | 61 | 242 |
|  | Below Benchmark | n/a | 207 | 1 |
|  | **Exceed Benchmark** | n/a | 0 | n/a |
| **Total Samples** | | 750 | 749 | 682 |
| **Total Exceedances** | | 0 | 6(6) | 0 |
| **Percent of Exceedances** | | 0% | 0.80% | 0% |
| **Total Exceedances After 3 August** | | 0 | 0 | 0 |

*The # in parantheses refers to exceedances consistent with MC252 oil.

*Table 4.2. List of aquatic life benchmark exceedances for water and sediments in the the nearshore zone after 3 August. Details are listed for each exceedance including the source of the oil, identified as follows: (1) consistent with MC252 oil, (2) not consistent with MC252 oil, and (3) indeterminate.*

| Sample Date | Type of Exceedance | Sample Location | Sample ID | Source |
|---|---|---|---|---|
| NONE | NONE | | | |

## 4.6    Comparison to Dispersant Benchmarks

There were no exceedances of the dispersant-related chemicals benchmarks in the offshore sampling zone. Approximately half the samples in the offshore zone had detections of dispersant-related chemicals in water samples (199/440). Figure 4.5 shows the concentration of DPnB in water samples collected in the offshore zone over the course of the response. In sediment samples, there was only one detect of a dispersant-related chemical out of 243 samples.

31

*Figure 4.5 DPnB concentration over time. Note that no samples exceeded the benchmark.*



## Section 5: Deep-Water Sampling Results

### 5.1    Description of Sampling and Monitoring Activities in the Deep-water Zone

The deep-water zone is defined as the region seaward of the 200-m bathymetric contour (approximately the continental shelf break; Map 7.1). Beginning in May 2010, extensive water sampling in this zone was conducted by private, federal, and academic scientists.

Water samples were collected by a number of vessels (NOAA, BP contract, and academic) operating both in the vicinity of the wellhead and in the far field (Map 7.3). Conductivity/temperature/depth (CTD) casts—vertical profiles measuring physical and chemical water properties—were conducted by most of the sampling vessels operating in the deep-water zone. The CTD sensor array typically included a dissolved oxygen sensor and a fluorometer for qualitative screening of hydrocarbon signatures. Water samples collected at discrete depths were analyzed for a number of parameters, including oil chemistry, dispersant indicators, and toxicity to rotifers and luminescent bacteria (data to be presented as a addendum to this report). Analytical data were uploaded to the Scribe database for comparison with water-quality benchmarks for the deep-water zone (Section 2). The distribution of analytical data available in Scribe is shown with respect to depth and distance from the wellhead in Figure 5.1.

*Figure 5.1. Distribution of analytical data for deep-water sampling zone. Data spans the period from 9 May through 16 October. Different colors denote sampling through and since 3 August.*



Early in the response, observations from vertical profiles within approximately 30 km of the wellhead identified a signature of dispersed oil droplets in a depth range of 1100–1300 m. Much of the subsequent work in the deep-water zone focused on delineation and characterization of this sub-surface plume. From mid-July onward, a mission guidance program provided coordination, allowing for the multiple vessels to more efficiently and effectively sample the deep water and to create a 4D image of dispersed oil in the sub-surface. To coordinate and direct the sampling, mission guidance was kept informed by daily reports from Chief Scientists in the field, real-time analysis of data, knowledge of ocean currents, and predicted fate and transport of dispersed/dissolved oil from trajectory models. Further review of data for the sub-surface plume showed that it was generally confined to a specific density layer defined by potential density 1027.70–1027.71 kg/m$^3$.

Sub-surface monitoring, trajectory models, and ocean current data indicated that the overall movement of the sub-surface plume would be primarily along bathymetric contours to the southwest. A significant water-sampling effort effectively characterized the plume as it moved to the southwest; this sampling spanned the along-shelf region from the wellhead out to 500 km to the southwest and 200 km to the northeast. However, sampling was not temporally linked to strong current reversals, particularly to the NE when movement into that region would occur. In late September, after analysis of recent results and comparison with water-quality indicators, the OSAT recommended that further far-field water sampling of the dispersed oil plume was no longer necessary as part of the response (OSAT recommendation 1, 20 September 20, App. F).

As much of the sampling in August and September had focused on delineating this deep plume as it moved to the southwest, observations since July in the vicinity of the wellhead were limited. As part of the Strategic Plan, the OSAT recommended a limited number of stations in the near-field be resampled (20 September, App. F.1). Many of these stations had been sampled very early in the spill and indicated oil presence. These stations were revisited in late September.

At the time of this report, approximately 4000 water and sediment samples from the deep-water zone had been analyzed and published to the Scribe database (Map 7.3; Fig. 5.1; Table 5.1). Due to the evolution of sampling described above, the bulk of the samples from May through early August are in the near-field vicinity of the wellhead, whereas the bulk of the samples from August and September are primarily to the southwest. In September, water sampling in the deep-water zone was limited to the near-field stations mentioned above.

The need for sediment sampling in the deep-water zone was identified as a sampling gap in the Strategic Plan. This sampling was undertaken beginning in late September. Samples were collected using a Mega Corer in the near field around the wellhead, and in the far field toward the northeast and southwest (in the along-shelf direction). Sediment cores (Map 7.3) were analyzed for oil chemistry and microtox toxicity.

34

## 5.2    Fisheries Closures

Many of the fishery closure areas span both the offshore and deep-water zones, and were discussed earlier in Section 4.2. A deep-water fisheries area that has yet to be re-opened is a square region around the wellhead that is approximately 30x30 nmi in size (1041 mi$^2$) (Fig. 4.2). One factor determining the re-opening of this region is the decontamination of the M/V *Discoverer Enterprise* drillship in deep water, which is currently in process.

## 5.3    Reference Stations

Reference stations for sediments in the deep-water zone were obtained from two historical MMS studies. The 2009 MMS study (Rowe and Kennicutt, 2009) was part of the Deep Gulf of Mexico Benthos (DGoMB) project and resulted in the collection of sediment samples at 67 different locations, during 2000–2002 (Fig. 2.1). The sediment PAH values were in the range of 0 to 1033 ng/g (mean of 139.5 ng/g). The acute and chronic ratios for comparison to EPA's aquatic life benchmarks were calculated for these samples, and all ratios were well below the benchmark of 1 (ranging from 0.0011 to 0.1881 for the chronic ratio).

The 2006 MMS study (Continental Shelf Assoc., 2006) measured sediment PAHs at 45 locations in four distinct lease blocks (Viosca Knoll Block 916, Garden Banks Block 516, Garden Banks Block 602, and Mississippi Canyon Block 292) during 2000–2002 (Fig. 2.1). Sediment PAH values ranged from 11.8 to 23,840 ng/g (with a mean of 801.5 ng/g). The mean PAH concentration across all deep-water sediment samples was 596 ng/g. Both of the MMS 2006 and 2009 studies measured numerous parameters in addition to sediment PAHs, including metals, meio/macrofauna, bacterial activity, and sediment toxicity.

