# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: Oil Spill by the Oil Rig** | \* | **MDL No. 2179** |
| **"Deepwater Horizon" in the Gulf** | \* | |
| **of Mexico on April 20, 2010** | \* | **SECTION "J"** |
| | \* | **JUDGE BARBIER** |
| **This Document Relates to:** | \* | |
| *All Cases in Pleading Bundle B1* | \* | **MAGISTRATE NO. 1** |
| | \* | **MAGISTRATE SHUSHAN** |

\* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF
DEFENDANTS ANADARKO PETROLEUM CORPORATION,
ANADARKO E&P COMPANY LP, MOEX OFFSHORE 2007 LLC, AND MOEX USA
CORPORATION TO DISMISS FIRST AMENDED MASTER COMPLAINT, CROSS-
CLAIM, AND THIRD-PARTY COMPLAINT FOR PRIVATE ECONOMIC LOSSES IN
ACCORDANCE WITH PTO NO. 11 [CMO NO. 1] SECTION III (B1)
["B1 BUNDLE"]  PURSUANT TO FED. R. CIV. P. 12(b)(6)**

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................ 1

II.    RELEVANT FACTUAL ALLEGATIONS In MASTER COMPLAINT B1 ................... 3

       A.     Plaintiffs Allege Thirteen Distinct Categories of Amended Master
              Complaint B1 Plaintiffs ........................................................................ 3

       B.     Plaintiffs Allege Three Distinct Categories of Defendants Named in
              Amended Master Complaint B1 ............................................................. 4

              1.     The Drilling Defendants ................................................................ 5

              2.     The Products Liability Defendants ............................................... 6

              3.     The Non-Operating Defendants .................................................... 7

III.   ARGUMENT ..................................................................................................... 9

PLAINTIFFS FAIL TO STATE ANY CLAIMS AGAINST THE NON-OPERATING DEFENDANTS
FOR WHICH RELIEF CAN BE GRANTED

       A.     Plaintiffs' Maritime Negligence Claim Against the Non-Operating
              Defendants Fails as a Matter of Law Because Maritime Law Is Superseded
              by the Oil Pollution Act in this Case ................................................... 10

       B.     Plaintiffs' OPA Claim Against the Non-Operating Defendants Fails
              Because They Do Not Allege That Each Plaintiff Complied with OPA's
              Pre-Suit Presentment Requirement ...................................................... 12

       C.     Plaintiffs' OPA Claim Against Anadarko E&P Must Be Dismissed
              Because Anadarko E&P Did Not Hold a Lease Interest in the Macondo
              Prospect at the Time of the Discharge ................................................. 15

       D.     Even if Plaintiffs' Maritime Negligence Claim Is Not Displaced by OPA,
              Plaintiffs Fail to State a Claim for Negligence Against the Non-Operating
              Defendants .......................................................................................... 18

              1.     Plaintiffs do not allege that the Non-Operating Defendants
                     conducted or had operational control over any of the activities that
                     allegedly caused them harm .................................................... 18

              2.     The Macondo Prospect Offshore Deepwater Operating Agreement
                     establishes that BP is an independent contractor with sole authority
                     to conduct operations on the leased property ............................. 20

              3.     Plaintiffs' allegations that the Non-Operating Defendants had
                     contractual rights to conduct safety inspections is insufficient as a
                     matter of law to establish liability for maritime negligence ............ 21

              4.     Plaintiffs' allegations that the Non-Operating Defendants had
                     access to information about BP's operations are insufficient as a
                     matter of law to establish liability for maritime negligence ............ 23

i

TABLE OF CONTENTS
(continued)

Page

     5.    To the extent Plaintiffs seek to recover economic losses without alleging physical injury to a proprietary interest, their maritime negligence claim is barred by the economic loss rule ............................ 27

E.    Plaintiffs' Florida Pollutant Discharge and Control Act Claim Must be Dismissed Because State Law Does Not Apply to this Case ............................ 28

    1.    Federal law applies exclusively under the Outer Continental Shelf Lands  Act ............................................................................................. 29

    2.    Plaintiffs' Florida Pollutant Discharge Prevention and Control Act claim must be dismissed ....................................................................... 31

        a.    OCSLA requires the exclusive application of OPA to claims for property damages and economic losses arising from oil spills originating on the OCS ......................................... 32

        b.    Federal law preempts  the Florida statute here ........................... 33

IV.    CONCLUSION ............................................................................................. 37

TABLE OF AUTHORITIES

Page

**CASES**

*Ainsworth v. Shell Offshore, Inc.*,
    829 F.2d 548 (5th Cir. 1987), *cert. denied*, 485 U.S. 1034 (1988) ................................. passim

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ....................................................................................9, 10, 21

*Askew v. Am. Waterways Operators, Inc.*,
    411 U.S. 325 (1973) ............................................................................................38, 39

*Barasich v. Shell Pipeline Co.*,
    No. 05-4180, 2006 WL 3913403 (E.D. La. Nov. 20, 2006) (Barbier, J.) ..........................10, 31

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................................9, 10

*Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*,
    51 F.3d 235 (11th Cir. 1995) ....................................................................................14

*Bolivar v. R & H Oil and Gas Co.*,
    789 F. Supp. 1374 (S.D. Miss. 1991) .........................................................................23

*Canal Barge Co. v. Torco Oil Co.*,
    220 F.3d 370 (5th Cir. 2000) ....................................................................................20

*Carr v. United States*,
    130 S. Ct. 2229 (2010) ..............................................................................................19

*Carrieri v. Jobs.com, Inc.*,
    393 F.3d 508 (5th Cir. 2004) ....................................................................................19

*Cinel v. Connick*,
    15 F.3d 1338 (5th Cir. 1994) ....................................................................................18

*City of Milwaukee v. Illinois*,
    451 U.S. 304 (1981) ..................................................................................................11

*Collins v. Morgan Stanley Dean Witter*,
    224 F.3d 496 (5th Cir. 2000) ....................................................................................23

*Conner v. Aerovox, Inc.*,
    730 F.2d 835 (1st Cir. 1984) ....................................................................................11

TABLE OF AUTHORITIES
(continued)

Page

*Demette v. Falcon Drilling Co.*,
  280 F.3d 492 (5th Cir. 2002), *overruled in part on other grounds by Grand Isle Shipyard Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009) .......................................34

*Denson v. Diamond Offshore Co.*,
  955 So.2d 730 (La. Ct. App. 2007) ..........................................................................29

*Dunham-Price Group, LLC v. Citgo Petroleum Corp.*,
  2010 WL 1285446 (W.D. La. Mar. 31, 2010) ..........................................................29

*Duplantis v. Shell Offshore, Inc.*,
  948 F.2d 187 (5th Cir. 1991) ...................................................................................25

*EP Operating LP v. Placid Oil Co.*,
  26 F.3d 563 (5th Cir. 1994) .................................................................................32, 33

*Fontenot v. Southwestern Offshore Corp.*,
  787 So.2d 588 (La. Ct. App. 2001) ..........................................................................28

*Fruge v. Penrod Drilling Co.*,
  918 F.2d 1163 (5th Cir. 1990) .................................................................................21

*Gabarick v. Laurin Mar. (Am.) Inc.*,
  623 F. Supp. 2d 741 (E.D. La. 2009) .......................................................................13

*Gabarick v. Laurin Maritime (Am.) Inc.*,
  No. 08-4007, 2009 WL 102549 (E.D. La. Jan. 12, 2009)...................................15, 16

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000).................................................................................................38

*Grammer v. Patterson Servs., Inc.*,
  860 F.2d 639 (5th Cir. 1988), *cert. denied*, 491 U.S. 906 (1989)............................21

*Gregory v. Mitchell*,
  634 F.2d 199 (5th Cir. 1981) ...................................................................................15

*Gremillion v. Gulf Coast Catering Co.*,
  No. 88-4544, 1989 WL 104100 (E.D. La. Sept. 5, 1989), *aff'd*, 904 F.2d 290 (5th Cir. 1990) .....................................................................................................................28

*Guillory v. Conoco, Inc. v. Cont'l Oil Co.*,
  521 So.2d 1220 (La. App. 3d Cir.), *cert. denied*, 526 So.2d 801 (La. 1988) ..........21

TABLE OF AUTHORITIES
(continued)

Page

*Gulf Offshore Co. v. Mobil Oil Corp.*,
    453 U.S. 473 (1981)........................................................................................33

*Hallstrom v. Tillamook County*,
    493 U.S. 20 (1989)..........................................................................................15

*Hershey v. Energy Transfer Partners*,
    610 F.3d 239 (5th Cir. 2010) ...........................................................................9

*Hooper v. Thomas*,
    No. 01-1730, 2002 WL 1268399 (E.D. La. June 5, 2002)...................................15

*IMTT-Gretna v. Robert E. Lee SS*,
    993 F.2d 1193 (5th Cir. 1993) .........................................................................30

*In re Katrina Canal Breaches Litig.*,
    495 F.3d 191 (5th Cir. 2007) ......................................................................18, 23

*In re Settoon Towing LLC*,
    722 F. Supp. 2d 710 (E.D. La. 2010).................................................................20

*In re Taira Lynn Marine Ltd. No. 5*,
    444 F.3d 371 (5th Cir. 2006) ......................................................................30, 31

*Int'l Paper Co. v. Ouellette*,
    479 U.S. 481 (1987)..............................................................................36, 37, 38

*John v. Nat'l Sec. Fire and Cas. Co.*,
    501 F.3d 443 (5th Cir. 2007) ............................................................................4

*Jones v. Bock*,
    549 U.S. 199 (2007)........................................................................................10

*Kane Enters. v. MacGregor Inc.*,
    322 F.3d 371 (5th Cir. 2003) ..........................................................................23

*Landry v. Huthnance Drilling Co.*,
    889 F.2d 1469 (5th Cir. 1989) .........................................................................24

*LeJeune v. Shell Oil Co.*,
    No. 90-0614, 1991 WL 28879 (E.D. La. Feb. 27, 1991).....................................21

TABLE OF AUTHORITIES
(continued)

Page

*Louisiana ex rel. Guste v. M/V Testbank*,
    752 F.2d 1019 (5th Cir. 1985) (en banc) ........................................................29, 30

*Louisiana ex rel. Guste v. M/V Testbank*,
    752 F.2d 1019 (5th Cir. 1985) (en banc) ...............................................................30

*Marathon Pipe Line Co. v. LaRouche Indus. Inc.*,
    944 F. Supp. 476 (E.D. La. 1996) ...........................................................................14

*McCormack v. Noble Drilling Corp.*,
    608 F.2d 169 (5th Cir. 1979) ............................................................................28, 29

*Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
    453 U.S. 1 (1981) ....................................................................................................10

*Miles v. Apex Marine Corp.*,
    498 U.S. 19 (1990) ..................................................................................................11

*Mobil Oil Corp. v. Higginbotham*,
    436 U.S. 618 (1978) ................................................................................................11

*Mobil Oil Exploration & Producing SE, Inc. v. United States*,
    530 U.S. 604 (2000) ................................................................................................38

*Nat'l Envtl. Found. v. ABC Rail Corp.*,
    926 F.2d 1096 (11th Cir. 1991) ..............................................................................15

*Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atl. Corp.*,
    924 F. Supp 1436 (E.D. Va. 1996), *aff'd*, 122 F.3d 1062 (4th Cir. 1997) ........12, 36

