**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | SECTION "J" |
| | * | JUDGE BARBIER |
| This Document Relates to: | * | |
| *All Cases in Pleading Bundle B3* | * | MAGISTRATE NO. 1 |
| | * | MAGISTRATE SHUSHAN |
| | * | |
| * * * * * * * * * * * * | * | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANTS
ANADARKO PETROLEUM CORPORATION, ANADARKO E&P COMPANY LP,
MOEX OFFSHORE 2007 LLC AND MOEX USA CORPORATION
TO DISMISS MASTER COMPLAINT IN ACCORDANCE WITH
PTO NO. 11 [CASE MANAGEMENT ORDER NO. 1] SECTION III.B(3)
["B3 BUNDLE"] PURSUANT TO FED. R. CIV. P. 12(b)(6)**

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................ 1

II.     RELEVANT FACTUAL ALLEGATIONS IN MASTER COMPLAINT B3 ................. 3

        A.      Plaintiffs Allege that the "BP Defendants" and the "Transocean
                Defendants" Oversaw the Drilling and Recovery Operations and Operated
                the Deepwater Horizon ........................................................................... 4

        B.      Plaintiffs Allege That the "Dispersant Defendants" were Responsible for
                the Manufacture and Use of Dispersants in the Post-Explosion Clean-Up
                Efforts .................................................................................................... 5

        C.      Plaintiffs Allege That Anadarko and MOEX Offshore are Non-Operating
                Leaseholders of the Macondo Prospect. ..................................................... 6

III.    ARGUMENT ...................................................................................................... 7

PLAINTIFFS HAVE NOT PLEADED CLAIMS AGAINST THE NON-OPERATING DEFENDANTS FOR
WHICH RELIEF CAN BE GRANTED

        A.      Plaintiffs' Claims Against the Non-Operating Defendants Under General
                Maritime Law Fail ................................................................................. 8

                1.      Plaintiffs Fail to Allege that the Non-Operating Defendants
                        Engaged in or had Operational Control Over Any Conduct that
                        Caused the Alleged Harm ............................................................ 8

                        a.      Plaintiffs' allegations establish that the Non-Operating
                                Defendants took no part in the post-explosion clean-up
                                efforts or the use of dispersants ...................................... 11

                        b.      Plaintiffs' allegations establish that the Non-Operating
                                Defendants are not liable under the general maritime law
                                for the explosion on the Deepwater Horizon and the
                                resulting oil spill ......................................................... 13

                2.      Plaintiffs' Nuisance Claim Also Fails Because it is Barred by
                        Federal Maritime Law and OPA .................................................. 16

        B.      Plaintiffs Fail to State a Claim Against the Non-Operating Defendants
                Under the Oil Pollution Act .................................................................... 19

        C.      Plaintiffs' OPA Claim Against Anadarko E&P Must Be Dismissed
                Because Anadarko E&P Did Not Hold a Lease Interest in the Macondo
                Prospect at the Time of the Discharge ..................................................... 23

        D.      Plaintiffs' State Law Claims Must Be Dismissed Because State Law Does
                Not Apply to this Case ......................................................................... 25

i

TABLE OF CONTENTS
(continued)

Page

1.   Federal Law Applies Exclusively Under the Outer Continental Shelf Lands Act.................................................................... 25

2.   Plaintiffs' Florida Medical Monitoring Claim and State Law Negligence Per Se Claim Must Be Dismissed......................................... 28

3.   Plaintiffs' Florida Pollutant Discharge Prevention and Control Act Claim Must Be Dismissed ..................................................... 29

   a.   OCSLA requires the exclusive application of OPA to claims for property damages and economic losses arising from oil spills originating on the OCS ......................................... 30

   b.   Federal law preempts  the Florida statute here ........................... 31

E.   Even If State Law Could Apply to Plaintiffs' State Law Claims as Asserted, Those Claims Must Be Dismissed ...................................... 34

1.   Plaintiffs Fail to State a Claim for Medical Monitoring Even Under Florida Law ............................................................................. 34

2.   Plaintiffs Fail to State a Claim of Negligence Per Se Under Any Potentially Applicable Law.............................................................. 37

IV.   CONCLUSION................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ainsworth v. Shell Offshore, Inc.*,
    829 F.2d 548 (5th Cir. 1987), *cert. denied*, 485 U.S. 1034 (1988)..........................................15

*Ambrose v. New Orleans Police Ambulatory. Serv.*,
    639 So.2d 216 (La. 1994) .....................................................................................................10

*Ambrosio v. Carter's Shooting Ctr., Inc.*,
    20 S.W.3d 262 (Tex. App. 2000).........................................................................................41

*Anchundia v. Northeast Util. Servs. Co.*,
    No. CV 07-4446(AKT), 2010 WL 2400154 (E.D.N.Y. June 11, 2010).................................42

*Aramark Uniform and Apparel v. Easton*,
    894 So. 2d 20 (Fla. 2005).....................................................................................................10

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009).........................................................................................7, 8, 14, 17

*Askew v. Am. Waterways Operators, Inc.*,
    411 U.S. 325 (1973).............................................................................................................37

*Badillo v. Am. Brands, Inc.*,
    16 P.3d 435 (Nev. 2001) ......................................................................................................38

*Baggett v. Richardson*,
    342 F. Supp. 1024 (E.D. La. 1972)......................................................................................10

*Barasich v. Shell Pipeline Co.*,
    No. 05-4180, 2006 WL 3913403 (E.D. La. Nov. 20, 2006) (Barbier, J.)................................8

*Becker v. Tidewater, Inc.*,
    586 F.3d 358 (5th Cir. 2009) .................................................................................................9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...............................................................................................................8

*Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*,
    51 F.3d 235 (11th Cir. 1995) ........................................................................................22, 23

i

*Bolivar v. R & H Oil and Gas Co.*,
  789 F. Supp. 1374 (S.D. Miss. 1991) ................................................................. 17

*Bravo v. United States*,
  577 F.3d 1324 (11th Cir. 2009) ........................................................................ 38

*Carr v. United States*,
  130 S. Ct. 2229 (2010) ..................................................................................... 26

*Carrieri v. Jobs.com, Inc.*,
  393 F.3d 508 (5th Cir. 2004) ............................................................................ 27

*Carroll v. Litton Sys. Inc.*,
  No. B-C-88-253, 1990 WL 312969 (W.D.N.C. Oct. 29, 1990) ........................... 38

*Caudle v. Betts*,
  512 So. 2d. 389 (La. 1987) ............................................................................... 10

*Cinel v. Connick*,
  15 F.3d 1338 (5th Cir. 1994) ............................................................................ 25

*City of Milwaukee v. Illinois*,
  451 U.S. 304 (1981) .................................................................................... 19, 35

*Collins v. Morgan Stanley Dean Witter*,
  224 F.3d 496 (5th Cir. 2000) ............................................................................ 13

*Conner v. Aerovox, Inc.*,
  730 F.2d 835 (lst Cir. 1984) ............................................................................. 19

*Cont'l Oil Co. v. London S.S. Owners' Mut. Ins. Ass'n*,
  417 F.2d 1030 (5th Cir. 1969) .......................................................................... 32

*Cook's Pest Control, Inc. v. Rebar*,
  28 So. 3d (Ala. 2009) ....................................................................................... 41

*Demette v. Falcon Drilling Co.*,
  280 F.3d 492 (5th Cir. 2002) ............................................................................ 30

*Duncan v. Northwest Airlines, Inc.*,
  203 F.R.D. 601 (W.D. Wash. 2001) .................................................................. 38

*EP Operating LP v. Placid Oil Co.*,
  26 F.3d 563 (5th Cir. 1994) ........................................................................ 29, 30

*Ex parte Atmore Community Hosp.*,
    719 So. 2d 1190 (Ala. 1998) ............................................................................................10

*Florida Dep't of Corr. v. Abril*,
    969 So. 2d 201 (Fla. 2007) ...............................................................................................10

*Gabarick v. Laurin Mar. (Am.) Inc.*,
    623 F. Supp. 2d 741 (E.D. La. 2009) ...........................................................................20, 33

*Gabarick v. Laurin Mar. (Am.) Inc.*,
    No. 08-4007, 2009 WL 102549 (E.D. La. Jan. 12, 2009) ............................................22, 24

*Gates v. W.R. Grace & Co.*,
    No. 8:08-cv-2560-T-27TBM, 2009 WL 1455316 (M.D. Fla. May 21, 2009) ......................42

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000) .........................................................................................................36

*Grand Isle Shipyard Inc. v. Seacor Marine, LLC*,
    589 F.3d 778 (5th Cir. 2009) ........................................................................................30, 31

*Gregory v. Mitchell*,
    634 F.2d 199 (5th Cir. 1981) ............................................................................................22

*Gulf Offshore Co. v. Mobil Oil Corp.*,
    453 U.S. 473 (1981) .........................................................................................................29

*Hallstrom v. Tillamook County*,
    493 U.S. 20 (1989) ...........................................................................................................22

*Hawkins v. Evans Cooperage Co.*,
    766 F.2d 904 (5th Cir. 1985) ............................................................................................15

*Henry v. Dow Chem. Co.*,
    701 N.W.2d 684 (Mich. 2005) ..........................................................................................38

*Hershey v. Energy Transfer Partners*,
    610 F.3d 239 (5th Cir. 2010) ..............................................................................................8

*Holler v. Cinemark USA, Inc.*,
    185 F. Supp. 2d 1242 (D. Kan. 2002) ...............................................................................42

*Hooper v. Thomas*,
    No. 01-1730, 2002 WL 1268399 (E.D. La. June 5, 2002) ..................................................23

iii

*In re Alex C Corp.*,
No. 01-12184-DPW, 2003 WL 203078 (D. Mass. Jan. 30, 2003)...........................................20

*In re The Exxon Valdez*,
104 F.3d 1196 (9th Cir. 1997) ....................................................................................................18

*In re Great Lakes Dredge & Dock Co.*,
624 F.3d 201 (5th Cir. 2010) .......................................................................................................9

*In re Katrina Canal Breaches Litig.*,
495 F.3d 191 (5th Cir. 2007) ................................................................................................13, 25

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987).............................................................................................................35, 36

*Jacobs v. Osmose, Inc.*,
No. 01-944-CIV, 2002 WL 34241682 (S.D. Fla. Jan. 3, 2002).................................................39

*Jamail v. Stoneledge Condo. Owners Ass'n*,
970 S.W.2d 673 (Tex. App. 1998)...............................................................................................10

*Jebaco, Inc. v. Harrah's Operating Co.*,
587 F.3d 314 (5th Cir. 2009) .....................................................................................................14

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
513 U.S. 527 (1995)....................................................................................................................31

*John v. Nat'l Sec. Fire and Cas. Co.*,
501 F.3d 443 (5th Cir. 2007) .......................................................................................................7

*Jones v. Bock*,
549 U.S. 199 (2007).................................................................................................................8, 16

*Kane Enters. v. MacGregor Inc.*,
322 F.3d 371 (5th Cir. 2003) .....................................................................................................13

*Kelley v. Cowesett Hills Assocs.*,
768 A.2d 425 (R.I. 2001).............................................................................................................38

*Leaf River Forest Prods., Inc. v. Ferguson*,
662 So. 2d 648 (Miss. 1995)........................................................................................................10

*Louisiana ex rel. Guste v. M/V Testbank*,
752 F.2d 1019 (5th Cir. 1985) (en banc) ....................................................................................17

iv

*Lowe v. Philip Morris USA, Inc.*,
    183 P.3d 181 (Or. 2008) ...........................................................................................38

*Marathon Pipe Line Co. v. LaRouche Indus. Inc.*,
    944 F. Supp. 476 (E.D. La. 1996) .............................................................................22

*Marshall v. Isthmian Lines, Inc.*,
    334 F.2d 131 (5th Cir. 1964) ....................................................................................41

*McCormack v. Noble Drilling Corp.*,
    608 F.2d 169 (5th Cir. 1979) ....................................................................................15

*Meany v. Meany*,
    639 So. 2d 229 (La. 1994) .........................................................................................10

*Mergenthaler v. Asbestos Corp. of Am.*,
    480 A.2d 647 (Del. 1984) ..........................................................................................38

*Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
    453 U.S. 1 (l981)..............................................................................................19, 42

*Miller v. E.I. Du Pont de Nemours & Co.*,
    880 F. Supp. 474 (S.D. Miss. 1994)..........................................................................43

*Mobil Oil Exploration & Producing SE, Inc. v. United States*,
    530 U.S. 604 (2000)...................................................................................................36

*Moses v. Mosley*,
    146 So. 2d 263 (La. Ct. App. 1962)..........................................................................41

*Nabors Drilling USA, Inc. v. Escoto*,
    288 S.W.3d 401 (Tex. 2009).....................................................................................10

