**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater | * | |
| Horizon" in the Gulf of Mexico, | * | MDL No. 2179 |
| on April 20, 2010, | * | |
| | * | Section: J |
| | * | |
| This Pleading applies to: | * | Judge Barbier |
| *All Cases* (*Including D1 Master Answer/Master* | * | |
| *Claim in Limitation* [*Doc. 244*]) | * | Magistrate Shushan |
| | * | |
| | * | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**BP DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT
TO FED. R. CIV. P. 12(B)(1), 12(B)(6), AND 12(B)(7) THE MASTER COMPLAINT
FOR INJUNCTIVE RELIEF CLAIMS AGAINST PRIVATE PARTIES,
FILED IN ACCORDANCE WITH
PTO NO. 11 [CMO NO. 1], SECTION III(D1) ("D1 BUNDLE")**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................1

ADDITIONAL BACKGROUND ........................................................................................5

      A.     The Response ...............................................................................................5

      B.     Assessment of Natural Resource Damages...............................................7

      C.     Civil Suit for Penalties Against BP and Other Responsible Parties ........8

ARGUMENT .......................................................................................................................9

I.     PLAINTIFFS ASSERT THREE NON-EXISTENT CAUSES OF ACTION THAT MUST BE DISMISSED (SECOND, FIFTH, AND SIXTH CLAIMS FOR RELIEF).................................................................................................11

      A.     Clean Water Act Citizen Suits Do Not Lie to Enforce CWA Section 311 (Second and Fifth Claims for Relief)....................................................11

      B.     No CERCLA Citizen Suit Is Viable Because CERCLA Contains a Petroleum Exclusion (Sixth Claim for Relief).........................................16

II.    PLAINTIFFS FAILED TO COMPLY WITH THE PRE-SUIT NOTICE OBLIGATIONS FOR ALL OF THEIR ENVIRONMENTAL CITIZEN SUITS (FIRST THROUGH EIGHTH CLAIMS FOR RELIEF). ..................................20

      A.     Compliance with Pre-Suit Notice Requirements Is an Unavoidable Condition Precedent to Filing an Environmental Citizen Suit..............21

      B.     The Specific Citizen Suits Underlying the D1 Master Complaint Did Not Comply With the Applicable Notice Requirements. ............................23

III.   KILLING THE WELL STOPPED ANY THEN-ONGOING DISCHARGES, SO THE CITIZEN SUIT CAUSES OF ACTION MUST BE DISMISSED ON BOTH *GWALTNEY* STATUTORY GROUNDS AND ON CONSTITUTIONAL MOOTNESS GROUNDS (FIRST THROUGH EIGHTH CLAIMS FOR RELIEF)...................................................................................................26

      A.     The Alleged Violations In The Citizen Suits Are Not Ongoing Or Reasonably Likely To Recur (First Through Eighth Claims For Relief). ............27

      B.     Additionally, Most Of The Citizen Suit Causes Of Action Are Moot (First Through Sixth And Eighth Claims For Relief)....................................31

IV.   PLAINTIFFS LACK STANDING TO PURSUE THEIR CWA, ESA, AND EPCRA CAUSES OF ACTION (FIRST THROUGH FIFTH, PLUS SIXTH AND SEVENTH CLAIMS FOR RELIEF).................................................................36

    A.   Plaintiffs Lack Standing To Bring Their Clean Water Act Claims (First Through Fifth Claims for Relief)...........................................................37

    B.   Plaintiffs Lack Standing To Bring Their ESA Claim (Eighth Claim for Relief). ..........................................................................................37

    C.   Plaintiffs Lack Standing To Bring Their EPCRA Claim (Seventh Claim for Relief)..................................................................................40

    D.   Plaintiffs Cannot Mix and Match Their Organizational and Individual Members to Show Standing. ....................................................40

V.   PLAINTIFFS' ENDANGERED SPECIES ACT CLAIMS SUFFER FROM ADDITIONAL, UNIQUE DEFECTS (EIGHTH CLAIM FOR RELIEF). .....................41

    A.   Plaintiffs Failed to Join Indispensable Parties to Their ESA Claim for Relief...............................................................................................41

    B.   At the Very Least, and in the Alternative, the ESA Claim for Relief Must Be Dismissed Without Prejudice or Stayed Pursuant to the Doctrine of Primary Jurisdiction. ...............................................................43

VI.   THE MARITIME CLAIM FOR RELIEF IS DISPLACED, THE STATE LAW CLAIMS ARE PREEMPTED, AND THESE TWO CLAIMS INSTEAD BELONG EXCLUSIVELY IN THE B1 MASTER COMPLAINT (NINTH AND TENTH CLAIMS FOR RELIEF)...............................................................45

CONCLUSION.........................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**No table of authorities entries found.**No table of authorities entries found.No table of authorities entries found.**No table of authorities entries found.**

## <u>INTRODUCTION</u>

The Plaintiffs' Master Complaint for the "D1 Pleadings Bundle" ("D1 Master Complaint") is fundamentally defective, beginning with the fact that it combines the core of Plaintiffs eight citizen suit causes of action with two bolted-on private causes of action having no legal or procedural commonality with the citizen suit issues.  The two private causes of action plainly belong instead within the B1 Master Complaint.  *See* Section VI, below (incorporating the BP Defendants' B1 Motion to Dismiss by reference, and thereby avoiding duplication that places additional burdens on the Court).

The principal error in the D1 Master Complaint is a failure by the Plaintiffs to comply with the strict limitations placed by Congress on citizen suit causes of action.  Contrary to the Plaintiffs' assertions, they are not entitled merely to point to a claimed violation of any and every environmental statute and then sue for injunctive relief.  The environmental citizen suit provisions they have invoked are far more constrained and involve several prerequisites that Plaintiffs ignore.  Plaintiffs proceed as if they are entitled to exercise the enforcement prerogatives of the United States.  They are not.  The remedies provided to them are inherently limited and gap-filling in nature.

Indeed, the Supreme Court has made clear (in a Clean Water Act case no less) that citizen suits are limited ***supplements*** to governmental enforcement:

> [C]itizen suit[s are] meant to supplement rather than to supplant governmental action.  The legislative history of the Act reinforces this view of the role of the citizen suit.  The Senate Report noted that "[t]he Committee intends the great volume of enforcement actions [to] be brought by the State," and that citizen suits are proper only "if the Federal, State, and local agencies fail to exercise their enforcement responsibility."

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987) (quoting S. Rep. No. 92-414, p. 64 (1971) (3d and 4th alterations in original), *reprinted in* 2 LEGISLATIVE

HISTORY OF THE WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972, p. 1482 (1973), *also available at* 1972 U.S.C.C.A.N. 3668, 3730 (Oct. 28, 1971).  Similarly, as the Fifth Circuit has emphasized, "the 'primary function of the provision for citizen suits is to enable private parties to assist in enforcement efforts where Federal and State authorities appear unwilling to act.'" *Lockett v. EPA*, 319 F. 3d 678, 684 (5th Cir. 2003) (quoting *N&S Rivers Watershed Ass'n, Inc. v. Town of Scituate*, 949 F.2d 552, 555 (1st Cir. 1992)).  By contrast, the citizen suits included in the D1 Master Complaint have not been advanced in the context of slumbering or quiescent governmental agencies that are sitting passively by in the face of alleged violations.  To the contrary, these citizen suits are being pressed despite the comprehensive remedial activities being taken by the federal government over many months.  Moreover, these suits are also being presented to the Court well after the claimed violations have already ended.

The legal defects of the D1 Master Complaint fall into several categories:

***First***, Plaintiffs have advanced two causes of action that simply do not exist.  In one of them, the Plaintiffs seek to enforce a provision in the Clean Water Act ("CWA") that citizens are just not empowered to enforce (but that the United States can and already is seeking to enforce).  That same non-existent CWA cause of action is also the basis for a disguised attempt to seek a non-injunctive, monetary remedy, contrary to the very ground rules for the D1 Master Complaint.  And in the third relevant cause of action, the Plaintiffs seek to enforce the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").  The fatal flaw there is that the CERCLA statute contains a petroleum exclusion, making it inapplicable to the *Deepwater Horizon* oil spill.  *See* Argument Section I, below.

***Second***, all of the Plaintiffs, and certainly all of the Individual and Business (i.e., Non-Organizational) Plaintiffs who are seeking to enforce common law trespass or nuisance remedies

in the D1 Master Complaint (see the Ninth and Tenth Claims for Relief, the non-citizen suit causes of action) in connection with their own property rights, have failed to comply with the 60-day notice requirements imposed on citizen suits.  Worse yet, these Plaintiffs have not even tried to make an effort to show that they had complied with those pre-suit requirements.  Indeed, the D1 Master Complaint is defectively structured to suggest that all plaintiffs are on equal footing and would have an equal right to qualify for citizen suit relief.  Plaintiffs cannot simply ignore the individualized citizen-suit notice requirements.  *See* Argument Section II, below.

*Third*, citizen suits can only be invoked to remedy violations of environmental laws that are ongoing in nature — not ones that have already ended.  The gravamen of the Plaintiffs' environmental claims against BP trace to BP's status as lessee of the MC-252 area containing the Macondo well and the fact that a leak from that well was caused by the *Deepwater Horizon* incident.  But that leak has been capped successfully for more than seven months, which bars any argument that the alleged violations are ongoing.  Plaintiffs are not entitled to prophylactic remedies for speculative future harm.  *See* Argument Section III.A., below.

*Fourth*, the Plaintiffs face both constitutional standing and mootness problems in continuing to mount the citizen suit causes of action here.  As an initial matter, it is difficult to see how any Plaintiff can show both (i) that it has standing and (ii) that its claims to secure citizen suit relief in the form of a *prospective* injunction have not become moot.  The leak has stopped.  In addition, it is true that some of the Organizational Plaintiffs attempted to comply (though incompletely) with the citizen suit notice provisions.  But those Organizational Plaintiffs have generally not properly sought to establish that they have standing.  Conversely, the non-organizational, Individual Plaintiffs in the D1 Pleadings Bundle who are, for instance, private beachfront property owners in areas where oil from the Macondo well leak came ashore, may be

-3-

able to make the injury-in-fact showing (albeit just one component of a constitutional standing demonstration), but such individuals have not attempted to comply with the citizen suit notice requirements.  The Plaintiffs, collectively, cannot use *one group* of parties who are members of the D1 Pleadings Bundle *to meet the standing requirement* and *another group* who are D1 members *to meet the citizen suit notice requirements*.  Instead, the only D1 Plaintiffs who can survive a motion to dismiss must be shown ***both* to have standing *and* to have complied** in toto **with the citizen suit notice requirements**.  In addition, all Plaintiffs must explain why their call for prospective injunctive relief is not mooted by the dead well.  No Plaintiffs in the D1 Bundle meet all three of those requirements.  *See* Argument Sections III.B to IV, below.

**Fifth**, the citizen suit cause of action the Plaintiffs have brought under the Endangered Species Act ("ESA") is defective in two key respects.  As an initial matter, Plaintiffs have failed to join indispensible parties (the federal agencies involved in the response and restoration efforts).  Additionally, Plaintiffs ignore the close nexus of their claims to the ongoing federal and state Natural Resource Damages Assessment ("NRDA") being undertaken pursuant to the Oil Pollution Act ("OPA").  Under the NRDA process, federal and state trustees are closely examining the impacts from the spill on listed and unlisted species alike, and are formulating remedial measures.  The existence of the NRDA process brings the primary jurisdiction doctrine into play, and thus even if Plaintiffs' ESA claim could survive the other challenges noted above, it would need to be dismissed without prejudice or stayed pending conclusion of the NRDA process under OPA.  *See* Argument Section V, below.

