# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | : | |
| IN RE:  OIL SPILL by the OIL RIG | : | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | : | |
| GULF OF MEXICO, on | : | |
| APRIL 20, 2010 | : | |
| | : | SECTION: J |
| This Pleading Applies To: | : | |
| *MDL 2179 B1 Amended Master Complaint And* | : | |
| *All Cases In Pleading Bundle B1* | : | |
| | : | JUDGE BARBIER |
| This Pleading Applies To: | : | MAG. JUDGE SHUSHAN |
| *No. 10-2771 (Limitation Action)* | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**BP DEFENDANTS' MEMORANDUM IN SUPPORT OF
BP DEFENDANTS' MOTION TO DISMISS PURSUANT TO
FED. R. CIV. P. 12(B)(1) AND FED. R. CIV. P. 12(B)(6) THE
FIRST AMENDED MASTER COMPLAINT CROSS-CLAIM, AND
THIRD-PARTY COMPLAINT FOR PRIVATE ECONOMIC LOSSES IN
ACCORDANCE WITH PTO NO. 11 [CMO NO. 1] SECTION III.B1 ["B1 BUNDLE"]**

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................1

COMPLAINT ALLEGATIONS AND BACKGROUND............................................................4

    A.      The *Deepwater Horizon* Incident............................................................................4

    B.      BP's Commitment To Pay All Legitimate OPA Claims. ........................................5

    C.      Plaintiffs Associated With The B1 Amended Master Complaint. ..........................6

Statutory Framework ........................................................................................................................7

    A.      The Outer Continental Shelf Lands Act (OCSLA)..................................................7

    B.      The Oil Pollution Act Of 1990 (OPA)....................................................................9

    C.      The Clean Water Act ("CWA") NPDES Regulatory Regime And The General Permit For Macondo Operations On The Outer Continental Shelf.........11

ARGUMENT ...................................................................................................................................13

I.      PLAINTIFFS HAVE NO VALID MARITIME CLAIMS AGAINST BP. .....................13

    A.      OPA Displaces Plaintiffs' Maritime Claims Against BP. .....................................13

    B.      Even If Plaintiffs' Maritime Claims Were Not Displaced By OPA, They Must Be Dismissed Pursuant To The *Robins Dry Dock* Rule. ..............................17

II.      PLAINTIFFS' OPA CLAIMS MUST BE DISMISSED FOR FAILURE TO SATISFY OPA'S CLAIM PRESENTATION REQUIREMENT. ...................................19

    A.      Plaintiffs Must Satisfy OPA's Claim Presentation Requirement *Before* Filing Suit.............................................................................................................19

    B.      Plaintiffs Did Not Satisfy OPA's Claim Presentation Rule Before Filing Suit. .......................................................................................................................22

    C.      OPA Does Not Apply To The Claims Alleged By "VoO Plaintiffs."...................24

    D.      OPA Does Not Permit Private Recovery Of Natural Resource Damages. ............26

III.      PLAINTIFFS HAVE NO VALID STATE LAW CLAIMS AGAINST BP....................26

A.   Pursuant To OCSLA, The Laws Of Non-Adjacent States, Such As Alabama, Florida, Mississippi and Texas, Are Preempted and Cannot Apply Here...................................................................................................26

B.   Pursuant To The Supreme Court's *Ouellette* Line Of Precedent, The Clean Water Act's Comprehensive Regime Preempts *All* Of The Plaintiffs' State Law Claims, Including Claims Under The Laws Of Louisiana............................29

C.   There Is No "Gap" In Federal Law Permitting Application Of Louisiana Law, The "Adjacent State" Here, As Borrowed Surrogate Federal Law Under OCSLA. ...........................................................................................34

D.   Even If Louisiana Law Was Applicable Here, Plaintiffs Have No Valid Claims Under Louisiana Law. ..................................................................35

1.   LOSPRA Would Be Plaintiffs' Exclusive Remedy If Louisiana Law Applied, And Plaintiffs Do Not Assert A LOSPRA Claim...............36

2.   Plaintiffs Fail To Allege Necessary Prerequisites For Asserting A Nuisance Claim Under Louisiana Law. ...................................................37

3.   Plaintiffs' Trespass Claim Is Brought By Individuals And Businesses Who Do Not Meet The Prerequisites For Asserting Such A Claim. ........................................................................................39

4.   Plaintiffs Fail To State A  Claim For Fraudulent Concealment................40

E.   Even If Florida Law Was Not Preempted, The Florida Pollutant Discharge Prevention and Control Act Does Not Apply Here And Must Be Dismissed...................................................................................................42

IV.   PLAINTIFFS' PUNITIVE DAMAGES COUNT MUST BE DISMISSED....................45

A.   There Is No Independent Cause Of Action For Punitive Damages. .....................45

B.   Punitive Damages Are Not Recoverable Under OPA. ..........................................46

V.   PLAINTIFFS' ATTEMPTS TO IMPEDE SETTLEMENT OF OPA CLAIMS BY WAY OF DECLARATORY RELIEF MUST BE  DISMISSED..............................48

CONCLUSION....................................................................................................50

## TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Abundiz v. Explorer Pipeline Co.*,
  Nos. 300CV2029H, 303CV0508H, 303CV0787H,
  2003 WL 23096018 (N.D. Tex. Nov. 25, 2003) .................................................... 20, 21, 22, 23

*Allen v. R & H Oil and Gas Co.*,
  63 F.3d 1326 (5th Cir. 1995) .................................................................................... 45

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chicago*,
  977 F.2d 1147 (7th Cir. 1992) ................................................................................... 30

*Amoco Prod. Co. v. Sea Robin Pipeline* Co.,
  844 F.2d 1202 (5th Cir. 1988) ..................................................................................... 9

*Arkansas v. Oklahoma*,
  503 U.S. 91 (1992) ..................................................................................................... 32

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) .............................................................................................. 40

*Ashwander v. TVA*,
  297 U.S. 288 (1936) ................................................................................................... 44

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ................................................................................................... 45

*Ault v. Lohr*,
  538 So. 2d 454 (Fla. 1989) ........................................................................................ 46

*Barasich v. Columbia Gulf Transmission Co.*,
  467 F. Supp. 2d 676 (E.D. La. 2006) ........................................................................ 38

*Barasich v. Shell Pipeline Co.*,
  Nos. 05-4180, 05-4197, 05-4199, 05-4212, 06-5102, 2006 WL 3913403 (E.D. La. Nov. 20,
  2006).................................................................................................................... 38, 39

*Berthelot v. Boh Bros. Constr. Co.*,
  No. 05-4182, 2006 WL 2256995 (E.D. La. July 19, 2006)............................... 20, 23

*Blaze v. Payne*,
  819 F.2d 128 (5th Cir. 1987).................................................................................... 47

*Blue Gulf Seafood, Inc. v. TransTexas Gas Corp.*,
   24 F. Supp. 2d 732 (S.D. Tex. 1998)....................................................... 18

*Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*,
   51 F.3d 235 (11th Cir. 1995)......................................................... passim

*Bourg v. BT Operating Co.*,
   No. H-08-0596, 2009 WL 960011 (S.D. Tex. Apr. 8, 2009) ................................... 29

*Bourgeois v. De Soto*,
   280 So. 2d 271 (La. Ct. App. 1973) ..................................................... 41

*Byrne v. Nezhat*,
   261 F.3d 1075 (11th Cir. 2001)......................................................... 45

*Carr v. Alta Verde Indus.*,
   931 F.2d 1055 (5th Cir. 1991)......................................................... 12

*City of Milwaukee v. Illinois and Michigan*,
   451 U.S. 304 (1981) (*Milwaukee II*) ............................................... 14, 30

*Clausen v. M/V NEW CARISSA*,
   171 F. Supp. 2d 1127 (D. Ore. 2001) ................................................... 47

*Collin Cty. v. Homeowners Ass'n for Values Essential to Neighborhoods*,
   915 F.2d 167 (5th Cir. 1990).......................................................... 48

*Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216 (Fla. 2010)............................... 45

*Dean v. Am. Sec. Ins. Co.*,
   559 F.2d 1036 (5th Cir. 1977),  *en banc reh'g denied*,
   564 F.2d 97 (5th Cir. 1977), *cert. denied*, 434 U.S. 1066 (1978) ........................... 46

*Demette v. Falcon Drilling Co.*,
   280 F.3d 492 (5th Cir. 2002)........................................................... 27

*Dempster v. Louis Eymard Towing Co.*,
   503 So. 2d 99 (La. Ct. App. 1987) ..................................................... 39

*Dennis v. Bud's Boat Rental, Inc.*,
   987 F. Supp. 948 (E.D. La. 1997) ..................................................... 29

*Earnest v. Lowentritt*,
   690 F.2d 1198 (5th Cir. 1982).......................................................... 49

*East River S.S. Corp. v. Transamerica Delaval, Inc.*,
   476 U.S. 858 (1986) .................................................................. 15

*EP Operating Ltd. P'ship v. Placid Oil Co.*,
   26 F.3d 563 (5th Cir. 1994) ................................................................. 2, 9

*Farwell v. Milliken & Farwell, Inc.*,
   145 So. 2d 644 (La. Ct. App. 1963) ..................................................... 41

*Foley & Lardner, LLP v. Aldar Invs., Inc.*,
   491 F. Supp. 2d 595 (M.D. La. 2007) .................................................. 42

*Freightliner Corp. v. Myrick*,
   514 U.S. 280 (1995) ............................................................................. 30

*Friends of the Earth v. Conrail*,
   768 F.2d 57 (2d Cir. 1985) ................................................................. 11

*G&G Steel, Inc. v. Sea Wolf Marine Transp., LLC*,
   380 Fed. Appx. 103 (2d Cir. 2010) ..................................................... 18

*Gabarick v. Laurin Mar. (Am.), Inc.*,
   623 F. Supp. 2d 741 (E.D. La. 2009) ............................................... 1, 16

*Gabarick v. Laurin Mar. (Am.), Inc.*,
   No. 08-4007, 2009 WL 102549 (E.D. La. Jan. 12, 2009) ....................... 3, 20, 22, 23

*Gatlin Oil Co., Inc. v. United States*,
   169 F.3d 207 (4th Cir. 1999) ........................................................... 17, 25

*Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*,
   589 F.3d 778 (5th Cir. 2009) .............................................................. 27

*Gulf Offshore Co. v. Mobil Oil Corp.*,
   453 U.S. 473 (1981) ............................................................................ 2, 8

*Hallstrom v. Tillamook Cnty.*,
   493 U.S. 20 (1989) ........................................................................... 21, 23

*Haynes v. Blue Ridge Paper Prods., Inc.*,
   No., 2010 WL 3075738 (W.D.N.C. Aug. 5, 2010) ................................. 32

*Healy v. Beer Inst., Inc.*,
   491 U.S. 324 (1989) ......................................................................... 43, 44

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*,
   471 U.S. 707 (1985) ............................................................................ 31

*Hopewell Enters., Inc. v. Trustmark Nat'l Bank*,
   680 So. 2d 812 (Miss. 1996) ............................................................... 46

*Hufnagel v. Omega Serv. Indus., Inc.*,
   182 F.3d 340 (5th Cir. 1999) ................................................................................. 8

*In re Oil Spill by the Oil Rig Deepwater Horizon*,
   MDL No. 2179, 2010 WL 3943451 (E.D. La. Oct. 6, 2010) ............................... 7, 29

*In re Operation of Mo. River Sys. Litig.*,
   418 F.3d 915 (8th Cir. 2005) ................................................................................ 33

*In re Settoon Towing LLC*,
   No. 07-1263, 2009 WL 4730969 (E.D. La. Dec. 4, 2009) .................................... 18

*In re Taira Lynn Marine Ltd. No. 5, LLC*,
   444 F.3d 371 (5th Cir. 2006) ..................................................................... 17, 25, 45

*Inabnet v. Exxon Corp.*,
   93-0681 (La. 9/6/94); 642 So. 2d 1243 ................................................................ 38

*Ingram Corp. v. J. Ray McDermott & Co.*,
   698 F.2d 1295 (5th Cir. 1983) ............................................................................. 4, 49

*Int'l Paper Co. v. Ouellette*,
   479 U.S. 481 (1987) .................................................................................. passim

*Jefferson v. Lead Indus. Ass'n, Inc.*,
   106 F.3d 1245 (5th Cir. 1997) ............................................................................ 42

*Johnson v. Colonial Pipeline Co.*,
   830 F. Supp. 309 (E.D. Va. 1993) ................................................... 20, 21, 22, 23

*Johnson v. Seacor Marine Corp.*,
   404 F.3d 871 (5th Cir. 2005) .............................................................................. 42

*Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs.*,
   527 F.3d 412 (5th Cir. 2008) ......................................................................... 40, 42

*Kaplan v. Harco Nat'l Ins. Co.*,
   708 So. 2d 89 (Miss. Ct. App. 1998) .................................................................. 46

*Kingston Shipping Co. v. Roberts*,
   667 F.2d 34 (11th Cir. 1982) ............................................................................. 18

*Kirby v. Field*,
   2004-1898 (La. App. 1 Cir. 9/23/05); 923 So. 2d 131 ....................................... 41

*La. Crawfish Producers Ass'n-West v. Amerada Hess Corp.*,
   2005-1156 (La. App. 3 Cir. 7/12/06); 935 So. 2d 380 ....................................... 39

*Lane v. Champion Int'l Corp.*,
  827 F. Supp. 701 (S.D. Ala. 1993) ........................................................... 34

*Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*,
  754 F.2d 1223 (5th Cir. 1985) ................................................................. 8

*LaRue v. Crown Zellerbach Corp.*,
  512 So. 2d 862 (La. App. 1 Cir.), *writ denied*,
  514 So. 2d 1176 (La. 1987) ..................................................................... 39

*Life Ins. Co. of Ga. v. Smith*,
  719 So. 2d 797 (Ala. 1998) ..................................................................... 45

*Louisiana ex rel. Guste v. M/V Testbank*,
  752 F.2d 1019 (5th Cir 1985) ................................................................. 18

*Marathon Pipe Line Co. v. LaRoche Indus. Inc.*,
  944 F. Supp. 476 (E.D. La. 1996) ........................................................... 23

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
  453 U.S. 1 (1981) ........................................................................... 14, 47

*Miles v. Apex Marine Corp.*,
  498 U.S. 19 (1990) ................................................................................. 15

*Mobil Oil Corp. v. Higginbotham*,
  436 U.S. 618 (1978) ............................................................................... 15

*Mosing v. Domas*,
  2002-0012 (La. 10/15/02); 830 So. 2d 967 ........................................... 45

*Nabours v. Longview Sav. & Loan Ass'n*,
  700 S.W.2d 901 (Tex. 1985) ................................................................... 46

*Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*,
  924 F. Supp. 1436 (E.D. Va. 1996), *aff'd*, 122 F.3d 1062 (4th Cir. 1997), *cert. denied*, 523
  U.S. 1021 (1998) ........................................................................... 15, 16

*Nations v. Morris*,
  483 F.2d 577 (5th Cir. 1973), *cert. denied*, 414 U.S. 1071 (1973) ......................................... 35

*New Jersey v. New York*,
  283 U.S. 336 (1931) ............................................................................... 14

*Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*,
  451 U.S. 77 (1981) ................................................................................. 14

*Offshore Logistics, Inc. v. Tallentire*,
    477 U.S. 207 (1986) ................................................................. 27

*Olsen v. Shell Oil Co.*,
    708 F.2d 976 (5th Cir. 1983) ...................................................... 35

*Orson, Inc. v. Miramax Film Corp.*,
    189 F.3d 377 (3d Cir. 1999) ........................................................ 30

*Phillips v. G&H Seed Co.*,
    2008-934 (La. App. 3 Cir. 4/8/09); 10 So. 3d 339 .................. 39

*PPG Indus., Inc. v. Bean Dredging*,
    447 So. 2d 1058 (La. 1984) ........................................................ 39

*Rice v. Harken Exploration Co.*,
    89 F. Supp. 2d 820 (N.D. Tex. 1999) ........................................ 17

*Richard v. Richard*,
    2009-539 (La. App. 3 Cir. 11/4/09); 24 So. 3d 292 .................. 39

*Robin v. Binion*,
    469 F. Supp. 2d 375 (W.D. La. 2007) ....................................... 49

*Robins Dry Dock & Repair Co. v. Flint*,
    275 U.S. 303 (1927) .................................................................. 17

*Rodrigue v. Aetna Cas. & Sur. Co.*,
    395 U.S. 352 (1969) .................................................................. 27

*Ronquille v. MMR Offshore Servs., Inc.*,
    353 F. Supp. 2d 680 (E.D. La. 2004) ........................................ 29

*S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*,
    234 F.3d 58 (1st Cir. 2000) ................................................ passim

*S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*,
    547 U.S. 370 (2006) .................................................................. 11

*Seaboats, Inc. v. Alex C Corp.*,
    Nos. 01-12184-DPW, 01-12186-DPW, 00-12500-DPW,
    2003 WL 203078 (D. Mass. Jan. 30, 2003) .............................. 16

*Shandong Yinguang Chem. Indus. Joint Stock Co., v. Potter*,
    607 F.3d 1029 (5th Cir. 2010) ................................................... 41

*Snyder Oil Corp. v. Samedan Oil Corp.*,
    208 F.3d 521 (5th Cir. 2000) .................................................... 29

viii

*State Line Fishing & Hunting Club, Inc. v. City of Waskom*,
   754 F. Supp. 1104 (E.D. Tex. 1991) ................................................................ 34

*Sullivan v. Leaf River Forest Prods., Inc.*,
   791 F. Supp. 627 (S.D. Miss. 1991) ................................................................ 33

*Tanguis v. M/V Westchester*,
   153 F. Supp. 2d 859 (E.D. La. 2001) ...................................................... 1, 16, 17

