# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE:   OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010

THIS DOCUMENT RELATES TO:

02:10-CV-1196

MDL NUMBER 2179  SECTION: J

JUDGE BARBIER

MAGISTRATE JUDGE SHUSHAN

**************************************************************************************

## THIRD AMENDING COMPLAINT

NOW INTO COURT, through undersigned counsel, come Plaintiffs, **Michelle M. Jones** as personal representative of the decedent Gordon Lewis Jones on behalf of his surviving beneficiaries including Michelle M. Jones, the children of Gordon Jones and Michelle M Jones (Stafford Hess Jones and Maxwell Gordon Jones); **Keith D. Jones** and **Eileen K. "Missy" Jones**.

1.

The jurisdiction of this Honorable Court is based upon the Admiralty and Maritime jurisdiction pursuant to Article III, Section 2 of the United States Constitution and 28 USC § 1333 and is a claim brought pursuant to the Federal Rules Of Civil Procedure Rule 9(h).

2.

The following parties are made defendants herein:

A.    **BP Exploration & Production, Inc.** ("BP Exploration"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block

252, the location known as "Macondo" where the Spill originated. BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714. This court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

B.   **BP America Production Company** ("BP America"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Delaware corporation with its principal place of business in Houston, Texas. BP America was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the Deepwater Horizon vessel. This Court has personal jurisdiction over BP America, because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

C.   **BP p.l.c.**, Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. BP p.l.c. is one of the world's largest energy companies with over 80,000 employees and $239 billion in revenues in 2009. BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division in which BP Exploration and BP America fall, through vertical business arrangements aligned by product or service groups. BP p.l.c.'s operations are worldwide, including in the United States. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally.

1. BP p.l.c. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development. A sampling of BP p.l.c.'s contacts with the U.S. are as follows: (a) BP p.l.c.'s American Depository Shares are listed on the New York Stock Exchange and BP p.l.c. is the largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP p.l.c. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP p.l.c.'s fixed assets are located in the U.S. or the European Union; and (e) BP p.l.c. reports having 2,100 U.S.-based employees in non-Exploration & Production, non-Refining & Marketing BP entities.

2. This Court has general jurisdiction over BP p.l.c. pursuant to Louisiana's longarm general jurisdiction provision (13 Louisiana Statute § 3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure. BP p.l.c. does business in Louisiana, has had continuous and systematic contacts with Louisiana (and the U.S. more generally).

3. Alternatively, if BP p.l.c. contests that it is subject to jurisdiction under Louisiana's long-arm jurisdiction statute, then this Court may exercise personal jurisdiction over BP p.l.c. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, the federal long-arm jurisdiction provision, because claims in this action arise under federal law, the exercise of jurisdiction over BP p.l.c. is consistent with the United States Constitution and laws."

4. This Court also has specific jurisdiction over BP p.l.c. pursuant to

Louisiana's long-arm specific jurisdiction provision (13 Louisiana Statute § 3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure. Plaintiffs' causes of action arise out of wrongful conduct committed by BP p.l.c., directly or indirectly by its agents, that caused injury or damage in Louisiana by an offense or quasi offense committed through an act or omission outside of Louisiana, and BP, p.l.c. regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana. These acts or omissions took place both before the blowout resulting in the oil spill and in the negligent conduct of BP, p.l.c. after the blowout in attempting to contain the catastrophic damage caused by the oil spill.

5.      In addition, this Court also has personal jurisdiction over BP p.l.c. under agency principles, because BP p.l.c.'s agents, BP America and BP Exploration, do business in Louisiana. BP America and BP Exploration are both wholly-owned subsidiaries of BP p.l.c. In BP p.l.c.'s Annual Report for 2009, in which it presents a consolidated financial statement that includes BP America and BP Exploration, BP p.l.c. states that it "controls" both BP America and BP Exploration, among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities . . . ." 194. BP p.l.c.'s direct, joint and/or assumed responsibility and/or liability for safety and well control, both before and/or after the explosions and blowout on April 20, 2010, is further evidenced by the announcement of the Macondo Project on the BP

website hosted and copyrighted by BP p.l.c., the publication of information

concerning the casualty and spill on the BP website hosted and copyrighted

by BP, the express and/or implied acceptance of responsibility for the safety

of BP operations in North America and the Gulf of Mexico in statements by

officers of BP p.l.c., the presence (upon information and belief) of a BP p.l.c.

