# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ' ' ' ' | MDL NO. 2179  SECTION: J |
| *This document relates to:* 2:11-cv-00261 *Billy Coon, et al v. BP Exploration & Production, Inc. et al* | ' ' ' | JUDGE BARBIER  MAG. JUDGE SHUSHAN |

## Plaintiffs' Amended Complaint

Subject to Plaintiffs' Motions to Remand, Plaintiffs Billy Coon and Carl Taylor, (collectively as "Plaintiffs") complain of Defendants BP Products North America Inc. ("BP"), BP Exploration and Production Inc. ("BP"), BP, PLLC ("BP"), BP Corporation North America, Inc. ("BP"), Halliburton Energy Services, Inc. ("Halliburton"), and Cameron International Corporation d/b/a Cameron Systems Corporation ("Cameron") (all defendants collectively as "Defendants"), and would respectfully show the Court that:

### I.

### Jurisdiction and Venue

1. This claim is maintained under the Jones Act (46 U.S.C. §§ 30104, *et seq.*) and/or the general maritime law of the United States.[1]  The Court lacks subject-matter jurisdiction and/or this case was improperly removed to federal court and should be remanded.  The purported basis for subject-matter jurisdiction is 28 U.S.C. § 1331 (federal question) because OCSLA is alleged to apply.

2. Venue is laid in this district pursuant to 28 U.S.C. § 1407 for coordinated pre-trial proceedings.  However, Plaintiffs deny that venue is proper here for trial.

---

[1] Plaintiffs deny that OCSLA applies.  However, if OCSLA does somehow apply, then Mississippi is the "adjacent" state and Mississippi law applies by virtue of OCSLA.  Alternatively, Louisiana law would apply.

## II.

## Parties

3. Plaintiff Billy Coon is a resident of Mississippi. At the time of the explosion Mr. Coon was employed by Transocean where had worked for 10 years. His path to a lifeboat was blocked by a subsequent explosion. Rather than just taking off in a lifeboat, Mr. Coon helped load wounded men.

4. Plaintiff Carl Taylor is a resident of Mississippi. He worked for Transocean at the time of the explosion.

5. Defendant BP Products North America Inc. is a foreign entity with its principal place of business in Texas.

6. Defendant BP Exploration and Production Inc. is a foreign entity with its principal place of business in Texas.

7. Defendant BP, LLC is a foreign entity with its principal place of business in Texas.

8. Defendant BP Corporation North America, Inc. is a foreign entity with its principal place of business in Texas.

9. Defendant Halliburton Energy Services, Inc. is a foreign entity with its principal place of business in Texas.

10. Defendant Cameron International Corporation d/b/a Cameron Systems Corporation is a foreign corporation with its principal place of business in Texas.

### III.

### Nature of the Action

11. Plaintiffs suffered severe injuries as a result of the senseless DEEPWATER HORIZON explosion on April 20, 2010. At the time, Plaintiffs were seamen, borrowed or otherwise. While the DEEPWATER HORIZON was deployed on navigable waters, and while Plaintiffs were each contributing to and aiding such vessel to accomplish its mission, Plaintiffs were critically injured as a result of the explosion. Plaintiffs suffered smoke inhalation, physical injuries, hearing loss and other damages. Aside from the human losses, the explosion has caused what is expected to be the worst man-made environmental disaster in U.S. history – far eclipsing the EXXON VALDEZ oil spill in 1989.

12. The DEEPWATER HORIZON was a floating semi-submersible drilling rig owned by Transocean. It was built in 2001, utilized dynamic positioning technology, and was designed to move from location to location as necessary. BP leased the drilling rig from Transcocean for $500,000 per day. The total lease contract was worth more than $544 million. Prior to the April 20th explosion, the DEEPWATER HORIZON had suffered other fires, collisions, and oil spills.

13. As a result of the tragedy, U.S. Attorney General Eric Holder is considering bringing criminal charges against BP. This would not be the first time BP has faced criminal charges in relation to its activities in and around the Gulf of Mexico. In 2007, BP pled guilty to felony charges arising out of the March 2005 explosion at its Texas City refinery which killed 15 workers and injured hundreds more. After that explosion, BP was fined more than $21 million by OSHA – the largest penalty ever issued at that time. BP was also required to

fix the deficiencies which led to the Texas City disaster. However, BP refused to comply with its obligations and failed to make the required safety upgrades. As a result, in 2009, BP was fined an additional $87 million by OSHA – by far the largest fine in OSHA history. BP's reckless safety culture is systemic.

