# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010

MDL NUMBER 2179  SECTION: J

JUDGE BARBIER

THIS DOCUMENT RELATES TO:

02:10-CV-1196

MAGISTRATE JUDGE SHUSHAN

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OF MICHELLE M. JONES IN OPPOSITION TO MOTION TO DISMISS FILED BY HALLIBURTON ENERGY SERVICES, INC AND HALLIBURTON COMPANY

MAY IT PLEASE THE COURT:

## I.      INTRODUCTION

Gordon Lewis Jones was a seaman working aboard the *Deepwater Horizon* on April 20, 2010 at the time of the blowout, explosions, fire and sinking of the vessel. Michelle M. Jones is the widow of Gordon Lewis Jones and the mother of their two children, Stafford Hess Jones and Maxwell Gordon Jones. For reasons which are unclear, Halliburton Energy Services Inc. (hereinafter "HESI") has filed a Motion to Dismiss Jones' *First* Amending Complaint [Record Document 1193] although Jones had filed a *Second* Amended Complaint [Record Document 696] at the time of HESI"s Motion. Recently, Plaintiff has filed a *Third* amended complaint [Record Document 1529]. Nonetheless, Plaintiff opposes HESI's motion and will address the issues raised in the order set out in HESI's Omnibus Memorandum in Support of Motions to Dismiss Plaintiff's Bundle A Personal Injury Complaints [Record Document 1195].

## II.      RULE 12(B)(6) LEGAL STANDARD

When ruling upon a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept as true all well-plead allegations and resolve all doubts in favor of the plaintiff. *See, Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1572 (5th Cir. 1988). The Court should deny a Rule 12(b)(6) motion unless "it appears beyond doubt that the plaintiff can

prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). These Rule 12(b)(6) motions are "viewed with disfavor, and [are] rarely granted." *Sosa v. Coleman*, 646 F.2d 991, 993 (5th Cir. 1981).

## III.   PLAINTIFF'S ALLEGED CLAIMS UNDER THE JONES ACT FOR MAINTENANCE AND CURE AND FOR UNSEAWORTHINESS

HESI argues that Plaintiff Michelle Jones cannot state a claim against HESI under the Jones Act and for maintenance and cure. In neither the first, second or third amending complaint filed by Michelle Jones does she make a claim against HESI under the Jones Act or for maintenance and cure. As to this Plaintiff, this part of the motion and argument is moot.

Plaintiff is alleging that HESI's cement was defective and the cementing job was negligently done thus rendering HESI liable to Plaintiff and rendering the *Deepwater Horizon* unseaworthy. However, Plaintiff Jones is making her unseaworthiness claims against the owner and operators of the vessel, not HESI, and thus this part of HESI's motion and argument is also moot.

## IV.   PLAINTIFF HAS PLED SUFFICIENT FACTS TO STATE A CLAIM FOR RELIEF

The allegations set out in Michelle Jones' First, Second and Third Amending Complaints are sufficient and meet the *Twombly/Iqbal* plausibility standard.

### THE "BUNDLE A" WRONGFUL DEATH/PERSONAL INJURY CASES MEET THE TWOMBLY/IQBAL PLAUSIBILITY STANDARD

Concerned about the rising costs of litigation and the fairness of requiring parties to expend substantial resources and time on discovery in cases lacking the facial plausibility necessary to support a cognizable claim, the Supreme Court attempted to clarify pleading standards under the Federal Rules in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937 (2009). What the *Twombly/Iqbal* "facial plausibility" standard means has occasioned much debate, and there is no standard answer. As *Iqbal* itself explained, determining plausibility is "a context-specific task" that requires the court to "draw on its judicial experience and

common sense." 129 S.Ct. at 1949.  In the specific context of these MDL proceedings, this Court may draw on its judicial experience with maritime cases and mass disasters, and its common sense, to rebuff HESI's *Twombly/Iqbal* challenge as unnecessary and counterproductive.

A.    **The Basics**

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. at 1949; *Twombly*, 550 U.S. at 547. A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, Id.*  As the Fifth Circuit recently reiterated, "[A] complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. 544, 555).

The Fifth Circuit, in applying and interpreting the *Twombly/Iqbal* standard, has held that when faced with a Rule 12(b)(6) motion to dismiss, that is, a motion to dismiss for failure to plead a claim on which relief can be granted, "courts must . . . accept all factual allegations in the complaint as true." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009), *citing*, *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308 (2007); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination United*, 507 U.S. 163, 164 (1993). As *Lormand* reminds, "[w]e must also draw all reasonable inferences in the plaintiff's favor." 565 F.3d at 232.

B.    **The Rationale**

The fundamental point of the *Twombly/Iqbal* standard is to conserve judicial and party resources for the pleading, discovery and ultimate proof of contested issues in facially plausible cases, leaving implausible or frivolous suits behind.

According to the Supreme Court's opinion, the *Twombly* complaint alleged that major

telecommunications providers had engaged in anti-competitive parallel conduct; the complaint, however, lacked any "factual context suggesting agreement, as distinct from identical, independent action." 550 U.S. at 548, 549.  In such an antitrust action, "the crucial question" was whether the challenged conduct stemmed "from independent decisions or from an agreement, tacit or express." *Id.* at 553. This was so because "conscious parallelism" "is not in itself unlawful." *Id.* at 554.  In *Twombly*, the Supreme Court viewed potential liability as a close call, moreover, it found no allegations in the complaint suggesting that direct or circumstantial evidence would ever make the prospect of liability plausible.

As the *Twombly* court noted, "asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556. Thus, "some threshold of plausibility must be crossed at the outset before a[n] antitrust case should be permitted to go into its inevitably costly and protracted discovery phase." *Id.* at 558, *quoting*, *Asahi Glass Co. v. Pentech Pharmaceuticals, Inc.*, 289 F. Supp. 2d 986, 995 (N.D. Ill. 2003).

In *Twombly*, the Supreme Court empowered district courts to "retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed," because "the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." 550 U.S. at 558. The Supreme Court thus articulated and imposed a facial probability standard because "it is only by taking care to require [such] allegations . . . that we can hope to avoid the potentially enormous expensive discovery in cases with no 'reasonably founded hope that the [discovery] process will reveal relevant evidence.'" 550 U.S. at 560, *quoting*, *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

K:\Public\JWD.JONES.GORDON\Pleadings\USDC-ED (LA) -- CA No 10-MD-02179 & 10-2771-- AFTER transfer by JPML\Memo in Opp to Motion to Dismiss - Halliburton.wpd

Page 4 of 26

### C.  The Plausibility of *Deepwater Horizon* Claims is in the Public Domain

Here, it is beyond peradventure that a catastrophic explosion and fire occurred on the *Deepwater Horizon*, resulting directly in injuries and death among those aboard. HESI's role, in its broad outlines, and in ever-emerging detail, is likewise known. It cannot be said that substantial discovery, now ongoing, into the events leading up to the explosion and fire in general, and into HESI's role therein, is not justified in terms of time or expense. The *Twombly/Iqbal* problem does not exist in this case. Accordingly, the level of specificity and detail required in the antitrust context of *Twombly* and the invidious discrimination context of *Iqbal* should not be required here.

