IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig § | | MDL NO. 2179 |
| "Deepwater Horizon" in the Gulf § | | |
| of Mexico, on April 20, 2010 § | | |
| § | | SECTION: J |
| § | | |
| This document relates to: § | | JUDGE BARBIER |
| 2:10-CV-3168 § | | MAGISTRATE SHUSHAN |

**MEMORANDUM IN OPPOSITION OF PLAINTIFFS, BILL FRANCIS,
TYRONE BENTON, and CARLOS RAMOS, TO CAMERON INTERNATIONAL
CORPORATION'S MOTION TO DISMISS PLAINTIFFS' PETITION
FOR FAILURE TO STATE A CLAIM UNDER RULE 12(b)(6)**

TO THE HONORABLE CARL J. BARBIER, UNITED STATES DISTRICT JUDGE:

Plaintiffs, Bill Francis, Tyrone Benton, and Carlos Ramos, file this Memorandum in Opposition to the Motion to Dismiss Plaintiffs' Petition for Failure to State a Claim under Rule 12(b)(6) filed by Cameron International Corporation ("Cameron").

### INTRODUCTION

Cameron argues that maritime law should not apply to the claims on behalf of the personal injury and death victims of the explosion and capsizing of the *M/V Deepwater Horizon* ("Bundle A claimants"), a vessel in navigation for maritime tort purposes.  Instead, Cameron asserts that Louisiana state law, applied as surrogate federal law via the Outer Continental Shelf Lands Act (OCSLA), should supplant maritime law and govern those claims.  To support its argument, Cameron has to misstate the holdings of several cases, completely ignore the controlling jurisprudence, and improperly swirl together three separate and unrelated tests - the tests (1) for the application of OCSLA jurisdiction, (2) for state law to apply as surrogate federal law under OCSLA, and (3) for the application of admiralty jurisdiction and substantive maritime

law. Before addressing the numerous deficiencies in Cameron's argument, the Bundle A claimants need to set forth the proper framework.

**I.     An accurate roadmap: OCSLA's key provisions, admiralty jurisdiction, and the *PLT* test.**

The pertinent provisions of OCLSA are contained in 43 U.S.C. § 1349(b)(1) (OCSLA's judicial jurisdictional provision), § 1333(a)(1) (OCSLA's assertion of federal sovereignty), and § 1333(a)(2)(A) (OCSLA's "surrogate federal law" provision). As this Court indicated in treating another claim arising out of this disaster, the judicial jurisdictional provision is completely independent of, and much broader in scope than, the test used to determine what substantive law applies under OCSLA. *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 2010 WL 3943451 at *3  (E.D.La. Oct. 6, 2010). All that is required for OCSLA judicial jurisdiction (§ 1349(b)(1)) is that the event occurred on the outer Continental Shelf - defined as all submerged lands bordering the United States that are more than three miles from the coast - and that the event arose out of or related to mineral production.

Given its breadth of coverage, § 1349(b)(1) encompasses a wide range of activities that also fall within the coverage of the federal courts' admiralty jurisdiction under 28 U.S.C. § 1333. Indeed, in Outer Continental Shelf (OCS) litigation, § 1349(b)(1) coverage and admiralty coverage frequently overlap and provide concurrent bases for jurisdiction. *See, e.g., Recar v. CNG Prod. Co.,* 853 F.2d 367, 369 (5th Cir. 1988) ("The district court may well have both admiralty jurisdiction under the general maritime law and federal question jurisdiction by virtue of OCSLA."); *Tennessee Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996) (same); *Strong v. B.P. Exploration & Production, Inc.*, 440 F.3d 665 (5th Cir. 2006) (holding that

the plaintiff properly pleaded jurisdiction under § 1349(b)(1) but that the case also fell within admiralty jurisdiction and was therefore governed by federal maritime law).

