UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL NO. 2179<br><br>SECTION: J |
| This Document Relates Only To:<br>*Rhodes v. Transocean, Ltd., et al*<br>2:10-CV-01502 | JUDGE BARBIER<br>MAG. JUDGE SHUSHAN |

**Third Amended Complaint**

Karl W. Rhodes, appearing through his undersigned counsel, files this Third Amended Complaint as follows:

**Jurisdiction**

1.

Petitioner amends his original Complaint to delete Paragraph 20 and to rewrite Paragraph 2 of his original Complaint (Rec. Doc. 1 in Docket No. 2:10-CV-1502) to now read as follows:

"The Court's jurisdiction is based upon the Admiratly and Maritime jurisdiction under Article III of the United States Constitution, 46 U.S.C. § 30104 (formerly 46 U.S.C. § Appx. 688) *et seq*, 28 U.S.C. § 1333, and the General Maritime Law of the United States. Petitioner brings this claim pursuant to the

Federal Rules of Civil Procedure Rule 9(h)."

**Existing Defendant**

2.

Petitioner named Weatherford U.S., L.P. in his First Amended Complaint (¶ 3, Rec. Doc. 17 in Docket No. 2:10-CV-1502) but incorrectly stated its juridical status, which petitioner now amends to read as follows:

> "WEATHERFORD U.S., L.P. is a Louisiana limited partnership that maintains its principal place of business in Houston, Texas and, at all times pertinent it was registration to do and was doing business in Louisiana and within this district. It has appointed C T Corporation System 5615 Corporate Boulevard, Suite 400B, Baton Rouge, Louisiana 70808 as its Louisiana agent for service of process. It designed and manufactured, marketed, sold, and/or distributed the casing components such as the float collar, shoe, and centralizers appurtenant to the vessel, and provided the personnel and equipment for running the casing and casing components into the wellbore."

**Additional Defendants**

2.

Petitioner amends his Complaint to add the following defendants:

A.  HALLIBURTON COMPANY ("Halliburton")[1] is a Delaware corporation with its principal place of business in Houston, Texas, and which company does business in

---

[1] Unless otherwise stated, "Halliburton" refers to all Halliburton defendants and Triton Asset Leasing Gmbh as named herein and in petitioner's original Complaint.

        the State of Louisiana and this district, and it has appointed C T Corporation System, 5615 Corporate Boulevard, Suite 400B, Baton Rouge, Louisiana 70808 as its Louisiana agent for service of process.

B.    BP AMERICA PRODUCTION COMPANY ("BP Defendants),[2] defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Delaware corporation with its principal place of business in Houston, Texas, and which company does business in the State of Louisiana and this district. It has appointed C T Corporation System 5615 Corporate Boulevard, Suite 400B, Baton Rouge, Louisiana 70808 as its Louisiana agent for service of process. BP America was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the *Deepwater Horizon* vessel.

### Negligence

4.

BP Defendants and Transocean[3] acted with gross negligence, willful misconduct and reckless disregard for human life by, among other things, using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

---

[2] "BP Defendants" means and shall include, unless otherwise stated, all BP entitled named in petitioner's original and amended complaints.

[3] "Transocean" means and shall include, unless otherwise stated, Transocean, Ltd., Transocean Deepwater, Inc., Transocean Offshore Deepwater Drilling, Inc., Transocean Holding, LLC, and Triton Asset Leasing Gmbh.

5.

