**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | **MDL No. 2179** |
| "Deepwater Horizon" in the Gulf | * | |
| Of Mexico, on April 20, 2010 | * | **SECTION "J"** |
| | * | **JUDGE BARBIER** |
| Relates to: *All Bundle A Cases* | * | |
| | * | |
| (Including 10-1156, 10-1196, 10-1243, 10-1502, | * | **MAGISTRATE SHUSHAN** |
| 10-1540, 10-1921, 10-2814, 10-3066, 10-3168, | * | |
| 10-3169, 10-3184, 10-3815, 10-4211, 10-4226, | * | |
| 10-4227, 10-4229, 10-4252, 10-4360, 10-4427, | * | |
| 11-261, 11-262, 11-263) | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OMNIBUS RESPONSE MEMORANDUM TO HALLIBURTON'S MOTIONS TO DISMISS BUNDLE "A" CLAIMS

The Plaintiffs Steering Committee, through Liaison Counsel, respectfully submits the following opposition to Halliburton Energy Services, Inc.'s Motions to Dismiss some or all of the claims asserted in the Pleading Bundle A cases [Doc 1195]:

MAY IT PLEASE THE COURT:

When ruling upon a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept as true all well-plead allegations and resolve all doubts in favor of the plaintiff. *See Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1572 (5th Cir. 1988). The Court should deny a Rule 12(b)(6) motion unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  Rule 12(b)(6) motions are "viewed with disfavor, and [are] rarely granted." *Sosa v. Coleman*, 646 F.2d 991, 993 (5th Cir. 1981).

**LEGAL ARGUMENT**

## I.  PLAINTIFFS HAVE STATED A CAUSE OF ACTION AGAINST HALLIBURTON.[1]

Halliburton had an extensive and central role in the events leading up to the explosion of the Deepwater Horizon.  Halliburton was hired to provide the cementing operations at the well site. *See generally*, First Amended Master B1 Complaint [Doc. No. 1128].  Among other things:

- "Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the Deepwater Horizon, as well as onshore engineering support for those operations. Halliburton was responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo well. At and before the time of the blowout, Halliburton was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil." *Id.* at ¶ 226.

- "Halliburton, hired for its cementing expertise, was fully aware that the number of centralizers BP chose to use was unsafe. Halliburton employee Marvin Volek had warned the BP well site team that BP's cementing plan "was against our best practices." Yet even after running the models that made it clear proceeding with only six centralizers would lead to "failure of the cement job," Halliburton did not stop work or insist that BP use additional centralizers, instead recklessly proceeding with the cement job it knew was destined to fail." *Id.* at ¶ 326.

- "Halliburton technical advisor Jesse Gagliano told BP that Halliburton's 'recommendation and best practice was to at least circulate one bottoms up on the well before doing a cement job.' Yet again, Halliburton knew of the risk but did not insist that BP follow safe and recommended practices." *Id.* at ¶ 329.

- "Notwithstanding all of Drilling Defendants' risky choices and skipped safety precautions up to this point, and despite knowing the risks of using insufficient centralizers and skipping the bottoms up circulation, Halliburton began the cementing job on the Macondo well." *Id.* at ¶ 332.

---

[1] Many Bundle A plaintiffs have amended their complaints as of right pursuant to Rule 15 of the Federal Rules of Civil Procedure, or moved the Court for leave to allow them to do so - which likely moots Halliburton's Motion(s) in this regard.  However, because Halliburton's *Twombly / Iqbal* argument is general in nature, the PSC responds in order to preserve the argument for those plaintiffs who believed that the allegations in their complaints were sufficient and therefore did not seek to amend.  To the extent the Court might find allegations insufficient in any particular case, it is respectfully suggested by the PSC that a cause of action certainly can be stated against Halliburton, and that any such Plaintiffs should be afforded leave to amend.

- "Prior to beginning cementing operations on the last section of the Macondo well, Halliburton had to make decisions about the type, volume, placement, and pumping of the cement, while taking into account the narrow range of safe operating pressures at the bottom of the well, in addition to the gaseous nature of the hydrocarbon reservoirs surrounding the well.4Halliburton also knew that BP had not properly prepared the annulus for the cement job by performing a bottoms up circulation, and that BP was not planning to use the recommended number of centralizers on the casing pipe." *Id.* at 336.

- ". . . Halliburton improperly designed the cement slurry and failed to thoroughly conduct and/or review the results of laboratory testing of the cement slurry stability under conditions that would be found in the Macondo well." *Id.* at 337.

- "Prior to using its slurry mixture in the Macondo well, Halliburton conducted at least four foam stability tests on it, or on similar formulations, but the tests were incomplete and substandard, and mostly indicated the slurry would not be stable in the Macondo well." *Id.* at ¶ 343.

- In short, "[t]here was a host of reckless decisions concerning well design, cementing, and integrity testing that prioritized speed and cost savings over safety and industry best practices." *Id.* at ¶ 37.

**<u>Twombly and Iqbal: The Basics</u>**

Concerned about the rising costs of litigation, and the fairness of requiring parties to expend substantial resources and time on discovery in cases lacking the facial plausibility necessary to ever support a cognizable claim, the Supreme Court attempted to clarify pleading standards under the Federal Rules in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937 (2009). What the *Twombly/Iqbal* "facial plausibility" standard means has occasioned much debate, and there is no standard answer. As *Iqbal* itself explained, determining plausibility is "a context-specific task" that requires the court to "draw on its judicial experience and common sense." 129 S. Ct. at 1949. In the specific context of these MDL proceedings, this Court may draw on its judicial experience with maritime cases and mass disasters, and its common sense, to rebuff Halliburton's *Twombly/Iqbal* challenge as unnecessary and counterproductive.

3

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. at 1949; *Twombly*, 550 U.S. at 547. A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, *id*. As the Fifth Circuit recently reiterated, "[A] complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. 544, 555).

The Fifth Circuit, in applying and interpreting the *Twombly/Iqbal* standard, has held that when faced with a Rule 12(b)(6) motion to dismiss, that is, a motion to dismiss for failure to plead a claim on which relief can be granted, "courts must . . . accept all factual allegations in the complaint as true." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009), *citing Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308 (2007); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination United*, 507 U.S. 163, 164 (1993). As *Lormand* reminds, "We must also draw all reasonable inferences in the plaintiff's favor." 565 F.3d at 232.

## A.    The Rationale

The fundamental point of the *Twombly/Iqbal* standard is to conserve judicial and party resources for the pleading, discovery, and ultimate proof of contested issues in facially plausible cases, leaving implausible or frivolous suits behind.

