UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| Of Mexico, on April 20, 2010 | * | SECTION "J" |
| | * | JUDGE BARBIER |
| Relates to: *All Bundle A Cases* | * | |
| | * | |
| (Including 10-1156, 10-1196, 10-1243, 10-1502, | * | MAGISTRATE SHUSHAN |
| 10-1540, 10-1921, 10-2814, 10-3066, 10-3168, | * | |
| 10-3169, 10-3184, 10-3815, 10-4211, 10-4226, | * | |
| 10-4227, 10-4229, 10-4252, 10-4360, 10-4427, | * | |
| 11-261, 11-262, 11-263) | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OMNIBUS RESPONSE MEMORANDUM TO CAMERON'S MOTIONS  TO DISMISS BUNDLE A CLAIMS

The Plaintiffs Steering Committee, through Liaison Counsel, respectfully submits the following opposition to Cameron International Corporation's Motions to Dismiss some or all of the claims asserted in the Pleading Bundle A cases [Doc 1154]:

**MAY IT PLEASE THE COURT:**

When ruling upon a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept as true all well-plead allegations and resolve all doubts in favor of the plaintiff. *See Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1572 (5th Cir. 1988). The Court should deny a Rule 12(b)(6) motion unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quoting

*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Rule 12(b)(6) motions are "viewed with disfavor, and [are] rarely granted." *Sosa v. Coleman*, 646 F.2d 991, 993 (5th Cir. 1981).

**LEGAL ARGUMENT**

Maritime law clearly applies to the claims of the personal injury and death victims of the explosions and capsizing of the *M/V Deepwater Horizon*, a vessel in navigation. Cameron's argument that Louisiana state law should be applied as surrogate federal law under the Outer Continental Shelf Lands Act ("OCSLA") confuses three separate and unrelated tests – namely, the tests (1) for the application of OCSLA jurisdiction, (2) for state law to apply as surrogate federal law under OCSLA, and (3) for the application of admiralty jurisdiction and substantive maritime law. In order to address Cameron's argument, the proper framework must first be set forth.

### I. An Accurate Roadmap: OCSLA's Key Provisions, Admiralty Jurisdiction, and the *PLT* Test.

The pertinent provisions of OCLSA are contained in 43 U.S.C. § 1349(b)(1) (OCSLA's judicial jurisdictional provision), § 1333(a)(1) (OCSLA's assertion of federal sovereignty), and § 1333(a)(2)(A) (OCSLA's "surrogate federal law" provision). As this Court indicated in treating another claim arising out of this disaster, the judicial jurisdictional provision is completely independent of, and much broader in scope than, the test used to determine what substantive law applies under OCSLA. *See In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 2010 WL 3943451 at *3 (E.D. La. Oct. 6, 2010). All that is required for OCSLA judicial jurisdiction under § 1349(b)(1) is that the event occurred on the Outer Continental Shelf ("OCS"), which is defined as all submerged lands bordering the United States that are more than three miles from the coast, and that the event arose out of or related to mineral production.

Given its breadth of coverage, Section 1349(b)(1) encompasses a wide range of activities that also fall within the coverage of the federal courts' admiralty jurisdiction under 28 U.S.C. § 1333. Indeed, in OCS litigation, Section 1349(b)(1) coverage and admiralty coverage frequently overlap and provide concurrent bases for jurisdiction. *See, e.g., Recar v. CNG Prod. Co.,* 853 F.2d 367, 369 (5th Cir. 1988) (noting "[t]he district court may well have both admiralty jurisdiction under the general maritime law and federal question jurisdiction by virtue of OCSLA."); *Tennessee Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996) (same); *Strong v. B.P. Exploration & Production, Inc.*, 440 F.3d 665 (5th Cir. 2006) (holding that the plaintiff properly pleaded jurisdiction under § 1349(b)(1) but that the case also fell within admiralty jurisdiction and was therefore governed by federal maritime law).

Unlike the broad grant of OCSLA jurisdiction, the test for determining what substantive law applies under OCSLA, as set forth in § 1333(a)(2)(A), is far more restrictive. Under that provision, "federal law [which means, predominantly, federal maritime law] governs ... to the extent that there is applicable federal law; however, if there is a gap in the federal law, the law of the adjacent state is used as a gap-filler and becomes surrogate federal law." *Bartholomew v. CNG Producing Co.,* 862 F.2d 555, 557 (5th Cir. 1989).

It is well settled in the Fifth Circuit that for state law to apply as surrogate federal law under OCSLA (§1333(a)(2)(A)), the three conditions established in *Union Texas Petroleum Corp. v. PLT Engineering, Inc.,* 895 F.2d 1043 (5th Cir. 1990) ("*PLT')* must be met. The three *PLT* conditions are: "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto), (2) federal maritime law must not apply of its own force, and (3) the state law must not be inconsistent with Federal

3

law." *PLT Engineering,* 895 F.2d at 1047.  All three of these conditions must be met in order for adjacent-state law to apply as surrogate federal law under OCSLA. *See Grand Isle Shipyard, Inc. v. Seacor Marine, LLC,* 589 F.3d 778, 783 (5th Cir. 2009) (en banc).  Otherwise, maritime law applies.

