UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf Of Mexico, on April 20, 2010 | * * * * * | MDL No. 2179  SECTION "J" JUDGE BARBIER |
| Relates to: *All Bundle A Cases* | * * | |
| (Including 10-1502, 10-1540, 10-1921,   10-4252, 10-3815, 10-3066) | * * * * | MAGISTRATE SHUSHAN |

* * * * * * * * * * * * * * * *

### OMNIBUS RESPONSE MEMORANDUM TO ANADARKO AND MOEX'S MOTIONS TO DISMISS BUNDLE "A" CLAIMS

The Plaintiffs Steering Committee, through Liaison Counsel, respectfully submits the following opposition to Anadarko and Moex's Motions to Dismiss some or all of the claims asserted in the Pleading Bundle A cases [Doc 1210, 1212, 1215, 1218, 1219, 1223]:

**MAY IT PLEASE THE COURT:**

When ruling upon a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept as true all well-plead allegations and resolve all doubts in favor of the plaintiff. *See Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1572 (5th Cir. 1988). The Court should deny a Rule 12(b)(6) motion unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  Rule 12(b)(6) motions are "viewed with disfavor, and [are] rarely granted." *Sosa v. Coleman*, 646 F.2d 991, 993 (5th Cir. 1981).

I. **THE PLAINTIFFS STATE A LEGALLY VIABLE CLAIM OF STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES.**

Anadarko argues that a claim for strict liability for ultrahazardous activities should be dismissed because maritime law does not recognize the claim. Although courts in other Circuits have held that maritime law does not recognize the doctrine of strict liability for ultrahazardous activities, the question has not been answered in this Circuit. The trend, however, is toward acceptance of the doctrine. In *East River Steamship Corp. v. TransAmerica Delaval, Inc.,* 476 U.S. 858, 864-66 (1986), the Court explicitly recognized strict products liability as a part of the general maritime law. As the Court in *East River* explained, substantive admiralty law is drawn from state and federal sources, and the general maritime law "is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *Id.* at 864 (citing *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959) and *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 373-375 (1959)). The Court noted that strict products liability had been a part of the common law of torts for some time and that there was a trend in maritime law toward strict liability. The Court explained

> This Court's precedents relating to injuries of maritime workers long have pointed in that direction. *See Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 94 (1946) (strict liability for unseaworthiness); *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.,* 376 U.S. 315, 322 (1964) (strict liability for breach of implied warranty of workmanlike service). The Court's rationale in those cases -- that strict liability should be imposed on the party best able to protect persons from hazardous equipment -- is equally applicable when the claims are based on products liability. *Compare Sieracki,* 328 U.S., at 93-94, with *Escola v. Coca Cola Bottling Co. of Fresno,* 24 Cal. 2d 453, 462, 150 P. 2d 436, 441 (1944) (concurring opinion).

*Id.* at 866.

Parties involved in hazardous activities such as ultra-deepwater oil drilling - like those that manufacture defective products, operate unseaworthy vessels, and breach warranties - are in

the best position to protect persons from the dangers associated with their hazardous equipment, and strict liability should be imposed upon them pursuant to maritime law. Like strict products liability, the doctrine of strict liability for ultrahazardous activities is well established. It was first recognized in the English case of *Rylands v. Fletcher,* L.R. 3 H.L. 330 (1868), and later adopted and expanded by the Restatement of Torts §§ 519-20 (1938). Today, a majority of courts have adopted the *Rylands* rationale and impose strict liability in cases of abnormally dangerous activities, normally defined in accord with factors identified in Section 520 of the Restatement (Second) of Torts. W. Prosser, Law of Torts § 78, at 509 (4th ed. 1971); William K. Jones, *Strict Liability for Hazardous Enterprise,* 92 Colum. L. Rev. 1705, 1779 n. 36 (1992). The doctrine is now ripe for inclusion as a part of the general maritime law of torts. Like its adoption of Section 402A of the Restatement (Second) of Torts, it is time for maritime law to adopt Section 519 and 520 of the Second Restatement. The Restatement provides as follows:

