UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig<br>          "Deepwater Horizon" in the Gulf<br>          Of Mexico, on April 20, 2010<br><br>This Document Relates to:<br><br>Case No. 2:11-cv-00275<br>Case No. 2:11-cv-00274 | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAG. JUDGE SHUSHAN |

**MEMORANDUM IN SUPPORT OF TRANSOCEAN'S
MOTION FOR LEAVE TO FILE COMPLAINT IN INTERVENTION**

Transocean Offshore Deepwater Drilling, Inc., Transocean Holdings LLC, Transocean Deepwater Inc. and Triton Asset Leasing GmbH (collectively "Transocean"), respectfully move this Court for leave to file their Complaint in Intervention in the above captioned action in which Ranger Insurance Limited and Certain Underwriters at Lloyd's, London and various insurance companies, have filed Complaints for Declaratory Judgment against BP plc, BP Exploration and Production Inc., BP America Production Company, BP Corporation North America, Inc., BP Company North America, Inc., BP Products North America, Inc., BP America Inc., and BP Holdings North America Limited ("BP").[1]

---

[1] Transocean's Motion and Memorandum in Support of Transocean's Motion is filed subject to, and without waiver of, Transocean Holdings' rights to invoke and compel arbitration of any disputes arising out of or related to the Drilling Contract dated December 9, 1998 between Transocean Holdings LLC and BP America

# I.
## BACKGROUND

At the time of the blow-out of BP's Macondo Well and the resulting fire and explosion aboard the MODU *Deepwater* Horizon on April 20, 2010, the *Deepwater Horizon* was on location pursuant to a Drilling Contract between BP America Production Company (hereinafter "BP America") and Transocean Holdings LLC (hereinafter "Transocean Holdings"). The Drilling Contract allocated the pollution liability between BP America and Transocean Holdings depending on the origin of the pollution in relation to the water's surface. Pursuant to the explicit and unambiguous terms of the Drilling Contract, Transocean Holdings was allocated responsibility only for pollution originating from above the surface of the water from spills or discharges of certain liquids or solids in the possession and control of Transocean;[2] BP America

---

Production Company. The Drilling Contract's "ARBITRATION" provision provides:

> 35.4 ARBITRATION
>
> Any controversy or claim arising out of or related to this CONTRACT, or the breach thereof, which cannot be resolved satisfactorily between the parties, shall be settled by arbitration in Houston, Texas, in accordance with the Rules of the American Arbitration Association Commercial Disputes. If no agreement can be reached by the parties on discovery disputes, then the Federal Rules of Civil Procedure shall govern in judgement upon the award rendered by the arbitrator(s) may be entered in any court of competent jurisdiction.

[2] The Drilling Contract provides as to the Contractor (Transocean Holdings) as follows:

ARTICLE 24

POLLUTION

24.1 CONTRACTOR RESPONSIBILITY
CONTRACTOR SHALL ASSUME FULL RESPONSIBILITY FOR AND SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY, AND HOLD COMPANY AND ITS JOINT OWNERS HARMLESS FROM AND AGAINST ANY LOSS, DAMAGE, EXPENSE, CLAIM, FINE, PENALTY, DEMAND, OR LIABILITY FOR POLLUTION OR CONTAMINATION, INCLUDING CONTROL AND REMOVAL THEREOF, ORIGINATING ON OR ABOVE THE SURFACE OF THE LAND OR WATER, FROM SPILLS, LEAKS, OR DISCHARGES OF FUELS, LUBRICANTS, MOTOR OILS, PIPE DOPE, PAINTS, SOLVENTS,

was allocated responsibility for <u>all</u> pollution originating from the Macondo Well below the surface of the water.[3]

On a limited basis, the Drilling Contract also required Transocean to procure insurance to cover the obligations it had contractually assumed in the Drilling Contract. Transocean purchased coverage from Ranger Insurance Company[4] and the "Transocean Excess Insurers"[5] to

