UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG        MDL NO. 2179
*"DEEPWATER HORIZON"* in the
GULF OF MEXICO, on April 20, 2010     SECTION:    J

                                         JUDGE BARBIER

                                         MAGISTRATE JUDGE SHUSHAN

THIS DOCUMENT RELATES TO:
2:10-cv-03168

## PLAINTIFFS' SIXTH AMENDED COMPLAINT WITH JURY DEMAND

1.     This amended complaint is filed subject to and without waiver of Plaintiff's previously filed objections to jurisdiction and their motion to remand.

2.     Plaintiffs Douglas Harold Brown, Christopher Choy, Brent Mansfield and Dominique Ussin, by and through undersigned counsel, subject to their continued objection to the jurisdiction of this Honorable Court and the MDL No. 2179 this Sixth Amended Complaint against Transocean Offshore Deepwater Drilling, Inc., Transocean Deepwater, Inc., Transocean Holdings, LLC, Triton Asset Leasing GmbH, Triton Hungary Asset Management Limited Liability Company, BP Exploration & Production, Inc., BP America Production Company, BP p.l.c., Halliburton Energy Services, Inc., Cameron International Corporation f/k/a Cooper-Cameron Corporation, M-I, LLC, Art Catering, Inc., Anadarko E & P Company, LP, Anadarko Petroleum Corporation, MOEX Offshore 2007 LLC, MOEX USA Corporation, Weatherford U.S. L.P., Weatherford International, Inc., and Dril-Quip, Inc.

3.     This case was previously filed in Harris County state court under Cause Number 2010-25245 in the 234th Judicial District Court. Cameron improperly removed it without the timely consent of the named Defendants, asserting a legal theory not recognized in the Fifth Circuit. The parties briefed the remand issue while the case was pending in the Southern District

of Texas, which ultimately transferred the case here.   The parties again briefed the remand issues.

4.      Since that time, the Plaintiffs have sat on the sidelines not participating in the proceedings while continuing to maintain their objections to the jurisdiction of this Honorable Court and of their inclusion in the MDL No. 2179, awaiting the day this Court rules on the remand motion.   They file this amended complaint both to name new parties following Transocean's Rule 14 tender, which bears no effect on this case but informed Plaintiffs about who the proper parties are.   Moreover, Plaintiff's pleading was filed pursuant to Texas's liberal pleading standard, and while it is obvious that the original pleading satisfied the federal pleading standards, this pleading resolves that question beyond doubt.

5.      Plaintiffs file this without waiver of their motion to remand nor objections and affirmative defenses they may file in the future related to the MDL and the Limitation proceeding.

6.      Plaintiffs specifically contend that any bench trial related to Transocean's Rule 14(c) tender does not apply to them because they are not participating and are not a party to that proceeding.

7.      Plaintiffs further aver that every day they are required to be in this improper jurisdiction and/or are not permitted to maintain discovery against the Defendants, either in whole or in part, they are being denied their due process under the United States Constitution 5th Amendment.

## I.

## PARTIES

8.      The Plaintiffs are as follows:

A.    Douglas Harold Brown is a citizen of the United States of America, of lawful age, and is a resident and domiciled in Vancouver, Clark County, Washington.

B.    Christopher Choy is a citizen of the United States of America, of lawful age, and is a resident and domiciled in Katy, Fort Bend County, Texas.

C.    Brent Mansfield is a citizen of the United States of America, of lawful age, and is a resident and domiciled in San Antonio, Bexar County, Texas.

D.    Dominique Ussin is a citizen of the United States of America, of lawful age, and is a resident and domiciled in Slidell, St. Tammany Parish, Louisiana.

9.    The "Transocean Entities" are, collectively, as follows:

A.    Transocean Offshore Deepwater Drilling Inc. is, and was at all material time hereinafter mentioned, a corporation organized and existing under the laws of the State of Delaware, with its principal office in Houston, Texas.

B.    Transocean Deepwater Inc. is, and was at all material time hereinafter mentioned, a corporation organized and existing under the laws of the State of Delaware, with its principal office in Houston, Texas.

C.    Transocean Holdings LLC is, and was at all material time hereinafter mentioned, a limited liability company organized and existing under the laws of the State of Delaware, with its principal office in Houston, Texas.

D.    Triton Asset Leasing GmbH is, and was at all material time hereinafter mentioned, a limited liability company organized and existing under the laws of the Swiss Confederation with its principal office in Zug, Switzerland.

    E.      Triton Hungary Asset Management Limited Liability Company is a foreign corporation doing business in the State of Louisiana.

10.    The "BP Entities" are as follows:

    A.      BP Exploration & Production, Inc. ("BP Exploration") is a Delaware Corporation with its principal place of business in Warrenville, Illinois. BP Exploration was a lease-holder and the designated operator in the lease granted by the former Minerals Management Service ("MMS"), now re-organized as the Bureau of Ocean Energy Management Regulation & Enforcement ("BOEMRE"), allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon, Blk. 252, the location known as "Macondo," where the Macondo well was located and from which the BP Oil Spill originated.  This Court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

    B.      BP America Production Company ("BP America") is a Delaware Corporation with its principal place of business in Houston, Texas. BP America was a party to the Drilling Contract with Transocean Holdings LLC for the drilling of the Macondo Well by the MODU *DEEPWATER HORIZON*. This Court has personal jurisdiction over BP America, because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

C.    BP p.l.c. is a British Public Limited Company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the world-wide business operating under the "BP" logo. BP p.l.c. operates its various business divisions, such as the "Exploration & Production" division in which BP Exploration and BP America fall, through vertical business arrangements. BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally. This Court has general jurisdiction over BP p.l.c. pursuant to Louisiana's Long-Arm General Jurisdiction Provision (13 Louisiana Statute § 3201(B)), in combination with Rule 4(k)(l)(A) of the Federal Rules of Civil Procedure. BP p.l.c. does business in Louisiana, has had continuous and systematic contacts with Louisiana (and the U.S. more generally). This Court also has specific jurisdiction over BP p.l.c. pursuant to Louisiana's Long-Arm Specific Jurisdiction Provision (13 Louisiana Statute § 3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.

11.    Halliburton Energy Services, Inc. ("Halliburton") is a Delaware Corporation with its principal place of business in Houston, Texas. Halliburton is registered to do and does business in the State of Louisiana. Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations onboard the *DEEPWATER HORIZON*, as well as onshore engineering support for those operations. Halliburton was responsible for the provision of technical advice about the design, modeling, placement and testing of the cement that was

used in the Macondo Well at and before the time of the Macondo Well blow-out. Halliburton was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil. Through its division Sperry Drilling Services (f/k/a Sperry Sun Drilling Services), Halliburton Energy Services, Inc. was responsible for mud logging personnel and equipment on the *DEEPWATER HORIZON*, including down-hole drilling tools. Halliburton and Sperry Drilling Services' mud logging personnel were responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations. This Court has personal jurisdiction over Halliburton because Halliburton is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

12.    Cameron International Corporation f/k/a Cooper-Cameron Corporation ("Cameron") is a Delaware corporation with its principal place of business in Houston, Texas. Cameron is registered to do and does business in the State of Louisiana. Cameron manufactured, designed, supplied and/or installed the *DEEPWATER HORIZON*'s sub-sea emergency well-closure device known as a blowout-preventer ("BOP") and, at all pertinent time, contracted with Third-Party Plaintiff Transocean Deepwater Drilling, Inc. for the provision of the BOP which was installed at the Macondo Wellhead. This Court has personal jurisdiction over Cameron, because Cameron is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

13.    M-I, LLC ("M-I") is a Delaware limited liability company with its principal place of business in Wilmington, Delaware. M-I was, at all relevant time, registered to do, and was doing, business in Louisiana and within this district. M-I also known as M-I Swaco, supplies drilling and completion fluids and additives to oil and gas companies in Louisiana and

elsewhere, providing pressure control, vessel instrumentation, and drilling waste management products and services. On the *DEEPWATER HORIZON*, M-I provided mud products, including drilling fluids and spacers, engineering services, and mud supervisory personnel, such as mud engineers and drilling fluid specialists, to manage the properties of those fluids in the Macondo Well. M-I employed, planned and/or supervised key fluid activities concerning the Macondo Well, such as the mud displacement that was occurring at the time of the April 20, 2010 Macondo Well blow-out. This Court has personal jurisdiction over M-I because M-I is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

14.    Art Catering, Inc. (hereinafter "Art Catering") is a foreign corporation doing business in the State of Louisiana.  It provided food services on the vessel.  Dominique Ussin is the only person who is filing a claim against Art Catering.

