ELECTRONICALLY FILED
1/17/2011 3:59 PM
CV-2010-902180.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

SYNOVUS BANK;                                        :
                                                     :
    Plaintiff,                    :
                                                     :
v.                                                   :       CIVIL ACTION NO.: CV-2010-902180.00
                                                     :       [JURY TRIAL REQUESTED]
PLASH ISLAND RESORT, LLC;                            :
KEITH ROTENBERRY; LEWIS M.                           :
LOCKHART; RICHARD D. ROWE;                           :
NIKOLAOS MANKIDES; RICKEY L.                         :
LOCKHART; WILLIAM R. IVEY;                           :
MICHAEL W. McCAIN;                                   :
CHRISTOPHER ANDREW                                   :
YARBOROUGH; ESTATE OF GARY                           :
L. MARCRUM, SR., DONA S.                             :
MARCRUM, ADMINISTRATOR;                              :
MARCRUM DEVELOPMENT, LLC;                            :
                                                     :
    Defendants.                   :

---

PLASH ISLAND RESORT, LLC;                            :
                                                     :
    Defendant/Third Party Plaintiff, :
                                                     :
v.                                                   :
                                                     :
BP P.L.C.; BP AMERICA INC.; BP                       :
PRODUCTS NORTH AMERICA INC.;                         :
BP AMERICA PRODUCTION                                :
COMPANY; BP EXPLORATION &                            :
PRODUCTION INC.; ANADARKO                            :
PETROLEUM CORPORATION;                               :
ANADARKO E&P COMPANY, LP;                            :
MOEX OFFSHORE 2007, LLC;                             :
TRANSOCEAN LTD.; TRANSOCEAN                          :
DEEPWATER, INC.; TRANSOCEAN                          :
OFFSHORE DEEPWATER DRILLING,                         :
INC.; TRANSOCEAN HOLDINGS,                           :
LLC; TRITON ASSET LEASING                            :
GMBH; HALLIBURTON ENERGY                             :
SERVICES, INC.; M-I, LLC;                            :
DRILQUIP, INC.; CAMERON                              :
INTERNATIONAL CORPORATION                            :

F/K/A COOPER CAMERON             :
CORPORATION; JOHN AND JANE       :
DOES A-Z; and CORPORATIONS A-Z.  :
                                 :
    Third Party Defendants.      :

## THIRD PARTY COMPLAINT

Third party complainant Plash Island Resort, LLC brings this Third Party Complaint against the above-referenced third party defendants. As a result of the *Deepwater Horizon Oil Spill*, third party complainant has suffered injuries and damages, including but not limited to, loss of property value and loss of income in the millions of dollars. The conduct of the third party defendants directly contributed to and resulted in the plaintiff's claims against defendants/counterclaim plaintiffs as well as the counterclaims against plaintiff. There exist numerous common issues of fact and law concerning the condition of the subject property and its value which are central to the issues between all parties.

## INTRODUCTION

1. This third party complaint (the "Action") is brought for actual, compensatory, and punitive damages arising from the *Deepwater Horizon oil spill* in the Gulf of Mexico (hereinafter the "Oil Spill") which resulted in substantial harm to property originally owned by Plash Island Resort, LLC (hereinafter the "Third Party Plaintiff") and its members. The Oil Spill stemmed from an oil well blowout - a sudden, uncontrolled flow of high pressure gas, mud and oil that shot up from the deep water oil reservoir on April 20, 2010 – and subsequent resulting catastrophic explosion on *the Deepwater Horizon ("Deepwater Horizon"* or "Oil Rig"), a semi-submersible off-shore drilling rig used in the exploration and production of sub-sea oil wells that was situated approximately 40 miles southeast of the Alabama coast.

2. This massive and uncontrolled discharge of oil has polluted the waters and natural resources in the Gulf of Mexico and continues to threaten territorial waters, shores, bayous, and waterways of Alabama. Significant quantities of oil have floated to the ocean's surface; moreover, enormous subsurface plumes of oil have been identified in the deep waters of the Gulf of Mexico. Defendant BP has admitted that the volume of the Oil Spill may have reached 60,000 barrels (2,500,000 gallons) per day. Others estimate the volume of the Oil Spill may have reached even greater levels. This Oil Spill grew to massive proportions, and has already damaged the Gulf of Mexico's marine and coastal environments, natural resources, estuarine areas, and tourism industry resulting in the injuries and damages sought herein.

3. Complainant owned investment property in Alabama's coastal region at the time of the oil spill. The property owned by Complainant, which is the subject matter of the claims and counterclaims between Plaintiff and Complainant, suffered direct harm as a result of the Oil Spill thereby resulting in the harm complained of by Complainant as well as Plaintiff. Complainant has suffered and continues to suffer injuries and damages, including but not limited to diminution of property value and loss of income in the millions of dollars, as the result of the *Deepwater Horizon Oil Spill's* harm to their property.

4. This Action seeks to compensate Complainant for their injuries and damages suffered, including but not limited to, diminution of property value and loss of income, as the result of the *Deepwater Horizon Oil Spill.*

5. Jurisdiction is proper in this Court and under 28 U.S.C. § 1332(a) because complete diversity exists among the parties and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interests and costs.

6. Venue is proper in this district under 28 U.S.C. §1391(a)(2).

## PARTIES

7. Complainant, Plash Island Resort, LLC, is a limited liability company organized under the laws of the State of Alabama, with its principal place of business in Baldwin County, Alabama.

8. Complainant owned investment property located in Baldwin County, Alabama. Due to the Oil Spill and its polluting effects, Complainant has sustained and continues to sustain injuries and damages, including but not limited to tortious physical invasion of their property by contaminants which have, and continue to, cause significant diminution of property value and loss of income.

9. Defendant BP p.l.c. is an international corporation doing business in the United States with its corporate headquarters at 1 St. James's Square, London, United Kingdom. Defendant BP p.l.c. maintains a corporate office in the United States at 501 Westlake Park Boulevard, Houston, Texas.

10. Defendant BP America Inc. is a BP p.l.c.-affiliated entity and a Delaware corporation with its principal place of business in Warrenville, Illinois.

10. Defendant BP Products North America Inc., is a BP p.l.c.-affiliated business entity and a Maryland corporation with its principal place of business in Houston, Texas.

12. Defendant BP America Production Company is a BP p.l.c.-affiliated business entity and a Delaware corporation with its principal place of business in Warrenville, Illinois.

13. Defendant, BP Exploration & Production Inc. is a BP p.l.c.-affiliated business entity and Delaware corporation with its principal place of business in Warrenville, Illinois.

14. Defendants BP America Inc., BP Products North America Inc., BP America *Production Company*, and BP Exploration & Production Inc. are wholly owned subsidiaries of the global parent corporation, BP p.l.c., and are referred to herein collectively as 'BP." Personal jurisdiction over the BP Defendants is proper because it has, *inter alia,* committed an offense or quasi offense committed through an act or omission done in whole, or in part, in Alabama, and has caused injuries to Complainant.

15. BP is a holder of a lease granted by the Minerals Management Service ("MMS"), a federal entity that divides the *Gulf of Mexico's seafloor* into rectangular "blocks," and then auctions the oil and gas drilling rights. BP, along with Defendants, Anadarko, Anadarko LP, and MOEX, was the holder of the Mississippi Canyon Block 252 lease, allowing it to drill for oil and perform oil-production related operations at the Macondo prospect lease where the Oil Spill originated. On April 20, 2010, Defendant BP was an operator of the *Deepwater Horizon.*

16. Defendant Anadarko Petroleum Corporation ("Anadarko") is a Delaware corporation with its principal place of business in The Woodlands, Texas. *Defendant Anadarko is an oil and gas exploration and production company that owns a 2.5% stake in the Macondo prospect lease* where the Oil Spill originated. Personal jurisdiction over Defendant Anadarko is proper because it has, *inter alia,* committed an offense or quasi offense committed through an act or omission done in whole or in part in Alabama, and has caused injuries to Complainant.

17. Defendant Anadarko E&P Company LP ("Anadarko LP") is a Delaware limited partnership with its principal place of business in The Woodlands, Texas. Defendant Anadarko is an oil and gas exploration and production company that owns a 22.5% stake in the Macondo prospect lease where the *Oil Spill originated.* Personal jurisdiction over Defendant Anadarko is

proper because it has, *inter alia*, committed an offense or quasi offense committed through an act or omission done in whole or in part in Alabama, and has caused injuries to Complainant.

18. Defendant MOEX Offshore 2007, LLC ("MOEX") IS a Delaware corporation with its principal place of business in Houston, Texas. Defendant MOEX holds a 10% stake in the Macondo prospect lease where the Oil Spill originated. Personal jurisdiction over Defendant MOEX is proper because it has, *inter alia*, committed an offense or quasi offense committed through an act or omission done in whole or in part in Alabama, and has caused injuries to Complainant.

19. Together, Defendants BP, Anadarko, Anadarko LP, and MOEX are the holders of a lease granted by the MMS, which allows for oil exploration, drilling, and production related operations on the Macondo prospect.

20. Defendants BP, Anadarko, Anadarko LP, and MOEX were parties to a joint operating agreement governing the operations of the Macondo prospect well.

21. Defendants Anadarko, Anadarko LP, and MOEX were informed of, involved in, participated in, and upon information and belief, had some level of control over BP's decisions and actions while Macondo prospect lease was explored and drilled, including, *inter alia*, the decisions regarding the use of casing and centralizers while drilling.

22. Defendant Transocean Ltd. is a Swiss corporation. Defendant Transocean Ltd. maintains substantial U.S. offices at 4 Greenway Plaza, Houston, Texas 77046. Defendant Transocean Ltd. is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon's* offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. Personal jurisdiction over Defendant Transocean Ltd. is proper because it has, inter alia, committed an offense or quasi offense

committed through an act or omission done in whole or in part in Alabama, and has caused injuries to Complainant.

23. Defendant Transocean Deepwater, Inc. is a Transocean Ltd. -affiliated entity and a Delaware corporation with its principle place of business in Houston, Texas. Defendant Transocean Deepwater, Inc. is an owner, managing owner, owner *pro hac vice,* and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon's* offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. Personal jurisdiction over Defendant Transocean Deepwater, Inc. is proper because it has, inter alia, committed an offense or quasi offense committed through an act or omission done in whole or in part in Alabama, and has caused injuries to Complainant.

24. Defendant Transocean Offshore Deepwater Drilling, Inc. is a Transocean Ltd.-affiliated entity and a Delaware corporation with its principle place of business in Houston, Texas. Defendant Transocean Offshore Deepwater Drilling, Inc. is an owner, managing owner, owner *pro hac vice,* and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon's* offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. Personal jurisdiction over Defendant Transocean Offshore Deepwater Drilling, Inc. is proper because it has, inter alia, committed an offense or quasi offense committed through an act or omission done in whole or in part in Alabama, and has caused injuries to Complainant.

