**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In Re: Oil Spill by the Oil Rig** | ) | |
| **"Deepwater Horizon" in the Gulf** | ) | **MDL No. 2179** |
| **of Mexico, on April 20, 2010** | ) | |
| | ) | **SECTION:  J** |
| **Pleading Applies To:** | ) | |
| *All Cases in Pleading Bundle B2* | ) | **JUDGE BARBIER** |
| | ) | |
| | ) | **MAGISTRATE SUSHAN** |

**<u>PLAINTIFFS' AMENDED RICO CASE STATEMENT</u>**

Pursuant to the standing order of the Eastern District of Louisiana, Plaintiffs file the following Amended RICO Case Statement::

**1.    State whether the alleged unlawful conduct is in violation of 18 U.S.C. Sections 1962(a), (b), (c), and/or (d).  If you allege violations of more than one Section 1962 subsection, treat each as separate RICO claim.**

The alleged unlawful conduct is in violation of 18 U.S.C. Sections 1962(c).

The alleged unlawful conduct is in violation of 18 U.S.C. § 1962(d) for conspiring to violate § 1962(c).

The alleged unlawful conduct is in violation of 18 U.S.C. 1962 (d) for conspiring to violate 18 U.S.C. § 1962(a).

**2.    List <u>each</u> defendant and state the alleged misconduct and basis of liability of <u>each</u> defendant.**

BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrensville, Illinois.  BP Exploration was a lease holder and the designated operator in the lease granted that allowed the oil exploration, drilling and production-related operations in the location where the spill emanating from the Deepwater Horizon originated.  BP Exploration participated and conspired to participate in the predicate acts that form the pattern of racketeering alleged below.

BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas. BP America was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the Deepwater Horizon vessel. BP America participated and conspired to participate in the predicate acts that form the pattern of racketeering alleged below.

BP p.l.c. is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. BP p.l.c. participated and conspired to participate in the predicate acts that form the pattern of racketeering alleged below.

BP Exploration, BP America, and BP p.l.c. are generally referred to herein collectively as "BP."

**3.    List the alleged wrongdoers, other than the defendants listed above, and state the alleged misconduct of each wrongdoer.**

Other possible wrongdoers involved in the pattern of racketeering include the following, although at this point the full extent of their involvement is unknown:

Transocean Ltd. ("Transocean Ltd.") is a Swiss corporation that maintains substantial U.S. offices in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Ltd. was an owner, managing owner, owner *pro hac vice,* and/or operator of the Deepwater Horizon.  Transocean Ltd. participated and conspired to participate in overt acts in furtherance of the pattern of racketeering alleged below.

Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas. Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice,* and/or operator of the Deepwater Horizon.  Transocean Offshore participated and conspired to participate in overt acts in furtherance of the pattern of racketeering alleged below.

Transocean Deepwater, Inc. ("Transocean Deepwater"), is a Delaware corporation with its principal place of business in Houston, Texas. Transocean Deepwater is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice,* and/or operator of the Deepwater Horizon.  Transocean Deepwater participated and conspired to participate in overt acts in furtherance of the pattern of racketeering alleged below.

Transocean Holdings, LLC ("Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas. Transocean Holdings is affiliated with Transocean Ltd. and is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings is an owner, managing owner, owner *pro hac vice,* and/or operator of the Deepwater Horizon.  Transocean Holdings participated and conspired to participate in overt acts in furtherance of the pattern of racketeering alleged below.

Triton Asset Leasing GmbH ("Triton") is a Swiss limited liability company with its principal place of business in Zug, Switzerland. Triton is affiliated with Transocean Ltd. and is an owner, managing owner, owner *pro hac vice,* and/or operator of the Deepwater Horizon.  Triton participated and conspired to participate in overt acts in furtherance of the pattern of racketeering alleged below.

Transocean Ltd., Transocean Deepwater, Transocean Offshore, Transocean Holdings, and Triton are hereinafter referred to collectively as "Transocean."

Halliburton Energy Services, Inc. ("Halliburton") is a Delaware corporation with its principal place of business in Houston, Texas. Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the Deepwater Horizon, as

well as onshore engineering support for those operations. Subject to discovery of information in the hands of the Defendant, Plaintiffs may determine that Halliburton participated and conspired to participate in overt acts in furtherance of the pattern of racketeering activity alleged below.

Halliburton division Sperry Drilling Services ("Sperry") (formerly Sperry Sun Drilling Services) was responsible for mudlogging personnel and equipment on the Deepwater Horizon, including downhole drilling tools. Subject to discovery of information in the hands of the Defendant, Plaintiffs may determine that Sperry participated and conspired to participate in overt acts in furtherance of the pattern of racketeering activity alleged below.

"Halliburton" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

Cameron International Corporation f/k/a Cooper-Cameron Corporation ("Cameron") is a Delaware corporation with its principal place of business in Houston, Texas. Cameron is registered to do and does business in the State of Louisiana. Cameron manufactured, designed, supplied, and/or installed the Deepwater Horizon's sub-sea emergency well-closure device known as a blowout-preventer ("BOP"), which is, and was at all material times, an appurtenance of the vessel and a part of the vessel's equipment. Subject to discovery of information in the hands of the Defendant, Plaintiffs may determine that Cameron participated and conspired to participate in overt acts in furtherance of the pattern of racketeering activity alleged below.

