**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In Re:  Oil Spill by the Oil Rig** | ) | **MDL No. 2179** |
| **"Deepwater Horizon" in the Gulf** | ) | |
| **of Mexico, on April 20, 2010** | ) | **SECTION:  J** |
| | ) | |
| | ) | **The Hon. CARL J. BARBIER** |
| **This document relates to:** | ) | |
| *All Cases in Pleading Bundle B2* | ) | **Magistrate Judge SHUSHAN** |

<u>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO BP DEFENDANTS'**</u>
<u>**MOTION TO DISMISS CONSOLIDATED CLASS ACTION RICO**</u>
<u>**COMPLAINT IN ACCORDANCE WITH PTO NO. 11 [CMO NO. 1]**</u>
<u>**SECTION III(B2) ["B2 BUNDLE"]**</u>

# **TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 1

BACKGROUND ........................................................................................ 5

LEGAL STANDARD ................................................................................. 10

ARGUMENT .............................................................................................. 11

    I.     Plaintiffs Allege Proximate Causation .................................. 13

    II.    Plaintiffs Allege "Racketeering Activity" ............................ 25

    III.   Plaintiffs Allege "Participation" in an "Enterprise" ............ 31

    IV.   Plaintiffs Allege a RICO "Pattern" ...................................... 34

    V.    Plaintiffs Allege RICO Injury .............................................. 37

    VI.   Plaintiffs Allege A RICO Conspiracy ................................. 44

    VII.  Plaintiffs Allege a Violation of Florida RICO ..................... 49

CONCLUSION ........................................................................................... 49

CERTIFICATE OF SERVICE ................................................................... 53

# TABLE OF AUTHORITIES

Page(s)

## Cases

*AAMCO Transmissions, Inc. v. Marino,*
  Nos. 88-5522, 88-6197, 1992 WL 38120 (E.D. Pa. Feb. 20, 1992) ...............................38

*Abbott v. BP Exploration & Prod., Inc.,*
  No. H-09-1193, 2011 WL 923504 (S.D. Tex. Mar. 15, 2011) ......................................24

*Abraham, et al. v. Singh, et al.,*
  480 F.3d 351 (5th Cir. 2007) ..........................................................................................36

*Advanced Bus. Sys., Inc. v. Phillips Info. Sys. Co.,*
  750 F. Supp. 774 (E.D. La. 1990).....................................................................................38

*Agile Software Corp. v. Merrill Lynch & Co., Inc.,*
  174 F. Supp. 2d 1032  (N.D. Cal. 2001) ..........................................................................24

*Allwaste, Inc. v. Hecht,*
  65 F.3d 1523 (9th Cir.1995) ............................................................................................36

*American Soc'y of Mech. Engineers v. Hydrolevel Corp.,*
  456 U.S. 556 (1982)..........................................................................................................13

*Anza v. Ideal Steel Supply Corp.,*
  547 U.S. 451 (2006) ...........................................................................14, 15, 16, 21, 22

*Ashcroft v. Iqbal,*
  129 S. Ct. 1937 (2009)...............................................................................10, 47, 48

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
  459 U.S. 519 (1983)....................................................................................16, 17

*B&M Nat. Automation, LLC v. AMX Corp.,*
  No. 06-20412, 2007 WL 809675 (S.D. Fla. Mar. 15, 2007).............................................38

*Badders v. United States,*
  240 U.S. 391 (1916)..........................................................................................................26

*BCS Services, Inc. v. Heartwood,*
  *88 LLC,* Nos. 05C 4095, 07 C 1367 (7th Cir. decided Mar. 24, 2011)....................29, 31

*Bechtold v. Sprint Nextel Corp.*,
    No. 08-cv-23, 2008 WL 8140103 (S.D. Ill. Oct. 30, 2008)..............................................31

*Beck v. Prupis*,
    529 U.S. 494 (2000).................................................................................................48

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................10, 44, 47, 48

*Bd. of Regents v. Roth*,
    408 U.S. 564 (1972)..................................................................................................41

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982)………………………………………………………………….....17

*Blumenthal v. United States*,
    332 U.S. 539 (1947)..................................................................................................44

*Bonvillain v. La. Land & Exploration Co.*,
    702 F. Supp. 2d 667 (E.D. La. 2010)..........................................................................42

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008)........................................................................................ *passim*

*Brown v. Cassens Transport Co.*,
    546 F.3d 347 (6th Cir. 2008)…………………………………………………………….22

*Capitol West Appraisals, LLC v. Countrywide Fin. Corp.*,
    No. C08-1520RAJ, 2010 WL 5560774 (W.D. Wash. Sept. 28, 2010)...........................34

*Carpenter v. United States*,
    484 U.S. 19 (1987)..............................................................................................26, 40

*Carter v. Berger*,
    777 F.2d 1173 (7th Cir. 1985) ....................................................................................43

*Caterpillar Inc. v. Williams*,
    482 U.S. 386 (1987).....................................................................................................2

*Chaney v. Dreyfus Serv. Corp.*,
    595 F.3d 219 (5th Cir. 2010) .....................................................................................47

*City of Columbia v. Omni Outdoor Adver., Inc.*,
    499 U.S. 365 (1991)..................................................................................................23

*Cleveland v. United States*,
    531 U.S. 12 (2000)....................................................................................................25

*Conley v. Gibson*,
    355 U.S. 41 (1957) ..................................................................................................10

*Cox v. Adm' United States Steel & Carnegie*,
    17 F.3d 1386 (11th Cir. 1994) ...............................................................................18

*Crater v. Binninger*,
    33 N. J. L. 513 (Ct. Errors and Appeals 1869) .....................................................18

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006)...................................................................................43

*Desiano v. Warner-Lambert Co.*,
    326 F.3d 339 (2d Cir. 2003)......................................................................................2

*Diaz v. Gates*,
    420 F.3d 897 (9th Cir. 2005) ..........................................................................41, 42

*Direct Sales Co. v. United States*,
    319 U.S. 703 (1942)................................................................................................44

*Dirt Hogs Inc. v. Natural Gas Pipeline Co. of America*,
    No. 99-6026, 2000 WL 368411 (10th Cir. Apr. 10, 2000) ....................................34

*Doe v. Roe*,
    958 F.2d 763 (7th Cir. 1992) .................................................................................42

*Domberg v. State*,
    518 So. 2d 1360 (Fla. 1st  DCA 1988)…………..…………………………………49

*Ducote Jax Holdings, L.L.C. v. Bradley*,
    No. 04-1943, 2007 WL 2008505 (E.D. La. July 5, 2007) .....................................11

*Durland v. United States*,
    161 U.S. 306 (1896)..........................................................................................25, 26

*Edwards v. St. John the Baptist Parish*,
    No. 09-4384, 2010 WL 3720436 (E.D. La. Sept. 9, 2010)....................................17

*Empress Casino Joliet Corp. v. Blagojevich*,
    Nos. 09-3975, 10-1019, 2011 WL 710467 (7th Cir. Mar. 2, 2011)..................19, 24

*FDIC v. Refco Group, Ltd.*,
    989 F. Supp. 1052 (D. Colo. 1997).........................................................................34

*Feinstein v. Resolution Trust Corp.*,
　　942 F.2d 34 (1st Cir. 1991) ...................................................................................11

*Florida Power & Light Co. v. Jennings*,
　　518 So. 2d 895 (Fla. 1987)....................................................................................42

*Francis v. Ecoquest Int'l, Inc.*,
　　No. 4:06C1168DDN, 2007 WL 2362496 (E.D. Mo. Aug. 14, 2007)...........................34

*Genty v. Resolution Trust Corp.*,
　　937 F.2d 899 (3d Cir. 1991).................................................................................42

*Glassen v. United States*,
　　315 U.S. 60 (1942)...............................................................................................44

*Gottstein v. Nat'l Ass'n for Self Employed*,
　　53 F. Supp. 2d 1212 (D. Kan. 1999) .................................................................34

*Grant v. Turner*,
　　No. Civ. A 09-2381 (JAG), 2010 WL 988537 (D.N.J. Mar. 12, 2010).........................34

*Gregory v. United States*,
　　253 F.2d 104 (5th Cir. 1958) .........................................................................26, 27

*Gulf Prod. Co., Inc. v. Hoover Oilfield Supply, Inc.*,
　　672 F. Supp. 2d 752 (E.D. La. 2009) ...............................................................10

*H.J. Inc. v. Northwestern Bell Tel. Co.*,
　　492 U.S. 229 (1989)..............................................................11, 12, 24, 35, 36

*Halpin v. Crist*,
　　No. 10-10339, 2010 WL 5078222 (11th Cir. Dec. 14, 2010).......................................15

*Hamlin v. United States*,
　　418 U.S. 87 (1974)...............................................................................................44

*Heller Fin. Inc. v. Grammco Computer Sales, Inc.*,
　　71 F.3d 518 (5th Cir. 1996) ...............................................................................35

*Hemi Group LLC v. City of New York*,
　　130 S. Ct. 983 (2010) ...................................................................................15, 22, 23

*Henneford v. Silas Mason Co., Inc.,*
     300 U.S. 577 (1937) ................................................................................17

*Holmes v. S.I.P.C,*
     503 U.S. 258 (1992) ...........................................................15, 16, 17, 19, 20, 39

*In re Ins. Brokerage Antitrust Litig.,*
     618 F.3d 300 (3d Cir. 2010) .......................................................................34

*In re Ins. Brokerage Antitrust Litig.,*
     Nos. MDL 1663, Civ. 04-5184 (GEB), Civ. 05-1079 (GEB),
     2007 WL 1062980 (D.N.J. Apr. 5, 2007) ..................................................34

*In re Ins. Brokerage Antitrust Litig.,*
     Nos. MDL 1663, Civ. 04-5184 (GEB), Civ. 05-1079 (GEB),
     2007 WL 2892700 (D.N.J. Sept. 28, 2007) ...............................................34

*In re SmithKline Beecham Clinical Labs., Inc. Lab. Test Billing Prac. Litig.,*
     108 F. Supp. 2d 84 (D. Conn. 1999) ...........................................................34

*In re Taxable Mun. Bond Secs. Litig.,*
     51 F.3d 518 (5th Cir. 1995) ...................................................................41, 43

*International Bd. of Teamsters v. Carey,*
     297 F. Supp. 2d 706 (S.D.N.Y. 2004) ........................................................37

*J. Truet Payne & Co. v. Chrysler Motor Corp.,*
     451 U.S. 557 (1981) ................................................................................40

*Jepson, Inc. v. Makita Corp.,*
     34 F.3d 1321 (7th Cir. 1994) .....................................................................31

*Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.,*
     162 F.3d 1290 (11th Cir. 1998) .................................................................15

*Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp.,*
     192 F. Supp. 2d 519 (M.D. La. 2001) ....................................................18, 38

*Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp.,*
     259 F. Supp. 2d 471 (M.D. La. 2002) ....................................................48, 49

*Leonard v. City of Los Angeles,*
     208 Fed. Appx. 517, 2006 WL 3406837 (9th Cir. 2006) .............................38

*Lexecon v. Milberg Weiss Bershad Hynes & Lerach,*
     523 U.S. 26 (1998) ................................................................................49

vi

*Lorentzen v. Curtis,*
        18 F. Supp. 2d 322 (S.D.N.Y. 1998)..................................................................34

*Maio v. Aetna, Inc.,*
        221 F.3d 472 (3d Cir. 2000)...........................................................................41

*Maiz v. Virani,*
        253 F.3d 641 (11th Cir. 2001) ..................................................................38, 40

*Marks v. United States,*
        430 U.S. 188 (1977).......................................................................................22

*Marriott Brothers v. Gage,*
        911 F.2d 1105 (5th Cir. 1990) .........................................................................2

*Mendoza v. Zirkle Fruit Co.,*
        301 F.3d 1163 (9th Cir. 2002) .......................................................................22

*Metromedia Co. v. Fugazy,*
        983 F.2d 350 (2d Cir. 1992)...........................................................................36

*Nat'l Org. for Women, Inc. v. Scheidler,*
        510 U.S. 249 (1994).......................................................................................12

*Newcal Indus., Inc. Ikon Office Solutions,*
        513 F.3d 1038 (9th Cir. 2008) .......................................................................41

*North Bridge Assoc., Inc. v. Boldt,*
        274 F.3d 38 (1st Cir. 2001) ............................................................................11

*Ocean Energy II, Inc. v. Alexander & Alexander, Inc.,*
        868 F.2d 740 (5th Cir. 1989) .........................................................................38

*Oceanic Exploration Co. v. ConocoPhillips,*
        No. H-07-815, 2008 WL 1777003 (S.D. Tex. Apr. 16, 2008)....................23, 24

*Orkin Exterminating Co. v. Delguidice,*
        790 So. 2d 1158 (Fla. DCA 2001) ..................................................................42

*Oscar v. Univ. Students Co-op. Ass'n,*
        965 F.2d 783 (9th Cir. 1992) .........................................................................41

*Owl Const. Co., Inc. v. Ronald Adams Contractor, Inc.,*
        727 F.2d 540 (5th Cir. 1984) .........................................................................12

*PacifiCare Health Sys., Inc. v. Brook,*
    538 U.S. 401 (2003) ...................................................................................13

*Palsgraf v. Long Island R.R. Co.,*
    248 N.Y. 339 (1928) ...................................................................................17

*Parker & Parsley Petroleum Co. v. Dresser Indus.,*
    972 F.2d 580 (5th Cir. 1992) ......................................................................34

*Pasquantino v. United States,*
    544 U.S. 349 (2005).....................................................................................40

*Patterson v. Mobil Oil Corp.,*
    335 F.3d 476 (5th Cir. 2003) ......................................................................43

*Perry v. Am. Tobacco Co., Inc.,*
    324 F.3d 845 (6th Cir. 2003) ......................................................................18

*Price v. Pinnacle Brands, Inc.,*
    138 F.3d 602 (5th Cir. 1998) ................................................................42, 43

*Procter & Gamble Co. v. Amway Corp.,*
    242 F.3d 539 (5th Cir. 2001) ......................................................................28

*Purchase Real Estate Group Inc. v. Jones,*
    No. 05-10859, 2010 WL 1837809 (S.D.N.Y. Apr. 30, 2010) .........................37

*R.J. Reynolds Tobacco Co. v. S K Everhart, Inc.,*
    No. 1:00CV00260, 2003 WL 21788858 (M.D.N.C. July 31, 2003) ...............34

*RWB Services, LLC v. Hartford Computer Group, Inc.,*
    539 F.3d 681 (7th Cir. 2008) ................................................................19, 20

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979).....................................................................................39

*Resolution Trust Corp. v. Stone,*
    998 F.2d 1534 (10th Cir. 1993) ...................................................................36

*Rotella v. Wood,*
    528 U.S. 549 (2000).................................................................................11, 21

*Russello v. United States,*
    464 U.S. 16 (1983).......................................................................................38

*Salinas v. United States,*
    522 U.S. 52 (1997).......................................................................................44

*Scheuer v. Rhodes*,
　　416 U.S. 232 (1974) ...................................................................................2, 25

*Sedima, S.P.R.L. v. Imrex Co.*,
　　473 U.S. 479 (1985) ...............................................................1, 12, 13, 20, 37, 41

*Sessions Tank Liners, Inc. v. Joor Mfg, Inc.*,
　　17 F.3d 295 (9th Cir. 1994) ...........................................................................23

*Shapo v. Engle*,
　　No. 98 C 7909, 1999 WL 1045086 (N.D. Ill. Nov. 12, 1999) ........................................34

*Smith v. Bolles*,
　　132 U.S. 125 (1889) ...................................................................................18

*States v. Hanson*,
　　161 F.3d 896 (5th Cir. 1998) ..........................................................................26

*Steele v. Hosp. Corp. of America*,
　　36 F.3d 69 (9th Cir. 1994) .............................................................................43

*Tanglewood East Homeowners v. Charles-Thomas, Inc.*,
　　849 F.2d 1568 (5th Cir. 1988) .........................................................................10

*Tel-phonic Services, Inc. v. TBS Int'l, Inc.*,
　　975 F.2d 1134 (5th Cir. 1992) .........................................................................36

*Terminate Control Corp. v. Horowitz*,
　　28 F.3d 1335 (2d Cir. 1994) ...........................................................................38

*Tipton v. Northrop Grumman Corp.*,
　　No. 08-1267, 2009 WL 2914365 (E.D. La. Sept. 2, 2009) ..........................................34

