UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>Pleading Applies To:<br>All Cases in Pleading Bundle B2 | ) <br>) MDL No. 2179<br>)<br>) SECTION: J<br>)<br>) The Hon. CARL J. BARBIER<br>)<br>) Magistrate Judge SALLY SUSHAN |

STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA
IN RESPONSE TO BP DEFENDANTS' MOTION TO DISMISS
CONSOLIDATED CLASS ACTION RICO COMPLAINT
IN ACCORDANCE WITH PTO NO. 11 [CMO NO. 1] SECTION III(B2) ["B2 BUNDLE"]

# TABLE OF CONTENTS

Page

A. Factual Background..................................................................................3

B. Argument..................................................................................................5

    *1. Critical Post-Lease Permit Applications Submitted by*
    *BP Are Claims For Property*............................................................6

    *2. BP's Analogy to Cases in which the Government*
    *is Merely Regulating a Third Party's Property Is Misplaced*.........11

C. Conclusion..............................................................................................12

# TABLE OF AUTHORITIES

## UNITED STATES SUPREME COURT CASES:

*Cleveland v. United States*,
531 U.S. 12 (2000) .................................................. 11,12

*Mobil Oil Exploration & Producing Southeast, Inc. v. United States*,
530 U.S. 604 (2000) .............................................. 7,8,10,12

*Pasquantino v. United States*,
544 U.S. 349 (2005) .................................................... 12

*Sec'y of the Interior v. California*,
464 U.S. 312 (1984) .................................................... 7,8

*United States v. California*,
332 U.S. 19 (1947) ...................................................... 6

*United States v. Locke*,
471 U.S. 84 (1985) ..................................................... 10

*United States v. State of Louisiana*,
339 U.S. 699 (1950) ..................................................... 6

## FEDERAL CIRCUIT COURT CASES:

*Center for Biological Diversity v. U.S. Dept. of Interior*,
563 F.3d 466 (D.C. Cir. 2009) ............................................ 9

*Laredo Offshore Constructions, Inc v. Hunt Oil Co.*,
754 F.2d 1223 (5th Cir. 1985) ............................................ 7

*McKenna v. Wallis*,
344 F.2d 432 (5th Cir. 1965) ............................................ 10

*Sierra Club v. Morton*,
510 F.2d 813 (5th Cir. 1975) ............................................ 11

*Union Oil Co. of California v. Morton*,
512 F.2d 743 (9th Cir. 1975) ............................................. 9

**FEDERAL DISTRICT COURT CASES:**

*Sun Oil Co. v. United States,*
572 F.2d 786 (Ct. Cl. 1978) .................................................. 10

*United States ex rel. Abbott v. BP Exploration,*
2011 WL 923504 (S.D. Tex. Mar. 15, 2011) .............................. 2,9,10,12

**STATUTORY PROVISIONS:**

18 U.S.C. §§ 1961-68 ........................................................ 1

28 U.S.C. § 517 ............................................................. 2

31 U.S.C. § 3729 *et seq* .................................................... 2

43 U.S.C.S. § 1331 *et seq.* ................................................. 7

**REGULATORY PROVISIONS:**

30 C.F.R. §§ 250.400-490 .................................................... 9

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: | Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : : : : |
| | | MDL NO. 2179 |
| | | SECTION: J |
| | | JUDGE BARBIER |
| This Document Relates to All Cases | | MAG. JUDGE SHUSHAN |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA
IN RESPONSE TO BP DEFENDANTS' MOTION TO DISMISS
CONSOLIDATED CLASS ACTION RICO COMPLAINT
IN ACCORDANCE WITH PTO NO. 11 [CMO NO. 1] SECTION III(B2) ["B2 BUNDLE"]**

The United States of America files this Statement of Interest in response to the Motion to Dismiss that BP Exploration & Production Inc., BP America Production Company, and BP p.l.c. (collectively "BP") submitted in this matter on February 28, 2011. (Doc No. 1437.) That motion seeks dismissal of the Consolidated Class Action RICO Complaint, filed on January 24, 2011 (Doc. No. 1059). In its Motion to Dismiss, BP argues that the consolidated complaint fails to allege a violation of the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. §§ 1961-68, because, among other reasons, the plaintiffs did not adequately plead a predicate violation of the mail or wire fraud statutes. Specifically, BP contends that a false statement to obtain regulatory permits and approvals does not constitute an attempt to obtain money or property for purposes of these statutes. See BP's Motion to Dismiss at 20-25.

