# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010**<br><br>**This Document Relates to:**<br>***All Cases in Pleading Bundle B3.***<br><br>(This Document applies to No. 10-2771) | **MDL No. 2179**<br><br><br>**SECTION: J**<br><br>**JUDGE BARBIER**<br><br>**MAGISTRATE SUSHAN** |

## OMNIBUS MEMORANDUM IN OPPOSITION TO MOTIONS TO DISMISS BUNDLE B3 MASTER COMPLAINT

# TABLE OF CONTENTS

**Page**

STANDARD OF REVIEW ...................................................................................... 3

ARGUMENT .......................................................................................................... 4

I.     THE OPA DOES NOT PREEMPT PLAINTIFFS' MARITIME OR STATE LAW CLAIMS ................................................................................ 4

II.    MEDICAL MONITORING IS AVAILABLE UNDER GENERAL MARITIME LAW ......................................................................................... 9

        1.    The Plaintiffs Have Alleged Discernable Personal Injury. .......... 10

        2.    The Jones Act Is Not Controlling. .............................................. 11

        3.    State Law Supplements General Maritime Law Allowing Plaintiffs To Recover Medical Monitoring Costs. ....................... 12

        4.    Plaintiffs' Claim For Medical Monitoring Under Florida Law Is Valid.............................................................................. 17

III.   THE ECONOMIC LOSS DOCTRINE DOES NOT BAR PLAINTIFFS' CLAIM FOR NUISANCE................................................................................. 18

IV.   DEFENDANTS ARE NOT IMMUNE FROM LIABILITY FOR ACTIONS TAKEN IN THE AFTERMATH OF THE OIL SPILL ................... 20

        A.   Summary of Arguments. ........................................................... 21

        B.   Defendants Are Not Entitled To Derivative Absolute Immunity. ........... 23

        C.   Defendants Are Not Immune From Suit Under the Federal Tort Claims Act. ............................................................................ 26

        D.   Defendants Are Not Immune From Suit under the Federal Government Contractor Defense Set Forth in *Yearsley*. ........................... 28

        E.   Defendants Are Not Entitled to Responder Immunity under the Clean Water Act................................................................... 35

                1.    The Responder Immunity Provision On Its Face Does Not Limit Defendants' Liability for Plaintiffs Damages. .................. 35

                2.    Plaintiffs' Claims Fall within the Exceptions to the Responder Immunity Provision. .............................................. 37

                3.    Case Law Confirms That Defendants Are not Entitled to Responder Immunity................................................................ 37

V.    PLAINTIFFS SUFFICIENTLY ALLEGE NEGLIGENCE PER SE ................ 39

        A.   The B3 Master Complaint Sufficiently Identifies the Applicable Laws................................................................................... 39

# TABLE OF CONTENTS
(continued)

Page

B.    Plaintiffs Satisfy Elements of Negligence *Per Se* as a Matter of Law. ............................................................................................... 40

C.    The Clean Water Act Expressly Provides a Private Right of Action........................................................................................................ 41

D.    Plaintiffs Allege Individual Actions for O'Brien Giving Rise to Liability............................................................................................... 44

VI.    PLAINTIFFS ADEQUATELY PLEADED FACTS TO SUPPORT THE CLAIMS IN THE COMPLAINT ...................................................... 45

CONCLUSION............................................................................................................ 48

# TABLE OF AUTHORITIES

**Page**

## Cases

*Ackerson v. Bean Dredging LLC*,
 589 F.3d 196 (5th Cir. 2009) ............................................................... 22, 28

*Alcoa S.S. Co. v. Charles Ferran & Co.*,
 383 F.2d 46 (5th Cir. 1967) ................................................................... 13

*American Dredging Co. v. Lambert*,
 81 F.3d 127 (11th Cir. 1996) ................................................................. 14

*American Frozen Food Institute v. Train*,
 539 F.2d 107 (D.C. Cir. 1976) .............................................................. 42

*Andrulonis v. United States*,
 952 F.2d 652 (2d Cir. 1991) .................................................................. 33

*Ashcroft v. Iqbal*,
 ___ U.S. ___, 129 S. Ct. 1937 (2009) .................................................... 3

*Askew v. Am. Waterways Operators, Inc.*,
 411 U.S. 325 (1973) .............................................................................. 13

*Aslakson v. United States*,
 790 F.2d 688 (8th Cir. 1986) ................................................................. 34

*Ayers v. Twp. of Jackson*,
 525 A.2d 287 (1987) .............................................................................. 18

*Barnes v. The American Tobacco Co.*,
 161 F.3d 127 (3d Cir. 1998) .................................................................. 18

*Bates v. Dow Agrosciences LLC*,
 544 U.S. 431 (2005) ......................................................................... 5, 6, 8

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007) ................................................................................ 4

*Berkowitz v. United States*,
 486 U.S. 531 (1988) .......................................................................... 32, 33

*Berthelot v. Boh Bros. Constr. Co.*,
 No. 05-4182, 2006 U.S. Dist. LEXIS 57817 (E.D. La. July 19, 2006) ...................... 3

*Bldg. & Constr. Trades Council v. Associated Builders & Contrs.*,
 507 U.S. 218 (1993) ............................................................................ 6, 8

*Bodin v. Vagshenian*,
 462 F3d 481 (5th Cir. 2006) .................................................................. 22

**TABLE OF AUTHORITIES**
(continued)

Page

*Bower v. Westinghouse Electric Corp.*,
    522 S.E.2d 424 (W. Va. 1999)..................................................................... 18

*Boyle  v. United Tech. Corp.,*
    487 U.S. 500 (1988)..................................................................... 27, 28, 30

*Bultema v. United States,*
    359 F.3d 379 (6th Cir. 2004) ..................................................................... 32

*Burns v. Jaquays Min. Corp.*,
    752 P.2d 28 (1987)..................................................................... 18

*Caillouet Land Corp v. Chevron Pipe Line Co*.,.
    No. 06-10533, 2007 U.S. Dist. LEXIS 48364 (E.D. La. July 3, 2007) .............................. 37, 38

*Cape Flattery Ltd. v. Titan Maritime LLC*,
    607 F.Supp.2d 1179 (D. Haw. 2009) ..................................................................... 37

*Caplan* v. *United States,*
    877 F.2d 1314 (6th Cir. 1989) ..................................................................... 34

*Coastal Iron Works, Inc. v. Petty Ray Geophysical*,
    783 F.2d 577 (5th Cir. 1986) ..................................................................... 13, 14

*Cosmopolitan Shipping Co. v. McAllister*,
    337 U.S. 783 (1949)..................................................................... 11, 12

*CSX Transp., Inc. v. Easterwood*,
    507 U.S. 658 (1993)..................................................................... 6, 8

*Dalrymple ex. Rel Dalrymple v. Fairchild Aircraft, Inc.*,
    575 F. Supp. 2d 790 (S.D. Tex. 2008) ..................................................................... 13

*Dragon v. Cooper/T. Smith Stevedoring*,
    726 So.2d 1006 (La. Ct. App. 4th Cir. 1999)..................................................................... 9, 12

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982)..................................................................... 5

*Florida Lime & Avocado Growers, Inc. v. Paul*,
    373 U.S. 132 (1963)..................................................................... 5, 8

*Friends for All Children, Inc. v. Lockheed Aircraft Corp.*,
    746 F.2d 816 (D.C. Cir. 1984) ..................................................................... 18

*Gehlken v. McAllister Towing & Transp. Co.*,
    No. 2:03-3935, 2007 WL 2332487 (Jan. 29, 2007 D.S.C.) ..................................................................... 15

**TABLE OF AUTHORITIES**
(continued)

Page

*Geier v. Am. Honda Motor Co.*,
   529 U.S. 861 (2000)...................................................................................... 7

*Gillespie v. United States Steel Corp.*,
   379 U.S. 148 (1964).................................................................................... 12

*Green v. McAllister Bros., Inc.*,
   No. 02 7588 (FM), 03 1482 (FM), 2005 WL 742624 (S.D.N.Y. Mar. 25, 2005) .................... 12

*Griffin v. United States*,
   500 F.2d 1059 (3d Cir. 1974)........................................................................ 33

*Hagerty v. L & L Marine Services, Inc.*,
   788 F.2d 315 (5th Cir. 1986) ................................................................... 9, 12

*Hansen v. Mountain Fuel Supply Co.*,
   858 P.2d 970 (Utah 1993)............................................................................ 18

*Hendry v. United States*,
   418 F.2d 774 (2d Cir. 1969)......................................................................... 33

*Hines v. Davidowitz*,
   312 U.S. 52, 67 (1941).................................................................................. 5

*Horsley v. Mobil Oil Corp.*,
   15 F.3d 200 (1st Cir. 1994)......................................................................... 16

*Houston Cnty. Health Care Auth. v. Williams*,
   961 So. 2d 795 (Ala. 2006)......................................................................... 16

*In re Consolidation Coal Co.*,
   228 F. Supp. 2d 764 (N.D. W. Va. 2001) ....................................................... 15

*In re Denet Towing Serv., Inc.*,
   No. 98-1523, 98-1583, 1999 WL 329698 (E.D. La. May 21, 1999) ........................ 15

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
   175 F. Supp. 2d 593 (S.D.N.Y. 2001)............................................................ 7

*In re SkipperLiner Industries, Inc.*,
   No. 00-C-0730, 2002 WL 32348827 (W.D. Wis. Jan. 31, 2002)............................ 15

*In re World Trade Center Disaster Site Litig.*,
   456 F. Supp. 2d 520 (S.D.N.Y 2006).......................................................... 23, 25

*In re World Trade Center Disaster Site Litigation*,
   521 F.3d 169 (2d Cir. 2008)........................................................................ 27

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, No. MDL 1358*,
457 F. Supp. 2d 324 (S.D.N.Y. 2006)......................................................................................... 5

*J. Ray McDermott & Co., Inc.  v. Vessel Morning Star*,
457 F.2d 815 (5th Cir. 1972) ................................................................................................... 14

*Jacobs v. Osmose, Inc.*,
No. 01-944-CIV, 2002 WL 34241682 (S.D. Fla. Jan. 3, 2002)............................................... 17

*Jones v. NL Industries*,
No. 4:03-CV-229, 2006 WL 1487026 (N.D. Miss. May 24, 2006) ........................................ 16

*Just v. Chambers*,
312 U.S. 383 (1941)................................................................................................................. 13

*Kelly v. Bass Enterprises Production Co.*,
17 F. Supp. 2d 591 (E.D. La. 1998) ........................................................................................ 14

*Kuhne v. United States*,
267 F.Supp. 649 (E.D. Tenn. 1967)......................................................................................... 34

*Louisiana ex rel. Guste v. M/V TESTBANK*,
752 F.2d 1019 (5th Cir. 1985) ................................................................................................. 19

*Marastro Compania Naviera, S.A. v. Canadian Mar. Carriers, Ltd.*,
959 F.2d 49 (5th Cir. 1999) ..................................................................................................... 13

*Maryland v. Louisiana*,
451 U.S. 725 (1981)................................................................................................................... 6

*Matheny v. Tennessee Valley Auth.*,
503 F. Supp. 2d 917 (M.D. Tenn. 2007).................................................................................. 14

*Matrixx Initiatives, Inc. v. Siracusano*,
No. 09-1156, __U.S.__, 2011 U.S. LEXIS 2416 (2011) ................................................. 3, 4, 45

*Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Ware*,
414 U.S. 117 (1973).............................................................................................................. 6, 8

*Metro-North Commuter R.R. Co. v. Buckley*,
521 U.S. 424 (1997)................................................................................................................. 12

*Moragne v. States Marine Lines, Inc.*,
398 U.S. 375 (1970)................................................................................................................. 12

*Morrow v. Marine Max, Inc.*,
731 F. Supp. 2d 390 (D.N.J. 2010) .......................................................................................... 14

# TABLE OF AUTHORITIES
## (continued)

Page

*Myers v. United States*,
17 F.3d 890 (6th Cir. 1994) ........................................................................... 32, 33, 34

*Northwest Environmental Advocates v. U.S. E.P.A.*,
537 F.3d 1006 (9th Cir. 2008) .................................................................................. 42

*Norwood v. Raytheon Co.*,
414 F. Supp. 2d 659 (W.D. Tex. 2006)..................................................................... 16

*Oppenheimer v. Prudential Sec., Inc.*,
94 F.3d 189 (5th Cir. 1996) ........................................................................................ 3

*Oxygenated Fuels Ass'n v. Davis*,
331 F.3d 665 (9th Cir. 2003) ...................................................................................... 7

*Palestina v. Fernancez*,
701 F.2d 438 (5th Cir. 1983) .................................................................................... 13

*Patton v. General Signal Corp.*,
984 F. Supp. 666 (W.D.N.Y. 1997) .......................................................................... 18

*Persson v. Scotia Prince Cruises, Ltd.*,
330 F.3d 28 (1st Cir. 2003) ....................................................................................... 13

*Petito v. A.H. Robins Co., Inc.*,
750 So. 2d 103 (Fla. Dist. Ct. App., 3d Dist. 1999), *review denied*,
780 So. 2d 912 (Fla. 2001)................................................................................... 16, 17

*Potter v. Firestone Tire and Rubber Co.*,
863 P.2d 795 (1993)................................................................................................... 18

*Powers v. Bayliner Marine Corp.*,
855 F. Supp. 199 (W.D. Mich. 1994),
*aff'd*, 83 F.3d 789 (6th Cir. 1996), *cert. denied*, 519 U.S. 992 (1996) ..................... 13

*Pryor Oil Co., Inc. v. U.S.*,
299 F. Supp.2d 804 (E.D. Tenn. 2003).................................................................... 44

*Redland Soccer Club, Inc. v. Dep't. of the Army*,
696 A.2d 137 (1997) ................................................................................................. 18

