UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL No. 2179 |
| | SECTION: J |
| This Document Relates to: *All Cases in Pleading Bundle D1.* | JUDGE BARBIER |
| This Document applies to: No. 10-01768 and No. 10-02454 | MAGISTRATE SUSHAN |

OMNIBUS RESPONSE MEMORANDUM TO MOTIONS TO DISMISS  BUNDLE D1
MASTER COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.  THE DEFENDANTS INCORRECTLY PORTRAY THE RELEVANT STANDARDS
    GOVERNING MOTIONS TO DISMISS AND JUDICIAL NOTICE. . . . . . . . . . . . . . . 8

II.  THE D1 PLAINTIFFS HAVE CONSTITUTIONAL STANDING TO MAINTAIN
     THEIR CLAIMS UNDER THE CWA, EPCRA, CERCLA, AND THE ESA. . . . . . . . 11

     A.  The Injuries Sustained by the Center's Members will be Redressed by a Favorable
         Court Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     B.  The ESA Plaintiffs' Citizen Suit will Redress the ESA Claims. . . . . . . . . . . . . 13

         1.  The ESA Plaintiffs sufficiently allege the elements of Article III standing
             at the pleading stage of this litigation and the Court can draw upon its
             traditional equitable powers to redress their claims. . . . . . . . . . . . . . . . . 14

         2.  BP's generic assertion that the spill is being cleaned up does not establish
             that the injuries to listed species will be redressed. . . . . . . . . . . . . . . . . . 16

     C.  BP's and Transocean's Failure to Report the Release of Hazardous Substances
         under EPCRA Causes Plaintiffs An Informational Injury-in-Fact. . . . . . . . . . . 19

III.  CITIZEN ENFORCEMENT OF 33 U.S.C. § 1311 IS COEXTENSIVE WITH 33 U.S.C.
      § 1321. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

IV.  THE CENTER AND THE ESA PLAINTIFFS COMPLIED WITH THE CITIZEN SUIT
     NOTICE PROVISIONS OF THE CWA, CERCLA, EPCRA, AND THE ESA, AND
     THUS THE D1 MASTER COMPLAINT IS SUFFICIENTLY GROUNDED. . . . . . . . 25

     A.  The Immediate Suit Provision of 33 U.S.C. § 1365(b) Applies to Private
         Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

     B.  BP Concedes the Adequacy of the Center's Notice and Delay with Regard to
         "CBD II." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

     C.  The Center Served the Requisite Statutory Notice on Transocean, Ltd. . . . . . . . 31

D.     The ESA Plaintiffs Fulfilled the ESA's Statutory Notice Provisions Prior to Filing Suit against BP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

V.     THE FIRST THROUGH EIGHTH CAUSES OF ACTION IN THE D1 MASTER COMPLAINT ARE NOT SUBJECT TO DISMISSAL UNDER *GWALTNEY* NOR ARE THEY CONSTITUTIONALLY MOOT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

A.     There Were Ongoing Violations and a Reasonable Likelihood of Continuing Violations at the Time Suit was Commenced. . . . . . . . . . . . . . . . . . . . . . . . . . . 40

1.     Discharges from the Macondo well continued until at least August 23, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

2.     Discharges from the Macondo well were reasonably likely to continue until at least September 19, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

B.     Defendants' Failure to Abide by the Emergency Notification and Reporting Provisions of EPCRA and CERCLA Constitute "Ongoing Violations." . . . . . . 45

C.     The Alleged "Capping" of the Well Does Not Moot the First through Eighth Causes of Action Contained in the D1 Complaint. . . . . . . . . . . . . . . . . . . . . . 47

D.     The ESA Provides for Injunctive Relief for the Ongoing Take of Endangered and Threatened Species, and, Therefore, the ESA Claims are Not Barred under *Gwaltney*, and are Not Moot. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

VI.    DEFENDANTS' ARGUMENTS REGARDING CERCLA'S "PETROLEUM EXCLUSION" IGNORE PLAIN STATUTORY LANGUAGE AND, IN ANY EVENT, ARE UNDERMINED BY THE INJECTION OF HAZARDOUS (AND OTHER) SUBSTANCES INTO THE MACONDO WELL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

A.     The Plain Language of CERCLA Defines Hazardous Substances as Including "Specifically Listed" Fractions of Crude Oil. . . . . . . . . . . . . . . . . . . . . . . . . . . 55

B.     Defendants' Injection of Hazardous Substances into the Macondo Well Negates any Possible Protection under the Petroleum Exclusion. . . . . . . . . . . . . . . . . . . 58

C.     Transocean's EPCRA Argument is Deficient for Similar Reasons. . . . . . . . . . 61

VII.   THERE IS NO DILIGENT PROSECUTION BAR. . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

VIII.  RULE 19 DOES NOT REQUIRE DISMISSAL OF THE ESA CLAIMS. . . . . . . . . . . . 63

A.    The Government Agencies Are Not Required Parties. . . . . . . . . . . . . . . . . . . . 64

B.    The Government Agencies Are Not Indispensable Parties under Rule 19. . . . . . 67

IX.    THE PRIMARY JURISDICTION DOCTRINE IS INAPPLICABLE TO THE ESA CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

X.    THE STATE AND MARITIME LAW COUNTS STATE A CLAIM. . . . . . . . . . . . . . 69

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

# TABLE OF AUTHORITIES

**CASES:**

*Alabama v. U.S. Army Corps of Eng'rs*, 441 F. Supp. 2d 1123 (N.D. Ala. 2006) . . . . . . . . . . 37

*Ambraco Inc. v. Bossclip B.V.*, 570 F.3d 233 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*American Frozen Food Institute v. Train*, 539 F .2d 107 (D.C. Cir. 1976) . . . . . . . . . . . . . . . . 21

*Animal Welfare Inst. v. Beech Ridge Energy, LLC*, 675 F. Supp.2d 540 (D. Md. 2009) . . . 18, 52

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Ass'n to Protect Hammersley, Eld, and Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Atl. States Legal Found. v. Buffalo Envelope Co.*, 823 F. Supp. 1065 (W.D.N.Y. 1993) . . . . . . 19

*Atl. States Legal Found. v. Eastman Kodak Co.*, 933 F.2d 124 (2d Cir. 1991) . . . . . . . . . . . . . 48

*Atl. States Legal Found. v. Stroh Die Casting Co.*, 116 F.3d 814 (7th Cir. 1997) *cert. denied*, 522 U.S. 981 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Atl. States Legal Found. v. Tyson Foods, Inc.*, 897 F.2d 1128 (11th Cir. 1990) . . . . . . . . . . . . 51

*August v. Boyd Gaming Corp.*, 135 Fed. Appx. 731 (5th Cir. June 22, 2005) . . . . . . . . . . . 63, 67

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Bennett v. Spear*, 520 U.S. 154 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 14, 15, 65, 66

*Calderon v. Moore*, 518 U.S. 149 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . 40, 50

*Catskill Mtns. Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481 (2d Cir. 2001), *cert. denied*, 549 U.S. 1252 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Chesapeake Bay Found. v. Gwaltney of Smithfield, Ltd.*, 844 F.2d 170 (4th Cir. 1988) . . . . 41, 45

*Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) . . . . . . . . . 57

*Church of Scientology of Cal. V. U.S.*, 506 U.S. 9 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Citizens Against Pollution v. Ohio Power Co.*, 484 F. Supp.2d 800 (S.D. Ohio 2007) . . . . . . . 46

*City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*City of Mesquite v. Aladdin's Castle Inc.*, 455 U.S. 283 (1982) . . . . . . . . . . . . . . . . . . . . . . . . 48

*Coal. for a Sustainable Delta v. City of Stockton*, 2:09-CV-00466-JAM-DAD, 2009 U.S. Dist. LEXIS 74353 (E.D. Cal. Aug. 21, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Coalition for Health Concern v. LWD, Inc.*, 60 F.3d 1188 (6th Cir. 1995) . . . . . . . . . . . . . . . . 46

*Coho Salmon v. Pac. Lumber Co.*, 30 F. Supp.2d 1231 (N.D. Cal. 1998) . . . . . . . . . . . . . . . . 68

*Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351 (8th Cir. 1998) . . . . . . . . 48

*Conn. Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.*, 989 F.2d 1305 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Conn. Nat'l. Bank v. Germain*, 503 U.S. 249 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102 (1980) . . . . . . . . . . . . . 27

*Covington v. Jefferson County*, 358 F.3d 626 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

*Dague v. City of Burlington*, 935 F.2d 1343 (2d Cir. 1991), *rev'd on other grounds*, 505 U.S. 557 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

*Dailey v. Vought Aircraft Co.*, 141 F.3d 224 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Davel Commc'ns, Inc. v. Quest Corp*, 460 F.3d 1075 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . 69

*Dole v. United Steelworkers of America*, 494 U.S. 26 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Dore v. Jefferson Guaranty Bank*, 543 So.2d 560 (La. App. 4th Cir. 1989) . . . . . . . . . . . . . . . 71

*Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141 (9th Cir. 2000) . . . . . . . . . . . . . 51

*English v. Seaboard C.L.R. Co.*, 465 F.2d 43 (5th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Envtl. Conservation Organization v. City of Dallas*, 529 F.3d 519 (5th Cir. 2008) . . . . . . . 47, 48

*Federal Election Comm'n v. Akins*, 524 U.S. 11 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781 (9th Cir. 1995) . . . . . . . . . 52

*Forest Guardians v. U.S. Bureau of Reclamation*, 462 F. Supp. 2d 1177 (D.N.M. 2006) . . . . . 36

*Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Friends of the Earth v. Carey*, 535 F.2d 165 (2nd Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Friends of the Earth v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167 (2000) . . 12, 45, 47, 48, 50, 51

*Gonzalez v. Kay*, 577 F.3d 600 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Gwaltney of Smithfield v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49 (1987) . . 5, 40, 41, 45, 48, 52

*Hallstrom v. Tillamook County*, 493 U.S. 20 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Hamker v. Diamond Shamrock Chem. Co.*, 756 F.2d 392 (5th Cir. 1985) . . . . . . . . . . . . . . . . 41

*Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . 10, 18

*Hensley v. Redi-Med of Mandeville*, 2009 WL 2408319 (E.D. La. 2009) . . . . . . . . . . . . . . . . . 8

*Hood v. City of Memphis*, 570 F.3d 625 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 64

*Hunt v. Wash. State Apple Advertising Comm'n.*, 432 U.S. 333 (1977) . . . . . . . . . . . . . . . 12, 14

*In re Katrina Canal Breaches Consol. Litig.*, No. 05-cv-4182, 2008 WL 4185869 (E.D. La. Sept. 8, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*J.E.M. Ag Supply v. Pioneer Hi-Bred Int'l*, 534 U.S. 124 (2001) . . . . . . . . . . . . . . . . . . . . . . . 56

*La. Envtl. Action Network v. LWC Mgmt. Co.*, Civ. No. 07-0595, 2008 WL 3343006 (W.D. La. Aug. 11, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*La. Envtl. Action Network v. Sun Drilling Products Corp.*, 716 F. Supp.2d 476 (E.D. La. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Lockett v. EPA*, 176 F. Supp.2d 628 (E.D. La. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Loggerhead Turtle v. Cnty. Council of Voluisa Cnty., Fla.*, 148 F.3d 1231 (11th Cir. 1998) . . 15, 37, 54, 66-68

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383 (5th Cir. 2010) . . . . . . . . . 8

*Longoria v. Thaler*, No. C-09-75, 2010 WL 986486 (S.D. Tex. Mar. 16, 2010) . . . . . . . . . . . 11

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 14

*Lutz v. Chromatex, Inc.*, 718 F. Supp. 413 (M.D. Pa. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Marbled Murrelet v. Babbitt*, 83 F.3d 1068 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Matrixx Initiatives, Inc. v. Siracusano*, 2011 WL 977060 (U.S. March 22, 2011) . . . . . . . . . . . 9

*McEvoy v. IEI Barge Services, Inc.*, 622 F.3d 671 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . 24

*Miss. River Revival, Inc. v. City of Minneapolis, Minn.*, 319 F.3d 1013 (8th Cir. 2003) . . . . . . 51

*N.R.D.C. v. Texaco Ref. & Mktg., Inc.*, 2 F.3d 493 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 51

*National Environmental Foundation v. ABC Rail Corp.*, 926 F.2d 1096 (11th Cir. 1991) . . . . . 29

*Niecko v. Emro Mkgt. Co.*, 769 F. Supp. 973 (E.D. Mich. 1991) . . . . . . . . . . . . . . . . . . . . . . 57

*Northwest Environmental Advocates v. U.S. E.P.A.*, 537 F.3d 1006 (9th Cir. 2008) . . . . . . . . 21

*Northwinds Abatement v. Employers Ins.*, 69 F.3d 1304 (5th Cir. 1995) . . . . . . . . . . . . . . . . 69

*Nw. Envtl .Def. Ctr. v. Gordon,* 849 F.2d 1241 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . 47

*Our Children's Earth v. EPA*, 506 F.3d 781 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*O'Shea v. Littleton*, 414 U.S. 488 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Perdue v. Cruse*, 38 So.3d 1235 (La. App. 3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Powell v. McCormack*, 395 U.S. 486 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Pryor Oil Co., Inc. v. U.S.*, 299 F. Supp.2d 804 (E.D. Tenn. 2003) . . . . . . . . . . . . . . . . . . . . 24

*Public Citizen v. Dep't of Justice*, 491 U.S. 440 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Puerto Rico Campers' Ass'n. v. Puerto Rico Aqueduct and Sewer Authority*, 219 F. Supp.2d 201 (D. P.R. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Rathborne v. Rathborne*, Civ. A. No. 04-0938, 2004 U.S. Dist. LEXIS 11806 (E.D. La. June 25, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Raymond Proffit Foundation v. U.S. Army Corp of Engineers*, 175 F. Supp.2d 755 (E.D. Pa. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*S.F. BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153 (9th Cir. 2002), *cert. denied*, 539 U.S. 924 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Save Our Community v. U.S. E.P.A.*, 971 F.2d 1155 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . 12

*Secko Energy, Inc. v. M/V Margaret Chouest*, 820 F. Supp. 1008 (E.D. La. 1993) . . . . . . . . . 24

*Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . 24

*Sierra Club v. Morton*, 405 U.S. 727 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Sierra Club v. Tri-State Generation & Transmission Ass'n, Inc.*, 173 F.R.D. 275 (D.Colo. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Sierra Club v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693 (W.D. Ky. 2003) . . . . . . . . . . . . . . 20, 45

*Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434 (5th Cir. 2001) . . . . . . . . . . . . . . . . . 16

*Sierra Club v. Union Oil Co. of Cal.*, 853 F.2d 667 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . 45

*Sierra Club v. Yeutter*, 926 F.2d 429 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546 (5th Cir. 1996) . . . . 22

*SPPI-Somersville, Inc. v. TRC Companies, Inc.*, No. C 04-2648 SI, consolidated with 07-5824 SI, 2009 U.S. Dist. LEXIS 74464 (N.D. Cal. Aug. 21, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Refining, L.L.C.*, 500 F. Supp.2d 592 (E.D. La. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Refining, LLC*, 348 F. Supp.2d 765 (E.D. La. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

*Stewart-Sterling One, LLC v. Tricon Global Rests., Inc.*, Civ. A. No. 00-477 Section N, 2002 U.S. Dist. LEXIS 15746 (E.D. La. Aug. 9, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 54, 67

*Sw. Ctr. For Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Taylor v. Charter Medical Corp.*, 162 F.3d 827 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) . . . . . . . . . . . . . . . . . . . . . . 35

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Tull v. United Sates*, 481 U.S. 412 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*U.S. Parole Commission v. Geraghty*, 445 U.S. 388 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*U.S. v. Alcan Aluminum Corp.*, 964 F.2d 252 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . 59, 60

*U.S. v. Concentrated Phosphate Export Ass'n.*, 393 U.S. 199, 203 (1968) . . . . . . . . . . . . 47, 48

*U.S. v. Frezzo Bros., Inc.*, 602 F.2d 1123 (3d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*U.S. v. Gayle*, 342 F.3d 89 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*U.S. v. Hamel*, 551 F.2d 107 (6th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*U.S. v. Menasche*, 348 U.S. 528 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*U.S. v. Turkette*, 452 U.S. 576 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Walters v. Metropolitan Educ. Enters., Inc.*, 519 U.S. 202 (1997) . . . . . . . . . . . . . . . . . . . . . . 30

*Walton v. Hammons*, 192 F.3d 590 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Warth v. Seldin*, 422 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 19

*Wash. Trout v. McCain Foods, Inc.*, 45 F.3d 1351 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . 39

*Water Keeper Alliance v. U.S. Dep't of Def.*, 271 F.3d 21 (1st Cir. 2001) . . . . . . . . . . . . . . . . 37

*Weinburger v. Romero-Barcelo*, 456 U.S. 305 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Wilshire Westwood Associates v. Atlantic Richfield Corp.*, 881 F.2d 801 (9th Cir. 1989) . . 56, 57

*Wilson v. Amoco Corp.*, 989 F. Supp. 1159 (D. Wyo. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Young v. Hosemann*, 598 F.3d 184 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**STATUTES:**

16 U.S.C. § 1532(19) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

16 U.S.C. § 1538(a)(1)(B)-(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

16 U.S.C. § 1540(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

16 U.S.C. § 1540(g)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 67

16 U.S.C. § 1540(g)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

33 U.S.C. § 1311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

33 U.S.C. § 1311(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

33 U.S.C. § 1316(a)-(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

33 U.S.C. § 1316(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

33 U.S.C. § 1317(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

33 U.S.C. § 1317(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

33 U.S.C. § 1319(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

33 U.S.C. § 1321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 20

33 U.S.C. § 1321(b)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

33 U.S.C. § 1321(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

33 U.S.C. § 1321(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

33 U.S.C. § 1321(b)(7)(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

33 U.S.C. § 1321(b)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

33 U.S.C. § 1321(b)(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

33 U.S.C. § 1362(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

33 U.S.C. § 1365 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

33 U.S.C. § 1365(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 26

33 U.S.C. § 1365(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

33 U.S.C. § 1365(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

33 U.S.C. § 1365(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

33 U.S.C. § 1365(f)(3)-(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

33 U.S.C. § 2718 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

42 U.S.C. § 6901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

42 U.S.C. § 6901(14) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

42 U.S.C. § 6903(27) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

42 U.S.C. § 6921 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

42 U.S.C. § 9601(14) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

42 U.S.C. § 9601(14)(A)-(F) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

42 U.S.C. § 9601(14)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

42 U.S.C. § 9603(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 54-56

42 U.S.C. § 9659(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

42 U.S.C. § 11004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 61

42 U.S.C. § 11046(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

**PUBLIC LAWS:**

Pub. L. No. 101-380, § 1006, Title I, 104 Stat. 494 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Pub. L. No. 97-304, § 11, 87 Stat. 897 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**REGULATIONS:**

40 C.F.R. § 261.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

40 C.F.R. § 261.4(b)(5) (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

40 C.F.R. § 302.4 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 61

**LEGISLATIVE HISTORY:**

H. Conf. Rep. 101-653 (Aug. 1, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

S. Rep. 92-414 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 28

S. Rep. No. 101-94 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

Hearings Before the Comm. on Public Works, 92d Cong. 165 (1971) . . . . . . . . . . . . . . . . . . . 28

**RULES OF CIVIL PROCEDURE:**

Fed. R. Civ. P. 8(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Fed. R. Civ. P. 12(b)(1) & 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Civ. P. 19(a)(1)(A)-(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Fed. R. Civ. P. 19(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Fed. R. Civ. P. 19(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

**OTHER AUTHORITIES:**

2 WILLIAM H. RODGERS, TREATISE ON ENVIRONMENTAL LAW, 70 . . . . . . . . . . . . . . . . . . . 21, 22

ALAN WRIGHT & FENNETH W. GRAHAM, JR., *FEDERAL PRACTICE AND PROCEDURE* § 5106 (2D ED. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Plaintiffs respectfully submit the following memorandum in opposition to the Motions to Dismiss the pleadings in the "D1 Bundle" filed by Defendants BP Exploration & Production Inc., BP America Production Company and BP p.l.c. ("BP"), Doc 1439, and Transocean Offshore Deepwater Drilling, Inc., Transocean Holdings LLC, Transocean Deepwater, Inc. and Triton Asset Leasing GmbH ("Transocean"), Doc 1407.

