UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" GULF OF MEXICO, APRIL 20, 2010 | * * * * | MDL NO. 2179 SECTION "J" |
| **Pleading Applies to:** *All Cases in Pleading Bundle D1* * * * * * * * * * * * * * * * * | * * * | JUDGE BARBIER MAGISTRATE SUSHAN |

# DECLARATION OF GREGORY BUPPERT

I, Gregory Buppert, declare as follows:

1. I am over twenty-one years of age and make this declaration based on my own personal knowledge.

2. I am a Staff Attorney at the nonprofit organization Defenders of Wildlife, and one of the counsel for the D1 plaintiffs in these proceedings. More specifically, I represent the plaintiffs Defenders of Wildlife, Gulf Restoration Network, Inc., and Save the Manatee Club, Inc. who have alleged violations of the Endangered Species Act against the BP defendants.

3. I am submitting this declaration in support of the plaintiffs' memorandum in opposition to BP's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 12(b)(7).

4. Attached hereto as **Exhibit A** is a true and correct copy of the notice letter that the plaintiffs sent to the BP defendants, pursuant to 16 U.S.C. § 1540(g)(2)(A), on May 25, 2011, providing notice of the "take" of threatened and endangered species in violation of the Endangered Species Act resulting from the BP defendants' release of oil from the Macondo well and their use of dispersants in the Gulf of Mexico.

I make this declaration under penalties of perjury pursuant to 28 U.S.C. § 1746, and I state that the facts set forth herein are true.

/s/     Gregory Buppert

Gregory Buppert

Dated: March 29, 2011

May 25, 2010

**<u>Via Certified Mail, Return Receipt Requested</u>**

| | | |
|---|---|---|
| Tony Hayward,<br>Chief Executive Officer<br>BP America, Inc.<br>501 Westlake Park Blvd.<br>Houston, TX 77079 | Andy Inglis,<br>Chief Executive, Exploration<br>& Production<br>BP America, Inc.<br>501 Westlake Park Blvd.<br>Houston, TX 77079 | Lamar McKay,<br>Chairman & President,<br>BP America, Inc.<br>501 Westlake Park Blvd.<br>Houston, TX 77079 |

Dear Sirs:

      Pursuant to Section 11(g) of the Endangered Species Act ("ESA") (16 U.S.C. § 1531 *et seq*.), this letter serves as notice on behalf of Defenders of Wildlife ("Defenders") and the Southern Environmental Law Center ("SELC") of our intent to sue BP for violations of Section 9 of the ESA (16 U.S.C. § 1538) arising from oil and gas exploration and development activities in the Gulf of Mexico ("the Gulf"). Specifically, BP has unlawfully taken and continues to unlawfully take federally listed endangered and threatened species, including listed marine mammals, fish, sea turtles, and birds as the result of its release of crude oil and dispersants into the Gulf of Mexico in connection with the Deepwater Horizon disaster.

    **I.**    **LEGAL FRAMEWORK**

      Congress enacted the ESA to provide a "means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . [and] a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b). Pursuant to these objectives, section 9(a)(1) of the ESA makes it "unlawful for any person subject to the jurisdiction of the United States" to "take any such [endangered] species within the United States or within the territorial sea of the United States" or to "take any such species on the high seas." 16 U.S.C. § 1538(a). FWS regulations extend these prohibitions to most threatened species.[1] 50 CFR §§ 17.31, 17.21. The ESA defines the term "take" as meaning, "to harass, harm, pursue, hunt, shoot wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532 (19). The U.S. Fish and Wildlife Service ("FWS") and National Marine Fisheries Service ("NMFS") (collectively "the Services") have interpreted the term "harm" to mean "an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation where it actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns including breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 17.3; 64 Fed. Reg. 60,727 (Nov. 8, 1999). The Services have interpreted the term "harass" to mean "an intentional or negligent act or

---

[1]     FWS and NMFS have adopted special rules that regulate certain threatened species in the Gulf. *See* 50 C.F.R. §§ 17.40-17.48; 50 C.F.R. §§ 223.201-223.208. These rules restrict take of the Gulf sturgeon and Elkhorn and Staghorn corals. 50 C.F.R. § 17.44; 50 CFR § 223.208.

omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3.

