UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO on APRIL 20, 2010 **This Document Relates to: ALL CASES IN PLEADING BUNDLE D1** | ) ) ) ) ) ) ) ) ) ) |

MDL NO. 2179

SECTION: J

JUDGE BARBIER
MAG. JUDGE SHUSHAN

<u>Declaration of Daniel C. Snyder in Response to Motions to Dismiss</u>

I, Daniel C. Snyder, hereby declare that:

1.       I am over 21 years of age.  I am an associate with the Law Offices of Charles M. Tebbutt,

P.C., located at 451 Blair Blvd., Eugene, OR 97402.  I am a member in good standing with the

Oregon State Bar, OSB # 105127.  My firm represents the Center for Biological Diversity, one

of the D1 Plaintiffs, in *Center for Biological Diversity v. BP America, Inc., et al.,* 2:10-cv-01768

and 2:10-cv-02454.

2.       On March 23, 2011, I searched Transocean's public website for a listing of all corporate

directors and officers.  The specific URL I visited was

"http://www.deepwater.com/fw/main/Our-Management-7.html".  Attached hereto as Exhibit A is

a true and correct copy of the webpage as of the date of my visit.  At the time of my visit, the

following individuals were identified as executive officers and senior managers of Transocean,

Ltd.: John Briscoe, Vice President and Controller, Keelan I. Adamson, Vice President of

Engineering and Technical Support, Eric B. Brown, Executive Vice President, Legal and

Administration, and Terry B. Bonno, Vice President, Marketing.

3.      On March 23, 2011, I searched the Louisiana Secretary of State's corporations database, available online at "http://www.sos.louisiana.gov/tabid/819/Default.aspx". Attached hereto as Exhibit B, pp. 1-4, are true and correct copies of the publicly-available corporate information I retrieved from the database for "Transocean Offshore USA, Inc." and "Transocean Offshore Ventures, Inc." On March 23, 2011, I utilized Westlaw's Corporate & Business Records tool to search the Texas Secretary of State's Business Filings database. Attached hereto as Exhibit A, pp. 5-16, are true and correct copies of the publicly-available corporate information I retrieved from the database for "Transocean Enterprises, Inc.," "Transocean Offshore Deepwater Drilling, Inc.," and "Transocean Offshore Ventures, Inc."

4.      On March 10, 2011, I searched the United States Securities and Exchange Commission's Electronic Data-Gathering, Analysis, and Retrieval system ("EDGAR") for information related to Transocean Ltd. Attached hereto as Exhibit C are true and correct copies of the relevant excerpts from Transocean Ltd.'s Form 10-Q filing for the period ending March 31, 2010, and Transocean Ltd.'s 2010 Form 10-K filing.

5.      On March 28, 2011, I obtained a copy of BP's Regional Oil Spill Response Plan for the Gulf of Mexico from the New Orleans.com website. The specific URL I visited was: "http://www.neworleans.com/images/media/BP_Regional_OSRP_Redactedv2.pdf." Attached hereto as Exhibit D is a true and correct copy of the relevant excerpts from BP's plan.

6.      On March 28, 2011, I accessed the CBS News website and viewed an article entitled, "BP May Re-Tap Reservoir, Citing 'Lots of Oil.'" The URL I visited was "http://www.cbsnews.com/stories/2010/08/06/national/main6749005.shtml". The article is dated August 6, 2010, and quotes BP Chief Operating Officer Doug Suttles as stating that "[t]here's lots of oil and gas here," making reference to the MC #252 Macondo lease. He is also quoted as

saying that "[w]e're going to have to think about what to do with that at some point." A true and correct copy of the web page I viewed is attached hereto as Exhibit E.

7. On March 28, 2011, I viewed video from an underwater submersible that was purportedly recorded during BP's removal of approximately 3,500 feet of drill pipe from the Macondo Well on August 22, 2010. The video shows pollutants being discharged from the Macondo Well during the procedure. The URL that I used to access the video was "http://www.youtube.com/watch?v=_L9UX7e0hY4&feature=related".

8. On March 28, 2011, I viewed video from an underwater submersible, Enterprise ROV 1, that was allegedly recorded during BP's removal of approximately 3,500 feet of drill pipe from the Macondo Well on August 23, 2010. The video shows pollutants being discharged from the Macondo Well during the procedure. The URL that I used to access the video was "http://www.youtube.com/watch?v=p_mGLDE1YnU".

9. On March 28, 2011, I accessed a July 15, 2010 article by Kristen Hays entitled "BP says test shuts off oil leak from Gulf well." The URL I visited was "http://www.reuters.com/article/2010/07/15/us-oil-spill-idUSTRE65O5TA20100715". The article quotes BP Chief Operating Officer Doug Suttles as stating that the initial tests from the stacking cap were "a great sight but its far from the finish line." The article also states that the U.S. Coast Guard described the containment cap as "at best a temporary fix to the leak while BP finishes two relief wells that it is drilling that are intended to intersect the blown-out well and permanently seal it next month." A true and correct copy of the article is attached as Exhibit F.

10. On March 28, 2011, I accessed a July 15, 2010 Press Release from National Incident Commander Admiral Thad Allen on the U.S. Government's website concerning the oil spill,

DECLARATION OF DANIEL C. SNYDER                                                3 / 5

www.restorethegulf.gov.  A true and correct copy of that press release is attached hereto as Exhibit G.

11.      On March 28, 2011, I accessed the transcripts from a July 19, 2010 press conference with National Incident Commander Admiral Thad Allen on the U.S. Government's website concerning the oil spill, www.restorethegulf.gov.  A true and correct copy of the transcript is attached hereto as Exhibit H.

12.      On March 28, 2011, I accessed the transcripts from a July 20, 2010 press conference with National Incident Commander Admiral Thad Allen on the U.S. Government's website concerning the oil spill, www.restorethegulf.gov.  A true and correct copy of the transcript is attached hereto as Exhibit I.

13.      On March 28, 2011, I accessed the transcripts from a August 9, 2010 press conference with National Incident Commander Admiral Thad Allen on the U.S. Government's website concerning the oil spill, www.restorethegulf.gov.  A true and correct copy of the transcript is attached hereto as Exhibit J.

14.      On March 28, 2011, I accessed a July 18, 2010 letter from National Incident Commander Admiral Thad Allen to Bob Dudley, BP's Chief Managing Director, on the U.S. Government's website concerning the oil spill, www.restorethegulf.gov.  A true and correct copy of the transcript is attached hereto as Exhibit K.

15.      On March 28, 2011, I accessed the Summary Report for Fate and Effects of Remnant Oil in the Beach Environment, a February 10, 2011 report completed by the Operational Science Advisory Team (OSAT-2).  This report is available on the U.S. Government's website concerning the oil spill, www.restorethegulf.gov.  A true and correct copy of the relevant excerpts of the report is attached hereto as Exhibit L.

16.     On March 28, 2011, I accessed the July 19, 2010 transcript of the *Deepwater Horizon* investigatory hearings before the Joint United States Coast Guard / Bureau of Ocean Management, Regulation, and Enforcement.  The full transcript is available at: "http://www.deepwaterinvestigation.com/external/content/document/3043/856483/1/7-19-10.pdf".  A true and correct copy of the relevant excerpts of the transcripts is attached hereto as Exhibit M.

17.     On March 28, 2011, I accessed BP's Responses to a June 14, 2010 Informational Request from the Honorable Edward J. Markey and the Honorable Louis Capps, Concerning Activities Related to Environmental and Worker Health Impacts.  BP's Response is available at: "http://globalwarming.house.gov/files/LTTR/2010-07-23_ResponseTo2001-06-14_MarkeyCappsLetter.pdf".  A true and correct copy of the BP Response is attached hereto as Exhibit N.

18.     On March 28, 2011, I accessed an August 20, 2010 letter from National Incident Commander Admiral Thad Allen to Bob Dudley, BP's Chief Managing Director, on the U.S. Government's website concerning the oil spill, www.restorethegulf.gov.  A true and correct copy of the transcript is attached hereto as Exhibit O.

        I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED THIS 29TH DAY OF MARCH, 2011

                                        s/Daniel C. Snyder

                                        Daniel C. Snyder, OSB #105127

DECLARATION OF DANIEL C. SNYDER



Governance / Contact Info / Site Map / Search

**Transocean**

| OUR COMPANY | THE FLEET | NEWS & EVENTS | INVESTOR RELATIONS | CAREER CENTER | RESPONSIBILITY |

Our Company → Our Management

## Our Management

**Executive Officers**

Steven L. Newman
President and CEO

Arnaud A.Y. Bobillier
Executive Vice President,
Asset and Performance

Ricardo H. Rosa
Senior Vice President,
Chief Financial Officer

Ihab Toma
Executive Vice President,
Global Business

John H. Briscoe
Vice President and
Controller

Nick Deeming
Senior Vice President,
General Counsel and
Assistant Corporate
Secretary

**Senior Management**

Eric B. Brown
Executive Vice President,
Legal and Administration

Keelan I. Adamson
Vice President,
Engineering and Technical
Support

Terry B. Bonno
Vice President, Marketing

Ian M. Clark
Vice President, Human
Resources

Gary B. Eshenroder
Vice President, Global
Supply Chain

Stephen L. Hayes
Vice President of Tax

Sidebar navigation:
- Vision and Core Values
- Quality Policy
- Norway
- Global Operations
- Our Management
- Our History
- Our Offices
- Transocean Solutions
- CMI - Oil and Gas Properties
- ADTI - Drilling Management Services
- View Company Video

Search... [GO]

 Robert L. Herrin, Jr
Vice President of Internal
Audit

 Michael F. Munro
Vice President and Chief
Compliance Officer

 Gregory S. Panagos
Vice President, Investor
Relations and
Communications

 Alan Quintero
Vice President, Quality,
Health, Safety and
Environment

 Adrian P. Rose
Vice President, Special
Projects

 Rob Shaw
Vice President and
Treasurer

 David A. Tonnel
Senior Vice President,
Europe and Africa Unit

 Paul H. Tranter
Vice President, Assets

 John L. Truschinger
Vice President and Chief
Information Officer

**Board of Directors**

Robert E. Rose
Chairman of the Board
Transocean Ltd.

W. Richard Anderson
Chief Financial Officer
Eurasia Drilling Company Limited

Thomas W. Cason
Former Senior Vice President and Chief Financial Officer
Baker Hughes Incorporated

Victor E. Grijalva
Retired Vice Chairman of the Board
Schlumberger Limited

Martin B. McNamara
Former Partner
Gibson, Dunn & Crutcher, LLP

Edward R. Muller
Chairman and Chief Executive Officer
GenOn Energy Inc.

Steven L. Newman
President and Chief Executive Officer
Transocean Ltd.

Robert M. Sprague
Retired Royal Dutch/Shell Executive

Ian C. Strachan

Exhibit A
Page 2

Former Chairman
Instinet Group Incorporated

J. Michael Talbert
Vice Chairman of the Board
Transocean Ltd.

Copyright © 2011 Transocean Ltd.

Exhibit A
Page 3

Tom Schedler
Secretary of State

State of Louisiana
Secretary of State

<u>COMMERCIAL DIVISION</u>
225.925.4704



<u>Fax Numbers</u>
225.932.5317 (Admin. Services)
225.932.5314 (Corporations)
225.932.5318 (UCC)

| Name | Type | City | Status |
|------|------|------|--------|
| TRANSOCEAN OFFSHORE USA INC. | Business Corporation (Non-Louisiana) | WILMINGTON | Active |

Previous Names

SONAT OFFSHORE USA INC. (Changed: 8/25/1999)

THE OFFSHORE COMPANY (USA) (Changed: 5/2/1984)

Business:                      TRANSOCEAN OFFSHORE USA INC.

Charter Number:                32708940 F

Registration Date:             7/18/1979

State Of Origin:

Domicile Address

1209 ORANGE STREET

WILMINGTON, DE 19801

Mailing Address

4 GREENWAY PLAZA

HOUSTON, TX 77046

Principal Business Office

4 GREENWAY PLAZA

HOUSTON, TX 77046

Registered Office in Louisiana

5615 CORPORATE BLVD., STE. 400B

BATON ROUGE, LA 70808

Principal Business Establishment in Louisiana

926 DEGRAVELLE ROAD

AMELIA, LA 70340

## Status

Status:                  Active

Annual Report Status:    In Good Standing

Qualified:               7/18/1979

Last Report Filed:       6/28/2010

Type:                    Business Corporation (Non-Louisiana)

## Registered Agent(s)

| Agent: | C T CORPORATION SYSTEM |
|--------|------------------------|
| Address 1: | 5615 CORPORATE BLVD., STE. 400B |

Exhibit B
Page 1

| City, State, Zip: | BATON ROUGE, LA 70808 |
| Appointment Date: | 7/18/1979 |

## Officer(s)

Additional Officers: No

| Officer: | JOHN H. BRISCOE |
| Title: | President, Director |
| Address 1: | 4 GREENWAY PLAZA |
| City, State, Zip: | HOUSTON, TX 77046 |

| Officer: | KEELAN ADAMSON |
| Title: | Vice-President |
| Address 1: | 4 GREENWAY PLAZA |
| City, State, Zip: | HOUSTON, TX 77046 |

| Officer: | RAMON YI |
| Title: | Vice-President, Treasurer |
| Address 1: | 4 GREENWAY PLAZA |
| City, State, Zip: | HOUSTON, TX 77046 |

## Amendments on File (8)

| Description | Date |
| --- | --- |
| Name Change | 5/2/1984 |
| Stmt of Chg or Chg Prin Bus Off | 2/22/1985 |
| Stmt of Chg or Chg Prin Bus Off | 4/1/1986 |
| Stmt of Chg or Chg Prin Bus Off | 2/1/1993 |
| Stmt of Chg or Chg Prin Bus Off | 12/20/1993 |
| Stmt of Chg or Chg Prin Bus Off | 1/31/1996 |
| Name Change | 8/25/1999 |
| Stmt of Chg or Chg Prin Bus Off | 1/29/2008 |

Print

Exhibit B
Page 2

Tom Schedler
Secretary of State

State of Louisiana
Secretary of State



<u>COMMERCIAL DIVISION</u>
225.925.4704

<u>Fax Numbers</u>
225.932.5317 (Admin. Services)
225.932.5314 (Corporations)
225.932.5318 (UCC)

| Name | Type | City | Status |
|---|---|---|---|
| TRANSOCEAN OFFSHORE VENTURES INC. | Business Corporation (Non-Louisiana) | WILMINGTON | Active |

Previous Names

    SONAT OFFSHORE VENTURES, INC. (Changed: 6/10/1997)

    SONAT OFFSHORE - DF, INC. (Changed: 4/6/1987)

| | |
|---|---|
| Business: | TRANSOCEAN OFFSHORE VENTURES INC. |
| Charter Number: | 34232961 F |
| Registration Date: | 3/12/1987 |
| State Of Origin: | |

Domicile Address

    1209 ORANGE STREET

    WILMINGTON, DE 19801

Mailing Address

    ATTN: TAX DEPT RAQUEL MONTERO

    4 GREENWAY PLAZA

    HOUSTON, TX 77046

Principal Business Office

    4 GREENWAY PLAZA

    HOUSTON, TX 77046

Registered Office in Louisiana

    5615 CORPORATE BLVD., STE. 400B

    BATON ROUGE, LA 70808

Principal Business Establishment in Louisiana

    3850 N. CAUSEWAY BLVD.

    STE 500

    METAIRIE, LA 70002

## Status

| | |
|---|---|
| Status: | Active |
| Annual Report Status: | In Good Standing |
| Qualified: | 3/12/1987 |
| Last Report Filed: | 3/11/2011 |
| Type: | Business Corporation (Non-Louisiana) |

Exhibit B
Page 3

## Registered Agent(s)

| | |
|---|---|
| Agent: | C T CORPORATION SYSTEM |
| Address 1: | 5615 CORPORATE BLVD., STE. 400B |
| City, State, Zip: | BATON ROUGE, LA 70808 |
| Appointment Date: | 3/12/1987 |

## Officer(s)

Additional Officers: No

| | |
|---|---|
| Officer: | JOHN H. BRISCOE |
| Title: | Director, President |
| Address 1: | 4 GREENWAY PLAZA |
| City, State, Zip: | HOUSTON, TX 77046 |

| | |
|---|---|
| Officer: | HEATHER CALLENDER |
| Title: | Secretary, Director |
| Address 1: | 4 GREENWAY PLAZA |
| City, State, Zip: | HOUSTON, TX 77046 |

| | |
|---|---|
| Officer: | ROBERT HERRIN |
| Title: | Director |
| Address 1: | 4 GREENWAY PLAZA |
| City, State, Zip: | HOUSTON, TX 77046 |

## Amendments on File (6)

| Description | Date |
|---|---|
| Name Change | 4/6/1987 |
| Stmt of Chg or Chg Prin Bus Off | 2/1/1993 |
| Stmt of Chg or Chg Prin Bus Off | 12/20/1993 |
| Stmt of Chg or Chg Prin Bus Off | 1/31/1996 |
| Name Change | 6/10/1997 |
| Stmt of Chg or Chg Prin Bus Off | 1/29/2008 |

Print

Exhibit B
Page 4

Page 1

TX11319006

## Corporate Records & Business Registrations

### Source Information

| | |
|---|---|
| **This Record Last Updated:** | 02/23/2011 |
| **Database Last Updated:** | 03/22/2011 |
| **Update Frequency:** | DAILY |
| **Current Date:** | 03/23/2011 |
| **Source:** | AS REPORTED BY THE SECRETARY OF STATE OR OTHER OFFICIAL SOURCE |

### Company Information

| | |
|---|---|
| **Name:** | **TRANSOCEAN** ENTERPRISE INC. |
| **Address:** | 4 GREENWAY PLAZA |
| | HOUSTON, TX 77046 |
| | USA |

### Filing Information

| | |
|---|---|
| **Filing Number:** | 11319006 |
| **Filing Date:** | 12/23/1996 |
| **State of Incorporation:** | DELAWARE |
| **Country of Incorporation:** | UNITED STATES OF AMERICA |
| **Duration:** | PERPETUAL |
| **Status:** | IN EXISTENCE |
| **Corporation Type:** | PROFIT |
| **Business Type:** | FOREIGN FOR-PROFIT CORPORATION |
| **State Tax ID:** | 30119257738 |
| **Where Filed:** | SECRETARY OF STATE |
| | 1019 BRAZOS ST |
| | AUSTIN, **TX** 78701 |

### Registered Agent Information

| | |
|---|---|
| **Name:** | CAPITOL CORPORATE SERVICES, INC. |
| **Address:** | 800 BRAZOS, SUITE 400 |
| | AUSTIN, TX 78701 |

Exhibit B
Page 5

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

USA

### Name Information

| | |
|---|---|
| LegalName: | **TRANSOCEAN** ENTERPRISE INC. |
| Status: | IN USE |
| Filing date: | 12/23/1996 |

### Principal Information

| | |
|---|---|
| **Name:** | ANIL B SHAH |
| **Title:** | TREASURER |
| **Address:** | 4 GREENWAY PLAZA |
| | HOUSTON, TX 77046 |
| | USA |
| **Name:** | TERRY B BONNO |
| **Title:** | VICE PRESIDENT |
| **Address:** | 4 GREENWAY PLAZA |
| | HOUSTON, TX 77046 |
| | USA |
| **Name:** | ERIC B BROWN |
| **Title:** | DIRECTOR, SEC |
| **Address:** | 4 GREENWAY PLAZA |
| | HOUSTON, TX 77046 |
| | USA |
| **Name:** | GREGORY L CAUTHEN |
| **Title:** | DIRECTOR, PRESIDENT |
| **Address:** | 4 GREENWAY PLAZA |
| | HOUSTON, TX 77046 |
| | USA |

### Amendment Information

| | |
|---|---|
| **Amendments:** | 12/23/1996 APPLICATION FOR CERTIFICATE OF AUTHOR-ITY; DOCUMENT NUMBER - 3377618 |
| | 10/22/2001 CHANGE OF REGISTERED AGENT/OFFICE; DOCUMENT NUMBER - 2950140002 |
| | 04/22/2003 PUBLIC INFORMATION REPORT (PIR); DOCUMENT NUMBER - 32370760001 |
| | 10/19/2003 PUBLIC INFORMATION REPORT (PIR); DOCUMENT NUMBER - 45435190001 |
| | 08/23/2004 PUBLIC INFORMATION REPORT (PIR); DOCU- |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit B
Page 6

MENT NUMBER - 68107590001

02/01/2006 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 116201390001

10/17/2006 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 148097600001

04/11/2007 CHANGE OF REGISTERED AGENT/OFFICE; DOC-
UMENT NUMBER - 167432830925

02/17/2008 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 203929270001

06/12/2009 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 261805830001

09/23/2010 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 329728770001

02/23/2011 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 356247290001

The preceding public record data is for information purposes only and is not the official record. Certified copies can only be obtained from the official source.

The public record items reported above may have been paid, terminated, vacated or released prior to today's date.

**Order Documents**

Call Westlaw CourtExpress at 1-877-DOC-RETR (1-877-362-7387)
for on-site manual retrieval of documents related to this or other matters.
Additional charges apply.

END OF DOCUMENT

Exhibit B
Page 7

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

TX12663706

## Corporate Records & Business Registrations

### Source Information

| | |
|---|---|
| **This Record Last Updated:** | 02/23/2011 |
| **Database Last Updated:** | 03/22/2011 |
| **Update Frequency:** | DAILY |
| **Current Date:** | 03/23/2011 |
| **Source:** | AS REPORTED BY THE SECRETARY OF STATE OR OTHER OFFICIAL SOURCE |

### Company Information

| | |
|---|---|
| **Name:** | **TRANSOCEAN** OFFSHORE DEEPWATER DRILLING INC. |
| **Address:** | 4 GREENWAY PLAZA |
| | HOUSTON, TX 77046-0400 |
| | USA |

### Filing Information

| | |
|---|---|
| **Filing Number:** | 12663706 |
| **Filing Date:** | 05/17/1999 |
| **State of Incorporation:** | DELAWARE |
| **Country of Incorporation:** | UNITED STATES OF AMERICA |
| **Duration:** | PERPETUAL |
| **Status:** | IN EXISTENCE |
| **Corporation Type:** | PROFIT |
| **Business Type:** | FOREIGN FOR-PROFIT CORPORATION |
| **State Tax ID:** | 17606058463 |
| **Where Filed:** | SECRETARY OF STATE |
| | 1019 BRAZOS ST |
| | AUSTIN, **TX** 78701 |

### Registered Agent Information

| | |
|---|---|
| **Name:** | CAPITOL CORPORATE SERVICES, INC. |
| **Address:** | 800 BRAZOS, SUITE 400 |
| | AUSTIN, TX 78701 |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

USA

### Name Information

| | |
|---|---|
| **LegalName:** | **TRANSOCEAN** OFFSHORE DEEPWATER DRILLING INC. |
| **Status:** | IN USE |
| **Filing date:** | 05/17/1999 |

### Principal Information

**Name:**   JOHN H BRISCOE
**Title:**   PRESIDENT, DIRECTOR
**Address:**   4 GREENWAY PLAZA
HOUSTON, TX 77046
USA

**Name:**   KEELAN ADAMSON
**Title:**   VICE PRESIDENT
**Address:**   4 GREENWAY PLAZA
HOUSTON, TX 77046
USA

**Name:**   CHRISTOPHER L NESS
**Title:**   VICE PRESIDENT
**Address:**   4 GREENWAY PLAZA
HOUSTON, TX 77046
USA

**Name:**   CHERYL D RICHARD
**Title:**   VICE PRESIDENT, DIRECTOR
**Address:**   4 GREENWAY PLAZA
HOUSTON, TX 77046
USA

**Name:**   ANNE-MARIE SUIRE
**Title:**   VICE PRESIDENT
**Address:**   4 GREENWAY PLAZA
HOUSTON, TX 77046
USA

**Name:**   WALTER A BAKER
**Title:**   VICE PRESIDENT, SECRETARY, DIRECTO
**Address:**   4 GREENWAY PLAZA
HOUSTON, TX 77046
USA

**Name:**   RAMON YI

Exhibit B
Page 9

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

| | |
|---|---|
| **Title:** | VICE PRESIDENT, TREASURER |
| **Address:** | 4 GREENWAY PLAZA<br>HOUSTON, TX 77046<br>USA |
| **Name:** | DAVID E FAURE |
| **Title:** | VICE PRESIDENT, ASSISTANT SECRETARY |
| **Address:** | 4 GREENWAY PLAZA<br>HOUSTON, TX 77046<br>USA |
| **Name:** | MARGARET C FITZGERALD |
| **Title:** | VICE PRESIDENT, ASSISTANT SECRETARY |
| **Address:** | 4 GREENWAY PLAZA<br>HOUSTON, TX 77046<br>USA |
| **Name:** | THOMAS F GECZIK |
| **Title:** | ASSISTANT TREASURER |
| **Address:** | 4 GREENWAY PLAZA<br>HOUSTON, TX 77046<br>USA |
| **Name:** | CAROLE P DRIVER |
| **Title:** | ASSISTANT SECRETARY |
| **Address:** | 4 GREENWAY PLAZA<br>HOUSTON, TX 77046<br>USA |
| **Name:** | LISA M NEWBURN |
| **Title:** | ASSISTANT SECRETARY |
| **Address:** | 4 GREENWAY PLAZA<br>HOUSTON, TX 77046<br>USA |

**Amendment Information**

| | |
|---|---|
| **Amendments:** | 05/17/1999 APPLICATION FOR CERTIFICATE OF AUTHOR-ITY; DOCUMENT NUMBER - 3448479 |
| | 10/22/2001 CHANGE OF REGISTERED AGENT/OFFICE; DOCUMENT NUMBER - 2950250002 |
| | 04/24/2003 PUBLIC INFORMATION REPORT (PIR); DOCUMENT NUMBER - 32553070001 |
| | 02/06/2004 PUBLIC INFORMATION REPORT (PIR); DOCUMENT NUMBER - 53238220001 |
| | 03/17/2005 PUBLIC INFORMATION REPORT (PIR); DOCU- |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit B
Page 10

MENT NUMBER - 85436130001

04/24/2006 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 127055400001

04/11/2007 CHANGE OF REGISTERED AGENT/OFFICE; DOC-
UMENT NUMBER - 167432830926

07/23/2010 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 317218160001

08/25/2010 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 323045620001

09/21/2010 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 328958720001

09/25/2010 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 331096870001

09/25/2010 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 331121320001

02/23/2011 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 356168910001

02/22/2011 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 356162270001

02/22/2011 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 356162290001

02/22/2011 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 356162310001

02/23/2011 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 356245150001

The preceding public record data is for information purposes only and is not the official record. Certified copies can only be obtained from the official source.

