## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | **MDL No. 2179** |
| **This Document Relates to:** *All Cases in Pleading Bundle B1* | **SECTION: J** |
| (This Document also applies to No. 10-2771) | **JUDGE BARBIER** |
| | **MAGISTRATE SUSHAN** |

## OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS BUNDLE B1 FIRST AMENDED MASTER COMPLAINT, CROSS-CLAIM, AND THIRD-PARTY COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 17

LEGAL STANDARDS ...................................................................................... 18

    A.    Plaintiffs' First Amended B1 Master Complaint Meets Prevailing Rule 12(b)(6) Standards........................................................................ 18

    B.    Plaintiffs' First Amended B1 Master Complaint Meets Prevailing Rule 12(b)(1) Standards ....................................................................... 20

    C.    Plaintiffs' First Amended B1 Master Complaint Is Not Susceptible to Rule 12(b)(c) Judgment on the Pleadings ............................................ 20

LEGAL ARGUMENT ....................................................................................... 21

    I.    FEDERAL MARITIME LAW IS APPLICABLE TO PLAINTIFFS' CLAIMS. ................................................................................................. 21

        A.    An Accurate Roadmap:  OCSLA's Key Provisions, Admiralty Jurisdiction, and the *PLT* Test. ......................................................... 21

        B.    The Claims At Issue Do Not Fall Within The *PLT* Test......................... 23

            1.    *PLT* Factor #1:  The M/V Deepwater Horizon Was Not an OCSLA "Situs."........................................................................ 23

            2.    *PLT* Factor # 2:  Maritime Law Applies "of Its Own Force."................................................................................... 25

    II.    THE OPA DOES NOT PREEMPT PLAINTIFFS' MARITIME OR STATE LAW CLAIMS. ...................................................................... 30

        A.    The Plain Language of the OPA Expressly Saves (and Does Not Preempt) both State Law and General Maritime Law. ........................... 34

        B.    The Legislative History Confirms That The OPA Does Not Preempt State Law Or The General Maritime Law. ............................... 36

        C.    Congress Did Not Intend To Occupy The Field Of Oil Pollution Remedies Nor Does Preserving State Law and General Maritime Claims Conflict With The OPA............................................................ 41

        D.    The OPA Does Not Prohibit or Preempt Plaintiffs' Punitive Damage Claims. ................................................................................... 43

        E.    Attorneys' Fees Are Allowed Under General Maritime Law.................. 49

    III.    PLAINTIFFS' STATE LAW CLAIMS ARE NOT PREEMPTED BY THE CLEAN WATER ACT. ............................................................ 50

916087.7

# TABLE OF CONTENTS
## (continued)

Page

IV. THE GENERAL MARITIME LAW DOES NOT PREEMPT
PLAINTIFFS' STATE LAW CLAIMS. ............................................................... 53

V. ALL PLAINTIFFS HAVE STATED CLAIMS FOR WHICH RELIEF
MAY BE GRANTED UNDER THE OPA. ........................................................ 56

    A. The Court Should Not Dismiss Plaintiffs' Actions For Lack Of
Presentment ................................................................................................ 56

        1. A Plaintiff-by-Plaintiff Determination of Presentment is
Inappropriate at this Time .......................................................... 57

        2. Presentment to the GCCF Satisfies Presentment to All
Defendants ................................................................................ 58

        3. If the Court Does Consider Defendants' Presentment
Argument, it Should Find that it is Not Well-Taken ................... 59

    B. Defendants' Rule 12 Motions On The Issue Of Responsible Party
Status Are Premature. ................................................................................ 61

    C. The OPA May Apply To At Least Some of the Claims By The
Vessels Of Opportunity Plaintiffs. ............................................................. 63

    D. The Moratorium Plaintiffs Have Stated A Viable Claim Under The
OPA For Which Relief May Be Granted. .................................................... 66

    E. Private Plaintiffs Do Not Seek Natural Resource Damages Under
The OPA. .................................................................................................... 74

VI. THE RULE IN *ROBINS DRY DOCK* DOES NOT BAR PLAINTIFFS'
ECONOMIC LOSS CLAIMS. ....................................................................... 74

    A. *Robins Dry Dock* Should Not Apply Here. ................................................. 76

    B. The Fishermen Plaintiffs' Claims Are Not Barred by *Robins Dry
Dock*. .......................................................................................................... 77

VII. THE PROPERTY PLAINTIFFS HAVE PROPERLY ALLEGED
CLAIMS FOR WHICH RELIEF MAY BE GRANTED FOR TRESPASS. ....... 77

    A. Plaintiffs State Maritime Trespass Claims under Recognized
Principles of Federal Common Law. .......................................................... 77

    B. The Lessees Among The Property Plaintiffs Have Standing To
Bring A Trespass Action Against Defendants Under Louisiana
Law. ........................................................................................................... 79

**TABLE OF CONTENTS**
**(continued)**

Page

VIII.  THE FLORIDA PLAINTIFFS HAVE PROPERLY PLED A CLAIM
UNDER THE FLORIDA POLLUTANT DISCHARGE PREVENTION
AND CONTROL ACT, FLA. STAT. §§ 376.011, *ET SEQ.* ............................ 83

    A.  The Florida Act Applies to Discharges That, Although Originating
In Federal Waters, Pollute Florida Coastal Areas, And This
Application Is Compatible With Federal Law. ........................................ 87

        1.  The Florida Act Applies to <u>Any</u> Discharge that Affects
Florida Lands or Water. ................................................................. 87

        2.  There is no Dormant Commerce Clause Violation, Because
Congress Expressly Permitted States to Enact Legislation
that Imposes Liability for Pollution of State Waters. ................... 88

        3.  The Florida Act is Not Preempted by The Clean Water Act
under the Supreme Court's Decision in O*uellette.* ...................... 92

IX.  DEFENDANTS MISSTATE THE ECONOMIC LOSS RULE UNDER
STATE LAW. ................................................................................................. 92

    A.  Alabama State Law Does Not Recognize An Economic Loss Rule. ........ 92

    B.  Mississippi State Law Does Not Recognize The Economic Loss
Rule. ........................................................................................................ 93

    C.  Florida Does Not Recognize The Economic Loss Rule With
Respect To Oil Spill Claims. .................................................................. 94

    D.  Under Louisiana Law, An "Economic Loss Rule" Would Not Bar
Claims By Oyster Fisherman Operating On State Leases. ..................... 94

X.  PLAINTIFFS STATE VALID CLAIMS FOR DECLARATORY RELIEF ...... 95

    A.  Governing Law ....................................................................................... 97

    B.  Plaintiffs' Request For Declaratory Relief Is Justiciable ........................ 98

XI.  BP'S ARGUMENT THAT "THERE IS NO INDEPENDENT CAUSE OF
ACTION FOR PUNITIVE DAMAGES" IS A NON SEQUITUR. ................... 102

CONCLUSION ..................................................................................................................... 103

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alcoa S.S. Co. v. Charles Ferran & Co.*,
383 F.2d 46 (5th Cir. 1967) ................................................................ 55

*Altria v. Good*,
129 S. Ct. 538 (2008) ........................................................................ 32

*American Dredging Co. v. Lambert*,
81 F.3d 127 (11th Cir. 1996) ............................................................. 56

*AmSouth Bank, N.A. v. City of Mobile*,
500 So. 2d 1072 (Ala. 1986) .............................................................. 83

*Aramark Uniform Career and Apparel, Inc. v. Easton*,
894 So. 2d 20 (Fla. 2004) .................................................................. 85

*Ashcroft v. Iqbal*,
___ U.S. ___, 129 S. Ct. 1937 (2009) ......................................... 19, 20

*Askew v. Am. Waterways Operators, Inc.*,
411 U.S. 325 (1973) ..................................................................... passim

*Atl. Sounding Co. v. Townsend*,
129 S. Ct. 2561 (2009) ................................................. 33, 44, 45, 50

*AXA Re Prop. & Cas. Ins. Co. v. Day*,
162 Fed. Appx. 316 (5th Cir. 2006) ................................................... 98

*Barasich v. Shell Pipeline Co., LP*,
2006 WL 3913403 (2006) .................................................................. 96

*Bartholomew v. CNG Producing Co.*,
862 F.2d 555 (5th Cir. 1989) ............................................................. 23

*Bates v. Dow Agrosciences LLC*,
544 U.S. 431 (2005) .......................................................................... 54

*Beacham v. Hardy Outdoor Advertising, Inc.*,
520 So. 2d 1086 (La. App. 2d Cir. 1987) .......................................... 80

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................... 20, 21

*Berthelot v. Boh Bros. Constr. Co.*,
2006 U.S. Dist. LEXIS 57817 (E.D. La. 2006) ................................. 19

*BMW of N. Am. v. Gore*,
517 U.S. 559 (1995) ..................................................... 97, 101, 103

*Bowman v. Niagara Mach. & Tool Works, Inc.*,
832 F.2d 1052 (7th Cir. 1987) ........................................................... 91

*Brookshire Bros. Holding v. Total Containment, Inc.*,
No. 04-1150, 2007 WL 184600 (W.D. La. Jan. 18, 2007) ................. 95

# TABLE OF AUTHORITIES
## (continued)

Page

*Broughton Offshore Drilling, Inc. v. S. Cent. Machine, Inc.*,
911 F.2d 1052-53 (5th Cir. 1990) ...................................................................... 30

*Brown & Root, Inc. v. Big Rock Corp.*,
383 F.2d 662 (5th Cir. 1967) ........................................................................... 98

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.*,
476 U.S. 573 (1986) ........................................................................................ 91

*C & A Carbone, Inc. v. Town of Clarkstown, New York*,
511 U.S. 383 (1994) ........................................................................................ 92

*Castro v. United States*,
560 F.3d 381 (5th Cir. 2009) ........................................................................... 21

*Chad Youth Enhancement Ctr., Inc. v. Colony Nat'l Ins. Co.*,
No. 3:09-0545, 2010 U.S. Dist. LEXIS 8714 (M.D. Tenn. Feb. 2, 2010) .......................... 100

*City of Milwaukee v. Illinois*,
451 U.S. 304 (1981) ................................................................................... 51, 53

*Clausen v. M/V New Carissa*,
171 F. Supp. 2d 1127 (D. Or. 2001) ................................................................. 49

*Coastal Iron Works, Inc. v. Petty Ray Geophysical*,
783 F.2d 577 (5th Cir. 1986) ....................................................................... 55, 56

*Collin County v. Homeowners Ass'n for Values Essential to Neighborhoods*,
915 F.2d 167 (5th Cir. 1990) ........................................................................... 98

*Commonwealth of Puerto Rico v. M/V Emily S*,
1998 AMC 2726 (D.P.R 1998) ......................................................................... 48

*Corry v. State*,
710 So. 2d 853 (Miss. 1998) ........................................................................... 83

*Cunningham v. Anchor Hocking Corp.*,
558 So. 2d 93 (Fla. 1st DCA), *rev. denied*, 574 So. 2d 139 (Fla. 1990) .............................. 87

*Curd v. Mosaic Fertilizer, LLC*,
39 So. 3d 1216 (Fla. 2010) ................................................................. 85, 87, 88, 95

*D. L. Fair Lumber Co. v. Weems*,
16 So. 2d 770 (Miss. 1944) ............................................................................. 83

*Dalrymple v. Fairchild Aircraft, Inc.*,
575 F. Supp. 2d 790 (S.D. Tex. 2008) ............................................................... 56

*Davis v. U.S.*,
597 F.3d 646 (5th Cir. 2009) ........................................................................... 21

*Demette v. Falcon Drilling Co.*,
280 F.3d 492 (5th Cir. 2002) .................................................................... passim

# TABLE OF AUTHORITIES
## (continued)

Page

*Dempster v. Louis Eymard Towing Co., Inc.*,
503 So. 2d 99 (La. App. 5th Cir. 1987), *writ denied* 505 So. 2d 1136 (La. 1987) ................................................................................................................ 96

*Doe v. Hillsboro Indep. Sch. Dist.*,
81 F.3d 1395 (5th Cir. 1996) ...................................................................... 22

*Domingue v. Ocean Drilling and Exp. Co.*,
923 F.2d 393 n. 9 (5th Cir. 1991) ............................................................... 30

*Dostie Development, Inc. v. Arctic Peace Shipping, Co., Ltd.*,
1996 WL 866119 (M.D. Fla. Aug. 14, 1996) ..................................... 84, 85, 86

*Dunham-Price Group, LLC v. Citgo Petroleum Corp.*,
No. 2:07 CV 1019, 2010 U.S. Dist. LEXIS 31901 (E.D. La., March 31, 2010) ............ 66, 67

*E. River S.S. Corp. v. Transamerica Delaval, Inc.*,
476 U.S. 858 (1986)..................................................................................... 26

*Easton v. Aramark Uniform & Career*,
825 So. 2d 996 (Fla. 1st DCA 2002) *aff'd*, 894 So. 2d 20 (Fla. 2004).................................. 87

*Exxon Shipping Co. v. Baker*,
554 U.S. 471, 489 (2008).......................................................................... 33, 54

*Exxon Shipping Co. v. Baker*,
128 S.Ct. 2605 (2008)............................................................................ passim

*Gabarick v. Laurin Mar. (Am), Inc.*,
623 F. Supp. 2d 741 (E.D. La. 2009).......................................................... 32, 41

*Gabarick v. Laurin Mar. (Am.), Inc.*
No. 10-30148, 2010 U.S. App. LEXIS 26681 (5th Cir. Dec. 30, 2010).............................. 62

*Gabarick v. Laurin Mar. (America) Inc.*,
No. 08-4007, 2009 U.S. Dist. LEXIS 20974 (E.D. La. Jan. 12, 2009)................................ 61

*Galveston County Nav. Distr. v. Hopson Towing Co.*,
92 F.3d 353 (5th Cir. 1996) ........................................................................ 50

*Gaspard v. St. Martin Parish Sewerage Dist. # 1*,
569 So. 2d 1083 (La. App. 3d Cir. 1990) ..................................................... 80

*Gatlin Oil Co. v. United States*,
169 F.3d 207 (4th Cir. 1999) ................................................................... 65, 66

*Geier v. American Honda Motor Co.*,
529 U.S. 861 (2000)...................................................................................... 54

*Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*,
589 F.3d 778 (5th Cir. 2009) .............................................................. 24, 25, 27

*Guevara v. Maritime Overseas Corp.*,
59 F.3d 1496 (5th Cir. 1995) ....................................................................... 50

- vi -

# TABLE OF AUTHORITIES
## (continued)

Page

*Harris Moran Seed Co, Inc. v. Phillips*,
    949 So. 2d 916 (Ala. Civ. App. 2006) ................................................................. 94

*Harris v. Oil Reclaiming Co.*,
    94 F. Supp. 2d 1210 (D. Kan. 2000) ..................................................................... 63

*Head v. New Mexico Bd. of Exam'rs in Optometry*,
    374 U.S. 424 (1963) .............................................................................................. 90

*Healy v. The Beer Institute*,
    491 U.S. 324 (1989) ......................................................................................... 91, 92

*Hebert Abstract Co. v. Touchstone Props., Ltd.*,
    914 F.2d 74 (5th Cir. 1990) .................................................................................. 21

*Hebert v. Outboard Marine Corp.*,
    638 F. Supp. 1166 (E.D. La. 1986) ....................................................................... 79

*Heimann v. National Elevator Indus. Pension Fund*,
    187 F.3d 493 (5th Cir. 1999) *overruled in part on other grounds*, *Arana v.*
    *Ochsner Health Plan*, 338 F.3d 433 (5th Cir. 2003) ....................................... 98, 99

*Herb's Welding, Inc. v. Gray*,
    470 U.S. 414 (1985) .............................................................................................. 30

*Hercules Carriers, Inc. v State of Florida*,
    720 F.2d 1201 (11th Cir. 1983), vacated and affirmed by equally divided *en*
    *banc* court, 728 F.2d 1359 (11th Cir. 1984) ....................................................... 77

*Hodgen v. Forest Oil Corp.*,
    87 F.3d 1512 (5th Cir. 1996) ........................................................................... 26, 27

*Houston Oil and Minerals Corp. v. Am. Int'l Tool Co.*,
    827 F.2d 1053-54 (5th Cir. 1987) ......................................................................... 30

*Hufnagel v. Omega Serv. Indus., Inc.*,
    182 F.3d 340 (5th Cir. 1999) ........................................................................... 26, 29

*Hughes v. Tobacco Institute*,
    278 F.3d 417 (5th Cir. 2001) ................................................................................ 21

*Illinois v. City of Milwaukee*,
    406 U.S. 91 (1972) .......................................................................................... 51, 53

*Illinois v. City of Milwaukee*,
    731 F.2d 403 (7th Cir. 1984) ........................................................................... 51, 53

*In re Exxon Valdez*,
    236 F. Supp. 25 1043 (D. Alaska 2002) ............................................................... 97

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20,*
*2010*,
    2010 WL 3943451  3 (E.D. La. Oct. 6, 2010) ..................................................... 23

# TABLE OF AUTHORITIES
## (continued)

Page

*In re Settoon Towing, LLC*,
Civ. A. 07-1263, 2009 U.S. Dist. LEXIS 113533 (E.D. La., December 4,
2009) ............................................................................................................... 69

*In re Taira Marine Ltd No 5, LLC*,
444 F.3d 371 (5th Cir. 2006) ........................................................................ 78

*Indian Bayou Hunting Club, Inc. v. L.J. Taylor*,
261 So. 2d 669 (La. App. 3d Cir. 1972) ....................................................... 82

*Ins. Co. of the Pa. v. Vimas Painting Co.*,
No. 4:06CV1048, 2007 U.S. Dist. LEXIS 34401 (N.D. Ohio May 10, 2007) .................... 100

*Instructional Sys., Inc. v. Computer Curriculum Corp.*,
35 F.3d 813 (3d Cir. 1994)............................................................................. 92

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987)........................................................................ 51, 52, 53, 93

*Isla Corp v. Sundown Energy LP*,
No. 06-8645, 2007 WL 1240212 (E.D. La. April 27, 2007) ....................... 34

*Isla Corp. v. Sundown Energy, LP*,
No. 06-8645, 2007 U.S. Dist. LEXIS 31259 (E.D. La. Apr. 26, 2007)....... 43

*Italiano v. Jones Chemicals, Inc.*,
1997 WL 118426  (M.D. Fla. Feb. 21, 1997) ............................................... 86

*J. Ray McDermott v. Vessel Morning Star*,
457 F.2d 815 (5th Cir. 1972) ........................................................................ 56

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
513 U.S. 527 (1995)................................................................................. passim

*Jones v. Greninger*,
188 F.3d 322 (5th Cir. 2000) ........................................................................ 22

*Jurisich v. Louisiana Southern Oil & Gas Co.*,
284 So. 2d 173 (La. App. 4th Cir. 1973) ..................................................... 96

*Just v. Chambers*,
312 U.S. 383 (1941)....................................................................................... 55

*Kaplan v. Peterson*,
674 So. 2d 201 (Fla. 5th DCA 1996) ............................................................ 87

*Kelly v. Smith*,
485 F.2d 520 (5th Cir. 1973) ........................................................................ 30

*Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*,
571 F.3d 672 (7th Cir. 2009)......................................................................... 61

*La Rue v. Crown Zellerbach Corp.*,
512 So. 2d 862 (La. App. 1st Cir. 1987)....................................................... 82

# TABLE OF AUTHORITIES
## (continued)

Page

*Lakes of Gum Cove Hunting & Fishing, L.L.C. v. Weeks Marine, Inc.,*
182 F. Supp. 2d 537 (W.D. La. 2001).................................................................. 79

*Laredo Offshore Constructors, Inc. v. Hunt Oil Co.,*
754 F.2d 1223 (5th Cir. 1985) .......................................................................... 26

*Lloyd Wood Coal Co. v. Clark Equipment Co.,*
543 So. 2d 671 (Ala. 1989)................................................................................ 94

*Lorman v. U.S. Unwired, Inc.,*
565 F.3d 228 (5th Cir. 2009) ............................................................................ 19

*Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.,*
959 F.2d 49 (5th Cir. 1999) ........................................................................ 56, 79

*Marianna & B.R. Co. v. Maund,*
62 Fla. 538 (1911)............................................................................................. 83

*Martin v. Halliburton,*
618 F.3d 476 (5th Cir. 2010) ............................................................................ 21

*Matheny v. Tennessee Valley Auth.,*
503 F. Supp. 2d 917 (M.D. Tenn. 2007)............................................................ 56

*Matrixx Initiatives, Inc. v. Siracusano,*
__U.S.__, 2011 U.S. LEXIS 2416 (2011) ................................................... 20, 21

*Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,*
453 U.S. 1 (1981)............................................................................................... 41

*Miles v. Apex Marine Corp.,*
498 U.S. 19 (1990)....................................................................................... passim

*Miller Indus. v. Caterpillar Tractor,*
733 F.2d 813 (11th Cir. 1984) .......................................................................... 78

*Mills v. Director, Office of Workers' Compensation Programs,*
877 F.2d 356 (5th Cir. 1989) ............................................................................ 24

*Minnesota v. Clover Leaf Creamery Co.,*
449 U.S. 456 (1981)........................................................................................... 90

*Morales v. Garijak, Inc.,*
829 F.2d 1355 (5th Cir. 1987) .......................................................................... 50

*Morrow v. Marine Max, Inc.,*
731 F. Supp. 2d 390 (D.N.J. 2010) ................................................................... 56

*National Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.,*
924 F. Supp. 1436 (E.D.Va. 1996), *aff'd*, 122 F.3d 1062 (4th Cir. 1997)............ 32

*Nichols v. Weeks Marine, Inc.,*
513 F. Supp. 2d 627 (E.D. La. 2007)................................................................. 50

*Nissan Motor Corp. v. Maryland Shipbuilding and Drydock Co.,*
544 F. Supp. 1104 (D. Md. 1982) ..................................................................... 79

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Northwest Central Pipeline Corp. v. State Corp. Comm'n of Kan.,*
    489 U.S. 493 (1989) ................................................................................................ 90

*Offshore Co. v. Robison,*
    266 F.2d 769 (5th Cir. 1959) ................................................................................. 30

*Offshore Logistics, Inc. v. Tallentire,*
    477 U.S. 207 (1986) .......................................................................................... 24, 25

*Oppenheimer v. Prudential Sec., Inc.,*
    94 F.3d 189 (5th Cir. 1996) ................................................................................... 19

*Palestina v. Fernandez,*
    701 F.2d 438 (5th Cir. 1983) ................................................................................. 55

*Persson v. Scotia Prince Cruises, Ltd.,*
    330 F.3d 28 (1st Cir. 2003) ................................................................................... 55

*Pharmaceutical Research & Mfrs. of Am. v. Walsh,*
    538 U.S. 644 (2003) ................................................................................................ 91

*Pike v. Bruce Church,*
    397 U.S. 137 (1970) ................................................................................................ 93

*Pippen v. Shell Oil Co.,*
    661 F.2d 378 (5th Cir. 1981) ................................................................................. 29

*Poe v. PPG Industries,*
    782 So. 2d 1168 (La. App. 3rd Cir. 2001) ........................................................... 53

*Prudential Ins. Co. v. Benjamin,*
    328 U.S. 408 (1946) ................................................................................................ 90

*Raffray v. Gulf Logistics, LLC,*
    2010 WL 5055849 (E.D. La. 2010) ...................................................................... 29

*Recar v. CNG Prod. Co.,*
    853 F.2d 367 (5th Cir. 1988) ................................................................................. 23

*Reeves v. B & S Welding, Inc.,*
    897 F.2d 178 (1990) ................................................................................................ 31

*Richard v. Richard,*
    24 So. 3d 292 (La. App. 3d Cir. 2009) ............................................................ 81, 82

*Robins Dry Dock & Repair Co. v Flint,*
    275 U.S. 303 (1927) ........................................................................................ passim

*Robinson v. Shell Oil,*
    519 U.S. 337 (1997) ................................................................................................ 35

*Rodrigue v. Aetna Casualty & Surety Co.,*
    395 U.S. 352 (1969) ................................................................................................ 30

*Rogers v. Coastal Towing, L.L.C.,*
    723 F. Supp. 2d 929 (E.D. La. 2010) ................................................................... 56

## TABLE OF AUTHORITIES
### (continued)

Page

*Romero v. Int'l Terminal Co.,*
   358 U.S. 373-75 (1959) ........................................................................... 55

*Sanamo v. Trico Marine Services, Inc.,*
   73 Fed. Appx. 79, 2003 WL 21756647 (5th Cir. 2003) ...................... 25

*Saudi v. S/T Marine Atl.,*
   159 F. Supp. 2d 492 (S.D. Tex. 2000) ................................................ 49

*Scarborough v. Clemco Indus.,*
   391 F.3d 660 (5th Cir. 2004) ............................................................... 29

*Silkwood v. Kerr-McGee Corp.,*
   464 U.S. 238 (1984) ............................................................................. 35

*Skansi v. Humble Oil and Refining Co.,*
   176 So. 2d 236 (La. App. 4th Cir. 1965) ............................................ 96

*Skipperliner Indus., Inc. v. Ray,*
   No. 00-C-0730, 2002 WL 32348827 (W.D. Wis. Jan. 31, 2002) ......... 56

*Smith v. Penrod Drilling Co.,*
   960 F.2d 456 (5th Cir. 1992) ............................................................... 27

*Snyder Oil Corp. v. Samedan Oil Corp.,*
   208 F.3d 521 (5th Cir. 2000) ............................................................... 31

*Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co.,*
   644 F.2d 1132 (5th Cir. 1981) ............................................................. 30

*South Port Marine, LLC v. Gulf Oil Ltd. P'ship,*
   234 F.3d 58 (1st Cir. 2000) ................................................................. 43

*St. Paul Mercury Ins. Co. v. Williamson,*
   224 F.3d 425 (5th Cir. 2000) ............................................................... 21

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
   538 U.S. 408 ....................................................................................... 101

*State Farm Mutual Automobile Insurance Co. v. Ford Motor Co.,*
   736 So. 2d 384 (Miss. Ct. App. 1999) ................................................ 94

*Stewart v. Dutra Const. Co.,*
   543 U.S. 481 (2005) ...................................................................... 25, 30

*Strong v. B.P. Exploration & Production, Inc.,*
   440 F.3d 665 (5th Cir. 2006) ..................................................... 23, 26, 29

*TAG/ICIB Services v. Pan American Grain Co.,*
   215 F.3d 172 (1st Cir. 2000) ............................................................... 56

*Taira Lynn Marine Ltd. No. 5, LLC v. Jays Seafood, Inc., et al.,*
   444 F.3d 371 (5th Cir. 2006) ............................................................... 69

*Tanglewood E. Homeowners v. Charles-Thomas, Inc.,*
   849 F.2d 1568 (5th Cir. 1988) ............................................................. 19

## TABLE OF AUTHORITIES
### (continued)

Page

*Tanguis v. M/V Westchester,*
   153 F. Supp. 2d 859 (E.D. La. 2001) .................................................................. 34

*Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.,*
   975 F.2d 1134 (5th Cir. 1992) ........................................................................... 19

*Tenn. Gas Pipeline v. Houston Cas. Ins. Co.,*
   87 F.3d 150 (5th Cir. 1996) ............................................................................... 23

*Terre Aux Boeufs Land Co. v. J.R. Gray Barge Co.,*
   803 So. 2d 86 (La. App. 4th Cir. 2001) ............................................................. 80

*Texaco Exploration and Prod., Inc. v. AmClyde Engineered Prods. Co., Inc.,*
   448 F.3d 760 (5th Cir. 2006) ....................................................................... 30, 31

*Theriot v. Bay Drilling Corp.,*
   783 F.2d 527 (5th Cir. 1986) ............................................................................. 29

*Trosclair v. Superior Oil Company,*
   219 So. 2d 278 (La. App. 1st Cir. 1969)............................................................ 96

*Turner v. Murphy Oil USA, Inc.,*
   No. 05-4206, 2007 U.S. Dist. LEXIS 94304 (E.D. La. Nov. 21, 2007) ............. 61

*U.S. v. Bestfoods,*
   524 U.S. 51 (1998).............................................................................................. 63

*U.S. v. Bodenger,*
   No. 03-0272, 2003 WL 22228517 (E.D. La. Sept. 25, 2003)............................. 34

*U.S. v. Egan Marine Corp.,*
   No. 08-3160, 2009 WL 855964 (N.D. Ill. March 30, 2009)............................... 32

*U.S. v. Locke,*
   529 U.S. 89 (2000).............................................................................................. 34

*U.S. v. M/V Cosco Busan,*
   557 F. Supp. 2d 1058 (N.D.Cal. 2008) ............................................................. 32

*Union Oil Co. v. Oppen,*
   501 F.2d 558 (9th Cir. 1974) ............................................................................. 78

*Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.,*
   895 F.2d 1043 (5th Cir. 1990) .............................................................. 24, 25, 26

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Management Auth.,*
   550 U.S. 330 (2007)............................................................................................ 90

*United States Supreme Court in International Paper v. Ouellette,*
   479 U.S. 481 (1987) ........................................................................................... 88

*United States v. Pickett,*
   598 F.3d 231 (5th Cir. 2010) ............................................................................. 26

*United States v. Texas,*
   507 U.S. 529 (1993) ........................................................................................... 35

**TABLE OF AUTHORITIES**
(continued)

Page

*Unocal Corp. v. U.S.*,
    222 F.3d 528 (9th Cir. 2000) ........................................... 62

*Vaughan v. Atkinson*,
    82 S. Ct. 997 (1962) ...................................................... 50

*Voest-Alpine Trading USA Corp. v. Bank of China*,
    142 F.3d 887 (5th Cir. 1998) ........................................... 22

*Weinman v. DePalma*,
    232 U.S. 571 (1914) ....................................................... 83

*Western and Southern Life Ins. Co. v. State Bd. of Equalization*,
    451 U.S. 648 (1981) ....................................................... 90

*Who Dat Yat LLC v. Who Dat? Inc.*,
    2011 U.S. Dist. LEXIS 513 (E.D. La. Jan. 4, 2011) ........................... 19

*Williams v. Potomac Elec. Power Co.*,
    115 F. Supp. 2d 561 (D. Md. 2000) .................................... 58, 60

*Williams v. Wynne*,
    533 F.3d 360 (5th Cir. 2008) ........................................... 21

*Wright v. Shell Offshore, Inc.*,
    No. 10-2108, 2011 U.S. Dist. LEXIS 16290 (E.D. La. Feb. 17, 2011) ................... 19

*Wyeth v. Levine*,
    129 S. Ct. 1187 (2009) .................................................... 32

*Yamaha Motor Corp. v. Calhoun*,
    516 U.S. 199 (1996) ............................................... 54, 55, 56

**STATUTES**

1 United States Code
    § 3 .................................................................. 25

28 United States Code
    § 1333 ............................................................... 23

33 United States Code
    § 1251 ............................................................... 51
    §§ 2701, *et seq.* ...................................................... 22
    § 2701(14) ........................................................... 65
    § 2701(32) ........................................................ 61, 63
    § 2701(33) ........................................................... 58
    § 2702 ........................................................... 65, 69
    § 2702(a) ........................................................ 64, 65
    § 2702(d)(1)(A) ...................................................... 62
    § 2703(a) ............................................................ 62
    § 2703(a)(3) ......................................................... 62
    § 2713 ............................................................... 62
    § 2718 ....................................................... 32, 36, 41, 47

**TABLE OF AUTHORITIES**
(continued)

Page

33 United States Code (cont.)
§ 2718(a) ................................................................................................. 34
§ 2718(c) ................................................................................... 32, 33, 89
§ 2743(c)(1) ............................................................................................. 48
§ 2751 ...................................................................................... 32, 41, 48
§ 2751(e) .............................................................................................. 32, 49

42 United States Code
§ 9601, *et seq.* ....................................................................................... 76
§ 9607(h) ................................................................................................. 76

43 United States Code
§ 1333(a) ................................................................................................. 24
§ 1333(a)(1) ...................................................................................... 22, 26
§ 1333(a)(2)(A) .............................................................................. passim
§ 1333(b) ................................................................................................. 24
§ 1349(b)(1) ..................................................................................... 22, 23

33 Code of Federal Regulation
§ 136.305 ................................................................................................. 58


Alabama Code
§ 6-11-20(a) ........................................................................................... 33

Florida Code
§ 768.72(2) ............................................................................................. 33

Florida Statute
§ 376.031(7) ........................................................................................... 89
§ 376.041 .......................................................................................... 84, 88
§ 376.12(1) ............................................................................................. 84
§ 376.205 .......................................................................................... 84, 85
§ 376.21 ................................................................................................. 84
§ 376.313 .......................................................................................... 85, 86
§§ 376.011-376.21 ................................................................................. 84
§§ 376.011, *et seq.* ......................................................................... 56, 84

Louisiana Civil Code
Article 2315 ..................................................................................... 81, 95
Article 3440 ..................................................................................... 81, 82

Louisiana Code of Civil Procedure
Article 681 ............................................................................................. 81
Article 927 ............................................................................................. 81
Article 3656 ..................................................................................... 81, 82

Louisiana Revised Statutes
§ 56:423 ................................................................................................. 83
§ 56:423(B)(1) ....................................................................................... 96
§ 9:2800.53(5) ....................................................................................... 96

## TABLE OF AUTHORITIES
### (continued)

Page

Mississippi Code Annotated
§ 11-1-65 (1)(a) ........................................................................................... 33

Tex. Civ. Prac. & Rem. Code
§ 41.003 (a) ................................................................................................. 33

## OTHER AUTHORITIES

135 Cong. Rec.
E3956-3957 (Nov. 17, 1989) ................................................. 38, 70, 71, 72
H7898-H7910 (Nov. 1, 1989) .................................................................. 72
H7954-H7978 (Nov. 2, 1989) ............................................................ passim
S9689-S9716 (Aug. 3, 1989). ................................................. 40, 71, 72, 73

136 Cong. Rec.
H6920-H6949 (daily ed. Aug. 3, 1990) ................................................... 39

H.R. Rep.
No. 99-962 (1986) (Conf. Rep.), as reprinted in 1986 U.S.C.C.A.N. 3068,
3352 ............................................................................................................ 77
No. 101-241, pt. 1: Committee on Public Works and Transportation, at 29
(Sept. 13, 1989) ......................................................................................... 74
No. 101-242, pt. 2:
Committee on Merchant Marine and Fisheries (Sept. 18, 1989) .................. 38, 39
No. 101-653 (Aug. 1, 1990) .......................................................... 39, 40, 70

S. Rep.
No. 94, 101st Cong., 1st Sess. (1989) ...................................................... 34
No. 101-94: Committee on Environment and Public Works (July 28, 1989) ........... 37, 38, 70

Maraist, Galligan & Maraist, *Admiralty in a Nutshell* 43 (6th ed. 2010) ................... 29

Thomas J. Schoenbaum, Admiralty and Maritime Law, 4th ed. (2004) ..................... 79

8 Thompson on Real Property, Thomas Edition § 68.06 (a)(1) (David A. Thomas
ed., 1994) ................................................................................................. 83

## RULES

Federal Rule of Civil Procedure
Rule 8(a)(3) ................................................................................................ 63
Rule 12 ......................................................................................... 62, 67, 68
Rule 12(b)(6) ........................................................................ 18, 20, 66, 77
Rule 12(c) ................................................................................................. 20
Rule 14(c) ................................................................................................. 59
Securities Exchange Act of 1934
Rule 10b-5 ................................................................................................ 19

**TABLE OF AUTHORITIES**
**(continued)**

Page

**TREATISES**

5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure
§ 1367 (3d ed. 1990) ............................................................................. 21

10B Charles A. Wright, Arthur R. Miller, Mary K. Kane, *Federal Practice and
Procedure*
§ 2757 (2010) ........................................................................................ 99

2 Am. Jur. 2d *Admiralty* § 102 (2010) ..................................................... 55

57A Am. Jur. 2d *Negligence* § 602 ........................................................... 68

Restatement (Second) of Property: Landlord and Tenant
§ 12.2 cmt. g  (1977) ............................................................................. 83

Restatement (Second) of Torts............................................................. 56, 79

## INTRODUCTION

Plaintiffs respectfully submit the following Omnibus Memorandum in response to the motions to dismiss filed by BP Exploration & Production Inc., BP America Production Company, and BP p.l.c. (collectively, "BP") [Doc 1440)]; Transocean Offshore Deepwater Drilling, Inc., Transocean Holdings LLC, Transocean Deepwater, Inc. and Triton Asset Leasing GmbH (collectively, "Transocean") [Doc 1390]; Halliburton Energy Services, Inc. ("Halliburton") [Doc 1429]; Cameron International Corporation ("Cameron") [Doc 1395]; Weatherford U.S., L.P. ("Weatherford") [Doc 1433]; Anadarko Petroleum Corporation, Anadarko E&P Company LP (collectively, "Anadarko") [Doc 1414]; MOEX Offshore 2007 LLC and MOEX USA Corporation (collectively, "MOEX") [Doc 1414]; and M-I LLC ("M-I"), [Doc 1589]:

MAY IT PLEASE THE COURT:

The vast majority of the issues raised in Defendants' motions to dismiss involve questions of applicable substantive law.  Because the Deepwater Horizon was a vessel in navigation that discharged oil into a navigable waterway, this case is governed by the Oil Pollution Act ("OPA") and general maritime law.  The OPA specifically preserves, and does not preempt, Plaintiffs' general maritime, state, and common law claims.  In addition, because the general maritime law is an incomplete body of law, this Court may look to state and common law to afford Plaintiffs complete and appropriate relief.  For example, Plaintiffs have stated and may maintain claims for strict products liability, for punitive damages under the general maritime law, and for damages and attorneys' fees under the Florida Pollutant Discharge Prevention and Control Act.

For these reasons, and for the reasons further provided herein, Defendants' motions to dismiss should be denied.

916087.7

## LEGAL STANDARDS

### A.   Plaintiffs' First Amended B1 Master Complaint Meets Prevailing Rule 12(b)(6) Standards.

When ruling upon a Rule 12(b)(6) motion to dismiss for failure to state a claim, such as those filed by Defendants to challenge the detailed allegations of the operative First Amended B1 Master Complaint, the Court must accept as true all well-pleaded allegations and resolve all doubts in favor of the plaintiff. *See Oppenheimer v. Prudential Sec., Inc.,* 94 F.3d 189, 194 (5th Cir. 1996); *Tanglewood E. Homeowners v. Charles-Thomas, Inc.,* 849 F.2d 1568, 1572 (5th Cir. 1988). "A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff," as this Court noted in *Who Dat Yat LLC v. Who Dat? Inc.*, 2011 U.S. Dist. LEXIS 513, at *16 (E.D. La. Jan. 4, 2011) (quoting *Lorman v. U.S. Unwired, Inc.*, 565 F.3d 228, 232-33 (5th Cir. 2009). "In other words, a motion to dismiss an action for failure to state a claim 'admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts." *Berthelot v. Boh Bros. Constr. Co.,* 2006 U.S. Dist. LEXIS 57817, at *77 (E.D. La. 2006) (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1137 (5th Cir. 1992)).

To defeat a motion to dismiss, a Plaintiff must merely "plead enough facts 'to state a claim to relief that is plausible on its face.'" *Wright v. Shell Offshore, Inc.*, No. 10-2108, 2011 U.S. Dist. LEXIS 16290, at *5-6 (E.D. La. Feb. 17, 2011) (quoting *Ashcroft v. Iqbal*, ___U.S. ___, 129 S.Ct. 1937, 1949 (2009) . This Court has observed that "[a] claim is facially plausible when the plaintiff pleads facts that allow the court to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Wright, 2011 U.S. Dist. LEXIS 16290 at *6 (quoting Iqbal, 129 S. Ct. at 1949

On March 22, 2011, the Supreme Court issued a unanimous decision in *Matrixx Initiatives, Inc. v. Siracusano*, ___ U.S. ___, 2011 U.S. LEXIS 2416 (2011), clarifying the role of a district court in applying the pleading standards of *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and reversed an order of dismissal of a 10b-5 claim. *Matrixx* reaffirms that the factual allegations in a complaint must be taken as true, that there are no "bright line" pleading requirements under *Twombly/Iqbal*, and that the functional test is whether the complaint, taken as a whole, raises "a reasonable expectation that discovery will reveal evidence" that could enable the ultimate trier of fact, weighing contested evidence and opinions and making the allowable inferences, to decide the case for plaintiffs. 2011 U.S. LEXIS 2416, at *34 (citing, *Twombly*, 550 U.S. at 556). In *Matrixx*, the defendant drug manufacturer argued that its nondisclosure to the market of facts suggesting a link between its product Zicam Cold Remedy and the disease anosmia (loss of smell) in users could not, as a matter of law, be material without a statistically significant study or data linking the medication to the disease. *Id.* at *7. But, the Supreme Court reasoned, even anecdotal reports of the problem, concerns voiced by doctors, and the existence of some lawsuits could be enough to alter the total mix of information a reasonable investor would consider important in her investment decision-making—a call, ultimately, for the trier of fact. *Id.* at *35-36, *39. *Matrixx* rejects "bright line" standards of specific pleading requirements as dysfunctional, as they "must necessarily be over-inclusive or under-inclusive." *Id.* at *20. Hence *Matrixx* recognizes that the ultimate proof of liability elements, such as materiality and causation, require considerations, often complex and nuanced, of source, content, and context that go beyond what can or should be required in a pleading. *See id.*, at **34-38. Reviewing "all the allegations holistically," as *Matrixx* directs, *id.* at *38, Plaintiffs have stated facially plausible

claims that "raise a reasonable expectation that discovery will reveal evidence" to support their claims at trial. *Id.* at *34 (quoting *Twombly*, 550 U.S. at 556).

> **B.**    **Plaintiffs' First Amended B1 Master Complaint Meets Prevailing Rule 12(b)(1) Standards**

"A Rule 12(b)(1) motion should be granted only if it appears certain that the plaintiff cannot prove a plausible set of facts that establish subject-matter jurisdiction." *Davis v. U.S.,* 597 F.3d 646, 649 (5th Cir. 2009) (quoting *Castro v. United States*, 560 F.3d 381, 386 (5th Cir. 2009)). "[T]he standard of Rule 12(b)(1) . . . while similar to the standard of Rule 12(b)(6), permits the court to consider a broader range of materials in resolving the motion." *Martin v. Halliburton,* 618 F.3d 476, 481 (5th Cir. 2010) (quoting *Williams v. Wynne,* 533 F.3d 360, 365 n.2 (5th Cir. 2008)).

> **C.**    **Plaintiffs' First Amended B1 Master Complaint Is Not Susceptible to Rule 12(b)(c) Judgment on the Pleadings**

A Rule 12(c) motion for judgment on the pleadings can be filed by any party at any time, provided submission of the motion does not delay the trial. "A motion brought pursuant to Fed. R. Civ. P. 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Hebert Abstract Co. v. Touchstone Props., Ltd.,* 914 F.2d 74, 76 (5th Cir. 1990) (per curiam) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1367, at 509-10 (3d ed. 1990)). As with a Rule 12(b)(6) motion, a court will view the complaint in the light most favorable to the non-moving party when determining if the complaint states a valid claim of relief. *Hughes v. Tobacco Institute,* 278 F.3d 417, 420 (5th Cir. 2001) (quoting *St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425, 440 n.8 (5th Cir. 2000)). "Pleadings should be construed liberally" and the motion determined solely on questions of law. *Id.* (citing *Voest-Alpine Trading USA Corp. v. Bank of China,* 142 F.3d 887, 891 (5th Cir.

1998)).  "In analyzing the complaint, we will accept all well-pleaded facts as true . . ."  *Jones v. Greninger,* 188 F.3d 322, 324 (5th Cir. 2000) (per curiam) (citing *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996)).  The proper inquiry is not whether the plaintiff will prevail at trial but rather whether plaintiff "is entitled to offer evidence to support his claim."  *Id.*

## LEGAL ARGUMENT

## I.    FEDERAL MARITIME LAW IS APPLICABLE TO PLAINTIFFS' CLAIMS.

Determining the substantive law applicable to Plaintiffs' claims in this case requires an examination of the interplay of the Outer Continental Shelf Land Act, 43 U.S.C. § 1349(b)(1), 43 U.S.C. § 1333(a)(1), and § 1333(a)(2)(A) ("OCSLA"); the Oil Pollution Act, 33 U.S.C. §§ 2701, *et seq.* ("OPA"); and federal maritime law.  Because the Deepwater Horizon disaster and resulting oil spill ("the Spill") took place on the Outer Continental Shelf of the United States, it is appropriate to begin the analysis with a review of OCSLA's jurisdictional and substantive law provisions.  The argument that Louisiana state law should be exclusively applied as surrogate federal law under OCSLA, as has been raised by some defendants, confuses three separate and unrelated tests—namely, the tests (1) for the application of OCSLA jurisdiction, (2) for state law to apply as surrogate federal law under OCSLA, and (3) for the application of admiralty jurisdiction and substantive maritime law.  In order to address these arguments, we first set forth the legal framework for the interaction among these statutes.

### A.    An Accurate Roadmap:  OCSLA's Key Provisions, Admiralty Jurisdiction, and the *PLT* Test.

The pertinent provisions of OCLSA are contained in 43 U.S.C. § 1349(b)(1) (judicial jurisdictional provision), § 1333(a)(1) (assertion of federal sovereignty), and § 1333(a)(2)(A) ("surrogate federal law" provision).  As this Court indicated in another claim arising out of this disaster, the judicial jurisdictional provision is completely independent of, and much broader in

- 21 -

scope than, the test used to determine what substantive law applies under OCSLA. *See In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 2010 WL 3943451 at *3 (E.D. La. Oct. 6, 2010). All that is required for OCSLA judicial jurisdiction under § 1349(b)(1) is that the event occurred on the Outer Continental Shelf ("OCS"), which is defined as all submerged lands bordering the United States that are more than three miles from the coast, and that the event arose out of or related to mineral production. *Id.*

Given its breadth of coverage, Section 1349(b)(1) encompasses a wide range of activities that also fall within the coverage of the federal courts' admiralty jurisdiction under 28 U.S.C. § 1333. Indeed, in OCS litigation, Section 1349(b)(1) and federal maritime law frequently overlap and provide concurrent bases for jurisdiction. *See, e.g., Recar v. CNG Prod. Co.,* 853 F.2d 367, 369 (5th Cir. 1988) (noting "[t]he district court may well have both admiralty jurisdiction under the general maritime law and federal question jurisdiction by virtue of OCSLA."); *Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 156 (5th Cir. 1996) (same); *Strong v. B.P. Exploration & Production, Inc.*, 440 F.3d 665, 669-70 (5th Cir. 2006) (holding that the plaintiff properly pleaded jurisdiction under § 1349(b)(1) but that the case also fell within admiralty jurisdiction and was therefore governed by federal maritime law).

Unlike the broad scope of OCSLA jurisdiction, the test for determining what substantive law applies under OCSLA, as set forth in § 1333(a)(2)(A), is far more restrictive. Under that provision, "federal law [which means, predominantly, federal maritime law] governs . . . to the extent that there is applicable federal law; however, if there is a gap in the federal law, the law of the adjacent state is used as a gap-filler and becomes surrogate federal law." *Bartholomew v. CNG Producing Co.,* 862 F.2d 555, 557 (5th Cir. 1989).

It is well settled in the Fifth Circuit that for state law to apply as surrogate federal law under OCSLA (§ 1333(a)(2)(A)), the three conditions outlined in *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.,* 895 F.2d 1043 (5th Cir. 1990) ("*PLT*") must be met.  The three *PLT* conditions are:  "(1) the controversy must arise on a situs covered by OCSLA (i.e., the subsoil, seabed, or artificial structures permanently or temporarily attached thereto), (2) federal maritime law must not apply of its own force, and (3) the state law must not be inconsistent with Federal law."  *PLT Engineering,* 895 F.2d at 1047.  All three of these conditions must be met for adjacent-state law to apply as surrogate federal law under OCSLA.  *Id.*; *see also Grand Isle Shipyard, Inc. v. Seacor Marine, LLC,* 589 F.3d 778, 783 (5th Cir. 2009) (*en banc*).  If all three conditions are not met, federal maritime law applies.  *Id.*

**B.     The Claims At Issue Do Not Fall Within The *PLT* Test.**

**1.     *PLT* Factor #1:  The M/V Deepwater Horizon Was Not an OCSLA "Situs."**

The Supreme Court and the Fifth Circuit have held that 43 U.S.C. § 1333(a) creates a "situs" requirement for the application of surrogate state law under OCSLA.  *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 219-20 (1986); *Demette v. Falcon Drilling Co.,* 280 F.3d 492, 496 (5th Cir. 2002).[1]  The Fifth Circuit has conclusively stated that the "situs" required to trigger OCSLA refers to the location of the injury.  *See, e.g., Demette,* 280 F.3d at 496 (stating that "[f]irst, we must determine whether the injury occurred on an OCSLA situs . . ."); *Mills v. Director, Office of Workers' Compensation Programs,* 877 F.2d 356, 357 (5th Cir. 1989) (*en banc*) (holding that the applicability of § 1333(b) is limited to the "situs" of injury).  In its most

---

[1] *Demette* was overruled in part on other grounds in *Grand Isle Shipyard v. Seacor Marine, Inc.,* 589 F.3d at 788-89 n.8 (5th Cir. 2009) (*en banc*).

recent *en banc* decision addressing OCSLA, the Fifth Circuit summarized the governing law as follows:

> [I]n a tort action, *Rodrigue* [*v. Aetna Cas. & Sur. Co.*, 395 U.S. 352 (1969)] illustrates that the OCSLA situs requirement is met if the tort occurs on a platform or other OCSLA covered situs as provided in § 1333(a)(2)(A). . . .   The converse is also equally clear.  In a tort action, if the tort occurs on navigable water instead of a fixed platform (or other structure attached to the seabed), the OCSLA situs requirement is not met.

*Grand Isle Shipyard*, 589 F.3d at 784 (holding that *Rodrigue* and *Tallentire* provide the "situs" rule for tort cases).

Defendants' effort to characterize the Deepwater Horizon as an OCS situs for purposes of *PLT* factor # 1 thus ignores this dispositive line of Fifth Circuit jurisprudence.  It is indisputable that the Deepwater Horizon was a *vessel* for all maritime-law purposes.[2]  It is also clear that during its operations in connection with the Macondo well, the Deepwater Horizon was never attached to the ocean floor; instead, it stabilized itself by using complex "thruster" technology and was connected to nothing at all, except—via a 5,000-foot long riser pipe—the wellhead. Therefore, Fifth Circuit precedent makes clear that the Deepwater Horizon was well outside the scope of 43 U.S.C. § 1333(a)(2)(A), which limits the applicability of adjacent-state law to events occurring on "the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon."  *See Sanamo v. Trico Marine Services, Inc.,* 73 Fed. Appx. 79, 2003 WL 21756647, at *3 (5th Cir. 2003) (noting that "[a] jack-up rig that is not jacked up . . .

