EFiled: Aug 4 2010 4:01PM EDT
Transaction ID 32492727
Case No. N10C-08-032 PLA

**SUPERIOR COURT**
**CIVIL CASE INFORMATION STATEMENT (CIS)**

COUNTY:   (N)   K   S          CIVIL ACTION NUMBER:_____

| | |
|---|---|
| Caption:<br><br>The St. Joe Company,<br><br>Plaintiff,<br><br>v.<br><br>Halliburton Energy Services, Inc.,<br><br>Defendant. | Civil Case Code: CPRD<br><br>Civil Case Type: Property Damage<br>(SEE REVERSE SIDE FOR CODE AND TYPE)<br><br>Name and Status of Party filing document:<br><br>Plaintiff The St. Joe Company<br><br>Document Type: (E.G.; COMPLAINT; ANSWER WITH COUNTERCLAIM)<br><br>Complaint<br><br>JURY DEMAND:  YES XX   No ____ |

| | |
|---|---|
| ATTORNEY NAME(S):<br><br>Edmond D. Johnson<br><br>ATTORNEY ID(S):<br><br>Del. Bar No. 2257<br><br>FIRM NAME:<br><br>Pepper Hamilton LLP<br><br>ADDRESS:<br>Hercules Plaza, Suite 5100<br>1313 Market St., P.O. Box 1709<br><br>Wilmington, DE  19899-1709<br><br>TELEPHONE NUMBER:<br><br>302-777-6500<br><br>FAX NUMBER:<br><br>302-421-8390<br><br>E-MAIL ADDRESS:<br><br>johnsone@pepperlaw.com | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS:<br><br>None.<br><br><br>EXPLAIN THE RELATIONSHIP(S):<br><br><br><br><br>OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT:<br><br><br><br>(IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGE) |

**THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER, OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED. THE FAILURE TO FILE THE CIS AND HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.**

Revised 3/2008

EFiled: Aug 4 2010 4:01PM EDT
Transaction ID 32492727
Case No. N10C-08-032 PLA

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| THE ST. JOE COMPANY, | ¶ | |
| | ¶ | |
| Plaintiff, | ¶ | |
| | ¶ | |
| v. | ¶ | No. _____ |
| | ¶ | |
| HALLIBURTON ENERGY | ¶ | |
| SERVICES, INC., | ¶ | |
| | ¶ | |
| Defendant. | ¶ | |

### PRAECIPE

To:    THE PROTHONOTARY

PLEASE issue a Writ of Summons for service of the Complaint and Summons on

the Defendant as follows:

To the Sheriff, New Castle County:

Halliburton Energy Services, Inc., c/o The Corporation
Trust Company, Corporation Trust Center, 1209 Orange
Street, Wilmington, DE  19801

Dated:  August 4, 2010                     /s/ *Edmond D. Johnson*                     
                                                         Edmond D. Johnson (#2257)
                                                         James G. McMillan, III (#3979)
                                                         James H.S. Levine (#5355)
                                                         PEPPER HAMILTON LLP
                                                         Hercules Plaza, Suite 5100
                                                         1313 N. Market Street
                                                         P.O. Box 1709
                                                         Wilmington, DE   19899-1709
                                                         Telephone No. (302) 777-6500
                                                         Facsimile No.  (302) 421-8390

                                                         *Attorneys for Plaintiff St. Joe Company*

#12968228 v1

EFiled:  Aug  4 2010  4:01PM EDT
Transaction ID 32492727
Case No. N10C-08-032 PLA

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

**IN AND FOR NEW CASTLE COUNTY**

| | | |
|---|---|---|
| THE ST. JOE COMPANY, | ¶ | |
| | ¶ | |
| Plaintiff, | ¶ | |
| | ¶ | |
| v. | ¶ | No. _____ |
| | ¶ | |
| HALLIBURTON ENERGY | ¶ | |
| SERVICES, INC., | ¶ | |
| | ¶ | |
| Defendant. | ¶ | |

**THE STATE OF DELAWARE,**
**TO THE SHERIFF, NEW CASTLE COUNTY,**
**YOU ARE COMMANDED:**

To summon the above named Defendant so that, within 20 days after service hereof upon Defendant, exclusive of the day of service, Defendant shall serve upon Edmond D. Johnson, Plaintiff's attorney, whose address is Pepper Hamilton LLP, Hercules Plaza, 1313 Market Street, Suite 5100, Post Office Box 1709, Wilmington, DE 19899-1709, an answer to the Complaint.

To serve upon Defendant a copy hereof and of the Complaint.

Dated: _____

SHARON D. AGNEW_____
Prothonotary

_____
Per Deputy

**TO THE ABOVE NAMED DEFENDANT:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on the Plaintiff's attorney named above an answer to the Complaint (and, if an affidavit of demand has been filed, an affidavit of defense), judgment by default will be rendered against you for the relief demanded in the Complaint (or in the affidavit of demand, if any).

SHARON D. AGNEW_____
Prothonotary

_____
Per Deputy

#12968228 v1

EFiled:  Aug  4 2010  4:01PM EDT
Transaction ID 32492727
Case No. N10C-08-032 PLA

IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| THE ST. JOE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | No. _____ |
| | ) | |
| v. | ) | JURY OF 12 DEMANDED |
| | ) | |
| HALLIBURTON ENERGY | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT AND JURY DEMAND

The St. Joe Company ("St. Joe" or "Plaintiff") files this Complaint and Jury Demand against defendant Halliburton Energy Services, Inc. ("Halliburton" or "Defendant"), upon personal knowledge as to itself and its own actions, and on information and belief as to all other matters, as follows:

## I.    PRELIMINARY STATEMENT

### A.    The *Deepwater Horizon* Disaster

1.    The *Deepwater Horizon* oil spill is the most horrific environmental disaster in our nation's history.  Millions of livelihoods, billions of dollars, and the future of the Gulf Coast have been sacrificed as a result of the wanton and willful disregard for others by a handful of wrongdoers.  As Representative Henry A. Waxman, Chairman of the Committee on Energy and Commerce, so accurately said on July 27, 2010, "The BP oil spill in the Gulf of Mexico is the worst environmental disaster this country has seen.  While we have every hope that the cap will hold and the flow of oil into the Gulf has truly stopped, we know that the devastation is enormous and its effects will continue for years."  Chief among those responsible for this disaster is Halliburton.  It is now well-known that Halliburton failed to carry out its important and sensitive responsibilities in even a marginally prudent manner.  Worse,

Halliburton ignored multiple warning signs that signaled trouble – signs that, if heeded, would have prevented the disaster.  BP Exploration & Production, Inc. ("BP"), the lessor of the *Deepwater Horizon* drilling rig, hired Halliburton to undertake the critical task of cementing the well – Halliburton's duties if performed properly would have protected the safety of the well, the lives on the *Deepwater Horizon*, the residents living along the Gulf Coast, and the Gulf of Mexico ("Gulf") itself.  Unfortunately, Halliburton blatantly ignored its legal obligations, industry standards, and federal regulations in the performance of its duties.  The result was a disaster that has devastated an entire region of our country and destroyed a significant portion of our nation's precious coastline.

2.     These facts render hollow Halliburton's claim that it abides by a Health, Safety and Environmental policy.  In particular, Halliburton contends that:  "[T]he Company… compl[ies] with all applicable Laws and relevant industry standards of practice concerning protection of health and safety of its Employees in the work place and other persons affected by its business activities and the prevention of environmental pollution.  Protection of health, safety, and the prevention of pollution to the environment is a primary goal of the Company …."  Having itself proclaimed the standard of care that should have guided its conduct, it is, then, incredible that Halliburton so willingly failed to meet its own standards and facilitated BP's determination to put saving money above the safety of employees, other persons and the environment.

