# BICKEL & BREWER

ATTORNEYS AND COUNSELORS

4800 COMERICA BANK BUILDING

1717 MAIN STREET

DALLAS, TEXAS 75201

PHONE: (214) 653-4000

FAX: (214) 653-1015

www.bickelbrewer.com

767 FIFTH AVENUE
50TH FLOOR
NEW YORK, NEW YORK  10153
(212) 489-1400

March 29, 2011

**VIA HAND DELIVERY**

Donald E. Godwin, Esq.
Godwin Ronquillo PC
1201 Elm St.
Suite 1700
Dallas, TX 75270-2041

Re:  *In the matter of The St. Joe Company v. Halliburton Energy Services, Inc. and M-I, L.L.C a/k/a M-I SWACO, Case No. N11C-03-264*

Dear Mr. Godwin:

Please find enclosed courtesy copies of the (i) Complaint and Jury Demand; (ii) Praecipe; and (iii) Civil Case Information Statement for the above-captioned matter.  Should you have any questions, please contact me directly at (214) 653-4838.

Sincerely,

Drew Downs
Case Manager

Enclosures

5239389.1
2132-03

EFiled: Mar 27 2011 11:09PM
Transaction ID 36700313
Case No. N11C-03-264 PLA

IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| THE ST. JOE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | No. _____ |
| | ) | |
| v. | ) | JURY OF 12 DEMANDED |
| | ) | |
| HALLIBURTON ENERGY | ) | |
| SERVICES, INC. and M-I, L.L.C. | ) | |
| a/k/a M-I SWACO, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AND JURY DEMAND

The St. Joe Company ("St. Joe" or "Plaintiff") files this Complaint and Jury Demand against defendants Halliburton Energy Services, Inc. ("Halliburton") and M-I, L.L.C. a/k/a M-I SWACO ("M-I SWACO") (collectively "Defendants"), upon personal knowledge as to itself and its own actions, and on information and belief as to all other matters, as follows:

## I.    PRELIMINARY STATEMENT

1.    The oil spill which resulted from the destruction of the *Deepwater Horizon* drilling rig is the most horrific environmental disaster in our nation's history.  Millions of livelihoods, tens of billions of dollars, and the economic vitality of the Gulf Coast have been sacrificed by the willful disregard for rights and safety of others by a handful of wrongdoers. Chief among those responsible for this disaster are Halliburton, the cementing contractor for the *Deepwater Horizon*, and M-I SWACO, the drilling fluid contractor for the drilling rig.

### A.    Halliburton's And MI-SWACO's Roles In The *Deepwater Horizon* Disaster

#### 1.    Halliburton's gross negligence.

2.    BP Exploration & Production, Inc. ("BP"), the lessor of the *Deepwater Horizon*, hired Halliburton to undertake the critical task of cementing the well – duties that, if performed

properly, would have protected the safety of the well, the lives on the *Deepwater Horizon*, the residents living along the Gulf Coast, and the Gulf of Mexico ("Gulf") itself.  Unfortunately, Halliburton blatantly ignored its legal obligations, industry standards, and federal regulations in the performance of its duties.  Indeed, it is now well-known that Halliburton failed to carry out its important and sensitive responsibilities in even a marginally prudent manner.  Worse, Halliburton ignored multiple warning signs that signaled trouble – signs that, if heeded, would have prevented the disaster.

3.      Specifically, at approximately 9:45 p.m. on April 20, 2010, Halliburton's many failures at the *Deepwater Horizon* drilling operation became a substantial cause for the now infamous explosion.  At that time, Halliburton was preparing to seal the well for later exploitation.  As workers on the rig prepared the well for the "final" cement plug, the lower cement block that Halliburton had previously set in place failed.  As a result, methane gas raced up the well, rapidly spread out onto the *Deepwater Horizon*'s platform and then ignited, engulfing the rig in flames.  Eleven workers lost their lives in the resulting explosion.  The remaining crew-members were forced to abandon the rig as the fire spun out of control.

4.      Over the next 36 hours, the 32,000-ton *Deepwater Horizon* sank to the bottom of the Gulf (the "Incident").  As it descended to the seafloor, the rig pulled the drilling apparatus down with it, bending and breaking the pipe before finally tearing away from it completely.  The well was left uncapped, allowing as much as 100,000 barrels of crude oil per day to spew unchecked into the waters of the Gulf – a condition that lasted for almost three months.

5.      Halliburton caused the *Deepwater Horizon* disaster in two ways.  First, Halliburton blatantly disregarded industry standards in performing a grossly inadequate cementing job in the well.  Halliburton knew that BP's suggested cementing plan was inadequate

and inherently dangerous.  Nonetheless, Halliburton followed the cementing plan as presented, fully aware of the potentially disastrous consequences.  Thereafter, Halliburton failed at every stage to cement the well in accordance with applicable regulations, industry standards, and its own best practices.  As a result, the cementing failed, allowing oil and gas to escape the well and to cause the catastrophic blowout.

6.      Second, Halliburton failed to alert the proper authorities of the existence of a series of regulatory violations that should have led to a suspension of operations on the *Deepwater Horizon*.  Drilling operations were troubled from the start of the *Deepwater Horizon*'s arrival at the drilling site.  Halliburton knew of the rig's frequent equipment malfunctions, loss of well control due to gas "kicks," and other setbacks.  However, Halliburton stood by as BP pressured the rig's crew to cut corners on safety in order to speed operations because the operation was nearly five weeks past its original completion date and significantly over budget.

7.      Following the Incident, Halliburton representatives have shamelessly attempted to cover up their own responsibility for the billions of dollars of economic consequences being borne by innocent third parties as well as the environmental consequences on an entire region that will last for decades.  Along with BP, Halliburton has attempted to mislead the American people by hiding key facts related to the explosion.  Halliburton has deflected responsibility and cynically denied any obligation for the consequences it caused.  In literally scores of cases filed by the victims of its failures, Halliburton has taken the incredible position that it has no legal responsibility to the millions of victims of its misconduct – a contention that ignores both its ethical obligations and the duties imposed on Halliburton under applicable law.

### 2.     **M-I SWACO's gross negligence.**

8.      BP hired M-I SWACO to undertake the critical task of ensuring the proper composition and use of drilling fluid in the well that was being drilled.  Drilling fluid – also called "mud" – is used during the drilling operation to provide the downward force that prevents oil and gas from escaping up the well.  Thus, drilling mud is the first line of defense against a blowout.  Careful monitoring of the drilling mud is critical to ensure that the right amount of pressure is maintained at all times.  Removal of the drilling mud is an inherently risky procedure that must be completed with the utmost care.  In this case, M-I SWACO's failure to insist upon proper testing coupled with its disregard of required safety procedures during the highly dangerous process of removing the drilling mud at the well site render it legally responsible for the damage done by the *Deepwater Horizon* disaster.

9.      Specifically, on April 20, 2010, at around 9:00 p.m., M-I SWACO began to displace the drilling mud from the well despite the lack of adequate testing of the drilling mud, and in the face of numerous warnings in the available data that it was "risky" to remove the mud without further well stability tests.   This was especially true given the unfinished state of the cementing in the well.  Incredibly, MI-SWACO began removing the drilling mud in the face of these known risks.

10.      Forty-five minutes later, when Halliburton's cementing job to seal the bottom of the well catastrophically failed, M-I SWACO's decision to displace the drilling mud meant that the counterweight normally provided by sufficient volumes of drilling mud was unavailable.  As a result, methane gas raced unimpeded up the drilling column, rapidly spread out onto the *Deepwater Horizon*'s platform and explosively ignited.

11.      Subsequent investigations into the cause of the Incident have clearly established that M-I SWACO's decision to prematurely remove the drilling mud from the well was a

significant contributing cause of this catastrophe.  Professor Robert Bea ("Bea"), a leading drilling expert hired by the U.S. Government to assist in investigating the cause of the *Deepwater Horizon* disaster, has stated the obvious: there would have been no blowout if the drilling fluid had been left in the well until after the final cement plug was set in place.

### 3. Both Halliburton and M-I SWACO failed to meet their own standards of conduct and operation.

12.    The known facts render hollow Halliburton's claim that it abides by a Health, Safety and Environmental policy.   In particular, Halliburton falsely contends that: "[T]he Company… compl[ies] with all applicable Laws and relevant industry standards of practice concerning protection of health and safety of its Employees in the work place and other persons affected by its business activities and the prevention of environmental pollution. Protection of health, safety, and the prevention of pollution to the environment is a primary goal of the Company …."   They also belie M-I SWACO's claims that it "puts a high priority on protecting the environment as not only a part of our business, but as a way of life," and "ensure[s] that M-I SWACO operations are in compliance with the latest safety standards," while "[f]ull-time occupational health and safety specialists make sure that . . . [the] rigs where our people work are safe."   Having themselves proclaimed the standard of care that should have guided their conduct, it is incredible that Halliburton and M-I SWACO so willingly failed to meet those standards and facilitated BP's determination to put saving money above the safety of those working on the *Deepwater Horizon*, other persons and the environment.

