UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL NO. 2179 |
| | SECTION: J |
| This Document Relates Only To: *Rhodes v. Transocean, Ltd., et al* 2:10-CV-01502 | JUDGE BARBIER MAG. JUDGE SHUSHAN |

**Fifth Amending Complaint**

Petitioner, Karl W. Rhodes, appearing herein through his undersigned counsel, files his Fifth Amending Complaint and respectfully represent that:

**Jurisdiction**

1.

The Court's jurisdiction is based upon the Admiralty and Maritime jurisdiction under Article III of the United States Constitution, 46 U.S.C. § 30104 (formerly 46 U.S.C. § Appx. 688) *et seq*, 28 U.S.C. § 1333, and the General Maritime Law of the United States.  Petitioner brings this claim pursuant to the Federal Rules of Civil Procedure Rule 9(h).

**Additional Defendants**

2.

Petitioner amends his Complaint to name as additional defendants **Anadarko E&P Company LP, MOEX USA Corporation**, and **Mitsui Oil Exploration Co., Ltd**, and in the following paragraph he recites their legal status and the Court's jurisdiction over them.

**The Defendants**

3.

The following parties are made defendants herein:

A.    **BP Exploration & Production, Inc.** ("BP Exploration"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Delaware corporation with its principal place of business in Warrenville, Illinois.   BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Spill originated. BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714. This court has personal jurisdiction over BP Exploration, because it is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

B.    **BP America Production Company** ("BP America"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Delaware corporation with its principal place of business in Houston, Texas.  BP America was the party to

the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the *Deepwater Horizon* vessel.  This Court has personal jurisdiction over BP America, because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

C.    **BP p.l.c.**, Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a British public limited company with its corporate headquarters in London, England.  BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo.  BP p.l.c. is one of the world's largest energy companies with over 80,000 employees and $239 billion in revenues in 2009.  BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division in which BP Exploration and BP America fall through vertical business arrangements aligned by product or service groups. BP p.l.c.'s operations are worldwide, including in the United States. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally.

1.    BP p.l.c. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development. A sampling of BP p.l.c.'s contacts with the U.S. are as follows: (a) BP p.l.c.'s American Depository Shares are listed on the New York Stock Exchange and BP p.l.c. is the largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP p.l.c. files annual reports with the U.S. Securities and Exchange Commission;

(d) approximately 60% of BP p.l.c.'s fixed assets are located in the U.S. or the European Union; and (e) BP p.l.c. reports having 2,100 U.S.-based employees in non-Exploration & Production, non-Refining & Marketing BP entities.

2.   This Court has general jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm general jurisdiction provision (13 Louisiana Statute § 3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure. BP p.l.c. does business in Louisiana, and it has had continuous and systematic contacts with Louisiana (and the U.S. more generally).

3.   Alternatively, if BP p.l.c. contests that it is subject to jurisdiction under Louisiana's long-arm jurisdiction statute, then this Court may exercise personal jurisdiction over BP p.l.c. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, the federal long-arm jurisdiction provision, because claims in this action arise under federal law, and the exercise of jurisdiction over BP p.l.c. is consistent with the United States Constitution and laws.

4.   This Court also has specific jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm specific jurisdiction provision (13 Louisiana Statute § 3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.   Plaintiffs' causes of action arise out of wrongful conduct committed by BP p.l.c., directly or indirectly by its agents, that caused injury or damage in Louisiana by an offense or quasi offense committed through an act or omission outside of Louisiana, and BP, p.l.c. regularly does or solicits

business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana. These acts or omissions took place both before the blowout resulting in the oil spill and in the negligent conduct of BP, p.l.c. after the blowout in attempting to contain the catastrophic damage caused by the oil spill.

5.      Additionally, this Court also has personal jurisdiction over BP p.l.c. under agency principles, because BP p.l.c.'s agents, BP America and BP Exploration, do business in Louisiana.  BP America and BP Exploration are both wholly-owned subsidiaries of BP p.l.c.  In BP p.l.c.'s Annual Report for 2009, in which it presents a consolidated financial statement that includes BP America and BP Exploration, BP p.l.c. states that it "controls" both BP America and BP Exploration, among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities . . . ." 194.  BP p.l.c.'s direct, joint and/or assumed responsibility and/or liability for safety and well control, both before and/or after the explosions and blowout on April 20, 2010, is further evidenced by the announcement of the Macondo Project on the BP website hosted and copyrighted by BP p.l.c., the publication of information concerning the casualty and spill on the BP website hosted and copyrighted by BP, the express and/or implied acceptance of responsibility for the safety of BP operations in North America and the Gulf of Mexico in statements by officers of BP p.l.c., the presence (upon information and belief) of a BP p.l.c.

officer or employee on the Deepwater Horizon for the celebration that occurred shortly before the explosions and fire, the direct participation of BP p.l.c. employees in the post-casualty investigation, the direct participation of BP p.l.c. officers and employees in the Governmental post-casualty investigations, the direct participation of BP p.l.c. officers and employees in the post-casualty well-control efforts, and the direct participation of BP p.l.c. in the establishment and/or funding of the Escrow Fund and/or Gulf Coast Claims Facility.

