UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL NO. 2179 |
| | SECTION: J |
| This Document Relates Only To: *Rhodes v. Transocean, Ltd., et al* 2:10-CV-01502 | JUDGE BARBIER MAG. JUDGE SHUSHAN |

**Karl W. Rhodes' Memorandum Opposing Anadarko Petroleum Corporation and MOEX Offshore 2007's Motion to Dismiss His Complaint Pursuant to Fed. R. Civ. P. Rule 12(b)(6)**

Petitioner, Karl W. Rhodes, files his opposition to the Rule 12(b)(6) motion filed jointly by

Anadarko Petroleum Corporation ("Anadarko") and MOEX Offshore 2007 ("MOEX") and their

Omnibus Memorandum in support their dismissal motion to dismiss Bundle "A" claims (Rec. Docs.

1219 and 1219-1).  For purpose of brevity, petitioner will refer to these parties as the "Anadarko and

MOEX" in this memorandum.[1]

---

[1]    To the extent applicable and to avoid repetition in his opposition, petitioner adopts and quotes from the Omnibus Response Memoranda to the defendants' motions to dismiss the Bundle A and B3 complaints (Rec. Docs. 1613, 1813,  and 1815), the First Amended Master Answer to Complaint, First Amended Master Claim, First Amended Master Complaint, etc. (Rec. Doc. 1128) ("Am. B1 Master Compl."), and the Memorandum of Michelle Jones in opposition to a dismissal motion (Rec. Doc. 1573).

## 1.      Introduction.

On April 20, 2010, petitioner was a seaman working aboard the vessel the *Deepwater Horizon* when the blowout, fire, explosions, and sinking occurred.  He named  Anadarko and MOEX as defendants in his unopposed Second Supplemental and Amended Complaint (Rec. Docs. 760 and 761).  Petitioner thereafter, with leave of Court, filed his unopposed Third (Rec. Doc. 1648) and Fifth Amending Complaints (Rec. Docs. 1833 and 1834) (hereafter "Complaints").  Petitioner submits that these complaints state with the legally-required specificity  a negligence claim against them for causing and/or contributing to this *Deepwater Horizon* incident and, as such, his Complaints moot the defendants' Rule 12(b)(6) motion to dismiss.

## 2.      Rule 12(b)(6) Legal Standard or Standard of Review.

When ruling upon a Rule 12(b)(6) motion to dismiss for failure to state a claim, like the one filed by Anadarko and MOEX, the Court must accept as true all well-pled allegations and resolve all doubts in the plaintiff's favor.[2]  "In other words, a motion to dismiss an action for failure to state a claim 'admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts.'"[3]

To defeat a dismissal motion, a plaintiff need only "plead enough facts 'to state a claim to

---

[2]    *See Oppenheimer v. Prudential Sec., Inc.*, 94 F.3d 189, 194 (5th Cir. 1996); *Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1572 (5th Cir. 1988).

[3]    *Berthelot v. Boh Bros. Constr. Co.*, No. 05-4182, 2006 U.S. Dist. LEXIS 57817, at *77 (E.D. La. July 19, 2006) (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1137 (5th Cir. 1992)).

relief that is plausible on its face.'"[4]  This Court has observed that "[a] claim is facially plausible when the plaintiff pleads facts that allow the court to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'"[5]

On March 22, 2011, a unanimous Supreme Court reversed a dismissal order of a 10(b)-5 claim in a decision further clarifying standards set forth in *Iqbal* and *Twombly*.[6]  The Court reiterated that all factual allegations in a complaint must be taken as true, that there is no "bright line" pleading requirements under *Twombly/Iqbal*, and that the functional test is whether the complaint, taken as a whole, raises "a reasonable expectation that discovery will reveal evidence" that could enable the ultimate trier of fact, weighing contested evidence and opinions and making the allowable inferences, to decide the case for plaintiffs.[7]  Reviewing "all the allegations holistically," as *Matrixx* directs,[8] petitioner Rhodes has stated facially plausible claims that "raise a reasonable expectation that discovery will reveal evidence" to support his claims at trial.[9]

---

[4]    *Wright v. Shell Offshore, Inc.*, No. 10-2108, 2011 U.S. Dist. LEXIS 16290, at *5-6 (E.D. La. Feb. 17, 2011) (quoting *Ashcroft v. Iqbal*, __U.S.__, 129 S.Ct. 1937, 1949 (2009) ).

[5]    Wright, 2011 U.S. Dist. LEXIS 16290 at *6 (quoting *Iqbal*, 129 S.Ct. at 1949).

[6]     *See Matrixx Initiatives, Inc. v. Siracusano*, No. 09-1156, __U.S.__, 2011 U.S. LEXIS 2416 (2011).

[7]    *Matrixx*, 2011 U.S. LEXIS 2416, at *38 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

[8]    *Matrix*, *Id.* at *38.

