Page 1

USCG/MMS BOARD OF INVESTIGATION

INTO THE MARINE CASUALTY, EXPLOSION, FIRE,
POLLUTION AND SINKING
OF MOBILE OFFSHORE DRILLING UNIT

DEEPWATER HORIZON, WITH LOSS OF LIFE

IN THE GULF OF MEXICO, 21-22 APRIL 2010

THURSDAY, MAY 27, 2010


A.M. SESSION


\* \* \* \* \* \*


The Transcript of the Joint United States Coast Guard/Minerals Management Service Investigation of the above entitled cause before CATHY RENEE' POWELL, a certified court reporter authorized to administer oaths of witnesses pursuant to Section 961.1 of Title 13 of the Louisiana Revised Statute of 1950, as amended, reported at the Radisson Hotel, 2150 Veterans Memorial Boulevard, Kenner, Louisiana 70062, on Thursday, May 27, 2010, beginning at 8:00 a.m.

PROFESSIONAL SHORTHAND REPORTERS, INC (800) 536-5255                    (504) 529-5255
New Orleans * Baton Rouge * Shreveport

f03a8c7d-d217-


EXHIBIT E

**Page 6**

1  everything, you know. I am over the entire
2  rig along with the captain.
3      Q.  Prior to becoming an OIM, did you
4  have any previous oil and gas experience?
5      A.  Yes, I did.
6      Q.  Can you elaborate.
7      A.  I was toolpusher, driller, derrick
8  hand, floorhand, all the way down.
9      Q.  All with Transocean?
10     A.  Not all. I have been working with
11 Transocean since 1979. I worked for two
12 other companies prior to.
13     Q.  How long have you been assigned to
14 the DEEPWATER HORIZON?
15     A.  January 22, 2004, it will be a
16 little over six years, six and a half.
17        Not all of it.
18     Q.  At the time of the incident, how
19 long were you on your hitch?
20     A.  I had been out a little over two
21 weeks. I had six days remaining on a 21-day
22 hitch.
23     Q.  At any time during the duration of
24 the well, were you made aware of any
25 specific drilling problems such as lost

**Page 7**

1  returns, stuck pipe, cement in the casing,
2  any other issues?
3      A.  You are talking about --
4      Q.  The drilling of the well that was
5  taking place March through April?
6      MR. CLEMENTS:
7          That entire period of time?
8      THE WITNESS:
9          Oh, yeah.
10 EXAMINATION BY MR. MATHEWS:
11     Q.  Can you please elaborate on what
12 kinds of problems you encountered.
13     A.  It was several cases of lost
14 returns, and we took a couple of kicks and
15 had stuck pipe. Actually had a side
16 attraction.
17     Q.  Can you please inform me of what a
18 lost return is.
19     A.  That is when the formation won't
20 hold the weight of the drilling fluid. The
21 hydrostatic pressure exerts.
22     Q.  How about a kick?
23     A.  That is when your mud grade is not
24 dense enough to handle the pressure exerted
25 by the formation.

**Page 8**

1      Q.  And all of these are potential
2  problems that could lead to later problems
3  in the well?
4      A.  Well, I wouldn't say that, you
5  know.
6      Q.  Okay. Can you briefly go through
7  the day of the 20th and up to the time of
8  the incident?
9      A.  Yes. We had run a casing the day
10 before, a string of 9 and 7/8ths by 7 inch,
11 and cemented and were actually pulling out
12 of the hole to go and displace and run a top
13 plug. We did have a lot of visitors come
14 out that day, BP and Transocean. Spent the
15 bigger part of the day, you know, talking
16 with them.
17     Q.  And after that discussion, up to
18 the incident?
19     A.  Up to the incident, I got out of a
20 meeting roughly, I would say, at 2115, and
21 got through with the meeting. I went to the
22 bridge, central control room and looked at
23 permits, closed out permits and talked with
24 the senior toolpusher.
25        Then later on, I got -- went and

