# DEBEVOISE & PLIMPTON LLP

Date          March 22, 2011

Memorandum to   Feinberg Rozen, LLP

From         Michael B. Mukasey[1]

## Gulf Coast Claims Facility:
### Supplemental Memorandum Regarding Feinberg Rozen, LLP's Compensation

In August 2010, we were retained by Feinberg Rozen, LLP (the "Firm") to review the reasonableness of the Firm's compensation for administering the $20 billion Gulf Coast Claims Facility (the "GCCF" or "Facility"). We assessed the Firm's work in establishing the GCCF and administering the initial emergency claims process, and concluded that a flat fee of $850,000 per month was reasonable given the Firm's unique qualifications, the unprecedented size and scope of the GCCF project, and the consequential impact on the Firm's practice. In a memorandum dated October 8, 2010 (the "Initial Memorandum") we summarized the facts we relied on and explained our conclusions. Familiarity with the Initial Memorandum is assumed for current purposes. Since the delivery of the Initial Memorandum, the Firm's work administering the GCCF has become in many ways more challenging – the number of claims received has grown from 128,100 to 828,225 and complex claims for permanent relief requiring assessment of financial statements and projections of future harm have replaced relatively more straightforward emergency claims.

The Firm typically reevaluates its fee during long-running engagements to reflect changes like this, and in the Initial Memorandum we recommended that the Firm and BP do

---

[1] Partner, Debevoise & Plimpton LLP. This memorandum has been written with the assistance of Lorna G. Schofield, also a partner of Debevoise & Plimpton LLP, and of David W. Feder and John Nichols, associates of Debevoise & Plimpton LLP.

so periodically in this case. Accordingly, the Firm and BP now have agreed to a flat monthly fee of $1,250,000 from January 15, 2011 through the end of the year. The Firm has asked us to evaluate the reasonableness of this adjusted compensation. In view of our Initial Memorandum and later developments, as discussed below, we conclude that the Firm's adjusted compensation is reasonable.

In the months after its retention in June 2010, the Firm assumed responsibility for the claims process that had been established by BP after the oil spill. The Firm hired and trained subcontractors, drafted an emergency claims protocol, processed claims for emergency relief, and consulted with diverse stakeholders. This work demanded ongoing and intensive attention from Firm members. As of November 23, 2010, the GCCF stopped accepting emergency claims. In its second and final phase, the Facility will resolve final claims, until it ceases operations in August 2013. The Firm's work on the Facility has engaged and consumed nearly all of the Firm's human resources, and the Firm and BP have agreed to increase the Firm's compensation to reflect its efforts. The Firm's fee is a small percentage of BP's over-all cost of administering the entire claims facility, which includes the cost of retaining an extensive network of subcontractors, including claims intake staff at the 35 separate claims offices, accountants, IT specialists and fraud detection analysts. This operation, involving more than 3,000 employees, is directed as to policy and otherwise administered and supervised by the Firm.

Several factors that supported the reasonableness of the Firm's initial compensation are unchanged. The Firm remains unrivalled in its experience, ability and reputation for claims work and is uniquely qualified to administer the GCCF, the largest fund in American

history. The GCCF continues to command intense public scrutiny, exposing the Firm to reputational risks, and the Firm devotes considerable energies to reforming the claims process to address legitimate concerns. The Firm will continue to receive a flat fee, which we concluded was the most appropriate form of compensation, and the fee will not be paid from the compensation fund. The fee will still cover significant overhead expenses of the Firm necessitated by this engagement (*e.g.*, additional support staff hired in part to help administer the GCCF, additional office supplies and equipment purchased for the GCCF project), in addition to salaries. Finally, the Firm's increased compensation continues to be in line with the few roughly analogous engagements that exist. Those factors that have materially changed are discussed below.

