UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | : | MDL NO. 2179 |
| | : | SECTION: J |
| THIS DOCUMENT RELATES TO: | : | JUDGE BARBIER<br>MAG. JUDGE SHUSHAN |

1. *Bill's Oyster House v BP et al* (C.A. 10-1308)
2. *Howard Buras v BP et al* (C.A.10-2994)
3. *Armand's Bistro v BP et al* (C.A. 10-4489)
4. *Faye Loupe et al. v BP et al* (C.A. 10-2764)
5. *Laura Gautreaux v BP et al* (C.A. 10-1539)
6. *Brent Rodrigue, Sr. et al. v BP et al* (C.A. 10-1325)

.. .. .. .. .. .. .. .. .. .. .. .. .. .. . . . . . . . . .

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST CAMERON INTERNATIONAL CORPORATION**

MAY IT PLEASE THE COURT:

**A. FACTS:**

1. **Background of the Macondo Well (March 2008 – April 20, 2010)**
2. **The Failure of the Blowout Preventer and the Release of Hydrocarbons (April 20 – July 16, 2010)**
3. **Det Norske Veritas's Report on the Blowout Preventer (March 20, 2011)**

**B. LAW:**

1. **General Maritime Law - Products Liability, Negligence and Strict Liability**
2. **Louisiana Products Liability Law**
3. **DNV's Final Report Proved The Elements Required by the Louisiana Products Liability Act.**
4. **Summary Judgment Standards**

**C. CONCLUSION**

## A. FACTS[1]:

### 1. Background of the Macondo Well (March 2008 – April 20, 2010):

In March 2008, BP leased from the United States' Department of the Interior a nine-square-mile area in the northern Gulf of Mexico, 42 miles southeast of Venice, Louisiana, known as "Macondo".

BP then hired Transocean to provide the rig and crew to dig a well for oil and gas production. Transocean's *Marianas* rig dug the well in October and November 2009, but had to leave when Hurricane Ida approached. After that Transocean sent its *Deepwater Horizon* rig to take over.

On January 31, 2010, *Deepwater Horizon* began work on the well. After a week of tests the *Deepwater Horizon* crew lowered the blowout preventer, which had been manufactured by Cameron International Corporation (Cameron) of Houston through a mile of seawater and latched it to the wellhead that *Marianas* had prepared.

Its BOP, Cameron had assured, had several features that would close the drill pipe and seal the well in case of a blowout. If worse came to worse, Cameron assured, ultimately its "blind shear rams" would literally split BP's drill pipe in two and shut off all the hydrocarbons escaping from the reservoir.

### 2. The Failure of the Blowout Preventer and the Release of Hydrocarbons (April 20 – July 16, 2010):

---

[1] All facts are contained in (1) the "Final Report of the Chief Counsel of the National Commission on BP Deepwater Horizon Oil Spill and Offshore Drilling", dated February 17, 2011 and (2) DNV's "Final Report – Forensic Examination of Deepwater Horizon Blowout Preventer" (dated March 20, 2011). They are available, respectively, at (1) *http://www.oilspillcommission.gov/chief-counsels-report* and (2) http://www.deepwaterinvestigation.com/go/doctype/3043/59279/ .

On April 20, at 9:49 p.m., control of the Macondo well was lost, resulting in a blowout. The pressurized oil and gas in the reservoir came up through the drill pipe, the blowout preventer and the riser pipe and, ultimately, reached and came out onto *Deepwater Horizon*, resulting in the explosions killed the eleven crewmembers.

At 9:56 p.m., crewmembers on the bridge were unable to activate the blowout preventer's Emergency Disconnect Sequence. The EDS should have activated and closed the "blind shear rams" in the BOP, severed the drill pipe and disconnected the rig from the BOP. Further, the "deadman function" of the BOP, which was to automatically activate the EDS in such a situation, failed.

At 10:28 p.m., because of the failure of the BOP, the crew abandoned the rig as hydrocarbons continued to be released onto the rig and into the waters of the Gulf as the rig continued to burn.

