UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | MDL NO. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br>MAG. JUDGE SHUSHAN |

THIS DOCUMENT RELATES TO:
1. *Bill's Oyster House v BP et al* (C.A. 10-1308)
2. *Howard Buras v BP et al* (C.A.10-2994)
3. *Armand's Bistro v BP et al* (C.A. 10-4489)
4. *Faye Loupe et al. v BP et al* (C.A. 10-2764)
5. *Laura Gautreaux v BP et al* (C.A. 10-1539)
6. *Brent Rodrigue, Sr. et al. v BP et al* (C.A. 10-1325)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST HALLIBURTON ENERGY SERVICES, INC.

MAY IT PLEASE THE COURT:

A. FACTS:
1. The Background of the Macondo Well and *Deepwater Horizon* and The Lowering of the Final Casing String Into The Well (March 2008 – April 19, 2010)
2. Halliburton's Cement Failed (April 19-20)

B. LAW:
   1. General Maritime Law; Negligence, Products Liability
   2. Louisiana Products Liability Law
   3. The Presidential Commission Determined Halliburton's Cement To Be The Proximate Cause of the Failure of the Well
   4. Summary Judgment Standards

C. CONCLUSION

1

A. FACTS[1]:

## 1. The Background of the Macondo Well and *Deepwater Horizon* and The Lowering of the Final Casing String Into The Well
(March 2008 – April 19, 2010)

In March 2008, BP leased from the United States' Department of the Interior a nine-square-mile area in the northern Gulf of Mexico, 42 miles southeast of Venice, Louisiana, known as "Macondo".

BP hired Transocean to provide the rig and crew to dig a well for oil and gas production. Transocean's *Marianas* rig dug the well in October and November 2009, but had to leave when Hurricane Ida approached. After that Transocean sent its *Deepwater Horizon* rig to take over.

BP hired Halliburton Energy Services, Inc. (Halliburton) to provide and set the cement for the well.

On January 31, 2010, *Deepwater Horizon* began work on the well.

Below the wellhead stretched four telescoping "casing strings" that had been installed by *Marianas* to reinforce the hole. The *Deepwater Horizon* crew proceeded to drill deeper, cementing each new string into place to anchor the well and seal it from the surrounding rock.

In early April the Transocean crew finally reached the "pay zone" that BP had spent $38 million for. But it kept going deeper.

On April 9 it suffered a setback. At 18,193 feet the downward pressure caused by the weight of the drilling mud exceeded the strength of the rock formation and the mud cracked the formation and escaped into it instead of circulating back up to the rig.

The crew had to stop drilling until it sealed all the fractures.

---

[1] All facts are from the Chief Counsel's Final Report, National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, available at: http://www.oilspillcommission.gov/

2

Drilling mud is used to lubricate and cool the drill bit during drilling, but it also plays a critical role in controlling the pressure in a well. The weight of the huge column of mud creates the enormous downward pressure needed to counterbalance the upward pressure from the hydrocarbons in the formation. If the mud weight is too low, oil and gas will enter the well and rise up, causing a "kick". But if the mud's weight is too high, it squeezes into and fractures the rock, which is called "lost returns" – leakage of mud into the rock formation. The crew, therefore, must constantly monitor and adjust the weight and density of the mud while the well is being drilled.

After stabilizing the situation, the crew stopped the drilling, at 18,360 feet – 3 and ½ miles below the earth's surface and 4 and ½ miles below *Deepwater Horizon*. It was one of the deepest wells in history.

The well was stable.

BP and its contractors, including Transocean and Halliburton, spent the next five days (April 11 – 15) "logging" the open hole with sophisticated instruments. They then decided they had drilled into a hydrocarbon reservoir of sufficient size that would be worthwhile to install the final "production casing" string that would ultimately be able to remove the oil and gas, then close the wellhead and leave, with another rig to come to reopen the well and remove the oil and gas.

The lost circulation problems, the extraordinary depth of the well, and the unusually delicate rock formation should have made the crew especially cautious as it installed the casing, finished the cement job and abandoned the well.

After the crew lowered the final casing into position, Halliburton would cement it into place, pumping a very unique type of cement, blended with nitrogen gas to make the cement

3

lighter, down the casing. When the cement reached the bottom, it flowed out and up into the open "annular" space between the casing and the hole. Once it hardened, the cement was to bond to the formation and the casing and seal off the annular space. When the production rig would later arrive and reopen the well to remove the oil and gas, it would perforate holes through the cement and the oil and gas would flow up and out the well.

