### Additional Circulation During Course of Cementing

BP has argued that the Chief Counsel's team must also take into account the additional mud volume circulated up the annulus from the bottom during the cement job itself in determining the total volume of mud circulated prior to the conclusion of the cement job. During the cement job, rig personnel pumped approximately 1,020 bbl of base oil, spacer, cement, and mud down into the well, which would have displaced an equal volume of mud.[203]

When combined with the pre-cementing circulation, this means that rig personnel pumped a total of 1,370 bbl of fluids (mud, spacer, and cement) down the well by the time cementing was complete.[204] This would have brought the bottomhole mud up into the riser to a depth of 4,250 feet below the ocean surface by the end of the cement job as shown in Figure 4.3.18. It would have taken a total of 2,760 bbl of circulation to bring the bottom mud all the way back to the rig.[205]

**Table 4.3.2. Plans reduce pre-cement circulation volumes and rates.**

| Plan | Recommended Volume | Volume in Barrels | Recommended Circulation Rate |
|---|---|---|---|
| API RP 65, Part 2[206] (First edition) | 1.5 annular volumes or one casing volume, whichever is greater | 4,140 bbl (1.5 annular volumes) | |
| Full Bottoms Up | | 2,760 bbl[207] | |
| BP September 2009 Plan[208] and January 2010 Plan[209] | 1.5 x pipe volume | 1,325.73 bbl[210] | — |
| BP April 12 Plan[211] | 1 casing and drill pipe capacity, if hole conditions allow | 883.82 bbl[212] | ~ 8 bpm |
| BP April 15 Plan[213] | 1 casing and drill pipe capacity, if hole conditions allow | 883.82 bbl[214] | 3 bpm, based on M-I SWACO models to keep ECD below 14.5 ppg |
| April 18 Halliburton Cement Proposal[215] | | 111 bbl | 1 bpm |
| | | 150 bbl per company man | 4 bpm |
| April 19 Actual Circulation | | 350 bbl | 1-4 bpm |

# Cementing Process at Macondo

Halliburton's cementing team began pumping cement for the production casing on April 19.[216] In all, they pumped the following fluids down the well:

**Table 4.3.3. Cementing volumes.**

| Material Pumped | Volume |
|---|---|
| Base oil | 7 bbl[217] |
| Spacer fluid | 72 bbl[218] |
| Unfoamed lead cement | 5 bbl[219] |
| Foamed cement | 39 bbl (Foamed to 48)[220] |
| Unfoamed tail cement | 7 bbl[221] |
| Spacer | 20 bbl[222] |

After pumping these fluids, the cementing crew pumped mud into the drill pipe to push the cement down the well into position.[223]

Over the next three-and-a-half hours, the cement traveled down the drill pipe and into the well. During that time, rig personnel watched pump pressures at the rig for signs of cementing progress. Morel saw small pressure spikes suggesting that the top and bottom plugs had passed through the crossover joint in the long string.[224] Personnel on the rig agreed that the plugs bumped.[225] At 12:38 a.m. on April 20, Chaisson marked in his tally book that the plugs bumped at a pressure of 1,175 psi.[226]

Morel noted that the bottom plug landed 9 bbl ahead of plan.[227] This meant that the rig crew had to pump 9 bbl less fluid down the well than they planned before the bottom plug reached the float collar, potentially suggesting that the bottom plug had bypassed mud on its way down the well, and that the bypassed mud had contaminated the cement.

The top plug landed according to plan.[228] Chaisson watched the Sperry-Sun data[229] and estimated 100 psi of lift pressure before the top plug bumped.[230] Guide looked at the data from shore and thought it "easy" to see lift pressure.[231] Throughout cementing, the rig crew saw "full returns."[232]

BP and Halliburton declared the job a success based on the indirect indicators—lift pressure, bumping the plugs on time, and full returns. Chaisson sent an email to Gagliano at 5:45 a.m. saying, "We have completed the job and it went well."[233] He attached a detailed report stating that the job had been "pumped as planned" and that "full returns were observed throughout."[234] Just before leaving the rig, Morel emailed the rest of the BP team: "Just wanted to let everyone know the cement job went well. Pressures stayed low, but we had full returns the entire job, saw 80 psi lift pressure and landed out right on the calculated volume.... We should be coming out of the hole shortly."[235] Later, Morel followed up with an email saying "the Halliburton cement team...did a great job."[236] Sims congratulated Morel and the BP team, writing, "Great job guys!"[237]

# The Float Check at Macondo

After cementing was complete, rig personnel conducted a **float check** to ensure the float valves had closed properly. Rig personnel began by pressuring up the system after bumping the top wiper plug.[238] They then released the pressure and monitored the system for pressure differentials and flow back from the well.[239] BP well site leader trainee Lee Lambert and Halliburton cementer Vincent Tabler opened a valve at the cementing unit to see how much mud flowed out of the well when they released the pressure.[240] (Some modest flow back is expected due to the compressibility of fluids during the pumping of the cement job.) Models had predicted 5 or 6 bbl of flow back.[241] The two men observed 5.5 bbl of flow, which tapered off to a "finger

**Figure 4.3.19. Decision tree.**





tip" trickle.[242] Tabler testified they watched flow "until it was probably what we call a pencil stream," which stopped, started up again, and then stopped altogether.[243] The total flow at that point was close to the predicted flow,[244] and the two men concluded the float valves were holding.[245]

# Cement Evaluation at Macondo

## BP's Decision Tree for Cement Evaluation

BP's decision process for determining whether to run evaluation tools after the cement job focused on lost circulation concerns as shown in Figure 4.3.19. On April 15, Hafle developed a cementing decision tree that effectively reduced the decision process to a single question: "Losses while cementing long string?"[246] If the cementing crew reported losses while pumping the cement job, the decision tree stated that BP engineers would "Calculate theoretical [top of cement] based on loss volume." If that calculation estimated that TOC was *below* 17,970 feet that would mean that there was less than 100 feet of cement above the top of the pay zone—400 feet less than MMS requires.[247] In that situation, the decision tree required a "log to confirm" the TOC.

If the theoretical calculation predicted that TOC was *above* 17,970 feet, the decision tree stated that the Macondo team would discuss MMS requirements and consider seeking a dispensation. If unable to get dispensation or "obtain MMS approval," then BP would "perforate" the casing and "squeeze" the annulus to remediate the cement job. An operator would not normally run a cement evaluation log and plan to remediate cement before temporary abandonment operations; the Macondo team's explicit discussion of these contingencies illustrates how concerned they were about the possibility of cement losses.[248]

On April 15, Morel distributed a full plan for the temporary abandonment procedures at Macondo. The plan summarized the cement evaluation decision tree and provided further detail on the criteria for how to evaluate the cement job:[249]

1. If cement job **is not** successful: (no returns or lift pressure seen): set wear bushing / Run IBC-CBL log / Wait on decision to do remedial work (MMS and BP).

2. If cement job **is** successful (partial returns or lift pressure seen) **or** IBC-CBL log and required remedial work is completed.

The plan thus stated that the BP team would declare the cement job "successful" if it saw "partial returns" or "lift pressure." It anticipated that the team might need to run cement evaluation tools ("IBC-CBL log") but required doing so only if "no returns or lift pressure seen." Steps one and two were the only steps in the BP plan that contemplated cement evaluation: In step three, the crew would move on to the temporary abandonment phase of the well and begin to displace mud in the wellbore with seawater.

BP/TrialGraphix

## BP Ordered Cement Evaluation Services From Schlumberger

On the same day that Morel distributed the temporary abandonment procedures, BP well site leader Ronnie Sepulvado placed an order with Schlumberger for cement evaluation services.[250] Sepulvado did so to ensure that a cement evaluation team would be available on the rig if the cement job did not go as planned. The order included a "full suite of logs,"[251] including a cement bond log, isolation scanner, variable density log, and inclinometer survey.[252] Schlumberger planned to evaluate the annular cement from the float collar to about 500 feet above the expected TOC.[253] The total cost for the services would be about $128,000.[254]

On April 18 and 19, a team of technicians from Schlumberger flew out to the rig.[255] BP told the team that the cement evaluation log would be run only if there were lost returns.[256] The Schlumberger team waited for more than a day on the rig to see if BP needed their services.

## BP Sent Schlumberger Home

At 7:30 a.m. on April 20, the Macondo team discussed the cement job during its daily morning phone call with its contractors. BP concluded during the call that the cement job had gone well enough that it could send home the Schlumberger technicians. According to Guide, "everyone involved with the job on the rig site was completely satisfied with the job."[257] Having seen lift pressure and no lost returns during the cement job, BP sent the Schlumberger team home and moved on to prepare the well for temporary abandonment. At approximately 11:15 a.m., the Schlumberger crew left the rig on a regularly scheduled BP helicopter flight.[258] Not running the cement log probably saved BP about eight hours of rig time.[259]

# Technical Findings

## The Primary Cement at Macondo Failed to Isolate Hydrocarbons

It is undisputed that the primary cement at Macondo failed to isolate hydrocarbons in the formation from the wellbore—that is, it did not accomplish zonal isolation.[260] If the cement had set properly in its intended location, the cement would have prevented hydrocarbons from flowing out of the formation and into the well. The cement would have been a stand-alone barrier that would have prevented a blowout even in the absence of any other barriers (such as closed blowout preventer rams, drilling mud, and cement plugs).

Although the Chief Counsel's team is certain that the Macondo cement failed, data currently available do not allow the team to determine precisely why. It may never be possible to make such a determination. Government investigators recovered samples of debris from the blowout that may be cement, but they have not currently determined whether it came from the well and, if so, from where within the well.[261] There are no plans to directly examine the annular cement currently remaining at Macondo for clues. Even if someone were to plan such an examination, the blowout and subsequent remedial efforts may have obscured or erased any clues that might otherwise have been discovered.

