## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION J |
| This document relates to: | * | |
| *All cases* | * * | Honorable CARL J. BARBIER |
| | * * | Magistrate Judge SHUSHAN |
| | * * | |

## BP DEFENDANTS' MEMORANDUM IN SUPPORT OF
## THEIR PROPOSED FEBRUARY 2012 TRIAL PLAN

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Andrew B. Bloomer, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for BP Exploration & Production Inc., BP America Production Company, and BP p.l.c.*

## TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................1

I.     THE COURT SHOULD CONDUCT A SINGLE TRIAL IN MULTIPLE
       PHASES TO ADDRESS THE *DEEPWATER HORIZON* CASUALTY
       AND ITS CONSEQUENCES. ................................................................................3

       A.     BP's Proposed Trial Plan Provides That The Core Limitation And
              Liability Issues Will Be Decided In A Proceeding That
              Commences In February 2012. ...................................................................3

       B.     BP's Plan Reflects The Proper Order Of Proof In Limitation Of
              Liability Trials. ..........................................................................................5

       C.     Plaintiffs' Plan For Multiple Fault Allocations For A Single
              Marine Casualty Is Contrary To Law And Ignores Settled Tort
              Principles Of Proximate Cause. ..................................................................7

II.    BP's TRIAL PLAN IS MANAGEABLE UNDER THE CURRENT
       SCHEDULE WHILE  PLAINTIFFS' PROPOSAL IS UNWORKABLE,
       UNMANAGEABLE AND UNFAIR. ....................................................................9

       A.     BP Proposes That The First Phase Address Numerous Issues
              Relating To The Casualty And Transocean's Limitation Action. .............10

       B.     Plaintiffs' Proposal To Try Nearly All Liability Issues At Once Is
              Unrealistic, Unattainable, And Unfair. ....................................................13

III.   BP PROPOSES ORDERLY PHASING OF THE LITIGATION TO
       ALLOW FOR EFFICIENT TRIAL OF THE ISSUES WHILE
       DISCOVERY CONTINUES. ...............................................................................19

CONCLUSION..................................................................................................................21

i

## INTRODUCTION

Over the past several months BP, plaintiffs, and the other parties to MDL 2179 have been engaged in substantial discovery efforts to advance the course of this massive maritime litigation, the scope of which is unprecedented.  BP Exploration & Production Inc. and its affiliates have produced more than 1.6 million pages of documents in response to hundreds of requests; other parties have produced an additional 1.8 million pages. The parties have completed 29 depositions of fact witnesses from BP and other companies, with almost 100 more scheduled as of today. More than 870 deposition exhibits have been marked.  Scores of witnesses remain to be scheduled for deposition before the July 30, 2011 fact discovery cutoff.

Counsel for BP, plaintiffs, the United States government, and other parties have also conferred on multiple occasions regarding the nature and scope of the February 2012 trial on liability, limitation, exoneration, and fault allocation contemplated by PTO 11/CMO 1, and exchanged proposed trial plans.[1]  These efforts reveal that the parties are in broad agreement on the fundamental nature and scope of the proceedings in this case.  Specifically, they agree that the trial beginning in February 2012 is a single admiralty trial that should be divided into multiple phases.  The first phase of that trial will consider:

- Transocean's petition to limit its liability pursuant to 46 U.S.C. §§ 30501, *et seq.* and Supplemental Rule F, including whether the *Deepwater Horizon* and its owner Transocean are liable for the marine casualty that occurred on April 20, 2010; Transocean's knowledge and privity; allocation of fault among the parties; and, at a minimum, the liability portion of personal injury, wrongful death and property claims directly arising from the explosion and fire aboard the *Deepwater Horizon* and the loss of the rig.  (*Compare* PSC draft Trial Plan for February 28, 2012 Phase I Trial on Limitation, Liability and Fault Allocation ("PSC Trial Plan"), ¶¶ 1, 4 *with* BP draft

---

[1]   The following defendants have authorized counsel for BP to state that they join in and support BP's brief and proposed trial plan order: Weatherford International, Inc. and Weatherford U.S.L.P.  In addition, the following defendants have stated they join in BP's proposed trial plan order but have separately submitted their own supporting briefs: Anadarko Petroleum Corp., Anadarko E&P Company LP, and MOEX Offshore 2007 LLC.

