UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "*DEEPWATER HORIZON*" in the GULF OF MEXICO, on APRIL 20, 2010 | * * * | MDL NO. 2179 SECTION : J JUDGE BARBIER |
| THIS DOCUMENT RELATES TO ALL CASES AND CONSOLIDATED ACTIONS IN MDL NO. 2179 AND *COMPLAINT AND PETITION OF TRITON ASSET LEASING GMBH, ET AL*, NO. 10-2771 | * * * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### MEMORANDUM IN SUPPORT OF MOTION TO ADOPT TRIAL PLAN PROPOSED BY PSC, TRANSOCEAN LIMITATION PETITIONERS AND THE STATE OF ALABAMA

### INTRODUCTION

The Plaintiff Steering Committee, joined by the Transocean Petitioners in the Limitation Action, and the State of Alabama, respectfully present this memorandum in support of the attached Joint Trial Plan (the "Joint Trial Plan" is attached as "Exhibit A" hereto) for the liability, limitation and fault allocation trial scheduled to commence in February of 2012. The Joint Trial Plan calls for a single trial on the ***main liability issues*** that are also the subject of this MDL, with two allocations of fault among the defendants: (1) for fault associated with the April 20, 2010 blowout and explosion; and (2) for fault associated with the discharge of oil from the well, including post-April 20, 2010 well or "source control". The determination of these liability

1

issues and allocations of fault can be made from a "single note of evidence," and as a result, the Joint Trial Plan will simplify this Limitation Action and mass tort MDL, reducing the complexity and cost of the trial, and improving its overall quality.  Most importantly, it ensures that common issues of fact and law are tried once as opposed to multiple times.

Conversely, the trial plan exchanged by BP ("BP's Plan") on April 4, 2011, calls for a bare-bones limitation trial with a single fault allocation, and seeks to narrowly limit the trial to: (1) claims for property loss to the Deepwater Horizon Rig and its appurtenances;[1] (2) claims for personal injury arising from the explosion and fire aboard the rig; and (3) claims for wrongful death arising from the explosion and fire aboard the rig.[2]  Further, BP expressly seeks to limit the "core factual and legal issues" to be adjudicated and the allocation of fault to "the initiation of an uncontrolled flow of oil."  In other words, BP's plan proposes a trial only on fault associated with the blowout and explosion, and seeks to divorce the adjudication of any facts, including the conduct, acts, or omissions of the defendants, the cause of the discharge (including post April 20, 2010 well source control efforts), and the amount of oil spilled, despite that there is no clear (or even blurry) line on which to base such a restriction.  BP's Plan ignores that liability and allocation of fault on these issues are based on overlapping facts that should be  a single note of evidence.  BP's Plan ignores the existence of common issues of law and fact, and is an explicit and transparent attempt to phase out liability issues for as long as it can, so as to delay judicial determinations on post blowout and explosion issues and the resulting economic damages caused thereby.

---

[1] To the extent that there is a dispute regarding claims for property loss to the Deepwater Horizon Rig and its appurtances, it is part of an insurance coverage discovery dispute, and should not be part of the liability, limitation, and fault allocation trial.

[2] The April 4, 2011 BP Plan is attached hereto as Exhibit "B".

At best, BP's Plan is short-sighted and inadequate. The Joint Trial Plan is best for this MDL, which in essence is a mass tort, economic loss case that occurred on the navigable waters of the Gulf of Mexico, consolidated with a Limitation Action. The Joint Trial Plan addresses the wrongful death and personal injury claims resulting from the explosion and fire, but does not seek to unreasonably isolate the determinations of liability to the explosion and fire. The same "single note" of related evidence which forms the basis for these personal injury claims, most of which – if not all – will be settled by the time this case goes to trial in ten months, is also the same basis for tens, if not hundreds, of thousands of property damage and economic loss claims which will be pending before this Court as of the April 20, 2011 Monition Date. Consequently, the February 2012 trial and subsequent damage trials must address well source control (the well capping effort) and evidence related to discharge volume issues in order to properly do the consolidated MDL and Limitation matters justice. Threshold liability for punitive damages and the defendants' willful conduct / gross fault and quantification of the number of barrels of oil should also be included within the liability trial. Phasing out liability and allocation of fault, as BP proposes, will result in delay, complicate and confuse the presentation of evidence, and unnecessarily require the inefficient adjudication of multiple trials on common issues and facts.

## THE PROPOSED JOINT TRIAL PLAN

The proposed Joint Trial Plan follows a structure regularly adopted by district courts in Limitation Actions and MDLs. As an Admiralty Court presiding over a Limitation Action, the District Court has the authority and discretion to try all issues of liability related to the core Limitation Action, including issues of causation, liability and allocation of fault that are common to the consolidated claims of the Petitioners, limitation claimants, and third party defendants. Further, because this Case involves a Limitation Action consolidated with an MDL consisting of

mass tort economic loss claims, wrongful death and personal injury cases, the District Court has the authority and discretion to structure a common issue trial on liability and allocations of fault. See Fed. R. Civ. P. 42(a) and (b); *see also* MANUAL FOR COMPLEX LITIGATION, FOURTH, §22.93.

## THE JOINT TRIAL PLAN PROVIDES FOR A SINGLE ADJUDICATION OF ALL COMMON ISSUES AND FACTS RELATED TO THE GENERAL LIABILITY OF DEFENDANTS

The Joint Trial Plan proposes a trial structure in which issues related to "the negligence, gross negligence and/or willful conduct, liability, contributory negligence and comparative fault, if any, of the parties, along with the availability of punitive damages regarding Plaintiffs' claims, if any, and all applicable defenses set forth in the Defendants' responsive pleadings …[and] will include factual findings regarding the Defendants' conduct and the causal relationship between such conduct and the claims at issue; the liability of any third parties or non-parties; and comparative fault defenses."[3]   Pursuant to Rule 9(h), the trial will address claims involving personal injury/wrongful death and claims for economic losses (like *Robins Dry Dock* and Admiralty Extension Act economic loss claims).   The adjudication of liability will involve a single note of evidence, common to all claims, and will be separated into *two* fault allocations which encompass general liability for all non-governmental claims in this matter.

### A.   THE TWO FAULT ALLOCATIONS ARE NOT PLAINTIFF-SPECIFIC OR CASE SPECIFIC

The two allocations of fault are separated between claims involving (1) personal injury/wrongful death and (2) claims for economic loss (including *Robins Dry Dock* and Admiralty Extension Act claims).   Under the Joint Plan, the first liability and fault allocation will be "with respect to the Rule 9(h) personal injury/wrongful death claims arising out of

---

[3] Joint Trial Plan, ¶4, Ex. "A".

