# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | **:** | |
| | **:** | **MDL NO. 2179** |
| **IN RE: OIL SPILL by the OIL RIG** | **:** | |
| **"DEEPWATER HORIZON" in the** | **:** | **SECTION: J** |
| **GULF OF MEXICO, on** | **:** | |
| **APRIL 20, 2010** | | |
| | **:** | **JUDGE BARBIER** |
| **THIS DOCUMENT RELATES TO:** | | **MAG. JUDGE SHUSHAN** |

1. *Bill's Oyster House v BP et al* (C.A. 10-1308)
2. *Howard Buras v BP et al* (C.A.10-2994)
3. *Armand's Bistro v BP et al* (C.A. 10-4489)
4. *Faye Loupe et al. v BP et al* (C.A. 10-2764)
5. *Laura Gautreaux v BP et al* (C.A. 10-1539)
6. *Brent Rodrigue, Sr. et al. v BP et al* (C.A. 10-1325)

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST TRANSOCEAN

MAY IT PLEASE THE COURT:

**A. FACTS:**

**1. The Background of the Macondo Well and *Deepwater Horizon* and The Lowering of the Final Casing String Into The Well (March 2008  – April 19, 2010)**

**2. Transocean Failed to Recognize that its own Safety-Pressure Tests Showed that the Hydrocarbons  Were Leaking Into the Drill Pipe**

**3. Transocean Failed to Recognize the Warning "Kicks" Showing that the Hydrocarbons Were Coming Up the Drill Pipe**

**4. Transocean Failed to Divert The Hydrocarbons Overboard**

**B. LAW:**

   **1. General Maritime Law, Negligence**

   **2. Summary Judgment Standards**

**C. CONCLUSION**

**A. FACTS[1]:**

1. **The Background of the Macondo Well and *Deepwater Horizon* and The Lowering of the Final Casing String Into The Well**
   **(March 2008 – April 19, 2010)**

   In March 2008, BP leased from the United States' Department of the Interior a nine-square-mile area in the northern Gulf of Mexico, 42 miles southeast of Venice, Louisiana, known as "Macondo".

   BP hired Transocean (i.e., Transocean Offshore Deepwater Drilling, Inc.; Transocean Deepwater, Inc.; and Transocean Holdings, L.L.C.) to provide the rig and crew to dig a well for oil and gas production. Transocean's *Marianas* rig dug the well in October and November 2009, but had to leave when Hurricane Ida approached. After that Transocean sent its *Deepwater Horizon* rig to take over.

   On January 31, 2010, *Deepwater Horizon* began work on the well.

   Below the wellhead stretched four telescoping "casing strings" that had been installed by *Marianas* to reinforce the hole. The *Deepwater Horizon* crew proceeded to drill deeper, cementing each new string into place to anchor the well and seal it from the surrounding rock.

   In early April the Transocean crew finally reached the "pay zone" that BP had spent $38 million for. But it kept going deeper.

   On April 9 Transocean suffered a setback. At 18,193 feet the downward pressure caused by the weight of the drilling mud exceeded the strength of the rock formation and the mud cracked the formation and escaped into it instead of circulating back up to the rig.

   The crew had to stop drilling until it sealed all the fractures.

---

[1] All facts are from the Chief Counsel's Final Report, National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, available at: http://www.oilspillcommission.gov/

Drilling mud is used to lubricate and cool the drill bit during drilling, but it also plays a critical role in controlling the pressure in a well. The weight of the huge column of mud creates the enormous downward pressure needed to counterbalance the upward pressure from the hydrocarbons in the formation. If the mud weight is too low, oil and gas will enter the well and rise up, causing a "kick".  But if the mud's weight is too high, it squeezes into and fractures the rock,  which is called "lost returns" – leakage of mud into the rock formation.  The crew, therefore, must constantly monitor and adjust the weight and density of the mud while the well is being drilled.

After stabilizing the situation, the crew stopped the drilling,  at 18,360 feet – 3 and ½ miles below the earth's surface and 4 and ½ miles below *Deepwater Horizon*. It was one of  the deepest wells in history.

The well was stable.

