UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| : | |
| : | **MDL NO. 2179** |
| **IN RE: OIL SPILL by the OIL RIG** : | |
| **"DEEPWATER HORIZON" in the** : | **SECTION: J** |
| **GULF OF MEXICO, on** : | |
| **APRIL 20, 2010** | |
| : | **JUDGE BARBIER** |
| **THIS DOCUMENT RELATES TO:** | **MAG. JUDGE SHUSHAN** |

1. *Bill's Oyster House v BP et al* (C.A. 10-1308)
2. *Howard Buras v BP et al* (C.A.10-2994)
3. *Armand's Bistro v BP et al* (C.A. 10-4489)
4. *Faye Loupe et al. v BP et al* (C.A. 10-2764)
5. *Laura Gautreaux v BP et al* (C.A. 10-1539)
6. *Brent Rodrigue, Sr. et al. v BP et al* (C.A. 10-1325)

. .   . .   . .   . .   . .   . .   . .   . .   . .   . .   . .   . .   . . .   .

## PLAINTIFFS' STATEMENT OF MATERIAL UNCONTESTED FACTS

Pursuant to Local Rule 56.1 (Motions For Summary Judgment), Plaintiffs submit the following

statement of material facts regarding Transocean which they contend present no genuine issue.

**A. Transocean Failed to Recognize that its own Safety-Pressure Tests Showed that the Hydrocarbons Were Leaking Into the Drill Pipe**

**B. Transocean Failed to Recognize the Warning "Kicks" Showing that the Hydrocarbons Were Coming Up the Drill Pipe**

**C. Transocean Failed to Divert The Hydrocarbons Overboard**

---

**A. Transocean Failed to Recognize that its own Safety-Pressure Tests Showed that the Hydrocarbons Were Leaking Into the Drill Pipe:**

1. After cementing the production casing, BP was nearly ready to complete the Macondo well and turn it into a producing well.
*(Chief Counsel's Final Report, National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling ["Final Report"], p. 143)*

1

2. The last responsibility of Transocean's crew that operated its Deepwater *Horizon* rig that dug the well for BP was be to secure the well to ensure that nothing could leak in or out—to confirm the well's integrity—during that intervening time.
*Final Report, p. 143*

3. It was during this temporary abandonment process, rather than during drilling, that the blowout occurred.
*Final Report, p. 143*

4. As part of the temporary abandonment procedure, the rig crew conducted tests to check the well's integrity. If there were a leak in the system of cement, casing strings, and mechanical seals that comprised the well, these tests should have revealed it.
*Final Report, p. 143*

5. The rig crew conducted three different tests: a seal assembly test, a positive pressure test, and a negative pressure test. The tests each checked different parts of the well's integrity. However, the negative pressure test was the only one that tested the integrity of the cement at the bottom of the well.
*Final Report, p. 143*

6. The purpose of the negative pressure test is to make sure that when that pressure is removed, the casing, cement, and mechanical seals in the well will prevent high-pressure hydrocarbons or other fluids in the pay zone outside the well from leaking in. The test thus evaluates the integrity of the wellhead assembly, the casing, and the mechanical and cement seals in the well—indeed, it is the only pressure test that checks the integrity of the primary cement
*Final Report, p. 147*

7. At Macondo, the crew had unexpected difficulty in bleeding the drill pipe pressure down to 0 psi. After each attempt, the crew would shut in the well, and the pressure would build back up. The rig crew attempted three times to bleed off the drill pipe pressure, but each time, the drill pipe pressure rose after being bled off. After the third attempt, drill pipe pressure rose from 0 to 1,400 psi.
*Final Report, p. 147-8*

8. All parties now agree that this 1,400 psi pressure reading indicated that the well had failed the negative pressure test and that the cement job would not prevent hydrocarbons in the pay zones from entering the well.
*Final Report, p. 148*

9. The 1,400 psi pressure was the pressure of the hydrocarbon-bearing pay zone that was not properly sealed off by the primary cement. The crew did not recognize that this first negative pressure test had identified a problem with the well—or if they did, they did not act upon that fact. Instead, they conducted a second test.
*Final Report, p. 148*

2

10. BP had submitted a permit modification to MMS stating that it would conduct the negative pressure test on the kill line rather than the drill pipe.  At least in part for this reason, BP well site leaders decided to follow up their first test on the drill pipe with a second negative pressure test in which they monitored pressure and flow on the kill line.
*Final Report, p. 148*

11. Rig personnel therefore opened the  kill line, bled the pressure down to 0  psi, and monitored the line for  30 minutes. This time, there was no  flow or pressure buildup in the kill  line. The well site leaders and rig  crew decided this was a successful negative pressure test and moved on to the next steps in the temporary abandonment procedure.
*Final Report, p. 148*

12. Although the pressure on the kill line may have stayed at 0 psi, drill pipe pressure remained at 1,400 psi.
*Final Report, p. 148*

13. The well site leaders and rig crew never adequately accounted for that elevated pressure in the drill pipe.
*Final Report, p. 148*

14. The negative pressure test at Macondo "failed" in the sense that it did not show that the well had integrity. It was successful, however, in that it repeatedly and accurately identified a serious problem.
*Final Report, p. 148*

15. All parties have since agreed that the 1,400 psi pressure reading on the drill pipe showed that hydrocarbons from the formation were entering the well from the pay zones and that the cement had failed to isolate or block off those pay zones.
*Final Report, p. 148-9*

16. When the crew first closed the annular preventer around the drill pipe, the pressure on the drill pipe was approximately 700 psi higher than it should have been.  That anomaly should have merited further investigation because it could have indicated that spacer remained below the BOP. But it does not appear that anyone in the drill shack had ever calculated what the drill pipe pressure should have been.
*Final Report, p. 152*

17. This higher-than-expected pressure was the first of many unrecognized and unheeded anomalous readings during the negative pressure test.
*Final Report, p. 152*

18. The rig crew next bled the drill pipe to 1,250 psi, in an effort to equalize pressure on the drill pipe with pressure on the kill line (which was 1,250 psi at the time).  Once the crew had bled the drill pipe pressure down to 1,250 psi, it opened a valve on the kill line at the BOP so that both the drill pipe and kill line were open to the well. At this point, the drill pipe and kill line should have behaved like two straws in the same glass of

water: The pressure in both should have been a steady 1,250 psi. Instead, when rig personnel opened the valve, the drill pipe pressure jumped, and the kill line pressure dropped.
*Final Report, p. 152*

19. This should have been another indication that spacer might have ended up beneath the Boor that something else was amiss.  There is some evidence that the crew or well site leaders may have recognized a concern, but nobody appears to have acted upon it.
*Final Report, p. 153*

20. In what became a pattern, individuals on the rig did not take a simple precaution: They could have opened up the annular preventer, pumped more seawater into the well to ensure that all spacer had been displaced above the BOP, and begun the negative pressure test anew.  This would have taken time but also would have ensured that misplaced spacer did not confound the test results.
*Final Report, p. 153*

21. Just before 5 p.m., the crew opened a valve at the top of the drill pipe on the rig and attempted to bleed the drill pipe pressure down to 0 psi.
*Final Report, p. 153*

22.  The crew was unable to do so and could only reduce pressure to 260 psi.  It is not clear how many barrels of fluid the crew bled off at this point.
*Final Report, p. 153*

23. Three witnesses have testified that 23 to 25 barrels were bled off; other accounts suggest it may have been more or less. The uncertainty over how much fluid flowed from the well during the bleed-off suggests that the well site leaders and crew failed to monitor the bleed-off volumes with requisite rigor.
*Final Report, p. 153*

