UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | : : : : : | MDL NO. 2179<br><br>SECTION:  J<br><br>JUDGE BARBIER<br>MAG. JUDGE SHUSHAN |
| **THIS DOCUMENT RELATES TO PLEADINGS IN THE "A" BUNDLE CASES, IN PARTICULAR: 10-1540, 10-3168, 10-3169, 10-3184, 10-3815, 10-4211, 10-4226, 10-4227, 10-4229, 10-4252, 10-4360, 11-263** | : : : : : | |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**CONSOLIDATED REPLY BRIEF OF DEFENDANT CAMERON
INTERNATIONAL CORPORATION IN SUPPORT OF ITS
<u>MOTION TO DISMISS THE PLEADINGS IN THE "A" BUNDLE</u>**

*"Hydrocarbons had entered the riser well before the crew attempted to activate the BOP, and <u>even a perfectly functioning BOP could not have prevented the explosions that killed 11 men on April 20</u>."*

MACONDO: THE GULF OIL DISASTER
Chief Counsel's Report | 2011
National Commission on the BP Deepwater Horizon
Oil Spill and Offshore Drilling (Released 2/27/11)
www.oilspillcommission.gov/chief-counsels-report
(emphasis added)

1052976v.2

Defendant Cameron International Corporation ("Cameron") respectfully submits this reply brief in support of its consolidated motion to dismiss the pleadings in the "A" Bundle for failure to state a claim upon which relief may be granted and/or for judgment on the pleadings (Doc. 1154) – primarily to explain the lack of legal merit in the Omnibus Response Memorandum to Cameron's Motion to Dismiss Bundle A Claims (Doc. 1612; hereafter "Omnibus Response").[1]  As the quotation on the front of this brief indicates, however, the Bundle A pleadings are deficient not just on legal grounds, but also because the simple chronology of events undercuts their claims against Cameron.

## SUMMARY OF REPLY

1. The Omnibus Response studiously avoids governing Supreme Court authority. The Supreme Court has consistently followed the precept that in enacting the Outer Continental Shelf Lands Act ("OCSLA") Congress "deliberately eschewed the application of admiralty principles to" accidents arising from oil and gas operations on the Outer Continental Shelf.

---

[1] Several of the Bundle A Plaintiffs filed amended complaints in response to Cameron's motion to dismiss.  Because those amendments supersede the original pleadings, the amendments as a technical matter make moot the Cameron motion to the extent that it addresses those original pleadings, and likewise make moot the individual oppositions filed in those cases that purport to defend the now superseded allegations (Docs. 1575 [10-1196], 1581-1 [10-3168], 1587 [10-3168], 1622 [10-1156], and 1623 [10-1243]).

Furthermore, it should be noted that the *Taquino* case (10-1921), the *Murray* case (10-2814), the *Becnel* case (10-3066), and the named plaintiffs in the *Kleppinger* case (10-3168) have settled.

The Bundle A Pleadings that have not been amended and thus remain subject to Cameron's motion are the following: Crawford Complaint, 10-1540; Stone Petition in Intervention in *Kleppinger* 10-3168; Davis Second Amended Petition, 10-3169; Brad Jones Original Petition, 10-3184; Roberts Complaint, 10-3815; Lavergne Petition, 10-4211; Benton Petition, 10-4226 Faulk Petition, 10-4227; John Petition, 10-4229; Reed Petition, 10-4252; Morales Petition, 10-4360; and Trahan Petition, 11-263.  Notably, none of the Plaintiffs or Intervenors in any of these cases filed an opposition defending their allegations against Cameron.  The Omnibus Response is the only opposition to dismissal on file in those cases.

1052976v.2

*Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 356 (1969); *accord, Chevron Oil Co. v. Huson*, 404 U.S. 97, 101 (1971) ("comprehensive admiralty law remedies [do not] apply under" OCSLA); *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 218 (1985) ("the operative assumption underlying the statute [is] that admiralty jurisdiction generally should not be extended to accidents in areas covered by OCSLA").

