## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | § | MDL-2179 |
|     "DEEPWATER HORIZON" in the | § | |
|     GULF OF MEXICO, on | § | |
|     APRIL 20, 2010 | § | SECTION "J" |
| | § | |
| THIS DOCUMENT RELATES TO: | § | JUDGE BARBIER |
| | § | MAG. JUDGE SHUSHAN |
|     *10-3059 and 11-0516* | § | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### STATE OF LOUISIANA'S MEMORANDUM OF LAW IN INTEREST IN AND OPPOSITION TO DEFENDANTS' PENDING MOTIONS TO DISMISS

**TABLE OF CONTENTS**

I.   OPA IS THE CONTROLLING FEDERAL STATUTE APPLICABLE TO ALL OIL DISCHARGES, AND IT EXPRESSLY SAVES STATE LAW CLAIMS. ................... 13

    A.   OPA Explicitly Repealed OCSLA's Oil Spill Liability And Compensation Provisions, And Is The Exclusive, Unified Federal Legislation Applicable To The Spill. ................................................................................................... 14

    B.   OPA's Savings Clauses Preserve States' Rights To Adopt State Laws Imposing Additional Liability For Oil Discharges................................................. 15

    C.   OPA's savings clauses preserve state law claims for all oil discharges, regardless of whether the spill is in federal or state territorial waters. .......................... 16

    D.   OPA does not preempt the application of state law................................. 17

II.  UNDER OCSLA CHOICE-OF-LAW ANALYSIS, FEDERAL MARITIME LAW ALSO APPLIES AND DOES NOT PREEMPT STATE LAW.................................................. 21

    A.   General maritime law applies of its own force, and therefore state law does not apply as surrogate federal law........................................................................ 22

    B.   General maritime law does not preempt state law in this matter................ 24

    C.   Maritime law does not preempt state police power to regulate sea-to-shore pollution. .................................................................................................... 26

    D.   OPA preserves the holding in Askew that state law is not preempted by maritime law from applying to oil spills. ....................................................................... 27

    E.   Alternatively, Even if OCSLA is Applicable, Louisiana's State Law Claims Are Appropriate Under OCSLA's Choice-of-law Provisions......................... 28

III. THE SPILL WAS NOT AN AUTHORIZED DISCHARGE UNDER THE CWA AND THE CWA DOES NOT PREEMPT STATE LAW CLAIMS HERE............................ 32

IV. PLAINTIFFS' LAWSUITS SHOULD NOT BE DISMISSED FOR LACK OF PRESENTMENT........................................................................................................... 33

    A.    A factual inquiry into the sufficiency of presentment is not appropriate at this time. 34

    B.    The OPA presentment procedure in 33 U.S.C. § 2713 is not jurisdictional.............. 34

    C.    The Court has authority to excuse lack of compliance with the presentment procedure. .............................................................................................................. 37

    D.    A State's OPA claim may proceed without first being presented to the Responsible Party...................................................................................................................... 39

V. DEFENDANTS' EFFORTS TO AVOID RESPONSE AND MORATORIUM DAMAGES MUST BE REJECTED. .............................................................................. 42

    A.    The text of OPA's liability provision requires "but for" causation............................ 43

    B.    The Moratorium resulted from the "incident."............................................................ 52

    C.    Moratorium damages are recoverable under OPA ..................................................... 54

    D.    Damages resulting from response actions, including those resulting from the Vessels of Opportunity program, are recoverable under OPA. ............................................... 62

CONCLUSION.................................................................................................................... 65

## TABLE OF AUTHORITES

**Cases**

*Abundiz v. Explorer Pipeline Co.*, No. Civ. A. 300CV2029H, Civ. A. 303CV508H, Civ. A. 303CV0787H, 2003 WL 23096018, at *3-4 (N.D. Tex. Nov. 25, 2003) ................................. 38

*Ace Prop. and Cas. Ins. Co. v. Fed. Crop Ins. Corp.*, 440 F.3d 992, 999 (8th Cir. 2006) ........... 35

*Askew v. American Waterways Operators, Inc.,* 411 U.S. 325 (1973) ........................................ 24

*Bartholomew v. CNG Producing Co.,* 862 F.2d 555, (5th Cir. 1989) ........................................ 27

*Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., Inc.*, 51 F.3d. 235 (11th Cir. 1995) ................ 37

*Bourg v. BT Operating Co.*, No. H-08-0596, 2009 WL 960011, at *4 (S.D. Tex. Apr. 8, 2009) 28

*Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 581 (1987) ....................................... 15

*Clausen v. M/V New Carissa,* 171 F. Supp. 2d 1127, 1133 (D. Or. 2001) .................................. 17

*Coastal Iron Works, Inc. v. Petty Ray Geophysical*, 783 F.2d 577, 582 (5th Cir. 1986).............. 24

*Dawson Farms, LLC v. Farm Serv. Agency*, 504 F.3d 592, 605-06 (5th Cir. 2007).................... 34

Demette v. Falcon Drilling Co., 280 F.3d 492, 495 (5th Cir. 2002)............................................. 19

*Dennis v. Bud's Boat Rental, Inc.*, 987 F. Supp. 948 (E.D. La. 1997) ........................................ 28

Diamond Offshore Co. v. A & B Builders, Inc., 302 F.3d 531, 544 n.12 (5th Cir. 2002) ........... 21

*Dole v. United Steelworkers of Am.*, 494 U.S. 26 (1990) ............................................................ 45

Domingue v. Ocean Drilling and Exploration Co., 923 F.2d 393, 394 n. 1 (5th Cir. 1991) ........ 21

*Dunham-Price Group, LLC, et al. v. Citgo Petroleum Corp.*, No. 2:07 CV 1019, 2010 WL 1285446 (W.D. La. March 31, 2010),...................................................................................... 63

E. River S.S. Corp. v. Transamerica Delaval Inc., 476 U.S. 858, 864 (1986)............................. 24

*Exxon Shipping Co. v. Baker*, 556 U.S. 471 (2008)..................................................................... 18

*Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982) .............................. 15

*Gatlin Oil Co. v. United States*, 169 F.3d 207 (4th Cir. 1999) ...................................................... 43

*Henderson v. Eric Shinsekie, Sec'y of Veterans Affairs*, 131 S. Ct. 1197, 1206 (2011)............... 33

*In re Settoon Towing LLC*, Civ. A. No. 07-1263, 2009 WL 4730969, at *4 (E.D. La. Dec. 4, 2009) ................................................................................................................................. 44

*Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987) ....................................................................... 30

*Isla Corp. v. Sundown Energy L.P.*, Civ. Action No. 06-8645, 2007 WL 1240212, at *2 (E.D. La. Apr. 27, 2007 ................................................................................................................... 13

*J. Ray McDermott v. Vessel Morning Star*, 457 F.2d 815, 818 (5th Cir. 1972) (*en banc*) ............ 24

Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534 (1995) ............ 21

*Johnson v. Colonial Pipeline Co.*, 830 F. Supp. 309, 311 (E.D. Va. 1993) ................................. 36

Just v. Chambers, 312 U.S. 383, 389-390 (1941) .......................................................................... 24

Laredo Offshore Constructors, Inc. v. Hunt Oil Co., 754 F.2d 1223, 1229 (5th Cir. 1985).......... 20

*LeBoeuf v. Texaco*, 9 F. Supp. 2d 661 (E.D. La. 1998) ................................................................. 34

*Mathis v. Union Exploration Partners, Ltd.*, 1990 WL 150122, *1 (E.D. La. Dec. 2, 1990) ...... 27

*Moody v. Callon Petroleum Operating Co.*, 37 F.Supp.2d 805 (E.D. La. 1999) ......................... 29

*Moragne v. States Marine Lines, Inc.*, 398 U.S. 375 (1970) ....................................................... 23

*Nat'l Shipping Co. of Saudi Arabia v. Moran Trading Corp.*, 924 F. Supp.1436 (E.D. Va. 1996), *aff'd*, 122 F.3d 1062 (4th Cir. 1997) (*per curiam*).................................................................. 15

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-204 (1983) ............................................................................................................................... 15

Pippen v. Shell Oil Co., 661 F.2d 378, 384 (5th Cir. 1981) ......................................................... 21

PLT Eng'g, 895 F.2d at 1047....................................................................................................... 20

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)........................................................ 15

*Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, at 361 (1969) ................................................. 19

*Rogers v. Coastal Towing, L.L.C.*, 723 F. Supp. 2d 929, 933 (E.D. La. 2010) ........................... 22

*Ronquille v. MMR Offshore Servs., Inc.*, 353 F. Supp. 2d 680 (E.D. La. 2004) .......................... 28

*Russo v. M/T Dubai Star*, No. C 09-05158, 2010 WL 1753187, at *3 (N.D. Cal. Apr. 29, 2010) 38

*S. Pacific Co. v. Jensen*, 244 U.S. 205, 216 (1917) ...................................................................... 22

*S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65-66 (1st Cir. 2000) ......................... 13

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984) ........................................................... 16

*Snyder Oil Corp. v. Samedan Oil Corp.*, 208 F.3d 521, (5th Cir. 2000) ....................................... 27

*St. Joe Co. v. Transocean Offshore Deepwater Drilling Co.*, C.A. No. 1:10-cv-968-LPS, 2011
WL 915300 (D. Del. March 15, 2011) ....................................................................................... 17

*Sun Ship, Inc. v. Pa.*, 447 U.S. 715 (1980) .................................................................................. 24

*Taira Lynn Marine Ltd. No. 5, LLC v. Jays Seafood, Inc.*, 444 F.3d 371, 383 (5th Cir. 2006) ..... 42

*Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001) ..................................... 13

*Texaco Exploration and Production, Inc., v. AmClyde Engineered Products Co., Inc.*, 448 F.3d
760 (5th Cir. 2006) .................................................................................................................... 28

