**A.  The Text Of OPA's Liability Provision Requires "But For" Causation.**

Based upon the clear language of OPA, as well as a significant amount of available legislative history and applicable case law, OPA requires "but for" causation.  Accordingly, "moratorium" claims, as well as Vessels of Opportunity claims and other response-related claims, clearly fall within the purview of OPA's liability and damage provisions.

A careful reading of OPA's text, alone, requires this interpretation of the statute.  The liability provision of OPA reads:

> *Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel* or a facility *from which oil is discharged*, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone *is liable for the removal costs and damages* specified in subsection (b) of this section *that result from such incident.*

33 U.S.C. § 2702(a) (emphasis added).  As indicated by the first clause, the provision must be read and construed solely within the text of the Act and "[n]otwithstanding any other provision or rule of law. . . ."  *Id.*  The next clause, "each responsible party for a vessel or a facility from which oil is discharged," illuminates the applicability of the paragraph.  It is the enabling provision of OPA's liability section.  In other words, there must be a discharge of oil from a vessel or facility, and there must be a responsible party (further defined by the Act) for that vessel or facility, in order for the liability provision to apply.  *Id.*  When these preconditions are met, § 2702(a) is clear that the responsible party "is liable."  *Id.*  Such liability is strict, joint and several.  *Id.*  The only remaining question, and the one to which "but for" causation applies, is: Liable for what?  OPA makes clear that the answer is:  "[T]he removal costs and damages specified in subsection (b) of this section that result from such incident."  *Id.*

As presented in the briefing, the parties appear to be in agreement that the key phrase for the causation question as it pertains to the liability section of OPA is "that result from such

incident." This phrase may be further broken down into two components: "result from" and "such incident." Each will be addressed in turn.

### 1. "Result from" means "but for."

Fundamentally, "result" means "to proceed, spring, or arise as a consequence, effect, or conclusion" and "from" "indicate[s] the source, cause, agent or basis;" *e.g.*, "death resulted from the disease."[10] Thus, "result from" means that the event is a consequence of the cause. An event results from the cause if it is a consequence of that source. An event obviously would not occur without the existence of the cause. Thus, stated another way, "result from" means the cause (or, at least, a cause) without which the event would not have occurred; *i.e.*, the cause-in-fact of the event or the cause "but for" which the event would not have occurred. As used in § 2702(a), then, a responsible party is liable for removal costs and damages that would not have occurred "but for" the incident. This level of causation, cause-in-fact, is precisely what was contemplated by Congress in passing OPA and is the basis for OPA's "result from" language in § 2702(a).

In its brief, Defendant Transocean, without explanation, substitutes the phrase "caused by" for OPA's "result from" language. (Transocean Brief, at 47.) To the extent Transocean is using the phrase "caused by" to mean cause-in-fact (*i.e.*, "but for" causation), the State does not disagree. However, Transocean's further analysis of causation, which attempts to improperly limit the damages flowing form the Spill, is fundamentally flawed.

Transocean, citing *Taira Lynn Marine Ltd. No. 5, LLC v. Jays Seafood, Inc.*, 444 F.3d 371, 383 (5th Cir. 2006), argues that a "responsible party may thus *be liable under OPA* only if the Plaintiffs' damages 'were caused by the pollution incident,' *i.e.*, the discharge or threatened

---

[10] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 1937 (Unabridged ed., Merriam-Webster, Inc., 1993); *The Merriam-Webster Dictionary online*, http://www.merriam-webster.com/dictionary/result?show=0&t= 1302396398; http://www.merriam-webster.com/dictionary/from.                    *See       also*,       Dictionary.com, http://dictionary.reference.com/browse/result ("something that happens as a consequence").

discharge of oil."  (Transocean Brief, at 47 (emphasis added).)  Similarly, in its brief, BP argues that the "VoO [Vessels of Opportunity] Plaintiffs do not state a claim under OPA because they concede their damages are a result of the VoO program participation, not a result of the oil spill."  (BP Brief, at 25.)  BP paraphrases § 2702(a), including its "result from" language, but then concludes by citing in part to *Taira Lynn*, ostensibly in support of its position that the "VoO Plaintiffs' [sic] admit their damages did not result from the oil spill but instead from participation in the VoO Program."  *Id.*

Contrary to Defendants' arguments, the issue before the Fifth Circuit in *Taira Lynn* was whether certain categories of damages under OPA—property damages pursuant to § 2702(b)(2)(B) and economic damages pursuant to § 2702(b)(2)(E)—were recoverable by private plaintiffs according to the specific facts of that case.  *Taira Lynn*, 444 F.3d at 382-83.  The Fifth Circuit did not address OPA's liability provision, § 2702(a), or that provision's "result from" language.  Accordingly, *Taira Lynn* is inapplicable to construing OPA's liability provision.[11] Defendants' extrapolation of the Fifth Circuit's discussion of the availability of two categories of damages to apply across-the-board to OPA liability is unfounded.  Furthermore, the *Taira Lynn* decision as to certain categories of OPA damages available in that case was premised upon the Fourth Circuit's decision in *Gatlin Oil Co. v. United States*, 169 F.3d 207 (4th Cir. 1999).  As discussed, *infra*, *Gatlin Oil* is not binding on this Court, was wrongly decided, and is contrary to the text, intent and implementation of OPA.  Thus, Transocean's misquoted reliance upon *Taira Lynn* does not overcome or alter the rule of "but for" causation provided by OPA.

---

[11] The *Taira Lynn* case is further discussed, *infra*, regarding causation as it relates to specific categories of damages under § 2702(b).

