

THE SECRETARY OF THE INTERIOR

WASHINGTON

**JUL 1 2 2010**

## DECISION MEMORANDUM

**TO:**     Michael R. Bromwich
Director, Bureau of Ocean Energy Management, Regulation and
Enforcement

**FROM:**  Secretary

**SUBJECT:**  Decision memorandum regarding the suspension of certain offshore
permitting and drilling activities on the Outer Continental Shelf

## I.     INTRODUCTION

As Secretary of the Department of the Interior (Department), I take seriously the
Department's ongoing obligation, prescribed by the Outer Continental Shelf Lands Act
(OCSLA), to ensure that drilling activity undertaken on the Nation's Outer Continental
Shelf (OCS) is conducted in a manner that is safe for workers, coastal communities, and
the environment. *See* 43 U.S.C. §§ 1332(6), 1334(a), 1347 and 1348; 30 C.F.R. §
250.106. Applicable regulations provide that the Bureau of Ocean Energy Management,
Regulation and Enforcement may order suspensions of operations when activities "pose a
threat of serious, irreparable, or immediate harm or damage" to human or animal "life,
property, any mineral deposit or the marine, coastal, or human environment" or "[w]hen
necessary for the installation of safety or environmental protection equipment." 30
C.F.R. §§ 250.172(b)-(c). Pursuant to these authorities, this decision memorandum
directs you, as Director of BOEM, to direct the suspension of certain offshore permitting
and drilling activities on the OCS, as set forth in Section VI of this memorandum.

## II.    SUMMARY

Pursuant to 30 C.F.R. § 250.172(b)-(c), and with certain exceptions explained below, I
have determined that BOEM shall direct the suspension of the drilling of wells using
subsea blowout preventers (BOPs) or surface BOPs on a floating facility. I have also
determined that BOEM shall cease the approval of pending and future applications for
permits to drill wells using subsea BOPs or surface BOPs on a floating facility. These
directives and suspensions shall apply in the Gulf of Mexico and the Pacific regions
through November 30, 2010, subject to modification if I determine that the significant
threats to life, property, and the environment set forth in this memorandum have been
sufficiently addressed. The exceptions and other details of my decision are set forth in
Section VI below.

Exhibit A - 000001

This suspension is required to mitigate a clear threat that additional deepwater drilling poses of serious, irreparable, or immediate harm to life, to property, or to the marine, coastal, or human environment. I have concluded, based on an extensive record, that this temporary pause in deepwater drilling will provide time for a number of important steps toward addressing this threat and improving the safety of drilling operations, including the following:

> (1) the collection and analysis of key evidence regarding the potential causes of the April 20, 2010, explosion and sinking of the *Deepwater Horizon* offshore drilling rig, which caused the deaths of 11 workers and the subsequent and on-going release of millions of barrels of oil in the Gulf of Mexico (collectively referred to as the "BP Oil Spill"), and further efforts to determine the root causes of the accident, which can be considered and assessed in the context of new safety measures that I have directed BOEM to implement;

> (2) the assessment of wild well intervention and blowout containment resources – which are not currently available to handle a blowout such as the one that has defied containment since April 20, 2010 – to determine the strategies and methods by which they can be made more readily available should another blowout occur; and

> (3) the submission of evidence by operators demonstrating that they have the ability to respond effectively to a potential oil spill in the Gulf, given the unprecedented commitment of available oil spill response resources that are now being dedicated to the BP Oil Spill.

The BP Oil Spill is a dynamic situation, and new information is made available every day about the risks associated with deepwater drilling on the OCS, including: (1) systemic drilling and workplace safety issues, (2) the inadequacies of a variety of attempted wild well intervention and blowout containment strategies, and (3) the shortcomings of current oil spill response plans and resources. Recent events also have made clear that there are systemic problems that apply across different types of deepwater drilling, including, but not limited to, problems with BOPs, a lack of viable deepwater wild well intervention and blowout containment strategies and capabilities, and inadequacies in oil spill response plans and resources, particularly in light of the ongoing response to the BP Oil Spill. All of these factors are relevant to and form the basis for my decision.

In addition, suspending these particular operations until November 30, 2010, is necessary to provide time for you to submit a report to me no later than October 31, 2010 as a result of additional public outreach and information gathering and to allow me sufficient time to review and analyze your report, potentially conduct additional outreach, and make a determination as to whether additional action must be taken, including the potential for a modification to the scope or duration of this suspension decision. The November 30 date will also allow BOEM and the Department to develop the interim rules required to address the safety issues that have recently come to light. Some of these interim rules are expected to be issued within 120 days of the issuance of the May 27, 2010, Departmental

2

report entitled "Increased Safety Measures for Energy Development on the Outer Continental Shelf" (Safety Report), and additional time will be required after these rulemaking actions are completed for operators to implement the new requirements established by those rules. The Atlantic hurricane season also runs from June 1, 2010 until November 30, 2010, which is another reason for the duration of the suspension until this date. The November 30 end date also takes into account the expected killing or containment of the Macondo well, which is anticipated to occur by approximately mid-August 2010, and which may have an effect on the availability of spill containment and response capabilities for potential use in response to other incidents. Finally, the November 30 date accounts for the requirement that certain Technical Workgroups, established as part of the Government's response to the BP Oil Spill, provide recommendations to improve OCS drilling operations within 180 days of the issuance of the Safety Report.

