related complications, difficulties, and delay.[27] For example, while Alex took a path away from the Macondo site, ocean conditions generated by the storm still necessitated that all 510 skimmers responding to the BP Oil Spill be temporarily recalled to shore.[28] Moreover, the storm surge from a hurricane or other significant storm could distribute oil over a wider area and carry the oil into the coastline and inland areas.[29] The Atlantic hurricane season, which includes the Gulf of Mexico, runs from June 1, 2010 until November 30, 2010.[30]

Therefore, under the present conditions, there are serious concerns about whether operators have the capacity to mount a prompt and effective containment and clean-up effort in the event of another significant deepwater spill, whatever its probability. Before deepwater drilling activity resumes, it is prudent – and necessary to ensure operators have adequate response plans as required by BOEM regulations – and for companies to work with BOEM, the USCG, and other authorities, to determine when adequate spill response resources are available to address a future deepwater spill event.

### E. Economic Impacts

The OCSLA does not require that I conduct a balancing of harms analysis in connection with the suspension of drilling operations. The statute requires only that I conclude that there is a threat of serious or irreparable harm to life, property, or the marine, coastal, or human environment. *Compare* 43 U.S.C. § 1334(a)(1) *with* 43 U.S.C. § 1334(a)(2)(i)-(iii). *See also* H.R. Rep. 95-590, at 132 (1977). Nevertheless, there are those that suggest that such a balancing of harms may be appropriate. Even if I had to engage in a balancing of the economic effects both of the BP Oil Spill and of the suspension of drilling operations, I would conclude that a temporary suspension of drilling operations is warranted.

I have reviewed the materials submitted by the State of Louisiana expressing its concerns over the economic effects of a temporary suspension of drilling operations, as well as the submissions made by the plaintiffs and *amici* in the *Hornbeck* litigation on the predicted economic effects of a temporary suspension of drilling operations. Even accepting their assessment of the economic impact of a suspension, I conclude that it is outweighed by economic impact of another catastrophic event like the blowout at the Macondo well, if

---

[27] Admiral Thad Allen, June 25, 2010 Briefing (stating that a storm would have a "very negative effect" on containment efforts because it will require breaking production and getting production units to a safe locale. *See also* Admiral Thad Allen, June 26, 2010 Briefing and 28, 2010 Briefing (stating that if evacuation is required as a result of a tropical storm, the containment effort would be delayed by about 14 days).

[28] "Waves from Storm Hinder Spill Effort," New York Times, June 30, 2010, citing statements by Coast Guard Rear Adm. Paul F. Zukunft.

[29] Admiral Thad Allen June 28 Briefing; NOAA Hurricane Factsheet, http://www.deepwaterhorizonresponse.com/posted/2931/NOAA_fact_sheet_on_hurricanes_and_oil_spills.572167.pdf.

[30] NOAA National Hurricane Center at http://www.nhc.noaa.gov/.

Exhibit A - 000016

one were to occur. It is self-evident that the economic and environmental costs of the current spill, which even now has not been brought under control, outweighs the economic impacts of a temporary suspension of drilling activities, especially since production operations in the Gulf continue. The need to prevent another such occurrence fully supports the brief suspension – for approximately four and a half months until November 30, 2010 – of drilling activities, even on the assumption that I am required to take into account the economic impact of the suspension.

There is no question that a suspension of deepwater drilling will have a significant, negative economic impact on direct and indirect employment in the oil and gas industry, as well as other secondary economic consequences. These economic impacts must be considered against the backdrop of the substantial economic effects associated with the on-going BP Oil Spill and the potential economic damage that would be caused by another deepwater accident under the current circumstances. Therefore, while the economic effects of any drilling suspension – in terms of employment, spending, energy production, and government revenues – are and will be significant, another accident or oil spill would exacerbate the BP Oil Spill's effects on the economy and deal an unacceptable blow to the industry and the environment.

