DET NORSKE VERITAS (U.S.A.), INC.

# SHORT FORM AGREEMENT - LITIGATION



| DNV Order No.: | | Customer No. (ID):<br>1239434 | |
|---|---|---|---|
| Customer | Name:<br>BP Exploration & Production, Inc. | Address:<br>501 Westlake Park Blvd. Houston, Tx 77079 | |
| | Contact Person, Name:<br>Frank Monago | Contact Person, Telephone/Fax/E-Mail:<br>281.366.3159  Frank.Monago@bp.com | |
| DNV | Unit:<br>Technology Center, Columbus | Section/Department:<br>ANEUS815 | |
| | Contact Person, Name:<br>Dr. Neil Thompson | Contact Person, Telephone/Fax/E-Mail:<br>614-761-6907 (T)  614-761-1633 (F)  Neil.Thompson@dnv.com | |
| Work /<br>Project Name | BOP Forensic Testing, Phase II | | |
| | Commencement Date:<br>Note 1 (attached) | Termination Date:<br>Note 2 (attached) | Work Location:<br>Note 3 (attached) | Project Number:<br>PP012207 |
| Scope of Work<br>(Hereinafter<br>called<br>the Work) | As stated in the Protocol(s) for further forensic study of the DEEPWATER HORIZON Blowout Preventer, attached. | | |
| Remuneration<br>and Terms of<br>Payment | As stated in the Remuneration and Terms of Payment Sheet, attached. | | |
| Specification of<br>Fees, Expenses<br>and Additional<br>Costs | As stated in the Fees, Expenses and Additional Costs Sheet, attached. | | |
| Special<br>Conditions | This contract (referred to below from time to time as the "Agreement") must be approved by, and the Work shall be performed under the auspices of, the United States District Court for the Eastern District of Louisiana. Reference In Re Oil Spill by the Oil Rig DEEPWATER HORIZON in the Gulf of Mexico, MDL No. 2179 (hereinafter "MDL 2179"). See the Court's Order dated March 25, 2011, Document No. 1757 in the MDL, hereinafter referred to as the "MDL Order." | | |

The Customer and DNV are referred to in this Agreement as the "Parties." This Agreement consists of this cover page, the numbered paragraphs that follow, being General Terms and Conditions, and the other documents referred to above that are attached, which constitute the entire agreement between the Parties, which shall supersede and invalidate all prior representations relating to the subject matter hereof. This Agreement shall be read as one document and in case of contradiction between the provisions in the various parts of the Agreement, the General Terms and Conditions shall prevail.

No substantial amendment, variation, or change to the Agreement is allowed without a Court order.

The Parties acknowledge that this Agreement is made in duplicate, one original for each party hereto.

| Customer sign below and initial at end of document. | for Det Norske Veritas (U.S.A.), Inc. |
|---|---|
| Place:_____ Date:_____ | Place:_____ Date:_____ |

DET NORSKE VERITAS (U.S.A.), INC.

## SHORT FORM AGREEMENT - LITIGATION

_____
Signature

_____
Printed Name

_____
Signature

_____
Printed Name

DET NORSKE VERITAS (U.S.A.), INC.

# SHORT FORM AGREEMENT



## 1. WORK EXECUTION

1.1 DNV shall use its reasonable best efforts to execute the Work in a professional manner and in accordance with this Agreement. DNV shall perform its work in a good and workmanlike manner. DNV makes no representation or warranty regarding the result of its performance. DNV neither promises nor represents that it can or will perform all of the Work identified in the protocols in the limited time for performance provided by the Order in MDL 2179 dated March 25, 2011 identified as Document 1757 ("MDL Order").

1.2 The Parties acknowledge that per the MDL Order, DNV shall perform the Work with due regard to the rules and parameters imposed by NASA, as site owner, and the members of the Joint Investigation Team, which is the current legal custodian of the DEEPWATER HORIZON Blowout Preventer.

1.3 The Parties acknowledge that per the MDL Order, only DNV and its agents shall have "hands on" access to the DEEPWATER HORIZON Blowout Preventer.

1.4 Customer agrees that DNV may include in the charges for the Work the cost of services and expenses incurred by DNV personnel including consultants and advisors, at appropriate hourly rates during the planning period post dating April 5, 2011" and that DNV will bill for services rendered on that basis - services 6 April and going forward, not prior to 6th April, which has resulted in the creation and execution of this Agreement, and the commencement of the Work.

## 2. SAFETY, HEALTH AND ENVIRONMENT (SHE)

2.1 DNV will abide by all applicable County, State, and Federal health, safety and environmental laws during the performance of the Work.

2.2 DNV shall provide "escorts" for all individuals in the work areas as required by the NASA. DNV shall participate with NASA in daily safety meetings.

2.3 DNV shall submit the daily work plans to NASA for review and approval. Work plans shall be submitted for NASA approval sufficiently in advance of the Work so that the NASA process does not cause any delay in the Work.

## 3. REMUNERATION

3.1 Notwithstanding any alleged or actual event of force majeure or other event or condition of any sort preventing or affecting performance of any or all of the Work (excepting only the gross negligence or willful misconduct of DNV), the Customer shall timely pay DNV for the Work as specified in this Agreement. Payment shall be made to DNV's bank account as stated on the invoice unless otherwise specified in this Agreement.

3.2 Prices quoted are exclusive of VAT, any other local sales taxes and/or withholding taxes.

3.3 Payment shall be made within 30 days after the date of the invoice. For late payment, interest will be charged at a rate of 1% per month or part thereof, or the highest permitted interest according to the law designated in article 11.1 if this rate is lower.

## 4. VARIATIONS, AMENDMENTS, AND CHANGES

In view of the MDL Order and the requirement that the Court approve this Agreement, the Customer's right to order that DNV shall perform additional or less work (herein referred to as "variations," "amendments," or "changes") under this Agreement is limited to those variations, amendments or changes that are agreed in advance by DNV and approved by the Court, and Customer warrants that it shall make no attempt to control, manage, or direct DNV's performance of the agreed Work.

