# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **STATE OF LOUISIANA,** | * | **MDL NO. 2179** |
| **Plaintiff** | * | |
| | * | **SECTION: J** |
| **v.** | * | |
| | * | |
| **BP EXPLORATION & PRODUCTION,** | * | |
| **INC.; BP CORPORATION NORTH** | * | |
| **AMERICA, INC.; BP AMERICA, INC.;** | * | |
| **BP AMERICA PRODUCTION** | * | |
| **COMPANY; BP P.L.C.; ANADARKO** | * | **JUDGE BARBIER** |
| **PETROLEUM CORPORATION;** | * | **MAGISTRATE SHUSHAN** |
| **ANADARKO E&P COMPANY LP;** | * | |
| **MOEX OFFSHORE 2007 LLC; MOEX** | * | |
| **USA CORPORATION; MITSUI OIL** | * | |
| **EXPLORATION CO., LTD.;** | * | |
| **TRANSOCEAN HOLDINGS LLC;** | * | |
| **TRITON ASSET LEASING GMBH;** | * | |
| **TRANSOCEAN DEEPWATER, INC.;** | * | |
| **TRANSOCEAN OFFSHORE** | * | |
| **DEEPWATER DRILLING, INC.;** | * | |
| **TRANSOCEAN LTD.; CAMERON** | * | |
| **INTERNATIONAL CORPORATION** | * | **JURY TRIAL DEMANDED** |
| **F/K/A COOPER-CAMERON** | * | |
| **CORPORATION; HALLIBURTON** | * | |
| **ENERGY SERVICES, INC.; M-I, LLC,** | * | |
| **and WEATHERFORD U.S. L.P.** | * | |
| **Defendants** | * | |
| | * | |
| ***This Pleading Relates To:*** | * | |
| **CASE NO. 11-cv-0516;** | | |
| **CASE NO. 10-cv-03059** | | |

## <u>FIRST AMENDED COMPLAINT</u>

NOW INTO COURT through undersigned counsel, James D. "Buddy" Caldwell, Attorney

General of the State of Louisiana, comes the State of Louisiana and Bobby Jindal, Governor of

Louisiana, appearing herein on behalf of the State (Louisiana or "the State"), which hereby

consolidates, amends, and restates its complaints against the Defendants identified below.

1

## INTRODUCTION

1.

The State of Louisiana is the epicenter of the environmental and economic harms suffered as a result of the *Deepwater Horizon* disaster and resulting oil spill. The well blowout, explosion and sinking of the *Deepwater Horizon*, resulting in the largest marine oil spill in U.S. history, occurred approximately fifty miles off Louisiana's coast. Louisiana's shoreline, which was and continues to be significantly oiled as a result of the Gulf Oil Spill, constitutes a vitally important and valuable natural resource of national significance that provides numerous economic, environmental, cultural and recreational benefits. Louisiana's citizens, waters, marshes, wetlands, shoreline, ecology, economy, tourism, fisheries, and wildlife have been profoundly impacted by the Gulf Oil Spill, and will continue to be impacted for years to come.

2.

The economic and environmental impacts to Louisiana resulting from this Incident are widespread and severe. The State and its people have suffered and are continuing to suffer vast economic damages as a consequence of this oil spill and the resulting response efforts. Likewise, Louisiana's coastal environment and ecosystem have incurred and are continuing to incur broad injuries that could fundamentally alter Louisiana's most defining natural resources and that may prove to be generational in both scope and duration. In every respect, the damages that the Defendants have caused Louisiana are as insidious as the oil itself, still appearing and mounting daily without an apparent end in sight. The State of Louisiana now files this First Amended Complaint to ensure that Louisiana, its environment and its citizens are made whole and the Defendants are brought to answer for the catastrophic consequences of their conduct, and of this disaster of historic proportions.

3.

Among the other claims asserted herein the State of Louisiana hereby brings claims for natural resource damages and other forward looking claims for long term economic impacts and lost revenues associated with the Spill in an abundance of caution.  These claims are subject to ongoing assessments by the State, the costs of which the State is seeking herein.  The State acknowledges that these claims are not currently ripe for adjudication and that they may be appropriately phased into the litigation, if ultimately necessary, at such time as the claims and damages are properly assessed and quantified.  However, because Louisiana has a residual one-year prescription period and the State could not risk the Defendants' arguments that the State's claims were time-barred or that the State was impermissibly splitting its claims, the State has included these claims in this Complaint.

## NATURE OF ACTION

4.

This civil action arises from the blowout that occurred as the mobile offshore drilling unit ("MODU") *Deepwater Horizon* was performing temporary abandonment procedures on the Macondo Well on April 20, 2010, catching the rig on fire and causing the rig to sink on April 22, 2010.  The well blowout, explosion and sinking of the *Deepwater Horizon* resulted in the unauthorized discharge of oil, gas and other pollutants from the wellhead, through *Deepwater Horizon*'s blowout preventer ("BOP"), lower marine riser package ("LMRP") and a riser pipe, all of which were connected to the Macondo Well, into the Gulf of Mexico and ultimately into and upon the waters and coastline of the State of Louisiana (hereinafter referred to as the "Incident" or "*Deepwater Horizon* disaster").

5.

The resulting oil, gas and other pollutants discharged from the Macondo Well and from the *Deepwater Horizon* and its equipment (hereinafter referred to as the "Gulf Oil Spill") invaded Louisiana's waters and adjoining coastline, severely injuring Louisiana's natural resources including its wetlands, shorelines, habitat and wildlife, and endangering the health, safety and welfare of the citizens of Louisiana.  These impacts are ongoing.  The Gulf Oil Spill is the largest marine oil spill in U.S. history with an approximate release of over 4.9 million barrels of oil, methane gas and other pollutants.  Louisiana has been, and will continue to be, profoundly impacted by the *Deepwater Horizon* disaster and has incurred, and will continue to incur, significant costs and damages.

6.

The State of Louisiana files this civil action seeking declaratory relief, statutory damages, compensatory damages, response costs, civil penalties, punitive damages, and all other relief to which the State is entitled.

7.

The State seeks a declaration as to certain Defendants' unlimited, joint and several liability and responsibility for all removal costs and damages to the State of Louisiana under the Oil Pollution Act, 33 U.S.C. § 2701 *et seq*., ("OPA") and the Louisiana Oil Spill Prevention and Response Act, La. R.S. 30:2452 *et seq*. ("OSPRA").

8.

The State asserts claims against certain Defendants under the federal Oil Pollution Act, the Louisiana Oil Spill Response and Prevention Act, federal maritime law, and state tort law for removal costs and damages arising from the Gulf Oil Spill.  The State alleges specifically that Defendants were negligent, grossly negligent, and/or willful; that certain Defendants

manufactured, supplied, or sold defective products or engaged in ultra hazardous activities; that certain Defendants' actions created a public nuisance; and that certain Defendants' actions amount to trespass.  Due to the wanton and willful nature of actions by BP and Transocean, the State seeks an award of punitive damages against these Defendants.

9.

The State of Louisiana has also filed a Complaint against several Transocean Entities for Declaratory Relief under OPA and Louisiana's OSPRA (Case No. 10-cv-03059).

10.

The State also asserts claims against certain Defendants herein for civil penalties and costs under the Louisiana Environmental Quality Act, La. R.S. 30:2001 *et seq*., for the unauthorized discharge of vast quantities of oil, gas and other pollutants which entered the waters of the State of Louisiana and adjoining coastline of Louisiana as a result of the Gulf Oil Spill beginning on or about April 20, 2010 and continuing through the present and into the future.

11.

The Defendants from which the State of Louisiana seeks relief are BP Exploration & Production, Inc. ("BP E&P"), BP Corporation North America, Inc., BP America, Inc., BP America Production Company, BP p.l.c. (unless stated otherwise, collectively referred to as "BP"), Anadarko Exploration & Production LP ("Anadarko Exploration"), Anadarko Petroleum Corporation ("Anadarko Petroleum") (Anadarko Exploration and Anadarko Petroleum, unless stated otherwise, collectively shall be referred to as the "Anadarko Defendants" or "Anadarko"), MOEX Offshore 2007 LLC ("MOEX 2007"), MOEX USA Corporation ("MOEX USA"), Mitsui Oil Exploration Co., Ltd. ("MOECO") (MOEX 2007, MOEX USA and MOECO, unless stated otherwise, collectively shall be referred to as "MOEX"), Transocean Holdings LLC, Triton Asset Leasing GmbH, Transocean Deepwater, Inc., Transocean Offshore Deepwater Drilling, Inc.,

Transocean Ltd.   (Transocean Holdings LLC, Triton Asset Leasing GmbH, Transocean Deepwater, Inc., and Transocean Offshore Deepwater Drilling, Inc., and Transocean Ltd., unless stated otherwise, collectively shall be referred to as the "Transocean Defendants" or "Transocean"), Cameron International Corporation f/k/a Cooper-Cameron Corporation ("Cameron"), Halliburton Energy Services, Inc. ("Halliburton"), M-I, LLC ("M-I"), and Weatherford U.S. L.P. ("Weatherford").

### PARTIES

12.

The State of Louisiana is a sovereign state of the United States.  Louisiana brings this action on its own behalf to protect the State's economic and environmental resources and revenue, and as *parens patriae* on behalf of the citizens of Louisiana who have been, and will continue to be, impacted by the Gulf Oil Spill.  Louisiana has standing, as *parens patriae*, to seek relief from impacts of the Defendants' acts and omissions upon the State as well as Louisiana's citizens and businesses.

13.

Under OPA and OSPRA, the Louisiana Oil Spill Coordinator's Office ("LOSCO"), along with other State Natural Resource Trustees, are authorized to undertake a process for assessing, pursuing and resolving natural resource damages resulting from an oil spill.  33 U.S.C. § 2706; La. R.S. 30:2480.   The State Natural Resource Trustees are the Louisiana Department of Environmental Quality ("LDEQ"), the Louisiana Department of Wildlife and Fisheries ("LDWF"), the Louisiana Department of Natural Resources ("LDNR") and "other agencies of the state of Louisiana designated by the governor according to the Oil Pollution Act of 1990 as state natural resource trustees."  Louisiana Administrative Code 43:XXIX.101(A).  By letter dated May 20, 2010, from Governor Bobby Jindal to President Barack Obama, Governor Jindal appointed the

Louisiana Coastal Protection and Restoration Authority ("CPRA") as the lead trustee agency for the purposes of the Gulf Oil Spill.  That letter also designated LOSCO as lead administrative trustee and LDEQ, LDWF and LDNR as additional trustees.  LOSCO, CPRA, LDEQ, LDWF and LDNR are collectively referred to herein as the "State Trustees."

14.

The Louisiana Attorney General and the State Trustees are authorized and obligated to take affirmative action in order to protect those resources that are held in trust for the benefit of the citizens of Louisiana.  The claims for declaratory relief sought herein against Defendants are asserted so that the State may properly and adequately protect, assess and recover for those public resources injured by Defendants, as well as for any other damages allowed pursuant to OPA and OSPRA.

15.

BP Exploration & Production, Inc. is a foreign corporation organized and existing under the laws of the State of Delaware and is licensed to and is doing business in the State of Louisiana. BP E&P conducts its deepwater drilling and completion operations through its Gulf of Mexico Strategic Performance Unit ("GoM SPU").

16.

BP Corporation North America, Inc. is a foreign corporation domiciled in the State of Indiana, with its principal place of business in the State of Illinois, and which is licensed to do business and is doing business in the State of Louisiana and this District.

17.

BP America, Inc. is a Delaware corporation with its principal place of business in the State of Illinois and is licensed to do business and is doing business in the State of Louisiana and this District.  BP America, Inc. is the direct parent company of BP Exploration & Production, Inc.

18.

BP America Production Company is a Delaware corporation with its principal place of business in Houston, Texas.  BP America Production Company was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the *Deepwater Horizon* vessel.  BP America Production Company is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

19.

BP p.l.c. is a foreign corporation with its principal place of business in London, England, and is doing business in the State of Louisiana and this District.  BP p.l.c. has conducted continuous and systematic activities within the United States and this District for at least the last ten years, directly and through its wholly owned and controlled subsidiaries.  Those activities are partly responsible for the cause of the Incident as described herein.  It was reasonably foreseeable that BP p.l.c.'s activities would lead to the possibility of being sued in this District.

20.

Anadarko E&P Company, LP is a foreign business organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Texas and is doing business in the State of Louisiana and in this District.

21.

Anadarko Petroleum Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Texas, and is doing business in the State of Louisiana and in this District.

22.

MOEX Offshore 2007, LLC is a foreign business organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Texas, and is doing business in the State of Louisiana and in this District.

23.

MOEX USA Corporation is a foreign business organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Texas and is doing business in the State of Louisiana and in this District.

24.

Mitsui Oil Exploration Co., Ltd. is a foreign business organized and existing under the laws of Japan and has its principal place of business in Tokyo, Japan.  MOEX Offshore 2007, LLC and MOEX USA Corporation are wholly owned subsidiaries of Mitsui Oil Exploration Co., Ltd.

25.

MOEX 2007 and MOEX USA are not distinct corporate entities and they do not perform autonomous business activities; rather, they are directly and wholly controlled by their ultimate parent company, MOECO.  As an alter ego of its subsidiaries, MOECO is liable to the same extent as MOEX 2007 and MOEX USA.

26.

Transocean Holdings LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal office located in the State of Texas, and is doing business in the State of Louisiana and in this District.

27.

Triton Asset Leasing GmbH is a limited liability company organized and existing under the laws of the Swiss Confederation, with its principal office in Zug, Switzerland, and is doing

business in the State of Louisiana and in this District.  Triton Asset Leasing GmbH has conducted continuous and systematic activities within the United States and this District for at least the last ten years.  Those activities are partly responsible for the cause of the Incident as described herein.

28.

Transocean Deepwater, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal office located in the State of Texas, and is doing business in the State of Louisiana and in this District.

29.

Transocean Offshore Deepwater Drilling, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal office located in the State of Texas, and is doing business in the State of Louisiana and in this District.

30.

Transocean Ltd. is a corporation organized and existing under the laws of the Swiss Confederation, with an office in the State of Texas, and is, upon information and belief, doing business in the State of Louisiana and in this District.

31.

Cameron International Corporation f/k/a Cooper-Cameron Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal office located in the State of Texas, and is doing business in the State of Louisiana and in this District.

32.

Halliburton Energy Services, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal office located in the State of Texas, and is doing business in the State of Louisiana and in this District.  Sperry Drilling Services (formerly Sperry Sun Drilling Services) is a division of Halliburton.

33.

M-I, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal office located in the State of Delaware, and is doing business in the State of Louisiana and in this District.

34.

Weatherford U.S. L.P. is a limited liability company organized and existing under the laws of the State of Delaware, with its principal office located in the State of Texas, and is doing business in the State of Louisiana and in this District.

## JURISDICTION AND VENUE

35.

Jurisdiction is proper in this Court under 33 U.S.C. § 2717(b), which grants the United States District Courts exclusive original jurisdiction over all controversies arising under the Oil Pollution Act, without regard to the citizenship of the parties or the amount in controversy, and 33 U.S.C. § 2717(f)(2) which authorizes this Court to enter a declaratory judgment on liability for removal costs or damages that will be binding on any subsequent action or actions to recover removal costs or damages.  28 U.S.C. § 2201(a) further grants this Court the authority to declare the rights of the parties hereto.

35.

Jurisdiction also exists pursuant to Article III, Section 2 of the United States Constitution which empowers this Court to hear  "all claims of admiralty and maritime jurisdiction."

36.

The Court has supplemental jurisdiction over the State's civil penalty and state law claims pursuant to 28 U.S.C. § 1367(a) because these claims are so related to other claims in the action within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

37.

Venue is proper in the Eastern District of Louisiana under 28 U.S.C. § 1391(a)(2), 33 U.S.C. § 2717(b) and La. R.S. 30:2025 because a substantial part of the events or omissions giving rise to the State's claims occurred in this District and substantial damage occurred in that part of the State encompassing this District.

## FACTUAL ALLEGATIONS

### The Defendants and Their Wrongful Conduct

38.

BP E&P is the holder of Lease No. OCS-G 32306 granted by the United States Minerals Management Service ("MMS")[1] through Lease Sale #206 for Mississippi Canyon Block 252 (the "Lease"). The Lease became effective on June 1, 2008. This Lease allowed the Defendants BP, Anadarko and MOEX to drill for oil and perform oil production-related operations at the Macondo Prospect. BP Corporation North America, Inc. was registered with MMS as the financial guarantor for BP E&P.

39.

Pursuant to a series of agreements, including an Assignment of Record Title Interest in Federal OCS Oil and Gas Lease, and as evidenced by the Macondo Prospect Offshore Deepwater

---

[1] Secretary of Interior Ken Salazar changed the name of the Mineral Management Service on June 21, 2010, to the Bureau of Ocean Energy Management Regulation and Enforcement

Operating Agreement, or Joint Operating Agreement ("JOA"), filed with and approved by MMS, BP E&P maintained a 65% ownership and operation stake in the Lease, or "Macondo Prospect," and assigned ownership stakes of 25% to Anadarko and 10% to MOEX. BP E&P is the designated "operator and local agent (designated operator) with full authority to act in the lessee's behalf in complying with the terms of the lease and applicable regulations" pursuant to a "Designation of Operator" for the Macondo Prospect.

