## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE OIL SPILL BY THE OIL RIG                          MDL: 2179
"*DEEPWATER HORIZON*" IN THE
GULF OF MEXICO, ON APRIL 20, 2010                       SECTION: J

THIS DOCUMENT RELATES TO:                               JUDGE BARBIER
*Carnival's Complaint for Private Economic*
*Losses in Accordance with PTO No, 11*
*[CMO NO.1] Section III (BI) ["B1 Bundle].*            MAG. JUDGE SHUSHAN

### JURY TRIAL REQUESTED

### COMPLAINT FOR PRIVATE ECONOMIC LOSSES IN ACCORDANCE WITH PTO NO. 11 [CMO NO. 1] SECTION III (B1) ["B1 BUNDLE"]

## I.   INTRODUCTION

Carnival is a Cruise Line that operates Cruise Vessels in the Gulf of Mexico and elsewhere. Carnival has suffered economic losses and damages as a result of the explosion and fire aboard the oil rig *Deepwater Horizon* and the subsequent sinking of that vessel.

1.      Carnival hereby sues: BP Exploration and Production, Inc. ("BP Exploration"); BP America Production Company ("BP America"); BP p.l.c.; Transocean Ltd. ("Transocean Ltd."); Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore"); Transocean Deepwater, Inc. ("Transocean Deepwater"); Transocean Holdings, LLC ("Transocean Holdings"); Triton Asset Leasing GmbH ("Triton"); Halliburton Energy Services, Inc.; Sperry Drilling Services (formerly Sperry Sun Drilling Services); M-I, LLC ("M-I"); Cameron International Corporation f/k/a Cooper-Cameron Corporation ("Cameron"); Weatherford U.S. L.P. ("Weatherford"); Anadarko Petroleum Corporation Co. ("Anadarko"); Anadarko E&P

MASE LARA EVERSOLE

Company LP ("Anadarko E&P"); MOEX Offshore 2007 LLC ("MOEX Offshore"); MOEX USA Corporation ("MOEX USA"); Mitsui Oil Exploration Co., Ltd. ("MOECO"); and Mitsui & Co., Ltd. ("Mitsui") (hereinafter referred to collectively as "Defendants").

2.      This Complaint is brought to recover damages suffered by Carnival as a result of the oil spill that resulted from the explosion and fire aboard, and subsequent sinking of the mobile offshore drilling rig *Deepwater Horizon.*

3.      On April 20, 2010, *Deepwater Horizon,* exploded and caught fire. It burned for nearly forty-eight hours before being submerged into the sea. On its way down to the seafloor, the long riser pipe broke, and oil began to gush out of control from the seafloor.

4.      The emergency valve ("blowout preventer") on the base of the well opening which was installed for the very purpose of averting such a disaster, failed to properly seal the opening of the well.

5.      As a result, crude oil spewed out into the Gulf of Mexico uncontrollably at a rate of 10,000 to 20,000 barrels of for nearly four (4) months, covering almost 10,000 square miles, and spreading with winds currents toward coastlines in Texas, Louisiana, Mississippi, Alabama, Florida and the Caribbean.

## II.      **PARTIES**

6.      Carnival is a corporation organized pursuant to the laws of Panama, with its principal place of business in Miami, Florida. Carnival derives revenue from cruise bookings in the Gulf of Mexico.  Carnival serves ports in Florida, Alabama, Texas and Louisiana, and uses the Gulf of Mexico daily to transport passengers and crewmembers to several ports worldwide.

7.       Pursuant to the Federal Rule of Civil Procedure 10 (c), Carnival alleges and incorporates herein by reference each and every allegation contained in paragraphs 210 through 250 of the B1 Bundle Complaint.

