**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:   Oil Spill by the Oil Rig "Deepwater | * | **MDL No. 2179** |
| Horizon" in the Gulf of Mexico, on | * | |
| April 20, 2010 | * | **SECTION: J** |
| | * | |
| This Document Relates To: | * | **JUDGE BARBIER** |
| *2:10-cv-04536-CJB-SS (United States v.* | * | |
| *BP Exploration & Production Inc.,* et al.*)* | * | **MAGISTRATE SHUSHAN** |
| | * | |
| *   *   *   *   *   *   *   *   *   *   *   *   * | * | |

**BP EXPLORATION & PRODUCTION INC.'S THIRD-PARTY COMPLAINT**
**AGAINST CAMERON INTERNATIONAL CORP.**

Defendant/Third-Party Plaintiff BP Exploration & Production Inc. ("BPXP") hereby

brings this third-party complaint for contribution pursuant to the Oil Pollution Act of 1990

("OPA"), 33 U.S.C. §§ 2701 *et seq.*, against Third-Party Defendant Cameron International

Corporation ("Third Party Defendant" or "Cameron"), as set forth below, for the monetary

recovery, if any, obtained by the United States pursuant to OPA and as a result of the release of

oil and hazardous substances in connection with the *Deepwater Horizon* incident.

## INTRODUCTION

1.      BPXP and its co-lessees, as leaseholders of the Macondo prospect, decided to drill

an exploratory well in MC252 to discover whether any oil and gas could be extracted for sale.

To drill the well, BPXP hired Transocean Inc. ("Transocean"), which used the *Deepwater*

*Horizon* to finish drilling the MC252 exploratory well.

2.      Cameron (through its predecessor Cooper Cameron Corp.) provided Transocean

(through its predecessor R&B Falcon Corp.) with a "blowout preventer," or BOP, along with

maintenance and repair services intended to ensure that the BOP worked as expected.

3.      Cameron's design and manufacture of the BOP used on the *Deepwater Horizon*, as well as Cameron's maintenance and modification of that BOP, did not meet the standards of a reasonable manufacturer and service provider, resulting in a BOP that failed to properly operate when needed and was unreasonably dangerous when used as intended.

4.      Cameron's design and production of an unreasonably dangerous BOP and its negligent conduct in maintenance and repair of it, was a cause, in whole or in part, of the blowout of the Macondo well and the ensuing oil spill in the Gulf of Mexico.  As a result of such blowout and ensuing oil spill, BP has incurred, and will continue to incur, substantial costs, expenses and damages in containing and cleaning up the oil spill and responding to the myriad claims and lawsuits that have been filed.

5.      On December 15, 2010, the United States of America filed a complaint (the "DOJ Complaint") against BPXP, Anadarko Exploration & Production LP ("Anadarko Exploration"), Anadarko Petroleum Corporation ("Anadarko Petroleum"), MOEX Offshore 2007 LLC ("MOEX"), Triton Asset Leasing GmbH ("Triton"), Transocean Holdings LLC ("Transocean Holdings"), Transocean Offshore Deepwater Drilling Inc. ("Transocean Offshore"), Transocean Deepwater Inc. ("Transocean Deepwater"), and QBE Underwriting Ltd., Lloyd's Syndicate 1036 ("Lloyd's") seeking, *inter alia*, "a declaratory judgment that is binding in this action and any subsequent action or actions against Defendants [BPXP], Anadarko Exploration, Anadarko Petroleum, MOEX, Triton, Transocean Holdings, Transocean Offshore, and Transocean Deepwater, jointly and severally and without any limitation, and Lloyd's, the latter up to the amount of its [Certificate of Financial Responsibility] guarantee, that said Defendants are liable for, *inter alia*, removal costs and damages in this action and in any such subsequent action or actions."

## THE PARTIES

6.     Third-Party Plaintiff BPXP is a Delaware corporation with its principal place of business in Houston, Texas.  The address of BPXP is 501 Westlake Park Boulevard, Houston, Texas, 77079.

