# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * * | MDL NO. 2179 SECTION J |
| THIS DOCUMENT RELATES TO: | * | JUDGE CARL J. BARBIER |
| *ALL CASES IN PLEADING BUNDLE SECTION III.B(3) AND LIMITATION ACTION 10-2771* | * | MAG JUDGE SALLY SHUSHAN |
| *   *   *   *   *   *   * | * | |

## REPLY MEMORANDUM OF INTERNATIONAL AIR RESPONSE REGARDING THE SCOPE OF THE FEBRUARY 27, 2012 TRIAL IN THIS MATTER

IAR is mindful of the demands of this case on the Court's time and thus will be as brief as possible here, and confine its comments herein to a handful of the most salient points.

International Air Response ("IAR") is a small company that was engaged, after the blowout and sinking of *Deepwater Horizon,* to fly one of the several aircraft that were used to execute one of the many oil-spill response modalities – the aerial application of dispersants to oil slicks that were located far out into the Gulf of Mexico. The decision to utilize Corexit® dispersants for this purpose was made by those who directed the response, and was specifically approved by the U.S. Coast Guard in its role as On-Scene Coordinator of this Spill of National Importance. It is currently the subject of the B-3 Bundle Master Complaint.

### Introduction

The trial scope proposals of the different parties vary considerably. None suggest that claims of any Bundle B-3 plaintiff be tried in the February 27, 2012 trial. What happens <u>after</u> the February 12, 2012 trial is very much disputed.

BP's proposed plan makes the most sense as to the scope of a February 27, 2012 trial. As Cameron correctly points out, the first pre-requisite to decision-making as to further trial scheduling is a precise delineation of the applicable law, based on sufficient facts pertinent to that issue. Even the PSC admits at p. 16 of its submission that the Manual for Complex litigation, at § 22.318, requires that the Court have "evidence" that will prove the essential elements or claims and defenses before making decisions as to suggested aggregation of claims. Anadarka's point is well taken that "a sudden rush to trial speaks of too much concern for speed and not enough for justice and due process," quoting *Salt v. Epps*, 696 F.Supp.2d 639, 654 (N.D. Miss. 2010) (Doc. No. 1955 at pp. 7-8). So is its point that the expansion of issues beyond the self-contained claims of the cause of the well blowout and sinking of the DEEPWATER HORIZON increases "exponentially" the complexity of a trial, and along with it, the reasonable discovery requirements necessary to accord traditional and actual due process to those seeking to defend the claims.

IAR is concerned that a rush to trial that involved IAR or adjudicated its interests would in fact deprive it of fundamental due process that would prejudice its ability to defend itself against myriad claims, none of which has been adequately specified, much less made subject of adequate discovery.

Because a lot of people wish to crowd into Court in search of litigation gold via an extremely easy procedure is all the more reason to <u>not</u> dispense with adequate discovery and procedural safeguards which will ensure a <u>fair</u> resolution based on deliberate evidence gathering, and an ability to present the evidence in a manner whereby the truth will most likely be found and, further, that will ensure the correct application of applicable laws, all with due deliberation necessary to avoid error.

## Not All Claims Have True Commonality

From a conceptual standpoint, it is likely that any of the eleven death claims or the direct injury to persons on or in the vicinity of the DEEPWATER HORIZON when it exploded will have a single common cause in the event of the blowout itself. Thus, it would make sense to have the limitation trial adjudicate the cause of the blowout and allocate fault among those who contributed substantially to the occurrence, including the Transocean parties, and the issue of their privity. It would make sense to include bellwether death and personal injury claims in the February 22, 2012 trial so long as they were caused by the blowout. The same could apply to the property damage consisting of loss of the rig itself. All of these claims are well defined and have true commonality fact-wise and legally. Only those claims are concrete and truly arise out of only one event – the blowout on April 21, 2010.

The blowout claims were the stated focus of discovery pursuant to the instruction or pretrial order No. 11 and this is how discovery in fact has proceeded to date. Only these claims stand a chance of having a semblance of necessary discovery completed in time to allow a trial on them to proceed on February 27, 2012.

