## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | | |
|---|---|---|---|
| In re: | Oil Spill by the Oil Rig "*Deepwater Horizon*" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
| This Document Relates To: 2:10-cv-04536-CJB-SS (*United States v. BP Exploration & Production Inc., et al.*) | | : : | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |

……………………………………………...

## BPXP'S CROSS-CLAIM AND
## THIRD PARTY COMPLAINT AGAINST TRANSOCEAN

Defendant/Third-Party Plaintiff BP Exploration & Production Inc. ("BPXP") hereby brings this third-party complaint for contribution pursuant to the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§ 2701 *et seq.*, against Defendants Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH and Third-Party Defendants Transocean Ltd. and Transocean, Inc. (collectively, "Transocean"), as set forth below, for the monetary recovery, if any, obtained by the United States pursuant to OPA and as a result of the release of oil and hazardous substances in connection with the *Deepwater Horizon* incident.

## INTRODUCTION

1.      Transocean owned and operated the *Deepwater Horizon*, a mobile offshore drilling unit or rig.  On April 20, 2010, the *Deepwater Horizon* was in the process of completing an exploratory drilling well in the Gulf of Mexico when it exploded and caught fire.  Lives were lost and people were injured.  Two days later, on April 22, 2010, the vessel sank and from that point forward, until July 15, 2010, oil flowed out of the well and into the Gulf of Mexico.  The *Deepwater Horizon* was owned and operated by Transocean.  But for Transocean's improper conduct, errors, omissions, and violations of maritime law, there would not have been any

blowout of the exploratory well in Mississippi Canyon, Block 252 ("MC252," commonly referred to as the Macondo prospect).  Nor, but for Transocean's misconduct, would there have been any explosion and fire on the *Deepwater Horizon*, or any deaths and personal injuries, or an oil spill in the Gulf of Mexico.  ***The simple fact is that on April 20, 2010, every single safety system and device and well control procedure on the Deepwater Horizon failed, resulting in the casualty.***

2.      Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH (the "Transocean *Deepwater Horizon* Companies") have alleged that they are the *Deepwater Horizon's* owners, managing owners, owners *pro hac vice*, and/or operators.  Each of these Transocean entities therefore is directly liable for the improper conduct, errors, omissions, and violations of maritime law related to the *Deepwater Horizon*.  Transocean's top level corporate entities, Transocean Ltd. and Transocean Inc., dominate, control, or are otherwise the alter egos of the Transocean *Deepwater Horizon* Companies.  Transocean Ltd. and Transocean Inc. are also directly responsible for policies and practices that led to the MC252 well blowout.

3.      Transocean's breaches of contract, negligence, and the unseaworthiness of the *Deepwater Horizon*, were causes, in whole or in part, of the blowout of the Macondo well and the ensuing oil spill in the Gulf of Mexico.  As a result of such blowout and ensuing oil spill, BP has incurred, and will continue to incur, substantial costs in containing and cleaning up the oil spill and responding to the myriad claims and lawsuits that have been filed.

4.      On December 15, 2010, the United States of America filed a complaint (the "DOJ Complaint") against BPXP, Anadarko Exploration & Production LP ("Anadarko Exploration"), Anadarko Petroleum Corporation ("Anadarko Petroleum"), MOEX Offshore 2007 LLC

("MOEX"), Triton Asset Leasing GmbH ("Triton"), Transocean Holdings LLC ("Transocean Holdings"), Transocean Offshore Deepwater Drilling Inc. ("Transocean Offshore"), Transocean Deepwater Inc. ("Transocean Deepwater"), and QBE Underwriting Ltd., Lloyd's Syndicate 1036 ("Lloyd's") seeking, *inter alia*, "a declaratory judgment that is binding in this action and any subsequent action or actions against Defendants [BPXP], Anadarko Exploration, Anadarko Petroleum, MOEX, Triton, Transocean Holdings, Transocean Offshore, and Transocean Deepwater, jointly and severally and without any limitation, and Lloyd's, the latter up to the amount of its COFR guarantee, that said Defendants are liable for, *inter alia*, removal costs and damages in this action and in any such subsequent action or actions."

5.     BPXP acknowledges that BP America Production Company and Transocean Holdings LLC are parties to a Drilling Contract with an arbitration provision.  That arbitration provision does not apply here because, among other reasons, Transocean and Transocean Holdings LLC through their conduct have waived any rights to arbitrate any aspects of the disputes between any BP entities and Transocean relating to the *Deepwater Horizon* incident and resulting oil spill.

## **THE PARTIES**

6.     BPXP is a Delaware corporation with its principal place of business at 501 Westlake Park Boulevard, Houston, Texas, 77079.

7.     Transocean Offshore Deepwater Drilling Inc. is a Delaware corporation with its principal place of business at 4 Greenway Plaza, Houston, Texas, 77046-0400.

8.     Transocean Deepwater Inc. is a Delaware corporation with its principal place of business at 4 Greenway Plaza, Suite 700, Houston, Texas, 77046-0400.

9.     Transocean Holdings LLC is a Delaware limited liability company with its principal place of business at 4 Greenway Plaza, Suite 700, Houston, Texas, 77046-0400.

10.     Triton Asset Leasing GmbH is a Swiss Confederation limited liability company with its principal place of business at Turmstrasse 30, CH-6300 Zug, Switzerland.