## 5.4    Qualitative Observations of Oil

Fluorometers were deployed concurrently with CTD and dissolved oxygen sensors to delineate areas of potential sub-surface oil by detecting the presence of dissolved organic compounds in the water column or very finely dispersed oil droplets (generally <60 μm). The fluorometer does not identify specific compounds or distinguish the sources of organic material. However, the intensity of fluorescence is influenced by the presence of specific compounds and the excitation wavelength of the ultraviolet light source. Therefore, fluorometry is a screening tool that estimates the level of oil in the water, but it is not a standalone method for accurately measuring oil concentration.

Sub-surface monitoring in the near field around the wellhead initially identified the sub-surface plume as a relative increase in background fluorescence between 1100 m and 1300 m, measured with a Chromophoric Dissolved Organic Matter (CDOM) fluorometer. Fluorescence, though not a quantitative measurement of hydrocarbon concentration, was found to correlate very strongly with PAH concentrations in the deep water. The same study measured PAH concentrations in this layer around the wellhead of up to 189 ppb in May, resulting in large spikes in fluorescence intensity (Diercks et al., 2010). Fluorescence remained a valuable screening tool throughout the response, providing a rapid indication of potential dispersed oil in the water column. After the well was capped on July 15, the fluorometry signal began to attenuate. By September, many vessels began using the Chelsea Aquatracka, which was shown to be more sensitive for MC252 oil.

The R/V *Pisces* cruise that performed water sampling in late September near the wellhead also detected fluorometric anomalies (signal spike) at a depth consistent with previous observations of the sub-surface plume using an Aquatracka. As per OSAT Recommendation 2 (September 20, App. F.1), the R/V *Pisces* returned to the area to collect water samples for chemistry measurements. As of the writing of this report, the analytical chemistry results from this cruise were still not published to the Scribe database. However, preliminary communication with LSU labs (Scott Miles, pers. comm.) indicated that all PAH samples were below detection limits. Thus, it appears that PAH concentrations have significantly decreased around the wellhead since the previous sampling in mid-July, when exceedances of benchmarks were still being observed.

Response sediment sampling in deep-water zone was primarily conducted using a multi corer on the vessels R/V *Gyre* and R/V *Ocean Veritas*, with a smaller number of samples collected using a grab sampler. In total, for the deep-water zone, qualitative results from multi corer sampling were obtained for 64 sediment samples from the R/V *Gyre* and 56 samples from the R/V *Ocean Veritas*, for a total of 120 samples (Fig. 5.2). These samples were analyzed for qualitative indications of oil, including both visual and olfactory inspection. Based on qualitative indicators, 29% of the 115 deep-water sediment samples showed potential indication of contamination by oil. Note that based on *quantitative* results 6% of the 115 sediment samples exceeded aquatic life benchmarks, as will be discussed in Section 5.7. Qualitative comments of possible oil contamination ranged from "thin layer of oil sheen on supernatant water surface" to "oil in sediment with slight oil smell." Example pictures are shown (Fig. 5.3) of R/V *Gyre* sediment cores for which MC252 oil was confirmed in the sample. A fluffy, brown, flocculated layer was reported in the upper part of some cores, which differs in color from the grayer drilling muds. This flocculated layer likely includes contributions from organic detritus sinking out of surface waters, including for example, algal flocs and zooplankton fecal material. Historical data from MMS (2003) similarly shows an upper flocculated layer in sediment cores in Viosca Knoll, next to Mississippi Canyon.

Qualitative observations from two academic cruises were also reviewed by the OSAT (Fig. 5.2). Note that, as of this report, quantitative sediment results from these academic cruises were not yet available, so qualitative assessments of oil have not been fingerprinted. Dr. Samantha Joye (UGA) shared qualitative results with the response from the R/V *Oceanus* academic cruise (21 August to 16 September; Fig. 5.2). They found indications of oil at 10 of the 14 sites they sampled, with thicker layers of potential oil-entrained sediments found all the way out to 37 km from the wellhead. Dr. Kevin Yeager (USM) was chief scientist on the R/V *Cape Hatteras* academic cruise (10-17 October; Fig. 5.2) that also collected sediment samples. He teleconferenced with the OSAT and discussed qualitative results from their samples. They observed 6 stations within ~20 km of the wellhead with some indication of oil (fingerprinting pending). The two stations with particularly strong indications of oil were within 5 km of the wellhead. All samples indicated that oil was sediment-entrained and not in liquid form (free-phase). Response sampling conducted under the Operational Annex re-visited many of these sampling sites between 22 September and 23 October. Sediment samples collected on these response cruises found MC252 oil present at levels of concern (i.e., levels that exceed aquatic life benchmarks) extending as far as 3 km from the

36

wellhead (Section 5.7). The aquatic life ratios approach reference levels within ~10 km from the wellhead.

A recent NOAA-BOEMRE cruise on the NOAA Ship *Ronald H. Brown* from 14 October to 4 November noted stressed deep water coral at a location approximately 11 km southwest of the wellhead location. As part of the response Implementation Plan, sediment cores were taken that surrounded both the wellhead location and the stressed coral location. Although there were detectable oil-related compounds in the sediments of that immediate area, concentrations of oil-related compounds in these samples did not exceed aquatic life benchmarks (Fig. 5.2).

*Fig 5.2. Location of multi corer sediment samples collected by the response. "Oil present" in the legend refers to positive qualitative (visual and/or olfactory) observations of oil. Qualitative results from two academic cruises (R/V Cape Hatteras and R/V Oceanus) are also shown. Analytical data collected during the response indicate exceedances of aquatic life benchmarks in sediment within approximately 3 km of the wellhead.*



*Figure 5.3. Pictures of sediment samples collected by the R/V Gyre near the wellhead. These samples were confirmed to contain MC252 oil. The sample IDs are SE-20101001-GY-ALTNF001-VA-020 (left panel), which shows the sediment depth profile, and SE-20101001-GY-NF006MOD-VA-021 (right panel), which shows extruded sediment (into a plastic bag) containing oil from the top 3 cm of the core.*



## 5.5    Hypoxia

Dissolved oxygen data collected from 8 May to 9 August was analyzed and discussed by the Joint Analysis Group (JAG) (Report 3, 16 August). They reported significant dissolved oxygen depressions relative to background concentrations (minimum dissolved oxygen concentration observed was 3.7 mg/L in late July; depressions ranged from 0.14 mg/L to 3.7 mg/L below background). These dissolved oxygen depressions occurred coincident with relative maxima in fluorescence profiles used to screen for hydrocarbons and extended as far as 80 km from the wellhead. However, as dissolved oxygen concentrations were not approaching hypoxic levels (<2.0 mg/L) and did not appear to be decreasing over time, their analysis indicated that hypoxic conditions would not occur in association with the deep dispersed plume.

From 3 August through early October, numerous vessels sampling the plume responded to mission guidance, i.e., results were reported on dissolved oxygen depressions on a real-time (daily) basis. These measurements were made using an *in situ* oxygen sensor on the CTD (CTD/$O_2$). The accuracy of these sensors was calculated in the AOML Oxygen Report (2010) which demonstrated that the CTD/$O_2$ sensor and validation by Winkler's titration method were accurate to within 2%. Response sampling since 3 August resulted in a comprehensive delineation of the plume to the southwest. The minimum dissolved oxygen value measured since 3 August was ~4 mg/L, a depression relative to climatological background of <0.3 mg/L (JAG Oxygen Report, 2010). Stations revisited around the wellhead in October showed no measurable oxygen depressions.