*Northwest Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*,
    451 U.S. 77 (1981) ..................................................................................................11

*Offshore Logistics, Inc. v. Tallentire*,
    477 U.S. 207 (1986) ...........................................................................................36, 38

*Quaker State Corp. v. U.S. Coast Guard*,
    681 F. Supp. 280 (W.D. Pa. 1988) ..........................................................................19

*Robins Dry Dock & Repair v. Flint*,
    275 U.S. 303 (1927) ...........................................................................................29, 30

TABLE OF AUTHORITIES
(continued)

Page

*Rodrigue v. Aetna Cas. & Sur. Co.*,
    395 U.S. 352 (1969)..............................................................................33, 34

*Rogers v. Shell Oil Co.*,
    No. 92-1040, 1993 WL 30052 (E.D. La. Feb. 3, 1993).........................................27

*Ronquille v. MMR Offshore Servs., Inc.*,
    353 F. Supp. 2d 680 (E.D. La. 2004)...................................................21, 28

*Russo v. M/T Dubai Star*,
    No. C 09-05158 SI, 2010 WL 1753187 (N.D. Cal. Apr. 29, 2010).........................15

*Snyder Oil Corp. v. Samedan Oil Corp.*,
    208 F.3d 521 (5th Cir. 2000) ......................................................................34

*South Port Marine, LLC v. Gulf Oil LP*,
    234 F.3d 58 (1st Cir. 2000)........................................................................12

*Tanguis v. M/V Westchester*,
    153 F. Supp. 2d 859 (E.D. La. 2001) .........................................................12, 35

*Ten Taxpayer Citizens Group v. Cape Wind Assocs.*,
    373 F.3d 183 (1st Cir. 2004)......................................................................36

*Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co.*,
    448 F.3d 760 (5th Cir. 2006) ......................................................................32

*Thibodeaux v. Vamos Oil & Gas Co.*,
    No. Civ. A. 03-1883, 2005 WL 3019773 (W.D. La. Nov. 10, 2005)....................24

*Thomas v. Burlington Res. Oil & Gas Co.*,
    No. Civ. A. 99-3904, 2000 WL 1528082 (E.D. La. Oct. 13, 2000) (Barbier, J.) ..............21, 28

*Toussaint v. Chevron Phillips Chem. Co.*,
    2006 WL 2349465 (E.D. La. Aug. 11, 2006) .......................................................32

*Transcon. Gas Pipe Line Corp. v. Mr. Charlie*,
    294 F. Supp. 1025 (E.D. La. 1968), *aff'd in relevant part and rev'd in part on other
    grounds*, 424 F.2d 684 (5th Cir. 1970), *cert. denied*, 400 U.S. 832 (1970)...........................23

*Turner v. Murphy Oil USA, Inc.*,
    No. 05-4206, 2007 WL 4208986 (E.D. La. Nov. 21, 2007)..................................14

TABLE OF AUTHORITIES
(continued)

Page

*Union Texas Petroleum Corp. v. PLT Eng'g, Inc.*,
  895 F.2d 1043 (5th Cir. 1990) ................................................................34

*United States v. Dixie Carriers, Inc.*,
  627 F.2d 736 (5th Cir. 1980) .............................................................11, 37

*Wallace v. Oceaneering Int'l*,
  727 F.2d 427 (5th Cir. 1984) .............................................................28, 29

*Wilkins v. P.M.B. Sys. Eng'g, Inc.*,
  741 F.2d 795 (5th Cir. 1984) ................................................................28

*Wooten v. Pumpkin Air, Inc.*,
  869 F.2d 848 (5th Cir. 1989) ................................................................33

RULE

FED. R. CIV. P. 12................................................................................10

REGULATIONS

30 C.F.R. § 256.62................................................................................18

STATUTES

16 U.S.C. §§ 1451–1464.........................................................................37

16 U.S.C. § 1456...................................................................................38

33 U.S.C. 2701.................................................................................16, 19

33 U.S.C. 2702.......................................................................10, 13, 16, 35

33 U.S.C. 2713.................................................................................13, 14

33 U.S.C. 2718.................................................................................36, 38

33 U.S.C. 2751.................................................................................12, 35

42 U.S.C. § 9607...................................................................................19

43 U.S.C. § 1331...................................................................................32

43 U.S.C. §1333............................................................................32, 33, 34

TABLE OF AUTHORITIES
(continued)

Page

43 U.S.C. § 1349 ...................................................................................................32, 33, 38

FLA. STAT. § 376.121 (2010) ............................................................................................35

FLA. STAT. § 376.205 (2010) ............................................................................................35

**OTHER AUTHORITIES**

135 CONG. REC. H7954-02 (daily ed. Nov. 2, 1989) ........................................................14

H.R. REP. NO. 101-242, pt. 2 (1989) ...............................................................................14

H.R. REP. NO. 95-590 (1977), *reprinted in* 1978 U.S.C.C.A.N. 1450 ...........................33

RESTATEMENT (SECOND) OF TORTS § 414 cmt. a (1965) .................................................25

S. REP. NO. 101-94 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722 ...........................12, 33

## I.    INTRODUCTION

In Section III(B1) of PTO No. 11 [CMO No. 1], the Court directed Plaintiffs' Liaison Counsel to file a single master complaint on behalf of all plaintiffs in Pleading Bundle B1. Those plaintiffs had filed claims for nongovernmental economic loss and property damages, such as: "(i) *Robins Dry Dock* claims; (ii) OPA claims; and (iii) state law claims."  CMO No. 1 at 3. On December 15, 2010, Plaintiffs' Liaison Counsel filed their Master Complaint, Cross-Claim, and Third Party Complaint for Private Economic Losses in Accordance with PTO No. 11 [CMO No. 1] Section III(B1) ["B1 Bundle"], (hereafter "Mast. Compl. B1"), which amends and supersedes all previously filed complaints within Pleading Bundle B1.  *See* PTO No. 25 [Dkt. No. 983] at ¶5.  On February 9, 2011, Plaintiffs filed their First Amended Master Complaint, Cross-Claim, and Third Party Complaint for Private Economic Losses in Accordance with PTO No. 11 [CMO No. 1] Section III(B1) ["B1 Bundle"] (hereafter "Amend. Mast. Compl. B1").

Amended Master Complaint B1 asserts three claims against Anadarko E&P Company LP, Anadarko Petroleum Corporation; MOEX Offshore 2007 LLC; MOEX USA; and Mitsui Oil Exploration Co., Ltd.:[1] general maritime negligence (Count I(A)); a claim under the federal Oil Pollution Act (Count II); and a claim for strict liability pursuant to the Florida Pollutant Discharge Prevention and Control Act (Count III(D)).[2]  All three claims fail as a matter of law

---

[1]     Named defendant Mitsui Oil Exploration Co., Ltd. ("MOECO") has not been served with any individual complaint in connection with this case or with Master Complaint B1 and does not join in this Motion or otherwise appear for any purpose in the MDL court.  Simply for ease, this Motion refers to (a) the movants together as the "Non-Operating Defendants;" and to (b) Anadarko Petroleum Corporation and Anadarko E&P Company LP, together as "Anadarko."  All movants are independent and distinct corporate entities, and by using the shorthand, movants do not suggest or acknowledge otherwise.

[2]     Plaintiffs exclude the Non-Operating Defendants from the remaining claims in their Complaint. They bring Count I(B) against the "Drilling Defendants" (BP, Transocean, Halliburton, and M-I) and Cameron; Count I(C) against Cameron; Count I(D) against Weatherford; Count III(A–B) against the "Drilling Defendants," Cameron, and Weatherford; Count III(C) against BP, Halliburton, and Transocean; Count IV against BP, Transocean, and Halliburton; and Count VI against BP.  Count V for Declaratory Relief: Punitive Damages relates only to relief sought from Defendants against whom

1

and must be dismissed.  The comprehensive and reticulated liability scheme set forth in the Oil Pollution Act ("OPA") provides the exclusive remedy for oil-pollution cases governed by federal or the general maritime law.  Therefore, OPA displaces duplicative causes of action under the general maritime law.

Plaintiffs' OPA claim fails because Plaintiffs have not alleged that each individual plaintiff has complied with OPA's pre-suit presentment requirement.  OPA's presentment requirement is a jurisdictional prerequisite to filing suit, and all OPA claims by individual plaintiffs that have not complied must be dismissed.  Furthermore, Plaintiffs fail to state a claim under OPA against Anadarko E&P because it was not a lessee of the Macondo Prospect at the time of the discharge.

Even if Plaintiffs could resort to the general maritime law, their maritime negligence claim would still fail.  Taken as true, Plaintiffs' factual allegations establish that the Non-Operating Defendants are <u>not liable</u> for negligence under maritime law.  Furthermore, Plaintiffs' maritime negligence claim against the Non-Operating Defendants is barred by the economic loss rule.

Plaintiffs' state law claim pursuant to the Florida Pollution Discharge Control and Prevention Act fails because state law does not apply to this case.  Federal law alone applies to claims arising out of and in connection with oil exploration, development, and extraction operations on the Outer Continental Shelf ("OCS").  Although federal law sometimes borrows state law as surrogate federal law in OCS cases, it does not do so in this case, and even if it did, it would not borrow Florida law.

Accordingly, Plaintiffs' three claims against the Non-Operating Defendants in Amended

---

Plaintiffs have asserted claims for punitive damages.  Because Plaintiffs seek punitive damages only against BP, Transocean, and Halliburton, Count XI does not apply to the Non-Operating Defendants.

Master Complaint B1 must be dismissed.

## II.     RELEVANT FACTUAL ALLEGATIONS IN MASTER COMPLAINT B1

Plaintiffs allege that on April 20, 2010, a blowout caused explosions on the *Deepwater Horizon*, an "oil vessel" operating 48 miles off the coast of Louisiana.  Amend. Mast. Compl. B1 at ¶¶ 198, 272.  The *Deepwater Horizon* sank, breaking a riser pipe that had connected the vessel to the wellhead on the seafloor.  *Id.* at ¶ 199.  Plaintiffs allege that oil began to spill from the broken pipe into the Gulf of Mexico.  *Id.*  Plaintiffs claim that the spill damaged environmental and natural resources and, because waters were closed to fishing, swimming, and boating, caused economic damage as well.  *Id.* at ¶ 204.  Plaintiffs also claim that fishermen and other marine-related businesses have lost income and that real property owners have suffered loss, damage, or diminution of property value.  *Id.*