*Nat'l Envtl. Found. v. ABC Rail Corp.*,
    926 F.2d 1096 (11th Cir. 1991) ................................................................................22

*Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atl. Corp.*,
    924 F. Supp 1436 (E.D. Va. 1996), *aff'd*, 122 F.3d 1062 (4th Cir. 1997) ..............20

*Nissan Motor Corp. v. Maryland Shipbuilding and Drydock Co.*,
    544 F. Supp. 1104 (D. Md. 1982)..............................................................................10

*North Carolina ex rel. Cooper v. Tenn. Valley Auth.*,
    615 F.3d 291 (4th Cir. 2010) ....................................................................................17

*Northwest Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO,*
    451 U.S. 77 (1981) ........................................................................................................18

*Offshore Logistics, Inc. v. Tallentire,*
    477 U.S. 207 (1986) ................................................................................................34, 37

*Parker Bldg. Servs. Co. v. Lightsey,*
    925 So. 2d 927 (Ala. 2005) .........................................................................................42

*Parker v. Brush Wellman, Inc.,*
    377 F. Supp. 2d 1290 (N.D. Ga. 2005) .......................................................................38

*Petito v. A.M. Robins Co.,*
    750 So.2d 103 (Fla. Dist. Ct. App. 2000), *rev. denied*, 780 So.2d 912 (Fla. 2001) ..........38, 39

*Player v. Motiva Enters.,*
    2006 WL 166452 (D.N.J. 2006) ..................................................................................40

*Qore, Inc. v. Bradford Bldg. Co.,*
    25 So. 3d 1116 (Ala. 2009) .........................................................................................10

*Rodrigue v. Aetna Cas. & Sur. Co.,*
    395 U.S. 352 (1969) ....................................................................................................30

*Rodriguez v. Am. Cyanamid Co.,*
    858 F. Supp. 127 (D. Ariz. 1994) ...............................................................................43

*Ronquille v. MMR Offshore Servs., Inc.,*
    353 F. Supp. 2d 680 (E.D. La. 2004) ..........................................................................15

*Royal Ins. Co. of Am. v. Southwest Marine,*
    194 F.3d 1009 (9th Cir. 1999) ......................................................................................9

*Russo v. M/T Dubai Star,*
    No. C 09-05158 SI, 2010 WL 1753187 (N.D. Cal. Apr. 29, 2010).............................22

*Sekco Energy, Inc. v. M/V Margaret Chouest,*
    820 F. Supp. 1008 (E.D. La. 1991) .............................................................................17

*Smith v. Trans-World Drilling Co.,*
    772 F.2d 157 (5th Cir. 1985) .......................................................................................41

*Snyder Oil Corp. v. Samedan Oil Corp.,*
    208 F.3d 521 (5th Cir. 2000) .......................................................................................32

*South Port Marine, LLC v. Gulf Oil LP*,
    234 F.3d 58 (1st Cir. 2000) ..................................................................................19, 43

*Tanguis v. M/V Westchester*,
    153 F. Supp. 2d 859 (E.D. La 2001) .................................................................19, 20, 33

*Ten Taxpayer Citizens Group v. Cape Wind Assocs.*,
    373 F.3d 183 (1st Cir. 2004) ............................................................................34

*Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co.*,
    448 F.3d 760 (5th Cir. 2006) ...........................................................................29

*Theer v. Philip Carey Co.*,
    628 A.2d 724 (N.J. 1993) .................................................................................40

*Thomas v. Burlington Res. Oil & Gas Co.*,
    No. 99-3904, 2000 WL 1528082 (E.D. La. Oct. 13, 2000) (Barbier, J.) .................................15

*Thomas v. FAG Bearings Corp.*,
    846 F. Supp. 1400 (W.D. Mo. 1994) ....................................................................38

*Thompson v. Am. Tobacco Co.*,
    189 F.R.D. 544 (D. Minn. 1999) .......................................................................38

*Toussaint v. Chevron Phillips Chem. Co.*,
    No. 03-3481, 2006 WL 2349465 (E.D. La. Aug. 11, 2006) ...........................................15, 29

*Transcon. Gas Pipe Line Corp. v. Mr. Charlie*,
    294 F. Supp. 1025 (E.D. La. 1968), *aff'd in relevant part and rev'd in part on other
    grounds*, 424 F.2d 684 (5th Cir. 1970), *cert. denied*, 400 U.S. 832 (1970) ...........................17

*Transp. Ins. Co. v. Moriel*,
    879 S.W.2d 10 (Tex. 1995) ................................................................................10

*Trimble v. Asarco Inc.*,
    232 F.3d 946 (8th Cir. 2000) ............................................................................38

*Turner v. Murphy Oil USA, Inc.*,
    No. 05-4206, 2007 WL 4208986 (E.D. La. Nov. 21, 2007) .............................................22

*Union Texas Petroleum Corp. v. PLT Eng'g, Inc.*,
    895 F.2d 1043 (5th Cir. 1990) ..........................................................................30

*United States v. Dixie Carriers, Inc.*,
    627 F.2d 736 (5th Cir. 1980) ...........................................................................19

*United States v. Louisiana Land & Exploration Co.*,
   No. 03-3208, 2006 WL 851183 (E.D. La. Mar. 17, 2006) .....................................................26

*Watson Quality Ford, Inc. v. Casanova*,
   999 So. 2d 830 (Miss. 2008) ...............................................................................................10

*Wood v. Wyeth-Ayerst Labs.*,
   82 S.W.3d 849 (Ky. 2002) ...................................................................................................38

*Wooten v. Pumpkin Air, Inc.*,
   869 F.2d 848 (5th Cir. 1989) ...............................................................................................29

STATUTES

16 U.S.C.
   §§ 1451–1464 ........................................................................................................................36
   § 1456(e) ...............................................................................................................................36

33 U.S.C.
   § 2701(16) .............................................................................................................................26
   § 2701(32) ................................................................................................................24, 25, 27
   § 2702 ....................................................................................................................................20
   § 2702(a) ...........................................................................................................................24, 32
   § 2702(b)(2) .......................................................................................................................18, 32
   § 2713 .................................................................................................................................21, 43
   § 2718 .................................................................................................................................34, 36

42 U.S.C.
   § 9607(a)(2) ...........................................................................................................................27

43 U.S.C.
   § 1331 ................................................................................................................................25, 26
   § 1333(a)(2)(A) ......................................................................................................................32
   § 1349(a)(6) ...........................................................................................................................36
   § 1349(b)(1)(A) ......................................................................................................................28

FLA. STAT.
   §§ 376.205, 376.121 (2010) ..................................................................................................32

Florida Pollutant Discharge Prevention and Control Act, FLA. STAT.
   § 376.011 (2010) .....................................................................................................................7

LA. CIV. CODE ANN. art. 2315(B) (2010) ..................................................................................32

Oil Pollution Act, 33 U.S.C.
   § 2701................................................................................................................7

**REGULATIONS**

30 C.F.R. § 256.62(c)............................................................................................27

**RULES**

FED. R. CIV. P. 9(h) ......................................................................................1, 8, 31

FED. R. CIV. P. 12(b)(6)...................................................................................1, 3, 8

**OTHER AUTHORITIES**

135 CONG. REC. H7954-02 (daily ed. Nov. 2, 1989)................................................23

H.R. REP. NO. 101-242, pt. 2 (1989)....................................................................23

H.R. REP. NO. 95-590 (1977), *reprinted in* 1978 U.S.C.C.A.N. 1450........................30

RESTATEMENT (SECOND) OF TORTS § 13 .................................................................11

RESTATEMENT (SECOND) OF TORTS § 281 (1965).......................................................9

RESTATEMENT (SECOND) OF TORTS § 821C(1) ........................................................18

RESTATEMENT (SECOND) OF TORTS § 821C cmt. b....................................................18

RESTATEMENT (SECOND) OF TORTS § 822 cmt. a.......................................................10

S. REP. NO. 101-94 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722 ..............................34

# I.
## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Anadarko Petroleum Corporation; Anadarko E&P Company LP (together "Anadarko"); MOEX Offshore 2007 LLC; and MOEX USA Corporation (all movants collectively, the "Non-Operating Defendants") move to dismiss all claims alleged against them in Master Complaint B3.[1]  In its Case Management Order, dated October 19, 2010, and clarified in Pre-trial Order No. 25, the Court ordered Plaintiffs to set forth in Master Complaint B3 "all claims, of any type, relating to post-explosion clean-up efforts asserted against Defendants not named in the B1 Master Complaint, as well as all claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 20, 2010."  PTO No. 25 at ¶ 1.  Plaintiffs expressly designate Master Complaint B3 as a Complaint in Admiralty pursuant to Federal Rule of Civil Procedure 9(h) and assert claims for personal injury and property damage pursuant to the general maritime law, the Oil Pollution Act ("OPA"), and the law of Florida and other states.

Plaintiffs' maritime claims against the Non-Operating Defendants (Negligence, Gross Negligence, Battery, and Nuisance) all fail to state a claim because Plaintiffs do not allege that the Non-Operating Defendants controlled any of the operations of the *Deepwater Horizon* that allegedly caused Plaintiffs' injuries.  On the contrary, the allegations make clear that the "BP Defendants" and the "Transocean Defendants"—not the Non-Operating Defendants—controlled all operations at the Macondo Prospect and on the *Deepwater Horizon*.  Plaintiffs also do not

---

[1]    Reference to Anadarko Petroleum Corporation and Anadarko E&P Company LP together as "Anadarko" and to all movants together as the "Non-Operating Defendants" is solely for purposes of this Motion and is not intended to, and expressly does not, acknowledge or characterize any relationship between the parties or signify that each party is not an independent and distinct corporate entity.  Named defendant Mitsui Oil Exploration Co., Ltd., has not been served with any individual complaint in connection with this case, or with Master Complaint B3, and does not join in this Motion or otherwise appear for any purpose in the MDL court.

allege that the Non-Operating Defendants controlled any clean-up efforts or participated in the decision to use chemical dispersants.  Plaintiffs conspicuously exclude the Non-Operating Defendants from the list of "Dispersant Defendants" who (along with the BP Defendants and Nalco Company) allegedly exposed Plaintiffs to harm during the clean-up.  Thus, even if the allegations against the Non-Operating Defendants satisfied the minimum requirements of Rule 8 (which they do not), the allegations themselves establish as a matter of law that Plaintiffs can state no cognizable claim against the Non-Operating Defendants.  Furthermore, Plaintiffs' Nuisance claim is displaced by OPA and should be dismissed for that reason as well.

Plaintiffs' state law claims fail because state law does not apply to this case.  Federal law alone applies to claims arising out of and in connection with oil exploration, development, and extraction operations on the Outer Continental Shelf ("OCS").  Although federal law sometimes borrows state law as surrogate federal law in OCS cases, it does not do so in this case, and even if it did, it would not borrow Florida law.

Plaintiffs' OPA claim should be stricken from Master Complaint B3 because it duplicates the OPA claim in First Amended Master Complaint B1.  The Court's Case Management Order specifically directs that all nongovernmental claims for economic losses should be pleaded in the Master Complaint for Pleading Bundle B1.[2]  In addition, Plaintiffs' OPA claim fails because

---

[2]      Plaintiffs allege that the factual allegations "pleaded in the Master Complaint for the B1 Pleading Bundle are incorporated into and made part of" Master Complaint B3.  Mast. Compl. B3 ¶ 18.  On February 9, 2011, Plaintiffs filed their First Amended Master Complaint, Cross-Claim, and Third-Party Complaint for Private Economic Losses in Accordance with PTO No. 11 [CMO No. 1] Section III(B1) ["B1 Bundle"] (Dkt. # 1128).  It is not clear whether Plaintiffs intend that the allegations of the Amended B1 Master Complaint are to be incorporated into the B3 Master Complaint.  It is also not clear which factual allegations the Plaintiffs intend to control in the event of inconsistency: the allegations of First Amended Master Complaint B1, or the allegations of the un-amended Master Complaint B3.  To the extent the allegations of the Amended B1 Master Complaint are considered part of and incorporated into the allegations of the Master Complaint B3, the arguments presented in the Motion of Defendants Anadarko Petroleum Corporation, Anadarko E&P Company LP, MOEX Offshore 2007, LLC and MOEX USA Corporation to Dismiss First Amended Complaint, Cross-Claim, and Third-Party Complaint for

they do not allege that they have satisfied OPA's jurisdictional presentment requirement. Plaintiffs' OPA claim against Anadarko E&P also fails because it was not a leaseholder of the Macondo Prospect at the time of the discharge.  For these and other reasons described below, the Court must dismiss Plaintiffs' claims against the Non-Operating Defendants in their entirety.