**Finally**, turning to the non-citizen suit causes of action advanced by the Plaintiffs in their Ninth and Tenth Claims for Relief, the Non-Organizational members of the D1 Pleadings Bundle are improperly seeking to invoke maritime law or state trespass or nuisance law.  As explained in

the B1 Motion to Dismiss, OPA displaces maritime claims against BP under federal common law. And the Outer Continental Shelf Lands Act ("OCSLA") precludes the application of non-adjacent state law to the Outer Continental Shelf ("Shelf") — an area where States have no regulatory power and where Clean Water Act preemption is in full force. Louisiana is the adjacent State under OCSLA, but for its law to apply as surrogate federal law, Plaintiffs would first need to show a gap in federal law. OPA makes finding such a gap impossible here. Individual and business plaintiffs have ample damages remedies to pursue to make themselves whole under OPA. But it is important to recognize that OPA neither provides for injunctive relief to claimants, nor does it provide for any form of citizen suit relief, so it is doubly clear that it does not provide for injunctive relief to citizen plaintiffs. All of this leaves the Organizational Plaintiffs without an OPA remedy. Moreover, even if a gap did exist within the meaning of OCSLA, the applicable state law would be the Louisiana Oil Spill Prevention and Response Act ("LOSPRA"). LOSPRA also provides only a damages remedy and, with one irrelevant exception, it explicitly bars the application of other Louisiana laws. *See* Argument Section VI, below; *see also* Motion to Dismiss B1 Master Complaint at Section III.D.1.

## ADDITIONAL BACKGROUND

### A.    The Response

The United States describes its cleanup and related activities in the wake of the *Deepwater Horizon* incident as "a government response unprecedented in size, duration, and expense." *United States v. BP Exploration & Production Inc.*, Civ. A. No. 10-cv-04536-CJB-SS (E.D. La. Dec. 15, 2010), Complaint at ¶ 2 [hereafter "*United States v. BPXP*"]. Through the Unified Command, the Federal On Scene Coordinator ("FOSC"), and the National Incident Command ("NIC"), the United States has, in minute detail, directed and overseen this Response

to the oil spill.  From the beginning of the incident on April 20, 2010, through July 15, 2010, at which time BP successfully and completely stopped the flow of oil into the Gulf of Mexico, and continuing to this day, the Unified Command and its member federal and state agencies have actively directed a military-style operation to contain and ultimately halt the subsea oil spill and remediate its effects.

Hand-in-hand with National Incident Command and the fourteen federal agencies that make up the Unified Command, BP engaged in a full-scale effort to secure the well, capture oil escaping from the marine riser, contain the spill on the surface, and man response activities onshore.  The website established by the Unified Command to collect information on the response efforts, www.restorethegulf.gov (Ex. 1.A) (as its predecessor site www.deepwaterhorizonresponse.com (Ex. 1.B) had done previously), continues to provide daily information on the resources devoted to addressing the spill.  As of December 17, 2010, when the Response led by the Unified Command was officially declared complete and long-term response operations were transferred to regional U.S. Coast Guard units, there have been more than 47,000 responders.  *See* Federal Oil Spill Response Transitions to Regional Structure, Releases Scientific Report: Responders Review Scientific Report to Guide Ongoing Cleanup and Mitigation Actions (Dec. 17, 2010), *available at* http://www.restorethegulf.gov/release/ 2010/12/17/federal-oil-spill-response-transitions-regional-structure-releases-scientific-rep (Ex. 1.C).  Even as of July 30, 2010, several weeks after the leak was stopped, the Unified Command was indicating that 4,400 vessels were involved in the response, including nearly 2,000 troops and thousands of responders.  *See* The Ongoing Administration-Wide Response to the Deepwater BP Oil Spill (July 30, 2010), *available at* http://www.restorethegulf.gov/release/ 2010/07/30/ongoing-administration-wide-response-deepwater-bp-oil-spill (Ex. 1.D.).  The

Unified Command coordinated this massive effort with the full participation and cooperation of BP.

**B.      Assessment of Natural Resource Damages**

A second important aspect of the government's activities has been the largest natural resource damages assessment ever undertaken.  Beginning on April 20, 2010, the National Oceanic and Atmospheric Administration ("NOAA"), as federal Trustee of the resources impacted by the spill, began to conduct a comprehensive assessment and restoration of natural resource damages.  *See* http://www.gulfspillrestoration.noaa.gov/ (Ex. 1.E); *see also generally* http://response.restoration.noaa.gov/dwh.php?entry_id=809 (Ex. 1.F).  Together with NOAA, two other federal agencies (the Departments of Interior and Commerce) and five affected States (Alabama, Louisiana, Florida, Mississippi, Texas) are Co-Trustees in this Natural Resources Damage Assessment ("NRDA") process.  http://www.gulfspillrestoration.noaa.gov/about-us/co-trustees/ (Ex. 1.G).

The Trustees have identified numerous categories of impacted and potentially impacted resources, including threatened and endangered species, fish, shellfish, marine mammals, turtles, birds and other sensitive resources as well as their habitats, such as wetlands, marshes, beaches, corals and the water column, and the effects to human use resulting from the impacts on the resources.  http://www.gulfspillrestoration.noaa.gov/oil-spill/affected-gulf-resources/ (Ex. 1.H). The Trustees are conducting activities to evaluate injuries and potential injuries within these categories.  Indeed, as of November 15, 2010, NRDA teams had collected 29,599 environmental samples for analysis; conducted 37,183 laboratory analyses on these samples; validated and made more than 8,000 analyses available to the public.  *See* NOAA, NRDA by the Numbers (Dec.      1,      2010),      *available      at*      http://www.gulfspillrestoration.noaa.gov/wp-

content/uploads/2010/12/FINAL-NRDA-by-the-Numbers-for-12-1-10.pdf [hereafter "*NRDA by the Numbers*"] (Ex. 1.I).   "The almost 30,000 total samples include those collected by 83 offshore research cruises [that] NOAA either has conducted or are under way, and include: 17,026 water samples; 3,806 sediment samples; 5,007 tissue samples; 1,917 tarball samples."   *Id.* NRDA teams have surveyed about 4,000 linear miles of shoreline and "have deployed several hundred transmitters in wide-ranging species like whale sharks, bluefin tuna and sperm whales to inform studies designed to detect changes in species behavior, reproductive patterns and mortality."   *Id.*

On September 29, 2010, the federal and state Trustees completed the pre-assessment NRDA phase and moved into the second phase, releasing their Notice of Intent to Conduct Restoration Planning ("NOI") (Sept. 8, 2010), *available at* http://www.gulfspillrestoration. noaa.gov/wp-content/uploads/2010/10/Deepwater_Horizon_Final_NOI1.pdf   (Ex.  1.J).   This restoration planning will fully evaluate, assess, quantify, and develop plans for restoring, replacing, or acquiring natural resource injuries or losses resulting from the *Deepwater Horizon* incident.

## C.      Civil Suit for Penalties Against BP and Other Responsible Parties

A third component of the government's activities was the filing by the United States in this Court on December 15, 2010 of a civil enforcement action against BP and certain other responsible parties within the meaning of the Oil Pollution Act of 1990 ("OPA").   *See United States v. BPXP*, No. 2:10-cv-04536-CJB-SS.   The complaint asserts claims under Clean Water Act Section 311 and for OPA declaratory relief, and makes detailed allegations concerning the activities that allegedly led to the blowout of the Macondo well and the subsequent release of oil. The complaint alleges that the oil has injured or destroyed natural resources.   *See id.* at ¶¶ 2, 65-

66.   The United States seeks to hold the defendants, including BP, liable for civil penalties and declaratory relief as a predicate for OPA damages and response costs.  *See id.* (Prayer for Relief). The United States also requests "injunctive relief against the Defendants as appropriate."  *See id.* (Prayer for Relief at ¶ 3).  And the United States emphasized that its investigation continues — explicitly seeking to reserve a right to add new claims under a number of other statutes, including the Endangered Species Act ("ESA") and the Marine Mammal Protection Act, National Marine Sanctuaries Act, and the Park System Resource Protection Act.  *See id.* at ¶ 92.

In the context of this intensive government action, the D1 Plaintiffs (both Organizational and Individual) assert claims under Clean Water Act Section 311, the ESA, the Emergency Planning and Community Right-to-Know Act of 1986 ("EPCRA"), and CERCLA, as well as a claims for maritime or state law trespass and/or nuisance.  Plaintiffs' Complaint is both entirely unnecessary and, for the reasons detailed below, legally insufficient.

## **ARGUMENT**

The standards to be applied to motions to dismiss are well known and we will not long belabor them here.  This motion to dismiss is filed under Federal Rule of Civil Procedure 12(b)(1).  There are two reasons for this:  (a) because the standing and mootness issues covered in Sections III.B. to IV below go to the jurisdiction of the Court; and (b) because some courts have found that the lack of an ongoing discharge creates a statutory defect, such that a purported citizen suit no longer comes within the subject matter jurisdiction of the federal district courts (see Section III.A., below).

This motion is also being filed pursuant to Federal Rule of Civil Procedure 12(b)(6) because there are numerous non-jurisdictional defects in the D1 Master Complaint.  For instance, Plaintiffs assert three claims for relief (*see* Section I, below) that are premised on a cause of

action to enforce Clean Water Act Section 311 that simply does not exist.  That category of defects therefore pose situations in which the Plaintiffs have failed to state a claim on which relief can be granted.

All of the defects identified in this motion are purely legal in nature, although in some cases an understanding of the legal issues comes into better focus when supplemented by judicially noticeable facts.  Consideration of judicially noticeable material, however, does not convert a motion to dismiss into a summary judgment motion.  *See Funk v. Stryker Corp.*, No. 10-20022, --- F.3d ---, 2011 WL 207961, at *5 (5th Cir. Jan. 28, 2011) (quoting *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) ("it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record.")).

As this Court has stated before, review of 12(b)(1) and 12(b)(6) motions occurs as follows:

> The Standard of Review for a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is the same as for motion to dismiss under Rule 12(b)(6). *United States v. City of New Orleans*, 2003 U.S. Dist. LEXIS 16765, 2003 WL 22208578 (E.D. La. Sept. 19, 2003).  Therefore, the Court cannot dismiss the claim for lack of jurisdiction unless Plaintiff cannot establish a plausible set of facts to support his claim.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

*Hensley v. Redi-Med of Mandeville*, Civ. A. No. 09-47, 2009 WL 2408319, at *2 (E.D. La. Aug. 4, 2009) (Barbier, J.).  "Under *Twombly*'s construction of Rule 8 [a complaint must] nudge[] [a claimed cause of action] across the line from conceivable to plausible." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950-51 (2009) (internal quotation marks omitted).  "Conclusor[ily]" stated facts are "distentitle[d to] the presumption of truth." *Id.* at 1951.

Finally, the Plaintiffs' Eighth Claim for Relief under the Endangered Species Act is additionally defective for failing to join indispensable parties.  Hence, this motion is also

partially filed pursuant to Fed. R. Civ. P. 12(b)(7).  Rule 12(b)(7) motions fall within the sound

discretion of the District Court to grant or deny.  *See, e.g., HS Res., Inc. v. Wingate*, 327 F.3d

432, 438 (5th Cir. 2003); *Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305, 1309 (5th Cir. 1986) ("Rule

19's emphasis on a careful examination of the facts means that a district court will ordinarily be

in a better position to make a Rule 19 decision than a circuit court would be.").

* * *

Most of Plaintiffs' claims for relief run afoul of more than one, and usually several, of the

legal defects identified below.  Hence, for the Court's convenience, set forth in parenthetical

form at the end of each heading in the Argument Sections below is a list of the particular claims

as to which relief which must be dismissed.

## I.   PLAINTIFFS ASSERT THREE NON-EXISTENT CAUSES OF ACTION THAT MUST BE DISMISSED (SECOND, FIFTH, AND SIXTH CLAIMS FOR RELIEF).

It is elementary that Plaintiffs can obtain judicial relief only if they have a valid cause of

action to pursue in the first place.  *See Middlesex County Sewerage Auth. v. National Sea

Clammers Ass'n*, 453 U.S. 1, 22 (1981) (dismissing two asserted causes of action because they

did not exist).  Here, with the exception of their Ninth and Tenth Claims for Relief, the D1

Plaintiffs are asserting the existence of ***federal statutory*** causes of action.  Three of the

prominent federal statutory causes of action the Plaintiffs attempt to make out simply do not

exist, however.  Two of these do not exist (citizen suits to enforce various aspects of CWA

Section 311) because Congress did not create them.  And the other does not exist (CERCLA

citizen suit) because Plaintiffs ignore an explicit exception to CERCLA's coverage for oil spills.