*Targa Midstream Servs. Ltd. P'ship v. K-Sea Transp. Partners, LP*,
   No. G-05-629, 2006 WL 2520914 (S.D. Tex. Apr. 20, 2006) ................................ 17

*Taylor v. Gen. Motors Corp.*,
   875 F.2d 816 (11th Cir. 1989) ........................................................................ 30

*Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*,
   87 F.3d 150 (5th Cir. 1996) ............................................................... 2, 7, 8, 28

*Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co.*,
   448 F.3d 760 (5th Cir. 2006) ..................................................................... 7, 27

*Texas Oil & Gas Ass'n v. EPA*,
   161 F.3d 923 (5th Cir. 1998) .......................................................................... 12

*Ting v. AT&T*,
   319 F.3d 1126 (9th Cir. 2003) ........................................................................ 30

*TS&C Invs., LLC v. BEUSA Energy, Inc.*,
   637 F. Supp. 2d 370 (W.D. La. 2009) .............................................................. 38

*Turner v. Murphy Oil USA, Inc.*,
   No. 05-4026 (E.D. La. Dec. 29, 2005) .............................................................. 50

*Turner v. Murphy Oil USA, Inc.*,
   No. 05-4206, 2007 WL 4208986 (E.D. La. Nov. 21, 2007) ...................... 3, 20, 21, 23

*Unimobil 84, Inc. v. Spurney*,
   797 F.2d 214 (5th Cir. 1986) .......................................................................... 40

*Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*,
   895 F.2d 1043 (5th Cir. 1990) .................................................................... 8, 28

*United States v. Dixie Carriers, Inc.*,
   627 F.2d 736 (5th Cir. 1980) .......................................................................... 15

*United States v. Florida*,
   425 U.S. 791 (1976) ...................................................................................... 43

*United States v. Louisiana*,
   363 U.S. 121 (1960) ................................................................................... 43

*United States v. Underwood*,
   597 F.3d 661 (5th Cir. 2010) .................................................................. 44

*Williams v. WMX Techs., Inc.*,
   112 F.3d 175 (5th Cir. 1997) .................................................................. 41

## OTHER AUTHORITIES

135 Cong. Rec. H7965 (daily ed. Nov. 2, 1989) ...................................... 20, 48

15 C.F.R. pt. 990 .............................................................................................. 11

18 U.S.C. § 13 .................................................................................................. 28

22 Am. Jur. 2d *Damages* § 551 (2010) ........................................................ 46

26 U.S.C. § 9509 ............................................................................................. 10

33 C.F.R. pts. 133-38 ...................................................................................... 11

33 U.S.C. § 1321(b)(7) D) ............................................................................... 46

33 U.S.C. § 1321(b)(7)(A) ............................................................................... 46

33 U.S.C. § 1321(c) ......................................................................................... 10

33 U.S.C. § 1321(d) ......................................................................................... 10

33 U.S.C. § 1321(e) ......................................................................................... 10

33 U.S.C. § 1321(f)-(i) ..................................................................................... 10

33 U.S.C. § 1321(j) .......................................................................................... 10

33 U.S.C. § 1321(l)-(m) ................................................................................... 10

33 U.S.C. § 1342 ............................................................................................... 2

33 U.S.C. § 2701(3) .................................................................................... 20, 21

33 U.S.C. § 2701(32) ................................................................................... 9, 37

33 U.S.C. § 2702 .................................................................................... 5, 25, 46

33 U.S.C. § 2702(a) ......................................................................................... 16

33 U.S.C. § 2702(b)(1) .................................................................................................. 10

33 U.S.C. § 2702(b)(2) .................................................................................................. 10

33 U.S.C. § 2702(b)(2)(A) ............................................................................................ 26

33 U.S.C. § 2702(b)(2)(C) ............................................................................................ 21

33 U.S.C. § 2703 ........................................................................................................... 10

33 U.S.C. § 2704 ........................................................................................................... 10

33 U.S.C. § 2705 ........................................................................................................... 10

33 U.S.C. § 2706 ........................................................................................................... 11

33 U.S.C. § 2708 ........................................................................................................... 10

33 U.S.C. § 2709 ............................................................................................................. 9

33 U.S.C. § 2710(c) ...................................................................................................... 10

33 U.S.C. § 2712 ........................................................................................................... 10

33 U.S.C. § 2713 ............................................................................................................. 3

33 U.S.C. § 2713(a) ...................................................................................................... 19

33 U.S.C. § 2713(c) .......................................................................................... 19, 20, 50

33 U.S.C. § 2715 ............................................................................................................. 9

33 U.S.C. § 2716 ........................................................................................................... 10

33 U.S.C. §§ 2701(11) ................................................................................................... 10

33 U.S.C. §§ 2702(a) ...................................................................................................... 9

33 U.S.C. §§ 2702(b) ...................................................................................................... 9

33 U.S.C. 1321(b) ......................................................................................................... 10

40 C.F.R. § 122.28 ........................................................................................................ 12

42 U.S.C. § 6972(b)(1) .................................................................................................. 21

43 U.S.C. § 1312 ........................................................................................................... 43

43 U.S.C. § 1331 ............................................................................................................. 2

43 U.S.C. § 1331(q) ................................................................................................ 9

43 U.S.C. § 1332(1) ............................................................................................ 7, 27

43 U.S.C. § 1333 ................................................................................................... 8

43 U.S.C. § 1333(a)(1) ........................................................................................ 27

43 U.S.C. § 1333(a)(2) ........................................................................................ 2, 8

43 U.S.C. § 1349(b)(1) .......................................................................................... 9

43 U.S.C. § 1802 ................................................................................................... 8

43 U.S.C. §1333(a)(2)(A) ..................................................................................... 28

72 Fed. Reg. 31,575 (June 7, 2007) ..................................................................... 32

BLACK'S LAW DICTIONARY (9th ed. 2009) ......................................................... 27

CWA § 311(b)....................................................................................................... 10

CWA § 311(b)(7)(A) ............................................................................................ 46

CWA § 311(b)(7)(D) ............................................................................................ 46

CWA § 311(c)....................................................................................................... 10

CWA § 311(d)....................................................................................................... 10

CWA § 311(e)....................................................................................................... 10

CWA § 311(f)-(i) .................................................................................................. 10

CWA § 311(j) ....................................................................................................... 10

CWA § 311(l)-(m) ................................................................................................ 10

Fla. Stat. § 376.031(5)........................................................................................... 44

Fla. Stat. § 376.12(5)............................................................................................. 44

H.R. Rep. No. 92-911 (1972)................................................................................ 11

La. Admin. Code, Title 43, Part XXIX § 101(B) ................................................ 35

La. R.S. § 30:2453(A)........................................................................................... 36

La. R.S. § 30:2453(B)........................................................................................... 35

La. R.S. § 30:2454(22) ................................................................................................ 36, 37

La. R.S. § 30:2454(5) .................................................................................................. 36

La. R.S. § 30:2479 ...................................................................................................... 37

La. R.S. § 30:2480(G) ................................................................................................. 36

La. R.S. § 30:2491(A) .................................................................................................. 36, 37

La. R.S. § 30:2496 ...................................................................................................... 36, 37

Oil Pollution Act of 1990,
  Pub. L. No. 101-380, 104 Stat. 484 (Aug. 18, 1990) ................................................ 10

RESTATEMENT (SECOND) OF TORTS § 538 ....................................................................... 41

S. Rep. No. 101-94 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722 ........................................ 9, 17

U.S. Const. art. I, § 8, cl. 3 .......................................................................................... 43

## INTRODUCTION AND SUMMARY OF ARGUMENT

The BP Defendants — BP Exploration & Production Inc. ("BPXP"), BP America Production Company and BP p.l.c. — (together "BP") respectfully submit this Memorandum in support of their Motion to Dismiss Plaintiffs' B1 First Amended Master Complaint for Private Economic Losses (hereinafter "B1 Amended Master Complaint" or "B1 Compl.").

Plaintiffs seek to assert seven Counts against BP in their B1 Amended Master Complaint: general maritime law claims for negligence, gross negligence and willful misconduct (Count I.A-B), an OPA claim (Count II), state law claims (Count III), a punitive damages count (Count IV), and counts seeking declaratory relief in an attempt to interfere with settlements that parties have every right to choose to enter into to resolve claims relating to the *Deepwater Horizon* incident rather than engage in litigation (Counts V and VI).  BP moves to dismiss all of these Counts.

The B1 Pleading Bundle encompasses "Non-Governmental Economic Loss and Property Damages." (PTO 11 [Doc. 569].)  ***The Oil Pollution Act of 1990 (OPA)***, 33 U.S.C. §§ 2701 *et seq*., *is the sole remedy for non-governmental entities asserting economic loss and property damage claims against BP resulting from the Deepwater Horizon incident and oil spill*.

***There is no role for the admiralty law claims Plaintiffs assert against BP in Count I.*** These federal common law claims must be dismissed.  Where, as here, Congress enacts a statute on a subject previously controlled by federal common law, the federal statute displaces the prior common law.  Every court addressing this issue has held that OPA displaces maritime law claims against responsible parties such as BP.  *See Gabarick v. Laurin Mar. (Am.), Inc.*, 623 F. Supp. 2d 741, 750 (E.D. La. 2009); *Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001).

***Likewise, there is no role for the state law claims that Plaintiffs assert against BP in***

***Count III.***  These state law claims are preempted for two independent reasons:

- ***First, Plaintiffs' state law claims are preempted as a result of the Outer Continental Shelf Lands Act (OCSLA)***, 43 U.S.C. §§ 1331 *et seq.*  The *Deepwater Horizon* incident and resulting oil spill originated on the Outer Continental Shelf (OCS), and OCSLA establishes that federal law exclusively governs legal problems arising in connection with operations on the OCS.  *See, e.g.*, *Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 156 (5th Cir. 1996); *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994).  Under OCSLA the ***only*** state law with any potential applicability to operations on the OCS is the law of the "adjacent State," which may be ***borrowed as surrogate federal law***, ***but only if*** there is a "***substantial gap***" or "***void***" in federal law.  *See Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 480-81 (1981) (citing 43 U.S.C. § 1333(a)(2)).  Here, Louisiana is the "adjacent State," but Louisiana law cannot be borrowed.  Because BP is a "responsible party" under OPA, there is no "substantial gap" let alone "void" in federal law concerning asserted economic loss and property damage claims arising out of the *Deepwater Horizon* incident.  The federal OPA statute makes available comprehensive and detailed provisions for relief.

- ***Second***, ***Plaintiffs' state law claims are preempted by the extensive regulatory regime of the Clean Water Act and its National Pollutant Discharge Elimination System ("NPDES")***, 33 U.S.C. § 1342.  Pursuant to the U.S. Supreme Court's *Ouellette* line of precedent, impacted States' laws of any kind are preempted as applied to water pollution originating outside those States, where such pollution is regulated by the Clean Water Act under the NPDES regulatory regime administered by the U.S. EPA.  Only tort laws and regulations of the ***source*** State of the pollution may be applied; application of the tort laws and regulations of States ***impacted*** by pollution originating elsewhere is barred.  *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987).  Here, there is no source State.  Instead, the *Deepwater Horizon*'s drilling activities, and the inter-state water pollution resulting from the *Deepwater Horizon* incident and ensuing oil spill originated on the OCS.  Thus, only the exclusively federal laws governing the OCS may be applied here, namely OCSLA, and application of the tort laws and regulations of the impacted Gulf Coast States (or any other State) is barred.

***With regard to OPA, from the outset of the Deepwater Horizon incident, BP has expressed its commitment to pay all legitimate OPA claims, and BP's actions reflect this commitment***.  In early May 2010, BP accepted the designation as an OPA "responsible party" by the U.S. Coast Guard.  BP quickly established a claims process as OPA requires a "responsible party" to do.  BP paid nearly $400 million to individuals and businesses while operating its OPA claims process.  (Ex. 2.)  Following a June 16, 2010 meeting with President Obama, BP agreed to transition its claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund.  (Ex. 3.)  OPA did not require BP to turn over to a third party decision-

2

making on OPA claims.  At Mr. Feinberg's direction, over $3.4 billion has been paid to date from the trust fund to parties filing claims with the Gulf Coast Claims Facility ("GCCF"). (Ex. 4.)

**OPA includes a compulsory two-step claim presentation process that each B1 Plaintiff must satisfy _before_ filing suit.  Plaintiffs' OPA count (Count III), and individual complaints, must be dismissed because Plaintiffs have not done so.**  Pursuant to OPA, before filing suit, a claimant must (i) "present" a claim to the GCCF (or BP if before the GCCF's establishment), and (ii) await denial of the claim or expiration of a 90-day negotiation period, which begins after the claim is "presented."  *See* 33 U.S.C. § 2713.  Every court considering the issue has held that dismissal is mandatory for a plaintiff who failed to comply with OPA's claim presentation requirement.  *See, e.g.*, *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*, 51 F.3d 235, 240 (11th Cir. 1995); *Gabarick v. Laurin Mar. (Am.), Inc.*, No. 08-4007, 2009 WL 102549, at *2 (E.D. La. Jan. 12, 2009).  **Courts do not have discretion to stay lawsuits pending satisfaction of the OPA claim presentation requirement, for doing so would violate OPA's express language and end-run the very purpose of the requirement "to promote settlement and avoid litigation**."  *Turner v. Murphy Oil USA, Inc.*, No. 05-4206, 2007 WL 4208986, at *2 (E.D. La. Nov. 21, 2007).

What follows is a summary of all grounds on which BP moves to dismiss the B1 Amended Master Complaint, including independent, alternative grounds for dismissal:

- *Count I (maritime law claims for negligence, gross negligence, and willful misconduct)*: *First*, OPA displaces these maritime claims against BP as an OPA responsible party.  *And*, even if not displaced, these claims are barred by *Robin's Dry Dock* because Plaintiffs assert economic losses with no physical injury to a proprietary interest.

- *Count II (OPA)*:  *First*, dismissal is mandatory because Plaintiffs did not comply with OPA's claim presentation process before filing suit.  *Also*, for "VoO Plaintiffs," participants in BP's post-incident Vessels of Opportunity program that provided opportunity for local boat operators to assist with response activities, (B1 Compl. ¶ 209(g)), this Count must be dismissed because OPA does not apply to injuries incurred "as a result of their work in the

VoO program" (*id.*).  ***Finally***, Plaintiffs' natural resource damages ("NRD") request must be dismissed because OPA does not permit private parties to seek NRDs.

- ***Count III (state law claims for nuisance, trespass, and fraudulent concealment and under the Florida Pollutant Discharge Prevention and Control Act (PDPCA))***:  ***First***, as described above, OCSLA preempts Plaintiffs' state law claims.  ***Second***, as described above, pursuant to *Ouellette* and its progeny, all Plaintiffs' state law claims are conflict preempted by the Clean Water Act and its NPDES regime.  ***Third***, even if there were a "substantial 'gap'" in federal law and, pursuant to OCSLA, Louisiana law could be borrowed as surrogate federal law for B1 Bundle claims against BP, Plaintiffs have no valid claim against BP under Louisiana law.  The Louisiana Oil Spill Prevention and Response Act (LOSPRA) is the exclusive state law remedy, and Plaintiffs do not assert a LOSPRA claim.  And, even if LOSPRA did not exist, Plaintiffs' nuisance, trespass, and fraudulent concealment claims fail to pass muster under Louisiana law.  ***Fourth***, even if Florida law was not preempted by OCSLA and the CWA, the PDPCA claim must be dismissed because it is inapplicable here.

- ***Count IV (punitive damages)***:  Plaintiffs' punitive damages count must be dismissed because (i) there is no cause of action for punitive damages and (ii) punitive damages are not recoverable under OPA.  *See S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65-66 (1st Cir. 2000) ("Congress's very specific treatment of oil pollution in the OPA, which does not provide for punitive damages, supplanted general admiralty and maritime law.").

- ***Counts V and VI (declaratory relief to impede settlement of OPA claims)***:  Plaintiffs seek to undermine the ability of parties to settle OPA claims with a declaration that any "settlement provisions" that purport to "release or affect the calculation the punitive damages" are "ineffective" (Count V) and a declaration that "the conduct of" BP and the GCCF "in obtaining releases and/or assignments of claims … is not an obligation of BP under OPA" (Count VI).  These Counts should be dismissed because they seek to undermine the purpose behind the OPA claims process "to encourage settlement and avoid litigation."  *Boca Ciega*, 51 F.3d at 238-39.  Releases waiving all claims are valid and facilitate settlement.  *See Ingram Corp. v. J. Ray McDermott & Co.*, 698 F.2d 1295, 1312 (5th Cir. 1983).

## COMPLAINT ALLEGATIONS AND BACKGROUND

**A.**    **The *Deepwater Horizon* Incident.**

The *Deepwater Horizon* drilling rig was owned and operated by Transocean Ltd. and/or its affiliates.  (B1 Compl. ¶ 220.)  BP hired Transocean to use the *Deepwater Horizon* to drill an exploration well on the seabed at Mississippi Canyon Block 252 (MC252) located in the Gulf of Mexico approximately 130 miles southeast of New Orleans and 50 miles southeast of Venice, Louisiana.  On April 20, 2010, a fire and explosion occurred onboard the *Deepwater Horizon*.  (*Id.* ¶ 198.)  The rig sank on April 22, 2010.  Following this incident, the well began to spill oil.

4

(*Id.* ¶ 199.)  The National Incident Command and Federal On Scene Coordinator working within the Unified Command Structure led by the United States Coast Guard, and joined by BP, as well as by other state/local partners, established and operated an extensive spill response operation.