officer or employee on the Deepwater Horizon for the celebration that

occurred shortly before the explosions and fire, the direct participation of BP

p.l.c. employees in the post-casualty investigation, the direct participation of

BP p.l.c. officers and employees in the Governmental post-casualty

investigations, the direct participation of BP p.l.c. officers and employees in

the post-casualty well-control efforts, and the direct participation of BP p.l.c.

in the establishment and/or funding of the Escrow Fund and/or Gulf Coast

Claims Facility.

BP Exploration, BP America, and BP p.l.c. are generally referred to herein collectively as

"BP." As lease operator of the Macondo prospect site, BP was responsible for assessing the geology

of the prospect site, engineering the well design, obtaining regulatory approvals for well operations,

and retaining and overseeing the contractors working on the various aspects of the well and  the

drilling operations.

D.     **Transocean Ltd.** ("Transocean Ltd.") is a Swiss corporation that maintains substantial U. S. offices in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. According to its Complaint and Petition for Exoneration from or Limitation of Liability, Transocean Ltd. was an owner, managing owner, owner pro hac vice, and/or operator of the Deepwater Horizon.

E.     **Transocean Offshore Deepwater Drilling, Inc.** ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner pro hac vice, and/or operator of the Deepwater Horizon.

F.     **Transocean Deepwater, Inc.** ("Transocean Deepwater"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Deepwater is affiliated with Transocean Ltd. and was an owner, managing owner, owner pro hac vice, and/or operator of the Deepwater Horizon.

G.     **Transocean Holdings, LLC** ("Transocean Holdings"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Holdings is affiliated with Transocean Ltd. and is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings is an owner, managing owner, owner pro

hac vice, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Spill originated. More specifically, Transocean Holdings is party to the contract with BP regarding the lease of the Deepwater Horizon for drilling operations in the Gulf of Mexico. On April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the blowout by the Deepwater Horizon.

H.   **Triton Asset Leasing GmbH** ("Triton"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Swiss limited liability company with its principal place of business in Zug, Switzerland. Triton is affiliated with Transocean Ltd. and is an owner, managing owner, owner pro hac vice, and/or operator of the Deepwater Horizon.

Transocean Ltd., Transocean Deepwater, Transocean Offshore, Transocean Holdings, and Triton are hereinafter referred to collectively as "Transocean." At the Macondo site, Transocean provided the Deepwater Horizon vessel and personnel to operate it. At all times relevant to the Spill, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control  systems. Transocean also provided operational support for drilling-related activities on board the Deepwater Horizon, as well as onshore supervision and support for those drilling activities at all times relevant to the Spill.

I.    **Halliburton Energy Services, Inc.** ("Halliburton"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Delaware corporation with its principal place of business in Houston, Texas. Halliburton is registered to do and does business in the State of Louisiana. Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the Deepwater Horizon, as well as onshore engineering support for those operations. Halliburton was responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo well. At and before the time of the blowout, Halliburton was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil. Halliburton division Sperry Drilling Services (formerly Sperry Sun Drilling Services) was responsible for mudlogging personnel and equipment on the Deepwater Horizon, including downhole drilling tools. Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations. Throughout this Complaint "Halliburton" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

BP, Transocean and Halliburton are collectively referred to herein as the "Drilling Defendants," as they were all involved in the drilling, cementing, and other temporary well abandonment activities of the Deepwater Horizon, and thus their actions caused and/or contributed to the Spill.