14.     The DEEPWATER HORIZON tragedy was caused by, among other things, a failure of the rig's well control system. Cameron supplied much of the rig's inadequate, defective blow out prevention equipment. For instance, Cameron designed, manufactured, and supplied the rig's blowout preventer ("BOP") and component parts for the BOP. The BOP was unreasonably dangerous when it left Cameron's control. Cameron expressly represented, in writing and orally, that the BOP was effective for preventing blowouts. Cameron anticipated, and indeed was informed by Transocean, that the BOP would be used in deepwater conditions. These warranties were breached because the BOP was not effective in preventing blowouts (and did not prevent the blowout on April 20, 2010). In short, the BOP failed to operate on April 20, 2010 and was not fit for its ordinary purpose. This occurred because, in designing, constructing, composing, and manufacturing the BOP (and its component parts), Cameron relied on calculations to determine the needed strength of its component parts in deepwater conditions, as opposed to actually testing the components in deepwater conditions. The calculations were improper and resulted in a BOP that would not be effective in deepwater conditions like those that existed for the incident in question. This is because Cameron used shear forces lower than required or desired for the BOP in question. Additionally, the rubber gaskets or "packers" on the BOP were too small and too weak to prevent the blowout. This made the BOP unreasonably dangerous. This defect existed when

the BOP left Cameron's control.  These defects also resulted in a nonconformity to express warranties given by Cameron for the BOP in question.  Moreover, this made the BOP unreasonably dangerous in construction, composition, and design.  Cameron failed to warn anyone that the BOP would likely not prevent blowouts in deepwater even though it knew this to be the case.  Cameron also failed to warn of the defectively designed and/or manufactured packers.  These defects existed when the BOP left Cameron's control.  The defects caused a danger to everyone on the rig who depended and relied on the BOP to prevent blowouts.  These defects was not known by anyone other than Cameron and no one else had any reason to know about the defects.

15.     Halliburton was in charge of cementing the well, but failed to safely do its job. Halliburton knew or, based on its experience in the industry, should have known that poor cementing significantly increases the risk of a blowout.  Halliburton's cementing job should have filled the annulus between the casing and the well bore and sealed off the hydrocarbon-filled formations.  It also should have plugged the bottom of the casing pipe to prevent an influx.  However, the cement slurry Halliburton designed and created on this job failed to perform these function.  Halliburton's light nitrified foam cement slurry failed in its function and allowed hydrocarbons to enter the wellbore annulus.  The cement design and testing was improper and fell far below the standard of care.  In fact, the slurry failed multiple stability tests prior to the blowout.  Halliburton ignored these failed tests.  Halliburton's account representative/engineer on the rig knew about these problems and complained that there was a "high probability" of explosive gas flowing through the cement unless changes were made. Further, the Macondo well was located in brittle, variable rock formations laced with volatile

high temperature, high pressure, and gaseous hydrocarbon reserves. Given this environment, Halliburton's improper cement mixture was a recipe for disaster. This conduct was willful, wanton, reckless and grossly negligent. Halliburton was aware of this conduct, authorized it, and ratified it. Moreover, BP complained that Halliburton's account representative/engineer was not competent to perform his cement-related job responsibilities. Halliburton had a duty to train and supervise him, but failed. Moreover, Halliburton was charged with real time gas monitoring, but failed to notice the dangerous pressure readings (or noticed, but failed to inform the proper persons or take appropriate action). Had Halliburton safely performed this function, the factors leading to the blowout would have been detected in time to take proper preventative actions.

16. Halliburton's faulty cementing work has been linked to other major offshore disasters, including nearly half of all Gulf of Mexico blowouts since 1992. Halliburton's cementing work also caused a massive blowout in August 2009 on another rig off the coast of Australia.