### D.  HESI Has Fair Notice of the Claims Against It

In addition to establishing a facial plausibility threshold, the purpose of the *Twombly/Iqbal* pleading standard is to give the defendant "fair notice of the claims against it." *Wright v. Shell Offshore, Inc.*, 2001 U.S. Dist. LEXIS 16290, *6 (E.D. La. 2011). In *Wright*, this Court recently addressed and applied the *Twombly/Iqbal* standards in a maritime context. The claim arose from exposure to benzene-containing chemicals and solvents while plaintiff worked for various employers aboard various vessels. Mr. Wright asserted a Jones Act claim of unseaworthiness and maintenance and cure against his former employers and products liability claims against an array of "Manufacturer Defendants." After Mr. Wright died of acute myelogenous leukemia, wrongful death and survivor claims were added to the suit.  In denying the Rule 12(b)(6) motion, this Court held in *Wright* that plaintiffs had "sufficiently pled enough facts to give defendant 3M Company fair notice of the claims against it in order to survive dismissal under Rule 12(b)(6)" and that "plaintiffs' lack of certain specific factual allegations as to defendant 3M Company does not necessitate a dismissal of those claims. The court finds that plaintiffs have pled enough facts to state a claim for relief that is plausible on its face and to give defendant 3M Company fair notice of those claims." *Wright*, *Id.* at **6-7.

K:\Public\JWD.JONES.GORDON\Pleadings\USDC-ED (LA) — CA No 10-MD-02179 & 10-2771— AFTER transfer by JPML\Memo in Opp to Motion to Dismiss - Halliburton.wpd

Page 5 of 26

Comparing the disposition in the *Wright* action (denial of the dismissal motion) to the factual and procedural context here, it is reasonable to expect that HESI's motion will be similarly denied. Mr. Wright's exposure to benzene was long-term (from 1976 to 2009) and occurred in the employ of various defendants at various locations. In stark contrast, the claims for personal injury and wrongful death against HESI arose from one incident, at one time and place, in a catastrophic incident that indisputably implicated the products and conduct of HESI and others. The causal connection between benzene exposure and leukemia remains controversial; indeed, defendants might argue the connection is implausible. There can be no such implausibility argument with respect to the causal connection between the *Deepwater Horizon* explosion and fire and the deaths and injuries alleged in the complaints coordinated in this MDL litigation.

HESI's precise percentage of fault and/or liability is disputed, true; but at this point, given ongoing inquiries, discovery, and governmental reports, much is known factually about HESI's role. While this was not known to plaintiffs when they filed their initial complaints, it is known to HESI now, and it is matter of both ongoing discovery under the auspices of this Court and of other public inquiries. HESI cannot claim it is not on fair notice to defend itself; indeed, HESI's counsel have been ably doing just that.

The question that must be asked is whether at this stage of the litigation requiring plaintiffs to amend their complaints to provide further factual detail will "expose the facts, ventilate the competing positions or further adjudication on the merits." Arthur R. Miller, *Conley to Twombly to Iqbal:  A Double Play on the Federal Rules of Civil Procedure*, 60 Duke L.J. 1, 3 (October, 2010). If it does not, no purpose is served by invoking *Twombly/Iqbal* after HESI has been put on fair notice of the legal claims and factual theories it faces from the plaintiffs in these cases.

### E.  Contextual Plausibility, Judicial Experience and Common Sense

*Twombly* requires "enough facts to state a claim to relief that is plausible on its face."

*Twombly*, 550 U.S. at 570.  The concise complaints challenged by HESI meet this standard in the factual and legal context of the *Deepwater Horizon* litigation.  With respect to the wrongful death and personal injury claims of those on board the rig, the claim does not turn on the arcane choice between "conscious parallelism" and a *sub rosa* antitrust conspiracy as it did in *Twombly*.  The *Deepwater Horizon's* demise is more akin to *res ipsa loquitur*, and no more need be pleaded than the facts in the Bundle A Complaints allege that HESI was engaged in cementing operations and cement supply for the rig.

HESI criticizes complaints such as the *Jones* Complaint for alleging in "conclusory fashion" that HESI was negligent "in the cementing of the well and well cap" and "in performing other operations" on the rig.[1]  However, as the Presidential Oil Spill Commission reported recently,[2] on February 17, 2011, HESI's negligence in its cementing activities is indeed implicated in the blowout. The "root technical cause" of the blowout and spill was a failure of "the cement that BP and HESI pumped to the bottom of the well."  *See, e.g.*, Jennifer A. Dlouhy (*Houston Chronicle*, *Washington Bureau*) "Spill Panel Blames Lax Oversight of Well Cementing," February 11, 2011.

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Iqbal*, 129 S.Ct. at 1949.  Here, that factual content, concise as it is (and it was concise of necessity, since these complaints were originally filed in the immediate wake of the explosion and spill), are now echoed in the exact language of official investigative reports.  Contrary to HESI's arguments, Plaintiff's "assertions of negligence and other torts" are more than "dressed-up legal conclusions" and she is indeed "entitled to the assumption of truth" for purposes of going forward via discovery to trial.[3]

---

[1]  HESI Omnibus Memorandum at p. 6, citing *Jones* complaint at ¶ 10.

[2]  http://www.oilspillcommission.gov

[3]  *See* HESI's Omnibus Memorandum at p. 13.

K:\Public\JWD.JONES.GORDON\Pleadings\USDC-ED (LA) — CA No 10-MD-02179 & 10-2771– AFTER transfer by JPML\Memo in Opp to Motion to Dismiss - Halliburton.wpd

Page 7 of 26

This is especially true given her subsequent and clarifying Second and Third Supplemental Complaints.

The transformation of the familiar Fed. R. Civ. P. 8 "short and plain statement of the claim" requirement to the more nuanced and subjective *Twombly/Iqbal* standards places "plausibility in the eye of the beholder." *See* Miller, 60 Duke L.J. at 18. The Supreme Court intended it to be so. The judicial beholder is now called upon to draw from his or her wisdom and discretion in enabling cases to advance from pleading to discovery to trial. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." 129 S.Ct. at 1949.