Unlike the broad grant of OCSLA jurisdiction, the test for determining what substantive law applies under OCSLA (set forth in § 1333(a)(2)(A)) is far more restrictive. Under that provision, "federal law [which means, predominantly, federal maritime law] governs ... to the extent that there is applicable federal law; however, if there is a gap in the federal law, the law of the adjacent state is used as a gap-filler and becomes surrogate federal law." *Bartholomew v. CNG Producing Co.,* 862 F.2d 555, 557 (5th Cir. 1989).

It is well settled in the Fifth Circuit that for state law to apply as surrogate federal law under OCSLA (§1333(a)(2)(A)), the three conditions established in *Union Texas Petroleum Corp. v. PLT Engineering, Inc.,* 895 F.2d 1043 (5th Cir. 1990) must be met. The three *PLT* conditions are: "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto), (2) federal maritime law must not apply of its own force, and (3) the state law must not be inconsistent with Federal law." *PLT Engineering,* 895 F.2d at 1047. All three of these conditions must be met in order for adjacent-state law to apply as surrogate federal law under OCSLA. *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC,* 589 F.3d 778, 783 (5th Cir. 2009) (en banc). Otherwise, maritime law applies.

## II.     Cameron cannot satisfy the *PLT* test.

### A.     *PLT* Factor # 1: The M/V Deepwater Horizon was not an OCSLA "situs."

The Supreme Court and the Fifth Circuit have held that 43 U.S.C. § 1333(a) creates a "situs" requirement for the application of surrogate state law under OCSLA. *Offshore Logistics,*

*Inc. v. Tallentire,* 477 U.S. 207, 219 (1986); *Demette v. Falcon Drilling Co.,* 280 F.3d 492, 496 (5th Cir. 2002).[1] The Fifth Circuit has conclusively stated that the "situs" required to trigger OCSLA refers to the location of the injury. *See, e.g., Demette,* 280 F.3d at 496 ("First, we must determine whether the injury occurred on an OCSLA situs ..."); *Mills v. Director, Office of Workers' Compensation Programs,* 877 F.2d 356 (5th Cir.1989) (en banc) (holding that the applicability of § 1333(b) is limited to the "situs" of injury). In its most recent en banc decision addressing OCSLA, the Fifth Circuit summarized the governing law as follows:

> [I]n a tort action, *Rodrigue* [*v. Aetna Cas. & Sur. Co., 395 U.S. 352 (1969)*] illustrates that the OCSLA situs requirement is met if the tort occurs on a platform or other OCSLA covered situs as provided in § 1333(a)(2)(A). ... The converse is also equally clear. In a tort action, if the tort occurs on navigable water instead of a fixed platform (or other structure attached to the seabed), the OCSLA situs requirement is not met [citing *Tallentire*].

*Grand Isle Shipyard*, 589 F.3d at 784. (The *Grand Isle* court went on to hold that, while a tort action arising from an injury to a platform worker aboard a vessel that was only a few yards from - but not yet in contact with - the platform was a maritime-law and not an OCSLA case, a different analysis applied to a contractual indemnity action arising from the tort.)

Cameron's effort to characterize the *Deepwater Horizon* as an OCS situs for purposes of *PLT* factor # 1 thus ignores a dispositive line of Fifth Circuit jurisprudence. It is indisputable that the *Deepwater Horizon* was a *vessel* for all maritime-law purposes.[2] It is also clear that during its operations in connection with the Macondo well, the *Deepwater Horizon* was never

---

[1] *Demette* was overruled in part on other grounds in Grand Isle Shipyard v. Seacor Marine, Inc., 589 F.3d 778, 788-89 (5th Cir. 2009) (en banc).