Petitioner avers that the fire, explosion, and sinking of the *Deepwater Horizon* were caused by, among other things, a failure of the rig's well control system. Cameron supplied much of the rig's inadequate, defective blow out prevention equipment. For instance, Cameron designed, manufactured, and supplied the rig's blowout preventer ("BOP") and its component parts. The BOP was unreasonably dangerous when it left Cameron's control. Cameron expressly represented, in writing and orally, that the BOP was effective for preventing blowouts. Cameron anticipated, and indeed was informed by Transocean, that the BOP would be used in deepwater conditions. These warranties were breached because the BOP was not effective in preventing blowouts (and did not prevent the blowout on April 20, 2010). In short, the BOP failed to operate on April 20, 2010 and was not fit for its ordinary purpose. This occurred because, in designing, constructing, composing, and manufacturing the BOP (and its component parts), Cameron relied on calculations to determine the needed strength of its component parts in deepwater conditions, as opposed to actually testing the components in deepwater conditions. The calculations were improper and resulted in a BOP that would not be effective in deepwater conditions like those that existed for the incident in question. This is because Cameron used shear forces lower than required or desired for the BOP in question. Additionally, the rubber gaskets or "packers" on the BOP were too small and too weak to prevent the blowout. This made the BOP unreasonably dangerous. This defect existed when the BOP left Cameron's control. These defects also resulted in a nonconformity to express warranties given by Cameron for the BOP in question. Moreover, this made the BOP unreasonably dangerous in construction, composition, and design. Cameron failed to warn anyone that the BOP would likely not prevent blowouts in deepwater even though it knew this to be the case. Cameron also failed to

warn of the defectively designed and/or manufactured packers. These defects existed when the BOP left Cameron's control. The defects caused a danger to everyone on the rig who depended and relied on the BOP to prevent blowouts. These defects was not known by anyone other than Cameron and no one else had any reason to know about these defects.

6.

Halliburton was in charge of cementing the well, but failed to safely do its job. Halliburton knew or, based on its experience in the industry, should have known that poor cementing significantly increases the risk of a blowout. Halliburton's cementing job should have filled the annulus between the casing and the well bore and sealed off the hydrocarbon filled formations. It also should have plugged the bottom of the casing pipe to prevent an influx. However, the cement slurry Halliburton designed and created on this job failed to perform these function. Halliburton's light nitrified foam cement slurry failed in its function and allowed hydrocarbons to enter the wellbore annulus. The cement design and testing was improper and fell far below the standard of care. In fact, the slurry failed multiple stability tests before the blowout. Halliburton ignored these failed tests. Halliburton's account representative/engineer on the rig knew about these problems and complained that there was a "high probability" of explosive gas flowing through the cement unless changes were made. Further, the Macondo well was located in brittle, variable rock formations laced with volatile high temperature, high pressure, and gaseous hydrocarbon reserves. Given this environment, Halliburton's improper cement mixture was a recipe for disaster. This conduct was willful, wanton, reckless and grossly negligent. Halliburton was aware of this conduct, authorized it, and ratified it. Moreover, BP complained that Halliburton's account representative/engineer was not competent to perform his cement-related job responsibilities. Halliburton had a duty to train and

supervise him, but failed. Moreover, Halliburton was charged with real time gas monitoring, but failed to notice the dangerous pressure readings (or noticed, but failed to inform the proper persons or take appropriate action). If Halliburton safely performed this function, the factors leading to the blowout would have been detected in time to take proper preventative actions.

7.

Petitioner avers that this subject incident and his resulting injuries and damages sued upon herein were the direct and proximate result of the gross, willful, and wanton negligence, and fault of the Transocean Defendants, and unseaworthy conditions caused, created, or allowed to exist by virtue of these defendants' gross, willful and wanton conduct. This negligence, fault, conduct, and conditions are listed more particularly but not exclusively, as follows:

A. Negligent failure to properly perform the operation ongoing at the time of the accident in question;

B. Negligent failure to take all appropriate precautions to avoid an accident and explosion of the kind that occurred;

C. Negligent failure to have all proper equipment and gear necessary to perform the job being performed at the time of the accident and explosion in a safe manner;

D. Negligent failure to keep the equipment on board the vessel in proper condition and repair;

E. Negligent failure to properly inspect the rig and all of its equipment and gear;

F. Negligent failure to have sufficient number of properly trained and qualified personnel to perform the job being performed at the time of the accident and explosion in a safe manner;

G. Negligent failure to properly train and/or instruct and/or warn petitioner and those similarly situated;

H. Negligent violation of government and industry rules, regulations and standards;

I. Proceeding with the operation ongoing before the accident in the face of negative pressure and other testing which showed that well integrity had not been established and that there was an extreme risk of a blowout, explosion and fire;