According to the Supreme Court's opinion, the *Twombly* complaint alleged that major telecommunications providers had engaged in anticompetitive parallel conduct; the complaint, however, lacked any "factual context suggesting agreement, as distinct from identical,

4

independent action." 550 U.S. at 548, 549. In such an antitrust action, "the crucial question" was whether the challenged conduct stemmed "from independent decisions or from an agreement, tacit or express." *Id.* at 553. This was so because "conscious parallelism" "is not in itself unlawful." *Id.* at 554. In *Twombly*, the Supreme Court viewed potential liability as a close call, moreover, it found no allegations in the complaint suggesting that direct or circumstantial evidence would ever make the prospect of liability plausible.

As the *Twombly* court noted, "asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556. Thus, "some threshold of plausibility must be crossed at the outset before a[n] antitrust case should be permitted to go into its inevitably costly and protracted discovery phase." *Id.* at 558 (quoting *Asahi Glass Co. v. Pentech Pharmaceuticals, Inc.*, 289 F. Supp. 2d 986, 995 (N.D. Ill. 2003)).

In *Twombly*, the Supreme Court empowered district courts to "retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed," because "the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." 550 U.S. at 558. The Supreme Court thus articulated and imposed a facial probability standard because "it is only by taking care to require [such] allegations . . . that we can hope to avoid the potentially enormous expensive discovery in cases with no 'reasonably founded hope that the [discovery] process will reveal relevant evidence.'" 550 U.S. at 560 (quoting *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

**B.**    **The Plausibility of Plaintiffs Claims Against Halliburton Arising from the Deepwater Horizon Blow-Out Lies  in the Public Domain**

Here, it is beyond peradventure that a catastrophic explosion and fire occurred on the Deepwater Horizon, resulting directly in injuries and death among those aboard.  Halliburton's role, in its broad outlines, and in ever-emerging detail, is likewise known.  It cannot be said that substantial discovery, now ongoing, into the events leading up to the explosion and fire in general, and into Halliburton's role therein, is not justified in terms of time or expense.  The *Twombly/Iqbal* problem does not exist in this case.  Accordingly, the level of specificity and detail required in the antitrust context of *Twombly*, and the invidious discrimination context of *Iqbal*, should not be required here.

**C.**    **Halliburton Has Fair Notice of the Claims Against It**

In addition to establishing a facial plausibility threshold, the purpose of the *Twombly/Iqbal* pleading standard is to give the defendant "fair notice of the claims against it." *Wright v. Shell Offshore, Inc.*, 2001 U.S. Dist. LEXIS 16290, *6 (E.D. La. 2011).  In *Wright*, this Court recently addressed and applied the *Twombly/Iqbal* standards in a maritime context.  The claim arose from exposure to benzene-containing chemicals and solvents while plaintiff worked for various employers aboard various vessels.  Mr. Wright asserted a Jones Act claim of unseaworthiness and maintenance and cure against his former employers, and products liability claims against an array of "Manufacturer Defendants."   After Mr. Wright died of acute myelogenous leukemia, wrongful death and survivor claims were added to the suit.  In denying the Rule 12(b)(6) motion, this Court held in *Wright* that plaintiffs had "sufficiently pled enough facts to give defendant 3M Company fair notice of the claims against it in order to survive dismissal under Rule 12(b)(6)," and that "plaintiffs' lack of certain specific factual allegations as to defendant 3M Company does not necessitate a dismissal of those claims.  The court finds that

plaintiffs have pled enough facts to state a claim for relief that is plausible on its face and to give defendant 3M Company fair notice of those claims." *Wright*, *id.* at **6-7.

Comparing the disposition in the *Wright* action (denial of the dismissal motion) to the factual and procedural context here, it is reasonable to expect that Halliburton's motion will be similarly denied.  Mr. Wright's exposure to benzene was long term (from 1976 to 2009), and occurred in the employ of various defendants at various locations.  In stark contrast, the claims for personal injury and wrongful death against Halliburton arose from one incident, at one time and place, in a catastrophic incident that indisputably implicated the products and conduct of Halliburton and others.  The causal connection between benzene exposure and leukemia remains controversial; indeed, defendants might argue the connection is implausible.  There can be no such implausibility argument with respect to the causal connection between the Deepwater Horizon explosion and fire, and the deaths and injuries alleged in the complaints coordinated in this MDL litigation.

Halliburton's precise percentage of fault and/or liability is disputed, true; but at this point, given ongoing inquiries, discovery, and governmental reports, much is known factually about Halliburton's role.  Although this was not known to plaintiffs when they filed their initial complaints, it is known to Halliburton now, and it is matter of both ongoing discovery under the auspices of this Court, and of other public inquiries.  Halliburton cannot claim it is not on fair notice to defend itself; indeed, Halliburton's counsel have been ably doing just that.

The question that must be asked is whether at this stage of the litigation, requiring plaintiffs to amend their complaints to provide further factual detail will "expose the facts, ventilate the competing positions or further adjudication on the merits."  Arthur R. Miller, *Conley to Twombly to Iqbal:  A Double Play on the Federal Rules of Civil Procedure*, 60 Duke

L.J. 1, 3 (October, 2010).  If it does not, no purpose is served by invoking *Twombly/Iqbal* after Halliburton has been put on fair notice of the legal claims and factual theories it faces from the plaintiffs in these cases.

### D.        Contextual Plausibility, Judicial Experience and Common Sense

*Twombly* requires "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  The concise complaints challenged by Halliburton meet this standard in the factual and legal context of the *Deepwater Horizon* litigation.  With respect to the wrongful death and personal injury claims of those on board the rig, the claim does not turn on the arcane choice between "conscious parallelism" and a *sub rosa* antitrust conspiracy, as it did in *Twombly*.  The Deepwater Horizon's demise is more akin to *res ipsa loquitur*, and no more need be pleaded than the facts that the Bundle A Complaints allege: that Halliburton was engaged in cementing operations and cement supply for the rig.

Halliburton criticizes complaints such as the *Jones* Complaint for alleging in "conclusory fashion" that Halliburton was negligent "in the cementing of the well and well cap" and "in performing other operations" on the rig. *See* Halliburton Omnibus Memorandum at p. 6 (citing Jones Complaint at ¶ 10).  However, as the Presidential Oil Spill Commission reported recently, on February 17, 2011, Halliburton's negligence in its cementing activities is indeed implicated in the blowout.  The "root technical cause" of the blowout and spill was a failure of "the cement that BP and Halliburton pumped to the bottom of the well."  *See, e.g.*, Jennifer A. Dlouhy (*Houston Chronicle*, *Washington Bureau*) "Spill Panel Blames Lax Oversight Of Well Cementing," February 11, 2011.

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

*See Iqbal*, 129 S. Ct. at 1949.  Here, that factual content, concise as it is (and it was concise of necessity, since these complaints were originally filed in the immediate wake of the explosion and spill) are now echoed in the exact language of official investigative reports.  Contrary to Halliburton's arguments, Plaintiffs' "assertions of negligence and other torts" are more than "dressed-up legal conclusions" and they are indeed "entitled to the assumption of truth" for purposes of going forward, via discovery, to trial.  *See* Halliburton's Omnibus Memorandum at p. 13.