## II.  The Claims at Issue Do Not Fall Within the *PLT* Test.

### A.  *PLT Factor # 1: The M/V Deepwater Horizon Was Not an OCSLA "Situs."*

The Supreme Court and the Fifth Circuit have held that 43 U.S.C. § 1333(a) creates a "situs" requirement for the application of surrogate state law under OCSLA. *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 219 (1986); *Demette v. Falcon Drilling Co.,* 280 F.3d 492, 496 (5th Cir. 2002).[1]  The Fifth Circuit has conclusively stated that the "situs" required to trigger OCSLA refers to the location of the injury. *See, e.g., Demette,* 280 F.3d at 496 ("First, we must determine whether the injury occurred on an OCSLA situs ..."); *Mills v. Director, Office of Workers' Compensation Programs,* 877 F.2d 356 (5th Cir.1989) (en banc) (holding that the applicability of § 1333(b) is limited to the "situs" of injury).  In its most recent *en banc* decision addressing OCSLA, the Fifth Circuit summarized the governing law as follows:

> [I]n a tort action, *Rodrigues* [*v. Aetna Cas. & Sur. Co*., 395 U.S. 352 (1969)] illustrates that the OCSLA situs requirement is met if the tort occurs on a platform or other OCSLA covered situs as provided in § 1333(a)(2)(A). ... The converse is also equally clear.  In a tort action, if the tort occurs on navigable water instead of a fixed platform (or other structure attached to the seabed), the OCSLA situs requirement is not met [citing *Tallentire*].

*Grand Isle Shipyard*, 589 F.3d at 784 (and holding further that although a tort action arising from an injury to a platform worker aboard a vessel that was only a few yards from - but not yet in

---

[1]*Demette* was overruled in part on other grounds in *Grand Isle Shipyard v. Seacor Marine, Inc.*, 589 F.3d 778, 788-89 (5th Cir. 2009) (en banc).

4

contact with - the platform was a maritime law and not an OCSLA case, a different analysis applied to a contractual indemnity action arising from the tort).

Cameron's effort to characterize the *Deepwater Horizon* as an OCS situs for purposes of *PLT* factor # 1 thus ignores a dispositive line of Fifth Circuit jurisprudence. It is indisputable that the *Deepwater Horizon* was a *vessel* for all maritime-law purposes.[2] It is also clear that during its operations in connection with the Macondo well, the *Deepwater Horizon* was never attached to the ocean floor; instead, it stabilized itself by using complex "thruster" technology and was connected to nothing at all except - via a 5,000-foot long riser pipe - the wellhead. Fifth Circuit precedent makes clear that the *Deepwater Horizon* was thus well outside the scope of 43 U.S.C. § 1333(a)(2)(A), which limits the applicability of adjacent-state law to events occurring on "the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon."[3] See *Sanamo v. Trico Marine Servcies, Inc.,* 73 Fed. Appx. 79, 2003 WL 21756647 at

---

[2]*See Stewart v. Dutra Const. Co.*, 543 U.S. 481, 489-90 (2005) (holding that 1 U.S.C. § 3 "suppl[ies] the default definition of *vessel* throughout the U.S. Code ... [and] codifie[s] the meaning that the term *vessel* [has] acquired in general maritime law."); 1 U.S.C. § 3 ("The term *vessel* includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."); *see also Demette*, 280 F.3d at 498 n. 18 (stating that it "is beyond dispute ... that special-purpose movable drilling rigs ... are vessels within the meaning of admiralty law").

[3]Cameron tries to get around the language of 1333(a)(2)(A) by an overly-selective use of legislative history. At p. 7 of its Memorandum in Support, Cameron presents two short quotations from 1978 USCCAN at p. 1534 (Cameron mistakenly cites p. 1679 for one of the quotations) that seem potentially misleading. In actuality, until 1978, Sections 1333(a)(1) and 1333(a)(2)(A) had identical coverages. *See* Christopher, *The Outer Continental Shelf Lands Act: Key to a New Frontier,* 6 Stan. L. Rev. 23, 62 (1953) (appendix setting forth original (1953) OCSLA and showing that Sections 1333(a)(1) and 1333(a)(2)(A) were both confined to "subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon"). The 1978 Congress broadened Section 1333(a)(1) to add "all installations and other devices permanently or temporarily attached to the seabed," but Congress did not change Section 1333(a)(2)(A).