> (1)   One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
> (2)   This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Restatement (Second) of Torts § 519. In determining whether an activity qualifies as abnormally dangerous, Section 520 of the Restatement (Second) of Torts requires consideration of the following factors:

> (a) the existence of a high degree of risk of some harm to the person, land or chattels of others;
> (b) the likelihood that the harm that results from it will be great;
> (c) the inability to eliminate the risk by the exercise of reasonable care;
> (d) the extent to which the activity is not a matter of common usage;
> (e) the inappropriateness of the activity to the place where it is carried on; and
> (f) the extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 520. There can be no question that ultra-deepwater drilling creates a high degree of risk to persons, land and chattels or that the resulting harm caused by the activity is likely to be great. Even with the exercise of reasonable care, given the nature of the work, the risks cannot be eliminated. As the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (the "Commission") stated in its Final Report released on January 11, 2011, drilling in extreme water depths poses special and different challenges. The Commission explained:

> Risers connecting a drilling vessel to the blowout preventer on the seafloor have to be greatly lengthened, and they are exposed to strong ocean currents encountered in the central Gulf. Managing higher volumes of mud and drilling fluid in these long risers makes drillers' jobs more demanding. Connecting and maintaining blowout preventers thousands of feet beneath the surface can only be performed by remote-operating vehicles….More broadly, knowledge about localized geology, types of hydrocarbons, and pressure profiles in ultra-deepwater wells is still not thoroughly developed. Geological conditions are complicated and vary from prospect to prospect, and from well to well. Each well, indeed, has its own "personality" that requires maintaining an extremely delicate balance between the counteracting pressures of the subsurface formation and drilling operation. Beneath the salt, pressures in the pores of the sediment are exceedingly hard to predict. Reservoirs in the Lower Tertiary are thicker and with higher viscosity than the fluids found in younger rock. Finally, ultra-deepwater developments are far removed from shore and thus from established infrastructure. As a BP technical paper prepared for the May 2010 Offshore Technology Conference noted, "the trend of deepwater discoveries in the [Gulf of Mexico] is shifting toward one with greater challenges across many disciplines represented by the conditions of Lower Tertiary discoveries."

(Final Report, pp. 51-52). Also, ultra-deepwater drilling is not a matter of common usage, meaning that it is not carried on by a large percentage of the population. Further, the activity was inappropriate to the site where it was carried on. The Macondo prospect site was notorious in the industry for high temperature, high pressure, highly gaseous hydrocarbon reservoirs trapped in weak, brittle rock formations. At the Macondo site, the Deepwater Horizon was conducting drilling operations in excess of 18,000 feet. At depths almost 3.5 miles below the sea

floor, the pressures within and strengths of the various formation layers the Deepwater Horizon was drilling through varied widely and changed often, requiring constant adjustments to drilling fluid density and other factors. In some places, the subsea rock formations were so brittle that they fractured, letting gallons of expensive drilling mud escape into the cracked and porous rock around the drill. Given the extremely dangerous and unpredictable conditions at the site, ultra-deepwater drilling was inappropriate.

As for the final factor, while drilling for oil is valuable to the community at large, the value of ultra-deepwater drilling pales when compared to its dangerous attributes. In this case, the activity resulted in multiple deaths, personal injuries, and environmental and economic devastation, the effects of which will be felt in the Gulf region and throughout the country for many years to come. The attributes of ultra-deepwater drilling simply cannot outweigh the wreckage the activity has left in its wake.