---

BALLAST, AIR EMISSIONS, BILGE SLUDGE, GARBAGE, OR ANY OTHER LIQUID OR SOLID WHATSOEVER IN POSSESSION AND CONTROL OF CONTRACTOR AND WITHOUT REGARD TO NEGLIGENCE OF ANY PARTY OR PARTIES AND SPECIFICALLY WITHOUT REGARD TO WHETHER THE SPILL, LEAK OR DISCHARGE IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OR OTHER FAULT OF COMPANY, ITS CONTRACTORS, (OTHER THAN CONTRACTOR) PARTNERS, JOINT VENTURERS, EMPLOYEES, OR AGENTS. IN ADDITION TO THE ABOVE, CONTRACTOR TO A LIMIT OF FIFTEEN MILLION DOLLARS (US$15,000,000.00) PER OCCURRENCE, SHALL RELEASE INDEMNIFY AND DEFEND COMPANY FOR CLAIMS FOR LOSS OR DAMAGE TO THIRD PARTIES ARISING FROM THE DRILLING LOCATIION, WHILE UNDERWAY OR DURING DRIVE OFF OR DRIFT OFF FROM THE DRILLING LOCATION.

[3] The Drilling Contract further provides as to the Company (BP America) as follows:

POLLUTION

* * *

24.2   COMPANY RESPONSIBILITY
COMPANY SHALL ASSUME FULL RESPONSIBILITY FOR AND SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY, AND HOLD CONTRACTOR HARMLESS FROM AND AGAINST ANY LOSS, DAMAGE, EXPENSE, CLAIM, FINE, PENALTY, DEMAND, OR LIABILITY FOR POLLUTION OR CONTAMINATION, INCLUDING CONTROL AND REMOVAL THEREOF, ARISING OUT OF OR CONNECTED WITH OPERATIONS UNDER THIS CONTRACT HEREUNDER AND NOT ASSUMED BY CONTRACTOR IN ARTICLE 24.1 ABOVE, WITHOUT REGARD FOR NEGLIGENCE OF ANY PARTY OR PARTIES AND SPECIFICALLY WITHOUT REGARD FOR WHETHER THE POLLUTION OR CONTAMINATION IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OR FAULT OF CONTRACTOR.

[4] Ranger issued primary liability insurance comprising the lowest layer policy which is $50 million in limits.

[5] This is a term of convenience to describe the dozens of issuers and/or subscribers to the various layers of excess liability insurance which are set forth on Exhibit "A" to the Complaint for Declaratory Judgment filed in C.A. 4:10-cv-01823. The lowest layer policy comprising the Transocean Excess Insurers' layers of excess liability insurance attach excess of the $50 million in limits afforded under the Ranger primary policy. The limits of liability afforded under the policies provided by the Transocean Excess Insurers are, in the aggregate, $700 million.

insure itself and to insure its contractual indemnity obligations in the Drilling Contract. Further, Transocean agreed to, and did, provide one or more BP entities with additional insured endorsements, with the endorsements being strictly limited to those liabilities assumed contractually by Transocean Holdings in the Drilling Contract.

After the BP Oil Spill, BP sought coverage as an additional insured under Transocean's primary and excess liability insurance policies. This would have been unremarkable, had BP restricted its pollution coverage demand to the comparatively minor spill of diesel oil originating above the surface of the water which occurred when the *Deepwater Horizon* sank. But instead of restricting its coverage demand to pollution "originating on or above the surface of the land or water," BP claimed additional insured coverage for the very pollution liabilities for which it had assumed responsibility under the Drilling Contract. Specifically, BP made an overbroad claim for additional insured coverage for the downhole release of oil from the Macondo Well, a well situated thousands of feet below the surface of the water, for the very pollution for which BP alone has been named as the OPA Responsible Party under 33 U.S.C. § 2714.[6] It is the pollution from the Macondo Well and not the minor pollution from the spill of diesel fuel from the *Deepwater Horizon* which has resulted in the filing of billions of dollars in claims.

---

[6] Section 2714(a) of OPA, entitled "Designation of Source and Notification," provides:

**§ 2714. Designation of source and advertisement**

**(a) Designation of source and notification**

When the President receives information of an incident, the President shall, where possible and appropriate, designate the source or sources of the discharge or threat. If a designated source is a vessel or a facility, the President shall immediately notify the responsible party and the guarantor, if known, of that designation.
33 U.S.C. § 2714(a).