15.    The "Anadarko Entities" are as follows:

A.    Anadarko E & P Company, LP ("Anadarko E&P") is a Delaware limited partnership with its principal place of business in The Woodlands, Texas. Anadarko E&P is registered to do and does business in the State of Louisiana. Anadarko E&P is an oil and gas exploration production company. On various dates, BP and Anadarko E&P became co-lessees under the terms of a lease executed on or about May 8, 2008, by BP, as Lessee, and the United States, by and through the MMS, as Lessor, for the "Oil & Gas Lease of Submerged Lands under the Outer Continental Shelf Lands Act, Serial No. OCS-G 32306" (hereinafter the "Lease"), pertaining to "All of Block 252, Mississippi Canyon OSC Official Protraction Diagram, N.H. 16-10," which Lease became effective on June 1, 2008.

B.    Anadarko Petroleum Corporation Co. ("Anadarko") is a Delaware corporation with its principal place of business in The Woodlands, Texas. Anadarko is registered to do and does business in the State of Louisiana. Anadarko is an oil and gas exploration and production company. This Court has personal jurisdiction over Anadarko, because Anadarko is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana. On various dates, BP and Anadarko became co-Lessees under the terms of the Lease. As of April 20, 2010, and continuing until at least April 28, 2010, Anadarko held a 2.5% interest in the Lease.

16.    The "MOEX Entities" are as follows:

A.    MOEX Offshore 2007 LLC ("MOEX Offshore") is a Delaware corporation with its principal place of business in Houston, Texas. On various dates, BP and MOEX became co-Lessees under the terms of the Lease. As of April 20, 2010 and continuing until at least April 28, 2010, MOEX Offshore held a 10% interest in the Lease.

B.    MOEX USA Corporation ("MOEX USA") is a Delaware corporation with its principal place of business in Houston, Texas. MOEX USA is the parent company of MOEX Offshore 2007 LLC. This Court has general jurisdiction over MOEX USA pursuant to Louisiana's Long-Arm Specific Jurisdiction Provision (13 Louisiana Statute § 3201(B)), in combination with Rule 4(k)(l)(A) of the Federal Rules of Civil Procedure. MOEX USA does business in Louisiana, has continuous and systematic contacts with

Louisiana (and the U.S. more generally) and has been served with a Summons and individual Complaints that are the subject of the Master Claim in Limitation. This Court has specific jurisdiction over MOEX USA pursuant to Louisiana's Long-Arm Specific Jurisdiction Provision (13 Louisiana Statute § 3201(B), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure. The Third-Party Plaintiffs' Complaint arises out of conduct committed by MOEX USA directly or indirectly, by its agents, that caused injury or damage in Louisiana by an offense or quasi-offense committed through an act or omission outside of Louisiana, and MOEX USA regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana. These acts or omissions took place both before the BP Oil Spill and in the conduct of MOEX USA after the BP Oil Spill and attempted to contain the damage caused by the BP Oil Spill.

17. The "Weatherford Entities" are as follows:

   A. Weatherford U.S. L.P. ("Weatherford") is a Louisiana limited partnership but maintains its principal place of business in Houston, Texas, and at all pertinent time was registered to do, and was doing business, in Louisiana and within this District. Weatherford designed and manufactured, marketed, sold and/or distributed the casing components such as the float collar, shoe, and centralizers and provided the personnel and equipment for running the casing and casing components into the well bore. This

Court has personal jurisdiction over Weatherford because Weatherford is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

B.    Weatherford International, Inc. ("Weatherford International") is a Delaware corporation with its principal place of business in Houston, Texas. Weatherford International designed and manufactured, marketed, sold and/or distributed the casing components such as the float collar, shoe, and centralizers and provided the personnel and equipment for running the casing and casing components into the well bore.

18.    Dril-Quip, Inc. ("Dril-Quip") is a Delaware corporation which maintains its principal place of business in Houston, Texas. Dril-Quip, Inc. was involved with providing wellhead systems to the *DEEPWATER HORIZON*, including the Macondo Well that suffered the Incident of April 20, 2010 and subsequently led to the BP Oil Spill. This Court has personal jurisdiction over Dril-Quip, Inc., because Dril-Quip, Inc. is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

## II.

## JURISDICTION

19.    This Courts' jurisdiction in general maritime law and Jones Act claims is well established. However, in a Jones Act case, the concurrent right of a state court's jurisdiction is also well established and afforded protection under the Savings to Suitors' Clause of the U.S. Constitution.

20.    Plaintiffs herein rightfully chose the State District Court in Houston, Harris County, Texas to maintain their Jones Act claim and were wrongfully removed.  While Plaintiffs

strongly contend that Louisiana state law does not govern any of their claims, if the Court finds that Louisiana state law governs certain claims, this Court has subject matter jurisdiction concerning those claims.

21.     Plaintiffs recognize this Court's desire to streamline this piece of litigation and its desire to "hold off" remanding these Plaintiffs at this moment. For these reason, Plaintiffs are respectfully waiting for the time when this Court remands Plaintiffs to their rightful court. In essence, Plaintiffs should have **_never_** been removed and **_never_** transferred here.   It was previously filed in *a County of proper venue*.  This Court does have venue of MDL No. 2179.

### III.

### FACTUAL SUMMARY

<u>Employment Allegations</u>

22.     On April 20, 2010, Transocean Deepwater, Inc. employed Douglas Harold Brown, Christopher Choy and Brent Mansfield as Jones Act seamen and members of the crew of a semi-submersible mobile drilling unit known as the *DEEPWATER HORIZON*.

23.     On April 20, 2010, Art Catering employed Dominique Ussin as a Jones Act seaman and a member of the crew of a semi-submersible mobile drilling unit known as the *DEEPWATER HORIZON*.

24.     Transocean Deepwater, Inc. controlled the details of Ussin's work.   Transocean told the cooking crew when to cook and what to cook.

25.     Transocean provided Ussin food and lodging.

26.     On information and belief, Transocean provided Ussin's supplies and equipment. As a result, Ussin was Transocean's borrowed servant.

27.     Transocean was also Ussin's Jones Act employer.

---

28.    At all pertinent times herein, including on or about April 20, 2010, Transocean Entities were the owners, managing owners, owners *pro hac vice,* charters, supervisors and/or operators of the oil rig *DEEPWATER HORIZON* and participated in the *DEEPWATER HORIZON's* offshore oil drilling operations at the location known as "Macondo" in the Gulf of Mexico located about 50 miles southeast of Venice, Louisiana.

29.    The *DEEPWATER HORIZON* was a $560,000,000 dynamically-positioned, semi-submersible deepwater drilling vessel put into service in February 2001.

30.    It was a vessel within the meaning of the Jones Act and General Maritime Law.

31.    At all material times, including April 20, 2010, the *DEEPWATER HORIZON* was in navigation in navigable waters off the Louisiana coast within the Court's jurisdiction.

32.    At all times pertinent hereto, the *DEEPWATER HORIZON* was owned by Transocean and leased to BP Exploration & Production, Inc. for drilling exploratory wells at the Macondo prospect site.

33.    As part of their agreement with BP, Transocean provided employees, contractors, and other officials who assisted Halliburton Energy Services, Inc., the company engaged as the cementing advisor and cement product and equipment provider for the Macondo well in their oil exploration and drilling activities at the Macondo site.

34.    On or about April 20, 2010, during drilling operations at the Macondo site, a blowout, explosions, and fire occurred aboard the *DEEPWATER HORIZON* which resulted in the sinking of the vessel and an oil spill (the "Spill"), that has caused, and will continue to cause, devastating damage.

35.    The subject incident was caused by no fault of Plaintiffs and was caused solely by the negligence of the Defendants as more fully set forth herein.

36.     On April 20, 2010, Douglas Harold Brown, Christopher Choy, Brent Mansfield and Dominique Ussin were performing their respective duties on-board the vessel, *DEEPWATER HORIZON.*

37.     Douglas Harold Brown, Christopher Choy, Brent Mansfield and Dominique Ussin, at all times pertinent, were where they were ordered to be and performing the duties and functions they were instructed and obliged to perform pursuant to the directives of their respective employers.