25. Defendant Transocean Holdings, LLC is a Transocean Ltd.-affiliated entity and a Delaware limited liability company with its principle place of business in Houston, Texas. Defendant Transocean Holdings, LLC is an owner, managing owner, owner *pro hac vice,* and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon's* offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. Personal jurisdiction

over Defendant Transocean Holdings, LLC is proper because it has, inter alia, committed an offense or quasi offense committed through an act or omission done in whole or in part in Alabama, and has caused injuries to Complainant.

26. Defendant Triton Asset Leasing GmbH, is a Transocean Ltd.-affiliated entity and is a Swiss limited liability company with its principle place of business in Zug, Switzerland. Defendant Triton Asset Leasing GmbH is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon's* offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. Personal jurisdiction over Defendant Triton Asset Leasing GmbH. is proper because it has, inter alia, committed an offense or quasi offense committed through an act or omission done in whole or in part in Alabama, and has caused injuries to Complainant.

27. Defendants Transocean Ltd., Transocean Deepwater, Inc., Transocean Offshore Deepwater Drilling, Inc, Transocean Holdings, LLC, and Triton Asset Leasing GmbH are hereinafter referred to collectively as "Transocean." Upon information and belief, Transocean was operating, participating in, and providing employees, equipment, and operational support for drilling-related activities at the off-shore site of the *Deepwater Horizon,* as well as onshore activities and support the at all times relevant to the Oil Spill.

28. Defendant Halliburton Energy Services, Inc. ("Halliburton') is a Delaware corporation with its principal place of business in, Houston, Texas. Defendant Halliburton was engaged in drilling-related operations and support for the *Deepwater Horizon* both on and offshore. Personal jurisdiction over Defendant Halliburton is proper because it has, inter alia, committed an offense or quasi offense committed through an act or omission done in whole or in part in Alabama, and has caused injuries to Complainant.

29. Defendant M-I, LLC ("M-I") is a Delaware limited liability company with its principal place of business in Wilmington, Delaware. Defendant M-I is also known as "M-I SWACO." It supplies drilling and completion fluids and additives to oil and gas companies, providing pressure control, rig instrumentation, and drilling waste management products and services. M-I provided the drilling fluids, or "mud," for the well where the blowout and subsequent Oil Spill occurred .. Personal jurisdiction over Defendant M-I is proper because it has, inter alia, committed an offense or quasi offense committed through an act or omission done in whole or in part in Alabama, and has caused injuries to Complainant.

30. Defendant Dril-Quip, Inc. ("Dril-Quip") is a Delaware corporation and maintains its principal place of business in Houston, Texas. Defendant Dril-Quip was involved with providing wellhead systems for *Deepwater Horizon,* including the well that suffered the blowout that subsequently leading to the Oil Spill. Personal jurisdiction over Defendant Dril-Quip is proper because it has, inter alia, committed an offense or quasi offense committed through an act or omission done in whole or in part in Alabama, and has caused injuries to Complainant

31. Defendants BP, Anadarko, Anadarko LP, MOEX, Transocean, Halliburton, M-I, and Dril-Quip are collectively referred to herein as the "Drilling Defendants" as they were collectively and respectively involved in the drilling and exploration activities of the *Deepwater Horizon* and their actions caused and/or contributed to the Oil Spill.

32. Cameron International Corporation f/k/a Cooper Cameron Corporation ("Cameron") is a Delaware corporation with its principle place of business in Houston, Texas. Defendant Cameron manufactured, designed, supplied, installed and/or maintained a sub-sea device known as a blowout preventer ("BOP") installed and deployed at the wellhead at the location of the initial incident involving the *Deepwater Horizon* that failed to operate at the time of the initial

blowout, was improperly designed, not appropriate for the intended environment of use and/or possessed product defects. Personal jurisdiction over Defendant Cameron is proper because it has, inter alia, committed an offense or quasi offense committed through an act or omission done in whole or in part in Alabama, and has caused injuries to Complainant.

33. Defendants John and Jane Does A-Z are persons or entities whose identities and/or proper corporate names are currently unknown. All allegations and claims asserted herein against the "Drilling Defendants" are incorporated by reference against John and Jane Does A through Z. If necessary and appropriate, said John Does A through Z will be identified by proper name and joined in this action under the Rules of Civil Procedure when such identities are discovered.

34. Defendants Corporations A-Z are corporations or companies whose identities and/or proper corporate names are currently unknown. All allegations and claims asserted herein against the "Drilling Defendants" are incorporated by reference against Defendants Corporations A-Z. If necessary and appropriate, said Defendant Corporations A-Z be identified by proper name and joined in this action under the Rules of Civil Procedure when such identities are discovered.

## FACTUAL ALLEGATIONS

### The Process of Ultra-Deepwater Offshore Drilling

35. The process of ultra-deepwater offshore drilling generally involves several steps. First, seismic and/or magnetic surveys are undertaken to locate "traps," rock formations that may contain significant deposits of oil, natural gas, or other hydrocarbons.

36. Upon locating a "trap," oil rigs such as the *Deepwater Horizon* are positioned to drill the oil well at the site of the wellhead and prepare it for a production platform to move into place to recover crude oil.

37. Once an oil rig such as the *Deepwater Horizon* has been properly positioned, a wide-diameter hole is drilled into the seabed, generally to a depth of about 300 to 400 feet. This hole is known as a "pilot hole."

38. Once drilled, the pilot hole is "cased." "Casing" is a specific type of pipe used below the seabed for oil extraction.

39. The combination of drilling the pilot hole and casing is known as "spudding in."

40. The casing initially lowered into the pilot hole generally anchors a device known as the blowout preventer, or "BOP."

41. The BOP is an assembly of hydraulically operated valves that sense pressure. It is designed to prevent a blowout from reaching an oil rig. Its valves are mounted in a direction perpendicular to the anticipated flow of oil. The BOP is equipped with a series of different "rams" which can be utilized to close off the well in various situations, depending on the presence or absence of the drill stem or casing in the shaft. The BOP on this well was a 53-foot tall steel framed stack weighing 450 tons.

42. BOP devices generally close within 30 seconds of activation. A BOP's rams can be manually activated from the drill rig. Likewise, BOPs generally feature a deadman's switch, which is intended to activate the device's rams if electrical and/or hydraulic connections to the oil rig are severed.

44. BOP devices are also able to be activated by using remotely operated vehicles, or "ROYs", at the wellhead.

45. The BOP is positioned atop the wellhead by attaching successive pieces of pipe know as "marine riser" and then placing in on the seafloor.

46. Once on the seafloor, the BOP is fastened to the wellhead using ROYs.

47. Once the BOP is properly positioned and secured, the drill stem and any additional casing is then lowered down inside the marine riser and through the BOP.

48. As the drill stem is passed through the marine riser and BOP, drilling fluid known as "mud" is pumped down the center of the drill pipe. This "mud," a thick mixture of barite, water, clay, and chemicals, cools and lubricates the drill bit and suspends and carries drilled rock fragments to the surface as it flows upwards outside of the drill stem but inside the marine riser.

49. Mud is designed and formulated so that its density matches the ambient fluid and gas pressure conditions of the rock formations being drilled. This keeps the upward pressure of the oil and gas in those formations counterbalanced by exerting a column of weight down the hole to control against a possible blowout.

50. Another fluid, "spacer," is used to separate the mud from the seawater as it circulates in the well.

51. Once oil, natural gas, or other hydrocarbon reservoir is reached by the drilling apparatus, the casing is extended into it. This casing is then "capped" with a plug of cement.

52. A cementing contractor then places a temporary second cement plug in the shaft below the BOP.

53. Assuming the integrity of the well holds, and proper testing and analysis confirms the safety of cementing, casing, and other drilling activities previously undertaken, the riser is then disconnected from the BOP, and a permanent oil production platform is put into place.

**The Deepwater Horizon**

54. The *Deepwater Horizon* was a $560,000,000.00 ultra-deepwater, dynamically positioned semi-submersible oil drilling rig built by Hyundai Heavy Industries Co., Ltd. of South Korea.

55. The *Deepwater Horizon* was delivered to Defendant Transocean in February 2001.

56. At times relevant herein, the *Deepwater Horizon* was owned by Transocean but leased to Defendant BP for a term continuing through September 2013.

57. Defendant BP leased the *Deepwater Horizon* to drill exploratory wells at the Macondo prospect site leased to Defendants BP, Anadarko, Anadarko LP, and MOEX. The Macondo prospect is located in Mississippi Canyon Block 252 ("Macondo") in the Gulf of Mexico. As part of its agreement with Defendant BP, Defendant Transocean provided employees, contractors, and other officials who assisted Defendants BP, Anadarko, Anadarko LP, and MOEX, in their oil exploration and production activities at the Macondo prospect.

58. Defendants BP, Anadarko, Anadarko LP, and MOEX were parties to a joint operating agreement governing the operations of the Macondo prospect well, and Defendants BP Anadarko, Anadarko LP, and MOEX are jointly responsible for costs and liabilities arising out the operations at the Macondo prospect.

59. In February 2009, as part of obtaining the Macondo lease, Defendants BP, Anadarko, Anadarko LP, and MOEX filed a 52 page exploration and environmental impact plan for the Macondo Well, which stated that it was "unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities," and that in the event of an accident, the well's distance from the shore would mean that no significant adverse impacts would occur.

60. As a mobile offshore drilling unit, the *Deepwater Horizon* was utilized by the Drilling Defendants for, *inter alia,* drilling sub-sea wells for oil exploration and production in areas of depth in excess of 5,000 feet of water.

61. The Drilling Defendants started drilling the Macondo well on October 7, 2009, using the Marianas rig. This rig was damaged in Hurricane Ida on November 9, 2009. As a result, BP

and the rig operator, Transocean, replaced the Marianas rig with the *Deepwater Horizon*. Drilling with the *Deepwater Horizon* stared on February 6, 2010.

62. Prior to its destruction, the *Deepwater Horizon* was conducting drilling operations in excess of 22,000 feet 2,000 feet deeper than described in the BP Exploration Plan or allowed by any permits issued by the MMS to BP.

63. The *Deepwater Horizon* rig was expensive. Transocean charged BP approximately $500,000 per day to lease the rig, plus contractors' fees. BP targeted drilling the well to take 51 days and cost approximately $96 million.

64. The *Deepwater Horizon* was supposed to be drilling at a new location as early as March 8, 201 0. In fact, the Macondo well took considerably longer than planned to complete. By April 20, 2010, the day of the blowout, the rig was 43 days late for its next drilling location, which may have cost BP as much as $21 million in leasing fees alone. It also set the context for the series of decisions that BP made in the days and hours before the blowout.