M-I, LLC ("M-I") is a Delaware limited liability company with its principal place of business in Wilmington, Delaware.  M-I, also known as M-I SWACO, supplies drilling and completion fluids and additives to oil and gas companies in Louisiana and elsewhere, providing pressure control, vessel instrumentation, and drilling waste management products and services. On the Deepwater Horizon, M-I provided mud products, including drilling fluids and spacers, engineering services, and mud supervisory personnel, such as mud engineers and drilling fluid specialists, to manage the properties of those fluids in the well. M-I employees planned and/or supervised key fluid-related activities at Macondo, such as the mud displacement that was occurring at the time of the April 20, 2010, blowout.  Subject to discovery of information in the hands of the Defendant, Plaintiffs may determine that M-I participated and conspired to participate in overt acts in furtherance of the pattern of racketeering activity alleged below.

Weatherford U.S. L.P. ("Weatherford") is a Louisiana limited partnership that maintains its principal place of business in Houston, Texas. Weatherford designed and manufactured, marketed, sold, and/or distributed the casing components such as the float collar, shoe, and centralizers appurtenant to the vessel, and provided the personnel and equipment for running the casing and casing components into the wellbore.  Subject to discovery of information in the

hands of the Defendant, Plaintiffs may determine that Weatherford participated and conspired to participate in overt acts in furtherance of the pattern of racketeering activity alleged below.

Anadarko Petroleum Corporation Co. ("Anadarko") is a Delaware corporation with its principal place of business in The Woodlands, Texas. Anadarko is an oil and gas exploration and production company. Anadarko E&P Company LP ("Anadarko E&P") is a Delaware limited partnership with its principal place of business in The Woodlands, Texas. Anadarko E&P is an oil and gas exploration and production company. MOEX Offshore 2007 LLC ("MOEX Offshore") is a Delaware corporation with its principal place of business in Houston, Texas. MOEX Offshore is a wholly-owned subsidiary of MOEX USA Corporation. MOEX USA Corporation ("MOEX USA") is incorporated in Delaware and has its principal place of business in Houston, Texas. MOEX USA is the parent company of MOEX Offshore. Mitsui Oil Exploration Co., Ltd. ("MOECO") is incorporated in Japan and has its principal place of business in Tokyo, Japan. As of June 30, 2010, MOECO identified itself as having the following U.S. subsidiaries or affiliates: MitEnergy Upstream LLC, MOEX USA Corporation, MOEX Offshore 2007 LLC, MOEX Gulf of Mexico Corporation, MOEX Oil & Gas Texas LLC, and Mitsui E&P USA LLC. Each of these subsidiaries of MOECO share the same Houston, Texas, address. Defendants MOEX Offshore, MOEX USA, and MOECO are referred to collectively herein as "MOEX." While BP was the sole lease operator of the Deepwater Horizon, Anadarko, Anadarko E&P, and MOEX were considered non-operational leaseholders. On October 1, 2009, BP Exploration, as operator, and MOEX Offshore, as non-operator, entered into the Macondo Prospect Offshore Deepwater Operating Agreement. On December 17, 2009, BP Exploration, MOEX Offshore, Andarko E&P, and Andarko executed a "Joinder" of the Operating Agreement. Subsequently, the parties to the Operating Agreement held the following ownership percentages in the Macondo Prospect: BP Exploration, 65%; MOEX Offshore, 10%; Anadarko E&P, 22.5%; and, Anadarko, 2.5%. According to the MMS's website, effective April 1, 2010, record title interest in the Macondo prospect was held as follows: BP Exploration, 65%; MOEX Offshore, 10%; and, Anadarko, 25%. Subject to discovery of information in the hands of the Defendant, Plaintiffs may determine that Anadarko and MOEX participated and conspired to participate in overt acts in furtherance of the pattern of racketeering activity alleged below.

The former Minerals Management Service ("MMS") was a federal entity created in 1982, intended to serve as the designated agency responsible for the mineral leasing of submerged lands of the Outer Continental Shelf, including the supervision of the Deepwater Horizon drilling operations. The MMS was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2010; however, it shall be referred to as the MMS throughout this document. Subject to discovery of information in the hands of the Defendant, Plaintiffs may determine that certain dishonest MMS employees participated and conspired to participate in overt acts in furtherance of the pattern of racketeering activity alleged below.

The Marine Preservation Association ("MPA") is a consortium of major oil industry companies, including BP, Chevron, Exxon-Mobil, Shell and Conoco Phillips, created in response to the 1990 Oil Pollution Act, which required that anyone involved in the transportation, distribution or receipt of petroleum products on water must establish an approved plan that—should they cause a significant oil spill, responds to the "maximum extent practicable." The MPA funds the Marine Spill Response Corporation ("MSRC"), which has been held out by Defendants as the "largest, most dedicated standby oil spill response program in the United States." The above oil companies all utilized the Response Group to prepare the plans submitted to the MMS that contain misrepresentations and omissions regarding their ability to respond to and contain deepwater oil spills. Subject to discovery of information in the hands of the Defendant, Plaintiffs may determine that the above oil companies colluded through the above entities to misrepresent their ability to contain a deepwater oil spill and thereby participated and conspired to participate in overt acts in furtherance of the pattern of racketeering activity alleged below.