*Trollinger v. Tyson Foods, Inc.*,
　　370 F.3d 602 (6th Cir. 2004) ....................................................................18, 21, 22

*United States v. Blumeyer*,
　　114 F.3d 758 (8th Cir. 2003) ..........................................................................27

*United States  v. BP Exploration & Prod., Inc., et al.*
　　2:10-cv-04536 (E.D. La 2010) (filed on Dec, 15, 2010) ..............................................20

*United States v. Carter*,
　　493 F.2d 704 (2d Cir. 1974) ...........................................................................13, 43

*United States v. Cauble*,
    706 F.2d 1322 (5th Cir. 1983) ............................................................................11

*United States v. Christopher*,
    142 F.3d 46 (1st Cir. 1998)................................................................................27

*United States v. Consentino*,
    869 F.2d 301 (7th Cir. 1989) ......................................................................27, 28

*United States v. Erwin*,
    793 F.2d 656 (5th Cir. 1986) ............................................................................32

*United States ex rel. Joshi v. St. Luke's Hosp., Inc.*,
    441 F.3d 552 (8th Cir. 2006) ......................................................................10, 11

*United States. v. Freeman*,
    6 F.3d 586 (9th Cir. 1993) ................................................................................36

*United States v. Gelb*,
    881 F.2d 1155 (2d Cir. 1989)............................................................................41

*United States v. Gunter*,
    876 F.2d 113 (5th Cir. 1989) ............................................................................26

*United States v. Jimenez*,
    537 U.S. 270 (2003)..........................................................................................44

*United States v. Lemons*,
    941 F.2d 309 (5th Cir. 1991) ............................................................................26

*United States v. Loney*,
    959 F.2d 1332 (5th Cir. 1992) ..........................................................................41

*United States v. Lopez*,
    74 F.3d 575 (5th Cir. 1996) ..............................................................................44

*United States v. Massey*,
    48 F.3d 1560 (10th Cir. 1995) ..........................................................................26

*United States v. Maze*,
    414 U.S. 395 (1974)..........................................................................................26

*United States v. McMillan*,
    600 F.3d 434 (5th Cir. 2010) ................................................................27, 28, 30

*United States v. Pelullo,*
    964 F.2d 193 (3d Cir. 1992)..........................................................................36

*United States v. Pierce*,
    224 F.3d 158 (2d Cir. 2000)..........................................................................30

*United States v. Puig-Infante,*
    19 F.3d 929 (5th Cir. 1994) ..........................................................................35

*United States v. Ratcliff,*
    488 F.3d 639 (5th Cir. 2007) ...................................................................29, 30

*United States v. Richman,*
    944 F.2d 323 (7th Cir. 1991) ........................................................................26

*United States v. Saks,*
    964 F.2d 1514 (5th Cir. 1992) .......................................................................26

*United States v. Shyres*,
    898 F.2d 647 (8th Cir. 1990) ........................................................................41

*United States v. Sims,*
    895 F.2d 326 (7th Cir 1990) .........................................................................26

*United States v. Stodola,*
    953 F.2d 266 (7th Cir. 1992) ........................................................................36

*United States  v. Thompson,*
    253 F.3d 700, No. 99-41007, 2001 WL 498430 (5th Cir. Apr. 9, 2001).......................36

*United States v. Trapilo,*
    130 F.3d 547 (2d Cir. 1997)..........................................................................26

*United States v. Turkette,*
    452 U.S. 576 (1981).....................................................................................38

*United States v. Uni Oil, Inc.,*
    646 F.2d 946 (5th Cir. 1981) ........................................................................12

*United States v. Wallach*,
    935 F.2d 445 (2d Cir. 1991)..........................................................................41

*Williams v. Dow Chem. Co.*,
    255 F. Supp. 2d 219 (S.D.N.Y. 2003).............................................................30

*Williams v. Mohawk Indus., Inc.*,
    465 F.3d 1277 (11th Cir. 2006) ........................................................................21, 23, 24

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969) ...........................................................................................40

## Statutes and Rules

18 U.S.C. § 1341 ......................................................................................................28

18 U.S.C. § 1344 ......................................................................................................26

18 U.S.C. § 1961(4) ..................................................................................................47

18 U.S.C. § 1962(a) ..................................................................................................48

18 U.S.C. § 1964(c) .....................................................................................15, 38, 41, 48

28 U.S.C. § 1407(a) ..................................................................................................49

31 U.S.C. § 3730(b)(1) ..............................................................................................24

30 C.F.R. § 250.300 ...................................................................................................5

30 C.F.R. § 250.400 ........................................................................................7, 34, 45

Fed. R. Civ. P. 8 .......................................................................................................10

Fed. R. Civ. P. 8(a)(2) ...............................................................................................10

Fed. R. Civ. P. 9(b) ..............................................................................................10, 11

Fed. R. Civ. P. 11(b)(3).............................................................................................11

Fed. R. Civ. P. 12(b)(6) .........................................................................................2, 10

Fla. Stat. Ann. 772.102(1)(b)....................................................................................49

Fla. Stat. Ann. 895.02(1)(b)......................................................................................49

Fla. Stat. Ann. 895.05(1)...........................................................................................49

Fla. Stat. Ann. 895.05(6)...........................................................................................49

P.L. No. 91-452, 84 Stat. 923, 947 (1970).............................................................13, 24

Statement of Finding and Purpose, 84 Stat. 922-23 (1970)..........................................39

## Miscellaneous

Blakey, *The RICO Civil Fraud Action in Context: Reflections on Bennett v. Berg* (1982), 58 NOTRE DAME L. REV 237 ...............................................12

Blakey & Roddy, *Reflections on Reves v. Ernst & Young*, (1996) 33 AM. CRIM. L. REV. 1345.........................................................................27

Bryner, *BP Oil Spill Forces Florida Beach to Slip from Top 10 Beaches List*, Christian Science Monitor, May 26, 2010, http://www.csmonistor.com/Science/010/0526/BP-oil-spill-forces-Florida-beach-to-slip-from-top-10-beaches-list/ ...........................43

DAN B. DOBBS, LAW OF REMEDIES (1993) ........................................................43

HENRY FRIENDLY, BENCHMARKS (1976)...........................................................38

HOLLAND, ELEMENTS OF JURISPRUDENCE (Legal Classic ed. 1998) ............................................41

Kunzelman and Bluestein, *BP Criminal Investigation Launched By Feds* (The Huffington Post, June 1, 2010)...............................................1

Ludington, *Measure and Elements of Damage Under 15 U.S.C.A. § 15 Entitling Person Injured in his Business or Property by Reason of Anything Forbidden in Federal Antitrust Laws to Recover Treble Damages,* (2010), 16 A.L.R. Fed. 14 ...................................................40

*New Study Warns of Effects of BP Oil Spill: Study-Spill Will Be Felt for Generations,* Feb. 6, 2011, http://video.foxnews.com/v/4526685/new-study-warns-on-effects-of-bp-oil-spill/.........................................................43

OXFORD ENGLISH DICTIONARY (8th ed. 2004)………………………………………….38

PAPERBACK OXFORD ENGLISH DICTIONARY (2001)………………………………………..38

FREDERICK POLLOCK, A TREATISE ON THE LAW OF TORTS (1894)...................................................

PROSSER & KEETON, PROSSER AND KEETON ON THE LAW OF TORTS (5th ed. 1984)...............17, 18

Reeves, *Buried Under the Sand, BP Oil Hidden From Easy Cleanup*, July 7, 2010, http://www.aolnews.com/2010/07/07/under-the-sand-bp-oil-hidden-from-easy-cleanup/ ...........43

*Restatement (Second) of Torts,* § 435 (1979)..................................................................19

Sunstein, *Legal Reasoning and Political Conflicts* (1993) ............................................................16

Wisniowski, *Stigma of BP Oil Spill Impacts Housing Markets Beyond Gulf*, Mortgage Banking, Oct. 2010, at 14 ..........................................................................................43

## INTRODUCTION AND SUMMARY OF ARGUMENT

The gist of BP's memorandum is that RICO was intended to combat organized crime, not "legitimate" businesses such as BP, and that plaintiffs' RICO complaint ("Complaint") is therefore an "abuse."[1]  This is the type of argument that civil RICO defendants have repeatedly made in prior cases, and that the Supreme Court has repeatedly laid to rest.  *See Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 660 (2008) (citing prior Supreme Court cases). RICO "is to be read broadly," and "liberally construed to effectuate its remedial purposes," which are "nowhere more evident than in the provision of a private action for those injured by racketeering activity."  *Sedima, S.P.R.L. v. Imrex Co*., 473 U.S. 479, 497-98 (1985).  BP's protestations against the use of a "criminal" statute ring particularly hollow in this case where, in addition to multiple civil suits, there are ongoing criminal investigations of BP's conduct.[2]

This is a prototypical civil RICO case.  BP, as a regular way of doing business over a number of years, has in part used the BP/Transocean joint venture to misrepresent to federal regulators its ability to prevent and contain offshore oil spills.  BP engaged in this unlawful conduct to cut its safety expenses for offshore drilling and spill containment, to eliminate the expense of delay caused by proper safety measures for offshore drilling and spill containment, and thereby to obtain more oil and profits.  The misrepresented safety measures were intended to prevent or minimize oil spills; their absence was a substantial factor in the resulting oil spill that directly, logically and foreseeably caused injury to plaintiffs' business or property.

BP's Memorandum takes another tack that, although not limited to civil RICO defendants, is unfortunately common.  Instead of forthrightly construing the Complaint most

---

[1]     *See* Memorandum in Support of Motion to Dismiss Consolidated Class Action RICO Complaint in Accordance with PTO No. 11 [CMO No. 1] Section III(B2) ["B2 Bundle] (hereafter "Memorandum").

[2]     *See, e.g.,* Mike Kunzelman and Greg Bluestein, *BP Criminal Investigation Launched By Feds,* The Huffington Post, June 1, 2010.

favorably to plaintiffs, as inarguably required by law on a motion to dismiss,[3] BP misconstrues the Complaint in *its* favor, creating straw men to knock down.  For example, according to BP, the Complaint alleges that BP used the mails or wires fraudulently to obtain "regulatory permits and approval."  Memorandum at 22.  BP then uses this mischaracterization to launch into an extended argument that regulatory permits and approvals are not "money or property" under the mail and wire fraud statutes.  *Id.* at 22-24.  Plaintiffs' Complaint and case statements,[4] on the other hand, state clearly that the purpose of the unlawful scheme was to obtain oil and profits at the expense of safety. Complaint, ¶ 238.[5]  The plaintiffs are the masters of their pleading; BP cannot construe the Complaint to suit itself.[6]

   Applying the proper standard of review to the facts as alleged, BP's motion to dismiss fails.  Each of its seven arguments is without merit.

   First, BP argues that the "simple point" that BP defrauded regulators, not plaintiffs, defeats plaintiffs' claims due to a lack of proximate causation.   Memorandum at 1.  But this

---

[3]   *See  Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

[4]   *See Marriott Brothers v. Gage,* 911 F.2d 1105, 1107 (5th Cir. 1990) (it is "well established" in the Fifth Circuit that a district court may consider a RICO case statement in deciding a dispositive motion).  Plaintiffs, contemporaneously with this response, have filed a motion for leave to file an Amended RICO Case Statement.  The Amended RICO Case Statement makes no substantive changes, but rather: 1) supplements some of the allegations with information gleaned since the time of the original case statement; and 2) attempts to clarify beyond reach of misconstruction what plaintiffs do and do not allege.

[5]   Stating in relevant part:  "Each predicate act had the same or similar purpose:  the predicate acts involved material misrepresentations, omissions and concealment in a scheme to defraud the regulators into believing BP would conduct oil operations safely and that BP could effectively respond to and contain any oil spill, all so BP could fraudulently obtain oil and billions of dollars in proceeds and profits at the expense of safety."

[6]   *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) ("[T]he plaintiff [is] the master of the claim.").  *See also Desiano v. Warner-Lambert Co.,* 326 F.3d 339, 350 (2d Cir. 2003), where the Second Circuit reversed the district court, because it erroneously "*characterized* …[insurance companies] 'essentially [as] financial intermediaries,' rather than …[immediate] purchasers of [the drug]. … [On] a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court is obliged to accept as true Plaintiffs' assertion that they were, in fact, the purchasers of the drug. It follows that the district court erred in its *characterization*.  In dismissing Plaintiffs' claims on a 12(b)(6) motion, the district court *erred* by treating Plaintiffs' complaint as one analogous to…[other] insurance companies' claims…. Instead, *the court should have considered the complaint as it was presented.*  Under this *characterization*, the insurance companies were the…[immediate] victims of Defendants' fraudulent marketing." (emphasis added; citations omitted).

argument ignores, and would eviscerate, the Supreme Court's holding in *Bridge* that first-person reliance is not necessary as an element of proximate cause. *Bridge,* 553 U.S. 639. In this case the causal link is direct: BP defrauded the regulators into believing appropriate safety measures were in place to prevent and mitigate the effects of a spill; through BP's deceptive and unlawful conduct these measures were not in place, and their absence directly injured the plaintiffs.

Second, BP argues that plaintiffs fail to demonstrate "racketeering" because plaintiffs supposedly allege that the sole purpose of BP's unlawful scheme was to obtain regulatory permits and approvals. Memorandum at 20. But BP's argument mischaracterizes both the complaint and the case law; plaintiffs' Complaint repeatedly alleges that the purpose of BP's unlawful scheme was "to fraudulently obtain billions of dollars in oil and proceeds and profits at the expense of safety."[7] The case law recognizes this as racketeering.

Third, BP argues that plaintiffs fail to satisfy RICO's "participation" and "enterprise" requirements, because there supposedly is no allegation of a "nexus" between the mail and wire fraud of BP and the use of the BP/Transocean enterprise. Memorandum at 25. But BP again misconstrues the pleadings, which allege and set forth facts clearly demonstrating the nexus: BP's unlawful conduct—the mail and wire fraud—could not have taken place without the use of the BP/Transocean enterprise.

Fourth, BP argues that plaintiffs fail to demonstrate a "pattern," because plaintiffs set out a limited number of predicate acts all taking place over a period from 2009-10 and all relating to the Macondo well. Memorandum at 33. But to make this argument, BP misconstrues the pleadings and ignores as "unrelated" all of the prior actions of BP, such as a fraudulent oil response plan submitted to the regulators in 2000. Memorandum at 3. The facts as alleged are

---

[7]    Complaint, at ¶ 238. *See also* ¶¶ 28 ("unlawful scheme was to obtain oil and billions of dollars in proceeds and profits"), 233, 241.

these:  BP and Transocean have been working together on oil wells in the Gulf of Mexico and elsewhere for years before and since 2000.  When BP filed the fraudulent Regional Oil Response Plan in 2000 for the Gulf of Mexico, this was part and parcel of the pattern of fraud that related to all BP/Transocean wells in the Gulf.  The misrepresentations and omissions were essentially repeated in the revised Regional Oil Response plan submitted in 2009, and echoed in the particular filings for Macondo and other wells.  The fraudulent workings of the BP/Transocean enterprise with respect to the Macondo well were a regular way of doing business for BP with respect to all BP/Transocean wells for years.

Fifth, BP's argument that plaintiffs' claims fail for lack of injury is in reality an argument that, at most, *some* of the claims are not cognizable under RICO or have not been pled with sufficient specificity.  Memorandum at 38.  Yet the "business or property" requirement fairly encompasses the claims made.  And this is notice pleading.  The allegation that Roland and Barbara Hingle, commercial shrimpers in the Gulf of Mexico, lost "earnings and property from the Spill" plainly and fairly puts BP on notice of the nature of the injury.  Complaint, ¶ 10.  BP's claim that it has "no clue" as to what such business or property loss or damage might be rings false.  Memorandum at 42.

Sixth, BP argues that the conspiracy claims fail because the complaint does not allege any facts showing agreement between BP and another party.  Memorandum at 42.  This argument simply ignores the multiple allegations showing that BP and Transocean often worked together to deceive the federal regulators, and that Transocean's agreement was necessary to effect the scheme.[8]

---

[8]    *See, e.g.,* Complaint ¶¶ 67, 141, 142, 145, 157-159, 194-186; RICO Case Statement, ¶¶ 5(c) & (d), 6(a) & (b), 8, 9 and 10; Amended RICO Case Statement, ¶¶ 5, 5(c) & (d), 6(a) & (b), 8, 9, and 10.