1

Although BP's Motion to Dismiss is unrelated to the claims of the United States, the United States nevertheless has a substantial interest in the question of whether false statements to the United States to obtain approval of permits and applications to drill for oil on federal leases constitute requests for "property." This Court's resolution of that issue may have far reaching consequences in the mail and wire fraud and RICO contexts, as well as in other areas of the law. Accordingly, the United States is submitting this response pursuant to 28 U.S.C. § 517 for the limited purpose of urging this Court to reject BP's argument that false statements to obtain regulatory permits and approvals to drill for oil from a federal lease can *never* amount to claims for property.

As set forth more fully below, the conveyance of property rights in BP's lease is contingent upon BP's compliance with certain regulatory and permitting requirements, such as applications for permits to drill (APDs). Without compliance with these regulatory requirements, including the issuance of an approved permit to drill, nothing in the lease affords BP the right to drill for or develop oil from the submerged lands of the Outer Continental Shelf (OCS). Thus, when the United States grants BP a permit to drill, it authorizes BP to exercise a property interest beyond that which is authorized by the lease alone. This was the conclusion reached in a recent decision by the United States District Court for the Southern District of Texas, where BP raised precisely this same issue in moving unsuccessfully to dismiss a case under the False Claims Act, 31 U.S.C. § 3729 *et seq. See United States ex rel. Abbott v. BP Exploration* (*Abbott*), No. H-09-1193, 2011 WL 923504 (S.D. Tex. Mar. 15, 2011) (attached to this Statement of Interest as Attachment 1). This decision is correct and is consistent with long established precedent governing the rights of lessees who seek to drill for oil on federal lands.

2

Other than urging this Court to reject BP's argument about whether permits and applications to drill for federal oil constitute claims for property, the United States takes no position on any other issues raised in BP's Motion to Dismiss.

## FACTUAL BACKGROUND

On January 24, 2011, private party plaintiffs (plaintiffs) filed a Consolidated Class Action RICO Complaint (RICO Complaint) against BP pursuant to Case Management Order (CMO) No. 1, Paragraph III B (2). The RICO Complaint sought damages for injury to business or property caused by the April 20, 2010 blowout of the Macondo oil well and subsequent oil spill in the Gulf of Mexico.[1] RICO Compl. Intro. at ¶¶1-3.

In the RICO Complaint, plaintiffs allege that they (and the class as a whole) were injured in their business or property by a fraudulent scheme between BP and Transocean, Ltd. (Transocean) to:

> obtain oil and billions of dollars in proceeds and profits from offshore drilling by engaging in a pattern of mail and wire fraud, particularly: (1) fraudulently deceiving federal and state regulators that BP would safely conduct their oil drilling operations to prevent oil spills; (2) fraudulently deceiving federal and state regulators that BP could safely and effectively respond to and contain any oil spill, including worse case scenario oil spills like the Deepwater Horizon disaster; (3) hampering containment and cleanup responses by fraudulently deceiving federal and state regulators regarding the oil spill flow rate; and (4) fraudulently deceiving federal and state regulators regarding the quickest and safest method to kill the Macondo well and stop the Spill.

RICO Compl. at ¶¶ 28-29. Specifically, plaintiffs allege, *inter alia*, that BP made the

---

[1] In addition to seeking relief for the named plaintiffs, the RICO Complaint also seeks certification of a plaintiff class, defined as "[a]ll individuals and entities residing or owning property in the United States who claim economic losses, or damages to their occupations, businesses, and/or property as a result of the April 20, 2010 explosions and fire aboard, and sinking of, the Deepwater Horizon, and the resulting Spill." RICO Compl. at ¶ 216.

following false or fraudulent representations: false statements to federal regulators in its Initial Exploration Plan for the Macondo site; misrepresentations in its initial and revised Regional Oil Spill Response Plans about BP's ability to respond to and clean up an oil spill; fraudulent equipment and operations inspection reports that were submitted to MMS for approval; misrepresentations in its planned well design; representations to MMS regarding its drilling and abandonment procedures that were contrary to those actually implemented; misrepresentations regarding the actual flow rate of the oil spill; and other false statements of compliance in connection with other, unidentified government regulations. RICO Compl. at ¶¶ 63-64, 73, 78-80, 90, 102, 162, 164-67, 237. According to plaintiffs, each of these misrepresentations had the same or similar purpose: "to defraud the [MMS] regulators . . . so BP could fraudulently obtain oil and billions of dollars in proceeds and profits at the expense of safety." RICO Compl. at ¶ 238.