*Reminga v. United States*,
631 F.2d 449 (6th Cir. 1980) .................................................................................... 34

*Ricchiuti v. The Home Depot Inc.*,
412 F. Supp. 2d 456 (E.D. Pa. 2005) ....................................................................... 19

**TABLE OF AUTHORITIES**
(continued)

Page

*Rink v. Cheminova, Inc.*,
203 F.R.D. 648 (M.D. Fla. 2001) .............................................................................................. 17

*Robins Dry Dock and Repair Co. v. Flint*,
275 U.S. 303 (1927) ..................................................................................................................... 19

*Rogers v. Coastal Towing, L.L.C.*,
723 F. Supp. 2d 929 (E.D. La. 2010) ......................................................................................... 14

*Romero v. Int'l Terminal Co.*,
358 U.S. 354 (1959) ..................................................................................................................... 13

*Rosebush v. United States*,
119 F.3d 438 (6th Cir. 1997) ............................................................................................... 31, 33

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*,
73 F.3d 546 (5th Cir. 1996) ........................................................................................................ 43

*Silivanch v. Celebrity Cruises, Inc.*,
171 F. Supp. 2d 241 (S.D.N.Y. 2001) ........................................................................................ 13

*TAG/ICIB Services, Inc. v. Pan American Grain Co.*,
215 F.3d 172 (1st Cir. 2000) ....................................................................................................... 14

*Tanglewood East Homeowners v. Charles-Thomas, Inc.*,
849 F.2d 1568 (5th Cir. 1988) ...................................................................................................... 3

*Tate v. Boeing Helicopters*,
55 F.3d 1150 (6th Cir. 1995) ...................................................................................................... 31

*Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*,
975 F.2d 1134 (5th Cir. 1992) ...................................................................................................... 3

*Trevino v. Gen. Dynamics Corp.*,
865 F.2d 1474 (5th Cir. 1989) ......................................................................................... 27, 29, 31

*Turner, et al. v. Murphy Oil USA, Inc.*
No. 05-4206, 2007 WL 2407310 (E.D.La., Aug. 20, 2007) ...................................................... 37

*U.S. v. Frezzo Bros., Inc.*,
602 F.2d 1123 (3d Cir. 1979) ..................................................................................................... 42

*United States v. Gaubert*,
499 U.S. 315 (1991) ......................................................................................................... 31, 32, 34

*United States v. Hamel*,
551 F.2d 107 (6th Cir. 1977) ...................................................................................................... 43

## TABLE OF AUTHORITIES
### (continued)

Page

*Unocal Corp. v. U.S.*,
   222 F.3d 528 (9th Cir. 2000) ............................................................................. 37

*Wheatley v. Gladden*,
   660 F.2d 1024 (4th Cir. 1981) ........................................................................... 12

*Wheeler v. Pilgrim's Pride Corp.*,
   591 F.3d 355 (5th Cir. 2009) ............................................................................. 24

*Wright v. Shell Offshore, Inc.*,
   No. 10-2108, 2011 U.S. Dist. LEXIS 16290 (E.D. La. Feb. 17, 2011) ...................... 3

*Yamaha Motor Corp. v. Calhoun*,
   516 U.S. 199 (1996).......................................................................... 13, 14, 15, 16

*Yearsley v. W.A. Ross Constr. Co.*,
   309 U.S. 18 (1940).............................................................................. 28, 29, 30

### Statutes

28 U.S.C.
   § 2674.......................................................................................................... 22, 26
   § 2680.......................................................................................................... 22, 26
   § 2680(a)............................................................................................................ 26

33 U.S.C.
   § 2718................................................................................................................ 4
   § 2751................................................................................................................ 4
   § 1311(a).......................................................................................................... 42
   § 1321........................................................................................................ 36, 42
   § 1321(a)(8)...................................................................................................... 36
   § 1321(a)(25).................................................................................................... 36
   § 1321(b)(3)...................................................................................................... 43
   § 1321(c)(4)(A)........................................................................................... 35, 36
   § 1321(c)(4)(B)..................................................................................... 25, 35, 37
   § 1321(d).......................................................................................................... 27
   § 1321(j)(5)(H)................................................................................................. 24
   § 1362(6).......................................................................................................... 43
   § 1362(j)(8).................................................................................................. 22, 23
   § 1365.............................................................................................................. 42
   § 1365(a)(1)...................................................................................................... 43
   § 1365(f)(1)...................................................................................................... 43

40 C.F.R.
   § 300 (59 FR 47384, Sept. 15, 1994).................................................................. 27
   § 300.1.............................................................................................................. 27
   § 300.150(a)...................................................................................................... 40

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

§ 300.150(b) ........................................................................................................ 40

§ 300.150(c) ........................................................................................................ 41

42 U.S.C.

§ 9601 ............................................................................................................. 25

46 U.S.C.

§ 30104 ........................................................................................................... 11

**Other Authorities**

2 Am. Jur. 2d Admiralty

§ 102 (2010) .................................................................................................... 13

S. Rep. 92-414 .................................................................................................... 42

**Rules**

LA. CIV. CODE. ANN.

Art. 2315 (2010) .............................................................................................. 16

Plaintiffs respectfully submit the following Memorandum of Law in Opposition to the Motions to Dismiss the B3 Master Complaint filed by Defendants BP Exploration & Production Inc., BP America Production Company and BP p.l.c. ("BP") [Doc 1406], Anadarko Petroleum Corporation, Anadarko E&P Company LP ("Anadarko") [Doc 1416], MOEX Offshore 2007 LLC and MOEX USA Corporation ("MOEX") [Doc 1416], Marine Spill Response Corporation ("MSRC") [Doc 1397], Nalco Company Holdings ("Nalco") [Doc 1409], International Air Response ("IAR") [Doc 1404], National Response Corporation ("NRC") [Doc 1388], O'Brien's Response Management ("O'Brien's") [Doc 1388], and Lynden, Inc. and Lynden Air Cargo ("Lynden") [Doc 1399] (collectively "Defendants"):

**MAY IT PLEASE THE COURT:**

The B3 Bundle Plaintiffs are largely people who risked their health and welfare in the wake of the worst oil spill in this country's history to assist in the clean-up efforts. They are individuals who worked in the Vessels of Opportunity ("VoO") program, other vessel captains and crew not involved in the VoO program who were nonetheless assisting in clean-up efforts and were exposed to the oil's and/or chemical dispersants' harmful effects, and beach clean-up workers and residents who live in close proximity to the shore. (*See* Doc. 881 ("B3 Master Compl.") ¶ 21.) The chemicals to which they were exposed—hydrocarbons from the oil and in situ burning and chemical dispersant, including Corexit®—can cause a wide array of health problems, such as respiratory ailments, disruption to the nervous system, impairment of liver and kidney function, and interference with the reproductive system. These illnesses and diseases (or symptoms) sometimes manifest themselves shortly after exposure, however, in other cases it can take months or even years before an individual shows signs of degraded health. In the case of

the explosion of the *M/V Deepwater Horizon*, the Defendants had the means, ability and opportunity to protect the people who participated in the clean-up effort, as well as shoreline residents, from this toxic exposure.  Consequently, the Defendants could have prevented their illnesses and diseases.  But, instead, the Defendants cavalierly failed to take even the minimum of safety measures to ensure the health and welfare of workers and the community at risk of exposure to the chemicals. As a result, thousands of people are ill and/or have been exposed to chemicals in a manner that puts them at risk of becoming ill in the future.  They need and deserve court-supervised monitoring to detect and prevent life-threatening illness, in addition to compensation for their injuries.

The vast majority of the issues raised by Defendants in their motions to dismiss Plaintiffs' B3 Bundle Master Complaint involve questions of preemption and immunity. While the *M/V Deepwater Horizon* blowout, explosion, and resulting Spill took place on the Outer Continental Shelf of the United States, this case is not subject to OCSLA's substantive law provisions nor OCSLA's provisions concerning the application of adjacent state law as "surrogate federal law."[1]  The Oil Pollution Act does not, in any way, preempt general maritime and state law claims, including, in particular, claims for personal injury, medical monitoring, punitive damages and attorneys' fees.[2]

---

[1] *See generally*, OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO DISMISS B1 MASTER COMPLAINT, § I.

[2] Simultaneously with the filing of this Memorandum, Plaintiffs have also filed a Motion for Leave to File a First Amended B3 Bundle Master Complaint which removes all OPA causes of action.  Thus, Plaintiffs do not oppose or otherwise respond to Defendants' arguments that OPA economic damages claims in the B3 Bundle Master Complaint "violate" PTO 25 (which amended the B3 Bundle definition *after* the B3 Master Complaint was originally filed).  (*See* BP Mot. to Dismiss at 20; MOEX/Anadarko Mot. to Dismiss at 19.)

**STANDARD OF REVIEW**

When ruling upon a Rule 12(b)(6) motion to dismiss for failure to state a claim, such as those filed by Defendants to challenge the detailed allegations of the operative B3 Master Complaint, the Court must accept as true all well-pleaded allegations and resolve all doubts in favor of the plaintiff.  *See Oppenheimer v. Prudential Sec., Inc.,* 94 F.3d 189, 194 (5th Cir. 1996); *Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1572 (5th Cir. 1988).  "In other words, a motion to dismiss an action for failure to state a claim 'admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts.'" *Berthelot v. Boh Bros. Constr. Co.*, No. 05-4182, 2006 U.S. Dist. LEXIS 57817, at *77 (E.D. La. July 19, 2006) (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc*., 975 F.2d 1134, 1137 (5th Cir. 1992)).

To defeat a motion to dismiss, a Plaintiff must merely "plead enough facts 'to state a claim to relief that is plausible on its face.'"  *Wright v. Shell Offshore, Inc.*, No. 10-2108, 2011 U.S. Dist. LEXIS 16290, at *5-6 (E.D. La. Feb. 17, 2011) (quoting *Ashcroft v. Iqbal*, __U.S.__, 129 S.Ct. 1937, 1949 (2009) ).  This Court has observed that "[a] claim is facially plausible when the plaintiff  pleads facts that allow the court to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Wright*, 2011 U.S. Dist. LEXIS 16290 at *6 (quoting *Iqbal*, 129 S.Ct. at 1949).

On March 22, 2011, a unanimous the Supreme Court reversed an order of dismissal of a 10(b)-5 claim in a decision further clarifying standards set forth in *Iqbal* and *Twombly*.  *See Matrixx Initiatives, Inc. v. Siracusano*, No. 09-1156, __U.S.__, 2011 U.S. LEXIS 2416 (2011). The Court reiterated that all factual allegations in a complaint must be taken as true, that there are no "bright line" pleading requirements under *Twombly/Iqbal*, and that the functional test is

whether the complaint, taken as a whole, raises "a reasonable expectation that discovery will reveal evidence" that could enable the ultimate trier of fact, weighing contested evidence and opinions and making the allowable inferences, to decide the case for plaintiffs. *Matrixx*, 2011 U.S. LEXIS 2416, at *34 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Reviewing "all the allegations holistically," as *Matrixx* directs, *id*. at *38, Plaintiffs have stated facially plausible claims that "raise a reasonable expectation that discovery will reveal evidence" to support their claims at trial, *id.* at *34 (quoting *Twombly*, 550 U.S. at 556).

## ARGUMENT

## I. THE OPA DOES NOT PREEMPT PLAINTIFFS' MARITIME OR STATE LAW CLAIMS

The Oil Pollution Act of 1990 ("OPA") expressly reserves claims under both State Law and the General Maritime Law. 33 U.S.C. §§ 2718 and 2751; *see generally*, OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO DISMISS B1 MASTER COMPLAINT, § I.

In the context of post-April 20 personal injury or medical monitoring claims, moreover, the argument for any type of "implied" preemption based on the remedial structure of OPA is even more tenuous, as the Act does not provide for or otherwise address personal injuries. In other words, there is no "conflict" preemption.

Yet, Defendant Nalco moves to dismiss the B3 Bundle Master Complaint on the grounds that Plaintiffs' products liability claims are "conflict preempted" because the federal government has approved the use of dispersants, including Corexit®, for oil spill response generally and specifically for the BP oil spill response.[3]  (Nalco Mot. to Dismiss at 15-16.)  To prevail on its motion, Defendant Nalco would have to show as a matter of law that Plaintiffs' injuries stem

---

[3] Defendant IAR makes the same preemption arguments that defendant Nalco makes (*see* IAR Mot. to Dismiss at 23-25) and for the reasons conflict preemption is unavailable to Nalco on its motion to dismiss, it is also unavailable to IAR.

from Defendants' compliance with federal law and that it was physically impossible to use a less toxic chemical dispersant. *See Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 143 (1963) (explaining that state law does not conflict with federal law unless it is "physically impossible" to comply with both). Not difficult, not inconvenient: *impossible.* Alternatively, in the absence of impossibility, Defendant Nalco would have to show that a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 155 (1982) (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941) (emphasis in original). "The state law must interfere *directly* with the federal purpose." *In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, No. MDL 1358*, 457 F. Supp. 2d 324, 331 (S.D.N.Y. 2006) (emphasis added). Defendant Nalco's motion to dismiss, however, merely sets forth a series of factual disagreements with Plaintiffs' allegations regarding Nalco's defective product and how that product injured plaintiffs. Nalco has not shown that the state law underlying Plaintiffs' claims are in a direct conflict with a federal purpose as a matter of law, much less that it is impossible to comply with both state and federal law simultaneously.

The Supreme Court has described conflict preemption as follows:

[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest.