May It Please the Court:

The D1 Master Complaint filed in this matter, Doc. No. 880 ("D1 Master Compl."), seeks injunctive relief against BP Exploration and Transocean Drilling and their related companies ("BP" and "Transocean" or collectively "Defendants") under the Clean Water Act ("CWA" or the "Act"), the Endangered Species Act ("ESA"), the Emergency Planning and Community Right-to-Know Act ("EPCRA"), the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), and maritime and state law.[1]

BP and Transocean have moved to dismiss all claims in the D1 Master Complaint on similar but not identical grounds. *See* BP Defendants' Memorandum in Support of Motion to Dismiss, Doc. No. 1439-1, pp. 1-5 ("BP Mem."); Brief in Support of the Transocean Defendants' Motion to Dismiss, Doc. No. 1407-1, pp. 1-8 ("Transocean Mem."). This opposition addresses both motions to dismiss.

---

[1] The D1 Master Complaint, per the Court's Pretrial Order No. 11 (Doc. 569), includes the following:

> **D. Injunctive and Regulatory Claims.** These claims brought by private parties challenging regulatory action or authority and/or seeking injunctive relief will each be pled pursuant to Master Complaints as delineated below, and will include the following types of claims:

> **D1. Claims Against Private Parties.** These claims will be pled separately and uniformly in a Master Complaint.

As set out below, the D1 Master Complaint and the underlying complaints are more than sufficient to meet the standards set by the Federal Rules of Civil Procedure and the applicable caselaw.  The motions to dismiss should be denied.

## INTRODUCTION

As part of its orchestrated campaign to shut out members of the public from knowing the full extent of the devastation it has wreaked upon the Gulf of Mexico and its inhabitants, BP now seeks to exclude the public from the legal efforts to hold it accountable.  But just as former BP Chief Executive Officer ("CEO") Tony Hayward's statement that "[t]he Gulf of Mexico is a very big ocean . . . [t]he amount of volume of oil and dispersant we are putting into it is tiny in relation to the total water volume"[2] was one of the more cavalier misstatements of fact in recent history, BP now grossly misstates the legal standards on which its seeks dismissal.  In fact, BP and Transocean openly misstate numerous key legal standards on which they base their motions.[3] BP similarly relies on self-serving factual statements to support its arguments.  Such statements, however, are flatly contradicted by the findings of government and industry investigations, including the President's Oil Spill Commission and BP's own investigative reports.  The

---

[2]  BP Parties' Responses and Objections to Plaintiffs' Interrogatories, Requests for Production, and Requests for Admission, Response to Request for Admission No. 30, pp. 280-81, LN File & Serve Doc. No. 34758413.

[3]  The following misstatements are the most egregious: 1) *Gwaltney* ( BP Mem. at 26); 2) mootness (BP Mem. at 26); 3) unavailability of civil penalties (BP Mem. at 27); 4) relying on a case – *Hamker (*BP Mem. at 27) - that has been effectively overturned by the Supreme Court in *Gwaltney*; 5) EPCRA standard for ongoing violations for failure to report (BP Mem. at 29-30); 6) incorrect statements of the judicial notice standards; (BP Mem. at 10-11) and 7) implying that *Forest Conservation Council* and *Animal Welfare Institute* establish that ESA citizen suits are *only* available to enjoin future violations of the ESA (BP Mem. at 29). These blatant misrepresentations of the law are in addition to numerous other misrepresentations of the law, mischaracterizations of the D1 Master and underlying pleadings and factual cherry-picking by BP that will be pointed out throughout this response.

incontrovertible conclusions from these reports undermine the wobbly factual underpinnings BP uses to support its motion.[4]

Given the variety of differing issues raised by BP's and Transocean's motions to dismiss, the D1 Plaintiffs have divided this Response into ten sections.  A summary of these sections illustrates why Defendants' motions must be denied in their entirety.

**First**, BP and Transocean fail to properly cite and apply the standards governing motions to dismiss under Fed. R. Civ. P. 12(b)(1) & 12(b)(6).  Application of the correct standards requires the denial of Defendants' motions to dismiss.  To defeat a preliminary motion to dismiss, a well-pled complaint must merely allege facts sufficient enough to "nudge" the claims contained therein "across the line from conceivable to plausible."  Tellingly, if the well-pled facts of the D1 Master Complaint – facts that specifically detail BP's and Transocean's starring roles in creating the worst oil spill in United States history – cannot satisfy this low burden, then no case will ever defeat a motion to dismiss under the relevant standards.  BP's attempt at "informing" the Court about the procedures for taking judicial notice fail for similar reasons.

**Second**, BP makes a blanket attack on the D1 Plaintiffs' standing by arguing that the relief sought in the D1 Master Complaint is incapable of redressing Plaintiffs' injuries.[5]  The well-established principles of constitutional standing clearly run counter to BP's arguments.

_____

[4] BP's reliance upon extra-judicial evidence prompted the D1 Plaintiffs to include certain materials in this response which exist outside of the facts pled in the D1 Master Complaint.  These materials are cited throughout to rebut BP's erroneous assertions.  To the extent the Court wishes to go beyond the pleadings – which is not necessary given the stage of the proceedings and the veracity of the allegations contained in the D1 Master Complaint – it may examine the relevant exhibits attached to the Declaration of Daniel C. Snyder (hereinafter "Snyder Decl.")

[5] While unnecessary at this early pleading stage, the standing of certain Plaintiffs is provided, where necessary, in the declarations of designated members of the Center for Biological Diversity (the"Center").  *See* Declarations of Center members and staff provided with the Center's Motion for Partial Summary Judgment on Liability.  Standing was also pled in the D1 Master Complaint as injury to organizations and their members, as well as in more detail in the underlying complaints.  *See, e.g.,* Master Compl. at 5, ¶ 5, pp. 26-27, ¶¶ 125-126; Doc. No. 1, pp. 5, ¶ 12-13, pp. 11-12, ¶ 58, 2:10-cv-02454, E.D. La., Aug. 4, 2010 ("CBD II") .  For BP to argue that Plaintiffs did not plead the standing requirements illustrates Defendant's penchant for ignoring what is plainly before them.

Furthermore, BP's and Transocean's failure to report the release of crude oil, methane, and other hazardous substances from the Macondo well and the *Deepwater Horizon* under EPCRA's emergency notification provisions causes Plaintiffs' ongoing, undeniable injury-in-fact.  With regard to the ESA claims, nothing offered by BP establishes that injuries to listed species in the Gulf are, in fact, being redressed.

**Third**, Defendants try to shield themselves from liability by claiming that citizens have no cause of action under § 311 of the CWA, 33 U.S.C. § 1321.  But as explained in Section III, a violation of § 311 is necessarily a concomitant violation of the general prohibition against the discharge of pollutants contained in § 301 of the Act, 33 U.S.C. § 1311 – a prohibition which citizens *are* allowed to enforce.  The very structure of the CWA supports this construction, as it empowers the Court to impose penalties against Defendants under *either* the Act's general penalty provision or the higher, volumetric penalty provision prescribed by Congress for oil spills.  Indeed, BP does not even contest the availability of declaratory relief on liability under § 301 of the Act.

**Fourth**, BP and Transocean argue that the D1 Plaintiffs, including the Center for Biological Diversity (the "Center") and the ESA Plaintiffs, including the Defenders of Wildlife ("Defenders"), failed to provide the requisite pre-suit notices under the relevant environmental statutes.  Defendants' arguments, however, ignore the plain facts before them.  Notice *was* properly sent to the Defendants prior to the filing of the Center's and the ESA Plaintiffs' underlying complaints, and was pled in the D1 Master Complaint.  With respect to the Center's CWA claims, the immediate notice provisions of §§ 306 and 307 were properly invoked based

on the nature and enormity of the discharges.[6]  The ESA Plaintiffs' notice letter provided detailed statements of the injuries to listed species resulting from BP's release of oil and use of dispersants.  As to Transocean's specific arguments, any attempt to dismiss at this early stage must be denied as premature, as there is ongoing discovery regarding the Court's power to exercise personal jurisdiction over Transocean Ltd.

**Fifth**, BP attempts to achieve dismissal by conflating multiple, and separate, legal principles.  First, BP fails to properly explain or apply the Supreme Court's holding in *Gwaltney of Smithfield v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 57 (1987) (hereinafter "*Gwaltney*").  The correct standard for whether a citizen enforcement action defeats a motion to dismiss is whether there was a violation on the day of filing or after the complaint was filed *or* whether there was a reasonable likelihood of continuing violations *at the time the complaint was filed*.  Plaintiffs have gone well beyond the requirements of making good faith allegations of ongoing violations at the pleading stage by showing, for instance, that discharges occurred well after the initial complaint was filed by the Center on June 18, 2010, and occurred after the amended complaint and protective complaint were filed in early August 2010.[7]  At the very least, there was a clear, not just reasonable, likelihood of continuing discharges from the well and containment efforts in early August.  *See* Section V, *infra*.  The existence of such basic facts defeats any motion to dismiss at the pleading stage.  Second, the mootness issues raised by BP

---

[6] Even if the Court finds that the immediate notice provisions were not available in this case, an issue the Center discusses at length in Section IV.A herein, the amended complaint filed on August 2 and the new complaint filed on August 4 were past the 60-day notice window, thereby providing an alternative grounds for the Court to deny the Defendants' motions to dismiss.

[7] The Center has cross-moved for Partial Summary Judgment on Liability, which asks the Court to declare that the BP and Transocean Defendants are strictly liable for violating §§ 301 and 311 of the Clean Water Act.  Many of the issues in this Response overlap with the legal issues more fully set forth in the related Motion for Partial Summary Judgment.  For purposes of judicial economy, references are made to the partial summary judgment filings where appropriate.

are disposed of by reference to the proper standards set forth by a long line of Supreme Court

cases.  Once citizens pass the requirements of *Gwaltney*, the burden shifts squarely to Defendants

to prove the heavy burden of mootness.  *See* Section V.C *infra*.  The availability of the

imposition of civil penalties and the continuing injuries suffered by Plaintiffs provide the

necessary nexus to defeat BP's mootness arguments.[8]  Thus, BP cannot meet its heavy burden in

this case.

With regard to the ESA claims, BP misunderstands the nature of the ESA violations that

it faces in the D1 Master Complaint.  The Plaintiffs allege ongoing "take" of threatened and

endangered species in the Gulf, violations of the ESA which did not end when the Macondo well

was "killed" and have not abated in the following months.  Furthermore, the ESA claims are not

moot because the Court can draw upon its traditional equitable authority to redress the Plaintiffs'

injuries.

**Sixth**, BP and Transocean argue that the D1 Plaintiffs lack a cause of action under

EPCRA and CERCLA because petroleum, crude oil, and its fractions are exempt from the

definition of "hazardous substance" and therefore from coverage under the statute.  This

argument fails because (1) the plain language of CERCLA defines "hazardous substances" as

including "specifically listed" fractions of crude oil; and (2) Defendants' injection of hazardous

substances into the Macondo well negates the ability to claim protection under the petroleum

---

[8] BP generally asserts, BP Mem. at 5-6, that because of the enormity of the federal response and orders for clean up [pursuant to CWA § 311], that there could be no possibility of injunctive relief from the D1 Plaintiffs.  The enormity of the response, however, is required because of the enormity of the disaster.  As this Court is no doubt aware from the Katrina Hurricane disaster and its aftermath, a *large* response does not equate to a *sufficient* response.  Serious questions of fact remain that preclude any dismissal of injunctive claims at the pleading stage.  It should also be noted the United States pled for injunctive relief in its December 15 Complaint, Doc. No. 1, p. 26, ¶ 3, 2:10-cv-04536 (E.D. La. Dec. 15, 2010), more than 6 months after the Center filed its initial complaint and more than 4 months after BP claimed the spill ended.

exclusion to which they cite.

**Seventh**, Defendants curiously invoke the CWA's diligent prosecution bar.  These arguments demonstrate a disregard for the facts of this case, as the complaints underlying the D1 Master Complaint were filed *before* any government action commenced.

**Eighth**, BP's argument that the government agencies are required parties under Rule 19 ignores the nature of the relief sought be the Plaintiffs.  Furthermore, BP fails to grasp an essential element of a proper dismissal under Rule 19: the joinder of a required party must defeat the subject-matter jurisdiction of the Court.  Because the government agencies are neither required parties nor indispensable parties, BP's arguments for dismissal based on Rule 19 are fatally flawed.

**Ninth**, BP's argument that the primary jurisdiction doctrine requires dismissal of the Plaintiffs' ESA claims ignores case-law from numerous courts, including the Eastern District of Louisiana, holding that citizen-suits brought pursuant to the federal environmental statutes are not barred by primary jurisdiction.  In the ESA's citizen suit provision, Congress clearly instructed the courts to entertain claims brought by citizens for violations of the Act, while specifying a narrow set of circumstances, none of which are present here, when such claims would be precluded.

**Tenth**, BP and Transocean allege that all maritime and state law claims are pre-empted by the Oil Pollution Act, and adopt by reference the legal arguments they have made in their motion to dismiss the B1 Master Complaint.  The D1 Plaintiffs likewise incorporate by reference the response to these arguments.  In addition, it is clear that the D1 Master Complaint adequately pleads the injury necessary for an injunction, and that state law principles afford a basis for

injunctive relief apart from money damages.

Additional issues of sufficiency of pleading, availability of injunctive relief, and whether civil penalty discussions may be raised in the D1 Master Complaint are all misguided attempts to force citizens out of these cases.  The Defendants' omnibus motions to dismiss public efforts to hold them accountable should be denied.

## ARGUMENT

I.    **THE DEFENDANTS INCORRECTLY PORTRAY THE RELEVANT STANDARDS GOVERNING MOTIONS TO DISMISS AND JUDICIAL NOTICE.**

BP and Transocean incorrectly portray the standards governing a motion to dismiss.  BP also glosses over the law of judicial notice, as discussed below.  A motion to dismiss under Fed. R. Civ. Proc. 12(b)(1) and 12(b)(6) tests "whether the plaintiff has stated a legally cognizable claim that is plausible."  *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).[9]  In analyzing such motions, courts follow a two-prong approach.  Under the first prong, courts identify the well-pled facts of the complaint.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009).  While well-pled facts must not contain bare legal conclusions, s*ee id*., detailed factual allegations are not required; rather, a complaint must simply contain "a short and

---

[9] The standards for 12(b)(1) and 12(b)(6) motions are substantially similar.  *Hensley v. Redi-Med of Mandeville*, 2009 WL 2408319 at *2 (E.D. La. 2009) (Barbier, J.).  The pleading standard under a 12(b)(1) motion, however, is less strict than that under 12(b)(6).  *See Young v. Hosemann*, 598 F.3d 184, 188 (5th Cir. 2010) (citing *Williamson v. Tucker*, 645 F.2d 404, 415-416 (5th Cir. 1981) (en banc)).  Thus, at this preliminary stage of the litigation the Court may rely on the bare allegations contained in the D1 Master Complaint for purposes of establishing constitutional standing.  *See Bennett v. Spear*, 520 U.S. 154, 167-68 (1997) (observing that "each element of Article III standing must be supported...with the manner and degree of evidence required at the successive stages of the litigation" and that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice.")(quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  While the Court may also rely on facts found outside of the pleadings, all the facts must still be viewed in a light most favorable to the plaintiff.  *Ambraco Inc. v. Bossclip B.V.*, 570 F.3d 233, 237 (5th Cir. 2009).  Thus, where a complaint asserts a cognizable federal claim on its face, as the D1 Master Complaint does here, dismissal for want of jurisdiction under 12(b)(1) is disfavored. *See Young*, 598 F.3d at 188.  In addition, certain D1 Plaintiffs have provided standing declarations that go beyond the legal requirements at this stage.  *See, e.g.*, Declarations filed with the Center's Mot. Part. Sum. Judgment. *See also*, Standard of Review Section of Plaintiffs' opposition memoranda to the B1 and B3 Master Complaints.

plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Once identified, the well-pled facts must be accepted as true and viewed in the light most favorable to the non-moving party. *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009). The second prong requires courts to determine next whether the facts plausibly give rise to an entitlement for relief. *Iqbal*, 129 S. Ct. at 1950. A complaint satisfies this requirement when the facts merely "nudge[]" the claims contained therein "across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim passes this low threshold if the factual content pled therein allows the court to draw a "reasonable inference" that the defendant is potentially liable for its alleged misconduct. *See Iqbal*, 129 S. Ct. at 1949. The Supreme recently confirmed these standards in *Matrixx Initiatives, Inc. v. Siracusano*, 2011 WL 977060 (U.S. March 22, 2011), finding that the allegations in a securities law complaint "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Slip op. at 12 (quoting *Iqbal*).

BP's and Transocean's contention that the well-pled facts of the D1 Master Complaint fail to survive the plausibility standard is absurd. While BP may share Mr. Hayward's his sentiments that the environmental impacts of the spill are likely to be "very, very modest," the present motion to dismiss is not BP's ticket out of this litigation nor will it shield BP from its undeniable liability.[10] Indeed, BP has openly admitted and corroborated the pertinent facts underlying the claims of the D1 Master Complaint. See *supra* Section V; see also LN File & Service Doc. No. 34758413, pp. 288 & 341 (BP's discovery responses affirming that there was

---

[10] BP Parties' Responses and Objections to Plaintiffs' Interrogatories, Requests for Production, and Requests for Admission, Response to Request for Admission No. 28 & 29, pp. 279-80, LN File & Serve Doc. No. 34758413 (admitting that BP CEO Tony Hayward stated that he believed the environmental impact of the spill to be "very, very modest").

an uncontrollable discharge from the Macondo well and that the discharge released vast amounts

of oil and other substances into the Gulf of Mexico); BP Mem. at 30 (admitting that the relief

well was completed nearly five months after the initial explosion, on September 19, 2010).

Transocean also does not contest these facts, nor that it was the owner and operator of the

*Deepwater Horizon*.  If the magnitude and veracity of these facts cannot "nudge" the D1 Claims

from conceivable to plausible, then no case will ever survive a motion to dismiss under *Iqbal* and

*Twombly*.

     Additionally, BP asks the Court to judicially notice certain facts throughout its motion to

dismiss.  At no point, however, does BP cite the relevant law underpinning judicial notice.[11]

Pursuant to Fed. R. Evid. 201(b), only those facts which are (1) generally known within the

territorial jurisdiction of the court or (2) are capable of accurate and ready determination by resort

to sources whose accuracy cannot reasonably be questioned may be judicially noticed.  The facts

to be noticed must be "indisputable," that is, "self-evident truth[s] that no reasonable person

could question…truisms that approach platitude[s] or banalit[ies]."  *Taylor v. Charter Medical

Corp.*, 162 F.3d 827, 830 n.18 (5th Cir. 1998) (citing *Hardy v. Johns-Manville Sales Corp.*, 681

F.2d 334, 347-8 (5th Cir. 1982).  Where there is evidence on both sides of an issue, the matter is

subject to reasonable dispute.  *Hardy*, 681 F.2d at 348.

     The facts BP urges the Court to notice include, among other contentious issues, (1) that

there is no reasonable possibility that there will be any future release from the "now-shut" well;

and  (2) that at all times BP participated as a key member of the Unified Command and followed

---

[11] BP makes a bare citation to *In re Katrina Canal Breaches Consol. Litig.*, No. 05-cv-4182, 2008 WL 4185869 at *2 (E.D. La. Sept. 8, 2008).  In that case, the Court simply ruled that it had not committed error by judicially noticing the legislative intent of certain Acts of Congress.  *Id*. at *3.  What application this has to the "facts" BP seeks to have noticed is left unaddressed by its motion to dismiss.

the directives of the National Incident Commander.  *See* BP Mem. at 20 & 30.  These facts, though not "adjudicative,"[12] are nonetheless far from indisputable.  Indeed, reasonable persons can *easily* question whether there will be future releases from the Macondo well, especially given BP's stated intent to return to the reservoir.[13]  Additionally, while the Court may take judicial notice of the *existence* of a response to the oil spill, it cannot accept as a matter of judicially noticed fact BP's assertion that the Gulf cleanup will redress the injuries to threatened and endangered species and the Plaintiffs' interests in such species.  Given these blatant shortcomings, and pursuant to Fed. R. Evid. 201(e), the D1 Plaintiffs respectfully request that the Court provide prior notice of any fact it intends to judicially notice, such that Plaintiffs have an opportunity to conduct discovery on such matters and present arguments as to the propriety of taking judicial notice of facts proffered by BP.

## II.  THE D1 PLAINTIFFS HAVE CONSTITUTIONAL STANDING TO MAINTAIN THEIR CLAIMS UNDER THE CWA, EPCRA, CERCLA, AND THE ESA.

BP makes three scattered arguments concerning standing: (1) that the Center cannot show its injuries will be redressed through a favorable court decision; (2) that the ESA Plaintiffs lack standing because their injuries are already being redressed by the Unified National Command; and (3) that the Center's members have no interest in the data collected under EPCRA.  As discussed below, BP's arguments are based upon flawed law and fact.