## II. FACTUAL BACKGROUND

### A. Risks Identified Prior to the Deepwater Horizon Blowout

#### 1. NFMS's Biological Opinion

On April 13, 2007, Minerals Management Service ("MMS") issued a Final Environmental Impact Statement addressing eleven oil and gas lease sales in the Outer Continental Shelf of the Gulf of Mexico that were set to occur during the course of MMS's Five-Year Program (hereinafter termed "Gulf FEIS"). *See* 72 Fed. Reg. 18,667 (Apr. 13, 2007). The Gulf FEIS identified twenty-one endangered or threatened species present in the project area, and noted that many of the species would suffer deleterious impacts from oil spills. *See* Gulf FEIS at 4-238. Accordingly, pursuant to Section 7 of the ESA, MMS initiated consultation with NMFS and FWS. On June 29, 2007, NMFS issued a biological opinion ("Gulf BiOp") addressing the effects of "the exploration, development and production, and associated activities as a result of MMS lease sales of available [outer continental shelf] blocks" on seven listed species—sperm whales, Gulf sturgeon, and five species of sea turtles (leatherback, loggerhead, green, hawksbill, and Kemp's ridley). *See* Gulf BiOp at 3, 14. Although NMFS discounted the risk of oil spills, it nonetheless determined that many of these protected species would be subjected to and potentially harmed by oil spills during the 40-year lifetime of the proposed actions. *See id.* at 72-82. NMFS estimated that eight leatherback turtles, forty-nine green turtles, twenty-five Kemp's ridley turtles, 153 loggerhead turtles, and one hawksbill turtle would be taken as a result of oil spills over that period, with sixty-six of those takes being lethal. *See id.* at 78-80. Oil spills were also expected to lead to two lethal and two non-lethal takes of gulf sturgeon, as well as eleven non-lethal takes of sperm whales. *See id.* at 81.

In addition to the risk of oil spills, NMFS examined other potential threats, most notably vessel strikes and seismic surveys, to the seven listed species. *See id.* at 68-72. Based on these analyses, it expected that, due to vessel strikes, there would be take of over 500 sea turtles, approximately one-third of which would be lethal and the majority of which involved loggerhead turtles. *See id.* at 100. Based on its findings, NMFS concluded that the lease sales and related actions, including drilling, would "not appreciably reduce the likelihood of survival and recovery" of any of the listed species and that "implementation of the proposed action described in this biological opinion is not likely to jeopardize the continued existence of these species." *Id.* at 99. NMFS issued an ITS for these takes for vessel strikes, seismic surveys and other non-spill activities associated with the lease sales and related actions. *See id.*

2

Exhibit A
Page 2

### 2. MMS's Environmental Analysis

On March 19, 2008, MMS held Lease Sale 206, which encompassed Mississippi Canyon 252 ("MC252"), the site of the Deepwater Horizon oil disaster. Prior to commencing this sale, on October 22, 2007, MMS published an Environmental Assessment ("EA") examining the sale's potential environmental effects. The EA summarized and incorporated by reference many of the findings of the Gulf FEIS and included new information discovered subsequent to publication of that FEIS. Based on the information contained in the EA, MMS made a Finding of No New Significant Impact ("FONNSI"), and chose not to prepare a supplemental EIS. Nonetheless, the EA concluded that many of the listed species inhabiting the area would suffer oil-spill-related takes from Lease Sale 206. The EA predicted, for example, that over the forty-year lifetime of Lease Sale 206, the following would occur: eleven non-lethal takes of sperm whales; forty-two lethal and 111 nonlethal takes of loggerhead turtles; two lethal and seven nonlethal takes of a leatherback sea turtles; nine lethal and sixteen nonlethal takes of Kemp's ridley sea turtles; and thirteen lethal and thirty-six nonlethal take of green sea turtles. *See* EA at 38, 41. Neither MMS nor BP received ESA authorization for these predicted takes. *See id.*

### 3. BP's Exploration Plan

On March 10, 2009, BP submitted to MMS an Exploration Plan ("EP") and Environmental Impact Analysis ("EIA") for MC252, in which it asserted that it did "not anticipate that any protected species might be incidentally taken during operations proposed in this plan." EP at 8-1. BP also predicted that the worst case scenario for an oil spill from an uncontrolled blowout was 162,000 barrels of crude oil per day. *See id.* at 7-1. The EP noted that accidental oil spills could have adverse impacts on protected species and critical habitat in the area. *See, e.g., id.* at 14-3 ("Oil spills and oil spill response activities are potential threats that could have lethal effects on turtles."). Nevertheless, it anticipated that there would be no such impacts because "it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities." *Id.* at 14-3 to 14-6. MMS approved the EP on April 6, 2009, instructing BP to "[e]xercise caution while drilling due to indications of shallow gas and possible water flow."