The public record items reported above may have been paid, terminated, vacated or released prior to today's date.

**Order Documents**

Call Westlaw CourtExpress at 1-877-DOC-RETR (1-877-362-7387)
for on-site manual retrieval of documents related to this or other matters.
Additional charges apply.

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

TX7242506

## Corporate Records & Business Registrations

### Source Information

| | |
|---|---|
| **This Record Last Updated:** | 02/23/2011 |
| **Database Last Updated:** | 03/22/2011 |
| **Update Frequency:** | DAILY |
| **Current Date:** | 03/23/2011 |
| **Source:** | AS REPORTED BY THE SECRETARY OF STATE OR OTHER OFFICIAL SOURCE |

### Company Information

| | |
|---|---|
| **Name:** | **TRANSOCEAN** OFFSHORE VENTURES INC. |
| **Address:** | 350 N. ST. PAUL STREET |
| | DALLAS, TX 75201-0000 |
| | USA |

### Filing Information

| | |
|---|---|
| **Filing Number:** | 7242506 |
| **Filing Date:** | 04/06/1987 |
| **State of Incorporation:** | DELAWARE |
| **Country of Incorporation:** | UNITED STATES OF AMERICA |
| **Duration:** | PERPETUAL |
| **Status:** | IN EXISTENCE |
| **Corporation Type:** | PROFIT |
| **Business Type:** | FOREIGN FOR-PROFIT CORPORATION |
| **State Tax ID:** | 17602150322 |
| **Where Filed:** | SECRETARY OF STATE |
| | 1019 BRAZOS ST |
| | AUSTIN, **TX** 78701 |

### Registered Agent Information

| | |
|---|---|
| **Name:** | C T CORPORATION SYSTEM |
| **Address:** | 350 N. ST. PAUL ST.STE. 2900 |
| | DALLAS, TX 75201-4234 |

Exhibit B
Page 12

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

USA

## Name Information

| | |
|---|---|
| **LegalName:** | **TRANSOCEAN** OFFSHORE VENTURES INC. |
| **Status:** | IN USE |
| **Filing date:** | 04/06/1987 |
| **LegalName:** | SONAT OFFSHORE VENTURES, INC. |
| **Status:** | PRIOR |
| **Inactive Date:** | 10/28/1999 |

### Principal Information

| | |
|---|---|
| **Name:** | JOHN H BRISCOE |
| **Title:** | PRESIDENT |
| **Address:** | 4 GREENWAY PLAZA |
| | HOUSTON, TX 77046 |
| | USA |
| **Name:** | KEELAN ADAMSON |
| **Title:** | VICE-PRESIDENT |
| **Address:** | 4 GREENWAY PLAZA |
| | HOUSTON, TX 77046 |
| | USA |
| **Name:** | CHRISTOPHER L NESS |
| **Title:** | VICE-PRESIDENT |
| **Address:** | 4 GREENWAY PLAZA |
| | HOUSTON, TX 77046 |
| | USA |
| **Name:** | CHERYL D RICHARD |
| **Title:** | VICE PRESIDENT |
| **Address:** | 4 GREENWAY PLAZA |
| | HOUSTON, TX 77046 |
| | USA |
| **Name:** | ANNE-MARIE SUIRE |
| **Title:** | VICE-PRESIDENT |
| **Address:** | 4 GREENWAY PLAZA |
| | HOUSTON, TX 77046 |
| | USA |
| **Name:** | WALTER A BAKER |
| **Title:** | VICE-PRESIDENT |
| **Address:** | 4 GREENWAY PLAZA |

Exhibit B
Page 13

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

|  |  |
|---|---|
|  | HOUSTON, TX 77046 |
|  | USA |
| **Name:** | JOHN H BRISCOE |
| **Title:** | DIRECTOR |
| **Address:** | 4 GREENWAY PLAZA |
|  | HOUSTON, TX 77046 |
|  | USA |
| **Name:** | WALTER A BAKER |
| **Title:** | SECRETARY |
| **Address:** | 4 GREENWAY PLAZA |
|  | HOUSTON, TX 77046 |
|  | USA |
| **Name:** | RAMON YI |
| **Title:** | VICE-PRESIDENT, TREASURER |
| **Address:** | 4 GREENWAY PLAZA |
|  | HOUSTON, TX 77046 |
|  | USA |
| **Name:** | DAVID E FAURE |
| **Title:** | VICE-PRESIDENT, ASSISTANT SECRETARY |
| **Address:** | 4 GREENWAY PLAZA |
|  | HOUSTON, TX 77046 |
|  | USA |
| **Name:** | MARGARET C FITZGERALD |
| **Title:** | VICE-PRESIDENT, ASSISTANT SECRETARY |
| **Address:** | 4 GREENWAY PLAZA |
|  | HOUSTON, TX 77046 |
|  | USA |
| **Name:** | THOMAS F GECZIK |
| **Title:** | ASSISTANT TREASURER |
| **Address:** | 4 GREENWAY PLAZA |
|  | HOUSTON, TX 77046 |
|  | USA |
| **Name:** | CAROLE P DRIVER |
| **Title:** | ASSISTANT SECRETARY |
| **Address:** | 4 GREENWAY PLAZA |
|  | HOUSTON, TX 77046 |
|  | USA |
| **Name:** | LISA M NEWBURN |
| **Title:** | ASSISTANT SECRETARY |
| **Address:** | 4 GREENWAY PLAZA |

Exhibit B
Page 14

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

HOUSTON, TX 77046
USA

**Amendment Information**

**Amendments:**

04/06/1987 APPLICATION FOR CERTIFICATE OF AUTHOR-
ITY; DOCUMENT NUMBER - 3088236

10/28/1999 APPLICATION FOR AMENDED CERTIFICATE OF
AUTHORITY; DOCUMENT NUMBER - 3088237

06/20/2000 CHANGE OF REGISTERED AGENT/OFFICE; DOC-
UMENT NUMBER - 3088238

04/08/2003 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 31424280001

10/19/2003 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 45434900001

08/23/2004 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 68109860001

03/03/2006 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 119595320001

10/18/2006 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 148112210001

12/27/2007 CHANGE OF OFFICE BY REGISTERED AGENT;
DOCUMENT NUMBER - 197728291601

02/20/2008 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 204434310001

07/13/2009 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 266234970001

04/19/2010 CHANGE OF NAME OR ADDRESS BY RE-
GISTERED AGENT; DOCUMENT NUMBER - 304538406979

07/23/2010 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 317211280001

02/23/2011 PUBLIC INFORMATION REPORT (PIR); DOCU-
MENT NUMBER - 356244270001

The preceding public record data is for information purposes only and is not the official record. Certified copies
can only be obtained from the official source.

The public record items reported above may have been paid, terminated, vacated or released prior to today's
date.

**Order Documents**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit B
Page 15

Call Westlaw CourtExpress at 1-877-DOC-RETR (1-877-362-7387)
for on-site manual retrieval of documents related to this or other matters.
Additional charges apply.

END OF DOCUMENT

Exhibit B
Page 16

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
_____

FORM 10-Q

(Mark one)

☑   QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended March 31, 2010

OR

☐   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____.
_____

Commission file number 000-53533

# TRANSOCEAN LTD.

(Exact name of registrant as specified in its charter)



| | |
|---|---|
| Zug, Switzerland | 98-0599916 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| Chemin de Blandonnet 10 Vernier, Switzerland | 1214 |
| (Address of principal executive offices) | (Zip Code) |

+41 (22) 930-9000
(Registrant's telephone number, including area code)

Blandonnet International Business Center
Chemin de Blandonnet 2
Building F, 7th Floor
Vernier, Switzerland  1214
(Former name, former address and former fiscal year, if changed since last report)

_____

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company.  See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑   Accelerated filer ☐   Non-accelerated filer (do not check if a smaller reporting company) ☐   Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

As of April 27, 2010, 319,933,046 shares were outstanding.

Exhibit C

Page 1

TRANSOCEAN LTD.
INDEX TO FORM 10-Q
QUARTER ENDED MARCH 31, 2010

PART I.  FINANCIAL INFORMATION                                                      Page

Item 1.      Financial Statements (Unaudited)

             Condensed Consolidated Statements of Operations                          1

             Condensed Consolidated Statements of Comprehensive Income                2

             Condensed Consolidated Balance Sheets                                    3

             Condensed Consolidated Statements of Equity                              4

             Condensed Consolidated Statements of Cash Flows                          5

             Notes to Condensed Consolidated Financial Statements                     6

Item 2.      Management's Discussion and Analysis of Financial Condition and Results of Operations   20

Item 3.      Quantitative and Qualitative Disclosures About Market Risk              36

Item 4.      Controls and Procedures                                                 36


PART II.  OTHER INFORMATION

Item 1.      Legal Proceedings                                                       37

Item 1A.     Risk Factors                                                            37

Item 2.      Unregistered Sales of Equity Securities and Use of Proceeds             39

Item 6.      Exhibits                                                                39

Exhibit C
Page 2

TRANSOCEAN LTD. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)
(Unaudited)

At March 31, 2010 and December 31, 2009, our subsidiary had 13,567,674 shares and 14,011,416 shares, respectively, available for this purpose.

Note 14—Fair Value of Financial Instruments

We estimate the fair value of each class of financial instruments, for which estimating fair value is practicable, by applying the following methods and assumptions:

Cash and cash equivalents—The carrying amount approximates fair value because of the short maturities of those instruments.

Accounts receivable—The carrying amount, net of valuation allowance, approximates fair value because of the short maturities of those instruments.

Short-term investments—The carrying amount represents the estimated fair value, measured using pricing data that are representative of quoted prices for similar instruments in active markets or identical instruments in less active markets. Our short-term investments include investments in The Reserve International Liquidity Fund Ltd. and The Reserve Primary Fund. At March 31, 2010 and December 31, 2009, the carrying amount of our short-term investments was $32 million and $38 million, respectively, recorded in other assets on our condensed consolidated balance sheets.

Notes receivable—The carrying amount represents the estimated fair value, measured using unobservable inputs that require significant judgment, for which there is little or no market data. At March 31, 2010, the aggregate carrying amount of our notes receivable was $130 million, including $19 million and $111 million recorded in other current assets and other assets, respectively. We did not hold notes receivable as of December 31, 2009.

Debt—The fair value of our fixed-rate debt is measured using quoted prices for identical instruments in active markets. Our variable-rate debt is included in the fair values stated below at its carrying amount since the short-term interest rates cause the face value to approximate its fair value. The TPDI Notes and Overseas Drilling Limited Loan Facility are included in the fair values stated below at their aggregate carrying amount of $158 million at March 31, 2010 and December 31, 2009, since there is no available market price for such related-party debt. The carrying amounts and estimated fair values of our long-term debt, including debt due within one year, were as follows (in millions):

| | March 31, 2010 | | December 31, 2009 | |
| --- | --- | --- | --- | --- |
| | Carrying amount | Fair value | Carrying amount | Fair value |
| Long-term debt, including current maturities | $ 10,437 | $ 11,047 | $ 10,534 | $ 11,218 |
| Long-term debt of consolidated variable interest entities, including current maturities | 1,002 | 1,004 | 1,183 | 1,178 |

Derivative instruments—The carrying amount of our derivative instruments represents the estimated fair value, measured using pricing data, including quoted prices and other observable market data, for the instruments. The carrying amount of our derivative instruments were $5 million and $2 million at March 31, 2010 and $5 million and $5 million at December 31, 2009, recorded in other assets and other long-term liabilities, respectively, on our condensed consolidated balance sheets.

Note 15—Subsequent Events

Share repurchase program—Subsequent to March 31, 2010, we repurchased 1,732,900 of our shares under our share repurchase program in exchange for an aggregate amount of CHF 160 million, equivalent to $150 million. At May 5, 2010, we held 2,449,900 treasury shares, at cost.

Deepwater Horizon incident—Subsequent to March 31, 2010, our Ultra-Deepwater Floater Deepwater Horizon, which had been drilling a well for its operator in the U.S. Gulf of Mexico, sank on April 22, 2010 after an explosion and fire onboard the rig that began on April 20, 2010. Eleven persons are missing and presumed dead and others were injured as a result of the incident. Our underwriters declared the vessel a total loss and, as of May 5, 2010, we received $401 million as partial payment of the expected insurance recoveries. The combined response team was unable to stem the flow of hydrocarbons from the well prior to the sinking of the rig and efforts to contain the flow of hydrocarbons are still underway. The Departments of Homeland Security and Interior have begun a joint investigation into the cause of the incident. The U.S. Coast Guard and the Minerals Management Service share jurisdiction over the investigation into the incident. In addition, various committees and subcommittees of the House of Representatives and the Senate of the United States have requested our participation in hearings related to the incident. We have also received a request to preserve information from the DOJ. There have also been numerous lawsuits filed related to the incident, and we expect additional lawsuits to be filed. We expect to incur significant legal fees and costs in responding to these matters.

Exhibit C
Page 3

PART II.    OTHER INFORMATION

Item 1.    Legal Proceedings

*Deepwater Horizon Litigation*—In April and May 2010, we and one or more of our subsidiaries were named, along with other unaffiliated defendants, in numerous complaints that were filed in either the United States District Court, Eastern District of Louisiana or the District Courts of the State of Texas involving multiple plaintiffs that allege wrongful death and other personal injuries arising out of the *Deepwater Horizon* incident.  The complaints generally allege negligence and seek awards of unspecified economic damages and punitive damages.

Also in April and May 2010, we and one or more of our subsidiaries were named, along with other unaffiliated defendants, in numerous putative class-action complaints filed in either the United States District Court, Eastern or Western Districts of Louisiana, the Southern District of Texas, the United States District Court, Southern District of Mississippi, the United States District Court, Southern District of Alabama or the United States District Court, Northern or Southern Districts of Florida and possibly other courts on behalf of various potential classes of persons.  The complaints generally allege, among other things, potential economic losses as a result of environmental pollution.  The plaintiffs are generally seeking awards of unspecified economic, compensatory and punitive damages, as well as injunctive relief.

The lawsuits were recently filed.  We have not been served with many of these complaints.  We have retained counsel and are investigating and evaluating the claims, the theories of recovery, damages asserted and our respective defenses to all these claims.  We are also investigating our potential rights of indemnity and the scope of our insurance coverage.  There can be no assurance as to the ultimate outcome of these lawsuits.

See "Item 2.  Management's Discussion and Analysis of Financial Condition and Results of Operations—Outlook—Insurance matters" and "Item 1A. Risk Factors."

*Environmental Matters*— On April 28, 2010, in connection with the *Deepwater Horizon* incident, one of our subsidiaries was notified by the U.S. Coast Guard that, under the provisions of the Oil Pollution Act of 1990 ("OPA"), *Deepwater Horizon* had been designated as a source of oil discharges and our subsidiary has been designated as a responsible party under OPA.  In the notice, the U.S. Coast Guard noted that its information indicates that oil discharges resulting from the incident include discharges from *Deepwater Horizon* on or above the surface of the water and ongoing discharges from the well head.  Because the ongoing discharges from the well head are occurring nearly a mile below the surface of the water, for which we believe we have no responsibility under OPA, we have responded to the U.S. Coast Guard's notice and denied our subsidiary's designation as a responsible party to the extent of any underwater discharges from the well head.  There can be no assurance as to the ultimate outcome of this matter.

See "Item 2.  Management's Discussion and Analysis of Financial Condition and Results of Operations—Outlook—Insurance matters" and "Item 1A. Risk Factors."

*Other Matters*—We have certain actions or claims pending as discussed and reported in Notes to Condensed Consolidated Financial Statements Note 12—Contingencies.  We are also involved in various tax matters as described in Notes to Condensed Consolidated Financial Statements Note 6—Income Taxes.  As of March 31, 2010, we were also involved in a number of lawsuits which have arisen in the ordinary course of our business and for which we do not expect the liability, if any, resulting from these lawsuits to have a material adverse effect on our current consolidated financial position, results of operations or cash flows.  We cannot predict with certainty the outcome or effect of any of the matters specifically described above or of any such other pending or threatened litigation or legal proceedings.  There can be no assurance that our beliefs or expectations as to the outcome or effect of any lawsuit or other matters will prove correct and the eventual outcome of these matters could materially differ from management's current estimates.

Item 1A.    Risk Factors

In addition to the risk factor set forth below and the other information set forth in this quarterly report on Form 10-Q, careful consideration should be given to factors described in "Item 1A. Risk Factors" in our annual report on Form 10-K for the year ended December 31, 2009, that could materially affect our business, financial condition or future results.

*The* Deepwater Horizon *incident may have a material adverse effect on us.*

Our Ultra-Deepwater Floater *Deepwater Horizon*, which had been drilling a well for its operator in the U.S. Gulf of Mexico, sank on April 22, 2010 after an explosion and fire onboard the rig that began on April 20, 2010.  Eleven persons are missing and presumed dead and others were injured as a result of the incident.  The combined response team was unable to stem the flow of hydrocarbons from the well prior to the sinking of the rig and efforts to contain the flow of hydrocarbons are still underway.  The Departments of Homeland Security and Interior have begun a joint investigation into the cause of the incident.  The U.S. Coast Guard and the Minerals Management Service share jurisdiction over the investigation into the incident.  In addition, various committees and subcommittees of the House of Representatives and the Senate of the United States have requested our participation in hearings related to the incident.  We have also

Exhibit C

Page 4

received a request to preserve information from the U.S. Department of Justice.  We may also face additional requests for participation in hearings from the Congress of the United States or investigations from other governmental bodies.  There have also been numerous lawsuits filed related to the incident, and we expect additional lawsuits to be filed.  We expect to incur significant legal fees and costs in responding to these matters.

As a result of the incident, our business will be negatively impacted by the loss of revenue from the rig.  We do not carry insurance for loss of revenue.  The rig is insured for total loss coverage of $560 million and wreck removal, subject to certain policy limits, to the extent removal can be carried out and is required.

Under our drilling contract for *Deepwater Horizon*, the operator has agreed, among other things, to assume full responsibility for and defend, release and indemnify us from any loss, expense, claim, fine, penalty or liability for pollution or contamination, including control and removal thereof, arising out of or connected with operations under the contract (other than for pollution or contamination originating on or above the surface of the water from fuels, lubricants, motor oils and other substances, as to which we similarly agreed to assume responsibility and protect, release and indemnify the operator).  The operator has also agreed, among other things, (1) to defend, release and indemnify us against loss or damage to the reservoir, and loss of property rights to oil, gas and minerals below the surface of the earth and (2) to defend, release and indemnify us and bear the cost of bringing the well under control in the event of a blowout or other loss of control.  However, to the extent any of the indemnities from the operator are not enforceable or the operator does not indemnify us, our insurance policies may not fully cover these amounts.  In addition, we may be subject to various claims, costs, penalties and fines for which we may not be indemnified.  Also under the drilling contract, we have, among other things, generally agreed to defend, release and indemnify the operator for the claims for personal injury or death of our employees and those of our subcontractors as well as for damage to the rig, equipment and removal costs.  We carry personal injury and other third-party liability insurance coverage; however, this coverage is subject to significant deductibles and to overall aggregate policy limits.  See Notes to Condensed Consolidated Financial Statements Note 12—Contingencies—Retained risk.  Insurance coverage can be the subject of uncertainties and, particularly in the event of large claims, potential disputes with insurance carriers.

Our business may also be adversely impacted by any negative publicity relating to the incident and us, any negative perceptions about us by customers, the skilled personnel that we require to support our operations or others, any increased premiums for insurance or difficulty in obtaining coverage, any claims that may be asserted against us and any other expenses that are not covered, in whole or in part, by our insurance policies or indemnification arrangements, the outcome of any investigations relating to the incident and the diversion of management's attention from our other operations to focus on matters relating to the incident.  Any increased regulation of the drilling industry as a whole that arises out of this incident could result in higher operating costs, which could, in turn, adversely affect our operating results.  Although we are currently unable to estimate the full impact of the incident on our business, the incident is expected to have a material effect on our future consolidated results of operations and cash flows and may have a material effect on our future consolidated statement of financial position.

Exhibit C
Page 5

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on May 5, 2010.

TRANSOCEAN LTD.

By:  /s/ Ricardo H. Rosa
      Ricardo H. Rosa
      Senior Vice President and Chief Financial Officer
      (Principal Financial Officer)

By:  /s/ John H. Briscoe
      John H. Briscoe
      Vice President and Controller
      (Principal Accounting Officer)

Exhibit C
Page 6

Exhibit 31.1

CEO CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Steven L. Newman, certify that:

1.      I have reviewed this report on Form 10-Q of Transocean Ltd.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

   a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; and

   b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; and

   c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

   a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated:   May 5, 2010

/s/ Steven L. Newman
Name: Steven L. Newman
President and Chief Executive Officer

Exhibit C
Page 7

Exhibit 31.2

CFO CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Ricardo H. Rosa, certify that:

1.      I have reviewed this report on Form 10-Q of Transocean Ltd.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

   a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; and

   b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; and

   c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

   a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated:    May 5, 2010                          /s/ Ricardo H. Rosa
                                               Name: Ricardo H. Rosa
                                               Senior Vice President and Chief Financial Officer

Exhibit C
Page 8

Exhibit 32.1

CERTIFICATION PURSUANT TO SECTION 906 OF
THE SARBANES-OXLEY ACT OF 2002 (SUBSECTIONS (a) AND (b)
OF SECTION 1350, CHAPTER 63 OF TITLE 18, UNITED STATES CODE)

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code), I, Steven L. Newman, Chief Executive Officer of Transocean Ltd., a Swiss corporation (the "Company"), hereby certify, to my knowledge, that:

(1)    the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2010 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Dated:    May 5, 2010                          /s/ Steven L. Newman
                                               Name: Steven L. Newman
                                               President and Chief Executive Officer

The foregoing certification is being furnished solely pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code) and is not being filed as part of the Report or as a separate disclosure document.

A signed original of this written statement required by Section 906 has been provided to Transocean Ltd. and will be retained by Transocean Ltd. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit C
Page 9

Exhibit 32.2

CERTIFICATION PURSUANT TO SECTION 906 OF
THE SARBANES-OXLEY ACT OF 2002 (SUBSECTIONS (a) AND (b)
OF SECTION 1350, CHAPTER 63 OF TITLE 18, UNITED STATES CODE)

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code), I, Ricardo H. Rosa, Senior Vice President and Chief Financial Officer of Transocean Ltd., a Swiss corporation (the "Company"), hereby certify, to my knowledge, that:

(1)     the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2010 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated:   May 5, 2010                        /s/ Ricardo H. Rosa
                                            Name: Ricardo H. Rosa
                                            Senior Vice President and Chief Financial Officer

The foregoing certification is being furnished solely pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code) and is not being filed as part of the Report or as a separate disclosure document.

A signed original of this written statement required by Section 906 has been provided to Transocean Ltd. and will be retained by Transocean Ltd. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit C
Page 10

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

# FORM 10-K

(Mark one)

☑ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2010

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____.

---

Commission file number 000-53533

## TRANSOCEAN LTD.
(Exact name of registrant as specified in its charter)



| Zug, Switzerland | 98-0599916 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| Chemin de Blandonnet 10 Vernier, Switzerland | 1214 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: +41 (22) 930-9000

Securities registered pursuant to Section 12(b) of the Act:

| Title of class | Exchange on which registered |
|---|---|
| Shares, par value CHF 15.00 per share | New York Stock Exchange |
| | SIX Swiss Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

---

Indicate by check mark whether the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☑  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.  Yes ☐  No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☑  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☑  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller company.  See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑   Accelerated filer ☐   Non-accelerated filer (do not check if a smaller reporting company) ☐   Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined by Rule 12b-2 of the Exchange Act).  Yes ☐  No ☑

As of June 30, 2010, 318,916,207 shares were outstanding and the aggregate market value of shares held by non-affiliates was approximately $14.8 billion (based on the reported closing market price of the shares of Transocean Ltd. on such date of $46.33 and assuming that all directors and executive officers of the Company are "affiliates," although the Company does not acknowledge that any such person is actually an "affiliate" within the meaning of the federal securities laws).  As of February 15, 2011, 319,100,641 shares were outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive Proxy Statement to be filed with the Securities and Exchange Commission within 120 days of December 31, 2010, for its 2011 annual general meeting of shareholders, are incorporated by reference into Part III of this Form 10-K.

Exhibit C
Page 11

TRANSOCEAN LTD. AND SUBSIDIARIES
INDEX TO ANNUAL REPORT ON FORM 10-K
FOR THE YEAR ENDED DECEMBER 31, 2010

| Item | | Page |
|------|------|------|
| **PART I** | | |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 14 |
| Item 1B. | Unresolved Staff Comments | 25 |
| Item 2. | Properties | 26 |
| Item 3. | Legal Proceedings | 26 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Shareholder Matters and Issuer Purchases of Equity Securities | 34 |
| Item 6. | Selected Financial Data | 38 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 39 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 67 |
| Item 8. | Financial Statements and Supplementary Data | 69 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 119 |
| Item 9A. | Controls and Procedures | 119 |
| Item 9B. | Other Information | 119 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 120 |
| Item 11. | Executive Compensation | 120 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Shareholder Matters | 120 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 120 |
| Item 14. | Principal Accountant Fees and Services | 120 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 120 |

Exhibit C
Page 12

PART I

Item 1.     Business

## Overview

Transocean Ltd. (together with its subsidiaries and predecessors unless the context requires otherwise, "Transocean," the "Company," "we," "us" or "our") is a leading international provider of offshore contract drilling services for oil and gas wells.  As of February 10, 2011, we owned, had partial ownership interests in or operated 138 mobile offshore drilling units.  As of this date, our fleet consisted of 47 High-Specification Floaters (Ultra-Deepwater, Deepwater and Harsh Environment semisubmersibles and drillships), 25 Midwater Floaters, nine High-Specification Jackups, 54 Standard Jackups and three Other Rigs.  In addition, we had one Ultra-Deepwater Floater and three High-Specification Jackups under construction.

We believe our mobile offshore drilling fleet is one of the most modern and versatile fleets in the world.  Our primary business is to contract our drilling rigs, related equipment and work crews predominantly on a dayrate basis to drill oil and gas wells.  We specialize in technically demanding sectors of the offshore drilling business with a particular focus on deepwater and harsh environment drilling services.  We also provide oil and gas drilling management services on either a dayrate basis or a completed-project, fixed-price (or "turnkey") basis, as well as drilling engineering and drilling project management services, and we participate in oil and gas exploration and production activities.