---

[2]  *See Stewart v. Dutra Const. Co.*, 543 U.S. 481, 489-90 (2005) (holding that 1 U.S.C. § 3 "suppl[ies] the default definition of *vessel* throughout the U.S. Code . . . [and] codifie[s] the meaning that the term *vessel* had acquired in general maritime law."); 1 U.S.C. § 3 (stating "[t]he term *vessel* includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."); *see also Demette*, 280 F.3d at 498 n.18 (stating that it "is beyond dispute . . . that special-purpose movable drilling rigs . . . are vessels within the meaning of admiralty law").

does not necessarily constitute an OCS situs.  . . .[A] jack-up rig is a floating rig that can be towed to a particular site.  Until it is attached to the seabed and erected, it cannot be considered an OCSLA situs."); *United States v. Pickett*, 598 F.3d 231, 236 (5th Cir. 2010) (Clement, J., concurring) (stating that "for a rig or platform to be [covered by OCSLA] it must be 'erected' upon the Outer Continental Shelf . . .; OCSLA does not apply to vessels that float on the water.") and holding that a pipelay barge that "drops eight large anchors to stabilize its position . . . is not erected on the OCS" so as to be covered by § 1333(a)(1)); *Demette*, 280 F.3d at 499-500 (noting that a drilling rig tender, "attached to the OCS only by an anchor," was not an OCSLA situs). Accordingly, it is clear that the first *PLT* factor cannot be met in this case.

> ### 2.     *PLT* Factor # 2:  Maritime Law Applies "of Its Own Force."
>
> #### a.     If there is jurisdiction over an OCS event, maritime law applies of its own force.

Generally speaking, "with admiralty jurisdiction comes the application of substantive admiralty law."  *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 865 (1986).  In OCSLA litigation, this generalization is invariably true.  *See Strong,* 440 F.3d at 668-70 (addressing *PLT* factor # 2 by conducting an admiralty jurisdiction inquiry and concluding: "[b]ecause *Strong* has alleged a traditional maritime tort, federal maritime law applies of its own force, precluding incorporation of state law under OCSLA"); *see also Hodgen v. Forest Oil Corp.,* 87 F.3d 1512, 1524-25 (5th Cir. 1996) (stating that "whether a contract is maritime [for admiralty jurisdiction purposes] and whether maritime law applies of its force [for purposes of *PLT* factor # 2] [are] identical . . . inquiries."); *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1229 (5th Cir. 1985) (noting that "where admiralty and OCSLA jurisdiction overlap, the case is governed by maritime law"); *Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 350 (5th Cir. 1999) (stating "[b]ecause OCSLA does not displace general maritime law,

- 25 -

substantive maritime law continues to govern where both OCSLA and general maritime law could apply"); *Tenn. Gas Pipeline*, 87 F.3d at 154 (holding "where OCSLA and general maritime law both could apply, the case is to be governed by maritime law"); *Smith v. Penrod Drilling Co.*, 960 F.2d 456, 459 (5th Cir. 1992) (stating "[w]hen an event occurs on an OCSLA situs but also is governed by maritime law, maritime law controls.").[3]   Therefore, it is clear that admiralty jurisdiction exists in this case.[4]

> **b.    On the basis of the Supreme Court's *Grubart* decision, admiralty jurisdiction is incontestable here.**

The admiralty tort jurisdiction formula laid out in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.* is as follows:

> [A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity.  A court applying ***the location test*** must determine whether the tort occurred on navigable water. .... the connect test raises two issues. A court, first, must assess the general features of the type of incident involved to determine whether the incident has a ***potentially disruptive impact on maritime commerce***.  Second, a court must determine whether the general character of the activity giving rise of the incident shows a ***substantial relationship to traditional maritime activity***.

513 U.S. 527, 534 (1995)  (citation and internal quotation marks omitted) (emphasis added).

---

[3] *Hodgen* and *Smith* were overruled in part on other grounds in *Grand Isle Shipyard,* 689 F.3d at 788-89.

[4] In responding to the Motions to Dismiss the Amended B1 Master Complaint, Plaintiffs take no position regarding the law that would be applicable where a plaintiff seeks to invoke jurisdiction on some basis other than the admiralty or maritime jurisdiction of the Court.

**(1)    The location requirement**

The location test, which is satisfied when the tort occurs on navigable water, is readily satisfied in this case.  It is undisputed that the oil that spilled into the Gulf of Mexico occurred as a result of the blowout, explosions, and fire aboard the Deepwater Horizon while it was located in the Gulf of Mexico, afloat on almost mile-deep water and more than forty miles from the nearest coastline, and that the Spill has caused property damage, economic loss and personal injury.  Further, the Deepwater Horizon certainly was a vessel in navigation.  *See, e.g., Demette,* 280 F.3d at 498 (noting "[t]his [C]ircuit has repeatedly held that special-purpose movable drilling rigs, including jack-up rigs, are vessels within the meaning of admiralty law").  Therefore, the location requirement for maritime jurisdiction is met.

**(2)    The "potential disruption" requirement**

The second *Grubart* requirement is that the incident involved must have been of a sort with the potential to disrupt maritime commerce.  *Grubart*, 513 U.S. at 534.  There is no question that the Deepwater Horizon explosion and resulting Spill has caused actual, severe, and lasting disruption of maritime commerce of a virtually unprecedented scope.

**(3)    The "substantial relationship" requirement**

The final requirement—of a substantial relationship to traditional maritime activity—is also met.  The inquiry here is whether any of the tortfeasors were involved in traditional maritime activity.  *Grubart* spells this out as follows:

> [W]e need to look only to whether *one* of the arguably proximate causes of the incident originated in the maritime activity of a tortfeasor: as long as *one* of the putative tortfeasors was engaged in traditional maritime activity, the allegedly wrongful activity will "involve" such traditional activity and will meet the second nexus prong.

*Id.* at 541 (emphasis added); *see also Scarborough v. Clemco Indus.*, 391 F.3d 660, 665 (5th Cir. 2004) (same, quoting *Grubart*, 513 U.S. at 541); *Raffray v. Gulf Logistics, LLC*, 2010 WL 5055849, at *3 (E.D. La. 2010) (same); Maraist, Galligan & Maraist, *Admiralty in a Nutshell* 43 (6th ed. 2010) (same).

The *Grubart* ruling that *one maritime tortfeasor* is sufficient for maritime activity is determinative of the existence of admiralty jurisdiction here, as it is irrefutable that Defendants were engaged in a traditional maritime activity when operating the Deepwater Horizon.  As explained above, courts in the Fifth Circuit have repeatedly held that drilling and exploring by vessels such as the Deepwater Horizon constitute traditional maritime activity.

The courts have drawn a distinction between oil and gas drilling conducted from vessels versus those same activities performed from fixed platforms, recognizing that when those activities are performed from vessels such as the Deepwater Horizon, they are traditional maritime activities sufficient to invoke the application of maritime law (whereas when performed from a fixed platform, they are not).  *See, e.g., Hufnagel,* 182 F.3d at 352-53 (noting the distinction between tort claims arising on fixed platforms in which admiralty law does not apply and claims arising on drilling vessels in which admiralty law does apply); *see also Theriot v. Bay Drilling Corp.,* 783 F.2d 527, 538-39 (5th Cir. 1986) ("Oil and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce."); *Strong*, 440 F.3d at 669 (holding that a liftboat, although jacked up and not "under sail," qualifies as a vessel on navigable waters thereby satisfying the location requirement of *Grubart*); *Demette*, 280 F.3d at 498 (same); *Pippen v. Shell Oil Co.,* 661 F.2d 378, 384 (5th Cir. 1981) (recognizing that offshore drilling of oil and natural gas from the sea bottom is maritime commerce when performed from a vessel).

Here Defendants' activities bore a "substantial relationship to traditional maritime activity." *Grubart*, 513 U.S. at 539. Offshore drilling has been central to admiralty jurisdiction and maritime law for more than 50 years. *See, e.g.*, *Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir. 1959). The Supreme Court recently confirmed that it still remains the case in the 21st century. *See Stewart v. Dutra Const. Co.*, 543 U.S. 481 (2005). Moreover, Defendants do not claim that the Deepwater Horizon was not a vessel or that the Deepwater Horizon's blowout preventer, cement, or float collar were not components to the accomplishment of the Deepwater Horizon's mission.[5]

The cases Defendants rely upon for the argument against admiralty jurisdiction cannot bear the weight. *See Herb's Welding, Inc. v. Gray*, 470 U.S. 414 (1985); *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352 (1969); and *Texaco Exploration and Prod., Inc. v. AmClyde Engineered Prods. Co., Inc.*, 448 F.3d 760 (5th Cir. 2006). Both *Rodrigue* and *Herb's Welding* involved personal injuries that occurred on fixed locations, not on vessels in navigation, thereby failing to satisfy the location test. *Rodrigue*, 395 U.S. at 352 (artificial island); *Herb's Welding*, 470 U.S. at 415 (fixed platform). In *Texaco*, the plaintiffs did not make claims against any party that was engaged in traditional maritime activity. 448 F.3d at 774. Instead, *Texaco*

---

[5] Plaintiffs note that *Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co.*, 644 F.2d 1132 (5th Cir. 1981), which has sometimes been cited for the erroneous proposition that blowout preventers are generally outside the reach of admiralty and maritime law, is inapposite. *Sohyde* concerned property damage from an accident involving a "submersible drilling barge . . . resting on the bottom of a dead-end dredged canal slip in Louisiana." *Id.* at 1133. In finding no admiralty jurisdiction, the *Sohyde* court relied on a case that the Supreme Court has subsequently disapproved. *See id.* at 1136 (citing *Kelly v. Smith*, 485 F.2d 520 (5th Cir. 1973)); *but see Grubart*, 513 U.S. at 544 (abrogating *Kelly*). The Fifth Circuit itself has repeatedly criticized or narrowly limited *Sohyde*. *See, e.g., Domingue v. Ocean Drilling and Exp. Co.*, 923 F.2d 393, 397 n. 9 (5th Cir. 1991); *see also Broughton Offshore Drilling, Inc. v. S. Cent. Machine, Inc.*, 911 F.2d 1052-53 (5th Cir. 1990); *Houston Oil and Minerals Corp. v. Am. Int'l Tool Co.*, 827 F.2d 1053-54 (5th Cir. 1987). Most importantly, the *Sohyde* court said that the restrictive view it took of admiralty jurisdiction would not be appropriate in actions "for personal injuries under the Jones Act or maritime law." *Sohyde*, 644 F.2d at 1136.

involved a suit by the lessees of an offshore federal lease against a land-based company that designed and manufactured a crane that failed during the construction of a fixed platform (causing a deck module to fall into the sea), as well as the company that was charged with designing and constructing the platform. Id. at 765. In short, if the claimant in *Texaco* had sued the owner or operator of a vessel, (as Plaintiffs have in this case), admiralty jurisdiction would have applied.[6]

Accordingly, the law of the adjacent State does not apply exclusively by virtue of the OCLSA to all claims;[7] rather, the Court's jurisdiction is founded (at least in part) upon admiralty jurisdiction, and federal maritime law is applicable to claims.

## II. THE OPA DOES NOT PREEMPT PLAINTIFFS' MARITIME OR STATE LAW CLAIMS.

The Oil Pollution Act of 1990 expressly provides that, "except as otherwise provided in this Act, this Act does **not** affect (1) admiralty and maritime law; or (2) the jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."

---

[6] It bears repeating that OCSLA's surrogate federal law provision, 43 U.S.C. § 1333(a)(2)(A), is not applicable here. Accordingly, the demonstration above that (a) state law cannot apply to an OCSLA case falling within admiralty jurisdiction and (b) admiralty jurisdiction is present here means that the restrictions on First Am. B1 Master Bundle Plaintiffs' rights that the Defendants purport to find in Louisiana law are irrelevant.

[7] If the court were to decide that an "adjacent" state law applies, a significant question would then arise—namely, which state is the "adjacent" one for Section 1333(a)(2)(A) purposes. Defendants' assumption that the "adjacent" state is Louisiana is somewhat blithe. *Snyder Oil Corp. v. Samedan Oil Corp.*, the Fifth Circuit treated the "adjacency" inquiry as follows: "we ... considered four types of evidence in the "adjacency" analysis: (1) geographic proximity; (2) which coast federal agencies consider the subject platform to be "off of"; (3) prior court determinations; and (4) projected boundaries." 208 F.3d 521, 524 (5th Cir. 2000) (citing *Reeves v. B & S Welding, Inc.*, 897 F.2d 178 (1990)). Obviously, three of the four *Snyder/Reeves* factors are questions of fact and are not ripe for consideration at the complaint-dismissal stage. In addition, the OPA's savings clause, as discussed in Section II below, preserves Plaintiffs' access to favorable state law that may have otherwise been displaced by general maritime law or OCSLA.

33 U.S.C. § 2751(e)  (emphasis supplied).  While, admittedly, some courts have (with all due respect, erroneously) determined that general maritime law claims might be preempted to the extent that the damages sought fall within the specifically enumerated provisions of the OPA,[8] even those decisions recognize that the OPA has no effect on claims for damages or other relief which are not covered under the OPA.[9]

Indeed, the OPA contains within it a second savings clause, which provides that nothing within the OPA "shall in any way affect, or be construed to affect, the authority of the United States ... (1) to impose additional liability or additional requirements; or (2) to impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law; relating to the discharge, or substantial threat of a discharge of oil."  33 U.S.C. § 2718(c); *see, e.g.*, *U.S. v. Egan Marine Corp.*, No. 08-3160, 2009 WL 855964, at *3 (N.D. Ill. March 30, 2009) (plaintiff may pursue claims under both the OPA and the Rivers and Harbors Act); *U.S. v. M/V Cosco Busan*, 557 F. Supp. 2d 1058, 1063 (N.D. Cal. 2008) (plaintiff may

---

[8] The decisions supporting OPA preemption seem to rely heavily upon snippets of legislative history, without giving due deference to the express terms of the OPA itself.  In addition to the express savings provisions contained with 33 U.S.C. §§ 2718 and 2751, the OPA does not expressly purport to provide a "comprehensive" remedial scheme, nor state that the damages provided in § 2702 shall be "exclusive," nor purport to expressly preempt or invalidate any other law or regulation; indeed, the limitation provided in § 2704 (which is not available in the event of gross negligence, violation of a federal Regulation, or failure to provide all reasonable cooperation and assistance) only applies to a "responsible party" and only to those damages provided in § 2702.  Moreover, there is no actual conflict in applying OPA's strict liability regime as to the responsible party, while also providing for additional admiralty, Maritime, federal Statutory and/or state law remedies, where negligent, grossly negligent, wanton or willful conduct is alleged and/or shown. *See generally*, *Wyeth v. Levine*, 129 S. Ct. 1187 (2009) (no FDA preemption of failure-to-warn claims); *Altria v. Good*, 129 S. Ct. 538 (2008) (no FDA or FTC preemption of deceptive trade practices claims); *Baker*, 554 U.S. at 489) ("we see no clear indication of congressional intent to occupy the entire field of pollution remedies").

[9] *See, e.g.*, *Garbarick v. Larin (Am.) Maritime*, 623 F. Supp. 2d 741, 748 (E.D. La. 2009) ("OPA expressly leaves claims not addressed by the Act to general maritime and admiralty law"); *see also, National Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*, 924 F. Supp. 1436, 1447 (E.D. Va. 1996) (Section 2751 "preserves admiralty claims which are not addressed in OPA"), *aff'd*, 122 F.3d 1062 (4th Cir. 1997).

- 31 -

pursue claims based on the Clean Water Act and other federal statutes in addition to the OPA, even when seeking to recover the same damages).

Even *assuming* arguendo that strict liability claims against BP for removal costs and damages were preempted by the OPA, there is no basis for the preemption of general maritime law claims for punitive damages under *Exxon v. Baker*[10]—nor for compensatory or punitive damage claims against other parties, such as Transocean, Cameron, or Halliburton, who are not rendered strictly liable to a broad and expansive class of plaintiffs by operation of the OPA.

It is also clear that the OPA does not preempt the available state law claims for punitive damages.[11]  In addition to Section 2718(c),[12] noted above, the OPA expressly provides that nothing within the OPA shall "affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to the discharge of oil or other pollution by oil within such State" or

---

[10] *See Exxon Shipping Co. v. Baker*, 556 U.S. 471, 484-89 (2008) (Clean Water Act does not preempt claim for punitive damages, which is available under the general maritime law); *see also*, *Atl. Sounding Co. v. Townsend*, 129 S. Ct. 2561, 2569 (2009) (recognizing that "punitive damages have long been an available remedy at common law for wanton, willful, or outrageous conduct," and that the remedy "extended to claims arising under federal maritime law").

[11] The state laws under which Plaintiffs seek to punish and deter Defendants' willful, reckless, and otherwise reprehensible conduct allow the award of punitive damages upon proof of such conduct, motivation, or intent.  An award of punitive damages in these states is appropriate if Plaintiffs can show by "clear and convincing evidence" that the Defendants "consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." Ala. Code, § 6-11-20(a); *see also* Fla. Code, § 768.72(2) ("[I]ntentional misconduct or gross negligence."); *Miss. Code Ann*. § 11-1-65 (1)(a)("[A]ctual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud."); *Tex. Civ. Prac. & Rem. Code* § 41.003 (a) ("(1) fraud; (2) malice; or (3) gross negligence.").   Here, Plaintiffs have alleged that Defendants' conduct was willful, wanton, oppressive, malicious, reckless, and grossly negligent.  (Am. B1 Master Compl. ¶¶ 202, 469, 628-36, 656, 675, 683, 705-707, 731, 748-69.)

[12] "Nothing in this chapter shall in any way affect, or be construed to affect, the authority of ... any State or political subdivision thereof (1) to impose additional liability or additional requirements; or (2) to impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law; relating to the discharge, or substantial threat of a discharge of oil."  33 U.S.C. § 2718(c).

- 32 -

"affect or modify in any way the obligations or liabilities of any person under ... State law, including common law." 33 U.S.C. § 2718(a); *see, e.g.*, *U.S. v. Locke*, 529 U.S. 89, 105-106 (2000) (noting that the OPA was not intended to preempt state law); *Isla Corp v. Sundown Energy LP*, No. 06-8645, 2007 WL 1240212, at *2 (E.D. La. April 27, 2007) ("OPA does not preempt Plaintiff's state law claims"); *U.S. v. Bodenger*, No. 03-0272, 2003 WL 22228517, at *3 (E.D. La. Sept. 25, 2003) ("OPA's savings provisions expressly preserve state authority to impose additional liability"); *Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859, 863 (E.D. La. 2001) (the OPA does not preempt state law in the area of oil spill liability and compensation).

That the OPA would act as a shield to insulate persons or entities that would have been otherwise liable for compensatory and/or punitive damages under existing law seems incomprehensible given the purpose and intent of the OPA.  As noted in *Bodenger*, the OPA was passed by Congress in response to then-existing federal and state laws that were deemed to provide inadequate remedies, and to present substantial barriers to victims' recoveries such as legal defenses, corporate forms, and burdens of proof unfairly favoring those responsible for the spills.  "Congress' intent is manifest, that the new law would effect compensation for victims, quick and efficient cleanup with minimization of damages to natural resources, and the internalization of the costs of oil spills within the oil industry."  *Bodenger*, 2003 WL 22228517, at *3 (citing S. Rep. No. 94, 101st Cong., 1st Sess. (1989); 1990 U.S.C. 722).

Taking Defendants' argument to its logical extension, for example, the general damage claims of a Jones Act Seaman would have to be dismissed, pending the presentment of his economic loss claims to BP under the OPA.  This is certainly not what Congress could have intended.

For these reasons, and for the reasons further outlined below, neither general maritime law claims nor state law claims are preempted.

> A.   **The Plain Language of the OPA Expressly Saves (and Does Not Preempt) both State Law and General Maritime Law.**

In order for a statute to abrogate a common law principle, the statute must speak directly to the question addressed by the common law. *See Baker*, 554 U.S. at 489 (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)). Federal statutes are typically found to preempt state law only where: (1) Congress evidences an intent to occupy a given field; (2) it is impossible to apply both laws without direct conflicts, or the state law interferes with the purposes and objectives of Congress. *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984); *see also Baker*, 554 U.S. at 489 (applying a similar test to determine if a federal statute displaces general maritime law).

The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil*, 519 U.S. 337, 340 (1997). Inquiry into statutory history is inappropriate if the statutory language is unambiguous and "the statutory scheme is coherent and consistent." *Id.* The plain language of the OPA expressly provides that it does not preempt the imposition of additional liabilities under state law, including common law:

> Relationship to other law
>
> (a) Preservation of State authorities; Solid Waste Disposal Act. Nothing in this Act or the Act of March 3, 1851 shall—
>> (1) affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to—
>>> (A) the discharge of oil or other pollution by oil within such State; or
>>> (B) any removal activities in connection with such a discharge; or

> (2) affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) or State law, including common law.

33 U.S.C. § 2718.  Section 2718 also provides that nothing in the OPA should be construed to affect the ability of the United States or any state to impose additional liability or civil penalties for any violation of the law relating to the discharge of oil:

> (c) Additional requirements and liabilities; penalties. Nothing in this Act, the Act of March 3, 1851 (46 U.S.C. 183 et seq.), or section 9509 of the Internal Revenue Code of 1986 (26 U.S.C. 9509), shall in any way affect, or be construed to affect, the authority of the United States or any State or political subdivision thereof—
> (1) to impose additional liability or additional requirements; or
> (2) to impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law; relating to the discharge, or substantial threat of a discharge, of oil.

*Id.*  Moreover, the OPA expressly provides that admiralty and maritime laws are not affected except as otherwise provided in the act:

> Savings provisions
>
> (e) Admiralty and maritime law. Except as otherwise provided in this Act, this Act does not affect—
> (1) admiralty and maritime law; or
> (2) the jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

*Id.* at § 2751.  Examining the plain language of the OPA explicitly demonstrates that Congress did not intend to occupy the field of recovery for oil spills.  The statute, on its face, states that "this Act does not affect admiralty and maritime law . . . saving to suitors in all cases all other remedies to which they are otherwise entitled."  *Id.*

- 35 -

**B.    The Legislative History Confirms That The OPA Does Not Preempt State Law Or The General Maritime Law.**

While the plain language of the OPA does not warrant resorting to the statute's legislative history, the legislative history of the OPA lays to rest any lingering doubt as to whether the OPA preempts any state law or maritime law.  Indeed, whether the OPA would preempt state law was one of the more debated issues during the bill's drafting, with a clear Congressional declaration against preemption.

Congress vigorously debated whether the OPA would preempt state law.[13]  In fact, the House and the Senate's inability to reach an agreement on preemption prevented earlier versions of the bill from passing.  The principal argument in favor of preemption was that "[t]he whole idea of a Federal oil spill legislation is to have one coordinated and one comprehensive legislation, not a patchwork of State and Federal laws which have turned out to be inadequate." *See, e.g.*, 135 Cong. Rec. H7954-H7978, at H7977 (Nov. 2, 1989) (statement of Rep. Frenzel).  Proponents of preemption also argued that small businesses that transport oil would not be able to operate if faced with state laws allowing unlimited liability.

Opponents of preemption responded that oil companies had operated for years in the 17 states that allowed unlimited liability, and there was no evidence to suggest that the OPA would serve as an additional deterrent to irresponsible conduct.[14]  Opponents of preemption also made

---

[13]   S. Rep. No. 101-94: Committee on Environment and Public Works, at 17 (July 28, 1989) ("Preemption has been discussed by the members of the Committee more than any other single issue."); *see infra* notes 2-10.

[14] S. Rep. No. 101-94: Committee on Environment and Public Works, at 7 (July 28, 1989)  ("It is sometimes argued that liability must be limited in order for the owner or operator to afford reasonably priced insurance coverage.  Some arguments are so extreme as to suggest that tankship companies and offshore producers would not operate in an atmosphere of 'unlimited' risk.  But these claims are totally unfounded.  Even in the 17 States without liability limits, oil shipping and producing companies are not refusing to do business.  None of the testimony *Footnote continued on next page*

916087.7

the point that the bill should not preempt state law because, *inter alia*, stricter state standards would ensure that victims are compensated fully for their injuries and would enhance clean-up efforts.[15]

In further arguing against preemption, members of Congress noted that preemption would "violate[] a longstanding tradition that Federal environmental laws should not preempt state laws. For this reason, the Clean Water Act does not preempt; the Superfund law does not preempt; and Federal oil pollution laws—including those governing outer Continental Shelf, the trans-Alaska pipeline and deepwater ports do not preempt." H.R. Rep. No. 101-242, pt. 2: Committee on Merchant Marine and Fisheries, at 150 (Sept. 18, 1989).[16]

In the end, the preemption opponents prevailed: both houses passed bills that did not preempt state law claims. The Conference Report summarized that "Section 106 of the Senate amendment and section 1018 of the House bill are generally similar provisions preserving the

---

*Footnote continued from previous page*

received by the Committee contained evidence that any shipper or producer has avoided these 17 States or has chosen to quit the business.").