**B.     Halliburton's Willful Disregard For The Rights And Well-Being of Others –
A Necessary Predicate To The Incident**

3.     At approximately 9:45 p.m. on April 20, 2010, Halliburton's many failures at the *Deepwater Horizon* drilling operation became a substantial cause for the now famous explosion.  At that time, Halliburton was preparing to seal the well for later exploitation.  As

workers on the rig prepared the well for the "final" cement plug, the lower cement block that Halliburton had previously set in place failed.  As a result, methane gas raced up the well, rapidly spread out onto the *Deepwater Horizon*'s platform and then ignited, engulfing the rig in flames. Eleven workers lost their lives in the resulting explosion.  The remaining crew-members were forced to abandon the rig as the fire spun out of control.  Over the next 36 hours, the 32,000-ton *Deepwater Horizon* sank to the bottom of the Gulf (the "Incident").  As it descended to the seafloor, the rig pulled the drilling apparatus down with it, bending and breaking the pipe before finally tearing away from it completely.  The well was left uncapped, allowing as much as 100,000 barrels of crude oil per day to spew unchecked into the waters of the Gulf – a condition that lasted for almost three months.

4.      Halliburton caused the *Deepwater Horizon* disaster in two ways.  First, Halliburton blatantly disregarded industry standards in performing a grossly inadequate cementing job in the well.  Halliburton knew that BP's suggested cementing plan was inadequate and inherently dangerous.  Nonetheless, Halliburton followed the cementing plan exactly as it had been presented, fully aware of the potentially disastrous consequences.  Thereafter, Halliburton failed at every stage to cement the well in accordance with applicable regulations, industry standards, and its own best practices.  As a result, the cementing failed, allowing oil and gas to escape the well which caused the catastrophic blowout.

5.      Second, Halliburton failed to alert the proper authorities of the existence of a series of regulatory violations that should have led to a suspension of operations on the *Deepwater Horizon*.  Drilling operations were troubled from the start of the *Deepwater Horizon*'s arrival at the drilling site.  Halliburton knew of the rig's frequent equipment malfunctions, loss of well control due to gas "kicks," and other setbacks.  However, Halliburton

stood by as BP pressured the rig's crew to cut corners on safety in order to speed operations because the operation was nearly five weeks past its original completion date and significantly over budget.

6.      Following the incident, Halliburton representatives have shamelessly attempted to cover up their own responsibility for the billions of dollars of economic consequences being borne by innocent third parties as well as the environmental consequences on an entire region that will last for decades.   Along with BP, Halliburton has attempted to mislead the American people by hiding key facts related to the explosion.   Halliburton has deflected responsibility and cynically denied any obligation for the consequences it caused.   In literally scores of cases filed by the victims of its failures, Halliburton has taken the incredible position that it has no legal responsibility to the millions of victims of its misconduct – a contention that ignores both its ethical obligations and the duties imposed on Halliburton under applicable law.

## C.      Halliburton Caused Damage to St. Joe

7.      St. Joe - the owner and developer of approximately 577,000 acres of property along Florida's Northwest coast - is among those whose assets have been directly damaged by Halliburton's failure to exercise due care.  Given the business of the company, it was not surprising when St. Joe's stock price tumbled over forty percent in the days following the explosion.   Since then, as the magnitude of the environmental and economic devastation in the Gulf has become apparent, St. Joe's stock has remained depressed.   Oil and other harmful pollutants discharged from the uncapped well have fouled the Gulf's waters, damaged marine life and brought immediate and long-term economic harm to businesses operating in Florida.   St. Joe's vision for development of Northwest Florida has been directly damaged as a result of Halliburton's actions.   The full scope of the environmental devastation is increasing and it is

-4-

difficult to foresee how long it will take for the Gulf to recover its former vitality.  George Crozier, Executive Director of the Dauphin Island Sea Lab at the State of Alabama Marine Science Institution states that the oil spill "will cause long-term economic loss for years, because there's no way to clean it."

8.     As a real estate development company focused on Northwest Florida, the intrinsic value and financial success of St. Joe is inextricably tied to the health and well-being of the Gulf.  The environmental harm to the Gulf triggered by this disaster, as well as the resulting economic and financial losses to Gulf Coast residents and businesses, will have predictable long-term consequences on St. Joe.

### D.     Halliburton Is Legally Responsible For The Billions Of Dollars Of Damages It Caused.

9.     Halliburton is liable for the grossly negligent way in which it conducted the cementing of the well and its intentional disregard for its obligation to take appropriate action in the face of BP's obvious and continuous violations of the law.  The destruction of the *Deepwater Horizon*, and the resulting environmental and economic damage, stemmed as much from Halliburton's indifference to known risk, gross negligence, and greed as it did from BP. Halliburton could have and *should have* prevented this disastrous event.  Against any application of existing law, Halliburton is jointly and severally liable for all of the actual and consequential damages that St. Joe has suffered, and will continue to suffer, caused by this readily preventable disaster.

## II.     PARTIES

### A.     Plaintiff

10.     The St. Joe Company, a Florida corporation, is a residential and commercial real estate developer with its principal place of business in WaterSound, Florida.

B.     **Defendant**

11.     Halliburton, d/b/a Halliburton Energy Services, Inc., is a Delaware corporation with two headquarters, one in Houston, Texas and one in Dubai, United Arab Emirates.  It may be served at its United States headquarters, located at 3000 North Sam Houston Parkway East, Houston, Texas, 77032 or through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE  19801.

## III.   JURISDICTION AND VENUE

12.     This lawsuit is properly before this Court pursuant to Article 4, Section 7 of the Delaware Constitution because Plaintiff is seeking legal damages.

13.     The Court has subject matter jurisdiction over this action.

14.     This Court has personal jurisdiction over Halliburton because it is a corporation organized under Delaware law.

15.     Venue is proper in this Court because Halliburton's agent within this State is located in Wilmington, New Castle County, Delaware.

## IV.   FACTUAL BACKGROUND

A.     **The St. Joe Company – A Proud History**

16.     In 1926, Alfred Irene DuPont began acquiring large tracts of land in Florida that would one day form the nucleus of St. Joe's assets.  DuPont died in 1935, leaving the majority of his assets in a charitable trust and appointing Edward Ball as head of his business conglomerate.  Ball incorporated the St. Joe Paper Company in 1936 using the vast timberlands acquired by DuPont.  By the 1970s, St. Joe's pulp and paper operations were among the largest in the United States.  Ball ran St. Joe Paper until his death in 1981.  At that time, St. Joe was the largest private landowner in Florida, having amassed over 1.2 million acres to support its pulp and paper operations.

17.     In the 15 years following Ball's death, St. Joe continued to prosper. However, the company did not take full advantage of the inherent value of its enormous land holdings, its various businesses, or its cash reserves.  St. Joe decided to narrow the scope of its operations to focus on its most valuable asset – its real estate holdings – and reorganized itself as a real estate development company.  To that end, in May 1996, the Company sold its paper mill and cardboard container plants for an aggregate price of $390 million.  St. Joe Paper Company changed its name to the St. Joe Corporation and later to The St. Joe Company.

**B.**     **The "New" St. Joe:  A Vision for a Prosperous Northwest Florida.**

18.     In the late 1990s, St. Joe expanded its operations and began to convert itself into a real estate development company.  Through the balance of the 1990s and the first decade of the 21st Century, St. Joe created many master-planned communities and commercial projects across Florida.