### B. The Damage Caused To St. Joe

13.    St. Joe - the owner and developer of approximately 577,000 acres of property along Florida's Northwest coast - is among those directly damaged by Halliburton's and M-I SWACO's failure to exercise due care.  St. Joe's stock price tumbled over forty percent in the

days following the explosion.  Since then, as the magnitude of the environmental damage and economic devastation in the Gulf has become apparent, St. Joe's stock has remained depressed. Oil and other harmful pollutants discharged from the uncapped well have fouled the Gulf's waters, damaged marine life, and brought immediate and long-term economic harm to businesses operating in Florida.  St. Joe's vision for development of Northwest Florida has been directly damaged as a result of Halliburton's and M-I SWACO's actions.  As scientists grope to comprehend the full scope of the environmental devastation, it is difficult to foresee how long it will take for the Gulf to recover its former vitality.  George Crozier, Executive Director of the Dauphin Island Sea Lab at the State of Alabama Marine Science Institution predicts that the oil spill "will cause long-term economic loss for years, because there's no way to clean it."

14.     As a real estate development company focused on Northwest Florida, the intrinsic value and financial success of St. Joe is inextricably tied to the health and well-being of the Gulf. The environmental harm to the Gulf triggered by this disaster, as well as the resulting economic and financial losses to Gulf Coast residents and businesses, will have predictable long-term consequences for St. Joe.

### C.     Halliburton and M-I SWACO Are Legally Responsible For The Billions Of Dollars Of Damages They Have Caused.

15.     Halliburton and M-I SWACO are liable for the grossly negligent and reckless way in which they managed cementing operations at the Deepwater Horizon drilling site, the use of drilling fluids to maintain well control, as well as their intentional disregard of their obligations to take appropriate action in the face of multiple violations of the law by others on the Deepwater Horizon.  The destruction of the Deepwater Horizon, and the resulting environmental and economic damage, stemmed as much from Halliburton's and M-I SWACO's indifference to known risks, gross negligence, and greed as it did from that of BP and others.  Halliburton and

M-I SWACO could have, and should have, prevented this catastrophic event.  Against any application of existing law, Halliburton and M-I SWACO are jointly and severally liable for all of the actual and consequential damages that St. Joe has suffered, and will continue to suffer, because of this readily preventable disaster.

## II.    PARTIES

### A.    Plaintiff

16.    The St. Joe Company, a Florida corporation, is a residential and commercial real estate developer with its principal place of business in WaterSound, Florida.

### B.    Defendants

17.    Halliburton, d/b/a Halliburton Energy Services, Inc., is a Delaware corporation with two headquarters, one in Houston, Texas, and one in Dubai, United Arab Emirates.  It may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE  19801.

18.    M-I, L.L.C. a/k/a M-I SWACO is a Delaware limited liability company with its principal place of business in Houston, Texas.  It may be served through its registered agent, The Corporation Trust Company, Capitol Services, Inc., 615 South Dupont Highway, Dover, Delaware 19901.

## III.    JURISDICTION

19.    This lawsuit is properly before this Court pursuant to Article 4, Section 7 of the Delaware Constitution because Plaintiff is seeking legal damages.

20.    The Court has subject matter jurisdiction over this action.

21.    This Court has personal jurisdiction over Halliburton because it is a corporation organized under Delaware law.

22.     This Court has personal jurisdiction over M-I SWACO because it is a limited liability company organized under Delaware law.

## IV.     FACTUAL BACKGROUND

### A.     <u>The St. Joe Company – A Proud History</u>

23.     In 1926, Alfred Irene DuPont began acquiring large tracts of land in Florida that would one day form the nucleus of St. Joe's assets.  DuPont died in 1935, leaving the majority of his assets in a charitable trust and appointing Edward Ball as head of his business conglomerate. Ball incorporated the St. Joe Paper Company in 1936 using the vast timberlands acquired by DuPont.  By the 1970s, St. Joe's pulp and paper operations were among the largest in the United States.  Ball ran St. Joe Paper until his death in 1981.  At that time, St. Joe was the largest private landowner in Florida, having amassed over 1.2 million acres to support its pulp and paper operations.

24.     In the 15 years following Ball's death, St. Joe continued to prosper.  However, the company did not take full advantage of the inherent value of its enormous land holdings, its various businesses, or its cash reserves.  St. Joe decided to narrow the scope of its operations to focus on its most valuable asset – its real estate holdings – and reorganized itself as a real estate development company.  To that end, in May 1996, St. Joe sold its paper mill and cardboard container plants for an aggregate price of $390 million.  St. Joe Paper Company changed its name to the St. Joe Corporation and later to The St. Joe Company.

### B.     <u>The "New" St. Joe:  A Vision for A Prosperous Northwest Florida</u>

25.     In the late 1990s, St. Joe expanded its operations and began to convert itself into a real estate development company.  Throughout the balance of the 1990s and the first decade of the 21st Century, St. Joe created many master-planned communities and commercial projects across Florida.

26.     In September 2006, St. Joe declared a sweeping reorganization of its operational structure designed to refocus the company on long-term growth opportunities while capturing operating efficiencies.   Pursuant to that plan, St. Joe merged its operating units into one integrated organization.   In essence, the reorganization was borne out of a desire to focus St. Joe's business plan on developing its vast real estate holdings in Northwest Florida.

27.     Throughout 2007, St. Joe completed the sale of its seventeen building office portfolio and its North Carolina homebuilding operations.

28.     In 2008, St. Joe completed an equity financing and used the proceeds to pay off substantially all of its debt.   Having eliminated short-term debt constraints, St. Joe was positioned to preserve its land holdings and focus on its long-term value creation opportunities in Northwest Florida.

29.     During 2009, St. Joe divested its remaining real estate assets in Central and Southern Florida.

30.     St. Joe also devoted significant resources to promoting the long-term economic success of Northwest Florida by facilitating numerous infrastructure improvements in the region, including new hospitals, roads, schools and, most importantly, a new international airport.

31.     In May 2010, years of strategic planning, regulatory efforts, legal successes, and infrastructure development culminated in the opening of the new Northwest Florida Beaches International Airport near Panama City.   The opening of the airport is a key component in the development of land holdings marked for industrial, commercial, and residential real estate activity in the surrounding area.

32.     The new airport is located within a 75,000 acre tract known as the West Bay Sector Plan, which St. Joe plans to use as a catalyst for regional growth and increased demand for all St. Joe real estate holdings.

33.     In October 2009, St. Joe entered into a Strategic Alliance Agreement for Air Service with Southwest Airlines ("Southwest").  Pursuant to the agreement, Southwest is now providing air service to Northwest Florida via Northwest Florida Beaches International Airport. St. Joe believed its commercial opportunities would be significantly enhanced by Southwest's planned service to the region.  In fact, all pieces necessary for implementation of the master plan were in place when St. Joe announced its development activity at its VentureCrossings Enterprise Centre – one of the nation's largest office, retail, hotel, and industrial developments – which will encompass the first 1,000 acres to be developed within the 75,000-acre West Bay Sector Plan adjacent to the airport site.

34.     In support of its commitment to the West Bay Sector Plan, St. Joe senior management announced, in March 2010, that St. Joe would relocate its headquarters from Jacksonville, Florida, to its new VentureCrossing Enterprise Centre.  On April 12, 2010, just days before the *Deepwater Horizon* explosion, St. Joe publicly announced the launch of VentureCrossings Enterprise Centre.

35.     St. Joe's strategic alliances and its long-term visionary goals positioned the company as a frontrunner in the future development of the Northwest Florida corridor.  The new airport is in close proximity to seven military bases, providing substantial incentives for aviation, aerospace, and defense contractors to move into the region, which it was hoped would combine with the beauty of the surrounding area to entice other commercial and residential buyers to relocate to Northwest Florida.

36.     Thus, on April 20, 2010, St. Joe was poised to reap the benefits of a new era of economic prosperity in Northwest Florida – one which it had worked so hard to promote over the prior decade.  That was the state of things until the *Deepwater Horizon* disaster.

### C.     Halliburton and M-I SWACO – Partners In Crime With BP.

#### 1.     Halliburton's and M-I SWACO's long-time relationship with BP.

37.     Founded in 1919 by Erle Halliburton as the New Method Oil Well Cementing Company, Halliburton is today the world's second largest oilfield services corporation with operations in more than 70 countries.  It has hundreds of subsidiaries, affiliates, branches, brands, and divisions and employs over 50,000 people worldwide.  Although Halliburton provides many services related to oil drilling and exploration, its main expertise remains the cementing of oil wells.  Since it first used cement to bring a wild oil well under control in 1921, Halliburton has established itself as an expert in the field of oil well cementing.

38.     M-I SWACO began as a joint venture between Smith International, Inc. ("Smith") and Schlumberger Ltd. ("Schlumberger"), until August 2011, when Schlumberger became the 100% owner of M-I SWACO as a result of Schlumberger's acquisition of Smith. M-I SWACO provides drilling and completion fluids, as well as pressure control, rig instrumentation, and drilling waste management products to the oil and gas industry.  Since its formation, M-I SWACO has worked with BP on numerous projects around the world, and continues to do so to this day.