BP Exploration, BP America, and BP p.l.c. are generally referred to herein collectively as "BP." As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

D.   **Transocean Ltd.** ("Transocean Ltd.") is a Swiss corporation that maintains substantial U. S. offices in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district.   According to its Complaint and Petition for Exoneration from or Limitation of Liability, Transocean Ltd. was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

E.   **Transocean Offshore Deepwater Drilling, Inc.** ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this

district.  Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

F.  **Transocean Deepwater, Inc.** ("Transocean Deepwater"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Deepwater is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

G.  **Transocean Holdings, LLC** ("Transocean Holdings"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Holdings is affiliated with Transocean Ltd. and is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon* and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Spill originated.  More specifically, Transocean Holdings is party to the contract with BP regarding the lease of the Deepwater Horizon for drilling operations in the Gulf of Mexico.  On April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the blowout by the Deepwater Horizon.

H.  **Triton Asset Leasing GmbH** ("Triton"), Defendant, Cross-Defendant in Limitation,

and/or Third-Party Defendant in Limitation, is a Swiss limited liability company with its principal place of business in Zug, Switzerland.   Triton is affiliated with Transocean Ltd. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

Transocean Ltd., Transocean Deepwater, Transocean Offshore, Transocean Holdings, and Triton are hereinafter referred to collectively as "Transocean."  At the Macondo site, Transocean provided the Deepwater Horizon vessel and personnel to operate it.  At all times relevant to the Spill,

Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems.  Transocean also provided operational support for drilling-related activities on board the *Deepwater Horizon*, as well as onshore supervision and support for those drilling activities at all times relevant to the Spill.

I. **Halliburton Energy Services, Inc**. ("Halliburton"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Delaware corporation with its principal place of business in Houston, Texas.  Halliburton is registered to do and does business in the State of Louisiana.  Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the *Deepwater Horizon*, as well as onshore engineering support for those operations. Halliburton was responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo well. At and before the time of the blowout, Halliburton was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well

against the influx of hydrocarbons like gas and oil. Halliburton division Sperry Drilling Services (formerly Sperry Sun Drilling Services) was responsible for mudlogging personnel and equipment on the Deepwater Horizon, including downhole drilling tools. Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations. Throughout this Complaint "Halliburton" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

BP, Transocean and Halliburton are collectively referred to herein as the "Drilling Defendants," as they were all involved in the drilling, cementing, and other temporary well abandonment activities of the Deepwater Horizon, and thus their actions caused and/or contributed to the Spill.

**J.**     **Cameron International Corporation f/k/a Cooper-Cameron Corporation** ("Cameron"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Delaware corporation with its principal place of business in Houston, Texas. Cameron is registered to do and does business in the State of Louisiana. Cameron manufactured, designed, supplied, and/or installed the Deepwater Horizon's sub-sea emergency well-closure device known as a blow-out-preventer ("BOP") , which is, and was at all material times, an appurtenance of the vessel and a part of the vessel's equipment. The Cameron-made BOP that was installed at the Macondo wellhead failed to operate as intended at the time of the blowout on April 20, 2010, was improperly designed, was inappropriate for the intended environment or use, and/or possessed product defects.

K.    **Weatherford U.S. L.P.** ("Weatherford"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Louisiana limited partnership that maintains its principal place of business in Houston, Texas, and that at all pertinent times was registered to do, and was doing business in Louisiana and within this district.  Weatherford designed and manufactured, marketed, sold, and/or distributed the casing components such as the float collar, shoe, and centralizers appurtenant to the vessel, and provided the personnel and equipment for running the casing and casing components into the wellbore.

L.    **Anadarko Petroleum Corporation Co.** ("Anadarko"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Delaware corporation with its principal place of business in The Woodlands, Texas. Anadarko is registered to do and does business in the State of Louisiana. Anadarko is an oil and gas exploration and production company.

M.    **Anadarko E&P Company LP** ("Anadarko E&P"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Delaware limited partnership with its principal place of business in The Woodlands, Texas. Anadarko E&P is registered to do and does business in the State of Louisiana. Anadarko E&P is an oil and gas exploration and production company.

N.    **MOEX Offshore 2007 LLC** ("MOEX Offshore"),Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is a Delaware corporation with its principal place of business in Houston, Texas.  MOEX Offshore does business in the State of Louisiana and/or in state and/or federal waters off the coast

of Louisiana.  MOEX Offshore is a wholly-owned subsidiary of MOEX USA Corporation.