[9]    *Id.* at *34 (quoting *Twombly*, 550 U.S. at 556).

3.    **Petitioner's Complaints plead sufficient facts to state a claim for relief against Anadarko and MOEX.**

A.    **Introduction.**

Petitioner submits that his Complaints complaints satisfy the *Twombly/Iqbal* plausible standard, which transformed his complaint into a "plausible" cause of action against the defendants.[10]

B.    **The amended complaints meet the *Twombly/Iqbal* standards by which the district court determines if a complaint states a cause of action.**

The following principles now determine whether a claimant satisfies Fed. R. Civ. P. 8 as now interpreted by the Supreme Court in these two decisions, *viz:*

- The Rule 8 pleading standard does not require detailed factual allegations.[11]

- "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[12] In other words, "a claimant need only state a plausible complaint that states a plausible claim for relief survives a motion to dismiss."[13]

- "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[14]

Recently the Fifth Circuit reiterated that, "[A] complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual

---

[10]   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937 (2009).

[11]   *Iqbal*, 129 S.Ct. at 1949; *Twombly,* 550 U.S. at 547.

[12]   *Iqbal* at 1949.

[13]   *Id.* at 1950.

[14]   *Id.*

allegations that when assumed to be true 'raise a right to relief above the speculative level.'"[15]

Relying on the *Twombly/Iqbal* standard, the Fifth Circuit ruled that, when faced with a Rule 12(b)(6) motion to dismiss—that is, a motion to dismiss for failure to plead a claim on which relief can be granted—that "courts must . . . accept all factual allegations in the complaint as true."[16] As *Lormand* reminds, "[w]e must also draw all reasonable inferences in the plaintiff's favor."[17]

The Court will readily see that petitioner's Complaints satisfy these guidelines as he alleges specific factual wrongdoings by the defendants that he says contributed to this incident.

**C.  The Supreme Court's rationale for determining if a complaint states a cause of action is couched in terms of judicial and litigants' economy.**

The fundamental point of the *Twombly/Iqbal* standard is to conserve judicial and party resources for the pleading, discovery and ultimate proof of contested issues in facially plausible cases, leaving implausible or frivolous suits behind.

According to the Supreme Court, the *Twombly* complaint alleged that major telecommunications providers had engaged in anti-competitive parallel conduct; the complaint, however, lacked any "factual context suggesting agreement, as distinct from identical, independent action."[18] In an antitrust action, "the crucial question" is whether the challenged conduct stemmed "from

---

[15]   *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. 544, 555).

[16]   *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (internal citations omitted).

[17]   *Id.* at 232 (internal citations omitted).

[18]   *Twombly*, 550 U.S. at 548, 549.

independent decisions or from an agreement, tacit or express."[19] This is so because "conscious parallelism" "is not in itself unlawful."[20]  The *Twombly* Court viewed potential liability as a close call.  Still it found no allegations in the complaint suggesting that direct or circumstantial evidence would ever make the prospect of liability plausible.

As the *Twombly* Court noted, "asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for a reasonable expectation that discovery will reveal evidence of illegal agreement."[21]  Thus, "some threshold of plausibility must be crossed at the outset before a[n] antitrust case should be permitted to go into its inevitably costly and protracted discovery phase."[22]

In *Twombly*, the Court empowered district courts to "retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed " because "the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint."[23]  The Supreme Court thus articulated and imposed a facial probability standard because "it is only by taking care to require [such] allegations . . . that we can hope to avoid the potentially enormous expensive discovery in cases with no 'reasonably founded hope that the [discovery] process will reveal relevant

---

[19]   *Id.* at 553.

[20]   *Id.* at 554.

[21]   *Id.* at 556.

[22]   *Id.* at 558 (internal quotation omitted).

[23]   550 U.S. at 558.

evidence.'"[24]  The *Twombly* Court concluded its decision, saying that:

> [W]e do not require heightened fact pleadings of specifics, but only enough facts to state a claim to relief that is plausible on its fact."[25]

When evaluated by this standard, the *Twombly* Court simply found that, in this anti-trust action, "nothing in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy."[26]  In sum, the claimants failed to state plausible facts that supported its conspiracy contention.  In contrast, petitioner's Complaints state plausible facts from which the Court can conclude that he has a right of action against the defendants.  His Complaints have "nudged" his claims against the defendants across the line from conceivable to plausible.[27]

D.   **The "plausibility" of the *Deepwater Horizon* claims is in the public domain.**

The catastrophic explosions and fire that occurred on the *Deepwater Horizon* resulted in injuries and death among those aboard.  The defendants' role, in its broad outlines, and in ever-emerging detail, is likewise known.  It must be said that the substantial on-going court-approved discovery into the events leading up to the explosion and fire in general, and into M-I's role therein, is justified in terms of time and expense.  The *Twombly/Iqbal* problem does not exist in this case.  Accordingly, the level of specificity and detail required in *Twombly*'s antitrust context and that the invidious discrimination context of *Iqbal* should not be required here.