**Page 9**

1  took a shower about the time of the
2  incident, because I was in the shower during
3  the incident.
4      Q.  Can you please elaborate on what
5  happened during the incident as to what you
6  heard and saw up to leaving the DEEPWATER
7  HORIZON.
8      A.  Well, it was a major explosion,
9  followed by, you know, a second explosion.
10 A lot of back draft in the living quarters.
11 It totally destroyed the living quarters
12 over there on the starboard side where I was
13 taking a shower in my stateroom. And I
14 managed to get debris out of the way and
15 crawled and walked up toward the bridge.
16        And also, I seen some injured
17 personnel, you know, during the way up
18 there.
19        I got to the bridge, the captain,
20 he was up there. The subsea engineer, Chris
21 Pleasant, he was up there also, you know,
22 looking at the disaster we had. I knew we
23 needed to get away. So Chris, I told him to
24 go ahead and disconnect the EDS.
25        Also, I went back down to the

Page 150

1   CAPTAIN NGUYEN:
2       Yes.
3   EXAMINATION BY MR. WHEATLEY:
4       Q. Would you please state and spell
5   your name.
6       A. Curt Robert Kuchta, K-U-C-H-T-A.
7       Q. Do you currently have counsel,
8   Captain?
9       A. I do.
10      Q. And is it Mr. Kohnke?
11      A. Yes.
12      Q. Do you hold any Coast Guard
13  licenses or credentials?
14      A. Master 100 tonnage, USCG.
15      Q. When did you first obtain that
16  certification?
17      A. I want to say -- on the license
18  right now, I'm not sure of the exact date.
19      Well, the new one was issued
20  May 4. I have been in that position for
21  about two years on the HORIZON.
22      Q. And would you please outline your
23  background for us.
24      A. I graduated from Massachusetts
25  Maritime Academy in 1998. Went to work as a

Page 151

1   third mate for Reading & Bates on board the
2   PATHFINDER. Stayed on board as third mate
3   until I went to another ship in 2008. I
4   went to help build two new projects, and
5   then came back to be master in 2008 on the
6   DEEPWATER HORIZON.
7       Q. Thank you. Could you outline your
8   education, please.
9       A. Massachusetts Maritime Academy,
10  bachelor of science in marine
11  transportation.
12      Q. What is your current title?
13      A. Master.
14      Q. When did you first assume that
15  role?
16      A. June of 2008.
17      Q. As the master of the DEEPWATER
18  HORIZON, could you outline for us the scope
19  of your duties and responsibilities?
20      A. Sure. Safety of the vessel,
21  navigation of the vessel while under way and
22  station-keeping. I supervise the
23  station-keeping as well as all the
24  regulatory on the vessel side of it. Class,
25  safety, that type of thing.

Page 152

1       Q. Would it be fair to say you are
2   responsible for supervision of required
3   inspections and certifications and things
4   related to that for the DEEPWATER HORIZON?
5       A. Correct.
6       Q. Could you basically kind of
7   outline for us what we have seen in the
8   organizational chart related to the
9   DEEPWATER HORIZON, your relationship with
10  the OIM?
11      A. In reference to?
12      Q. How do you interact with him, what
13  types of communications do you have, how
14  often do you discuss issues of concern?
15      A. Whenever one arises. We have
16  extremely open communications. Any time any
17  type of question arises, whether on the
18  drilling side or marine side, whatever side,
19  we have very, very good, open
20  communications. We have worked together
21  quite a while.
22      Q. Do you have regular safety
23  meetings as such?
24      A. Yes, we have numerous meetings.
25      Q. Have you ever seen this chart

Page 153

1   before?
2       A. Yes.
3       Q. Are you familiar with it?
4       A. Yes.
5       Q. Is it fair to say this is the
6   organizational chart for the DEEPWATER
7   HORIZON?
8       A. Yes.
9       Q. It was basically effective on the
10  date of the incident which we are
11  discussing, April 20?
12      A. Yes.
13      Q. You can see here it identifies the
14  OIM as the person in charge, and it places
15  you in the top line on the left. We have
16  had a number of questions, if you will,
17  about who is in charge and at what point and
18  when that role changes, how do you know?
19      Basically, when the vessel is
20  under way, making way, you as the master
21  would be in charge of the vessel. Is that
22  true?
23      A. Correct.
24      Q. At what point, based upon your
25  understanding of this organizational chart,