<u>The Time, Labor and Results Obtained by Counsel.</u> The Firm's members are almost exclusively devoted to the GCCF project, and the Firm has responded by hiring additional staff and reallocating most of its existing workforce. Today, eight of the Firm's professionals now spend all or most of their time on this matter, according to time records that we have reviewed. Despite the increased staffing, the average hours worked by Firm members has actually increased since the initial phase of the assignment. For example, one Firm attorney's average daily hours on this matter have risen from 6.4 to 7.9. Firm members' days regularly run to 12 hours or more. The Firm's hard work (and the considerable efforts expended by GCCF subcontractors working under the Firm's supervision) has yielded notable results: As of March 19, the GCCF has distributed more than $3.6 billion to claimants, including over $2.5 billion to 168,958 claimants that have submitted claims for emergency relief, and nearly $1 billion to 102,973 claimants that have submitted claims for

final relief. The GCCF already has received the largest number of claims – 828,225 – ever submitted to a private fund, and the Firm expects roughly 50,000 more. Unlike the pattern encountered in other claims administrations, the rate of claims here has not slowed since the Facility's inception.

<u>The Novelty and Difficulty of the Assignment.</u> Statistics alone fail to capture the difficulty of the assignment. Since the delivery of the Initial Memorandum, Firm members have drafted the protocol for final claims in consultation with environmental experts, created an appeals process, expended additional efforts obtaining public buy-in and worked with claimants' counsel to resolve large blocks of claims. The Firm – principally claims administrator Camille Biros – oversees more than 3000 claims workers, from Gulf State claims office staffers to data processing contractors to accountants. The day-to-day work of administering the Facility requires Firm members to review complex claims for potentially tens of millions of dollars. In particular, several Firm members dedicate all their time to reviewing claims for sufficient documentation, while others also work directly – and sometimes face-to-face – with claimants, their counsel and various interested parties to resolve claims. Kenneth Feinberg is heavily involved in resolving claims with precedential and other substantial significance, and he continues to speak with government officials in the Gulf and in Washington and hold public forums with claimants and interest groups in the affected states.

The Firm's work on the GCCF has not become more routine for two principal reasons. First, many claims for final payment lack sufficient documentation to assess damage accurately. This problem plagued claims for emergency relief, too, but is more acute

now; emergency claims compensated limited harms and were intended to be disbursed quickly for interim relief, but final claims are intended to compensate all past and future harm, and thus require additional documentation reflecting damages with greater certainty. The Firm must dedicate significant resources to evaluating final claims and seeking additional documentation where possible. Second, even documented claims are not easily resolved. The vagaries of geography, the diversity of the Gulf economy and widely varying levels and types of documentation all compel individual attention to many claims. Unlike the practice in some other claims administrations, the Firm is not able to streamline processing by reducing the harms claimed to a formula or placing them easily in recurring categories. By at least one measure, the Firm's exacting claims review has been successful: An appeals board administered by the U.S. Coast Guard for the review of claims determinations under the Oil Pollution Act has affirmed every one of the Firm's 467 determinations challenged to date.

The Preclusion of Other Employment Due to the Acceptance of the Project. The Firm's intense attention to the GCCF has affected its ability to attract new work as its other projects wind down. Since accepting the assignment, the Firm has not been approached about any mass tort claims administration and has forgone other engagements for which it would typically be considered. The Firm's work for existing clients is also significantly reduced. Although the Firm cannot determine precisely how much of this decrease is due to the GCCF assignment, it is reasonable to infer that the significant reductions in the Firm's non-GCCF work are due at least in part to widespread knowledge of the Facility's demands on the Firm among clients and potential clients.

\* \* \* \* \*

In sum, the Firm remains unique in its qualification for the assignment, and the assignment remains unprecedented. The Firm's fee remains roughly consistent with similar engagements, and is a small fraction of the total cost of the extensive and complex program the Firm implements and administers. Moreover, since we last considered the issue, the Firm has expanded its staff working on the GCCF, and the staff are working longer hours, apparently reducing the Firm's other business. As the GCCF progresses in its second and final phase, there is no sign that the demands of the assignment will abate soon. In light of this and of the matters set forth in our Initial Memorandum, we have concluded that a flat fee of $1,250,000 per month through 2011 is reasonable.