The next day, April 21, BP and Transocean, while searching for the eleven missing crewmembers, began using submersible "remotely operated vehicles" to try to close the BOP and stop the hydrocarbon flow.

The day after that, April 22, the rig sank, breaking in half the riser pipe - the pipe that had connected *Deepwater Horizon* to Cameron's blowout preventer. Oil and gas continued to flow out of the riser pipe, which was still connected to the BOP but now fallen and resting on the floor of the Gulf.

April 22, according to DNV's Final Report, is probably when the blind shear rams were finally activated, by a remotely operated vehicle. The blind shear rams, however, as detailed below, did not close all the way and the hydrocarbons continued to flow.

On May 5, BP gave up trying to close the BOP, saying, "the possibility of closing the BOP has now been essentially exhausted".

On July 16, the flow from the well was finally stopped, after a method termed "top kill" was completed.

On September 4, the blowout preventer was raised from the sea floor, put on a barge and taken to the NASA-Michoud facility in New Orleans for examination.

On September 19, 152 days after the blowout, a relief well that BP had been digging finally intercepted the Macondo well, allowing BP to pump in cement and permanently seal the reservoir, ending the flow of hydrocarbons.

Had the blowout preventer worked as intended, the flow of the hydrocarbons would have lasted only seven minutes rather than almost three months (April 20 through July 16).

**3. <u>Det Norske Veritas's Report on the Blowout Preventer (March 20, 2011)</u>:**

On April 27, 2010, a week after the explosion, the Departments of the Interior and Homeland Security created a Joint Investigation for the explosion and sinking of *Deepwater Horizon*, comprised of persons from both the Coast Guard and the Bureau of Ocean Energy Management.

On August 10, the Joint Investigation team issued a "Request For Proposal" for forensic investigations and tests on the blowout preventer, including whether any manufacturing defects had caused or contributed to its failure.

On September 1, the contract was awarded to Det Norske Veritas USA, Inc. (DNV), a Norwegian risk management company.

On November 15, testing began, and was completed on March 4, 2011.

Last week, on March 23, DNV release its Final Report (dated March 20, 2011), "Forensic Examination of Deepwater Horizon Blowout Preventer". (The report is available at the Joint Investigation's website: http://www.deepwaterinvestigation.com/go/doctype/3043/59279/ ).

The report concluded: "The primary cause of failure was identified as the BSRs (blind shear rams) failing to fully close and seal due to a portion of drill pipe trapped between the blocks" (*Final Report, page 5*), further noting:

> **7.3 Discussion of Causes**
> **7.3.1 Primary Cause**
> *The BSRs failed to fully close and seal due to a portion of drill pipe trapped between the blocks.*
>
> On closure of the BSRs, a portion of the drill pipe cross section was outside of the BSR shearing surfaces. The portion of the drill pipe cross section outside the shear blade surfaces became trapped between the ram block faces, preventing the blocks from fully closing and sealing.
> *(Final Report, page 174)*
> *(A copy of the Final Report accompanies this Motion as Exhibit A.)*

DNV's reconstruction of the event showed as follows:

> The shear model with off-centered drill pipe showed that the required shear force (RF-max) increased as the pipe was pressed between the flat outer faces of the ram blocks. A maximum shear force for the off-centered pipe analysis was calculated as 1,017,040 lb-f, which is equivalent to 4,273 psi for this BSR design. **Based on this analysis, the BSR would likely stall at this point, if not prior to this, as the required pressure exceeded the hydraulic system pressure (regulated to 4,000 psi).**
>
> With the drill pipe collapsed between the ram faces, the upper and lower BSR blocks were 2 inches from being fully closed (Figure 146). The side packers were 1 inch from making initial contact and sealing.
>
> Further investigation was performed using the laser scanned models. The models of the upper and lower BSR blocks, and drill pipe segment 94 [the segment from between the casing shear rams and the blind shear rams] were assembled with segment 94 contacting the upper block (deformation features aligned – Figure 147). With the blocks spaced 2 inches from fully closed, the lower block fit against segment 94. Figure 148 shows the BSR CAD [computer aided design] models (side packers removed) in the same