Halliburton had cemented all the previous casing strings in Macondo, but this job would be especially important, called the "primary cement job". It must seal off the hydrocarbon-bearing zone from the annular space around the casing and from the inside of the casing itself.

Even moving at top speed, with tools traveling through the well at about only ¼ mile per hour, the *Deepwater Horizon* crew needed more than 18 hours just to lower a tool, such as a drill bit, from the well head to the bottom of the well, 18,000 feet below sea level. Assembling the production casing section-by-section and lowering the lengthening string down into the well would require about 37 hours.

On the morning of April 18, the crew finally began assembling and lowering the final casing string into position.

On the afternoon of April 19, it was installed and put in its final position. Halliburton was ready at last to pump its experimental nitrogen-blended-cement.

## 2. Halliburton's Cement Failed:
   (April 19-20)

In the days leading up to the final cementing process, BP and Halliburton engineers had focused heavily on their biggest challenge: the risk of fracturing the formation and losing "returns" during the cementing process. There was much concern that too much pressure on the geologic formation might trigger another "lost returns" event like the one on April 9. But such an

event would now be much more catastrophic - it would be cement, not mud, that would flow into the formation, leaving the annular space at the bottom of the well open for the hydrocarbons to enter.

To address this concern Halliburton used "nitrogen foam cement" – a cement lightened with tiny bubbles of nitrogen gas, injected into the cement slurry just before it goes down the well. The trouble, though, was that the nitrogen gas could – and, in fact, did, migrate out of the cement and create an opening for the oil and gas to flow through and up the well. After it flowed past the cement it shot up the drill pipe, through the blowout preventer and riser and onto the *Deepwater Horizon*, where it exploded.

At 12:40 a.m. on April 20, 19 hours before the explosion, Halliburton finished pumping its experimental cement and told BP that the job was a success. Indeed, at the 7:30 a.m. daily morning meeting a few hours later, BP told the Schlumberger cement-testing crew it would not need to test the cement after all and sent it back to shore.

Once the Schlumberger crew was sent home, Transocean's crew began the "temporary abandonment" of Macondo and the final phase of its work – sealing the well closed.

## Cement Testing:

A cement slurry must be tested before it is used in a cement job.

On February 10, 2010, soon after *Deepwater Horizon* had begun working on Macondo, Halliburton ran tests on the cement blend stored on *Deepwater Horizon*. The cement failed the tests; the tests showed that the cement was highly unstable and that the nitrogen gas would escape from the cement while it was hardening. On March 8 it sent the highly technical lab report to BP, but only as an attachment to an email discussing another, unrelated matter. Only

to a trained eye did the report data show that the cement design was unstable, and <u>Halliburton did not tell BP about the failed test.</u>

Halliburton had also conducted another test earlier in February. That test had failed even more severely and Halliburton also never reported the result of that test to BP.

Halliburton conducted even more tests in mid-April, during the time of the final cementing. The first showed, once again, that the cement was unstable. <u>Halliburton never discussed this with BP either.</u>

Instead, it appears, Halliburton just decided to run a second test, this time doubling the pre-test "conditioning time" to three hours. That test would normally take 48 hours, but Halliburton finished pumping the cement even before those 48 hours had elapsed. Further, <u>Halliburton did not give the results to BP until six days after the explosion.</u>

### B. LAW:

#### 1 General Maritime Law; Negligence and Products Liability:

As the Fifth Circuit has noted:

> The analysis of a maritime tort is guided by general principles of negligence law. <u>Casaceli v. Martech Int'l., Inc., 774 F.2d 1322 (5th Cir.1985)</u>; <u>Daigle v. Point Landing, Inc., 616 F.2d 825 (5th Cir.1980)</u>. Under those principles a tortfeasor is accountable only to those to whom a duty is owed. …
>
> Determination of the tortfeasor's duty, and its parameters, is a function of the court. . . .That determination involves a number of factors, including most notably the foreseeability of the harm suffered by the complaining party. …    "Duty ... is measured by the scope of the risk that negligent conduct foreseeably entails." *Consolidated Aluminum Corp. v C.F. Bean Corp.* 833 F.2d 65 (5th Cir., 1987), rehearing denied en banc.