BP, Halliburton, and Transocean have each speculated about potential failure mechanisms. Based on information currently available, the Chief Counsel's team can conclude that most (if not all) of the cement pumped at Macondo flowed through the float valves and that most of the cement that rig personnel intended to place in the annular space around the production casing did in fact reach that location. (Chapter 4.1 discusses the remote possibility of a casing breach

that would have affected cement placement.)  Several events may have contributed to cement failure, either alone or in combination:

- cement in the annular space may have flowed back into the production casing due to u-tube pressure and failure to convert the float valves;
- drilling mud may have contaminated the cement in the shoe track and/or annular space badly enough to significantly slow cement setting time;
- cement in the annular space may not have displaced mud from the annular space properly, leaving channels of mud behind;
- cement in the shoe track may have flowed down into the rathole (the open section of wellbore below the reamer shoe), "swapping" places with drilling mud and increasing the potential for flow through the shoe track;
- cement slurry characteristics (such as retarder concentration, base slurry stability/rheology, or foam instability) may have compromised the sealing characteristics of the cement (discussed in Chapter 4.4); and
- severe foam instability may have allowed nitrogen bubbles to break out of the slurry, with unpredictable consequences (also discussed in Chapter 4.4).

Any theory regarding the precise mechanisms of the Macondo cement failure must account for several issues that the Chief Counsel's team has identified.  Most importantly, if our team is correct that hydrocarbon flow came through the shoe track and up the production casing, then the tail cement in the shoe track must have failed to block that flow.  It would have taken only a relatively small amount of properly set cement in the shoe track to block that flow.  This suggests one of three nonexclusive possibilities to the Chief Counsel's team.

**Drilling mud contamination.**  The first is that enough drilling mud contaminated the shoe track to delay cement setting time so that the shoe track cement did not provide a competent flow barrier at the time of the blowout.  This probably would have taken a significant amount of mud; testing by Chevron indicated that even with 25% mud contamination, the Macondo cement formulation would develop adequate compressive strength without serious delay.[262]

The mud in question could have been entrained in the cement flow during cement placement by, for instance, the wiping action of the plugs.  If the plugs landed off-schedule (as post-blowout statements by Morel suggest), that would support this theory.  Cementing experts emphasize that the shoe track is designed to prevent cement contaminated by plug bypass from entering the annular space.  Shoe track cement should therefore properly be treated as one part of the overall cement barrier system and may not bar hydrocarbon flow on its own.

Drilling mud could also have "swapped" into the shoe track from the open hole section below the casing (sometimes called the rathole).  The rathole volume was similar to the shoe track volume.  Mud contamination could also have come from the annular space around the production casing if channeling or other phenomena caused contamination of that area and float equipment malfunctions allowed this material to flow back into the shoe track under u-tube pressure.

**Gross nitrogen breakout.**  The second possibility is that the foamed middle section of the cement slurry was so unstable (as discussed in Chapter 4.4) that nitrogen gas bubbles in it "broke out" of suspension while the cement was flowing down the drill pipe and production casing.  This

could have left large gas-filled voids not only in the middle section of cement that was injected with nitrogen, but also in the tail cement (which became the shoe track cement). That tail cement should not otherwise have had nitrogen in it. A problem with this theory is that pumping data from the cement job do not show the sorts of gross anomalies that one would expect if cement and nitrogen flowed through the float collar separately.

Nitrogen breakout could also have occurred after the cement arrived at the bottom of the well. This might not have produced anomalies in the pumping job data but still could have compromised the quality of the set cement. As described in Chapter 4.4, unstable nitrogen foamed cement can be excessively porous and permeable once set. Hydrocarbons can flow through such cement.

**Gross cement slurry failure.** A final possibility is that the Macondo cement slurry was unstable even before being foamed with nitrogen. As Chapter 4.4 explains in greater detail, pre-blowout testing shows that the Macondo slurry had a very low yield point, and post-blowout testing shows that a cement slurry produced using the Macondo recipe had a tendency to settle as it set. It is possible that these problems compromised the quality of the Macondo cement job so that cement in the shoe track could not have prevented hydrocarbon flow. A problem with this theory is that it appears, based on available information, that the cap cement in the annulus above the pay zone set up properly and created a barrier to flow up the annulus.

## Using Six Centralizers Increased the Risk of Cement Failure

Reduced pipe centralization increases the risk of poor mud displacement, the risk that mud channels will compromise zonal isolation, and the risk that hydrocarbons will migrate into and through the annular cement as it sets. Without a direct examination of the Macondo cement, the Chief Counsel's team cannot determine whether any of these things occurred, let alone whether they caused or contributed to the blowout. The team can only conclude that BP's engineering decision increased the risk of cementing failure.

The Chief Counsel's team cannot at this time accept Halliburton's conclusory assertion that the limited number of centralizers at Macondo caused inadequate mud displacement, channeling, and cement failure.[263] To support its view, Halliburton relies heavily on the results of the model that Gagliano produced on April 18.[264] But Gagliano produced the April 18 report using several assumptions that did not match the eventual Macondo conditions. Halliburton points out that Gagliano received these assumed figures from BP, but that it is irrelevant; because the April 18 modeling inputs were inaccurate, the modeling output was unreliable even if one were to assume that those models accurately predicted problems with a cement job.[265] (Halliburton personnel have argued that their model would still have predicted channeling even with corrected inputs. However, Halliburton has yet to provide the results of a corrected model to the Chief Counsel's team or the public. This leads the Chief Counsel's team to infer that the results are not favorable to Halliburton.)

The Chief Counsel's team also cannot accept BP's equally conclusory assertion that the decision to use only six centralizers "likely did not contribute to the cement's failure to isolate the main hydrocarbon zones...."[266] Chapter 4.1 explains that the Chief Counsel's team finds it likely that hydrocarbon flow came up the production casing through the shoe track. But even though insufficient centralization may not have directly affected the integrity of the cement in the shoe track, it very well could have damaged the integrity of the cement in the annular space around the pay zone. If that cement had worked properly, shoe track cement failure would have been irrelevant.

BP's technical guidance and early Macondo well plans called for more centralizers than were actually run and for centralizers to be used over a larger casing interval.[267] If BP believed that its engineers could reliably reduce the number of centralizers (and hence cost) by scrutinizing caliper logs and pinpointing the placement of centralizers, one would expect its guidance documents and well plans to describe this practice. And while BP has repeatedly questioned the accuracy of the Macondo cementing models and the value of Halliburton's model in general,[268] it offers little affirmative technical analysis of its own to support its claim that centralization was not an issue at Macondo. Moreover, *before* the Macondo blowout, BP engineers thought the model's predictions of channeling were sufficiently credible that they flew 15 more centralizers to the rig in response.

## Limited Pre-Cementing Mud Circulation Increased the Risk of Cement Failure

BP's decision to circulate a limited volume of mud at a relatively low rate before cementing may have led to inadequate mud conditioning and wellbore preparation. BP's decision was perhaps an understandable response to its concerns about formation integrity and lost returns, but it also increased the risks of cementing failure.

BP has defended its decision not to circulate bottoms up before cementing. It has argued, among other things, that modern technologies can identify wellbore cleanliness problems without full mud circulation and that the Macondo team took other measures to prepare the wellbore for cementing. For instance, the team circulated bottoms up *before* running the production casing[269] and pumped additional spacer during the cementing process to remove debris from the well.[270] At the same time, BP cannot dispute that circulating bottoms up is a "best practice" specified by Halliburton and other cementing experts,[271] and that its team did not do so. Although circulating less mud may have reduced the particular risk of lost returns, it nevertheless increased other aspects of the risk for cement failure, as compared to completing a full bottoms up.

## Low Cement Volume Increased the Risk of Cement Failure

The limited volume of cement used at Macondo increased the risk of cement failure. BP pumped only about 60 barrels of cement (after nitrogen foaming) at Macondo. While BP may have thought it necessary to pump a small amount of cement to reduce the risk of lost returns, this approach magnified three other risks.

First, it meant there would be less cement in the annular space above the hydrocarbon zones—less even than BP's technical guidance recommends.[272] Second, it increased the risk that placement errors would leave insufficient cement in the shoe track or in the annular space corresponding to the hydrocarbon zone. And third, it increased the detrimental effects of any mud contamination. Mud contamination may have been a particular problem at Macondo because the design called for a tapered long string casing. That casing design called for the top and bottom wiper plugs both to wipe mud from a relatively long length of casing and to wipe two different casing diameters.[273]

Before the blowout, BP's engineering team recognized that their design called for a low cement volume that would provide little room for error.[274] And since the blowout, BP has recognized that "small cement slurry volume" increased cementing difficulties at Macondo.[275]

## Cementing Pump Rate Increased the Risk of Cement Failure

In concert with Halliburton, BP chose to pump the primary cement at a relatively low rate.[276] This low rate would have decreased the efficiency with which the cement would have displaced mud from the annular space, especially given Halliburton's predictions regarding the impact of

a reduced number of centralizers.[277] This, in turn, would have increased the risk of mud-related cementing failures such as channeling, contamination, and gas flow.

## Using a Reamer Shoe Instead of a Float Shoe May Have Increased the Risk of Cement Failure

BP could have decreased cementing risks using a float shoe. Like a reamer shoe, a float shoe is a rounded piece of equipment that attaches to the bottom of a casing string and helps to guide the string down. But unlike the reamer shoe, the float shoe includes a check valve that functions much like the valves in the float collar. That extra check valve serves as an extra line of defense against cement contamination and helps keep debris and contaminants away from the float collar's valves. The existence of the extra check valve also helps to ensure proper cement placement by preventing cement from flowing back up the casing. Industry engineers often install float shoes where they are concerned about cement contamination.[278] While cement contamination was (or should have been) a concern at Macondo, BP chose not to install a float shoe on its production casing.

## Rathole Issues Could Potentially Have Increased the Risk of Cement Failure

BP chose not to take precautions against **rathole** swapping. The rathole, again, is the open section of wellbore below the end of the production casing. As described above, mud in this portion of the wellbore can swap places with cement in the shoe track if the mud is less dense than the tail cement. This can contaminate the cement in the shoe track or potentially create a flow path through the cement in the shoe track.

One common precaution to guard against this phenomenon is to pump a small volume of dense mud into the rathole. If this mud is more dense than the cement, it will tend to stay in place rather than swap places with the cement. Although early BP plans called for this procedure,[279] the engineers eventually chose not to do it because the volume was small and improper placement could cause ECD concerns.[280] They reasoned that this created relatively small risks: the density differential between the mud and tail cement was not large, and the rathole volume was relatively low.[281] Halliburton personnel admitted after the blowout that rathole swapping could create a problem, but they had not considered the issue before pumping the job.[282]

## Rig Personnel May Not Have Converted the Float Valves

Although rig personnel and BP concluded that they successfully converted the float valves, the Chief Counsel's team finds that the float valves at Macondo may not have actually converted.[283] Unconverted float valves could have compromised the bottomhole cement job at Macondo.