Trial Plan for February 27, 2012 Phase I Trial on Liability, Limitation, Exoneration, and Fault Allocation ("BP Trial Plan") (attached as Exhibit A), ¶¶ 1-4); and

- Whether each or any defendant is responsible for negligence, gross negligence, or willful misconduct as regards their contribution to the initiation of an uncontrolled flow of oil as of April 22, 2010.  (*Compare* PSC Trial Plan, ¶ 6(a) *with* BP Trial Plan, ¶ 3)

BP, plaintiffs, the government and other parties also agree that, despite their diligence and extraordinary commitments of time, energy, and resources, the discovery necessary to fairly try the entire case is too vast to accomplish by February 2012.  Thus, at a minimum, the parties agree that governmental or other statutorily identified trustee claims for natural resource damages, and civil fines and penalties will necessarily be decided in later phases of the trial of this case.  (*Compare* PSC Trial Plan, ¶ 9 *with* BP Trial Plan, ¶¶ 12, 14)

Despite their agreement on several aspects of the trial structure, the parties disagree over the precise scope of the first phase of trial in February 2012.  BP proposes that to ensure an early decision on the core events and issues in the case, the first phase trial should address: (1) Transocean's claims for exoneration or limitation of liability arising from the marine casualty involving the *Deepwater Horizon* vessel; (2) the allocation of fault among the parties and the liability portion of property loss, personal injury and wrongful death claims directly arising from the explosion and fire aboard the *Deepwater Horizon*; and (3) whether each or any defendant is responsible for negligence, gross negligence, or willful misconduct as regards their contribution to the initiation of an uncontrolled flow of oil as a result of the casualty.

The scope and structure of BP's proposed trial plan is consistent with PTO 11/CMO 1, follows the law governing trial of Limitation Act and admiralty claims, and is manageable under the fact and expert deadlines established by the Court in this case.  Equally important, BP's plan will decide significant issues that advance the just and efficient resolution of these massive multidistrict proceedings.

2

The plaintiffs' proposed trial plan, on the other hand, exponentially expands the scope of the February 2012 first phase, primarily by seeking "two (2) separate and distinct liability and fault allocations," which encompass not only the numerous issues in BP's trial plan but also all "Rule 9(h) *non-personal injury/wrongful death claims* arising out of alleged damages that occurred *after April 20, 2010*."  (PSC Trial Plan ¶ 6(b) (emphasis added)).  Plaintiffs' proposed scope of the first phase of trial necessarily includes issues such as efforts to cap and contain the Macondo well, the massive response to the spill under the direction of the Unified Command and in which BP and numerous government agencies participated, the flow rate of oil and other materials from the well, the extent of the spill, its "footprint" and geographic reach, and virtually all other liability issues involved in all the cases in the entire multidistrict litigation.  Plaintiffs' proposal is unsupported by PTO 11/CMO 1, contrary to governing law, and inherently unmanageable and unfair.  Notwithstanding the plaintiffs' view, virtually every other party to these proceedings (including the United States) acknowledges that it is simply not practicable or possible to conduct the substantial fact and expert discovery necessary to prepare the issues in plaintiffs' expanded case for trial in February 2012.  Plaintiffs' proposed trial plan takes what is already a huge litigation undertaking against which all parties and their counsel are straining, and makes it impossible.  The Court should adopt BP's proposed trial plan.

## I.  THE COURT SHOULD CONDUCT A SINGLE TRIAL IN MULTIPLE PHASES TO ADDRESS THE *DEEPWATER HORIZON* CASUALTY AND ITS CONSEQUENCES.

### A.  BP's Proposed Trial Plan Provides That The Core Limitation And Liability Issues Will Be Decided In A Proceeding That Commences In February 2012.

In the plan proposed by BP, the first phase trial commencing in February 2012 would resolve the core liability issues in this case:  (1) whether certain Transocean entities are entitled to limitation of liability under 46 U.S.C. §§ 30501-30512; (2) the liability and allocation of fault

for the *Deepwater Horizon* casualty and the wrongful death, personal injury, and property loss claims arising directly from that casualty; and (3) fault for initiating the uncontrolled well flow. (*See* BP Trial Plan ¶ 9; *see also* Parts II and III, *infra*.)  Under BP's proposed plan, the Court would decide remaining issues in subsequent phases, including, for example, categories of issues such as those related to source control, spill response, geographic spread of the oil, and economic damages.

BP's proposal—to consider certain issues only after the core limitation and casualty issues are decided—follows traditional admiralty practice and is authorized by Fed. R. Civ. P. 42(b), under which courts may separately try individual claims or issues.  *See In re Incident Aboard the D.B. Ocean King on Aug. 30, 1980*, 877 F.2d 322, 325 (5th Cir. 1989) ("'Rule 42(b), borrowed from admiralty, takes its lead from [t]he broad discretion of the admiralty court to separate claims and issues for trial, coupled with the right to appeal an interlocutory order determining the rights and liabilities of the parties, [which] made it a common practice for the issues of liability to be first determined; and if liability was found, then to hold a hearing to assess damages.'") (quoting 7A Moore's Federal Practice ¶ .60 [3] at 422; 3 BENEDICT ON ADMIRALTY § 93 at 8-171 (7th ed. 1988)); *In re Ingram Barge Co.*, No. 05-4419, 2008 WL 906303, at *2 (E.D. La. March 31, 2008) (trying case arising out of Hurricane Katrina in separate phases).