4

injuries/deaths that occurred on April 20, 2010."[4]  The parties to this fault allocation will be all Defendants, Third-Party Defendants, and all Rule 9(h) limitation claimants asserting personal injury and/or wrongful death claims.[5]

The second liability and fault allocation will be "with respect to the Rule 9(h) claims for economic losses that are alleged to have occurred after April 20, 2010."[6]  This second fault allocation will include evidence relating to the First Fault Allocation, and also take into account any aggravating effects of negligence, gross negligence and/or willful misconduct of Defendants before or after April 20 relating to the post-April 20 efforts to cap the well (i.e. "source control").[7]  The parties to the second fault allocation will be all Defendants, Third-Party Defendants, and all Rule 9(h) limitation claimants asserting claims and defenses regarding economic loss issues for which there is maritime jurisdiction, even though joined with or otherwise including claims asserted under the Oil Pollution Act or relevant State Law.[8]  For example, evidence related to BP's presumed contribution claims with respect to the payments it has made under the OPA will be included within the evidence adduced by the parties at the liability, limitation, and allocation of fault trial.  Consequently, the Joint Trial Plan provides the efficient structure for the Court to determine once, with common evidence, liabilities related to maritime claims for economic losses and OPA.

---

[4] Joint Trial Plan, ¶ 4(a), Ex. "A".

[5] *Id.*

[6] JOINT TRIAL PLAN, ¶4(b), Ex. "A".

[7] The second fault allocation will not include dispersant issues, or other clean-up issues (*e.g. in situ* burning, or use of boom, etc), which would be reserved for the B3 Trial (or other proceedings).  Nor is the trial contemplated to determine, quantify or otherwise assess the extent of natural resource damages.

[8] JOINT TRIAL PLAN, ¶4(b), Ex. "A".

**B.** **JUDICIAL ECONOMY WOULD NOT BE WELL-SERVED BY ELIMINATING THE SECOND FAULT ALLOCATION FROM THE TRIAL**

An attempt to divorce the consideration of liability for the spill from liability for the original blow-out and explosion will likely result in a waste of judicial resources and lead to a result that is potentially unjust. The failure to kill or otherwise control the well after April 20th is not only the result of the explosion and the blowout itself, but also: (1) post-April 20 acts or omissions; and (2) pre-April 20 fault in failing to reasonably prepare for the potential catastrophe at hand.

There are numerous witnesses who have information relevant to both the April 20 casualty and the post-April 20 failure to regain well control.[9] If the trial were limited to casualty events, these witnesses would have to be re-deposed and re-called to (at least) a second trial. Several of these witnesses (e.g., Pleasant, Sprague, Bodek, Stringfellow) have already been deposed, and many others are scheduled to be deposed between now and the end of July. In addition, the claims of private plaintiffs may overlap with the penalty claims of the United States with respect to the potential gross negligence and/or willful misconduct of the defendants, as well as the total number of barrels of oil actually discharged.

The Fifth Circuit has held that a trial plan structured for a single adjudication of common facts and issues "is clearly superior to the alternative of repeating, hundreds of times over, the litigation of [the same issues] with … days of the same witnesses, exhibits and issues from trial to trial." *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 473 (5th Cir. 1986). The Fifth Circuit has approved trial plans in which common issues of liability, negligence, and certain defenses are tried commonly, with actual damages and other individualized issues in a subsequent phase of

---

[9] Such witnesses are believed to include, but are likely not limited to, Bodek, Cramond, Dupree, Hayward, Holleck, Inglis, Lynch, McWhorter, O'Bryan, Pleasant, Rainey, Sprague, Stringfellow, Suttles, Theirens, Tooms, Wells, Winslow, Wright and Yamamoto.

6

the trial.  *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 628 (5th Cir. 1999).  The Fifth

Circuit holds that it is within the trial judge's discretion to "attempt a common issue trial."  *In re*

*Chevron U.S.A.*, 109 F.3d 1016, 1021 (5th Cir. 1997).

### C.    MULTIPLE FAULT ALLOCATIONS AND TRIAL OF SOURCE CONTROL ISSUES HAVE BEEN CONTEMPLATED FOR MANY MONTHS

The proposed Joint Trial Plan is not limited to the blowout and explosion which occurred

on April 20, 2010, but will involve evidence, findings of fact, and fault determinations regarding

post April 20, 2010 events such as source control and the amount of oil discharged.[10]   These

facts and issues are common to, and indeed inexorably intertwined with, facts leading up to and

including the blowout and explosion, and a bright line cannot be drawn for general liability

arising from the event, post-event, or both.  This comes as no surprise to BP.  As recent as the

April 8, 2011 Conference with Magistrate Judge Shushan, there can be no doubt that the parties

are all aware that this case is to be tried on a single note of evidence, which includes post April

20, 2010 conduct and the amount of oil spilled.

Leading up to the entry of Case Management Order No. 1,[11]  the parties were encouraged

by the Court to attempt to agree on a schedule leading up to a limitation and liability/fault

allocation trial to occur in October of 2011.  Plaintiffs took the position that the test plaintiffs for

the trial should include economic loss plaintiffs with standing under *Robins Dry Dock* or

otherwise to designate their 9(h)claims.  As clearly articulated by the plaintiffs, the Court would

likely be required to make two separate fault allocations: one relating to the causes of the initial

blowout and explosion on April 20, 2010; and a second fault allocation, which would take into

---

[10] The Joint Trial Plan provides that "[a]s part of the same note of evidence, the Court will consider expert opinion testimony relating to the total volume of oil discharged commencing on June 1, 2012. JOINT TRIAL PLAN, ¶5, Ex. "A".  Further, under the Joint Plan, the liability, limitation, and allocation of fault trial will be held open until the record is closed on the total volume of oil discharged.  *Id.* at fn 3.

[11] PRE-TRIAL ORDER No. 11 [Doc 569].

account those factors, but also any additional negligence, gross negligence or other fault causing or contributing to the resulting spill.