BP and its contractors, including Transocean, spent the next five days (April 11 – 15) "logging" the open hole with sophisticated instruments. They then decided they had drilled into a hydrocarbon reservoir of sufficient size that would be worthwhile to install the final "production casing" string that would ultimately be able to remove the oil and gas, then close the wellhead and leave, with another rig to come to reopen the well and remove the oil and gas.

The lost circulation problems, the extraordinary depth of the well, and the unusually delicate rock formation should have made the crew especially cautious as it installed the casing, finished the cement job and abandoned the well.

After the crew lowered the final casing into position, Halliburton cemented it into place. Once it hardened, the cement was to bond to the formation and the casing and seal off the annular space. When the production rig would later arrive and reopen the well to remove the oil

and gas, it would perforate holes through the cement and the oil and gas would flow up and out the well.

On the morning of April 18, the crew finally began assembling and lowering the final casing string into position, and on April 19 Halliburton proceeded with its final cementing of the well, after which the well was to be tested then closed ("temporary abandonment") until another rig came to reopen the well and produce the oil.

**3.  Transocean Failed to Recognize its Own Safety-Pressure Tests Showed that the Hydrocarbons  Were Leaking Into the Drill Pipe**
   **(April 20, 5 p.m.)**

In preparing for temporary abandonment, several final safety tests are performed on the well, one of the most important being the "negative pressure test".  This test checks the quality of the casing and the final cement job. At Macondo, the negative pressure test was the only test done to check the quality of the final cement job.

At 5 p.m. Transocean began the negative pressure test.

To perform this test, the Transocean crew, through a series of procedures, removed all the pressure from inside the well to see if hydrocarbons were leaking through the cement and into the well. If the cement had been designed and installed properly, it would have prevented hydrocarbons from intruding. The Transocean crew bled the pressure down to zero, then waited to see if the pressure started to build back up, which would indicate that hydrocarbons were escaping into the well.

Three times the crew bled the pressure down to zero, and three times the pressure then rose back up. For a successful negative test, the pressure must remain at zero.

Transocean Toolpusher Jason Anderson guessed that the pressure was being caused by a phenomenon he said he had heard of before and he called it "the bladder effect".   Nobody else

had ever heard of this.  Mr. Alexander claimed that the pressure that the test showed being  in the drill pipe was actually caused by  pressure going <u>down</u> into  the drill pipe from the weight of the mud in the riser above (and even through the BOP), rather than pressure coming <u>up</u> into the drill pipe from hydrocarbons at the bottom.

The crew, therefore, did one more test, but this time using a different procedure.  That test produced successful (wrongly, as it turned out)  results but the crew never bothered to reconcile why the pressure in the drill pipe kept rising. When BP's Vice President for Drilling and Completions received an email mentioning the so-called "bladder effect" as the cause of the pressure, he responded with an email with a string of question marks: "??????????????????????????????????????????????????".

This vice president was one of the visiting executives on the rig at the time of the explosion. If anyone had consulted him or anybody onshore, the blowout should have never have happened. Every industry expert the Presidential Spill Commission's investigative team met with dismissed the so-called "bladder effect"  as a fiction that could not have accounted for the pressure readings the Transocean crew saw on April 20.


**4. <u>Transocean Failed to Recognize the Warning "Kicks"  Showing that the Hydrocarbons Were  Coming Up the Drill Pipe</u>**
   **(8:02 – 9:39 p.m.)**

At 8:02 p.m., satisfied with the results of the negative tests, the crew proceeded with the temporary abandonment and began removing the mud from the riser in preparation for removing the riser and the BOP and sealing the wellhead closed.

Mr. Dewey Revette was Transocean's Chief Driller and while the mud was being removed his job was to monitor computer screens for "kicks", from his chair in the Drill Shack.

A "kick" is an unplanned influx of gas or fluids, and observing them is critical because a single barrel of natural gas at the bottom of the well could expand over a hundred times by the time it travelled the 5,000 feet from the wellhead to the rig. The primary way to monitor for kicks is to observe the computer data logs video screens showing the amount of mud both going into and coming out of the mud pits. An increase in volume is a powerful indicator that something is flowing into the well and that a kick is underway.  Another way is to note data on logs that show unusual changes in drill pipe pressure.