24.  It does not appear that anyone had calculated ahead of time how many barrels should have flowed from the well during the bleed, even though such calculations would have been relatively straightforward.
*Final Report, p. 153-4*

25. After failing to bleed the pressure down to 0 psi, the crew closed the valve on the drill pipe, and the pressure built back up to 1,262 psi.
*Final Report, p. 154*

26. These events indicated that the well was not behaving as a closed system. Something was entering the well, although the source of the material entering the well was indeterminate. If the well had been a closed system, the crew would have had no difficulty bleeding the drill pipe pressure down to 0 psi, and the well would have returned far less than 23 barrels of fluid during the bleed-off.
*Final Report, p. 154*

27. Also, the drill pipe pressure would not have increased.
*Final Report, p.154*

28. As John Smith, an expert witness, testified, this series of events actually constituted a failed negative pressure test, although the crew did not recognize that fact.
*Final Report, p.154*

29. Despite clear evidence that spacer had probably leaked below the BOP, rig personnel again did nothing to ensure that they had fully displaced the spacer above the BOP and instead proceeded with the test.  Having tightened the annular preventer, the crew once again tried to bleed the pressure in the drill pipe to 0 psi.
*Final Report, p.155*

30. This time they were successful. According to witness accounts, 15 barrels of fluid were bled off from the drill pipe in the process.  Again, nobody had done any calculations to predict the returns. Those calculations would have predicted only three to five barrels of returns; the bleed-off process had produced more fluids than it should have.
*Final Report, p.155*

31. The crew shut in the drill pipe, but the pressure again built back up.  In this case, the pressure reached 773 psi and most likely would have gone higher had the crew not begun immediately bleeding it off.
*Final Report, p.155*

32. This second series of bleed-offs, excessive flows, and pressure buildups constituted another failed "negative pressure test" that the crew again did not recognize as such.
*Final Report, p.155*

33. With the annular preventer fully closed and sealed, the only explanation for the excessive returns and pressure increase would be that the primary cement job had failed to seal off the pay zone.
*Final Report, p.155*

34. Hydrocarbons were leaking from the formation into the well. Individuals involved in the test at this point should have recognized that the well lacked integrity.
*Final Report, p.155*

35. As the pressure on the drill pipe dropped almost to 0 psi,  the kill line continued to flow and spurt water until the crew closed the line's upper valve on the rig.  Over the next 30 to 40 minutes, the drill pipe pressure rose to 1,400 psi. This was the clearest indication yet that the well lacked integrity.
*Final Report, p.156*

36.  The 1,400 psi pressure buildup can only have been caused by hydrocarbons leaking into the well from the reservoir formation.

5

*Final Report, p.156*


37. John Smith, an expert witness who testified before the Commission, described this test result as a "conclusive failure."
*Final Report, p.156*


38. Later analysis has shown that 1,400 psi is approximately the reading that one would have expected reservoir hydrocarbon pressure to produce at the surface if there had been no cement at the bottom of the well during the negative pressure test.
*Final Report, p.156*


39. According to notes from BP's post-incident interviews of Kaluza and Vidrine, as well as testimony from Lambert, Anderson explained that the 1,400 psi pressure on the drill pipe was being caused by a "bladder effect" or "annular compressibility."
*Final Report, p.157*


40. According to Lambert, Anderson explained that "heavier mud in the riser would push against the annular and transmit pressure into the wellbore, which in turn you would expect to see up the drill pipe".
*Final Report, p.157*


41. The Chief Counsel's team found no evidence to support this theory. Indeed, every industry expert that the Chief Counsel's team spoke with agreed that no such phenomenon exists.
*Final Report, p.157*


42. Even if it did exist, any pressure caused by this "bladder effect "would have disappeared after the rig crew bled off the drill pipe and kill line.
*Final Report, p.157*


43. Any "bladder effect" could not explain the 1,400 psi on the drill pipe.
*Final Report, p.157*


44. Although there was a long discussion about the drill pipe pressure, it does not appear as though anyone in the discussion seriously challenged the bladder effect. According to BP witness accounts, Anderson explained that the pressure buildup after bleeding was not unusual. He told the well site leaders, "Bob and Don, this happens all the time."  Revette, the driller, apparently agreed that he had seen the bladder effect before.  Lambert testified that he asked about the phenomenon but accepted Anderson's explanation. On later reflection after the blowout, however, Lambert agreed that the explanation did not make sense.
*Final Report, p.157*


6

45. The lack of pressure or flow on the kill line, on its own, would have meant a successful negative pressure test. But the 1,400 psi on the drill pipe had never disappeared. *Final Report, p. 158*

46. Anderson and Revette apparently continued to explain the pressure as a "bladder effect." Kaluza's statements to BP investigators suggest that he was present for the discussion as well and that he too accepted the Transocean explanation. *Final Report, p.158*

47. Experts and witnesses alike agree that industry practice requires the well site leader to make the final decision regarding whether the test has passed or failed.  There is also widespread agreement that the rig crew plays some role in interpreting tests, given their experience in running them and their authority to stop work if they recognize a safety concern. *Final Report, p.159*

48. The Chief Counsel's team believed that the group of personnel involved in the Macondo negative pressure test—including Transocean drilling personnel and the two BP well site leaders—decided as a group that the test had succeeded. *Final Report, p.159*

49. It appears that the highly experienced Transocean crew  affirmatively advocated the view that the first and second negative pressure tests were acceptable  once the "bladder effect" was considered, and the well site leaders eventually agreed. *Final Report, p.159*

50.  The long  time spent conducting and discussing the tests shows a desire for consensus. It is possible, even  likely, that this desire obscured the parties' responsibilities. *Final Report, p.159*

51. The second negative pressure test showed again that the well lacked integrity. *Final Report, p.159*

52. The pressure readings and flow indications during the negative pressure test were not ambiguous. *Final Report, p.160*

53. In retrospect, BP, Transocean, independent experts, and other investigations all agree that this critical test showed that the cement had failed and there was a leak in the well. *Final Report, p.160*

54. Transocean had no pre-established standard procedures for conducting a negative pressure test.  While BP required negative pressure tests under certain conditions, one of its Transocean likewise required negative pressure tests but did not have set procedures.

*Final Report, p.161*

55. Transocean has acknowledged that it does not train its personnel in the conduct or interpretation of negative pressure tests and that its Well Control Handbook does not describe a negative pressure test. Instead, Transocean states that its rig crews learn how to conduct a negative pressure test through general work experience.
*Final Report, p.162*

56. Partly because of this, Transocean has been unable to conclude whether its Deepwater Horizon rig crew had enough experience to conduct and interpret the negative pressure test on April 20. Transocean is not unique in omitting training for the negative pressure test. Experts have stated that academic training on the negative pressure test may only be included in coursework as time allows.
*Final Report, p.162*

57. Transocean has argued that the members of its rig crew were tradesmen, not engineers, and could not have been expected to interpret the complex results of the Macondo negative pressure test. However, a negative pressure test essentially consists of underbalancing a well and then watching to see if a hydrocarbon kick enters the well as a result. Transocean expected its rig crew to recognize signs of a kick during complex drilling operations.
*Final Report, p.162*

58. It appears inconsistent for Transocean to claim that its crew is trained in and skilled in recognizing kick indicators during drilling but is unable to recognize the same kick indicators during controlled testing.
*Final Report, p.162*