The Omnibus Response likewise attempts to sidestep the most recent Fifth Circuit decision directly on point. That decision rests squarely on the controlling Supreme Court precedent and holds that activities "connected with the development of the Outer Continental Shelf and an installation for the production of resources there . . . are insufficiently connected to traditional maritime activity to support the application of admiralty law." *Texaco Exploration and Production, Inc. v. AmClyde Engineered Products Co., Inc.*, 448 F.3d 760, 771 (5th Cir.), *cert. denied*, 549 U.S. 1053 (2006).

2. The Omnibus Response misapplies the test prescribed by the Fifth Circuit in *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990), for determining whether OCSLA or admiralty law governs a particular issue. *See also Grand Isle Shipyard, Inc. v. Seacor Marine, L.L.C.*, 589 F.3d 778, 783-89 & n.9 (5th Cir. 2009) (en banc) (the *PLT* test governs OCSLA choice of law determinations).

i. The Omnibus Response misapplies the first part of the *PLT* test, relating to "situs." The allegations in this case conclusively demonstrate that the personal injuries and deaths at issue occurred on an OCSLA situs. As the Fifth Circuit has most recently explained, a "structure attached to the seabed" satisfies the OCSLA situs test. *Grand Isle*, 589 F.3d at 784. There would have been no explosion and accompanying injuries

1052976v.2

3

aboard the *Deepwater Horizon* had the rig not been attached to the hydrocarbon reservoir in the seabed through casing and a marine riser pipe. The OCSLA "situs" test is plainly met.

ii. The Omnibus Response also misapplies the second part of the *PLT* test, concerning whether general maritime law applies of its own force. This issue depends on the character of the injury-causing activities. In this case, the injuries were caused by oil and gas development operations that allowed hydrocarbons from the subsea to rush up the well pipe and onto the rig floor, where they exploded and burned. The plaintiffs allege an oil drilling accident, not a maritime accident. As the Supreme Court has stated on this very point, "exploration and development of the Continental Shelf are not themselves maritime commerce." *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 422 (1985); *accord*, *AmClyde Engineered Products*, 448 F.3d at 771. Accordingly, maritime law does not apply here of its own force. Instead, OSCLA requires application of the law of the adjacent state.

3. That Louisiana is the "adjacent state" under OCSLA is conclusively demonstrated by any map of the Macondo well site or Mississippi Canyon Block 252. Because Louisiana is the "adjacent state," Louisiana law applies.

4. The Omnibus Response makes no attempt to uphold the allegations against Cameron as a matter of Louisiana law. The failure of the A Pleadings to state a claim against Cameron under Louisiana law is transparent and irrefutable.

1052976v.2

**REPLY TO OPPOSITION**

Both controlling Supreme Court precedent and the *PLT* test deployed by the Fifth Circuit as a synthesis of that precedent confirm and mandate that under OCSLA this case is governed by the law of the adjacent state and not by general maritime law.  It is beyond meaningful dispute that Louisiana is the "adjacent state" within the meaning of OCSLA.  The controlling Louisiana law is furnished by the Louisiana Products Liability Act, and the Bundle A Pleadings all fail to allege the necessary elements of liability under that Act.  Accordingly, Cameron's motions to dismiss the Bundle A federal complaints, or for judgment on the pleadings in the removed Bundle A cases, should be granted.