Theriot v. Bay Drilling Corp., 783 F.2d 527, 538-539 (5th Cir. 1986) ......................................... 21

*Turner v. Murphy Oil USA, Inc.*, Civ. Action No. 05-4206, 2007 WL 4208986, at *2-3 (E.D. La.
November 21, 2007) .................................................................................................................. 38

*U.S. v. Conoco, Inc.*, 916 F. Supp. 581, 583 (E.D. La. 1996) ...................................................... 45

*U.S. v. Locke*, 529 U.S. 89, 106 (2000) ........................................................................................ 13

*U.S. v. M/V Cosco Busan*, 557 F. Supp. 2d 1058, 1061 (N.D. Cal. 2008) ................................... 36

*U.S. v. Mizhir*, 106 F.Supp.2d 124, 125 (D. Mass. 2000) ........................................................... 46

*Union Pac. R.R. Co. v. Locomotive Eng'rs and Trainmen Gen. Comm. of Adjustment, Central Region,* 130 S. Ct. 584, 599 (2009)........................................................................ 33

*Union Petroleum Corp. v. U.S.*, 51 F.2d 734, 744 (Ct. Cl. 1981)................................................... 45

Union Tex. Petroleum Corp. v. PLT Eng'g, Inc., 895 F.2d 1043 (5th Cir. 1990)....................... 20

*Williams v. Potomac Elec. Power Co.*, 115 F. Supp. 2d 561 (D. Md. 2000).............................. 14

*Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199 (1996) ............................................................. 22

## Statutes

§ 1333(a)(2)(A) ............................................................................................................................... 13

33 U.S.C. § 2701 ............................................................................................................................. 36

33 U.S.C. § 2717 ............................................................................................................................. 34

33 U.S.C. §§ 2702, 2704, 2712 ...................................................................................................... 12

33 U.S.C. §§ 2718(a) and (c) .......................................................................................................... 13

33.U.S.C. § 2713.............................................................................................................................. 31

43 U.S.C. § 1333(a)(1)..................................................................................................................... 19

43 U.S.C. § 1333(a)(2)(A) ............................................................................................................... 20

46 U.S.C. app. § 740 (2004) ........................................................................................................... 21

CWA, 33 U.S.C. § 1251, *et seq.* ...................................................................................................... 9

Deepwater Port Act of 1974, 33 U.S.C. § 1505, *et seq.* ............................................................. 11

OCSLA, 43 U.S.C §§ 1331-56a........................................................................................................ 8

OPA, 33 U.S.C. §§ 2701, *et seq.*..................................................................................................... 9

Outer Continental Shelf Lands Act Amendments of 1978, 43 U.S.C. § 1801, *et seq.*. ................. 11

Trans-Alaska Pipeline Authorization Act of 1973, 43 U.S.C. § 1651, *et seq.*............................... 11

## Other Authorities

*Dunham-Price Group, LLC v. Citgo Petroleum Corp.*, No. 2:07 CV 1019, 2010 WL 1285446, at

   *3 (W.D. La. March 31, 2010).................................................................................... 55

H.R. Conf. Rep. No. 101-653, at 104 (1990)................................................................ 54

*NPDES No. GMG290000* I(B)........................................................................................ 31

P.L. 101-380 § 402......................................................................................................... 12

S. Rep. No. 101–94 (1989) ............................................................................................ 17

S. Rep. No. 101-94, at 9 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722, 730.............. 13

W. Page Keeton *et al.*, PROSSER AND KEETON ON TORTS § 41, at 264 (5th ed. 1984).................... 58

     **NOW INTO COURT**, through undersigned counsel, comes the State of Louisiana, by and through its Attorney General, James D. "Buddy" Caldwell (hereinafter "Louisiana" or the "State"), which respectfully files this Memorandum of Law in Interest in and Opposition to various Defendants' pending motions to dismiss ("Memorandum of Law").[1]  While no motion to dismiss is currently pending in either of the cases filed on behalf of the State of Louisiana (Case Numbers: 10- 3059 and 11- 0516), several of Defendants' motions to dismiss now before this Court seek to categorically dispose of claims, remedies and damages in which the State has a manifest interest.[2]  Therefore, the State requests that the Court consider this Memorandum of Law in connection with Defendants' pending Motions to Dismiss ("Motions") and that the Court deny the Motions with respect to the issues as set forth herein.

## INTRODUCTION

     The State of Louisiana is the epicenter of the environmental and economic harms suffered as a result of the *Deepwater Horizon* catastrophe and resulting oil spill (the "Spill"). The State and its people have suffered substantial economic damages as a result of the Spill and the associated response efforts.  Likewise, Louisiana's coastal environment and ecosystem are

---

[1] Motions to Dismiss have been filed by BP Exploration & Production Inc., BP America Production Company, and BP p.l.c. (collectively, "BP") [Doc 1440 (Bundle B1); Doc 1406 (Bundle B3); Doc 1786 (Bundle C)]; Transocean Offshore Deepwater Drilling, Inc., Transocean Holdings LLC, Transocean Deepwater, Inc. and Triton Asset Leasing GmbH (collectively, "Transocean") [Doc 1390 (Bundle B1)]; Halliburton Energy Services, Inc. ("Halliburton") [Doc 1429 (Bundle B1)]; Cameron International Corporation ("Cameron") [Doc 1395 (Bundle B1)]; Weatherford U.S., L.P. ("Weatherford") [Doc 1433 (Bundle B1)]; Anadarko Petroleum Corporation, Anadarko E&P Company LP (collectively, "Anadarko") [Doc 1414 (Bundle B1); Doc 1416 (Bundle B3); Doc 1426 (Bundle C)]; MOEX Offshore 2007 LLC and MOEX USA Corporation (collectively, "MOEX") [Doc 1414 (Bundle B1); Doc 1416 (Bundle B3)]; and M-I LLC ("M-I"), [Doc 1589]; International Air Response, Inc. [Doc 1404 (Bundle B3)]; NALCO Company, NALCO Holdings LLC, NALCO Financial Holdings LLC and NALCO Holding Company [Doc 1409 (Bundle B3)]; Marine Spill Response Corporation [Doc 1397 (Bundle B3)]; O'Brien's Response Management, Inc. and National Response Corporation [Doc 1388 (Bundle B3)] (collectively, "Defendants").

[2] In addition many of the positions taken by Defendants in the context of these Motions to Dismiss are reflected in the Transocean Defendants Answer to the State of Louisiana's Complaint for Declaratory Relief.  *See.* Rule 12 Defense, Answer and Affirmative Defenses in Response to Complaint for Declaratory Judgment and Compulsory Counterclaim, filed 10/13/10 [Doc. 534].

continuing to suffer extensive injuries that could fundamentally alter Louisiana's most defining natural resources for generations.  The damages that Defendants have caused Louisiana are as insidious as the oil itself, still appearing and mounting daily without an apparent end in sight.

Nonetheless, Defendants have filed a series of motions to dismiss requesting that this Court dismiss–based on the face of the pleadings and without factual inquiry–broad categories of claims and damages arising from the Spill.  Because certain relief requested in these motions would significantly impact the State of Louisiana, would deprive Louisiana of the application of its own laws, and would serve to shift billions of dollars of damages from the Defendants to the public, the State of Louisiana hereby seeks to be heard and respectfully requests that the Court reject the Defendants' Motions.

## ARGUMENT AND AUTHORITIES

As set forth below, the State of Louisiana requests that the Court consider the State's position and reject the following arguments put forward by the Defendants:

- **Defendants argue that Louisiana's laws and maritime claims do not apply because the Outer Continental Shelf Lands Act ("OCSLA") renders meaningless the Oil Pollution Act's ("OPA") savings clauses.**  In the Motions to Dismiss, the Defendants argue that broad categories of state law claims and damages are preempted because the release of almost 5 million barrels of oil as a result of the *Deepwater Horizon* incident was caused by their actions on the outer continental shelf ("OCS").  By focusing on the fact that they were drilling on the OCS–and ignoring the fact that this is the worst oil spill in the history of our country–the Defendants have constructed a circular series of preemption arguments founded on the notion that the Court should first look to OCSLA, 43 U.S.C §§ 1331-56a, as somehow controlling liability here.  This is wrong.  Congress

made it clear:  the Court's analysis here, as in any oil spill case, must begin with OPA, 33 U.S.C. §§ 2701, *et seq.*  OPA consolidated all federal statutory oil spill-related liability provisions into one law–*and specifically amended OCSLA to remove its liability provisions*–to avoid the circular logic the Defendants now espouse.  OPA is <u>the</u> federal law applicable to oil spills, and OPA expressly saves both federal maritime remedies and the States' rights to create additional remedies in the event of an oil spill.  Defendants' arguments to the contrary should be flatly rejected.

- **Defendants argue that Louisiana's laws and maritime claims are preempted by the Clean Water Act ("CWA") by fundamentally misconstruing the Act's purpose and suggesting that the release of almost 5 million barrels was a permitted discharge.** Likewise, Defendants assert that none of the laws of any of the impacted states apply to the Spill because, under CWA, 33 U.S.C. § 1251, *et seq.*, interstate water pollution is controlled by the law of the source of the pollution, not the law of any affected state. Defendants reason that, since the source of the pollution is located on the OCS, a federal enclave, federal law applies exclusively and state laws are preempted.  However, this argument is built upon a fundamental misreading of the federal regulatory framework. Defendants equate the *Deepwater Horizon* catastrophe with a permitted release under the CWA,[3] when in fact the release was never permitted under the CWA or any other state or federal statute.  Thus, there can be no conflict that gives rise to preemption under the CWA.  The Court should summarily reject the Defendants' CWA preemption argument.