2. **"Incident" is a defined term under OPA and means the occurrence or series of occurrences resulting in the discharge or threatened discharge of oil.**

In their briefs, Defendants generally argue that "incident," as used in § 2702(a), is synonymous with "the discharge or threatened discharge of oil," and contend then that all damages must result directly from oil in order to be compensable under OPA. (*See*, *e.g.*, BP's Brief at 25; Transocean's Brief at 47.) Defendants make this argument in an attempt to artificially limit the scope of damages recoverable pursuant to OPA. Defendants reach this conclusion based upon the Fourth Circuit Court of Appeal's opinion in *Gatlin Oil Co. v. United States*, 169 F.3d 207 (4th Cir. 1999), *cited in Taira Lynn*, 444 F.3d 371. This interpretation (and *Gatlin*, for that matter) ignores the clear text of OPA and seeks to read a new and more restrictive definition into the statute for an already defined term.

a. **The Court should interpret "Incident" as it is <u>defined</u> in OPA.**

In the context of this case, especially, it is clear why Congress defined "incident" not as just the oiling, but as the source of the oiling: it provides breadth and context to the scope of OPA liability. Reading OPA as it is written, "incident" is defined as:

> *any occurrence or series of occurrences* having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil.

33 U.S.C. § 2701(14) (emphasis added). "Such incident" referenced in § 2702(a) is therefore, by statutory definition, an "occurrence or series of occurrences . . . resulting in the discharge . . . of oil." 33 U.S.C. § 2701(14). Thus, the "incident" is not the discharge of oil itself.[12] Indeed, how

---

[12] In its brief, citing *In re Settoon Towing LLC*, Civ. A. No. 07-1263, 2009 WL 4730969, at *4 (E.D. La. Dec. 4, 2009), Transocean argues that "under OPA, the 'damages' must also result from 'the discharge of oil.'" (Transocean Brief, at 47). The court in *In re Settoon* cited *Taira Lynn* and *Gatlin* for this proposition. The rationale and applicability of *Taira Lynn* and *Gatlin* are addressed, *supra*. Further, the *Settoon* court's language cited by Transocean was directed only at economic damages under 33. U.S.C. § 2702(B)(2)(E), not all OPA damages as argued by Transocean.

could it be when the clear language of § 2701(14) and § 2702(a) provide that the "substantial threat of the discharge of oil" is also sufficient for liability to attach?  Rather, it is the event or series of events that give rise to the discharge or threatened discharge of oil to which liability attaches.  *Id.*  Here, then, the occurrence resulting in the discharge of oil–the "incident" at issue– was the Deepwater Horizon rig explosion and Macondo well blowout.  That occurrence or series of occurrences resulted in the discharge of more than 5,000,000 barrels of oil into the Gulf of Mexico.  And, it clearly resulted in the Moratorium.

**b.  Rules of statutory construction demand that "incident" be used as defined in OPA.**

A review of OPA and its legislative history and purpose further reflect that the majority in *Gatlin* strained to interpret OPA in such a way as to deny compensating Gatlin Oil from the fund.[13]  Some basic rules of statutory construction must guide the Court here:

- First, "[i]n construing a statute, the court is 'guided not by a single sentence or member of a sentence, but [must] look to the provisions of the whole law, and to its object and policy.'"  *U.S. v. Conoco, Inc.*, 916 F. Supp. 581, 583 (E.D. La. 1996) (quoting *Dole v. United Steelworkers of Am.*, 494 U.S. 26 (1990)).  The *Gatlin* majority focused on a single word:  "such."

- Second, in construing environmental statutes, courts should avoid a "'hypertechnical approach' to [] statutory definitions . . . that would be 'likely to delay cleanup operations while arguing over the responsibility.'"  *Union Petroleum Corp. v. U.S.*, 51 F.2d 734, 744 (Ct. Cl. 1981) (court broadly construed definition of "onshore facility" under an OPA precursor, the Federal Water Pollution Control Act, where vandals opened valves on two railroad tank cars and discharged 60,000 gallons of

---

[13] For an extensive and in depth analysis of the *Gatlin* case, *see* Holmen, Brian Theodore, *Gatlin Oil Co. v. United States:  A Myopic View of OPA Liability*, 42 Wm. & Mary L. Rev. 1893 (2001).

oil).   The *Gatlin* majority strained to protect the Fund by a hypertechnical and incorrect reading of the word "such" so as to avoid using the definition of "incident" mandated by Congress.

- Third, the statutory definitions afforded to "damages," "removal costs," "responsible party," as well as "incident," are all wide-ranging, reflecting Congress's intent that OPA's provisions be read broadly.[14]   Reading "incident" in the circular fashion employed by the *Gatlin* majority, so as to point back at the pollution itself, rather than the source of the pollution, collapses the scope of OPA on itself.[15]   Such a result further indicates the impropriety of the *Gatlin* majority's interpretation.

- Fourth, Congress clearly intended that "incident" be read to encompass all actions contributing to the discharge or threatened discharge of oil; it defined it as such.   *See* S. Rep. No. 101-94, at 102 (1990), reprinted in 1990 U.S.C.C.A.N. 722, 780. ("'Incident' is defined to mean an occurrence or series of related occurrences because, as under other Federal law, it is the intent of the Conferees that the entire series of events resulting in the spill of oil comprise one 'incident.'").   Again, the *Gatlin* majority's holding is clearly contrary to Congressional intent.

- Finally, as a general rule, OPA, like other remedial statutes, is to be read broadly to effectuate its purpose and obvious remedial intent.[16]   For example, in *U.S. v. Hyundai Merchant Marine, Co.*, 172 F.3d 1187 (9th Cir. 1999), Hyundai, the responsible party

---

[14] 33 U.S.C. §§ 2701(5), (31), (32) and (14), respectively.

[15] In addition, the Defendants' efforts to read these terms narrowly is inconsistent with their arguments regarding preemption.