In reaching this decision, I am aware that the suspension of deepwater drilling over the next few months will have a serious, negative impact on rig workers and those who support them. I also am aware that, as a general matter, the safety record for deepwater drilling has been good. Nevertheless, I am reminded daily that deepwater drilling accidents can have and in the case of the BP Oil Spill do have a profound, devastating impact on the economic and environmental health of an entire region. References to the track record for the deepwater drilling industry are of limited relevance, given that deepwater drilling is a relatively young and still-evolving enterprise (having only begun in earnest in the late 1990s), particularly given the reality that a devastating accident has, in fact, occurred, with the full dimensions and consequences of that accident still unfolding before us.

With regard to the first basis for my decision – the need to ensure that adequate safety measures are in place to address the risks of deepwater drilling – it is imperative that we have additional information about the causes of the BP Oil Spill and implement safety measures to address the risks associated with those causes. I note that several investigations and reviews to identify the root causes of the disaster are underway, including a joint BOEM/U.S. Coast Guard investigation, a review by the National Academy of Engineering (NAE), and on-going Congressional inquiries. Also, the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (Presidential Commission) is beginning its deliberations. I have been collecting information from some of these sources, and I will continue to do so as their deliberations proceed, so that I can make a more fully informed judgment regarding the safety of deepwater drilling. In that regard, I note that because the Macondo well still has not been contained, it is not yet possible to review key physical evidence that should help determine what caused the accident – the BOP that apparently failed remains on the seabed. In short, a threat exists, and we are in the midst of determining the full nature and extent of that threat. This is not to say that the Department intends to suspend drilling until all investigations have been completed, but additional time is critical to get the preliminary results of ongoing investigations to better inform our decisionmaking and longer term rulemaking throughout this process. Although some have suggested that the BP Oil Spill represents an anomalous situation and that it would therefore be

Exhibit A - 000003

inappropriate to suspend other deepwater drilling activities, we simply do not know if the BP situation is unique. With regard to the performance of blowout prevention equipment, for example, it is noteworthy that there are only a small number of major manufacturers of the BOPs that are used by drilling contractors. Also, testing that has been required for the BOPs on the new relief wells has identified unexpected performance problems with those BOPs. This evidence suggests that the problems that lie at the heart of the BP Oil Spill are not unique to the *Deepwater Horizon* and Macondo well.

Second, this temporary pause in deepwater drilling will give industry time to take concerted action toward the development of more effective blowout containment strategies and capabilities for deepwater operations. The oil industry has limited capability to stop an uncontrolled blowout of an oil well in deepwater. BP's inability, after more than 80 days, to contain the Macondo blowout and spill provides continuing evidence that BP – and the rest of the industry, which has been cooperating with BP in its efforts to contain the on-going spill – had not prepared to contain a blowout in the deepwater environment. In Congressional testimony, industry executives have admitted that the industry is unprepared to stop deepwater oil well blowouts effectively, and that many of the containment methods attempted with respect to the Macondo blowout have been improvised and were untested. Although industry has begun to organize efforts to address strategies and options for subsea well control and blowout containment, much work remains to be done to develop effective containment and response options as well as to achieve an appropriate level of preparedness in the event of another deepwater wild well.[1]   It may not be necessary or appropriate to wait for the full build-out of this capability before resuming deepwater drilling, but it is reasonable, before new deepwater drilling activities recommence, to require industry to develop workable plans to address a blowout in a more timely and effective manner than has been the case with the BP Oil Spill.

The third key reason for my decision is that the unprecedented deployment of spill response equipment and cleanup crews to address the massive BP Oil Spill raises serious legal and practical questions about whether other deepwater operators would be able to employ adequate quantities of skimmers, boom, and other oil spill response resources to address another spill if it occurs.[2] Simply put, there may be insufficient resources

---

[1]     *See* API submissions regarding "Enhanced Industry Capability for Offshore Operations" and "Joint Industry Task Force to Address Subsea Well Control and Oil Spill Response", July 6, 2010. The JITF document states that "The Joint Industry Task Force on Subsea Well Control and Containment has been formed to review current subsea well control preparedness and response options to determine their efficacy throughout all offshore operations." This task force "will review intervention and containment at the seafloor" and "will focus on other well control procedures including well shut in, kill methods, as well as subsea containment and collection methods" (emphasis in original).

[2]     Shallow water spills tend to be more confined and easier to address, if only because of the smaller geographic area affected by the spill. For example, with respect to the BP Oil Spill, it has been estimated that each molecule of oil can take as much as three hours to reach the surface, thereby creating conditions that allow for the spill to spread over a large geographic area. *See, e.g.,* David A. Fahrenthold and Juliet Eilperin, "Depth of Oil Spill Obscures Impact," (15 May 2010) ("[T]his oil is flowing out nearly a mile underwater, and takes, by one estimate, three hours to reach the surface.").