## V.  OPTIONS CONSIDERED BUT REJECTED

### A.  No suspensions of drilling.

Under this option, the Department would allow drilling to go forward under the workplace and drilling safety, blowout containment, and oil spill response conditions that currently exist. Compliance with the safety requirements of NTL No. 2010-N05 would still be required, but all previously permitted drilling activity, including deepwater exploratory drilling, could resume prior to any additional rulemaking or completion of the reviews of the *Deepwater Horizon* incident.

I have rejected this option because it would allow deepwater drilling operations with known safety risks – *i.e.*, operations that pose risks and involve the use of subsea BOPs or surface BOPs on floating facilities – to proceed before I can have confidence that all necessary safety measures have been implemented. While NTL 2010-N05 increases the level of safety for deepwater drilling, it does not implement all of the safety measures recommended in the Safety Report, and I cannot be sufficiently confident that compliance with the Safety NTL is sufficient to mitigate the threats posed by deepwater drilling before we know more about the exact causes of the BP Oil Spill. This option would allow deepwater drilling to go forward while the Macondo well remains uncontrolled and before tailored strategies and measures for containing deepwater blowouts and spills have been developed and implemented. Finally, I do not believe it would be prudent or responsible to allow deepwater drilling operations to proceed while available oil spill response capacity, particularly in the Gulf of Mexico region, is occupied with responding to the BP Oil Spill.

### B. Moratorium on drilling, but with defined criteria for relief from suspensions.

Under this option a drilling moratorium would prohibit deepwater drilling, but provide opportunities for an early exit from the moratorium for certain lower-risk deepwater drilling activities based on the satisfaction of specified requirements relating to the three topics discussed above: workplace and drilling safety, blowout containment, and oil spill response capacity. This option would allow time for the implementation of additional safety measures, the development of strategies for deepwater blowout containment, and the BP Oil Spill response to continue while reducing the risk of a second significant spill event. It also would provide operators with framework and guidance for relief from the moratorium. Further, though anticipation of an early exit from the moratorium may not prove sufficient to keep the entire current fleet in the Gulf of Mexico, it may potentially maintain some deepwater drilling presence in the Gulf of Mexico.

Unfortunately, I cannot take this approach at this time because there remain too many unanswered questions about specific workplace and drilling safety measures that may be needed to ensure safe deepwater drilling, strategies and alternatives for the containment of deepwater blowouts, and the status of oil spill response capacity and where the gaps in the current regulation on those matters lie. For this reason, I have directed you to aid in the effort to gain a more full understanding of the risks of deepwater drilling and the current shortcomings of containment and cleanup capacity by conducting public meetings and outreach to gather, on an expedited basis, additional information to augment the results of ongoing studies and investigations. I am hopeful that the exercise that you will engage in will provide the type of additional information to define the criteria for relief from suspensions. I have asked you to report to me the results of your findings and recommendations no later than October 31, 2010. We must have a firm understanding of the fundamental issues bearing on whether drilling in deepwater can proceed safely prior to allowing it to proceed at all, and for this reason I rejected this option.

### C. Adopt recommendations from industry representatives regarding suspensions.

Representatives from the oil and gas industry have offered various proposals that would allow industry to resume or continue certain drilling operations that they characterize as presenting a relatively low risk after the implementation of certain safety measures. The types of drilling that the proposals would permit, subject only to compliance with NTL No. 2010-N05, include: wells that are abandoned before reaching producing zones, disposal wells, development wells to known reservoirs, and delineation wells.

Although these types of drilling operations are characterized as "lower risk," they still pose an unacceptable level of risk at this time. Further, as discussed above, I have asked you to gather additional information about whether any such activities should be permitted prior to the expiration of any suspensions. The BP Oil Spill demonstrates the true magnitude of the risk that exists in what was considered a controllable environment. In light of the vulnerable status of the Gulf of Mexico and a desire to implement the

18

correct regulatory scheme that will be capable of supporting safe drilling on the OCS for the longer term, we must exercise caution. While my decision presented below does allow for some activities to continue based on our understanding of risks, responsible oversight and implementation of my duties under OCSLA require that I have more information about even relatively lower risk drilling activity before allowing any additional activity to go forward, particularly while the Macondo well remains uncontrolled and operators may be in non-compliance with regulations relating to oil spill response due to, among other things, inadequate spill response plans. Nevertheless, as I continue to receive the additional information I have requested, I will continue to review this option.