## 5. TERMINATION

5.1 Both the Customer and DNV shall in good faith have the right to terminate this Agreement at any time upon 30 days written notice stating all then known reasons for termination. The Notice shall be delivered to the other Party and the Court. Written notice shall be delivered simultaneously to the Party's Point of Contact identified below and filed as a Notice in the proceedings in MDL 2179.

5.2 Both Customer and DNV have the right to terminate this Agreement with immediate effect if the other Party is in material breach of its obligations hereunder, if the other Party becomes bankrupt or insolvent, or if the other Party enters into liquidation proceedings.

5.3 In the event of the Customer's termination of this Agreement, the Customer shall reimburse DNV for all Work, including all costs and expense of preparations and mobilization performed up to the date of termination, and all costs and expenses of termination and demobilization incurred by DNV.

## 6. NO CONFIDENTIALITY

6.1 Per the MDL Order, the scope of the Work, this Agreement, the physical performance of the Work by DNV, and the data thereby obtained are not confidential, excepting only that DNV hereby designates its Fee Rates and Terms of Remuneration as "HIGHLY CONFIDENTIAL" per MDL 2179 Pre-Trial Order No. 13, Order Protecting Confidentiality. Per the MDL Order, DNV shall perform the Work in a transparent manner, as it did during the initial forensic analysis of the DEEPWATER HORIZON Blowout Preventer for the Department of the Interior and the Department of Homeland Security.

6.2 No information DNV obtains from any source in connection with its performance of the Work shall be confidential, excepting only information DNV is provided and accepts in accordance with the terms of Pre-Trial Order No. 13, Order Protecting Confidentiality, issued in MDL 2179.

6.3 Per the MDL Order, DNV must disclose the data obtained through the Work to all parties in MDL 2179 on a real time basis as they are generated. DNV shall fulfill its duty to do so by using its best efforts to release same on a rolling basis. The Parties expect that to the extent practicable, DNV shall disclose data, including photographs and videotapes daily, via a single point of data distribution, anticipated to be a commercial vendor of data management services. Upon release of the data, photographs, or videotapes to the vendor, DNV's custody, control, or management of same is ended, excepting only that as described below, DNV shall deliver one complete set of the data, to the vendor at the conclusion of the Work. DNV makes no representations or warranties regarding the ability of the Vendor to authenticate data issued to MDL 2179 participants. Customer intends to provide the vendor services described in this paragraph. DNV will use its reasonable best efforts to help this vendor become familiar with the Work and related procedures.

6.4 Each of the Parties shall be free to disclose such information as is:

a) known by it prior to the information being disclosed by the other party, or

b) part of the public domain at the time of disclosure, or

c) required to be disclosed by public authorities in accordance with applicable law.

6.5 DNV may refer to the Customer's name in public information releases, proposals, or submissions made to prospective customers beginning on the date that is forty-five days from the completion of the Work.

## 7. INTELLECTUAL PROPERTY RIGHTS

7.1 Per the MDL Order, the Customer has no ownership rights in the data developed by DNV through the Work.

7.2 DNV shall retain the title to its work papers, such as diagrams, models, or computer programs, created during the course of the Work. DNV claims no title to any photographs, video recordings, or data created during the course of the Work.

7.3 All information in any form in the possession of DNV at the time this Agreement is executed shall remain the exclusive intellectual property of DNV to the same extent that such information constituted DNV's intellectual property as of the date of this Agreement.

## 8. LIABILITY AND INDEMNITY

8.1 ABSENT ONLY GROSS NEGLIGENCE OR WILLFUL MISCONDUCT ON THE PART OF DNV, DNV SHALL HAVE NO LIABILITY TO THE CUSTOMER FOR ANY DAMAGES OF ANY TYPE OR CHARACTER, WHETHER PROVEN OR CLAIMED TO BE A RESULT OF ANYTHING RELATED TO OR ARISING OUT OF THIS AGREEMENT, THE WORK, DNV'S PERFORMANCE OF THE WORK, OR TERMINATION OF SAME, HOWEVER THOSE DAMAGES OR THE CLAIM ARE DESCRIBED, UNDER ANY LEGAL REGIME, INCLUDING BY WAY OF EXAMPLE ONLY AND NOT IN LIMITATION OF THE GENERALITY OF THE FOREGOING, INCIDENTAL, SPECIAL, CONSEQUENTIAL, OR OTHER DAMAGES, DAMAGES FOR LOST PROFITS, EXPOSURES OR DAMAGES FOR INDEMNITY, DAMAGES FROM LOSS OF USE,

DET NORSKE VERITAS (U.S.A.), INC.

## SHORT FORM AGREEMENT



DAMAGES FROM DELAY IN PERFORMING OR FAILURE TO PERFORM PARTS OF THE WORK, DAMAGES RESULTING FROM A POLLUTION INCIDENT, OR DAMAGES OF ANY OTHER FORM OR TYPE CONTEMPLATED AT LAW, IN EQUITY, OR IN ADMIRALTY.