40.

On or about May 22, 2009, the MMS approved BP E&P's application for a permit to drill (APD) exploratory well No. 1 on the Macondo Prospect: the "Macondo Well."

41.

On or around October 2009, the Defendants began drilling the Macondo Well using the Transocean Marianas, which was owned by Transocean Defendants and operated pursuant to one or more contractual agreements between BP E&P and Transocean.

42.

On or around February 2010, the MODU *Deepwater Horizon*, a dynamically positioned, semi-submersible drilling rig owned and operated by the Transocean Defendants, replaced the *Transocean Marianas* and the exploratory drilling operations of the Macondo Well continued through April 9, 2010. Immediately thereafter, procedures for the temporary abandonment of the Macondo Well were begun, and were in progress at the time of the Incident.

43.

The *Deepwater Horizon* rig included various pieces of operating equipment such as sub-sea equipment and appurtenances, including, but not limited to, a blowout preventer ("BOP"), a lower marine riser package ("LMRP"), and a marine riser and associated piping ("riser pipe").

13

All of this equipment was attached to the wellhead, and was part of the facility at the time of the Incident.

44.

M-I, also known as M-I SWACO, was a contractor involved in oil and gas drilling on the Deepwater Horizon.   Specifically, M-I provided BP and Transocean with drilling fluids (sometimes referred to as mud or drilling mud) that were used during the ill-fated attempt to temporarily abandon the Macondo Well.   Additionally, M-I provided support and supervisory personnel, including mud engineers and drilling fluid specialists, to oversee and manage the use of drilling fluids in the well.   M-I employees therefore planned, supervised, and/or participated in the mud displacement activities that preceded the blowout of the Macondo Well on April 20, 2010. The proper use of drilling fluids, including the selection of appropriate spacer materials as well as the displacement and circulation of the drilling mud, was a crucial step in the efforts to temporarily plug the Macondo Well.

45.

Despite the importance of drilling fluids, BP and M-I elected to utilize an inappropriate and unusually large amount of spacer fluid during the mud displacement operations.   Spacer fluid is used to create a division between different types of fluids.   In the case of the *Deepwater Horizon* operations, spacer fluid was required to separate the drilling mud from the seawater that was to displace it.   By selecting an inappropriate and untested spacer fluid, BP and M-I increased the risk that the mud displacement operations would be ineffective, interfered with requisite testing of the integrity of the cementing operations, and/or adversely impacted the condition of the BOP. Similarly, the use of a high volume of spacer fluid, far more than was otherwise required, also jeopardized the success of the mud displacement procedure.   Upon information and belief, BP and

14

M-I selected the unconventional spacer fluid for the purpose of circumventing environmental regulations regarding the proper disposal of materials contained in the spacer fluid.

46.

Weatherford manufactured the float collar that was utilized during drilling operations on the *Deepwater Horizon*. The float collar is a casing component that is installed at the bottom of the casing string. The float collar, which is essentially a one-way valve, is responsible for eliminating backflow of drilling fluids and cement and also prevents hydrocarbons from escaping from the well and traveling up the casing to the drilling rig.

47.

During drilling operations, personnel aboard the Deepwater Horizon—including Weatherford personnel—encountered problems with the float collar, including difficulties closing (or converting) the float collar after it was installed. The failure of the float collar to seal properly and/or any other defects in the float collar could have allowed hydrocarbons to leak into the casing, thereby contributing to the blowout and explosions.

## BP p.l.c. –Single Business Enterprise

48.

BP p.l.c. is a global energy company operating in eighty countries, with its headquarters in London, England. Although BP has myriad corporate subsidiaries, in reality it operates itself as a single business enterprise, through "groups" organized by industry segments. These include Exploration & Production, Refining & Marketing, and Alternative Energy. Each group includes a large number of corporate subsidiaries around the world, and some corporate subsidiaries' activities are included in more than one group.

49.

In all substantive respects, the corporate structure of BP's subsidiaries is disregarded.  BP p.l.c. directs and controls the overall operations of its subsidiaries through its group management structure.  For example, BP p.l.c. implemented a corporate-wide operating management system ("OMS") which, according to BP, "provides a single framework for all BP operations to follow, covering all areas from process safety, to personal health, to environmental performance."  BP also creates Group Practices ("GP") or Group Defined Practices ("GDP") and Engineering Technical Practices (ETP), which require detailed operations and procedures across all BP entities.  For example, the Exploration & Production group has issued GPs for Well Operations, Zonal Isolation, Working with Pressure, and Well Control.

50.

BP E&P is part of BP p.l.c.'s Exploration & Production group.  As such, all of its drilling and completion operations were directed and controlled by BP p.l.c. through, among other things the OMS, and the issuance of GPs, GDPs and ETPs.

51.

Upon information and belief: (1) the corporate chain of ownership of BP E&P, through BP America, Inc. and other entities up to BP p.l.c. gives BP p.l.c. actual working control of these subsidiaries; (2) BP E&P, BP America, Inc. and BP p.l.c. share common directors or officers and/or have promoted officers of these subsidiaries to officer and/or director positions at BP p.l.c.; (3) BP p.l.c. exercises unified administrative control of its subsidiaries, including BP E&P and BP America, Inc., through groups whose business functions are similar or supplementary; (4) the directors and officers of BP E&P and BP America, Inc. act independently in the interest of BP p.l.c.; (5) BP p.l.c. finances BP E&P and BP America, Inc.; (6) BP p.l.c. (or its predecessor in name) caused the incorporation of BP E&P and BP America, Inc.; (7) BP E&P, BP America, Inc.

16

and BP p.l.c. use each other's property, services, and personnel as their own; (8) BP E&P and BP America, Inc. and BP p.l.c. share common employees; (10) BP E&P, BP America, Inc. and BP p.l.c. render services to each other by the employees of one corporation on behalf of the other corporation; (11) BP E&P, BP America, Inc. and BP p.l.c. share common offices; (12) BP E&P, BP America, Inc. and BP p.l.c. share centralized accounting; (13) BP E&P, BP America, Inc. and BP p.l.c. file consolidated U.S. income tax returns; and (14) there is excessive fragmentation of a single enterprise into separate corporations.

52.

The Incident and the resulting unauthorized discharge of oil, gas and other pollutants into the waters and onto the land of Louisiana were caused by the acts, omissions, fault, negligence, gross negligence, reckless, willful and wanton behavior, and/or breach of federal and state law and regulations, by the Defendants, which renders them jointly and severally liable to Louisiana for all of its damages as set forth below.

53.

The Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Louisiana's marine and coastal environments and estuarine areas, and the State's coastal zone.

54.

The Macondo Well was difficult to drill, especially in light of its location in 5,000 feet of water.  Before April 20, 2010, the well had experienced several lost circulation events and kicks. One such event on March 8, 2010 nearly resulted in a catastrophic blowout of the well.  As the drilling went deeper, the tolerance between pore pressure and fracture gradient became extremely tight, increasing the risk of a blowout.   All Defendants knew, or should have known, of these problems and should have taken precautions to prevent the Incident.

55.

The Defendants failed to observe and/or comply with federal regulations and/or industry standards including, but not limited to, federal regulations and/or industry standards regarding the design, installation, maintenance, surveillance, repair, observation and operation of drilling equipment and/or operations.  These regulations and industry standards include 30 C.F.R. § 250 *et seq.*, as well as American Petroleum Institute (API) recommended practices including API RP 65 and API RP 75.

56.

At the time of the Incident, the Macondo Well was months behind schedule and significantly over budget. Defendants made and/or authorized a number of reckless decisions concerning well design, cementing, and integrity testing in the interest of speed and cost savings, at the expense of safety and industry best practices.

57.

BP E&P's casing design for the Macondo Well was flawed.  Before the Incident BP E&P knew that the casing used in the Macondo Well might collapse under the high pressures encountered in the well. Just a few weeks before the Incident, BP E&P changed the original casing design to use a "long string" casing for the final casing string rather than a "liner/tieback" design, which would have provided more barriers against a well blowout. BP E&P knew that the long string design was a risky option for the Macondo Well, given the problems that had already been encountered with the well.

58.

Before cementing the well for temporary abandonment, BP E&P elected to use only six centralizers (which are used to center the casing in the well to avoid cement channeling), despite

notice from Halliburton, the cement contractor, that using less than 21 centralizers could cause a severe gas flow problem.

59.

In order to save time, BP E&P decided to forego a "bottoms up" circulation of drilling mud before cementing the well.  This would have allowed for testing the mud for gas influx, release of gas pockets, and removal of debris from the bottom of the well so that the cement would not become contaminated. A "bottoms up" circulation likely would have indicated the gas flow problem that caused the Incident in time to prevent it.

60.

Because of the tight downhole pressure conditions of the Macondo Well, Halliburton recommended the use of nitrified foam cement slurry to seal the formations in the well.  BP E&P knew, or should have known, that Halliburton's foam cement slurry design would be unstable and could cause nitrogen breakout. Nevertheless, BP E&P decided to use the cement slurry before receiving the lab tests which would have indicated the instability.  Given the instability of the cement slurry design, BP E&P and Halliburton should have mixed fluid loss additives in the slurry mix to prevent formation losses, but did not do so.

61.

Halliburton performed a variety of services on the rig, including cementing, and had four employees stationed on the rig at the time of the accident.  As a result of testing that it performed prior to the start of final cementing operations on April 20, Halliburton knew that its cement slurry design was unstable and yet elected to use the design anyway.  Halliburton and BP were also aware that prior test results of a similarly designed cement slurry demonstrated that the slurry was unstable, and yet an alternative design was never utilized or requested.  Despite these warning signs, Defendants proceeded with cementing operations with Halliburton's slurry design.

62.

As part of the cementing process, BP E&P used an improper base oil spacer mix just ahead and behind the cement slurry that, coupled with the small volume of cement used, may have contaminated the cement slurry.  BP E&P and Halliburton knew, or should have known, that the cement design and implementation had a very low probability of ever becoming an effective barrier to well flow.

63.

The spacer used in the cement job was a combination of Forma-set and Form-a-squeeze loss containment material (LCM) pills.  This was leftover material that government regulations prohibited from discharge directly into the Gulf.  However, if these materials are circulated in the well, a loophole in the regulations allowed them to be dumped overboard.   BP E&P intentionally used these materials as a spacer in order to save the cost of having to transport them to shore and properly dispose of them, all the while knowing that they were not designed for that application and that cement contamination could result.

64.

After the cement job, BP E&P and Transocean ran a negative pressure test, designed to test the integrity of the cement. The negative pressure test was abnormal.  Transocean personnel advised the well site leader that the abnormal readings were due to the "bladder effect" and that the test results were normal.  The "bladder effect" is an unknown phenomenon and both BP E&P and Transocean had actual and/or constructive knowledge before the Incident that a negative pressure test indicated that the cement had failed to seal the hydrocarbon-bearing formation.  Nevertheless, BP E&P and Transocean elected to ignore the abnormal test results without shutting in the well.

65.

BP E&P had a Schlumberger team on the rig to perform a cement bond log (CBL) to test the integrity of the cement.  In spite of the abnormal negative pressure test results, BP E&P sent the Schlumberger team home without doing the CBL.  MMS regulations (30 CFR 250.428) require the running of a CBL when there is an indication of an inadequate cement job, such as the abnormal negative pressure test.  The cement bond log test would have conclusively determined the integrity of the cement job, and BP E&P knew that it should have been performed and elected to violate Federal regulations requiring it.

66.

As part of its casing design and well plan, BP E&P decided not to deploy the long string casing hanger lockdown sleeve for the long string casing before cementing the well.  This lockdown sleeve would have locked the top of the long string casing at the wellhead, thereby providing an extra layer of protection against a blowout.  The long string wellhead seal at some point was likely lifted out of place by pressure from below, resulting in a flow path for hydrocarbons to escape into the Gulf of Mexico.

67.

As long as the BOP, LMRP and Marine Riser are attached to the wellhead, a conduit directly to the rig exists through which well data will be obtained in real time.  As long as a direct conduit from the well to the rig exists, constant monitoring to ensure that well control is maintained is required.  Transocean is responsible, regardless of the other operations that were occurring, for ensuring that well control is maintained at all times.  In the critical hours before the blowout, Transocean and BP E&P decided to offload drilling mud to a waiting vessel, which caused rig workers to become distracted and fail to properly monitor well conditions.  Additionally, the mud offloading process prohibited certain rig workers from monitoring the

Sperry Sun data.  The mud offloading should have been delayed until after the well was finally secured.

68.

Warning signs of well flow were being transmitted to the rig, to Halliburton's Houston office and BP E&P's Houston office in real time for almost an hour before hydrocarbons reached the rig, alerting rig workers to shut down the well.  Nevertheless, the rig workers apparently ignored these warning signs until it was too late.  Moreover, during that critical hour before the well blowout, there was no one at the Halliburton or BP E&P offices to monitor this data and issue the appropriate warnings.  This data was also available on any BP E&P employee's laptop computer yet none of them were monitoring that data.

69.

When drilling mud started gushing onto the rig floor, the vessel crew diverted the flow from the well into the mud-gas separator (MGS), a device used to separate gas out of the drilling fluid and vent it safely into the air in the event of a kick.  The MGS vent was designed for small gas releases and the massive amount of gas flowing through it vented down onto the deck of the rig, causing the explosion and fire on the rig.  Another larger alternative diverter pipe was available, which would have vented the gas overboard, making it less likely to have ignited.  The rig crew should have employed that option, but failed to do so.

70.

On information and belief, the initial explosion on the *Deepwater Horizon* on the night of April 20, 2010, was caused when an engine in the rig's engine room sucked in the gas vapors from the MGS vent pipe, causing the engine to overspeed.  Gas sensors designed to help avoid explosions by shutting down these engines and closing air intake manifolds when flammable gas is

present were not operational on the night of the Incident.  Gas alarms which would have alerted the crew to shut down the rig had been intentionally disarmed.

71.

The rig's Emergency Disconnect System (EDS), which was designed to separate the vessel from the Marine Riser in case of an emergency, failed to activate, allowing gas to continue flowing through the riser and fueling the fire on the *Deepwater Horizon*, resulting in her sinking two days later.

72.

MMS regulations and industry standards required a blowout preventer as the last line of defense to a well blowout.  The regulations and industry standards mandated a minimum configuration of annular preventers and blind sheer rams to shut off the well in the event of a blowout.  They also required backup systems and controls, as well as periodic maintenance, to ensure that the BOP functioned when necessary.

73.

The *Deepwater Horizon*'s BOP and its control systems, manufactured, designed, and installed by Defendant Cameron, were not properly configured, improper modifications were made to them, and they were not properly functioning at the time of the Incident.  In addition, required inspections and maintenance on the BOP was not performed.  Rig audits of the *Deepwater Horizon* in September 2009 and April 2010 placed BP E&P and Transocean on notice of these deficiencies, yet these Defendants did nothing to correct them in time to prevent the Incident.

74.

BP made numerous ill-fated decisions before the disaster, including but not limited to: (1) selecting an inappropriate well-design for the reservoir; (2) adopting risky well-design and

operations procedures; (3) failing to implement process safety changes to address a dysfunctional safety culture; (4) failing to perform tests and misinterpreting test results; (5) improperly messaging employees and contractors to put other concerns ahead of safety; (6) inadequately supervising employees and contractors; (7) failing to communicate with employees and contractors; (8) failing to properly train employees and contractors; (9) indemnifying contractors for negligent acts that also discourages best practices; and (10) instituting other procedures that deviated from industry norms.

75.

For example, BP chose a risky well casing over more traditional equipment because it would save the company three days and $7 million to $10 million. BP knew, or should have known, that it was the wrong design for this particular job.

76.

Again BP decided to take an untraditional approach when it attempted to remove drilling mud before capping.  It ordered a loading sleeve but did not install it until drilling mud was removed from the site.

77.

Ronald Sepulvado, one of the BP p.l.c. employees overseeing the rigs operations, told federal investigators on July 20, 2010, that workers detected a leak in the hydraulic system that controls the blowout preventer, the huge stack of valves on the sea floor that is supposed to shut down a well in an emergency.  Several individuals were aware of and reported that the BOP's yellow pod (one of two) was leaking hydraulic fluid:  Tyrone Benton, a remotely operated vehicle ("ROV") technician for Oceaneering, reported this to BP personnel while on the rig; Billy Stringfellow, a Transocean subsea superintendent, has testified he knew of the leak; Ronnie Sepulvado, BP's wellsite leader, stated he reported the leak to John Guide, another wellsite leader,

just before leaving the rig four days before the explosion, stating: "I assumed everything was ok, because I reported it to the team leader and he should have reported it to MMS." Ultimately, Guide testified on July 22, 2010, that: "We did not feel the leak affected functionality of the BOP and therefore it did not rise to the level it needed to be reported to the MMS."

78.

BP violated federal regulations when it continued drilling even though it knew that either, or both, of the blowout preventers' two control systems did not work properly. Federal Regulations, specifically, 30 CFR 250.451(d), state that in the event of a "BOP control station or pod that does not function properly," drilling operations must be suspended "until that station or pod is operable."