8.       Carnival hereby names as defendants: BP Exploration and Production, Inc. ("BP Exploration"); BP America Production Company ("BP America"); BP p.l.c.; Transocean Ltd. ("Transocean Ltd."); Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore"); Transocean Deepwater, Inc. ("Transocean Deepwater"); Transocean Holdings, LLC ("Transocean Holdings"); Triton Asset Leasing GmbH ("Triton"); Halliburton Energy Services, Inc.; Sperry Drilling Services (formerly Sperry Sun Drilling Services); M-I, LLC ("M-I"); Cameron International Corporation f/k/a Cooper-Cameron Corporation ("Cameron"); Weatherford U.S. L.P. ("Weatherford"); Anadarko Petroleum Corporation Co. ("Anadarko"); Anadarko E&P Company LP ("Anadarko E&P"); MOEX Offshore 2007 LLC ("MOEX Offshore"); MOEX USA Corporation ("MOEX USA"); Mitsui Oil Exploration Co., Ltd. ("MOECO"); and Mitsui & Co., Ltd. ("Mitsui") (hereinafter referred to collectively as "Defendants").

### III.       JURISDICTION AND VENUE

9.       Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which gives the federal judiciary the power to hear "all Cases of admiralty and maritime jurisdiction."

10.      Furthermore, this Court has jurisdiction over this action pursuant to the Oil Pollution Act, 33 U.S.C. § 2717 (b) (the "OPA").

11.     This Court has supplemental jurisdiction over Carnival's state law claims pursuant to 28 U.S.C. § 1367.

12.     Prosecution of this action in this district is proper under 28 U.S.C. § 1391 because the events or omissions giving rise to the claims asserted herein occurred in this district.

13.     Venue is otherwise appropriate in this district consistent with 28 U.S.C. § 1407 and the 2010 Transfer Order of the Judicial Panel on Multidistrict Litigation ("JPML"), filed on February 7, 2011. See *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179, --- F. Supp. 2d ----, 2010 WL 3166434, 2010 AMC 1977 (JPML, August 10, 2010).

14.     Venue is also proper pursuant to the OPA, 33 U.S.C. 2717 (b), as the discharge occurred in this district. In addition, venue is proper pursuant to this Court's Pretrial Order No. 20, which allows Carnival to directly file its complaints arising out of the Spill in this District.

## IV.     FACTUAL ALLEGATIONS

15.     Transocean Ltd.; "Transocean Offshore; Transocean Deepwater; Transocean Holdings; and Triton (collectively "Transocean") are the owners, managing owners, owners *pro hac vice* and/or operators of the oil rig *Deepwater Horizon*, a semi-submersible mobile oil drilling rig, which was performing drilling operations for BP Exploration; BP America and BP p.l.c. on the outer Continental Shelf, at the site where the oil spill originated.

16.     BP Exploration, BP America, BP p.l.c. (collectively "BP") along with MOEX USA, MOEX Offshore, MOECO, Mitsui, Anadarko E&P and Anadarko Petroleum are the holders and/or investors of a leasehold interest granted by the Minerals Management Service that

allows BP to drill for oil and perform oil production related activities and operations at the site of the oil spill, and on April 20, 2010, operated the oil well that was the source of the oil spill.

17. Upon information and belief, Cameron manufactured and/or supplied the *Deepwater Horizon's* blowout preventers that failed to operate upon explosion, which, if operating properly, would have prevented the explosion. The blowout preventers were defective because they failed to operate properly.

18. Upon information and belief, Whetherford designed manufactured and/or supplied *Deepwater Horizon's* float collar which failed to operate properly which, if operated properly, would have prevented the fire, explosion and the oil spill.

19. Halliburton was engaged in the cementing operations of the well and well cap, and upon information and belief, improperly and negligently performed these duties, increasing the pressure at the well and contributing to the fire, explosion and resulting oil spill.

20. At all material times, the *Deepwater Horizon* was owned, manned, possessed, managed, controlled, chartered and/or operated by Transocean, BP , MOEX USA,  MOEX Offshore, Mitsui, MOECO Anadarko E&P and/or Anadarko Petroleum.

21. Transocean, or its predecessors are the designers of the *Deepwater Horizon.*

22. The fire and explosion of the *Deepwater Horizon*, its sinking and resulting oil spill were caused by the combined and concurrent negligence of the Defendants, which renders them liable, jointly and severally, to Carnival for all their damages.

23.     Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Carnival and the Gulf of Mexico's marine and coastal environment, which Carnival's ships travel through on a daily basis.

24.      The spilled oil caused environmental contamination of the Gulf of Mexico and its shorelines.

25.     The oil spill and the contamination caused Carnival to incur increased fuel costs and additional vessel cleaning costs.