7.     Third-Party Defendant Cameron International Corporation is a Delaware corporation with its principal place of business in Houston, Texas.  Cameron International Corporation was formerly known as Cooper Cameron Corporation until an official name change in 2006.  The address of Cameron International Corporation is 1333 West Loop South, Suite 1700, Houston, Texas, 77027.

## JURISDICTION

8.     The United States of America has filed a complaint against BPXP, among other defendants, seeking a declaratory judgment that BPXP and other defendants are liable under OPA for, *inter alia*, removal costs and damages incurred and that will be incurred by the United States.

9.     BPXP is named in the DOJ Complaint as a defendant in admiralty and maritime claims that are pending before this Court.

10.     Because of the acts and omissions described herein, Cameron is wholly or partly liable to the United States and/or BPXP for any OPA financial liability.  Accordingly, pursuant to Federal Rule of Civil Procedure 14(c)(2), BPXP impleads Cameron and hereby tenders it to the United States.  Accordingly, Cameron must defend against the United States' claim for OPA financial liability, and the action proceeds as if the United States had sued Cameron.  BPXP also brings its own third-party claims directly against Cameron.

11.     This Court has jurisdiction over this complaint pursuant to 28 U.S.C. § 1333 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*

12.     Venue is proper pursuant to 28 U.S.C. § 1391(b)-(c).

## FACTS

**A.     Background Of The Parties.**

13.     BPXP is an energy company that uses sophisticated technologies and techniques to find and extract oil and gas.  In exploring for and extracting oil, BPXP must rely on various companies that are themselves expert in drilling technologies.  One of the companies on which BPXP and other energy companies rely is Cameron.

14.     Cameron is a leading provider of flow equipment products, systems, and services to worldwide oil, gas, and process industries.  Through its Drilling and Production Systems business division, Cameron is a leading provider of systems and equipment used to control pressures, direct flows of oil and gas wells, and separate oil and gas from impurities.

15.     Among the products that Cameron designs, manufactures, and maintains are blowout preventers ("BOPs"), which are critical safety devices that are attached to the wellhead. A BOP allows the well to be sealed to confine the well fluids in the wellbore if unexpected flows of hydrocarbons from the reservoir into the wellbore (known as "kicks") are encountered.

16.     Cameron designed and manufactured the *Deepwater Horizon* BOP, and performed certain maintenance and modifications to the *Deepwater Horizon* BOP for Transocean after the *Deepwater Horizon* commenced operations.

**B.     Transocean Was Hired To Drill The MC252 Well.**

17.     In 2009, BP America Production Company ("BPAPC") hired Transocean to drill the MC252 well.

18.     After Transocean's *Marianas* rig was damaged by Hurricane Ida, Transocean provided the *Deepwater Horizon* to complete drilling operations on the MC252 well.  The *Deepwater Horizon* arrived at the wellsite on January 31, 2010, and continued operations for

4

three months until the MC252 well blew out on April 20, 2010, causing an explosion and fire that resulted in the sinking of the *Deepwater Horizon* vessel on April 22, 2010.

### C.     The *Deepwater Horizon* MODU Vessel.

19.     On December 9, 1998, R&B Falcon Drilling Co. ("R&B Falcon") and Vastar Resources, Inc. ("Vastar") entered into a drilling contract for the construction and operation of the *Deepwater Horizon*.

20.     In 2000, BPAPC succeeded Vastar under the Drilling Contract.  That same year, Transocean succeeded R&B Falcon under that contract.

21.     The *Deepwater Horizon* was equipped with machinery, equipment, gear, tackle, and appliances for the purpose of drilling subsea wells for oil exploration and production.  This included critical well control equipment to prevent blowouts and loss-of-well-control events.  For example, the *Deepwater Horizon* was equipped with a BOP.