Claims against IAR and other dispersant applicators fall on the other end of the spectrum. While one can say their involvement would not have occurred but for the blowout that then triggered the uncontrolled flow of crude oil into the Gulf, the claims as articulated in the B-3 Master Complaint and in the handful of individual claims otherwise share no commonality with the blowout related claims described above, which were caused directly, within a short time frame, by one cataclysmic event (the blowout itself). The platform crew death and personal injury victims, whose claimant identities and locations are definite and truly arise from a common event, caused virtually instantaneously from that single common event. In contrast, the

3

claims by the B-3 Bundle plaintiffs against IAR are much different. They, even today, are in a nascent and preliminary stage, with no meaningful differentiation among plaintiffs in each of the broad classes generally described therein. These claimants were allegedly harmed, individually, on different dates and different places, by different applicators, under different circumstances. Each claim against IAR and its brethren applicator defendants is individual by its very nature, and whether looked at individually or collectively, they truly are not common claims in terms of each essential element of the causes of action each actually possesses or asserts.

A VoO captain or crewman who claim that IAR (or any other of the applicators) sprayed them with Corexit® while they were on a boat at sea must individually allege and prove what, by definition, is a single and discrete event. Only those crewmen on one boat, typically a small one, could have the date, time and location in common. Among all the boats there is no commonality of even the alleged exposure event. Even for those present on a given boat at the same time, the exposures would be individual, depending, *e.g.*, on whether there was a covered area, and regardless, each person's injury, including whether one occurred, and all damages will be strictly individual, and depend wholly on individual health history, genetics, family history, compounding and pre-existing conditions, clearing mechanisms, and ultimate reaction and individual medical evaluation and treatment.

For the persons whose situations are only generically and generally described in broad categories in the B-3 Bundle Complaint not only all have individual claims as to specific causation, injury and damages, but also as to actual proof of the identity of the specific applicator defendants involved in that specific incident, along with the specific circumstances compromising each spray incident (none of which are currently included in the Master Complaint), what the specific applicator observed and did at that moment, and whether, for that

4

incident, it was in fact negligent or grossly negligent (or worse) as is generically and non-specifically alleged in the Master Complaint, but which in real life is not the least bit generic when it comes time to proving the essential elements of each claim.

Thus, a common trial with the blowout claims or the OPA claims along with the fault or liability of IAR is clearly improper and a practical impossibility. So contraindicated is a common trial of the B-3 plaintiffs as to fault of IAR, or damages, within the B-3 Master Complaint. Bellwether trials, to the extent allowed by law, could take place eventually over specific claims, but we are nowhere near that point now.

Discovery of many of the individual claimants who make claims against IAR and the other dispersant applicators is necessary <u>before</u> any decisions intelligently can be made as to how the B-3 Bundle claims should be handled procedurally. Again, the conceptual difference between the blowout caused injuries and the B-3 claims precludes a "lump" approach. Adequate time must be provided for individualized motion practice so that efficiency can be gained in the Court being able to first prune away what never will need to be tried, which is considerable. This requires contextual evidence first be developed, at which point the law is applied in light of those facts.

Such information is also needed in order for the court to intelligently and wisely decide how to use whatever discretion it has under the Limitation or Liability Act to address claims beyond those comprising the care of the limitation action itself. At this point, the case limitation issues should be focused in terms of the upcoming trial.

Thus, IAR respectfully suggest that it is not realistic or procedurally proper to <u>now</u> decide there will be "trial of the responder claims" in November of 2012 or "the last half of 2012" [per DRC] for the dispersant applicator or other "response" claims. What exactly will be tried cannot

yet be determined.  It is also not appropriate or procedurally proper to have a plan for a "note of evidence" trial as to the responder claims, as <u>claims</u> must be tried, not merely issues in a generic context.  IAR should not be dragged into or near the limitation blowout based claims.  Indeed, there appears to be unanimity on this point.