11.     Transocean Inc. is a Cayman Islands corporation with principal places of business at 4 Greenway Plaza, Houston, Texas, 77046, and 70 Harbour Drive, Grand Cayman, Cayman Islands, KY1-1003.  Transocean Inc. is the direct or indirect parent of the Transocean *Deepwater Horizon* Companies.

12.     Transocean Ltd. is a Swiss Confederation corporation with its principal place of business at Turmstrasse 30, CH-6300 Zug, Switzerland.   Transocean Ltd. owns 100% of defendant Transocean Inc., and is the ultimate parent and controlling entity of the Transocean *Deepwater Horizon* Companies.

## JURISDICTION

13.     The United States of America has filed a complaint against BPXP, among other defendants, seeking a declaratory judgment that BPXP and other defendants are liable under OPA for, *inter alia*, removal costs and damages incurred and that will be incurred by the United States.

14.     BPXP is named in the United States' Complaint as a defendant in admiralty and maritime claims that are pending before this Court.

15.     Because of the acts and omissions described herein, Transocean is wholly or partly liable to the United States and/or to BPXP for OPA financial liability.  Accordingly, pursuant to Federal Rule of Civil Procedure 13(g), BPXP brings cross-claims against Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH.  Pursuant to Federal Rule of Civil Procedure 14(c)(2), BPXP impleads Transocean Ltd. and Transocean, Inc. and hereby tenders them to the United States. Accordingly, Transocean Ltd. and Transocean, Inc. must defend against the United States'

claims for OPA financial liability, and the action proceeds as if the United States had sued Transocean Ltd. and Transocean, Inc.  BPXP also brings its own third-party claims directly against Transocean Ltd. and Transocean, Inc.

16.     This Court has jurisdiction over this complaint pursuant to 28 U.S.C. § 1333 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c).

## FACTS COMMON TO ALL CLAIMS

18.     BPXP obtained a lease for Mississippi Canyon, Block 252, commonly known as the Macondo prospect.  BP, like other oil companies, contracts with and relies upon third parties experienced and expert in the drilling and provision of other services and products for the exploration, drilling, and development of deepwater wells.  Pursuant to a Drilling Contract between BP America Production Company ("BPAP") and Transocean Holdings LLC, Transocean was hired to drill the MC252 well using the *Deepwater Horizon* mobile offshore drilling unit ("MODU").  Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc., and Transocean Deepwater Inc. admit that they are the owners, managing owners, owners *pro hac vice*, and/or operators of the *Deepwater Horizon*.

### A.     Transocean's Duties And Obligations.

19.     Transocean had numerous express obligations under the Drilling Contract, including:

- Transocean "shall be solely responsible for the operation of the Drilling Unit" and "shall act at all times as an independent contractor."

- Transocean "shall exercise due diligence to prevent the well from blowing out." Transocean's manuals specify that "Detection of a kick (intrusion of liquid or gas into the wellbore) is the responsibility of the Driller," a Transocean employee, and that "It is the responsibility of the Driller (or person performing the Driller's role) to shut-in the well as quickly as possible if a kick is indicated or suspected."

- Transocean was responsible for "maintain[ing] the Drilling Unit at optimal operating condition, in accordance with good oilfield practices through the duration of the Contract," and "agree[d] to ensure that the Drilling Unit and all equipment and materials furnished by [Transocean] are adequately maintained and in such condition as to permit their continuous and efficient operation."

- Transocean "shall have the primary responsibility for the safety of all its operations, shall take all measures necessary or proper to protect the personnel and facilities and, in addition, shall observe all safety rules and regulations of any governmental agency having jurisdiction over operations conducted hereunder."

- Transocean "represents that all of [Transocean's] personnel shall be fully qualified, trained, competent, able bodied and fit for their respective assignments and shall have complied with all necessary laws and regulations in connection therewith."

- Transocean "represents that during the Contract Period, the Drilling Unit is outfitted, conformed, and equipped to meet all applicable laws, rules, requirements, and regulations promulgated by the U.S. Coast Guard, the U.S. Environmental Protection Agency, the United States of America Department of the Interior as well as any other agency, bureau, or department of the U.S. federal, territorial possession, state, municipal, or local governments, any political subdivisions thereof, having jurisdiction over the operations in U.S. federal waters."

20.     The provisions of the Drilling Contract should have reflected the operational realities onboard the *Deepwater Horizon* and Transocean's duties under the law.  For example, as a vessel owner, Transocean had non-delegable legal duties with respect to seaworthiness and providing a properly trained crew and Captain.

21.     Transocean also was required by law and contract to comply with certain international conventions and codes.  The Marshall Islands, the flag state of the *Deepwater Horizon*, is a signatory to the International Convention for the Safety of Life at Sea, 1974 ("SOLAS"), and its flagged vessels must comply with SOLAS's safety regulations.  Exhibit B-1 of the Drilling Contract, which contains the specifications for the drilling unit, specifies that SOLAS is an applicable rule and regulation for the rig.  SOLAS in turn incorporates the International Safety Management Code ("ISM") (2002), which sets forth requirements for safely operating ships and preventing pollution.

**B.      Transocean's Equipment And Maintenance Practices.**

22.      The *Deepwater Horizon* carried various appurtenances to drill subsea wells and to protect the vessel during drilling.   These included a blowout preventer ("BOP"), a specialized assembly of valves, annular preventers, and ram preventers, that sits atop the well on the sea floor and is used to monitor, seal, and control the well during drilling operations.   The *Deepwater Horizon's* BOP also was equipped with an Emergency Disconnect System ("EDS"), which was supposed to activate the BOP's blind shear rams and separate the rig from the riser that connected it with the BOP, allowing the rig to seal the well and disconnect from it.   The BOP also had an automatic mode or "deadman" function that should have closed the BOP's blind shear rams, shearing the drill pipe and sealing the open hole, if hydraulic and electrical power and communication with the rig were lost.   This deadman function depended on two identical, independent control pods (yellow and blue) having sufficient battery charge and hydraulic fluid to activate the blind shear rams if the BOP lost connection with the rig.