## 5.6     Comparisons to Aquatic Life Benchmarks

In the deep-water sampling zone, the majority of the samples (~90%) were analyzed for the full suite of analytes (parent PAHs and alkylated PAHs). However, in a subset of these samples (~30%), the analyses for the volatile organic compounds (e.g. benzene, toluene, ethylbenzene and xylene) were given a different sample name and it was not possible to match up the samples within Scribe and hence these compounds were not included in the aquatic life ratio calculation (for more information on this issue and its implications see Appendices C.1 and C.5, respectively). A number of samples (roughly 1000) early in the response were analyzed only for BTEX compounds. Data from each sample that exceeded the benchmark for aquatic life in either the water or the sediment was examined in detail to confirm the validity of the exceedance and to assess the likelihood that the exceedance was due to MC252 oil (see Appendix D for methodology).

In the deepwater sampling zone there was a total of 70 exceedances of aquatic life benchmarks in water and 7 exceedances in sediment. Total aquatic life benchmark exceedances for PAHs in water and sediment represented ~2% of all samples collected (Table 5.1).

*Table 5.1. Summary of water and sediment analytical chemistry results in the deep-water zone. Datasets were compared to benchmarks for human health, aquatic life, and dispersant chemicals. For each benchmark, total numbers of samples that were non-detect, below benchmark, or that exceeded the benchmark were computed. The total number of samples is not the same for the human health, aquatic life, or dispersant analyses because not all samples were analyzed for all analytes.*

| | | | | |
|---|---|---|---|---|
| **Water Column** | Non-detect | 4121 | 2721 | 3761 |
| | Below Benchmark | 673 | 821 | 353 |
| | **Exceed Benchmark** | 0(0)* | 70(63)* | 0 |
| **Sediment** | Non-detect | n/a | 6 | 119 |
| | Below Benchmark | n/a | 114 | 1 |
| | **Exceed Benchmark** | n/a | 7(7)* | n/a |
| **Total Samples** | | 4794 | 3739 | 4234 |
| **Total Exceedances** | | 0 | 77(70) | 0 |
| **Percent of Exceedances** | | 0% | 2% | 0% |
| **Total Exceedances After 3 August** | | 0 | 7(7) | 0 |

*The # in parentheses refers to exceedances consistent with MC252 oil.

The chronic aquatic life ratios in water samples decreased with distance from the wellhead (Fig. 5.4). Chronic exceedances potentially associated with MC252 oil were constrained to within approximately 70 km of the wellhead in deep water (Fig. 5.4; Map 7.4a). No exceedances consistent with MC252 oil were observed in the period post-August 3 (Fig. 5.5; Map 7.4b). The last exceedance consistent with MC252 oil was observed on 22 July at a depth of 1,140 m.

Exceedances of the chronic aquatic life benchmark were generally observed at two depth ranges throughout the water column. The highest aquatic life ratios were associated with surface or near-surface water. Exceedances were also observed in the water column at the depth range from 1100 m to 1300 m (Fig. 5.6), consistent with the qualitative observations of the deep plume of dispersed and dissolved oil.

A total of 16 samples also exceeded the acute toxicity benchmark in the deep-water sampling zone. All of these occurred prior to mid-July.

*Figure 5.4. Chronic aquatic life ratios as a function of distance from the wellhead. The horizontal dotted line represents the chronic aquatic life benchmark of 1.*





*Figure 5.5. Chronic aquatic life ratios as a function of time. The horizontal dotted line represents the chronic aquatic life benchmark of 1.*



*Figure 5.6 Chronic aquatic life ratios as a function of depth. The horizontal dotted line represents the chronic aquatic life benchmark of 1.*



41

All sediment samples collected in the deep-water zone were collected as part of the Operational Annex (Maps 7.5a,b). Samples were compared to EPA's aquatic life benchmarks for sediments. Seven samples were found to exceed the chronic benchmark (Table 5.1; Fig. 5.7). One of the sediment samples also exceeded the acute benchmark. Samples that exceeded sediment benchmarks were all located within the range of 0.33-2.7 km of the wellhead and were all confirmed to be consistent with MC252 oil (Table 5.2; Figure 5.7). The absolute concentrations of total PAHs were 9,900 ng/g to 28,000 ng/g.

*Figure 5.7 Sediment chronic aquatic life ratios as a function of distance from the wellhead. The blue horizontal dotted line represents the chronic aquatic life benchmark. The green horizontal line represents the average chronic ratio at deep-water reference stations.*



Chronic aquatic life ratios for sediment samples were also compared to ratios for reference locations in the deep water. These historical, reference studies included two MMS studies (Continental Shelf Assoc., 2006; Rowe and Kennicutt, 2009). The average chronic aquatic life ratio at these deep water reference stations ranged from 0.0011 – 0.33, with an average of 0.029 across all stations. In comparison to the average chronic ratio at reference stations, the chronic ratio for response samples were (on average) at or below the reference value beyond 10 km from the wellhead (Fig. 5.7). Thus, chronic aquatic life exceedances were observed within 3 km of the wellhead, but samples above reference levels were observed out to 10 km from the wellhead.

*Source characterization of exceedances*

A vast majority of the samples that exceeded the chronic aquatic life benchmark were either indeterminate in origin (given lack of data) or were consistent with MC252 oil. A portion of these exceedances were from the DEEP program (Appendix E), all of which were consistent with MC252 oil. The 7 samples that were considered not consistent with MC252 oil fell into one of the following categories: consistent with diesel range oil (likely caused by other sources), consistent with pyrogenic PAHs, or consistent with seep sources (see Appendix D).

The one water sample that was associated with a seep source (SW-20100909-OV19-12) was collected on 9 September in 1450 m of water at a distance of 299 km from the wellhead. The GC/MS Extracted Ion Current Profiles (EICPs) indicated the presence of crude-oil- related hydrocarbons. The abundance and distribution of the triterpanes and steranes are substantially different from MC252 oil, which demonstrates that MC252 oil is likely not the source of the hydrocarbons in this sample. The overall distribution of hydrocarbons suggests that the petroleum in this sample may be related to seep oil. This result was corroborated by preliminary data provided by NOAA's analyses that indicate that this sample is near a known seep area.

The 7 sediment samples that exceeded benchmarks were confirmed to be consistent with MC252 oil based on an analysis of the chromatograms. The samples IDs for these are preceeded by "SE" in Table 5.2. These deep-water samples were all collected within 3 km of the wellhead. There were also indications of drilling mud compounds in these samples based on 3 parameters: (1) higher barium levels than area sediments, (2) the presence of C16 and C18 alpha olefins (synthetic drilling mud additive), and (3) presence of relatively unweathered crude oil. Oiled sediment samples were not weathered to the same extent as oiled water samples in surface waters. For example, SE-20101001-GY-ALTNF001-020 lost its gasoline range organics through C10-11, and SE-20101001-GY-NF006mod-022 lost them through C12. Most of the sediment exceedance samples showed PAH depletion of 4-8% and a few were as high as 57–75%.