### A.     Plaintiffs Allege Thirteen Distinct Categories of Amended Master Complaint B1 Plaintiffs.

Plaintiffs identify the following categories of plaintiffs whose claims are superseded and amended by Amended Master Complaint B1: (a) the "Commercial Fishermen Plaintiffs," including commercial fishermen, shrimpers, crabbers, oystermen, and owners and operators of business involving commercial fishing, shrimping, and oystering; (b) the "Processing and Distributing Plaintiffs," including seafood processors, distributors, retail and seafood markets, and restaurant owners, operators, and employees; (c) the "Recreational Business Plaintiffs," including recreational business owners, operators, and workers; (d) the "Commercial Business Plaintiffs," including commercial businesses, business owners, and workers, divers, offshore oil service, repair, and supply, real estate agents; and supply companies and their employees; (e) the "Recreation Plaintiffs," including sport fishermen, recreational divers, beachgoers, and recreational boaters; (f) the "Plant and Dock Worker Plaintiffs," including commercial seafood

plaint workers, longshoremen, and ferry operators; (g) the "VoO Plaintiffs," including boat captains, crews, charterers, and workers who were not adequately compensated for their work or whose property was damaged as a result of work in the Vessels of Opportunity Program; (h) the "Real Property Plaintiffs," including the owners, lessors, and lessees of real property alleged to be physically or economically damaged, harmed, or impacted; (i) the "Real Property/Tourism Plaintiffs," including hotel owners and operators, vacation rental owners and agents, and those who earn a living from the tourism industry; (j) the "Banking/Retail Business Plaintiffs," including banks, financial institutions, and retail businesses that allegedly suffered losses as a result of the spill; (k) the "Subsistence Plaintiffs," who allegedly use natural resources for subsistence; (l) the "Moratorium Plaintiffs," including oil service companies, workers, and suppliers who have lost income due to the moratorium on drilling in the Gulf of Mexico imposed by the U.S. Department of the Interior; and (m) the "Dealer Claimants," including automobile and boat businesses and their employees who allegedly suffered loss of income and profits.  *Id.* at    ¶ 209 (a–m).[3]

> **B.    Plaintiffs Allege Three Distinct Categories of Defendants Named in Amended Master Complaint B1.**

Plaintiffs recognize that the Non-Operating Defendants are distinct among the named defendants.  Specifically, Plaintiffs divide the defendants in Amended Master Complaint B1 into three categories: (1) the "Drilling Defendants," including certain BP entities, certain Transocean entities, Halliburton, and M-I, all of whom allegedly operated the *Deepwater Horizon* and participated in the drilling operations in a manner that caused harm, Amend. Mast. Compl. B1 at

---

[3]    Plaintiffs also include Class Action Allegations in Amended Master Complaint B1 at ¶¶ 544–566. While defendants normally are able to move to dismiss class action claims, *see John v. Nat'l Sec. Fire and Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007), the Non-Operating Defendants have not done so here because the Court has stayed class action motion practice and deadlines.  CMO 1 at 12.  The Non-Operating Defendants thus do not waive any argument that the class action allegations in Master Complaint B1 are insufficient as a matter of law.

¶¶ 210–229; (2) the "Products Liability Defendants," including Weatherford and Cameron, who allegedly manufactured defective products that, when used on the *Deepwater Horizon*, caused harm, *id.* at ¶¶ 230-232; and (3) the "Non-Operating Investor Defendants," including Anadarko Petroleum Corporation; Anadarko E&P Company LP; MOEX Offshore 2007 LLC; MOEX USA Corporation; and Mitsui Oil Exploration Co., Ltd.  Anadarko and MOEX Offshore are alleged to be "non-operational leaseholders" of the area where the Drilling Defendants conducted their operations but, unlike the other categories of defendants, are not alleged to have engaged in any affirmative conduct causing harm or to have controlled the conduct of others causing harm.  *Id.* at ¶¶ 233–50.  Pertinent allegations about each category of defendants are summarized below.

### 1.     The Drilling Defendants.

The "Drilling Defendants" all are alleged to have been involved in "the drilling, cementing, and other temporary well abandonment activities of the Deepwater Horizon."  *Id.* at ¶ 229; *see also id.* at ¶ 593 ("At all times material hereto, the Deepwater Horizon was leased and operated pursuant to a contract between Transocean and BP.  Together, Transocean and BP and other Drilling Defendants were responsible for design and well control").  Plaintiffs allege that the Drilling Defendants' actions "caused and/or contributed to the Spill."  *Id.* at ¶ 229.

Plaintiffs allege that BP is a "lease holder and the designated operator of the lease granted by the former Minerals Management Service ('MMS') allowing it to perform oil exploration, drilling and production related operations in Mississippi Canyon Block 252," also known as the Macondo Prospect, "where the Spill originated."  *Id.* at ¶ 210.  "As lease operator of the Macondo Prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations."  *Id.* at ¶ 219.

Plaintiffs allege that Transocean was the "owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon." *Id.* at ¶ 220. "At the Macondo site, Transocean provided the Deepwater Horizon vessel and personnel to operate it." *Id.* at ¶ 225. At "all times relevant to the Spill, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems." *Id.* Transocean also allegedly provided "operational support for drilling-related activities on board the Deepwater Horizon, as well as onshore supervision and support for those drilling activities . . . ." *Id.*; *see also id.* at ¶ 588 ("At all times material hereto the Deepwater Horizon was owned, navigated, manned, possessed, managed and controlled by Transocean").

Plaintiffs allege that Halliburton provided "technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo well." *Id*. at ¶ 226. At the time of the blowout, Halliburton was allegedly "engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx" of oil and gas. *Id.* Sperry Drilling Services, a division of Halliburton, allegedly provided mudlogging personnel on the *Deepwater Horizon*, who were partially responsible for monitoring the well. *Id.* at ¶ 227.

Plaintiffs allege that M-I provided drilling mud products, personnel, and services used on the *Deepwater Horizon*, "including drilling fluids and spacers, engineering services, and mud supervisory personnel, such as mud engineers and drilling fluid specialists, to manage the properties of those fluids in the well." *Id.* at ¶ 228.

### 2.    The Products Liability Defendants.

Plaintiffs allege that Cameron "manufactured, designed, supplied, and/or installed the Deepwater Horizon's sub-sea emergency well-closure device known as a blowout-preventer ('BOP') . . . ." *Id.* at ¶ 230. The BOP allegedly "failed to operate as intended at the time of the blowout on April 20, 2010, was improperly designed, was inappropriate for its intended

6

environment or use, and/or possessed product defects." *Id.* Plaintiffs also allege that Weatherford "designed and manufactured, marketed, sold, and/or distributed the casing components such as the float collar, shoe, centralizers appurtenant to the vessel, and provided the personnel and equipment for running the casing and casing components into the wellbore" of the Macondo well. *Id.* at ¶ 231.

### 3. The Non-Operating Defendants.

Plaintiffs allege that Anadarko Petroleum Corporation and Anadarko E&P are "oil and gas exploration" companies with minority leasehold interests in the Macondo Prospect, and that both are parties to the "Macondo Prospect Offshore Deepwater Operating Agreement" with BP. *Id.* at ¶¶ 233–34. Plaintiffs also allege that MOEX Offshore is in the business of oil and gas exploration, holds a minority leasehold interest in the Macondo Prospect, and is a party to the Operating Agreement with BP. *Id.* at ¶¶ 235. Plaintiffs also name MOEX USA and Mitsui Oil Exploration Co., Ltd. ("MOECO") as defendants. *Id.* at ¶¶ 236–50.

Plaintiffs allege that pursuant to the "Macondo Prospect Offshore Deepwater Operating Agreement," Anadarko and MOEX Offshore "held the following working interest ownership percentages in the lease of the Macondo Prospect: BP E&P, 65%; MOEX Offshore, 10%, Anadarko E&P, 22.5%; and Anadarko, 2.5%." *Id.* at ¶ 247. Plaintiffs further allege that pursuant to the Operating Agreement, as "non-operational leaseholders" Anadarko and MOEX Offshore possessed a right to receive certain types of information from BP regarding BP's drilling operations at the Macondo Prospect, including BP's files and audits, and "access to Halliburton/Sperry Sun INSITE real-time data that was transmitted from the Deepwater Horizon on April 20, 2010 . . . ." *Id.* at ¶¶ 282–85, 573. Plaintiffs also allege that pursuant to the Operating Agreement with BP, Anadarko and MOEX Offshore were "on notice" of certain provisions of BP's well plan and possessed contractual rights to suggest proposed well plans, call

meetings with BP, approve press releases, and conduct health, safety and environmental ("HSE") inspections. *Id.* at ¶¶ 283-285.   Based on these allegations, Plaintiffs assert that the Non-Operating Defendants "owed a duty to Plaintiffs to warn of the impending disaster in sufficient time to avert it" and that the Non-Operating Defendants "breached their duties to Plaintiffs by failing to warn the drilling vessel crew of the imminent blowout so that they could take evasive action." *Id.* at ¶ 573.

In the same vein, Plaintiffs allege that "[e]ngineers knowledgeable about blowout responses told BP how to kill the well as early as June 2010" but that BP, after "conferring" with the Non-Operating Defendants, "chose to ignore the engineers' well-kill procedure, because BP did not want to damage the well . . . ." *Id.* at ¶ 486.   Plaintiffs further allege that BP, "along with" the Non-Operating Defendants, "hoped to retap the Macondo well" and "ignored expert well-kill information that could have stopped the Spill many weeks earlier." *Id.*

The sparseness of Plaintiffs' allegations against the Non-Operating Defendants is telling. Plaintiffs seek to impose liability on the Non-Operating Defendants based entirely on their alleged ability to access information about the operations, whether obtained through access to plans, data or a right to conduct inspections.   Plaintiffs do <u>not</u> allege that the Non-Operating Defendants had any operational involvement in, control of, or supervisory authority over the engineering or design of the Macondo well; the *Deepwater Horizon* or its crew; the drilling operations conducted at the Macondo Prospect; the completion operations conducted on the Macondo well; or the post-April 20, 2010 cleanup activities.   Plaintiffs do <u>not</u> allege that any of the Non-Operating Defendants had any ownership, contractual, or leasehold interest in the *Deepwater Horizon*, and Plaintiffs do <u>not</u> allege that any of the Non-Operating Defendants manufactured or distributed any product used on the *Deepwater Horizon*.

8

## III.    ARGUMENT

**PLAINTIFFS FAIL TO STATE ANY CLAIMS
AGAINST THE NON-OPERATING DEFENDANTS
FOR WHICH RELIEF CAN BE GRANTED.**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555); *see Hershey v. Energy Transfer Partners*, 610 F.3d 239, 245–46 (5th Cir. 2010) (same).

Rather, to state a claim for relief, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).  If the factual allegations do not raise a right to relief "above the speculative level," *Twombly*, 550 U.S. at 555, or if the allegations reveal an insuperable bar to relief, *Jones v. Bock*, 549 U.S. 199, 215 (2007), a claim should be dismissed.  In the latter circumstance, which applies here, the plaintiff "pleads himself out of court by 'admitting all the ingredients of an impenetrable defense.'"  *Barasich v. Shell Pipeline Co.*, No. 05-4180, 2006 WL 3913403, at *2 (E.D. La. Nov. 20, 2006) (Barbier, J.) (internal citations omitted) (granting Rule 12(b)(6) dismissal in part).

**A.**     **Plaintiffs' Maritime Negligence Claim Against the Non-Operating Defendants Fails as a Matter of Law Because Maritime Law Is Superseded by the Oil Pollution Act in this Case.**

Invoking maritime negligence, Plaintiffs seek recovery from the Non-Operating Defendants for injuries to real and personal property, lost profits and earning capacity, damages to natural resources, and loss of subsistence use of natural resources allegedly caused by an oil spill in the navigable waters.  Amend. Mast. Compl. B1 at ¶ 209 (a–m), 614–26.  Those damages are indisputably "covered damages" under OPA.  *See* 33 U.S.C. §§ 2702(b)(2)(A), (B), (C), and (E) (listing "Natural resources," "Real or personal property," "Subsistence use," and "Profits and earning capacity" as "covered damages" in OPA cases).  Because OPA is the exclusive federal remedy for claimants seeking "covered damages" after an oil spill, Plaintiffs' duplicative maritime negligence claim is unavailable and so must be dismissed.