## II.
## RELEVANT FACTUAL ALLEGATIONS IN MASTER COMPLAINT B3

Plaintiffs allege in that "BP leased the *Deepwater Horizon* to drill exploratory wells at the Macondo Prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf off the coast of Louisiana,"  Mast. Compl. B3 ¶ 79,  and that on April 20, 2010, "workers on the *Deepwater Horizon* oil vessel lost control of the Macondo well just after the final cementing work was completed," and the vessel subsequently "caught fire" and "sank," resulting in an oil spill.  *Id.* ¶ 80–82.

Plaintiffs claim to be "citizens of Florida, Alabama, Mississippi, Louisiana, Texas and other states, who have been exposed to harmful chemicals, odors and emissions during the clean-up following the *Deepwater Horizon* explosion."  *Id.* ¶ 21.  Plaintiffs divide themselves into five categories:  (a) The "VoO Plaintiffs," who are boat captains and crew who participated in BP's Vessels of Opportunity Program ("VoO") program; (b) the "Decontamination Plaintiffs," who are workers involved in decontaminating vessels that came into contact with oil and/or chemical dispersants; (c) the "Vessel Plaintiffs," who include vessel captains and crew who were not involved in the VoO program but allegedly were exposed to harmful chemicals, odors, and emissions during post-explosion clean-up activities; (d) the "Onshore Plaintiffs," who are clean-up workers and beach personnel involved in clean-up activities along shorelines and intercoastal

Private Economic Losses in Accordance with PTO No. 11 [CMO No. 1] Section III (B1) ["B1 Bundle"] Pursuant to Fed. R. Civ. P. 12(b)(6), filed concurrently herewith, are hereby incorporated into this Motion to the extent applicable.

and intertidal zones; and (e) the "Resident Plaintiffs," who are individuals who live and work in close proximity to coastal waters. *Id.*

The Master Complaint divides the Defendants into groups based on their alleged involvement in the incident: (1) The "BP Defendants" and the "Transocean Defendants," who allegedly oversaw the drilling operations on the *Deepwater Horizon* and/or the subsequent clean-up efforts, *see id.* ¶¶ 24–36, 48–53; (2) the "Dispersant Defendants," who allegedly used and applied dispersant chemicals in response to the oil spill, and Nalco Company, the manufacturer of one dispersant, *see id.* ¶¶ 54–70; and (3) Anadarko and MOEX Offshore (and companies alleged to be related to MOEX Offshore) who are alleged to be "non-operational leaseholders" of the Mississippi Canyon Block 252, but are not alleged to have engaged in any conduct that caused harm during either the drilling of the well or the subsequent clean-up efforts. *See id.* ¶¶ 37–47.

### A.    Plaintiffs Allege that the "BP Defendants" and the "Transocean Defendants" Oversaw the Drilling and Recovery Operations and Operated the *Deepwater Horizon*.

Plaintiffs allege that BP "was a holder of a lease granted by the former Minerals Management Service ('MMS') allowing it to perform oil exploration, drilling, and production-related operations" at the Macondo site, in which BP held a 65% interest. *Id*. ¶¶ 24, 46. "As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations." *Id*. ¶ 36. The Plaintiffs allege that Transocean, "subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems. Transocean also provided operational support for drilling-

4

related activities on board the *Deepwater Horizon*, as well as onshore supervision and support for those drilling activities at all times relevant to the Oil Spill."  *Id.* ¶ 53.  BP and Transocean are alleged to have "recklessly, willfully and/or wantonly failed to ensure," <u>first</u>, "that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout," and <u>second</u> "that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico . . . ."  *Id.* ¶¶ 160–61.

Plaintiffs further allege that "[i]n the wake of the disaster, BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf States."  *Id.* ¶¶ 4, 94 (emphasis added).  They allege that under the so-called VoO program, "BP directed the use of vessels to recover oil coming to the surface of the Gulf of Mexico . . . ."  *Id.* ¶ 95; *see also id.* ¶ 96 ("The VoO program is touted by BP as a key component to BP's response to the disaster").  Plaintiffs also allege that "BP coordinates and directs aircraft owned and/or operated by [other named Defendants] that fly out over the Gulf to spot oil slicks and to spray chemical dispersants to oil on the surface of the Gulf."  *Id.* ¶ 105.

**B.    Plaintiffs Allege That the "Dispersant Defendants" were Responsible for the Manufacture and Use of Dispersants in the Post-Explosion Clean-up Efforts.**

Plaintiffs allege that twelve defendants—the Non-Operating Defendants not among them—"participated in the post-explosion Oil Spill remediation and response efforts."  *Id.* ¶¶ 54–65.  These "Dispersant Defendants," along with BP, allegedly "covered approximately 291 square miles of the Gulf with dispersant" chemicals, *id.* ¶ 118, causing Plaintiffs harm by exposing them to dispersants.  *Id.* ¶¶ 149–58.  Plaintiffs allege that Nalco Co. "is the manufacturer of the chemical dispersants purchased by BP for use in connection with clean-up efforts in response to the Oil Spill" and that "Nalco knew or should have known that its chemical

dispersants would be applied beneath the surface of the water, on the surface of the water, and aerially from planes." *Id.* ¶¶ 67, 128.  Plaintiffs further allege that the Dispersant Defendants "recklessly, willfully and/or wantonly failed to use reasonably safe dispersant chemicals or other chemicals in their attempts to respond to the Oil Spill, and thereby exacerbated the pollution of the Gulf of Mexico and injury to Plaintiffs." *Id.* ¶ 162.

C.    **Plaintiffs Allege That Anadarko and MOEX Offshore are Non-Operating Leaseholders of the Macondo Prospect.**

Plaintiffs allege that "[w]hile BP was the sole lease operator of the Deepwater Horizon, Anadarko, Anadarko E&P, and MOEX were considered non-operational leaseholders." *Id*. ¶ 45. Plaintiffs acknowledge that the Non-Operating defendants are in a materially different position than the other Defendants.  Plaintiffs allege that Anadarko held a 25% interest share and that MOEX Offshore held a 10% share in the Macondo Prospect lease.  *Id.* ¶ 46.  Plaintiffs do not allege that the Non-Operating Defendants had involvement in, control of, or supervisory authority over, the engineering and design of the Macondo well, the *Deepwater Horizon* and its crew, or the drilling and completion operations.  Plaintiffs also do not allege that any Non-Operating Defendant had any ownership, contractual, or leasehold interest in the *Deepwater Horizon*.  Moreover, Plaintiffs do not allege that the Non-Operating Defendants had anything to do with the clean-up efforts in response to the oil spill, participated in the VoO program, or had any input into or control over the use of chemical dispersants.  Plaintiffs do not allege that the Non-Operating Defendants participated in any acts that amounted to reckless, willful, or wanton conduct.

Notwithstanding the fact that Master Complaint B3 contains no allegations tying the Non-Operating Defendants to any conduct that allegedly caused Plaintiffs' harm, Plaintiffs assert claims against the Non-Operating Defendants under the Oil Pollution Act, 33 U.S.C. § 2701 (*id.*

¶¶ 194–201) and the Florida Pollutant Discharge Prevention and Control Act, FLA. STAT. § 376.011 (2010) (*id.*¶¶ 307–20), and for maritime Negligence (*id.* ¶¶ 219–28), Gross Negligence (*id.* ¶¶ 229–36), Negligence *Per Se* (*id.* ¶¶ 237–42), Nuisance (*id.* ¶¶ 259–71), Battery (*id.* ¶¶ 272–77), and Medical Monitoring under Florida law (*id.* ¶¶ 278–88).[3]

## III.
## ARGUMENT

### PLAINTIFFS HAVE NOT PLEADED CLAIMS AGAINST THE NON-OPERATING DEFENDANTS FOR WHICH RELIEF CAN BE GRANTED

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555); *see also Hershey v. Energy Transfer Partners*, 610 F.3d 239, 245–46 (5th Cir. 2010) (same).

Rather, to state a claim for relief, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556). If the factual allegations do not

---

[3]   Plaintiffs also include Class Action Allegations in Master Complaint B3 at ¶¶ 176–93. "Where it is facially apparent from the pleadings that there is no ascertainable class, a district court may dismiss the class allegation on the pleadings." *John v. Nat'l Sec. Fire and Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007). The Court, however, has ordered a stay of all class action motion practice and deadlines. CMO No. 1 at 12. The Non-Operating Defendants therefore hereby reserve, and expressly do not waive, any and all arguments that Plaintiffs' Class Action Allegations as set forth in Master Complaint B3 are facially insufficient to state an ascertainable class as a matter of law, until such time as the Court lifts the stay on Class Action motions practice.

raise a right to relief "above the speculative level," *Twombly*, 550 U.S. at 555, or if the allegations reveal an insuperable bar to relief, *Jones v. Bock*, 549 U.S. 199, 215 (2007), the claim should be dismissed.  In the latter circumstance, as in this case, the plaintiff "pleads himself out of court by 'admitting all the ingredients of an impenetrable defense.'"  *Barasich v. Shell Pipeline Co*., No. 05-4180, 2006 WL 3913403, at *2 (E.D. La. Nov. 20, 2006) (Barbier, J.) (internal citations omitted) (granting Rule 12(b)(6) dismissal in part).

A.     **Plaintiffs' Claims Against the Non-Operating Defendants Under General Maritime Law Fail.**

Plaintiffs designate Master Complaint B3 as a Complaint in Admiralty under Federal Rule of Civil Procedure 9(h) and assert four claims under the general maritime law:  Negligence (Count 3), Gross Negligence (Count 4), Nuisance (Count 7), and Battery (Count 8).[4]  All of these claims fail because Plaintiffs do not allege <u>any</u> facts that, if true, would establish that the Non-Operating Defendants owed a legal duty to the Plaintiffs or engaged in conduct that caused them harm.  On the contrary, the facts Plaintiffs allege, even if true, conclusively establish that the Non-Operating Defendants are <u>not</u> liable for Plaintiffs' alleged injuries, whether they result from exposure to dispersants or to oil.  Because <u>all</u> of the general maritime claims alleged against the Non-Operating Defendants require some sort of negligent conduct and proximate causation, these claims must be dismissed.

1.     **Plaintiffs Fail to Allege that the Non-Operating Defendants Engaged in or had Operational Control Over Any Conduct that Caused the Alleged Harm**.

To state a claim for negligence under the general maritime law, "the plaintiff must demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty,

---

[4]      Plaintiffs plead three additional claims under state law: Negligence *Per Se* (Count 5); Medical Monitoring under Florida law (Count 9); and violations of the Florida Pollutant Discharge Prevention and Control Act (Count 11), each of which fails for the reasons described in Parts III(C–D), *infra*.  Plaintiffs' federal statutory claim under OPA also fails for the reasons described in Part III (B), *infra*.

8

injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury." *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 211 (5th Cir. 2010) (internal citations and quotations omitted); *see also Becker v. Tidewater, Inc.*, 586 F.3d 358, 367 (5th Cir. 2009) ("Gross negligence . . . has been defined as harm willfully inflicted or caused by gross or wanton negligence") (quoting *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 411 (5th Cir. 1982); *Royal Ins. Co. of Am. v. Southwest Marine*, 194 F.3d 1009, 1015 (9th Cir. 1999) (defining gross negligence under maritime law as "the intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another . . .") (*quoting* BLACK'S LAW DICTIONARY 1185 (4th ed. 1968); RESTATEMENT (SECOND) OF TORTS   § 281 (1965) (actor liable for negligence if "the interest invaded is protected against unintentional invasion, and . . . the actor's conduct is a legal cause of the invasion")).