### A.   Clean Water Act Citizen Suits Do Not Lie to Enforce CWA Section 311 (Second and Fifth Claims for Relief).

Two of the Clean Water Act claims, the Second and Fifth Claims for Relief, assert claims

under CWA Section 311, 33 U.S.C. § 1321 of the Act — the very same provision pursuant to which the United States has filed suit and which addresses discharges of oil and hazardous substances within federally jurisdictional ocean waters.  These claims should be dismissed because, on its face, the Clean Water Act's citizen suit provision, CWA Section 505, 33 U.S.C. § 1365, does not authorize citizens to enforce Section 311.

The Clean Water Act allows citizen suits against private parties in only two limited situations.   "Section 505 evidences a congressional intent to carefully channel public participation in the enforcement of the Act."  *City of Evansville v. Kentucky Liquid Recycling, Inc.*, 604 F.2d 1008, 1015 (7th Cir. 1979) (footnote omitted), *cert. denied*, 444 U.S. 1025 (1980). Section 505(a), provides in pertinent part:

> Except as provided in subsection (b) of this section and section 1319 (g)(6) of this title,[1] any citizen may commence a civil action on his own behalf—
>
> **(1)** against any person . . .who is alleged to be in violation of (A) **an effluent standard or limitation** under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation.
>
> * * *

33 U.S.C. §1365(a) (emphasis added).  Clean Water Act Section 505 makes "effluent standard or limitation" a defined term, however.  Not every provision of the Clean Water Act qualifies. "Effluent standard or limitation" is specifically defined in CWA Section 505(f) to include **seven and only seven** specific requirements of the Act, **none of which is Section 311**.[2]

---

[1] CWA Section 505(b) contains the 60-day notice requirement with which Plaintiffs have also failed to comply.  *See* Section II below.  Section 309(g)(6), 33 U.S.C. § 1319(g)(6), essentially provides that where the EPA or State enforcers have opted to enforce the Clean Water Act through an administrative action as opposed to a civil action, civil penalties are not available, including pursuant to Section 505 citizen suits.  Since no relevant CWA administrative proceedings have been commenced, Section 309(g)(6) is irrelevant here.

[2] These seven enumerated provisions enforceable by CWA citizen suit are:  (1) beginning July 1, 1973, an unlawful act under Section 301(a) (the general prohibition against discharging pollutants without a permit) [in other words, the Plaintiffs' First Claim for Relief to enforce CWA Section 301 does not suffer from the same defect as afflicts

Indeed, long ago a seminal law review article on environmental citizen suits recognized this very point:  "[C]itizens may enforce against discharges which lack . . . §§ 402 [NPDES] or 404 [dredge and fill] permits; violations of . . . §§ 402 or 404 permits; and violations of new source, toxic pollutant, and pretreatment standards.  ***They may not enforce against*** . . . ***§ 311 oil or hazardous materials spill requirements and prohibitions***; . . . § 312 marine sanitation device requirements; or . . . § 405 sludge disposal and permit requirements."  Jeffrey G. Miller, *Private Enforcement of Federal Pollution Control Laws* (pt. 1), 13 ENVTL. L. REP. 10,309, 10,320-21 (1983) (emphasis added).  We are aware of no cases holding to the contrary or scholarly sources taking a different position.  The United States agrees that CWA Section 311 is not enforceable by citizen suit.  *See* U.S. Mem. in Opp. to Sierra Club's Mot. to Intervene, at 6 [Doc. 1411].

Moreover, it is clear that Congress opted with eyes wide open to exclude Section 311 from the Section 505(f) list of provisions enforceable by citizens.  *See Pharmaceutical Research & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001) ("traditional tools of statutory interpretation" include "text, structure, ***purpose***, and legislative history") (emphasis added); *see also Martinez v. Mukasey*, 519 F.3d. 532, 544 (5th Cir. 2008).  As one commentator has put it:

> The omission of the oil spill provisions from citizen suit authorization appears to be a deliberate choice by Congress.  The forerunner of the current oil spill provision in the Clean Water Act was the Federal Water Quality Improvement Act of 1970, enacted in response to the 1969 Santa Barbara oil well blowout. When the 1972 Federal Water Pollution Control Act, Public Law 92-500, was enacted two years later, it incorporated the 1970 Act into the FWPCA as section 311 with very few changes.  It also added the citizen suit provision, section 505, but omitted any reference to section 311 and its penalty provisions.  ***Congress***

their attempts to enforce CWA Section 311 via citizen suit]; (2) an effluent or other limitation promulgated under Sections 301 and 301 (technology-based and water quality-based effluent limitations); (3) a standard of performance under Section 306 (national standards of performance for new sources); (4) a prohibition, effluent standard or pretreatment standard under Section 307 (effluent standards for toxic pollutants); (5) certification under Section 401; (6) a permit or condition thereof issued under Section 402 (the National Pollutant Discharge Elimination System ("NPDES") permit regime); or (7) a regulation under Section 405 (disposal or use of sewage sludge).

> *revisited section 311 nearly two decades later when it enacted the Oil Pollution*
> *Act (OPA) and significantly revised section 311, but it made no change in*
> *section 505 to make the oil spill provisions subject to citizen suit, despite the*
> *express addition of substantial volumetric based penalties to section 311.*

Russell V. Randle, *The* Deepwater Horizon *Oil Spill Disaster and Clean Water Citizen Suits:*

*The Other Petroleum Exclusion*, 25 TOXICS L. REP. 958 (Sept. 16, 2010) (emphasis added)

[hereafter "Randle, *The Other Petroleum Exclusion*"].[3]

CWA Section 311 does allow for citizens suits if an order of the Administrator or a State

in connection with one of the seven enumerated effluent standards or limitations have been

violated. *See* 33 U.S.C. § 1365(a)(1). But there is no allegation in the D1 Master Complaint that

BP has failed to comply with any such order. In fact, the only sparse references to "orders" in

the entire D1 Master Complaint are to ***court*** orders, either actual or requested, not agency orders.

*See* D1 Master Complaint at 2 & Prayer for Relief, ¶ 196(c)-(g) [Doc. 880]. Plaintiffs have not

claimed BP violated any EPA orders in connection with the cleanup, and as discussed above

BP's conduct in the cleanup operations by means of its participation in the Unified Command

has been exemplary and at the frontiers of engineering science.[4] Hence, both the Second and

Fifth Claims for Relief must be dismissed. Plaintiffs Fifth Claim for Relief is a sub-species of

---

[3] The Randle article also notes that the congressional decision to exclude CWA Section 311 from citizen suit enforcement has an obvious basis in good governance: "Given the emphasis in section 311 on emergency response, federal direction of spill response, flexibility, and on recovery of removal (cleanup) costs, it was a defensible policy choice for Congress to omit violations of section 311 from the list of requirements for which penalties and injunctive relief can be sought by means of a citizen suit under section 505. Put differently, Congress did not want the court 'jostling the elbow' of the Commandant of the Coast Guard in directing the cleanup, given the emergency nature of spill response. In this respect, the Clean Water Act and OPA are similar to Superfund [CERCLA], which also restricts judicial challenges to EPA's remedial choices." Randle, *The Other Petroleum Exclusion*.

[4] *See* Transcript, Press Briefing by Federal On-Scene Coordinator Rear Admiral Paul Zukunft (Sept. 28, 2010), *available at* http://www.restorethegulf.gov/release/2010/09/28/transcript-%E2%80%93-press-briefing-federal-scene-coodinator-rear-admiral-paul-zukunft ("I have the best of science here surrounding me just as we did, when we did that relief well, which was a feat — quite a feat onto itself to be able to intercept that well from three miles away, a seven-inch casing intercepting a seven-inch casing.") (Ex. 1.K). *See also* Remarks by the President on Oil Spill (May 2, 2010), *available at* http://www.restorethegulf.gov/release/2010/05/02/remarks-president-oil-spill ("Currently, the most advanced technology available is being used to try and stop a leak that is more than 5,000 feet under the surface. [T]his leak is unique and unprecedented . . .") (Ex. 1.L).

their Second Claim for Relief.  In the Second Claim for Relief, Plaintiff attempt to enforce CWA Section 311 generally, while in the Fifth Claim of Relief, they aver that the D1 Defendants acted with gross negligence or willful misconduct in violation of CWA 311.

Indeed, together with the fact that Plaintiffs include in the D1 Master Complaint a catch-all request for "such other and further relief as may be just and proper" (Prayer for Relief ¶ 196(p), D1 Master Complaint), the fact that Plaintiffs are attempting to bring not just one defective cause of action under Clean Water Act Section 505 to enforce Section 311, *but two* such defective causes of action suggests that Plaintiffs are attempting to evade the restriction of the D1 Master Complaint to claims for injunctive relief.  Pretrial Order #11 (Case Management Order #1) (PTO #11) [Doc. 569], Section III.D.1. (emphasis added) provides as follows:

> **D.  Injunctive and Regulatory Claims.**  These claims brought by private parties challenging regulatory action or authority and/or *seeking injunctive relief* will each be pled pursuant to Master Complaints as delineated below, and will include the following types of claims:
>
> **D1. Claims Against Private Parties.**  These claims will be pled separately and uniformly in a Master Complaint.

Despite this limitation, Plaintiffs have advanced a second CWA Section 311 cause of action, one alleging gross negligence or willful misconduct.  Under Section 311, demonstrating gross negligence or willful misconduct has no significance at all for obtaining injunctive relief. The only significance of such a showing is to enhance the level of monetary penalties that can be sought from up to a maximum of $1,100 per barrel discharged to up to an asserted maximum of $4,300 per barrel of oil discharged (*see* 40 C.F.R. § 19.4).  Indeed, the D1 Master Complaint explicitly pleads the significance for potential monetary penalties of gross negligence or willful misconduct.  *See* D1 Master Complaint, at ¶ 41 ("Section 311(b)(7)(D) of the CWA, 33 U.S.C. § 1321(b)(7)(D), provides that if the defendants' actions that caused the spill were the result of

gross negligence or willful misconduct that the civil penalties per barrel of hydrocarbon or unit of reportable quantity of hazardous substance discharged shall be up to $4,300 per barrel or unit."). *See also id.* at ¶ 170.  Such averments in an injunctive relief-only Master Complaint are out of place.  Plaintiffs cannot properly seek declaratory relief concerning monetary penalty matters in a complaint limited to seeking injunctive relief.  To do so is to seek monetary relief through the backdoor or to improperly attempt to induce the Court into making a factual finding that only the federal government is empowered to seek.  Remarkably, the un-amended underlying complaints of the Center for Biological Diversity ("CBD") seek such relief openly.[5]

Because there is no right of citizens to enforce CWA Section 311 in Section 505 suits, the Second and Fifth Claims for Relief must be dismissed.  Additionally, the Fifth Claim for Relief must be dismissed or stricken because it effectively seeks only monetary penalty relief that is beyond the scope of what is authorized for the D1 Master Complaint in PTO #11.

### B.    No CERCLA Citizen Suit Is Viable Because CERCLA Contains a Petroleum Exclusion (Sixth Claim for Relief).

Plaintiffs also make a claim pursuant to the citizen suit provisions of CERCLA Section 310, 42 U.S.C. § 9659, for alleged failures to properly report releases of regulated substances.  Plaintiffs' CERCLA claim (Sixth Claim for Relief) must be dismissed because it is barred by the CERCLA "petroleum exclusion."