## B.    BP's Commitment To Pay All Legitimate OPA Claims.

After the *Deepwater Horizon* incident, the Coast Guard designated BPXP a "responsible party" under the OPA.  OPA requires a "responsible party" to receive claims for removal costs and damages resulting from an oil spill compensable under OPA.  *See* 33 U.S.C. § 2702.

From the outset, BP expressed that it "is committed to paying all legitimate claims for damages resulting from the *Deepwater Horizon* Incident."  (Ex. 2.)  Acting on this commitment, BP initiated its OPA claims process within days of the incident.  During the four-plus months that BP managed its OPA claims process, from late April 2010 until August 23, 2010, BP made payments of nearly $400 million to individuals and businesses.  (*See id*.)  In this initial phase of the OPA claims process, BP focused upon providing interim payments to claimants.  (*See* Ex. 5.)

BP implemented agreed measures after meeting with President Obama on June 16, 2010[1]:

***First***, BP agreed to transition its process for individual and business claims to a facility administered by Kenneth Feinberg.  BP made this transition to Mr. Feinberg's Gulf Coast Claims Facility ("GCCF") on August 23, 2010.  The GCCF, and Mr. Feinberg as Claims Administrator, act in order to fulfill BP's obligations as an OPA "responsible party"; the GCCF and Mr. Feinberg exercise their own judgment with respect to evaluation and payment of claims. (*See* Ex. 8, GCCF "Frequently Asked Questions" at Questions 1, 3 and 4.)

***Second***, BP agreed to establish a $20 billion trust fund that is available to pay claims resolved by the GCCF, legitimate claims by state and local governments, natural resource

---

[1]  *See* Exs. 3, 6-9, BP, White House, and GCCF documents; *see also* MDL 2179, Statement Of United States Regarding The Court's February 2, 2011 Order, at 4-5 (Feb. 18, 2011) [Doc. 1322].

damage costs pertaining to the Spill, and final judgment or settlement agreements resolved outside the GCCF that relate to the Spill.  (Ex. 9.)  As of February 26, 2011, the GCCF has received claims from 492,775 claimants.   To date, at the direction of Mr. Feinberg, $3,501,808,909.03 has been paid from the $20 billion trust fund to individuals and businesses that filed claims with the GCCF.  (*See* Ex. 4, GCCF "Overall Program Statistics" at 1.)

The GCCF offers several options to claimants:  (1) *"Emergency Advance Payment" (a form of interim payment)*:  From August 23 to November 23, 2010, claimants could submit non-final, interim requests for emergency relief, for damages caused by the Spill, *without a release*. (2) *"Interim Payment"*:   From January 2011 through August 22, 2013 claimants may seek payment once each quarter of each calendar year for documented *past* damages caused by the Spill, *without a release*.  (3) *"Quick Payment"*:  A claimant who received an Emergency Advance Payment or Interim Payment may choose to sign a release and within 14 days be paid $5,000 if an individual or $25,000 if a business without having to submit any further documentation or undergo any further claims review.  (4) *"Full Review Final Payment"*:  Under this option, the claimant seeks a lump sum single payment for all losses and damages recoverable under OPA, both past and future, caused by the Spill, and must "submit documents that prove the losses or injuries…claim[ed to be] suffered as a result of the Spill."[2]

## C.    Plaintiffs Associated With The B1 Amended Master Complaint.

Plaintiffs in MDL 2179 before January 12, 2011 have not identified whether or not they are part of Pleading Bundle B1.  On January 12, 2011, this Court ordered that a revised Plaintiff Profile Form (PPF), which includes a B1 Bundle check box, be used for new complaints transferred to MDL 2179 and approved a short-form joinder with a B1 Bundle check box.  (PTO

---

[2] *See* Ex. 8, GCCF FAQs at Questions 14-17, 18-32, 33-53, 54-73; Ex. 10, GCCF Summary of Final and Interim Payment Options; Ex. 11, GCCF Protocol for Interim and Final Claims.

25 at ¶¶ 9, 16 [Doc. 983].)  Based upon BP's review of PPFs, there appear to be approximately 41,939 individual Plaintiffs in the B1 Bundle as of February 22, 2011.  Of these, about 40,002 are represented by the Watts Guerra Craft law firm ("Watts firm Plaintiffs"); approximately 1,937 are *pro se* or represented by various other counsel ("non-Watts firm Plaintiffs").  (*See* Ex. 12, Bloom Decl. re Dismissal of Indiv. Pls. at ¶¶ 7-9)

## STATUTORY FRAMEWORK

Three federal statutes are significantly implicated by the B1 Amended Master Complaint: (1) the Outer Continental Shelf Lands Act, (2) OPA, and (3) the Clean Water Act.

### A.     The Outer Continental Shelf Lands Act (OCSLA).

OCSLA declares that "the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition."  43 U.S.C. § 1332(1).  OCSLA establishes "***national authority over the OCS at the expense of both foreign governments <u>and</u> the governments of the <u>individual states</u>***."  *Tenn. Gas Pipeline*, 87 F.3d at 153 (emphasis added).  "We have recognized that OCSLA's jurisdictional grant is broad, and that the Act covers a wide range of activity occurring beyond the territorial waters of the states on the outer continental shelf of the United States."  *Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co.*, 448 F.3d 760, 768 (5th Cir. 2006) (citations and internal quotation marks omitted).  This Court has highlighted the breadth of OCSLA.  *See In re Oil Spill by the Oil Rig Deepwater Horizon*, MDL No. 2179, 2010 WL 3943451, at *3 (E.D. La. Oct. 6, 2010) ("The Fifth Circuit has held that the jurisdictional grant contained in § 1349(b)(1) is very broad [and this] reading of the jurisdictional grant of section 1349 is supported by the expansive substantive reach of the OCSLA.") (citations and internal quotation marks omitted).

OCSLA has many purposes, embracing not just resource extraction but (i) protection of the environment, (ii) consideration of the interests of affected States and local governments, and

(iii) harmonization of OCSLA with the operations of the OPA of 1990, which establishes the Oil

Spill Liability Trust Fund.  Specifically, OCSLA's relevant purposes are to:

> (2) ***preserve, protect, and develop oil and natural gas resources*** in the Outer Continental Shelf in a manner which is consistent with the need (A) to make such resources available to meet the Nation's energy needs as rapidly as possible, (B) ***to balance orderly energy resource development with protection of the human, marine, and coastal environments*** . . . .

> (4) ***provide States, and through States, local governments***, which are impacted by Outer Continental Shelf oil and gas exploration, development, and production ***with comprehensive assistance in order to anticipate and plan for such impact***, and thereby to assure adequate protection of the human environment; . . . .

> (6) ***assure that States, and through States, local governments***, which are directly affected by exploration, development, and production of oil and natural gas ***are provided an opportunity to participate in policy and planning decisions*** relating to management of the resources of the Outer Continental Shelf; . . . .

> (8) ***establish an oil spill liability fund*** to pay for the prompt removal of any oil spilled or discharged as a result of activities on the Outer Continental Shelf and for any damages to ***public or private interests*** caused by such spills or discharges;

43 U.S.C. § 1802 (emphasis added).

National authority over the Outer Continental Shelf (OCS) is exercised in two ways:

***First***, OCSLA "makes federal law exclusive in its regulation of the OCS . . . ." *Tenn.*

*Gas Pipeline*, 87 F.3d at 153; *see also* 43 U.S.C. § 1333*; Gulf Offshore*, 453 U.S. at 480-81

(1981) ("All law applicable to the [OCS] is federal law….").  To fill any "***substantial 'gaps'*** in

the coverage of federal law, OCSLA borrows the 'applicable and not inconsistent' laws of the

adjacent States as surrogate federal law." *Gulf Offshore*, 453 U.S. at 480-81 (quoting 43 U.S.C.

§ 1333(a)(2)) (emphasis added).[3]  OCSLA "casts a broad substantive net" and is "intended 'to

---

[3] *See also Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 349 (5th Cir. 1999); *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1052 (5th Cir. 1990)  ("Any other result here would frustrate the Congressional purpose that the OCS be treated as an area of exclusive federal jurisdiction within the state where state law will apply to fill in the gaps in the federal law."); *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985)  ("If the OCSLA was intended only to govern those cases directly implicating the regulatory and proprietary purposes of the Act, there would have been no need to make available such a broad legal base, including both civil and criminal laws, upon which courts could draw to fill in anticipated gaps in federal law.").

govern the **full range** of potential legal problems that might arise in connection with operations on the Outer Continental Shelf.'" *EP Operating*, 26 F.3d at 569 (5th Cir. 1994) (citation omitted and emphasis added).

**Second**, OCSLA grants federal District Courts broad jurisdiction to decide **any** dispute "arising out of, or in connection with" operations conducted on the OCS. *See* 43 U.S.C. § 1349(b)(1) ("[T]he district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf . . . .");[4] *see also EP Operating*, 26 F.3d at 569 (capacious jurisdictional grant in OCSLA matches its expansive substantive reach).

## B.    The Oil Pollution Act Of 1990 (OPA).

Congress enacted OPA "to create a **single** Federal law providing cleanup authority, penalties, and liability for oil pollution." S. Rep. No. 101-94, at 9 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722, 730 (emphasis added). OPA defines a category of "responsible parties" (33 U.S.C. § 2701(32)); requires "responsible parties" to pay specified cleanup costs ("removal costs") and damages "that result from" the incident, 33 U.S.C. §§ 2702(a), (b); and authorizes responsible parties to initiate contribution actions against "any other person who is liable or potentially liable" under OPA or another law, 33 U.S.C. § 2709. When a responsible party pays OPA claims, they are "subrogated to all rights, claims, and causes of action that the claimant has under any other law." *Id*. § 2715. Also, OPA reserves other claims a responsible party such as BP may have by providing that "[n]othing in this Act … bars a cause of action that a responsible

---

[4] OCSLA defines "minerals" to include oil. *See* 43 U.S.C. § 1331(q). The term "operation" is read expansively as "the doing of some physical act." *Amoco Prod. Co. v. Sea Robin Pipeline* Co., 844 F.2d 1202, 1207 (5th Cir. 1988).

party subject to liability under this Act … has or would have, by reason of subrogation or otherwise, against any person." *Id*. § 2710(c).

Non-governmental entities may recover the following under OPA:  (a) ***removal costs*** — costs incurred for acts taken "which are consistent with the National Contingency Plan;" (b) ***real or personal property*** — damages for "injury to, or economic losses resulting from destruction of, real or personal property" recoverable by claimants who own or lease property; (c) ***subsistence use*** — damages for "loss of subsistence use of natural resources" recoverable by any claimant who "uses natural resources which have been injured, destroyed, or lost"; and (d) ***profits and earning capacity*** — damages "equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources" recoverable by any claimant.  33 U.S.C. §§ 2702(b)(1), (2).[5]

When Congress passed OPA, it included within OPA's provisions amendments to the Clean Water Act § 311, 33 U.S.C. § 1321.  *See* Oil Pollution Act of 1990, Pub. L. No. 101-380, 104 Stat. 484 (Aug. 18, 1990) (OPA Sections 2002, 4201-4202, 4204, 4301, 4304-06 each amend Clean Water Act Section 311).  CWA Section 311 contains the federal executive branch oil spill cleanup authorities along with federal enforcement powers.[6]

Numerous agencies exercise authority under OPA.  The Coast Guard administers the Oil Spill Liability Trust Fund.  *See* 26 U.S.C. § 9509; OPA, 33 U.S.C. §§ 2701(11), 2712, 2716.

---

[5] Other OPA provisions delimit the available forms of damages relief.  *See* 33 U.S.C. § 2703 (providing defenses to liability); *id.* § 2704 (establishing limits on liability); *id.* § 2705 (covering interest awards and making provisions for the partial payment of claims; *id.* § 2707 (special provisions for recoveries by foreign plaintiffs); *id.* § 2708 (special provisions for recovery by responsible parties); and *id.* § 2713(c) (offering claimants an election of remedies between a private claims payout and going to court).

[6] *See* CWA § 311(c), 33 U.S.C. § 1321(c) (sets parameters for federal removal authority); CWA § 311(d), 33 U.S.C. § 1321(d) (concerns the National Contingency Plan; CWA § 311(j), 33 U.S.C. § 1321(j) (establishing the National Response System); CWA § 311(l)-(m), 33 U.S.C. § 1321(l)-(m) (miscellaneous administrative provisions); CWA § 311(b), 33 U.S.C. § 1321(b) (providing graduated monetary penalty regime for releases of oil); CWA § 311(e), 33 U.S.C. § 1321(e) (other civil enforcement provisions, including orders to protect the public health); and CWA § 311(f)-(i), 33 U.S.C. § 1321(f)-(i) (additional liability provisions).

EPA and the Coast Guard administer and enforce CWA Section 311, and NOAA oversees the natural resource damages assessment ("NRDA") process (natural resource damages themselves are referred to as "NRD").  *See* 33 U.S.C. § 2706.

The combined OPA/CWA Section 311 regime is complex and comprehensive — and even more so taking into account the regulations issued under its authority.  *See, e.g.*, 15 C.F.R. pt. 990 (NRD regulations); 33 C.F.R. pts. 133-38 (Coast Guard regulations).  The federal government's response to the *Deepwater Horizon* incident was particularly complex, drawing sixteen departments and agencies into the Unified Command process flowing out of the National Contingency Plan established under OPA and CWA Section 311.  (*See* Ex. 13.)

## C.    The Clean Water Act ("CWA") NPDES Regulatory Regime And The General Permit For Macondo Operations On The Outer Continental Shelf.

The CWA is a "complicated statute . . . where technical definitions are worked out with great effort in the legislative process."  *S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 380 (2006) (citing H.R. Rep. No. 92-911, at 125 (1972) ("[I]t is extremely important to an understanding of [§ 402] to know the definition of the various terms used[,] and a careful reading of the definitions . . . is recommended.  Of particular significance [are] the words '***discharge of pollutants***'') (emphasis added).  The point of the CWA Section 402 program is to "set allowable pollutant discharge limits for particular locations."  *Friends of the Earth v. Conrail*, 768 F.2d 57, 59 (2d Cir. 1985).  The term "***discharge of pollutants***" is relevant to this motion because, as the CWA has been interpreted by the Supreme Court, the source location of where the pollutant "discharge" initially occurs is of immense significance (*see infra* Part III.B., discussing the *Ouellette* case).  Here, it is indisputable that discharges comprising the *Deepwater Horizon* spill and sinking of the rig initially occurred exclusively in federal waters over the OCS.

In addition to CWA Section 311, the CWA's National Pollutant Discharge Elimination

System ("NPDES") is relevant here.  The general permit issued by EPA to govern Shelf operations for which Louisiana is the "adjacent State" describes the NPDES program as follows: "NPDES[] means the national program for issuing, modifying, revoking, and reissuing, terminating, monitoring, and enforcing permits, and imposing and enforcing pretreatment requirements, under section 307, 318, 402, and 405 of the Act."[7]  The Fifth Circuit has described the function of NPDES permits as "allow[ing] the issuer to assure that the applicant meets any applicable water quality standards, treatment standards, or schedule of compliance standards in addition to the basic effluent limitations."  *Carr v. Alta Verde Indus.*, 931 F.2d 1055, 1060 n.3 (5th Cir. 1991).  "NPDES permits may be either individual or general; that is, either site-specific or generally applicable to a whole category or subcategory of point sources.  General NPDES permits are permissible only where the point sources:  1) all involve the same or similar types of operations; 2) discharge the same types of wastes; and 3) require the same or similar monitoring. 40 C.F.R. § 122.28.  The EPA frequently uses such general permits for the oil and gas industry." *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 929 (5th Cir. 1998).

NPDES EPA General Permit 290000 applies to Macondo operations.  Shelf mineral lessees such as BP and mobile offshore drilling unit (MODUs) operators were permitted to opt into EPA General Permit 290000.  This NPDES permit establishes a range of restrictions on oil and gas operations (as well as for any similar operations on Shelf lands off the coast of Texas to those off the coast of Louisiana).  These restrictions range from limits on discharges of drilling fluid, oil, well treatment fluids, and produced water and sand, to discharges of garbage and sanitary waste from the human crews of drilling rigs.  (*See* Ex. 14, EPA General Permit 290000.)

---

[7] Ex. 14, NPDES General Permit for Discharges from the Offshore Subcategory of the Oil and Gas Extraction Category for the Western Portion of the Outer Continental Shelf of the Gulf of Mexico off the Coasts of Louisiana and Texas, 18 (June 7, 2007), *announced at* Notice of Final NPDES General Permit, 72 Fed. Reg. 31,575 (June 7, 2007) (valid until midnight, CST September 30, 2012) [hereinafter EPA General Permit 290000].

EPA General Permit 290000 states, in relevant part, as follows — carefully distinguishing between when it governs in federal waters and when it governs in state waters:

> In compliance with the Federal Water Pollution Control Act [another name for the CWA], as amended (33 U.S.C. 1251 et. seq. the "Act"), operators of lease blocks in the Oil and Gas Extraction Point Source Category located in *Federal waters* of the Western Portion of the Gulf of Mexico (*defined as seaward of the outer boundary of the territorial seas off Louisiana and Texas*) are authorized to discharge to the Western Portion of the Federal Waters of the Gulf of Mexico in accordance with the effluent limitations, monitoring requirements, and other conditions set forth in Parts I, II, and III hereof.
>
> Also, operators of lease blocks located *in the territorial seas of Louisiana and Texas* [i.e., not in a federal waters block such as MC252] are authorized to discharge produced water from wells located in those lease blocks to the Western Portion of the Federal Waters of the Gulf of Mexico in accordance with effluent limitations, monitoring requirements, and other conditions set forth in Parts I, II, and III hereof. *Operators of mobile offshore drilling units (MODUs) located in Federal Waters of the Western Gulf of Mexico are required to comply with the cooling water intake structure provisions of Part I.B.12 of this permit.*

(Ex. 14, EPA General Permit 290000, at 2 (paragraph break added).)