J.      **Cameron International Corporation f/k/a Cooper-Cameron Corporation** ("Cameron"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Delaware corporation with its principal place of business in Houston, Texas. Cameron is registered to do and does business in the State of Louisiana. Cameron manufactured, designed, supplied, and/or installed the Deepwater Horizon's sub-sea emergency well-closure device known as a blowout-preventer ("BOP"), which is, and was at all material times, an appurtenance of the vessel and a part of the vessel's equipment. The Cameron-made BOP that was installed at the Macondo wellhead failed to operate as intended at the time of the blowout on April 20, 2010, was improperly designed, was inappropriate for the intended environment or use, and/or possessed product defects.

K.      **Weatherford U.S. L.P.** ("Weatherford"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Louisiana limited partnership that maintains its principal place of business in Houston, Texas, and that at all pertinent times was registered to do, and was doing business in Louisiana and within this district. Weatherford designed and manufactured, marketed, sold, and/or distributed the casing components such as the float collar, shoe, and centralizers appurtenant to the vessel, and provided the personnel and equipment for running the casing and casing components into the wellbore.

L.      **Anadarko Petroleum Corporation Co.** ("Anadarko"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Delaware corporation with its principal place of business in The Woodlands, Texas. Anadarko is registered to do and does business in the State of Louisiana. Anadarko is an oil and gas

exploration and production company.

M.    **Anadarko E&P Company LP** ("Anadarko E&P"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Delaware limited partnership with its principal place of business in The Woodlands, Texas. Anadarko E&P is registered to do and does business in the State of Louisiana. Anadarko E&P is an oil and gas exploration and production company.

N.    **MOEX Offshore 2007 LLC** ("MOEX Offshore"),Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Delaware corporation with its principal place of business in Houston, Texas. MOEX Offshore does business in the State of Louisiana and/or in state and/or federal waters off the coast of Louisiana. MOEX Offshore is a wholly-owned subsidiary of MOEX USA Corporation.

O.    **MOEX USA Corporation** ("MOEX USA"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is incorporated in Delaware and has its principal place of business in Houston, Texas. MOEX USA is the parent company of MOEX Offshore. According to Texas Secretary of State records, the stated business purposes of MOEX USA include the direct or indirect engagement in the business of "exploration, development and production of hydrocarbons and any business related to the exploration, development and production of hydrocarbons," and the acquisition of "Hydrocarbon Interests by purchase, lease, farm-in, license, exchange or other means or methods. . . ."

P.    **Mitsui Oil Exploration Co., Ltd.** ("MOECO"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is incorporated in Japan and

has its principal place of business in Tokyo, Japan. As of June 30, 2010, MOECO identified itself as having the following U.S. subsidiaries or affiliates: MitEnergy Upstream LLC, MOEX USA Corporation, MOEX Offshore 2007 LLC, MOEX Gulf of Mexico Corporation, MOEX Oil & Gas Texas LLC, and Mitsui E&P USA LLC. Each of these subsidiaries of MOECO share the same Houston, Texas, address. MOECO states on its website as follows: "MOEX USA Corporation, a wholly owned subsidiary of MOECO, has a 10% interest in ultra-deepwater Mississippi Canyon 252, located in the U.S. Gulf of Mexico, through its 100% owned subsidiary, MOEX Offshore 2007 LLC." In a press release dated July 24, 2007, MOECO announced that it had entered into an "Acquisition and Participation Agreement with BP Exploration and Production, Inc. … on the 29th of June 2007 to participate in an ultra-deep gas exploration project in the Gulf of Mexico …which is being actively pursued by BP." According to the release, "MOECO decided to participate in the project based upon its evaluation of the prospect which BP's [Gulf of Mexico] technical team has conducted extensive study and research [sic]." The release also indicates that "Japan Oil, Gas and Metals National Corporation . . . has agreed to provide equity capital finance for MOECO's share of the drilling costs payable under the Acquisition and Participation Agreement. An exploratory well is scheduled to be drilled from September 2007 by BP as the operator and as a result of the participation and such well interests in the project will be BP (75%), MOECO (15%) and other (10%)." The release concludes with MOECO indicating that its participation in the project "provides an excellent opportunity to further expand its business in the U.S." See www.MOECO.co.jp/english/topics/070724.html.

Defendants MOEX Offshore, MOEX USA, and MOECO are referred to collectively herein as "MOEX."