17. Defendants are negligent, negligent per se, grossly negligent, and reckless for the following reasons:

      a.    failure to properly supervise their crew;

      b.    failure to properly train their employees;

      c.    failure to provide adequate safety equipment;

      d.    failure to provide adequate medical treatment;

      e.    operating the vessel with an inadequate crew;

      f.    failure to maintain the vessel;

      g.    failure to conduct a proper search and rescue mission;

      h.    vicariously liable for their employees' and agents' negligence, gross negligence, and recklessness;

      i.    violating applicable Coast Guard, MMS, and/or OSHA regulations;

      j.    failure to provide plaintiff with a safe place to work, and requiring plaintiff to work in unsafe conditions;

      k.    failure to provide sufficient personnel to perform operations aboard the vessel;

      l.    failure to exercise due care and caution;

      m.    failure to avoid this accident; and

      n.    other acts deemed negligent.

18. At all relevant times, the DEEPWATER HORIZON was unseaworthy.

19. Plaintiffs further adopt and incorporate the allegations made in Case 2:10-md-02179; Doc. # 879 at ¶¶ 27-101; 122-132; 145-149; 170-172; 177- 179; 225-439; 563-582 and Doc. # 1320 at ¶¶ XLII; XLIV; XLVI.

20. As a result of said occurrences, Plaintiffs sustained the following damages:

      a.    Past, present, and future physical pain and suffering;

      b.    Past, present, and future mental pain, suffering, emotional distress, and anguish;

      c.    Past, present, and future medical expenses;

      d.    Past lost wages;

      e.    Loss/impairment of future earning capacity;

      f.    Loss of fringe benefits;

      g.    Disfigurement and disability;

   h. Loss of enjoyment of life;

   i. All other damages recoverable under law.

 21. Plaintiffs are also entitled to punitive damages because the aforementioned actions of Defendants were grossly negligent and reckless. Defendants' conduct was willful, wanton, arbitrary, and capricious. They acted with flagrant and malicious disregard of Plaintiffs' health and safety and the health and safety of Plaintiffs' co-workers. Defendants were subjectively aware of the extreme risk posed by the conditions which caused Plaintiffs' injuries, but did nothing to rectify them. Instead, Defendants had Plaintiffs and other crew members continue working despite the dangerous conditions that were posed to them and the faulty, defective equipment provided to them. Defendants did so knowing that the conditions posed dangerous and grave safety concerns. Defendants' acts and omissions involved an extreme degree of risk considering the probability and magnitude of potential harm to Plaintiffs and others. Defendants had actual, subjective awareness of the risk, and consciously disregarded such risk by allowing Plaintiff to work under such dangerous conditions. Moreover, Plaintiffs may recover punitive damages under the general maritime law following the United States Supreme Court's ruling in *Atlantic Sounding* and *Exxon Shipping Company*.

 22. As a result of said occurrences, Plaintiffs sustained severe injuries to his body which resulted in physical pain, suffering, mental anguish, fear, and discomfort. Plaintiffs continue to suffer following their injuries. They are owed maintenance and cure for the past and the future. To the extent Defendants have refused and will refuse to pay Plaintiffs maintenance and cure, their refusal is willful, intentional, arbitrary, and capricious, entitling

Plaintiffs to an award of attorneys' fees and punitive damages. Plaintiffs have sustained a loss of earnings in the past and earning capacity in the future. Plaintiffs have been damaged in a sum far in excess of the minimum jurisdictional limits of this Honorable Court, for which they now sue.

## IV.

## Jury Trial

23. Plaintiffs hereby request a trial by jury on all claims.

## V.

## Prayer

Plaintiffs prays that this citation issue and be served upon Defendants in a form and manner prescribed by law, requiring that the Defendants appear and answer, and that upon final hearing, Plaintiffs have judgment against Defendants, both jointly and severally, in a total sum in excess of the minimum jurisdictional limits of this Court, plus pre-judgment and post-judgment interests, all costs of Court, attorneys' fees, punitive damages, and all such other and further relief, to which they may show themselves justly entitled.

Respectfully submitted,

ARNOLD & ITKIN LLP

*/s/ Kurt B. Arnold*

_____
Kurt B. Arnold, Texas Bar No. 24036150
Robert P. Wynne, # 30123
Jason A. Itkin, Texas Bar No. 24032461
Cory D. Itkin, Texas Bar No. 24050808
M. Paul Skrabanek, Texas Bar No. 24063005
1401 McKinney Street, Suite 2550
Houston, Texas 77010
Telephone: (713) 222-3800
Facsimile: (713) 222-3850

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on March 11, 2011.

*/s/ Kurt B. Arnold*

_____
Kurt B. Arnold