In this case, the parties are fortunate. This Court's judicial experience and common sense embodies not only years of experience with maritime and admiralty cases, how they are pleaded, how they are discovered, and how they are tried and proved, but also includes mastery of the unfolding facts and procedural context of the coordinated MDL 2179 proceedings over which it presides. These proceedings include not only the Bundle A Complaints, but comprehensive Bundle B1 and Bundle B3 Master Complaints that describe the events leading up to, constituting, and following the *Deepwater Horizon* explosion and spill, and the conduct of HESI and others in abundant detail. In this "context-specific" frame, the personal injury and wrongful death complaints cannot be consigned, consistent with judicial experience or common sense, to the realm of implausibility. They are entitled to proceed.

*Twombly* and *Iqbal* have their justification in the legitimate quest to reduce cost and delay in civil litigation and to conserve the resources of the courts and of the parties. These goals are not promoted by requiring the Bundle A plaintiffs to amend their complaints to include the voluminous detail now available about HESI's conduct and its cement product, their roles in causing and/or exacerbating the explosion and fire, and resulting injuries and deaths. While such amendment is

K:\Public\JWD.JONES.GORDON\Pleadings\USDC-ED (LA) -- CA No 10-MD-02179 & 10-2771-- AFTER transfer by JPML\Memo in Opp to Motion to Dismiss - Halliburton.wpd

Page 8 of 26

certainly possible at this juncture and will be done promptly should this Court so order, Plaintiff respectfully submits it is unnecessary and should not be required.

However, to the extent the Court believes that Jones' factual allegations are insufficient, Jones should be given leave to amend and correct the insufficiency.[4]

## V.      THE PLAINTIFF'S CLAIMS AGAINST HESI FOR PUNITIVE AND NON-PECUNIARY DAMAGES ARE RECOGNIZED AND VIABLE UNDER THE GENERAL MARITIME LAW

Gordon Lewis Jones was a seaman aboard the *Deepwater Horizon* working as a mud engineer. [See Record Document 696, p. 3 of 14, ¶ 4; Record Document 1529, p. 13 24, ¶ 5.]  As a result of the explosions, fire and sinking of the *Deepwater Horizon*, Gordon Jones suffered great fear, bodily injury, pain and suffering, mental anguish and distress and ultimately died.  [see Record Document 696, p. 10 of 12, ¶ 15; Record Document 1529, p. 13 of 24, ¶ 6.]

Because Gordon Jones was a seaman, his personal representative may pursue one or more maritime causes of action:  first, she can sue Gordon's employer (or employers)[5] for negligence under the Jones Act.[6]  Secondly, she can sue the vessel owner for the unseaworthiness of the vessel under the general maritime law, regardless of whether the vessel owner was Gordon's employer. See, *e.g.*, *Becker v. Tidewater, Inc.*, 335 F.3d 376 (5th Cir. 2003); and *Mahramas v. American Export Isbrandtsen Lines*, 475 F.2d 165 (2d Cir. 1973).   Third, under the general maritime law, the seaman's representative may sue the manufacturer of a defective product for strict products liability.

---

[4]  Under FRCP 15(a)(2) "the court should freely give leave [to amend] when justice so requires."  In *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594 (5th Cir. 1983), the 5th Circuit held that ". . . rule 15(a) severely restricts the judge's freedom" to deny leave to amend.  *Id.* at 597.  Rule 15(a) "evinces a bias in favor of granting leave to amend."  *Id.* "Unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Id.* at 598.

[5]  Under the Jones Act, a seaman may have multiple employers subject to liability thereunder. *Guidry v. South La. Contractors Inc.*, 614 F.2d 447 (5th Cir. 1980); *Cordova v. Crowley Marine Services*, 02-2880 (E.D. La. 2003,) 2003 WL 21790195.

[6]  The Jones Act allows the personal representative of the deceased seaman to bring an action on behalf of certain named beneficiaries. *Calton v. Zapata Lexington*, 811 F.2d 919 (5th Cir. 1987).

See, *e.g*, *East River S.S. Corp. v. Transamerica Delaval, Inc*., 476 U.S. 858 (1986); and *Szollosy v. Hyatt* Corp., 396 F.Supp.2d 159 (D.Conn. 2005). Finally, the seaman's representative can sue other defendants for general maritime negligence. See, *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625 (1959); Robert Force & Martin J. Norris, THE LAW OF SEAMEN, § 29.8, 5th Edition, 2003.

When a seaman is killed as a result of an accident occurring more than a marine league from shore (as in the case of the *Deepwater Horizon*), the personal representative may combine the remedy provided by the Death on the High Seas Act ("DOHSA"), 46 U.S.C. § 30301 *et. seq.* with that provided by the Jones Act.[7] The underlying law controlling liability under the Jones Act is Jones Act negligence. 2 Robert Force & Martin J. Norris, THE LAW OF SEAMAN, § 30.35 (5th Edition, 2003). The law governing liability for the DOHSA remedy is the general maritime law — meaning unseaworthiness for a seaman's survivors against a vessel owner, maritime products liability against the manufacturer of a product and negligence as to all others. 2 Robert Force & Martin J. Norris, THE LAW OF SEAMEN, § 29.8 (5th Edition, 2003).

HESI argues that no form of non-pecuniary damage can be recovered in any death remedy arising out of the explosions, fire and sinking of the *Deepwater Horizon*. It argues that loss of future earnings, pre-death pain and suffering and punitive damages all fall within the ambit of this supposed rule. In doing so, it draws no distinction between seamen and non-seamen plaintiffs on the one hand or employers and third party defendants on the other. It also blurs the line between pecuniary and non-pecuniary damages. In its effort to gain dismissal of valid claims, HESI's argument oversimplifies and confuses the remedies available to the Plaintiff in her claims against HESI and others. For instance, it is clear that under both the Jones Act and DOHSA, a survivor is entitled to economic loss of support damages suffered as a result of the worker's death. See *De*

---

[7] *Peace v. Fidalgo Island Packing Co.*, 419 F.2d 371 (9th Cir. 1969).

*Centeno v. Gulf Fleet Crews,* Inc., 798 F.2d 138, 141, (5th Cir. 1986) (loss of support recoverable under Jones Act); *Bergen v. F/V St. Patrick, supra* (loss of support recoverable under DOHSA).