[2] *See Stewart v. Dutra Const. Co.*, 543 U.S. 481, 489-90 (2005) (holding that 1 U.S.C. § 3 "suppl[ies] the default definition of *vessel* throughout the U.S. Code ... [and] codifie[s] the meaning that the term *vessel* [has] acquired in general maritime law."); 1 U.S.C. § 3 ("The term *vessel* includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on

attached to the ocean floor; instead, it stabilized itself by using complex "thruster" technology and was connected to nothing at all except - via a 5,000-foot long riser pipe - the wellhead. Fifth Circuit cases make clear that the *Deepwater Horizon* was thus well outside the scope of 43 U.S.C. § 1333(a)(2)(A), which limits the applicability of adjacent-state law to events occurring on "the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon."[3/] See *Sanamo v. Trico Marine Services, Inc.,* 73 Fed.Appx. 79, 2003 WL 21756647 at *3 (5th Cir. 2003) ("A jack-up rig that is not jacked up ... does not necessarily constitute an OCS situs. ... [A] jack-up rig is a floating rig that can be towed to a particular site. Until it is attached to the seabed and erected, it cannot be considered an OCSLA situs."); *United States v. Pickett*, 598 F.3d 231, 236 (5th Cir. 2010 (Clement, J., concurring) ("for a rig or platform to be [covered by OCSLA] it must be 'erected' upon the Outer Continental Shelf...; OCSLA does not apply to vessels that float on the water."); *id.* (stating that a pipelay barge that "drops eight large anchors to stabilize its position ... is not erected on the OCS" so as to be

---

water."); *Demette*, 280 F.3d at 498 n. 18 (stating that it "is beyond dispute ... that special-purpose movable drilling rigs ... are vessels within the meaning of admiralty law.").

[3/] Cameron tries to get around the language of 1333(a)(2)(A) by an overly-selective use of legislative history. At p. 7 of its Memo in Support, Cameron presents two short quotations from 1978 USCCAN at p. 1534 (Cameron mistakenly cites p. 1679 for one of the quotations) that seem potentially misleading. The actual story is this: Until 1978, §§ 1333(a)(1) and 1333(a)(2)(A) had identical coverages. See Christopher, *The Outer Continental Shelf Lands Act: Key to a New Frontier,* 6 Stan. L. Rev. 23, 62 (1953) (appendix setting forth original (1953) OCSLA and showing that §§ 1333(a)(1) and 1333(a)(2)(A) were both confined to "subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon"). The 1978 Congress broadened § 1333(a)(1) to add "all installations and other devices permanently or temporarily attached to the seabed," but Congress did not change § 1333(a)(2)(A).

Cameron wants the Court to read the two passages it quotes from USCCAN to mean that the 1978 Congress effectively broadened both provisions. But on the same page of USCCAN Congress (via the House Committee Report) said just the opposite: "The Committee ... has left [§ 1333(a)(2)(A)] ***untouched***" (1978 USCCAN at 1534; emphasis supplied). Among the reasons for leaving the provision untouched was a lobbying effort by the Association of Trial Lawyers of America, who feared that changing § 1333(a)(2)(A) to conform to the newly-broadened § 1333(a)(1) "would jeopardize the seaman status of workers on jack-up, submersible, and semi-submersible rigs." Robertson & Sturley, *Recent Developments in Admiralty and Maritime Law at the National Level and in the Fifth and Eleventh Circuits*, 27 Tul. Mar. L.J. 495, 575 n. 759 (2003).

covered by § 1333(a)(1)); *Demette*, 280 F.3d at 499-500 (stating that a drilling rig tender, "attached to the OCS only by an anchor," was not an OCSLA situs).