J. Placement of heavy drilling mud with seawater at a time when there was no well integrity, underbalancing the well and allowing hydrocarbons under pressure to flow up to the production casing and past the blow out preventer;

K. Ignoring data showing an influx of pressured hydrocarbons and an increase in drill pipe pressure, which were unmistakable signs of an impending blowout or blowout in progress;

L. Failing to take steps to prevent the impending blowout or blowout in progress in the face of test data that called for immediate protective measures to control the well;

M. Closing the blow out preventer and diverter, routing the fluids exiting the riser to the vessel's mud gas separator system rather than to the overboard diverter line;

N. Flowing the diversion of hydrocarbons to the mud gas separator, venting the hydrocarbons directly onto the rig through a 12 inch gooseneck vent and other flowlines, which allowed the hydrocarbons onto the rig floor to be exposed to ignition sources;

O. Failing to properly inspect, maintain, and repair a blowout preventer, which blowout preventer was in disrepair and was unseaworthy and which failed to seal the well;

P. Having a fire and gas system that allowed for the dispersion of hydrocarbons and, ultimately, their ignition and which rendered the vessel unseaworthy;

Q. Having a crew that was not properly trained and overly worked and which rendered the vessel unseaworthy;

R. Violation of statutes and/or regulations and/or applicable Coast Guard, MMS, OSHA, and other rules designed to promote and foster safety which constitutes negligence *per se*;

S. Vicariously liable for their employees' and agents' negligence, gross negligence, and recklessness;

T. Failing to furnish petitioner with a safe place in which to work;

U. Other items of unseaworthiness that may be shown from discovery or trial;

V. Other acts of gross, willful, reckless, and wanton conduct that may be shown through discovery or at trial;

W. Generally, these defendants' failure to act with the required degree of care commensurate with the existing situation.

8.

Petitioner avers that this incident and his resulting injuries and damages sued upon herein were the direct and proximate result of the gross, willful, and wanton negligence and conduct of the BP Defendants that is listed more particularly, but not exclusively, as follows:

A. Negligent failure to properly perform the operation ongoing at the time of the accident in question;

B. Negligent failure to take all appropriate precautions to avoid an accident and explosion of the kind that occurred;

C. Negligent failure to have all proper equipment and gear necessary to perform the job being performed at the time of the accident and explosion in a safe manner;

D. Negligent failure to keep the equipment on board the vessel in proper condition and repair;

E. Negligent failure to properly inspect the rig and all of its equipment and gear;

F. Negligent failure to have sufficient number of properly trained and qualified personnel to perform the job being performed at the time of the accident and explosion in a safe manner;

G. Negligent failure to properly train and/or instruct and/or warn petitioner and those similarly situated;

H. Negligent violation of government and industry rules, regulations, and standards;

I. Proceeding with the operation ongoing before the accident in the face of negative pressure and other testing which showed that well integrity had not been established and that there was an extreme risk of a blowout, explosion and fire;

J. Placement of heavy drilling mud with seawater at a time when there was no well integrity, underbalancing the well and allowing hydrocarbons under pressure to flow up to the production casing and past the blow out preventer;

K. Ignoring data showing an influx of pressured hydrocarbons and an increase in drill pipe pressure, which were unmistakable signs of an impending blowout or blowout in progress;

L.   Failing to take steps to prevent the impending blowout or blowout in progress in the face of test data that called for immediate protective measures to control the well;

M.   Closing the blow out preventer and diverter, routing the fluids exiting the riser to the vessel's mud gas separator system rather than to the overboard diverter line;

N.   Flowing the diversion of hydrocarbons to the mud gas separator, venting the hydrocarbons directly onto the rig through a 12 inch gooseneck vent and other flowlines which allowed the hydrocarbons onto the rig floor to be exposed to ignition sources;

O.   Failing to properly inspect, maintain, and repair a blowout preventer, which blowout preventer was in disrepair and was unseaworthy and which failed to seal the well;

P.   Having a fire and gas system that allowed for the dispersion of hydrocarbons and, ultimately, their ignition and which rendered the vessel unseaworthy;

Q.   Violation of statutes and/or regulations and/or applicable Coast Guard, MMS, OSHA, and other rules designed to promote and foster safety, which constitutes negligence *per se*;

R.   Other acts of gross, willful, reckless, and wanton conduct which may be shown through discovery or at trial;

S.   Generally, these defendants' failure to act with the required degree of care commensurate with the existing situation.