The transformation of the familiar Fed. R. Civ. P. 8 "short and plain statement of the claim" requirement to the more nuanced and subjective *Twombly/Iqbal* standards, places "plausibility in the eye of the beholder."  *See* Miller, 60 Duke L.J. at 18.  The Supreme Court intended it to be so.  The judicial beholder is now called upon to draw from his or her wisdom and discretion in enabling cases to advance from pleading, to discovery, to trial.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  129 S. Ct. at 1949.

In this case, the parties are fortunate.  This Court's judicial experience and common sense embodies not only years of experience with maritime and admiralty cases, how they are pleaded, how they are discovered, and how they are tried and proved, but also includes mastery of the unfolding facts and procedural context of the coordinated MDL 2179 proceedings over which it presides.  These proceedings include not only the Bundle A Complaints, but comprehensive B1 and B3 Master Complaints that describe the events leading up to, constituting, and following the Deepwater Horizon explosion and spill, and the conduct of Halliburton and others, in abundant detail.  In this "context-specific" frame, the personal injury and wrongful death complaints

cannot be consigned, consistent with judicial experience or common sense, to the realm of implausibility.  They are entitled to proceed.

*Twombly* and *Iqbal* have their justification in the legitimate quest to reduce cost and delay in civil litigation, and to conserve the resources of the courts and of the parties.  These goals are not promoted by requiring the Bundle A plaintiffs to amend their complaints to include the voluminous detail now available about Halliburton's conduct and its cement product, and their roles in causing and/or exacerbating the explosion and fire, and resulting injuries and deaths.  While such amendment is certainly possible at this juncture, and will be done promptly should this Court so order, plaintiffs respectfully submit it is unnecessary and should not be required.

## II.   LOST FUTURE EARNINGS AND PUNITIVE DAMAGES ARE NOT PRECLUDED BY DOHSA OR THE JONES ACT.

Halliburton argues that survivors of seamen may not recover nonpecuniary damages, including lost future earnings, and that punitive damages are not recoverable in a seaman's wrongful death and survival action. *See* Halliburton's Omnibus Memorandum at p. 16-17. However, an analysis of the law does not support Halliburton's exclusion of lost future earnings and punitive damages.

Personal representatives of seamen may pursue one or more maritime causes of action: first, the personal representative can sue the seaman's employer (or employers)[2] for negligence under the Jones Act.[3]  Secondly, the personal representative can sue the vessel owner for the

---

[2]  Under the Jones Act, a seaman may have multiple employers subject to liability thereunder. *Guidry v. South La. Contractors Inc.*, 614 F.2d 447 (5th Cir. 1980); *Cordova v. Crowley Marine Services*, 02-2880 (E.D. La. 2003,) 2003 WL 21790195.

[3]  The Jones Act allows the personal representative of the deceased seaman to bring an action on behalf of certain named beneficiaries. *Calton v. Zapata Lexington*, 811 F.2d 919 (5th Cir. 1987).

unseaworthiness of the vessel under the general maritime law, regardless of whether the vessel owner was the seaman's employer.  See, *e.g.*, *Becker v. Tidewater, Inc.*, 335 F.3d 376 (5th Cir. 2003); and *Mahramas v. American Export Isbrandtsen Lines*, 475 F. 2d 165 (2d Cir. 1973). Third, under the general maritime law, the seaman's representative may sue the manufacturer of a defective product for strict products liability.  See, *e,g*, *East River S.S. Corp. v. Transamerica Delaval, Inc*., 476 U.S. 858 (1986); and *Szollosy v. Hyatt* Corp., 396 F.Supp.2d 159 (D.Conn. 2005).   Finally, the seaman's representative can sue other defendants for general maritime negligence. See, *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625 (1959); *see also* Robert Force & Martin J. Norris, THE LAW OF SEAMEN, § 29.8, 5th Edition, 2003.

When a seaman is killed as a result of an accident occurring more than a marine league from shore – as in the case of the *Deepwater Horizon* – the personal representative may combine the remedy provided by the Death on the High Seas Act ("DOHSA"), 46 U.S.C. § 30301 *et. seq.* with that provided by the Jones Act.  *See Peace v. Fidalgo Island Packing Co.*, 419 F.2d 371 (9th Cir. 1969).  The underlying law controlling liability under the Jones Act is Jones Act negligence. *See* 2 Robert Force & Martin J. Norris, THE LAW OF SEAMAN, § 30.35 (5th Edition, 2003). The law governing liability for the DOHSA remedy is the general maritime law — that is, unseaworthiness for a seaman's survivors against a vessel owner, maritime products liability against the manufacturer of a product, and negligence as to all others. 2 Robert Force & Martin J. Norris, THE LAW OF SEAMEN, § 29.8 (5th Edition, 2003).

Halliburton argues that no form of non-pecuniary damage can be recovered in any death remedy arising out of the explosions, fire and sinking of the *Deepwater Horizon*.  It argues that loss of future earnings, pre-death pain and suffering and punitive damages all fall within the ambit of this supposed rule.  In doing so, it draws no distinction between seamen and non-

seamen plaintiffs on the one hand or employers and third party defendants on the other.  It also blurs the line between pecuniary and non-pecuniary damages.  In its effort to gain dismissal of valid claims, Halliburton's argument oversimplifies and confuses the remedies available to the Plaintiffs.  For instance, it is clear that under both the Jones Act and DOHSA, a survivor is entitled to economic loss of support damages suffered as a result of the worker's death.  See *De Centeno v. Gulf Fleet Crews,* Inc., 798 F.2d 138, 141, (5th Cir. 1986) (holding loss of support recoverable under Jones Act); *Bergen v. F/V St. Patrick, supra* (holding loss of support recoverable under DOHSA).

Likewise, Halliburton's motion to dismiss Plaintiff's claim for punitive damages under DOHSA should also be denied.  In *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008), the Supreme Court affirmed maritime law's long-standing recognition of punitive damages as an item which may be recovered when defendant's conduct justifies such an award.  In *Atlantic Sounding Co. v. Townsend*, 129 S.Ct. 2561 (2009), the Court affirmed the right of a seaman to recover punitive damages from employer/shipowners when the seaman's settled maritime-law rights were flouted or abused through serious misconduct.  The Supreme Court has never ruled that punitive damages are not recoverable under DOHSA.  46 U.S.C. § 30303 allows the successful plaintiff to recover "fair compensation for the pecuniary loss sustained."  Although lower courts have held that DOHSA does not allow for the recovery of punitive damages,[4] these decisions are based upon the untested and unsupported assumption that punitive damages are not pecuniary.