*3 (5th Cir. 2003) ("A jack-up rig that is not jacked up ... does not necessarily constitute an OCS situs. ... [A] jack-up rig is a floating rig that can be towed to a particular site. Until it is attached to the seabed and erected, it cannot be considered an OCSLA situs."); *United States v. Pickett*, 598 F.3d 231, 236 (5th Cir. 2010 (Clement, J., concurring) ("for a rig or platform to be [covered by OCSLA] it must be 'erected' upon the Outer Continental Shelf...; OCSLA does not apply to vessels that float on the water."); *id.* (stating that a pipelay barge that "drops eight large anchors to stabilize its position ... is not erected on the OCS" so as to be covered by § 1333(a)(1)); *Demette*, 280 F.3d at 499-500 (stating that a drilling rig tender, "attached to the OCS only by an anchor," was not an OCSLA situs). Accordingly, Cameron cannot meet the first *PLT* factor.

B. **PLT Factor # 2: Maritime Law Applies "Of Its Own Force."**

1. *If there is admiralty jurisdiction over an OCS event, maritime law applies of its own force.*

Generally speaking, "with admiralty jurisdiction comes the application of substantive admiralty law." *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 865 (1986). In OCSLA litigation, this generalization is invariably true. *See Strong,* 440 F.3d at 668-670 (addressing *PLT* factor # 2 by conducting an admiralty jurisdiction inquiry and concluding:

---

Cameron wants the Court to read the two passages it quotes from USCCAN to mean that the 1978 Congress effectively broadened both provisions. But on the same page of USCCAN, Congress (via the House Committee Report) said just the opposite: "The Committee ... has left [§ 1333(a)(2)(A)] ***untouched.***" 1978 USCCAN at 1534 (emphasis supplied). Among the reasons for leaving the provision untouched was a lobbying effort by the Association of Trial Lawyers of America, who feared that changing Section 1333(a)(2)(A) to conform to the newly-broadened Section 1333(a)(1) "would jeopardize the seaman status of workers on jack-up, submersible, and semi-submersible rigs." Robertson & Sturley, *Recent Developments in Admiralty and Maritime Law at the National Level and in the Fifth and Eleventh Circuits*, 27 Tul. Mar. L.J. 495, 575 n. 759 (2003).

"[b]ecause Strong has alleged a traditional maritime tort, federal maritime law applies of its own force, precluding incorporation of state law under OCSLA"); *Hodgen v. Forest Oil Corp.,* 87 F.3d 1512, 1524-25 (5th Cir. 1996) (stating that "whether a contract is maritime [for admiralty jurisdiction purposes] and whether maritime law applies of its force [for purposes of *PLT* factor # 2] [are] identical ... inquiries."); *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1229 (5th Cir. 1985) (noting that "where admiralty and OCSLA jurisdiction overlap, the case is governed by maritime law"); *Hufnagel v. Omega Service Industries, Inc.*, 182 F.3d 340, 350 (5th Cir. 1999) (stating "[b]ecause OCSLA does not displace general maritime law, substantive maritime law continues to govern where both OCSLA and general maritime law could apply."); *Tennessee Gas Pipeline*, 87 F.3d at 154 (holding "where OCSLA and general maritime law both could apply, the case is to be governed by maritime law"); *Smith v. Penrod Drilling Co.*, 960 F.2d 456, 459 (5th Cir. 1992) (stating "[w]hen an event occurs on an OCSLA situs but also is governed by maritime law, maritime law controls.").[4]  Therefore, it follows that a showing of admiralty jurisdiction by the Bundle A claimants is dispositive of Cameron's motion.

### 2. On the basis of the Supreme Court's Grubart decision, admiralty jurisdiction is incontestable here.

The admiralty tort jurisdiction formula laid out in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995) (citation and internal quotation marks omitted) (emphasis supplied) is as follows:

> [A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity.  A court applying ***the location test*** must

---

[4]*Hodgen* and *Smith* were overruled in part on other grounds in *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 689 F.3d 778, 788-789 (5th Cir. 2009) (en banc).

7

> determine whether the tort occurred on navigable water. .... the connect test raises two issues. A court, first, must assess the general features of the type of incident involved to determine whether the incident has a ***potentially disruptive impact on maritime commerce***. Second, a court must determine whether the general character of the activity giving rise of the incident shows a ***substantial relationship to traditional maritime activity***.

### (a) <u>The location requirement</u>

The location test, which is satisfied when the tort occurs on navigable water, is readily satisfied in this case. It is undisputed that the deaths and injuries at issue all occurred aboard the *M/V Deepwater Horizon* while it was located in the Gulf of Mexico, afloat on almost mile-deep water and more than forty miles from the nearest coastline. Certainly, the *M/V Deepwater Horizon* was a vessel in navigation. *See, e.g., Demette,* 280 F.3d at 498 (noting "[t]his circuit has repeatedly held that special-purpose movable drilling rigs, including jack-up rigs, are vessels within the meaning of admiralty law"). Therefore, the location requirement for maritime jurisdiction is met.