Anadarko relies on the Fifth Circuit's decision in *Ainsworth v. Shell Offshore, Inc.,* 829 F.2d 548 (5th Cir. 1987) for its argument that oil drilling is not an ultrahazardous activity as a matter of law. Anadarko's reliance is misplaced because *Ainsworth* was decided under Louisiana law, which is inapplicable here. Even if *Ainsworth* were controlling, the advances in deepwater drilling since *Ainsworth* was decided, which have resulted in drilling at greatly increased depths, render the decision factually inapposite here. In the period since *Ainsworth* was decided, particularly within the last five years, technological advances have made previously inaccessible oil reachable, but only with greatly increased risk. The push to drill in deeper water in the search for huge oil deposits has created unique and formidable challenges and dangers that did not exist at the time *Ainsworth* was decided. Ultra-deepwater drilling is a new and

unfamiliar frontier. Thus, *Ainsworth*'s holding that oil drilling is not ultrahazardous is of no significance in the instant case.

The Fifth Circuit's decision in *Roberts v. Cardinal Servs.,* 266 F.3d 368 (5th Cir. 2001), also cited by Anadarko, is likewise inapposite. There, the plaintiff was injured while performing plugging and abandoning operations on a drilling platform. The Court followed *Ainsworth* and held that the use of the wireline perforation gun that caused the plaintiff's injury was not an ultrahazardous activity as it was a "drilling operation." Here, the activity at issue is ultra-deepwater drilling, which carries with it much greater risks than drilling operations ten years ago.

Finally, the extremely hazardous nature of offshore drilling, as well as the rapid advances being made in the industry, was recognized in this circuit in *Armstrong v. Chambers & Kennedy,* 340 F. Supp. 1220 (S.D. Tex. 1972). In *Armstrong,* a platform owner (C&K) hired a contractor to bring a deteriorated oil platform located on the Outer Continental Shelf into compliance with U.S. pollution regulations. The contractor then hired a subcontractor. While this work was being done, an explosion occurred on the platform, killing and injuring workers on the platform and in a standby boat that was moored below the platform. The explosion was caused by the welding of equalizing lines by an employee of the subcontractor at a time when oil remained in the oil tanks. All parties were aware of the remaining oil in the tanks. In discussing the platform owner's liability, the Court stated:

> The exploration and development of offshore oil resources under the seas is a relatively new area of technological progress. Unlike the search for oil and gas on land, it presents new and more dangerous challenges in its development. 35 Tex. L. Rev. 1; 33 Tex. L. Rev. 574; *Warren Petr. Corp. v. Martin,* 153 Tex. 465, 271 S.W.2d 410, *reh. de*n. (1954). Thus, the duty placed here upon the oil lessee is similar to the traditional tort duty of one using an ultrahazardous substance.

*Id.* at 1233-1234 (emphasis added).  The Fifth Circuit, in affirming this portion of the district court's decision, quoted the district court's language.  *In re Dearborn Marine Service, Inc.,* 499 F.2d 263, 267, n. 7 (5th Cir. 1974).  Thus, even before the practice of ultra-deepwater drilling began, the Fifth Circuit recognized the extremely hazardous nature of exploration and development of offshore oil resources and the duty placed on those engaging in it.  Given the extreme depths at which the activity now takes place and the special problems associated with it, offshore drilling has developed into a much more hazardous activity than it was in 1972, or even ten years ago.  Its recognition as an ultrahazardous activity to which strict liability applies under maritime law is therefore crucial.

For these reasons, this Court should find that maritime law recognizes the tort of strict liability for ultrahazardous activities, and deny Anadarko's motion to dismiss this claim

## II.     PUNITIVE DAMAGES ARE NOT PRECLUDED BY DOHSA.

Anadarko asserts that the Bundle A plaintiffs' recovery of punitive damages is barred under DOHSA, because non-pecuniary damages are not recoverable. *See e.g.,* <u>Anadarko Memorandum</u> in Support at p. 2 (citing *Miles v. Apex Mar. Corp.*, 498 U.S. 19, 31–32 (1990)). This argument fails.

Personal representatives of seamen may pursue one or more maritime causes of action: first, the personal representative can sue the seaman's employer (or employers)[1] for negligence under the Jones Act.[2]  Secondly, the personal representative can sue the vessel owner for the

---

[1] Under the Jones Act, a seaman may have multiple employers subject to liability thereunder. *Guidry v. South La. Contractors Inc.*, 614 F.2d 447 (5th Cir. 1980); *Cordova v. Crowley Marine Services*, 02-2880 (E.D. La. 2003,) 2003 WL 21790195.