To resolve the issue of the extent of BP's additional insured status under Transocean's relevant policies, Transocean's primary and excess insurers each brought a separate declaratory judgment action against BP in the Southern District of Texas.[7] Each action was then transferred to this Court by the JPML.  As the sole named insured under the relevant policies, Transocean seeks to intervene in these actions to (1) ensure that its rights in the relevant policies are preserved, and (2) prevent the insurance it purchased to protect itself—for its own obligations— from being depleted to fund obligations expressly assumed by BP and others and for which BP (and Anadarko and MOEX) have no legitimate right to claim coverage.  If BP, Anadarko and MOEX succeed in their efforts to pass off their liabilities and contractual obligations for the BP Oil Spill to Transocean's insurers, potentially little or nothing will remain of these policies to cover any costs or liabilities that may fairly be allocated to Transocean by law or under the Drilling Contract, such as liabilities for Transocean employee personal injury and death claims and any claims related to pollution originating on or above the surface of the land or water.

## II.
### ARGUMENT

**A.     Transocean Has a Right to Intervene**

Rule 24 provides as follows:

>    **(a)   Intervention of Right.**  On timely motion, the court must permit anyone to intervene who:
>
>    . . .
>
>    (2)   claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a

---

[7] The docket numbers in the Southern District of Texas are 4:10-cv-0823 (the Excess Insurers' suit) and 4:10-cv-2009 (Ranger's suit).

> practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

FED. R. CIV. P. 24(a)(2). The rule has been broken down and reformulated into separate components by the courts. In the Fifth Circuit, intervention as of right is satisfied when the following elements are present:

> (1) the motion to intervene is timely; (2) the potential intervenor asserts an interest that is related to the property or transaction that forms the basis of the controversy in the case into which she seeks to intervene; (3) the disposition of that case may impair or impede the potential intervenor's ability to protect her interest; and (4) the existing parties do not adequately represent the potential intervenor's interest.

*Ross v. Marshall*, 426 F.3d 745, 753 (5th Cir. 2005) (quoting *Saldano v. Roach*, 363 F.3d 545, 551 (5th Cir. 2004)). "'[T]he inquiry under subsection (a)(2) is a flexible one, which focuses on the particular facts and circumstances surrounding each application,' and . . . 'intervention of right must be measured by a practical rather than technical yardstick.'" *Id.* (quoting *Edwards v. City of Houston*, 78 F.3d 983, 999 (5th Cir. 1996)). "Intervention should generally be allowed where 'no one would be hurt and greater justice could be attained.'" *Id.* (quoting *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994)).

As the sole named insured on the relevant liability policies, Transocean meets the requirements of Rule 24(a)(2) for intervention as of right. First, the motion is timely. Second, the insurance proceeds of Transocean's policies form the "subject of the action." Third, Transocean is "so situated that disposing of the action may as a practical matter impair or impede [Transocean's] ability to protect its interest" in its own policies. Finally, no "existing parties adequately represent that interest."

### 1. Transocean's Motion Is Timely

Courts in the Fifth Circuit discuss four "contextual" timeliness factors:

> Factor 1. The length of time during which the would-be intervenor actually or reasonably should have known of his interest in the case before he petitioned for leave to intervene.
>
> Factor 2. The extent of prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case.
>
> Factor 3. The extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied.
>
> Factor 4. The existence of unusual circumstances militating either for or against a determination that the application is timely.

*Ross*, 426 F.3d at 754 (quoting *Stallworth v. Monsanto Co.*, 558 F.2d 257, 264–66 (5th Cir. 1977)).

With regard to the first timeliness factor, there are "no 'absolute measures of timeliness.'" *Id.* It matters not whether intervention is sought one week, one month, or one year after the underlying suit was filed—even post-judgment interventions as of right are often warranted by the facts and circumstances of the case. *See id.* Again, the analysis of the factors is "contextual," not technical. *See id.* Here, Transocean has filed its motion to intervene in the coverage litigation well before anything substantive has taken place in those cases. To date, solely procedural matters have predominated, i.e., whether the actions should proceed apart from this MDL Court or should remain in their original venue. Because this litigation has not yet progressed beyond the filing of the Original Complaint and responsive, non-dispositive pleadings, this factor affirms the timeliness of Transocean's Motion.