**A Series of Reckless Decisions Leading Up To The Blowout**

38.     At the time of the blowout, drilling at Macondo was months behind schedule and over budget, and Transocean and BP repeatedly chose to violate industry guidelines and government regulations, and ignore warnings from their own employees and contractors on board the vessel to reduce costs and save time.

39.     Before the blowout, Transocean and BP made and/or acquiesced to a host of reckless decisions concerning well design, cementing, and integrity testing that prioritized speed and cost-savings over safety and industry best practices.

40.     Transocean chose and/or acquiesced to BP's choice of a "long string" casing system as opposed to a "liner/tieback" design, which would have provided more barriers against blowouts. Transocean and BP knew that the long string design was a risky option and that it was especially inappropriate for a well as difficult as Macondo.

41.     Transocean chose and/or acquiesced to BP's choice of metal casings, which they knew or should have known might collapse under the high pressure surrounding the well.

42.     Transocean decided and/or acquiesced to BP's decision to use only six centralizers (which are used to ensure that the casing is centered in the well), despite their

knowledge that the use of too few centralizers presented a severe risk that the cement job would fail to create a proper seal and cause a gas flow problem.   Weatherford failed to make Transocean and BP use the correct number of centralizers and failed to run a proper computer generated simulation related to the centralizers.

43.     Transocean, Halliburton, and MI also decided and/or acquiesced to BP's decision not to use a "bottoms up" circulation of drilling mud which would have allowed for testing the mud for gas influx, release of gas pockets, and removal of debris from the bottom of the well so that the cement would not become contaminated. A bottoms up circulation could have revealed the severity of the situation at Macondo before disaster struck.

44.     Transocean further acquiesced to the faulty cementing job performed by Halliburton, despite its actual or constructive knowledge that Halliburton's foam cement slurry design would be unstable.

45.     Defendants had actual and/or constructive knowledge before the spill that a negative pressure test indicated that the cement had failed to form a seal at the casing nearest the hydrocarbon reservoir. Defendants, however, elected to ignore the ominous testing results, and continue with the plan to seal the well as if the cement job had been a success.

46.     Transocean, Halliburton, and BP also decided and/or acquiesced to the decision to cancel a crucial cement bond log test, in violation of industry standard and MMS regulation. The cement bond log test would have determined the integrity of the cement job.

47.     Transocean, Weatherford, and BP also decided and/or acquiesced to the decision not to deploy the casing hanger lockdown sleeve, which ties down the top of a well and provides an extra layer of protection against a blowout, and would have prevented the wellhead seal from being blown out by pressure from below, as it ultimately was on April 20, 2010.

48.     BP, M-I, and Transocean also decided and/or acquiesced to the decision to use an abnormally large quantity of mixed and untested spacer material, which confounded the results of later pressure tests and adversely affected the functioning of the blowout preventer, a subsea device installed for the purpose of closing the well in the event of an emergency, which was at all material times herein, an appurtenance of the vessel and part of its equipment.

49.     Defendants also decided and/or acquiesced to the decision to perform simultaneous operations on the *DEEPWATER HORIZON* in an effort to expedite the project, which caused rig workers to become distracted and fail to take heed of the alarming signs of imbalance in the well. A few hours after the mud displacement process began at noon, Transocean and BP began a four-hour offload of mud to the nearby supply vessel M/V *Damon Bankston.* There is no evidence that Defendants had any reason to perform these activities during the mud displacement process other than time savings.

**The Final Hours – The Blowout, Explosions, Fire, and Spill**

50.     Pressure data from the vessel in the two-hour period before the explosions, during the process of displacing drilling mud with seawater, should have put Defendants on notice that there was a problem and that pressure was building in the wellbore, yet they completely ignored this additional red flag and simply carried on displacing the drilling mud. At 8:52 p.m., the pumps displacing the mud with seawater were slowed, but instead of flow out of the well decreasing as expected, it increased — a clear "red flag" indicating that hydrocarbon pressure from the reservoir below was pushing the mud out of the well faster than the seawater that was supposed to be displacing the mud was being pumped in. Yet Defendants appear to have completely ignored this red flag and simply carried on with the mud displacement process. Pressure data should have caused Defendants to shut down operations.

51.     Transocean and BP's policies and instructions regarding well control procedures in emergencies addressed relatively small influxes, and were therefore woefully inadequate to provide guidance to the crew as the mud spewed out of the riser. At 9:41 p.m., the vessel crew reacted to the flowing mud by diverting it from the well into the mud-gas separator, a device used to separate gas out of the drilling fluid and vent it safely into the air in the event of a kick; this only exacerbated the disaster, because the venting pipes on the mud-gas separator vented gas downwards toward the vessel, spreading gas all over the vessel and overwhelming the separator entirely. As a result, at 9:49 p.m., the *DEEPWATER HORIZON*'s drill floor ignited into a deadly blast of flames.

52.     Investigations and testimony suggest that the initial explosion on the *DEEPWATER HORIZON* on the night of April 20, 2010, was caused by an engine on the rig deck that sucked in the gas vapors blasting out of the well and began to rev uncontrollably.

53.     Gas sensors, which shut down rig engines when dangerous vapors are present, are critical to preventing explosions in such situations. However, the gas sensors on the *DEEPWATER HORIZON* were not operational on the night of the blowout.

54.     In addition, the air intake valves, which should have closed upon sensing gas entering the engine room, failed to operate.

55.     Moreover, the engine room was not equipped with a gas alarm system that could have shut off the power. The installation and maintenance of these sensors, alarms, and emergency shutdown systems were BP's and Transocean's responsibility.

56.     Eleven crewmembers were killed as the fire spread. The rig's Emergency Disconnect System, which was designed to separate the vessel from the riser in case of an emergency such as an explosion, failed to activate. As a result, gas continued to rush up

uncontrollably through the riser and feed the raging fire on the *DEEPWATER HORIZON* platform.

57.     The vessel burned for two days before it sank to the ocean floor. As it sank, the long riser pipe connecting it to the wellhead on the seafloor bent and broke, causing the blown-out well to spew oil into the Gulf waters at a rate of tens of thousands of barrels per day.

58.     The *DEEPWATER HORIZON* Study Group found no evidence that any of the rig workers or onshore employees directly involved with the Macondo well had formal training or qualifications in risk assessment and management of complex systems such as was found aboard the *DEEPWATER HORIZON*.

**The Failure of the Poorly-Maintained Blowout Preventer and Cameron's, Transocean's, and BP's Knowledge of its Defects, Deficiencies, and Vulnerabilities Before the Blowout**

59.     Immediately after the explosion, desperate rig workers tried in vain to activate the BOP, which had been installed at the wellhead on the sea floor early in the drilling process to obstruct an uncontrolled gas or oil surge in just such an emergency.

60.     The BOP was equipped with a "blind shear ram," which, when activated, was supposed to shear the drill pipe and seal the wellbore. Closure of the blind shear ram was the only way to isolate the well at the BOP.

61.     There were two emergency methods available to rig personnel to close the blind shear ram from the vessel. One was a high-pressure closure of the blind shear ram, and the other was the emergency disconnect sequence (EDS). Both methods could be activated by pushing buttons on the BOP control panel on the vessel, and both required communication between the vessel and the BOP through multiplex cables running from the vessel to the BOP. The fire and explosions onboard the *DEEPWATER HORIZON* disabled both of these methods, because the

multiplex cables were not protected against explosions or fire; hence, the rig workers were unable to communicate with the BOP.

62.     Transocean's subsea supervisor, Christopher Pleasant, pressed the EDS button after the explosion, but the EDS failed to initiate, indicating that the explosion and fire damaged the multiplex cables to the extent that the communication line and electrical power necessary to initiate these functions was no longer available to rig workers.

63.     The BOP was also equipped with two other emergency methods of sealing the wellbore: the automatic mode function ("AMF", or "dead man switch"), and activation by remotely operated vehicles (ROVs) on the seafloor using the "hot stab" or autoshear functions.