### The Events Preceding the Oil Spill

65. Prior to the onset of the Oil Spill, Defendants BP, Transocean, Anadarko, Anadarko LP, and MOEX approved and/or acquiesced to the *Deepwater Horizon's* drilling plan.

66. In the weeks and months before the Oil Spill, the Drilling Defendants were engaged in exploring and drilling the Macondo prospect onboard and below the site positioned *Deepwater Horizon.*

67. These operations were experiencing delays. Upon information and belief, BP insisted that the Drilling Defendants increase the rate of their activities to expedite the placement of a permanent oil rig at the site to begin production. This emphasis on speed over safety led to errors

and omissions by the Drilling Defendants, which in turn caused and/or contributed to the initial explosion and subsequent Oil Spill.

68. For example, on April 9, 2010, the Drilling Defendants had largely finished the initial drilling of the last section of the well. The final section of the wellbore extended to a depth of approximately 18,360 feet below sea level, which was approximately 1,192 feet below the casing that had previously been inserted into the well.

69. At this point, the Drilling Defendants had to make an important well design decision: how to secure the final 1,192 feet of the well.

70. There were two primary options available to the Drilling Defendants. The first option involved hanging a steel tube called a "liner" from a liner hanger on the bottom of the casing already in the well and then inserting another steel liner tube called a "tieback" on top of the liner hanger.

71. The second option available to the Drilling Defendants involved running a single string of steel casing from the seafloor all the way to the bottom of the well.

72. The "Liner/Tieback Casing" (first option) provides advantage over full string casing (second option) with redundant barriers to annular flow. With a single string of casing, there are just two barriers to the flow of gas up the annular space that surrounds the casing: the cement at the bottom of the well and the seal at the wellhead.

73. In contrast, the "Liner/Tieback" option provides four barriers to annular flow: (1) the cement at the bottom of the well, (2) the hanger seal that attaches the liner to the existing casing in the well (3) the cement that secures the tieback on top of the liner, and (4) the seal at the wellhead. The Liner/Tieback option also takes more time to install, requiring several additional days to complete.

74. The Drilling Defendants were aware of the risks of the single casing approach. An undated "Forward Plan Review" that appears to be from mid-April recommended against the single string of casing because of the risks. According to this document, "Long string of casing ... was the primary option" but a "Liner..., is now the recommended option."

75. This Forward Review Plan noted that single string casing was risky because, *inter alia,* it could lead to the following:

    a. "Cement simulations indicate it is unlikely to be a successful cement job due to formation breakdown;"

    b. "Unable to fulfill MMS regulations of 500' of cement above top HC zone;"

    c. "Open annulus to the well head, with ... seal assembly as only barrier;" and

    d. "Potential need to verify with bond log, and perform remedial cement job(s)."

76. Conversely, the Forward Review Plan noted at least four advantages to using the liner option. These included:

    a. "Less issue with landing it shallow (we can also ream it down);"

    b. "*Liner hanger acts as second barrier for HC in annulus;*"

    c. "Primary cement job has slightly higher chance for successful cement lift;" and

    d. "Remedial cement job, if required, easier to justify to be left for later."

77. Despite the risks, one or more of the Drilling Defendants chose to install the single string of casing instead of a liner and tieback. The decision to run a single string of casing was made, on information and belief, to save time and reduce costs.

78. Defendant BP was aware of the decision to utilize the "long string" method, despite the abnormally dangerous risks associated with it.

79. Defendant Transocean was aware of the decision to utilize the "long string" method, despite the abnormally dangerous risks associated with it.

80. Defendant Halliburton was aware of the decision to utilize the "long string" method, despite the abnormally dangerous risks associated with it.

81. Defendant Anadarko was aware of the decision to utilize the "long string" method, despite the abnormally dangerous risks associated with it.

82. Defendant Anadarko LP was aware of the decision to utilize the "long string" method, despite the abnormally dangerous risks associated with it.

83. Defendant MOEX was aware of the decision to utilize the "long string" method, despite the abnormally dangerous risks associated with it.

84. Defendant M-I was aware of the decision to utilize the "long string" method, despite the abnormally dangerous risks associated with it.

85. Defendant Dril-Quip was aware of the decision to utilize the "long string" method, despite the abnormally dangerous risks associated with it.

86. Despite awareness of the dangers associated with using a single liner, the Drilling Defendants utilized a single liner to case the last 1,192 feet of the well without using a liner/tie back casing that would have provided redundant barriers to flow.

87. In utilizing the single liner casing, the Drilling Defendants saved time and between $7,000,000 and $10,000,000 dollars in costs.

88. Moreover, one or more of the Drilling Defendants failed to ensure that appropriate "centralizer" devices were used in the casing the well.

89. Centralizers are attachments that go around the casing as it begins lowered into the well to keep the casing in the center of the borehole. If the well is not properly centered prior to

the cementing process, there is increased risk that channels will form *in the cement that allow* gas to flow up the annular space around the casing.

90. The American Petroleum Institute's Recommended Practice 65 explains: "If casing is not centralized, it may lay near or against the borehole wall. .. .It is difficult, if not impossible, to displace mud effectively from the narrow side of the annulus *if casing is poorly centralized. This results in bypassed mud channels and inability to achieve zonal isolation.*

91. On or about April 15, 2010, BP notified one or more of the other Drilling Defendants that it was planning to use six centralizers on the final casing string at the Macondo well.

92. On or before April 20, 2010, one or more of the other Drilling Defendants was aware that use of only six centralizers posed a severe risk of *gas flow problems, channeling, and failure* of the well's cementing.

93. Defendant BP was aware of the decision to use of only six centralizers and that doing so posed a severe risk of gas flow problems and failure of the well's cementing.

94. Defendant Transocean was aware of the decision to use of only six centralizers and that doing so posed a severe risk of gas flow problems and failure of the well's cementing.

95. Defendant Halliburton was aware of the decision to use of only six centralizers and that doing so posed a severe risk of gas flow problems and failure of the well's cementing.

96. Defendant Anadarko was aware of the decision to use of only six centralizers and that doing so posed a severe risk of *gas flow problems and failure of the well's cementing.*

97. Defendant Anadarko LP was aware of the decision to use of only six centralizers and that doing so posed a severe risk of gas flow problems and failure of the well's cementing

98. Defendant MOEX was aware of the decision to use of only six centralizers and that doing so posed a severe risk of *gas flow problems and failure of the well's cementing.*

99. Prior to the *Deepwater Horizon* Oil Spill, two or more of the Drilling Defendants, including but not limited to Defendants Transocean, BP, Anadarko, Anadarko LP, and/or MOEX had actual and/or constructive knowledge of significant problems related to *Deepwater Horizon's* ballast system, the system responsible for keeping the rig afloat and stable.

100. Upon information and belief, these significant problems with the *Deepwater Horizon's* ballast system was a cause and/or contributing factor the sinking of the rig, which in turn caused, contributed to, and/or exacerbated the Oil Spill.

101. Prior to the *Deepwater Horizon* Oil Spill, two or more of the Drilling Defendants, including but not limited to Defendants Transocean, BP, Anadarko, Anadarko LP, and/or MOEX had actual and/or constructive knowledge of significant problems related to *Deepwater Horizon S* hydraulic relays that controlled the rig's watertight doors.

102. Upon information and belief, these problems with the *Deepwater Horizon's* watertight was a cause and/or contributing factor the sinking of the rig, which in turn caused, contributed to, and/or exacerbated the Oil Spill.

103. Furthermore, the Drilling Defendants also knew or should have known that ultra-deepwater drilling carried significant safety and environmental risks.

104. Prior to the *Deepwater Horizon* Oil Spill, two or more of the Drilling Defendants, including but not limited to Defendants Transocean, BP, Anadarko, Anadarko LP, and/or MOEX had actual and/or constructive knowledge that improving safety performance during offshore drilling operations was necessary. For example, prior to the Oil Spill, Mr. Steven L. Newman, chief executive of Defendant Transocean, admitted that "we have to improve our safety performance. "

105. Prior to the *Deepwater Horizon* Oil Spill, two or more of the Drilling Defendants, including but not limited to Defendants Transocean, BP, Anadarko, Anadarko LP, and/or MOEX had actual and/or constructive knowledge of dozens of deficiencies with the *Deepwater Horizon's* equipment.

106. Prior to the *Deepwater Horizon* Oil Spill, two or more of the Drilling Defendants, including but not limited to Defendants Transocean, BP, Anadarko, Anadarko LP, and/or MOEX had actual and/or constructive knowledge that *Deepwater Horizon* had significant deficiencies in at least 36 pieces of "critical equipment items."

107. Prior to the *Deepwater Horizon* Oil Spill, two or more of the Drilling Defendants, including but not limited to Defendants Transocean, BP, Anadarko, Anadarko LP, and/or MOEX had actual and/or constructive knowledge that the at least 36 critical equipment deficiencies on the *Deepwater Horizon* could "lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment."

108. In a 2007 study, the MMS expressed concerns that oil rig blowouts can be caused by ineffective and/or improper cementing work. Although the study noted that the overall risk of blowouts has been declining, it suggested that blowouts related to cementing work continued with some regularity, and most frequently in the Gulf of Mexico.

109. According to the 2007 study, cementing problems were associated with 18 of 39 blowouts that occurred between 1992 and 2006, and in 18 of the 70 blowouts that occurred from 1971 to 1991. Nearly all of the blowouts examined occurred in the Gulf of Mexico.

110. The Drilling Defendants knew or should have known that careless, ineffective, negligent, or reckless cementing work caused an August 2009 blowout in the Timor Sea. During

that incident, which shares similarities with the *Deepwater Horizon* Oil Spill, oil leaked from the Timor Sea site for ten weeks, causing damage over 200 miles from the well site.

111. According to the *Associated Press*, the MMS has implicated the cementing process as faulty or ineffective 34 times since 1978.

112. One way to ensure the viability of cementing work is to conduct a "cement bond log." A cement bond log is an acoustic test that is conducted by running a tool inside the casing after the cementing is completed. The cement bond log determines whether the cement has bonded to the casing and surrounding formations. If a channel that would allow gas flow is found, the casing can be perforated and additional cement injected into the annular space to repair the cement job.

113. Tommy Roth, a Halliburton Vice President of Cementing, has stated that BP should have conducted a cement bond log. According to Mr. Roth, "If the cement is to be relied upon as an effective barrier, the well owner must perform a cement evaluation as part of a comprehensive system integrity test."

114. *MMS regulations also appear to direct a cement bond log or equivalent test at the Macondo well.* According to the regulations, if there is an indication of an inadequate cement job, the oil company must "(1) Pressure test the casing shoe; (2) Run a temperature survey; (3) Run a cement bond log; or (4) Use a combination of these techniques." 30 CFR § 250.428.