**4.    List the alleged victims and state how each victim allegedly was injured.**

The named plaintiffs and their injuries are as follows:

Plaintiff, Robert L. Rinke owns and resides at 18 Via De Luna Drive, Beach Club Penthouse #6, Pensacola Beach, Florida 32561. The Beach Club Resort and Spa is a 130 unit condominium complex located on the Gulf of Mexico, Pensacola Beach, Escambia County, Florida. Due to the Spill, Plaintiff Rinke has suffered the loss, damage and diminution in value of his condominium property abutting the Gulf of Mexico.

Plaintiff, Armand's Bistro LLC, is a domestic limited liability company domiciled and doing business in Louisiana. Armand's Bistro was a seafood restaurant located inside the Holiday Inn on Highway 51 in LaPlace, Louisiana. Due to the Spill, it could not obtain the seafood it needed to operate, and had to close.

Plaintiffs Roland and Barbara Hingle reside at 151 Bouson Lane, Buras, Louisiana. The Hingles are commercial shrimpers in the Gulf of Mexico who have lost earnings and property from the Spill.

Plaintiff Alan Sheen, M.D. is a resident of Louisiana who resides in this district and owns property in Florida—a condominium with the address of Sundunes 112, 7979 Gulf Blvd., Navarre Beach, Florida. Dr. Sheen has owned the condominium for more than five years. In 2010, his rental income was less than half the average of the prior two years, due to the Spill.

Plaintiff Mid South Seafood, Inc. is a Mississippi corporation doing business throughout the state

of Mississippi.  Plaintiff is a seafood business that buys seafood from the Gulf of Mexico on the Gulf Coast and sells the seafood throughout Mississippi.  Due to the Spill, Plaintiff Mid South Seafood has lost business and earnings.

The alleged class members—all victims—fall into nine basic categories, all of whom were injured in their business or property as a result of the Deepwater Horizon oil spill.   In presenting these categories of victims in the following order, Plaintiffs do not suggest or imply any hierarchy of merit, preference, or importance:

> (a)     Commercial fishermen, shrimpers, crabbers, oystermen, the owners and operators of businesses involving commercial fishing, shrimping, crabbing and oystering (the "Commercial Fishermen Plaintiffs").

> (b)     Seafood processors, distributors, retail and seafood markets, and restaurant owners and operators, and all those employed by seafood processors, distributors, retail and seafood markets, and restaurants (the "Processing and Distributing Plaintiffs").

> (c)     Recreational business owners, operators, and/or workers, including recreational fishing businesses, commercial guides, and charter fishing businesses who earn their living through the use of the Gulf of Mexico for businesses (the "Recreational Business Plaintiffs").

> (d)     Commercial businesses, business owners, operators, and/or workers, including commercial divers, offshore oilfield service, repair, and supply, real estate agents, and supply companies and their employees (the "Commercial Business Plaintiffs").

> (e)     Recreational sport fishermen, recreational divers, beachgoers, and recreational boaters (the "Recreation Plaintiffs").

> (f)     Plant and dockworkers, including commercial seafood plant workers, longshoremen, and ferry operators (the "Plant and Dock Worker Plaintiffs"). Owners, lessors, and lessees of real property, alleged to be damaged, harmed, or impacted, physically or economically, including but not limited to condominium owners along the Gulf Coast that suffered economic loss through diminution in their property value and lessees of oyster beds (the "Real Property Plaintiffs").

(g)     Hotel owners and operators, vacation rental owners and agents, and all those who earn their living from the tourism industry (the "Real Property/Tourism Plaintiffs").

(h)     Banks, financial institutions, and retail businesses that suffered losses as a result of the Spill (the "Banking/Retail Business Plaintiffs").

(i)     Persons who utilize natural resources for subsistence (the "Subsistence Plaintiffs").

**5.     Describe in detail the pattern of racketeering activity or collection of an unlawful debt alleged for each RICO claim.**

THE PATTERN OF RACKETEERING

The pattern of racketeering engaged in by BP consists of numerous acts of mail and wire fraud, from at least 2000 forward, all related to the scheme to defraud federal regulators regarding the safety of offshore drilling operations conducted by BP on Transocean drilling rigs, and containment of oil spills that might be generated by those operations.  The scheme to defraud involves misrepresentations and omissions to the regulators regarding the ability of BP and its subcontractor, Transocean, both to prevent and to contain oil spills.  BP and Transocean's fraudulent scheme has not just involved the Macondo well offshore drilling project that utilized the *Deepwater Horizon*, but has also involved other wellsites in the Gulf of Mexico and indeed around the world.

BP and Transocean have enjoyed a long and lucrative offshore drilling operations enterprise since at least 2000:

- In its 2000 10-K, Transocean reported that BP remained a principal client, and was elevated to the status as one of Transocean's largest unaffiliated clients, accounting for 14.4 percent of the Company's 2000 operating revenues. Transocean 10-K, FYE Dec. 31, 2000, at 11.

- For the year ended December 31, 2005, BP accounted for approximately 11.7 percent of Transocean's operating revenues.  Transocean 10-K, FYE Dec. 31, 2005.

- For the year ended December 31, 2006, BP accounted for approximately 11 percent of Transocean's operating revenues.   Transocean 10-K, FYE Dec. 31, 2006.

- For the year ended December 31, 2007, BP accounted for approximately 10 percent of Transocean's operating revenues.   Transocean 10-K, FYE Dec. 31, 2007.

- For the year ended December 31, 2008, BP accounted for approximately 11 percent of Transocean's operating revenues, and "[n]o other client accounted for 10 percent or more of [its] 2008 operating revenues."   Transocean 10-K, FYE Dec. 31, 2008.