Seventh, BP argues that the claims under Florida RICO law fail for the same reason that the federal claims fail. (Memorandum at 46). Inasmuch as the federal claims survive, however, this argument disappears. And the question of the extraterritorial application of Florida RICO to claims arising outside of Florida is irrelevant. Two of the named plaintiffs suffered injury in Florida. For them, the application of Florida RICO is not extraterritorial in this MDL proceeding. And given that the relief claimed for violation of Florida RICO is solely equitable in nature and applicable to all, the issue of extraterritoriality is irrelevant.

BP spent years, using its association with Transocean, to deceive regulators into believing that its deep-sea explorations were safe, that oil spills could be prevented or contained, and that it was complying with regulations intended to ensure that was true. BP and Transocean were required not to "create conditions that [would] impose unreasonable risk to public health, life, property, aquatic life, wildlife, recreation, navigation, commercial fishing, or other uses of the ocean." 30 C.F.R. § 250.300. But that is precisely what they did. BP used its association with Transocean to cut costs and delay at the expense of safety, placing the increasing risk of loss squarely on plaintiffs. On April 20, 2010, that risk was realized, causing injury to plaintiffs' business or property, in violation of the RICO statutes alleged. Accordingly, for the reasons discussed below, BP's arguments are without merit, and its motion to dismiss should be denied.

## BACKGROUND

The factual background section of BP's Memorandum is limited to a brief description focusing on the "story" of how the joint offshore drilling endeavors of BP, Transocean and Transocean's *Deepwater Horizon* drilling rig began ten years ago in 2001, how BP used *Deepwater Horizon* on the Macondo well beginning in 2008, and how the well blew out on April 20, 2010. Memorandum at 4-5. But this only tells a small part of the story. What BP's factual

background omits is the fact that BP and Transocean have engaged in a scheme—through their longstanding offshore drilling enterprise relationship—to obtain oil and money by defrauding regulators regarding their drilling operations' safety in preventing oil spills and in containing them if they occur.

Plaintiffs allege that BP and Transocean's fraudulent scheme has not just involved the Macondo well offshore drilling project that utilized the *Deepwater Horizon*, but has also involved other wellsites in the Gulf of Mexico and indeed around the world.[9]  BP and Transocean have enjoyed a long and lucrative offshore drilling operations enterprise since at least 2000.[10]  For example, in its 2000 10-K, Transocean reported that BP remained a principal client, and was elevated to the status as one of Transocean's largest unaffiliated clients, accounting for 14.4 percent of the Company's 2000 operating revenues.[11]  In the intervening years Transocean has often described BP as its "most significant client," accounting for the largest share of Transocean's revenues.[12]  Transocean's most recent SEC Form 10-Q reports that "[a]s of October 14, 2010, the contract backlog associated with our contracts with BP was $3.1 billion."[13]

By law and by necessity BP and Transocean must reach agreement on critical aspects of safety, including oil spill prevention and containment.  By way of regulatory background,

---

[9]     Complaint, ¶ 184; *see also* Amended RICO Case Statement, ¶ 5, citing Transocean 10-K, FYE Dec. 31, 1999, at 5; Transocean 10-K, FYE Dec. 31, 2000, at 4; Transocean 10-K, FYE Dec. 31, 2001, at 5-6; Transocean 10-K, FYE Dec. 31, 2002, at 4-6; Transocean 10-K, FYE Dec. 31, 2003, at 6-7; Transocean 10-K, FYE Dec. 31, 2005, at 6; Transocean 10-K, FYE Dec. 31, 2006,  at 7-8.

[10]    *Id.*; *see also* Complaint, ¶¶ 65, 184, 185.

[11]    Amended RICO Case Statement, ¶ 5, citing Transocean 10-K, FYE Dec. 31, 2000, at 11.

[12]    Amended RICO Case Statement, ¶ 5, citing Transocean 10-K, FYE Dec. 31, 2005, at 14; Transocean 10-K, FYE Dec. 31, 2006, at 11; Transocean 10-K, FYE Dec. 31, 2007, at 14; Transocean 10-K, FYE Dec. 31, 2008, at 13; Transocean 10-K, FYE Dec. 31, 2009, at 12; Transocean 10-K, FYE Dec. 31, 2010, at 12.

[13]    Amended RICO Case Statement, ¶ 5, citing Transocean 10-Q, FQE Sept. 30, 2010, at 54.

Subpart D of the prescriptive offshore drilling operations regulations of the Minerals Management Service (the "MMS") apply to both BP and Transocean, because the regulations "apply to lessees, operating rights owners, operators, and their contractors and subcontractors." 30 C.F.R. § 250.400. Similarly, the MMS's prescriptive offshore drilling regulations require those entities involved in offshore drilling operations to ensure there are safe blowout preventer systems ("BOP") in place, along with all system components, surface and subsea stacks, associated systems and equipment, choke manifolds, kelly valves, drilling-string safety valves, maintenance and inspections, pressure tests and additional testing, and recordkeeping. "You must design, install, maintain, test, and use the BOP system and system components to ensure well control. The working-rating of each BOP component must exceed anticipated surface pressures. The BOP system includes the BOP stack and associated BOP systems and equipment." *Id*.

The *Deepwater Horizon* illustrates how the joint responsibility is employed in practice. Transocean supplied almost every employee involved in the day-to-day operations on the rig.[14] While Transocean supplied the manpower on the rig, BP made the key decisions affecting oil spill prevention and containment—with Transocean's agreement. The Offshore Installation Manager ("OIM") is an employee of Transocean and its senior employee on the rig. An OIM is the only employee on the rig that may overrule decisions by the "Company Man" (BP's senior employee on the rig) pertaining to drilling operations if the OIM believes that that the action will endanger the rig or the crew. Thus, <u>every</u> decision by the Company Man or any other BP employee located either on the rig or on the beach was told to the OIM whose duty it was to

---

[14]   Amended RICO Case Statement, ¶ 5, citing National Comm'n on the BP Deepwater Horizon Oil Spill & Offshore Drilling, *Deep Water: The Gulf Oil Disaster & the Future of Offshore Drilling*, Final Report to the President, Jan. 2011, Ch. 1, at 3.

approve or disapprove the action.[15]   And BP and Transocean were in continuous contact regarding operations on the rig.[16]

   An incident that came to light through the *Deepwater Horizon* disaster provides an example of the BP/Transocean relationship in action.   Seven years ago, BP and Transocean agreed to exacerbate the risk of BOP failure to prevent a blowout in the Gulf of Mexico by equipping the *Deepwater Horizon* with just one single blind sheer ram.[17]   In 2004, BP contracted Transocean to replace one of the rams on the *Deepwater Horizon*'s BOP with a test ram in order to speed up testing procedures, both knowing the installation of this test ram lowered the BOP unit's reliability even further.   Indeed, the agreement between BP and Transocean executed in 2004 noted BP and Transocean's awareness that the removal of the second ram would "reduce the built-in redundancy" of the BOP and raise the rig's "risk profile."[18]

   Upon information and belief and subject to discovery, BP contracted with Transocean to provide a single ram on rigs other than the *Deepwater Horizon* it operated in the Gulf of Mexico.[19]   Thus, BP and Transocean's scheme to deceive regulators involved the *Deepwater Horizon* as well as other drilling operations in the Gulf of Mexico.

   BP furthered the deception associated with the agreement to equip the *Deepwater Horizon* and other offshore drilling rigs with a single ram when David Rainey, Vice President of

---

[15]   Amended RICO Case Statement, ¶ 5.

[16]   *See* Amended RICO Case Statement, ¶ 5, citing Deposition of Mark Robert Bly, Executive Vice President of Safety & Operational Risk for BP, plc., (February 17, 2011), at 704:7-16 ("there's constant communication between BP and Transocean on the rig."); Deposition of Kent Corser, Drilling Engineer Manager, BP E&P-Alaska, (February 11, 2011), at 389:24-390:1 (noting that BP gave instructions to Transocean relating to rig operations).

[17]   Amended RICO Case Statement, ¶ 5, citing Letter Agreement for Conversion of VBR to a Test Ram, CONTRACTOR-5121-2002-011, Oct. 11, 2004.

[18]   *Id.*

[19]   Amended RICO Case Statement, ¶ 5.

BP Exploration for the Gulf of Mexico, deceptively misrepresented in testimony to the United States Senate Committee on Energy and Natural Resources on November 19, 2009, that BP had the BOP technology for redundant systems and controls.[20] Mr. Rainey failed to disclose that BP had purposely removed such redundant systems in all of its Gulf of Mexico drilling operations and that BP and Transocean had agreed to purposely remove such redundant systems from the *Deepwater Horizon*.  Amended RICO Case Statement, ¶ 5.  BP did not report to the MMS that the *Deepwater Horizon* was operating with a single ram, and the existence of the BP and Transocean agreement to equip the *Deepwater Horizon* with a single ram remained undisclosed until June 20, 2010.  *Id.*

Just as BP misrepresented the capability of BP and Transocean to contain an oil spill on the Macondo well, they similarly misrepresented the ability to contain spills on other wells in the Gulf of Mexico.  For example, BP used Transocean's *Discoverer Enterprise* rig in the Thunderhorse drilling operations that started production in 1999.  *Id.*  BP caused a "BP Exploration & Production, Inc. Supplemental Exploration Plan" to be submitted by wire to MMS on April 10, 2007 in which BP "certifies that they have the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such discharge, resulting from the activities proposed in their EP."  *Id.*  This was a knowingly false assertion.

These are but a few examples of the larger "story" ignored in BP's Memorandum.  They help tell the alleged and true story of BP and Transocean scheming and conspiring to obtain oil and money through a long time pattern of defrauding regulators.  Other such facts abound[21] and more will undoubtedly come to light through discovery.

---

[20]    Amended RICO Case Statement, ¶ 5, citing Testimony of David Rainey, United States Senate Committee on Energy and Natural Resources, November 19, 2009.

[21]  Amended RICO Case Statement, ¶ 5.

**LEGAL STANDARD**

As set forth by the Supreme Court in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007), the standard to be applied when deciding a Rule 12(b)(6) motion is whether the plaintiffs have stated enough facts in the complaint to allow a court to conclude that it is "plausible" that the plaintiffs are entitled to relief. The Court must accept as true all well-pleaded allegations and resolve all doubts in favor of the plaintiff. *Tanglewood East Homeowners v. Charles-Thomas, Inc.,* 849 F.2d 1568, 1572 (5th Cir.1988). Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) "is viewed with disfavor and is rarely granted." *Gulf Production Co., Inc. v. Hoover Oilfield Supply, Inc.* 672 F. Supp. 2d 752, 755 -756 (E.D. La. 2009) (motion denied).

To prevent a dismissal pursuant to Rule 12(b)(6), Rule 8(a)(2) requires *only* "a short and plain statement of the claim showing that the pleader is entitled to relief" . . . "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007) (quoting *Conley* v. *Gibson*, 355 U.S. 41, 47 (1957)(emphasis added)); *accord Ashcroft v. Iqbal,* 129 S. Ct. 1937 (2009). In brief, the pleader must cross the line between "possibility and plausibility." *Id.* at 557. Thus, the pleader need only allege sufficient "facts" to establish the "grounds" for a "plausible" claim for relief; "probable cause" pleading is *not* required. *Id.* at 570. While more than bare bones conclusions must be pled, detailed fact pleading is not required. *See Iqbal*, 129 S. Ct. 1949-50 ("[Fed. R. Civ. P.] 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . .").

The pleading of mail and wire fraud in a RICO claim must generally meet the particularity requirements of Fed. R. Civ. P. 9(b), but in the case of RICO claims these requirements may be relaxed where information lies in the hands of defendants. *See United*

*States ex rel. Joshi v. St. Luke's Hosp., Inc.* 441 F.3d 552, 561 (8th Cir. 2006) (noting Seventh Circuit relaxation of 9(b) requirements in RICO context; declining to extend such relaxed standard to False Claims Act cases); *North Bridge Assoc., Inc. v. Boldt,* 274 F.3d 38, 44 (1st Cir. 2001) (noting that in the RICO context, where "the specific information [concerning the defendants' use of interstate mail or telecommunications facilities] is likely in the exclusive control of the defendant, the court should make a *second* determination as to whether the claim as presented warrants the allowance of discovery and if so, thereafter provide an opportunity to amend the defective complaint") (quoting *Feinstein v. Resolution Trust Corp.,* 942 F.2d 34, 43 (1st Cir. 1991)); *Ducote Jax Holdings, L.L.C. v. Bradley,* No. 04-1943, 2007 WL 2008505, at *5 (E.D. La. 2007) (particularity requirement of 9(b) relaxed in RICO case where plaintiff lacks all facts necessary to detail his claim). *See also Rotella v. Wood,* 528 U.S. 549, 560-561 (2000) (Rule 11(b)(3) provides flexibility in RICO context, allowing pleadings based on evidence reasonably anticipated after further investigation or discovery).

## ARGUMENT

In 1970, Congress enacted RICO, modeled on the antitrust statutes, to deal with "enterprise criminality," including "sophisticated white-collar schemes."[22] Congress "drafted RICO broadly enough to encompass a wide range of criminal activity, taking many different forms, and likely to attract a broad array of perpetrators operating in many different ways."[23] Thus, while an original purpose of RICO may have been to combat organized crime, the statute as drafted and interpreted extends far beyond that narrow focus. The Fifth Circuit, for example, refused many years ago to place any "organized crime" limitation on civil RICO, stating:

---

[22]  *United States v. Cauble*, 706 F.2d 1322, 1330 (5th Cir. 1983) ("enterprise criminality" consists of "all types of organized criminal behavior [ranging] from simple political corruption to sophisticated white-collar schemes to traditional Mafia-type endeavors") (internal citations omitted).

[23]  *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 248-49 (1989).

> In *United States v. Uni Oil, Inc.*, 646 F.2d 946 (5th Cir. 1981), we held that "[a]lthough the legislative history of RICO vividly demonstrates that it was primarily enacted to combat organized crime, nothing in that history, or in the language of the statute itself, expressly limits RICO's use to members of organized crime." *Id.* at 953. Although *Uni Oil* involved a criminal prosecution, we see no reason to limit our holding in this regard to criminal proceedings.

*Owl Const. Co., Inc. v. Ronald Adams Contractor, Inc.,* 727 F.2d 540 (5th Cir. 1984) (citing in part Blakey, *The RICO Civil Fraud Action in Context: Reflections on Bennett v. Berg,* 58 NOTRE DAME L. REV. 237, 284-285 (1982)).

Civil RICO defendants, however, have repeatedly attempted to limit the scope and application of RICO.  In the recent *Bridge* case, the Supreme Court chronicled these efforts in clarifying that first-person reliance is unnecessary in civil RICO cases based on mail and wire fraud:

> We have repeatedly refused to adopt narrowing constructions of RICO in order to make it conform to a preconceived notion of what Congress intended to proscribe. *See, e.g., National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 252, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) (rejecting the argument that "RICO requires proof that either the racketeering enterprise or the predicate acts of racketeering were motivated by an economic purpose"); *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 244, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (rejecting "the argument for reading an organized crime limitation into RICO's pattern concept"); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 481, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (rejecting the view that RICO provides a private right of action "only against defendants who had been convicted on criminal charges, and only where there had occurred a 'racketeering injury'"). We see no reason to change course here.

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 660 (2008).  Congress created civil and criminal remedies for RICO violations, and it instructed the courts not to read them narrowly.  Indeed, RICO makes its principle of "liberal" construction a matter of express statutory language

to achieve its "remedial purposes."[24]   Thus, like the antitrust statutes, "RICO is to be read broadly."[25]

BP's Memorandum turns this RICO precedent on its head.  Not too subtly, BP insinuates that Congress drafted RICO *only* with "organized crime" in mind; that is, wide-brimmed Fedoras, black shirts, white ties, and machine guns in violin cases, and not the white-shirted executives of an oil industry leader whose trademark is conduct heedless of the law, and who by their conduct have caused incalculable damage to the environment, and likely billions in injury to business or property.[26]

## I.      Plaintiffs Allege Proximate Causation

BP's argument that Plaintiffs' have failed to plead proximate causation is premised on a substantial misapplication of law and fact.  BP utterly ignores the Supreme Court's holding in *Bridge v. Phoenix*, 553 U.S. 639 (2008) and attempts to revert back to the notion, rejected in *Bridge*, that first-person reliance is necessary for proximate cause.  BP's interpretation of "direct injury" improperly suggests that there is only one viable cause and one viable victim for any violation.  BP's argument would do away with civil RICO entirely, because RICO is premised

---

[24]   P.L. No. 91-452, 84 Stat. 923, 947 (1970); *see also PacifiCare Health Systems, Inc. v. Brook,* 538 U.S. 401, 406 (2003) ("Indeed, we have repeatedly acknowledged that the treble-damages provision contained in RICO itself is remedial in nature. … [W]e stated that 'both RICO and the Clayton Act are designed *to remedy* economic injury by providing for the recovery of treble damages, costs, and attorney's fees'…. [We have also taken] note of the 'remedial function' of RICO's treble damages provision.") (emphasis in original; citations omitted).