On February 28, 2011, BP filed its Motion to Dismiss, which alleged that the consolidated complaint should be dismissed on various grounds. Specifically, BP argued that the plaintiffs failed adequately to plead that any of BP's actions: (1) proximately caused the plaintiffs' injuries; (2) were committed in the context of BP's participation in a RICO enterprise; (3) constituted a pattern of related crimes over a substantial period of time; (4) caused an actionable injury; (5) were committed through an enterprise distinct from BP itself; or (6) were the result of a conspiracy between BP and another party. BP also contended that the consolidated complaint failed to state a claim under the Florida RICO statute. The United States takes no

4

position on whether any of these alleged deficiencies invalidates the plaintiffs' complaint.[2] Rather, in this Statement of Interest, the United States focuses on one additional allegation that BP raised in its Motion to Dismiss: that the consolidated complaint failed to allege a predicate violation of the mail or wire fraud statutes because a false statement to obtain regulatory permits and approvals to drill for oil on federal lands cannot amount to a fraudulent attempt to obtain property. *See* BP's Motion to Dismiss at 20-25. For the reasons set forth below, this aspect of BP's Motion to Dismiss is simply wrong and should be rejected.

## ARGUMENT

BP's Motion to Dismiss erroneously argues that false statements to obtain regulatory permits and approvals for the right to obtain oil from an OCS lease – which by definition constitutes property belonging to the United States – do not constitute claims for property. BP's erroneous argument starts from a mistaken premise regarding the nature of the property interest conveyed by an OCS lease and the relationship between the lease and the regulations incorporated into the lease. Contrary to BP's assertion, OCS leases do not convey an unfettered

---

[2] With respect to BP's "proximate cause" argument, BP contended that any injuries the plaintiffs suffered would have been caused by the oil spill itself, not the alleged fraud on government regulators, and thus that the RICO complaint failed to plead the requisite link between the asserted injury and the injurious conduct. BP's Motion to Dismiss at 10-13. The United States takes no position on whether plaintiffs adequately pled proximate causation here. However, in the event that BP is suggesting that false statements to federal regulators in the process of obtaining permits to drill for oil can *never* proximately cause oil-spill related damages to the United States, the United States disagrees. That is not an issue that the Court needs to resolve here.

Moreover, BP's Motion to Dismiss, at 31-32, alleges that the Consolidated Class Action Rico complaint is a successor to several complaints in which the Bureau of Ocean Energy Management Regulation and Enforcement (formerly the Minerals Management Service) is, together with BP, named as a component of a RICO "enterprise," as that term is used in the RICO law. The United States denies any such allegation that may have been made in those original complaints.

property interest subject only to the regulatory control of the government. Rather, these leases convey only a conditional property interest that does not allow the lessee to drill into, or remove oil from, the OCS without further approval by the Government. These additional property rights arise only if the lessee obtains certain permits that are preconditions to the lessee's ability lawfully to drill into, and ultimately produce oil from, the lease. As a result, when a lessee resorts to false statements to obtain approval of these permits and applications from the government, it engages in a fraudulent scheme to obtain government property.

### I.   Critical Post-Lease Permit Applications Submitted by BP Are Claims For Property.

In its Motion to Dismiss, BP contends that the approval of a permit to drill for oil and gas in the OCS cannot convey a property interest. It grounds this position on the premise that the only interest the government retains after the execution of an OCS lease is the ability to issue "a regulatory approval or permit," which is "not the regulator's property." Motion to Dismiss at 24.

BP's argument is contrary to well established law. Stated simply, the government's interests in regulating the activities of OCS lessees stem not only from its regulatory powers but also from its own ownership interests in the OCS and the oil contained within it.