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (internal citation and quotation marks omitted). When considering claims of conflict preemption, the Supreme Court has cautioned: "We are reluctant to infer pre-emption. 'Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law.'" *Bldg. & Constr. Trades Council v. Associated Builders & Contrs.*, 507 U.S. 218, 224 (1993) (quoting *Maryland*

*v. Louisiana*, 451 U.S. 725, 746 (1981)) (citations omitted); *accord CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664 (1993). The Supreme Court explained in *Bates* that the "long history of tort litigation against manufacturers of poisonous substances adds force to the basic presumption against pre-emption." *Bates*, 544 U.S. at 449. "Moreover, this history emphasizes the importance of providing an incentive to manufacturers to use the utmost care in the business of *distributing* inherently dangerous items." *Id.* (emphasis added); (holding also that overbroad preemption ruling "creates not only financial risks for consumers, but risks that affect their safety and the environment as well"). "Our analysis is also to be tempered by the conviction that the proper approach is to reconcile the operation of both statutory schemes with one another rather than holding one completely ousted." *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Ware,* 414 U.S. 117, 127 (1973); *see id.* at 127 n.8 (citing additional authorities).

Defendants' motion is little more than an assembly of statements by the Coast Guard (and even the Environmental Protection Agency), without context, that Defendant Nalco argues proves the federal government *ordered* the use of its Corexit® product. But these statements contradict the allegations in Plaintiffs' Complaint. For example, while Plaintiffs acknowledge that the Coast Guard had to approve BP's request to use chemical dispersants, the Complaint does not allege, nor is it true, that the Coast Guard ordered that Corexit® be used as the dispersant of choice. (B3 Master Compl. ¶ 109.) And as to the EPA, the Complaint alleges the opposite of what Nalco states: the EPA directed BP "to change to chemical dispersants that are less toxic than Nalco's Corexit® dispersants . . . ." (*Id.* ¶ 113.) These and other factual disputes illustrate why Defendants' motions to dismiss cannot succeed.

Defendant Nalco's argument is similar to arguments made in the products liability multi-district litigation brought by the plaintiff water providers against the petroleum industry for

adding an additive—methyl tertiary butyl ether ("MTBE")—to gasoline, which caused nationwide contamination of groundwater (MDL 1358).  *See generally In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 175 F. Supp. 2d 593 (S.D.N.Y. 2001).

Defendants there argued that Congress, in enacting the Clean Air Act ("CAA"), intended refiners to be able to choose among oxygenates, that MTBE was one of the oxygenates the EPA identified as an option in its CAA regulations, and that tort liability for MTBE contamination of groundwater "'stood as an obstacle'" to Congress' goal of making MTBE one of the "choices" available to refiners.  *See id.* at 615.  The MDL 1358 court, however, rejected the argument that tort liability for MTBE "stood as an obstacle" to Congressional purposes and objectives.  *See id.* ("[T]he RFG [Reformulated Gas] Program does not *deliberately* seek to employ various 'means-related' objectives . . . in order to further its goal of reducing air pollution" and "plaintiffs do not seek to require the use of a specific oxygenate." (emphasis in original).)  As the Ninth Circuit said in another MTBE case:  "The legislative history of the Clean Air Act does not support a conclusion that Congress meant to give gasoline producers an unconstrained choice of oxygenates."  *Oxygenated Fuels Ass'n v. Davis*, 331 F.3d 665, 672 (9th Cir. 2003) (citation omitted).  Similarly, here, there is no federal statute or regulation—and defendant Nalco does not cite any—that *mandated* the use of Corexit® as *the* dispersant to use for the BP oil spill clean-up.

Defendant relies upon *Geier v. Am. Honda Motor Co*., 529 U.S. 861 (2000).  *Geier*, however, is distinguishable from the instant case in that, unlike the federal program in *Geier*, neither the OPA nor any other federal statute dictates the *means* for achieving federal objectives, and Plaintiffs in this case, unlike plaintiffs in *Geier*, are not seeking to require the use of a specific dispersant.  This is consistent with the Supreme Court's decision in *Bates*, where the

Court rejected defendants' attempts to equate tort liability with regulatory requirements.  As the Court stated: "[t]he Court of Appeals was . . . quite wrong when it assumed that any event, such as a jury verdict, that might 'induce' a pesticide manufacturer to change its label should be viewed as a requirement." *Bates*, 544 U.S. at 443.  In other words, preserving state common law liability for a "choice" that a defendant makes among alternatives that are permitted, but not required, by federal law does not equate to a "requirement" that stands as an obstacle to federal law.

Defendant Nalco further argues that Plaintiffs' claims are preempted because their enforcement would interfere with the goals set by Congress when passing the Clean Water Act and issuing the National Contingency Plan.  (Nalco Mot. to Dismiss at 16.)  Their argument again is based on facts outside the pleadings and that contradict Plaintiffs' allegations, and is thus inappropriately made on a motion to dismiss.  *See Florida Lime & Avocado Growers*, 373 U.S. at 143.

Finally, Defendants posit that Plaintiffs' claims are preempted because, if permitted to proceed, they present the possibility that in the future entities will not mobilize to assist in a similar emergency.  (Nalco Mot. to Dismiss at 6-7.)  The Supreme Court has repeatedly stated its reluctance to preempt the enforcement of state laws in matters that fall within the states' traditional police powers, *see, e.g., Bldg. & Constr. Trades Council v. Associated Builders & Contrs.*, 507 U.S. 218, 224 (1993); *CSX Transp. v. Easterwood*, 507 U.S. 658, 665 (1993), and its preference for approaches that favor the operation of both state and federal schemes.  *See, e.g., Merrill, Lynch*, 414 U.S. at 127 & n.8.  Defendant Nalco's suggestion that this Court should preempt Plaintiffs' claims on nothing more than speculation, that one day Defendant Nalco or other businesses similar to Nalco might find themselves victims of inconsistent adjudications that

might effectively preclude them from manufacturing or selling their chemical dispersant product in connection with an oil spill clean-up, is meritless.

## II.   MEDICAL MONITORING IS AVAILABLE UNDER GENERAL MARITIME LAW

Several Defendants argue that the claims of Plaintiffs including boat captains and crew involved in the Vessels of Opportunity program ("VoO Plaintiffs") for medical monitoring damages under general maritime law must be dismissed because Plaintiffs "cannot recover a lump sum damages award for medical monitoring in the absence of physical injury under the Jones Act or federal maritime law."  (*See e.g.,* BP Mot. to Dismiss at 8; Nalco Mot. to Dismiss at 35.)  The primary foundations for their arguments are in error and collapse under close scrutiny. First, Defendants wrongly contend that Plaintiffs have not alleged physical injury.  A cursory reading of the B3 Master Complaint shows that Plaintiffs have plainly and sufficiently pled discernable physical injury.  Second, Defendants mistakenly assume that the Jones Act applies to the VoO Plaintiffs.   The Jones Act does not apply to any of the Plaintiffs' claims because Plaintiffs are generally not asserting claims against their employers.[4]   The limitations on damages under the Jones Act are irrelevant to claims against non-employer third-parties. Because general maritime law applies to Plaintiffs' claims and is silent as to recovery of costs for medical monitoring, the Court can and should supplement maritime law by applying state law providing for medical monitoring damage awards.

---

[4] To the extent a plaintiff may be the employee of one of the B3 Defendants, medical monitoring has been recognized under general maritime law for seamen, consistent with the duty to provide maintenance and cure.  *See, e.g., Hagerty v. L & L Marine Services, Inc.*, 788 F.2d 315 (5th Cir. 1986), reconsideration denied, 797 F.2d 256 (5th Cir.) (en banc); *Dragon v. Cooper/T. Smith Stevedoring*, 726 So.2d 1006 (La. Ct. App. 4th Cir. 1999) .

1.      **The Plaintiffs Have Alleged Discernable Personal Injury.**

The Defendants' argument is fundamentally flawed because plaintiffs have indeed alleged in the B3 Bundle Master Complaint that they "have suffered a discernable physical injury from exposure to oil, Nalco's dispersants, and/or oil and dispersant mixtures." (B3 Master Compl. ¶ 171.) The B3 Bundle Master Complaint specifically alleges that the "VoO Plaintiffs have required medical treatment as a result of injuries caused by exposure to oil and/or chemical dispersants and other hazardous chemicals used to combat or resulting from the Oil Spill and have not reached maximum medical improvement." (*Id.* ¶ 214.) The B3 Master Complaint further alleges that "[a]s a result of Defendants' acts or omissions, many Plaintiffs have suffered . . . physical injury damages" from exposure to chemicals in crude oil, exposure to chemicals in weathered crude, exposure to chemicals in dispersants and exposure to chemicals in oil and dispersant mixtures. (*Id.* ¶ 170.) All of these exposures have "caused adverse health effects." (*Id.*) Plaintiffs have also incurred costs and inconvenience sustained "by obtaining medical treatment for exposure to chemicals." (*Id.* ¶ 170(e).) In addition, the B3 Master Complaint alleges that "[m]any Plaintiffs have already experienced headaches, nausea, vomiting, dizziness, elevated blood pressure, eye and respiratory irritation, and rashes and/or chemical burns caused by coming into contact with oil and/or chemical dispersants." (*Id.* ¶ 12.)[5]

---

[5] Citing Paragraph 209 of the B3 Master Complaint, BP Defendants claim that "there is no specific allegation that the VoO Plaintiffs currently suffer from a physical injury." BP Memo. at 8. However, that paragraph merely states that the "VoO Plaintiffs' exposure may lead to serious health problems, diseases, and medical conditions that may be prevented by timely medical diagnosis and treatment." B3 Bundle Master Compl. ¶ 209. The fact that Plaintiffs seek costs of medical monitoring for their "significantly increased risk of contracting a serious latent disease," B3 Bundle Master Compl. ¶ 211, does not nullify the discernible physical injury they have suffered already from exposure to oil, Nalco's dispersants, and/or oil and various mixtures. B3 Bundle Master Compl. ¶ 171.

If, as discovery progresses, some Plaintiffs are determined to be asymptomatic, those claims can only be dismissed on summary judgment or by voluntary dismissal, and then only if the Court finds that Florida law does not apply, despite Plaintiffs' arguments below.  But at this state of the litigation, Plaintiffs' claims survive Defendants' motions.

### 2.        The Jones Act Is Not Controlling.

Plaintiffs have brought a claim for medical monitoring as an element of damages under general maritime law under the Court's admiralty and maritime jurisdiction.  (B3 Master Compl. ¶¶ 71, 74, 76, 202-18.)   Plaintiffs also plead a cause of action for medical monitoring under Florida law.  (*Id.* ¶¶ 278-288.)   The Defendants claim that the VoO Plaintiffs' claims more properly fall under the Jones Act and that the Act's limitations on damages should apply.  (*See e.g.,* BP Mot. to Dismiss at 8-10**.)**  BP baldly assert that the "Jones Act is the applicable federal law for all VoO Plaintiffs who were seamen and allegedly were exposed to 'oil, disburses, and/or other hazardous chemicals' as a result of the alleged negligence of the Defendants."  (*Id.* at 8-9 (quoting B3 Master Compl. ¶ 207).)   Defendants are in error.  The Jones Act provides that a "seaman injured *in the course of employment* or, if the seaman dies from the injury, the personal representative of the seamen *may* elect to bring a civil action at law, with the right of trial by jury, *against the employer*."  46 U.S.C. § 30104 (emphasis added).  Thus, the Jones Act applies only to claims by seamen against their employers.  46 U.S.C. § 30104; *Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 790 (1949).

The purpose of the Jones Act was to "create[] new rights in seamen for damages arising from maritime torts" against their employers, and the Act was not intended "to enforce tort claims . . . against others than [the injured seaman's] employer[]."  *Cosmopolitan*, 337 U.S. at 790.  Congress intended the Jones Act to achieve uniformity in the exercise of admiralty jurisdiction by giving seamen a federal right to recover from their employers for negligence

regardless of the location of the injury or death.  *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 401 (1970) (citing *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 155 (1964)).  Thus, "an employer/employee relationship is a necessary antecedent to a Jones Act negligence claim."  *Wheatley v. Gladden*, 660 F.2d 1024, 1026 (4th Cir. 1981) (citing *Cosmopolitan*, 337 U.S. at 783).  Here, none of the Plaintiffs is asserting claims against employers.  Thus, the Jones Act, with its limitations, does not apply.

Ignoring Plaintiffs' pleadings and relying on *Metro-North Commuter R.R. Co. v. Buckley*, 521 U.S. 424 (1997), BP argues that the Federal Employers Liability Act ("FELA") has been incorporated into the Jones Act, and the U.S. Supreme Court has held that lump sum medical monitoring costs are not recoverable under FELA in the absence of manifest injury.  Yet the Jones Act, unlike FELA, is supplemented by the duty under general maritime law to provide maintenance and cure.[6]  Moreover, Plaintiffs' claims are generally not being asserted against their employers and, therefore, do not fall under the Jones Act or FELA by extension.[7]

In any event, and assuming *arguendo* that some manifest injury is required, Plaintiffs have alleged in the B3 Bundle Master Complaint that "Plaintiffs have suffered a discernable physical injury from exposure to oil, Nalco's dispersants, and/or oil and dispersant mixtures." (B3 Master Compl. ¶ 171.)

> ### 3.    State Law Supplements General Maritime Law Allowing Plaintiffs To Recover Medical Monitoring Costs.

In the absence of a relevant federal statute in an admiralty or maritime case, courts follow

---

[6] *See, e.g.*, *Hagerty v L & L Marine Services, Inc.*, 788 F.2d 315 (5th Cir. 1986), reconsideration denied, 797 F.2d 256 (5th Cir.) (en banc); *Dragon,* 726 So.2d 1006, which indicate that medical monitoring is available under general maritime law, consistent with the duty to provide maintenance and cure.