---

[12] Only "adjudicative" facts may be judicially noticed.  Fed. R. Evid. 201 advisory committee's note.  Facts that make up a party's arguments, such as BP's "facts," are not adjudicative in nature.  *See Longoria v. Thaler*, No. C-09-75, 2010 WL 986486 at *2 (S.D. Tex. Mar. 16, 2010).  Geographic, historical, political, economic, sociological, and other similar facts are the type of facts properly noticed under Fed. R. Evid. 201.  *See* ALAN WRIGHT & FENNETH W. GRAHAM, JR., *FEDERAL PRACTICE AND PROCEDURE* § 5106 (2D ED. 2010).

[13] Comments by BP Chief Operating Officer Doug Suttles, BP Press Conference, August 6, 2010 ("[T]here's lots of oil and gas" remaining in the reservoir, such that BP will have to "think about what to do with that at some point.").  *See* Snyder Decl., Exhibit E, p. 1.

### A.    The Injuries Sustained by the Center's Members will be Redressed by a Favorable Court Decision.

Contrary to BP's unsupported assertions, the injuries sustained by the Center's members will be redressed by a favorable court decision.  One requirement for an organization to have standing is that its members must otherwise have standing to sue in their own right.[14]  *Hunt v. Wash. State Apple Advertising Comm'n.*, 432 U.S. 333, 343 (1977).  For an individual to have standing, he or she must show that (1) he or she suffered an "injury in fact," (2) that is "fairly traceable" to the defendant's activity, and (3) that the individual's injuries are likely to be redressed by a favorable decision.  *See Save Our Community v. U.S. E.P.A.*, 971 F.2d 1155, 1160-61 (5th Cir. 1992) (internal citations omitted) (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982)).

BP does not contest that its actions caused the numerous injuries sustained by the Center's members, i.e., injury-in-fact and traceablity.  Rather, it only alleges that those injuries cannot be redressed by this Court.  "The redressability factor focuses upon the connection between the plaintiff's injury and the judicial relief sought."  *Save Our Community*, 971 F.2d at 1161.  In the context of the CWA, the redressability factor is satisfied whenever the plaintiff seeks an award of injunctive relief, remedial relief, or civil penalties, all of which were pled by the Center.[15]  *See Friends of the Earth v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 185-186 (2000).  Indeed, the Center's members have sustained injuries that will directly be redressed by the relief sought in the D1 Master Complaint. *See*, e.g., Decls. of G. Scott, ¶¶ 6-9,

---

[14] Neither BP nor Transocean dispute the Center's organizational standing to maintain this case.

[15]  The Center seeks a declaratory judgment, injunctive relief, remedial relief, civil penalties, the divulgement of information related to the spill, costs including attorney fees and expert witness fees, and such other relief as the Court deems appropriate.  *See* Doc. No. 1, pp. 19-21, 2:10-cv-01768 (E.D. La. June 18, 2010) ("CBD I"); CBD II, pp. 19-21.  The D1 Master Complaint seeks even more expansive relief.  Doc. No. 880, pp. 41-43.

11; A. Sondak, ¶¶ 8-10, 16; C. Craigs, ¶¶ 5-8  filed with the Center's Motion for Partial

Summary Judgment.

In making its ill-fated argument, BP asserts that the injunctive relief sought by the D1

Plaintiffs is "fruitless," because there is no longer a massive leak emanating from the Macondo

well or a facility from which any future release could occur.  BP Mem. at 37.  BP ignores the

relief sought in the D1 Master Complaint, which includes: enjoining the Defendants from adding

any further pollutants to the Gulf of Mexico; requiring Defendants to fully and completely report

all hazardous substances already released by the well or the *Deepwater Horizon*; authorizing

Plaintiffs to sample any discharged pollutants from the wells, costs to be borne by Defendants;

ordering Defendants to remove the oil and other pollutants from the water, sediments, and coastal

areas of the Gulf; and ordering Defendants to pay for the costs of any environmental restoration

and remediation.  Master Compl., pp. 41-43.  This type of relief will redress the injuries of the

D1 Plaintiffs by speeding up the remediation and restoration process, which at its current state

could take years, if not decades, to fully accomplish.  The fact that the United States asks for

injunctive relief in its much later filed complaint also provides support for the citizen-Plaintiffs'

request for injunctive relief.  Doc. No. 1, p. 26, ¶ 3, 2:10-cv-04536 (E.D. La. Dec. 15, 2010).

Moreover, comments from BP's Chief Operating Officer suggest that the company does have

plans to return to Macondo in the future.[16]  As such, BP's argument is meritless.

### B.    The ESA Plaintiffs' Citizen Suit will Redress the ESA Claims.

The Plaintiffs' citizen suit will redress the ESA claims.  In Section IV.B. of its

memorandum, BP argues that because the Plaintiffs do "not assert any deficiency in the federal

---

[16] *See supra* n. 14.

and state remediation efforts already underway," the Plaintiffs' ESA claims should be dismissed

for failure to satisfy the redressability prong of the Article III standing inquiry.  BP Mem. at 38.

According to BP, the ESA claims are "already being redressed."  BP Mem. at 37.  Applying the

Rule 12(b)(1) standard of review, BP's redressability arguments fail for at least two reasons.

First, the ESA Plaintiffs sufficiently allege Article III standing — ongoing injuries to their

members' interests in listed species, causation, and redressability — at the pleading stage of this

litigation.  Second, BP fails to identify how, if at all, the alleged general cleaning up of the Gulf

will specifically and invariably ameliorate all the harms to listed species that are at the core of the

ESA complaint.  In conclusion, whether or not the Gulf cleanup is recovering listed species and

fully redressing the ESA claims is a detailed factual issue that cannot be resolved at this stage of

the litigation.  For these reasons, BP's motion to dismiss based on Section IV.B. of its

memorandum must be denied.

> **1.      The ESA Plaintiffs sufficiently allege the elements of Article III
> standing at the pleading stage of this litigation and the Court can
> draw upon its traditional equitable powers to redress their claims.**

The ESA Plaintiffs sufficiently allege the elements of Article III standing — injury-in-

fact, causation, and redressability — at the pleading stage of this litigation.  *See Bennett*, 520

U.S. at 167-68 (observing that "each element of Article III standing must be supported . . . with

the manner and degree of evidence required at the successive stages of the litigation" and that "at

the pleading stage, general factual allegations of injury resulting from the Defendant's conduct

may suffice.") quoting *Lujan*, 504 U.S. at 561; *Warth v. Seldin*, 422 U.S. 490, 527 (1975); *see

also Hunt*, 432 U.S. at 343 (identifying the elements of associational standing). The Plaintiff

organizations allege injuries to their members' scientific, recreational, and aesthetic interests in

listed species caused by the Gulf oil spill, that such injuries are ongoing because the oil released from Macondo well "has caused and will continue to cause the take" of listed species, and that "[t]his Court can remedy Plaintiffs' members' injuries caused by BP by granting the relief requested in this Complaint."  *Defenders of Wildlife v. BP, p.l.c.*, Civ. A. No. 2:10-cv-03879-CJB-SS at ¶¶ 6-11 (E.D. La. Oct. 20, 2010) (hereafter, the "ESA Complaint").  They request injunctive relief and offer examples as to the specific type of injunctive relief that would help redress their injuries.  ESA Compl. at ¶ 74.  This is more than adequate for standing at the pleading stage.  *See Bennett*, 520 U.S. at 167-68; *Lujan*, 504 U.S. at 561; *Warth*, 422 U.S. at 527; s*ee, e.g.*, *Coal. for a Sustainable Delta v. City of Stockton*, 2:09-CV-00466-JAM-DAD, 2009 U.S. Dist. LEXIS 74353 at *3-5 (E.D. Cal. Aug. 21, 2009) (finding ESA claims redressable where the plaintiffs requested that "the Court enjoin San Joaquin County from violating the ESA and the MS4 Permits and order injunctive relief" (internal quotations omitted)).

BP does not argue that the Court does not have the authority to redress the ESA claims, nor can it.  "The ESA does not limit the injunctive power available in a citizen suit" and grants "a district court the full scope of its traditional equitable injunctive powers."  *Strahan v. Coxe*, 127 F.3d 155, 170 (1st Cir. 1997); *see also Weinburger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.") (internal quotations and citations omitted); *Loggerhead Turtle v. Cnty. Council of Voluisa Cnty., Fla.*, 148 F.3d 1231, 1254 (11th Cir. 1998) (finding that "the district court in this case has available a wide range of effective injunctive relief" to remedy ESA violations).

The purposes of the ESA support this broad grant of equitable power.  The Supreme Court has observed that "examination of the language, history, and structure of the [ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities" and that Congress's purpose "was to halt and reverse the trend toward species extinction, whatever the cost."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174, 184 (1978); *see also Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 438 (5th Cir. 2001) ("[T]he objective of the ESA is to enable listed species not merely to survive, but to recover from their endangered or threatened status.").  Within this statutory framework, the Court can fashion equitable injunctive relief to remedy the Defendants' ESA violations.  The Plaintiffs have suggested relief that would help redress their injuries, including among others: ordering BP to take specific measures to ameliorate and mitigate the effects of their release of oil on listed species, e.g., by establishing protected areas removed from oiled areas.  ESA Compl. at ¶ 74.  For this first reason, BP's motion to dismiss based on Section IV.B. of its memorandum must be denied.

> ## 2.     BP's generic assertion that the spill is being cleaned up does not establish that the injuries to listed species will be redressed.

BP's generic assertion — which itself involves controverted factual allegations outside of the complaint — that the spill is being cleaned up, does not begin to demonstrate that the specific ESA claims are, or will be, fully addressed in the absence of the Plaintiffs' requested relief.  Thus, even if the Court were to accept at face value BP's assertion of facts outside the complaint, BP's general statements do not establish that the cleanup will fully redress the injuries to listed species.  In fact, Exhibit J to BP's memorandum expressly recognizes the limitations of the

cleanup: "response actions employed for this spill include in situ burning, dispersant applications, containment, and skimming of oil, and removal operations.  These response actions have not addressed and are not expected to address all injuries resulting from the discharges of oil."  BP Mem., Ex. J at 4.  BP makes no effort in its memorandum to identify a single specific project, action, or remedial effort that has been completed, is underway, or even planned, as part of the Gulf cleanup that is redressing the injuries to listed sea turtles, manatees, piping plovers, and sperm whales.  Because BP only offers unwarranted conclusions regarding listed species, its argument that the ESA Plaintiffs do not "assert any deficiency in the federal and state remediation efforts already underway," BP Mem. at 38, is irrelevant.

As an initial matter, the Plaintiffs note that although BP's redressability arguments strongly imply that natural resource damage assessments preclude ESA citizen suits, it never directly makes this claim.  BP cannot make such an argument.  Congress created the natural resource damage assessment process in the Oil Pollution Act of 1990, Pub. L. No. 101-380, § 1006, Title I, 104 Stat. 494 (1990) ("OPA"), seventeen years after the enactment of the ESA, Pub. L. No. 97-304, § 11, 87 Stat. 897 (1973).  Had Congress intended to bar ESA citizen suits like the present case when a natural resource damage assessment is underway, it could have done so.  In addition, BP admits that, notwithstanding the current natural resource damage assessment, the federal government has specifically reserved its rights to bring a claim for equitable relief and penalties under the ESA.  *See* BP Mem. at 9.

Furthermore, whether cleanup efforts will even reduce the ongoing take of listed species is unknown, may be unknown for years, and, at the very least, is subject to factual dispute.  Exhibit J to BP's memorandum acknowledges that: "discharged oil and the response activities to

RESP.  TO MOTIONS TO DISMISS BUNDLE  D1 COMPLAINT                    Page 17

address the discharges of oil have resulted in adverse effects on natural resources in and around the Gulf of Mexico" and "[t]he full extent of potential injuries is currently unknown, and may not be known for many years."  BP Mem., Ex. J to Clark Decl. at 3.  BP itself acknowledges that the results of the cleanup are uncertain: "We are going to make sure this well is killed, make sure the oil on the surface is responded to, and make sure that shores are clean . . . *how clean is clean is something that we will develop* with our local leaders and the trustees of all the resources that are applied as we move forward."  BP Mem. at 38 n. 15 (quotes of Admiral Allen)(emphasis added).

BP has not asserted, nor can it, that restoration efforts have fully remedied the ongoing take of listed species, or will at some definite point in the future.[17]  *See* 16 U.S.C. § 1532(19) (defining take as meaning to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct").  While the Court may take judicial notice of the existence of the oil spill response, it cannot take judicial notice of BP's asserted outcome of the cleanup: that the injury to listed species will be fully redressed.  *See, Hardy*, 681 F.2d at 347-48 (finding the district court abused its discretion when taking judicial notice that "asbestos causes cancer, because [this proposition] is inextricably linked to a host of disputed issues").

The Rule 12(b)(1) inquiry requires that the Court accept the uncontroverted allegations of the complaint as true and that disputed facts be capable of resolution.  *See Rathborne v. Rathborne*, Civ. A. No. 04-0938, 2004 U.S. Dist. LEXIS 11806 at *4-5 (E.D. La. June 25, 2004).  Nothing offered by BP controverts the allegations made by the Plaintiffs.  Whether the current government-run cleanup will fully redress the Plaintiffs' ESA claims cannot be evaluated without

---

[17] In *Animal Welfare Inst. v. Beech Ridge Energy, LLC*, 675 F. Supp.2d 540, 554, n.15 (D. Md. 2009), the court observed that the Fish and Wildlife Service recommended adaptive management, "a process of iterative decision-making, with the aim to reduce uncertainty over time through monitoring," to evaluate impacts to listed species.

further detailed factual development, and cannot be resolved at this stage of the litigation.[18]  For this second reason, BP's motion to dismiss based on Section IV.B. of its memorandum must be denied.[19]

### C.    BP's and Transocean's Failure to Report the Release of Hazardous Substances under EPCRA Causes Plaintiffs An Informational Injury-in-Fact.

The D1 Plaintiffs, including their organizational and individual members, have sustained an injury-in-fact caused by BP's and Transocean's continuing failure to report the releases from the *Deepwater Horizon* and the Macondo well under EPCRA's emergency notification provisions.  42 U.S.C. § 11004.  It is well established that an Article III injury may exist solely by virtue of "statutes creating legal rights, the invasion of which creates standing."  *Warth*, 422 U.S. at 500 (citing *Sierra Club v. Morton*, 405 U.S. 727 (1972)).  An injury-in-fact therefore occurs whenever a "plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute," such as EPCRA.  *See Federal Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) (citing *Public Citizen v. Dep't of Justice*, 491 U.S. 440, 449 (1989)); *see also Atl. States Legal Found. v. Buffalo Envelope Co.*, 823 F. Supp. 1065, 1068-71 (W.D.N.Y. 1993).

Contrary to BP's unsupported claims, BP Mem. at 40, the D1 Plaintiffs do indeed have members who make economic, recreational, and other uses of the Gulf of Mexico and its

---

[18] BP claims that the *SPPI-Somersville* "analysis is worth quoting at length" (BP Mem. at 37) in support of its redressability arguments, but unlike the present case, the district court decided *SPPI-Somersville* on cross motions for summary judgment.  *SPPI-Somersville, Inc. v. TRC Companies, Inc.*, No. C 04-2648 SI, consolidated with 07-5824 SI, 2009 U.S. Dist. LEXIS 74464 (N.D. Cal. Aug. 21, 2009).  The court received proof in the form of declarations establishing that: (i) the contaminated groundwater at issue was the subject of a remedial action plan and a consent order containing detailed remedial activities and (ii) the plan and order had been in effect and adhered to for eight years.  *Id.* at *44-48.

[19] BP also argues that ongoing cleanup activities are under the control of various government agencies.  However, Plaintiffs are not challenging any government cleanup activities.  As is specified in their ESA notice letter, the ESA Plaintiffs allege "take" of listed species as a result of BP's release of oil from the Macondo well and its use of dispersants in the Gulf of Mexcio.  As such, no government control is involved.

RESP.  TO MOTIONS TO DISMISS BUNDLE  D1 COMPLAINT                    Page 19

surrounding areas. *See, e.g.*, Decls. of A. Sondak, ¶¶ 5-10; C. Celano, ¶¶ 4-9; G. Scott ¶¶ 3-6. These and other members maintain a concrete interest in obtaining information about the precise types and quantities of substances released from the Macondo well. *See, e.g.*, Decls. of A. Sondak, ¶ 16; G. Scott ¶ 7; C. Craig ¶ 8.  The D1 Plaintiffs' members are statutorily entitled to this information under ECPRA's reporting provisions.  *See, e.g., Sierra Club v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693, 704 (W.D. Ky. 2003) (plaintiffs who allege a failure to report under EPCRA suffer the exact type of informational injury that Congress intended to prevent by enacting the reporting requirements of EPCRA and CERCLA).  Physicians also require this information to effectively treat patients.  *See* Decl of Dr. Thrasher, filed herewith.  Given this background, BP's argument that no injury has befallen Plaintiffs borders on the absurd. Plaintiffs have clearly suffered the exact type of informational injury envisioned by EPCRA.  As such, the D1 Plaintiffs have standing to pursue their EPCRA claims.[20]

### III.   CITIZEN ENFORCEMENT OF 33 U.S.C. § 1311 IS COEXTENSIVE WITH 33 U.S.C. § 1321.

The D1 Plaintiffs are empowered to enforce the provisions of § 311 of the CWA, 33 U.S.C. § 1321, through the citizen suit provisions of 33 U.S.C. § 1365.  The reason is elementary: a violation of § 311 is a concomitant violation of the general prohibition contained in § 301 of the Act.  That prohibition reads:

> Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of *any* pollutant by *any* person shall be unlawful.

---

[20] BP does not contest whether Plaintiffs' injuries were caused by its failure to report or that an injunction would redress such injury.  In any event, the court's analysis in *Sierra Club v. Tyson Foods*, 299 F. Supp. 2d at 702-05, would make these arguments superfluous, as the court easily determined that a plaintiff's informational injury under EPCRA was caused by the defendant's failure to report and would be redressed by a favorable injunctive order.

33 U.S.C. § 1311(a) (emphasis added).  This proscriptive one-sentence provision is the foundation upon which the rest of the Act stands.  *See Northwest Environmental Advocates v. U.S. E.P.A.*, 537 F.3d 1006, 1020 (9th Cir. 2008) (Section 301(a) prohibition is "[t]he cornerstone and fundamental premise of the Clean Water Act.") (internal quotation marks and citations omitted); *U.S. v. Frezzo Bros., Inc.*, 602 F.2d 1123, 1127 (3d Cir. 1979) ("The core provision of the Act is found in [§ 301]."); *American Frozen Food Institute v. Train*, 539 F .2d 107, 113 (D.C. Cir. 1976) ("The basic concept of the Act . . . is an ultimate flat prohibition upon all discharges of pollutants").  Indeed, § 301(a) represents the Congressional determination that "no one has the right to pollute - that pollution continues because of technological limits, not because of any inherent right to use the nation's waterways for the purpose of disposing of wastes."  S. Rep. 92-414, p. 41 (1971).

Congress built upon the § 301 foundation when it authorized citizens to enforce its prohibition.  Section 505 of the Act, 33 U.S.C. § 1365, allows citizens to commence a civil action against any person alleged to be in violation of "an effluent standard or limitation."  33 U.S.C. § 1365(a)(1).  An "effluent standard or limitation" includes any act that violates the general § 301 prohibition against discharging pollutants.  33 U.S.C. § 1365(f)(1).  The term "effluent standard or limitation" is very broad.  *See* 2 William H. Rodgers, Treatise on Environmental Law, 70  ("reference to 'effluent standard or limitation *under this Act'* in Section 505 means not that the standard must be imposed formally in accordance with the Act but rather only that the obligation is of a sort that falls within the Act's general understanding of effluent limitation.") (emphasis in original) (footnotes omitted).  Thus, citizens may bring suit against any person who violates the foundational § 301(a) prohibition.