## B. Deepwater Horizon Oil Spill and Subsequent Events

On April 20, 2010, an offshore oil rig at MC252 exploded and caught fire, causing the deaths of eleven workers and spilling millions of gallons of oil into the water. The oil rig at the site, the Deepwater Horizon, sank shortly thereafter, and the well over which it was operating continues to spew oil as of the date of this letter. According to current estimates, at least 5,000 barrels (about 210,000 gallons) of oil per day are being spilled, however, there is good reason to believe this figure is a gross underestimation, with the actual figure possibly as high as 70,000 barrels (about 2.9 million gallons) per day – meaning that over 6 million gallons have been spilled to date. *See* Joel Achenbach, *5,000 or 26,000 Barrels a Day: Size of Gulf Oil Spill Is a*

3

*Guesstimate*, Wash. Post (May 14, 2010), at A6. As of the date of this letter, the oil slick created by this spill is estimated to cover at least 2,500 square miles of open ocean and has begun polluting the shores of the Gulf Coast. Scientists also believe that the spill will enter the Loop Current and be transported around the Florida panhandle and up the Atlantic seaboard.

At present, efforts to contain the disaster and stop the release of oil have been unsuccessful. Digging a relief well may turn out to be the only viable solution, an option that could take at least three months to complete. Based on current estimates of spill volume this would mean that between 450,000 and 2.3 million barrels (about 19 to 90 million gallons) of oil could leak into the gulf, an amount that would dwarf the approximately 12 million gallons spilled in the 1989 Exxon Valdez accident.

As part of its effort to remediate the spill BP has applied large amounts of dispersant, including Corexit 9500A and Corexit 9527A. Although both forms of Corexit applied at the Deepwater Horizon site have been approved by EPA, BP's use of the chemicals is unprecedented in both manner and quantity. *See* U.S. Environmental Protection Agency, NCP Product Schedule Technical Notebook, http://www.epa.gov/oem /docs/oil/ncp/notebook.pdf (last visited May 24, 2010). To date, over 115,000 gallons of dispersant has been used subsurface at the source of the spill, and over 700,000 gallons of dispersant has been applied to surface water. *See* Deepwaterhorizonresponse.com, Current Operations and Ongoing Response, http://www.deepwaterhorizon response.com/go/doc/2931/543103/ (last visited May 24, 2010).

Risks associated with the use of these dispersants include degradation of air quality resulting from emissions of volatile chemicals and direct harm to marine organisms. EPA has repeatedly acknowledged that the potential ecological damage resulting from the use of these dispersants is unknown, and has noted that "[i]t is too early in the process to know what the scope of the natural resource damage will be[,]" and "the long term effects on aquatic life are unknown...." *See* U.S. Environmental Protection Agency, Questions and Answers on Dispersants, http://www.epa.gov/oem/ docs/oil/ncp/notebook.pdf (last visited May 24, 2010). In addition, "[i]t is unknown if dispersed oil has toxic implications to the human population because bioaccumulation through the food chain has not been evaluated." *Id.* A study examining the toxicity of Corexit 9500 found that it increased the exposure of fish to the polycyclic aromatic hydrocarbons from crude oil, and the use of Corexit 9500 and 9527 has been prohibited elsewhere for over a decade as a result of the chemicals' documented adverse impacts. *See* Shahunthala D. Ramachandran, Peter V. Hodon, Colin W. Khan & Ken Lee, Oil dispersant increases PAH uptake by fish exposed to crude oil, 59 Ecotoxicology and Envtl. Safety 300 (2004); U.K. MARINE MANAGEMENT ORGANISATION, OIL SPILL TREATMENT PRODUCTS APPROVED FOR USE IN THE UNITED KINGDOM 10 (2010), http://www. marinemanagement.org.uk/protecting/pollution/documents/approval_approved_products.pdf.