Transocean Ltd. is a Swiss corporation with principal executive offices located at Chemin de Blandonnet 10, 1214 Vernier, Switzerland.  Our telephone number at that address is +41 22 930-9000.  Our shares are listed on the New York Stock Exchange ("NYSE") under the symbol "RIG," and effective April 20, 2010, our shares were listed and began trading on the SIX Swiss Exchange under the symbol "RIGN."  For information about the revenues, operating income, assets and other information related to our business, our segments and the geographic areas in which we operate, see "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" and Notes to Consolidated Financial Statements—Note 22—Segments, Geographical Analysis and Major Customers.

## Background

In December 2008, Transocean Ltd. completed a transaction pursuant to an Agreement and Plan of Merger among Transocean Ltd., Transocean Inc., which was our former parent holding company, and Transocean Cayman Ltd., a company organized under the laws of the Cayman Islands that was a wholly owned subsidiary of Transocean Ltd., pursuant to which Transocean Inc. merged by way of schemes of arrangement under Cayman Islands law with Transocean Cayman Ltd., with Transocean Inc. as the surviving company and, as a result, a wholly owned subsidiary of Transocean Ltd. (the "Redomestication Transaction").  In the Redomestication Transaction, Transocean Ltd. issued one of its shares in exchange for each ordinary share of Transocean Inc.  In addition, Transocean Ltd. issued 16 million of its shares to Transocean Inc. for future use to satisfy Transocean Ltd.'s obligations to deliver shares in connection with awards granted under our incentive plans or other rights to acquire shares of Transocean Ltd.  The Redomestication Transaction effectively changed the place of incorporation of our parent holding company from the Cayman Islands to Switzerland.  As a result of the Redomestication Transaction, Transocean Inc. became a direct, wholly owned subsidiary of Transocean Ltd.  In connection with the Redomestication Transaction, we relocated our principal executive offices to Vernier, Switzerland.  We refer to the Redomestication Transaction and the relocation of our principal executive offices together as the "Redomestication."

Exhibit C
Page 13

TRANSOCEAN LTD. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — Continued

*Transocean Mercury* and related equipment.  As of December 31, 2010, *Transocean Mercury* had a net carrying amount of less than $1 million, recorded in assets held for sale on our consolidated balance sheet.  See Note 25—Subsequent Events.

During the year ended December 31, 2009, we received net proceeds of $10 million in connection with our sale of *Sedco 135-D* and disposals of other unrelated property and equipment, and these disposals had no net effect on income taxes or net income.  In addition, we received net proceeds of $4 million in exchange for our 45 percent ownership interest in Caspian Drilling Company Limited, which operates *Dada Gorgud* and *Istigal* under long-term bareboat charters with the owner of the rigs and $38 million in exchange for our interest in Arab Drilling & Workover Company.  During the year ended December 31, 2009, we recognized a loss on disposal of assets of $9 million, which had no tax effect.

During the year ended December 31, 2008, we completed the sale of three Standard Jackups, *GSF High Island VIII*, *GSF Adriatic III* and *GSF High Island I*.  We received cash proceeds of $320 million associated with the sales, which had no effect on earnings.

*Deepwater Horizon*—On April 22, 2010, the Ultra-Deepwater Floater *Deepwater Horizon* sank after a blowout of the Macondo well caused a fire and explosion on the rig.  The rig's insured value was $560 million, which was not subject to a deductible, and our insurance underwriters declared the vessel a total loss.  During the year ended December 31, 2010, we received $560 million in cash proceeds from insurance recoveries related to the loss of the drilling unit and, for the year ended December 31, 2010, we recognized a gain on the loss of the rig in the amount of $267 million ($0.83 per diluted share), which had no tax effect.  See Note 14—Commitments and Contingencies.

Note 10—Goodwill and Other Intangible Assets

Goodwill and other indefinite-lived intangible assets—The gross carrying amounts of goodwill and accumulated impairment were as follows (in millions):

| | Year ended December 31, 2010 | | | Year ended December 31, 2009 | | |
|---|---|---|---|---|---|---|
| | Gross carrying amount | Accumulated impairment | Net carrying amount | Gross carrying amount | Accumulated impairment | Net carrying amount |
| Contract drilling services | | | | | | |
| Balance, beginning of period | $ 10,626 | $ (2,494) | $ 8,132 | $ 10,620 | $ (2,494) | $ 8,126 |
| Purchase price adjustment | — | — | — | 6 | | 6 |
| Balance, end of period | 10,626 | (2,494) | 8,132 | 10,626 | (2,494) | 8,132 |
| | | | | | | |
| Drilling management services | | | | | | |
| Balance, beginning of period | 176 | (176) | — | 176 | (176) | — |
| Balance, end of period | 176 | (176) | — | 176 | (176) | — |
| | | | | | | |
| Oil and gas properties | | | | | | |
| Balance, beginning of period | 2 | — | 2 | 2 | — | 2 |
| Impairment | — | (2) | (2) | — | — | — |
| Balance, end of period | 2 | (2) | — | 2 | — | 2 |
| | | | | | | |
| Total goodwill | | | | | | |
| Balance, beginning of period | 10,804 | (2,670) | 8,134 | 10,798 | (2,670) | 8,128 |
| Impairment | — | (2) | (2) | — | — | — |
| Purchase price adjustment | — | — | — | 6 | — | 6 |
| Balance, end of period | $ 10,804 | $ (2,672) | $ 8,132 | $ 10,804 | $ (2,670) | $ 8,134 |

The gross carrying amounts of the ADTI trade name, which we consider to be an indefinite-lived intangible asset, and accumulated impairment were as follows (in millions):

| | Year ended December 31, 2010 | | | Year ended December 31, 2009 | | |
|---|---|---|---|---|---|---|
| | Gross carrying amount | Accumulated impairment | Net carrying amount | Gross carrying amount | Accumulated impairment | Net carrying amount |
| Trade name | | | | | | |
| Balance, beginning of period | $ 76 | $ (37) | $ 39 | $ 76 | $ (31) | $ 45 |
| Impairment | — | — | — | — | (6) | (6) |
| Balance, end of period | $ 76 | $ (37) | $ 39 | $ 76 | $ (37) | $ 39 |

Exhibit C
Page 14

TRANSOCEAN LTD. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — Continued

*Macondo well incident*

Overview—On April 22, 2010, the Ultra-Deepwater Floater *Deepwater Horizon* sank after a blowout of the Macondo well caused a fire and explosion on the rig. Eleven persons were declared dead and others were injured as a result of the incident. At the time of the explosion, *Deepwater Horizon* was located approximately 41 miles off the coast of Louisiana in Mississippi Canyon Block 252 and was contracted to BP America Production Co.

As we continue to investigate the cause or causes of the incident, we are evaluating its consequences. Although we cannot predict the final outcome or estimate the reasonably possible range of loss with certainty, we have recognized a liability for estimated loss contingencies that we believe are probable and for which a reasonable estimate can be made. We have also recognized a receivable for the portion of this liability that we believe is recoverable from insurance. As of December 31, 2010, the amount of the estimated liability was $135 million, recorded in other current liabilities, and the corresponding estimated recoverable amount was $94 million, recorded in accounts receivable, net, on our consolidated balance sheet. New information or future developments could require us to adjust our disclosures and our estimated liabilities and insurance recoveries. See "—Contractual indemnity."

Litigation—As of December 31, 2010, 304 actions or claims were pending against Transocean entities, along with other unaffiliated defendants, in state and federal courts. Additionally, government agencies have initiated investigations into the Macondo well incident. We have categorized below the nature of the legal actions or claims. We are evaluating all claims and intend to vigorously defend any claims and pursue any and all defenses available. In addition, we believe we are entitled to contractual defense and indemnity for all wrongful death and personal injury claims made by non-employees and third-party subcontractors' employees as well as all liabilities for pollution or contamination, other than for pollution or contamination originating on or above the surface of the water. See "—Contractual indemnity."

*Wrongful death and personal injury*—As of December 31, 2010, we and one or more of our subsidiaries have been named, along with other unaffiliated defendants, in 30 complaints that were pending in state and federal courts in Louisiana and Texas involving multiple plaintiffs that allege wrongful death and other personal injuries arising out of the Macondo well incident. Per the order of the Multi-District Litigation Panel (the "MDL"), these claims have been centralized for discovery purposes in the U.S. District Court, Eastern District of Louisiana. The complaints generally allege negligence and seek awards of unspecified economic damages and punitive damages. BP plc (together with its affiliates, "BP"), MI-SWACO, Weatherford Ltd. and Cameron International Corporation and certain of its affiliates have, based on contractual arrangements, also made indemnity demands upon us with respect to personal injury and wrongful death claims asserted by our employees or representatives of our employees against these entities. See "—Contractual indemnity."

*Economic loss*—As of December 31, 2010, we and one or more of our subsidiaries were named, along with other unaffiliated defendants, in 70 individual complaints as well as 185 putative class-action complaints that were pending in the federal and state courts in Louisiana, Texas, Mississippi, Alabama, Georgia, Kentucky, South Carolina, Tennessee, Florida and possibly other courts. The complaints generally allege, among other things, potential economic losses as a result of environmental pollution arising out of the Macondo well incident and are based primarily on the Oil Pollution Act of 1990 ("OPA") and state OPA analogues. See "—Environmental matters." One complaint also alleges a violation of the Racketeer Influenced and Corrupt Organizations Act, but we were not named in this particular master complaint. The plaintiffs are generally seeking awards of unspecified economic, compensatory and punitive damages, as well as injunctive relief. See "—Contractual indemnity." Per the order of the MDL, the economic loss claims filed in federal courts have been or will be centralized for discovery purposes in the U.S. District Court, Eastern District of Louisiana. Absent agreement of the parties, however, the cases will be tried in the courts from which they were transferred.

*Federal securities claims*—Three federal securities law class actions are currently pending in the U.S. District Court, Southern District of New York, naming us and certain of our officers and directors as defendants. Two of these actions generally allege violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated under the Exchange Act and Section 20(a) of the Exchange Act in connection with the Macondo well incident. The plaintiffs are generally seeking awards of unspecified economic damages, including damages resulting from the decline in our stock price after the Macondo well incident. The third action was filed by a former GlobalSantaFe shareholder, alleging that the proxy statement related to our shareholder meeting in connection with our merger with GlobalSantaFe violated Section 14(a) of the Exchange Act, Rule 14a-9 promulgated thereunder and Section 20(a) of the Exchange Act. The plaintiff claims that GlobalSantaFe shareholders received inadequate consideration for their shares as a result of the alleged violations and seeks rescission and compensatory damages.

*Shareholder derivative claims*—In June 2010, two shareholder derivative suits were filed by our shareholders naming us as a nominal defendant and certain of our officers and directors as defendants in the District Courts of the State of Texas. The first case generally alleges breach of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement and waste of corporate assets in connection with the Macondo well incident and the other generally alleges breach of fiduciary duty, unjust enrichment and waste of corporate assets in connection with the Macondo well incident. The plaintiffs are generally seeking, on behalf of Transocean, restitution and disgorgement of all profits, benefits and other compensation from the defendants.

*Environmental matters*—Environmental claims under two different schemes, statutory and common law, and in two different regimes, federal and state, have been asserted against us. See "—Litigation—Economic loss." Liability under many statutes is imposed without fault, but such statutes often allow the amount of damages to be limited. In contrast, common law liability requires proof of fault and causation, but generally has no readily defined limitation on damages, other than the type of damages that may be redressed. We

Exhibit C
Page 15

TRANSOCEAN LTD. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — Continued

have described below certain significant applicable environmental statutes and matters relating to the Macondo well incident.  As described below, we believe that we have limited statutory environmental liability and we are entitled to contractual defense and indemnity for all liabilities for pollution or contamination, other than for pollution or contamination originating on or above the surface of the water.  See "—Contractual indemnity."

*Oil Pollution Act*—OPA imposes strict liability on responsible parties of vessels or facilities from which oil is discharged into or upon navigable waters or adjoining shore lines.  OPA defines the responsible parties with respect to the source of discharge.  We believe that the owner or operator of a mobile offshore drilling unit ("MODU"), such as *Deepwater Horizon*, is only a responsible party with respect to discharges from the vessel that occur on or above the surface of the water.  As the responsible party for *Deepwater Horizon*, we believe we are responsible only for the discharges of oil emanating from the rig.  Therefore, we believe we are not responsible for the discharged hydrocarbons from the Macondo well.

Responsible parties for discharges are liable for: (1) removal and cleanup costs, (2) damages that result from the discharge, including natural resources damages, generally up to a statutorily defined limit, (3) reimbursement for government efforts and (4) certain other specified damages.  For responsible parties of MODUs, the limitation on liability is determined based on the gross tonnage of the vessel.  The statutory limits are not applicable, however, if the discharge is the result of gross negligence, willful misconduct, or violation of federal construction or permitting regulations by the responsible party or a party in a contractual relationship with the responsible party.

Additionally, the National Pollution Funds Center ("NPFC"), a division of the U.S. Coast Guard, is charged with administering the Oil Spill Liability Trust Fund ("OSLTF").  The NPFC collects fines and civil penalties under OPA from responsible parties, as defined in the statute.  The payments are directed to the OSLTF.  To date, the NPFC has issued nine invoices to BP, Anadarko Petroleum Corporation (together with its affiliates, "Anadarko") and MOEX Offshore LLC (together with its affiliates, "MOEX"), as the operator and leasehold owners of the well and, thus, the statutorily defined responsible parties for discharges from the well and wellhead.  To date, BP has paid all nine of these invoices.  Invoices have also been sent to us, and we have acknowledged responsible party status only with respect to discharges from the vessel on or above the surface of the water, if any.

In addition, on December 15, 2010, the Department of Justice (the "DOJ") filed a civil lawsuit against us and other unaffiliated defendants.  The complaint alleges violations under OPA and the Clean Water Act, and the DOJ reserved its rights to amend the complaint to add new claims and defendants.  The complaint asserts that all defendants named are jointly and severally liable for all removal costs and damages resulting from the Macondo well incident.  In addition to the civil complaint, the DOJ served us with Civil Investigative Demands ("CIDs") on December 8, 2010.  These demands are part of an on-going investigation by the DOJ to determine if we made false claims in connection with the operator's acquisition of the leasehold interest in the Mississippi Canyon Block 252, Gulf of Mexico and drilling operations on *Deepwater Horizon.*

We have also received claims directly from individuals, pursuant to OPA, requesting compensation for loss of income as a result of the Macondo well incident.  BP has accepted responsible party status with the U.S. Coast Guard for the release of hydrocarbons from the Macondo well and has stated its intent to pay all legitimate claims, and we have not paid any of these claims.

*Other federal statutes*—Several of the claimants have made assertions under other statutes, including the Clean Water Act, the Endangered Species Act, the Migratory Bird Treaty Act, the Clean Air Act, the Comprehensive Environmental Response Compensation and Liability Act and the Emergency Planning and Community Right-to-Know Act.

*State environmental laws*—As of December 31, 2010, claims had been asserted by private claimants under state environmental statutes in Florida, Louisiana, Mississippi and Texas.  As described below, claims asserted by various state and local governments are pending in Alabama, Florida, Louisiana and Texas.

In June 2010, the Louisiana Department of Environmental Quality (the "LDEQ") issued a consolidated compliance order and notice of potential penalty to us and certain of our subsidiaries asking us to eliminate and remediate discharges of oil and other pollutants into waters and property located in the State of Louisiana, and to submit a plan and report in response to the order.  We requested that the LDEQ rescind the enforcement actions against us and our subsidiaries because the remediation actions that are the subject of such orders are actions that do not involve us or our subsidiaries, as we are not involved in the remediation or clean-up activities.  Alternatively, if the LDEQ would not rescind the enforcement actions altogether, we requested the LDEQ to dismiss the enforcement actions against us and certain of our subsidiaries as these entities are not proper parties to the enforcement actions and were improperly served.  In October 2010, the LDEQ rescinded its enforcement actions against us and our subsidiaries but reserved its rights to seek civil penalties for future violations of the Louisiana Environmental Quality Act.

In September 2010, the State of Louisiana filed a declaratory judgment seeking to designate us as a responsible party under OPA and the Louisiana Oil Spill Prevention and Response Act ("LOSPRA") for the discharges emanating from the Macondo well.  Specifically the declaratory judgment claims (1) that we are a responsible party under OPA for all hydrocarbons discharged from the Macondo well, including underwater discharges of oil from the well head; (2) that we, as a responsible party, are jointly, severally, and strictly liable for the spill from the Macondo well in accordance with OPA; (3) that we are a responsible party under the Louisiana Oil Spill Prevention and Response Act for all hydrocarbons discharged from the Macondo well, including underwater discharges of oil from the well head; (4) that we, as a responsible party, are jointly, severally, and strictly liable for the spill from the Macondo well in accordance with the LOSPRA; and (5) seeks an award Plaintiff's costs incurred in pursuing this action as allowed by law.

Exhibit C
Page 16

TRANSOCEAN LTD. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — Continued

Additionally, suits have been filed by the State of Alabama and the cities of Greenville, Evergreen, Georgiana and McKenzie, Alabama in the U.S. District Court, Middle District of Alabama; the Mexican States of Veracruz, Quintana Roo and Tamaulipas in the U.S. District Court, Western District of Texas; and the City of Panama City Beach, Florida in the U.S. District Court, Northern District of Florida. Generally, these governmental entities allege economic losses under OPA and other statutory environmental state claims and also assert various common law state claims.  The claims of the State of Alabama, the cities in Alabama, and the Mexican States have been centralized in the MDL and will proceed in accordance with the MDL scheduling order, and the City of Panama City Beach's claim was voluntarily dismissed.

By letter dated May 5, 2010, the Attorneys General of the five Gulf Coast states of Alabama, Florida, Louisiana, Mississippi and Texas informed us that they intend to seek recovery of pollution clean-up costs and related damages arising from the Macondo well incident.  In addition, by letter dated June 21, 2010, the Attorneys General of the 11 Atlantic Coast states of Connecticut, Delaware, Georgia, Maine, Maryland, Massachusetts, New Hampshire, New York, North Carolina, Rhode Island and South Carolina informed us that their states have not sustained any damage from the Macondo well incident but they would like assurances that we will be responsible financially if damages are sustained.  We responded to each letter from the Attorneys General and indicated that we intend to fulfill our obligations as a responsible party for any discharge of oil from *Deepwater Horizon* on or above the surface of the water, and we assume that the operator will similarly fulfill its obligations under OPA for discharges from the undersea well.  Other than the lawsuit filed by the State of Alabama discussed above, no further requests have been made or actions taken with regard to the initial communication.

*Wreck removal*—By letter dated December 6, 2010, the Coast Guard requested us to formulate and submit a comprehensive oil removal plan to remove any diesel fuel contained in the sponsons and fuel tanks that can be recovered from *Deepwater Horizon*.  We have conducted a survey of the rig wreckage and are reviewing the results.  We have insurance coverage for wreck removal for up to 25 percent of *Deepwater Horizon's* insured value, or $140 million, with any excess wreck removal liability generally covered to the extent of our remaining excess liability limits.

*Contractual indemnity*—Under our drilling contract for *Deepwater Horizon*, the operator has agreed, among other things, to assume full responsibility for and defend, release and indemnify us from any loss, expense, claim, fine, penalty or liability for pollution or contamination, including control and removal thereof, arising out of or connected with operations under the contract other than for pollution or contamination originating on or above the surface of the water from hydrocarbons or other specified substances within the control and possession of the contractor, as to which we agreed to assume responsibility and protect, release and indemnify the operator.  Although we do not believe it is applicable to the Macondo well incident, we also agreed to indemnify and defend the operator up to a limit of $15 million for claims for loss or damage to third parties arising from pollution caused by the rig while it is off the drilling location, while the rig is underway or during drive off or drift off of the rig from the drilling location.  The operator has also agreed, among other things, (1) to defend, release and indemnify us against loss or damage to the reservoir, and loss of property rights to oil, gas and minerals below the surface of the earth and (2) to defend, release and indemnify us and bear the cost of bringing the well under control in the event of a blowout or other loss of control.  We agreed to defend, release and indemnify the operator for personal injury and death of our employees, invitees and the employees of our subcontractors while the operator agreed to defend, release and indemnify us for personal injury and death of its employees, invitees and the employees of its other subcontractors, other than us.  We have also agreed to defend, release and indemnify the operator for damages to the rig and equipment, including salvage or removal costs.

Although we believe we are entitled to contractual defense and indemnity, given the potential amounts involved in connection with the Macondo well incident, the operator may seek to avoid its indemnification obligations.  In particular, the operator, in response to our request for indemnification, has generally reserved all of its rights and stated that it could not at this time conclude that it is obligated to indemnify us.  In doing so, the operator has asserted that the facts are not sufficiently developed to determine who is responsible and has cited a variety of possible legal theories based upon the contract and facts still to be developed.  We believe this reservation of rights is without justification and that the operator is required to honor its indemnification obligations contained in our contract and described above.

*Other legal proceedings*

*Asbestos litigation*—In 2004, several of our subsidiaries were named, along with numerous other unaffiliated defendants, in 21 complaints filed on behalf of 769 plaintiffs in the Circuit Courts of the State of Mississippi and which claimed injuries arising out of exposure to asbestos allegedly contained in drilling mud during these plaintiffs' employment in drilling activities between 1965 and 1986.  A Special Master, appointed to administer these cases pre-trial, subsequently required that each individual plaintiff file a separate lawsuit, and the original 21 multi-plaintiff complaints were then dismissed by the Circuit Courts.  The amended complaints resulted in one of our subsidiaries being named as a direct defendant in seven cases.  We have or may have an indirect interest in an additional 12 cases.  The complaints generally allege that the defendants used or manufactured asbestos-containing products in connection with drilling operations and have included allegations of negligence, products liability, strict liability and claims allowed under the Jones Act and general maritime law.  The plaintiffs generally seek awards of unspecified compensatory and punitive damages.  In each of these cases, the complaints have named other unaffiliated defendant companies, including companies that allegedly manufactured the drilling-related products that contained asbestos.  The preliminary information available on these claims is not sufficient to determine if there is an identifiable period for alleged exposure to asbestos, whether any asbestos exposure in fact occurred, the vessels potentially involved in the claims, or the basis on which the plaintiffs would support claims that their injuries were related to exposure to asbestos.  However, the initial evidence available would suggest that we would have significant defenses to liability and damages.  In 2009, two cases that were part of the original 2004 multi-plaintiff suits went to trial in Mississippi against unaffiliated defendant companies which allegedly manufactured drilling-related products containing asbestos.  We were not a defendant in either of these cases.  One of the cases resulted in a substantial jury verdict in

Exhibit C
Page 17

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned; thereunto duly authorized, on February 28, 2011.

TRANSOCEAN LTD.
By /s/ Ricardo H. Rosa
    Ricardo H. Rosa
    Senior Vice President and Chief Financial Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant in the capacities indicated on February 28, 2011.

| Signature | Title |
|---|---|
| *<br>Robert E. Rose | Chairman of the Board of Directors |
| *<br>J. Michael Talbert | Vice Chairman of the Board |
| /s/ Steven L. Newman<br>Steven L. Newman | Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ Ricardo H. Rosa<br>Ricardo H. Rosa | Senior Vice President and Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ John H. Briscoe<br>John H. Briscoe | Vice President and Controller<br>(Principal Accounting Officer) |
| *<br>W. Richard Anderson | Director |
| *<br>Thomas W. Cason | Director |
| *<br>Victor E. Grijalva | Director |
| *<br>Martin B. McNamara | Director |
| *<br>Edward R. Muller | Director |

Exhibit C
Page 18

| Signature | Title |
|---|---|

_____*_____

Robert M. Sprague                          Director

_____*_____

Ian C. Strachan                            Director

*        /s/ John H. Briscoe
_____

John H. Briscoe
(Attorney-in-Fact)

Exhibit C
Page 19

Exhibit 31.1

CEO CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Steven L. Newman, certify that:

1.     I have reviewed this report on Form 10-K of Transocean Ltd.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; and

    c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

    a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated:    February 28, 2011                /s/ Steven L. Newman
                                          Steven L. Newman
                                          Chief Executive Officer

Exhibit C
Page 20

Exhibit 31.2

CFO CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Ricardo H. Rosa, certify that:

1.      I have reviewed this report on Form 10-K of Transocean Ltd.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

  a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

  b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; and

  c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this  report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

  d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

  a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

  b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated:    February 28, 2011                                /s/ Ricardo H. Rosa
                                                           Ricardo H. Rosa
                                                           Senior Vice President and Chief Financial Officer

Exhibit C
Page 21

Exhibit 32.1

CERTIFICATION PURSUANT TO SECTION 906 OF
THE SARBANES-OXLEY ACT OF 2002 (SUBSECTIONS (a) AND (b)
OF SECTION 1350, CHAPTER 63 OF TITLE 18, UNITED STATES CODE)


Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code), I, Steven L. Newman, Chief Executive Officer of Transocean Ltd., a Swiss corporation (the "Company"), hereby certify, to my knowledge, that:

(1)     the Company's Annual Report on Form 10-K for the year ended December 31, 2010 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Dated:   February 28, 2011                        /s/ Steven L. Newman
                                                  Steven L. Newman
                                                  Chief Executive Officer

Exhibit C
Page 22

Exhibit 32.2

CERTIFICATION PURSUANT TO SECTION 906 OF
THE SARBANES-OXLEY ACT OF 2002 (SUBSECTIONS (a) AND (b)
OF SECTION 1350, CHAPTER 63 OF TITLE 18, UNITED STATES CODE)


Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code), I, Ricardo H. Rosa, Senior Vice President and Chief Financial Officer of Transocean Ltd., a Swiss corporation (the "Company"), hereby certify, to my knowledge, that:

(1)     the Company's Annual Report on Form 10-K for the year ended December 31, 2010 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Dated:   February 28, 2011                              /s/ Ricardo H. Rosa
                                                        Ricardo H. Rosa
                                                        Senior Vice President and Chief Financial Officer

Exhibit C
Page 23



# BP
## GULF OF MEXICO REGIONAL OIL SPILL RESPONSE PLAN



**BP**
**200 Westlake Park Blvd.**
**Houston, TX 77079**

*Developed by:*

*The Response Group*
*Emergency Response | Pre-Planning & Support*

*Houston, TX - Anchorage, AK - Boston, MA - Chicago, IL*
*www.responsegroupinc.com*
*281.880.5000*

Exhibit D
Page 1



**BP**
Regional Oil Spill Response Plan – Gulf of Mexico

Section 1
Quick Guide

## OSRP QUICK GUIDE TABLE OF CONTENTS

| | PAGE |
|---|---|
| Spill Assessment & Volume Estimation — Spill Assessment & Volume Estimation | 2 |
| Pollution Report Form — Spill Report Form | 10 |
| Notification Flow Charts — Notification Flow Charts | 17 |
| Internal Notifications — Internal Notifications | 22 |
| External Notifications — External Notifications: Agency Notifications, Emergency Support, Spill Response Support, OSRO & SRT | 23 |
| Organizational Chart & Roles/Responsibilities — Organizational Chart & Roles/Responsibilities | 39 |
| Dispersant Approval Process — Dispersant Approval Process | 58 |
| OSRO Locations & Equipment Inventories — OSRO Locations & Equipment Inventory | 71 |
| Facility Locations — Facility Locations | 75 |
| ICS Forms — ICS Forms: Weather Report, Notification Report, ICS 201-1 through 201-4, ICS 202, ICS 205, ICS 206, ICS 208, ICS 214 | 90 |

Title of Document:  Regional Oil Spill Response Plan
Authority:  Dan R. Replogle,
GoM EMS Mgmt Representative
Scope:  GoM EMS
Issue Date:  12/01/00
Revision Date:  06/30/09
Next Review Date:  06/30/11

UPS-US-SW-GOM-HSE-DOC-00177-2
Custodian:  Earnest Bush,
Environmental Coordinator
Document Administrator:  Kristy McNease,
GoM HSSE Document Mgmt Administrator
Issuing Dept.:  GOM SPU
Control Tier:  Tier 2 - GoM Region
Section 1, Page 1 of 134
© The Response Group 06/2009

Exhibit D
Page 2



**BP**
Regional Oil Spill Response Plan – Gulf of Mexico

Section 11
Resource
Identification

## Sensitive Biological & Human-Use Resources          Figure 11-3

| Resource Category | Sub-Category | Comments |
|---|---|---|
| *Habitats* | *Shoreline type* | *ESI or other geomorphological class* |
| | Submerged aquatic vegetation | All types of subtidal grass beds |
| | Kelp beds | |
| | Coral reefs | |
| | Worm beds | |
| *Fish & Wildlife Resources* | | |
| Marine Mammals | Whales | Seasonal use areas; migration routes |
| | Dolphins | Populated concentration areas |
| | Sea Lions | Haul outs |
| | Seals | Haul outs |
| | Sea Otters | Population concentration areas |
| | Manatees | Population concentration areas |
| | Walruses | Haul outs |
| Terrestrial Mammals | Water-associated species (e.g., Otter, Beaver Mink) | Concentrate areas |
| | Endangered Species | Important habitats as identified by resource agency |
| Birds | Waterfowl | Nesting/concentration areas; Wintering/migration areas |
| | Seabirds | Rookeries; wintering concentration areas |
| | Shorebirds | Nesting sites; migration stopover sites; wintering concentration areas |
| | Gulls/Terns | Nesting sites |
| | Raptor | Nest sites; important forage areas |
| | Other migratory species | Nest sites; important stopover sites; wintering concentration areas; important habitants, as identified by resource agency |
| Fish | Anadromous fish | Spawning streams |
| | Beach spawners | Spawning beaches |
| | Nursery areas | Areas for all near shore species; Areas of unique concentrations |

Title of Document:  Regional Oil Spill Response Plan
Authority:  Dan R. Replogle,
GoM EMS Mgmt Representative
Scope:  GoM EMS
Issue Date:  12/01/00
Revision Date:  06/30/09
Next Review Date:  06/30/11

UPS-US-SW-GOM-HSE-DOC-00177-2
Custodian:  Earnest Bush,
Environmental Coordinator
Document Administrator:  Kristy McNease,
GoM HSSE Document Mgmt Administrator
Issuing Dept.:  GOM SPU
Control Tier:  Tier 2 - GoM Region
Section 11, Page 7 of 10 Pages
© The Response Group, Inc.