[15] S. Rep. No. 101-94: Committee on Environment and Public Works, at 7 (July 28, 1989) ("Of the 24 States with oil spill liability and compensation laws, 17 of them have liability without specified limits. This is based on two widely accepted principles: a polluter should pay in full for the costs of oil pollution caused by that polluter; and, a victim should be fully compensated."); *see also* 135 Cong. Rec. H7954-H7978, at H7975 (Nov. 2, 1989); S. Rep. No. 101-94: Committee on Environment and Public Works, at 7 (July 28, 1989); H.R. Rep. No. 101-242, pt. 2: Committee on Merchant Marine and Fisheries, at 150 (Sept. 18, 1989).

[16] *See also* S. Rep. No. 101-94: Committee on Environment and Public Works, at 6 (July 28, 1989) (noting that "[m]ore stringent State laws are specifically preserved in the Clean Water Act," the Deepwater Port Act, title III of the Outer Continental Lands Act Amendments of 1978, and the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (the toxic chemical "Superfund" law) and its amendments); 135 Cong. Rec., E3956-3957, at E3956 (Nov. 17, 1989) (remarks by Rep. Unsoeld) ("The bill passed by the House sets out a single federal standard of liability as necessary minimum. This is the same approach taken in the Clean Air Act, Clean Water Act, Superfund, and even the four existing federal oil spill laws that we are attempting to consolidate here today. None of these federal laws, however, preempts the authority of a State to impose stricter standards. Federal law does not prohibit States from requiring cleaner water, cleaner air, or safer hazardous waste disposal. Why should the policy be different for oil pollution?").

authority of any State to impose its own requirements or standards with respect to discharges of oil within that State."  H.R. Rep. No. 101-653, at 121 (Aug. 1, 1990) (Conf. Rep.).  The Conferees "agreed to preserve the right of States to establish their own liability and compensation systems," providing to coastal states "the freedom to impose standards that reflect the importance of the resources at risk."  136 Cong. Rec. H6920-H6949, at H6934 (daily ed. Aug. 3, 1990) (statement of Rep. Lowey).  Thus, the history shows that Congress carefully considered whether or not to preempt state law, and that Congress ultimately rejected such preemption.

While the legislative history underlying the OPA's preservation of maritime laws is less voluminous, it still leads to the conclusion that maritime law is not preempted.  The Conference Report explains that the Senate bill had "no savings provision regarding admiralty and maritime laws or jurisdiction," but the House bill clarified that it did "not affect admiralty and maritime law or the jurisdiction of the District Courts of the United States with respect to civil actions under admiralty and maritime jurisdiction, saving to suitors in all cases other remedies to which they are otherwise entitled."  H.R. Rep. No. 101-653, at 159 (Aug. 1, 1990) (Conf. Rep.).[17]  The Conference Report explained that "[t]his section is intended to clarify that the House bill does

---

[17] The House Committee Report contains similar statements:

> This section clarifies that this Act does not affect admiralty and maritime law or the jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction, saving to suitors in all cases other remedies to which they are otherwise entitled. Article III, clause 2, of the Constitution creates the admiralty and maritime law of the United States.  This section is intended to clarify that this Act does not supercede [sic] that law, nor does it change the jurisdiction of the district courts under section 1333 of Title 28, United States Code (the codified section of the Judiciary Act of 1789).  It is not the intent of the Committee on this Act or change the jurisdiction in incidents that are within the admiralty and maritime laws of the United States.

H.R. Rep. No. 101-242, pt. 2: Committee on Merchant Marine and Fisheries, at 93 (Sept. 18, 1989).

- 38 -

not supersede [Article III, clause 2, which provides the basis for admiralty and maritime law], nor does it change the jurisdiction of the District Courts" in these actions.  H.R. Rep. No. 101-653, at 159 (Aug. 1, 1990) (Conf. Rep.).[18]

The Conference adopted the House's savings provision "with an amendment clarifying that the provision was subject to the provisions of the substitute."  H.R. Rep. No. 101-653, at 159 (Aug. 1, 1990) (Conf. Rep.).  Notably, the Conference Report explained the interplay between the Savings Provision and the liability imposed in Section 1002 (the Section that provides the elements that must exist for a responsible party to be liable for damages) by noting that Section 1002 "establishes liability notwithstanding any other provision or rule of law . . . . Therefore, there is no change in current law *unless there is a specific provision to the contrary*." H.R. Rep. No. 101-653, at 159 (Aug. 1, 1990) (Conf. Rep.) (emphasis added).[19]

Finally, the legislative history offers two additional arguments against preemption of maritime law: *first*, members of Congress compared the OPA to other federal laws and indicated that it should not have more of a preemptive effect than other federal laws; and *second*, Congress indicated that "[n]othing in this Act shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to discharges of oil."  135 Cong. Rec. S9689-S9716, at S9683 (Aug. 3, 1989).

---

[18] The Conference also noted that "[i]t is not the intent of the Conferees to change the jurisdiction in incidents that are within the admiralty and maritime laws of the United States.  The Conferees wish to promote uniformity regarding these laws."  H.R. Rep. No. 101-653, at 159 (Aug. 1, 1990) (Conf. Rep.).

[19] The Conference Report further explained that "notwithstanding any other provision or rule of the law . . . means that the liability provisions of this Act would govern compensation for removal costs and damages notwithstanding any limitations under existing statutes such as the act of March 3, 1851 (46 U.S.C. 183), or under existing requirements that physical damage to the proprietary interest of the claimant be shown."  H.R. Rep. No. 101-653, at 103 (Aug. 1, 1990) (Conf. Rep.).

It is true that, despite the plain statutory language and the unambiguous legislative history of the OPA, one decision in this District reflects a different interpretation. *Gabarick v. Laurin Mar. (Am), Inc.*, 623 F. Supp. 2d 741 (E.D. La. 2009). Plaintiffs respectfully suggest that the *Gabarick* court may have been presented with an incomplete or selective legislative history. As noted, at one point in the OPA drafting process it was suggested that the OPA stand as "a single Federal law regarding liability for oil pollution." *Id.* at 748. But Congress ultimately rejected that position, expressly preserving both state law *and* maritime law claims for victims of oil spills. 33 U.S.C. §§ 2718 and 2751.

The *Gabarick* court cited the Supreme Court's decision in *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1 (1981) , in which "the Supreme Court recognized the preemption of Federal Common Law and general maritime law by Congress's comprehensive legislation in the area of water pollution." 623 F. Supp. 2d at 747. In *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, however, the Supreme Court evaluated the Federal Water Pollution Control Act and concluded that "[i]n the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate." 453 U.S. at 15. But since then the Supreme Court has suggested that its holding in *National Sea Clammers* turned on the plaintiff's attempt to use the state common law of nuisance to impose a different (conflicting) regulatory scheme than that imposed by the Water Pollution Control Act. *See Baker*, 554 U.S. at 489 n.7 (concluding that *Baker* plaintiff's "private claims for economic injury do not threaten similar *interference* with federal regulatory goals with respect to 'water,' 'shorelines,' or 'natural resources'" as the plaintiffs' nuisance claims in *National Sea Clammers* had done) (emphasis added). Indeed, the *Baker* decision holds that the Clean Water Act did not preempt admiralty

and maritime law's provision of punitive damages.  Similarly, maritime claims would not frustrate the remedial scheme of the OPA.

### C. Congress Did Not Intend To Occupy The Field Of Oil Pollution Remedies Nor Does Preserving State Law and General Maritime Claims Conflict With The OPA.

The OPA simply does not preempt state law remedies or the general maritime law. Defendants' argument that the OPA is so comprehensive that Congress intended it to occupy the field and thus preempt general maritime law and state law remedies, is misplaced.  Indeed, it ignores the plain language of the statute that saves remedies under the general maritime law and state law.[20]  Defendants simply cannot show a "clear indication of congressional intent to occupy the entire field of [oil spill] remedies."  *Baker*, 554 U.S. at 489 (alterations in origional).  Neither the text of the OPA nor the legislative history indicate such an intent.

Furthermore, allowing state law and general maritime law to apply has no frustrating effect, the presence of which would require preemption.  A clear purpose of the OPA is undoubtedly to protect the waters, shores, and natural resources at risk from damage from oil pollution.  Thus allowing, for example, punitive damages to be recovered in an oil pollution case would not have a "frustrating effect" on the remedial scheme of the OPA.  Indeed, it has long been accepted that the laudable goal of punitive damages is "retribution and deterring harmful conduct."  *Baker*, 554 U.S. at 492.  Punitive damage awards in cases governed by general

---

[20] This argument must be rejected for the same reasons the Court refused to find that the CWA preempted common law claims in *Baker*.  If OPA was intended to occupy the field, then personal injury claims would also be preempted because OPA does not expressly provide damages for personal injury or punitive damages.  Clearly, the court cannot conclude that OPA, by its silence, was intended to eliminate oil companies' common law duties to refrain from injuring private persons or insulate them from punitive damages for gross negligence or willful misconduct.  *Baker*, 554 U.S. at 488-89 ("But we find it hard to conclude that a statute [the CWA] expressly geared to protecting 'water,' 'shorelines,' and 'natural resources' was intended to eliminate *sub silentio* oil companies' common law duties to refrain from injuring the bodies and livelihood of private individuals.")

maritime law do not frustrate, but rather further, the goal of protecting our natural resources from the kind of devastation that unfolds in the wake of a major (and avoidable) oil spill by deterring companies from making decisions that result in the type of devastation evidenced in this case.

In short, the OPA does not preempt state law or general maritime law compensatory and punitive remedies, because:  (1) the statute is unambiguous on its face; (2) the legislative history does not demonstrate any congressional intent to occupy the entire field of oil pollution law; and (3) there is no frustration of the OPA's purpose by allowing these supplemental remedies.

A few of the Defendants support their preemption argument by citing two additional Eastern District of Louisiana cases.  (*See e.g.,* Tr. Mot. to Dismiss, Doc. 1390-1 at 12 (filed February 28, 2011).)  *Tanguis*, 153 F. Supp. 2d at 867 is cited for the proposition that the "'OPA 'represents Congress' attempt to provide a comprehensive frame work in the area of marine oil pollution.'"  (*Id.*)  *Tanguis*, however, dealt simply with the question of removal.  Importantly, the *Tanguis* court stated further that "the first subsection of the admiralty and maritime savings clause recognizes that certain maritime remedies are preempted by the OPA, *while others survive*."  153 F. Supp. 2d at 867 (emphasis added).  At most, *Tanguis* stands for the proposition that remedies provided in the OPA are exclusive only as to the OPA's covered remedies and, beyond that, the OPA saves general maritime and state law remedies.  *Id.*  The other cited case out of the Eastern District of Louisiana is similarly unpersuasive, as it relies on *South Port Marine, LLC v. Gulf Oil Ltd. Part'ship*, 234 F.3d 58 (1st Cir. 2000) as good law.  *See, e.g., Isla*, 2007 U.S. Dist. LEXIS 31259, at *4-5 (holding that the OPA does not preempt state law remedies but noting *in dicta* that "*South Port Marine* and *Clausen* established that the OPA is the exclusive federal remedy) (internal citations omitted).  In *Isla*, federal preemption was not a question before the court, which only had to decide state preemption.  *Id.*  The court noted in

passing that federal law was exclusive and then found no preemption of state law remedies.  This inconsequential passage is unpersuasive, and the *Isla* court's reliance on *South Port Marine* undermines the significance of the *Isla* court's dicta on federal preemption, for the reasons that follow.

### D.  The OPA Does Not Prohibit or Preempt Plaintiffs' Punitive Damage Claims.

The OPA is silent on the recoverability of punitive damages.  However, it does not prohibit them and, therefore, they survive as permitted under the general maritime law and state law that is saved by the OPA, as discussed above.

In two recent cases, the Supreme Court has considered whether federal statutes have abrogated the availability of punitive damages under general maritime law.  *See Baker*, 554 U.S. 471; *see also Townsend,* 129 S. Ct. 2561.

In *Baker*, a unanimous Supreme Court held that the Clean Water Act did not disallow an award of punitive damages under general maritime law.  In finding there was no preemption of punitive damages, the Court held that:

> [a]ll in all, we see no clear indication of congressional intent to occupy the entire field of pollution remedies, *see*, *e.g., United States v. Texas*, 507 U.S. 529, 534 (1993) ("In order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law" (internal quotation marks omitted)); nor for that matter do we perceive that punitive damages for private harms will have any frustrating effect on the [Clean Water Act] remedial scheme, which would point to preemption.

*Baker*, 554 U.S. at 488-89.  Accordingly, the Supreme Court refused to find that the statute abrogated the firmly established availability of maritime punitive damages.  *Id.*

In *Townsend,* the Supreme Court considered whether the Jones Act or the Supreme Court's prior decision in *Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990), precluded the recovery of punitive damages under general maritime law for an employer's failure to pay an

injured seaman's maintenance and cure.  The Supreme Court discussed the historical availability of punitive damages for seamen and noted that the plaintiff is entitled to pursue punitive damages unless the plain language of the Jones Act evidences the clear intent of Congress to depart from the common law.  *Townsend*, 129 at 2569.  The Supreme Court found that the Jones Act is a remedial statute intended to enlarge the protection of seamen, not narrow it.  *Id*. at 2570.  Further, nothing in the language of the Jones Act or any of the Supreme Court's decisions applying it indicated that it interfered with the common law maintenance and cure action or the availability of punitive damages.  *Id*.  Therefore, the Supreme Court held that neither *Miles* nor the Jones Act interfered with recovery of punitive damages under general maritime law for an employer's refusal to pay maintenance and cure.

Defendants also rely on *South Port Marine* to support their argument that punitive damages are preempted by the OPA.  Although *South Port Marine* is the only federal appellate court case to address this issue, it was decided before the Supreme Court's decisions in *Baker* and *Townshend* and, as a result, erroneously concludes that the OPA displaces the availability of punitive damages under general maritime law based upon an outdated (and, respectfully, mistaken) reading of *Miles*.

In *South Port Marine*, the defendants caused a gasoline spill into Portland Harbor during the transfer of gasoline from onshore tanks to a tank barge, which damaged the Styrofoam flotation of the plaintiff's floating docks, causing them to sink.  The First Circuit Court of Appeals affirmed the district court's holding that general maritime law punitive damages are not recoverable under the OPA.  *South Port Marine*, 234 F.3d at 65-66.  Although the First Circuit acknowledged that the OPA does not expressly preempt the recovery of punitive damages, it found that Congress intended the OPA to supplant general maritime law, including punitive

damages, with regard to oil pollution. *Id.* In reaching this conclusion, the First Circuit stressed that the "OPA sets forth a comprehensive list of recoverable damages," which do not include punitive damages. *Id.*[21]

The First Circuit's holding in *South Park Marine* misunderstands the implications and rationales of *Miles*. *Miles* examined the damages recoverable under *preexisting* wrongful death statutes—the Jones Act and DOHSA—to determine the scope of recovery allowable under the general maritime wrongful death action. *Miles* sought to mirror the recovery under the gap filling general maritime action to the statutes that inspired it. *Id.* Generally, the rationale behind *Miles* was twofold: (1) a common law cause of action (i.e., general maritime wrongful death) created to fill an unintentional gap in preexisting statutory law to provide uniformity in admiralty law should not provide remedies inconsistent with the statutory framework; and (2) common law liability for harm without fault should not provide greater compensation than preexisting statutory liability for identical harm as a result of negligence—that is, more expansive recovery without fault would be inconsistent with the judgment of Congress expressed in the preexisting statutory actions. *Id.* *South Port Marine* is unpersuasive as its decision is contrary to both prongs of the *Miles'* rationale.

First, *South Port Marine* creates the very sort of anomalies in maritime law that the Supreme Court sought to eliminate in *Miles*. The First Circuit acknowledged that Congress did not intend the OPA to bar the imposition of additional liability under state law. *Id.* at 65. It

---

[21] Additionally, the First Circuit emphasized the absence of any cases or commentary suggesting that punitive damages under general maritime law survived the enactment of OPA. *South Port Marine*, 234 F.3d at 65. The court found this lack of authority to be "a strong indication that Congress intended the OPA to be the sole federal law applicable in this area of maritime pollution." *Id.* However, there was a complete lack of authority suggesting that the availability of punitive damages under maritime law was displaced by the OPA. The lack of cases and scholarly commentary discussing this issue most likely results from the plain language in the OPA preserving general maritime law.

could hardly find otherwise given the unambiguous language of 33 U.S.C. § 2718, which expressly provides that it does not preempt the imposition of additional liabilities under state law, including the common law.  Testing the *South Port Marine* interpretation demonstrates that it fails to provide a fair or consistent application of law.  For example, interpretation does result in punitive damages being available under state law when reckless conduct results in an oil discharge from a fixed platform (adjacent state law would apply under the OCSLA choice-of-law provision).  However, it *does not* permit the recovery of maritime punitive damages when the same reckless conduct results in an oil discharge from a drilling ship or floating platform (the OCSLA choice-of-law provision applies federal maritime law).  Similarly, punitive damages *would* be recoverable for the reckless discharge of oil from a drilling vessel within the first three miles of territorial waters in the Gulf of Mexico (where OCSLA does not apply).  However, punitive damages *would not* be recovered where the same conduct causes a discharge of oil from the same drilling vessel four miles from the coast.  This interpretation would create the same disunity in maritime law that the Supreme Court sought to eliminate in *Miles*.  Such strange anomalies might be tolerable if Congress had expressly intended them, but nothing in the text of the OPA or the rationale of *Miles* supports such an intent.

*South Port Marine* is also unsupported by the second rationale of *Miles*.  In *Miles,* the Supreme Court refused to allow broader damages under the strict liability common law cause of action than were available under the fault based statutes that preexisted and inspired the common law.  *Miles*, 498 U.S at 37.  The OPA creates statutory liability *without fault* for oil spills, but the damages are capped unless fault is established.  Thus, the preexisting common law punitive damages remedy is available, but only after a showing of willful misconduct.  There is nothing anomalous or inconsistent with Congress creating strict liability for oils spills but capping

- 46 -

liability to less than would be recoverable under general maritime law for willful misconduct. Properly understood, the Supreme Court's reasoning in *Miles* firmly supports the availability of punitive damages under general maritime law, despite the presence of an OPA claim.

Furthermore, *South Port Marine* completely fails to explain how the plain language of the OPA does not preserve the availability of punitive damages under general maritime law. The OPA expressly provides that admiralty and maritime law is not affected except as otherwise provided in the Act. *See* 33 U.S.C. § 2751. The plaintiff in *South Port Marine* properly asserted that this provision preserved all maritime law that did not conflict with the OPA. However, because the First Circuit mistakenly believed that *Miles* mandated the unavailability of punitive damages, the court never addressed why the plain language of Section 2751 did not preserve punitive damage claims. As previously explained, and as the Supreme Court, eight years after *South Port Marine*, subsequently reconfirmed, in order for a statute to abrogate the common law, it must speak directly to the issue addressed by the common law. *See Baker*, 554 U.S. at 486. Nothing in the OPA's plain language expressly forecloses the availability of punitive damages under general maritime law. The OPA expressly contemplates recovery of damages beyond the cap provided by § 2704 when gross negligence and willful misconduct is established. Either the OPA has created such a cause of action or it intends recovery for such conduct to be governed by state and maritime substantive law. In either case, the recovery of punitive damages is consistent with the OPA. *See* 33 U.S.C. § 2743(c)(1); *see also Commonwealth of Puerto Rico v. M/V Emily S*, 1998 AMC 2726 (D.P.R 1998) (general maritime law *in rem* remedy is available under the

OPA which expressly preserves admiralty and maritime law).  Thus, it is clear that *South Port Marine* is not persuasive authority here.[22]

Some Defendants argue that the Court should follow those cases that recognize a more limited preemptive effect of the OPA.  *See e.g., Gabarick*, 623 F. Supp. 2d at 746 (holding that "the plain language of the statute indicates its mandatory and exclusive nature *with respect to its covered damages*") (emphasis added).  This argument is unavailing because claims for punitive damages under the general maritime law are not enumerated among the "covered damages" and are, therefore, preserved by the savings clause.  *See* 33 U.S.C. § 2751(e).

Defendant Weatherford argues that Louisiana products liability law prohibits an award of punitive damages in this case.  Of course, as argued above in Section I, the general maritime law, and not Louisiana law, applies.  Weatherford, citing *Saudi v. S/T Marine Atl.,* 159 F. Supp. 2d 492 (S.D. Tex. 2000), argues that general maritime law does not recognize punitive damages in products liability cases.  This argument is misleading, as *Saudi* had nothing to do with products liability.  *Saudi* simply does not support the argument for which it is offered; the district court in *Saudi* did not address in any manner the availability of punitive damages against a product manufacturer under the general maritime law.

---

[22] Some of the Defendants also point to one other federal court case for the proposition that the OPA preempts punitive damages.  *See Clausen v. M/V New Carissa,* 171 F. Supp. 2d 1127 (D. Or. 2001).  However, this case relies on *South Port Marine*, which has already been shown to be erroneous, and which pre-dates *Baker*.  Second, the portion of the opinion that addresses this issue is *dicta* and not persuasive.  *Clausen,* 171 F. Supp. 2d at 1134 (noting "[e]ven if *South Port* is incorrect in its analysis of this issue, I fail to see any prejudice to plaintiffs in this case because their evidence for punitive damages in their general maritime claim would be the same as the proof offered on the state law claim.  While the federal standard for punitive damages is lower than that under Oregon law, (i.e., preponderance of the evidence proving conduct that is malicious or in reckless disregard of a plaintiff's rights), plaintiffs' evidence is insufficient to put the issue before a jury").

In sum, the OPA does not preempt general maritime law, state law, or punitive damages. The plain language of the statute and its legislative history provide no indication that Congress intended to occupy the field in this regard.  Finally, allowing these remedies does not frustrate the purposes of the OPA.  Accordingly, Defendants' motion for dismissal based on the preemptive effects of the OPA must be denied.

### E.    Attorneys' Fees Are Allowed Under General Maritime Law

Defendants' arguments that attorneys' fees are not allowed under maritime law are erroneous.  It should be initially noted that the cases Defendants rely on do not involve personal injury claims or claims for punitive damages.  Further, the cited cases (*e.g. Galveston County Nav. Distr. v. Hopson Towing Co.*, 92 F.3d 353 (5th Cir. 1996)), recognize a bad faith exception to the "American Rule" whereby attorneys' fees can be awarded if the defendant has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.  Obviously, Plaintiffs have alleged just this sort of behavior on the Defendants' part.

Additionally, attorneys' fees are, indeed, awardable under the general maritime law.  For instance, in bad faith failure to pay maintenance and cure actions *under the general maritime law*, courts sitting in admiralty have allowed awards for attorneys' fees.  For instance, in *Vaughan v. Atkinson*, 82 S. Ct. 997 (1962), the United States Supreme Court allowed for an award of attorneys' fees in a failure to pay maintenance and cure case.  *See also Morales v. Garijak, Inc.*, 829 F.2d 1355 (5th Cir. 1987).  Tellingly, even after *Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496 (5th Cir. 1995), but before *Townsend, supra* (which abrogated that decision, to establish the availability of punitive damages), attorneys' fees were still found to be awardable for general maritime law claims of bad faith failure to pay maintenance and cure.  *See, e.g., Nichols v. Weeks Marine, Inc.*, 513 F. Supp. 2d 627, 640 (E.D. La. 2007).  Hence, attorneys'

fees are awardable under the general maritime law and Plaintiffs' claims for fees should not be dismissed.

## III.   PLAINTIFFS' STATE LAW CLAIMS ARE NOT PREEMPTED BY THE CLEAN WATER ACT.

Defendants borrow from the water pollution permit scheme of Clean Water Act, 33 U.S.C. § 1251, *et. seq.* (the "CWA"), to argue that the OPA preempts state law claims in connection with oil spills.  Defendants rely on *Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987), and three opinions issued in one case—*Illinois v. City of Milwaukee*, 406 U.S. 91 (1972), *City of Milwaukee v. Illinois*, 451 U.S. 304 (1981), and *Illinois v. City of Milwaukee*, 731 F.2d 403 (7th Cir. 1984) in support of their position.  But those opinions all involve litigation over regulated discharges of pollutants, and they are limited to that context.  The OPA, in contrast to the CWA permit provision at issue in *Illinois/Milwaukee* and *Ouellette*, never allows for oil spills into navigable waters.

*Illinois/Milwaukee* and *Ouellette* involved the CWA's permit system that allows regulated entities to discharge pollutants into navigable waters provided they have a government-issued permit—a National Pollution Discharge Elimination System ("NPDES") permit—to do so.[23]  Under the statute, only a source state—that is the state in which the polluting facility resides—is allowed to issue a CWA permit if EPA has delegated the permit program.  In essence, because, by its very nature, the CWA NPDES permit scheme allows industry to discharge pollutants into water bodies that flow from one state to another, Congress provided greater rights to "source" states—the state in which regulated entity resides—than the neighboring state potentially affected by the pollution.  Under the scheme, the source state may

---

[23] The permit is issued by the federal EPA unless the EPA has authorized the state to assume its role under the CWA for permit issuance to the regulated community within the state.

impose its own, more stringent standards on the regulated community than EPA does, but it gives no such rights to neighboring states. *Ouellette*, 479 U.S. at 495. The Supreme Court held that, under such circumstances, the state law of a neighboring state of the pollution source is preempted by the permit scheme of the CWA.