19.     In September 2006, St. Joe declared a sweeping reorganization of its operational structure designed to refocus the company on long-term growth opportunities while capturing operating efficiencies.  Pursuant to that plan, St. Joe merged its operating units into one integrated organization.  In essence, the reorganization was borne out of a desire to focus St. Joe's business plan on developing its vast real estate holdings in Northwest Florida.

20.     Throughout 2007, St. Joe completed the sale of its seventeen building office portfolio and its North Carolina homebuilding operations.

21.     In 2008, St. Joe completed an equity financing and used the proceeds to pay off substantially all of its debt.  Having eliminated short-term debt constraints, the Company was positioned to preserve its land holdings and focus on its long-term value creation opportunities in Northwest Florida.

22.     During 2009, St. Joe divested its remaining real estate assets in Central and Southern Florida.

23.     St. Joe also devoted significant resources to promoting the long-term economic success of Northwest Florida by facilitating numerous infrastructure improvements in the region, including new hospitals, roads, schools and, most importantly, a new international airport.

24.     In May 2010, years of strategic planning, regulatory efforts, legal successes, and infrastructure development culminated in the opening of the new Northwest Florida Beaches International Airport near Panama City.  The opening of the airport is a key component in the development of land holdings marked for industrial, commercial, and residential real estate activity in the surrounding area.

25.     The new airport is located within a 75,000 acre tract known as the West Bay Sector Plan, which the Company plans to use as a catalyst for regional growth and increased demand for all St. Joe real estate holdings.

26.     In October 2009, St. Joe entered into a Strategic Alliance Agreement for Air Service with Southwest Airlines ("Southwest").  Pursuant to the agreement, Southwest is now providing air service to Northwest Florida via Northwest Florida Beaches International Airport.  St. Joe believed its commercial opportunities would be significantly enhanced by Southwest's planned service to the region.  In fact, all pieces necessary for implementation of the master plan were in place when St. Joe announced its development activity at its VentureCrossings Enterprise Centre, one of the nation's largest office, retail, hotel and industrial developments, encompassing the first 1,000 acres to be developed within the 75,000-acre West Bay Sector Plan adjacent to the airport site.

-8-

27.    In support of its commitment to the West Bay Sector Plan, St. Joe senior management announced, in March 2010, that St. Joe would relocate its headquarters from Jacksonville, Florida to its new VentureCrossing Enterprise Centre.  On April 12, 2010, just days before the *Deepwater Horizon* explosion, St. Joe publicly announced the launch of VentureCrossings Enterprise Centre.

28.    St. Joe's strategic alliances and its long-term visionary goals positioned the company as a frontrunner in the future development of the Northwest Florida corridor.  The new airport is in close proximity to seven military bases, providing substantial incentives for aviation, aerospace and defense contractors to move into the region, which it was hoped would combine with the beauty of the surrounding area to entice other commercial and residential buyers to relocate to Northwest Florida.

29.    Thus, on April 20, 2010, St. Joe was poised to reap the benefits of a new era of economic prosperity in Northwest Florida – one which it had worked so hard to promote over the prior decade.  That was the state of things until the *Deepwater Horizon* disaster.

### C.    Halliburton – Sacrificing Principle For Profits

#### 1.    Halliburton – a once proud company

30.    Founded in 1919 by Erle Halliburton as the New Method Oil Well Cementing Company, Halliburton is today the world's second largest oilfield services corporation with operations in more than 70 countries.  It has hundreds of subsidiaries, affiliates, branches, brands, and divisions and employs over 50,000 people worldwide.  Although Halliburton provides many services related to oil drilling and exploration, its main expertise remains the cementing of oil wells.  Since it first used cement to bring a wild oil well under control in 1921, Halliburton has established itself as an expert in the field of oil well cementing.

31.     In the last decade, Halliburton has also become known as a company willing to sacrifice principle for profit as its participation in one scandal after another is revealed. In recent years, Halliburton and its subsidiaries have been repeatedly accused of putting profits before the public's health and welfare by ignoring its ethical and legal obligations.   Whether engaging in environmentally dangerous drilling practices, violating securities laws, overcharging for defense contracts in major U.S. wars, or obtaining contracts under dubious circumstances, it seems that Halliburton is a company willing to cut any corners in order to add to the bottom line.

**2.   Halliburton and BP:  Two peas in the proverbial pod**

32.     Halliburton's willingness to ignore its legal and ethical obligations makes it the perfect partner for BP.  Well known to its competitors and others in the oil and gas industry for its own marginal ethics, BP is one of Halliburton's largest oil drilling and cement operations customers.  Halliburton has worked with BP on a vast number of projects over the past decade. As this relationship flourished, BP has amassed the worst safety record in the oil exploration, production and refining industries.  In the past ten years, BP has been fined repeatedly for its cavalier disregard for the health and safety of others.

33.     For example, in 2005, an explosion occurred at a refinery in Texas City, Texas, owned and operated by BP Products North America, Inc. ("BP Products") which killed 15 people and injured 180 others.  The United States Chemical Safety and Hazard Investigation Board ("Board") concluded that BP Products knew about risky practices at the refinery before the blast but did nothing about them.  The Board's report stated that the many failures that culminated in that tragic event could be traced all the way from Texas to BP's headquarters in London and disclosed that "[w]arning signs of a possible disaster [at the refinery] were present

-10-

for several years, but company officials did not intervene … to prevent it."  BP pled guilty to criminal violations of the Clean Air Act and was fined $50 million.

34.     Even after the Texas City refinery explosion, BP failed to take its obligations seriously.   Last year, the United States Occupational Safety and Health Administration ("OSHA") imposed an $87 million fine on BP Products – the largest penalty in OSHA's history – for failing to correct hundreds of safety violations at the Texas City refinery. In fact, in a study of OSHA records conducted by the Center for Public Integrity, it was found that, since 2007, two oil refineries owned and operated by BP Products – the Texas City and Toledo refineries – have been responsible for an astounding 97% of all "egregious willful" citations issued by OSHA to companies in the refining industry.   In light of these statistics, Jordan Barab, the United States Deputy Assistant Secretary for Labor for Occupational Safety and Health, stated that the "only thing you can conclude is that BP has a serious, systemic safety problem in their company."

35.     Of course, Halliburton knew about BP's record, and yet it still aggressively pursued lucrative assignments from BP, including its contract on the *Deepwater Horizon*.

36.     Given the challenged decision-making of these two "partners in crime," it is then, sadly, not surprising that each would decide - throughout the drilling process on the *Deepwater Horizon* – to ignore industry standards, accept and follow grossly inadequate procedures, refuse to report blatant regulatory violations and cut virtually every corner where the "right" course cost more than the "wrong" course.   Clearly, Halliburton placed the preservation of its ongoing relationship with BP - a known habitual offender in the oil drilling industry – over

its obligations to St. Joe and all the many others plainly within the scope of the foreseeable risk if "things" went wrong.

### D.     The *Deepwater Horizon* Disaster – Halliburton's Gross Negligence And Wanton Indifference To The Rights Of Others

#### 1.  BP purchases the lease rights to the Macondo Prospect

37.     In February 2008, BP was the highest bidder in an auction conducted by the United States Minerals Management Service ("MMS") for the right to conduct oil exploration, drilling, and production operations at the Macondo Prospect.  The site is located less than 50 miles off the coast of Louisiana, in an area designated on the Outer Continental Shelf as Block 252, Mississippi Canyon.