#### 2.     Halliburton and BP:  Two peas in the proverbial pod

39.     In the last decade, Halliburton has become known as a company willing to sacrifice principle for profit as its participation in one scandal after another is revealed.  In recent years, Halliburton and its subsidiaries have been repeatedly accused of putting profits before the public's health and welfare by ignoring ethical and legal obligations.  Whether engaging in

environmentally dangerous drilling practices, violating securities laws, overcharging for defense contracts in major U.S. wars, or obtaining contracts under dubious circumstances, it seems that Halliburton is a company willing to cut any corners in order to add to the bottom line.  This willingness to ignore legal and ethical obligations makes Halliburton the perfect partner for BP.

40.     As the relationship between BP and Halliburton flourished, BP sought to position itself publicly as an "Intelligent Energy" company, allegedly exploring the frontiers of energy resources with cutting edge technology that was environmentally and safety conscious.  For example, in a speech delivered on March 23, 2010, BP executive Doug Suttles ("Suttles") noted that:

41.     Deepwater has meant pushing our boundaries in several ways besides the sheer depth of water and wells.  We've developed the capability to create advanced floating production facilities, complex riser systems and subsea equipment, and the ability to integrate these elements to cope with extreme temperatures, pressures and oceanographic conditions . . . . How we improve the decision making and capability of our people will also be a significant source of future value.  Effective decision making is about getting the right data and information, as quickly as necessary, to the people with the skills to analyze and act, wherever they might be in the world.

42.     In reality, however, BP shamelessly and deliberately ignored the values of safety, appropriate technology, wise decision-making, and due care.  Instead, BP cynically pursued profits over principle, and in the process amassed the worst safety record in the oil exploration, production, and refining industries.  In the past ten years, BP has been fined repeatedly for its cavalier disregard for the health and safety of others.

43.     For example, in 2005, an explosion occurred at a refinery in Texas City, Texas, owned and operated by BP Products North America, Inc. ("BP Products"), which killed 15 people and injured 180 others.  The United States Chemical Safety and Hazard Investigation Board ("Board") concluded that BP Products knew about risky practices at the refinery before the blast but did nothing about them.  The Board's report stated that the many failures that culminated in that tragic event could be traced all the way from Texas to BP's headquarters in London and disclosed that "[w]arning signs of a possible disaster [at the refinery] were present for several years, but company officials did not intervene ... to prevent it."  BP pled guilty to criminal violations of the Clean Air Act and was fined $50 million.

44.     Even after the Texas City refinery explosion, BP failed to take its obligations seriously.  In 2009, the United States Occupational Safety and Health Administration ("OSHA") imposed an $87 million fine on BP Products – the largest penalty in OSHA's history – for failing to correct hundreds of safety violations at the Texas City refinery.  In fact, in a study of OSHA records conducted by the Center for Public Integrity, it was found that, since 2007, two oil refineries owned and operated by BP Products – the Texas City and Toledo refineries – have been responsible for an astounding 97% of all "egregious willful" citations issued by OSHA to companies in the refining industry.  In light of these statistics, Jordan Barab, the United States Deputy Assistant Secretary for Labor for Occupational Safety and Health, stated that the "only thing you can conclude is that BP has a serious, systemic safety problem in their company."

45.     Of course, Halliburton (and M-I SWACO) knew about BP's record, and yet still aggressively pursued lucrative assignments from BP, including their contracts on the *Deepwater Horizon*.

46.     Given the challenged decision-making of these two "partners in crime," it is then, sadly, not surprising that each would opt to ignore industry standards, accept and follow grossly inadequate procedures, refuse to report blatant regulatory violations, fail to employ additional safety mechanisms and technologies available to them, and cut virtually every corner where the "right" course cost more than the "wrong" course.   Clearly, Halliburton (and M-I SWACO) turned a blind eye to their self-professed commitment to preserve safety and the environment, and placed the preservation of their profitable relationship with BP over their obligations to St. Joe and all the many others plainly within the scope of the foreseeable risk if something went wrong.

**D.     The *Deepwater Horizon* Disaster – Halliburton's And M-I SWACO's Gross Negligence And Wanton Indifference To The Rights Of Others**

**1.     BP purchases the lease rights to the Macondo Prospect**

47.     In March 2008, BP was the highest bidder in an auction conducted by the United States Minerals Management Service ("MMS") for the right to conduct oil exploration, drilling, and production operations at the Macondo Prospect.   The site is located less than 50 miles off the coast of Louisiana, in an area designated on the Outer Continental Shelf as Block 252, Mississippi Canyon.

48.     In 2009, BP filed an exploration and environmental impact plan with MMS which revealed its plan for drilling operations at the Macondo Prospect.   In that plan, BP represented that it was "unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities."   Relying on BP's representation, MMS exempted BP from conducting a detailed environmental impact study.

49.     Thereafter, BP sold a 10% interest in the lease to MOEX Offshore 2007, LLC ("MOEX"), and 25% to a predecessor-in-interest of Anadarko Petroleum ("Anadarko").

50.     On December 17, 2009, BP, MOEX and Anadarko entered into a joint operating agreement regarding drilling operations at the Macondo Prospect.  In accordance with that agreement, BP oversaw the drilling operations at the Macondo Prospect.

### 2.     The Deepwater Horizon oil rig

51.     The Deepwater Horizon was an ultra-deepwater oil rig built in 2001 by Hyundai Heavy Industries of South Korea.  It was originally commissioned by R&B Falcon Corporation, which merged with Transocean Sedco Forex, Inc. ("Transocean") in 2001.  As a result, ownership of the Deepwater Horizon was transferred to Transocean in August 2001.  At the time of the Incident, the Deepwater Horizon was owned by Transocean, and leased to BP through a subsidiary, Triton Asset Leasing GmbH.

### E.     Halliburton's and M-I SWACO's Central Roles In The Operations Leading Up To The *Deepwater Horizon* Disaster

#### 1.     Halliburton's role as the *Deepwater Horizon*'s cementing contractor.

52.     BP contracted with Halliburton to conduct a number of operations at the Macondo Prospect.  The most significant of these tasks was responsibility for cementing the well and overseeing the final well-capping procedure.  The importance of these functions is described by Halliburton on its own website:  "[s]uccess in these deepwater environments calls for a service company with reliable and proven technology, along with the experience … through the entire process."

53.     Cement is used primarily at two stages of the deep-water drilling process.  Deepwater wells are drilled in sections.  The basic process involves drilling through rock, installing casing in the wellbore, drilling deeper, and then repeating this process.  Cement is used to fill gaps between the segments of the casing and the surrounding wellbore in order to prevent any seepage of oil and gas up the wellbore and riser.

54.     Thereafter, cement is used to plug the well.  After an exploration well is drilled, cement is pumped through a steel pipe or casing and out through a check valve at the bottom of the casing.  The cement then travels up the outside of the pipe, sheathing the part of the pipe surrounded by the oil and gas zone.  When the cement hardens, it is supposed to prevent oil or gas from leaking into adjacent zones along the pipe.  As the cement sets, the check valve at the end of the casing prevents any material from flowing back up the pipe.  A proper cementing procedure isolates the well until production is begun.

55.     Cementing is a delicate and vitally important function.  If not done properly, the chances of a well blowout – i.e., the uncontrolled release of oil from the well – increase exponentially.  As part of a study in 2007, MMS found that faulty cementing was a factor in 18 of 39 well blowouts in the Gulf over a 14-year period – the single largest factor of such events.

56.     Given its experience and expertise, Halliburton was well aware of the environmental and safety risks associated with an inferior cement job.  In fact, Halliburton had recently experienced first-hand the consequences of cement failure.  Just prior to the Incident, Halliburton was involved in a severe well blowout in which its cementing operations failed.

### 2.     M-I SWACO's role as the rig's drilling fluids contractor

57.     BP contracted with M-I SWACO to provide drilling and completion fluids for the well.  M-I SWACO's role included formulating and composing the fluids being used, managing their use and application, and monitoring the fluids to ensure that they were effective in maintaining well control.  M-I SWACO was also responsible for ensuring that any drilling fluids discharged into the Gulf's waters were in compliance with environmental regulations.

58.     Drilling fluid – also known as "mud" – plays a vitally important role in the offshore drilling process.  "Mud" is actually man-made material, composed of clay, minerals, water and chemical additives.  Drilling mud is primarily used to provide adequate hydrostatic

pressure — downward force — in the well to maintain stability of the wellbore and to prevent oil and gas from escaping up the well. In short, when plugging the wellbore, drilling mud is used to resist the massive upward pressure of flammable gas and oil coming from the reservoir below until the well is finally sealed.

59.     Other types of fluids used and managed by M-I SWACO on the *Deepwater Horizon* included Loss Circulation Material ("LCM"). LCM is used in batches, called "pills," to stop the leaking of other fluids used in the well. LCM is specially formulated to seep into the cracks of the well wall and then harden and expand – often on contact with water – in order to seal a hole.

60.     Another type of fluid supplied and managed by MI-SWACO is called "spacer fluid." Spacer fluid is used, among other things, to separate drilling mud from seawater during the stage in which the mud is pumped out of the well and displaced with seawater prior to being finally capped.