O.    **MOEX USA Corporation** ("MOEX USA"),  Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is incorporated in Delaware and has its principal place of business in Houston, Texas.  MOEX USA is the parent company of MOEX Offshore.  According to Texas Secretary of State records, the stated business purposes of MOEX USA include the direct or indirect engagement in the business of "exploration, development and production of hydrocarbons and any business related to the exploration, development and production of hydrocarbons," and the acquisition of "Hydrocarbon Interests by purchase, lease, farm-in, license, exchange or other means or methods. . . ."

P.    **Mitsui Oil Exploration Co., Ltd.** ("MOECO"), Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation, is incorporated in Japan and has its principal place of business in Tokyo, Japan. As of June 30, 2010, MOECO identified itself as having the following U.S. subsidiaries or affiliates: MitEnergy Upstream LLC, MOEX USA Corporation, MOEX Offshore 2007 LLC, MOEX Gulf of Mexico Corporation, MOEX Oil & Gas Texas LLC, and Mitsui E&P USA LLC. Each of these subsidiaries of MOECO share the same Houston, Texas, address. MOECO states on its website as follows: "MOEX USA Corporation, a wholly owned subsidiary of MOECO, has a 10% interest in ultra-deepwater Mississippi Canyon 252, located in the U.S. Gulf of Mexico, through its 100% owned subsidiary, MOEX Offshore 2007 LLC."  In a press release dated July 24, 2007, MOECO

announced that it had entered into an "Acquisition and Participation Agreement with

BP Exploration and Production, Inc. … on the 29th of June 2007 to participate in an

ultra-deep gas exploration project in the Gulf of Mexico …which is being actively

pursued by BP." According to the release, "MOECO decided to participate in the

project based upon its evaluation of the prospect which BP's [Gulf of Mexico]

technical team has conducted extensive study and research [sic]." The release also

indicates that "Japan Oil, Gas and Metals National Corporation . . . has agreed to

provide equity capital finance for MOECO's share of the drilling costs payable under

the Acquisition and Participation Agreement. An exploratory well is scheduled to

be drilled from September 2007 by BP as the operator and as a result of the

participation and such well interests in the project will be BP (75%), MOECO (15%)

and other (10%)." The release concludes with MOECO indicating that its

participation in the project "provides an excellent opportunity to further expand its

business in the U.S." *See* www.MOECO.co.jp/english/topics/070724.html.

Defendants MOEX Offshore, MOEX USA, and MOECO are referred to collectively herein

as "MOEX."

While BP was the sole lease operator of the Deepwater Horizon, Anadarko, Anadarko E&P,

and MOEX were considered non-operational leaseholders. On October 1, 2009, BP Exploration, as

operator, and MOEX Offshore, as non-operator, entered into the Macondo Prospect Offshore

Deepwater Operating Agreement. On December 17, 2009, BP Exploration, MOEX Offshore,

Anadarko E&P, and Anadarko executed a "Joinder" of the Operating Agreement. Subsequently, the

parties to the Operating Agreement held the following ownership percentages in the Macondo

Prospect: BP Exploration, 65%; MOEX Offshore, 10%; Anadarko E&P, 22.5%; and, Anadarko, 2.5%. According to the MMS's website, effective April 1, 2010, record title interest in the Macondo prospect was held as follows: BP Exploration, 65%; MOEX Offshore, 10%; and, Anadarko, 25%. As joint holders of a leasehold interest in an oil or gas lease on land beneath navigable waters, Defendants Anadarko, Anadarko E&P, and MOEX are jointly, severally, and solidarily liable with their codefendants BP pursuant to the Oil Pollution Act. Anadarko, Anadarko E&P, and MOEX also had access to Halliburton/Sperry Sun INSITE realtime data that was transmitted from the Deepwater Horizon on April 20, 2010, and therefore knew or should have known of the red flags indicating a leak in the well in sufficient time to avert the disaster.

Q.    **M-I L.L.C.** ("M-I"), a/k/a M-I SWACO, is a Delaware corporation with its principal place of business in Houston, Texas. M-I supplies drilling and completion fluids and additives to oil and gas companies in more than 75 countries worldwide. Its fluids cool and lubricate drill bits, remove rock cuttings, and maintain the stability of the wellbore. Through M-I's SWACO division, the company provides pressure control, rig instrumentation, and drilling waste management products and services. It is also a worldwide producer of barite and bentonite used by the oil and gas and industrial markets. M-I provided the drilling fluids for the *Deepwater Horizon* at all times material, including, April 20, 2010.

### Seaman and Vessel Status

### 4.

At all times material, including April 20, 2010, Transocean Deepwater, Inc. and/or collectively "Transocean" employed Karl W. Rhodes as a Jones Act seaman and a member of the crew of a semi-submersible mobile drilling unit known as the *Deepwater Horizon*, and which vessel

was operating in the navigable waters of the Gulf of Mexico off the Louisiana coast and within the Court's jurisdiction.

5.