---

[24]   550 U.S. at 560 (internal citation omitted).

[25]   *Id.* at 570.

[26]   *Id.* at 566.

[27]   *Iqbal*, 129 S.Ct. at 1951-52.

4.      **Petitioner has stated a valid claim against the defendants.**

A.      **Anadarko and MOEX were part owners of the Macondo Well.**

As of December 17, 2009, Anadarko and MOEX held leasehold interests in the Macondo

Prospect, on which the Macondo Well was eventually located.  MOEX Offshore and the Anadarko

defendants acquired this interest from BP Exploration & Production, Inc. ("BE E&P").[28]  The parties

to the Macondo Prospect Offshore Deepwater Operating Agreement ("Operating Agreement") held

the following working ownership interests in the lease of the Macondo Prospect: BP E&P, 65%;

MOEX Offshore, 10%; Anadarko E&P, 22.5%; and Anadarko Petroleum, 2.5%.[29]  So here Anadarko

and MOEX together owned a combined 25% interest in the Macondo Well.

B.      **Petitioner's Complaints state a cause of action against Anadarko and MOEX.**

Anadarko and MOEX correctly note that maritime law applies to petitioner's claim against

_____

[28]    BP E&P acquired the initial interest in the Macondo Prospect on June 1, 2008, when it
entered into a lease agreement for Block 252, Mississippi Canyon (the "Lease") with the United
States (represented by the Regional Director, Gulf of Mexico OCS Region, Minerals Management
Service ("MMS")).  On or about October 1, 2009, BP E&P and MOEX Offshore entered into the
Macondo Prospect Offshore Deepwater Operating Agreement ("Operating Agreement").  On or
about November 23, 2009, BP E&P sought MMS approval to assign a 10% record title interest in
he Lease to MOEX Offshore, to be effective October 1, 2009.  The MMS approved the assignment
on February 23, 2010, effective October 1, 2009.  On or about December 17, 2009, BP E&P, MOEX
Offshore, Anadarko Petroleum, and Anadarko E&P executed a "joinder" of the Operating
Agreement.  On or about February 11, 2010, Anadarko E&P and BP E&P sought MMS approval
to assign a 22.5% interest in the Lease to Anadarko E&P, to be effective October 1, 2009.  The
MMS approved the assignment on February 23, 2010, effective October 1, 2009.  On or about
February 11, 2010, Anadarko Petroleum and BP E&P sought the MMS' approval to assign a 2.5%
interest in the Lease to Anadarko Petroleum, to be effective October 1, 2009.  MMS approved the
assignment on February 23, 2010, effective October 1, 2009.

[29]    On or about April 20, 2011, Anadarko E&P sought approval from the MMS to assign its
22.5% interest in the Lease to Anadarko Petroleum (the request was received by the MMS on April
21, 2010).  The MMS approved the assignment on April 28, 2010, but accepted the assignment as
effective April 1, 2010.

them (Rec. Doc. 1219-1, page 4).  They then argue, however, that petitioner did not allege facts that show that they owed him a duty, that they breached that duty, and that their breach injured him.  *Id.* at 4 *et seq*.

Before continuing, perhaps a quick historical summary of the applicable pleadings will aid the Court in understanding that Anadarko and MOEX's dismissal motion is moot, *viz*: (a) On February 11, 2011, they filed their dismissal motion, (b) on March 14, 2011, petitioner filed his Third Amended Complaint (Rec. Doc. 1648), and (c) on March 31, 2011, petitioner filed his Fifth Amending Complaint (Rec. Doc. 1823).  These Complaints state factual allegations of negligence by Anadarko and MOEX because both incorporate "herein by reference, paragraphs 561-581, 583-600, 668-689 of the B1 Master Complaint." (Rec. Doc. 1128, ¶¶ 573-575).  *See* Fifth Amending Complaint (Rec. Doc.  1823, ¶ 12) and Third Amending Complaint (Rec. Doc. 1648, ¶ 15).  So the Complaints state that these defendants

> had access to Halliburton/Sperry Sun INSITE real time feed data that was transmitted from the Deepwater Horizon on April 20, 2010.  As such, they knew or should have known of the presence of hydrocarbons in the well on the evening of April 20, 2010, and they owed a duty to Plaintiffs to warn of the impending disaster in sufficient time to avert it. Anadarko, Anadarko E&P, and MOEX Offshore breached their duty to Plaintiffs by failing to warn the drilling vessel crew of the imminent blowout so that they could take evasive action.