39 (Pages 150 to 153)

## Page 154

1  does the OIM assume the role of being in
2  charge of the entire rig?
3      A.  When we latch up.
4      Q.  That's your understanding of the
5  distinction between the two positions?
6      A.  Yes, sir.
7      Q.  In times of emergency, we heard
8  testimony of the OIM, basically the master
9  assumes the role of being in charge,
10 correct?
11     A.  Correct.
12     Q.  How do you know when that transfer
13 of role takes place?
14     A.  There is always extremely good
15 communication, so it has never been an
16 issue.  I mean, there has never been an
17 issue where it has come up.
18     Q.  On the 20th of April, when the
19 incident occurred, did you have a formal
20 handoff of responsibility between yourself
21 and the OIM?
22     A.  In that short time frame, no.
23 However, we were both on the bridge
24 communicating about what was happening.
25     Q.  Now, being a mariner, obviously

## Page 155

1  you are familiar with the term "underway,
2  not making way"?
3      A.  Yes, sir.
4      Q.  When the vessel is latched up to
5  the BOP, is the vessel under way, not making
6  way?
7      A.  That would go back to the
8  corporation.
9      Q.  Based on your understanding of the
10 COLREGS, when you are under way, is the OIM
11 or you in charge?
12     A.  I go back to -- once you are on
13 location, latched up, the dynamic
14 positioning system has it under control.
15     Q.  When you are latched up, you are
16 still under way?
17     A.  I would say that.
18     Q.  So would it be your opinion that
19 COLREGS no long apply at that point?
20     A.  No, they still apply.  But that is
21 for actual definition.  Like I said, it has
22 never been a problem being latched up
23 conducting drilling operations.
24     Q.  Could you basically outline for us
25 the scope of the SMS plan on board the

## Page 156

1  DEEPWATER HORIZON?
2      A.  That is a very broad question.  In
3  reference to what aspect of it?
4      Q.  If you will, kind of the
5  10,000-foot view level.  How about what the
6  SMS is and how it applies to the DEEPWATER
7  HORIZON.
8      A.  I'm sorry.  It is such a broad
9  question.
10     Q.  On board the DEEPWATER HORIZON,
11 did you have an SMS?
12     A.  Yes.
13     Q.  Do you know who approved that
14 plan?
15     A.  Yes.
16     Q.  Who was that?
17     A.  DNV.
18     Q.  Do you know if it complied with
19 IMO standards?
20     A.  Yes.
21     Q.  Who on the rig is designated as
22 the safety management officer, or the safety
23 officer?
24     A.  It has been a long five weeks.  At
25 this point in time, I don't recall.  Those

## Page 157

1  types of questions, a few weeks ago would
2  have been no problem.  But as you can
3  imagine, it has been a rather difficult few
4  weeks.
5      Q.  I understand, sir.
6          Could you tell us how your company
7  documented their compliance with the Safety
8  Management System?
9      A.  I'm sorry, I don't understand.
10     Q.  Well, there are certain
11 requirements --
12     A.  We go through the inspection every
13 two and a half years as required.
14     Q.  Do you have annual inspections?
15     A.  Yes, through ABS, class.
16     Q.  Is that part of your safety
17 requirements as well?
18     A.  Yes.
19     Q.  Do you know where those are
20 documented on the DEEPWATER HORIZON, the
21 fact they have been completed?
22     A.  They are in a binder in my office,
23 every signed copy.
24     Q.  Do you know if you have ternal
25 audits to ensure your compliance --

Page 206

1 but I don't recall.
2    Q. One final question. Was the
3 DEEPWATER HORIZON under a daily rate
4 contract or a yearly contract with BP at the
5 time of the incident?
6    A. I don't recall.
7    MR. GODFREY:
8       Thank you. I have no further
9 questions.
10    MR. GORDON:
11       Captain, would it be okay if I
12 asked questions too?
13 EXAMINATION BY MR. GORDON:
14    Q. I want to talk to you about
15 COLREGS. Are you familiar with them?
16    A. Obviously, a week ago, I was much
17 more familiar with them, but yes.
18    Q. The DEEPWATER HORIZON, was she a
19 vessel?
20    A. Yes.
21    Q. Were you the master of that
22 vessel?
23    A. Yes.
24    Q. Was she operating in U.S. waters?
25    A. International waters.