> configuration and demonstrates that the lower BSR blade was 1.4 inches from contacting the rear packers.
> *(Final Report, Chapter 6.6 ["Failure Cause Analysis"], pages 164-165) (emphasis added)*
>
> As the BSRs were closed, the drill pipe was positioned such that the outside corner of the upper BSR blade contacted the drill pipe slightly off center of the drill pipe cross section. A portion of the drill pipe was outside of the BSR shearing blade surfaces. As the BSRs closed, this portion of the drill pipe cross became trapped between the ram block faces, preventing the blocks from fully closing and sealing. The drill pipe most likely deflected to the side of the well from the moment the well began flowing. Trapping of the drill pipe between the ram faces would have taken place regardless of which means initiated BSR closure (AMF/Deadman or Autoshear).
> *(Final Report, Chapter 7.2 "What is Considered to Have Happened", page 173)*

Cameron's blind shear rams could seal only pipes perfectly centered in a well. If a pipe had been set or moved "slightly off center", it would only be partially flattened by the blocks on the outer sides of the rams rather than completely pinched in two and closed by the angled shears in the middle. Cameron's rams could not close off-center pipes, as was the case in Macondo. (The report concluded that blowout had bent the pipe "slightly off-center".) Because Cameron's blind shear rams were not strong enough to seal the pipe, its1.4 inch gap resulted in 4.9 million barrels of spilled oil.

The failure of Cameron's blowout preventer is eerily reminiscent of the often-cited 2002 study on blowout preventer failures done by West Engineering Services, Inc. for the Interior Department's Minerals Management Service (the predecessor of the Bureau of Ocean Energy, Management, Regulation and Enforcement). Of the shears it studied, there was **only a 50% operational success rate**, leading West to conclude:

> The increase in drillpipe sizing as well as improved metallurgies, while benefitting the industry in many respects, detrimentally affects the ability to shear pipe should this last means of securing a well be necessary. Adding to the above concern is the hydrostatic effect of shearing at depth that must be taken into account. . . .

> This limited data set from the latest generation of rigs paints a grim picture of the probability of success when utilizing this final tool in securing a well after a well control event.
> - *"Mini Shear Study For U.S. Minerals Management Service", by West Engineering Services, Inc.,' December 2002, at page 3.)This is available at:* http://www.boemre.gov/tarprojects/455
> - Also, see, generally, West's follow-up report: "Shear Rams Capabilities Study For U.S. *Minerals Management Service, September 2004. This is available at*: http://www.boemre.gov/tarprojects/463.htm .

A 2009 confidential study performed by Det Norske Veritas for Transocean reached a similar conclusion – that blind shear rams used in deepwater rigs had **only a 45% success rate**. According to the *New York Times:*

> Last year Transocean commissioned a "strictly confidential" study of the reliability of blowout preventers used by deepwater rigs.
>
> Using the world's most authoritative database of oil rig accidents, a Norwegian company, Det Norske Veritas, focused on some 15,000 wells drilled off North America and the North Sea from 1980 to 2006.
>
> It found 11 cases where crews on deepwater rigs had lost control of their wells and then activated blowout preventers to prevent a spill. In only six of those cases were the wells brought under control, leading the researchers to conclude that in actual practice, blowout preventers used by deepwater rigs had a "failure" rate of 45%
> - *"Regulators Failed to Address Risks in Oil Rig Fail-Safe Device", New York Times, June 20, 2010, available at:*
> http://www.nytimes.com/2010/06/21/us/21blowout.html?_r=1&ref=stephaniesaul

The blowout preventer failed as a result of design flaws by Cameron and not because of any misuse or improper maintenance by Transocean, BP or anybody else.