Also, as the Fifth Circuit more recently noted noted:

> [N]egligence is an actionable wrong under general maritime law. In Leathers v. Blessing, 105 U.S. (15 Otto) 626, 26 L.Ed. 1192 (1881), the Supreme Court recognized the maritime tort of negligence which exists as a counterpart to state law negligence. Id. at 630 . . . The elements of a maritime negligence cause of action are essentially the same as land-based negligence under the common law. Kermarec v. Compagnie Generale Transatlantique. 358 U.S. 625, 630, 79 S.Ct. 406, 409, 3 L.Ed.2d 550 (1959); Canal Barge Co., Inc., 220 F.3d at 376-77; 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW 182-93 (4th ed. 2004) (discussing the elements in depth). *Withhart v Otto Candies 431 F.3d 840, at 842 (5th Cir., 2005)*

Also, see *In re Incident Aboard the D/B Ocean King on August 30, 1980*, 813 F.2d 679 (5th Cir. 1987), which involved several property damage claims, under theories of negligence and strict liability, against the Hydril Company for damages resulting from a offshore blowout caused by a defective blowout preventer it had manufactured.

**Products Liability Law**:

As recently stated by Judge Fallon in *Daigle v L & L Marine Trans. Co.* 322 F.S.2d 717, (E.D. La. 2004):

> "The doctrine of strict liability is part of the general maritime law." [citations omitted] There is also no dispute that Section 402A of the Restatement (Second) of Torts (1965) applies in maritime products liability cases . . .. [citations omitted]
>
> "Under the Restatement a seller as well as a manufacturer may be held liable for harm caused by a defective product placed in the stream of commerce. Section 402(A) of the Restatement (Second) of Torts (1965) provides:
>
> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if:
>
> (a) The seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

7

(2) The rule stated in Subsection (1) applies although:

(a) the seller has exercised all reasonable care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relationship with the seller.

Thus, § 402A requires the Plaintiff to prove: **(1) that the defendant sold or manufactured the product; (2) that the product was unreasonably dangerous or was in a defective condition when it left the defendant's control; and (3) that the defect resulted in the injury to the plaintiff.** Restatement (Second) of Torts § 402(A)(g) (1965); Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW § 5-6, at 206.

According to comment (g) of § 402A, the rule applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to the ultimate consumer. "The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed." Restatement (Second) of Torts § 402(A)(g) (1965).

The burden of proof that the product was in a defective condition at the time it left the hands of a particular seller is upon the plaintiff. According to comment (g), "unless evidence can be produced which will support the conclusion that it was then defective, then the burden is not sustained." A product is not in a defective condition when it is safe for normal handling and consumption. Restatement (Second) of Torts § 402(A)(g) (2003).

Comment (i) to § 402A provides a definition of "unreasonably dangerous." According to the comment, "the article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, which the ordinary knowledge common to the community as to its characteristics." Restatement (Second) of Torts § 402(A)(i) (2003).

The *Vickers* Court applied § 402A, including the comments, and explained that, in admiralty cases, the "normal" use of a product includes all reasonably foreseeable uses, including foreseeable misuse. *Vickers,* 822 F.2d at 538. In such cases, to prevent a product from being unreasonably dangerous,"a seller may be required to give directions or instructions for use." *Id;* Restatement (Second) of Torts § 402(A)(j) (1965). Liability is imposed upon sellers or manufacturers who fail to warn of a defective condition if the defect was known and the manufacturer or seller, by exercising reasonable diligence, could have made such warnings available to the user. *See Vickers v. Chiles Drilling Co., et al.,* 822 F.2d 535, 538-39 (5th Cir.1987).

8

*Daigle v L & L Marine Trans. Co.* 322 F.S.2d 717, at 726-727 (E.D. La. 2004) (emphasis added)

## 2. The Louisiana Products Liability Act:

In the event this Court believes that Louisiana Products Liability Act and not the general maritime law applies to this issue, Halliburtonwould still be liable for the damages caused by its blowout preventer.

The Louisiana Products Liability Act ("LPLA") states:

"This Chapter [i.e., "The Louisiana Products Liability Act", LSA R.S. 9:2800.51 through 2800.60] establishes the exclusives theories of liability for manufacturers for damage caused by their products".

Section 2800.54 of the LPLA lists the requirements required to prove a products liability action:

§2800.54. Manufacturer responsibility and burden of proof

**A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product** by the claimant or another person or entity.

**B. A product is unreasonably dangerous if and only if:**

(1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;

**(2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;**

(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or

(4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.

9

C. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer. **The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56 or 9:2800.57 must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.**

**D. The claimant has the burden of proving the elements of Subsections A, B and C of this Section.**[2] *(emphases added)*

### 3. The Presidential Commission Determined Halliburton's Cement To Be The Proximate Cause of the Failure of the Well:

Under any possible applicable standards, the Presidential Commission's investigation proved Halliburton's faulty experimental cement to be the proximate cause of the failure of the well, the subsequent blowout and explosion of *Deepwater Horizon* and oil spill:

- Tests performed by Halliburton itself showed that the cement was unstable and unable to generate a proper foam slurry and harden.