### Rig Personnel Never Pumped Mud at the Rates Weatherford Specified to Convert the Float Collar

Planning documents and pumping data show that rig personnel never pumped mud down the well at sustained rates high enough to ensure float valve conversion. While well plans specified mud circulation rates that would have converted the float valves, actual rates never exceeded 4.3 bpm—significantly less than the 6 bpm required to convert the equipment:

**Table 4.3.4**

| | Flow Rate Needed to Convert | Differential Pressure Needed to Convert |
|---|---|---|
| BP September 2009 Plan[284] and BP January 27, 2010 Final Drilling Program[285] | 12 bpm maximum | ~ 600 psi |
| BP April 12, 2010 Drilling Plan[286] and BP April 15, 2010 Drilling Plan[287] | 8 bpm minimum | ~ 500 to 700 psi per Weatherford recommendation |
| Weatherford Manufacturer Recommendation[288] Adjusted for 14.1 ppg Mud Weight[289] | 6 bpm[290] | 600 psi[291] |
| April 19 actual[292] steady flow rate never exceeds 4.3 bpm,[293] which would result in a differential pressure of approximately 328 psi[294] | | |

BP contracted Stress Engineering Services, a third-party engineering firm, to conduct post-blowout testing on float collars similar to those used at Macondo.[295] On the basis of this testing, BP asserts that temporary surge flow rates caused by sudden pressure changes in the well would have converted the float equipment.[296] BP contends that there were two potential surge-inducing events. The first was the sudden drop in pressure from 3,142 psi once mud circulation began.[297] The second was during the cement job when the bottom plug burst at 2,392 psi.[298]

The Stress Engineering analysis shows that the Macondo float valves may have converted because of pressure-induced surge flows. But if this in fact happened, it was by happenstance, not design. More importantly, without having pumped mud consistently through the float collar at Weatherford-prescribed rates, BP personnel had no sound basis for concluding that the float valves had converted. And the later float check that they performed was not a reliable indicator that the float collar had sealed.[299] BP's own report agrees.[300]

Although rig personnel deemed the Macondo float check to be a success, the check was actually inconclusive because of the small density differential between the cement and drilling mud in the well. Halliburton's April 18 model predicted 38 psi of differential pressure.[301] (The Chief Counsel's team's calculations based on actual volumes pumped indicate a u-tube pressure of about 56 psi—an inconsequential difference.[302]) A Weatherford representative confirmed that 38 psi of differential pressure is "pretty tiny,"[303] and other experts agree that it would be hard to detect.[304] The small u-tube pressure would also have meant that any cement backflow may have been too small and gradual for rig personnel to detect in the time that they monitored for flow.

## The Drop From 3,142 psi May Have Been Due to a Clogged Reamer Shoe or a Failure of the Float Collar System

Rig personnel assumed that the sudden drop in pump pressure from 3,142 psi indicated that they had converted the float collar. If the float collar did not actually convert, then something else must have caused this pressure drop. The Chief Counsel's team has identified two possible explanations.

### The Reamer Shoe May Have Been Clogged

The first possibility is that the unexpected pressure increases and sudden pressure drop may have been caused by a clog in the reamer shoe that eventually cleared in response to elevated pump pressure.

Drilling mud pumped down the Macondo production casing and through the float collar assembly had to exit the bottom of the casing through three 1⅝-inch holes ("circulation ports") at the

**Figure 4.3.20. Clogged reamer shoe.**

**Figure 4.3.21. Ball forced through tube.**





TrialGraphix

bottom of the reamer shoe.[305]  Debris and/or cuttings may have plugged these holes during the course of casing installation as shown in Figure 4.3.20.  This could explain why the rig crew was unable initially to establish mud circulation after landing the production casing.  It could also explain why the pressure dropped suddenly from 3,142 psi—that pressure may have been sufficient to clear a clog in the reamer shoe to allow mud to flow again.

After the blowout, at least two BP personnel identified a clogged reamer shoe as a factor that may have complicated the float conversion process.  Morel told BP investigators soon after the blowout that he believed the reamer shoe may have been plugged.[306]  Sepulvado, who was onshore at the time of the blowout, similarly told the Chief Counsel's team that the only reason such high pressures would have been needed was because differential pressure was not getting to the ball,[307] which may have been caused by a clogged reamer shoe.[308]  Besides interfering with float conversion, a clogged reamer shoe could have complicated cementing by altering cement flow out of the reamer shoe.

## The Ball May Have Been Forced Through the Auto-Fill Tube

A second possibility, shown in Figure 4.3.21, is that the sudden pressure drop may have been caused when pump pressure forced the ball inside the auto-fill tube through the end of the auto-fill tube.  The collar that would normally have retained the ball within the auto-fill tube was held in place with brass pins.  It is possible those pins and the collar failed, allowing the ball to pass through.[309]  This would have left the auto-fill tube in place between the float valves and created a path for flow in either direction.

TrialGraphix

If the ports in the bottom of the auto-fill tube were clogged, the rig pumps may have placed enough force on the collar to shear the brass pins instead of the pins holding the auto-fill tube in place. Clawson informed Morel on April 19 that it would only take 1,300 psi of pressure to force the ball through the collar without converting the float valves.[310] It is not apparent whether Morel considered or informed others of this possibility.[311]

## Unconverted Float Valves Would Have Increased the Risk of Cement Failure

If rig personnel never converted the float valves at Macondo, it would have left an open flow path through the float collar assembly. That flow path may have allowed cement to flow back into the casing from the annular space outside the casing, which would in turn have left less cement in the annular space. This flow would also have: (1) increased the potential for contamination of the shoe track cement with mud; (2) brought foamed cement from the annulus into the shoe track (which should have contained only unfoamed tail cement); and (3) allowed any nitrogen that broke out of the foamed cement to compromise the shoe track cement. The open flow path would also have made it easier for any hydrocarbons that bypassed the cement to flow through the float collar assembly.[312]

## Properly Converted Float Equipment Is Not a Reliable Barrier to Hydrocarbon Flow

The Chief Counsel's team does not believe that even properly converted float valves would have constituted a reliable physical barrier to hydrocarbon flow. While BP's internal investigation report appears to state that float valves could be a barrier,[313] several senior BP personnel disagreed with that statement.[314] Weatherford does not consider float equipment a barrier to hydrocarbon flow and instead provides the equipment only to prevent backflow of cement.[315] The API similarly states only that "float equipment is used to prevent the cement from flowing back into the casing when pumping is stopped"[316] and does not include float equipment among its list of subsurface mechanical barriers.[317]

# Management Findings

## BP's Management Processes Did Not Force the Macondo Team to Identify and Evaluate All Cementing Risks and Then Consider Their Combined Impact

BP engineers failed to fully appreciate the cementing challenge they faced at Macondo. Every deepwater cement job presents a technical challenge, but the Macondo cement job involved an unusual number of risk factors. Several were inherent in the conditions at the well. BP and Halliburton created several others during the course of the design and execution of the primary cement job. The list includes:

- narrow pore pressure/fracture gradient;
- use of nitrogen foamed cement;
- use of long string casing design;
- short shoe track;
- limited number of centralizers;
- uncertainty regarding float conversion;

- limited pre-cementing mud circulation;
- decision not to spot heavy mud in rathole;
- low cement volume;
- low cement flow rate;
- no cement evaluation log before temporary abandonment; and
- temporary abandonment procedures that would severely underbalance the well and place greater stress than normal on the cement job.

BP engineers certainly recognized some of these risk factors and even tried to address some of them. For instance, the team asked Halliburton to use additional spacer during the cement job to compensate for the limited pre-cementing circulation.[318] But it does not appear that any one person on BP's team—whether in Houston or on the rig—ever identified all of the risk factors. Nor does it appear that BP ever communicated the above risks to its other contractors, primarily the Transocean rig crew. For instance, Transocean was never aware that Halliburton had recommended more than the six centralizers that were used.[319]

More importantly, there is no indication that BP's team ever reviewed the *combined impact* of these risk factors or tried to assess the overall likelihood that the cement job would succeed, either on their own or in consultation with Halliburton. Rather, BP appeared to treat risk factors as surmountable and then forgettable. For instance, after Guide had decided to use only six centralizers despite the risk of channeling, one BP engineer wrote to another team member, "But who cares, it's done, end of story, [we] will probably be fine and we'll get a good cement job."[320] Reviewing the aggregate effect of risk factors may not even have led BP to change any of its design decisions. But if done properly, it may have led BP engineers to mitigate the overall risk in ways that could have prevented the blowout. Indeed, a major oil company representative stated that the risk factors at Macondo were so significant that his organization would not have counted the Macondo cement job as a barrier to annular flow outside the production casing even after a successful negative pressure test.[321]

A closely related issue is that once BP's engineering team properly identified a risk, it often examined and addressed the risk without a full appreciation of other risks its *response* might create. For instance, BP's team focused almost exclusively on the risk of lost returns in designing its cementing program. BP engineers may well have been right to view this as the largest individual risk they faced. But they failed to consider the secondary impacts of their numerous responses to that risk, which included reducing pre-cementing circulation, cement volume, and cement flow rate. Those responses may have increased the overall likelihood of cement failure even as they decreased the potential for lost returns.[322]

## BP Did Not Properly Manage Design Changes and Procedural Modifications

### Impact of Changes to Its Mud Circulation Plan

BP's engineering team does not seem to have recognized that late-stage changes to mud circulation plans might impact float collar conversion. Before the early April lost circulation event, the team intended to circulate fluids at 8 bpm—a rate that would have converted the float valves. But the BP team later reduced the planned circulation rate to 4 bpm because of ECD concerns—a rate that would not have converted the float valves according to the manufacturer's specifications. The April 15 drilling plan highlights the disjoint: It simultaneously calls for

circulation rates of *at least* 8 bpm to convert the float equipment but recommends circulating mud at 3 bpm "to keep ECD below 14.5 ppg."[323] Circulating at 8 bpm would clearly exceed that ECD threshold, and an independent expert found this inconsistency irreconcilable.[324]

If BP had recognized that lowering planned circulation rates could impact float collar conversion, it could have solved the problem easily. Weatherford can readily produce float collars that convert at different flow rates—changing the conversion flow rate can be as simple as changing the number of shear pins or the size of the holes in the bottom of the auto-fill tube. BP could therefore have used a different float collar assembly that would have converted at the lower flow rates it planned. Its engineering team does not appear to have considered this possibility or the internal inconsistency in its drilling plan.