This structure is also consistent with PTO 11/CMO 1 ("CMO No. 1"), which recognizes that the Court's and the parties' time and resources are finite and expressly provides for phased discovery.  Although the Court authorized discovery on issues relating to the oil spill, Phase I discovery was specifically "***focused on the activities and events leading up to and including [the] April 20, 2010 Macondo well incident and resulting explosion, fire and loss of the rig***."

*See* CMO 1 ¶ V.B.2.  CMO No. 1 indicates that plaintiffs should select "test cases" for bench trial during the February 2012 trial of liability, limitation, exoneration and fault allocation, including personal-injury/wrongful-death test cases as well as *Robins Dry Dock* (pure economic loss) test cases.  *See* CMO No. 1 ¶ VI.B.  Questions of compensatory and punitive damages in those test cases were to be resolved in a second phase in July 2012.  (*Id.* VI.B)

The reality, however, is that circumstances have changed dramatically after the Court entered CMO No. 1 last October, and plaintiffs' current proposal  to try economic loss cases in Phase I is not feasible.  This is because to determine liability for economic loss claims, such as whether coastal businesses suffered losses because of the oil spill, one would have to determine, at a minimum, the geographic reach of the oil spill.  The United States joined the proceedings ***after*** CMO No. 1 was entered (the USA filed its civil action in December 2010); and a trial of economic loss claims would necessitate discovery regarding the United States' participation in (and direction of) efforts to contain the spill.  This discovery, which only just started, will be enormous.  (*See* Part II, *infra.*)

Equally important, BP's plan reflects the actual status of discovery and what reasonably can be accomplished and managed before the February 2012 trial.  (*See* Part II, *infra.*)  During that first-phase trial, and after its completion, discovery would continue but, as in CMO No. 1, the parties would focus their efforts on completing the fact and expert discovery necessary for the issues to be tried in the next phase.  *Id.*

### B.   BP's Plan Reflects The Proper Order Of Proof In Limitation Of Liability Trials.

The order of proof in a limitation action is well settled; the trial begins with proof submitted by the claimants, followed next by the ship owner, and last by the Rule 14(c) defendants:

> "In the trial of the limitation action, ***it is appropriate for the claimants (defendants) who would seek to establish liability to proceed first***…. [*I*]*t is usual to proceed, upon the close of the claimants' case, with the vessel owner's proof of facts which will result in its exoneration*. … [*T*]*hird party defendants would then offer their proofs as to the issue of their liability, the liability of the vessel owner, and any other relevant issue*."

*See* 27-708 MOORE'S FEDERAL PRACTICE CIVIL § 708.07 (emphasis added) (citing *In re Nat'l Shipping Co. of Saudi Arabia*, 84 F. Supp. 2d 716, 718 (E.D. Va. 2000); *Bankers Trust Co. v. Bethlehem Steel Corp*., 761 F.2d 943, 948 (3d Cir. 1985)).  This order of proof stems from the "two-step analysis" in limitation claims, under which the Court first determines what acts of negligence or conditions of unseaworthiness caused the accident and second, whether the shipowner had knowledge or privity of those same acts or conditions.  *Farrell Lines Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976)*; see also* Thomas J. Schoenbaum, 2 ADMIRALTY & MARITIME LAW § 15-5.

In conducting its analysis, the court may separate the two steps and consider them in different phases of the trial.  *See, e.g., Ingram Barge Co.*, 2008 WL 906303, at *2.  Courts may reverse the steps and sometimes take up the question of the owner's privity or knowledge first, particularly if doing so might result in findings that would streamline the remaining issues unnecessary.  *Id.*  BP's proposal calls for the first-phase trial to proceed according to the traditional and settled order of proof.  The plaintiffs' proposed order of proof, however, ignores the traditional order of proof in limitation actions and the required two-step analysis is lost altogether.  (*See* PSC Trial Plan ¶ 8)  The trial and order of proof proposed by the PSC all but ignores Transocean's limitation claims and proceeds as a typical trial of tort claims against the Rule 14(c) defendants, focusing first and foremost on BP.  (*See id.*)  Indeed, Transocean, which in a limitation trial would present its evidence immediately following the claimant's case, presents its evidence under the plaintiffs' plan only *after* BP and seven other Rule 14(c)

6

defendants have presented their defenses to the plaintiffs' claims.  The plaintiffs' structure is improper for trial of the limitation petition and should be rejected.

### C.   Plaintiffs' Plan For Multiple Fault Allocations For A Single Marine Casualty Is Contrary To Law And Ignores Settled Tort Principles Of Proximate Cause.