On September 29, 2010, Liaison Counsel appeared in chambers at the request of defense counsel, to request a five month continuance of the trial. Defense Liaison Counsel presented the Court with a draft proposed Timeline, which included *Robins Dry Dock* test cases – and, at least implicitly, a second fault allocation regarding the post-April 20 failure to cap, kill or otherwise control the well. The Court agreed to the continuance, and urged the Plaintiffs and Defendants to continue to work together towards the February 2012 Trial (as well as other issues outlined and addressed in the proposed Case Management Order ("CMO")). Over this continued meet and confer process, however, the defendants (other than Transocean) attempted to remove the second fault finding from their proposal. Defendants, similarly, attempted to remove "spill" issues from the scope of the Phase I Discovery.[12]

The parties were heard at a Status Conference conducted by the Court on October 15, 2010. Mr. Roy clearly articulated the plaintiffs' position as follows:

> ... the defense desire to basically say, no spill liability discovery, really is – you can't tease the two out. I think ultimately at a trial, as you have scheduled for February of 2012, we believe that because you will need, not just a PI wrongful death brace of cases, but will also need a *Robins Dry Dock* brace of cases, all of which have been 9(h)'d so that you can take them as bench cases, and even if you dismiss the limitation at the conclusion of the first phase of the liability trial, you're able to continue with the liability and so forth.
>
> **The *Robins Dry Dock* cases in that test case are going to have a slightly divergent path of potential fault allocation. You may end up saying that they are allocated the same fault as the casualty itself; but you could also conceivably arrive at the conclusion that because of certain actions that took place after the explosion, the amount of the spill, the duration of the spill and so forth, that this is more – substantially more another party's fault than you found to be them having fault in the actual explosion itself.[13]**

---

[12] *See generally*, Submission of Plaintiffs' Proposed Case Management Order, [Doc 474] (Oct. 6, 2010).

[13] TRANSCRIPT (Oct. 15, 2010), pp. 20-21.

The Court, after considering the issues, specifically included the *Robins Dry Dock* test cases,[14] and specifically defined the Phase I Discovery to include "discovery of issues relating to the cause or causes and extent of the associated oil spill, and the cause or causes of damages alleged to have resulted therefrom."[15]

During this same time period, the parties discussed the inclusion of "Expanded Initial Disclosures" within the CMO. These topics, first discussed in September, were served as "Plaintiffs' Omnibus Discovery Requests on All Defendants" on Defendants on October 5, 2010,[16] with leave formally granted by the Court on October 15, 2010.[17] In addition to any well-control documents which may have been provided to Coast Guard, MMS, MBI or a Congressional Committee or Sub-Committee,[18] those Omnibus Requests specifically called for:

> Within one hundred and twenty (120) days, [*i.e.* on or before February 15, 2011], please provide the name, employer, address, job title, job description, immediate supervisor, and direct subordinates, of any and all other officers, employees or consultants who were involved or participated in any and all **well control**, clean-up, or remediation efforts as a result of the spill.[19]

On January 23, 2011, Plaintiffs served their Third Set of Omnibus Discovery Requests on all Defendants, seeking:

> Please identify by name, employer, title and job description each and every employee and/or retained expert or consultant who participated in, or has knowledge of, discussions, decisions made, and/or the process of evaluating and/or implementing same, with respect to the Macondo **well control, capping, shut in, and/or kill efforts, after April 20, 2010.**

---

[14] CMO No. 1, Section VI(B).

[15] CMO No. 1, Section V(B)(2).

[16] *See* Doc 510-1.

[17] CMO No. 1, Section V(A).

[18] Omnibus Request No. 1 [Docs 510-1], p. 2.

[19] Omnibus Interrogatory No. 2 and Request for Production No. 8 [Doc 510-1], p. 4.

Please produce a copy of any and all communications or other documents (and/or ESI) containing or reflecting any comment, examination, discussion, decision, analysis, instruction and/or implementation of any and all **well control, capping, shut in, top kill, bottom kill and/or other flow termination efforts at the Macondo Well after April 20, 2010,** including any and all geological, technical, engineering, professional, management, economic and/or other testing, evaluation, study and/or analysis of any potential method or technique, including the possible risks, benefits or other consequences thereof.[20]

On January 28, 2011, counsel appeared before Magistrate Judge Shushan to discuss discovery issues. Magistrate Judge Shushan requested from all parties a prioritized list of fact witnesses who might be relevant to the February 2012 Trial. Following up on comments made during a smaller Liaison Conference meeting, Plaintiffs' Liaison Counsel advised on the record as follows:

MR. HERMAN: Just, I wanted to put a caveat on the record. I know we discussed this in our conference where Kerry represented the defendants with Your Honor the other day, but just so it doesn't come back to bite us down the line, we're putting this list together in good faith, and – but I just want to state for the record one of the issues that we have in putting together the list now, and we talked about this the other day, is that it's relatively easy to identify the witnesses involved in what we'll call the original casualty for April 20th that's been the subject of MBI hearings, oil spill commission, Congressional hearings, et cetera. **We're still working and we have some discovery pending that went out, I guess, about a week ago, and as well as looking through documents to better identify the witnesses who may be most relevant from the April 20th time period to whenever the well was capped,** which I think is in August. So we understand it's a nonprejudicial list, but **we could easily imagine maybe 30 days from now moving in some more witnesses and giving them a higher priority that we don't know about right now that would be involved in the capping containment issue and maybe giving less of a priority to some of the people that are on our casualty list right now.**

THE COURT: Any problem with that, guys? So that we all understand the constraints.

MR. LANGAN: Your Honor, I've also understood that what you're trying to accomplish is in the nature of a target aspirational, without prejudice. That goes for everybody, plaintiffs and the defense.[21]

---

[20] Omnibus Interrogatory No. 6 and Request No. 14, (Jan. 23, 2011).

[21] TRANSCRIPT (Jan. 28, 2011), pp. 29-30.

The priority list circulated by Plaintiffs on February 14, 2011, included several witnesses with knowledge of the post-April 20 well-control issues, as well as two specific placeholders for an "Unknown" witness on "Post Spill Well Control / Containment".[22]

On February 17, 2011, in a response to the request by Magistrate Judge Shushan that all parties exchange 30(b)(6) Topics related to the February 2012 Trial,[23] Plaintiffs circulated proposed topics to BP (and the other major defendants) which specifically included:

> The existence, nature and contents of any discussions with MOEX, Anadarko, Transocean, Cameron and/or Halliburton regarding the potential costs, risks, benefits and other analyses or evaluations of potential **methods to cap, control, contain, shut-in and/or kill the Macondo Well after April 20, 2010.**

> The existence, nature, scope, contents and results of any and all geological, technical, engineering, professional, management, economic and/or other testing, evaluation, study and/or analysis of any potential **method or technique to cap, control, contain, shut-in and/or kill the Macondo Well after April 20, 2010,** including the possible risks, benefits or other consequences thereof.