From 9:08 p.m. to 9:14 p.m., according to the logs (which were also sent to Houston), the drill pipe pressure was inexplicably increasing, but nobody noticed. Had someone noticed it, they would have recognized this as a significant anomaly that warranted immediate attention.

At 9:18 p.m. a presssure-relief valve on one of the pumps blew, and Mr. Revette organized some of the Transocean crew to go to the pump room to fix it.

At about 9:30 p.m. Mr. Revette, for the first time, noticed unusual pressure readings. The pumps were turned off while he discussed the situation with Jason Anderson, Transocean's Toolpusher.  Despite mounting evidence of a kick, neither Mr. Revette nor Mr. Anderson performed a visual flow check or closed off the well.

At 9:39 p.m. drill pipe pressure shifted direction and suddenly started decreasing. This was a very bad sign. It meant that the lighter weight hydrocarbons were now pushing the much heavier mud out of the way and up the casing past the drill  pipe.

## 5. Transocean Failed to Divert The Hydrocarbons Overboard (9:40 – 9:49 p.m.)

Somewhere between 9:40 and 9:43 the mud reached the surface and began spewing onto the rig floor. This appears to have been the first time Mr. Revette, Mr. Anderson or anybody else

on duty realized that hydrocarbons had escaped into the drill pipe and were rushing to the surface.  When this started, Mr. Anderson and  Transocean Assistant Driller Stephen Curtis routed the flow coming out the well, sending it to the "mud-gas separator" rather than overboard and into the Gulf.  They also began trying to close the BOP to shut the well.

But by then it was too late – gas was already above the BOP and rocketing up the riser and expanding rapidly.  The flow quickly overwhelmed the mud-gas separator and the first explosion occurred at 9:49 p.m.

## B. LAW:

### 1. General Maritime Law, Negligence

As the Fifth Circuit has noted:

The analysis of a maritime tort is guided by general principles of negligence law. Casaceli v. Martech Int'l., Inc., 774 F.2d 1322 (5th Cir.1985); Daigle v. Point Landing, Inc., 616 F.2d 825 (5th Cir.1980). Under those principles a tortfeasor is accountable only to those to whom a duty is owed. …

Determination of the tortfeasor's duty, and its parameters, is a function of the court. . . .That determination involves a number of factors, including most notably the foreseeability of the harm suffered by the complaining party. …      "Duty ... is measured by the scope of the risk that negligent conduct foreseeably entails." Consolidated Aluminum Corp. v C.F. Bean Corp. 833 F.2d 65 (5th Cir., 1987), rehearing denied en banc.

Also, as the Fifth Circuit more recently noted:

[N]egligence is an actionable wrong under general maritime law. In Leathers v. Blessing, 105 U.S. (15 Otto) 626, 26 L.Ed. 1192 (1881), the Supreme Court recognized the maritime tort of negligence which exists as a counterpart to state law negligence. Id. at 630 . . . The elements of a maritime negligence cause of action are essentially the same as land-based negligence under the common law. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 630, 79 S.Ct. 406, 409, 3 L.Ed.2d 550 (1959); Canal Barge Co., Inc., 220 F.3d at 376-77; 1 THOMAS J. SCHOENBAUM, ADMIRALTY

AND MARITIME LAW 182-93 (4th ed. 2004) (discussing the elements in depth).
*Withhart v Otto Candies 431 F.3d 840, at 842 (5th Cir., 2005)*

And as this Court has stated:

The Fifth Circuit has held that "general principles of negligence law" apply in maritime tort cases. *Daigle v. Point Landing, Inc.,* 616 F.2d 825, 827 (5th Cir.1980). A maritime "tortfeasor is accountable only to those to whom a duty is owed." *Consolidated Aluminum Corp. v. C.F. Bean Corp.,* 833 F.2d 65, 67 (5th Cir.1987) (citations omitted). This duty is circumscribed by the doctrine of foreseeability: the duty "may be owed only with respect to the interest that is foreseeably jeopardized by the negligent conduct, and not to other interests even of the same plaintiff which may in fact happen to be injured." *Id.* (quoting Harper, James & Gray, *The Law of Torts, Scope of Duty in Negligence Cases* § 18.2 at 655 (2d ed.1986)).