59. The most conspicuous problem with the negative pressure test procedures at Macondo is that there were almost no written procedures at all.
*Final Report, p.162*

60. The negative pressure test performed at Macondo showed repeatedly over a three-hour period that the well lacked integrity and that the cement had failed to seal off the hydrocarbons in the pay zone.
*Final Report, p.143*

61. Transocean and BP rig personnel nevertheless mistakenly concluded that the test had demonstrated well integrity and then proceeded to the next phase of temporary abandonment.
*Final Report, p.143*

62. The Chief Counsel's team finds that the failure to properly conduct and interpret the negative pressure test was a major contributing factor to the blowout.
*Final Report, p.143*

**B. Transocean Failed to Recognize the Warning "Kicks" Showing that the**

**Hydrocarbons Were Coming Up the Drill Pipe**

63. A kick is an unwanted influx of fluid or gas into the wellbore. The influx enters the wellbore because a barrier, such as cement or mud, has failed to control fluid pressure in the formation. In order to control the kick, personnel on the rig must first detect it, then stop it from progressing by adding one or more barriers. The crew must then circulate the influx out of the wellbore. If the crew does not react properly, fluids will continue to enter the wellbore. This will eventually escalate into uncontrolled flow from the well—in other words, a blowout.  In order to detect a kick, rig personnel examine various indicators of surface and downhole conditions. These indicators include pit gain, flow-out versus flow-in, drill pipe pressure, and gas content in the mud.
*Final Report, p. 165*

64. The Transocean driller was responsible for monitoring well conditions at all times, interpreting and responding to downhole conditions, and securing the well in a well control situation.  The driller sat in the A-chair in the drill shack. He normally monitored three screens: two screens in front of him that displayed Hitec data and a screen to the side.
*Final Report, p. 171*

65. He also had a screen with live video feeds and a window straight ahead with a direct view of the rig floor. The driller was supposed to actively look at his data screens during well operations.  He contemporaneously recorded rig activities for each day's daily drilling report.
*Final Report, p. 172*

66. The Transocean driller was the central point of contact for all well control concerns: Anyone with an understanding of something that may have indicated a well control event, would have called back to the driller, most likely, and informed him.  He was the one who had the most information about current operations on the rig and the ability to react to them.
*Final Report, p. 172*

67. The Transocean  assistant driller was also responsible for monitoring the well and taking well control actions. He served as a crucial backup and assist to the driller. The assistant driller was expected to have a comprehensive understanding of well control and be able to recognize the signs of a well kick or blowout before it develops into an emergency condition. He assisted the driller in monitoring the drilling instrumentation and recognizing and controlling well conditions. Apart of that assistance, he monitored the pit volumes and from time to time would go to the pits and check in with the derrick hand to make sure all was well.
*Final Report, p. 172*

68. There were two Transocean assistant drillers on duty at any one time. One sat in the B-chair, adjacent to the driller in the drill shack.  He had access to the same screens as the driller. If there was activity on the deck—like pipe handling—another assistant

driller would sit in the −C-chair in the auxiliary driller's shack. Although the assistant drillers had many responsibilities, at least one should have been monitoring the well at any given time.
*Final Report, p. 172*

69. The Transocean Toolpusher supervised the driller and ensured that all drilling operations were carried out safely, efficiently, and in accordance with the well program. That included confirming that all well control requirements were in place, performing all well control calculations, and assisting in killing the well in emergency situations. The Toolpusher was generally on the rig floor at all times, had access to the driller's and assistant driller's monitors, and had a small office inside the drill shack.
*Final Report, p. 173*

70. The Transocean  toolpusher reported to the Transocean  senior toolpusher. The senior toolpusher had a similar job description as the toolpusher but was one level higher in the hierarchy. Although he had no continuous role in operations and was not generally on the rig floor, the senior toolpusher was supposed to be consulted when there were anomalies or emergencies. In a well control event, the senior toolpusher organized response actions and acted as a liaison to the well site leader. The senior toolpusher reported to the offshore installation manager.
*Final Report, p. 173*

71. The Transocean offshore installation manager (OIM**)** was the senior-most Transocean drilling manager on the rig and oversaw the entire Transocean crew. He assisted with abnormal or emergency situations. Both the senior toolpusher and OIM had separate offices away from the rig floor, near their living quarters, that included data displays.
*Final Report, p. 173*

72 At the start of the displacement process, Transocean driller Dewey Revette was in the drill shack's A-chair, monitoring the well. Transocean assistant driller Stephen Curtis was likely in the drill shack's B-chair, also monitoring the well. BP well site leader Don Vidrine was in the drill shack to oversee the initiation of the displacement. Donald Clark, the other Transocean assistant driller, was at the bucking unit (a machine for making up pipe) on the port aft deck, working with personnel from Transocean, Weatherford, and Dril-Quip to prepare for setting the lockdown sleeve.  Sperry Drilling mudlogger Joseph Keith was in the mudlogger's shack, monitoring the well.
*Final Report, p. 174-5*

73. At 8:02 p.m., the crew began displacing the mud and spacer in the riser with seawater. The pumps were not lined up in a closed-loop system. Instead, the crew was pumping seawater from the ocean through the sea chest and into the well. This bypassed the pits. Returns from the well were flowing into the active pits. As a result, individuals monitoring the well could not rely on the pit volume change display. To monitor pit gain, rig personnel would have had to perform volumetric calculations comparing the increase in pit volume(reflecting returns) against the volume of seawater pumped into the well (pump strokes× volume per stroke). There is no evidence, one way or the other,

as to whether the crew performed such volumetric calculations. This setup should not have impaired rig personnel's ability to monitor flow-out versus flow-in.
*Final Report, p. 175*

74. However, the flow-out readings appear to have been more erratic than readings captured the previous day.  This may be because cranes were moving on the rig's deck, causing the rig to sway and thus affecting the level of fluids in the flow line. Otherwise, flow-out appeared normal. This setup also should not have impaired rig personnel's ability to monitor drill pipe pressure. The drill pipe pressure appears to have behaved as expected. It rose initially as the pumps turned on and then decreased gradually as lighter seawater replaced the heavier mud and spacer in the riser. At 8:10 p.m., mud engineer Leo Lindner looked at the drilling screen and thought everything was fine. At 8:16 p.m., the data showed an increase in gas units—not atypical at the start of circulation. The gas readings then tapered off as the last of themed left the wellbore.
*Final Report, p. 175*

75. From 8:28 to 8:34 p.m., the crew emptied the trip tank with the fluid going into the flow line and pits with the rest of the returns. This complicated the monitoring of both the pits and flow-out. To accurately monitor either parameter, the crew had to perform calculations to subtract the effect of emptying the trip tank from the pit volume and flow-out readings that appeared on-screen. It is unknown whether the crew did so.
*Final Report, p. 176*

76. At 8:34 p.m., the crew did three things simultaneously. They (1) directed returns away from the active pits and into a reserve pit (2) emptied the sand traps into the active pits; and (3) began filling the trip tank.  Each of these actions further complicated pit monitoring for well control purposes. The active pit system was eliminated as a well monitoring tool. In order to know the volume coming out of the well, the crew had to perform calculations taking into account that returns were going to two different places—the reserve pit  and the trip tank.  In addition, routing returns to the trip tank bypassed the flow-out meter, so the flow-out reading appeared artificially low and had to be added to the rate of entry of fluids into the trip tank to ascertain actual flow-out. Again, it is unknown whether the crew was performing any such calculations. In addition, communication between their crew and mudlogger may have broken down at this time: The drill crew did not inform Keith about the switch in pits. Keith did notice a slow gain in the active pits and called M-I SWACO mud engineer Leo Lindner to inquire; Lindner said they were moving the mud out of the sand traps and into the active pits.
*Final Report, p. 176*