**A.  Supreme Court Precedent Requires Application of the Law of the Adjacent State**

In its initial supporting brief, Cameron discussed at some length the Supreme Court precedent governing choice of law under OCSLA and the limited reach of maritime law in connection with activities both on the outer continental shelf and elsewhere.  Consolidated Memorandum of Defendant Cameron International Corporation in Support of Its Motion to Dismiss the Pleadings in the "A" Bundle (Doc. 1154-1, hereafter "Cameron Br."), pp. 9- 12.  The abiding principle underlying that body of Supreme Court jurisprudence is that Congress affirmatively rejected the application of general maritime law to oil and gas operations on the outer continental shelf.  *Rodrigue*, 395 U.S. at 356 (Congress "deliberately eschewed the application of admiralty principles to" to accidents arising from oil and gas operations on the Outer Continental Shelf); *Chevron Oil*, 404 U.S. 97, 101 (1971) ("comprehensive admiralty law remedies [do not] apply under" OCSLA); *Herb's Welding,* 470 U.S. at 422 ("exploration and development of the Continental Shelf are not themselves maritime commerce"); *Offshore*

1052976v.2

5

*Logistics*, 477 U.S. at 218 ("the operative assumption underlying the statute [is] that admiralty jurisdiction generally should not be extended to accidents in areas covered by OCSLA"). These decisions lead inexorably to the conclusion that OCSLA rather than general maritime law governs the claims against Cameron in the Bundle A cases. *See also AmClyde Engineered Products*, 448 F.3d at 771. In turn, OCSLA adopts the law of the adjacent state "as the law of the United States." 43 U.S.C. § 1333(a)(2)(A).

**B. Plaintiffs Misapply the *PLT* Test**

This case easily satisfies the *PLT* test for application of "adjacent state" law under OCSLA. *See* Cameron Br., pp. 14-17. Plaintiffs misapply the *PLT* test in arguing the contrary.

1. Cameron and Plaintiffs agree that the first part of the three-part *PLT* test concerns whether the accident in question occurred on an OCSLA situs. *Compare* Cameron Br., p. 14 (quoting from *Grand Isle*, 589 F.3d at 784) *with* Omnibus Response, p. 4 (quoting from *Demette v. Falcon Drilling Co.*, 280 F.3d, 492, 496 (5th Cir. 2002)). In *PLT*, the Fifth Circuit resolved the situs issue by looking to whether the place of accident "fits the statutory definition of an 'other device[] *permanently or temporarily attached to the seabed* . . . erected thereon for the purpose of . . . developing, or producing resources therefrom.' 43 U.S.C. § 1333(a)(1)." 895 F.2d at 1047 (ellipsis in original; emphasis added). Subsequent Fifth Circuit cases are in accord, explicitly resolving the situs issue by reference to the quoted language from 43 U.S.C. § 1333(a)(1). *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 541-42 & n. 10 (5th Cir. 2002); *Demette*, 280 F.3d at 496-98. In short, under governing Fifth Circuit law a "structure attached to the seabed" for the purpose of oil and gas development is an OCSLA situs, both when the attachment is permanent when it is temporary. Thus, because the *Deepwater Horizon*

1052976v.2

was attached to the seabed at the time of the explosions and fires giving rise to this case, the accident occurred on an OCSLA situs.

Plaintiffs appear to argue first (and only implicitly), that devices temporarily attached to the seabed do not satisfy the requirement of an OCSLA situs; and second, that in any event the *Deepwater Horizon* was not even temporarily attached to the seabed. The first argument is wrong as a matter of law; the second argument is at odds both with the factual pleadings on file in this case and with the Plaintiffs' very theory of liability.

In determining whether the situs requirement has been satisfied, the Fifth Circuit routinely looks to subsection (a)(1) of 43 U.S.C. § 1333, which explicitly refers to devices "temporarily attached to the seabed." The wording of subsection (a)(2)(A) of the statute is different, referring to "artificial islands and fixed structures." Plaintiffs attempt to take comfort from the Fifth Circuit's comment in *Grand Isle* that the OCSLA situs requirement also is met "if the tort occurs on a platform or other covered situs as provided in § 1333(a)(2)(A)." 589 F.3d at 784. There are two problems with this approach, however. First, taking *Grand Isle* together with *Diamond Offshore* and *Demette* on this point, it is appropriate to look to 43 U.S.C. § 1333 in its entirety in assessing the situs issue: if a location meets the description set forth in either subsection (a)(1) or subsection (a)(2)(A), it is an OCSLA situs. The Court in *Grand Isle* effectively acknowledged this when, commingling elements from both subsections (a)(1) and (a)(2)(A), it described "a fixed platform (*or other structure attached to the seabed*)" as constituting an OCSLA situs. 589 F.3d at 784 (emphasis added). Second, there is in any event no substantive difference between the locations described in subsections (a)(1) and (a)(2)(A). Their language was originally identical. And when subsection (a)(1) was amended in 1978 it