---

[3] The BP Defendants further claim that because operations on the drilling platform were subject to a CWA water discharge general permit, the discharge of some 5 million barrels of formation oil from that structure was actually water pollution regulated under the CWA permit regime.  BP therefore argues that the tort laws and regulations of those states affected by the oil spill are barred and that only the laws of the state of the source of the oil pollution apply.  BP reasons that, here, the oil spill originated on the OCS, a federal enclave, rather than a source state, so only federal law applies.  Any suggestion that the Spill was in any way a permitted release under the CWA is completely meritless.

- **Defendants argue that the Court should dismiss thousands of claimants' claims based upon a perceived failure to meet the presentment procedures of OPA**.  As a procedural matter, Defendants' presentment arguments should be rejected because "presentment" requires a factual analysis and is not appropriate for dismissal on the face of the pleadings.  OPA's presentment procedures are not jurisdictional, and, accordingly, the Court should apply a flexible approach.  Specifically, BP and the other responsible parties, have failed to establish a working claims procedure as contemplated under OPA.  BP's program, pre-Gulf Coast Claims Facility ("GCCF"), is universally perceived to have failed.  Rote application of typical presentment concepts simply should not apply to proceedings in a case of this magnitude.  Finally, under any circumstance, the requirements of presentment are not applicable to governmental entities.  The economic claims of governments will include multiple and complicated injuries across broad economic sectors and over what is likely to be a several year time frame.  Governmental entities should not be required to present claims for economic impacts repeatedly.  The Court should reject Defendants' argument to the contrary.

- **Defendants argue that claims related to response actions, including the moratorium enacted in response to the *Deepwater Horizon* incident, should be dismissed on the face of the pleadings**.  Defendants' requests to push onto the public sector enormous economic damages arising directly and foreseeably from their gross negligence and fraudulent misrepresentations should be denied.  First, the categories of damages at issue resulted from the *Deepwater Horizon* catastrophe and resulting spill.  As such, they are recoverable pursuant to OPA and the Louisiana Oil Spill Prevention and Response Act, La. R.S. 30:2451, *et seq.* ("LOSPRA").  Moreover, even under the Defendants' strained

concepts of proximate causation, the federal and state emergency response to an incident and spill like this one was entirely foreseeable.  However the Court rules, Defendants are expected to raise similar arguments in an effort to defeat valuable claims for damages to, *inter alia,* oysterbeds. Defendants' attempts to categorically excise billions of dollars in damages arising from response injuries, including the drilling moratorium implemented in response to the incident and almost 5 million barrels of oil gushing unabated into the Gulf of Mexico, must be flatly rejected.

I.   **OPA IS THE CONTROLLING FEDERAL STATUTE APPLICABLE TO ALL OIL DISCHARGES, AND IT EXPRESSLY SAVES STATE LAW CLAIMS.**

Defendants' arguments that state and maritime laws are preempted by OCSLA and not saved by OPA must be rejected.  OPA, not OCSLA, is the single controlling federal statute exclusively applicable to liability for oil discharges, including the Spill.

OPA was passed following the catastrophic 1989 *Exxon Valdez* spill, which was caused when a tanker ran aground off the coast of Alaska, spilling 11 million gallons of crude oil into Prince William Sound.  At the time of the *Exxon Valdez* incident, Congress had not agreed on a unified oil spill law.  Rather, the laws and regulations that addressed oil discharges were scattered throughout multiple authorities including the Federal Water Pollution Control Act (known as the Clean Water Act (CWA)) of 1972, 33 U.S.C. § 1251, *et seq.* (establishing requirements for oil spill reporting, response, and liability); the Trans-Alaska Pipeline Authorization Act of 1973, 43 U.S.C. § 1651, *et seq.* (covering oil spills and liability relating to the Trans-Alaska Pipeline System); the Deepwater Port Act of 1974, 33 U.S.C. § 1505, *et seq.* (addressing oil spills and liability issues at deepwater oil ports and establishing a fund for cleanup costs and to compensate damages above liability limits); and the Outer Continental Shelf Lands Act Amendments of 1978, 43 U.S.C. § 1801, *et seq.* (establishing an oil spill liability

framework and requirements for oil exploration and development facilities in federal offshore waters, and creating the Offshore Pollution Fund to finance oil spill cleanup and damages).

Spurred to action by the *Exxon Valdez* disaster and a national demand for better compensation for losses resulting from any and all oil discharges, Congress enacted the Oil Pollution Act of 1990 ("OPA"), a unified comprehensive law specific to oil spills on the waterways and coastlines of the United States. With OPA, Congress consolidated the existing federal oil spill statutes under one program and made conforming amendments to the CWA, OCSLA, and other laws.

**A.     OPA Explicitly Repealed OCSLA's Oil Spill Liability And Compensation Provisions, And Is The Exclusive, Unified Federal Legislation Applicable To The Spill.**

OPA supplants OCSLA in the area of oil discharges. In passing OPA, Congress explicitly repealed Title III of OCSLA. *See* P.L. 101-380 § 405. Title III had defined, among other things, the types of injuries that could be compensated under OCSLA and the potential claimants who have standing to assert claims for each type of damage. Title III had also established liability limits for ships and other vessels, included exceptions for gross negligence or willful misconduct, and imposed joint, several, and strict liability on the owners and operators of pollution sources. All of the issues that were formerly covered by OCSLA Title III are now addressed by the OPA statutory framework. *See, e.g.* 33 U.S.C. §§ 2702 (liability and damages), 2704 (limits on liability), and 2712 (availability of Oil Spill Liability Trust Fund). Congress similarly amended and repealed portions of CWA § 311 relating to spill reporting, response, and liability for oil spills to conform to the newly created OPA. *See* P.L. 101-380 § 402.

No party in this matter disputes that OPA applies to the Spill. OPA provides a single federal law providing clean up authority, penalties, and liability for oil pollution. S. Rep. No.

101-94, at 9 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722, 730; *see Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001).  OPA was intended by Congress to be the exclusive federal statute governing oil spills.  *S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65-66 (1st Cir. 2000); *Tanguis*, 153 F. Supp. 2d at 867 (finding OPA creates a new, comprehensive federal scheme for recovery of oil spill cleanup costs and compensation for those injured by such spills).  OPA occupies the entire field of federal legislation with respect to liability for oil discharges to navigable waters, and trumps any application of OCSLA to claims arising from such discharges.

**B.      OPA's Savings Clauses Preserve States' Rights To Adopt State Laws Imposing Additional Liability For Oil Discharges.**

Because OPA, not OCSLA, is the controlling law with respect to oil discharges, OCLSA's provision for adopting applicable, and not inconsistent, liability laws of the adjacent state as surrogate federal law in § 1333(a)(2)(A) does not come into play.  If state law applies, it is directly through OPA's savings provisions, not as borrowed federal law under OCSLA.

Importantly, OPA does not prevent states from adopting state laws governing oil spill liability and compensation.  *Isla Corp. v. Sundown Energy L.P.*, Civ. Action No. 06-8645, 2007 WL 1240212, at *2 (E.D. La. Apr. 27, 2007; *U.S. v. Locke*, 529 U.S. 89, 106 (2000) (noting that the Court has upheld state laws imposing liability for pollution caused by oil spills); *S. Port Marine*, 234 F.3d at 65 (noting that Congress did not intend to bar the imposition of additional liability by the States).

OPA's savings clauses provide that states may impose any additional liability or requirements relating to the discharge of oil or other pollution by oil within the state.  *See e.g.*, 33 U.S.C. §§ 2718(a) and (c).  Specifically, § 2718(a) provides that nothing in OPA shall "affect, or be construed or interpreted as preempting, the authority of any State or political subdivision

thereof from imposing any additional liability or requirements with respect to . . . the discharge of oil or other pollution by oil within such State . . ." or "affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under . . . State law, including common law."  Similarly, the savings clause at § 2718(c) provides that nothing in OPA shall "affect, or be construed to affect, the authority of . . . any State or political subdivision thereof to impose additional liability or additional requirements . . . relating to the discharge, or substantial threat of a discharge, of oil."

Courts uniformly have held that that these clauses preserve state law claims and the right of states to establish their own oil spill cleanup, liability and compensation schemes that might have different or additional requirements than those provided in OPA.  *See Locke*, 529 U.S. at 105 (OPA does not preempt state law claims for damages caused by oil spills); *Williams v. Potomac Elec. Power Co.*, 115 F. Supp. 2d 561 (D. Md. 2000) (preserving state common law claims); *Tanguis*, 153 F. Supp. 2d at 863-864 (noting rights of states to protect their own air, water, and land resources with state standards that are more restrictive than federal standards). Therefore, state statutory and common law claims are not preempted and, to the contrary, were expressly saved.

## C.     OPA's savings clauses preserve state law claims for all oil discharges, regardless of whether the spill is in federal or state territorial waters.

OPA preserves state law claims regardless of whether an oil discharge occurs in federal waters or within a state's territorial waters.  Pursuant to § 2718(a)(1)(a), states are explicitly authorized to impose additional liability for "other pollution by oil within such a State" (§ 2718(a)), and as "relating to the discharge of oil" (§ 2718(c)).   Each of these provisions contemplates a state's exercise of authority over any oil discharge that affects the state's resources and citizens.  Indeed:

16

> [the very] purpose behind the savings clause is to allow the states to impose
> liability upon oil polluters above the liability imposed through OPA.  Congress
> wanted to give the states the power to force polluters to cleanup [sic] completely
> oil spills and to compensate the victims of oil spills, even if their liability for these
> remediation expenses is limited under OPA.

*Nat'l Shipping Co. of Saudi Arabia v. Moran Trading Corp.*, 924 F. Supp.1436, 1448 (E.D. Va.

1996), *aff'd*, 122 F.3d 1062 (4th Cir. 1997) (*per curiam*) (unpublished table decision).

Defendants' arguments that Louisiana's laws and claims afforded under state law are

somehow preempted fails as a matter of law.  Both the plain language of OPA, and the

Congressional intent behind its enactment, demonstrate that all applicable laws of Louisiana are

to be preserved and applied in the event of an oil spill.  The State of Louisiana has a paramount

interest in seeing that its laws apply to its claims here and requests that the Motions to Dismiss

be denied.