[16] *See, e.g., U.S. v. Conoco, Inc.*, 916 F.Supp.581 (E.D. La. 1996) (monitoring costs recoverable as removal costs under OPA); *U.S. v. Murphy Exploration and Production Co.*, 939 F.Supp.489 (E.D. La. 1996) (same); *Sun Pipe Line Co. v. Conewago Contractors, Inc.*, No. 4:CV-93-1995, 1994 WL 539326, *12-14 (M.D. Pa. Aug. 22, 1994) (reading "navigable" expansively in connection with oil spill on a golf course); *U.S. v. Mizhir*, 106 F.Supp.2d 124, 125 (D. Mass. 2000) (accepting a broad definition of "waters of the United States" for OPA liability).

under OPA, argued that the salaries of Coast Guard personnel who monitored cleanup operations after an oil spill were "not a cost that 'results from' the incident."  *Id.* at 1192.  The court rejected Hyundai's argument for a narrow reading of "incident" under OPA and instead read a broader definition that included monitoring costs as response costs that resulted from the incident.  *Id.* (quoting 33 U.S.C. § 2702(a)).   A reading of OPA that excises those damages flowing from the cause of the spill artificially constrains the remedial nature of the statute and frustrates Congressional intent.

Thus, by simply applying the definition that Congress provided, and using common rules of statutory construction, it is clear that this Court should not read OPA so as to limit damages only to those resulting directly from the discharged oil.  An understanding of the facts in *Gatlin* is necessary to evaluate why the Fourth Circuit held as it did, and why it is the wrong interpretation.

### c. *Gatlin* is wrongly decided and does not control.

The facts in *Gatlin* were that a vandal opened seven of Gatlin Oil's above-ground fuel tanks in the middle of the night, thereby discharging 20,000-30,000 gallons of oil, some of which ran into a river located near the property.  *Id.* at 209.  In addition to the discharge, the oil caught on fire, causing significant property damage.  *Id.*  The Coast Guard designated Gatlin Oil a responsible party under OPA and directed it to undertake cleanup operations.  *Id.*  Gatlin Oil successfully asserted a complete defense to liability under OPA (the damages resulted solely from the act of a third party) and thereafter sought compensation from OPA's trust fund for its removal costs and property damages.  *Id.*

Initially, the Coast Guard denied some of Gatlin Oil's claimed damages. *Id.* at 208-09. Gatlin Oil therefore filed suit in the United States District Court for the Eastern District of North Carolina to reverse the Coast Guard's decision. The district judge reversed the agency's action and found that Gatlin Oil was entitled to full compensation for its removal costs and damages from the Oil Spill Liability Trust Fund. *Id.* at 209. The United States thereafter appealed to the Fourth Circuit Court of Appeals.

The Fourth Circuit, in a fragmented and brief analysis, determined that whether the damages at issue were recoverable under OPA turned upon the meaning of the phrase "such incident" in § 2702(a). *Id.* at 210. After first noting that § 2701(14) of "[t]he Act [OPA] defines 'incident' as: any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil[,]" the court then determined that it would ignore the statutory definition in § 2701(14) based upon the court's interpretation of the word "such" in § 2702(a). The court concluded that "[t]he antecedent of 'such incident' is the discharge or substantial threat of discharge into navigable waters or adjacent shorelines" language in § 2702(a). Therefore "the removal costs and damages specified in § 2702(b) are those that result from a discharge of oil or from a substantial threat of a discharge of oil into navigable waters or the adjacent shoreline." *Id.* at 210, 211. In essence, the Gatlin majority determined that "such incident" meant "such discharge," despite Congress's clear use an definition of the term "incident." The *Gatlin* opinion was a 2-to-1 decision by the Fourth Circuit panel.

In its opinion, the *Gatlin* majority misapplied the definitions afforded the word "such" in BLACK'S LAW DICTIONARY (6th ed. 1990) and A DICTIONARY OF MODERN LEGAL USAGE (2d ed. 1995). While both dictate that "such" refers to an antecedent, neither requires that it be an

50

antecedent in the same sentence, *to wit*, the liability sentence in § 2702(a), as held by the majority.  Rather, it could just as easily refer to an earlier section of the statute, such as the definitions in § 2701.  Indeed, such would be the logical conclusion given that there are eleven terms in § 2702(a) defined by § 2701 and the Fourth Circuit chose to ignore only one of them.[17]  Obviously, the reference to "such incident" should refer to an "incident" as the antecedent, not a "discharge," particularly in a statutory scheme where "incident" is defined and is significantly broader in scope than "discharge."

In fact, Judge Niemeyer, in his partial dissent in *Gatlin*, argued that "incident" is a defined term in OPA and the court should apply only its statutory meaning.  *Gatlin*, 169 F.3d at 214 (Niemeyer, J., concurring in part and dissenting in part) ("As a defined term in the OPA, 'incident' means [its statutory definition in § 2701(14)].")  Judge Niemeyer stated that the majority misapplied their own test to the facts of the case and that Gatlin Oil should have recovered all of its response costs and damages, including those attributable to the fire:

> While I remain convinced that incident must mean the defined term, even if the interpretation given by the majority is the correct one, Gatlin would nevertheless be entitled to its damages because those damages "resulted from" the vandals' discharge of oil, a discharge which both polluted navigable waters and immediately threatened to pollute navigable waters.  . . .  The statutory test— whether fire damage "resulted from" the discharge of oil that threatened to pollute navigable waters—was still satisfied.

*Id.* at 214-15.

The faulty reasoning and exceptionally narrow reading in *Gatlin* would allow an OPA responsible party, *with no defense to liability*, to seek to limit the scope of its responsibility by arguing that not all of the removal costs and/or damages result from the "incident," just as BP and Transocean have argued to this Court.  Such a reading of OPA turns the statute's strict, joint

---

[17] In order of appearance in § 2702(a):  "responsible party," § 2701(32); "vessel," § 2701(37); "facility," § 2701(9); "oil," § 2701(23); "discharge," § 2701(7); "navigable waters," § 2701(21); "exclusive economic zone," § 2701(8); "liable," § 2701(17); "removal costs," § 2701(31); "damages," § 2701(5); and "incident," § 2701(14).

and several liability structure on its head.  A broader interpretation of OPA's terms, as required by the statute's own text, its legislative history, applicable case law, and as described by Judge Niemeyer in his dissent in *Gatlin*, prevents a responsible party from unfairly limiting its strict, joint and several liability, and would avoid situations where innocent parties remain uncompensated and the burden of removal costs and damages is foisted upon the public.  It is this broader reading that should be employed by this Court to prevent Defendants from escaping the liability provided by OPA and intended by Congress.