Exhibit A - 000004

available to respond should another deepwater spill occur while the BP Oil Spill containment and clean-up efforts are at their peak. Before deepwater drilling activity resumes, oil spill response plans need to be reviewed under the changed circumstances presented by the BP Oil Spill to determine whether sufficient spill response resources are available to address another deepwater spill event.

Each of these three factors provides a strong, independent rationale for pushing the "pause" button on the drilling of new deepwater wells in the Gulf of Mexico. I do not believe that this stoppage, however, should continue for an indefinite period. I have identified November 30, 2010, as the end-date for the suspensions because it represents the period of time needed to address the three serious issues of deepwater drilling safety, blowout containment capabilities, and oil spill response capacity. I acknowledge a continuing sense of urgency in addressing these issues. For that reason, I am directing you, as the Director of BOEM, to engage in an active, public outreach effort in the weeks ahead on these issues with industry, academic experts, the public and other interested parties. I further direct you to issue a report to me no later than October 31, 2010 that contains your findings and recommendations as a result of your outreach efforts and any other information you have acquired in the interim. As discussed in Section VI of this memorandum, November 30 is an appropriate end date for this suspension. However, I reserve my statutory and regulatory authority to issue a new decision or to modify this decision based on new information that addresses, to my satisfaction, the need to ensure that particular deepwater drilling practices can be conducted safely.

## III.   BACKGROUND

This directive is based on my authority under OCSLA to ensure safe operations on the OCS, my consideration of materials in the decision file, including the documents summarized in Attachment 1 and significant information that has developed since the imposition of the original suspension, as well as my consideration of the following types of information that I have acquired through my own personal and extensive involvement in this matter:

(1)   my review with you of potential options to ensure safe drilling operations on the OCS;

(2)   the daily morning meeting updates over the last 2 months that I have convened with United States' officials and BP to review and oversee the multiple work streams to contain the blowout of the Macondo well;

(3)   my review of the daily Unified Command Report submitted by BP at my direction and the direction of the National Incident Command Center on the numerous work streams associated with the blowout of the Macondo well;

(4)   my review of the multiple daily Departmental oil spill incident reports since the blowout of the Macondo well detailing matters relating to the blowout, impacts to

Exhibit A - 000005

ecological resources, including state and Federal sensitive wildlife areas and refuges and state and national parks;

(5) my multiple visits to the area, including overflights of the Gulf of Mexico and the site of the *Deepwater Horizon* incident, which have allowed me to see first-hand the condition of the oil spill in the Gulf of Mexico and the impacts on the coastal environment and economy, including impacts on sensitive ecological, historical and restoration areas such as national wildlife refuges and national parks;

(6) the legal authorities under the OCSLA and implementing regulations concerning safety and environmental protection, including the legislative history of OCSLA's 1978 amendments enacted in the wake of the 1969 Santa Barbara blowout and oil spill; and

(7) my participation in the preparation of the Safety Report, which responded to the President's directive to report within 30 days, "what, if any, additional precautions and technologies should be required to improve the safety of oil and gas exploration and production operations on the outer continental shelf."[3]

The May 28, 2010, Suspension and Subsequent Judicial Action

The OCSLA authorizes the promulgation of regulations for the "suspension or temporary prohibition of any operation or activity, including production, pursuant to any lease or permit . . . if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, . . . or to the marine, coastal, or human environment . . . ." 43 U.S.C. § 1334(a)(1). The BOEM regulations provide that the agency may order suspensions of operations when activities "pose a threat of serious, irreparable, or immediate harm or damage" to human or animal life, property, any mineral deposit, or the marine, coastal, or human environment as described in Section 1334(a)(1) above or "[w]hen necessary for the installation of safety or environmental protection equipment." 30 C.F.R. §§ 250.172(b)-(c).

On May 28, 2010, I directed the Minerals Management Service, now BOEM, to exercise its authority under OCSLA and its implementing regulations to suspend certain deepwater drilling activities. Accordingly, BOEM issued a Notice to Lessees and Operators (NTL) suspending permitting and drilling operations in the Gulf of Mexico and the Pacific region for operations in water depths greater than 500 feet for a period of 6 months. The 6-month duration of the May 28, 2010, suspension was intended, among other things, to minimize the possibility of another catastrophic event, particularly while we are still responding to the BP Oil Spill; to ensure that operators similarly situated to *Deepwater Horizon* were operating in a safe manner; to take into account the expected timeline for killing the Macondo well; and to provide adequate time to obtain information

---

[3]     Department of the Interior, *Increased Safety Measures for Energy Development on the Outer Continental Shelf* at 1 (May 27, 2010) (Safety Report).

6

Exhibit A - 000006

from on-going investigations of the disaster and to develop regulations addressing the safety-related issues described in the Safety Report.