## VI.   DECISION

### A.   Affected Operators

For the reasons discussed above and pursuant to the provisions of OSCLA, including 43 U.S.C. § 1334(a)(1), and 30 C.F.R. § 250.172(b)-(c), and with certain exceptions set forth below, I am directing BOEM to direct the suspension of any authorized drilling of wells using subsea BOPs or surface BOPs on a floating facility. I further direct BOEM to cease the approval of pending and future applications for permits to drill wells using subsea BOPs or surface BOPs on a floating facility. These suspensions shall apply in the Gulf of Mexico and the Pacific regions through November 30, 2010, subject to modification if I determine that the significant threats to life, property, and the environment set forth in this memorandum have been sufficiently addressed. These suspensions do not apply to production activities; drilling operations that are necessary to conduct emergency activities, such as the drilling operations related to the ongoing BP Oil Spill; drilling operations necessary for completions or workovers (where surface BOP stacks are installed, they must be utilized during these operations); abandonment or intervention operations; or waterflood, gas injection, or disposal wells. BOEM shall order any current drilling operations covered by this decision to proceed to the next safe opportunity to secure the well and take all necessary steps to cease operations and temporarily abandon or close the well. Pursuant to 30 CFR § 250.168(a), BOEM may direct a suspension for all or any part of a lease or unit area. Depending on the "nature of the suspended activity" the suspension is either of operations or production. 30 C.F.R.§ 250.168(b). In this case, BOEM will be suspending certain activity involving certain operations and will issue individual suspension letters to that effect.

My interpretation of OCSLA and its implementing regulations finds ample support in the legislative history of the statute. *See* Pub. L. No. 95-372, 92 Stat. 629 (1978); H.R. Rep. No. 95-590, at 55, 74 (1977); S. Rep. No. 95-284, at 43 (1977). Congress added 43 U.S.C. § 1334(a)(1) "to put some 'flesh on the bones'" of OCSLA by providing the Department with clear authority to suspend operations when there is a "threat" of "serious or irreparable" harm to the "marine, coastal, or human environment."

Exhibit A - 000019

### B.     Duration of the Suspension

The basis for the November 30, 2010, end-date has been discussed throughout this memorandum. The duration of the suspension is the time needed to ascertain what is necessary to improve the safety of operations in the OCS and adequate containment and response capabilities. The time provided by the suspensions allows for the acquisition and development of additional information on the risks of deepwater drilling operations and the needed equipment and procedures to reduce those risks to an acceptable level. In addition to the third-party commissions and investigations referenced earlier, a number of which may provide valuable information before November 30, 2010, the Department is undertaking its own investigations that will yield vital information on safety measures during the next several months. For example, the Department's Outer Continental Shelf Safety Oversight Board, established by Secretarial Order will provide recommendations regarding interim measures that may enhance OCS safety and recommendations for improving and strengthening the Department's overall management, regulation and oversight of OCS operations. The Oversight Board will complete its report by August 15, 2010. Moreover, additional information development by the several investigations assigned to examine the causes of the *Deepwater Horizon* disaster, as well as the results of your public outreach efforts discussed in this memorandum, will be informative. With regard to your public outreach efforts, which I address in the next section, I will receive a report from you no later than October 31, 2010, containing your recommendations and analysis of any new information that you have received. In your discretion, I welcome the submission of preliminary input regarding the issues underlying this memorandum. I look forward to receiving the information that you are collecting through your review, which I will consider in determining whether additional action must be taken, including the potential for a modification to the scope or duration of this suspension decision.