8.2 ABSENT ONLY GROSS NEGLIGENCE OR WILLFUL MISCONDUCT ON THE PART OF DNV, CUSTOMER STIPULATES THAT IT SHALL ALWAYS AND WITHOUT FAIL INDEMNIFY, DEFEND, AND HOLD DNV HARMLESS FROM AND AGAINST ANY AND ALL COSTS, LOSSES, CLAIMS, DEMANDS, LIABILITIES, EXPOSURES, AND DAMAGES THAT ARE ALLEGED OR CLAIMED TO RELATE TO OR ARISE OUT OF THIS AGREEMENT, THE WORK, DNV'S PERFORMANCE OF THE WORK, OR TERMINATION OF SAME, THAT ARE THE RESULT OF ANY CAUSE OR FACT PATTERN, INCLUDING BY WAY OF EXAMPLE ONLY AND NOT IN LIMITATION OF THE GENERALITY OF THE FOREGOING:

A) DELAYS OR STOPPAGES IN PERFORMANCE NOT EXPRESSLY AGREED TO BY DNV,

B) COSTS AND EXPENSES INCURRED BY DNV AS A RESULT OF ACTIONS OF CUSTOMER OR A THIRD PARTY, INCLUDING BY WAY OF EXAMPLE ONLY AND NOT IN LIMITATION OF THE GENERALITY OF THE FOREGOING, AGENCIES OF THE UNITED STATES GOVERNMENT SUCH AS THE DEPARTMENT OF HOMELAND SECURITY, THE UNITED STATES COAST GUARD, NASA, THE DEPARTMENT OF THE INTERIOR, OR ANY OTHER ORGAN OF GOVERNMENT,

c) DISPUTES OR DISAGREEMENTS REGARDING INTELLECTUAL PROPERTY RIGHTS,

D) RESTRICTED OR LIMITED ACCESS TO THE SITE, EVIDENCE, OR EQUIPMENT NECESSARY TO PERFORM THE WORK,

E) POLLUTION DAMAGES OF ALL TYPES,

HOWEVER CAUSED. THIS DUTY OF THE CUSTOMER TO DEFEND, INDEMNIFY, AND HOLD DNV HARMLESS SHALL APPLY WITHOUT REGARD TO THE FORM OF THE ALLEGED CLAIM OR LIABILITY, AND WITHOUT REGARD TO THE ACTUAL SUBSTANCE OR ULTIMATE VALIDITY OF SUCH ALLEGED LIABILITY, IN WHATEVER FORM IT ARISES, EXCEPTING ONLY THAT THIS DUTY SHALL NOT APPLY IF THE CUSTOMER PROVES THIS LIABILITY RESULTS FROM DNV'S ACTUAL GROSS NEGLIGENCE OR ACTUAL WILLFUL MISCONDUCT.

8.3 IN ANY AND EVERY SITUATION ARISING UNDER OR RELATED TO THIS AGREEMENT, DNV'S MAXIMUM CUMULATIVE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, FOR ANY AND EVERY CAUSE, SHALL BE LIMITED TO AN AMOUNT EQUAL TO THE REMUNERATION ACTUALLY PAID TO AND RECEIVED BY DNV BY THE CUSTOMER UNDER THIS AGREEMENT, OR FIVE HUNDRED THOUSAND UNITED STATES DOLLARS ($500,000.00), WHICHEVER IS THE SMALLER AMOUNT.

8.4 IF EITHER PARTY BECOMES AWARE OF ANY INCIDENT(S) OR CIRCUMSTANCE(S) LIKELY TO GIVE RISE TO A CLAIM UNDER THE ABOVE PARAGRAPHS, HE SHALL IMMEDIATELY NOTIFY THE OTHER PARTY IN WRITING.

8.5 SHOULD IT BE NECESSARY FOR DNV TO BE DEFENDED BY CUSTOMER AGAINST ANY CLAIM, DEMAND, LITIGATION, OR OTHER ISSUE, DNV SHALL HAVE THE RIGHT TO CHOOSE ITS DEFENSE COUNSEL, AND CUSTOMER SHALL NOT UNREASONABLY OBJECT TO THE CHOICE.

8.6 THE PARTIES STIPULATE THAT THIS LIABILITY AND INDEMNITY CLAUSE IN MULTIPLE PARAGRAPHS ABOVE IS FULLY ENFORCEABLE AS A MATTER OF LAW.

### 9. INSURANCE

DNV agrees that during the performance of this Agreement it shall maintain in force general liability insurance of no less than ONE MILLION UNITED STATES DOLLARS ($1,000,000.00).

### 10. FORCE MAJEURE

An event of force majeure for purposes of this Agreement is any event beyond the control of DNV which DNV had no reasonable means of preventing, including by way of example only and not in limitation of the generality of the foregoing an actual or reasonably anticipated act of war, hurricane, earthquake, other natural disaster, fire, explosion, labor dispute, lack of materials, or equipment necessary for performance of the Work, failure of the Customer's contractor(s) in this project to perform their tasks in a timely or adequate manner, failure of government personnel or their contractor(s) to perform their tasks in a timely or adequate manner, interference with or stoppage of the Work by any agency or agent of the government concerned with health, safety, or environmental protection issues, or a partial "shutdown" of services and activities by the United States Government, or failure of any litigant in MDL 2179 to cooperate with DNV in the performance of the Work. If an event of force majeure is anticipated or thought to have occurred, DNV shall notify the Customer in writing of the causes and expected duration of any such event. Even in the event of an actual or claimed event of force majeure, the Customer's obligation to pay DNV for the portion of the Work completed shall continue unabated, and the Liability and Indemnity Terms above shall continue in full force and effect. And, in addition to all other remuneration to which DNV is entitled under the Agreement, Customer shall also reimburse DNV for all additional or added costs and expenses of any type incurred by DNV arising out of or related to the performance of the Work as the result of the actual event of force majeure. Delay, stoppage, or failure of performance by DNV due to an actual event of force majeure shall not constitute a default hereunder, or give rise to any liability to the Customer or claim by the Customer for costs, expenses, or damages.

### 11. CHOICE OF LAW; JURISDICTION; CHOICE OF FORUM

11.1 This Agreement shall be governed and construed in accordance with the admiralty and maritime law of the United States of America, as interpreted by the Fifth Circuit Court of Appeals of the federal court system, without regard to conflict of laws.