79.

BP also violated federal regulations through its failure to examine and test the BOP every three to five years as required by law.

80.

The standard for inspection and certification was created by the industry-run API. API institutes standards that regulators adopt and become mandatory as part of the law. *See  e.g.* National commission on the BP Deepawter Horizon Oil Spill and Offshore Drilling, Report to the President, *Deep Water, The Gulf Oil Disaster and the Future of Offshore Drilling,*p. 225. Washington, D.C.; U.S. Government Printing Office, January 2011.

81.

A maintenance audit conducted by BP in September 2009 found that Transocean had left 390 maintenance jobs undone, requiring more than 3,500 hours of work. The BP audit referred to this amount of deferred work as "excessive".

82.

When the rig exploded on April 20, 2010, BP was approximately forty-three days behind schedule.  This delay cost the company more than $21 million in additional rig rental rates.

83.

Once the well began to flow out of control, vital safety systems on the rig failed, resulting in an uncontrolled disaster.  Successful deployment of the safety systems should have prevented or lessened the severity of the disaster.

84.

Michael Williams, the vessel's chief electrician and an employee of Transocean Ltd., testified on July 23, 2010, at a federal hearing, that the general alarm system aboard *Deepwater Horizon* was disabled before the explosion.

85.

In addition, the rig's emergency power failed, systems that were designed to shut down engines before they could spark an explosion failed, and the rig's emergency disconnect system, which is supposed to shut down the well and disconnect the rig so it can float free, failed.  The Forensic Examination of *Deepwater Horizon* Blowout Preventer performed by Det Norske Veritas for the Department of the Interior ("DNV BOP Report") dated March 21, 2011, indicates that the BOP's remaining operable pod, the blue pod, may have had battery issues that kept the deadman function (EDS) from allowing the rig disconnection.

86.

The injuries and damages suffered by the State were caused not only by the Defendants' deficient and risky decision-making, but also by the Defendants' violations of numerous statutes and regulations, including, but not limited to, statues and regulations issued by OSHA and the United States Coast Guard, including the requirement to test the sub-sea BOPs at regular intervals.

87.

Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Louisiana's marine and coastal environments and estuarine areas, and the coastal zone.

88.

Pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq*., lessees must file an Exploration Plan outlining the proposed drilling activities.  According to OCSLA, and regulations implementing the Act, the proposed activities should not:

(1)     Cause serious or undue harm or damage to life, property,... or the marine, coastal, or human environment;

(2)     Unreasonably interfere with other uses of the area;

(3)     Interfere with or endanger operations on other leases;

(4)     Result in pollution;

(5)     Create hazardous or unsafe conditions; or

(6)     Disturb any site, structure, or object of historical or archaeological significance.

*See* 43 U.S.C. § 1340(g) and 30 C.F.R. 251.6(a).  The BP Defendants did not prepare such a plan.

89.

In 2005, after extensive public notice and comment, the MMS adopted regulations that set national standards governing oil and gas drilling on the Outer Continental Shelf ("OCS"). 30 C.F.R. 200 *et seq*. These regulations require that every Exploration Plan contain public disclosures of a blowout scenario, including the highest volume of hydrocarbons that could be discharged

from an uncontrolled well blowout, the maximum flow rate, duration and volume of such a blowout, the likelihood that the blowout could be stopped by surface intervention, rig package constraints and the availability of a rig to drill a relief well, as well as the time needed to drill such a relief well. 30 C.F.R. 250.213(a).  The regulations also require the oil company to submit an Oil Spill Response Plan containing, inter alia, a description of a "worst case" spill scenario from an exploration well. 30 C.F.R. 250.219 & 250.250.   Together, these requirements ensure that operators consider and plan for what can go wrong and how to prevent disasters, or mitigate the damage.

90.

In 2009, the MMS proposed a rule that would have required companies to have their safety and environmental management programs audited once every three years.  The BP Defendants submitted a formal objection to this rule, claiming, in part, that: "BP currently operates under our Operating Management System (OMS), which includes all of the elements proposed in this rulemaking. While BP is supportive of companies having a system in place to reduce risk, accidents, injuries and spills, we are not supportive of the extensive, prescriptive regulations as proposed in this rule.   We believe industry's current safety and environmental statistics demonstrate that the voluntary programs implemented since the adoption of API RP 75 have been and continue to be very successful."

91.

Jim Hackett, the CEO of Anadarko Petroleum, testified that "mounting evidence clearly demonstrates that this tragedy was preventable and the direct result of BP's reckless decisions and actions."  Anadarko also asserted that "publicly available information . . . indicates BP operated unsafely and failed to monitor and react to several critical warnings during the drilling of the

28

Macondo well.  BP's behavior and actions likely represent gross negligence or willful misconduct and thus affect the obligations of the parties under the operating agreement."

92.

Rex Tillerson, ExxonMobil's CEO, testified:   "[T]he API already has a number of standards and recommended practices for cement and cementing operations; and I think, had those been followed, at least that element in this case might have been eliminated.  [I]t appears clear to me that a number of design standards were — that I would consider to be the industry norm were not followed. . .We would not have drilled the well the way they did."  June 15, 2010 U.S. House Energy and Commerce, Subcommittee on Energy and the Environment hearing on "Offshore Drilling Operations and Safety."

93.

Similarly, John Watson, the CEO of Chevron, testified:  "At Chevron one goal overrides all others: making sure everyone goes home safe every day. We have multiple systems to prevent a tragedy like the *Deepwater Horizon*.   Our drilling policies and procedures are rigorous.   We require continuous training.   We certify our drilling personnel to ensure they are qualified to manage unusual circumstances, and we verify that contractors have the skills to execute well control. . . .   There are several areas that appear, based on the information we've seen in the joint industry task force and based on the information we've been able to gather, that suggest the practices that we would not put in place were employed here."  June 15, 2010 U.S. House Energy and Commerce, Subcommittee on Energy and the Environment hearing on "Offshore Drilling Operations and Safety."

94.

The President of Shell Oil, Marvin Odum, likewise testified that "[F]rom the information that was in your letter and what we know about the well, a similar statement, that it's not a well that

we would have drilled with that mechanical setup, and there are operational concerns." June 15, 2010 U.S. House Energy and Commerce, Subcommittee on Energy and the Environment hearing on "Offshore Drilling Operations and Safety."

95.

In 2000, a chemical plant in Grangemouth, Scotland, owned and operated by a BP p.l.c. subsidiary, had a number of chemical releases and fires. A subsequent investigation by the U.K. authorities attributed the accidents to systemic failures in BP's safety management system. In 2005, a catastrophic explosion occurred at the Texas City, Texas refinery owned and operated by BP America, Inc. An independent report by the Baker Commission cited BP for systemic failures in its safety management systems. In 2006, an oil pipeline leak occurred in Alaska at a BP America, Inc. facility. Once again, an independent report by Booz, Allen, Hamilton cited BP for systemic failures in its safety management systems.

96.

After each of the foregoing events, BP p.l.c. announced that it was enacting sweeping reforms to its safety management systems. As each succeeding incident occurred, these alleged reforms did not prevent the next disaster.

97.

The latest iteration of BP p.l.c.'s safety management system is called the Operating Management System (OMS). BP p.l.c. intended to implement its OMS in all of its divisions or groups, including the GoM SPU division of BP E&P, before the design and drilling of the Macondo Well. The OMS included implementation of Group Defined Practices which affected the design and operation of the Macondo Well.

98.

A critical element of BP's OMS is the concept of continuous improvement of procedures and practices. As stated by BP p.l.c. "Our performance improvement cycle is at the heart of OMS, driving and sustaining change and improvement in local business processes. It incorporates the concept of continuous improvement (CI), which provides the tools and frame of mind needed to engage the entire organization in tackling challenges and ensuring that problems are eliminated and operations run at maximum efficiency."

99.

After the *Deepwater Horizon* disaster, BP E&P conducted an internal investigation of the causes of the Incident. The investigation specifically did not address systemic problems as potential causes of the Incident. Nevertheless, recommendations by the investigative report indicated significant failures in BP E&P's OMS before the Incident. Had OMS been properly implemented by BP p.l.c. at BP E&P, the problems pointed out in the recommendations of the investigative report should have been addressed and cured before the design and drilling of the Macondo Well, and the Incident would have been less likely to occur.

100.

BP p.l.c.'s OMS contained inherent weaknesses which did not ensure an adequate safety management system. BP p.l.c. took on the obligation to implement OMS across its subsidiaries, but did not insure that they properly did so. The inherent weaknesses in BP p.l.c.'s OMS and the failure to properly implement and supervise the OMS contributed, in part, to the cause of the Incident.

101.

The GoM SPU's OMS document created a detailed Central Team Model responsible for well design and management centered around two core groups: Engineering and Operations.

However, just months before the Incident, the GoM SPU rearranged its management structure. This led to confusion in critical decisions made affecting the management of the Macondo Well which resulted, in part, in the Incident.

102.

According to BP E&P it gave or made available to its co-owners, Anadarko and MOEX, documents that showed the well design and changes to the well design.  BP E&P also identified major well control events encountered during drilling operations and personnel from the co-owners engaged in periodic communications with BP about well design and other issues related to the well.

103.

On information and belief, Anadarko and MOEX were aware of design choices for the well, including the decision to use a so-called "long string casing", and the number of centralizers being used to stabilize the long string, rather than the safer alternative of hanging a liner to the lower end of the casing with a "tieback."

104.

The operating agreement among BP E&P, Anadarko and MOEX: (1) required that copies of all APDs, IADC daily reports, core data, logs, surveys, all digitally recorded data, well test results, bottomhole pressure surveys, hydrocarbon analyses, drilling prognoses, and forty-eight (48) hours' advance notice of logging, coring, or testing operations be provided to Anadarko and MOEX; (2) gave Anadarko and MOEX the right to request copies of any Health, Safety and Environmental ("HSE") audits conducted of the drilling operations on the subject well; (3) gave Anadarko and MOEX the right of access to activities and operations and access to Operator's HSE files as provided for in this Operating Agreement; (4)  gave Anadarko and MOEX the right to request the Operator to present to the Non-Operators, at a meeting called in accordance with the

Operating Agreement, a sufficient overview of its Health, Safety and Environmental Management systems to evidence compliance with an effective Health, Safety & Environmental Management Plan or Plans, in accordance with API RP75, or an equivalent standard, including Operator's internal policies, for all operations conducted under the Operating Agreement; and (5) required Anadarko and MOEX to give cooperation and support to the Operator to:

a) design and manage activities or operations to standards intended to achieve sustained reliability and promote the effective management of HSE risks;

b) apply structured HSE management systems and procedures consistent with those generally applied in the petroleum industry to effectively manage HSE risks and pursue sustained reliability of operations under this Agreement; and

c) conform with locally applicable HSE related statutory requirements that may apply.

105.

The foregoing contractual rights and obligations placed Anadarko and MOEX in the position of being able to oversee all of the operations at the Macondo Well and to intervene to prevent the Incident from occurring. Anadarko and MOEX failed to properly exercise their rights or obligations under the operating agreement which caused, in part, the Incident.

106.

Prior to the Incident, all Defendants had actual and/or constructive knowledge of significant problems related to the *Deepwater Horizon*'s equipment, its maintenance, and the negligent design and operation of the Macondo Well.

107.

One or more of the foregoing actions or inactions constitute violations of federal regulations, particularly 30 C.F.R. § 250, *et seq*.

108.

The Defendants' failures to observe and/or comply with federal regulations and/or industry standards include, but are not limited to, failures to observe and/or comply with federal regulations and/or industry standards regarding the design, installation, maintenance, surveillance, repair, observation and operation of the Defendants' equipment and/or drilling operations.

### The Disaster and Its Impact on Louisiana

109.

The well blowout, explosion and sinking of the *Deepwater Horizon*, resulting in the largest marine oil spill in U.S. history, occurred approximately fifty miles off Louisiana's coast.  The economic and environmental impacts on Louisiana resulting from this Incident are widespread and severe.  Louisiana's shoreline, which was and continues to be significantly oiled as a result of the Gulf Oil Spill, constitutes a vitally important and valuable natural resource of national significance that provides numerous economic, environmental, cultural and recreational benefits.  Louisiana's citizens, waters, marshes, wetlands, shoreline, ecology, economy, tourism, fisheries, and wildlife have been profoundly impacted by the Gulf Oil Spill, and will continue to be impacted for years to come.

110.

The initial leak of 1,000 barrels per day that BP initially reported on April 24, 2010, was grossly underestimated and was repeatedly replaced by exponentially growing figures.  The government-chartered Flow Rate Technical Group "FRTG" estimated on June 10, 2011, that the oil was flowing out of the well at a rate of 20,000 to 40,000 barrels per day.  This estimate was subsequently revised to 35,000 to 60,000 barrels per day.  Final estimates from the FRTG and the U.S. Department of Energy place the flow rate at 53,000 to 62,000 barrels per day.  Repeated efforts to curtail or stop the flow of oil leaking from the Macondo Well failed until approximately

87 days after the initial explosion, resulting in a total estimated discharge of over 4.9 million barrels of oil.

111.

On April 29, 2010, shortly after the well blowout, explosion and sinking of the *Deepwater Horizon,* Louisiana Governor Bobby Jindal declared a state of emergency, requesting additional resources from the federal government to assist the State in preparations for the impacts of the *Deepwater Horizon* disaster.  Governor Jindal's declaration was based upon the "predicted impact of oil along the Louisiana coast leaking from the *Deepwater Horizon* which threatens the state's natural resources, including land, water, fish, wildlife, fowl and other biota, and likewise threatens the livelihoods of Louisiana's citizens living along the coast which increases the economic impact of this incident."

112.

On or around April 30, 2010, oil began washing up on the shoreline of Venice, Louisiana and nearby beaches.  On May 6, 2010, federal, state and BP officials confirmed that oil was found on the beach at Chandeleur Islands, a small group of uninhabited barrier islands northeast of the Mississippi Delta.

113.

On May 31, 2010, the Secretary of the LDEQ issued to BP Exploration and Production, Inc. a Consolidated Compliance Order and Notice of Potential Penalty, which ordered BP to immediately take any and all measures necessary to eliminate the unauthorized discharge of oil and other pollutants into waters and property located in the State of Louisiana, and to remediate all oil contaminated media to the extent practicable.  Similar compliance orders were issued to the Transocean defendants on October 12, 2010.

114.

On August 10, 2010, the United States Judicial Panel on Multidistrict Litigation issued a Transfer Order centralizing and transferring litigation arising from the *Deepwater Horizon* disaster to the Eastern District of Louisiana. Explaining its decision, the Panel noted in the Transfer Order that, "[w]ithout discounting the spill's effects on other states, if there is a geographic and psychological 'center of gravity' in this docket, then the Eastern District of Louisiana is closest to it."

115.

Southern Louisiana contains 40 percent of the coastal wetlands in the continental United States, with a coastal zone containing more than 4,500 square miles of wetlands that are world-renowned for their natural productivity and economic significance. This complex coastal ecosystem supports diverse habitats and wildlife and provides many benefits to the environment and the citizens of Louisiana. Louisiana's abundant natural resources, including the fisheries and wildlife contained therein, are the epicenter for Louisiana's culture, its way of life and its economy.

116.

Louisiana's wetlands constitute a unique and precious resource, providing a multitude of goods, benefits and services of both ecological and environmental value including flood control, water purification, storm buffer, wildlife habitat, nursery grounds for aquatic life, and recreational areas. Wetlands provide a significant environmental benefit by acting as a filter for pollution and excess nutrients thereby improving water quality. Wetlands also protect shorelines of rivers, lakes, and oceans from erosion by decreasing the amount of sediment entering into water bodies.

117.

Additionally, wetlands contain an extraordinary diversity of environments, including swamps and marshes that provide crucial habitats for hundreds of species of wildlife and migratory birds. With over 5 million birds wintering in Louisiana, including colonial waterbirds, seabirds, shorebirds, and waterfowl, Louisiana's coastal wetlands, barrier islands, and chenieres are a crucial habitat to these birds, as well as to neotropical migratory songbirds and other avian species who use the wetlands as a crucial stopover habitat. Louisiana wetlands also provide crucial nesting habitats for many species of water birds, including the endangered brown pelican.

118.

Louisiana's estuaries have significant value to the entire Gulf ecosystem. Ninety percent of the species in the entire Gulf of Mexico and 98 percent of the commercially-harvested species in the Gulf are dependent upon Louisiana's estuaries for sustainability. Louisiana's coastal zone is also home to 77 percent of the 26 threatened and endangered species in Louisiana, including the Bald Eagle, the Pearshell Clam and the Gulf Sturgeon. An additional 103 plants and 64 animals in the coastal zone have been listed as important species of concern.

119.

The estuaries and coastal waters of Louisiana contain an abundance of resources that contribute significantly to wildlife populations. Louisiana's marshes and coastal wetlands serve as critical nurseries for many fish and crustaceans of fishery value, in part due to the high production of flora, as well as the protection from predation that these flora and associated shallow-water, complex habitats offer. The prosperity of these resources depends on an infrastructure of healthy, functioning ecosystems, such as salt marshes, open bay bottoms, barrier island shores, and coastal waters.