26.     The oil spill and the contamination caused loss of revenue/decreased revenue and and loss of bookings/decreased bookings to Carnival.

27.     On or about April 28, 2010, the United States Coast Guard designated BP Exploration and BP Corporation as responsible parties under the OPA. Upon information and belief, Transocean, Anadarko E & P, Anadarko Petroleum MOEX USA, MOEX Offshore and Mitsui also have been or will be designated as responsible parties under the OPA.

28.     Pursuant to the OPA, Carnival presented an interim claim to BP and Transocean on June 10, 2010 for losses and damages suffered by Carnival as a result of the oil spill.

29.     Pursuant to the OPA, Carnival presented a second interim claim to BP and Transocean on July 14, 2010 for damages and losses suffered by Carnival as a result of the oil spill.

30.     Pursuant to the OPA, Carnival presented a third amended and supplemental interim claim to BP and Transocean on July 27, 2010 for damages suffered as a result of the oil spill.

31.     Pursuant to the OPA, Carnival presented a fourth interim claim to BP and Transocean on September 1, 2010 for losses and damages suffered by Carnival as a result of the oil spill.

32.     In addition, Carnival also presented interim and supplemental claims to the Gulf Coast Claims Facility ("GCCF") on November 23, 2010 for losses and damages suffered by Carnival as a result of the oil spill.

33.     All conditions precedent prior to the filing of this action have been met and/or waived.

## FIRST CAUSE OF ACTION

### Negligence

### *Carnival v. All Defendants*

34.     Carnival realleges each allegation as stated in paragraphs 1 through 33 as if fully stated herein.

35.     The fire, explosion and resulting oil spill was caused by the concurrent negligence of Defendants.

36.     Defendants owed a duty of reasonable care to Carnival in the operation and maintenance of the *Deepwater Horizon.*

37.     Defendants were negligent, grossly negligent, reckless, wanton, willful, and consciously indifferent to Carnival and acted with egregious and arbitrary conduct, in the following non-exclusive particulars:

a.     failing to properly operate the *Deepwater Horizon*;

MASE LARA EVERSOLE

7

b.      operating the *Deepwater Horizon* in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in oil spill;

c.      failing to properly inspect the *Deepwater Horizon* to assure that its equipment was fit for its intended purposes;

d.      acting in a careless and negligent manner without due regard for others;

e.      failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the *Deepwater Horizon*, which if they had been so promulgated, implemented and enforced, would have averted the fire, explosion, sinking and oil spill;

f.      operating the *Deepwater Horizon* with untrained and unlicensed personnel;

g.      inadequate and negligent training, hiring and supervising of personnel;

h.      failing to take appropriate action to avoid or mitigate the accident;

i.      negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

j.      employing untrained or poorly trained employees and failing to properly train their employees;

k.      failing to ascertain that the *Deepwater Horizon* and its equipment were free from defects and/or in proper working order;

l.      failure to timely warn;

m.      failure to timely bring the discharge of oil under control;

n.      failure to provide appropriate accident prevention equipment;

o.      failure to observe and read gauges that would have indicated excessive pressures in the well;

p.      failure to react to signs of danger;

q.      providing blowout preventers that did not work as intended;

r.      conducting well and cap cementing operations improperly;

s.      failing to heed the warnings of an impending disaster and disruption of the of the operation of the *Deepwater Horizon;*

t.      such other acts of negligence, gross negligence and omissions as will be shown at the trial of this matter, all of which are in violation of applicable General Maritime Law, federal law and state law.

63.     In addition, and in the alternative, the fire, explosion, sinking and resulting oil spill were caused by defective equipment, including but not limited to the blowout preventers, which were in the care, custody and control of the Defendants. Defendants knew or should have known of these defects and are, therefore, liable for them.

64.     The injuries to Carnival were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the dangers associated with their operations.

65.     As a direct and proximate result of the Defendants' acts and/or omissions, Carnival incurred increased fuel costs, additional vessel cleaning costs, loss of revenue/decreased revenue and loss of bookings/decreased bookings.