22.     BOPs, including the *Deepwater Horizon* BOP, are specialized assemblies that sit on top of the well on the sea floor and are used to monitor, seal, and control subsea wells during drilling operations.  BOPs in general, and the *Deepwater Horizon* BOP in particular, are—and are intended to be—designed to shut the opening to a subsea well, severing or closing around drill pipe inserted into the well in the process, to prevent oil and gas from flowing out, thereby preventing a loss of well control, preventing an explosion and/or fire, preventing any risk to the vessel's drilling crew and other personnel, and also preventing any pollution incident.

23.     The *Deepwater Horizon* BOP was equipped with various emergency systems, including an Emergency Disconnect System ("EDS"), which were supposed to be capable of being activated in the event the vessel or its crew was endangered.  The EDS would close the BOP's blind shear rams, shear the drill pipe, seal the opening to the well, and disconnect the rig

from the well so that the *Deepwater Horizon* could sail away and remove itself from any dangers or risks related to the subsea well.

**D.      Cameron Designed, Manufactured, and Supplied the *Deepwater Horizon* Blowout Preventer.**

24.      In May 1999, R&B Falcon placed an order with Cooper Cameron Corporation ("Cooper Cameron") for a BOP that would be installed on the *Deepwater Horizon*.  The BOP was supposed to be designed and manufactured by Cameron to be fit for its intended purpose of sealing a well to prevent loss of well control.

25.      The *Deepwater Horizon* BOP, including its control system, was designed, engineered, and manufactured by Cooper Cameron.

26.      In 2006, Cooper Cameron officially changed its name to Cameron International Corporation, the Third-Party Defendant.

**E.      The *Deepwater Horizon* Blowout Preventer**

27.      The *Deepwater Horizon* BOP consisted of a vertical stack containing two kinds of preventers, annular and ram-type.

28.      The *Deepwater Horizon* BOP contained two annular preventers, each located in the Lower Marine Riser Package ("LMRP"), which is the upper section of the BOP stack.  This section was designed to separate from the lower BOP upon activation of certain BOP functions, such as the Emergency Disconnect System (EDS).  Each annular preventer was intended to seal the well by closing against a drill pipe in the well.

29.      The *Deepwater Horizon* BOP contained a blind shear ram, which was located in the lower BOP section.  The blind shear ram was supposed to be capable of sealing the well regardless of the presence or absence of drill pipe in the well.  If drill pipe was present in the

well and placed across the blind shear ram, the blind shear ram was supposed to be capable of cutting the drill pipe in the process of sealing the well.

30.     The *Deepwater Horizon* BOP contained a casing shear ram, which was located in the lower BOP section.  The casing shear ram was intended to be capable of cutting well casing or drill pipe that might be present in the well and placed across the casing shear ram, but it was not intended to seal the well.

31.     The *Deepwater Horizon* BOP originally contained three variable-bore rams ("VBRs"), also known as pipe rams.  The three pipe rams—the upper VBR, the middle VBR, and the lower VBR—were located in the lower BOP section.  The pipe rams were each intended to be capable of sealing the well by closing against drill pipe that was present in the well and placed across the appropriate pipe ram.

32.     In 2004, the lower pipe ram was converted to an inverted test ram, which is not capable of sealing the well against pressure applied from the formation side of the BOP. Because the inverted test ram was designed to seal only against pressure applied from above (as experienced during a pressure test of the BOP) rather than against pressure applied from below (as experienced during a blowout), the inverted test ram was not capable of sealing the well during a loss-of-well-control event.

### F.     The *Deepwater Horizon* Blowout Preventer Control System

33.     The *Deepwater Horizon* BOP could be manually operated from operator panels located on the rig.  When activated, an operator panel would send an electrical signal, via a heavy-duty electrical cable, to one of two control pods attached to the BOP (the yellow and blue control pods).

34.     The yellow and blue control pods were identical, providing redundancy, and they controlled the BOP hydraulic system via one of two subsea electronic modules ("SEMs").  The

SEMs sent electrical signals to operate solenoid valves, which opened and closed in response to those signals, permitting hydraulic fluid to flow where it was needed to open or close the valves, annular preventers, and ram-type preventers that made up the BOP.