What occurs later as to the IAR-type claims, however, should not be arbitrarily set now. More is needed to be known <u>before</u> specific plans can or should be made.  Thus, the BP plan, which clearly defines the core issues to be tried in the February 27, 2012 trial and leaves open what is to be done in the interim as to discovery in the responder claims is a reasonable approach, particularly at this time.  "Expedition should not be pursued at the cost of quality or justice." *United States v. Blount*, 479 F.2d 650, 652 (6th Cir. 1973).

The moment the Court chooses to step beyond these core issues, and potentially seeks to make fact determinations applicable to all of these types of claims, while keeping the February 27, 2012 trial date, would increase the complexity of the trial exponentially, and with it the risk of extreme prejudice to IAR with the effective denial of due process, who is, at most, a peripheral party.

IAR respectfully objects to the plaintiffs' proposed trial plan for "notes of evidence" trials insofar as it would lead to IAR's inclusion in all or even part of a huge proceeding that includes much more than the core issues of the limitation proceeding being tried, *i.e.*, addressing the respective fault and causation *for the blowout*, that caused the loss of the vessel.  The B-3 Bundle Complaint, even today, lacks any of the critical features required for an actual claim against IAR to be tried.  Whether IAR was negligent cannot be adjudicated in a vacuum or generically.  Yet, at the present time, there is not a single individual plaintiff from whom discovery can be had.  There is no actual person whose alleged damages are ascertainable or the

alleged particular cause of his injury identified so that it can be investigated and tested via discovery.    The complaint itself is currently under attack via pending Rule 12 motions. Moreover, the decision makers for the response are not identified and cannot be deposed soon.

Those responsible for the oil being released into the sea are in an entirely different position and category of defendant than those like IAR, who, as mere hired help, and the equivalent of a truck driver, were brought to the scene weeks after the blowout, and only to help execute decisions made by those in charge as to steps to be taken, including use of dispersants, to help mitigate the ultimate effect of the oil spill.  Like a truck accident, each one has to be individually assessed for fault, causation and actual injury.  No one could seriously suggest that all the truck accidents in Louisiana for the year 2010 be tried in one proceeding.

Thus, IAR and its responder brethren came into the already-produced disaster of someone else's making.  IAR merely executed the decisions made by those who directed the response, including the Coast Guard, using dispersants provided by those in charge that were approved for the very use to which they were put.  Indeed, IAR, in its position, would question whether it may properly be a part of the limitation proceeding as filed at all, because it had nothing to do with any event or sequence of events that led to the sinking of the *Deepwater Horizon*, which ended its "voyage."  Regardless, aggregating the claims even within the B-3 Bundle is problematic, as discovery will show.  It is clear enough now that these claims certainly do not belong with the direct blowout-based claims.

Even if the B-3 Bundle claims *can* properly be made part of the limitation proceeding, within the discretion afforded by the Court, to go beyond the core issues, the Court does not *have* to include them at all.  Discretion is not to be exercised without knowledge.  While it is presently obvious that the supporting claims should not be included in one huge blowout trial, it is

certainly not clear they should even be appended to some subsequent "stage" of a huge trial whose focus is necessarily on the reasons for the blowout. Unlike the monolithic issue of who contributed to the sinking of one vessel via one blowout, the personal injury claims alluded to generally and generically in the B-3 master complaint against IAR are *entirely individual* and thus are conceptually different on the most fundamental level from the single cataclysmic event that constitutes the sinking of the *Deepwater Horizon*, and the direct and immediate cause of deaths and injuries to crewmen via the explosion and fire that ultimately sank the vessel.

Claims against those who are responsible parties like BP and Transocean under OPA, based on the presence and effects of oil in the water, are likewise of a distinctly different legal nature than those pleaded against IAR. IAR does not belong in the same trial with them whether on February 27, 2012, or even as a follow-on July or November, 2012 phase. We believe that once there is an opportunity for discovery to be accomplished in a normal fashion, and the applicable law is carefully reviewed in light of the evidence derived as to *a particular* plaintiff or a particular set of plaintiffs, there well may be few, or even no claims left against IAR as a matter of law. Time to make this determination in a deliberate manner is both efficient and fair. If there are any remaining claims against IAR, they will be entirely of an individual nature both as to fault and causation, and thus not appropriate for a huge "fault" trial premised on the disallowed theory of group liability. *See, e.g.*, Judge Vance's opinion in *Barasich v. Columbia Gas Trans. Co.*, 467 F.Supp. 2d 676 (E.D. La. 2006). In the meantime, much is accomplished in adjudging the fault and causation for the blowout and loss of the vessel and injury to those present on it at the time.