23.      Other rig protection equipment included an alarm system that was supposed to activate when gas was detected on the rig; the emergency shutdown system ("ESD") designed to cut off ventilation and electricity in areas where gas was detected; rig savers that should have prevented gas flow to the engine control room and shut down the rig's engines if combustible gas was detected; and overspeed controls designed to shut down the engines when their rotational speed significantly increased, preventing sparking that could ignite gas.

24.      All of the *Deepwater Horizon's* safety equipment depended on frequent, competent, and quality maintenance for its operation.   The BOP in particular, because it contained a number of complex and redundant hydraulic and electrical systems, required extensive and diligent maintenance by Transocean and its contractors.

25.     Audits and inspections of the *Deepwater Horizon*, and the investigations to date, have discovered a number of problems with Transocean's maintenance programs for the *Deepwater Horizon* and its equipment.  These audits and inspections as well as Transocean's maintenance problems provided Transocean with actual knowledge of the problems related to the *Deepwater Horizon's* equipment and maintenance.

26.     These problems included Transocean's failure to perform necessary and appropriate BOP inspections.[1]  Transocean's own deficient inspection and maintenance practices, of which Transocean had actual knowledge, caused the *Deepwater Horizon*'s BOP to have numerous leaks that impaired its functions.  Transocean also made various unauthorized (and, in many cases, undocumented) modifications to the BOP, or failed to properly perform approved modifications.  In addition to the BOP, various other critical systems on the *Deepwater Horizon* also experienced problems because of Transocean's maintenance practices.

C.     **Transocean's Captain And Crew.**

27.     Transocean's training and organization of the *Deepwater Horizon's* captain and crew was plainly inadequate.  Under maritime law, SOLAS, and the ISM, a vessel's captain (also known as the master) should have ultimate decision-making authority and responsibility over the vessel at all times.  Yet, for the *Deepwater Horizon* (and apparently other rigs as well), Transocean divided authority between the captain and the offshore installation manager ("OIM") as a matter of corporate policy.  Transocean policies designated the OIM as the person-in-charge when the vessel was in drilling mode, sowing confusion as to who was the ultimate commander of the vessel.

---

[1]  The BPXP understands that Cameron International Corporation ("Cameron") conducted certain maintenance on or modifications to the BOP at Transocean's request.  Thus, all allegations in this Complaint concerning maintenance of or modifications to the BOP are made either directly or vicariously against Transocean, which was responsible for the BOP.

28.     Concerns about Transocean's drilling rig crew are not limited to the Captain. Prior to April 20, 2010, Transocean's management has acknowledged that it was diluting its crews, leading to close calls that put rigs and their crews in danger.  Indeed, just a few months before the *Deepwater Horizon* incident, a Transocean rig drilling the Shell 711 well in the North Sea suffered a blowout whose pattern and loss of well control was strikingly similar to what would occur a short time later to the *Deepwater Horizon*.

29.     Audits of the *Deepwater Horizon* confirmed that it experienced high crew turnover.  Interviews by an outside consultant reviewed by Transocean management revealed that many supervisors were concerned over the crew's ability to identify hazards and understand the relevant risks.   This concern increased after March 8, 2010, when the MC252 well experienced a kick that went unidentified by the Transocean drilling crew for approximately 33 minutes.

**D.     Transocean's Errors And The *Deepwater Horizon's* Unseaworthiness Caused The April 20 Blowout, Explosion And Fire, As Well As The Tragic Deaths, Personal Injuries, And Resulting Oil Spill.**

30.     On April 20, 2010, Transocean's *Deepwater Horizon* was executing a temporary abandonment procedure on the MC252 well, which involved capping the well so that offshore oil and gas production could begin at a later date.  As part of this process, the crew installed casing — a large diameter pipe — that reached to the bottom of the wellbore.  A contractor (Halliburton Energy Services, Inc.) then cemented the casing to the wellbore.  In addition to casing and cementing, Transocean and other contractors removed from the wellbore dense drilling fluid or "mud" used to contain hydrocarbons such as oil and gas during drilling procedures.  When the kick began on April 20, Transocean's drillers and other crew members were in the process of removing this drilling fluid and displacing it with seawater.

1.    **Transocean Failed To Identify And React To Warning Signs That The Well Was Flowing.**

31.    On April 20, 2010, from approximately 20:00 until the incident began, Transocean's drilling crew was displacing drilling fluid with seawater.  Although the explosion on the *Deepwater Horizon* occurred at approximately 21:49, clear and obvious warnings of a well control incident had begun almost an hour earlier.

32.    To fulfill his duties in monitoring the well to detect kicks and to shut in the well when necessary, the *Deepwater Horizon* driller typically ran three data screens in the driller cabin.  The screens would have displayed, among other things, the drill pipe pressure and the volume of drilling fluids.  Transocean's drillers could (and should) be able to identify a kick in a well by monitoring the flow of drilling fluids into and out of the well, and the pressure on the drill pipe.