43

*Table 5.2. List of aquatic life benchmark exceedances for water and sediments in the the deep-water zone after 3 August. Details are listed for each exceedance including the source of the oil, identified as follows: (1) consistent with MC252 oil, (2) not consistent with MC252 oil, and (3) indeterminate. Highlighted rows indicate sediment samples; non-highlighted rows indicate water samples.*

| | | | | |
|---|---|---|---|---|
| 8/20/2010 | Chronic | 27.1512, -88.1777 | SW-20100820-OV15-004 | 2 |
| 9/9/2010 | Chronic | 26.8251, -90.5024 | SW-20100909-OV19-012 | 2 |
| 10/1/2010[1] | Chronic | 28.7347, -88.3705 | SE-20101001-GY-ALTNF001-HC-021_BDO | 3 |
| 10/1/2010 | Chronic | 28.7347, -88.3705 | SE-20101001-GY-ALTNF001-HC-020_BDO | 1 |
| 10/1/2010 | Chronic | 28.7451, -88.3591 | SE-20101001-GY-NF006MOD-HC-022_BDO | 1 |
| 10/17/2010 | Acute | 28.7150, -88.3587 | SE-20101017-GY-D031S-HC-050_BDO | 1 |
| 10/17/2010 | Chronic | 28.7404, -88.3681 | SE-20101017-GY-D038SW-HC-053_BDO | 1 |
| 10/17/2010[2] | Chronic | 28.7449, -88.3742 | SE-20101017-GY-D044S-HC-055 | 1 |
| 10/17/2010 | Acute | 28.7423, -88.3622 | SE-20101017-GY-D040S-HC-052_BDO | 1 |
| 10/17/2010 | Chronic | 28.7425, -88.3705 | SE-20101017-GY-D042S-HC-054_BDO | 1 |

[1]This sample was removed from consideration because it is a field duplicate.

[2]When the actual TOC is used for this sediment sample (versus an assumed 1%), it becomes an exceedance.

## 5.7     Comparison to Dispersant Benchmarks

Deep-water samples were analyzed for the dispersant-related chemicals 2-Butoxyethanol, DPnB, and Propylene Glycol (Appendix A, Table A-1). Screening levels exist for dispersant compounds in water only.

The dispersant-related chemical measures predominantly in the deep-water zone was DPnB. The benchmark for DPnB in water is 1,000 µg/L (1 ppm). Of the 4114 total samples that were analyzed for dispersants in the water column, 353 samples contained measurable amounts of DPnB. The range in detected DPnB concentrations was 0.0170 – 113.4 µg/L (mean 4.3 µg/L), with all samples significantly below the chronic screening

level (Fig. 5.8). Concentrations of DPnB decreased with time, with all values less than 5 µg/L by July 30. Peaks in DPnB detects were observed in two distinct layers, at the surface and in the sub-surface (1100 to1300m; Fig. 5.9) similar to distributions of exceedances of the aquatic life benchmark for PAHs.

*Figure 5.8. Concentrations of the dispersant DPnB in water samples versus time.*



*Figure 5.9 Concentrations of DPnB versus depth.*



## 5.8    Biodegradation

Measurements of the microbial community, including both community structure and biodegradation, have been an important topic of research during the DWH oil spill. Many of these studies have been funded through academia, with some support  from the response. For example, Dr. David Valentine's (UCSB) microbial sampling on the R/V *Pisces* (9/8/2010 – 9/17/2010) was coordinated with John Kessler's chemistry sampling which is being funded by the Response.  However, Valentine's post-cruise laboratory analyses are being funded by multiple sources, and that data will not be available for a couple of months. Several different researchers and their respective science teams have been involved in academic microbial sampling missions, including Dr. Terry Hazen (LBNL), Dr. David Valentine (UCSB), Dr. Andreas Teske (UNC-Chapel Hill), Dr. Richard Camilli (WHOI), and Dr. Samantha Joye (UGA). Much of this work has not yet been published.  As well, the JAG Oxygen Report (2010) discusses factors affecting biodegradation of deepwater hydrocarbons and modeled the impact biodegradation could have on the time required to reach hypoxia in the deep sea.

The OSAT reviewed published literature for the DWH oil spill to enhance our understanding of oil biodegradation. Microbial analyses in Hazen et al. (2010) were performed on water samples collected from vertical casts near the wellhead in late May and early June. Hazen's team provided evidence that a large number of bacterial genes involved in hydrocarbon degradation were significantly increased in sub-surface oil plume samples. Total bacterial densities were also significantly correlated with MC252 alkane concentration in the plume. Hazen's group measured 16S rRNA gene sequences in bacteria from the plume and found that they were dominated by the order Oceanospirillales in the γ-proteobacteria. The presence of this order was unique to the deep-water plume and this

order was not present above or below it. Hazen's group calculated maximum biodegradation rates based on concentrations of C13-C26 n-alkanes, resulting in half-lives ranging from 1.2 to 6.1 days that were similar for both field and microcosm conditions . Previous laboratory studies using crude oil and dispersants (including COREXIT 9500) showed rapid loss of dispersed oil in the sea by biodegradation (Venosa and Holder, 2007).

Biodegradation rates will necessarily vary as the sub-surface plume ages, and the most labile components of the oil are degraded, leaving behind the recalcitrant fractions. Hazen's rates indicated that the least recalcitrant fraction (alkanes) of the oil would persist for only weeks. The degradation rates for the complete mixture of compounds that characterize MC252 oil have not yet been determined.

Estimates of oil biodegradation have also been made using changes in dissolved oxygen concentrations measured in the sub-surface plume, based on the premise that bacterial degradation of oil is expected to cause consumption of dissolved oxygen. Camilli et al. (2010) estimated bacterial respiration based on temporal changes in dissolved oxygen concentration in the sub-surface plume. Their work was based on samples collected farther away from the wellhead and at a later date (i.e., late June) compared to the Hazen study. The results of Camilli et al. (2010) suggested that microbial respiration rates within the plume were not appreciably more than 1 $\mu$M O2 day$^{-1}$, such that minimal biodegradation was occurring in the remaining plume, which included monoaromatic hydrocarbons, such as BTEX. The JAG Oxygen Report (2010) also estimated biodegradation of oil in the plume using various techniques for estimating biochemical oxygen demand. They estimated a first-order biodegradation rate constant of 0.0054/d as a lower bound on biodegradation estimates. The report estimated the possible time needed to reach hypoxia, assuming no replenishment of dissolved oxygen by mixing with oxygen-rich surrounding waters, ranged from 24 to 74 days. A shorter time of 1.3 days to hypoxia was estimated using using Hazen's high first-order biodegradation rate. Significantly, hypoxia was never observed in deep water during the incident.

In summary, the various microbial and chemical (i.e., oxygen) measurements made in the deep-water plume confirm that biodegradation of oil has been occurring. Estimates of biodegradation rates range from a lower bound of 0.0054/d estimated in the JAG oxygen report, which is likely more representative of the whole oil mixture, to an upper bound estimated by Hazen's group of 0.310/d for alkane biodegradation.