Comprehensive congressional legislation in an area displaces preexisting federal common law in that area.  *See*, *e.g.*, *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 11 (1981) (Federal Water Pollution Control Act, as amended, displaced federal common law of nuisance in area of ocean pollution); *United States v. Dixie Carriers, Inc*., 627 F.2d 736, 740–42 (5th Cir. 1980) (holding that the Federal Water Pollution Control Act provides the exclusive legal remedy for the government to recover oil spill cleanup costs).  Federal common law is a last resort, so "when Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears."  *City of Milwaukee v. Illinois*, 451 U.S. 304, 314 (1981) (Clean Water Act displaces federal common law of interstate pollution).

That well-settled principle has equal force "[e]ven in admiralty . . . where the federal judiciary's lawmaking power may well be at its strongest" because it remains the "duty [of the judiciary] to respect the will of Congress."  *Northwest Airlines, Inc. v. Transp. Workers Union of*

*Am., AFL-CIO*, 451 U.S. 77, 96 (1981).   Thus federal courts have held, in a variety of circumstances, that federal statutes displace non-statutory maritime causes of action.  *See*, *e.g.*, *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978) (Death on the High Seas Act ("DOHSA") "announces Congress' considered judgment," and while it does not address every issue of wrongful death law, "when it does speak directly to a question, the courts are not free to 'supplement' Congress' answer so thoroughly that [DOHSA] becomes meaningless"); *Conner v. Aerovox, Inc.*, 730 F.2d 835, 840–41 (lst Cir. 1984) (Federal Water Pollution Control Act displaces genera1 maritime law tort claims).  Federal courts also hold that they cannot, under the guise of maritime law, supplement applicable federal statutes.  *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 31–33 (1990) (declining to supplement the damages provisions of the Jones Act with general maritime law remedies).

OPA is no different.  Courts have uniformly held that "Congress intended the OPA to be the exclusive federal law governing oil spills." *South Port Marine, LLC v. Gulf Oil LP*, 234 F.3d 58, 65–66 (1st Cir. 2000) (holding that punitive damages were not available under OPA because "Congress's very specific treatment of oil pollution in the OPA, which does not provide for punitive damages, supplanted general admiralty and maritime law, which has traditionally provided for the general availability of punitive damages for reckless conduct").  "OPA clearly preempts maritime law as to recovery of cleanup expenses and the cost of compensating injured persons" from an oil spill.  *Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atl. Corp.*, 924 F. Supp 1436, 1447 (E.D. Va. 1996), *aff'd*, 122 F.3d 1062 (4th Cir. 1997).

OPA's legislative history confirms that the Act is the exclusive federal cause of action for economic loss claims arising from oil pollution that displaces federal maritime law.  OPA "creates a <u>single</u> Federal law providing clean up authority, penalties, and liability for oil

pollution." S. REP. NO. 101-94, at 9 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722, 730 (emphasis added); *see Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859, 867–68 (E.D. La. 2001) ("The Senate found that 'the Nation need[ed] . . . to replace the inadequate and 'fragmented collection of Federal and State laws' in existence prior to OPA").

Maritime causes of action, like Plaintiffs' maritime negligence theory, are not preserved by OPA Section 2751, which provides, "Except as otherwise provided in this Act, this Act does not affect . . . admiralty and maritime law. . . ." 33 U.S.C. § 2751(e). "[S]ection 2751 only preserves admiralty claims which are not addressed in OPA," such as claims for collision damages. *Nat'l Shipping Co.*, 924 F. Supp. at 1447. In other words, Section 2751 confirms Congress's intent that OPA provide the exclusive federal remedy for claims arising out of oil spills. This Court has reached the same conclusion. *See, e.g., Tanguis*, 153 F. Supp. 2d at 867 (holding that OPA "includes new remedies, which, in many respects, preempt traditional maritime remedies"); *Gabarick v. Laurin Mar. (Am.) Inc.*, 623 F. Supp. 2d 741, 750–51 (E.D. La. 2009) (holding that all general maritime law claims that are recoverable under OPA, and specifically those covered damages enumerated in 33 U.S.C. § 2702, are preempted by OPA).

In sum, because OPA displaces maritime claims arising out of oil pollution, Plaintiffs' maritime negligence claim against the Non-Operating Defendants must be dismissed with prejudice. Because the B1 Bundle Plaintiffs seek damages covered by OPA Section 2702, OPA is their only potential recourse.

###### B. Plaintiffs' OPA Claim Against the Non-Operating Defendants Fails Because They Do Not Allege That Each Plaintiff Complied with OPA's Pre-Suit Presentment Requirement.

OPA requires that "all claims for removal costs or damages <u>shall</u> be presented first to the responsible party . . . of the source designated under section [2714(a) of this title]." 33 U.S.C. § 2713(a) (emphasis added). A claimant may elect to commence an action in court against a

responsible party only after presenting his claim, and only after the responsible party either denies liability or does not settle within 90 days.  33 U.S.C. § 2713(c).

Plaintiffs allege that "[t]o the extent required by law and/or by consent or stipulation by BP, Plaintiffs have satisfied, or will have satisfied, all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), as to each and all defendants, by the submission of their claims to the Gulf Coast Claims Facility (the 'GCCF') and/or BP and/or its agents or designees."  Amend. Mast. Compl. B1 at ¶ 689 (emphasis added).  On its face, that allegation fails the mandatory presentment requirement of OPA.  Contrary to Plaintiffs' apparent view, their presentment failure cannot be cured by a tardy presentment of their claims in the midst of ongoing litigation. Because the Court lacks jurisdiction over claims that have not been presented, Plaintiffs' OPA claim must be dismissed.

Simply put, "the clear text of § 2713 creates a mandatory condition precedent barring all OPA claims unless and until a claimant has presented her claims . . . ."  *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*, 51 F.3d 235, 240 (11th Cir. 1995) (emphasis added).  By failing to comply and rushing to the courthouse instead, Plaintiffs undermine one of the principal purposes of OPA.  Congress wanted to avoid slow and costly litigation and believed that lawsuits are appropriate only "where attempts to reach a settlement with the responsible party . . . were unsuccessful."  H.R. REP. NO. 101-242, pt. 2, at 66 (1989); *see* 135 CONG. REC. H7954-02 (daily ed. Nov. 2, 1989) (statement of Rep. Hammerschmidt), 135 CONG. REC. H7954-02, at *H7965 (Westlaw) (OPA is "intended to allow for quick and complete payment of reasonable claims without resort to cumbersome litigation"); *id.* at *H7962 (statement of Rep. Lent) ("The thrust of [OPA] is to eliminate, to the extent possible, the need for an injured person to seek recourse through the litigation process . . . ."); *id.* at *H7955 (statement of Rep. Jones) ("We do not want

13

claimants to have to wait years upon years to recover their losses while lawsuits drag on in the courts"). The claims presentment provision reflects a compromise "to temper the Act's increased liability with a congressional desire to encourage settlement and avoid litigation." *Boca Ciega*, 51 F.3d at 238–39 (citing legislative history of the Act). This central congressional purpose—the fundamental premise and condition precedent for the enactment and application of the Oil Pollution Act—cannot be ignored for the sake of convenience or any other reason.

Accordingly, courts—including this Court—have consistently held that OPA's presentment requirement "is jurisdictional and mandates dismissal when . . . not complied with by the claimant." *Marathon Pipe Line Co. v. LaRouche Indus. Inc.*, 944 F. Supp. 476, 477 (E.D. La. 1996); *see also Turner v. Murphy Oil USA, Inc.*, No. 05-4206, 2007 WL 4208986, at *2 (E.D. La. Nov. 21, 2007) (presentment provision is a "'mandatory condition precedent'" to bringing a suit under OPA) (quoting *Boca Ciega*, 51 F.3d at 240); *Russo v. M/T Dubai Star*, No. C 09-05158 SI, 2010 WL 1753187, at *2–3 (N.D. Cal. Apr. 29, 2010) (collecting cases holding that OPA's presentment requirement is jurisdictional and mandates dismissal for failure to comply). Indeed, this Court has ruled that dismissal, not some lesser remedy, is the proper course when a party files an OPA claim in court before presenting it to a responsible party. *Gabarick v. Laurin Maritime (Am.) Inc.*, No. 08-4007, 2009 WL 102549, at *3 (E.D. La. Jan. 12, 2009) (dismissing OPA claims for failing to comply with OPA's presentment requirement and denying plaintiff's request for a stay in lieu of dismissal). Jurisdictional defects, like failure to comply with the presentment requirement, cannot be cured in the midst of litigation. *Hallstrom v. Tillamook County*, 493 U.S. 20, 33 (1989) (holding that failure to comply with a 60-day notice provision necessitates dismissal and that a district court cannot stay the case to await compliance); *Nat'l Envtl. Found. v. ABC Rail Corp.*, 926 F.2d 1096, 1097–98 (11th Cir. 1991)

14

("If a plaintiff fails to comply with [the notice requirement of the Clean Water Act] where it is applicable, the district court is required to dismiss the action"); *Gregory v. Mitchell*, 634 F.2d 199, 203–04 (5th Cir. 1981) (holding that "[t]he requirement of exhaustion of administrative review is a jurisdictional requisite to the filing of an action under the FTCA" and that the failure to exhaust cannot be cured by a stay of the case until the requirement is met); *Hooper v. Thomas*, No. 01-1730, 2002 WL 1268399, at *1 (E.D. La. June 5, 2002) (holding that the "federal court's power to adjudicate a claim brought under the Federal Tort Claims Act depends solely on whether the claimant has previously complied" with the mandatory notice requirement and that a "stay pending exhaustion cannot cure a jurisdictional defect which was present when the suit was filed").

Because Plaintiffs have failed to comply with OPA's presentment requirement, dismissal of the OPA claim in Amended Master Complaint B1 is mandatory.  While some individual plaintiffs may have complied with the pre-suit presentment requirement, others have not.  Any individual plaintiff that has failed to comply can re-file only after properly presenting a claim and awaiting either rejection of the claim or expiration of the 90-day statutory period.  *See Gabarick*, 2009 WL 102549, at *3.

C.    **Plaintiffs' OPA Claim Against Anadarko E&P Must Be Dismissed Because Anadarko E&P Did Not Hold a Lease Interest in the Macondo Prospect at the Time of the Discharge.**

Plaintiffs allege that Anadarko E&P is liable as a responsible party under OPA because it "held a leasehold interest in a lease granted by the MMS for Block 252, Mississippi Canyon (the 'Macondo lease') . . . before and/or at the time of the Spill."  *Id.* at ¶ 681 (emphasis added). Plaintiffs go on to state that Anadarko E&P was a lessee "at the time of the Spill" and is a responsible party pursuant to Section 2701 (16) and (32) of OPA.  *Id.*  This is demonstrably

15

groundless because Anadarko E&P held <u>no interest in the lease as of April 1, 2010</u>.  Plaintiffs' OPA claim against Anadarko E&P fails as a matter of law and must be dismissed.