Similarly, claims for battery and nuisance, assuming *arguendo* that they are actionable under general maritime law, require the plaintiff to plead that the defendant took some action that caused the alleged harm.  According to the Second Restatement of Torts, causation is an element of both public nuisance and battery.  *See* RESTATEMENT (SECOND) OF TORTS § 822 cmt. a (subject to exceptions that do not apply in this case, "the tort law of public nuisance is consistent with" the private nuisance causation requirement); *id.* § 13 ("An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results"); *see also Nissan Motor Corp. v. Maryland Shipbuilding and Drydock Co.*, 544 F. Supp. 1104, 1120 n.17 (D. Md. 1982) (noting Plaintiffs cannot recover under a theory of nuisance under maritime law without proving "fault on the part of defendant") (citing RESTATEMENT (SECOND) OF TORTS § 822); *cf. Baggett v.*

9

*Richardson*, 342 F. Supp. 1024, 1027 (E.D. La. 1972) (adopting state law for maritime assault and battery claim in part because "the areas of tort law dealing with assault and battery and *respondeat superior* apparently are uniformly treated throughout the fifty states…").[5]

Because Plaintiffs' general maritime law claims require them to plead some breach of duty or other act by the defendants that caused their harm, the Court must focus on Master Complaint B3's specific factual allegations about the Non-Operating Defendants.  As explained below, those allegations fail to set forth <u>any allegations</u> that Anadarko, MOEX Offshore, and MOEX USA—whom Plaintiffs allege were at most "non-operational leaseholders" of the mineral rights to the Macondo Prospect—did <u>anything</u> that amounted to a breach of duty or otherwise caused the harm alleged to have arisen from Plaintiffs' exposure to dispersants or oil. Indeed, the Plaintiffs' own allegations, if true, establish that the other Defendants, and not the Non-Operating Defendants, are responsible for either the clean-up efforts or the drilling

---

[5]   Although Plaintiffs bring Master Complaint B3 in admiralty and assert claims under general maritime law, breach of duty and causation are required elements under any potentially applicable law. *See Meany v. Meany*, 639 So. 2d 229, 233 (La. 1994) ("The four elements of negligence include duty, breach, a causal relationship between the defendant's alleged negligent act and the plaintiff's injuries (which includes both cause in fact and legal cause), and damages") (internal citations omitted); *Qore, Inc. v. Bradford Bldg. Co.*, 25 So. 3d 1116, 1123 (Ala. 2009) (same); *Nabors Drilling USA, Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009) (same); *Watson Quality Ford, Inc. v. Casanova*, 999 So. 2d 830, 835 (Miss. 2008) (same); *Florida Dep't of Corr. v. Abril*, 969 So. 2d 201, 204 (Fla. 2007) (same); *see also Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 24–25 (Tex. 1995) (both gross negligence and negligence require evidence of a breach of duty and evidence of proximate cause); *Ambrose v. New Orleans Police Ambulatory. Serv.*, 639 So.2d 216, 220 (La. 1994) (gross negligence requires elements of proximate cause and duty).  Likewise, the common law theories of battery and nuisance in any of the potentially applicable states require proof of causation on the part of the defendants.  *See, e.g.*, *Aramark Uniform and Apparel v. Easton*, 894 So. 2d 20, 23 (Fla. 2005) (nuisance claims "require[] proof that the defendant caused the pollution resulting in the damages"); *Ex parte Atmore Community Hosp.*, 719 So. 2d 1190, 1193–94 (Ala. 1998) (citing RESTATEMENT (SECOND) OF TORTS § 18 in battery case); *Jamail v. Stoneledge Condo. Owners Ass'n*, 970 S.W.2d 673, 676 (Tex. App. 1998) (quoting RESTATEMENT § 822); *Leaf River Forest Prods., Inc. v. Ferguson*, 662 So. 2d 648, 662 (Miss. 1995) (quoting RESTATEMENT § 822); *Caudle v. Betts*, 512 So. 2d. 389, 391 (La. 1987) ("A harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact, is a battery") (internal citations omitted); RESTATEMENT (SECOND) OF TORTS § 13 ("An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results").

operations alleged to have caused the oil spill.  Plaintiffs' maritime claims against the Non-Operating Defendants must therefore be dismissed.

> ### a.  Plaintiffs' allegations establish that the Non-Operating Defendants took no part in the post-explosion clean-up efforts or the use of dispersants.

Pursuant to this Court's order, Master Complaint B3 encompasses "all claims related to post-explosion clean-up efforts."  *See* PTO No. 11 [CMO No. 1] at 3.  To this end, Plaintiffs' allegations center on the alleged health problems and other damages suffered by individuals engaged in cleanup efforts organized by or in conjunction with BP, including the VoO program.  *See* Mast. Compl. B3 ¶¶ 21(a–c), 94–104.  Master Complaint B3, however, lacks any allegation that the Non-Operating Defendants were in any way responsible for these clean-up efforts.  On the contrary, Plaintiffs allege that "[i]n the wake of the disaster, <u>BP</u> began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf States."  *Id.* ¶¶ 4, 94 (emphasis added).  Similarly, under the VoO program, "<u>BP</u> directed the use of vessels to recover oil coming to the surface of the Gulf of Mexico . . . ."  *Id.* ¶ 95 (emphasis added); *see also id.* ¶ 96 ("The VoO program is touted by <u>BP</u> as a key component to <u>BP's response</u> to the disaster") (emphasis added).

Likewise, many of the facts and claims set forth in Master Complaint B3 address the use of chemical dispersants in the Gulf of Mexico.  *See, e.g.*, *id.* ¶¶ 105–28, 149–58.  Again, Plaintiffs do not allege that the Non-Operating Defendants participated in the use of these dispersants.  The Non-Operating Defendants are not named among the "Dispersant Defendants" in Master Complaint B3, *id.* ¶¶ 54–65, nor are they alleged to have any connection to the manufacturer of the dispersants identified in Master Complaint B3.  *Id.* ¶ 67.  Plaintiffs specifically allege that <u>BP</u>, and <u>not</u> the Non-Operating Defendants, "began implementing a

11

disaster response plan . . . to disperse oil in the water using Nalco's chemical dispersants." *Id.*
¶ 94; *see also id.* ¶ 108 ("<u>BP</u> began subsea and aerial application of chemical dispersants
manufactured by Defendant Nalco to the resulting oil slicks and sheens on the surface of the
Gulf") (emphasis added); *id.* ¶ 109 ("The Coast Guard's Federal On Site Coordinator . . . must
approve <u>BP's requests</u> to use chemical dispersants") (emphasis added).

The absence of any such allegations about the Non-Operating Defendants is no accident.
As Plaintiffs are well aware, the Operating Agreement between BP and the Non-Operating
Defendants clearly establishes that BP was granted <u>sole</u> authority to direct the clean-up efforts,
including the use of dispersants.[6]   Article 4.1 of the Operating Agreement designates "BP
Exploration & Production Inc." as the "Operator."   *See* Ex. A at 14.   Article 5.1 provides that
"the Operator has the <u>exclusive right and duty to conduct (or cause to be conducted) all activities
or operations under this Agreement</u>.   In performing services under this Agreement for the Non-
Operating Parties, the Operator is an independent contractor, <u>not subject to the control or
direction of Non-Operating Parties</u> . . . ."   *Id.* at 20 (emphases added).   Article 6.1 further
provides:

---

[6]        Master Complaint B3 specifically refers to the responsibilities accorded to each of the Macondo
site lessees under the terms of the Operating Agreement.  *See* Mast. Compl. B3 ¶¶ 36, 45.  "[D]ocuments
that a defendant attaches to a motion to dismiss, the contracts were referred to in the pleadings if they are referred to
in the plaintiff's complaint and are central to her claim."   *Collins v. Morgan Stanley Dean Witter*, 224
F.3d 496, 498–99 (5th Cir. 2000) (internal citation and quotation marks omitted); *see also In re Katrina
Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) ("[B]ecause the defendants attached the
contracts to their motion to dismiss, the contracts were referred to in the complaints, and the contracts are
central to plaintiffs' claims, we may consider the terms of the contracts in assessing the motions to
dismiss"); *Kane Enters. v. MacGregor Inc.*, 322 F.3d 371, 374 (5th Cir. 2003) ("[T]he court may review
the documents attached to the motion to dismiss, e.g., the contracts in issue here, where the complaint
refers to the documents and they are central to the claim").   Here, Plaintiffs' allegations reference the
Operating Agreement, and Plaintiffs' division of operational control among the lessees is central to the
viability of Plaintiffs' claims against the Non-Operating Defendants.   The Court thus may consider the
Operating Agreement in ruling on this motion to dismiss.

> [In] the event of an <u>emergency</u>, or if in the <u>sole discretion of the Operator</u> a perceived emergency exists that poses an imminent threat to life, safety, property, or the environment, the <u>Operator</u> may immediately make those expenditures for the Joint Account as, in its opinion as a reasonable and prudent operator, are necessary to deal with the emergency, but only to the extent necessary to stabilize the situation and alleviate the imminent threat.

*Id.* at 26 (emphases added). Although the "Operator shall report to the Participating Parties, as promptly as possible, the nature of the emergency, the action taken, and the Costs incurred," <u>nothing</u> in the Operating Agreement permits the Non-Operating Parties to direct or control <u>any</u> aspect of the emergency response. *See id.*

In sum, the allegations in Master Complaint B3 and the other materials properly before the Court establish as a matter of law that the Non-Operating Defendants had nothing to do with—and certainly had no authority to control—the post-explosion clean-up efforts. According to the Plaintiffs' own allegations, the Non-Operating Defendants took no part in the VoO program, and the Plaintiffs deliberately exclude the Non-Operating Defendants from the defendants alleged to have manufactured or used the dispersants. On the basis of the Plaintiffs' own pleadings, then, the Non-Operating Defendants are not liable under any general maritime theory for harms caused by the use of dispersants or other clean-up efforts. At a minimum, Plaintiffs have fallen far short of the requirement that they plead a nonconclusory, plausible basis for relief against the Non-Operating Defendants. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 318 (5th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

> **b.    Plaintiffs' allegations establish that the Non-Operating Defendants are not liable under the general maritime law for the explosion on the *Deepwater Horizon* and the resulting oil spill.**

In addition to the claims arising from the application of dispersants and BP's other clean-up efforts, Master Complaint B3 alleges that Plaintiffs were exposed to oil that flowed into the

Gulf of Mexico following the explosion and sinking of the *Deepwater Horizon*. *See* Mast. Compl. B3 ¶¶ 22–23, 143–48, 175. As with the use of dispersants, Plaintiffs' allegations establish that BP and Transocean, rather than the "non-operational leaseholders," were responsible for the drilling operations at the Macondo site, and the Non-Operating Defendants therefore cannot be held directly liable for any breach of duty or harm arising from the explosion on the *Deepwater Horizon* or the resulting oil spill.

It is fundamental that a duty to prevent harm resulting from oil and gas operations arises as a consequence of operational control over the activity. *See, e.g.*, *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550 (5th Cir. 1987), *cert. denied*, 485 U.S. 1034 (1988). It is also settled that where a principal contracts with an independent contractor to conduct oil and gas operations but retains no operational control, the principal neither assumes nor owes any duty to protect others from the contractor's negligence. *Thomas v. Burlington Res. Oil & Gas Co.*, No. 99-3904, 2000 WL 1528082, at *2 (E.D. La. Oct. 13, 2000) (Barbier, J.); *Hawkins v. Evans Cooperage Co.*, 766 F.2d 904, 909 (5th Cir. 1985) (a principal was not liable because it did not exercise control over the independent contractor and had no duty to discover and remedy hazards the contractor created); *McCormack v. Noble Drilling Corp.*, 608 F.2d 169, 174–75 (5th Cir. 1979) (holding that the principal of an oil drilling operation owed no duty to ensure that independent contractors performed safely, even though the principal's company man on the rig was aware of their operations, because the principal had no control over the contractor); *Ronquille v. MMR Offshore Servs., Inc.*, 353 F. Supp. 2d 680, 682 (E.D. La. 2004) (the presence of a company representative on an oil platform with knowledge of the rig's operations "is insufficient to create a duty; therefore, the law does not support the imposition of liability for any failure to intercede"); *Toussaint v. Chevron Phillips Chem. Co.*, No. 03-3481, 2006 WL 2349465, at *2 (E.D. La. Aug.

14

11, 2006) ("[T]he right to inspect or comment is insufficient to subject a principal to liability for a contractor's negligence") (citation omitted).

Master Complaint B3 does not contain any allegation that the Non-Operating Defendants retained any control over the drilling or operations at the Macondo site.  Plaintiffs allege that "[w]hile BP was the <u>sole lease operator</u> of the Deepwater Horizon, Anadarko . . . and MOEX were considered non-operational leaseholders."  Mast. Compl. B3 ¶ 45 (emphasis added).  These allegations are confirmed by the terms of the Operating Agreement, under which the Non-Operating Defendants delegated to BP "the exclusive right and duty to conduct (or cause to be conducted) all activities or operations under this Agreement."  Ex. A at 20.  BP is expressly designated "an independent contractor, <u>not subject to the control or direction of Non-Operating Parties</u> . . . ."  *Id.* (emphasis added).  Plaintiffs recognize this fact throughout Master Complaint B3, expressly alleging that "[a]s a lease operator of the Macondo prospect site, <u>BP was responsible for</u> . . . engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations."  *Id.* ¶ 36 (emphasis added); *see id* ¶ 53 ("At all times relevant to the Oil Spill, Transocean, <u>subject to BP's inspection and approval</u>, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems") (emphasis added).

In light of the Plaintiffs' explicit allegations that BP and Transocean were responsible for the drilling operations and that the Non-Operating Defendants were at most only "non-operational leaseholders," the Plaintiffs' general maritime claims against the Non-Operating Defendants must be dismissed.  *See Jones v. Bock*, 549 U.S. 199, 215 (2007).  Absent any power to control BP or its contractors, the Non-Operating Defendants owed no duty to Plaintiffs and did

15

not cause them any harm.[7]   The factual allegations in Master Complaint B3 are insufficient to state any plausible claim against the Non-Operating Defendants for negligence, gross negligence, nuisance, or battery.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

### 2. Plaintiffs' Nuisance Claim Also Fails Because it is Barred by Federal Maritime Law and OPA.

Plaintiffs' nuisance claim also fails because federal maritime law does not recognize a claim for nuisance.  Even if it did, Plaintiffs' claim would be displaced by OPA, which provides the exclusive federal remedy for  damages to real property that are recoverable under a nuisance theory.