CERCLA's emergency notification regulations requires that "any person in charge of a vessel or an offshore . . . facility shall" immediately notify the National Response Center "as soon as he or she has knowledge of any release (other than a federally permitted release . . .) of a

---

[5] CBD boldly proclaimed in its original press release: "Lawsuit Seeks $19 Billion in Clean Water Act Penalties from BP" (June 18, 2010), *available at* http://www.biologicaldiversity.org/news/press_releases/2010/bp-clean-water-act-06-18-2010.html (last visited January 29, 2011) ("The Center is seeking the maximum possible penalty against BP.") (Ex. 1.M).

hazardous substance" in a "reportable quantity" over a 24-hour period.  40 C.F.R. § 302.6(a), *amended*, 76 Fed. Reg. 9,665 (Feb. 22, 2011).  However, CERCLA's definition of "hazardous substances" in Section 101(14) of that statute explicitly excludes "petroleum, including crude oil or any fraction thereof," natural gas, natural gas liquids, or liquefied natural gas.  *See* 42 U.S.C. § 9601(14); *see also* 42 U.S.C. § 9601(33).  OPA (including its amendments to CWA Section 311) is the specific statute designed to cover oil spills.  CERCLA's coverage is mutually exclusive to the OPA/CWA coverage.  "The legislative purpose behind the petroleum exclusion is simply that Congress did not intend appropriated Superfund monies to be spent to clean up oil spills, and other releases of 'strictly oil.'"  *Niecko v. Emro Mktg. Co.*, 769 F. Supp. 973, 982 (E.D. Mich. 1991).  Oil spills are instead handled pursuant to the Oil Spill Liability Trust Fund, which is separate from CERCLA's Superfund.  *See* 26 U.S.C. § 9509; 33 U.S.C. § 2701(11), *amended in irrelevant part*, Pub. L. No. 111-281, 124 Stat. 2905, 2988 (Oct. 15, 2010).

Nearly thirty years ago, EPA definitively interpreted the CERCLA petroleum exclusion to apply to crude oil, even if a specifically listed or designated hazardous substance is present in the crude.  *See* EPA, Final Rule, *Notification Requirements; Reportable Quantity Adjustments*, 50 Fed. Reg. 13,456, 13,460 (Apr. 4, 1985); *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 266-67 (3d Cir. 1992) (petroleum exclusion applies to oil and oil fractions which naturally contain hazardous substances).

Moreover, it is clear that the petroleum exclusion is intended to apply even to petroleum feedstocks and to gasoline blends.  *See, e.g., Wilshire Westwood Assocs. v. Atlantic Richfield Corp.*, 881 F. 2d 801, 810 (9th Cir 1989) (holding that the petroleum exclusion applies to fuel oil and leaded gasoline); Memorandum from Francis S. Blake, EPA Gen. Counsel, to J. Winston Porter, Ass't Adm'r for Solid Waste and Emergency Response, Scope of the CERCLA

-17-

Petroleum Exclusion Under Sections 101(14) and 104(a)(2), 1987 WL 123926 (July 31, 1987) (petroleum exclusion applies to: (1) "crude oil and fractions of crude oil, including the hazardous substances, such as benzene, which are indigenous in those petroleum substances;" and (2) "hazardous substances which are normally mixed with or added to crude oil or crude oil fractions during the refining process."); Arnold W. Reitze, Jr., *Criminal Enforcement of Pollution Control Laws*, 9 ENVTL. LAW. 1, 69 (2002) ("[CERCLA] petroleum exclusion also excludes from the reporting requirement those hazardous substances that are normally found in crude oil, petroleum feedstocks and refined petroleum products").

Because the releases here concern naturally occurring crude oil, natural substances at the very core of the petroleum exclusion are involved and a CERCLA citizen suit against BP simply fails. Accordingly, the CERCLA claims in the Sixth Claim for Relief must be dismissed. *Contrast United States v. Gurley*, 43 F.3d 1188, 1199 (8th Cir. 1994) (wastes contaminated with PCBs and sulfuric acid could not qualify for petroleum exclusion under CERCLA).

Additionally, the only basis for the CERCLA citizen suit here is an alleged failure to meet reporting requirements. Ignoring CERCLA's petroleum exclusion (but suggesting Plaintiffs are nonetheless keenly aware of it), the Sixth Claim for Relief in the D1 Master Complaint seeks to have BP be found liable only for failing to report releases of certain natural components contained within the MC-252 crude.[6]

Plaintiffs cannot escape the CERCLA petroleum exclusion, however, by pretending that the presence of specific toxic components naturally appearing in crude oil must be separately

---

[6] *See* D1 Master Complaint at ¶ 124 ("Upon information and belief, and ***depending on variations in the components in the earth's crust***, Defendants' operations have released reportable quantities of benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (PAHs) (including, but not limited to, phenanthrene, benzanthracenes, benzopyrenes, benzofluoranthene, chrysenes, dibenzanthracenes, and indenopyrenes), fluoranthene, haloethers, halomethanes, methane, arsenic, cadmium, copper, mercury, and nickel under CERCLA.") (emphasis added).

-18-

reported, as if those toxic components were the byproduct of some industrial activity or an added ingredient to a manufacturing process. Oil *contaminated* with hazardous substances through industrial and consumer use can vitiate the petroleum exclusion, but crude oil that *naturally contains* hazardous substances is not thereby removed from the core of the exclusion's shield. *See Alcan Aluminum*, 964 F.2d at 267 ("EPA's interpretation of the petroleum exclusion comports with the relevant legislative history which indicates that *the exclusion was intended for oil spills*, not for releases of oil which has become infused with hazardous substances through use. *See* S. Rep. No. 848, 96th Cong., 2d Sess. 30-31 (1980), *reprinted in* A Legislative History, Vol. I, at 405.") (emphasis added).

Additionally, Plaintiffs' attempt to pierce the petroleum exclusion by focusing on the components of natural crude would render the petroleum exclusion an empty and pointless shell. *See Wilshire Westwood*, 881 F.2d at 802 ("[W]hether or not these constituents are fractions of petroleum, to interpret the petroleum exclusion otherwise would render the exclusion meaningless since it would result in no petroleum products coming under the petroleum exclusion."); *cf. United States v. Marrifield*, 515 F.2d 877, 881 (5th Cir. 1975) ("We hold that the strained statutory construction urged by the appellants is counter to the stated legislative purpose and would if followed emasculate the Act.").

Finally, Plaintiffs ignore that Congress established a more specific set of reporting obligations for spills under CWA Section 311(b)(5), 33 U.S.C. § 1321(b)(5). But any attempt to pursue a citizen suit for a claimed reporting failure under the right provision of law would run right back into the fact that Section 311 was deliberately drawn to reside outside the boundaries of provisions of law in the Clean Water Act enforceable by citizens. *See* Section I.A., above.

Sight also should not be lost of the fact that the Plaintiffs' claimed CERCLA reporting

-19-

obligation violation is hyper-technical and is based only on an alleged failure to report the specific **constituents** of the crude oil released as if those constituents were ingredients to or byproducts from an industrial process, as opposed the inevitable fractions or constituents of an accidental release of crude oil.  It is clear here that BP informed the federal government of the spill and at all relevant times participated as a key member of the Unified Command, following the directives of the National Incident Commander and Federal On Scene Coordinator.[7]

* * *

In sum, there are two petroleum exclusions applicable to the D1 Master Complaint's claims.  The first is the exclusion of CWA Section 311's oil spill regulatory regime from CWA citizen suit enforcement — the subject of Section I.A., above.  The other bars the Plaintiffs' CERCLA cause of action — the subject of Section I.B., above.  *See* Randle, *The Other Petroleum Exclusion* ("The superfund law — the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) — excludes the cleanup of petroleum from its coverage, leaving those issues to section 311 of the Clean Water Act and to the Oil Pollution Act.  A recent citizen suit [CBD's] filed in the wake of the April 20, 2010 *Deepwater Horizon* disaster illustrates another petroleum exclusion:  Congress omitted section 311's oil spill liability provisions from the Clean Water Act's authorization to bring citizen suits.") (footnotes omitted).

## II.  PLAINTIFFS FAILED TO COMPLY WITH THE PRE-SUIT NOTICE OBLIGATIONS FOR ALL OF THEIR ENVIRONMENTAL CITIZEN SUITS (FIRST THROUGH EIGHTH CLAIMS FOR RELIEF).

Even for those violations as to which a citizen suit is authorized, to effectuate Congress' preference for government enforcement, the citizen suit provisions mandate that prior to commencing suit, prospective Plaintiffs provide at least 60-days notice to federal and state

---

[7] The Court can take judicial notice of those facts.  *See In re Katrina Canal Breaches Consol. Litig.*, No. 05-cv-4182, 2008 WL 4185869, *2 (E.D. La. Sept. 8, 2008); Fed. R. Evid. 201.

authorities and to the alleged violators.  The objective is to allow the regulators sufficient time to enforce compliance by some means or to afford the alleged violators an opportunity to take the necessary steps to come into compliance.  Section 505(b) of the Clean Water Act expressly provides that "[n]o action may be commenced . . . prior to sixty days after the Plaintiff has given notice of the alleged violation" to the Administrator of the Environmental Protection Agency, the State in which the alleged violation occurs, and to any alleged violator of the effluent standard or limitation at issue.  33 U.S.C. § 1365(b).[8]  The ESA, CERCLA, and EPCRA all contain similar 60-day notice and delay requirements.[9]  Yet Plaintiffs have failed to comply with the mandatory 60-day notice requirements of the Clean Water Act, CERCLA, EPCRA, and the ESA.

A.     **Compliance with Pre-Suit Notice Requirements Is an Unavoidable Condition Precedent to Filing an Environmental Citizen Suit.**

Compliance with the 60-day notice requirement is a "mandatory condition[] precedent to commencing suit" under the citizen suit provisions of the aforementioned regulatory statutes. *Hallstrom v. Tillamook County*, 493 U.S. 20, 31 (1989) (affirming dismissal of citizen suit under the Resource Conservation and Recovery Act for failure to comply with analogous 60-day notice requirement); *see also Lockett,* 319 F. 3d at 682 (applying *Hallstrom*'s holding to the Clean Water Act); *Atlantic States Legal Found., Inc. v. United Musical Instruments, U.S.A., Inc.,* 61 F.3d 473, 476 (6th Cir. 1995) (applying *Hallstrom*'s holding to EPCRA); *Sierra Club v. Yeutter,*

---

[8] Under EPA regulations, notice provided pursuant to the citizen suit provision of the Clean Water Act must include sufficient information to allow the recipient "to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the persons or person responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, ***and the full name, address, and telephone number of the person giving notice.***"  40 C.F.R. 135.3(a) (emphasis added).

[9] The ESA's citizen suit provision prohibits a citizen suit "prior to sixty days after written-notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation."  16 U.S.C. § 1540(g)(2)(A).  CERCLA and EPCRA prohibit the filing of a citizen suit prior to 60 days after the plaintiff has given notice of the alleged violation to the President, the State in which the alleged violation occurred, and to the alleged violator.  42 U.S.C. § 9659(d); 42 U.S.C. § 11046(d).

-21-

926 F.2d 429, 437 (5th Cir. 1991) (holding that the ESA's notice requirements are "clearly mandatory"); *Joy v. Louisiana Conference Ass'n. of Seventh-Day Adventists*, No. 91-4025, 1992 WL 165670, at *3 (E.D. La. July 6, 1992) (noting that failure to comply with CERCLA notification requirements precludes recovery under CERCLA Section 310, its citizen suit provision).   As the United States Supreme Court has underscored, "a district court may not disregard these requirements at its discretion."   *Hallstrom*, 493 U.S. at 31.   "[W]here a party suing under the citizen suit provisions of [an applicable regulatory statute] fails to meet the notice and 60-day delay requirements . . . the district court ***must dismiss*** the action as barred by the terms of the statute."   *Id.* at 33 (emphasis added).

The D1 Master Complaint alleges that "***at least one*** of the Organizational Plaintiffs joining in this Master Complaint provided a valid notice of intent to sue, setting out the violations specified in the complaint and all other necessary information."   Master Complaint at ¶ 7 (emphasis).   Aside from this conclusory assertion, the Master Complaint provides no details regarding notice — it does not specify either which Organizational Plaintiff provided notice, when that notice was provided, or what violations were noticed.   As such, the allegations in the Master Complaint are insufficient to satisfy the 60-day notice requirements.