BP expressed its intention to be governed by this General Permit on February 23, 2009, and was assigned General Permit Number 290110.  (*See* Ex. 15, BP Ltr. to U.S. EPA.)

### ARGUMENT[8]

## I.      PLAINTIFFS HAVE NO VALID MARITIME CLAIMS AGAINST BP.

### A.      OPA Displaces Plaintiffs' Maritime Claims Against BP.

Count I alleges claims under general maritime law against BP for negligence, gross negligence, and willful misconduct.  These maritime claims must be dismissed because there is a federal statute directly on point — the Oil Pollution Act.  It is well-settled that federal common law claims apply only *in the absence of* an applicable federal statute.  Here, OPA squarely applies and provides a remedy for Plaintiffs.  OPA, accordingly, displaces all of Plaintiffs'

---

[8] BP reserves all rights to challenge underlying individual complaints of Bundle B1 Plaintiffs.

federal-common-law claims against BP arising out of discharge incidents — as federal courts across the nation (including courts in this District) have repeatedly held.

Where Congress enacts a federal statute on a subject previously controlled by federal common law, the federal statute displaces claims under the prior common law regime. That is because federal common law is "subject to the paramount authority of Congress," *New Jersey v. New York*, 283 U.S. 336, 348 (1931), and, thus, "when Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears." *City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 314 (1981) (*Milwaukee II*). Where Congress speaks — especially when it speaks comprehensively, as in OPA — it displaces preexisting federal common law. *See, e.g.*, *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 21-22 (1981) (the Clean Water Act displaced federal common law of nuisance in the area of ocean pollution). Indeed, the Supreme Court has held, to ensure that federal courts give due deference to Congress, there is a ***presumption in favor of displacement of common law claims*** when a new federal statute is adopted to control a particular subject area. *See Milwaukee II*, 451 U.S. at 317.

It is therefore well-settled that judge-created admiralty doctrines — a form of federal common law — must give way to the will of Congress reflected in a federal statute. The Supreme Court has noted: "[e]ven in admiralty, . . . where the federal judiciary's lawmaking power may well be at its strongest, it is our duty to respect the will of Congress." *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 96 (1981). In the context of maritime claims, "once Congress addresses a subject . . . the task of the federal courts is to interpret and apply statutory law, not to create common law." *Id.* at 95 n.34. Indeed, federal courts have found maritime law to be displaced by such statutes as the Clean Water Act, *see*

*United States v. Dixie Carriers, Inc.*, 627 F.2d 736, 738 (5th Cir. 1980), the Death on the High Seas Act, *see Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978), and the Equal Pay Act and Title VII of the Civil Rights Act of 1964, *see Nw. Airlines*, 451 U.S. at 95-97.

Congress acted to provide a comprehensive set of remedies against responsible parties for all cognizable forms of economic loss arising from oil spills in OPA.  Since Plaintiffs can seek recovery for their economic damages under OPA from responsible parties, they must do so, as those remedies are exclusive.  Plaintiffs cannot use maritime law to evade or add to the remedies chosen by Congress.  *Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*, 924 F. Supp. 1436, 1447 (E.D. Va. 1996), *aff'd*, 122 F.3d 1062 (4th Cir. 1997), *cert. denied*, 523 U.S. 1021 (1998) ("[The National Shipping Company of Saudi Arabia (NSCSA)] seeks to escape OPA's limitation provision by bringing multiple counts under general maritime law . . . .  [But] OPA clearly preempts maritime law as to recovery of cleanup expenses and the cost of compensating injured persons. A Court exercising its admiralty jurisdiction will apply the general maritime law **only in the absence of a relevant federal statute**.  *See East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986).  **In this case, OPA provides NSCSA with a remedy against Moran; it, therefore, preempts the general maritime law as to recovery of cleanup expenses and the cost of compensating third parties.**").  Similarly, the First Circuit recognized in *S. Port Marine*, displacement by OPA embraces the specific "'area covered by statute' . . . .  *See Miles* [*v. Apex Marine Corp.*, 498 U.S. 19, 31 (1990)] (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978))," and held that "Congress did so intend" for OPA "to supplant the existing general admiralty and maritime law."  234 F.3d at 65-66.

OPA displaces all maritime claims mounted against BP in the B1 Amended Master Complaint.  OPA provides the sole federal remedy for any claimant seeking recovery for

damages and/or cleanup costs resulting from an oil spill.  *See* 33 U.S.C. § 2702(a) (establishes damages and cleanup cost remedies "[n]otwithstanding any other provision or rule of law").  The scope of the remedies OPA authorizes is set out in 33 U.S.C. § 2702(b), which provides "a comprehensive list of recoverable damages, including:  [1] removal costs; damage to [2] natural resources and [3] real or personal property; [4] loss of subsistence use of natural resources; [5] loss of government revenues, [6] lost profits and earning capacity; and [7] costs of increased or additional public services occasioned by the unlawful act."  *S. Port Marine*, 234 F.3d at 64. The remedies recoverable under OPA are thus exclusive.  Any maritime remedy or theory of recovery not authorized by OPA is foreclosed.  *See Id.* at 65 ("[I]n an area covered by statute, it would be no more appropriate to prescribe a different measure of damage than to prescribe a different statute of limitations, or a different class of beneficiaries.").

Every federal court addressing the issue has held that OPA displaces preexisting, judge-made maritime claims of the sort Plaintiffs seek to bring against BP here.  In *Tanguis*, this Court held that "[t]his new scheme [OPA] includes new remedies, which, in many respects, preempt traditional maritime remedies."  153 F. Supp. 2d at 867.  In *Gabarick*, this Court held that "*all* claims that are recoverable under OPA," specifically those covered damages enumerated in § 2702, "are preempted by OPA."  623 F. Supp. 2d at 750-51 (emphasis added).  Courts in other jurisdictions agree.[9]  As courts have recognized, OPA is an expansive and inclusive system of liability regulation:  "OPA 'represents Congress' attempt to provide a comprehensive framework

---

[9] In *South Port Marine,* the First Circuit held that the "scheme is comprehensive" in oil discharge cases, and, thus, that OPA is "the sole federal law applicable in this area of maritime pollution."  234 F.3d at 65; *see also Seaboats, Inc. v. Alex C Corp.*, Nos. 01-12184-DPW, 01-12186-DPW, 00-12500-DPW, 2003 WL 203078, at *11 (D. Mass. Jan. 30, 2003) (dismissing claims under maritime contribution and indemnity where OPA had provided for recovery of those damages); *Nat'l Shipping Co. of Saudi Arabia*, 924 F. Supp. at 1447 ("OPA clearly preempts maritime law as to recovery of cleanup expenses and the cost of compensating injured persons.").

in the area of marine oil pollution." *Tanguis*, 153 F. Supp. 2d at 867.[10]  Congress observed that OPA "creates a single federal law providing clean up authority, penalties, and liability for oil pollution."  S. Rep. No. 101-94, at 9 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722, 730.

Plaintiffs' maritime claims alleged against BP in Count I fall squarely within the scope of OPA.  Certainly, Plaintiffs can point to no gap in OPA that would rebut the presumption in favor of displacement that exists in these circumstances.  As a matter of federal law, Plaintiffs' federal common-law maritime claims against BP are displaced by OPA and must be dismissed.

## B.   Even If Plaintiffs' Maritime Claims Were Not Displaced By OPA, They Must Be Dismissed Pursuant To The *Robins Dry Dock* Rule.

Even if Plaintiffs' maritime claims against BP were not displaced by OPA, they should be dismissed for an independent reason.  Plaintiffs' maritime claims are barred by *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 309 (1927), which prohibits for general maritime law tort claims recovery of economic losses absent physical injury to a proprietary interest.  *See In re Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d 371, 377 (5th Cir. 2006) ("It is unmistakable that the law of this circuit does not allow recovery of purely economic claims absent physical injury to a proprietary interest in a maritime negligence suit.").

To avoid the *Robins Dry Dock* rule, a maritime plaintiff must demonstrate that (1) it possesses a sufficient and cognizable interest in the property allegedly damaged; and (2) the property suffered physical injury such that the situation is not one involving mere economic injury to the property interest holder.  Plaintiffs' claims fail under both prongs of the *Robins Dry*

---

[10] *See also Targa Midstream Servs. Ltd. P'ship v. K-Sea Transp. Partners, LP*, No. G-05-629, 2006 WL 2520914, *2 (S.D. Tex. Apr. 20, 2006) ("OPA created a stricter and more comprehensive liability scheme for oil spill pollution than had existed under prior legislation . . . ."); *Rice v. Harken Exploration Co.*, 89 F. Supp. 2d 820, 822 (N.D. Tex. 1999) ("[OPA] represents Congress's attempt to provide a comprehensive framework in the area of marine oil pollution."); *cf. Gatlin Oil Co., Inc. v. United States*, 169 F.3d 207, 209 (4th Cir. 1999) (Congress enacted OPA to provide a "prompt, federally-coordinated response to oil spills in navigable waters of the United States and to compensate innocent victims.").

*Dock* test.  *See, e.g.*, *G&G Steel, Inc. v. Sea Wolf Marine Transp., LLC*, 380 Fed. Appx. 103, 104-05 (2d Cir. 2010) (charterer of a barge's duty to maintain it in good condition and pay a $50,000 insurance deductible did not give it enough of a proprietary interest in the barge to meet the *Robins Dry Dock* test); *Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1031-32 (5th Cir 1985) (en banc) (affirms summary judgment for defendants pursuant to *Robins Dry Dock* where boat operators, seafood enterprises, bait shops, and recreational fishermen brought general maritime claims were seeking purely economic damages resulting from chemical spill).[11]

Nowhere do Plaintiffs allege they suffered physical injury to a proprietary interest.  (B1 Compl. ¶¶ 569-677.)[12]  The "Commercial Fishermen Plaintiffs" and "Processing and Distributing Plaintiffs" meet neither prong of *Robins Dry Dock* — they do not own the seafood and their injuries are economic.  (*Id.* ¶¶ 209(a)-(b), 614-15.)   "Commercial Business Plaintiffs," "Recreational Business Plaintiffs," "Recreation Plaintiffs," and "Plant and Dock Worker Plaintiffs" do not allege any ownership interest, and only consequential economic losses.  (*Id.* ¶¶ 209(c)-(f), 616-19.)  The same is true for "Banking/Retail Business Plaintiffs," "Subsistence Plaintiffs," "Dealer Plaintiffs," and "Moratorium Plaintiffs."  (*Id.* ¶¶ 209(j)-(m), 623-626.)

Count I.A.-B. must therefore be dismissed for the additional reason that Plaintiffs do not

---

[11] *See also Kingston Shipping Co. v. Roberts*, 667 F.2d 34, 35 (11th Cir. 1982) (applying *Robins Dry Dock* to affirm dismissal of negligence claims alleging pure economic damages, and rejecting attempts to question the rule's validity); *In re Settoon Towing LLC*, No. 07-1263, 2009 WL 4730969, at *3 (E.D. La. Dec. 4, 2009) (*Robins Dry Dock* bars recovery for pure economic damages from oil well owner's inability to access the oil platform due to a spill); *Blue Gulf Seafood, Inc. v. TransTexas Gas Corp.*, 24 F. Supp. 2d 732, 734-35 (S.D. Tex. 1998) (dismissing claims of unlicensed oyster farmers who alleged pure economic losses as a result of defendants' negligent acts).

[12] While Plaintiffs do allege that "Real Property Plaintiffs" and "Real Property/Tourism Plaintiffs" have "suffered, *inter alia*, damage to their real and personal property," (*see* B1 Compl. ¶¶ 621-622), they have not specified that such "damage" was a "physical injury" or that the injury was to a "proprietary interest."  Moreover, in the "Real Property/Tourism Plaintiffs" the Plaintiffs are mixing in claimants who might be able to meet the ownership prong of the *Robins Dry Dock* test (*e.g.*, hotel owners) with "all those who earn their living from the tourism industry" (*Id.* ¶ 209(i).)  Obviously, many of those earning their living from the tourism industry would not be even remotely eligible to claim an ownership interest in property damaged by oil.  Similarly, for "VoO Plaintiffs," (*Id.* ¶ 620) Vessel of Opportunity operators who did not experience boat damage improperly are lumped together with those that did.

satisfy the *Robins Dry Dock* rule that purely economic claims absent physical injury to a proprietary interest are not recoverable in admiralty.  Also, BP moves to dismiss the maritime claims of 40,002 Watts firm Plaintiffs and 1,752 non-Watts firm Plaintiffs who do not allege physical injury to a proprietary interest in their complaints or PPFs, and reserves the right to supplement this list.  (*See* Ex. 12, Bloom Decl. re Dismissal of Indiv. B1 Pls. at ¶¶ 40-48 & Tabs K-1, K-2)

## II.   PLAINTIFFS' OPA CLAIMS MUST BE DISMISSED FOR FAILURE TO SATISFY OPA'S CLAIM PRESENTATION REQUIREMENT.

Plaintiffs' OPA claims against BP (Count II) fail to satisfy OPA's compulsory claim presentation requirement.  Not only must Count II be dismissed, so too must Plaintiffs' underlying B1 Bundle complaints.  Plaintiffs' OPA claims are not yet ripe for adjudication, and may never be.  Also, OPA claims by "VoO Plaintiffs" must be dismissed because OPA does not permit recovery for injuries that do not result from the Spill.  Finally, Plaintiffs' request for natural resource damages is not viable because OPA does not allow private recovery of NRDs.

### A.   Plaintiffs Must Satisfy OPA's Claim Presentation Requirement *Before* Filing Suit.

Every would-be B1 Bundle Plaintiff must satisfy OPA's compulsory two-step claim presentation process *before* filing suit against BP.  *First*, the claimant must "present" a claim to the GCCF (or to BP if before the GCCF's establishment).  *See* 33 U.S.C. § 2713(a).  *Second*, the claimant may not file a lawsuit until either (a) the claim is denied or (b) a 90-day negotiation period has expired without settlement of the claim — a period that begins to run after the claim has been "presented."  *See id.* § 2713(c) [13]

---

[13] OPA's mandatory pre-suit presentment requirement is set forth in 33 U.S.C. § 2713.  Subpart (a) provides that "*all claims* for removal costs or damages *shall be presented first to the responsible party* or guarantor of the source designated under section 2714(a) of this title."  *Id.* § 2713(a) (emphasis added).  Pursuant to subpart (c), only *after* "a claim is presented in accordance with subsection (a) of this section," and "(1) each person to whom the claim is presented denies all  liability for the claim," or "(2) the claim is not settled by any person by payment within 90 days after the date upon which (A) the claim was presented, or (B) advertising was begun pursuant to section 2714(b) of

Congress created the mandatory OPA claims presentation requirement to encourage settlement and prompt resolution of claims arising from an oil spill.   Representative Hammerschmidt explained in urging passage of OPA, "[t]he system of liability and compensation provided for in the bill . . . *is intended to allow for quick and complete payment of reasonable claims without resort to cumbersome litigation*."   135 Cong. Rec. H7965 (daily ed. Nov. 2, 1989) (emphasis added); *see also Turner*, 2007 WL 4208986 at *2 ("The purpose of the OPA notice requirement is to promote settlement *and avoid litigation*.").

Compliance by every Plaintiff with OPA § 2713 *before* filing suit is not a mere "administrative" requirement as Plaintiffs assert.   (B1 Compl. ¶ 689.)   Rather, compliance is a "*mandatory condition precedent*" to filing suit in court.   *Boca Ciega*, 51 F.3d at 240.   In this regard, *courts do not have discretion to stay a complaint until OPA presentment is met.*   OPA claims must be "dismissed without prejudice, rather than stayed" if § 2713 was not satisfied. *Gabarick*, 2009 WL 102549 at *2; *see also Turner*, 2007 WL 4208986 at *2 ("The Court will not waive the notice requirement under OPA."); *Abundiz v. Explorer Pipeline Co.*, Nos. 300CV2029H, 303CV0508H, 303CV0787H, 2003 WL 23096018, at *5 (N.D. Tex. Nov. 25, 2003) (presentment "must be given prior to the 90 days before filing a lawsuit;" interrogatory responses "may not be taken into account as part of any [OPA] notice"); *Johnson v. Colonial Pipeline Co.*, 830 F. Supp. 309, 310 (E.D. Va. 1993) ("If plaintiffs fail to comply with the prerequisites for bringing such a claim, the OPA claim must be dismissed.").

In holding that dismissal is mandatory if a plaintiff failed to comply with OPA's claim presentation requirement before filing suit, courts point to *Hallstrom v. Tillamook Cnty.*, 493

---

this title, whichever is later, the claimant may elect to commence an action in court against the responsible party or guarantor or to present the claim to the [Oil Spill Trust] Fund." *Id.* § 2713(c).   "Claim" is defined as "a request, made in writing for a *sum certain*, for compensation for damages or removal costs resulting from an incident." *Id.* § 2701(3) (emphasis added). *See Berthelot v. Boh Bros. Constr. Co.*, No. 05-4182, 2006 WL 2256995, at *7 (E.D. La. July 19, 2006) (no jurisdiction if § 2713 is not met).

U.S. 20 (1989). *See Abundiz*, 2003 WL 23096018 at *3; *Johnson*, 830 F. Supp. at 310. At issue in *Hallstrom* was the notice provision of the Resource Recovery Act (RCRA) which provides that no citizen suit can be filed prior to sixty days after the plaintiff has given notice of the alleged RCRA violation to the alleged permit violator and regulators. 493 U.S. at 25-26 (interpreting 42 U.S.C. § 6972(b)(1)). Plaintiffs argued for a "flexible or pragmatic construction" of the RCRA provision such that any defect in compliance could be cured by the court staying the lawsuit until proper notice was given. *Id*. at 26. The Supreme Court rejected this idea holding that courts cannot "disregard the plain language" of a statute, and "we are not at liberty to create an exception where Congress has declined to do so." *Id*. at 26-27, 31. Likewise, federal courts are not at liberty to allow exceptions to OPA's compulsory claim presentation rule.