While BP was the sole lease operator of the Deepwater Horizon, Anadarko, Anadarko E&P, and MOEX were considered non-operational leaseholders. On October 1, 2009, BP Exploration, as operator, and MOEX Offshore, as non-operator, entered into the Macondo Prospect Offshore Deepwater Operating Agreement. On December 17, 2009, BP Exploration, MOEX Offshore, Andarko E&P, and Andarko executed a "Joinder" of the Operating Agreement. Subsequently, the parties to the Operating Agreement held the following ownership percentages in the Macondo Prospect: BP Exploration, 65%; MOEX Offshore, 10%; Anadarko E&P, 22.5%; and, Anadarko, 2.5%. According to the MMS's website, effective April 1, 2010, record title interest in the Macondo prospect was held as follows: BP Exploration, 65%; MOEX Offshore, 10%; and, Anadarko, 25%. As joint holders of a leasehold interest in an oil or gas lease on land beneath navigable waters, Defendants Anadarko, Anadarko E&P, and MOEX are jointly, severally, and solidarily liable with their codefendants BP pursuant to the Oil Pollution Act. Anadarko, Anadarko E&P, and MOEX also had access to Halliburton/Sperry Sun INSITE realtime data that was transmitted from the Deepwater Horizon on April 20, 2010, and therefore knew or should have known of the red flags indicating a leak in the well in sufficient time to avert the disaster.

3.

Keith and Missy Jones are the legal and natural parents of Gordon Lewis Jones.

4.

At all times pertinent herein, including April 20, 2010, Michelle M. Jones was married to and living with Gordon Lewis Jones. Of that marriage two children were born: Stafford Hess Jones, born on March 28, 2008 and Maxwell Gordon Jones, born on May 14, 2010.

5.

On or about April 20, 2010, Gordon Lewis Jones was an employee of M-I, L.L.C. and working as a seaman and member of the crew of the semi-submersible mobile drilling unit, Deepwater Horizon, which was a vessel operating in the navigable waters of the Gulf of Mexico off the coast of Louisiana.

6.

On April 20, 2010, because of the conduct of defendants described elsewhere herein, Gordon Lewis Jones suffered severe fright, mental anguish and distress, grievous bodily injury, great physical pain and suffering and after same ultimately died as a result of the blow out, explosions, fire and sinking of the Deepwater Horizon. Jones' body was never found and a judgment of Presumed Death was signed and entered on August 10, 2010.

7.

Plaintiffs incorporates herein by reference paragraphs 225 - 440 of the MASTER COMPLAINT, CROSS-CLAIM, AND THIRD PARTY COMPLAINT FOR PRIVATE ECONOMIC LOSSES IN ACCORDANCE WITH PTO NO. 11 [CMO NO. 1], SECTION III (B1) ["B1 BUNDLE"], DOCUMENT NO. 879 (hereinafter, B1 Master Complaint).

8.

Plaintiffs incorporate herein by reference paragraphs 501-506, 508, 510, 512-513, 518-529, 533-543, 522, 552-558 of the B1 Master Complaint.

9.

BP and Transocean acted with gross negligence, willful misconduct and reckless disregard for human life by, among other things, using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

10.

Plaintiffs incorporate herein by reference, paragraphs 561-581, 583-600, 668-689 of the B1 Master Complaint.

11.

Plaintiffs show that the accident and resulting injuries to and death of Gordon Lewis Jones and the damages sued upon were the direct and proximate result of the gross, willful, and wanton negligence and fault of the Transocean defendants, and unseaworthy conditions caused, created or allowed to exist by virtue of these defendants' gross, willful and wanton conduct.  Said negligence, fault, conduct and conditions are listed more particularly but not exclusively, as follows:

A.     Negligent failure to properly perform the operation ongoing at the time of the accident in question;

B.     Negligent failure to take all appropriate precautions to avoid an accident and explosion of the kind which occurred;

C.     Negligent failure to have all proper equipment and gear necessary to perform the job being performed at the time of the accident and explosion in a safe manner;