Likewise, HESI's motion to dismiss Plaintiff's claim for punitive damages under DOHSA should also be denied. In *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008), the Supreme Court affirmed maritime law's long-standing recognition of punitive damages as an item which may be recovered when defendant's conduct justifies such an award. In *Atlantic Sounding Co. v. Townsend*, 129 S.Ct. 2561 (2009), the Court affirmed the right of a seaman to recover punitive damages from employer/shipowners when the seaman's settled maritime-law rights were flouted or abused through serious misconduct. The Supreme Court has never ruled that punitive damages are not recoverable under DOHSA. 46 U.S.C. § 30303 allows the successful plaintiff to recover "fair compensation for the pecuniary loss sustained." While lower courts have held that DOHSA does not allow for the recovery of punitive damages[8] these decisions are based upon the untested and unsupported assumption that punitive damages are not pecuniary.

This assumption is incorrect. The common definitions of "pecuniary" are "1. relating to money, as in pecuniary affairs; and 2. *Involving a money penalty, or fine*, *as pecuniary offense*."[9] *Black's Law Dictionary* defines "pecuniary damages" as "damages that can be estimated and monetarily compensated"[10] and "non-pecuniary damages" as "damages that cannot be measured in money."[11]

Whichever of these definitions one chooses, punitive damages *are* pecuniary. They are

---

[8] See *e.g. Motts v. M/V Green Wave*, 210 F.3d 565, 569 (5th Cir. 2000) where the court wrote: "Appellee can recover punitive and other non-pecuniary damages only if DOHSA is inapplicable"; *Bergen v. F/V St. Patrick*, 816 F.2d 1345-1347 (9th Cir. 1987). In that case the 9th Circuit noted that: "Punitive damages are non-pecuniary damages unavailable under the Jones Act".

[9] *Webster's New Universal Unabridged Dictionary* (2d ed. 1983), emphasis added.

[10] *Black's Law Dictionary* 418 (8th ed. 2004).

[11] *Id.*

K:\Public\JWD.JONES.GORDON\Pleadings\USDC-ED (LA) -- CA No 10-MD-02179 & 10-2771-- AFTER transfer by JPML\Memo in Opp to Motion to Dismiss - Halliburton.wpd

Page 11 of 26

awarded as money, can be estimated and, as recently stated by the Supreme Court in *Exxon Shipping Co. v. Baker*, punitive damages are awarded as "*measured* retribution."[12]  Approximately one year before writing the opinion for the Court in *Miles*, Justice O'Connor repeatedly referred to punitive damages as "pecuniary punishment."[13]  The case most often cited for the proposition that punitive damages are "non-pecuniary" cites no authority and conducts no analysis to support this declaration.[14]

There is an alternative basis for concluding that DOHSA allows for the recovery of punitive damages.  As mentioned above, DOHSA allows for the recovery of "fair compensation for pecuniary loss sustained," 46 U.S.C. § 30303.  "Pecuniary" damage is a form of compensatory damage.  § 30303 does not address one way or the other, and certainly does not exclude, punitive damages as they are a non-compensatory item of damage.  Further, as outlined above, punitive damages are pecuniary and, therefore, § 30303 does not disallow such damages.

Some maritime scholars who have examined this issue have also concluded that *Miles* does not address, and its reasoning does not preclude, a general maritime punitive damage award because the "pecuniary/non-pecuniary" distinction does not apply to punitive damages.[15]

HESI also challenges the recoverability of non-pecuniary damages under the Jones Act death remedy.  First, it is clear that under the Jones Act, damages for the seaman's conscious pain and suffering before death are allowed.  45 U.S.C. § 59; *Snyder v. Whittaker Corp.*, 839 F.2d 1085,

---

[12] *Baker*, 128 S.Ct. at 2633, emphasis added.

[13] *Browning Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 295-297 (1989) (O'Connor, J., concurring in part and dissenting in part).  *See also*, *Austin v. United States*, 509 U.S. 602, 614 n. 7 (1993), in which the Court's opinion, joined by Justice O'Connor, characterized a civil forfeiture as "pecuniary punishment."

[14] *Kopczynski v. The Jaqueline*, 742 F.2d 555, 561 (9th Cir. 1984).

[15] *See* Robertson, *Punitive Damages:  Miles, Baker and Townsend*, 70 LA. L. REV. 463 (Winter 2010), at 463-65; Robert Force, *The Curse of Miles v. Apex Marine Corp.: The Mischief of Seeking 'Uniformity' and 'Legislative Intent' In Maritime Personal Injury Cases*, 55 LA. L. REV. 745 (March 1995), at p. 777 n.1 and p. 793; Robertson, *Punitive Damages:  Miles, Baker and Townsend*, at 473-75.

1092-1094 (5th Cir. 1988); *DeCenteno v. Gulf Fleet Crews, Inc.*, 798 F.2d 138, 142 (5th Cir. 1986).

HESI's assertion that punitive damages are not awardable in Jones Act actions rests on *Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496, 1512, (5th Cir. 1995) (en banc), where-in the course of holding that a seaman was not entitled to seek punitive damages from an employer who flouted the venerable maintenance-and-cure obligation–the Fifth Circuit said in dictum that " the Jones Act does not provide for punitive damages."  *Guevara* has been "abrogat[ed]" by *Atlantic Sounding Co. v. Townsend*, 129 S.Ct. 2561 (2009) (The Court held that a seaman was entitled, as a matter of general maritime law, to seek punitive damages for his employer's alleged willful and wanton disregard of its maintenance and cure obligation).  Moreover, in *Townsend* the Supreme Court went out of its way to flag the availability of punitive damages in Jones Act actions as an open question stating:

> Because we hold that *Miles [v. Apex Marine Corp.* 498 U.S. 19] does not render the Jones Act's damages provision determinative of respondent's remedies, we do not address the dissent's argument that the Jones Act, by incorporating the provisions of the Federal Employer's Liability Act, see *46 U.S.C. § 20104(a)*, prohibits the recovery of punitive damages in actions under the statute. *Townsend*, 129 S.Ct. at 2575, n.12 (citation omitted).