    B.  *PLT* **Factor # 2: Maritime law applies "of its own force."**

        **1.**  **If there is admiralty jurisdiction over an OCS event, maritime law applies of its own force.**

   Generally speaking, "with admiralty jurisdiction comes the application of substantive admiralty law." *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 865 (1986). In OCS litigation, this generalization is invariably true. See *Strong,* 440 F.3d at 668-670 (addressing *PLT* factor # 2 by conducting an admiralty jurisdiction inquiry and concluding: "Because Strong has alleged a traditional maritime tort, federal maritime law applies of its own force, precluding incorporation of state law under OCSLA"); *Hodgen v. Forest Oil Corp.,* 87 F.3d 1512, 1524-25 (5th Cir. 1996) (stating that "whether a contract is maritime [for admiralty jurisdiction purposes] and whether maritime law applies of its force [for purposes of *PLT* factor # 2] [are] identical ... inquiries."); *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1229 (5th Cir. 1985) (noting that "where admiralty and OCSLA jurisdiction overlap, the case is governed by maritime law"); *Hufnagel v. Omega Service Industries, Inc.*, 182 F.3d 340, 350 (5th Cir. 1999) ("Because OCSLA does not displace general maritime law, substantive maritime law continues to govern where both OCSLA and general maritime law could apply."); *Tennessee Gas Pipeline*, 87 F.3d at 154 ("where OCSLA and general maritime law both could apply, the case is to be governed by maritime law"); *Smith v. Penrod Drilling Co.*, 960 F.2d 456,

459 (5th Cir. 1992) ("When an event occurs on an OCSLA situs but also is governed by maritime law, maritime law controls.").[4/]  *K*

It follows that a showing of admiralty jurisdiction by the Bundle A claimants will be dispositive of Cameron's motion.

### 2. On the basis of the Supreme Court's *Grubart* decision, admiralty jurisdiction is incontestable here.

Here is the admiralty tort jurisdiction formula laid out in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995) (citation and internal quotation marks omitted; emphasis supplied):

> [A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity. A court applying ***the location test*** must determine whether the tort occurred on navigable water. .... the connect test raises two issues. A court, first, must assess the general features of the type of incident involved to determine whether the incident has a ***potentially disruptive impact on maritime commerce***. Second, a court must determine whether the general character of the activity giving rise of the incident shows a ***substantial relationship to traditional maritime activity***.

#### a. The location requirement.

The location test, which is satisfied when the tort occurs on navigable water, is readily satisfied in this case. It is undisputed that the deaths and injuries at issue all occurred aboard the *M/V Deepwater Horizon* while it was located in the Gulf of Mexico, afloat on almost a mile-deep water and more than forty miles from the nearest coastline. Certainly, the *M/V Deepwater Horizon* was a vessel in navigation. *See, e.g., Demette,* 280 F.3d at 498 ("This circuit has

---

[4/] *Hodgen* and *Smith* were overruled in part on other grounds in *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 689 F.3d 778, 788-789 (5th Cir. 2009) (en banc).

repeatedly held that special-purpose movable drilling rigs, including jack-up rigs, are vessels within the meaning of admiralty law.").

### b.      The "potential disruption" requirement.

The second *Grubart* requirement is that the incident (accident) involved must have been of a sort with the potential to disrupt maritime commerce. Cameron concedes that this factor is satisfied. Presumably Cameron does not contest the matter because the actual disruption of maritime commerce has been so overwhelming and virtually unprecedented.

### c.      The "substantial relationship" requirement.

The inquiry here is whether any of the tortfeasors was involved in traditional maritime activity. *Grubart* spells this out as follows, 513 U.S. at 541 (emphasis supplied):

> [W]e need to look only to whether *one* of the arguably proximate causes of the incident originated in the maritime activity of a tortfeasor: as long as *one* of the putative tortfeasors was engaged in traditional maritime activity the allegedly wrongful activity will "involve" such traditional activity and will meet the second nexus prong.

*See also Scarborough v. Clemco Industries*, 391 F.3d 660, 665 (5th Cir. 2004) (same, quoting *Grubart*); *Raffray v. Gulf Logistics, LLC*, 2010 WL 5055849 at * 3 (E.D. La. 2010) (same); Maraist, Galligan & Maraist, *Admiralty in a Nutshell* 43 (6th ed. 2010) (same).