9.

In addition to the statements contained in Paragraph 6 above, petitioner avers that this incident and his resulting injuries and damages sued upon herein were the direct and proximate result of the gross, willful, and wanton negligence and conduct of the Halliburton that is listed more particularly, but not exclusively, as follows:

A. Its (their) strict liability for the defective and unreasonably dangerous design, manufacturing, marketing and sale of a defective and unreasonably dangerous product, namely the cement, which ultimately failed and led to the explosion and fire aboard the *Deepwater Horizon*;

B. Its (their) grossly negligent failure to properly test the cement product before selling it to BP and allowing it to be used aboard the *Deepwater Horizon*;

C. Its (their) grossly negligent failure to properly and adequately inform, communicate and warn BP of test data or its failure to have adequate *test data before selling it to BP and allowing it to be used aboard the Deepwater* Horizon;

D. Negligent failure to keep the equipment on board the vessel in proper condition and repair;

E. Negligent failure to properly inspect the rig and all of its equipment and gear;

F. Negligent failure to have a sufficient number of properly trained and qualified personnel to perform the job being performed at the time of the accident and explosion in a safe manner;

G. Negligent failure to properly train and/or instruct and/or warn petitioner and those similarly situated;

H. Negligent violation of government and industry rules, regulations and standards;

I. Proceeding with the operation ongoing before the accident in the face of negative pressure and other testing, which showed that well integrity had not been established and that there was an extreme risk of a blowout, explosion and fire;

J. Placement of heavy drilling mud with seawater at a time when there was no well integrity, underbalancing the well, and allowing hydrocarbons under pressure to flow up to the production casing and past the blow out preventer;

K. Ignoring data showing an influx of pressured hydrocarbons and an increase in drill pipe pressure, which were unmistakable signs of an impending blowout or blowout in progress;

L. Failing to take steps to prevent the impending blowout or blowout in progress in the face of test data that called for immediate protective measures to control well;

M. Closing the blowout preventer and diverter, routing the fluids exiting the riser to the vessel's mud gas separator system rather than to the overboard diverter line;

N. Following the diversion of hydrocarbons to the mud gas separator, venting the hydrocarbons directly onto the rig through a 12 inch gooseneck vent and other flowlines that allowed the hydrocarbons onto the rig floor to be exposed to ignition sources;

O. Failing to properly inspect, maintain, and repair a blowout preventer, which blowout preventer was in disrepair and was unseaworthy and which failed to seal the well;

P. Having a fire and gas system that allowed for the dispersion of hydrocarbons and, ultimately, their ignition and which rendered the vessel unseaworthy;

Q. Its (their) gross, willful, wanton and reckless negligence and conduct in the cementing of the well and well cap;

R. Its (their) gross, willful, wanton and reckless negligence and conduct in performing other operations aboard the vessel *Deepwater Horizon*;

S. Violation of statutes and/or regulations and/or applicable Coast Guard, MMS, OSHA, and other rules designed to promote and foster safety, which constitutes negligence *per se*;

T. Other acts of gross, willful, reckless, and wanton conduct that may be shown through discovery or at trial;

U. Generally, these defendants' failure to act with the required degree of care commensurate with the existing situation.

10.