---

[4] See *e.g. Motts v. M/V Green Wave*, 210 F.3d 565, 569 (5th Cir. 2000) where the court wrote: "Appellee can recover punitive and other non-pecuniary damages only if DOHSA is inapplicable"; *Bergen v. F/V St. Patrick*, 816 F.2d 1345-1347 (9th Cir. 1987).  In that case the United States Court of Appeals for the Ninth Circuit noted that: "Punitive damages are non-pecuniary damages unavailable under the Jones Act."  *Id.*

This assumption is incorrect.  The common definitions of "pecuniary" are "1.  relating to money, as in pecuniary affairs; and 2.  *Involving a money penalty, or fine*, *as pecuniary offense*." *Webster's New Universal Unabridged Dictionary* (2d ed. 1983) (emphasis added).  *Black's Law Dictionary* defines "pecuniary damages" as "damages that can be estimated and monetarily compensated" and "non-pecuniary damages" as "damages that cannot be measured in money." *Black's Law Dictionary* 418 (8th ed. 2004).

Whichever of these definitions one chooses, punitive damages *are* pecuniary.  They are awarded as money, can be estimated and, as recently stated by the Supreme Court in *Exxon Shipping Co. v. Baker*, punitive damages are awarded as "*measured* retribution."  *See Baker*, 554 U.S. at 513 (emphasis added).  Approximately one year before writing the opinion for the Court in *Miles*, Justice O'Connor repeatedly referred to punitive damages as "pecuniary punishment." *See Browning Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 295-297 (1989) (O'Connor, J., concurring in part and dissenting in part).  Moreover, the United States Supreme Court has characterized a civil forfeiture as "pecuniary punishment."  *Austin v. United States*, 509 U.S. 602, 614 n. 7 (1993).  The case most often cited for the proposition that punitive damages are "non-pecuniary" cites no authority and conducts no analysis to support this declaration. *See Kopczynski v. The Jaqueline*, 742 F.2d 555, 561 (9th Cir. 1984).

Furthermore, there is an alternative basis for concluding that DOHSA allows for the recovery of punitive damages.  As mentioned above, DOHSA allows for the recovery of "fair compensation for pecuniary loss sustained," 46 U.S.C. § 30303.  "Pecuniary" damage is a form of compensatory damage.  § 30303 does not address and certainly does not exclude punitive

damages as a non-compensatory item of damage.  Accordingly, as outlined above, punitive

damages are pecuniary and, therefore, § 30303 does not disallow such damages.[5]

Halliburton also challenges the recoverability of non-pecuniary damages under the Jones

Act death remedy.  First, it is clear that under the Jones Act, damages for the seaman's conscious

pain and suffering before death are allowed.  45 U.S.C. § 59; *Snyder v. Whittaker Corp.*, 839

F.2d 1085, 1092-1094 (5th Cir. 1988); *DeCenteno v. Gulf Fleet Crews, Inc.*, 798 F.2d 138, 142

(5th Cir. 1986).  Halliburton's assertion that punitive damages are not awardable in Jones Act

actions rests on *Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496, 1512, (5th Cir. 1995) (en

banc).  In *Guevara*, in the course of holding that a seaman was not entitled to seek punitive

damages from an employer who flouted the venerable maintenance-and-cure obligation, the Fifth

Circuit said in dictum that "the Jones Act does not provide for punitive damages."  *Guevara* has

been "abrogat[ed]" by *Atlantic Sounding Co. v. Townsend*, 129 S.Ct. 2561 (2009) (holding that a

seaman was entitled, as a matter of general maritime law, to seek punitive damages for his

employer's alleged willful and wanton disregard of its maintenance and cure obligation).

Moreover, in *Townsend* the Supreme Court went out of its way to flag the availability of

punitive damages in Jones Act actions as an open question stating:

> Because we hold that *Miles [v. Apex Marine Corp.* 498 U.S. 19] does not render
> the Jones Act's damages provision determinative of respondent's remedies, we do
> not address the dissent's argument that the Jones Act, by incorporating the
> provisions of the Federal Employer's Liability Act, see *46 U.S.C. § 20104(a)*,
> prohibits the recovery of punitive damages in actions under the statute.

---

[5] Some maritime scholars have also concluded that *Miles* does not address, and its reasoning
does not preclude, a general maritime punitive damage award because the pecuniary /
non-pecuniary" distinction does not apply to punitive damages.  *See* Robertson, *Punitive
Damages: Miles, Baker and Townsend*, 70 LA. L. REV. 463 (Winter 2010), at 463-65;  *see also*
Robert Force, *The Curse of Miles v. Apex Marine Corp.: The Mischief of Seeking 'Uniformity'
and 'Legislative Intent' In Maritime Personal Injury Cases*, 55 LA. L. REV. 745 (March 1995),
at p. 777 n.1 and p. 793; Robertson, *Punitive Damages: Miles, Baker and Townsend*, at 473-75.

*Townsend*, 129 S.Ct. at 2575, n.12 (citation omitted).  Ultimately, the portions of Halliburton's argument that do not rest entirely on DOHSA's "fair compensation for the pecuniary loss" language rests on an expansive reading of *Miles* that was rejected in *Townsend*.  In deciding whether punitive damages are allowed under the Jones Act, *Miles* has no greater relevance to this issue than it did on the issue of maintenance and cure punitive damages.  *Miles* did not deal in any way with the issue of punitive damages.  Rather, it dealt only with the kinds of *compensatory* damages available in maritime death cases, holding that loss of society damages could not be recovered in a general maritime death action brought by the survivor of a seaman killed in territorial waters.[6]

Historically, seamen had the right to sue for punitive damages prior to the passage of the Jones Act.  See, *e.g.*, *Swift v. Happy Return*, 23 F.Cas 560 (D. Pa. 1799); *Gould v. Christianson*, 10 F.Cas. 857 (S.D.N.Y. 1836); *The Rolph*, 293 F. 269, 270 (N.D. Cal. 1925); *The Margharita*, 140 F. 820, 821, 825 (5th Cir. 1905); *The Scotland*, 42 F.925 (S.D.N.Y. 1890).[7]  The language of the Jones Act does not purport to affect this long standing right.  The Supreme Court has repeatedly held that the Jones Act does not eliminate or restrict causes of action and remedies that were available to seaman before its passage.  See, e.g., *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 248 (1942); *Arizona v. Anelich*, 298 U.S. 110,1231 (1936); *Bainbridge v. Merchs*

---

[6]  It should also be emphasized here that, regardless of the wisdom of applying *Miles*' reasoning to preclude a punitive damage claim by a seamen under the Jones Act, such reasoning would make no sense in a seaman's claims under other causes of action available to him.  See, *e,g.*, *Wagner v. Kona Blue Water Farms, LLC*, 09-00600, 2010 WL 3566731, (D.C. Hi. September 13, 2010) (denying defendant's motion to dismiss plaintiff's claim for punitive damages based on unseaworthiness); *see also In re: Denet Towing Service Inc.*, 2010 WL 3566731 (E.D. La. 2000) (denying defendant's motion to dismiss plaintiff's claims for loss of society, punitive damages, etc., as to third party defendant).