### (b) <u>The "potential disruption" requirement</u>

The second *Grubart* requirement is that the incident (accident) involved must have been of a sort with the potential to disrupt maritime commerce. Cameron concedes that this factor is satisfied. Presumably Cameron does not contest the matter because the actual disruption of maritime commerce has been overwhelming and is virtually unprecedented.

### (c) <u>The "substantial relationship" requirement</u>

The final requirement of -- a substantial relationship to traditional maritime activity – is also met. The inquiry here is whether any of the tortfeasors was involved in traditional maritime activity. *Grubart* spells this out as follows:

> [W]e need to look only to whether *one* of the arguably proximate causes of the incident originated in the maritime activity of a tortfeasor: as long as *one* of the putative tortfeasors was engaged in traditional maritime activity, the allegedly wrongful activity will "involve" such traditional activity and will meet the second nexus prong.

513 U.S. at 541 (emphasis added). *See Scarborough v. Clemco Industries*, 391 F.3d 660, 665 (5th Cir. 2004) (same, quoting *Grubart*); *Raffray v. Gulf Logistics, LLC*, 2010 WL 5055849 at * 3 (E.D. La. 2010) (same); Maraist, Galligan & Maraist, *Admiralty in a Nutshell* 43 (6th ed. 2010) (same).

The *Grubart* ruling that *one maritime tortfeasor is enough* puts an end to all sensible debate about the existence of admiralty jurisdiction here: it is irrefutable that Transocean was engaged in a traditional maritime activity when operating the *Deepwater Horizon*. Courts in the Fifth Circuit have repeatedly held that drilling and exploring by vessels such as the *M/V Deepwater Horizon* constitute traditional maritime activity. The courts have drawn a distinction between oil and gas drilling conducted from vessels versus those same activities performed from fixed platforms, recognizing that when those activities are performed from vessels such as the *Deepwater Horizon*, they are traditional maritime activities sufficient to invoke the application of maritime law (whereas when performed from a fixed platform, they are not). *See e.g., Hufnagel,* 182 F.3d at 352-353 (noting the distinction between tort claims arising on fixed platforms in which admiralty law does not apply and claims arising on drilling vessels in which admiralty law does apply); *Theriot v. Bay Drilling Corp.,* 783 F.2d 527, 538-39 (5th Cir.1986) ("oil and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce."); *Strong*, 440 F.3d at 669 (holding that a liftboat, although jacked up and not "under sail," qualifies as a vessel on navigable waters thereby satisfying the location requirement of *Grubart*); *Demette*

(same); *Pippen v. Shell Oil Co.,* 661 F.2d 378, 384 (5th Cir. 1981) (recognizing that offshore drilling of oil and natural gas from the sea bottom is maritime commerce when performed from a vessel).

Turning for the sake of thoroughness to Cameron's own activities, it seems plain enough that assuming, *arguendo,* those activities were themselves not traditionally maritime, they certainly (in the language of *Grubart*) bore a "substantial relationship to traditional maritime activity." 513 U.S. at 539. In maritime oil and gas exploration, a blowout preventer, such as the one manufactured by Cameron and in use at the time of this tragedy, is not just a generic piece of oil field equipment: instead, it is a crucial component to all maritime oilfield exploration.[5] MODUs (mobile offshore drilling units) have been central to admiralty jurisdiction and maritime law at least since *Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir. 1959). *Stewart v. Dutra Const. Co.*, 543 U.S. 481 (2005) (see *supra* note 2), confirms that they still are central. Cameron does not seem to claim that the *Deepwater Horizon* was not a MODU or that the BOP was not a key component to the accomplishment of the *Deepwater Horizon's* mission.[6]

---

[5]In an internal document describing the challenges of manufacturing BOPs for offshore drilling, Cameron engineer Mel Whitby wrote: "[w]hen the BOP is called on to function in an emergency situation, it is the main barrier protecting human life, capital equipment and the environment. Therefore, it must function without fail." Melvyn F (Mel) Whitby, *Design Evolution of a Subsea BOP,* Drilling Contractor magazine, p. 36 (May/June 2007).