[2] The Jones Act allows the personal representative of the deceased seaman to bring an action on behalf of certain named beneficiaries. *Calton v. Zapata Lexington*, 811 F.2d 919 (5th Cir. 1987).

7

unseaworthiness of the vessel under the general maritime law, regardless of whether the vessel owner was the seaman's employer.  See, *e.g.*, *Becker v. Tidewater, Inc.*, 335 F.3d 376 (5th Cir. 2003); and *Mahramas v. American Export Isbrandtsen Lines*, 475 F. 2d 165 (2d Cir. 1973). Third, under the general maritime law, the seaman's representative may sue the manufacturer of a defective product for strict products liability.  See, *e.g*, *East River S.S. Corp. v. Transamerica Delaval, Inc*., 476 U.S. 858 (1986); and *Szollosy v. Hyatt* Corp., 396 F.Supp.2d 159 (D.Conn. 2005).  Finally, the seaman's representative can sue other defendants for general maritime negligence. See, *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625 (1959); *see also* Robert Force & Martin J. Norris, THE LAW OF SEAMEN, § 29.8, 5th Edition, 2003.

When a seaman is killed as a result of an accident occurring more than a marine league from shore – as in the case of the *Deepwater Horizon* – the personal representative may combine the remedy provided by the Death on the High Seas Act ("DOHSA"), 46 U.S.C. § 30301 *et. seq.* with that provided by the Jones Act.  *See Peace v. Fidalgo Island Packing Co.*, 419 F.2d 371 (9th Cir. 1969).  The underlying law controlling liability under the Jones Act is Jones Act negligence. *See* 2 Robert Force & Martin J. Norris, THE LAW OF SEAMAN, § 30.35 (5th Edition, 2003). The law governing liability for the DOHSA remedy is the general maritime law — that is, unseaworthiness for a seaman's survivors against a vessel owner, maritime products liability against the manufacturer of a product, and negligence as to all others. 2 Robert Force & Martin J. Norris, THE LAW OF SEAMEN, § 29.8 (5th Edition, 2003).

Anadarko argues that no form of non-pecuniary damage can be recovered in any death remedy arising out of the explosions, fire and sinking of the *Deepwater Horizon*.  It argues that loss of future earnings, pre-death pain and suffering and punitive damages all fall within the ambit of this supposed rule.  In doing so, it draws no distinction between seamen and non-

seamen plaintiffs on the one hand or employers and third party defendants on the other. It also blurs the line between pecuniary and non-pecuniary damages. In its effort to gain dismissal of valid claims, Anadarko's argument oversimplifies and confuses the remedies available to the Plaintiffs. For instance, it is clear that under both the Jones Act and DOHSA, a survivor is entitled to economic loss of support damages suffered as a result of the worker's death. See *De Centeno v. Gulf Fleet Crews,* Inc., 798 F.2d 138, 141, (5th Cir. 1986) (holding loss of support recoverable under Jones Act); *Bergen v. F/V St. Patrick, supra* (holding loss of support recoverable under DOHSA).

Likewise, Anadarko's motion to dismiss Plaintiff's claim for punitive damages under DOHSA should also be denied. In *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008), the Supreme Court affirmed maritime law's long-standing recognition of punitive damages as an item which may be recovered when defendant's conduct justifies such an award. In *Atlantic Sounding Co. v. Townsend*, 129 S.Ct. 2561 (2009), the Court affirmed the right of a seaman to recover punitive damages from employer/shipowners when the seaman's settled maritime-law rights were flouted or abused through serious misconduct. The Supreme Court has never ruled that punitive damages are not recoverable under DOHSA. 46 U.S.C. § 30303 allows the successful plaintiff to recover "fair compensation for the pecuniary loss sustained." Although lower courts have held that DOHSA does not allow for the recovery of punitive damages,[3] these decisions are based upon the untested and unsupported assumption that punitive damages are not pecuniary.