The second timeliness factor is tied to the first.  "This factor is concerned only with the prejudice caused by the applicants' delay, not that prejudice which may result if intervention is allowed."  *Ross*, 426 F.3d at 755; *see also Ass'n of Prof'l Flight Attendants v. Gibbs*, 804 F.2d 318, 321 (5th Cir. 1986) (finding timeliness where intervention was no more distressing to other parties at a late date than at an earlier one).  Other than the issues surrounding the JPML's eventual CTO, nothing has happened in these coverage cases.  As lawyers for BP have stated in a recent pre-conference report to this Court,

> *Current status*: To date, no discovery has occurred, and no substantive rulings have been issued in either the *Ranger* suit or the *Lloyd's* suit.

Doc. 1333 at 6 (submitted on February 22, 2011).  Prejudice caused by delayed intervention cannot, therefore, be claimed.  This factor affirms the conclusion that Transocean's motion is timely.

The third timeliness factor is also prejudice-related, but looks to the harm Transocean will suffer if its motion to intervene is denied as untimely.  (This factor is discussed in greater detail at "**C.**," *infra*.)  If unable to intervene in the Declaratory Judgment actions, as a non-party, Transocean will be unable to contest the many competing claims against the finite proceeds of the policies it purchased to cover itself and its obligations to third-parties, contractual or otherwise.  These possibilities each compel a finding of timeliness.

Finally, the fourth factor addresses any "unusual circumstances" that have a bearing on timeliness.  Here, the actions have just been transferred to this Court for "consolidated pretrial proceedings" by the JPML.  *See* 28 U.S.C. § 1407.  As discussed above, nothing beyond the CTO sending the cases to this Court has occurred in these cases.  Transocean is essentially

seeking to intervene before the coverage litigation even begins. The actions' recent transfer is another circumstance supporting a finding of timely intervention.

In sum, all four of the Fifth Circuit's timeliness factors counsel in favor of deeming Transocean's motion to intervene as timely filed under Rule 24(a)(2).

### 2. Transocean Asserts an Interest in the Subject Matter of the Coverage Cases

To intervene as of right, the potential intervenor must satisfy the second element by "assert[ing] an interest that is related to the property or transaction that forms the basis of the controversy in the case into which [it] seeks to intervene." *Ross*, 426 F.3d at 753 (citing FED. R. CIV. P. 24(a)(2)). The Fifth Circuit has held that, in order to meet this requirement,

> [A]n applicant must point to an interest that is "direct, substantial, [and] legally protectable." This requires a showing of something more than a mere economic interest; rather, the interest must be "one which the *substantive law* recognizes as belonging to or being owned by the applicant." In addition, "the intervenor should be the real party in interest regarding his claim."

*Id.* at 757 (emphasis in original, citations omitted).

The underlying coverage dispute is between Transocean's insurers and BP, and potentially Anadarko and MOEX, and concerns the payment of defense costs and the disbursement of policy funds to various parties asserting "additional insured" status under Transocean's policies.[8] Transocean undoubtedly has a direct, substantial, and protectable interest in its own insurance policies as named insureds. Contractual rights are direct,

---

[8] As co-owners of the leasehold with BP, both MOEX and Anadarko assert additional insured status under Transocean's policies and seek intervention as of right. Immediately before the CTO transferred the coverage cases to this Court, MOEX moved to intervene in the Transocean Excess Insurers' action in the Southern District of Texas. *See* S.D. Tex. No. 4:10-cv-1823, Doc. 56. MOEX's motion was not ruled on in the transferor court prior to transfer. Anadarko moved to intervene directly in MDL 2179 on March 3, 2011. *See* Doc. 1503. Both proposed intervenors' motions are labeled "unopposed."

substantial, and protectable interests. The Fifth Circuit permits intervention as of right when the prospective intervenor's interest is a contractual right related to the underlying suit. *See, e.g.*, *Sierra Club v. Espy*, 18 F.3d 1202, 1207 (5th Cir. 1994) ("Movants [in intervention] . . . have legally protectable property interests in existing . . . contracts that are threatened . . . ."); *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 469–70 (5th Cir. 1984) (en banc) ("enforcement of the contract" is a "substantive legal right" with the proper "character of interest required by Rule 24(a)(2)" to permit intervention as of right). The Fifth Circuit has made it clear that "'the interest 'test' is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process.'" *Id.*[9] Transocean's contractual rights more than satisfy the practical, "apparent concern" permitted by the Fifth Circuit.