64.     The AMF sequence activates the blind shear ram to shear the drill pipe and seal the wellbore in the event of a catastrophic failure of the riser. It is initiated if certain conditions, including the loss of electrical power, communications and hydraulic power, are met. At least one of the BOP's control pods must be operational for the AMF sequence to function. Each of the conditions necessary to initiate the AMF sequence were certainly met when the unprotected multiplex cables and hydraulic conduit hose were damaged by explosions and/or fire; however, because both of the pods had insufficient battery charge and one pod had a failed solenoid valve, neither pod was capable of completing an AMF sequence.

65.     Transocean's and BP's BOP maintenance records from 2001 to 2010 indicate that the control pod batteries were changed far less frequently than the manufacturer's recommended annual replacement. Unlike the solenoid valve failure, the BOP's diagnostic function did not measure battery charge, all the more reason for Transocean and BP to change the batteries frequently to avoid failure. The records indicate that in December 2007, the batteries in one of the pods were fully depleted when the BOP was brought to the surface.

66.     After the explosions, as the vessel was burning on the surface, emergency responders sent ROVs to the sea floor to attempt to close the blind shear ram using the "hot stab" or autoshear functions. An ROV performs a hot stab by injecting hydraulic fluid into dedicated ports on the BOP, bypassing the usual methods for activating BOP functions like the blind shear ram. Several hot stab attempts to close the blind shear ram failed due to insufficient hydraulic pressure. Over the course of these events, several leaks were discovered in the BOP's hydraulic system, as well as incorrect hydraulic plumbing from the ROV intervention panel to the pipe rams, which was likely the result of aftermarket BOP modifications.

67.     Ultimately, six leaks were discovered in the hydraulic system of the BOP. Transocean and BP were aware of at least two, but likely were aware of almost all of these leaks prior to April 20, 2010. One such leak was discovered as early as February 2010, but was never repaired or otherwise addressed. Also, there was no indication that the AMF and ROV intervention systems were tested at the surface, as required by Transocean and BP testing policy prior to the BOP's deployment on the well.

68.     Cameron, Transocean, and BP were also aware of the aftermarket modifications that hindered the emergency responders' ability to activate the BOP via hot stab procedures. In addition to the incorrect aftermarket hydraulic plumbing, they had switched out one of the *DEEPWATER HORIZON's* variable bore rams with a test ram. However, because they failed to update the BOP's schematic diagram to reflect the aftermarket changes, in violation of 29 C.F.R. § 1910.119, which requires, inter alia, up-to-date process and safety system equipment drawings as a part of basic process safety management, emergency responders spent a day futilely trying to close a variable bore ram, not knowing it had been replaced with a useless test part.

69.     Despite rig workers' efforts just after the blowout, and emergency engineers' efforts in the weeks after the blowout and sinking, the *DEEPWATER HORIZON's* blind shear ram never successfully sealed the well, and investigations since the blowout have been unable to determine why it failed to do so.

70.     At the time of the disaster, BP and Transocean were certainly aware that in addition to increasing the risk of blowouts, deep-sea drilling also increases the risk of BOP failure. Despite being aware of the risk of the BOP failing at greater depths, Transocean and BP did not install backup BOP activation systems, backup BOPs or other secondary redundant precautionary measures available to protect the vessel, its workers, Plaintiffs, and the environment from the catastrophic results of a well blowout.

71.     Inasmuch as all of the methods available to seal the well by way of the BOP rely on a properly-functioning blind shear ram, it is critical that a BOP be equipped with redundant features in the event the blind shear ram fails. This is particularly true since blind shear rams are vulnerable to a "single-point failure," meaning that if just one of the small shuttle valves that carry hydraulic fluid to the ram blades jams, the BOP will be unable to seal the well. In a 2000 report on the *DEEPWATER HORIZON's* BOP, consultants attributed 56 percent of the BOP's "failure likelihood" to this one small valve. Indeed, evidence suggests that when the crew attempted to activate the *DEEPWATER HORIZON*'s BOP's blind shear ram, the blades could not cut the drill pipe because one or more of the shuttle valves leaked hydraulic fluid.

72.     Transocean and BP failed to ensure the testing, if any, of the *DEEPWATER HORIZON's* BOP was comprehensive, reviewed, and verified, and further failed to check and verify the BOP's entire operating and control system, including but not limited to, checking for

leaks at ROV connection points, and verifying the functionality of the AMF, autoshear, or ROV "hot stab" connection points.

73.     Moreover, during drilling operations at Macondo, the *DEEPWATER HORIZON's* BOP was out of certification and long overdue for extensive maintenance and repair. It had not undergone a thorough series of maintenance checks since 2005, despite the significant problems uncovered within the device during that inspection. Moreover, although the BOP's manufacturer required that the device undergo testing by the manufacturer every five years, the *DEEPWATER HORIZON's* BOP had not been inspected by its manufacturer since 2000.

**Defendants' Knowledge of Other Safety, Operational, Equipment, and Maintenance Issues on the *DEEPWATER HORIZON* Before the Blowout**

74.     Prior to the blowout, Transocean and BP had actual and/or constructive knowledge of significant problems related to the *DEEPWATER HORIZON's* equipment and maintenance, including the electronic alarm systems, and the ballast systems used to stabilize the vessel in the water.

75.     Prior to the blowout, Transocean and BP had actual knowledge, based on an independent equipment assessment they had commissioned, that the *DEEPWATER HORIZON* had significant deficiencies in at least 36 pieces of "critical equipment items" that could "lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment."

76.     The investigators also found problems with the vessel's ballast system that they noted could directly affect the stability of the ship. The vessel also had a malfunctioning pressure gauge and multiple leaking parts. The report faulted the decision to use a type of sealant "proven to be a major cause of pump bearing failure."

77.    The equipment assessment commissioned by Transocean echoed the results of a similar BP-commissioned audit conducted in September 2009, which found that Transocean had "overdue planned maintenance considered excessive — 390 jobs amounting to 3,545 man hours [of needed maintenance work]."

78.    In addition, in the weeks before the disaster, the vessel experienced power blackouts, computer glitches and a balky propulsion system. In some cases, Transocean's officers even purposely overrode or disabled vital safety mechanisms.

79.    Rig-wide electrical failures had occurred two or three times before the blowout, and the driller's control chair had lost power just a few days prior to the blowout. The primary computer used to control all vessel drilling functions routinely crashed and had to be restarted, interfering with workers' ability to monitor well data. One of the vessel's thrusters, an underwater propeller that helps the floating vessel move and stabilize itself in the water, had been "having problems" for eight months prior to the blowout.

80.    Further, the computerized system used to monitor routine maintenance aboard the vessel was not working optimally because glitches from a recent computer system migration had not yet been resolved. Sometimes the computer called for maintenance to be done on equipment that did not exist aboard the vessel, while some pieces of equipment that were aboard the vessel and in need of maintenance were not registered by the computer.

81.    Transocean and BP bypassed or disabled key safety systems on the vessel, including a gas safety valve and the fire alarm system, that were intended to monitor for fire and explosive and toxic gases, with utter disregard for the safety ramifications.

82.    Had Transocean and BP not disabled the alarm systems, the system would have sounded before the explosion, shut down all potential ignition sources, and activated the drilling

vessel's emergency disconnect system, which would have prevented the explosion and saved the lives of the 11 vessel workers who perished and prevented the multiple personal injuries resulting from the disaster.

83.     When the *DEEPWATER HORIZON* lost power during the blowout, none of the backup or emergency generators that were onboard to provide power to alarm and safety systems in just such an emergency were working. There was no general alarm, no internal communication, and no power to the vessel's engines.

84.     Without power, the crew was also unable to engage the Emergency Disconnect System that would have halted the flow of gas fueling the fire on the vessel, and many other alarm and safety systems were rendered silent and useless.

85.     In a confidential worker survey conducted on the *DEEPWATER HORIZON* in the weeks before the disaster, workers voiced concerns about poor equipment reliability, and one worker noted that the vessel had not once in its nine-year career been taken to dry dock for necessary repairs. As he stated, "we can only work around so much." Another worker described Petitioners' policy of running equipment ragged before making even the bare minimum of repairs. As he explained, "[r]un it, break it, fix it. … That's how they work."