115. One or more of the other Drilling Defendants failed to perform a cement bond log test on the subject well.

116. The decision not to conduct the cement bond log test was, on information and belief, driven by concerns about expense and time. The cement log would have cost $128,000 to complete. Moreover, Mr. Roth of Halliburton estimated that conducting the test would have

taken an additional 9 to 12 hours. Remediating any problems found with the cementing job would have taken still more time.

117. Gordon Aaker, Jr., P.E., a failure analysis consultant with the firm Engineering Services, LLP, retained by the U.S. House of Representatives Subcommittee on Oversight and Investigations, has opined that it was "'unheard of not to perform a cement bond log on a well using a single casing approach, and he described the decision not to conduct a cement bond log as "horrible negligence." Another independent expert consulted by the House of Representatives, John Martinez, P.E., has opined that "cement bond or cement evaluation logs should always be used on the production string."

118. The failure of the Drilling Defendants conduct adequate cement bond logs in critical sections of the *Deepwater Horizon's* well establishes an egregious lack of reasonable Quality Assurance and Quality Control procedures.

119. On April 1, 2010 Marvin Volek, an employee of Defendant Halliburton, indicated that the Drilling Defendants cementing procedures aboard the *Deepwater Horizon* "was against our best practices."

120. Another questionable decision by one or more of the Drilling Defendants was the failure to circulate fully the drilling mud in the well before cementing. This procedure, known as "bottoms up," involves circulating drilling mud from the bottom of the well all the way to the surface. Bottoms up has several purposes: it allows workers on the rig to test the mud for influxes of gas; it permits a controlled release of gas pockets that may have entered the mud; and it ensures the removal of well cuttings and other debris from the bottom of the well, preventing contamination of the cement.

121. The American Petroleum Institute's guidelines recommend a full bottoms-up circulation between running the casing and beginning a cementing job. The recommended practice states that "when the casing is on bottom and before cementing, circulating the drilling fluid will break its gel strength, decrease its viscosity and increase its mobility. The drilling fluid should be conditioned until equilibrium is achieved .... At a minimum, the hole should be conditioned for cementing by circulating 1.5 annular volumes or one casing volume, whichever is greater."

122. The April 15, 2010 operations plan for the *Deepwater Horizon* called for a full bottoms up procedure to "circulate at least one (1) casing and drill pipe capacity, if hole conditions allow." Nevertheless, upon information, and belief, the final procedure called for circulating just 261 barrels of mud, just a small fraction of the mud in the Macondo well.

123. Mr. Roth of Halliburton has stated that one reason for the decision not to circulate the mud could have been a desire for speed, as fully circulating the mud could have added a much as 12 hours to the operation.

124. Furthermore, on or about April 20, 2010, two or more of the Drilling Defendants, specifically including Defendants BP and M-I, inserted an abnormally large volume of "spacer" fluid in the wells BOP and the upper part of the well. In doing so, two or more of the Drilling Defendants, including Defendants BP and M-I, combined two disparate types of spacer fluid that M-I official Leo Linder indicated had not been previously used in together.

125. The combination of these two disparate types of spacer had not been used before April 20, 2010. Upon information and belief, despite a lack of the safety of using the mixture of this spacer admixture, and despite the abnormally large volume of mixed spacer, two or more of the Drilling Defendants, including Defendants BP and M-I, utilized this mixture because, upon

completion of operations, the mixed substances would could be disposed of into the ocean rather than having to dispose of the two separate substances as hazardous wastes, which would have been required without a mixture of the substances.

126. Upon information and belief, the use of an abnormally large the quantity of mixed spacer by two or more of the Drilling Defendants, including Defendants BP and M-I, adversely affected the functioning of the BOP.

127. Approximately four weeks before the blowout and onset of the Oil Spill, the Drilling Defendants, including but not limited to BP, Transocean, Anadarko, Anadarko LP, MOEX, and M-I, became aware of damage to the *Deepwater Horizon's* BOP. This included the intrusion of the drill pipe into the BOP, damaging the BOP's annular seal, a rubber gasket vital to the proper functioning of the device.

128. As a result of this failure, foreign materials including chunks of rubber broken away from the annular seal floated to the surface of the *Deepwater Horizon* and were observed by Defendants BP and Transocean, and upon information and belief, other Defendants herein.

129. In response to the discovery of pieces of the annular seal and other evidence in the drilling fluid, Defendants BP and Transocean failed to act to prevent or mitigate risk of the Oil Spill. The other Drilling Defendants were also aware of this discovery, and similarly failed to report this information to outside sources. One or more of the Drilling Defendants acted unreasonably by ignoring this evidence and continuing drilling operations.

130. In conjunction with their knowledge of the failure of the annular seal on the BOP device, Defendants BP and Transocean were also aware of inoperability of the pods used to control and belief, Defendants BP and Transocean were aware of failures in the BOP's battery system and power source.

131. The Drilling Defendants also failed to maintain and possess accurate safety system equipment drawings for the *Deepwater Horizon's* BOP devices.

132. The failure to maintain and possess accurate safety system equipment drawings for the *Deepwater Horizon's* BOP devices was in violation of 29 C.F.R. 1910.119, which requires, *inter alia, up-to-date* process and safety system equipment drawings as a part of basic process safety management.

133. Defendants Cameron, BP and Transocean, and one or more of the other Drilling Defendants, failed to ensure that the BOPs present on the *Deepwater Horizon* had sufficient built-in redundancy to eliminate sing-point failure modes.

134. Defendants Cameron, BP and Transocean, and one or more of the other Drilling Defendants, failed to ensure that redundant safety features, if any, in the BOPs present on the *Deepwater Horizon* were fully functional on and before April 20, 2010.

135. Defendants Cameron, BP and Transocean, and one or more of the other Drilling Defendants, failed to ensure that all leaks, foreseeable repairs, if any, and foreseeable modifications, if any, to the *Deepwater Horizon's* BOPs were performed, completed, and test with the rig's operations shutdown and the well secured.

136. Defendants Cameron, Defendants BP, Transocean, Anadarko, Anadarko LP, MOEX and one or more of the other Drilling Defendants, failed to ensure the testing, if any, of the *Deepwater Horizon's* BOPs were comprehensive reviewed and verified the BOPs' entire operating and control system including but not limited to checking for leaks at ROV connection points, and verifying the functionality of the deadman's switch, autoshear, or ROVs.

137. Defendant Cameron failed to ensure and verify that the BOPs it designed, manufactured, marketed and sold and which was present on the *Deepwater Horizon* was suitable

for the drill pipe and casing that would foreseeably be used during the *Deepwater Horizon's* drilling and exploration operations.

138. Defendants BP, Transocean, Anadarko, Anadarko LP, MOEX and one or more of the other Drilling Defendants, failed to ensure and verify that the BOPs present on the *Deepwater Horizon* were suitable for the drill pipe and casing Defendants BP, Transocean, Anadarko, Anadarko LP, and MOEX planned to use and/or were aware were being used in the well being drilled on the lease jointly controlled and operated by, *inter alia,* Defendants BP, Transocean, Anadarko, Anadarko LP, and MOEX.

139. Defendants BP, Transocean, Anadarko, Anadarko LP, MOEX and one or more of the other Drilling Defendants, failed to ensure that the BOPs present on the *Deepwater Horizon* possessed reasonably safe, adequate technology to prevent foreseeable blowouts, including but not limited to EDS technology for wireless control.

140. The Drilling Defendants knew or should have known that the threat of blowouts increases as drilling depths increase. The Drilling Defendants were drilling in 5,000 feet of water and to a total depth in excess 18,000 feet below the sea floor. Some sources indicate that the *Deepwater Horizon* may have been drilling in excess of its permitted depth.

141. The Drilling Defendants knew or should have known that on June 22, 2009, Mark E. Hafle, senior drilling engineer at BP, identified the significant risks of the collapse of the metal casing for the BOP under high pressure, such as that involved in the *Deepwater Horizon's* drilling activities.

142. The Drilling Defendants were also aware that ultra-deepwater drilling increases the risk and manifestation of product defects in the *Deepwater Horizon's* most critical blowout safety mechanism, the BOP.

143. The Drilling Defendants were aware of the risk of the BOP failing at the great depths in which the *Deepwater Horizon* was operating, yet neither the Drilling Defendants nor Defendant Cameron installed a backup BOP activation system or a backup BOP, nor provided adequate warnings, instructions, or guidelines on permissible uses, modifications, and applications of the BOP.

144. A 2004 study by Federal regulators showed that BOPs may not function in deepwater drilling environments because of the increased force needed to pinch and cut the stronger pipes used in deep-water drilling. Only 3 of 74 rigs studied in 2004 had BOPs strong enough to squeeze off and cut the pipe at the water pressures present at the equipment's maximum depth. "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a Blowout," the study said. Moreover, the study singled out Defendant Cameron, the manufacturer of the *Deepwater Horizon's* BOP, for relying on faulty calculations to determine the necessary strength for its BOP equipment to function properly at ultra-deepwater depths.

145. Defendants BP, Transocean, and Cameron could have ensured that a BOP and/or back-up BOP with sufficient strength for deepwater drilling were installed on the *Deepwater Horizon,* but did not do so.

146. In fact, federal regulators at the MMS communicated to one or more of the Drilling Defendants in 2000 that MMS considered a backup BOP activation system to be "an essential component of a deepwater drilling system."

147. Despite this notice, and although the backup trigger is a common drill-rig requirement in other oil producing nations, including other areas where the Defendant BP operates, the *Deepwater Horizon* was not equipped with this backup remote BOP trigger.

148. The *Deepwater Horizon* was also not equipped with a second BOP, as are many newer oil rigs. Rather, the *Deepwater Horizon* only had one BOP installed, leaving the well especially vulnerable to a blowout and subsequent oil spill.

149. In the days immediately prior to the onset of the Oil Spill, BP made a series of unusual, rapid-fire requests to modify operational permits regarding the *Deepwater Horizon*. These requests were approved in an extremely expeditious fashion, one being "reviewed" and "approved" within five minutes.

150. On April 14, 2010, one of these modifications included Defendant BP asking MMS if it could use a so-called "one-pipe" method, rather than a "two pipe" method to reach the oil and gas reservoir below the *Deepwater Horizon*. According to *The New York Times,* Defendant BP concluded that the one-pipe option was the "best economic case" despite having "some risk" of leaving an open path for gas to travel up outside the well. The two pipe method, according to some experts, is "more or less the gold standard," especially for high pressure wells such as the one below the *Deepwater Horizon*.

151. Upon information and belief, the two-pipe method was the safer option because it would have provided an extra layer of protection against gas traveling up the outside of the well to the surface. However, the one-pipe method was easier and faster by about 7 days, saving Defendant BP nearly $7 million.