- For the year ended December 31, 2009, BP accounted for approximately 12 percent of Transocean's operating revenues, and was Transocean's "most significant customer.". Transocean 10-K, FYE Dec. 31, 2009.

- For the year ended December 31, 2010, BP accounted for approximately 10 percent of Transocean's operating revenues, and was Transocean's "most significant customer." Transocean 10-K, FYE Dec. 31, 2010.

- A recent Transocean SEC Form 10-Q reports that "[a]s of October 14, 2010, the contract backlog associated with our contracts with BP was $3.1 billion." Transocean 10-Q, FQE Sept. 30, 2010, at 54.

This relationship between BP and Transocean involves offshore deep sea oil drilling in the Gulf of Mexico and around the world:

- As of March 1, 2000, Transocean's Sedco Express-Class Semisubmersibles, the *Transocean Leader* and the *Paul B. Loyd, Jr.*, both operating in the U.K. North Sea, were under contract to BP through March 2001 and July 2000, respectively.  Transocean 1999 10-K at 5.

- BP contracted for the *Discoverer Enterprise* and *Discoverer 534* drillships, operating in the U.S. Gulf of Mexico, through December 2004 and October 2000, respectively.  *Id.*

- As of March 1, 2001, the drillship *Discoverer Enterprise*, which continued to operate in the U.S. Gulf of Mexico, remained under contract to BP.   Additionally, BP had contracted with Transocean for five high-specification semisubmersibles – the *Deepwater Horizon* (U.S. Gulf of Mexico), the *Jack Bates* (U.K. North Sea), the *Transocean Leader* (U.K. North Sea), the *Transocean Rather* (U.S. Gulf of Mexico) and the *Paul B. Loyd, Jr.* (U.K. North Sea) – and Transocean's *Sedco 714* semisubmersible (U.K. North Sea). Transocean 2000 10-K at 4-5.

- As of March 1, 2002, Transocean's drillship the *Discoverer Enterprise* continued to operate in the U.S. Gulf of Mexico under contract with BP, as did the *Deepwater Horizon* and the *Transocean Rather*.   Transocean's *Sedco Express* was under contract and operating for BP in Egypt, while the *Jack Bates*, *Transocean Leader*, *Paul B. Loyd, Jr.* and *Sedco 714* all worked for BP in the U.K. North Sea.  Transocean 2001 10-K at 5-6.

- As of February 28, 2003, the *Discoverer Enterprise* and the *Deepwater Horizon* continued to ply the waters of the U.S. Gulf of Mexico, and the *Transocean Leader*, the *Paul B. Loyd, Jr.* and the *Sedco 714* the waters of the U.K. North Sea, on behalf of BP. Transocean 2002 10-K at 4-6.

- As of February 27, 2004, the *Discoverer Enterprise* and the *Deepwater Horizon* were still working in the U.S. Gulf of Mexico, and the *Paul B. Loyd, Jr.* in the U.K. North Sea, for BP.  Transocean reported operating revenues of 11.8 percent attributable to BP for 2003. Transocean 2003 10-K at 6-7, 10.

- As of February 28, 2005, the *Discoverer Enterprise* (U.S. Gulf of Mexico), *Deepwater Horizon* (U.S. Gulf of Mexico), *Transocean Marianas* (U.S. Gulf of Mexico), *Sedco Express* (Angola), *Transocean Rather* (U.K. North Sea) and *Paul B. Loyd, Jr.* (U.K. North Sea) were all under contract with BP. Transocean 2005 10-K at 6.

- As of March 2, 2006, the *Discoverer Enterprise* (U.S. Gulf of Mexico), *Deepwater Horizon* (U.S. Gulf of Mexico), *Transocean Marianas* (U.S. Gulf of Mexico), *Sedco Express* (Angola), *Transocean Rather* (U.K. North Sea) and *Paul B. Loyd, Jr.* (U.K. North Sea) were all still under contract with BP.  Transocean 2006 10-K at 7-8.

EXAMPLES OF PREDICATE ACTS FORMING THE PATTERN

The facts and details such as time, place, content of misrepresentations and omissions, and identity of persons or the government entity to whom and by whom the alleged misrepresentations and omissions were made that are known to date constituting the predicate acts are:

    i.    Upon information and belief, on December 1, 2000, BP submitted by mail and/or interstate wire or interstate carrier to MMS a Regional Oil Response Plan addressing the entire Gulf of Mexico area, including the area later drilled by the Deepwater Horizon.  This plan falsely stated that BP could contain an oil spill of up to 250,000 barrels per day.  This plan included other blatant misrepresentations, such as: an ability to haul out sea lions, seals and walruses; links to a Japanese home shopping website as being one of the "primary equipment providers for BP in the Gulf of Mexico region [for] rapid deployment of spill response resources." BP Regional Oil Response Plan – Gulf of Mexico.