[25]   *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 497-98 (1985) (RICO); *accord, American Soc'y of Mech. Engineers v. Hydrolevel Corp.*, 456 U.S. 556, 568-69 (1982) (antitrust).

[26]   *Compare United States v. Carter,* 493 F.2d 704, 708 (2d Cir. 1974):

> While crimes of violence engineered by gangs of thugs are of course repulsive …[T]he  fact that the alleged perpetrators are presumably respected and entrusted by an electorate or a profession or by stockholders does not suggest, in our view, that they are incapable of engaging in organized criminal activity. We all stand equal before the bar of criminal justice and the wearing of a white collar, even though it is starched, does not preclude the organized pursuit of unlawful profit.

13

on criminal predicate acts, and to take BP's argument to its logical conclusion it is always the government who is "directly" injured by the predicate act violations.   The facts alleged by plaintiffs, as properly construed, reflect a simple and direct chain of causation: if the safety efforts and containment ability of BP were as represented, then the injuries to the plaintiffs would have been prevented or mitigated.   The injuries suffered by plaintiffs were direct, foreseeable, and proximately caused by BP's pattern of racketeering.

*Bridge*, a 2008 case and a unanimous decision, is obviously still good law, and yet it is not so much as mentioned in BP's Memorandum when it discusses proximate cause.   The civil RICO action in *Bridge* was brought by regular bidders at a county's tax lien auctions, who alleged that the defendants, also regular bidders, were able to obtain a disproportionate share of valuable liens by lying to the county.   *Id.* at 639, 643-44.   The Court held that the injury alleged in *Bridge* resulted directly, and was proximately caused, by the fraudulent representations to the government that constituted the racketeering activity.   *Id.* at 641-42, 660-61, 658.   The Court held:

> Respondents' alleged injury-the loss of valuable liens-is the direct result of petitioners' fraud.   It was a foreseeable and natural consequence of petitioners' scheme to obtain more liens for themselves that other bidders would obtain fewer liens.

*Id.* at 658.[27]

BP miscites *Anza*, a 2006 case, for the proposition that the Supreme Court "rejected the notion that a third party may bring a claim under RICO based on defendant's alleged predicate acts of fraud against the government."   Memorandum at 13, citing *Anza v. Ideal Steel Supply*

---

[27]    The Court continued: "And here, unlike in *Holmes* and *Anza* there are [1] no independent factors that account for respondents' injury, [2] there is no risk of duplicative recoveries plaintiffs removed at different level of injury from the violation, and [3] no more immediate victim is better situated to sue."   *Id.*   The same is true here:   [1] plaintiffs' injuries are the result of the lack of safety precautions to prevent or mitigate disasters such as occurred, [2] each plaintiff seeks recovery for only his or her injury, and [3] no one else can sue for these injuries, much less be in better position to sue for them.

*Corp.*, 547 U.S. 451 (2006).  Of course, that was not the holding of *Anza*, and is directly contrary to *Bridge*, which held that a third party can in fact bring a RICO claim based on predicate acts of fraud against the government.  BP similarly cites to *Hemi* as "[confirming] that a third party cannot bring a civil claim under RICO based on alleged predicate acts of fraud against the government." Memorandum at 14, citing *Hemi Group LLC v. City of New York*, 130 S. Ct. 983 (2010).    But again, this is not the holding of *Hemi*; if it were, *Bridge* would have been overturned.

BP similarly cites a number of cases for the proposition that "civil RICO claims by private parties based on fraud against the government fail for lack of proximate causation." Memorandum at 15.  But most of the cases cited were outdated pre-*Bridge* cases that were implicitly or explicitly premised on the first-person reliance "requirement" rejected in *Bridge*. *See, e.g., Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1318 (11th Cir. 1998) ("This means that, when the alleged predicate act is mail or wire fraud, the plaintiff must have been a target of the scheme to defraud and must have relied to his detriment on misrepresentations made in furtherance of that scheme.").  One of the cited cases was post-*Bridge*, but, like BP, simply ignored *Bridge*.  *See Halpin v. Crist,* No. 10-10339, 2010 WL 5078222, at *2 (11th Cir. Dec. 14, 2010) ("The plaintiff may not assert misrepresentations that were directed toward another person or entity, but he must have been the target of the scheme to defraud and detrimentally relied on the misrepresentations*."*).

There is, without doubt, and plaintiffs affirmatively posit, a requirement of proximate cause for a civil RICO plaintiff.  *See Holmes v. S.I.P.C*, 503 U.S. 258 (1992). In *Holmes* the Court followed RICO's antitrust parentage and read "by reason of" in 18 U.S.C. § 1964(c) to embody traditional notions of "proximate cause" on the issue of relative remoteness, one element

of the proximate cause determination (the other elements are "but for" (or factual) causation and foreseeability). *Holmes*, 503 U.S. at 265-69 (citing *Associated General Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 535 (1983) (antitrust) (*AGC*)). *Accord Anza*, 547 U.S. at 460 (2006); *Bridge,* 553U.S. at 654-55 (2008).

*Holmes* applied modified antitrust remoteness factors to RICO. The Court reformulated[28] the five *AGC* antitrust factors into a three-factor standard to fit RICO: (1) the relative "difficult[y]" of "ascertain[ing]" the plaintiff's damage "attributable to the violation" between him and other more immediate victims, (2) the danger that recognizing the less immediate victim's claim would require the "adopt[ion of] complicated rules apportioning damages among [claimants] … removed at different levels of injury ... to obviate the risk of multiple recoveries," and (3) the absence of a "need to grapple with the problems" because more immediate "victims ... [could] be counted on to vindicate the law as private attorneys general ...." *Holmes*, 503 U.S. at 269-270 (citing *AGC*, 459 U.S. at 540-42). *Accord Anza*, 547 U.S. 451, 460-62 (2006); *Bridge*, 553 U.S. at 654-55 (2008).

*Holmes* did not announce a "black letter" rule that would "dictate the result in every case," but reformulated the 19th century "remoteness" rule of the common law— that turned on an analytical analysis of "direct or indirect" injury, that is, a formal "rule"—into a 20th century "standard." 503 U.S. at 274 n.20 ("Thus, our use of … 'direct' should ... be understood as a reference to the proximate-cause enquiry … informed by the … [three factors] set out in the text. We do not necessarily use it in the same sense as courts before us have …..") (emphasis added).[29]

---

[28] The modification occurred because RICO does not have an "antitrust injury" analogue. *Holmes*, 503 U.S. at 269 n.15.

[29] Professor Sunstein brings out the distinction between a "rule" (drive 55 mph) and a "standard" (drive reasonably) in *Legal Reasoning and Political Conflicts,* 106-08, 110-15, 130-35 (1993).

Labels, which substitute for reasons and merely tag outcomes without giving the true criteria for the remoteness decision—that is, "direct or indirect"—were no longer to obtain in determining "remoteness." The Court in *AGC* specifically rejected, for example, the labels of "target" and "zone of interests," because the use of "labels [as a techniques of making decisions] may lead to contradictory and inconsistent results." 459 U.S. at 537 nn. 33, 34.[30]

Accordingly, "proximate cause" requires the examination of three elements: (1) factual causation ("but for"), (2) foreseeability, and (3) remoteness. Factual ("but for") cause is, of course, necessary, but not sufficient. *Holmes,* 503 U.S. at 265-266. Nor is foreseeability, or even intention, alone sufficient. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 479 (1982) (antitrust; proximate cause "not a question of the specific intent of the conspirators"). And lack of remoteness is also required. *Holmes*, 503 U.S. at 265.

The factual or "but for" causation in this case is simple and obvious. *Cf. Edwards v. St. John the Baptist Parish,* No. 09-4384, 2010 WL 3720436 (E.D. La. Sept. 9, 2010) (Barbier, J.) (RICO claim that public corruption led to decreased property value was so complex and attenuated that it failed to establish even "but for" causation). BP, through its association with Transocean, misrepresented to regulators both its ability to prevent and its ability to contain oil spills. Had the offshore oil drilling safety or and oil spill containment measures been in place as represented, the injury to business or property of plaintiffs would not have occurred.

For the purposes of finding factual causation, it does not matter that others aside from BP and Transocean may have had roles in this disaster. If more than one cause played a role in the

---

[30]   "What we do mean by the word 'proximate' is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point.'" (quoting *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 351-352 (1928) (Andrews, J., dissenting); *see also* W. PROSSER & W. KEETON, TORTS 264, 274 (5th ed. 1984) (proximate causation reflects "ideas of what justice demands, or of what is administratively possible and convenient"). *See also Henneford v. Silas Mason Co., Inc.,* 300 U.S. 577, 586 (1937) (Cardozo, J.) ("labels ... are subject to the dangers that lurk in metaphors ... and must be watched ... lest they put us off our guard").

injury, factual cause is a question of "substantial factor."  A wrongful act is "a proximate cause if it is a substantial factor in the sequence of responsible causation." *Cox v. Administrator United States Steel & Carnegie,* 17 F.3d 1386, 1399 (11th Cir. 1994) ("If the defendant's conduct was a substantial factor in causing the plaintiff's injury, it follows that he will not be absolved from liability merely because other causes have contributed to the result, since such causes, innumerable, are always present.") (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 41, at 268 (5th ed. 1984)); *Livingston Downs Racing Ass'n Inc. v. Jefferson Downs Corp.,* 192 F. Supp. 2d 519, 544 (M.D. La. 2001) (proximate cause depends in part on ". . . whether the defendant's acts are a substantial factor in the sequence of responsible causation. . . .").  Here, where an injury brought on by BP's lack of represented safety measures and exacerbated by a lack of represented containment measures occurs, it is essentially a tautology to assert that the lack of represented safety measures was a "substantial factor in the sequence of responsible causation."[31]

Once Plaintiffs show factual causation, the inquiry turns to foreseeability.  *See Bridge*, 553 U.S. at 658 (2008) ("It was a *foreseeable and natural consequence* of petitioners' scheme to obtain more liens for themselves that other bidders would obtain fewer liens.") (emphasis added); *Smith v. Bolles,* 132 U.S. 125, 130 (1889) (for causation purposes, "those results are proximate which the wrong-doer from his position must have contemplated as the probable consequence of his fraud") (quoting *Crater* v. *Binninger*, 33 N. J. L. 513, 518 (Ct. Errors and Appeals 1869)); *Trollinger v. Tyson Foods, Inc.,* 370 F.3d 602, 614 (6th Cir. 2004); *Perry v. Am. Tobacco Co., Inc.*, 324 F.3d 845, 850 (6th Cir. 2003) (foreseeability and remoteness distinct requirements of RICO proximate cause analysis).  Traditionally, too, foreseeability plays a

---

[31]    *See* Complaint, ¶¶ 28, 220, 233-243, 247, 251, 258-259, 264, 269; RICO Case Statement, ¶¶ 5(c)(i)-(vii). (allegations of misrepresentations and omissions); Amended RICO Case Statement, ¶ 5.

diminished role in "proximate cause" determinations where the "tort" is, as here, intentional.  *See Restatement (Second) of Torts*, § 435 (1979).

In any case, foreseeability here is, like factual causation, a given: it is foreseeable that misrepresenting your ability to prevent or contain an oil spill may result in an uncontained oil spill, causing injury to the business or property of people such as the plaintiffs.  Alleging facts evidencing the misrepresentations and material omissions, as was done here, supports this factor of proximate causation.[32]

Finally, the analysis turns to remoteness, which focuses on "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes,* 503 U.S., at 268.  *See also Empress Casino Joliet Corp. v. Blagojevich*, Nos. 09-3975, 10-1019, 2011 WL 710467 (7th Cir. Mar. 2, 2011) (civil RICO claim against former governor for use of influence to obtain statute creating fund benefiting race tracks at expense of casino; casino injury is not too remote under *Holmes, Anza,* and *Bridge*).  BP mistakenly equates "directness" with the notion that there can be but one cause of an injury and one victim (supposedly the Government).  Memorandum at 13.  But, as discussed above, there can be and are often multiple causes of an injury, and the inquiry is simply one asking whether BP was a "substantial factor" in causing plaintiffs' injuries, which is clearly both alleged in the pleadings and the conclusion reached by investigations.  Complaint, ¶¶ 8-13; RICO Case Statement, ¶ 5(c)(vii); Amended RICO Case Statement, ¶ 5.  And civil RICO violations often have multiple victims; in fact, the presence of multiple victims is a positive factor in determining whether there is a "pattern" for RICO purposes.  *See, e.g., RWB Services, LLC v. Hartford Computer Group, Inc.*, 539 F.3d 681, 688-89 (7th Cir. 2008) (RICO

---

[32]  Complaint, ¶¶ 63-64, 67-69, 73, 78-80, 88-90, 94, 98, 100, 102-104, 120, 135, 141-146, 149-151, 155, 157-159, 162-168, 176-183; 234-237; RICO Case Statement, ¶¶ 3, 5, 9, 15, 16; Amended RICO Case Statement, ¶¶ 3, 5, 9, 15, 16.

scheme proximately caused injury to both RWB and Walmart; "one of the hallmarks of a RICO violation is 'the occurrence of distinct injuries' affecting several victims.").

BP also claims that the "simple point" that it is alleged to have defrauded the government, and not the plaintiffs, defeats proximate causation for lack of "directness." Memorandum at 1, 11.  This is not only directly contrary to *Bridge,* as discussed above, but by logical extension BP's argument would eliminate all of civil RICO.  Because a RICO defendant must commit a pattern of predicate acts that are criminal in nature, by BP's logic it is always the government that is "directly" harmed.  This is certainly not the "broad reading" and "liberal construal" of civil RICO envisioned by the Supreme Court.  *Sedima, S.P.R.L. v. Imrex Co*., 473 U.S. 479, 497-98 (1985).

Applying the factors generally considered by the courts to determine if an injury is "direct," the plaintiffs' injuries as alleged meet this element of proximate causation.  BP claims that the Government is the party "directly" injured by conduct alleged; a stronger argument can be made, however, that the Government's injuries are secondary to the injuries suffered by plaintiffs.  The current Government lawsuit is not a RICO lawsuit, and seeks primarily recovery of clean-up expenses.  *United States  v. BP Exploration & Prod., Inc., et al*. 2:10-cv-04536 (E.D. La 2010) (filed on Dec, 15, 2010).  These expenses, currently estimated at least $75 million though the full amount of the damages has not been fully realized, pale in comparison to the estimated billions of dollars in injuries to business or property suffered by the plaintiffs as a result of the oil spill.  Complaint, ¶ 19.  And while both the Government's clean-up expenses and the plaintiffs' injuries to business and property stem from the oil spill, they are non-duplicative.  *Holmes,* 503 U.S. at 269-70.  The Government lawsuit, based on statutory violations, cannot be expected to vindicate plaintiffs' interests in enforcement of the RICO laws and recoveries of

injuries stemming from RICO violations.[33]   There is no more immediate RICO victim stepping forward, nor could one step forward to recover for plaintiffs' injuries.   *Id.; Anza,* 547 U.S. at 459-60.

*Bridge* is not the only RICO case that disproves BP's RICO proximate cause analysis. For example, in *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1287-91 (11th Cir. 2006), legal workers in Georgia brought a RICO claim alleging that employer Mohawk had a widespread scheme of knowingly hiring and harboring illegal workers with the purpose and direct result of depressing the wages paid to the plaintiffs.   *Williams,* 465 F.3d at 1280.   In upholding a denial on motion to dismiss, the Eleventh Circuit rejected Mohawk's arguments that:  1) other factors contributed to the wages paid to workers; 2) the cause of plaintiffs' alleged harms were a set of actions (paying lower wages) "entirely distinct" from the alleged RICO violation (hiring illegal workers); and 3) the Government was the immediate victim.   The Court held that the workers' injuries were "direct" because the hiring of illegal workers was a proven factor in depressing wages and the cause of the harm was therefore not "entirely distinct."   *Id.* at 1288-1289.   And the Court noted that it was consistent with civil RICO's purpose to turn the workers into private attorney generals seeking to eliminate the illegal hiring scheme.     *Id.* at 1290, *citing Rotella v. Wood,* 528 U.S. 549, 557 (2000) (acknowledging that the very "object of civil RICO is ... to turn [victims] into prosecutors, private attorneys general dedicated to eliminating racketeering activity") (quotation marks and citation omitted).   Other courts have also found RICO proximate causation based on similar allegations.   *See Trollinger*, 370 F.3d at

---

[33]   The Government lawsuit is complementary, however, to the extent that it also asserts violations by BP.   For example, the Government alleges that BP failed to use the best and safest technology available; plaintiffs allege BP falsely stated that they *had* used the best and safest technology.