The government's ability to regulate oil and gas leasing activities in the OCS reflects its "paramount rights in and power over" the relevant portion of the OCS, "which is full dominion over the resources under the soil of that water area, including oil." *United States v. California*, 332 U.S. 19, 28-39 (1947) (ruling that the United States' interests in offshore submerged lands outside of California trumps the state's rights of ownership); *see also United States v. State of Louisiana*, 339 U.S. 699 (1950) (following the principles in the California case, the Supreme Court made like holdings with respect to submerged lands in the Gulf of Mexico). Similarly, the

enactment of the Outer Continental Shelf Lands Act (OSCLA) in 1953, "vests the federal government with a proprietary interest in the [OCS] and establishes a regulatory scheme governing leasing and operations there." *Laredo Offshore Constructions, Inc v. Hunt Oil Co.*, 754 F.2d 1223, 1227-28 (5th Cir. 1985) (citing the 1953 House of Representatives Committee on the Judiciary report on the OCSLA). Likewise, the 1978 amendments to the OCSLA were adopted to "update government control of resource development on the [OCS] and to ensure the promotion of the dual policies of resource production and environmental protection." *Id.* (citing the House Committee on the Outer Continental Shelf).

While the acquisition of an oil and gas lease transfers to a lessee some of the Government's property rights, the extent of that transfer is limited. In *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 620-21 (2000), the Court concluded that conveyance of the right to drill for and remove oil and natural gas from the OCS is a multi-stage process, and compliance with applicable regulatory and permitting requirements is vital for the lessee to obtain such key sought-after OCS interests as the exclusive rights to explore the OCS and develop the oil contained within it. There, the Court declared:

> [T]he lease contracts gave the companies more than rights to obtain approvals. They also gave the companies rights to explore for, and to develop, oil. But the need to obtain government approvals so qualified the likely future enjoyment of the exploration and development rights that the contract, in practice, amounted primarily to an opportunity to try to obtain exploration and development rights in accordance with the procedures and under the standards specified in the cross-referenced statutes and regulations. Under the circumstances, if the companies did not at least buy a promise that the government would not deviate significantly from those procedures and standards, then what did they buy? ... (the companies bought exclusive rights to explore and develop oil '*if they met*' OCLSA requirements). (Emphasis in original).

*See also Sec'y of the Interior v. California*, 464 U.S. 312, 339 (1984) ("by purchasing a lease,

7

lessees acquire no right to do anything more. Under the plain language of OCSLA, the purchase of a lease entails no right to proceed with full exploration, development, or production . . . the lessee acquires only a priority in submitting plans to conduct those activities. If these plans, when ultimately submitted, are disapproved, *no further exploration or development is permitted*.") (emphasis added).

The Supreme Court has thus repeatedly recognized that a federal oil and gas lease does not convey an unfettered right to explore for and produce oil from a federal lease. The conditions that are placed on these leases protect the United States' residual property interests through a system of permits and approvals that the lessee is required to obtain before it can drill into the OCS and produce oil from it. Indeed, in this case, the lease itself makes clear that the property interest it conveys is "subject to . . . applicable statutes and regulations." OCSLA Lease at Sec. 1 (attached to this Statement of Interest as Attachment 2).[3] *See Mobil Oil*, 530 U.S. at 620-21 (holding that an OCSLA lease is subject to OCSLA's implementing regulations). BP's lease additionally provides that BP "shall conduct all operations on the lease area in accordance with approved exploration plans and approved development of production plans as are required by regulations." *Id.* at Sec. 9. Furthermore, BP "may depart from an approved plan only as provided by applicable regulations." *Id.* The lease also reserves for the United States all rights in the leased area that are not *"expressly granted"* to BP, including the right to grant leases for other minerals to other parties on the leased area. *Id.* at Sec. 19.

---

[3] See also *id.* at Sec. 2(a) (lease conveys right to conduct "geological and geophysical explorations in accordance with applicable regulations"); *id.* at Sec. 10 ("[t]he lessee shall comply with all regulations and Orders"); and *id.* at Sec. 12(b) (requiring the lessee to "maintain all operations within the lease area in compliance with regulations or orders intended to protect persons, property, and the environment on the Outer Continental Shelf").