[7] *Green v. McAllister Bros., Inc.*, No. 02 7588 (FM), 03 1482 (FM), 2005 WL 742624 (S.D.N.Y. Mar. 25, 2005), cited by the BP Defendants, is also distinguishable from the present case because it, too, involved claims brought under the Jones Act.  *Id.* at *23.

and apply general maritime law as developed by the federal courts. *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864-65 (1986); *Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241, 252 (S.D.N.Y. 2001); *Powers v. Bayliner Marine Corp.*, 855 F. Supp. 199, 202-03 (W.D. Mich. 1994), *aff'd*, 83 F.3d 789 (6th Cir. 1996), *cert. denied*, 519 U.S. 992 (1996). However, it is well-established that the exercise of admiralty jurisdiction does not result in the automatic displacement of state law. *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 206 (1996); *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 545 (1995). Where neither statutory nor judicially created maritime principles answer a specific legal issue, state law applies to an action in admiralty provided it does not *directly* conflict with the principles of federal maritime law nor frustrate the policy interest of having national uniformity in maritime actions. *Askew v. Am. Waterways Operators, Inc.*, 411 U.S. 325, 341 (1973) (citing *Romero v. Int'l Terminal Co.*, 358 U.S. 354, 373-75, 378 n. 42 (1959); *Just v. Chambers*, 312 U.S. 383, 391 (1941)); *Coastal Iron Works, Inc. v. Petty Ray Geophysical*, 783 F.2d 577, 582 (5th Cir. 1986); *Palestina v. Fernancez*, 701 F.2d 438, 439 (5th Cir. 1983); *Alcoa S.S. Co. v. Charles Ferran & Co.*, 383 F.2d 46, 50 (5th Cir. 1967); 2 Am. Jur. 2d Admiralty § 102 (2010). In other words, state law supplements maritime law where maritime law is silent. *Yamaha,* 516 U.S. at 206; *Coastal Iron Works*, 783 F.2d at 582; *Persson v. Scotia Prince Cruises, Ltd.*, 330 F.3d 28, 32 (1st Cir. 2003).[8]   The Supreme Court followed the approach of "supplementing" general maritime law with state law in *Yamaha.*  In that case, parents of a non-seaman girl who

---

[8] To promote uniformity in the general maritime law, admiralty courts may also look to, and borrow from, general common law. *Marastro Compania Naviera, S.A. v. Canadian Mar. Carriers, Ltd.*, 959 F.2d 49, 53 (5th Cir. 1999). The Fifth Circuit frequently relies on the Restatement (Second) of Torts for statements of common law principles relevant to admiralty cases. *Dalrymple ex. Rel Dalrymple v. Fairchild Aircraft, Inc.*, 575 F. Supp. 2d 790 (S.D. Tex. 2008) (citing *Marastro*, *supra*). Thus, even if Plaintiffs' state common law claims were preempted by the general maritime law, the Court could borrow common law principles as set forth in the Restatement to preserve Plaintiffs' common law claims.

was killed in a collision with a vessel in territorial waters off Puerto Rico while using a jet ski for recreational purposes, sued the jet ski's manufacturer under Pennsylvania's wrongful death and survival statutes.  *See Yahama*, 516 U.S. at 202.  The Supreme Court addressed whether federal maritime law completely displaced state wrongful death law.  The Court found that when "Congress has prescribed a comprehensive tort recovery regime to be uniformly applied, there is, we have generally recognized, no cause for enlargement of the damages statutorily provided."  *Id.* at 215 (citations omitted).  However, regarding non-seafarers, workers who are not seamen, longshoremen, or otherwise engaged in maritime trade, Congress has not prescribed remedies for their wrongful deaths in territorial waters.  *See id.* at 202, 215.  As a result, the Court preserved the application of state statutes to deaths of non-seafarers within territorial waters.  *See id.* at 215.[9]

In the wake of *Yamaha,* the federal courts have routinely applied state laws to admiralty cases where those state laws "fill gaps" or provide relief that otherwise would not be available under admiralty law.  *See, e.g., Coastal Iron Works, Inc.*, 783 F.2d at 582; *J. Ray McDermott & Co., Inc. v. Vessel Morning Star*, 457 F.2d 815, 818 (5th Cir. 1972) (en banc); *Rogers v. Coastal Towing, L.L.C.*, 723 F. Supp. 2d 929, 933 (E.D. La. 2010); *TAG/ICIB Services, Inc. v. Pan American Grain Co.*, 215 F.3d 172, 177 (1st Cir. 2000); *American Dredging Co. v. Lambert*, 81 F.3d 127, 130-31 (11th Cir. 1996); *Morrow v. Marine Max, Inc.*, 731 F. Sup. 2d 390, 394 (D.N.J. 2010); *Matheny v. Tennessee Valley Auth.*, 503 F. Supp. 2d 917, 923 (M.D. Tenn. 2007).  For instance, "state law may supplement the measure of damages while maritime law provides the

---

[9] In *Kelly v. Bass Enterprises Production Co.*, 17 F. Supp. 2d 591 (E.D. La. 1998), the court found *Yamaha* applicable in the context of a non-seaman whether the injury is fatal or non-fatal. In that case, the court held that "[a] fair reading of [*Yamaha* ] reveals that the state statutory law applies to non-seafarers injured in state territorial waters regardless of whether their injury was fatal or non-fatal," and *Yamaha* can apply to a non-fatal personal injury claim. *Id.* at 599.

substantive law." *In re SkipperLiner Industries, Inc.*, No. 00-C-0730, 2002 WL 32348827, at *14 (W.D. Wis. Jan. 31, 2002).

The question becomes whether supplementation of state law under *Yamaha* is permissible only in the limited context of claims involving non-seamen or whether it is permissible also in the context of claims by seaman that are not brought against their employers and therefore do not fall under the Jones Act. Courts have expanded *Yamaha's* application to include the latter category.

In *In re Consolidation Coal Co.*, 228 F. Supp. 2d 764 (N.D. W. Va. 2001), the court held that, because the plaintiffs could not sue the non-employer defendants under the Jones Act and had to maintain their claims under general maritime law, state remedies were available to supplement general maritime law and non-pecuniary damages (loss of consortium under West Virginia law). *Id*. at 770-71. The court reasoned that "there is no need for uniform treatment of an employer and a third-party tortfeasor where [there] is no statutory remedy that is different than the general maritime law remedy." *Id*. at 771-72 (quoting *In re Denet Towing Serv., Inc.*, No. 98-1523, 98-1583, 1999 WL 329698, at *2 (E.D. La. May 21, 1999)). The court found this reasoning "consistent with the teaching of *Yamaha*, where the Court held that when Congress has not prescribed specific remedies, state remedies can be used to supplement general maritime law." *Id*. at 772 (citing *Yamaha*, 516 U.S. at 215).

Similarly, in *Gehlken v. McAllister Towing & Transp. Co.*, No. 2:03-3935, 2007 WL 2332487 (Jan. 29, 2007 D.S.C.), plaintiffs did not assert a Jones Act claim against the defendant because the defendant was not the plaintiffs' employer. Instead, the court found that general maritime law controlled the action against the non-employer third-party and that non-pecuniary damages were available under state law. *Id*. at *12. Here, general maritime law is silent about

whether Plaintiffs may recover costs of medical monitoring. The Court should therefore look to state law to fill the gap.[10]

Defendants urge the Court to look to the Jones Act and its limitations, relying on *Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990). *Miles* is distinguishable from the present case because the case involved the death of a seaman during employment and the claims were thus covered by the Jones Act. *Miles*, 498 U.S. at 21, 28, 33. The Supreme Court in *Miles* naturally looked to the Jones Act as a guide to protect the uniformity of federal maritime law because the claims arose in the employment context, where Congress had clearly expressed intent.[11] Here, however, Plaintiffs' claims generally do not target employers and do not trigger Congressional protections provided in the Jones Act.

In addition, in *Miles,* the Supreme Court held that damages available under a general maritime wrongful death action are limited by the Death on the High Seas Act (DOSHA) to

---

[10] Under Florida law, there is no requirement that plaintiffs have current injury or symptoms to seek damages for medical monitoring. *Petito v. A.H. Robins Co., Inc.*, 750 So. 2d 103, 104 (Fla. Dist. Ct. App., 3d Dist., 1999), *review denied*, 780 So. 2d 912 (Fla. 2001). Plaintiffs assert that Florida law should apply to the post-explosion victims of the BP oil spill clean-up. *See infra*. If this Court does not apply Florida law, Plaintiffs nevertheless are entitled to medical monitoring damages because the Plaintiffs have alleged discernable physical injury. See La. Civ. Code. Ann. Art. 2315 (2010); *Jones v. NL Industries*, No. 4:03-CV-229, 2006 WL 1487026, at *4 (N.D. Miss. May 24, 2006) (permitting under Mississippi law plaintiffs with present physical injury to recover costs of medical monitoring as damages); *Houston County Health Care Authority v. Williams*, 961 So. 2d 795, 811 (Ala. 2006) (under Alabama law, if a plaintiff shows present injury or illness, a court may provide medical monitoring costs as damages); *Norwood v. Raytheon Co.*, 414 F. Supp. 2d 659, 665-66 (W.D. Tex. 2006) (applying Texas state law and finding that a Texas court would likely not recognize an independent cause of action for medical monitoring without a physical injury but leaving open recovery of medical monitoring costs as an element of damages).

[11] The *Yamaha* Supreme Court held that state court remedies were not displaced by the federal cause of action specifically because the decedent was not a seaman and therefore she was not the kind of plaintiff contemplated by the uniform tort recovery scheme uniformly applied pursuant to *Miles*. *Yamaha*, 516 U.S. at 215; *see also Horsley v. Mobil Oil Corp.*, 15 F.3d 200, 202 (1st Cir. 1994) (explaining that the *Miles* uniform rule is applicable to "all actions for the wrongful death of a seaman whether under DOSHA, the Jones Act, or the general maritime law").

"pecuniary loss sustained by the persons for whose benefit the suit is brought."  *Id.* at 31 (quoting 46 U.S.C. app. § 762).  The Court found such language to be explicit in limiting and foreclosing non-pecuniary losses, such as loss of society in a general maritime action.  *See Miles*, 498 U.S. at 31.  Respondent in that case argued that the Court has power to supplement maritime statutes.  However, the Court found that Congress had spoken directly to the issue of recoverable damages on the high seas, and when Congress speaks directly courts are not free to supplement its answer.  *See id.*

In this case, Plaintiffs have no claim against the non-employer Defendants under the Jones Act; therefore, they assert a claim under general maritime law.  Congress and federal courts in admiralty have not clearly ruled as to whether manifest injury is a pre-requisite to medical monitoring remedies.  Thus, this Court should follow *Yamaha* and apply state law to fill the gap and permit the Plaintiffs to proceed with their claim for medical monitoring as a cause of action as recognized in Florida.

> **4.      Plaintiffs' Claim For Medical Monitoring Under Florida Law Is Valid.**

Because general maritime law is silent, this Court, sitting in admiralty, should look to state law to fill the gap.  Under Florida law, there is a cause of action for medical monitoring and, under that law, Plaintiffs need not suffer from current injury or symptoms to allege a medical monitoring cause of action.  *Petito v. A.H. Robins Co., Inc.*, 750 So. 2d 103, 104 (Fla. Dist. Ct. App., 3d Dist. 1999); *see also Jacobs v. Osmose, Inc.*, No. 01-944-CIV, 2002 WL 34241682, at *2-3 (S.D. Fla. Jan. 3, 2002; *Rink v. Cheminova, Inc.*, 203 F.R.D. 648, 661 n.8 (M.D. Fla. 2001).

Defendants argue that Florida law on the issue of medical monitoring differs greatly with the laws of other Gulf States (*see, e.g.,* NRC/O'Brien's Mot. to Dismiss at 26) and that Florida's

approach to medical monitoring "is an outlier" (s*ee, e.g.,* IAR Mot. to Dismiss at 38.)  On the contrary, Florida law on this matter is representative of many state laws across the country. Indeed, Florida law comports with the law of many other states in the nation which permit recovery of costs of medical monitoring in the absence of any manifest physical injury.  *See, e.g.*, *Potter v. Firestone Tire and Rubber Co.*, 863 P.2d 795 (1993); *Ayers v. Twp. of Jackson*, 525 A.2d 287 (1987); *Burns v. Jaquays Min. Corp.*, 752 P.2d 28, 33-34 (1987); *Redland Soccer Club, Inc. v. Dep't. of the Army*, 696 A.2d 137 (1997); *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970 (Utah 1993); *Bower v. Westinghouse Electric Corp.*, 522 S.E.2d 424 (W. Va. 1999); *Barnes v. The American Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998) (applying Pennsylvania law); *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816 (D.C. Cir. 1984); *Patton v. General Signal Corp.*, 984 F. Supp. 666, 674 (W.D.N.Y. 1997) (applying New York law). Florida law on this matter is, therefore, decidedly not "an outlier."

Because Florida law on medical monitoring is representative of the law of many states by not requiring manifest physical injury for recovery of medical monitoring costs, application of Florida law would not undermine the goal of uniformity of the general maritime law, as Defendants contend.  Instead, applying Florida law would actually promote uniformity and fairness because it is representative of the approach of a great many states that have focused on the issue.  Using its powers in admiralty, the Court should choose the gap-filling state law that promotes justice and uniformity for all concerned.  Thus, the Court should apply Florida law to Plaintiffs' claims, whether Plaintiffs who are victims of the BP oil spill reside in Florida or not.

## III.   THE ECONOMIC LOSS DOCTRINE DOES NOT BAR PLAINTIFFS' CLAIM FOR NUISANCE

Defendants correctly note that there is no public nuisance claim under federal common law or general maritime law.  As discussed above, however, the Court, sitting in admiralty, may

then apply state law to supplement general maritime law.