A more specific prohibition on the discharge of pollutants is contained in § 311(b)(3), amended in 1990 by the Oil Pollution Act.  That section forbids "the discharge of oil or hazardous substances" into the navigable waters or the contiguous zone waters of the United States.  33 U.S.C. § 1321(b)(3).  While it appears isolated from the rest of the Act, this prohibition is simply a specific example of the § 301(a) prohibition against the discharge of pollutants.  There can be no discharge of oil *in compliance with* § 311.  Importantly, the definition of "pollutant" as used in the foundational prohibition includes both "oil" and "hazardous substances."  *See* 33 U.S.C. § 1362(6); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 565 (5th Cir. 1996) ("[t]he breadth of the many items in the list of 'pollutants' tends to eviscerate any restrictive effect."); *U.S. v. Hamel*, 551 F.2d 107, 110 (6th Cir. 1977) ("[o]il is oil and whether useable or not by industrial standards it has the same deleterious effect on waterways . . . [i]n either case, its presence in our rivers and harbors is both a menace to navigation and a pollutant.").  Thus, by definition, discharges of "oil" and "hazardous substances" are discharges of "pollutants."  Put another way, the "effluent standard" in § 311 is no "discharge of oil" in harmful quantities.  *See* RODGERS, pp. 512-13.  This necessarily means that a violation of § 311(b)(3) is concomitant with – indeed, subsumed by – a violation of § 301(a), as the foundational prohibition is the "cornerstone" and "fundamental premise" upon which the narrowly tailored language of § 311(b)(3) stands.[21]

Rather than creating an isolated, independent form of liability under the Act, § 311 channels conduct involving the discharge of oil and hazardous substances into the higher

---

[21] Legislative history confirms that a violation of § 311 is, by definition, a violation of § 301: "In addition, recent court decisions have confirmed that oil is a "pollution" [sic] within the definition of the Clean Water Act and discharges of oil to the navigable waters are subject to the general penalty provisions of section 309 of the Clean Water Act."  S. Rep. No. 101-94, at 9 (1989).  The general penalty provisions of § 309 explicitly reference violations of § 301(a).

volumetric civil penalties contained in § 311(b)(7).  The statutory language makes clear that "[c]ivil penalties shall not be assessed under both this section and section 1319 [§ 309] of this title for the same discharge."  33 U.S.C. § 1321(b)(11).  Section 309 contains the general civil penalties that can be applied to a multitude of violations under the Act, including the foundational § 301(a) prohibitions.  33 U.S.C. § 1319(d).  The penalties under § 311(b)(7), on the other hand, are volumetrically (per-barrel) based.  Congress added these much higher penalties to the Act after the Exxon-Valdez disaster.  Only the lower per day penalties were available under the Act prior to 1990 and they were deemed insufficient to deter oil companies from future spills of the magnitude of the Exxon-Valdez.  *See* S. Rep. No. 101-94, at 3 (1989) ("At the present time, the costs of spilling and paying for its clean-up and damage is not high enough to encourage greater industry efforts to prevent spills and develop effective techniques to contain them.").  Thus, while liability for discharges of oil and hazardous substances into the waters of the United States may lie under § 301(a), the courts have jurisdiction to impose civil penalties for such specific discharges under either § 309(d) or § 311(b)(7), the higher penalty provision Congress enacted specifically for situations like the BP disaster.  This is evidenced by the jurisdictional section of § 311, which states that "[a]n action to impose *a civil penalty . . . may be brought in the district court of the United States for the district in which the defendant is located, resides, or is doing business, and such court shall have jurisdiction to assess such penalty*."  33 U.S.C. § 1321(b)(7)(E) (emphasis added); *see also* 33 U.S.C. § 1321(b)(8) ("[i]n determining the amount of a civil penalty . . . *the court*, as the case may be, shall consider . . . ") (emphasis added).

BP and Transocean apparently believe that, because § 311 is not listed under the definition of "effluent standard or limitation" contained in 33 U.S.C. § 1365(f), courts are unable to impose the higher per-barrel penalties in citizen enforcement actions.[22,23]   The enormity of this case, however, illustrates why a violation of § 311 *must* be enforceable as a concurrent, overlapping violation of the foundational § 301 prohibitions.  *Cf. Pryor Oil Co., Inc. v. U.S.*, 299 F. Supp.2d 804, 808 (E.D. Tenn. 2003) ("§§ 309 and 311 are complementary and overlapping authorities, and are not mutually exclusive.").

In sum, enforcement of § 311 is coextensive with § 301.  There is a concomitant violation of both sections whenever oil is discharged into waters of the United States.  Because citizens are empowered to enforce any violation of § 301(a) through the citizen suit provisions of the Act, and the courts are empowered to impose penalties under either § 309(d) or § 311(b)(7), this Court may impose the higher per-barrel penalties prescribed by Congress.[24]

---

[22] Transocean errantly cites to *Secko Energy, Inc. v. M/V Margaret Chouest*, 820 F. Supp. 1008, 1014 (E.D. La. 1993) for the proposition that "Section 1321 of the CWA is not subject to citizen suits."  Transocean Mem. at 2. That case did *not* hold that citizen suits are barred under § 311; to the contrary, it ruled that a private party may not commence a private suit for private damages under the statute. *Id.* at 1014.  The D1 Plaintiffs are *not seeking a private remedy* under § 311, but rather are acting as private attorneys general seeking to enforce the proscriptions of the Act.  *See Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1521 (9th Cir. 1987) (citizen suit is not designed to provide a private remedy); *McEvoy v. IEI Barge Services, Inc.*, 622 F.3d 671, 674 (7th Cir. 2010) ("Citizen-suit provisions in environmental laws empower individual persons to serve as private attorneys general and to enforce standards set at the federal or state level.").  Thus, the *Secko* holding is irrelevant to the issue at hand.

[23] The Court should be wary of the fortuitous publication of Russell V. Randle, cited by BP numerous times in its motion to dismiss.  Mr. Randle's opinion-laden article focuses on the alleged "serious risks" posed by the citizen suit Clean Water Act cases in MDL 2179.  Respectfully, the Court should view the ostensibly "scholarly" work of an industry confidant with skepticism.

[24] The Defendants' motion to dismiss Count 5, the request to find that Defendants acted with gross negligence and are therefore subject to even lighter per-barrel penalties, fails for similar reasons.  The penalty factors for the Court to consider, set forth in 33 U.S.C. § 1321(b)(8), relate to gross negligence and are essentially the same as, though more explicit than, the penalty factors to be considered under 33 U.S.C. § 1319(d).

IV.    **THE CENTER AND THE ESA PLAINTIFFS COMPLIED WITH THE CITIZEN SUIT NOTICE PROVISIONS OF THE CWA, CERCLA, EPCRA, AND THE ESA, AND THUS THE D1 MASTER COMPLAINT IS SUFFICIENTLY GROUNDED.**

The Center and ESA Plaintiffs complied with the requisite citizen suit notice provisions of the CWA, CERCLA, EPCRA, and the ESA.  *See, e.g.*, D1 Master Compl. at 5, ¶ 7; CBD I, Exs. A & B; Buppert Decl., Ex. A, filed herewith (hereinafter the "ESA Notice").  With regard to CBD I, the Center invoked the immediate suit provisions of 33 U.S.C. § 1365(b).  Under the plain language of the CWA, citizens are empowered to immediately commence suit against any person, such as BP, who is alleged to be in violation of a § 306 or § 307 effluent standard or limitation.  With regard to CBD II, BP concedes by its silence that notice was proper.[25]  BP also incorrectly argues that the D1 Master Complaint failed to plead notice.  Notice was, in fact, pled.  D1 Master Compl. at p. 5, ¶ 7.  Transocean, on the other hand, argues that it received no notice whatsoever under the CWA, EPCRA, and CERCLA.  This is simply not true, as the Center provided notice to Transocean, Ltd., the preeminent Transocean entity.  Finally, BP argues that Defenders did not provide adequate notice of all of its ESA claims.  This argument, even if valid, does not warrant dismissal of all the ESA claims and, in any event, doing so would require that the Court go beyond the ESA complaint.

As there is no jurisdictional problem posed by the Center's or ESA Plaintiffs' actions, BP's and Transocean's broadside swipe at notice fails.

A.    **The Immediate Suit Provision of 33 U.S.C. § 1365(b) Applies to Private Defendants.**

Pursuant to § 505(b) of the CWA, 33 U.S.C. § 1365(b), citizens may immediately

---

[25] CBD II was filed as a protective matter in the off-chance that the immediate notice provisions were not allowed. This filing was made 61 days after the June 4 notice was served.

commence suit against any person who is allegedly in violation of the standards promulgated under § 306 and § 307 of the Act, so long as the citizen has provided the statutorily prescribed notice before filing suit.  Citizens are empowered under the Act to bring enforcement actions against any person alleged to be violation of an "effluent standard or limitation."  33 U.S.C. § 1365(a)(1).  An "effluent standard or limitation" includes any "standard of performance" promulgated under § 306 and any "prohibition, effluent standard or pretreatment standard[]" issued under § 307.  33 U.S.C. § 1365(f)(3)-(4).  Under most circumstances, the Act requires citizens to provide 60-day notice to the person alleged to be in noncompliance with an effluent standard or limitation before the citizen may bring suit.  33 U.S.C. § 1365(b).  If the citizen alleges a violation of a § 306 or § 307 standard, however, then the statute authorizes the citizen to commence suit immediately after providing the required notice.  The statutory section provides, in pertinent part:

> No action may be commenced—
>> (1) under subsection (a)(1) of this section—
>>> (A) prior to sixty days after the plaintiff has given notice of the alleged violation
>>>> (i) to the Administrator,
>>>> (ii) to the State in which the alleged violation occurs, and
>>>> (iii) to any alleged violator of the standard, limitation, or order, or
>>> ...
>> *except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of sections 1316 and 1317(a) of this title.*

33 U.S.C. § 1365(b) (emphasis added).

BP argues that the immediate suit provision applies only to citizen suits filed against the EPA Administrator.  BP Mem. at 24 n.11.  This argument is inconsistent with the plain language and the overall structure of the Act.  When the language of a statute is clear, the text of the statute

must control unless there is a clearly expressed legislative intent to the contrary.  *See U.S. v. Turkette*, 452 U.S. 576, 580 (1981); *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980).  The specific context in which the language is used and the broader context of the statute as a whole must also be considered.  *Dole v. United Steelworkers of America,* 494 U.S. 26, 35 (1990).

The language of the Act allows citizens to immediately commence suit if the alleged illegal conduct is "respecting a violation of" sections 306 and 307(a).  33 U.S.C. §  1365(b).  Section 306 requires the EPA Administrator to create categories of sources and to promulgate performance standards for new sources that fall within those categories.  33 U.S.C. § 1316(a)-(b).  The section then makes it unlawful for the owner of any new source to operate the source in violation of any applicable standard of performance.  33 U.S.C. § 1316(e).  Section 307 pertains to the creation of toxic pollutant effluent limitations and makes it unlawful for any person to operate in violation of the toxic effluent limitations once they are promulgated.  33 U.S.C. § 1317(a), (d).  Thus, if a citizen suit alleges violations of the standards promulgated under § 306 and § 307(a) – that is, allegations of conduct "respecting a violation of" § 306 and § 307 standards - then the citizen is entitled to immediately file its action.  This language is not opaque; to the contrary, it unambiguously allows immediate suit in these circumstances.

A contradictory Congressional intent does not arise from the Act itself.  Indeed, the decision to forgo the 60-day notice requirements in situations where a person was in violation of new source performance standards or toxic effluent limitation standards was a deliberate choice

by lawmakers.[26]  Congress understandably believed that any delay in enforcing these provisions

of the Act was unacceptable, especially given the pervasive and persistent nature of toxic

pollutants.[27]  *See, e.g., Hallstrom v. Tillamook County*, 493 U.S. 20, 30 (1989) (Supreme Court

recognized that Congress allowed immediate suit where violations of the toxic pollutant effluent

limitations promulgated under § 307 occurred); *Covington v. Jefferson County*, 358 F.3d 626,

637 (9th Cir. 2004) (under the Resource Conservation and Recovery Act ("RCRA") "[i]t is not

surprising that Congress put aside notice requirements" when plaintiffs allege violations of

federal environmental statutory provisions dealing with toxic or hazardous waste); *Dague v. City*

---

[26] BP's argument that the notice provisions are intended to provide a neutral period in which the parties can resolve their differences before a complaint is filed is not only belied by the plain language of the statute but is also disingenuous in this case because BP made no attempt to contact the Center during the notice period.  In fact, the first substantive communication between counsel for the Center and BP came in the form of the present motion to dismiss - nearly nine months after the first notice was sent.

[27] While the plain language of the Act does not require it, should the Court desire, an examination of the legislative history supports the D1 Plaintiffs' position.  In S.B. 2770, the Senate Committee explained:

> The Committee emphasizes that if the alleged violation is a failure to comply with an administrative enforcement order, a violation of a standard of performance, or a prohibition, or effluent standard or limitation established under the act, there would be no waiting period following notice.  It is the Committee's intent that enforcement of these control provisions be immediate, that citizens should be unconstrained to bring these actions, and that the courts should not hesitate to consider them.  S. Rep. No. 92-414 at 78 (1971).

The companion House Bill authorized immediate suit for alleged violations of § 301, § 302, §306, § 307, § 309, and § 402. *See* Water Pollution Control Legislation – 1971 (H.R. 11896, H.R. 11895): Hearings Before the Comm. on Public Works, 92d Cong. 165 (1971).

The immediate suit provision was eventually modified by the Conference Committee.  The Conference Report trimmed down the House Bill's immediate suit provision to violations of only § 306 and § 307(a).  More importantly, the Conference Report expanded the scope of the immediate suit provision by modifying the statutory structure of § 505(b).  The language that eventually became part of the Act moved the immediate suit exception to the bottom of § 505(b), thereby making it apply to *all* citizen suits and not just suits against the Administrator under subsection (a)(2), as the House Bill had done.   The Conference Report also did not contain any language suggesting that the immediate suit provision should apply only to the EPA Administrator.

Furthermore, the Conference Report did not disagree with the Senate Report's position that "enforcement of these control provisions be immediate" and that "citizens should be unconstrained to bring these actions."  This lack of disagreement indicates that the Conference Committee intended to adopt the Senate Committee's viewpoint on the immediate suit provision.  *See U.S. v. Gayle*, 342 F.3d 89, 94-6 (2d Cir. 2003) (Legislative intent is evidenced by statement contained in Senate Report where Conference Report did not disagree with that statement, even though Conference Report ended up adopting House Bill version of the specific provision in question.).  Thus, the legislative history of the Act makes clear that the immediate suit provision applies to private defendants.

RESP.  TO MOTIONS TO DISMISS BUNDLE  D1 COMPLAINT                    Page 28

*of Burlington*, 935 F.2d 1343, 1351 (2d Cir. 1991), *rev'd on other grounds*, 505 U.S. 557 (1992) (in a hybrid RCRA/CWA suit the court stated that "[c]ongress obviously determined that with hazardous wastes the dangers of delay and the potential for greater damage to public health or the environment outweigh the justifications for the pre-suit delay periods.").

One appellate case interpreting § 307 disallowed immediate notice, but is distinguishable and was wrongly decided.  In *National Environmental Foundation v. ABC Rail Corp.*, 926 F.2d 1096 (11th Cir. 1991), the plaintiff attempted to correct a failure to provide 60-day notice by arguing that its general allegations concerning chemical discharges were in fact specific allegations concerning violations of the toxic effluent limitations published pursuant to § 307(a). *ABC Rail Corp.,* 926 F.2d at 1097.  Unlike the Plaintiffs in the D1 Master Complaint, the plaintiffs in *ABC Corp.* did not allege concurrent violations of § 306.  The court determined that § 307(d) was the only portion of § 307 that proscribed conduct by private parties and that § 307(a) created responsibilities that applied only to the EPA Administrator.  *Id.* at 1099.

The Eleventh Circuit's interpretation of 33 U.S.C. § 1365(b) runs counter to the plain language of the Act, and in any case, did not address the different plain language of § 306. Congress chose very specific terms when drafting the immediate suit provision, as only allegations that are "*respecting* a violation of" sections 306 and 307(a) are entitled to bypass the 60-day notice requirement.  Judge Anderson recognized this distinction in his concurrence in *ABC Corp.* when he stated that "an action against a private party pursuant to subsection 1317(d) is an action 'respecting' a violation of subsection 1317(a) when the action seeks to enforce an effluent standard which was promulgated under subsection 1317(a)."  *Id.* at 1100.

Furthermore, the *ABC Corp.* decision failed to apply a bedrock principle of statutory construction.  As the Supreme Court has said numerous times, statutes must be interpreted to give each word some operative effect.  *Walters v. Metropolitan Educ. Enters., Inc.*, 519 U.S. 202, 209 (1997) (citing *U.S. v. Menasche*, 348 U.S. 528, 538-39 (1955)).  The holding of *ABC Corp.* turns this principle on its head, as it glossed over the fact that Congress did not constrain the immediate suit provision for violations of § 306 as the court held that it had apparently done for § 307.  The language clearly states that citizens may bring immediate suit "in the case of an action . . . respecting a violation of sections *1316* and *1317(a)* of this title." (emphasis added).  The Eleventh Circuit's interpretation that the immediate suit provision applies only to the EPA Administrator improperly blends the unrestricted "1316" language and the arguably constrained "1317(a)" term chosen by Congress.  The holding made no attempt to reconcile this obvious flaw in its interpretation.  At a minimum, the *ABC Corp.* holding supports the proposition that citizens are empowered to immediately bring suit if they allege violations of § 306(e), as Congress did not constrain the language of the immediate suit provision to limit violations of § 306 to any particular subsection as the *ABC Corp.* court held that it had done with § 307(a).[28]

The Center served BP with notice of its initial intent to sue on June 1, 2010 and its supplemental notice on June 4 (though dated June 3).  CBD I, Exs. A & B.  These notices explicitly allege violations of § 306 and § 307(a) of the Act.[29]  On June 18, the Center filed its

---

[28] This being true, then the D1 Master Complaint (and underlying complaints) take the form of "hybrid" complaints, free from any notice and delay restraints.  *See Dague v. City of Burlington*, 935 F.2d at 1352-54 (stating that allegations of a RCRA subchapter III violation made § 6972(b) notice requirements inapplicable to entire "hybrid" suit, including CWA claims, so long as alleged RCRA violations were "closely related," such as claims that arise "from the operation of a single facility"); *Covington v. Jefferson County*, 358 F.3d at 637 (notice requirements did not apply to plaintiff's numerous RCRA claims where complaint alleged violation of hazardous waste requirements, which allow immediate suit; complaint was properly considered "hybrid" in nature, eliminating the need to obey the 60- or 90-day notice periods).

[29] BP has not alleged that the Clean Water Act notices provided by the D1 Plaintiffs are substantively inadequate.

initial complaint against BP and other Defendants pursuant to the immediate suit provision of §

505(b).  As described above, the Act plainly allows citizens to immediately commence suit

against any person who is allegedly in violation of the standards promulgated under § 306 and §

307 of the Act.[30]  As such, there is no statutory or jurisdictional problem posed by the Center's

June 18, 2010 complaint or the D1 Plaintiffs' Master Complaint.[31]

### B.    BP Concedes the Adequacy of the Center's Notice and Delay with Regard to "CBD II."

BP concedes the adequacy of the Center's notice with regard to "CBD II."  In describing

CBD II as being "filed too late," BP plays its legal shell game by asserting merely that the claim

was moot when filed pursuant to the Supreme Court's holding in *Gwaltney,* not that the Center

failed to comply with notice and delay provisions of 33 U.S.C. § 1365(b).  BP Mem. at 26.  BP's

*Gwaltney* argument is wholly irrelevant to compliance with notice and delay provisions, and in

any event is defective.  *See* Section V, *infra*.  Contrary to BP's characterization, the discharges

had not ceased as of the filing date of CBD II, nor were they reasonably likely to cease.[32]  *See* BP

Mem. at 30 (quoting Admiral Thad Allen's press release, which announced on September 19,

2010, that the completion of the relief wells rendered the Macondo well "effectively dead").

Thus, BP concedes that the Center is compliant with relevant notice and delay provisions.

### C.    The Center Served the Requisite Statutory Notice on Transocean, Ltd.

Transocean's principal contention is that the D1 Plaintiffs allegedly failed to provide any

Transocean entity with the requisite pre-suit notice of intent to sue under the CWA, EPCRA or

---

[30] BP also does not contest that the Center's amended complaint in CBD I, filed on August 2, 2010, cured any possible defect in the 60-day notice requirements.

[31] Regardless, the Center filed a protective complaint after the 60-day notice period expired, rendering this issue moot.

[32] "CBD III," as it is called by BP, amended the Center's earlier complaints to include additional pollutants, such as the thousands of tons of methane released from the Macondo well.

CERCLA.  Transocean Mem. at 3-8.  Transocean believes this "fact" strips the Court of jurisdiction over the D1 Plaintiffs' First through Seventh Claims.  A close reading of Transocean's argument, however, reveals two fatal flaws.