Acknowledging the risks associated with Corexit, EPA has directed BP to use a less toxic dispersant both at the source of the leak and at the surface.[2] *See* U.S. Environmental Protection Agency, *EPA: BP Must Use Less Toxic Dispersant*, EPA NEWSROOM, May 20, 2010, http://yosemite.epa.gov/opa/admpress.nsf/d0cf6618525a9efb85257359003fb69d/0897f55bc6d9a 3ba8525772 90067f67f!OpenDocument. BP, however, initially declined to change its practice, stating that Corexit was the only dispersant immediately available in sufficient quantities at the time of the Deepwater Horizon blowout, and that, in BP's view, it remains the best option. *See* Letter from Douglas J. Suttles, Chief Operating Officer Exploration and Production, BP, to Rear Admiral Mary Landry, Commander, Eighth Coast Guard District, and Samuel Coleman, Director, Superfund Division, U.S. EPA Region 6 (May 20, 2010) (copy available at http://www.epa.gov/bpspill/dispersants/5-21bp-response.pdf).

### III. IMPACTS ON ENDANGERED SPECIES AND HABITAT

The Gulf of Mexico is home to numerous endangered and threatened species all of which face acute and/or chronic risks from the Deepwater Horizon disaster including: five species of whale (blue, fin, sei, humpback, and sperm); five species of sea turtle (green, hawksbill, leatherback, Kemp's ridley, and loggerhead); seven species of beach mice (Alabama, Choctawhatchee, Anastasia, St. Andrew, Southeastern and Perdido Key); seven species of bird (piping plover, roseate tern, whooping crane, Mississippi sandhill crane, Everglade snail kite, wood stork, and least tern); four species of fish (Gulf sturgeon, Alabama sturgeon, pallid sturgeon and smalltooth sawfish); two species of coral (elkhorn and staghorn); Florida salt marsh vole; and the West Indian manatee.

Oil effects on wildlife depend on the species but may include: hypothermia due to conductance changes in skin; resulting in metabolic shock; toxic effects and secondary organ dysfunction due to ingestion of oil; congested lungs and damaged airways (via the whale's blowhole); interstitial emphysema due to inhalation of oil droplets and vapor; gastrointestinal ulceration and hemorrhaging due to ingestion of oil during feeding; eye and skin lesions from continuous exposure to oil; decreased body mass due to restricted diet and stress due to oil exposure; and behavioral changes. Researchers indicate that inhalation of oil droplets, vapors and fumes is among the greatest risks, particularly for whales, sea turtles and other marine mammals, which may need to surface in extensive slicks to breathe, thereby taking in oil which can damage mucous membranes, damage airways or cause immediate death.

The five species of federally listed sea turtle inhabiting the Gulf face particularly acute and chronic threats from the Deepwater Horizon disaster. Exposure to oil threatens sea turtles at all stages of life. Oil poured directly on eggs can kill or maim developing turtles, probably because the oil prevents vital oxygen from entering the eggs. Females attempting to nest after

---

[2] The full text of the directive and addendums are available at: http://www.epa.gov/bpspill/dispersants.html# summary.

5

the spill has hit shore will have to cross the oiled zone of the beach to reach the high ground on which they nest. Thus, they risk exposure to the oil, and may forego nesting in contaminated areas entirely. Turtles that survive to hatching must crawl from the nest to the water, avoiding predators such as gulls and crabs, and on oiled beaches this means crossing a potentially toxic zone. Once in the water, hatchlings face a number of risks from oil spills. Because they are small, they are more easily overwhelmed by any toxic substance. They are also more likely to choke on clumps of oil and tar, or have their mouths or stomachs blocked. Small turtles are likely to disperse and forage by moving in the same Gulf of Mexico currents that concentrate the oil. These young creatures also have to spend more time at the surface than adults, since they cannot hold their breath as long. This increases the likelihood that they will encounter a floating oil slick.

Sea turtles of all ages have trouble distinguishing tarballs from food. Ingested oil and tar can be toxic to sea turtles, and can also accumulate in the esophagus and stomach—interfering with feeding and diving. Sea turtles' tendency to inhale rapidly and deeply before diving also puts them at risk of exposure to oil slicks and vapors. Both sudden exposure to large amounts of oil and long term exposure to small quantities of oil harm turtles internally and externally. Internal effects include drops in the volume of red blood cells, elevated levels of white blood cells, changes in liver enzymes, and a shutting down of the glands that help the turtles get rid of excess salt. External effects include skin inflammation and swelling, with the loss of skin layers over several weeks following exposure.