Exhibit D
Page 3



**BP**
Regional Oil Spill Response Plan – Gulf of Mexico

**Section 17**
Wildlife
Rehabilitation
Procedures

## 17. <u>WILDLIFE REHABILITATION PROCEDURES</u>

### A. Overview

Rehabilitation of oiled wildlife is a complex, crisis oriented process that requires an experienced staff with medical, technical, and crisis management skills. Regulatory permits and specialized training for Occupational Health and Safety Administration (OSHA) compliance are also required to conduct a comprehensive oiled wildlife response. Rehabilitation of oiled wildlife focuses primarily on the adverse physiological effects of oil on individual birds and animals. The effects, which are complex, may be counteracted through a cooperative effort of veterinarians, biologists, and rehabilitation specialists with oil spill response experience. The primary objective of wildlife rehabilitation is to care for injured animals and return them to their natural environment.

> Wildlife rehabilitation serves two purposes in an efficient oil spill response:
> - Provide a humane response to wild animals harmed through man-related activities, and
> - Attempts to treat and return affected animals to healthy breeding populations in the wild.

Rehabilitation efforts are particularly important when endangered or threatened species are contaminated.

> In general, the effects of oil on birds may be characterized as environmental, external, and/or internal:
> - Environmental Effects include, but are not limited to, immediate contamination of food source biomass, reduction in breeding animals and plants that provide future food sources, contamination of nesting habitat, and reduction in reproductive success through contamination and reduced hatchability of eggs or temporary inhibition of ovarian function.

Title of Document: Regional Oil Spill Response Plan
Authority: Dan R. Replogle,
GoM EMS Mgmt Representative
Scope: GoM EMS
Issue Date: 12/01/00
Revision Date: 06/30/09
Next Review Date: 06/30/11

UPS-US-SW-GOM-HSE-DOC-00177-2
Custodian: Earnest Bush,
Environmental Coordinator
Document Administrator: Kristy McNease,
GoM HSSE Document Mgmt Administrator
Issuing Dept.: GOM SPU
Control Tier: Tier 2 - GoM Region
Section 17, Page 1 of 34
© The Response Group 06/2009

Exhibit D
Page 4

NEW ORLEANS, Aug. 6, 2010

# BP May Re-Tap Reservoir, Citing "Lots of Oil"

## COO Doug Suttles Says BP Might Still Drill in Reservoir Involved in Massive Spill, Saying "There's Lots of Oil and Gas Here"



Play CBS Video  BP to Seal Oil Well

BP's "Static Kill" strategy was successful and now the well will be sealed permanently to the relief of Gulf Coast residents. Don Teague reports.

(CBS/AP)  BP PLC said Friday it might someday drill again in the same undersea pocket of oil that gushed millions of gallons of its crude into the sea, crushing livelihoods and fouling beaches and wildlife habitat along hundreds of miles of Gulf of Mexico shoreline.

"There's lots of oil and gas here," Chief Operating Officer Doug Suttles said at a news briefing. "We're going to have to think about what to do with that at some point."

Special Section: Disaster in the Gulf

The vast oil reservoir beneath the blown well is still believed to hold nearly $4 billion worth of crude. With the company and its partners facing tens of billions of dollars in liabilities, the incentive to exploit the wells and the reservoir could grow.

Retired Coast Guard Adm. Thad Allen, the government's point man on the spill, said he had no information on BP's future plans.

"I would assume that's a policy issue related to the management of the lease," he told reporters.

Exhibit E
Page 1



In this July 28, 2010 satellite image provided by NASA, oil from the Deepwater Horizon oil spill is visible on the surface of the Gulf of Mexico. **(AP Photo)**

"Frankly, it hasn't been raised to my level at this point. I'm not sure I can comment on it."

Suttles has spent more than three months managing BP's response efforts on the Gulf but is now returning to his day job in Houston, the company said. Mike Utsler, a vice president who has been running BP's command post in Houma, La., since April, will replace him.

The personnel shift comes as BP appears to be gaining the upper hand on plugging the leak, triggered when an oil rig exploded off Louisiana on April 20, killing 11 workers and triggering the massive spill.

Engineers this week poured in cement to complete a plug at the top of the wellbore as part of a process dubbed a "static kill," but they needed to wait at least a day for it to harden. Once it does, crews can finish the last stretch of a relief well intersecting the blown well just above the oil's source, injecting more mud and cement from the bottom to form a final plug.

Suttles confirmed Friday that crews for now plan to use the 18,000-foot relief well to seal off with mud and cement the underground reservoir feeding the blown well.

The company had been hedging on how exactly it would use the relief well, which it has been digging for three months, as federal officials insisted it should be used to perform the so-called "bottom kill."

**More Oil Spill Coverage**

BP Finishes Pumping Cement into Blown-Out Well
Reporting from the Coast Guard's "Decisive"
Report: Oil Rig Co. Had Issues at 3 More Wells
U.S. Says 75% of Oil Gone, but Skeptics Remain

Crews have already plugged up the well from the top with mud and cement. But federal officials

want BP to plug it from the bottom to make sure it's permanently sealed.

Suttles says crews are preparing to drill the final 100 feet of the primary relief well.

If not used for the bottom kill, the relief wells could have conceivably offered a way for BP or another company to pump oil from the reservoir and sell it, an idea unlikely to sit well with Gulf Coast residents and families of workers who died on the rig.

Linda Kaye Randolph, 54, a real estate investor who grew up on the coast in Pass Christian, Miss., said Thursday it disturbs her that anyone might use the site commercially.

"People died out there on that rig," she said, her voice cracking. "It isn't about the money. It would bother me that they're not respecting the people who died there. There's thousands of other wells. They can find another place. Leave that one alone."

BP has not been approached by any other company about buying the relief wells, spokesman Scott Dean said.

But with the company and its partners facing tens of billions of dollars in liabilities, the incentive to exploit the wells and the reservoir could grow.

Outgoing BP Chief Executive Tony Hayward said in June that the reservoir feeding the busted well was believed to hold about 2.1 billion gallons of oil. Roughly 200 million gallons have leaked out, leaving about 1.9 billion gallons, or about 45,238,000 barrels. At the current market price per barrel - $82 - that would make the reservoir still worth $3.7 billion.

BP still has access to a roughly 3-by-3-mile block of sea floor that could contain multiple reservoirs, "so there is a lot more potential" for oil production, said George Hirasaki, a Rice University professor in chemical and biomolecular engineering an expert on oil containment.

The static kill started Tuesday with engineers pumping enough mud down the top of the well to push the crude back to its underground source. Suttles said engineers plan to monitor the cement newly pumped in from the top and hope to test the plug with a burst of pressure Friday afternoon to make sure it's sealed.

"All the indications so far look very encouraging," he said.

A federal report this week indicated that only about a quarter of the spilled crude remains in the Gulf and is degrading quickly.

"There's essentially no skimmable oil left on the surface, no recoverable oil left on the surface," Suttles said.

Some scientists disputed the report's veracity, and much of the remaining crude has permeated deep into marshes and wetlands, complicating cleanup.

As BP pulled brought in 33-year employee Utsler to take over the response and the blown well appeared to have flatlined, some Gulf residents who still see the oil wreaking havoc worry the nation's attention is shifting.

"I'm losing trust in the whole system," said Willie Davis, a 41-year-old harbormaster in Pass Christian, Miss. "If they don't get up off their behinds and do something now, it's gonna be years before we're back whole again."

© MMX, CBS Interactive Inc. All Rights Reserved. This material may not be published, broadcast, rewritten, or redistributed. The Associated Press contributed to this report.

**Don't Miss This**

Scroll Left Scroll Right



- [America's smokiest cities](#)



- [Actors who dropped out of school](#)



» Print

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# BP says test shuts off oil leak from Gulf well

Thu, Jul 15 2010

By Kristen Hays

HOUSTON (Reuters) - BP Plc said on Thursday no oil was leaking into the Gulf of Mexico for the first time since its huge spill began in April as it conducted pressure tests on its blown-out deep-sea well.

For the test, BP closed valves and vents on a tight-sealing containment cap installed atop its ruptured well earlier this week. Initial results early in the test showed the cap had completely contained the flow of oil, BP said.



"It's a great sight but it's far from the finish line," Doug Suttles, a senior BP executive, told reporters.

BP's U.S. shares initially jumped 10 percent after the company announced that its test had shut off the flow of oil.

President Barack Obama called the end of the flow of oil into the ocean a "positive sign," but cautioned that the latest effort was still in the testing phase. The spill has caused an economic and environmental disaster along the U.S. Gulf Coast.

As the company pushed ahead on the spill-control effort, U.S. energy company Apache Corp was moving forward on a possible $10 billion deal for some BP properties, including major assets in Alaska, CNBC reported.

After a delay to fix a leak, BP began the test on Thursday afternoon on the cap that could stop all or most of the flow of crude that has been polluting the ocean and coastline since April 20 in the worst offshore oil spill in U.S. history.

The test, which could last between six to 48 hours, gauges pressure in the well -- which extends 2.5 miles under the seabed -- to assess its condition. Officials said it will show whether the cap can safely shut off the flow from the well if oil-capture vessels at the surface must disconnect.

The U.S. Coast Guard has described the containment cap as at best a temporary fix to the leak while BP finishes two relief wells that it is drilling that are intended to intersect the blown-out well and permanently seal it next month.

The test is intended to determine whether the structure of the lengthy well is damaged or intact. Retired Coast Guard Admiral Thad Allen, the U.S. government's point man on the spill, compared the test to placing one's thumb over the end of a garden hose -- if the pressure does not increase that means there is a leak somewhere.

Regarding the BP well, a build-up of pressure would signal that the well is intact, which would make it easier to seal it with the relief wells.

The cap is a crucial step toward a multi-vessel oil-capture system that is hurricane-ready and can collect up to 80,000 barrels (3.34 million gallons/12.7 million liters) per day.

That should be more than enough to capture the whole well output, as estimates put the spill rate between 35,000 barrels (1.47 million gallons/5.56 million liters) and 60,000 barrels (2.5 million gallons/9.5 million liters) a day.

Allen backed away from earlier assurances that the new cap would be used to completely seal the well until the relief wells eventually kill it with heavy mud and cement.

Allen said the cap could shut the well, but might be used only to block the flow during emergency situations like a hurricane when BP's surface containment effort would be suspended. "The intention of the capping stack was never to close in the well per se," Allen said in New Orleans.

BP STOCK

Reports that Apache was seeking $6 billion to $7 billion for the purchase helped boost BP's U.S. shares from midday. The shares then rose further on the initial test results and ended up 7.6 percent at $38.92.

"It's been one of those headline things we've heard for 87 days, lots of people waiting for some good news," said John Massey, portfolio manager at Sunamerica Asset Management in Jersey City, New Jersey.

Exhibit F
Page 1

Analysts surveyed by Reuters Insider predict that BP will spend between $63 billion to $100 billion over the next 15 years in fines, cleanup costs and legal costs.

BP's shares have been ravaged since the well rupture, with $100 billion in market value being knocked off at one stage, before a three-week rally sparked by takeover talk, speculation about investment by a sovereign wealth fund and hopes that the well would be capped.

The news that it had finally stopped the leak -- at least during the test -- was a bit of good news for the British company, which has seen its share value plummet and reputation battered since the April 20 rig explosion that killed 11 workers and led to the spill of millions of gallons of oil.

BP also faced new measures in the U.S. Congress. Lawmakers are mulling a range of new laws that could require tougher safety regulations on offshore drilling or bar companies like BP from new offshore exploration leases.

The U.S. government, which has vowed to make BP pay for fixing the well and all cleanup efforts, told the oil giant that it was responsible for paying all royalties on the oil it is collecting from the ruptured well.

Currently, energy companies pay the government a royalty rate of up to 18.75 percent of the value of the oil and gas drilled in offshore tracts.

Through its containment systems, BP has collected or burned more than 800,000 barrels of oil.

The Gulf spill has soiled hundreds of miles/kilometers of shoreline, shut down about a third of Gulf fisheries and hurt tourism and fishing in all five U.S. Gulf states. It has also created problems for Obama as the government works to respond to the crisis while area residents struggle financially.

"It's a great thing, it's a wonderful thing," said Jerome DeGree in Larose, Louisiana when he heard that BP had at least temporarily stopped the oil from gushing into the ocean.

"This has been hurting this whole area," the shallow-water oil driller said. "I couldn't buy my shrimp, I couldn't buy my oysters, I couldn't take my boat out."

In an issue unrelated to the spill, but illustrating the pressure BP faces in the United States, the company confirmed on Thursday that it had lobbied the British government to speed up a prisoner transfer agreement with Libya in late 2007.

In August 2009, Britain released a Libyan convicted of blowing up a U.S. plane, angering the United States. Many of the 270 dead in the 1988 Lockerbie bombing were American.

The U.S. Senate Foreign Relations Committee said it would hold a hearing on the issue on July 29.

(Additional reporting by Chris Baltimore in Houston, Alexandria Sage in Louisiana, Matthew Lynley in New York and Ayesha Rascoe, Tom Doggett and Andrew Quinn in Washington; Writing by Deborah Charles; Editing by Simon Denyer)

© Thomson Reuters 2011. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

Exhibit F
Page 2





An Official Website of the United States Government

# Statement from National Incident Commander Admiral Thad Allen on Well Integrity Test

July 15, 2010 | 12:49:00 PM EDT

0 tweets

tweet

Admiral Thad Allen, National Incident Commander:

"Were encouraged by this development, but this isnt over. Over the next several hours we will continue to collect data and work with the federal science team to analyze this information and perform additional seismic mapping runs in the hopes of gaining a better understanding on the condition of the well bore and options for temporary shut in of the well during a hurricane. It remains likely that we will return to the containment process using this new stacking cap connected to the risers to attempt to collect up to 80,000 barrels of oil per day until the relief well is completed."

Exhibit G
Page 1

🇺🇸 *An Official Website of the United States Government*

Follow us:   🐦  📘  📶  ✉    | Join Mailing List | About Us | Contact Us | Site Map

**Restore**TheGulf.gov

[Search]

Home › News › Transcripts Docs?page=13 › Transcript - PressBrief with National Incident Commander Admiral Thad Allen July 19, 2010

## Transcript - PressBrief with National Incident Commander Admiral Thad Allen July 19, 2010

July 20, 2010 | 10:57:00 AM EDT

0 tweets

tweet

WASHINGTON -- Coast Guard Adm. Thad Allen, the National Incident Commander for the Deepwater BP Oil Spill response briefing.  A downloadable audio file of the conference is available here; a full transcript of the call follows:

**July 19th, 2010**

**3:15 p.m. EDT**

Admiral Allen: Thank you, Megan.

Good afternoon.  Its been a busy weekend.  I can report that weve been working long and hard with the National Incident Command and our science team, looking at issues associated with the relief wells, their current containment operations, most notably, the well integrity tests that have been going on for the past several days.

Let me state right away that our priorities are to plug this well.  So the number one priority is to finish these relief wells out.  I can talk about that status in a minute.  In the meantime containment options are our next priority, followed by response to the oil in the water.

Over the last several days, weve been watching the pressure in the capping stack that was put on last week.  That pressure now sits at 6,811 psi.  It continues to gradually rise several pounds or a pound or so every hour, and thats a positive trend.  As we know, the overall pressure itself was lower than what was expected.  Thats one of the issues we continue to discuss up here in our science team and BP as we move forward.

We have agreed that we will go forward with another 24-hour period from today till tomorrow.  This is contingent on a reply to a letter that I sent to BP yesterday, laying out requests for some extensive information regarding the various aspects of the wells containment and the current operations, including how we are conducting monitoring to make sure there is no seepages or leaks associated with the well integrity test that would lead us to believe there might be a problem with the wellbore integrity.

That would include vigorous and robust visual monitoring, seismic monitoring, acoustic monitoring with an oil vessel that is out there and also sensors that are already in place, sonar associated with the – the working of the well itself, hydrophones, and so forth.

As a condition of moving forward with the well integrity test, BP is to report to us any anomalies and act on those within four hours.  We continue to work through that process, and Ill go over some of the anomalies weve encountered and how were dealing with moving forward.

At the same time theres been an interaction with the seismic research vessels and acoustic research vessels and our need to build out long-term containment.  We had talked to before the capping stack went on of the need to build capacity up to 60,000 to 80,000 barrels per day by the end of July.

We have necessarily had to make some trade-offs between allowing the seismic vessels in and finish things like the vertical riser associated with that system.  We continue to negotiate with BP right now the best trade-off and how we best want to prioritize our long-term containment as it relates to the well integrity test, long-term containment second goal following the relief wells, as I noted earlier.

As I said, we have granted 24 more hours for BP to come back and provide us a response.  Therell be a science meeting later on this evening in Houston that will – that will take a look at the data and the timelines provided by BP, and well be assessing that as we move forward to the next 24 hours as well.

Some key things were working on – and these have been discussed before – Ill start with the – the big one related to the pressure being lower than we thought.  This has to do with a discussion about whether or not dealing with depletion of the reservoir versus some other reason why that pressure might be lower.  The – the most notable reason for that would be some kind of a leakage in the wellbore itself.

There are different views on how this could come about.  Theres not a resolution moving forward, but we continue to discuss that.  One reason we are continuing to discuss it is we

Exhibit H
Page 1

do have the robust response and the monitoring thats going on, as we requested from BP.

There have been three general areas of anomalies that have been detected since the 17th of July.  The first one was to see pitch about three nautical miles from the wellhead itself.  We do not believe that is associated with this particular well integrity test or the Macando well.  However, we are continuing to look at baseline data associated with past activity thats in the area, and well continue to monitor that moving forward.

We also have just picked up some anomalies within several hundred meters of the – of the wellhead itself, and we are continuing to take a look at that and what that might portend.

And finally, we do have some bubbles that have arisen around the base of the legacy blowout preventer, and then late last night we established that there was some leakage in the capping stack itself.  Ive got a picture and a schematic of the capping stack.

Let me just tell you right away, because this happened overnight, as you know, we had a – a connector piece of equipment that we established in to allow us to put the capping stack on.  These are the three rams that are associated with the capping stack.  This is a schematic of those three rams.  The leakage is occurring in a phalange just located right about here, and there is hydrate formation appearing on this side of the capping stack as we move forward.

We do not know, but we do not believe this is consequential at this time, nor is – doesnt appear that the hydrate formation is inhibiting any operation of the capping stack.  This is something we will continue to monitor as we move forward.

So we have the things that were seeing right around the blowout preventer and the capping stack itself.  There are a couple of anomalies that have been detected within 100 to 200 meters around the well itself, and then the anomaly was detected on 17th of July out to three kilometers.

Again, theres no indication at this time that this is any indication of a significant problem in the wellbore, but we are running every one of these anomalies down.  One of the reasons were starting to find these most likely is that during the time that the well was open, it would be impossible to get those sensors in there and detect it with all the amount of hydrocarbons and noise that was being generated.

So with the opportunity to see in a very quiet environment what the bottom of the ocean looks like there, and some of these conditions should be pre-existing in trying to sort this out is something were dealing with, but it is the collective opinion of the folks that are talking about this that the – the small seepages we are finding right now do not present, at least at this point, any indication that there is a threat to the wellbore.  If we think that was – was going to happen, we would be taking immediate action.

Now, having said that, if there is any indication of a precipitous drop in pressure for any reason, while we might need to do something about it, we would need to have to vent immediately to let – relieve the pressure on the well and move to longer-term containment.  And one of the requests that we have made to BP – and theyll be answering in a letter we will get today – is a detailed timeline on what it would take to restart containment operations, should we need to do that.

This is – it gets a little more complicated than what it would appear, because with the capping stack being shut down for the time that it has been, we would have to first of all lower pressure and create the conditions to be able to bring the Q4000 and the – the Helix Producer back online.  This could take several days, because there are concerns about sand buildup in the – in the oil column and they need to make sure we treat these systems and get them operational before we bring the production back online.

That said, weve asked for detailed timeline on the interaction between the seismic testing, the acoustic testing, long-term containment, so we understand the interaction of the sensors that are out there right now and our need to continue to build out long-term containment as the – as we move forward.

And with that, Id be glad to take your questions.

Mark Ellis: Mark Ellis with CNN. You mentioned that the pressure is lower than you anticipated and that there was some depletion, whether...

Admiral Allen: Yes.

Mark Ellis: Theres a disagreement as to whether it is depletion at the reservoir or – or leakage elsewhere and that there are differing views on this.  Are – are the differing views – is there – is there a federal government camp and a BP camp?  Is there a way to describe this?  Or are there differing views throughout – throughout all parties here?

Admiral Allen: I think there are differing views between everybody in the science community.  And let me make sure I state this correctly, because this was the initial pressures when the well was shut in.  The pressures have continued to rise in a way that would – that would lead some to believe that the well is holding pressure.  The problem is the pressure we started at was much lower than what we thought we were going to be when the well was shut in.

So that leads to the discussion of why with pressure low to begin with.  We were thinking that somehow it needed to be up around 7,500 to 8,000 psi, and we started out at around 6,000 and were up to, you know – 6,000 and change.  Were up to 6,811 today.  So the question is what caused that initial low pressure, even though its following a pattern thats

consistent with the well with integrity, what has happened?  And could there be leakage, or is there an issue of well depletion?  And there are arguments to be made on both sides.

Those discussions continue, and were trying to develop information that would allow us to do that.  One of them is whether or not the well has been depleted and theres just less oil down there to create pressure.  Or is there an aquifer somehow related to this oil field that would still provide a way for the oil to rise and have pressure underneath it?

So the question of whether or not this oil field is related to an aquifer is one of the questions theyre dealing with right now.  And that gets back to the seismology and the geology around the area and the testing, and that continues to be under discussion as we move forward.

Mark Ellis: Could you also elaborate a little bit on the seepages?  You found this one three nautical miles from the wellhead.

Admiral Allen: Three kilometers.

Mark Ellis: Three kilometers, and one closer in.  I presume that all of these are hydrocarbons.  Do you know whats seeping out?  Is the one closer in believed to be related to this oilfield?  And how did you detect it?  And do you know what type of volume...

Admiral Allen: The reason were – what were actually looking for in this case would be methane gas, which that is sometimes a precursor to oil actually rising up through the formation.  So if it is methane, and you can establish that its that, that would be an indication you might need to look further.

There is some indication that the seepage three kilometers away may not be related to this well, and were going back through background data and taking a look at that.  The only thing were doing is in closer to the well.  Were actually taking samples of the gas itself and testing it for if there are any hydrocarbons in it.

There was some trace of methane in some of the gas that was coming out near the – the base of the block preventer – not a lot, but were taking extra samples, and were sending those ashore to be tested right now.

Mark Ellis: And then, finally, I was looking at that chart, and it seems to indicate that there might be some type of leak in a gasket or the phalange.  And I was hoping you could go into...

Admiral Allen: Thats exactly what we think.  There is a – theres actually a medical gasket in the phalange, rather than a rubber.  Its actually a metal – metal circle in there.  And that appears to be the source of it.  But we dont know if its consequential to the operations of it.  Its not a huge leak, but it is causing the formation of hydrates.