In *Ouellette*, defendant International Paper Company ("IPC") had a facility on Lake Champlain and a validly issued CWA permit from the State of New York to discharge pollutants into the lake. Citizens in Vermont, across the lake from IPC on the Vermont side, brought a nuisance action against IPC for nuisance under Vermont state law, seeking damages for diminution of their home values. The Supreme Court found that application of the Vermont nuisance law against IPC was an obstacle to the full implementation of the CWA because it would allow the plaintiffs to "circumvent the NPDES permit system, thereby upsetting the balance of public and private interests so carefully addressed by the Act.". 479 U.S. at 494. The Supreme Court explained as follows:

> An interpretation of the saving clause that preserved actions brought under an affected State's law would disrupt this balance of interests. If a New York source were liable for violations of Vermont law, that law could effectively override both the permit requirements and the policy choices made by the source State. The affected State's nuisance laws would subject the point source to the threat of legal and equitable penalties if the permit standards were less stringent than those imposed by the affected State. Such penalties would compel the source to adopt different control standards and a different compliance schedule from those approved by the EPA, even though the affected State had not engaged in the same weighing of the costs and benefits.

*Id.* at 495. The Supreme Court made clear that the Vermont residents were not left without a remedy: "The saving clause specifically preserves other state actions, and therefore nothing in the Act bars aggrieved individuals from bringing a nuisance claim pursuant to the law of the source State in that case New York nuisance law. *Id.* at 497.

- 51 -

Defendants overstate the holding in *Ouellette*. The Supreme Court did not hold that the CWA preempts state law entirely. Rather, the Supreme Court explained that the Act "precludes only those suits that may require standards of effluent control that are incompatible with those established by the procedures set forth in the Act." 479 U.S. at 497. Thus, while the Supreme Court did not allow the suit to proceed under Vermont state law, it found that an action under New York law would not frustrate the goals of the CWA.

A Louisiana appellate court held that the Act did not preempt commercial fishermen's claims for punitive damages under the general maritime law. *Poe v. PPG Industries*, 782 So. 2d 1168 (La. App. 3rd Cir. 2001). The fishermen claimed that PPG's plant discharged toxic chemicals that contaminated their fishing area and sought compensatory and punitive damages. *Id.* at 1171. PPG argued that *Ouellette* and *Illinois/Milwaukee* compelled a holding that the Clean Water Act (and OPA and CERCLA) preempted the claim for punitive damages. The *Poe* court found that the Supreme Court precedent only decisions involved "remedies in nuisance actions for the intended release of pollutants into public waterways." *Id.* at 1177 (citation omitted). Those are simply different from cases that do not concern the release of pollutants in waterways but instead arise from "alleged negligence causing an accidental oil spill by a tanker." *Id.*

Moreover, the Supreme Court recently distinguished the facts giving rise to litigation after the Exxon Valdez spill from those giving rise to *Illinois/Milwaukee* and *Ouellette* opinions:

> In this respect, this case differs from two invoked by Exxon, *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, . . . and *Milwaukee v. Illinois*, . . . where plaintiffs' common law nuisance claims amounted to arguments for effluent-discharge standards different from those provided by the CWA. Here, Baker's private claims for economic injury do not threaten similar interference with federal regulatory goals with respect to "water," "shorelines," or "natural resources."

- 52 -

*Baker*, 554 U.S. at 489 (citations omitted).  Defendants' reliance on *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000) is also misplaced.  *Geier* is distinguishable from the instant case in that, unlike the federal program in *Geier*, neither the Oil Pollution Act nor any other federal statute dictates the means for achieving federal objectives, and Plaintiffs in this case, unlike the plaintiffs in *Geier*, are not seeking to require the use of a specific means of controlling or preventing oil spills. This is consistent with the Supreme Court's decision in *Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005), where the Court rejected the defendants' attempts to equate tort liability with regulatory requirements.  As the *Bates* Court stated: "[t]he Court of Appeals was . . . quite wrong when it assumed that any event, such as a jury verdict, that might 'induce' a pesticide manufacturer to change its label should be viewed as a requirement."  544 U.S. 443.  In other words, preserving state common law liability for a "choice" that a defendant makes among alternatives that are permitted, but not required, by federal law does not equate to a "requirement" that stands as an obstacle to federal law.

## IV. THE GENERAL MARITIME LAW DOES NOT PREEMPT PLAINTIFFS' STATE LAW CLAIMS.[24]

Transocean argues that even if the OPA had not been enacted, Plaintiffs' state law claims would have been preempted by general maritime law.  (Tr. Mot. to Dismiss at 14.)  It is well-established, however, that the exercise of admiralty jurisdiction does not result in the automatic displacement of state law.  *See Yamaha Motor Corp. v. Calhoun,* 516 U.S. 199, 206 (1996); *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 545 (1995).  In the situation where neither statutory nor judicially created maritime principles answer a specific

---

[24] As noted, Plaintiffs take no position, in response to the Motions to Dismiss the Amended B1 Master Complaint, as to what law might be applicable where a plaintiff alleges a jurisdictional basis other than the admiralty or maritime jurisdiction of the Court.

legal issue, state law is applied provided it does not *directly* conflict with the principles of federal maritime law nor frustrate the policy interest of having national uniformity in maritime actions. *Askew v. Am. Waterways Operators, Inc.,* 411 U.S. 325, 341 (1973) (citing *Romero v. Int'l Terminal Co.,* 358 U.S. 373-75, 378 n. 42 (1959); *Just v. Chambers,* 312 U.S. 383, 391 (1941); *Coastal Iron Works, Inc. v. Petty Ray Geophysical,* 783 F.2d 577, 582 (5th Cir. 1986); *Palestina v. Fernandez,* 701 F.2d 438, 439 (5th Cir. 1983); *Alcoa S.S. Co. v. Charles Ferran & Co.,* 383 F.2d 46, 50 (5th Cir. 1967); 2 Am. Jur. 2d *Admiralty* § 102 (2010).  In other words, state law supplements maritime law where maritime law is silent.  *Yamaha,* 516 U.S. at 206; *Coastal Iron Works,* 783 F.2d at 582; *Persson v. Scotia Prince Cruises, Ltd.,* 330 F.3d 28, 32 (1st Cir. 2003).

The U.S. Supreme Court followed the approach of "supplementing" general maritime law with state law in *Yamaha.*  In that case, a non-seaman girl was killed in a collision with a vessel in territorial waters off Puerto Rico while using a jet ski for recreational purposes.  *See id.* at 202.  Her parents then brought suit against the jet ski's manufacturer under Pennsylvania's wrongful death and survival statutes.  *Id.*  The Supreme Court considered the argument that federal maritime law completely displaced state wrongful death law, but rejected it.  The Supreme Court first noted that when "Congress has prescribed a comprehensive tort recovery regime to be uniformly applied, there is, we have generally recognized, no cause for enlargement of the damages statutorily provided."  *Id.* at 215.  The Supreme Court continued, however, to find that Congress had only prescribed remedies for the wrongful deaths in territorial waters of those who were engaged in maritime trade.  *See id.* 202, 215.  As a result, the Supreme Court preserved the application of state statutes to deaths of non-seafarers within territorial waters.  *See id.* at 215.

In the wake of *Yamaha,* federal courts routinely apply state laws in admiralty cases when those state laws "fill gaps" or provide relief that otherwise would not be available under admiralty law.  *See, e.g., Coastal Iron Works, Inc.*, 783 F.2d at 582; *J. Ray McDermott v. Vessel Morning Star*, 457 F.2d 815, 818 (5th Cir. 1972) (*en banc*); *Rogers v. Coastal Towing, L.L.C.*, 723 F. Supp. 2d 929, 933 (E.D. La. 2010); *TAG/ICIB Services v. Pan American Grain Co.,* 215 F.3d 172, 177 (1st Cir. 2000); *American Dredging Co. v. Lambert,* 81 F.3d 127, 130-31 (11th Cir. 1996); *Morrow v. Marine Max, Inc.*, 731 F. Supp. 2d 390, 394 (D.N.J. 2010); *Matheny v. Tennessee Valley Auth.*, 503 F. Supp. 2d 917, 923 (M.D. Tenn. 2007).  For instance, "state law may supplement the measure of damages while maritime law provides the substantive law." *Skipperliner Indus., Inc. v. Ray*, No. 00-C-0730, 2002 WL 32348827, at *14 (W.D. Wis. Jan. 31, 2002).

In this case, Plaintiffs' state law claims are not preempted by general maritime law.  For instance, the Florida Pollutant Discharge Prevention and Control Act (the "Florida Act"), Fla. Stat. §§ 376.011, *et seq*., discussed in more detail *infra,* fills a gap that might otherwise not be available under the general maritime law.  If this Court were to find that attorneys' fees were unavailable under the general maritime law, for example, attorneys' fees would nevertheless be available under the Florida Act.  Hence, Transocean's argument that state law is preempted by general maritime law should be rejected.

Moreover, to promote uniformity in the general maritime law, admiralty courts may also look to, and borrow from, general common law.  *Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.,* 959 F.2d 49, 53 (5th Cir. 1999).  The Fifth Circuit frequently relies on the *Restatement (Second) of Torts* for statements of common law principles relevant to admiralty cases.  *Dalrymple v. Fairchild Aircraft, Inc.,* 575 F. Supp. 2d 790, 796 (S.D. Tex. 2008) (citing

*Marastro,* 959 F.2d at 53).  Thus, the Court could borrow common law principles as set forth in the Restatement to preserve Plaintiffs' common law claims.

## V.     ALL PLAINTIFFS HAVE STATED CLAIMS FOR WHICH RELIEF MAY BE GRANTED UNDER THE OPA.

### A.     The Court Should Not Dismiss Plaintiffs' Actions For Lack Of Presentment

In their motions to dismiss, BP, Transocean, and the MOEX and Anadarko Defendants assert that this Court lacks jurisdiction over Plaintiffs' First Amended B1 Master Complaint because Plaintiffs have failed to "present" their claims to a "responsible party" pursuant to the OPA pre-suit claims process.  (*See* BP Mot. to Dismiss B1 at 19-24; Tr. Mot. to Dismiss at 4-7; MOEX/Anadarko Mot. to Dismiss B1 at 22-25.)[25]  In particular, Defendants allege that this Court cannot exercise subject matter jurisdiction over the Plaintiffs' claims because: (1) Plaintiffs were required to present their claims through the OPA-mandated claims process; and (2) the OPA presentment requirement is a mandatory condition precedent to filing suit based on the OPA, which Plaintiffs have failed to satisfy.  (*See id.*)[26]

Plaintiffs do not dispute the applicability of the OPA's presentment requirements to claims arising under the OPA against those parties designated as the OPA "responsible parties." 33 U.S.C. §§ 2701, *et seq.*  Plaintiffs, however, need not make OPA presentment for their non-OPA claims against Defendants.  Thus, to the extent Defendants' motions to dismiss could be construed to contend that Plaintiffs should have presented non-OPA claims through the OPA-mandated claims process, this Court should reject such arguments. *See, e.g., Williams v. Potomac*

---

[25] B3 Plaintiffs are seeking leave to file a B3 Amended Complaint contemporaneously with this brief and do not assert claims under the OPA in that amended pleading.

[26] Transocean also argues that Plaintiffs failed to make presentment to Transocean for the release of diesel oil on the surface.  (*See* Tr. Mot. to Dismiss at 6-7.)  Plaintiffs, however, are not proceeding under the OPA against Transocean for damages (if any) resulting from the release of diesel.

916087.7

*Elec. Power Co.*, 115 F. Supp. 2d 561, 565 & n.3 (D. Md. 2000) ("OPA does not preempt . . . state common law actions . . . [a]nd there is, in consequence, no requirement for the presentment of claims under OPA prior to commencing suit."); *see also,* 33 U.S.C. § 2751(e)(2) (preserving the admiralty and maritime jurisdiction of the U.S. District Courts).

Defendants' arguments that individual Plaintiffs have failed to present under the OPA should be rejected as well. First, a plaintiff-by-plaintiff factual challenge regarding presentment is inappropriate on the instant motions to dismiss. Second, Defendant Transocean's argument that presentment must be made to Transocean separate and apart from the GCCF should be rejected as contrary to both logic and the Congressional framework underlying the OPA. Third, nothing in the OPA or Defendants' caselaw counsels for dismissal of an entire claim when a complaint alleges that plaintiffs have satisfied the OPA's presentment requirement.[27]

### 1.    A Plaintiff-by-Plaintiff Determination of Presentment is Inappropriate at this Time

Defendants' primary argument is that certain Plaintiffs have failed to present properly under the OPA. (*See*, *e.g.*, BP Mot. to Dismiss at 33-38.) These arguments are premature and not appropriate at this time.[28] This Court's orders make clear that the Master Complaints are claim-specific pleadings, rather than plaintiff-specific ones. (*See* Doc. 569 ("PTO 11"; *see also*

---

[27] In response to the Deepwater Horizon Spill, BP E&P, Transocean Holdings, Anadarko Petroleum Corp., Anadarko E&P, LP, and MOEX Offshore 2007 LLC have has been named "responsible parties" under 33 C.F.R. § 136.305, and as defined at 33 U.S.C. § 2701(33). (Am. B1 Master Complaint ¶¶ 680, 682). As plaintiffs have submitted and continue to submit all claims within the purview of the OPA to the GCCF, plaintiffs have satisfied, and will continue to satisfy, the Act's presentation requirements.

[28] Because Plaintiffs interpret the Court's direction on these motions to be on legal, not plaintiff-specific, issues, we do not here brief our position on what constitutes proper presentment under OPA. If, however, the Court wishes briefing on that issue at this time, Plaintiffs will, of course, provide it.

Doc. 986 ("PTO 25") ¶¶ 8, 15.)  This motion is not the proper venue to argue that any particular Plaintiff or group of Plaintiffs has not satisfied presentment of their individual OPA claims.

### 2.       Presentment to the GCCF Satisfies Presentment to All Defendants

As the OPA requires one presentment for losses from the Spill, there is no need to present separately to the other OPA Defendants.  This is particularly true where, as here, one responsible party has established or acceded to a presentment mechanism, which BP did affirmatively and publicly via the GCCF.  (*See, e.g.*, Doc. 594-1 ("Haycraft Letter")).  It would be cumbersome, duplicative, and wasteful — in short, contrary to the intended function of the OPA, to require a plaintiff to repeat presentment to each and every defendant who has or may be determined to be a responsible party.[29]  This Court is well aware of the magnitude of Deepwater Horizon presentment infrastructure.  Defense counsel reports regularly on the GCCF claims statistics at the monthly MDL status conferences.  As the media recently reported, BP now pays the GCCF Administrator, Ken Feinberg, over $1 million every month to run it.  Nothing in the statute, its legislative history, or the case law interpreting it supports the notion that an expensive and time-consuming presentment system be replicated, at duplicative expense and concomitant delay and confusion, for each of the defendants involved in a single pollution disaster.  To adopt Transocean's position is to mandate a "cumbersome" process of the very type Congress sought to avoid.[30]

---

[29] It is also unclear how Transocean envisions presentment to separate entities from a practical standpoint.  Under Transocean's view, it seems that a plaintiff would be required to present a claim for all of his or her losses, simultaneously, to *both* the GCCF and Transocean and thus be entitled to double compensation.  This cannot be right.

[30] It is presumably for this reason that the MOEX and Anadarko Defendants do not question that Plaintiffs who have presented to the GCCF have fulfilled their statutory requirement as to all Defendants.  (*See* MOEX/Anadarko Mot. to Dismiss B1 at 22-25.)

As much to the point, BP is the only defendant that has established a claims process for the receipt, evaluation, and payment of claims, as is required by the OPA. *See* 33 U.S.C. § 2705(a) ("The responsible party shall establish a procedure for the payment or settlement of claims for interim, short-term damages."); 33 U.S.C. § 2714(b)(1) (providing that a responsible party must advertise the claims presentment process). To the extent that this Court might reason that presentment should be made to each individual party, a defendant should not be allowed to violate the OPA and then use its own violation as a means to contest this Court's jurisdiction.

### 3. If the Court Does Consider Defendants' Presentment Argument, it Should Find that it is Not Well-Taken

As noted above, Plaintiffs have no obligation to make OPA presentment to pursue general maritime law or state law claims. *See, e.g., Williams*, 115 F. Supp. 2d 561, 565 & n.3. This is true, Plaintiffs suggest, with respect to general maritime law or state law claims against the OPA-designated responsible party, but, in any event, is certainly true with respect to maritime actions against third parties such as Cameron and Halliburton. *See* 33 U.S.C. § 2751(e)(2). Taking such an argument to its logical conclusion, the general damage claims of a Jones Act seaman would have to be dismissed pending the presentment of his economic loss claims to BP under the OPA. This is not what Congress could have intended, nor could it have been intended that general maritime law or state law claims subject to Limitation - which must be asserted on or before the April 20, 2011 Monition Date - be first presented to BP.[31]

While Plaintiffs, moreover, agree that a plaintiff must generally satisfy presentment under the OPA prior to invoking the Court's jurisdiction for the purpose of asserting claims under the OPA, *see, e.g.*, *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*, 51 F.3d 235, 240 (11th Cir.

---

[31] Indeed, Defendants consented to a procedure by which Plaintiffs' Claims in Limitation (including tenderd claims under Rule 14(c) against BP) could be filed together with OPA and other claims. *See* PTOs 24 and 25.

1995), there is no dispute that some of the plaintiffs have satisfied (and will continue to satisfy) the OPA's requirements.  (*See* Am. B1 Master Compl. ¶ 689.)  Nothing in the OPA counsels for the dismissal of an entire claim under such circumstances.[32]  Indeed, all of Defendants' cases appear to refer to the situation when *no* plaintiff had alleged that he or she had presented properly.  *See, e.g.*, *Boca Ciega*, 51 F.3d at 237 ("Appellants never claimed that they satisfied OPA's claims presentation requirement."); *Gabarick v. Laurin Mar. (America), Inc.*, No. 08-4007, 2009 U.S. Dist. LEXIS 20974 at *16 (E.D. La. Jan. 12, 2009) ("[N]o claimant argues that ninety days have elapsed since the claim was presented."); *Turner v. Murphy Oil USA, Inc.*, No. 05-4206, 2007 U.S. Dist. LEXIS 94304 (E.D. La. Nov. 21, 2007) ("J.P. Morgan failed to comply with the notice requirements of the OPA, and J.P. Morgan's OPA claims are dismissed.").  Those cases, then, do not provide guidance here, where a significant number of plaintiffs *have* complied with the OPA.  *Cf. Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*, 571 F.3d 672, 677 (7th Cir. 2009) (Posner, J.) ("[A] class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable because at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown.").  Defendants' suggestion, that an entire claim be dismissed merely because some potential class members may not ultimately be able to assert it, is without analogue.[33]

---

[32] Defendants' suggestion is also impractical; presumably the non-OPA claims would proceed to be litigated (including discovery) and the Court would defer the prosecution of the OPA claims until such time as *all* plaintiffs/class members who can timely comply with OPA's presentment requirements did so (or their OPA claims become time-barred).

[33] In this case, although class allegations are not challenged and it would be premature to consider such challenges, the OPA subclass includes by definition only plaintiffs "who have timely complied with all administrative requirements."  (Am. Master Compl. ¶ 545.) In other words, the OPA subclass includes by definition only those who have made presentment, which is a population that grows daily as the presentment process continues.

- 60 -

### B.    Defendants' Rule 12 Motions On The Issue Of Responsible Party Status Are Premature.

Regardless of whether they meet the definition of "responsible party" under 33 U.S.C.A. § 2701(32), under the facts alleged in the First Amended B1 Master Complaint, the acts or omissions of Defendants Cameron, Halliburton, Weatherford, and M-I (as well as Transocean, Anadarko, MOEX, and BP) caused the Spill.  *See* 33 U.S.C. § 2702(d)(1)(A).  Under the unequivocal terms of § 2702(d)(1)(A), any third party whose act or omission caused the discharge of oil "shall be treated as the responsible party."  33 U.S.C. § 2702(d)(1)(A).  Under the facts alleged, Defendants Halliburton, Cameron, Weatherford, and MI could ultimately "become the responsible part[ies]" and be liable to "all claimants."  *See, e.g.*, *Gabarick v. Laurin Mar. (Am.), Inc.* No. 10-30148, 2010 U.S. App. LEXIS 26681, at *8-10 (5th Cir. Dec. 30, 2010) (unpublished) (reversing grant of partial summary judgment because facts were too undeveloped to conclusively assign fault to any of the parties for purposes of OPA liability).

BP, Transocean, Anadarko Petroleum Corp., Anadarko E&P, LP, and MOEX Offshore 2007 LLC have been designated as responsible parties by the U.S. Coast Guard, not because they have been found liable for causing injury to plaintiffs, but to provide claimants with an expeditious avenue for recovery of the relief afforded by the OPA.  33 U.S.C. § 2713.  The OPA, at the same time, "provides the responsible party with a complete defense to liability" if it can prove, through litigation, that a third party was the sole cause of the oil spill.  *Gabarick,* 2010 U.S. App. LEXIS 26681, at *7 (citing 33 U.S.C. § 2703(a)(3)).  The designated responsible party has no way to raise the defense of liability, except through litigation.

In holding that summary judgment was premature, the *Gabarick* court stated that if the § 2703(a) defense is proven, "liability under the OPA shifts to the third party at fault for the spill, and the third party becomes the responsible party and is liable to *all claimants* under the OPA."

*Id.* at *8 (emphasis added); *see also Unocal Corp. v. U.S.*, 222 F.3d 528, 534 (9th Cir. 2000) (holding that "[o]nce the responsible party establishes these three factors, the third party who caused the spill officially becomes a "responsible party," and the owner/operator no longer bears any liability for the spill.  33 U.S.C. § 2702(d)(1)(A)").

Therefore, until there is a *judicial determination* concerning the liability of the responsible party (or parties), it would be improper to fully and finally dismiss, with prejudice, any third party not designated as a "responsible party" by the government, so long as there is a colorable claim that such party might later be found liable for the Spill**.**

Furthermore, with respect to vessels, the OPA provides that a responsible party is "any person owning, operating or demise chartering the vessel." § 2701(32).  However, the OPA does not define the term "operator."  To determine whether a person or entity qualifies as an "operator" under the OPA, the analysis in *U.S. v. Bestfoods*, 524 U.S. 51 (1998) is instructive.[34] In *Bestfoods*, the Supreme Court stated that liability should attach to an operator "regardless of whether that person is the facility's owner, the owner's parent corporation *or business partner*, or even a saboteur who sneaks into the facility at night to discharge poisons out of malice."  *Id.* at 65 (emphasis added).  Further, the Supreme Court held that "an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility."  *Id.* at 66.  In the context of "environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."  *Id.* at 66-67. This broad definition of the term "operator" establishes that a Rule 12 Motion to Dismiss is

---

[34] *Bestfoods* has been recognized as applicable in OPA cases.  *See U.S. v. Viking Resources, Inc.*, 607 F. Supp. 2d 808, 822 (S.D. Tex. 2009); *see also Harris v. Oil Reclaiming Co.*, 94 F. Supp. 2d 1210, 1213 (D. Kan. 2000).

premature.  For instance, material issues of fact still remain as to whether Defendant Halliburton was an "operator" where it managed and conducted operations having to do with the cement job or other aspects of the drilling operation.  In short, at this stage of the litigation, these claims should survive and, accordingly, the Defendants' motions in this regard should be denied.

> **C.     The OPA May Apply To At Least Some of the Claims By The Vessels Of Opportunity Plaintiffs.**

The Vessels of Opportunity ("VoO") Plaintiffs are boat owners or other workers who participated in the clean-up effort, and have asserted various types of claims in this litigation. Some of the VoO Plaintiffs' claims include, for example, claims for loss of profits or earning capacity, property damage, subsistence damages, or removal costs, irrespective of their participation in the VoO program.  In addition, or separately, they may be owed compensation from BP (or other sub-contractors) under their VoO charter agreements.  They may have claims for medical monitoring or post-Spill injury due to their exposure to oil and/or dispersants, (which might be solely related to their participation in the VoO program, or which may be partially related to non-VoO-related living or working conditions).  And, finally, they may have damage to their vessels or other property, (which may be wholly related to participation in the VoO program, or which may be partially related to other living or working conditions).  Depending on the particular facts and circumstances, their claims may be properly asserted in contract, under the OPA, under general maritime law, or perhaps under state law.  These claims may be joined together, and stated in the alternative, pursuant to PTOs 24 and 25, and Federal Rule of Civil Procedure 8(a)(3).

With respect to the OPA specifically, the act provides for liability on the part of responsible parties for damages that result from discharges of oil.  Section 2702(a) of the OPA provides that

916087.7

> each responsible party for a vessel or a facility from which oil is
> discharged, or which poses the substantial threat of a discharge of
> oil, into or upon the navigable waters or adjoining shorelines or the
> exclusive economic zone is liable for the removal costs and
> damages specified in subsection (b) that *result from such incident*.

33 U.S.C. § 2702(a). (emphasis added).   Section 2701(14) of the OPA defines the term

"incident" as follows:

> (14) "incident" means any occurrence or series of occurrences
> having the same origin, involving one or more vessels, facilities, or
> any combination thereof, resulting in the discharge or substantial
> threat of discharge of oil;

33 U.S.C. § 2701(14).  BP argues that the Spill is the "incident" to which Section 2702(a) refers,

and that the VoO Plaintiffs' damages did not "result from" that incident.  Plaintiffs agree that the

Spill qualifies as an OPA "incident."  Plaintiffs disagree, however, with BP's interpretation of

the requirement in Section 2702 that a claimant's damages "result from" the discharge of oil.