38.     In 2009, BP filed an exploration and environmental impact plan with MMS which revealed its plan for drilling operations at the Macondo Prospect.  In that plan, BP represented that it was "unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities."   Relying on BP's representation, MMS exempted BP from conducting a detailed environmental impact study.

39.     Thereafter, BP sold a 10% interest in the lease to MOEX Offshore 2007, LLC ("MOEX"), and 25% to a predecessor-in-interest of Anadarko Petroleum ("Anadarko").

40.     On December 17, 2009, BP, MOEX and Anadarko entered into a joint operating agreement regarding drilling operations at the Macondo Prospect.  In accordance with that agreement, BP oversaw the drilling operations at the Macondo Prospect.

#### 2.  The Deepwater Horizon oil rig

41.     The *Deepwater Horizon* was an ultra-deepwater oil rig built in 2001 by Hyundai Heavy Industries of South Korea.  It was originally commissioned by R&B Falcon Corporation, which merged with Transocean Sedco Forex, Inc. ("Transocean") in 2001.  As a

-12-

result, ownership of the *Deepwater Horizon* was transferred to Transocean in August 2001. At the time of the Incident, the *Deepwater Horizon* was owned by Transocean, and leased to BP through a subsidiary, Triton Asset Leasing GmbH.

**E.    Halliburton's Central Role In The Operation Leading Up To The Deepwater Horizon Incident**

42.    BP contracted with Halliburton to conduct a number of operations at the Macondo Prospect. The most significant of these tasks was responsibility for cementing the well and overseeing the final well-capping procedure. The importance of these functions is described by Halliburton on its own website: "[s]uccess in these deepwater environments calls for a service company with reliable and proven technology, along with the experience … through the entire process."

43.    Cement is used primarly at two stages of the deep-water drilling process. Deepwater wells are drilled in sections. The basic process involves drilling through rock, installing casing in the wellbore, drilling deeper and then repeating this process. Cement is used to fill gaps between the segments of the casing and the surrounding wellbore in order to prevent any seepage of oil and gas up the wellbore and riser.

44.    Thereafter, cement is used to plug the well. After an exploration well is drilled, cement is pumped through a steel pipe or casing and out through a check valve at the bottom of the casing. The cement then travels up the outside of the pipe, sheathing the part of the pipe surrounded by the oil and gas zone. When the cement hardens, it is supposed to prevent oil or gas from leaking into adjacent zones along the pipe. As the cement sets, the check valve at the end of the casing prevents any material from flowing back up the pipe. A proper cementing procedure isolates the well until production is begun.

45.     Cementing is a delicate and vitally important function.  If not done properly, the chances of a well blowout – *i.e.*, the uncontrolled release of oil from the well – increase exponentially.  As part of a study in 2007, MMS found that faulty cementing was a factor in 18 of 39 well blowouts in the Gulf of Mexico over a 14-year period – the single largest factor of such events.

46.     Given its experience and expertise, Halliburton was well aware of the environmental and safety risks associated with an inferior cement job.  In fact, Halliburton had recently experienced first-hand the consequences of cement failure.  Just prior to the *Deepwater Horizon* incident, Halliburton was involved in a severe well blowout in which its cementing operations failed.

47.     Halliburton was the contractor in charge of cementing operations for a well being drilled in the Timor Sea off the coast of Australia known as the Montara well.  In August 2009, the Montara well suffered a blowout and discharged approximately 85,000 gallons of oil a day into the ocean until a relief well stemmed the flow two and half months later.  Although its final report has not yet been publicly released, an Australian governmental commission is investigating the likelihood that the blowout was due to Halliburton's failure to properly conduct the cementing process at the Montara well.  Elmer P. Danenberger, the former head of regulatory affairs for MMS, advised the Austrialian government that a poor cement job was the probable cause of the blowout.  Given this recent experience, it is nothing short of incredible that Halliburton would knowingly involve itself in a drilling operation that was being conducted in an unsafe manner.

1.      **Halliburton ignores all signs indicating that drilling operations on the**
        ***Deepwater Horizon* were unsafe.**

48.     Drilling operations at the Macondo Prospect began on October 7, 2009.
The intention was to drill an exploratory well and then cement and plug the well temporarily for
later completion as a sub sea producer of crude oil.   The original plan called for drilling
operations on the exploratory well to take 51 days and to cost $96 million.

49.     Almost from the beginning, however, the crew at the Macondo Prospect
encountered significant problems.  The original drilling rig on site was the *Marianas*, but it was
damaged in Hurricane Ida.  The *Deepwater Horizon* was then transferred to the site, and drilling
began again on February 6, 2010.

50.     Throughout March 2010, the *Deepwater Horizon* experienced serious
problems at the drilling site, including loss of well control and incidents related to sudden and
unexpected releases of gas from the well bore, called "kicks."   In one instance, the rig's
operations had to be completely shut down after a severe gas kick pushed so much gas up the
riser that senior crew officials feared it would ignite.  Smaller kicks also occurred in the days
before the explosion that destroyed the rig.  And, on at least three occasions fluid leaked from the
blowout preventer, a safety device used to seal, control, and monitor the well.

51.     At one point, the well experienced a total loss of drilling mud in the well.
"Mud" is actually a man-made fluid, composed of clay and other ingredients, that is used in the
bores of both oil and natural gas wells.  The primary function of drilling mud is to provide
enough pressure in the bore to prevent formation fluids and gas from entering the well bore
("hydrostatic pressure").  Accordingly, maintaining adequate drilling mud in the bore is critical
to keeping gas from entering the bore and rising up and out to the rig platform.

#12967692 v1

52. As the drilling schedule fell farther behind due to these and other problems, BP increased the pressure on the *Deepwater Horizon*'s crew to "bump up" the drilling effort at the wellbore. However, the effort to "speed up" the drilling damaged the geological formation at the bottom of the well hole to such an extent that it caved in and swallowed up drilling tools and mud. This "cave in" forced BP to abandon the initial wellbore and to begin again at a cost of $25 million and the loss of considerable time. According to Mike Williams, an electronics technician employed by Transocean on the *Deepwater Horizon*, it also caused BP to further increase their demands that the rig's crew complete drilling operations at the well at a dangerously shortened pace.

53. Thus by early April 2010, Halliburton and every other member of the operation was concerned about their ability to control the well. On April 14, 2010, Brian Morel ("Morel"), a BP drilling engineer, emailed a BP colleague, Richard Miller, that "this has been a nightmare well which has everyone all over the place."

54. Even the typically passive MMS recognized that conditions at the Macondo Prospect mandated care and not expediency. On April 6, 2010, it warned BP to "[e]xercise caution while drilling due to indications of shallow gas and possible water flow."

55. Unfortunately, neither BP nor Halliburton were willing to put caution before profits. The *Deepwater Horizon* operation was expensive, with lease costs alone at $500,000 per day. And, of course, there were additional costs for contractors' fees to Halliburton and others. At the time of the explosion, the rig was 43 days late for its next drilling location, which meant that BP had already incurred more than $21 million in additional leasing fees alone.

#12967692 v1

56.     In a confidential survey of workers on the *Deepwater Horizon* that was conducted in the weeks before the explosion, many commented on the "unsafe behaviors on the rig."   The comments included the prophetic lament that "drilling priorities [took] precedence over planned maintenance," but that they feared reprisals if they reported the "risky" situation on the rig.

**2.    Halliburton ignores its own best practices and undertakes to implement BP's flawed cementing plan for the well.**

57.     BP's casing and cementing plan for the well was not appropriate for a well with problem gas kicks.  Halliburton knew this.  Dr. Robert Bea, a Professor of Engineering at the University of California, Berkeley and a member of the school's Center for Catastrophic Risk Management, was requested by the White House to investigate the Incident.