61.     Among M-I SWACO's critical jobs at the *Deepwater Horizon* was monitoring the drilling fluid to ensure that the right amount of pressure was being maintained in the well at all times. As the drilling fluids were circulated through the well and returned to the "mud pit room" on the *Deepwater Horizon*, M-I SWACO removed samples for testing. Such testing is important because the weight and density of the mud is critical to ensuring that the pressure inside the wellbore equals the pressure outside the well. The drilling fluid is also monitored for debris or other contaminants, such as gas bubbles, which are indicators of potential well control problems.

62.     Given its experience, M-I SWACO was well aware of the environmental and safety consequences that would be inevitable if it conducted the drilling fluid program at the well – a site with significant challenges because of the geology surrounding the oil reservoirs and the

depth of the well being drilled – in a manner that compromised well control.  As stated by M-I

SWACO executive Hazam El-Shaife:

> Fluids to drilling is like the blood to your body . . . . There's very little that's
> routine about many of the wells currently being drilled. These applications can
> wreak havoc on drilling-fluid properties, which must be constantly monitored and
> adjusted to handle rapidly changing wellbore conditions. Failure to address even
> one fluid property could quickly lead to a host of difficulties . . . expensive
> headaches . . . but also result in serious safety and environmental problems.

### F.     Halliburton and M-I SWACO Ignored All Signs That Drilling Operations On The *Deepwater Horizon* Were Unsafe.

63.     Drilling operations at the well began on October 7, 2009.  The intention was to

drill an exploratory well and then cement and plug the well temporarily for later completion as a

subsea producer of crude oil.  The original plan called for drilling operations on the exploratory

well to take 51 days and to cost $96 million.

64.     Almost from the beginning, however, the drilling encountered significant

problems at the well site.  The original drilling rig on site was the *Marianas*, but it was damaged

in Hurricane Ida.  The *Deepwater Horizon* was then transferred to the site and drilling began

again on February 6, 2010.

65.     Shortly thereafter, the *Deepwater Horizon* experienced serious problems at the

drilling site, including various incidents related to sudden and unexpected releases of gas from

the wellbore, called "kicks."  In one instance, the rig's operations had to be completely shut

down after a severe gas kick pushed so much gas up the riser that senior crew officials feared it

would ignite.  In addition, on at least three occasions fluid leaked from the blowout preventer,

the safety device used to seal the well in case of an emergency.   At one point the well

experienced a total loss of drilling mud.

66.     As each of these problems arose, the drilling schedule fell further and further

behind.  BP's response was to increase the pressure on the *Deepwater Horizon*'s crew to "bump

up" the drilling effort. However, the effort to "speed up" the drilling damaged the geological formation at the bottom of the well hole to such an extent that it caved in and swallowed up drilling tools and mud. This "cave in" forced BP to abandon the initial wellbore and begin again at a cost of $25 million and the loss of considerable time. According to Mike Williams, an electronics technician employed by Transocean on the *Deepwater Horizon*, it also caused BP to further increase their demands that the rig's crew complete drilling operations at the well at a dangerously shortened pace.

67.     Accordingly, Halliburton, M-I SWACO, and every other member of the operation knew that their ability to control the well was tenuous, and that they faced a particularly strong blowout risk. As stated by Brian Morel, a BP drilling engineer, in an email to a BP colleague on April 14, 2010, "this has been a nightmare well which has everyone all over the place." Indeed, even the typically passive MMS recognized that conditions at the Macondo Prospect mandated care and not expediency. On April 6, 2010, it warned BP to "[e]xercise caution while drilling due to indications of shallow gas and possible water flow."

68.     Unfortunately, BP, Halliburton, and M-I SWACO were not willing to put such caution before profits. The *Deepwater Horizon* operation was expensive to operate, with lease costs alone at $500,000 per day. And, of course, there were additional costs for contractors' fees to Halliburton, M-I SWACO, and others. At the time of the explosion, the rig was 43 days late for its next drilling location, which meant that BP had already incurred more than $21 million in additional leasing fees alone.

69.     Despite all of the above, Halliburton and M-I SWACO recklessly continued to work without taking adequate safety measures on a gas kick-prone well being drilled at tremendous depth. That state of affairs was confirmed by a confidential survey of workers on

the *Deepwater Horizon* that was conducted in the weeks before the explosion, in which many commented on the "unsafe behaviors on the rig." The comments included the prophetic lament that "drilling priorities [took] precedence over planned maintenance," but that rig workers feared reprisals if they reported the "risky" situation to BP.

### G.   Halliburton and M-I SWACO Conducted Operations At The Well In A Grossly Negligent Manner That Made A Blowout Almost Certain.

#### 1.   Halliburton's Grossly Negligent Conduct of Cementing Operations on the *Deepwater Horizon.*

##### a.   Halliburton implemented BP's flawed cementing plan.

70.     BP's casing and cementing plan for the well was not appropriate for a well with problem gas kicks. Halliburton knew this. Dr. Bea was requested by the White House to investigate the Incident. In his initial review of what led to the failure on the Deepwater Horizon, Dr. Bea determined that one of the causes of the disaster was the "improper cement design . . ." The cementing process did not, by design, provide a complete barrier between the casing and the surrounding geology through the entire length of the wellbore, as it should have.

71.     Halliburton, hired for its expertise in cementing, was fully aware of the Deepwater Horizon's history of well control problems. Halliburton knew from the beginning that the cementing plan was unsafe. Indeed, on April 1, 2010, Halliburton employee Marvin Volek warned in an email that the cementing plan BP had given to Halliburton "was against our best practices." Despite this knowledge, Halliburton elected to implement the plan without changes.

**b.**      **Halliburton opted to use an unacceptably risky method to seal the well.**

72.      The Deepwater Horizon crew drilled the last section of the well on April 9, 2010. The wellbore was 18,360 feet below sea level, and the last 1,192 feet required casing before the well could be plugged successfully for later exploitation.

73.      BP and Halliburton had two options for casing the final section of the wellbore in preparation for final sealing of the well.  The safer option was to hang a steel tube, called a "liner," from a liner hanger on the bottom of the last section of casing already in the well, and then insert another steel liner tube, called a "tieback," on top of the liner hanger.  This method would provide four redundant barriers to prevent gas and other hydrocarbons from flowing up the unsealed parts of the drilling column to the riser.

74.      The alternative, cheaper but far less safe, was to lower a single string of steel casing from the top of the wellhead at the seafloor to the bottom of the well.  This method would, however, provide only two barriers to gas flowing up the well.

75.      In mid-April 2010, as part of a "Forward Plan of Review," BP's own drilling engineers recommended against the use of the single string of casing option as unsafe.

76.      Nonetheless, BP decided to use a single casing string to seal the well because it could be installed in less time and would cost $7-10 million less than the safer liner and tieback method.

77.      Given its knowledge and experience, it is shocking that Halliburton opted to implement the inferior plan despite its significantly riskier profile.  Clearly, Halliburton's decision to seal the well using the riskier casing string option, instead of a liner/tieback, was not only grossly negligent, but was a breach of MMS regulations at 30 C.F.R. § 250.401.  That regulation required Halliburton to take necessary precautions to keep well control, i.e. to prevent

-21-

gas from migrating up the drilling column at all times by using the "best available and safest drilling technology to minimize the potential for the well to flow or kick," and to "use and maintain equipment and materials necessary to ensure safety and protection of personnel, equipment, natural resources, and the environment."

**c.**     **Halliburton knowingly conducted the final cementing process in a manner likely to fail.**

**(1)**     **Halliburton failed to use the required number of centralizers needed to ensure a successful cement job.**

78.     In conducting a well-sealing operation using casing string, centralizers (attachments that go around the casing as it is lowered into the well to keep the casing in the center of the borehole) are an important part of the process. In order for this method to have any chance to inhibit gas from flowing "up," the casing must be properly centered in the well. Halliburton was well aware of this necessity.

79.     As the American Petroleum Institute's ("API") Recommended Practice 65 explains, "If the casing is not centralized, it may lay near or against the borehole wall . . . . It is difficult, if not impossible, to displace mud efficiently from the narrow side of the annulus if casing is poorly centralized. This results in bypassed mud channels and inability to achieve zonal isolation." Consequently, it is important that an adequate number of centralizers be used.

80.     However, on April 15, 2010, BP informed the Halliburton account representative that Halliburton was to use only six centralizers in casing the well.

81.     Halliburton then spent the day running computer simulations to determine how many centralizers would be needed in the well to prevent unsafe gas flow. Those simulations established that at least 21 centralizers were needed to ensure only "MINOR gas flow problems," while ten centralizers resulted in a "MODERATE" gas flow problem. Halliburton then recommended to BP that Halliburton use 21 centralizers to cement the casing string into the well.

82.     BP emailed Halliburton back that same day, rejecting the use of 21 centralizers because there were only six centralizers of the type needed on the Deepwater Horizon. The BP representative stated that "it's too late to get any more product on the rig, [and thus] our only option is to rearrange placement of these centralizers."

83.     Given the obvious importance of this issue to the safety of the well-drilling, the following day, on April 16, 2010, the centralizer issue was elevated within BP. BP workers informed the drilling engineer team leader that they had "located 15 Weatherford centralizers with stop collars . . . in Houston and worked things out with the rig to be able to fly them out in the morning."