As a Jones Act seaman, petitioner is entitled to file and prosecute this action without prepayment of costs under 28 U.S.C. § 1916.

6.

At all times pertinent herein, including April 20, 2010, a Transocean entity designated herein collectively as "Transocean" and/or BP Entity owned and/or operated and/or managed and/or chartered and/or controlled or, alternatively, was the demise or bareboat charterer or owner *pro hac vice* of the *Deepwater Horizon*.

7.

The *Deepwater Horizon* is a vessel within the meaning of the Jones Act and the General Maritime Law.

8.

On April 20, 2010, and because of the defendants' conduct elsewhere described herein, petitioner Karl W. Rhodes suffered severe fright, mental anguish and distress, grievous bodily injury, and great pain and suffering when an explosion or explosions and fire suddenly and without warning occurred aboard the vessel while he was asleep in his bunk.

9.

Petitioner incorporates herein by reference paragraphs 225 - 440 of the Master Complaint, Cross-claim, and Third Party Complaint for Private Economic Losses in Accordance with PTO No. 11 [CMO NO. 1], SECTION III (B1) ["B1 BUNDLE"], DOCUMENT NO. 879 (hereinafter, B1

Master Complaint).

10.

Petitioner incorporates herein by reference paragraphs 501-506, 508, 510, 512-513, 518-529, 533-543, 522, 552-558 of the B1 Master Complaint.

**Negligence**

11.

BP and Transocean acted with gross negligence, willful misconduct and reckless disregard for human life by, among other things, using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

12.

Petitioner incorporates herein by reference, paragraphs 561-581, 583-600, 668-689 of the B1

Master Complaint.

13.

Petitioner avers that this subject incident and his resulting injuries and damages sued upon herein were the direct and proximate result of the gross, willful, and wanton negligence, and fault of the **Transocean Defendants**, and unseaworthy conditions caused, created, or allowed to exist by virtue of these defendants' gross, willful and wanton conduct.  This negligence, fault, conduct, and conditions are listed more particularly but not exclusively, as follows:

    A.    Negligent failure to properly perform the operation ongoing at the time of the accident in question;

B.      Negligent failure to take all appropriate precautions to avoid an accident and explosion of the kind that occurred;

C.      Negligent failure to have all proper equipment and gear necessary to perform the job being performed at the time of the accident and explosion in a safe manner;

D.      Negligent failure to keep the equipment on board the vessel in proper condition and repair;

E.      Negligent failure to properly inspect the rig and all of its equipment and gear;

F.      Negligent failure to have sufficient number of properly trained and qualified personnel to perform the job being performed at the time of the accident and explosion in a safe manner;

G.      Negligent failure to properly train and/or instruct and/or warn petitioner and those similarly situated;

H.      Negligent violation of government and industry rules, regulations and standards;

I.      Proceeding with the operation ongoing before the accident in the face of negative pressure and other testing which showed that well integrity had not been established and that there was an extreme risk of a blowout, explosion and fire;

J.      Placement of heavy drilling mud with seawater at a time when there was no well integrity, underbalancing the well and allowing hydrocarbons under pressure to flow up to the production casing and past the blow out preventer;

K.      Ignoring data showing an influx of pressured hydrocarbons and an increase in drill pipe pressure, which were unmistakable signs of an impending blowout or blowout in progress;

Page 16 of 33

L.      Failing to take steps to prevent the impending blowout or blowout in progress in the face of test data that called for immediate protective measures to control the well;

M.      Closing the blow out preventer and diverter, routing the fluids exiting the riser to the vessel's mud gas separator system rather than to the overboard diverter line;

N.      Flowing the diversion of hydrocarbons to the mud gas separator, venting the hydrocarbons directly onto the rig through a 12 inch gooseneck vent and other flowlines, which allowed the hydrocarbons onto the rig floor to be exposed to ignition sources;

O.      Failing to properly inspect, maintain, and repair a blowout preventer, which blowout preventer was in disrepair and was unseaworthy and which failed to seal the well;

P.      Having a fire and gas system that allowed for the dispersion of hydrocarbons and, ultimately, their ignition and which rendered the vessel unseaworthy;

Q.      Having a crew that was not properly trained and overly worked and which rendered the vessel unseaworthy;

R.      Violation of statutes and/or regulations and/or applicable Coast Guard, MMS, OSHA, and other rules designed to promote and foster safety which constitutes negligence *per se*;

S.      Vicariously liable for their employees' and agents' negligence, gross negligence, and recklessness;

T.      Failing to furnish petitioner with a safe place in which to work;

U.      Other items of unseaworthiness that may be shown from discovery or trial;

V.      Other acts of gross, willful, reckless, and wanton conduct that may be shown through

discovery or at trial;

W.      Generally, these defendants' failure to act with the required degree of care commensurate with the existing situation.

14.