> . . . . [They had] actual or constructive notice of the potentially disastrous conditions at the well site.  Further, having been on actual or constructive notice of those conditions and having negotiated for and obtained the right to be privy to [Health, Safety, and Environmental ("HSE")] information, conduct HSE inspections, and call HSE meetings, it was incumbent on Anadarko, Anadarko E&P, and MOEX Offshore to perform the important check and balance role that they had carved out for themselves in the both the Operating Agreement and the Lease Exchange Agreement. Failure to exercise this role given the known history of specific problems at the wellsite was negligence.

As alleged above in paragraphs 222 - 235, at all relevant times, MOECO Case dominated and controlled the business, operations, policies, and actions of its subsidiaries MOEX Offshore and MOEX USA to such an extent that they were agents and/or alter egos of MOECO. Neither MOEX Offshore nor MOEX USA properly complied with corporate formalities or operated as corporations distinct from MOECO – rather, MOECO conducted its U.S. activities, including its activities regarding the Macondo Prospect lease, through these agent/alter ego entities. Thus, all activities of MOEX Offshore and MOEX USA, including activities surrounding the leasehold interest in the Macondo Prospect, should be imputed to MOECO, rendering MOECO liable to Plaintiffs for negligence.

Petitioner alleges that Anadarko and MOEX had real time feed data that was transmitted from the *Deepwater Horizon* on April 20, 2010 and that they therefore knew or should have known of the presence of hydrocarbons in the well on the evening of April 20, 2010, and they thus owed a duty to petitioner to warn of the impending disaster in sufficient time to aver it.  Further, engineers who were knowledgeable about the blowout told BP how to kill the well as early as June 2010.  But BP, after conferring with its Macondo lease partners Anadarko and MOEX chose to ignore the engineers' well-kill procedure because BP did not want to damage the well and because BP, along with Anadarko and MOEX, hoped to retap the well and its large, valuable reservoirs beneath it. So they ignored expert well-kill information that, weeks earlier, could have prevented this series of explosions and fire aboard and the sinking of the *Deepwater Horizon*.

Anadarko and MOEX premise their argument that petitioner has alleged no facts to show that they owed him a duty and, based on their premise, they argue that all the other legal pieces of the puzzle as it were—breach of duty, causation, and damages—*ipso facto* fail.  (Rec. Doc. 1219-1, pages 4-7).  These defendants continue by making their lump-together argument, which is more succinctly stated that "Plaintiff improperly lumps together with broad and ambiguous factual assertions entities (meaning other named defendants) that are differently situated."  *Id.* at page 7.

In fairness to Anadarko and MOEX, however, they filed their dismissal motion before petitioner filed his Third and Fifth Amending Complaints that state facts from which the Court can conclude satisfy the legal requirements of duty, breach, and causation under the *Twombal/Iqbal* analysis discussed above. The existence of common facts that casts a wide negligence net as it were to embrace multiple defendants in this litigation is not improper pleading and certainly does not create an escape hatch for Anadarko and MOEX to slip out of this suit.

In sum, this Court should conclude that an owner of a leasehold interest to "perform oil exploration, drilling, and production-related operations" has a duty to prevent those operations from harming others when the owner has knowledge of impending harm and the ability to prevent it, this Court should deny Anadarko and MOEX's motions to dismiss.

## C.   Anadarko and MOEX owed petitioner a duty of reasonable care.

Whether one party owes a duty to another is generally a question of forseeability.[30] The Fifth Circuit in the *Canal Barge* case explained:

> We perceive a harm to be the foreseeable consequence of an act or omission if harm of a general sort to person of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention.[31]

This question here is whether a "reasonably thoughtful" owner of a leasehold interest to "perform oil exploration, drilling, and production-related operations" would have thought that its failure to alert BP to dangerous levels of hydrocarbons in the well could lead directly to petitioner's injuries. *See id.*; (Am. B1 Master Compl. ¶ 573 ("[The MOEX and Anadarko Defendants] knew or

---

[30]   *Canal Barge Co. Inc. v. Torco Oil Co*., 220 F.3d 370, 377 (5th Cir. 2000).

[31]   *Id.* (citation omitted).

should have known of the presence of hydrocarbons in the well on the evening of April 20, 2010, and they owed a duty to Plaintiffs to warn of the impending disaster in sufficient time to avert it."). Additionally, MOEX and Anadarko must be found to have owed petitioner a duty if the "reasonably thoughtful" party with the "right to be privy to HSE information, conduct HSE inspections, and call HSE meetings" would have realized that the failure to exercise this right given the specific history of problems in the Macondo Well could lead directly to the petitioner's injuries, or if the "reasonably thoughtful" party with access to "expert well-kill information" would have considered that information in order to prevent substantial economic harm to others.  (Am. B1 Master Compl. ¶ 574.)[32]  Petitioner submits that the Court should conclude that he has properly alleged that Anadarko and MOEX owed him a duty of reasonable care under these circumstances.