Page 207

1    Q. Was she subject to the IMO regs?
2    A. Yes.
3    Q. Was Rule 3 of the IMO regs
4 applicable to your vessel, sir?
5    A. In what section of the IMO regs?
6    Q. Rule 3. What is highlighted with
7 an asterisk.
8    A. The word "under way."
9    Q. Okay. So it defines under way,
10 correct?
11    A. Correct.
12    Q. Could you please read that into
13 the record?
14    A. "The word 'under way' means that a
15 vessel is not at anchor or made fast to
16 shore or ground."
17    Q. Okay. Just prior to the
18 explosion, was the DEEPWATER HORIZON fixed
19 to the ground or anchored?
20    MR. KOHNKE:
21       When you say "fixed," do you mean
22 made fast to the ground?
23    MR. GORDON:
24       Yes.
25    THE WITNESS:

Page 208

1       We did have a riser and BOP down.
2 EXAMINATION BY MR. GORDON:
3    Q. Do you consider that, sir, to be
4 anchored to the ground?
5       You are the captain of the vessel,
6 sir?
7    MR. KOHNKE:
8       Here is the problem. Mr. Gordon,
9 this witness has raised his right hand and
10 taken an oath and been told that a false
11 statement is punishable by both jail and a
12 fine.
13       You are asking him now to
14 interpret something. There is no black or
15 white, there is no absolute here. I am
16 very, very reluctant to allow him to
17 interpret something in an argument with
18 counsel. So proceed very carefully, please.
19 EXAMINATION BY MR. GORDON:
20    Q. Have you had a chance to read it,
21 sir?
22    A. If I am going to be asked about
23 it, I would like to keep it in front of me.
24    Q. I would like to introduce this as
25 an exhibit.

Page 209

1       I only have the one -- do you have
2 a copy of this?
3    CAPTAIN NGUYEN:
4       You brought the document.
5       Can I ask you the relevance of
6 your questioning before you introduce
7 something in the record?
8    MR. GORDON:
9       I have here Marine Notice 7-038-2,
10 the Marshall Islands document, which is --
11 this DEEPWATER HORIZON was flagged to the
12 Marshall Islands. In it, under the "Minimum
13 Safe Manning," it has something called "On
14 location."
15       The COLREGS do not have that
16 definition, so I would like to ask the
17 captain if he considered his vessel
18 unoperating (sic) when they had the BOP
19 down. Operating under the Schedule A of
20 2.2.5, or if he considered himself subject
21 to the COLREGS.
22       The reason, if you are on location
23 in the Marshall Islands, you don't need a
24 master, you just need an OIM. So I am
25 trying to figure out under what rules they

Page 214

```
 1    THE WITNESS:
 2       Yes, sir.
 3    CAPTAIN NGUYEN:
 4       Thank you, you are dismissed.  We
 5    are adjourned for the morning, please come
 6    back at 1:30.
 7       (Recess for lunch.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 215

```
 1
 2              REPORTER'S CERTIFICATE
 3
 4       I, Cathy Renee' Powell, Certified
 5    Court Reporter, do hereby certify that the
 6    foregoing proceedings were reported by me in
 7    shorthand and transcribed under my personal
 8    direction and supervision, and is a true and
 9    correct transcript, to the best of my
10    ability and understanding;
11       That I am not of counsel, not related
12    to counsel or parties hereto, and not in any
13    way interested in the outcome of this
14    matter.
15
16
17
18
                 _____
19               CATHY RENEE' POWELL, CCR
20
21
22
23
24
25
```