## B. LAW:

### 1. General Maritime Law, Products Liability, Negligence and Strict Liability:

As recently stated by Judge Fallon in *Daigle v L & L Marine Trans. Co.* 322 F.S.2d 717, (E.D. La. 2004):

> "The doctrine of strict liability is part of the general maritime law." [citations omitted] There is also no dispute that Section 402A of the Restatement (Second) of Torts (1965) applies in maritime products liability cases . . .. [citations omitted]
>
> "Under the Restatement a seller as well as a manufacturer may be held liable for harm caused by a defective product placed in the stream of commerce. Section 402(A) of the Restatement (Second) of Torts (1965) provides:
>
> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if:
>
> (a) The seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although:
>
> (a) the seller has exercised all reasonable care in the preparation and sale of his product, and
>
> (b) the user or consumer has not bought the product from or entered into any contractual relationship with the seller.
>
> Thus, § 402A requires the Plaintiff to prove: **(1) that the defendant sold or manufactured the product; (2) that the product was unreasonably dangerous or was in a defective condition when it left the defendant's control; and (3) that the defect resulted in the injury to the plaintiff.** Restatement (Second) of Torts § 402(A)(g) (1965); Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW § 5-6, at 206.
>
> According to comment (g) of § 402A, the rule applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to the ultimate consumer. "The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed." Restatement (Second) of Torts § 402(A)(g) (1965).

The burden of proof that the product was in a defective condition at the time it left the hands of a particular seller is upon the plaintiff. According to comment (g), "unless evidence can be produced which will support the conclusion that it was then defective, then the burden is not sustained." A product is not in a defective condition when it is safe for normal handling and consumption. Restatement (Second) of Torts § 402(A)(g) (2003).

Comment (i) to § 402A provides a definition of "unreasonably dangerous." According to the comment, "the article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, which the ordinary knowledge common to the community as to its characteristics." Restatement (Second) of Torts § 402(A)(i) (2003).

The *Vickers* Court applied § 402A, including the comments, and explained that, in admiralty cases, the "normal" use of a product includes all reasonably foreseeable uses, including foreseeable misuse. *Vickers,* 822 F.2d at 538. In such cases, to prevent a product from being unreasonably dangerous,"a seller may be required to give directions or instructions for use." *Id;* Restatement (Second) of Torts § 402(A)(j) (1965). Liability is imposed upon sellers or manufacturers who fail to warn of a defective condition if the defect was known and the manufacturer or seller, by exercising reasonable diligence, could have made such warnings available to the user. *See Vickers v. Chiles Drilling Co., et al.,* 822 F.2d 535, 538-39 (5th Cir.1987).
*Daigle v L & L Marine Trans. Co.* 322 F.S.2d 717, at 726-727 (E.D. La. 2004) (emphasis added)

DNV's Final Report clearly shows that each of the three requirements of Section 402(A) have been met:

(1) *The defendant sold or manufactured the product:* The BOP stack "was built by Cameron…", Final Report, page 2)

*(2) The product was unreasonably dangerous or was in a defective condition when it left the defendant's control:* No maintenance or modifications after the blind shear rams were delivered to Transocean contributed to their failure. Final Report, page171)

*(3) The defect resulted in the injury to the plaintiff:* The drill pipe getting trapped between the ram block faces was the "primary cause" for the failure of the blind shear rams to not fully seal the pipe, directly resulting in damage and loss to the plaintiff.

Also, see *In re Incident Aboard the D/B Ocean King on August 30, 1980*, 813 F.2d 679 (5th Cir. 1987), which involved several property damage claims, under theories of negligence and strict liability, against the Hydril Company for damages resulting from a offshore blowout caused by a defective blowout preventer it had manufactured.

**2. The Louisiana Products Liability Act:**

In the event this Court believes that Louisiana Products Liability Act and not the general maritime law applies to this issue, Cameron would still be liable for the damages caused by its blowout preventer.

The Louisiana Products Liability Act ("LPLA") states:

> "This Chapter [i.e., "The Louisiana Products Liability Act", LSA R.S. 9:2800.51 through 2800.60] establishes the exclusives theories of liability for manufacturers for damage caused by their products".