- The cement Halliburton used was experimental and there were other designs it could have used.

- Halliburton, nevertheless, provided BP with this cement for the well.

- The cement stayed in Halliburton's contyrol. Nobody altered or modified it.

- After the explosion, both BP and the Presidential Commission worked with independent experts to study Halliburton's cement and both also concluded that the cement used by Halliburton had been unstable, resulting in nitrogen migration and breakout, followed by the blowout of the well.

- The Deepwater Horizon Study Group, led by Professor Bob Bea, reached the same conclusion.

---

[2] La. Rev. Stat. Ann. § 9:2800.54

### 4. Summary Judgment Standards:

Summary judgment is appropriate "if the pleadings, the discovery, and disclosure materials on file . . . show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law".[3]

The principal purpose of the summary judgment rule is to "isolate and dispose of factually unsupported claims and defenses".[4]

Rule 56 ("Summary Judgment") "mandates the entry of summary judgment . . . against a party who fails to make sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial".[5]

The moving party bears the initial responsibility of identifying the basis for its motion and the parts of the record that support its claim that no such genuine issue of material facts exists.[6] Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to demonstrate that the court should not grant summary judgment.[7] Top do so, the non-moving party must "go beyond the pleadings" to identify specific facts that establish a genuine issue or trial.[8] Rule 56 expressly requires as much, stating as follows:

> When a motion for summary judgment is properly made and supported, an opposing party may not merely rely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in the rule – set out specific facts showing a genuine issue for trial.[9]

---

[3] Fed. R. Civ. P. 56(c)(2)
[4] *Celotex v Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 2553 (1986)
[5] *Celotex* at 322. *Moore v Miss. Valley State Univ.*, 871 F.2d 545, 549 (5th Cir., 1989)
[6] *Burge v Parish of St. Tammany*, 187 F.3d 452, 465 (5th Cir., 1999)
[7] *Ragas v Tenn. Gas Pipeline Corp.*, 136 F.3d 455, 458 (5th Cir., 1998)
[8] *Celotex*, at 324
[9] Fed. R. Civ. P. 56(e)(2)

Indeed, it is established that "the non-movant may not rely upon the theoretical possibility that its claim is valid.[10] Rather, a party opposing a motion for summary judgment must present "significant probative evidence" to defeat the motion.[11] If the non-moving party submits evidence that is "merely colorable" or "not significantly probative", or establishes only a "metaphysical doubt", the movant is entitled to summary judgment.[12]

### C. CONCLUSION:

The Plaintiffs have met their burden of showing that no genuine issue of material facts exists as to whether the failure of the Macondo well and resulting damages were caused by the negligence of Halliburton , through both its defective cement design and its negligent testing and application of tis cement, under the general maritime law of negligence and product liability as well as under the Louisiana Products Liability Act, with the result being the damages caused by the release of the oil and gas from the Macondo well.

Accordingly, it is respectfully submitted that Halliburton Energy Services, Inc., be held liable, jointly and in solido, for these damages.

Respectfully submitted,

/s/ Daniel E. Becnel, Jr.
DANIEL E. BECNEL, JR. (#2926)
BECNEL LAW FIRM, LLC
P. O. Drawer H
106 West Seventh Street
Reserve, Louisiana 70084

---

[10] Pennington v Vistron Corp., 876 F.2d 414, 426 (5th Cir., 1989)
[11] Conkling v Turner, 18 F.3d 1285, 1295 (5th Cir., 1994)
[12] Hawking v Ford Motor Credit Co., 210 F.3d 540, 545 (5th Cir., 2000)

Telephone: (985) 536-1186
Facsimile: (985) 536-6444
E-mail: dbecnel@becnellaw.com
**Attorneys for Plaintiffs in:**
1. *Bill's Oyster House v BP et al* (C.A. 10-1308)
2. *Howard Buras v BP et al* (C.A.10-2994)
3. *Armand's Bistro v BP et al* (C.A. 10-4489)
4. *Faye Loupe et al. v BP et al* (C.A. 10-2764)
5. *Laura Gautreaux v BP et al* (C.A. 10-1539)
6. *Brent Rodrigue, Sr. et al. v BP et al* (C.A. 10-1325)

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Memorandum has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this __12th__ day of __April__, 2011.

_/s/ Daniel E. Becnel, Jr._