## Centralizer Sub Procurement

By January 2010, BP's well plan had called for at least 11 centralizers for its final production casing string. Weatherford, BP's centralizer supplier, recommends that its clients notify it of equipment needs four to six weeks in advance.[325] But BP engineers waited until the last day of March to begin the process of ordering centralizers, leaving themselves less than three weeks of lead time. If BP had ordered centralizers earlier, Weatherford personnel would have had ample lead time to manufacture more centralizer "subs" to meet BP's request,[326] and BP's team would not have been forced to decide whether to use slip-on centralizers.

When BP eventually ordered centralizers from Weatherford, the engineer who made the request only asked for a range of "7–10" centralizers rather than the 11 centralizers that BP's January 2010 plan specified. It appears that BP engineers relied on their own estimates of centralizer needs given well conditions, but it is unclear why those conditions would have been any different than when the original well plan was designed.[327] When Weatherford responded that it had only six centralizers in stock, BP's team viewed this as sufficient even though it was less than the number the engineer requested and about half the number called for in the well plan. There is no indication that BP's team even asked whether additional centralizer subs could be manufactured in time, nor is there any evidence that BP attempted to secure acceptable equipment from other suppliers besides Weatherford.[328]

Managing equipment procurement is a key part of safe and efficient offshore drilling. By failing to plan centralizer procurement properly, BP's engineering team forced itself to choose between using only a few centralizer subs, adding slip-on centralizers that its team believed posed mechanical risks, or incurring costs by waiting for Weatherford to manufacture additional subs at the last minute.

## Decision Not to Run Additional Slip-On Centralizers

BP also mismanaged its engineering response to Halliburton's advice to add centralizers. First, BP and Halliburton could have considered centralizer availability during the mid-April design review that led them to determine they could cement a long string without exceeding ECD thresholds. Instead, they simply assumed optimal centralization without examining whether they had the materials on hand to achieve it.

Once Gagliano advised BP's team that additional centralizers would be needed to avoid channeling, the team responded by procuring 15 additional centralizers immediately. The immediate response reflects appropriate levels of concern, but also highlights the problems with making complex design changes at the last minute. The engineering team believed that

it was ordering slip-on centralizers with integrated stop collars even though a Weatherford representative sent the team specifications that showed otherwise. It appears that BP's team did not review these specifications carefully, perhaps because of time pressure. Careful review here would have avoided last-minute decision making on April 16.[329] The decision to send these additional centralizers prompted Guide to complain to his supervisor Sims the next day:

> David, over the past four days there has been so many last minute changes to the operation that the WSL's have finally come to their wits end. The quote is "flying by the seat of our pants." More over we have made a special boat or helicopter run everyday. Everybody wants to do the right thing, but this huge level of paranoia from engineering leadership is driving chaos.... The operation is not going to succeed if we continue in this manner.[330]

After the centralizers were delivered, BP made its final decision not to use them without careful engineering review. After Guide found out the type of centralizers Weatherford had provided, he argued that they should not be used because of recent problems that BP had experienced with the design.[331] (Guide mentioned time and cost concerns as well.) But Guide and the rest of the BP team appear to have been motivated by personal experience rather than any disciplined analysis. Notably, they did not consult the Weatherford centralizer technician that they had flown to the rig, who could have provided valuable input on the relative risks of centralizer hang-up.[332] It is not even clear whether BP believes *now* that its Macondo team should or should not have used the centralizers; the Bly report states that the team "erroneously believed that they had received the wrong centralizers."[333]

BP also did not examine whether the mechanical risks of running additional centralizers outweighed the cementing risks of *not* using them. BP's team could easily have asked Gagliano to run a new model to predict the impact of using only six centralizers and could have provided up-to-date wellbore and well design data to improve the accuracy of those predictions. The team also could have consulted its in-house cementing expert Cunningham.[334] BP could have asked Halliburton to incorporate Morel's irregular placement of centralizers into its model, rather than simply relying on Morel's apparent ad hoc analysis to determine their placement. It did none of these things.[335] BP's engineering team may have been motivated by skepticism of Halliburton's modeling,[336] but this was the only analytical tool the team had at the time.

Having made a last-minute decision to use fewer centralizers than planned, BP's team should have recognized that decision would increase the risks, first, of lost returns (by increasing ECD), and second, of overall cementing failure. Instead, the team appears to have viewed its centralizer decision-making process as a "miss-step"[337] that had little significance after it occurred. Had BP at least noted the risks of using fewer centralizers than it had planned, its rig personnel and contractors might have been better prepared for the events that followed.

## Communication of Centralizer Decisions Hampered Risk Identification and Management

Once BP decided not to run the additional centralizers, it made no effort to inform its contractors of its decision. Weatherford's technician only learned that the centralizers would not be used by asking about the issue hours after the installation should have occurred.[338] When he did learn of it, the technician was concerned enough to call his supervisor—he had never been on an installation job that had been canceled.[339] But neither he nor anyone else at Weatherford expressed concerns to BP. Instead, the technician's supervisor instructed him to defer completely, stating: "Third party, we do what the company man requests."[340]

Gagliano only learned about the decision from Tabler, who in turn learned it from Chaisson, who in turn learned of the decision by happenstance.[341] Gagliano stated that he was "frustrated,"[342] and emailed BP's team to confirm the decision and to ask if he should rerun his models, but nobody ever responded to him.[343] Gagliano eventually updated the cement model on his own, but his model lacked up-to-date information from BP, and he sent it only after the casing run had begun. A prompt response from BP to Gagliano might have improved the Macondo team's appreciation of the risks they faced.

## Use and Management of Modeling Results

BP engineers mismanaged their use of Halliburton's computer cementing models.

It is unclear why BP did not review Halliburton's modeling results more carefully and continually update Halliburton's data after April 14. Industry experts say that it is not uncommon for operators to depart from cementing rules of thumb (such as full bottoms up) in reliance on favorable modeling predictions. But operators who do so should continually update such models to ensure that their departures do not cause cementing problems. At Macondo, BP appears to have done little after April 14 to ensure that Halliburton was using up-to-the-minute data. BP provided Halliburton a caliper log but not updated information about reservoir pressure and centralizer placement. Instead, it appears that BP's engineering leadership paid little attention to refining the model once it produced results they found favorable.

BP's willingness to disregard Halliburton's April 18 modeling predictions is especially questionable given the degree to which BP relied on the model's earlier predictions. On April 14, BP relied almost exclusively on a Halliburton model to conclude that it could successfully cement a long string casing. At this time, BP engineers knew that the model was based on incomplete data. BP then disregarded the April 18 predictions even though the concerns it identified were similar to those that motivated more serious analysis on April 14. BP's apparent skepticism of the value of the April 18 results is hard to square with its near-total reliance on the April 14 results.

# BP Did Not Adequately Evaluate the Significance of Float Conversion Difficulties

BP's management and review of the float collar conversion process were inadequate. As explained above, BP should have secured different float equipment once it modified its planned circulation rates. BP also mismanaged its evaluation of the float conversion process on the rig. BP rig personnel properly consulted their shore-based engineering team after encountering difficulties when converting the float collar. But after reinitiating circulation at much higher pressures than expected, BP's team appears to have assumed the float valves converted. If the team had instead reviewed the data carefully, it would have recognized that it had not yet circulated mud in excess of 4.3 bpm and might have increased circulation to ensure conversion.

Making matters worse, BP and Transocean personnel then tried to explain away concerns about lower-than-predicted circulation pressures by blaming a faulty pressure gauge. BP has since pointed out that the circulating pressures predicted by M-I SWACO were erroneous and that the circulation pressure observed was actually what should have been expected. But rig personnel believed at the time that M-I SWACO's predictions were accurate, and yet there is no evidence that they took steps to confirm the gauge was actually faulty or tried to replace it.[344]

If BP or Transocean had adequately considered the possibility that the float valves did not convert, they could have undertaken efforts to mitigate the potential risks. For instance, one

standard industry tactic to address float valve failure is to add pressure inside the casing system after pumping cement and to thereby counterbalance any u-tube pressure that might otherwise induce flow back through open float valves.[345]

## BP Focused Excessively on Full Returns as an Indicator of Cementing Success

The Macondo team's approach to cement evaluation at Macondo was flawed. Because the team focused its attention so heavily on the risk of lost returns, it overemphasized the significance of full returns as an indicator of cementing success.

Receiving full returns showed that cement had not flowed into the weakened formation but provided little or no information about: (1) the precise location where the cement had ended up; (2) whether channeling had occurred; (3) whether the cement had been contaminated;[346] or (4) whether the foamed cement had remained stable. Similarly, reports of on-time top plug arrival indicated, at most, only one thing for certain: The cement flowed through the float collar. (Morel's report that the bottom plug bumped early may suggest that mud contaminated the cement during job placement.) Accordingly, BP's technical guidance documents do not list reports of full returns or on-time plug bumping as indicators of zonal isolation.[347]

BP engineers also considered lift pressure a positive indication. Company technical guidance documents state that lift pressure can provide a coarse indication of TOC (if not zonal isolation) but that it "is unlikely to provide a sufficiently accurate estimate" of TOC when "cement and mud weights are very similar,"[348] as they were at Macondo. While one BP engineer stated that lift pressure was "easy" to see at Macondo,[349] another admitted after the blowout that it was not a valid confirmation of good cement placement.[350] Industry experts who reviewed the data after the fact were also skeptical. The Chief Counsel's team spoke with several experts who agreed that the roughly 100 psi pressure increase that rig personnel observed at Macondo after the bottom plug landed was too low to be a reliable indication that cement had turned the corner and flowed up into the annulus.[351] One described 100 psi of lift pressure as "nearly unreadable."[352] That relatively small pressure increase might have been caused by cement "turning the corner" into the annulus, but it might also have been caused by friction from cement flow.[353]

Better management would have encouraged the BP team to question the overall value of its pressure and volume indicators. BP's own report appears to agree. It states:

> A formal risk assessment might have enabled the BP Macondo well team to identify further mitigation options to address risks such as the possibility of channeling; this may have included the running of a cement evaluation log.... Improved technical assurance, risk management and management of change by the BP Macondo well team could have raised awareness of the challenges of achieving zonal isolation and led to additional mitigation steps.[354]

Rather than aiding decision making, the Macondo team's cementing decision tree reinforced the flaws in its analytic approach. Proper risk management in a complex engineering project requires a constant awareness of risks and potential risks. The decision tree instead encourages a simplified linear approach in which complex risks (such as the risk of failed cementing) can be forgotten or ignored on the basis of simple and incomplete indicators (such as partial returns or lift pressure).