The multi-phased approach urged by BP and other parties does not change the character of the action:  a single admiralty trial of a single marine casualty, conducted in multiple phases to address the consequences of that casualty.  The plaintiffs' trial plan, by contrast, not only ignores the limitation claims, it calls for the Court to make two determinations of liability and to allocate fault separately for the same tortious conduct, depending on when the injuries occurred.  (PSC Trial Plan ¶ 6)  Thus, under plaintiffs' plan, the Court would make one determination for claims "arising out of injuries/deaths that occurred on April 20, 2010," and a second finding of liability and allocation of fault for "claims arising out of damages that occurred after April 20, 2010." (*Id.*)  This double-allocation of fault for the same tort is contrary to law and should be rejected.

***First***, it is black letter law that a tortfeasor is liable for all consequences proximately caused by its alleged negligence.  *See, e.g., Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 838 (1996).  Thus, contrary to plaintiffs' proposal, the scope of the consequences for which a tortfeasor is liable is determined not by the date when those consequences occurred but by proximate cause and related legal doctrines.  (*Id.*)  For example, under the doctrine of intervening cause, a tortfeasor is liable for harm caused by its negligence—including harm allegedly caused by another party's later negligent conduct—unless that later conduct is entirely independent, unforeseeable and the sole proximate cause of the harm.  *See Nunley v. M/V Dauntless Colocotronis*, 696 F.2d 1141, 1146 (5th Cir. 1983) ("'[a] subsequent negligent act does not excuse prior negligence'"); *Sofec, Inc.*, 517 U.S. at 837 ("'The doctrine of superseding cause is … applied where the defendant's negligence in fact substantially contributed to the plaintiff's

injury, but the injury was actually brought about by a ***later cause of independent origin that was not foreseeable.***'").

Allocating fault separately for later consequences is contrary to these settled principles and arbitrarily breaks the chain of causation. Under plaintiffs' multiple fault allocation proposal, proximate cause for later events would be determined in isolation and the original tortfeasor(s) could be relieved of liability regardless of whether the later harm was due to intervening or superseding causes. Under such circumstances, any apportionment of fault would be meaningless. *See Nunley*, 696 F.2d at 1146 ("the causal initial negligence of the [defendants] that contributed to [a] later accident would ordinarily require them to bear their apportioned share of the loss"); *Sofec, Inc.*, 517 U.S. at 837-38 ("'Superseding cause operates to cut off the liability of an admittedly negligent defendant, and there is properly no apportionment of comparative fault where there is an absence of proximate causation.'" (quoting T. Schoenbaum, § 5-3, p. 164)). In effect, to adopt plaintiffs proposed trial plan would require the court to decide, without evidence, that damages occurring after April 20, 2010 were not (and could not have been) proximately caused by the explosions and fire that occurred on April 20, 2010, as well as actions and omissions that caused or contributed to the uncontrolled flow of oil following loss of the rig on April 22, 2010. The law does not allow this. *See Alcoa S.S. Co. v. Charles Ferran & Co.*, 251 F. Supp. 823, 832 (E.D. La. 1966) (a tortfeasor cannot avoid liability for harm proximately caused by its negligent conduct by casting the subsequent events as independent torts).

***Second***, a party's actions to mitigate harm from the original tortious conduct—even if unreasonable—do not relieve the original party of liability and do not change the allocation of fault. *Alcoa S.S. Co.*, 251 F. Supp. at 832. Under the doctrine of avoidable consequences, ***"an***

*injured party is required to exert reasonable efforts to minimize the extent of [its] damages after [it] has been tortiously injured*." *Id.* (emphasis added).  If it does not, the party is "*precluded from recovering that portion of its damages resulting from*" its "*failure to make reasonable efforts towards diminishing its damages.*" *Id.* (emphasis added).  According to the Fifth Circuit, the doctrine is "a question of damages, not one of liability." *Id.* at 833 (citing *Southport Transit Co. v. Avondale Marine Ways, Inc*. 234 F.2d 947, 954 (5th Cir. 1956)). Plaintiffs' proposed second allocation of liability for consequences occurring after the explosions, fire, and loss of the *Deepwater Horizon* ignores these settled principles and would transform a party's mitigation of damages (which the law encourages) into a separate basis for a liability.  The proposal is contrary to law and should be rejected.  *See Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1474 (5th Cir. 1991) ("'the doctrine of avoidable consequences is really a rule of damages, and that as such it stands wholly apart from the rules that determine who is at fault for the initial injury.'") (citing *Southport Transit Co.*, 234 F.2d at 952).

## II.    BP's TRIAL PLAN IS MANAGEABLE UNDER THE CURRENT SCHEDULE WHILE  PLAINTIFFS' PROPOSAL IS UNWORKABLE, UNMANAGEABLE AND UNFAIR.