Around this same time, a conference was held before Judge Shushan regarding the production of ESI by BP. During this conference, Liaison Counsel for Plaintiffs confirmed that, (at least from Plaintiffs' point of view), while "environmental" issues were not going to be part of the February 2012 Trial, the duration and extent of the spill from a post-April 20 well-control vantage point, would be at issue:

> .... issues such as the biology, the marine biology, whether the fisheries are going to be alive or dead or impaired eight years from now, I think we generally agree with that to the extent of environmental damage; but, to the extent what some of our experts and our people call fate and transport of the oil, or as we call the duration of the spill and the extent of the spill, and whether or not it would have been as great as it was had it been capped sooner, etcetera, etcetera, to the extent that has an environmental ring to it, want to make it very clear that we believe that is part –

---

[22] E-Mail from Robert Cunningham to Don Godwin, et al (Feb. 14, 2011).

[23] TRANSCRIPT (Feb. 11, 2011), p. 55. *See also,* TRANSCRIPT (Feb. 25, 2011), p. 66, ln. 9-21.

THE COURT: I think that's a good point. I would consider that to be one of the exceptions where BP will then, on a regular basis, update the custodial information.

MR. ROY: And the second thing is, come May, assuming it happens in May that we actually make the selection of the plaintiffs between the Court, the defense, and the PSC and whoever else actually select test plaintiffs for the February trial, and to the extent an OPA type case is implicated, once again, at least the nature and extent and duration of the spill will be, we believe, relevant there....[24]

It was not until the February 25th Discovery Conference when someone – in particular,

Mr. Kanner, purporting to speak for the State of Louisiana – "objected" to this notion of the trial

plan.

MR. UNDERHILL: .... I don't have the list [of BP's proposed deposition witnesses] before me, but I went through it. It looks like about 98, 99 percent of all those witnesses dealt with post incident response issues, and I'm not clear how that fits into the scope of this trial. Perhaps Andy can explain it to me when we meet, but I'm not getting how that fits into what we're doing to try to get these depositions set up for a trial next February and March.

MR. LANGAN: .... I think there is at least substantial doubt, and I think Mr. Roy would say there is no doubt, about whether or not we're going to try the issues of where did the oil go, why wasn't it capped sooner, how could it have been capped sooner, what took so long, those kinds of things. I think there's a school of thought here that says that's very much part of this trial.....

MR. ROY: .... Reiterating the points made earlier, and Andy articulated it is our position, it's been our position ever since the CMO came out saying that there is going to be *Robins Dry Dock* type plaintiffs. To have *Robins Dry Dock* type plaintiffs, you have to talk cap and contain, nature and extent of oil.

On multiple occasions, going back months with the Court, these discussions have taken place. There is no surprise. In our list, there are witnesses. In our experts, there will be experts.

We've contended from day one, and it seems to have been reflected and acknowledged by the Court in the scheduling order, that there need to be two separate fault determinations at the February trial, and the second one very much is geared toward the well's failure to be capped sooner.[25]

---

[24] TRANSCRIPT (Feb. 18, 2011), pp 37-39.

[25] TRANSCRIPT (Feb. 25, 2011), pp. 68-70.

*   *   *

COURT: Mr. Roy, while we were on the subject of post spill well control, you listed some unidentified deponents on that issue.

MR. ROY: Yes, we have, Your Honor. As a matter of fact, we received a voluminous discovery response from Transocean and have been working very busily to analyze it, and had already culled an additional name, which we have provided to our deposition team, which will, in turn, liaise with Kerry and the Transocean people.

Apparently, two of the people, in addition to that, already, coincidentally, because of knowledge in other areas, were already scheduled and on the list, or at least on the list.

So we'll have at least three names, I believe, to address that area, possibly more. It's moving right along.[26]

*   *   *

MR. HERMAN: .... just to put it on the record, again, to reserve our rights, etcetera, this issue came up with a few unidentified as of yet cap and contain witnesses, for lack of a better word.

Your Honor may recall, you know, last week, we had talked about the outstanding omnibus requests from BP for who was involved in all these projects. We got an answer from them which just said, we will produce, after however many months.

Andy and I communicated about that over the weekend, and, I think, on – my understanding is on Wednesday, we got about 3,500 pages of org charts. So we have the information, thank you very much, we appreciate it, but it's not very helpful.

At the same time, in response to our third omnibus requests, which were specifically interrogatory-type things to identify cap and containment type witnesses, we got responses from many of the parties. BP's response, again, was about 16 pages of objections, and the response is, we will give them to you, or we will produce, or we will search. You know, if it takes time, it takes time. We will work through those issues and -- Mr. Gonzalez will, etcetera.

But, just in terms of reserving our rights on identifying witnesses and putting them on a priority list, there are probably going to be some more cap and containment people that we don't know about or we haven't found the best witness for.

---

[26] TRANSCRIPT (Feb. 25, 2011), pp. 72-73.

13

THE COURT:  We're aware of that.

\*    \*    \*

MR. ROY:  ....  We can cut to the chase here.  It's no great mystery.  I mean, we're interested in the immediate identification of the people that have knowledge that is material knowledge about the decisions that were made to cap and contain this well, people that can tell us at what point those decisions were made and what was considered prior to those decisions and either not acted on or rejected and the reasons therefor.

This is not mystery.  We may have petabytes, but I suspect a huge hunk of the petabytes is dealing with high definition video, perhaps, of the well spewing oil and gas.  I don't know, I'm speculating.  But I suspect that BP knows who was in that decision tree, and it's not 900 people.

THE COURT:  Jim, isn't that covered in your 30(b)(6)?

MR. ROY:  Part of it is, yes, ma'am.

\*    \*    \*

MR. KANNER:   Your Honor, just briefly, Allan Kanner for the State of Louisiana.....  I thought I heard Judge Barbier say today that he had not decided on a trial plan yet, that that would be decided.   For the first time today, I'm hearing that the PSC believes that we'll be trying some of the ecological impact associated with the DEEPWATER HORIZON, which does get into potentially NRDA type claims.
As I understand it, that's going to be decided by Judge Barbier, and we're not going to try to slow up any discovery into those issues now, but I just want to note that we have a different position on that.  Thank you.

THE COURT:  Thank you.

MR. ROY:  Your Honor, as the PSC appreciates it, the February trial is a liability trial on two different discrete sets of plaintiffs, the PI and the wrongful death plaintiffs and then what can be described as Robins Dry Dock slash OPA, whatever they are, separate set of plaintiffs.

That second group of plaintiffs, the issue of the extent and duration of the oil is relevant, okay, but it is not necessarily, and we do not believe it will address, an ecological, environmental, scientific, biological aspect in order to be able to establish what needs to be established for the February trial.

So, to that extent, we do not envision that overlap.[27]

Based on the above, the fact that well source control will be included in the February, 2011 trial on liability, limitation, and allocation of fault cannot come as a surprise to BP, or any other party to the trial.