In *Consolidated Aluminum,* the Fifth Circuit articulated its standard of foreseeability applicable in maritime cases:

> We perceive a harm to be the foreseeable consequence of an act or omission if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention.
> *Gisclair v Galliano Marine*, 484 F.S. 518 (E.D. La. 2007)

After an exhaustive investigation, the "National Commission  on the BP Deepwater Horizon Oil Spill and Offshore Drilling" released its "Chief Counsel's Final Report" earlier this year. The record clearly shows that Transocean owed and breached its duty to the plaintiffs. This Report clearly shows that Transocean's negligent operation of *Deepwater Horizon* (including its testing of the well, its failure to detect the signals preceding the blowout, and its failure to properly divert overboard the hydrocarbons released by the blowout)  was a proximate cause of the damages resulting from the blowout, explosions and spill.

**4. Summary Judgment Standards:**

Summary judgment is appropriate "if the pleadings, the discovery, and disclosure materials on file . . . show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law".[2]

The principal purpose of the summary judgment rule is to "isolate and dispose of factually unsupported claims and defenses".[3]

Rule 56 ("Summary Judgment") "mandates the entry of summary judgment . . . against a party who fails to make sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial".[4]

The moving party bears the initial responsibility of identifying the basis for its motion and the parts of the record that support its claim that no such genuine issue of material facts exists.[5]  Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to demonstrate that the court should not grant summary judgment.[6]  Top do so, the non-moving party must "go beyond the pleadings" to identify specific facts that establish a genuine issue or trial.[7]  Rule 56 expressly requires as much, stating as follows:

> When a motion for summary judgment is properly made and supported, an opposing party may not merely rely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in the rule – set out specific facts showing a genuine issue for trial.[8]

Indeed, it is established that "the non-movant may not rely upon the theoretical possibility that its claim is valid.[9]  Rather, a party opposing a motion for summary judgment

---

[2] Fed. R. Civ. P. 56(c)(2)
[3] *Celotex v Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 2553 (1986)
[4] *Celotex* at 322. Moore v Miss. Valley State Univ., 871 F.2d 545, 549 (5th Cir., 1989)
[5] *Burge v Parish of St. Tammany*, 187 F.3d 452, 465 (5th Cir., 1999)
[6] *Ragas v Tenn. Gas Pipeline Corp.,* 136 F.3d 455, 458 (5th Cir., 1998)
[7] Celotex, at 324
[8] Fed. R. Civ. P. 56(e)(2)
[9] Pennington v Vistron Corp., 876 F.2d 414, 426 (5th Cir., 1989)

must present "significant probative evidence" to defeat the motion.[10] If the non-moving party submits evidence that is "merely colorable" or "not significantly probative", or establishes only a "metaphysical doubt", the movant is entitled to summary judgment.[11]

## C. CONCLUSION:

The Plaintiffs have met their burden of showing that no genuine issue of material facts exists as to whether the failure of the Macondo well and resulting damages were caused by the negligence of Transocean.

Accordingly, it is respectfully submitted that Transocean be held liable, jointly in solido, for all damages caused by the blowout and release of oil and and gas from *Deepwater Horizon*.

Respectfully submitted,

___/s/ Daniel E. Becnel, Jr.___
DANIEL E. BECNEL, JR. (#2926)
BECNEL LAW FIRM, LLC
P. O. Drawer H
106 West Seventh Street
Reserve, Louisiana 70084
Telephone: (985) 536-1186
Facsimile: (985) 536-6444
E-mail: dbecnel@becnellaw.com
**Attorneys for Plaintiffs in:**
1. *Bill's Oyster House v BP et al* (C.A. 10-1308)
2. *Howard Buras v BP et al* (C.A.10-2994)
3. *Armand's Bistro v BP et al* (C.A. 10-4489)
4. *Faye Loupe et al. v BP et al* (C.A. 10-2764)
5. *Laura Gautreaux v BP et al* (C.A. 10-1539)
6. *Brent Rodrigue, Sr. et al. v BP et al* (C.A. 10-1325)

---

[10] Conkling v Turner, 18 F.3d 1285, 1295 (5th Cir., 1994)
[11] Hawking v Ford Motor Credit Co., 210 F.3d 540, 545 (5th Cir., 2000)

.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Memorandum has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this _15th_ day of _April_, 2011.

_/s/ Daniel E. Becnel, Jr._