77. At 8:49 p.m., the crew again rerouted returns, this time from one reserve pit to another. At about this time, the displacement process had underbalanced the well. The combined hydrostatic pressure at the bottom of the well (generated by the mud and spacer still in the riser, the seawater in the riser and the well, and the mud remaining in the well beneath 8,367 feet below sea level) dropped below the reservoir pressure.
*Final Report, p. 176*

78. Transocean's post-explosion analysis estimates that the well became underbalanced at 8:50 p.m. BP's post-explosion modeling estimates that the time was 8:52 p.m.  Given the failed bottomhole cement job, hydrocarbons would have begun flowing into the well at this time.
*Final Report, p. 176*

79. At 8:52 p.m., Vidrine called BP's shoreside senior drilling engineer Mark Hafle to ask about the procedure for testing the upcoming surface cement plug. Hafle asked Vidrine if everything was OK. Hafle had the Sperry-Sun real-time data up on-screen in front of him. It does not appear that the two discussed the rig crew's handling of the displacement or rig activities complicating well control monitoring.
In retrospect, it does not appear there were (or would have been) any signs of a kick prior to about 9 p.m. Nevertheless, between 8 and 9 p.m., rig personnel did not adequately account for whether and to what extent certain simultaneous operations, such as emptying the trip tanks, may have confounded their ability to monitor the well.
*Final Report, p. 176-7*

**Drill pipe pressure anomalies from 9:01 to 9:14 p.m.:**

80. Just before 9 p.m., Keith left the mudlogger's shack to take a short break.  He notified the drill crew (by calling Curtis) and then stepped out.  He went downstairs, used the restroom, got a cup of coffee, and smoked half a cigarette.  He was apparently gone for about 10 minutes before returning to his post.
*Final Report, p. 177*

81. At 8:59 p.m., the crew simultaneously decreased the pump rate on all three pumps and began emptying the trip tanks. The decrease in the pump rate should have caused a decrease in the flow-out, but because emptying the trip tanks sent additional fluid flowing past the flow-out meter, the flow-out reading actually increased. That increase potentially masked any sign of a kick from the flow-out reading.
*Final Report, p. 177*

82. At 9:01 p.m., drill pipe pressure changed direction. Instead of continuing to steadily decline, it began to increase. This change in direction was a significant anomaly. If lighter seawater were replacing the heavier mud and spacer in the riser as should have been the case, drill pipe pressure should have continued to drop, as it had done for at least the previous 40 minutes. In retrospect, this change in drill pipe pressure likely indicated that hydrocarbons were pushing heavier mud up from the bottom of the well against and around the drill pipe. By 9:08 p.m., with the pump rates constant, drill pipe pressure had increased by approximately 100 pounds per square inch (psi). The magnitude of the increase would have appeared subtle on
the Sperry-Sun screen showing only trend lines, but it likely would not have been subtle on the numerical displays.
*Final Report, p. 177*

12

83. The change in direction was by now clear and clearly anomalous. An individual who saw the drillpipe pressure increase should have been seriously concerned and should have investigated further. But Keith, who would have returned from his break by that time, reviewed the logs for the period he was absent and did not notice any indication of a problem: ‒I went back over it and looked, and to my recollection, I didn't see nothing wrong.
*Final Report, p. 177*

84. At 9:08 p.m., after the top of the spacer column reached the rig, the crew shut down the pumps and switched the lineup to route returns overboard. Keith looked at the video feed from the flow line camera and visually confirmed that there was no flow. He likely communicated this tithe rig floor. According to Vidrine, who was on the rig floor, everything looked fine.
*Final Report, p. 177*

85. Everything was not fine. For about a minute after the pumps stopped, flow-out continued beyond The Horizon's typical flow-out signature. **This was a kick indicator.**
*Final Report, p. 177*

86. A driller, assistant driller, or mudlogger watching the screen could have seen it. Instead, they thought they had visual confirmation of no flow, based at least on Keith's observations.
*Final Report, p. 177*

87. There are several possible explanations for this contradiction: (1) Keith may have seen some flow but attributed it to residual flow; (2) Keith may not have looked at the camera for long enough to realize that it was not residual flow; (3) the flow may have been too modest to detect from the video feed; or (4) the flow may already have been rerouted overboard before Keith performed his flow check. Rig personnel could have performed a secondary flow check by sending someone to physically look behind the gumbo box, but apparently they did not do so. On many rigs (including the *Horizon*), this would have been a common practice, especially if rig personnel had noted anomalies.
*Final Report, p. 178*

88. By 9:10 p.m., the crew had rerouted returns overboard. Doing so bypassed the pits, the Sperry-Sun flow-out meter, and the gas sensors. That equipment could no longer be used to monitor the well. The flow did not bypass the Hitec flow-out meter, but for some reason—perhaps malfunction, perhaps neglect—data from that meter never alerted the crew to the kick.
*Final Report, p. 178*

89. At about the same time that they rerouted returns overboard, the crew also transferred mud from the active pits to the reserve pit that had been taking returns from the well.
*Final Report, p. Final Report, p. 178*

90. At 9:01 p.m., drill pipe pressure changed direction. By 9:08 p.m., with the pump rates constant, drill pipe pressure had increased by approximately 100 psi. From 9:08 to 9:14 p.m., while the pumps were shut down, drill pipe pressure increased by approximately 250 psi. Each of these changes in drill pipe pressure was an anomaly that should have prompted rig personnel to stop and investigate, but the signs apparently went unnoticed.
*Final Report, p. 179*

91. The crew probably made this pit transfer to prepare for cleaning out the active pits. The immediacy of the transfer suggests that the crew did not take the time to compare the volume of fluid pumped into the well with the volume of fluid returned from the well. Meanwhile, the mud engineers conducted the sheen test and communicated to the drill shack that it passed.
*Final Report, p. 179*

92. Vidrine directed the crew to get in place to start sending returns overboard and ordered the displacement to begin again. He then returned to his office and did paperwork. During the course of these activities, drill pipe pressure gradually increased.
*Final Report, p. 179*

93. From 9:08 to 9:14 p.m., while the pumps were shut down, drill pipe pressure increased by approximately 250 psi. This was a significant anomaly. By 9:14 p.m., the increase would have been noticeable and a cause for concern. The driller apparently missed this increase, perhaps because ―having looked and seen 60 seconds of constant pressure...he may have then turned to do the next step in the process which was line up another mud pump to pump down the kill lines.   It is unclear why the assistant driller and the mudlogger also missed the increase.
*Final Report, p. 179*

94. At 9:14 p.m., the drill crew turned the pumps back on. Keith called Curtis and asked why the drill crew was turning the pumps on gradually and not at full rate. Curtis replied, ―That's the way we're going to do it this time'.
*Final Report, p. 179*

95. Shortly after 9:17 p.m., the crew also turned on pump 2 to pump down the kill lines. Within seconds of turning on pump 2, the pressure relief valve (PRV) on pump 2 blew. The PRV probably blew because the crew had inadvertently started the pump against a closed kill line valve (a rare but not unheard-of mistake).
*Final Report, p. 179*

96. After the PRV blew, at 9:18 p.m., the crew shut down the primary pumps. They left the riser boost pump on. The driller organized a group of individuals including Clark to go to the pump room and fix the PRV on pump 2.  In addition, the driller ordered someone to open up the closed kill line valve that had caused the PRV to blow.
*Final Report, p. 179*