1052976v.2

7

was not, as Plaintiffs wrongly argue, Omnibus Response, pp. 5-6 n.3, to change the meaning of the statute, but only to clarify the preexisting Congressional understanding that the phrase "fixed structures" encompasses all "devices permanently or temporarily attached to the seabed." *See* Cameron Br., pp. 6-7.

Plaintiffs' principal argument is factual rather than legal, contending that the *Deepwater Horizon* "was never attached to the ocean floor." Omnibus Response, p. 5. That contention, however, is contrary to the Plaintiffs' own factual allegations and to their very theory of liability. The First Amended B1 Complaint (Doc. 1128) affirmatively alleges that the drilling rig was in fact attached to the sea floor. For deepwater offshore drilling like that conducted at the Macondo prospect, construction of a well begins with the drilling of a "pilot hole" into the seabed. *Id.* ¶ 264. "The pilot hole is then 'cased,' or lined with pipe." *Id.* "The first section of casing pipe lowered into the pilot hole generally anchors a safety device known as a blowout preventer ("BOP")." *Id.* ¶ 265. The BOP at issue was "installed at the wellhead on the seafloor." *Id.* ¶ 62. ***A "pipe called a 'marine riser' connects the wellhead to the drilling" rig on the surface.*** *Id.* (emphasis added).

The accident then occurred because the rig was so attached to the subsoil and seabed. "***[H]ydrocarbons leaked in through the bottom of the casing and into the casing string, rising up the casing through the BOP and riser to the surface***." *Id.* ¶¶ 52, 403 (emphasis added). This "long riser pipe" was "connecting" the drilling unit "to the wellhead" until April 22, 2010, more than a day after the allegedly injurious explosions and fires. *Id.* ¶¶ 60, 199. In other words, the *Deepwater Horizon* was firmly attached to the seabed by means of the casing pipe, the BOP, and the marine riser pipe.

Moreover, as Cameron demonstrated and no Plaintiff disputes, the theory of liability alleged in the Bundle A pleadings is that a negligent or otherwise tortious failure to secure the Macondo well during completion and cementing operations led to the forceful and explosive discharge of hydrocarbons on the deck of the *Deepwater Horizon*. Cameron Br., p. 7 & n. 2, p.8 & n.3 (quoting and citing to allegations of Bundle A pleadings). Yet this could not have happened without a connection between the drilling rig and the hydrocarbon reservoir in the subsoil. As again alleged by the Plaintiffs' Steering Committee in the First Amended B1 Complaint, the accident resulted from the failure to secure a "subsea oil well" for temporary abandonment. *Id*. ¶ 258. "When highly pressurized hydrocarbons leaked into the well," appurtenant "emergency equipment failed to stop the oil and gas from blowing out of the well, which led to explosions and a fire on the Deepwater Horizon, and ultimately the sinking of the [rig] and the resulting spill." *Id.* This series of events could only have occurred if the drilling unit was attached to the subsea by the marine riser pipe, creating a conduit for the forceful and ultimately explosive release of hydrocarbons from the subsea onto the unit floor. If the unit had not been attached to the subsea for purposes of oil and gas development, no explosion would or could have occurred on the floor of the rig.

The accident occurred on an OCSLA situs. The first part of the *PLT* case is met.