D.      **OPA does not preempt the application of state law.**

Defendants wrongly argue that state law claims such as those Louisiana may have are

preempted by OPA.  The statutory text of OPA, as interpreted by this Court, demonstrates that

there is no such preemption.  The United States Supreme Court has held that state law can be

pre-empted in one of two general ways.  First, "if Congress evidences an intent to occupy a given

field, any state law falling within that field is pre-empted."  *Cal. Coastal Comm'n v. Granite

Rock Co.*, 480 U.S. 572, 581 (1987) (citing *Pac. Gas & Elec. Co. v. State Energy Res.

Conservation & Dev. Comm'n*, 461 U.S. 190, 203-204 (1983); *Fidelity Fed. Sav. & Loan Ass'n

v. De la Cuesta*, 458 U.S. 141, 153 (1982); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230

(1947)).  Second, if Congress "has not entirely displaced state regulation over the matter in

question, state law is still pre-empted to the extent it actually conflicts with federal law, that is,

when it is impossible to comply with both state and federal law . . . or where the state law stands

as an obstacle to the accomplishment of the full purposes and objectives of Congress."   *Id.*

(citing *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984) (internal citations omitted).

Congress did not intend for OPA to occupy the entire field of oil pollution remedies.

Sections 2718(a) and (c) of OPA specifically preserve remedies under State law.   Section

2718(a) is entitled "Preservation of State Authorities" and provides, in pertinent part, as follows:

> Nothing in this Act . . . shall—
>
> (1)  affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to—
>
> > (A)  the discharge of oil or other pollution by oil within such State; or
> >
> > (B)  any removal activities in connection with such a discharge . . . .

33 U.S.C. § 2718(a).  Similarly, § 2718(c), entitled "Additional Requirements and Liabilities,"

states that:

> Nothing in this Act . . . shall in any way affect, or be construed to affect, the authority of . . . any State or political subdivision thereof—
>
> (1)  to impose additional liability or additional requirements; or
>
> (2)  to impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law;
>
> relating to the discharge, or substantial threat of a discharge, of oil.

33 U.S.C. § 2718(c).

Congress, in passing OPA, did not intend to occupy the entire field of recovery for

damage caused by oil spills.  This very Court has held, based in part on the OPA savings clauses

referenced above, that OPA preserves state common law actions for oil spill damages.  In *Isla*

*Corp. v. Sundown Energy L.P*, Civ. Action No. 06-8645, 2007 WL 1240212 (E.D. La. Apr. 27,

2007) this Court held, in the context of a motion to dismiss a complaint asserting OPA and state

law claims, that "OPA does not preempt state law in the area of oil spill liability and compensation." *Id*. at *2. Plaintiff in *Isla Corp.* had sued under OPA for property damage sustained after Hurricane Katrina ruptured oil storage tanks on a drill site owned and operated by the defendant Sundown. *Id.* However, the plaintiff also asserted state law claims for Sundown's alleged failure to take proper precautionary measures in securing the oil storage tanks. *Id.* Sundown moved to dismiss based on its argument that OPA was the exclusive remedy available, while the plaintiff contended that OPA did not preempt state law claims. *Id.*

This Court first acknowledged OPA's savings provision and rejected the defendant's reliance upon *S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65 (1st Cir. 2000) and *Clausen v. M/V New Carissa*, 171 F. Supp. 2d 1127, 1133 (D. Or. 2001), which involved only the preemption of federal, and not state, remedies. Further, this Court also stated that it had already decided in *Tanguis v. Westchester*, 153 F. Supp. 2d 859, 863 (E.D. La. 2001) that OPA "does not preempt state law in the area of oil spill liability and compensation." *Id.* at *2.

Most recently, the United States District Court for the District of Delaware, in *St. Joe Co. v. Transocean Offshore Deepwater Drilling Co.*, C.A. No. 1:10-cv-968-LPS, 2011 WL 915300 (D. Del. March 15, 2011), addressed state law preemption in a case arising out of the Spill. The court's analysis arose in the context of Transocean's removal of the action. Transocean argued that federal question jurisdiction applied because OPA preempted state law tort claims. *Id.* The court concluded that § 2718(a)(1)(A) of OPA "explicitly prevents preemption of state law liability for '*the discharge of oil or other pollution by oil*'" and that this proposition was "confirmed by the legislative history and judicial decisions." *Id.* at *6 (emphasis in original) (citing S. Rep. No. 101–94 (1989) and *U.S. v. Locke*, 529 U.S. 89,106 (2000) ("We have upheld

state laws imposing liability for pollution caused by oil spills . . . .  Our view of OPA's saving clauses preserves this important role for the States")).

According to the court, § 2718(a)(1)(A) drew "no distinction between a State exercising this authority via state common law or a state statutory regime."  *St. Joe. Co.,* 2011 WL 915300 at *8 (citing *Williams v. Potomac Elec. Power Co.,* 115 F. Supp. 2d 561, 565 (D. Md. 2000) (holding that OPA does not preempt state common law actions such as negligence, trespass, strict liability, and nuisance)).  Moreover, the court held that § 2718(a)(2), which provides that OPA shall not be "construed to affect or modify in any way obligations or liabilities of any person under . . . .  State law, including common law," means that "in addition to the preservation of state authority to impose liability above and beyond OPA, any liability existing prior to OPA under State law, including common law, is not altered either."  *Id.* at *8.

Furthermore, there is nothing in OPA which conflicts with state law such that the application of state law would "stand as an obstacle" to Congressional intent in passing OPA. Congress' aim in passing OPA was to provide for the protection of the waters, shores, and natural resources from oil pollution, and Defendants cannot point to any application of state law that would impede this goal.  The United States Supreme Court's decision in *Exxon Shipping Co. v. Baker*, 556 U.S. 471 (2008), is also instructive.  In *Baker*, numerous private party plaintiffs who relied on Prince William Sound for their livelihoods sued Exxon to recover for economic losses, along with punitive damages, after the *Exxon Valdez* disaster.  *Id.* at 476.  The Court held that the CWA's water pollution penalties did not preempt punitive damages awards in maritime spill cases, in part, because it was unlikely that "punitive damages for private harms will have any frustrating effect on the CWA's remedial scheme."  *Id.* at 472.  The Court also concluded that that the plaintiffs' "private claims for economic injury do not threaten . . . interference with

federal regulatory goals with respect to 'water,' 'shorelines,' or 'natural resources.'"  *Id.* at 489 n.7.

Similarly, the application of state law claims for nuisance, trespass or products liability would not have a frustrating effect on OPA's goals, particularly given the savings provisions expressly allowing for such claims.  Consequently, the state law claims are not preempted by OPA.

## II.   UNDER OCSLA CHOICE-OF-LAW ANALYSIS, FEDERAL MARITIME LAW ALSO APPLIES AND DOES NOT PREEMPT STATE LAW.

Under OCSLA, despite OPA's displacement of its liability and compensation schemes, as discussed, *supra*, application of the choice-of-law framework the courts have developed under OCSLA establishes that both maritime law and the state law of the various affected states still apply to this case.

Congress's purpose in enacting OCSLA "was to define a body of law applicable to the seabed, the subsoil, and the fixed structures . . . on the outer Continental Shelf."  Rodrigue v. Aetna Cas. & Sur. Co., 395 U.S. 352, 361 (1969).  OCSLA provides "comprehensive" choice-of-law rules that delineate the locations on the OCS where federal law or state law can be used as surrogate federal law.  Demette v. Falcon Drilling Co., 280 F.3d 492, 495 (5th Cir. 2002).  The relevant provisions in OCSLA state:

> The Constitution and laws and civil and political jurisdiction of the United States are hereby extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State . . . .

43 U.S.C. § 1333(a)(1).

21

> To the extent that they are applicable and not inconsistent with this Act or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are hereby declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf . . . .

43 U.S.C. § 1333(a)(2)(A).

Based on these provisions, the Fifth Circuit Court of Appeals, in Union Tex. Petroleum Corp. v. PLT Eng'g, Inc., 895 F.2d 1043 (5th Cir. 1990), developed a three-part test (the "PLT test") to determine what law to apply in a case arising on the OCS. The PLT test prescribes that state law will apply as surrogate federal law when three conditions are met: (1) the controversy arises on an OCSLA situs; (2) federal maritime law does not apply of its own force; and (3) the state law is not inconsistent with federal law. Demette v. Falcon Drilling Co., 280 F.3d 492, 497 (5th Cir. 2002) (citing PLT Eng'g, 895 F.2d at 1047). Because federal maritime law applies of its own force to the Spill, state law does not apply as surrogate federal law. However, assuming *arguendo*, that OCSLA applies to the present case as argued by Defendants, state law claims are nonetheless appropriate because Louisiana's state law claims meet the test set forth by the Fifth Circuit and other courts for application of the law of the adjacent state as "surrogate federal law" under OCSLA.

### A. General Maritime Law Applies Of Its Own Force, And Therefore State Law Does Not Apply As Surrogate Federal Law.

Although the Spill occurred on the OCS, substantive maritime law will govern where admiralty and OCSLA jurisdiction overlap. Laredo Offshore Constructors, Inc. v. Hunt Oil Co., 754 F.2d 1223, 1229 (5th Cir. 1985). Admiralty jurisdiction exists over a tort claim when (1) the tort occurs on navigable water, (2) the incident has a potentially disruptive impact on maritime

commerce, and (3) the, "general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534 (1995). Additionally, the Admiralty Extension Act provides that "[t]he admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." 46 U.S.C. app. § 740 (2004).