## B. The Moratorium Resulted From The "Incident."

With the *Deepwater Horizon* rig explosion and *Macondo* well blowout identified as the "incident" subjecting certain Defendants to § 2702(a) liability, it is abundantly clear that the moratorium was a result of the "incident."   In his Decision Memorandum directing the imposition of the moratorium, the Secretary of the Department of the Interior identified the basis for the moratorium:

> This suspension is required to mitigate a clear threat that additional deepwater drilling poses of serious, irreparable, or immediate harm to life, to property, or to the marine, coastal, or human environment.  I have concluded, based on an extensive record, that *this temporary pause in deepwater drilling* will provide time for a number of important steps *toward addressing this threat and improving the safety of drilling operations*, including the following:
>
> 1. the collection and analysis of key evidence regarding the potential causes of *the April 20, 2010, explosion and sinking of the Deepwater Horizon offshore drilling rig, which caused the deaths of 11 workers and the subsequent and ongoing release of millions of barrels of oil in the Gulf of Mexico (collectively referred to as the "BP Oil Spill")*, and further efforts to determine the root causes of the accident, which can be considered and assessed in the context of new safety measures that I have directed BOEM to implement;
>
> 2. the assessment of wild well intervention and blowout containment resources – which are not currently available to handle *a blowout such as the one that has defied containment since April 20, 2010* – to determine

strategies and methods by which they can be made more readily available should another blowout occur; and

3. the submission of evidence by operators demonstrating that they have the ability to respond effectively to a potential oil spill in the Gulf, *given the unprecedented commitment of available oil spill response resources that are now being dedicate to the BP Oil Spill.*

*DOI Decision Memorandum*, dated July 12, 2010, at 2 (emphasis added)  *See* Exhibit A.

These three points, the cause of the *Deepwater Horizon* rig explosion, assessing blowout containment resources which failed to quell the flow of oil from the wild *Macondo* well, and the remaining resources beyond those dedicated to the BP Oil Spill, are the basis for, or cause of, the moratorium.   All three result from, indeed, are directly due to, the *Deepwater Horizon* rig explosion and *Macondo* well blowout.   As summed up by the Secretary, "I am reminded daily that deepwater drilling accidents can have *and in the case of the BP Oil Spill do have a profound, devastating impact on the economic and environmental health of an entire region*."   *Id.* at 3 (emphasis added).   Further:

The third key reason for my decision is that the unprecedented deployment of spill response equipment and cleanup crews to address the massive BP Oil Spill raises serious legal and practical questions about whether other deepwater operators would be able to employ adequate quantities of skimmers, boom, and other spill response resources to address another spill if it occurs.   Simply put, there may be insufficient resources available to respond should another deepwater spill occur while the BP Oil Spill containment and clean-up efforts are at their peak.   Before deepwater drilling activity resumes, oil spill response plans need to be reviewed under the changed circumstances presented by the BP Oil Spill to determine whether sufficient spill response resources are available to address another deepwater spill event.

*DOI Decision Memorandum*, dated July 12, 2010, at 4-5.

In discussing the proposed length of the moratorium, the Secretary again repeatedly referenced the *Deepwater Horizon* rig explosion and *Macondo* well blowout as the cause of the moratorium:

> The 6-month duration of the May 28, 2010, suspension was intended, among other things, to minimize the possibility of *another catastrophic event, particularly while we are still responding to the BP Oil Spill*; to ensure that operators *similarly situated to the Deepwater Horizon* were operating in a safe manner; to take into account the expected timeline *for killing the Macondo well*; and to provide adequate time to obtain information from *on-going investigations of the disaster* and to develop regulations *addressing the safety-related issued described in the Safety Report*."

*Id.* at 6-7 (emphasis added).  The "catastrophic event" and "disaster" refer to the "*Deepwater Horizon*" rig explosion, the wild "*Macondo* well," and the "BP Oil Spill."

Thus, after giving "result from such incident" its intended and defined meaning under OPA, and applying that definition to the facts here, it is clear that the moratorium "result[ed] from the incident."  *See* 33 U.S.C. §§ 2702(a), 2701(14).  Accordingly, moratorium "response costs and damages" fall within the purview of OPA's liability scheme and are recoverable to the extent they are listed in § 2702(b).

## C. Moratorium Damages Are Recoverable Under OPA

Damages recoverable pursuant to § 2702(a) are only those that are "specified in subsection (b)."  33 U.S.C. § 2702(a).  Of the six categories of damages available under § 2702(b)(2), four are of primary importance to the State in regards to the moratorium.[18]  These are:

> (A)   Natural resources.  Damages for injury to, destruction of, or loss of use of, natural resources, including the reasonable costs of assessing the damage, which shall be recoverable by a United States trustee, a State trustee, an Indian tribe trustee, or a foreign trustee.
>
> . . .
>
> (D)   Revenues.  Damages equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction of, or loss of real property, personal property, or natural resources, which shall be recoverable by the

---

[18] This is not to say that other categories of damages, as well as response costs addressed in § 2702(a), are not important to the State.  The State expressly reserves all of its rights in this regard.

> Government of the United States, a State, or a political subdivision thereof.
>
> (E)   Profits and earning capacity.   Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant.
>
> (F)   Public services.   Damages for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, caused by a discharge of oil, which shall be recoverable by a State, or a political subdivision of a State.