On June 7, 2010, certain providers of support services to offshore oil and gas operations in the Gulf of Mexico filed a lawsuit in the Federal District Court for the Eastern District of Louisiana seeking to invalidate the May 28, 2010, suspension (*Hornbeck* litigation). On June 22, 2010, the Court preliminarily enjoined enforcement of the suspension. The Department of the Interior appealed the Court's decision and requested that the U.S. Court of Appeals for the Fifth Circuit stay the injunction pending appeal. On July 8, 2010, the Fifth Circuit denied the stay motion on the grounds that the Department had not shown irreparable harm because there was no indication that the drilling activities subject to the suspension were likely to resume, but invited the Government to seek emergency relief if such activities had resumed or were imminent.

While we are complying with the Court's injunction in the *Hornbeck* litigation, as Secretary of the Interior, I have an ongoing obligation under OCSLA to manage the OCS in a safe and environmentally sound manner. As such, we have continued to review data and information concerning management of the OCS, and as a result of this continuing review, have further identified facts and risks associated with deepwater drilling that are addressed here.

## IV.   IDENTIFIED RISKS TO CONTINUTED DRILLING IN DEEPWATER

The OCSLA requires that operations on the OCS be conducted in a "safe manner . . . using technology, precautions, and techniques sufficient to prevent or minimize the likelihood of blowouts, loss of well control, fires, spillages, physical obstruction to other users of the waters or subsoil and seabed, or other occurrences which may cause damage to the environment or to property, or endanger life or health." 43 U.S.C. § 1332(6). The following categories of risks related to deepwater drilling activities must be addressed to ensure fulfillment of the requirements of this law: (1) the current status of drilling and workplace safety and the implementation of safety measures; (2) the current status of well control and spill containment capabilities; and (3) the current status of spill response capabilities.

### A.   Certain Drilling Activities and Conditions Involve Heightened Safety Risks

While all offshore drilling for oil and gas involves various risks, including the risk of equipment or systems failure, human error, and other occurrences that could threaten the safety of workers and endanger the environment, certain equipment and drilling conditions undertaken in the deepwater environment carry heightened risks of producing an event such as the BP Oil Spill.[4]

---

[4]   These conclusions are based on a memorandum prepared in consultation with senior BOEM staff who have engineering expertise and experience. *See* Memorandum from Walter Cruickshank, Deputy Director of BOEM (June 30, 2010) (Safety Report).

7

### 1.    Equipment – Blowout Preventers

Because of their essential role in the existing systems for preventing oil spills resulting from blowouts, it is critical that BOPs be as reliable and effective as possible. The statistical infrequency of deepwater blowouts accounts for only one of the factors that must be considered in evaluating whether it currently is safe to proceed with deepwater drilling in the OCS. Also relevant to the risk analysis are the catastrophic consequences – in terms of the health and safety of workers, effects on the regional and national economies, and damage to the environment – of an uncontrollable blowout and spill, regardless of the probability of such an event.

- Subsea BOPs. The control system for subsea BOPs is much more complex than the control system for a surface BOP, and subsea BOPs require regular testing to ensure that they will respond properly on demand. Also significant is the fact that subsea BOPs are less accessible to intervention, requiring the use of remotely operated vehicles (ROVs) to intervene, and that they are difficult to repair while attached to the wellhead. Their placement in deepwater also vastly complicates containment efforts in the event of an uncontrolled blowout – in a nutshell, the ability to contain a deepwater spill effectively and quickly when a subsea BOP stack fails does not exist.

- Surface BOPs on floating facilities. The operations of surface BOPs are not subject to all of the complicating factors associated with subsea BOPs, and they are more accessible for repair and intervention. However, surface BOPs that are placed on floating facilities (as opposed to jack-up rigs) present other significant risks. The high-pressure riser and casing from the seafloor to the rig can be exposed to dynamic stresses. A failure of a high-pressure riser due to these stresses can lead to uncontrolled flow below the surface BOP system located on the floating facility. Well operations from a floating platform with a surface BOP stack and a high pressure riser (through the water column) are higher risk operations than drilling from a jack-up rig or a fixed platform. The single high pressure riser (or in some cases, a dual riser system) used by floating platforms are subject to environmental forces such as vortex induced vibration (VIV) that make them more susceptible to stress fatigue. Jack-up rigs and fixed production platforms have more casing strings tied back to the surface of the rig or platform, which provide additional external support for the pressured casing. Also, because these tied back casing strings are used in shallower water operations with a shorter water column, they are less exposed to current induced stress.

The failure of the *Deepwater Horizon*'s subsea BOP to stop flow from the Macondo well underscores the risks associated with BOP failures in deepwater, although at this time the precise reasons for the *Deepwater Horizon* BOP's failure are not known. Indeed, as discussed above, the lack of knowledge about the root cause in and of itself poses a present and unacceptable risk to the extent that we have no guarantee that operators would not be engaging in the very same activity that led to the BP Oil Spill.