The duration until November 30 also is designed to allow time for the killing or containment of the Macondo well, which is expected to be accomplished by approximately mid-August 2010, and which may have an effect on spill containment and response capabilities for potential use on other wells. Another important factor that explains the November 30 date is that the Atlantic hurricane season, which includes the Gulf of Mexico, runs from June 1 until November 30. As discussed herein, the ability to conduct containment activities and oil spill response can be compromised by hurricane storms. During this time of year, as we have already seen this year, the ability to contain and respond to a spill is often compromised by weather conditions.

Lastly, suspending these particular operations until November 30 will allow BOEM and the Department to develop the interim rules required to address the safety issues that have recently come to light. Some of these interim rules are expected to be issued within 120 days of the issuance of the Safety Report, and additional time will be required after these rulemaking actions are completed for operators to implement the new requirements established by those rules. Other rules will have a longer development or implementation timeline, and I will determine whether their implementation is essential before suspended operations may resume. Finally, the November 30 date accounts for the requirement that certain Technical Workgroups established as part of the government's response to the BP

Oil Spill provide recommendations to improve OCS drilling operations within 180 days of the issuance of the Safety Report.

Based on what we know now and what we expect to learn in the next several months, November 30 is a reasonable end date for this suspension decision. However, I reserve my statutory right to issue a new suspension order which will be justified based on the circumstances that exist at the time and will contain a definitive end date.

### C.   Potential Lifting of Suspension

The suspension could be lifted earlier than November 30, 2010, if BOEM assures me that the safety, containment and response issues that have created the need for a suspension have been resolved, or if those three issues are addressed to a degree that can be determined upon further study to ensure an acceptable margin of safety. If the results of the various investigations reveal significant unexpected risks, however, my duties under OCSLA could require me to extend the duration of the suspensions.

As noted above, I will continue to solicit and review information relevant to this matter, and I will remain open to potentially adjusting the suspension period based on additional information and analysis. In that regard, I direct you to conduct public meetings and outreach to gather additional information, on an expedited basis, on the primary issues that I have identified as raising the most significant risks regarding the resumption of deepwater drilling. You will be focusing on the following:

    a.    Drilling and workplace safety requirements as outlined in the Safety Report and a timeline for the implementation of such safety requirements and others that may be necessary to ensure safe drilling practices;

    b.    Well intervention and blowout containment technology and methodology designed to effectively address and expeditiously contain any blowouts that could occur;

    c.    A review of additional and necessary oil spill response plans for offshore drilling and production facilities, and an evaluation of industry capacity to address a worst case discharge scenario under 30 CFR part 254.

I further direct you to issue a report to me no later than October 31, 2010, that contains your findings and recommendations as a result of your outreach efforts and any other information you have acquired in the interim. This information gathering will be critical to addressing the serious risks presented by oil and gas drilling activities in deepwater environments. This additional information potentially could provide the basis for identifying conditions for resumption of drilling activities if certain conditions are met, and/or the identification of any oil and gas drilling activities that might be allowed prior to the expiration of the suspensions based on the relative level of risk associated with those activities.

## VII. IMPLEMENTATION

Consistent with the above discussion and decisions, this memorandum replaces and supersedes the memorandum dated May 28, 2010, entitled "Suspension of Outer Continental Shelf (OCS) Drilling of New Deepwater Wells." NTL No. 2010-N04, which was used to implement the decision made in the May 28, 2010, memorandum and is hereby rescinded. I direct you to withdraw the suspension letters issued under NTL No. 2010-N04, and I direct you to issue new suspensions and to cease the approval of pending and future applications for permits to drill consistent with this decision, for all operations described in this decision. To provide certainty to affected operators, please issue the suspension orders promptly.