11.2 If there is a dispute between Customer and DNV arising out of or related to this Agreement or DNV's performance of the Work: the Parties shall make their best efforts to settle promptly any dispute arising out of or related to the Agreement or occurring as a consequence of this Agreement, but in the unlikely event that any dispute cannot be settled amicably through negotiations between the Parties, it shall be subject to mandatory and binding arbitration in New York City, New York State, United States of America. The arbitration shall be conducted before three arbitrators. Each of the Parties shall select one arbitrator, and those arbitrators shall select a third arbitrator. All questions regarding the arbitrability of any issue shall in the first instance be resolved by the arbitration panel. Arbitration awards shall be enforceable in any court having jurisdiction to enforce such award. Rules of the Society of Maritime Arbitrators, Inc. of New York (SMANY) shall control. The Arbitrators shall be members in good standing of the SMANY.

### 12. TESTIMONY

In the event DNV is requested or required by subpoena or otherwise by the Customer to provide testimony as a fact witness or other evidence at a deposition, hearing, trial, or legal proceeding of any sort regarding anything arising out of or relating to (i) its performance of the Work, (ii) any aspect of the Work, its scope, the data obtained, or matters that were the subject of the Work, or (iii) documentary evidence relating to any of the foregoing, DNV shall charge and the Customer shall pay DNV, at DNV's then current billing rates, for the service DNV thereby performs, and the Customer shall also pay DNV its out of pocket expenses actually incurred and paid. DNV's service charge will include all time and expenses reasonably incurred by DNV in preparing and presenting such testimony, as well as incurred in providing any documentary matreials and responding to any documentary disclosure requests, in conjunction with providing testimony. All payments by Customer to DNV under this paragraph as necessary or required shall be disclosed to (and if necessary under the rules governing such an event approved by) the relevant Court or tribunal with jurisdiction over such deposition, hearing, trial or other legal proceeding.

### 13. PERSONNEL

13.1 DNV will provide suitably qualified personnel to carry out the engagement.

13.2 DNV shall provide a list of all personnel it intends to use, or may use, including the names of all personnel employed by its subcontractors, with all deliberate speed following Court approval of the Agreement, so that Customer has sufficient time to obtain clearance from NASA for those personnel to have access to the NASA facility. Should DNV seek to use additional personnel during its performance beyond those personnel identified as previously described, DNV is aware that NASA

DET NORSKE VERITAS (U.S.A.), INC.

# SHORT FORM AGREEMENT



clearance takes three business days for U.S. citizens, and twenty business days for foreign nationals, and DNV will provide additional names within sufficient time so that the clearance process does not delay the Work.

13.3 In the interest of expediting progress of the Work, DNV may provide the names of personnel referred to in 13.2 above direct to the United States Coast Guard as well as to the Customer.

13.4 DNV may substitute staff provided that the substituted staff has essentially the same qualifications as the staff being replaced and notwithstanding any other provision of this Agreement, such substitution does not in any way delay or disrupt the performance of the Work.

13.5 DNV presently plans to perform the Work on a schedule of twelve hours per day, six days per week, as circumstances allow. If DNV considers that a shorter or longer work day is appropriate on any day or days, or that work should occur, if allowed by the cognizant authorities, on the seventh day of the week, then in the exercise of its sole discretion described elsewhere in this Agreement and consistent with its obligation to use its best efforts to execute the Work, DNV may change the hours during which the Work is performed.

## 14. PERIOD OF PERFORMANCE

14.1 The Parties anticipate that under the MDL Order, DNV's performance of the Work will begin on or about April 15, 2011, but in no event shall the Work begin until the District Court approves this Agreement on the record. Likewise, per the MDL Order, forensic testing shall end no later than 18:00 hours Central Standard Time, June 15, 2011. The Parties agree that even after that date, DNV may continue the Work related to disseminating data, demobilization, prompt clean up of the work location, and performance of all other tasks necessary to bring the Work to a conclusion.

14.2 The Parties agree that all demobilization and clean up work shall be complete by July 15, 2011. However, the Parties acknowledge that at this time, it is unknown whether the federal custodian of the evidence will require some or all disassembled components of the DEEPWATER HORIZON Blowout Preventer to be reassembled at the conclusion of the Work. If such reassembly is required, that process is part of the Work of this Agreement, and DNV shall endeavor to accomplish same promptly, using its best efforts, and within the July 15, 2011 limit stated above. If that is not reasonably possible, DNV shall, as soon as it becomes aware of the impending deadline issue, inform the Customer and federal custodian of the situation and seek instructions so that the evidence is appropriately handled. DNV shall inform the Customer when the demobilization and clean up are concluded, or if there is an issue related to the evidence as described, have been progressed as far as reasonably possible within the allotted time.

14.3 The Parties stipulate that time is of the essence in the performance of this Agreement.

## 15. DELIVERABLES

15.1 DNV shall deliver the following: Data, including photographs and videotapes, resulting from DNV's forensic analysis. As discussed above, the MDL Order requires such data be delivered on a real time basis as they are generated, and DNV shall use its best efforts to upload same to the single point of data distribution on a rolling basis, to proceed through June 15, 2011. Reference Section Six above. At the conclusion of the Work on June 15, 2011, and not by way of expanding DNV's otherwise limited duty to care for or manage the data collected, DNV shall deliver to vendor handling the data one complete set of data, including photographs and videotape recordings, resulting from the Work done between April 15, 2011 and June 15, 2011.

15.2 DNV has no duty under this Agreement to issue any update, supplement, amendment, or modification of its Final Report dated March 20, 2011 issued to the United States Government regarding the forensic examination of the DEEPWATER HORIZON Blowout Preventer.

## 16. CONTRACTOR CONFLICT OF INTEREST

16.1 DNV was founded in 1864. The parent organization is an independent foundation based in Norway that through its subsidiary companies in the United States and elsewhere performs classification, certification, verification, and risk management services for the maritime and energy industries worldwide. DNV has more than 100 years of experience in working as an independent third party consultant. DNV works as an independent third party consultant on behalf of more than 100 government authorities, including the United States Coast Guard and the Bureau of Ocean Energy Management Regulation and Enforcement of the Department of the Interior. DNV works with most organizations and governments involved in the marine and the energy industries. DNV works for many of the Parties-In-Interest to the USCG/BOEMRE Joint Investigation Team. For example, BP, Transocean and Cameron are all customers of DNV, whose technical services for these firms relate to many offshore or marine activities.