120.

Louisiana's natural resources have been, and continue to be, severely impacted and injured by the Gulf Oil Spill.  The Louisiana State Trustees (CPRA, LOSCO, LDEQ, LDWF and LDNR), in cooperation with other state and federal trustees and BP, are currently cooperatively assessing the injuries to natural resources resulting from the Gulf Oil Spill pursuant to the Natural Resource Damage Assessment ("NRDA") process set forth in OPA and OSPRA.  Although this Complaint includes claims under OPA and OSPRA for damages to natural resources over which Louisiana has trusteeship, the State requests that these claims be appropriately phased into litigation in light of ongoing assessment efforts.

121.

Louisiana's precious barrier islands, wetlands, marshes, and beaches have been, and continue to be, injured and/or threatened by the deleterious effects of the Gulf Oil Spill and the actions undertaken in response.  Oil, gas and other pollutants from the *Deepwater Horizon* disaster have, in one or more forms, invaded, and continue to invade, significant portions of Louisiana's waters and shoreline.  Hundreds of miles of Louisiana's shoreline have been and continue to be impacted by the Gulf Oil Spill.

122.

These impacts are ongoing.  One year after the Incident, many areas remain oiled and continue to be re-oiled, resulting in further injuries.  Impacts will continue as oil continually and/or periodically washes ashore due to the disturbance of oiled sediment and surface and subsurface waters moved by various tropical and subtropical weather phenomena commonly experienced in the Gulf of Mexico, and as oil is released from entrapments by summer weather and other causes, and is otherwise disturbed or redistributed by various causes.

123.

The full extent of the short- and long-term impacts of the Gulf Oil Spill to Louisiana's natural resources and citizens are currently unknown.  The oil, pollutants and dispersants from the Gulf Oil Spill, and their impacts, are likely to persist in the environment long into the future.

124.

Louisiana's coastline is home to over 2 million citizens who use and enjoy Louisiana's natural resources.  Many of Louisiana's citizens derive their livelihood from Louisiana's coast, which supports an array of industries such as commercial fishing and shrimping, oil and gas production, and shipping.  Louisiana's coast is fundamental to the prosperity and well-being of Louisiana citizens who reside, recreate and/or work along the coast.

125.

Substantial economic benefits are derived from activities occurring in Louisiana's coastal zone, including commercial and recreational fishing, hunting, non-consumptive fish and wildlife recreating, recreational boating, alligator harvesting, reptile and amphibian collecting, and fur harvesting.  Louisiana has a $3 billion fishing industry and is the source of one third of the seafood consumed in the United States, according to the Louisiana Seafood Marketing and Promotion Board, a state-run agency.

126.

The negative impact of this spill on Louisiana fishermen, processors, charter boat operators, home ports and supporting infrastructure including cold storage, marinas, boatyards, suppliers, repair yards and transportation businesses, will be long-lasting and profound.

127.

In response to the spill, Louisiana closed a considerable amount of fishing areas within its territorial waters, which has further impacted the approximately 27,000 Louisianans employed by

39

the seafood industry.  Louisiana's shellfish industry has been significantly damaged, as the State has been forced to close oyster beds along over one hundred miles of coastline.  At considerable expense, Louisiana continually samples oysters from open beds—along with other seafood—to ensure that the public is protected.

128.

In addition to Louisiana's fishery closures, the National Oceanic and Atmospheric Administration (NOAA) began prohibiting all commercial and recreational fishing, including catch and release, in federal waters between the mouth of the Mississippi River to waters off Florida's Pensacola Bay on May 2, 2010.  As the oil continued to spread, NOAA expanded the area closed to fishing on a regular basis.

129.

The Gulf Oil Spill has caused, and continues to cause, damage to and destruction of Louisiana's coastal wetlands, reducing this resource and causing coastal land loss that increases the catastrophic risk posed by hurricanes to the citizens, businesses, property, and environment of the State.  Wetlands loss threatens valuable fish and wildlife production and the viability of residential, agricultural, energy, and industrial development in coastal Louisiana.  La. R.S. 43:214.1(A).

130.

As a result of the Gulf Oil Spill, the State of Louisiana has suffered, and will continue to suffer, extensive injury to its natural resources as well as damage to its real and personal property, loss of subsistence use of its natural resources, loss of taxes, rents, royalties and fees due to the injury to, loss or destruction of its real property, personal property and natural resources.  Further, Louisiana, through its agencies, has incurred substantial costs in responding to this disaster and providing increased and additional public services.  Additionally, many of Louisiana's coastal

40

citizens have experienced a loss of subsistence use of the State's natural resources that has resulted in additional losses of State revenue, such as decreased fishing licenses and oyster tags.

131.

The Gulf Oil Spill has caused, and will continue to cause, loss of revenue to persons and businesses that cannot, due to the extensive and ongoing contamination of Louisiana's waters and shoreline, use the Gulf of Mexico and Louisiana's Coastal Zone for diverse activities, including commercial and recreational fishing, recreation, working and earning a living, and/or otherwise subsidizing their earnings and providing for themselves and their families.

132.

Efforts undertaken in response to the Gulf Oil Spill have caused further injuries and damages to property, the environment and natural resources of Louisiana.  (*See, e.g.,* Kim Murphy, *Death by Fire in the Gulf*, LA Times, June 17, 2010; WDSU, *Officials*:  *Cleanup Crews Trampling Pelican Nests, accessed at* http://www.WDSU.com/print/23909922/detail.html (last updated June 16, 2010 and captured July 6, 2010)).

133.

The State of Louisiana has sustained, and will continue to sustain, substantial removal and response costs including "removal costs" and "damages" as defined by the OPA, OSPRA and related regulations.  Pursuant to 33 U.S.C. § 2701(30), "removal activities" include not only removal of oil from water and shorelines, but also "the taking of other actions as may be necessary to minimize or mitigate damage to the public health or welfare, including but not limited to fish, shellfish, wildlife, and public and private property, shorelines and beaches."  *See also* La. R.S. 30:2454(25) (identifying removal costs).

## Economic Impact of Deepwater Drilling Moratorium

### 134.

On May 27, 2010, the United States Department of the Interior ordered a six-month moratorium on deepwater drilling, thereby suspending activity at the twenty-two (22) deepwater drilling rigs that had been operational off the Louisiana coast, and crippling the staging and support activities for the offshore oil industry located in Louisiana.

### 135.

On October 12, 2010, the United States Department of the Interior announced that the federal government would lift the drilling moratorium.  However, although the moratorium was officially lifted, drilling has not resumed and has lagged far behind its pre-spill pace due to the federal government's imposition of additional regulations and requirements as a result of the Gulf Oil Spill.

### 136.

The May 27, 2010 moratorium and the de facto moratorium that has continued since the official lifting of the moratorium are direct results of the *Deepwater Horizon* disaster.  All losses and damages associated with the moratorium are, accordingly, the direct result of, and proximately caused by, the acts and omissions of each Defendant as alleged herein.

## The BP Claims Procedure and Its Impacts on Louisiana's Economy

### 137.

OPA requires that BP establish a procedure for the payment or settlement of claims for interim, short-term damages.  33 U.S.C. § 2705.  Pursuant to OPA, BP established the Gulf Coast Claims Facility (GCCF) for private claimants in Louisiana and along the Gulf.  BP and GCCF have failed to fully, finally and adequately compensate Louisiana claimants for either short term

losses or long term impacts, and this Court has been asked to oversee GCCF's interactions with the public accordingly.

138.

The State of Louisiana has suffered economic losses and costs flowing from the individual and business losses suffered by the citizens of the State who have not obtained the full measure of their damages.  Failure of BP and its agent, GCCF, to make full restitution has resulted in direct and indirect costs to the State, including but not limited to increased unemployment claims, increased costs of public services, and myriad lost tax revenues from closed businesses, lost sales tax revenues, and decreased income tax revenues.  BP's and GCCF's acts and omissions in the context of their claims procedures have also interfered with the State's ability to mitigate its own damages.  For example Louisiana's Office of Workforce Development's oil spill related costs are in excess of $20,000 per day due to an increased number of recruiting events, staffing and other costs, including the operation of mobile units deployed to affected areas.

## Economic Impacts on the State of Louisiana

139.

The economic impacts, costs and damages to the State of Louisiana arising from the *Deepwater Horizon* disaster and the resulting Spill are wide-spread and extensive, permeating every corner of the State's economy.   As a result of the Defendants' conduct, the public, citizens and businesses of Louisiana have suffered from a variety of impacts to the State's natural resources, its seafood and tourism industries, and its critical oil and gas sector.

140.

The oil and necessary response actions have caused untold ecological and environmental harms to Louisiana's coast, its fisheries, and its entire eco-system.   Vast economic damages were done to the State and its people as a result.

141.

Likewise, as a result of the Deepwater Horizon explosion, the resulting Spill, and resulting harms, the State's oil and gas sector was dramatically impacted.   The May 27, 2010, Moratorium has resulted in losses and damages and are accordingly the direct result of and caused by the acts and omissions of each Defendant as alleged herein. Likewise, the *de facto* shallow water moratorium substantially impacted the near-shore segments of Louisiana's economy.

142.

The State of Louisiana is still assessing the full impacts of the *Deepwater Horizon* event and Spill.   However, it is clear that the State has suffered property damages, response costs, increased costs of public services, revenue and tax losses, and injuries to the Louisiana brand and similar impacts to the State's earning capacity as a result of the Defendants' conduct.   As set forth

in the claims below, the State of Louisiana is entitled to be made whole and recover all of the costs and damages flowing from this tragedy.

## **Presentment Procedure and**
## **Presentment by the State of Louisiana**

143.

Given the size of the Spill, the enormous scope of the impacts and response efforts occasioned thereby, and the complexity of the many issues raised thereby, the State has been regularly presenting to (and negotiating with) BP a variety of the State's claims since the first days following the Spill.  The GCCF and presentment processes created thereunder explicitly do not apply to the State or other public/governmental entities.  To the extent that presentment is possible, even if not required for Government claims, the State has directly presented BP with its claims. Though Government claims should not and do not require presentment before proceeding to litigation, especially under the circumstances found here, Louisiana has worked diligently to present and resolve those claims that it could prior to filing this Complaint.

144.

The State has previously presented claims to BP for voluminous removal costs, increased costs of public services, loss of revenues and earning capacity, property damages, and other damages, including but not limited to, Department of Natural Resources' claims for lost royalties and severance taxes associated with shut in wells; Department of Wildlife and Fisheries' claims for lost fishing license revenue; Department of Transportation and Development's claims for transportation infrastructure repairs; costs to repair the harm to the State's tourism industry; claims to address seafood safety and response; response costs; and claims associated with coastal

restoration and berm projects.  As such, the State has repeatedly satisfied any presentment requirements and should not be required to repeatedly present government claims especially as to those categories of claims which are a direct result of the incident and for which BP has actual or constructive notice.

145.

For example, in an effort to facilitate the protection of the State's seafood industry and mitigate the damage to Louisiana's economy and welfare of its citizens, a long-term Seafood Sampling and Assurance program was developed and proposed to BP as outlined in correspondence to Tony Hayward, dated May 29, 2010.  The proposal was presented as a coordinated effort among Louisiana Department of Wildlife and Fisheries Secretary Robert Barham, Secretary Alan Levine of the Louisiana Department of Health and Hospitals, Louisiana Department of Environmental Quality Secretary Peggy Hatch, Louisiana Department of Economic Development Secretary Steven Moret, and Louisiana Department of Agriculture and Forestry Commissioner Mike Strain.  These efforts were to include:

146.

The implementation of a science-based seafood safety testing program with transparent metrics of safety and quality;

147.

The implementation of a certification program for quality and processing of certified Louisiana seafood.

148.

Both a short-term and sustained long-term consumer information campaign designed to reassert the Louisiana brand.

149.

In addition to sending a detailed proposal for a 20-year, multi-agency initiative, the State requested that BP make $457 million available for implementation of the program.  Although these expenditures are recoverable under the OPA, BP refused to fund the program.

150.

After negotiations, Louisiana accepted funding for a $78 million Seafood Testing, Marketing, and Tourism Program as a starting point for mitigating the damages to Louisiana's citizens, fisheries, and economy, without waiving rights to sue.  A more comprehensive Seafood Testing and Quality Assurance program is still needed to ensure long-term testing of Louisiana seafood, in order to confirm the safety of Louisiana seafood and to restore its pre-spill desirability in the seafood market.

151.

Some of the State's presented claims have been paid by BP, but many claims have been rejected by BP due to the State's refusal to accept unreasonable conditions, while other claims have been subjected by BP to circular rejections and perpetual reservations due to impossible documentation requirements, although such are unnecessary to establish proof of legitimate claims.

152.

In addition to the many claims and categories of damages previously presented, the State has included in this Complaint claims for natural resource damages and other forward looking

costs and economic damages that the State is entitled to recover under OPA and LOSPRA but which are incapable of quantification at this time.  In an abundance of caution, the State had to assert such claims now, but the State is seeking that the Court phase these claims into the litigation at an appropriate time, after appropriate assessment and quantification work has been performed. The State simply could not risk Defendants' arguments that these claims were later barred by Louisiana's residual one-year prescription period or that the State impermissibly spilt its claims by withholding them from this filing.

## CLAIMS FOR RELIEF

### COUNT I

**Against BP, Anadarko, MOEX and Transocean Defendants**

**Declaratory Judgment That Defendants Are Jointly,**

**Strictly and Severally Liable Under OPA**

153.

Paragraphs 1 through 152 are realleged and incorporated herein by reference.

154.

This Count is alleged against BP, Anadarko, MOEX and Transocean Defendants.

155.

The Declaratory Judgment Act allows a federal court to declare the rights and other legal relations of any interested party seeking such declaration in an actual controversy within its jurisdiction.  28 U.S.C. § 2201.

156.

The facts and circumstances alleged herein present an actual and existing controversy between the BP, Anadarko, MOEX and Transocean Defendants and the State.

157.

OPA, 33 U.S.C. § 2701 *et seq*., as enacted in 1990, establishes a strict liability scheme which holds responsible parties strictly liable for damages and removal costs related to oil spills. OPA also provides that each responsible party for a vessel or facility from which oil is discharged "into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages . . . that result from such incident."  33 U.S.C. § 2702(a).

158.

Responsible parties for an offshore facility include the lessee or permittee of the area in which the facility is located or the holder of a right to use and easement granted under applicable state law or the Outer Continental Shelf Lands Act, 43 U.S.C. § 1301 *et seq*., for the area in which the facility is located.  Responsible parties also include any person owning, operating, or demise chartering the vessel. 33 U.S.C. § 2701(32).

159.

As a result of the various contractual and other agreements alleged and identified herein, and the corporate relationships among the parties, the BP, Anadarko, MOEX and Transocean Defendants are responsible parties within the meaning of OPA, and are jointly and severally responsible to the State of Louisiana for removal costs and damages, as defined in 33 U.S.C. § 2702(b)(2), including (1) all removal costs; (2) damages to natural resources; (3) damages to real or personal property; (4) subsistence use of natural resources; (5) net loss of revenues to a state or political subdivision thereof; (6) lost profits and earning capacity; and (7) damages for net costs of providing increased or additional public services during or after removal activities.

160.

Louisiana has incurred, and will continue to incur, removal costs related to the unauthorized discharge or threat of discharge of oil, gas and other pollutants and the costs related

to preventing, mitigating, and minimizing oil pollution which has impaired or threatens to impair Louisiana's waters, coast line, and natural resources.

161.

The BP, Anadarko, MOEX and Transocean Defendants are strictly liable for damages to natural resources belonging to, held in trust by, managed by, controlled by or appertaining to the State of Louisiana.  33 U.S.C. § 2706(a)(2).  Natural resources are broadly defined and include "land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by…any State."  33 U.S.C. § 2701(20).  The measure of natural resource damages is the cost of restoring, rehabilitating, replacing or acquiring the equivalent of the damaged natural resources; the diminution in value of those natural resources pending restoration; plus the reasonable costs of assessing those damages.  33 U.S.C. § 2706(d)(1).

162.

The BP, Anadarko, MOEX and Transocean Defendants are strictly liable to Louisiana for damages associated with injury to, or economic losses resulting from, the destruction of real or personal property owned or leased by the State.  33 U.S.C. § 2702(b)(2)(B).

163.

The BP, Anadarko, MOEX and Transocean Defendants are strictly liable to Louisiana for lost revenues associated with the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property or natural resources.  33 U.S.C. § 2702(b)(2)(D).

164.

The BP, Anadarko, MOEX and Transocean Defendants are strictly liable to Louisiana for net costs of providing increased or additional public services during or after removal activities,

including protection from fire, safety, or health hazards caused by the discharge of oil.  33 U.S.C. § 2702(b)(2)(F).

165.

The actions and inactions of the BP, Anadarko, MOEX and Transocean Defendants, as described above, constitute gross negligence and/or willful misconduct and/or constitute violations of Federal safety, construction or operating regulations.  Therefore, the BP, Anadarko MOEX and Transocean Defendants' liability pursuant to OPA is unlimited pursuant to 33 U.S.C. § 2704 (c)(1)(A) and 33 U.S.C. § 2704 (c)(1)(B).