## SECOND CAUSE OF ACTION

### Strict Liability for Manufacturing Defect

### *Carnival v. Cameron*

66.     Carnival realleges each allegation as stated in paragraphs 1 through 33 as if fully stated herein.

67.     Carnival is entitled to recover from Cameron for its defective design and/or manufacture of the blowout preventer that was appurtenant to and a part of the equipment of the *Deepwater Horizon*, pursuant to Section 402A of the Restatement (Second) of Torts as adopted by maritime law.

68.     At all times relevant hereto, Cameron was in the business of designing, manufacturing, marketing, selling, and/or distributing the blowout preventer used in connection with the drilling operations onboard the *Deepwater Horizon*.

69.     If operating as intended, the blowout preventer could have been manually or automatically activated immediately after the explosion, cutting off the flow of oil at the wellhead, and limiting the oil spill to a minute fraction of its ultimate severity and thereby sparing Carnival losses and damage.

70.     Cameron sold and delivered the blowout preventer at the *Deepwater Horizon* to Defendant Transocean on or around 2001.

71.     Cameron's blowout preventer failed to operate properly or at all, at the time of or following the blowout, and this failure caused and/or contributed to the oil spill.

72.     Cameron failed to effectively design the blowout preventer with a backup activation system, or provide adequate warnings, instructions, and/or guidelines on the permissible uses, modifications and applications of the blowout preventer.

73.     The blowout preventer was defectively designed because its emergency modes of system operation did not provide a fully-independent means of closing the blowout preventer, which rendered the blowout preventer abnormally dangerous.

74.     Moreover, Cameron's blowout preventer was defectively designed and/or manufactured because it was vulnerable to the failure of a single valve that carries hydraulic fluid to the ram blades, which operates the blind shear ram which seals the well. If this single valve fails, the blind shear ram is unable to seal the well.

75.     Cameron's blowout preventer was defectively designed and/or manufactured because it failed to operate as intended, if at all, and thus proximately caused and contributed to the blowout and subsequent oil spill.

76.     Cameron's blowout preventer was defectively designed and/or manufactured such that it did not operate as intended to prevent or minimize blowouts, which caused and/or contributed to the oil spill.

77.     Cameron's blowout preventer was in a defective condition and unreasonably dangerous when it left Cameron's control.

78.    At all times, Cameron's blowout preventer was used in the manner intended, or in a manner reasonably foreseeable and/or actually disclosed to Cameron prior to April 20, 2010.

79.    At the time the blowout preventer left Cameron's control, it was in a defective condition and unreasonably dangerous in that it was designed and manufactured with known defects and failure modes, including but not limited to:

a.    Inadequate, faulty, nonfunctioning and defective battery systems;

b.    inadequate, faulty, nonfunctioning and defective dead man switches and related wiring;

c.    the absence of acoustic triggers;

d.    inadequate, faulty, nonfunctioning and defective emergency disconnect systems   (EDS);

e.    improperly sealed, leaky hydraulic systems;

f.    improperly designed, manufactured, and installed annular seals;

g.    insufficiently robust blind shear rams;

h.    insufficient warnings, instructions, and guidelines on permissible, foreseeable uses and modifications to the blowout preventer and its component parts;

i.    insufficient testing and design verification of the blowout preventer and its component parts to ensure the shearing capability of the ram and other

functioning of the blowout preventer during reasonably foreseeable uses; and

j.      in such other particulars as the evidence may show.

80.    At the time the blowout preventer appurtenant to the *Deepwater Horizon* left Cameron's control, Cameron knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

81.    At the time the blowout preventer appurtenant to the *Deepwater Horizon* left Cameron's control, feasible design alternatives existed which would have to a reasonable probability prevented the harm suffered by Carnival without impairing the utility, usefulness, practicality or desirability of the blowout preventer.

82.    At all relevant times, the blowout preventer appurtenant to the *Deepwater Horizon* was used in an intended and/or reasonably foreseeable manner.

83.    Carnival was a foreseeable victim of the manifestation of the defects in the *Deepwater Horizon's* blowout preventer.

84.    Cameron had actual and/or constructive knowledge of the facts and circumstances relative to the blowout preventer which caused or contributed to this incident, which in turn caused Carnival's damages, and its actions and/or inactions were negligent, grossly negligent, reckless, willful, and/or wanton.