35.     In addition to manual operations, the *Deepwater Horizon* BOP had an automatic mode function, also called a deadman system (hereinafter referenced as the "AMF deadman system").  The AMF deadman system was an automated secondary intervention system that was intended to activate when the BOP was unable to communicate with the drilling rig and hydraulic and electrical power supplied to the BOP from the drilling rig had been lost.  When activated, the AMF deadman system was intended to close the BOP's blind shear rams, shearing the drill pipe and sealing the well.

### G.     Cameron's Maintenance Activities With Respect To The *Deepwater Horizon* Blowout Preventer

36.     Because it contained a number of hydraulic and electrical systems, the BOP required extensive and diligent maintenance.

37.     Transocean was responsible for operating and maintaining the *Deepwater Horizon* BOP.  Transocean, however, periodically hired Cameron on various occasions to conduct certain maintenance and repair activities for the *Deepwater Horizon* BOP.

### H.     The Macondo Well Blowout And Its Aftermath

38.     On April 20, 2010, while Transocean was displacing the heavy drilling mud in the Macondo well riser with lighter-weight seawater in preparation for temporary abandonment of the well, oil and gas from the Macondo formation entered the wellbore and began flowing toward the surface.

39.     When the hydrocarbons reached the *Deepwater Horizon* rig, they formed a flammable cloud that subsequently ignited, causing an explosion and fire that damaged the rig. The *Deepwater Horizon* sank on April 22, 2010.

40.     Although the *Deepwater Horizon* BOP was designed to be used to close a well in response to a blowout like the one experienced at the Macondo well, it did not successfully seal the Macondo well through manual BOP operations initiated by the *Deepwater Horizon* crew, through operation of the EDS initiated by the *Deepwater Horizon* crew, through automatic operation of the AMF deadman system, or through subsequent ROV intervention with the BOP's ROV intervention panel.

41.     Because the EDS and other BOP functions failed and did not operate as intended, the flow from the well was not shut off and the *Deepwater Horizon* could not be disconnected from the BOP stack and the flowing well.

42.     Despite the *Deepwater Horizon* losing communication with the BOP and the conditions for its activation being met, the AMF deadman system did not seal the Macondo well.

43.     After the April 20 incident, a response team comprising BP, Transocean and Cameron employees, along with support from various third-party contractors, attempted to activate the BOP to seal the well through ROV intervention.  These efforts did not seal the well.

44.     In May 2010, as part of the response team efforts, the yellow control pod was cut away from the BOP and brought to the surface for inspection by BP, Transocean, Cameron, BOEMRE, and U.S. Coast Guard representatives.

45.     During the inspection, it was discovered that a solenoid valve necessary for operating the AMF deadman system (solenoid 103Y) did not function when tested.

46.     If solenoid 103Y was not functional or was defective, as the May 2010 inspection results revealed, the yellow control pod would have been incapable of activating the AMF deadman system on April 20.

47.     The blue control pod was intended to provide redundancy for the yellow control pod, meaning that, in the event that the yellow control pod did not successfully activate the AMF deadman system, the blue control pod could activate it.   Yet when the blue control pod was recovered, the response team found that at least one of the AMF deadman system batteries in that pod had insufficient charge to activate the AMF deadman system.   Because one of the batteries had insufficient charge, the blue control pod failed and would have been incapable of activating the AMF deadman system on April 20.

48.     With these deficiencies, neither the yellow control pod nor the blue control pod would have been capable of activating the AMF deadman system at the time of the April 20 blowout.

49.     During the response efforts following the blowout, explosion, and fire at the Macondo well, the response team discovered that the ROV intervention panel had not been modified to allow ROVs to operate the middle pipe ram instead of the inverted test ram.   This discovery occurred only after multiple unsuccessful attempts had been made to shut off the flow from the Macondo well using what the response team believed to be the ROV intervention panel's connection to the middle pipe ram, delaying attempts to shut in the Macondo well by many hours.