With the utmost respect for the Court's laudable goals to resolve everything as quickly as possible, there are practical limits to what can and *ought* to be done. Every "normal" case has

8

such limits. By way of a simple comparison, trial no earlier than 24 months from the occurrence of a single fatality car wreck is not at all unusual. Just addressing the cause of the blowout and allocating fault for it is a gargantuan task for February 27, 2012. The presence of unique set of non-common cases forming the B-3 Bundle poses unique risks to due process and emphasizes the need for appropriate and deliberate legal process, which takes into consideration the actual facts and evidence and applicable law before making important trial decisions.

### IAR's Proposal

The trial plan proposed by BP is appropriate for the February 27, 2012 trial. As IAR perceives it, that plan focuses on the limitation action and does not prevent or suggest that the Court not simultaneously, to the extent reasonably possible given the needs imposed by the February 27, 2012 trial, allow for discovery to begin on the B-3 claimants after the Court rules on the Rule 12 motions, and that a reasonable and adequate opportunity be provided for the plaintiffs alluded to generically in the B-3 master complaint to be actually identified specifically, ideally in a formal pleading, along with the pleading or disclosure of the specifics of each claim so that follow-up discovery can be had. IAR is concerned that *only if* and when the actual facts can be gotten, can the Court address even the appropriateness of any type of aggregation, *e.g.*, of a class action alluded to in the B-3 complaint, which the limitation procedure cannot employ. Even in the "law side," the Court must first know, from considerable discovery, whether the personal injury claims for supposed exposures, upon examination, are based on the facts unique to each claimant, including where he or she was at the time, which defendants actually interacted with him or her, in what specific circumstances, what was the actual exposure thus experienced, what was the individual's reaction given his individual genetic and what was his medical background and history.

Thus, IAR's proposal, which is subject to modification based on further information and developments, is for the B-3 bundle claims to be properly discovered during an 18-month period, after which, summary judgment motions would be widely used in the next three months to pare the B-3 case that now exists in a generic form into a reduced set of claims where the discrete actors peculiar to each plaintiff would be known and able to be settled or tried.  IAR did not apply dispersants in many areas of the Gulf and was very unlikely to have ever directly sprayed dispersants into any crews of many vessels, much less all of them who decide to join via a post-card type joinder method.  Should there, hypothetically, be any individual or group of individuals located on a given boat (*e.g.*, "VoO") that was allegedly sprayed by the IAR plane at a given location, on a given day and time, under the peculiar circumstances present at that time, causing documented medical conditions requiring treatment, it must first be identified as such for discovery to be completed, all before there can be scheduling of a trial.  The same should apply as to the other applicators.

IAR respectfully suggests that it is far too early to decide the scope of and to set a trial as to the claims against IAR and the other applicators or responder defendants.  To do so now would be like writing a recipe for a dish without knowledge of its appropriate ingredients.  Discovery and motion practice will provide the necessary information, at which time informed decisions can be made.

Respectfully, submitted,

**DARRELL K. CHERRY (#4036 T.A.)**
**MARC J. YELLIN (#13741)**
Deutsch, Kerrigan & Stiles, L.L.P.
755 Magazine St.
New Orleans, LA 70130
Telephone:  (504) 581-5141
Email: dcherry@dkslaw.com

myelin@dkslaw.com
*Attorneys for International Air Response, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 20th day of April, 2011 the foregoing pleading was electronically filed with the Clerk of Court by using the CM/ECF system pursuant to the rules and procedures of the United States District Court for the Eastern District of Louisiana and served via Lexis File-Serve to all counsel of record.

**DARRELL K. CHERRY**

1918677_1.DOC

11