33.    At approximately 20:52 hydrocarbons began flowing into the wellbore.  The first indications of a kick occurred between 20:58 and 20:59, when the flow out of the well nearly doubled while the flow into the well decreased—a standard indication of a kick.  A few minutes later, at 21:01, the drill pipe pressure increased from 1250 psi to 1350 psi while the pump rate remained constant.  This occurred while mud was being removed from the wellbore and replaced with lighter seawater, which should have resulted in a *decrease* in pressure, not the increase that went undetected.  Over the next half hour, high drill pipe pressure and flow out of the well continued to indicate a kick.  Notwithstanding these clear kick indications, Transocean did nothing.

34.    Gas did not pass from the well into the riser until approximately 21:38 — 46 minutes after the well began flowing and long after indications of flow should have been apparent to Transocean.  If Transocean had closed the BOP around the drill pipe at any time

before 21:38 — and if Transocean's poorly maintained BOP had shut in the well — the flow of hydrocarbons into the riser would have been eliminated.

35.     But without any well control action taken by Transocean, by 21:38 hydrocarbons had headed up the riser and onto the rig.  At 21:40, the expanding gas pushed out drilling fluid and spewed mud onto the rig floor.  One minute later, mud shot through the *Deepwater Horizon's* derrick.

36.     At 21:41, Transocean took its first well control action, apparently attempting to close the lower annular preventer.  This was *over forty minutes after* the initial indications that the well was flowing.  Transocean's failure to identify the kick during this period resulted from its inadequate policies and training, and led directly to gas reaching and then flowing onto the rig.

> **2.     Transocean Failed To Properly Monitor The Well To Detect Whether It Was Flowing.**

37.     Transocean's failure to monitor the "mud pits" also is likely to have contributed to its failure to recognize that a kick was in progress (though the changes in drill pipe pressure and flow in versus flow out each gave clear, sufficient indications of a kick).  The amount of return and loss of drilling fluids is a key indicator of well integrity.  Upon being displaced from the well, these fluids are discharged into mud pits.  Comparing changes in pit volumes to seawater volume pumped into the well is one way to determine whether the well was experiencing a kick during displacement.  Any discrepancy in the two volumes could indicate that the well was flowing.

38.     Transocean failed to monitor the return and loss of drilling fluids from the well.  Instead, it transferred mud to another vessel without measuring its volume and discharged drilling fluids directly overboard.  These procedures prevented Transocean and other contractors

upon whom BP relied to accurately measure the volume of pit gains and thus removed another data set, in addition to drill pipe pressure and flow in versus flow out, that would have shown that a kick was in progress.

### 3. Transocean's Belated Well Control Actions Dispersed Gas Onto The Rig, Causing The Explosions.

39.     Even with gas coming up through the riser, the blowout still could have been controlled by a properly trained crew.  But Transocean's manuals do not address or explain to its crews how to handle a continuous and uncontrolled flow of gas from a well.  As a consequence, and due to a lack of training, Transocean's crew used the wrong equipment at the wrong times to attempt to control the blowout.

40.     The *Deepwater Horizon* was equipped with a diverter system that provided two alternate paths for gas or gas-bearing mud reaching the rig from the well.  The first path was through the mud-gas separator ("MGS"), which is designed to remove gas from relatively small quantities of mud.  The second diverter path sends flow directly overboard through two 14-inch pipes, one starboard and one portside.

41.     The obvious question is which path—the MGS or overboard diverters—should be used when mud and hydrocarbons are proceeding up the riser to the rig.  Transocean's shut-in protocols do not fully address or explain how to respond to high flow emergency situations, and, in fact, provide contradictory instructions.  On the night of April 20, 2010, the drilling crew chose to use the MGS, which was almost immediately overwhelmed, causing gas to spray onto the center of the rig rather than over the side of the vessel through the diverters.

42.     Transocean's protocols also do not fully address or explain how to respond to a loss of well control.  There are no instructions on how to handle continuous well flow, such as by

closing the BOP's blind shear rams.  Nor is there any mention of whether or when to activate the EDS in response to a well control emergency.

43.     On April 20, 2010, Transocean's attempts to activate the BOP came far too late to successfully shut in the well.  Transocean's crew did not attempt to activate the BOP until 21:41, when they triggered the BOP's annular preventer.  The lower annular apparently failed to seal until approximately five minutes later, at 21:47.  During this time, highly combustible gas continued to spew onto the rig.[2]

### 4.     The *Deepwater Horizon's* ESD, Rig Savers, And Overspeed Controls Failed.

44.     Because of Transocean's decision to use the MGS rather than the overboard diverter, gas quickly covered the rig.  Although the *Deepwater Horizon* had multiple safety devices designed to prevent that gas from igniting, these devices—some of which had malfunctioned before and all of which were subjected to Transocean's poor maintenance practices—failed when they were needed most.  Transocean had actual knowledge of the inadequate maintenance on these safety devices from audits and inspections.

45.     The first such device was the rig's emergency shutdown system ("ESD"), which should cut off ventilation and electricity in areas where gas is detected.  But on April 20, 2010, Transocean's ESD safety systems failed to prevent gas from reaching the rig's engine spaces.

46.     The next safety device was the rig savers, which should have prevented gas flow to the engine spaces and tripped or shut down the engines if combustible gas was detected.  The rig savers failed to function on April 20, 2010 when gas from the well entered the engine spaces.

---

[2] In addition to activating the annular preventer, Transocean's drilling crew may have belatedly attempted to activate one or more of the variable bore rams at approximately 21:46.  While it is possible that these rams may have temporarily sealed the well, they did not shut it in.