## Section 6: Conclusions

The UAC's Operational Science Advisory Team (OSAT) concludes that sampling was adequate to address the presence and distribution of sub-surface oil (with the exception of very shallow nearshore areas where submerged tar mats may be present; discussed below). No deposits of liquid-phase MC252 oil were identified in sediments beyond the shoreline. Based on the analysis of extensive data in the nearshore, offshore, and deep water zones, the OSAT identified two areas of concern with respect to the indicators considered. Sediments exceed the aquatic life benchmark within 3 km of the well head and are above reference levels within 10 km and tar mats exist in some shallow sub-tidal areas near the shore.

Sediment PAH concentrations exceeded the aquatic life benchmark within 3 km (~2 miles) of the wellhead and were above reference concentrations within 10 km. The decision on whether or not this oil is actionable lies with the FOSC. The assessment of acute and long-term chronic effects to the Gulf of Mexico ecosystem is not within the purview of the response and is being addressed as part of the injury assessment conducted through the Natural Resources Damage Assessment (NRDA) process.

Observations from qualitative programs in the nearshore sampling zone indicate tar mats in sub-tidal nearshore areas are another area of concern. The sediment-bound oil within these subsurface tar mats could potentially be remobilized leading to the re-oiling of adjacent or neary-by shorelines. The sub-surface sampling plans did not entirely address this region due to difficulties with sampling in shallow water. Current efforts to address this issue within the UAC include continued monitoring by shoreline clean up and assessment teams (SCAT) and the formation of a specialized group at the UAC (OSAT II) to evaluate existing data and make recommendations for any additional sampling.

Other than these two areas of concern (sediments near the wellhead and near shore tar mats) the OSAT found:

- No deposits of liquid-phase MC252 oil in sediments.

- No exceedances of EPA's Human Health benchmark in water.

- No exceedances of EPA's dispersant benchmarks.

- Since 3 August, no exceedances of the aquatic life benchmark for PAHs in water that were consistent with MC252 oil.

- Since 3 August, no exceedances of the aquatic life benchmark for PAHs in sediment beyond 3 km of the wellhead that were consistent with MC252 oil.

The OSAT is confident that the quality of these data is sufficient to address the presence or absence of sub-surface oil and dispersants within the context of an operational emergency response evaluation. However, several factors should be considered in interpreting these findings for any other purpose.

48

- Sample detection limits varied. Because some analytes had very high detection limits, the treatment of "below detection" results (calculating them as zeros) has the potential to underestimate concentrations.

- Many of the aquatic life ratios used in the Aquatic Life Benchmark for PAHs are estimates. Since some calculations did not include contribution of volatile organic compounds, ratios may be underestimated in some circumstances. Some analyses did not include alkylated compounds. The use of a multiplier to adjust total concentrations could underestimate or overestimate concentrations.

- Reference concentrations do not represent "background" conditions. Concentrations of PAHs in reference samples do not represent clean or pristine conditions, but represent average concentrations in the zone of interest before the spill. Other sources of PAHs, including seeps, may be represented in these comparisons.

- Many TOC values used in calculating the Aquatic Life Benchmarks for PAHs for sediments are estimates because actual TOC values were often not available. Though a conservative TOC concentration was applied, this could underestimate or overestimate exceedances of sediment quality benchmarks for individual samples.

# EXHIBIT J

**EPA**

**Moderator:   Adora Andy**
**May 24, 2010**
**3:30 p.m. CT**

Operator:  Ladies and gentlemen, I will now turn the call over to Adora Andy.

Adora Andy:  Hi, everybody.  Thank you so much for joining us.  We apologize for being late to this call.  The administrator just actually literally just got off a boat, just saw some of the damaged wetlands, which she'll talk a little bit about today.  We're going to begin this call with brief remarks from the administrator and from Rear Admiral Landry, and then we will open it up for Q&A.  Administrator?

Lisa Jackson:  Good afternoon, everybody.  Again, thank you.  Sorry for the delay.  I'll get right into dispersant.  All I'll say is that it is a clear, warm Louisiana day out there.  And we went through – we left from Venice and went to the Delta Wildlife Refuge and kind of turned the corner, and saw what I now call that reeds that look like silent, you know, witnesses because you could see an oil mark on them.  And I thought, well, OK, you know we're seeing some impact.  But when we turned the corner, it's clear that the oil at least around (Paso Lutre) is really piling up in those marshes.  It's different oil in different places, but it's quite a bit.

We also saw people responding to the oil and using an oil-water separator to try to pull it out, but I'm never more convinced than now that we are doing a lot, but that BP, Transocean, Halliburton, everyone who's responsible for this has a big job in front of them.  And all of us are never more committed than I've been to work side by side, with Admiral Landry to make sure she has whatever she needs to ensure that they're doing the job.

So I would like to thank you for joining us. Let me take a moment to thank Admiral Landry for joining us today and for all the work she and all of our Coast Guard responders have been doing. They had shown extraordinary resolve in leading this effort, and I'm proud and glad to be in partnership with her and them. Today we want to talk about three elements of our ongoing response and some of the adjustments we are making to this changing situation, but first let me outline what the situation is.

The BP spill has thrust upon us what potentially could be one of the greatest environmental challenges of our time. More than 20,000 federal responders are continuing their work on creative solutions; hundreds of EPA staff have focused on this crisis. In responding to the spill, we had to make some tough decisions. I can honestly say I don't think I've made a tougher decision than the one regarding use of chemical dispersant to break up the oil and speed its natural degradation.

Due to the unprecedented nature of this event, BP has used dispersant in ways never seen before, that is, in terms of both the amount applied, which is approaching a world record and in the method of application. A little more than a week ago, EPA and the Coast Guard authorized after testing for effectiveness, a novel use of dispersant underwater, at the source of the leak. With that authorization, we required the implementation of a rigorous monitoring system, a condition that will ensure that underwater application continues to be effective and tracks any measurable environmental impact.

Under the circumstances, the overall results to date are positive. Our tracking indicates that these dispersants are breaking up the oil and speeding its final degradation with limited environmental impact at this time. In other words, dispersants continue to be the best of the two very difficult choices. Their use inevitably means that we are making environmental tradeoffs. But in all of these, it is critical to remember that the number one enemy is the oil. Until we find a way to stem the flow of oil, we must continue to take any responsible actions that will mitigate the impact of the oil, and that's what we're doing.

The steps we have taken are in full recognition of our tradeoff. We know that dispersants are less toxic than oil. We know that surface use of dispersants

decreases the risk to shorelines and organisms at the surface when they are properly applied. And we know that dispersants breakdown of a week rather than remaining for several years as untreated oil might. So after testing and authorizing dispersant use underwater, we also remain optimistic that we are achieving similar results with the use of less chemicals.

We have put in place an extensive monitoring network to ensure that the health of the air and water here – to ensure the health of the air and water here. Excuse me. We have numerous stationary and mobile air monitors throughout the region, including a mobile unit that I personally inspected and toured this morning. To ensure the fullest level of transparency, all of the data we collect is being posted on www.epa.gov/bpspill as soon as we gather and analyze it.