Publicly available Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE") records demonstrate that Anadarko E&P's status as a lessee of the Macondo Prospect terminated effective April 1, 2010.  *See* Ex. B.[4]  Before the *Deepwater Horizon* incident, Anadarko E&P assigned its interest in the lease to Anadarko Petroleum Corporation and forwarded that assignment to the MMS for approval.  *See* Ex. C, Assignment of Record Title Interest In Federal OCS Oil And Gas Lease.  Although MMS did not approve the assignment until April 28, 2010, by law the effective date of the assignment as approved by the MMS was April 1, 2010. 30 C.F.R. § 256.62(c); Ex. C.  As a matter of law, Anadarko E&P held no interest in the lease at the Macondo Prospect as of April 1, 2010, and, therefore, is not a person "holding a leasehold interest" or a "lessee" under OPA.

Plaintiffs recognize that Anadarko E&P no longer held an interest in the Macondo Lease as of April 1, 2010, but now seek to obscure this fact through artful pleading.  Plaintiffs alleged in their original Master Complaint for Pleading Bundle B1:  "According to MMS's website, <u>effective April 1, 2010</u>, record title interest in the Macondo prospect was held as follows:  BP Exploration, 65%; MOEX Offshore, 10%; and, Anadarko, 25%."  Mast. Compl. B1 at ¶ 217 (Dkt. No. 879) (emphasis added).  In their Amended Master Complaint B1, Plaintiffs now allege

---

[4]      Lease Owner Query Search Results, BUREAU OF OCEAN ENERGY MANAGEMENT, REGULATION AND ENFORCEMENT, http://www.gomr.boemre.gov/homepg/fastfacts/leaseOwner/master.asp (check box next to "Lease Number;" enter G32306 into text box next to "Lease Number;" click "Submit Query" button). Ex. B.  Master Complaint B3 expressly references the cited MMS records, Mast. Compl. B3 at ¶ 46, and the website is a matter of public record of which the Court may take judicial notice.  *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (noting that documents attached to motion to dismiss are considered part of pleadings if referenced in complaint and central to claim) (internal citations omitted); *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) ("In deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record") (internal citations omitted).

that "[a]t all relevant times, Anadarko E&P . . . held a 22.5% ownership interest in the lease." Amend. Mast. Compl. B1 at ¶ 234.  Further, in Master Complaint B3, Plaintiffs admit that "[a]ccording to MMS records," Anadarko E&P no longer held record title interest in the Macondo Lease, effective April 1, 2010.  Mast. Compl. B3 at ¶ 46 (Dkt. No. 881).

Because Anadarko E&P held no leasehold interest in the Macondo Prospect on April 20, 2010, Plaintiffs apparently assert that parties that <u>held</u> a leasehold interest prior to a discharge also can be responsible parties under the Act.  Amend. Mast. Compl. B1 at ¶ 681.  But OPA's definition of the term "lessee" does not include <u>former lessees</u>.  *See Carr v. United States*, 130 S. Ct. 2229, 2236 (2010) ("Consistent with normal usage, we have frequently looked to Congress' choice of verb tense to ascertain a statute's temporal reach") (internal citations omitted); *cf.* 42 U.S.C. § 9607(a)(2) (imposing former owner/operator liability on persons who "owned or operated" facility at time of a disposal).  Rather, under OPA, former lessees are responsible parties only in "the case of an abandoned . . . offshore facility," which is not the case here.  33 U.S.C. § 2701(32)(F).  If former lessees were also liable as responsible parties, then this provision would be superfluous.  *See Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 520 n.11 (5th Cir. 2004) ("[A] statute should be construed such that none of its terms are redundant. . . .") (internal citations omitted).  Courts have construed similar provisions in the Clean Water Act as defining liable parties based on the time of the discharge or discovery of the discharge.  *See, e.g.*, *Quaker State Corp. v. U.S. Coast Guard*, 681 F. Supp. 280, 285 (W.D. Pa. 1988).

Because the assignment of the lease was effective as a matter of law on April 1, 2010, prior to the *Deepwater Horizon* incident, Anadarko E&P did not hold any leasehold interest on the date of the discharge on April 20, 2010.  Amend. Mast. Compl. B1 at ¶ 34.  Thus, Plaintiffs' OPA claim against Anadarko E&P fails as a matter of law and must be dismissed.

17

**D.**    **Even if Plaintiffs' Maritime Negligence Claim Is Not Displaced by OPA, Plaintiffs Fail to State a Claim for Negligence Against the Non-Operating Defendants.**

"To establish maritime negligence, a plaintiff must 'demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury.'"  *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) (quoting *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991)).   Plaintiffs allege no facts that, if true, would establish that the Non-Operating Defendants are liable for negligence.  On the contrary, the facts alleged in Amended Master Complaint B1 make clear that, as a matter of law, the Non-Operating Defendants <u>are not liable</u> for Plaintiffs' alleged injuries.  Plaintiffs' maritime negligence claim against the Non-Operating Defendants must be dismissed for this reason as well.

**1.**    **Plaintiffs do not allege that the Non-Operating Defendants conducted or had operational control over any of the activities that allegedly caused them harm.**

It is fundamental that a duty to prevent harm resulting from oil and gas operations arises as a consequence of operational control over the activity.  *See, e.g.*, *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550 (5th Cir. 1987), *cert. denied*, 485 U.S. 1034 (1988).  It is also settled that where a principal contracts with an independent contractor to conduct oil and gas operations but retains no operational control, the principal neither assumes nor owes any duty to protect others from the contractor's negligence.  *Thomas v. Burlington Res. Oil & Gas Co.*, No. Civ. A. 99-3904, 2000 WL 1528082, at *2 (E.D. La. Oct. 13, 2000) (Barbier, J.).  Even where a principal without operational control has <u>actual knowledge</u> of dangerous conditions on an oil rig, the principal has no legal duty to intercede.  *See id.*; *Ronquille v. MMR Offshore Servs., Inc.*, 353 F. Supp. 2d 680, 682 (E.D. La. 2004) (the presence of a company representative on an oil platform with knowledge of the rig's operations "is insufficient to create a duty; therefore, the law does

18

not support the imposition of liability for any failure to intercede").[5]

"Operational control" requires "direct supervision over the step-by-step process of accomplishing the work." *Guillory v. Conoco, Inc. v. Cont'l Oil Co.*, 521 So.2d 1220, 1223 (La. App. 3d Cir.), *cert. denied*, 526 So.2d 801 (La. 1988); *Grammer v. Patterson Servs., Inc.*, 860 F.2d 639, 644 (5th Cir. 1988), *cert. denied*, 491 U.S. 906 (1989) (same).  Whether a principal retains operational control "depends in large measure on whether and to what degree the <u>right</u> to control has been contractually reserved by the principal.  Whether or not <u>actual</u> supervision or control was exercised by the principal is less significant." *LeJeune v. Shell Oil Co.*, No. 90-0614, 1991 WL 28879, at *2 (E.D. La. Feb. 27, 1991) (citing *Ainsworth,* 829 F.2d at 551.

Plaintiffs do not allege that the Non-Operating Defendants retained a contractual right to control BP or any other defendant.  Plaintiffs allege only that the Non-Operating Defendants are, at most, minority, non-operating leaseholders of the Macondo Prospect and that they entered into an Operating Agreement with BP under which BP possessed sole authority to conduct all operations on the leased property. Amend. Mast. Compl. B1 at ¶¶ 281–85.  Possessing a <u>non-operating</u> interest in a lease does not, by itself, give rise to a duty to third parties like Plaintiffs; does not, by itself, suggest that the Non-Operating Defendants acted in a way that breached any such duty; and does not, by itself, plausibly show that Plaintiffs' injuries resulted from an act of the Non-Operating Defendants.   On the contrary, the allegation that the Non-Operating Defendants are "<u>non-operational</u> leaseholders" <u>negates</u> the inference that they conducted any of the operations that allegedly led to Plaintiffs' injuries.  The utter absence of allegations about the

---

[5]     Plaintiffs also assert the applicability of the doctrine of *res ipsa loquitur*.  Amend. Mast. Compl. B1 at ¶ 610.  That is a legal conclusion, not a factual allegation assumed to be true on a motion to dismiss. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  In addition, as a legal matter, *res ipsa loquitur* applies only "when a thing which causes injury . . . is shown to be under the exclusive control of the defendant." *Fruge v. Penrod Drilling Co.*, 918 F.2d 1163, 1166 (5th Cir. 1990) (quoting *San Juan Light & Transit Co. v. Requena*, 224 U.S. 89, 98–99 (1912)).  The Plaintiffs' allegations establishing the Non-Operating Defendants' lack of control make *res ipsa loquitur* inapplicable.

conduct of the Non-Operating Defendants contrasts sharply with the extensive allegations about the conduct of the Drilling Defendants, who allegedly undertook the drilling operation, designed the well, and maintained control of it.  *See* Amend. Mast. Compl. B1 at ¶ 229.

Because the Non-Operating Defendants did not conduct or control any of the operations that allegedly caused Plaintiffs harm, Plaintiffs attempt to impose liability on the Non-Operating Defendants based upon their alleged rights to conduct safety inspections and their alleged access to information about BP's operations.  Both of Plaintiffs' efforts fail as a matter of well-established law.

### 2.   The Macondo Prospect Offshore Deepwater Operating Agreement establishes that BP is an independent contractor with sole authority to conduct operations on the leased property.

The Macondo Prospect Offshore Deepwater Operating Agreement ("Operating Agreement"), on which Plaintiffs extensively rely, makes clear that BP was an independent contractor and that the Non-Operating Defendants retained no operational control over BP's drilling operations on the leased property.  *See* Amend. Mast. Compl. B1 at ¶¶ 281–85; Ex. A, Macondo Prospect Offshore Deepwater Operating Agreement.[6]  The Operating Agreement vests all authority to control the drilling operations in BP.  Article 4.1 designates "BP Exploration & Production Inc." as the "Operator."  Ex. A at 14.  Article 5.1 provides that "the Operator has the

---

[6]      "[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) (internal citation and quotation marks omitted); *see In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) ("[B]ecause the defendants attached the contracts to their motion to dismiss, the contracts were referred to in the complaints, and the contracts are central to plaintiffs' claims, we may consider the terms of the contracts in assessing the motions to dismiss"); *Kane Enters. v. MacGregor Inc.*, 322 F.3d 371, 374 (5th Cir. 2003) ("[T]he court may review the documents attached to the motion to dismiss, e.g., the contracts in issue here, where the complaint refers to the documents and they are central to the claim") (internal citation omitted).  Because Plaintiffs' claims against the Non-Operating Defendants are based solely upon their leasehold interests in the Macondo well and their contractual relationship with BP, the Court may consider the Agreement in ruling on this motion to dismiss.

exclusive right and duty to conduct (or cause to be conducted) all activities or operations under this Agreement." *Id.* at 20 (emphases added).  In performing services under the Operating Agreement,  BP is an "independent contractor, not subject to the control or direction of Non-Operating Parties . . . ." *Id.* (emphases added).  Thus, Plaintiffs' own allegations establish that BP was an independent contractor, and nothing in the Operating Agreement supports Plaintiffs' contention that the Non-Operating Defendants owed any duty to the Plaintiffs or had any to intercede in BP and its contractor's drilling operations.[7]

### 3. Plaintiffs' allegations that the Non-Operating Defendants had contractual rights to conduct safety inspections is insufficient as a matter of law to establish liability for maritime negligence.