Nuisance has been called the "ill-defined omnibus tort of last resort."  *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 301–02 (4th Cir. 2010).   Many courts have determined that maritime law simply does not recognize the kind of public nuisance claim that Plaintiffs assert.  *See Sekco Energy, Inc. v. M/V Margaret Chouest*, 820 F. Supp. 1008, 1014 (E.D. La. 1991) ("we decline to create a cause of action" for public nuisance); *see also Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1030 n.13 (5th Cir. 1985) (en banc) (denying plaintiffs' nuisance claim because of the economic loss doctrine and recognizing that the Supreme Court has "apparently foreclosed" a "federal cause of action for public nuisance caused

---

[7]      Plaintiffs do not expressly allege that the Non-Operating Defendants are vicariously liable as principals of, or joint venture partners with, BP and do not plead any vicarious liability theory against the Non-Operating Defendants.   In any event, Plaintiffs' allegations and the Operating Agreement conclusively establish that the Non-Operating Defendants are <u>not</u> vicariously liable for any acts or omissions of BP or its contractors, because the Non-Operating Defendants are not alleged to have (and do not have) any right to control BP's operations.  *See, e.g.*, *Transcon. Gas Pipe Line Corp. v. Mr. Charlie*, 294 F. Supp. 1025, 1031 (E.D. La. 1968) (no indirect liability under maritime law for non-operating co-owners of oil and gas lease where designated operator, but not non-operators, was negligent), *aff'd in relevant part and rev'd in part on other grounds*, 424 F.2d 684 (5th Cir. 1970), *cert. denied*, 400 U.S. 832 (1970); *Bolivar v. R & H Oil and Gas Co.*, 789 F. Supp. 1374, 1381–82 (S.D. Miss. 1991) (collecting cases for proposition that non-operating investor who has no right to control operations at gas well may not be held liable as joint venturer).

by the obstruction of navigable waterways”).[8]

Even if the general maritime law recognized a claim for public nuisance, OPA displaces it.  Plaintiffs' nuisance claim is based upon alleged property damage and economic losses.  For example, Plaintiffs allege that “[p]rior to the *Deepwater Horizon* disaster, Plaintiffs enjoyed the use of the Gulf of Mexico for fishing, boating, and other economic and recreational pursuits, including residing on the Gulf of Mexico” and that “[s]ince the disaster, Plaintiffs have been unable to fish or boat, and many have lost their livelihoods.”  Mast. Compl. B3 ¶¶ 261–62 (emphases added).  These allegations describe the loss of profits, earning capacity, and use of natural resources.  Each of these damages is covered by OPA.  *See* 33 U.S.C. § 2702(b)(2)(A), (E).

OPA is the exclusive federal remedy for any claimant seeking recovery for covered damages.  The “will of Congress” is dominant in admiralty.  *Northwest Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 96 (1981).  Accordingly, comprehensive legislation like OPA displaces federal common law and general maritime law in that same area.  *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 11 (l981) (Federal Water Pollution Control Act, as amended, fully preempts federal common law of nuisance in area of ocean pollution); *Conner v. Aerovox, Inc.*, 730 F.2d 835, 840–41 (lst Cir.

---

[8]      Even if such a claim were  recognized under federal maritime law, public nuisance claims require an allegation that the plaintiff “suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference.”  RESTATEMENT (SECOND) OF TORTS § 821C(1).  Plaintiffs allege only that they have been “exposed to harmful chemicals . . . at levels, amounts, and under conditions different from the general public.”  Mast. Compl. B3 ¶¶ 263–64.  In other words, they allege damages different in degree rather than in kind, which is insufficient to establish a specialized injury.  *See* RESTATEMENT (SECOND) OF TORTS § 821C cmt. b (“It is not enough that [a plaintiff] has suffered the same kind of harm or interference but to a greater extent or degree [than the general public]”); *In re The Exxon Valdez*, 104 F.3d 1196, 1198 (9th Cir. 1997) (rejecting public nuisance claim even though “oil spill may have affected [Plaintiffs] Alaska Natives more severely than other members of the public . . . .”).

1984) (Federal Water Pollution Control Act preempts general maritime law tort claims); *United States v. Dixie Carriers, Inc.*, 627 F.2d 736, 740–42 (5th Cir. 1980) (Federal Water Pollution Control Act provides the exclusive legal remedy for the government to recover its oil spill clean-up costs).  "[W]hen Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears."  *City of Milwaukee v. Illinois*, 451 U.S. 304, 314 (1981) (holding that the Clean Water Act displaces the federal common law of interstate water pollution).

Congress passed OPA to occupy the field of economic damages caused by marine oil pollution, as the legislative history makes clear.[9]  Courts uniformly have held that "Congress intended the OPA to be the exclusive federal law governing oil spills."  *South Port Marine, LLC v. Gulf Oil LP*, 234 F.3d 58, 65–66 (1st Cir. 2000) (holding that punitive damages were not available under OPA because "Congress's very specific treatment of oil pollution in the OPA, which does not provide for punitive damages, supplanted general admiralty and maritime law, which has traditionally provided for the general availability of punitive damages for reckless conduct"); *see also Gabarick v. Laurin Mar. (Am.) Inc.*, 623 F. Supp. 2d 741, 750–51 (E.D. La. 2009) (holding that all general maritime law claims that are recoverable under OPA, and specifically those covered damages enumerated in 33 U.S.C. § 2702, are preempted by OPA); *Tanguis*, 153 F. Supp. 2d at 867 ("This new scheme includes new remedies, which, in many respects, preempt traditional maritime remedies"); *Nat'l Shipping Co. of Saudi Arabia v. Moran*

---

[9]        Legislative history also supports the view that OPA establishes an exclusive federal cause of action displacing federal maritime law.  As the court in *Tanguis* noted, "OPA 'represents Congress's attempt to provide a comprehensive framework in the area of marine oil pollution.'"  *Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859, 867 (E.D. La 2001) (*citing Rice v. Harken Exploration Co.*, 89 F. Supp. 2d 820, 822 (N.D. Tex. 1999)).  The Senate Report also states that "OPA 'creates a single Federal law providing cleanup authority, penalties, and liability for oil pollution.'"  *Tanguis*, 153 F. Supp. 2d at 867 (citing S. REP. NO. 101-94, at 9 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722, 730) (emphasis added).

*Mid-Atl. Corp.*, 924 F. Supp 1436, 1447 (E.D. Va. 1996), *aff'd*, 122 F.3d 1062 (4th Cir. 1997)

("Because OPA provides a comprehensive scheme for the recovery of oil spill clean-up costs and

compensation of those injured by oil spills, the general maritime law does not apply to recovery

of these types of damages"); *In re Alex C Corp.*, No. 01-12184-DPW, 2003 WL 203078, at *11

(D. Mass. Jan. 30, 2003) (dismissing claims under maritime contribution law and maritime law

indemnity where OPA has provided for recovery of those damages).  Because maritime law does

not recognize a claim for public nuisance and, even if it did, OPA would displace it, Plaintiffs'

nuisance claim must be dismissed.

**B.      Plaintiffs Fail to State a Claim Against the Non-Operating Defendants Under the Oil Pollution Act.**

As an initial matter, Plaintiffs' claim against the Non-Operating Defendants under the Oil

Pollution Act should be stricken from Master Complaint B3 because the Court in PTO No. 11

[CMO No. 1] directed that all claims for "Non-Governmental Economic Loss and Property

Damages" shall be included in Pleading Bundle B1, which expressly includes "OPA claims."

PTO No. 11 [CMO No. 1] at 3, § B1.  In PTO No. 25, the Court clarified that Pleading Bundle

B3 includes "Clean Up, Medical Monitoring, and Post-April 20 Personal Injury Claims."  PTO

No. 25 [Dkt. # 983] at ¶ 1.  The Court explained that Pleading Bundle B3 includes "all claims, of

any type, relating to post explosion clean up efforts asserted against Defendants <u>not named</u> in the

B1 Master Complaint as well as all claims for personal injury and/or medical monitoring for

exposure or other injury occurring after the explosion and fire of April 20, 2010."  *Id.* (emphasis

added).  Because the Non-Operating Defendants are named in the Plaintiffs' First Amended

Master Complaint B1 OPA claim, Plaintiffs cannot assert a duplicative OPA claim against the

Non-Operating Defendants in Master Complaint B3.   Regardless, as argued in the Non-

Operating Defendants' Motion to Dismiss Plaintiffs' First Amended Master Complaint For

19

Pleading Bundle B1 (filed concurrently herewith), Plaintiffs fail to state a claim under OPA for which relief can be granted, no matter where the claim appears.

OPA's pre-suit presentment requirement states: "all claims for removal costs or damages shall be presented first to the responsible party . . . of the source designated under section [2714(a) of this title]."  33 U.S.C. § 2713(a) (emphasis added).  If such a claim is presented and the responsible party denies all liability, or if the claim is not settled within 90 days, the claimant may elect to commence an action in court against the responsible party.  33 U.S.C. § 2713(c).

Plaintiffs allege that "[t]o the extent required by law, Plaintiffs have satisfied, or will have satisfied, all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), as to each and all of the defendants, by the submission of their claims to the Gulf Coast Claims Facility (the 'GCCF'), and/or BP, and/or its agents or designees."  Mast. Compl. B3 at ¶ 200 (emphasis added).  Plaintiffs' allegation on its face fails to satisfy the mandatory presentment requirement of OPA, and Plaintiffs' OPA claim, therefore, should be dismissed for failure to state a claim. Because the Court lacks jurisdiction over claims that have not first been presented, this defect cannot be cured by the tardy presentation of Plaintiffs' claims mid-course in litigation.

Simply put, "the clear text of § 2713 creates a mandatory condition precedent barring all OPA claims unless and until a claimant has presented her claims . . . ."  *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*, 51 F.3d 235, 240 (11th Cir. 1995).  This presentation requirement "is jurisdictional and mandates dismissal when [the presentment provision] is . . . not complied with by the claimant."  *Marathon Pipe Line Co. v. LaRouche Indus. Inc.*, 944 F. Supp. 476, 477 (E.D. La. 1996); *see also Gabarick v. Laurin Mar. (Am.) Inc.*, No. 08-4007, 2009 WL 102549, at *3 (E.D. La. Jan. 12, 2009) (dismissing OPA claims for failing to comply with OPA's presentment requirement and denying plaintiff's request for a stay in lieu of dismissal); *Turner v. Murphy Oil*

*USA, Inc.*, No. 05-4206, 2007 WL 4208986, at *2 (E.D. La. Nov. 21, 2007) (presentment provision is a "'mandatory condition precedent'" to bringing a suit under OPA) (quoting *Boca Ciega*, 51 F.3d at 240); *Russo v. M/T Dubai Star*, No. C 09-05158 SI, 2010 WL 1753187, at *2–3 (N.D. Cal. Apr. 29, 2010) (collecting cases holding that OPA's presentation requirement is jurisdictional and mandates dismissal for failure to comply).

It is well established that plaintiffs cannot cure a jurisdictional flaw by providing the requisite presentment in the midst of ongoing litigation. *See Hallstrom v. Tillamook County*, 493 U.S. 20, 33 (1989)  (holding that plaintiffs' failure to comply with a statutory 60-day notice provision is a failure to satisfy a condition precedent to maintaining a suit and necessitates dismissal of the case, and that the district court cannot stay the case to permit plaintiffs to comply with the notice requirement); *Nat'l Envtl. Found. v. ABC Rail Corp.*, 926 F.2d 1096, 1097–98 (11th Cir. 1991) ("If a plaintiff fails to comply with [the notice requirement of the Clean Water Act] where it is applicable, the district court is required to dismiss the action"); *Gregory v. Mitchell*, 634 F.2d 199, 203–04 (5th Cir. 1981) (holding that "[t]he requirement of exhaustion of administrative review is a jurisdictional requisite to the filing of an action under the FTCA" and that the failure to exhaust cannot be cured by a stay of the case until the requirement is met); *Hooper v. Thomas*, No. 01-1730, 2002 WL 1268399, at *1 (E.D. La. June 5, 2002) (holding that the "federal court's power to adjudicate a claim brought under the Federal Tort Claims Act depends solely on whether the claimant has previously complied" with the mandatory notice requirement and that a "stay pending exhaustion cannot cure a jurisdictional defect which was present when the suit was filed").