Moreover, to the extent that any Organizational or Individual Plaintiff attempts to rely on notice provided by another Plaintiff to satisfy its own notice requirements, its claims must be dismissed.   Under the Supreme Court's ruling in *Hallstrom*, ***each plaintiff must independently comply with the 60-day notice requirement*** — notice provided by one plaintiff (or even several) does not satisfy the notice requirement as to any other plaintiffs who did not themselves provide the requisite notice.   *See New Mexico Citizens for Clean Air and Water v. Espanola Mercantile Co.*, 72 F.3d 830, 833 (10th Cir. 1996) (each Plaintiff must have submitted a notice, else the

purpose of the pre-suit notice would not be served: "If the defendant and the agencies do not know the parties involved, effective negotiation is not possible."); *Washington Trout v. McCain Foods, Inc.*, 45 F.3d 1351, 1354 (9th Cir. 1995) (dismissing a Clean Water Act citizen suit because the notice was not sent by the Plaintiff and reasoning that the defendants could not have been expected to negotiate with parties not identified in the notice).[10]

### B. The Specific Citizen Suits Underlying the D1 Master Complaint Did Not Comply With the Applicable Notice Requirements.

Moreover, Plaintiffs have not provided adequate notice of any of the individual lawsuits filed against the BP Defendants alleging violations of the Clean Water Act, the ESA, CERCLA, or EPCRA.   The BP Defendants are aware of four individual lawsuits (not counting pre-amendment versions of complaints and the like) filed against various of the BP Defendants that allege violations of one or more of the regulatory statutes at issue in this case.   In three of these cases, Plaintiffs failed to provide proper notice under the relevant statutes.   The remaining case is defective for non-notice reasons.

In two of the cases, the suits were filed without any notice or without waiting 60 days after the notice.   In the first case, *Crenshaw v. BP PLC, et al.*, No. 2:10-CV-03255 (E.D. La. Sept. 29, 2010) ("Crenshaw"), Plaintiff did not provide any notice before filing its Complaint.   In the second case, *Center for Biological Diversity, Inc. v. BP America, Inc., et al.*, No. 2:10-CV-01768 (E.D. La. June 18, 2010) ("*CBD I*"), Plaintiff waited only fifteen days after notice before

---

[10]   Although some district courts have held that notice by one plaintiff can serve as notice by all, *see, e.g.*, *Environmental Def. Fund v. Tidwell*, 837 F. Supp. 1344, 1352-53 (E.D.N.C. 1992), these holdings are flatly inconsistent with *Hallstrom*'s admonition that the notice requirement be strictly construed.   493 U.S. at 31 ("'[I]n the long run, experience teaches that ***strict adherence*** to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.'") (emphasis added) (quoting *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980)).   In addition, cases like *Tidwell* ignore a primary purpose of the notice requirement — to allow the parties time to "resolve their conflicts in a nonadversarial time period."   *Washington Trout*, 45 F.3d at 1354.   "If the defendant and the agencies do not know the parties involved, effective negotiation is not possible." *New Mexico Citizens*, 72 F.3d at 833.

-23-

filing its Clean Water Act claim.[11]  Because these two sets of Plaintiffs failed to comply with the mandatory 60-day notice requirement of the Clean Water Act, the Court "must dismiss the action[s] as barred by the terms of the statute." *Hallstrom*, 493 U.S. at 33.

In the third case, *Defenders of Wildlife, et al. v. BP PLC, et al.*, No. 2:10-CV-03879 (E.D. La. Oct. 20, 2010) [hereafter "*Defenders*"], Plaintiff did wait more than 60 days after its notice to file suit, but the notice was deficient for the reasons discussed below and those deficiencies require dismissal of this suit.

***First***, the Defenders notice asserted that BP America was in violation of the ESA "as the result of its release of crude oil and dispersants into the Gulf of Mexico in connection with the Deepwater Horizon disaster," Defenders Notice at 1, but did not mention other cleanup activities as harming endangered or threatened species.  The Complaint, on the other hand, refers to harm "resulting from [the] release of crude oil and subsequent cleanup operations," *Defenders*, Compl. ¶ 1, but does not mention dispersants and acknowledges that the release of oil is no longer ongoing.  "A general notice letter that fails sufficiently to inform its recipients of the violations upon which a citizen intends to bring suit will not conform to the Act's requirement[s]." *Public Interest Research Grp. of N.J. v. Hercules, Inc.*, 50 F.3d 1239, 1248 (3d Cir. 1995) (construing similar Clean Water Act notice requirement) [hereafter "*PIRG of N.J. v. Hercules*"].  "*At a*

---

[11]  The Clean Water Act citizen suit provision does recognize a limited statutory exemption to the 60-day notice requirement, but it does not apply to Plaintiff's claim against BP.  Only citizen suits filed against the EPA Administrator respecting a violation of Section 306 (regarding "national standards of performance") or Section 307(a) (regarding "toxic and pretreatment effluent standards") may be brought immediately after giving notice. 33 U.S.C. § 1365(b)(2).  But these exceptions apply only to suits in the nature of mandamus actions against the government.  *See e.g., Walls v. Waste Res. Corp.*, 761 F.2d 311, 316-17 (6th Cir. 1985) ("Both the RCRA and the [Clean Water Act] citizen suit statutes contain a sole, explicit exception to the notice requirement which authorizes an action ***against the EPA Administrator*** immediately after notice is given when certain kinds of violations are alleged.  ***In all other instances***, plaintiffs invoking these citizen suit provisions 'must comply with specified procedures . . . ,' including '60 days prior notice to potential defendants.'") *Id.* at 316-17 (quoting *Middlesex County Sewerage Auth.*, 453 U.S. at 14) (footnote omitted).  The D1 Master Complaint and underlying suits are not in the nature of mandamus actions against governmental actors, but by their very nature are claims for injunctive relief against ***private*** defendants such as BP.  *See* PTO #11, Section III.D.1.

*minimum*, [a Plaintiff is] obligated to provide sufficient information of a violation so that the [defendant] could identify and attempt to abate the violation." *Southwest Ctr. for Biological Diversity v. Bureau of Reclamation*, 143 F.3d 515, 522 (9th Cir. 1998) (citing *PIRG of N.J. v. Hercules*, 50 F.3d at 1249 (emphasis added); *see also In re Voluntary Purchasing Grps. Inc.*, No. 396-2985, 2002 WL 32438760, at *3 (N.D. Tex. Oct. 16, 2002) (notice is only sufficient if it "give[s] the accused company the opportunity to correct the problem") (quoting *Atlantic States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 820 (7th Cir. 1997)). The purpose of notice, after all, is to allow the parties time to resolve the specific problems that a notice letter asserts, and to allow the government to intervene if develops its own concerns about the alleged violation. *See, e.g.*, *Washington Trout,* 45 F.3d at 1354. Neither purpose is served where, as here, a Plaintiff notices a particular alleged violation and then sues for something else.[12]

*Second*, the Defenders notice also failed to name the same parties as those that are now defendants to the relevant lawsuit — BP p.l.c. and BP Exploration & Production Inc. are not even mentioned in the notice. The ESA specifically requires that notice go "to the alleged violator." 16 U.S.C. § 1540(g)(2)(A)(i). Notice that is not provided to the proper parties does not serve the purposes of the notice requirement, as described above, and requires dismissal as to those parties. *See, e.g.*, *Hawkbill Sea Turtle v. FEMA*, 126 F.3d 461, 464 (3d Cir. 1997) (holding that notice requirement was not complied with when landowners suing on behalf of endangered

---

[12] For example, in *Southwest Center for Biological Diversity v. Bureau of Reclamation*, 143 F.3d 515 (9th Cir. 1998), the plaintiff had served the Bureau of Reclamation with a sixty-day notice alleging that the Bureau's activities on the Lower Colorado River were causing a take of certain listed species. *Id.* at 521. The notice, however, did not allege that the government's operation of Hoover Dam was harming species at Lake Mead, which was the subject of the subsequent lawsuit. *Id.* The court held that this failure did not provide the agency with sufficient information of a violation to allow it to "identify and attempt to abate the violation." *Id.* at 522. The Ninth Circuit accordingly affirmed dismissal of the proceeding. *Id.* at 520. Likewise, the notice here did not provide BP or the relevant government agencies with notice that Plaintiffs objected to anything besides the spill that was then ongoing, and the use of dispersants to clean it up.

-25-

sea turtles did not notify the correct government officials); *Southwest Ctr. for Biological Diversity*, 143 F.3d at 520 ("A failure to **strictly comply** with the notice requirement acts as an absolute bar to bringing suit under the ESA.") (emphasis added).  Thus, at the very least, BP p.l.c. and BP Exploration & Production must be dismissed from this suit.

The fourth case filed prior to the Master Complaint, *Center for Biological Diversity, Inc. vs. BP America, Inc., et al.*, No. 2:10-CV-02454 (E.D. La. Aug. 4, 2010) ("*CBD II*"), was filed by the same plaintiff as in the second case discussed above.  A new complaint was filed in August presumably because CBD recognized that the earlier complaint filed in June had been prematurely filed.  But while the earlier complaint was filed too early, the later complaint was filed too late, since by August the well had been capped and there were no ongoing discharges from it.  CBD's third attempt to get it right in a new filing ("*CBD III*") (Dkt # 813), styled an amended complaint to *CBD II*, was filed on November 26, 2010.  *CBD III* suffers from the same tardiness defect as *CBD II*, being even more late.  *See* Section III.A., below.

In any event, all of the Clean Water Act, ESA, EPCRA and CERCLA claims must be dismissed on the basis of lack of proper notice, with the sole exception of the claims asserted by CBD in its second lawsuit, as amended — *CBD III*.  However, as shown in the next section, *CBD III* must also be dismissed on the ground that there was no ongoing discharge when the action was filed.  In sum, none of the first through eighth Claims for Relief in the D1 Master Complaint can survive dismissal.

## III.   KILLING THE WELL STOPPED ANY THEN-ONGOING DISCHARGES, SO THE CITIZEN SUIT CAUSES OF ACTION MUST BE DISMISSED ON BOTH *GWALTNEY* STATUTORY GROUNDS AND ON CONSTITUTIONAL MOOTNESS GROUNDS (FIRST THROUGH EIGHTH CLAIMS FOR RELIEF).

The Macondo well has been killed.  Hence, discharges from that well are not ongoing.

There is also no reasonable prospect of discharges continuing. Accordingly, the citizen suits here face the twin obstacles of the statutory *Gwaltney* doctrine and constitutional mootness, especially given the unavailability of CWA civil penalties in citizen suits as a matter of law.

### A. The Alleged Violations In The Citizen Suits Are Not Ongoing Or Reasonably Likely To Recur (First Through Eighth Claims For Relief).

Citizen suits are not legally viable if they are seeking relief against conduct that is not ongoing or reasonably likely to recur. This violates the *Gwaltney* doctrine, as detailed below.

### 1. Plaintiff's Attempted CWA Citizen Suit Claims Fall Under *Gwaltney's* Express Holding (First Through Fifth Claims for Relief).

As explained above, the citizen-suit provision of the Clean Water Act states that "any citizen may commence a civil action on his own behalf against any person . . . who is "***alleged to be in violation***…" of an effluent standard or limitation. 33 U.S.C. § 1365(a). Suits, like this one, which are based on "wholly past violations," are thus precluded. *See Gwaltney*, 484 U.S. at 57 (barring citizen suit under Clean Water Act based on wholly past violations). Indeed, a court does not have subject matter jurisdiction over a Clean Water Act citizen suit where there is not a ***continuing discharge*** of pollutants at the time the Complaint is filed. *See Hamker v. Diamond Shamrock Chem. Co.*, 756 F.2d 392, 397 (5th Cir. 1985). Because the release from the Macondo well ended on July 15, 2010, "an injunction does not benefit [P]laintiffs if defendant has already stopped the unlawful activity at the time Plaintiffs filed suit." *Domino v. Didion Ethanol, LLC*, 670 F. Supp. 2d 901, 917 (W.D. Wis. 2009) (construing Clean Water Act's citizen suit provision). Thus, the two complaints filed after July 15, 2010 — *Defenders of Wildlife* and *CBD III* (amending *CBD II*) must be dismissed, as must any additional claims included in the D1 Master Complaint filed on December 15, 2010, and any attempts by new plaintiffs to adopt the first through eighth Claims for Relief of the D1 Master Complaint.