Importantly, the mere filing of a bare claim is insufficient either to satisfy OPA's requirement to "present" a claim and start the clock running on the 90-day negotiation period. Instead, to "present" a claim, a claimant must specify the amount of damages being sought (referred to as a "sum certain," *see* 33 U.S.C. § 2701(3)), ***and*** provide evidence and information sufficient for the GCCF (or, in the past, BP) to assess (i) whether the alleged loss satisfies OPA's causation requirements[14] and (ii) whether the claimant incurred the amount of damages alleged.

Courts are rigorous in their review on motions to dismiss, and hold would-be plaintiffs to the requirement of Section 2713 that they "present" their OPA claim. Judge Fallon has explained: "If the claim does not have the ***necessary specificity***, the responsible party will be unable to make a[n] informed offer of settlement." *Turner*, 2007 WL 4208986 at *2 (grants

---

[14] Pursuant to OPA, a "responsible party" is liable only for specified damages "result[ing] from" the incident, 33 U.S.C. § 2702(a), and OPA further includes specific causation requirements for each permissible category of damages. For example, OPA provides that only losses "resulting from destruction of, real or personal property" may be recovered as property damages. *Id*. § 2702(b)(2)(B). And, OPA mandates that only losses "due to the injury, destruction, or loss of real property, personal property, or natural resources" are recoverable as lost earnings or profits. 33 U.S.C. § 2702(b)(2)(E). Also, OPA requires that a claimant must "use[] natural resources which have been injured, destroyed or lost" in order to recover subsistence damages. 33 U.S.C. § 2702(b)(2)(C).

motion to dismiss where § 2713 not met).  Granting a motion to dismiss, the *Johnson* court held:

> **[T]the purpose of OPA's claim presentation requirement is to enable the parties to negotiate, if possible, a settlement** of potential claims resulting from an oil spill without having to resort to litigation. . . .  **In order to accomplish this purpose, the claim presented must inform the responsible party with some precision of the nature and extent of the damages alleged and of the amount of monetary damages claimed.**  Otherwise, the responsible party will be unable to make an informed offer of its own, unable to engage in meaningful substantive negotiations, and thus unable to settle the matter by agreeing to a final amount. **Instead, the responsible party will have to ask for a more definite statement of the claim, as Colonial has done here, and the 90-day period will be spent trying to obtain basic information rather than actually negotiating a settlement.**

830 F. Supp. at 311 (emphasis added).  In *Johnson*, the court reviewed a letter by plaintiffs which purported to present an OPA claim, and held that the letter was "plainly inadequate": "**Plaintiffs make no effort to describe the nature or extent of these alleged damages, much less to explain the basis for claiming that these damages have been sustained.  They fail to state a sum certain for any of the types of damages alleged.**" *Id.* (emphasis added).  Likewise, in *Gabarick* the court reviewed an invoice submitted by plaintiff and ruled that it did not satisfy OPA's "statutory requirements for a proper claim" because it "has not described the manner in which the oil spill impacted it, **nor has it cited evidence in support of its purported claim**." 2009 WL 102549 at *21 (emphasis added); *see also Abundiz*, 2003 WL 23096018 at *3-5 (court reviewed Excel files and a letter plaintiffs' submitted to the responsible party, found them "ambiguous" as to the amount in dispute, and held that plaintiffs "did not successfully meet the sum certain presentation requirement of the OPA").

## B.      Plaintiffs Did Not Satisfy OPA's Claim Presentation Rule Before Filing Suit.

Plaintiffs admit that not all among them satisfied OPA's claim presentation requirement, and the PPFs prove this to be true.  Thus, Count II is defectively pled, and the underlying suits by Plaintiffs who did not comply with 33 U.S.C. § 2713 must be dismissed pursuant to Rule

12(b)(1) and/or Rule 12(b)(6).[15]

Based upon Plaintiffs' B1 Amended Master Complaint allegations, there can be no doubt

that various Plaintiffs did not satisfy OPA's claim presentation requirement before fling suit:

> To the extent required by law, and/or by consent or stipulation of BP, **Plaintiffs have satisfied, _or will have satisfied_, all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b),** as to each and all defendants, by the submission of their claims to the Gulf Coast Claims Facility (the "GCCF") and/or BP and/or its agents or designees.

(B1 Compl. ¶ 689 (emphasis added).)

The task of identifying whether or not each individual Plaintiff satisfied OPA § 2713

before filing suit has fallen to BP.  Nowhere do individual Plaintiffs themselves affirmatively

represent that they have complied with § 2713 — not in their underlying complaints and not in

their PPFs.[16]   At a minimum, individual Plaintiffs should be required to affirmatively plead

compliance with § 2713, and individual Plaintiffs who acknowledge that they have not satisfied

§ 2713 should be required to identify themselves.

Nonetheless, based upon review of PPFs and information provided to date by the GCCF

---

[15] Just as the Supreme Court in *Hallstrom* reasoned that it need not decide whether RCRA's notice provision was "jurisdictional or procedural" because "[a]s a general rule, if an action is barred by the terms of a statute, it must be dismissed," 493 U.S. at 31, this Court need not decide whether OPA's claim presentation provision is "jurisdictional or procedural" because dismissal is required by "literal interpretation" of 33 U.S.C. § 2713. *See id.*  Courts dismiss OPA claims under either Rule 12(b)(1) or Rule 12(b)(6) when § 2713 is not met.  *See Boca Ciega*, 51 F.3d at 240 (holds court lacks subject matter jurisdiction absent a plaintiff's compliance with § 2713(a)); *Gabarick*, 2009 WL 102549 at *3 (§ 2713(c) is a "jurisdictional condition precedent"); *Turner*, 2007 WL 4208986 at *1-2 (grants Rule 12(b)(6) motion for failure to comply with § 2713); *Berthelot*, 2006 WL 2256995 at *7 (court lacks jurisdiction where OPA claim presentation prerequisite has not met); *Abundiz*, 2003 WL 23096018 at *3 (dismisses for failure to satisfy § 2713 due to lack of "subject matter jurisdiction"); *Marathon Pipe Line Co. v. LaRoche Indus. Inc.*, 944 F. Supp. 476, 477 (E.D. La. 1996) ("The Court agrees that § 2713's presentation requirement is jurisdictional and mandates dismissal when that provision is applicable and not complied with by the claimant."); *Johnson*, 830 F. Supp. at 310-11 (dismisses for failure to comply with § 2713; no indication if pursuant to Rule 12(b)(1) or 12(b)(6)).

[16] Of the 41,939 PPFs filed to date by Plaintiffs who appear to fit within the B1 Bundle, 41,529 are associated with underlying complaints that do not even allege an OPA count.  Of the 410 PPFs associated with underlying complaints that do include an OPA count, only three complaints include *any* assertion that the plaintiff satisfied OPA's presentment requirement.  Allegations in the three complaints are cursory; each alleges: "On or about [date], [plaintiff] 'presented' a claim for damages to BP pursuant to, and in compliance with, all applicable rules, regulations, and laws, including, but not limited to, 33 U.S.C. § 2701, et seq."  (*See* Ex. 12, Bloom Decl. re Dismissal of Indiv. B1 Pls. at ¶¶ 10-15 & Tabs A, B, C)

pursuant to PPF authorizations, BP specifically moves to dismiss the following individual Plaintiffs for failure to satisfy OPA § 2713 before filing suit, (Ex. 12, Bloom Decl. re Dismissal of Indiv. B1 Pls.):

- Plaintiffs who admit they have not filed an OPA claim with BP or the GCCF because they did not check either box on their PPF form, and, thus, do not satisfy § 2713(a).  This includes 14,492 Watts firm Plaintiffs and 584 non-Watts firm Plaintiffs.  (*Id.* at ¶¶ 16-21 & Tabs D, E)

- Plaintiffs who have sought only interim payment from BP or only emergency advance payments and/or interim payments from the GCCF, so have yet to submit a claim for the full amount of OPA damages they are seeking, and, thus, do not satisfy the "sum certain" requirement of § 2713(a).  This includes 976 non-Watts firm Plaintiffs.  (*Id.* at ¶¶ 22-27, 37-39 & Tabs F, J)

- Six non-Watts firm Plaintiffs who have chosen the Quick Payment Final Claim option with the GCCF, and, thus, have chosen to accept a final payment and to release and waive any claims against BP and all other parties with regard to the oil spill.  (*Id.* at ¶¶ 28-30 & Tab G)

- Fourteen non-Watts firm Plaintiffs who have submitted final claims to the GCCF, but the 90-day negotiation period has not passed.  Thus, regardless of whether their GCCF submissions satisfy § 2713(a), none of these Plaintiffs have satisfied § 2713(c).  (*Id.* at ¶ 31-33 & Tabs H)

- Plaintiffs who have submitted a final claim to the GCCF, but did not provide a "sum certain" and/or provided insufficient evidence thereby failing to "present" a claim as required by Section 2713(a).  This category includes 24 non-Watts firm Plaintiffs.  (*Id.* at ¶¶ 34-36 & Tab I)

BP's review of underlying complaints, PPFs, and information released by the GCCF pursuant to PPF authorizations is ongoing.  For example, with regard to 25,510 PPFs for Watts-firm Plaintiffs indicating on their PPFs that they have filed a claim with the GCCF, the GCCF has not yet produced any information in response to the PPF authorizations.  (*Id.* at ¶¶ 23-25).  BP reserves its right to seek dismissal of additional individual Plaintiffs as more information and analysis becomes available.

**C.      OPA Does Not Apply To The Claims Alleged By "VoO Plaintiffs."**

Even if VoO Plaintiffs had fulfilled OPA's claim presentation requirement, their claims

must be dismissed because OPA does not apply.  The VoO Program was spill response program under which BP entered into contracts with local vessel owners who agreed to use their vessels to assist in spill response activities.  (B1 Compl. ¶¶ 506-07; Ex. 16, About VoO Program.)  The complaint defines "VoO Plaintiffs" as "[b]oat captains, crew, charterers, workers, and/or volunteers involved in the VoO program."  (B1 Compl. ¶ 209)(g).)  The VoO Plaintiffs allege they were damaged because:  (i) they were "not adequately compensated for *their work or time in the VoO program*"; and, (ii) their property was damaged "*as a result of their work in the VoO program*."  (*Id.* ¶ 209(g).) (emphasis added).  The VoO Plaintiffs do not state a claim under OPA because they concede their damages are a result of the VoO program participation, not a result of the oil spill.

A claimant may only recover under OPA if their damages result from a covered  incident.  *See* 33 U.S.C. § 2702 ("[n]otwithstanding any other provision or rule of law . . . each responsible party for a vessel or a facility from which oil is discharged . . . into or upon the navigable waters or adjoining shorelines . . . is liable for the removal costs and damages specified in subsection (b) of this section *that result from such incident*."); *Taira Lynn*, 444 F.3d at 382 ("In order to recover under § 2702(b)(2)(B) a plaintiff must show that her property was damaged as a result of a release or threatened release of oil."); *Gatlin Oil Co. v. United States*, 169 F.3d 207, 211 (4th Cir. 1999) ("[R]emoval costs and damages specified in section 2702(b) are those that result from a discharge of oil or from a substantial threat of a discharge of oil into navigable waters or the adjacent shoreline.").  Here, VoO Plaintiffs' admit their damages did not result from the oil spill but instead from participation in the VoO Program.  (B1 Compl. ¶ 209(g).)  Where OPA claimants' damages do not result from an oil spill incident, their OPA claims must be dismissed.  *See  Gatlin*, 169 F.3d at 210-12 (OPA inapplicable to damages from a fire following an oil spill).

**D.      OPA Does Not Permit Private Recovery Of Natural Resource Damages.**

Plaintiffs' NRD claim (B1 Compl. ¶ 685) cannot proceed because OPA does not allow for private recovery of NRD's.  Under OPA, NRD's are recoverable only by "a United States trustee, a State trustee, an Indian tribe, or a foreign trustee."  33 U.S.C. § 2702(b)(2)(A).

**III.     PLAINTIFFS HAVE NO VALID STATE LAW CLAIMS AGAINST BP.**

Count III appears to assert trespass, nuisance and fraudulent concealment claims under the law of every Gulf Coast State and perhaps beyond.  And Plaintiffs assert a Florida Pollutant Discharge Prevention and Control Act (PDPCA) claim, yet conspicuously omit to bring a Louisiana Oil Spill Prevention and Response Act (LOSPRA) claim.  These state law claims are not valid and must be dismissed:

- ***First***, **under OCSLA, Louisiana, as the "adjacent State," is the only State whose laws could conceivably be applied as borrowed surrogate federal law** to claims arising out of the *Deepwater Horizon* oil spill.  **The laws of Alabama, Florida, Mississippi, and Texas (or beyond) are preempted pursuant to OCSLA** and can have no application to the incident.

- ***Second***, **under the Supreme Court's Ouellette line of precedent, the law of all impacted States (Louisiana included) is preempted by the CWA**.

- ***Third***, **there is no role here for Louisiana law as borrowed surrogate federal law pursuant to OCSLA** because the comprehensive Clean Water Act and OPA regimes leave no gap in federal law as to claims against BP, and hence there is no gap needing to be filled by the law of the adjacent State.

- ***Fourth***, **even if there was a "gap" in federal law such that Louisiana law was applicable to claims against BP as borrowed surrogate federal law, Plaintiffs have no valid claims under Louisiana law**: (a) LOSPRA would provide the exclusive remedy, and Plaintiffs do not assert a LOSPRA claim; and (b) even absent LOSPRA, Plaintiffs do not allege the Louisiana law prerequisites for nuisance, trespass and fraudulent concealment claims.

- ***Finally***, **even if Florida law was not preempted by the CWA and OCSLA, Plaintiffs' claims under the PDPCA must be dismissed because it is inapplicable here**.

**A.      Pursuant To OCSLA, The Laws Of Non-Adjacent States, Such As Alabama, Florida, Mississippi and Texas, Are Preempted and Cannot Apply Here.**

To the extent Plaintiffs assert non-Louisiana state law claims under Count III, they must

be dismissed because OCSLA specifies that federal law must apply to operations on the Shelf, and dictates that only the laws of a single "adjacent State" may be borrowed as surrogate federal law in the event of a gap in actual federal law. Plaintiffs' alleged damages stem from operations on the Shelf, namely the discharge of oil from MC252, and Louisiana is indisputably the "adjacent State." Thus, the laws of non-adjacent States have no application here.

OCSLA establishes the Shelf as a "federal enclave" such that federal law applies to operations there. *See* 43 U.S.C. § 1332(1) ("[T]he subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control and power of disposition.").[17] Accordingly, under OCSLA:

> The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were ***an area of exclusive Federal jurisdiction located within a State*** . . . .

*Id.* § 1333(a)(1) (emphasis added). The Supreme Court has explained that "[t]he intent behind OCSLA was to treat the artificial structures covered by the Act as upland islands or as ***federal enclaves*** within a landlocked State." *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 217 (1986) (emphasis added).[18] As the Fifth Circuit explained, OCSLA establishes "national

---

[17] Areas of "exclusive Federal jurisdiction located within a State" are known as "federal enclaves." *See, e.g.*, BLACK'S LAW DICTIONARY (9th ed. 2009) ("Examples of federal enclaves are military bases, national parks, federally administered highways, and federal Indian reservations. The U.S. government has ***exclusive authority and jurisdiction*** over federal enclaves.") (emphasis added).

[18] *See also Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 355 (1969) ("[OCSLA] makes it clear that federal law, supplemented by state law of the adjacent State, is to be applied to these artificial islands as though they were federal enclaves in an upland State."); *Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co.*, 448 at 772 (5th Cir. 2006) (same), *amended in irrelevant part on reh'g*, 453 F.3d 652 (5th Cir. 2006); *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 498 (5th Cir. 2002) ("a device temporarily attached to the seabed, which was erected on the OCS for the purpose of drilling for oil" falls within the scope of § 1333(a)(1)), *overruled in irrelevant part by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009) (en banc).

authority over the OCS at the expense of both foreign governments and the governments of the individual states" and "***makes federal law exclusive in its regulation of the OCS*** . . . ." *Tenn. Gas Pipeline*, 87 F.3d at 153 (emphasis added).

State law, accordingly, does not apply to actions stemming from operations on the Shelf unless it applies under OCSLA.  And OCSLA makes clear that only the law of the "adjacent state" applies as borrowed federal law to fill in gaps in actual federal law:

> ***To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations*** of ***the*** Secretary now in effect or hereafter adopted, the civil and criminal ***laws of each adjacent State***, now in effect or hereafter adopted, amended, or repealed ***are declared to be the law of the United States*** for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf, and the President shall determine and publish in the Federal Register such projected lines extending seaward and defining each such area.

43 U.S.C. §1333(a)(2)(A).[19]  *Cf.*  Assimilative Crimes Act, 18 U.S.C. § 13 (incorporating the law of the State in which a federal enclave is situated to act as surrogate federal law).  As the Fifth Circuit explained, the law of the "adjacent state" is applied only "to fill in the gaps in the federal law." *Union Tex. Petroleum* Corp. *v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1052 (5th Cir. 1990).