D.     Negligent failure to keep the equipment on board the vessel in proper condition and repair;

E.     Negligent failure to properly inspect the rig and all of its equipment and gear;

F.     Negligent failure to have sufficient number of properly trained and qualified personnel to perform the job being performed at the time of the accident and explosion in a safe manner;

G.     Negligent failure to properly train and/or instruct and/or warn Gordon Lewis Jones and those similarly situated;

H.     Negligent violation of government and industry rules, regulations and standards;

I.     Proceeding with the operation ongoing prior to the accident in the face of negative pressure and other testing which showed that well integrity had not been established and that there was an extreme risk of a blowout, explosion and fire;

J.     Placement of heavy drilling mud with seawater at a time when there was no well integrity, underbalancing the well and allowing hydrocarbons under pressure to flow up to the production casing and past the blow out preventer;

K.     Ignoring data showing an influx of pressured hydrocarbons and an increase in drill pipe pressure which were unmistakable signs of an impending blowout or blowout in progress;

L.     Failing to take steps to prevent the impending blowout or blowout in progress in the face of test data which called for immediate protective measures to control well;

M.     Closing the blow out preventer and diverter, routing the fluids exiting the riser to the vessel's mud gas separator system rather than to the overboard diverter line;

N.     Following the diversion of hydrocarbons to the mud gas separator, venting the

hydrocarbons directly onto the rig through a 12 inch gooseneck vent and other flowlines which allowed the hydrocarbons onto the rig floor to be exposed to ignition sources;

O.     Failing to properly inspect, maintain and repair a blowout preventer, which blowout preventer was in disrepair and was unseaworthy and which failed to seal the well;

P.     Having a fire and gas system which allowed for the dispersion of hydrocarbons and, ultimately, their ignition and which rendered the vessel unseaworthy;

Q.     Having a crew which was not properly trained and overly worked which rendered the vessel unseaworthy;

R.     Violation of statutes and/or regulations and/or rules designed to promote and foster safety which constitutes negligence *per se*;

S.     Other items of unseaworthiness which may be shown from discovery or trial;

T.     Other acts of gross, willful, reckless, and wanton conduct which may be shown through discovery or at trial; and

U.     Generally, the failure of these defendants to act with the required degree of care commensurate with the existing situation.

12.

Plaintiffs show that the accident and resulting injuries to and death of Gordon Lewis Jones and the damages sued upon were the direct and proximate result of the gross, willful, and wanton negligence and conduct of the BP defendants which is listed more particularly, but not exclusively, as follows:

A.     Negligent failure to properly perform the operation ongoing at the time of the accident in question;

B.     Negligent failure to take all appropriate precautions to avoid an accident and explosion of the kind which occurred;

C.     Negligent failure to have all proper equipment and gear necessary to perform the job being performed at the time of the accident and explosion in a safe manner;

D.     Negligent failure to keep the equipment on board the vessel in proper condition and repair;

E.     Negligent failure to properly inspect the rig and all of its equipment and gear;

F.     Negligent failure to have sufficient number of properly trained and qualified personnel to perform the job being performed at the time of the accident and explosion in a safe manner;

G.     Negligent failure to properly train and/or instruct and/or warn Gordon Lewis Jones and those similarly situated;

H.     Negligent violation of government and industry rules, regulations and standards;

I.     Proceeding with the operation ongoing prior to the accident in the face of negative pressure and other testing which showed that well integrity had not been established and that there was an extreme risk of a blowout, explosion and fire;

J.     Placement of heavy drilling mud with seawater at a time when there was no well integrity, underbalancing the well and allowing hydrocarbons under pressure to flow up to the production casing and past the blow out preventer;

K.     Ignoring data showing an influx of pressured hydrocarbons and an increase in drill pipe pressure which were unmistakable signs of an impending blowout or blowout in progress;

L.     Failing to take steps to prevent the impending blowout or blowout in progress in the

face of test data which called for immediate protective measures to control well;

M.      Closing the blow out preventer and diverter, routing the fluids exiting the riser to the vessel's mud gas separator system rather than to the overboard diverter line;