Ultimately, the portion's of HESI's argument that do not rest entirely on DOHSA's "fair compensation for the pecuniary loss" language rests on an expansive reading of *Miles* that was rejected in *Townsend*.  In deciding whether punitive damages are allowed under the Jones Act, *Miles* has no greater relevance to this issue than it did on the issue of maintenance and cure punitive damages.  *Miles* did not deal in any way with the issue of punitive damages.  Rather, it dealt only with the kinds of *compensatory* damages available in maritime death cases, holding that loss of society damages could not be recovered in a general maritime death action brought by the survivor of a seaman killed in territorial waters.[16]

---

[16] It should also be emphasized here that, regardless of the wisdom of applying *Miles*' reasoning to preclude a punitive damage claim by a seamen under the Jones Act, such reasoning would make no sense in a seaman's claims under other causes of action available to him.  See, *e,g*., *Wagner v. Kona Blue Water Farms, LLC*, 09-00600, 2010 WL 3566731,

Seaman had the right to sue for punitive damages prior to the passage of the Jones Act.  See, e.g., *Swift v. Happy Return*, 23 F.Cas 560 (D. Pa. 1799); *Gould v. Christianson*, 10 F.Cas. 857 (S.D.N.Y. 1836); *The Rolph*, 293 F. 269, 270 (N.D. Cal. 1925); *The Margharita*, 140 F. 820, 821, 825 (5th Cir. 1905); *The Scotland*, 42 F. 925 (S.D.N.Y. 1890).[17]  The language of the Jones Act does not purport to affect this long standing right.  The Supreme Court has repeatedly held that the Jones Act does not eliminate or restrict causes of action and remedies that were available to seaman before its passage.  See, e.g., *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 248 (1942); *Arizona v. Anelich*, 298 U.S. 110,1231 (1936); *Bainbridge v. Merchs and Miners' Trans. Co.*, 287 U.S. 278, 282 (1932).  Further support for the right of a seaman to recover punitive damages can be found in the long standing tradition in admiralty to treat seamen as a "favored class" of litigants[18] enjoying "heightened legal protections [that are] unavailable to other maritime workers."[19]  The Supreme Court in *Exxon Shipping Co. v. Baker* allowed "commercial fishermen, native Alaskans and landowners,"[20] whose livelihoods were impacted by the oil pollution flowing from the grounding of the Exxon Valdez, to recover punitive damages under maritime law.  In doing so, the Court looked to the Ninth Circuit's decision in *Union Oil v. Oppen*, 510 F.2d 558 (9th Cir. 1974), where that Court created for commercial fishermen an exception to the general rule requiring that a plaintiff have a proprietary interest in the polluted property in order to recover for damages flowing from the pollution.  The Court justified this special treatment given to commercial fishermen by likening them

---

(D.C. Hi. September 13, 2010), denying defendant's motion to dismiss plaintiff's claim for punitive damages based on unseaworthiness. *In re: Denet Towing Service Inc.*, 2010 WL 3566731 (E.D. La. 2000), denying defendant's motion to dismiss plaintiff's claims for loss of society, punitive damages etc. as to third party defendant.

[17] For discussion of this issue, see also David W. Robertson, *Punitive Damages in U.S. Maritime Law: Miles, Baker and Townsend,* 70 LA. L. Rev. 463, 478-83 (2010).

[18] *Bainbridge v. Merchs. & Miners Transp.* Co., 287 U.S. 278, 282 (1932).

[19] *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995).

[20] 128 S.Ct. at 2613.

K:\Public\JWD.JONES.GORDON\Pleadings\USDC-ED (LA) -- CA No 10-MD-02179 & 10-2771-- AFTER transfer by JPML\Memo in Opp to Motion to Dismiss - Halliburton.wpd

Page 14 of 26

to seamen, traditional wards of the admiralty.  510 F.2d  at 567.

Surely it would turn the law on its head to allow "commercial fishermen, native Alaskans and landowners" to recover punitive damages under the maritime law but deny these damages to the "favored class" of seamen.  There is nothing in the language or history of the Jones Act which justifies granting this remedy to such plaintiffs but withholding it from seamen.

Withholding the punitive damages remedy from seamen is further contrary to established tenets of maritime law when one considers that ". . . it is settled cannon of maritime jurisprudence that 'it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy, when not required to withhold it by established and inflexible rule.'" *American Export Lines, Inc. v. Alvez*, 160 S.Ct. 1673, 1678, quoting *Moragne v. States Marine Lines*, 90 S.Ct. 1772, 1781.

## VI.   A CLAIM OF STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES IS AVAILABLE

HESI argues that the doctrine of strict liability due to ultrahazardous activities is not recognized by maritime law.  Although courts in other circuits have held that maritime law does not recognize the doctrine of strict liability for ultrahazardous activities, the question has not been answered in this circuit.  The trend, however, is toward recognition of the doctrine.  In *East River Steamship Corp. v. TransAmerica Delaval, Inc.,* 476 U.S. 858, 864-66 (1986), the Court explicitly recognized strict products liability as a part of general maritime law.  As the Court in *East River* explained, where admiralty jurisdiction exists, substantive admiralty law is applicable, and substantive admiralty law is "drawn from state and federal sources, the general  maritime law is an amalgam of traditional common law rules, modifications of those rules, and newly created rules." *Id.* at 864 (citing *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959) and *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 373-375 (1959)).  The Court noted that strict products liability had been a part of the common law of torts for some time and that there

K:\Public\JWD.JONES.GORDON\Pleadings\USDC-ED (LA) -- CA No 10-MD-02179 & 10-2771-- AFTER transfer by JPML\Memo in Opp to Motion to Dismiss - Halliburton.wpd

Page 15 of 26

was a trend in maritime law toward strict liability.  The Court explained:  "This Court's precedents relating to injuries of maritime workers long have pointed in that direction."  *See Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 94 (1946) (strict liability for unseaworthiness); and *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.,* 376 U.S. 315, 322 (1964) (strict liability for breach of implied warranty of workmanlike  service).  The Court's rationale in those cases — that strict liability should be imposed on the party best able to protect persons from hazardous equipment — is equally applicable when the claims are based on products liability.  *Compare Sieracki,* 328 U.S. at 93-94, with *Escola v. Coca Cola Bottling Co. of Fresno,* 24 Cal.2d 453, 462, 150 P.2d 436, 441 (1944) (concurring opinion).  *Id.* at 866.