The *Grubart* ruling that *one maritime tortfeasor is enough* puts an end to all sensible debate about the existence of admiralty jurisdiction here: It is irrefutable that Transocean was engaged in a traditional maritime activity when operating the *Deepwater Horizon*. Courts in the Fifth Circuit have repeatedly held that drilling and exploring by vessels such as the *M/V Deepwater Horizon* constitute traditional maritime activity. The courts have drawn a distinction between oil and gas drilling conducted from vessels versus those same activities performed from

fixed platforms, recognizing that when those activities are performed from vessels such as the *Deepwater Horizon*, they are traditional maritime activities sufficient to invoke the application of maritime law (whereas when performed from a fixed platform, they are not). *See e.g., Hufnagel,* 182 F.3d at 352-353 (noting the distinction between tort claims arising on fixed platforms in which admiralty law does not apply and claims arising on drilling vessels in which admiralty law does apply); *Theriot v. Bay Drilling Corp.,* 783 F.2d 527, 538-39 (5th Cir.1986) ("oil and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce."); *Strong*, 440 F.3d at 669 (holding that a liftboat, although jacked up and not "under sail," qualifies as a vessel on navigable waters thereby satisfying the location requirement of *Grubart*); *Demette* (same); *Pippen v. Shell Oil Co.,* 661 F.2d 378, 384 (5th Cir. 1981) (recognizing that offshore drilling of oil and natural gas from the sea bottom is maritime commerce when performed from a vessel).

Turning for the sake of thoroughness to Cameron's own activities, it seems plain enough that, assuming arguendo that those activities were themselves not traditionally maritime, they certainly (in the language of *Grubart*) bore a "substantial relationship to traditional maritime activity." 513 U.S. at 539. In maritime oil and gas exploration, a blowout preventer (BOP), like the one manufactured by Cameron and in use at the time of this tragedy, is not just some generic piece of oil field equipment; it is a crucial component to maritime oilfield exploration.[5] The BOP at issue, which was part of the *Deepwater Horizon* and remained with the vessel at all

---

[5] In an internal document describing the challenges of manufacturing BOPs for offshore drilling, Cameron engineer Mel Whitby wrote: "When the BOP is called on to function in an emergency situation, it is the main barrier protecting human life, capital equipment and the environment. Therefore, it must function without fail." Melvyn F (Mel) Whitby, *Design evolution of a subsea BOP,* Drilling Contractor magazine, p. 36 (May/June 2007)

times, was specifically designed to be used in waters as deep as 10,000 feet.[6/]  It was not located on the seafloor; instead, part was located in the water between the *Deepwater Horizon* and the seafloor and the remainder was located on the vessel itself.  Furthermore, MODUs (mobile offshore drilling units) such as the *Deepwater Horizon* have been central to admiralty jurisdiction and maritime law at least since *Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir. 1959).  *Stewart v. Dutra Const. Co.*, 543 U.S. 481 (2005) (see *supra* note 2), confirms that they still are.  To its credit, Cameron does not seem to claim that the *Deepwater Horizon* was not a MODU or that the BOP was not a key component to the accomplishment of the *Deepwater Horizon's* mission.[7/]

The cases Cameron centrally relies upon for its (somewhat subtle) argument against admiralty jurisdiction cannot bear the weight.  These are *Herb's Welding, Inc. v. Gray,* 470 U.S. 414 (1985); *Rodrigue v. Aetna Casualty & Surety Co.,* 395 U.S. 352 (1969); and *Texaco Exploration and Production, Inc. v. AmClyde Engineered Products Co., Inc.,* 448 F.3d 760 (5th Cir.), *cert. denied,* 549 U.S. 1053 (2006).  Both *Rodrigue* and *Herb's Welding* involved personal injuries that occurred on fixed platforms, not on vessels in navigation, thereby failing to satisfy

---

[6/] See Attachment 1, Section 1, to the Purchase Order for the BOP, attached as Ex. "A" (Cameron Bates Stamped docs. CAM_CIV_0002911 - 0002918)