In addition to the allegations stated in Paragraph 5 above, petitioner avers that this incident and his resulting injuries and damages sued upon herein were the direct and proximate result of the gross, willful, and wanton negligence and conduct of Cameron that is listed more particularly, but not exclusively, as follows:

A. Its defective, unreasonably dangerous and negligent design, manufacture, marketing and sale of the BOP and associated the casing components including, for example, the rubber gaskets or "packers" that it furnished for work on the *Deepwater Horizon* job;

B. Its negligent failure to properly test said equipment;

    C.      Its negligent failure to monitor or inspect its equipment during work on the *Deepwater Horizon* job;

    D.      Its negligent failure to properly instruct and/or warn regarding said equipment;

    E.      Its negligent failure to properly trained personnel regarding the safe use of its equipment;

    F.      Its gross, willful, wanton and reckless conduct and negligence, as stated above;

    G.      Other items of strict liability, negligence, and fault that may be shown through discovery or at trial;

    H.      Generally, its failure to act with the required degree of care commensurate with the existing situation.

11.

Petitioner avers that this incident and his resulting injuries and damages sued upon herein were the direct and proximate result of the gross, willful, and wanton negligence and conduct of Weatherford that is listed more particularly, but not exclusively, as follows:

    A.      Its defective, unreasonably dangerous and negligent design, manufacture, marketing and sale of the its casing components to include, for example, the float collar, shoe, and centralizers that it furnished for work on the *Deepwater Horizon* job;

    B.      Its negligent failure to properly test said equipment;

    C.      Its negligent failure to monitor or inspect its equipment during work on the *Deepwater Horizon* job;

    D.      Its negligent failure to properly instruct and/or warn regarding said equipment;

E. Its negligent failure to properly trained personnel regarding the safe use of its equipment;

F. Its gross, willful, wanton and reckless conduct and negligence, as stated above;

G. Other items of strict liability, negligence, and fault that may be shown through discovery or at trial;

H. Generally, its failure to act with the required degree of care commensurate with the existing situation.

12.

Petitioner further adopt and incorporate the allegations made in Case 2:10-md- 02179; Doc. # 879 at ¶¶ 27-101; 122-132; 145-149; 170-172; 177- 179; 225-439; 563-582 and Doc. # 1320 at ¶¶ XLII; XLIV; XLVI.

13.

Plaintiffs incorporates herein by reference paragraphs 225 - 440 of the Master Complaint, Cross-claim, and Third Party Complaint for Private Economic Losses in Accordance with Pto No. 11 [CMO NO. 1], SECTION III (B1) ["B1 BUNDLE"], DOCUMENT NO. 879 (hereinafter, B1 Master Complaint).

14.

Petitioner incorporates herein by reference paragraphs 501-506, 508, 510, 512-513, 518-529, 533-543, 522, 552-558 of the B1 Master Complaint.

15.

Petitioner incorporates herein by reference, paragraphs 561-581, 583-600, 668-689 of the B1 Master Complaint.

**Concluding Statement**

16.

To the extent that this Third Amended Complaint is consistent and compatible with his Original, First and Second Supplemental and Amended Complaints, petitioner incorporates those pleadings and prayer as through set forth at length herein.

WHEREFORE, petitioner, Karl W. Rhodes, prays that after due proceedings are had, the Court render judgment in his favor and against the defendants and their respective liability insurers, jointly, severally, and *in solido* for compensatory, punitive, exemplary, and other appropriate damages, together with prejudgment interest from date of loss until paid, post-judgment interest, and for all costs of these proceedings.  Finally, petitioner prays for such further orders and relief to which he is entitled, whether at law, in admiralty, or in equity.

Respectfully submitted,

*s/Richard R. Kennedy*
RICHARD R. KENNEDY (#7788), T.A.
RICHARD R. KENNEDY III
309 Polk Street
P.O. Box 3243
Lafayette, LA   70502-3243
Phone:   (337) 232-1934
Fax:       (337) 232-9720
E-Mail:   ken309@richardkennedy.com
E-Mail:   rrk3@richardkennedy.com
*Attorneys for Karl W. Rhodes*

**Certificate of Service**

I hereby certify that the above and foregoing Pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Orer Nol. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179 on this 13st day of March, 2011.

                              */s/ Richard R. Kennedy*