[7]  For discussion of this issue, see also David W. Robertson, *Punitive Damages in U.S. Maritime Law: Miles, Baker and Townsend,* 70 LA. L. Rev. 463, 478-83 (2010).

*and Miners' Trans. Co.*, 287 U.S. 278, 282 (1932).  Moreover, there is a long standing tradition in admiralty to treat seamen as a "favored class" of litigants, *Bainbridge v. Merchs. & Miners Transp*. Co., 287 U.S. 278, 282 (1932), enjoying "heightened legal protections [that are] unavailable to other maritime workers."  *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995). The Supreme Court in *Exxon Shipping Co. v. Baker* allowed "commercial fishermen, native Alaskans and landowners," whose livelihoods were impacted by the oil pollution flowing from the grounding of the Exxon Valdez, to recover punitive damages under maritime law.  *See Baker,* 554 U.S. at 513.  In doing so, the Court looked to the Ninth Circuit's decision in *Union Oil v. Oppen*, 510 F.2d 558 (9th Cir. 1974), where that Court created an exception for commercial fishermen to the general rule requiring that a plaintiff have a proprietary interest in the polluted property in order to recover for damages flowing from the pollution.  The Court justified this special treatment given to commercial fishermen by likening them to seamen, traditional wards of the admiralty.  *See Union Oil,* 510 F.2d  at 567.  Thus, it is clear that it would turn the law on its head to allow "commercial fishermen, native Alaskans and landowners" to recover punitive damages under the maritime law but deny these damages to the "favored class" of seamen. There is nothing in the language or history of the Jones Act which justifies granting this remedy to such plaintiffs but withholding it from seamen.  Withholding the punitive damages remedy from seamen is further contrary to established tenets of maritime law when one considers that ". . . it is settled cannon of maritime jurisprudence that 'it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy, when not required to withhold it by established and inflexible rule.'"  *American Export Lines, Inc. v. Alvez*, 446 U.S. 274, 281-82 (1980) (quoting *Moragne v. States Marine Lines*, 398 U.S. 375, 387 (1970)). Accordingly, Halliburton's motion to dismiss should be denied in this regard.

III.    **PLAINTIFFS ASSERT A LEGALLY VIABLE CLAIM OF STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES.**

Halliburton argues that a claim of strict liability for ultrahazardous activities should be dismissed because the claim is not recognized by maritime law.  Although courts in other Circuits have held that maritime law does not recognize the doctrine of strict liability for ultrahazardous activities, the question has not been answered in this Circuit. The trend, however, is toward recognition of the doctrine.   In *East River Steamship Corp. v. TransAmerica Delaval, Inc.,* 476 U.S. 858, 864-66 (1986), the Court explicitly recognized strict products liability as a part of the general maritime law.   As the Court in *East River* explained, substantive admiralty law is drawn from state and federal sources, and the general maritime law "is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *Id.* at 864 (citing *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 630 (1959) and *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 373-375 (1959)).   The Court noted that strict products liability had been a part of the common law of torts for some time and there was a trend in maritime law toward strict liability.  The Court explained

> This Court's precedents relating to injuries of maritime workers long have pointed in that direction. *See Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 94 (1946) (strict liability for unseaworthiness); *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.,* 376 U.S. 315, 322 (1964) (strict liability for breach of implied warranty of workmanlike service). The Court's rationale in those cases -- that strict liability should be imposed on the party best able to protect persons from hazardous equipment -- is equally applicable when the claims are based on products liability. *Compare Sieracki,* 328 U.S., at 93-94, with *Escola v. Coca Cola Bottling Co. of Fresno,* 24 Cal. 2d 453, 462, 150 P. 2d 436, 441 (1944) (concurring opinion).

*Id.* at 866.

Parties involved in extremely dangerous activities such as ultra-deepwater oil drilling - like those that manufacture defective products, operate unseaworthy vessels, and breach warranties - are in the best position to protect persons from the dangers associated with their

hazardous equipment, and strict liability should be imposed upon them pursuant to maritime law. Like strict products liability, the doctrine of strict liability for ultrahazardous activities is well-established.  It was first recognized in the English case of *Rylands v. Fletcher,* L.R. 3 H.L. 330 (1868), and later adopted and expanded by the Restatement of Torts §§ 519-20 (1938).  Today, a majority of courts have adopted the *Rylands* rationale and impose strict liability in cases of abnormally dangerous activities, normally defined in accord with factors identified in Section 520 of the Restatement (Second) of Torts.  W. Prosser, Law of Torts § 78, at 509 (4th ed. 1971); William K. Jones, *Strict Liability for Hazardous Enterprise,* 92 Colum. L. Rev. 1705, 1779 n. 36 (1992). The doctrine is now ripe for inclusion as a part of the general maritime law of torts. Like its adoption of Section 402A of the Restatement (Second) of Torts, it is time for maritime law to adopt Section 519 and 520 of the Second Restatement.  The Restatement provides:

> (1)     One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
> (2)     This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Restatement (Second) of Torts § 519.  In determining whether an activity qualifies as abnormally dangerous, Section 520 of the Restatement (Second) of Torts requires consideration of the following factors:

> (a) the existence of a high degree of risk of some harm to the person, land or chattels of others;
> (b) the likelihood that the harm that results from it will be great;
> (c) the inability to eliminate the risk by the exercise of reasonable care;
> (d) the extent to which the activity is not a matter of common usage;
> (e) the inappropriateness of the activity to the place where it is carried on; and
> (f) the extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 520.   There can be no question that ultra-deepwater drilling creates a high degree of risk to persons, land and chattels or that the harm resulting from it are

likely to be great.  Even with the exercise of reasonable care, given the nature of the work, the risks cannot be eliminated.   As the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (the "Commission") stated in its Final Report released on January 11, 2011, drilling in extreme water depths poses special and different challenges.   The Commission explained:

> Risers connecting a drilling vessel to the blowout preventer on the seafloor have to be greatly lengthened, and they are exposed to strong ocean currents encountered in the central Gulf. Managing higher volumes of mud and drilling fluid in these long risers makes drillers' jobs more demanding.  Connecting and maintaining blowout preventers thousands of feet beneath the surface can only be performed by remote-operating vehicles….More broadly, knowledge about localized geology, types of hydrocarbons, and pressure profiles in ultra-deepwater wells is still not thoroughly developed. Geological conditions are complicated and vary from prospect to prospect, and from well to well. Each well, indeed, has its own "personality" that requires maintaining an extremely delicate balance between the counteracting pressures of the subsurface formation and drilling operation. Beneath the salt, pressures in the pores of the sediment are exceedingly hard to predict. Reservoirs in the Lower Tertiary are thicker and with higher viscosity than the fluids found in younger rock. Finally, ultra-deepwater developments are far removed from shore and thus from established infrastructure. As a BP technical paper prepared for the May 2010 Offshore Technology Conference noted, "the trend of deepwater discoveries in the [Gulf of Mexico] is shifting toward one with greater challenges across many disciplines represented by the conditions of Lower Tertiary discoveries."