[6]Cameron deserves credit for eschewing reliance on *Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co.*, 644 F.2d 1132 (5th Cir. 1981), which has sometimes been cited for the erroneous proposition that blowout preventers are generically outside the reach of admiralty and maritime law. *Sohyde* dealt with property damage from an accident involving a "submersible drilling barge ... resting on the bottom of a dead-end dredged canal slip in Louisiana." *Id.* at 1134. In finding no admiralty jurisdiction, the court relied on a case that the Supreme Court has subsequently disapproved. See *id.* at 1136 (citing *Kelly v. Smith*, 485 F.2d 520 (5th Cir. 1973)); see *Grubart*, 513 U.S. at 544 (abrogating *Kelly*). The Fifth Circuit itself has repeatedly criticized or narrowly limited *Sohyde*. See *Domingue v. Ocean Drilling and Exp. Co.*, 923 F.2d 393, 397

The cases Cameron relies upon for its (somewhat subtle) argument against admiralty jurisdiction cannot bear the weight. *See Herb's Welding, Inc. v. Gray,* 470 U.S. 414 (1985); *Rodrigue v. Aetna Casualty & Surety Co.,* 395 U.S. 352 (1969); and *Texaco Exploration and Production, Inc. v. AmClyde Engineered Products Co., Inc.,* 448 F.3d 760 (5th Cir.), *cert. denied,* 549 U.S. 1053 (2006). Both *Rodrigue* and *Herb's Welding* involved personal injuries that occurred on fixed platforms, not on vessels in navigation, thereby failing to satisfy the location test. In *Texaco*, the plaintiffs did not make claims against any party that was engaged in traditional maritime activity. Instead, the case involved a suit by the lessees of an offshore federal lease against a land-based company that designed and manufactured a crane that failed during the construction of a fixed platform (causing a deck module to fall into the sea), as well as the company that was charged with designing and constructing the platform. In short, if the claimant in *Texaco* had sued the owner or operator of a vessel, as the claimants have in this case, admiralty jurisdiction would have applied.[7] Accordingly, it is federal maritime law that governs the claims against Cameron, and not adjacent state law.

---

n. 9 (5th Cir. 1991); *Broughton Offshore Drilling, Inc. v. South Central Machine, Inc.,* 911 F.2d 1050, 1053 (5th Cir. 1990); *Houston Oil and Minerals Corp. v. American Int'l Tool Co.*, 827 F.2d 1049, 1054 (5th Cir. 1987). Most importantly, the *Sohyde* court said that the restrictive view it took of admiralty jurisdiction would not be appropriate in actions "for personal injuries under the Jones Act or maritime law." *Sohyde*, 644 F.2d at 1136.

[7] It bears repeating that OCSLA's surrogate federal law provision, 43 U.S.C. § 1333(a)(2)(A), is not applicable here. Accordingly, the demonstration above that (a) state law cannot apply to an OCSLA case falling within admiralty jurisdiction and (b) admiralty jurisdiction is present here means that the restrictions on the Bundle A claimants' rights that Cameron purports to find in Louisiana law are irrelevant.

If the court were to decide that an "adjacent" state law applies, a significant question would then arise – namely, which state is the "adjacent" one for Section 1333(a)(2)(A) purposes. Cameron's assumption that the "adjacent" state is Louisiana is somewhat blithe. *Snyder Oil Corp. v. Samedan Oil Corp.*, 208 F.3d 521 (5th Cir. 2000), treated the "adjacency" inquiry as follows:

> [In *Reeves v. B & S Welding, Inc.*, 897 F.2d 178 (1990)] we ... considered four types of evidence in the "adjacency" analysis: (1) geographic proximity; (2)

11

III. **The Plaintiffs Have Properly Alleged a Viable Products Liability Cause of Action Under Maritime Law.**

As demonstrated above, the plaintiffs' claims against Cameron are clearly governed by maritime law and, specifically, maritime law as it concerns products liability. In *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986), the United States Supreme Court recognized a strict products liability cause of action arising under the general maritime law. In that case, the Supreme Court wrote that "...the question whether principles of strict products liability are part of maritime law 'is no longer seriously contested" *Id.* (citing *Ocean Barge Trans. Co. v. Hess Oil*, 726 F.2d 121 (3rd Cir. 1984)). *East River*, citing with favor *Pan-Alaska Fisheries Inc. v. Marine Const. & Design Co.*, 565 F.2d 1129 (9th Cir. 1977)), and other federal jurisprudence, *see e.g.*, *Szollosy v. Hyatt Corp.*, 396 F.Supp.2d 159 (D. Conn. 2005); *see also In re Skipper Liner Industries, Inc.*, 00-0730, 2002 WL 32348827 (W.D. Wis. January 31, 2002), has established that Section 402A of the Restatement (Second) of Torts is the governing and applicable set of rules for a maritime products liability cause of action. Therefore, the Plaintiffs have a viable strict products liability claim against Cameron under the general maritime law.

VII. **Assuming, *Arguendo*, that Louisiana Law Applies, the Plaintiffs Have Sufficiently Stated Claims Against Cameron.**

Even assuming *arguendo* that Plaintiffs' Bundle A claims against Cameron were governed by the LPLA, such a claim has been sufficiently stated. Under the standard to be applied to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the district court must take the factual allegations of the complaint as true and resolve any ambiguities or doubts

---

which coast federal agencies consider the subject platform to be "off of"; (3) prior court determinations; and (4) projected boundaries.