---

[3] See *e.g. Motts v. M/V Green Wave*, 210 F.3d 565, 569 (5th Cir. 2000) where the court wrote: "Appellee can recover punitive and other non-pecuniary damages only if DOHSA is inapplicable"; *Bergen v. F/V St. Patrick*, 816 F.2d 1345-1347 (9th Cir. 1987). In that case the United States Court of Appeals for the Ninth Circuit noted that: "Punitive damages are non-pecuniary damages unavailable under the Jones Act." *Id.*

This assumption is incorrect. The common definitions of "pecuniary" are "1. relating to money, as in pecuniary affairs; and 2. *Involving a money penalty, or fine*, *as pecuniary offense*." *Webster's New Universal Unabridged Dictionary* (2d ed. 1983) (emphasis added). *Black's Law Dictionary* defines "pecuniary damages" as "damages that can be estimated and monetarily compensated" and "non-pecuniary damages" as "damages that cannot be measured in money." *Black's Law Dictionary* 418 (8th ed. 2004).

Whichever of these definitions one chooses, punitive damages *are* pecuniary. They are awarded as money, can be estimated and, as recently stated by the Supreme Court in *Exxon Shipping Co. v. Baker*, punitive damages are awarded as "*measured* retribution." *See Baker*, 554 U.S. at 513 (emphasis added). Approximately one year before writing the opinion for the Court in *Miles*, Justice O'Connor repeatedly referred to punitive damages as "pecuniary punishment." *See Browning Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 295-297 (1989) (O'Connor, J., concurring in part and dissenting in part). Moreover, the United States Supreme Court has characterized a civil forfeiture as "pecuniary punishment." *Austin v. United States*, 509 U.S. 602, 614 n. 7 (1993). The case most often cited for the proposition that punitive damages are "non-pecuniary" cites no authority and conducts no analysis to support this declaration. *See Kopczynski v. The Jaqueline*, 742 F.2d 555, 561 (9th Cir. 1984).

Furthermore, there is an alternative basis for concluding that DOHSA allows for the recovery of punitive damages. As mentioned above, DOHSA allows for the recovery of "fair compensation for pecuniary loss sustained," 46 U.S.C. § 30303. "Pecuniary" damage is a form of compensatory damage. § 30303 does not address and certainly does not exclude punitive

damages as a non-compensatory item of damage. Accordingly, as outlined above, punitive damages are pecuniary and, therefore, § 30303 does not disallow such damages.[4]

Anadarko also challenges the recoverability of non-pecuniary damages under the Jones Act death remedy. First, it is clear that under the Jones Act, damages for the seaman's conscious pain and suffering before death are allowed. 45 U.S.C. § 59; *Snyder v. Whittaker Corp.*, 839 F.2d 1085, 1092-1094 (5th Cir. 1988); *DeCenteno v. Gulf Fleet Crews, Inc.*, 798 F.2d 138, 142 (5th Cir. 1986). Anadarko's assertion that punitive damages are not awardable in Jones Act actions rests on *Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496, 1512, (5th Cir. 1995) (en banc). In *Guevara*, in the course of holding that a seaman was not entitled to seek punitive damages from an employer who flouted the venerable maintenance-and-cure obligation, the Fifth Circuit said in dictum that "the Jones Act does not provide for punitive damages." *Guevara* has been "abrogat[ed]" by *Atlantic Sounding Co. v. Townsend*, 129 S.Ct. 2561 (2009) (holding that a seaman was entitled, as a matter of general maritime law, to seek punitive damages for his employer's alleged willful and wanton disregard of its maintenance and cure obligation). Moreoever, in *Townsend* the Supreme Court went out of its way to flag the availability of punitive damages in Jones Act actions as an open question stating:

> Because we hold that *Miles [v. Apex Marine Corp.* 498 U.S. 19] does not render the Jones Act's damages provision determinative of respondent's remedies, we do not address the dissent's argument that the Jones Act, by incorporating the provisions of the Federal Employer's Liability Act, see *46 U.S.C. § 20104(a)*, prohibits the recovery of punitive damages in actions under the statute.