Transocean's legal, contractual rights in the policies suffice as direct, substantial and protectable interests warranting intervention to safeguard them.

### 3.     The Coverage Cases May Impair or Impede Transocean's Ability to Protect Its Interests

The third element in analyzing a motion for intervention as of right "focuses on the prejudice the potential intervenor would suffer if not allowed to intervene." *Ross*, 426 F.3d at 756 (quoting *John Doe No. 1 v. Glickman*, 256 F.3d 371, 378–79 (5th Cir. 2001)); *see also* FED.

---

[9]   *See also N.H. Ins. Co. v. Greaves*, 110 F.R.D. 549 (D.R.I. 1986):

> Surely it runs counter to our notions of fairness and justice to find that the company would be harmed by being forced to face a stronger, more vigorous opposition. The role of this court and the judicial process is to reach a just and equitable resolution based on the facts, a task which can only be aided and served by the assistance of the strongest possible arguments by counsel.

*Id.* at 552.

R. CIV. P. 24(a)(2) ("... is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest ..."). As discussed above, the coverage disputes' resolution will hinge upon the interpretation given to Transocean's Drilling Contract with BP and Transocean's insurance contracts issued or subscribed to by Ranger and the Transocean Excess Insurers. The additional insured status claimed by BP and by Anadarko and MOEX would be in "addition" to Transocean's status as named insured. The decisions reached by the Court with regard to these issues could prejudice Transocean throughout the *Deepwater Horizon* litigation.

First, there is a finite amount of insurance money available under Transocean's policies. If BP, Anadarko and MOEX are granted additional insured status under Transocean's policies beyond what was clearly expressed in the Drilling Contract and the policies, these policies could be exhausted to cover BP's (or even Anadarko's and MOEX's) liabilities for the downhole release of oil from the Macondo Well, a result clearly not contemplated by the express terms of the Drilling Contract and the policies. Exhaustion of Transocean's policies for BP's liabilities is not only a possibility, but a probability, if BP is granted additional assured status. BP has already paid out over four times the total value of the policies at issue to pollution Claimants to date. Transocean thus faces the potential prospect of being uninsured for its own liabilities arising from the BP Oil Spill and the explosion and sinking of the *Deepwater Horizon*. And this is important not only for Transocean, but for certain Claimants who, unlike Transocean, are not named insureds in the insurance policies, but will be looking to Transocean for the payment of their losses. In particular, the surviving spouses of the Transocean employees who were aboard the *Deepwater Horizon* who lost their lives will at the end of the day look to Transocean — and

indirectly to the insurance policy proceeds through Transocean — for compensation for their losses.

BP, a company with substantially greater assets than Transocean, made a conscious decision to self-insure its own contractual obligations and liabilities as the operator of the Macondo Well. And BP's liabilities for the downhole release of oil are enormous. BP has already established a $20 billion dollar trust fund for individuals and businesses that file claims with the Gulf Coast Claims Facility (the "GCCF"), and to date, has paid out $3,501,808,909.03. It is critical that Transocean be permitted to intervene to protect its insurance policies from depletion or exhaustion by BP and its non-operating partners, Anadarko and MOEX.

Second, Transocean faces potential liability arising out of the sinking of the *Deepwater Horizon* unique to Transocean. For one example, Transocean has been designated by the U.S. Coast Guard as the "Responsible Party" for the release of diesel on the surface of the water. Thousands of pollution-related claims have been filed against Transocean. And while it is unclear that any damages resulted from the on-the-surface release as opposed to the enormous quantity released from the undersea well, Transocean is incurring defense costs with respect to these potential liabilities. These defense costs must be paid out of the proceeds of the insurance policies. Thus, these same considerations — which have also been urged by Anadarko in support of Anadarko's Motion for Leave to Intervene — apply equally to Transocean.