86.     The *DEEPWATER HORIZON* disaster was "entirely preventable," according to one of the world's leading experts on oil well management, Dr. Nansen Saleri. "There are many … redundant elements in a robust safety management system," Saleri said. "The first line of defense is not ever to let that kind of pressure build up. The reason this happened was a series of bad decisions about the well that are human-based and that completely disregarded the risks." At bottom, "[t]he whole episode was systemic failure on a grand scale."

**The Drilling Defendants' Actions**

87.     BP, Transocean, Halliburton, and M-I are collectively referred to herein as the "Drilling Defendants."

88.     Prior to the Spill, Drilling Defendants had actual and/or constructive knowledge that their safety performance during offshore drilling operations was poor. Transocean CEO Steven L. Newman admitted prior to the Spill that "we have to improve our safety performance." Just a month before the Spill, in response to "a series of serious accidents and near-hits within the global organization," Transocean commissioned a broad review of the safety culture of its North American operations, including the *DEEPWATER HORIZON*.

89.     Also prior to the Spill, Drilling Defendants had actual and/or constructive knowledge of significant problems related to the *DEEPWATER HORIZON*'s equipment and maintenance, including problems with the vessel's BOP, electronic alarm systems, ballast systems used to stabilize the vessel in the water, and other significant deficiencies that could "lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment." These equipment and maintenance problems are discussed more fully below.

90.     Even if Drilling Defendants' equipment and operations inspection reports were ostensibly in compliance with MMS regulations, reports have surfaced that oil companies often authored their own inspection reports, submitting them for rubber-stamping by the MMS. Thus any seeming compliance with MMS inspection report regulations lacks credibility and does not protect Drilling Defendants' actions.

91.     For the behind-schedule and over-budget Macondo well, Drilling Defendants chose a vulnerable well design with relatively few barriers against the ever-present risk of

hydrocarbon blowouts because the safer option — which had been part of their original well design and was recommended by their contractors — would have taken longer to complete and would have cost up to an additional $10 million.

92.     Drilling Defendants were aware that the long string design was risky.  The BP Forward Review Plan identified several arguments against using the long string casing design, including the high risk of a failed cement job, the inability to comply with MMS regulations, and the need to verify the cement job with a cement bond log test and most likely perform remedial cement job(s).

93.     The long string casing design was especially inappropriate for a difficult and kick-prone well like Macondo. Documents show that BP had originally planned to use the safer liner/tieback design, but rewrote the drilling plan just weeks before the disaster — against the advice of its contractors and its own employees — because the project was behind schedule and over budget. Internal BP emails from late March, 2010 acknowledged the risks of the long string design but chose it as the primary option because it "saves a lot of time…at least 3 days," "saves a good deal of time/money," and is the "[b]est economic case."

94.     Despite the known and documented operational risks and advantages to the respective well design options, one or more of the Drilling Defendants chose (or acquiesced to the choice) to install the long string casing instead of the safer liner/tieback design. There is no evidence that there was any motivation behind that decision other than the desire to save time and cut costs on the behind-schedule and over-budget well.

95.     Drilling Defendants also made a risky choice for the casing pipe material itself, using metal well casings that raised concerns from their own engineers. Federal investigators cited internal documents showing that as early as 11 months prior to the blowout, BP engineers

worried that the metal casings BP wanted to use might collapse under the high pressure at the bottom of the well. Senior drilling engineer Mark E. Hafle warned other BP employees that "I have seen it happen so know it can occur." Using the metal casings also violated BP's own safety policies and design standards. Nevertheless, the riskier metal casings were used after special permission was granted by BP supervisors. The internal reports do not explain why BP allowed for such a risky departure from its own safety standards, nor why the other Drilling Defendants allowed BP to use unsafe casings inappropriate for use in the highly pressurized environment in the Macondo well bore.

96.    In addition to the casing-related problems, the Weatherford-manufactured float collar installed on the final section of casing may have failed to seal properly, which could have allowed hydrocarbons to leak into the casing, contributing to the April 20, 2010 blowout.

97.    A float collar is a component installed near the bottom of the casing string on which cement plugs land during the cementing job. A check-valve assembly fixed within the float collar works like a one-way valve, allowing drilling fluids or cement to be pumped in one direction through the valve, but preventing backflow of the fluids or cement when pumping is stopped, and preventing any influx of hydrocarbons below the float collar from rising farther up the casing. Failure of the Macondo well's float collar would have allowed hydrocarbons to flow up through the casing, towards the riser and the *DEEPWATER HORIZON* at the surface, contributing to the blowout and the subsequent explosions, fire, sinking, and Spill.

98.    To properly prevent backflow of fluids or hydrocarbons into the casing, a float collar must be "converted," or closed after installation. Prior to conversion, an "auto-fill tube" holds the float collar's one-way check valves open so that mud can flow through without having to be pumped through with high force that could damage the formation –especially important

when working in brittle formations like those at the bottom of the Macondo well. A float collar is converted by partially blocking the bottom of the autofill tube, which essentially pops the autofill tube out of the check valves, allowing them to close.

99.     Drilling Defendants installed the Macondo well's float collar after the final casing was installed in the well. When they attempted to convert the float collar, however, there seemed to be some blockage preventing the mud circulation that would have completed the conversion. The drilling vessel crew made nine attempts to re-establish circulation by increasing environment in the Macondo well bore.

100.    In addition to the casing-related problems, the Weatherford-manufactured float collar installed on the final section of casing may have failed to seal properly, which could have allowed hydrocarbons to leak into the casing, contributing to the April 20, 2010 blowout.

101.    Drilling Defendants also cut corners — again despite multiple warnings from their employees and contractors — with the number of centralizers used on the last piece of casing pipe.

102.    Another questionable decision made by one or more of the Drilling Defendants was the failure to fully circulate the drilling mud through the entire length of the well before beginning the cementing job.

103.    Creating solid cement seals on a well is delicate, precise work, and among the most critical tasks to ensure the integrity and safety of the well. Nevertheless, after cutting corners on well design and the number of centralizers, and incomprehensibly skipping the bottoms up circulation, Drilling Defendants made even more cost-cutting, careless decisions about the crucial cementing work in the Macondo well.

104.    Drilling Defendants knew or should have known that poor cementing increases the risk of a blowout.   Drilling Defendants also knew or should have known that careless, ineffective, negligent, or reckless cementing work by Halliburton caused an August 2009 blowout at the Montara well in the Timor Sea off the coast of Australia. During that incident, a sequence of events almost identical to those at Macondo led to a similarly disastrous blowout, and a spill that gushed oil for ten weeks, causing environmental damage across a 200-mile radius.

105.    The Drilling Defendants used the wrong type of cement.

106.    After having made risky choices on well design, casing choice, the number of centralizers, skipping the bottoms up circulation, and using an unstable cement slurry, all of which sharply increased the risk that the cement job would fail, BP and Transocean then made the unfathomable decision to cancel the "cement bond log" test, which would have checked the integrity of the completed cement job by using an imaging tool to gauge the thickness of the cement, and to determine if the cement was properly bonded to the casing and the rock formations surrounding the well.

107.    Given the insufficient number of centralizers, the failure to run a bottoms up mud circulation prior to cementing, and the results of Halliburton's and BP's own simulations, the risk of a failed cement job at Macondo was already high, making the strength and integrity of the seal assembly at the wellhead — the second and final barrier against a blowout — paramount. Yet here again BP made a decision based on time and money rather than well, worker, and environmental safety: it did not deploy the casing hanger lockdown sleeve that would have prevented the wellhead seal from being broken by pressure from below, as it likely was on April 20, 2010.

108.    On the morning of April 20, 2010, the day of the blowout, BP informed M-I drilling fluid specialist Leo Lindner that the mud displacement would be more substantial than usual, displacing the top 8,367 feet of mud in the riser and drilling string, instead of the typical 300 feet. In his congressional testimony, Lindner did not mention why BP was displacing almost 28 times the usual amount of heavy mud, nor did he say that he questioned the decision, despite its atypicality.

109.    Lindner calculated a mud displacement plan according to BP's specifications, including the suspension of the displacement procedure partway through to allow for pressure testing of Halliburton's recently completed cement job. Lindner testified that he distributed copies of his mud displacement plan to BP, Transocean, and M-I employees on the drilling vessel; thus some, if not all, of the Drilling Defendants were aware of and complicit in BP's plan to displace an unusually large amount of mud from the well, without the added safety of the casing hanger lockdown sleeve, and beginning before the cement had even fully set and been pressure tested.