152. As noted in a May 25, 2010 memorandum authored by Congressmen Henry A. Waxman and Bart Stupak, Members of the House of Representatives' Committee on Energy and Commerce, in the hours and minutes immediately preceding the onset of the Oil Spill, the *Drilling Defendants* were faced with clear signs that serious problems with the rig's operations were developing and manifesting.

153. For example, as early as 5:05 p.m., almost 5 hours before the explosion, one or more of the Drilling Defendants observed an unexpected loss of fluid in the riser pipe, suggesting that there were leaks in the annular preventer in the BOP.

154. Moreover, two hours before the explosion, during efforts to begin negative pressure testing, the system gained 15 barrels of liquid instead of the 5 barrels that were expected, leading to one or more of the Drilling Defendants to become aware of the possibility that there was an "influx from the well."

155. The Drilling Defendants, including but not limited to BP, Transocean, Halliburton, and M-I, conducted this negative pressure testing initially on the drill pipe rather than the kill line, even though the drill plan specified that it would be done on the kill line. The line was opened and pressure on the kill line was bled to 0 psi, while pressure on the drill pipe remained at 1400 psi. Officials from Defendant BP have admitted that this was a "fundamental mistake" as this difference in psi was an "indicator of a very large abnormality." Nevertheless, after anomalous results, the negative pressure testing was conducted on the kill line and ultimately accepted by the Drilling Defendants.

156. Approximately 51 minutes before the explosion that began the Oil Spill, one or more of the Drilling Defendants knew or should have known that more fluid had begun flowing out of the well than was being pumped in. This was a clear indication to one or more of the Drilling Defendants of serious problems with the drilling operation.

157. Approximately 41 minutes before the explosion that began the Oil Spill, one or more of the Drilling Defendants was aware that although the pump was shut down for a "sheen" test, the well continued to flow instead of stopping. Moreover, at this time one or more of the Drilling

Defendants knew or should have known that the drill pipe pressure also unexpectedly increased. These were additional, clear indicators of problems with the drilling operation.

158. Approximately 18 minutes before the explosion that began the Oil Spill, one or more of the Drilling Defendants observed abnormal pressures and mud returns, and the pump was abruptly shut down. This was a further, clear indicator to the Drilling Defendants of problems with the drilling operation immediately prior to the explosion and Oil Spill.

159. Data presented by Defendant BP to the United States House of Representatives' Committee on Energy and Commerce suggests that the crew may have attempted mechanical interventions at that point to control the pressure, but soon after, the blow-out occurred, reservoir pressures became unstable resulting in massive quantities of flammable gases shooting to the surface resulting in the tragic and devastating explosion on board the *Deepwater Horizon.*

160. At some point prior to the blowout and the onset of the Oil Spill, Defendants BP and Transocean disabled vital alarm systems present on the *Deepwater Horizon* that were intended to monitor for fire and explosive and toxic gases.

161. Upon information and belief, Defendants BP and Transocean disabled these alarm systems solely as a matter of convenience with utter disregard for the safety ramifications.

162. One or more of the other Drilling Defendants was aware that Defendants BP and Transocean had disabled these alarm systems, but did not attempt to reactivate the alarm systems or report this development to relevant authorities.

163. Upon information and belief, had Defendants BP and Transocean not disabled the alarm systems, an alarm would have sounded before the explosion that lead to the Oil Spill.

164. On or about April 20, 2010, at approximately 9:45 p.m. CST, a series of explosions occurred on the *Deepwater Horizon.* These explosions ensued due the release of reservoir

pressure and a blowout, which funneled flammable gases into the oil rig. These explosions killed eleven (11) crew members, and injured many more. Two days following the initial explosions, the remnants of the *Deepwater Horizon* sank to the ocean floor.

165. Shortly before the explosions aboard the *Deepwater Horizon*, employees, agents, and/or contractors of one or more of the Drilling Defendants were participating in drilling-related activities, including cementing and mudding, to seal and plug the wellhead. Cementing is intended to, among other things, hold back the flow of oil and hydrocarbons from the well bore. Cementing and mudding are delicate activities, and each carries the risk of a blowout if not performed properly. Improper or ineffective cementing work and/or mudding operations performed by one or more of the Drilling Defendants was a cause or contributing factor to the Oil Spill.

166. Almost immediately following the explosion, oil began to discharge into the Gulf of Mexico from a depth of 5,000 feet below the *Deepwater Horizon*.

167. Before the Oil Spill, the *Deepwater Horizon* had been connected to the wellhead at the seafloor by a 5,000 foot pipe called a "riser." As the *Deepwater Horizon* sank to the seafloor, it pulled the riser down with it, buckling and eventually breaking the riser. This riser was connected to a well casing that ultimately linked the *Deepwater Horizon* to an oil field located thousands of feet below the ocean floor.

168. While crude was believed to be discharged before the *Deepwater Horizon* finally sank on April 22, 2010, the rate of discharge is believed to have increased once the *Deepwater Horizon* sank to the ocean floor. Oil is now (as of the time this Action was filed) flowing out from the open end of the riser in at least two places. The Drilling Defendants permitted, allowed, and failed to properly monitor and inspect pressure levels in the riser and the BOP valves.

169. On April 20, 2010, the *Deepwater Horizon's* BOP's emergency disconnect system (EDS) device failed to operate.

170. On April 20, 2010, the *Deepwater Horizon's* BOP's deadman switch device failed to operate.

171. On April 20, 2010, the *Deepwater Horizon's* BOP's shearing ram failed to operate.

172. Defendant Cameron designed and manufactured the *Deepwater Horizon's* BOP device. Defendant Cameron failed to effectively design the BOP, install a backup activation system for the BOP, or provide adequate warnings, instructions, and guidelines on permissible uses, modifications, and applications of the BOP. Additionally, upon information and belief, the BOP may not appropriate for this intended environment of use, as it built with only one set of shear-rams when it should have had two such rams. The failure of Defendant Cameron's BOP was a cause or contributing factor to the Oil Spill.

173. The Drilling Defendants knew or should have known of the dangers associated with ultra-deepwater drilling and failed to take appropriate measures to prevent damage to Complainant, and marine, coastal, and estuarine areas of Alabama and the Gulf Coast.

174. Moreover, additional safety mechanisms, technologies, and precautions were known and available to one or more of the Drilling Defendants and/or Defendant Cameron but the Drilling Defendants elected not to employ them on the *Deepwater Horizon.*

## Defendant BP Misrepresents its Oil-Spill Response Capabilities

175. After the onset of the Oil Spill, Defendants BP and Transocean attempted to downplay and conceal the severity of the Oil Spill in the press. In this regard, their initial estimate was that following the blowout and Oil Spill, the well was discharging 1,000 barrels of crude oil per day.

176. However, on or about April 28, 2010, ROVs exploring the wreckage of the *Deepwater Horizon* discovered kinks in rig's sunken, broken riser. At this point, BP indicated that oil might be leaking at a rate of as much as 5,000 barrels (or 210,000 gallons) of oil discharged per day.

177. On May 4, 2010, BP executives admitted to members of Congress that the rate of the Oil Spill leak could reach 60,000 barrels, or 2,500,000 gallons, per day.

178. On or about June 20, 2010, Congressman Edward Markey released an internal BP document showing that the company's own analysis revealed that the rate of Oil Spill could reach *100,000 barrels, or 4,200,000 gallons, per day.*

179. As of the date this Action was filed, an oil slick with a range of thousands of miles had formed and could be seen from space. Additionally, thick, voluminous plumes of oil have been identified in deep waters within the Gulf of Mexico. The Oil Spill caused this slick and these plumes to form. Oil is washing ashore in the Gulf of Mexico and damaging marine animals' coastal habits.

180. On February 23, 2009, Defendant BP submitted a document entitled "Initial Exploration Plan Mississippi Canyon Block 252" ("Exploration Plan") to the MMS. In the Exploration plan, Defendant BP evaluated the potential environmental impact of a blowout at an ultra-deepwater oil well. It also described its ability to respond to a blowout resulting from an oil spill. Additionally, Defendant BP made *misrepresentations about its capability to respond* to a blowout in the Exploration Plan.

181. In describing the impact a blowout and subsequent spill could have on essential fish habitats, Defendant BP indicated the following:

> In the event of an unanticipated blowout resulting in an oil spill, it
> is unlikely to have an impact based on the industry wide standards

for using proven equipment and technology for such responses, implementation of BP's Regional Oil Spill Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill.

182. Likewise, Defendant BP stated in its February 23, 2009 Exploration Plan that it was "unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities," and that "due to the distance to shore (48 miles (77 km)) and the response capabilities that would be implemented, no significant adverse impacts are expected."

183. On May 17, 2010, U.S. Senators Barbara Boxer, Ben Cardin, Frank Lautenberg, Kirsten Gillibrand, Bernie Sanders, Amy Klobuchar, Tom Carper, and Jeff Merkely contacted U.S. Attorney General Eric Holder to specifically request that the U.S. Department of Justice "open an inquiry into whether British Petroleum (BP) made false and misleading statements to the federal government regarding its ability to respond to oil spills in the Gulf of Mexico."

184. On May 17, 2010, Senators Boxer, Cardin, Lautenberg, Gillibrand, Sanders, Klobuchar, Carper and Merkely, in a letter to Attorney General Holder noted:

> In the wake of the Deepwater Horizon oil spill, it does not in any way appear that there was 'proven equipment and technology' to respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico. Much of the response and implementation of spill control technologies appears to be taking place on an ad hoc basis.

185. Defendant BP has admitted that it had no proven or tested techniques available to deal with a blowout like that seen onboard the *Deepwater Horizon* when it explained on May 10, 2010 that "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

186. Moreover, Defendant BP p.l.c.'s chief executive officer, Anthony Hayward ("Hayward"), further admitted that Defendant BP was unprepared for an event like the Oil Spill when he stated on May 12, 2010 that it was "probably true" that Defendant BP was unprepared for an emergency of this magnitude.

187. Defendant BP has stymied efforts to gauge the scope of the disaster on land and at sea. *The New York Times* reported on May 16, 2010 that 'BP has resisted entreaties from scientists that they be allowed to use sophisticated instruments at the ocean floor that would give a far more accurate picture of how much oil is really gushing from the well."

188. Furthermore, reports have surfaced that the oil companies, such as the Drilling Defendants, were in some instances authored their own inspection reports for the MMS, which were then rubber-stamped. As such, even if the Drilling Defendants were in compliance with MMS regulations, that compliance lacks credibility and cannot establish the propriety of the Drilling Defendants' actions.

## Willful, Wanton Conduct of the Defendants

189. Defendants BP, Transocean, and/or one or more of the other Drilling Defendants, emphasized profits over and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon*.

190. Defendants BP, Transocean, and/or one or more of the other Drilling Defendants, emphasized profits over and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by using a well design with few barriers to gas flow.