    ii.    On October 14, 2004, in furtherance of the scheme to defraud, BP and Transocean used the mails and agreed to exacerbate the risk of BOP

failure to prevent a blowout in the Gulf of Mexico by equipping the *Deepwater Horizon* with just one single blind sheer ram.   Letter Agreement for Conversion of VBR to a Test Ram, CONTRACTOR-5121-2002-011, Oct. 11, 2004.  BP contracted Transocean to replace one of the rams on the *Deepwater Horizon*'s BOP with a test ram in order to speed up testing procedures, both knowing the installation of this test ram lowered the BOP unit's reliability even further.  Indeed, the agreement between BP and Transocean executed in 2004 noted BP and Transocean's awareness that the removal of the second ram would "reduce the built-in redundancy" of the BOP and raise the rig's "risk profile." *Id.*  Upon information and belief and subject to discovery, BP contracted with Transocean to provide a single ram on rigs other than the *Deepwater Horizon* it operated in the Gulf of Mexico.  Thus, BP and Transocean's scheme to deceive regulators involved the *Deepwater Horizon* as well as other drilling operations in the Gulf of Mexico. BP furthered the deception associated with the agreement to equip the *Deepwater Horizon* and other offshore drilling rigs with a single ram when David Rainey, Vice President of BP Exploration for the Gulf of Mexico, deceptively misrepresented in testimony to the United States Senate Committee on Energy and Natural Resources on November 19, 2009, that BP had the BOP technology for redundant systems and controls.  Testimony of David Rainey, United States Senate Committee on Energy and Natural Resources, November 19, 2009. Mr. Rainey failed to disclose that BP had purposely removed such redundant systems in all of its Gulf of Mexico drilling operations and that BP and Transocean had agreed to purposely remove such redundant systems from the *Deepwater Horizon*.  BP did not report to the MMS that the *Deepwater Horizon* was operating with a single ram, and the existence of the BP and Transocean agreement to equip the *Deepwater Horizon* with a single ram remained undisclosed until June 20, 2010

iii.    On April 10, 2007, BP caused a "BP Exploration & Production, Inc. Supplemental Exploration Plan" to be submitted by wire to MMS on April 10, 2007 in which BP falsely certified "that they have the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such discharge, resulting from the activities proposed in their EP."  www.boemre.gov.  This related to BP's use of Transocean's *Discoverer Enterprise* rig in Thunderhorse drilling operations that started production in 1999 in the Gulf of Mexico. www.subsealQ.com.

iv.    Upon information and belief, on June 30, 2009, BP submitted by mail

and/or interstate wire or interstate carrier to MMS a revised Regional Oil Response Plan addressing the Gulf of Mexico, that included the same misrepresentations as the 2000 plan. It also added new misrepresentations, such as references to a professor listed as a consultant for responding to the spill who had died in 2005.

v.      Upon information and belief, on February 23, 2009, BP submitted by mail and/or interstate wire or interstate carrier to MMS an Initial Exploration Plan for Mississippi Canyon Block 252 – the document covering the Macondo project.  In this document, BP falsely minimized the prospect of any serious damage associated with a spill, saying there would be only "sub-lethal" effects on fish and marine mammals, and "birds could become oiled."  BP further misrepresented that "[i]n the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using *proven equipment and technology* for such responses, implementation of BP's Regional Oil Spill Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill." [emphasis added].  BP also falsely stated that it was prepare to handle a worst-case discharge of 162,000 barrels of oil per day.

vi.      Interstate wires were used on March 25, 2010 and March 30, 2010 to further BP's scheme to defraud the MMS.  Emails on those dates were sent among BP personnel, and concluded that the long string casing design would "save a lot of time…at least 3 days," "saves a good deal of time/money," and is the "[b]est economic case."  Email from Brian Morel, BP Drilling Engineer, to Allison Crane, Materials Management Coordinator, March 25, 2010; Email from Brian Morel, BP Drilling Engineer, to Sarah Dobbs, Completion Engineer, March 30, 2010.  Despite the fact the BP itself had concluded that it would not use the long string casing design because of the high risk of a failed cement job and the inability to comply with MMS regulations, BP then on April 15, 2010 sent by mail and/or interstate wire or interstate carrier a request to MMS asking for a permit to use long string casing, apologizing for not having mentioned its use earlier and falsely stating that they had "inadvertently" failed to include its use in earlier submitted plans.

vii.      Similarly, interstate wires were used on March 25, 2010 to further BP's scheme to defraud the MMS when Brian Morel of BP sent an email to Heather Powell, copied to Scherie Douglas, Senior Regulatory Compliance Team Lead at BP, stating in part with respect to obtaining a

bypass permit:  "I have attached what I feel is pertinent data, only thing missing from the documents we submitted for the bypass permit is the engineering calculations, as they don't completely pertain to this liner, hopefully they will not ask for them.  However if they do want them I can provide."  This email reflects an intent to knowingly provide insufficient documentation to MMS and then, if caught with respect to the insufficient documentation, provide incorrect documentation.

viii.   BP used the interstate wires in furtherance of its scheme, in particular as the scheme was implemented to place profit above safety with respect to the use of pipe centralizers.  BP knowingly chose an insufficient number of "centralizers" to prevent channeling of gas during the cementing process. Halliburton, the contractor hired by BP to cement the well, warned BP that the well could have a "SEVERE gas flow problem" if BP lowered the final string of casing with only six centralizers instead of 21 recommended by Halliburton.  BP rejected Halliburton's advice to use additional centralizers, solely because the delay it would entail. In an April 16, 2010 email, a BP executive involved in the decision-making explained: "it will take 10 hours to install them…I do not like this."  Later that day, another BP official knowingly acknowledged the increased risk of proceeding without a sufficient number of centralizers, but carelessly commented with lethal disregard for the people and the environment that could be seriously injured, causing further injury to business or property: "who cares, it's done, end of story, will probably be fine. . . ." (Email from Brett W. Cocales to Brian P. Morel, April 16, 2010).

ix.   According to the National Commission report, on April 16, 2010 BP sent, upon information or belief by mail or interstate wire, an Application for Permit to Modify to MMS describing a temporary abandonment procedure that was different from the procedure in either the April 12 drilling plan, an April 14 email, or an April 20 "Ops Note."  There is no evidence that these changes went through any sort of formal risk assessment or management of change process as required.