619 (hiring illegal workers); *Mendoza v. Zirkle Fruit Co.,* 301 F.3d 1163 (9th Cir. 2002) (hiring illegal workers).[34]

BP cites the *Anza* and *Hemi* cases repeatedly and at length,[35] but both of those cases are readily distinguishable.  In *Anza,* the plaintiff alleged that National Steel Supply, a competitor, had stopped paying sales taxes to the New York tax authority, submitted fraudulent documents to the tax authority, and used its tax savings to lower prices.  *Anza,* 547 U.S. at 454-55, 458.  The plaintiff sued for treble damages for sales lost to National.  The Supreme Court concluded that New York, which lost the tax revenue due to National's fraudulent conduct, was the direct victim who could bring suit and not the plaintiff.  *Id.* at 458-59.  The Court held that National's decision to lower prices was "entirely distinct" from the alleged RICO violation of fraud with respect to taxes owed the New York tax authority.  *Id.*  National may have lowered prices for other reasons, regardless of the fraud; it may have kept prices high despite the fraud; and plaintiffs' injuries may have stemmed from other causes.  *Id.*  The Court in particular noted that: "This remoteness concern is heightened when RICO suits are brought by economic competitors seeking damages for lost sales because those types of claims, if left unchecked, could blur the line between RICO and the antitrust laws." *Id.* at 460.  In this case, the fraud and the injuries are far from "entirely distinct"—they are direct cause and effect.  And plaintiffs are not competitors of BP, so the heightened remoteness concern in *Anza* is absent in this case.

---

[34]   *See also Brown v. Cassens Transport Co.,* 546 F.3d 347, 357 (6th Cir. 2008) (on remand after *Bridge*; loss of workmen compensation claims by fraud; "In a RICO case, … proximate cause is shown when 'the wrongful conduct [is] a substantial and foreseeable cause' of the injury and the relationship between the wrongful conduct and the injury is 'logical and not speculative'. … The "direct causal connection" requirement has been met, as no 'intricate, uncertain' inquiries are required to link the defendants' alleged fraud and the plaintiffs' injuries.") (citing *Anza*, 547 U.S. at 460).

[35]   BP's citations to *Hemi*, a plurality opinion, on the issue of proximate causation are questionable.  *See, e.g., Marks v. United States*, 430 U.S. 188, 193-94 (1977) ("When a fragmented Court decides a case and no single rational explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. . . .'") (citations omitted).  Justice Ginsburg played that role in *Hemi*, and she did so ". . . without subscribing to the broader range of the Court's proximate cause analysis . . . ." *Hemi*, 130 S. Ct. at 995 (Ginsburg, J., concurring).

*Hemi* is even further removed factually.   In *Hemi,* New York City brought a RICO complaint alleging that defendant Hemi, an out-of-state cigarette seller, failed to submit customer information to the State of New York as required by statute.   *Hemi Group, LLC v. City of New York, N.Y.*, 130 S. Ct. 983 (2010).   New York State forwarded that information to New York City, which in turn used it to help track down cigarette purchasers who do not pay their taxes on cigarettes as required by New York City.   *Id.* at 984.    The Supreme Court held there was no RICO liability because it would extend liability to the situation where the defendant's fraud on the third party (the State) made it easier for a fourth party (the taxpayers) to cause harm to the plaintiff (New York City).   But, as the Court pointed out, Hemi's obligation was to file the reports with the State, not the City; and the City's harm was caused by the customer's failure to pay their taxes, not by Hemi.   *Id.*   That is a far cry from the direct causal chain in this case—the pattern of racketeering by BP caused the spill that injured Plaintiffs.

BP's argument that one can never bring a RICO case based on fraud against the Government because of the "inappropriate judicial deconstruction" that would allegedly be necessary also falls to cases such as *Bridge* and *Williams.*   Memorandum at 16.   And the cases cited by BP for this proposition are totally inapposite—two were cases involving *challenges* to governmental action, where the courts were naturally leery of second-guessing governmental decision-making, and one was simply a case of bad facts.   *See City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 377-78 (1991) (Court declined to engage in reassessment of "public interest" as determined by govt. action regulating billboards); *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.*, 17 F.3d 295 (9th Cir. 1994) (challenge to govt. immunity); *Oceanic*

*Exploration Co. v. ConocoPhillips*, No. H-07-815, 2008 WL 1777003 (S.D. Tex. Apr. 16, 2008) (challenge to govt. award of bid).[36]

In addition to cases such as *Bridge, Empress Casino* and *Williams,* there are many areas of the law where the courts are called upon to analyze government action.  For example, in False Claims Act cases, which are often brought by private plaintiffs, the courts must determine the issue of "materiality[37]," *i.e.* whether the false claims at issue would have or were likely to have influenced government action.[38]

When Congress enacted RICO, with its new civil complement to the then existing criminal sanctions, it found that the existing "sanctions and remedies available . . . [were] unnecessarily limited in scope and impact."  84 Stat. 923 (1970).  That is why Congress "provid[ed] enhanced sanctions and new remedies" through the statute.  *Id.*  BP seeks nothing short of rewriting the statute.  Such legislative activity is up to Congress, not BP.  *H.J. Inc.*, 492 U.S. at 249 (rejecting defendant's proposed RICO limitation; rewriting RICO "is a job for Congress, if it is so inclined, and not for this Court").

---

[36]   *Oceanic* was not about "judicial deconstruction" but rather about weak facts.   This was a case where one oil company accused another of bribing foreign governmental officials not to reopen bidding on its mineral concessions. It asserts that it would have bid and won, allowing it to recover a substantial part of the revenue earned by its competitor.  The Court said in part:  "Oceanic says that if East Timor had allowed bidding, it would have won. Oceanic cannot show that. In 2001 and 2002-the years of the missing auction-Oceanic did no exploration or development. (Oceanic Form 10-KSB for 2002 (filed Mar. 26, 2003) at 3).  Its principal business was being an employment agency in San Diego. It had eight employees with total assets of $3.7 million."

[37]   31 U.S.C. § 3730(b)(1). "Materiality" in a False Claims Act case requires a showing that the defendants' false statements "could have" influenced the government's payment decision or had the potential to do so.  *See Abbott v. BP Exploration & Prod., Inc.,* No. H-09-1193, 2011 WL 923504, at *8-*9 (S.D. Tex. Mar. 15, 2011) (denying motion to dismiss).  *Abbott* involves false statement allegedly made by BP with respect to the compliance with MMS regulations on the BP Atlantis, another BP/Transocean venture.

[38]   There are also many areas of the law—securities, antitrust, and civil rights to name a few—where private rights of action coexist with government action based on the same facts.  For example, in the securities context, the SEC is afforded discretion in determining whether complex regulatory requirements are violated, yet private plaintiffs can bring suit for injuries suffered by the same acts, and it is up to the courts to determine if there is a violation.  *See Agile Software Corp. v. Merrill Lynch & Co., Inc.*  174 F. Supp. 2d 1032, 1035  (N.D. Cal. 2001) ("Courts routinely interpret SEC regulations in private actions.").

BP's arguments that plaintiffs have failed to plead proximate causation are based upon a misapplication of case law and misconstruction of facts.  Plaintiffs allege that BP proximately caused their injuries.

## II.      Plaintiffs Allege "Racketeering Activity"

BP argues that plaintiffs' complaint fails to allege racketeering activity, because the complaint supposedly is premised solely on allegations that BP used the mails or wires "fraudulently to obtain regulatory permits and approvals."  Memorandum at 22.  BP references the complaint at ¶ 233 in support of this argument, but a review of that paragraph reveals no discussion of use of the mails or wires to obtain "regulatory permits or approvals."  Complaint, ¶ 233.  Certainly, permits and approvals are mentioned in the complaint, but the complaint repeatedly emphasizes that the purpose of the mail and wire fraud schemes carried out by BP was to obtain oil and profits at the expense of the plaintiffs.  Complaint, ¶¶ 28, 55, 87, 233, 238; RICO Case Statement, ¶ 9.  BP obviously misconstrues the complaint so that it can cite *Cleveland v. United States*, 531 U.S. 12 (2000), which held generally that regulatory permits or approvals are not "money or property" under mail or wire fraud statutes.  But, as stated previously, BP cannot refashion plaintiffs' complaint to its convenience; it must deal with the allegations as they are, construed in plaintiffs', not BP's, favor.  *See Scheuer*, 416 U.S. at 236.  The allegations, properly construed, allege racketeering activity.

Plaintiffs allege that BP used the mails and wires to carry out a scheme to defraud, establishing the racketeering activity.[39]  The elements of "scheme to defraud" are simply set out.  The defendant must act with "intent to defraud."  *Durland v. United States*, 161 U.S. 306, 312-14

---

[39]    Complaint, ¶¶ 25, 28, 63, 79, 80, 90, 164, 165, 232, 233, 235, 236-39, 255; RICO Case Statement, ¶¶ 5(a) & (c), 8, 9, 14; Amended RICO Case Statement, ¶¶ 5, 8, 9, 14.

(1896)[40].   Good faith is an absolute defense.   *Id.*   He or she must formulate his or her

"scheme."[41]   "Scheme" is "sufficiently general" to reach a broad range of illicit activity.[42]   The

perpetrator must intend the result of his or her scheme, that is, he or she must intend to deprive

another of something of value, or to gain a benefit for himself or herself by means of deprivation

or gain.   *See Carpenter v. United States*, 484 U.S. 19, 27 (1987).[43]   "Intent . . . make[s] an

otherwise innocent act criminal, if it is a step in a plot."   *Badders v. United States*, 240 U.S. 391,

394 (1916) (mail fraud) (Holmes, J.).   Apart from the jurisdictional elements (mail, wire,

federally insured bank, etc.), "scheme to defraud" *requires* nothing else; it may be implemented

through a variety of techniques, including, *but not limited to*, representations, etc.[44]

Nevertheless, the most widely adopted standard—if not definition—for "scheme to

defraud" is that of *Gregory v. United States*, 253 F.2d 104, 109 (5th Cir. 1958) (described as a

---

[40]   Typically, courts define "intend to defraud" as "act[ing] knowingly and with the specific intent to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to one's self."   *United States v. Gunter,* 876 F.2d 113, 1120 (5th Cir. 1989); *accord United States v. Sims,* 895 F.2d 326, 329 (7th Cir. 1990) (*"*To act with 'intent to defraud' means to act willfully and with the specific intent to deceive to cheat, ordinarily for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself."); *States v. Hanson,* 161 F.3d 896, 900 (5th Cir. 1998) ("The requisite intent to defraud is established if the defendant acted knowingly and with the specific intent to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to himself.") (quoting *United States v. Saks*, 964 F.2d 1514, 1518 (5th Cir. 1992)).

[41]   *United States v. Massey,* 48 F.3d 1560, 1566 (10th Cir. 1995) ("A scheme refers to the overall design to defraud one or many by means of a common plan or technique.").

[42]   *See, e.g., United States v. Maze,* 414 U.S. 395, 399 n.4 (1974) (mail fraud's "scheme to defraud" applicable to a credit card scam, even though credit cards were not in existence in 1872, when it was drafted).

[43]   The "contemplated" loss need not easily measurable.   *See, e.g., United States v. Richman,* 944 F.2d 323, 329-31 (7th Cir. 1991) (loss of an opportunity to bargain because a lawyer plotted to pay an insurance agent to settle a claim).   Indeed, the imposition of a *risk* of loss suffices.   *United States v. Lemons,* 941 F.2d 309, 316 (5th Cir. 1991) (bank fraud 18 U.S.C.§ 1344; no loss occurred; "they were at risk').   Courts interpret bank fraud like mail and wire fraud, on which Congress modeled the statute.   *United States v. Saks,* 964 F.2d 1514, 1524 (5th Cir. 1992) ( risk of loss suffices for "intent to defraud").

[44]   *See United States v. Trapilo*, 130 F.3d 547, 551 (2d Cir. 1997) (scheme to defraud Canadian Government out of cigarette tax revenue) ("Under both the mail and wire fraud statutes, '[t]he thing which is condemned is (1) the forming of the scheme to defraud, *however and in whatever form it may take,* and (2) a use of [mail and wire communications] in its furtherance.   *If that is satisfied, more is not required.*") (citations omitted; emphasis added).

"non-technical" standard that reflects "moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of the members of society"). The *Gregory* standard is widely followed today.[45]

BP also vainly argues, however, that the mail or wire fraud wasn't directed at the plaintiffs, and therefore cannot constitute racketeering for the purposes of RICO, urging the doctrine of "convergence." But this is simply another attempt to make an end-run around controlling Supreme Court and Fifth Circuit precedent. *See Bridge*, 553 U.S. at 648 (2008) ("[I]f petitioners' proposed requirement of first-party reliance seems to come from out of nowhere, there is a reason: Nothing on the face of the relevant statutory provisions imposes such a requirement."); *United States v. McMillan*, 600 F.3d 434, 449 (5th Cir. 2010) ("It is irrelevant for our purposes whether the alleged misrepresentations about the Oath's financial condition were made to the state Department of Insurance or to the alleged victims of the scheme. The issue is whether the victim's property rights were affected by the misrepresentations."); *United States v. Blumeyer*, 114 F.3d 758, 767-68 (8th Cir. 2003) ("[A] defendant who makes false representations to a regulatory agency in order to forestall regulatory action that threatens to impede the defendant's scheme to obtain the money or property from others is guilty" of mail fraud); *see also United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998) ("convergence" between the perpetrator who makes the misrepresentations and the injured victim is not required; "Nothing in the mail and wire fraud statutes requires that the party deprived of money or property be the same party who is actually deceived.")[46]; *United States v. Consentino*, 869 F.2d

---

[45]   *See generally* G. Robert Blakey & Kevin P. Roddy, *Reflections on Reves v. Ernst & Young*, 33 AM. CRIM. L. REV. 1345, 1584-89 (1996) (collecting decisions from the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Circuits).

[46]   *Christopher,* 142 F.3d 52-53 discusses the use of the term "convergence," the conflicts between the circuits, and its rejection of the doctrine as baseless.

301, 307 (7th Cir. 1989) ("[I]n misleading the Department of Insurance, the scheme permitted the agency to remain in business past the point it would have had the Department been aware of the defendants' activities – and that additional time allowed the defendants more time to take [the victim's] money . . ."). As discussed above, the complaint clearly alleges that BP made misrepresentations to government agencies with the purpose of obtaining oil and profits at the expense of the plaintiffs.

Apparently aware of the authority specifically contradicting its argument, BP attempts to graft an additional requirement onto the RICO statute by asserting that a defendant's scheme to defraud must be intended to obtain the money or property *of the plaintiff* in order to satisfy RICO. There is, in fact, no such requirement. A defendant's scheme "for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," 18 U.S.C. § 1341 is actionable whether or not the defendant intended to obtain the money or property of the plaintiff. Defendants are, in fact, arguing for application of a "convergence" requirement for RICO – that is, the perpetrators' false statement had to go to the victim, and the perpetrator had to get the thing the victim lost. The Fifth Circuit, however, has never adopted this "convergence" requirement. *See United States v. McMillan*, 600 F.3d 434, 449-50 (5th Cir. 2010) (citing *inter alia* the *Christopher* and *Blumeyer* cases). *See also Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 565 (5th Cir. 2001) (competitor may recover for misrepresentations directed at its customers).

In any event, *Bridge* settled once and for all that there is no convergence requirement. The plaintiffs in *Bridge* were competitive bidders in a public auction for property tax liens. They alleged that the defendants – other bidders in the auction – engaged in a scheme to submit false information to the county government in order to obtain an advantage during the bidding

process.  *See Bridge*, 553 U.S. at 642.  Thus, the defendants' scheme was designed to obtain the property liens available at auction, not to obtain the money or property of the plaintiffs. Nevertheless, the Court held that other bidders who were deprived of the opportunity to acquire the valuable liens as a result of that scheme had an actionable RICO claim because they "were injured in their business or property by reason of [defendants'] violations . . ." of the RICO statute.  *Id*. at 648.[47]  Plaintiffs here have alleged that BP's false representations to regulatory agencies were designed to obtain money and property – valuable oil rights and savings on safety expenditures – and that plaintiffs were injured as a proximate result of that scheme when the disaster occurred.  Pursuant to the RICO statute and *Bridge*, those allegations are sufficient to maintain a RICO claim based on mail or wire fraud.