8

The regulatory and permitting requirements pertinent to this matter include the provisions set forth in Subpart D of the regulations implementing the OCSLA and entitled "Oil and Gas Drilling Operations," 30 C.F.R. §§ 250.400-490. These provisions, *inter alia*, require BP to submit a legally sufficient APD and obtain written approval from the United States *before* BP may drill a well and *before* BP may sidetrack, bypass or deepen a well. 30 C.F.R. §§ 250.410-418 (emphasis added). Thus, until BP satisfies the requirements set forth in these regulations, it does not have the right to drill into, or remove oil from, the OCS.

Other courts have rejected the position that an OCS lease grants a complete property interest to the lessee. *See, e.g., Union Oil Co. of California v. Morton*, 512 F.2d 743, 747 (9th Cir. 1975) ("A lease issued under the [OCSLA] does not convey title in the land, nor does it convey an unencumbered estate in the oil and gas. . . . The lease does convey a property interest enforceable against the government, of course, but it is an interest lacking many of the attributes of private property.") (citation omitted); *see also Center for Biological Diversity v. U.S. Dept. of Interior*, 563 F.3d 466 (D.C. Cir. 2009) (characterizing the "four-stage process" of developing an offshore well as "pyramidic in structure, proceeding from broad-based planning to an increasingly narrower focus as actual development grows more imminent.") (internal citations omitted).

Notably, when BP recently litigated *precisely* this same issue in a False Claims Act case brought in the Southern District of Texas, the Court held explicitly that permits granting BP the right to either drill for or develop oil from a federal lease constitute actionable claims for property. *Abbott*, 2011 WL 923504 at *7. In *Abbott*, which involved an OCS lease comparable to the one at issue here, BP had contended that the lease itself conveyed all of the government's

9

property interests in the oil covered by the lease, and hence, there were no subsequent property interests remaining to be transferred. The Court held, however, that the OCS lease, "standing alone, does not transfer to the lessee the rights to explore, develop or produce oil and gas resources . . . [and] do[es] not give rise to property rights in the oil and gas minerals themselves." *Id.* at * 5-6. Rather, the Court said, it is when the lessees receive permits based on their compliance with "the continuing obligations set forth in the leases, statutes, and regulations" that they are given the right to seek and exploit oil and other resources in the OCS. *Id.* at * 6-7. In light of the above, the *Abbott* Court concluded that

> the issuance of a lease begins, rather than ends, the process by which BP may exercise the right to explore for and extract oil or gas by way of its OCS leases. This process includes critical government permits that effectuate the lessee's right to drill for and develop oil from a federal lease, and *thus these permits can constitute actionable 'claim[s] . . . for . . . property"* under the FCA [False Claims Act]. 31U.S.C. §3729(b)(2).

*Id.* at * 7 (emphasis added).

*Abbott* is thus consistent with *Mobil Oil* in finding that BP's acquisition of an OCS lease merely provides the *opportunity* to obtain the oil covered by the lease. It does not transfer all of the government's interests in the property.[4] To effectuate the opportunity that it is receiving under its lease – i.e. to gain the right to drill into, or remove oil, from the OCS -- a lessee like BP must first comply with the various relevant regulatory and permitting requirements. *See Sierra*

---

[4] *See U.S. v. Locke*, 471 U.S. 84, 104-105 (1985) ("the United States, as owner of the underlying fee title to the public domain, maintains broad powers over the terms and conditions upon which the public lands can be used, leased, and acquired."); *see also McKenna v. Wallis*, 344 F.2d 432, 440-41 (5th Cir. 1965), *vacated on other grounds*, 384 U.S. 63 (1966) ("a mineral lease does not give the lessee anything approaching the full ownership of a fee patentee, nor does it convey an unencumbered estate in the minerals."); *Sun Oil Co. v. U. S.*, 572 F.2d 786, 793-94 (Ct. Cl. 1978) (a "lease issued under [OSCLA], like a mineral lease granted under the Mineral Leasing Act of 1920, . . . does not convey title in the land, nor does it convey an unencumbered estate in the oil and gas.")).

*Club v. Morton*, 510 F.2d 813, 827-828 (5th Cir. 1975) (the regulations governing oil and gas lease operations in the Gulf of Mexico "must be complied with by the lessee throughout the life of the lease just as fully as lease stipulations."). In short, until BP obtains the necessary permits and approvals, it does not have the right to drill for or produce the oil covered by the lease, and subsequent false statements made in connection with applications to drill for, or produce, oil covered by the lease may indeed amount to false claims for government property.