Defendants argue that under *Robins Dry Dock and Repair Co. v. Flint*, 275 U.S. 303 (1927), and *Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019 (5th Cir. 1985) (*en banc*), Plaintiffs cannot recover purely economic claims absent physical injury to a proprietary interest in a maritime suit. (BP Mot. to Dismiss at 14-15; Nalco Mot. to Dismiss at 23-24; IAR Mot. to Dismiss at 39.) They also argue that Plaintiffs' nuisance claims are barred by the economic loss doctrine under state law. (BP Mot. to Dismiss at 15-16; Nalco Mot. to Dismiss at 24-25; IAR Mot. to Dismiss at 40.) Defendants are wrong. The economic loss doctrine may, under limited circumstances, prohibit purely economic damages caused by the tort but does not foreclose damages related to, *inter alia*, physical injury or medical monitoring. *East River*, 476 U.S. at 874-75; *see also Ricchiuti v. The Home Depot Inc.*, 412 F. Supp. 2d 456, 459-60 (E.D. Pa. 2005) (finding that the economic loss doctrine did not bar plaintiff's recovery of damages for physical injury under Pennsylvania law (citing *East River S.S.*, 476 U.S. at 874)). However, as set forth above, Plaintiffs here have alleged manifest personal injury, so the *Robins Dry Dock* rule and the state economic loss doctrine do not apply.

Defendants further contend that under state law Plaintiffs have failed to allege "special injury" different in kind from the general public. (*See, e.g.,* IAR Mot. to Dismiss at 33-34; NRC/O'Brien's Mot. to Dismiss at 23.) Specifically, they claim that Plaintiffs' exposure to "foul and harmful odors emanating from the crude oil soaked booms and/or the chemical dispersants" are the same type of damages suffered by the general public. (IAR Mot. to Dismiss at 34; NRC/O'Brien's Mot. to Dismiss at 23-24.) However, by the very nature of the tasks conducted by Plaintiffs as part of the post-disaster clean-up, they have been exposed to odors and chemicals to which the general public has not been exposed. Thus, Plaintiffs' injuries are "special" because

they differ in kind from the general public.

A plain reading of the B3 Master Complaint bears this out. The Complaint alleges that as a result of Defendants' acts or omissions Plaintiffs have been and are exposed to harmful chemicals, fumes and noxious odors in the chemical dispersants and crude oil.  (B3 Master Compl. ¶¶ 129-58, 170.)  Plaintiffs further allege that the VoO Plaintiffs during their work on boats laying booms to absorb the oil, or hauling in oil saturated booms, among other activities, are exposed to crude oil and/or crude oil mixed with chemical dispersants, sea water mixed with crude oil and/or chemical dispersants on their skin.  (*Id*. ¶ 129.)  "They also inhale fumes from the crude oil and/or chemical dispersants" (*id*.) and have otherwise been "subjected to foul and harmful odors emanating from the crude oil soaked booms and/or the chemical dispersants" (*id*. ¶ 265).  The Decontamination Plaintiffs' primary task is to spray and clean vessels that come into contact with oil and dispersants and other harmful chemicals resulting from the oil spill and the application of dispersants, and in this capacity, they are exposed to crude oil and dispersants and other harmful chemicals by inhalation, ingestion, dermal exposure and through contact with the eyes from spray mist.  (*Id*. ¶ 138.)  Thus, as Plaintiffs allege, and as common sense dictates, Plaintiffs are "exposed to harmful chemicals in the crude oil and in the chemical dispersants at levels, amounts, and under conditions different from the general public."  (*Id*. ¶ 263.)  Plaintiffs have validly pleaded public nuisance, and Defendants' motions to dismiss this claim also fail.

## IV.   DEFENDANTS ARE NOT IMMUNE FROM LIABILITY FOR ACTIONS TAKEN IN THE AFTERMATH OF THE OIL SPILL

After the disastrous blowout of BP's Macondo well, and the explosion and sinking of Transocean's vessel the *M/V Deepwater Horizon*, the Defendants[12] entered into contracts with

---

[12] Point V, Sections A-D, respond to arguments made by a subset of defendants raising the same or similar immunity arguments.  For purposes of those sections, Defendants refers to O'Brien's

BP and its sub-contractors to provide services to clean up and/or disperse the massive oil spill. In addition, Defendant Nalco supplied the chemical dispersant Corexit® for the clean-up operations. The Bundle B3 Plaintiffs have suffered personal injuries and property damage as a result of the Defendants' activities.

Defendants dismissal motions make a series of elaborate immunity arguments all resting on principles of federal sovereign immunity. (*See* O'Brien's/NRC Mot to Dismiss at 11-18; MSRC Mot. to Dismiss at 19-26; Nalco Mot. to Dismiss at 21-22; IAR Mot. to Dismiss at 14-23.) None of Defendants' arguments has merit, however, and none provides this Court with any basis to grant their motions to dismiss the B3 Master Complaint. In short, Defendants are not the federal government, they are not government contractors, and they are not acting under the control of the federal government; therefore, the Court should deny their motions to dismiss.

### A.       Summary of Arguments.

First, Defendants argue that the Court has no subject matter jurisdiction over the claims because Defendants enjoy derivative immunity under section 13672(j)(8) of the Clean Water Act relating to the federal government's alleged "absolute immunity."[13]  Defendants misapprehend the law of sovereign immunity, and their reading of the Act is fatally flawed. Defendants' F.R.C.P. Rule 12(b)(1) motion should be denied.

Second, Defendants argue that the B3 Plaintiffs have failed to state a claim, and, pursuant to F.R.C.P Rule 12(b)(6), the claims should be dismissed on immunity grounds. There is, however, no absolute immunity that would shield them from liability, and because they are not

---

National Response Corporation, National Response Corporation, Marine Spill Response Corporation, Nalco Company and International Air Response.

[13] Plaintiffs acknowledge that only defendants IAR, O'Brien's and NRC advance an argument pursuant to R. 12(b)(1), but for ease of readership, this memorandum refers to Defendants and provides specific citations to relevant pages of individual movant's memoranda.

government contractors—they are contractors to Responsible Parties like BP—they cannot invoke sovereign immunity.  Moreover, even if they were deemed to be government contractors, it is a question of fact as to whether they could satisfy the requirements necessary to establish derivative immunity under the discretionary function exception to tort liability.  Because the Moving Defendants have not established as a *matter of law* that they are immune from liability, their Rule 12(b)(6) motions should also be denied.

A court will be deprived of subject matter jurisdiction over the claims by B3 Plaintiffs if, as a matter of law, the federal government is immune from liability and Defendants can somehow derive their immunity from that same source. *See Bodin v. Vagshenian*, 462 F3d 481, 484 (5th Cir. 2006); *see also Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009).  No such immunity exists in this case that could divest the Court of jurisdiction.  The Defendants cannot establish that as a matter of law they are entitled to derive any immunity from the Clean Water Act's limitation of liability benefiting the federal government.  Fundamentally, Defendants are not the federal government; they simply are not entitled to the immunities the federal government enjoys under 33 U.S.C. § 1362(j)(8).  In fact, the language of the Act countenances against that extension.  Additionally, they are mistaken in their characterization, in the first instance, of even the federal government's immunity in the present case.  Further, the Federal Tort Claims Act provides that the federal government may be liable for the negligence of its employees. 28 U.S.C. § 2674.  Any exceptions to that liability, including for carrying out discretionary functions, 28 U.S.C. § 2680, apply only to the government.  Again, Defendants are not the federal government, and to the extent they assert they deserve federal government treatment their motion is inappropriate as a motion to dismiss because such an argument is a question of fact, not law.  For these reasons, the motion to dismiss for lack of subject matter

jurisdiction should be denied.

**B.      Defendants Are Not Entitled To Derivative Absolute Immunity.**

Defendants are not entitled to derivative absolute immunity because Congress limited the narrow liability exemption for actions under response plans solely to the federal government. Congress expressly immunized the federal government from liability for "any damages arising from its actions or omissions relating to any *response plan* required by" the Clean Water Act. 33 U.S.C. § 1321(j)(8).   This limitation on liability inures only to the benefit of the federal government for the specified activity.   Defendants are not the federal government; they are private entities.  Nothing in the language of the Act suggests that this provision extends to any other party or entity.  *See In re World Trade Center Disaster Site Litig.*, 456 F. Supp. 2d 520, 566 (S.D.N.Y 2006) ("*WTC I*") (holding that Stafford Act immunity not be extended to private parties).   Defendants provide no legal support or authority for their argument that the mere existence of this limitation on liability for the benefit of the federal government also benefits them.  The authorities provided support only the theory of derivative immunity for government contractors, the applicability of which requires case-specific factual analysis not appropriate for determination at this stage.

Not only are Defendants not the federal government and thus not immune under 33 U.S.C. § 1321(j)(8), but the plain language of the Clean Water Act does not provide absolute immunity even to the federal government.   Congress expressly immunized the federal government only from liability for "any damages arising from its actions or omissions relating to any *response plan* required by" the Clean Water Act.  33 U.S.C. § 1321(j)(8) (emphasis added). The immunity provision does not relieve the federal government from suit, only from liability for damages relating to a response plan required by the Clean Water Act.  In the present case, B3 Plaintiffs seek not only damages, but also injunctive relief, from Defendants.  (B3 Master Compl.

at 72-73.)  The limitation on government liability for acts or omissions related to Clean Water Act required response plans is narrower than described by Defendants, and, more importantly, is not applicable to Defendants, since they are not government entities or contractors.  Thus, this Court is not deprived of jurisdiction over the claims in the B3 Master Complaint.

Further counseling against Defendants' interpretation are two other provisions of the OPA, both of which would be rendered superfluous if the Court were to adopt Defendants' reading of 33 U.S.C. § 1321(j)(8).  "It is a basic precept of statutory construction that we should ... not construe statutes in a way that renders words or clauses superfluous."  *Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355, 375 (5th Cir. 2009) (en banc) (citation omitted). Defendants' interpretation of the immunity provisions of the OPA fails to account for a companion provision in the same subparagraph (j) of section 1321, which expressly denies the availability of a limitation on liability to certain parties.  In 33 U.S.C. § 1321(j)(5)(H), Congress provides that "[t]he owner or operator of a tank vessel, nontank vessel, offshore facility, or onshore facility may not claim as a defense to liability under title I of the Oil Pollution Act of 1990 [33 U.S.C. §2701 et seq.] that the owner or operator was acting in accordance with an approved response plan."  Defendants' interpretation of the limitation on liability would eviscerate this section of the OPA.[14]

Congress created another exemption from liability that would also be rendered superfluous if Defendants' interpretation of 33 U.S.C. § 1321(j)(8) were correct.  Specifically, the OPA shields responders from liability for defined costs under specific circumstances. 33 U.S.C. § 1321(c)(4)(A).  This exemption from liability provides:

---

[14] Notably, BP, Transocean and the MOEX and Anadarko Defendants fail to address this section of the OPA.

> A person is not liable for removal costs or damages which result from actions taken or omitted to be taken in the course of rendering care, assistance, or advice consistent with the National Contingency Plan or as otherwise directed by the President relating to a discharge or a substantial threat of a discharge of oil or a hazardous substance.

*Id*.

Congress further narrowed the scope of the exemption, however, and carved out circumstances under which the exemption would not apply. 33 U.S.C. § 1321(c)(4)(B). Notably, the exemption is not available to a responsible party; to responses carried out pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. § 9601, *et seq.*); to personal injury or wrongful death claims and damages; or to instances in which the person or entity is grossly negligent or engages in willful misconduct. *Id*. Defendants' interpretation of the immunity provision in OPA, therefore, fails as a matter of law.

Finally, the policy underlying the narrow interpretation of immunity provisions supports the plain language of the statute at issue here. The Southern District of New York articulated these considerations when reviewing similar claims by the World Trade Center defendants for extension of federal immunity outside of the otherwise available derivative immunity doctrines that are also argued by Defendants and addressed below. In the aftermath of the World Trade Center disaster—an event caused not by the negligence and malfeasance of multi-billion dollar corporations seeking vast oil reserves and enormous profits but by previously unidentifiable individuals with a wholly different agenda—the court stated:

> Our system of justice is premised on accountability, save for specific exceptions based on statute or fundamental common law principles of necessity. Defendants urge that courts should encourage private actors to enlist in recovery efforts from mass disasters, but the same policy has to be sensitive to the individual workers who risk their lives. The job of restoring society cannot be based on a system rewarding businesses, but being indifferent to the health and welfare of working people.

*WTC I*, 456 F. Supp. 2d at 567. Similar policy considerations, coupled with the plain language

of the OPA, militate against this Court cloaking Defendants in a mantle of immunity reserved specifically to the federal government in the context of oil spill disasters, in particular at this juncture of the litigation.

### C.   Defendants Are Not Immune From Suit Under the Federal Tort Claims Act.

The federal government, as sovereign, is immune from suit unless it waives its immunity. In the context of torts committed by the federal government and its employees, Congress passed what is known as the Federal Tort Claims Act ("FTCA") and waived sovereign immunity for tort claims.  28 U.S.C. § 2674.  Congress created a number of exceptions to this waiver of immunity. 28  U.S.C.  § 2680.   Among  those  exceptions  is  a  provision  that  immunizes  the  federal government  from  tort  claims  based  on  acts  or  omissions  of  its  employees  when  performing discretionary acts.  28 U.S.C. § 2680(a).  This immunity, however, is not available to Defendants and cannot lead to dismissal of the B3 Master Complaint under either Rule 12(b)(1) or Rule 12(b)(6).