First, the substance of Transocean's argument is based primarily on obfuscation of fact. Transocean attempts to defeat notice by walling off Transocean Ltd., the parent and dominating Transocean entity, from the rest of the subservient U.S. Transocean subsidiaries.  As a result of this self-imposed bifurcation, the U.S. Transocean Defendants are able to pose the illusory argument that they received no pre-suit notice under the applicable environmental statutes.  *See id*.  This assertion is erroneous, as at least one D1 Plaintiff *did provide pre-suit notice* to Transocean Ltd., the governing Transocean entity and one of the Transocean Defendants.  *See* CBD I & CBD II, Exs. A & B.  The Center served both its June 1 notice and June 4 supplemental notice on Transocean Ltd.'s U.S. Post Office Box, located in Houston, Texas, and on Transocean Ltd.'s U.S. corporate agent, CT Corporation Systems, Inc., in Austin, Texas.  *Id.*  Thus, Transocean's argument distorts the uncontested facts of this case, namely that the chief Transocean entity did  receive statutory pre-suit notice.[33]  Transocean cannot avoid this fact by relying upon its fragmented corporate existence and its shell companies' fictional "independence."

Second, Transocean's argument is entirely premature.  There is pending discovery related to the Court's authority to exercise personal jurisdiction over Transocean, Ltd.  *See* LN Serve & File 36683869 (March 25, 2011) (stipulating that discovery must be completed by September, 2011); LN File & Serve Nos. 36050897 & 36050900.  This discovery entails, *inter alia*, whether

---

[33] Transocean does not dispute the adequacy of the Center's pre-suit notices.

and to what extent the Transocean Defendants operate as one entity under the auspices of Transocean, Ltd.  Only after this discovery is completed – which, as of the time of this brief, appears to be September 2, 2011, Doc. No. 1750 – may Transocean's motion even be considered, as questions of fact are outstanding as to whether notice upon Transocean Ltd. qualifies as notice to all the Transocean entities.

Information that is publicly available, however, suggests that Transocean's corporate separateness is false.  For instance, the directors and officers identified on Transocean's website include John Briscoe, Vice President and Controller, Keelan I. Adamson, Vice President of Engineering and Technical Support, Eric B. Brown, Executive Vice President, Legal and Administration, and Terry B. Bonno, Vice President, Marketing.  Snyder Decl., Exhibit A, p. 1. These four individuals not only hold top executive management positions with Transocean, Ltd., but also with many of its U.S. subsidiaries.  According to the Louisiana Secretary of State, Mr. Briscoe and Mr. Adamson are the President and Vice President, respectively, of Transocean Offshore USA, Inc., and Transocean Offshore Ventures, Inc.  *Id*., Exhibit B, pp. 2, 4.  The Texas Secretary of State records indicate that Mr. Briscoe and Mr. Adamson are also the President and Vice President of Transocean Offshore Deepwater Drilling, Inc., and Transocean Offshores Ventures, Inc.  *Id*., pp. 9, 13.  Mr. Brown and Ms. Bono are listed as the Director and Vice President, respectively, of Texas-based Transocean Enterprise, Inc.  *Id*., p. 5.  This "sharing" of executives likely represents only a small part of Transocean's larger corporate governing scheme.

Besides maintaining the same core executives, Transocean Ltd. also holds itself out to the United States Government as the preeminent Transocean company.  The "overview"

section of Transocean's most recent 10-K filing with the U.S. Securities and Exchange
Commission states that:

> Transocean Ltd. (together with its subsidiaries and predecessors unless the context
> requires otherwise, "Transocean," the "Company," "we," "us" or "our") is a leading
> international provider of offshore contract drilling services for oil and gas wells.

Snyder Decl., Exhibit C, p. 13.  A post-spill 10-Q statement by Transocean Ltd. described how

"**our** Ultra-deepwater Floater *Deepwater Horizon*  . . . sank on April 22, 2010, after an explosion

and fire onboard the rig that began on April 20, 2010."  *Id*. p 3 (emphasis added).  Indeed,

Transocean's most recent filing even describes how Transocean Ltd. received the full insurance

value of the *Deepwater Horizon*, valued at $560 million.  *Id*., p. 14.  Given Transocean's own

expressions of its corporate commonality, it is difficult to understand how the U.S. Transocean

Defendants argue that they did not receive *any* notice of the Center's impending lawsuit.

While these facts certainly raise doubts concerning Transocean's structure, only upon

completion of the discovery related to Transocean Ltd.'s personal jurisdiction will the full extent

of Defendants' disregard for corporate formalities be known.  Until that point is reached, any

motion to dismiss based upon the failure of the D1 Plaintiffs to provide the requisite pre-suit

notices is at best premature and should be denied.

> **D.**      **The ESA Plaintiffs Fulfilled the ESA's Statutory Notice Provisions Prior to
>          Filing Suit against BP.**

BP does not dispute that the Plaintiffs gave notice of violations of the ESA to at least

some BP-related entities pursuant to 16 U.S.C. § 1540(g).  *See* BP Mem. at 24-25 (conceding

that the Plaintiffs gave notice of ESA violations in connection with BP's release of crude oil and

that Plaintiffs provided notice to BP America).[34]  BP questions, however, whether the Plaintiffs

provided adequate notice of *all* their ESA claims and whether they provided such notice to *all* of

the Defendants named in the complaint.  BP's argument fails, as all parties are on notice of all

claims.  For these reasons, BP's motion to dismiss based on Section II of its memorandum must

be denied as to the ESA claims.  For the convenience of the Court, the ESA Plaintiffs attach a

copy of their May 25, 2010 notice letter as Exhibit A to the Declaration of Greg Buppert, filed

herewith ("ESA Notice").

      Resolution of the notice issues raised by BP is not appropriate in response to a motion to

dismiss.[35]  The Plaintiffs' complaint pled that "[p]ursuant to 16 U.S.C. § 1540(g)," the Plaintiffs

provided BP with "written notice of the ongoing take of threatened and endangered species in

violation of the ESA as a result of the Deepwater Horizon blowout, oil spill and subsequent

cleanup efforts."  ESA Compl. at ¶ 4.  Because the Plaintiffs properly pled that they fulfilled the

ESA's notice requirement, BP must reserve any challenge to the Plaintiffs' notice until this case

reaches summary judgment.  *See, e.g.*, *St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette

Refining, L.L.C.*, 500 F. Supp.2d 592, 608-10, n. 2 (E.D. La. 2007) (considering adequacy of

notice under the Clean Air Act on the parties' motions for summary judgment and noting that the

citizen suit provisions of the Clean Water Act and Clean Air Act are virtually identical); *S.F.

BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1158-59 (9th Cir. 2002), *cert. denied*, 539 U.S.

---

[34] Even though it concedes that at least one BP-related entity received notice of ESA violations, nowhere in its memorandum does BP indicate that it attempted to contact the Plaintiffs to resolve the ESA claims before the expiration of the 60-day notice period or the initiation of this lawsuit.

[35] The Plaintiffs reiterate that they do not convert BP's motion to dismiss on the ESA claims to one for summary judgment.  The Court may consider the attached ESA notice letter on a Rule 12(b)(6) motion to dismiss without converting the motion to dismiss.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (observing that on Rule 12(b)(6) motion to dismiss "courts must consider the complaint in its entirety . . . [and] documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").

924 (2003) (reversing a district court grant of summary judgment on the adequacy of notice provided under the Clean Water Act.)  Should the Court reach BP's notice issues, the Fifth Circuit has held that the notice requirement of the ESA is "not jurisdictional in the strict sense of the term," *Sierra Club v. Yeutter*, 926 F.2d 429, 437 (5th Cir. 1991) (internal quotation omitted), and the standard of review applicable to a Rule 12(b)(6) motion to dismiss is appropriate.  *See, e.g.*, *Forest Guardians v. U.S. Bureau of Reclamation*, 462 F. Supp. 2d 1177, 1183 (D.N.M. 2006) (considering defendants' claim that plaintiffs failed to give notice under the ESA under Rule 12(b)(6)).

BP's argument that the Plaintiffs have not adequately given them notice of all ESA claims raised in the complaint is incorrect.  The Plaintiffs' detailed May 25, 2010 notice letter alerted BP to ESA violations resulting from the release of crude oil and the use of dispersants to clean up the oil.  *See* ESA Notice at 1.   The ESA Notice put BP on notice that its actions are resulting in the ongoing "take" of listed species, *see* ESA Notice at 1-8; the complaint included parallel ESA Section 9 claims, *see* ESA Compl. at ¶¶ 45-73.[36]  The letter discussed impacts to several species, including five species of sea turtles, five species of whales, seven species of birds, and the West Indian manatee.  *See* ESA Notice at 5-8.  The complaint alleged ESA violations resulting from the oil spill and associated cleanup to the same five species of sea turtles, four of the five species of whales, one of the species of birds, and the West Indian manatee, as discussed in the notice letter.  *See* ESA Compl. at ¶¶ 45-73.

---

[36] Both the notice letter and the complaint specify that oil released in the Gulf has the following effects, among others, on listed species: toxic effects, reduced nesting success, hypothermia, and the accumulation of ingested oil and tar in the animals' esophagus and stomachs.

RESP.  TO MOTIONS TO DISMISS BUNDLE  D1 COMPLAINT          Page 36

Thus, the ESA Notice letter is clearly sufficient to afford BP legally adequate notice of the ESA violations. *See Loggerhead Turtle*, 148 F.3d at 1256 (mention of a species only once suffices to give notice under the ESA); *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir. 1996) (letter provided sufficient notice of Section 7 violation because "[a]lthough section 7 was referenced only in one part of the letter, the letter as a whole provided notice sufficient to afford the opportunity to rectify the asserted ESA violations"); *see also Water Keeper Alliance v. U.S. Dep't of Def.*, 271 F.3d 21, 30 (1st Cir. 2001) ("To say that the Navy was not on notice that Water Keeper would object to the failure to prepare a biological assessment for its interim activities, when the Notice makes it clear that Water Keeper intended to challenge an ongoing delinquency in the preparation of a biological assessment, would be setting the bar for adequacy of notice too high."); *Alabama v. U.S. Army Corps of Eng'rs*, 441 F. Supp. 2d 1123, 1130 (N.D. Ala. 2006) ("The court finds that the express terms of [the notice] letter put the Corps on notice . . .").

Indeed, given the specificity of the Plaintiffs' notice letter — which alerted BP as to the specific effects of its actions on the species at issue — BP makes no argument whatsoever that it was not put on notice of the Plaintiffs' central claim, i.e., the oil spill is having and will continue to have ongoing adverse impacts, rising to the level of prohibited take, on listed species. *See* BP Mem. at 24. Instead, BP argues only that while it was on notice of ESA violations resulting from the use of dispersants to clean up the oil spill, this notice somehow did not advise it of the claims alleging ESA violations resulting from its cleanup operations. *Id.* (arguing that Plaintiffs "notice[d] a particular alleged violation and then sue[d] for something else"); *see also Sw. Ctr. For Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 522 (9th Cir. 1998)

RESP. TO MOTIONS TO DISMISS BUNDLE D1 COMPLAINT                    Page 37

(notice must "provide sufficient information of a violation so that the Secretary or [action agency] could identify and attempt to abate the violation").  But this is simply a straw man argument.  Not only is the use of dispersants inarguably a form of cleanup, but more importantly, the Plaintiffs' complaint does not allege violations resulting from any specific cleanup activities other than the use of dispersants.  Therefore, the Defendants had notice of all claims that the Plaintiffs are presently pursuing against them, and their challenge to the sufficiency of that notice should fail.

BP is mistaken in its suggestion that the Plaintiffs did not provide adequate notice to all BP parties of the ESA violations resulting from the *Deepwater Horizon* oil spill.[37]  On May 25, 2010, the Plaintiffs sent a letter clearly stating their intent to sue over violations of the ESA resulting from the "release of crude oil and dispersants into the Gulf of Mexico in connection with the Deepwater Horizon disaster" to Tony Hayward, Andy Inglis, and Lamar McKay in their official capacities as officers in BP-affiliated corporations.  ESA Notice at 1.  At the time, Mr. Hayward was the CEO of BP, p.l.c., Mr. Inglis was the Chief Executive of Exploration and Production and Executive Director of BP, p.l.c., and Mr. McKay was the President of BP America, Inc.  The letter was addressed to these individuals at 501 Westlake Park Boulevard, Houston, *see* ESA Notice at 1, the address that the Alabama Secretary of State identifies as the principal business address for BP Exploration & Production, Inc.

Therefore, BP's claim that the Plaintiffs did not give notice to BP, p.l.c. is erroneous.  Furthermore, its argument that claims should be dismissed against BP Exploration & Production, Inc. because that BP-affiliated entity did not receive adequate notice should be rejected by the

---

[37] BP is incorrect that the Plaintiffs broadly challenge take caused by all cleanup efforts.  The Plaintiffs challenge take resulting from oil and dispersants discharged by BP, as stated in the notice letter and the complaint.

RESP.  TO MOTIONS TO DISMISS BUNDLE  D1 COMPLAINT                Page 38

Court as putting form over substance, especially because BP has made no argument that the notice delivered to BP America, Inc. did not *in fact* put all of the BP entities on notice of the ESA violations — i.e., that the central purpose of the notice requirement was met.  *See Wash. Trout v. McCain Foods, Inc.*, 45 F.3d 1351, 1354 (9th Cir. 1995) (discussing the purpose of statutory notice provisions); *see also Catskill Mtns. Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 487 (2d Cir. 2001), *cert. denied*, 549 U.S. 1252 (2007) (finding that courts should not "allow form to prevail over substance" in determining whether a statutory notice requirement has been fulfilled); *La. Envtl. Action Network v. LWC Mgmt. Co.*, Civ. No. 07-0595, 2008 WL 3343006, at *7-8 (W.D. La. Aug. 11, 2008) (holding that notice under the ESA is adequate when notice has been sent to the proper agent of the corporation, even where plaintiffs failed to list the corporation's name in the address line); *Lockett v. EPA*, 176 F. Supp. 2d 628, 635 (E.D. La. 2001) (finding that "minor, hypertechnical deviation from the regulation does not render a notice ineffectual").[38]

For these reasons, BP's motion to dismiss based on Section II. of its memorandum must be denied as to the ESA claims.

## V.  THE FIRST THROUGH EIGHTH CAUSES OF ACTION IN THE D1 MASTER COMPLAINT ARE NOT SUBJECT TO DISMISSAL UNDER *GWALTNEY* NOR ARE THEY CONSTITUTIONALLY MOOT.

Contrary to the bold assertions made by BP, the First through Eighth Causes of Action in the D1 Master Complaint are not subject to dismissal under the Supreme Court's holding in *Gwaltney* nor are they constitutionally moot.  BP misstates the well-settled standards of

---

[38] Although the ESA Plaintiffs believe that the notice to BP America, Inc. is fully adequate, out of an abundance of caution, on December 16, 2010, the Plaintiffs sent a supplemental notice to BP, p.l.c. and BP Exploration & Production, Inc.  Accordingly, if the Court decides that dismissing two of the BP Defendants is warranted — which would still leave the Plaintiffs' complaint against BP America — the Plaintiffs respectfully request that leave be granted so that they can file a supplemental or amended complaint against the other BP entities in the interest of judicial efficiency.

*Gwaltney* and mootness.  When applying the correct tests, it is evident that the D1 Master

Complaint defeats a motion to dismiss on both *Gwaltney* and mootness grounds.

> **A.      There Were Ongoing Violations and a Reasonable Likelihood of Continuing Violations at the Time Suit was Commenced.**

At the time the D1 Plaintiffs filed suit, there were actual ongoing violations and,

consequently, a reasonable likelihood of continuing, future violations at the Macondo well.[39]

Under the Supreme Court's holding in *Gwaltney*, all that a court needs to have subject matter

jurisdiction over the CWA is that a plaintiff allege, *at the time of suit*, "a state of either

continuous or intermittent violation – that is, a reasonable likelihood that a past polluter will

continue to pollute in the future."  484 U.S. at 57.   A plaintiff is not required to actually prove

allegations of ongoing violations before jurisdiction attaches; a good faith belief is enough.  *See*

*id*. at 64.   In evaluating the existence of a continuing violation, Justice Scalia stated in his

concurring opinion in *Gwaltney* that "[s]ubject matter jurisdiction depends on the state of things

at the time of the action brought; if it existed when the suit was brought, subsequent events

cannot ous[t] the court of jurisdiction."  *Id*. at 69 (alteration in original) (internal quotation marks

omitted).

To prevail in a motion to dismiss, therefore, a defendant must prove that plaintiff's

allegations of continuous or intermittent violations are a "sham," such that they do not raise a

genuine issue of material fact.  *See Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1061 (5th Cir.

1991); *see also Conn. Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.*, 989 F.2d 1305,

1311 (2d Cir. 1993).  Any doubt as to whether there were continuous or intermittent violations at

---

[39] *See* the Center's cross-motion for partial summary judgment on liability that addresses in greater detail the factual and legal issues that defeat *Gwaltney*.

the time of suit is "resolved in favor of the citizen-plaintiffs." *Conn. Coastal Fishermen's Ass'n*, 989 F.2d at 1311.

BP makes several arguments regarding the D1 Plaintiffs' ability to satisfy the requirements of *Gwaltney*. BP's logic, however, is based upon a fundamental misstatement of the holding in that case. First, BP characterizes *Gwaltney* as "unambiguously requir[ing] ongoing discharges or violations." BP Mem. at 28. This characterization is plainly wrong, as a plaintiff may allege, at the time of the complaint, that there were either continuing violations *or* a reasonable likelihood of future continuing or intermittent violations.[40] *Gwaltney*, 484 U.S. at 57; *see also Chesapeake Bay Found. v. Gwaltney of Smithfield, Ltd.,* 844 F.2d 170, 171-72 (4th Cir. 1988) (on remand) (citizens may show ongoing violations by adducing evidence "from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations"). Second, BP claims that the Court "may" have jurisdiction in "limited situations" where a citizen-plaintiff can show a reasonable likelihood of recurring violations. BP Mem. at 34. This is also incorrect, for there simply is no "may" about jurisdiction; *Gwaltney* holds that if there is an ongoing violation or a reasonable likelihood of recurrence, then a court *shall* have subject matter jurisdiction under 33 U.S.C. § 1365(a). *See Gwaltney*, 484 U.S. at 64.

Finally, BP makes a failed attempt at satisfying its burden on a motion to dismiss. BP tries to "prove" that the allegations of continuous and intermittent violations from the Macondo well do not raise a genuine issue of material fact. To accomplish this feat, BP proffers that the well was "killed" on July 15, 2010, thus rendering the D1 Plaintiffs' CWA claims based on a

---

[40] BP cites to *Hamker v. Diamond Shamrock Chem. Co.*, 756 F.2d 392, 397 (5th Cir. 1985) claiming that a discharge must be "continuing" at the time suit is brought for subject matter jurisdiction to exist. BP fails to point out that *Hamker* predates and was overruled, in relevant part, by the Supreme Court's decision in *Gwaltney*, which held that subject matter jurisdiction exists under the CWA where citizen-plaintiffs allege a state of either continuous *or* *intermittent* violations at the time of suit. *Gwaltney*, 484 U.S. at 57.

"wholly past violation." BP Mem. at 27. Portraying the largest oil spill in US history as a "wholly past violation" is a gross misnomer. BP's discharges from the Macondo well, which were ongoing and reasonably likely to continue until at least September 19, 2010, are still causing damage to human health and the environment on a scale never before encountered. BP cannot skirt liability by relying on July 15, 2010 as the date that all violations permanently ceased, as this is simply *not true*. *See* BP Mem. at 30 (admitting that the Macondo well was effectively killed September 19, 2010, the date the relief wells were complete). BP's motion therefore fails under *Gwaltney* because, at the time of suit, (1) there were actual, ongoing violations and, at the very least, (2) there was a reasonable likelihood of continuing violations.

### 1. Discharges from the Macondo well continued until at least August 23, 2010.

The Macondo well discharged oil, methane, and other hazardous pollutants until at least August 23, 2010. *See* Snyder Decl., p. 3. The July 15 date cited by BP was nowhere near the date when discharges ceased. BP Mem. at 10. To the contrary, it was merely the date that BP finally managed to *temporarily* cap the wellhead, fully 87 days after the April 20, 2010 blowout. Snyder Decl., Exhibit F, p. 1 (U.S. Coast Guard described the cap as "at best a temporary fix" while BP finishes the relief wells); Exhibit G (Admiral Allen indicating that the cap would allow the collection of oil "until the relief well is complete"). The capping of the well did not stop all leaks or other discharges, as at least one additional leak on the seafloor occurred on July 19, just after the cap was shut, *id*., Exhibit H, p. 2, methane was observed around the cap, *id*. at p. 3, and hydrocarbons continued to seep from around the cap itself. *Id*., Exhibit I, p. 1. There were also widespread concerns that the capping of the well would not provide complete closure of the leak,

prompting BP to explore other "kill" options.[41]  *See id.*, Exhibit G.  On August 5, BP completed

one of those other options, the "static kill."  Only after cement was pumped into the wellhead as

part of the static kill was the Macondo well partially sealed.  *See id.*, Exhibit J, p. 1 (Transcript of

Admiral Allen press conference, indicating that while top kill was successful, sealing the well

through the relief wells was the only permanently fix).  During the removal of the drill pipe on or

about August 23, 2010, further discharges of oil and other hazardous substances occurred.  *Id.*, p.