In addition to the direct harm caused by exposure to oil, sea turtles may suffer indirect impacts for weeks or months afterwards. Sea turtles may ingest small amounts of oil from the water or their food that, over time, may accumulate in their bodies and harm or kill them. They may also suffer from lack of food if a spill is large enough that it kills off seagrass beds, shellfish and other food sources. Low levels of oil exposure that don't cause immediately observable harm could also have subtle but damaging chronic effects, like impairing the turtles' sense of smell, hampering their immunity or reducing their levels of gut-dwelling, digestion-aiding bacteria.[3]

The Deepwater Horizon blowout is also threatening 38 National Wildlife Refuges ("NWR") lining the Gulf Coast which serve as havens for the region's endangered and threatened species and numerous other species of birds, sea turtles, marine mammals, and other wildlife. The interface between land and ocean draws a unique and diverse assemblage of species to these refuges. The Delta NWR includes marsh and open water habitat that is used by

---

[3] Scientists have also become concerned over the impact the oil could have on manatees, including a pod recently seen moving along the Florida coast towards Mobile Bay Alabama. *See* http://blog.al.com/live/2010/05/scientists_worry_gulf_oil_spil.html.

hundreds of thousands of waterfowl and shorebirds, as well as several sensitive species including Arctic peregrine falcon, piping plover and Gulf sturgeon. Similarly important to the protection of sensitive bird populations, the Breton NWR consists of several barrier islands off Louisiana's southeast coast. This refuge is a designated Globally Important Bird Area, and serves as a haven for threatened and endangered seabird, shorebird, and waterfowl species, including the piping plover, and the least tern.

A variety of sensitive species also rely on the Grand Bay, Bon Secour, and Key West NWRs for their survival or recovery. The Grand Bay NWR, along with the adjacent Grand Bay National Estuarine Research Reserve, provides nearly 20,000 acres of protected habitat for gopher tortoises, American alligators, and pelicans, and endangered manatees have been observed on occasion. The Bon Secour NWR protects nearly 7,000 acres of dune, marsh, and forest habitats and is home to several threatened and endangered species, including the Alabama beach mouse, piping plover, wood stork, and green, loggerhead, and Kemp's ridley sea turtles. The Key West NWR's lands and waters, which span more than 200,000 acres, serve as critical habitat for 5 endangered or threatened species, including the West Indian manatee, piping plover, and green, hawksbill, and leatherback sea turtles. The Reserve is also home to a number of other federally listed or candidate species, including loggerhead and Kemp's ridley sea turtles, roseate turns, red knots, smalltooth sawfish, Miami blue butterflies, Garber's spurge, and Cape Sable thoroughwort.

Oil from the Deepwater Horizon spill has already come ashore at Breton and Bon Secour National Wildlife Refuges, and the U.S. Fish and Wildlife Service confirms that at least 25 Gulf Coast refuges are vulnerable to the spill. Even more refuges could be at risk if ocean currents carry oil around Florida and up the eastern U.S. coast. The injection of oil from the Deepwater Horizon spill into these fragile ecosystems has the potential to disrupt the health, productivity and diversity of the refuges and the sensitive species that inhabit them.

### IV.   CONCLUSION

For the reasons set forth above, Defenders of Wildlife and the Southern Environmental Law Center intend to file suit against BP for violations of Section 9 of the ESA (16 U.S.C. § 1538) sixty days after the service of this notice. Please contact us if you are interested in discussing this matter and opportunities for avoiding the need for litigation.

Sincerely,

Catherine M. Wannamaker

Southern Environmental Law Center
127 Peachtree St. NE, Suite 605
Atlanta, GA 30303-1840

Michael P. Senatore & Sierra Weaver

Defenders of Wildlife
1130 17th St., N.W.
Washington, DC 20036

7

Phone: (404) 521-9900

Email: cwannamaker@selcga.org

Phone: (202) 682-9400

Email: sweaver@defenders.org
msenatore@defenders.org

CC:

The Hon. Ken Salazar,
Secretary of the Interior
U.S. Department of the
Interior
1849 C St., N.W.
Washington, DC 20240

Eric Schwaab, Assistant
Administrator
NOAA Fisheries/NMFS
1315 East-West Highway
Silver Spring, MD 20910

Rowan Gould, Acting Director
U.S. Fish and Wildlife Service
1849 C St., N.W., 3256 MIB
Washington, DC 20240

Gary Locke, Secretary of
Commerce
Department of Commerce
1401 Constitution Ave., N.W.,
Room 5516
Washington, DC 20230