Erika Bolstad:Hi.  Its Erika Bolstad with McClatchy Newspapers. And you had mentioned in your statement this morning that your science team got the answers that it was looking for.  I was hoping you could elaborate a little bit on – on what some – some of those specific answers were that give you the confidence to go forward with testing.

Admiral Allen: Well, as we try and deal with the overall issue of the low pressure and the integrity of the wellhead, one of the – one of the things that gives us confidence to move forward every 24 hours that if we find an anomaly, were moving very rapidly to get more information, get more data and analyze it.  And we put protocols in place whereby BP is given a response time – in this case four hours to come back and start providing the information.

            Now, some of this we can go out and we can make a seismic run.  It may take several hours to analyze the data, but we now have a systematic way to look at the anomalies that allow us to be able to address those as we move forward, continue with the well integrity test, and be able to make a decision early on whether or not its consequential.  At this point theres not any reason to believe that we have anything thats – thats a major issue related to well integrity from the seepages weve located.

Erika Bolstad: And one final thing.  Are you – are you concerned that if you dont return, to ever return to surface containment, that it might be difficult to ever determine the flow rate on this well?

Admiral Allen: Well, I think there are lots of ways to determine the flow rate, and I know theres some question if we dont open it up, will you ever know if that 35,000 to 60,000 flow rate is – is accurate.  I think we – I think were going to know enough about this well from the pressure readings and everything else that by the time were done, were going to have a good basis to do that.

Its hard to predict the future on whether or not it if and when were going to have to activate long-term containment, because thats conditioned-based as we move forward to the well integrity test.  And were – were looking at the conditions every 24 hours and making – making those kind of decisions, understanding that each day that – that we have the well shut in, thats a lot less pollution and oil thats going into the environment.

Erika Bolstad: Hi, Admiral.  Matthew Daly at the Associated Press.

Today at his briefing, Robert Gibbs mentioned that, you know, you may be looking at trying a separate kill operation, using this cap and this blowout preventer.  What does he mean by that?  Are you talking about growing and using the temporary cap as a basis for a permanent kill?

Admiral Allen: Well, one of the things that – that exists right now is that we have the well under some pressure.  If you remember when we tried the top kill procedure a while back, while we were pushing mud down, we were able to suppress the oil and the hydrocarbons.  When we stopped pumping the mud down, it came back up, and we had a lot of loss of mud up through the top of the lower marine riser package into the – into the riser pipe itself.

We now have a closed system, so theres back pressure.  And so the question is is there enough back pressure there where you could do basically more of a static rather than a dynamic top kill, where you could put mud in.  That might suppress the hydrocarbons.

Theres been some discussion about whether or not that might be possible.  Were looking for BP to give us an idea of whether or not that its possible, how they would do it.  And well react to that when we receive it.

Erika Bolstad: How does it relate to using the ultimate relief well?  And where are you with the relief well?

Admiral Allen: Well, the relief well if the ultimate solution, and we are still moving in that regard.  We will start sometime in the next 24 hours, laying in what we call the last casing pipe that we intend to do that will get us as close as we are with the reinforced wellbore for the relief well.  And then after that, itll be cemented into place.  That would take several days to do.

Once that is done, then we will be in a position to start drilling down and actually intercept the annulus of the wellbore itself.  That will be somewhere around – I think the target date right now is maybe around 29th of July theyll be ready to do that.  But theyve got to put the casing run in and finish the last structural construction of the wellbore itself that will allow them to move in then.

Erika Bolstad: So you may or may not do containment until then?

Admiral Allen: Well, were managing everything simultaneously.  Were looking at the well integrity tests.  Were looking for anomalies.  We understand theres no pollution right now.  Theres some discussion that there might be some way to – to do a – a static pumping of mud into the top that would suppress the hydrocarbons.  Were looking to continue to build out long-term containment.

These are all risk mitigation measures that are – that are being done over an over abundance of caution as we take look at the final thing, which will be the relief wells.

Erika Bolstad: So I just want to check and see if my understanding is correct.  Originally, you thought that you needed, like, free-flowing oil in order to affect the bottom kill, but now youre – youre – now youre investigating whether you can keep the containment cap on and effect bottom kill.

Admiral Allen: Well, were looking at all those options right now.  Basically, were trading off a lot of different scenarios.  As you can see, we – we discussed about three or four different things that could happen, the relief well being number one.

But one – one of the things that kind of made this more complex – but its a – maybe its a good feature of complexity – we were going to put the cap, the new cap, on later in the month of July, but we had a weather window that would allow us to do it and remove the risk of weather later on.  So at that point we stopped building out the capacity to get us to 53,000 barrels a day through the Helix Producer, the Q4 and the Discoverer Enterprise.

The Discoverer Enterprise is no longer on station.  The annulus has sealed.  We were in the position for a while where we were producing through the Q4000 and the Helix Producer.  But we have a cap on now.  It was actually constructed to be able to go to for platforms.  So the good news is the new caps in place.  The well is shut in for now.  There is no oil leaking.

We still have concerns about the condition of the wellbore and the difference in pressure related to the reservoir, so were kind of managing a couple of different work streams right now and the risks associated with each of these, as were trying to minimize the impact on the environment until we get the true solution, which is the bottom kill.

So I think as we go along each day, were evaluating what we see before us.  We are in a position now with the capping stack to be able to go to four production platforms.  We need to finish the freestanding riser to be able to do that.  Thats interacting with seismic runs and the acoustic testing.

So this is a real interaction of a lot of different lines of operations that are going on simultaneously.  Very complex, each one of them has risks associated with it, and thats the reason there have been such detailed discussions between the science team and BP moving forward, and there will continue to be every day for the foreseeable future.

(Megan): Operator, at this time were prepared to take questions from the phone.

Exhibit H
Page 4

Operator: At this time if you would like to ask a question, press star, then the number one on your telephone keypad.  We will pause for just a moment to compile the Q&A roster.

And your first question comes from the line of Colleen Long from Associated Press.

Colleen Long: Hi, Admiral.  I am – I just want to clear up a couple of small things.  So the – when the – you say that theres slight leaking in the phalange.  Do you mean is it leaking oil, or is it leaking methane?  I know that you were saying that – that hydrates are formed, but Im a little unclear, because Im not a scientist, so I dont know if hydrates can be formed by oil or if theyre just formed by gas.

And then, secondly, is – is it possible that you can – that the well can remain shut in all the way up until the – the bottom kill is completed?  I know that you were saying that there are all these options on the table, but Im just trying to get a sense of whether or not its a possibility that we – that, you know, the well can remain shut in until – until the relief wells are all completed and the bottom kill is completed.

Admiral Allen: First of all, on the leakage around the seal, as you know, these products are a combination of natural gas, oil and water.  And when they escape into the environment, its the – its natural gas in contact with the cold water and the pressure that forms the hydrates.

Colleen Long: OK.

Admiral Allen: So what you actually see – what we will physically see are the hydrates, so in the sense that theres a small amount of oil and water leaking out, that would be vented out into the environment and would probably just rise to the service, or at least – at least the oil would, so there wouldnt – there may not be any clearer visual indication of the oil.  We believe its a small amount of oil and a small amount of natural gas, at the natural gas to be associated with the hydrates.

Regarding your second question, were going on a day-to-day basis regarding the well integrity test, understanding there is some benefit – in fact, substantial benefit – to the fact that oil is not being introduced into the environment.

So Im not prepared to say that the well is shut in until the relief well is done.  There is too much uncertainty between now and then.  There are too many unanswered questions about the integrity of the wellbore.  There are too many detailed discussions that are going on right now.

And we will continue to run both seismic and acoustic tests, and we will slowly move out from the radius around the wellbore to a broader area to make sure we know as much as we can about the geology associated with and the formations associated with where this well is at.

So I think it would be very, very premature to say that the well is shut in until the relief well is done.  We will make that – make decisions on the well integrity test on a – on a day-by-day basis, knowing that events could present themselves as a cause for action that would – that would require us to go to a containment system.  And we – we are prepared to do that, if we need to, but it will take several days to do that.  In the meantime there would be an open discharge in the environment while we were doing that.

So I dont think there is any set course of action.  Its based on the conditions were encountering, but the overall goal is the relief well.

Operator: And your next question comes from the line of Anna Bratton with Associated Press. Anna?  Your line is open.

And your next question from the line of Tom Fowler with Houston Chronicle.

Anna Bratton: Hi.  Thanks for taking my question. I just wanted to double check.  The – the seep that was found – not the 1.8 mile away one, but the one closer in – I was wondering if you could give us a little bit more on – on how close in that is.  I think you said several hundred yards or meters, but if you could maybe clarify that?

And also, Im wondering if theres any chance that this – the leakage that youre seeing around the system itself, if its actually sort of normal to put the industry these around regularly, but were just not used to having millions of people sitting – sitting around the clock, looking at this sort of thing.

Admiral Allen: Well, if I could address the second part first, I think there – there is some natural seepage out there both of oil and natural gas, and the question is trying to separate what we are seeing from what would be normally expected out there, understanding that while the well was open and flowing freely, there would be no opportunity at all to go out and measure this because of the background noise and the – and the hydrocarbons being produced from – from the well itself.

I would tell you that what happens is if – if an anomaly is encountered, and an anomaly could be anything than a – than a density or something thats different than they expected, that is followed up with further testing.  If its close enough, ROVs are dispatched.  In some cases there was – there was an anomaly that might indicate there was a plume.  We sent ROVs out.  There wasnt a plume found by the ROVs when they got there.

Separate from that three-kilometer anomaly that was talked about earlier on the – on the 18th of July, we found several that ranged from 80 to a couple of hundred meters away from the wellhead.  On further testing we didnt find anything when we went – when they went to check.  But if there are anomalies, they must be followed up on.

But to this date, we know that there was a seepage three kilometers away, and we do know that there is some seepage around the base of the – of the blowout preventer in terms of gas bubbles that are coming up, and thats what were focusing on right now.  But it does not appear to be at this point that its a consequential problem.

Operator: And your next question comes from the line of Susan Daker with Dow Jones News.

Susan Baker: Hi, Admiral.  I was wondering how long do you expect this weather window to keep on being good?

Admiral Allen: Well, weve been very fortunate on the weather window thus far, and regardless of the complexities that are presented to us right now and some of the hard choices were making because we accelerated the stack – the stacking cap, I think we all have to recognize that we got the weather window.  We seized it, and I think were in a better place now than we would have been.  And we have some of choices.  And, of course, were going to move ahead on that.

Looking out to the long-term weather window, there is a very, very weak depression to the east of the – of the lower Antilles that were – that were watching, as we would watch anything.  But I think at this point this morning, I believe NOAA rated a 10 percent chance or less that it might develop into anything that would be consequential to our operations.

And my last reading of the weather maps, behind that there was nothing a good ways out in the Atlantic that would be queued up behind it, so I think, absent that depression going against probability and increasing to something that would be consequential to us, were in a pretty good weather window for the foreseeable future.

Operator: And your next question comes from the line of Daniel Chang with Miami Herald.

And your next question comes from the line of Zunaira Zaki with ABC News.

Zunaira Zaki: Hi, Admiral.  This is Zunaira Zaki.  I just had a question about containment, if you actually do end up having to go to that route.  Is – how would you be able to contain right away?

And then why cant the Q4000, the Helix – but how long would it take to get the Q4000 Helix Producer collecting oil?  And why do you actually have to – Im sorry Im asking a lot of questions, but I cant seem to understand why the cap has to be open to release pressure.  Why cant just the Q4000 Helix Producer be used to do that?

Admiral Allen: Well, thanks for the question.

Well, currently, we know the pressure inside the stacking cap is 6,800 psi.  And if we were to hook up the Q4000 and the Helix Producer, that would produce a number of problems right away.

Number one, there would be expensive pressure in those lines over and above what they used to – to handling when they were both in production.

Secondarily, there are some issues about the makeup of the hydrocarbon stream at that point, an issue of sand in the column and whether or not it would be forced up under that pressure once it was vented.  I think the – the notion is that the – the choke and/or the kill line or some combination would have to be opened up and let that vent for some period of time to make sure that we knew what the hydrocarbon stream was that was being diverted to the Q4000 and the – and the Helix Producer.

The original long-term goal with the new stacking cap in place, which we have right now, was to actually have four production vessels, to coming off the lower kill line and choke line from the legacy blowout preventer, and two coming from the kill and the choke line off the stacking cap under the assumption that we would close the annulus, which we have now with that metal ram, which was closed to start the shut-in testing for the well integrity tests.

What weve got, though, is the stacking cap has actually been put in place before we finish building out the infrastructure to support the four-platform production.  And that – the main – the main issue there is the second vertical riser package that we currently are using with the Helix Producer that we would anticipate using in another floating production platform to do, so the cap is ahead of the rest of the infrastructure.

That infrastructure needs to be built out, so our capacity right now, if we had to go to production, would be the Q4000 and the Helix Producer alone, because we havent finished the – the vertical riser package.  So were somewhat limited right now, but we have the cap in place and are finishing the infrastructure to take us to the 60,000 to 80,000 barrels a day protection capacity.

(Megan): Operator, at this time we are prepared to take the final question.

Operator: And your question comes from the line of Harry Weber with Associated Press.

Harry Weber: Thank you.

Admiral Allen, can you talk a little bit about the dynamic thats going on behind the scenes?  First and foremost, you all have indicated to administration officials and – and then yourself today that – that BP wasnt doing all that it should have been doing with regard to the monitoring.  What specifically were they not doing?  And – and can you talk about the relationship the government currently has with BP?  Is it strained?

Admiral Allen: Regarding the monitoring, Ill just give you a couple of examples.  There were expectations created by the science team that would allow us to respond to anomalies when they were detected in a – in a very rapid fashion and with the right type of sensors to collect the right type of information.

And when you get down to the small details as things like the – the remotely operated vehicle plan that makes those available to investigate the anomalies around the wellhead when theyre detected, the ability to pan those ROVs around the type of sensors that are out there to collect information and then making sure on a routine basis that were doing seismic surveys and acoustic testing, and then when we had reason to believe theres an issue out there, anomaly that needs to be investigated, that we could put those resources out there.

That led to a performance measure of being able to do that within four hours.  Those are the things that weve been working through since we started the well integrity test as conditions to move to the next 24-hour period, because we need to be assured as were going to do next 24-hour period and allowing us to develop more information about pressure, about the – about whether – whether theres a depletion in the reservoir, that the number one issue is to be able to respond to an anomaly would indicate we have an irreversible problem in the wellbore and be able to respond to that.

So the – the back-and-forth was more about getting the metrics, the reaction time, the procedures and the doctrine down, where BP would provide that type of response when anomalies were detected.  And weve made significant progress over the last 24 hours.  That is the reason were proceeding with the next 24.

(Megan): Thank you, everyone, for your participation here today and to those on the conference call.

END

**Home**

**Task Force**
About Task Force
Joint Info Center
Education Resources
Federal Partners
Recovery Plan
Investigation
Response
State and Local

**Assistance**
File a Claim
Other Assistance
Small Business

**Health & Safety**
Boating
Drinking Water
Health Matters
Mental Health
Seafood Safety
Workers and Volunteers

**Fish & Wildlife**
Birds
Fish
Turtles
Other Wildlife
Fish & Wildlife Reports

**Environment**
Air
Beaches
Coral
Waste
Water

**News**
Press Releases
Response Updates
Transcripts & Docs
Events
Features
FOIA Library
Maps & Data
Multimedia

Follow us:

Cambodian | Croatian | Español | Français | Korean | Kreyòl ayisyen | Lao | Russian | Thai | Vietnamese

Site Map | Site Notices & Plug-Ins

Exhibit H
Page 7



An Official Website of the United States Government

Follow us:   Join Mailing List | About Us | Contact Us | Site Map

Search

Home › News › Transcripts Docs?page=13 › Transcript - PressBrief with National Incident Commander Admiral Thad Allen July 20, 2010

## Transcript - PressBrief with National Incident Commander Admiral Thad Allen July 20, 2010

July 20, 2010 | 5:21:00 PM EDT



0 tweets

tweet

WASHINGTON -- Coast Guard Adm. Thad Allen, the National Incident Commander for the Deepwater BP Oil Spill response briefing.  A downloadable audio file of the conference is available here; a full transcript of the call follows:

**July 20th, 2010**

3:30 p.m. EDT

Admiral Thad Allen: Thanks, Megan.  Good afternoon.  First of all my thanks to Attorney General Holder and his staff for hosting us here today to do the press events.  If you're wondering why I'm in the DOJ building, I like to, when I'm in town, circulate among the Cabinet officers and make sure that there aren't any issues that I need to be dealing with and just stay aligned.  And it's helpful to have their perspective on the different problematic issues that are going on.  So I had a brief meeting with the Attorney General and his staff and it was a very good meeting.

One other item of note, I will be traveling down to the Gulf later this week.  And my intention on Thursday is to accompany the Vice President on a tour of facilities and local responders in and around the Mobile area.  Most likely our staging base at Theodore.  And I'll now be in New Orleans on Friday.

We just authorized another 24 hour period for the oil integrity test to continue.  Provided that in writing to Bob Dudley just an hour or so ago.  We continue to be pleased with the progress as far as monitoring responsiveness to anomalies that are detected out there.  And we feel it's indicated to go on for another 24 hours.  We'll continue that as the scientific teams from the U.S. Government and BP and other industry experts in active emissions continue to talk about the pressure difference in the well and the sources for that.  That continues to be the main point of discussion.

In the meantime, we are looking for all indicators of anomalies and are working very, very hard to make sure that we don't see any indicators that there would be any compromise to the integrity of the well head.

Just to give you an idea of what we're looking at there in terms of those indicators, we are taking temperature readings.  This is to let you know that the temperature readings down there are stable at about 40 degrees Fahrenheit.  Any temperature fluctuation will be an indication of movement of products through the well bore that might be something that we should be concerned about for the nature of the product of the well bore.

We continue to run pressure versus time as we have from the start.  And the current pressure is 6,834 pounds per square inch and continues to slide very slowly between one and two pounds per day.  Excuse me, per hour.  Sorry.  And we continue to collect acoustic, sonar and seismic data.  And we continue to look for anomalies such as gas bubbles.

As you know, there is some minor leaks that are around the blow out preventer and the, and the stacking cap itself.  We don't think those are consequential to the response but we are tracking them.  They are the source of some hydrates in and around the material as we move forward.

As we go through the next 24 to 48 hours, we're going to continue to analyze the seismic data.  We generate a lot of that.  And sometimes the computation associated with that analysis takes almost longer to do this, longer than it takes to do the seismic run.

We currently have the NOAA Vessel, Pices in place.  NOAA will continue to do acoustic monitoring.  We've got a really good system set up by now with BP that any anomalies are investigated within four hours and data provided back for us to take a look at.  And to the extent that we can, we try to create some of the ways to increase our ability to collect the gas samples of the bubbles that are seen out there in seepage and to bring those to shore for further evaluation.  And we'll continue our discussions on the issue of depletion of the well and the causes of this lack of pressure or whether or not it's caused by a leak.  We'll continue to move forward on that.

I will tell you that while this is going on, we continue to have probably the largest most integrated response on the surface against oil that remains up there.  And we assist these vessels in and around the source as they do skimming operations as well as a number of vessels in closer to shore.  A total of 750 skimming vessels are out in operation.  We will continue to do that.  We are making great progress with the oil that was released while we were changing out the capping stacks.

And to date, the weather has been fairly good to us holding that oil near or just south of the well head.  As the winds have started to change in the next 24 to 48 hours, there could be some of that oil moving to the west to northwest.  And that will be back towards the Mississippi Sound, the Chandelier Breton Sounds and the southeast coast of Louisiana.

In the meantime, we're still dealing looking for oil any closer to shore.  And a little bit of break in the action is allowing us to repair some equipment, get booms ready to restage and make preparations for any oil that may be coming to shore.  Now I'd be glad to take your questions.

Male: (Inaudible) how big the leak is at this point?  Is it getting bigger and (inaudible)?

Admiral Thad Allen:     Well there's, let me classify the leaks.  We have five very small leaks in and around the blow out preventer and the stack itself.  These are leaks in flanges or gaskets not unlike leaks you might have in your car, very small drips, I would say.  We don't consider them consequential involving the integrity of the well head.

We'll be beyond that when we find anomalies where there's a difference in density located by the acoustic sensors or the seismic sensors.  We go out and investigate those in ROVs.  The most prominent one to date has been three kilometers away, which we attribute to another facility which was producing some type of hat.  But we found nothing that will be consequential for the integrity of the well head to date.

Male: Admiral, thanks for taking our questions.  About static kill, what kinds of risks does it carry, particularly if the well has been damaged?  And what type of time frame are you

Exhibit I
Page 1

looking for for decisions?  How soon can static kill occur?

Admiral Thad Allen: Static kill discussions are ongoing right now.  And we'll probably have a good idea over the next 24 hours exactly what the detailed plan by BP will be to do that.  The positive assertion is that with the pressure on top now, we can probably overcome the hydrocarbons that are in there and basically have the mud to seat the oil that's in the well bore, which we were not able to do with top kill because a lot of that mud was releasing out through the lower marine riser package.

One of the things that could help if there is a problem with the well bore and we had a drop in pressure because we were putting the mud in, we would know with virtual certainty that there was a compromise in the well bore.  It really couldn't tell us that.  If there is no drop in pressure, what we've done is we've probably enhanced our chances to especially kill it from the bottom because we already had mud into the column and it's done part of the job we'd have to do anyway to kill the well from the bottom.


Male: What's the down side?  What if the well integrity is damaged?

Admiral Thad Allen: Well what you're doing is you're putting mud down and your not putting hydrocarbons into the formation.  You're putting mud into the formation so the question would be the depth, probably what that would tell you.  And then we'd have to analyze the data associated with that.

If we thought there was a problem with well integrity, we could at that point start going to containment or vent.  But I think we need to have a detailed discussion understanding what the actual key this would be based on the results.  As they do that, most of the discussions are going right now.


Male: Admiral, two questions.  One is could you describe a little bit more the type of things you were talking about with the Attorney General (inaudible).  And then wondering how worried you are, I guess there's potential of bad weather coming through there (inaudible) area that could come up.  I'm wondering how that affects this, what you're working on down there.  Does it really make sense to bring in the, I guess the recovery ship to take the oil if you'd (inaudible).

Admiral Thad Allen: OK, thanks for the question.  There weren't any different topics in the meeting with the Attorney General.  I kind of stop by every once and a while.  And frankly, a lot of that time was spent with me explaining some of the things I explain to you all about some of the things that's going on at the well site.  And giving him better insight on what we're trying to do to control the leakage, recovery operations and so forth.  So nothing in particular that's noteworthy.  Just a general drop by.

Regarding the weather.  There is a tropical depression in the vicinity of the (inaudible) island of Puerto Rico and that area of the tropics.  Extends to Hispanola.  We're watching that very closely.  We're in direct contact with principles that talk about this on a daily basis.  We are in contact with Jane Lubchenco, the administrator of NOAA.  I believe they have a reconnaissance flight scheduled for tomorrow to learn more about it.

The probability is low at this time that there would be gail force winds that would impact the well site.  That could change and develop over the next few days.  Obviously we're watching that very, very closely.

In association with that, we will continue to talk with BP and make sure that at whatever stage we are in, that we've assessed how long it's going to take us to complete whatever element of work, whether it's putting the casing in for the relief well or the static kill or the containment options--how that relates in terms of timeline where we might be able to expect gail force winds.  And as you might imagine, slightly different each day on where you're at in the lines of operation.  So when I took the letter to them today indicating they were OK for 24 more hours of operations, I said, give me your current line of operation.  Extrapolate out where you think even with a low probability that the weather might impact on that and then give us your timelines and your options of how you would deal with that moving forward.

Understanding we all ready have a fairly robust severe weather plan that's all ready been developed with our area unified command down there and our incident command post that are at (inaudible) and Mobile move forward.

I can give you a general description of how that will progress if you'd like it.  But —


Male: I think we're more serious about how, I mean you seem to be a couple of weeks maybe away from the well kill, the release well kill.

Admiral Thad Allen:     Right.


Male: How much sense that really makes to bring all these things in when you're that close.

Admiral Thad Allen: Well that's the reason in the letter I sent to Bob Dudley that I said given the current lines of effort and the timelines associated with that, it's going to take so long to do the static top kill, if you will.  It will take so long to do the casing.  And then make that the, that's the final step before we actually do the well interception.  That's five to seven days.  So we start looking at the window of the tone of probability of the weather.  And that's also something we're considering right now.  We want to do it far as ahead of time where we can have that discussion.  That's the reason we've asked BP for those plans.


Female: Can you talk about the timing, how long will the static kill fill take?  (Inaudible).

Admiral Thad Allen: It wouldn't necessarily take a long time but there's a phasing issue here related to the casing around the release well.  This goes back to (Mike's) earlier question.  If you, if you're doing the static kill and you've got an indication you've got a problem with well bore integrity as a result of where the mud's going, what you wouldn't want to do is somehow damage the chances for the relief well to be finished out.  And the insurance policy you have by writing the casing is you have a pipe reinforced well bore in the relief well.

And it's like this, the desired sequence would be to run the casing of the relief well before we would do the static kill.  Even though the static kill may take the shorter period of time, you don't want to have the vulnerability of the well bore for the relief well adjacent to the current well and then have a problem with the integrity of the well.  Does that make sense?


Male: With the capping taking place, have you been able to get a, provide flow rate figured out?

Admiral Thad Allen: We're actually having that discussion right now.  There's a lot of discussion about if we don't open the cap again for whatever reason, we will be able to revise the flow rate which is now is, you know, is, 35,000, 60,000 barrels a day.  I've asked our flow rate technical team to come back and give me their assessment with all the different pressure readings that are available to us, the temperature readings and everything else.  Do we have enough data or parameters that would allow us to narrow that range or get a more accurate flow rate?  And from that we'll have to develop some options moving forward.  That's a little bit of a dilemma to have a cap in the oil going out and then needing to understand for a lot of reasons, as you all know, to get an exact rate of a flow reading as we can.


Male: You said in 10 days ago (inaudible).

Exhibit I
Page 2

Admiral Thad Allen: Well, we're getting very accurate pressure readings.  The question is the (inaudible)  are always that we put the cap on and we could seal the well at that point and then slowly build out the production that allow us to go to 60, 80,000 barrels a day.  And what we've done is some of that's been interrupted because we wanted to make sure we aren't doing harm to the integrity of the well by keeping the cap on.  So we've run seismic vessels through there, and no acoustic vessels, and where we're doing that it has to be very quiet so we had to move some of the equipment away that was actually building that second vertical riser.