      In support of its argument that the VoO Plaintiffs' damages did not result from the

discharge of oil, BP relies on the Fourth Circuit Court of Appeals' decision in *Gatlin Oil Co. v.*

*United States,* 169 F.3d 207 (4th Cir. 1999).  In *Gatlin Oil*, vandals jammed open seven of

Gatlin's above-ground fuel storage tanks, causing an oil spill.  Vapors from the discharged oil

ignited a fire that destroyed Gatlin's warehouse, the bulk plant, inventory, other property, the

loading dock, and several vehicles.  *Id.* at 209.  Gatlin claimed that it was entitled to all damages

resulting from the discharge of oil and the ensuing fire from the Oil Spill Liability Trust Fund.

*Id.*  The Coast Guard contended that Gatlin was not entitled to damages under the OPA for the

fire damage.   *Id.*   The court held that "the removal costs and damages specified in

section 2702(b) are those that result from a discharge of oil . . . into navigable waters or the

adjacent shoreline," *Id.* at 212, and that Gatlin could not recover compensation for fire damage

because the evidence did not establish that the fire caused the discharge of oil into navigable waters or posed a threat to do so, as required by section 2702(a).  *Id.*

Unlike the fire damage in *Gatlin Oil,* the damages sustained by the VoO Plaintiffs resulted directly from a discharge of oil into navigable waters.  The claimant in *Gatlin Oil* could not show that an OPA "incident" caused the fire; by contrast, there is no question that the VoO Plaintiffs would not have sustained their damages *but for* the spill, an OPA "incident."  As a direct result of the spill, BP contracted with at least 2,000 vessel owners to recover oil coming to the surface, skim oil from the surface of the water, and conduct in situ burning of oil that reached the surface of the water and recover light oil and tar balls.  In addition to BP's failure to compensate the vessel owners, many VoO vessels sustained substantial physical damage as the result of their participation in the program, as they were required to navigate through oil contaminated waters, which caused accumulation of oil on, and staining of, their propellers, rudders, and engines.  BP failed to decontaminate the vessels until the damage had become permanent, and the decontamination efforts themselves caused additional physical damage to the hulls, decks, equipment, and appurtenances of the vessels.  Thus, the VoO Plaintiffs sustained damage to their property, as well as economic loss, as the direct result of the Defendants' discharge of oil into a navigable waterway.

In *Dunham-Price Group, LLC v. Citgo Petroleum Corp.,* No. 2:07 CV 1019, 2010 U.S. Dist. LEXIS 31901 (E.D. La., March 31, 2010), an oil spill from Citgo's Lake Charles refinery into the Calcasieu River resulted in the Coast Guard's closure of approximately 22 miles of the Calcasieu River.  *Id.* at *2.  Dunham Price owned a concrete facility located upriver from Citgo's refinery and asserted an OPA claim against Citgo for damages resulting from the temporary closure of the waterways.  Citgo sought dismissal, arguing that an OPA plaintiff must prove that

his injuries are directly "due to" property damage resulting from an oil discharge, and that Dunham Price's damages were due to the closure of the ship channel, and not to a physical injury to property or natural resources.  *Id.* at \*6.  Dunham Price argued that the OPA does not require a direct causal link between a claimant's economic losses and damage to property or natural resources.  The *Dunham-Price* court held as follows:

> Citgo has admitted that its discharge of oil into the Calcasieu River polluted a navigable water of the United States and damaged the personal property of owners along the Calcasieu River. Moreover, the Coast Guard issued a community advisory, notifying the public of the spill and the subsequent closure of the Calcasieu River. *Dunham Price has submitted evidence demonstrating genuine issues of material fact, so it will be for the trier of fact to determine whether Dunham Price's economic losses are due to Citgo's oil spill.* Accordingly, Citgo's Motion for Summary Judgment regarding Dunham Price's OPA claims is DENIED.

*Id.* at \*7-8 (emphasis added).

If the OPA claims at issue in *Dunham-Price* withstood summary judgment, the VoO Plaintiffs' claims should certainly surpass 12(b)(6) scrutiny in the instant case.  The VoO program was a key component of BP's response to the Spill.  The purpose of the program was to respond to the Spill, and therefore "result[ed] from" the Spill.  Moreover, the damage caused to the vessels owned by the VoO Plaintiffs was the result of direct contact with the oil, and, accordingly, the VoO Plaintiffs' claims are even more compelling than those at issue in *Dunham-Price*.  Accordingly, the VoO Plaintiffs have stated a viable claim for their economic losses, damage to and destruction of their vessels, and loss of profits and earning capacity resulting from the oil spill, an OPA "incident."

### D.     The "Moratorium Plaintiffs" Have Stated A Viable Claim Under The OPA For Which Relief May Be Granted.

The Amended B1 Master Complaint includes claims for oil service, exploration and/or drilling service companies, workers, providers, or suppliers who have lost income, profits and/or

earning capacity as a direct result of the adverse effects of the Deepwater Horizon explosion, blow-out, and Spill on deepwater exploration and/or drilling in the Gulf of Mexico (including, but not limited to the Moratorium issued by the United States Department of Interior) (the "Moratorium Plaintiffs").  (Am. B1 Master Compl., ¶ 209(1).)  Transocean asserts that the Moratorium Plaintiffs' claims must be dismissed for failure to state a claim under the OPA, because the imposition of the Moratorium was an "intervening" or "superseding" cause of damage that could not reasonably have been anticipated.  Tr. Mot. to Dismiss, at 47.

First, assuming *arguendo* that the Moratorium could be considered a "superseding" or "intervening" cause under the OPA, (which is denied), there are certainly some economic losses which did occur and would have occurred as a result of the Spill, irrespective of the Moratorium.

Furthermore, it is clear that the Moratorium was imposed in direct and foreseeable response to the Spill.  Or, stated in terms of causation: But-for the Spill, the Moratorium would not have been implemented.

As a pleading issue, Plaintiffs expressly alleged that the Moratorium damages were "a result of the Spill" and that the Moratorium was implemented "in response to the Spill."  (Am. B1 Master Compl. ¶ 521.)  The Amended B1 Master Complaint further alleges that the Moratorium was "a direct, proximate and foreseeable result of the Deepwater Horizon/Macondo Well blowout and spill."  *Id*. at ¶ 522.  These allegations, which are at the very least "plausible" under the *Iqbal/Twombly* standard, must be accepted as true for Rule 12 purposes.  Indeed, the question of foreseeability is a factual issue not capable of disposition on a motion to dismiss. 57A Am.Jur.2d *Negligence* §602. ("Generally, the determination of whether an intervening act

was foreseeable or could have been reasonably anticipated is a question of fact for the jury or trier of fact.").[35]

As a matter of law, moreover, the causation standard under the OPA is clearly more relaxed than traditional concepts of "legal" or "proximate" cause.  The statutory terms "result from"[36] and "due to"[37] are not specialized legal terms; they are English-language synonyms for the term "caused by."[38]  As used in ordinary English, "caused by" normally refers to factual causation,[39] not the typically more stringent standard of "proximate" cause.  The prevailing default test for factual causation is the but-for test,[40] which is clearly satisfied in this case.

Notably, the text of the statute permits recovery for damages resulting from the mere "*threat*" of an oil spill. 33 U.S.C. §2702(a).  This statutory language is significant in this context because it confirms an intent to extend the right of recovery for real and tangible economic losses

---

[35] Tellingly, Transocean does not cite to a single case in which the question of whether alleged damages were caused by a discharge or threatened discharge of oil or a superseding intervening cause was decided on a Rule 12 motion to dismiss.  Both of the cases upon which Transocean relies were decided in the summary judgment phase, on a completely developed record as to foreseeability.  *Taira Lynn Marine Ltd. No. 5, LLC v. Jays Seafood, Inc., et al.*, 444 F.3d 371 (5th Cir. 2006) *and In re Settoon Towing, LLC*, Civ. A. 07-1263, 2009 U.S. Dist. LEXIS 113533 (E.D. La., December 4, 2009).  Indeed, *Settoon Towing* supports the viability of the Moratorium claims.  In *Settoon Towing*, the court *denied* summary judgment as to plaintiffs who claimed purely economic damages resulting from the shutdown of a waterway following an oil spill, because there remained a factual question as to whether the oil spill was the cause of those economic damages.  *Id.* at *13.

[36] 33 U.S.C. §2702(a).

[37] 33 U.S.C. §2702(b)(2)(E).  Plaintiffs refer herein to 33 U.S.C. §2702 as OPA's "Damages Provision" herein, (particularly §2702(a) and §2702(b)(2)(E)).

[38] *See* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1981) at 403 (defining "due to" as "caused by"); 510 (in a list of synonyms for "follow," stating that "*result* refers to an event that is discernibly caused by a prior event or events); 1109 (defining "result" as "to occur or exist as a consequence of a particular cause," and referring to the list of synonyms for "follow"); *id.* (defining "resultant as "issuing or following as a consequence or result").

[39] *See id.* at 214 (defining the noun "cause" to mean "that which produces an effect, result, or consequence" and the verb "cause" to mean "make happen").

[40] *See* RESTATEMENT (THIRD) OF TORTS:  LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 26 and cmt. b (2010).

which might be incurred even in the absence of direct physical damage.  It is further significant in the sense that the Moratorium was, among other things, the direct and foreseeable (or perhaps unforeseeable, but direct) response to the significant "threat" of an oil spill, for which BP is clearly a responsible party.

The legislative history additionally demonstrates that during the drafting of the OPA, Congress considered and rejected language that would have imposed stricter causation standards, and specifically referred to broad classes of individuals who had been affected by oil spills.  The legislative history, in this respect, suggests that members of Congress intended to enact an OPA with a broad damages provision, and supports the conclusion that individuals and businesses that rely on the waters and shores and experienced economic losses as a result of the Spill satisfy the OPA's causation requirements.

First, the history indicates that Congress considered and intentionally rejected arguably more restrictive causation standards for OPA damages.  As the OPA's Damages Provision evolved during the drafting process, at least four different causation standards, each of which was arguably more restrictive than the causation language ultimately enacted in the OPA, were considered and rejected by Congress.[41]  The final version of the OPA provided that "each responsible party … is liable for … damages … *that result from*" an oil spill, including damages for lost profits "*due* to the injury, destruction, or loss of real property, personal property, or natural resources."  H.R. Rep. No. 101-653, at 103 (Aug. 1, 1990) (Conf. Rep.) (emphasis

---

[41] Specifically, S. 686 required that the responsible party that "causes the incurrence of removal costs, shall be liable for . . . all damages for economic loss or loss of natural resources *resulting from* such a discharge;" H.R. 1465, as proposed, required that the damages "*arise out of or directly result from*" the oil spill; H.R. 3027 specified that damages must be *proximately caused* by the oil spill; and H.R. 1465, as adopted by the House, provided that responsible parties were "jointly, severally, and strictly liable for the removal costs and damages specified in subsection (b) that *directly result from* such incident." H.R. 1465 (Nov. 15, 1989) (emphasis added).  The history does not explain why the various causation standards were chosen in each instance.

- 69 -

added).[42]   Congress' consideration and rejection of earlier causation language that was more restrictive and were certainly more specific, including "directly result from" and "proximate cause" language, suggests that Congress intended that the Damages Provision it enacted in the OPA would apply a more liberal causation requirement.

Second, Congress specifically referred to broad classes of individuals who had been affected by oil spills.  The legislative history contains nothing indicating that Congress intended to limit the reach of the Damages Provision to a particular category of claimant.  Moreover, Congress appears to have considered perception/stigma-related losses (e.g., the reduction in the price of a non-contaminated fish because of a public perception that it is unsafe to eat) as a potential damage claim.  During the OPA drafting, members of Congress took note of the broad classes of entities and individuals who had been affected by the *Exxon Valdez* oil spill, suggesting that Congress intended that these parties be compensated for their damages.[43]

---

[42] The history explains that "Subsection . . . (b)(2)(E) provides that any claimant may recover for loss of profits or impairment of earning capacity *resulting from* injury to property or natural resources."  H.R. Rep. No. 101-653, at 103 (Aug. 1, 1990) (Conf. Rep.) (emphasis added).  The history also clarified Congress' intent to abrogate the common law's requirement that a claimant have a proprietary interest in damaged property to recover damages, by specifying that "[t]he claimant need not be the owner of the damaged property or resources to recover for lost profits or income.  For example, a fisherman may recover lost income due to damaged fisheries resources, even though the fisherman does not own those resources."  *Id.*

[43] Specifically, Congress observed the impact of the *Exxon Valdez* spill and other spills on: (1) local residents and communities; (2) parties who lost their jobs, livelihoods, homes, and local environment because of a spill; and (3) parties who depend on clean water and clean coastlines for their livelihoods.  *See* 135 Cong. Rec. S9689-S9716, at S9904 (Aug. 3, 1989) (statement of Sen. Murkowski) ("It is difficult to put into words the impact that this spill has had on the environment inside and outside Prince William Sound and on the lives of the local residents.."); 135 Cong. Rec. H7954-H7978, at H7969 (Nov. 2, 1989) (statement of Rep. Dyson) ("But the consequences of a spill, for the States, local communities and private citizens that have to live with the oil fouled waters, can't be so easily measured.  A major spill can devastate the lives and the livelihoods of those who must live with the consequences of such a disaster."); 135 Cong. Rec. S9689-S9716, at S9863 (Aug. 3, 1989) (statement of Sen. Metzenbaum) ("The poverty problem has to do with those poor people in Alaska who have lost their jobs, their livelihood, their homes, and the beautiful areas in which they live."); 135 Cong. Rec. S9689-S9716, at

*Footnote continued on next page*

Congress further indicated its intent that the Damages Provision apply to more obvious classes of individuals and entities, including fishermen and the fishing industry;[44] beachfront property and business owners;[45] and the tourism industry.[46]   Congress also appears to have considered

---

*Footnote continued from previous page*

S9863 (Aug. 3, 1989) (statement of Sen. Metzenbaum) ("The poverty problem has to do with those poor people in Alaska who have lost their jobs, their livelihood, their homes, and the beautiful areas in which they live."); H.R. 1465, 101st Cong., E3956-3957, at E3956 (Nov. 17, 1989) (remarks by Rep. Unsoeld) ("…these disasters scar our shorelines and create havoc for marine ecosystems and for those who depend on clean water and coastlines for their livelihood.").

[44] H.R. Rep. No. 101-653, at 103 (Aug. 1, 1990) (Conf. Rep.) ("[A] fisherman may recover lost income due to damaged fisheries resources, even though the fisherman does not own those resources."); H.R. 1465, 101st Cong., at E2110 (June 22, 1990) (remarks by Rep. Schneider) ("H.R. 1465 would have also required the owners [of the World Prodigy, a vessel that caused an oil spill,] to adequately compensate those losses due to the oilspill, including those incurred by shell fishermen and dealers and processors, bait and tackle store owners, beach concessionaires, and so forth.  This compensation would have been complete and quickly paid, and would have covered all damages to natural resources.").

[45] 135 Cong. Rec. H7954-H7978, at H7966 (Nov. 2, 1989) (statement of Rep. Stangeland) ("For many individuals and business owners along the coast, time is money."); 135 Cong. Rec. H7954-H7978, at H7962 (Nov. 2, 1989) (statement of Rep. Ortiz) ("[I]t guarantees that . . . beachfront property owners will be compensated promptly and in full for any oil spill damages they might suffer."); 135 Cong. Rec. H7954-H7978, at H7956 (Nov. 2, 1989) (statement of Rep. Studds) ("The Nation should focus first on oilspill prevention and cleanup, but we must not lose sight of liability and compensation issues either. The polluter should pay and the victim should receive full compensation for direct, proven damages. This includes governmental cleanup costs, natural resource damages, and economic damages to third parties such as fishermen and beachfront property owners.  And when the polluter cannot or will not pay, a federal fund should be available for prompt, adequate compensation to oilspill victims without having to endure endless and costly litigation.  Our bill follows these important principles."); H.R. 1465, 101st Cong., at E2110 (June 22, 1990) (remarks by Rep. Schneider) ("H.R. 1465 would have also required the owners [of the World Prodigy vessel that caused an oil spill] to adequately compensate those losses due to the oilspill, including . . . beach concessionaires, and so forth.  This compensation would have been complete and quickly paid, and would have covered all damages to natural resources.").

[46] *See* 135 Cong. Rec. S9689-S9716, at S9922 (Aug. 3, 1989) (statement of Sen. Kerry) ("Mr. President, it will take several years and perhaps decades to completely understand the impact of the spill in Alaska. What will the economic impact of lost tourism, the impact to the fisheries and the livelihood of the fishermen really be?"); 135 Cong. Rec. H7898-H7910, at H7900 (Nov. 1, 1989) (statement of Rep. Jones) ("Finally, subsection (b)(2)(E) allows recovery for loss of earnings due to injury to property or natural resources.  The claimant need not be the owner of the property or resources to bring the claim for lost earnings, as required by common law.  This

*Footnote continued on next page*

- 71 -

compensation of losses resulting from perception/stigma-related problems. For example, during the *Exxon Valdez* spill hearings, Representative Don Young of Alaska asked Exxon Chairman L.G. Rawl how Exxon would treat a price reduction in fish from Prince William Sound based on a perception that it might contaminated.[47] Members of Congress further noted that a broad class of parties would be injured if a spill similar to the *Exxon Valdez* occurred in an area more densely populated than Alaska.[48]

Finally, Transocean's narrow interpretation of the OPA is further undermined by Congress' intent that the OPA serve the broad remedial purpose of compensating parties affected by oil spills without extensive litigation. Congress intended that the OPA provide swift and just compensation to individuals who were affected by an oil spill without debate regarding whether those claims have been properly brought. The legislative history demonstrates that "[t]he Fund is to provide compensation for damage claims fully and promptly." S. Rep. No. 101-94: Committee on Environment and Public Works, at 10 (July 28, 1989) (emphasis added). Consequently, "[w]hile the Fund must require some evidence of loss and the establishment of a

---

*Footnote continued from previous page*

means, for example, that an employee at a coastal motel may have standing to make a claim for damages even though the employee owns no property which has been injured as a result of an oil spill.").

[47] H.R. Rep. No. 101-242, pt. 2: Committee on Merchant Marine and Fisheries (Sept. 18, 1989). Rawl responded to Young's question: "I understand what you are saying, but when you get into things like remote damages, and so forth, if they are valid claims, they will be paid," suggesting that it might have considered such a claim in some circumstances. *Id*. at 75 (statements of L.G. Rawl, Chairman of Exxon).

[48] For example, Representative Hutto observed that "[t]he economy of the State of Florida depends heavily on the tourism industry. Aside from the obvious environmental devastation which would result from an oil spill off our coast, tourism is also directly tied to the world's most beautiful beaches." 135 Cong. Rec. H7954-H7978, at H7971 (Nov. 2, 1989) (statement of Rep. Hutto). Similarly, Senator Stevens of Alaska cautioned that "if such a spill, God forbid, would happen … along Cape Cod, … the thousands of communities that are along the east coast of the United States between the Canadian border and New York, all could be affected by one supertanker spill." 135 Cong. Rec. S9689-S9716 at S9700 (Aug. 3, 1989) (statement of Sen. Stevens).

causal connection with oil pollution, *it should not routinely contest or delay the settlement of damage claims[, and] ... litigation or lengthy adjudicatory proceedings over liability, defenses, or the propriety of claims should be reserved for subrogation actions against dischargers.*" S. Rep. No. 101-94: Committee on Environment and Public Works, at 10 (July 28, 1989) (emphasis added).  Thus, Congress expressed its intent that damages claims be paid quickly and that lengthy litigation be reserved only for subrogation claims.

Additional statements in the history further support that the OPA was intended to provide full compensation to those individuals who suffered damage from an oil spill.  For example, it "provides for compensation to individuals and entities which suffer economic damage due to a spill."  H.R. Rep. No. 101-241, pt. 1: Committee on Public Works and Transportation, at 29 (Sept. 13, 1989); *see also* H.R. Rep. No. 101-242, pt. 2: Committee on Merchant Marine and Fisheries, at 34 (Sept. 18, 1989) ("It will guarantee that those suffering economic loss as the result of an oil spill from a vessel or facility will be quickly and fairly compensated for the loss, whether or not the spiller accepts liability or admits negligence in connection with the discharge of oil."); S. Rep. No. 101-94: Committee on Environment and Public Works, at 12 (July 28, 1989) ("*These provisions are intended to provide compensation for a wide range of injuries and are not so narrowly focused as to prevent victims of an oil spill from receiving reasonable compensation*.  For example, economic damages include both loss of use and loss of subsistence use of natural resources.  Under this provision, fishermen, for example, would not only receive the equivalent of unemployment compensation, but would also receive compensation to prevent loss of a boat.  Lost wages are of limited value if the means of earning the wages, such as a boat, go uncompensated.") (emphasis added); 135 Cong. Rec. H7954-H7978 at H7964 (Nov. 2, 1989) (statement of Rep. Hammerschmidt) ("In developing this bill, we have attempted to provide a

system of liability that ensures payment for all justifiable costs and damages.  If a spill directly causes a quantifiable injury, the person injured will be entitled to compensation.").

Therefore, to the extent that some oil field workers or service providers may have suffered damages partially attributable to the Moratorium, where such damages also "result from" the Oil Spill, relief is available under the OPA. Congress considered and rejected language that would have imposed stricter causation standards for the OPA, and specifically referred to broad classes of individuals who had been affected by oil spills, to further its intent that the OPA serve the broad remedial purpose of entitling and enabling all those affected by oil spills to receive full compensation without litigating a hyper-technical or restrictive causation requirement.

### E.    Private Plaintiffs Do Not Seek Natural Resource Damages Under The OPA.

Plaintiffs eek no private recovery of "Natural Resource Damages" under the OPA in Plaintiffs' Amended B1 Master Complaint.

## VI.    THE RULE IN *ROBINS DRY DOCK* DOES NOT BAR PLAINTIFFS' ECONOMIC LOSS CLAIMS.

The rule in *Robins Dry Dock & Repair Co. v Flint,* 275 U.S. 303 (1927) is ordinarily interpreted to stand for the proposition that no duty is owed under the general maritime law of negligence to a plaintiff that suffers only economic loss as a result of the alleged wrongful act, absent personal injury or damage to physical property in which the plaintiff has some proprietary interest.  *See also State ex rel Guste v. M/V TESTBANK,* 752 F.2d 1019 (5th Cir. 1985) (*en banc*).

Yet, with respect to OPA claims, it is clear that *Robins Dry Dock* and *TESTBANK* do not apply.  "Any claimant" may sue under the OPA for loss of profits or impairment of earning capacity due to the injury, destruction or loss of real property, personal property or natural

resources. 33 U.S.C. ¶ 2702; *see, e.g.,* 33 C.F.R. 136.231(a) ("The claimant need *not* be the owner of the damaged property or resources to recover for lost profits or income") (emphasis added).[49]

Moreover, it could be argued that the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA" (also known as "The Superfund Act"), 42 U.S.C. § 9601, *et seq.*) was amended just after *TESTBANK* in 1986 to overrule *TESTBANK* and *Robins Dry Dock*.  The amendment provided as follows:

> *The owner or operator of a vessel shall be liable* in accordance with this section, *under maritime tort law,* and as provided under section 9614 of this title *notwithstanding* any provision of the Act of March 3, 1851 (46 U.S.C. 183ff)[which is "The Limitation of Liability Act"] or *the absence of any physical damage to the proprietary interest of the claimant.*

42 U.S.C. § 9607(h) (emphasis added).

Plaintiffs, of course, have asserted no claims under CERCLA in their Amended B1 Master Complaint with respect to property damages and economic losses arising from the Deepwater Horizon blow out and resulting Spill.   Nevertheless, some commentators have suggested that these statutory amendments were intended to alter not only claims brought under the Superfund Act, but claims brought under the general maritime law.  The current version of Section 9607(h) was part of Amendment 671, introduced as part of the Superfund Amendments and Reauthorization Act of 1986.  The relevant part of the Amendment provides: "Section 107(h) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 is amended by inserting 'under maritime tort law,' after 'with this section' and by inserting before the period 'or the absence of any physical damage to the proprietary interest of the

---

[49] *See also,* 33 U.S.C. §2702(a) (responsible party liable for damages resulting from the mere "*threat*" of an oil spill) (emphasis supplied).

claimant.'"  Pub. L. No. 99-499, 94 Stat. 2767 (October 17, 1986).  The House Report issued on

October 3, 1986 explained as follows concerning the Amendment: "Section 107 of CERCLA is

amended to clarify that a vessel owner would be liable in accordance with section 107 under

maritime tort law and that physical damage to the proprietary interest of the claimant is not

required as a condition of liability."  H.R. Rep. No. 99-962, at 56 (1986) (Conf. Rep.), as

reprinted in 1986 U.S.C.C.A.N. 3068, 3352.

One commentator indicated that these legislative pronouncements were intended to

implicitly overrule *Robins Dry Dock* and *TESTBANK,* stating:

> The subsection can be understood to mean that the requirement of
> physical injury to a proprietary interest and the Limitation of
> Liability Act are inapplicable in three situations: (1) actions
> brought under section 9607 of CERCLA, namely the Act's liability
> provisions; (2) *actions brought under the general maritime law*;
> and (3) actions brought under state law pursuant to the authority of
> section 9614 of CERCLA.