58.     In his initial review of what led to the failure on the *Deepwater Horizon*, Dr. Bea determined that one of the causes of the disaster was the "improper cement design . . ." The cementing process did not, by design, provide a complete barrier between the casing and the surrounding geology through the entire length of the wellbore, as it should have.

59.     Halliburton, hired for its expertise in cementing, was fully aware of the *Deepwater Horizon's* history of well control problems.  Halliburton knew from the beginning that the cementing plan was unsafe.  Indeed, on April 1, 2010, Halliburton employee Marvin Volek ("Volek") warned in an email that the cementing plan BP had given to Halliburton "was against our best practices."  Despite this knowledge, Halliburton elected to implement the plan without changes.

-17-

**3.   Halliburton opts to use an unacceptably risky method to seal the well.**

60.     The *Deepwater Horizon* crew drilled the last section of the well on April 9, 2010.  The wellbore was 18,360 feet below sea level, and the last 1,192 feet required casing before the well could be plugged successfully for later exploitation.

61.     BP and Halliburton had two options for casing the final section of the wellbore in preparation for final sealing of the well.  The safer option was to hang a steel tube, called a "liner," from a liner hanger on the bottom of the last section of casing already in the well, and then insert another steel liner tube, called a "tieback," on top of the liner hanger.  This method would provide four redundant barriers to prevent gas and other hydrocarbons from flowing up the unsealed parts of the drilling column and to the riser.

62.     The alternative, cheaper but far less safe, was to lower a single string of steel casing from the top of the wellhead at the seafloor to the bottom of the well.  This method would, however, provide only two barriers to gas flowing up the well.

63.     In mid-April 2010, as part of a "Forward Plan of Review," BP's own drilling engineers recommended against the use of the single string of casing option as unsafe.

64.     Nonetheless, BP decided to use a single casing string to seal the well because it could be installed in less time and would cost $7-10 million less than the safer liner and tieback method.

65.     Given its knowledge and experience, it is shocking that Halliburton opted to implement the inferior plan despite its significantly riskier profile.  Clearly, Halliburton's decision to seal the well using the riskier casing string option, instead of a liner/tieback, was not only grossly negligent, but was a breach of MMS regulations at 30 C.F.R. § 250.401.  That regulation required Halliburton to take necessary precautions to keep well control, *i.e.* to prevent gas from migrating up the drilling column at all times by using the "best available and safest

-18-

drilling technology to minimize the potential for the well to flow or kick," and to "use and maintain equipment and materials necessary to ensure safety and protection of personnel, equipment, natural resources, and the environment."

**4. Halliburton knowingly conducted the final cementing process in a manner likely to fail.**

     **a. <u>Halliburton failed to use the required number of centralizers needed to ensure a successful cement job.</u>**

66.    In conducting a well-sealing operation using casing string, centralizers (attachments that go around the casing as it is being lowered into the well to keep the casing in the center of the borehole) are an important part of the process. In order for this method to have any chance to inhibit gas from flowing "up," the casing must be properly centered in the well. Halliburton was well aware of this necessity.

67.    As the American Petroleum Institute's ("API") Recommended Practice 65 explains, "If the casing is not centralized, it may lay near or against the borehole wall . . . . It is difficult, if not impossible, to displace mud efficiently from the narrow side of the annulus if casing is poorly centralized. This results in bypassed mud channels and inability to achieve zonal isolation." Consequently, it is important that an adequate number of centralizers be used.

68.    However, on April 15, 2010, BP informed the Halliburton account representative that Halliburton was to use only six centralizers in casing the well.

69.    Halliburton then spent the day running computer simulations to determine how many centralizers would be needed in the well to prevent unsafe gas flow. Those simulations established that at least 21 centralizers were needed to ensure only "MINOR gas flow problems," while ten centralizers resulted in a "MODERATE" gas flow problem. Halliburton then recommended to BP that Halliburton use 21 centralizers to cement the casing string into the well.

70.     BP emailed Halliburton back that same day, rejecting the use of 21 centralizers because there were only six centralizers of the type needed on the *Deepwater Horizon*.  The BP representative stated that "it's too late to get any more product on the rig, [and thus] our only option is to rearrange placement of these centralizers."

71.     Given the obvious importance of this issue to the safety of the well-drilling, the following day, on April 16, 2010, the centralizer issue was elevated within BP.  BP workers informed the drilling engineer team leader that they had "located 15 Weatherford centralizers with stop collars . . . in Houston and worked things out with the rig to be able to fly them out in the morning."

72.     Internally, BP knew that using the number of centralizers recommended by Halliburton was important because "we need to honor the modeling to be consistent with our previous decisions to go with the long string."  Despite this awareness of the risks and a readily available solution to the problem, BP determined to push ahead with only six centralizers because it would take up to ten additional hours for the centralizers to arrive from Houston.

73.     Thus, on April 16, 2010, in an e-mail that is chilling in its stark revelation of the callous indifference to the risk to the crew on board and surrounding environment, BP's Operations Drilling Engineer instructed that only six centralizers would be used.  In the e-mail, BP expressly acknowledged that "[e]ven if the hole is perfectly straight, a straight piece of pipe even in tension will not not seek the perfect center of the hole unless it has something to centralize it."  Nonetheless, he flippantly dismissed the concern - "who cares, it's done, end of story…"

74.     Upon receipt of the instruction, on April 17, 2010, Halliburton warned BP that using only six centralizers would likely produce channeling and a failed cement job.  In a

#12967692 v1

follow-up email on April 18, 2010, Halliburton notified BP that additional computer modeling confirmed that using only six centralizers would lead to a "SEVERE" gas problem in the well. BP remained unmoved and insisted on using only six centralizers in the cementing process.

75.    Unbelievably, Halliburton, despite having already determined that such a procedure would produce a "failure of the cement job," again sacrificed principles and moved forward with the final sealing of the well in an unsafe and grossly negligent manner, rather than insisting on using the necessary number of centralizers, creating an imminent safety hazard. Given the ultimate consequences, it is a decision Halliburton will rue for years to come.

### b.    Halliburton conducted the final cementing operation without insisting on a complete "bottoms up" circulation of the drilling mud in the well.

76.    Halliburton also recommended to BP that the crew circulate the drilling mud from the bottom of the well all the way up to the surface before actually cementing the well – a "bottoms up" test.  This advice was in accordance with that of the generally accepted industry standards, which provided that oil companies should fully circulate the drilling mud in the well from the bottom to the top before commencing the cementing process.  While fully circulating the mud would have taken as long as 12 hours, it would have allowed workers on the *Deepwater Horizon* to test to eliminate debris and condition the mud, which would have served to prevent contamination of the cement.  In addition, it would have alerted the crew to any gas infiltration into the well, the very cause of the explosion that eventually doomed the rig.

77.    BP, however, rejected Halliburton's recommendation, and conducted only a partial circulation of the drilling mud.  Halliburton knew that BP had not done a "bottoms up" test and elected to begin the cementing process anyway, creating an imminent safety hazard.

### c. **Halliburton failed to install a casing hanger lockdown sleeve prior to displacing drilling mud.**

78.     In order to ensure the integrity of the seal assembly, which was now the only barrier against an influx of hydrocarbons from the sea floor, prudence required the use of a casing hanger lockdown sleeve – a device that locks the production casing and wellhead in place. A lockdown sleeve would have prevented the well plugs installed by Halliburton from being blown out from below.