84.     Internally, BP knew that using the number of centralizers recommended by Halliburton was important because "we need to honor the modeling to be consistent with our previous decisions to go with the long string." Despite this awareness of the risks and a readily available solution to the problem, BP determined to push ahead with only six centralizers because it would take up to ten additional hours for the centralizers to arrive from Houston.

85.     Thus, on April 16, 2010, in an e-mail that is chilling in its stark revelation of the callous indifference to the risk to the crew on board and surrounding environment, BP's Operations Drilling Engineer instructed that only six centralizers would be used. In the e-mail, BP expressly acknowledged that "[e]ven if the hole is perfectly straight, a straight piece of pipe even in tension will not not seek the perfect center of the hole unless it has something to centralize it." Nonetheless, he flippantly dismissed the concern - "who cares, it's done, end of story…"

86.     Upon receipt of the instruction, on April 17, 2010, Halliburton warned BP that using only six centralizers would likely produce channeling and a failed cement job. In a follow-

up email on April 18, 2010, Halliburton notified BP that additional computer modeling confirmed that using only six centralizers would lead to a "SEVERE" gas problem in the well. BP remained unmoved and insisted on using only six centralizers in the cementing process.

87.     Unbelievably, Halliburton, despite having already determined that such a procedure would produce a "failure of the cement job," again sacrificed principles and moved forward with the final sealing of the well in an unsafe and grossly negligent manner, rather than insisting on using the necessary number of centralizers, creating an imminent safety hazard. Given the ultimate consequences, it is a decision Halliburton will rue for years to come.

(2)     **Halliburton and M-I SWACO conducted the final cementing operation without insisting on a complete "bottoms up" circulation of the drilling mud in the well.**

88.     Halliburton also recommended to BP that the crew circulate the drilling mud from the bottom of the well all the way up to the surface before actually cementing the well – a "bottoms up" test.   API RP 65, Parts 1 and 2 provides that "[w]ell preparation, particularly circulating and conditioning fluids in the wellbore, is essential for successful cementing." Accordingly, "common cementing best practice" is to conduct at least one "bottoms up" procedure of the drilling fluid before beginning the final cementing and capping of a well. Halliburton's advice was thus in accordance with that of the generally accepted industry standards, which provided that oil companies should fully circulate the drilling mud in the well from the bottom to the top before commencing the cementing process.

89.     The "bottoms up" procedure involves circulating the drilling mud through the entire well, such that the mud at the bottom of the well is brought all the way up to the drilling rig to allow the mud to be conditioned in preparation for the final sealing job.  This procedure also permits crewmembers to observe and remove any debris in the mud that might contaminate the cement.  Finally, and most critically, a full circulation of the mud allows the rig's crew to test

the mud to see if it is absorbing gas that may be infiltrating into the well – the very cause of the explosion that subsequently destroyed the Deepwater Horizon.  Once such gas is detected, the "bottoms up" procedure removes it.

90.     Because the well at the Macondo Prospect was 18,360 feet deep, the full "bottoms-up" procedure would have taken as long as twelve hours to conduct.  That length of time was unacceptable to BP, which was pushing Halliburton, M-I SWACO, and the rest of the Deepwater Horizon's crew to speed up the final capping of the well so that the rig could move on to its next drilling site.  As a result, M-I SWACO circulated the drilling mud in the well for only 30 minutes before the final cementing job began, and Halliburton blithely proceeded with cementing nonetheless – despite failing to circulate mud from the bottom of the well up to the rig.

91.     The decision to forego a complete "bottoms up" procedure was especially disturbing in light of the well's prior troublesome history of gas "kicks."  As noted by Robert MacKenzie, a former drilling cement engineer, "If you have any worries about gas . . . you should definitely do it."  Accordingly, Halliburton and M-I SWACO's failure to conduct the procedure was a gross deviation from the minimum standard of care.

### (3)     Halliburton failed to install a casing hanger lockdown sleeve prior to displacing drilling mud.

92.     In order to ensure the integrity of the seal assembly, which was now the only barrier against an influx of hydrocarbons from the sea floor, prudence required the use of a casing hanger lockdown sleeve – a device that locks the production casing and wellhead in place.  A lockdown sleeve would have prevented the well plugs installed by Halliburton from being blown out from below.

93.     BP and Halliburton, however, did not install a lockdown sleeve prior to running the negative pressure tests on the well before the procedure began to displace drilling mud with light seawater, again creating an imminent safety hazard.

### (4)     Halliburton failed to insist on proper pressure testing.

94.     Given the obvious danger of a gas release in the well, Halliburton should not have permitted the drilling mud to be removed from the drill column prior to installing the final plug unless it was absolutely certain that the plug already installed created an adequate barrier to methane gas pushing up through the wellbore and the marine riser.

95.     However, making that determination required pressure tests on the well, tests that are conducted using a well's blowout preventer ("BOP").  The BOP is a series of valves and seals that are supposed to control oil well pressure in the event of a catastrophe by pinching the drilling pipe, cutting it, and sealing it – thereby stopping the release of oil from a well.  In short, it is designed to prevent the uncontrolled flow of oil that has resulted from the Incident.

96.     It is not known whether the BOP was even capable of successfully completing pressure tests on April 19, 2010.  Transocean's employees have admitted that in March 2010 it was common knowledge on the rig that a critical gasket on the BOP was damaged in an unrelated accident.

97.     Thus, the crew of the Deepwater Horizon would not have been able to gauge reliably whether or not methane or other gases were being released into the well and potentially rising to the rig platform, ready to explode.  This, of course, posed an imminent safety hazard.

98.     Accordingly, as the rig's crew began removing drilling mud from the column and replacing it with seawater, Halliburton knew that it was relying on pressure tests that were likely inaccurate because of the damage to one of the BOP's gaskets.

**(5)**     **Halliburton failed to confirm that the cement job was successful.**

99.     Because of the decision to use a single string of casing, the well had just two barriers to prevent gas flow up the annular space around the final string of casing – the cement at the bottom of the well and the seal at the wellhead on the sea floor.  Given the significant risk that the cement job would fail, it was critically important to run a cement bond log to accurately assess the status of the cement job.

100.     MMS regulations, at 30 CFR § 250.428, required Halliburton to conduct a definitive test of the integrity of a well's cement, called a "cement bond log," if there were indications that its cement job was inadequate.  The cement bond log is a test that confirms that the cement has properly set, bonded to the well casing and surrounding formations, and is preventing gas from seeping into the drilling column.

101.     Under 30 C.F.R. § 250.428 of the MMS regulations, the existence of indicators of an inadequate cement job – such as indefinite or anomalous negative and positive pressure tests conducted during the final cementing process – requires a cement bond log to be conducted. Two pressure tests were conducted on the well on April 20, 2010.  Neither was definitive.

102.     Negative pressure tests are not usually considered successful unless zero drilling mud is being returned to the rig.  During the first negative test conducted on April 20, 2010, 23 barrels of mud were returned, while the second test returned 15 barrels.  In addition, a "very large abnormality" in pressure was indicated by the second negative pressure test.  Nonetheless, a cement bond log test was not performed.

103.     Even without indefinite test results, a cement bond log should have been ordered on April 20, 2010, because of Halliburton's own previous concerns that the method chosen to seal the well was likely to fail.

104.    In fact, on April 19, 2010, BP had arranged for Schlumberger to fly in a crew to the *Deepwater Horizon* to conduct a cement bond log test.  However, on the morning of April 20, 2010, Schlumberger was informed that the test was being cancelled because it would have taken 9–12 hours and cost $128,000.  The Schlumberger crew departed the *Deepwater Horizon* at 11:15 a.m. on April 20, 2010.  Despite an obligation to do so, Halliburton did not insist on this test – which would have confirmed whether or not their cementing process had been successful, creating an imminent safety hazard.

105.    Gordon Aaker, a professional engineer and independent drilling expert consulted by the Subcommittee on Oversight and Investigations of the United States House of Representatives Energy and Commerce Committee, called the decision to forego the cement bond log test "horribly negligent."

106.    Another expert consulted by the subcommittee, John Martinez, stated that "cement bond or cement evaluation logs should always be used on the production string."  That is because it is virtually impossible to ensure the effectiveness of the cement seal without running a cement bond log.

107.    Tommy Roth, a Halliburton employee, confirmed the need for testing in his briefing to the staff of the House Energy and Commerce Committee, where he admitted that a cement bond log must be conducted "if the cement is to be relied upon as an effective barrier."  Yet, Halliburton did not insist that Schlumberger perform the test and agreed to continue the process of installing the final cement plugs in the wellbore without it.

### 2. M-I SWACO's grossly negligent conduct of drilling fluid operations on the *Deepwater Horizon*.

### a. M-I SWACO failed to conduct a "bottoms up" procedure prior to the final cement job at the well.

108.    As discussed above, M-I SWACO circulated the drilling mud in the well for only 30 minutes before the final cementing job began, despite knowing that conducting a "bottoms up" circulation was imperative for this particular well, and in disregard of the API's industry standards.  M-I SWACO's failure to conduct a "bottoms up" circulation was a gross deviation from the minimum standard of care.