Petitioner avers that this incident and his resulting injuries and damages sued upon herein were the direct and proximate result of the gross, willful, and wanton negligence and conduct of the **BP Defendants** that is listed more particularly, but not exclusively, as follows:

A.      Negligent failure to properly perform the operation ongoing at the time of the accident in question;

B.      Negligent failure to take all appropriate precautions to avoid an accident and explosion of the kind that occurred;

C.      Negligent failure to have all proper equipment and gear necessary to perform the job being performed at the time of the accident and explosion in a safe manner;

D.      Negligent failure to keep the equipment on board the vessel in proper condition and repair;

E.      Negligent failure to properly inspect the rig and all of its equipment and gear;

F.      Negligent failure to have sufficient number of properly trained and qualified personnel to perform the job being performed at the time of the accident and explosion in a safe manner;

G.      Negligent failure to properly train and/or instruct and/or warn petitioner and those similarly situated;

H.      Negligent violation of government and industry rules, regulations, and standards;

I. Proceeding with the operation ongoing before the accident in the face of negative pressure and other testing which showed that well integrity had not been established and that there was an extreme risk of a blowout, explosion and fire;

J. Placement of heavy drilling mud with seawater at a time when there was no well integrity, underbalancing the well and allowing hydrocarbons under pressure to flow up to the production casing and past the blow out preventer;

K. Ignoring data showing an influx of pressured hydrocarbons and an increase in drill pipe pressure, which were unmistakable signs of an impending blowout or blowout in progress;

L. Failing to take steps to prevent the impending blowout or blowout in progress in the face of test data that called for immediate protective measures to control the well;

M. Closing the blow out preventer and diverter, routing the fluids exiting the riser to the vessel's mud gas separator system rather than to the overboard diverter line;

N. Flowing the diversion of hydrocarbons to the mud gas separator, venting the hydrocarbons directly onto the rig through a 12 inch gooseneck vent and other flowlines which allowed the hydrocarbons onto the rig floor to be exposed to ignition sources;

O. Failing to properly inspect, maintain, and repair a blowout preventer, which blowout preventer was in disrepair and was unseaworthy and which failed to seal the well;

P. Having a fire and gas system that allowed for the dispersion of hydrocarbons and, ultimately, their ignition and which rendered the vessel unseaworthy;

Q. Violation of statutes and/or regulations and/or applicable Coast Guard, MMS,

OSHA, and other rules designed to promote and foster safety, which constitutes

negligence *per se*;

R.    Other acts of gross, willful, reckless, and wanton conduct which may be shown

through discovery or at trial;

S.    Generally, these defendants' failure to act with the required degree of care

commensurate with the existing situation.

15.

**Halliburton** was in charge of cementing the well, but failed to safely do its job.  Halliburton

knew or, based on its experience in the industry, should have known that poor cementing

significantly increases the risk of a blowout.  Halliburton's cementing job should have filled the

annulus between the casing and the well bore and sealed off the hydrocarbon filled formations.  It

also should have plugged the bottom of the casing pipe to prevent an influx.  However, the cement

slurry Halliburton designed and created on this job failed to perform these function. Halliburton's

light nitrified foam cement slurry failed in its function and allowed hydrocarbons to enter the

wellbore annulus.  The cement design and testing was improper and fell far below the standard of

care.  In fact, the slurry failed multiple stability tests before the blowout.  Halliburton ignored these

failed tests.  Halliburton's account representative/engineer on the rig knew about these problems and

complained that there was a "high probability" of explosive gas flowing through the cement unless

changes were made.  Further, the Macondo well was located in brittle, variable rock formations

laced with volatile high temperature, high pressure, and gaseous hydrocarbon reserves.  Given this

environment, Halliburton's improper cement mixture was a recipe for disaster.  This conduct was

willful, wanton, reckless and grossly negligent.  Halliburton was aware of this conduct, authorized

it, and ratified it.  Moreover, BP complained that Halliburton's account representative/engineer was not competent to perform his cement-related job responsibilities.  Halliburton had a duty to train and supervise him, but failed.  Moreover, Halliburton was charged with real time gas monitoring, but failed to notice the dangerous pressure readings (or noticed, but failed to inform the proper persons or take appropriate action). If Halliburton safely performed this function, the factors leading to the blowout would have been detected in time to take proper preventative actions.

16.