### D.      Anadarko and MOEX breach their duty to petitioner.

Because the explosions, fire, and sinking of the *Deepwater Horizon* and the resulting damages, which included deaths and serious personal injury suffered by those aboard the vessel, are exactly the type of harm that one would expect to result from Anadarko and MOEX's failure to alert

---

[32]   The MOEX and Anadarko Defendants appear to have contemplated specifically that negligence on the part of an owner of a leasehold interest to "perform oil exploration, drilling, and production-related operations" could harm third parties.  In particular, the Operating Agreement provides that BP E&P does not indemnify the MOEX and Anadarko Defendants from liability for such harm absent BP E&P's gross negligence. (MOEX/Anadarko Mot. to Dismiss B1, Exhibit A, Doc. 1414-2 at § 5.2.)  This very same section of the Operating Agreement provides that BP E&P shall "consult with" the MOEX and Anadarko Defendants and "keep them informed," presumably because the MOEX and Anadarko Defendants foresaw that the failure to monitor their leasehold properly could lead to the exact type of disaster that actually occurred. (Id.)  Similarly, the Operating Agreement provides that damage caused to third parties would generally be split among the MOEX and Anadarko Defendants and BP E&P in proportion to their respective leasehold interests. (MOEX/Anadarko Mot. to Dismiss B1, Exhibit B, Doc. 1414-3, at § 22.5.)  It thus seems that the MOEX and Anadarko Defendants understood their duty to Plaintiffs even prior to the Spill.

BP to the presence of hydrocarbons in the well, Anadarko and MOEX owed a duty to petitioner to have alerted BP in time to prevent the events, even though they had designated BP as the "operating party" and themselves as "non-operators."[33]  Additionally, given the history of problems with the Macondo Well, these events and their resulting damage are the type of harm that one would expect to result from Anadarko and MOEX' failure to exercise their right "to be privy to HSE information, conduct HSE inspections, and call HSE meetings."  (Am. B1 Master Compl. ¶ 574.)

The Court's analysis at this stage of litigation, then, should begin and end with a straightforward application of the basic principle that one has a duty to prevent the foreseeable arms resulting from of one's own negligence.[34]  A "reasonably thoughtful" owner of a leasehold interest to "perform oil exploration, drilling, and production-related operations," alerted to the possibility of a lethal explosion and resulting oil spill causing many billions of dollars in damages, would take action to prevent such a disaster and would not simply assume that its independent contractor was handling the danger.

To conclude, petitioner has properly alleged that Anadarko and MOEX are liable for their action or inaction as owners of a leasehold interest to "perform oil exploration, drilling, and production-related operations."  They cannot escape liability here merely  because they chose BP E&P to manage that leasehold.

---

[33]  *See, e.g., Canal Barge*, 220 F.3d at 377; *Dupre v. Chevron U.S.A.*, 20 F.3d 154, 157 (1994); *cf. Jones v. Sheraton Operating Corp.*, No. 03-0051, 2003 U.S. Dist. LEXIS 8348, at *11 (E.D. La. May 15, 2003) (explaining that non-operating hotel owners must protect guests from the tortious acts of third parties when they are aware of impending harm and are "in a position to reasonably protect against it").

[34]  *Canal Barge*, 220 F.3d at 377; *Dupre*, 20 F.3d at 57.

**E.      Anadarko and MOEX  argue that they cannot be held vicariously liable under Maritime Law but ignore the fact that petitioner's Complaints state their own acts of negligence.**

Here Anadarko and MOEX premise their argument that they cannot be held vicariously liable under general maritime law because they had only a minority ownership interest in the lease that someone else operated and it was a "non-actor" or "non-operating partner" in this joint venture over which it has no control.[35]  From the position of owning a combined 25% interest in this fabulously valuable investment, these defendants now seek to distance themselves from everything related to the on-going operations, conjuring up the well-worn excuse to explain why a person is not responsible for his actions, namely, hear no evil, speak no evil, and see no evil.

Anadarko and MOEX argue that the owner of a leasehold interest in an oil well is immune from liability that accrues to others as a result of the operation of that well, so long as the owner does not control the specific means by which oil is extracted from the well.  So they argue that petitioner's complaint contains no factual allegations that would support their being held vicariously liable for other defendants' negligence or gross negligence under the general maritime law.[36]  Again, petitioner refers the Court back to the factual allegations stated in his Complaints and, at least in part, quoted above and from which the Court can readily see that he has stated factual allegations from which the fact-finder could plausibly find that Anadarko and MOEX were guilty of at least contributing to this disaster.

---

[35]    Anadarko and MOEX's Brief, pages 9-11 (Rec. Doc. 1219-1).

[36]    *Id.* at p. 11.