Section 2800.54 of the LPLA lists the requirements required to prove a products liability action:

> §2800.54. Manufacturer responsibility and burden of proof
>
> **A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product** by the claimant or another person or entity.
>
> **B. A product is unreasonably dangerous if and only if:**
>
> (1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;
>
> **(2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56**;

(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or

(4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.

C. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer. **The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56** or 9:2800.57 **must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.**

**D. The claimant has the burden of proving the elements of Subsections A, B and C of this Section.**[2] *(emphases added)*

**3. DNV's Final Report Proved All Three Elements Required by the Louisiana Products Liability Act:**

DNV's Final Report proved all three elements required by the Louisiana Products Liability Act, namely, that:

(1) The damage caused by the failure of the blowout preventer was **"proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use** of the product by the claimant or another person or entity" *(Sec. 2800.54[A].*

In interpreting The LPLA, the Fifth Circuit has held that "this objective inquiry requires us to ascertain what uses of its product the manufacturer should have reasonably expected at the time of manufacture"[3]

As stated in the Final Report, an "anticipated use" of the blowout preventer was as follows: "The Blind Shear Rams [of the blowout preventer] are designed to sever drill pipe that might be in the wellbore and seal the wellbore in the event of the loss of well control". (Final Report, pages 15-16)

---

[2] La. Rev. Stat. Ann. § 9:2800.54

[3] Spears v Cintas, No. 09-30750, at p. 2; February 28, 2011 (5th Cir., 2011) (quoting Kampen v. Am. Isuzu Motors, Inc., 157 F.3d 306, 309 (5th Cir. 1998) (en banc)

As also stated in the Final Report, this was precisely the use actually made of the blowout preventer that resulted in its failure to seal the well and stop the flow:

> At 21:56/57 . . . the EDS [Emergency Disconnect Sequence] was reported to have been pushed. This was the only recorded activation of a system on the rig, which would have functioned the high-pressure blind shear ram circuit. Despite having initiated the EDS, the LMRP [Lower Marine Riser Package] did not unlatch from the lower BOP (one of several EDS functions). . . In addition, the well continued to flow through the BOP stack, feeding the fires on the rig, indicating the BSRs had not closed and sealed. (Final Report, page 17)

(2) The blowout preventer was **"unreasonably dangerous in design"** *(Sec. 2800.54[B]); and*

(3) **The characteristic** that made the blowout preventer unreasonably dangerous **"existed at the time it left the control of its manufacturer"** *(Sec. 2800.54[C]).*

As stated in *Holloway v Midland Risk Insurance Company*, 832 So.2d 1004, at 1011 (La. App., 2d Cir., 2002), writ denied 840 So2d 571 (La. 2003):

> "Under the LPLA . . . a product is unreasonably dangerous in design if, at the time it left the manufacturer's control, there existed an alternative design that was capable of preventing the claimant's damage and the likelihood and gravity of that damage outweighed the burden on the manufacturer of adopting the alternative design and any adverse effect on the product's utility. LSA R.S. 9:2800.56; Ashley v General Motors Corp., 666 So.2d1320 (La. App. 1996) *Holloway v Midland Risk Insurance Company*, 832 So.2d 1004, at 1011 (La. App., 2d Cir., 2002), writ denied 840 So2d 571 (La. 2003)

In the "Other Considerations" section of its Final Report, DNV studied other possible reasons why the blind shear rams failed and concluded it was solely due to its design and not to any subsequent modifications or other factors:

> It is DNV's view that the evidence indicates the reported leaks in the hydraulic circuits were not a contributor to the blind shear rams being unable to close fully and seal the well. In its review of various modifications made to the control logic board or BOP stack, it is DNV's view that there is no evidence these modifications were a factor in the ability of the blind shear rams being able to fully close and seal the well. (Final Report, page 171)

The design of the blowout preventer resulted in what the President called than the President called "the worst environmental disaster America has ever faced". It cannot be argued that the gravity and likelihood of such an event occurring again far outweighs any burden on Cameron to institute an alternative design that would make its blind shear rams effective. This design, as DVN noted in its "Recommendations" section would ensure that the blind shear rams "complete their intended function of completely cutting tubulars regardless of their position in the wellbore, and sealing the well". (Final Report, page 177).