## Most Operators Would Not Have Run a Cement Evaluation Log in This Situation, but BP Should Have Run One Here, in Part Because of Its Chosen Temporary Abandonment Procedures

At least some personnel appear to have believed that the Macondo team was planning to run a cement bond log no matter what. On April 20, a BP completions engineer emailed Morel to ask for cement bond log data. When Morel responded "No CBL," the completions engineer wrote "Can you explain why? I thought y'all were planning to run one."[355]

A cement evaluation log would have provided more direct and reliable information about the cement job than pressure and volume indicators on which BP relied. While most operators would not have run a cement evaluation log until the completion phase, BP should have run one here[356] for at least two reasons. First, BP engineers recognized or should have recognized that this was a "finesse" cement job that presented higher-than-average risks.[357] Full returns would not identify if channeling had occurred; a cement bond log could.[358] Second, BP's temporary abandonment procedures would force the rig crew to rely on this finesse cement job as the sole hydrocarbon barrier in the Macondo wellbore. Alternatively, BP should have sought other means for addressing the risk of unsuccessful cementing.

## Halliburton Did Not Adequately Inform BP of Cementing Risks or Suggest Design Alternatives

Halliburton did not provide BP the full benefit of its corporate cementing expertise. Since the blowout, senior Halliburton personnel have repeatedly and forcefully emphasized the complexity and difficulty of the Macondo cement job and the limitations of indicators such as full returns.[359] But Halliburton's personnel did not raise all of these concerns before the blowout, let alone emphasize them with the same force.

It appears that Gagliano mentioned the possibility of cement channeling to individual BP engineers on April 15 and then again later on April 19.[360] But he did not flag the concern in his emails or express serious reservations. Gagliano told Congressional investigators that he "recommended to BP that they use 21 centralizers" but admitted that he "did not think there would be a well control issue."[361]

Gagliano also testified that he would have recommended that BP perform a cement bond log given the reduction in the number of centralizers but did not do so because "we do not recommend running a [cement] bond log"[362] and, anyway, he "was never asked."[363] Although Gagliano was present when BP discussed criteria for the cement bond log, he never told anyone full returns alone could not identify channeling.[364] Moreover, the only risk factor that Halliburton identified during the design process was the relatively low number of centralizers. Halliburton did not discuss any other risk factors or recommend other design changes that might have mitigated those risks. Halliburton personnel were aware that BP's design called for a low cement volume and a low cement flow rate. They also knew of the decision not to circulate bottoms up, the float valve conversion difficulties, and the low post-conversion circulating pressures.[365] But they never raised concerns about these risk factors, let alone offered BP an independent assessment of the overall likelihood of success of the cement job.

The format of Halliburton's modeling reports exacerbated communication difficulties. After the blowout, Halliburton personnel argued that the reports included predictions of channeling and gas flow that BP engineers should have heeded.[366] Halliburton could have highlighted these warnings—along with overall assessments of cementing success—in a simple summary early in

**Figure 4.3.22. Page 23 of Halliburton's April 18, 2010 OptiCem™ report.**



Halliburton

Channeling

**Halliburton personnel explained the green areas as predicted channeling.**

the report. Instead, the reports presented information in an obscure and unnecessarily technical manner. (For instance, as shown in Figure 4.3.22, the reports present channeling predictions only as unexplained jagged lines in a well diagram).[367] As a result, BP engineers reviewed the predictions in a cursory fashion, if at all.[368]

Halliburton missed another opportunity to communicate its concerns when it reported the overall success of its cement job. Chiasson expressed complete satisfaction with the cement job in his post-job report but later clarified that "[cementing] was successful on the surface. As far as being successful downhole, actually if it were successful at getting zonal isolation, I cannot be sure of that."[369] Halliburton explains the difference between its pre-blowout reports and its post-blowout skepticism by suggesting that it is BP's responsibility as the operator to evaluate the significance of cementing indicators and BP's responsibility to mitigate risks at the well. Whether that turns out to be true as a legal matter, Halliburton could have helped avoid the blowout if it had highlighted the risks of the cement job and the limitations of the few cementing indicators it had reviewed.◆

# Chapter 4.4 | Foamed Cement Stability

**BP** and Halliburton chose to cement the final Macondo production casing into place using nitrogen foamed cement. That technology offered several advantages at Macondo, but it also posed a risk: An improperly designed or incorrectly pumped nitrogen foamed cement slurry can be unstable and lead to a failed primary cement job. Data from pre- and post-job laboratory testing lead the Chief Counsel's team to conclude that the foamed cement slurry pumped at Macondo was very likely unstable. The Chief Counsel's team finds that Halliburton failed to review properly the results of its own pre-job tests, and that a proper review would have led Halliburton to redesign the cement slurry system. The Chief Counsel's team also finds that BP inadequately supervised the cement design and testing process.

## Foamed Cement

Cementing personnel create **nitrogen foamed cement** by injecting inert nitrogen gas into a base cement slurry. This produces a slurry that contains fine nitrogen bubbles. If the system is properly designed, the bubbles will remain evenly dispersed in the slurry as it cures, and the set cement will retain the bubbles in the same form.

Foamed cement offers two principal technical advantages. First, the nitrogen bubbles in the foamed cement slurry make the overall cement mixture less dense than the base cement slurry. Second, cementing personnel can adjust the density of the foamed cement slurry in response to well conditions by adjusting the rate at which they inject the nitrogen into the base cement slurry. Whereas a base cement slurry typically weighs about 15 pounds per gallon (ppg), foamed cement can weigh as little as 5 ppg.[1] All other things being equal, a low-density column of cement in the annular space around a well casing will exert less hydrostatic pressure on the formation than a high-density column of cement. As a result, using a low-density foamed cement can reduce the risk of formation breakdown. Such a breakdown may result in the loss of cement into the formation, compromising zonal isolation and reducing the productivity of the well over the long term.[2]

## Risks of Unstable Foamed Cement

A foamed cement system must exhibit good foam **stability**.[3] A stable nitrogen foamed cement slurry will retain the nitrogen bubbles internally and maintain its design density as the cement cures. The result is hardened set cement that has tiny, evenly dispersed, and unconnected nitrogen bubbles throughout. If the foam does not remain stable as the cement cures, the small nitrogen bubbles may coalesce into larger ones, potentially rendering the hardened cement porous and permeable to fluids and gases, including hydrocarbons.[4] If the instability is

particularly severe, the nitrogen can **break out** of the cement, with unpredictable consequences.[5] While technical authorities do not appear to have definitively determined the effects of pumping unstable foamed cement downhole, they uniformly agree that only stable foamed cement designs should be used.[6]

## Foamed Cement Testing

When designing a nitrogen foamed cement system, it is critical to test the stability of the foamed slurry.[7] The American Petroleum Institute (API) has published recommended procedures for conducting **foam stability tests**.[8]

**Figure 4.4.1. Foam testing apparatus.**

**Five-blade blender.**



API RP 10b-4

The technician mixes a volume of base cement slurry with air (not nitrogen) in a sealed blender to generate a foamed slurry of the same density that will be used in the field (see Figure 4.4.1). The laboratory may then conduct foam stability tests using one of two methods.

The first method involves pouring a sample of the foamed cement into a graduated cylinder (see Figure 4.4.2). After two hours, the technician visually examines the foamed slurry for signs of instability, such as large coalescing bubbles or cement density variations caused by nitrogen bubble migration or escape.

The second method involves pouring the foamed cement into a plastic cylinder, sealing it, and then allowing it to cure and set (see Figure 4.4.3). The technician then removes the solid cement sample from the cylinder and measures the density of solid cement at the top, middle, and bottom of the sample. If there are density variations from top to bottom, or if the densities are equal to one another but significantly higher than the target density, the foamed cement is deemed unstable.

**Figures 4.4.2 and 4.4.3. Foam testing apparatus.**





Sambhav N. Sankar



API RP 10b-4

**Left:** Graduated cylinder for unset foam test.
**Above:** Curing mold for set cement tests.

The API lists five signs of foamed slurry instability in the laboratory:[9]

- more than a trace of free fluid;
- bubble breakout noted by large bubbles on the top of the sample;
- excessive gap at the top of the specimen;
- visual signs of density segregation as indicated by streaking or light to dark color change from top to bottom; and
- large variations in density from sample top to bottom.

None of these criteria is quantitative. All rely to some degree on the judgment of laboratory personnel or cementing experts.