The total scope of litigation arising out of the *Deepwater Horizon* incident presents the most complex admiralty proceedings in history.  Plaintiffs' assertion that all liability issues in this litigation (except for governmental claims, natural resource damages, and civil fines and penalties) brought by at least 18 categories of plaintiffs against at least 21 defendants can be tried over a three month period after an abbreviated period of discovery is unrealistic fantasy.  The entirety of this litigation will involve several hundred fact witnesses, scores of expert witnesses, and several thousand exhibits concerning dozens of issues.  Any attempt to try all of these issues at one time will result in an unmanageable presentation of evidence.  The Court will need to hear

all evidence relating to certain issues and groups of issues, giving both plaintiffs and defendants an adequate opportunity to heard.  Thus, phasing the trial of these proceedings is inevitable.

Instead of being forced into ad hoc, haphazard phasing as the February 2012 trial date fast approaches, BP proposes a single admiralty trial divided into multiple phases allowing the Court to try a manageable number of issues in each phase.  Each phase will cover a finite, related set of issues, allowing discovery and expert work to continue apace on issues to be tried in future phases.  All claimants in the Limitation Act case who file claims versus Transocean by the April 20 monition date will be parties to the trial.  While the litigation will remain unalterably complex, phasing the litigation as BP suggests will allow the myriad issues to be decided in the most efficient and systematic manner.

### A. BP Proposes That The First Phase Address Numerous Issues Relating To The Casualty And Transocean's Limitation Action.

BP's proposed first phase of the trial is ambitious yet manageable on the current schedule.  Under its trial plan, BP proposes that the phase starting in February 2012 try:  (1) the limitation action filed by certain Transocean entities; (2) liability and allocation of fault for the *Deepwater Horizon* casualty and claims for wrongful death, personal injury, and property loss arising directly therefrom; and (3) quality of fault for initiating the uncontrolled well flow.  These topics encompass many if not most of the critical questions necessary to resolve most of the claims pending in this multidistrict litigation.

The number of issues tried and the amount of evidence presented in BP's proposed first phase would dwarf the full trials of other multi-party, complex litigation.  Issues to be decided include:

- Causes of why the well began flowing;

- Whether the well was monitored appropriately;

- Whether well control actions were taken appropriately;

- Whether the *Deepwater Horizon* crew received adequate training in how to monitor and control the well;

- Why the various safety equipment on the *Deepwater Horizon* failed and did not prevent the explosions on the rig;

- Whether the *Deepwater Horizon*, its equipment, and appurtenances were properly maintained;

- Whether the vessel's emergency disconnect system should have been activated earlier;

- Why the *Deepwater Horizon's* blowout preventer failed to stop oil flowing from the well;

- The impact of modifications to and maintenance of the *Deepwater Horizon's* blowout preventer on efforts to activate that key safety equipment through remotely operated vehicles after the incident;

- Whether the *Deepwater Horizon's* crew received appropriate orders and direction during the emergency;

- Whether the efforts to fight fires on the *Deepwater Horizon* were proper;

- Whether the *Deepwater Horizon* was seaworthy;

- Whether the *Deepwater Horizon's* unseaworthiness caused and/or contributed to the casualty;

- Whether the *Deepwater Horizon's* Master/Captain, OIM, and crew were properly trained for their jobs;

- The privity and knowledge of Transocean; and

- The effect of the *Deepwater Horizon's* sinking on efforts to stop the flow of oil.

Each of these issues—along with *many others*—contains various subparts, and will take

significant time to litigate properly.

Moreover, the evidence necessary to litigate the proposed phase one issues is extensive.

Discovery to date has focused almost solely on events leading up to and including the April 20,

2010 loss of well control and explosions aboard the *Deepwater Horizon*—issues that all parties

agree would be litigated in the first phase—and thus provides a baseline indication of the number

of exhibits and witnesses.  To date, the parties have deposed 29 witnesses, with another 95 depositions planned and more being added each week from now until July 30.  Many of the deposed witnesses will be called during the first phase of the trial.  Over 874 exhibits have been marked during the first 27 depositions alone, with many of these likely to be proposed exhibits at trial.  As depositions continue, the number of deposition exhibits—and likely trial exhibits—will increase dramatically.  Expert discovery on phase one trial issues has not yet begun, but will involve scores of experts, with each party likely having at least one expert on each issue of interest.

The multi-party nature of this case will necessarily have a substantial impact on the length and complexity of trial.  BP's phase one proposal will have 9 groups of defendants, each with its own interests and perspective on the factual issues.  Each defendant will have the right to present its own witnesses, both fact and expert, as well as its own exhibits.  Each one will be entitled to examine every witness on the issues that concern it.  Moreover, the PSC is representing several diverse groups of plaintiffs, each with its own concerns that will need to be covered during trial.