### D. DISCOVERY RELATING TO THE POST-APRIL 20, 2010 WELL CONTROL ISSUES IS NOT UNDULY BURDENSOME

Under the Joint Trial Plan, the February 27, 2012 trial will proceed on "all counts of the applicable Master Complaint(s) as of the time of trial," but "parties shall engage in pretrial motion practice to attempt to eliminate or limit certain claims and defenses, and to resolve evidentiary and *Daubert* issues.[28] Further, the trial will proceed "with Plaintiffs presenting their evidence first *on all issues.*"[29] BP's proposed plan would limit the trial to "core factual and legal issues" arising from "the fire and explosion aboard the rig" and "the initiation of an uncontrolled flow of oil," and BP has indicated discovery beyond the scope of these issues is unduly burdensome. While numerous people may have been involved in the "response effort" generally, the universe of decision-makers working on post-April 20 well-control is clearly limited, with the overwhelming majority being BP and U.S. Government employees. Indeed, BP, in conjunction with the identification of "key personnel" for ESI searches in response to Plaintiffs' initial discovery requests, identified a total of only ten (10) key employees involved with well source control. Several of these witnesses (*e.g.* Doug Suttles, Pat O'Bryan) were already on the plaintiffs' priority list with respect to the events of April 20[th] and are scheduled to be deposed in June As note *supra*, several of the other witnesses identified in connection with source control (*e.g.,* Bodek, Dupree, Hayward, Inglis, Lynch, Pleasant, Sprague, Stringfellow,

---

[27] TRANSCRIPT (Feb. 25, 2011), pp. 79-84.

[28] JOINT TRIAL PLAN, ¶ 7.

[29] JOINT TRIAL PLAN, ¶ 8 (emphasis added).

Theirens and Tooms) are already scheduled to be deposed. The U.S. believes that there are only a half-dozen to a dozen material witnesses with personal knowledge of the source control efforts on behalf of the U.S.

## LAW AND ARGUMENT

### A.   PURPOSE OF THE TRIAL PLAN

One of the values of Multidistrict Litigation proceedings is that they bring before a single judge all of the cases, parties, and counsel comprising the litigation. MANUAL FOR COMPLEX LITIGATION, FOURTH, § 20.132.   The District Court can then better manage the litigation for the purpose of "reduce[ing] complexity, cost and trial time, and can improve the quality of the trial." *Id.* at §12.   The effectiveness of judicial management "depends on the implementation of flexible and creative plans that take into account the specific needs of a particular litigation and permit the attorneys to try their case in an orderly fashion." *Id.*   To promote these interests, "the judge should seek suggestions from counsel for approaches to structuring the trial that will improve the trial process." *Id.* at § 11.63.

To this end, the District Court can request trial plans from counsel, which will assist the Court in determining whether common issues justify aggregating related cases for trial and the extent and nature of the appropriate aggregation. *Id.* at § 22.318.   The plans should address whether to try cases "on a traditional case by case basis, on a test-case basis, in a bifurcated or multifurcated organization of issues, in a consolidated or class format." *Id.*   In developing the plans, the parties should point to evidence that will prove the elements of the claims and defenses at issue.   Such information enables the judge to test whether common issues support some form of aggregation and whether to limit aggregation to particular issues. *Id.*

**B.    TRIAL ON COMMON ISSUES IS PROPER IN BOTH THE LIMITATION ACTION AND THE CONSOLIDATED MDL CASES**

In this unique and complicated matter, the District Court is confronted with the daunting task of managing a Limitation Action, brought under the Limitation of Liability Act, 46 U.S.C. §181 *et. seq.*, involving tens of thousands of claimants, which is consolidated with a MDL involving hundreds of cases. As an Admiralty Court presiding over a Limitation Action and as the transferee Court in the MDL, the District Court has considerable discretion in managing the litigation. The issues of liability and allocation of fault are common to the Limitation Action and the multiple consolidated suits in the MDL, and the District Court has the authority to aggregate these common issues so that they are litigated once, and only once.

**1.    A SINGLE TRIAL ON LIABILITY AND ALLOCATIONS OF FAULT IS PROPER UNDER THE LIMITATION OF LIABILITY ACT**

Federal Courts have exclusive jurisdiction to determine whether a vessel owner is entitled to limit its liability under the Limitation of Liability Act, 46 U.S.C. §181 *et. seq. Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 442 (2001). The procedure for a limitation action is found in Supplemental Admiralty and Maritime Claims Rule F, which sets forth the process for filing a petition for exoneration from or limitation of liability. *Id.* at 1001. The District Court secures the value of the vessel, or the owner's interest in the vessel, marshals claims, and enjoins the prosecution of other actions with respect to the claims. *Id.* The limitation court, "sitting without a jury, adjudicates the claims ... determines whether the vessel owner is liable and whether the owner may limit liability. The court then determines the validity of the claims, and if liability is limited, distributes the limited funds among the claimants." *Id.*

The judge in a limitation proceeding is given wide discretion to decide which claims to hear even when the court denies limitation. *Just v. Chambers*, 312 U.S. 383, 386 (1941);

*Hartford Accident & Indemnity Co. v. Southern Pacific Co.*, 273 U.S. 207 (1927); *Fecht v. Makowski*, 406 F.2d 721, 723 n. 7 (5th Cir. 1969); *Pershing Auto Rentals, Inc. v. Gaffney*, 279 F.2d 546, 552 (5th Cir.1960) (the "power of the admiralty court to adjudicate the whole case and grant full relief even though limitation is denied"); *In re Complaint of Clearsky Shipping Corp.*, 1998 WL 308011 at *2 (E.D. La. 1998) (finding where limitation is denied, it is discretionary with the court to retain jurisdiction and adjudicate the claims or remit the claimants to another forum.); *see also Lewis v. Lewis & Clark Marine Inc.*, 531 U.S. 438, 449 (2001) (reaffirming that district court's decision to hear claims in limitation is one of discretion in every case) citing *Langnes v. Green*, 282 U.S. 531, 544 (1931). This discretion protects injured claimants, preserves uniformity in admiralty law, and economically manages complex litigation. *In re Complaint of Clearsky Shipping Corp.*, 1998 WL 308011 at *2 (E.D. La. 1998) *citing In the Matter of the Complaint of the Great Lakes Dredge and Dock Co.*, 895 F.Supp. 605, 612 (S.D.N.Y. 1995).