97. At 9:20 p.m., the drill crew restarted the primary pumps. Transocean senior toolpusher Randy Ezell called the drill shack and spoke with toolpusher Jason Anderson. He asked how the displacement was going. Anderson said, ─It's going fine. It won't be much longer...I've got this.
*Final Report, p. 179-80*

98. From 9:14 to 9:27 p.m., the data did not clearly reflect any anomalies. The return flow bypassed the pits, Sperry-Sun flow-out meter, and gas sensors. Drill pipe pressure appeared to be behaving roughly as expected—increasing as the pumps ramped up and then decreasing as seawater replaced the last of the spacer.
*Final Report, p. 180*

**Drill Crew Notices Anomaly but Does Not Treat It as a Kick:**

99. By 9:27 p.m., an obvious anomaly appeared. The pressure on the kill line—now discernable because the drill crew had just opened up the previously closed kill line valve—rose to approximately 800 psi. This kill line pressure was anomalous. The crew noticed a ─differential pressure‖ between the kill line (approximately 800 psi) and the drill pipe(approximately 2,500 psi). At 9:30 p.m., they shut down the pumps to investigate.
*Final Report, p. 180*

100. Around that time, Transocean chief mate David Young went to the drill shack to speak with Anderson and Revette about the timing of the surface plug cement job. Revette, sitting in the driller's A-chair, and Anderson, standing next to him, were speaking to each other. At times, they looked at the driller's screens. Revette noted that they were ─seeing a differential. The two men appeared concerned but calm. According to Young, ─It was quiet...there was no panic or anything like that.
*Final Report, p. 180*

101. From 9:30 to 9:35 p.m., drill pipe pressure increased by approximately 550 psi This was another significant anomaly: With the pumps shut off, there should have been no movement in the well. (The increase might have reflected mud continuing to travel up the wellbore with oil and gas below.) Revette and Anderson were intently watching the screens, but they did not shut in the well. Instead, Revette ordered Transocean floorhand Caleb Holloway to bleed off the drill pipe pressure—apparently to eliminate the differential pressure.
*Final Report, p. 180*

102. At 9:36 p.m., Holloway cranked open a valve on the stand pipe manifold to bleed down the pressure. But it was taking longer than usual to bleed off. Revette told Holloway, ─Okay, close it back. Once he did, at 9:38 p.m., the drill pipe pressure shot back up. It increased by approximately600 psi. Again, the increase was a serious anomaly.
*Final Report, p. 180*

103. By this point, rig personnel had observed several serious anomalies. Each was ―a sign that fluids are moving‖ in the well. Those anomalies should have ―caused alarm. But there appears to have been no hint of alarm.
*Final Report, p. 181*

104. The crew actively investigated the anomalies and performed diagnostic interventions. But it appears that the crew did not perform the most basic kick detection intervention—a flow check. If they had done so, they would have directly seen flow coming out of the well and should have shut in the well.
*Final Report, p. 181*

105. The fact that the crew apparently did not perform a flow check suggests that Revette and Anderson either did not consider or had already ruled out the possibility of a kick. Anderson thought it would be a little bit longer before they figured out the differential pressure and told Young that they probably wouldn't need him for the cement job meeting for another couple of hours.
*Final Report, p. 181*

 106.  According to Young, Anderson wasn't sure if they were going to need to circulate. Anderson then left to go to the pump room. Young also left at about the same time. He ran into Holloway, who was coming down from the stand pipe manifold; they spoke for a couple of minutes and joked. There was no sign of concern or hurry.
*Final Report, p. 181*

107. Not long afterward, Holloway was leaving the rig floor and ran into Curtis. Curtis was on his way to the drill shack. He was in no rush. Curtis and Holloway spoke for a few minutes. Throughout this period of investigation, the drill crew did not communicate with the mudlogger about the anomaly. Nor did they contact the senior toolpusher, OIM, or well site leader to ask for their help or to notify them that something was amiss.
*Final Report, p. 181*


**Mud Overflow and Recognition of the Anomaly as a Kick:**

108. Sometime between 9:40 and 9:43 p.m., mud overflowed onto the rig floor, shot up to the top of the derrick, and poured down onto the main deck. By about that time, drill pipe pressure had decreased by approximately 1,000 psi. At 9:41 p.m., the trip tank abruptly gained about 12 barrels in volume. The crew likely routed flow back to the trip tank intentionally to help diagnose whether the riser was static. The gain showed that there was still flow from the well up the riser.
*Final Report, p. 181*

109. At about the same time, Anderson returned to the drill shack. At 9:41 p.m., he activated the blowout preventer's (BOP's) annular preventer. Drill pipe pressure began to increase (as it should when a well is shut in). By now, gas would already have been in the riser, expanding rapidly on its way to the surface. This may have made it more

difficult to successfully activate the blowout preventer. In any case, even if the crew had successfully shut in the well, they should have expected flow from the well to continue at least until all of the gas in the riser had escaped.
*Final Report, p. 181*

110. Interviews and testimony after the blowout recount what happened next. Anderson called Vidrine to say the crew was getting mud back and had diverted flow to the mud gas separator and closed the annular. Curtis called Ezell and said: ─We have a situation. The well is blown out. We have mud going to the crown.... [Anderson] is shutting it in now.
*Final Report, p. 181*

111. Someone, perhaps Revette, called Andrea Fleytas on the bridge, said ─We have a well control situation,‖ and hung up. Vidrine started for the rig floor. Ezell did the same. Fleytas turned to Yancy Keplinger and yelled, ─We‘re in a well control situation. Keplinger radioed the *Damon Bankston*, alongside the rig, and told the vessel to disconnect and move off 500 meters: The *Horizon* was in a well control situation.
*Final Report, p. 181-2*

112. Although Anderson had activated the annular preventer, that action had not fully shut in the well. Instead of reaching the expected shut-in pressure (approximately 6,000 psi), drill pipe pressure plateaued at about 1,200 psi. In response, the drill crew either tightened the annular to create a seal or activated a variable bore ram. At 9:47 p.m., drill pipe pressure increased dramatically.
*Final Report, p. 182*

113. At this point, the well may have been shut in.
*Final Report, p. 182*

114. At 9:48 p.m., pit 20 abruptly gained 12 barrels in volume. The data also show an increase inactive pit volume and several upward spikes in flow-out. Flow from gas already in the riser might have been jostling the rig or otherwise overwhelming the rig‘s systems.
*Final Report, p. 182*

115. The first explosion happened at 9:49 p.m.
*Final Report, p. 182*

**Technical Findings:**

116. The data available to rig personnel showed clear indications of a kick.
*Final Report, p. 182*

117. The change in direction of drill pipe pressure (9:01 p.m.) and its subsequent steady increases (9:01 to 9:08 p.m., 9:08 to 9:14 p.m.) should have been a cause for concern but apparently went unnoticed.
*Final Report, p. 182*

118. Even after the drill crew noticed an anomaly (9:30 p.m.), they do not appear to have seriously considered the possibility that a kick was occurring. The anomaly the rig crew noticed at 9:30 p.m. and discussed occurred before hydrocarbons had entered the riser and 10 to 13 minutes before mud appeared on the rig floor. If the rig crew had at all considered that a kick might be occurring, they had plenty of time to activate the blowout preventer.
*Final Report, p. 182*

### **Rig Activities Potentially Confounded Kick Detection:**

119. The crew on the Deepwater Horizon engaged in a number of concurrent activities during displacement of the riser. Each could have interfered with the data.
*Final Report, p. 182*