2. Cameron and Plaintiffs agree that the second part of the *PLT* test asks whether "general maritime law applies of its own force." *Compare* Cameron Br., pp. 13, 15, *with* Omnibus Response, pp. 3, 6-7. But the parties deeply disagree over how this part of the test is to be applied. Cameron has shown that controlling Supreme Court and Fifth Circuit precedent delimits the range of maritime law and squarely establishes the inapplicability of maritime law to

offshore oil and gas operations. Cameron Br., pp. 10-16. Plaintiffs, without coming to terms with these governing authorities, baselessly claims that it is "invariably true" that "substantive admiralty law" applies "[i]n OSCLA litigation." Omnibus Response, p. 6.

The pertinent Supreme Court and Fifth Circuit authorities may be summarized in a nutshell. Even as to conduct occurring in a maritime setting, general maritime law applies of its own force only "if the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995). Mineral exploration and development of the type in which the *Deepwater Horizon* was engaging does not bear the necessary "substantial relationship" to traditional maritime activity. To the contrary, the Supreme Court repeatedly has held that exploration and development "are not themselves maritime commerce." *Herb's Welding*, 470 U.S. at 421.

The Fifth Circuit has properly followed the Supreme Court's lead, holding that "oil and gas exploration and production" are "not traditionally maritime," *PLT*, 895 F.2d at 1049; and, even more explicitly, that activities "connected with the development of the Outer Continental Shelf . . . are insufficiently connected to traditional maritime activity to support the application of admiralty law." *AmClyde Engineered Products*, 448 F.3d at 771. These authorities make crystal clear that maritime law did not and could not apply of its own force to this case.

The authorities Plaintiffs cite are not to the contrary. Plaintiffs principally rely on *Strong v. BP Exploration & Production, Inc.*, 440 F.3d 665, 670 (5th Cir. 2006). Omnibus Response, pp. 6-7. But the facts and reasoning of that case support Cameron instead. The

1052976v.2

plaintiff in *Strong* had been injured while moving tools and equipment on a lifeboat. 440 F.3d at 667. The Fifth Circuit noted that the "key inquiry is whether the allegedly tortious activity is 'so closely related to activity subject to maritime law that the reasons for applying special maritime admiralty rules would apply in the suit at hand.'" 440 F.3d at 669, quoting *Grubart*, 513 U.S. at 539-40. Because admiralty has long imposed a duty of care with respect to work space on a vessel, the court concluded that "by asserting that his injury was caused by the cluttered unsafe conditions of the lifeboat deck, Strong has stated a maritime tort claim." 440 F.3d at 670. In contrast, the injuries in question in this case stemmed not from traditional maritime concerns and activities but from an oil drilling accident.

The template for this case is not *Strong* but *Amclyde Engineered Products*, where the accident "would not have occurred but for the development of the Outer Continental Shelf" and "traditional maritime transportation was complete at the time of the [accident]." 448 F.3d at 769. Here, as in *Amclyde*, there was "nothing inherently maritime about the alleged causes of" the accident, because oil and gas development is not "maritime commerce." *Id.* at 774-75, citing *Rodrigue*, 395 U.S. at 360, and *Herb's Welding*, 470 U.S. at 425. Although both here and in *Amclyde* a vessel was involved "in the accident and other elements of maritime activity" preceded the accident, the claims in each case were and are "governed by OCSLA and not by maritime law." 448 F.3d at 775. Apart from *Strong*, Plaintiffs unjustifiably rely on a hodgepodge of inapplicable general quotations from decisions that do not in fact take issue with the proposition, announced in *PLT* and applied anew in *Amclyde*, that oil and gas exploration and production are not traditionally maritime. *See* Omnibus Response, p. 7.