The locality and nexus requirements for admiralty tort jurisdiction set forth in Grubart are satisfied here. The oil spill occurred as a result of the blowout on the Deepwater Horizon forty miles off the coast of Louisiana in the Gulf of Mexico. The Deepwater Horizon can be treated as a vessel on navigable water. Diamond Offshore Co. v. A & B Builders, Inc., 302 F.3d 531, 544 n.12 (5th Cir. 2002) ("the Ocean Concorde is a semi-submersible drilling rig, which is undisputably a vessel . . . ."); Domingue v. Ocean Drilling and Exploration Co., 923 F.2d 393, 394 n. 1 (5th Cir. 1991) ("We have consistently applied general maritime law . . . to accidents aboard special-purpose watercraft such as submersibles, semi-submersibles, jack-ups, and other similar rigs").[4] The blowout and resulting spill had an actual disruptive impact on maritime commerce in the Gulf of Mexico. Oil and gas drilling, when conducted from a vessel such as the Deepwater Horizon, has long been held to be a traditional maritime activity. Theriot v. Bay Drilling Corp., 783 F.2d 527, 538-539 (5th Cir. 1986); Pippen v. Shell Oil Co., 661 F.2d 378, 384 (5th Cir. 1981).

---

[4] The classification of the *Deepwater Horizon* as a vessel, for purposes of this subsection, does not take into account that this case involves both the *Deepwater Horizon* and the blown-out Macondo well. Under OPA, the *Deepwater Horizon* is also a mobile offshore drilling unit ("MODU"). OPA defines MODU as " a vessel…capable of use as an offshore facility." 33 U.S.C. § 2701(22). "Offshore facility" is defined as "any facility of any kind located in, on or under the navigable waters of the United States…other than a vessel or a public vessel. 33 U.S.C. § 2701(22). For purposes of OPA Sections 2704(b)(1) and (2), a MODU is capable of being used as an offshore facility. Thus, in this case, for purposes of *admiralty jurisdiction*, the MODU may or may not be a vessel. *See also* 33 U.S.C. § 2701(25) (defining "Outer Continental Shelf facility")

Maritime law applies of its own force.  Therefore, under the PLT test, state law does not apply as surrogate federal law.  However, that does not end the inquiry because maritime law does not preempt the application of state law.

**B.      General Maritime Law Does Not Preempt State Law In This Matter.**

At least one Defendant has argued that regardless of OPA, Louisiana's state law claims are preempted by general maritime law (which, according to Defendants, is in turn preempted by OPA).  The Defendants miss the mark on this question as well.  It is settled law that state law supplements maritime law where maritime law is silent.  As this Court has noted, "the Supreme Court has approved the application of State law where it serves to supplement, but not contravene, the general maritime law by filling a 'gap' therein."  *Rogers v. Coastal Towing, L.L.C.*, 723 F. Supp. 2d 929, 933 (E.D. La. 2010) (citing *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199 (1996)).  Further, a state law may not supplement the general maritime law where the State law (i) conflicts with an applicable act of Congress, (ii) works material prejudice to a characteristic feature of the general maritime law, or (iii) interferes with the proper harmony and uniformity of the general maritime law in its international and interstate relations. *Id.* (citing *S. Pacific Co. v. Jensen*, 244 U.S. 205, 216 (1917)).

In the present matter, Defendants fail to demonstrate how a state law claim for nuisance, trespass or products liability arising out of oil-spill-related damage sustained by non-seamen in any way, shape or form interferes with "characteristic feature(s) of the general maritime law."  Neither have they demonstrated, nor can they demonstrate, interference of such claims with the "proper harmony and uniformity of the general maritime law in its international and interstate relations."  The claims brought by Louisiana in this matter are in fact the very types of state law claims intended to "fill the gap" in an area where maritime law is entirely

silent.  This is exactly the scenario contemplated by the wide range of case law providing for state law remedies in the absence of comparable maritime remedies, where there is no conflict between the two.

The seminal case in this regard is *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199 (1996), where the United States Supreme Court allowed application of state law in a matter involving an accident causing injury to a non-seaman in state territorial waters.  *Id.* at 206.  In *Yamaha*, the parents of a girl killed in a jet ski collision in territorial waters off Puerto Rico sued the jet ski's manufacturer and distributor.  *Id.* at 199.  The suit was a federal diversity and admiralty action for damages and invoked Pennsylvania's wrongful-death and survival statutes.  *Id.*  The district court agreed with Yamaha that the federal maritime wrongful-death action recognized in *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375 (1970) controlled to the exclusion of state law, but the Supreme Court ultimately found otherwise.

The *Yamaha* Court concluded that in maritime wrongful-death cases in which no federal statute specifies the appropriate relief and the decedent was not a seaman, longshore worker, or person otherwise engaged in a maritime trade, state remedies remain applicable and have not been displaced by the wrongful-death action recognized in *Moragne*.  *Id.* at 199.  Rejecting the defendants' argument that the wrongful-death action provided by *Moragne* "covers the waters, creating a uniform federal maritime remedy for all deaths occurring in state territorial waters, and ousting all state remedies previously available to supplement general maritime law," the Court reasoned that *Moragne* did not apply because maritime issues such as "unseaworthiness were not at issue."  *Id.* at 200.  The Court held that "[t]he uniformity concerns that prompted the *Moragne* [decision] . . . related to ships and the workers who serve them, and to the frequent unavailability of unseaworthiness, a distinctively maritime substantive concept, as a basis of

liability under state law." *Id.*  It is worthy of note that in so ruling, the Court also stated that States have "traditionally contributed to the provision of environmental and safety standards for maritime activities." *Id.* (citing *Askew v. American Waterways Operators, Inc.,* 411 U.S. 325 (1973) (oil pollution case))*; see also Sun Ship, Inc. v. Pa.*, 447 U.S. 715 (1980) (holding that a State may apply its workers' compensation scheme to land-based injuries that fall within the compass of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.*)); *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co*., 513 U.S. 527, 545 (1995); *J. Ray McDermott v. Vessel Morning Star*, 457 F.2d 815, 818 (5th Cir. 1972) (*en banc*); *Coastal Iron Works, Inc. v. Petty Ray Geophysical*, 783 F.2d 577, 582 (5th Cir. 1986) (holding that "state law may supplement maritime law where maritime law is silent").

      **C.**      **Maritime Law Does Not Preempt State Police Power To Regulate Sea-To-Shore Pollution.**

"With admiralty jurisdiction comes the application of substantive admiralty law."  E. River S.S. Corp. v. Transamerica Delaval Inc., 476 U.S. 858, 864 (1986).  However, admiralty jurisdiction does not automatically displace state law.  In certain instances, admiralty courts apply state law.  Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, 206 (1996); Grubart, 513 U.S. at 545.  Specifically, a state, in the exercise of its police powers, may enact rules that affect maritime activities, provided that "the state action does not contravene any acts of Congress, nor work any prejudice to the characteristic features of the maritime law, or interfere with its proper harmony and uniformity in its international and interstate relations."  Askew v. Am. Waterways Operators, Inc., 411 U.S. 325, 339 (1973) (quoting Just v. Chambers, 312 U.S. 383, 389-390 (1941)).

In Askew, a pre-OPA case, the Court considered an action by shipping interests to enjoin application of the Florida Oil Spill Prevention and Pollution Control Act.  The Florida law

provided for the state's recovery of clean-up costs and imposed no-fault liability for oil spill damage to the state or private persons.  Askew, 411 U.S. at 327-328.  The Court reversed the district court's ruling that the Florida law was an unconstitutional intrusion on the federal maritime domain, stating as follows:

> To rule as the District Court has done is to allow federal admiralty jurisdiction to swallow most of the police power of the States over oil spillage-an insidious form of pollution of vast concern to every coastal city or port and to all estuaries on which the life of the ocean and the lives of the coastal people are greatly dependent.

Askew, 411 U.S. at 328-329.  In upholding the Florida law, the Court stated that, "[h]istorically, damages to the shore or to shore facilities were not cognizable in admiralty." Id. at 340.  In 1948 Congress enacted the Admiralty Extension Act, which extended admiralty and maritime jurisdiction to include damage on land caused by a vessel on navigable water, but absent a clear conflict with federal law, state regulation was permissible.  Id. at 341.  The Court held that, "[i]t follows, a fortiori, that sea-to-shore pollution-historically within the reach of the police power of the States-is not silently taken away from the States by the Admiralty Extension Act, which does not purport to supply the exclusive remedy." Id. at 343.

Therefore, to the extent that the various state laws of the Gulf Coast States exercise their police powers by enacting rules governing damages in their states caused by oil spills, these rules are not preempted by maritime law.

### D.     OPA Preserves The Holding In Askew That State Law Is Not Preempted By Maritime Law From Applying To Oil Spills.

The holding in Askew was reiterated by the Supreme Court in U.S. v. Locke, 529 U.S. 89 (2000), after OPA was enacted.  In Locke, an oil tanker trade association sought declaratory and injunctive relief from Washington State regulations on oil tankers promulgated in the aftermath of the Exxon Valdez oil spill.  Locke, 529 U.S. at 96-97.  In holding that the Washington

regulations were preempted by federal regulations, the Court noted that the OPA savings clauses are found in Title I of the Act, entitled Oil Pollution and Compensation, which creates a liability scheme for oil pollution.  Id. at 105.  The Court reasoned that, "[p]lacement of the savings clauses in Title I of OPA suggests that Congress intended to preserve state law of a scope similar to the matters contained in Title I of OPA . . . ."  The State's attempt to regulate vessel operation, design and manning was held to be outside the scope of Title I.  Id.  In so holding, the Court affirmed the holding in Askew as an example of the proper exercise of the state's police power to regulate oil spills under both maritime law and the OPA savings clauses, stating:

> Limiting the savings clauses as we have determined respects the established federal state balance in matters of maritime commerce between the subjects as to which the States retain concurrent powers and those over which the federal authority displaces state control.  *We have upheld state laws imposing liability for pollution caused by oil spills.  Our view of OPA's savings clauses preserves this important role for the States, which is unchallenged here*.