33 U.S.C. § 2702(b)(2).

In their briefs, Defendants have focused on the economic damages contemplated in § 2702(b)(2)(E), *i.e.*, lost profits and diminished earning capacity.   Specifically, Defendants argue that the "due to" language in § 2702(b)(2)(E) imposes yet another layer of causation and requires that the damages be directly caused by the oil.   For example, Transocean states that "[a]s the Moratorium Plaintiffs' damages were not caused by the discharge of oil, but in fact resulted from the Moratorium, a superseding unforeseeable cause, the Moratorium Plaintiffs may not recover as a matter of law under OPA, or under any other laws, state or federal."   (Transocean Brief, at 47 (emphasis added).)   "Superseding unforeseeable cause" is the language of proximate cause in traditional tort analysis.[19]   OPA, however, is a statutory construct and must be construed as such, not as a common law tort.   As mandated in the opening clause of OPA's liability provision: "*Notwithstanding any other provision or rule of law, and subject to the provisions of this Act . . . .*"   33 U.S.C. § 2702(a).   Proximate cause, at least in the traditional tort sense, is not part of OPA's statutory framework.

---

[19] "Foreseeability, n.   The quality of being reasonably anticipatable.   Foreseeability, along with actual causation, is an element of proximate cause in tort law."   *BLACK'S LAW DICTIONARY*, 660 (7th ed. 1999).   "Superseding cause.   An intervening act that the law considers sufficient to override the cause for which the original tortfeasor was responsible, thereby exonerating that tortfeasor from liability."   *Id.* at 213.

Transocean bases its superseding unforeseeable cause argument on its claim that "Moratorium Plaintiffs' damages were not *caused by the discharge of oil* . . . ." (Transocean Brief, at 47 (emphasis added).)   Transocean's argument is belied by OPA's text, the defined term "incident" and "but for" causation, as discussed *supra*.   Furthermore, Congress's explicit use of "caused by a discharge of oil" in subsection § 2702(b)(2)(F), the very next category of recoverable damages in OPA's damages provision, indicates   that economic damages recoverable under § 2702(b)(2)(E) do ***not*** need to be caused by the discharge of oil itself.   If Congress intended the "due to" language in § 2702(b)(2)(E) to mean "caused by a discharge of oil," Congress would have said so and used the same language as it did in § 2702(b)(2)(F), but it did not.   A better reading of § 2702(b)(2)(E) is that the "due to" language means "as a consequence of."   This is the interpretation implemented by the United States Coast Guard ("USCG") in administering the Oil Spill Liability Trust Fund.   *See* 33 C.F.R. § 136.233(b).   "As a consequence of" is merely another way of saying "but for."

1. **There is no traditional proximate cause requirement in OPA's liability or damages provisions.**

The USCG's official guidance on Oil Spill Liability Trust Fund claims ("Claimant's Guide") identifies an eligible claimant as "*anyone* with loss of profits or income" and goes on to provide that a claimant must only demonstrate that "[p]roperty or natural resources [] were damaged, destroyed or lost, *resulting in your loss*" to qualify.   *Claimant's Guide: A Compliance Guide for Submitting Claims Under the Oil Pollution Act of 1990*, National Pollution Funds Center, U.S. Coast Guard, April 2003 (updated November 2009), at 10.   Further, the Claimant's Guide, as well as OPA's legislative history, makes clear that one need not own the damaged property or resource to recover economic damages.   *See id.*; *see also* H.R. Conf. Rep. No. 101-653, at 104 (1990).   The USCG, the agency tasked with administering the Oil Spill Liability

Trust Fund, interprets the "due to" language in § 2702(b)(2)(E) to be synonymous with "result[s]" from, which, as discussed, *supra*, means "but for."  According to USCG, such "due to" showing may be made by, *inter alia*, "Information on EPA or USCG notification" or "[n]ewspaper reports describing the spill."  *Id*.  The burden is therefore very low and certainly not the "caused by" or foreseeability standard espoused by Transocean.

Here, there is no doubt that the moratorium was "a consequence of" the "injury, destruction, or loss of real property, personal property, or natural resources."  *See Claimant's Guide*, at 10; 33 U.S.C. § 2702(b)(2)(E).  As discussed above, the pertinent focus is on the incident, the *Deepwater Horizon* rig explosion and *Macondo* well blowout.  It is undisputed that the rig was injured and destroyed.  Similarly, it is undisputed that the *Macondo* well gushed tens of millions of gallons of oil into the Gulf of Mexico and its adjoining shorelines thereby injuring natural resources.[20]  It is also beyond dispute that the Secretary implemented the moratorium as a result of the Spill; he said so himself.  Clearly, then, moratorium economic damages fall within the purview of § 2702(b)(2)(E) and are recoverable pursuant to OPA.

Moreover, as discussed, *supra*, OPA was drafted and intended to address marine oil spills, ranging in size from small to catastrophic, particularly in light of the prior five federal statutes' failure to effectively address such occurrences, as demonstrated by the *Exxon Valdez* incident.  That said, and as reflected in the extensive legislative history, OPA was ultimately a compromise that addresses various, and often competing, interests.  On the one hand, OPA imposes strict liability for oil discharges, provides both civil and criminal penalties for violations

---

[20] *See, e.g.*, *Dunham-Price Group, LLC v. Citgo Petroleum Corp.*, No. 2:07 CV 1019, 2010 WL 1285446, *3 (W.D. La. March 31, 2010) (denying Citgo's Motion for Summary Judgment against a concrete facility located several miles upriver from Citgo's refinery and the area closed by the Coast Guard that sought economic damages under § 2702(b)(2)(E) because the undisputed facts showed that Citgo had discharged oil into the Calcasieu River, the Calcasieu River met OPA's definition of a natural resource, and the Coast Guard issued a community advisory regarding the spill).

of the statute, and expands the categories of available damages.  On the other hand, OPA imposes certain liability caps for most responsible parties, provides the Oil Spill Compensation Trust Fund for damages in excess of the liability caps and to address absent responsible parties, provides a mechanism for replenishing the Fund through a per barrel tax on oil, and allows for subrogation actions in order for the responsible party to potentially re-distribute responsibility. OPA, then, contemplates statutorily limited exposure, except in the case of gross negligence or willful misconduct, or the violation of an applicable Federal regulation, by the responsible party related to the incident.  *See* 33 U.S.C. § 2704(c)(1).