Exhibit A - 000008

It is clear that the apparent performance problem with the *Deepwater Horizon's* BOP is not an isolated incident. Performance problems have also been identified in recent weeks with the BOPs on the relief wells that BP is drilling. The problems have been uncovered during new testing requirements that were imposed on the relief wells after the BP Oil Spill, thus providing more evidence that prior testing requirements were inadequate.[5] It is unlikely that these problems are unique to BP. The BOPs are manufactured by a very small number of companies, and BOPs used across the industry tend to employ standardized components.

### 2.    Factors That Correlate to Deepwater

Drilling that takes place in the deepwater environment poses more significant risks than drilling in shallow waters. The primary risk factors turn on the type of equipment that must be used in deeper water. More specifically, beyond approximately 500 feet in depth, floating facilities – rather than "jack-up" rigs – typically are used.[6] For purposes of this decision, I am defining "deepwater drilling" with reference to the type of blowout prevention equipment used in deepwater drilling operations, rather than to a specific water depth even though, as a practical matter, 500 feet of depth is the typical trigger for needing to use floating drilling facilities.[7]

In addition to the heightened risks associated with the use of floating rigs and platforms, deepwater wells can be very productive and have flow potentials that can be 5 to 10 times higher than shallow water wells. These characteristics have been fully demonstrated by the Macondo well. Accordingly, operators' worst-case discharge scenarios typically anticipate larger releases from deepwater wells.

---

[5]     Pursuant to NTL No. 2010-N05, we are seeking re-certifications from operators on their subsea BOP stacks and independent third party verifications that the BOP stack is designed for specific equipment and for the specific well design. We also will be imposing new secondary control requirements, remote operated vehicle capacity requirements, new testing requirements, and new reporting requirements, as well as new blind shear ram redundancy requirements. These measures apply to each operator and demonstrate the lack of sufficient safety measures shared by all operators using such BOPs.

[6]     In my May 28 suspension decision, I used a 500-foot water depth delineation as part of the description of the suspension. This 500-foot delineation served as a shorthand proxy for the risks associated with using subsea BOPs or surface BOPs on floating facilities. To avoid any possible confusion over the use of the proxy, I have chosen to make this new suspension decision in reference to the types of blowout prevention equipment used in deepwater operations, rather than in reference to the functionally equivalent concept of water depth.

[7]     A number of different water depths have been used to define "deepwater" on the OCS, and they generally have a basis in how technologies change with depth. These delineations have included: (1) 500 feet to reflect the change in drilling rigs from bottom founded jack-up rigs to floating rigs; (2) 200 meters (656 feet) in the Deep Water Royalty Relief Act of 1995, which varied royalty terms in water depths greater than 200 meters to reflect the greater cost of drilling in those depths; (3) 400 meters (1312 feet) and 800 meters (1968 feet) in BOEM regulations (30 C.F.R. § 256.37(a)(3)), which allow for setting the initial term of the lease based on water depth to reflect the greater time necessary to explore tracts in deep water; and (4) 1000 feet to reflect the change in development scenarios from bottom-founded to floating production facilities.

9

Exhibit A - 000009

Also, over-pressured formations (defined as formations with pressures that exceed the normal pressure expected at a given depth) present special challenges in the deepwater drilling environment. Addressing over-pressured formations in deepwater drilling operations is more complex than in shallow water operations. In general, deepwater wells have more casing/liner strings, leaving less annular space between the casing and hole diameter. This makes cementing the hole more difficult. Higher than normal pressure formations further complicate the operation.

Finally, the BP Oil Spill response has demonstrated that water depth, pressure, and temperature are major factors affecting the ability of well control crews to bring deepwater blowouts under control. Complications associated with responding to a deepwater blowout include inaccessibility of the well, methane hydrate formation at lower seafloor water temperatures, longer times needed to move ROVs and equipment from the surface to the work zone, and the need to work with larger and less available support equipment due to the greater water pressure.[8]

### B.    Drilling and Workplace Safety

There is ample evidence that there is a need to temporarily pause certain drilling activity to allow for the installation of safety and environmental protection equipment. 30 C.F.R. § 250.172(c). As detailed in the Safety Report, substantial improvement in the industry's safety practices and procedures relating to offshore drilling, particularly with respect to deepwater drilling conducted from floating rigs and production facilities, is necessary.[9] While some of the drilling safety recommendations contained in the Safety Report are being implemented through industry compliance with NTL No. 2010-N05,[10] the Safety Report also describes regulatory gaps and other shortcomings in the Bureau's current regulatory scheme for offshore drilling. Some of the Safety Report's recommendations for filling regulatory gaps will be accomplished through a subsequent rulemaking, which BOEM plans to issue within 120 days from the issuance of the May 27, 2010, Safety Report. The Safety Report also anticipates that technical workgroups will be formed, and that they will provide recommendations within 180 days. Thus, only the NTL No. 2010-N05 safety measures will be implemented in the near term. Furthermore, fulfillment of NTL No. 2010-N05's requirements will not completely address all of the identified safety

---

[8]      See, Memorandum by Dr. Marcia McNutt, Director of the United States Geological Survey, regarding "USGS Support for Macondo Well Control and Containment; Observations Regarding Technical Problems with Deepwater Efforts," June 27, 2010.