ATTACHMENT 1

Date: July 12, 2010
Summary of Decision File

The following is a non-exhaustive summary of documents and information included in the Decision File:

**30-Day Safety Report and Supporting Documents:** The Department of the Interior's May 27, 2010, Report entitled "Increased Safety Measures for Energy Development on the Outer Continental Shelf" (Safety Report), including, but not limited to, the following documents from the record that formed the basis for that report:

- The April 27, 2010, Memorandum from Wilma Lewis to the Secretary entitled, "Immediate Response Measures Pending Investigation of the BP oil spill;"
- Notes from Department of the Interior Meetings with Various Experts and Industry / NGO representatives;
- The API Joint Industry Task Force Recommendations;
- The "Fact Sheet Notebook" summarizing the events of the BP oil spill;
- Correspondence from various petroleum companies in response to the Secretary's request for recommendations;
- Comments and Recommendations from experts affiliated with the National Academy of Engineering;
- MMS Studies (Cited in Table 3 of the Safety Report).

**Information Provided by BOEM Internal Experts:** Information obtained from consultation with BOEM internal experts, including experts from BOEM's Gulf of Mexico Region. The BOEM experts provided comments regarding the risks inherent in certain offshore drilling equipment, water depth, and various drilling activities, as well as the adequacy of current response plans and containment resources. They also suggested various options for addressing the risks of deepwater drilling.

**Information Provided by Industry Representatives:** Information provided in meetings between officials of the Department of the Interior and representatives of the drilling industry, including but not limited to:

- A June 21, 2010, meeting between the Secretary and industry consultants, in which the consultants made a PowerPoint presentation that discussed, among other things, claimed risks associated with suspension of drilling, suggested methods for reducing these claimed risks, and a proposal to allow drilling to resume in certain categories of wells;

Exhibit A - 000023

- A June 28, 2010, meeting between Department officials and operators and rig owners currently operating in Federal waters in the Gulf of Mexico. Suggestions provided by various industry operators with regard to the resumption of drilling operations in the Gulf of Mexico, including suggestions for well design, operation procedures, rig equipment, safety and training risk management and well control system certification and maintenance.

**Daily Incident Reports:** Information contained in the daily reports from the site of the BP oil spill issued since the spill, including but not limited to:

- BOEM's Offshore Incident Report Daily Updates;
- U.S. Department of the Interior, Office of Emergency Management Emergency Daily Situation Reports;
- U.S. Department of the Interior, Office of Emergency Management Spot Reports.

**Briefings by National Incident Commander:** Information provided by Admiral Thad Allen in daily briefings from the National Incident Command Center.

**Macondo Well Intervention and Containment Efforts:** Information related to specific well control and containment efforts for the Macondo well blowout, as well as testing and performance difficulties encountered with the BOPs being used for the two relief wells being drilled to intercept and kill the Macondo well.

**Oil Spill Regional Response Plans:** The provisions of the Gulf of Mexico regional response plans of BP, Chevron, Conoco Phillips, ExxonMobil, and Shell.

**Congressional Hearing Testimony:** Information from Congressional testimony related to the BP oil spill, including testimony regarding the possible causes of the spill, the efforts to contain the spill, the environmental and economic impacts of the spill, the economic consequences of a possible moratorium on deep-sea drilling, the adequacy of current preparedness plans in responding to a similar incident, and the availability of resources to respond to another spill. The BOEM conducted a comprehensive review of transcripts, written testimony, and related documents from the following hearings:

- House Committee On Energy and Commerce, Subcommittee On Oversight and Investigations, *Inquiry into the Deepwater Horizon Gulf Coast Oil Spill* (May 12, 2010)

- House Committee on Transportation and Infrastructure, *Hearing on Deep Horizon Oil Spill Prevention and Response Measures and Natural Resource Impacts* (May 19, 2010)

Exhibit A - 000024

- House Committee on Natural Resources, *Hearing on The Outer Continental Shelf Oil and Gas Strategy and Implications of the Deepwater Horizon Rig Explosion* (May 26, 2010)