16.2 The Parties stipulate that DNV has no actual, implied, or potential conflict of interest that might prevent it from undertaking the performance of this Agreement or actually doing so, and that nothing about DNV's work history creates even the appearance of impropriety or conflict of interest.

## 17. CUSTOMER OBLIGATIONS

17.1 The Customer warrants as of the date of making this Agreement, it has obtained, or is in the process of obtaining, all necessary, required, or appropriate government contracts, permissions, clearances, authorizations, and permits, and has hired or is hiring necessary staff or contractors so that on approval of this Agreement as required by the MDL Order, DNV may immediately commence performance of the Work smoothly and without interruption.

17.2 The Customer acknowledges that it is entirely the Customer's obligation under this Agreement to provide all services, site access clearances, contractors, subcontractors, supplies, and materials, from any and all sources that DNV from time to time requires to carry out the smooth and uninterrupted performance of the Work, excepting from the foregoing only the undertakings expressly stated in this Agreement to be those of DNV. By way of example only and not in limitation of the generality of the foregoing, Customer may from time to time be asked, for DNV's use, during the Work, to rent, lease, purchase, or borrow schematic drawings, control devices, hardware, specifications, software, or other technical material or information that may be the property of a technical working group member, such as Cameron or Transocean, so that the Work can proceed.

17.3 The Customer warrants that in effecting these arrangements, it shall use its best efforts to anticipate DNV's needs, and to the extent any need of DNV is not met, Customer shall promptly comply with DNV's requests for assistance of any type. Customer acknowledges that it has been provided, as an Attachment to this Agreement, a list of equipment, materials, documents and information that DNV needs to be provided as quickly as possible to progress the Work.

17.4 The Customer warrants that it shall instruct all of its employees, agents, contractors, subcontractors, and vendors that they shall use their reasonable best efforts to comply with DNV's requests, instructions, or orders related to performance of the Work, so that DNV is assisted to the maximum extent practicable in its ability to progress the Work smoothly and without interruption.

17.5 The Customer acknowledges that in the unlikely event any participant in MDL 2179 is uncooperative or otherwise impedes the progress of the Work contrary to the terms of the MDL Order, it will seek all necessary and proper orders of the Court in the MDL so that the Work may proceed smoothly and without interruption. DNV will make reasonable efforts to cooperate with the Customer to obtain relief from the Court necessary to give full effect to the MDL Order.

17.6 The Customer warrants that it and its contractors, subcontractors, and vendors shall adhere to all applicable County, State, and Federal health, safety and environmental laws during the performance of the Work.

17.7 The Customer acknowledges that DNV is relying on Customer to perform promptly and fully all of Customer's undertakings under this Agreement.

## 18. CONTRACTORS, SUBCONTRACTORS AND VENDORS, AND OTHER SOURCES

18.1 With the exception of those contractors, subcontractors, or vendors listed in 18.3 below, all contractors, subcontractors, and vendors necessary for the proper and timely performance of the Work shall be engaged by Customer at Customer's sole risk and expense, but subject to approval by DNV, which approval shall not be unreasonably withheld.

18.2 DNV may find it necessary to rent, lease, purchase, or borrow schematic drawings, control devices, hardware, software or other technical material or information that may be the property of a technical working group member, such as Cameron or Transocean, so that the Work can proceed. In the exercise of its discretion described elsewhere in this

DET NORSKE VERITAS (U.S.A.), INC. 

# SHORT FORM AGREEMENT

Agreement, DNV may handle such task(s) itself, or may instruct the Customer to do so, as discussed under the heading of the Customer's Obligations above.

18.3 DNV's contractors, subcontractors, and vendors include the firms listed below, or other firms who are in the judgment of DNV equally qualified to provide like services or materials. Promptly following approval of the Agreement by the Court, DNV shall provide the Customer information about its contractors, subcontractors, and vendors sufficient for the Customer to obtain NASA clearance for those contractors, subcontractors, and vendors to operate at the NASA facility. DNV understands that contractors, subcontractors, and vendors may not work at the NASA facility without proper clearance from NASA, and DNV shall to the best of its ability provide the Customer with contractor, subcontractor and vendor information with sufficient lead times so that the NASA clearance process does not delay the Work. DNV's contractors, subcontractors, and vendors include:
   Challenger Equipment & Tool, Inc.
   Triumph Rig and Fabrication LLC
   J.A.M. Video Productions, Inc.
   VisionMonitor Software, LLC
   Francis Torque Services
   Survice Engineering LLC
   US Environmental Services LLC

## 19. CONTROL OF WORK BY DNV – DNV DISCRETION

19.1 The Customer acknowledges that upon approval of this Agreement by the Court per the MDL Order, DNV shall have complete, sole, and unfettered discretion to control the course of performance of the Work described in the protocol(s). By way of example only and not in limitation of this intentionally broad discretion, DNV may exercise its discretion to add detail to the protocols in consultation with TWG, to decide that certain tasks in any protocol(s) cannot or should not be performed, or can or should be performed only in part, that operations must temporarily cease, that tasks shall be performed in a different sequence from what was originally planned, that certain tasks shall be performed in sequence and others in parallel, that DNV shall seek technical or non-technical input of any sort from one or more members of the Technical Working Group or other sources in or out of the Technical Working Group or the roster of litigants in MDL 2179, that work should be temporarily halted or accelerated, that work should be performed on a longer or shorter schedule on any or every day, that a certain task or tasks should be assigned to a subcontractor working under DNV's supervision, or that certain tasks should be performed using drawings, plans, equipment, software, hardware or other material sourced from one or more members of the Technical Working Group or other sources in or out of the Technical Working Group or the roster of litigants in MDL 2179. However, it shall not be the proper exercise of DNV's discretion to add work to the scope of the Work described in the Protocols, or violate the MDL Order.