166.

The State requests that this Court enter a Declaratory Judgment finding that the BP, Anadarko, MOEX and Transocean Defendants have unlimited joint, several and strict liability under OPA for the State of Louisiana's removal costs and damages resulting from the *Deepwater Horizon* disaster, and that the State is entitled to relief as set forth above, and such further relief as may be deemed appropriate pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 2202, *et seq*.

167.

Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., and Rule 57 of the Federal Rules of Civil Procedure, as well as OPA, 33 U.S.C. § 2717(f)(2), the State seeks a judicial declaration, which shall be binding on subsequent actions by the State to recover damages and removal costs, that the BP, Anadarko, MOEX and Transocean Defendants are responsible parties under OPA, 33 U.S.C. § 2701 *et seq*. and are liable for all removal costs and damages arising out of the *Deepwater Horizon* disaster.

**COUNT II**

**Against BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants**

**Declaratory Judgment That Defendants Are Jointly, Strictly and Severally**

**Liable For Costs and Damages under OSPRA**

168.

Paragraphs 1 through 167 are realleged and incorporated herein by reference.

169.

This Count is alleged against the BP, Anadarko, MOEX, and Transocean, Cameron and Halliburton Defendants.

170.

The Declaratory Judgment Act allows a federal court to declare the rights and other legal relations of any interested party seeking such declaration in an actual controversy within its jurisdiction.  28 U.S.C. § 2201.

171.

This suit is ripe for adjudication as there exists a real controversy between the State of Louisiana, which has been damaged because of the Gulf Oil Spill, and the BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants.

172.

Louisiana has suffered significant injury to its natural resources and has incurred and will continue to incur costs related to removal of the oil as well as economic damages associated with the *Deepwater Horizon* disaster.

173.

OPA does not preempt states from imposing additional requirements or liability for the discharge of oil.  33 U.S.C. §§ 2718(a)(1) and 2718(c)(1).

174.

The Louisiana Legislature recognized Louisiana's unique exposure to oil spills when it enacted OSPRA, codified at La. R.S. 30:2451, *et seq.*. La. R.S. 30:2452(A).  In passing OSPRA, the Legislature expressly recognized the constitutional duties of the State of Louisiana to "protect, conserve and replenish the natural resources of [Louisiana]." La. R.S. 30:2453(A) (*citing* La. Const. art. IX Sec. 1). Louisiana's constitutional duty of protecting the environment is based on the public trust doctrine which is recognized in the State Constitution. Article IX, Section 1 of the Louisiana Constitution provides:

> The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.

OSPRA applies "in the event that an unauthorized discharge of oil or the substantial threat of an unauthorized discharge of oil to state waters results in injury to natural resources." Louisiana Administrative Code 43:XXIX.101(A).

175.

Responsible parties under OSPRA include "[t]he owner or operator of a vessel or terminal facility from which an unauthorized discharge of oil emanates or threatens to emanate." La. R.S. 30:2454(22)(a). Responsible parties also include any person "who causes, allows, or permits an unauthorized discharge of oil or threatened unauthorized discharge of oil."  La. R.S. 30:2454(22)(c).

176.

The BP, Anadarko, MOEX, and Transocean Defendants were each owners and/or operators of the Macondo Well and the *Deepwater Horizon* rig and as such are responsible parties under OSPRA.  *See* La. R.S. 30:2454(20).

177.

Additionally the BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants each caused, allowed or permitted the unauthorized discharge of oil from the Macondo Well and *Deepwater Horizon* rig.  As such, they are responsible parties under OSPRA. La. R.S. 30:2454(22)(c).

178.

OSPRA defines "discharge of oil" broadly to include "an intentional or unintentional act or omission by which harmful quantities of oil are spilled, leaked, pumped, poured, emitted, or dumped into or on coastal waters of the state or at any place where, unless controlled or removed, they may drain, seep, run, or otherwise enter coastal waters of the state."  La. R.S. 30:2454(7).

179.

Under the provisions of OSPRA, the BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants, as responsible parties, are strictly, jointly, and severally liable for this oil spill.

180.

The State requests that this Court enter a Declaratory Judgment finding that the BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants have unlimited, joint and several, and strict liability under OSPRA for all of the State of Louisiana's removal costs and damages resulting from the *Deepwater Horizon* disaster, and that the State is entitled to relief as set forth above.

**COUNT III**

**Against BP, Anadarko, MOEX and Transocean Defendants**

**Civil Penalties for Violations of the Louisiana Environmental Quality Act**

181.

Paragraphs 1 through 180 are realleged and incorporated herein by reference.

182.

This Count is alleged against the BP, Anadarko, MOEX and Transocean Defendants.

183.

La. R.S. 30:2072 provides that the waters of the state of Louisiana are among the State's most important natural resources and their continued protection and safeguard is of vital concern to the citizens of this State.

184.

La. R.S. 30:2076(A)(1) prohibits the discharge into any waters of the State of any waste or any substance of any kind that will tend to cause water pollution in violation of any rule, order, or regulation.  La. R.S. 30:2076 (A)(3) prohibits the violation by a person of any rule or regulation adopted under the Louisiana Water Control Law, La. R.S. 30, Subtitle II, Chapter 4 or under authority of that Subtitle.

185.

Defendants caused and/or allowed the unauthorized discharge of oil, gas and other pollutants into the waters and onto the coastline of the State of Louisiana.  Defendants' unauthorized discharge of pollutants constitute continuing violations of La. R.S. 30:2075, La. R.S. 30:2076(A)(1)(a) and (A)(3) and LAC 33:IX.1701.B.

186.

La. R.S. 30:2025(E)(1)(a) authorizes the assessment of civil penalties against each Defendant of not more than thirty two thousand five hundred dollars ($32,500) for each day of violation of the Louisiana Environmental Quality Act. A penalty of up to $50,000 may be assessed against each Defendant for each day of violation of a compliance order issued by LDEQ.  La. R.S. 30:2025(E)(2).  However, when any such violation is done intentionally, willfully, or knowingly or results in a discharge or disposal which causes irreparable or severe damage to the environment or if the substance discharged is one which endangers human life or health, such person may be liable for an additional penalty or not more than one million dollars ($1,000,000) for each penalty event. La. R.S. 30:2025(E)(1)(a);  LAC 33:I.703;  LAC 33:I.705.  For violations lasting more than one 24-hour day, each such day of violation may be treated as a separate penalty event.  LAC 33:I.703.A.

187.

The presence of oil, gas and other pollutants in Louisiana coastal waters continues to this day, and has caused severe damage to the environment, endangering human life and health, and is likely to continue to do so for an unspecified period of time, in violation of Louisiana law.

188.

As a result of Defendants violations, each Defendant is liable under La. R.S. 30:2025 for a civil penalty of not more than $32,500 for each day of violation ($50,000 for each day of violation of a compliance order issued by LDEQ), and for an additional penalty of not more than $1,000,000 for each day of violation.

189.

The State of Louisiana further requests an award of costs incurred in this litigation, including attorney fees, to the extent recoverable under the Louisiana Environmental Quality Act.

## COUNT IV

### Against All Defendants

### Recovery of Response Action Costs

190.

Paragraphs 1 through 189 are realleged and incorporated herein by reference.

191.

This Count is alleged against all Defendants.

192.

The State has incurred response action costs associated with the discharge.  Many of these costs have not been paid by Defendants to date.

193.

As of February 15, 2011, the State has incurred significant and unpaid response costs.  The State will continue to incur response costs in the future.

194.

Pursuant to La. R.S. 30:2025, Defendants are liable to the State for response action costs the State incurs in responding to the discharge.

## COUNT V

### Against BP, Anadarko, MOEX and Transocean Defendants

### Oil Pollution Act Claim for Costs and Damages

195.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 194 above.

196.

The State of Louisiana is hereby asserting claims for natural resource damages and other forward looking claims for long term economic impacts and lost revenues associated with the Spill in an abundance of caution. These claims are subject to ongoing assessments by the State, the costs of which the State is seeking herein. The State acknowledges that these claims are not currently ripe for adjudication and that they may be appropriately phased into the litigation, if ultimately necessary, at such time as the claims and damages are properly assessed and quantified. However, because Louisiana has a residual one-year prescription period and the State could not risk the Defendants' arguments that the State's claims were time-barred or that the State was impermissibly splitting its claims, the State has included these claims in this Complaint.

197.

This Count is alleged against the BP, Anadarko, MOEX, and Transocean Defendants.

198.

OPA establishes a strict liability scheme that holds responsible parties strictly liable for damages and removal costs related to oil spills. OPA, 33 U.S.C. § 2702(a), provides that each responsible party for a vessel or facility from which oil is discharged, "into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages . . . that result from such incident."

199.

Responsible parties for an offshore facility include the lessee or permittee of the area in which the facility is located or the holder of a right to use and easement granted under applicable state law or the Outer Continental Shelf Lands Act (43 U.S.C. § 1301 *et seq*.) for the area in which the facility is located. Responsible parties also include any person owning, operating, or demise chartering the vessel. 33 U.S.C. § 2701(32).

200.

OPA also provides for a limitation of liability for $75 million for offshore facilities..  This limitation does not apply if the oil spill was caused by gross negligence or willful misconduct or a violation of an applicable Federal safety, construction, or operating regulation by the responsible party.  33 U.S.C. § 2704(a)-(c).  The Gulf Oil Spill was caused by the gross negligence or willful misconduct, and/or violation of applicable Federal safety, construction, and/or operating regulations by BP, Anadarko, MOEX, and Transocean Defendants, and therefore this limitation is inapplicable..

201.

The United States Coast Guard has designated Transocean Holdings Incorporated and BP Exploration and Production Inc. as responsible parties for the oil spill in letters dated April 28, 2010.

202.

BP has waived the limitation of liability provisions contained in OPA.  *See* "Statement Of BP Exploration & Production Inc. Re Applicability Of Limit Of Liability Under Oil Pollution Act of 1990" (10/18/10) (Rec. Doc. 559); *see also* "Order re: Applicability of Limit of Liability Under Oil Pollution Act of 1990 to BP Exploration & Production Inc. (and its affiliates)." (12/23/10) (Rec. Doc. 925).

203.

OPA describes the categories of recoverable costs and damages in 33 U.S.C. § 2702(b) which include: (1) all removal costs; (2) damages to natural resources; (3) damages to real or personal property; (4) subsistence use of natural resources; (5) net loss of revenues to a state or political subdivision thereof; (6) lost profits and earning capacity; and (7) damages for net costs of providing increased or additional public services during or after removal activities.

204.

Pursuant to OPA, Defendants are responsible to the State of Louisiana for removal costs and damages which include natural resource damages, lost revenues and costs related to "providing increased or additional public services during or after removal activities" resulting from the Gulf Oil Spill as alleged throughout this Complaint.  33 U.S.C. §§ 2702.

205.

Louisiana has incurred, and will continue to incur, removal costs related to the discharge or threat of discharge of oil and other pollutants as well as the costs related to preventing, mitigating, and minimizing oil pollution which has impaired or threatens to impair Louisiana's waters, coast line, and natural resources.

206.

Defendants are strictly liable for damages to natural resources belonging to, held in trust by, managed by, controlled by or appertaining to the State of Louisiana.  33 U.S.C. § 2706(a)(2). Natural resources are broadly defined to include "land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by…any State." 33 U.S.C. § 2701(20).

207.

The measure of natural resource damages is the cost of restoring, rehabilitating, replacing or acquiring the equivalent of the damaged natural resources; the diminution in value of those natural resources pending restoration; plus the reasonable costs of assessing those damages.  33 U.S.C. § 2706(d)(1).

208.

Natural resource damages include the "reasonable costs of assessing the damage." 33 U.S.C. § 2702(b)(2).

209.

"Natural resource damage assessment" means the process of collecting and analyzing information to evaluate the nature and extent of injuries resulting from an incident, and determine the restoration actions needed to bring injured natural resources and services back to baseline and make the environment and public whole for interim losses.." 15 C.F.R. § 990.30.

210.

15 C.F.R. § 990.30 defines "reasonable assessment costs" as "assessment costs that are incurred by trustees in accordance with this part. In cases where assessment costs are incurred, but trustees do not pursue restoration, trustees may recover their reasonable assessment costs provided they have determined that assessment actions undertaken were premised on the likelihood of injury and need for restoration."

211.

The oil, gas, and other pollutants, including dispersants, associated with the spill have contaminated Louisiana waters, and injured or killed wildlife including numerous birds, fish, turtles, dolphins, and other marine wildlife.  Louisiana's beaches, barrier islands, wetlands, and marshes have also been, and continue to be, damaged by the Gulf Oil Spill as the oil washes ashore and invades wetlands and marshes.  The oil, pollutants and dispersants continue to spread and/or wash ashore and will continue to injure Louisiana's precious natural resources.

212.

Defendants are strictly liable to Louisiana for lost revenues associated with the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property or natural resources which shall be recoverable by the State.

213.

Defendants are strictly liable to Louisiana for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards caused by the discharge of oil.

214.

Defendants are liable to the State for removal costs it incurs in cleaning up and remedying the impacts from the Gulf Oil Spill. Cleanup and removal costs include costs related to actions to prevent, minimize, mitigate, or clean up an oil spill.

215.

Defendants are liable for damages directly related to the injury to natural resources and/or to require restoration or replacement of natural resources as well as the loss of benefit/use of those resources while they are offline. Damages include the reasonable costs of assessing the damage. 33 U.S.C. § 2702(b)(2)(A).

216.

Defendants are liable for damages for injury to, or economic losses resulting from destruction of, real or personal property are recoverable to the extent the State owns or leases property which has been directly impacted by the oil spill. 33 U.S.C. § 2702(b)(2)(B).

217.

Defendants are liable for loss of subsistence use of natural resources where those resources have been injured, destroyed, or lost.  33 U.S.C. § 2702(b)(2)(C).

218.

Defendants are liable to the State of Louisiana for the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources.  33 U.S.C. § 2702(b)(2)(D).

219.

The State and its political subdivisions or agencies may recover loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources.  33 U.S.C. §2702(b)(2)(E).

220.

Defendants are liable to the State for the net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, caused by a discharge of oil. 33 U.S.C. §2702(b)(2)(F).

221.

Louisiana has suffered and will continue suffer damages associated with the discharge of oil and other pollutants as well as continue to expend costs that are recoverable under OPA.

**COUNT VI**

**Against BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants**

**Louisiana Oil Spill Prevention and Response Act Claim for Costs and Damages**

222.

The State realleges and incorporates each of the allegations contained in paragraphs 1 - 221 above.

223.

The State of Louisiana is hereby asserting claims for natural resource damages and other forward looking claims for long term economic impacts and lost revenues associated with the Spill in an abundance of caution.  These claims are subject to ongoing assessments by the State, the costs of which the State is seeking herein.  The State acknowledges that these claims are not currently ripe for adjudication and that they may be appropriately phased into the litigation, if ultimately necessary, at such time as the claims and damages are properly assessed and

63

quantified.   However, because Louisiana has a residual one-year prescription period and the State could not risk the Defendants' arguments that the State's claims were time-barred or that the State was impermissibly splitting its claims, the State has included these claims in this Complaint.

224.

This Count is alleged against BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants.

225.

OPA expressly allows states to impose additional requirements or liability for the discharge of oil. 33 U.S.C. §§ 2718(a)(1) and 2718(c)(1).

226.

The Louisiana Legislature recognized Louisiana's unique exposure to oil spills when it enacted OSPRA, codified at La. R.S. 30:2451, *et seq.*. La. R.S. 30:2452(A). In passing OSPRA, the Legislature expressly recognized the constitutional duties of the State of Louisiana to "protect, conserve and replenish the natural resources of [Louisiana]." La. R.S. 30:2453(A) (citing La. Const. art. IX Sec. 1). Louisiana's constitutional duty of protecting the environment is based on the public trust doctrine that is recognized in the State Constitution. Article IX, Section 1 of the Louisiana Constitution provides:

> The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.

227.

OSPRA applies "in the event that an unauthorized discharge of oil or the substantial threat of an unauthorized discharge of oil to state waters results in injury to natural resources." Louisiana Administrative Code 43:XXIX.101(A).

228.

Responsible parties under OSPRA include "[t]he owner or operator of a vessel or terminal facility from which an unauthorized discharge of oil emanates or threatens to emanate." La. R.S. 30:2454(22)(a). Responsible parties also include any person "who causes, allows, or permits an unauthorized discharge of oil or threatened unauthorized discharge of oil." La. R.S. 30:2454(22)(c).

229.

The BP, Anadarko, MOEX and Transocean Defendants were each owners and/or operators of the Macondo Well and/or the *Deepwater Horizon* rig and as such are responsible parties under OSPRA. La. R.S. 30:2454(20).

230.

Additionally the BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants each caused, allowed or permitted the unauthorized discharge of oil from the Macondo Well and *Deepwater Horizon* rig. As such, they are responsible parties under OSPRA. La. R.S. 30:2454(22)(c).

231.