85.     As a direct and proximate result of the Defendants' acts and/or omissions, Carnival incurred increased fuel costs and additional vessel cleaning costs as well as loss of revenue/decreased revenue and loss of bookings/decreased bookings.

86.     In the alternative to the foregoing claim arising under the general maritime law against Cameron for its defective design and/or manufacture of the blowout preventer Carnival seeks relief pursuant to the Louisiana Products Liability Act (La. Rev. St. Ann. § 9:2800.51, et seq.); the Texas Products Liability Act of 1993 (Tex. Civ. Prac. & Rem. Code Ann. § 82.002, et seq.); the Mississippi Products Liability Act (Miss. Code Ann. § 11-1-63); and/or the Alabama Extended Manufacturer's Liability Doctrine, and Florida Common Law.

### THIRD CAUSE OF ACTION

### Strict Liability for Manufacturing Defect

### *Carnival v. Weatherford*

87.     Carnival realleges each allegation as stated in paragraphs 1 through 33 as if fully stated herein.

88.     At all times relevant hereto, Weatherford was in the business of designing, manufacturing, marketing, selling, and/or distributing the float collar appurtenant to the vessel and used in connection with the drilling operations by the *Deepwater Horizon*.

89.     Weatherford sold and delivered the float collar at the *Deepwater Horizon* to Defendant Transocean in 2001.

90.     The float collar is a check valve device that is installed to prevent backflow or ingress of fluids into the casing. Hydrocarbons flowing into the casing from the bottom of the wellbore must first pass through the float collar.

91.     On April 20, 2010, the Weatherford-manufactured float collar did not seal properly, which allowed hydrocarbons to leak into the casing, contributing to the blowout and subsequent explosions, fire, sinking, and oil spill.

92.      Weatherford's float collar failed to operate properly or at all, at the time of or following the blowout, and this failure caused or contributed to the oil spill.

93.     Weatherford's float collar was defective because it failed to operate as intended.

94.     The float collar on the *Deepwater Horizon* supplied by Weatherford failed to operate as intended, if at all and thus proximately caused and contributed to the blowout and subsequent oil spill.

95.     The float collar used on the *Deepwater Horizon* was defectively designed and/or manufactured such that it did not operate as intended to prevent or minimize blowouts, which caused and/or contributed to the oil spill.

96.     Weatherford's float collar was in a defective condition and unreasonably dangerous when it left Weatherford's control.

97.     At all material times, Weatherford's float collar was used in the manner intended, or in a manner reasonable foreseeable and/or actually disclosed to Weatherford prior to April 20, 2010.

98.     At the time the float collar used at the *Deepwater Horizon* site left Weatherford's control, Weatherford knew, or in light of reasonably available information or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

99.    At the time the float collar used at the *Deepwater Horizon* site left Weatherford's control, feasible design alternatives existed which would have to a reasonable probability prevented the harm suffered by Carnival without impairing the utility, usefulness, practicality or desirability of the float collar.

100.    At all relevant times, the float collar used on the *Deepwater Horizon* site was used in an intended and/or reasonably foreseeable manner.

101.    Carnival was a foreseeable victim of the manifestation of the defects in the *Deepwater Horizon's* float collar.

102.    Weatherford had actual and/or constructive knowledge of the facts and circumstances relative to the float collar that caused or contributed to this incident, which in turn caused Carnival' damages, and its actions and inactions were negligent, grossly negligent, reckless, willful, and/or wanton.

103.    As a direct and proximate result of the Defendants' acts and/or omissions, Carnival incurred increased fuel costs, additional vessel cleaning costs, loss of revenue/decreased revenue and loss of bookings/decreased bookings.

104.    Carnival is entitled to recover from Weatherford for its defective design and/or manufacture of the float collar on the *Deepwater Horizon* pursuant to Section 402A of the Restatement (Second) of Torts as adopted by maritime law.

105.    In the alternative to the foregoing claim arising under the general maritime law against Weatherford for its defective design and/or manufacture of the float collar, Carnival seeks relief pursuant to the Louisiana Products Liability Act (La. Rev. St. Ann. § 9:2800.51, et seq.); the Texas Products Liability Act of 1993 (Tex. Civ. Prac. & Rem. Code Ann. § 82.002, et

seq.); the Mississippi Products Liability Act (Miss. Code Ann. § 11-1-63); and/or the Alabama Extended Manufacturer's Liability Doctrine, and Florida Common Law.