50.     On March 20, 2011, Det Norske Veritas ("DNV") issued a final report for the United States Department of the Interior Bureau of Ocean Energy Management Regulation and

Enforcement regarding a forensic examination of the *Deepwater Horizon* BOP that DNV conducted between November 2010 and March 2011.

51.     DNV's report, among other things, concluded that the blind shear rams of the *Deepwater Horizon* BOP, once activated, failed to fully close and seal the well due to a portion of drill pipe being trapped between the blocks.  DNV concluded that one of the contributing causes of this failure was that the blind shear rams were not able to move the entire pipe cross section into the shearing surfaces of the blades, and thus the drill pipe in the process of shearing was deformed outside the shearing blade surfaces.

**I.       The Claims, Lawsuits, And Expenses Asserted Against BPXP As Result Of The *Deepwater Horizon* Incident.**

52.     Oil and gas flowed from the Macondo well into the Gulf of Mexico until July 15, 2010.  The scale of the response program was massive and unprecedented.  Under the dictates of and as required by the Oil Pollution Act of 1990, 33 U.S.C. § 2701, *et seq*. ("OPA"), BP has committed to paying all legitimate claims for damages pursuant to the requirements and terms of OPA, while reserving its right to seek reimbursement, contribution, and indemnification from Cameron and other responsible parties.  BP faces hundreds of lawsuits and thousands of claims arising out of the *Deepwater Horizon* incident.

53.     The total amounts that will ultimately be paid by BP under OPA or otherwise in relation to the incident are subject to significant uncertainty.  The ultimate exposure and cost to BP will depend on many factors, including the amount of claims that become payable by BP, the amount of fines ultimately levied against BP (including any determination of negligence by BP), the outcome of lawsuits and claims, and any costs arising from any longer-term environmental consequences of the oil spill.

54.     As of the end of 2010, BP's incurred costs relating to the incident were $17.7 billion.  BP's group income statement for 2010 reflects a pre-tax charge of $40.9 billion in relation to the Gulf of Mexico oil spill.

55.     The DOJ Complaint seeks, *inter alia*, "a declaratory judgment that is binding in this action and any subsequent action or actions against Defendants [BPXP], Anadarko Exploration, Anadarko Petroleum, MOEX, Triton, Transocean Holdings, Transocean Offshore, and Transocean Deepwater, jointly and severally and without any limitation, and Lloyd's, the latter up to the amount of its [Certificate of Financial Responsibility] guarantee, that said Defendants are liable for removal costs and damages in this action and in any such subsequent action or actions."

56.     The DOJ Complaint also alleges that: "'natural resources,' as that term is defined in OPA, 33 U.S.C. § 2701(20), have been injured, destroyed, or lost;" the "amount of damages and the extent of injuries sustained by the United States as a result of the Deepwater Horizon Spill are not yet fully known, but far exceed $75,000,000;" and that "[a]s a result of the Deepwater Horizon Spill, the United States has expended and/or sustained and/or will expend or sustain, *inter alia*, 'removal costs' and 'damages,' within the meaning of OPA, 33 U.S.C. § 2702(b)."

**J.     Cameron Is Liable To BPXP For An Unreasonably Dangerous Product.**

57.     BP's harm, loss, and damages arose from a reasonably anticipated use of the *Deepwater Horizon* BOP in response to a blowout of the well to which that BOP was attached. The *Deepwater Horizon* BOP that was designed, engineered, and manufactured by Cameron, was not fit for purpose or use, and in the event when it was needed, did not function as intended on April 20, 2010, and thereafter.  In fact, the BOP failed to work and perform the function it was designed and manufactured to perform—*i.e.*, to secure the well.

58.     At the time the *Deepwater Horizon* BOP left Cameron's control, the BOP was flawed in design and alternative designs existed that did not have these flaws.