47.     The *Deepwater Horizon*'s engines themselves had yet another safety device that failed.  Engines 3 and 6, which were on-line at the time of the incident, were equipped with two independent sets of overspeed controls designed to shut down the engines when their rotational speed significantly increased.  These devices should have prevented the engines from igniting any gas reaching the rig.  But on April 20, 2010, the overspeed controls failed when gas from the blowout reached the engines, causing them to overspeed significantly and trigger the explosions on the vessel.

> **5.     The Rig's Power Generators Failed To Operate After The Explosion, Rendering The Vessel And Its Crew Helpless.**

48.     Engines supplied all of the electrical power to the *Deepwater Horizon*, including to the rig's six primary generators.  These primary generators shut down after the first explosion, when engine 3 likely blew up.  Yet none of the other primary generators started up, leaving the vessel dead in the water and without power.  Three Transocean crew members attempted to start the vessel's backup generator, which was necessary to power the rig's emergency and firefighting equipment, but that generator also would not start.   This rendered the rig's firefighting systems inoperable, as the lack of power disabled the electric pump that drives the watering system.  Although the three crew members who attempted to start the vessel's backup generator did their best, they had not been trained by Transocean in how to start the vessel's backup generator.

> **6.     Transocean's Divided Command Structure, Combined With The Failures Of Its Captain, Compounded The Effects Of The Casualty.**

49.     Transocean's split command led to confusion during the well control incident. Who was in charge of the vessel was unclear.  When disaster struck on the evening of April 20, 2010, neither the *Deepwater Horizon's* Captain nor its OIM gave clear orders to crew members and passengers.   Instead, following the explosions, the crew scattered throughout the rig.

Transocean's Captain — who by law should have been in control of the vessel — never took the measures necessary to secure the vessel or the well.  The Captain's actions (and, more importantly, his inactions) demonstrate that he underestimated the severity of the incident, even after the emergency was obvious to everyone else.

### 7.  Transocean And Its Captain Erred In Delaying To Activate The Blowout Preventer and EDS.

50.     Transocean's Captain inexplicably delayed when it came to the vessel's ultimate safety device: the EDS.  Transocean personnel on the bridge — particularly the Captain — could and should have taken decisive action to save the vessel and shut in the well by immediately activating the EDS.  Instead, the Captain delayed ordering that the EDS be triggered until several minutes after the explosion, when it was too late.  Even then, the Captain did not order activation of the EDS until he had first conferred with the OIM.  In the meantime, in the midst of the emergency and before the OIM arrived on the bridge following the explosions, the Captain expressly forbade the crew from activating the EDS.  Transocean's inadequate training of the Captain and failure to identify when the EDS should be operated in well control situations caused these errors.

### 8.  Transocean's EDS And Blowout Preventer Malfunctioned, Failing To Shut In The Well.

51.     When Transocean finally activated the EDS and BOP, these safety devices failed. Given the loss of control over the BOP, its deadman functionality should have automatically activated, closing the blind shear rams, shearing the drill pipe, and sealing the open hole.  But despite the rig losing control of the BOP, the deadman failed to operate.

52.     Investigation after the casualty revealed that, of the two independent control pods on the BOP, a valve in one did not function when tested and the battery in the other was insufficiently charged to activate the deadman.  A number of different leaks in the BOP pods

also were identified, which may also have compromised their ability to generate sufficient hydraulic power to activate the BOP.

>**9.**   **Transocean's Uncoordinated Fire-Fighting Attempts Allowed The Rig To Burn For Over 36 Hours And Then Sink Into The Gulf of Mexico.**

53.    After the *Deepwater Horizon* was set ablaze on April 20, 2010, Transocean not only failed to undertake its own fire-fighting efforts onboard the vessel, but also abdicated its responsibility to coordinate efforts of the response vessels that arrived on the scene shortly after the explosions.   As a result, the *Deepwater Horizon* burned for over thirty-six hours before sinking into the Gulf of Mexico.

>**E.**   **The Claims, Lawsuits, And Expenses Asserted Against BP As Result Of The *Deepwater Horizon* Incident.**

54.    Because of Transocean's misconduct and multiple errors, both before, on and after April 20, 2010, oil and gas flowed from the MC252 well into the Gulf of Mexico until July 15, 2010, when BP sealed the well.   The scale of BP's response program was massive and unprecedented.   Under the dictates of and as required by the Oil Pollution Act of 1990, 33 U.S.C. § 2701, *et seq*. ("OPA"), BP has committed to paying all legitimate claims for damages pursuant to the requirements and terms of OPA, while reserving its right to seek reimbursement, contribution, and indemnification from Transocean and other responsible parties.   Because of Transocean's conduct, BP faces hundreds of lawsuits and thousands of claims arising out of the *Deepwater Horizon* incident.

55.    The total amounts that will ultimately be paid by BP under OPA or otherwise in relation to the incident are subject to significant uncertainty.   The ultimate exposure and cost to BP will depend on many factors, including the amount of claims that become payable by BP, the amount of fines ultimately levied against BP (including any determination of negligence by BP),

the outcome of lawsuits and claims, and any costs arising from any longer-term environmental consequences of the oil spill.

56.     As of the end of 2010, BP's incurred costs relating to the incident were $17.7 billion.  BP's group income statement for 2010 reflects a pre-tax charge of $40.9 billion in relation to the Gulf of Mexico oil spill.