We are still deeply concerned about these things we don't know. The long-term effects on aquatic life are still unknown, and we must make sure that the dispersants that are used are as non-toxic as possible. Those unknowns and the lengthening period of this crisis are why we last week directed BP to look for more effective, less toxic alternatives to their current dispersants. We felt it was important to ensure that all possible options were being explored in the hopes that we might minimize the environmental tradeoffs in whatever ways possible.

It's also why we have called on BP to be more transparent about their own processes. We have directed them to share information with the American people who certainly deserve to know what actions we are taking, which brings me to the three points we are here to discuss with you all today.

First, the federal government led by the Coast Guard is today instructing BP to take immediate steps to significantly scale back the overall use of dispersants. Throughout this process, EPA and the Coast Guard have reserved the authority, in particular, to discontinue the use of underwater dispersants. As of today, our data demonstrate that subsea dispersant application is having an effect on the oil at the source of the leak and thus far has no measurable ecological impact. That is good news. And we continue to monitor both whether the oil is being dispersed effectively and the impact of dispersant on the environment.

But given our concerns over the environmental unknowns, we think it's proven at this time to ramp-down overall use of dispersants. Now the reason we can ramp down the overall use is because subsea use appears to be having a positive effect. As a result, we should use no more dispersant than is necessary especially at the surface. By ramping down on the amount of dispersant used, particularly on the surface where we expect less undispersed oil, we believe we can reduce the amount of dispersant applied by as much as half, and I think probably 75 percent, maybe more. We will continue to track the effectiveness of this response.

Admiral Landry, of course, reserves command control as she's here as federal on-scene coordinator to decide if it makes sense to resume broader usage of dispersant, whether for a day or longer. Second, we have made it clear to BP, including in a meeting Admiral Landry and I held with company officials last night that we are not satisfied that BP has done an extensive enough analysis of other dispersion options.

We expect BP to keep evaluating other options. BP's response to our directive was insufficient, and we are concerned that BP seemed in their response more interested in defending their initial decisions than analyzing possible better options. So today, we are calling on them to continue searching and studying better options.

But third, as a result of being dissatisfied with BP's response and to ensure we know everything we can know about the current environmental impact, EPA will be performing our own scientific verification of data. We will conduct our own tests to determine the least toxic, most effective dispersant available in the volumes necessary for a crisis of this magnitude. Our tox test will address the claims and conclusions that were put forth by BP in their response to us late last week. And the EPA scientists have been tasked with conducting parallel independent tests to determine BP's argument that Correxit remains the best alternative is accurate and supported by science.

In the meantime, we will continue to do all we can to address this crisis in the most aggressive and responsible way possible. We will continue to

aggressively monitor air quality, water quality, and the effects of dispersants used by BP. This is unfortunately a tragic situation that presents a great threat to the environmental, ecological, and economic future of the Gulf region – the region I call home.

The EPA and the entire federal government continue to work around the clock to do everything possible to ensure both of the citizens of the Gulf region are protected and that BP is putting every resource at their disposal towards stopping this leak. Thank you very much.

Adora Andy:      Admiral Landry.

Admiral Mary Landry:      Good afternoon, everyone, and thank you for coming to the call. And I thank Administrator Jackson for her leadership and support which has been there since day one. And I also thank the tireless members, the hours and the tireless efforts that both the national response team and the regional response team put towards making sure they could cross this threshold that they did not cross lightly.

We have always had pre-approval for use of dispersants. Nobody ever anticipated it would need to be used in this scale and scope. And as Administrator Jackson said, our commitment to everyone is to make sure we have the right science and the right analysis, and the right – we studied the impacts and the effects this has on the environment.
We are in the crisis mode still, though, we are in a response that is very significant and that is quite novel.

And that I've been in over 30 years, I've done pollution spills from ships that have a certain capacity. do it from facilities on the dock that have a certain capacity. We have never dealt with something where we have a well releasing oil 5,000 feet below the water, below the surface to the water. And we also have to make sure we emphasize to everyone that the situation we've been in since day one is that this well could fail on any given day. And the entire release, there could be a significantly more, a significantly larger amount that could be released to the environment.

And that has had us all from day one very aggressively positioned to fight what we call a worst case scenario discharge. This is why we have almost 24,000 people at the national, regional, local, and right down to the community based level involved. We have members of the private sector and over $750 million has been spent to date on this response. Regardless of the people and the money, it doesn't make any of us feel good that our environment is at risk. And that is what's most important.

We absolutely agree with Administrator Jackson and the EPA's concerns with the, to minimize the use of dispersants. When the pre-approval was authorized, no one envisioned a scale and scope of the response that were involved in now. And even though I had pre-approval for signing off as the federal on-scene commander based on the operation, I had the authority to approve this on the surface. We did it in consultation with the full regional response team.

And then as we considered the use of subsea dispersant, crossing a threshold that had not been envisioned when this pre-approval was signed, we absolutely felt we had to engage the full national response team and all the members of, whether it's the state or local or scientific groups. Everybody has huge equities involved in these decisions, and we really respect and understand it.

So as public servants, we are here to commit to you that we absolutely are trying to exercise these options very cautiously, very carefully, certainly weighing in favor of burning, on the surface control, burning on the surface when we can, certainly in favor of mechanical skimming, but when weather when limitations take those tools away, we use dispersants.

In crossing this threshold for subsea, it's been noted there were significant tests that were done ahead of allowing that. And the only thing that gets us a little peace of mind is that we know subsea injection requires much less volume than surface dispersant. And we absolutely are working towards less use of dispersants. And certainly, we are all eagerly awaiting the interventions that will be attempted to secure this well this week.

I'm going to pause without saying, Administrator Jackson has been down here several times engaged in this fight right at the frontline and certainly has applied pressure on BP. They hand-delivered a letter to us last night after her meeting where they clearly understood Administrator Jackson was not satisfied with the response they have given on the search for alternative measures. And they've recommitted the continuing to search for an alternative dispersant that is available, effective, and less toxic.

They're also going to research and examine case studies. We know that they're trying to work with China on releasing some information on dispersants there. They're looking worldwide at various products and they're committed to minimizing as much as possible the use of dispersants. This is their letter signed yesterday. I just have to let everyone know that as operational leader in this response, I have to weigh and measure the tradeoff associated with use of dispersants.

And while we go through this top kill procedure, it is certainly important to allow for subsea injection while this top kill procedures are going on because it's so critical. But, as I said, as I flew out over the site yesterday, I watched a plane apply very little dispersant in a very controlled matter because we actually audited to make sure they were sticking within the protocols. And we saw significantly less surface dispersant applied yesterday based on the fact five planes went up and did not apply dispersant because it was not appropriate to do so.

So, we're going to stick to those controls and absolutely try to minimize the impact and then we're going to ensure there's long term analysis and science shared with everybody to understand the impact on this. Our goal is obviously to minimize the impact on the environment. And I think I'll stop there so we can allow questions.

Adora Andy:   (Tanika), would you mind opening the lines for questions please.