Plaintiffs allege that, pursuant to the Operating Agreement, the Non-Operating Defendants had the right "to conduct 'health , safety, and environmental ["HSE"] inspection[s]' with a 'right of access to activities and operations' on the rig, as well as access to BP's files, audits, and statistics" on HSE issues.  Amend. Mast. Compl. B1 at ¶ 285.  From this, Plaintiffs conclusorily allege that "having . . . obtained the right to be privy to HSE information, conduct HSE inspections, and call HSE meetings, it was incumbent on [the Non-Operating Defendants] to perform the important check and balance role" and that "[f]ailure to exercise this role . . . was negligence." *Id.* at ¶ 574.

---

[7]    Plaintiffs do not allege that the Non-Operating Defendants are vicariously liable as a principal of, or joint venture partner with, BP and do not plead a vicarious liability theory against the Non-Operating Defendants.  In any event, Plaintiffs' allegations and the Operating Agreement conclusively establish that the Non-Operating Defendants are not vicariously liable for any actions or omissions by BP, because the Non-Operating Defendants are not alleged to have (and do not have) any right to control BP's operations. *See, e.g.*, *Transcon. Gas Pipe Line Corp. v. Mr. Charlie*, 294 F. Supp. 1025, 1031 (E.D. La. 1968) (no indirect liability under maritime law for non-operating co-owners of oil and gas lease where designated operator, but not non-operators, was negligent), *aff'd in relevant part and rev'd in part on other grounds*, 424 F.2d 684 (5th Cir. 1970), *cert. denied*, 400 U.S. 832 (1970); *Bolivar v. R & H Oil and Gas Co.*, 789 F. Supp. 1374, 1381–82 (S.D. Miss. 1991) (collecting cases for proposition that non-operating investor who has no right to control oil and gas operations may not be held vicariously liable as joint venturer).

Plaintiffs' allegations fail as a matter of law.  The "reservation of the right to monitor contractor safety does not give rise to operational control so as to make the principal liable for the contractor's actions."  *Thibodeaux v. Vamos Oil & Gas Co.*, No. Civ. A. 03-1883, 2005 WL 3019773, at *1 (W.D. La. Nov. 10, 2005) (context of offshore drilling operations) (citations omitted).  Nor are Plaintiffs' allegations that the Non-Operating Defendants could "suggest their own proposed well plans . . . place their own personnel on key drilling and well development teams . . . call meetings with BP" and approve "of all press releases regarding the prospect" sufficient to give rise to liability, because none amount to operational control.  Amend. Mast. Compl. B1 at ¶ 284; *see Landry v. Huthnance Drilling Co*., 889 F.2d 1469, 1471 (5th Cir. 1989) (holding under the general maritime law that "'a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations'" is "not enough" to give rise to liability).[8]   It is simply beyond dispute that the contractual rights that Plaintiffs allege <u>do not</u> give rise to liability.  *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 193 (5th Cir. 1991) (applying Louisiana law) ("The fact that a principal takes an active interest in the safety of the employees of its independent contractor does not, in and of itself, constitute direct operational control" and therefore does not lead to any liability of the principal).  Plaintiffs'

---

[8]      The Restatement (Second) of Torts provides that for a principal to retain "operational control" of an independent contractor:

> It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

RESTATEMENT (SECOND) OF TORTS § 414 cmt. a (1965).

allegations, even if true, fail to support their maritime negligence claim against the Non-Operating Defendants.

> **4.      Plaintiffs' allegations that the Non-Operating Defendants had access to information about BP's operations are insufficient as a matter of law to establish liability for maritime negligence.**

Plaintiffs attempt to bolster their Amended Complaint with allegations that the Non-Operating Defendants had access to information about BP's operations, but these allegations do not avail the Plaintiffs.  For example, Plaintiffs allege that the Non-Operating Defendants were "on notice of the following relevant provisions of [BP's] well plan: (a) location; (b) the anticipated time necessary to conclude the operation; (c) total depth and target zones; (d) the proposed drilling and completion plans, including the casing program and directional details; (e) details of all coring, logging, and other evaluation operations conducted; (f) information about the drilling rig to be used[,]" as well as "the financial aspects of the well plan."  Amend. Master Compl. B1 at  ¶ 283.  Plaintiffs do not explain how access to this basic information gives rise to liability, nor can they.  Indeed, the MMS indisputably also had access to this same information as part of the licensing process, and Plaintiffs do not suggest that the MMS's access to this information renders the United States liable to them in negligence.

Plaintiffs also allege that the Non-Operating Defendants had real-time access to data transmitted from the *Deepwater Horizon* and, on that basis, conclusorily assert that the Non-Operating Defendants "knew or should have known of the presence of hydrocarbons in the well . . . ."  Amend. Mast. Compl. B1 at ¶ 573.  Plaintiffs further assert that the Non-Operating Defendants "owed a duty to Plaintiffs to warn" the crew of the *Deepwater Horizon* "of the impending disaster in sufficient time to avert it" and that the Non-Operating Defendants "breached their duties by failing to warn the drilling vessel crew of the imminent blowout so that they could take evasive action."  *Id.*

23

These conclusory allegations are unsupported by factual allegations and are implausible. Plaintiffs allege only that the Non-Operating Defendants had <u>access</u> to data from the rig at the time of the blowout.  Plaintiffs do not allege, because they cannot, that the Non-Operating Defendants were monitoring the data or had any obligation to do so.  Plaintiffs do not allege that it is even possible for off-rig observers, without knowledge of contemporaneous operations on a rig, to interpret the available data and conclude that hydrocarbons have entered a well.  Nor do Plaintiffs allege that the Non-Operating Defendants had any reason to believe that the crew on the *Deepwater Horizon* was not aware of the same information allegedly available to the Non-Operating Defendants.   Most critically, Plaintiffs do not allege that the Non-Operating Defendants had any authority whatsoever to direct the crew of the *Deepwater Horizon* to "take evasive action," that the crew would have heeded any warning, or that the crew could have done anything in response to such a warning to stop the blowout.

Plaintiffs' conclusory allegation that unidentified engineers offered BP unspecified advice on how to kill the well and that <u>BP chose not to follow it</u> after "conferring" with the Non-Operating Defendants is similarly deficient.  *Id.* at ¶ 486.  Plaintiffs do not allege the nature of the advice, who gave it, or when it was given, and do not offer any explanation as to how BP's alleged failure to act on this advice relates to any of Plaintiffs' claims against the Non-Operating Defendants.  Plaintiffs do not allege that the Non-Operating Defendants took any position on the alleged "advice" or themselves "advised" BP one way or the other.  Plaintiffs' allegation is, at bottom, just another allegation that the Non-Operating Defendants had access to information about BP's operations, and it is inconsequential absent supporting factual allegations about control and causation.

Even if Plaintiffs' farfetched and conclusory allegations deserved the presumption of truth, they remain insufficient as a matter of law to state a claim of negligence against the Non-Operating Defendants.  Based solely upon purported <u>access</u> to information, Plaintiffs attempt to impose on the Non-Operating Defendants a duty to intercede in the operations of an independent contractor (BP) and unrelated parties (Transocean) over whom the Non-Operating Defendants are not alleged to have any right, authority, or ability to control.  That notion contravenes settled law.

"A principal has no duty . . . to intercede when an independent contractor's actions have created a dangerous situation" *Rogers v. Shell Oil Co.*, No. 92-1040, 1993 WL 30052, at *2 (E.D. La. Feb. 3, 1993) (citing *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548 (5th Cir. 1987)), unless the principal maintains "operational control" over the contractor.  *Ainsworth*, 829 F.2d at 550.[9]  *Ainsworth* is instructive and is cited by courts applying both Louisiana law and the general maritime law.  *See, e.g.*, *Gremillion v. Gulf Coast Catering Co.*, No. 88-4544, 1989 WL 104100, at *6 (E.D. La. Sept. 5, 1989), *aff'd*, 904 F.2d 290 (5th Cir. 1990) (citing *Ainsworth* in tort case under maritime law); *Fontenot v. Southwestern Offshore Corp.*, 787 So.2d 588, 594 (La. Ct. App. 2001) (tort case under maritime law).  In *Ainsworth*, Shell hired an independent contractor,

---

[9]    *See also Wallace v. Oceaneering Int'l*, 727 F.2d 427, 437 (5th Cir. 1984) (holding under maritime law that principal who hires independent contractor over which he exercises no operational control "has no duty to discover and remedy hazards created by its independent contractors"); *Wilkins v. P.M.B. Sys. Eng'g, Inc.*, 741 F.2d 795, 799 (5th Cir. 1984) (same); *McCormack v. Noble Drilling Corp.*, 608 F.2d 169, 174–75 (5th Cir. 1979) (holding that the principal of an oil drilling operation owed no duty to ensure that independent contractors performed safely, even when the principal's company man on the rig was aware of their operations, because the principal had no control over the contractor); *Ronquille v. MMR Offshore Servs., Inc.*, 353 F. Supp. 2d 680, 682 (E.D. La. 2004) (the presence of a company representative on an oil platform with knowledge of the rig's operations is "is insufficient to create a duty; therefore, the law does not support the imposition of liability for any failure to intercede"); *Thomas v. Burlington Res. Oil & Gas Co.*, No. Civ. A. 99-3904, 2000 WL 1528082, at *2 (E.D. La. Oct. 13, 2000) (Barbier, J.) (even if a principal has knowledge of an independent contractor's unsafe practices, the principal has no duty to "intervene in and correct the work practices selected by an independent contractor") (internal citations omitted).

Hercules, to erect an offshore drilling rig.  829 F.2d at 549.  Hercules worked its crews around the clock, with no lights in the work area, and a worker fell as a result.  *Id.*  Shell had a "company man" on the rig who was aware of the hazardous conditions, but Shell retained no control over and did not participate in the operation of the rig.  The Fifth Circuit rejected the plaintiff's argument that Shell's knowledge of the danger made it directly liable for the injury and held instead that because Shell lacked control over the operation, it had no duty to intervene.  A similar analysis pertains here because Plaintiffs' allegations fall far short of even the *Ainsworth* facts.

Plaintiffs allege that the Non-Operating Defendants "knew or should have known" that hydrocarbons entered the well, but this is wholly conclusory.  Plaintiffs' <u>factual</u> allegations consist only of speculation that the Non-Operating Defendants <u>potentially could have known</u> of a dangerous situation, not that they actually knew.   As in *Ainsworth*, the Non-Operating Defendants are not alleged to have had authority or control over the operation.  If in *Ainsworth* a company man on the rig with <u>actual</u> knowledge of a dangerous situation had no duty to intercede because he lacked control of the operation, it necessarily follows that the Non-Operating Defendants, who were hundreds of miles away and are not alleged to have had any actual knowledge of a dangerous situation, cannot have had any legal obligation to intercede.[10]

In sum, even if accepted as true, none of Plaintiffs' allegations against the Non-Operating Defendants support a finding that the Non-Operating Defendants are liable for general maritime negligence.  Plaintiffs' general maritime negligence claim against them must be dismissed.