By failing to comply with OPA's requirement that all claimants present a claim to the responsible party for settlement consideration before filing a lawsuit, Plaintiffs undermine one of

the principal purposes of the Act.  The presentation requirement reflected Congress's belief that lawsuits against parties are appropriate only "where attempts to reach a settlement with the responsible party . . . were unsuccessful."  H.R. REP. NO. 101-242, pt. 2, at 66 (1989). Legislative debate on the bill highlighted the goal of avoiding litigation as one of the primary purposes, and benefits, of the Act.  *See* 135 CONG. REC. H7954-02 (daily ed. Nov. 2, 1989) (statement of Rep. Hammerschmidt), 135 Cong. Rec H7954-02, at *H7965 (Westlaw) (OPA is "intended to allow for quick and complete payment of reasonable claims without resort to cumbersome litigation"); *id.* at *H7962 (statement of Rep. Lent) ("The thrust of [OPA] is to eliminate, to the extent possible, the need for an injured person to seek recourse through the litigation process . . . ."); *id.* at *H7955 (statement of Rep. Jones) ("We do not want claimants to have to wait years upon years to recover their losses while lawsuits drag on in the courts").  The claims presentation provision reflected a compromise "to temper the Act's increased liability with a congressional desire to encourage settlement and avoid litigation."  *Boca Ciega*, 51 F.3d at 238–39 (citing legislative history of the Act).  Dismissal is required to vindicate that essential congressional objective.

Accordingly, Plaintiffs' OPA claim against the Non-Operating Defendants must be dismissed for failure to state a claim because Plaintiffs did not sufficiently allege the requisite element of presentment of their claims prior to filing suit.  Although some of the individual plaintiffs may have complied with the OPA presentment requirement, others have not.  Any individual plaintiff that has failed to fully comply with OPA can re-file only after properly presenting a claim and awaiting either rejection of his claim or expiration of the 90-day statutory period.  *See Gabarick*, 2009 WL 102549, at *3.

**C.**      **Plaintiffs' OPA Claim Against Anadarko E&P Must Be Dismissed Because Anadarko E&P Did Not Hold a Lease Interest in the Macondo Prospect at the Time of the Discharge.**

Plaintiffs allege in Master Complaint B3 that Anadarko E&P is liable as a responsible party under OPA because the "Coast Guard has treated" Anadarko E&P as a responsible party. Mast. Compl. B3 ¶ 196.  Even if accepted as true, Plaintiffs' allegation is insufficient to establish liability under OPA.  *See United States v. Louisiana Land & Exploration Co.*, No. 03-3208, 2006 WL 851183, at *2 (E.D. La. Mar. 17, 2006).

Plaintiffs allege in Master Complaint B3 that Anadarko E&P "<u>owned</u> a 22.5% stake" in the Macondo prospect lease.  Mast. Compl. B3 ¶ 46 (emphasis added).  OPA defines "Lessee" as "a person <u>holding</u> a leasehold interest in an oil or gas lease . . . on submerged lands of the Outer Continental Shelf, granted or maintained under applicable State law or the Outer Continental Shelf Lands Act (43 U.S.C. 1331 et seq.)."  33 U.S.C. § 2701(16) (emphasis added).  The statute does not define lessees to include former lessees.  *See Carr v. United States*, 130 S. Ct. 2229, 2236 (2010) ("Consistent with normal usage, we have frequently looked to Congress' choice of verb tense to ascertain a statute's temporal reach") (citations omitted); *cf.* 42 U.S.C. §9607(a)(2) (imposing former owner/operator liability on persons who "owned or operated" facility at time of a disposal).  Rather, under OPA, former lessees are responsible parties only in "the case of an abandoned . . . offshore facility," which is not the case here.  33 U.S.C. § 2701(32)(F); if former lessees were also liable as responsible parties, then this provision would be superfluous.  *See Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 520 n.11 (5th Cir. 2004) ("A couple of canons of construction state that a statute should be construed such that none of its terms are redundant and should be read to avoid internal inconsistency") (citations omitted).  Even in such cases, Congress could have imposed liability on any former lessee, but it imposed liability on only "the

persons who would have been responsible parties <u>immediately prior to</u> the abandonment of the . . . facility." 33 U.S.C. § 2701(32)(F) (emphasis added).

Furthermore, public Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE" formerly the Minerals Management Service ("MMS")) records demonstrate that Anadarko E&P's status as a lessee of the Macondo Prospect terminated on April 1, 2010.[10]  *See* Ex. B.  Before the *Deepwater Horizon* incident, Anadarko E&P assigned its interest in the lease to Anadarko Petroleum Corporation and forwarded that assignment to the MMS for approval. *See* Ex. C, Assignment of Record Title Interest In Federal OCS Oil And Gas Lease.  Although MMS did not approve the assignment until April 28, 2010, by law the effective date of the assignment as approved by the MMS was April 1, 2010.  30 C.F.R. § 256.62(c); Ex. C.

Because the assignment of the lease was effective as a matter of law on April 1, 2010, prior to the *Deepwater Horizon* incident, Anadarko E&P held no interest in the lease at the Macondo Prospect on the date of the discharge on April 20, 2010, and, therefore, is not a person "holding a leasehold interest" in the area of the discharge or a "lessee" under OPA.  Plaintiffs <u>admit</u> that Anadarko E&P held no interest in the lease as of April 1, 2010, Mast. Compl. B3 ¶ 46, and thus fail to state a claim based on their own allegations.  No other allegations in Master Complaint B3 would render Anadarko E&P liable as a responsible party under OPA.  Plaintiffs' OPA claim against Anadarko E&P therefore fails as a matter of law and must be dismissed.

---

[10]     Lease Owner Query Search Results, BUREAU OF OCEAN ENERGY MANAGEMENT, REGULATION AND ENFORCEMENT, http://www.gomr.boemre.gov/homepg/fastfacts/leaseOwner/master.asp (check box next to "Lease Number;" enter G32306 into text box next to "Lease Number;" click "Submit Query" button); *see* Ex. B.  Furthermore, the website is a matter of public record, of which the Court may take judicial notice.  *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (noting documents attached to motion to dismiss are considered part of pleadings if referenced in complaint and central to claim) (internal citations omitted); *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) ("In deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record") (internal citations omitted).

**D.      Plaintiffs' State Law Claims Must Be Dismissed Because State Law Does Not Apply to this Case.**

Plaintiffs assert three claims against the Non-Operating Defendants under state law: Florida Medical Monitoring (Count 9), Strict Liability Pursuant to the Florida Pollutant Discharge Prevention and Control Act ("FPDCA") (Count 11), and Negligence *Per Se* pursuant to various states' laws (Count 5).   State law, however, does not apply to this action; federal law alone applies to claims arising out of and in connection with oil exploration, development, and extraction operations on the Outer Continental Shelf ("OCS").   Although federal law sometimes borrows state law as surrogate federal law in OCS cases, it does not do so in this case, and even if it did, it would not borrow Florida law.   Plaintiffs can assert a medical monitoring claim for exposure to hazardous chemicals <u>only</u> under federal maritime law and a claim for property damage <u>only</u> under OPA.   Because Plaintiffs' state law claims are based on substantive laws that do not apply, they must be dismissed.

**1.      Federal Law Applies Exclusively Under the Outer Continental Shelf Lands Act.**

Plaintiffs allege that this case arises out of, or in connection with, operations conducted on the outer Continental Shelf ("OCS") involving the exploration and production of oil from the subsoil and seabed of the outer Continental Shelf.   *Cf.* 43 U.S.C. § 1349(b)(1)(A) (granting U.S. district courts jurisdiction of cases "arising out of, or in connection with . . . any operation conducted on the outer Continental Shelf . . .).   This Court has already held that the Outer Continental Shelf Lands Act ("OCSLA") gives it jurisdiction over cases arising from the *Deepwater Horizon* incident, *see* Order Denying State of Louisiana's Motion to Remand, Case No. 10-cv-1758 [Dkt. # 471] (E.D. La. Oct. 6, 2010), and Plaintiffs themselves invoke this Court's jurisdiction under OCSLA, *see* Mast. Compl. B3 ¶ 72, alleging harms arising from

25

operations on the OCS.  *See, e.g.*, *id.* ¶¶ 79, 82, 109, 315.  Because the controversy is thus "inextricably linked" to resource exploration and development on the OCS "and would not have arisen but for such development," *Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co.*, 448 F.3d 760, 774 (5th Cir. 2006), OCSLA confers federal jurisdiction and also supplies comprehensive choice-of-law rules codified in Section 1333 of the Act.  *See EP Operating LP v. Placid Oil Co.*, 26 F.3d 563, 569 & n.14 (5th Cir. 1994) ("the most consistent reading of the statute instructs that the jurisdictional grant of section 1349 should be read co-extensively with the substantive reach of section 1333"); *Toussaint v. Chevron Phillips Chem. Co.*, 2006 WL 2349465, at *2 (E.D. La. Aug. 11, 2006) (when a "case arises in connection with a mineral production operation on the Outer Continental Shelf[,] it falls within the scope of OCSLA," and Section 1333 "in turn" applies).

The question of which substantive law governs the Plaintiffs' claims is answered solely by Section 1333 of OCSLA.  Other choice-of-law rules, such as those of the forum state or maritime choice-of-law rules, are irrelevant.  *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 482 n.8 (1981) (OCSLA "supersede[s] the normal choice-of-law rules that the forum would apply"); *Wooten v. Pumpkin Air, Inc.*, 869 F.2d 848, 852 (5th Cir. 1989) (rejecting the *renvoi* argument that Section 1333 adopts the choice-of-law rules of the state adjacent to an OCSLA situs).  Even if Plaintiffs alleged they were exposed or injured in state territorial waters (they have not), they could not avoid Section 1333(a)'s choice-of-law rules, which apply "co-extensively" with Section 1349, *EP Operating*, 26 F.3d at 569 & n.14, and are in place because Congress intended to have federal law govern all cases involving "activities" occurring on the

OCS.  *See* H.R. REP. No. 95-590, at 128 (1977), *reprinted in* 1978 U.S.C.C.A.N. 1450, 1534.[11] The Non-Operating Defendants are aware of no case under Section 1349 where a court used choice-of-law rules other than those Congress prescribed in Section 1333.

OCSLA's choice-of-law rules are straightforward: "Federal law is 'exclusive' in its regulation of this area, and [therefore] state law is adopted only as surrogate federal law," *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 357 (1969), and "then only when no inconsistent federal law applied." *Id.* at 358.  According to Section 1333(a), then, the substance of the adjacent state's law may apply (as "surrogate federal law") in an OCSLA case, but only if: (a) the controversy arises on a situs covered by OCSLA; (b) substantive maritime law does not apply of its own force; and (c) state law is not inconsistent with federal law.  *Union Texas Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990); *see Demette v. Falcon Drilling Co.*, 280 F.3d 492, 499 (5th Cir. 2002), *overruled in part on other grounds by Grand Isle Shipyard Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 782–83 (5th Cir. 2009) ("Since the incident occurred on the OCS beyond the territorial waters of Louisiana, the only way state law could have operated was by incorporation into federal law under OCSLA").[12]  Otherwise, federal law, not supplemented by state law, is all that applies.  Because Plaintiffs' claims are all

---

[11]     The House Report states: "Section 203—Laws Applicable to Outer Continental Shelf[:] . . . It is thus made clear that Federal Law is to be applicable to <u>all activities</u> on all devices in contact with the seabed for exploration, development, and production.  The Committee intends that Federal Law is, therefore, to be applicable to <u>activities</u> on drilling ships, semi-submersible drilling rigs, and other watercraft, when they are connected to the seabed by drillstring, pipes, or other appurtenances, on the OCS for exploration, development, or production purposes."  H.R. REP. No. 95-590, at 128, 1978 U.S.C.C.A.N. at 1534 (emphasis added).

[12]     *Grand Isle* holds that, for tort actions under OCSLA, the situs of a claim is the location where the controversy arises.  *See Grand Isle*, 598 F.3d at 784.  For contract actions, the situs of a claim is the location where the majority of work under the contract is to be performed.  *Id.* at 787.  In so holding, the Fifth Circuit overruled prior decisions (like *Demette*) insofar as they applied the tort situs analysis to contract claims.  However, *Demette*'s other holdings remain good law.  *Id.*

governed by either maritime law or some other federal law (like OPA), Plaintiffs cannot state a cause of action under state law.