Importantly, national environmental group the Sierra Club has conceded in MDL 2179 what the Organizational Plaintiffs in the D1 Master Complaint apparently do not — that the *Gwaltney* doctrine bars direct citizen suit enforcement now that the well has been sealed. "Because the discharge of oil has stopped, Sierra Club cannot bring an action of its own under . . . *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49 (1987)." Sierra Club's Mot. to Intervene and Mem. of Legal Auth. in Support of the Mot., at 5 n.3 (Feb. 7, 2011) [Doc. 1115.1] (attempting to intervene in the United States' civil enforcement action, No. 2:10-cv-04536-CJB-SS). The Sierra Club's position on that issue is correct.

There is no exception to the *Gwaltney* requirement for alleged "patterns" of violation, which inherently would attempt to reach back to rest on past conduct; *Gwaltney* instead unambiguously requires ***ongoing*** discharges or violations. Nor can Plaintiffs be allowed to satisfy the *Gwaltney* doctrine by conflating an allegedly ongoing violation under one statute with one under another statute at another facility or during another time period. Inherent in the pre-suit notice requirements applicable to citizen suits is that a particularized violation at a specific time and place is the only possible grounding for a viable citizen suit. *See, e.g.,* 33 U.S.C. § 1365(b), CWA Section 505(b)(1) ("No suit may be commenced . . . prior to sixty days after the plaintiff has given notice of ***the alleged violation*** . . . .") (emphasis added); *Communities for a Better Env't v. Tosco Ref. Co.*, No. C 00-0248, 2001 WL 114441, at *7 (N.D. Cal. Jan. 29, 2001) ("Given the structure and procedural requirements of the CWA, plaintiffs cannot, at this point, rely on allegations of violations at other Tosco facilities to demonstrate that civil penalties will deter Tosco from future CWA violations."). The Macondo well is dead and alleged violations elsewhere, past or present, are simply insufficient to support the suits in the D1 Bundle.

-28-

**2.      Plaintiffs' ESA Cause of Action Fails for the Same Reasons (Eighth Claim for Relief).**

Similarly, the ESA authorizes citizen suits, but only "***to enjoin any person*** . . . who is alleged ***to be in violation*** of any provision of this chapter or regulation issued under the authority thereof."  16 U.S.C. § 1540(g)(1)(A) (emphasis added).  Thus, an injunction is the only relief available in a citizen suit, and a citizen suit directed at a private entity may only enjoin the entity if, at the time of suit, the entity is taking endangered or threatened species.  *See, e.g., Center for Biological Diversity v. Marina Point Dev.,* 566 F.3d 794, 804 (9th Cir. 2009) ("The ESA allows a citizen suit for the purpose of obtaining injunctive relief only.").  The ESA's sole citizen-suit remedy is "to enjoin any person . . . who is alleged ***to be*** in violation" of the ESA's prohibition on takes of listed species.  16 U.S.C. § 1540(g)(1)(A) (emphasis added).  "[T]he ESA's citizen-suit provision provides for injunctive relief which by design prevents *future* actions that will take listed species."  *Animal Welfare Inst. v. Beech Ridge Energy, LLC*, 675 F. Supp. 2d 540, 560 (D. Md. 2009) (emphasis in original); *see also Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 785 (9th Cir. 1995) ("[T]he injunctive relief authorized by the citizen suit provision, 16 U.S.C. § 1540(g), is by its very nature directed at ***future actions***.").  Where the action complained of — in this case the release of oil — occurred in the past, the relevant claim (Eighth Claim for Relief) must be dismissed.

**3.      EPCRA and CERCLA Are No Different (Sixth and Seventh Claims for Relief).**

EPCRA and CERCLA also require on-going violations and, therefore, the Sixth and Seventh Claims should be dismissed.  As the Court stated in *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83 (1998) (in dismissing wholly past EPCRA violations, "'[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding

-29-

injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'"). *Id.* at 109 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 4950-96 (1974) (alteration in original)). *See also Coalition for Health Concern v. LWD, Inc.*, 60 F.3d 1188, 1193 (6th Cir. 1995) (dismissing CERCLA citizens suit for failure to allege continuous or intermittent violations); *Lutz v. Chromatex, Inc.*, 718 F. Supp. 413, 420-22 (M.D. Pa. 1989) (applying *Gwaltney* to CERCLA).

Further, while a court may have jurisdiction in those limited situations where a citizen plaintiff can show a reasonable likelihood of reoccurrence, Plaintiffs' mere assertion of possible recurrence is insufficient to trigger that limited exception. ***First***, there is no longer any facility from which a release could occur. ***Second***, there have been multiple closures of the well — first by the Capping Stack, then by the use of Static Kill, followed by the cementing of the Macondo well casing, and, for good measure, the United States ordered the Bottom Kill method to be applied by drilling two separate relief wells. There is no reasonable possibility that there will be any release from the now shut-in well in the future. These are matters that are judicially noticeable. Indeed, National Incident Commander Thad Allen announced on September 19, 2010 that tests confirmed that cement injected into the well sealed and permanently shut it in:

> After months of extensive operations planning and execution under the direction and authority of the U.S. government science and engineering teams, BP has successfully completed the relief well by intersecting and cementing the well nearly 18,000 feet below the surface. With this development, which has been confirmed by the Department of the Interior's Bureau of Ocean Energy Management, we can finally announce that the Macondo 252 well is effectively dead.

Press Release, U.S. Coast Guard, Statement from Admiral Allen on the Successful Completion of the Relief Well (Sept. 19, 2010), *available at* http://www.restorethegulf.gov/release/2010/09/19/statement-admiral-allen-successful-completion-relief-well (Ex. 1.N). Accordingly, without an ongoing violation, without a facility from which any future violation

could occur, and facing a "dead" well, there is simply no likelihood that the release can reasonably be expected to reoccur.   Hence, the first through eighth Claims for Relief in Plaintiffs' D1 Master Complaint must be dismissed.

**B.     Additionally, Most Of The Citizen Suit Causes Of Action Are Moot (First Through Sixth And Eighth Claims For Relief).**

Plaintiffs' citizen suit claims here are unavoidably hemmed in by their very nature in several ways that clearly render them moot.   Several factors combine to create this effect:

(1) <u>PTO #11's Restrictions:</u>     PTO #11 precludes the Master Complaint from encompassing claims seeking monetary relief within the D1 bundle and the Master Complaint's Prayer for Relief also does not appear to call for monetary relief;

(2) <u>Monetary Penalties Unavailable Here:</u>   The only monetary penalties mentioned even in passing, under Clean Water Act Section 311, are manifestly not available to citizen enforcers (*see* Section I.A. above);

(3) <u>Prospective Injunctive Relief Can Only Be Sought to Remedy Ongoing Violations:</u> The calls for ***prospective injunctive relief*** in the environmental citizen suit claims advanced in the Plaintiffs first eight causes of action are all subject to the *Gwaltney* doctrine of demonstrating ***ongoing noncompliance***; but

(4) <u>Dead Well:</u>   The Macondo well is dead and is no longer discharging oil.

Collectively, then, Plaintiffs are confined to seeking environmental citizen suit injunctive relief of a prospective nature to stop noncompliance in the form of a continued release of oil, where any such releases have already stopped.   The citizen suit claims for relief are therefore moot.   *See Honig v. Students of Cal. Sch. for the Blind*, 471 U.S. 148, 149 (1985) (per curiam) (case seeking review of injunction to perform additional seismic testing mooted by completion of the tests).   *See also Environmental Conserv. Org. v. City of Dallas*, 529 F.3d 519, 529-30 (5th Cir. 2008) (claim for injunctive relief in CWA citizen suit mooted by resolved EPA enforcement action, even though consent decree did not order immediate cessation of all violations).

The Supreme Court decided one of the seminal mootness cases in the specific context of

environmental citizen suits in *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000).  In *Laidlaw*, the defendant repeatedly violated mercury discharge limits.  Plaintiffs secured civil fines payable to the U.S. Treasury based on their suit, but the court declined to order injunctive relief.  Friends of the Earth chose not to appeal a denial of injunctive relief.  The Fourth Circuit vacated the district court's order as moot after Laidlaw had come into compliance with its CWA permit.  The Supreme Court reversed, finding the case not to be moot because an award of civil penalties to the Treasury could still have had a deterrent effect.  *See id.* at 174 (lower court "misperceived the remedial potential of civil penalties.  Such penalties may serve, as an alternative to an injunction, to deter future violations and thereby redress the injuries that prompted a citizen suitor to commence litigation.").

This case presents the flip side of *Laidlaw* and thus reveals a commonly recognized situation where a citizen suit has become moot.  Here, to comport with the terms of PTO #11, Plaintiffs are not seeking the type of civil monetary penalties that saved the *Laidlaw* case from mootness in the face of a then-unappealable denial of prospective injunctive relief.  *Cf. Laidlaw*, 528 U.S. at 185 ("Laidlaw is right to insist that a plaintiff must demonstrate standing separately for each form of relief sought.").  Moreover, citizens lack standing to seek civil penalties payable to the U.S. Treasury for past violations, and consistent with *Laidlaw* have standing only to seek civil penalties payable to the U.S. Treasury if such penalties could be assessed in the future based on ongoing discharges — something that cannot occur now that the well has been killed.  *See id.* at 188 ("In short, *Steel Co.* held that private plaintiffs, unlike the Federal Government, may not sue to assess penalties for wholly past violations, but our decision in that case did not reach the issue of standing to seek penalties for violations that are ongoing at the time of the complaint and that could continue into the future if undeterred.").  Finally, the citizen plaintiffs here are not able

-32-

to seek such civil penalty relief under the Clean Water Act, since CWA Section 311 is not even potentially enforceable via citizen suit (see Section I.A., above).

Plaintiffs here are seeking injunctive relief, it is true.  But consistent with the *Gwaltney* doctrine (which has often been extended well beyond the Clean Water Act to the other environmental statutes the Plaintiffs are asserting here, *see* Section III.A., above), Plaintiffs can seek only a ***prospective*** injunction.  The lion's share of the citizen suit claims brought by the Plaintiffs are therefore moot, because there is no prospect for the future-oriented injunctions that Plaintiffs would otherwise have the power to seek to secure any meaningful relief for the Plaintiffs in terms of stopping discharges that already concluded back in mid-July 2010.  *See Raymond Proffitt Found. v. Army Corps of Eng'rs*, 175 F. Supp. 2d 755, 773 (E.D. Pa. 2001) ("However, the ***only relief being sought by plaintiffs is prospective injunctive relief*** against further storage.  The grant of such a remedy will not provide plaintiffs with any relief from the violations that they are challenging.") (emphasis added) (footnote omitted).

A review of the now-moot causes of action that specifically seek relief for the purpose of halting allegedly present and continuing discharges will sharpen the point:

(1) First Claim for Relief:  Plaintiffs allege that BP is violating CWA Section 301(a) by discharging pollutants, and specifically oil, into the Gulf from the site where the *Deepwater Horizon* sank.  *See* D1 Master Complaint at ¶¶ 155, 158.  Those discharges were from the killed well and are no longer taking place.

(2) Second Claim for Relief:  Plaintiffs allege that BP is violating CWA Section 311(b) by discharging oil and hazardous substances into the Gulf in connection with the well.  *See* D1 Master Complaint at ¶ 161.  Again, those discharges have ended.

(3) Third Claim for Relief:  Plaintiffs allege that BP is violating CWA Section 307 by its

-33-

discharges.  *See* D1 Master Complaint at ¶¶ 164-65.  Again, those discharges have ended.

(4) <u>Fourth Claim for Relief:</u>  Plaintiffs allege that BP is violating CWA Section 306 by its discharges.  *See* D1 Master Complaint at ¶ 168.  Again, those discharges have ended.

(5) <u>Fifth Claim for Relief:</u>  Plaintiffs make the same discharge allegations as in their Second Claim for Relief, except that they allege that the discharges are being made in connection with gross negligence or willful misconduct.  *See* D1 Master Complaint at ¶ 170.  Again, those discharges have ended.