Louisiana is the "adjacent state" for application of OCSLA to the *Deepwater Horizon* incident and resulting discharge of oil from MC252.[20]  *See In re Oil Spill*, 2010 WL 3943451 at

---

[19] OCSLA Section 1333(a)(2) is often called OCSLA's "choice of law" provision, but this is a misnomer.  Choice of law matters involve situations in which there are one or more candidate bodies of law that a court might be able to apply based on a set of balancing tests applied to the individual facts of a case in which the parties might be diverse or their conduct touches multiple jurisdictions, or where, in a contractual setting, the parties to a contract made a selection for a particular jurisdiction's law at the time of formation.  There is no "choice" involved in § 1333(a)(2)(A) because, as it has been interpreted by the Fifth Circuit, it directs the application of federal law where it exists, or the law of a single, adjacent State for gap-filling purposes. *See, e.g.*, *Union Tex. Petroleum*, 895 F.2d at 1052.  The provision thus must be read as a mandatory directive by Congress as to what law controls the Shelf's territory and activities, not as an invitation to judicial discretion as to which body of law to select.

[20] "[F]our types of evidence" are considered by a district court to determine which State is adjacent to an OCS location:  "(1) geographic proximity; (2) which coast federal agencies consider the subject platform to be 'off of'; (3) prior court determinations; and (4) projected boundaries." *Snyder Oil Corp. v. Samedan Oil Corp.*, 208 F.3d

*3 ("Defendants were exploring and producing minerals, namely oil, from the outer Continental Shelf. It is these activities that allegedly caused the April 20, 2010 explosion and the resulting oil spill."). The OCSLA system of regulation and the very idea of a federal enclave would be nullified if multiple state laws could supply statutory or tort duties to operations on the Shelf to impose on rig owners, lessees, and operators a hodgepodge of duties governing the same project or set of operations. Thus, Plaintiffs' non-Louisiana state law claims must be dismissed.

**B.      Pursuant To The Supreme Court's *Ouellette* Line Of Precedent, The Clean Water Act's Comprehensive Regime Preempts *All* Of The Plaintiffs' State Law Claims, Including Claims Under The Laws Of Louisiana.**

Plaintiffs' attempt to assert **state** law claims against BP runs afoul of *Ouellette*, 479 U.S. 481, and its progeny. *Ouellette* flatly barred an impacted State from applying its tort laws to water pollution originating outside that State, in a different source State. As this line of cases establishes, regulation of interstate water pollution is a matter of federal law alone pursuant to the Clean Water Act. Only the tort laws and regulations of the **source** State from which the water pollution originates may be applied. Here, the pollution originates from oil spilled from MC252 on the Shelf in the Gulf of Mexico, so the source location is a federal enclave rather than a State. This makes *Ouellette* preemption even stronger because OCSLA's applicability means that only federal law can regulate water pollution from Shelf waters, not the laws of the impacted Gulf Coast States. As noted above, under OCSLA, **federal** law applies exclusively to Shelf operations, and to the extent Louisiana law could ever apply, it would only be by virtue of

---

521, 524 (5th Cir. 2000). With regard to MC252, where the incident occurred, Louisiana is geographically closer than any other Gulf Coast State. (*See* Ex. 17, *Deepwater Horizon* Incident Map.) Courts have concluded that OCS locations within the Mississippi Canyon field are adjacent to the State of Louisiana and have applied Louisiana law as surrogate federal law. *See, e.g.*, *Ronquille v. MMR Offshore Servs., Inc.*, 353 F. Supp. 2d 680 (E.D. La. 2004) (Mississippi Canyon Block 809); *Dennis v. Bud's Boat Rental, Inc.*, 987 F. Supp. 948 (E.D. La. 1997) (Mississippi Canyon Block 20). Lastly, if the state boundary between Louisiana and its bordering Gulf Coast States is projected seaward, the incident would be located on the Louisiana side of such boundaries. Judicial notice has been taken of the applicable factors of the *Snyder Oil* test. *See Bourg v. BT Operating Co.*, No. H-08-0596, 2009 WL 960011, at *4 (S.D. Tex. Apr. 8, 2009) (considers maps and online resources to find "Louisiana is clearly the nearest state").

Louisiana being the "adjacent state" such that OCSLA would need to borrow Louisiana law as federal law to gap fill.  But given the comprehensiveness of the CWA regulatory regime as recognized in *Ouellette* and that regime's indisputable applicability to the Shelf, no such gap exists here as to BP or any party covered by EPA General Permit 290000.

*Ouellette* arose after the *Milwaukee II* decision (*see supra* Part I.A), which held that the federal common law of interstate water pollution was displaced by the regulatory regime established by the 1977 CWA amendments. *See* 451 U.S. 304 (1981).  *Ouellette* expanded on *Milwaukee II* to hold that the CWA not only displaced ***federal*** common law, it also ***preempted*** attempts by ***States*** to regulate in the area of interstate water pollution:  "[T]he regulation of interstate water pollution is a matter of federal, not state, law . . . ." 479 U.S. at 488.[21]

*Ouellette* involved a situation in which the International Paper Company operated a mill on New York's side of Lake Champlain that was directly impacting landowners on the other side of the lake in Vermont, who sought to invoke Vermont nuisance law, alleging that water pollution discharges from the mill were "diminishing the value of their property."  *Id.* at 484. Despite the fact that International Paper was foreseeably sending pollution from New York into Vermont waters, the Supreme Court held that any attempt to apply Vermont tort law to those discharges was preempted by the CWA.  "After examining the CWA as a whole, its purposes and its history, we are convinced that if affected States were allowed to impose separate discharge standards on a single point source, the inevitable result would be a serious interference

---

[21] *Ouellette* is recognized as one of the leading conflict preemption cases decided by the Supreme Court.  Numerous decisions invoke *Ouellette*.  *See, e.g., Ting v. AT&T*, 319 F.3d 1126, 1135 (9th Cir. 2003) (telecommunications preemption); *Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377, 383 (3d Cir. 1999) (copyright preemption); *Am. Agric. Movement, Inc. v. Bd. of Trade of Chicago*, 977 F.2d 1147, 1155 (7th Cir. 1992) (commodity futures preemption); *Taylor v. Gen. Motors Corp.*, 875 F.2d 816 (11th Cir. 1989) (automobile safety preemption); (In *Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995), the Supreme Court repudiated its earlier view that the presence of an express preemption clause in a statute weakened a court's ability to find conflict preemption.  *American Agricultural Movement* and *Taylor* were decided before *Myrick*, but remain good law in finding conflict preemption because those courts labored under a constraint on implied preemption the Court lifted in *Myrick*.)

with the achievement of the 'full purposes and objectives of Congress.'"   *Id.* at 493-94 (quoting

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)).  "In this case the

application of Vermont law against [International Paper] would allow respondents to circumvent

the NPDES permit system, thereby upsetting the balance of public and private interests so

carefully addressed by the Act."   479 U.S. at 494.   The *Ouellette* Court also spotlighted that

application of state **nuisance law** in the interstate context would be especially problematic.  *See*

*id.* at 497 ("often . . . 'vague' and 'indeterminate'" state nuisance law would impose, in effect, a

"chaotic regulatory structure" that would disrupt the calibrated federal NPDES program).

Notably, *Ouellette* rejected the argument that Vermont's state tort law would merely

supplement the regulatory directives of the CWA.  *See Id.* at 486-87.  "In determining whether

Vermont nuisance law 'stands as an obstacle' to the full implementation of the CWA, it is not

enough to say that the ultimate goal of both federal and state law is to eliminate water pollution.

A state law also is pre-empted if it interferes with the methods by which the federal statute was

designed to reach this goal."   *Id.* at 494 (citation omitted).  The Supreme Court made the point,

fully applicable to Shelf operations governed exclusively by federal law, that the tort duties of

impacted States projected into a source State could interfere with how NPDES-permitted parties

in the source State conduct their affairs under the federal CWA laws and regulations applicable

in the source State:

> If the Vermont court ruled that respondents were entitled to the full amount of
> damages and injunctive relief sought in the complaint, at a minimum
> [International Paper] would have to change its methods of doing business and
> controlling pollution to avoid the threat of ongoing liability.  ***In suits such as this,***
> ***an affected-state court also could require the source to cease operations by***
> ***ordering immediate abatement.*** . . . . ***The inevitable result of such suits would***
> ***be that Vermont and other States could do indirectly what they could not do***
> ***directly — regulate the conduct of out-of-state sources.***

*Id.* at 495 (emphasis added).

31

Thus, Plaintiffs' attempt to project the law of impacted Gulf States onto the Shelf must be rejected under *Ouellette*. "If common law nuisance claims were held to be an exception to general federal preemption in this area, such would be the exception that swallows the rule . . . . The result would be a complete rewriting of the regulatory scheme and the elimination of state and federal regulatory agencies from regulation of industrial discharge into waters, and placing in their stead various courts to cobble together regulations from common law doctrines." *Haynes v. Blue Ridge Paper Prods., Inc.*, No., 2010 WL 3075738, at *6 (W.D.N.C. Aug. 5, 2010).

After *Ouellette* a similar issue arose when the State of Oklahoma sought to apply its statutory water quality standards (authorized by the CWA) to pollutant discharges occurring upriver in Arkansas. *See Arkansas v. Oklahoma*, 503 U.S. 91 (1992). The Supreme Court approved of EPA's grant of a permit to the Arkansas sewage treatment plant, notwithstanding Oklahoma's claim that its water quality standards prohibited the grant of such a permit. The Supreme Court reaffirmed its *Ouellette* holding emphasizing that *Ouellette* held that in interstate water pollution situations, it is ***federal*** authorities that are exclusively entrusted with discretion to address impacts on affected States from out-of-State water pollution, and that impacted States (or private plaintiffs wielding state tort law) cannot take matters into their own hands and apply their own state law to water pollution originating outside the State. Instead, the recourse for impacted States and their citizens is to request EPA to protect their state waters consistent with federal law. *See id.* at 100 n.6 ("The affected State may try to persuade the federal government or the source state to increase effluent requirements, but ultimately possesses no statutory authority to compel that result, even when its waters are adversely affected by out-of-state pollution."). Here, the general permit governing BP's operations on the Shelf off the coasts of Louisiana and Texas reflects that EPA consulted with those States. *See* 72 Fed. Reg. 31,575 (June 7, 2007); *see also*

*Ouellette*, 479 U.S. at 490 ("Even though it may be harmed by the discharges, an affected State only has an advisory role in regulating pollution that originates beyond its borders.").

The *Ouellette* and *Arkansas* precedent is fully applicable to water pollution originating from oil discharges from the Macondo well on the Shelf into the Gulf of Mexico impacting Gulf Coast States.  As noted above, BP conducted operations at the Macondo well in connection with an EPA General Permit under the CWA's NPDES permitting system.  It was the NPDES permitting system that the Supreme Court in *Ouellette* held preempts the tort laws of impacted States outside of the area where a NPDES-regulated discharge arose.  *See Ouellette*, 479 U.S. at 494.  The only difference between the NPDES permit applicable to BP here and the NPDES permit at issue in *Ouellette* is that New York issued the latter permit whereas EPA issued the NPDES permit here.  That difference is not material.  There is no indication in *Ouellette* that the fact that operations take place under a federal NPDES permit as opposed to under a state NPDES permit would diminish the preemptive effect created by the CWA's NPDES program.  Logic suggests that the rationale for preemption is ***stronger*** here, since EPA is the issuing authority for federal NPDES permits, not a State, and because Plaintiffs invoke ***multiple*** impacted States' tort laws.  *See Sullivan v. Leaf River Forest Prods., Inc.*, 791 F. Supp. 627, 633 (S.D. Miss. 1991) ("[I]n cases which involve multiple state regulations applied to a single discharge site, federal law must prevail and preempts any state law claims.  This avoids the necessity of a court applying two different sets of state pollution laws and deciding which is most applicable when the source of the pollution is in one state and that pollution crosses into another state.").

Courts give *Ouellette* a straightforward reading to preempt state attempts to regulate out-of-state discharges.  *See, e.g.*, *In re Operation of Mo. River Sys. Litig.*, 418 F.3d 915, 918 (8th Cir. 2005) (North Dakota attempt to argue federal management of Missouri River water levels

violated state water quality standards preempted based in part on *Ouellette*); *Lane v. Champion Int'l Corp.*, 827 F. Supp. 701, 702 n.2 (S.D. Ala. 1993) (Alabama residents' attempt to apply Alabama law of "negligence, wantonness, breach of duty to warn, fraud, misrepresentation, deceit, nuisance, trespass, battery, assault, negligent infliction of emotional distress, intentional infliction of emotional distress, outrage, and strict liability" preempted by *Ouellette*, which required application of Florida law as the source State); *State Line Fishing & Hunting Club, Inc. v. City of Waskom*, 754 F. Supp. 1104, 1113 (E.D. Tex. 1991) ("The state law of the source state (Texas) and not the affected state (Louisiana) applies to determine whether defendant's discharge of effluents into State Line Lake constitutes a nuisance.").

Accordingly, *all* state law claims against BP alleged by Plaintiffs, including those under the laws of Louisiana, are barred by the *Ouellette* line of precedent which precludes impacted States from applying their own state laws to interstate water pollution originating elsewhere.

**C.    There Is No "Gap" In Federal Law Permitting Application Of Louisiana Law, The "Adjacent State" Here, As Borrowed Surrogate Federal Law Under OCSLA.**

OCSLA applies the law of a single, determinate adjacent State as borrowed surrogate ***federal law*** to fill substantial "gaps" or "voids" in actual federal law.  Hence, to avoid preemption by OCSLA and the collective regulatory regimes of OPA and the CWA, ***two conditions must both be met***:  (i) a plaintiff must be attempting to apply the law of the adjacent State (not the law of a non-adjacent State, which is wholly preempted by OCSLA); and (ii) a plaintiff must identify a substantial gap or void in federal law.  As to BP, Plaintiffs' state law claims do not meet either, let alone both tests.  OPA establishes a federal compensatory regime for those impacted by an oil spill, and that regime is fully applicable against BP.

For an OPA "responsible party," finding an OCSLA gap that would allow Louisiana law to apply as borrowed federal law is not possible.  OPA's comprehensiveness in the field of

compensating for oil spill damages makes it similar to the Longshore and Harbor Workers' Compensation Act ("LHWCA"), of which the Fifth Circuit has said that "no more comprehensive a workers' compensation scheme could be mapped out than the LHWCA.  It explicitly provides for settlements, and no [OCSLA] gap-filling is required."  *Oceanic Butler, Inc. v. Nordahl*, 842 F.2d 773, 777 n.4 (5th Cir. 1988); *see also Olsen v. Shell Oil Co.*, 708 F.2d 976, 983 (5th Cir. 1983) ("[T]here are no gaps in the federal law on computation of interest to be filled by the Louisiana interest statute.") (internal quotation marks and citation omitted).  OPA is a considerably more complex and intricate statute than the LHWCA, especially when its interlocking nature with the regulatory regime of the CWA is considered.

Beyond the fact there is no gap to fill, LOSPRA would be Plaintiffs' exclusive remedy under Louisiana law.  *See infra* Part III.D.1.  LOSPRA cannot serve as a gap-filling statute not only because of the *Ouellette* doctrine, but also because a "significant void" is required under OCSLA before any form of gap-filling can be contemplated.  LOSPRA  is not intended to fill a "significant void," but only as the most interstitial of statutes.  The Louisiana Legislature designed LOSPRA in recognition of OPA's comprehensive nature. [22]

## D.      Even If Louisiana Law Was Applicable Here, Plaintiffs Have No Valid Claims Under Louisiana Law.

Even if there was a "gap" that would permit the borrowing of Louisiana law (the

---

[22] *See Nations v. Morris*, 483 F.2d 577, 585 (5th Cir. 1973) (explains "significant void" requirement; holds employee's claim that "the Louisiana Workmen's Compensation Act with its freedom to sue fellow employees is 'applicable' as surrogate federal law is too frail a craft to venture to the Outer Continental Shelf."), *cert. denied*, 414 U.S. 1071 (1973).  "The [Louisiana] legislature declares that it is the intent of [LOSPRA] to **support and complement the Oil Pollution Act of 1990 . . . and other federal law**, specifically those provisions relating to the national contingency plan for cleanup of oil spills and discharges, including provisions relating to the responsibilities of state agencies designated as natural resources trustees.  The legislature intends [LOSPRA] to be interpreted and implemented in a manner consistent with federal law."  La. R.S. § 30:2453(B) (emphasis added); *see also* La. Admin. Code, Title 43, Part XXIX § 101(B) ("These rules shall be interpreted and implemented in a manner consistent with federal law.  Any conflict between a provision of these rules and the National Oil and Hazardous Substances Pollution Contingency Plan . . . and/or the Oil Spill Prevention and Response Act . . . should be resolved in favor of the cited authorities.").

"adjacent state") as surrogate federal law pursuant to OCSLA (and there is not), Plaintiffs'

nuisance, trespass and fraudulent concealment claims fail under Louisiana law.  LOSPRA would

be Plaintiffs' exclusive remedy, and, even absent LOSPRA, Plaintiffs' state law claims must be

dismissed for failure to allege prerequisites for asserting such claims under Louisiana law.

### 1.    LOSPRA Would Be Plaintiffs' Exclusive Remedy If Louisiana Law Applied, And Plaintiffs Do Not Assert A LOSPRA Claim.

Plaintiffs do not assert a LOSPRA claim.  Yet LOSPRA is the exclusive authority for oil

spill response, natural resource damage assessment, and liability under Louisiana law.  LOSPRA

was enacted in 1991 "to assist the legislature in fulfilling its duties to protect, conserve, and

replenish the natural resources of this state in accordance with . . . the Constitution of Louisiana."

La. R.S. § 30:2453(A).  Thus, Plaintiffs' claims against BP for nuisance, trespass and fraudulent

concealment must be dismissed for the independent reason that they are barred by LOSPRA.