N.      Following the diversion of hydrocarbons to the mud gas separator, venting the hydrocarbons directly onto the rig through a 12 inch gooseneck vent and other flowlines which allowed the hydrocarbons onto the rig floor to be exposed to ignition sources;

O.      Failing to properly inspect, maintain and repair a blowout preventer, which blowout preventer was in disrepair and was unseaworthy and which failed to seal the well;

P.      Having a fire and gas system which allowed for the dispersion of hydrocarbons and, ultimately, their ignition and which rendered the vessel unseaworthy;

Q.      Violation of statutes and/or regulations and/or rules designed to promote and foster safety which violation constitutes negligence *per se*;

R.      Other acts of gross, willful, reckless, and wanton conduct which may be shown through discovery or at trial; and

S.      Generally, the failure of these defendants to act with the required degree of care commensurate with the existing situation.

13.

Plaintiffs show that the accident and resulting injuries to and death of Gordon Lewis Jones and the damages sued upon were the direct and proximate result of the gross, willful, and wanton negligence and conduct of Halliburton which is listed more particularly, but not exclusively, as follows:

A.   Its (their) strict liability for the defective and unreasonably dangerous design, manufacturing, marketing and sale of a defective and unreasonably dangerous product, namely the cement which ultimately failed and led to the explosion and fire aboard the Deepwater Horizon;

B.   Its (their) grossly negligent failure to properly test the cement product before selling it to BP and allowing it to be used aboard the Deepwater Horizon;

C.   Its (their) grossly negligent failure to properly and adequately inform, communicate and warn BP of test data or its failure to have adequate test data before selling it to BP and allowing it to be used aboard the Deepwater Horizon;

D.   Negligent failure to keep the equipment on board the vessel in proper condition and repair;

E.   Negligent failure to properly inspect the rig and all of its equipment and gear;

F.   Negligent failure to have sufficient number of properly trained and qualified personnel to perform the job being performed at the time of the accident and explosion in a safe manner;

G.   Negligent failure to properly train and/or instruct and/or warn Gordon Lewis Jones and those similarly situated;

H.   Negligent violation of government and industry rules, regulations and standards;

I.      Proceeding with the operation ongoing prior to the accident in the face of negative pressure and other testing which showed that well integrity had not been established and that there was an extreme risk of a blowout, explosion and fire;

J.      Placement of heavy drilling mud with seawater at a time when there was no well integrity, underbalancing the well and allowing hydrocarbons under pressure to flow up to the production casing and past the blow out preventer;

K.      Ignoring data showing an influx of pressured hydrocarbons and an increase in drill pipe pressure which were unmistakable signs of an impending blowout or blowout in progress;

L.      Failing to take steps to prevent the impending blowout or blowout in progress in the face of test data which called for immediate protective measures to control well;

M.      Closing the blow out preventer and diverter, routing the fluids exiting the riser to the vessel's mud gas separator system rather than to the overboard diverter line;

N.      Following the diversion of hydrocarbons to the mud gas separator, venting the hydrocarbons directly onto the rig through a 12 inch gooseneck vent and other flowlines which allowed the hydrocarbons onto the rig floor to be exposed to ignition sources;

O.      Failing to properly inspect, maintain and repair a blowout preventer, which blowout preventer was in disrepair and was unseaworthy and which failed to seal the well;

P.      Having a fire and gas system which allowed for the dispersion of hydrocarbons and, ultimately, their ignition and which rendered the vessel unseaworthy;

Q.      Violation of statutes and/or regulations and/or rules designed to promote and foster safety which constitutes negligence *per se*;

R.      Other acts of gross, willful, reckless, and wanton conduct which may be shown through discovery or at trial; and

S.      Generally, the failure of these defendants to act with the required degree of care commensurate with the existing situation.

14.

Plaintiffs show that the accident and resulting injuries and damages sued upon were also the direct and proximate result of the negligence and fault of Halliburton, which negligence and fault is listed more particularly, but not exclusively, as follows:

A.      Its (their) gross, willful, wanton and reckless negligence and conduct in the cementing of the well and well cap;

B.      Its (their) gross, willful, wanton and reckless negligence and conduct in performing other operations aboard the vessel Deepwater Horizon;

C.      Other acts of negligence and fault which may be shown through discovery or at trial; and

D.      Generally, the failure of this (these) defendant(s) to act with the required degree of care commensurate with the existing situation.