Parties involved in hazardous activities such as ultra-deepwater oil drilling — like those that manufacture defective products, operate unseaworthy vessels, and breach warranties — are in the best position to protect persons from the dangers associated with their hazardous equipment, and strict liability should be imposed upon them pursuant to maritime law.  The doctrine of strict liability for ultrahazardous activities, like strict products liability, is well-established.  It was first recognized in the English case of *Rylands v. Fletcher,* L.R. 3 H.L. 330 (1868) and later adopted and expanded by the Restatement of Torts §§ 519-20 (1938).  Today, the doctrine is accepted by a majority of the states.  W. Prosser, Law of Torts § 78, at 509 (4th ed. 1971).  Thus, it has long been accepted as a part of the common law of torts.  Like the doctrine of strict products liability, it is ripe for inclusion as a part of the general maritime law of torts.  Like its adoption of Section 402A of the Restatement (Second) of Torts, it is time for maritime law to adopt Section 519 and 520 of the Second Restatement, which, if applied here, would result in a determination that ultra-deepwater drilling qualifies as an ultrahazardous or "abnormally dangerous" activity for which those that engage in it, including HESI, should be strictly liable.  In determining whether an activity qualifies as abnormally dangerous, Section 520 of the Restatement (Second) of Torts requires consideration of the following

factors:

    (a)    the existence of a high degree of risk of some harm to the person, land or chattels of others;

    (b)    the likelihood that the harm that results from it will be great;

    (c)    the inability to eliminate the risk by the exercise of reasonable care;

    (d)    the extent to which the activity is not a matter of common usage;

    (e)    the inappropriateness of the activity to the place where it is carried on; and

    (f)    the extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 520.

There can be no question that ultra-deepwater drilling creates a high degree of risk to persons, land and chattels or that the resulting harm will be great.  Even with the exercise of reasonable care, given the nature of the work, the risks cannot be eliminated.  As the National Commission on the BP *Deepwater Horizon* Oil Spill and Offshore Drilling (the "Commission") stated in its Final Report released on January 11, 2011, drilling in extreme water depths poses special and different challenges. The Commission explained:

> Risers connecting a drilling vessel to the blowout preventer on the seafloor have to be greatly lengthened, and they are exposed to strong ocean currents encountered in the central Gulf.  Managing higher volumes of mud and drilling fluid in these long risers makes drillers' jobs more demanding.   Connecting and maintaining blowout preventers thousands of feet beneath the surface can only be performed by remote-operating vehicles. . . .   More broadly, knowledge about localized geology, types of hydrocarbons, and pressure profiles in ultra-deepwater wells is still not thoroughly developed.  Geological conditions are complicated and vary from prospect to prospect, and from well to well.  Each well, indeed, has its own "personality" that requires maintaining an extremely delicate balance between the counteracting pressures of the subsurface formation and drilling operation. Beneath the salt, pressures in the pores of the sediment are exceedingly hard to predict. Reservoirs in the Lower Tertiary are thicker and with higher viscosity than the fluids found in younger rock.  Finally, ultra-deepwater developments are far removed from shore and thus from established infrastructure.  As a BP technical paper prepared for the May 2010 Offshore Technology Conference noted, "the trend of deepwater discoveries in the [Gulf of Mexico] is shifting toward one with greater challenges across many disciplines represented by the conditions of Lower Tertiary

discoveries."

(Final Report, pp. 51-52).  Also, ultra-deepwater drilling is not a matter of common usage, and the activity was inappropriate to the site where it was carried on.  The Macondo prospect site was notorious in the industry for high temperature, high pressure, highly gaseous hydrocarbon reservoirs trapped in weak, brittle rock formations.  At the Macondo site, the *Deepwater Horizon* was conducting drilling operations in excess of 18,000 feet.  At depths almost 3.5 miles below the sea floor, the pressures within and strengths of the various formation layers the *Deepwater Horizon* was drilling through varied widely and changed often, requiring constant adjustments to drilling fluid density and other factors.  In some places, the subsea rock formations were so brittle that they fractured, letting gallons of expensive drilling mud escape into the cracked and porous rock around the drill.  Given the extremely dangerous and unpredictable conditions at the site, ultra-deepwater drilling was inappropriate.

In addition, the value of ultra-deepwater drilling to the community pales when compared to its dangerous attributes.  In this case, the activity resulted in multiple deaths, personal injuries and environmental and economic devastation, the effects of which will be felt in the Gulf region and the entire country for many years to come.  The attributes of ultra-deepwater drilling simply cannot outweigh the wreckage the activity has left in its wake.

Finally, the extremely hazardous nature of offshore drilling was recognized in this circuit in *Armstrong v. Chambers & Kennedy,* 340 F.Supp. 1220 (S.D. Tex. 1972), where a platform owner (C&K) hired a contractor to bring a deteriorated oil platform located on the Outer Continental Shelf into compliance with U.S. pollution regulations.  The contractor then hired a subcontractor.  While this work was being done, an explosion occurred on the platform, killing and injuring workers on the platform, and in a standby boat that was moored below the platform.  The explosion was caused by the welding of equalizing lines by an employee of the subcontractor at a time when oil remained

in the oil tanks.  All parties were aware of the remaining oil in the tanks.  In discussing the platform

owner's liability, the Court stated:

> The exploration and development of offshore oil resources under the seas is a relatively new area of technological progress.  Unlike the search for oil and gas on land, it presents new and more dangerous challenges in its development.  35 Tex. L. Rev. 1; 33 Tex. L. Rev. 574; *Warren Petr. Corp. v. Martin,* 153 Tex. 465, 271 S.W.2d 410, reh. den. (1954).  Thus, the duty placed here upon the oil lessee is similar to the traditional tort duty of one using an ultrahazardous substance.

*Id.* at 1233-1234 (emphasis added).  The Fifth Circuit, in affirming this portion of the district court's

decision, quoted this language.  *In re Dearborn Marine Service, Inc.,* 499 F.2d 263, 267, n. 7 (5th

Cir. 1974).  Thus, even before the practice of ultra-deepwater drilling began, the Fifth Circuit

recognized the extremely hazardous nature of exploration and development of offshore oil resources

and the duty placed on those engaging in it.  Given the extreme depths at which the activity now

takes place and the special problems associated with it, offshore drilling has developed into a much

more hazardous activity than it was in 1972.  Its recognition as an ultrahazardous activity to which

strict liability applies under maritime law is therefore crucial.  For these reasons, this Court should

find that maritime law recognizes the tort of strict liability for ultrahazardous activities..

## VII.    *RES IPSA LOQUITUR* IS AN EVIDENTIARY DOCTRINE NOT A CLAIM FOR RELIEF THAT CAN BE DISMISSED

HESI moves this court to dismiss Plaintiff's "claim" for *res ipsa loquitur* on the ground that

it is not a valid cause of action.  In asserting this argument, HESI misconstrues the nature of

Plaintiff's claims.  The relevant claim that Plaintiff is making is for negligence, not *res ipsa loquitur*.

Indeed, all of the allegations cited by HESI are contained in sections of Plaintiff's complaints that

either plead a cause of action for negligence or directly reference the defendant's negligence.  *See*,

*e.g.*, *Crawford* Complaint, Civil Action Number 2:10-CV-1540, at ¶ 55.