[7/] Cameron also deserves credit for eschewing reliance on Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co., 644 F.2d 1132 (5th Cir. 1981), which has sometimes been misleadingly cited for the (facially ridiculous) proposition that blowout preventers are generically outside the reach of admiralty and maritime law. *Sohyde* dealt with property damage from an accident involving a "submersible drilling barge ... resting on the bottom of a dead-end dredged canal slip in Louisiana." *Id.* at 1134. In finding no admiralty jurisdiction, the court relied on a case that the Supreme Court has subsequently disapproved. See *id.* at 1136 (citing Kelly v. Smith, 485 F.2d 520 (5th Cir. 1973)); see *Grubart*, 513 U.S. at 544 (abrogating *Kelly*). The Fifth Circuit itself has repeatedly criticized or narrowly limited *Sohyde*. See Domingue v. Ocean Drilling and Exp. Co., 923 F.2d 393, 397 n. 9 (5th Cir. 1991); Broughton Offshore Drilling, Inc. v. South Central Machine, Inc., 911 F.2d 1050, 1053 (5th Cir. 1990); Houston Oil and Minerals Corp. v. American Int'l Tool Co., 827 F.2d 1049, 1054 (5th Cir. 1987). Most importantly, the *Sohyde* court said that the restrictive view it took of admiralty jurisdiction would not be appropriate in actions "for personal injuries under the Jones Act or maritime law." n *Sohyde*, 644 F.2d at 1136.

the location test.  In *Texaco*, the plaintiffs did not make claims against any party that was engaged in traditional maritime activity.  Instead, the case involved a suit by the lessees of an offshore federal lease against a land-based company that designed and manufactured a crane that failed during the construction of a fixed platform (causing a deck module to fall into the sea), as well as the company that was charged with designing and constructing the platform.  If the claimant in *Texaco* had sued the owner or operator of a vessel, as the claimants have in this case, admiralty jurisdiction would have applied.

**III.    The existence of admiralty jurisdiction moots Cameron's Louisiana-law arguments.**

The demonstration above that (a) state law cannot apply to an OCS case falling within admiralty jurisdiction and (b) admiralty jurisdiction is present here means that the restrictions on the Bundle A claimants' rights that Cameron purports to find in Louisiana law are irrelevant.

**IV.    Even if adjacent-state law were applicable here, it would not necessarily be Louisiana law.**

It bears repeating that OCSLA's surrogate federal law provision, 43 U.S.C. § 1333(a)(2)(A), is not applicable here.  If it were, a significant question would then arise - which state is the "adjacent" one for § 1333(a)(2)(A) purposes?  Cameron's assumption that the "adjacent" state is Louisiana is somewhat blithe.  *Snyder Oil Corp. v. Samedan Oil Corp.*, 208 F.3d 521, 524 (5th Cir. 2000), treated the "adjacency" inquiry as follows:

> [In *Reeves v. B & S Welding, Inc.*, 897 F.2d 178 (1990)] we ... considered four types of evidence in the "adjacency" analysis: (1) geographic proximity; (2) which coast federal agencies consider the subject platform to be "off of"; (3) prior court determinations; and (4) projected boundaries.

Obviously, three of the four *Snyder/Reeves* factors are questions of fact.  Equally obvious, none of them is ripe for consideration at the complaint-dismissal stage.

V.  **Plaintiffs' First Amended Complaint moots Cameron's motion to dismiss, or the Amended Complaint cures Cameron's complaints.**

Cameron's Rule 12(b)(6) motion is directed to the petition in intervention plaintiffs filed in Texas State Court. *See* CONSOLIDATED MEMORANDUM (**Doc. No. 1154-1**) at p. 1 & fn. 1.[8] However, plaintiffs timely filed their First Amended Complaint (**Doc. No. 1524**) within 21 days after service of Cameron's Rule 12(b)(6) motion. *See* FED.R.CIV.P. 15(a)(1)(B).[9] Plaintiffs' Amended Complaint supplants plaintiffs' state-court Petition in Intervention.