(Final Report, pp. 51-52).  Also, ultra-deepwater drilling is not a matter of common usage, meaning that it is not carried on by a large percentage of the population.  Further, the activity was inappropriate to the site where it was carried on.  The Macondo prospect site was notorious in the industry for high temperature, high pressure, highly gaseous hydrocarbon reservoirs trapped in weak, brittle rock formations.   At the Macondo site, the Deepwater Horizon was conducting drilling operations in excess of 18,000 feet.  At depths almost 3.5 miles below the sea floor, the pressures within and strengths of the various formation layers the Deepwater Horizon was drilling through varied widely and changed often, requiring constant adjustments to drilling

fluid density and other factors.  In some places, the subsea rock formations were so brittle that they fractured, letting gallons of expensive drilling mud escape into the cracked and porous rock around the drill.   Given the extremely dangerous and unpredictable conditions at the site, ultra-deepwater drilling was inappropriate.

As for the final factor, while drilling for oil is valuable to the community at large, the value of ultra-deepwater drilling pales when compared to its dangerous attributes. In this case, the activity resulted in multiple deaths, personal injuries, and environmental and economic devastation, the effects of which will be felt in the Gulf region and the entire country for many years to come.  The attributes of ultra-deepwater drilling simply cannot outweigh the wreckage the activity has left in its wake.

The extremely hazardous nature of offshore drilling, as well as the rapid advances being made in the industry, was recognized in this circuit in *Armstrong v. Chambers & Kennedy,* 340 F. Supp. 1220 (S.D. Tex. 1972), where a platform owner (C&K) hired a contractor to bring a deteriorated oil platform located on the Outer Continental Shelf into compliance with U.S. pollution regulations. While this work was being done, an explosion occurred on the platform, killing and injuring workers on the platform and in a standby boat that was moored below the platform.  The explosion was caused by the welding of equalizing lines by an employee of a subcontractor at a time when oil remained in the oil tanks. In discussing the platform owner's liability, the Court stated:

> The exploration and development of offshore oil resources under the seas is a relatively new area of technological progress. Unlike the search for oil and gas on land, it presents new and more dangerous challenges in its development. 35 Tex. L. Rev. 1; 33 Tex. L. Rev. 574; *Warren Petr. Corp. v. Martin,* 153 Tex. 465, 271 S.W.2d 410, reh. den. (1954). Thus, the duty placed here upon the oil lessee is similar to the traditional tort duty of one using an ultrahazardous substance.

*Id.* at 1233-1234 (emphasis added).   The Fifth Circuit, in affirming this portion of the decision, quoted the district court's language.  *See In re Dearborn Marine Service, Inc.,* 499 F.2d 263, 267, n. 7 (5th Cir. 1974). Thus, the Fifth Circuit recognized the extremely hazardous nature of offshore drilling and the duty placed on those engaging in it.   Given the extreme depths at which the activity now takes place and the special problems associated with it, offshore drilling has developed into a much more hazardous activity than it was in 1972.   Its recognition as an ultrahazardous activity to which strict liability applies under maritime law is therefore crucial.

For these reasons, this Court should find that maritime law recognizes the tort of strict liability for ultrahazardous activities, and deny Halliburton's motion to dismiss this claim.

**IV.    *RES ISPSA LOQUITOR* IS AN EVIDENTIARY DOCTRINE, NOT A CLAIM FOR RELIEF THAT CAN BE DISMISSED AT THE PLEADING STAGE, AS A MATTER OF LAW.**

Halliburton moves this court to dismiss Plaintiffs' "claim" for *res ipsa loquitur* on the ground that it is not a valid cause of action.  In asserting this argument, Halliburton misconstrues the nature of Plaintiffs' claims.  The relevant claim that Plaintiffs are making is for negligence, not *res ipsa loquitur.*   Indeed, all of the allegations cited by Defendant are contained in sections of Plaintiffs' complaints that either plead a cause of action for negligence or directly reference the defendant's negligence.  *See*, *e.g.*, Crawford Complaint, Cause No. 2:10-cv-1540, at ¶ 55.

Put succinctly, *res ipsa loquitur* is an evidentiary doctrine, not a cause of action. *See Kerns v. Sealy*, 496 F. Supp. 2d 1306, 1315 n. 13 (S.D. Ala. 2007).  In other words, the doctrine is simply one way by which a plaintiff may prove negligence; it is not a cause of action that is separate and apart from negligence.  Motions to dismiss a claim under Fed. R. Civ. Proc. 12(b)(6) are not intended to address these types of evidentiary issues. Halliburton's challenge to

Plaintiffs' *res ipsa* allegations should therefore be denied because there is no cause of action that is subject to dismissal.[8]

Moreover, Halliburton is wrong to assert that Plaintiffs' pleadings do not support the imposition of *res ipsa loquitur*.   In the Fifth Circuit, *res ipsa loquitur* will apply where: 1) the injured party was without fault; 2) the instrumentality causing the injury was under the exclusive control of the defendant; and 3) the accident is of a type that ordinarily does not occur in the absence of negligence.  *See United States v. Nassau Marine Corp.*, 778 F.2d 1111, 1115 (5th Cir. 1985).  Notably, Halliburton does not contest the presence of the first and third elements of this test.  Rather, Halliburton asserts only that the second element is absent because Halliburton did not exercise exclusive control of the Deepwater Horizon.  However, this argument misrepresents the nature of the second element.

In order to establish an inference of negligence under *res ipsa loquitur*, the plaintiff need not demonstrate that the defendant exercised exclusive control over the entire chain of events that ultimately resulted in the accident.   Rather, the plaintiff need only establish that the defendant controlled the particular instrument that is a *possible* source of the accident, even where that instrument is but a component of a larger device.  *See Bradshaw v. Freightliner Corp.*, 937 F.3d 197, 201 (5th Cir. 1991). Moreover, to successfully invoke *res ipsa loquitur*, the plaintiff must only establish that the defendant was in exclusive control of the instrumentality at the time the negligence occurred. *Id*. It is immaterial that the defendant did not exercise any control at the time of the accident that caused the injury. *Id*.