*Snyder Oil Corp*, 208 F.2d at 524. Obviously, three of the four *Snyder/Reeves* factors are questions of fact. Equally obvious, none of them is ripe for consideration at the complaint-dismissal stage.

regarding the sufficiency of the claim in favor of the plaintiff.  *See Jefferson v. Lead Indus. Assc., Inc.*, 930 F. Supp. 241, 244 (E.D. La. 1996) (citing *Fernandez-Montes v. Allied Pilots Ass'n.*, 987 F.2d 278, 284 (5th Cir.1993)).  The complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff cannot prove any set of facts in support of her claim that would entitle her to relief. *Id.* (citing *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 524 (5th Cir.1994)).

The United States Supreme Court recently explained that reviewing a motion to dismiss is a context-specific task, one in which the court should draw from its common sense and judicial experience.  *See Ashcroft v. Iqbal*, 556 U.S. ___, 129 S. Ct. 1937, 1950 (2009) (internal citations omitted) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 556 (2007) (holding "a complaint that states a plausible claim for relief survives a motion to dismiss.  Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense")).  As explained below, the Supreme Court's plain words are especially applicable to the circumstances and procedural posture of the Bundle A pleadings.

The Bundle A pleadings sufficiently state a claim under the Louisiana Products Liability Act ("LPLA").  Notably, in Cameron's Consolidated Memorandum, it acknowledges the claims lodged against it:  "the A Pleadings seek to impose liability on Cameron in its capacity as manufacturer of the *Deepwater Horizon* blowout preventer."  Cameron's Consolidated Memorandum, p. 18 (Doc. 1154-1).  Yet, Cameron seeks to impose pleading requirements on Plaintiffs beyond those required by  law.  In so doing, Cameron relies heavily on two LPLA cases decided on a summary judgment standard, and not at the pleading stage as a matter of law. *See generally Stahl v. Novartis Pharmaceuticdals Corp.*, 283 F.3d 254 (5th Cir. 2002);

13

*Broussard v. Procter & Gamble Co.*, 463 F. Supp. 2d 596 (5th Cir. 2008). Cameron utilizes these summary judgment decisions as a means to impose a greater burden on Plaintiffs than is proper under 12(b)(6). The evidentiary proof requirements and analysis inherent in the summary judgment standard cannot be applied to a motion to dismiss and Cameron's reliance on these cases is misplaced.

The only two cases cited by Cameron that do involve a 12(b)(6) motion to dismiss are factually dissimilar. In *Jefferson*, *supra*, this Court dismissed the plaintiff's LPLA claims because the plaintiff did not identify the manufacturer whose product caused her injury – a mandatory requirement under the LPLA. Id. Here, each Bundle A Plaintiff has identified Cameron as the manufacturer of the defective product, the BOP. Then in *In re Air Bag Products Liability Litigation*, 7 F. Supp.2d 792, 800 (E.D. La. 1998), this Court again dismissed claims for very specific reasons that do not exist in the present case. In *In re Air Bag Products Liability Litigation*, the plaintiffs stated unequivocally in their pleadings that "they press[ed] no claims under the" LPLA. This statement, or anything like it, does not exist anywhere in the Bundle A pleadings.

Instead, the Bundle A pleadings contain references to the LPLA, cite Cameron as the manufacturer and supplier of the defective BOP, or allege that Cameron is responsible for the catastrophe due to its defective equipment. These allegations, accepted as true and viewed in the light most favorable to the plaintiffs, are sufficient to support a claim under the LPLA, place Cameron on notice that such a claim has been alleged, and defeat Cameron's motion to dismiss.

Cameron also suggests that claims made under the Texas Products Liability Act by certain plaintiffs in their Bundle A pleadings should be dismissed because the LPLA does not permit recovery under the separate terms of the Texas Act. Cameron's position in this regard is

14

absurd because it imposes a penalty upon the Texas plaintiffs for failing to divine that the MDL would eventually land in the Louisiana federal courts or that Louisiana law would possibly apply.

Moreover, Bundle A plaintiffs have alleged facts specific to one or more of the LPLA's theories of liability against manufacturers. Numerous plaintiffs have alleged that the BOP was defective in design. *See e.g.* Benton, ¶VII; Bird ¶31, 64, 65, 91. Likewise, most of the Bundle A complaints expressly allege Cameron's failure to warn. *See e.g.* Benton, ¶VII; Choy; ¶28, Crawford, ¶ 63; Bird ¶91. Others allege that the BOP contains defects in composition. *See e.g.* Choy, ¶28, Crawford, ¶61. Even to the extent that the Complaints do not contain such specific allegations, should this Court determine such detailed pleading is required, as is briefed *infra*, plaintiffs should be granted leave to amend where such amendments can cure any perceived pleading deficiencies.