---

[4] Some maritime scholars have also concluded that *Miles* does not address, and its reasoning does not preclude, a general maritime punitive damage award because the pecuniary / non-pecuniary" distinction does not apply to punitive damages. *See* Robertson, *Punitive Damages: Miles, Baker and Townsend*, 70 LA. L. REV. 463 (Winter 2010), at 463-65; *see also* Robert Force, *The Curse of Miles v. Apex Marine Corp.: The Mischief of Seeking 'Uniformity' and 'Legislative Intent' In Maritime Personal Injury Cases*, 55 LA. L. REV. 745 (March 1995), at p. 777 n.1 and p. 793; Robertson, *Punitive Damages: Miles, Baker and Townsend*, at 473-75.

*Townsend*, 129 S.Ct. at 2575, n.12 (citation omitted). Ultimately, the portions of Anadarko's argument that do not rest entirely on DOHSA's "fair compensation for the pecuniary loss" language rests on an expansive reading of *Miles* that was rejected in *Townsend*. In deciding whether punitive damages are allowed under the Jones Act, *Miles* has no greater relevance to this issue than it did on the issue of maintenance and cure punitive damages. *Miles* did not deal in any way with the issue of punitive damages. Rather, it dealt only with the kinds of *compensatory* damages available in maritime death cases, holding that loss of society damages could not be recovered in a general maritime death action brought by the survivor of a seaman killed in territorial waters.[5]

Historically, seamen had the right to sue for punitive damages prior to the passage of the Jones Act. See, *e.g.*, *Swift v. Happy Return*, 23 F.Cas 560 (D. Pa. 1799); *Gould v. Christianson*, 10 F.Cas. 857 (S.D.N.Y. 1836); *The Rolph*, 293 F. 269, 270 (N.D. Cal. 1925); *The Margharita*, 140 F. 820, 821, 825 (5th Cir. 1905); *The Scotland*, 42 F.925 (S.D.N.Y. 1890).[6] The language of the Jones Act does not purport to affect this long standing right. The Supreme Court has repeatedly held that the Jones Act does not eliminate or restrict causes of action and remedies that were available to seaman before its passage. See, e.g., *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 248 (1942); *Arizona v. Anelich*, 298 U.S. 110,1231 (1936); *Bainbridge v. Merchs*

---

[5] It should also be emphasized here that, regardless of the wisdom of applying *Miles*' reasoning to preclude a punitive damage claim by a seamen under the Jones Act, such reasoning would make no sense in a seaman's claims under other causes of action available to him. See, *e,g.*, *Wagner v. Kona Blue Water Farms, LLC*, 09-00600, 2010 WL 3566731, (D.C. Hi. September 13, 2010) (denying defendant's motion to dismiss plaintiff's claim for punitive damages based on unseaworthiness); *see also In re: Denet Towing Service Inc.*, 2010 WL 3566731 (E.D. La. 2000) (denying defendant's motion to dismiss plaintiff's claims for loss of society, punitive damages, etc., as to third party defendant).

[6] For discussion of this issue, see also David W. Robertson, *Punitive Damages in U.S. Maritime Law: Miles, Baker and Townsend,* 70 LA. L. Rev. 463, 478-83 (2010).