And finally, issue preclusion (or collateral estoppel) might later be argued to operate to impede Transocean's ability to protect itself against BP and any interests aligned with BP should BP or its partners prevail to any extent in this Declaratory Judgment action. As noted, several provisions in the Drilling Contract must be interpreted to adjudicate the additional insured claims

raised in the Declaratory Judgment actions. For example, the pollution indemnity provisions in the Drilling Contract will have to be construed and given effect.[10] Transocean must be afforded a full opportunity to advance its own position regarding the correct interpretation of the Drilling Contract and the policies to which it is a direct party. *Cf. Sierra Club*, 18 F.3d at 1207 ("[A]n intervenor's interest 'is impaired by the *stare decisis* effect of the district court's judgment.'" (citation omitted)); *see also Ceres Gulf v. Cooper*, 957 F.2d 1199, 1204 (5th Cir. 1992) (permitting intervention where "denying intervention impairs, if not prevents, his ability to provide his interpretation of the law he is charged with administering").[11]

### 4. The Existing Parties Do Not Adequately Represent Transocean's Interests

Transocean's motion meets the final element for intervention, that "existing parties do not adequately represent the potential intervenor's interest." *Ross*, 426 F.3d at 753; *see also* FED. R. CIV. P. 24(a)(2). The Fifth Circuit has "described this burden as 'minimal,' noting that a potential intervenor need only show that 'representation by the existing parties *may* be inadequate.'" *Ross*, 426 F.3d at 761 (emphasis in original) (quoting *Heaton v. Monogram Credit Card Bank*, 297 F.3d 416, 425 (5th Cir. 2002)).

BP and any others seeking to join as additional insureds directly oppose Transocean's interests. BP may argue that the Ranger and the Excess Insurers adequately represent Transocean's interests, but in fact they do not. Transocean's insurers' interests are plainly

---

[10] A proper additional insured determination can be made only by specific reference to the language of Transocean's Drilling Contract with BP America Production Company. *Becker v. Tidewater, Inc.,* 586 F.3d 358 (5th Cir. 2009) ("Additional assured" status is determined by reference to the contract between named insured and additional assured and the language of the policy).

[11] This estoppel/preclusion argument is also related to the next element required to intervene as of right, that of inadequate representation by existing parties: The law is clear that a nonparty may be bound when its interests are "adequately represented by someone with the same interests who is a party." *Richards v. Jefferson County, Ala.*, 517 U.S. 793, 798 (1996).

distinct from Transocean's. Coverage disputes can and do arise between named insureds and their insurers. Furthermore, the coverage provided by Ranger and Transocean Excess Insurers is clearly limited, and BP and Transocean, in addition to other parties seeking to join in this action, including MOEX and Anadarko, have competing interests. That these interests are competing is apparent from Anadarko's and MOEX's separate Motions for Leave to Intervene. As Anadarko and MOEX have both asserted, BP, Anadarko, and MOEX assert competing claims to the policies. And without question, BP's, Anadarko's and MOEX's interests are adverse to Transocean's interest. Recovery by one or all is limited due to the available policies' limits, and Transocean's undisputed interest in the policies as the named insured. The resulting allocation of such insurance proceeds is therefore a point of contention, and cannot be adequately represented by the current parties, in Transocean's absence. Given each party's self-interest, Transocean cannot rely upon any party to protect the interests of Transocean.

Considering the divergent approaches to both (1) the desired ultimate objectives and (2) the means pursued to reach them in the coverage litigation, Transocean's right to intervene is even more fully established.

### 5.    Transocean's Intervention as of Right is Warranted

In sum, when considering the four elements in the context of the practical facts and circumstances here—the possible harm to Transocean's interests, the existing parties' inability to protect them and the lack of any taint of untimeliness or prejudice—Transocean's intervention as of right in the coverage cases becomes necessary. *Ross v. Marshall*, 426 F.3d 745, 753 (5th Cir. 2005) (permitting intervention as of right where "no one would be hurt and greater justice could be attained").

### B. Alternatively, Transocean Has a Permissive Right to Intervene

Though the Court need not address this issue if intervention as of right is granted, Transocean moves for permissive intervention. Rule 24 further provides:

> **(b) Permissive Intervention.**
>
> > **(1) In General.** On timely motion, the court may permit anyone to intervene who:
> >
> > . . .
> >
> > (B) has a claim or defense that shares with the main action a common question of law or fact.
> >
> > . . .
> >
> > **(3) Delay or Prejudice.** In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

FED. R. CIV. P. 24(b)(1), (3).