110.    There were anomalies in the pressure testing, which should have resulted in the Drilling Defendants stopping the job.

111.    During the mud displacement process, two or more of the Drilling Defendants, specifically including BP and M-I, used an unconventional fluid mixture — and an unusually large volume of it — as "spacer" fluid. This novel composition and amount of fluid may have interfered with the negative pressure test results and/or caused damage or clogging in the BOP.

**Lease Agreements**

112.    On June 1, 2008, BP acquired a ten-year lease from the MMS to search for hydrocarbon reservoirs at the Macondo prospect site in Mississippi Canyon Block 252, 48 miles off the coast of Louisiana.

113.    Before BP could begin operations at the Macondo site, federal regulations required BP to submit an Exploration Plan ("EP") demonstrating that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservation practices, and would not cause undue or serious harm or damage to human or marine health, or the coastal environment. 30 C.F.R. §§ 250.201, 250.202.

114.    Once the EP and drilling permits for Macondo were approved, BP then entered into an Operating Agreement with Anadarko, Anadarko E&P, and MOEX Offshore, as described paragraph above.

115.    The Operating Agreement defined the roles and responsibilities of the three joint leaseholders, including a series of checks and balances regarding health, safety, and environment issues in which the non-operational leaseholders Anadarko, Anadarko E&P, and MOEX Offshore were to receive significant information from BP regarding those issues and had the right to demand further information, as well as to call for meetings on those subjects and conduct their own inspections of the *DEEPWATER HORIZON* vessel.

116.    As a condition to acquiring their leasehold interests in the Macondo prospect, BP required Anadarko, Anadarko E&P, and MOEX Offshore to execute BP's well plan and Authorizations for Expenditure (AFEs) for Macondo. This put Anadarko, Anadarko E&P, and MOEX Offshore on notice of the following relevant provisions of that well plan: (a) location; (b) the anticipated time necessary to conclude the operation; (c) total depth and target zones; (d) the

proposed drilling and completion plans, including the casing program and directional details; (e) details of all coring, logging, and other evaluation operations conducted; (f) information about the drilling rig to be used. The AFEs informed Anadarko, Anadarko E&P, and MOEX Offshore about the financial aspects of the well plan.

117.    The Operating Agreement also granted Anadarko, Anadarko E&P, and MOEX Offshore the rights to suggest their own proposed well plans for drilling exploratory and appraisal wells within the Macondo prospect, to place their own personnel on key drilling and well development teams, to receive substantial information and data about operations (including Insite real-time well data) on an ongoing basis, to call meetings with BP and other parties regarding any aspect of the Macondo prospect, and the right of unanimous approval of all press releases regarding the prospect.

118.    Moreover, a November 2009 amendment to the Operating Agreement gave Anadarko, Anadarko E&P, and MOEX Offshore the right to conduct "health, safety, and environmental inspection[s]" with a "right of access to activities and operations" on the rig, as well as to access BP's files, audits, and statistics on health, safety, and environmental issues.

# IV.

## CAUSES OF ACTION

119.    All claims are governed by general maritime law, including product liability claims.  General maritime law establishes a standard of care.  For the reasons stated in this pleading, all parties breached that standard, which caused Plaintiffs' injuries.

120.    Plaintiffs' claims against the Transocean Entities are also governed by the Jones Act, which establishes a standard of care.  For the reasons stated in this pleading, Transocean breached that standard, which caused Plaintiffs' injuries.

121.    While it is obvious that Louisiana State Law does not govern Plaintiffs' claims, in the event that the Court finds that Louisiana law applies, Plaintiffs alternatively assert a state law negligence claim against all Defendants.  Louisiana law establishes a standard of care.  For the reasons stated in this pleading, all parties breached that standard, which caused Plaintiffs' injuries, if the Court finds that Louisiana law applies.

122.    While it is obvious that Louisiana state law does not govern Plaintiffs' claims, in the event that the Court finds that it does, Plaintiff asserts a negligence and strict liability products liability claimed on the Louisiana Products Liability Act (in addition to a products liability claim under general maritime law) against:

    a.  Cameron (concerning its defective BOP)

        i.  There were several characteristic in the BOP that were unreasonably dangerous under the Louisiana Product Liability Act, including that it was insufficient to sheer casing, operate a deep ocean depths, had no back up system or dead man mechanism, and for all other reasons stated in the various bundle pleadings.

        ii.  These defects were unreasonably dangerous in construction and composition of the BOP and existed at the time it left Cameron's facility.  The BOP deviated from Cameron's performance standards and from other products manufactured by others.

        iii.  The BOP was defectively designed pursuant to Section 2800.56 for the foregoing reasons and there were alternative designs available.  Cameron would have faced little burden to implement those changes in comparison to the effect of its defective design.

---

    iv. The BOP was also unreasonable dangerous because of inadequate warnings based on the foregoing.

b. Halliburton (cement)

    i. There were characteristics of the cement that were unreasonably dangerous under the Louisiana Product Liability Act, including that it was prone to not cure sufficiently or stop gas from escaping the well head.

    ii. These defects were unreasonably dangerous in construction and composition of the cement and existed at the time it left Halliburton's facility. The cement deviated from Halliburton's performance standards and from other products manufactured by others.

    iii. The cement was defectively designed pursuant to Section 2800.56 for the foregoing reasons and there were alternative designs available. Halliburton would have faced little burden to implement those changes in comparison to the effect of its defective design.

    iv. The cement was also unreasonable dangerous because of inadequate warnings based on the foregoing.

123. In the further alternative, Plaintiffs, reiterating and re-alleging each and every allegation set forth in this complaint, as though set forth herein in *extensor*, avers the applicability of the doctrine of *Res Ipsa Loquitur.*

124. Plaintiffs assert the following additional facts concerning why the various defendants are negligent.

Transocean Entities

125. Transocean Entities were negligent in the following non-exclusive particulars:

a.  The Transocean Entities owed and breached duties of ordinary and reasonable care in connection with its drilling operations owed and breached duties to the Plaintiffs to guard against and/or prevent the risk of an oil spill;

b.  The Transocean Entities failed to exercise reasonable care while participating in drilling operations to ensure that a blow-out and subsequent oil spill did not occur;

c.  The Transocean Entities failed to exercise reasonable care to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *DEEPWATER HORIZON* in the event of a blow-out;

d.  The Transocean Entities failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico;

e.  The Transocean Entities chose and implemented a long string well design instead of a liner/tie back design;

f.  The Transocean Entities used pipe material that it knew, and which it recognized before the blow-out, might collapse under high pressure;

g.  The Transocean Entities used too few centralizers to ensure that the casing was centered into the well bore;

h.  The Transocean Entities failed to implement a full "bottoms-up" circulation of mud between the running of the casing and the beginning of the cement job;

i.  The Transocean Entities failed to require comprehensive lab testing to ensure the density of the cement, and did not account for the results of the negative pressure

testing;

j.   The Transocean Entities cancelled the cement bond log test that would have determined the integrity of the cement job;

k.   The Transocean Entities failed to deploy the casing hanger lock down sleeve to prevent the well head seal from being blown out by pressure from below;

l.   The Transocean Entities used an abnormally large quantity of mixed and untested spacer fluid;

m.   The Transocean Entities failed to train its employees in the management of complex systems like those found on the *DEEPWATER HORIZON*;

n.   The Transocean Entities required simultaneous operations in an effort to expedite the project making it difficult to track fluid volumes in the wellbore;

o.   The Transocean Entities failed to take appropriate action to avoid or mitigate the BP Oil Spill;

p.   The Transocean Entities failed to timely bring the oil release under control;

q.   The Transocean Entities failed to provide a competent crew;

r.   The Transocean Entities failed to properly supervise its employees;

s.   The Transocean Entities failed to properly follow drilling protocols and policies, proper well monitoring and control practices;

t.   The Transocean Entities failed to implement a proper well plan;

u.   Other acts of negligence which will be shown more fully at trial.

126.   Plaintiffs also assert an unseaworthy claim based on the all the allegations in this pleading. In addition, the Transocean Entities did not insure that the *DEEPWATER HORIZON* and all of her parts and equipment were properly serviced and reasonably fit for their intended

purpose. Nor did they insure that the *DEEPWATER HORIZON* was properly manned and supplied for the job it was intended to complete including not providing a crew that was properly trained to perform the duties assigned.