191. Defendants BP, Transocean, and/or one or more of the other Drilling Defendants, emphasized profits over and safety while undertaking their ultra-hazardous activities on the

*Deepwater Horizon* by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

192. Defendants BP, Transocean, Halliburton, and/or one or more of the other Drilling Defendants, emphasized profits over and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by failing to run a cement bond log to evaluate the effective of the cement job.

193. Defendants BP, Transocean, M-I and/or one or more of the other Drilling Defendants, emphasized profits over and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by failing to circulate potentially gas bearing drilling mud out of the well.

194. Defendants BP, Transocean, M-I and/or one or more of the other Drilling Defendants, emphasized profits over and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by using an untested, abnormally large volume a of mixed spacer solutions to prevent having to dispose of the two separate spacer substances as hazardous wastes.

195. Defendants BP and Transocean and Cameron, recklessly, willfully and/or wantonly caused or contributed to the catastrophic Oil Spill by their tortious design and/or operation and use of the BOPs.

196. Defendants BP and Transocean, and/or one or more of the other Drilling Defendants, recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout.

197. Defendants BP and Transocean, and/or one or more of the other Drilling Defendants, recklessly, willfully and/or wantonly caused or contributed to the catastrophic Oil

Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

198. Defendants BP and Transocean, and/or one or more of the other Drilling Defendants, recklessly, willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

199. Defendant BP and/or one or more of the other Drilling Defendants recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Oil Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

200. Defendants BP and Transocean, and one or more of the other Drilling Defendants, by their conscious and/or deliberate unreasonable acts and/or omissions complained of herein, and/or as the evidence may show, displayed negligence, gross negligence, reckless indifference, willfulness, and/or wantonness.

## The Impact to Complainant

201. The Oil Spill has impacted and continues to impact the Gulf Coast's and Alabama's shorelines on which Complainant's property is located. The Oil Spill has already grievously harmed the beaches, shores, marshes, harbors, lakes, bayous, bays and waters in Alabama where Complainant own or did own investment property.

202. Since the onset of the Oil Spill, unprecedented amounts of raw crude oil and chemical dispersants have contaminated the waters of the Gulf of Mexico and the State of Alabama.

203. The Oil Spill has created an unreasonable physical invasion that impaired the value of Complainant's property.

204. The Oil Spill has created an unreasonable physical invasion of Complainant's property that diminished the value of their property in Baldwin County, Alabama.

205. Miles of Alabama shoreline has been inundated with enormous patches emulsified oil from the *Deepwater Horizon* Oil Spill. Moreover, vast areas of the waters in the Alabama's coastal lands have been closed to swimmers due to the serious health and safety risks posed by the pollution from the *Deepwater Horizon Oil Spill*.

206. Landfall of the oil along the Gulf Coast and Alabama's coast has severely damaged and will continue to damage the delicate wetlands and intertidal zones, including those that line the coast of Alabama, further diminishing the value of Complainant's investment property.

207. Damage to Alabama's coastal zone, and to the beaches, shores, marshes, harbors, lakes, bayous, and/or bays within Alabama has damaged Complainant because pollution of those natural resources has diminished and will continue to diminish the value of Complainant's property.

208. The oil from the *Deepwater Horizon* Oil Spill contains benzene, toluene, polyaromatic hydrocarbons and other compounds (collectively referred to as Total Petroleum Hydrocarbons, or "TPH"), all of which are known carcinogens. The oil from the *Deepwater Horizon* Oil Spill also contains mercury, lead and other heavy metals that are hazardous to the health of people, aquatic life. Pollution of Complainant's property in Baldwin County, Alabama and the nearby waters and natural resources by these substances has and will continue to diminish the property value.

209. Additionally, due to all the size and nature of the spreading oil slick and subsea oil plumes and the toxic effects of the oil and chemicals released from the *Deepwater Horizon* to people, aquatic life, and the Gulf of Mexico's waters, there have been and will continue to be further economic losses, stigma damages and diminution of property values to individuals and entities owning residential or investment properties in Alabama's coast.

210. Contamination of Complainant's investment property and the surrounding waters and natural resources by pollutants from the *Deepwater Horizon* Oil Spill has and will continue to damage Complainant's property for years. As noted by Dr. Lisa Kaplowitz of the U.S. Department of Health and Human services, in her June 15, 2010 testimony before Congress, "Oil can remain toxic in the environment for years."

211. Moreover, chemical dispersants used by one or more of the Drilling Defendants have been reported to be causing the health of those assisting in the clean up of the Oil Spill. The Toxic economic losses, stigma damages and diminution of property values to individuals and entities owning residential or investment properties in Alabama's coastal areas.

212. The Oil Spill, the subsequent inability to stop the discharge of crude oil into the Gulf of Mexico, and the use of toxic dispersant chemicals has caused and will continue to directly and proximately cause economic injuries Complainant, including but not limited to the fact that they:

a. Have experienced invasion of their real property and/or adjoining waterways by oil and other pollution from the Oil Spill;

b. Have experienced interruption and frustration of the use and enjoyment and marketability of their investment property in Alabama's coastal areas;

c. Have experienced and will continue to experience the pollution of and damage to their investment property in Alabama's coastal areas and nearby waters and natural resources;

d. Have experienced and will continue to experience significant diminution in the value of their investment property; and

e. Have experienced and will continue to experience a significant "stigma effect", giving rise to stigma damages.

## COUNT I
## NEGLIGENCE/MARITIME
### (Against the Drilling Defendants)

213. Complainant repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this Action and incorporates same by reference as though fully set forth herein.

214. All times material hereto, one or more of the Drilling Defendants were participating in drilling operations onboard the *Deepwater Horizon* in the Gulf of Mexico. At all times material hereto, the Drilling Defendants were under a duty to utilize reasonable care in undertaking and carrying out their collective and respective activities onboard the *Deepwater Horizon*.

215. At all times material hereto the *Deepwater Horizon* was jointly owned, navigated, manned, possessed, managed, controlled, chartered and/or operated by Defendants BP, Transocean, Anadarko, Anadarko LP, and/or MOEX.

216. All times material hereto, Defendant Halliburton responsible for cementing the well that was the subject of the Oil Spill, and further was engaged in testing, analysis, and monitoring of the aforementioned well.

217. At all times material hereto, Defendant M-1 was providing the drilling fluids or "mud" for the drilling operations onboard the *Deepwater Horizon*. and was responsible for mud drilling, composition, and monitoring, and for the provision of "spacer" solution.

218. At all times material hereto, Complainant has and continues to have a special, proprietary in the use and enjoyment investment property in the Gulf Coast's marine and coastal environments, natural resources, beaches, shores, marshes, harbors, lakes, bayous, and/or bays (hereinafter "natural resources") as their investment property in Baldwin County, Alabama are situated in close proximity those natural resources.

219. Damage to the aforementioned natural resources has and will continue to adversely affect the value of Complainant's investment property in Baldwin County, Alabama.

220. At all times material hereto, the Drilling Defendants' onshore and offshore oil drilling and exploration operations involved locating, extracting, collecting, storing, and transporting pollutants and hazardous contaminants.

221. At all times material hereto, the Drilling Defendants' onshore and offshore oil drilling and exploration operations which involved locating, extracting, collecting, storing, and transporting pollutants and hazardous contaminants created an appreciable zone of risk within which the Drilling Defendants were obligated to protect Complainant.

222. Complainant was and is within the appreciable zone of risk created by the Drilling Defendants' activities, and injuries and damages to Complainant, including but not limited diminution in the value of Complainant's investment property, was foreseeable given risks created by one or more of the Drilling Defendants.

223. At all times material hereto, Defendants BP, Transocean, Anadarko, Anadarko LP, and MOEX owed duties of care to Complainant to, *inter alia,* jointly navigate, man, possess, manage, control, and/or operate the *Deepwater Horizon* in a reasonably safe manner.

224. All times material hereto, Defendant Halliburton owed duties of care to Complainant to, *inter alia*, exercise reasonably care in conducting its cementing, testing, analysis, and monitoring of the *Deepwater Horizon's* well.

225. At all times material hereto, Defendant M-1 owed duties of care to Complainant to, *inter alia*, exercise reasonable care in providing, controlling, and monitoring the mud and spacer solutions used on the *Deepwater Horizon*.

226. At all times material hereto, Defendant Dril-Quip owed a duties of care to Complainant to, *inter alia*, exercise reasonable care in providing wellhead systems for *Deepwater Horizon*.

227. The Drilling Defendants were under a duty of care to refrain from negligent conduct that would cause pollution of the waters, beaches, shores, marshes, harbors, lakes, bayous, bays and natural resources of Alabama's coastal areas.

228. The Drilling Defendants were under a duty to exercise reasonable care while participating in drilling operations to ensure that an Oil Spill and subsequent discharge of oil did not occur.

229. The Drilling Defendants were under a duty to exercise reasonable care to ensure that if crude oil discharged in the event of a blowout, that it would be contained and/or stopped within the immediate vicinity of the *Deepwater Horizon* in an expeditious manner.

230. The Drilling Defendants were under a duty to exercise reasonable care to ensure that crude oil and pollutants from the *Deepwater Horizon* Oil Spill did not contaminate and/or diminish the value of Complainant's investment property based on Complainant's interest in the use and enjoyment of use and enjoyment of the *Gulf of Mexico's* and Alabama's marine and coastal natural resources.

231. The Drilling Defendants knew or should have known that the acts and omissions described herein could result in damage to Complainant.

232. Defendants BP, Transocean, Anadarko, Anadarko LP, and MOEX breached their duties of care owed under general maritime law to Complainant by , *inter alia,* failing to jointly navigate, man, possess, manage, control, and/or operate the *Deepwater Horizon* in a reasonably safe manner, proximately causing and/or contributing to Complainant's injuries and damages.

233. Defendant Halliburton breached its duties to Complainant by, *inter alia,* failing to exercise reasonable care in conducting its cementing, testing, analysis, and monitoring of the *Deepwater Horizon's* well, proximately causing and/or contributing to Complainant's injuries and damages.

234. Defendant M-I breach its duties to Complainant's by, *inter alia,* failing to provide, control, and monitor the mud and spacer solutions used on the *Deepwater Horizon* in a reasonably safe manner, proximately causing and/or contributing to Complainant's injuries and damages.

235. Defendant Dril-Quip breached its duties of care to duty of care to Complainant by, *inter alia,* failing to exercise reasonable care in providing wellhead systems, related equipment, and support services and technicians for *Deepwater Horizon,* proximately causing and/or contributing to Complainant's injuries and damages.

236. The Drilling Defendants, respectively and collectively, failed to exercise reasonable care while participating in drilling operations, and thereby breached duties owed to Complainant.