Upon information and belief, numerous other acts of mail and wire fraud will be uncovered in discovery, because the bulk of relevant mails and wires currently are in the hands of BP and its co-conspirator Transocean.

THE RELATIONSHIP OF THE PREDICATE ACTS TO THE ENTERPRISE

BP had to use the BP/Transocean association-in-fact enterprise to carry out its scheme to defraud.  BP could not have done so without Transocean, because Transocean was required, by law and by necessity, to agree with BP on critical aspects of safety, including oil spill prevention and containment, that were being misrepresented to or concealed from the regulators.  Subpart D of the prescriptive offshore drilling operations regulations of the Minerals Management Service (the "MMS") apply to both BP and Transocean, because the regulations "apply to lessees, operating rights owners, operators, and their contractors and subcontractors." 30 C.F.R. § 250.400.  Similarly, the MMS's prescriptive offshore drilling regulations require those entities involved in offshore drilling operations to ensure there are safe blowout preventer systems ("BOP") in place, along with all system components, surface and subsea stacks, associated systems and equipment, choke manifolds, kelly valves, drilling-string safety valves, maintenance and inspections, pressure tests and additional testing, and recordkeeping.  "You must design, install, maintain, test, and use the BOP system and system components to ensure well control. The working-rating of each BOP component must exceed anticipated surface pressures. The BOP system includes the BOP stack and associated BOP systems and equipment." *Id.*

The *Deepwater Horizon* illustrates how the joint responsibility is employed in practice. Transocean supplied almost every employee involved in the day-to-day operations on the rig. According to the National Commission on the BP Deepwater Horizon Oil Spill & Offshore Drilling, Deep Water: The Gulf Disaster & the Future of Offshore Drilling, Final Report to the President, Jan. 2011, Ch. 1, at 3: "About 126 people were aboard [the Deepwater Horizon on April 20, 2010]: approximately 80 Transocean employees, a few BP men, cafeteria and laundry workers, and a changing group of workers contracted for specialized jobs."   While Transocean supplied the manpower on the rig, BP made the key decisions affecting oil spill prevention and containment—with Transocean's agreement.  The Offshore Installation Manager ("OIM") is an employee of Transocean and its senior employee on the rig.  An OIM is the only employee on the rig that may overrule decisions by the "Company Man" (BP's senior employee on the rig) pertaining to drilling operations if the OIM believes that that the action will endanger the rig or the crew.  Thus, every decision by the Company Man or any other BP employee located either on the rig or on the beach was told to the OIM whose duty it was to approve or disapprove the action.  In fact, it was Transocean employees, not BP employees, who were initially deemed "parties of interest" and asked to come before a joint U.S. Cost Guard-Interior Department investigative panel.  (http://www.bloomberg.com/news/2010-07-20/well-boss-kaluza-was-bp-temporary-replacement-on-rig-refuses-to-testify.html).  The BP well-site leader told the panel that Transocean's offshore installation manager, or OIM, had the authority to veto any drilling operations he deemed unsafe; and when asked "where the buck stops," the BP leader testified "It stops with the OIM."   *Id.*   And BP and Transocean were in continuous contact regarding operations on the rig.  *See* Deposition of Mark Robert Bly, Executive Vice President of Safety & Operational Risk for BP, plc., (February 17, 2011), at 704:7-16 ("there's constant communication between BP and Transocean on the rig."); Deposition of Kent Corser, Drilling

Engineer Manager, BP E&P-Alaska, (February 11, 2011), at 389:24-390:1 (noting that BP gave instructions to Transocean relating to rig operations).

**A description of the pattern of racketeering activity shall include the following information:**

**(a)    List the alleged predicate acts and the specific statutes allegedly violated;**

The predicate acts constitute violations of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343.  These predicate acts form the pattern of racketeering and are the basis of BP's violation of 18 U.S.C. § 1962(c).  These predicate acts also  constitute the primary overt acts taken in furtherance of the conspiracies under 18 U.S.C. § 1962(d) to violate 18 U.S.C. §§ 1962(c) and (a).

**(b)    Provide the dates of the predicate acts, the participants in the predicate acts and a description of the facts surrounding each predicate act;**

See examples in the "Pattern of Racketeering," above.

**(c)    If the RICO claim is based upon the predicate offenses of wire fraud, mail fraud, fraud in the sale of securities, or fraud in connection with a case under U.S.C. Title 11, the "circumstances constituting fraud or mistake shall be stated with particularity," Fed. R. Civ. P. 9(b).  Identify the time, place, and contents of the alleged misrepresentation or omissions, and the identity of persons to whom and by whom the alleged misrepresentations or omissions were made;**

See examples in the "pattern of Racketeering," above.

**(d)    Describe whether the alleged predicate acts relate to the enterprise as part of a common plan.  If so, describe in detail.**

The alleged predicate acts relate to the association-in-fact enterprise of BP and Transocean as part of a common plan to place profits over safety by: (1) fraudulently deceiving federal and state regulators that they would safely conduct their offshore oil drilling operations to prevent oil spills, and (2) fraudulently deceiving federal and state regulators that they could effectively respond to and contain any oil spill, including worse case scenario oil spills like the Deepwater Horizon disaster.. Defendant BP participated in and conspired with Transocean to engage in these schemes.  BP individually, and BP in conjunction with its co-conspirator Transocean, used the association-in-fact enterprise of BP and Transocean to carry out this common plan.