The authority on which BP relies for its assertion that the defendant must have intended to obtain the money or property of plaintiffs offers BP no support.  In *United States v. Ratcliff*, 488 F.3d 639 (5th Cir. 2007), the court affirmed dismissal of a RICO claim alleging that the defendant conducted a scheme to obtain the salary and benefits of elected office through misrepresentations to the Louisiana Board of Ethics.  Its holding was based not on some illusory requirement that the defendant's scheme was intended to obtain the plaintiffs' money or property, as BP contends.  Instead, the court affirmed dismissal on the basis that *no* party was deprived of money or property because the parish paying the defendant's salary and benefits would have expended that money even absent the fraud: "[I]t cannot be said that the parish would be deprived of this money by means of Ratcliff's misrepresentations, as the financial

---

[47]    Significantly, on remand in *Bridges,* the district court dismissed the complaint only to have the Seventh Circuit reverse and reaffirm its original decision, but this time remanding to a new district court. *See BCS Services, Inc. v. Heartwood, 88 LLC,* Nos. 05C 4095, 07 C 1367 (7th Cir. decided March 24, 2011) (Posner, J., reviewing extensively the basic principles and rationale of proximate cause; in particular, holding the plaintiffs do not have the burden of negating alternative theories of causation, either to show the fact of damage or its extent).

benefits budgeted for the parish president go to the winning candidate regardless of who that person is." *Id.* at 645.[48]

BP cites *United States v. Pierce*, 224 F.3d 158, 165-166 (2d Cir. 2000), for the proposition that "[a] defendant does not deprive the victim of 'money or property' by simply savings its ***own*** money, unless the defendant has a duty to pay the victim that money . . ." Memorandum at 23 (emphasis in original). That, however, is not what the *Pierce* court decided. The scheme in *Pierce* was to smuggle liquor into Canada, thus avoiding the payment of taxes and duties to the Canadian government. Like *Ratcliff*, the fatal flaw in *Pierce* was that *no* party actually sustained any loss of money or property because the government offered no evidence at trial that Canada actually imposes duties on imported liquor in the first place. *See Id.* at 166.

Finally, BP's reliance on *Williams v. Dow Chemical Co.*, 255 F. Supp. 2d 219 (S.D.N.Y. 2003), is misplaced. Citing *Cleveland*, the court in *Williams* held that the alleged scheme was designed to obtain EPA regulatory approval rather than money or property. *See Id.* at 226. As discussed above, however, plaintiffs have alleged not that BP's intent was simply to obtain regulatory permits, but that the purpose of the mail and wire fraud schemes carried out by BP was to obtain oil and profits and savings on safety costs at the expense of the plaintiffs. Moreover, *Williams* was decided five years before the Supreme Court's decision in *Bridge* settled the issue of whether there was a requirement that the defendant's intent be to obtain the money or property of the plaintiff. *See Bridge*, 553 U.S. at 648.

In any event, even if plaintiffs are required to show that the intent of BP's fraud was to obtain the plaintiffs' money or property—which they are not, as clearly established by *Bridge*— the complaint sufficiently alleges such intent on the part of BP. In executing its scheme to

---

[48]   Indeed, the more recent Fifth Circuit decision in *McMillan* <u>rejected</u> the defendant's argument there that precedent required "that the scheme be to defraud the actual victim and that the object of the scheme be money or property *in the hands of that deceived victim.*" *McMillan*, 600 F.3d at 447 (emphasis added).

defraud, BP intended to obtain plaintiffs' money or property by shifting BP's risk of loss onto the plaintiffs.[49]  When BP saved money by avoiding necessary safety measures through its fraud, it necessarily shifted its risk directly onto the plaintiffs and their businesses.   That risk came to fruition on April 20, 2010.[50]   Accordingly, even though there is no requirement that BP intended to obtain the money or property of plaintiffs, the complaint sufficiently alleges such intent.

Finally, BP's argument that the racketeering allegations fail because they do not distinguish among the three BP entities named as defendants is without merit.   While it is generally true that where there are multiple defendants each defendant must be apprised of its alleged individual role, this is relaxed where, as here, the defendants in question are all part of the same corporate entity.  *See Jepson, Inc. v. Makita Corp.*  34 F.3d 1321, 1329 (7th Cir. 1994) (". . .the three corporate defendants in this case are related corporations that can most likely sort out their involvement without significant difficulty");  *Bechtold v. Sprint Nextel Corp.*, No. 08-cv-23, 2008 WL 8140103, at *4 (S.D. Ill., Oct. 30, 2008) (names and corporate affiliations "can be easily ascertained by Defendants, who are all corporate subsidiaries of Sprint-Nextel Corporation.").

### III.    Plaintiffs Allege "Participation" in an "Enterprise"

BP claims that the complaint fails to allege BP's "participation" in an "enterprise" because: 1) there is allegedly no nexus between BP's alleged wrongdoing and the BP/Transocean enterprise; and 2) the enterprise is allegedly solely BP, and there are no allegations of participation by Transocean.   Memorandum at 25-33.   BP flatly misconstrues the pleadings;

---

[49]   Complaint, ¶¶ 33, 63, 91, 94, 98, 135, 142-146, 150-151; 154-155; 157-158; 161-162, 165-168, 188, 192-215, 218, 221.

[50]   In *Bridge*, for example, the false bids shifted the risk to the plaintiffs that they would not prevail on bids they should have won.  Presumably the *Bridge* plaintiffs would have no cause of action for damages until the actual bid decision was made; that is, when the risk of loss was realized.  *See BCS Services, Inc. v. Heartwood 88 LLC*, Nos. 05C 4095, 07C 1367 (7th Cir. Decided March 24, 2011).

31

plaintiffs allege that Transocean was an integral and necessary participant in BP's pattern of racketeering.  Without Transocean's willing participation in the schemes to defraud regulators regarding BP's ability to avoid and contain oil spills, the schemes would not have succeeded, and neither BP nor Transocean could have amassed its expected multi-millions of dollars in illicit profits.

In order to show a nexus between the pattern of racketeering activity and the enterprise plaintiffs must show that: 1) defendant has in fact committed the alleged racketeering acts; 2) its position in the enterprise facilitated its commission of those acts; and 3) the predicate acts had some effect on the enterprise.  *See United States v. Erwin*, 793 F.2d 656, 671 (5th Cir. 1986).  Each of these requirements is distinctly alleged by plaintiffs.  The pleadings without question allege that BP has committed acts of mail and wire fraud, *i.e.* "racketeering acts."[51]  BP appears to question, however, whether the last two requirements are met.  Memorandum at 27-33.

BP argues that no facts are alleged indicating how "BP engaged in any predicate acts ***through*** its association with Transocean."  Memorandum at 27 (emphasis in original).  This presumably refers to the second requirement: showing that BP's "position in the enterprise facilitated its commission of those acts."  But this is clearly alleged.  BP and Transocean have worked together for years on deep-sea oil well projects.[52]  And for years BP has been Transocean's largest customer.[53]  The legitimate activities of the BP/Transocean enterprise include work on the deep-sea oil well projects.[54]  But the pattern of racketeering—the repeated

---

[51]   *See* Complaint, ¶¶ 238-242; Rico Case Statement, ¶ 5; Amended RICO Case Statement, ¶ 5.

[52]   *See* Complaint, ¶¶ 15, 65, 66, 142, 184, 231; Rico Case Statement, ¶¶ 2, 3, 5(d), 8; Amended RICO Case Statement, ¶¶ 2, 3, 5, 8.

[53]   *See* Complaint, ¶¶ 65, 184, 231, 285; Amended RICO Case Statement, ¶ 5.

[54]   *See* Complaint, ¶¶ 15, 66, 184; RICO Case Statement, ¶ 6(b), 8.

misrepresentations and omissions to the federal regulators regarding the safety of the projects—was also committed through the BP/Transocean enterprise.[55]  BP argues that the allegations all relate solely to the activity of BP, but to the contrary the allegations set forth that BP's commanding position in the enterprise facilitated the pattern of racketeering.[56]  Transocean owned the *Deepwater Horizon* and did the drilling, but BP was in charge of every detail and made crucial decisions that more than "facilitated" the purpose of the enterprise (massive profits heedless of risk)—they were the heart of the illicit pattern of racketeering that was essential to the financial success of the enterprise.[57]

Transocean knew of the lack of safety on the projects, and could have halted the projects for lack of safety or reported the misrepresentations and omissions to the regulators at any time during the drilling job; it did neither—instead it knowingly and willingly went along with the deceit of the regulators by its partner in the pattern of racketeering.[58]  Transocean worked *with* its largest customer to facilitate the pattern of racketeering.  The effect on the enterprise is obvious—BP and Transocean continue the lucrative symbiotic relationship that they have had for years.

The facts as alleged also dispel the notion that what is alleged is simply a fraud by BP, with Transocean tacked on to create a viable enterprise.  Memorandum at 29-31.  Transocean is a necessary component of the enterprise, without which the pattern of racketeering by BP would have been impossible.  BP had to have the assistance of and/or complicity of its enterprise

---

[55]   *See* Complaint, ¶¶ 5, 28, 55, 76, 79, 102, 135, 154, 162, 179, 233-236, 238, 264; Rico Case Statement, ¶¶ 5(d), 9, 14; Amended RICO Case Statement, ¶¶ 5, 9, 14.

[56]   *See* Complaint, ¶¶ 184, 185; Amended RICO Case Statement, ¶ 5.

[57]   *See* Complaint, ¶ 184; Amended RICO Case Statement, ¶ 5.

[58]   *See* Complaint, ¶¶ 67, 116, 141, 142, 145, 146; Rico Case Statement, ¶¶ 5(d), 9, 14; Amended RICO Case Statement, ¶¶ 5, 9, 14.

associate Transocean, because Transocean also had a duty under the regulations to conduct the enterprise's offshore drilling operations and oil spill containment measures according to MMS safety regulations.  30 C.F.R. § 250.400.

BP also points to the irrelevant fact that the originally filed RICO complaints had a variety of alleged enterprises, and suggests that this somehow shows the insufficiency of the enterprise alleged in the consolidated complaint.  Memorandum at 31-32 (*citing Dirt Hogs Inc. v. Natural Gas Pipeline Co. of Am.*, No. 99-6026, 2000 WL 368411 (10th Cir. Apr. 10, 2000)).  But *Dirt Hogs* simply dealt with an insufficient description of the alleged members of an association-in-fact enterprise, not whether multiple enterprises are appropriate.  *Id.*  In fact, more than one viable enterprise may exist for a RICO claim, and it is common, although hardly required, to plead alternative enterprises.[59]   In this case, for the sake of simplicity in the consolidated complaint, plaintiffs chose to set forth only one enterprise.

## IV.    Plaintiffs Allege a RICO "Pattern"

BP once again refuses to follow required rules of construction and give a fair reading to the pleadings.  Instead of fairly and liberally construing the pleadings, BP reconstructs them to

---

[59]    *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 376 n.76 (3d Cir. 2010) (noting that plaintiffs could have alleged alternative enterprises); *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 584 (5th Cir. 1992) (discussing viability of alternately alleged enterprises)**;** *Capitol West Appraisals, LLC v. Countrywide Fin. Corp.*, No. C08-1520RAJ, 2010 WL 5560774, at *7-8 (W.D. Wash. Sept. 28, 2010) (analyzing alternately pled enterprises); *Grant v. Turner*, No. Civ. A 09-2381 (JAG), 2010 WL 988537, at *10 (D.N.J. Mar. 12, 2010) (analyzing alternately pled enterprises); *Tipton v. Northrop Grumman Corp.*, No. 08-1267, 2009 WL 2914365, at *12 n.12 (E.D. La. Sept. 2, 2009) (recognizing that plaintiffs could have alleged alternate enterprises); *In re Ins. Brokerage Antitrust Litig.*, Nos. MDL 1663, Civ. 04-5184 (GEB), Civ. 05-1079 (GEB), 2007 WL 2892700, at *14   (D.N.J. Sept. 28, 2007) (analyzing alternately pled enterprises); *In re Ins. Brokerage Antitrust Litig.*, Nos. MDL 1663, Civ. 04-5184 (GEB), Civ. 05-1079 (GEB), 2007 WL 1062980, at *15-16 (D.N.J. Apr. 5, 2007) (same); *Francis v. Ecoquest Int'l, Inc.*, No. 4:06C1168DDN, 2007 WL 2362496, at *5-6 (E.D. Mo. Aug. 14, 2007) (same); *R.J. Reynolds Tobacco Co. v. S K Everhart, Inc.*, No. 1:00CV00260, 2003 WL 21788858 (M.D.N.C. July 31, 2003) (same); *Shapo v. Engle*, No. 98 C 7909, 1999 WL 1045086 (N.D. Ill. Nov. 12, 1999) (same); *In re SmithKline Beecham Clinical Labs., Inc. Lab. Test Billing Prac. Litig.*, 108 F. Supp. 2d 84 (D. Conn. 1999) (same); *Gottstein v. Nat'l Ass'n for Self Employed*, 53 F. Supp. 2d 1212 (D. Kan. 1999) (same); *Lorentzen v. Curtis*, 18 F. Supp. 2d 322 (S.D.N.Y. 1998) (same); *FDIC v. Refco Group, Ltd.*, 989 F. Supp. 1052, 1076-77 (D. Colo. 1997) (same).

argue that the only pattern alleged consists of seven predicate acts in a 14-month period. Memorandum at 34.  BP ignores the beginning (at least) predicate act 9 years earlier because "it does not relate to the Macondo well."  Memorandum at 35.  But that is the whole point—BP's pattern of racketeering is not confined to the Macondo well, but rather covers all of the BP/Transocean operations, particularly in the Gulf of Mexico.  This long-standing racketeering activity qualifies as a "pattern," inasmuch as it demonstrates continuity as either a "closed" or "open pattern."[60]

On December 1, 2000, BP submitted a false Regional Oil Response Plan for the Gulf of Mexico.  Complaint, ¶ 237; RICO Case Statement ¶ 5(c).  At the time, BP was Transocean's biggest customer, and was engaged in deep-sea oil exploration with Transocean in the Gulf. Amended RICO Case Statement, ¶ 5.  The misrepresentations contained in that Response Plan were part and parcel of the pattern of racketeering that included the Macondo well years later. Complaint, ¶ 160-169; RICO Case Statement, ¶ 5(c); Amended RICO Case Statement, ¶ 5. These events were not "widely separated" or "isolated," but served the same general purpose (to deceive the regulators), with the same results (more drilling at less expense), with the same participants (BP and Transocean), and the same victims (the plaintiffs). *Heller Fin. Inc. v. Grammco Computer Sales, Inc.*, 71 F.3d 518, 524 (5th Cir. 1996).  Upon information and belief, similar misrepresentations of safety with respect to BP/Transocean wells occurred throughout Gulf of Mexico during the period from 2000 until the Deepwater Horizon disaster in 2010.

---

[60]  A RICO "pattern" consists of racketeering predicates that are related and amount to or pose a threat of continued criminal activity.  *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989).  Closed-ended continuity is shown by a series of related predicates extending over a substantial period of time; open-ended continuity is shown by related predicates that threaten repetition.  *Id.* at 242.  Relevant here are also the usual rules regarding the continuation of a conspiracy once it begins.  *See, e.g., United States v. Puig-Infante,* 19 F.3d 929, 945 (5th Cir. 1994) ("Ordinarily, a defendant is presumed to continue involvement in a conspiracy unless that defendant makes a substantial affirmative showing of withdrawal, abandonment, or defeat of the conspiratorial purpose.") (citation and internal quotation marks omitted).  Inasmuch as BP and Transocean continue to operate together in the Gulf of Mexico and around the world, the presumption is certainly justified in this case.