## II. BP's Analogy to Cases in which the Government is Merely Regulating a Third Party's Property Is Misplaced.

To support its argument that no property interests are at stake in this case, BP relies upon decisions holding that the mere issuance of a permit or approval of an application by the government does not implicate any property interests. These cases are easily distinguishable, however, because they did not involve permits or applications for the transfer of government property.

In *Cleveland v. United States*, 531 U.S. 12, 23-37 (2000), for example, the Court distinguished between tangible and intangible rights, holding that the power of the government to regulate intangible rights was an exercise of its police power and involved no governmental property right. The Court explained that "for the purposes of the mail and wire fraud statute, the thing obtained must be property in the hands of the victim." *Id.* at 26. As discussed above, however, that is precisely what is at stake in the case at bar – the United States' conveyance of its *own* property interests in the OCS, which BP is not fully authorized to exercise at the time of a lease sale.

11

This case is therefore more akin to *Pasquantino v. United States*, 544 U.S. 349, 355 (2005), where the Supreme Court held that the government's right to uncollected excise taxes was "'property' in its hands" for it possessed an "entitlement to collect money" from a party. The Court thus concluded that a scheme to defraud the government of this right was actionable under the mail and wire fraud statutes. Here, the property "in the hands" of the United States is the OCS and the oil it contains. Put another way, a permit to drill, such as an APD, is not merely a request for the permit itself, but rather a request for the right to drill into the OCS – a greater property interest than what is acquired merely by obtaining a lease. Thus, unlike in *Cleveland*, the permits at issue do not involve the mere regulation of intangible rights; rather, the permits submitted by BP had the consequence of transferring the government's proprietary interest in actual, tangible OCS property to BP. *Abbott*, 2011 WL 923504 at *5-7.

Together, the provisions of BP's OCS lease make clear that when it acquired the lease, it obtained only a limited property right. Specifically, BP obtained the nonexclusive right to perform preliminary geological and geophysical explorations and similar activities, and the exclusive *opportunity* to obtain further exploration and development rights for oil and natural gas in that area, provided it submitted and obtained approvals of the necessary permits and applications. *See* Section 2 of the OSCLA Lease, attached as Attachment 2; *see also Mobil Oil*, 530 U.S. at 620. Hence, both as a matter of law and logic, if BP made false statements in these permit applications, then BP submitted false or fraudulent claims for Government property.

## CONCLUSION

For the foregoing reasons, the United States respectfully suggests that, in the event the Court reaches the issue of whether BP's alleged false statements were part of a scheme to obtain

12

government property, the Court should refrain from holding that requests for regulatory permits and approvals for access to oil on a federal lease can never constitute claims for government property for purposes of the wire and mail fraud statutes.

Dated: March 28, 2011

Respectfully submitted,

| | |
|---|---|
| IGNACIA S. MORENO<br>Assistant Attorney General<br>Environment & Natural Resources<br>   Division | MICHAEL F. HERTZ<br>Deputy Assistant Attorney General<br>Civil Division |
| /s/ Steven O'Rourke<br>STEVEN O'ROURKE<br>Senior Attorney<br>Environmental Enforcement Section<br>U.S. Department of Justice<br>P.O. Box 7611<br>Washington, D.C. 20044<br>Telephone: 202-514-2779<br>Facsimile: 202-514-2583<br>E-mail: steve.o'rourke@usdoj.gov | /s/ R. Michael Underhill<br>R. MICHAEL UNDERHILL<br>Attorney in Charge, West Coast Office<br>Torts Branch, Civil Division<br>U.S. Department of Justice<br>7-5395 Federal Bldg., Box 36028<br>450 Golden Gate Avenue<br>San Francisco, CA 94102-3463<br>Telephone: 415-436-6648<br>Facsimile: 415-436-6632<br>E-mail: mike.underhill@usdoj.gov |

JIM LETTEN
  United States Attorney
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
Hale Boggs Federal Building
500 Poydras Street, Ste. B-210
New Orleans, LA 70130

Attorneys for the UNITED STATES OF AMERICA

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 28th day of March, 2011.

*/s/*