Defendants  argue  that  they  are  immune  under  the  FTCA's  discretionary  function exception, although only O'Brien's and NRC argue this as a basis for dismissal for lack of subject matter jurisdiction under Rule 12(b)(1).  (IAR Mot. to Dismiss at 22-23; MSRC Mot to Dismiss at 22; O'Brien's/NRC Mot. to Dismiss at 16.)  As explained above, the defendants are not the federal government; thus, the FTCA does not apply to them.  They are also not federal government  contractors.   (IAR  Mot.  to  Dismiss  at  2;  MSRC  Mot.  to  Dismiss  at  4,  12; O'Brien's/NRC Mot. to Dismiss at 7.)  Furthermore, it is at best a question of fact whether there are facts to support Defendants' argument that the discretionary function exception applies and that  federal  agencies  would  be  entitled  to  immunity  under  this  doctrine  if  they  are  could somehow craft an argument that they were equivalent to the federal government.  *Id.*  Finally, Defendants fail to identify, for example, the conflict between state law and federal policy or

interest that is required before the courts will allow derivative immunity to flow. *In re World Trade Center Disaster Site Litig.*, 521 F.3d 169, 197 (2d Cir. 2008) (*WTC II*) (citing *Boyle  v. United Tech. Corp.,* 487 U.S. 500, 509 (1988)).

As in the case of the multi-agency effort in the aftermath of the World Trade Center tragedy, *WTC II*, 521 F.3d at 198, Defendants essentially concede that there was a great deal of collaboration and cooperation among the various response agencies in the wake of the oil spill. (IAR Mot. to Dismiss at 2, 5-6; MSRC Mot to Dismiss at 6, 9; O'Brien's/NRC Mot. to Dismiss at 4, 5.)  This type of collaboration is the intent and purpose of the OPA and the amendment to the National Contingency Plan, which created a tiered response system that allows many affected agencies, state governments, and localities to participate in a coordinated way in the event of an oil spill, particularly one of unprecedented size and scope such as the one at issue here.   33 U.S.C. § 1321(d).  The centerpiece of federal oil spill planning is the National Contingency Plan, required by 33 U.S.C. § 1321(d)(2), delegated to EPA by Executive Order 12777, and published at 40 CFR § 300 (59 FR 47384, Sept. 15, 1994).  The purpose of the National Contingency Plan "is to provide organizational structure and procedures for preparing for and responding to discharges of oil and releases of hazardous substances, pollutants, and contaminants." 40 CFR § 300.1.  The mantra, in other words, is planning and coordination—not heavy-handed control and exacting specifications.  This type of planning, collaboration and coordination does not have the hallmarks of the type of discretionary function activities giving rise to derivative immunity or displacement of state laws.  *See Boyle*, 487 U.S. at 509; *WTC II*, 521 F.3d at 198; *Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1480 (5th Cir. 1989); *WTC I*, 456 F. Supp. 2d at 566.  At a minimum, it would require a factual inquiry to determine.  For these reasons, Defendants motion to dismiss based on derivative qualified immunity under the Federal Tort Claims Act should be

denied.

**D.    Defendants Are Not Immune From Suit under the Federal Government Contractor Defense Set Forth in *Yearsley*.**

As a final matter, none of the cases IAR and O'Brien's/NRC cite support their argument that they are entitled to dismissal of the B3 Complaint as government contractors pursuant to Rule 12(b)(1).  (IAR Mot. to Dismiss at 15; O'Brien's/NRC Mot. to Dismiss at 15.)  It is well-settled in the Fifth Circuit that even if the Court finds that derivative sovereign immunity may be applicable to government contractors, it will not divest the Court of subject matter jurisdiction.  *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 208 (5th Cir. 2009).  For this reason, too, the Court should deny IAR, O'Brien's/NRC's Rule 12(b)(1) motion.

Plaintiffs agree that under certain circumstances, after conducting an intensive review of a fully-developed factual record, non-governmental entities may be entitled to immunity for their actions under limited theories.  However, Plaintiffs have already dispensed with the argument that absolute immunity does not exist for Defendants under the Clean Water Act.  Similarly, Plaintiffs have also refuted any claim to immunity that would be available only to the federal government or federal government contractors, because Defendants are neither.  Finally, for the reasons discussed in more detail below, Defendants' motions to dismiss should be denied because there is no discretionary function immunity.

The government contractor defense is based on the doctrine of derivative immunity for private contractors to the federal government.  The Supreme Court first articulated this doctrine in *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940), and later *Boyle v. United Tech. Corp.*, 487 U.S. 500, (1988), to shield government defense contractors from liability under the product liability laws of the states.  Under special circumstances, derivative immunity may thus extend to private contractors the immunity traditionally afforded to the federal government when required

to conform with specifications adopted by the federal government in the government's discretion.  *See WTC I* , 456 F.Supp.2d at 560.  The Fifth Circuit has recognized that the purpose of such limited immunity "is to prevent the contractor from being held liable when the government is actually at fault. . . ."  *Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1478 (5th Cir. 1989) (citation omitted).  But when the contractor's actions are not specifically dictated and approved by the government, then the defense does not apply.  *See id.* at 1480.

Accepting for purposes of argument only that the federal government's immunity in 33 U.S.C. § 1321(j)(8) is as sweeping as Defendants suggest (which it is not), their motion to dismiss nevertheless would still be legally flawed because the facts pled in the B3 Master Complaint defeat a finding as a matter of law that Defendants are entitled to derivative immunity under *Yearsley*.  Defendants desperately attempt to cast themselves as good Samaritans responding to a spill.  Yet, the allegations in the well-pled B3 Master Complaint, and Defendants' own memoranda, indicate that they are primarily businesses profiting from the contracts they entered into with BP to respond to the Oil Spill Disaster.

In *Yearsley*, the plaintiffs were land owners with properties located along the banks of the Missouri River who sued a contractor for negligence that resulted in damage to their properties while the contractor carried out a navigation project.  309 U.S. at 19.  The contractor was performing the work pursuant to an Act of Congress and under the direction of the Secretary of War.  *Id.*  The Court dismissed the suits and in the process created a two-part test for extending government immunity principles to contractors of the federal government.  Federal immunity may be extended to private contractors when (1) the contractor was working pursuant to the authorization and direction of the federal government; and (2) the acts complained of fell within the scope of the government directives.  *Id.* at 21.  There may be liability where the contractor

exceeded the scope of its authorization, or where the authority to take the actions was not validly conferred. *Id.*

In *Boyle v. United Techs. Corp.*, the Supreme Court framed the central issue for inquiry in determining whether to extend federal immunity to a private manufacturer acting in accordance with governmental specification as the "uniquely federal interest" "in getting the Government's work done." 487 U.S. at 505. Where a unique federal interest existed, such as the manufacturing of military helicopters, state law will be displaced to the extent those laws would create a "significant conflict" with the federal policy or interest. *Id.* at 507. In such cases, the federal government provided strict guidelines and procedures for the manufacturer to follow, as in the case of exact guidelines for the production of the government helicopters that the contractor had to follow.

Accordingly, state law (or general maritime law) will not be displaced simply because there is a uniquely federal interest—there must also be a significant conflict with federal policy that would "frustrate specific objectives of federal legislation." *Id.* In *Boyle*, the Supreme Court found both a federal interest and the potential for the finding of a significant conflict. *Id.* at 511. The conflict was rooted in the fact that the federal government and its officers could not be sued for defectively designing a helicopter hatch. The Court determined, therefore, that since the federal government could not be sued under these circumstances, to allow suits against government contractors for claims arising out of the same action would give rise to an inherent conflict. *Id.* Ultimately, the *Boyle* court held that the imposition of liability under state law would fail where: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the

United States."  *Id.* at 512.

If a contractor acts independently of precise government directions and approvals, the defense does not apply.  *Trevino*, 865 F.2d at 1480; *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1154 (6th Cir. 1995).  Moreover, if the government does not expressly and directly supervise and control the contractor's actions, or if the government does not exercise supervisory judgment over them, then laws allowing injured parties to file lawsuits for negligence are not in conflict and should not be displaced. *See Tate*, 55 F.3d at 1154 ("When the government merely accepts, without any substantive review or evaluation, decisions made by a government contractor, then the contractor, not the government, is exercising discretion." (citing *Trevino*, 865 F.2d at 1480)). As the B3 Master Complaint alleges, these Defendants were contractors of BP, not of the federal government.  Whether Defendants are able to show they were acting under the direction and control of the federal government for purposes of derivative immunity is a question of fact that cannot be resolved on their dismissal motions.

Further, even if they were somehow deemed contractors of the federal government, they still would not be entitled to derivative immunity because they would only be entitled to the immunity to which the federal government would be entitled if it had performed the acts itself. As explained above, the federal government is subject to suit in tort under the FTCA.  In particular, the discretionary function exception to the FTCA would not apply to the facts pleaded here.  The Supreme Court has established a two-part test for courts to apply when deciding whether the discretionary function exception applies to the actions of a governmental entity.  *See United States v. Gaubert*, 499 U.S. 315, 322-23 (1991). "The first part of the test requires a determination of whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice."  *Rosebush v. United States*, 119 F.3d 438, 441 (6th

Cir. 1997) (citing *Gaubert*, 499 U.S. at 322-23).  If the governmental entity is governed by a regulation or is subject to a mandate, then "the discretionary function exception does not apply because there was no element of judgment or choice in the complained of conduct." *Id.* (citing Gaubert, 499 U.S. at 322).   Thus, statutes, regulations and policies that prescribe particular conduct to follow are not discretionary.  *Id.*  If, however, there is no regulation or mandate, the court must then determine whether "the challenged conduct is of the kind that the discretionary function exception was designed to shield." *Id.*  The Supreme Court has held that the exception "protects only governmental actions and decisions based on considerations of public policy." *Berkowitz v. United States*, 486 U.S. 531, 537 (1988) (citations omitted).  These are factual determinations that cannot be decided on a motion to dismiss.

Assuming Defendants could overcome the legal and factual hurdles outlined above, they would still have to show that the activity that gave rise to this action involved governmental public policy actions and/or decisions.  Defendants cannot prevail on this last test either because the challenged conduct did not involve uniquely federal governmental public policy considerations.

Courts do not take for granted that an exercise of judgment or choice by a government actor will necessarily benefit from discretionary function immunity.  *See Myers v. United States*, 17 F.3d 890, 896 (6th Cir. 1994) (finding that "many acts performed by agency personnel— though they involve a significant degree of choice—are not grounded in regulatory policy and thus are not protected by the discretionary function exception"); *see also Bultema v. United States*, 359 F.3d 379, 385 (6th Cir. 2004) (finding that even if Government agents retained some discretion in carrying out a policy, "that discretion was not of the type that the discretionary function exception was intended to protect").  The *Myers* court held that the discretionary

function exception does not shield the Mine Safety and Health Administration (MSHA) from an action by survivors of a mine explosion because the MSHA safety inspectors' authority to conduct their inspections were not rooted in social, economic or political policy. *Myers*, 17 F.3d at 890.

The public policy test is an outgrowth of the underlying purpose of governmental immunity: that decisions by a Federal agency grounded in public policy and the policy goals of a statute or regulation must not be subject to "judicial second-guessing." *See Rosebush*, 119 F.3d at 441; *cf. Andrulonis v. United States*, 952 F.2d 652, 655 (2d Cir. 1991) (holding that discretionary function immunity is inapplicable where a government doctor failed to warn of the hazards of a research experiment because his decision not to act could not possibly have been grounded in the agency's policy scheme). But if an actor "merely implement[s], under objective criteria, the policy decisions of others," then his conduct does not carry the markings of a governmental act, and it does not receive the benefit of discretionary function immunity. *Myers*, 17 F.3d at 897 (*citing Berkovitz*, 486 U.S. at 544) (finding that if the agent makes decisions "by the mere application of objective scientific standards," plaintiff's claim would not be barred by the discretionary function doctrine). Consequently, decisions grounded in professional judgment and choice are necessarily not also grounded in political, social, or economic policy goals. *See, e.g.*, *Andrulonis*, 952 F.2d at 655 (holding actionable the medical judgment of a government doctor in failing to warn of the hazards of a research experiment); *Griffin v. United States*, 500 F.2d 1059, 1063-69 (3d Cir. 1974) (holding actionable the professional, scientific judgment exercised in approving a live polio virus vaccine); *Hendry v. United States*, 418 F.2d 774, 783 (2d Cir. 1969) (holding actionable the medical judgment of a government psychiatrist and psychologist in the diagnosis of a patient).

Here, Defendants argue that they were simply implementing the National Contingency Plan.  First, the facts do not support that proposition, and as their motions are dismissal motions and not for summary judgment, they fail on this basic ground.   But even if Defendants' contentions accurately described the extent of their actions, Defendants' argument fails as a matter of law because in making those arguments they concede that they were merely implementing an existing plan, an action that is not entitled to discretionary function immunity. Where a government agent is acting pursuant to an already established policy, and merely implementing that policy, that employee is not engaged in conduct that would constitute independent decisions grounded in public policy.  *See Caplan* v. *United States*, 877 F.2d 1314, 1316 (6th Cir. 1989); *see also Aslakson v. United States*, 790 F.2d 688, 693 (8th Cir. 1986) ("where the challenged governmental activity involves safety considerations under an established policy rather than the balancing of competing public policy considerations, the rationale for the exception falls away and the United States will be held responsible for the negligence of its employees"); *Reminga v. United States*, 631 F.2d 449 (6th Cir. 1980) (holding that once having exercised discretion to issue navigational charts, the government is accountable for its negligence in failing to locate hazards accurately on the charts it publishes); *Kuhne v. United* States, 267 F.Supp. 649 (E.D. Tenn. 1967) (holding that once having completed a plan at Oak Ridge supporting national defense, the government is accountable for the negligent implementation of that plan).  Here, again, is precisely what Defendants claimed they were doing—implementing the plan.  As such, any immunity to which they allege they are entitled disappears.

Finally, while the Court's evaluation of a discretionary act should emphasize the nature of the conduct rather than the status of the actor, the level at which the decision is made is often *relevant* to the discretionary function inquiry, since the answer to that inquiry turns on *both* the

subject matter *and* the office of the decision-maker.  *See Gaubert*, 499 U.S. at 335 (Scalia, J.,

concurring); *Myers*, 17 F.3d at 896.  Also, while not dispositive, another indicator that an act is

not discretionary is if it is principally operational.  *See Gaubert*, 499 U.S. at 321.  Defendants do

not show how as a matter of law they are the federal government, and, even if they had, the acts

in which they engaged are not entitled to immunity.