3.  Thus, there were ongoing violations or a reasonable likelihood of continuing and intermittent

violations at the Macondo well until at least August 23, 2010.[42]  *See id.*, p. 3; *see also* Exhibit O

(Admiral Allen ordering BP to make real-time videos of the process that involved the removal of

the drill pipe).

     The Center filed suit well before August 23.  The Center's first complaint was filed on

June 18, far in advance of even the false date BP proffers of July 15.  *See* CBD I.[43]  That

complaint was brought pursuant to the immediate suit provisions of 33 U.S.C. § 1365, as

explained in detail *supra*, Section IV.  The Center's second, protective complaint was filed on

August 4, the day before the "static kill" was completed, five days before it was deemed

temporarily successful, and eighteen days before the discharges associated with the drilling pipe

removal.  *See* CBD II.  Thus, at the time of the D1 Plaintiffs' underlying lawsuits, there were

---

[41] BP's repeated, colossal failures at terminating the Macondo well further support a finding that, at the time the Center filed its August 2 amended complaint and August 4 protective complaint (discussed *supra*), there was at least a reasonable likelihood that BP's violations would continue.  There is no question that violations continued on or after the original complaint filing on June 18, 2010.
[42] If anything, the disagreement about when violations were fully abated presents a question of material fact, demonstrating the need for further discovery and rendering Defendants' Motion to Dismiss improper.
[43] The Center amended this complaint on August 2, 2010.

continuous and ongoing violations at the Macondo well, even using BP's suggested date.[44]  This

is all that *Gwaltney* requires, and the D1 Plaintiffs more than pass this test.

> **2.      Discharges from the Macondo well were reasonably likely to continue
> until at least September 19, 2010.**

There remained a reasonable likelihood of future violations from the Macondo well until

at least September 19, 2010, the date that the relief wells were completed.  According to BP's

own admission, it was not until the relief wells intersected the Macondo well that sealing was

accomplished.[45]  Up to that point, at the very least, there remained a reasonable likelihood that

additional discharges would occur.  Snyder Decl., Exhibit J, p.1 (Admiral Thad Allen's statement

on August 9 that completion of the relief wells will "permanently kill the well"); *Id.*, Exhibit K,

pp. 1-2 (Admiral Thad Allen writing that the primary method of securing the source of oil

discharges is the relief well and completion of this effort takes precedence).  As Justice Scalia

stated in his concurrence in *Gwaltney*, "[w]hen a company has violated an effluent standard or

limitation, it remains, for purposes of § 505(a), 'in violation' of that standard or limitation so

long as it has not put in place remedial measures that clearly eliminate the cause of the

---

[44] Defendants cite to the Sierra Club's Motion to Intervene for the proposition that the D1 Plaintiffs' complaint violates the requirements of *Gwaltney*.  BP Mem. at 28.  Considering that Sierra Club filed its motion on February 7, 2011 – nearly five months after the completion of the relief wells – the concession that it cannot bring suit itself is hardly surprising. By February, there were no apparent ongoing violations from the Macondo Well, as the relief wells had been completed on September 19, 2010.  The Plaintiffs in the D1 Bundle, however, brought suit as early as June 18.  Thus, even if the Sierra Club's position is correct *as to itself*, it is entirely irrelevant to the D1 Master Complaint and the underlying complaints.

[45] BP's motion cites a press release from the U.S. Coast Guard, released on September 19, 2010. That release states, quite definitively, that:

> After months of extensive operations planning and execution under the direction and authority of the U.S. government science and engineering teams, BP has successfully completed the relief well by intersecting and cementing the well nearly 18,000 feet below the surface. With this development, which has been confirmed by the Department of the Interior's Bureau of Ocean Energy Management, we can *finally announce* that the Macondo 252 well is effectively dead.  BP Mem. at 30 (emphasis added).

Prior to September 19, another blowout was still reasonably likely.

violation." *Gwaltney*, 484 U.S. at 69; *see also Gwaltney*, 844 F.2d at 172 (a continuing

likelihood of future intermittent or sporadic violations exists until there is "no real likelihood of

repetition"); *Sierra Club v. Union Oil Co. of Cal.*, 853 F.2d 667, 671 (9th Cir. 1988) (same).

Here, the only remedial measure that could eliminate the cause of the Macondo well leak was the

completion of the relief wells.  As such, there existed a reasonable likelihood that violations

would continue at the Macondo well until at least September 19, 2010.  Given that the underlying

complaints of the D1 Plaintiffs, including the Center's June 18, August 2 and August 4

complaints, were filed well prior to that date, it is clear that Plaintiffs have satisfied the

requirements of *Gwaltney*.

> **B.**     **Defendants' Failure to Abide by the Emergency Notification and Reporting Provisions of EPCRA and CERCLA Constitute "Ongoing Violations."**

Defendants' continuing failure to report the releases of hazardous substances from the

Macondo well and the *Deepwater Horizon* constitute ongoing violations of the emergency

notification provisions of EPCRA and CERCLA.  Congress enacted EPCRA to establish "a

framework of state, regional and local agencies designed to inform the public about the presence

of hazardous and toxic chemicals, and to provide for emergency response in the event of health-

threatening release."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 86 (1998).  The

purpose of CERCLA's reporting requirement is analogous, as it provides federal agencies with

the information necessary to assess hazards and mitigate potential injury from releases.  *See*

*Sierra Club Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d at 704.  Similar to other environmental

statutes, EPCRA and CERCLA allow citizens to sue only for "ongoing violations."  *See Steel*

*Co.*, 523 U.S. at 108-09; *Laidlaw*, 528 U.S. at 188 ("*Steel Co.* held that private plaintiffs . . . may

not sue . . . for wholly past violations[.]").  An ongoing violation exists whenever a defendant is alleged to have failed to report a release subject to EPCRA and CERCLA's emergency notification provisions at the time suit is brought.  *See* 42 U.S.C. § 11046(a)(1)(A) (authorizing citizen suits against the owner or operator of a facility for failure to submit report of release); 42 U.S.C. §§ 9603(a), 9659(a)(1) (authorizing citizen suits against any person who fails to provide emergency notification of any release of a hazardous substance).  The appropriate remedy for such failure includes injunctive relief.[46]  *See Steel Co.*, 523 U.S. at 109.

The D1 Master Complaint clearly alleges that the Defendants' failure to report the discharges from the Macondo well and the *Deepwater Horizon* constitute ongoing violations of EPCRA and CERCLA.  Master Compl., pp. 26-27 & 37-38.  BP tries to maneuver around this fact by improperly conflating the meaning of an "ongoing violation" under EPCRA and CERCLA's reporting provisions with an "ongoing violation" under the CWA.[47]  The two are not interchangeable.  *See Citizens Against Pollution v. Ohio Power Co.*, 484 F. Supp.2d 800, 810 (S.D. Ohio 2007) (ongoing violations of EPCRA and CERCLA's reporting provisions are factually and legally distinct from violations of other environmental statutes).  The Defendants' failure to abide by the statutory reporting scheme is not abrogated by eliminating the source of the release, but by actually *filing* the reports and thereby providing accurate information of what

---

[46] The Center also seeks civil penalties for the Defendants' failure to abide by EPCRA and CERCLA.  Pursuant to PTO #11, these claims were segregated from the rest of the Center's relief.  The Center agrees with BP that these civil penalties claims should be in Bundle C, but this issue has not yet been directly addressed by the Court.

[47] The cases cited by BP are easily distinguishable.  In *Steel Co.*, the Supreme Court found that plaintiffs lacked standing because the defendant filed all the necessary reports *before* plaintiffs brought suit.  *Steel Co.*, 523 U.S. at 108-09.  BP's brazen failure to file the requisite reports under EPCRA and CERCLA continues to this day, making the holding of *Steel Co.* inapplicable.  In *Coalition for Health Concern v. LWD, Inc.*, 60 F.3d 1188, 1193 (6th Cir. 1995), the plaintiff apparently failed to allege an ongoing violation of CERCLA's reporting requirements, which starkly contrasts with the claims of continuous violations made by the D1 Plaintiffs.  The final case, *Lutz v. Chromatex, Inc.*, 718 F. Supp. 413 (M.D. Pa. 1989), is distinguishable for the same reason.

was released.  Whether or not capping of the Macondo well stopped all likelihood of discharges,

BP and Transocean remain in violation of both EPCRA and CERCLA today.[48]   The D1

Plaintiffs' Sixth and Seventh Claims should not be dismissed.

**C.    The Alleged "Capping" of the Well Does Not Moot the First through Eighth Causes of Action Contained in the D1 Complaint.**

The alleged "capping" of the Macondo well on July 15 does not render the causes of

action in the D1 Master Complaint moot.  A case becomes moot only "when the issues presented

are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *See U.S.*

*Parole Commission v. Geraghty*, 445 U.S. 388, 396 (1980) (quoting *Powell v. McCormack*, 395

U.S. 486, 496 (1969)).  A case will remain live and present so long as "the parties maintain a

'concrete interest in the outcome' and effective relief is available to remedy the effect of the

violation[.]"  *Envtl. Conservation Organization v. City of Dallas*, 529 F.3d 519, 527 (5th Cir.

2008) (quoting *Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 227 (5th Cir. 1998)).  "The fact that

[an] alleged violation has itself ceased is not sufficient to render a case moot."  *Nw. Envtl .Def.*

*Ctr. v. Gordon*, 849 F.2d 1241, 1245 (9th Cir. 1988).  Rather, the defendant bears a "heavy

burden" to demonstrate that it is "absolutely clear that the allegedly wrongful behavior could not

reasonably be expected to recur."  *Laidlaw*, 528 U.S. at 189 (citing *U.S. v. Concentrated*

*Phosphate Export Ass'n.*, 393 U.S. 199, 203 (1968)).  This "stringent standard" is especially

applicable to voluntary cessation of CWA violations, as it protects the D1 Plaintiffs from

---

[48] BP tries, unsuccessfully, yet another approach to dismissal. BP argues that injury-in-fact was not pled in either the D1 Master Complaint or the underlying complaints. BP Mem. at 37.  Once again, BP ignores the facts before them. The Master Complaint, Doc. No. 880 ¶¶ 5, 26-27, and 125-126, alleges informational injury to members, as do the underlying Center complaints.  *See, e.g.,* CBD II, p. 4, ¶ 10.e, p. 5, ¶¶ 12-13; pp. 11-12, ¶ 58; *see also supra,* Section II.

defendants like BP who seek to evade sanction by the "predictable protestations of repentance and reform." *Envtl. Conservation Org.*, 529 F.3d at 527 (citing *Gwaltney*, 484 U.S. at 66).[49]

BP portrays the mootness doctrine as requiring dismissal because BP has allegedly "successfully and completely stopped the flow of oil into the Gulf of Mexico." BP Mem. at 6, 31. This argument ignores the plethora of case law holding exactly the opposite. *See Laidlaw*, 528 U.S. at 193 (facility closures will moot case only if defendant can show with absolute clarity that such closure will prevent future violations); *City of Mesquite v. Aladdin's Castle Inc.*, 455 U.S. 283, 289 (1982) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."); *Concentrated Phosphate Export Ass'n.*, 393 U.S. at 203 ("Mere voluntary cessation of an allegedly illegal activity does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways'.") (citation omitted). To prevail in its motion to dismiss, BP must prove the impossible - not only that all discharges from the Macondo well ceased prior to June 18, 2010, but also that its wrongful behavior will be absolutely certain not to

---

[49] BP peripherally argues in a footnote that its attempts to stop the massive flow of oil from the well were not "voluntary," but based on "strict federal oversight." BP Mem. at 35 n. 14. Regardless of whether there was federal oversight, BP's repeated failures were voluntary actions subject to the stricter "voluntary cessation" mootness standard applied in *Laidlaw*. A violator may avail itself of a different mootness standard only where its complete cessation of violations was compelled by formal governmental enforcement and/or settlement, and the violator paid civil penalties as a result. *See Envtl. Conservation Org.*, 529 F.3d at 528 (violator's compliance compelled by formal EPA enforcement action, resulting in $800,000 civil penalty); *Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351, 355 (8th Cir. 1998) (violator's compliance compelled by formal stipulation agreement, resulting in $12,203 civil penalty); *Atl. States Legal Found. v. Eastman Kodak Co.*, 933 F.2d 124, 128 (2d Cir. 1991) (violator's compliance compelled by state agency's enforcement order, resulting in $1,000,000 civil penalty). As BP's eventual "killing" of the Macondo well was not compelled by formal governmental enforcement or settlement, and it has not yet paid any civil penalties as a result of its violations, it is bound by the stringent "voluntary cessation" mootness standard.

recur.[50]  It is here where BP's motion must fail, as no set of facts can satisfy this high threshold. Tellingly, BP did not even try to satisfy this burden in its motion to dismiss.

Instead, BP tries to sidestep this critical deficiency by shifting the focus to the relief sought by the D1 Plaintiffs.  While the D1 Plaintiffs may be limited to seeking injunctive relief as required by Pretrial Order #11,[51] that fact alone does not moot any of the D1 claims.  BP's erroneous assertion that the prospective injunctive relief sought by the D1 Plaintiffs is eliminated by the alleged cessation of discharge from the Macondo well overlooks the vast, ongoing environmental damage caused by the oil spill.  *See O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) (case is not mooted when plaintiffs suffer continuing, present adverse effects as a result of defendants wrongful conduct).  Oil and other hazardous pollutants from the Macondo well are *still* washing up on the shores of the Gulf of Mexico.  In fact, Unified Command's Operational Advisory Science Team estimates that it will take at least five years for 80% of the toxic and carcinogenic polycyclic aromatic hydrocarbons ("PAHs") to dissipate from coastal soils; the remaining 20% will likely persist "substantially longer."  Snyder Decl., Exhibit L, p.2.  Unlike *Laidlaw*, where the polluter stopped its impermissible mercury discharges, oil is repeatedly appearing in various forms throughout the Gulf.[52]  Thus, whether or not the Macondo well was

---

[50] BP admits that it may return to the Macondo lease, Snyder Decl., Ex. E, p. 1. Comments by BP COO Doug Suttles, BP Press Conference, August 6, 2010 ("[T]here's lots of oil and gas" remaining in the reservoir, such that BP will have to "think about what to do with that at some point.").

[51] The Center maintains that its civil penalty claims under 33 U.S.C. §§ 1319 and 1321 should be in Bundle C. Indeed, the entirety of the Center's requests for relief (including penalties, injunctive relief, and remedial relief) span both Bundle D1 (injunctive relief) and Bundle C (civil penalties).  As the Center has stated in previous motions, Doc. Nos. 240, 574, and 1056, the Center sues as a private attorney general in the shoes of the government, and thus should be within Bundle C.

[52] BP's reliance on *Raymond Proffit Foundation v. U.S. Army Corp of Engineers*, 175 F. Supp. 2d 755 (E.D. Pa. 2001) is misplaced.  In that case, the plaintiffs sought to enjoin defendant from storing water in a reservoir.  *Id.* at 760.  At the time of suit, water was no longer being stored in the manner complained of by the plaintiffs.  *Id.* at 773. The plaintiffs *did not allege* that "any specific effects of the storage are still manifest today."  *Id.*  This case is easily distinguishable from the situation here.  The D1 Master Complaint does indeed allege that there are specific effects of the massive release of oil that are still manifest today.  *See* Master Compl., pp. 2-3; 22-33.  The grant of injunctive

declared "effectively dead" on September 19, 2010, the D1 Plaintiffs continue to suffer injury from fallout of the Defendants' wrongful behavior.  *See* BP Mem. at 30 (admitting that well was killed on September 19, 2010); Snyder Decl., Exhibit J (the primary method of securing the source is the relief well and this effort takes precedence).

Furthermore, the circumstances surrounding this case rule against the possibility that future violations will absolutely not recur.  First, at least one of the BP entities remains subject to the National Pollutant Discharge Elimination System ("NPDES") General Permit GMG 290000. Where a violator remains subject to a NPDES permit, the likelihood of discharges remains, eliminating claims of mootness.  *See Laidlaw*, 528 U.S. at 193-94; *see also Carr v. Alta Verde Indus., Inc.*, 931 F.2d at 1065 (possibility of future discharges from holder of NPDES permit negates mootness).  Second, even though the *Deepwater Horizon* is destroyed and the wellhead allegedly sealed, those circumstances alone do not abate the possibility of future violations.  *See Laidlaw*, 528 U.S. at 193-94 (closure of defendant's factory, the source of violations, did not moot case); *Puerto Rico Campers' Ass'n. v. Puerto Rico Aqueduct and Sewer Authority*, 219 F. Supp. 2d 201, 220 (D. P.R. 2002) (sealing the point of discharges did not moot case, where, *inter alia*, defendant subject to NPDES permit).  As a current owner of the MC #252 leasehold, BP has the option of returning to the well to continue drilling.  *See* footnote 14, *supra*.  This alone is enough to keep this case present and alive.  *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 287-88 (2000) (case not mooted when 72-year old owner sold strip club to a non-related entity and submitted an affidavit indicating that he had no intentions of operating another club in the future;

---

relief sought by the D1 Plaintiffs, including remedial efforts to remove oil and repair the thousands of miles of beaches, marshlands, and private property affected by the spill, will provide Plaintiffs some relief for the violations that they are challenging.

despite these protestations, owner could still "decide again in the future to operate a club" because corporate entity remained incorporated under state law).  Under the present facts, which are yet to be fully developed, BP cannot show that it is absolutely clear that the alleged wrongful behavior will not recur.

In addition to the arguments above, one more point must be raised.  Pursuant to Pretrial Order #11, the complaints contained in Bundle D1 were limited to an injunctive remedy.  Many of the claims asserted by the D1 Plaintiffs in their individual complaints, however, seek civil penalties in addition to injunctive and remedial relief.  Courts have universally held that such civil penalties have a deterrent effect, *see, e.g.*, *Laidlaw*, 528 U.S. at 185, especially given that Congress intended penalties to deter future violations of the CWA.[53]  *See Tull v. United Sates*, 481 U.S. 412, 422-423 (1987) (examining legislative history).  Thus, even where a violator has allegedly ceased all wrongdoing, the existence of civil penalties will overcome mootness by ensuring that future violations will be prevented.  *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1153 (9th Cir. 2000) (where injunctive relief mooted, claim for civil penalties kept suit alive and present); *Atl. States Legal Found. v. Stroh Die Casting Co.*, 116 F.3d 814, 820, (7th Cir. 1997) *cert. denied*, 522 U.S. 981 (1997) (same); *N.R.D.C. v. Texaco Ref. & Mktg., Inc.*, 2 F.3d 493, 502-03 (3d Cir. 1993) (same); *Atl. States Legal Found. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1135 (11th Cir. 1990) (same); *but see Miss. River Revival, Inc. v. City of Minneapolis, Minn.*, 319 F.3d 1013, 1016 (8th Cir. 2003).  Pretrial Order #11's segregation of the remedies sought by the D1 Plaintiffs from the Center's claims for civil penalties and other relief

---

[53] If civil penalties do not, at least in part, redress a citizen's grievance then *Gwaltney* is absurd on its face, suffering from an internal contradiction.  By their very nature, civil penalties arise only in circumstances when the offending deed is past – that is, the violation has already occurred.  Thus, Congress would not have allowed citizens to sue for monetary penalties and give district courts jurisdiction to "apply" those penalties while simultaneously intending to restrict the district courts' jurisdiction when the violations occurred in the past.

should not give countenance to BP's argument for mootness where, in the usual case, none at all would exist.  Even though BP's arguments regarding mootness fail in all aspects, the Court must consider *all* the remedies sought by Plaintiffs, including civil penalties, in determining whether the causes of action raised in the D1 Master Complaint are moot.

> ### D. The ESA Provides for Injunctive Relief for the Ongoing Take of Endangered and Threatened Species, and, Therefore, the ESA Claims are Not Barred under *Gwaltney*, and are Not Moot.

The ESA provides for injunctive relief for the ongoing take of endangered or threatened species.[54]  *See* 16 U.S.C. § 1540(g)(1)(A) (establishing that "any person may commence a civil suit on his own behalf . . . to enjoin any person . . . who is alleged *to be in violation* of any provision of this Act or regulation issued under the authority thereof"); *cf. Gwaltney*, 484 U.S. at 57 (observing that, in the context of a Clean Water Act citizen suit, the "most natural reading of 'to be in violation' is a requirement that citizen-plaintiffs allege a state of either continuous or intermittent violation").  Unlike the Clean Water Act, the ESA is not directed at discharges of pollutants but, rather, the "take" of listed species.  16 U.S.C. § 1538(a)(1)(B)-(C).  BP argues in Section III.A.2 and Section III.B. of its memorandum that injunctive relief is not available to the ESA Plaintiffs because the "Macondo well has been killed" and the "release of oil . . . occurred in the past."  BP Mem. at 26, 29.  However, BP misunderstands the ESA allegations that it faces in the D1 complaint.