You can see right now we're making trade offs here between construction of the containment system versus trying to understand the integrity of the well.  Whether or not there's any seepage.  And that's all related ultimately to building out containment of the well to 60 to 80,000 barrels, which will give us an accurate determination of flow rate.

The question is will there be interventions in the meantime to allow us to keep the well capped.  We're starting to look at the oncoming ability to actually kill the well at the bottom.  So that's all being traded off up against each other.  And at some point, we'll have to make a determination, but it's still under discussion right now.


Male: (Inaudible) interaction between DOJ and (inaudible) government entities (inaudible)?

Admiral Thad Allen: We do not discuss the investigation per se.  We have a number of areas where our interest crop from the Federal On-scene Coordinator.  I was accompanied by one of our Coast Guard attorneys at the same time.  We just talked in general the issues we're dealing with down there.  And I was (inaudible) appropriate for discussion here.


Male: Is it something (inaudible)?

Admiral Thad Allen:     Oh, not an indicator of things being walled off.  We just have a very general discussion about the issues that are going down there.  And it was just a private discussion between myself and the Attorney General.


Male: (Inaudible) under the impression or maybe the misimpression all this time that the government has had its scientists and its representatives virtually looking over the shoulders of people at BP.  I mean at BP's control center, at BP's drilling rigs, at BP's at the ROVs, the people managing those.  And your letters almost give me the impression that it's not that at all.  That you have been given periodic updates from BP.  (Inaudible).

Admiral Thad Allen:     Well, not necessarily on the rig, but in Houston where all the decisions and all of the analysis, all of the ROV video feeds, everything comes back to Houston.  That is the command center for BP and for control.  We have people there permanently.  There are Coast Guard people there 24 hours a day.  When we had the hydrate problem a couple of days ago surface on the capping stack, I got an e-mail at 2:30 in the morning from our people that were on watch to advise me on that.  So there are people down there all the time from all different departments that are represented there.

When I write those letters, that's to give clear unambiguous guidance and to establish priorities of what we expect BP to do.  They are there.  There are a lot of people working a lot of projects.  And some of those things are more important in terms of the policy objectives we're trying to achieve in terms of well integrity--testing for seepage and things like that.  We want to make sure that there is a sequence to all this.  And (inaudible) lot of work that's going on down there that our priorities are clear and the activities are all engaged and directed in the things that we want them to do.


Male: But do you feel that you have the real time information that you need to make those decisions?

Admiral Thad Allen: I am advised probably, it depends on a particular day and what's going on, but at a minimum probably six to ten times a day by either phone calls or e-mails from our folks in Houston and sometimes it goes down to hourly or half hourly depending on what we're working on and the time limit associated with it.


Megan Moloney: Operator, at this time we're prepared to take questions form the phone.

Operator: At this time I would like to remind everyone in order to ask a question, please press star one on your telephone key pad.  Again, that is star one.  Your first question comes from the line of (Colleen Long).


Colleen Long: Hi, Admiral.  You had said that one of the anomalies about three kilometers away was caused by another facility.  I was wondering if you could give a little more detail about that?  Are you talking about another well that had been temporarily abandoned?  Is that seepage normal, detectable in other ways?  That type of thing.

Admiral Thad Allen: It is near another production facility.  I don't have the name in front of me right now but will provide that to you for background.  In fact, it's closer to that facility than it is the maCondo well.  The combination of those factors and the fact that it's not unusual to have seepage around the old wells, led us to believe that we could exclude that as a scheduled source of leakage from this particular well bore.

It was also, and again I don't remember the name right now, it was also one of the sites that is being considered as a backup.  If you remember, I talked to you a while back about what is the backup for the relief wells themselves?  And the backup for the relief wells themselves is actually the established piping systems along the bottom of the ocean where we could potentially put oil back into an exhausted well some place else.  And this is one of the wells that's under consideration.  The name eludes me right now but we'll get back to you.

Collin Long: OK, thank you.


Operator: Your next question comes from the line of (Noah Brenner).


Noah Brenner: Hi, Admiral.  I was interested in this question, I was trying to pin point the flow rate versus refining estimates.  I guess I was wondering in your opinion would it be worth turning the well back on and containing that product in order to measure that flow?  And what significance of having a hard figure versus an estimate of the flow rate when we're moving forward and looking at things like assessing damages in the future?

Admiral Thad Allen: You're getting good insight into my line of work right now.  What it is is managing multiple lines of effort, risks associated with that, return on effort should you engage in it.  And right now one of the things we're talking about is do we have a means to establish flow rate without having the cap reopened?

And that is currently under discussion and I'll be briefing that in subsequent days.  But we're also managing contrary lines of action.  If you're going to do one, you're doing it at the cost of the other one.  And the other one is how we're doing seismic surveys and acoustic surveys to the extent that that may interfere with building out the second riser package.

These are things that are being managed almost on a daily basis.  And these are the topics of discussion every day between our science team and BP down there.  And that, those are some of the things that get folded into the direction that we're providing and writing to BP to help us resolve where there's not a clear trade off but we have to make a decision and move forward.  Those are the kinds of things that I provide guidance in those letters.  Next question.

Exhibit I
Page 3

Operator: Your next question comes from the line of Vivian Kuo.

Vivian Kuo: Hi there, Admiral Allen. You've talked about investigating things that would tell you if the well doesn't have integrity and haven't found anything. And so in expanding these deadlines 24 hours again and again, is there something that would ultimately convince you and the scientific community that the well does in fact have integrity? It is stable. And that you could keep it capped. Would your feelings change especially in light of this possible storm looming?

Admiral Thad Allen: I would say that we have not reached a consensus on how we would determine whether or not our total assurance that there was integrity in the well. And that mainly revolves around the fact of the competing theories of depletion versus leakage that caused the low initial pressure reading. Until the competing theories for those are exhausted and reconciled, I'm not sure we are going to know that. And that is a subject of ongoing intense discussions and we're slowly excluding, we both agree that, we both agree that's not consequential.

We're not going to talk about that anymore. But one of the things that's trying to model the size of that reservoir, whether or not it's connected to an aquifer that would still cause pressure and make it rise and theories on leakage and how much is leaking out that would cause that pressure differential. You're exactly at the heart of the discussions that have been going on for several days as we've been trying to come to grips with the pressure readings as we saw them.

Regarding the potential for hurricane. As I said, we have tasked BP because of those tropical depressions that's present, and let me state there's no hurricane warning or indication of a hurricane, what we are looking at is a tropical depression. And as that starts to move to the west, looking at the probabilities of that developing further into a more coherent system and what are the implications of our lines of work that exists right now.

The lines of work that exists right now are we have the well cap. We're in the middle of well integrity testing. We're doing seismic sensing and acoustic sensing. We are trying to balance that with building out the second free standing riser that will take us to the containment pressure that we need at the same time we're approaching goal to finish the relief well to be in a position right absence of anything changing somewhere around the 29th of July to have the casing run completed and be prepared to start the drilling into the annulus to begin the bottom kill. All that is subject to daily events, changes in what we're observing out there, and anomalies that are detected and of course the weather can play a role in that. And we're watching that very, very closely.

Operator: Your next question comes from the line of (Allison Bennett).

Allison Bennett: Admiral, with all these trade offs, is the casing still scheduled for Thursday and what about the second marine riser?

Admiral Thad Allen: As it stands right now, we are ready to lay the next, the final piece of casing tomorrow. But once we start that, that could be a five to seven day evolution leading us to the ability to drill into the annulus. We will be discussing the length of time it takes to do that in connection with the current weather system. And be looking for the information that BP provides us back in the next 24 hours as we consider that. What was your second part of the question?

Allison Bennett:   No, that's great. Thank you.

Admiral Thad Allen:   OK.

Operator: Your next question comes from the line of (Christine Hayes).

Christine Hayes:   Yes, hello, Admiral. I just want to be clear on the relief on the static kill. Which comes first? Does the relief well intercept the well first and then you do static kill or would static kill come first?

Admiral Thad Allen:   Well you've got to understand these are, we're under preliminary discussions right now. We do not have the final exact plan presented to us by BP on how they would do a static kill. But in general, the current thinking is that you would want to lay the final casing around because then you have protection for the well bore that has been drilled for the relief well that at this point is very, very close to the Macondo well bore. And in the event that you were doing a static kill and there was some kind of problem with the well bore or the integrity of the well bore, that you would do no harm to the relief well, which is the ultimate goal and the ultimate way to solve the problem.

So as it stands right now and this is merely for discussion. This is, there hasn't been a final decision made. Running that casing line would need to be done to preserve the integrity of the relief well before you started the static kill. Is that responsive?

Christine Hayes:  Yes sir. Thank you.

Megan Moloney: Operator, we'll take a final question at this point.

Operator: OK. Your next question comes from the line of (David Dishneau).

David Dishneau: Admiral, yesterday BP said that the static kill would accelerate the big fix or could accelerate the big fix. I'm wondering if you could give us any information about why that would accelerate it and how? And also whether any oil would be released during the static kill process? And if so, how much?

Admiral Thad Allen: Let me go over the sequence again because I've been talking about it in piece parts and it's probably confusing. Sequence, and again this is under discussion; there have been no decisions made. Finish the final casing run. Make sure we have integrity of the well bore of the release well in advance of drilling into the annulus to begin the bottom kill process. BP will then assert at that point if we did the static kill we would all ready put mud from the top down into the well bore. All ready filling the upper part up. Thereby diminishing the amount of mud or the effort where you need to take it from killing from the bottom.

Exhibit I
Page 4

So the sequence would be run the casing line.  And if we decided to do it to do the static kill.  And then proceed with the actual drilling into the annulus following the static kill, knowing that there might be a chance that the static kill would increase the chances that we'd be successful with the bottom kill because mud would all ready be in the well bore.  Is that responsive?

David Dishneau: Can you say to how much that might accelerate the process of closing everything off?

Admiral Thad Allen: Well I'm not sure we would know until we actually did it.  Again, as I said earlier, if we do the static kill, it could be successful and you could put a lot of mud in and substantially start to kill the well from there.  But if for some reason we had a drop in pressure, it would lead us to believe that mud is going out through, you know, some kind of a breach in the well bore.  Then you know that too and you know that you're, a kill from the bottom may be more difficult and require more mud.  In other words, in either case you would get more information to raise your chances for success because you'd have less uncertainty associated with the bottom kill.

David Dishneau:  Right.  And would any oil be released during the static kill process?

Admiral Thad Allen: Well, we would keep the cap, the stack would be in place and there's no oil being released right now so the mud would come in and under that pressure that's all ready there, it would be forced down over the oil.  And the reason we think we can do that is we know that we can tolerate a certain amount of pressure at that, between 6,000 and 7,000.  And that was not there when we tried to do the top kill.  That leads us to believe it will be much more successful if we do this, decide to do this to have the mud go down the well bore.

David Dishneau: So you're saying no.  No oil would be released.

Admiral Thad Allen: Not anticipated, no.

David Dishneau: OK, thank you.

Megan Moloney: That concludes our conference today.  Thank you everyone.

Operator: This concludes today's conference call.  You may now disconnect.

END

**Home**

**Task Force**
About Task Force
Joint Info Center
Education Resources
Federal Partners
Recovery Plan
Investigation
Response
State and Local

**Assistance**
File a Claim
Other Assistance
Small Business

**Health & Safety**
Boating
Drinking Water
Health Matters
Mental Health
Seafood Safety
Workers and Volunteers

**Fish & Wildlife**
Birds
Fish
Turtles
Other Wildlife
Fish & Wildlife Reports

**Environment**
Air
Beaches
Coral
Waste
Water

**News**
Press Releases
Response Updates
Transcripts & Docs
Events
Features
FOIA Library
Maps & Data
Multimedia

Follow us:

Cambodian | Croatian | Español | Français | Korean | Kreyòl ayisyen | Lao | Russian | Thai | Vietnamese

Site Map | Site Notices & Plug-Ins

Exhibit I
Page 5



## Transcript Press Briefing by National Incident Commander Admiral Thad Allen

August 9, 2010 | 9:44:00 AM EDT

**0 tweets**

**tweet**

Below is a transcript from Mondays teleconference press briefing by Admiral Thad Allen, National Incident Commander for the Deepwater Horizon/BP oil spill.

A downloadable audio file of the conference is available here.

August 9, 2010

9 a.m. EDT

Thad Allen: Thanks.

Good morning, everyone.  As you know at the end of last week, we successfully cemented in the well from the top down.  There were pressure tests conducted at the end of last week to make sure we had integrity of the well.  We do.

We believe that we have filled the casing with cement and have secured that part of the well.  The job before us now is to finish the relief well, to enter the annulus from the bottom, assess its condition, and then seal the well with cement from the bottom up.  That will, in our view, at that point, permanently kill the well.

We are alternating runs of drilling and putting a sensing wire down to ascertain where the casing is at as we slowly close in on it.  We are less than 100 feet away from the intersection of the annulus at this point, and this will continue through the week.  We expect that some time towards the end of the week well be in a position to intercept the annulus and commence the kill.

In the meantime, we are redoubling our efforts in the areas that are most impacted by oil.  This would include the northern areas of Barataria Bay, behind the Chandeleur Islands, Breton Sound, areas over in Terrebonne and Timbalier Bay, as well.

I will be traveling to the gulf.  I will be in Alabama, Mississippi and Louisiana from Wednesday through Friday, and on Friday, looking to meet with the parish presidents as a follow-up to our meeting that we had two weeks to discuss hurricane planning, the shift from source control to dealing with the oil in the marshes and on the beaches, and issues related to vessels of opportunity.

And with that, Id be glad to take your questions.

Operator: At this time, ladies and gentlemen, if you would like to ask a question, please press star, one.  Your first question comes from the line of Jeffrey Collins with the Associated Press.

Jeffrey Collins: Thank you, Admiral, for taking my question.  I just wanted to check on something, clarify something.  So has BP begun to close in on that final 100 feet between the relief well and the blown-out well?  Has that drilling actually begun?

Thad Allen: Yes, it is.  Its ongoing.  And its going in segments.  They will drill approximately 20 or 30 feet.  Theyll withdraw the drill bit.  Theyll put a sensing wire down, ascertain how far they are away from the casing, and then repeat the process.

Theyve already done this twice, so theyre closing in on the last, Id say, 30 or 40 feet at this point, but its very, very slow, because they have to be very exact, and they dont want to inadvertently intercept the annulus when they are prepared to do that.  There are mud and cement boats on the surface that are ready to move in and begin the bottom kill when the intercept is complete.

Operator: Your next question comes from the line of Thomas Davis with dailykos.com.

Thomas Davis: Morning, Admiral.  Thank you.  We were wondering about the feed.  There are two ROVs that we have not been able to ascertain any data from, any visible feeds.  And also, is it possible to release the actual pressure that was obtained during the pressure test?  As much data on the pressure to the BOP as we could get would be lovely.

Thad Allen: Yes, I actually had access to those pressure readings.  Im not sure why they cant be released.  We will talk to the science team at BP and see if we can get those released later on today.  Are there any particular ROV views that you were concerned about?  Otherwise, well just ask for a status on all the ROV views.

Thomas Davis: It would be the BOA sub C, which has not been released at all.

Thad Allen: Right. BOA sub C.

Thomas Davis: (Inaudible)

Thad Allen: Was there something besides the BOA sub C?

Thomas Davis: No.

Thad Allen: OK.  Yes, the ROV management – just for everybodys information – there are a lot of different activities going on down there, including some of the monitoring.  We use the ROVs to obtain data every 24 hours, from like the geophones that are looking for vibrations and so forth, but we will get a status in post that.

Thomas Davis: Thank you.

Operator: Your next question comes from the line of Darrell Han with H&H Ranch.

Darrell Han: Morning, Admiral.  I was wondering; I had heard that you guys are combing the seafloor for evidence of what had caused the explosion.  Have they actually retrieved the pipe that they had cut off?

Thad Allen: What we are assessing as part of the recovery is any chance that there might be any leakage or anything having to do with the integrity of the well, so theres a number of

seismic tests, acoustic tests.  Were taking pressure readings, temperature readings, looking for vibration and acoustic signals.

As part of the response, I have not been involved with any assessment of what is on the seafloor and what might be happening as a result of the investigation.  Thats handled by the Marine Board of Investigation, which is jointly being done by the Department of Interior and Homeland Security through the Coast Guard.

I will attempt to get an answer, but I would just tell you, the disposition of any of the equipment on the seafloor as it relates to the investigation will be handled separately from this response, but well give you an appropriate point of contact.

Darrell Han: All right.  Thank you.

Operator: Your next question comes from the line of Nancy McKenzie with Defenders at the COA.

Nancy McKenzie: Hi.  Thank you, Admiral, for taking my question.  Actually, as a follow-up, theres – I only see three cameras working out of 14 right now, three or four, as a follow-up on the ROVs.

Thad Allen: OK.  We will check and give you a status.  Go ahead.

Nancy McKenzie: Yes, my question is about the acoustic and seismic testing.  The Gecko Topaz, is that still running seismic runs?

Thad Allen: Im not sure which vessels on scene.  It was the Gecko Topaz.  If it is not that, we will check and let you know.

Nancy McKenzie: Have you see any anomalies from those?

Thad Allen: So far, there have been no anomalies detected.  As you know weve been doing these cross-cuts for quite a while right now.  Were doing two things, one of the seismic cross-cuts, and the other the acoustic testing for any bubbles or anything that might be coming up from the floor, but nothing that hasnt been resolved and nothing that has been of concern to our science team.

Nancy McKenzie: Thank you.

Operator: Your next question comes from the line of John Sullivan with the Energy Intelligence.

John Sullivan: Good morning, Admiral.  Thank you for taking my call.  Sir, has there been any further discussions or any discussions about salvaging any parts of the Deepwater Horizon?

Thad Allen: If youre talking about the actual drilling rig itself, I would refer you to BP for that inquiry.  None that Im aware of, and I dont think theres any intent to do that, but I would refer any final determination on that in answering the question to BP.

John Sullivan: Thank you, sir.

Operator: Your next question comes from the line of Paula Dittrick with Oil and Gas Journal.

Paula Dittrick: Good morning, Admiral.  Thanks for taking my question.  I asked you last week about the flow assessment rate, and I had a follow-up question, but I got cut off.  So we talked about all the things that are in the oil besides just the oil, but my editors want to know if, in that 53,000-barrel-a-day rate estimate, if theres any – if that is strictly all oil or if theres any water in that.  Thank you.

Thad Allen: No, that is a good question.  Let me answer it this way.  We know that, in determining the flow rate, were going to be dealing not only with oil, but with water, natural gas, and sediment.  We also know that thats not equally distributed in the flow.  And we also know that some of the gas that comes up is actually – you could almost phase it, and it has to do with the make-up of the – whats in the reservoir regarding oil, gas, sediment, and so forth.

As weve been able to get higher-resolution video, the flow rate technical group has actually taken into account the differences in volume related to the constituent parts of that oil, gas, water, and sediment, and also the phasing of when the gas might be more present than at other points, and thats been determined using the high-resolution video, but its also been – we used information from the Woods Hole Oceanographic Institute.  We used acoustic devices to sense the mass of the column as it was going up.

So the answer is, yes, we understand there are constituent parts of that.  The ultimate flow rate, 53,000 barrels a day plus or minus 10 percent, is for oil, excluding gas and water.

Paula Dittrick: Great.  Thank you.

Thad Allen: Yes.

Operator: Your next question comes from the line of Tom Fowler with the Houston Chronicle.

Tom Fowler: Hi, good morning.  I just wanted to see if theres any plans underway or in the future for recovering the – I think its about 750,000 gallons of diesel that were on the Deepwater Horizon when it went down.  I know obviously it was kind of secondary to actually dealing with the spill, but I was wondering if thats still – if theres any plans for getting at that, that fuel source.

Thad Allen: Well, as you know the original response when the rig was on fire – our original environmental response before we knew that we had lost the rig was in response to the 700,000 gallons of diesel fuel that was on board.

Right now, I know of no plans to salvage the Deepwater Horizon.  Whether or not that oil is recoverable or could be recovered at 5,000 feet I think is somewhat problematic, but Ill be prepared to address that tomorrow or make a statement on it for you.  We will sit down and give you some background on it.

Tom Fowler: Sure.  And Im not thinking of it in terms of a recoverable fuel, but more just as a prevention of a future leak kind of thing, so thank you.

Thad Allen: Yes.

Operator: Your next question comes from the line of Elizabeth Cook with Freelance Writer.

Elizabeth Cook: Yes.  My question, Admiral Allen, is that there are persistent rumors from fishermen in Louisiana that dispersant is still being sprayed both offshore and in the marshes of Barataria Bay.  And I have a twofold question.  Has dispersant ever been sprayed in Barataria Bay?  And is it still being used?  And also, if it isnt being used, when was the last day that dispersant was used by BP?

Thad Allen: We have not used dispersant since the capping stack was put on.  I believe that was the 15th of July.  To my knowledge, there have been no dispersants used in Barataria Bay, but I will not state that unequivocally until I go back and check.

But I would tell you, there are no dispersants being used at this time.  Theyre used under very strict protocols offshore.  And I will go back and check just for the record if they were ever used early on in the response in Barataria Bay, but my sense is they were not.

Elizabeth Cook: Right.  Barataria Bay, though, is not offshore.  Its pretty close to the marshes.  And Im surprised, sir, that you dont know whether or not its been used in Barataria Bay.

Thad Allen: Well, early on in the response – Im saying I dont believe it has been, but I dont want to state it unequivocally until I go back and check the records.  Its not a matter of whether or not I understand whats going on with the response.  Im trying to give you a correct answer.  And we will check in, and well get you the information.

Elizabeth Cook: Thank you.

Operator: Once again, if you would like to ask a question, please press star, one.  Your next question comes from the line of Jeffrey Collins, the Associated Press.

Jeffrey Collins: Admiral, have you – are you guys watching that little potential tropical system that could move into the gulf this week?  And are you concerned at all about that?  And also, with the peak of hurricane season coming, do you feel like a – theres a need to be a little bit faster in making sure everything gets wrapped up?

Thad Allen: We are watching the disturbance to the east of Florida right now.  It has the potential to cross the Florida peninsula and, in three or four days, potentially impact the drilling site.  Obviously, theres an interaction there with the timeline for the relief well.

The meteorologists at NOAA are looking very closely at this.  And Im in contact with Jane Lubchenco of NOAA on this, and were watching it very closely.

At this point, I believe as of this morning, they thought there was a 10 percent chance that this could develop into a system that would be of consequence to us.  So at this point, were not taking any directed action, but were watching it very closely.

And what was your second question?  Im sorry.

Jeffrey Collins: Just is there a sense of urgency in getting everything wrapped up, since its the peak of hurricane season thats right around the corner?

Thad Allen: Well, I think theres a sense of urgency to complete the recovery and the clean-up as fast as we can.  Since were very close to being able to control the spill at the source, our focus now has to be in the areas that are impacted ashore.

And we still have some impacts in Mississippi and Alabama and Florida regarding tar balls on beaches, but were really focusing, too, on the marsh areas that extend from the eastern into Mississippi Sound around clear to Timbalier Bay and Terrebonne and areas to the west.  And that is where we have the largest impact of oil marshes, which is the main focus of our response.

Operator: Your next question comes from the line of Darrell Han with H&H Ranch.

Darrell Han: Morning, Admiral.  I wanted to ask you, I know some men that had went to training school for six months to be in the shipping industry and to build ships and whatnot.  And about the same time that this oil rig explosion happened, they were supposed to graduate.  And unfortunately, the whole area has shut down as far as job-wise.  Are these guys entitled to file a claim with BP for relief and money?  Or are they not?

Thad Allen: Well, I would just make a general comment regarding the impact of the event itself on employment and the moratorium and so forth is not directly part of the response itself, and thats what Im responsible for. As far as filing a claim right now, BP is accepting claims on lost income, and then it will be shifted to Mr. Feinbergs operation here later on in the month.

But as far as the exact status of those claims, its not part of the response, and Im not in a position to comment on it, and Id refer that to Mr. Feinbergs office.

Darrell Han: All right.  Thank you.

Operator: Your next question comes from the line of Luco Durant with Al Jazeera.

Luco Durant: Hi.  Good morning, Admiral.  Two questions, please.  I came in late, so I apologize, but just giving a snapshot of what has progressed from over the weekend and was expected today.

And then second question in regards to the lost oil.  Is there a plan to actually scan the ocean floor for the big residues of possibly tar balls that might have fall, then settled?  And when these discoveries are made, what is the plan to actually, I guess, vacuum or pick this stuff up from the ocean bed?

Thad Allen: Just to recap – and maybe a little more than I provided at the top of the briefing – Development Driller 3 is at a depth of 17,909 feet below sea level.  Thats measured depth the length of the pipe, true vertical depth, which is straight down from the sea level is 17,152 feet.  Theyre in the process of going in about 30-foot increments of drilling, backing out, putting a wire down to measure the magnetic field around the casing, and moving forward.  Theyve done this twice over the last 72 to 96 hours.  They still have one more run to complete.

And then since, again, hopefully by the end of this week, theyll be down close enough where they can intercept the annulus and go ahead and complete the relief well intercept and then the cementing.  We look to have that later on this week.

And what was your other question, sir?

Luco Durant: My other question was regarding the lost oil.  I dont know if there was plans to scan the ocean floor, the seabed, to find the oil that may have settled.  And once these – discovery is made of this, what is the plan to pick it up or sweep it up or vacuum it up from the ocean floor?

Thad Allen: Thank you.  NOAA has a number of research vessels out there that are conducting samples of hydrocarbons in the water column.  They will continue to do that.  We are trying to get an idea of where there might be concentrations.

The oil that we are encountering is almost – and such small particles while we can detect it, its either almost background levels when you get away from the well site, and really not in a position where it can be recovered, because its already starting to biodegrade.

Where we do have concerns, we have put some crab traps out with devices in them to actually – the oil attaches to it in and around places like the Chandeleur Islands and Breton Sound, so were in closer to shore.  Were actually using crab traps to try and trap oil there to see if theres any indication it might be moving below the surface.

But in general offshore, the oil has degraded to the point where its not recoverable, but were more concerned about hydrocarbons in the water column and the presence of oil out there as it relates to being able to open fishing areas.

Operator: Your next question comes from the line of Sandy Davis with the Advocate.

Sandy Davis: Hi, Admiral.  Thank you for taking my call.  Is the cap technically in use right now?  And has there been any pressure on it since the well was cemented?  And if there has not been any pressure, will you ever remove it?

Thad Allen: Well, there are a couple of different devices there.  Im assuming youre talking about the capping stack that was employed on the 15th of July.