S. Olssen, *Recovery for the Lost Use of Water Resources: M/V TESTBANK on the Rocks?*,

67 Tul. L. Rev. 271, 300 (1992) (emphasis added).  No court, to Plaintiffs' knowledge, has

specifically addressed this issue and held to the contrary.

### A.  *Robins Dry Dock* Should Not Apply Here.

Unlike the situation presented in *Robins Dry Dock*, Plaintiffs here do not complain that a

party in contractual privity with them was injured by the acts of Defendants, which in turn

caused their damage.  Instead, Plaintiffs seek recovery for the torts committed by Defendants that

has caused direct, albeit economic, harm.  As Judge Clark explained in his special concurrence in

*Hercules Carriers, Inc. v State of Florida*, 720 F.2d 1201, 1203 (11th Cir. 1983), vacated and

affirmed by equally divided *en banc* court*,* 728 F.2d 1359 (11th Cir. 1984), *Robins Dry Dock*

should be construed to apply only in cases where the plaintiff is damaged because of injury to a

party in privity with the plaintiff.  Judge Clark's well-reasoned concurrence accurately defined

the appropriate limits of *Robins Dry Dock*, and he strongly advocated that the Eleventh Circuit should clarify the law and properly limit *Robins Dry Dock*.  He succeeded in having the court consider the issue *en banc*, but came up one vote short, with the entire court being evenly split on the issue.  *Id.*  The facts here make a far more compelling case for confining *Robins Dry Dock* to its original boundaries, in which case the doctrine would not apply.  The full extent of the *Robins Dry Dock* rule is not clear in any circuit.  Hence, even if the Court were of the opinion that *Robins Dry Dock* has not been overruled by statute, it should be held inapplicable here.

        **B.**     **The Fishermen Plaintiffs' Claims Are Not Barred by *Robins Dry Dock*.**

Finally, even if *Robins Dry Dock* were applicable to some of the claims asserted by some of the plaintiffs herein, there is no question that Plaintiffs who are fishermen and fishing boat owners can sue for non-impact economic loss notwithstanding the *Robins Dry Dock* rule.  *See Miller Indus. v. Caterpillar Tractor,* 733 F.2d 813, 820 (11th Cir. 1984); *see also Union Oil Co. v. Oppen,* 501 F.2d 558, 567 (9th Cir. 1974).  While it could be argued that this issue is still open in the Fifth Circuit, s*ee TESTBANK,* 752 F.2d at 1027 n.10, and *In re Taira Marine Ltd No 5, LLC,* 444 F.3d 371, 378 n.16 (5th Cir. 2006), it is respectfully suggested that this Court should follow the well-reasoned authority in favor of an exception for commercial fishermen.  *See, e.g., Shaughnessy v. PPG Indust., Inc.*, 795 F. Supp. 193, 196-197 (W.D. La. 1992).  Moreover, it would be inappropriate to decide the question of who qualifies as a fisherman in the context of a 12(b)(6) motion.

**VII.**    **THE PROPERTY PLAINTIFFS HAVE PROPERLY ALLEGED CLAIMS FOR WHICH RELIEF MAY BE GRANTED FOR TRESPASS.**

        **A.**     **Plaintiffs State Maritime Trespass Claims under Recognized Principles of Federal Common Law.**

Because Plaintiffs are not limited to Louisiana law for their common law claims, Defendants' various arguments under Louisiana law should be rejected.  As discussed in

Section I above, OCSLA does not require the exclusive application of Louisiana law as "surrogate federal law." As the body of judicially-created general maritime law is incomplete, judges in admiralty cases often borrow common law in the interest of uniformity. Thomas J. Schoenbaum, Admiralty and Maritime Law, 4th ed., § 4-2 (2004) (citing *Hebert v. Outboard Marine Corp.,* 638 F. Supp. 1166 (E.D. La. 1986)); *see also Marastro,* 959 F.2d at 53. With specific respect to Plaintiffs' claims for trespass, the principles of common law found in the Restatement (Second) of Torts are frequently applied. *See Marastro,* 959 F.2d at 53 (stating "[t]he general common law and in particular the Restatement (Second) of Torts should control to determine the law of maritime trespass, in order to promote uniformity in general maritime law"); *see also Lakes of Gum Cove Hunting & Fishing, L.L.C. v. Weeks Marine, Inc.,* 182 F. Supp. 2d 537, 545 (W.D. La. 2001) ("[n]o rule of trespass to land exists in maritime law, but 'federal courts may borrow from a variety of sources in establishing common law admiralty rules to govern maritime liability where deemed appropriate.'") (quoting *Marastro,* 959 F.2d at 53); *Nissan Motor Corp. v. Maryland Shipbuilding and Drydock Co.,* 544 F. Supp. 1104, 1111 (D. Md. 1982) (applying Restatement (Second) of Torts in a maritime nuisance claim). "In the absence of federal cases or an established federal admiralty rule on trespass, it would be more appropriate to apply general common law rather than state law which would 'impair the uniformity and simplicity which is a basic principle of the federal admiralty law. . . .'" *Marastro,* 959 F.2d at 53 (quoting *Nissan Motor Corp.,* 544 F. Supp. at 1111). Although "the facts in *Marastro* involved maritime trespass, the unauthorized entry on a vessel, . . . the same goal of uniformity applies to a claim of trespass to land caused by a ship." *Lakes of Gum Cove*, 182 F. Supp. 2d at 545. "If different ports were to have different rules concerning whether legitimate maritime activity amounted to trespass or nuisance, the smooth flow of commerce

would be adversely affected."  *Id*.  Therefore, this Court, applying general maritime law, may borrow from general common law principles "that do not contravene maritime law, relying primarily on the Restatement (Second) of Torts."  *Id*.

BP and M-I assert that, under Louisiana law, the lessees among the Property Plaintiffs cannot maintain an action for trespass.  As addressed below, their argument is baseless.  Even if these Defendants were correct, a common law action would still be available to these plaintiffs, because the Restatement does not recognize such a limitation.  Under the Restatement, a defendant is subject to liability for trespass regardless of whether he causes harm to any legally protected interest, if he intentionally enters land in the possession of another, or causes a thing or third person to do so, or fails to remove a thing from the land that he is under a duty to remove.  Restatement (Second) of Torts § 158 (a) and (c).  The Restatement provides further that a person who is in "possession" of land includes one who "is in occupancy of land with intent to control it."  Restatement (Second) of Torts § 157 (a).  Ownership, therefore, is not a prerequisite to the maintenance of a trespass claim under the Restatement.  Accordingly, the lessees among the Property Plaintiffs may seek recovery for their damages under the common law found in the Restatement (Second) of Torts.

## B.    The Lessees Among The Property Plaintiffs Have Standing To Bring A Trespass Action Against Defendants Under Louisiana Law.

Under Louisiana law, a trespass occurs when there is an unlawful physical invasion of the property or possession of another.  *See Terre Aux Boeufs Land Co. v. J.R. Gray Barge Co.,* 803 So. 2d 86, 94 (La. App. 4th Cir. 2001); *see also Gaspard v. St. Martin Parish Sewerage Dist. # 1,* 569 So. 2d 1083, 1084 (La. App. 3d Cir. 1990).  Damages are recoverable for "unconsented to activities performed on the property of another, based on physical property damage, invasion of privacy, inconvenience, and mental and physical suffering."  *Beacham v. Hardy Outdoor*

*Advertising, Inc.,* 520 So. 2d 1086, 1091 (La. App. 2d Cir. 1987).  The Property Plaintiffs who may recover for trespass are those who have sustained an unlawful invasion of their owned or leased property.

A tenant or lessee in Louisiana has a right of action against trespassers who interfere with their possession of the property.  Pursuant to Article 3440 of the Louisiana Civil Code, "where there is a disturbance of possession, the possessory action is available to a precarious possessor, such as a lessee or a depositary, against anyone except the person for whom he possesses."  La. Civ. Code Ann. art. 3440.  Comment (d) to Article 3440 states as follows:

> (d) According to Article 3440, a precarious possessor may bring a possessor action against any one other than the person for whom he possesses.  *Thus, a lessee may bring a possessory action against a trespasser* or an adverse possessor but he cannot bring a possessory action against his lessor.  The judgment in a possessory action brought by the precarious possessor is not res judicata vis-a-vis the person for whom he possesses, unless the latter has been made a party to the proceedings.  See R.C.C. (1870) Article 2286.

La. Civ. Code Ann. art. 3440 cmt. (d) (emphasis added).  Thus, those who leased property and suffered damages as a result of the physical invasion caused by the Spill have a right of action under Louisiana law.

The Third Circuit's opinion in *Richard v. Richard,* 24 So. 3d 292 (La. App. 3d Cir. 2009), upon which BP relies, is of no moment here.  The court in *Richard* held that a property owner's son had no right of action in trespass under La. Civ. Code Ann. art. 2315 or La. Code Civ. Proc. Ann. arts. 681 and 927 because, although he was living on the property with his mother who was in possession of the property, he was not an owner or lessee of the property. There, the plaintiff was merely an occupant, and not a possessor of the property and, accordingly, he had no standing to maintain the action.  *Id.* at 298.  The *Richard* court relied on Article 3656 of the Louisiana Code of Civil Procedure, which provides that a plaintiff "in a

possessory action shall be one who possesses for himself, meaning that he is entitled to the use or usufruct of immovable property and who owns a real right therein."  La. Civ. Proc. Ann. art. 3656.  Article 3656 also provides that, "a predial lessee possesses for and in the name of his lessor, and not for himself."  *Id.*  The court in *Richard* merely held that the plaintiff was not a lessee and, if he were, he could not recover under Article 3656.  There is no mention in the *Richard* decision of Article 3440, which allows a tenant to maintain an action against a trespasser.  In any event, because the plaintiff failed to prove that he was a tenant, the discussion of what would have been the result if he were a tenant is *dicta*.

In *Indian Bayou Hunting Club, Inc. v. L.J. Taylor,* 261 So. 2d 669 (La. App. 3d Cir. 1972), also cited by BP, the question was whether a lessee may enjoin trespassers without alleging or proving irreparable harm, which the court answered in the affirmative.  BP cites to the concurring opinion in *Indian Bayou*, wherein the court cited Article 3656 and stated that a predial lessee "does not claim ownership, possession or enjoyment of a real right; he possesses for a lessor and he has the enjoyment of a personal right, namely, that of the lease."  *Id.* at 677-678 (Domengeaux, J., concurring).  However, *Indian Bayou* was decided prior to the enactment of Article 3440, which gives lessees the right to seek damages resulting from trespass.

The opinion in *La Rue v. Crown Zellerbach Corp.,* 512 So. 2d 862 (La. App. 1st Cir. 1987), cited by M-I, is equally unavailing.  There, the court held that landowners who brought a trespass action against their neighbor and a timber cutter for cutting trees on their neighbor's property failed to allege that they were the owners or possessors of the property and could not, therefore, maintain an action in trespass.  *Id.* at 863-864.  M-I asserts that *La Rue* stands for the proposition that "[o]nly property owners may recover for trespass in Louisiana."  M-I Mot. to Dismiss, Doc. 1597-1, at 19.  The actual holding in *La Rue* was that a plaintiff must be an owner

*or possessor* of property to sue for trespass. The term "possessor" was not defined, and the question of whether a lessee may maintain an action in trespass was not addressed.

Under Louisiana law, therefore, a tenant or lessee has standing to maintain a claim against those who trespass on his or her leased property.[50] The same is true in Mississippi, Alabama, and Florida, where Defendants have also trespassed on leased property. *See Corry v. State,* 710 So. 2d 853, 856 (Miss. 1998) (stating that lessees have standing to assert a claim of trespass on leased property); *see also D. L. Fair Lumber Co. v. Weems,* 16 So. 2d 770 (Miss. 1944) (stating that tenant leasing a pasture had a trespass action against a lumber company that owned timber situated on the land and who cut the fence and allowed tenant's cattle to escape); *AmSouth Bank, N.A. v. City of Mobile,* 500 So. 2d 1072, 1074 (Ala. 1986) (tenant who has right of possession can maintain an action for trespass); *Marianna & B.R. Co. v. Maund,* 62 Fla. 538, 543 (1911) (tenant has an action for trespass against third persons separate from the landowner). *See Weinman v. DePalma,* 232 U.S. 571, 575 (1914) (tenant may sue third party contractor for damages caused by negligence and trespass); 8 Thompson on Real Property, Thomas Edition § 68.06 (a)(1), at 199 (David A. Thomas ed., 1994) (stating that "[p]ossession rather than ownership is the key requirement" for a claim of trespass); Restatement (Second) of Property: Landlord and Tenant § 12.2 cmt. g (1977) (stating "[w]hen the damage to the leased property is caused by [a trespasser] whose conduct is not attributable to the tenant, the tenant and the landlord each may be entitled to recover for the damage to their respective interests in the leased property. The tenant and the landlord each may be entitled to recover for the damage to their respective interests in the leased property.").

---

[50] Notably, lessees of oyster beds in Louisiana "...have the right to maintain an action for damages against any person, partnership, corporation, or other entity causing wrongful or negligent injury or damage to the beds or grounds under lease to such lessee." La. Rev. Stat. Ann. § 56:423.

Accordingly, the arguments asserted by BP and M-I that the Property Plaintiffs have not asserted a viable claim for trespass under Louisiana law should be rejected.

## VIII.  THE FLORIDA PLAINTIFFS HAVE PROPERLY PLED A CLAIM UNDER THE FLORIDA POLLUTANT DISCHARGE PREVENTION AND CONTROL ACT, FLA. STAT. §§ 376.011, *ET SEQ.*

The Florida Pollutant Discharge Prevention and Control Act (the "Florida Act"), Fla. Stat. §§ 376.011, *et seq.*, prohibits "[t]he discharge of pollutants into or upon any coastal waters, estuaries, tidal flats, beaches, and lands adjoining the seacoast of the state."  Fla. Stat. § 376.041. The statute expressly states that:  "Because it is the intent of §§ 376.011-376.21 to provide the means for rapid and effective cleanup and to minimize cleanup costs and damages, any responsible party who permits or suffers a prohibited discharge or other polluting condition to take place within state boundaries shall be liable to the fund for all costs of removal, containment, and abatement of a prohibited discharge," subject to certain limitations and defenses.  Fla. Stat. § 376.12(1).  The Florida Legislature has made clear that "§§ 376.011-376.21, being necessary for the general welfare and the public health and safety of the state and its inhabitants, shall be liberally construed to effect the purposes set forth under §§ 376.011-376.21 and the Federal Water Pollution Control Act, as amended."  Fla. Stat. § 376.21.

In furtherance of the purpose of the Florida Act, plaintiffs are afforded a private right of action, such that:  "Notwithstanding any other provision of law, any person may bring a cause of action against a responsible party in a court of competent jurisdiction for damages, as defined in § 376.031, resulting from a discharge or other condition of pollution covered by §§ 376.011-376.21."  Fla. Stat. § 376.205; *see also Dostie Development, Inc. v. Arctic Peace Shipping, Co., Ltd.*, 1996 WL 866119, *2 (M.D. Fla. Aug. 14, 1996) (finding "that this statute provides a clear statutory remedy to one who suffers damages as a result of oil or other pollutants which are spilled into the public waterways of this state and which cause measurable harm to his

916087.7

property.").  Under the statute, it is not necessary that plaintiffs "plead or prove negligence in any form or manner."  Fla. Stat. § 376.205.  Rather, they "need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it occurred."  *Id.*; *see also Dostie*, 1996 WL 866119 at *2 (holding "[t]he plain language of the Florida Act makes clear that a private, strict liability cause of action is available"); *cf. Aramark Uniform Career and Apparel, Inc. v. Easton*, 894 So. 2d 20, 26 (Fla. 2004) (Florida Act, § 376.313 in particular, "creates a cause of action for strict liability regardless of causation").

The Florida Act provides that "any person" may seek "damages ... resulting from a discharge or other condition of pollution covered by [the Act]."  Fla. Stat. § 376.205.  The Florida Supreme Court has interpreted this provision broadly, in a case holding that the private cause of action recognized in the Florida Act permits commercial fishermen to recover damages for their loss of income despite the fact that the fishermen do not own any property damaged by the pollution.  *See Curd v. Mosaic Fertilizer, LLC,* 39 So. 3d 1216, 1218 (Fla. 2010).

In *Curd,* the plaintiffs alleged "damage to the reputation of the fishery products" they were "able to catch and attempt to sell."  That is, they claimed injury "in the nature of lost income or profits."  *Id.* at 1219.  Significantly, the plaintiffs in *Curd* did not allege any ownership interest in the damaged marine life.  *See id.* at 1218.  Nevertheless, in upholding the statutory allegations in the complaint, the court focused on the statute's "clear and unambiguous" language permitting *any person* to bring an action for damages and on the Legislature's intent "that the statute be liberally construed."  *Id.* at 1221.

Defendants' restrictive interpretation of the Florida Act is not warranted based on an examination of the plain language of the Act, the intent of the Legislature and the Florida case law permitting similar claims to go forward.  First, the Florida Act allows "*any person*" to bring

a cause of action "for damages, as defined in § 376.031, *resulting from a discharge or other condition of pollution* covered by §§ 376.011-376.21."  Fla. Act. § 376.205 (emphasis added). Plainly, the provision creating a private right of action under the Act does not limit a plaintiff's recovery to only those damages *directly* resulting from the discharge or other polluting condition.  *Id.*  The word "directly" is omitted from that provision, and it is that provision that defines who may bring an action.

Second, in the analogous Section 376.313, creating a private right of action "for all damages resulting from a discharge or other condition of pollution covered by §§ 376.30-376.317 (pertaining to ground and surface waters)," the term "damages" is not defined.  But, again, the plain language used in the statute to create a private right of action does not limit recovery to only those damages *directly* resulting from the discharge or other polluting condition.

Third, the Florida case law interpreting the boundaries of a private right of action under the Florida Act is persuasive, and Defendants' restrictive interpretation on damages is not warranted.  In *Dostie*, for example, the court found that a property owner's allegations of damage resulting from oil that was discharged from a vessel into an adjoining river, which then traveled across the river and washed ashore onto the plaintiff's property "would warrant recovery pursuant to the [Florida Act]."  *Dostie*, 1996 WL 866119 at *3.  The *Dostie* court rejected the defendants' argument that plaintiff had no cause of action for relief "for pure economic loss for properties not directly impacted by the alleged discharge of oil into the [river]."  *Id.* at *4.  The court found that allegations that plaintiff "suffered damages as a result of [a] physical intrusion" were sufficient to survive a motion to dismiss, even though the discharge was not directly on the plaintiff's property.  *Id.* at *4.  *See also Italiano v. Jones Chemicals, Inc.*, 1997 WL 118426, *1

- 85 -

(M.D. Fla. Feb. 21, 1997) (denying motion to dismiss action for compensatory damages under Florida Act where plaintiffs alleged that the migration of pollutants in the soil and groundwater "significantly reduced the value of their . . . property, and . . . rendered the property non-saleable and virtually useless"); *see also Easton v. Aramark Uniform & Career*, 825 So. 2d 996, 998-999 (Fla. 1st DCA 2002) (holding that a plaintiff who sought damages arising from prior and ongoing migration of contaminated groundwater from adjacent commercial property stated cause of action under Section 376.313(3)), *aff'd*, 894 So. 2d 20 (Fla. 2004); *Kaplan v. Peterson*, 674 So. 2d 201, 205 (Fla. 5th DCA 1996) (finding that Section 376.313 permits private causes of action brought "for all damages resulting from pollution covered by the Chapter" where successor plaintiff brought suit for costs of cleaning up property, and noting that "neighbors and employees are afforded a remedy against a polluter"); *Cunningham v. Anchor Hocking Corp.*, 558 So. 2d 93, 98-99 (Fla. 1st DCA), *rev. denied*, 574 So. 2d 139 (Fla. 1990) (permitting an action under § 376.313 brought by private plaintiffs who had been employees of the defendant and who alleged that they had suffered personal injuries as a result of the defendant's discharges of pollutants during their employment with the defendant).

Contrary to Defendants' assertion that *Curd* should not apply here, the *Curd* court held that the Act allows *any* person to recover for damages suffered as a result of pollution. The court went on to state that lack of ownership of personal property or real property damaged as a result of a pollutive condition is not a defense to a claim under the Act. The court stated: "commercial fisherman [are allowed] to recover damages for their loss of income despite the fact that the fishermen do not own any real or personal property." *Curd*, 39 So. 3d at 1222. Further, quoting from Fla. Stat. § 376.313(3), the *Curd* court stated that "*in any such suit*...[a] person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it has

occurred." *Id.* In interpreting this section of the statute, and applying the definition of damages from the statute, the *Curd* court held that "[t]he only defenses to such cause of action shall be those specified in s. 376.308." *Id.* The court stated further that

> Those defenses specified in section 376.308 include acts of war, acts by a governmental entity, acts of God, and acts or omissions by a third party. Because the statute does not specifically list the lack of property ownership as a defense, we find that defense, much as we found the omission of causation in *Aramark*, was deliberately omitted.

*Id.* The statute is far-reaching, aimed at remedying, preventing and removing the discharge of pollutants from Florida's waters and lands. The cleanup costs asserted by Plaintiffs are part of the damages sustained to remedy the pollutive condition and should be held to be within the scope of damages recoverable.

**A.    The Florida Act Applies to Discharges That, Although Originating In Federal Waters, Pollute Florida Coastal Areas, And This Application Is Compatible With Federal Law.**

Defendants argue that the Florida Act only applies to oil spills that originate in Florida territorial waters. They also contend that a contrary application would violate the Commerce Clause of the United States Constitution or that the Florida Act is preempted by the Clean Water Act under the rationale espoused by the United States Supreme Court in *Ouellette*, 479 U.S. 481. None of these arguments withstands scrutiny.

**1.    The Florida Act Applies to <u>Any</u> Discharge that Affects Florida Lands or Water.**

The Florida Act provides that "the discharge of pollutants into or upon any coastal waters . . . adjoining the seacoast of the state . . . is prohibited." Fla. Stat. § 376.041. Defendants focus solely upon the "into or upon" language and simply ignore the definition of "discharge" in the Florida Act. The statute broadly defines "discharge" as "any spilling, leaking, seeping, pouring, emitting, emptying, or dumping which occurs within the territorial limits of the state *or*

- 87 -

*outside the territorial limits of the state* and affects lands and waters within the territorial limits

of the state." Fla. Stat. § 376.031(7) (emphasis added). Thus, by its own clear terms, the Florida

Act applies to any oil spill, regardless of where it occurs, so long as it affects Florida resources.[51]

Plaintiffs allege that the oil spill occurred outside of Florida's territorial waters. (*See* Am.

B1 Master Compl. ¶ 272.) However, they also allege that the oil migrated into and affected

Florida's territorial waters and lands. (*See* Am. B1 Master Compl. ¶ 657; B3 Master Compl.

¶ 315.) These allegations are clearly sufficient to state a claim under the Florida Act.

> **2.    There is no Dormant Commerce Clause Violation, Because Congress Expressly Permitted States to Enact Legislation that Imposes Liability for Pollution of State Waters.**

Defendants next contend that the Florida Act, even if otherwise applicable, violates the

dormant Commerce Clause because it purports to remedy damage that occurred in Florida as a

result of an out-of-state oil spill. This argument is easily dispensed with by reference to the

OPA's savings clause. *See* 33 U.S.C. § 2718(c) ("Nothing in this Act . . . shall in any way affect,

or be construed to affect, the authority of the United States or any State or political subdivision

thereof . . . to impose additional liability or additional requirements . . . relating to the discharge,

or substantial threat of a discharge, of oil.").

The savings clause expressly preserves the right of states to enact laws that are more

stringent than federal law. Notably, Section 2718(c) is not restricted to discharges that occur in

state water; rather, it applies to all discharges of oil, regardless of where they occur. A dormant

---

[51] Defendants' reliance on *Askew v. Am. Waterways Operators, Inc.*, 411 U.S. 325 (1973) is misplaced. The Supreme Court was never asked and did not attempt to address the scope of the Florida Act. The sole issue before the court was whether the statute was constitutional (and the Supreme Court held that it was). Moreover, the passages cited by Defendants do not support their restrictive interpretation of the scope of the Florida Act; they merely stand for the proposition that the statute only imposes liability for oil pollution that occurs in state waters. The dispositive point is that the Florida Act defines "discharge" to include out-of-state spills that result in pollution of pollute state waters.

Commerce Clause analysis is therefore made unnecessary by the OPA's explicit grant of power by Congress to the states. *See Western and Southern Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 652-53 (1981) ("If Congress ordains that the States may freely regulate an aspect of interstate commerce, any action taken by a State within the scope of the congressional authorization is rendered invulnerable to the Commerce Clause challenge."); *see also Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 430-431 (1946) (reaffirming that state regulation otherwise invalid under a dormant Commerce Clause analysis may be legitimized by affirmative Congressional action). The analysis need proceed no further than this.

Nevertheless, even if the OPA did not dispense with Commerce Clause challenges to state anti-pollution laws, Defendants' argument would still fail because it goes too far. It would effectively prevent states from enacting a whole host of laws that are vital to the protection of the welfare of their citizens. As the Supreme Court explained, "the Constitution when conferring upon Congress the regulation of commerce, . . . never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." *Head v. New Mexico Bd. of Exam'rs in Optometry*, 374 U.S. 424, 428 (1963) (citations omitted). Thus, the Supreme Court has repeatedly upheld state statutes even where they impact interstate commerce, including the very statute at issue here. *See*, *e.g.*, *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Management Auth.*, 550 U.S. 330, 346-347 (2007) (plurality opinion); *Northwest Central Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 524-525 (1989); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 472-473 (1981), *Askew*, 411 U.S. at 343 (upholding constitutionality of the Florida Act and concluding that states "may act, in many areas of

interstate commerce and maritime activities, concurrently with the federal government")
(citations omitted).