79.     BP and Halliburton, however, did not install a lockdown sleeve prior to running the negative pressure tests on the well before the procedure began to displace drilling mud with light seawater, again creating an imminent safety hazard.

### d. **Halliburton failed to insist on proper pressure testing.**

80.     Given the obvious danger of a gas release in the well, Halliburton should not have permitted the drilling mud to be removed from the drill column prior to installing the final plug unless it was absolutely certain that the plug already installed created an adequate barrier to methane gas pushing up through the wellbore and the marine riser.

81.     However, making that determination required pressure tests on the well, tests that are conducted using a well's blowout preventer ("BOP").  The BOP is a series of valves and seals that are supposed to control oil well pressure in the event of a catastrophe by pinching the drilling pipe, cutting it, and sealing it – thereby stopping the release of oil from a well.  In short, it is designed to prevent the uncontrolled flow of oil that has resulted from the Incident.

82.     It is not known whether the BOP was even capable of successfully completing pressure tests on April 19, 2010.  Transocean's employees have admitted that in March 2010 it was common knowledge on the rig that a critical gasket on the BOP was damaged in an unrelated accident.

83.     Thus, the crew of the *Deepwater Horizon* would not have been able to gauge reliably whether or not methane or other gases were being released into the well and potentially rising to the rig platform, ready to explode.  This, of course, posed an imminent safety hazard.

84.     Accordingly, as the rig's crew began removing drilling mud from the column and replacing it with seawater, Halliburton knew that it was relying on pressure tests that were likely inaccurate because of the damage to one of the BOP's gaskets.

**e.     Halliburton failed to confirm that the cement job was successful.**

85.     Because of the decision to use a single string of casing, the well had just two barriers to prevent gas flow up the annular space around the final string of casing – the cement at the bottom of the well and the seal at the wellhead on the sea floor.  Given the significant risk that the cement job would fail, it was critically important to run a cement bond log to accurately assess the status of the cement job.

86.     MMS regulations, at 30 CFR § 250.428, required Halliburton to conduct a definitive test of the integrity of a well's cement, called a "cement bond log," if there were indications that its cement job was inadequate.  The cement bond log is a test that confirms that the cement has properly set, bonded to the well casing and surrounding formations, and is preventing gas from seeping into the drilling column.

87.     Under 30 C.F.R. § 250.428 of the MMS regulations, the existence of indicators of an inadequate cement job – such as indefinite or anomalous negative and positive pressure tests conducted during the final cementing process – requires a cement bond log to be conducted.  Two pressure tests were conducted on the well on April 20, 2010.  Neither was definitive.

-23-

88.     Negative pressure tests are not usually considered successful unless zero drilling mud is being returned to the rig.  During the first negative test conducted on April 20, 2010, 23 barrels of mud were returned, while the second test returned 15 barrels.  In addition, a "very large abnormality" in pressure was indicated by the second negative pressure test.  Nonetheless, a cement bond log test was not performed.

89.     Even without indefinite test results, a cement bond log should have been ordered on April 20, 2010, because of Halliburton's own previous concerns that the method chosen to seal the well was likely to fail.

90.     In fact, on April 19, 2010, BP had arranged for Schlumberger Limited ("Schlumberger") to fly in a crew to the *Deepwater Horizon* to conduct a cement bond log test.  However, on the morning of April 20, 2010, Schlumberger was informed that the test was being cancelled because it would have taken 9–12 hours and cost $128,000.  The Schlumberger crew departed the *Deepwater Horizon* at 11:15 a.m. on April 20, 2010.  Despite an obligation to do so, Halliburton did not insist on this test – which would have confirmed whether or not their cementing process had been successful, creating an imminent safety hazard.

91.     Gordon Aaker, a professional engineer and independent drilling expert consulted by the Subcommittee on Oversight and Investigations of the United States House of Representatives Energy and Commerce Committee, called the decision to forego the cement bond log test "horribly negligent."

92.     Another expert consulted by the subcommittee, John Martinez, stated that "cement bond or cement evaluation logs should always be used on the production string."  That is because it is virtually impossible to ensure the effectiveness of the cement seal without running a cement bond log.

93.     Tommy Roth, a Halliburton employee, confirmed the need for testing in his briefing to the staff of the House Energy and Commerce Committee, where he admitted that a cement bond log must be conducted "if the cement is to be relied upon as an effective barrier." Yet, Halliburton did not insist that Schlumberger perform the test and agreed to continue the process of installing the final cement plugs in the wellbore without it.

**5.     As predicted, the lower plug installed by Halliburton to seal the well fails – The *Deepwater Horizon* is engulfed in flames.**

94.     At approximately 9:45 p.m. CST on April 20, 2010, as the crew was attempting to displace the drilling mud in the wellbore with seawater, the lower cement plug installed by Halliburton catastrophically failed.  Methane gas shot up and out of the well. Because the BOP's annulus had been opened to allow Halliburton to install the planned second cement plug, the gas had a clear path up the drill casing and through the marine riser.  It quickly expanded out onto the *Deepwater Horizon*'s platform, where it ignited, exploded and engulfed the rig in flames.

95.     Eleven crewmembers were killed.   The rig's Emergency Disconnect System ("EDS") – designed to separate the rig from the riser in case of an emergency such as an explosion – failed to activate.  Accordingly, methane gas continued to pour through the riser and feed the raging fire on the platform.  The crew members that survived the explosion were forced to abandon the rig.

96.     The *Deepwater Horizon* burned for two days until it finally sank on April 22, 2010.

97.     While the exact cause of the explosion has not been officially determined, almost all knowledgeable observers have concluded that poor cementing was the primary contributing factor to the blowout.  Robert MacKenzie, managing director of energy and natural

resources at FBR Capital Markets and a former cementing engineer, told the *Wall Street Journal* that the "initial likely cause of gas coming to the surface had something to do with the cement."

98.     Such a conclusion is bolstered by the litany of deliberate and grossly negligent decisions by Halliburton to conduct the cementing operations for the well in a manner that it knew was not in accordance with its own practices, applicable regulations, or accepted industry standards.  Halliburton should have known better than to run these risks.

99.     Despite its specialized knowledge and experience, Halliburton deliberately chose to conduct the cementing process in a manner it knew was unsafe.  Throughout the drilling process, and especially during the final cementing process, Halliburton: 1) chose to ignore or failed to report BP's safety violations, and 2) implemented its own flawed and grossly negligent cementing procedures.  Halliburton is, therefore, fully liable for the deaths of 11 members of the *Deepwater Horizon*'s crew, an unfathomable amount of pollution in the Gulf, the extraordinary effects on the marine and coastal ecosystems, and the disastrous economic consequences to millions of Gulf residents and businesses, including St. Joe.

### F.     The Damage Done:     The Resulting Environmental And Economic Catastrophe

#### 1.   Millions of gallons of oil and other hydrocarbons have been discharged into the Gulf's fragile waters.

100.     As the rig sank to the seafloor it pulled the marine riser down with it, bending and breaking the pipe before finally tearing away from it completely at about 1500 feet above the seabed.  Massive amounts of crude oil and other hydrocarbon pollutants immediately began spewing into the Gulf.  This continued until July 15, 2010, when BP finally managed to install a makeshift cap on the damaged riser.

101.     The pollutants from the Deepwater Horizon Incident were so massive that they formed a rainbow-colored slick across the Gulf's surface large enough to be seen from outer

space.  As the slick has moved toward the coastlines of Louisiana, Mississippi, Alabama, and Florida, there has yet to be an accurate estimate of the actual volume of pollutants resulting from the Incident.  However, estimates have ranged from approximately 60,000 barrels per day to BP's internal documents which have put the flow rate as high as 100,000 barrels per day.  Even using the more conservative flow rate of 60,000 barrels per day, the well discharged more pollutants every four to seven days than the entire volume of oil that leaked from the *Exxon Valdez* in 1989.