### b. MI-SWACO inexplicably began removing drilling mud from the drilling column before confirming that the well had been properly sealed

109.    Prior to capping an exploration well for later exploitation by a production platform, the drilling mud must be removed from the well and either disposed of or reconditioned for later use.  It was M-I SWACO's job to remove the drilling fluid from the well and displace it with much lighter seawater.

110.    In deepwater drilling operations, heavy drilling mud placed in the wellbore is the primary barrier against a blowout of gas and oil.  Accordingly, it is vital that displacement of the mud not begin until the drilling fluid manager is absolutely certain that the well has been properly sealed.  Otherwise, removal of the drilling fluid will lower the pressure in the well and permit oil or gas to move up the wellbore.

111.    On the Deepwater Horizon, because it was more expedient and less costly, M-I SWACO began displacing the drilling mud with seawater before the final cement plug sealing the well was in place.  In fact, M-I SWACO elected to begin removing drilling mud from the well without any definitive confirmation that Halliburton had successfully cemented the bottom of the well, and that the upward pressure in the tapped hydrocarbon reservoir was being blocked.

112.    M-I SWACO's decision to do so was grossly negligent in light of the well's documented prior history of significant gas "kicks," which dictated greater vigilance against blowouts.  Moreover, M-I SWACO knew that BP had decided to forego a cement bond log, which is the only test that could have confirmed that the bottom of the well had been properly cemented to prevent the upflow of gas and oil from below.  Gordon Aaker, a drilling engineer and failure analysis consultant, testified before the House Energy and Commerce Committee that the failure to conduct a cement bond log was "horribly negligent."

113.    That conclusion is underscored by the fact that, even before beginning the displacement procedure, M-I SWACO knew that the well had failed at least one, and possibly two, negative pressure tests.  This information was a clear warning that there was a pressure problem in the well.  Leo Lindner ("Lindner"), M-I SWACO's ranking employee on the Deepwater Horizon, testified before a Board of Investigation into the disaster being conducted by the U.S. Government that he knew that these results indicated that "something could be wrong" with the well.  Nevertheless, M-I SWACO began removing drilling mud from the well without taking any extra precautions against a blowout to the displacement plan.

114.    M-I SWACO ignored other red flags that it was unsafe to remove drilling mud before all of the well's cement plugs were in place.  For example, approximately five hours before displacement began, M-I SWACO noticed an unexpected loss of drilling fluid in the marine riser – a 5,000 foot column of pipe attaching the rig to the wellhead on the seafloor.  That loss was an indication that there were leaks in the BOP's annular gasket.  Subsequently, about two hours before displacement began, M-I SWACO personnel in the "mud pit room" became aware that more drilling fluid was being returned from the well than expected, a troubling sign that there was an influx of gas and/or oil into the well.  Yet, M-I SWACO proceeded with

displacement, despite the admonition contained in its own drilling fluids manual that "[i]ncreases in pit volume" are a positive indicator of gas kick in the well and that "when . . . these indicators are recognized at the surface, immediate action must be taken to prevent the further influx of fluid.  Failure to take appropriate actions can lead to a blowout."

115.    M-I SWACO ignored other warning signs just minutes before it began displacing mud from the well when it became clear that the well had experienced a loss of drilling fluid – a sign that gas is seeping into the well through a hole in the wellbore.   Then, approximately twenty-five minutes into the procedure, the rig's drilling crew was alerted to differential pressure readings, another sign that the well was about to "kick."   Given these multiple red flags, M-I SWACO should not have begun displacing drilling mud from the well and it certainly should have immediately ended the process once the well experienced anomalous pressure readings.  M-I SWACO's own drilling fluids manual warns that "[w]hen the … signs of a kick are recognized steps should be taken immediately to determine if the well is flowing and to shut the well in as quickly and safely as possible, to prevent any further influx into the wellbore."

116.    Instead of adhering to its own standards, M-I SWACO continued to dismantle the well's last line of defense against a blowout even as the well gave clear signals that a catastrophe was imminent.  That reckless decision virtually guaranteed that an explosion on the Deepwater Horizon would result once the bottom cement seal failed.

        c.    **M-I SWACO's use of untested and unsafe methods and materials to carry out the displacement of the drilling mud itself constitutes a gross deviation from the standard of care**

117.    Not only was M-I SWACO grossly negligent in choosing to displace the drilling mud before ensuring that the well had been properly sealed, but it conducted the displacement in a manner that was equally reckless, and which contributed to the well's eventual blowout.

118.    Two weeks prior to the destruction of the Deepwater Horizon, the well was experiencing a significant loss of drilling fluid, indicating a lost circulation zone.  In response, Lindner prepared two batches of LCM — loss control material — "pills."  However, the problem was "fixed" without the need to use them.  The two "pills" had still not been used as of April 20, 2010, the day of the explosion on the rig.  Because environmental regulations prevented the rig's crew from simply dumping the LCM material into the Gulf's waters, BP was going to have to pay extra for a barge to pick up and transport this toxic waste to a handling site.  However, the regulations protected BP from being punished for releasing material into the Gulf if it had been circulated through the well first.  Thus, by needlessly passing the toxic sludge through the well, BP could save tens of thousands of dollars.

119.    Unfortunately, M-I SWACO cynically decided to use the unneeded LCM as spacer fluid in preparation for the final displacement of the drilling mud from the well with seawater.  Once the LCM was run through the well, it could be dumped overboard from the rig.

120.    The use of LCM as a spacer fluid is inconsistent with accepted oil and gas industry practice.  Spacer fluid and LCM are not the same chemical formulations and have different purposes.  Indeed, during his testimony to the Board of Investigation, Lindner admitted that he could not think of a single example where either he, or any other fluid specialist, had ever before used LCM as a spacer.

121.    Moreover, Lindner failed to adequately test to see if the use of the two separate LCM "pills" as spacer would pose a problem during the displacement process.  Instead, he simply mixed one gallon each of the two "pills" to confirm that the mixture did not harden.  Incredibly, he failed to expose the two LCM mixtures to seawater, drilling fluid, or any other material it might encounter during the displacement process.  Nor did he take into account the

differences in how the chemicals would react under the extreme pressure conditions that actually existed in the well.

122.    Moreover, the very nature of the LCM created inherent risks in using it as a spacer fluid.  Its intended purpose is to expand in order to plug and fill holes in the wellbore.  If the LCM put into the well as spacer fluid did expand, it might have clogged the choke and kill lines on the BOP, preventing it from sealing the well in an emergency.

123.    Lindner also testified to the Board of Investigation that the well would normally have required 180-200 barrels of spacer fluid for a successful displacement of drilling mud.  M-I SWACO, however, used 450 barrels of the repurposed LCM as spacer so that it could then dump the entire amount into the Gulf after circulating it in the well.  According to Lindner, this volume was "not standard."  By effectively doubling the amount of pressure that would exist if a correct amount of spacer fluid had been used, M-I SWACO may have damaged both the well and the BOP.

124.    Finally, M-I SWACO decided to offload drilling mud to a nearby vessel – after which it would be taken to a remediation facility for reuse – at the same time that the mud was also being circulated back to the mud pit room and negative pressure tests were being conducted on the well.  From a practical standpoint, this combination of actions made it virtually impossible for the Deepwater Horizon's mud logging contractor to accurately monitor the amount of drilling mud being circulated in the well.  That meant that the mud logger was unable to determine prior to the blowout if a hole in the well was permitting gas to infiltrate into the wellbore.

**H.     When, As Predicted, Halliburton's Cement Job Failed To Properly Seal The Well, M-I SWACO's Removal Of Drilling Fluid Permitted Methane Gas And Other Hydrocarbons To Escape Up The Drilling Column, Leading To The Catastrophic Explosion On The *Deepwater Horizon.*

125.     Ultimately, Halliburton's and M-I SWACO's many reckless decisions at the well proved catastrophic.  At approximately 9:45 p.m. CST on April 20, 2010, about 45 minutes after M-I SWACO began displacing the heavy drilling mud from the well with lighter seawater, the lower cement seal previously installed by Halliburton failed.  Without sufficient drilling mud to hold it back in the well reservoir, methane gas and other hydrocarbons shot up the drilling column and out on the platform of the *Deepwater Horizon*.  The gas then ignited, exploded, and engulfed the rig in flames.

126.     Eleven crewmembers were tragically killed.  The rig's Emergency Disconnect System – designed to separate the rig from the riser in case of an emergency such as an explosion – failed to activate.  Accordingly, methane gas continued to pour through the riser and feed the raging fire on the platform.  Those crew members that survived the explosion were forced to abandon the rig.  The *Deepwater Horizon* then burned for two days, until it finally sank on April 22, 2010.

127.     Since that time, experts have universally concluded that significant contributing factors to this disaster include a poor cementing job by Halliburton and the decision to remove drilling mud before the well had been finally sealed.  Robert MacKenzie, managing director of energy and natural resources at FBR Capital Markets and a former cementing engineer, told the *Wall Street Journal* that the "initial likely cause of gas coming to the surface had something to do with the cement."   Dr. Bea has noted that there would have been no blowout if the drilling fluid had been left in the well until after the final cement plug was set in place.