In addition to the statements contained in Paragraph 15 above, petitioner avers that this incident and his resulting injuries and damages sued upon herein were the direct and proximate result of the gross, willful, and wanton negligence and conduct of the **Halliburton** that is listed more particularly, but not exclusively, as follows:

A.     Its (their) strict liability for the defective and unreasonably dangerous design, manufacturing, marketing and sale of a defective and unreasonably dangerous product, namely the cement, which ultimately failed and led to the explosion and fire aboard the *Deepwater Horizon*;

B.     Its (their) grossly negligent failure to properly test the cement product before selling it to BP and allowing it to be used aboard the *Deepwater Horizon*;

C.     Its (their) grossly negligent failure to properly and adequately inform, communicate and warn BP of test data or its failure to have adequate *test data before selling it to BP and allowing it to be used aboard the Deepwater* Horizon;

D.     Negligent failure to keep the equipment on board the vessel in proper condition and

repair;

E.     Negligent failure to properly inspect the rig and all of its equipment and gear;

F.     Negligent failure to have a sufficient number of properly trained and qualified personnel to perform the job being performed at the time of the accident and explosion in a safe manner;

G.     Negligent failure to properly train and/or instruct and/or warn petitioner and those similarly situated;

H.     Negligent violation of government and industry rules, regulations and standards;

I.     Proceeding with the operation ongoing before the accident in the face of negative pressure and other testing, which showed that well integrity had not been established and that there was an extreme risk of a blowout, explosion and fire;

J.     Placement of heavy drilling mud with seawater at a time when there was no well integrity, underbalancing the well, and allowing hydrocarbons under pressure to flow up to the production casing and past the blow out preventer;

K.     Ignoring data showing an influx of pressured hydrocarbons and an increase in drill pipe pressure, which were unmistakable signs of an impending blowout or blowout in progress;

L.     Failing to take steps to prevent the impending blowout or blowout in progress in the face of test data that called for immediate protective measures to control well;

M.     Closing the blowout preventer and diverter, routing the fluids exiting the riser to the vessel's mud gas separator system rather than to the overboard diverter line;

N.     Following the diversion of hydrocarbons to the mud gas separator, venting the

hydrocarbons directly onto the rig through a 12 inch gooseneck vent and other flowlines that allowed the hydrocarbons onto the rig floor to be exposed to ignition sources;

O.   Failing to properly inspect, maintain, and repair a blowout preventer, which blowout preventer was in disrepair and was unseaworthy and which failed to seal the well;

P.   Having a fire and gas system that allowed for the dispersion of hydrocarbons and, ultimately, their ignition and which rendered the vessel unseaworthy;

Q.   Its (their) gross, willful, wanton and reckless negligence and conduct in the cementing of the well and well cap;

R.   Its (their) gross, willful, wanton and reckless negligence and conduct in performing other operations aboard the vessel *Deepwater Horizon*;

S.   Violation of statutes and/or regulations and/or applicable Coast Guard, MMS, OSHA, and other rules designed to promote and foster safety, which constitutes negligence *per se*;

T.   Other acts of gross, willful, reckless, and wanton conduct that may be shown through discovery or at trial;

U.   Generally, these defendants' failure to act with the required degree of care commensurate with the existing situation.

17.

Plaintiffs show that the accident and resulting injuries and damages sued upon were also the direct and proximate result of the negligence and fault of **Halliburton**, which negligence and fault is listed more particularly, but not exclusively, as follows:

A.     A. Its (their) gross, willful, wanton and reckless negligence and conduct in the cementing of the well and well cap;

B.     Its (their) gross, willful, wanton and reckless negligence and conduct in performing other operations aboard the vessel *Deepwater Horizon*;

C.     Other acts of negligence and fault which may be shown through discovery or at trial;

D.     Generally, the failure of this (these) defendant(s) to act with the required degree of care commensurate with the existing situation.

18.

Petitioner avers that the fire, explosion, and sinking of the *Deepwater Horizon* were caused by, among other things, a failure of the rig's well control system. **Cameron** supplied much of the rig's inadequate, defective blow out prevention equipment. For instance, Cameron designed, manufactured, and supplied the rig's blowout preventer ("BOP") and its component parts. The BOP was unreasonably dangerous when it left Cameron's control. Cameron expressly represented, in writing and orally, that the BOP was effective for preventing blowouts. Cameron anticipated, and indeed was informed by Transocean, that the BOP would be used in deepwater conditions. These warranties were breached because the BOP was not effective in preventing blowouts (and did not prevent the blowout on April 20, 2010). In short, the BOP failed to operate on April 20, 2010 and was not fit for its ordinary purpose. This occurred because, in designing, constructing, composing, and manufacturing the BOP (and its component parts), Cameron relied on calculations to determine the needed strength of its component parts in deepwater conditions, as opposed to actually testing the components in deepwater conditions. The calculations were improper and resulted in a BOP that would not be effective in deepwater conditions like those that existed for the incident in question.

Page 24 of 33

This is because Cameron used shear forces lower than required or desired for the BOP in question. Additionally, the rubber gaskets or "packers" on the BOP were too small and too weak to prevent the blowout. This made the BOP unreasonably dangerous. This defect existed when the BOP left Cameron's control. These defects also resulted in a nonconformity to express warranties given by Cameron for the BOP in question. Moreover, this made the BOP unreasonably dangerous in construction, composition, and design. Cameron failed to warn anyone that the BOP would likely not prevent blowouts in deepwater even though it knew this to be the case. Cameron also failed to warn of the defectively designed and/or manufactured packers. These defects existed when the BOP left Cameron's control. The defects caused a danger to everyone on the rig who depended and relied on the BOP to prevent blowouts. These defects was not known by anyone other than Cameron and no one else had any reason to know about these defects.