Anadarko and MOEX's argument is misguided because the issue of control would be relevant only if the petitioner was alleging vicarious liability, i.e., that Anadarko and MOEX were liable for BP's negligence.  In contrast, the question before the Court is whether the "probable result" of Anadarko and MOEX' own action or inaction was harm to petitioner.[37]  As explained above, the Court should conclude that they were.[38]

Instead of addressing the question before the Court, Anadarko and MOEX  cite an entirely different line of cases that decline to impose vicarious liability on the owners of oil rigs for the unsafe work environments created by their independent contractors.[39]  While *Ainsworth* involved the injury of a worker on an oil rig and therefore is frequently cited in other cases involving the injury of a worker on an oil rig, it is fundamentally a case about vicarious liability for an unsafe

---

[37]   *See Dupre*, 20 F.3d at 157 ("[The] owner or operator of a facility has the duty of exercising reasonable care . . . ."); *Rogers v. Shell Oil Co.*, No. 92-1040, 1993 U.S. Dist. LEXIS 1147, at *4 (E.D. La. Feb. 2, 1999) ("[A] principal is still liable for its own acts of negligence despite the independent contractor relationship")

[38]   To the extent that Judge McNamara's reasoning, that "[a] principal has no duty, however, to intercede when an independent contractor's actions have created a dangerous situation," *Rogers*, 1993 U.S. Dist. LEXIS 1147, at *4 (citing *Ainsworth v. Shell Offshore, Inc*., 829 F.2d 548 (5th Cir. 1987); *Kent v. Gulf States Utils. Co.*, 418 So. 2d 493 (La. 1982)), could be read to apply outside a worker's claim for personal injury due to unsafe work conditions created by his employer, the below discussion of *Ainsworth* explains that such a reading would be inconsistent with Fifth Circuit precedent.

[39]   *See Ainsworth,* 829 F.2d at  549 ("Under Louisiana law, a principal generally is not liable for the offenses an independent contractor commits in the course of performing its contractual duties."); *Thomas v. Burlington Res. Oil & Gas Co.*, No. 99-3904, 2000 U.S. Dist. LEXIS 15577, at *4 (E.D. La. Oct. 13, 2000) (Barbier, J.) (same) (citing same); cf. id. at *6 (explaining that an owner has no duty to "intervene in and correct the work practices selected by an independent contractor" to prevent injury to one of the independent contractor's employees).

worksite, with no applicability in a case about a party's own negligence.[40]

Accordingly, this Court should not apply the cases cited by MOEX and Anadarko to the facts of this case.

## 5.   Anadarko and MOEX correctly note that petitioner did not state a claim against them under the Jones Act.

Anadarko and MOEX correctly contend that petitioner did not state a claim against them under the Jones Act.  (Rec. Doc. 1219-1, pp. 11-12).  Mr. Rhodes does not contend otherwise.

## 6.   Mr. Rhodes' claims against the defendants for punitive and non-pecuniary damages are recognized and viable under the general maritime law.

Here Anadarko and MOEX argue that the Court should dismiss petitioner's claims for non-pecuniary damages, claiming that they are not recoverable under the Jones Act or the general maritime law.  (Rec. Doc. 1291-1, pp. 12-13).  He was a seaman aboard the *Deepwater Horizon* working for Transocean when the explosions, fire, and sinking of the vessel happened and, as a result of these events, he suffered great fear, bodily injury, pain and suffering, and mental anguish and distress (Rec. Doc. 1, Docket No. 10-cv-5102).

While Anadarko and MOEX cite *Miles v. Apex Marine Corp.*[41] to support their argument, it should be noted that *Miles* did not involve any punitive damage issue.  Rather, it concerned the

---

[40]   *See, e.g., Hernandez v. Creative Group, Inc.*, No. 09-7514, 2010 U.S. Dist. LEXIS 94650, at *7 (E.D. La. Sept. 10, 2010) (citing *Ainsworth* to explain that a conference planner is not liable for the torts of the bus company hired to transport people to and from the conference); *Gonzales v. Brazley*, No. 09-137, 2009 U.S. Dist. LEXIS 70819, at *21 (E.D. La. Aug. 4, 2009) (citing *Ainsworth* to explain that a bank was not liable for the torts of an independent contractor hired to provide security).

[41]   *Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275, 1991 AMC 1 (1990).

recoverability of loss of society damages under the general maritime wrongful death action. Although *Miles* did not involve a punitive damage issue, lower courts use its rational to disallow punitive damages in Jones Act cases.[42]   While citing *Scarborough v. Clemco Industries* to support its position,[43] that court chose not to draw a distinction between a seaman's case against his employer and that brought against others.