**4. Summary Judgment Standards:**

Summary judgment is appropriate "if the pleadings, the discovery, and disclosure materials on file . . . show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law".[4]

The principal purpose of the summary judgment rule is to "isolate and dispose of factually unsupported claims and defenses".[5]

Rule 56 ("Summary Judgment") "mandates the entry of summary judgment . . . against a party who fails to make sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial".[6]

The moving party bears the initial responsibility of identifying the basis for its motion and the parts of the record that support its claim that no such genuine issue of material facts exists.[7] Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to demonstrate that the court should not grant summary judgment.[8] Top do so, the

[4] Fed. R. Civ. P. 56(c)(2)
[5] *Celotex v Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 2553 (1986)
[6] *Celotex* at 322. Moore v Miss. Valley State Univ., 871 F.2d 545, 549 (5th Cir., 1989)
[7] *Burge v Parish of St. Tammany*, 187 F.3d 452, 465 (5th Cir., 1999)
[8] *Ragas v Tenn. Gas Pipeline Corp.*, 136 F.3d 455, 458 (5th Cir., 1998)

non-moving party must "go beyond the pleadings" to identify specific facts that establish a genuine issue or trial.[9] Rule 56 expressly requires as much, stating as follows:

> When a motion for summary judgment is properly made and supported, an opposing party may not merely rely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in the rule – set out specific facts showing a genuine issue for trial.[10]

Indeed, it is established that "the non-movant may not rely upon the theoretical possibility that its claim is valid.[11] Rather, a party opposing a motion for summary judgment must present "significant probative evidence" to defeat the motion.[12] If the non-moving party submits evidence that is "merely colorable" or "not significantly probative", or establishes only a "metaphysical doubt", the movant is entitled to summary judgment.[13]

## C. CONCLUSION:

The Plaintiffs have met their burden of showing that no genuine issue of material facts exists as to whether the failure of the blowout preventer was caused by a defect in the design of Cameron's blind shear rams under general maritime, product liability, strict liability and negligence law as well as under the Louisiana Products Liability Act, with the result being the damages caused by the release of the oil and gas from the Macondo well from April 20, 2010 at 9:56 p.m. (when the crew first tried to operate the Emergency Disconnect Sequence) until the well was finally sealed.

---

[9] Celotex, at 324
[10] Fed. R. Civ. P. 56(e)(2)
[11] Pennington v Vistron Corp., 876 F.2d 414, 426 (5th Cir., 1989)
[12] Conkling v Turner, 18 F.3d 1285, 1295 (5th Cir., 1994)
[13] Hawking v Ford Motor Credit Co., 210 F.3d 540, 545 (5th Cir., 2000)

Accordingly, it is respectfully submitted that Cameron International Corporation be held liable, jointly and in solido, for those damages.

Respectfully submitted,

__*/s/ Daniel E. Becnel, Jr.*___
DANIEL E. BECNEL, JR. (#2926)
BECNEL LAW FIRM, LLC
P. O. Drawer H
106 West Seventh Street
Reserve, Louisiana 70084
Telephone: (985) 536-1186
Facsimile: (985) 536-6444
E-mail: dbecnel@becnellaw.com
**Attorneys for Plaintiffs in:**

1. *Bill's Oyster House v BP et al* (C.A. 10-1308)
2. *Howard Buras v BP et al* (C.A.10-2994)
3. *Armand's Bistro v BP et al* (C.A. 10-4489)
4. *Faye Loupe et al. v BP et al* (C.A. 10-2764)
5. *Laura Gautreaux v BP et al* (C.A. 10-1539)
6. *Brent Rodrigue, Sr. et al. v BP et al* (C.A. 10-1325)

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that the above and foregoing Memorandum has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this _12th____ day of ___April___, 2011.

___*/s/ Daniel E. Becnel. Jr.*__