# Foamed Cement at Macondo

## Decision to Use Foamed Cement

BP and Halliburton planned from the very beginning to use foamed cement technology for at least some of the cementing work at Macondo. It is common to use foamed cement on the first few casing strings in a deepwater well because shallow formations are often too weak to withstand the hydrostatic and dynamic pumping forces exerted by a heavier, normal-density cement slurry. (The *Marianas* crew and Halliburton cemented at least two of Macondo's early casing strings with foamed cement.)[10]

Operators use foamed cement less frequently for deeper casing strings and in applications for which synthetic oil-based mud is being used as a drilling fluid. While at least one operator—Shell—often uses foamed cement in deepwater Gulf of Mexico production casings, BP appears to have had relatively little experience with using the technology for this purpose.[11]

To cement the final long string production casing at Macondo, Halliburton and BP began planning as early as February 2010 to start with a base slurry having a density of 16.7 ppg and then to add enough nitrogen to reduce the density to 14.5 ppg. It appears that BP drilling engineer Brian Morel first raised the idea of using foamed cement technology for the production casing. He suggested the idea because using foamed cement might provide long-term strength benefits over the life of the well.[12] Halliburton cementing engineer Jesse Gagliano agreed that foamed cement would be useful at Macondo.[13] But an internal BP cementing expert cautioned Morel as early as March 8 that:

> Foaming cement after swapping to [oil-based drilling mud] presents some significant stability challenges for foam, as the base oil in the mud destabilizes most foaming surfactants and will result in $N_2$ [nitrogen] breakout if contamination occurs. This drives the need for a lot of attention to the spacer programs and often results in non-foamed cap slurries being placed on top of the foamed slurry to mitigate breakout.[14]

The early April lost returns problems appear to have further solidified the decision to use nitrogen foamed cement. According to BP and Halliburton's calculations, using the lighter foamed cement would reduce the risk of fracturing the formation at the well and thereby reduce the risk of losing returns during the cementing process.

Case 2:10-md-02179-CJB-DPC   Document 1927-6   Filed 04/12/11   Page 22 of 33

## Pre-Blowout Cement Testing

When the *Deepwater Horizon* arrived at Macondo to replace the *Marianas*, it had on board a large quantity of cement dry blend that Halliburton had originally designed for use at Kodiak #2, the previous BP well the *Horizon* crew had drilled.[15] Gagliano had designed the primary features of that blend in late 2009.[16]

**Dry Blend.** The term **dry blend** refers to the combination of dry cement components that are blended together onshore for use on the rig. The Macondo dry blend included Portland cement, two different grades of silica powder, potassium chloride, a proprietary antisettling agent, and a proprietary flow-enhancing additive. The rig cementing team added water, two liquid chemical additives, and a glass fiber material to the dry blend to produce the base slurry.

On February 10, Gagliano instructed technicians in Halliburton's Broussard, Louisiana, laboratory to conduct pilot tests on a cement slurry recipe based on this dry blend. The slurry recipe specified the amount of water and the type and quantity of liquid chemical additives that should be mixed with the dry blend to produce the cement slurry. If the dry blend had been unsuitable—either because of its original design or because it had degraded during storage—then Halliburton could have delivered a new dry blend to the rig for use at Macondo.

## Foamed Cement Pilot Testing

Gagliano's February 10 pilot cement design listed the precise amount of liquid retarder, surfactant, and fresh water that the laboratory should add to the dry blend to produce a cement slurry for testing. The "recipe" that Halliburton tested in February was identical to the recipe that it eventually used at Macondo, with one exception: The February recipe included roughly twice the amount of liquid chemical "retarder" that Halliburton eventually used (0.20 gallons per sack (gal/sack) vs. the final 0.09 gal/sack) and correspondingly less water. (Adding retarder extends the setting time of cement.)[17] The laboratory used the dry blend from the *Deepwater Horizon* but used local tap water and stock liquid chemicals rather than water and liquid chemicals from the rig.

The Broussard laboratory conducted several tests in February, including two separate foam stability tests.[18] Both foam stability tests were "set" slurry tests, in which personnel poured foamed cement into a cylinder, allowed it to cure for 48 hours, and then examined the density of the top and bottom of the set cement cylinder.

Laboratory personnel appear to have conducted the first February foam stability test on or about February 13. The top and bottom of this sample weighed 16.8 ppg and 17.6 ppg, respectively. These measurements indicated serious instability because they differ significantly from each other, and they are both higher than the target density of 14.5 ppg. *The test measurements showed either that: (1) The lab personnel were unable to generate a proper foamed slurry; (2) gas bubbles migrated within the foamed slurry; (3) gas escaped from the slurry before it could set; or (4) some combination of these things occurred.*

Laboratory personnel appear to have conducted a second February foam stability test on or about February 17. The top and bottom of this sample weighed 15.9 ppg and 15.9 ppg, respectively.

While these two measurements were identical, the data still indicated serious instability because both measurements were significantly higher than the target density of 14.5 ppg. Again, nitrogen gas must have escaped from the tested slurry before it could cure, or the lab personnel had been unable to generate a proper foamed slurry.

These two February 2010 lab tests should have caused Halliburton technical personnel to conclude that the foamed cement Halliburton was planning to pump at Macondo was likely unstable.

Three other facts about the February tests are worth noting. First, laboratory personnel did not condition the cement before conducting the February 13 foam stability test but conditioned the cement for two hours before conducting the February 17 test. Second, rheology test results showed that the yield point of the base slurry was quite low. This can be an independent warning that the base slurry may be unstable and that a foamed slurry prepared from that base slurry may also be unstable.[19] Third, time-lapse strength testing showed that the pilot cement recipe set extremely slowly, suggesting that the recipe included too much retarder.

Halliburton did not report any of the February pilot testing data to BP until March 8.[20] On that date, Gagliano attached an official data report of the February test results to an email in which he discussed his recommended plan for cementing one of the Macondo casing strings.

The official data report included only the results of the February 17 foam stability test, in which the top and bottom portions of the set cement both weighed 15.9 ppg. (The official laboratory reports list the results in terms of specific gravity (SG) rather than pounds per gallon.) Because the top and bottom weights matched, the test did not demonstrate density segregation, but the test was still a clear failure because both weights were significantly higher than the target density.

For some unexplained reason, Halliburton's official data report to BP *incorrectly* stated that laboratory personnel had not conditioned the cement prior to the February 17 foam stability test.

Apparently, Halliburton did no further testing of the proposed Macondo cement slurry until April 2010, as the final production casing planning was under way.

## April 13 Pre-Job Testing

On April 1, Morel sent an email to Gagliano, BP senior drilling engineer Mark Hafle, BP operations engineer Brett Cocales, and Quang Nguyen of Halliburton requesting that Halliburton begin testing cement for the final production casing cement job. Morel wrote, "This is an important job and we need to have the data well in advance to make the correct decisions on this job."[21] Gagliano responded on the same day with an email stating that he had already run the February pilot tests, and that he would run further tests "[o]nce I get samples from the rig sent into the lab" and once he had the latest data on the downhole temperatures at the well.[22] Gagliano attached the same official laboratory report that he had sent on March 8.

Gagliano appears to have first ordered additional testing on April 12.[23] This time, the laboratory tested samples of dry blend, additives, and water from the rig, and used a design recipe that was nearly identical to the one that Halliburton eventually pumped. (The tested recipe contained slightly less retarder than the pumped recipe—0.08 gal/sack instead of 0.09 gal/sack.) According to Gagliano, the main goal of this test was to determine how much retarder the recipe should use.[24]

It appears that the laboratory performed a foam stability test on this recipe on or about April 13 and conditioned the cement slurry for 1.5 hours at 180 degrees before conducting the test.[25] They finished the test on or about April 15. After curing, the top and bottom of the set cement sample weighed 15.7 ppg and 15.1 ppg, respectively.

This April 13 test result, just a week before the blowout, indicated serious instability.[26]

On April 17, Gagliano sent an email to Morel, Cocales, and BP drilling engineer team leader Gregg Walz and attached two official laboratory reports.[27] The data reports included results from various tests on cement slurry recipes with two slightly different retarder concentrations: 0.08 gal/sack and 0.09 gal/sack. BP and Halliburton had discussed increasing the retarder concentration in order to compensate for the fact that they planned to pump the cement at a low rate. The slow pumping rate would translate to increased cement travel time, which would in turn raise the risk of premature cement thickening.

Neither data report included the results of the April 13 foam stability test (or any other foam stability test). *Gagliano did not otherwise alert BP to the foam stability test results*. Gagliano's cover email discussed the data from recently completed thickening time tests, presumably because this measured the cement characteristic that would vary depending on retarder concentration. Gagliano also stated that he had not yet obtained compressive strength results for the final cement recipe that BP planned to use—which included slightly more retarder.

Morel complained to Hafle that Gagliano had started the compressive strength tests later than he should have. Morel asked Hafle if Morel would be "out of line" by sending the following message to BP wells team leader John Guide and Walz:

> I need help next week dealing with Jesse. I asked for these lab tests to be completed multiple times early last week and Jesse still waited until the last minute as he has done throughout this well. This doesn't give us enough time to tweak the slurry to meet our needs.... As a team we requested that [Gagliano] run another test with 9 gals on Wednesday, I know the first [compressive strength] test had issues, but I do not understand what took so long to get it underway and why a new one wasn't put on right away. There is no excuse for this as the cement and chemicals we are running has been on location for weeks.[28]

Hafle agreed that Morel's concerns were reasonable and that BP should ask Halliburton to replace Gagliano soon (a request that BP appears to have made earlier as well).[29] Morel and Hafle conveyed their concerns to Walz, Cocales, and Guide, and on April 18, Walz responded that he and Guide would be meeting soon with Halliburton.[30]

Meanwhile, on April 17, Morel responded directly to Gagliano's email. Morel wrote:

> I would prefer the extra pump time with the added risk of having issues with the nitrogen. What are your thoughts? There isn't a compressive strength development yet, so it's hard to ensure we will get what we need until it[']s done.[31]

Morel thus told Gagliano that he would prefer to alter the cement slurry recipe to include more retarder to increase the thickening time (or "pump time") of the cement. In the same email, he appears to have recognized that adding more retarder would potentially increase the risk of nitrogen foam instability.

Laboratory personnel appear to have conducted a second April foam stability test on or about April 18.[32] They used the same amount of retarder (0.08 gal/sack) but conditioned the cement at 180 degrees for three hours—the longest period yet. The top and bottom of the set cement sample weighed 15.0 ppg and 15.0 ppg, respectively.

While these numbers are the same as each other, they are both 0.5 ppg higher than the target of 14.5 ppg. This means one of two things. First, laboratory personnel may have generated a foamed cement slurry that *initially* weighed 15.0 ppg and retained that density throughout the test. If this was the case, however, the laboratory documents should at least have noted the difficulty; API standards state that if laboratory procedures generate a foamed slurry density that is above the design density, "it will be difficult to obtain the proper foamed cement density in the field, and the slurry should be redesigned."[33]

Second, laboratory personnel may have generated a foamed slurry of 14.5 ppg, but some nitrogen gas may have escaped from the slurry as it set, making the slurry more dense. Because the change from 14.5 to 15.0 ppg is not indisputably "large" within the meaning of API testing criteria, this might suggest that the foamed cement was stable. Halliburton appears to contend that this is what happened and argues that the April 18 test shows that its cement slurry was stable.