Finally, at the conclusion of phase one, the Court will have tried several critical issues and substantially advanced the ultimate resolution of litigation related to the *Deepwater Horizon* incident and resulting oil spill.  Whether certain Transocean entities can extinguish or limit their liability will be determined, which in turn will impact what, and from whom, damages can be recovered.  The defendants' liability to the death and personal injury claimants also will be decided, such that those claims can be fully resolved once damages are tried.  Fault will be allocated among the various defendants for the *Deepwater Horizon* incident and the resulting oil spill, which will allow plaintiffs to know from which defendants they may recover.  Finally, the

quality of defendants' fault for the initiation of the uncontrolled flow of oil will be decided, which will shape the remaining phases of trial and determine the defendants who will participate and the nature of the damages that plaintiffs might be able to recover depending upon the validity of their claims and the evidence.

> **B.      Plaintiffs' Proposal To Try Nearly All Liability Issues At Once Is Unrealistic, Unattainable, And Unfair.**

The complexity of BP's proposed first phase of the trial—likely involving thousands of exhibits and well over 100 to 200 fact and expert witnesses, each of whom will be subject to examination by 10 different parties—will tower over other complex litigation.  Completing discovery and preparation for this phase by February 2012 is a daunting prospect.  Adding many more issues, which will require significantly more fact and expert witnesses, more exhibits, and more plaintiffs and defendants, would render this first phase entirely unmanageable.  Indeed, plaintiffs' proposed trial plan does not provide any explanation of how the Court could conceivably try so many issues involving so much evidence in a single three-month period.

Plaintiffs' overly broad trial plan would require the Court to try, in addition to the issues proposed by BP, several additional categories of issues related to the oil spill resulting from the *Deepwater Horizon* incident.  According to their plan, plaintiffs apparently intend to try every liability issue for the entire litigation (except governmental claims, natural resource damages, and civil fines and penalties) in a three-month trial starting in February 2012.  In addition to the categories of issues identified in Section II.A., plaintiffs seek to have the parties litigate, at a minimum:   (1) spill preparedness; (2) source control/well containment; (3) spill response; (4) flow rate and spill volume; and (5) geographic reach of oil that flowed from the well.  For all parties—including the United States—to conduct adequate discovery regarding these issues on the current schedule for fact and expert witnesses simply is not possible.  Beyond this, adding

such issues would render the February 2012 trial wholly unmanageable and impossible to complete within three to four months.

*First*, these additional issues would require participation in the first phase trial of approximately 12 additional defendants involved in spill containment and response efforts, and would greatly expand the involvement of existing parties such as the United States. As with the defendants involved in drilling the Macondo Well, each of these defendants will be represented by its own counsel, have its own priorities and interests, and will be entitled to examine each relevant witness and present its own evidence. These additional defendants will lengthen significantly the amount of time to try each issue sought by plaintiffs.

*Second*, every additional category includes its own numerous sub-issues that will need to be litigated. For example, source control/well containment will include trying fact issues such as:

- The establishment, structure, and operation of the Unified Command, both in Roberts, Louisiana, where the main stakeholders were located, and Houston, where source control operations were developed and overseen;

- The various source control methods utilized or considered, and how source control fits within the overall response effort;

- The role of BP, the government, government scientists, other defendants, or third parties in the identification, analysis, development, approval, rejection and implementation of source control methods;

- How the understanding of potential or actual flow rates impacted the source control methods, including the timing and development of such estimates; and

- Any alternative proposals for well control raised by plaintiffs.[2]

---

[2]   The PSC will say that "it is ready" to present what Liaison Counsel has described as a "prima facie" case of fault against BP for alleged lack of a timely and effective well control and spill containment effort. Despite this encomium from the PSC, the Court well knows that the United States and BP must be permitted to present their side of the story about the astounding resources employed as well as the effectiveness of those resources. This is not something to be brushed off as a matter than can be discovered through a few witnesses and a few weeks of depositions.

Litigating each of these issues requires introducing masses of additional evidence and many scores of new witnesses.  It will also require the adjudication of several different legal issues, including the effect of the federal government's approval of BP's oil spill response plan, and the impact of the government's authority to approve or reject specific source control procedures and the manner in which the government exercised that authority.  Thus, adding more categories and issues for trial will increase the summary judgment, *Daubert*, and other legal briefing that will occur before trial begins.  And these are the issues associated with only one category; every other category has its own issues that will have to be litigated when they are tried.