The jurisdiction of the limitation court includes all claims arising out of the events which led to the filing of the limitation action. *British Transp. Comm'n v. United States*, 354 U.S. 129, 138 (1957) (holding it is a necessary concomitant of jurisdiction that the Court have power to adjudicate all of the demands made and arising out of the same disaster). Further, the limitation court has the discretion to hear complaints against non-ship-owner, third parties who may be at fault for the claimant's injuries in the limitation action. *In re Katrina Dredging Limitation Actions Consolidated Litigation*, 2008 WL 3876461 at *3 (E.D. La. 2008) (finding petitioner in limitation proceeding may implead third parties); *see also In re McAninch*, 392 F. Supp. 96 (S.D. Tex. 1975) (allowing vessel owners under Rule 14 to implead third-party refrigeration company for contribution and indemnity based on their negligence). This discretion allows the limitation

court to adjudicate the potential liability of the third-parties in the limitation proceeding. *See In re Queeny/Corinthos*, 503 F.Supp. 361 (E.D. Penn. 1980) (After allowing limitation for one ship-owner but not the other in a collision action, the limitation court heard the claims of certain claimants and the ship-owners against the third-party product manufacturers because its admiralty jurisdiction was not so limited to be unable to hear the claims and it had already determined the defective component parts were a contributing cause of the collision.); *see also Texas Trading and Transp. Inc. Laine Constr. Co. Inc.*, 1998 WL 814615 at *2 (E.D. La. 1998) (finding petitioner in limitation action has right to conduct discovery with respect to any potentially responsible party and to file third-party actions).   At least one District Court within the Fifth Circuit has held that the case law and the reasoning set out therein does not in any way limit the Court's discretionary ability to decide, not only the issue of damages, but to also adjudicate some of the ancillary matters including whether, as a matter of law, punitive damages are available. *See, In re Athena Const., LLC*, 2007 WL 1668753 (W.D.La. 2007) (Melancon, J.).

### 2.   A SINGLE TRIAL ON LIABILITY AND ALLOCATIONS OF FAULT IS PROPER UNDER FED. R. CIV. P. 42

In addition to a limitation court's jurisdiction over complaints against non-ship-owner, and third party defendants tendered by the vessel owner under Rule 14(c), Federal Rule of Civil Procedure Rule 42 applies in maritime actions, and its procedures can be used to consolidate and sever common issues related to the limitation for trial.    *See e.g. Caytrans BBC, LLC v. Equipment Rental and Contractors Corp.*, 2009 WL 3248044 *2 (S.D.Ala. 10/6/09) ("Based on considerations of efficiency, judicial economy, the risk of inconsistent rulings on common questions, the burden on the parties and the court, and the relative expense of proceeding separately versus together, consolidation of these actions would plainly streamline these proceedings and eliminate unnecessary repetition and confusion. Simply stated, it would be far

more sensible and efficient to litigate all issues of fault and liability arising from the August 23, 2008 incident aboard the M/V BBC ARAMIS in a single proceeding than to do so piecemeal in multiple actions. The discretion of the court to consolidate is not limited to the consolidation of admiralty claims, but can include the consolidation of maritime claims and claims at law."); *see also Parsons Mills, Inc. v. Companhia Portuguese De Transportes Maritima S.A.R.L.*, 82 F.R.D. 331, 333 (D.C.N.Y. 1978) ("the consolidation of an action at law and an admiralty suit [under Fed. R. Civ. P. 42(a)] will save trial time and make for consistency and efficiency in the disposition of closely related disputes arising out of the same transaction or mishap ... only by the decision of common issues of fact by a single trier of fact can the potential benefits of such consolidation be realized fully").

The rules applicable to admiralty and maritime claims supplement the federal rules, and as such, the management tools and devices available to a District Court in a case sounding in law, including MDLs, are available to an Admiralty Judge presiding over a limitation action. In the context of a mass tort MDL, "the structure of the trial should be addressed as early in the pre-trial process as feasible," and judges will often require the parties to submit detailed trial plans, which "should assist the court and the parties in determining which issues, claims, and defenses may apply across groups and how to present proof. MANUAL FOR COMPLEX LITIGATION, FOURTH, §22.93. The trial plan may call for a unitary trial, bifurcate liability and damages, or create other helpful trial structures. *Id.* In the context of mass tort litigation, "it is not uncommon that judges may try jury and non jury issues concurrently (occasionally with an advisory jury, whose verdict is not binding)." *Id.* at § 12.53.

One trial management device available to a District Court is consolidation under Rule 42(a), which authorizes the judge to consolidate, for trial or pretrial, actions in the same court

involving common questions of law or fact if it will avoid unnecessary cost or delay. Fed. R.

Civ. P. 42(a). Section 11.631 of the MANUAL FOR COMPLEX LITIGATION, provides that "[i]t may

be appropriate even if some issues are to be tried before a jury and others before the court; the

same evidence must be presented only once. MANUAL FOR COMPLEX LITIGATION, FOURTH, §

11.631. Furthermore, procedural devices, such as Rule 42 consolidation and issue severance are

considered "essential in order to aggregate a critical mass of cases to accentuate global concerns,

[and] to reduce individual transaction costs..." Francis E. McGovern , *Class Actions and Social*

*Justice Torts in the Gulf South*, 74 Tul. L. Rev. 1655, 1664 (2000). Whether consolidation of

common issues for trial under Federal Rule 42 is permissible or desirable depends largely on the

amount of common evidence among the cases. *Id.* The judge may consider severing for a joint

trial those issues on which common evidence predominates, reserving non-common issues for

subsequent trial. *Id.*

In the context of an MDL, liability issues can be consolidated for joint trial and damage

issues reserved for later trials. *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 473 (5th Cir.

1986) (holding that a trial plan which has a phase for adjudicating common facts and issues "is

clearly superior to the alternative of repeating, hundreds of times over, the litigation of [the same

issues] with ... days of the same witnesses, exhibits and issues from trial to trial."); see *Mullen v.

Treasure Chest Casino, LLC*, 186 F.3d 620, 628 (5th Cir. 1999) (approving trial plan in which

common issues of liability, negligence, and certain defenses are tried commonly, with actual

damages and other individualized issues trial individually in a subsequent phase of the trial); *In

re Chevron U.S.A.*, 109 F.3d 1016, 1021 (5th Cir. 1997) (holding that it is within the trial judge's

discretion to "attempt a common issue trial."). In *Turner v. Murphy Oil USA, Inc.*, a case

involving claims arising from the discharge of oil from the Defendant's facility after Hurricane

Katrina made landfall, the court adopted a trail plan bifurcating the trial into two phases: (1) addressing common issues of liability and causation; and (2) consisting of successive trials of specific causation and damages. *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 830, 837 (E.D. La. 2007). The court's order adopting the trial plan (Rec. Doc. 257) specified that the common issues to be tried in Phase One included: "[t]he Defendant's liability, if any, for the oil spill," which included, "factual findings regarding defendant's conduct and the casual relationship of the conduct to the oil spill itself … [l]iability of any third parties for the spill and comparative fault defenses … [t]he total amount or quantity of oil and/or chemicals spilled in connection with the [] incident   [and] [t]he composition and contents of the spill. *Turner v. Murphy Oil USA, Inc.*, NO. 05-CV-04206, Rec.Doc. 257, pp. 4,5 (E.D.La. 3/3/2006). Under the Plan, Phase Two would only take place if the defendant was held to be liable, in whole or in part, in Phase One. *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 830, 837 (E.D. La. 2007).