120. First, rig personnel were pumping seawater directly into the well from the sea chest. The crew had to pump water in from the sea chest for the displacement. But pumping it in directly from the sea chest to the rig pumps, thereby bypassing the pits, made it harder for the crew to monitor the pits. It created a non-closed-loop system that made it impossible to detect a kick by visually monitoring pit gain. Instead, pit monitoring required volumetric calculations. The crew could have, and should have, performed those calculations—it was the rig crew's regular practice to do so but there is no evidence that they did so here. They also could have routed the seawater through the active pit system before sending it down the well. That approach would have preserved visual monitoring of pit gain.
*Final Report, p. 182*

121. Second, rig personnel sent returns overboard during the latter part of the displacement. Sending returns overboard was an inherent part of the displacement. But pumping it directly from the well overboard—bypassing the pits, Sperry-Sun flow-out meter, and both gas meters—eliminated the crew's ability to monitor the pits and the Sperry-Sun flow-out meter for kick indicators.
*Final Report, p. 183*

122. The crew could still monitor the well by using the Hitec flow-out meter and by physically checking the overboard line whenever the pumps were stopped. But there is no evidence that they did so. The crew could also have lined up the displacement so that it did not confound well monitoring by taking returns to the pits first and then channeling it overboard.
*Final Report, p. 183*

123. Third, rig personnel were using the cranes. From early in the displacement (about 8:20 p.m.)until the explosion, rig personnel were operating one or both of the cranes. Crane movement can cause the rig to sway, affecting the flow-out levels and pit volumes, and complicating kick recognition. Rig personnel can still detect kicks when there is rig sway, but the movement increases the level of background noise in the data and thereby

18

reduces the minimum detectable kick sensitivity with respect to flow-out and pit volumes. The crane movement was not necessary for the displacement. Rig personnel could have waited until the displacement was complete to engage in crane activity.
*Final Report, p. 183*

124. Fourth, rig personnel appear to have begun emptying the mud pits without first checking for pit gain. During the sheen test, the rig crew began emptying the active pits into reserve pit 6. Until that point, returns from the well had been flowing to pit 6. The problem is, the crew does not appear to have measured the volume in pit 6 before emptying the active pits into it. This suggests that the crew was not mathematically comparing the actual volume of returns to the expected volume of returns to verify that there had been no gain. The apparent reason that rig personnel emptied the active pits was to prepare for cleaning them. It was unnecessary to clean the active pits, or even empty them in preparation for cleaning, during the displacement.
*Final Report, p. 183*

125. Fifth, rig personnel were emptying the sand traps into the pits. Sand traps separate sand from mud. After a while, they fill up with clean mud. When that happens, the crew empties the mud from the sand traps into the pits. Emptying the sand traps was not problematic by itself. The problem was that the crew emptied them into the active pit system and thereby complicated pit monitoring. The crew could have simplified pit monitoring by using the active pit system to monitor the volume of fluid returning from the well and routing mud from the sand traps to a reserve pit instead.
*Final Report, p. 183*

126. Sixth, rig personnel were emptying the trip tanks during the displacement. It appears that the crew had to do so at this point in the displacement process. It also appears that the rig's plumbing forced the crew to route flow-out from the trip tank past the flow-out meter. This flow added to pit gain and flow-out, making both figures higher than they would have been otherwise. The crew could nevertheless have preserved pit monitoring and flow-out monitoring if they calculated the effect of emptying the trip tank in this manner, but there is no evidence that they did so. Alternatively, the crew could have stopped displacing the riser while they emptied the trip tanks.
*Final Report, p. 183*

### **Kick Detection Instrumentation Was Mediocre and Highly Dependent on Human Factors:**

127. The data sensors on the rig had several shortcomings.
*Final Report, p. 183*

128. First, the system did not have adequate coverage. For example, there was no camera installed to monitor returns sent overboard and no sensor to indicate whether the valve sending returns overboard was open or closed. Therefore, while video monitoring of flow was possible when returns went to the pits, it was not possible when returns went overboard.
*Final Report, p. 183-4*

129. Second, some of the sensors were not particularly accurate. For example, electronic sensors for pit volumes can be unreliable, so much so that the crew would sometimes revert to using a string with a nut to measure pit volume change.
*Final Report, p. 184*

130. Third, the sensors often lacked precision and responded to movement unrelated to the state of the well. For example, a fluctuation in flow-out might result from crane activity on the rig.
*Final Report, p. 184*

131. These shortcomings can result in rig personnel not receiving quality data and, furthermore, discounting the value of the data they do receive. The data display systems also had notable limitations. There were no automated alarms built into the displays. Rather, the system depended on the right person being in the right place at the right time looking at the right information and drawing the right conclusions.  Although the systems did contain audible and visual alarms, the driller was required to set them manually.  He could also shut them off. Manually setting and resetting alarm thresholds is a tedious task and not always done. For example, there is typically no alarm set for flow-in and flow-out because the pumps stop and start so often that the alarms would trigger too frequently. There was also no automation of simple well monitoring calculations. For example, if the displacement is set up as a non-closed-loop system, and rig personnel want to keep track of volumes, they must perform the calculation by hand (return volume – (pump strokes × volume per pump stroke)). If the rig is emptying its trip tank while taking returns, and rig personnel want to disaggregate the two activities, they must perform the subtraction by hand. Each of those
calculations could easily be automated and displayed for enhanced real-time monitoring.
*Final Report, p. 184*

132. There was also no advance planning or real-time modeling of expected pressures, volumes, and flow rates for the displacement. Although well flow modeling has been employed in post-explosion analysis. there was no comparable modeling technology in place for real-time analysis.
*Final Report, p. 184*

133. Finally, the displays themselves sometimes made fluctuations in data hard to see. Indeed, in post-explosion reports and presentations, BP has consistently chosen to rotate the vertical Sperry-Sun log and enlarge it so that viewers can understand the data from April 20.These limitations made well control monitoring unnecessarily dependent on human beings 'attentions and abilities.
*Final Report, p. 184*

**<u>Management Findings</u>**:

20

134. One of the most important questions about the Macondo blowout is why the rig crew and mudlogger failed to recognize signs of a kick and did not diagnose the kick even when they shut operations down to investigate a well anomaly. The Chief Counsel's team finds that a number of management failures, alone or in combination, may explain those errors.
*Final Report, p. 184-5*


**Transocean Personnel Exhibited a Lack of Vigilance During the Final Displacement:**

135. The evidence suggests that Transocean  personnel on the rig were not sufficiently alert to the possibility that a loss of well control might occur during the final displacement. There are several reasons why this might have been the case. First, kicks are not commonly associated with the temporary abandonment phase of well operations. In a 2001 study of 48 deepwater kicks in the Gulf of Mexico, the vast majority of kicks occurred during drilling operations.  By contrast, only one kick occurred in association with a well abandonment operation.
*Final Report, p. 185*

136. Second, confidence in barriers, particularly tested barriers, can make rig personnel overconfident in the well's overall security. A satisfactory negative pressure test generally confirms that the well is secure and that hydrocarbons will not flow into the well during riser displacement operations. Once rig personnel deemed the Macondo negative pressure test a success, they may have believed that a kick was no longer a realistic hazard.  Investigations of a 2009 North Sea blowout and a 2009 Timor Sea blowout found that rig personnel were —blinkered by a successful negative pressure test or drew a —unwarranted level of comfort from the presence of a barrier.  Both attitudes —reflected and influenced a lax approach to well control.
*Final Report, p. 185*