1052976v.2

Plaintiffs pin their hopes on the false notion that "one maritime tortfeasor is enough," arguing that at least defendant Transocean, operator of the *Deepwater Horizon*, "was engaged in traditional maritime activity." Omnibus Response, p. 9. To be sure, operation of the *Deepwater Horizon* involved traditional maritime transportation when it was being moved from well site to well site. But the allegations in this case are not directed at that function of the rig. At the time of the accident, the *Deepwater Horizon* was not engaged in maritime transportation. It was attached to the seabed via a marine riser pipe, and fully engaged in the decidedly non-maritime activity of oil and gas development. Plaintiffs base their claims against Transocean on allegedly tortious handling of an oil well during completion operations, not the maritime handling of the drilling unit as a whole. *See* Cameron Br., p. 7 & n. 2, p.8 & n.3 (quoting and citing to allegations of Bundle A pleadings); *see also* B1 Complaint ¶¶ 37-47, 76-87. As the Fifth Circuit held in *Amclyde*, the conduct of some maritime activity before or surrounding the actual tortious event does not transform oil and gas development itself into maritime activity.

Plaintiffs have their premise wrong in any event. One maritime tort is enough to establish maritime jurisdiction. One maritime tort does not make all torts maritime, however.

In short, general maritime law does not apply of its own force to the oil and gas development activities that led to the accident in this case. Accordingly, the second part of the *PLT* test is also met: this case is governed not by maritime law but, under OCSLA, by the law of the adjacent state.

**C. Louisiana is the "Adjacent" State Under OCSLA**

In the Master B2 RICO Complaint, Plaintiffs affirmatively allege that Louisiana law has "been declared under 43 U.S.C. §§ 1331(f)(1) and 1333(a)(2) to be the law of the United

1052976v.2

12

States for that portion of the outer Continental Shelf from which the oil spill originated." Doc. 1059 ¶ 26.  Plaintiffs now suggest, however, that the issue of which state is truly adjacent to the Macondo well site requires further factual development.  Omnibus Response, pp. 11-12 n.7.  That suggestion is wholly lacking in merit.  The NOAA map showing the Gulf coastline and Macondo well site is dispositive.  The Court may take judicial notice that Louisiana is the "adjacent state" within the meaning of 43 U.S.C. § 1333(a)(2).

### D. The Bundle A Pleadings Fail to State a Valid Claim Against Cameron Under Applicable Louisiana Law

In explaining why the Bundle A pleadings failed to state a valid claim against it under Louisiana law, Cameron demonstrated that the Louisiana Products Liability Act provided the exclusive avenue of relief against Cameron as a product manufacturer and that Plaintiffs had failed to allege facts sufficient to support a claim under any provision of that Act.  Cameron Br., pp. 17-23.  Plaintiffs do not even attempt to rebut this showing.  *See* Omnibus Response, pp. 12-17.  Instead, Plaintiffs merely assert, without reference either to the specific requirements of the Act or to their own factual allegations, that "such a claim has been sufficiently stated."  Omnibus Response, p. 12.  This flat assertion is unavailing as a matter of law.  It does not overcome Plaintiffs' failure to allege facts sufficient to support a viable claim under the Louisiana Act.

Rather than address the merits of Cameron's argument, Plaintiffs criticize Cameron for drawing support from cases decided on summary judgment rather than at the pleading stage.  Omnibus Response, pp. 13-14.  They miss the point. If a defendant is entitled to summary judgment as a matter of law when a plaintiff fails to ***offer proof*** of an essential element of a cause of action, and of course that is the nature of summary judgment, then *a fortiori* a

defendant is entitled to judgment on the pleadings when a plaintiff fails even to *allege* an essential element of a cause of action.

Implicitly conceding the failure of their pleadings to state a viable claim against Cameron under the Louisiana Act, Plaintiffs suggest that a claim may be made against a product manufacturer "to the extent" that the manufacturer has been "negligent in post-sale maintenance, repair, or other use." Omnibus Response, p. 16. That may be true as a theoretical matter, but the point is irrelevant here: no Bundle A pleading makes any non-conclusory allegation about Cameron's post-sale conduct, and Plaintiffs to this date cannot point to any fact that would support a negligence claim based on post-sale conduct.