Locke, 529 U.S. at 106 (emphasis added) (internal citations omitted).

The state laws under which the claims at issue in this case arise create liability schemes for oil pollution consistent with the proper exercise of the states' police power.  These claims, therefore, are not preempted by maritime law, just as they are not preempted by OPA, as addressed, *supra*.  Choice of law analysis under OCSLA, to the extent it applies, compels the same result.  Accordingly, Defendants' Motions to Dismiss should be denied insofar as they seek to preempt state law and maritime claims.

### E.  Alternatively, Even if OCSLA is Applicable, Louisiana's State Law Claims Are Appropriate Under OCSLA's Choice-of-law Provisions.

Several Defendants argue that since the Spill arises out of exploration, drilling, and production-related well operations on the outer continental shelf, OCSLA applies, and under OCSLA, federal law (OPA or the general maritime law) preempts all state common law (or in

Louisiana's case, civil code) claims.  According to this argument, state law may only apply as "surrogate" federal law if federal maritime law does not apply of its own force and the state law is not inconsistent with federal law, *i.e.*, where there is a "gap" in federal legal coverage such that state law applies as "surrogate" federal law under OCSLA.  Defendants, however, argue that there is no "gap" and that OPA and the general maritime law apply to the exclusion of state law.

If OCSLA applies to the present case as argued by Defendants, state law claims are nonetheless appropriate because Louisiana's state law claims meet the test set forth by the Fifth Circuit and other courts for application of state law as "surrogate federal law" under OCSLA.  As the Fifth Circuit stated in *Bartholomew v. CNG Producing Co.,* 862 F.2d 555, 557 (5th Cir. 1989), federal law thus "governs actions under OCSLA to the extent that there is applicable federal law; however, if there is a gap in the federal law, the law of the adjacent state is used as a gap-filler and becomes surrogate federal law."  *Id., see also Mathis v. Union Exploration Partners, Ltd.*, 1990 WL 150122, *1 (E.D. La. Dec. 2, 1990) (holding that OCSLA "adopts state law as surrogate federal law"); *Rodrigue v. Aetna Casualty Co.*, 395 U.S. 353, 357 (1969).

In the present case, it is beyond dispute that Louisiana qualifies as the "adjacent" state for purposes of gap-filling state law.  In *Snyder Oil Corp. v. Samedan Oil Corp.*, 208 F.3d 521, 524 (5th Cir. 2000), the Fifth Circuit held that four types of evidence are considered by a district court to determine which state is adjacent to an OCS location: (1) geographic proximity; (2) which coast federal agencies consider the subject platform to be "off of;" (3) prior court determinations; and (4) projected boundaries.  As BP has conceded in its Motion to Dismiss the B1 Pleading Bundle claims, Louisiana is geographically closer than any other Gulf Coast State. (*See* Ex. 17, BP Motion to Dismiss (Doc. 1440)).  Secondly, OCS locations falling within the Mississippi Canyon field are adjacent to Louisiana.  In this regard, courts have applied Louisiana law as

surrogate federal law in this scenario. *See Ronquille v. MMR Offshore Servs., Inc.*, 353 F. Supp. 2d 680 (E.D. La. 2004); *Dennis v. Bud's Boat Rental, Inc.*, 987 F. Supp. 948 (E.D. La. 1997). Finally, Louisiana qualifies as the "adjacent" state based on boundary projection. The Macondo well clearly falls within Louisiana boundaries when state boundaries of Texas, Louisiana and Mississippi are projected seaward. In this regard, as BP points out, there is precedent for establishing such an obvious fact via judicial notice. *See Bourg v. BT Operating Co.*, No. H-08-0596, 2009 WL 960011, at *4 (S.D. Tex. Apr. 8, 2009) (holding Louisiana to be nearest state based on online resources and maps).

The State law claims by Louisiana also qualify as "gap-filling" law if traditional maritime law does not apply, requiring the application of Louisiana law as "surrogate federal law." This argument is well illustrated by the Fifth Circuit's decision in *Texaco Exploration and Production, Inc., v. AmClyde Engineered Products Co., Inc.*, 448 F.3d 760 (5th Cir. 2006). In *Texaco*, two oil companies brought a product liability action against a company that had manufactured a crane used in the offshore construction of an oil and gas production facility, on the theory that a defect in the crane had caused an expensive deck section to fall into the Gulf of Mexico. *Id.* at 765. After an initial analysis of the district court's OCSLA jurisdiction, the court first concluded that, because the matter involved "platform construction" on the Outer Continental Shelf, OCSLA jurisdiction applied pursuant to 43 U.S.C. § 1349(b)(1). *Id.* at 768. The court further noted that such federal question jurisdiction under OCSLA is expressly "independent of any additional maritime basis for federal jurisdiction," and overruled the district court's conclusion that admiralty alone was the basis for federal jurisdiction. *Id.*

However, the court then held that state law was applicable as "gap-filling" law for purposes of the products liability and negligence claims at issue. *Id.* at 772. The court's decision

was based on OCSLA, 43 U.S.C. § 1333(a)(2)(A), which provides that state laws apply "to the extent that they are applicable and not inconsistent with [OCSLA] or with other Federal laws and regulations." *Id.* at 772. The court rejected the arguments of both parties that maritime law controlled based on their contractual "choice-of-law" provision. *Id.* In so holding that the products liability and negligence actions for the crane mishap were appropriately made as "gap-filling" state law, the court relied upon *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969). There, the Supreme Court had addressed whether state law was applicable by virtue of OCSLA's choice of law provision in a tort case involving two fatal accidents on artificial drilling rigs on the Outer Continental Shelf. *Id.* at 772-3 (citing *Rodrigue* at 352). The *Rodrigue* Court held that the sole remedy arose under state law and rejected wholesale the application of admiralty law, explaining that "the accidents had no more connection with the ordinary stuff of admiralty than do accidents on piers." *Rodrigue*, 395 U.S. at 355. Moreover, the *Texaco* court concluded that "the distinctive text and legislative history of OCSLA weigh against the application of admiralty law to claims arising out of the accidental death of shelf workers on platforms." *Id.* at 773.

In the present matter, if OCSLA applies as argued by Defendants, the incident nevertheless arose on an offshore drilling unit on the Outer Continental Shelf in the context of oil and gas production, and resulted in the despoliation of the environment through the pollution of Louisiana's natural resources. Under such an analysis, maritime law would not apply "by its own force" because these activities and harms bear no more relation to "traditional maritime" activity than those addressed in *Texaco* or *Rodrigue*. State law claims by Louisiana including nuisance, trespass, and product liability would therefore be available under 43 U.S.C. § 1333. *See also Moody v. Callon Petroleum Operating Co.*, 37 F.Supp.2d 805 (E.D. La. 1999) (holding

that state law applied as "surrogate" gap-filling law where plaintiff had filed under Louisiana's "Direct Action" statute against insurer after being injured in slip-and-fall on offshore drilling platform).  Nonetheless, as discussed, *supra*, even if OCSLA did not apply to the present case, general maritime law would apply and state law remedies such as nuisance and trespass would be appropriate in the absence of comparable maritime remedies.

## III.   THE SPILL WAS NOT AN AUTHORIZED DISCHARGE UNDER THE CWA AND THE CWA DOES NOT PREEMPT STATE LAW CLAIMS HERE.

BP argues that because the *Deepwater Horizon* drilling rig was covered by a CWA general permit, the 5 million barrels of oil discharged are not subject to challenge under the laws of any of the affected states.  Relying on *Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987) and its progeny, Defendants analogize the Spill to cases of interstate water pollution.  In that context, federally-authorized discharges in one state cannot be challenged under the affected state's nuisance or other laws because only the laws of the source state apply.  Here, Defendants assert that because the Spill occurred on the OCS, there is no source state, and only federal law applies. Defendants' arguments are meritless.

The *Ouellette* line of cases applies only when the complained-of discharge is authorized by a permit issued under a federal regulatory scheme.  *See Ouellette,* 479 U.S. at 494-95 (holding that in cases of EPA-permitted discharges, laws of an affected state are preempted by CWA; which limits the right to administer the NPDES permit system to EPA and the source state only, not the affected state).  The permit allegedly at issue here is the "National Pollutant Discharge Elimination System (NPDES) General Permit for Discharges from the Offshore Subcategory of the Oil and Gas Extraction Category" ("OCS General Permit").  The OCS General Permit sets limits on the amount and type of pollutants that may be discharged from offshore drilling platforms, and establishes requirements for monitoring and reporting those discharges.  The OCS

General Permit is meant to regulate incidental discharges associated with offshore oil and gas activities by controlling potential pollutant sources such as drilling fluids, drill cuttings, produced water, sanitary waste, and deck drainage.   Importantly, the permit prohibits any sort of oil discharge from the offshore activities.   *See, e.g., NPDES No. GMG290000* I(B)(1)(a) (no discharge of oil-based drilling fluids, oil-contaminated drilling fluids, diesel oil); *NPDES No. GMG290000* I(B)(2)(a) (no discharge of drill cuttings from oil-contaminated drilling fluids, diesel oil-based drilling fluids, or mineral oil-based drilling fluids); *NPDES No. GMG290000* I(B)(1)(b) ("no free oil shall be discharged"); *NPDES No. GMG290000* I(B)(2)(b) ("no free oil shall be discharged"); *NPDES No. GMG290000* I(B)(10)(a) ("no free oil shall be discharged").

Most significantly–and omitted from BP's arguments–the permit completely bans any release of formation oil.   *See NPDES No. GMG290000* I(B)(2)(c)(2) ("Formation Oil.   No discharge.").   The OCS General Permit did not permit BP and the other Defendants to release the millions of gallons of formation oil discharged to the Gulf of Mexico.   The oil released as a result of the well blowout and rig explosion was an unauthorized discharge under the CWA.   As such, liability and compensation for injuries associated with that release are covered exclusively by OPA, including application of state and maritime laws preserved through its savings clauses. Defendants' Motions to Dismiss based upon CWA preemption must be denied.