In those situations where the caps are inapplicable due to gross negligence or willful misconduct, or the violation of an applicable Federal regulation, Congress has explicitly determined that notions of proximate cause apply.  *See id.*  Section 2704(c)(1) (the exceptions to the caps) provides:

> Subsection (a) of this section does not apply if the incident was proximately caused by—
>
> **(A)**  gross negligence or willful misconduct of, or
>
> **(B)**  the violation of an applicable Federal safety, construction, or operating regulation by,
>
> the responsible party, an agent or employee of the responsible party, or a person acting pursuant to a contractual relationship with the responsible party (except where the sole contractual arrangement arises in connection with carriage by a common carrier by rail).

*Id.*  The express use of proximate cause language in this subsection of OPA, but not in the liability or damages sections of OPA, clearly indicates that Congress intended that proximate cause apply ***only*** to this subsection (*i.e.*, the limited issues related to the exceptions to the caps). Congress recognized that in those exceptional cases in which the responsible party's conduct was so egregious, a heightened level of causation should be required in making that determination.

58

As noted, *supra*, regarding Congress's use of "caused by a discharge of oil" in § 2702(b)(2)(F) and not in § 2702(b)(2)(E), had Congress intended proximate cause to apply to either OPA's liability provision (§ 2702(a)) or certain categories of damages (*e.g.*, § 2702(b)(2)(E)), Congress would have said so just as it said "proximately caused by" in § 2704(c)(1).  But Congress did not.

Even assuming, *arguendo*, that there were some element of foreseeability applicable to economic damages under § 2702(b)(2)(E), it would be confined to the clear language of the provision, *i.e.*, the "due to" language, and would not equate to traditional notions of foreseeability in tort.  *See* 33 U.S.C. §§ 2702(a) ("Notwithstanding any other provision or rule of law, and subject to the provisions of this Act. . . .") & 2702(b)(2)(E) ("[Economic] [d]amages . . . due to the injury, destruction or loss of real property, personal property, or natural resources . . . .").  Thus, any claimant may recover certain economic damages that are due to any injury to any real property, personal property or natural resource, so long as the damage resulted from the incident.  *Id.*  While some would argue that such a reading draws a distinction between discharges that cause no property or resource damages and those that cause some property or resource damages, the distinction is of no consequence.[21]  In reality, every discharge of oil that falls within the purview of OPA will have injured, at the very least, a natural resource in some manner.[22]  *See, e.g.,* Ramseur, Jonathan L., *Oil Spills in U.S. Coastal Waters:  Background,*

---

[21] *See*, *e.g.*, Goldberg, John C.P., *Liability for Economic Loss in Connection with the Deepwater Horizon Spill*, November 22, 2010, prepared at the request of Kenneth R. Feinberg.  Fundamentally, Mr. Goldberg misunderstands the "incident" made the basis of OPA liability.  As in *Gatlin*, Mr. Goldberg improperly focuses upon the discharge of oil, not the "occurrence or series of occurrences . . . resulting in the discharge or threatened discharge of oil."  33 U.S.C. § 2701(14).

[22] Mr. Goldberg agrees that "[o]n this reading, there is no such thing, under OPA, as a spill that fails to cause damage to, or loss of, *some* property or natural resources."  *Id.* at 19 (emphasis in original).  OPA's principal purpose is to compensate any party, including natural resource trustees, suffering damages from oil spills.  *See* S. Rep. No. 94, 101st Cong., 1st Sess. (1989), reprinted in 1990 U.S.C.C.A.N. 722.  Indeed, Congress designed OPA to provide protection for the environment and to aid all victims of oil spills.  *Id.*

*Governance, and Issues for Congress*, at 3, Congressional Research Service RL33705, April 30, 2010 ("No oil spill is entirely benign.  Depending on timing and location, even a relatively small spill can cause significant harm to individual organisms and entire populations.  Oil spills can cause impacts over a range of time scales, from days to years, or even decades for certain spills.")  Whether that injury is quantifiable is a separate question saved for the calculation of damages under the natural resource damages provision of OPA.  *See* 33 U.S.C. § 2702(b)(2)(A).

Despite the clear language of OPA, Transocean and others have argued for the application of traditional proximate cause from the tort jurisprudence.  (Transocean Brief, at 47.)  Proximate cause is merely the limitation traditionally imposed by courts on the realm of liability for a tortfeasor's negligent conduct.  Arguably, the consequences of an act go forward to eternity, and the cause of an event go backward to the dawn of time.  Thus, as a practical matter, courts and legislatures impose limitations on a tortfeasor's scope of liability based upon some idea of justice or policy.  *See generally*, W. Page Keeton *et al.*, *PROSSER AND KEETON ON TORTS* § 41, at 264 (5th ed. 1984).  This limitation on tort liability is embodied in proximate cause.  For common law torts, proximate cause has traditionally been analyzed according to notions of temporal and physical proximity to the negligent act.