[9]      See also, BP, Blowout Preventer Testing Memorandum, presented at the Hearing on "Inquiry into the Deepwater Horizon Gulf Coast Oil Spill" (May 12, 2010) (stating that "[s]hort and long term actions are required to improve subsea BOP stack testing, reliability and intervention"); API, "Joint Industry task Force to Address Subsea Well Control and Oil Spill Response" (July 6, 2010).

[10]      NTL No. 2010-N05, National Notice to Lessees and Operators of Federal Oil and Gas Leases, Outer Continental Shelf (OCS): Increased Safety Measures for Energy Development on the OCS (June 8, 2010).

Exhibit A - 000010

concerns, and more time will be needed for rulemaking and assessment of the technical workgroups' recommendations. The November 30, 2010, date also allows time for the technical workgroups to provide an opportunity for them to provide input. I will ask these workgroups to provide me with interim progress reports, as necessary.

The BOEM is also considering further safety-related requirements relating to, for example, blind shear ram redundancy requirements and the establishment of deepwater well-control guidelines. In addition, I have requested that the Safety Oversight Board, chaired by Assistant Secretary for Land and Minerals Management, Wilma Lewis, provide input regarding inspections and other safety and enforcement-related issues by August 15, 2010, based on preliminary findings of the BOEM/United States Coast Guard (USCG) Joint Investigation and other information gathered by the Safety Oversight Board.

Given this dynamic, on-going review of measures that are being considered to improve the safety of deepwater drilling, I cannot conclude at this time that deepwater drilling can move forward in a safe and environmentally sound manner. I note, in that regard, that the root cause of the BP Oil Spill has not yet been identified. I will be receiving additional information about the risk factors associated with deepwater drilling based on the many investigations that are now underway, including the investigation that my Department is actively engaged in with the USCG. Even if these investigations are not fully complete by November 30, 2010, we will by that time have the benefit of a great deal of additional information about the BP Oil Spill. To the extent additional information or changes in circumstances require specific modifications to this decision or a new decision, I will provide the basis for any such decision.[11]

The fact that the industry has a track record of relatively few accidents, and that the inspections of current deepwater rigs have uncovered only limited infractions, does not change the present risks or my conclusion. It is true that 27 of the 29 rigs in the Gulf of Mexico inspected by BOEM after the BP Oil Spill had no infractions. *See* MMS Deepwater Drilling Rig Inspection Report. It also is true that the *Deepwater Horizon* rig passed its most recent inspections prior to the explosion.[12] These facts provide very limited assurance, however, regarding the safety of deepwater drilling. The reality is that the BP Oil Spill disaster occurred, regardless of prior inspection results, and regardless of the prior accident history of the *Deepwater Horizon* and other, similar rigs. And, as discussed above, new evidence has emerged that suggests that the deepwater drilling industry may face some industry-wide risks (*e.g.*, with regard to BOPs) that should be addressed before new deepwater drilling goes forward. Until the Department can

---

[11]     Industry executives have acknowledged the relevance of the on-going investigations to determinations about deepwater drilling safety. *See e.g.*, Written Testimony of Steve Newman, Subcommittee on Oversight and Investigations, Hearing on "Inquiry into the Deepwater Horizon Gulf Coast Oil Spill" (May 12, 2010) ("Until we fully understand what happened on April 20, we cannot determine with certainty how best to prevent such tragedies in the future.").

[12]     BOEM Information Memorandum for the Secretary Re: Inspection History of Deepwater Horizon (May 15, 2010).

Exhibit A - 000011

implement rules to address newly-identified deepwater drilling concerns, rig-by-rig compliance reviews conducted under the current regime cannot ensure safety.

In this regard, it is noteworthy that in establishing a "threat of serious, irreparable, or immediate harm or damage" to life or property or to demonstrate a need for "installation of safety or environmental protection equipment", 30 C.F.R. § 250.172(b)-(c), there is no requirement that "systematic noncompliance" must be demonstrated. The current regulatory regime for offshore operations is not sufficient to ensure safety and environmental protection, there is a need to bolster and improve safety measures. Testimony before the BOEM/USCG Joint Investigation by MMS inspectors has indicated that BOP inspection and testing requirements should be strengthened, a conclusion that my Safety Report also has endorsed. Simply put, there is an ample record supporting my conclusion that existing oversight mechanisms, including compliance with NTL No 2010-N05, are not, by themselves, adequate to prevent a catastrophic blowout and major spill.