- House Committee on Natural Resources, *Hearing on Outer Continental Shelf Oil and Gas Strategy and Implications of the Deepwater Horizon Rig Explosion* (May 27, 2010) House Committee on Energy and Commerce, Subcommittee on Energy and Environment, *Hearing on Response Efforts to the Gulf Coast Oil Spill* (May 27, 2010)

- House Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, *Hearing on the Local Impact of the Deepwater Horizon Oil Spill* (June 7, 2010)

- House Committee on Energy and Environment, *Hearing on Beneath the Surface of the BP Spill: What's Happening Now, What's Needed Next* (June 9, 2010)

- House Committee on Energy and Commerce, Subcommittee on Energy and the Environment, *Hearing on The BP Oil Spill: Human Exposure and Environmental Fate* (June 10, 2010)

- House Committee on Natural Resources, Subcommittee on Insular Affairs, Oceans and Wildlife, *Oversight Hearing on Our Natural Resources at Risk: The Short and Long Term Impacts of the Deepwater Horizon Oil Spill* (June 10, 2010)

- House Committee on Energy and Commerce, Subcommittee on Energy and Environment, *Hearing on Drilling Down on America's Energy Future, Safety Security and Clean Energy* (June 15, 2010)

- House Committee on Natural Resources, Subcommittee on Insular Affairs, Oceans and Wildlife, *Hearing on Ocean Science and Data Limits in a Time of Crisis: Do NOAA and Fish and Wildlife Service Have the Resources to Respond?* (June 15, 2010)

- House Committee on Energy and Commerce, Subcommittee on Health, *Hearing on Health Impacts of the Deepwater Horizon Oil Spill* (June 16, 2010)

- House Committee on Energy and Commerce, Subcommittee on Oversight and Investigation, *The Role of BP in the Deepwater Horizon Explosion and Oil Spill* (June 17, 2010)

Exhibit A - 000025

- House Committee on Education and Labor, *Hearing on Worker Health and Safety Standards Related to the Oil Industry, Oil Rigs and Drilling* (June 23, 2010)

- House Committee on Natural Resources Hearing, *Hearing on State Planning for Offshore Energy Development: Standards for Preparedness* (June 24, 2010)

- Senate Committee on Commerce, Science and Transportation Hearing (May 18, 2010)

- Senate Committee on Energy and Natural Resources Hearing (May 11, 2010)

- Senate Committee on Environment and Public Works, *Hearing on Economic and Environmental Impacts of the Recent Oil Spill in the Gulf of Mexico* (May 11, 2010)

- Senate Committee on Homeland Security and Governmental Affairs, *Hearing on the Gulf Coast Catastrophe: Assessing the Nation's Response to the Deepwater Horizon Oil Spill* (May 17, 2010)

- Senate Committee on Commerce, Science and Technology, *Hearing on Potential Impacts of the Deepwater Horizon Oil Spill on Marine and Coastal Ecosystems* (May 18, 2010)

- Senate Committee on Environment and Public Works, *Hearing on Federal Response to the Recent Oil Spill in the Gulf of Mexico* (May 18, 2010)

- Senate Committee on Energy and Natural Resources Hearing (May 25, 2010)

- Senate Committee on Environment and Public Works, *Legislative Hearing on S. 3305, The Big Oil Bailout Prevention Liability Act of 2010* (June 9, 2010)

- Senate Committee on Homeland Security and Governmental Affairs, Subcommittee on State, *Hearing on Local and Private Sector Preparedness and Integration* (June 10, 2010)

- Senate Committee on Health, Education, Labor and Pensions, *Hearing on the Deepwater Horizon Oil Spill* (June 15, 2010)

- Senate Committee on Small Business Hearing (June 17, 2010)

- Senate Committee on Energy and Natural Resources Hearing (June 24, 2010)

**Information Provided by the U.S. Coast Guard:** Information provided by the U.S. Coast Guard relating to the BP Oil Spill and oil spill statistics and information in relation to the 1979 Cameche oil spill in Corpus Christi, Texas.