19.2 DNV shall be under no duty to explain or memorialize its exercise of discretion, though in the exercise of its discretion as described above it may choose to make such explanation(s) orally or in writing at such times or places as it deems appropriate in the circumstances.

19.3 The Customer acknowledges that to the extent it is necessary for a term or clause of this Agreement to be interpreted, DNV shall have the right to do so in the exercise of its discretion stated above.

19.4 DNV anticipates that during the performance of the Work it may seek information from a "Parties in Interest Technical Working Group" set up in a manner consistent with the practices established in connection with the recent BOP inspection conducted by the JIT. The Department of the Interior and Department of Homeland Security may have a representative on the Technical Working Group. The Parties agree that DNV shall ask each Member of such Technical Working Group to execute a simple Technical Working Group Agreement, similar in form to what was used during the forensic analysis performed by DNV for the Joint Investigation Team. The form DNV intends to use is attached.

## 20. SURVIVAL

This Agreement shall survive the performance of same and shall remain enforceable in perpetuity.

## 21. POINT OF CONTACT

The point of contact for notices to DNV is:
Mr. Phillip Nidd
Det Norske Veritas (USA), Inc.
5777 Frantz Road
Dublin, Ohio 43017-1386
Telephone: (713) 449-9917
Facsimile: (614) 761-1633

Email Address: Phillip.Nidd@dnv.com

The point of contact for notices to BP is:

David Grassmick,

Kirkland & Ellis, LLP.

300 N. La Salle Street

Chicago, IL 60654

Telephone (312) 862-2000

Facsimile (312) 862-2200

## 22. INTERPRETATION IN FAVOR OF ENFORCEABILITY

The Parties agree that this Agreement shall be interpreted with a view to enforcing its terms and achieving performance of the Work and prompt payment for same. Therefore, the Parties agree that if any term or condition of same appears to be contrary to a rule or provision of law, that term shall nevertheless be enforced as written here, after interpretation by DNV if necessary, and that any factual or legal objection shall be and is fully waived.

Customer initial here:_____

## ATTACHMENT

Note 1:  Immediately upon approval of this contract by the United States District Court for the Eastern District of Louisiana, Judge Carl J. Barbier presiding, in MDL No. 2179 (such litigation referred to herein as "the MDL.").

Note 2:  18:00 hours Central Standard Time, June 15, 2011, unless extended by Court Order in the MDL.

Note 3:  Michoud Assembly Facility, New Orleans, Louisiana, DNV facilities at Dublin, Ohio and elsewhere.

Commercially Sensitive – Proprietary and Highly Confidential

# THIS IS A HIGHLY CONFIDENTIAL DOCUMENT PER MDL NO. 2179 PRE-TRIAL ORDER NO. 13

++++++++++++++++++++++++++++++++++++++++

# DNV REMUNERATION – SPECIFICATION OF FEES, EXPENSES AND ADDITIONAL COSTS

## 1. TIME & MATERIAL CONTRACT

This contract is performed on a time and material cost basis, plus expenses.

Prices quoted are exclusive of VAT, any other sales taxes and/or withholding tax, ref. Clause 3.2 in contract.

## 2. HOURLY RATES

DNV personnel are charged by category according to the following table.

| Category | USD/hour |
|---|---|
| Director/Project Sponsor/Project Manager | 500 |
| Associate Director/Deputy Project Manager/Site Technical Lead | 390 |
| Principal Consultant/Principal Specialist | 285 |
| Senior Consultant/Senior Specialist | 260 |
| Consultant/Specialist | 210 |
| Associate/Technician/Project Administrator | 180 |
| Administrative Assistant | 95 |

The personnel identified to work on the project are given in Section 7 below.

## 3. COSTS

All expenses of the project are charged to the Customer at cost plus a 10% administration fee. Typical expenses include airfare, accommodation, meals, cost of materials necessary for testing, copying, delivery and courier services, car rental, field supplies, field test equipment, remote telecommunication charges, site office rental, and personal protective gear.

Travel and accommodation will be in accordance with DNV's travel policy, a copy of which can be provided on request.

## 4. SUBCONTRACTORS

The project will use a number of subcontractors, ref. Clause 18.3 in the contract.

Commercially Sensitive – Proprietary and Highly Confidential

All subcontractor charges and costs will be charged to the Customer at cost plus a 10% administration fee.

## 5. ESTIMATED PROJECT EXPENSE

The total expense stream generated by the project will depend on the final testing protocol, the effort required to complete tasks in the project, and how much re-assembly must take place after completion of the testing by 15 June 2011.

The presently *estimated* costs during the testing period assuming a 60 hour work week (10 hours per day, six days per week, are as follows:

- DNV Labor: USD 300,000 per week
- Travel and subsistence: USD 60,000 per week
- Subcontractors: USD 150,000 per week

Thus, the total expense for an 8 weeks testing period (planned testing before 15th June 2011) is *estimated* to be USD 4.1 million.

Additional work for demobilization and clean-up after 15th June 2011 will depend upon requirements from the primary evidence custodian for re-assembly and preservation of BOP and LMRP. All such required demobilization and clean-up will be charged to BP under this Agreement. Furthermore, the planning activity for the project before 15th April 2011 will be charged to BP under this Agreement.

The Customer should note well that the above *estimates* are based on very conservative assumptions regarding work hours allowed by the government, and number of staff the project can simultaneously accommodate. If it proves possible to expand hours of work and staffing, for example, due to cooperation from NASA and other government agencies, there will be substantial upward excursions from the figures above, and the total *estimated* cost of the project will therefore increase.

## 6. INVOICING AND TERMS OF PAYMENT

See Clause 3.3 in contract.