OSPRA defines "discharge of oil" broadly to include "an intentional or unintentional act or omission by which harmful quantities of oil are spilled, leaked, pumped, poured, emitted, or dumped into or on coastal waters of the state or at any place where, unless controlled or removed, they may drain, seep, run, or otherwise enter coastal waters of the state." La. R.S. 30:2454(7).

232.

Under the provisions of OSPRA, the BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants, as responsible parties, are strictly, jointly, and severally liable to the State

of Louisiana (along with any other responsible party) for all costs and damages resulting from this oil spill.

233.

Defendants are liable to the State of Louisiana for damages associated with injury to or economic loss resulting from destruction of, immovable or corporeal movable property, which shall be recovered by a person who owns or leases that property.  La. R.S. 30:2454(5)(b).

234.

Defendants are liable to the State of Louisiana for damages equal to the net loss of taxes, royalties, rents, fees or net profit share due to the injury, destruction, or loss of immovable or corporeal movable property or natural resources.  La. R.S. 30:2454(5)(c).

235.

Defendants are liable to the State of Louisiana for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, caused by a discharge of oil. La. R.S. 30:2454(5)(d).

236.

In addition, Defendants are liable to the State of Louisiana for natural resource damages which are defined to include: damages for injury to, destruction of, or loss of natural resources including the reasonable and any direct, documented cost to restore, rehabilitate, or replace injured natural resources, or to mitigate further injury, and their diminution in value after such restoration, rehabilitation, replacement, or mitigation.  La. R.S. 30:2454(5)(a)

237.

Accordingly, the State of Louisiana may recover costs attributable to the performance of its assessment of damages and the development, implementation, and monitoring of any restoration plan including:

(a) salaries, benefits, transportation, overhead, and state per diem costs;

(b) costs of sampling, and analyses of oil and natural resources;

(c) costs of laboratories, contractors, and other experts retained by the trustees in assessing injury and determining damages;

(d) costs of mediation; and

(e) lost revenues.

Louisiana Administrative Code 43:XXIX.129(B)(1).

238.

Louisiana has suffered damages and expended costs as a result of the discharge of oil and other pollutants, including dispersants.  The State will continue to suffer damages and expend costs, all of which are recoverable under OSPRA.

## COUNT VII

### Against BP, Anadarko, MOEX, Transocean,  Halliburton, Cameron M-I Defendants

### Negligence Under Maritime Law

239.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 238 above.

240.

This Count is alleged against the BP, Anadarko, MOEX, Transocean , Halliburton, Cameron and M-I Defendants

241.

The fire, explosion and resulting oil spill was caused by the concurrent negligence (including gross negligence and/or willful misconduct) of the Defendants.

242.

Defendants owed and breached duties of ordinary and reasonable care to the State in connection with the drilling operations and maintenance of the *Deepwater Horizon* and its equipment, apparatuses, and personnel.

243.

Defendants also owed and breached duties of ordinary and reasonable care to the State to guard against, prevent, and/or mitigate the risk of an oil spill.

244.

Defendants also owed and breached duties of ordinary and reasonable care to the State by providing, supplying, using, and/or controlling equipment and products including, but not limited to, the BOP, which Defendants knew or should have known to be defective.

245.

Upon information and belief, Defendants were negligent (and or grossly negligent or willful) in the following non-exclusive particulars:

  a. Failing to properly operate the *Deepwater Horizon* and apparatuses associated therewith;

  b. Operating the *Deepwater Horizon* and apparatuses in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an oil spill;

  c. Failing to properly inspect the *Deepwater Horizon* and apparatuses to assure that its equipment and personnel were fit for their intended purpose;

  d. Acting in a careless and negligent manner without due regard for the safety of others;

  e. Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the *Deepwater Horizon* which, if they had been so

promulgated, implemented, and enforced, would have averted the fire, explosion, sinking and oil spill;

f.   Operating the *Deepwater Horizon* with untrained and unlicensed personnel;

g.   Inadequate and negligent training and hiring of personnel;

h.   Failing to take appropriate action to avoid or mitigate the accident;

i.   Negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico.

j.   Employing untrained or poorly trained employees and failing to properly train their employees;

k.   Failing to ascertain that the *Deepwater Horizon* and its equipment were free from defects and/or in proper working order;

l.   Failure to timely warn;

m.   Failure to timely bring the oil release under control;

n.   Failure to provide appropriate accident prevention equipment;

o.   Failure to observe and read gauges that would have indicated excessive pressures in the well;

p.   Failure to react to danger signs;

q.   Providing BOPs, float collars, and other equipment and/or products that do not work properly;

r.   Providing cement, cement slurry and/or cement slurry designs that resulted in improper and inadequate cementing;

s.   Conducting well and well cap cementing operations improperly;

t.  Disregarding known risks to human safety, human life, and the safety and health of the environment;

u.  Acting in a manner that justifies imposition of punitive damages;

v.  Failing to ensure that the drilling fluids utilized on the *Deepwater Horizon,* including any spacer solutions, were used in a reasonably safe manner; and

w.  Such other acts and omissions of negligence, gross negligence, and willful misconduct that violated Defendants' duty of care.

246.

Defendants' duties of reasonable care are imposed by general maritime law.

247.

As a direct and proximate result of Defendants' negligence, gross negligence, and/or willful misconduct:

a.  the State has suffered, and will continue to suffer, damage to, loss of, or destruction of its natural resources, real and personal property, industry, and economy;

b.  the State has incurred, and will continue to incur, substantial costs and expenses in responding to this disaster and providing increased and additional public services;

c.  the State has lost, and will continue to lose, revenues from taxes, rents, royalties, and fees due to the injury to, loss of, or destruction of, its real property, personal property, and natural resources;

d.  the State has suffered the loss of use and enjoyment of property;

e.  the State has suffered the diminution in the value of property;

f.  the State has incurred and will continue to incur removal and restoration costs;

g.  the State has incurred and will continue to incur economic losses;

h.   the State has incurred and will continue to incur other consequential and incidental damages.

248.

The Incident and resulting Gulf Oil Spill were caused by the joint and concurrent negligence of Defendants, which renders them jointly and severally liable to the State under general maritime law.

## COUNT VIII

**Against BP, Transocean, Anadarko, MOEX, Halliburton, M-I, and Cameron Defendants**

**Public and Private Nuisance Under Maritime Law**

249.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 248 above.

250.

This Count is alleged against the BP, Transocean, Anadarko, MOEX, Halliburton, M-I, and Cameron Defendants.

251.

As a result of the explosion on the *Deepwater Horizon*, oil, hydrocarbons, and dispersant chemicals invaded and continue to invade the State's real and personal properties and natural resources and have resulted in both public and private nuisances for which Defendants are responsible.

252.

The presence of oil, hydrocarbons, and dispersant chemicals unreasonably interferes with public health, safety, peace, comfort, or convenience.

253.

The presence of oil, hydrocarbons, and dispersant chemicals unreasonably interferes with the State's use of its real and personal properties.

254.

The State has suffered significant harm different in kind from that suffered by the general public.

255.

The State has sustained particular damages, different from and greater than the damages suffered by the general public.

256.

General maritime law imposes liability for creating and/or maintaining a nuisance.

257.

As a direct and proximate result of the nuisance:

    a. the State has suffered, and will continue to suffer, damage to, loss of, or destruction of its natural resources, real and personal property, industry, and economy;

    b. the State has incurred, and will continue to incur, substantial costs and expenses in responding to this disaster and providing increased and additional public services;

    c. the State has lost, and will continue to lose, revenues from taxes, rents, royalties, and fees due to the injury to, loss of, or destruction of, its real property, personal property, and natural resources;

    d. the State has suffered the loss of use and enjoyment of property;

    e. the State has suffered the diminution in the value of property;

    f. the State has incurred and will continue to incur removal and restoration costs;

    g. the State has incurred and will continue to incur economic losses;

h.   the State has incurred and will continue to incur other consequential and incidental damages.

258.

Defendants jointly and concurrently engaged in negligent, reckless, and/or willful conduct that caused the nuisance, rendering them jointly and severally liable to the State under general maritime law.

## COUNT IX

## Against BP, Transocean, Anadarko, MOEX, Halliburton and Cameron Defendants

## Trespass Under Maritime Law

259.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 258 above.

260.

This Count is alleged against the BP, Transocean Anadarko, MOEX, Halliburton and Cameron Defendants.

261.

At all times relevant to the causes of action alleged in this Complaint, the State owned and/or lawfully possessed property on, near or adjacent to the Louisiana Gulf Coast.

262.

Defendants released, discharged or otherwise permitted the escape of oil and other pollutants in a manner they knew or should have known would invade the State's property, thereby interfering with the State's exclusive possessory rights.

263.

The continuing migration on and around the State's property of oil and other pollutants originating in the Gulf of Mexico has resulted in a trespass to the State's property for which Defendants are responsible.

264.

Defendants acted negligently, recklessly, and /or intentionally in causing the invasion of the State's property, in failing to prevent the migration of oil and other pollutants onto the State's property, and in failing to correct the invasion.

265.

The presence of oil and other pollutants on the State's property is unauthorized.

266.

Defendants have not sought nor obtained the State's consent to store its hazardous substances and oil on the State's  properties.

267.

General maritime law imposes liability for trespass.

268.

As a direct and proximate result of Defendants' trespass:

    a.  the State has suffered, and will continue to suffer, damage to, loss of, or destruction of its natural resources, real and personal property, industry, and economy;

    b.  the State has incurred, and will continue to incur, substantial costs and expenses in responding to this disaster and providing increased and additional public services;

    c.  the State has lost, and will continue to lose, revenues from taxes, rents, royalties, and fees due to the injury to, loss of, or destruction of, its real property, personal property, and natural resources;

d.   the State has suffered the loss of use and enjoyment of property;

e.   the State has suffered the diminution in the value of property;

f.   the State has incurred and will continue to incur removal and restoration costs;

g.   the State has incurred and will continue to incur economic losses;

h.   the State has incurred and will continue to incur other consequential and incidental damages.

269.

Defendants jointly and concurrently engaged in negligent, reckless, and/or willful conduct that caused the trespass onto Plaintiff's property, rendering them jointly and severally liable to the State under general maritime law.

## COUNT X

**Against Cameron, Halliburton and Weatherford Defendants**

**Strict Products Liability Under Maritime Law**

270.

The State realleges and incorporates of the allegations contained in paragraphs 1 through 269 above.

271.

This Count is alleged against the Cameron, Halliburton and Weatherford Defendants.

272.

Defendant Cameron manufactured, designed, supplied, and/or installed at the Macondo wellhead the *Deepwater Horizon*'s blowout-preventer ("BOP"), a sub-sea emergency device whose uses include closure of the well to prevent blowout.  The BOP at all relevant times was an appurtenance of the vessel and part of the equipment of the vessel.

273.

Cameron was in the business of designing, manufacturing, marketing, selling, and/or distributing the BOP used in connection with the drilling operations on the *Deepwater Horizon*.

274.

Cameron sold and delivered the BOP at the *Deepwater Horizon* to Defendant Transocean in 2001.

275.

Cameron's BOP was used in the manner intended, or in a reasonably foreseeable manner, in connection with drilling operations on the *Deepwater Horizon*.

276.

The BOP was defectively designed and/or manufactured in that it failed to operate as intended on April 20, 2010, causing the blowout and resultant explosion and oil spill.

277.

Cameron failed to provide reasonable instructions or warnings to reduce or avoid the foreseeable risk of harm posed by the BOP that it would fail to operate as intended on April 20, 2010, causing the blowout and resultant explosion and oil spill.  The failure to provide reasonable instructions or warnings rendered the BOP unreasonably dangerous.

278.

Cameron knew or should have known about the unreasonably dangerous condition of the BOP at the time it was supplied for use by *Deepwater Horizon*.

279.

Defendant Halliburton manufactured, designed, supplied, and/or installed the cement and/or nitrogen foam cement slurry mixture (the "Cement") that was used in connection with

drilling operations by the *Deepwater Horizon*.  The Cement is intended to seal the well and prevent the uncontrolled release of oil and other hydrocarbons.

280.

Halliburton was in the business of designing, manufacturing, marketing, selling, and/or distributing the Cement used in connection with the drilling operations on the *Deepwater Horizon*.

281.

Halliburton sold and delivered the Cement used to temporarily seal the Macondo Well in 2010.

282.

Halliburton's Cement was used in the manner intended, or in a reasonably foreseeable manner, in connection with drilling operations on the *Deepwater Horizon*.

283.

The Cement was defectively designed and/or manufactured in that it failed to operate as intended on April 20, 2010, causing the blowout and resultant explosion and oil spill.  Halliburton failed to provide reasonable instructions or warnings to reduce or avoid the foreseeable risk of harm posed by the Cement that it would fail to operate as intended on April 20, 2010, causing the blowout and resultant explosion and oil spill.  The failure to provide reasonable instructions or warnings rendered to Cement unreasonably dangerous.

284.

Halliburton knew or should have known about unreasonably dangerous condition of the Cement at the time it was supplied for use by *Deepwater Horizon*.

285.

Defendant Weatherford manufactured, designed, supplied, and/or installed the float collar, which was used in connection with drilling operations by the *Deepwater Horizon*.  The float collar is intended to prevent backflow of fluids and hydrocarbons into the casing.

286.

Weatherford was in the business of designing, manufacturing, marketing, selling, and/or distributing the float collar appurtenant to the vessel and used in connection with the drilling operations by the *Deepwater Horizon*.

287.

Weatherford sold and delivered the float collar at the *Deepwater Horizon* to Defendant Transocean in 2001.

288.

The float collar was used in the manner intended, or in a reasonably foreseeable manner, in connection with drilling operations by the *Deepwater Horizon.*

289.

The float collar was defectively designed and/or manufactured and/or Weatherford failed to provide reasonable instructions or warnings rendering the float collar unreasonably dangerous such that it did not operate as intended on April 20, 2010.  Such failure caused the blowout and resultant explosion and oil spill.

290.

Weatherford knew or should have known about the unreasonably dangerous condition of the float collar at the time it was supplied for use by the *Deepwater Horizon.*

291.

As a direct and proximate result of Defendants' defectively designed and/or manufactured products and/or Defendants failure to provide reasonable instructions or warnings:

    a.  the State has suffered, and will continue to suffer, damage to, loss of, or destruction of its natural resources, real and personal property, industry, and economy;

    b.  the State has incurred, and will continue to incur, substantial costs and expenses in responding to this disaster and providing increased and additional public services;

    c.  the State has lost, and will continue to lose, revenues from taxes, rents, royalties, and fees due to the injury to, loss of, or destruction of, its real property, personal property, and natural resources;

    d.  the State has suffered the loss of use and enjoyment of property;

    e.  the State has suffered the diminution in the value of property;

    f.  the State has incurred and will continue to incur removal and restoration costs;

    g.  the State has incurred and will continue to incur economic losses;

    h.  the State has incurred and will continue to incur other consequential and incidental damages.

292.

The Incident and resulting Gulf Oil Spill were caused by the joint and concurrent negligence of Defendants, which renders them jointly and severally liable to the State under general maritime law.

## COUNT XI

### Against the BP, Transocean, Anadarko, and MOEX Defendants

### Negligence/Louisiana Civil Code Articles 2315 & 2316

293.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 292 above.

294.

This Count is alleged against the BP, Transocean, Anadarko, and MOEX Defendants.

295.

The fire, explosion and resulting oil spill was caused by the concurrent negligence (including gross negligence and/or willful misconduct) of the Defendants.

296.

Upon information and belief, the State avers that the fire, explosion, and resulting oil spill was caused by the joint gross negligence and fault of the Defendants in the following non-exclusive particulars:

a. Failing to properly operate the *Deepwater Horizon* and apparatuses associated therewith;

b. Operating the *Deepwater Horizon* and apparatuses in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an oil spill;

c. Failing to properly inspect the *Deepwater Horizon* and apparatuses to ensure that its equipment and personnel were fit for their intended purpose;

d. Acting in a careless and negligent manner without due regard for the safety of others;

e.  Failing to promulgate, implement and enforce rules and procedures pertaining to the safe operations of the *Deepwater Horizon* and apparatuses which, if they had been so promulgated, implemented, and enforced, would have averted the fire, explosion, sinking and oil spill;

f.  Operating the *Deepwater Horizon* and apparatuses with untrained and unlicensed personnel;

g.  Inadequate and negligent training and hiring of personnel;

h.  Failing to take appropriate action to avoid or mitigate the Incident;

i.  Negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico.

j.  Employing untrained or poorly trained employees and failing to properly train their employees;

k.  Failing to ensure that the *Deepwater Horizon* and its equipment and apparatuses were free from defects and/or in proper working order;

l.  Failure to timely warn;

m.  Failure to timely bring the oil release under control;

n.  Failure to provide appropriate accident prevention equipment;

o.  Failure to observe and read gauges that would have indicated excessive pressures in the well;

p.  Failure to react reasonably to danger signs;

q.  Utilizing BOPs that do not work properly;

r.  Conducting well and well cap cementing operations improperly and unreasonably;

s.  Acting in a manner that justifies imposition of punitive damages; and

t.   Such other acts of gross negligence and omissions as will be shown at the trial of this matter; all of which acts are in violation of the laws of Louisiana as well as Federal Law applicable on the Outer Continental Shelf.