## FOURTH CAUSE OF ACTION

### Fraudulent Concealment

### *Carnival v. All BP Entities, All Transocean Entities and Halliburton.*

106.    Carnival realleges each allegation as stated in paragraphs 1 through 33 as if fully stated herein.

107.    To the extent available under state law, Carnival is entitled to recovery against Defendants BP, Halliburton and Transocean for their fraudulent concealment of material facts concerning the oil spill.

108.    After the explosions, BP attempted to downplay and conceal the severity of the oil spill. BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of the actual leakage amount of 50,000 barrels of oil per day.

109.    Moreover, in the aftermath of the explosions, BP did not provide complete and timely announcements and warnings about the severity, forecast and trajectory of the oil spill.

110.    In addition, BP misrepresented its capabilities to respond to the oil spill. BP overstated its ability to a handle a blowout in its Exploration Plan, wherein it claimed that in the event of a blowout resulting in an oil spill; it was "unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses."

111.    In fact, BP did not have proven equipment and technology to respond to the oil spill; instead, according to the letter to Attorney General Eric Holder by Members of Congress

on May 17, 2010, it did not "in any way appear that there was 'proven equipment and technology' to respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico." As noted further in that letter, "much of the response and implementation of spill control technologies appear[ed] to be taking place on an ad hoc basis."

112.    BP admitted on May 10, 2010 that "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

113.    Despite its inability to respond and control the oil spill, BP resisted requests from scientists to use sophisticated instruments at the ocean floor that would have provided a more accurate picture of the amount of oil that was gushing from the well.

114.    BP did not provide, in the aftermath of the blowout, or since that time complete or timely announcements and warnings about the severity, forecast and trajectory of the oil spill

115.    The severity, forecast and trajectory of the oil spill, and BP's ability to respond to the oil spill, were material facts that BP had a duty to disclose.

116.    In addition, Halliburton misrepresented and concealed the stability of the cement used at the well, despite having performed three tests before the oil spill, all of which demonstrated that the foam cement used at the well was unstable.

117.    The instability of the cement used at the well and the results of the testing performed before the oil spill were material facts that Halliburton had a duty to disclose.

118.     Moreover, BP was aware, before the oil spill, that Halliburton's testing had revealed that the concrete foam was unstable, yet it concealed this material fact.

119.     For its part, Transocean misrepresented and concealed the condition of the *Deepwater Horizon* and the known hazards associated with the disabling of, and/or failure to maintain, its safety features and appurtenances, including, *inter alia*, its blowout preventer.

120.     Transocean also misrepresented and concealed the safety record of the vessel, which was based on false data supplied by its personnel.

121.     Transocean misrepresented and concealed the condition of many key components, including, *inter alia*, the blowout preventer valves, which had not been fully inspected for ten years before the blowout, as well as other components and systems on the vessel that were in "bad" or "poor" condition, and which it was aware might lead to loss of life, serious injury or environmental damage.

122.     The foregoing known hazards, poor condition, and maintenance and safety issues associated with the *Deepwater Horizon* and its appurtenances and equipment were material facts that Transocean had a duty to disclose.

123.     Halliburton, BP, and Transocean failed to disclose or concealed the foregoing material facts post –spill as alleged in the preceding paragraphs in this fourth cause of action, and their failure to do so induced Carnival to act or to refrain from acting to protect their property, businesses, and revenues.

124.    As a direct and proximate result of the Defendants' acts and/or omissions, Carnival incurred increased fuel costs, additional vessel cleaning costs, loss of revenue/decreased revenue and loss of bookings/decreased bookings.

125.    Moreover, the acts of misrepresentation and concealment of the foregoing material facts by Halliburton, BP, and Transocean were intentional, willful, wanton, and/or in callous disregard for the safety of others and, accordingly, Carnival is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION

### Violation of the Oil Pollution Act of 1990

***Carnival v. BP Exploration, BP Corporation, Bp p.l.c, Transocean Holdings, Anadarko, Anadarko E&P, MOEX Offshore, MOEX USA and MOECO.***

126.    Carnival realleges each allegation as stated in paragraphs 1 through 33 as if fully stated herein.

127.    The Oil Pollution Act, 33 U.S.C. § 2701, et seq. (the "OPA"), imposes liability upon a "responsible party for a... vessel or a facility from which oil is discharged...into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702.