59.     At the time the *Deepwater Horizon* BOP left Cameron's control, the BOP was flawed in design because, among other things, the BOP was not designed to allow for the blind shear rams, the annulars, and the other ram-type preventers to seal the Macondo well under the conditions present during the April 20 incident or during subsequent spill response efforts.

60.     Alternative designs for the BOP were available at the time the *Deepwater Horizon* BOP left Cameron's control, including designs that would have allowed for the blind shear rams, as well as the annulars and other ram-type preventers, to seal the Macondo well under the conditions present during the April 20 incident or during subsequent spill response efforts.

61.     At the time the *Deepwater Horizon* BOP left Cameron's control, the BOP was flawed in design because, among other things, the BOP control system contained single points of failure, such as solenoid 103Y for operation of the AMF deadman system from the yellow control pod and the shuttle valve that carried hydraulic fluid to the blind shear rams, and relied on solenoid valves for successful operation that were known, or reasonably should have been known, to Cameron to malfunction.

62.     Alternative designs for the BOP control system were available at the time the *Deepwater Horizon* BOP left Cameron's control, including designs that were not vulnerable to single points of failure or contained solenoid valves, or functionally alternative equipment, that were not as prone to malfunction.

63.     At the time the *Deepwater Horizon* BOP left Cameron's control, the BOP was flawed in design because, among other things, the BOP relied on batteries to function the AMF deadman system.

64.     Alternative designs for the BOP control system were available at the time the *Deepwater Horizon* BOP left Cameron's control, including designs that did not rely on the use of batteries to function the AMF deadman system.

65.     At the time the *Deepwater Horizon* BOP left Cameron's control, the BOP was flawed in design because, among other things, it did not include a system to warn its operators when the AMF deadman system batteries were discharged to an extent that would prevent the AMF deadman system from operating as expected.

66.     Alternative designs for the BOP were available at the time the *Deepwater Horizon* BOP left Cameron's control, including designs that included a warning system if the AMF deadman system or other emergency system would not operate as expected.

67.     At the time the *Deepwater Horizon* BOP left Cameron's control, all of the alternative designs referenced above would not have affected the utility of the BOP, and the likelihood and gravity of the damages to BP (and also to Transocean) vastly outweighed the cost of manufacturing such alternative designs.

68.     Cameron's design for the *Deepwater Horizon* BOP was unreasonably dangerous under maritime law.

69.     The *Deepwater Horizon* BOP was unreasonably dangerous in design and was a cause-in-fact and also a legal cause of each of BP's injuries.  Because the *Deepwater Horizon* BOP was designed with the design flaws referenced above, the *Deepwater Horizon* BOP did not operate as intended to shut off the flow from the Macondo well.

70.     The *Deepwater Horizon* BOP was unreasonably dangerous in design and manufacture, and has caused and continues to cause harm, loss, injuries, and damages to BP (and others) stemming from the blowout of the Macondo well, the resulting explosion and fire

onboard the *Deepwater Horizon*, the efforts to regain control of the Macondo well, and the oil spill that ensued before control of the Macondo well could be regained.

**K.      Cameron Was Negligent In The Maintenance Of The Blowout Preventer.**

71.      Cameron performed maintenance activities for the *Deepwater Horizon* BOP throughout its operating history, including maintenance and replacement of the control pod batteries that activate the AMF deadman system.

72.      Cameron had a duty to exercise a reasonable standard of care in performing its maintenance work for the *Deepwater Horizon* BOP, including its battery maintenance work.

73.      The AMF deadman system batteries in the blue control pod of the *Deepwater Horizon* BOP were not maintained in a fashion that allowed them to perform the function for which they were designed, *i.e.*, powering the blue pod SEM and solenoid valves so that the AMF deadman system could operate as intended on April 20.

74.      By failing to properly maintain the AMF deadman system batteries, among other things, Cameron breached its duty to exercise a reasonable standard of care in performing its maintenance work and thereby acted negligently.