57.     The DOJ Complaint seeks, *inter alia*, "a declaratory judgment that is binding in this action and any subsequent action or actions against Defendants [BPXP], Anadarko Exploration, Anadarko Petroleum, MOEX, Triton, Transocean Holdings, Transocean Offshore, and Transocean Deepwater, jointly and severally and without any limitation, and Lloyd's, the latter up to the amount of its COFR guarantee, that said Defendants are liable for removal costs and damages in this action and in any such subsequent action or actions."

58.     The DOJ Complaint also alleges that: "'natural resources,' as that term is defined in OPA, 33 U.S.C. § 2701(2), have been injured, destroyed, or lost;" the "amount of damages and the extent of injuries sustained by the United States as a result of the Deepwater Horizon Spill are not yet fully known, but far exceed $75,000,000;" and that "[a]s a result of the Deepwater Horizon Spill, the United States has expended and/or sustained and/or will expend or sustain, *inter alia*, 'removal costs' and 'damages,' within the meaning of OPA, 33 U.S.C. § 2702(b)."

**F.      Transocean's Domination And Control Of Its Corporate Subsidiaries.**

59.     Transocean Ltd. is the holding company of an international group of companies involved in offshore contract drilling services for oil and gas wells, oil and gas drilling management services, drilling engineering services and drilling project management services, and oil and gas exploration and production activities.  Transocean Ltd. conducts its business through a tightly controlled labyrinth of subsidiaries and related entities owned by Transocean

Ltd. in whole or in significant part, and through joint ventures with other entities. Transocean Ltd. has no assets or operations independent from its wholly owned subsidiary Transocean Inc. Transocean Inc. itself holds interests in a variety of Transocean operating companies, and is the direct or indirect parent company of defendants Transocean Offshore Deepwater Drilling Inc. and Triton Asset Leasing GmbH. Transocean Offshore Deepwater Drilling Inc., in turn, is the direct corporate parent of defendants Transocean Deepwater Inc. and Transocean Holdings LLC.

60.    Transocean Ltd., Transocean Inc. and other parent Transocean entities exercised, directly or indirectly, complete control over the various Transocean subsidiaries, including the Transocean *Deepwater Horizon* Companies. Together, the Transocean entities operated as a *de facto* single economic enterprise and the affairs of the junior subsidiaries were conducted for the sole benefit of their direct or indirect corporate owners.

61.    Corporate formalities are on the whole not observed and/or are moot given the senior entities' direct or indirect control over the selection of and leverage over the officers and directors of their subsidiaries.

62.    On information and belief, Transocean subsidiaries were owned and controlled by and for the benefit of their corporate owners in various ways, including but not limited to the following:

- common or overlapping stock ownership;

- de facto control and leverage over the selection of the Transocean subsidiaries' officers and directors, which overlapped with the officers and directors of other Transocean entities;

- common and/or de facto ownership of significant assets such as, for example, the *Deepwater Horizon* (in which four of the defendants claim an interest, for purposes of limiting their liability, as "Owner, Managing Owners, Owners *Pro Hac Vice*, and/or Operators");

18

- formal or informal agreements under which one Transocean entity pays the wages and salaries of Transocean employees working on or in connection with an asset owned by another entity;

- shared facilities and services pursuant to formal or informal agreements;

- common or consolidated financial and shareholder reporting and income tax and securities filings, which deceive the public about the true financial condition of the various Transocean entities, individually and collectively;

- formal or informal agreements under which significant business decisions could not be made without consultation with and/or approval of the corporate parent, either directly or indirectly;

- formal and informal intracorporate loans;

- intermingled daily operations and treating property of the junior subsidiaries as the property of their owners;

- providing the sole or a significant source of the subsidiaries' financing; and

- company-wide policies relating to the operation and maintenance of drilling rigs and the training and performance of their crews.

63.     On information and belief, junior Transocean subsidiaries had unreasonably small capital relative to the significant risk of their various operations, which prejudiced the entities' creditors, including those injured by the subsidiaries' operations and those to which the subsidiaries owe indemnity and/or contribution obligations.

64.     Transocean entities intentionally represented the independence of their direct or indirect subsidiaries, which had in effect no independent existence.  An adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the Transocean entities to escape liability arising out of operations conducted for the benefit of the senior entities or the collective economic enterprise.

**G.     Transocean Breached It Duties Under The Drilling Contract.**

65.     The Drilling Contract imposes a series of duties on Transocean Holdings LLC. The Drilling Contract requires that Transocean Holdings LLC:

- "shall maintain well control equipment in accordance with good oilfield practices at all times and shall use all reasonable means to control and prevent fire and blowouts . . . ." Drilling Contract ¶ 15.2.

- "exercise due diligence to prevent the well from blowing out, and to enable the efficient drilling, logging, and testing of all formations without caving or formation contamination." *Id.* ¶ 15.6.

- "shall take all measures necessary or proper to protect the personnel and facilities." *Id.* ¶ 17.1.

- "shall place the highest priority on safety while performing the work." *Id.*

- "shall observe all of [BP's] safety rules and guidelines . . . and the requirements contained in Exhibit D." *Id.*

- represent that its personnel "shall be fully qualified, trained, competent, able bodied and fit for their respective assignments and shall have complied with all necessary laws and regulations in connection therewith." *Id.* ¶ 3.1.4.

- "maintain the Drilling Unit at optimal operating condition, in accordance with good oilfield practices through the duration of the Contract." *Id.* ¶ 14.1.