Operator:        At this time, if you would like to ask a question, please press star, then the number one on your telephone keypad. We'll pause for just a moment to compile the Q and A roster.

Please hold while we poll for questions.

Please hold while we poll for questions.

Your first question comes from the line of David Fahrentold with the Washington Post.

David Fahrentold: Thank you.  Administrator, I just wanted to make sure – make sure I understand this.  You guys last week or a few days ago, instructed BP that they had 24 hours to find a new dispersant.  I want to make sure, they're evaluating other dispersants but they continue to use the one you told them not to use.  Is that right?

Lisa Jackson: Yes, that's not exactly right, David.  What we told them is that they had 24 hours to evaluate and identify less toxic alternatives.  They did come back within 24 hours and essentially presented an analysis that they believe leads to a conclusion that says the best thing out there is Correxit.

If you look at the directive, it said that they were to switch but they were to switch only with the approval of the Coast Guard and EPA, because we were very concerned about giving them basically a blank check to switch to anything they might deem less toxic.  And they've raised some scientific concerns which rather than take their word for it, at this point, I would rather just have my own scientists do their own testing.  So, that's what we're going to do on all alternatives that are on the list.  So, there was no order that they have to switch – they had to switch with our approval.  And I'm not in the position and I think to recommend to Admiral Landry that there's something to switch to.

Operator: Your next question comes from the line of Julie Cart with Los Angeles Times.

Julie Cart: Yes, my question is for Administrator Jackson.  You said that you're not satisfied that BP has done extensive analysis.  What led you to that conclusion?

Lisa Jackson: My read of their letter was that they presented a lot of problems with alternatives that are on the list.  That at least based on the acute toxicity

framework, the rubric that's always been used on, as far as the dispersants would look to be less toxic.

Now, you know, we live in a world where we're making tough decisions based on little science. As we went – as I've said earlier, we don't have the science that talks about what happens when you use dispersants in the deep sea. We don't have the science that talks about when you use, you know, hundreds and hundreds of thousands of gallons of dispersants on a single response. And so we're having to make those decisions and sometimes the best answer we can get is, we will do testing.

What I was disappointed in is that, rather than reach the conclusion as BP seemed to do that Correxit was the way to go, they weren't proposing additional testing, talking about finding a way to test other dispersants that at least on the list are more effective and less toxic than Correxit. The other disappointment I had was that there seemed to be a belief that because they had a supply of Correxit, that was the reason not to necessarily order something else.

And if indeed we determine that there's another option out there, everything we know about this response to date and everything the president has told us to do is to plan for the worst. So, I think about needing to have dispersant on hand a month from now rather than the month we just finished.

Operator:        Your next question comes from the line of (Mark Feldstein) from the Times Picayune.

(Mark Feldstein):  Hello. Yes, Ms. Jackson, now that oil has actually reached its way to the shoreline, are there any plans for any sort of fines or violation findings against BP for causing a pollution problem?

Lisa Jackson:    Yes, absolutely. There will need to be fines and enforcement penalties levied and I'm happy if the federal on-scene coordinator needs us at any time to use the Clean Water Act to compel BP to respond faster or do something they're not real happy to do it. But, at this point, you know, we are taking our lead on the actual response from the federal on-scene coordinator and the national incident commander. So, there are lots of investigations going on as to what

happened.  But, there are certainly going to be opportunities for fines and penalties as well.

Operator:            Your next question comes from the line of Elisabeth Rosenthal of the New York Times.

Elisabeth Rosenthal:  Yes.  Hello, thanks for taking questions.  I was wondering what kind of tools you have available should the BP scientists and the scientists from the EPA disagree about whether what was the best dispersants to use.  And how will you monitor this reduction in use of dispersants, what's in your toolbox to enforce that?

Lisa Jackson:        I'll do very quickly what we can do if we disagree and I'll – I'll turn it over to Admiral Landry because her operations are pretty tight.  I was briefed on them last night in terms of every morning I know she's getting briefed on what was used.  But, every morning she's also instructing the entire response as to what the order of preference is in terms of the tools available.  And she can give you some additional detail on that.  You asked about whether or not we can "reach an agreement" with BP or their scientists.  Listen, at any point we can stop subsea dispersant application.

The reason I don't recommend that at this point is two-fold.  Number one, you use a lot less of it when you use it in the subsea, you're using it out in the very deep water which will hopefully minimize the chances that it gets into the shallows and causes the kind of damage I saw out at (Paso Lutra) earlier, but also because we're monitoring it.  We have a dispersant monitoring plan that was put together with NOAA, with Coast Guard, with other experts, with scientists at EPA and it is monitoring dissolved oxygen, particle size and doing toxicity testing within the plume of dispersed oil.

That gives me – and that's the beginning, those results are up, if you'll look at them, you'll see that the toxicity tests are actually not bad news.  We see a high rate of survivability of rotifers which are a form of plankton which you would expect to find in the food chain out where we're seeing the dispersant applied.

We also know dispersants in general last a much shorter period of time in the environment. We need to keep getting more data to back that up. We're taking near shore samples, and we're taking sediments samples and water samples, all looking for dispersant.

We haven't quite gotten much results in so I don't want to oversell. We haven't seen anything yet but it would be unfair – the science is not, we don't have enough samples yet for me to tell people we never see dispersants.

But, so – if we get to the point where for whatever set of reasons, we don't think it's effective, we think it's making the problem worse, it's not helping on the surface which was all it was supposed to do. Any of those things, we would make a recommendation to the Coast Guard that they stop, and I have no doubt based on the working relationship we've established with Admiral Landry and her staff that they would weigh that recommendation extremely heavily. She was very, very clear with BP last night that any concerns we had at EPA needed to be met.

Operator:         Your next question comes from the line of Matthew Daly with The Associated Press.

Matthew Daly:     Hello, Administrator Jackson. So, at what point would you tell them that you know, they can't do this anymore at all. And that this will be you know the end of Corexit?

Lisa Jackson:     Matthew, well, you know, I think what we will see first is we'll have some time to get data. What we'll be doing over the next several days is an independent assessment of dispersants and Corexit will be on the list to see whether, we'll do toxicity testing and a range of bio accumulation and bio degradation test. We're airing on the side of the ones that can be done quickly. So, you can get a sense, Matthew, we're going to be relying on the science but obviously if we weren't in the middle of a response, in the middle of a crisis we would do even longer term scientific tests as well.

But, if at any point in doing that work, we find that Corexit or another dispersant is better or worse, or we see a real problem, we're going to – the first call we'll make will be to the Coast Guard, to Admiral Landry. Admiral

Landry, I don't know if you – Landry, I don't know if you want to say a couple of words on how you operationalized the dispersant used to make sure it's being minimized day by day.  But, I think it's a pretty impressive operation that's going on there now.

Admiral Mary Landry:   Thank you, Administrator Jackson.  Yes, absolutely.  I think we have to emphasize that even though BP is the responsible party and will pay for all, not just the clean up and the response but also the natural resource damage assessment that comes after this to see what impact this spill and the attending response had on the environment.  And they have to restore and make people and the environment whole but also on the day to day, we absolutely emphasized the use of controlled burn and the use of on water mechanical skimmingas a preference over any dispersant use. .