---

[10]    Plaintiffs' allegations against the Non-Operating Defendants contrast sharply with Plaintiffs'allegations against the Drilling Defendants on this point.   Unlike the Non-Operating Defendants, the Drilling Defendants are expressly alleged to have either controlled, approved or participated in the drilling, cementing, and temporary well abandonment activities of the *Deepwater Horizon* that allegedly caused Plaintiffs harm.   Amend. Mast. Compl. B1 at ¶ 229; *see also Denson v. Diamond Offshore Co.*, 955 So.2d 730, 733–34 (La. Ct. App. 2007) (distinguishing *Ainsworth*, *Wallace*, and *Noble Drilling* because evidence showed company man on oil rig was involved in operations).

5.     **To the extent Plaintiffs seek to recover economic losses without alleging physical injury to a proprietary interest, their maritime negligence claim is barred by the economic loss rule.**

The Supreme Court held more than 50 years ago that a plaintiff may not recover economic losses resulting from negligence if he lacks a proprietary interest in the damaged property.  *Robins Dry Dock & Repair v. Flint*, 275 U.S. 303 (1927).  Called the "economic loss rule," this principle still governs unintentional maritime tort cases in the Fifth Circuit.  *See Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019 (5th Cir. 1985) (en banc); *Dunham-Price Group, LLC v. Citgo Petroleum Corp.*, 2010 WL 1285446, at *3 (W.D. La. Mar. 31, 2010).

Plaintiffs do not allege that any individual plaintiff within Pleading Bundle B1 suffered physical injury to a proprietary interest in connection with the economic losses Plaintiffs seek to recover.  Based on review of a sample of the individual superseded complaints, it is clear that many, if not most, individual plaintiffs in Pleading Bundle B1 seek purely economic losses.  *See, e.g.*, Complaint at ¶¶ 10–11, *Papa Rod, Inc. v. BP, PLC*, No. 10-3250 (May 26, 2010) (alleging injury only to public waters, lands, and fisheries); Amended Complaint at ¶¶ 167–74, *Shemper v. BP, PLC*, No. 10-3274 (Aug. 3, 2010) (same); Complaint at ¶¶ 7–20, 44–45, *Hopkins v. Transocean Ltd.*, No. 10-2653 (May 3, 2010) (real property owners alleging diminution of property value due to only a "threat" of contamination).  Plaintiffs' attempt to recover for alleged economic losses without physical injury to a proprietary interest fails: "It is unmistakable that the law of this circuit does not allow recovery of purely economic claims absent physical injury to a proprietary interest in a maritime negligence suit."  *In re Taira Lynn Marine Ltd. No. 5*, 444 F.3d 371, 377 (5th Cir. 2006); *see also IMTT-Gretna v. Robert E. Lee SS*, 993 F.2d 1193, 1195 (5th Cir. 1993) ("Maritime law specifically denies recovery to non proprietors [*i.e.* those without proprietary interest in property physically damaged] for economic damages").

27

The economic loss rule is a "bright line" rule, without exceptions based upon foreseeability or any other particularized concern.  *Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1032 (5th Cir. 1985) (en banc) ("Denying recovery for pure economic losses is a pragmatic limitation on the doctrine of foreseeability, a limitation we find to be both workable and useful").  While one judge in this District once recognized an exception to *Robins Dry Dock* for commercial fishermen, the Fifth Circuit did not approve the exception on appeal.  *See Louisiana ex rel. Guste v. M/V Testbank*, 524 F. Supp. 1170, 1173–74 (E.D. La. 1981), *aff'd on other grounds*, 752 F.2d 1019, 1027 n.10 (5th Cir. 1985) (en banc), *cert. denied*, 477 U.S. 903 (1986) ("Whether the claims of commercial fishermen ought to be analyzed in this manner or simply carved from the rule today announced . . . or allowed at all, we leave for later"); *see also Barasich v. Shell Pipeline Co*., No. 05-4180, 2006 WL 3913403, at *6 n.1 (E.D. La. Nov. 20, 2006) (Barbier, J.) ("This Court notes that [the commercial fishermen] exception has never been formally recognized by the Fifth Circuit or the United States Supreme Court").  Thus there is no exception to the economic loss rule in the Fifth Circuit, and Plaintiffs' general maritime negligence claim must be dismissed for this reason as well.  *In re Taira Lynn*, 444 F.3d at 379 ("[P]hysical injury to a proprietary interest is a prerequisite to recovery of economic damages in cases of unintentional maritime tort") (internal citation and quotation marks omitted).

### E.   Plaintiffs' Florida Pollutant Discharge and Control Act Claim Must be Dismissed Because State Law Does Not Apply to this Case.

Plaintiffs, on behalf of the putative Florida Subclass, assert one claim against the Non-Operating Defendants under state law for strict liability pursuant to the Florida Pollutant Discharge and Control Act (the "FPDPCA") (Count III(D)).  State law, however, does not apply to this action; federal law alone applies to claims arising out of and in connection with oil exploration, development, and extraction operations on the Outer Continental Shelf ("OCS").

28

Although federal law sometimes borrows state law as surrogate federal law in OCS cases, it does not do so in this case, and even if it did, it would not borrow Florida law.  Plaintiffs can assert their claim for property damage <u>only</u> under OPA.  Because Plaintiffs' state law claim is based on substantive law that does not apply, it must be dismissed.

> ### 1.    Federal law applies exclusively under the Outer Continental Shelf Lands Act.

Plaintiffs allege that this case arises out of, and in connection with, operations involving the exploration and production of oil from the subsoil and seabed of the OCS.[11]  *Cf.* 43 U.S.C. § 1349(b)(1)(A) (granting U.S. district courts jurisdiction of cases "arising out of, or in connection with . . . any operation conducted on the outer Continental Shelf . . . ).  This Court has already held that the Outer Continental Shelf Lands Act ("OCSLA") gives it jurisdiction over cases arising from the *Deepwater Horizon* incident.  Order Denying State of Louisiana's Motion to Remand, Case No. 10-cv-1758 [Dkt. # 471] (E.D. La. Oct. 6, 2010).  Because the controversy is "inextricably linked" to resource exploration and development on the OCS "and would not have arisen but for such development," *Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co.*, 448 F.3d 760, 774 (5th Cir. 2006), OCSLA confers federal jurisdiction and also supplies comprehensive choice-of-law rules codified in Section 1333 of the Act.  *See*

---

[11]    Plaintiffs allege that the well blowout giving rise to their claims occurred on an "oil vessel" attached to an oil well 48 miles off the coast of Louisiana, which is indisputably on the OCS.  Amend. Mast. Compl. B1 at ¶¶198, 272.  The OCS is "all submerged lands lying seaward and outside" the territorial jurisdiction of the States, "and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control . . . ."  43 U.S.C. § 1331(a).  In their original Master Complaint B1, Plaintiffs expressly alleged that the activities giving rise to their claims occurred on the OCS, but perhaps in an attempt to avoid the inevitable conclusion that state law cannot apply to this case, Plaintiffs excised all mention of the incident's connection to the OCS from their Amended Master Complaint B1.  *Compare, e.g.*, Mast. Compl. B1 at ¶ 239 ("On June 1, 2008, BP acquired a ten-year lease from the MMS to search for and exploit hydrocarbon reservoirs at the Macondo prospect site in Mississippi Canyon Block 252, <u>a location on the Outer Continental Shelf</u> 48 miles off the coast of Louisiana") (emphasis added) *with* Amend. Mast. Compl. B1 at ¶ 272 ("On June 1, 2008, BP acquired a ten-year lease from the MMS to search for and exploit hydrocarbon reservoirs at the Macondo prospect site in Mississippi Canyon Block 252, 48 miles off the coast of Louisiana").

*EP Operating LP v. Placid Oil Co.*, 26 F.3d 563, 569 & n.14 (5th Cir. 1994) ("the most consistent reading of the statute instructs that the jurisdictional grant of section 1349 should be read co-extensively with the substantive reach of section 1333"); *Toussaint v. Chevron Phillips Chem. Co.*, 2006 WL 2349465, at *2 (E.D. La. Aug. 11, 2006) (when a "case arises in connection with a mineral production operation on the Outer Continental Shelf[,] it falls within the scope of OCSLA," and Section 1333 "in turn" applies).

The question of which substantive law governs the Plaintiffs' claims is answered solely by Section 1333 of OCSLA. Other choice-of-law rules, such as those of the forum state or maritime choice-of-law rules, are irrelevant. *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 482 n.8 (1981) (OCSLA "supersede[s] the normal choice-of-law rules that the forum would apply"); *Wooten v. Pumpkin Air, Inc.*, 869 F.2d 848, 852 (5th Cir. 1989) (rejecting the *renvoi* argument that Section 1333 adopts the choice-of-law rules of the state adjacent to an OCSLA situs). Even if Plaintiffs had alleged they were injured in state territorial waters (they have not), they could not avoid Section 1333(a)'s choice-of-law rules, which apply "co-extensively" with Section 1349, *EP Operating*, 26 F.3d at 569 & n.14, and are in place because Congress intended to have federal law govern all cases involving "activities" occurring on the OCS. *See* H.R. REP. NO. 95-590, at 128 (1977), *reprinted in* 1978 U.S.C.C.A.N. 1450, 1534.[12] The Non-Operating Defendants are aware of no case under Section 1349 where a court used choice-of-law rules other than those Congress prescribed in Section 1333.

---

[12] The House Report states: "Section 203—Laws Applicable to Outer Continental Shelf[:] . . . It is thus made clear that Federal Law is to be applicable to all activities on all devices in contact with the seabed for exploration, development, and production. The Committee intends that Federal Law is, therefore, to be applicable to activities on drilling ships, semi-submersible drilling rigs, and other watercraft, when they are connected to the seabed by drillstring, pipes, or other appurtenances, on the OCS for exploration, development, or production purposes." H.R. REP. NO. 95-590, at 128, 1978 U.S.C.C.A.N. at 1534 (emphasis added).