### 2. Plaintiffs' Florida Medical Monitoring Claim and State Law Negligence Per Se Claim Must Be Dismissed.

Applying OCSLA's choice of law rules, Plaintiffs' Florida law medical monitoring claim against the Non-Operating Defendants must be dismissed because substantive maritime law supplies the only medical monitoring remedy available. Plaintiffs expressly designate Master Complaint B3 as a Complaint in Admiralty under Federal Rule of Civil Procedure 9(h) and so concede that substantive maritime law applies to this case. *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 533–34, 545 (1995) ("With admiralty jurisdiction comes the application of substantive admiralty law") (citations and quotation marks omitted). Furthermore, Plaintiffs expressly plead a duplicative claim for medical monitoring <u>under the maritime law</u>, conceding that maritime law provides a remedy for the relief they seek. Mast. Compl. B3 ¶ 202–18. They do <u>not</u>, however, name the Non-Operating Defendants in that count. *See* Mast. Compl. ¶¶ 202–18. Finally, Plaintiffs complain about exposure to harmful chemicals that were released from <u>vessels</u> into the navigable waters in connection with the clean-up of an oceanic oil spill originating from operations on the OCS. This constitutes a claim under maritime law. *See Grubart*, 513 U.S. at 533–34. Because state law cannot apply in an OCSLA case when maritime law applies of its own force, Plaintiffs' Florida medical monitoring claim against the Non-Operating Defendants is not cognizable. *See Cont'l Oil Co. v. London S.S. Owners' Mut. Ins. Ass'n*, 417 F.2d 1030, 1034 (5th Cir. 1969) (application of Louisiana law to

case arising on the OCS was neither "needed [n]or permitted" because "there was a fully effective maritime right and remedy").[13]

The Court also must dismiss Plaintiffs' claim that the Non-Operating Defendants' alleged violations of federal and state statutes "constitute negligence *per se* under Louisiana, Texas, Mississippi, Alabama and Florida law." Mast. Compl. B3 ¶ 240. Because federal law applies exclusively in this case, and Plaintiffs have no resort to any state's law through OCSLA, Plaintiffs' Negligence *Per Se* claims under state law fail and should be dismissed.

### 3. Plaintiffs' Florida Pollutant Discharge Prevention and Control Act Claim Must Be Dismissed.

Given that Plaintiffs' FPDPCA allegations in Count Eleven essentially replicate their OPA allegations in Count One, Plaintiffs cannot contest that OPA provides relief essentially identical to that which they seek under the FPDPCA. In both Counts, Plaintiffs seek to recover for "damage to their real and/or personal property as a result of the post-explosion clean-up activity . . . ." Mast. Compl. B3 ¶¶ 197, 316. The statutory causes of action track each other closely. *Compare* FLA. STAT. §§ 376.205, 376.121 (2010), *with* 33 U.S.C. §§ 2702(a), (b)(2). Because OPA is directly on point, it applies exclusively to Plaintiffs' property damage claims for two reasons: first, because OPA leaves no gaps to be filled through the OCSLA choice-of-law rules in Section 1333(a); second, because the comprehensive federal scheme for regulating

---

[13]    Even if state law could be applied to this case, as opposed to maritime law, it would not be the law of Florida because Louisiana is the "adjacent state" for purposes of the application of state law as surrogate federal law. *See* 43 U.S.C. §1333(a)(2)(A); *see also Snyder Oil Corp. v. Samedan Oil Corp.*, 208 F.3d 521 (5th Cir. 2000). Under Louisiana law, if it applied, Plaintiffs' medical monitoring claim would fail. *See* LA. CIV. CODE ANN. art. 2315(B) (2010) ("Damages do not include costs for future medical treatment, services, surveillance, or procedures of any kind unless such treatment, services, surveillance, or procedures are directly related to a manifest physical or mental injury or disease").

activity on the OCS, including pollution flowing from the OCS, preempts the law of affected states.[14]

### a.   OCSLA requires the exclusive application of OPA to claims for property damages and economic losses arising from oil spills originating on the OCS.

OPA is Congress's comprehensive and reticulated liability scheme for all economic loss claims in oil-pollution cases governed by federal or maritime law.  *See Gabarick v. Laurin  Mar. (Am.) Inc*., 623 F. Supp. 2d 741, 750–51 (E.D. La. 2009) (general maritime law claims are displaced by OPA); *Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001) (OPA "includes new remedies, which . . . preempt traditional maritime remedies").  OPA leaves no gaps that OCSLA could use state law to fill.

OPA's savings clause does not rescue Plaintiffs' FPDPCA claim from dismissal.  Unlike cases involving oil spills in state territorial waters, in which Plaintiffs can plead one as an alternative remedy to the other,OPA and the FPDPCA are not mere alternatives in this case.  Under the choice-of-law rules in OCSLA's Section 1333(a), it is only OPA—neither the FPDPCA applying of its own force nor the FPDPCA applying as surrogate federal law—that provides the substantive rules of decision for claims arising out of oil spills originating from operations on the OCS.  Because it is OCSLA—not OPA—that precludes applying state law,

---

[14]    One notable difference between the OPA and FPDPCA allegations in Master Complaint B3, however, is that while Plaintiffs allege that Non-Operating Defendants have been treated as "responsible parties" under OPA, they do not make the same allegation with respect to the FPDPCA.  In their FPDPCA claim, Plaintiffs allege only that "[t]he Coast Guard has named BP as the responsible party for the downhole release of oil, and Transocean as the responsible party for the release of diesel on the surface," and that therefore, "BP and Transocean are liable under the Florida Act for all damages" resulting from the Oil Spill.  Mast. Compl. B3 ¶ 313.  With respect to the Non-Operating Defendants, Plaintiffs merely lump them together with other Defendants in the conclusory allegation that "Defendants had a statutory duty to Plaintiffs to maintain and operate the Deepwater Horizon and the Macondo well, and/or to conduct post-Oil Spill remedial efforts so as to not create or sustain hazardous conditions due to the discharge of pollutants."  *Id.* ¶ 309.  Thus, even if Florida law applies, which it does not, Plaintiffs fail to plead an essential element of an FPDPCA claim against the Non-Operating Defendants.

OPA's savings clause, which limits only the preemptive effect of OPA itself, does not allow state law to be applied in this case.  *See* 33 U.S.C. § 2718; *cf. Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 223–27 (1986) (holding that the savings clause in the Death on the High Seas Act does "not implicitly sanction the operation of state wrongful death statutes on the high seas," where states have no power, but only "preserve[s] the state courts' jurisdiction to provide wrongful death remedies under state law for fatalities <u>on territorial waters</u>") (emphasis added); *Ten Taxpayer Citizens Group v. Cape Wind Assocs.*, 373 F.3d 183, 193–97 (1st Cir. 2004) (rejecting the argument that a federal statute recognizing state power over specific activities overrides OCSLA's displacement of state law on the OCS).[15]

### b.    Federal law preempts the Florida statute here.

Even if OCSLA did not require exclusive application of federal law to this case, the combined effect of OPA and OCSLA preempts application of the FPDPCA.  Precedents holding that federal law preempts application of an affected state's law to interstate <u>water pollution</u> originating from non-OCS sources require the similar conclusion that federal law preempts an affected state's law to <u>oil spills</u> originating from OCS sources.

"[R]egulation of interstate water pollution is a matter of federal, not state, law . . . ."  *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 488 (1987) (citations omitted).  Since Congress's enactment of extensive legislation in the area (through, for instance, the Clean Water Act), federal statutes have displaced the *ad hoc* federal common law remedy that previously supplied

---

[15]    When enacting OPA, Congress foresaw this very result.  Senators Chaffee, Lieberman, Graham, and Durenberger objected that an early draft of OPA was ill-suited to OCS oil spills because it capped liability for clean-up costs.  S. REP. NO. 101-94, at 26 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722, 748.  In a statement on the bill, which had a savings clause like that which was enacted into law, the Senators noted that states lacked authority to impose additional liability above the cap because OCS facilities "are outside the 3 mile limit, and therefore are not subject to state laws." *Id.* at 27, 1990 U.S.C.C.A.N. at 749.  Congress resolved the Senators' objection by eliminating the OPA cap on clean-up liability, not by giving states authority to impose additional liability with respect to OCS oil spills.

the substantive rules of decision.  *See City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981).

With federal statutory law firmly in place, "it is clear that the only state suits that remain

available are those specifically preserved by" the new federal statutes.  *Ouellette*, 479 U.S. at

492.

In *Ouellette*, the Supreme Court held that the Clean Water Act, in light of its text,

purposes, and history, and <u>notwithstanding its savings clause</u>, does not "preserve the right to

bring suit under the law of any affected State."  *Id.* at 493.  Applying the law of an affected state

to pollution originating in another state would seriously undermine, and stand as an obstacle to

the full implementation of, the methods by which the Clean Water Act regulates interstate water

pollution.  *Id.* at 494–97 (explaining how applying an affected state's law would circumvent the

Act, which gives regulatory authority only to EPA and source states and which defines a narrow

role for affected states).  Because of those federal-state conflicts, together with the likelihood of

state-state conflicts, the Court ultimately held that the Act's savings clause preserves only claims

brought under the law of a source state.  *Id.* at 497–500; *see id.* at 495 ("An interpretation of the

saving clause that preserved actions brought under an affected State's law would disrupt this

balance of interests").[16]

That reasoning also requires that OPA's savings clause cannot be interpreted to allow

application of the FPDPCA in this case.  Applying the FPDPCA to an oil spill originating on the

OCS would frustrate Congress's methods for regulating OCS operations and would lead to

problems of conflicting multistate regulation.  Through OCSLA and the Coastal Zone

Management Act ("CZMA"), 16 U.S.C. §§ 1451–1464, the federal government extensively

---

[16]     The Clean Water Act's preservation of source state law is inapplicable here because Plaintiffs
have pleaded that the oil that harmed them was discharged not from a state, but from a federal enclave on
the OCS.  Mast. Compl. B3 ¶¶ 72, 79, 82.

regulates exploration and drilling operations on the OCS for their potential environmental impacts. *See Mobil Oil Exploration & Producing SE, Inc. v. United States*, 530 U.S. 604, 609–10 (2000) (summarizing the four pillars of the comprehensive regime). Just as in *Ouellette*, applying the law of an affected state to discharges from OCS operations would circumvent this careful scheme, which specifically assigns a largely advisory role to affected states: "The inevitable result of" applying an affected state's law "would be that . . . States could do indirectly what they could not do directly—regulate the conduct of" OCS operations. *Ouellette*, 479 U.S. at 495. Applying the law of an affected state also would "undermine the important goals of efficiency and predictability," for "application of numerous States' laws would only exacerbate the vagueness and resulting uncertainty." *Id.* at 496. Also, as in *Ouellette*, the savings clauses in the relevant federal statutes (*e.g.*, 16 U.S.C. § 1456(e) (CZMA); 33 U.S.C. § 2718 (OPA); 43 U.S.C. § 1349(a)(6) (OCSLA)) do not obviate resort to ordinary conflict preemption principles. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869–74 (2000) (citing *Ouellette*, 479 U.S.); *cf. Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 230 (1986) ("[I]t is hardly conceivable that Congress," through a mere savings clause, "could have intended that these diverse state statutes could be applied to remedy maritime torts occurring the world over").

*Askew v. Am. Waterways Operators, Inc.*, 411 U.S. 325 (1973), does not require a contrary result. There, considering a limited preemption question, the Supreme Court upheld an earlier and more limited version of the FPDPCA, which by its own terms applied only to oil pollution discharged in State territorial waters. *Id.* at 327–38. The Court held that there was "no collision" between the FPDPCA and the federal Water Quality Improvement Act (earlier legislation on which the Clean Water Act expanded) because that federal Act was "concerned only with actual cleanup costs incurred by the Federal Government" as a result of an oil spill,

33

and did not address the clean-up costs or other costs incurred by States for damages resulting from injury to their citizens and natural resources.  *Id.* at 333–34, 335–36.  The Court also held that federal maritime law did not prohibit Florida from so legislating.  *Id.* at 337–44.  The Court reserved the question of whether the FPDPCA unconstitutionally "conflict[ed] with any federal Act."  *Id.* at 343.

Because the then-extant FPDPCA expressly applied only to discharges within Florida territorial waters, the *Askew* Court did not consider whether any federal statute preempted the application of the FPDPCA to underarbitrary oil spills or to oil spills resulting from operations on the OCS, which are the circumstances alleged here.  With the passage of the Clean Water Act and OPA, Congress broadly expanded federal regulation of interstate oil pollution to areas conflicting with the FPDPCA, including clean-up costs and other costs incurred by States for damages to their citizens and natural resources.  Furthermore, OCSLA governs all operations on the OCS to the exclusion of state law and applies to oil spills and other environmental harms resulting from those operations.  The Clean Water Act, OCSLA, and OPA were not at issue in *Askew*, and they are what preempts the substantive laws of states affected by oil spills originating on the OCS, including the FPDPCA.

**E.      Even If State Law Could Apply to Plaintiffs' State Law Claims as Asserted, Those Claims Must Be Dismissed.**

**1.      Plaintiffs Fail to State a Claim for Medical Monitoring Even Under Florida Law.**

The Supreme Court of Florida has not yet ruled on whether Florida law recognizes a cause of action for medical monitoring.[17]  In *Petito v. A.M. Robins Co.*, 750 So.2d 103 (Fla. Dist.