(6) <u>Sixth Claim for Relief:</u>  Plaintiffs allege that BP is making releases into the Gulf in violation of CERCLA Section 103(a) and that they failed to report those releases.  *See* D1 Master Complaint at ¶ 174.  Again, those discharges have ended.[13]

(7) <u>Eighth Claim for Relief:</u>  Plaintiffs allege that BP's discharges are taking listed species in violation of ESA Section 9.  *See* D1. Master Complaint at ¶ 179.  Once more, those discharges have ended.

Specially notable is the Supreme Court's rejection in *Gwaltney* of arguments to impose even stricter requirements on environmental citizen suits than the Court imposed, since "longstanding" mootness doctrine served the goals that the *Gwaltney* defendant sought to vindicate.  As the Court explained, the *Gwaltney* doctrine and mootness go hand-in-hand, and treat both citizen plaintiffs and industry defendants fairly:

---

[13] If Plaintiffs possessed a viable cause of action under CERCLA, perhaps the reporting claim aspect of the Sixth Claim for Relief would not be mooted because a prospective injunction to file the relevant reports could be seen as something that would have future utility for those using Gulf waters.  But as noted in Section I.B. above, Plaintiffs lack a viable CERCLA cause of action pursuant to the petroleum exclusion.  Hence, under a combination of mootness and the petroleum exclusion (and other defects), the entirety of the Sixth Claim for Relief must be dismissed.  The notice issues implicated by the EPCRA claim for relief are similar.  For that reason, BP is not asserting that the Seventh Claim for Relief is mooted because the EPCRA provision involved does not impose a substantive obligation on BP to stop discharging, only a reporting obligation, if discharges are made.  Nevertheless, BP is asserting that there is no statutory standing to pursue an EPCRA claim here, *see* Section IV, below.

> Petitioner also worries that our construction of § 505 [of the CWA] would permit citizen-plaintiffs, if their allegations of ongoing noncompliance become false at some later point in the litigation because the defendant begins to comply with the Act, to continue nonetheless to press their suit to conclusion . . . . Mootness doctrine[, however,] protects defendants from the maintenance of suit under the Clean Water Act based solely on violations wholly unconnected to any present or future wrongdoing, while it also protects plaintiffs from defendants who seek to evade sanction by predictable "protestations of repentance and reform." *United States v. Oregon State Medical Society*, 343 U.S. 326, 333 (1952).

*Gwaltney*, 484 U.S. at 66-67.[14] No mere "protestations of reform" are involved in the species of mootness created here — rather, objective mootness is created by the dead well.

Finally, mootness is not prevented — either on constitutional grounds or as a statutory matter — when discharge of a pollutant terminates, but the pollutant continues to have effects as it breaks down in the natural world. *See, e.g., Hamker*, 756 F.2d at 397 (complaint must allege a discharge from a "point source" and not just continuing effects from a prior discharge, in order to meet the *Gwaltney* requirement); *Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1312-13 (2d Cir. 1993) ("The present violation requirement of the [CWA] would be completely undermined if a violation included the mere decomposition of pollutants."). Mootness is measured with reference to the cause of action asserted to the court. Hence, courts can be left with no further relief to grant depending on how a particular cause of action maps onto current facts. *See, e.g., Lusardi v. Xerox Corp.*, 975 F.2d 964, 974 (3d Cir. 1992) ("The 'case or controversy' requirement ***demands that a <u>cause of action</u> before a federal court present a 'justiciable' controversy,*** and 'no justiciable controversy is presented . . . when the question

---

[14] It is true that the *Gwaltney* Court also notes that the burden to show mootness is a "heavy one" in some situations. *See* 484 U.S. at 66. But that case involved discharges from the defendant's meat-packing plants that could readily be mechanically halted. The Supreme Court clarified in *Laidlaw* that the elevated burden regarding a mootness showing applies only to situations involving voluntary conduct. *See Laidlaw*, 528 U.S. at 190 ("[A] defendant claiming that ***its voluntary compliance*** moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.") (emphasis added). The termination of the Macondo leak was based on strict federal oversight and is not comparable to discharges like those from the ordinary operations of wastewater plants (as in *Laidlaw*) or industrial pork processors (as in *Gwaltney*).

sought to be adjudicated has been mooted by subsequent developments . . . .'") (emphasis added) (quoting *Flast v. Cohen*, 392 U.S. 83, 95 (1968)).

## IV.   PLAINTIFFS LACK STANDING TO PURSUE THEIR CWA, ESA, AND EPCRA CAUSES OF ACTION (FIRST THROUGH FIFTH, PLUS SIXTH AND SEVENTH CLAIMS FOR RELIEF).

Plaintiffs lack standing to bring their alleged violations of the Clean Water Act, the ESA, and EPCRA.  The "irreducible constitutional minimum of standing" contains three requirements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  ***First***, there must be alleged, and ultimately proven, an "injury in fact" — a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.'"  *See City of L.A. v. Lyons*, 461 U.S. 95, 101-102 (1983) (quoting *Golden v. Zwickler*, 394 U.S. 103, 109-110 (1969)).  ***Second***, there must be causation — a fairly traceable connection between the plaintiff's injury and the complained of conduct of the defendant.  *See Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).  And ***third***, there must be redressability — a likelihood that the requested relief will redress the alleged injury. *Id.*, at 45-46.  The party invoking federal jurisdiction bears the burden of establishing its existence.  *See Santos v. Reno*, 228 F.3d 591, 594 (5th Cir. 2000).

Lack of standing requires dismissal for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1); *Barrett Computer Servs. Inc. v. PDA, Inc.*, 884 F.2d 214, 220 (5th Cir. 1989) ("[B]ecause standing issues present jurisdictional questions, an inquiry into the existence of a party's standing usually should be governed by the standards controlling explorations into a court's subject matter jurisdiction.").  Moreover, pursuant to the *Steel Company* case, this Court must consider jurisdictional issues before merits issues, *see Steel Co.*, 523 U.S. at 93-94, though if it decides that the lack of ongoing discharges precludes the existence of subject matter jurisdiction under *Hamker* (see Section III.A., above), it can resolve a dismissal on that basis in

-36-

advance of considering the standing issues.  *See Steel Co.*, 523 U.S. at 92 (questions of statutory jurisdiction can be decided before addressing jurisdictional issues of constitutional dimension).

### A.   Plaintiffs Lack Standing To Bring Their Clean Water Act Claims (First Through Fifth Claims for Relief).

To establish standing under the citizen suit of the Clean Water Act, the Plaintiffs must show that the injuries they allege will be redressed if they prevail.  Plaintiffs do not have to show that the injunction will return the waters to the pre-spill state, but must show that an injunction will at least provide some benefit or reduction in pollution.  *See Public Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 73 (3d Cir. 1990).  Plaintiffs cannot make any showing of benefit.  Indeed, the injunctive relief sought by Plaintiffs — including a declaration of a violation of the Clean Water Act, CERCLA, and EPCRA and an injunction "***from operating their offshore facility*** in such manner as will result in further violation of the CWA, CERCLA, and EPCRA."  D1 Master Complaint at ¶ 196(b)-(c) (emphasis added) — is fruitless, as not only is there no ongoing release from the dead well, but there is no viable offshore facility from which any release could possibly occur.  The *Deepwater Horizon* is sunk.

### B.   Plaintiffs Lack Standing To Bring Their ESA Claim (Eighth Claim for Relief).

*First*, Plaintiffs' suit is also barred because BP and the agencies comprising the Unified Area Command, among others, are already cleaning up the Gulf of Mexico.  A Plaintiff's injury is not redressable by a citizen suit when the injury is already being redressed.  *See, e.g., SPPI-Somersville, Inc. v. TRC Cos.*, No. 07-5824, 2009 WL 2612227 (N.D. Cal. Aug. 21, 2009).  The *SPPI-Somersville* analysis is worth quoting at length:

> Plaintiffs seek relief that [has] already been provided outside of this lawsuit, and aside from the alleged vapor intrusion issues discussed *infra*, plaintiffs "ha[ve] identified nothing whatsoever that this Court could order defendant to do to supplement [already existing remediation] efforts."  *87th St. Owners Corp. v.*

> *Carnegie-Hill-87th St. Corp.*, 251 F. Supp. 2d 1215, 1220-21 (S.D.N.Y. 2002) (dismissing RCRA ["Resource Conservation and Recovery Act"] claim as moot due to ongoing state-supervised cleanup addressing contamination).
>
> That the RCRA claim is superfluous is demonstrated by the relief sought by the complaint, which is simply an order directing defendants to implement remedial measures to the satisfaction of the DTSC [California Department of Toxic Substances.]
>
> Whether this is viewed as a lack of standing because the harm will not be redressed by this Court, or as a failure to demonstrate entitlement to relief under RCRA, the problem is the same: there is no basis for the relief plaintiffs seek because the contamination is already being addressed by the DTSC through the Consent Order and the [Remedial Action Plan]. *See Glanton v. AdvancePCS, Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) ("There is no redressability, and thus no standing, where . . . any prospective benefits depend on an independent actor who retains 'broad and legitimate discretion the courts cannot presume to control or to predict.'") (internal citation omitted); *87th St. Owners*, 251 F. Supp. 2d at 1220-21; *Kara-Holding Corp. v. Getty Petroleum Mktg. Inc.*, 99 Civ. 0275 (RWS), 2004 WL 1811427, at *11 (S.D.N.Y. Aug. 12, 2004) (granting defendants summary judgment on RCRA claim where "Kara has not shown that the remediation plan proposed by the plaintiffs is necessary to insure that the petroleum contamination is no longer an imminent and substantial endangerment in light of the considerable remediation that has already taken place.").

*SPPI-Somersville*, 2009 WL 2612227, at *15 (paragraph breaks added) (first alteration added).

The failure of standing is especially acute where, as here, the Plaintiff does not assert any deficiency in the federal and state remediation efforts already underway. *SPPI-Somersville*, at *11. In particular, the federal remediation efforts here by multiple agencies, including EPA, the Department of Interior, NOAA, and the Coast Guard are at or among the most extensive levels ever undertaken in American environmental history.[15] As in *SPPI-Somersville*, the Plaintiffs lack standing to effectively second guess existing governmental remediation decisionmaking.

---

[15] *See* Press Release, Joint Information Ctr., The Ongoing Administration-Wide Response to the Deepwater BP Oil Spill (July 30, 2010), *available at* http://www.restorethegulf.gov/release/2010/07/30/ongoing-administration-wide-response-deepwater-bp-oil-spill ("Admiral Allen reiterated the administration's commitment to long-term recovery in the Gulf. "We are on scene. We are fully staffed and ready to go . . . . We are going to make sure this well is killed, make sure the oil on the surface is responded to, and make sure the shores are clean — and how clean is clean is something we will develop with our local leaders and the trustees of all of the resources that are applied as we move forward.") (Ex. 1.O).

*Second*, even if the Plaintiffs were to allege that a particular cleanup activity is taking endangered or threatened species, such injury would not be redressable in an ESA lawsuit because the cleanup activities in the Gulf have been largely dictated by the National Incident Commander, Federal On Scene Coordinator, Unified Area Command and now by the Coast Guard in cooperation with other federal agencies, not by BP.  As the *Glanton* case recognizes, an injury is not redressable for purposes of Article III standing when a claim depends on the actions of actors not before the court.  *See Young America's Found. v. Gates*, 573 F.3d 797, 801 (D.C. Cir. 2009) (plaintiff lacked standing because redressability depended on undisputed discretion of third party); *Fund for Animals v. Norton*, 295 F. Supp. 2d 1, 7 (D.D.C. 2003) ("Courts have been loath to find standing when redress depends largely on policy decisions yet to be made by government officials.").  Indeed, in *SPPI-Somersville*, 2009 WL 2612227, at *15, the Plaintiffs asserted that state-supervised remediation efforts did not adequately address one specific impact from a contaminated site, and requested an order requiring the defendant to study that impact. The court held that the Plaintiffs lacked standing because, even if it ordered a study of the impact at issue, the government would "necessarily be involved in that process, and would make the determination as to whether mitigation was necessary."  *Id.*

Likewise, even if Plaintiffs alleged a deficiency in the ongoing cleanup, they would have to prove that an order from this Court would actually eliminate the harm, rather than simply be subject to approval of the National Incident Commander, the Federal On Scene Coordinator, specific agencies or the NRD Trustees — to avoid risk of contradiction by the eventual NRDA restoration plan.  They cannot do so because these federal officials, trustees, and agencies will dictate how the Gulf is cleaned up and none of those decision makers are before the Court in the actions referenced in the D1 Master Complaint.  *See also ASARCO Inc. v. Kadish*, 490 U.S. 605,

614-615 (1989) (where redressability "depends on the unfettered choices made by independent actors not before the courts," a court should "have much less confidence in concluding that relief is likely to follow from a favorable decision"). *See also City of Dallas*, *supra*.