By its terms, LOSPRA is "the *exclusive authority* on oil spill prevention, response,

removal, and the limitations of liability" under Louisiana law, and its provisions broadly apply to

any "responsible party" as well as "potentially responsible party" for an oil spill.  *Id.* §§ 30:2496,

30:2454(22) (emphasis added), § 30:2480(G); *see also* La. Admin. Code, Title 43, Part XXIX  §

115(A).  LOSPRA expressly supersedes other causes of action conflicting with LOSPRA.  *See*

La. R.S. § 30:2491(A) ("When applicable, the limitations of liability and immunities provided in

[LOSPRA] shall be exclusive and shall supersede any other liability provisions provided by any

other applicable state law.")  Plaintiffs claims for nuisance, trespass, and fraudulent concealment

damages are all based on alleged losses from property contamination.  (B1 Compl. ¶¶ 691-731.)

Because LOSPRA applies to "damages for injury to, or economic loss resulting from destruction

of, immovable or corporeal movable property," Plaintiffs' state law claims are inconsistent with

LOSPRA.  *See* La. R.S. § 30:2454(5).  This is a critical feature of LOSPRA because without the

liability limitations and caps LOSPRA could not operate properly.   *See Id.* § 30:2479 (eestablishes detailed caps on damages and removal costs attributable to responsible parties).

A "responsible party" is defined under LOSPRA to include:  "(c) ***Any other person*** . . . who causes, allows, or permits an unauthorized discharge of oil or threatened unauthorized discharge of oil."  La. R.S. § 30:2454(22) (emphasis added).  This LOSPRA catch-all category for any person who causes an unauthorized discharge of oil is broader than OPA, which does not include such a catch-all category.  *See* 33 U.S.C. § 2701(32) (defines OPA responsible parties only as certain owners, operators, and lessees).  It is LOSPRA's coverage of any party that may have had a causal role in a spill that may fill any gaps in OPA.  As to BP, an OPA "responsible party," however, there is no such gap.

LOSPRA provides that "[t]he provisions of this Chapter shall supersede . . . any conflicting laws of this state."   La. R.S. § 30:2491(A); *see also id.* § 30:2496.   LOSPRA's exclusive remedies bar is fully applicable to the state law claims being pursued here by Plaintiffs against BP.  Accordingly, Plaintiffs' state law claims are preempted by LOSPRA as a matter of Louisiana law.   It can be surmised that the Plaintiffs are well aware of LOSPRA and its exclusivity provision, which is why they scrupulously avoided pleading the statute, instead filing a claim only under Florida's PDPCA.  (*See* B1 Compl. Count III.D.)

### 2. Plaintiffs Fail To Allege Necessary Prerequisites For Asserting A Nuisance Claim Under Louisiana Law.

Plaintiffs' nuisance claim (Count III.A) must be dismissed for failure to satisfy the "neighbor" requirement of Louisiana Civil Code Article 667, and for failure to allege physical injury to a proprietary interest which is necessary to overcome the economic loss rule.

***First***, Plaintiffs do not allege that they own property that adjoins BP's property, (*see* B1 Compl. ¶¶ 209(h)-(i), 691-99), nor could they, yet such allegations are a prerequisite for

asserting a nuisance claim under Louisiana law.  As this Court has recognized, "**nuisance**," defined in Louisiana Civil Code Articles. 667-69, "**is limited to the obligations proprietors owe to their neighbors**," and a plaintiff thus cannot "be a party whose property is physically remote and not adjacent to Defendants' property."  *Barasich v. Shell Pipeline Co.*, Nos. 05-4180, 05-4197, 05-4199, 05-4212, 06-5102, 2006 WL 3913403, at *8 (E.D. La. Nov. 20, 2006) (Barbier, J.) (emphasis added).  According to the Louisiana Supreme Court, liability under Article 667 arises only "when activity by one party holding a right to immovable property has caused damages to a party holding a right to a neighboring property."  *Inabnet v. Exxon Corp.*, 93-0681 (La. 9/6/94); 642 So. 2d 1243, 1251-52.  Here, the *Deepwater Horizon* lies approximately 47 miles offshore, and is the undisputed origin of the "contaminants and noxious odors" (B1 Compl. ¶ 696) of which Plaintiffs complain.  Indeed, Plaintiffs themselves point out that the damage occurred as a result of "the migration" of those substances (*id.*), not a direct intrusion from one property onto another.  Plaintiffs cannot demonstrate that they are "neighbors" in any sense of the term.  Thus, Plaintiffs' cannot state a claim for nuisance under Louisiana law.[23]

*Second*, the economic loss rule applies to nuisance claims brought under Louisiana law, and prohibits recovery for economic losses where there is no physical injury to a proprietary interest.  *See TS&C Invs., LLC v. BEUSA Energy, Inc*., 637 F. Supp. 2d 370, 376 (W.D. La. 2009) (holding "the economic loss rule applies in this case" where plaintiffs assert an Article 667 claim, and dismissing complaint on grounds that plaintiffs, property owners located miles away

---

[23] *See TS&C Invs., LLC v. BEUSA Energy, Inc.*, 637 F. Supp. 2d 370, 381-84 (W.D. La. 2009) (dismissing Article 667 claim on ground "neighbor" requirement not met in putative class action alleging damages against companies involved in placement and drilling of an oil well after oil well blowout caused closure of interstate highway where named plaintiffs were located miles away from the well blowout site); *Barasich*, 2006 WL 3913403 at *8 (dismissing Article 667 claim on ground that "neighbor" requirement not met by plaintiffs who fished commercially in waters where oil migrated after rupture of defendant's crude oil pipeline that traversed a levee); *Barasich v. Columbia Gulf Transmission Co.*, 467 F. Supp. 2d 676, 690-91 (E.D. La. 2006) (Vance, J.) (dismissing Article 667 claim in part on ground that "neighbor" requirement not met where plaintiffs were inland property owners alleging that defendant oil and gas companies' dredging of canals through Louisiana marshlands contributed to the destructive impact of Hurricanes Katrina and Rita to inland communities).

from oil well blowout site, "do not have a proprietary interest in any property that was damaged and have not alleged injuries either to themselves or their properties.")  Here, Plaintiffs' nuisance claim is likewise barred by the economic loss rule because they do not allege physical injury to a proprietary interest.  (*See* B1 Compl. ¶¶ 209(h)-(i), 692-93.)[24]

### 3.   Plaintiffs' Trespass Claim Is Brought By Individuals And Businesses Who Do Not Meet The Prerequisites For Asserting Such A Claim.

Plaintiffs' trespass claim (Count III.B) must be dismissed for the independent reason that it is overly broad, for the claim is brought on behalf of Plaintiffs who are not owners of a property that has been physically invaded as a result of the Spill.  Under Louisiana law, "[a] trespass occurs when there is an unlawful ***physical invasion*** of the property of possession of another."  *Richard v. Richard*, 2009-539 (La. App. 3 Cir. 11/4/09); 24 So. 3d 292, 296 (emphasis added).  Also, the Plaintiff must be an owner or in legal possession of land to bring a suit under trespass.  *See LaRue v. Crown Zellerbach Corp.*, 512 So. 2d 862 (La. App. 1 Cir.), *writ denied*, 514 So. 2d 1176 (La. 1987).[25]  Here, the Plaintiffs who purport to assert a trespass claim, "Real

---

[24] While Plaintiffs do not appear to assert state law claims for negligence or gross negligence, (*see* B1 Compl. Count III.A-D), they do make passing reference in nuisance and trespass counts to alleged "negligence" and "gross negligence" by Drilling Defendants.  (*See id.* ¶¶ 693, 705.)  To the extent Plaintiffs are asserting state law claims for negligence, gross negligence and willful misconduct, such claims are also barred under Louisiana law pursuant to the economic loss rule because Plaintiffs have not alleged any physical injury to a proprietary interest.  (*See id.* ¶ 209(h)-(i).)  *See, e.g.*, *Phillips v. G&H Seed Co.*, 2008-934 (La. App. 3 Cir. 4/8/09); 10 So. 3d 339, 441-44 (dismissing negligence claim on grounds economic loss rule barred purely economic claims by buyers and processors of crawfish who had contracts with a commercial crawfish farm whose crop was damaged by defective rice seed); *La. Crawfish Producers Ass'n-West v. Amerada Hess Corp.*, 2005-1156 (La. App. 3 Cir. 7/12/06); 935 So. 2d 380, 385 (dismissing state tort claims as barred by economic loss rule where commercial crawfishermen alleged that oil and gas exploration activities had damaged their fishing grounds); *Dempster v. Louis Eymard Towing Co.*, 503 So. 2d 99, 100-02 (La. Ct. App. 1987) (dismissing negligence claim pursuant to economic loss rule on grounds fishermen had no proprietary interest in unharvested fish in state waters); *PPG Indus., Inc. v. Bean Dredging*, 447 So. 2d 1058, 1062 (La. 1984) (dismissing negligence claim on grounds economic loss rule barred recovery of pure economic losses of downstream users of gas from a damaged pipeline); *Barasich*, 2006 WL 3913403 at *7 (holding commercial fisherman alleging negligence and strict liability claims "who did not sustain physical damages to their property lack standing to sue under either federal or state law").

[25] *See also Britt Builders, Inc. v. Brister*, 618 So. 2d 899, 903 (La. Ct. App. 1993) ("The tort of trespass has long been recognized by courts throughout this state as a means to correct the damage caused when an ***owner*** is unjustly deprived of the use and enjoyment of his immovable") (emphasis added).  Holding a lease is insufficient to sustain an action under trespass.  *Richard*, 24 So. 3d at 298-99 (a son, as tenant or lessee at his mother's residence, could not sue for trespass because "he did not have a legal usufruct of, or [a] real right in, [] property"); *Indian Bayou Hunting*

Property Plaintiffs" and "Real Property/Tourism Plaintiffs," (*see* B1 Compl. ¶¶ 693, 706, 708, 711), include Plaintiffs who are *not* property owners and Plaintiffs who own property but do *not* allege any physical invasion of their property as a result of the Spill.[26]

### 4.      Plaintiffs Fail To State A  Claim For Fraudulent Concealment.

Plaintiffs' fraudulent concealment claim (Count III.C) must be dismissed for the independent reason that Plaintiffs did not plead necessary elements of such a claim.   Under Louisiana law, fraudulent misrepresentation "is essentially an allegation of fraud."   *Unimobil 84, Inc. v. Spurney*, 797 F.2d 214, 217 (5th Cir. 1986) (citation omitted).  The elements are:  "(1) a misrepresentation of a material fact; (2) made with intent to deceive; and (3) causing justifiable reliance with resultant injury."   *Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs.*, 527 F.3d 412, 418 (5th Cir. 2008). Fraudulent misrepresentation "by silence or inaction," as alleged here, requires that "defendant owed a duty to the plaintiff to disclose the information."   *Id*. at 418.

*First*, Plaintiffs have not alleged with the requisite specificity of Rule 12(b)(6) or Rule 9(b) that BP made any fraudulent statements or omissions.[27]   Plaintiffs merely assert in general terms that "BP attempted to downplay and conceal the severity of the Spill" and "did not provide complete and timely announcements and warnings about the severity, forecast and trajectory of the Spill."  (B1 Compl. ¶¶ 714-15, 720.)  But general allegations of this nature do not suffice to

---

*Club, Inc. v. Taylor*, 261 So. 2d 669, 677-78 (La. Ct. App. 1972) ("A predial lessee [as opposed to a mineral lessee] does not claim the ownership, possession, or enjoyment of a real right; he possesses for a lessor and he has the enjoyment of a personal right, namely, that of the lease.").

[26] Plaintiffs describe "Real Property Plaintiffs" as "[o]wners, lessors, and *lessees* of real property alleged to be damaged, harmed, or impacted, physically *or economically*, including lessees of oyster beds," and "Real Property/Tourism Plaintiffs" as "[h]otel owners and *operators*, vacation rental owners *and agents*, and *all those who earn their living from the tourism industry*."  (B1 Compl. ¶¶ 209(h)-(i) (emphasis added).)

[27] Under Rule 9(b) "general allegations, which do not state with particularity what representations each defendant made, do not meet this requirement."  *Unimobil 84, Inc.*, 797 F.2d at 217; *see also Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1977) (Rule 9(b) requires Plaintiffs to "[1] specify the statements contended to be fraudulent, [2] identify the speaker, [3] state when and [4] where the statements were made, and [5] explain why the statements were fraudulent.") (citations omitted).  Under Rule 12(b)(6), "naked assertions devoid of further factual enhancement" will not suffice.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quotations, and citation omitted).

state a claim.  *See Williams v. WMX Techs., Inc.*, 112 F.3d 175, 180 (5th Cir. 1997) (dismissing claim where excerpts reprinted in complaint "do not quote a defendant, they merely say that the defendants were widely quoted or paraphrase previous statements.").[28]

Also, Plaintiffs do not plead any facts which suggest that BP's alleged misrepresentations or silence was "material" to them.  *See* RESTATEMENT (SECOND) OF TORTS § 538 ((1) Reliance upon a fraudulent misrepresentation is not justifiable unless the matter misrepresented is material.  (2) The matter is material if (a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.); *Shandong Yinguang Chem. Indus. Joint Stock Co.*, *v. Potter*, 607 F.3d 1029, 1033 (5th Cir. 2010) (A false representation is material if a reasonable person would attach importance to and be induced to act on the information).

*Second*, the B1 Amended Master Complaint is devoid of any factual allegations regarding an "intent to deceive" by BP, which is a necessary prerequisite for such a claim.[29]

*Third*, Plaintiffs fail to allege "justifiable reliance" and "resultant injury."  The complaint does not contain any allegations to support a claim by Plaintiffs of reliance on BP's alleged

---

[28] Plaintiffs' only specific allegation cannot give rise to a fraudulent misrepresentation claim.  Plaintiffs allege BP "overstated its ability to handle a blowout" in its Exploration Plan, which states an oil spill was "unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses," (B1 Compl. ¶ 716), but do not allege that statement was false when it was made.  BP's statement that techniques to contain the flow of oil involve "significant uncertainties because they have not been tested in these conditions before," (*id.* ¶ 718), does not show that BP's statement that "impacts" were "unlikely" was false.  Plaintiffs, accordingly, have failed to show the "misrepresentation of a material fact" required under Louisiana law.

[29] *See Farwell v. Milliken & Farwell, Inc.*, 145 So. 2d 644, 648 (La. Ct. App. 1963) ("In the instant case the necessary essential of an intent to defraud cannot be imputed from the alleged misdeeds alone if we disregard the conclusions of the pleader.  There are no facts alleged tending to show artifices, maneuvers and other external manifestations of the will which could show an intent to defraud."); *Bourgeois v. De Soto*, 280 So. 2d 271, 275 (La. Ct. App. 1973), *reh'g on other grounds* (noting "[i]ntent is an essential element of fraud," and pointing to plaintiff's failure to allege intent.) (citation omitted); *Kirby v. Field*, 2004-1898 (La. App. 1 Cir. 9/23/05); 923 So. 2d 131, 136 (holding petition deficient for failing to allege facts purportedly constituting fraud, including element of intent).

silence or misrepresentations.  *See Jefferson v. Lead Indus. Ass'n, Inc.*, 106 F.3d 1245, 1254 (5th Cir. 1997) (Louisiana fraudulent misrepresentation claim defective as a matter of law because "[n]owhere in the complaint does plaintiff allege that she bought, used, or ingested the lead paint pigment in reliance on defendants' misrepresentations.").  Plaintiffs do not even allege that they were aware of BP's allegedly false statement, and, indeed, it is quite likely that Plaintiffs had no knowledge of BP's statement in its Exploration Plan.  Without such awareness, there can be no reliance.  *See Johnson v. Seacor Marine Corp.*, 404 F.3d 871, 878 (5th Cir. 2005) ("If SEACOR cannot demonstrate that it was aware of the contents of the certificate it certainly cannot demonstrate that it relied to its detriment on the certificate.").  No less importantly, such reliance would not be "justifiable" in this case, because a plaintiff cannot justifiably rely on predictions, such as the one contained in Paragraph 716, that a certain event will be "unlikely" in the future. (B1 Compl. ¶ 716.)  Because predictions of the likelihood of future events often turn out to be incorrect, Louisiana law bars plaintiffs from converting a forecast into a fraud claim.  *See Foley & Lardner, LLP v. Aldar Invs., Inc.*, 491 F. Supp. 2d 595, 604 (M.D. La. 2007).

*Finally*, Plaintiffs' blanket assertion that BP "had a duty to disclose" (B1 Compl. ¶ 721) is insufficient.  In Louisiana, "a duty to disclose does not exist absent special circumstances, such as a fiduciary or confidential relationship between the parties, which, under the circumstances, justifies the imposition of the duty."  *Kadlec*, 527 F.3d at 420 (citations omitted).  "[T]he existence of a duty is a question of law" in Louisiana.  *Id*. at 421.  As a matter of law, no such duty exists between BP and Plaintiffs.

**E.    Even If Florida Law Was Not Preempted, The Florida Pollutant Discharge Prevention and Control Act Does Not Apply Here And Must Be Dismissed.**

Even if Florida law is not preempted by OCSLA and the CWA, Plaintiffs' Florida Pollutant Discharge Prevention And Control Act (PDPCA) claim (Count III.D) would still be

meritless.  Plaintiffs' PDPCA claim is based upon alleged damages from the flow of pollution into Florida's territory.  Plaintiffs admit that "[t]he immediate discharge from the Spill occurred into waters *outside* the territorial limits of Florida," but maintain that "lands and waters within the territorial limits of Florida have been directly affected by the discharge and are reasonably expected to continue to be so affected." (B1 Compl. ¶ 742 (emphasis added).)  This contingent effect is insufficient to ground the claim under the Florida PDPCA.