15.

Plaintiffs show that the accident and resulting injuries and damages sued upon were also the direct and proximate result of the negligence, strict liability and fault of Cameron which negligence, strict liability and fault is listed more particularly, but not exclusively, as follows:

A.      Its defective, unreasonably dangerous and negligent design, manufacture, marketing and sale of the BOP and associated piping and equipment;

B.      Its negligent failure to properly test said equipment;

C.    Its negligent failure to properly instruct and/or warn regarding said equipment;

D.    Its negligent failure to properly train regarding the safe use of its equipment;

E.    Its gross, willful, wanton and reckless conduct and negligence, as stated above;

F.    Other items of strict liability, negligence and fault which may be shown through discovery or at trial; and

G.    Generally, the failure this defendant act with the required degree of care commensurate with the existing situation.

16.

Plaintiffs specifically plead the doctrine of *res ipsa loquitur* inasmuch as the defendants herein owned and had custody and control of the rig where the accident and explosion occurred and the accident and explosion could not have occurred absent the negligent conduct of one or all of the defendants herein.

17.

Plaintiff is entitled to recover as personal representative of the decedent Gordon Lewis Jones the following nonexclusive list of items of damage proximately caused by the negligence, fault and breach of obligations owed by defendants to plaintiff and the decedent's beneficiaries:

A.    Physical injury, pain and suffering of Gordon Lewis Jones prior to death;

B.    Extreme fright, mental injury and mental anguish and distress and fright for Gordon Lewis Jones prior to death;

C.    Loss of earnings and/or support, past and future;

D.    Loss of found, past and future;

E.    Funeral and related expenses;

F.    Loss nurture, guidance and support;

G.  Mental anguish, grief, profound depression, anxiety and suffering of Michelle M. Jones;

H.  Loss of enjoyment of life of Michelle M. Jones and her two children;

I.  Loss of love, affection, comfort, and society of Michelle M. Jones and her two children;

J.  Medical and related expenses of Michelle M. Jones;

K.  Loss of inheritance;

L.  Punitive or exemplary damages;

M.  Other items of damage which may be shown through discovery or at trial;

N.  All appropriate general and equitable relief;

O.  Prejudgment interest on all sums awarded from date of loss until judgment;

P.  Post-judgment interest on all sums awarded from date of judgment until paid; and

Q.  All court costs and litigation costs allowed by law.

WHEREFORE, Michelle M Jones, as personal representative of the decedent Gordon Lewis Jones on behalf of the beneficiaries of same including Michelle M Jones and the two minor children born of Gordon Lewis Jones and Michelle M. Jones (Stafford Hess Jones and Maxwell Gordon Jones) and the parents of Gordon Lewis Jones, Keith D. Jones and Eilleen K. "Missy" Jones, pray that after the proceedings are had there be judgment in their favor and against all named defendants herein, *in solido*, for compensatory and punitive, exemplary and other appropriate damages allowed by law with legal interest thereon from the date of loss until paid at for all costs of these proceedings. Plaintiff prays for all other relief as may be just and equitable in the premises.

By attorneys:


_____*s/John W. deGravelles*_____

**JOHN W. deGRAVELLES** (#04808)
RANDOLPH W. HUNTER (#7084)
J. NEALE deGRAVELLES (#29143)
deGravelles, Palmintier, Holthaus & Frugé, L.L.P.
618 Main Street
Baton Rouge, Louisiana  70801-1910
Telephone:  225/344-3735
Facsimile:  225/336-1146
jdegravelles@dphf-law.com
rhunter@dphf-law.com
ndegravelles@dphf-law.com


### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of March, 2011, the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Don K. Haycraft, James P. Roy and Stephen J. Herman by operation of the court's electronic filing system and to all counsel of record through the Lexis Nexis File & Serve.


_____*s/John W. deGravelles*_____
**JOHN W. deGRAVELLES**