*Res ipsa loquitur* is an evidentiary doctrine, not a cause of action.  *See Kerns v. Sealy*, 496

F.Supp. 2d 1306, 1315 n. 13 (S.D. Ala. 2007).  In other words, the doctrine is simply one way by

K:\Public\JWD.JONES.GORDON\Pleadings\USDC-ED (LA) -- CA No 10-MD-02179 & 10-2771-- AFTER transfer by JPML\Memo in Opp to Motion to Dismiss - Halliburton.wpd

Page 19 of 26

which a plaintiff may prove negligence; it is not a cause of action that is separate and apart from negligence. Motions to dismiss a claim under Fed. R. Civ. P. 12(b)(6) are not intended to address these types of evidentiary issues. HESI's challenge to Plaintiff's *res ipsa* allegations should therefore be denied because there is no cause of action that is subject to dismissal.[21]

Moreover, HESI is wrong to assert that Plaintiff's pleadings do not support the imposition of *res ipsa loquitur*. In the Fifth Circuit, *res ipsa loquitur* will apply where: 1) the injured party was without fault; 2) the instrumentality causing the injury was under the exclusive control of the defendant; and 3) the accident is of a type that ordinarily does not occur in the absence of negligence. *See, U.S. v. Nassau Marine Corp.*, 778 F.2d 1111, 1115. Notably, HESI does not contest the presence of the first and third elements of this test. Rather, HESI asserts only that the second element is absent because HESI did not exercise exclusive control over the *Deepwater Horizon*. However, this argument misrepresents the nature of the second element.

In order to establish an inference of negligence under *res ipsa loquitur*, the plaintiff need not demonstrate that the defendant exercised exclusive control over the entire chain of events that ultimately resulted in the accident. Rather, the plaintiff need only establish that the defendant controlled the particular instrument that is a *possible* source of the accident, even where that instrument is but a component of a larger device. *Bradshaw v. Freightliner Corp.*, 937 F.3d 197, 201 (5th Cir. 1991). Moreover, to successfully invoke *res ipsa loquitur*, the plaintiff must only establish that the defendant was in exclusive control of the instrumentality at the time the negligence occurred. *Id.* It is immaterial that the defendant did not exercise any control at the time of the accident that caused the injury. *Id.*

---

[21] Neither of the cases relied on by HESI concern the legal sufficiency of Plaintiff's pleadings. *See Johnson v. United States*, 333 U.S. 46, 68 S.Ct. 391, 92 L. Ed. 468 (1948); *United States v. Nassau Marine Corp.*, 778 F.2d 1111 (5th Cir. 1985). Rather, as is true with virtually all of the reported decisions in this area, the courts were concerned with whether the evidence adduced at trial supported an inference of negligence. *See generally* Restatement (Second) of Torts § 328 D.

K:\Public\JWD.JONES.GORDON\Pleadings\USDC-ED (LA) — CA No 10-MD-02179 & 10-2771-- AFTER transfer by JPML\Memo in Opp to Motion to Dismiss - Halliburton.wpd

Page 20 of 26

In *Bradshaw*, the plaintiff was injured while riding in a truck.  The plaintiff alleged that his injury was caused by the defective design of the seat he was riding in when the accident occurred. The plaintiff sued both the truck and the seat manufacturers.  The evidence produced at trial suggested that the seat's improper design was a "possible" cause of the accident.  *Id*.  The seat manufacturer asserted that a jury instruction regarding *res ipsa loquitur* was improper because the defendant did not have control of the seat at the time the accident occurred and because there were intervening causes of the accident.  *Id*.  The Fifth Circuit disagreed and held that the evidence regarding the seat's possible design defect was sufficient to submit the issue of *res ipsa loquitur* to the jury.  *Id*.

Plaintiff's allegations against HESI are no different than the evidence submitted in *Bradshaw*. HESI is therefore incorrect to assert that its alleged lack of control of the *Deepwater Horizon* is dispositive, as that is precisely the argument that was rejected by the Fifth Circuit in *Bradshaw*.  Plaintiff's allegations regarding *res ipsa loquitur* should be preserved.

## VIII.  <u>HESI'S LIABILITY AS PRODUCT MANUFACTURER</u>

In Section 6 of its argument [Record Document 1193, pp. 19-21], HESI correctly asserts that the rules governing the products liability action against it are those of the general maritime law which has adopted Section 402A of the Restatement (Second) of Torts.  However, HESI implies that the cement it manufactured was not a product.  Cement is a product, like any other, and subject to these rules.  For example in *Boyett v. Keene Corp.*, 815 F.Supp. 204 (E.D. Tex. 1993), the plaintiff was a seaman suing under the general maritime law claiming injury from defective products manufactured by the defendants, including cement, that contained asbestos.  No issue or argument was raised even suggesting that the cement was not a product.

Plaintiff Michelle Jones believes her pleadings adequately set forth a products liability claim against HESI (see *Twobly/Iqbal* discussion above).  In the alternative, and in the event that the court

K:\Public\JWD.JONES.GORDON\Pleadings\USDC-ED (LA) — CA No 10-MD-02179 & 10-2771— AFTER transfer by JPML\Memo in Opp to Motion to Dismiss - Halliburton.wpd

Page 21 of 26

finds that Plaintiff's allegations are insufficient, then Plaintiff asks for leave to amend and correct the deficiencies.

## IX.     PLAINTIFF'S CLAIMS FOR GROSS NEGLIGENCE

Plaintiff Michelle Jones believes her pleadings adequately set forth a claim for gross and reckless conduct on the part of HESI (see *Twombly/Iqbal* discussion above) but, in the alternative, in the event the Court believes the pleading is insufficient, Plaintiff asks for leave to amend to correct any deficiencies.

## X.      PLAINTIFF HAS STANDING TO SUE UNDER GENERAL MARITIME LAW

HESI argues that Michelle Jones, Gordon Jones' widow and mother and personal representative of their two sons, Stafford and Maxwell, is not the proper party to bring suit.  [Record Document 1195, p.27.]   HESI asserts that the proper party is the personal representative of the decedent.  *Id*.  In fact, Michelle Jones is the administrator of Gordon Jones' estate and is undeniably the proper party to bring suit for the death of her husband.  *In the Matter of the Succession of Gordon Lewis Jones*, Probate Number 92,128, Section 26, 19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana.