  A.  **Plaintiffs' Amended Complaint moots Cameron's 12(b)6) motion.**

Plaintiffs' amendment of their complaint renders Cameron's motion moot. *See Williamson v. Wyeth, Inc.*, 2010 WL 3312589 *1 (M.D.La 2010) (concluding amended complaint rendered defendants' motion to dismiss under Rule 12(b)(6) moot).

The Court should deny Cameron's motion as moot.[10]

  B.  **Plaintiffs' Amended Complaint cures Cameron's complaints.**

---

[8] The Court will note that plaintiffs originally filed their Petition in Intervention in Cause No. 2010-25245, *Kleppinger v. Transocean Offshore Deepwater Drilling, Inc., et al.*; in the District Court of Harris County, Texas, 234th Judicial District. (**Doc. No. 1-2**, pp. 13-16, in 2:10-CV-3168). Cameron removed the case without the timely consent of the named defendants.

[9] Plaintiffs have alternatively moved for leave to file their First Amended Complaint pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure. (**Doc. No. 1553**). On March 11, 2011, this Court granted leave to file (**Doc. No. 1566).**

[10] In any event, the Texas pleading standards are more lenient than the federal pleading-sufficiency standards and, thus, the *Twombly/Iqbal* standard does not apply to determine the sufficiency of plaintiffs' state-court intervention. *Cf. Edwea, Inc. v. Allstate Ins. Co.*, 2010 WL 5099607 *6 (S.D.Tex.2010) (holding that the *Twombly/Iqbal* sufficiency standard does not apply to the improper-joinder analysis [which is conducted pursuant to a Rule 12(b)(6)-type analysis] when the state-court pleading standards are more lenient). *See also Warren v. State Farm Mut. Auto. Ins. Co.*, 2008 WL 4133377 *4 (N.D.Tex.2008) ("Because state court plaintiffs should not be required to anticipate removal to federal court, the court assesses the sufficiency of the factual allegations of [the plaintiff's] complaint under Texas' notice-pleading standard."). Cameron makes no attempt to apply the Texas pleading standards to the allegations in plaintiffs' intervention.

In the further alternative to the foregoing, if Louisiana law applied here, plaintiffs' Amended Complaint cures Cameron's assertions that the A Pleadings fail to allege an actionable product defect under the Louisiana Product Liability Act.  Plaintiffs' Amended Complaint (**Doc. No. 1567**, ¶¶ 19-23, 28-32) incorporates by reference allegations from the B1 Bundle Complaint (**Doc. No. 1128**) and from the Rule 14(c) Third-Party Complaint/**Doc. No. 1320**).  Plaintiffs briefly summarize as follows the allegations showing Cameron's liability as a product manufacturer under Louisiana law.

Cameron claims that plaintiffs "make no attempt to allege, even in conclusory fashion, that the blowout preventer was defective when it left Cameron's control ...." **Doc. No. 1154-1 ¶ C(2) at p. 19**.  Contrary to Cameron's contention, plaintiffs specifically allege that "**Cameron's BOP was in a defective condition and unreasonably dangerous to Plaintiffs when it left Cameron's control**" and that  "**[a]t the time the BOP left Cameron's control**, [the BOP] was in a defective condition unreasonably dangerous to Plaintiffs in that they were designed and manufactured with over 260 known defects and failure modes, ...." **Doc. No. 1128 ¶¶ 649, 651** (incorporated by reference in paragraph 22 of plaintiffs' First Amended Complaint) (emphasis added).