---

[8] Neither of the cases relied on by Halliburton concern the legal sufficiency of a plaintiff's pleading. *See Johnson v. United States*, 333 U.S. 46, 68 S. Ct. 391, 92 L. Ed. 468 (1948); *United States v. Nassau Marine Corp.*, 778 F.2d 1111 (5th Cir. 1985). Rather, as is true with virtually all of the reported decisions in this area, the courts were concerned with whether the evidence adduced at trial supported an inference of negligence.  *See generally* Restatement (Second) of Torts § 328 D.

In *Bradshaw*, the plaintiff was injured while riding in a truck.  The plaintiff alleged that his injury was caused by the defective design of the seat he was riding in when the accident occurred.  The plaintiff sued both the truck and the seat manufacturer.  The evidence produced at trial suggested that the seat's improper design was a "possible" cause of the accident.  *Id*.  The seat manufacturer asserted that a jury instruction regarding *res ipsa loquitur* was improper because the defendant did not have control of the seat at the time the accident occurred and because there were intervening causes of the accident. *Id*. The Fifth Circuit disagreed and held that the evidence regarding the seat's possible design defect was sufficient to submit the issue of *res ipsa loquitur* to the jury. *Id*.

Plaintiffs' allegations against Halliburton are no different than the evidence submitted in *Bradshaw*. Halliburton is therefore incorrect to assert that its alleged lack of control of the Deepwater Horizon is dispositive, as that is precisely the argument that was rejected by the Fifth Circuit in *Bradshaw*.  Plaintiffs' allegations regarding *res ipsa loquitur* should be preserved.

## V.   HALLIBURTON'S FAILED PRODUCT – CEMENT—GIVES RISE TO A CLAIM FOR PRODUCTS LIABILITY UNDER THE GENERAL MARITIME LAW.

To the extent Halliburton suggests that a claim for strict products liability under the general maritime law should not survive, the argument fails.  As set forth above in Part III, the United States Supreme Court recognized a strict products liability cause of action arising under the general maritime law in  *East River S.S. Corp. v. Transamerica Delaval, Inc*., 476 U.S. 858 (1986),.  In that case, the Supreme Court wrote that "...the question whether principles of strict products liability are part of maritime law 'is no longer seriously contested" *Id.* (citing *Ocean Barge Trans. Co. v. Hess Oil*, 726 F.2d 121 (3rd Cir. 1984)).   *East River*, citing with favor *Pan-Alaska Fisheries Inc. v. Marine Const. & Design Co.*, 565 F.2d 1129 (9th Cir. 1977)), and other federal jurisprudence, *see e.g.*, *Szollosy v. Hyatt Corp.*, 396 F.Supp.2d 159 (D. Conn. 2005); *see*

*also In re Skipper Liner Industries*, *Inc.*, 00-0730, 2002 WL 32348827 (W.D. Wis. January 31, 2002), has established that Section 402A of the Restatement (Second) of Torts is the governing and applicable set of rules for a maritime products liability cause of action.

Furthermore, Halliburton's argument also fails to the extent that Halliburton suggests that the Plaintiffs' factual allegations for products liability fail because certain Plaintiffs have not alleged: (1) what product Halliburton sold or manufactured; (2) how this product was defective and unreasonably dangerous; or (3) how the defect in the product proximately caused Plaintiffs' injuries. As explained, *supra*, this argument is either i) mooted, as Plaintiffs have amended their complaints to incorporate the factual allegations sort forth in the B1 Master Complaint, or ii) the rationale of *Iqbal / Twombly* makes Halliburton's argument inapplicable for the reasons set forth above in Part I. In any event, Halliburton's product – cement – failed and a massive environmental disaster resulted. Plaintiffs have therefore set forth a proper claim for strict products liability under the general maritime law, as recognized by the United States Supreme Court. Accordingly, Halliburton's motion to dismiss this claim should be denied.

## VI.  PLAINTIFFS HAVE ASSERTED A LEGALLY VIABLE CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

Halliburton's efforts to dismiss the intentional infliction of emotional distress ("IIED") claim of Plaintiff Sara Stone ("Mrs. Stone") are misplaced. Haliburton's entire argument relies upon 46 U.S.C. § 30303 of the Death on the High Seas Act ("DOHSA") and two inapplicable cases discussing the "zone of danger" doctrine under the Jones Act. Mrs. Stone's injuries do not, however, fall within the ambit of the statute or the case law cited by Halliburton. Instead, her claims are governed by state tort law, because the anguish for which she seeks recovery, as well as its causes, are entirely separable from conduct occurring on the high seas.

First, Mrs. Stone's injuries do not arise out of the death of her husband Stephen Stone – despite the deadly explosion and fire aboard Defendants' rig, her husband is thankfully alive and well.  Her injuries and emotional distress arise from the Defendants' intentional and reckless decision to withhold information regarding the condition and whereabouts of her husband in the aftermath of the explosion. *See* Stone Petition in Intervention at ¶ 19.  In order for 46 U.S.C. § 30303 and the case law applying and interpreting this statute to apply there must necessarily be a "death . . . occurring on the high seas."  Seeing as there is no death in this instance, 46 U.S.C. § 30303 and related case law have no application to Mrs. Stone's tort claims, and the whole of Halliburton's legal basis for the dismissal evaporates.

Second, Mrs. Stone is not trying to recover for a death on the high seas, but for emotional injuries suffered as a result of independent, separable acts by the Defendants.  Simply put, Mrs. Stone's damages and the causes thereof occurred on dry land.  The decision to withhold information concerning the condition of Mrs. Stone's husband has no connection and is entirely separable from conduct occurring on the high seas.  As such, neither DOHSA nor the Jones Act applies to bar or limit Mrs. Stone's state law tort claim of IIED.

This Court has faced a similar set of circumstances and refused to dismiss an IIED claim when the injuries resulted from the independent and separable acts of the defendants that did not have not occur on the high seas.  In *Ostrowiecki v. Aggressor Fleet, Ltd.*, a father and daughter went on a scuba diving trip during which the father disappeared and, after a brief search, could not be found.  *See* No. 07-6598, 07-6931, 2008 WL 3874609 (E.D. La. Aug. 15, 2008) (Africk, J.).  The daughter alleged that she suffered IIED because she was not allowed to freely contact her mother by telephone, the diving company refused to end the trip, and refused her mother's efforts to get the daughter off the boat.  Instead, the diving company continued with the trip for

another five days with the daughter on board.  The mother and daughter also alleged that once the boat returned to port, certain diving company representatives spoke to the press about the incident and blamed the disappearance on the daughter.