The Bundle A Plaintiffs also refer the Court to the numbered allegations in the First Amended B1 Master Complaint directed at Cameron, its defective product – the BOP – and the damages suffered by the plaintiffs as a result. *See* First Amended B1 Master Complaint [Doc 1128], at ¶¶ 230, 416, 423, 435, 440, 442, 443-51, 572, 603-606, 629-33, 636-58, 693, 694, 697-99. Although the B1 Master Complaint was filed after the Bundle A pleadings, the allegations therein (particularly paragraphs 637 through 658) set forth a detailed and fact specific claim under the LPLA and are applicable in each of the Bundle A cases. Given the procedural nature of the MDL, the specific context of this Bundle A and the related Bundles, and the United States Supreme Court's logic in *Ashcroft v. Iqbal* – in which it instructed a reviewing court to draw on its experience and common sense, *Iqbal*, 129 S. Ct. at 1950 – entertaining Cameron's basis for

dismissing the Bundle A claims would be counterproductive and judicially inefficient when the necessary factual allegations are proven to exist as seen in the B1 Master Complaint.

Nevertheless, if the Court should accept Cameron's position regarding the Bundle A pleadings, the individual plaintiffs should be granted the opportunity to amend their pleadings to cure the alleged omissions. This will be easily accomplished given that the factual allegations and associated claims that are comprehensively contained in the B1 Master Complaint.

Finally, Bundle A plaintiffs have or can allege liability on the part of Cameron that is not subject to the LPLA's exclusivity provisions. As numerous courts have made clear, the LPLA's exclusivity provisions do not preclude claims against a tortfeasor who has been negligent in the post-sale maintenance, repair or other use of a product simply because it was the manufacturer of that product. *See In re Kaiser Plant Explosion at Kaiser*, 2001-2555 (La. 9/26/01), 797 So.2d 678 (per curiam) (granting writs to reverse summary judgment where there were genuine issues of material fact as to whether the defendant "acted in a role other than manufacturer"); *Lavergne v. America's Pizza Co.,* 838 So.2d 845 (La. App. 3 Cir.2003); *Colbert v. Sonic Restaurants, Inc.,* -- F.Supp. 2d --, 2010 WL 3769131 (W.D. La. 2010); *Crawford v. Dehl*, 2008 WL 4186863 (W.D. La. 2008). Upon information and belief, Cameron had continuing dealings with Transocean and BP with respect to maintenance and operation of the BOP long after the BOP was delivered.[8] To the extent Cameron was negligent in the conduct of these activities involving the BOP, which conduct included providing inspection and operation instruction and consultation and design services with respect to modifications, Cameron is liable to plaintiffs in

---

8   The Bird complaint alleges negligence in the maintenance of the BOP on the part of Cameron. *See* Bird Complaint at ¶31. At Coast Guard/MMS hearing on May 28, 2010, Transocean employee Christopher Pleasant testified that Transocean routinely called on Cameron with respect to maintenance and repair of the BOP. (May 28, 2010 Joint Investigation Hearing Transcript, p. 127).

16

negligence regardless of whether the LPLA applies to claims arising from Cameron's role as a manufacturer of the product.

**CONCLUSION**

For the above and foregoing reasons, and for the reasons separately raised by individual plaintiffs prosecuting Bundle A claims, Cameron's Motion(s) to Dismiss should be denied.

This 14th day of March, 2011.

Respectfully submitted,

| /s/ Stephen J. Herman | /s/ James Parkerson Roy |
|---|---|
| Stephen J. Herman, La. Bar No. 23129 | James Parkerson Roy, La. Bar No. 11511 |
| HERMAN HERMAN KATZ & COTLAR LLP | DOMENGEAUX WRIGHT ROY & EDWARDS LLC |
| 820 O'Keefe Avenue | 556 Jefferson Street, Suite 500 |
| New Orleans, Louisiana 70113 | Lafayette, Louisiana 70501 |
| Telephone: (504) 581-4892 | Telephone: (337) 233-3033 |
| Fax No. (504) 569-6024 | Fax No. (337) 233-2796 |
| E-Mail: sherman@hhkc.com | E-Mail: jimr@wrightroy.com |
| *Plaintiffs Liaison Counsel* | *Plaintiffs Liaison Counsel* |