*and Miners' Trans. Co.*, 287 U.S. 278, 282 (1932). Moreover, there is a long standing tradition in admiralty to treat seamen as a "favored class" of litigants, *Bainbridge v. Merchs. & Miners Transp*. Co., 287 U.S. 278, 282 (1932), enjoying "heightened legal protections [that are] unavailable to other maritime workers." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995). The Supreme Court in *Exxon Shipping Co. v. Baker* allowed "commercial fishermen, native Alaskans and landowners," whose livelihoods were impacted by the oil pollution flowing from the grounding of the Exxon Valdez, to recover punitive damages under maritime law. *See Baker*, 554 U.S. at 513. In doing so, the Court looked to the Ninth Circuit's decision in *Union Oil v. Oppen*, 510 F.2d 558 (9th Cir. 1974), where that Court created an exception for commercial fishermen to the general rule requiring that a plaintiff have a proprietary interest in the polluted property in order to recover for damages flowing from the pollution. The Court justified this special treatment given to commercial fishermen by likening them to seamen, traditional wards of the admiralty. *See Union Oil,* 510 F.2d at 567. Thus, it is clear that it would turn the law on its head to allow "commercial fishermen, native Alaskans and landowners" to recover punitive damages under the maritime law but deny these damages to the "favored class" of seamen. There is nothing in the language or history of the Jones Act which justifies granting this remedy to such plaintiffs but withholding it from seamen. Withholding the punitive damages remedy from seamen is further contrary to established tenets of maritime law when one considers that ". . . it is settled cannon of maritime jurisprudence that 'it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy, when not required to withhold it by established and inflexible rule.'" *American Export Lines, Inc. v. Alvez*, 446 U.S. 274, 281-82 (1980) (quoting *Moragne v. States Marine Lines*, 398 U.S. 375, 387 (1970)). Accordingly, Anadarko's motion to dismiss should be denied in this regard.

**CONCLUSION**

For the above and foregoing reasons, and for the reasons separately raised by individual plaintiffs prosecuting Bundle A claims, Anadarko and Moex's Motions to Dismiss should be denied.

This 14th day of March, 2011.

Respectfully submitted,

| | |
|---|---|
| /s/ Stephen J. Herman | /s/ James Parkerson Roy |
| Stephen J. Herman, La. Bar No. 23129 | James Parkerson Roy, La. Bar No. 11511 |
| HERMAN HERMAN KATZ & COTLAR LLP | DOMENGEAUX WRIGHT ROY & EDWARDS LLC |
| 820 O'Keefe Avenue | 556 Jefferson Street, Suite 500 |
| New Orleans, Louisiana 70113 | Lafayette, Louisiana 70501 |
| Telephone: (504) 581-4892 | Telephone: (337) 233-3033 |
| Fax No. (504) 569-6024 | Fax No. (337) 233-2796 |
| E-Mail: sherman@hhkc.com | E-Mail: jimr@wrightroy.com |
| *Plaintiffs Liaison Counsel* | *Plaintiffs Liaison Counsel* |