In determining whether to allow permissive intervention, "the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Cajun Elec. Power Coop., Inc. v. Gulf States Utils., Inc.,* 940 F.2d 117, 121 (5th Cir. 1991) (internal quotation omitted); *see also* Fed. R. Civ. P. 24(b)(3). "Permissive intervention depends on the facts of each case." *See Cajun Elec.*, 940 F.2d at 121. Concerns of untimeliness, delay, and prejudice have all been addressed above. No one will be delayed, especially insofar as nothing has happened yet; the Court will be assisted by Transocean's

presence and advocacy in attempting to resolve the dispute; and the focus of the litigation will not shift away from that of the original suits. Further, the requirement of "common question[s] of law or fact" is plainly satisfied by Transocean's motion. The same laws and facts applicable to the determination of additional insured status in the coverage disputes will apply to Transocean. Permissive intervention is therefore proper.

### III.

#### CONCLUSION

For the foregoing reasons, Transocean respectfully asks this Court to grant its Motion to Intervene.

Respectfully submitted,

| | |
|---|---|
| By: /s/ Steven L. Roberts | By: /s/ Kerry J. Miller |
| Steven L. Roberts (Texas, No. 17019300) | Kerry J. Miller (Louisiana, No. 24562) |
| Rachel Giesber Clingman (Texas, No. 00784125) | FRILOT, L.L.C. |
| Kent C. Sullivan (Texas, No. 19487300) | 1100 Poydras Street, Suite 3700 |
| Teri L. Donaldson (Florida, No. 784310) | New Orleans, Louisiana 70163 |
| SUTHERLAND ASBILL & BRENNAN LLP | Telephone: (504) 599-8169 |
| 1001 Fannin Street, Suite 3700 | Facsimile: (504) 599-8154 |
| Houston, Texas 77002 | Email: kmiller@frilot.com |
| Telephone: (713) 470-6100 | |
| Facsimile: (713) 654-1301 | -and- |
| Email: steven.roberts@sutherland.com, | |
| rachel.clingman@sutherland.com, | Edwin G. Preis, Jr. (Louisiana, No. 10703) |
| kent.sullivan@sutherland.com, | Edward F. Kohnke, IV (Louisiana, No. 07824) |
| teri.donaldson@sutherland.com | PREIS & ROY PLC |
| | 102 Versailles Boulevard, Suite 400 |
| | Lafayette, Louisiana 70501 |
| | Telephone: (337) 237-6062 |
| | Facsimile: (337) 237-9129 |
| | |
| | -and- |

        601 Poydras Street, Suite 1700  
        New Orleans, Louisiana 70130  
        Telephone: (504) 581-6062  
        Facsimile: (504) 522-9129  
        Email: egp@preisroy.com,  
        efk@preisroy.com

Of Counsel:

John M. Elsley (Texas, No. 0591950)  
ROYSTON, RAYZOR, VICKERY & WILLIAMS LLP  
711 Louisiana Street, Suite 500  
Houston, Texas 77002  
Telephone: (713) 224-8380  
Facsimile: (713) 225-9945  
Email: john.elsley@roystonlaw.com

Daniel O. Goforth (Texas, No. 08064000)  
GOFORTH GEREN EASTERLING LLP  
4900 Woodway, Suite 750  
Houston, Texas 77056  
Telephone: (713) 650-0022  
Facsimile: (713) 650-1669  
Email: dangoforth@goforthlaw.com

Brad D. Brian (California, No. 79001)  
Allen M. Katz (California, No. 054933)  
Munger Tolles & Olson LLP  
355 South Grand Avenue, 35th Floor  
Los Angeles, California 90071  
Telephone: (213) 683-9100  
Facsimile: (213) 683-5180, (213) 683-4018  
Email: brad.brian@mto.com, allen.katz@mto.com

        *Counsel for Triton Asset Leasing GmbH.,*  
        *Transocean Holdings LLC, Transocean*  
        *Offshore Deepwater Drilling Inc. and*  
        *Transocean Deepwater Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, on March 16, 2010.

/s/  Kerry J. Miller
KERRY J. MILLER