127.    In the weeks before the blowout, the *DEEPWATER HORIZON* suffered power outages, computer glitches, and a balky propulsion system. In some cases, vital safety mechanisms and alarms were purposely overridden or disabled. When the Macondo well blew out, the *DEEPWATER HORIZON*'s shoddy maintenance facilitated a cascade of failures of multiple emergency systems, exacerbating the disaster.

128.    An equipment assessment commissioned by Transocean in April, 2010, just before the blowout, revealed many key components on the *DEEPWATER HORIZON* had not been fully inspected since 2005, and at least 36 components and systems on the vessel were in "bad" or "poor" condition, which "may lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment." The equipment assessment also found problems with the vessel's ballast system that they noted could directly affect the stability of the ship. The assessment found a malfunctioning pressure gauge and multiple leading parts, and also faulted the decision to use a type of sealant "proven to be a major cause of pump bearing failure."

129.    In addition to the above, the allegations, contentions and causes of action which have been asserted against Transocean by the various Plaintiffs/Claimants in the B1 Master Claim/Master Complaint, the First Amended B1 Master Claim/Master Complaint, or other Complaints, filed as a result of the Incident of April 20, 2010 and/or the BP Oil Spill are incorporated herein for more particular reference, as if set forth herein.

BP Entities

130.   The BP Entities are negligent for the following reasons:

a.   BP owed and breached duties of ordinary and reasonable care in connection with its drilling operations owed and breached duties to the Claimants to guard against and/or prevent the risk of an oil spill;

b.   BP failed to exercise reasonable care while participating in drilling operations to ensure that a blow-out and subsequent oil spill did not occur;

c.   BP failed to exercise reasonable care to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *DEEPWATER HORIZON* in the event of a blow-out;

d.   BP failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico;

e.   BP chose and implemented a long string well design instead of a liner/tie back design;

f.   BP used pipe material that it knew, and which it recognized before the blow-out, might collapse under high pressure;

g.   BP used too few centralizers to ensure that the casing was centered into the well bore;

h.   BP failed to implement a full "bottoms-up" circulation of mud between the running of the casing and the beginning of the cement job;

i.   BP failed to require comprehensive lab testing to ensure the density of the cement,

and did not account for the results of the negative pressure testing;

j.     BP cancelled the cement bond log test that would have determined the integrity of the cement job;

k.     BP failed to deploy the casing hanger lock down sleeve to prevent the well head seal from being blown out by pressure from below;

l.     BP used an abnormally large quantity of mixed and untested spacer fluid;

m.     BP failed to train its employees in the management of complex systems like those found on the *DEEPWATER HORIZON*;

n.     BP required simultaneous operations in an effort to expedite the project, making it difficult to track fluid volumes in the wellbore;

o.     BP failed to take appropriate action to avoid or mitigate the BP Oil Spill;

p.     BP failed to timely bring the oil release under control;

q.     BP failed to properly train and/or supervise its crew and other employees;

r.     BP failed to ensure that its crew worked in a safe and prudent manner;

s.     BP failed to provide Plaintiffs with a safe place to work, and requiring Plaintiffs to work in unsafe conditions;

t.     BP failed to exercise due care and caution;

u.     Drilling at a depth which it was not permitted to drill at; and

v.     Other acts of negligence which will be shown more fully at trial.

131.     In addition to the above, the allegations, contentions and causes of action which have been asserted against BP by the various Plaintiffs/Claimants in the B1 Master Claim/Master Complaint, the First Amended B1 Master Claim/Master Complaint, or other Complaints, filed as a result of the Incident of April 20, 2010 and/or the BP Oil Spill are incorporated herein for more

particular reference, as if set forth herein.

Anadarko E&P, Anadarko, MOEX Offshore and MOEX USA

132.    As to Anadarko E&P, Anadarko, MOEX Offshore and MOEX USA, the Plaintiffs contend that they should have known of the presence of hydrocarbons in the well on the evening of April 20, 2010 and failed to warn the drilling vessel crew of the imminent blow-out so that the drilling vessel crew could take evasive action.

133.    In addition to the above, the allegations, contentions and causes of action which have been asserted against Anadarko E&P, Anadarko, MOEX Offshore and MOEX USA by the various Plaintiffs/Claimants in the B1 Master Claim/Master Complaint, the First Amended B1 Master Claim/Master Complaint, the B3 Master Complaint, or other Complaints, filed as a result of the Incident of April 20, 2010 and/or the BP Oil Spill are incorporated herein for more particular reference, as if set forth herein.

Cameron

134.    As to Cameron, Plaintiff asserts the following:

a.      Cameron, as designer, manufacturer, and supplier of the *DEEPWATER HORIZON*'s BOP, owed and breached duties of ordinary and reasonable care in connection with the design, manufacture and supply of the BOP;

b.      Cameron failed to ensure and verify that the BOP as designed and manufactured was suitable for the types of drill pipe and casing assembly design which would reasonably be used during the *DEEPWATER HORIZON*'s drilling and exploration operations;

c.      Cameron designed the BOP such that it was vulnerable to a single-point failure;

d.      Cameron failed to install a back-up activation system for the BOP;

e.     Cameron failed to provide adequate warnings, instructions and guidelines on the permissible uses, modifications and applications of the BOP;

f.     Cameron failed to effectively design the BOP with a back-up activation system, or provide adequate warnings, instructions, and/or guidelines on the permissible uses, modifications and applications of the BOP;

g.     Cameron's BOP was defective in design because its emergency modes of system operation did not provide a fully-independent means of closing the BOP which rendered the BOP abnormally dangerous;

h.     Cameron's BOP was defectively designed and/or manufactured because its blind shear rams were vulnerable to the failure of a single shuttle valve carrying hydraulic fluid to the ram blades;

i.     Cameron's BOP was defectively designed and/or manufactured because it failed to operate as intended, if at all;

j.     Cameron's BOP was defectively designed and/or manufactured such that it did not operate as intended to prevent or minimize blow-outs;

k.     Cameron's BOP was in a defective condition and unreasonably dangerous;

l.     The BOP left Cameron's control in a defective condition; and

m.     The BOP left Cameron's control with over 260 known defects and failure modes.

135.   In addition to the above, the allegations, contentions and causes of action which have been asserted against Cameron by the various Plaintiffs/Claimants in the B1 Master Claim/Master Complaint, the First Amended B1 Master Claim/Master Complaint, or other Complaints, filed as a result of the Incident of April 20, 2010 and/or the BP Oil Spill are incorporated herein for more particular reference, as if set forth herein.

Weatherford

136.   Plaintiff asserts the following allegations:

a.      Weatherford, as designer, manufacturer and supplier of the *DEEPWATER HORIZON*'s float collar, owed and breached duties of ordinary and reasonable care in connection with the design, manufacture and supply of the float collar;

b.      Weatherford designed and manufactured a float collar that failed to seal properly and which allowed hydrocarbon back-flow into the casing;

c.      The float collar manufactured by Weatherford did not seal properly;

d.      Weatherford's float collar failed to operate properly or at all;

e.      Weatherford's float collar was defective because it failed to operate as intended; and

f.      Weatherford's float collar was in a defective condition and unreasonably dangerous.

137.   In addition to the above, the allegations, contentions and causes of action which have been asserted against Weatherford by the various Plaintiffs/Claimants in the B1 Master Claim/Master Complaint, the First Amended B1 Master Claim/Master Complaint, or other Complaints, filed as a result of the Incident of April 20, 2010 and/or the BP Oil Spill are incorporated herein for more particular reference, as if set forth herein.