237. The Drilling Defendants, respectively and collectively, failed to exercise reasonable care while participating in drilling operations to ensure that a blowout and subsequent Oil Spill did not occur, and thereby breached duties owed to Complainant.

238. The Drilling Defendants, respectively and collectively, failed to exercise reasonable care to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout, and thereby breached duties owed to Complainant.

239. The Drilling Defendants, respectively and collectively, failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico, and thereby breached duties owed to Complainant.

240. The Drilling Defendants, respectively and collectively, failed to exercise reasonable care ensure that crude oil and pollutants from the *Deepwater Horizon Oil Spill* did not contaminate and/or diminish the value of Complainant's investment property, and thereby breached duties owed to Complainant.

241. One or more of the Drilling Defendants were in violation of federal and/or state statutes and/or regulations.

242. The blowout and subsequent Oil Spill was caused by one or more of the Drilling Defendants and has resulted in an economic and ecological disaster that has directly and proximately caused injuries and damages to Complainant.

243. The blowout and subsequent Oil Spill was caused by one or more of the Drilling Defendants and has resulted in an economic and ecological disaster that has directly and proximately caused a tortious invasion that has interfered with the Complainant's special interest, as an owner of residential or investment property on Alabama's coast, in using and enjoying the Gulf of Mexico's and Alabama's marine and coastal natural resources.

244. Prior to the blowout and Oil Spill, one or more of the Drilling Defendants had actual and/or constructive knowledge of the facts and circumstances leading to the Oil Spill. One or more of the Drilling Defendants knew or should have known of no less than three flow indicators from the *Deepwater Horizon's* well in the hours and minutes before the explosion and Oil Spill, all of which were clear evidence of significant problems with the rig's drilling operations. The Drilling Defendant's actions and inactions were grossly negligent (under general maritime and/or general common law), reckless, willful, and/or wanton.

245. Complainant is entitled to a judgment that one or more Drilling Defendants are jointly and severally liable to Complainant for damages suffered as a result of one or more of the Drilling Defendants' negligence, gross negligence, recklessness, willfulness or wantonness. Complainant should be compensated for damages in an amount to be determined by the trier of fact, including punitive damages for the *Drilling Defendants' conduct*.

## COUNT II
## NEGLIGENCE *PER SE*
## (Against the Drilling Defendants)

246. Complainant repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this Action and incorporates same by reference as though fully set forth herein.

247. The Drilling Defendants' joint and respective conduct with regard to the manufacture, maintenance, and/or participation of drilling operations and oil rigs such as the *Deepwater Horizon* is governed by numerous state and federal laws, and permits issued under the authority of these laws.

248. These laws and permits create statutory standards that are intended to protect and benefit Complainant, among others. One or more of the Drilling Defendants' violated these statutory standards. Such violations constitute negligence *per se* under Alabama law.

249. The Drilling Defendants' violations of these statutory standards proximately caused Complainant's injuries, warranting compensatory and punitive damages.

250. The Drilling Defendants had actual and/or constructive knowledge of the facts and circumstances leading to and causing this incident, which in turn caused Complainant's injuries, and their actions and inactions were grossly negligent, reckless, willful, and/or wanton.

251. Complainant is entitled to a judgment fording the Drilling Defendants liable to Complainant for damages suffered as a result of Defendants' negligence *per se* and awarding Complainant adequate compensation in an amount to be determined by the trier of fact, including punitive damages for Defendants' conduct.

### COUNT III
### STRICT LIABILITY FOR ABNORMALLY DANGEROUS, ULTRAHAZARDOUS ACTIVITIES
#### (Against All Defendants)

252. Complainant repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this Action and incorporates same by reference as though fully set forth herein.

253. Upon information and belief, the Drilling Defendants participated in ultra-deepwater drilling operations at the site of the *Deepwater Horizon.*

254. At all relevant times, Defendant Cameron supplied BOP device( s) and system( s) for the *Deepwater Horizon* site were designed and performed in an abnormally dangerous manner, and thus proximately caused and contributed to the blowout and subsequent Oil Spill.

255. The Drilling Defendants' operations, and the design and performance of Defendant Cameron's BOP(s) at the site of the *Deepwater Horizon* were abnormally dangerous, and differed from normal oil exploration activities because:

a. it involved ultra-deepwater drilling for oil, an activity that in and of itself is abnormally dangerous and is categorically different from onshore, mundane oil exploration and production activities;

b. it involved the retrieval, handling, and extraction of oil, an explosive, flammable, and toxic substance;

c. it involved the retrieval, handling, and extraction of oil, an explosive, flammable and toxic substance within one of the world's largest commercial fisheries;

d. it resulted in an explosion killing eleven individuals, injuring several others, and resulted in the discharge of untold amounts of crude oil into the Gulf of Mexico;

e. it created a high degree of risk of harm to Complainant, among others;

f. it created the likelihood that the harm caused by the Drilling Defendants' drilling operations would be great due to the explosive, carcinogenic, toxic, and sundry other deleterious properties of oil; and

g. in such other particulars as the evidence may show.

256. The risks associated with the Drilling Defendants' operations and activities and the design and performance of Defendant Cameron's BOP(s) required that such drilling be carried on at their peril, rather than at the expense of the innocent claimants who suffered harm as a result of the drilling operation. Indeed, the catastrophic, ultra-hazardous nature of deepwater oil exploration had led to the federal government to at least temporarily ban such activities due to the overwhelming risks posed by them.

257. The Drilling Defendants' activities, to wit, conducting ultra-deepwater oil exploration, and its consequences, the pollution of the Gulf of Mexico and the waters of the Gulf of Mexico, are inappropriate for the location utilized and uncommon for the area.

The design and performance of Defendant Cameron's BOP(s) used in conducting ultra-deepwater oil exploration, and its consequences, the pollution of the Gulf of Mexico and the waters of the State of Alabama, are inappropriate for the location utilized and uncommon for the area.

258. Any value of the Drilling Defendants' operation to the relevant Alabama communities was and is outweighed by the abnormal risk of, and the actual and continuing manifestation of, the harm suffered by Complainant, and others within the State of Alabama.

259. Any value in the design and performance of Defendant Cameron's BOP(s) to the relevant Alabama communities was and is outweighed by the abnormal risk of, and the actual and continuing manifestation of, the harm suffered by Complainant and others within the state of Alabama.

260. At all times relevant to this action, Drilling Defendants were in control of, or able to exercise control of, the *Deepwater Horizon* and its related drilling operations, as well as its personnel.

261. At all times relevant to this action, Defendant Cameron was in control of, able to exercise control of, the design and performance of the BOP(s) used on the *Deepwater Horizon* during its related drilling operations.

262. The magnitude of the risk of the Drilling Defendants' operations and the ramifications of the design and performance of Defendant Cameron's BOP( s) has created an abnormal, ultra-hazardous risk of physical harm to the waters of the United States' Gulf Coast,

coastal and shore areas and contiguous environs, including those of the State of Alabama, and one which has and is continuing to be realized as a direct and proximate result of the discharge of crude oil into the Gulf of Mexico.

263. The ultra-deepwater drilling was carried on by the Drilling Defendants, done in part through the use of Defendant Cameron's BOP(s), was done for their own benefit, and it created a risk to Complainant that was not a usual risk reasonably anticipated by Complainant, nor is it activity that is usual to their lives or businesses.

264. The Drilling Defendants knew or should have known that the ultra-deepwater drilling they carried on created a risk to Complainant that was not a usual risk reasonably anticipated by Complainant.

265. Defendant Cameron knew or should have known that the BOP(s) used in conducting ultra-deepwater oil exploration created a risk to Complainant's that was not a usual risk reasonably anticipated by Complainant.

266. As a direct and proximate result of the acts and omissions of one or more of the Drilling Defendants, Complainant has suffered injuries and damages.

267. As a direct and proximate result of the acts and omissions of Defendant Cameron, Complainant has suffered injuries and damages.

268. One or more of the Drilling Defendants, and Defendant Cameron, are strictly liable for the above damage which resulted directly from their engaging in an abnormally dangerous and/or ultra-hazardous activity, including for punitive damages to punish and deter the Drilling Defendants' conduct.

## COUNT IV
## PRIVATE NUISANCE
## (Against All Defendants)

269. Complainant repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this Action and incorporates same by reference as though fully set forth herein.

270. At all times material hereto, Complainant, as owner of investment property in Baldwin County, Alabama, has and continues to have a special, proprietary interest in the use Gulf of Mexico's and Alabama's marine and coastal environments, natural resources, beaches, shores, marshes, harbors, lakes, bayous, bays and estuarine areas.

271. The Drilling Defendants participation in the *Deepwater Horizon's* operations resulted in contamination and impairment in the use and enjoyment of Complainant's property, the Gulf of Mexico and Alabama's coastal zone and parishes by oil from the *Deepwater Horizon*.

272. The design and performance of Defendant Cameron's BOP(s) on the *Deepwater Horizon's* during drilling operations resulted in contamination and impairment in the use and enjoyment of Complainant's property by oil from the *Deepwater Horizon*.

273. The blowout and subsequent Oil Spill was caused and/or contributed to by one or more of the Drilling Defendants and Defendant Cameron and has resulted in an economic and ecological disaster that has directly and proximately caused a intense, annoying, inconvenient and tortious invasion that has interfered with Complainant's special interest as owner of investment property to use and enjoy their property and the Gulf of Mexico's and Alabama's marine and coastal environments, natural resources, beaches, shores, marshes, harbors, lakes, bayous, bays and estuarine areas.

274. The blowout and subsequent Oil Spill was caused and/or contributed to by one or more of the Drilling Defendants and Defendant Cameron and has resulted in an economic and ecological disaster that has directly and proximately caused a tortious invasion that has interfered with Complainant's special interest as owner of investment property to use and enjoy their property and the Gulf of Mexico's and Alabama's marine and coastal environments, natural resources, beaches, shores, marshes, harbors, lakes, bayous, bays and estuarine areas.

275. The Oil Spill caused and/or contributed to by one or more of the Drilling Defendants and Defendant Cameron constitutes a private nuisance that has caused and will continue to cause injury to Complainant, including economic and injuries and damages losses to Complainant by polluting their investment property on Alabama's coast and the surrounding marine and coastal environments.

276. The Oil Spill caused and/or contributed to by one or more of the Drilling Defendants and Defendant Cameron constitutes a private nuisance that has caused and will continue to directly and proximately cause injuries and damages to the Complainant, including but not limited to diminution of value of their property.

277. One or more of the Drilling Defendants had actual and/or constructive knowledge of facts and circumstances prior to the Oil Spill that could have prevented the Oil Spill.

278. Defendant Cameron had actual and/or constructive knowledge of facts and circumstances prior to the Oil Spill that could have prevented the Oil Spill.