**6.** **Describe in detail the alleged enterprise for each RICO claim.  A description of the enterprise shall include the following information;**

    **(a)** **State the names of the individuals, partnerships, corporations, associations or other entities allegedly constituting the enterprise;**

BP and Transocean constitute the association-in-fact enterprise, within the meaning of 18 U.S.C. § 1961(4), for Plaintiffs' 18 U.S.C. § 1962(c) claim, for Plaintiffs' 18 U.S.C. § 1962(d) RICO claim for conspiracy to violate 18 U.S.C. § 1962(c), and for Plaintiffs' 18 U.S.C. § 1962(d) claim for conspiracy to violate 18 U.S.C. § 1962(a).

    **(b)** **Describe the structure, purpose, roles, function and course of conduct of the enterprise;**

The structure of the enterprise is an association-in-fact between BP and Transocean.  The purpose, role, function and course of conduct of the enterprise is in part to carry out the lawful business of exploring and developing oil reserves, and in part to carry out the pattern of racketeering described in answer to question No. 5, above.  The enterprise possessed and continues to possess an ongoing organizational structure.

    **(c)** **State whether any defendants are employees, officers or directors of the alleged enterprise;**

Defendant BP is not an employee, officer or director of the alleged enterprise.

    **(d)** **State whether any defendants are associated with the alleged enterprise, and if so, how;**

Defendant BP is associated with alleged enterprise both as a member of the association-in-fact enterprise, and an entity engaged in the management, operation and control of the enterprise.

    **(e)** **State whether you allege that the defendants are individuals or entities separate from the alleged enterprise, or that the defendants are the enterprise itself, or members of the enterprise;**

Defendant BP is a member of the association-in-fact enterprise.

    **(f)** **If you alleged any defendants to be the enterprise itself, or members of the enterprise, explain whether such defendants are perpetrators, passive instruments, or victims of the alleged racketeering activity.**

Defendant BP is a perpetrator of the alleged racketeering activity.

**7.      State whether you allege and describe in detail how the pattern of racketeering activities and the enterprise are separate or have merged into one entity.**

The Enterprise exists separate and apart from its pattern of racketeering activity, inasmuch as BP and association-in-fact member Transocean have multiple goals, not all of which are fraudulent.

**8.      Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity.  Discuss how the racketeering activity differs from the usual and daily activities of the enterprise, if at all.**

The lawful activity engaged in by the Enterprise includes ongoing partnerships between BP and Transocean to explore and develop oil reserves.  But Defendant BP has, at a minimum since 2000, also used this enterprise to conduct the related acts of mail and wire fraud comprising the pattern of racketeering.

**9.      Describe what benefits, if any, the alleged enterprise receives from the alleged pattern of racketeering activities.**

The Enterprise benefits from the alleged pattern of racketeering activity by obtaining billions of dollars in oil and profits through the pattern of racketeering activity that misled the government regulators into believing the Enterprise was able to effectively prevent and contain offshore oil spills.  The mail and wire fraud constituting the pattern of racketeering activities was necessary for the Enterprise to receive this benefit, because it would have decreased BP's ability to obtain oil and profits if they actually employed the offshore oil spill and containment equipment and processes as represented.  In addition, absent the pattern of racketeering the regulators would have required BP and co-conspirator Transocean to expend the funds necessary to comply with regulatory requirements, or forego the profitable activities.  Government regulators would not have allowed the Enterprise to conduct its offshore exploration, development and containment activities in a knowingly unsafe manner, in violation of statute and regulation.

**10.     Describe the effect of the activities of the enterprise on interstate or foreign commerce.**

At all relevant times, the activities of the Enterprise substantially affected interstate and foreign commerce, through and including but not limited to, its large investments, expenditures and offshore drilling activities with numerous entities involved in its ongoing offshore drilling in the Gulf of Mexico and around the world.

11. **If the complaint alleges a violation of 18 U.S.C. Section 1962 (a), provide the following information:**

    (a)    **State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and,**

    (b)    **Describe the use or investment of such income.**

Not applicable.

12. **If the complaint alleges a violation of 18 U.S.C. Section 1962 (b), provide the following information:**

    (a)    **Describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise; and,**

    (b)    **State whether the same entity is both the liable "person" and the "enterprise" under Section 1962 (b).**

Not applicable.

13. **If the complaint alleges a violation of 18 U.S.C. Section 1962 (c), provide the following information:**

    (a)    **State who is employed by or associated with the enterprise;**

Defendant BP is associated with the Enterprise.

    (b)    **State whether the same entity is both the liable "person" and the "enterprise" under Section 1962 (c).**

Defendant BP is not both the liable "person" and the "enterprise" under Section 1962(c).