Amended RICO Case Statement, ¶ 5. For example, BP's misrepresentations regarding its ability to contain a spill—which Transocean knew to be false given the state of the containment mechanisms—had to have been false throughout the Gulf during this period.[61]  This period of almost ten years is sufficient to demonstrate closed-ended continuity.[62]

Even if closed-ended continuity were not present, there are allegations supporting open-ended continuity.  Complaint, ¶ 241.  The Supreme Court has identified several ways in which open-ended continuity may be established, including where the predicate acts "include a specific threat of repetition extending indefinitely into the future," or where the acts constitute "a regular way of conducting [an] ongoing legitimate business."  *H.J. Inc., et al., v. Northwestern Bell Tele. Co., et al.*, 492 U.S. 229, 242-243 (1989).  Both are manifestly shown by the facts alleged here. The Court was careful to note, however, that these two methods were not the only ways in which such continuity may be established.  *Id*. at 242.  *See Abraham, et al. v. Singh, et al*., 480 F.3d 351 (5th Cir. 2007) (clarifying that Supreme Court did not intend the continuity prong to be read as a stringent pleading requirement).

BP's argument that the threat of continued racketeering activity is not "plausible" given the "intense scrutiny" of regulators is itself implausible.  Memorandum at 36-38.  As noted in the

---

[61]   It would make no sense for BP to have told the truth about their inability to contain spills on some of their wells; that would have alerted the regulators to an inability to contain spills on all of the wells.

[62]   Even if the period were in fact only fourteen months as alleged by BP, the question of whether this is a sufficient period would still be an open question.  The Fifth Circuit has held that seven months is an insufficient period of time but that twenty or twenty-one months is sufficient.  *Compare Tel-phonic Services, Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1140 (5th Cir. 1992) (two instances of fraud in span of seven months insufficient), *with U.S. v. Thompson*, 253 F.3d 700, No. 99-41007, 2001 WL 498430, at *9 (5th Cir. Apr. 9, 2001) (20-21 months establishes closed-ended continuity).  The *Thompson* decision was based on the holdings of sister circuits, citing *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1995) (thirteen months could demonstrate a "substantial period of time" to satisfy the continuity requirement); *United States v. Pelullo*, 964 F.2d 193, 209 (3d Cir. 1992) (a jury could find a period of nineteen months sufficient for a finding of continuity); *United States. v. Freeman*, 6 F.3d 586, 596 (9th Cir. 1993)  (two years); *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1543 (10th Cir. 1993) (eighteen months); *Metromedia Co. v. Fugazy*, 983 F.2d 350, 369 (2d Cir. 1992) (two years); *United States v. Stodola*, 953 F.2d 266, 270 (7th Cir. 1992) (twenty months).

complaint, BP previously pled guilty to criminal charges, paid $50 million in fines and was placed on probation following a 2005 blast at a Texas refinery that killed 15 people and injured more than 170.  Any reasonable person would think that type of "intense scrutiny" would cause BP to change its regular way of doing business.  Yet in October 2009 BP was fined another $87 million—the largest fine in OSHA history—for failure to correct many of the safety violations that led to the original fine.  Complaint, ¶ 177.   This shows that it is more than plausible that BP will continue its regular way of doing business—deceive the regulators about the time-saving, cost-cutting actions taken that increase the risk of a spill.  And in this case, unlike many of the cases cited by BP, the BP/Transocean enterprise is still in business.[63]

## V.  Plaintiffs Allege RICO Injury

BP argues broadly that plaintiffs' "RICO claims fail for lack of injury."  Memorandum at 38.[64]  Plaintiffs, however, have alleged injuries to their "business or property," as required by the RICO statute.  18 U.S.C. § 1964(c).  Noting that the broad remedial purposes of the statute should be effectuated, the Supreme Court teaches that "the compensable injury ... is the harm caused by predicate acts sufficiently related to constitute a pattern...." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 497 (1985).  As one court stated:

> To recover damages for an injury sustained as a result of a RICO violation, a plaintiff must prove that the violation proximately caused a loss to its business or property. [citation omitted]. The touchstone of the inquiry, in other words, is proximate cause; there is no automatic rule against the recovery of any type of lost profits or lost value damages if proximate cause is shown.

---

[63]   *Cf., e.g. Int'l Bhd. of Teamsters v. Carey,* 297 F. Supp. 2d 706 (S.D.N.Y. 2004) (alleged association-in-fact enterprise involving election campaign; defendant ended up losing and was permanently barred from IBT membership); *Purchase Real Estate Group Inc. v. Jones,* No. 05-10859, 2010 WL 1837809, at *11 (S.D.N.Y. Apr. 30, 2010) (no allegation of existing business enterprise at time of complaint and "therefore there can be no concern that racketeering acts would continue as part of that business.").

[64]   In fact, at most what BP is arguing is that *some* of the plaintiffs' injuries may not be injuries to "business or property" as required under the statute.  *See* Memorandum at 38 (complaint must be dismissed *"to the extent* plaintiffs allege unrealized diminution in property value and/or unspecified injuries.")  (emphasis added).

*Maiz v. Virani,* 253 F.3d 641, 662-63 (11th Cir. 2001) (citation omitted).  In *Maiz,* the Court found that RICO damages could include the amount of money that Plaintiff, investors in fraudulent land partnerships, would have earned "if the proceeds that Defendants pocketed through their frauds had been invested in U.S. real estate." *Id.* at 662.[65]

Proper application of RICO—or any other statute—begins with understanding the "language of the statute is the most reliable evidence of its intent." *United States v. Turkette*, 452 U.S. 576, 593 (1981).[66]  Courts should read RICO's language in its ordinary or plain meaning. *Russello v. United States*, 464 U.S. 16, 20 (1983) (citing *Turkette*, 452 at 580, 593). By any ordinary understanding, BP's fraudulent conduct ultimately deprived Plaintiffs of their "business or property."  18 U.S.C. § 1964(c).  "Business" means "occupation," "work," "concern," or "activity," PAPERBACK OXFORD ENGLISH DICTIONARY at 110 (2001), or "enterprise," "transactions," or "matters," OXFORD ENGLISH DICTIONARY 211 (8th ed. 2004).  "Property," means "belonging" or "right." PAPERBACK OXFORD ENGLISH DICTIONARY at 669 ("belonging"); OXFORD ENGLISH DICTIONARY at 1252 ("right" "ownership," or "bundle of rights").  Thus, "'property' denotes a broad range of interests." *Russello,* 464 U.S. at 21.  In this case, each of the named plaintiffs suffered injury to their business or property:

---

[65]   *See also B&M Nat. Automation, LLC v. AMX Corp*., No. 06-20412, 2007 WL 809675, at *3 (S.D. Fla. Mar. 15, 2007) (lost sales); *Livingston Downs Racing Ass'n Inc. v. Jefferson Downs Corp*., 192 F. Supp. 2d 519, 543-544 (M.D. La. 2001) (lost profits); *Advanced Bus. Sys., Inc. v. Phillips Information Systems Co*., 750 F. Supp. 774, 778 (E.D. La. 1990)(phrase "injury to business or property" includes recovery for lost profits); *Ocean Energy II, Inc. v. Alexander & Alexander, Inc.*, 868 F.2d 740, 746-48 (5th Cir. 1989) (attorney fees; litigation costs; indemnity payments; and compensation within "property"); *Leonard v. City of Los Angeles*, 208 Fed. Appx. 517, 519, 2006 WL 3406837, at *1 (9th Cir. 2006) (lost profits); *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1343 (2d Cir. 1994) (lost contracts); *AAMCO Transmissions, Inc. v. Marino*, Nos. 88-5522, 88-6197, 1992 WL 38120, at *5-*6 (E.D. Pa. Feb. 20, 1992) (lost profits).

[66]   The importance of reading the statute cannot be overstated.  *See* HENRY FRIENDLY, BENCHMARKS, 202 (1976) (quoting the three rules of Justice Frankfurter for interpreting statutes, "(1) read the statute, (2) read the statute, (3) read the statute.

- Robert L. Rinke lives in a condominium located on the Gulf of Mexico in Pensacola Beach, Florida.  He alleges that due to the Spill, he suffered loss, damage and diminution in value of his condominium property .

- Armand's Bistro was a seafood restaurant located in LaPlace, Louisiana.  Due to the Spill, it could not obtain the seafood it needed to operate, and had to close.

- Roland and Barbara Hingle are commercial shrimpers in the Gulf of Mexico, who have lost earnings and property from the Spill.

- Alan Sheen, M.D. is a resident of Louisiana who owns a condominium in Navarre Beach, Florida, whose rental income in 2010 was less than half the average of the prior two years, due to the Spill.

- Mid South Seafood, Inc. is a seafood business that buys seafood from the Gulf of Mexico and sells it throughout Mississippi, and has lost business and earnings due to the Spill.

Complaint, ¶¶ 8-12; RICO Case Statement, ¶ 4.  And the alleged classes have similarly suffered injuries to business or property.[67]

Apart from the plain language of the statute, two other sources support plaintiffs' claims of injury to their "business or property."  First, the antitrust statutes, from which Congress took the "business or property" language.  *Holmes,* 503 U.S. at 265.  Second, the provisions that Congress set out as predicate offenses in RICO itself.  It hardly makes sense to read the remedy of RICO narrower than that afforded the statutes incorporated into RICO, given that Congress specifically incorporated those statutes based on a finding that the current remedies at the time were "unnecessarily limited in scope and impact."  Statement of Finding and Purpose, 84 Stat. 922-23 (1970).

Under the antitrust statutes, that "[m]oney . . . is a form of property" is not a serious question.  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979) (antitrust).  So, too, are lost

---

[67]   Contrary to BP's Memorandum, this is true even of the "Subsistence Plaintiffs" who utilize natural resources for subsistence.  Memorandum at 6, 41.  For example, to the extent Subsistence Plaintiffs can no longer, due to the Spill, obtain seafood for subsistence and must pay for replacement food, they have been injured in their property.

business profits "property" under the antitrust statutes;[68] the *fact* of damage is, moreover, distinguishable from *extent* of damages. *See, e.g., J. Truet Payne & Co. v. Chrysler Motor Corp.*, 451 U.S. 557, 566 (1981) (antitrust; a defendant should not profit from uncertainty in extent of damage created by his own illegal conduct, assuming reasonable certainty in the fact of damage); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123-25 (1969) (antitrust; treble-damage plaintiff may seek recovery for profits from a partial or total exclusion from a market; absent speculation, damage issues in these cases "are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.").

While looking to the antitrust statutes is a recognized move in RICO cases, looking to the predicate offenses in Title 18 that are incorporated into RICO makes equally good, if not, better, sense. Congress would hardly have created a civil remedy in RICO to enforce the predicate offenses (when the other elements of RICO are present), if the civil remedy in RICO were not to be at least as broad in its protection of "business and property," as the predicate offenses include in its scope. *See Maiz v. Viranti*, 253 F.3d 641, 662-66, 674 (11th Cir. 2001) (court ought to construe RICO to include for relief any offense included by Congress in the predicate offenses). The scope of the protection for business and property in RICO's predicate offenses is, significantly, capacious. *See, e.g., Pasquantino v. United States,* 544 U.S. 349, 355-356 (2005) ("Valuable entitlements [to uncollected taxes] are 'property'" within mail fraud statute); *Carpenter v. United States*, 484 U.S. 19, 25-29 (1987) (confidential business information is

---

[68]    So, too, are increased costs, or reduction in value of a business "injury to business or property" under the antitrust statutes. *See generally,* John D. Ludington, *Measure and Elements of Damage Under 15 U.S.C.A. § 15 Entitling Person Injured in his Business or Property by Reason of Anything Forbidden in Federal Antitrust Laws to Recover Treble Damages,* 16 A.L.R. Fed. 14 (2010).

"property" within wire fraud statute).  Thus, a wide variety of forms of "property" ought to fall within "business or property" under Section 1964(c).[69]

In the face of the plain language of the statute, and the guidance of the antitrust laws and the predicate offenses, BP takes snippets from cases in an attempt to engraft overly restrictive requirements upon RICO injury.  For example, BP cites *In re Taxable Mun. Bond Secs. Litig.*, 51 F.3d 518, 523 (5th Cir. 1995) for the proposition that a RICO plaintiff "must" allege "out-of-pocket expenditures."   Memorandum at 39.   But the referenced page of *Taxable Mun. Bond* simply cites a Ninth Circuit case where the court noted that the plaintiff had *not* alleged "out-of-pocket expenditures."  *Id.* (citing *Oscar v. University Students Co-op. Ass'n,* 965 F.2d 783, 786 (9th Cir. 1992)).  The *Oscar* case itself held that plaintiff, as the *tenant* of an apartment, did not suffer any injury to her business or property from a diminution in value because of fellow tenants' drug-related activities.   *Oscar,* 965 F.2d at 786-787.   The court specifically noted, however, that it was not addressing the claims of neighboring property *owners,* and that "one might measure an owner's loss by the diminution in fair market value. . . ."  *Id.*[70]

BP also cites, but fails to acknowledge the relevance of, *Maio v. Aetna, Inc*., 221 F.3d 472 (3d Cir. 2000).  In *Maio*, which also used the "concrete financial loss" language emphasized

---

[69]    Traditionally, "property" meant real estate (land, etc.) and personal property (goods), where the wealth of a traditional society was then held.  THOMAS HOLLAND, ELEMENTS OF JURISPRUDENCE 181 (Legal Classic ed. 1998).  Today, the concept is extended to "intangible" property, as that sort of "property" is no where the wealth of a modern society holds it property.  *Id.*  *See Also Board of Regents v. Roth*, 408 U.S. 564, 572, 577 (1972) ("the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money.").  Indeed, such "things" as frequent flyer mileage, *United States v. Loney*, 959 F.2d 1332, 1336 (5th Cir. 1992), shareholder information, *United States v. Wallach*, 935 F.2d 445, 464-66 (2d Cir. 1991), spending control, *United States v. Shyres*, 898 F.2d 647, 651-52 (8th Cir. 1990), and postal services, *United States v. Gelb*, 881 F.2d 1155, 1162 (2d Cir. 1989) are now considered "property" in various federal criminal statutes.  No sufficient reason appears why "property" under the rest of Title 18 ought not constitute "property" within § 1964(c), particularly given that its concepts are liberally construed.  *Sedima*, 473 U.S. at 491 n. 10).

[70]  BP failed to note that *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc) overruled *Oscar*; *see Newcal Indus., Inc. Ikon Office Solutions*, 513 F.3d 1038, 1055 (9th Cir. 2008) (noting that "[s]ince the district court issued its order [relying on *Oscar*] we have overturned the rules on which the court relied.").  The Ninth Circuit now reads "business or property" generally in light of state law.

41

by BP, the Court held that there was no RICO injury because the plaintiffs suing an HMO for an "inferior health care product" alleged neither a denial of benefits no inferior treatment.  *Id.* at 488-89.  The Court also specifically noted that the diminution in value of tangible property, "like a plot of land or diamond necklace," can constitute RICO injury.  *Id.*  The Court stated:

> In the context of a case in which the property interest at stake is of a tangible nature, it seems logical that an injury to that property, and consequently the fact of damage under RICO, may be demonstrated by reference to external conditions or the occurrence of events which cause the value of the real or personal property to be reduced. *See Genty v. Resolution Trust Corp.*, 937 F.2d 899, 918 (3d Cir. 1991) (district court permitted plaintiffs to recover damages under RICO for economic harm occasioned by the loss of the market value of their homes as a consequence of defendants' fraud in connection with their sale of real property near toxic waste landfill). . . .

*Id.*

Many other courts, including courts whose law would apply to claims involved in this case,[71] have similarly recognized diminution in value as a "concrete" injury.  *See, e.g., Orkin Exterminating Co. v. Delguidice*, 790 So. 2d 1158, 1159-1160 (Fla. DCA 2001) (recognizing "stigma" damages for diminution in property value can be awarded in Florida where the cost of complete repair would amount to economic waste or is otherwise prohibitive).  *See also Florida Power & Light Co. v. Jennings*, 518 So. 2d 895, 898-99 (Fla. 1987). (concluding that public fear of power lines on property, regardless of whether fear was substantiated, can amount to a damage to property value.).  In the present scenario, BP cannot totally remove the oil embedded in the sand, or prevent future oil sheens from encroaching on the beach.  Nor can it remove the

---

[71]  State law is used to determine whether a given interest qualifies as "property." *Diaz v. Gates*, 420 F.3d 897, 899 (9th Cir. 2005) (per curiam) (*citing Doe v. Roe*, 958 F.2d 763, 768 (7th Cir. 1992)).  *See also Bonvillain v. La. Land & Exploration Co.,* 702 F. Supp. 2d 667, 676 (E.D. La. 2010) (noting that "[c]ourts will look to state law to determine whether a particular interest amounts to property under RICO.")(*citing Price*, 138 F.3d at 607; *Doe*, 958 F.2d at 768).