> **E.  Defendants Are Not Entitled to Responder Immunity under the Clean Water Act.**

The Clean Water Act limits liability for certain actors from financial responsibility for

"removal costs or damages" resulting from the discharge of oil or hazardous substances.  33

U.S.C. § 1321(c)(4)(A).  This limitation, however, is narrow.  By its very terms, many of which

Congress has defined, the limitation is not available to Defendants as a matter of law.

Furthermore, the limitation is subject to a number of fact specific exceptions that apply in this

case and which prevent Defendants from escaping limitation from the claims in the B3 Bundle

Master Complaint.   33  U.S.C.  § 1321(c)(4)(B).   In  any  event,  if  the  responder  immunity

provision were deemed applicable, it would be a question of fact.  For these reasons, Defendants'

motion to dismiss the B3 Bundle plaintiffs' claims on the basis of the so-called "responder

immunity" provision should be denied.

> **1.  The Responder Immunity Provision On Its Face Does Not Limit Defendants' Liability for Plaintiffs Damages.**

As a threshold matter, the responder immunity provision expressly states that it only

relieves persons from liability for removal costs or damages that arise as a result of actions taken

to address an oil spill.  With respect to Nalco, the B3 Plaintiffs have not made such claims.

Instead, they have adequately pleaded factual allegations supporting claims for injuries and

damages as a result of Nalco's defective product, leading to the conclusion that the exemption

does not apply to Nalco.

The Clean Water Act's exemption from liability states:

A person is not liable for *removal costs or damages* which result from actions taken or omitted to be taken in the course of rendering care, assistance, or advice consistent with the National Contingency Plan or as otherwise directed by the President relating to a discharge or a substantial threat of a discharge of oil or a hazardous substance.

33 U.S.C. § 1321(c)(4)(A)(emphasis added).  Congress defined the term "removal costs" as "(A) the costs of removal of oil or a hazardous substance that are incurred after it is discharged; and (B) * * * the costs to prevent, minimize, or mitigate that threat." 33 U.S.C. § 1321(a)(25).  The terms "remove" and "removal" are also defined. *Id.* § 1321(a)(8).  They refer to "containment and removal of the oil or hazardous substances from the water and shorelines or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare…." *Id.*  The B3 allegations against Nalco are not for removal costs under the OPA. (*See* B3 Master Compl. ¶¶ 194-201 (alleging claims under the OPA for removal costs against certain defendants and specifically excluding Nalco).)

In the context of liability determinations, Congress stated that the terms "liable" and "liability" under the OPA, 33 U.S.C. § 2701(17), are construed to be the same standard as established in the Clean Water Act, 33 U.S.C. § 1321.  Further, the OPA's definitions for "removal costs" and "removal" are identical to those in the Clean Water Act.  33 U.S.C. §§ 2701(30) and (31).  Additionally, the OPA enumerates the "covered removal costs and damages" that are the subject of the liability provisions of OPA.  33 U.S.C. § 2702(b).  For example, removal costs include those costs incurred by a person for actions taken consistent with the National Contingency Plan to *remove* oil.  *Id.* § 2702(b)(1)(B).  Damages under the OPA are enumerated in section 2702(b)(2)(A)-(F), and none of those enumerated damages is alleged within the B3 Master Complaint.  Therefore, the exception does not apply.

-36-

2.      **Plaintiffs' Claims Fall within the Exceptions to the Responder Immunity Provision.**

In an effort to promote recovery by injured persons in the context of an oil spill response, Congress made certain exceptions from the responder immunity provision for a number of actors, events, and claims. The exclusions are for "personal injury or wrongful death" or grossly negligent behavior or willful misconduct, among others. 33 U.S.C. § 1321(c)(4)(B). B3 Plaintiffs allege that Defendants are liable for these types of claims or for damages arising out of precisely these circumstances. (B3 Master Compl. ¶¶ 232-236 (negligence); ¶ 241-242 (negligence *per se*); ¶ 256 (negligence design/manufacture); ¶¶ 263-264 (public nuisance); ¶¶ 275-276 (battery); ¶ 280 (Florida Medical Monitoring); ¶ 304 (strict liability); ¶¶ 316-320 (Florida strict liability).) Thus, even assuming for purposes of argument only that the responder immunity provision applies in the first instance, Plaintiffs have alleged both personal injury claims and allegations that Defendants were grossly negligent or engaged in willful misconduct. At a minimum, the B3 Master Complaint raises questions of fact as to whether Defendants have responder immunity under the Clean Water Act.

3.      **Case Law Confirms That Defendants Are not Entitled to Responder Immunity.**

Federal courts have had little occasion to interpret the responder immunity provision. Several of those court decisions support Plaintiffs' position that Defendants' motions fail because they are grounded in issues of fact that require adjudication to determine the applicability of the responder immunity provision. *See Unocal Corp. v. U.S.*, 222 F.3d 528, 535-36 (9th Cir. 2000); *Cape Flattery Ltd. v. Titan Maritime LLC*, 607 F.Supp.2d 1179, 1189 (D. Haw. 2009). Judge Fallon of this District interpreted a similar Louisiana state law immunity provision as requiring a factual inquiry to determine its applicability. *Turner, et al. v. Murphy Oil USA, Inc.*, No. 05-4206, 2007 WL 2407310, at *4 (E.D.La., Aug. 20, 2007). Defendants

neither cite nor distinguish these cases.  Instead, they (erroneously) rely on *Caillouet Land Corp v. Chevron Pipe Line Co.*, No. 06-10533, 2007 U.S. Dist. LEXIS 48364, at *6-8 (E.D. La. July 3, 2007).  *Caillouet* is instructive in that it confirms that the determination as to whether an exemption from liability applies is fact specific, and, more importantly, an exemption often is not established until after a court or jury makes a gross negligence or willful misconduct finding, provided they were pleaded in the first instance.  While the plaintiffs in *Caillouet* failed to *plead* the necessary facts and legal claims that would have allowed the court to reject application of the exemption, *Caillouet*, at *6-8, the B3 Plaintiffs adequately pleaded the requisite facts and claims in this case.

Plaintiffs claim that Nalco "had actual and/or constructive knowledge of the facts and circumstances relative to the dispersants that caused or contributed to Plaintiffs injuries and that its actions and inactions were negligent, grossly negligent, reckless, willful and/or wanton."  (B3 Master Compl. ¶ 241.)  Plaintiffs also alleged that Nalco "recklessly, willfully and/or wantonly failed to use reasonably safe dispersant chemicals or other chemicals in their attempts to respond to the Oil Spill and thereby exacerbated the pollution of the Gulf of Mexico and injury to Plaintiffs."  (*Id.* at ¶ 338.)  While Nalco argues that these statements are "conclusory" and that Plaintiffs failed to provide any facts proving these allegations of gross negligence and willful misconduct, (Nalco Mot. to Dismiss at 23), its arguments ignore the countless factual examples Plaintiffs provide of injuries and medical conditions that multiple Plaintiffs have already experienced, including respiratory and eye problems, headaches and elevated blood pressure and Nalco's culpability for those injuries.  (*See* B3 Master Compl. ¶¶ 12, 276.)  Unlike the plaintiffs in *Caillouet*, Plaintiffs adequately allege gross negligence, willful misconduct and personal injuries in the B3 Master Complaint.

For these reasons, Defendants' motions to dismiss Plaintiffs' claims on the basis of the so-called "responder immunity" provision should be denied.

## V.    PLAINTIFFS SUFFICIENTLY ALLEGE NEGLIGENCE PER SE

The statutory and regulatory sections cited to by Plaintiffs in the B3 Bundle Master Complaint are not a mysterious web of laws existing in the ether—they are the very heart of the laws that prohibit water pollution, in particular from oil spills, and set forth the clean-up responses and obligations to workers required in the unfortunate instances in which such a spill occurs.

### A.    The B3 Master Complaint Sufficiently Identifies the Applicable Laws.

The Defendants challenging the negligence *per se* claim unsuccessfully raise general objections to the specificity of the regulations cited as a basis for this Court to dismiss this claim. A cursory review of the statutory and regulatory sections cited in the Complaint set forth Defendants' duties to prevent pollution and duties to those who work to clean up the disaster. For example, Plaintiffs cite 40 C.F.R. Part 300—the portion of the Code of Federal Regulations containing the National Contingency Plan.  (B3 Master Compl. ¶ 238.)  It is behind this same regulatory regime that so many of the Defendants attempt to hide in the context of their various immunity and preemption arguments.  (*See e.g.,* MOEX/Anadarko Mot. to Dismiss B3 at 18; O'Brien's/NRC Mot. to Dismiss at 18-19; Nalco Mot. to Dismiss at 15, 19, 21; IAR Mot. to Dismiss at 23; MSRC Mot. to Dismiss at 18, 20.)  Certainly, then, these duties are known and familiar to Defendants, and thus any argument that the pleadings lack specificity should be summarily dismissed.  (*See* Anadarko Mot. to Dismiss B3 at 38; O'Brien's/NRC Mot. to Dismiss at 22; Nalco Mot. to Dismiss at 29; IAR Mot. to Dismiss at 26-27; MSRC Mot. to Dismiss at 40.)

**B.      Plaintiffs Satisfy Elements of Negligence *Per Se* as a Matter of Law.**

A number of Defendants argue that the various state law requirements for claims of negligence *per se* are unmet.  Those arguments do not withstand scrutiny, nor do they support dismissal as a matter of law.  Plaintiffs have satisfied the pleading requirements for their negligence *per se* claim as a matter of law.  All of the regulatory provisions cited below, and contained in the B3 Master Complaint, prescribe worker safety requirements and are designed to protect a class of people, not merely the general public.  Plaintiffs allege injury of the type contemplated by the laws set forth in the Complaint.  Furthermore, Plaintiffs allege that Defendants violated the applicable laws relating to pollution prevention and oil spill response worker safety. Finally, Plaintiffs allege how each Defendant caused the injuries suffered. The elements of negligence *per se* have been established as a matter of law and remaining issues of fact can only be developed and addressed on summary judgment.

Several Defendants argue that the laws relied upon by Plaintiffs only protect the general public, and thus cannot support a negligence *per se* claim.  (MSRC Mot. to Dismiss at 40; IAR Mot. to Dismiss at 27.)  On the contrary, the Clean Water Act and the OPA are designed to provide relief to victims of pollution, and the regulations alleged provide specific regulations for protection of workers and responders. Thus, while the public at large may also benefit, the class of persons to be protected is clearly identified.

Pursuant to its authority under § 311 of the Clean Water Act, the EPA promulgated regulations relating to the National Contingency Plan ("NCP") in the event of spills for oil and hazardous substances.  40 C.F.R. Part 300.  Specifically, 40 C.F.R. § 300.150 regulates worker health and safety. Response actions under the NCP, which *all* of the Defendants claim to have been a part of, either by designation as a responsible party under the OPA or by virtue of the activities they undertake to assist in clean-up efforts, must comply with worker safety and health

requirements.  40 C.F.R. § 300.150(a).  Responsible parties, such as the MOEX and Anadarko

Defendants and BP, must assure that workers are protected.  *Id.* § 300.150(b). Where a lead

agency, like the Coast Guard, is involved, contractors must also comply with worker health and

safety programs required by the Occupational Safety and Health Administration, as well as any

applicable state laws. *Id.* § 300.150(c)

Plaintiffs have sufficiently alleged that they fall within the ambit of these laws.  (*See* B3

Master Compl. ¶¶ 21, 22, 120-139.)  Each of the Defendants had responsibility for complying

with these statutes and regulations, either in their capacity as responsible parties or contractors

carrying out responses under the NCP.  (*See* B3 Master Compl. ¶¶ 26, 36, 51, 54-70, 93, 94-96,

105, 106, 107, 112, 113, 116.)  The Plaintiffs have alleged how they have been injured by the

actions of Defendants and that Defendants are the legal cause of the injuries suffered. For these

reasons, the motions to dismiss the negligence *per se* claim should be denied.

### C.    The Clean Water Act Expressly Provides a Private Right of Action.

Several other Defendants provide alternative arguments for dismissing this claim, none of

which withstand scrutiny.[15]   In particular, MSRC, the MOEX and Anadarko Defendants, and

IAR each argue that the Court should dismiss the negligence *per se* claim because Section 1321

of the Clean Water Act, 33 U.S.C. § 1251 *et. seq.*, does not permit a "private action."   (*See*

MSRC Mot. to Dismiss at 41; IAR Mot. to Dismiss at 27; MOEX/Anadarko Mot. to Dismiss at

39.)  Notably, MSRC and IAR provide no authority in support of the argument that the statutes

and regulations cited cannot form the basis of this claim.  (*See* MSRC Mot. to Dismiss at 41;

---

[15] Anadarko objects to the simultaneous pleading of claims under OPA and a negligence *per se* claim based on violations of OPA. Anadarko B3 Memo.at 39. Plaintiffs First Amended B3 Bundle Master Complaint, sought to be filed together with this memorandum, deletes the OPA claims, in accordance with the clarifications in PTO 25, and as such Anadarko's objections are now moot.

IAR Mot. to Dismiss at 27.)  Only the MOEX and Anadarko Defendants attempt to supply authority for this proposition, but the cases cited do not support its argument.  Moreover, the cases cited do not stand for the propositions for which they are mentioned.  (*See* MOEX/Anadarko Mot. to Dismiss B3 at 39.)