---

[54] BP's argument that *Animal Welfare Institute* and *Forest Conservation Council* establish that injunctive relief under the ESA is only available for future violations of the Act is misleading.  BP Mem. at 29.  These cases involved claims for alleged future harm to listed species, which the Ninth Circuit and the District of Maryland district court determined were actionable under the ESA, but they do not stand for the proposition that continuing violations of the Act cannot be enjoined.  *See Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 784-88 (9th Cir. 1995); *see also Animal Welfare Inst.*, 675 F. Supp. 2d at 560-61.

The Plaintiffs allege that oil released by BP continues to cause the take of threatened and endangered species, both through its direct effects on those species and its effects on coastal and marine ecosystems.  "Residual oil continues to be observed in Gulf waters and on Gulf shorelines," ESA Compl. at ¶ 34, and, according to the testimony of Ian MacDonald before the President's National Oil Spill Commission, "more than 50% of the total discharge of oil . . . remains in the Gulf ecosystem, much of it in coastal sediments," ESA Compl. at ¶ 35.  *See also* D1 Master Compl. at ¶¶ 104-109.  The Plaintiffs allege that "[t]he much smaller Exxon Valdez spill produced long-term devastating impacts on the wildlife of Prince William Sound."  ESA Compl. at ¶ 36.  Based on the persistence of oil in the Gulf ecosystem after the Macondo well was killed, the long-term ecological effects that have resulted from other, much smaller oil spills after the spills were no longer ongoing, and detailed allegations of the biology of listed species that make them vulnerable to ongoing harm from oil that persists in the Gulf, the Plaintiffs allege the continuing take of sea turtles, sperm whales, piping plovers, and manatees.  D1 Master Compl. at ¶¶ 138, 145, 150, 153.  These takes continue to occur, and will occur for some time, as a direct result of the spill of 4.9 million barrels of crude oil into the Gulf of Mexico from the Macondo Wwell.  *See id.*  Exhibit J to BP's memorandum acknowledges that injuries to natural resources as a result of the oil spill are ongoing: "While injured natural resources may eventually naturally recover to the condition they would have been in had the discharges not occurred, interim losses have occurred, *or are likely to occur in the future, and these will continue until baseline conditions are met*."  BP Mem., Ex. J at 4 (emphasis added).

Furthermore, the ESA claims are not constitutionally moot.  BP does not argue that injunctive relief specifically aimed at ameliorating impacts on listed species is unavailable, and

any suggestion that the only injunctive relief available under the ESA is an order requiring BP to kill the Macondo well is incorrect.  As is discussed in Section 2.B. herein, incorporated here fully by reference, the Court can draw upon its traditional equitable powers to redress the Plaintiffs' injuries.  *See Strahan*, 127 F.3d at 170; *Loggerhead Turtle*, 148 F.3d at 1254.  ("[t]he availability of a 'partial remedy' is 'sufficient to prevent [a] case from being moot'.")  *See Calderon v. Moore*, 518 U.S. 149, 150 (1996) (quoting *Church of Scientology of Cal. V. U.S.*, 506 U.S. 9, 13 (1992).

Because the Plaintiffs allege ongoing take as a result of the oil discharged from the Macondo well, and there are available remedies that could help mitigate impacts on listed species, the ESA claims are not barred by the *Gwaltney* doctrine and are not moot.  Therefore, BP's motion to dismiss based on Section 3.A.2. and Section 3.B. of its memorandum must be denied.

## VI.   DEFENDANTS' ARGUMENTS REGARDING CERCLA'S "PETROLEUM EXCLUSION" IGNORE PLAIN STATUTORY LANGUAGE AND, IN ANY EVENT, ARE UNDERMINED BY THE INJECTION OF HAZARDOUS (AND OTHER) SUBSTANCES INTO THE MACONDO WELL.

BP and Transocean argue that the D1 Plaintiffs lack a cause of action under § 103(a) of CERCLA, 42 U.S.C. § 9603(a), because petroleum, crude oil, and its fractions are exempt from the definition of "hazardous substance" and therefore from coverage under the statute.[55]  This argument fails because: (1) the plain language of CERCLA defines "hazardous substances" as

---

[55] §103(a) of CERCLA states:

> Any person in charge of a vessel or an offshore or an onshore facility shall, as soon as he has knowledge of any release (other than a federally permitted release) of a hazardous substance from such vessel or facility in quantities equal to or greater than those determined pursuant to section 9602 of this title, immediately notify the National Response Center established under the Clean Water Act of such release. The National Response Center shall convey the notification expeditiously to all appropriate Government agencies, including the Governor of any affected State.

including "specifically listed" fractions of crude oil; and (2) defendants' injection of hazardous substances into the Macondo well negates the ability to claim protection under the petroleum exclusion. At the outset, this Court should know that the Center, the only Plaintiff to bring CERCLA and EPCRA failure to report claims, is only seeking full reporting of the hazardous substances contained in the oil and other discharges by BP and Transocean prior to and after the blowout. Astonishingly, Defendants have still not reported the release of numerous toxic compounds – as required by EPCRA and CERCLA – despite requests from workers, physicians, and other members of the affected communities.

### A.    The Plain Language of CERCLA Defines Hazardous Substances as Including "Specifically Listed" Fractions of Crude Oil.

The plain language of § 101(14) of CERCLA defines hazardous substances as including "specifically listed" fractions of crude oil, thereby subject to the reporting requirements of CERCLA § 103(a).  42 U.S.C. §§ 9601(14), 9603(a).  CERCLA § 101(14) defines "hazardous substance" by reference to substances, wastes, and pollutants listed under other environmental statutory provisions, including the Clean Water Act and the Solid Waste Disposal Act, 42 U.S.C. § 6921.  *See* 42 U.S.C. § 9601(14)(A)-(F).  The so-called "petroleum exclusion" relied upon by BP and Transocean excludes "petroleum, including crude oil or any fraction thereof *which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F)*[.]" 42 U.S.C. § 6901(14) (emphasis added).  According to the plain language of the statute, fractions of crude oil are hazardous substances subject to the reporting requirements of CERCLA if specifically defined as a hazardous substance under subsections (A) through (F).[56]

---

[56] BP points to 33 U.S.C. § 1321(b)(5), CWA § 311(b)(5), as representing a "more specific set of reporting obligations for spills[.]"  BP Mem. at 19. But as the legislative history of §311(b)(5) makes clear, the definition of "oil" as used in §311 "does not include any constituent or component of oil *which may fall within the definition of*

Given this plain language, it is incontrovertible that many of the substances that were discharged from the Macondo well and the *Deepwater Horizon* are specifically identified as hazardous substances, and, therefore, must be reported pursuant to CERCLA § 103(a) and EPCRA § 304.[57]

BP and Transocean ignore the plain language of the statute and argue that the "petroleum exclusion" wholly removes discharges of crude oil and its fractions from the reporting requirements of CERCLA § 103(a), regardless of their specific listing.  42 U.S.C. §§ 9601(14), 9603(a).  In support of this argument, Defendants cite to *Wilshire Westwood Associates v. Atlantic Richfield Corp.*, 881 F.2d 801 (9th Cir. 1989), a decision issued before the 1990 OPA amendments and surprisingly relied upon by other courts despite its flawed logic.

In its analysis of the plain meaning of the exclusion, the Ninth Circuit in *Wilshire Westwood* construed the exception to the petroleum exclusion as applying to "any fraction thereof" and divorced the exception from "crude oil."  The decision was based on the grammar of the exception, holding that extension of the exception to crude oil "necessarily requires a plural verb in the qualifying phrase while the actual grammar sets forth a singular verb."  *Id.* at 805. The decision rests on the assertion that if the exception were to apply to crude oil, the exception should read: crude oil or any fraction thereof which *are* not otherwise specifically listed.  In pursuit of good grammar, the holding misconstrues the statutory language because a verb

---

*'hazardous substances'* as that term is defined  in CERCLA.  H. Conf. Rep. 101-653 (Aug. 1, 1990).  This definition corresponds with the plain language interpretation urged by Plaintiffs, as Congress believed that limiting the definition of "oil" for purposes of § 311 would ensure that certain hazardous oil fractions would fall under the regulatory requirements of CERCLA.  The Supreme Court's treatment of overlapping statutes confirms this analysis. *See J.E.M. Ag Supply v. Pioneer Hi-Bred Int'l*, 534 U.S. 124, 144 (2001) (Court "has not hesitated to give effect to two statutes that overlap, so long as each reaches some distinct cases"); *see also Conn. Nat'l. Bank v. Germain*, 503 U.S. 249, 253 (1992) (statutes that overlap "do not pose an either-or proposition" where each confers jurisdiction over cases that the other does not reach).

[57] The D1 Plaintiffs require further discovery to determine the exact substances and quantities that were discharged from the Macondo well and the *Deepwater Horizon*.  Virtually all hazardous pollutants identified in the D1 Master Complaint were derived from the CBD I and CBD II complaints.

following two singular subjects connected by "or" may properly be singular.  Thus, it appears

that the thrust of the holding is based on a faulty grammatical analysis and thus is not persuasive

precedent.  *Id.* at 804.

*Wilshire Westwood* additionally stated that placing specifically listed components of

crude oil and fractions thereof outside of the exclusion "would have the effect of rendering the

petroleum exclusion a nullity because all crude oil, petroleum and petroleum fractions, unrefined

or refined, would fall outside its ambit."  *Id.* at 805.  Here, the decision goes too far.  First, the

exceptions to the petroleum exclusion may properly exempt oil or petroleum themselves.  *See,*

*e.g.,* 33 U.S.C. § 1321(b)(2)(A) (excluding "oil as defined in this section" from EPA regulations

defining "hazardous substances").  Second, the petroleum exclusion is not rendered completely

null by recognizing its exceptions.  Rather, acknowledging that the exclusion contains exceptions

enables the statute to carry out its broader purpose, as it requires only those fractions of oil which

regulators have already determined are inherently hazardous to be reported.  Even if listed, such

fractions must also rise to a reportable level before triggering the reporting requirement – a fact

which is virtually certain to be the case with BP's massive spill.

Despite the obvious flaws contained in *Wilshire Westwood*, some lower courts have

followed the Ninth Circuit's ruling on this issue.  *See, e.g., Niecko v. Emro Mkgt. Co.*, 769 F.

Supp. 973 (E.D. Mich. 1991).  As no court in the Fifth Circuit has addressed this issue, the D1

Plaintiffs respectfully urge this Court to apply the plain meaning of the statute.[58]  The smoke-and-

---

[58] That the EPA has previously interpreted this statutory provision in guidance is of no consequence, as the statutory
language is unambiguous.  *See Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-42
(1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give
effect to the unambiguously expressed intent of Congress."); *see also Walton v. Hammons*, 192 F.3d 590, 601 (6th
Cir. 1999) (refusing to consider, much less defer to, agency's interpretation where statutory language was clear).
Even assuming, *arguendo*, that the statute poses some semblance of ambiguity, the EPA's interpretation is not
sufficiently rational to be given any deference.  *Our Children's Earth v. EPA*, 506 F.3d 781, 778 (9th Cir. 2007).

mirrors interpretation pressed by the Defendants is simply untenable in the face of such unambiguous language.  Numerous fractions of oil discharged from the Macondo well and the *Deepwater Horizon* are listed pursuant to CERCLA § 101(14)(A)-(F), including but not limited to benzene, toluene, ethylbenzene, phenanthrene, methane, arsenic, and cadmium.  *See* 40 C.F.R. § 302.4 (2010).  As the Defendants have yet to report the quantities of these substances pursuant to CERCLA § 103(a) and EPCRA § 304, dismissal on this issue would be improper.

In fact, the Defendants' actions in the aftermath of the spill illustrate its knowledge that the petroleum exclusion does not apply to the crude oil and other substances released during the spill.  From April 20 to July 30, 2010, BP contacted the National Response Center at least six times to report the in-situ burning of crude oil from the Macondo well.  *See* Decl. of Shahrzod Hanizavareh, p. 2 & Exhibit A, filed herewith.  In these reports, a person acting on behalf of BP informed the Response Center that reportable quantities of benzene, ethylbenzene, nitrogen dioxide, nitrogen oxide, and crude oil were released into the waters surrounding Mississippi Canyon Block #252.  *Id*.  Thus, BP's current position is self-contradictory: while it attempted to comply with the reporting requirements of CERCLA for actions taken in *response* to the spill, it now argues that it need not report the predicate release of oil that *prompted* that response in the first place.  This twisted reasoning cannot shield BP from its statutory duty to inform the public of the exact materials and quantities released during the *Deepwater Horizon* incident.

**B.    Defendants' Injection of Hazardous Substances into the Macondo Well Negates any Possible Protection under the Petroleum Exclusion.**

Even if this Court accepts the flawed logic of the Ninth Circuit and finds that the petroleum exclusion shields Defendants from their failure to report under CERCLA § 103(a) and

EPCRA § 304, the injection of hazardous substances into the Macondo well negates BP's and Transocean's ability to claim the exclusion's protection.  Where hazardous substances are added to crude oil or its fractions through methods other than the refining process, then that oil falls outside of the petroleum exclusion.  *See, e.g., Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 541 (6th Cir. 2001) (citing *U.S. v. Alcan Aluminum Corp.*, 964 F.2d 252, 266 (3d Cir. 1992)).[59]  In this instance, BP and Transocean injected numerous hazardous substances into the wellhead, both before the *Deepwater Horizon* explosion and afterward, in several failed attempts to stop the flow of oil from the Macondo well.

For example, BP and Transocean injected at least 450 barrels of "spacer" into the wellbore immediately before the *Deepwater Horizon* explosion.  The quantity used was over twice the amount used in standard industry practice.[60]  The "spacer" substance was a mixture of two different "pills"[61] – Form-A-Set and Form-A-Squeeze – which are not "specifically designed for application of spacers."[62]  The two "pills" had been made two weeks earlier,[63] and according to testimony of Leo Lindner, a drilling fluid specialist who was onboard the rig on and before April 20, 2010, "we had the product there and BP wanted to use it." [64]  The characteristics of the

---

[59] EPA's guidance, however flawed for other reasons, confirms this standard.  The agency has interpreted the petroleum exclusion to apply to (1) naturally occurring fractions of crude oil (2) hazardous substances that are *normally mixed with or added to crude* during the refining process.  *See* Memorandum from Francis S. Blake, EPA Gen. Counsel, to J. Winston Porter, Ass't Adm'r for Solid Waste and Emergency Response, Scope of the CERCLA Petroleum Exclusion Under Sections 101(14) and 104(a)(2), 1987 WL 123926 at *3-4 (July 31, 1987).  Hazardous substances that are *added* to petroleum, however, *are subject to CERCLA*.  *Id*. at *4.  Indeed, EPA previously stated that, "if the petroleum product and an added hazardous substance are so commingled that, as a practical matter, they cannot be separated, *then the entire oil spill* is subject to CERCLA response authority." *See id*. at *2; *see* 50 Fed. Reg. 13456-01 at 13460 (Apr. 4, 1985) (petroleum exclusion does not apply where CERCLA hazardous substances have been added).

[60] Snyder Decl., Exhibit M, pp. 299-300 (USCG/BOEM Marine Board of Investigation into the Marine Casualty, Explosion, Fire, Pollution, and Sinking of Mobile Offshore Drilling Unit Deepwater Horizon, with Loss of Life in the Gulf of Mexico 21-22 April 2010 (July 19, 2010) (testimony of Leo Lindner and Stephen Bertone, et al.).

[61] *Id*. at 297.

[62] *Id*. at 321.

[63] *Id*. at 317.

[64] *Id*. at 300.

mixture are not well known, but it may have been a gray or milky white "snot" which coated the rig immediately following the explosion.[65]  BP, which retained authority over the size of the "spacer,"[66] injected the excess mixture into the wellbore to avoid having to dispose of it consistent with the statutory requirements of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*[67]

Under RCRA, "waste associated with the exploration, development, or production of crude oil" is exempt from the statute's definition of "hazardous waste."  40 C.F.R. § 261.4(b)(5) (2010).  Defendants' actions, however, render the exemption inapplicable: excess material injected solely for the improper purpose of avoiding the requirements of RCRA cannot rightfully be considered waste associated with exploration, development, or production of oil.   This makes the excess material a "hazardous waste" under RCRA, which in turn is considered a "hazardous substance" under CERCLA.  *See* 42 U.S.C. § 9601(14)(B) (defining "hazardous substance" as including any material listed as a RCRA "hazardous waste").  As a consequence, the injection of the excess spacer material was an "addition" of hazardous substances to the crude oil contained in the Macondo well.  This "addition" was accomplished through methods other than the "refining process," thereby removing the discharges of crude oil and its fractions from the protection of the petroleum exclusion.  *See Alcan Aluminum Corp.*, 964 F.2d at 266.

BP also injected at least 30,000 barrels of used drilling muds directly into the oil leak as part of its "top kill" procedure.[68]  BP has conceded that these muds contained ethylene glycol and

---

[65] *Id.* at 41, 126 (testimony of Stephen Bertone), 320-21 (testimony of Leo Lindner).

[66] *Id.* at 296.

[67] *See id.* at 309-10 (testimony of Leo Lindner).

[68] *See* Snyder Decl., Exhibit N, p. 3 (BP's Responses to a June 14, 2010 Informational Request from the Honorable Edward J. Markey and the Honorable Louis Capps, Concerning Activities Related to Environmental and Worker Health Impacts).

caustic soda (sodium hydroxide), both of which are listed as CERCLA hazardous substances. *See* 40 C.F.R. § 302.4 (Chemical Abstract Service Registration Numbers "CASRN" 107-21-1 and 1310-73-2) (2010).  Moreover, BP has acknowledged that it also pumped at least 168,000 gallons of methanol into the well.[69]  Methanol, also known as Methyl Alcohol, is also a CERCLA hazardous substance.  *See* 40 C.F.R. § 302.4 (CASRN 67-56-1) (2010).  The injection of ethylene glycol, caustic soda, and methyl alcohol represent yet further "addition[s]" of hazardous substances to the Macondo well through a means other than the "refining process," further vitiating the protection of the petroleum exclusion.

In order to conclusively determine whether the petroleum exclusion has been vitiated by Defendants' injection of these and other hazardous substances into the wellhead, the D1 Plaintiffs request that the Sixth and Seventh (EPCRA) Claims for Relief proceed to discovery. Summary dismissal at this early stage would be improper.

### C.     Transocean's EPCRA Argument is Deficient for Similar Reasons.

Under EPCRA, Transocean was required to report the release of any reportable quantity of hazardous substances released from the *Deepwater Horizon* and the Macondo well.  *See* 42 U.S.C. § 11004.  Transocean attempts to overcome this requirement by arguing that EPCRA imposes no reporting obligation with respect to crude oil or its fractions, because such substances are excluded under CERCLA.  Transocean Mem. at 7.  As explained above, however, the plain language of the petroleum exclusion does not include specifically listed fractions of crude oil and does not preclude reporting pursuant to EPCRA.  Even if it does, Defendants' addition of foreign substances into the Macondo well eliminates the exclusion's shield.

---

[69] *See id.*, p. 4.

Furthermore, the D1 Master Complaint alleges that BP and Transocean failed to report numerous hazardous substances, not *just* crude oil or its specifically listed fractions.  The complaint states that:

> By releasing numerous hazardous substances in excess of the applicable reportable quantities into the Gulf of Mexico, and failing to report, or failing to adequately report, such releases to local and State emergency planning committees as detailed herein, Defendants have violated their duties under EPCRA, 42 U.S.C. § 11004.

D1 Master Compl. at p. 38, ¶ 177.  Upon information and belief, the Center further alleged that these hazardous substances included, among other materials, drilling muds and toxic pollutants listed in 40 C.F.R. § 401.15 (2010).  These substances were likely released by the *Deepwater Horizon* when it exploded.  D1 Master Compl. at pp. 25-26.  As Transocean has failed to report these releases, *see* Decl. of Shahrzod Hanizavareh, p. 2, ¶ 5, it cannot prevail in its motion to dismiss.