That currently is in place.  The ram is shut in the center, and the choke and the kill lines are shut, as well.  Thats what we did when we slowly closed it off.  And it maintained pressure, and theres some very small leaks at some of the flanges that are producing hydrates.  But in general, it is holding.

At some point, once the relief well is finished, that equipment will have to be removed, and the well will then be plugged under regulations that are issued by the Department of Interior.  That will involve several steps.  It will be removal of the cap itself and then ultimately the removal of the current blowout preventer and its replacement.

Once that happens, thatll be done under the supervision of the Coast Guard and Department of Interior that are conducting a joint Marine Board of Investigation into the cause of the event, with consultation with the Department of Justice.

And then the final disposition of the well will be taken care of under the current regulations, the Bureau of Ocean Energy Management and Department of Interior.  Was that responsive?

Sandy Davis: Yes, thank you.

Operator: Your next question comes from the line of Nancy McKenzie with Defenders of the COA.

Nancy McKenzie: Hey, thanks again.  Just a follow-up.  You just said that there were some small leaks on the flanges.  What is leaking out, oil, hydrocarbons?

Thad Allen: Well, theres a certain amount – there are a very, very small amount of hydrocarbons that were trapped in the upper end of the blowout preventer and the capping stack, because cement and the mud went down.  Its a negligible amount, and we knew even before we had attempted the top kill that there were some small leaks there, and it has to do with the seals and the flanges that are connecting those devices to each other, nothing of consequence to the environment, but we are watching them.  They are producing some hydrates.

And along with monitoring the seafloor, were monitoring the capping stack and the blowout preventer every day.

Nancy McKenzie: Awesome.  And my real question was, what is the difference between dissolved and dispersed when were talking about the oil left in the gulf?

Thad Allen: Sure.  Oil thats been dispersed as a result of having dispersants applied to it breaks down into smaller particles, in some cases smaller than the width of a human hair, and this facilitates the biodegrading of the oil or its assimilation into the water column, which it does naturally, but dispersed oil, it does it more rapidly because weve broken it down into smaller component parts.

Ultimately, oil degrades naturally and is absorbed into the oil.  And this is as a matter of a chemical transformation having to do with carbon and oxygen and so forth.  Im not up on the exact details.  Thats more Jane Lubchencos area of expertise, but sooner or later, all oil will degrade and be naturally absorbed in the ocean.

Dispersed oil is oil where thats happening more rapidly, because we had used dispersants, but we have not used dispersants since the capping stack was put on, so the oil that was previously dispersed should be out there degrading at a more rapid rate than the oil that was not dispersed.

Nancy McKenzie: OK, so when you said smaller than the human hair, was that dispersed or dissolved?  Because I didnt hear you talk about dissolved.

Thad Allen:     The impact of dispersed oil is that is gets disaggregated into almost microscopic particles that make it easier to biodegrade.  Dissolved is a term that NOAA uses for the natural absorption of oil into the water column.  Was that more clear?

Nancy McKenzie: Yes.  Yes.  Thank you.

Operator: Your next question comes from the line of Paula Dittrick with Oil and Gas Journal.

Paula Dittrick: Thank you, Admiral, for taking a follow-up.  My question was, is there a time range?  How many days does flow rate of 53,000 barrels a day (inaudible) was that for the whole spill or how long?

Thad Allen: Actually, its what the – we believe that (inaudible) 60,000 barrels a day at the start and then dropped down because of depletion of the reservoir.  And what theyve used is a number average over the period of time of 53,000, plus or minus 10 percent for an error rate as a general figure to assess the entire flow.  But we do know that at the early stages it was probably higher than that and it had dropped off at the end due to reservoir depletion.

Paula Dittrick: Thank you.

Jeff Carter: Operator, this is Jeff Carter.  We have time for two more questions.

Operator: Your next question comes from the line of Sandy Davis with the Advocate.

Sandy Davis: Hi.  Thanks for taking a second call.  I wanted to know whether you were surprised that only eight percent of the oil was dispersed by chemical dispersants, considering all of the chemicals that were used and the controversy surrounding them.  It seemed like a very small amount.

Thad Allen: First of all, I would challenge the notion that eight percent of 4.9 million barrels is a small amount.  Thats a significant amount.  And most of that oil, the reason dispersants were used; they were not in a position where we could actually effectuate in situ burning or skimming.  And of all the means out there, sometimes use of dispersants was the only means available to us, and dispersants are less toxic than the oil themselves, and EPA, after having completed testing on actually mixing dispersants with the Macondo well crude oil, have no increased levels of toxicity or no areas for concern, so I dont think its an issue of harm.

Its an issue of whats the most effective way to deal with oil in the water so it doesnt ultimately end up on the beaches or in the marshes.

Jeff Carter: Last question, Operator.

Operator: Your last question comes from the line of Thomas Davis with dailykos.com.

Thomas Davis: Thank you for a follow-up.  Can you actually give us a pressure that has been on the BOP stack at this time?

Thad Allen: Yes, actually, I can.  I dont have it in front of me right now.  Well make the pressure readings publicly available later this morning.  I just dont have them in front of me right now.

Thomas Davis: Thank you.

Jeff Carter: Thank you, ladies and gentlemen.

| **Home** | **Task Force** | **Assistance** | **Health & Safety** | **Fish & Wildlife** | **Environment** | **News** |
|---|---|---|---|---|---|---|
| | About Task Force | File a Claim | Boating | Birds | Air | Press Releases |
| | Joint Info Center | Other Assistance | Drinking Water | Fish | Beaches | Response Updates |
| | Education Resources | Small Business | Health Matters | Turtles | Coral | Transcripts & Docs |
| | Federal Partners | | Mental Health | Other Wildlife | Waste | Events |
| | | | Seafood Safety | Fish & Wildlife Reports | Water | |
| | | | Workers and | | | |

Exhibit J
Page 4

Recovery Plan          Volunteers          Features
Investigation                             FOIA Library
Response                                  Maps & Data
State and Local                           Multimedia

Follow us:

Cambodian | Croatian | Español | Français | Korean | Kreyòl ayisyen | Lao | Russian | Thai | Vietnamese

Site Map | Site Notices & Plug-Ins

Exhibit J
Page 5



National Incident Commander
Deepwater Horizon Response

2100 Second Street, S.W
Washington, DC 20593-0001
Staff Symbol: NIC
Phone: (202) 372-1710
Fax: (202) 372-1933

July 18, 2010
16451

Bob Dudley
Chief Managing Director
BP Group
501 West Lake Park Boulevard
Houston, Texas 77070

Dear Mr. Dudley,

My letter to you on July 16, 2010 extended the Well Integrity Test period contingent upon the completion of seismic surveys, robust monitoring for indications of leakage, and acoustic testing by the NOAA vessel PISCES in the immediate vicinity of the well head.  Given the current observations from the test, including the detected seep a distance from the well and undetermined anomalies at the well head, monitoring of the seabed is of paramount importance during the test period. As a continued condition of the test, you are required to provide as a top priority access and coordination for the monitoring systems, which include seismic and sonar surface ships and subsea ROV and acoustic systems. When seeps are detected, you are directed to marshal resources, quickly investigate, and report findings to the government in no more than four hours. I direct you to provide me a written procedure for opening the choke valve as quickly as possible without damaging the well should hydrocarbon seepage near the well head be confirmed.

As the National Incident Commander, I must remain abreast of the status of your source control efforts. Now that source control has evolved into a period beyond the expected 48 hour interval of the Well Integrity Test, I am requiring that you provide me a written update within 24 hours of your intentions going forward.  I remain concerned that all potential options to eliminate the discharge of oil be pursued with utmost speed until I can be assured that no additional oil will spill from the Macondo Well.

You may use your letter of 9 July as a basis for your update. Specifically, you must provide me your latest containment plan and schedule in the event that the Well Integrity Test is suspended, the status and completion timelines for all containment options currently under development, and details of any other viable source control options including hydraulic control that you are considering. You should highlight any points at which progress along one option will be impacted by resource trade-offs to achieve progress along another option. Include options for and impacts of continued twice-a day seismic testing versus once a day testing.

As you develop the plans above, note that the primary method of securing the source is the relief well and this effort takes precedence. Therefore, I direct you to provide a detailed plan for the

Exhibit K
Page 1

final stages of the relief well that specifically addresses the interaction of this schedule and any other activity that may potentially delay relief well completion.

Have your representative provide results on the monitoring efforts and source control requirements described above during today's BP and Government Science Team call at 8:00 PM CDT.

Sincerely,

THAD W. ALLEN

Exhibit K
Page 2

**Operational Science Advisory Team (OSAT-2)
Gulf Coast Incident Management Team**



# SUMMARY REPORT FOR FATE AND EFFECTS OF REMNANT OIL IN THE BEACH ENVIRONMENT

Prepared for
Lincoln D. Stroh, CAPT, U.S. Coast Guard
Federal On-Scene Coordinator
Deepwater Horizon MC252

February 10, 2011

Exhibit L
Page 1

## OPERATIONAL SCIENCE ADVISORY TEAM

## SUMMARY REPORT FOR FATE AND EFFECTS OF REMNANT OIL REMAINING IN THE BEACH ENVIRONMENT

## EXECUTIVE SUMMARY

The purpose of this report is to provide the Federal On-Scene Coordinator (FOSC) for the Deepwater Horizon MC252 Spill of National Significance with a risk-based Net Environmental Benefits Analysis (NEBA) associated with removing remnant oil from the near shore, surf zone, and shoreline sandy beach areas. This report was produced by primarily relying on data collected along the shoreline prior to the OSAT-2 effort. These data, however, were supplemented with laboratory and modeling information and certain supplemental data acquired during the course of the study. While no single source of information used by OSAT is conclusive, the multiple lines of evidence obtained informed the conclusions.

The massive shoreline cleanup effort along the impacted Gulf Coast removed much of the stranded oil residue. Three types of located oil residue are particularly challenging, or potentially damaging to the environment if removed. The three types of oil residue include: supratidal buried oil (SBO), small surface residue balls (SSRBs), and submerged oil mats (SOM). To evaluate the decision to either continue removing oil residue or leave it in place, answers were sought for three questions:

   a.   Are there human health concerns in leaving the three types of oil residue in place?

   b.   If no further action is taken aside from monitoring and maintenance, what are the potential effects of the three types of oil residue to the environment?

   c.   Does the Net Environmental Benefit Analysis (NEBA) justify a decision to remove the three types of oil residue or to leave it in place?

This report focused on four case study beach areas with sensitive habitats that are representative of oiling conditions across the Gulf: Fort Pickens, FL; Bon Secour, AL; Petit Bois, MS; and Grand Isle, LA. The conclusions of the report, however, are applicable to all oiled beach environment across the Gulf.

A NEBA was used to compare potential impacts of oil remaining in the environment to potential impacts of further treatment. Toxicology and risk assessment specialists examined the environmental risk of the remaining oil for specific groups of aquatic and wildlife resources. A summary of the NEBA endpoints is shown in figure 1. The first highlighted column, "Summed Effects Assessment", represents the overall risk from oil residue to individual resources. The risk associated with cleanup beyond established "No Further Treatment" guidelines is labeled as "Further Cleanup Impact" in the NEBA matrix. The general results of the comparison are summarized in the NEBA matrix (figure 1) with specific key findings presented below.

1

Exhibit L
Page 2

Key Findings:

1.  Recently collected weathered oil samples showed 86-98 percent depletion of total polycyclic aromatic hydrocarbons (PAHs).

2.  Risk of leaching from supratidal buried oil into groundwater is minimal due to the combined effects of weathering, biodegradation, and the location of the buried oil.

3.  In most locations, models predict PAH concentrations in supratidal buried oil will decrease to 20% of current levels within 5 years.  However, there are isolated conditions where PAH concentrations are predicted to persist substantially longer.

4.  Calculated potential cancer and non-cancer health effects from short and long-term exposures are below U.S. Environmental Protection Agency (USEPA) acceptable health-based risk and hazard levels.

5.  Aquatic and wildlife resources would likely experience a greater threat from further cleanup beyond established guidelines than from the oil that still remains on the beaches.

6.  Two particular routes of exposure posed potentially elevated risks to aquatic and wildlife resources:

    a.  Ingestion of SSRBs by adult, subsurface-probing shore birds.  Further study of the feeding habits of these birds in the presence of SSRBs will provide information to further evaluate risk.

    b.  Contact between buried oil and sea turtle eggs and hatchlings.  This is due to the combination of their endangered status, the possibility of buried oil interfering with nesting turtles, and that eggs could be in direct contact with residual oil. Active monitoring of turtle nesting and knowledge supratidal buried oil (such as location, thickness, and consistency) can be used to develop mitigation strategies.

Exhibit L
Page 3

1

1          USCG/BOEM MARINE BOARD OF INVESTIGATION
           INTO THE MARINE CASUALTY, EXPLOSION, FIRE,
2              POLLUTION, AND SINKING
               OF MOBILE OFFSHORE DRILLING UNIT
3          DEEPWATER HORIZON, WITH LOSS OF LIFE
           IN THE GULF OF MEXICO 21-22 APRIL 2010
4              Monday, July 19, 2010

5

6              *   *   *   *   *   *

7

           The transcript of The Joint United
8      States Coast Guard/The Bureau of Ocean Energy
       Management, Regulation and Enforcement
9      Investigation of the above-entitled cause,
       before Dorothy N. Gros, a Certified Court
10      Reporter, authorized to administer oaths of
       witnesses pursuant to Section 961.1 of Title
11       13 of the Louisiana Revised Statutes of 1950,
       as amended, reported at the Radisson Hotel,
12       2150 Veterans Memorial Boulevard, Kenner,
       Louisiana, 70062, on Monday, July 19, 2010,
13       beginning at 8:00 a.m.

14

15

16

17

18

19

Exhibit M
Page 1

1       APPEARANCES:
         MEMBERS OF THE BOARD:
2        CAPT HUNG M. NGUYEN, CO-CHAIR
         UNITED STATES COAST GUARD
3
         DAVID DYKES, CO-CHAIR
4        THE BUREAU OF OCEAN ENERGY MANAGEMENT,
         REGULATION AND ENFORCEMENT
5
         JASON MATHEWS
6        THE BUREAU OF OCEAN ENERGY MANAGEMENT,
         REGULATION AND ENFORCEMENT
7
         JOHN McCARROLL
8        THE BUREAU OF OCEAN ENERGY MANAGEMENT,
         REGULATION AND ENFORCEMENT
9
         ROSS WHEATLEY
10        UNITED STATES COAST GUARD

11        LTR ROBERT BUTTS, COURT RECORDER
         UNITED STATES COAST GUARD
12
         REPORTED BY:  DOROTHY N. GROS, CCR
13              CERTIFIED COURT REPORTER

14

15

16

17

18

19

Exhibit M
Page 2

1               I N D E X
                          PAGE
2        Caption. . . . . . . . . . . . . . . . . 1
         Appearances. . . . . . . . . . . . . . . 2
3        Certificate. . . . . . . . . . . . . . 364
         Examination of STEPHEN BERTONE:

4            BY MR. MATHEWS . . . . . . . 27, 95, 121
             BY MR. McCARROLL . . . . . . . . . .84
5            BY MR. WHEATLEY. . . . . . . . . . .86
             BY MR. LINSIN. . . . . . . . . . 107
6            BY MR. KOHNKE. . . . . . . . . . 115
             BY MS. KIRBY . . . . . . . . . . 121
7            BY MR. JONES . . . . . . . . . . 128
             BY MR. GORDON. . . . . . . . . . 131
8            BY CAPT NGUYEN . . . . . . 164, 167, 227
             BY MR. DYKES . . . . . . . . . . 167
9            BY MR. PENTON. . . . . . . . . . 170
             BY MR. GODFREY . . . . . . . . . . 193
10       Examination of LANCE MOORE JOHN:
             BY MR. MATHEWS . . . . . . 236, 250, 262
11           BY MR. McCARROLL . . . . . . . .245, 251
             BY MR. DYKES . . . . . . . . . . 249
12           BY MR. LINSIN. . . . . . . . .252, 265
             BY MS. KUCHLER . . . . . . . . . . 254
13           BY MR. CLEMENTS. . . . . . . . . . 258

14

15

16

17

18

19

Exhibit M
Page 3

4

1      EXAMINATION: (CONT'D)

2

3          BY MS. KARIS . . . . . . . . . . . 263

4      Examination of LEO LINDER:

5          BY MR. MATHEWS . . . . . . . .268, 348

6          BY MR. McCARROLL . . . . . . .286, 350

7          BY MR. LINSIN. . . . . . . . .291, 359

8          BY MR. PENTON. . . . . . . . . . . 295

9          BY MR. DYKES . . . . . . . . . . . 309

10          BY MR. KOHNKE. . . . . . . . . . . 312

11          BY MS. KIRBY . . . . . . . . . .315, 345

12          BY MR. GORDON. . . . . . . . .333, 356

13          BY MS. KARIS . . . . . . . . . . . 335

14          BY MR. GODWIN. . . . . . . . . . . 353

15

16

17

18

19

Exhibit M
Page 4

20      motorman, also fell in line and we ran towards

21      the standby generator.  As I was running to

22      the standby generator, I looked up at the

23      derrick where the crown should approximately

24      be and I could see nothing but flames way past

25      the crown.  I remember looking down at the

Exhibit M
Page 5

1      deck because it was very slick and I saw a

2      substance that had a consistency of snot.  I

3      can remember thinking to myself why is all

4      this snot on the deck.  It was approximately,

5      I would say, an inch to an inch and a half

6      thick.  As I made my way -- as we made our way

7      to the standby generator room, we had to come

8      pass right by the BOP house, which has a huge

9      door that's approximately, I'd say, 80, 90

10      feet tall and probably 50 foot wide that you

11      can actually look down into the moon pool.

12      When I looked into that space, I saw nothing

13      but flames.  I could see no equipment

14      whatsoever.  It was solid flames.  When we

15      walked into the standby generator room, myself

16      and Mike Williams ran to the starting panel.

17      I flipped the switch from automatic to manual,

18      hit the reset button and the start button.

19      There was absolutely no turning over of the

Exhibit M
Page 6

1          MR. LONDON:

2                    No, you know it was Chris.

3          MS. KIRBY:

4                    Feel free to correct me.

5          THE WITNESS:

6                    I know it was Chris.

7          MR. LONDON:

8                    He knows it was Chris and that's

9     during -- immediately after the

10          incident when you're talking about the

11          EDS?

12     BY MS. KIRBY:

13     Q.  Right after the incident you leave the

14     bridge, right?

15     A.  Correct.

16     Q.  And you go where?

17     A.  I was enroute to the standby generator

18     room.

19     Q.  And you see the snot, as you put it,

Exhibit M
Page 7

20      where?

21          A.   On the deck.  It was approximately an

22      inch to and inch and a half thick.  It had a

23      kind of a whitish, milky look to it.

24          Q.   Was it on fire?

25          A.   Not in the path that I was going.

Exhibit M
Page 8

1        Q.   Did you look around and see any --

2    what appeared to be any of it on fire

3    elsewhere?

4        A.   The only place that I looked as I came

5    out of the bridge was up to the derrick, of

6    course, because it was the biggest flame.

7    Then I noticed my feet slipping.  I looked

8    down at the deck and thought to myself what is

9    all this snot doing on the deck.  At that

10    point, I looked towards the moon pool and was

11    coming up to it and looked into the moon pool

12    itself.  I don't recall looking really

13    anywhere else other than the path that I was

14    on the derrick and the moon pool.

15        Q.   This substance that you were slipping

16    in, did you get any on your hands or anywhere

17    where you could feel it?

18        A.   No, ma'am.

19        Q.   Did it look like anything you'd seen

Exhibit M
Page 9

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

20      used on the rig before?

21              A.  No, ma'am.

22              Q.  Are you familiar with drilling mud,

23      obviously?

24              A.  I've seen it; I've touched it, but I'm

25      not familiar with all the different types and

Exhibit M
Page 10

1     such.

2          Q.  It didn't look like drilling mud?

3          A.  No, not the drilling mud that I'm used

4     to seeing, no.

5          Q.  What about spacer?

6          A.  I don't know what that is.

7          Q.  You don't know what it is.

8          MS. KIRBY:

9               No further questions.  Thanks.

10         CAPT NGUYEN:

11              Cameron?

12         MR. JONES:

13              A couple of questions, Captain.

14         Good morning, Mr. Bertone.  My name is

15         David Jones and I represent Cameron.

16         Just a couple of quick questions for

17         you.

18              E X A M I N A T I O N

19     BY MR. JONES:

Exhibit M
Page 11

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (255 of 731) [08/10/2010 2:27:17 PM]

1              MR. FANNING:

2                      No questions.

3              CAPT NGUYEN:

4                      Mike Williams?

5              MR. PENTON:

6                      Just a couple, Captain.

7                      E X A M I N A T I O N

8        BY MR. PENTON:

9          Q.   Captain, I'm Ronnie Penton and I

10       represent Mike Williams.  I have a couple

11       questions for you.  How standard in the

12       industry, at least in your experience, is a

13       450 barrel spacer?

14         A.   I'd say, just from my experience, it's

15       not standard.

16         Q.   That's not standard industry

17       practice, is it?

18         A.   No.

19         Q.   Why is that?

Exhibit M
Page 12

20          MR. EASON:

21               Go on and answer the questions as

22     best you can.

23          MR. PENTON:

24               Sure, if you can.

25          MR. EASON:

Exhibit M
Page 13

1                    If you can.

2               THE WITNESS:

3                    Just as a rule of thumb, you need

4               roughly 200 barrels is what we try to

5          pump -- 200 to 180.  To make that

6          distinction between the seawater and

7          the synthetic fluid?

8     BY MR. PENTON:

9        Q.  Yes.

10        A.  Any more than that wouldn't be called

11     for.  It would be unmerited to make more of

12     it.

13        Q.  Maybe I missed it.  Who specified that

14     size of spacer?

15        A.  That size of spacer?

16        Q.  Yes.

17        A.  Ultimately it was vetted through BP so

18     they gave the go-ahead to use it.

19        Q.  It was vetted through BP, but did you

Exhibit M
Page 14

20        or someone with your company recommend it?

21            A.   Recommend it?  Like I said before, the

22        idea to use an LCM spacer had been kicked

23        around before in the same circumstance when we

24        had LCM spacers left on -- not spacers, pills.

25        And I remember having a conversation with

Exhibit M
Page 15

297

1      Murray Sepulvado about what we could do with

2      it.  But that was very early on in the hitch.

3      As the hitch progressed and got more -- we got

4      closer to the point, we started asking

5      questions whether or not we could do this to

6      BP.  And that's how it came to be.

7         Q.   Well, when you say, "what we could do

8      with it," what do you mean?

9         A.   Use it as a spacer.

10        Q.   Why was it of such a great amount to

11     begin with?

12        A.   Because there were two different

13     pills, roughly 180 barrels a piece.

14        Q.   So you put them together?

15        A.   Yes.

16        Q.   And I appreciate your answer, but

17     maybe it was a poorly formed questions, but

18     who made that decision?

19        A.   The decision was made by BP to use it.

Exhibit M
Page 16

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (593 of 731) [08/10/2010 2:27:20 PM]

20        Q.  Did you recommend it or someone from

21     your company recommend it?

22        A.  Again, I broached the subject with

23     him.  It wasn't an idea that I came up with

24     so, I mean, it was an idea that was just in

25     the air and we talked about.

Exhibit M
Page 17

1          Q.   Well, was it a joint idea between

2     yourself and BP?

3              MR. EASON:

4                   Captain, at this point, I'd object.

5              He's answered this question three times

6              and at this point --

7              MR. PENTON:

8                   I haven't gotten an answer,

9              Captain.  I'm trying to work with the

10             witness to get an answer on if it was a

11             joint effort on behalf of this witness,

12             as well as BP, or were the other

13             parties involved in that process.

14             CAPT NGUYEN:

15                  He can answer that, but I think you

16             stated your question so he can answer

17             that question, please.

18             THE WITNESS:

19                  Is it a joint decision like did I

Exhibit M
Page 18

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (595 of 731) [08/10/2010 2:27:20 PM]

20          have a say in it?

21      BY MR. PENTON:

22          Q.  Yes.

23          A.  Or M-I SWACO had a say in it.

24      Ultimately, that decision was BP's decision.

25          Q.  Ultimately it was their decision?

Exhibit M
Page 19

1        A.  Yes.

2        Q.  But you were involved in that

3    decision?

4        A.  Yes.

5        Q.  Now, why is such a large pill not

6    recommended or not normally used?

7        MR. EASON:

8              Let me object --

9        MR. PENTON:

10             I'm sorry.  I can't hear your

11          objection.  I'm sorry.

12        MR. EASON:

13             Ronnie, you used the word

14          "recommended" in that question.  I'd

15          just object to that use.

16    BY MR. PENTON:

17        Q.  You testified that such a large volume

18    of spacer is not standard industry practice.

19    And so I'm asking, I guess the question is why

Exhibit M
Page 20

20      is it not the standard industry practice such

21      a large pill?

22            A.   Well the pill, depending on the size,

23      a large pill would do the same job as a

24      smaller pill.  So why make a 400 barrel pill

25      if you don't have the fluid already ready, as

Exhibit M
Page 21

1      opposed to just taking the 200 barrel pill.

2      But we had these two fluids already made.

3          Q.  So was it more driven by the idea that

4      you already had that made up and you used it?

5          A.  Well, I didn't but --

6          Q.  I understand.

7          A.  I understand.  But yes, we had the

8      product there and BP wanted to use it.

9          Q.  Tell me, if you know, what types of

10      difficulties or complications may be visited

11      on the well conditions with such a large pill,

12      if you know.

13          A.  If I know?

14          MR. SCAFF:

15                      Objection, Captain.  This witness

16          is not here to testify as an expert and

17          I believe he's asking him to speculate

18          as to wellbore conditions and it's

19          beyond his personal knowledge.

Exhibit M
Page 22

20          MR. PENTON:

21                    And, Captain, if he knows.  He's

22          the drilling fluid specialist.  That's

23          what this is, drilling fluid, if he

24          knows.

25                    MR. SCAFF:

Exhibit M
Page 23

301

1              It's used at the surface --

2       CAPT NGUYEN:

3              Yes, sir.  I agree with the M-I

4       SWACO adviser.

5    BY MR. PENTON:

6       Q.   Do you know -- I'll try to rephrase

7    and get by that, okay?  Do you know if this

8    450 barrel spacer caused complications in the

9    well condition that they were dealing with

10    that evening?

11       MR. SCAFF:

12              Again, Captain, that calls for an

13       expert opinion.  It's beyond the scope

14       of Mr. Lindner's personal knowledge and

15       what he's here to testify to under

16       oath.