The Supreme Court utilizes a two-pronged approach when analyzing state statutes under
the dormant Commerce Clause:

> When a state statute directly regulates or discriminates against
> interstate commerce, or when its effect is to favor in-state
> economic interests over out-of-state interests, we have generally
> struck down the statute without further inquiry. When, however, a
> statute has only indirect effects on interstate commerce and
> regulates evenhandedly, we have examined whether the state's
> interest is legitimate and whether the burden on interstate
> commerce clearly exceeds the local benefits.

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986)
(citations omitted). Without any analysis, Defendants simply assume that the Florida Act
directly regulates interstate commerce and, thus, must be analyzed under the first prong. This
assumption is erroneous.

In contrast to the price control statute at issue in *Healy v. The Beer Institute*, 491 U.S. 324
(1989), the Florida Act does not directly regulate any out-of-state transaction, either by its
express terms or by its inevitable effect. *Cf. Pharmaceutical Research & Mfrs. of Am. v. Walsh*,
538 U.S. 644, 669 (2003). The Florida Act, which only applies if pollution reaches state waters,
does not "control" oil drilling outside Florida any more than a state's product liability statute
controls the manufacture of products outside the state. As explained by the Seventh Circuit in
the context of state product liability laws, the fact that one state's law may "affect commercial
decisions by actors in other states . . . does not implicate the Commerce Clause. Differences in
the conditions and risks of doing business from state to state are in part the inevitable result of
*any* state economic regulation, but the effects that these differences have on commercial
decisions, even those that involve interstate trade, are not by themselves nearly so direct as to

- 90 -

'affect commerce' in the constitutional sense." *Bowman v. Niagara Mach. & Tool Works, Inc.*, 832 F.2d 1052, 1056 (7th Cir. 1987). The Supreme Court has "never suggested that the dormant Commerce Clause requires Balkanization, with each state's law stopping at the border." *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 825 (3d Cir. 1994).

Moreover, enforcing the Florida Act's liability provisions does not result in *any* increased costs to businesses because it does not require anything of businesses other than to adhere to existing federal and state law, which prohibit the discharge of pollutants into navigable waters absent a permit.  The statute only purports to impose liability for damage arising in Florida:  if pollution never enters Florida waters, then no liability results.  Taken to its logical conclusion, Defendants' argument would eviscerate any state tort law that is triggered based on the local effects of an out-of-state negligent act (such as the defective design of a consumer product in California that results in an injury or death in Florida).  The Supreme Court, however, does not demand such a draconian result.  Any risk that the Florida Act creates of damage awards that may conceivably affect Defendants' business decisions is not the "direct" control of commerce that the dormant Commerce Clause forbids.  *See Healy*, 491 U.S. at 336.

Finally, even if a state statute has an indirect effect on interstate commerce, a violation of the dormant Commerce Clause does not occur if there is also a corresponding local benefit. Stated differently, a state law will survive a dormant Commerce Clause challenge so long as it does not "impose[] a burden on interstate commerce that is clearly excessive in relation to the putative local benefits." *C & A Carbone, Inc. v. Town of Clarkstown, New York*, 511 U.S. 383, 390 (1994) (citation omitted).  Here, Florida's interest is paramount, as previously recognized by the Supreme Court.  In *Askew,* the Supreme Court upheld the constitutionality of the Florida Act and specifically held that "sea-to-shore pollution" is "historically within the reach of the police

power of the States." 411 U.S. at 343. The Supreme Court addressed the problem of oil spills specifically, and noted that they are "an insidious form of pollution of vast concern to every coastal city or port and to all the estuaries on which the life of the ocean and the lives of the coastal people are greatly dependent." *Askew* at 328-29. In contrast to this strong governmental interest, any effect the Florida Act would have on interstate commerce is "incidental" and not "clearly excessive in relation to the . . . local benefits." *Pike v. Bruce Church*, 397 U.S. 137, 142 (1970). Because Florida's interest in safeguarding its resources significantly outweighs any effect on interstate commerce, the Florida Act does not violate the dormant Commerce Clause.

### 3. The Florida Act is Not Preempted by The Clean Water Act under the Supreme Court's Decision in O*uellette.*

While some Defendants cite *Ouellette*, 479 U.S. 481, for the general proposition that conflict preemption may on occasion exist, even in the face of an express savings clause, Defendants do not explain how recovery under the Florida Act would directly (or even indirectly) interfere or conflict with the provisions of the OPA. Indeed, it is clear that the OPA was enacted to supplement state law and/or general maritime remedies that were found to be insufficient in the wake of the Exxon Valdez disaster. The Florida Act is, indeed, very similar to the OPA, and does not frustrate its policies or application in any way.

## IX. DEFENDANTS MISSTATE THE ECONOMIC LOSS RULE UNDER STATE LAW.

Defendants have suggested that Plaintiffs' state law claims are barred under the "economic loss rule" of *Robins Dry Dock* and its progeny as adopted by state law. This argument misstates the Gulf States' laws.

### A. Alabama State Law Does Not Recognize An Economic Loss Rule.

Although Defendants have cited to the holdings of federal courts in Alabama that have applied the *Robins Dry Dock* rule *in federal maritime cases*, they have not cited to a single

Alabama decision that has extended the *Robins Dry Dock* economic loss rule to claims brought under Alabama state law.  Alabama courts have *never* held that Alabama state law recognizes the bright line economic loss rule set forth in *Robins Dry Dock* or anything like it.  Alabama law does not require physical damage to a proprietary interest in order to assert a claim for economic loss.

The Alabama state court decisions cited by Defendants do not embrace a *Robins Dry Dock* type of rule.  *See Lloyd Wood Coal Co. v. Clark Equipment Co.*, 543 So. 2d 671 (Ala. 1989); *see also Harris Moran Seed Co, Inc. v. Phillips*, 949 So. 2d 916 (Ala. Civ. App. 2006).  Rather, both the *Lloyd Wood Coal* and *Harris Moran* decisions dealt with claims for damage to a defective product.  These cases do not stand for the proposition that Alabama law will automatically reject claims for economic loss absent physical damage to a proprietary interest.  No Alabama court has ever adopted such a rule with respect to claims brought under Alabama law.

### B.    Mississippi State Law Does Not Recognize The Economic Loss Rule.

The Mississippi Supreme Court has never embraced the *Robins Dry Dock* holding or, for that matter, any bright line rule that bars recovery of economic loss in the absence of physical injury to property.  Indeed, the only court in Mississippi to address any form of economic loss rule did so in the products liability context.  *See State Farm Mutual Automobile Insurance Co. v. Ford Motor Co.*, 736 So. 2d 384, 387 (Miss. Ct. App. 1999).  In addressing economic loss with respect to damage to a product, the *State Farm* court noted that the question of economic loss absent physical injury was one of first impression under Mississippi law.  To date, no court in Mississippi, state or federal, has held that Mississippi bars recovery for economic loss outside of the products liability context.

- 93 -

Defendants have not and cannot cite to a single case that holds that Mississippi embraces a *Robins Dry Dock* economic loss rule applicable to this case. Mississippi law does not present a bar to the recovery of economic losses.

### C.  Florida Does Not Recognize The Economic Loss Rule With Respect To Oil Spill Claims.

The Florida Supreme Court has held that the economic loss rule of *Robins Dry Dock* only applies in two limited circumstances, neither of which is applicable to the instant case. *See Curd v. Mosaic Fertilizer*, 39 So. 3d 1216 (Fla. 2010). In *Curd*, the Florida Supreme Court held that the economic loss rule only acts as a bar to recovery: "(1) where the parties are in contractual privity and one party seeks to recover damages in tort for matters arising out of the contract, or (2) where the defendant is a manufacturer or distributor of a defective product which damages itself but does not cause personal injury or damage to any other property." 39 So. 3d at 1223. Neither circumstance is raised by the claims in Plaintiffs' First Amended B1 Master Complaint.

Moreover, in *Curd*, the Florida Supreme Court expressly held that the economic loss rule would not act as bar to claims by fishermen for loss of fishing revenue as a result of pollution. To the extent Florida has recognized an economic loss rule, that rule simply does not apply to the claims at issue in this lawsuit.

### D.  Under Louisiana Law, An "Economic Loss Rule" Would Not Bar Claims By Oyster Fisherman Operating On State Leases.

Tort liability in Louisiana stems from Civil Code Article 2315, which generally provides for full reparation, irrespective of whether the damages involve personal injuries or are purely

economic in nature.[52]  (The Louisiana Products Liability Act, for example, "includes damage to the product itself and economic loss arising from a deficiency in or loss of use of the product" to the extent that such recovery for damage or economic loss is not already provided for under the law of Redhibition.[53])  Whether a defendant is liable for purely economic losses is evaluated under the duty/risk analysis, which is particular to the facts and circumstances of each case.

Nevertheless, to the extent that courts have denied recovery to plaintiffs for purely economic losses stemming from damages to property they do not own, such courts have long recognized the standing of oyster fishermen, since oyster fishermen operate on leases granted to them by the state.  *See e.g. Dempster v. Louis Eymard Towing Co., Inc.,* 503 So. 2d 99 (La. App. 5th Cir. 1987), *writ denied* 505 So. 2d 1136 (La. 1987) (citing *Skansi v. Humble Oil and Refining Co.*, 176 So. 2d 236 (La. App. 4th Cir. 1965)); *see also Jurisich v. Louisiana Southern Oil & Gas Co.*, 284 So. 2d 173 (La. App. 4th Cir. 1973); *Trosclair v. Superior Oil Company*, 219 So. 2d 278 (La. App. 1st Cir. 1969); *Barasich v. Shell Pipeline Co., LP*, No. 05-4180, 2006 WL 3913403, at *7 (E.D. La. Nov. 20, 2006) (citing La. Rev. Stat. Ann. § 56:423(B)(1)).  Hence, even assuming *arguendo* that Louisiana's "economic loss rule" acts as a bar to some plaintiffs' claims, such a bar would clearly not extend to oyster fishermen.

## X.    PLAINTIFFS STATE VALID CLAIMS FOR DECLARATORY RELIEF

As alleged in Sections V and VI of the First Amended B1 Master Complaint, Plaintiffs' requests for declaratory relief on the ramifications of BP's settlement of OPA claims are not, as Defendant BP argues, independent of or untethered to the other claims in that Complaint.

---

[52] *See, e.g., Brookshire Bros. Holding v. Total Containment, Inc.,* No. 04-1150, 2007 WL 184600, at p.*7 (W.D. La. Jan. 18, 2007) (rejecting application of the economic loss rule to Louisiana claims, as "Louisiana provides for full recovery and full reparation for a plaintiff under Louisiana's Civil Code Article 2315") La. Civ. Code Ann. art. 2315 ("Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it").

[53] La. Rev. Stat. Ann. § 9:2800.53(5).

Accordingly, this Court may grant the requested declaratory relief, to assure that BP's settlement activities do not exceed or contravene the bounds of the OPA; and do not unfairly or inequitably impact the ultimate calculation of punitive damages in this matter; and do not impede the ability of Plaintiffs to pursue their claims against other Defendants. This Court is familiar with the controversies surrounding the releases against other parties that BP continues to seek under the GCCF program. The validity and enforceability of such releases remains to be determined, and the First Amended B1 Master Complaint makes the allegations set forth in Sections V and VI to preserve them for later determination.

Section V of the Amended B1 Master Complaint, "Declaratory Relief: Punitive Damages," recognizes that the extent and manner in which voluntary payments, such as GCCF distributions or other settlements by Defendants, are to be considered as components of the "actual harm" or compensatory damages totals that will ultimately be used by this Court to calculate an appropriate quantum of punitive damages is inherently case-specific. For example, in the *Exxon Valdez* litigation, the district court included both the compensatory damages trial verdicts and the defendant's voluntary payments (including a number of settlements) in calculating the aggregate "actual harm," and rejected the defendant's arguments that these should be used to lower that figure. Punitive damages "should reflect the enormity of [the defendant's] offense…" *In re Exxon Valdez*, 236 F. Supp. 2d 1043, 1057 (D. Alaska 2002) (quoting *BMW of N. Am. v. Gore*, 517 U.S. 559, 575 (1995)). Accordingly, in that case, considering the defendant's place in "the hierarchy of reprehensibility," the district court concluded that "a reduction of the harm factor based upon voluntary payments is not appropriate" and "that it should not discount actual harm by voluntary payments made by Exxon." *Id.* at 1061. The

Supreme Court ultimately took this determination "for granted" and adopted the district court's "calculation of the total relevant compensatory damages." *Baker*, 554 U.S. at 515.

Plaintiffs thus properly request, in the context of declaratory relief, that this Court likewise declare when it determines the extent to which punitive damages are appropriate, that the total quantum of punitive damages is not lessened merely because Defendants have settled certain claims out of court. As Plaintiffs allege:

> Punitive damages do not compensate for injury. They are private fines, authorized by the General Maritime Law (and/or state law), to punish reprehensible conduct and deter its future occurrence. Punitive damages are specifically designed to exact punishment, in excess of actual harm, to make clear that the defendants' misconduct is especially reprehensible, to embody social outrage and moral condemnation of such misconduct, and to assure that it is not repeated. Accordingly, plaintiffs seek a judicial declaration against Defendants and in favor of the class that any settlement provisions that purport, directly or indirectly, to release or to affect the calculation of punitive damages without a judicial determination of fairness, adequacy, and reasonableness are ineffective as contrary to law, equity and public policy.

(Am. B1 Master Compl. ¶ 770.) Although Transocean and BP have moved to dismiss this claim (*see Tr. Mot. to Dismiss* at 11-12; BP Mot. to Dismiss B1 at 62-63), the Court should reject their arguments for the reasons that follow.

### A.     Governing Law

A plaintiff states a valid claim for relief under the Declaratory Judgment Act when he "allege[s] a 'justiciable controversy'." *Heimann v. National Elevator Indus. Pension Fund*, 187 F.3d 493, 510 (5th Cir. 1999) (citations omitted), *overruled in part on other grounds*, *Arana v. Ochsner Health Plan*, 338 F.3d 433 (5th Cir. 2003); *see also Collin County v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170 (5th Cir. 1990). In order "[f]or a declaratory judgment action to be justiciable, it 'must be such that it can presently be litigated and decided and not hypothetical, conjectural, conditional or based upon the

possibility of a factual situation that may never develop'." *AXA Re Prop. & Cas. Ins. Co. v. Day*, 162 Fed. Appx. 316, 319 (5th Cir. 2006) (unpublished) (quoting *Brown & Root, Inc. v. Big Rock Corp.,* 383 F.2d 662, 665 (5th Cir. 1967)).  Generally, "[t]here is little difficulty in finding an actual controversy if all of the acts that are alleged to create liability already have occurred.  The court is then merely being asked, as in any litigation, to determine the legal consequences of past events . . . ."  10B Charles A. Wright, Arthur R. Miller, Mary K. Kane, *Federal Practice and Procedure* § 2757 (3d ed. 2010) ("Wright & Miller").  So long as a justiciable controversy between parties exists, the Declaratory Judgment Act "should be given a liberal interpretation." *Heimann*, 187 F.3d at 510 (citation omitted).

### B.    Plaintiffs' Request For Declaratory Relief Is Justiciable

Plaintiffs ask this Court to adjudicate the scope of punitive damages to which they are entitled as a result of Defendants allegedly tortuous conduct.  (*See* Am. B1 Master Compl. ¶ 770.)  In order for Plaintiffs to state a valid claim for declaratory relief, then, there must be an "actual controversy" about the scope of punitive damages between the parties.  *See Heimann*, 187 F.3d at 510.  To the extent that Plaintiffs maintain valid claims against Defendants for punitive damages (*see* Am. B1 Master Compl. ¶¶ 748-769), which, as explained above, they do, (*see* Section II.D., *infra*), Plaintiffs' claim for declaratory relief adjudicating the scope of these damages is also valid.  *See* Wright & Miller § 2757 ("There is little difficulty in finding an actual controversy if all of the acts that are alleged to create liability already have occurred.").  Indeed, this straightforward proposition is not disputed by either Transocean or Halliburton.  (*See* Doc. 1390 at 11-12 (asking this Court to dismiss this claim on the sole ground that Plaintiffs do not state a valid cause of action for punitive damages); Doc. 1429-1 at 23-24 (attacking only the underlying claim for punitive damages).)

- 98 -

916087.7

BP, on the other hand, argues that this claim must be dismissed on three additional grounds, each of which should be rejected by this Court. First, BP asserts that "there is no independent cause of action for declaratory relief, and Plaintiffs do not identify any cause of action entitling them to the declaratory relief requested." (BP Mot. to Dismiss B1 at 62.) While it is true that an action for declaratory relief is only proper when there is some other justiciable controversy between the parties, here, there is a pending claim for punitive damages under a number of theories of tort liability. (*See* Section II.D., *infra* (explaining that Plaintiffs state valid claims for punitive damages).) Plaintiffs seek a declaration of their rights under this *pending controversy*. Even Transocean acknowledges implicitly that Plaintiffs have properly identified a "cause of action entitling them to the declaratory relief requested" when it argues that "[b]ecause the Plaintiffs are not entitled to a recovery of punitive damages, the claims for declaratory relief against Transocean should be dismissed." (Tr. Mot. to Dismiss at 12.) In sum, the Court should conclude that Plaintiffs have properly identified a cause of action under which they are entitled to declaratory relief. *See* Wright & Miller § 2757; *cf. Chad Youth Enhancement Ctr., Inc. v. Colony Nat'l Ins. Co.*, No. 3:09-0545, 2010 U.S. Dist. LEXIS 8714, at *32 (M.D. Tenn. Feb. 2, 2010) (issuing declaratory relief explaining that a particular insurance policy extended to cover pending claims for punitive damages); *Ins. Co. of the Pa. v. Vimas Painting Co.*, No. 4:06CV1048, 2007 U.S. Dist. LEXIS 34401, at *41-42 (N.D. Ohio May 10, 2007) (declaring that an insurer had an obligation to defend its insured against pending claims for punitive damages).

BP's second and third arguments are that "nothing in OPA limits the ability of OPA responsible parties to fully and finally resolve a dispute" (BP Mot. to Dismiss B1 at 63) and that "settlements that release all claims, known and unknown, are perfectly valid and enforceable"

(*id.*).  Plaintiffs agree with both of these propositions, as they relate to claims between BP and claimants damaged or injured by the events described in the complaint, but do not believe that either relates to whether Plaintiffs have stated a viable claim for declaratory relief.  It appears that BP may have misapprehended Plaintiffs' Complaint, in which it asks this Court to decree that, because punitive damages are private fines that "punish reprehensible conduct and deter its future occurrence," BP cannot somehow reduce or eliminate its exposure to punitive damages through out-of-court, purely compensatory, settlements.   (Am. B1 Master Compl. ¶ 770.) Accordingly, this Court should reject BP's second and third arguments.

It may ultimately be determined by this Court, under its authority to calculate and/or review the calculation of punitive damages under the criteria that under the prevailing criteria set forth by the Supreme Court (as discussed hereinabove) to determine the quantum of "actual harm" sustained by Plaintiffs, in order to determine an appropriate ratio between actual harm and punitive damages which factors in both the full measure of harm resulting from Defendants' conduct, and the degree of reprehensibility of that conduct.  *See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 427-428 (2004); *Gore*, 517 U.S. at 575.

Moreover, what BP pays in OPA settlements may appropriately be factored into the "calculation of the total relevant compensatory damages" for purposes of the determination of an appropriate level of punitive damages, as discussed above.  *See Baker*, 554 U.S. at 514.

A similarly inclusive calculus of the compensatory damages or actual harm component should be made in this litigation, and Plaintiffs' Declaratory Relief claim seeks to preserve that prospect.

The questions of whether BP can properly, through the GCCF, extract releases and assignments of claims against other defendants (and/or releases of punitive damages claims)

- 100 -

when, per the governing Trust Agreement and/or the statements of its Administrator, it cannot and is not paying money for those claims, which is addressed in Section VI of Plaintiffs' First Amended B1 Master Complaint ("Declaratory Relief Against BP"), is a real and pending controversy, over which Plaintiffs have sought this Court's ongoing supervision and ultimate adjudication, as Plaintiffs' Memorandum in Support of Motion to Supervise Ex Parte Communications Between Defendants and Putative Class Members (Dec. 21, 2010 [Doc. 912-1]) demonstrates and describes.   This Court's February 2, 2011 Order and Reasons, partially granting Plaintiffs' motion, affirms its "responsibility to ensure that the mandates of OPA are implemented".  (Order and Reasons, at 7 (Feb. 2, 2011) [Doc. 1098].)  This Court did indeed, as BP notes, state it "does not intend to impede or interfere" with the ability of Mr. Feinberg "to fairly and efficiently process claims." *Id.* at 8.  But fairness is the crux of what Plaintiffs' Count VI seeks, and at the core of what this Court may and should declare, adjudicate, and enforce.  As Plaintiffs' Memorandum states, on p. 1, plaintiffs' purpose in challenging BP's settlement practices, and asking this Court to supervise, and ultimately determine their validity and scope, is not, as BP argues, to "impede" settlement, but to ensure that the OPA's goals of "quick and complete payment of reasonable claims" are honored and fulfilled.  *See* 135 Cong. Rec. H7965 (daily ed. Nov. 2, 1989). Congress hoped that such would occur "without resort to cumbersome litigation", *Id.*, and Plaintiffs concur.  However, where what purport to be OPA settlements go out of statutory bounds, or contradict what governing Trust documents provide or the statements the Administrator makes to claimants, an ultimate declaration by this Court of claimants' rights and BP's responsibilities may be necessary, and Plaintiffs are entitled to preserve their request for it.

916087.7

For the aforementioned reasons, both Transocean's and BP's motions to dismiss Plaintiffs' claims for declaratory relief should be denied.

## XI.    BP'S ARGUMENT THAT "THERE IS NO INDEPENDENT CAUSE OF ACTION FOR PUNITIVE DAMAGES" IS A NON SEQUITUR.

Section IV of Plaintiffs' First Amended B1 Master Complaint, titled "Punitive Damages under All Claims", expressly realleges all preceding paragraphs in that Complaint (and hence all preceding claims, counts, and causes of action), (Am. B1 Master Compl. ¶ 668), followed by 21 paragraphs of punitive damages allegations that correspond to the factors and considerations supporting and governing the award and calculation of punitive damages under the common law, and under the reprehensibility and proportionality guidelines superimposed on all punitive damages requests by the Supreme Court. *See, e.g.*, *Gore*, 517 U.S at 575.  These allegations, (*id.* at ¶¶ 669-89), are not a stand-alone cause of action: they expressly relate to "All Claims".  They are not intended to constitute a self-contained claim untethered to violations of statutory and/or common law. Rather, these allegations serve the pleading functions of Fed. R. Civ. P. 8 and 9: to place the defendants against whom they are asserted ("BP, Transocean, and Halliburton") on notice of the nature and scope of their conduct, intent, and motivations (and the injury and damages that resulted therefrom) in allegations that track the prevailing reprehensibility factors, *Gore*, 517 U.S. at 521-522, upon which plaintiffs will seek the imposition of punitive damages once the court has determined defendants' liability on one or more of the underlying claims.

## CONCLUSION

For the above and foregoing reasons, Defendants' Motions to Dismiss Plaintiffs' Amended

B1 Master Complaint should be denied.

Dated:  March 30, 2011.

Respectfully submitted,

_____/s/ Stephen J. Herman_____
Stephen J. Herman, La. Bar No. 23129
HERMAN HERMAN KATZ & COTLAR
LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax No. (504) 569-6024
E-Mail: sherman@hhkc.com
*Plaintiffs' Liaison Counsel MDL 2179*

_____/s/ James Parkerson Roy_____
James Parkerson Roy, La. Bar No. 11511
DOMENGEAUX WRIGHT ROY
 & EDWARDS LLC
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233-3033
Fax No. (337) 233-2796
E-Mail: jimr@wrightroy.com
*Plaintiffs' Liaison Counsel MDL 2179*

## PLAINTIFFS' STEERING COMMITTEE

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail:  rgreenwald@weitzlux.com

Jeffrey A. Breit
BREIT DRESCHER IMPREVENTO &
WALKER, P.C.
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office: (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office: (334) 269-2343
Telefax: (334) 954-7555
E-Mail:  rhon.jones@beasleyallen.com

- 103 -

916087.7

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Malnt:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com


Of Counsel:
JOSH S. WHITLEY
BILLIE H. LEETH
STEVEN E. FINEMAN
ANNIKA K. MARTIN
JASON L. LICHTMAN
BRIAN COLOMB
DAVID BAGWELL
JAMES GARNER
ABAGAIL GAUNT
STEPHEN MURRAY, JR.
JOHNNY DEGRAVELLES
NEALE DEGRAVELLES
LARRY BERMAN
TOM SIMS
JULIA LEMENSE
DEBORAH WATERS
GARY MASON
KEVIN DEAN
*On Brief*


## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Opposition has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on March 30, 2011.

/s/ Stephen J Herman and James Parkerson Roy

916087.7