102.    Using the most recent U.S. government estimates and multiplying that flow rate by eighty-seven days, the estimated total volume of pollutants discharged into the Gulf from the well would range from approximately 210,000,000 gallons to over 365,400,000 gallons, making it the worst known oil spill disaster to date.  Samantha Joye, a researcher for the University of Georgia explains the impact, stating that "[t]here's a shocking amount of oil in the deep water, relative to what you see in the surface water.  There's a tremendous amount of oil in multiple layers, three or four or five layers deep in the water column."

## 2.  The devastating impact on the Gulf's ecosystem

103.    The impact of the oil and other pollutants discharged into the Gulf because of the *Deepwater Horizon* incident has been devastating.  As of July 24, 2010, the U.S. Fish & Wildlife Service had reported:  (1) 2770 dead birds and 1464 oil-covered birds collected alive; (2) 488 dead sea turtles, and 231 oil-covered live turtles, and (3) 64 dead mammals and five injured, but found alive.  Of the animals found alive, only 553 birds, 15 turtles, and 1 mammal have been successfully released.  The oil spill has also had a devastating impact on fish and shellfish in the Gulf.

104.    However, because of the unprecedented scope of the disaster, much of the devastation to marine life in the Gulf will take years to assess.  Terri Rowles, NOAA's Director

of Marine Mammal Health and Stranding Response has noted that impacts on "species living in deep water, like sperm whales, may not be detected," because dead whales simply disappear beneath the waves.

105.    The use of chemical dispersants to break up the slick will likely cause significant damage to the Gulf.  The chemical dispersants are designed to coagulate spilled oil into small droplets, which then sink below the surface, where these droplets can be more easily broken up by the natural movement of subsurface water.  In this case, however, the sheer volume of the oil and dispersants used may be causing the droplets to form into large plumes of oil and other hydrocarbons discharged from the well.

106.    The number and magnitude of these plumes is still under investigation. Recent studies, however, have confirmed the existence of large oil plumes at depths of 3,280 to 4,265 feet as far as 50 miles from the wellhead of the *Deepwater Horizon*.  In other places, scientists have found plumes existing in multiples of three to five layers in the water column.

107.    In the end, these plumes may prove be the most devastating consequence to the Gulf's ecosystem.  David Hollander, an oceanographer with the University of South Florida who is studying the plumes has stated that what scientists "have learned completely changes the idea of what an oil spill is [because it] . . . has gone from a two-dimensional disaster to a three-dimensional catastrophe."

108.    As the plumes are dissolving and depleting oxygen levels, they seem to be creating dead zones throughout the Gulf.  Such results will likely have long term effects on the fishing and shrimping industries.  Steve Murawski, the National Oceanic and Atmospheric Administration's ("NOAA") chief scientist for the spill response, recently stated that "[t]he plumes closest to the well may be concentrated enough to pose a threat to nearby deepwater coral

-28-

reefs, which host a diversity of ocean life," and that "even low concentrations can be harmful to the eggs and larvae of the deep coral."

109.    Much of the oil will also end up trapped in big eddies, like the infamous Pacific Garbage Patch or the Sargasso Sea, where sea turtles and other ocean life like to congregate.   As a result, according to NOAA National Sea Turtle Coordinator Barbara Schroeder, "[m]ost of those mortalities will never make their way to shore to be counted."

110.    As a result of this uncertainty, NOAA has extended its fishery closures to shut down more than 45,000 square miles of Gulf waters, which is roughly 19% of federal waters in the Gulf.

111.    As noted by Rowan Gould, Acting Director of the U.S. Fish & Wildlife Service, the *Deepwater Horizon* spill "is significant and in all likelihood will affect fish and wildlife across the Gulf, if not all of North America, for years if not decades . . . ."

### 3.  The ongoing threat to Northwest Florida

112.    The oil slick from the *Deepwater Horizon* disaster first made landfall on the Louisiana coastline on April 30, 2010.   Over the next weeks, elevated southerly winds pushed the perimeter of the spilled oil east to the Northwest Florida shoreline.   The first oil from the spill came ashore on the Northwest Florida coast on June 4, 2010, when a stretch of Pensacola Beach was shut down as tar balls and pools of black sludge washed up onto its formerly pristine white sands.

113.    Tar balls from the *Deepwater Horizon* incident first washed onto St. Joe's beaches on June 20, 2010.   On that day, tar balls were spotted and removed from the beaches at both WaterColor and WaterSound Beach, which are St. Joe properties located in Walton County, Florida.

#12967692 v1

114.    Since that time, oil has continued to wash ashore along the Northwest Florida coast, as the surface oil slick – driven to unpredictable paths by the currents and constantly changing weather of the Gulf – and the unseen undersea oil plumes pose a constant threat.

115.    Oil on the Gulf's surface is moved by winds and currents.  Specialized computer models, such as those used to help produce NOAA's oil trajectory maps, account for the influence of both by combining wind forecasts from weather models with current forecasts from ocean models.  The predictability of oil spill movement is limited, however, because all weather and ocean models have errors that grow with time for a variety of reasons, such as initial condition uncertainties and imperfect models.

116.    While wind and waves play a critical role in the movement of oil, it is likely that large, strong currents that evolve relatively slowly over time, most notably the Loop Current, which feeds into the Gulf Stream, will ultimately govern how much of the oil is carried elsewhere from the Gulf.  In addition, there is an eddy – a swirling maelstrom of seawater – that flows in a circle directly above the Loop Current.  As a result of the interaction of these currents, the oil is just as likely to head straight to the coast of Northwest Florida as it is to head south and into the Atlantic.  Current models of such currents, however, have only a limited ability to predict the evolution of such currents beyond a few days.

117.    In short, even the top experts at NOAA essentially engage in guesswork in determining how much oil has been discharged from the well, where it is now in the Gulf, and where it will end up.  Because the surface slick is thousands of square miles wide, it will grow and shrink as hundreds of thousands of gallons of chemical dispersants are added and the Gulf's weather and currents act on it.  According to Ian MacDonald, an oceanographer at Florida State

University, "[w]e're not really cleaning up the oil — we're just smudging it on the edges," and thus "much of this is still hidden." Thus, the economic impact on businesses operating in Northwest Florida will remain unknown for years to come.

### G. The Damage To St. Joe

118. Prior to April 20, 2010, St. Joe had invested considerable resources positioning itself to capitalize on the last great frontier of development available on Florida's Gulf Coast. As the owner of approximately 577,000 acres of land, approximately 70 percent of which are on or within 15 miles of the Northwest Florida coastline, the Company's strategic plan hinged on the master development of its own land as well as the entire Northwest Florida region. Clearly, St. Joe was uniquely positioned to capitalize on the opportunities available as this area began to emerge from the recession, both for its own benefit and for the collective prosperity of the communities in that region. Indeed, the new airport, which opened in May 2010, was set to be an important catalyst in attracting new businesses – and their many employees - to the region.

119. Not surprisingly, the financial markets have positively reflected the importance of the opportunities provided by St. Joe's master plan. St. Joe's stock price hit a 52 week high of $37.44, on April 29, 2010. Since that day, however, as the magnitude of the environmental and economic devastation wreaked by the Incident has become apparent, St. Joe's stock has plummeted more than 40 percent, closing at $22.08 only 39 days later. The resultant loss in market capitalization of approximately $1.4 billion reflects the perception of analysts and investors as to the loss in value of St. Joe's primary assets – its Gulf Coast land holdings.