128.   Despite their specialized knowledge and experience, Halliburton and M-I SWACO deliberately chose to conduct their operations on the *Deepwater Horizon* in a manner they knew was unsafe.   Throughout the drilling process, and especially during the final operations to seal the well for later exploitation, Halliburton and M-I SWACO chose to ignore, or failed to report, BP's repeated safety violations.   They also implemented their and BP's flawed and grossly negligent procedures for sealing the well.   Halliburton and M-I SWACO are, therefore, fully liable for the deaths of the eleven members of the *Deepwater Horizon*'s crew, an unfathomable amount of pollution in the Gulf, the extraordinary effects on the Gulf's marine and coastal ecosystems, and the disastrous economic consequences to millions of Gulf residents and businesses, including St. Joe.

### I.   The Damage Done:   The Resulting Environmental And Economic Catastrophe

#### 1.   Millions of barrels of oil and other pollutants have been discharged into the fragile waters of the Gulf.

129.   Because the rig was "dead" after the explosion, meaning it had no engine power and its backup generators had failed, it was unable to disconnect from the marine riser.   As a result, while sinking to the seafloor it pulled the riser down with it, bending and breaking the pipe before finally tearing away from the riser completely at about 1,500 feet above the seabed. Massive amounts of crude oil and other hydrocarbon pollutants immediately began spewing into the Gulf.   This continued until July 15, 2010, when BP finally managed to install a makeshift cap on the damaged riser and halt the flow of oil.

130.   The pollutants from the Incident were so massive that they formed a rainbow-colored slick across the Gulf's surface large enough to be seen from outer space.   The slick spread with the wind and currents to the coastlines of Louisiana, Mississippi, Alabama, and Florida, and there has yet to be an accurate estimate of the actual volume of oil spilled into the

Gulf because of the Incident. However, estimates have ranged from approximately 53,000 barrels per day to 100,000 barrels per day, the latter estimate comes from BP's own internal documents. Even using the more conservative flow rate of 53,000 barrels per day, the well discharged more pollutants every four to ten days than the entire volume of oil that leaked from the *Exxon Valdez* in 1989.

131.    Multiplying these flow rates by eighty-seven days, the estimated total volume of oil discharged into the Gulf from the well would range from approximately 194,000,000 gallons to over 365,000,000 gallons, making it the worst known oil spill disaster to date. The most recent U.S. Government estimates place the total volume at about 5 million barrels, or about 210 million gallons. Samantha Joye, a researcher for the University of Georgia, has explained the impact of such a massive volume of oil introduced into the Gulf, stating that "[t]here's a shocking amount of oil in the deep water, relative to what you see in the surface water. There's a tremendous amount of oil in multiple layers, three or four or five layers deep in the water column."

**2.    The devastating impact on the Gulf's ecosystem**

132.    The impact of the oil and other pollutants discharged into the Gulf because of the Incident has been devastating on the marine and other wildlife of the Gulf. However, because of the unprecedented size of the disaster, the devastation will take years to assess. Terri Rowles, NOAA's Director of Marine Mammal Health and Stranding Response has noted that impacts on "species living in deep water, like sperm whales, may not be detected" because dead whales simply disappear beneath the waves. Likewise, Rowan Gould, Acting Director of the U.S. Fish & Wildlife Service, noted that the Deepwater Horizon spill "is significant and in all likelihood will affect fish and wildlife across the Gulf, if not all of North America, for years if not decades . . . ."

133.    The oil slick from the Deepwater Horizon disaster first made landfall on the Louisiana coastline on April 30, 2010.  Over the next weeks, elevated southerly winds pushed the perimeter of the spilled oil east to the Northwest Florida shoreline.  The first oil from the spill came ashore on the Northwest Florida coast on June 4, 2010, when tar balls washed up onto Pensacola Beach.

134.    Tar balls from the oil spill caused by the Incident initially washed onto St. Joe's beaches on June 19, 2010.  On that day, tar balls were spotted and removed from the beaches at both WaterColor and WaterSound Beach.  Both resorts are St. Joe properties located in Walton County, Florida.  Oil then continued to wash ashore along the Northwest Florida coast.  Today, unseen undersea oil plumes pose a constant threat to beaches and the entire coastal zone.  It is clear that Northwest Florida has and will continue to suffer enormous economic impact for years to come as a result of actual damage to its coastline, as well as people's negative perception of the Northwest Florida coast as a damaged region.

**J.      The Damage To St. Joe**

135.    Prior to April 20, 2010, St. Joe had invested considerable resources positioning itself to capitalize on the last great frontier of development available on Florida's Gulf Coast.  As the owner of approximately 577,000 acres of land, approximately 70 percent of which are on or within 15 miles of the Northwest Florida coastline, the company's strategic plan hinged on the master development of its own land as well as the entire Northwest Florida region.  Clearly, St. Joe was uniquely positioned to capitalize on the opportunities available as this area began to emerge from the recession, both for its own benefit and for the collective prosperity of the communities in that region.  Indeed, the new airport, which opened in May 2010, was set to be an important catalyst in attracting new businesses – and their many employees – to the region.

136.   Not surprisingly, the financial markets have positively reflected the importance of the opportunities provided by St. Joe's master plan.  St. Joe's stock price hit a 52 week high of $37.44, on April 29, 2010.  Since that day, however, as the magnitude of the environmental and economic devastation wreaked by the Incident has become apparent, St. Joe's stock has plummeted more than 40 percent, closing at $22.08 only 39 days later.  The resultant loss in market capitalization of approximately $1.4 billion reflects the perception of analysts and investors as to the loss in value of St. Joe's primary assets – its Gulf Coast land holdings.

137.   St. Joe is an innocent victim of Halliburton's and M-I SWACO's reckless pursuit of profits over the safety, environmental integrity, and economic health of an entire region.  St. Joe has suffered direct physical damages to its real estate and business interests from the oil and other pollutants discharged because of the Deepwater Horizon disaster.

138.   In addition, St. Joe's intrinsic enterprise value, its earning power, and the worth of its significant land holdings, are all inextricably tied to the continued environmental vitality of the Gulf.  Halliburton's and M-I SWACO's gross misconduct on the Deepwater Horizon has directly and proximately caused St. Joe to sustain significant financial losses.  St. Joe files this suit seeking to recover damages for the harm caused by Halliburton and M-I SWACO, and for punitive damages to punish Halliburton and M-I SWACO for their gross negligence and callous indifference to the rights and safety of others.

## V.   CLAIMS

### A.   Count One:  Negligence And Breach Of Duty Of Care

139.   St. Joe incorporates herein by reference the allegations set forth in the preceding paragraphs.

140.   Halliburton owed St. Joe a duty of due care with respect to conducting drilling operations in the Gulf including, among other things, the cementing and casing of the well.

141.    M-I SWACO owed St. Joe a duty of due care with respect to conducting drilling operations in the Gulf including, among other things, the conduct of drilling fluid operations at the well.

142.    Halliburton and M-I SWACO each had a heightened duty of care because of the inherently dangerous nature of oil exploration and drilling activities.

143.    As set forth above, Halliburton and M-I SWACO violated those duties by, among other things: failing to conduct their operations on the Deepwater Horizon in a safe and workmanlike manner; failing to use the best and safest drilling technology; failing to ensure well control; disregarding regulations promulgated by MMS; disregarding safety standards promulgated by the API; failing to take appropriate action to avoid or mitigate the disaster and resulting oil spill; and by ignoring the data and evidence in its possession that indicated Halliburton's and M-I SWACO's continued operations seriously jeopardized the structural integrity of the well and the Deepwater Horizon, thereby not only placing every person on the Deepwater Horizon in imminent danger of injury and death, but also threatening the fragile ecosystem of the Gulf natural resources and the physical and economic interests of all those who rely upon and benefit from them.

144.    As a direct and proximate result of Halliburton's and M-I SWACO's negligence, St. Joe has sustained, and continues to suffer, substantial harm and injury.

145.    St. Joe has been damaged by the diminution in value of its properties located on or near the Florida Gulf Coast, its inability to rent properties it owns and/or manages on or near the Florida Gulf Coast, the loss of business, profits, and revenue on or near the Florida Gulf Coast, and the destruction of its enterprise value, all as a direct result of the Incident.

146.    Accordingly, St. Joe seeks to recover from Halliburton and M-I SWACO, each jointly and severally, monetary relief in the form of lost profits and impairment of earning capacity due to damage to its real property and to natural resources.  St. Joe also seeks to recover from Halliburton amd M-I SWACO monetary relief in the form of actual damages to real property, economic damages, lost profits, and diminution in value of its property and assets.

**B.      Count Two:  Gross And Culpable Negligence**

147.    St. Joe incorporates herein by reference the allegations set forth in the preceding paragraphs.

148.    Halliburton and M-I SWACO each had a heightened duty of care to St. Joe because of the inherent danger associated with deep petroleum drilling from floating platforms, and the especially high risk of blowouts, explosions, and other dangers arising from cementing work and drilling fluid operations such as that being performed by Halliburton and M-I SWACO at the time of the blowout and explosion.