19.

In addition to the allegations stated in Paragraph 18 above, petitioner avers that this incident and his resulting injuries and damages sued upon herein were the direct and proximate result of the gross, willful, and wanton negligence and conduct of **Cameron** and/or **Weatherford** that is listed more particularly, but not exclusively, as follows:

    A.    Its defective, unreasonably dangerous and negligent design, manufacture, marketing and sale of the BOP and associated the casing components including, for example, the rubber gaskets or "packers, that it furnished for work on the *Deepwater Horizon* job;

    B.    Its/their defective, unreasonably dangerous and negligent design, manufacture,

marketing and sale of its casing equipment and comments including, for example, float collar, shoe, and centralizers that it furnished for work on the *Deepwater Horizon* job;

C.      Its/their negligent failure to properly test said equipment;

D.      Its/their negligent failure to monitor or inspect its equipment during work on the *Deepwater Horizon* job;

E.      Its/their negligent failure to properly instruct and/or warn regarding said equipment;

F.      Its/their negligent failure to properly trained personnel regarding the safe use of its equipment;

G.      Its/their gross, willful, wanton and reckless conduct and negligence, as stated above;

H.      Other items of strict liability, negligence, and fault that may be shown through discovery or at trial;

I.      Generally, its/their failure to act with the required degree of care commensurate with the existing situation.

20.

Petitioner avers that the fire, explosion, and sinking of the *Deepwater Horizon* were caused by, among other things, a failure of the mud-control system.  **M-I** supplied the mud, drilling and completion fluids, additives, and other related components and equipment and personnel (mud engineers) to the rig for the *Deepwater Horizon* at the time of the explosion.  It provided pressure control, rig instrumentation, and drilling waste management products and services.  Its  mud engineers performed and otherwise carried out these services on this job.  They set up, calculated, and controlled the mud displacement procedures.  Its engineers determined what chemicals and other

additives to include in the mud to control the well to prevent loss of circulation.   They were responsible for determining the mud's viscosity and weight.  They were responsible for periodically testing the mud to ensure the correct viscosity and weight to maintain circulation.  When a spacer developed, its mud engineers chose a mud mixture composed of various additives that made up into a heavy grit that.  This presented a heavy, viscous mud composition that was pumped into the well and which migrated into the well's piping system.  The normal and proper procedure was to put in a spacer to separate the mud and the salt water to prevent their mixing.  Consequently, M-I's employees miscalculated what ingredients to add to the mud to maintain circulation and failed to correctly deal with the spacer that developed in the system, choosing to use the incorrect mud mixture rather than a spacer.  In other words, the mud mixture was wrong and not fit for its ordinary purpose.   M-I therefore breached its duties to furnish the correct mud mixture(s) to properly maintain circulation.

21.

**M-I** acted negligently and/or with gross negligence, willful misconduct and reckless disregard for human life by, among other things, using the wrong materials to maintain well circulation.  These miscalculations and errors endangered everyone on the rig who depended and relied on M-I to properly and correctly maintain well circulation, which miscalculations and errors were not known by anyone other than M-I.  It had a duty to train and supervise its employees but failed to do so, who then failed to use the correct mud composition or, alternatively, failed to have a spacer put into the well to help control it.  If M-I had safely performed its duties and responsibilities for maintaining well circulation, the factors leading to the explosions, fire, and sinking of the *Deepwater Horizon* would have been timely detected to take proper preventative actions.

22.

Petitioner avers that this subject incident and his resulting injuries and damages sued upon herein were the direct and proximate result of the negligence and/or gross, willful, and wanton negligence, and fault of **M-**I.  This negligence, fault, conduct, and conditions, including those discussed above, are listed more particularly, but not exclusively, as follows:

A.   Negligent failure to correctly and properly provide the mud mixture for the workers to put into the well to maintain well circulation;

B.   Negligent failure to put a spacer into the well to separate and otherwise keep the mud and the salt water from their mixing;

C.   Negligent failure to notify, inform, and advise BP and/or Transocean and/or any other necessary workers on the rig about the correct mud mixture to put into the well to maintain circulation;

D.   Negligent failure to notify, inform, and advise BP and/or Transocean and/or any other workers of the need to put a spacer into the well  to separate and otherwise keep the mud and the salt water from their mixing;

E.   Mixing the wrong mud materials to put into the well to maintain circulation and which materials tended to migrate and clog into the well's piping system;

F.   Negligent failure to take all appropriate precautions to avoid an accident and explosion of the kind that occurred;

G.   Negligent failure to properly train it employees;

H.   Negligent violation of government and industry rules, regulations and standards;

I.   Placement of heavy drilling mud with seawater at a time when there was no well

integrity, underbalancing the well and allowing hydrocarbons under pressure to flow

up to the production casing and past the blow out preventer;

J.      Negligent failure to have all proper equipment necessary to perform the job being

performed at the time of the accident and explosion in a safe manner;

K.      Negligently failing to properly and adequately inform, communicate, and warn BP

and/or Transocean about what mud, including additives, that its employees had

mixed to send into the well to maintain circulation.