"Regardless of one's view of *Miles*' reasoning in eliminating loss of society damages for seamen, there is no principled justification for the use of *Miles* to eliminate punitive damages. 'Miles then becomes relevant to punitive damages issues only by virtue of unexamined lower court assumptions that punitive damages are non-pecuniary and that all non-pecuniary damages issues in seaman's Jones Act and unseaworthiness cases demand like treatment.'"[44]

But punitive damages have long been a part of American maritime law.[45]   In 1818, the Supreme Court recognized the recoverability of punitive damages in admiralty.[46] More recently, the Supreme Court in *Exxon Shipping Co. v. Baker*[47] affirmed maritime law's long-standing recognition of punitive damages as an item that may be recovered when defendant's conduct justifies such an

---

[42]   *See*   M-I's memorandum (Rec. Doc. 1593, p. 7).

[43]   *Scarborough v. Clemco Industries*, 391 F.3d 660 (5th Cir. 2004).

[44]   This language comes from an unpublished article by John W. deGravelles entitled *Exxon Shipping Co. V. Baker: Maritime Punitive Damages and the Search for a Silver Lining,* p. 17, citing David W. Robertson, "Punitive Damages in American Maritime Law," 28 J. MAR.LAW & COM. 73, 163 (1997).

[45]   For an outstanding and detailed treatment of this subject, see David W. Robertson, "Punitive Damages in American Maritime Law," 28 J. MAR.LAW & COM. 73 (1997).

[46]   *The Amiable Nancy*, 16 U.S. 546 (1818).

[47]   *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008).

award.  In *Atlantic Sounding Co. v. Townsend*,[48] the Court affirmed the right of a seaman to recover punitive damages from employer/shipowners when the seaman's settled maritime-law rights were flouted or abused through serious misconduct.

The assumption or argument that punitive damages are not pecuniary is wrong.  The common definitions of "pecuniary" are "1. relating to money, as in pecuniary affairs; and 2. *Involving a money penalty, or fine, as pecuniary offense*."[49]  Black's Law Dictionary defines "pecuniary damages" as "damages that can be estimated and monetarily compensated"[50] and "non-pecuniary damages" as "damages that cannot be measured in money."[51]

Whichever of these definitions one chooses, punitive damages are pecuniary. They are awarded as money, can be estimated and, as recently stated by the Supreme Court in *Exxon Shipping Co. v. Baker*, punitive damages are awarded as "measured retribution."[52]  Approximately one year before writing the opinion in *Miles*, Justice O'Connor repeatedly referred to punitive damages as "pecuniary punishment."[53]  The case most often cited for the proposition that punitive damages are

---

[48]     *Atlantic Sounding Co. v. Townsend*, 129 S.Ct. 2561 (2009).

[49]     Webster's New Universal Unabridged Dictionary (2d ed. 1983) (emphasis added).

[50]     Black's Law Dictionary 418 (8th ed. 2004).

[51]     *Id.*

[52]     *Baker*, 128 S.Ct. at 2633 (emphasis added)

[53]     *Browning Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 295-297 (1989) (O'Connor, J., concurring in part and dissenting in part). See also, Austin v. United States, 509 U.S. 602, 614 n. 7 (1993), in which the Court's opinion, joined by Justice O'Connor, characterized a civil forfeiture as "pecuniary punishment."

"non-pecuniary" cites no authority and conducts no analysis to support this declaration.[54]

The *Exxon Shipping* [55] presented three questions: (1) whether maritime punitive damages are barred by federal statutory law; (2) whether maritime law permits corporate liability for punitive damages based on the conduct of its managerial employees; and (3) whether the $2.5 billion award against Exxon was excessive under maritime law.[56]

The Court (1) confirmed that maritime law allows punitive damages, (2) held that the jury's award was not barred by federal statutory law, specifically, the Clean Water Act,[57] and (3) held that the $2.5 billion punitive damage award was excessive and, under the rule-making authority given it by Art III, § 2 of the United States Constitution, imposed a maximum punitive damage cap of no more than the amount awarded for compensatory damages.

Because the Court was equally divided on the issue of the punitive damage liability of corporations for the acts of their managerial agents, it left the Ninth Circuit's opinion—holding Exxon accountable for the reckless acts of the EXXON VALDEZ's captain—undisturbed.  It stressed, however, that this holding was, under these circumstances, not precedential.

The Supreme Court in *Townsend* went out of its way to flag the availability of punitive damages in Jones Act actions as an open question, stating:

> Because we hold that *Miles [v. Apex Marine Corp.*, 498 U.S. 19] does not render the Jones Act's damages provision determinative of respondent's remedies, we do not address the dissent's argument that the Jones Act, by incorporating the provisions of

---

[54]   *Kopczynski v. The Jaqueline*, 742 F.2d 555, 561 (9th Cir. 1984).

[55]   *Id*. n. 1 *supra*.

[56]   *See* n. 33 (the next three paragraphs are taken from Mr. deGravelles unpublished article).