Internal documents provided by Halliburton do not clarify which of these two things happened.

## Availability of April 18 Test Results

The documents also do not establish conclusively *when* Halliburton completed its April 18 foam stability testing. Handwritten notes in the documents suggest that laboratory personnel began the test at 2:15 a.m. on April 18,[34] and Halliburton has confirmed this time in correspondence to the Chief Counsel.[35] Halliburton at one point stated publicly that the test took 48 hours to complete.[36] If that were true, the test results would not have been complete until at least 2:15 a.m. on April 20, which would have been after the time Transocean's rig crew and Halliburton's cementing personnel *finished* pumping the primary cement job at 12:35 a.m. on April 20.[37]

Six months after the blowout, and after the Chief Counsel's team publicly questioned the stability of the Macondo cement design and the timing of lab testing, Halliburton still had not determined whether its personnel had completed the April 18 foam stability test before pumping the Macondo job.[38] Finally, eight months after the blowout, Halliburton informed the Chief Counsel that it had "learned more about the specific facts surrounding the cement lab testing," including that "the second April foam stability test was finished before the final cement job started."[39] In the words of its counsel:

> Halliburton can now demonstrate that an email notification was sent to Jesse Gagliano on April 19, 2010, at approximately 4:14 pm indicating that all tests associated with the final cement job were then "finished in lab," more than three hours before the cement job commenced. Attached to this letter is a copy of a spreadsheet containing the "web log" data referenced above and explained further in Halliburton's January 7th letter to you. This constitutes objective evidence...that the foam stability test was run in less than 48 hours and that the test was completed prior to the final cement job.[40]

Halliburton contended that the "finished" notification "would not have been generated had the foam stability test failed or been incomplete."[41]

The Chief Counsel's team cannot accept or reject Halliburton's contentions based on these statements by its counsel. While Halliburton did provide a one-page spreadsheet that it views as "objective evidence" of the timing of its test, the Chief Counsel's team cannot decipher the document (displayed as Figure 4.4.4) without the aid of Halliburton personnel.

*Halliburton flatly refused to produce any witness who could explain this document (or any of the other timing and testing issues discussed above) in a transcribed interview.*

**Figure 4.4.4. Halliburton evidence of test times.**



Halliburton

Significant problems remain even if the Chief Counsel's team accepts Halliburton's assertions about when the April 18 test had been completed. While Halliburton argues that its computer system generated a notice that the April 18 test results were available before its personnel pumped the cement job, it has carefully avoided saying that any of its engineers actually *knew* that the results were available, let alone *reviewed* them, before pumping the job. Indeed, BP documents show that Halliburton first reported the April 18 result to BP on April 26, six days after the blowout.[42] And while Halliburton contends that the "finished" notification meant that the April 18 foam stability test did not fail by its standards, it refuses to identify those standards, let alone the person who actually applied them.

Halliburton presumably would not deny this information to the Chief Counsel if it were favorable to the company.

## Post-Blowout Cement Testing

### Testing by BP

BP's internal investigation raised several questions about Halliburton's cement slurry design and pre-job testing procedures.[43] BP asserted that the final April 18 foam stability test "indicated foam instability based on the foamed cement weight of 15 ppg."[44]

BP also commissioned third-party testing by CSI Laboratories, an independent cement consulting company.[45] CSI could not conduct these tests on the actual materials that had been used at the Macondo well because those materials sank into the ocean with the rig.

CSI also could not conduct these tests using the precise off-the-shelf ingredients specified by the cement slurry recipe because Halliburton refused to provide its proprietary additives to CSI. CSI therefore developed a model slurry to mimic the characteristics of the slurry used at Macondo. CSI prepared the model slurry by mixing commercially available cement and additives according to the final Macondo cement recipe. To replace proprietary Halliburton additives, CSI used third-party chemicals that served similar purposes (for example, using a commercially available third-party retarder instead of Halliburton's proprietary SCR-1000 retarder). Despite these differences, BP's investigation team asserted that the model slurry was "sufficiently similar to support certain conclusions concerning the slurries actually used in the Macondo well."[46]

CSI reported that foamed cement generated from the model slurry was unstable under several test conditions. Based in large part on this analysis, BP's investigation team concluded in its report that "the nitrified foamed cement slurry used in the Macondo well probably experienced nitrogen breakout, nitrogen migration and incorrect cement density."[47]

## Testing by Chevron and Chief Counsel's Team

The Chief Counsel's team conducted its own independent tests of cement slurry stability on behalf of the Commission.

The Chief Counsel's team worked with an independent expert and cement experts from Chevron to conduct these tests.[48] Halliburton recognized that Chevron's laboratory personnel were highly qualified for this work; Chevron maintains a state-of-the-art cement testing facility in Houston, Texas, and employs a staff of cement experts to supervise cement design and testing for its oil wells. Halliburton also agreed to supply the Chief Counsel's team with off-the-shelf cement and additive materials of the same kind used at the Macondo well. Although these materials did not come from the specific batches used at the Macondo well, they are in all other ways identical in composition to the slurry pumped there.

Halliburton refused to provide the Chief Counsel's team with full details of the methods and protocols that its laboratory used to conduct its February and April cement tests. *Most notably, Halliburton refused to provide any information on whether and how its staff had conditioned the cement before conducting the foam stability tests.* (At the time Chevron conducted its tests, Halliburton had not yet produced any internal laboratory documents to the Commission staff. Halliburton later provided some internal documents that disclosed conditioning times.) When the Chief Counsel's team sought input from BP and other parties regarding these and other issues, Halliburton demanded that the team refrain from doing so.[49] The Chief Counsel's team agreed to honor Halliburton's request by working solely with Chevron experts and an independent expert to develop protocols for testing Halliburton's cement materials.

Chevron conducted numerous tests on the Commission's behalf. Chevron's laboratory report states that many of its results "were in reasonable agreement" with results reported by Halliburton. However, Chevron's staff did not obtain foam stability test results that agreed with Halliburton's. Instead, Chevron's report stated that its staff was "unable to generate stable foam with any of the tests" that they conducted to examine foam stability.[50] Chevron's testing strongly

suggests that the foamed cement slurry actually used at Macondo was unstable. Appendix D is Chevron's letter to the Chief Counsel's team that accompanied its report.

# Technical Findings

## The Foamed Cement Slurry Used at Macondo Was Very Likely Unstable

Of all the tests done so far to evaluate the stability of the Macondo foamed cement slurry design, only one (the April 18 Halliburton pre-job test) even arguably suggests that the design would be stable.

Even the April 18 test result predicts only borderline stability. Industry experts believe that the three-hour high-temperature conditioning regimen for this test biased it in favor of success. Several have stated that cement laboratories should not condition a slurry sample *at all* before running foam stability tests, let alone at such elevated temperatures.[51] They reason that during field cementing operations, crews do not usually mix or circulate the base slurry before foaming it with nitrogen. Halliburton explained that its laboratory personnel derived the conditioning time from pumping time,[52] and then contended in writing that there is "sound operational basis" for conditioning cement in a laboratory prior to foam stability testing.[53] But when the Chief Counsel's team asked Halliburton to provide "[a]ny scientific study or other document" supporting the latter statement,[54] Halliburton cited only one thing: API Recommended Practice 10b-2.[55] Section 15 of that document states, "The cement slurry is conditioned to simulate dynamic placement in a wellbore." But this document discusses methods for testing the static stability of *unfoamed* cement slurries. By contrast, API's practice recommendations for testing *foamed* cement do not mention pre-test conditioning at all.

Halliburton also declined to provide any information that would help the Chief Counsel's team determine whether lab personnel had difficulty generating a proper density foamed slurry sample on April 18, which might account for the 15.0 ppg density of that sample.

Indeed, Halliburton repeatedly flatly refused Chief Counsel's personal requests for documents or recorded testimony regarding many otherwise unsupported assertions from Halliburton's lawyers. For example, Halliburton's lawyers have consistently asserted that the April 18 foam stability test produced passing results. Commission staff requested "any document specifying or prescribing the conditioning time...test duration, or success criteria" for this and other tests, and requested the opportunity to conduct and transcribe interviews with Gagliano, his supervisors, and any "individual or individuals competent to testify regarding standard Halliburton laboratory practices."[56] Halliburton produced no documents and provided no witnesses. It noted that it had allowed the Chief Counsel to interview Gagliano and a Halliburton cement expert early in the investigation—*before* the Chief Counsel had learned of the failed February and April tests and *before* the Chief Counsel's testing had identified concerns with the Macondo cement slurry recipe. Halliburton then stated:

> [H]alliburton is compelled to view these requested "interviews" as being more in the nature of adversarial depositions designed to defend the [Chief Counsel's] preliminary conclusions as opposed to furthering an objective evaluation of what occurred. Given Staff's apparent shift in purpose, Halliburton respectfully declines to make such witnesses available.

In contrast to the April 18 test, 12 other stability tests—three by Halliburton and nine by Chevron—clearly predict that the foamed cement slurry design would be unstable. One can debate the significance of these tests individually. For instance, the February Halliburton tests predicted severe instability but were performed with a recipe containing more retarder, which can potentially reduce slurry viscosity and make it more unstable.[57] And one can also debate how well laboratory testing approximates field conditions.[58] However, the sheer number of failed foam stability tests combined with other indicia of instability (discussed below) lead the Chief Counsel's team to conclude that the foamed cement slurry used at Macondo was very likely unstable.

The Commission-sponsored tests further suggest that the Halliburton base slurry was unstable even *before* being foamed with nitrogen. Chevron's lab report notes that its personnel observed base slurry "settling" in six of the nine tests it performed. The base slurry also consistently showed a very low yield point, which can be a warning that the slurry will be unstable before and after foaming. Base slurry instability also could have severely compromised the bottomhole cement job at Macondo.