*Third*, trying additional categories of issues will require vastly expanded discovery compared to what the parties have been conducting.  Discovery of the United States government, including the various agencies and departments involved in the response to the *Deepwater Horizon* spill, has just begun.  Deposition testimony would be needed from more than 100 additional witnesses, including scores of government officers and employees who directly participated in source control efforts.  Various witnesses for the co-defendant spill response contractors also would have to be identified and deposed.  Additional BP employees with source control responsibility would need to be identified as potential witnesses for trial and presumably deposed.  None of these depositions has yet taken place.  Attempting to squeeze them into the remaining time for depositions—especially when 95 depositions are currently scheduled but have not yet been taken—would render the schedule unmanageable.  Indeed, the effort to cram masses of discovery not yet started into a compressed time period is simply unfair to all concerned.  There is not enough time; there are not enough resources and personnel; and

defendants will be, in effect, stripped of their rights to necessary discovery and to gather the evidence in a reasonably timely fashion before trial.  This is not manageable; nor is it fair.

The various categories sought by plaintiffs also require extensive expert work. Categories for this additional work would include flow rate; flow path; the propriety of various source control efforts including, for example, deployment of a containment dome, use of a riser insertion tube tool, the effort to "top kill" the well, and implementing the lower marine riser package cap containment system; spill response planning; spill response organizations; mechanical response methods such as using skimmers and deploying boom; chemical response methods such as burning and using dispersants; and shoreline clean-up assessment technology. In short, litigating these issues will require reports, depositions, and testimony from scores of additional experts.

The additional categories of issues and discovery also would significantly increase the burdens of document production on the parties.  BP has run ESI searches, generating over 140,000 potentially responsive documents for just one request related to source control.  And BP is not the only party affected.  As required by applicable law, BP's response operations to the spill were carried out under the Unified Area Command of the U.S. Coast Guard Federal On-Scene Coordinator and other government agencies.  BP is entitled to and needs discovery from the federal government to defend the propriety of the company's unprecedented source control and spill response efforts.  The United States will likely have to produce millions of pages of documents from many different agencies—a doubtful proposition for a trial scheduled to begin in February 2012.  Similarly, the various co-defendants involved in spill response efforts also would need to produce documents in time for the start of trial.

The discovery necessary to prepare and try source control, spill response, and other categories has just barely begun.  BP and every other party is entitled to conduct adequate discovery to properly litigate their claims and defend themselves before the Court.  Conducting discovery and developing the evidence necessary to address these categories of issues for trial in February 2012 simply is not feasible.  Under the current schedule, the discovery will be so limited as to prevent BP from presenting its full defenses to all categories of issues.  "Due process requires that there be an opportunity to present every available defense." *Lindsey v. Normet*, 405 U.S. 56, 66 (1972).  "Although a district court has considerable latitude in determining the scope of discovery, it abuses its discretion when the discovery is so limited as to affect a party's substantial rights." *Long Island Lighting Co. v. Barbash*, 779 F.2d 793, 795 (2d Cir. 1985); *see also In re Rassi*, 701 F.2d 627, 631 (7th Cir. 1983) ("While a trial court has wide discretion to determine the manner and course of discovery, this court will reverse a trial court's limitation when it is improvident and prejudices a party's substantial rights.") (citations omitted). Under BP's proposed trial plan, the Court can avoid this unfairness and difficulty as explained in greater detail in Part III, *infra*, by allowing the parties to continue conducting discovery on the additional issues sought by plaintiffs while litigating the phase one issues identified by BP.

*Fourth*, plaintiffs offer no real trial plan to address the additional witnesses and exhibits that would be part of their draft order.  Plaintiffs' proposed order would add well over 100 witnesses and likely thousands of exhibits to the 120-plus fact witnesses, scores of experts, and thousands of exhibits already contemplated by BP's proposed phase one trial.  But plaintiffs' order does not provide any way to manage this massive amount of evidence.  Instead, their order simply states that plaintiffs will go first and then the 22 defendants will present their evidence and defenses seriatim.  That structure is neither fair nor efficient in a case involving so much

evidence on so many different issues.  Plaintiffs would have to present evidence on every liability issue in the entire litigation (except governmental claims natural resource damages, and civil fines and penalties), which by itself would take months.  Defendants would then do likewise, causing evidence on the myriad issues to be spread out over months.  When plaintiffs present testimony and exhibits on an issue, the first defendant will not have the opportunity to introduce their own evidence until weeks or even months later, then the second defendant may return to the same issue weeks or months later, and so forth for the remaining 20 defendants. Spreading out the evidence on the myriad issues would lead to confusion and make deciding each issue more difficult and time-consuming.