### C.    THE JOINT TRIAL PLAN PROPOSES A SINGLE TRIAL ON ALL COMMON ISSUES

For the reasons stated above, the Joint Trial Plan is preferable to BP's proposed plan because it structures a single trial, which would allow for one adjudication of the single note of evidence common to all defendants and plaintiffs, whether Rule 9(h) claimants with personal injury/wrongful death claims arising out of injuries/deaths that occurred on April 20, 2010, or the tens of thousands of Rule 9(h) claimants with non-personal injury/wrongful death claims arising out of alleged damages that occurred after April 20, 2010.  Phasing out determinations of liability, as BP proposes to do, would necessarily require re-adjudication of many general liability and causation issues, and would require the re-calling of witnesses in multiple trials to provide testimony on facts and issues already adjudicated. The bifurcation proposed in the Joint Trial Plan is between common issues, such as general causation and general damage, and

specific issues, such as specific damages. This is clearly superior to BP's multi-furcated plan with multiple mini-trials on common issues, which would be subject to varying factual findings and allocations of fault..

### D. THE TEST CASE PLAINTIFFS ARE NOT "CLASS REPRESENTATIVES"

It was not and is not intended that the Test Case Plaintiffs or any other plaintiffs "represent" absent class members in connection with the 2012 Trial. All parties falling within the Court's Admiralty jurisdiction - or, at the very least, all parties who have filed Claims in the Limitation - are before the Court, with claims that can be consolidated and bi-furcated under Rule 42 and/or under the inherent power and authority of the Court. Thus, issues raised by Cameron about "class action" trials and the failure to identify the parties to the proceeding are without merit.

Test Plaintiffs were originally proposed: (a) to ensure, out of an abundance of caution, the Court's jurisdiction to make liability and fault allocation determinations, irrespective of any rulings on limitation; (b) to provide some plaintiffs with the opportunity to obtain an early trial date; (c) to potentially provide justiciability or other context for the determination of fundamental and common legal matters; and (d) to provide the litigants and the Court with some degree of guidance with respect to damages.

Yet even without a "test" plaintiff, the Court can identify issues under Rule 42 to try, based on the justiciable issues which exist among Defendants with respect to all claims between them. As outlined above, the Court has discretion under its admiralty and maritime jurisdiction to try the issues of liability and fault allocation, in conjunction with the Limitation proceeding, particularly in light of the Rule 14(c) tender of the other defendants – *irrespective* of the inclusion or exclusion of specific "test" plaintiffs.

## CONCLUSION

The Joint Trial Plan proposed by Plaintiffs, Transocean and the State of Alabama is the only proposal that provides for a meaningful and efficient February 2012 trial. The Joint Trial Plan proposes a single trial on the main liability issues that are common to both the Limitation and MDL proceedings. The determination of these overlapping liability issues, and accompanying two allocations of fault, can be made from a "single note of evidence." As a result, the Joint Trial Plan will reduce the complexity and cost of the trial, and improve the trial's overall quality. Most importantly, it ensures that common issues of law and fact are tried only once, as opposed to multiple times as BP's Plan requires. BP's Plan is simply inadequate and short-sighted, as it is a not-so-veiled attempt to delay the adjudication of liability and post-blowout and explosion issues, along with the resulting economic damages caused thereby.

For these reasons, the Plaintiffs Steering Committee, joined by the Transocean Petitioners in the Limitation Action and the State of Alabama, respectfully request that this Court adopt the Joint Trial Plan.

Dated:   April 13, 2011

Respectfully submitted,

/s/ Stephen J. Herman
**STEPHEN J. HERMAN** (La. Bar #23129)
**HERMAN HERMAN KATZ & COTLAR, LLP**
820 O'Keefe Avenue
New Orleans, LA  70113
Office:  (504) 581-4892
Telefax: (504) 569-6024
E-Mail: sherman@hhkc.com
*Plaintiffs' Liaison Counsel*

/s/ James Parkerson Roy
**JAMES PARKERSON ROY** (La. Bar #11511)
**DOMENGEAUX WRIGHT ROY & EDWARDS LLC**
556 Jefferson Street, Suite 500
Lafayette, LA  70501
Office:  (337) 233-3033
Telefax: (337) 233-2796
E-Mail: jimr@wrightroy.com
*Plaintiffs' Liaison Counsel*

PLAINTIFFS' STEERING COMMITTEE

| | |
|---|---|
| Brian H. Barr<br>LEVIN, PAPANTONIO, THOMAS,<br>MITHCELL, ECHSNER & PROCTOR, PA<br>316 South Baylen Street,  Suite 600<br>Pensacola, FL  32502-5996<br>Office:  (850) 435-7045<br>Telefax:  (850) 436-6187<br>E-Mail:  bbarr@levinlaw.com | Robin L. Greenwald<br>WEITZ & LUXENBERG, PC<br>700 Broadway<br>New York, NY  10003<br>Office:  (212) 558-5802<br>Telefax:  (212) 344-5461<br>E-Mail:  rgeeenwald@weitzlux.com |
| Jeffrey A. Breit<br>BREIT DRESCHER & IMPREVENTO<br>999 Waterside Drive, Suite 1000<br>Norfolk, VA  23510<br>Office:  (757) 670-3888<br>Telefax:  (757) 670-3895<br>E-Mail:  jbreit@bdbmail.com | Rhon E. Jones<br>BEASLEY, ALLEN, CROW, METHVIN,<br>PORTIS & MILES, P.C.<br>218 Commerce Street, P.O. Box 4160<br>Montgomery, AL  36104<br>Office:  (334) 269-2343<br>Telefax:  (334) 954-7555<br>E-Mail:  rhon.jones@beasleyallen.com |
| Elizabeth J. Cabraser<br>LIEFF, CABRASER, HEIMANN &<br>BERNSTEIN, LLP<br>275 Battery Street, 29th Floor<br>San Francisco, CA  94111-3339<br>Office:  (415) 956-1000<br>Telefax:  (415) 956-1008<br>E-Mail:  ecabraser@lchb.com | Matthew E. Lundy<br>LUNDY, LUNDY, SOILEAU & SOUTH, LLP<br>501 Broad Street<br>Lake Charles, LA  70601<br>Office:  (337) 439-0707<br>Telefax:  (337) 439-1029<br>E-Mail:  mlundy@lundylawllp.com |
| Philip F. Cossich, Jr.<br>COSSICH, SUMICH, PARSIOLA &<br>TAYLOR<br>8397 Highway 23, Suite 100<br>Belle Chasse, LA  70037<br>Office:  (504) 394-9000<br>Telefax:  (504) 394-9110<br>E-Mail:  pcossich@cossichlaw.com | Michael C. Palmintier<br>deGRAVELLES, PALMINTIER,<br>HOLTHAUS & FRUGÉ<br>618 Main Street<br>Baton Rouge, LA  70801-1910<br>Office:  (225) 344-3735<br>Telefax:  (225) 344-0522<br>E-Mail:  mpalmintier@dphf-law.com |
| Robert T. Cunningham<br>CUNNINGHAM BOUNDS, LLC<br>1601 Dauphin Street, P.O. Box 66705<br>Mobile, AL  36660<br>Office:  (251) 471-6191<br>Telefax:  (251) 479-1031<br>E-Mail:  rtc@cunninghambounds.com | Paul M. Sterbcow<br>LEWIS, KULLMAN, STERBCOW &<br>ABRAMSON<br>601 Poydras Street, Suite 2615<br>New Orleans, LA  70130<br>Office:  (504) 588-1500<br>Telefax:  (504) 588-1514<br>E-Mail:  psterbcow@lksalaw.com |