137. Third, end-of-well activities tend to be marked by a hasty mindset and loss of focus. This can result simply from a desire to finish and move on, particularly when a well has been difficult to drill (like Macondo).  Rig personnel have noted in post-blowout interviews that —at the end of the well sometimes they think about speeding up. This may be because —everybody goes to the mindset that we're through, this job is done…everything's going to be okay.
*Final Report, p. 185*

138. Together, these factors appear to have contributed to reduced well monitoring vigilance, diminished sensitivity to anomalous data, delayed reactions, a failure to undertake routine well monitoring measures (like flow checks and volumetric calculations), and a willingness to perform rig operations in a manner that complicated well monitoring.
*Final Report, p. 185*

139. Such a lack of vigilance was particularly surprising at this well. Given the risk of a poor bottomhole cement job and the fact that the final displacement would severely underbalance the well, rig management—and the well site leader in particular—should have treated the displacement as a critical operation and personally monitored the data.
*Final Report, p. 185*

**Transocean Personnel Lacked Sufficient Training to Recognize That Certain Data Anomalies Indicated a Kick:**

140. Several times during the evening of April 20, data anomalies indicated that hydrocarbons were flowing into the well.  Despite noticing the anomalies—and taking time to discuss them—the rig crew did not recognize that a kick was under way.
*Final Report, p. 185*

141. Earlier in the evening, during the negative pressure test, hydrocarbons flowed into the well. Pressure anomalies signaled the kick. But rig personnel did not heed those signals.
*Final Report, p. 185*

142. During the final displacement, the pressure anomalies reappeared. Although some went unnoticed, the rig crew did recognize an anomaly at 9:30 p.m. and shut the pumps down to investigate. Over the next 10 minutes or so, the crew watched the drill pipe pressure visibly increase—steadily at first (9:30 to 9:35 p.m.) and then, after they attempted to bleed it off, rapidly(9:38 p.m.)—even though the pumps were off. They also saw an anomalous kill line pressure.
*Final Report, p. 185-6*

143. Each indicator was a sign that fluids are moving in the well, in other words, a sign of a kick. To a skilled observer, those anomalies would have caused alarm.  But there appears to have been no hint of alarm. Instead, the rig crew spent at least 10 minutes discussing the anomaly, scratching their heads to figure out what was happening. Even in retrospect, Transocean's internal investigator asserts that it was ―a very strange trend, ―a confusing signal, explained only after ―months of work. Transocean leaves open the possibility that its rig crew ―did not have the experience‖ or training to interpret pressure anomalies during the negative pressure test. If true, then the crew likely did not have sufficient training or ability to interpret the recurrence of those anomalies during the final displacement.
*Final Report, p. 186*

144. Transocean further states that its crew relied on the operator (BP) to make a final assessment of anomalies during the negative pressure test. But when those anomalies reappeared during the displacement, the rig crew did not notify BP rig personnel and ask for their help in interpreting the data.
*Final Report, p. 186*

**Transocean Allowed Rig Operations to Proceed in a Way That Inhibited Well Monitoring:**

145. Transocean management on the rig allowed simultaneous operations without adequately ensuring that those operations would not complicate or confound well monitoring. Simultaneous activities can interfere with well monitoring in several ways. *Final Report, p. 186*

146. First, they can influence data that are used to monitor for kicks (for example, by altering fluid levels) and thereby obscure signals of a kick. Second, they can make it more difficult to interpret data because rig personnel may attribute data anomalies to rig activities instead of a kick. Third, even when simultaneous operations are necessary, such as when changing the lineup of pipes and valves or fixing a mud pump, they can distract rig personnel who would otherwise be monitoring the well. Rig personnel can reduce these difficulties by identifying relevant rig activities, calculating or otherwise predicting their probable effect, and communicating any expected effects to well monitoring personnel. Rig management should ensure that someone is watching the screens at all times, despite ongoing activities. *Final Report, p.* 186

**Transocean Personnel Did Not Properly Communicate Information:**

147. Insufficient communication, both prior to and during the final displacement, affected risk awareness and well monitoring on the Deepwater Horizon. BP did not adequately inform Transocean about the risks at the Macondo well, particularly the risks of a poor bottomhole cement job. *Final Report, p. 186*

148. Transocean argues that if BP had done so, its crew might have demonstrated heightened awareness. But it is unlikely that this particular communication failure compromised kick detection; the crew would probably have dismissed warnings about cement risks anyhow after the successful negative pressure test. *Final Report, p. 186*

149. BP and Transocean did not do enough to ensure that rig personnel were aware of the objectives, procedures, and hazards of the riser displacement operation. The individuals conducting the pre-job meetings should have emphasized that BP's temporary abandonment procedures would leave only a single barrier in the well besides the BOP and would produce an unusually underbalanced well. They should have warned against complacency stemming from the negative pressure test and emphasized that tested barriers can fail. *Final Report, p. 187*

150. The pre-job meetings should also have informed well monitoring personnel that certain kick indicators such as pit gain and flow-out would be compromised or unavailable during the planned operations. Well monitoring personnel should have been told that, as a result, they would need to perform volumetric calculations to keep

track of pit gain, pay special attention to other parameters (such as drill pipe pressure), and conduct visual flow checks whenever the pumps were stopped.
*Final Report, p. 187*

151.  In addition, to facilitate well monitoring, those personnel should have been given a pump schedule for the different phases of the displacement, along with guidance regarding how much deviation from that schedule should be considered anomalous. Transocean personnel did not communicate effectively about the displacement operation.
*Final Report, p. 187*

152. Communication broke down between the drill crew and the mudloggers on several occasions. For example, when rig personnel announced early on April 20 that they would be pumping mud to a supply boat, Cathleenia Willis (the mudlogger on shift) told Clark she was concerned that this would limit her ability to monitor pit gain. Clark said he would address the matter but never got back to Willis. Keith reported after the explosion that he was concerned that simultaneous activities would complicate monitoring but never expressed those concerns to others. The drill crew repeatedly failed to inform Keith of various activities that influenced well monitoring data.
*Final Report, p. 187*

153. Even after the Transocean crew shut down the pumps to investigate an anomaly, they did not inform the Sperry Drilling mudlogger, senior Transocean personnel, or the BP well site leader of the anomaly or ask for their help in resolving it.
*Final Report, p. 187*

154. The Chief Counsel's team could not conclude that any one of these problems contributed to the failure to detect the kick. But together they suggest a communication breakdown that made kick detection more difficult. Knowledge of ongoing rig activity is essential to accurate interpretation of the data. Absent that knowledge, it is difficult to ascertain whether anomalous data are benign or problematic.
*Final Report, p. 187*

155. The Chief Counsel's team found that Transocean rig personnel missed signs of a kick during displacement of the riser with seawater. If noticed, those signs would have allowed the rig crew to shut in the well before hydrocarbons entered the riser and thereby prevent the blowout.
*Final Report, p. 165*

156. Management on the rig allowed numerous activities to proceed without ensuring that those operations would not confound well monitoring. Those simultaneous activities did confound well monitoring and masked certain data.
*Final Report, p. 165*

157. Despite the masking effect, the data that came through still showed clear anomalies. The crew either did not detect those anomalies or did not treat them as kick indicators.