Finally, Plaintiffs attempt to invoke the allegations of the B1 Master Complaint to supplement the allegations of the Bundle A pleadings. Omnibus Response, p. 15. The allegations of the B1 Master Complaint, however, actually demonstrate that the Bundle A plaintiffs do not have a valid claim against Cameron. That Complaint affirmatively alleges that the BOP sold by Cameron operated as expected before the explosion occurred. In particular, at 9:41 p.m., mud mixed with gas spurted "out of the riser" and onto the floor of the drilling unit. *Id.* ¶ 406. Transocean workers successfully "closed two of the" rams on the BOP at 9:47 p.m. *Id.* ¶ 410. Those rams then blocked "hydrocarbons from entering the riser" so that the "blowout could have been contained at this point, had the gas on the drilling vessel not exploded." *Id.* The explosions occurred at 9:48 p.m. *Id.* ¶ 414. The purported failures of the BOP to operate are alleged to have occurred only "*after the explosion*." *Id.* ¶ 415. (emphasis added).

Time does not go in reverse. The B1 Master Complaint makes plain that not only the release of hydrocarbons onto the floor of the drilling unit, but also the resulting explosions

1052976v.2

14

and fires occurred at a point in time *before* any alleged BOP failure.  The allegations of the B1 Master Complaint, therefore, affirmatively contradict any claim that a failure of the BOP caused the explosion and fires.  Put simply, those allegations show that any failure of the Cameron equipment was not and could not have been a but-for cause of the injuries and deaths alleged in the Bundle A pleadings.  The B1 Master Complaint, therefore, does not just fail to state a viable claim on behalf of the Bundle A plaintiffs against Cameron; it conclusively demonstrates why the Bundle A plaintiffs have not yet stated, and will never be able to state, a viable claim against Cameron.

One last point should be made.  While Plaintiffs ultimately acknowledge the Supreme Court's recent decisions in *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. ___ (2009), concerning the adequacy of pleadings under the Federal Rules, Plaintiffs open by invoking the decision in *Conley v. Gibson*, 355 U.S. 41 (1957), and related Fifth Circuit cases applying lax standards of pleading that *Twombley* and *Iqbal* explicitly overrule.  *Compare* Omnibus Response, pp. 1-2, *with id.*, p. 13.  But that is neither here nor there.  The Bundle A pleadings fail to state a claim against Cameron even under *Conley v. Gibson*, because they fail even to state the elements of a viable claim.

## CONCLUSION

Cameron's motion to dismiss the pleadings in the "A" Bundle for failure to state a claim upon which relief may be granted and/or for judgment on the pleadings should be granted.

                        Respectfully submitted,

| | |
|---|---|
| David J. Beck, T.A. | */s/ Phillip A. Wittmann* |
|     dbeck@brsfirm.com | Phillip A. Wittmann, 13625 |
| Joe W. Redden, Jr. |     pwittman@stonepigman.com |
|     jredden@brsfirm.com | Carmelite S. Bertaut, 3054 |
| David W. Jones |     cbertaut@stonepigman.com |
|     djones@brsfirm.com | Keith B. Hall, 24444 |
| Geoffrey Gannaway |     khall@stonepigman.com |
|     ggannaway@brsfirm.com | Jared Davidson, 32419 |
| |     jdavidson@stonepigman.com |
| BECK, REDDEN & SECREST, L.L.P. | STONE PIGMAN WALTHER WITTMANN L.L.C. |
| One Houston Center | 546 Carondelet Street |
| 1221 Mckinney, Suite 4500 | New Orleans, Louisiana 70130 |
| Houston, TX 77010-2010 | 504-581-3200 |
| 713-951-3700 | 504-581-3361 (fax) |
| 713-951-3720 (fax) | |
| | **ATTORNEYS FOR CAMERON INTERNATIONAL CORPORATION** |

                                                                                     1052976v.2

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Consolidated Memorandum of Defendant Cameron International Corporation in Support of its Motion to Dismiss the Pleadings in the "A" Bundle has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 15th day of April, 2011.

/s/ Phillip A. Wittmann

1052976v.2