## IV.   PLAINTIFFS' LAWSUITS SHOULD NOT BE DISMISSED FOR LACK OF PRESENTMENT.

Defendants argue that Plaintiffs who fail to allege compliance with the presentment procedures outlined by 33.U.S.C. § 2713 must have their OPA claims dismissed.   Defendants assert that such presentment is a "mandatory condition precedent" which is jurisdictional in nature and that failure of a plaintiff to comply strips the Court of OPA jurisdiction.   These arguments should be rejected for the following reasons:   (1) "presentment" requires a factual

analysis and is not appropriate for dismissal on the face of the pleadings; (2) the OPA presentment procedure is not jurisdictional and the Court retains authority to excuse any perceived deficiencies in claims presentment, especially, here, given the ineffectual claims process established by BP and Ken Feinberg; (3) OPA explicitly permits a party to sue at any time to recover removal costs, and claims for damages brought in conjunction with claims for removal costs are permissible, irrespective of whether OPA presentment was made; and (4) the presentment procedure is not applicable to government claims which are necessarily more complex and multifaceted than private party claims.[5]

### A.  A Factual Inquiry Into The Sufficiency Of Presentment Is Not Appropriate At This Time.

First, as a matter of procedure, Defendants' challenges to Plaintiffs' claims on the basis that certain Plaintiffs have not properly first presented their claims under OPA is premature and should be rejected.  Whether any given Plaintiff has satisfied OPA's presentment procedures is a fact-specific inquiry that is not appropriate for dismissal on the face of the pleadings.

### B.  The OPA Presentment Procedure In 33 U.S.C. § 2713 Is Not Jurisdictional.

Defendants argue that the OPA presentment procedure is jurisdictional and that a plaintiff's failure to present a claim to the responsible party pursuant to 33 U.S.C. § 2713 strips a court of OPA jurisdiction and requires a court to dismiss those claims.

Although courts have used the term "jurisdictional" in discussing § 2713, recent case law establishes that such a designation is not accurate or appropriate.  As is discussed in detail in the Mexican States' Memorandum in Response and Opposition to the Motions to Dismiss, not all

---

[5] Strict adherence to the notion of presentment as applied to government claims would cause unnecessary piece-meal litigation and would not serve the interests of judicial economy, especially in light of the conflicting deadlines such as the claims filing deadline for the Limitations proceedings.  The Limitations proceeding instituted by the Transocean Defendants both complicates and frustrates any presentment requirement under these circumstances. Plaintiffs have been directed to file any claim against Transocean on or before April 20, 2011, regardless of the presentment process.  Moreover, the State's damages continue to unfold and accumulate.

mandatory procedural rules are properly typed as jurisdictional.  *See Henderson v. Eric Shinsekie, Sec'y of Veterans Affairs*, 131 S. Ct. 1197, 1206 (2011) (holding that a provision of the Veterans' Judicial Review Act, which imposes a 120-day deadline on filing a notice of appeal with the Veterans Court, is not jurisdictional, despite being cast in mandatory language); *Union Pac. R.R. Co. v. Locomotive Eng'rs and Trainmen Gen. Comm. of Adjustment, Central Region,* 130 S. Ct. 584, 599 (2009) (holding that a procedural rule prescribed by the National Railroad Adjustment Board ("NRAB"), which requires proof of conferencing prior to the arbitration of minor disputes before the NRAB, was not jurisdictional in nature, despite the Board's characterization to the contrary).  The OPA presentment procedure of 33 U.S.C. § 2713 should not be branded "jurisdictional."

The United States Supreme Court recently stated in *Henderson* that "[a]mong the types of rules that should not be described as jurisdictional are what we have called 'claim-processing rules.'"  *Henderson,* 131 S.Ct. at 1203.  "These are rules that seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times."  *Id.*; *see also Union Pac. R.R. Co.*, 130 S. Ct. at 597-98.  In deciding whether a procedural rule that must generally be exhausted is or is not jurisdictional, courts look to see if there is any "clear" indication that Congress wanted the rule to be "jurisdictional."  *Henderson*, 131 S. Ct. at 1203.

Here, § 2713 does not suggest that Congress wanted that provision to be treated as having jurisdictional consequences.  Section 2713 does not speak in jurisdictional terms or refer to the jurisdiction of courts.  The presentment procedures contained in subsections (a) and (c) of § 2713 are directed to the claimant, not the court.  They do not in any way define, mention or limit federal jurisdiction.  Instead, OPA's presentment procedure is included in the subchapter of OPA

35

entitled "Claims procedure" and is clearly aimed at serving a "claims-processing" function.  *See Henderson*, 131 S. Ct. at 1205.  Although Congress could have elected to place the presentment procedure in § 2717—the OPA subchapter entitled "Litigation, jurisdiction, and venue"—it did not.  Section 2717 broadly confers on federal courts, the "exclusive original jurisdiction over all controversies arising under the Act."  Nothing in the jurisdictional provisions of § 2717 suggests that the Court's jurisdiction is dependent upon a Plaintiff's satisfaction of the presentment procedure.  Importantly, § 2717(f)(2) specifically provides that an action for the recovery of removal costs may be brought "*at any time* after such costs have been incurred" without regard to the presentment procedure referenced in § 2713.  33 U.S.C. § 2717(f)(2) (emphasis added).  Read together, these sections of OPA militate against presentment as a jurisdictional bar.

The court in *LeBoeuf v. Texaco*, 9 F. Supp. 2d 661 (E.D. La. 1998), agreed.  In *LeBoeuf*, this Court declined to hold that § 2713 deprived it of jurisdiction over OPA claims when the plaintiff had not first complied with OPA's presentment and claims procedure. *Id* at 666. Instead, the Court held that "[t]he presentment requirements of 33 U.S.C. § 2713 [were] not jurisdictional." *Id.*  While the presentment procedure might create a mandatory condition precedent, it was "more in accord with an exhaustion of administrative process." *Id.* at 665-66.

To evaluate whether a procedural requirement that must be exhausted is jurisdictional, courts look to the language of the statute as the key.[6] *See Dawson Farms, LLC v. Farm Serv. Agency*, 504 F.3d 592, 605-06 (5th Cir. 2007).  In particular, "one important factor in deciding

---

[6] The Fifth Circuit Court of Appeals in *Dawson* held that 7 U.S.C. § 6912 (e), requiring that all administrative appeal procedures be exhausted before a "person may bring an action in a court of competent jurisdiction" against the Secretary of the Department of Agriculture, is not a jurisdictional requirement that deprives federal courts of jurisdiction to consider excusing a failure to exhaust administrative remedies.  *Dawson Farms, LLC v. Farm Serv. Agency*, 504 F.3d 592 (5th Cir. 2007).  The appellate court further held that because the procedural requirement was not jurisdictional, the district court erred in concluding that the plaintiff's failure to exhaust administrative procedures deprived it of subject matter jurisdiction and the court should have determined whether under the circumstances of the case, the plaintiff should have been excused from exhausting the administrative procedures. *Id.*

whether exhaustion is 'textually required' or 'statutorily mandated' is whether the statute explicitly mentions and deprives federal courts of jurisdiction if administrative remedies are not exhausted." *Id.* at 605. Here, §§ 2713(a) and (c) are clearly directed to the claimant, not the court. 33 U.S.C. §§ 2713(a), (c). The language governs claims procedure, but does not in any way define, mention, or limit federal court jurisdiction. *Id.* Further, § 2717 broadly confers on federal courts the "exclusive original jurisdiction over all controversies arising under the Act." 33 U.S.C. § 2717(b). These considerations lead to the conclusion that presentment is not a jurisdictional prerequisite and the rule requiring pre-suit presentment does not impose any jurisdictional limitations on the Court as to claims filed by the Plaintiffs. *See Ace Prop. and Cas. Ins. Co. v. Fed. Crop Ins. Corp.*, 440 F.3d 992, 999 (8th Cir. 2006).

Defendants' argument that the Court lacks subject matter jurisdiction for any failure of Plaintiffs in following the OPA presentment procedure should be rejected.[7] In light of *Henderson*, the text of OPA clearly demonstrates that a failure to satisfy presentment does not divest the Court of OPA jurisdiction. Rather, a plaintiff's failure to exhaust the presentment procedure is a procedural defect that could be excused by the Court taking into consideration the circumstances.

### C. The Court Has Authority To Excuse Lack Of Compliance With The Presentment Procedure.

While the presentment procedure must generally be exhausted, under certain circumstances, the failure to exhaust the presentment procedure may be excused by the Court.

---

[7] Even if the Court should determine that OPA presentment is "jurisdictional," it is well within the authority of the Court to resolve factual disputes to determine jurisdiction over each Plaintiff's claims. Under the circumstances, rather than dismissing Plaintiffs' claims, it would be appropriate for the Court to consider the fact of compliance with the OPA presentment procedure on a case by case basis. *Dillon v. Rogers*, 596 F.3d 260, 271 (5th Cir. 2010) ("[W]hen subject matter jurisdiction over a case turns on disputed facts, judges have the power to resolve these disputes in assuring themselves of their courts' jurisdiction.") (citations omitted)).

*See, Dawson Farms, LLC,* 504 F.3d at 594-95.  Exhaustion of a procedural rule may be excused when:

> (1) the unexhausted administrative remedy would be plainly inadequate, (2) the claimant has made a constitutional challenge that would remain standing after exhaustion of the administrative remedy, (3) the adequacy of the administrative remedy is essentially coextensive with the merits of the claim (*e.g.*, the claimant contends that the administrative process itself is unlawful), and (4) exhaustion of administrative remedies would be futile because the administrative agency will clearly reject the claim or when (5) irreparable injury will result absent immediate judicial review.