However, there is no indication that OPA was drafted and implemented with the same notion of justice or policy as is the basis for the concept of proximate cause in torts.  Beyond the fact that OPA is a statutory construct, OPA was drafted and implemented "in response to the *Exxon Valdez* oil spill in Prince William Sound.  It represents Congress's attempt to provide a comprehensive framework in the area of marine oil pollution."   136 Cong. Rec. H6933-02, H6944.  Indeed, it was meant to expand the liability and damages associated with oil spills that,

up until OPA's implementation, had been woefully unaddressed via five prior federal statutes.[23]

Simply put, the policy behind OPA's implementation is not the same as the policy limiting the scope of liability for a negligent tortfeasor.  To the contrary, OPA's policy is for responsible parties to bear the costs and damages resulting from the occurrence or series of occurrences resulting in the discharge or substantial threat of discharge of oil, regardless of the policy underlying the law of torts.  Moreover, Defendants' conduct here, as it relates to the *Deepwater Horizon* rig explosion, *Macondo* well blowout, and spilling of almost 5,000,000 barrels of oil, was well beyond negligence.  The allegations and evidence support a finding of intentional, willful or grossly negligent conduct.

> **2.    Even if the Court were to draw "proximate cause" lines here, the State of Louisiana is the geographic epicenter of the Spill and its governmental damages are specifically enumerated.**

To the extent temporal and physical proximity are ever read into OPA's economic damages provision, the State of Louisiana's claims, including for moratorium damages, would clearly fall within the scope of proximate cause as applied to § 2702(b)(2)(E).  Given the situs of the incident, Louisiana suffered damages quickly and in a manner unparalleled by any other state or trustee.  Moreover, Louisiana has incurred tremendous response and removal costs.  Indeed, the damages and response costs remain ongoing in Louisiana.  Given its physical proximity to the *Deepwater Horizon* rig and *Macondo* well, even Defendants agree[24] that, to the extent state

---

[23] The five federal statutes are the Outer Continental Shelf Lands Act of 1953, the Water Quality Improvement Act of 1970, the Clean Water Act of 1972, the Trans-Alaskan Pipeline Authorization Act of 1973, and the Deepwater Port Act of 1974.

[24] *See* Defendants' arguments in BP's Brief at 26-9; Transocean's Brief at 22, 23 n. 17, 41-2; Halliburton's Brief at 12, 14 n. 15; Cameron's Brief at 14; Weatherford's Brief at 12, 15; MOEX's Brief at 31 n. 14; Anadarko's Brief at 23-4.

law applies to any claims, it should be Louisiana's law.[25]   Additionally, Louisiana's culture, its

"brand," is based principally upon its water-based resources, specifically its bayous, lakes,

marshlands, estuaries, the Gulf of Mexico and its tributaries.  In terms of proximity, Louisiana is

uniquely situated, both temporally and physically, in relation to the *Deepwater Horizon* rig

explosion, *Macondo* well blowout and oil Spill.

Likewise, when read in the context of the specified subcategories of damages and impacts

that OPA authorizes States and public entities to recover, the Defendants' remoteness arguments

fall away.  Congress specifically enumerated subcategories of damages that states and public

entities may recover in the event of a spill: Natural resource damages, revenues, profits and

earning capacity, and increased costs of services.   33 U.S.C. § 2702(b)(2) (A), (D), (E) and (F).

By identifying both the subcategories of claimants and damages recoverable by those claimants,

these damages were clearly foreseen by Congress and no limitation based on "proximity" was

included.

### D.  Damages Resulting From Response Actions, Including Those Resulting From The Vessels Of Opportunity Program, Are Recoverable Under OPA.

Similarly, Defendants' suggestions that damage occasioned as a result of the VoO

program should be rejected as such damages resulted from the Spill.  Plaintiffs who suffered

damage as a result of their participation in the VoO program have a valid claim under OPA

because such damages resulted from response actions necessitated by the incident and oil spill.

---

[25] The State of Louisiana also has claims for lost revenues pursuant to the Louisiana Oil Spill Prevention and Response Act at LA. REV. STAT. § 30:2451, *et seq*., and the applicable regulations at LA. ADMIN. CODE tit. 43, pt. XXIX, § 101, *et seq*.  In particular, LA. REV. STAT. § 30:2451(5)(c) defines revenue damages as "damages equal to the net loss of taxes, royalties, rents, fees, or net profit share due to the injury…"  Moreover, LA. ADMIN. CODE tit. 43, pt. XXIX, § 129(B)(5) clearly provides the State with a claim for recovery of its damages including "the net loss of taxes, royalties, rents, fees, or net profit share *that the state would otherwise have collected in the absence of the unauthorized discharge of oil.*"  LA. ADMIN. CODE tit. 43, pt. XXIX, § 129(B)(5)(emphasis added).  Thus, Louisiana is unequivocally entitled to the revenues it would have received in the absence of the unauthorized discharge of oil; and it is clear that the answer is the same under OPA, the question which is now before this Court.

The VoO Program was part of Defendant BP's response to the incident and oil spill and was coordinated with the Coast Guard in compliance with the National Contingency Plan[26] to provide local boat operators an "opportunity to assist with response activities, including transporting supplies, assisting wildlife resources, and deploying containment and sorbent boom."[27] However, BP's actual contracting with VoO parties was not overseen by the Coast Guard to any extent.   Now, BP alleges that VoO plaintiffs fail to state a claim under OPA because their damages "are a result of the VoO program participation, not a result of the oil spill." (BP's Brief, at 25.)  BP appears to be taking the position that the response efforts related to the incident and oil spill are somehow independent of the incident and oil spill, and damages resulting from those response actions somehow do not result from the incident and Spill.

BP's argument attempts to sever the causal link between the incident and Spill on the one hand, and the response efforts to that incident and Spill on the other hand, thereby precluding responsible party liability for any damages caused by response actions.  BP's argument is based on a strained interpretation of the "result from such incident" language in OPA's liability provision and, as discussed *supra*, is incongruous with OPA's text, legislative history and relevant jurisprudence.  Furthermore, any interpretation of OPA that precludes responsible party liability for damages resulting from response actions directly contradicts federal regulations promulgated for the Natural Resource Damage Assessment ("NRDA") process in accordance with 33 U.S.C. § 2702(b)(2)(A).