### C.     Attention Must Be Devoted to Post-Blowout Containment Strategies and Capabilities

The BOEM regulations require those seeking to engage in offshore drilling to have an adequate response plan in the event of a catastrophe.[13] Specifically, the regulations require that an emergency response action plan include "methods to ensure the containment and recovery equipment as well as response personnel are mobilized and deployed at the response site." 30 C.F.R. § 254.23(g)(5). Lessees must also certify in writing that it has the capability to respond "to the maximum extent practicable, to a worst case discharge or a substantial threat of a discharge." 30 C.F.R. § 254.2(b).[14]

BP's inability, after more than 80 days, to contain the Macondo blowout and spill – despite the cooperation of other major oil companies – provides continuing evidence of industry's limited capability to stop an uncontrolled blowout of an oil well in deepwater. I have witnessed on a daily basis the results of inadequate equipment and planning to contain a deepwater blowout. This conclusion is chronicled by a long litany of failed or only partially successful attempt to contain the leak, even as hundreds of thousands of additional barrels of oil and large volumes of gas continue to pollute the Gulf of Mexico. Immediately after the accident, ROVs made many unsuccessful attempts to close the BOP's rams via "hot stabbing." Multiple attempts were made over many days on virtually all of the types of rams included in the BOP stack – all to no avail. Next a containment dome was lowered over the well, but the failure to anticipate the formation of hydrates in the deepwater environment led to its failure as hydrates formed quickly, making the dome buoyant, and virtually uncontrollable. After that, a hastily-engineered

---

[13]     *See, e.g.,* 30 C.F.R. §§ 254.1(a); 254.23; §254.30; §254.2.

[14]     In the same vein, BOEM issued NTL No. 2010-N06 which requires all operators and lessees to provide a worst case discharge scenario, including all assumptions regarding well design, reservoir characteristics, and the daily discharge rate possible from the uncontrolled blowout portion of their worst case discharge scenario. This information is particularly relevant going forward.

Exhibit A - 000012

"riser insertion tool" was installed at the end of the riser, providing limited containment, while the "kink" in the riser near the wellhead continued to fail and emerged as a major additional leak.

The rest of the story has been chronicled in the public eye: a multiple-week construction effort was undertaken to prepare a long-distance hook-up for a "top kill" operation, using heavy drilling mud. The top kill failed. Priorities then shifted back to containment, with efforts made to execute a "clean" cut of the riser near the top of the BOP stack and install a fitted cap over the riser. A more crude cut was accomplished and an ill-fitting "top hat" was installed. In the succeeding weeks, additional containment options have been pursued, with BP scrambling to identify ships and other equipment to undertake a large containment effort. All of these efforts have been greatly complicated by the lack of precise information regarding the size of the uncontained flow, and the fact that BP has not had the equipment available to measure the flow, either directly, or through the installation of pressure measurement equipment.

In Congressional testimony, industry executives have admitted that industry is unprepared to effectively stop deepwater oil well blowouts, and that many of the containment methods attempted with respect to the Macondo blowout have been improvised and were untested.[15] The BOEM's daily incident reports chronicle the multiple unsuccessful or partially successful attempts to contain the Macondo well blowout.

Although industry has begun to organize efforts to address strategies and options for subsea well control and blowout containment, much work remains to be done in order to develop viable containment and response options as well as to achieve an appropriate level of preparedness in the event of another deepwater blowout.[16] . It may not be necessary or appropriate to wait for the full build-out of this capability before resuming deepwater drilling, but it is reasonable to require industry to develop a plan to address a blowout in a more timely and effective manner than has been the case with the BP Oil Spill before new deepwater drilling activities recommence.[17]

---

[15]    See, McNutt Memo. See also, e.g.., Testimony of Rex Tillerson, Hearing on "Drilling Down on America's Energy Future: Safety, Security and Clean Energy," Subcommittee on Energy and Environment (June 15, 2010). See also Written Testimony of Lamar McKay, Chairman and President of BP America, Senate Environment and Public Works Committee, Economic and Environmental Impacts of the Recent Oil Spill in the Gulf of Mexico (May 11, 2010).

[16]    See API submissions regarding "Enhanced Industry Capability for Offshore Operations" and "Joint Industry Task Force to Address Subsea Well Control and Oil Spill Response", July 6, 2010.

[17]    The Department has also issued NTL No. 2010-N06, which directs operators and lessees to provide additional information in their exploration and development plans regarding addressing a blowout scenario involving a well that is expected to have high volumes of liquid hydrocarbons, the availability of a rig to drill a relief well, and the likelihood that surface intervention would be able to stop a blowout, among other things. This directive is consistent with BOEM's regulatory authority and will provide important information relevant to the evaluation of each operator's capacity to contain a blowout.

Exhibit A - 000013

### D.    Limited Spill Response Resources Are Available to Battle Another Deepwater Spill

The BOEM's regulations require that all owners and operators must have a spill response plan that demonstrates the ability to "respond quickly and effectively" whenever oil is discharged from their facility. 30 C.F.R. § 254.1(a). The regulations also require that an owner and operator must be able to take "all appropriate actions necessary to immediately abate the source of a spill and remove any spills of oil." 30 C.F.R. § 254.5(c).