**Documents Related to the Joint Investigation of the BP Oil Spill:** Information provided during the public hearings in the joint Coast Guard - BOEM investigation of the causes of the BP oil spill, including but not limited to:

- Transcripts from USCG/BOEM Joint Investigation Public Hearings of May 11 – May 12, 2010;

- Transcripts from USCG/BOEM Joint Investigation Public Hearings of May 26 – May 29, 2010;

- Documents that have been made available in the course of the joint investigation.

**Notices to Lessees and Operators (NTLs):** A review of information contained in, and provided pursuant to, the following Notices to Lessees and Operators of Federal Oil and Gas Leases in the Outer-Continental Shelf:

- NTL No. 2010-N05: Increased Safety Measures for Energy Development on the OCS (effective June 8, 2010); and

- NTL No. 2010-N06: Information Requirements for Exploration Plans, Development and Production Plans, and Development Operations Coordination Documents on the OCS (effective June 18, 2010).

**Economic Impact Analysis:** Public records and internal memoranda analyzing the economic effects of a six-month suspension in deepwater drilling in the Gulf of Mexico, as well as the economic impacts of the oil spill on the local economy.

**Hornbeck Litigation Materials:** Court rulings, briefs, motions, declarations and other materials submitted in connection with the Hornbeck litigation, including but not limited to:

- The June 22, 2010, U.S. District Court Order and Reasons granting Motion for Preliminary Injunction

- The June 22, 2010, U.S. District Court Order Prohibiting US from Enforcing the Moratorium

- The July 7, 2010, Fifth Circuit Court Order Denying Motion to Stay Pending Appeal

**July 10, 2010 Memorandum from BOEM Director Michael Bromwich to Secretary Ken Salazar:** Memo from BOEM Director Michael Bromwich to Secretary Salazar entitled: "Options regarding the potential suspension of certain offshore drilling activities and permitting on the Outer Continental Shelf."

**Other Information Regarding Deepwater Drilling or the BP Oil Spill** including, but not limited to:

- Wood MacKenzie: *Deepwater Horizon* tragedy: near-term and long-term implications in deepwater Gulf of Mexico;

- Preliminary results of various investigations into the causes of the BP oil spill, including BP's own interim investigation briefings;

- The Joint Industry Task Force Recommendations to Improve Offshore Safety of Drilling & Completion Operations;

- Memorandum: The Department of the Interior and MMS's Economic Analysis of the 6-Month Moratorium (June 14, 2010);

- Memorandum from Dr. Marcia McNutt, Director of the United States Geological Survey regarding "USGS Support for Macondo Well Control and Containment: Observations Regarding Technical Problems with Deepwater Efforts" (June 28, 2010);

- MMS Economic Impact Assessment: Effects of Drilling Pause for 6 Months (June 10, 2010);

- Letter from Louisiana Governor Bobby Jindal to the President and the Secretary of the Interior, June 2, 2010, summarizing LA Department of Economic Development's analysis of employment impacts;

- Memorandum from BP Oil Spill Federal On-Scene Coordinator Rear Admiral Watson to National Incident Command (June 16, 2010);

- "Temporary Suspension of Certain Oil Spill Response Time Requirements to Support Deepwater Horizon Oil Spill of National Significance Response." 33 CFR 154, 155 and 40 CFR 112. (Sent to the Federal Register on June 28, 2010);

- Memorandum summarizing the activities of the Joint Industry Task Force to Address Subsea Well Control and Oil Spill Response;

- Memorandum entitled "Enhanced Industry Capability for Offshore Operations" summarizing improvements in regulatory, safety and response capabilities in the Gulf of Mexico;

- Memorandum from Solicitor Hilary Tompkins entitled "Overview of Blowout Causes;"

- Memorandum from BOEM Deputy Director Walter Cruickshank to Tommy Beaudreau entitled, "Relative Risk of Drilling Activities."

29

Exhibit A - 000029