## 7. PERSONNEL

The following personnel have at contract time been identified to work on the project. Additional staff, not already included in the table, but subsequently deemed necessary to undertake the testing, will be charged in accordance with the schedule of fees provided in Section 2.

| Staff | Project Role | Rates USD per hour |
|---|---|---|

| Peter Bjerager | Project Sponsor | 500 |
|---|---|---|
| Neil Thompson | Project Manager | 500 |
| Gary Kenney | Lead Investigator | 390 |
| Bryce Levett | Principal Investigator | 390 |
| Phil Nidd | Deputy Project Manager | 390 |
| TBD | Site Contract Advisor | 390 |
| TBD | Logistics Coordinator | 285 |
| Steven Kelsey | Technologist | 285 |
| Stephen Schroeder | Technologist | 260 |
| Ben Parker | Engineer | 260 |
| Brandon Rollins | Testing Scribe | 260 |
| Pete Youll | Testing Coordinator | 285 |
| Ben Terrien | Engineer | 210 |
| Emily Kane | Data Manager | 210 |
| Barbara Padgett | Materials Specialist | 260 |
| Shane Finneran | Materials Specialist | 210 |
| Brian Hart | NDE Specialist | 260 |
| Colin Scott | Materials Specialist | 260 |
| Gary Snyder | Technician | 180 |
| Barry Glennan | Technician | 180 |
| Katy Taylor | Evidence Oversight | 180 |
| Nikki Hanger | Evidence Oversight | 180 |
| Shaun Whisenant | Evidence Oversight | 180 |
| TBD | Evidence Oversight | 180 |
| Karen Chetock | Project Costs | 180 |
| Dorene Martin | Contract Specialist | 180 |
| Jessica Moorman | Project Cost Controller | 180 |
| Kristin Phillips | Admin Assistant | 95 |

## 7. BILLING CYCLE

The Customer will be invoiced at least MONTHLY for all services rendered, fees, and expenses.

| BOP Forensic Investigation | Request For Information And Materials | Det Norske Veritas DNV  |
|---|---|---|

1. DNV intends to use the information provided by Cameron, Transocean and other Parties in Interest to the Joint Investigation Team's investigations in accordance with the requirements of Judge Barbier's Pre-Trial Order Protecting Confidentiality.

2. Procedures, tools or special equipment the manufacturer requires or recommends required to remove the annulars, from the LMRP for further inspection, examination and testing and any tools or equipment required to disassemble the annular elements and donuts.

3. Material specifications or compositions of the following materials:
    a. The elastomeric materials used in the Upper and Lower Annular
    b. The elastomeric materials used in the packers or seals of the rams
    c. The Teflon wear pads of the rams

4. Mark II Subsea Electronic Module Operations and Maintenance Manual (if different from Volumes I-8 of the Cameron Manuals)

5. Mark II Control Pod Test Stand with receptacles

6. Subsea Electronic Module – Test Stand (already on site)

7. Portable Electronic Test Unit (PETU) – Two (2) each (one of which already on site)

8. In connection with the two Mark II Control Pods all drawings, documents, specifications or information of the overall design, manufacture and assembly including all modifications or changes that were made to the Control Pods since their original manufacture and assembly.  In addition, drawings, documents or other information of the wiring or electrical circuits and hydraulic circuits or systems of the two Control Pods as fitted to the Deepwater Horizon Mark II Blowout Preventer.

9. In connection with the Subsea Electronic Modules with the following identification:

    BF400213714
    5009 30/06/2009
    Part No. – 2020722-21
    Serial No. 75008327/01

    222507-40 A05
    A5024094-1
    30013510
    KIT 22413-25

    a. Drawings, documents, specifications or information of the overall design, wiring, or layout of the SEMs including any modifications or changes made to the SEMs and the circuitry.
    b. Cameron Proprietary Communications Protocol (i.e. software) for the above SEMs
        i. Software program for the AMF/Deadman function within the SEMs
    c. Equipment, materials or special tools required to vent or open the Subsea Electronic Module
    d. Drawings, Diagrams, parts list or PC board layouts for the:

| BOP Forensic Investigation | Request For Information And Materials | Det Norske Veritas DNV  |
|---|---|---|

    i. Subsea Electronic Modules
    ii. Automatic Mode Function Card
    iii. Central Processing Unit Function Card
    iv. Analog Input Card
    v. Solenoid Driver Cards
    vi. Communications Controller Card
    vii. Modem
    viii. 5V Power Supply
    ix. 24V Power Supply

  e. Manufacturer specifications and information for the 9 and 27 Volt Lithium batteries used to power the AMF/Deadman circuits.

10. Drawings, documents or other information of the design, manufacture or assembly of the High Pressure Regulators (i.e. 5000 psi to 4000 psi) as fitted to the high pressure shear panel of the Deepwater Horizon Blowout Preventer

11. Drawings, documents or other information of the design, manufacture or assembly of the Part No. 223290-63 solenoids as fitted to the Deepwater Horizon Blowout Preventer

12. Manufacturer specifications or design for the solenoid (Part No. 223290-63) e-connectors.

13. Hydraulic test bench or test set-up for testing solenoids 103Y/B and 3A (Part No. 223290-63).

14. Materials, tools, special equipment and procedures or practices required to disassemble the ram bonnets.

15. Materials, tools and equipment to test or verify the pressure/temperature sensors. All drawings, documents, specifications or other information concerning the manufacture and assembly of the pressure/temperature sensors as fitted to the Deepwater Horizon Blowout Preventer.

16. Materials, tools and special equipment (e.g. a hydraulic test stinger) used to test integrity or pressure retaining capability of the hydraulic circuits of the lower BOP and the Lower Marine Riser Package.

17. Cameron procedures (including disassembly, assembly and testing procedures), schematics, and drawings for the purposes of DNV's review in order to ensure compliance and consistency with Cameron documentation in developing the final procedures for implementation.