297.

In addition, and in the alternative, the fire, explosion, and sinking of the *Deepwater Horizon* and resulting oil spill were caused or aggravated by defective equipment, including the BOP, which were in the care, custody, and control of Defendants, and over which the Defendants had garde.  Defendants knew or should have known of these defects and Defendants are, therefore, liable for them.

298.

The injuries to the State were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with the operations.

299.

In addition to the negligent actions described above, and in the alternative thereto, the injuries and damages suffered by the State were caused by the acts and/or omissions of the Defendants that are beyond proof by the State but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the fire, explosion, sinking and oil spill resulted from the gross negligence of Defendants.  Furthermore, the fire, explosions, sinking and the resulting oil spill would not have occurred had the Defendants exercised the high degree of care imposed on them and the State, *therefore*, pleads the doctrine of *res ipsa loquitur.*

300.

By reason of the foregoing acts and omissions, the State is entitled to recovery from Defendants for the damages and injuries identified herein.

**COUNT XII**

**Against BP, Transocean, Anadarko, MOEX, Halliburton and Cameron Defendants**

**Nuisance/Louisiana Civil Code Art. 667**

301.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 300 above.

302.

This Count is alleged against the BP, Transocean, Anadarko, MOEX, Halliburton and Cameron Defendants.

303.

At all times relevant to the causes of action alleged in this Complaint, the State has ownership and/or proprietary interests in certain real and personal property in areas affected by the oil spill released into the Gulf of Mexico. The State also has the right to the exclusive use and quiet enjoyment of their property.

304.

The Defendants' actions or omissions which resulted in an explosion and oil spill, and including allowing the migration of oil into Louisiana's waters and upon Louisiana's shoreline, resulted in oil invading and contaminating the State's properties. This contamination has severely impacted the State's interest in the private use and enjoyment of its land, thereby resulting in a private nuisance for which Defendants are responsible.

305.

As a result of the Defendants' actions, the State has suffered annoyance, inconvenience, and discomfort arising from the nuisance created by defendants.

306.

Unless the nuisance is abated, the State's properties and its right to use and enjoy its property and their interests will be progressively further jeopardized.

307.

By reason of the nuisance, the State is entitled to recover damages for the following, including, but not limited to: (1) the loss of use and enjoyment of property; (2) the diminution in value of property; (3) restoration costs; (4) economic loss; (5) diminution of property value; (5) consequential and incidental damages; (6) disgorgement of profits realized; and (7) unjust enrichment.

**COUNT XIII**

**Against BP, Transocean, MOEX and Anadarko Defendants**

**Trespass**

308.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 307 above.

309.

This Count is alleged against the BP, Transocean, Anadarko and MOEX Defendants.

310.

At all times relevant to the causes of action alleged in this Complaint, the State owned, and/or lawfully possessed property on, near or adjacent to the Louisiana Gulf Coast.

311.

The continuing migration on and around the State's properties of the oil spill originated in the Gulf of Mexico and resulted from Defendants' deep water well operations and has resulted in a trespass to the State's properties for which Defendants are responsible.

312.

The presence of oil contamination on the State's properties is unauthorized.

313.

The Defendants have not sought nor obtained the State's consent to store its hazardous substances and oil on the State's properties.

314.

The Defendants have failed to prevent the migration of oil onto the State's properties.

315.

By reason of the trespass, the State is entitled to recover damages for the following, including, but not limited to: (1) the loss of use and enjoyment of property; (2) the diminution in value of property; (3) restoration costs; (4) economic loss; (5) consequential and incidental damages; (6) disgorgement of profits realized; and (7) unjust enrichment.

**COUNT XIV**

**Against the BP, Transocean Anadarko and MOEX Defendants**

**Strict Liability/Garde/Louisiana Civil Code Art 2317**

316.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 315 above.

317.

This Count is alleged against the BP, Transocean, Anadarko and MOEX Defendants.

318.

The *Deepwater Horizon* and the Macondo Prospect were and continue to be in the Defendants' custody and control.

319.

The *Deepwater Horizon* and the Macondo Prospect, which were and continue to be in the care and custody of Defendants, caused damage to the State.

320.

The *Deepwater Horizon* and the Macondo Prospect had a vice or defect which created an unreasonable risk of harm.

321.

The State's damages and injuries were caused by the vice or defect in the *Deepwater Horizon* and Macondo Prospect.

322.

By reason of the foregoing vice or defect, the State is entitled to recovery from Defendants for the damages and injuries identified herein.

## COUNT XV

**Against the BP, Transocean, Anadarko, MOEX and Halliburton Defendants**

**Abnormally Dangerous/Ultra Hazardous Activity**

323.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 322 above.

324.

This Count is alleged against the BP, Transocean, Anadarko, MOEX and Halliburton Defendants.

325.

The Defendants' drilling operation is an abnormally dangerous and ultra hazardous activity in that:

A.    There exists a high degree of risk of serious harm to the environment, persons, land, chattels of others, including plaintiffs, which cannot be eliminated by the exercise of reasonable care;

B.    There is a strong likelihood that great harm will result from oil drilling and release of oil;

C.    The discharge of oil into the Gulf of Mexico in large quantities is not a matter of common usage such as would be carried on by the great mass of mankind or many people in the community;

D.    The manner in which Defendants operated the drilling rig and released such materials was inappropriate

326.

As a direct and proximate result of Defendants' actions and abnormally dangerous and ultra hazardous activities, the State has suffered, and continues to suffer, damages and detriment herein alleged.

327.

By reason of the foregoing activities, the State is entitled to recovery from Defendants for the damages and detriment identified herein

**COUNT XVI**

**Against Halliburton**

**Negligence/Louisiana Civil Code Articles 2315 & 2316**

328.

The State realleges and incorporates each of the allegations contained in paragraphs 1through 327 above.

329.

This Count is alleged against Halliburton.

330.

Halliburton was responsible at the time of the accident for cementing operations aboard the *Deepwater Horizon*. Halliburton was responsible for performing the cementing of casing at the Macondo Well at all relevant times leading up to the blowout. Halliburton provided expertise including testing of cement properties and materials, as well as engineering services and onshore support for its *Deepwater Horizon* operations. Halliburton also provided technical and expert advice regarding cement design, modeling, testing, and ultimate placement of cement at the Macondo well. In addition, Halliburton (through its subdivision Sperry Drilling Services, f/k/a Sperry Sun Drilling Services) was responsible for mudlogging personnel and equipment on the *Deepwater Horizon*, including downhole drilling tools. At all relevant times, Halliburton participated in drilling operations and provided onshore support and engineering expertise for operations at the Macondo well.

331.

As the entity responsible for cementing operations aboard *Deepwater Horizon*, Halliburton owed a duty to the State to exercise ordinary and reasonable care in conducting its aforementioned operations and carrying out its aforementioned responsibilities, and breached this duty by the following actions and/or omissions:

    a.  negligently failing to ensure the safety and reliability of the nitrogen foam cement used in the Macondo Well during the temporary well abandonment operations leading up to the blowout, specifically by failing to employ adequate testing standards for its nitrogen foam cement, failing to report unfavorable test results to BP and rig personnel, and failing to report the final foam cement test results before the pumping of the cement job in the days leading up to the blowout;

b. negligently conducting the cement operation without ensuring a full "bottoms-up" circulation of the drilling mud in the well, in the process violating industry standards and regulations;

c. negligently ignoring the results of a negative pressure test which indicated that the cement job had failed;

d. negligently failing to ensure the performance of cement bond log test to ensure the integrity of the cement job, and/or ignoring the fact that such a test was not performed; and

e. negligently failing to employ a casing hanger lockdown sleeve to lock the production casing and wellhead in place, and thereby avert the blowout that occurred.

332.

Halliburton's breaches of duty resulted in the fire, explosion, and sinking of the *Deepwater Horizon*, and resulting oil spill, and thereby proximately caused and/or contributed to the State's injuries and damages.  Halliburton's breaches were both the actual and legal cause of the State's damages, and the risk of harm suffered by the State was within the scope of protection afforded by the duty breached.

333.

By reason of the foregoing acts and omissions, the State is entitled to recovery from Defendant for the damages and injuries identified herein.

## COUNT XVII

## Against Halliburton

## Trespass

### 334.

The State realleges and incorporates each of the allegations contained in paragraphs 1through 333 above.

### 335.

This Count is alleged against Halliburton.

### 336.

Halliburton had knowledge of the risk of a well blowout on the *Deepwater Horizon* and a resulting explosion and oil spill, and was further aware that such a blowout could result in a fire, explosion and oil spill such as that which has devastated Louisiana and its natural resources, including property owned and/or leased by the State. It was reasonably foreseeable to Halliburton that such a disaster would result in the invasion of the State of Louisiana's property and harm to Louisiana as a result of the pollutants discharged by the disaster.

### 337.

Halliburton wrongfully discharged a polluting substance onto the State of Louisiana's property. Halliburton, through its actions resulting in the disastrous oil spill, entered, invaded, and intruded on the properties of the State.

### 338.

By its gross negligence and willful, wanton and reckless indifference for the rights of the others, Halliburton breached the duty it had to use reasonable care not to enter, intrude on, or invade the State's property, and to exercise reasonable care in all of its cement and mud-logging

operations related to the Macondo Well.  This breach resulted in the entry, intrusion, or invasion on the property of the State.

339.

By reason of the trespass, the State is entitled to recover damages for the following, including, but not limited to: (1) the loss of use and enjoyment of property; (2) the diminution in value of property; (3) restoration costs; (4) economic loss; (5) consequential and incidental damages; (6) disgorgement of profits realized; and (7) unjust enrichment.

## COUNT XVIII

### Against Cameron

### Negligence/Louisiana Civil Code Articles 2315 & 2316

340.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through  339 above.

341.

This Count is alleged against Cameron.

342.

Cameron manufactured, designed, supplied, and/or installed at the Macondo wellhead the *Deepwater Horizon*'s blowout-preventer ("BOP"), a sub-sea emergency device whose uses include closure of the well to prevent blowout.  The BOP at all relevant times was an appurtenance of the vessel and part of the equipment of the vessel.

343.

Cameron's BOP failed to operate as intended on April 20, 2010, causing the blowout and resultant explosion and oil spill.

344.

Cameron owed a duty to the State to exercise ordinary and reasonable care in the manufacture, design, supply and installation of the BOP at the Macondo wellhead on the *Deepwater Horizon*. Cameron breached this duty by failing to exercise such ordinary and reasonable care and instead designing, manufacturing, supplying and/or installing a BOP that was defective and failed to work as intended in preventing a well blowout.

345.

Cameron's breach resulted in the fire, explosion, and sinking of the *Deepwater Horizon* and resulting oil spill and thereby proximately caused and/or contributed to the State's injuries and damages. Cameron's breach was both the actual and legal cause of the State's damages, and the risk of harm suffered by the State was within the scope of protection afforded by the duty breached.

346.

By reason of the foregoing acts and omissions, the State is entitled to recovery from Defendant for the damages and injuries identified herein.

**COUNT XIX**

**Against Cameron**

**Trespass**

347.

The State realleges and incorporates each of the allegations contained in paragraphs 1through 346 above.

348.

This Count is alleged against Cameron.

92

349.

Cameron had knowledge of the risk of a well blowout on the *Deepwater Horizon* and a resulting explosion and oil spill, and was further aware that such a blowout could result in a fire, explosion and oil spill such as that which has devastated Louisiana and its natural resources, including property owned and/or leased by the State.  It was reasonably foreseeable to Cameron that such a disaster would result in the invasion of the State of Louisiana's property and harm to Louisiana as a result of the pollutants discharged by the disaster.

350.

Cameron's actions resulted in the wrongful discharge of a polluting substance onto the State of Louisiana's property.  Cameron, through its actions resulting in the disastrous oil spill, entered, invaded, and intruded on the property of the State.

351.

By its gross negligence and willful, wanton and reckless indifference for the rights of the others, Cameron breached the duty it had to use reasonable care not to enter, intrude on, or invade the State's property, and to exercise reasonable care in designing, manufacturing, supplying and/or installing a BOP that was defective and failed to work as intended in preventing a well blowout. This breach resulted in the entry, intrusion, or invasion on the property of the State, causing harm to the State.

352.

By reason of the trespass, the State is entitled to recover damages for the following, including, but not limited to: (1) the loss of use and enjoyment of property; (2) the diminution in value of property; (3) restoration costs; (4) economic loss; (5) consequential and incidental damages; (6) disgorgement of profits realized; and (7) unjust enrichment.

353.

By reason of the foregoing acts and omissions, the State is entitled to recovery from Defendant for the damages and injuries identified herein.

## COUNT XX

### Against Cameron

### Louisiana Products Liability Act

354.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 353 above.

355.

This Count is alleged against Cameron.

356.

Cameron manufactured, designed, supplied, and/or installed at the Macondo wellhead the *Deepwater Horizon*'s BOP.  The BOP at all relevant times was an appurtenance of the vessel and part of the equipment of the vessel.  Cameron's BOP failed to operate as intended on April 20, 2010, causing the blowout and resultant explosion and oil spill.  The failure of the BOP caused and will continue to cause harm to Louisiana's natural resources including but not limited to water, wildlife, fisheries, oyster beds, and shorelines.  As a result the Louisiana will suffer economic damages and damages to its natural resources.

357.

As a manufacturer, Cameron is liable to the State of Louisiana for damages proximately caused by the failure of its BOP.

358.

The BOP was being used by Transocean, BP and/or Halliburton at the time of the blowout in a manner which constitutes a reasonably anticipated use of the product.

359.

The BOP was defective in design as the product was unreasonably dangerous due to numerous factors, including that Cameron failed to ensure that the BOP's shearing rams would effectively seal a well in the event of a blowout that bends the drill pipe; failed to ensure the BOP was suitable for the types of drill pipe and casing assembly design ultimately and foreseeably used at the Macondo well; designed the BOP so that it was vulnerable to a single-point failure; failed to install a backup activation system for the BOP; and failed to provide adequate warnings, instructions and guidelines on the permissible uses, modifications, and applications of the BOP appurtenant to the vessel.

360.

Cameron is liable for the damages that were proximately caused by the BOP.

## COUNT XXI

### Against Halliburton

### Louisiana Products Liability Act

361.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 360 above.

362.

This Count is alleged against Halliburton.

363.

Halliburton manufactured, designed, supplied, and/or installed the cement slurry mixture (the "Cement") used to temporarily seal the Macondo wellhead. Halliburton's Cement failed to operate as intended on April 20, 2010, causing the blowout and resultant explosion and oil spill. The failure of the Cement caused and will continue to cause harm to Louisiana's natural resources including but not limited to water, wildlife, fisheries, oyster beds, and shorelines.  As a result the Louisiana will suffer economic damages and natural resource damages.

364.

As a manufacturer, Halliburton is liable to the State of Louisiana for damages proximately caused by the failure of its Cement.

365.

Halliburton's Cement was being used by Transocean and/or BP at the time of the blowout in a manner which constitutes a reasonably anticipated use of the product.

366.

The Cement was defective in design as the product was unreasonably dangerous due to numerous factors, including that Halliburton failed to ensure that the cement would effectively seal a well and thereby prevent a blowout; failed to ensure the cement would prevent the uncontrolled transmission of nitrogen and other gases to the *Deepwater Horizon*; and failed to provide adequate warnings, instructions and guidelines on the permissible uses, modifications, and applications of the Cement.

367.

Halliburton is liable for the damages that were proximately caused by its cement.

**COUNT XXII**

**Against BP, Transocean and Halliburton Defendants**

**Fraudulent Concealment & Negligent Misrepresentation**

368.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 367 above.

369.

This Count is alleged against BP, Transocean and Halliburton.  The State is entitled to recover any and all damages and other relief available at law and in equity against BP, Transocean and Halliburton for their fraudulent concealment and misrepresentation of material facts concerning their safety procedures and capacity to manage an oil spill, the safety and condition of their respective materials and equipment, and the severity of the Spill and their capacity to address the Spill for months following the *Deepwater Horizon* explosion.

370.

BOEMRE regulations require that those seeking to engage in offshore drilling have an adequate response plan in the event of a catastrophe.  *See, e.g*., 30 C.F.R. §§ 254.1(a); 254.30; 254.2.  Specifically, the regulations require that an emergency response action plan include "methods to ensure that containment and recovery equipment as well as response personnel are mobilized and deployed at the response site."  30 C.F.R. §§ 254.23(g)(5).  A lessee must also certify in writing that it has the capability to respond "to the maximum extent practicable, to a worst case discharge or a substantial threat of a discharge."  30 C.F.R. §§ 254.2(b).

371.

BP repeatedly misrepresented its safety procedures and capacity to manage and remediate an oil spill.  BP overstated its ability to a handle a blowout in its Exploration Plan, wherein it claimed that in the event of a blowout resulting in an oil spill, it was "unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses."

372.