128.    The Coast Guard has named BP as the responsible party for the release of oil and Transocean as the responsible party for the release of diesel on the surface. Therefore, BP and Transocean are strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the oil spill.

129.    Defendants Anadarko, Anadarko E&P, MOEX Offshore, and/or MOEX USA held a leasehold interest (the "Macondo Lease"), on lands beneath navigable waters, before and/or at the time of the oil spill. As such, they were lessees of the area within which the well (an "offshore facility") was located at the time of the Spill and are responsible parties pursuant to Section 2701 (16) and (32) of the OPA. As such, they are strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the oil spill.

130.    At all relevant times, MOECO dominated and controlled the business, operations, policies, and actions of its subsidiaries MOEX Offshore and MOEX USA to such an extent that they were agents and/or alter egos of MOECO. Neither MOEX Offshore nor MOEX USA properly complied with corporate formalities or operated as corporations distinct from MOECO – rather, MOECO conducted its U.S. activities, including its activities regarding the Macondo Prospect lease, through these agent/alter ego entities. All activities of MOEX Offshore and MOEX USA, including the holding of the leasehold interest in the Macondo Lease, where the Macondo well is located, should be imputed to MOECO. MOECO is therefore a "responsible party" under OPA and liable to Plaintiffs for damages available under that statute.

131.    Defendants BP and Transocean are not entitled to limit their liability under Section 2704(a) of the OPA because the Spill was proximately caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. 33 U.S.C. § 2704(c).

132.    Moreover, in its "Statement of BP Exploration & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990," filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

133.    Defendants BP Exploration, BP Corporation, Transocean Holdings, MOEX, MOECO, Anadarko E & P and Anadarko Petroleum have wrongfully denied Carnival's claims that Carnival properly asserted to BP Exploration, BP Corporation, Transocean Holdings, MOEX, MOECO, Anadarko E & P, Anadarko Petroleum and the Gulf Coast Claims Facility pursuant to the OPA.

134.    As a direct and proximate result of the Defendants' acts and/or omissions, Carnival incurred increased fuel costs, additional vessel cleaning costs, loss of revenue/decreased revenue and loss of bookings/decreased bookings.

135.    Carnival is entitled to a judgment finding BP Exploration, BP Corporation, Transocean Holdings, MOEX Offshore, MOEX USA MOECO, Anadarko E&P and Anadarko Petroleum liable to Carnival for damages suffered as a result of the oil spill and awarding Carnival adequate compensation and punitive damages in an amount determined by the trier of fact.

### SIXTH CAUSE OF ACTION

**Strict Liability Pursuant to the Florida Pollutant Discharge Prevention and Control Act Fla. Stat. § 376.011, et seq.**

***Carnival v. BP, Transocean, Anadarko, Anadarko E&P, MOEX Offshore, MOEX USA, and MOECO***

136.    Carnival realleges each allegation as stated in paragraphs 1 through 33 as if fully stated herein.

137.    At all relevant times, BP and Transocean owned, leased, operated, and/or maintained the Deepwater Horizon and the Macondo well. Following the April 20, 2010

explosions, fire, and ultimate sinking of the Deepwater Horizon, the Macondo well began spewing crude oil into the Gulf of Mexico.

138.    At all relevant times, Defendants owed a statutory duty to Carnival to maintain and operate the Deepwater Horizon and the Macondo well so as to not discharge pollutants as defined by the Florida Pollutant Discharge Prevention and Control Act (the "Florida Act"), Fla. Stat. § 376.031.

139.    At all relevant times, Defendants breached their statutory duty to Carnival by discharging, or allowing to be discharged, crude oil into the Gulf of Mexico.