75.      Cameron's negligent maintenance was a cause-in-fact and also a legal cause of BP's injuries.  For example, if the batteries in the blue pod had been properly maintained such that their state of charge was sufficient to allow the AMF deadman system to operate as intended on April 20, the *Deepwater Horizon* BOP would have closed the blind shear rams and shut off the flow from the Macondo well.

76.      Cameron's negligent maintenance has caused and continues to cause harm, loss, injuries, and damages to BP (and others) stemming from the blowout of the Macondo well, the resulting explosion and fire onboard the *Deepwater Horizon*, the efforts to regain control of the

Macondo well, and the oil spill that ensued before control of the Macondo well could be regained.

**L.      Cameron Was Negligent In Modifying The Blowout Preventer.**

77.      Transocean hired Cameron to convert the lower pipe ram of the *Deepwater Horizon* BOP to an inverted test ram.

78.      During the conversion of the lower pipe ram to an inverted test ram, Cameron did not modify the ROV intervention panel of the *Deepwater Horizon* BOP to allow ROVs to operate the BOP's middle pipe ram instead of the inverted test ram.

79.      Because the ROV intervention panel was not modified to connect to the middle pipe ram, the response team could not use the ROV intervention panel through an ROV to close the middle pipe ram, delaying and impeding the post-incident ROV intervention efforts to seal the Macondo well.

80.      Cameron had a duty to exercise a reasonable standard of care in performing its BOP repair work.

81.      Because the ROV intervention panel of the *Deepwater Horizon* BOP was not modified properly, Cameron breached its duty to exercise a reasonable standard of care in performing its BOP repair work and thereby acted negligently.

82.      Cameron's negligent modification was a cause-in-fact and legal cause of BP's injuries.  If the ROV intervention panel had been properly modified such that it was possible to use the ROV intervention panel to close the middle pipe ram, the response team's effort to use an ROV to close the BOP's middle pipe ram to shut off the flow from the Macondo well would not have been delayed and impeded.

83.      Cameron's negligent modification has caused and continues to cause harm, loss, injuries, and damages to BP stemming from the blowout of the Macondo well, the resulting

explosion and fire onboard the *Deepwater Horizon*, the efforts to regain control of the Macondo well, and the oil spill that ensued before control of the Macondo well could be regained.

### M.    BP Has Contribution and Subrogation Rights As To Cameron

84.    The *Deepwater Horizon* incident has caused and continues to cause harm, loss, injuries, and damages to BP stemming from the blowout of the Macondo well, the resulting explosion and fire onboard the *Deepwater Horizon*, the efforts to regain control of the Macondo well, and the oil spill that ensued before control of the Macondo well could be regained.

85.    BP has a statutory duty to pay, has paid, and, on information and belief, will continue to pay damages to resolve claims brought against BP stemming from the blowout of the Macondo well, the resulting explosion and fire onboard the *Deepwater Horizon*, the efforts to regain control of the Macondo well, and the oil spill that ensued before control of the Macondo well could be regained.

86.    Cameron is wholly or partly at fault for the *Deepwater Horizon* incident and resulting damages for the reasons explained in the paragraphs above.

87.    As a result, BP is entitled to contribution under admiralty law from Cameron for all or a part of the damages resulting from the *Deepwater Horizon* incident, and is entitled to recover from Cameron reimbursement for all or a part of the damages resulting from the *Deepwater Horizon* incident that BP has paid or will pay.

### COUNT I:
### CONTRIBUTION UNDER THE OIL POLLUTION ACT OF 1990

88.    BP realleges, adopts and incorporates by reference the allegations contained in Paragraphs 1-87, as if fully set forth herein.

89.     Section 1009 of OPA, 33 U.S.C. §2709, provides in pertinent part: "A person may bring a civil action for contribution against any other person who is liable or potentially liable under this Act or another law."