- represent that "it will diligently perform the Work in a good workmanlike manner consistent with applicable industry standards and practices, … it will use sound technical principles where applicable, [and] … it will perform the Work in compliance with this Contract." *Id.* ¶ 14.1.1.

- "represent[] that during the Contract Period, the Drilling Unit is outfitted, conformed, and equipped to meet all applicable laws, rules, requirements, and regulations promulgated by the U.S. Coast Guard, the U.S. Environmental Protection Agency, the United States of America Department of the Interior as well as any other agency, bureau, or department of the U.S. federal, territorial possession, state, municipal, or local governments, any political subdivisions thereof, having jurisdiction over the operations in U.S. federal waters." *Id.* ¶ 14.5.

- shall comply with SOLAS, including the ISM. *Id.* Ex. B-1 at 6.

66.     Transocean materially breached its contractual duties in its actions and inactions leading to the loss of well control, the explosion, and the loss of life and injuries onboard the *Deepwater Horizon*, as well as the resulting oil spill.  Specifically, Transocean breached its contractual duties by the following acts and omissions, among others:

- Transocean did not adequately maintain the *Deepwater Horizon* and persistently delayed maintenance on the vessel.

- Transocean did not properly maintain the BOP.

- Transocean failed to conduct appropriate inspections of the BOP.

- Transocean had prior failures of the engine overspeed controls, which were not properly fixed.

- Because of Transocean's poor maintenance, the rig savers on the vessel failed to function to shut down the engines.

- After the explosion and the on-line primary generators shut down, other generators failed to function.

- Transocean made numerous unapproved (and, in many cases, undocumented) changes to the BOP.

- Authority for the vessel was improperly and unlawfully divided between Transocean's Captain and OIM.

- Transocean's Captain was not trained to use the rig's EDS, the vessel's ultimate safety device.

- The actions and inactions of Transocean's Captain showed that he underestimated the severity of the incident.

- Transocean had diluted its crews on the rigs and had experienced high levels of turnover.

- Transocean failed to properly coordinate efforts to fight the fires on board the *Deepwater Horizon* from April 20 to 22, 2010.

- Transocean failed to provide a seaworthy vessel, and also failed to provide proper training and a well-trained crew for the *Deepwater Horizon*.

- Before the well blew out on April 20, 2010, Transocean frustrated a safety check by transferring to another vessel drilling fluid displaced from the well and by discharging drilling fluids directly overboard.

- Transocean failed to properly train its drilling crews in how to handle blowouts.

- Transocean's drilling crew failed to promptly identify and address the kick that caused the incident.

As investigations into the incident continue, and once BPXP obtains discovery from Transocean,

BPXP believes that the evidence may support additional breaches of the Drilling Contract.  In

general, Transocean repeatedly breached the Drilling Contract in multiple, material ways—all leading to the casualty and injuries which took place on and after April 20, 2010.

67.     These obligations and breaches apply to Transocean as a whole because Transocean Ltd., Transocean Inc. and other parent Transocean entities exercised, directly or indirectly, complete control over the various Transocean subsidiaries, including the Transocean *Deepwater Horizon* Companies, and issued and/or enforced various policies and practices applicable to the *Deepwater Horizon*.

68.     Transocean's breach of its contractual duties has directly and proximately caused harm, loss, injuries, and damages to BPXP—as well as the harm, loss, injuries and damages to others.

**H.     Transocean Caused the Deepwater Horizon To Be Unseaworthy.**

69.     Respondents Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc., and Transocean Deepwater Inc., as the owner and/or operators of the *Deepwater Horizon* vessel, owed BPXP the duty to maintain the vessel in a seaworthy condition.  This duty requires that Transocean provide a vessel that is staunch and strong, fitted out with all proper equipment and in good order, and that carries a sufficient and competent crew and complement of officers.  A vessel owner's obligation to supply a seaworthy vessel extends to the vessel's appurtenances, including but not limited to the BOP, as well as the captain and crew of the vessel.

70.     Transocean breached its duties to supply a seaworthy vessel.  Specifically, Transocean breached its duties by the acts and omissions listed in the preceding paragraphs, including but not limited to Paragraphs 22-53 and 66.  As investigations into the incident continue, and once BPXP obtains discovery from Transocean, BPXP believes that the evidence is likely to provide additional examples of the *Deepwater Horizon's* unseaworthiness.  In

general, Transocean caused the *Deepwater Horizon* to be unseaworthy in multiple, material ways—all leading to the casualty and injuries which took place on and after April 20, 2010.

71.     These obligations and breaches apply to Transocean as a whole because Transocean Ltd., Transocean Inc. and other parent Transocean entities exercised, directly or indirectly, complete control over the various Transocean subsidiaries, including the Transocean *Deepwater Horizon* Companies, and issued and/or enforced various policies and practices applicable to the *Deepwater Horizon*.

72.     The *Deepwater Horizon's* unseaworthiness has directly and proximately caused harm, loss, injuries, and damages to BPXP—as well as the harm, loss, injuries and damages to others.