The only time we really have to use dispersant is when you have the terrible weather that we had last weekend and it's been up and down, the weather.  Skimming and burning are controlled by about a four foot sea state and those two – it becomes very difficult beyond a four foot sea state.  So, we have to sometimes use the surface dispersant and certainly the sub surface dispersant which really isn't weather controlled at all.  So, I think each day we go through it, we get numbers both in the morning and in the evening we get full number of what they've used and where they've done it, how much they've applied.  And we did audits already of that to make sure they're staying within the strict controls and parameters that are required.

And we can either verbally direct or we can issue written directives and we have no – I have no – I have no shyness about doing that and about emphasizing what our priorities are.  And if you can understand, we have every agency represented here including the states and everybody.  These are respected and career people who've been at this for years, who are very, very upset and anguished over what they're having to live through on this response.  And who are very troubled like you over the thought of what is going on out there and what has to go on in this crisis response.  So, we are all very eager to secure the source and we are really very committed to try to minimize the impact on the environment.

I'm going in to top kill, I have to say that this dangerous operation coming up with all the operations on the surface. We need to continue subsea surface, subsea injection of dispersants because of the issue of the VOCs, that the gasses that can come up to the water (column) because this is an oil and gas mixture emitting from this well, we have to make sure we don't have flammable gasses on the surface of the water that would impede the operations that are so critical to securing the source. But, for the most part on the day to day, we're absolutely preferring mechanical skimming and burning to any use of dispersants.

Lisa Jackson:     And the only thing I'll add to that, Admiral, is back to Matt's original question is, my next trip is going to be out to Gulf Breeze – EPA's Gulf Breeze Laboratory in Florida. Because that's where we're going to set up this – I guess you can call it an unfortunate but a very important set of experiments to learn more and to help inform your decision making process.

Admiral Mary Landry:     I should emphasize too Administrator Jackson that I have a federal – I have a federal checkbook for this but I also have a federal checkbook that comes from the Oil Pollution Act of 1990, the Oil Spill Liability trust fund and will be built back to BP. So, we are not sparing any of these federal resources or expense whether it's seafood safety, sampling that needs to be done or the important work that Administrator Jackson's going to do. This will all be billed to the responsible party and we are not holding back on any of that.

Operator:     Your next question comes from the line of Jeff Ball, Wall Street Journal.

Jeff Ball:     Hi. Good afternoon. Thanks for taking my call. I had two questions. One is – should the EPA have anticipated the possibility of the need to use dispersants at this level and why did it not – if it approved the use of a suite of dispersants including this one?

And the second is, is there any way in which the use of dispersants has made the problem of oil washing the shore any worse than it would have been had dispersants not been used? Thank you.

Lisa Jackson:     Over – on your first question, it's Lisa Jackson, over and over again the record is clear, that we were told by everyone from the drillers to the oil companies, to big oil, that this could never happen.  And so, the idea of having to use dispersants and inject them in the subsea I guess in my opinion, there's no reason for us to have thought that this would be upon us.  That being said, even when it came up we couldn't have said, "No, we just won't consider it." but we have so few tools out there for a spill that continues, a release that continues every day.  After consulting with the Coast Guard and seeing that they felt strongly that they needed to try not to take tools off the table, I thought and I believe that science can at a minimum give us some level of comfort.

And again, I have to ask each and everyone on the phone to realize that we do have some data.  Some of the picture of what we have in the subsurface is because of our systems that we take on that data.

Now, your second question is – can you ask it for me one more time there?

Adora Andy:      We made one – minimize the impact of oil at shore, I think was the second question.

Lisa Jackson:     Yeah.  You know we look at that today.  Obviously, I didn't sample.  We are sampling what I would generously call in unscientific terms "the goop" because there's lots of speculations as to what might be in this goop.

And we will be looking for dispersant chemicals, the constituents of dispersant as of Correxitt, as well as obviously looking in to see as what else might be there.  Obviously, that is the question that many people have.  Many folks would like to know what it is.

So, we will get the information.  I have no reason.  If I had a reason to believe we were making the situation worse in any way, I would recommend a full stop.  As it is I'm still recommending as strongly as I can that we minimize, absolutely minimize and I'm talking about a significant reduction in use of dispersants.

And then that we monitor as rigorously as we can for dispersant in the sea, for dispersant in the water, and then do toxicity testing in our lab. I will say this, it is clear to me that the science of dispersants has not in any way kept up with the science and the technology of our ability to drill and extract fossil fuels. And that is a huge disconnect and one that I will certainly be recommending that we remedy.

Adora Andy: I think this will be our last question, (Tanika).

Admiral Mary Landry: Okay. Can I just add to that previous question though, some important points that complement Administrator Jackson's remarks?

Two things that are very important are the – we have set up that at the national level a flow rate technical team and they're going to be looking at a system of what is called mass balance. The fact that we had to use this much dispersants as we had to use is evident in this response.

But the reality is that there would have been a significant amount of oil reaching the shore, much more than you're using reach the shore line now had we not used dispersants. That is evidence in this response. It is important to realize that it's a tradeoff.

And that's what we've had to do. And it's a very problematic and troublesome tradeoff. But it is what it is. The science for long term is so important. And we've already funded and begun.

There are several research vessels, NOAA vessels and university vessels, and coastal research center vessels that are going to be going the science on this near term and long term to study the impact. So, we didn't cross the threshold lightly. And we're prepared to analyze and, you know, share with everyone the long-term impact this spill response has heard.

Operator: And your last question comes from the line of Lauren Pearl with ABC News.

Lauren Pearl: Hi, good afternoon. I was wondering if you have tested the effects of the dispersement on droplet size. And also is there any biological sampling done at depth to see if there's biological effects on deepwater column organisms?

| | |
|---|---|
| Lisa Jackson: | Thank you, this is Lisa Jackson. Yes.  We call it particle size. |
| Lauren Pearl: | Okay. |
| Lisa Jackson: | The particle size measurements that are being done daily with dispersant use are a measure of how well it's dispersed.  If you think again of salad dressing, how small those droplet sizes are.  And everything we're seeing so far indicates – the science indicates that the injection is working.  We see good dispersion. |
| | The toxicity testing that we're doing that we can get on the short term is a critter called rotifer.  Rotifers are basically a form of plankton, they're in the food chain.  And you expose them in the rotifer test kit to the mixture and then see what their survivability is. |
| | And we've seen 90% greater survivability in general.  And in terms of larger organisms, I would – let us give you the answer back.  I do believe that there is some additional testing and sampling going on that NOAA has planned. Admiral, you maybe able to speak to this but if not, I think we can get you some information on that. |
| Lauren Pearl: | Okay.  I'd appreciate it. |
| Lisa Jackson: | Okay. |
| Adora Andy: | Well, thank you all for joining us on this call.  We apologize again for our tardiness.  The administrator is now going to do an in-person press briefing with the press corps here on the ground.  So, if you have counterparts there I'm sure that they are set-up and ready.  If you have additional questions please feel free to email press@epa.gov or give us a call.  Thank you so much. |
| Operator: | This concludes today's conference call.  You may now disconnect. |

END