OCSLA's choice-of-law rules are straightforward: "Federal law is 'exclusive' in its regulation of this area, and [therefore] state law is adopted only as surrogate federal law," *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 357 (1969), and "then only when no inconsistent federal law applied." *Id.* at 358. According to Section 1333(a), then, the substance of the adjacent state's law may apply (as "surrogate federal law") in an OCSLA case, but only if: (a) the controversy arises on a situs covered by OCSLA; (b) substantive maritime law does not apply of its own force; and (c) state law is not inconsistent with federal law. *Union Texas Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990); *see Demette v. Falcon Drilling Co.*, 280 F.3d 492, 499 (5th Cir. 2002), *overruled in part on other grounds by Grand Isle Shipyard Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 782–83 (5th Cir. 2009) ("Since the incident occurred on the OCS beyond the territorial waters of Louisiana, the only way state law could have operated was by incorporation into federal law under OCSLA").[13] Otherwise, federal law, not supplemented by state law, is all that applies. Because Plaintiffs' claims against the Non-Operating Defendants in Amended Master Complaint B1 are all governed by OPA, Plaintiffs cannot state a cause of action under state law.[14]

### 2. Plaintiffs' Florida Pollutant Discharge Prevention and Control Act claim must be dismissed.

Given that Plaintiffs' FPDPCA allegations essentially replicate their OPA allegations, Plaintiffs cannot contest that OPA provides relief essentially identical to that which they seek

---

[13]     *Grand Isle* holds that, for tort actions under OCSLA, the situs of a claim is the location where the controversy arises. *See Grand Isle*, 598 F.3d at 784. For contract actions, the situs of a claim is the location where the majority of work under the contract is to be performed. *Id.* at 787. In so holding, the Fifth Circuit overruled prior decisions (like *Demette*) insofar as they applied the tort situs analysis to contract claims. However, *Demette*'s other holdings remain good law. *Id.*

[14]     Even if state law could be applied to this case, it would not be the law of Florida because Louisiana is the "adjacent state" for purposes of the application of state law as surrogate federal law. *See* 43 U.S.C. §1333(a)(2)(A); *see also Snyder Oil Corp. v. Samedan Oil Corp.*, 208 F.3d 521 (5th Cir. 2000).

under the FPDPCA.  In both Counts, Plaintiffs seek to recover for damage to their real and/or personal property.  *Compare* Amend. Mast. Compl. B1 at ¶ 686 (OPA claim) *with* ¶ 744 (FPDPCA claim).  The statutory causes of action track each other closely.  *Compare* FLA. STAT. §§ 376.205, 376.121 (2010), *with* 33 U.S.C. §§ 2702(a), (b)(2).  Because OPA is directly on point, it applies exclusively to Plaintiffs' property damage claims for two reasons—because OPA leaves no gaps to be filled through the OCSLA choice-of-law rules in Section 1333(a); and because the comprehensive federal scheme for regulating activity on the OCS, including pollution flowing from the OCS, preempts the law of affected states.

a.  **OCSLA requires the exclusive application of OPA to claims for property damages and economic losses arising from oil spills originating on the OCS.**

As noted above, OPA is Congress's comprehensive and reticulated liability scheme for all economic loss claims in oil-pollution cases governed by federal or maritime law.  *See Gabarick v. Laurin  Mar. (Am.) Inc.*, 623 F. Supp. 2d 741, 750–51 (E.D. La. 2009) (general maritime law claims are displaced by OPA); *Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001) (OPA "includes new remedies, which . . . preempt traditional maritime remedies").  OPA leaves no gaps that OCSLA could use state law to fill.

OPA's savings clause does not rescue Plaintiffs' FPDPCA claim from dismissal.  Unlike cases involving oil spills in state territorial waters, in which Plaintiffs can plead one as an alternative remedy to the other, OPA and the FPDPCA are not alternatives in this case.  Under the choice-of-law rules in OCSLA's Section 1333(a), it is <u>only</u> OPA—neither the FPDPCA applying of its own force nor the FPDPCA applying as surrogate federal law—that provides the substantive rules of decision for claims arising out of oil spills originating from operations on the OCS.  Because it is OCSLA—not OPA—that precludes applying state law, OPA's savings clause, which limits only the preemptive effect of OPA itself, does not allow state law to be

32

applied in this case.  *See* 33 U.S.C. § 2718; *cf. Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 223–27 (1986) (holding that the savings clause in the Death on the High Seas Act does "not implicitly sanction the operation of state wrongful death statutes on the high seas," where states have no power, but only "preserve[s] the state courts' jurisdiction to provide wrongful death remedies under state law for fatalities *on territorial waters*") (emphasis added); *Ten Taxpayer Citizens Group v. Cape Wind Assocs.*, 373 F.3d 183, 193–97 (1st Cir. 2004) (rejecting the argument that a federal statute recognizing state power over specific activities overrides OCSLA's displacement of state law on the OCS).[15]

        **b.**        **Federal law preempts  the Florida statute here.**

Even if OCSLA did not require exclusive application of federal law to this case, the combined effect of OPA and OCSLA preempts application of the FPDPCA.  Precedents holding that federal law preempts application of an affected state's law to interstate <u>water pollution</u> originating from non-OCS sources require the similar conclusion that federal law preempts applying an affected state's law to <u>oil spills</u> originating from OCS sources.

"[R]egulation of interstate water pollution is a matter of federal, not state, law . . . ."  *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 488 (1987) (citations omitted).  Since Congress's enactment of extensive legislation in the area (through, for instance, the Clean Water Act), federal statutes have displaced the *ad hoc* federal common law remedy that previously supplied the substantive rules of decision.  *See City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981).

---

[15]      When enacting OPA, Congress foresaw this very result.  Senators Chaffee, Lieberman, Graham, and Durenberger objected that an early draft of OPA was ill-suited to OCS oil spills because it capped liability for clean-up costs.  S. REP. NO. 101-94, at 26 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722, 748.  In a statement on the bill, which had a savings clause like that which was enacted into law, the Senators noted that states lacked authority to impose additional liability above the cap because OCS facilities "are outside the 3 mile limit, and therefore are not subject to state laws."  *Id.* at 27, 1990 U.S.C.C.A.N. at 749.  Congress resolved the Senators' objection by eliminating the OPA cap on clean-up liability, not by giving states authority to impose additional liability with respect to OCS oil spills.

With federal statutory law firmly in place, "it is clear that the only state suits that remain available are those specifically preserved by" the new federal statutes. *Ouellette*, 479 U.S. at 492.

In *Ouellette*, the Supreme Court held that the Clean Water Act, in light of its text, purposes, and history, and <u>notwithstanding its savings clause</u>, does not "preserve the right to bring suit under the law of any affected State." *Id.* at 493. Applying the law of an affected state to pollution originating in another state would seriously undermine, and stand as an obstacle to the full implementation of, the methods by which the Clean Water Act regulates interstate water pollution. *Id.* at 494–97 (explaining how applying an affected state's law would circumvent the Act, which gives regulatory authority only to EPA and source states and which defines a narrow role for affected states). Because of those federal-state conflicts, together with the likelihood of state-state conflicts, the Court ultimately held that the Act's savings clause preserves only claims brought under the law of a source state. *Id.* at 497–500; *see id.* at 495 ("An interpretation of the saving clause that preserved actions brought under an affected State's law would disrupt this balance of interests").[16]

That reasoning also leads to the conclusion that OPA's savings clause cannot be interpreted to allow application of the FPDPCA in this case. Applying the FPDPCA to an oil spill originating on the OCS would frustrate Congress's methods for regulating OCS operations and would lead to problems of conflicting multistate regulation. Through OCSLA and the Coastal Zone Management Act ("CZMA"), 16 U.S.C. §§ 1451–1464, the federal government extensively regulates exploration and drilling operations on the OCS for their potential

---

[16]   The Clean Water Act's preservation of source state law is inapplicable here because Plaintiffs have pleaded that the oil that harmed them was discharged not from a state, but from a federal enclave on the OCS. *See* Amend. Mast. Compl. B1 at ¶ 272.

environmental impacts.  *See Mobil Oil Exploration & Producing SE, Inc. v. United States*, 530 U.S. 604, 609–10 (2000) (summarizing the four pillars of the comprehensive regime).  Just as in *Ouellette*, applying the law of an affected state to discharges from OCS operations would circumvent this careful scheme, which specifically assigns a largely advisory role to affected states: "The inevitable result of" applying an affected state's law "would be that . . . States could do indirectly what they could not do directly—regulate the conduct of" OCS operations.  *Ouellette*, 479 U.S. at 495.  Applying the law of an affected state also would "undermine the important goals of efficiency and predictability," for "application of numerous States' laws would only exacerbate the vagueness and resulting uncertainty."  *Id.* at 496.  Also, as in *Ouellette*, the savings clauses in the relevant federal statutes (*e.g.*, 16 U.S.C. § 1456(e) (CZMA); 33 U.S.C. § 2718 (OPA); 43 U.S.C. § 1349(a)(6) (OCSLA)) do not obviate resort to ordinary conflict preemption principles.  *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869–74 (2000) (citing *Ouellette*, 479 U.S.); *cf. Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 230 (1986) ("[I]t is hardly conceivable that Congress," through a mere savings clause, "could have intended that these diverse state statutes could be applied to remedy maritime torts occurring the world over").

 *Askew v. Am. Waterways Operators, Inc*., 411 U.S. 325 (1973), does not require a contrary result.  There, considering a limited preemption question, the Supreme Court upheld an earlier and more limited version of the FPDPCA, which by its own terms applied only to oil pollution discharged in State territorial waters.  *Id.* at 327–38.  The Court held that there was "no collision" between the FPDPCA and the federal Water Quality Improvement Act (earlier legislation on which the Clean Water Act expanded) because that federal Act was "concerned only with actual cleanup costs incurred by the Federal Government" as a result of an oil spill,

and did not address the clean-up costs or other costs incurred by States for damages resulting from injury to their citizens and natural resources.  *Id.* at 333–34, 335–36.  The Court also held that federal maritime law did not prohibit Florida from so legislating.  *Id.* at 337–44.  The Court reserved the question of whether the FPDPCA unconstitutionally "conflict[ed] with any federal Act."  *Id.* at 343.

Because the then-extant FPDPCA expressly applied only to discharges within Florida territorial waters, the *Askew* Court did not consider whether any federal statute preempted the application of the FPDPCA to <u>interstate</u> oil spills or to oil spills resulting from operations on the OCS, which are the circumstances alleged here.  With the passage of the Clean Water Act and OPA, Congress broadly expanded federal regulation of interstate oil pollution to areas conflicting with the FPDPCA, including clean-up costs and other costs incurred by States for damages to their citizens and natural resources.  Furthermore, OCSLA governs all operations on the OCS to the exclusion of state law and applies to oil spills and other environmental harms resulting from those operations.  The Clean Water Act, OCSLA, and OPA were not at issue in *Askew*, and they are what preempts the substantive laws of states affected by oil spills originating on the OCS, including the FPDPCA.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiffs' claims in Amended Master Complaint B1 against the Non-Operating Defendants MOEX Offshore, MOEX USA, Anadarko Petroleum Corporation and Anadarko E&P Company must be dismissed in their entirety.

Respectfully submitted,

BINGHAM McCUTCHEN, LLP

/s/*Ky E. Kirby*
Ky E. Kirby
ky.kirby@bingham.com
David B. Salmons
david.salmons@bingham.com
Michael B. Wigmore
michael.wigmore@bingham.com
Warren Anthony Fitch
tony.fitch@bingham.com
Randall M. Levine
randall.levine@bingham.com
2020 K Street, NW
Washington, DC 20006-1806
Telephone (202) 373-6000
Facsimile (202) 373-6001

James J. Dragna
jim.dragna@bingham.com
Bingham McCutchen LLP
355 South Grand Avenue
Suite 4400
Los Angeles, California 90071-3106
Telephone (213) 680-6436
Facsimile (213) 680-8636

KUCHLER POLK SCHELL
WEINER & RICHESON, LLC

Deborah D. Kuchler, T.A. (La. Bar No. 17013)
dkuchler@kuchlerpolk.com
Janika Polk (La. Bar No. 27608)
jpolk@kuchlerpolk.com

37

Robert Guidry (La. Bar No. 28064)
rguidry@kuchlerpolk.com
1615 Poydras Street, Suite 1300
New Orleans, LA  70112
Tel:  (504) 592-0691
Fax:  (504) 592-0696

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, pursuant to Pre-trial Order No. 12, I have caused the foregoing to be served on all counsel via the Lexis Nexis File & Serve system, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, who will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on February 28, 2011.

_____*/s/ Ky E. Kirby*_____
Ky E. Kirby