---

[17]      "'[F]ederal courts are bound by decisions of a state's intermediate appellate courts unless there is persuasive evidence that the highest state court would rule otherwise.'"  *Bravo v. United States*, 577 F.3d 1324, 1325 (11th Cir. 2009) (per curiam) (quoting *King v. Order of United Commercial Travelers of Am.*, 333 U.S. 153, 158 (1948)).  Although one intermediate appellate court of Florida has recognized a cause

Ct. App. 2000), *rev. denied*, 780 So.2d 912 (Fla. 2001), the Court of Appeals for the Third

District held that "under certain prescribed circumstances, Florida does recognize a cause of

action for future expenses for medical diagnosis" despite the absence of physical injury, *id.* at

105, and that "a trial court may use its equitable powers to create and supervise a fund for

medical monitoring purposes." *Id.* at 106. To establish the right to such relief under *Petito*, a

plaintiff must prove the following:

> (1) exposure greater than normal background levels; (2) to a proven hazardous
> substance; (3) caused by the defendant's negligence; (4) as a proximate result of
> the exposure, plaintiff has a significantly increased risk of contracting a serious
> latent disease; (5) a monitoring procedure exists that makes the early detection of
> the disease possible; (6) the prescribed monitoring regime is different from that
> normally recommended in the absence of the exposure; and (7) the prescribed
> monitoring regime is reasonably necessary according to contemporary scientific
> principles.

*Id.* at 106–07.

Plaintiffs fall far short of stating a claim on which relief in the form of a medical

monitoring fund may be granted. First, Plaintiffs fail to allege the third *Petito* element: that the

Non-Operating Defendants' negligence caused any of the Plaintiffs' alleged exposure to harmful

chemicals. *See* Part III.A.1, *supra.* Second, Plaintiffs' allegations of the Resident Plaintiffs'

exposure to hazardous compounds present in crude oil are also plainly inadequate. Plaintiffs

allege in a conclusory fashion that "due to the proximity of their homes and schools to the Gulf

---

of action for medical monitoring in the absence of present physical injury, there is persuasive evidence
that the Florida Supreme Court will follow other states' highest courts that have declined to recognize
such a claim. *See supra* note 12; s*ee also Trimble v. Asarco Inc.*, 232 F.3d 946, 962–63 (8th Cir. 2000)
(Nebraska); *Parker v. Brush Wellman, Inc.*, 377 F. Supp. 2d 1290, 1296, 1302 (N.D. Ga. 2005); *Duncan
v. Northwest Airlines, Inc.*, 203 F.R.D. 601, 607–09 (W.D. Wash. 2001); *Thompson v. Am. Tobacco Co.*,
189 F.R.D. 544, 552 (D. Minn. 1999); *Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1400, 1410 (W.D.
Mo. 1994); *Carroll v. Litton Sys. Inc.*, No. B-C-88-253, 1990 WL 312969, at *51 (W.D.N.C. Oct. 29,
1990); *Lowe v. Philip Morris USA, Inc.*, 183 P.3d 181, 187 (Or. 2008); *Henry v. Dow Chem. Co.*, 701
N.W.2d 684, 686 (Mich. 2005); *Wood v. Wyeth-Ayerst Labs.*, 82 S.W.3d 849, 857 (Ky. 2002); *Badillo v.
Am. Brands, Inc.*, 16 P.3d 435, 440–41 (Nev. 2001); *Kelley v. Cowesett Hills Assocs.*, 768 A.2d 425, 430
(R.I. 2001); *Mergenthaler v. Asbestos Corp. of Am.*, 480 A.2d 647, 651 (Del. 1984).

of Mexico, and the actions and omissions by Defendants, [Resident Plaintiffs] have been exposed to oil, dispersants, and other harmful chemicals" and are "subjected to fumes and odors from the oil and dispersants." Mast. Compl. B3 ¶¶ 139, 141. The allegation of "exposure," as the term is used here, gives no basis for the Non-Operating Defendants to understand how Resident Plaintiffs were exposed to the alleged harmful chemicals or whether Plaintiffs' alleged adverse health effects result from exposure to crude oil or the Corexit dispersants used by BP and the Dispersant Defendants. Similarly conclusory allegations were held to be inadequate to state a medical monitoring claim in *Jacobs v. Osmose, Inc.*, No. 01-944-CIV, 2002 WL 34241682, at *3 (S.D. Fla. Jan. 3, 2002) (dismissing plaintiffs' medical monitoring claim alleging that a product called Treated Wood contained hazardous substances and that plaintiff's deck was made of Treated Wood because the complaint "does not adequately provide the defendants with sufficient notice of how the plaintiff was exposed to the allegedly hazardous substances"). *See also Player v. Motiva Enters.*, 2006 WL 166452, at *9 (D.N.J. 2006) (concluding that medical monitoring damages were not available to plaintiffs who sought to recover costs of medical monitoring resulting from contamination of drinking water on their property) (citing *Theer v. Philip Carey Co.*, 628 A.2d 724, 733 (N.J. 1993)). Nor do Plaintiffs sufficiently allege that "medical surveillance is required because the exposure caused a distinctive increased risk of future injury." *Theer*, 628 A.2d at 733.

Plaintiffs also fail to plead any nonconclusory allegation that any monitoring regime is reasonably necessary. The Complaint states, "[t]he.method and means for diagnosing Plaintiffs' potential medical problems are well accepted in the medical and scientific community and will be of great benefit to Plaintiffs by preventing or minimizing health problems that Plaintiffs may encounter as a result of the Oil Spill and from dispersants used to attempt to clean the Oil Spill."

Mast. Compl. B3 ¶ 285.  As an initial matter, Plaintiffs completely fail to allege what medical monitoring procedure they seek.  Regardless, there are no factual allegations to support the reasonableness of ordering any court-supervised medical monitoring program for all plaintiffs in the Florida Subclass.  This expansive form of relief goes far beyond anything the *Petito* court contemplated when it recognized this limited cause of action and further supports dismissing Plaintiffs' claim against the Non-Operating Defendants.

### 2.    Plaintiffs Fail to State a Claim of Negligence *Per Se* Under Any Potentially Applicable Law.

Under either federal or state law, Plaintiffs' allegations of Negligence *Per Se* are insufficient to state a claim for relief.  To state a claim for Negligence *Per Se*, plaintiffs must identify a "violation of a statute which is intended to protect the class of persons to which [the plaintiffs] belong[] against the risk of the type of harm which has in fact occurred."  *Marshall v. Isthmian Lines, Inc*., 334 F.2d 131, 134 (5th Cir. 1964) (maritime law).  With only slight variation under state law, the "[f]ive elements of a . . . .negligence *per se* claim are the following: (1) a violation of  . . . [a statute or] regulations, (2) the plaintiff's membership in the class of intended beneficiaries of the [statute or] regulations, (3) an injury of a type against which the [statute or] regulations are designed to protect, (4) the unexcused nature of the [statutory or] regulatory violation, and (5) causation."  *Smith v. Trans-World Drilling Co*., 772 F.2d 157, 160 (5th Cir. 1985) (citations omitted); *Marshall*, 334 F.2d at 134; *see also Cook's Pest Control, Inc. v. Rebar*, 28 So. 3d 716, 726 (Ala. 2009); *Ambrosio v. Carter's Shooting Ctr., Inc.*, 20 S.W.3d 262, 265 (Tex. App. 2000); *Moses v. Mosley*, 146 So. 2d 263, 267 (La. Ct. App. 1962).

As noted above, Plaintiffs' Negligence *Per Se* claim fails because Master Complaint B3 does not set forth any underline factual allegations to support the conclusory assertion that the Non-Operating Defendants were among the Defendants who participated in "the manufacture,

maintenance and/or operation of drilling operations and oil vessels such as the *Deepwater Horizon*," caused "the release of hazardous and toxic chemicals into the environment," or took part in "the application of dispersants and other hazardous chemicals . . . ." *Id.* ¶¶ 238–39. Indeed, the Plaintiffs' allegations that the Non-Operating Defendants were at most "non-operational leaseholders" rebuts this bare assertion and requires dismissal of the Negligence *Per Se* claim.

Master Complaint B3 refers to unnamed "numerous state and federal laws and permits issued under the authority of these laws."  Mast. Compl. B3 ¶ 238.  Plaintiffs, however, must specifically identify a statute or regulation that the Non-Operating Defendants allegedly violated. *See Parker Bldg. Servs. Co. v. Lightsey*, 925 So. 2d 927, 931 (Ala. 2005); *see also Gates v. W.R. Grace & Co.*, No. 8:08-cv-2560-T-27TBM, 2009 WL 1455316, at *3 (M.D. Fla. May 21, 2009) (dismissing a claim of negligence *per se* where the plaintiff alleged only that the defendants "violated various Federal, state and local environmental laws and regulations") (internal citation and quotation marks omitted); *Anchundia v. Northeast Util. Servs. Co.*, No. CV 07-4446(AKT), 2010 WL 2400154, at *5 (E.D.N.Y. June 11, 2010) ("Where plaintiff fails to identify the statute upon which the [negligence *per se*] claim is based, it is impossible to determine if the plaintiff was in a class sought to be protected by the statute or whether the injury suffered by the plaintiff was the type of injury the statute was designed to prevent.  It is also impossible to assess whether the defendant breached a duty imposed by statute"); *Holler v. Cinemark USA, Inc.*, 185 F. Supp. 2d 1242, 1243–44 (D. Kan. 2002) ("Notice pleading requirements suggest that plaintiff must plead the specific statute on which he bases his claim for negligence per se").  Plaintiffs fail to offer the requisite modicum of specificity in their vague allegations that "[o]ne or more of Defendants violated these statutory and regulatory standards."  Mast. Compl. B3 ¶ 239.

The conclusory allegations that Defendants violated the Clean Water Act and OPA also fail to set forth a plausible basis for the Plaintiffs' Negligence *Per Se* claim.  The Clean Water Act does not give rise to a private right of action.  *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 14–15 (1981).  When Congress does not "create a private right of action" for a statute, "any alleged violation of that statute by defendant cannot provide a basis for a negligence per se claim."  *Miller v. E.I. Du Pont de Nemours & Co.*, 880 F. Supp. 474, 480 (S.D. Miss. 1994); *see Rodriguez v. Am. Cyanamid Co.*, 858 F. Supp. 127, 129 (D. Ariz. 1994) ("Courts considering whether to recognize negligence per se based on violation of broad environmental and public health statutes and regulations . . . have approached this issue by determining whether, in enacting the statute, the legislature intended to create a private right of action").

OPA also cannot serve as a basis for Plaintiffs' claim of Negligence *Per Se*.  Allowing plaintiffs to recast claims covered by OPA under state or federal negligence law would frustrate the intent of Congress for "OPA to be the exclusive federal law governing oil spills."  *South Port Marine, LLC v. Gulf Oil LP*, 234 F.3d 58, 65–66 (1st Cir. 2000).  Through creative pleading, Plaintiffs are trying to avoid the presentment requirement of OPA, s*ee* 33 U.S.C. § 2713(a), and to seek damages not provided by the statute, such as punitive damages.  *See South Port Marine*, 234 F.3d at 65–66.  And, to the extent that Plaintiffs' claims are not for damages covered by OPA, the Court should not use the general maritime law to expand OPA's substantive liability provisions to cover claims not included within OPA's reach by Congress.

# IV.
# <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' claims in Master Complaint B3 against the Non-Operating Defendants MOEX Offshore, MOEX USA, Anadarko Petroleum Corporation and Anadarko E&P Company must be dismissed in their entirety.


Respectfully submitted,

BINGHAM McCUTCHEN LLP


/s/ *Ky E. Kirby*
Ky E. Kirby
ky.kirby@bingham.com
David B. Salmons
david.salmons@bingham.com
Michael B. Wigmore
michael.wigmore@bingham.com
Warren Anthony Fitch
tony.fitch@bingham.com
Randall M. Levine
randall.levine@bingham.com
2020 K Street, NW
Washington, DC 20006-1806
Telephone (202) 373-6000
Facsimile (202) 373-6001

James J. Dragna
jim.dragna@bingham.com
Bingham McCutchen LLP
355 South Grand Avenue
Suite 4400
Los Angeles, California 90071-3106
Telephone (213) 680-6436
Facsimile (213) 680-8636

KUCHLER POLK SCHELL
WEINER & RICHESON, LLC

Deborah D. Kuchler, T.A. (La. Bar No. 17013)
dkuchler@kuchlerpolk.com

Janika Polk (La. Bar No. 27608)
jpolk@kuchlerpolk.com
Robert Guidry (La. Bar No. 28064)
rguidry@kuchlerpolk.com
1615 Poydras Street, Suite 1300
New Orleans, LA  70112
Tel:  (504) 592-0691
Fax:  (504) 592-0696

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, pursuant to Pre-trial Order No. 12, I have caused the foregoing to be served on all counsel via the Lexis Nexis File & Serve system, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, who will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on February 28, 2011.

_____/s/ *Ky E. Kirby*_____
Ky E. Kirby