### C.   Plaintiffs Lack Standing To Bring Their EPCRA Claim (Seventh Claim for Relief).

The Emergency Planning and Community Right-to-Know Act of 1986 ("EPCRA"), 42 U.S.C. §§ 11001 *et seq.* was enacted to inform the citizenry of hazardous chemicals in their community and to establish community-based response planning and notification requirements that would offer protection in the event of a release of the hazardous chemicals.  Even assuming that the operations 50 miles out into the Gulf were subject to EPCRA, Plaintiffs do not allege any use or interest that their members have in the data collected under EPCRA.  *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982) (no standing where plaintiff "fail[s] to allege a personal injury fairly traceable to defendant's conduct that is redressable by the requested relief"); *see also Steel Co.*, 523 U.S. at 105-06 (dismissing EPCRA case for lack of standing).  Accordingly, there is no injury and no standing.  The Seventh Claim should be dismissed.

### D.   Plaintiffs Cannot Mix and Match Their Organizational and Individual Members to Show Standing.

Even if Plaintiffs could overcome the constitutional hurdles to standing as to the particular claims for relief set forth above, they would still need to show that the Organizational Plaintiffs can meet the prudential requirements for associational standing.  *See Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977) ("[W]e have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane

-40-

to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.").  Plaintiffs cannot meet those burdens. For instance, as to associational standing, they make only generic allegations that do not identify a single specific member who is alleged to be injured by ongoing discharges at the time of suit and who has specific injuries that would be redressed by the relief sought in the citizen suits.  *See* D1 Master Complaint at ¶¶ 4-6.

For instance, particular Individual Plaintiffs (such as beachfront property owners where Macondo-252 oil came ashore) may (at least in theory) be able to show that the oil discharges ongoing at the time of suit harmed them, but the Organizational Plaintiffs cannot rely on injuries to those private plaintiffs to establish their own standing.  Indeed, such Individual Plaintiffs have not even sought to comply with the citizen suit notice requirements.  The Plaintiffs, collectively, cannot mix and match disparate Plaintiff groupings to satisfy the standing or notice requirements. Instead, the only D1 Plaintiffs who can survive a motion to dismiss must both be shown to have complied with the citizen suit notice requirements and to have standing (constitutional, or constitutional and associational, as appropriate).  No plaintiffs meet both criteria.

## V.    PLAINTIFFS' ENDANGERED SPECIES ACT CLAIMS SUFFER FROM ADDITIONAL, UNIQUE DEFECTS (EIGHTH CLAIM FOR RELIEF).

### A.    Plaintiffs Failed to Join Indispensable Parties to Their ESA Claim for Relief.

Not only have Plaintiffs ignored the ESA's notice requirements (see Section II, above), they have also ignored the strong interests of numerous federal and state agencies in ensuring an orderly, efficient, and focused cleanup of the Gulf of Mexico.  Federal Rule of Civil Procedure 19 requires Plaintiff to join any person if "in that person's absence, the court cannot accord complete relief among existing parties."  Likewise, a party must be joined if the person "claims an interest relating to the subject of the action" and the litigation either may "impair or impede

the person's ability to protect the interest," or may "leave an existing party subject to a substantial risk of incurring . . . inconsistent obligations."  Fed. R. Civ. P. 19.  Failure to do so is grounds for dismissal under Rule 12(b)(7).

Here, in the absence of the agencies involved in ongoing Gulf remediation efforts, the Court will be unable to accord complete relief.  The federal and state agencies comprising the Unified Area Command, the Gulf States' environmental agencies, and agencies serving as the NRD Trustees all claim an interest in the cleanup in the Gulf of Mexico.  The Trustees have, in fact, specifically asserted jurisdiction over that cleanup pursuant to the OPA.  *See* NOI at 1.

And while Plaintiffs disparage the cleanup efforts in the Gulf, Plaintiffs will not be able, without the participation of these agencies, to affect the process by which the Gulf is cleaned up. Moreover, this lawsuit may impair these agencies' interests if it were to require BP to engage in particular activity that the various agencies deemed improper.  And any orders this Court imposes may be contradicted or counteracted by actions of the governmental agencies, especially the NRDA recovery plan currently being prepared by the Trustees.  Accordingly, BP faces a serious risk of being subjected to inconsistent obligations.

While some decisions have held that governmental agencies are not indispensible in environmental citizen suits, *e.g., Association to Protect Hammersley ELD & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1012-13 (9th Cir. 2002) (holding state agency not indispensible in Clean Water Act citizen suit alleging company failed to obtain necessary discharge permit), those cases did not involve a situation where a citizen suit Plaintiff seeks to plunge a federal court into the middle of one of the most extensive cleanup and restoration efforts ever undertaken.  Accordingly, the Eighth Claim in the D1 Master Complaint must be dismissed for

-42-

failure to join the indispensable governmental agencies.[16]

**B.      At the Very Least, and in the Alternative, the ESA Claim for Relief Must Be Dismissed Without Prejudice or Stayed Pursuant to the Doctrine of Primary Jurisdiction.**

Based on the face of the Complaint and judicially noticeable facts, the doctrine of primary jurisdiction also bars Plaintiffs' attempt to inject this Court into the Gulf restoration process.  "Primary jurisdiction . . . comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body."  *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63-64 (1956).  In the Fifth Circuit, the doctrine should be applied to stay or dismiss a proceeding where: "(1) the court has original jurisdiction over the claim before it; (2) the adjudication of that claim requires the resolution of predicate issues or the making of preliminary findings; and (3) the legislature has established a regulatory scheme whereby it has committed the resolution of those issues or the making of those findings to an administrative body."  *Northwinds Abatement, Inc. v. Employers Ins. of Wausau*, 69 F.3d 1304, 1311 (5th Cir. 1996) (per curiam).  "[I]f . . . the primary jurisdiction doctrine applies on any set of facts that could be developed by the parties, there is no reason to await discovery, summary judgment, or trial, and the application of the doctrine properly may be determined on the pleadings."  *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1088 (9th Cir. 2006).

Even assuming the Court has jurisdiction over the Plaintiffs' claims here, the adjudication of Plaintiffs' ESA claim would require analysis of both the impacts of the *Deepwater Horizon* spill on endangered and threatened species and review of decisions about potential remedial

---

[16] The Court will recall that in July a now-withdrawn action was filed by certain citizen plaintiffs, including one of the organizations which is a plaintiff in the *Defenders* citizen suit, seeking to enjoin controlled burns that were alleged to be endangering sea turtles.  *See Animal Welfare Institute v. BP Am. Inc.*, Civ. A. No. 10-1866 (CJB) (July 20, 2010).  The United States' involvement there was crucial to the amicable resolution reached in that case.

measures concerning what can be done to prevent and/or minimize future harm to those species. Once again, this doctrine protects the legal policies highlighted in this motion regarding the avoidance of citizen suit intrusion that would second guess federal remedial decisions. *See, e.g., Schwartzman, Inc. v. Atchison, Topeka & Santa Fe Ry. Co.*, 857 F. Supp. 838, 843 (D.N.M. 1994) (staying CERCLA case because "Plaintiff fails to show how this Court would be more effective at ensuring compliance than the EPA."). Moreover, the agencies and especially the NRD Trustees have already begun their work, and are investing enormous resources in what is likely to be the most extensive Natural Resource Damages Assessment in history, which weighs heavily in favor of invoking the doctrine of primary jurisdiction. *See Mississippi Power & Light Co. v. United Gas Pipeline Co.*, 532 F.2d 412, 420 (5th Cir. 1976) ("The advisability of invoking primary jurisdiction is greatest when the issue is already before the agency.").

Here, the *Western Pacific* "predicate issues" are committed to numerous agencies. Most importantly, they are currently committed to the Trustees' ongoing NRDA analysis. *See Watts v. Missouri-Kan.-Tex. R.R. Co.*, 383 F.2d 571, 583 (5th Cir. 1967) (where Congress has entrusted agencies to bring their specialized expertise to bear on some issue, "[t]he piecemeal, sporadic decisions by courts should not interfere with or bypass these statutory schemes"); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 919-20 (5th Cir. 1983) (Army Corps of Engineers better suited to make a particular wetlands determination, and allowing it to do so will help to improve judicial efficiency). "In short, the agency should have the first word." *Mississippi Power & Light*, 532 F.2d at 417 (citing *Marine Engr's Beneficial Ass'n v. Interlake S.S. Co.*, 370 U.S. 173, 185 (1962)).

The fact that this is a citizen suit does not block application of primary jurisdiction doctrine. *See, e.g., Raritan Baykeeper, Inc. v. NL Indus.*, 713 F. Supp. 448, 457 (D.N.J. 2010)

(holding that citizen suit under CWA and RCRA must be dismissed pursuant to primary jurisdiction doctrine because of existing state-supervised remediation).  If any ESA citizen suit claims survive the arguments for dismissal set forth above in Sections I through V, they should be stayed until the NRDA process is complete.

## VI.   THE MARITIME CLAIM FOR RELIEF IS DISPLACED, THE STATE LAW CLAIMS ARE PREEMPTED, AND THESE TWO CLAIMS INSTEAD BELONG EXCLUSIVELY IN THE B1 MASTER COMPLAINT (NINTH AND TENTH CLAIMS FOR RELIEF).

The Oil Pollution Act displaces Plaintiffs' maritime law claims against BP.  In addition, OCSLA preempts the Plaintiffs' trespass and nuisance claims based on the law of non-adjacent States (i.e., Alabama, Florida, Mississippi, and Texas), even assuming that the Plaintiffs' vague and non-specific invocation of amorphous state law in the Ninth and Tenth Claims for Relief could be thought to comply with Federal Rule of Civil Procedure 8.  Next, even to the extent that Louisiana law, as the law of the adjacent State, could apply as "surrogate federal law" pursuant to OCSLA here, the Louisiana Oil Spill Prevention and Response Act ("LOSPRA") would bar any Louisiana trespass or nuisance claims.  Finally, the CWA preempts attempts by impacted States to regulate discharges subject to Clean Water Act regulation and permits where those discharges occur outside state boundaries.  These arguments are all elaborated on in the motion to dismiss the B1 Master Complaint and are hereby incorporated herein by reference.  There is also no rational basis for the Plaintiffs' decision to place the Ninth and Tenth Claims for Relief (which are merely disguised private damages claims masquerading as calls for injunctive relief) within the D1 Master Complaint.  That choice violates PTO #11, Section III.D.1.

## CONCLUSION

For the foregoing reasons, the D1 Master Complaint should be dismissed in its entirety.

Dated:  February 28, 2011

Respectfully submitted,

<u>/s/ Don K. Haycraft</u>
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Robert E. Holden (Bar #6935)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
312-862-2000 (Tel)
312-862-2200 (Fax)

Granta Y. Nakayama, P.C.
Stuart A.C. Drake
Jeffrey Bossert Clark
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000 (Tel)
(202) 879-5200 (Fax)

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
202-662-5985

Joel M. Gross
Allison Rumsey
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC  20004-1206
E-Mail:  Joel.Gross@aporter.com
Telephone:  202.942.5000
Facsimile:  202.942.5999

Attorneys for BP p.l.c., BP America Production
Company and BP Exploration & Production Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 28th day of February, 2011.

*/s/ Don K. Haycraft*

Don K. Haycraft