*First*, the *Deepwater Horizon situs* lies far outside Florida's territorial waters, and is not subject to the State's jurisdiction, which runs only to a line 3 marine leagues (about 9 nautical miles or 10.36 land miles) off its coast.  *See* 43 U.S.C. § 1312 (any State's boundary is at least 3 nautical miles seaward, but can extend beyond that for some States); *United States v. Florida*, 425 U.S. 791, 792 (1976) (per curiam) ("As against the United States, the State of Florida is entitled to all the lands, minerals, and other natural resources underlying the Gulf of Mexico extending seaward for a distance of 3 marine leagues from its coastline or its historic coastline, whichever is landward, but for not less than 3 geographic miles from its coastline…."); *United States v. Louisiana,* 363 U.S. 121, 129 (1960).  The United States, not Florida, holds jurisdiction over the MC252 *situs*.

*Second*, applying the PDPCA to an incident outside of Florida's territorial waters would be an unconstitutional extraterritorial application of state law to regulate interstate commerce. Interstate commerce, including the discovery, production, and transportation of oil in federal waters, is governed by Congress.  *See* U.S. Const. art. I, § 8, cl. 3.  "[T]he Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the state's borders, whether or not the commerce has effects within the state."  *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989).  The PDPCA is intended to regulate "[t]he transfer of pollutants

43

between vessels, … between offshore facilities and vessels" because it "is a hazardous undertaking," Fla. Stat. § 376.021(3)(a) (expressing legislative intent), and uses the state's police power to empower the state Department of Environmental Protection to "[d]eal with the hazards and threats of danger," *id.* § 376.021(4)(a).   The manner in which Plaintiffs seek to apply the PDPCA aims precisely to regulate interstate commerce that takes place outside Florida's borders based solely on an effect felt within its borders.   Plaintiffs admit the Macondo well is located and the discharge occurred "outside the territorial limits of Florida" (B1 Compl. ¶ 742), but attempt to invoke the Florida law on the basis of effects within Florida's boundaries, (*id.*).   Applying the PDPCA in this manner would have the practical effect of regulating commerce outside Florida because it would permit the regulation of and imposition of liability for pollution taking place wholly outside the state's waters.   This "practical effect" violates the Commerce Clause.   *Healy*, 491 U.S. at 336.   Applying the PDPCA to regulate an occurrence outside of Florida's waters on the basis of effects felt within Florida violates the Commerce Clause and is unconstitutional.[30]

***Third***, the PDPCA does not apply on its own terms.   A responsible party is "liable to any affected person for all damages as defined in s. 376.031."   Fla. Stat. § 376.12(5).   In turn, "damages" are defined as "the documented extent of any destruction to or loss of any real or personal property . . . ***as the direct result of the discharge*** of a pollutant." *Id.* § 376.031(5) (emphasis added).   Plaintiffs themselves recognize that their damages must be limited only to damages that occur as a direct result of the discharge.   (*See* B1 Compl. ¶ 744.)   But the only allegation concerning that damage states that "certain Plaintiffs and Florida Subclass Members have sustained damage to their personal property ***as a result of the post-Spill cleanup activity***"

---

[30] If the Court holds that OCSLA and/or *Ouellette* preemption bar Plaintiffs' PDPCA claim, it is unnecessary to reach the issue of whether Plaintiffs' application of the PDPCA would violate the Commerce Clause.   "The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of."   *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) (quoted in *United States v. Underwood*, 597 F.3d 661, 665 (5th Cir. 2010)).

(B1 Compl. ¶ 743) (emphasis added) not the discharge itself.  Under the parallel OPA statute, a claimant cannot recover unless the property damage is a direct result of the discharge.  *In re Taira Lynn*, 444 F.3d at 380.[31]  Whether or not Plaintiffs have a separate cause of action for alleged damage from the cleanup, it is not the proper subject of Florida's  PDPCA.  Applying the Florida PDPCA would require this Court to "go beyond the first step" of the chain of causation.  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983).  The PDPCA, by its terms, only remedies damage arising as the direct result of a discharge; the damage Plaintiffs claim is too attenuated to be remediable.

## IV.    PLAINTIFFS' PUNITIVE DAMAGES COUNT MUST BE DISMISSED.

Count IV seeking "punitive damages under all claims" fails to state a claim.  (B1 Compl. ¶¶ 748-69.)  *First*, there is no independent cause of action for punitive damages.  *Second*, as established above, OPA is the legal remedy available to Plaintiffs seeking to recover against BP for OPA-remediated harms, and punitive damages are not recoverable under OPA.

### A.    There Is No Independent Cause Of Action For Punitive Damages.

To the extent Count IV alleges a freestanding claim for punitive damages, it is patently meritless.  There is no independent claim for punitive damages.  *Byrne v. Nezhat*, 261 F.3d 1075, 1093 n.34 (11th Cir. 2001) ("We note that a prayer for punitive damages is not an independent cause of action."); *Allen v. R & H Oil and Gas Co.*, 63 F.3d 1326, 1333 (5th Cir. 1995) ("[A] claim for punitive damages is not by itself an independent tort.").[32]

---

[31] The proximate cause requirement is not loosened for Plaintiffs by *Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216 (Fla. 2010).  By its terms, the *Curd* doctrine only applies to commercial fishermen, and still requires proof of proximate causation.  *Id.* at 1228-30 (Polston, J., concurring in part) (discussing importance of the restrictive "as a direct result" language, and noting that it was not at issue in the case).

[32] The lack of an independent cause of action for punitive damages is black-letter law.  *See, e.g.*, *Mosing v. Domas*, 2002-0012 (La. 10/15/02); 830 So. 2d 967, 973 ("Under Louisiana law, exemplary or other 'penalty' damages are not allowable unless expressly authorized by statute."); *Life Ins. Co. of Ga. v. Smith*, 719 So. 2d 797, 806 (Ala. 1998) ("We now require, therefore, that a jury's verdict specifically award either compensatory damages or nominal damages in order for an award of punitive damages to be upheld."); *Hopewell Enters., Inc. v. Trustmark Nat'l Bank*,

**B.      Punitive Damages Are Not Recoverable Under OPA.**

Count IV must be dismissed because punitive damages are not recoverable under OPA.
"*Congress's very specific treatment of oil pollution in the OPA, which does not provide for*
*punitive damages*, supplanted general admiralty and maritime law." *S. Port Marine*, 234 F.3d at
65-66.

*First*, the comprehensive list of remedies recoverable under OPA expressly does not
include punitive damages, *see* 33 U.S.C. § 2702 (defining elements of damages liability), and
OPA's silence as to punitive damages means such damages are not recoverable.  *See Dean v.*
*Am. Sec. Ins. Co.*, 559 F.2d 1036, 1039 (5th Cir. 1977) ("The provisions for liquidated damages
for willful violation of the Act [the Age Discrimination in Employment Act] and its silence as to
punitive damages convinces us that the omission of any reference thereto was intentional . . . .
*[I]t is obvious that, if Congress believed punitive damages necessary* to eliminate
discrimination in employment based on age*, it knew exactly how to provide for them.*")
(emphasis added),  *en banc reh'g denied*, 564 F.2d 97 (5th Cir. 1977), *cert. denied*, 434 U.S.
1066 (1978).   OPA expressly addresses "gross negligence and willful misconduct" by a
responsible party by lifting the caps on liability contained in 33 U.S.C. § 2704(c)(1)(A), *not* by
providing for private recovery of punitive damages.[33]  Congress clearly chose not to provide a

___

680 So. 2d 812, 820 (Miss. 1996) ("Mississippi law is clear that punitive damages are not recoverable absent an
award of actual damages."); *Ault v. Lohr*, 538 So. 2d 454, 456 (Fla. 1989) ("We believe an express finding of a
breach of duty should be the critical factor in an award of punitive damages."); *id.* at 457 (Ehrlich, C.J., concurring)
("The crucial element in determining whether punitive damages may be awarded . . . is proof of the underlying
cause of action."); *Nabours v. Longview Sav. & Loan Ass'n*, 700 S.W.2d 901, 904 (Tex. 1985) ("Punitive damages
are recoverable only after proof of a distinct, willful tort."); *Kaplan v. Harco Nat'l Ins. Co.*, 708 So. 2d 89, 96 (Miss.
Ct. App. 1998) ("[P]unitive damages are a remedy, not a cause of action.  A claim for punitive damages is not itself
a chose in action.  It is not free-standing."); 22 AM. JUR. 2D *Damages* § 551 (2010) ("[A]s a rule, there is no cause of
action for punitive damages by itself; a punitive damages claim is not a separate or independent cause of action.").

[33] In addition, Congress's specification in the CWA as part of the 1990 enactment of OPA that the ceiling on per-
barrel civil penalties increases if gross negligence or willful misconduct are proven shows that Congress knows how
to provide for enhanced monetary liability to punish misconduct when it wants to.  *See* CWA § 311(b)(7)(A), (D),
33 U.S.C. § 1321(b)(7)(A), (D).

punitive damages remedy to private claimants under OPA.

**Second**, OPA's remedial regime is comprehensive, and, thus, the notion that Congress's silence on punitive damages was designed to open the field to courts to supplement OPA's carefully delineated categories of damages is entirely implausible.[34]   OPA defines a highly detailed set of remedial provisions that were clearly intended to be the exclusive remedies.  *See, e.g.*, *Blaze v. Payne*, 819 F.2d 128, 129 (5th Cir. 1987) ("To determine Congressional intent, '[w]e look first, of course, to the statutory language, particularly to the provisions made therein for enforcement and relief.'") (quoting *Nat'l Sea Clammers* Ass'n, 453 U.S. at 13 (1981)).  As a result, an award of punitive damages cannot be read into OPA.

For these reasons, courts addressing the issue have concluded that punitive damages cannot be awarded under OPA.  As noted above, the First Circuit held in *South Port Marine* that Congress intended for OPA to be a comprehensive damages scheme for oil spills, and because the OPA does not provide for punitive damages, such damages could not be awarded under general maritime law claims for oil pollution.  234 F.3d at 65-66; *see also Clausen v. M/V NEW CARISSA*, 171 F. Supp. 2d 1127, 1133 (D. Ore. 2001) (holding that OPA has precluded an award of punitive damages under any general maritime or admiralty law theory for any claim for which the OPA could provide relief).  Additionally, the *South Port Marine* Court explained that "Section 2702 [of OPA] sets forth a list of damages recoverable under the OPA, briefly describing each type.  As we have noted already, this scheme is comprehensive . . . .  We take this to be a strong indication that Congress intended the OPA to be the **sole federal law** applicable in this area of maritime pollution."  234 F.3d at 65 (emphasis added).

---

[34] *See* 33 U.S.C. § 2702 (defining elements of damages liability), § 2703 (providing defenses to liability), § 2704 (establishing limits on liability), § 2705 (covering interest awards and making provisions for the partial payment of claims), § 2707 (special provisions for recoveries by foreign plaintiffs), § 2708 (special provisions for recovery by responsible parties), and § 2713(c) (offering claimants an election of remedies).

In sum, Plaintiffs should not be able to read into OPA a remedy that Congress explicitly omitted from the statute's remedial scheme, and where courts have determined the same.

## V.   PLAINTIFFS' ATTEMPTS TO IMPEDE SETTLEMENT OF OPA CLAIMS BY WAY OF DECLARATORY RELIEF MUST BE  DISMISSED.

Counts V and VI seek declaratory relief aimed at impeding settlement of OPA claims. These attempts by Plaintiffs are in direct contravention of Congressional intent in creating the mandatory OPA claims process and presentation requirement, namely "*to allow for quick and complete payment of reasonable claims without resort to cumbersome litigation*."  135 Cong. Rec. H7965 (daily ed. Nov. 2, 1989) (emphasis added).  This Court has stated that it "recognizes and appreciates the enormity of the undertaking of Mr. Feinberg and does not intend to impede or interfere with his ability to fairly and efficiently process claims."  (Order And Reasons, at 8 (Feb. 2, 2011) [Doc. 1098].)  Counts V and VI should be dismissed because they are designed precisely to interfere with the GCCF's ability to fairly resolve OPA claims.

Count V requests that "settlement provisions that purport to, directly or indirectly, to release or to affect the calculation of punitive damages" be declared "ineffective as contrary to law, equity, and public policy."  (B1 Compl. ¶ 770.)  Count VI seeks a declaration "that the conduct of BP and its agents and representatives, including the Gulf Coast Claims Facility ('GCCF'), in obtaining releases and/or assignments of claims against other parties, persons, or entities is not an obligation of BP under OPA."  (*Id.* unnumbered par. after ¶ 770.)  Both counts should be dismissed for these reasons:

*First*, both counts must be dismissed because there is no independent cause of action for declaratory relief, and Plaintiffs do not identify any cause of action entitling them to the declaratory relief requested.  *See Collin Cnty. v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170-71 (5th Cir. 1990) ("it is the underlying cause of action

…that is actually litigated in a declaratory judgment action"); *Earnest v. Lowentritt*, 690 F.2d 1198, 1203 (5th Cir. 1982) ("[T]he request for declaratory relief is tied to no other cause of action within the jurisdiction of the federal court and must be dismissed.").

*Second,* nothing in OPA limits the ability of OPA responsible parties to fully and finally resolve a dispute.  Indeed, Congress made clear in OPA's legislative history, and federal courts have reaffirmed, that "*settlement and avoid[ance of] litigation is the primary goal of OPA's presentment requirement*."  *Boca Ciega*, 51 F.3d at 238-39 (emphasis added).  The United States has made clear that releases are commonplace in connection with settling OPA claims:

> OPA leaves this extra-judicial claims settlement process largely in the parties' hands....***Responsible Parties in oil spills regularly seek releases as part of the claims process***."

(MDL 2179, Statement Of United States Regarding The Court's February 2, 2011 Order, at 2 (Feb. 18, 2001) [Doc. 1322].)

*Third*, Fifth Circuit law is clear that settlements that release all claims, known and unknown, are perfectly valid and enforceable and indeed promote the public policy favoring settlement of disputes.  *See, e.g.*, *Ingram Corp. v. J. Ray McDermott & Co., Inc.*, 698 F.2d 1295, 1312 (5th Cir. 1983) ("When a release provides that 'any and all claims,' 'past, present, or future' are to be extinguished, a court is required to enforce its provisions both as to known and unknown claims.  A contrary result would not contribute significantly to the public policy of encouraging the settlement of differences and compromise of disputes .…"); *Robin v. Binion*, 469 F. Supp. 2d 375, 386-87 (W.D. La. 2007) (release of "any and all claims" "known or unknown" should be enforced because not doing so would undermine the strong public policy favoring settlement).

*Lastly*, claimants who do not wish to sign a release and settle their OPA claims through the GCCF have other options, and these options are clearly conveyed by GCCF to claimants.

Instead, claimants may choose to (i) apply for interim payments for which no release is required; (ii) present a claim to National Pollution Funds Center for payment from the Oil Spill Liability Trust Fund, or (iii) file suit in court after fulfilling OPA's mandatory claim presentation requirement.  *See* 33 U.S.C. § 2713(c) .  The GCCF expressly communicates these options to claimants.[35]  The GCCF also informs claimants that entering into a release forecloses these other options, and that claimants have the right to consult with an attorney prior to signing a release.[36]

## **CONCLUSION**

For these reasons, BP respectfully requests that this Court dismiss the claims filed against BP contained in the B1 Amended Master Complaint.  Additionally, BP respectfully requests that the Court's rulings "shall not only be applicable to the Administrative Master Complaint but also to the individual actions," and, that this Court dismiss the specific individual Complaints identified by BP in Exhibit 12 for the reasons cited herein.  *See Turner v. Murphy Oil USA, Inc.*, No. 05-4026 (E.D. La. Dec. 29, 2005) (Fallon, J.) (where appropriate, the Court "dismisses causes of action in all cases" not only in the Administrative Complaint), attached as Ex. 19.

---

[35] *See* Ex. 18, GCCF Full Review Final Payment Claim Form, Sample Release and Covenant Not to Sue ("You are under no obligation to accept the final payment offered to you by the Gulf Coast Claims Facility.  You are free to reject the final payment offered by the Gulf Coast Claims Facility and to pursue other means of compensation.  If you want to file a lawsuit regarding the Incident or make a claim to the Oil Spill Liability Trust Fund, do not sign this Release."); *see also* Ex. 8, GCCF FAQs at Questions 53 (claimant options if they disagree with GCCF full review final payment decisions), Questions 54-73 (addressing interim payment claims option); Ex. 10, GCCF Summary of Final and Interim Payment Options.

[36] *See* Ex. 10 at 1, GCCF Summary of Final and Interim Payment Options ("If you sign a release of liability, you will not be able to seek further compensation from the GCCF, the Coast Guard, or in court including in the … MDL No. 2179. . . .  "**Do not elect the Quick Payment Final Claim process unless you are willing to …sign a full release of liability.  If you sign a release of liability, you will not be able to seek further compensation from the GCCF, the Coast Guard, or in court.**") (emphasis in original); *see also* Ex. 8, FAQs at Question 1 ("You have the right to consult with an attorney of your choosing prior to accepting any settlement from the GCCF or signing a release of legal rights."), Questions 9-13 (addressing attorney representation), Questions 18, 22-23, 25-29 (describing "Quick Payment Final Claims" option and required release), Questions 43, 46-49, 53 (describing "Full Review Final Payment Claims" option and required release).

Respectfully submitted,


/s/ Don K. Haycraft
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

And

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Wendy L. Bloom
Jeffrey Bossert Clark
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
312-862-2000 (Tel)
312-862-2200 (Fax)

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
202-662-5985

***Attorneys for BP p.l.c., BP America Production Company and BP Exploration & Production Inc.***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 28th day of February, 2011.

<u>/s/ Don K. Haycraft</u>
Don K. Haycraft