Further, in Plaintiff's recently filed Third Amending Complaint [Record Document 1529] Plaintiffs bring the action as follows: "**Michelle M. Jones** as personal representative of the decedent Gordon Lewis Jones on behalf of his surviving beneficiaries including Michelle M. Jones, the children of Gordon Jones and Michelle M Jones (Stafford Hess Jones and Maxwell Gordon Jones); **Keith D. Jones** and **Eileen K. "Missy" Jones**."

If this Court finds that the Complaints do not sufficiently establish Michelle Jones as the proper party, this Court should allow Plaintiff to amend her complaints in order to remedy any deficiency, as was done in every case cited by HESI in its Motion to Dismiss.

K:\Public\JWD.JONES.GORDON\Pleadings\USDC-ED (LA) -- CA No 10-MD-02179 & 10-2771-- AFTER transfer by JPML\Memo in Opp to Motion to Dismiss - Halliburton.wpd

Page 22 of 26

## XI.  PLAINTIFF'S CLAIMS AGAINST SPERRY-SUN DRILLING SERVICES, INC. SHOULD NOT BE DISMISSED, AND PLAINTIFF SHOULD BE ALLOWED TO SUBSTITUTE HESI FOR SPERRY-SUN DRILLING SERVICES, INC.

The ultimate dismissal sought by HESI with respect to Sperry-Sun Drilling Services, Inc. ("Sperry-Sun") is expressly rejected by Fed. R. Civ. P. 17(a)(3).  Rule 17(a)(3) mandates that a party be allowed a reasonable time to join or substitute the real party in interest after a Rule 12(b)(6) objection has been lodged.[22]  Here, HESI admits in its Omnibus Memorandum that Sperry-Sun is "a division within HESI and is not a separate legal entity."[23]  Accordingly, Plaintiff should be given a reasonable time to substitute the real party at interest – HESI – in place of Sperry-Sun.[24]

## XII.  THIS COURT SHOULD ALLOW DISCOVERY BEFORE MAKING A PERSONAL JURISDICTION DETERMINATION REGARDING HALCO

Defendant's effort to dismiss Plaintiff Michelle Jones's claim against Halliburton Company ("HALCO") for lack of personal jurisdiction is misplaced and premature.  Louisiana law authorizes the exercise of personal jurisdiction to the limits of due process.  Such due process safeguards require that (1) the defendant has purposefully availed itself of the benefits and protections of the forum state by establishing "minimum contacts" with that state; and (2) the exercise of personal jurisdiction does not offend "traditional notions of fair play and substantial justice.[25] The "minimum contacts" inquiry is fact intensive and no one element is determinative.[26]  Instead, the primary

---

[22]  Fed. R. Civ. P. 17(a)(3):

    (3)    Joinder of the Real Party in Interest.

    The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action.  After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest**.**

[23]  HESI's Omnibus Memorandum in Support at p.29.

[24]  Notably, HESI's Motion to Dismiss in this regard is largely of no consequence as HESI is a named defendant in all of Plaintiff's suits.

[25]  See *Choice Healthcare, Inc. v. Kaiser Found Health Plan of Colorado*, 615 F.3d 364, 367 (5th Cir. 8/11/10) (citing *Mink v. AAAA Dev., L.L.C.*, 190 F.3d 333, 336 (5th Cir. 1999).

[26]  *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 11/9/09).

consideration is whether the defendant's conduct shows that it "reasonably anticipates being haled into court" or whether jurisdiction over the defendant would be solely as a result of "random, fortuitous, or attenuated contacts."[27]

Because analyzing personal jurisdiction is a fact-intensive inquiry, plaintiffs are generally allowed jurisdictional discovery to assist in their defense of a motion to dismiss based on lack of personal jurisdiction.[28]  Defendant, itself, acknowledged in its Motion to Dismiss that in making personal jurisdiction determinations, courts may consider outside discovery.[29]  Accordingly, HALCO's effort to dismiss Plaintiff's claims against it for lack of personal jurisdiction is premature. Plaintiff, therefore, asks this Court to defer any decision on this matter until personal jurisdiction discovery has been completed.

Aside from discovering HALCO's own "minimum contacts" within the forum, personal jurisdiction discovery is particularly important as HALCO is the wholly-owned parent company of HESI.  The United States Court of Appeal for the Fifth Circuit has set out particular factors to be considered in deciding whether a parent company can be held amenable to personal jurisdiction because of the acts of a subsidiary.[30]  These factors include:  (1) amount of stock owned by the parent of the subsidiary; (2) whether the two corporations have separate headquarters; (3) whether they have common officers and directors; (4) whether they observe corporate formalities; (5) whether they maintain separate accounting systems; (6) whether the parent exercise complete authority over general policy; and (7) whether the subsidiary exercises complete authority over daily operations.[31]  These issues were not addressed by the HALCO affidavit attached to HESI's Motion

---

[27]  See *Id.* (internal quotations omitted).

[28]  See *Dykes v. Maverick Motion Picture Group, L.L.C.*, No. 08-536, 2010 WL 4181448 at *1 (M.D. La. 10/20/10).

[29]  See HESI's Motion to Dismiss at p. 30.

[30]  *Dickson Marine Inc. v. Panapina, Inc.*, 179 F.3d 331, 338-39 (5th Cir. 1999).

[31]  See *Id.* (citing *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983).

to Dismiss.  Before making a personal jurisdiction determination, therefore, Plaintiff should be allowed to propound discovery on HALCO to determine both HALCO's "minimum contacts" and whether HESI's contacts in Louisiana are attributable to HALCO.

## XIII.   CONCLUSION

For the foregoing reasons, Halliburton Energy Services, Inc and Halliburton Company's motion to dismiss Michelle M. Jones should be **DENIED.**

By attorneys:

_s/John W. deGravelles_

**JOHN W. deGRAVELLES** (#04808)
RANDOLPH W. HUNTER (#7084)
J. NEALE deGRAVELLES (#29143)
deGravelles, Palmintier, Holthaus & Frugé, L.L.P.
618 Main Street
Baton Rouge, Louisiana  70801-1910
Telephone:  225/344-3735
Facsimile:  225/336-1146
jdegravelles@dphf-law.com
rhunter@dphf-law.com
ndegravelles@dphf-law.com

K:\Public\JWD.JONES.GORDON\Pleadings\USDC-ED (LA) — CA No 10-MD-02179 & 10-2771– AFTER transfer by JPML\Memo in Opp to Motion to Dismiss - Halliburton.wpd

Page 25 of 26

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of March, 2011, the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Don K. Haycraft, James P. Roy and Stephen J. Herman by operation of the court's electronic filing system and to all counsel of record through the Lexis Nexis File & Serve.

*s/John W. deGravelles*
**JOHN W. deGRAVELLES**