Cameron also says that plaintiffs fail to allege the necessary elements of a claim under any provision of the Louisiana Act.  **Doc. No. 1154-1 ¶ C(3) at pp. 19-23**.  Again, the Amended Complaint, incorporating from the B1 Bundle Complaint/**Doc. No. 1128**, alleges that the BOP suffered from the following manufacturing and/or design defects at the time it left Cameron's control:

(a) Inadequate, faulty, nonfunctioning and defective battery systems;

(b) Inadequate, faulty, nonfunctioning and defective dead man switches and related wiring;

(c) The absence of acoustic triggers;

(d) Inadequate, faulty, nonfunctioning and defective emergency disconnect systems (EDS);

(e) Improperly sealed, leaky hydraulic systems;

(f) Improperly designed, manufactured, and installed annular seals;

(g) Insufficiently robust blind shear rams;

(h) Insufficient warnings, instructions, and guidelines on permissible, foreseeable uses and modifications to the BOP and its component parts;

(i) Insufficient testing and design verification of the BOP and its component parts to ensure the shearing capability of the ram and other functioning of the BOP during reasonably foreseeable uses; and

(j) In such other particulars as the evidence may show.

**Doc. No. 1128** ¶ 651 (incorporated by reference in paragraph 22 of plaintiffs' Amended Complaint). *See also id.* ¶¶ 643 through 648 (detailing the defective design and/or manufacture of the BOP).

Plaintiffs' Amended Complaint is also contrary to Cameron's assertion that there is no allegation of any "alternative design of the BOP that would have prevented the injurious explosion." **Doc. No. 1154-1** ¶ C(3)(b) at p. 21. In particular, plaintiffs allege the following:

At the time the BOP appurtenant to the Deepwater Horizon left Cameron's control, feasible design alternatives existed which would have to a reasonable probability prevented the harm suffered by Plaintiffs without impairing the utility, usefulness, practicality or desirability of the BOP.

**Doc. No. 1128** ¶ 653 (incorporated by reference in paragraph 22 of plaintiffs' Amended Complaint).

In short, even if Louisiana law applied to this case, plaintiffs have pleaded enough facts to state a claim for relief that is plausible on its face and to give Cameron fair notice of those claims. *See Wright v. Shell Offshore, Inc.*, 2011 WL 690530 *1-2 (E.D. La. 2011).

## CONCLUSION

For the reasons stated here, plaintiffs respectfully request that Defendant Cameron International Corporation's Motion to Dismiss Plaintiffs' Petition for Failure to State a Claim Under Rule 12(b)(6) be in all things denied.

SCHECHTER, MCELWEE, SHAFFER, & HARRIS, L.L.P.

*/s/Matthew D. Shaffer*
MATTHEW D. SHAFFER
State Bar No. 18085600
Fed I.D. No. 8877
DENNIS M. MCELWEE
State Bar No. 13587820
Fed I.D. No. 7490
ARTHUR L. SCHECHTER
State Bar No. 17735000
Fed I.D. No. 1454
3200 Travis, 3rd Floor
Houston, Texas 77006
Tel: 713-524-3500
Fax: 713-751-0412
mshaffer@smslegal.com
dmcelwee@smslegal.com
arthurschechter@gmail.com

and

PAUL M. STERBCOW (#17817)
Lewis, Kullman, Sterbcow & Abramson
601 Poydras Street, Suite 2615
New Orleans, Louisiana  70130
Tel:  (504) 588-1500
Fax: (504) 588-1514
sterbcow@lksalaw.com
ATTORNEYS FOR PLAINTIFFS, BILL FRANCIS,
TYRONE BENTON, and CARLOS RAMOS

## CERTIFICATE OF SERVICE

     I certify that the above and foregoing Memorandum in Opposition of Plaintiffs, Bill Francis, Tyrone Benton, and Carlos Ramos, to Cameron International Corporation's Motion to Dismiss Plaintiffs' Petition for Failure to State a Claim Under Rule 12(b)(6) will be served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in Accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System which will send a notice of electronic filing in accordance with the procedures established in MDL 217, on this 11th day of March, 2011.

*/s/Matthew D. Shaffer*
MATTHEW D. SHAFFER