The diving company moved to dismiss the IIED claims alleging that DOHSA preempted such claims by the daughter and mother.  The Court stated that while DOHSA would preempt a claim for mental anguish arising out of the death of the father, the plaintiffs were not seeking such relief: "[i]nstead, the anguish for which they seek recovery is separable from the death-related anguish, and it is predicated on entirely different acts of the defendants from those which allegedly caused [the father's] death." *Id.* at 6. The Court found that "DOHSA's text does not 'speak directly to [the] question,' of recovery for emotional suffering flowing from defendants' discrete, post-death actions." *Id.* (internal citations omitted) (citing *Mobile Oil Corp. v. Higginbotham*, 436 U.S. 618, 625, 98 S. Ct. 2010 (1978)).   Because the plaintiffs' IIED claims were based upon the "post-death actions" of the diving company, the injuries had no connection to the high seas and were not preempted by DOHSA.  Notably, the Court stated that to rule otherwise would enable defendants to escape liability for any emotional distress inflicted in the wake of a death on the high seas:

> Permitting plaintiffs' state law claims to go forward does not, therefore, offend "Congress' considered judgment."  To rule otherwise would enable defendants to escape liability for any emotional distress inflicted in the wake of a death on the high seas.  Were this Court to accept defendants' argument, defendants could engage in any manner of deplorable conduct without incurring legal liability, so long as their conduct arose out of or was somehow related to a death on the high seas.  The Court does not interpret DOHSA to have such sweeping preemptive effect.

*Id.* at *6 (internal citations omitted).

Although there is no death on the high seas in this instance, *Ostrowiecki* is nonetheless instructive because the anguish for which Mrs. Stone seeks recovery is predicated on entirely

different acts by the Defendants from those that caused the explosion aboard the Deepwater Horizon.  Mrs. Stone's IIED did not occur or originate on the high seas; rather, her IIED occurred on dry land and resulted from the post-explosion conduct of the Defendants in withholding the condition and whereabouts of her husband.  Further, entertaining Defendants' Motion to Dismiss under these circumstances fosters a "sweeping preemptive effect" of DOHSA which has already been addressed and rejected by this Court in *Ostrowiecki*.  Defendants should not be allowed to apply DOHSA to circumstances it was never meant to govern in order to immunize themselves for the emotional distress they inflicted in the wake of the explosion. Accordingly, Halliburton's Motion to Dismiss Mrs. Stone's IIED claim should be denied.

**VII.   PLAINTIFFS' CLAIMS AGAINST SPERRY-SUN DRILLING SERVICES, INC. SHOULD NOT BE DISMISSED, AS PLAINTIFFS SHOULD BE ALLOWED TO SUBSTITUTE HALLIBURTON FOR SPERRY-SUN DRILLING SERVICES, INC.**

The ultimate dismissal sought by Halliburton with respect to Sperry-Sun Drilling Services, Inc. ("Sperry-Sun") is expressly rejected by Federal Rule of Civil Procedure 17(a)(3). Rule 17(a)(3) mandates that a party be allowed a reasonable time to join or substitute the real party in interest after a Rule 12(b)(6) objection has been lodged.[9]  Here, Halliburton admits in its Omnibus Memorandum that Sperry-Sun is "a division within Halliburton and is not a separate legal entity." Halliburton's Omnibus Memorandum in Support at p.29.  Accordingly, Plaintiffs

---

[9] Fed. R. Civ. P. 17(a)(3):

> (3) Joinder of the Real Party in Interest.
>
> The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action.  After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest**.**

should be given a reasonable time to substitute the real party at interest – Halliburton – in place of Sperry-Sun.[10]

## VIII.    THIS COURT SHOULD ALLOW DISCOVERY BEFORE MAKING A PERSONAL JURISDICTION DETERMINATION REGARDING HALCO.

Prior to the Court's consideration of personal jurisdiction over Halliburton Company ("HALCO"), the PSC respectfully requests the opportunity to conduct limited jurisdictional discovery, in accordance with Sections IV(B) and V(B)(1) of Case Management Order No. 11. *See* Pre Trial Order No. 11 [Doc 569].

## CONCLUSION

For the above and foregoing reasons, and for the reasons separately raised by individual plaintiffs prosecuting Bundle A claims, Halliburton's Motion(s) to Dismiss should be denied.

This <u>14</u><sup>th</sup> day of <u>March</u>, <u>2011</u>.

Respectfully submitted,


   /s/   Stephen J. Herman              /s/ James Parkerson Roy
Stephen J. Herman, La. Bar No. 23129    James Parkerson Roy, La. Bar No. 11511
HERMAN HERMAN KATZ & COTLAR LLP         DOMENGEAUX WRIGHT ROY & EDWARDS LLC
820 O'Keefe Avenue                      556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113            Lafayette, Louisiana 70501
Telephone: (504) 581-4892               Telephone: (337) 233-3033
Fax No. (504) 569-6024                  Fax No. (337) 233-2796
E-Mail: sherman@hhkc.com                E-Mail: jimr@wrightroy.com
*Plaintiffs Liaison Counsel*            *Plaintiffs Liaison Counsel*

---

[10]   Notably, Halliburton's Motion to Dismiss in this regard is largely of no consequence, as Halliburton is a named defendant in all of Plaintiffs' suits.

## PLAINTIFFS' STEERING COMMITTEE

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail:  bbarr@levinlaw.com

Jeffrey A. Breit
BREIT DRESCHER & IMPREVENTO
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail:  rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail:  rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com
Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605

| Telefax: (601) 949-3399<br>E-Mail:  mike@mikespy.com<br><br>Calvin C. Fayard, Jr.<br>FAYARD & HONEYCUTT<br>519 Florida Avenue, SW<br>Denham Springs, LA  70726<br>Office:  (225) 664-4193<br>Telefax: (225) 664-6925<br>E-Mail:  calvinfayard@fayardlaw.com<br><br>Ervin A. Gonzalez<br>COLSON HICKS EIDSON<br>255 Alhambra Circle, Penthouse<br>Coral Gables, FL 33134<br>Office: (305) 476-7400<br>Telefax: (305) 476-7444<br>E-Mail:  ervin@colson.com | Telefax: (214) 599-1172<br>E-Mail:  ssummy@baronbudd.com<br><br>Mikal C. Watts (PSC)<br>WATTS GUERRA CRAFT, LLP<br>Four Dominion Drive, Building 3, Suite 100<br>San Antonio, TX 78257<br>Office: (210) 447-0500<br>Telefax: (210) 447-0501<br>E-Mail:  mcwatts@wgclawfirm.com |
|---|---|

JOSH WHITLEY
JOHNNY deGRAVELLES
BRIAN COLOMB
BILLIE LEETH
DAVID BAGWELL
JAMES GARNER
STEPHEN MURRAY, JR.
LARRY BERMAN
TOM SIMS
*On Brief.*

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that the above and foregoing Opposition has been served on all counsel pursuant to PTO No. 12, *via* the Lexis-Nexis File & Serve system, this <u>14</u>[th] day of <u>March</u>, <u>2011</u>.

   /s/ Stephen J. Herman and James Parkerson Roy