**PLAINTIFFS' STEERING COMMITTEE**

| | |
|---|---|
| Brian H. Barr<br>LEVIN, PAPANTONIO, THOMAS, MITCHELL, ECHSNER & PROCTOR, PA<br>316 South Baylen St., Suite 600<br>Pensacola, FL 32502-5996<br>Office: (850) 435-7045<br>Telefax: (850) 436-6187<br>E-Mail: bbarr@levinlaw.com | Robin L. Greenwald<br>WEITZ & LUXENBERG, PC<br>700 Broadway<br>New York, NY 10003<br>Office: (212) 558-5802<br>Telefax: (212) 344-5461<br>E-Mail: rgreenwald@weitzlux.com |
| Jeffrey A. Breit<br>BREIT DRESCHER & IMPREVENTO<br>999 Waterside Drive, Suite 1000<br>Norfolk, VA 23510<br>Office: (757) 670-3888<br>Telefax: (757) 670-3895<br>E-Mail: jbreit@bdbmail.com | Rhon E. Jones<br>BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P. C.<br>218 Commerce St., P.O. Box 4160<br>Montgomery, AL 36104<br>Office: (334) 269-2343<br>Telefax: (334) 954-7555<br>E-Mail: rhon.jones@beasleyallen.com |
| Elizabeth J. Cabraser<br>LIEFF, CABRASER, HEIMANN & | Matthew E. Lundy<br>LUNDY, LUNDY, SOILEAU & SOUTH, LLP |

| | |
|---|---|
| BERNSTEIN, LLP<br>275 Battery Street, 29th Floor<br>San Francisco, CA  94111-3339<br>Office:  (415) 956-1000<br>Telefax: (415) 956-1008<br>E-Mail:  ecabraser@lchb.com<br><br>Philip F. Cossich, Jr.<br>COSSICH, SUMICH, PARSIOLA & TAYLOR<br>8397 Highway 23, Suite 100<br>Belle Chasse, LA  70037<br>Office:  (504) 394-9000<br>Telefax: (504) 394-9110<br>E-Mail:  pcossich@cossichlaw.com<br><br>Robert T. Cunningham<br>CUNNINGHAM BOUNDS, LLC<br>1601 Dauphin Street, P. O. Box 66705<br>Mobile, AL  36660<br>Office:  (251) 471-6191<br>Telefax: (251) 479-1031<br>E-Mail:  rtc@cunninghambounds.com<br><br>Alphonso Michael "Mike" Espy<br>MORGAN & MORGAN, P.A.<br>188 East Capitol Street, Suite 777<br>Jackson, MS 39201<br>Office: (601) 949-3388<br>Telefax: (601) 949-3399<br>E-Mail:  mike@mikespy.com<br><br>Calvin C. Fayard, Jr.<br>FAYARD & HONEYCUTT<br>519 Florida Avenue, SW<br>Denham Springs, LA  70726<br>Office:  (225) 664-4193<br>Telefax: (225) 664-6925<br>E-Mail:  calvinfayard@fayardlaw.com<br><br>Ervin A. Gonzalez<br>COLSON HICKS EIDSON<br>255 Alhambra Circle, Penthouse<br>Coral Gables, FL 33134<br>Office: (305) 476-7400<br>Telefax: (305) 476-7444<br>E-Mail:  ervin@colson.com | 501 Broad Street<br>Lake Charles, LA  70601<br>Office:  (337) 439-0707<br>Telefax: (337) 439-1029<br>E-Mail:  mlundy@lundylawllp.com<br><br>Michael C. Palmintier<br>deGRAVELLES, PALMINTIER,<br>HOLTHAUS & FRUGE'<br>618 Main Street<br>Baton Rouge, LA  70801-1910<br>Office:  (225) 344-3735<br>Telefax: (225) 344-0522<br>E-Mail:  mpalmintier@dphf-law.com<br><br>Paul M. Sterbcow<br>LEWIS, KULLMAN, STERBCOW & ABRAMSON<br>601 Poydras Street, Suite 2615<br>New Orleans, LA  70130<br>Office:  (504) 588-1500<br>Telefax:  (504) 588-1514<br>E-Mail:  sterbcow@lksalaw.com<br><br>Scott Summy<br>BARON & BUDD, P.C.<br>3102 Oak Lawn Avenue, Suite 1100<br>Dallas, TX  75219<br>Office:  (214) 521-3605<br>Telefax: (214) 599-1172<br>E-Mail:  ssummy@baronbudd.com<br><br>Mikal C. Watts (PSC)<br>WATTS GUERRA CRAFT, LLP<br>Four Dominion Drive, Building 3, Suite 100<br>San Antonio, TX 78257<br>Office: (210) 447-0500<br>Telefax: (210) 447-0501<br>E-Mail:  mcwatts@wgclawfirm.com | |

JOSH WHITLEY
JOHNNY DEGRAVELLES
BRIAN COLOMB
BILLIE LEETH
DAVID BAGWELL
JAMES GARNER

**STEPHEN MURRAY, JR.**
**LARRY BERMAN**
**TOM SIMS**
*On Brief.*

## CERTIFICATE OF SERVICE

    WE HEREBY CERTIFY that the above and foregoing Opposition has been served on all counsel pursuant to PTO No. 12, *via* the Lexis-Nexis File & Serve system, this 14th day of March, 2011.

                                                                 /s/ Stephen J. Herman and James Parkerson Roy