**PLAINTIFFS' STEERING COMMITTEE**

| | |
|---|---|
| Brian H. Barr<br>LEVIN, PAPANTONIO, THOMAS,<br>MITCHELL, ECHSNER & PROCTOR, PA<br>316 South Baylen St., Suite 600<br>Pensacola, FL 32502-5996<br>Office: (850) 435-7045<br>Telefax: (850) 436-6187<br>E-Mail: bbarr@levinlaw.com | Robin L. Greenwald<br>WEITZ & LUXENBERG, PC<br>700 Broadway<br>New York, NY 10003<br>Office: (212) 558-5802<br>Telefax: (212) 344-5461<br>E-Mail: rgreenwald@weitzlux.com |
| Jeffrey A. Breit<br>BREIT DRESCHER & IMPREVENTO<br>999 Waterside Drive, Suite 1000<br>Norfolk, VA 23510<br>Office: (757) 670-3888<br>Telefax: (757) 670-3895<br>E-Mail: jbreit@bdbmail.com | Rhon E. Jones<br>BEASLEY, ALLEN, CROW, METHVIN,<br>PORTIS & MILES, P. C.<br>218 Commerce St., P.O. Box 4160<br>Montgomery, AL 36104<br>Office: (334) 269-2343<br>Telefax: (334) 954-7555<br>E-Mail: rhon.jones@beasleyallen.com |
| Elizabeth J. Cabraser<br>LIEFF, CABRASER, HEIMANN &<br>BERNSTEIN, LLP<br>275 Battery Street, 29th Floor<br>San Francisco, CA 94111-3339<br>Office: (415) 956-1000<br>Telefax: (415) 956-1008<br>E-Mail: ecabraser@lchb.com | Matthew E. Lundy<br>LUNDY, LUNDY, SOILEAU & SOUTH, LLP<br>501 Broad Street<br>Lake Charles, LA 70601<br>Office: (337) 439-0707<br>Telefax: (337) 439-1029<br>E-Mail: mlundy@lundylawllp.com |
| Philip F. Cossich, Jr.<br>COSSICH, SUMICH, PARSIOLA & TAYLOR<br>8397 Highway 23, Suite 100<br>Belle Chasse, LA 70037<br>Office: (504) 394-9000<br>Telefax: (504) 394-9110<br>E-Mail: pcossich@cossichlaw.com | Michael C. Palmintier<br>deGRAVELLES, PALMINTIER,<br>HOLTHAUS & FRUGE'<br>618 Main Street<br>Baton Rouge, LA 70801-1910<br>Office: (225) 344-3735<br>Telefax: (225) 344-0522<br>E-Mail: mpalmintier@dphf-law.com |
| Robert T. Cunningham<br>CUNNINGHAM BOUNDS, LLC<br>1601 Dauphin Street, P. O. Box 66705<br>Mobile, AL 36660<br>Office: (251) 471-6191<br>Telefax: (251) 479-1031<br>E-Mail: rtc@cunninghambounds.com | Paul M. Sterbcow<br>LEWIS, KULLMAN, STERBCOW &<br>ABRAMSON<br>601 Poydras Street, Suite 2615<br>New Orleans, LA 70130<br>Office: (504) 588-1500<br>Telefax: (504) 588-1514<br>E-Mail: sterbcow@lksalaw.com |
| Alphonso Michael "Mike" Espy<br>MORGAN & MORGAN, P.A.<br>188 East Capitol Street, Suite 777<br>Jackson, MS 39201<br>Office: (601) 949-3388 | Scott Summy<br>BARON & BUDD, P.C.<br>3102 Oak Lawn Avenue, Suite 1100<br>Dallas, TX 75219<br>Office: (214) 521-3605 |

| | |
|---|---|
| Telefax: (601) 949-3399<br>E-Mail: mike@mikespy.com<br><br>Calvin C. Fayard, Jr.<br>FAYARD & HONEYCUTT<br>519 Florida Avenue, SW<br>Denham Springs, LA  70726<br>Office:  (225) 664-4193<br>Telefax: (225) 664-6925<br>E-Mail: calvinfayard@fayardlaw.com<br><br>Ervin A. Gonzalez<br>COLSON HICKS EIDSON<br>255 Alhambra Circle, Penthouse<br>Coral Gables, FL 33134<br>Office: (305) 476-7400<br>Telefax: (305) 476-7444<br>E-Mail: ervin@colson.com | Telefax: (214) 599-1172<br>E-Mail: ssummy@baronbudd.com<br><br>Mikal C. Watts (PSC)<br>WATTS GUERRA CRAFT, LLP<br>Four Dominion Drive, Building 3, Suite 100<br>San Antonio, TX 78257<br>Office: (210) 447-0500<br>Telefax: (210) 447-0501<br>E-Mail: mcwatts@wgclawfirm.com |

**JOSH WHITLEY**
**JOHNNY DEGRAVELLES**
**BRIAN COLOMB**
**BILLIE LEETH**
**DAVID BAGWELL**
**JAMES GARNER**
**STEPHEN MURRAY, JR.**
**LARRY BERMAN**
**TOM SIMS**
*On Brief.*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Opposition has been served on all counsel pursuant to PTO No. 12, *via* the Lexis-Nexis File & Serve system, this 14th day of March, 2011.

    /s/ Stephen J. Herman and James Parkerson Roy