Halliburton Entities

138.   Plaintiff asserts the following allegations:

a.      Halliburton, through its Division, Sperry Sun Drilling Services, owed and breached duties of ordinary and reasonable care in connection with the drilling

operations owed and breached duties to the Claimants to guard against and/or prevent the risk of an oil spill;

b.      Halliburton, through its Division, Sperry Sun Drilling Services, failed to exercise reasonable care in conducting its cementing, testing, analysis, and monitoring of the Macondo Well;

c.      Halliburton, through its Division, Sperry Sun Drilling Services, was negligent by failing to use a full "bottoms-up" circulation of mud between the running of the casing and the beginning of the cement job;

d.      Halliburton, through its Division, Sperry Sun Drilling Services, failed to properly monitor the Macondo Well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations;

e.      Halliburton, through its Division, Sperry Sun Drilling Services, was negligent in failing to require comprehensive lab testing to ensure the density of the cement;

f.      Halliburton, through its Division, Sperry Sun Drilling Services, was negligent in failing to heed the results of negative pressure testing;

g.      Halliburton, through its Division, Sperry Sun Drilling Services, was negligent in using a foam cement slurry design would be unstable.

h.      Halliburton, through its Division, Sperry Sun Drilling Services, was negligent in cancelling, or acquiesced in the cancellation of, the cement bond log test; and

i.      Halliburton, through its Division, Sperry Sun Drilling Services, failed to deploy, or acquiesced in the decision not to deploy, the casing hanger lock-down sleeve to prevent the wellhead seal from being blown out by pressure from below.

139.    In addition to the above, the allegations, contentions and causes of action which have been asserted against Halliburton by the various Plaintiffs/Claimants in the B1 Master Claim/Master Complaint, the First Amended B1 Master Claim/Master Complaint, or other Complaints, filed as a result of the Incident of April 20, 2010 and/or the BP Oil Spill are incorporated herein for more particular reference, as if set forth herein.

<u>M-I, LLC</u>

140.    As to M-I, the following allegations, among others, have been made by the Plaintiffs/Claimants:

    a.     M-I owed and breached duties of ordinary and reasonable care in connection with the drilling operations owed and breached duties to the Claimants to guard against and/or prevent the risk of an oil spill; and

    b.     M-I failed to provide, control and monitor the mud and spacer solutions in a reasonably safe manner.

    c.     Failing to monitor pressure of wells;

    d.     Failing to use adequate weight drilling fluid to prevent gas escape;

    e.     Failing to follow industry protocol and procedure during plug completion phases;

    f.     Use of sea water as weight and gas control medium during drilling and completion processes;

    g.     Attempting to carry out drilling operations with substandard and defective cement casing.

141.    In addition to the above, the allegations, contentions and causes of action which have been asserted against M-I by the various Plaintiffs/Claimants in the B1 Master Claim/Master Complaint, the First Amended B1 Master Claim/Master Complaint, or other

Complaints, filed as a result of the Incident of April 20, 2010 and/or the BP Oil Spill are incorporated herein for more particular reference, as if set forth herein.

Dril-Quip

142.    As to Dril-Quip, the following allegations, among others, have been made by the Plaintiffs/Claimants:

a.    Dril-Quip participated in drilling operations related to the Macondo Well and failed to exercise reasonable care while participating in these drilling operations;

b.    Dril-Quip failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources were available to prevent and/or mitigate the effects of an oil spill; and

c.    Dril-Quip provided wellhead systems for the Macondo Well which suffered the blow-out which subsequently led to the BP Oil Spill which failed to operate, were improperly designed, or possessed product defects.

143.    In addition to the above, the allegations, contentions and causes of action which have been asserted against Dril-Quip by the various Plaintiffs/Claimants in the B1 Master Claim/Master Complaint, the First Amended B1 Master Claim/Master Complaint, or other Complaints, filed as a result of the Incident of April 20, 2010 and/or the BP Oil Spill are incorporated herein for more particular reference, as if set forth herein.

**V.**

**GROSS NEGLIGENCE**

144.    Plaintiffs further assert that the incident forming the basis of this suit was proximately caused by the willful acts and omissions and gross negligence in the performance of the duties of the Defendants.   For the reasons stated above, Defendants' conduct was grossly

negligent in that it was carried out with a flagrant disregard for the rights of others and with actual awareness on the part of Defendants that their actions may result in serious bodily injury and/or death.

## VI.

## MAINTENANCE AND CURE

145.    Transocean Entities named above have an absolutely, non-delegable duty under the general maritime law to provide Plaintiffs with maintenance and cure and found from the date they were rendered unfit for duty until they reach maximum cure, in which they have not yet reached, subject to a credit for all amounts already paid in maintenance and cure.

146.    Art Catering, Inc. has an absolutely, non-delegable duty under the general maritime law to provide Dominique Ussin with maintenance and cure and found from the date he was rendered unfit for duty until he reaches maximum cure, in which he has not yet reached, subject to a credit for all amounts already paid in maintenance and cure.

147.    Defendants Transocean Entities and Art Catering have breached their absolute duty to provide Plaintiffs with adequate maintenance and cure.   As a result of Transocean Entities and Art Catering's unreasonable failure to provide adequate maintenance and cure, Plaintiffs are entitled to recover for damages and expenses incurred, including but not limited to, damages for prolongation or aggravation of injuries; pain and suffering and additional expenses. Plaintiffs would also show that they found it necessary to engage attorneys to represent them in the maintenance and cure action and they are entitled to reasonable attorney's fees for the collection of the maintenance and cure benefits due to them as well as punitive damages for the willful, arbitrary and capricious denial of adequate benefits.

148.    Plaintiffs have not reached maximum medical cure.

## VII.

### INJURIES

149.    This incident or explosion caused Plaintiffs severe and permanent injuries, and they have and will continue to indefinitely suffer bodily injuries, mental anguish, distress, depression, and the loss or diminishment of enjoyment of life, wage losses and/or the impairment of earning capacity, and other damages and injuries that will be shown at trial.  And, because of this incident, they will incur medical, hospital and other expenses.

150.    Douglas Harold Brown is currently suffering from post-traumatic stress disorder, depression, anxiety, orthopedic injuries, and other injuries that will be shown at trial.

151.    Christopher Choy is currently suffering from post-traumatic stress disorder, depression, anxiety, and other injuries that will be shown at trial.

152.    Brent Mansfield is currently suffering from post-traumatic stress disorder, depression, anxiety, closed head injury, skull fracture, fractured sinuses, orthopedic injuries and other injuries that will be shown at trial.

153.    Dominique Ussin is currently suffering from post-traumatic stress disorder, depression, anxiety, orthopedic injuries and other injuries that will be shown at trial.

## VIII.

### DAMAGES

154.    Plaintiffs are entitled to recover the full measure of their damages caused by this incident and which damages include the following, but not exclusively, as follows:

a.    Physical and mental injuries, pain and suffering, mental anguish, distress and fright, past and future;

b.    Loss of earnings, past and future;

c.      Loss of fringe benefits;

d.      Loss of found, past and future;

e.      Loss of earning capacity;

f.      Loss of or impairment of the enjoyment of life;

g.      Mental anguish, grief, depression, anxiety and suffering;

h.      Medical and related expenses past and future;

i.      Punitive and/or exemplary damages;

j.      Other items of damages that may be shown through discovery or at trial;

k.      All appropriate relief under the law, in admiralty, or in equity;

l.      Prejudgment interest on all sums awarded from the date of loss until paid;

m.      Post-judgment interest on all sums awarded from date of judgment until paid; and

n.      All court and litigation costs allowed by law.

## IX.

## JURY REQUEST

155.    Jury trial requested.

## X.

## PRAYER FOR RELIEF

156.    WHEREFORE, Plaintiffs Douglas Harold Brown, Christopher Choy, James Brent Mansfield and Dominique Ussin, subject to their continued objection to objection to jurisdiction, inclusion in the MDL No. 2179, and Motions to Remand, pray that after due proceedings are had, the Court render judgment in their favor and against the defendants and their respective liability insurers, if any for compensatory, punitive, exemplary, and other appropriate damages,

together with prejudgment interest from the date of loss until paid, and for all costs of these proceedings. Finally, Plaintiffs pray for such further orders and relief to which they are entitled.

Respectfully submitted,

GORDON, ELIAS & SEELY, L.L.P.

R. Todd Elias
Federal:                    21551
Texas Bar No.:              00787427
Steve Gordon
Texas Bar No. :             08207980
Jeff Seely
Texas Bar No.:              24033172
1811 Bering Drive, Suite 300
Houston, Texas  77057
Telephone:                  713-668-9999
Facsimile:                  713-668-1980

## CERTIFICATE OF SERVICE

I certify that the above and foregoing Amended Complaint will be served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in Accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System which will send a notice of electronic filing in accordance with the procedures established in MDL 217, on this 4th day of March, 2011.

R. Todd Elias