279. One or more of the Drilling Defendants acted in an intentional and unreasonable, and/or negligent, grossly negligent, reckless, willful, and wanton manner in creating the private nuisance described herein.

280. Defendant Cameron acted in an intentional and unreasonable, and/or negligent, grossly negligent, reckless, willful, and wanton manner in creating the private nuisance described herein.

281. Alternatively, the private nuisance described herein is the result abnormally dangerous activities of one or more of the Drilling Defendants and Defendant Cameron.

282. One or more of the Drilling Defendants and Defendant Cameron are liable to Complainant for injuries, and actual, special, and punitive damages sustained as the direct and proximate result of the private nuisance.

## COUNT V
## STRICT LIABILITY FOR PRODUCT DEFECT
### (Against Defendant Cameron)

283. Complainant repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this Action and incorporates same by reference as though fully set forth herein.

284. At all times relevant hereto, Defendant Cameron was in the business of designing, manufacturing, marketing, selling, and/or distributing the BOP device(s) and system(s) used in connection with the drilling operations onboard the *Deepwater Horizon.*

285. Defendant Cameron sold and delivered the BOP device(s) and system(s) at the *Deepwater Horizon* to Defendant Transocean in 2001.

286. The BOP device(s) and system(s) on the *Deepwater Horizon* supplied by Defendant Cameron failed to operate as intended, if at all, and thus proximately caused and contributed to the blowout and subsequent Oil Spill.

287. Defendant Cameron's BOP device(s) and system(s) on the *Deepwater Horizon* site were defectively designed and/or manufactured such that they did not operate as intended to prevent or minimize blowouts, which caused and or contributed to the Oil Spill.

288. As a result of the defect(s), a massive discharge of oil has emanated from the *Deepwater Horizon* site and has and will continue to injure Complainant.

289. Upon information and belief, at the time the BOP device(s) and system(s) used at the *Deepwater Horizon* site left Defendant Cameron's control, they were in a defective condition unreasonably dangerous to Complainant in that they were designed and manufactured with over 260 known defects and failure modes, including but not limited to:

a. Inadequate, faulty, nonfunctioning and defective battery systems;

b. Inadequate, faulty, nonfunctioning and defective dead man switches and related wiring;

c. The absence of acoustic triggers;

d. Inadequate, faulty, nonfunctioning and defective emergency disconnect systems (EDS);

e. Improperly sealed, leaky hydraulic systems;

f. Improperly designed, manufactured, and installed annular seals;

g. Insufficiently robust shear rams;

h. Insufficient warnings, instructions, and guidelines on permissible, foreseeable uses and modifications to the BOP and its component parts;

i. Insufficient testing and design verification of the BOP and its component parts to ensure the shearing capability of the ram and other functioning of the BOP during reasonably foreseeable uses; and

j. In such other particulars as the evidence may show.

290. Upon information and belief, at the time the BOP device(s) and system(s) used at the *Deepwater Horizon* site left Defendant Cameron's control, Defendant Cameron knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

291. Upon information and belief, at the time the BOP device(s) and system(s) used at the *Deepwater Horizon* site left Defendant Cameron's control, feasible design alternatives existed which would have to a reasonable probability prevented the harm suffered by Complainant without impairing the utility, usefulness, practicality or desirability of the BOPs.

292. Upon information and belief, at all relevant times the BOP device(s) and system(s) used on the *Deepwater Horizon* site were used in an intended and/or reasonably foreseeable manner.

293. Complainant is a foreseeable bystander and a victim of the manifestation of the defects in the *Deepwater Horizon's* BOP device.

294. The Defendant Cameron had actual and/or constructive knowledge of the facts and circumstances relative to the BOP which caused or contributed to this incident, which in turn caused' Complainant's injuries, and its actions and inactions were grossly negligent, reckless, willful, and/or wanton.

295. As a result of the defect(s) in Defendant Cameron's product, Complainant is entitled to a judgment finding Defendant Cameron liable to Complainant for damages suffered in an amount to be determined by the trier of fact, including but not limited to punitive damages.

**COUNT VI**
**STRICT LIABILITY FOR PRODUCT DEFECT**
**(Against Defendant Dril-Quip)**

296. Complainant repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this Action and incorporates same by reference as though fully set forth herein.

297. At all times relevant hereto, Dril-Quip manufactured, supplied, and/or installed the *Deepwater Horizon's* wellhead systems for *Deepwater Horizon,* including the well that suffered the blowout that subsequently leading to the Oil Spill.

298. The wellhead device(s) and system(s) on the *Deepwater Horizon* supplied by Defendant Dril-Quip failed to operate as intended, if at all, when put to its intended use and thus proximately caused and contributed to the blowout and subsequent Oil Spill.

299. As a result of the wellhead's defect(s), a massive discharge of oil has emanated from the *Deepwater Horizon* site and has and will continue to injure Complainant.

300. Upon information and belief, at the time Defendant Dril-Quip's wellhead device(s) and system(s) used at the *Deepwater Horizon* site left Defendant Dril-Quip's control, they were in a defective condition unreasonably dangerous to Complainant.

301. Upon information and belief, at the time the wellhead device(s) and system(s) used at the *Deepwater Horizon* site left Defendant Dril-Quip's control, Defendant Dril-Quip's knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, that the wellhead system was defective and unreasonably dangerous.

302. Upon information and belief, at all relevant times the wellhead device(s) and system(s) used on the *Deepwater Horizon* site were used in an intended and/or reasonably foreseeable manner.

303. Complainant was in the zone of foreseeable harm of the defects in the *Deepwater Horizon's* wellhead device(s).

304. Defendant Dril-Quip had actual and/or constructive knowledge of the facts and circumstances relative to the wellhead which caused or contributed to this incident, which in turn caused Complainant's injuries and losses.

305. Upon information and belief, Defendant Dril-Quip, by its conscious and/or deliberate unreasonable acts and/or omissions complained of herein, and/or as the evidence may show, displayed negligence, gross negligence, reckless indifference, willfulness, and/or wantonness in causing or contributing to the Oil Spill described herein.

306. As a result of the defect(s) in Defendant Dril-Quip's product, Complainant is entitled to a judgment finding Defendant Dril-Quip liable to Complainant for damages in an amount to be determined by the trier of fact, including punitive damages for Defendant Dril-Quip's conduct.

**COUNT VI**
**STRICT LIABILITY FOR PRODUCT DEFECT**
**(Against Defendant Dril-Quip)**

**PRAYER FOR RELIEF**

WHEREFORE, Complainant demands judgment against third party defendants, jointly and severally, as follows:

A. economic and compensatory damages in the amounts to be determined at trial;

B. punitive damages in an amount sufficient to punish the Defendants' for their conduct;

C. pre judgment and post judgment interest at the maximum rate allowable by law;

D. attorney's fees and costs of litigation;

E. such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate;

**JURY TRIAL REQUESTED**

*Complainant demands trial by jury.*

Respectfully submitted this the 12th day of January, 2011.

/s/ M. Shane Lucado
M. Shane Lucado (AL Bar No. ASB-7936-A53M)
Attorney for Plaintiff

OF COUNSEL
M. Shane Lucado
Lucado Law Firm, LLC
One Perimeter Park South, Suite 125 S
Birmingham AL 35243
(205) 278-0025
Fax: (205) 278-0030
Email: slucado@lucadolaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Third Party Complaint has been transmitted electronically and/or via U.S. Mail, postage prepaid, to all counsel of record.

/s/ M. Shane Lucado
M. Shane Lucado (LUCAM7936)

**PLEASE SERVE THE THIRD PARTY DEFENDANTS AS FOLLOWS:**

Moex Offshore 2007, LLC
9 Greenway Plaza
Houston, TX 77046

Transocean Offshore Deepwater
Drilling
c/o CT Corporation
2 North Jackson Street, Suite 605
Montgomery, AL 36104

Transocean, Ltd
4 Greenway Plaza
Houston, TX 77046

BP, plc
c/o CT Corporation System, The
Corporation Company
1200 South Pine Island Road
Plantation, FL 33324

Transocean Deepwater, Inc.
Park Ten Centre
1311 Broadfield Boulevard, Suite
400
Houston, TX 77084

BP Products North America
c/o CSC Lawyers Incorporating
Service
150 South Perry Street
Montgomery, AL 36104

Transocean Holdings, LLC
4 Greenway Plaza, Suite 700
Houston, TX 77046-0406

Triton Asset Leasing GmbH
24 Greenway Plaza
Houston, TX 77046

BP America, Inc.
c/o CT Corporation Systems
2 North Jackson Street, Suite 605
Montgomery, AL 36104
M-I, LLC
c/o Capital Corporate Services, Inc.
150 South Perry Street
Montgomery, AL 36104

Halliburton
c/o CT Corporation Systems
2 North Jackson Street, Suite 605
Montgomery, AL 36104

BP America Production Co.
c/o CT Corporation Systems
2 North Jackson Street, Suite 605
Montgomery, AL 36104

BP Exploration & Production,
Inc.
c/o CT Corporation Systems
2 North Jackson Street, Suite 605
Montgomery, AL 36104

Cameron International
Corporation f/k/a Cooper
Cameron Corporation
c/o CT Corporation Systems
2 North Jackson Street, Suite 605
Montgomery, AL 36104

Anadarko Petroleum Corp.
c/o CT Corporation Systems
2 North Jackson Street, Suite 605
Montgomery, AL 36104

DrilQuip, Inc.
One Shell Plaza
701 Poydras Street
New Orleans, LA 70139

Anadarko E & P Co, LP
c/o CT Corporation Systems
2 North Jackson Street, Suite 605
Montgomery, AL 36104

| State of Alabama | SUMMONS | Case Number: |
|---|---|---|
| Unified Judicial System | - CIVIL - | 01-CV-2010-902180.00 |
| Form C-34  Rev 6/88 | | |

IN THE CIVIL COURT OF JEFFERSON, ALABAMA

SYNOVUS BANK v. PLASH ISLAND RESORT LLC ET AL

MOEX OFFSHORE 2007, 9 GREENWAY PLAZA, HOUSTON, TX 77046

NOTICE TO _____

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY MICHAEL SHANE LUCADO MR.

WHOSE ADDRESS IS 1 Perimeter Park South, Ste 125 S. BIRMINGHAM, AL 35243

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☐ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☑ Service by certified mail of this summons is initiated upon the written request of     PLASH ISLAND RESORT LLC
   pursuant to the Alabama Rules of the Civil Procedure

| 1/17/2011 3:59:52 PM | /s ANNE-MARIE ADAMS | |
|---|---|---|
| Date | Clerk/Register | By |

☑ Certified mail is hereby requested     /s MICHAEL SHANE LUCADO MR.

Plaintiff's/Attorney's Signature

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____

_____

Date     Server's Signature