**14.     If the complaint alleges a violation of 18 U.S.C. Section 1962 (d), describe in detail the alleged conspiracy.**

As described in more detail in response to  ¶5 and in the Complaint, Defendant BP conspired with Transocean to mislead government regulators into believing they were safely conducting offshore drilling operations and that they could safely contain deepwater oil spills. Defendant BP and Transocean conspired under Section 1962(d) to violate Section 1962(c) and undertook overt acts of mail and wire fraud in furtherance of that conspiracy.   Similarly, Defendant BP and Transocean conspired under Section 1962(d) to violate Section 1962(a) by undertaking overt acts of mail and wire fraud in an effort to use or invest income unlawfully derived from such conduct, directly or indirectly, in the establishment or operation of the association-in-fact Enterprise. BP and Transocean both agreed to the objective of the conspiracy.   The specifics of some of the knowing interactions evidencing this conspiracy are set forth in more detail in response to ¶ 5, above, and some of the specifics will be secured in discovery since such additional evidence supporting these conspiracy claims is in the hands of Defendant BP and co-conspirator Transocean.

**15.     Describe the alleged injury to business or property.**

The RICO violations caused the spill and the failure to effectively contain the spill, which was the direct and proximate cause of injury to business or property of Plaintiffs.   The injury to business or property of the named Plaintiffs and class members is more fully described in response to question No. 4, above.

**16.     Describe the relationship between the alleged injury and violation of the RICO statute.**

The violation of the RICO statute is the direct and proximate cause of the injuries suffered by the victim/plaintiffs in this case.   The scheme to defraud regulators regarding the safety of Defendants' deep sea oil drilling allowed Defendants to proceed with the Deepwater Horizon drilling without prescribed and claimed safeguards that would have prevented the spill, causing the spill and the consequent damage to Plaintiffs' business and property.  The scheme to defraud regulators regarding Defendants' ability to contain a spill allowed Defendants to proceed with the Deepwater Horizon drilling without a prescribed and claimed containment plan in place, exacerbating the spill and the consequent injury and damage to Plaintiffs' business and property.

**17.     List the damages sustained by reason of the violation of Section 1962, indicating the amount for which each defendant allegedly is liable.**

The damages sustained by reason of the violation of Section 1962 are ongoing, but to date clearly number in the billions of dollars.  Defendant BP is liable for the injury to Plaintiffs and

class members and all damages. Plaintiffs reserve the right to amend the Complaint to add additional Defendants that are liable for the injury and damages to Plaintiffs and class members.

**18.     List all other federal causes of action, if any, and provide the relevant statute numbers.**

No other federal cause of action is set forth in the B2 Master Complaint. Plaintiffs reserve the right to add additional federal causes of action against BP and/or additional Defendants.

**19.     List all pendent states claim, if any.**

Plaintiffs also seek equity relief under FLA. STAT. ANN. §§ 895.05 (1), (6).

**20.     Provide any additional information you feel would be helpful to the Court in processing your RICO claim.**

Plaintiffs believe their RICO claim is a straightforward application of civil RICO, and would be pleased to answer any questions the Court may have in processing this claim.

      This 29th day of March, 2011.


Respectfully submitted,


*/s/ Stephen J. Herman*
**Stephen J. Herman,** La Bar No. 23129
HERMAN HERMAN KATZ & COTLAR LLP
820 O'Keefe Avenue
New Orleans, LA 70113
Telephone: (504) 581-4892
Facsimile: (504) 569-6024
E-Mail: sherman@hhkc.com
*Plaintiffs Liaison Counsel*

*/s/ James Parkerson Roy*
**James Parkerson Roy,** La. Bar No. 1511
DOMENGEAUX WRIGHT ROY & EDWARDS LLC
556 Jefferson Street, Suite 500
Lafayette, LA 70501
Telephone: (337) 233-3033
Facsimile: (337) 233-2796
E-Mail: jimr@wrightroy.com
*Plaintiffs Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT DRESCHER IMPREVENTO &
WALKER, P.C.
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office: (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

## RICO MASTER COMPLAINT
## WORKING GROUP

Hiram Eastland
EASTLAND LAW OFFICES, PLLC
307 Cotton Street
Greenwood, MS 38930
Telephone:  (662) 453-1227
Facsimile:  (662) 453-2808
Email:  eastlandlaw@bellsouth.net

Wanda J. Edwards
FAYARD & HONEYCUTT, APC
519 Florida Avenue SW
Denham Springs, LA 70726
Telephone:  (225) 664-4193
Facsimile:  (225) 664-6925
Email:  wandaedwards@fayardlaw.com

Keith D. Jones
8480 Bluebonnet Blvd., Suite F
Baton Rouge, LA 70810
Telephone:  (225) 763-6900
Facsimile:  (225)
Email:  keith@kjones-law.com

W. B. Markovits
WAITE, SCHNEIDER, BAYLESS &
CHESLEY CO., L.P.A.
1513 Fourth & Vine Tower
1 West Fourth Street
Cincinnati, OH  45202
Telephone:  (513) 621-0267
Facsimile:  (513) 621-0262
Email:  billmarkovits@wsbclaw.com

Peter Prieto
PODHURST ORSECK P.A.
25 West Flagler Street, Suite 800
Miami, FL 33130
Telephone:  (305) 358-2800

Facsimile:  (305) 358-2382
Email:  PPrieto@podhurst.com


Of Counsel:

G. Robert Blakey*
(*pro hac motion to be filed*)
Notre Dame Law School
Notre Dame, IN 36556
Telephone:  (574) 631-5717
Facsimile:  (574) 631-4197
Email:  G.R. Blakey.1@nd.edu

* Notre Dame Law School is used solely for purposes of address.


<u>**CERTIFICATE OF SERVICE**</u>

WE HEREBY CERTIFY that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on March 29, 2011.


/s/ Stephen J. Herman and James Parkerson Roy