"stigma" of the oil spill that has tarnished the Florida panhandle's reputation as a "pristine" beach destination.[72]

Swimming upstream into the force of general precedent, BP cites a number of other cases for the proposition that any loss must be "concrete," or "clear and definite," and not "intangible" or an "expectancy." Memorandum at 39-42. But, unlike in this case where losses have obviously been incurred, BP's cited cases involved plaintiffs who "received what they bargained for" or "suffered no financial loss." *See Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 492 (5th Cir. 2003) (noting that plaintiffs receiving workers' compensation benefits may have ended up better off, therefore ". . .plaintiffs have failed to show that they were injured at all. . . ."); *Price v. Pinnacle Brands, Inc.,* 138 F.3d 602, 607 (5th Cir. 1998) (plaintiffs who purchased trading cards received "precisely what they bargained for . . . ."); *In re Taxable*, 51 F.3d at 523 ("Anderson has not alleged that the plaintiffs have ever lost any money as a result of the RICO scheme;" lost opportunity for a low interest loan is speculative); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266-268 (2d Cir. 2006) (class members who have not been assessed a penalty by the IRS suffered no damage); *Steele v. Hospital Corp. of America,* 36 F.3d 69, 70-71 (9th Cir. 1994) (patients, who did not pay in overbilling scheme, suffered no financial loss).[73] Plaintiffs—

---

[72] *See* Jay Reeves, *Buried Under the Sand, BP Oil Hidden From Easy Cleanup*, July 7, 2010, http://www.aolnews.com/2010/07/07/under-the-sand-bp-oil-hidden-from-easy-cleanup/; *see also* Charles Wisniowski, *Stigma of BP Oil Spill Impacts Housing Markets Beyond Gulf*, Mortgage Banking, Oct. 2010, at 14; Jeanna Bryner, *BP Oil Spill Forces Florida Beach to Slip from Top 10 Beaches List*, Christian Science Monitor, May 26, 2010, http://www.csmonistor.com/Science/2010/0526/BP-oil-spill-forces-Florida-beach-to-slip-from-top-10-beaches-list/; *New Study Warns of Effects of BP Oil Spill: Study- Spill Will Be Felt for Generations,* Feb. 6, 2011, http://video.foxnews.com/v/4526685/new-study-warns-on-effects-of-bp-oil-spill/

[73] *Steele,* too, is doubly objectionable under the collateral source rule and the rationale of RICO of concentrating recovery into one plaintiff. 2 DANIEL DOBBS, LAW OF REMEDIES §8.6(3) (1993)(collateral source rule); *Carter v. Berger,* 777 F.2d 1173, 1175 (7th Cir. 1985) (RICO; "A pedestrian is entitled to recover for loss caused by being run over by a speeding motorist, even though the pedestrian also has insurance. The 'collateral benefit' rule of tort law rests on the belief that the wrongdoer should be made to pay -- the better to deter like conduct -- whether or not the victim has providently supplied another source of compensation, unless the supplier of the compensation has a subrogation clause.").

victims of the Spill—did not end up better off, they did not receive what they "bargained for," and they have clearly suffered financial loss.  Theirs are not the "speculative" injuries raised in BP's cited cases.

Finally, BP's argument that the allegations of injury are not specific enough would bring us back to the days of fact pleading.  The purpose of pleadings is still simply to give "fair notice."  *Twombly*, 550 U.S. at 545; Fed. R. Civ. P. 8(a).  The allegation that Roland and Barbara Hingle, commercial shrimpers, have lost earnings and property certainly gives notice to BP of the types of injuries alleged.  BP's argument that they have "no clue" as to what the loss or damage may be is disingenuous, at best.  Memorandum at 42.

### VI.    Plaintiffs Allege A RICO Conspiracy

BP argues that plaintiffs have not sufficiently pled their claim of a RICO conspiracy in which BP was a party.[74]  It bases its claim on two allegations:  First, BP alleges that the complaint fails to plead any facts regarding the alleged agreements that form the basis for the conspiracies.[75]  Second, it says the conspiracy allegations "necessarily fall along with the substantive violations that are the object of the alleged conspiracies."  Memorandum at 42.

In support of its first claim, BP argues that plaintiffs have made only "conclusory" statements and not alleged facts to support them.  Had plaintiff's complaint been limited to the

---

[74]   *See United States v. Jimenez*, 537 U.S. 270, 274-76 (2003) ["T]he essence of a conspiracy is 'an agreement to commit an unlawful act.' …That agreement is 'a distinct evil, which 'may exist and be punished whether or not the substantive crime ensues.'") (citing  *Salinas* v. *United States*, 522 U.S. 52, 65 (1997) (RICO)).

[75]   "Secrecy and concealment are essential features of a successful conspiracy." *Blumenthal v. United States*, 332 U.S. 539, 557 (1947).  Circumstantial evidence is, therefore, admissible to prove a conspiracy.  *Id.* at 556-58; *Direct Sales Co.* v. *United States*, 319 U.S. 703, 711-13 (1942); *Glassen v. United States*, 315 U.S. 60, 80 (1942).  Indeed, circumstantial evidence may be sufficient for a jury to reach a judgment—without the necessity of negating reasonable alternative hypotheses—even in a criminal case.  *See, e.g., United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996).  *See also Hamlin v. United States*, 418 U.S. 87, 125 (1974) ("[T]he jury was entitled to conclude that the individual  petitioners, as corporate officials directly concerned with the activities of their organizations, were aware of the mail … scheme, and of the contents of [the mailings]. The existence of an agreement may be shown by circumstances indicating that criminal defendants acted in concert to achieve a common goal.") (citations omitted).

brief portions quoted by BP in its memorandum, this argument might, but probably would not, succeed.   But far more of the complaint (and plaintiffs' RICO Case Statement, a document wholly ignored by BP) makes allegations not only of conspiracies but of situations wherein a conspiracy to achieve the tragic result of this disaster was a necessary precedent.

A brief discussion of the interaction of BP and Transocean employees may clarify plaintiffs' claims and avoid further mischaracterization.   In simple terms, BP contracted with Transocean not only to supply the rig, the Deepwater Horizon, but to supply the great majority of the employees on the rig.   Amended RICO Case Statement, ¶ 5.   Aside from the mud engineers, almost everyone involved in the day-to-day operation of the well was a Transocean employee. *Id.*   The Offshore Installation Manager ("OIM") was an employee of Transocean and was its' senior employee on the rig.   *Id.*   An OIM is the only employee on the rig that may overrule decisions by the "Company Man" (BP's senior employee on the rig) pertaining to drilling operations if the OIM believes that that the action will endanger the rig or the crew.   *Id.*   Thus, <u>every</u> decision by the Company Man or any other BP employee located either on the rig or on the beach was told to the OIM whose duty it was to approve or disapprove the action.   Because BP and Transocean employees interact, discuss, exchange ideas and jointly make decisions every day on the rig, it is not only "plausible" that BP's risky criminal departure from safe drilling practices was well known and acquiesced to by Transocean on a daily basis, it is impossible to conceive otherwise.   *Id.*   *See also* 30 C.F.R. § 250.400 (Transocean subject to same drilling operations and containment safety duties and responsibilities under MMS regulations as BP).

In both Counts 2 and 3, plaintiffs re-allege and incorporate by reference all previous paragraphs of the complaint.   A review of the prior allegations in the complaint provides more

than enough substance to plaintiffs' allegations that a conspiracy did exist and must have existed by the very nature of the relationship between BP and Transocean.

In paragraph 28, plaintiffs allege "Plaintiffs and the class were injured in their business or property by reason of BP's ongoing, systematic and fraudulent scheme to maximize financial gain at the expense of human and environmental safety, accomplished by the conduct of the BP-Transocean association-in-fact enterprise through a pattern of acts indictable as mail fraud and wire fraud, and conspiracies to effect those acts," including "fraudulently deceiving federal and state regulators that BP would safely conduct their oil drilling operations to prevent oil spills."

In paragraph 33, plaintiffs refer to the report of the National Commission on the BP Horizon Oil Spill and Offshore Drilling report identified as "Figure 4.10."  The contents of that document are by now well known to those who even casually follow the investigation of BP's and, in many cases Transocean's, conduct.  At least the last two of nine "decisions" indicated in the report are directly attributable to the conspiracy that existed between the two companies.  Because of the role of the Transocean OIM, all of the other decisions, except Halliburton's decision to use an untested and unreliable cement slurry are necessarily part of the ongoing conspiracy between the two companies.

All of the conduct referred to above and more is included in Section D. of plaintiffs' complaint: "BP's Scheme To Defraud -- Applied To Deepwater Horizon."  In that section, facts are abundantly alleged that discuss the many errors made by BP in its partnership[76] with Transocean.  Complaint, ¶¶ 55-169.

---

[76]   This reference is not meant to imply that BP and Transocean were legal partners in the well.  Rather, Transocean had a contract with BP to provide virtually all of the services necessary to drill the well from its platform, the *Deepwater Horizon*.  BP and Transocean were "partners" in the sense that seldom was a decision made by BP as to the drilling of the well without consultation with employees of Transocean, and never was a task performed on the well without the acquiescence of Transocean."

At paragraph 184, plaintiffs state: "BP's marginal ethics are well known to its competitors and others in the oil and gas industry, particularly Transocean.  As previously stated, in 2009, BP was listed as Transocean's significant customer."  Later, at paragraph 186, plaintiffs claim "clearly, Transocean values the preservation of its lucrative relationship with BP over its obligations to the MMS, the environment, its employees, plaintiffs, and all the many others plainly within the scope of the foreseeable risk when disaster inevitably struck at Macondo.  The allegation contained in paragraph 186, obviously overlooked by BP while preparing its motion to dismiss, in and of itself, makes sufficient allegations of circumstantial evidence that a conspiracy existed.  It is well settled that an agreement may be established by circumstantial evidence.  *See Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 240 n. 19 (5th Cir. 2010).

In paragraph 231 plaintiffs state, "BP has used an association-in-fact 'enterprise,' within the meaning of 18 U.S.C. § 1961(4), to carry out its pattern of racketeering activity.  This Enterprise possessed and continues to possess a common purpose and goal, a membership, organizational structure and ongoing relationships between BP and Transocean with sufficient longevity to permit and enable pursuit of the Enterprise's purpose and long-term objective through a continuous course of conduct that affected and continues to affect interstate and foreign commerce."

BP cites *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2006) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) as the leading United States Supreme Court decisions concerning the sufficiency of pleadings to support allegations of, among other things, a conspiracy.  BP curiously cites *Twombly* to state that parallel conduct among punitive conspirators, absent a plausibly alleged "meeting of the minds" does not establish a conspiratorial agreement.   Memorandum at 44. While that may be true, at no time have plaintiffs ever alleged that BP and Transocean were

involved in "parallel conduct."  In *Twombly*, "Baby Bell" telephone companies were remaining within allegedly agreed upon territories to the exclusion of smaller companies.  *Twombly*, 550 U.S. at 550-51.  Their "parallel conduct" was alleged to be a violation of the Sherman Antitrust Act.  *Id.* at 571.  Here, of course, BP and Transocean were, on a daily basis, involved in whatever is the opposite of parallel conduct.  That is to say, they worked side by side, conversed every day and made almost no agreements (including agreements to engage in criminally risky behavior) without consulting with the other.  BP's argument that parallel conduct is not enough to sufficiently plead a cause of action may be what *Twombly* said; it just has no relevance to plaintiffs' complaint.

Rather, *Twombly* established a new standard as described in *Iqbal* at page 1944, that is a flexible "'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."  Iqbal*, 129 S. Ct. at 1944.  Plaintiffs' burden is to allege enough facts in their complaint to move their claim from "conceivable" to "plausible."  *Id.*  As described above, that has been done over and over again.

As to BP's second claim that "the conspiracy counts fall along with the substantive counts …," the sufficiency of the allegations made by plaintiffs in support of their substantive counts were addressed earlier in this memorandum.   And, contrary to BP's argument, the conspiracy to violate § 1962(a) does not fall without an allegation of a substantive § 1962(a) violation.  *See Beck v. Prupis*, 529 U.S. 494, 506 n. 10 (2000) (leaving open the question of whether a plaintiff suing under § 1962(d) must allege an actionable violation under §§ 1962(a)-(c)); *Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp.*, 259 F. Supp. 2d 471, 479

(M.D. La. 2002) (conspiracy claim met where one of the predicate acts may have proximately caused injuries).

### VII.        Plaintiffs Allege a Violation of Florida RICO

Plaintiffs allege that BP violated Florida RICO statutes, and plaintiffs seek only equitable relief under these statutes.      Complaint, ¶¶ 251-269. *See, e.g.,* Fla. Stat. Ann. § 895.05(6)(injunctive relief for private actions: "Any aggrieved person" may institute a proceeding seeking equitable relief under § 895.05(1)).  As BP acknowledges, two of the named plaintiffs suffered injury in Florida.  Memorandum at 47.  Their claims and the claims of all who suffered injury in Florida are valid, for the same reasons the federal claims are valid. *See, e.g.,* Fla. Stat. Ann. §§ 772.102(1)(b) and 895.02(1)(b) (incorporating federal RICO predicate acts into Florida RICO and CRCPA); *see also, Domberg v. State*, 518 So. 2d 1360, 1361 (Fla. 1st DCA 1988). It is irrelevant that some plaintiffs do not have a claim under the Florida RICO statutes; the claims for equitable relief of those who do have such claims should proceed forward, at the very least for possible later resolution within Florida.  *See* 28 U.S.C. § 1407(a); *see also, Lexecon v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26 (1998) ("each transferred action that has not been terminated in the transferee district court shall be remanded by the Panel to the transferor district for trial.").

### CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that BP's motion to dismiss the Complaint be denied.

This 29th day of March, 2011.


Respectfully submitted,


/s/ Stephen J. Herman
**Stephen J. Herman,** La Bar No. 23129
**HERMAN HERMAN KATZ & COTLAR LLP**
820 O'Keefe Avenue
New Orleans, LA  70113
Telephone:  (504) 581-4892
Facsimile:  (504) 569-6024
E-Mail:  sherman@hhkc.com
*Plaintiffs Liaison Counsel*

/s/ James Parkerson Roy
**James Parkerson Roy,** La. Bar No. 1511
**DOMENGEAUX WRIGHT ROY & EDWARDS LLC**
556 Jefferson Street, Suite 500
Lafayette, LA  70501
Telephone:  (337) 233-3033
Facsimile:  (337) 233-2796
E-Mail:  jimr@wrightroy.com
*Plaintiffs Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT DRESCHER IMPREVENTO &
WALKER, P.C.
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

## RICO MASTER COMPLAINT
## WORKING GROUP

Hiram Eastland
EASTLAND LAW OFFICES, PLLC
307 Cotton Street
Greenwood, MS 38930
Telephone:  (662) 453-1227
Facsimile:  (662) 453-2808
Email:  eastlandlaw@bellsouth.net

Wanda J. Edwards
FAYARD & HONEYCUTT, APC
519 Florida Avenue SW
Denham Springs, LA 70726
Telephone:  (225) 664-4193
Facsimile:  (225) 664-6925
Email:  wandaedwards@fayardlaw.com

Keith D. Jones
8480 Bluebonnet Blvd., Suite F
Baton Rouge, LA 70810
Telephone:  (225) 763-6900
Facsimile:  (225)
Email:  keith@kjones-law.com

W. B. Markovits
WAITE, SCHNEIDER, BAYLESS &
CHESLEY CO., L.P.A.
1513 Fourth & Vine Tower
1 West Fourth Street
Cincinnati, OH  45202
Telephone:  (513) 621-0267
Facsimile:  (513) 621-0262
Email:  billmarkovits@wsbclaw.com

Peter Prieto
PODHURST ORSECK P.A.
25 West Flagler Street, Suite 800
Miami, FL 33130
Telephone:  (305) 358-2800
Facsimile:  (305) 358-2382
Email:  PPrieto@podhurst.com


Of Counsel:

G. Robert Blakey*
(*pro hac motion to be filed*)
Notre Dame Law School
Notre Dame, IN 36556
Telephone:  (574) 631-5717
Facsimile:  (574) 631-4197
Email:  G.R. Blakey.1@nd.edu

* Notre Dame Law School is used solely for purposes of address.

**<u>CERTIFICATE OF SERVICE</u>**

WE HEREBY CERTIFY that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on March 29, 2011.

/s/ Stephen J. Herman and James Parkerson Roy    