The MOEX and Anadarko Defendants state that the "Clean Water Act does not give rise to a private right of action."  (MOEX/Anadarko Mot. to Dismiss B3 at 39.)  This is a misreading of *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 14-15 (1981).  Instead, the Supreme Court simply drew the distinction between an express and an implied right of action, finding no implied right of action in the Clean Water Act.  *Id.*  This is, of course, because the right of action is *expressly* granted in the Clean Water Act, as described more fully below.

The Plaintiffs are empowered to enforce the provisions of § 311 of the Clean Water Act, 33 U.S.C. § 1321, through the citizen suit provisions of 33 U.S.C. § 1365.  The reason is elementary: a violation of § 311 is a concomitant violation of the general prohibition contained in § 301 of the Act.  That prohibition reads: "[e]xcept as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful."  33 U.S.C. § 1311(a) (emphasis added).  This proscriptive one-sentence provision is the foundation upon which the rest of the Act stands.  *See Northwest Environmental Advocates v. U.S. E.P.A.*, 537 F.3d 1006, 1020 (9th Cir. 2008) (holding the Section 301(a) prohibition is "the cornerstone and fundamental premise of the Clean Water Act") (internal quotations and citations omitted); *see also U.S. v. Frezzo Bros., Inc.*, 602 F.2d 1123, 1127 (3d Cir. 1979) (stating "[t]he core provision of the Act is found in [§ 301]"); *American Frozen Food Institute v. Train*, 539 F.2d 107, 113 (D.C. Cir. 1976) (stating "[t]he basic concept

of the Act...is an ultimate flat prohibition upon all discharges of pollutants"). Indeed, Section 301(a) represents Congress' determination that "no one has the right to pollute—that pollution continues [is] because of technological limits, not because of any inherent right to use the nation's waterways for the purpose of disposing of wastes." S. Rep. 92-414, p. 41.

Congress built upon the § 301 foundation when it authorized citizens to enforce its prohibition. Section 505 of the Act, 33 U.S.C. § 1365, allows citizens to commence a civil action against any person alleged to be in violation of an "effluent standard or limitation." 33 U.S.C. § 1365(a)(1). An "effluent standard or limitation" includes any act that violates the general § 301 prohibition against discharging pollutants. 33 U.S.C. § 1365(f)(1). Thus, citizens may bring suit against any person who violates the foundational § 301(a) prohibition.

A more specific prohibition on the discharge of pollutants is contained in § 311(b)(3), amended in 1990 by OPA. That section forbids "the discharge of oil or hazardous substances" into the navigable waters or the contiguous zone waters of the United States. 33 U.S.C. § 1321(b)(3). Although it appears isolated from the rest of the Act, this prohibition is simply a narrowly tailored restatement of the § 301(a) prohibition against the discharge of pollutants. Importantly, the definition of "pollutant" as used in the foundational prohibition includes both "oil" and "hazardous substances." *See* 33 U.S.C. § 1362(6); *see also Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 565 (5th Cir. 1996) (noting "[t]he breadth of the many items in the list of 'pollutants' tends to eviscerate any restrictive effect" (citation omitted)); *United States v. Hamel,* 551 F.2d 107, 110 (6th Cir. 1977) (stating "[o]il is oil and whether useable or not by industrial standards it has the same deleterious effect on waterways...[i]n either case, its presence in our rivers and harbors is both a menace to navigation and a pollutant"). Thus, by definition, discharges of "oil" and "hazardous substances" are

discharges of "pollutants." This necessarily means that a violation of § 311(b)(3) is concomitant with—moreover, subsumed by—a violation of § 301(a), as the foundational prohibition is the "cornerstone" and "fundamental premise" upon which the narrowly tailored language of § 311(b)(3) stands.

In sum, enforcement of § 311 is coextensive with § 301. *Pryor Oil Co., Inc. v. U.S.*, 299 F. Supp.2d 804, 808 (E.D. Tenn. 2003) (holding "§§ 309 and 311 are complementary and overlapping authorities, and are not mutually exclusive"). There is a concomitant violation of both sections whenever oil is discharged into waters of the United States. Citizens are empowered to enforce any violation of § 301(a) through the citizen suit provisions of the Act, and the courts are empowered to impose penalties under either § 309(d) or § 311(b)(7).

### D.     Plaintiffs Allege Individual Actions for O'Brien Giving Rise to Liability.

O'Brien's and NRC also suggest that Plaintiffs attempt to rely on a theory of group liability to support allegations that Defendants were negligent *per se*. (O'Brien's/NRC Mot. to Dismiss at 21.) These Defendants overlook specific allegations in the B3 Bundle Master Complaint that defeat this argument. As such, the motion to dismiss the negligence *per se* claim fails.

O'Brien and NRC spill a great deal of ink over the assistance they provided to the responsible parties and to the Coast Guard. (*Id.* at 1-7.) O'Brien's contends it provided "regulatory compliance, emergency preparedness, response management, disaster services, and crisis management." (*Id.* at 1-7.) NRC contends it "is a classified oil spill removal organization" and provided containment supplies, equipment, and personnel to operate that equipment. *Id.* These activities are subject to the requirements of the Clean Water Act, the OPA and the federal implementing regulations. Plaintiffs allege that they were engaged by these Defendants and others to perform certain clean-up tasks, and, in so doing, were exposed to certain hazardous

chemicals because they were not given the proper safety gear.  (B3 Master Compl. ¶¶ 105-107, 129-142.)  Each Defendant is responsible for their actions and omissions and failure to comply with the worker safety regulations.  These allegations do not give rise to the "group liability" theory suggested by O'Brien's and NRC.  Further, to the extent O'Brien's and NRC seek plaintiff-specific facts at this time, that is in contravention of the Court's order about the purpose of the filing of the Master Complaints, and their motion should be dismissed.

## VI.    PLAINTIFFS ADEQUATELY PLEADED FACTS TO SUPPORT THE CLAIMS IN THE COMPLAINT

Many of the Defendants argue under *Iqbal/Twombley* that the allegations in the B3 Bundle Master Complaint are not sufficiently pleaded.  As explained in the Standard of Review section above, the Supreme Court last week made clear that the pleadings in the instant Complaint are well-pleaded and not subject to dismissal under the *Iqbal/Twombley* standard. It is indisputable that the allegations, *taken as a whole*, raise a reasonable expectation that discovery will produce evidence that could allow the trier of fact, weighing disputed evidence and making allowable inferences, to rule in Plaintiffs' favor.  *Matrixx*, 2011 U.S. LEXIS 2416 at *34.  The Complaint adequately alleges the identity of the Dispersant Defendants, the role they played in the clean-up of the oil spill, and how their involvement injured Plaintiffs.  The Complaint describes how the Dispersant Defendants participated in either aerial spraying of dispersants or coordinated with the VoO Plaintiffs who were spotting oil slicks.  The Complaint also describes how the Dispersant Defendants were involved in onshore plaintiffs clean-up efforts and how those Plaintiffs were exposed.   The Dispersant Defendants also directed the work by Decontamination Plaintiffs, and that relationship is described in the Complaint.  The dangers associated with oil and dispersants were known and alleged in the Complaint.  The need for safety gear—and the denial by Dispersant Defendants of requests by VoO, Onshore and

Decontamination Plaintiffs ability to access that gear—is also alleged in the Complaint. Finally, the types of injuries suffered by Plaintiffs are adequately alleged in the Complaint, setting forth the Plaintiffs' exposure to dispersants and oil released and/or applied by Dispersant Defendants. In short, the Complaint more than adequately satisfies *Iqbal/Twombley*. (*See, e.g.,* B3 Master Compl. ¶¶ 61, 125 (containing allegations about NRC's negligent operation of planes during oil spill clean-up); ¶ 62 (containing allegations about O'Brien's negligent operation of planes during oil spill clean-up); ¶¶ 59, 123 (containing allegations about IAR's negligent operation of planes during oil spill clean-up); ¶¶ 54, 120 (containing allegations about MSRC's negligent operation of planes during oil spill clean-up); ¶¶ 66-67, 126-127 (containing allegations about Nalco's manufacture of dangerous dispersants); ¶¶ 57, 121 (containing allegations about negligent operation of planes during oil spill clean-up).)

Further, Plaintiffs adequately allege in the B3 Master Complaint the negligent and grossly negligent conduct of Defendants (*see, e.g., id.*¶ 94 (explaining that response efforts began using Nalco's Corexit® dispersants; ¶ 108 (alleging misuse of Nalco's Corexit® and negligent application of dispersants); ¶ 105 (discussing BP directing and coordinating the use of aircraft to spot slicks and/or to apply dispersants of Dispersant Defendants); ¶ 106 (explaining that onshore Plaintiffs worked for MSRC, O'Brien's and NRC in connection with oil spill clean-up); ¶107 (alleging MSRC's, O'Brien's, and NRC's direction and oversight of decontamination workers); ¶¶ 119, 127 (alleging lack of care in the use of planes in aerial application of chemical dispersants); ¶¶ 131-135 (alleging that Defendants prevented VoO workers from using protective gear, employed an irresponsible procedure for spotting and spraying by Dispersant Defendants, failed to warn workers of upcoming aerial spraying, sprayed Plaintiffs directly or indirectly by aerial application of dispersants, and exposed Plaintiffs without access to safety gear to

contaminated booms); ¶ 136 (alleging that onshore Plaintiffs were exposed from spray mist and/or by other means); ¶ 137 (alleging that no safety gear provided to Plaintiff workers); ¶ 138 (avering that Decontamination Plaintiffs were not provided the necessary safety gear); ¶ 139 (alleging that resident Plaintiffs were exposed to oil and/or dispersant contaminants); ¶ 140 (alleging that Plaintiffs were exposed to oil and/or dispersants as part of clean-up efforts); ¶ 149 (contending that Defendants used Nalco's Corexit® dispersant knowing of its chemical constituents and the health risks from contact with the product); ¶ 150 (alleging that the use of dispersants continued even after Defendants are told of the risks of using Corexit® for this clean-up effort); and ¶ 167 (alleging Defendants' collective awareness of the risks of using Corexit® to vessels and workers).[16] Taken as a whole, the claims in Plaintiffs' Complaint contain more than sufficient allegations against Defendants for, *inter alia*, negligence, negligence *per se*, gross negligence, nuisance, battery and products liability.  Their motion to dismiss on *Iqbal/Twombley* grounds fails as well.

The Plaintiffs Steering Committee respectfully requests the opportunity to conduct limited jurisdictional discovery, in accordance with Sections IV(B) and V(B)(1) of Case Management Order No. 1.  (*See* Doc. 569 ("PTO 11").)

---

[16] In addition, as to Defendant BP, the B3 Master Complaint (which also incorporates the factual allegations of the B1 Master Complaint) is replete with allegations of BP's negligence and gross negligence in connection with the *Deepwater Horizon* explosion and resulting oil spill clean-up efforts.  As to the MOEX and Anadarko Defendants, Plaintiffs address a number of well-pleaded facts against them in a separate brief.

## CONCLUSION

For the foregoing reasons, (and for the reasons stated in Plaintiffs' OMNIBUS RESPONSE TO THE MOTION TO DISMISS THE AMENDED B1 MASTER COMPLAINT), Defendants' motions to dismiss the Bundle B3 pleadings should be denied.

Dated: March 30, 2011.

Respectfully submitted,


| _____/s/ Stephen J. Herman_____ | _____/s/ James Parkerson Roy_____ |
|---|---|
| Stephen J. Herman, La. Bar No. 23129 | James Parkerson Roy, La. Bar No. 11511 |
| HERMAN HERMAN KATZ & COTLAR LLP | DOMENGEAUX WRIGHT ROY & EDWARDS LLC |
| 820 O'Keefe Avenue | 556 Jefferson Street, Suite 500 |
| New Orleans, Louisiana 70113 | Lafayette, Louisiana 70501 |
| Telephone: (504) 581-4892 | Telephone: (337) 233-3033 |
| Fax No. (504) 569-6024 | Fax No. (337) 233-2796 |
| E-Mail: sherman@hhkc.com | E-Mail: jimr@wrightroy.com |
| *Plaintiffs' Liaison Counsel MDL 2179* | *Plaintiffs' Liaison Counsel MDL 2179* |


## PLAINTIFFS' STEERING COMMITTEE


| | |
|---|---|
| Brian H. Barr | Robin L. Greenwald |
| LEVIN, PAPANTONIO, THOMAS, MITCHELL, ECHSNER & PROCTOR, PA | WEITZ & LUXENBERG, PC |
| 316 South Baylen St., Suite 600 | 700 Broadway |
| Pensacola, FL 32502-5996 | New York, NY 10003 |
| Office: (850) 435-7045 | Office: (212) 558-5802 |
| Telefax: (850) 436-6187 | Telefax: (212) 344-5461 |
| E-Mail: bbarr@levinlaw.com | E-Mail: rgreenwald@weitzlux.com |
| | |
| Jeffrey A. Breit | Rhon E. Jones |
| BREIT DRESCHER IMPREVENTO & WALKER, P.C. | BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P. C. |
| 999 Waterside Drive, Suite 1000 | 218 Commerce St., P.O. Box 4160 |
| Norfolk, VA 23510 | Montgomery, AL 36104 |
| Office: (757) 670-3888 | Office: (334) 269-2343 |
| Telefax: (757) 670-3895 | Telefax: (334) 954-7555 |
| E-Mail: jbreit@bdbmail.com | E-Mail: rhon.jones@beasleyallen.com |

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com


JOSH S. WHITLEY
BILLIE H. LEETH
BRIAN COLOMB
DAVID BAGWELL
JAMES GARNER
STEPHEN MURRAY, JR.
JOHNNY DEGRAVELLES
NEALE DEGRAVELLES
LARRY BERMAN
TOM SIMS
JULIA LEMENSE
DEBORAH WATERS
GARY MASON
KEVIN DEAN
*On Brief*


## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on March 30, 2011.

                                             /s/ Stephen J Herman and James Parkerson Roy