## VII.    THERE IS NO DILIGENT PROSECUTION BAR.

BP and Transocean apparently assert that the D1 Plaintiffs' claims are somehow impaired by the CWA's diligent prosecution bar under 33 U.S.C. § 1365(b)(1)(B).  These arguments demonstrate a complete disregard for the facts of this case.  The CWA precludes citizen suits that are filed *after* the government "has commenced" and is "diligently prosecuting" an action against the same person that the citizens allege to be in violation of the Act.  *Id.*  If a citizen-plaintiff files suit *before* the government, such as the Center did in this case, then there is no diligent prosecution bar.  *Id.*; *see also, e.g., La. Envtl. Action Network v. Sun Drilling Products Corp.*, 716 F. Supp. 2d 476, 479-81 (E.D. La. 2010) (Barbier, J.) (CWA bars citizen suits brought *after* diligent prosecution of an action has commenced).

In this instance, the D1 Plaintiffs provided the requisite pre-suit notices to BP and Transocean.  While there may be ongoing questions of fact concerning Transocean's corporate structure, no one contests that the complaints underlying the D1 Master Complaint were filed *before* any government action commenced.[70]  Thus, to the extent BP and Transocean believe that the diligent prosecution bar has some detrimental effect on the D1 Plaintiffs' claims, they are sorely mistaken.  The bar is totally irrelevant to the present case.

## VIII.  RULE 19 DOES NOT REQUIRE DISMISSAL OF THE ESA CLAIMS.

Rule 19 does not require the dismissal of the ESA claims.  BP states that various government agencies are "indispensible" parties but offers no explanation for its conclusion.  *See* BP Mem. at 41-43.  BP misunderstands the application of Federal Rule of Civil Procedure 19 in arguing for dismissal of the ESA claims in Section V.A. of its memorandum.  Rule 19 establishes a two-step inquiry for "[d]etermining whether to dismiss a case for failure to join an indispensable party."  *Hood v. City of Memphis*, 570 F.3d 625, 628-29 (5th Cir. 2009).  First, the Court must determine whether a person is a "necessary" party under Rule 19(a).  *See id.*  Second, "[i]f the necessary party cannot be joined *without destroying subject-matter jurisdiction*, the court must then determine whether that person is 'indispensable,' that is, whether litigation can be properly pursued without the absent party," under Rule 19(b).  *Id.* at 629 (emphasis added).  Dismissal of a complaint is proper under Rule 12(b)(7) only if the joinder of required parties deprives the court of subject matter jurisdiction.  *See August v. Boyd Gaming Corp.*, 135 Fed. Appx. 731, 732 (5th Cir. June 22, 2005) ("A prerequisite to a proper dismissal for failure to join an indispensible party is that the absent party, if added, would divest the court of subject-matter

---

[70] The federal government did not file an enforcement action against BP and other Defendants until December 15, 2010.

jurisdiction.").  Here, the government agencies are neither (1) required parties under Rule 19(a) nor (2) indispensable parties for which joinder would destroy the Court's subject matter jurisdiction.  Therefore, BP's motion to dismiss based on Section V.A of its memorandum must be denied.

### A.    The Government Agencies Are Not Required Parties.

The government agencies are not required parties pursuant to Rule 19(a).  Rule 19(a)(1) establishes two types of required parties: (A) a person in whose absence the "court cannot accord complete relief among existing parties" and (B) a person who "claims an interest relating to the subject of the action and is so situated" that the litigation will either "impair or impede the person's ability to protect the interest" or "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations."  Fed. R. Civ. P. 19(a)(1)(A)-(B).  The Rule 19 inquiry "is a highly-practical, fact-based endeavor," and the "party advocating joinder has the initial burden of demonstrating that a missing party is necessary."  *Hood*, 570 F.3d at 628.

The ESA creates a private right of action against private parties to enjoin violations of the Act's prohibition on the take of listed species.  *See* 16 U.S.C. § 1540(g).  As a general rule, "federal and state agencies administering federal environmental laws are not necessary parties in citizen suits to enforce federal environmental laws" like the ESA.  *Ass'n to Protect Hammersley, Eld, and Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1014 (9th Cir. 2002) (citing supporting cases from the Second Circuit, the D.C. Circuit, the District of Colorado, and the District of New Jersey.  The principle underlying these decisions is that "[i]t is the government agency's alleged failure to act that brings the citizen suit into play."  *Id.* (citing *Friends of the Earth v. Carey*, 535

F.2d 165, 173 (2nd Cir. 1976)); *see also Bennett*, 520 U.S. at 164-65 (observing that the ESA citizen suit provision is an "authorization of remarkable breadth").  Here, requiring joinder of the government would subvert the ESA citizen suit provision because it would undermine the direct instructions of Congress in 16 U.S.C. § 1540(g).[71]

Furthermore, the facts asserted by BP do not establish that "the Court will be unable to accord complete relief."  BP Mem. at 42.  More specifically, BP makes generalized statements about the Gulf cleanup that do not provide any indication that the Court cannot accord adequate relief for the injury sought to be remedied by the Plaintiffs, that is the injury to threatened and endangered species in the Gulf of Mexico as a result of the release of crude oil from the Macondo well and the application of dispersants in response to the oil spill. The ESA Plaintiffs have already suggested several possible forms of equitable relief in their complaint, none of which require that federal or state agencies be made parties.  *See* ESA Compl. at ¶ 74.  For example, should the Court determine that compelling the protection of listed species habitat, creating an endowment for several species, or any of the other relief suggested by the Plaintiffs is appropriate equitable relief for recovering "endangered and threatened species in the Gulf region in the wake of the *Deepwater Horizon* disaster," *id.*,  BP has failed to offer any explanation, let alone any facts demonstrating, why such relied could not be implemented without the participation of the agencies.  At a minimum, BP's argument is totally premature before the

---

[71] The ESA's citizen suit provision reserves "to the Government a right of first refusal to pursue the action initially and a right to intervene later."  *See Bennett*, 520 U.S. 1162.  Here, the Plaintiffs sent their May 25, 2010 notice letter to the Secretary of the Interior, the Acting Director of the U.S. Fish & Wildlife Service, the Secretary of Commerce, and the Assistant Administrator of NOAA Fisheries and the National Marine Fisheries Service.  As BP acknowledges, the federal government has reserved the right to commence an ESA action but has thus far not done so.  *See* BP Mem. at 9; *U.S. v. BP Exploration & Production Inc.*, Civ. A. No. 2:10-cv-04536-CJB-SS at ¶ 92 (E.D. La. Dec. 15, 2010).

Court has even considered relief that would help redress the Plaintiffs' interests in listed species harmed by the oil spill.

BP states that the lawsuit "*may* impair these agencies interests if it were to require BP to engage in particular activity that the various agencies deemed improper" and that "any orders this Court imposes may be contradicted or counteracted by actions of the government agencies." BP Mem. at 42 (emphasis added).  However, the Defendant fails to demonstrate how equitable relief targeted to the restoration and recovery of endangered species, such as a permanent endowment, will expose BP to a "serious risk of inconsistent obligations."  Rather, at this early stage, the Court should presume that any equitable relief fashioned by the Court on the ESA claims will be consistent with and likely complement the government's overall cleanup effort; it will be one component of a massive recovery destined to take decades.  BP offers wholly perfunctory conclusions masquerading as facts and ignores the fact-based analysis that Rule 19 requires as well as Congress' overarching intent to create a broad citizen suit provision in the ESA that would complement and supplement the government's efforts.  *See Bennett*, 520 U.S. at 165.

The Court, applying its traditional equitable powers, can craft a suitable remedy for the ESA violations that does not contradict the efforts of the government agencies. *See Strahan*, 127 F.3d at 170; *cf. Loggerhead Turtle*, 148 F.3d at 1255 (observing that the district court could fashion injunctive relief under the ESA so long as at least one available remedy is constitutional). In *Animal Welfare Inst. v. BP Am. Inc.*, Civ. A. No. 10-1866 (E.D. La. July 20, 2010) cited by BP, *see* BP Mem. at 43 n.16, the issue was the effect of the government-supervised cleanup on listed species, and therefore, the government's involvement in the case was necessary for resolution.  Unlike that case, here, the relief sought by the Plaintiffs will only supplement the

general government cleanup.  The Court can apply its traditional equitable powers at the remedial stage of this case and make a specific inquiry into whether the relief it proposes is consistent with other Gulf restoration efforts.  *See Loggerhead Turtle*, 148 F.3d at 1231; *Strahan*, 127 F.3d at 170.  Because the government agencies are not required parties, BP's motion to dismiss based on the arguments in Section V.A of its memorandum must be denied.

### B.      The Government Agencies Are Not Indispensable Parties under Rule 19.

The government agencies are not indispensable parties.[72]  The Defendants misunderstand the application of Federal Rule Civil Procedure 19 in arguing for dismissal of the ESA claims in Section V.A. of their motion.  The dismissal of a complaint under Rule 12(b)(7) is only proper if the joinder of required parties will deprive the court of jurisdiction.  *See August*, 2005 U.S. App. LEXIS 12526 at *3.[73]  Here, BP does not argue that the joinder of the alleged required parties, the "Unified Area Command, the Gulf States' environmental agencies, and agencies serving as the NRD Trustees," BP Mem. at 42, will deprive the Court of subject-matter jurisdiction, nor can it.  The ESA claims invoke the Court's federal question jurisdiction pursuant to 16 U.S.C.§ 1331, and the ESA itself specifically authorizes citizen suits against "any person, including the United States and any other governmental instrumentality or agency…" 16 U.S.C. § 1540(g)(1)(A).  As BP acknowledges, the United States has already invoked the Court's jurisdiction.  BP Mem. at 5.  Even if the Court determines that the agencies are required parties under Rule 19, a conclusion

---

[72] A party is labeled "indispensable" if the court determines (i) that its subject matter jurisdiction will be destroyed by joinder and (ii) that it must dismiss the lawsuit under Rule 19(b) in that party's absence.  *See English v. Seaboard C.L.R. Co.*, 465 F.2d 43, 48 (5th Cir. 1972).

[73] Furthermore, dismissal under Rule 19 is not automatic.  Even if joinder of a required party will deprive a court of subject-matter jurisdiction, the court may determine that the lawsuit should not be dismissed under the inquiry set forth in Rule 19(b).  *See* Fed. R. Civ. P. 19(b) ("If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed.")

RESP.  TO MOTIONS TO DISMISS BUNDLE  D1 COMPLAINT                    Page 67

not supported by the facts asserted by BP, the proper relief is joinder of such parties, not dismissal of the ESA claims.  *See* Fed. R. Civ. P. 19(a)(2) ("If a person has not been joined as required, the court must order that the person be made a party.")  Because the government agencies are not indispensable parties, BP's motion to dismiss based on the arguments in Section V.A of its memorandum must be denied.

## IX.    THE PRIMARY JURISDICTION DOCTRINE IS INAPPLICABLE TO THE ESA CLAIMS.

The primary jurisdiction doctrine is not applicable to the Plaintiffs' ESA citizen suit.  In general, courts, including this Court on a least two occasions, have determined that the doctrine of primary jurisdiction is not applicable to citizen suits brought pursuant to federal environmental laws like the ESA.  *See, e.g.*, *Loggerhead Turtle*, 148 F.3d at 1246 n.17 (finding primary jurisdiction doctrine inapplicable to ESA Section 9 claims); *Coho Salmon v. Pac. Lumber Co.*, 30 F. Supp.2d 1231, 1245 (N.D. Cal. 1998) (finding primary jurisdiction doctrine inapplicable to ESA Section 9 claims because "enforcement of the ESA's prohibition against the 'take' of endangered or threatened species has been placed squarely within the jurisdiction of the courts"); *St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Refining, LLC*, 348 F. Supp.2d 765, 768 (E.D. La. 2004) (finding doctrine of primary jurisdiction not applicable to Clean Air Act citizen suit); *Stewart-Sterling One, LLC v. Tricon Global Rests., Inc.*, Civ. A. No. 00-477 Section N, 2002 U.S. Dist. LEXIS 15746 at *17-22 (E.D. La. Aug. 9, 2002) (finding primary jurisdiction doctrine not applicable to RCRA citizen suit).  "[A]pplying the doctrine of primary jurisdiction to citizen suits would frustrate Congress's intent, as evidenced by its provision for citizen suits, to facilitate broad enforcement of environmental protection laws and regulations."  *Sierra Club v. Tri-State Generation & Transmission Ass'n, Inc.*, 173 F.R.D. 275, 284 (D.Colo. 1997); *see also*

*Wilson v. Amoco Corp.*, 989 F. Supp. 1159, 1170 (D. Wyo. 1998) ("There is an additional, overriding reason for courts to hear RCRA and CWA cases despite their supposed unique nature: Congress has told us to.").  Congress has already specifically set forth the circumstances under which a citizen suit under the ESA is precluded which are not present in this litigation.  *See* 16 U.S.C. § 1540(g)(2).

Furthermore, application of the primary jurisdiction doctrine is not appropriate at the motion to dismiss stage.  In *Davel Communications*, a decision relied on by BP, the Ninth Circuit observed that "where . . . the allegations of the complaint do not necessarily require the doctrine's applicability, then the primary jurisdiction doctrine may not be applied on a motion to dismiss. . . ."  *Davel Commc'ns, Inc. v. Quest Corp*, 460 F.3d 1075, 1088 (9th Cir. 2006).  Here, the Plaintiffs have sufficiently alleged injuries to their interest in listed species caused by the Gulf oil spill that are redressable.  For these reasons, BP's motion to dismiss based on Section V.B of its memorandum must be denied.[74]

## X.   THE STATE AND MARITIME LAW COUNTS STATE A CLAIM.

The Ninth and Tenth claims for relief in the D1 Master Complaint address the need for injunctive relief under state law or federal maritime law to address the ongoing impacts to property caused by the Deepwater Horizon spill.  BP and Transocean both incorporate by reference their claims in the motions to dismiss the B1 Master Complaint.  That motion argues that maritime and state law are both fully preempted by the Oil Pollution Act and Outer

---

[74] Alternatively, should the Court determine that the primary jurisdiction doctrine is applicable to the ESA claims, the appropriate remedy is a stay of proceedings, not dismissal.  *See Northwinds Abatement v. Employers Ins.*, 69 F.3d 1304, 1309 (5th Cir. 1995) ("in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views").

Continental Shelf Lands Act.  Rather than duplicate the arguments here, the D1 Plaintiffs incorporate by reference the response being filed with respect to the B1 complaint.

Two aspects of the BP and Transocean motions do require a brief additional response. First, Transocean argues that the D1 Plaintiffs have not pled any irreparable injury, as required for injunctive relief.  *See, e.g.,* Transocean Mem. at 6.  To the contrary, paragraphs 101-116 of the D1 Master Complaint clearly allege sufficient facts to support a claim of irreparable injury from inadequate cleanup.  These paragraphs set out the fact that oil remains in the offshore environment and marshes, and has continuing impacts on private landowners.  These paragraphs further allege that the Defendants have failed to characterize the remaining oil necessary to guide the cleanup, and that impacts are expected to continue for months or years.  Paragraphs 179-194 set out that cleanup of property to its pre-spill condition will require injunctive relief.

Second, BP alleges that the claims for injunctive relief in the D1 Master Complaint are simply "disguised private damages claims masquerading as calls for injunctive relief."  BP Mem. at 45.  BP misunderstands the law governing trespass on private lands, and state law cleanup standards.  Property owners are plainly entitled to injunctive relief to ameliorate the damage from BP's spill and the resulting trespass on their property, tailored to the extent that the proof on the merits of the case warrants it.

For instance, under Louisiana law a property owner is entitled to injunctive relief to both remove existing encroachments and to prevent future trespasses.  *E.g.*, *Perdue v. Cruse*, 38 So.3d 1235 (La. App. 3d Cir. 2010).   As the Louisiana court noted, the Louisiana Civil Code permits permanent injunctive relief in favor of a person whose possession of immovable property is disturbed, and trespass constitutes such a disturbance.  *Id.* at 1242.  The Louisiana courts have

granted injunctive relief specifically to require removal of items illegally dumped on property. *E.g., Dore v. Jefferson Guaranty Bank,* 543 So.2d 560, 562 (La. App. 4th Cir. 1989). Furthermore, the D1 Master Complaint alleges that oil contaminated sediments remain in the onshore, nearshore and offshore environments, that oil continues to contaminate property owners land, and that injunctive relief to require the adequate removal of oil and prevent future trespass may be required.

In stating broadly Plaintiffs' request for injunctive relief, Plaintiffs are putting the polluters on notice that they will be subject to requests for injunctive relief resulting from their contamination causing conduct.  By example, MC252 oil saturated sediment clearly meets the definition of solid waste, as a discarded material.  Solid Waste Disposal Act, 42 U.S.C. § 6903(27); 40 C.F.R. § 261.2.  Unified Command's emergency spill removal effort expressly does not displace state clean-up standards that ordinarily govern solid waste site remediation.  *See* 33 U.S.C. § 2718 (Oil Pollution Act).[75]  The open dump clean-up regulations in Louisiana, called "RECAP", require that the "submitter shall identify the name and mailing address of all other landowners… whose property is within an Area of Investigation (AOI).  RECAP also requires a thorough assessment of each property owners land and the development of a clean-up plan tailored to the conditions found on such land.  Property owners have the right to control access to their land.  Assuming BP did in fact identify each property owner as required, BP should notify each landowner before this assessment is done, to provide the owner with an opportunity to

---

[75] Section 2718 of the Oil Pollution Act provides:
 (a) Preservation of State authorities; Solid Waste Disposal Act
Nothing in this Act… shall (1) affect… the authority of any State… from imposing any additional liability or requirements with respect to … (B) any removal activities in connection with such a discharge; or (2) **affect… the obligations or liabilities of *any person*** under the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) or State law, including common law.

participate, in addition to inspections and tests obtained from their property.  These rights are enforceable as derived from the general prohibition against trespass and the concomitant right to abate such trespass.  BP has failed to do these things.

## CONCLUSION

The substance of Defendants' motions to dismiss poignantly illustrates their inherent contradiction: while they allegedly "care about the small people,"[76] they in fact have no intentions of being held accountable for their role in creating the worst environmental disaster in U.S. history.  For all the foregoing reasons, BP's and Transocean's motions should be denied both individually and in their entirety.

This 30th day of March, 2011.

Respectfully submitted,

*/s/ Stephen J. Herman*
Stephen J. Herman, LA Bar No. 23129
Herman Herman Katz & Cotlar LLP
820 O'Keefe Avenue
New Orleans, LA 70113
Tel: (504) 581-4892
Fax: (504) 569-6024
sherman@hhkc.com
*Plaintiffs Liaison Counsel*

*/s/ James Parkerson Roy*
James Parkerson Roy, LA Bar No. 1511
Domengeaux Wright Roy & Edwards LLC
556 Jefferson Street, Suite 500
Lafayette, LA 70501
Tel: (337) 233-3033
Fax: (337) 233-2796
jimr@wrightroy.com
*Plaintiffs Liaison Counsel*

---

[76]   BP Parties' Responses and Objections to Plaintiffs' Interrogatories, Requests for Production, and Requests for Admission, Response to Request for Admission No. 31, p. 281, LN File & Serve Doc. No. 34758413.

## PLAINTIFFS' STEERING COMMITTEE

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office: (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT DRESCHER IMPREVENTO &
WALKER, P.C.
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office: (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Office: (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL 36660

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY 10003
Office: (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office: (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLEW, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615

Office: (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA 70726
Office: (225) 664-4193
Telefax: (225) 664-6925
E-Mail: calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail: ervin@colson.com

New Orleans, LA 70130
Office: (504) 588-1500
Telefax: (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Office: (214) 521-3605
Telefax: (214) 599-1172
E-Mail: ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
4 Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail: mcwatts@wgclawfirm.com

## REGULATORY AND INJUNCTIVE RELIEF WORKING GROUP

CHARLES M. TEBBUTT
DANIEL C. SNYDER
Law Offices of Charles M. Tebbutt, P.C
451 Blair Blvd.
Eugene, OR 97402
Ph: 541-344-3505
Fax: 541-344-3516
charlie.tebbuttlaw@gmail.com

ROBERT B. WIYGUL #17411
JOEL R. WALTZER
Waltzer & Wiygul
1011 Iberville Drive

GREGORY BUPPERT
Tennessee BPR No. 024340
Defenders of Wildlife
1130 17th Street, N.W.
Washington, DC 20036-4604
Telephone: 202.682.9400
Facsimile: 202.682.1331
gbuppert@defenders.org

RICHARD C. ELLIS
William S. Strain & Associates
422 E. Woodstone Court
Baton Rouge, LA 70808

RESP.  TO MOTIONS TO DISMISS BUNDLE  D1 COMPLAINT              Page 74

Ocean Springs, Mississippi 39564                    (225) 382-3712
Tel:  (228) 872-1125
Fax:  (228) 872-1128
robert@waltzerlaw.com