17       MR. PENTON:

18              I believe the witness could say

19       that.  I mean, he's the one involved in

Exhibit M
Page 24

20          this.  I don't know who else I can ask

21          that question to.

22          MR. EASON:

23                    He's here as a fact witness,

24          Captain.

25          MR. PENTON:

Exhibit M
Page 25

1        MR. PENTON:

2               That's all I have, sir.  Thank you.

3        MR: DYKES:

4               I've got a couple of follow-up

5        questions.

6               E X A M I N A T I O N

7    BY MR. DYKES:

8        Q.   You had a 450 barrel loss circulation

9    material pill that you had combined out of two

10   separate pills.  So take an average, if you

11   have two, you have two 225 barrel pills,

12   originally?

13       A.   I don't remember exactly what the pit

14   volumes were, but yes.

15       Q.   Somewhere in that ballpark?

16       A.   Somewhere in that ballpark.

17       Q.   Why didn't you only use one and just

18   dump the other one overboard?

19       A.   We couldn't dump overboard because of

Exhibit M
Page 26

20      the way BP -- well, and this is, I'm speaking

21      for BP.  This is my understanding of it.  That

22      according to the RECRA Act, they couldn't just

23      discharge something that hadn't been

24      circulated through the well, the wellhead --

25          Q.   The wellbore?

Exhibit M
Page 27

1          A.   -- because it wouldn't be an exempt

2     waste.

3          Q.   So to be in compliance with the

4     National Pollution Discharge Elimination

5     System requirements, also known as the NPDES?

6          A.   I don't know that, plus I am not an

7     environmental lawyer, but I thought the RECRA

8     Act was different than the NPDES.  But it is

9     an environmental act from what I understand.

10          Q.   So the fluid has to come in contact

11     with the wellbore before it can be discharged

12     overboard.

13          A.   In order to be considered an exempted

14     waste, right.  And that, of course, it can't

15     be a synthetic fluid.  That's beyond the pale

16     but a water based -- if you're going to dump a

17     water based thing, you couldn't just build it

18     in your pit and dump it.

19          Q.   But you can build it in your pits,

Exhibit M
Page 28

20      pump it down the hole, take it right back up

21      the backside and dump it overboard?

22          A.  If you use it for something.

23          Q.  So even though common practice is 180

24      to 200 barrel spacer, we can combine this, an

25      uncommon practice, and pump it to get through

Exhibit M
Page 29

1          answered.

2          CAPT NGUYEN:

3                    I agree with M-I SWACO.

4    BY MS. KIRBY:

5      Q.  Did you hold yourself out as a

6    negative testing expert to Mr. Kaluza?

7      A.  Not at all.

8      Q.  Did he tell you why he was asking you

9    versus anyone else?

10      A.  No.

11      Q.   The two pills that you testified were

12    used, was one mixed on that day, April 20th?

13      A.  If I recall correctly, it was prior.

14    It was prior to -- it could have been earlier

15    that morning like 1 o'clock.

16      Q.  And the other one?

17      A.  Oh, you mean like mixed together --

18    those two pills mixed together?

19      Q.  No.  You had two pills, correct?  How

Exhibit M
Page 30

20        old was the one pill; how old was the other

21        pill?

22              A.   Both pills were mixed two weeks prior

23        to the event.

24              Q.   Was there any Form-A-Set material in

25        either of the pills?

Exhibit M
Page 31

1          A.   Form-A-Set, yes.  One pill was Form-A-

2     Set; one was Form-A-Squeeze.

3          Q.   And was there any Form-A-Squeeze test?

4          A.   Yes.

5          Q.   There was.  Tell us, please, what the

6     purpose of Form-A-Squeeze is.

7          A.   Form-A-Squeeze -- it's a material that

8     compresses against the porous surface and

9     dewaters, leaving the plug.

10         Q.   So it's a loss -- what they call a --

11         A.   It's a loss circulation pill.

12         Q.   So when you start losing mud while

13    you're drilling and it's because your

14    formation is breaking down, you put the Form-

15    A-Squeeze in there so that it will essentially

16    fill up that spot and hold it tight; is that

17    right?

18         A.   That is what its purpose, yes.

19         Q.   So it hardens, in other words?

Exhibit M
Page 32

20      A.   It dewaters.  That means the water

21      phase gets shoved into the formation and the

22      Form-A-Squeeze material creates a plug so the

23      whole pill itself does not harden.

24      Q.   And Form-A-Set, what does it do?

25      A.   Form-A-Set does if you add what's

Exhibit M
Page 33

1      called an accelerant.  It causes the pill to

2      cross link, which was not added.

3           Q.  So the accelerant was not added?

4           A.  The accelerant was not added.

5           Q.  So you had a Form-A-Squeeze pill,

6      true?

7           A.  True.

8           Q.  Mixed two weeks earlier, correct?

9           A.  Yes.

10          Q.   And you had a Form-A-Set pill mixed

11      two weeks earlier, correct?

12           A.   Uh-huh (affirmative response).

13           Q.   And no one wanted to have to keep

14      either one of those pills, correct?

15           A.  Yes.

16           Q.  And who was it --

17           A.  Well, again --

18           Q.  Who was it that didn't want to keep

19      those pills?

Exhibit M
Page 34

20      A.  It's BP.

21      Q.  BP told you it did not want to keep

22  the pills?

23      A.  They didn't want to have to dispose of

24  them, yes.

25      Q.  If you didn't use the pills, you

Exhibit M
Page 35

1    testified before that if you used them

2    downhole, then you could have an exemption as

3    drilling fluid, right?

4         A.  As an exempt waste, from what I

5    understand.

6         Q.  What if you hadn't used them that way,

7    what would have had -- what would the rig have

8    had to do --

9         A.  We would have had -- I wouldn't know

10    exactly where they would have to send it.  I

11    presume Newport does disposal so it would have

12    had to be disposed of.

13        Q.  Hazardous waste disposal, right?

14        A.  Yes.

15        Q.  When these pills are, either one or

16    both, when they're mixed, do they have a milky

17    fluid, milky white fluid look?

18        A.  A milky white fluid, but it looked

19    like a gray drilling fluid.

Exhibit M
Page 36

20        Q.  Like a what?  A gray?

21        A.  Gray.

22        Q.  Have you ever heard anybody

23    characterize it as looking like snot?

24        A.  It wasn't quite snotty.

25        Q.  But it was close?

Exhibit M
Page 37

1          A.  It was thick.  It was thick, but it

2     was still fluid.

3          Q.  So it was very viscous?

4          A.  Yes.

5          Q.  And really the only reason for putting

6     those two pills down there was just to get rid

7     of them; is that your understanding?

8          MR. EASON:

9               Objection.  If you know the answer

10          to the question.

11          THE WITNESS:

12               To my knowledge -- well, it filled

13          a function that we needed a spacer.  We

14          then had to build another one without

15          it.

16     BY MS. KIRBY:

17          Q.  Are these two materials, the Form-A-

18     Squeeze and the Form-A-Set, are they

19     specifically designed for application of

Exhibit M
Page 38

20      spacers?

21          A.   No.

22          Q.   But it was felt that this would be

23      alright in this instance?

24              MR. EASON

25                  Let me object to the form as to who

Exhibit M
Page 39

362

1          the hearing for this afternoon and we

2          will restart tomorrow morning at 8:00.

3          Thank you.

4

5                    *   *   *   *   *   *

6          (Whereupon, the hearing was adjourned at 3:45

7          p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

Exhibit M
Page 40

1

2                    R E P O R T E R ' S   P A G E

3            I, DOROTHY N. GROS, Certified Court

4      Reporter in and for the State of Louisiana,

5      the officer, as defined in Rule 28 of the

6      Federal Rules of Civil Procedure and/or

7      Article 1434(B) of the Louisiana Code of Civil

8      Procedure, before who this sworn testimony was

9      taken, do hereby state on the Record:

10            That due to the interaction in the

11      spontaneous discourse of this proceeding,

12      dashes (--) have been used to indicate pauses,

13      changes in thought, and/or talk overs; that

14      same is the proper method for a Court

15      Reporter's transcription of proceeding, and

16      that the dashes (--) do not indicate that

17      words or phrases have been left out of this

18      transcript;

19            That any words and/or names which could

Exhibit M
Page 41

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (725 of 731) [08/10/2010 2:27:21 PM]

20       not be verified through references material

21       have been denoted with the phrase

22       "(phonetic)".

23

24

25       _____

Exhibit M
Page 42

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (726 of 731) [08/10/2010 2:27:21 PM]

1                    DOROTHY N. GROS, CCR

2

3                 C E R T I F I C A T E

4

5            I, Dorothy N. Gros, Certified Court

6      Reporter, in and for the State of Louisiana,

7      authorized by the laws of said State to

8      administer oaths and to take the depositions

9      of witnesses, hereby certify that the

10      foregoing matter was taken before me at the

11      time and place herein above stated; the matter

12      being reported by me and thereafter

13      transcribed under my supervision; that the

14      foregoing pages contain a true and correct

15      transcription of the matter as thus given to

16      the best of my ability and understanding.

17

18            I further certify that I am not of

19      counsel nor related to any of the parties to

Exhibit M
Page 43

file:///d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (727 of 731) [08/10/2010 2:27:21 PM]

20        this cause, and that I am in no wise

21        interested in the result of said cause.

22

23

24

25

Exhibit M
Page 44

365

1     _____

2          DOROTHY N. GROS, CCR

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

Exhibit M
Page 45

RESPONSE TO JUNE 14, 2010 INFORMATION REQUEST FROM THE HONORABLE
EDWARD J. MARKEY AND THE HONORABLE LOIS CAPPS CONCERNING
ACTIVITIES RELATED TO ENVIRONMENTAL AND WORKER HEALTH IMPACTS

JULY 23, 2010

1.      **Please provide the coordinates for all ships used for sampling that have been funded by BP as a part of the cleanup effort, including all independent contractors and recruited locals, since April 20, 2010.  Please provide all data collected by these ships, including but not limited to rotifer toxicity, dead or stranded wildlife, methodology and associated data for monitoring or calculating the total volume of oil leaked and oxygen concentration/sampling.**

BP appreciates the importance of providing reliable and timely information regarding water quality and chemistry gathered in connection with the incident.  Much of the data referred to in the request is already available on the BP website.[1]

Additional data from the Unified Command's water column sampling program (conducted by the Environmental Protection Agency (EPA), the National Oceanic and Atmospheric Administration (NOAA) and BP scientists on the *R/V Brooks McCall*, the *R/V Ocean Veritas* and now the *R/V Ryan Chouest*) has recently been assembled, including data from NOAA and the EPA, and this data is now posted on the BP website consistent with the EPA monitoring directive and efforts to bring greater transparency to the monitoring process.[2]  This information and the analytical data and sampling plans from the other types of water, air, and sediment monitoring conducted by BP or its contractors is available from the "Monitoring and Sampling Information" page of the BP website.[3]  New or additional monitoring data from the continuing sampling programs will similarly be released as they become available for posting.  Please note that these results do not include data from samples collected by government agencies or other researchers not directed by the company.  With regard to your request for ship locations, sampling location information is included with analytical results where applicable.

Finally, although BP is not currently collecting data on dead or stranded wildlife, the Unified Command has a program for reporting and collecting information at its website.[4]

---

[1]   *See* http://www.bp.com/sectiongenericarticle.do?categoryId=9033821&contentId=7062498.

[2]   *See* http://www.bp.com/genericarticle.do?categoryId=9033821&contentId=7062604.

[3]   *See* http://www.bp.com/sectiongenericarticle.do?categoryId=9033821&contentId=7062498.

[4]   *See* http://www.deepwaterhorizonresponse.com/go/doctype/2931/55963.

2.     **Has BP sampled air and water to monitor for the presence of ingredients of the dispersants Corexit 9500 and 9527?  If yes, what are the results of this sampling?  If not, why not?  Please provide all data relating to the air and monitoring data, including the date the sample was taken, coordinates of sampling location, sampling equipment used and the limit of detection.**

The EPA and BP are involved in monitoring the air and water around worksites and along the shoreline for dispersant components.  BP is working with the EPA to test air and water samples and track any potential effects of dispersants, and to ensure that protective measures are adequate. To the best of our knowledge, the samples taken so far have shown very low to non-detectable levels of dispersant ingredients. Monitoring data is posted at http://www.bp.com/genericarticle.do?categoryId=9033821&contentId=7062604 and http://www.epa.gov/bpspill/dispersants.html#bpdata.

BP in coordination with the Unified Area Command (UAC) is working closely with the Occupational Safety and Health Administration (OSHA) and the National Institute for Occupational Safety and Health (NIOSH) in conducting industrial hygiene monitoring of the response workers.  These monitoring results have shown that worker exposure levels to dispersant ingredients are usually below the detection level and when detected, significantly below occupational exposure limits.  We have provided below a link to BP's detailed industrial hygiene monitoring data and summaries of that data presented in a chart format.
http://www.bp.com/genericarticle.do?categoryId=9033821&contentId=7062609.

In particular, the following monitoring studies have been performed:

Monitoring studies to test for the presence of 2-butoxy-1-ethanol, a component of Corexit EC9527A but not EC9500:

- Monitoring by BP in select industrial hygiene samples.  Results are posted on the BP web site at http://www.bp.com/genericarticle.do?categoryId=9033821&contentId=7062609.
- Monitoring by BP in coastal and near shore water and sediment.  Results and sampling locations are posted on the BP web site at http://www.bp.com/genericarticle.do?categoryId=9033821&contentId=7062586.
- Monitoring by the OSHA of worker air samples.  Results and work activities are posted on the OSHA web site at http://www.osha.gov/oilspills/index_sampling.html.
- Monitoring by the or EPA of shoreline air using mobile analytical methods.  Results are posted on the EPA web site at http://www.epa.gov/bpspill/taga.html.
- Monitoring by the EPA in shoreline water.   Results are posted on the EPA web site at http://www.epa.gov/bpspill/water.html#cumulative.

Exhibit N
Page 2

Monitoring studies to test for the presence of 1,2-propanediol (propylene glycol), a component of both Corexit EC9527A and EC9500:

- Monitoring by BP in coastal and near shore water and sediment.  Results and sampling locations are posted on the BP web site at  http://www.bp.com/genericarticle.do?categoryId=9033821&contentId=7062586.
- Monitoring by OSHA of worker air samples.   Results and work activities are posted on the OSHA web site at http://www.osha.gov/oilspills/index_sampling.html.
- Monitoring by the EPA in shoreline water.  Results are posted on the EPA web site at http://www.epa.gov/bpspill/water.html#cumulative.

Monitoring studies to test for the presence of 2-sulfo-butanedioic acid, 1,4-bis(2-ethylhexyl) ester (dioctyl sulfosuccinate), a component of both Corexit EC9527A and EC9500:

- Monitoring by the EPA in shoreline water.  Results are posted on the EPA web site at http://www.epa.gov/bpspill/water.html#cumulative.

Monitoring studies have been performed to test for the presence of 1-(2-butoxy-1-methylethoxy)-2-propanol (dipropylene glycol monobutyl ether), a component of Corexit EC9500A:

- Monitoring by the EPA of shoreline air using mobile analytical methods. Results are posted on the EPA web site at http://www.epa.gov/bpspill/taga.html.

**3.**     **It is my understanding that 30,000 gallons of drilling mud was used in the failed "top kill" procedure and much of that found its way out of the pipes and into the ocean.  It is my understanding, for example, that in addition to the synthetic oils and other chemicals that are used to make drilling mud, that BP may have included as much as 30% ethylene glycol, which is a common antifreeze, to ensure that methane hydrates didn't form during the procedure.  Ethylene glycol is also toxic.  To understand the potential effect the drilling mud may be having on the marine ecosystem, please list all ingredients that made up the drilling mud used in the failed "top kill" procedure.**

The U.S. Coast Guard and the Minerals Management Service approved the top kill procedure, including the ingredients for the drilling mud.  The ingredients used in the procedure were:  fresh water (which, as used, contained a sodium chloride brine solution), caustic soda, DUOVIS (which consists of xantham gum and Glyoxal), ethylene glycol, and MI BAR (which consists of Barite and Crystalline Silica Quartz).  The ethylene glycol used was a 30% solution, meaning that it was diluted with water at 30% concentration.  That solution is what was added to the mud.  BP used approximately 30,000 barrels of drilling mud in the top kill procedure.

**4.**     **How much methanol has BP pumped into the ocean as a part of the mitigation efforts?  Is BP continuing to use methanol to prevent the formation of hydrates?  If**

Exhibit N
Page 3

**so, how much methanol is currently being used and how is that figure determined? If not, when did BP start and stop discharging methanol into the ocean?  Please provide all measurements and data that pertain to methanol used in the mitigation effort.**

As of July 1, 2010, BP had pumped approximately 11,330 gallons of methanol in direct connection to the operations at the wellhead.  BP is continuing to use methanol to mitigate hydrate formation at a rate of about 2-8 gallons/minute, depending on the mitigation operation.  While the test facility is in recovery mode, the methanol is returned to the surface along with the captured oil and gas.  At this time, both the oil and methanol are stored on the Enterprise.

The spreadsheet being produced at BP-HZN-CEC0079795 through BP-HZN-CEC0079798 tracks the amount of methanol being pumped as part of the mitigation effort.  As for total methanol used during the mitigation effort, which includes pumped amounts and amounts used in other service, BP has used more than 168,000 gallons since the start of the mitigation effort.

5.  **What are the methane concentration measurements for the area surrounding the leak site?  Please provide the date of measurement, sampling equipment used, coordinates for sample location, and limit of detection of the equipment.**

BP monitors the air quality on the vessels that operate at the leak site in order to protect worker health and to help prevent potential fire hazards associated with exposure to methane and other crude oil constituents.  The monitoring is conducted pursuant to the Offshore Air Monitoring Strategy.

Fire and explosion hazards and controls are assessed using handheld or stationary direct reading instruments with catalytic bead sensors for 0-100% Lower Explosive Limit (LEL).  LEL sensors are not substance-specific.  These sensors measure methane and other combustible gases present in the environment.  The limit of detection or resolution for the LEL sensor is 1.0%.  Monitoring data for vessels located at the leak site is available beginning on April 27, 2010.  As of June 28, 2010, the average LEL concentration is 0.1% over an average of 16,239 measurements collected.

6.  **Has BP been collecting monitoring data in accordance with OSHA standard 1910.120(h)(1)(i) regarding employee exposure to hazardous concentrations of hazardous substances?  Please describe the methodology used to collect this data. What actions has BP taken in response to air quality measurements that exceeded the levels of concern or NIOSH recommended exposure limits?**

Monitoring for environmental and public health impacts is a joint effort among BP and several governmental agencies (*i.e.*, OSHA, the EPA, the Centers for Disease Control (CDC), NIOSH, and State Health Organizations (SHOs)).  Results are posted on BP's website for daily air monitoring and sampling, water sampling, and health monitoring, and the Unified Area Command updates results on the Deepwater Horizon Response

website for air quality monitoring and water and sediment testing.  The EPA also monitors and posts on its website air quality and water monitoring results.

In response to your question about air quality monitoring in particular, BP conducts air monitoring in accordance with air monitoring plans that have been approved by the Unified Area Command and are in compliance with 29 C.F.R. § 1910.120(h)(1)(i).  They are designed to ensure selection of proper engineering controls, work practices, and personal protective equipment so that workers are not exposed to hazardous-substance levels in excess of the Permissible Exposure Limits (PEL) set by OSHA, the Threshold Limit Values (TLV) set by the American Conference of Governmental Industrial Hygienists (ACGIH), and/or the Recommended Exposure Limits (RELs) set by NIOSH.

To ensure that safety measures, designed to protect the workforce, remain effective, BP as part of its industrial hygiene program has engaged approximately 100 industrial hygienists and technicians to monitor area and personal exposures at the offshore, near-shore, and beach work areas.  The air monitoring strategy includes both the use of real-time measurements and personal samples to demonstrate that safety systems including respiratory protection usage remain effective.

In particular, the technicians are using direct-reading instruments to conduct real-time monitoring for lower explosive limits for chemicals, and they monitor for exceedances of safe occupational exposure thresholds for benzene, hydrogen sulfide, carbon monoxide, oxygen, and other volatile organic compounds.  The technicians in the offshore source-control area also monitor for sulfur dioxide and particulate matter.  This real-time monitoring allows personnel to respond quickly to prevent over-exposure, provide necessary respiratory protection, or take any additional precautions.

Site action levels are set for the airborne hazards referred to above, and when an air-monitoring technician confirms a consistent reading above these action levels, they immediately inform the appropriate personnel—the vessel captain, in the case of offshore operations, or the site officials, in the case of onshore or near-shore operations.  Work is then restricted in that area to workers wearing appropriate respiratory protection or else they must leave the area of exposure.  It should be noted that in the case of vessel workers working offshore, they must first undergo the vessel's respiratory protection program that includes training, medical certification, and appropriate fit-testing for the respirator(s) that may be utilized for specific activities.

In addition to the real-time monitoring described above, Organic Vapor Monitor (OVM) badges are used to assess any personnel exposures to benzene, ethyl benzene, toluene, xylene and total hydrocarbons.  In offshore operations, OVM badges are placed on personnel identified as having the highest potential for exposure, and monitoring is conducted on workers who spend the most time on the deck each day.  For onshore and near-shore operations, the objective is to sample 10% of the representative population. The number of samples taken is based on an analysis of similar exposure groups, which consist of workers having the same general exposure profile based on, for example, the similarities of the tasks they perform and the materials with which they work.

OVM badges are analyzed pursuant to OSHA-approved methodologies by a laboratory accredited by the American Industrial Hygiene Association.  The laboratory results are reviewed by a certified industrial hygienist who investigates any exposures above OSHA PELs, ACGIH TLVs, or NIOSH RELs to determine whether the proper workplace controls were in place or whether they need to be modified.

To date, more than 9,000 personal samples have been taken of workers involved in source control activities, offshore and near-shore operations, beach cleanup, and other response activities.  In the vast majority of cases, there have been no significant exposures to airborne concentrations of benzene, total hydrocarbons or dispersant chemicals of interest.  In the small number of cases where exposure data was slightly above the applicable limit, the issue was investigated and has usually been attributable to an unusual, nonrecurring event (e.g., a marine vessel fuel or hydraulic leak).

As sample results are validated, personal exposure data are shared with OSHA, NIOSH, the CDC and the EPA.  Sample results are also published on the BP website at http://www.bp.com/genericarticle.do?categoryId=9033821&contentId=7062609.

**7.**     **There have been numerous reports of illness experienced by those responding to the BP spill, and given both the short-term and potential long-term health effects of exposure to oil, gas and dispersants, it may be important to monitor the health of these individuals well into the future.  What procedures are you taking to maintain records of all BP workers, contractors and recruited local residents that are assisting in the cleanup of the oil spill?  Do you maintain records of their contact information, dates that each individual worked, and how many hours were logged?  Do you also maintain records of what type of cleanup activities each individual partook in and the type of personal protective equipment they were given (i.e. respirators, gloves, hazmat suits)?**

BP takes very seriously the health and safety of every individual involved in the response effort.  BP provides identity badges for most of the workers assisting in the cleanup, and the computer system for the badges tracks contact information of the workers.  The workers without badges include those who are assisting with the skimming efforts and BP's Vessels of Opportunity program, since badges are a means of security and those particular workers generally do not enter the Incident Command Post sites or staging areas.

All workers assisting in the effort, including those without identity badges, must undergo training, which covers, among other things, any hazards associated with their assignments.  To complete the training, individuals must provide their contact information, which is kept in a database maintained by a BP contractor.  In addition, individuals assisting in the response effort have the opportunity to provide contact and other personal information to NIOSH as part of its rostering study.  BP and the Unified Area Command support the rostering study and the goal of identifying all workers, including volunteers, involved in all response and cleanup activities.  The NIOSH

rostering effort should be useful for short-term and long-term response worker health studies.

Given the massive number of volunteers and contractors, BP does not currently maintain records specifying for each individual worker the actual number of hours worked, the specific tasks conducted, and the type of personal protective equipment used.  However, BP is cooperating with NIOSH in that agency's rostering program, described above, which will provide that information for the workers who agree to participate in the program.  It is our understanding that worker participation in the NIOSH rostering has been very good.



National Incident Commander
Deepwater Horizon Response

2100 Second Street, S.W
Washington, DC 20593-0001
Staff Symbol: NIC
Phone: (202) 372-1710
Fax: (202) 372-1933

16451
20 August 2010

Bob Dudley
Chief Managing Director
BP Group
501 West Lake Park Boulevard
Houston, TX 77070

Dear Mr. Dudley,

You are authorized to proceed with the Fishing Through Capping Stack Re-entry Procedure (2200-T2-DO-PPR-4698) submitted to me today.

The Deepwater Horizon Joint Investigation Team issued you a subpoena to remove all equipment associated with the Deepwater Horizon, including the BOP stack and capping stack. In addition to the requirement to submit a procedure and timeline to remove and replace the current BOP stack with a new BOP stack in my letter to you yesterday, I direct BP to do the following:

1.   Submit to me, by August 22, 2010, a proposed procedure to raise and recover the BOP stack and the capping stack for my approval. Please ensure that the proposed procedure reflects concurrence from the on-site technical teams on which Transocean, Cameron, and other parties-in-interest are serving. The procedure should recognize and preserve the forensic and evidentiary value of the BOP stack, capping stack, and any other equipment or material removed or recovered, including but not limited to compliance with any Physical Evidence Collection directives issued by the Joint Investigation Team. The procedure should also include measures to enable capture and removal of oil in the event of a release during the procedure. The procedure may not be commenced without my prior approval.

2.   Cooperate with the Joint Investigation Team and the Department of Justice Criminal Investigation Evidence Recovery Team (collectively, the Team) in the BOP stack and capping stack removal and recovery process. Team members will take custody of all equipment removed from or associated with the BOP stack or capping stack from the time it is removed from the well head and will maintain that custody throughout the lifting process.

3.   Allow Team members unfettered access to observe and record the entire removal and recovery process, commencing with the preparation for detachment of the BOP stack or capping stack.

4.    Provide a continuous live ROV feed of the removal and recovery process to Team members on-scene as well as to other Federal Government personnel on-shore - making a permanent recording of the supplied ROV feed(s). The live feed should contain sufficient redundancies to maintain continuous visual contact and should accurately capture the entire removal, replacement, and recovery process. Cooperate with the photographing and videotaping at all times throughout the entire process.

Sincerely,

T. W. ALLEN
Admiral, U. S. Coast Guard (Ret.)
National Incident Commander

2

Exhibit O
Page 2