120. St. Joe is an innocent victim of Halliburton's reckless pursuit of profits over the safety, environmental integrity, and economic health of an entire region. St. Joe has suffered direct, physical damages to its real estate and business interests from the oil and other pollutants discharged by the *Deepwater Horizon* incident.

-31-

121.    In addition, St. Joe's intrinsic enterprise value, its earning power, and the worth of its significant land holdings, are all inextricably tied to the continued environmental vitality of the Gulf.  Halliburton's gross misconduct on the *Deepwater Horizon* has directly and proximately caused St. Joe to sustain significant financial losses.  St. Joe files this suit seeking to recover damages for the harm caused by Halliburton and for punitive damages to punish Halliburton for its gross negligence and callous indifference to the rights and safety of others.

## V.    CLAIMS

### A.    <u>Count One:  Negligence And Breach Of Duty Of Care</u>

122.    St. Joe incorporates herein by reference the allegations set forth in the preceding paragraphs.

123.    Halliburton owes St. Joe a duty of due care with respect to conducting drilling operations in the Gulf of Mexico including, among other things, the cementing and casing of the well.

124.    Halliburton had a heightened duty of care because of the inherently dangerous nature of oil exploration and drilling activities.

125.    As set forth above, Halliburton violated those duties by, among other things: failing to conduct its operation on the *Deepwater Horizon* in a safe and workmanlike manner; failing to use the best and safest drilling technology; failing to ensure well control; disregarding regulations promulgated by MMS; disregarding safety standards promulgated by the American Petroleum Institute; failing to take appropriate action to avoid or mitigate the Incident; and by ignoring the data and evidence in its possession that indicated Halliburton's continued operations seriously jeopardized the structural integrity of the well and the *Deepwater Horizon*, thereby not only placing every person on the *Deepwater Horizon* in imminent danger of

injury and death, but also threatening the fragile ecosystem of the Gulf natural resources and the physical and economic interests of all those who rely upon and benefit from them.

126.    As a direct and proximate result of Halliburton's negligence, St. Joe has sustained, and continues to suffer, substantial harm and injury.

127.    St. Joe has been damaged by the diminution in value of its properties located on or near the Florida Gulf Coast, its inability to rent properties it owns and/or manages on or near the Florida Gulf Coast, the loss of business, profits and revenue on or near the Florida Gulf Coast, and the destruction of its enterprise value, all as a direct result of the oil spill.

128.    Accordingly, St. Joe seeks to recover from Halliburton monetary relief in the form of lost profits and impairment of earning capacity due to damage to its real property and to natural resources.  St. Joe also seeks to recover from Halliburton monetary relief in the form of actual damages to real property, economic damages, lost profits, and diminution in value of its property and assets.

### B.    Count Two:  Gross And Culpable Negligence

129.    St. Joe incorporates herein by reference the allegations set forth in the preceding paragraphs.

130.    Halliburton had a heightened duty of care to St. Joe because of the inherent danger associated with deep petroleum drilling from floating platforms, and the especially high risk of blowouts, explosions, and other dangers arising from cementing work such as that being performed by Halliburton at the time of the blowout and explosion.

131.    The cementing and casing work performed by Halliburton presented a clear and present danger of injury.  Halliburton was aware of this danger when it voluntarily proceeded with the cementing and casing operations in an unreasonable and unlawful manner. Halliburton knew or should have known that its wanton and reckless conduct would foreseeably

-33-

result in a disastrous explosion, blowout, and oil spill, causing damage to the real property and economic interests of all those affected by the oil spill, including St. Joe.

132.    Halliburton acted with reckless and wanting care that constituted a conscious disregard and indifference not only to the life, safety, and rights of the workers present on the *Deepwater Horizon*, but also to the Gulf natural resources and all those who rely upon and benefit from them, including St. Joe.

133.    As a direct and proximate result of Halliburton's gross and culpable negligence, St. Joe has sustained, and continues to suffer, substantial harm and injury.

134.    St. Joe has been damaged by the diminution in value of its properties located on or near the Florida Gulf Coast, its inability to rent properties it owns or manages on or near the Florida Gulf Coast, the loss of business, profits and revenue on or near the Florida Gulf Coast, and the destruction of its enterprise value, all as a direct result of Halliburton's actions.

135.    Accordingly, St. Joe seeks to recover from Halliburton monetary relief in the form of compensatory and consequential damages, plus punitive damages in an amount of at least three (3) times the amount of the actual damages awarded.

**C.    Count Three:  Strict Liability For Abnormally Dangerous Activity**

136.    St. Joe incorporates herein by reference the allegations set forth in the preceding paragraphs.

137.    Through its cementing and casing operations, Halliburton engaged in abnormally dangerous activities that: created a high degree of risk of harm to the person, land, and chattels of others, and particularly to Plaintiff; created a likelihood that the harm resulting from such activities would be great and verging on the edge of catastrophic; created a risk of such great harm that elimination of risk by the exercise of reasonable care was impossible; were not a matter of common usage; and were inappropriate to the place carried on insofar as they

-34-

constituted a non-natural use of the waters of the Gulf of Mexico and in geographic proximity to Florida's fragile coast line.

138.    As a direct and proximate result of Halliburton's abnormally dangerous activities, St. Joe has sustained, and continues to suffer, substantial harm and injury.

139.    The harm sustained by St. Joe is exactly the kind of harm expected, the possibility of which made Halliburton's activities abnormally dangerous.

140.    St. Joe has been damaged by the diminution in value of its properties located on or near the Florida Gulf Coast, its inability to rent properties it owns and/or manages on or near the Florida Gulf Coast, the loss of business, profits and revenue on or near the Florida Gulf Coast, and the destruction of its enterprise value, all as a direct result of the oil spill.

141.    Accordingly, St. Joe is entitled to a judgment declaring Halliburton liable for all damages, including compensatory, consequential, and punitive damages, suffered as a result of Halliburton's abnormally dangerous activities.

## VI.    DEMAND FOR RELIEF

WHEREFORE Plaintiff requests that the court enter judgment in Plaintiff's favor and against Defendant, as follows:

a.    awarding Plaintiff actual damages, including compensatory and consequential damages, in an amount to be determined at trial;

b.    awarding Plaintiff exemplary or punitive damages;

c.    awarding Plaintiff pre-judgment and post-judgment interest at the highest lawful rates;

d.    awarding Plaintiff such costs and disbursement as are incurred in prosecuting this action, including reasonable attorneys' and experts' fees; and

e.     granting Plaintiff such other and further relief as this Court deems just and proper.

## VII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.


*/s/ Edmond D. Johnson*
Edmond D. Johnson (Del. Bar No. 2257)
James G. McMillan, III (Del. Bar No. 3979)
James H. S. Levine (Del. Bar No. 5355)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
William A. Brewer III                    Wilmington, DE  19899-1709
Michael J. Collins                        Telephone: (302) 777-6500
Kenneth N. Hickox, Jr.                  Facsimile:  (302) 421-8390
Julie J. Ehret                              *johnsone@pepperlaw.com*
BICKEL & BREWER                       *mcmillanj@pepperlaw.com*
1717 Main Street                          *levinejh@pepperlaw.com*
Suite 4800
Dallas, Texas 75201
Telephone:  (214) 653-4000
Facsimile:   (214) 653-1015
                                              *Attorneys For Plaintiff*
                                                *The St. Joe Company*

Dated: August 4, 2010

-36-