149.    The cementing and casing work performed by Halliburton, and the drilling fluid operations conducted by M-I SWACO, on the Deepwater Horizon presented a clear and present danger of injury.  Halliburton and M-I SWACO were aware of this danger when they voluntarily proceeded with the cementing and casing operations, and drilling fluid operations, in an unreasonable and unlawful manner.  Halliburton and M-I SWACO knew, or should have known, that their wanton and reckless conduct would foreseeably result in a disastrous explosion, blowout, and oil spill, causing damage to the real property and economic interests of all those affected by the oil spill, including St. Joe.

150.    Halliburton and M-I SWACO acted with reckless and wanting care that constituted a conscious disregard and indifference not only to the life, safety, and rights of the

workers present on the Deepwater Horizon, but also to the Gulf natural resources and all those who rely upon and benefit from them, including St. Joe.

151.    As a direct and proximate result of Halliburton's and M-I SWACO's gross and culpable negligence, St. Joe has sustained, and continues to suffer, substantial harm and injury.

152.    St. Joe has been damaged by the diminution in value of its properties located on or near the Florida Gulf Coast, its inability to rent properties it owns or manages on or near the Florida Gulf Coast, the loss of business, profits, and revenue on or near the Florida Gulf Coast, and the destruction of its enterprise value, all as a direct result of Halliburton's and M-I SWACO's actions.

153.    Accordingly, St. Joe seeks to recover from Halliburton and M-I SWACO, each jointly and severally, monetary relief in the form of compensatory and consequential damages, plus punitive damages in an amount of at least three (3) times the amount of the actual damages awarded.

**C.    Count Three:  Strict Liability For Abnormally Dangerous Activity**

154.    St. Joe incorporates herein by reference the allegations set forth in the preceding paragraphs.

155.    Through their cementing, casing, and drilling fluid operations, Halliburton and M-I SWACO engaged in abnormally dangerous activities that: created a high degree of risk of harm to the person, land, and chattels of others, and particularly to St. Joe; created a likelihood that the harm resulting from such activities would be great and verging on the edge of catastrophic; created a risk of such great harm that elimination of risk by the exercise of reasonable care was impossible; were not a matter of common usage; and were inappropriate to the place carried on insofar as they constituted a non-natural use of the waters of the Gulf and in geographic proximity to Florida's fragile coast line.

156.     As a direct and proximate result of Halliburton's and M-I SWACO's abnormally dangerous activities, St. Joe has sustained, and continues to suffer, substantial harm and injury.

157.     The harm sustained by St. Joe is exactly the kind of harm expected, the possibility of which made Halliburton's and M-I SWACO's activities abnormally dangerous.

158.     St. Joe has been damaged by the diminution in value of its properties located on or near the Florida Gulf Coast, its inability to rent properties it owns and/or manages on or near the Florida Gulf Coast, the loss of business, profits, and revenue on or near the Florida Gulf Coast, and the destruction of its enterprise value, all as a direct result of the Incident.

159.     Accordingly, St. Joe is entitled to a judgment declaring Halliburton and M-I SWACO, each jointly and severally, liable for all damages, including compensatory, consequential, and punitive damages, suffered as a result of Halliburton's and M-I SWACO's abnormally dangerous activities.

## VI.     DEMAND FOR RELIEF

WHEREFORE Plaintiff requests that the court enter judgment in Plaintiff's favor and against Defendants Halliburton and M-I SWACO, jointly and severally, as follows:

a.      awarding Plaintiff actual damages, including compensatory and consequential damages, in an amount to be determined at trial;

b.      awarding Plaintiff exemplary or punitive damages;

c.      awarding Plaintiff pre-judgment and post-judgment interest at the highest lawful rates;

d.      awarding Plaintiff such costs and disbursement as are incurred in prosecuting this action, including reasonable attorneys' and experts' fees; and

e.      granting Plaintiff such other and further relief as this Court deems just and proper.

## VII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

/s/ Edmond D. Johnson
Edmond D. Johnson (Del. Bar No. 2257)
James G. McMillan, III (Del. Bar No. 3979)
James H. S. Levine (Del. Bar No. 5355)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709

William A. Brewer III
Michael J. Collins
Kenneth N. Hickox, Jr.
Robert W. Gifford
BICKEL & BREWER
1717 Main Street
Suite 4800
Dallas, Texas 75201
Telephone:  (214) 653-4000
Facsimile:   (214) 653-1015

Dated: March 27, 2011

Wilmington, DE  19899-1709
Telephone: (302) 777-6500
Facsimile:  (302) 421-8390
johnsone@pepperlaw.com
mcmillanj@pepperlaw.com
levinejh@pepperlaw.com

*Attorneys For Plaintiff  The St. Joe Company*

5239252.3
2132-02

EFiled:  Mar 27 2011 11:09PM EDT
Transaction ID 36700313
Case No. N11C-03-264 PLA

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| THE ST. JOE COMPANY, | ¶ | |
| | ¶ | |
| Plaintiff, | ¶ | |
| | ¶ | |
| v. | ¶ | No. _____ |
| | ¶ | |
| HALLIBURTON ENERGY | ¶ | |
| SERVICES, INC., | ¶ | |
| | ¶ | |
| Defendant. | ¶ | |

## PRAECIPE

To:    THE PROTHONOTARY

PLEASE issue a Writ of Summons for service of the Complaint and Summons on

the Defendant as follows:

To the Sheriff, New Castle County:

Halliburton Energy Services, Inc., c/o The Corporation
Trust Company, Corporation Trust Center, 1209 Orange
Street, Wilmington, DE  19801

Dated:  March 27, 2011

/s/ Edmond D. Johnson
Edmond D. Johnson (#2257)
James G. McMillan, III (#3979)
James H.S. Levine (#5355)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE   19899-1709
Telephone No. (302) 777-6500
Facsimile No.  (302) 421-8390

Attorneys for Plaintiff St. Joe Company

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

THE ST. JOE COMPANY,           ¶

        Plaintiff,         ¶

    v.                ¶     No. _____

HALLIBURTON ENERGY      ¶
SERVICES, INC.,           ¶

        Defendant.       ¶

**THE STATE OF DELAWARE,**
**TO THE SHERIFF, NEW CASTLE COUNTY,**
**YOU ARE COMMANDED:**

To summon the above named Defendant so that, within 20 days after service hereof upon Defendant, exclusive of the day of service, Defendant shall serve upon Edmond D. Johnson, Plaintiff's attorney, whose address is Pepper Hamilton LLP, Hercules Plaza, 1313 Market Street, Suite 5100, Post Office Box 1709, Wilmington, DE 19899-1709, an answer to the Complaint.

To serve upon Defendant a copy hereof and of the Complaint.

Dated: _____           SHARON D. AGNEW_____
                                Prothonotary

                                _____
                                Per Deputy

**TO THE ABOVE NAMED DEFENDANT:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on the Plaintiff's attorney named above an answer to the Complaint (and, if an affidavit of demand has been filed, an affidavit of defense), judgment by default will be rendered against you for the relief demanded in the Complaint (or in the affidavit of demand, if any).

                                SHARON D. AGNEW_____
                                Prothonotary

                                _____
                                Per Deputy

**SUPERIOR COURT**
**CIVIL CASE INFORMATION STATEMENT (CIS)**

EFiled: Mar 27 2011 11:09PM EDT
Transaction ID 36700313
Case No. N11C-03-264 PLA

COUNTY:    N                    CIVIL ACTION NUMBER: _____

| | |
|---|---|
| Caption:<br><br>The St. Joe Company<br><br>    Plaintiff<br><br>  v.<br><br>Halliburton Energy Services, Inc. and<br>M-I LLC. aka M-I SWACO<br><br>    Defendants | Civil Case Code:  CPRD<br><br>Civil Case Type: property damage<br>       (SEE REVERSE SIDE FOR CODE AND TYPE)<br><br>Name and Status of Party filing document:<br><br>Plaintiff The St. Joe Company<br><br>Document Type: (E.G.; COMPLAINT; ANSWER WITH COUNTERCLAIM)<br><br>Complaint<br><br>JURY DEMAND:  YES XX    No ____ |
| ATTORNEY NAME(S):<br><br>Edmond D. Johnson<br><br>ATTORNEY ID(S):<br><br>Del. Bar No. 2257<br><br>FIRM NAME:<br><br>Pepper Hamilton LLP<br><br>ADDRESS:<br>Hercules Plaza, Suite 5100<br>1313 Market St., P.O. Box 1709<br><br>Wilmington, DE  19899-1709<br><br>TELEPHONE NUMBER:<br><br>302-777-6500<br><br>FAX NUMBER:<br><br>302-421-8390<br><br>E-MAIL ADDRESS:<br><br>johnsone@pepperlaw.com | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS:<br><br>The St. Joe Company v. Transocean offshore, CA # N10C-10-099 PLA<br><br>EXPLAIN THE RELATIONSHIP(S):<br><br>N10C-10-099 PLA arises out of the same incident, involves the same legal issues and involves the same plaintiff.<br><br>OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT:<br><br>N10C-10-099 PLA was removed to the District Court and remanded back to<br><br>this court by Order Granting Motion to Remand dated 3-15-11<br><br>(IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGE) |

**THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER, OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED. THE FAILURE TO FILE THE CIS AND HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.**

Revised 3/2008