L.      Negligent failure to have sufficient number of properly trained and qualified

personnel to safely undertake the job being performed at the time of the accident and

explosion in a safe manner;

M.      Ignoring data showing an influx of pressured hydrocarbons and an increase in drill

pipe pressure, which were unmistakable signs of an impending blowout or blowout

in progress;

N.      Having a mud engineering crew that was not properly trained;

O.      Violation of statutes and/or regulations and/or applicable Coast Guard, MMS,

OSHA, and other rules designed to promote and foster safety which constitutes

negligence *per se*;

P.      Being vicariously liable for their employees' and agents' negligence, gross

negligence, and recklessness;

Q.      Creating an unsafe place for petitioner to work in;

R.      Other acts of gross, willful, reckless, and wanton conduct that may be shown through

discovery or at trial;

S.      Generally, its  failure to act with the required degree of care commensurate with the existing situation.

23.

Petitioner specifically pleads the doctrine of *res ipsa loquitur* inasmuch as the defendants herein owned and had custody and control of the rig where the accident and explosion occurred and the accident and explosion could not have occurred absent the negligent conduct of one or all of the defendants herein.

**Damages**

24.

This incident or explosion caused petitioner severe and permanent injury, and he has and will continue to indefinitely suffer bodily injuries, mental anguish, distress, depression, and the loss or diminishment of enjoyment of life, wage losses and/or the impairment of earning capacity, and other damages and injuries that will be shown at trial.  And because of this incident, he and has or will incur surgical, hospital, and other medical expenses.  He is currently suffering from post-traumatic stress disorder, depression, anxiety, and other injuries that will be shown at trial.

25.

Petitioner is entitled to recover the full measure of his damages caused by this incident and which damages include the following, but not exclusively, as follows:

A.      Physical and mental injury, pain and suffering, mental anguish, distress and fright past and future;

B.      Loss of earnings, past and future;

C.      Loss of fringe benefits;

D.      Loss of found, past and future;

E.      Loss of earning capacity;

F.      Loss of or impairment of the enjoyment of life;

G.      Mental anguish, grief, depression, anxiety, and suffering;

H.      Medical and related expenses, past and future;

I.      Punitive or exemplary damages;

J.      Other items of damages that may be shown through discovery or at trial;

K.      All appropriate and equitable relief;

L.      Prejudgment interest on all sums awarded from date of loss until paid;

M.      Post-judgment interest on all sums awarded from date of judgment until paid;

N.      All court and litigation costs allowed by law.

26.

Due to the injuries caused by this incident, Petitioner is unfit for duty and is unable to return to duty.

27.

Petitioner has not reached maximum medical cure.

28.

As petitioner's Jones Act employer, Transocean Deepwater, Inc. and/or Transocean Entity has an absolute, nondelegable duty under the general maritime law to provide petitioner with maintenance, cure, and found from the date he was rendered unfit for duty until he reaches maximum cure, which he has not yet reached, subject to a credit for all amounts already paid in maintenance and cure.

**Concluding Statement and Prayer**

29.

To the extent that this Fifth Amending Complaint is consistent and compatible with his Original, First, Second, Third, and Fourth Amended Complaints, petitioner incorporates those pleadings and prayer as through set forth at length herein.

WHEREFORE, petitioner, Karl W. Rhodes, prays that after due proceedings are had, the Court render judgment in his favor and against the defendants and their respective liability insurers, jointly, severally, and *in solido* for compensatory, punitive, exemplary, and other appropriate damages, together with prejudgment interest from date of loss until paid, post-judgment interest, and for all costs of these proceedings.  Finally, petitioner prays for such further orders and relief to which he is entitled, whether at law, in admiralty, or in equity.

*/s/ Richard R. Kennedy*
RICHARD R. KENNEDY (#7788), T.A.
RICHARD R. KENNEDY (#26951)
309 Polk Street
P.O. Box 3243
Lafayette, LA   70502-3243
Phone:     (337) 232-1934
Fax:          (337) 232-9720
E-Mail:    ken309@richardkennedy.com
E-Mail:    rrk3@richardkennedy.com
*Attorneys for Karl W. Rhodes*

**Certificate of Service**

I hereby certify that the above and foregoing Pleading has been served on all Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179 on this 31st day of March , 2011.

*/s/ Richard R. Kennedy*