[57]   33 U.S.C. § 1321, hereinafter "CWA."

the Federal Employer's Liability Act, see *46 U.S.C. § 20104(a)*, prohibits the recovery of punitive damages in actions under the statute.[58]

Seaman had the right to sue for punitive damages before the passage of the Jones Act.[59] The language of the Jones Act does not purport to affect this long standing right. The Supreme Court has repeatedly held that the Jones Act does not eliminate or restrict causes of action and remedies that were available to seaman before its passage.[60]

Further support for the right of a seaman to recover punitive damages can be found in the long standing tradition in admiralty to treat seamen as a "favored class" of litigants[61] enjoying "heightened legal protections [that are] unavailable to other maritime workers."[62] The Supreme Court in *Exxon Shipping Co. v. Baker* allowed "commercial fishermen, native Alaskans and landowners,"[63] whose livelihoods were impacted by the oil pollution flowing from the grounding of the Exxon Valdez, to recover punitive damages under maritime law. In doing so, the Court looked to the Ninth Circuit's decision in *Union Oil v. Oppen*,[64] where that Court created for

---

[58]   *Townsend*, 129 S.Ct. at 2575, n.12 (citation omitted).

[59]   *See, e.g., Swift v. Happy Return*, 23 F.Cas 560 (D. Pa. 1799); *Gould v. Christianson*, 10 F.Cas. 857 (S.D.N.Y. 1836); *The Rolph*, 293 F. 269, 270 (N.D. Cal. 1925); *The Margharita*, 140 F. 820, 821, 825 (5th Cir. 1905); *The Scotland*, 42 F. 925 (S.D.N.Y. 1890).   For discussion of this issue, *see also* David W. Robertson, *Punitive Damages in U.S. Maritime Law: Miles, Baker and Townsend*, 70 LA. L. Rev. 463, 478-83 (2010).

[60]   *See, e.g., Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 248 (1942); *Arizona v. Anelich*, 298 U.S. 110,1231 (1936); *Bainbridge v. Merchs and Miners' Trans. Co.*, 287 U.S. 278, 282 (1932).

[61]   *Bainbridge,* 287 U.S. at 282.

[62]   *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995).

[63]   *Baker*, 128 S.Ct. at 2613.

[64]   *Union Oil v. Oppen*, 510 F.2d 558 (9th Cir. 1974).

commercial fishermen an exception to the general rule requiring that a plaintiff have a proprietary interest in the polluted property in order to recover for damages flowing from the pollution. The Court justified this special treatment given to commercial fishermen by likening them to seamen, traditional wards of the admiralty.[65]

Surely it would turn the law on its head to allow "commercial fishermen, native Alaskans and landowners" to recover punitive damages under the maritime law but deny these damages to the "favored class" of seamen. There is nothing in the language or history of the Jones Act which justifies granting this remedy to such plaintiffs but withholding it from seamen.

Withholding the punitive damages remedy from seamen is further contrary to established tenets of maritime law when one considers that ". . . it is settled canon of maritime jurisprudence that 'it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy, when not required to withhold it by established and inflexible rule.'"[66]

**7.    Alternatively, petitioner asks that the Court allow him to amend his Complaint if it finds that his factual allegations fail to meet the *Twombly/Iqbal* standard.**

If the Court determines that petitioner's Complaint, as amended, fails to meet the *Twombly/Iqbal* standard, it allow him reasonable time to amend his complaint to state more facts that show, to a plausible degree, that Anadarko and MOEX's negligence contributed to this *Deepwater Horizon* incident and to his injuries and damages.[67]

---

[65]   *Id.* at 567.

[66]   *American Export Lines, Inc. v. Alvez*, 160 S.Ct. 1673, 1678 (quoting *Moragne v. States Marine Lines*, 90 S.Ct. 1772, 1781).

[67]   Under Fed. R. Civ. P. 15(a)(2), "the court should freely give leave [to amend] when justice so requires."  In *Dissouy v. Gulf Coast Investment Corp.*, 660 F.2d 594 (5th Cir. 1983), the court

## Conclusion

For the reasons discussed above, Karl W. Rhodes respectfully submits that the Court should deny Anadarko and MOEX' motions to dismiss his claims against them.

*/s/ Richard R. Kennedy*
RICHARD R. KENNEDY (#7788), T.A.
RICHARD R. KENNEDY (#26951)
309 Polk Street
P.O. Box 3243
Lafayette, LA   70502-3243
Phone:      (337) 232-1934
Fax:           (337) 232-9720
E-Mail:      ken309@richardkennedy.com
E-Mail:      rrk3@richardkennedy.com
*Attorneys for Karl W. Rhodes*

---

**Certificate of Service**

I hereby certify that the above and foregoing Pleading has been served on all Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179 on this 3rd day of April, 2011.

*/s/ Richard R. Kennedy*

---

held that ". . . rule 15(a) severely restricts the judge's freedom" to deny leave to amend. *Id.* at 597. Rule 15(a) "evidences a bias in favor of granting leave to amend." *Id.* "Unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Id.* at 598.