The Chief Counsel's team notes that Halliburton's Broussard laboratory did retain a small sample (1.5 gallons) of dry blend material from the *Deepwater Horizon*. This material was left over from Halliburton's April pre-job testing process. At the time of this writing, the federal government had taken custody of the material and was holding it pending laboratory testing. Industry experts have informed the Chief Counsel's team, however, that the dry blend material has probably chemically degraded by now to the point where any laboratory testing results would be inconclusive. If this is the case, Halliburton's four pre-blowout tests and the Commission's nine post-blowout tests are the most probative information regarding the performance of the Macondo cement slurry.

## Halliburton May Not Have Reviewed the April 18 Test Results Before Beginning the Cement Job

Currently available data lead the Chief Counsel's team to conclude that Halliburton did not fully review its April 18 foam stability tests before pumping the Macondo cement job. While Halliburton states that its personnel completed the test at approximately 4:14 p.m. on April 19, it has provided neither documentary nor testimonial evidence to show that its personnel actually reviewed that data before pumping the job or communicated it to anyone at BP.

Once again, the Chief Counsel repeatedly offered Halliburton opportunities to produce witnesses with relevant knowledge to be examined by the Chief Counsel. Halliburton consistently refused to support its lawyers' assertions with sworn testimony or additional documentation.

Even if Halliburton did review final test results before pumping the cement job, it did not transmit those results to BP until April 26—six days after the blowout.[59] On that date, Jesse Gagliano sent BP an official laboratory data report containing the results of the second April foam stability test. Halliburton never sent BP the results of the April 13 foam stability test.

## Halliburton Should Have Redesigned the Slurry Before Pumping It

Halliburton personnel should have redesigned the Macondo slurry before pumping it. Richard Vargo, a Halliburton cementing expert who testified at the Commission's hearings on November

8, 2010, appears to agree. He testified: "I don't think at this point I would choose to run this slurry."[60]

Table 4.4.1 summarizes Halliburton's internal laboratory data concerning the stability of the Macondo cement slurry.

**Table 4.4.1**

| Test ID | Apparent Date | Target Density in ppg | Top Density in ppg | Bottom Density in ppg | Retarder Concentration in gal/sack | Conditioning Time in Hours | Stable? | Available Before Job? | Sent to BP Before Job? |
|---------|---------------|----------------------|--------------------|-----------------------|-----------------------------------|----------------------------|---------|----------------------|-----------------------|
| 65112/1 | Feb. 13 | 14.5 | 16.8 | 17.6 | 0.20 | 0:00 | Unstable | Yes | No |
| 65112/3 | Feb. 17 | 14.5 | 15.9 | 15.9 | 0.20 | 2:00* | Unstable | Yes | Yes |
| 73909/1 | Apr. 13 | 14.5 | 15.7 | 15.1 | 0.08 | 1:30 | Unstable | Yes | No |
| 73909/1 | Apr. 18 | 14.5 | 15.0 | 15.0 | 0.09 | 3:00 | Arguable | Uncertain | No |

\* Reported to BP as 0:00

Halliburton personnel should have redesigned the cement slurry design after receiving the February pilot test results. Both of the February foam stability tests clearly indicated that the pilot cement design was severely unstable.

Halliburton has repeatedly argued that these pilot tests do not reliably predict the stability of the cement system used during the Macondo cement job. Specifically, Halliburton notes that the final cement design was different and that the final well conditions differed from BP and Halliburton's assumptions in February.[61]

These facts are irrelevant to the question of whether Halliburton should have redesigned its slurry. The pilot test results showed that Halliburton's then-current design would be unstable under BP's then-available predictions of well conditions.[62] This should have led Halliburton to inform BP of the problem and to redesign the slurry as necessary. Instead, the Chief Counsel's team has found nothing to suggest that Halliburton personnel seriously considered the issue.

Halliburton missed another clear warning in April. The April 13 foam stability test data should again have prompted Halliburton to inform BP of stability problems and to redesign the slurry immediately. Halliburton personnel have since testified that they would not use a slurry that generated such test results.[63]

Halliburton contends that its laboratory personnel conducted the April 13 test improperly and that the results are therefore "irrelevant."[64] Halliburton cites a laboratory document to support this conclusion, but the Chief Counsel's team and an independent cementing expert were unable to confirm the conclusion merely by reviewing that document. The Chief Counsel asked Halliburton to provide witness testimony to support this assertion, but Halliburton declined.

Even if Halliburton personnel did conduct the April 13 test improperly, this is again irrelevant to the question of whether Halliburton should have redesigned the slurry. As of April 15, the *only* data Halliburton had in hand predicted that the Macondo slurry design would be unstable, and Halliburton had very little time before it would have to pump the cement job. Under the

circumstances, Halliburton should have immediately redesigned the slurry and immediately retested the new design. It appears that some Halliburton personnel recognized the problem and responded by rerunning the test two days later with additional conditioning time, perhaps hoping for a more favorable result. But that response was wholly inadequate given how soon the job was to be pumped and the fact that the April 13 test results were consistent with the two earlier February test results. On April 15 or shortly thereafter, Halliburton should have immediately alerted BP to the stability problem and immediately begun redesigning the Macondo slurry.

The Chief Counsel's team is not certain why Halliburton chose not to redesign its slurry. There are at least two possible explanations. One is that the Halliburton personnel who were responsible for approving or recommending the design were unaware of the foam stability test results or their importance. The other is that those personnel *were* aware of the results but did not consider them sufficiently problematic.[65]

# Management Findings

## Halliburton Mismanaged Its Cement Design and Slurry Testing Process

The number and magnitude of errors that Halliburton personnel made while developing the Macondo foamed cement slurry point to clear management problems at that company. In addition to the errors described above, the Chief Counsel's team believes that Halliburton personnel:

- began pumping the Macondo job without carefully reviewing laboratory foam stability data and without solid evidence that the foamed cement design would be stable;
- reported foam stability data to BP selectively, choosing in February not to report the more unfavorable February 13 test, and choosing in April not to report the more unfavorable April 15 test result (although Halliburton contends these results were erroneous);
- selected the pre-test conditioning time informally, choosing different conditioning times (ranging from no time to three hours) in each of the four foam stability tests without any stated explanation;
- assumed, without apparent scientific basis, that conditioning the base slurry before foaming was scientifically equivalent to foaming the cement then pumping it down the well; and
- recommended a cement design without conducting any formal internal review of that design. Notably, the only design element that Halliburton manipulated between February and April was retarder concentration, even though BP's well design changed significantly during that period and even though bottomhole well conditions were unknown in February. Halliburton has provided no evidence that a supervisor or senior technical expert ever reviewed the final cement slurry design.

To date, Halliburton has not provided any documents or testimony to suggest that established company rules or guidelines prohibited its personnel from doing any of these things. And if such guidelines did exist, it appears that Halliburton failed to enforce them on the Macondo job.

## Halliburton's Lab Report Format Complicated Data Evaluation

Halliburton's lab reports to BP were highly technical. As with its modeling runs, discussed in Chapter 4.3, Halliburton did not provide a summary of results, an overall assessment of slurry design, or even reference values for any of the laboratory data it provided to BP. Halliburton could have improved the value of the reports by, for instance, inserting its criteria for a successful foam stability test alongside the reported foam stability data. This would not only have helped BP personnel understand the significance of relatively obscure numerical data, but might also have helped Halliburton personnel do so as well.

## BP Did Not Adequately Supervise Halliburton's Work

BP technical guidance documents for cementing emphasize the importance of timely cement testing,[66] and BP Macondo team members themselves recognized that timely cement testing was important.[67] The team also expressed internal concern well before the blowout that Jesse Gagliano was not providing "quality work"[68] and was not "cutting it"[69] by waiting too long to start important tests. They had already asked Halliburton to reassign Gagliano, and Halliburton had apparently agreed to do so.[70] But while BP engineers discussed "how to handle Jesse's interim performance" by email on the very day of the blowout,[71] they did not double-check his work or supervise him more closely pending his replacement.

In particular, although BP personnel recognized the "significant stability challenges" of using foamed cement for the Macondo production casing,[72] and that changes to the retarder concentration in the cement design might increase the risks of foam instability,[73] BP does not appear to have insisted that Halliburton complete its foam stability tests—let alone report the results to BP for review—before ordering primary cementing to begin.[74] When asked why, a BP representative said, "I think we didn't appreciate the importance of the foam stability tests."[75]

BP also did not adequately supervise the slurry design process or review earlier test results.[76] BP documents show that its engineers questioned Gagliano's slurry recipes in other instances.[77] But the Chief Counsel's team found nothing to suggest that BP questioned the Macondo slurry recipe, even after the slurry failed to perform properly during the cement job for the 16-inch casing string. (A BP engineer explained that Halliburton dismissed the failure as the result of cement contamination and noted that this is a typical response for any cementing contractor.)[78] While the Macondo team consulted its in-house cementing expert on other issues, they did not ask him to review the foamed slurry recipe.[79] The expert raised several concerns as soon as he reviewed the recipe after the incident—among other things, he expressed surprise that the slurry design did not include a fluid loss additive and did include a defoamer additive.[80]

BP's failures are especially troubling because it had previously identified several relevant areas for concern during a 2007 audit of Halliburton's capabilities. In that year, BP hired Cemtech Consulting to review a Halliburton foamed cement job on the Na Kika project in the Gulf of Mexico.[81] Cemtech's report identified several issues that mirror problems at Macondo. For instance, Cemtech observed that Halliburton's initial foamed slurry design at Na Kika "had

tendencies to stratify" (that is, was unstable) and required redesign.  Cemtech also made broader observations such as:

- "The HES [Halliburton] Fluids Center chemists and senior lab technicians do a very good job of testing cement slurries, but they do not have a lot of experience evaluating data or assisting the engineer on ways to improve the cementing program."
- "COMMUNICATION and DATA TRANSFER/DOCUMENTATION could be improved to help avoid unnecessary delays or errors in the slurry design testing, data reporting, and evaluation of the cement program."
- "Lab reports could be improved!  They are difficult to evaluate; often incomplete; and are submitted WITHOUT supporting lab charts and DATA to validate the test results.  LAB DATA SHOULD BE MANDATORY!"

It does not appear that BP pressed Halliburton or its own Gulf of Mexico engineering teams to improve in these areas. ◆