Indeed, attempting to simultaneously try so many issues among two dozen parties creates serious risks to the parties' due process rights.  "Due process mandates that a judicial proceeding give all parties an opportunity to be heard on the critical and decisive allegations which go to the core of the parties' claim or defense and to present evidence on the contested facts."  *Columbus-America Discovery Group v. Atlantic Mut. Ins. Co.*, 974 F.2d 450, 470 (4th Cir. 1992).  The Fifth Circuit has recognized that an undifferentiated, complex trial may effectively deprive the parties of their opportunity to be heard.  *See Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 426 (5th Cir. 2004) (holding that a massive multi-party trial was not a superior method of conducting the litigation, because it would create confusion over which parties were to present evidence on which issues and risk basing a determination on evidence offered throughout a long proceeding); *Gwathmey v. United States*, 215 F.2d 148, 155-56 (5th Cir. 1954) (holding that "the very size of the case as tried, without the additional complexities, was such that the jury must have been overwhelmed" and the litigants deprived of their due process right to "fair opportunity to have

18

[their cases] determined from the evidence in reasonable proceedings").   Such concerns become all the more forceful when alternative methods of fairly trying the case are available.

Rather than trying all pre- and post-April 20, 2010 issues in an undifferentiated mass, as plaintiffs propose, the trial will need to proceed with some method of phasing issue-by-issue. Plaintiffs' proposed order would leave that phasing to be decided in an ad hoc manner as February 2012 approaches and the parties find themselves unable to conduct an appropriate trial encompassing all of the issues with several hundred witnesses and several thousands of exhibits. Such a process is neither efficient nor fair.   Instead, the Court should plan for phasing now to achieve the most appropriate and useful trial structure.

## III.   BP PROPOSES ORDERLY PHASING OF THE LITIGATION TO ALLOW FOR EFFICIENT TRIAL OF THE ISSUES WHILE DISCOVERY CONTINUES.

As phasing is inevitable, BP proposes a single trial in admiralty conducted in phases. Each phase would try a defined set of issues, allowing all evidence on those issues to be presented in a timely, efficient and fair manner.   An appropriate break would occur between each phase, as determined by the Court in later case management orders.   While the early phases are being tried, discovery would continue on the later phases, giving the parties sufficient time to conduct adequate discovery on each set of issues.

For the reasons explained in Section II, the most appropriate structure begins with the casualty itself.   The trial would then proceed in roughly chronological order with groups of related issues, as set forth in paragraph 14 of BP's proposed trial plan.   Thus, BP's proposed first phase on the casualty would try several key issues that shape the remainder of the litigation, including the wrongful death and personal injury claims arising directly from the explosion and fire onboard the *Deepwater Horizon*.   In another phase, the Court would try the damages on

these claims,[3] allowing individuals who were injured and the families of those who died to resolve their claims  and obtain the compensation to which they are entitled from any tortfeasor.

In another phase,  the parties would then begin the process of trying the various source control and spill response issues.  During trial of the casualty phase and subsequently, discovery on these complex questions would continue unabated, including depositions of the additional witnesses and production of documents from the federal government and the companies who worked on spill response.  A  later phase would address both source control (efforts to shut the well) as well as response efforts (containing and mitigating the effects of the oil).  As with the initial phase of trial, this subsequent phase likely would involve over a hundred facts witnesses, scores of experts, and thousands of exhibits, and so would take a similar amount of time to try.

Another phase of trial would try the volume and flow rate of oil discharged to the Gulf of Mexico from the Macondo well, which likely will primarily involve expert testimony.  And another phase would address the transport and geographic reach of oil that flowed from the well. Both of these phases are necessary to set up the final phases regarding damages.  Additionally, United States has asserted a civil penalty claim under Section 311 of the Clean Water Act in which it seeks to have the Court assess a penalty up to a maximum calculated based on the volume of oil discharged.  The transport and geographic reach of the spill are essential for determining who can recover for economic loss and determining any natural resources damages. As with the other phases, discovery on these issues would continue during the first three phases, and discovery on damages—to be decided in the sixth and seventh phases—would continue as other later phases were being tried.

---

[3]   At a minimum, the damages phase would determine compensatory damages for the wrongful death and personal injury claims.  BP reserves its rights on whether punitive damages could also be tried before all compensatory damages have been determined, and may submit separate briefing on this issue.

Finally, the last two phases would address damages.  The sixth would focus on economic damages.  The seventh and final phase would address fines, penalties, injunctive relief, natural resource damages, and other OPA damages

## CONCLUSION

The scope and structure of BP's proposed trial plan is consistent with CMO No. 1, adheres to the law governing trial of Limitation Act and admiralty claims, is manageable under the current deadlines in this case, and will advance the resolution of this massive litigation. Plaintiffs' proposed trial plan is impossible as a practical matter and fraught with error as a legal matter.  And it is simply unfair.  The Court should adopt BP's proposed trial plan.

Respectfully submitted,


/s/ Don K. Haycraft
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Andrew B. Bloomer, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

***Attorneys for BP Exploration & Production
Inc., BP America Production Company, and
BP p.l.c.***

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 13th day of April, 2011.

/s/ Don K. Haycraft
Don K. Haycraft