| | |
|---|---|
| Alphonso Michael "Mike" Espy<br>MORGAN & MORGAN, P.A.<br>188 East Capitol Street, Suite 777<br>Jackson, MS  39201<br>Office:  (601) 949-3388<br>Telefax:  (601) 949-3399<br>E-mail:  mike@mikespy.com<br><br>Calvin C. Fayard, Jr.<br>FAYARD & HONEYCUTT<br>519 Florida Avenue, SW<br>Denham Springs, LA  70726<br>Office:  (225) 664-4193<br>Telefax:  (225) 664-6925<br>E-Mail:  calvinfayard@fayardlaw.com<br><br>Ervin A. Gonzalez<br>COLSON HICKS EIDSON<br>255 Alhambra Circle, Penthouse<br>Coral Gables, FL  33134<br>Office:  (305) 476-7400<br>Telefax:  (305) 476-7444<br>E-Mail:  Ervin@colson.com | Scott Summy<br>BARON & BUDD, P.C.<br>3102 Oak Lawn Avenue, Suite 1100<br>Dallas, TX  75219<br>Office:  (214) 521-3605<br>Telefax:  (214) 599-1172<br>E-Mail:  ssummy@baronbudd.com<br><br>Mikal C. Watts (PSC)<br>WATTS GUERRA CRAFT, LLP<br>Four Dominion Drive, Building 3, Suite 100<br>San Antonio, TX  78257<br>Office:  (210) 447-0500<br>Telefax:  (210) 447-0501<br>E-Mail:  mcwatts@wgclawfirm.com |

## COUNSEL FOR TRANSOCEAN DEFENDANTS

| | |
|---|---|
| /s/ Steven L. Roberts<br>Steven L. Roberts (Texas, No. 17019300)<br>Rachel Giesber Clingman (Texas, No. 00784125)<br>Kent C. Sullivan (Texas, No. 19487300)<br>Teri L. Donaldson (Florida, No. 784310)<br>Sutherland Asbill & Brennan LLP<br>1001 Fannin Street, Suite 3700<br>Houston, TX  77002<br>Telephone: (713) 470-6100<br>Facsimile: (713) 654-1301<br>E-Mail: steven.roberts@sutherland.com,<br>rachel.clingman@sutherland.com,<br>kent.sullivan@sutherland.com,<br>teri.donaldson@sutherland.com | /s/ Kerry J. Miller<br>Kerry J. Miller (Louisiana, No. 24562)<br>Frilot L.L.C.<br>1100 Poydras Street, Suite 3700<br>New Orleans, LA 70163<br>Telephone: (504) 599-8169<br>Facsimile: (504) 599-8154<br>E-Mail: kmiller@frilot.com<br><br>-and-<br><br>/s/ Edwin G. Preis, Jr.<br>Edwin G. Preis, Jr. (Louisiana, No. 10703)<br>Edward F. Kohnke, IV (Louisiana, No. 07824)<br>Preis & Roy PLC<br>102 Versailles Boulevard, Suite 400<br>Lafayette, LA 70501<br>Telephone: (337) 237-6062<br>Facsimile: (337) 237-9129<br><br>-and- |

|  | 601 Poydras Street, Suite 1700<br>New Orleans, LA 70130<br>Telephone: (504) 581-6062<br>Facsimile: (504) 522-9129<br>E-Mail:  egp@preisroy.com, efk@preisroy.com |
|---|---|

Of Counsel:

| Daniel O. Goforth (Texas, No. 08064000)<br>Goforth Geren Easterling LLP<br>4900 Woodway, Suite 750<br>Houston, TX 77056<br>Office:  (713) 650-0022<br>Telefax:  (713) 650-1669<br>E-Mail:  dangoforth@goforthlaw.com | Brad D. Brian (California, No. 79001)<br>Allen M. Katz (California, No. 054933)<br>Munger Tolles & Olson LLP<br>355 South Grand Avenue, 35th Floor<br>Los Angeles, CA 90071<br>Office:  (213) 683-9100<br>Telefax:  (213) 683-5180, (213) 683-4018<br>E-Mail:  brad.brian@mto.com,<br>allen.katz@mto.com |
|---|---|
| John M. Elsley (Texas, No. 0591950)<br>Royston, Rayzor, Vickery & Williams LLP<br>711 Louisiana Street, Suite 500<br>Houston, TX 77002<br>Office:  (713) 224-8380<br>Telefax:  (713) 225-9945<br>E-Mail:  john.elsley@roystonlaw.com |  |

## COUNSEL FOR THE STATE OF ALABAMA

LUTHER STRANGE (ASB-0036-G42L)
Attorney General of the State of Alabama Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130
Telephone: (334) 242-7300
E-Mail: luther.strange@ago.state.al.us

*Counsel for the State of Alabama*
*Coordinating Counsel for the States*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 13th day of April, 2011, I electronically transmitted a PDF version of this document to the Clerk of Court, using the CM/ECF System, for filing and for transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

/s/ Kerry J. Miller
KERRY J. MILLER

28