24

*Final Report, p. 165*

**C. Transocean Failed to Divert The Hydrocarbons Overboard**

158. The *Deepwater Horizon's* crew did not respond to the April 20 kick before hydrocarbons had entered the riser, and perhaps not until mud began spewing from the rig floor. If the rig crew had recognized the influx earlier, they might have been able to shut in the well. But the crew still had response options even at the point that they eventually did recognize the kick.
*Final Report, p. 193*

159. The mud gas separator was not designed to handle this flow volume and was overwhelmed. Sending flow to the mud gas separator, rather than overboard, therefore increased the risk that gas from the well would explode on the rig.
*Final Report, p. 193*

160. The crew appears to have followed standard Transocean procedures for dealing with hydrocarbon kicks. But those procedures were written to guide the crew's response to routine hydrocarbon kicks. They did not address extreme emergencies like the one the *Deepwater Horizon* crew faced on the evening of April 20.
*Final Report, p. 193*

161. Transocean's Well Control Handbook warns that large amounts of gas above the BOP stack can rise rapidly and carry a large volume of mud out of the riser at high rates. In those situations, the rig's diverter becomes the last line of defense.
*Final Report, p. 194*

162. The diverter on the *Deepwater Horizon* sat directly beneath the rig floor.  It could prevent gas from flowing uncontrollably onto the drilling rig, in order to keep combustible gases safely away from sources of ignition. Mud coming out of the well normally flows up the riser, through the mud cleaning system and into the mud pits.
*Final Report, p. 194*

163. When the rig crew activates the diverter, an annular packer in the diverter closes around the drill pipe (or closes the open hole if no drill pipe is in the hole) and prevents flow up the riser and onto the drill floor. The *Deepwater Horizon's* diverter packer had a 500 pounds per square inch (psi) working pressure rating, meaning that it could safely withstand 500 psi of pressure exerted by fluids flowing up the riser. Although the diverter is designed to handle worst-case scenarios, pressures above the pressure rating could cause it to fail and allow an influx to continue up the riser.
*Final Report, p. 194*

164. When closed, the packer forced flow to one of two 14-inch diameter overboard lines —one going to the port side of the rig, the other to starboard. The rig crew could select the direction of overboard flow in order to discharge gas on the downwind side of the

rig. The starboard-side overboard line was also connected to another pipe that led to the mud gas separator. The rig crew could close a valve in the starboard line in order to route flow from that line to the mud gas separator.
*Final Report, p. 194*

165. A mud gas separator consists of a series of pipes, valves, and a tank. When gas-bearing mud flows into the tank, the mud falls to the bottom of the tank while the gas rises. The mud flows out through a pipe in the tank bottom to the rig's mud pits. The gas flows out through a separate pipe. On the Deepwater Horizon , that pipe ran to a vent high atop the derrick where gas could discharge into the open air.
*Final Report, p. 195*

166. When using the diverter system, the crew's most important decision is whether to send the fluid influx overboard or to send it to the mud-gas separator.
*Final Report, p. 195*

167. The choice depends on the size of the hydrocarbon influx in the riser. The mud gas separator is the right choice for small quantities of mud and hydrocarbons. By separating mud from gas, it allows the crew to collect and reuse the mud rather than discharge it overboard and pollute the sea. Moreover, it vents gas out of a gooseneck pipe on the derrick at the center of the rig. But sending a large influx to themed gas separator can create a large flammable cloud of gas over the rig.
*Final Report, p. 195*

168.   If a sufficiently large and sustained influx of gas from the riser goes to the mud gas separator, ignition becomes more likely, with the potential for explosion. As a result, it is inappropriate to send large flows through the mud gas separator. In the event of a large hydrocarbon influx into the riser, the crew should send flow overboard through the downwind line.
*Final Report, p. 195*


**Kick Response at Macondo:**

169. On April 20, gas moved through the *Deepwater Horizon's* open blowout preventer and shot up the riser. As it rose, the gas expanded, pushing the mud and gas faster and faster toward the rig.  Sometime between 9:40 and 9:43 p.m., mud spewed from the rotary table, sprayed onto their floor, and shot up and out the crown of the derrick about 200 feet above the rig floor.
*Final Report, p. 195*

170. A Transocean representative likened the force of the gas to a 550-ton freight train hitting the rig floor, followed by jet engine's worth of gas coming out of the rotary.
*Final Report, p. 196*

**The Rig Crew Sends the Influx to the Mud Gas Separator:**

171. After drilling mud began spraying out from the rig floor, the crew activated the diverter system. Transocean toolpusher Jason Anderson was in the drill shack. He called BP well site leader Don Vidrine to say that the crew was taking action in response to mud coming back from the well.  It appears that rig personnel had previously set the valves on the diverter system to route diverted flow through the mud gas separator rather than overboard.
*Final Report, p. 196*

172.   The crew may have done this to avoid inadvertently discharging oil-based drilling mud or other pollution into the Gulf of Mexico in violation of environmental regulations.
*Final Report, p. 196*

173. Whatever the reason, it appears that the rig crew did not change the valve settings to route the flow overboard in response to the sudden mud influx.
*Final Report, p. 196*

174. Diverting flow to the mud gas separator stopped the flow of mud onto the rig floor within seconds. Micah Sandell, a Transocean gantry crane operator, testified: ―I seen mud shooting all the way up to the derrick…then it just quit…I took a deep breath thinking, Oh, they got it under control.‘
*Final Report, p. 196*

175. Any relief was temporary. Given the size of the influx, routing the influx to the mud gas separator rather than overboard made ignition all but inevitable. The capacity of a mud gas separator depends on the size of the outlet lines, and these lines are generally not large enough to handle very high flow rates. The Macondo blowout therefore quickly overwhelmed the Deepwater Horizon's mud gas separator.  Sandell observed: ―Then all the sudden the…mud started coming out of the degasser…so strong and so loud that it just filled up the whole back deck with a gassy smoke…loud enough…it's like taking an air hose and sticking it to your ear.
*Final Report, p. 196*

176. A Weatherford specialist on the rig watched mud come out of the gas vent lines of the mud gas separator. Gas likely entered the line to the mud system, which would have sent gas to the pump room, the mud pit room, and the shaker room.  Components of the mud gas separator may have failed at that time as well.
*Final Report, p. 196*

177.   There was little wind on April 20, creating worst-case conditions for gas dispersion.  A flammable gas cloud started accumulating on the rig.
*Final Report, p. 196*

**Gas Ignites Minutes After Mud Reaches the Rig Floor:**

178. The first explosion occurred at about 9:49 p.m.
*Final Report, p. 197*

Respectfully submitted,


 _/s/    Daniel E. Becnel, Jr._____
DANIEL E. BECNEL, JR. (#2926)
**BECNEL LAW FIRM, LLC**
P. O. Drawer H
106 West Seventh Street
Reserve, Louisiana 70084
Telephone: (985) 536-1186
Facsimile: (985) 536-6445
E-mail: dbecnel@becnellaw.com
**Attorneys for Plaintiffs in:**
1. *Bill's Oyster House v BP et al* (C.A. 10-1308)
2. *Howard Buras v BP et al* (C.A.10-2994)
3. *Armand's Bistro v BP et al* (C.A. 10-4489)
4. *Faye Loupe et al. v BP et al* (C.A. 10-2764)
5. *Laura Gautreaux v BP et al* (C.A. 10-1539)
6. *Brent Rodrigue, Sr. et al v BP et al* (C.A. 10-1325)



## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Request For Oral Argument will be
served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in
accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed
with the Clerk of Court of the United States District Court for the Eastern District of
Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in
accordance with the procedures established in MDL 2179, on this _15th_ day of  April _,
2011.

 _/s/    Daniel E. Becnel, Jr._____