*Id.* at 606 (citations omitted).

This case is one in which it is appropriate for the Court to consider excusing failures of Plaintiffs to comply with the OPA presentment procedure.  Under the circumstances of this Spill, strict compliance with OPA presentment may be all but impossible.  OPA requires a claimant to present a request in writing for a sum certain for compensation for damages or removal costs resulting from an incident.  33 U.S.C. § 2701(3).  A "sum certain" for each type of damages and evidence to support each claim is generally required.  *Johnson v. Colonial Pipeline Co.*, 830 F. Supp. 309, 311 (E.D. Va. 1993).  Given the unprecedented size of the Spill, the scope of the cleanup process, the complexity of the legal issues, and the impossibility of quantifying sum-certain damages for harm that is still occurring and the extent of which will be unknowable for many years to come, the matter is one best addressed through the judicial process.  *See U.S. v. M/V Cosco Busan*, 557 F. Supp. 2d 1058, 1061 (N.D. Cal. 2008).

Moreover, this case is unique in that the BP Defendants have keen actual knowledge of the nature of the claims for damages, the basis for claiming damages, and the anticipated yet uncertain magnitude of the imminent damages.  For the year since the date of the Spill, Defendants have been well aware of the positions of many of the Plaintiffs and the nature of their damages, and importantly, that sum-certain damages for many claimants cannot presently be

quantified due to the sheer magnitude of the harm inflicted.  Without the ability to present a sum-certain amount, attempts to comply with the presentment procedure are futile.

Under the circumstances, participation in the claims process will not provide a superior mechanism to establish a level of certainty in damages or to foster negotiation and settlement. Claims processing will more likely promote protracted delay to the resolution of claims, since the process is specifically designed to resolve only sum-certain damages.  The courts are better equipped to promote settlement negotiations and resolve uncertain damages through the use of the discovery process with the aid of expert testimony.   Therefore, the Court should reject Defendants' arguments that strict adherence to OPA's presentment procedure is required, and allow Plaintiffs to pursue their claims in court, a more appropriate forum for uncertain claims and far superior to the Gulf Coast Claims Facility claims process which will inevitably prove futile to many.

### D.     A State's OPA Claim May Proceed Without First Being Presented To The Responsible Party.

Defendants argue that government claims pursuant to OPA must be dismissed if not first presented to BP in accordance with the procedure set forth in 33 U.S.C. § 2713.  Defendants' arguments on this point fail.

BP and the other Defendants rely heavily on *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., Inc*., 51 F.3d. 235 (11th Cir. 1995), and its progeny for the proposition that OPA presentment is mandatory.[8]  Neither *Boca Ciega* nor its progeny provide a solid foundation for Defendants' argument that government claimants must present claims for response costs and damages prior to filing a lawsuit.  Under *U.S. v. M/V Cosco Busan*, 557 F. Supp. 2d 1058 (N.D. Cal. 2008), such

---

[8]  *See* Doc 1440-1 at 3, 20, 23 n. 15 (BP); Doc 1406-1 at 21 (BP); Doc 1786-1 at 8 (BP); Doc 1390-1 at 5 (Transocean); Doc 1429-1 at 19 (Halliburton); Doc 1414-1 at 13-4 (MOEX); Doc 1416-1 at 20-2 (Anadarko); Doc 1426 at 18-9 (Anadarko).

result is not mandated.[9]  The *Cosco Busan* court is the only court that has directly decided the issue as it relates to government claims, and it explicitly rejected the *Boca Ciego* holding upon which the Defendants rely.  The *Cosco Busan* court distinguished *Boca Ciega* because it involved private party plaintiffs seeking damages and not removal costs, and because the only issue before that court was whether the OPA claims presentment procedure applied only "to actions seeking to recover from the OPA-created cleanup fund… [and] not to actions brought directly against the responsible party." *Cosco Busan,* 557 F. Supp. 2d at 1062.

In *Cosco Busan*, the United States (the "Government") filed suit against a vessel owner, vessel operator and vessel pilot to recover damages incurred after the vessel at issue collided with a bridge, causing more than 50,000 gallons of fuel to spill into the San Francisco Bay. *Cosco Busan*, 557 F. Supp. 2d at 1059-60.  The Government asserted claims under OPA, CWA, the National Marine Sanctuaries Act, and the Park System Resource Protection Act.  *Id*. at 1060. The defendants moved to dismiss or stay the proceedings, asserting that the court lacked jurisdiction over the Government's OPA causes of action because the Government had failed to follow the presentment procedure outlined in 33 U.S.C. § 2713.  *Id*. at 1059-60.  The specific issue before the court was "whether the Government [was] bound by these [presentment] requirements." *Id*. at 1060.  Notwithstanding the defendants' reliance on *Boca Ciega*, the court in *Cosco Busan* denied the defendants' motion to dismiss or stay the Government's OPA claims, holding that it did have jurisdiction to hear the Government's OPA causes of action.  *Id*. at 1063.

---

[9] Other courts have decided that certain types of claims are not subject to OPA's presentment requirement.  *See Russo v. M/T Dubai Star*, No. C 09-05158, 2010 WL 1753187, at *3 (N.D. Cal. Apr. 29, 2010) (applying OPA presentment procedure only to claims brought under OPA and not to state law claims); *Turner v. Murphy Oil USA, Inc.*, Civ. Action No. 05-4206, 2007 WL 4208986, at *2-3 (E.D. La. November 21, 2007) (same); *Isla Corp. v. Sundown Energy, LP*, 06-8645, 2007 WL 1240212, at *1-2 (E.D. La. April 27, 2007) (same); *Abundiz v. Explorer Pipeline Co.*, No. Civ. A. 300CV2029H, Civ. A. 303CV508H, Civ. A. 303CV0787H, 2003 WL 23096018, at *3-4 (N.D. Tex. Nov. 25, 2003) (same); *Williams v. Potomac Elec. Power Co.*, 115 F.Supp.2d 561, 565 n.3 (D. Md. 2000) ("OPA does not preempt ... state common law actions .... [a]nd there is, in consequence, no requirement for the presentment of claims under OPA prior to commencing suit.").  Therefore, any claims brought under state law, as opposed to OPA, are not subject to the OPA presentment procedure.

The court reasoned that § 2717(f)(2) allowed an action for the recovery of *removal costs* incurred by the United States, a State, an Indian Tribe, or a person acting pursuant to the National Contingency Plan to be initiated "*at any time* after such costs have been incurred."  *Id*. at 1060-61 (emphasis added).  Thus, by statute, presentment of removal costs is not required.

The *Cosco Busan* court also considered "whether the Government's *damages* claims under the same OPA causes of action [could] proceed without first being presented to the Responsible Party." *Cosco Busan*, 557 F. Supp. 2d. at 1062 (emphasis added).  The court held, "in the interest of judicial economy," that the Government's damages claims could proceed with the removal costs claims without first being presented to the Responsible Party.  *Id*.  In so holding, the Court reasoned that:

> [g]iven that the removal costs and damages are both sought under the same OPA causes of action, it would be anomalous to permit the same claim to proceed for removal costs but not for damages.  Requiring such a course of conduct would seemingly have no impact on the final result and would instead create extra, unnecessary steps in the recovery process.  For example, if the damages aspect of the OPA causes of action were to be dismissed or stayed, the parties would still litigate the removal costs and the Court would issue a judgment.  This judgment would then be binding on Defendants for the subsequent damages.  *See* 33 U.S.C. § 2717(f)(2) (stating that in an action for recovery of removal costs, "the court shall enter a declaratory judgment on liability for removal costs or damages that will be binding on any subsequent action or actions to recover further removal costs or damages").  With this judgment, the Government would then seek the damages, either directly from the responsible party or through a return trip to the Court.

*Id*. at 1062.  The same reasoning applies here for any similarly situated plaintiff, especially with respect to a state such as Louisiana that has incurred removal costs and suffered vast related resource and economic damages.   Moreover, in addition to the two states–Louisiana and Alabama–and the United States that have already filed complaints in the MDL, other Gulf Coast states may soon follow.

As the court in *Cosco Busan* recognized, there will be situations where "given the size of the spill, the scope of the cleanup process, the complexity of the legal issues . . . it would be preferable to proceed directly to a court" and "§ 2717 plainly provides this option."  *Id.* at 1061. The sheer magnitude of the Spill, the extensive damages, and the complex and novel, yet pivotal, legal issues involved warrant proceeding directly to the Court in this case.  OPA explicitly permits a government party to sue at any time to recover removal costs, regardless of whether an OPA presentment has been made.  Under the exceptional present circumstances, this Court should allow government claims for damages brought in conjunction with claims for removal costs to proceed, even in the absence of pre-suit presentment.

## V.  DEFENDANTS' EFFORTS TO AVOID RESPONSE AND MORATORIUM DAMAGES MUST BE REJECTED.

To varying degrees, Defendants' Motions to Dismiss argue that response-related injuries, including damages associated with the moratorium, are too remote, beyond the scope of damages that Congress intended OPA to compensate, and should be dismissed for failure to state a claim. Similarly, Transocean argues that any party claiming economic damages associated with the moratorium alone should be dismissed because OPA only allows a recovery of damages that result directly from the "incident," and that "incident" means a pollution incident, *i.e.*, the discharge of oil.  (*See* BP Brief, at 12; Transocean Brief, at 47-8.)  Thus, argues Transocean, any damages associated with the moratorium were not caused by the release of 5 million barrels of oil into the Gulf of Mexico, but were instead caused by an unforeseeable, superseding cause.  *Id.* Finally, several Defendants also argue that the "due to" language in OPA imposes a second layer of proximate causation and foreseeability with respect to certain categories of economic damages and thus ask that this Court draw a line beyond which it will not entertain factual inquiry.  *Id.* Defendants' Motions to Dismiss on these grounds should be denied.