---

[26] 33 C.F.R. § 155.1020; The Federal On-Scene Commander approved *in situ* burning (which itself caused injury to Louisiana resources), and using VoOs under a pre-existing Region VI (Louisiana and Texas) ISB Plan.  *Deepwater Horizon ISPR Final Report*, chartered by R.J. Papp, Jr. ADM, Commandant – United States Coast Guard, March 18, 2011.

[27] Press Release, Unified Command's Joint Information Center, About the Vessel of Opportunity Program (Sept. 17, 2010).  http://www.restorethegulf.gov/release/2010/09/17/about-vessal-opportunity-program.

As previously discussed, OPA's liability provision provides that "each responsible party for a vessel or a facility from which oil is discharged, into or upon navigable waters or adjoining shorelines… is liable for the removal costs and damages specified in subsection (b) that result from such incident."  33 U.S.C. § 2702(a).  With regard to damages to natural resources, applicable regulations are clear that the responsible party is liable for injuries to natural resources "resulting from response actions," in addition to injuries caused when a "natural resource has been exposed to discharged oil."[28]  15 C.F.R. § 990.51(e),(b)(1)(ii).  Although damages to "natural resources" and damages to "real or personal property" (such as the VoO Plaintiffs' claims) are distinct categories in § 2702(b), the qualification in § 2702(a) that responsible parties are liable for removal costs and damages that "result from such incident" applies to both.  Therefore, the inclusion of "injuries resulting from response actions" in the NRDA regulations is an administrative interpretation of OPA that supports a broad interpretation of the phrase "result from such incident" found in 33 U.S.C. § 2702(a).  Such an interpretation includes injuries from response actions, such as the potential injuries to the VoO Plaintiffs.

The case law cited by BP does not undercut the conclusion that responsible parties are liable for damages resulting from response actions.  In fact, *Gatlin Oil Co., Inc. v. U.S.*, 169 F.3d 207 (4th Cir. 1999), discussed extensively, *supra*, actually supports the VoO Plaintiffs' claims for damages resulting from their participation in response efforts.  Indeed, when the Fourth Circuit remanded the case to determine whether the Coast Guard's compensation was reasonable, the Court made clear that Gatlin Oil was not only entitled to full compensation for removal costs, but also "full compensation for the loss of earnings and earning capacity caused by the necessity to carry out the directions of the federal coordinator."  *Gatlin*, 169 F.3d at 212.  In other words,

---

[28] State regulations promulgated pursuant to LOSPRA are similarly clear that injuries resulting from response activities are recoverable from the responsible party.  LA. ADMIN. CODE Tit 49, Part XXIX, Sec. 119(4).

64

Gatlin Oil was entitled to recover the economic losses resulting from Gatlin Oil's participation in response actions.  Id.

At least one court has recently ruled that damages resulting from response actions may be recovered under OPA.  In *Dunham-Price Group, LLC, et al. v. Citgo Petroleum Corp.*, No. 2:07 CV 1019, 2010 WL 1285446 (W.D. La. March 31, 2010), the Court denied a motion for summary judgment that would have dismissed certain upriver business owners' claims for economic losses that resulted from the Coast Guard's closure of a 22-mile swath of the Calcasieu River "in response to" an oil spill.  *Id.* at *3.  In that case, the court found that there was a genuine issue of material fact as to "whether Dunham Price's economic losses are due to Citgo's oil spill."  *Id.*; *see also* FN 20, *supra*.  Clearly then, BP is liable under OPA for the damages resulting from the incident and oil spill, including damages resulting from response actions.  To the extent the VoO Plaintiffs sustained real or personal property damage while engaged in response activities, such damages are compensable under OPA.

## **CONCLUSION**

For the reasons set forth above, Louisiana hereby requests this Court deny Defendants' motions to dismiss on the issues addressed herein.


Dated this 18th day of April, 2011.

Respectfully submitted,


JAMES D. "BUDDY" CALDWELL            KANNER & WHITELEY, LLC
LOUISIANA ATTORNEY GENERAL

                                      /s/ Allan Kanner
James Trey Phillips                   Allan Kanner
First Assistant Attorney General      Elizabeth B. Petersen
Megan K. Terrell                      David A. Pote
Assistant Attorney General            701 Camp Street
Section Chief –Environmental          New Orleans, LA 70130

State of Louisiana
P.O. Box 94005
Baton Rouge, LA 70804-9005
Telephone: (225) 326-6708

HENRY DART,
ATTORNEYS AT LAW P.C.

/s/ Henry T. Dart
Henry T. Dart
Grady J. Flattmann
510 N. Jefferson St.
Covington, LA 70433
Telephone: (985) 809-8093
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**

SHOWS, CALI, BERTHELOT &
WALSH, LLP

/s/ E. Wade Shows
E. Wade Shows
628 St. Louis Street
Baton Rouge, LA 70802
Telephone: (225) 346-1461
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**

Telephone: (504) 524-5777
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**

USRY, WEEKS, &
MATTHEWS, APLC

/s/ T. Allen Usry
T. Allen Usry
1615 Poydras St.
Suite 12
New Orleans, LA 70112
Telephone: (504) 592-4641
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**

MARTEN LAW, PLLC

/s/ Bradley M. Marten
Bradley M. Marten
Linda R. Larson
1191 Second Avenue
Suite 2200
Seattle, WA 98101
(206) 292-2600
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Statement of Interest on Behalf of the State

of Louisiana Regarding Issues in Pending Motions to Dismiss has been served on All Counsel by

electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order

No. 12, and the foregoing was electronically filed with the Clerk of Court of the United States

District Court for the Eastern District of Louisiana by using the CM/ECF System, which will

send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of April, 2011.

Kanner & Whiteley, L.L.C.

Elizabeth B. Petersen
e.petersen@kanner-law.com