The *Deepwater Horizon* incident has demonstrated the inadequacy of response plans, and steps must be considered to ensure that those engaged in drilling offshore are complying with current regulations. The current situation also poses a serious question as to whether industry is in compliance with existing regulatory requirements. The BP Oil Spill response effort has revealed major deficiencies with respect to the adequacy and functionality of the equipment that was staged and deployed in connection with attempts to contain the spill; the adequacy of the applicable Offshore Spill Response Plan (OSRP) components and their implementation; and the expertise and training of personnel involved in the BP Oil Spill containment efforts.

This is not a question of a specific operator's record, but a measure of the adequacy of the entire industry's containment plans and capacity to address major spills in the deepwater environment. BP was not the only operator drilling with inadequate plans. The House Subcommittee on Energy and Environment reviewed the preparedness plans of five major oil companies and concluded that they were no better prepared to deal with a major oil spill than BP, and if a major blowout had occurred at another operator's well, they would not have been any more prepared to respond.[18]

The unprecedented deployment of spill response equipment and cleanup crews to the vicinity of the Macondo well and regional shorelines in response to the BP Oil Spill raises serious concerns about the industry's and the Government's current ability to respond in a meaningful way to another deepwater spill.[19]  There are insufficient resources currently available to respond should another deepwater spill occur while the BP Oil Spill containment and clean-up effort is ongoing. As an industry executive recently testified before Congress, "[regional response] plans look the same because in

---

[18]     Transcript of Hearing on "Drilling Down on America's Energy Future: Safety, Security and Clean Energy," Subcommittee on Energy and Environment (June 15, 2010); Opening Statement of Rep. Henry A. Waxman, Subcommittee on Energy and Environment, Drilling Down on America's Energy Future: Safety, Security and Clean Energy (June 15, 2010); Opening Statement of Rep. Edward J. Markey, Subcommittee on Energy and Environment, Drilling Down on America's Energy Future: Safety, Security and Clean Energy, (June 15, 2010); Opening Statement of Rep. Bart Stupak, Subcommittee on Energy and Environment, Drilling Down on America's Energy Future: Safety, Security and Clean Energy, (June 15, 2010).

[19]     Shallow water spills tend to be more confined and easier to address, if only because of the smaller geographic area affected by the spill.

14

Exhibit A - 000014

fact they call upon the same resources to respond."[20] As late as March 2010, BP had submitted its report on cleanup capacity projecting the capacity to skim and remove 491,721 barrels of oil per day. As of July 5, 2010, their skimming operations have averaged less than 900 barrels per day equivalent.[21]

The BP Oil Spill alone is taxing these shared response resources to the limit. Industry executives have testified and stated repeatedly that they already have offered all available resources to the BP Oil Spill.[22] U.S. military and foreign resources are being utilized in the response effort.[23] The USCG has determined that the number of oil spill response vessels currently skimming oil is inadequate to recover the oil released from the BP Oil Spill, and additional skimming vessels are being ordered and manufactured to aid with the response.[24] Despite these efforts, the USCG recently determined that "There are simply not enough U.S. [oil spill response vehicles] capable of skimming oil available to keep up with the pace at which oil flows from the [Macondo] well."[25] Accordingly, the USCG and the Environmental Protection Agency (EPA) amended their oil spill response time requirements to allow certain commercial and military vessels normally required to be available for spills in other regions to be deployed in support of the BP Oil Spill response.[26] In a June 28, 2010, meeting between Department officials and representatives from the drilling industry, the industry was unable to provide assurances that resources exist that would be available to address a second oil spill.

Finally, as concerns about the recent Tropical Storm Alex system in the Gulf of Mexico demonstrate, clean-up operations during hurricane season are subject to multiple weather-

---

[20]    Testimony by ExxonMobil CEO and Chairman Mr. Tillerson before the House Subcommittee on Energy and Environment, June 15, 2010.

[21]    Kindy Kimberly, Recovery Effort Falls Short of BP's Promises, The Washington Post, (July 6, 2010).

[22]    See, e.g., Testimony by BP, ExxonMobil, Chevron, and ConocoPhillips executives before the House Subcommittee on Energy and Environment Hearing, June 15, 2010.

[23]    Admiral Thad Allen, June 25, 10, and 1, 2010 briefings; Daily Administration updates on Deepwater Horizon response, June 28, 2010.

[24]    Memorandum from BP Deepwater Horizon Oil Spill Federal On-Scene Coordinator Rear Admiral Watson to National Incident Command (June 16, 2010); Admiral Thad Allen, June 25, 2010 briefing and June 18, 2010 briefing. See also 33 CFR 154, 155 & 40 CFR 112, Temporary Suspension of Certain Oil Spill Response Time Requirements to Support Deepwater Horizon Oil Spill of National Significance Response, 75 Fed. Reg. 37712, 37714 (June 30, 2010).

[25]    June 16, 2010 Memorandum from Rear Admiral Watson to the National Incident Command.

[26]    See "Temporary Suspension of Certain Oil Spill Response Time Requirements to Support Deepwater Horizon Oil Spill of National Significance Response." 75 Fed. Reg. 37712, 37714 (June 30, 2010).

Exhibit A - 000015