18. Cameron information regarding the differences between the two PETUs used at the NASA Michoud facility for the AMF/Deadman test of the Blue and Yellow Pods on March 3-4, 2011.

19. Cameron information constituting a general description and overview of the capabilities of the PETU used to test the Yellow Pod on the Q4000 and the Blue Pod on the Discoverer Enterprise in May/July 2010.

## **PHASE II Technical Working Group Participation Agreement**

1     **I. Composition**

The Interested Parties Technical Working Group (TWG) will be made up of technical representatives from interested parties. A table naming the individual representatives and their alternates will be prepared.

2     **II. Rules for participation in the TWG:**

- The TWG will have access to the primary test area (Level 3 access).
- The TWG will be limited to observing the examination and having technical discussions with the DNV Project Team personnel when appropriate to do so.
- The TWG is not allowed hands-on participation in the testing.
- TWG sponsor organizations may designate an alternate representative, or representatives, in addition to the primary representative. Only one representative will be allowed into the primary test area (Level 3 access) at any given time. Depending on space availability, Level 2 access may be granted for those approved TWG alternates not physically in Level 3. It is expected that Level 2 interest will fluctuate, and DNV will seek to accommodate TWG alternates if possible.
- To keep TWG participation manageable and to preclude testing delays, rotation between primary and alternate(s) TWG representatives should be limited to situations where a representative particular purpose or expertise will benefit the examination. Substitutions may only occur when it is safe to do so and will not interfere with the BOP examination. The DNV shall exercise its authority to exert greater control over the substitution of TWG representatives if warranted.
- All Level 3 participants, including the TWG representatives, must sign in and attend the morning briefing, held daily at 0730 each morning that work will be performed. The purpose of the morning meeting is to review the daily work plan and the safety procedures required to complete the planned activities. If the TWG representative misses the morning meeting, access will be denied that day unless a special exception is granted by the DNV representative on scene.
- A testing plan review will be conducted periodically, ona schedule to be set, to outline the details of the expected testing plan for the following week. The TWG will have the opportunity to discuss the details of the proposed testing plan with the DNV Project Team. The TWG will be given the opportunity to comment and/or suggest revisions on the plan prior to initiating testing the following Monday. All comments and/or suggestions should be put in writing and submitted to DNV as far in

- advance of the meeting as possible. DNV retains final approval authority of the testing plan.
- It is likely that a DNV approved contractor will be present and have exclusive access to the Level 3 area in order to provide photographic and videographic documentation of all aspects of the testing procedure. All photos and video shall be made available by DNV on a rolling basis. The TWG may request specific photographs or video be captured by the technicians involved.  Such a request will generally be honored so long as it is safe to do so, does not unnecessarily delay the testing, and does not duplicate efforts. **TWG members are prohibited from capturing independent photo or video media.**
- TWG members inside the primary test area will be permitted to engage in brief communication either by voice or electronic data. This communication must be conducted in a manner that does not distract anyone else inside the test area and does not impede or otherwise jeopardize the safety or integrity of the investigation. Unless otherwise approved by DNV, any such communication from inside the primary test area about the examination must be limited to within the TWG sponsor organization, counsel, or contracted third-parties.
- The TWG representatives may request a temporary stoppage of testing in the event that the representative believes that (i) the testing plan is not being followed, or (ii) a situation develops that could negatively impact evidence collection. If such a request is made, and delay will not materially compromise the testing activities or otherwise affect evidence collection and preservation, DNV will stop testing pending resolution. Following discussion within the TWG and the DNV Project Team, and in the event that a resolution is not agreed upon by DNV and the TWG, the following resolution procedures will apply:
  o The TWG should strive for a consensus recommendation. If consensus of the TWG members cannot be achieved, or the TWG and DNV Project Team are in disagreement, DNV will consult with those individuals, companies, or government representatives as it sees fit, and shall as promptly as warranted in the circumstances decide the matter.  DNV has  final decisional authority. If the matter relates to personnel safety, the NASA Safety Director (or their representative) will be consulted and the NASA Safety Director will determine an appropriate course of action.
- The TWG representatives have the right to request a temporary stoppage of testing in the event that the representative believes a situation develops that could negatively impact personnel safety. If a matter of personnel safety is raised, the stoppage will be mandatory until the matter is resolved. Following discussion, and a resolution is not agreed upon by DNV and the TWG, the above referenced resolution procedure shall be utilized to resolve any disagreement regarding safety concerns.

Each TWG representative and alternate(s) must read this document and sign a copy of same to confirm their understanding of agreement to comply with these rules established for participation. If DNV believes that a TWG representative(s) or organization is failing to comply with these rules, is unnecessarily impeding the progress of the investigation, or whose conduct is jeopardizing the personnel safety of the members of the investigation or TWG, DNV, at its sole discretion, may expel the representative(s) or organization from the TWG.  DNV will confer with the management of the sponsor organization to give notice of the expulsion and discuss, in good faith, measures to be taken to continue the organization representation within the TWG.

The TWG representative signing below understands and agrees that details of the testing performed on the BOP by DNV, observations of the conditions of the BOP, data resulting from the test procedures or obtained in any way from examination of the BOP, video-tapes, and photographs generated during the BOP tests are all "CONFIDENTIAL" materials pursuant to the Pre-Trial Order No. 13, Order Protecting Confidentiality, in the MDL No. 2179, and shall not be disclosed to any person or organization except in strict accordance with said Pre-Trial Order No. 13.

If necessary for the smooth and unimpeded flow of the Work, DNV may from time to time update or amend this Agreement, and ask the TWG representatives to execute the new version.

> I have read this Agreement, I understand same, and on behalf of myself and my organization, affirm that we shall comply with the rules described above.
>
> Date: _____
>
> Signed: _____
>
> Printed Name: _____
>
> Representing: _____

Version 2 : April 19, 2011