As it turned out, BP was wholly unprepared to effectively stop a deepwater oil well blowout.  BP did not have proven equipment and technology to respond to the Spill.  In fact, following the Spill, most of the containment efforts were improvised and wholly untested.  As stated in their May 17, 2010 letter to Attorney General Eric Holder, Congress noted that it did not "appear that there was 'proven equipment and technology' to respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico." Confirming this, on May 10, 2010, BP admitted that "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

373.

Similarly, BP misrepresented the capacity to mobilize and respond to the Spill.  As detailed in the BOEMRE Decision Memorandum, as late as March 2010, BP submitted its report on cleanup capacity, projecting the regional capacity "to skim and remove 491,721 barrels of oil per day."  Moreover, as of July 5, skimming operations were averaging less than 900 barrels per day equivalent.  BP clearly lacked the capabilities and the resources to respond to the Spill, despite its prior representations to the contrary.

374.

After the Spill, BP also attempted to downplay and conceal the severity of the Spill.  BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of the actual leakage amount of over 60,000 barrels of oil per day.  Moreover, in the aftermath of the explosions, BP did not provide complete and timely announcements and warnings about the severity, forecast and trajectory of the Spill.  The severity, forecast and trajectory of the Spill, and BP's ability to respond to the Spill, were material facts that BP had a duty to communicate because of the dire circumstances of this case and the risks attendant with the failure to disclose.  BP's failure to accurately report the accuracy of the Spill negatively impacted the response rates and efforts.

375.

Defendant Transocean misrepresented, concealed and suppressed the condition of the *Deepwater Horizon* and the known hazards associated with the disabling of, and/or failure to maintain, its safety features and appurtenances, including, *inter alia*, its BOP.  Transocean misrepresented, suppressed, and concealed the condition of the BOP rams and failsafe valves, which had not been fully inspected for ten years before the blowout, and at least 36 components and systems on the vessel that were in "bad" or "poor" condition, and which it was aware might lead to loss of life, serious injury, or environmental damage.  Transocean also misrepresented and concealed the safety record of the vessel, which was based on false data supplied by its personnel. The foregoing known hazards, poor condition, and maintenance and safety issues associated with the Deepwater Horizon and its appurtenances and equipment were material facts that Transocean had a duty to communicate because of the dire circumstances of this case and the risks attendant with the failure to disclose.

376.

Likewise, Defendant Halliburton misrepresented and concealed the stability of the cement used at the Macondo Well, despite having performed three tests before the blowout, all of which demonstrated that the foam cement used at Macondo was unstable.  The instability of the cement used at the Macondo Well and the results of the testing performed before the blowout were material facts that Halliburton had a duty to disclose because of the dire consequences of these facts and the risks attendant with the failure to disclose.  Moreover, BP was aware, before the blowout, that Halliburton's testing had revealed that the concrete foam was unstable, yet it concealed this material fact.

377.

Defendants BP, Transocean and Halliburton failed to disclose, suppressed and/or concealed the foregoing material facts, and their failure to do so induced the State and others to act or to refrain from acting to protect its property, the environment, economy of the State, businesses, livelihoods, and income.  As a direct result of the fraudulent concealment of the foregoing material facts by these Defendants, the State has and will continue to incur damages, including, but not limited to, damages to natural resources and State properties, lost tax and other revenues, and direct and indirect costs associated with Spill response actions.

378.

Moreover, the conscious or deliberate acts of misrepresentation, suppression, and concealment of the foregoing material facts by BP, Transocean and Halliburton were willful, wanton, and/or in callous disregard for the safety of others and, accordingly, the State is entitled to an award of compensatory and punitive damages.

## COUNT XXIII

### Against BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants

### Unjust Enrichment

379.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 378 above.

380.

This Count is alleged against the BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants.

381.

At all times relevant to the causes of action alleged in this Complaint, the State has ownership and/or proprietary interests in certain real and personal property, waters, resources, submerged lands and shores in areas affected by the oil spill released into the Gulf of Mexico.

382.

The State is entitled to recover its damages due to the unjust enrichment of the Defendants pursuant to common law, and civilian doctrine and jurisprudence, as well as pursuant to La. Civil Code Art. 2298 which provides that "[a] person who has been enriched without cause at the expense of another person is bound to compensate that person."

383.

The Defendants' actions or omissions which resulted in an explosion and oil spill, and including allowing the migration of oil into Louisiana's waters and upon Louisiana's shoreline, resulted in tremendous economic and other damages to the State and its citizens.  The Defendants also breached certain obligations owed to the State and its people that rendered State waters, resources, submerged lands and shorelines incapable of use or capable of only limited use which

resulted in damages to the State and its citizens.  Defendants' made economic and financial decisions in their operations which enriched themselves and resulted in economic and other losses to the State.  As a result of the Defendants' actions and omissions and their breach of obligations owed to the State and its citizens, the Defendants without cause have been unjustly enriched to the detriment of the State and its citizens.  Moreover, the Defendants have caused the State to suffer economic and other harm resulting from its inability to use or fully use its waters, resources, submerged lands and shores.

384.

While the Defendants' actions and omissions and their breach of obligations owed to the State and its citizens, have caused harm to the State and its citizens, the Defendants have unjustly benefited from their acts, omissions and breach of obligations.  The State and its citizens are entitled to be compensated for the losses caused by the Defendants.

385.

By reason of the Defendants' unjust enrichment, the State is entitled to recover damages for the following, including, but not limited to: (1) the loss of use and enjoyment of the property, waters, resources and shores of the State; (2) the diminution in value of property; (3) restoration costs; (4) economic loss; (5) diminution of property value; (5) consequential and incidental damages; (6) disgorgement of profits realized; and (7) all losses to the State associated with the moratorium and the de facto moratorium.

## COUNT XXIV

## Against BP and Transocean Defendants

## Punitive Damages

### 386.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 385 above.

### 387.

As set forth in the preceding paragraphs, the actions and omissions of BP and Transocean caused the largest oil spill in U.S. history, resulting in the release of more than 4.9 million barrels of oil, methane gas and other pollutants.  BP and Transocean engaged in gross negligence, reckless, willful, wanton and outrageous behavior and breached federal and state law and regulations, and this irresponsible and reprehensible conduct created an ecologic and economic disaster for the State of Louisiana, with no end to the damage in sight.  The State specifically incorporates paragraphs 108 through 151 above, which detail the enormity of the damage to the State, ranging from pollution of the State's marshes and coastal wetlands and the further endangering of threatened and endangered species to the closure of fisheries and oyster beds and a devastating decline in tourism and tax revenue.  Punitive damages are available and warranted under maritime and common law, to punish BP and Transocean's reprehensible conduct and to deter its future occurrence.

### 388.

BP and Transocean consistently made reckless decisions concerning, for example, well design, cementing, and integrity testing that put speed and cost savings – that is, their own profits – above safety, the State's natural resources, and the economic interests of the people of the State of Louisiana. The consistent and ingrained culture of BP and Transocean for many years has been to

put profits above safety, health and the environment, and that culture caused the reckless decisions resulting in the release of nearly 5 million barrels of oil and other pollutants.

389.

Examples of BP and Transocean's reckless and deplorable conduct which put their financial interests above the health and safety of others and the environment while they engaged in ultrahazardous, abnormally dangerous activities, include the following:

a. BP and Transocean performed a critical well pressure test with untrained and unqualified personnel and recklessly ignored and/or misinterpreted abnormal pressure test results which should have raised a red flag;

b. Transocean, with reckless disregard for human life, disabled the flammable gas alarm system aboard the *Deepwater Horizon* and prevented that system from operating properly and preventing or containing the explosions, fire and loss of life;

c. BP and Transocean used a well design with too few barriers to gas flow;

d. BP and Transocean failed to use a sufficient number of "centralizers" to prevent channeling during the cement process;

e. BP and Transocean failed to run a bottoms up circulation of the drilling mud prior to beginning the cement job;

f. BP and Transocean used an inappropriate cement mixture for the type of rock formation surrounding the well, and failed to appropriately test that cement mixture prior to using it in the well;

g. BP and Transocean failed to run a cement bond log to evaluate the integrity of the cement job;

h. BP and Transocean failed to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well;

i.   BP and Transocean used an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes;

j.   BP and Transocean grossly and inadequately maintained and recklessly and improperly operated the BOPs appurtenant to the *Deepwater Horizon*;

k.   BP and Transocean failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon*;

l.   BP and Transocean consistently disregarded proper drilling, casing, mudding and cementing procedures;

m.   Transocean failed to perform 390 maintenance jobs, which would have required more than 3,500 hours of work to perform;

n.   BP and Transocean failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill;

o.   BP failed to utilize reasonably safe dispersant chemicals in responding to the spill and as a result worsened the pollution of the Gulf of Mexico.

390.

BP and Transocean engaged in outrageous, oppressive, willful, wanton, malicious, reckless and/or grossly negligent conduct each time they:

a.   failed to properly maintain the *Deepwater Horizon*;

b.   operated the *Deepwater Horizon* such that the safety and integrity of the vessel and the well were disregarded in order to save time and money;

c.   ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

d.  failed to implement and enforce proper rules and regulations to ensure the safe operation of the *Deepwater Horizon*;

e.  violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

f.  failed to take appropriate action to avoid or mitigate the spill;

g.  failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

h.  failed to ensure that the *Deepwater Horizon* and its equipment was free from defects, properly maintained and in proper working order;

i.  failed to provide appropriate disaster prevention equipment; and

j.  failed to have an appropriate emergency spill response plan or readily available spill response equipment.

391.

Some wrongs are more blameworthy than others.  BP and Transocean's consistent and flagrant violations of state and federal law and industry standards in favor of their own pocketbook, and the sheer enormity of the resulting and foreseeable economic and ecologic devastation to the State, justify an award of punitive damages against it at the highest possible level.  BP and Transocean created the worst oil spill in U.S. history; punitive damages are warranted and necessary to impose effective and optimal punishment and to deter these Defendants and others from breaking this dubious record and creating an even more devastating natural disaster.  This State, its economy, and the environment cannot afford another such catastrophe.

## RESERVATION OF RIGHTS

### 392.

The full extent of the costs expended and damages suffered by the State of Louisiana is not yet known.  The investigation of other potential claims and parties continues, as does the assessment of environmental and economic damages as well as the performance of removal activities.  The State of Louisiana reserves its right as provided by law, including but not limited to 33 U.S.C. § 2717(f)(2), to amend this Complaint and/or file subsequent complaints under OPA or any other theory of law, statutory or otherwise, to assert claims for removal costs, damages, penalties or any other legal and/or equitable remedies, against the Defendants named herein and/or any other additional parties.  The State reserves the right to amend this Complaint once additional information becomes available regarding the continuing harms which are occurring as a result of Defendants' acts and omissions as well as the increased costs incurred and damages occasioned by Defendants.

## DEMAND FOR JURY TRIAL

### 393.

The State hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the State of Louisiana respectfully prays that this Court enter judgment in its favor and against Defendants, and that the Court:

1. Declare that the BP, Anadarko, MOEX and Transocean Defendants are responsible parties pursuant to OPA, and are jointly, severally, and strictly liable, along with all other responsible parties, for unlimited removal costs and damages resulting from

the *Deepwater Horizon* disaster pursuant to the Declaratory Judgment Act and Rule 57 of the Federal Rules of Civil Procedure.

2.   Declare that the BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants are responsible parties pursuant to OSPRA, and are jointly, severally, and strictly liable, along with all other responsible parties, for unlimited removal costs and damages resulting from the *Deepwater Horizon* disaster pursuant to the Declaratory Judgment Act and Rule 57 of the Federal Rules of Civil Procedure.

3.   Enter judgment of joint, strict and several liability against the BP, Anadarko, MOEX and Transocean Defendants for response costs and damages under OPA in a sum within jurisdictional limits of this Court;

4.   Enter judgment of joint, strict and several liability against the BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants for response costs and damages under OSPRA in a sum within jurisdictional limits of this Court;

5.   Enter judgment against all Defendants for response costs and damages under Louisiana law;

6.   Enter judgment against the Defendants as identified herein for damages for negligence, products liability, nuisance, and trespass as permitted by maritime law.

7.   Enter judgment against Transocean BP, Anadarko and MOEX Defendants and award the State of Louisiana civil penalties of not more than $32,500 for each day of violation, up to $50,000 for each day of violation of a compliance order and an

additional penalty of not more than $1,000,000.00 for each day of violation with legal interest from the date of judicial demand until paid.

8.  Enter judgment against all Defendants and award the State of Louisiana its unpaid response action costs in the amount of at least $342,612 with legal interest from the date of judicial demand until paid.

9.  Enter judgment against all Defendants and in favor of the State of Louisiana, ordering Defendants to reimburse the State for all reasonable costs it may incur responding to the oil spill described herein.

10. Pre-judgment and post judgment interest at the maximum rate allowable by law.

11. Enter judgment against the BP and Transocean Defendants for punitive damages.

12. Retain jurisdiction of this action to ensure compliance with its orders.

13. Award the State's costs incurred in pursuing this action, including attorney fees as allowed by law; and

14. Order such other and further relief as the Court may deem just and appropriate.

Dated this 20th day of April, 2011.

Respectfully submitted,

STATE OF LOUISIANA                          KANNER & WHITELEY, LLC

BOBBY JINDAL                                /s/ Allan Kanner
LOUISIANA GOVERNOR                          Allan Kanner
                                            Elizabeth B. Petersen

JAMES D. "BUDDY" CALDWELL
LOUISIANA ATTORNEY GENERAL

James Trey Phillips
First Assistant Attorney General
Megan K. Terrell
Assistant Attorney General
Section Chief –Environmental
State of Louisiana
P.O. Box 94005
Baton Rouge, LA 70804-9005
Telephone: (225) 326-6708

David A. Pote
701 Camp Street
New Orleans, LA 70130
Telephone: (504) 524-5777
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**

HENRY DART,
ATTORNEYS AT LAW P.C.

/s/ Henry T. Dart
Henry T. Dart
Grady J. Flattmann
510 N. Jefferson St.
Covington, LA 70433
Telephone: (985) 809-8093
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**

USRY, WEEKS, &
MATTHEWS, APLC

/s/ T. Allen Usry
T. Allen Usry
1615 Poydras St.
Suite 12
New Orleans, LA 70112
Telephone: (504) 592-4641
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**

SHOWS, CALI, BERTHELOT &
WALSH, LLP

/s/ E. Wade Shows
E. Wade Shows
628 St. Louis Street
Baton Rouge, LA 70802
Telephone: (225) 346-1461
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**

MARTEN LAW, PLLC

/s/ Bradley M. Marten
Bradley M. Marten
Linda R. Larson
1191 Second Avenue
Suite 2200
Seattle, WA 98101
(206) 292-2600
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**

**DEFENDANT WAIVER OF SERVICE SOUGHT:**

BP Exploration and Production
Through their Registered Agent
CT Corporation System
5615 Corporate Blvd.
Suite 400B
Baton Rouge, LA 70808

BP Corporation North America Inc.
Through their Registered Agent
The Prentice-Hall Corp. System
320 Somerulos Street
Baton Rouge, LA 70802

BP America Inc
Through their Registered Agent
C T Corporation System
5615 Corporate Blvd.
Suite 400B
Baton Rouge, LA 70808

BP America Production Company
Through their Registered Agent
C T Corporation System
5615 Corporate Blvd.
Suite 400B
Baton Rouge, LA 70808

BP p.l.c.
International Headquarters
1st James's Square
London
SW1Y 4PD

Anadarko Petroleum Corporation
Through their Registered Agent
C T Corporation System
5615 Corporate Blvd.
Suite 400B
Baton Rouge, LA 70808

Anadarko E&P Company, LP
Through their Registered Agent
C T Corporation System
5615 Corporate Blvd.

Suite 400B
Baton Rouge, LA 70808

MOEX Offshore 2007 LLC
9 Greenway Plaza, Suite 1220
Houston, TX 77046, USA

MOEX USA Corporation
9 Greenway Plaza, Suite 1220
Houston, TX 77046, USA

Mitsui Oil Exploration Co., Ltd.
9 Greenway Plaza, Suite 1220
Houston, TX 77046-0910

Transocean Holdings LLC
4 Greenway Plaza, Suite 700
Houston, TX 77046

Triton Asset Leasing GmbH
c/o Managing Director, Robert Bowden
Turmstrasse 30
Zug, ZG 6300 Switzerland, Europe

Transocean Deepwater, Inc.
4 Greenway Plaza
Houston, TX 77046

Transocean Offshore Deepwater Drilling
4 Greenway Plaza
Houston, TX 770406

Transocean LTD
P.O. Box 2765
Houston, Texas  77252-2765

Cameron International Corporation
F/K/A Cooper-Cameron Corporation
Through their Registered Agent
CT Corporation System
5615 Corporate Blvd.
Suite 400B
Baton Rouge, LA 70808

Halliburton Energy Services, Inc.

Through their Registered Agent
CT Corporation System
5615 Corporate Blvd.
Suite 400B
Baton Rouge, LA 70808

M-I L.L.C.
201 Rue Iberville, 7th Floor
Lafayette, LA 70508

Weatherford U.S. L.P.
Through their Registered Agent
CT Corporation System
5615 Corporate Blvd.
Suite 400B
Baton Rouge, LA 70808