140.    Defendants are strictly liable to Carnival under the Act, § 376.205, which provides in pertinent part:

> "… any person may bring a cause of action against a responsible party in a court of competent jurisdiction for damages, as defined in § 376.031, resulting from a discharge or other condition of pollution covered by §§ 376.011-376.21. In any such suit, it shall not be necessary for the person to plead or prove negligence in any form or manner. Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it occurred."

141.    The Florida Act creates a private cause of action. See Fla. Stat. § 376.205.

142.    The Coast Guard has named BP as the responsible party for the release of oil, and Transocean as the responsible party for the release of diesel on the surface. Therefore, BP and Transocean are liable under the Florida Act for all damages, as defined by the Florida Act, which result from the oil spill.

143.     Defendants Anadarko, Anadarko E&P, and MOEX Offshore held a leasehold interest in a lease granted by the MMS, an oil lease on lands beneath navigable waters, before and/or at the time of the oil spill. As such, they were lessees of the area within which the well, an offshore facility, was located at the time of the oil spill and are responsible parties pursuant to Section 376.031 of the Florida Act. As such, they are strictly liable pursuant to Section 376.205 of the Florida Act for damages resulting from the oil spill.

144.     As alleged in paragraphs 222 through 235 of the B1 Bundle Complaint and hereinabove incorporated by reference pursuant Federal Rule of Civil Procedure 10(c), at all relevant times, MOECO dominated and controlled the business, operations, policies, and actions of its subsidiaries MOEX Offshore and MOEX USA to such an extent that they were agents and/or alter egos of MOECO. Neither MOEX Offshore nor MOEX USA properly complied with corporate formalities or operated as corporations distinct from MOECO – rather, MOECO conducted its U.S. activities, including its activities regarding the subject oil lease, through these agent/alter ego entities. All activities of MOEX Offshore and MOEX USA, including the holding of the leasehold interest in the subject oil lease, should be imputed to MOECO. Thus MOECO is a "responsible party" under the Florida Act and liable to Carnival for damages available under that statute.

145.     The private cause of action under the Florida Act is a strict liability cause of action. Carnival "need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it occurred." Fla. Stat.§376.205. The oil spill constitutes a prohibited discharge within the meaning of the Florida Act and it has occurred.

146.   The immediate discharge from the oil spill occurred into waters outside the territorial limits of Florida; however, waters within the territorial limits of Florida have been directly affected by the discharge.

147.   Carnival is entitled to such damages pursuant to Fla. Stat. § 376.031(5), which defines "damages" as "the documented extent of any destruction to or loss of any real or personal property…."

148.   The Florida Act contains no presentation requirement. See Fla. Stat. § 376.205.

149.   As a direct and proximate result of the Transocean's acts and/or omissions, Carnival incurred increased fuel costs, additional vessel cleaning costs, loss of revenue/decreased revenue and loss of bookings/decreased bookings.

150.   By reason of the foregoing, Carnival has incurred damages in an amount to be determined at trial, and is entitled to compensatory and punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Carnival demands judgment against Defendants, jointly, severally, and solidarily, as follows:

(a)    Economic and compensatory damages in amounts to be determined at trial;

(b)    pre-judgment and post-judgment interest at the maximum rate allowable by law

(c)    costs of litigation;;

(d)     punitive damages;

(e)     such other and further relief available under all applicable state and federal laws

and any relief the Court deems just and appropriate.

Dated:  April 20, 2011

Respectfully submitted,

MASE LARA EVERSOLE, P.A.
*Attorneys for Carnival Corporation*
 *d/b/a Carnival Cruise Lines*
2601 South Bayshore Drive
Suite 800
Miami, Florida  33133
Telephone:  (305) 377-3770
Facsimile:  (305) 377-0080

By:    */s/ Curtis J. Mase*
          CURTIS J. MASE
          Florida Bar No.:  478083
          cmase@mletrial.com

By:     /s/ John P. Salas
          JOHN PAUL SALAS
          Florida Bar No. 87593
          jsalas@mletrial.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Complaint has been served on All Counsel by

electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order

No. 12, on this 20th day of April, 2011.

*/s/ Curtis J. Mase*
CURTIS J. MASE
Florida Bar No.:  478083
cmase@mletrial.com

/s/ John P. Salas
JOHN PAUL SALAS
Florida Bar No. 87593
jsalas@mletrial.com

18194/Doc#21