90.     The DOJ Complaint alleges that, as a result of the *Deepwater Horizon* incident, natural resources have been injured, destroyed, or lost; the amount of damages and the extent of injuries sustained by the United States are not yet fully known; and the United States has expended and/or sustained and/or will expend or sustain, *inter alia*, "removal costs" and "damages," within the meaning of OPA, 33 U.S.C. § 2702(b).  The DOJ Complaint also seeks a declaratory judgment that BPXP and the other defendants are liable for removal costs and damages in this action and in any such subsequent action or actions.

91.     If the United States successfully obtains and/or will obtain a monetary recovery from BPXP pursuant to OPA as a result of the release of oil and hazardous substances in connection with the *Deepwater Horizon* incident, including but not limited to the removal costs and damages alleged in the DOJ Complaint, such OPA financial liabilities to the United States on the part of BPXP would not primarily be due to any fault or negligence on the part of BPXP.

92.     Cameron is wholly or partly at fault for the *Deepwater Horizon* incident and any resulting OPA financial liability incurred and/or to be incurred by the United States for the reasons explained above.

93.     If BPXP is held liable to the United States for all or part of any monetary recovery under OPA obtained and/or to be obtained by the United States, including but not limited to the removal costs and damages alleged in the DOJ Complaint, Cameron is liable in contribution to BPXP under Sections 1009 and 1017 of OPA, 33 U.S.C. §§ 2709 and 2717.

94.     An actual controversy currently exists between BPXP and Cameron with regard to Cameron's liability to BPXP for any monetary recovery from BPXP obtained and/or to be obtained by the United States in connection with the *Deepwater Horizon* incident.  A declaratory judgment is therefore appropriate to define Cameron's liability in contribution to BPXP for BPXP's liabilities to the United States under OPA, if any, and bind Cameron in any subsequent action or actions that BPXP may bring.

## PRAYER FOR RELIEF

WHEREFORE, BPXP respectfully asks that this Court**:**

A.      Enter judgment in BPXP's favor against Cameron.

B.      Order that the United States assert its claims for OPA financial liability directly against Cameron.

C.      Award BPXP, in proportion to Cameron's fault, the amount of any OPA financial liability for which BPXP is determined to be liable, if any, plus interest.

D.      Enter an order pursuant to 28 U.S.C. § 2201 declaring that BPXP may recover from Cameron any OPA financial liability amounts for which BPXP is determined to be liable to the United States and/or that Cameron is liable for its equitable or proportionate share of BPXP's financial liability to the United States, if any, under OPA, and that BPXP is not liable in contribution, indemnification or otherwise to Cameron for damages, costs, or other expenses arising from the *Deepwater Horizon* incident and resulting oil spill under any applicable law.

E.      Award the reasonable costs and attorneys' fees incurred by BPXP in prosecuting this action.

F.      Award such other relief as the Court may deem appropriate and just.

Dated:  April 20, 2011                           Respectfully submitted,


                                                 /s/ Don K. Haycraft
                                                 Don K. Haycraft (Bar #14361)
                                                 R. Keith Jarrett (Bar #16984)
                                                 LISKOW & LEWIS
                                                 One Shell Square
                                                 701 Poydras Street, Suite 5000
                                                 New Orleans, Louisiana 70139-5099
                                                 Telephone:      (504) 581-7979
                                                 Facsimile:      (504) 556-4108

                                                 and

                                                 Richard C. Godfrey, P.C.
                                                 J. Andrew Langan, P.C.
                                                 Paul D. Collier
                                                 Kirkland & Ellis LLP
                                                 300 North LaSalle Street
                                                 Chicago, Illinois  60654
                                                 Telephone:      (312) 862-2000
                                                 Facsimile:      (312) 862-2200

                                                 and

                                                 Robert C. "Mike" Brock
                                                 Covington & Burling LLP
                                                 1201 Pennsylvania Avenue, NW
                                                 Washington, DC 20004-2401
                                                 Telephone:      (202) 662-5985
                                                 Facsimile:      (202) 662-6291

                                                 *Attorneys for BP Exploration and Production Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice in accordance with the procedures established in MDL 2179, on this 20th day of April, 2011.

/s/ Don K. Haycraft
Don K. Haycraft