    **I.**     **Transocean Was Negligent Through Deviating From The Standard Of Care And/Or Laws And Regulations.**

73.     Transocean owed BPXP various duties to use reasonable care related to the *Deepwater Horizon* vessel.  These included, though are not limited to, the duty to use reasonable care in:

- Operating the *Deepwater Horizon* rig and drilling wells;

- Maintaining and repairing the vessel;

- Maintaining and repairing the appurtenances of the vessel, including the BOP;

- Not making modifications to the BOP that would impair its functions;

- Properly and promptly operating the BOP;

- Responding to kicks encountered while operating the vessel;

- Preventing blowouts;

- Safely operating the vessel;

- Properly maintaining and using all safety equipment on board the vessel;

- Providing a competent and qualified crew;

- Providing proper and necessary training to the crew and Captain of the vessel;

- Properly maintaining the vessel;

- Providing proper well monitoring and well control training;

- Providing a seaworthy vessel and crew; and

- Complying with SOLAS, including the ISM.

74.     Transocean breached these duties of care and acted with negligence, or gross negligence and/or gross fault as may be established at trial based upon the evidence. Specifically, Transocean breached its duties by the acts and omissions listed in the preceding paragraphs, including but not limited to Paragraphs 22-53 and 66.  As investigations into the incident continue, and once BPXP obtains discovery from Transocean, BPXP believes that the evidence is likely to provide additional examples of Transocean's negligent acts and omissions by Transocean.  In general, Transocean acted with negligence, or gross negligence and/or gross fault as may be established at trial based upon the evidence, in multiple, material ways—all leading to the casualty and injuries which took place on and after April 20, 2010.

75.     These obligations and breaches apply to Transocean as a whole because Transocean Ltd., Transocean Inc. and other parent Transocean entities exercised, directly or indirectly, complete control over the various Transocean subsidiaries, including the Transocean *Deepwater Horizon* Companies, and issued and/or enforced various policies and practices applicable to the *Deepwater Horizon*.

76.     Transocean's negligence, or gross negligence and/or gross fault as may be established at trial based upon the evidence, in operating the *Deepwater Horizon* has directly and proximately caused harm, loss, injuries, and damages to BPXP—as well as the harm, loss, injuries and damages to others.

## BPXP'S CLAIM AGAINST TRANSOCEAN

**CLAIM I:   CONTRIBUTION UNDER THE OIL POLLUTION ACT OF 1990**

77.     BPXP realleges, adopts and incorporates by reference the allegations contained in Paragraphs 1-76, as if fully set forth herein.

78.     Section 1009 of OPA, 33 U.S.C. §2709, provides in pertinent part: "A person may bring a civil action for contribution against any other person who is liable or potentially liable under this Act or another law."

79.     The DOJ Complaint alleges that, as a result of the *Deepwater Horizon* incident, natural resources have been injured, destroyed, or lost; the amount of damages and the extent of injuries sustained by the United States are not yet fully known; and the United States has expended and/or sustained and/or will expend or sustain, inter alia, "removal costs" and "damages," within the meaning of OPA, 33 U.S.C. § 2702(b).  The DOJ Complaint also seeks a declaratory judgment that BPXP and the other defendants are liable for removal costs and damages in this action and in any such subsequent action or actions.

80.     If the United States successfully obtains and/or will obtain a monetary recovery from BPXP pursuant to OPA as a result of the release of oil and hazardous substances in connection with the *Deepwater Horizon* incident, including but not limited to the removal costs and damages alleged in the DOJ Complaint, such OPA financial liabilities to the United States on the part of BPXP would not primarily be due to any fault or negligence on the part of BPXP.

81.     Transocean is wholly or partly at fault for the *Deepwater Horizon* incident and any resulting OPA financial liability incurred and/or to be incurred by the United States for the reasons explained above.

82.     If BPXP is held liable to the United States for all or part of any monetary recovery under OPA obtained and/or to be obtained by the United States, including but not limited to the

removal costs and damages alleged in the DOJ Complaint, Transocean is liable in contribution to BPXP under Sections 1009 and 1017 of OPA, 33 U.S.C. §§ 2709 and 2717.

83.     An actual controversy currently exists between BPXP and Transocean with regard to Transocean's liability to BPXP for any monetary recovery from BPXP obtained and/or to be obtained by the United States in connection with the *Deepwater Horizon* incident.  A declaratory judgment is therefore appropriate to define Transocean's liability in contribution to BPXP for BPXP's liabilities to the United States under OPA, if any, and bind Transocean in any subsequent action or actions that BPXP may bring.

## PRAYER FOR RELIEF

WHEREFORE, BPXP respectfully asks that this Court:

A.     Enter judgment in BPXP's favor against Transocean.

B.     Order that the United States assert its claims for OPA financial liability directly against Transocean Ltd. and Transocean, Inc.

C.     Award BPXP, in proportion to Transocean's fault, the amount of any OPA financial liability for which BPXP is determined to be liable, if any, plus interest.

D.     Declare pursuant to 28 U.S.C. § 2201 that Transocean caused or contributed to the *Deepwater Horizon* incident and subsequent oil spill and is responsible in whole or in part for all damages incurred under OPA by BPXP related to the *Deepwater Horizon* incident and resulting oil spill, and that BPXP is not liable in contribution, indemnification, or otherwise to Transocean for damages, costs, or other expenses arising from the *Deepwater Horizon* incident and resulting oil spill under any applicable law or contract.

E.     Award the reasonable costs and attorneys' fees incurred by BPXP in prosecuting this action.

F.     Award such other relief as the Court may deem appropriate and just.

Dated:  April 20, 2011

Respectfully submitted,

/s/ Don K. Haycraft

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985
Facsimile: (202) 662-6291

Attorneys for BP Exploration & Production
Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice in accordance with the procedures established in MDL 2179, on this 20th day of April, 2011.

/s/ Don K. Haycraft_____