# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **STATE OF LOUISIANA** | * | **CASE NO.:** |
| **Plaintiff** | * | |
| | * | |
| **V.** | * | **JUDGE:** |
| | * | |
| **TRITON ASSET LEASING GmBH;** | * | **MAGISTRATE:** |
| **TRANSOCEAN HOLDING LLC;** | * | |
| **TRANSOCEAN OFFSHORE DEEPWATER** | * | |
| **DRILLING INC.; AND TRANSOCEAN** | * | |
| **DEEPWATER INC.** | * | **COMPLAINT FOR DECLARATORY** |
| **Defendants** | * | **JUDGMENT** |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT FOR DECLARATORY JUDGMENT

NOW INTO COURT, comes James D. "Buddy" Caldwell, Attorney General of the State of Louisiana, appearing herein on behalf of the State of Louisiana, the Louisiana Coastal Protection and Restoration Authority, the Louisiana Oil Spill Coordinator's Office, the Louisiana Department of Environmental Quality, the Louisiana Department of Wildlife and Fisheries, and the Louisiana Department of Natural Resources (collectively, the "State") who respectfully represents that:

1.

The State files this civil action seeking declaratory relief as to Defendants' liability under the Oil Pollution Act, 33 U.S.C. § 2701 *et seq.* ("OPA") and the Louisiana Oil Spill Prevention and Response Act, La. Rev. Stat. § 30:2452 *et seq.* ("OSPRA") as a responsible parties for discharges, including underwater discharges, of oil in the Gulf of Mexico.

2.

This action is brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure to determine an actual substantial case or



EXHIBIT

A

controversy which is real and immediate regarding Defendants' liability for the State of Louisiana's removal costs and damages related to this oil spill.

3.

Defendants Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc., and Transocean Deepwater Inc. (collectively "Transocean" or "Defendants") are owners, managing owners, and/or operators of the mobile offshore drilling unit ("MODU") Deepwater Horizon, which was performing drilling operations for BP p.l.c., BP Exploration and Production Inc. and BP America Production Company (collectively "BP") on the Macondo Prospect located on Mississippi Canyon Block 252 in the Gulf of Mexico. Any and all references to Transocean and Defendants refer to each and all of the entities described in Paragraphs 13 through 16 individually and collectively, acting as agents and/or instrumentalities of each other.  Plaintiff reserves its right to amend this Complaint to include any appropriate Defendants whose identity is unknown and yet to be ascertained.

4.

A blowout occurred on the Deepwater Horizon rig on April 20, 2010, catching the rig on fire and causing the rig to sink on April 22, 2010.  The explosion and sinking of the Deepwater Horizon caused a leak of oil from a riser pipe connected to the Macondo Prospect.  The leak is the largest marine oil spill in history with an approximate release of 5 million barrels of oil.

5.

The oil spill has invaded Louisiana's coast, impacting natural resources such as wetlands, shorelines, habitat, fisheries and wildlife.   The State has incurred and will continue to incur costs and certain damages including cleanup and removal costs, costs of increased public services, loss of state revenue, property damages and natural resource damages.

6.

Transocean Holdings and BP have been designated by the U.S. Coast Guard as responsible parties under OPA. (Exhibit A, Letter from Coast Guard to Transocean dated April 28, 2010; Exhibit B, Letter from Coast Guard to BP dated April 28, 2010). Additionally, OSPRA defines "responsible party" to include "[t]he owner or operator of a vessel or terminal facility from which an unauthorized discharge of oil emanates or threatens to emanate." La. Rev. Stat. § 30:2454(22)(a). Liability under OPA and OSPRA is strict, joint and several.

7.

Transocean has denied that it is a responsible party for the discharges emanating from the Macondo Prospect. Transocean claims it is responsible only for discharges emanating from the rig. (Exhibit C, Letter from Counsel for Transocean to Coast Guard dated May 3, 2010). The Deepwater Horizon rig carried approximately 700,000 gallons of fuel. The discharge from the Macondo Prospect is estimated at 5 million barrels of oil, or 210 million gallons of oil.

8.

Transocean's denial of liability contravenes OPA and OSPRA. That denial is also at odds with the State of Louisiana as it affects Louisiana's ability to seek recovery of costs and damages related to this oil spill from the responsible parties designated under OPA and OSPRA. The State has already incurred significant costs related to this spill and will continue to incur costs and damages. This legal dispute is an actual controversy between Transocean and the state Louisiana of sufficient immediacy and reality to warrant issuance of a declaratory judgment that will establish the rights of the state Louisiana and the obligations of Transocean as a responsible party under OPA and OSPRA.

9.

Therefore, the State seeks declaratory relief as to Transocean's designation as a responsible party under OPA and OSPRA for the discharges emanating from the Macondo Prospect and the Deepwater Horizon and the State's right to seek removal costs and damages from Transocean as a result of the spill.

## PLAINTIFF

10.

The State of Louisiana is a sovereign state of the United States.   Under the Louisiana Constitution, "The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people." Article IX, Section.1 of the Louisiana Constitution.   The Attorney General is the chief legal officer of the State of Louisiana pursuant to Article IV, Section 8 of the Louisiana Constitution.

11.

Under OPA and OSPRA, the Louisiana Oil Spill Coordinator's Office ("LOSCO"), along with other State Natural Resource Trustees, are authorized to undertake a process for assessing, pursuing and resolving natural resource damages resulting from an oil spill.  33 U.S.C. § 2706; La. Rev. Stat. § 30:2480.   The State Natural Resource Trustees are the Louisiana Department of Environmental Quality ("LDEQ"), the Louisiana Department of Wildlife and Fisheries ("LDWF"), the Louisiana Department of Natural Resources ("LDNR") and "other agencies of the state of Louisiana designated by the governor according to the Oil Pollution Act of 1990 as state natural resource trustees." Louisiana Administrative Code, Title 43 ("OSPRA Regs.") § 101(A).  By letter dated May 20, 2010, from Governor Bobby Jindal to President Barack Obama, Governor Jindal

appointed the Louisiana Coastal Protection and Restoration Authority ("CPRA") as the lead trustee agency for the purposes of the Gulf oil spill referenced herein. (Exhibit D Letter from Governor Bobby Jindal to President Barack Obama, May 20, 2010). That May 20 letter also designated LOSCO as lead administrative trustee and LDEQ, LDWF and LDNR as additional trustees. LOSCO, CPRA, LDEQ, LDWF and LDNR are collectively referred to herein as "the State Trustees." The State Trustees have trusteeship over the natural resources that have been injured by the Gulf oil spill.

12.

The State of Louisiana and the State Trustees, through the Louisiana Attorney General, are authorized and obligated to take affirmative action in order to protect those resources that are held in trust for the benefit of the citizens of Louisiana. The claims for declaratory relief sought herein against Defendants are asserted so that the State may properly and adequately protect, assess and recover for those public resources injured by Defendants.

**DEFENDANTS**

13.

Triton Asset Leasing GmbH is a limited liability company organized and existing under the laws of the Swiss Confederation, with its principal office in Zug, Switzerland, and is doing business in the State of Louisiana and in this district.

14.

Transocean Holdings LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal office in Houston, Texas, and is doing business in the State of Louisiana and in this district.

15.

Transocean Offshore Deepwater Drilling Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal office in Houston, Texas, and is doing business in the State of Louisiana and in this district.

16.

Transocean Deepwater Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal office in Houston, Texas, and is doing business in the State of Louisiana and in this district.

## JURISDICTION AND VENUE

17.

Jurisdiction is proper in this Court under 33 U.S.C. § 2717(b), which grants the United States District Courts original jurisdiction over all controversies arising under the Oil Pollution Act, without regard to the citizenship of the parties or the amount in controversy.

18.

Venue is proper in this Court under 33 U.S.C. § 2717(b) and 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred and are occurring in this judicial district.  In addition, a substantial part of property that is the subject of the action is situated within this Judicial District.

## FACTUAL ALLEGATIONS

**A. DEEPWATER HORIZON INCIDENT**

19.

On April 20, 2010, a blowout occurred on the Deepwater Horizon, a Mobile Offshore Drilling Unit located approximately 50 miles off the coast of Louisiana.

20.

The Defendants are the owners and operators of the Deepwater Horizon rig.

21.

BP America Production Company had a drilling contract with Transocean Holdings LLC for the Deepwater Horizon to perform offshore drilling services at the Macondo Prospect.

22.

BP Exploration & Production Inc. is the holder of Lease No. OCS-G 32306 granted by the United States Minerals Management Service (MMS)[1] through Lease Sale #206 for Mississippi Canyon Block 252. BP Exploration & Production Inc. maintains a 65 percent ownership and operation stake in the well prospect, known as the Macondo Prospect. This lease allowed BP to drill for oil and perform oil production-related operations at the site of the oil and oil spill.

23.

BP Exploration & Production Inc. is the designated operator under the Operating Agreement for the Macondo Prospect.

24.

Anadarko E&P, Anadarko Petroleum and MOEX, joint owners and operators with BP Exploration & Production Inc. for the Macondo Prospect, signed and filed a Designation of Operator with MMS on February 23, 2010, regarding the Macondo Well. The Designation identifies BP Exploration & Production Inc. as "operator and local agent (designated operator) with full authority to act in the lessee's behalf in complying with the terms of the lease and applicable regulations."

---

[1] United States Department of Interior Secretary Ken Salazar reorganized and changed the name of the Mineral Management Service on June 21, 2010, to the Bureau of Ocean Energy Management Regulation & Enforcement.

25.

BP America Production Company leased the Deepwater Horizon from Transocean Holdings LLC at a rate of approximately $500,000 per day, plus contractors' fees to perform drilling operations at the Macondo Prospect.

26.

Under the terms of the contract, Transocean Holdings LLC was responsible for the operation of the Deepwater Horizon and had responsibility for the safety of all its operations. Transocean was also required to maintain well control equipment in accordance with good oil field practices and to use all reasonable means to control and prevent fire and blowouts.

27.

Drilling was completed on April 17, 2010, and the well was prepared for cementing. Halliburton Energy Services, Inc. performed cementing of the final production casing string on April 19, 2010.

28.

On April 20, 2010, around 10:00 p.m., a massive blowout occurred at the Deepwater Horizon rig wherein gas, oil and cement exploded up the wellbore onto the deck and the rig caught fire. The explosion killed 11 platform workers and injured 17 others. Attempts were made to shut the blowout preventer ("BOP"), but the BOP was non-operational due to a loss of hydraulic pressure. The rig subsequently sank on April 22, 2010.

29.

BP initially reported a leak of approximately 1,000 barrels a day on April 24, 2010. However, this figure was grossly underestimated. By April 26, 2010, oil was reported 26 miles southeast of Louisiana and by April 27, the oil slick extended 100 miles. On April 28, 2010, the

National Oceanic and Atmospheric Administration ("NOAA") estimated that the leak was likely at least 5,000 barrels a day.

30.

Louisiana Governor Bobby Jindal declared a state of emergency on April 29, 2010, requesting additional resources from the federal government to assist the State in preparations for the impacts of the Gulf oil spill. Governor Jindal's declaration was based upon the "predicted impact of oil along the Louisiana coast leaking from the Deepwater Horizon, which threatens the state's natural resources, including land, water, fish, wildlife, fowl and other biota, and likewise threatens the livelihoods of Louisiana's citizens living along the coast, which increases the economic impact of this incident."

31.

After studying live video footage of the leak, a government panel determined that the oil was flowing out of the well at a rate of at least 20,000 to 40,000 barrels a day, or 1.7 to 2.5 million gallons a day.

32.

The total estimated discharge for this incident is approximately 5 million barrels of oil, making this the largest oil spill in history.

33.

On April 28, 2010, the U.S. Coast Guard issued a letter to Transocean Holdings, Inc. designating Transocean as a responsible party under OPA for the oil discharges resulting from the explosion and sinking of the Deepwater Horizon on April 20. (Exhibit A, Letter from U.S. Coast Guard to Transocean dated April 28, 2010).

34.

Counsel for Transocean Holdings LLC responded to the United States Coast Guard on May 3, 2010, confirming Transocean Holdings LLC f/k/a Transocean Holdings Inc. as a responsible party for oil discharge that occurs on or above the surface of the water but stating: "To the extent your letter of April 28, 2010 is intended to designate Transocean as a responsible party for any underwater discharges of oil from the well head, Transocean [sic] denies your designation of it as a responsible party." (Exhibit C, Letter from Transocean to U.S. Coast Guard, dated May 3, 2010).

35.

Transocean stated in its Quarterly Report dated August 4, 2010, that "OPA imposes strict liability on responsible parties of vessels or facilities from which oil is discharged into or upon navigable waters or adjoining shorelines.....We believe that the owner or operator of a mobile offshore drilling unit ("MODU"), such as *Deepwater Horizon*, is only a responsible party with respect to discharges from the vessel that occur on or above the surface of the water.  As the responsible party for the *Deepwater Horizon*, we believe we are responsible only for the discharges of oil emanating from the rig.  Therefore, we believe we are not responsible for the discharged hydrocarbons from the Macondo well." (Exhibit E, Excerpts from Transocean's Quarterly Report dated August 4, 2010).

36.

Pursuant to Regulations of the Minerals Management Service, Department of Interior, 30 C.F.R. 250.446 and 250.198, and Sections 18.10, 18.11, and 18.12 of American Petroleum Institute RP 53, Transocean must meet or exceed certain requirements pertaining to maintenance, inspection and quality control of Blowout Prevention Equipment Systems for Drilling Wells.

Included among these regulations is the requirement in Section 18.10.3 that Transocean disassemble and conduct a major inspection of its Blowout Preventers every five years.

37.

Transocean failed to meet the requirements of the Federal Regulations referenced above in Paragraph 36.   In testimony before the Joint United States Coast Guard/Bureau of Ocean Energy Management, Regulation and Enforcement Board of Investigation into the incident, given on August 25, 2010, Transocean Subsea Superintendent William T. Stringfellow, Jr. stated that Deepwater Horizon's Blowout Preventer Stack was out of compliance with API RP 53(18.10.3) pertaining to major inspection.  (Exhibit F, Transcript of the Testimony of the Joint United States Coast Guard Bureau of Energy Management Investigation, p.m. session, dated August 25, 2010, p. 183).  Stringfellow specifically stated that it was a "fact" that Deepwater Horizon's Blowout Preventer had not been disassembled in the requisite five-year period, and that by his knowledge the Blowout Preventer had never been drydocked for the entire duration of time it has been in the Gulf of Mexico.  (Exhibit F at pp. 195, 226).

38.

According to BP's Investigation Report, Transocean's rig crew and well site leaders "believed that a critical negative-pressure test was successful, even though well integrity had not been achieved."   (Exhibit G, BP Deepwater Horizon Accident Investigation Report dated September 8, 2010, at p. 107).  This was despite the test having "provided an opportunity to recognize that the well did not have integrity and to take action to evaluate the well further." (Exhibit G at p. 107).

39.

According to BP's Investigation Report, Transocean's "guidelines for the negative-

pressure test, a critical activity, did not provide detailed steps and did not specify expected bleed volume or success/failure criteria." (Exhibit G at p. 107). In addition, although the Transocean Well Control Handbook stated that the well was to be monitored at all times, the policy did not specifically address how the well was to be monitored during in-flow testing, cleanup or other end-of-well activities. (Exhibit G at p. 108). No apparent well control actions were taken by the rig crew until hydrocarbons were in the riser, and these actions did not succeed in controlling the well. (Exhibit G at p. 108). According to the Report, "Transocean's shut-in protocols did not fully address how to respond in an emergency situation (loss of well control)." (Exhibit G at p. 108). Finally, "[A]ctions taken prior to the explosion suggest the rig crew was not sufficiently prepared to manage an escalating well control situation." (Exhibit G at p. 108).

B.    **IMPACTS ON LOUISIANA**

40.

The first reports of oil washing ashore were in Venice, Louisiana on April 30, 2010. On May 6, 2010, federal, state and BP officials confirmed that oil was found on the beach at Chandeleur Islands, a small group of uninhabited barrier islands northeast of the Mississippi Delta. The Chandeleur Islands, accompanied by the nearby Breton Islands, are part of the Breton National Wildlife Refuge.

41.

A blanket of heavy oil has invaded reedy freshwater wetlands at Louisiana's southeastern tip and continues to impact new areas of Louisiana coastline.

42.

Louisiana's marshes, wetlands, shores, ecology, economy, tourism, fisheries, waters, and wildlife have been and will continue to be profoundly impacted by the Gulf oil spill. Southern

Louisiana has 40% of the nation's coastal wetlands. These wetlands provide a range of goods and services, including flood control, water purification, storm buffer, wildlife habitat, nursery grounds for aquatic life, and recreational areas. At least 642 miles of shoreline have been impacted by the oil spill. Additional impacts will continue as the oil washes ashore and further saturates the wetlands it has reached.

43.

In response to the spill, the State closed a considerable number of fishing areas within its territorial waters, which has further impacted the 27,000 Louisianans employed by the seafood industry. The State's shellfish industry has been especially damaged, as the State has been forced to close oyster beds along over one hundred miles of coastline. At considerable expense, the State continually samples oysters from open beds - along with other seafood - to ensure that the public is protected.

44.

Wildlife has been injured or destroyed as a result of this spill. Over 1,500 oiled birds found alive have been collected in Louisiana; over 3,300 dead birds have been collected in Louisiana; and numerous dead sea turtles have been collected in Louisiana. (Exhibit H, NOAA Deepwater Horizon Response Consolidated Fish and Wildlife Collection Report Chart, dated September 14, 2010).

45.

In addition, the State of Louisiana, through its agencies, has incurred substantial costs in responding to this disaster, assessing natural resource injuries, and providing increased and additional public services necessitated by this disaster, and will continue to do so in the future.

46.

The State Trustees, along with natural resource trustees from other states and the federal government, have commenced coordinated activities to assess natural resource damages resulting from the Gulf oil spill.  Transocean has thus far not participated in these activities.  The State Trustees will continue these efforts to the extent practicable and consistent with their obligations under federal and/or state statutes and associated regulations.

## COUNT I

## DECLARATORY RELIEF REGARDING TRANSOCEAN'S LIABILITY UNDER OPA

47.

The Declaratory Judgment Act allows a federal court to declare the rights and other legal relations of any interested party seeking such declaration in an actual controversy within its jurisdiction. 28 U.S.C. § 2201.

48.

This suit is ripe for adjudication as there exists a real controversy between the State, which has been damaged because of the oil spill, and Transocean. Although Transocean was designated a responsible party by the Coast Guard, it has publicly denied that it is a responsible party and has denied liability for any of the oil that leaked subsurface from the Macondo Prospect. This affects the State's ability to recover certain damages and costs under OPA from Transocean, a designated responsible party.  This also affects the ability of the State Trustees to conduct an effective and comprehensive assessment of natural resource damages. Thus, at this time, the State seeks only declaratory relief as set forth herein and to establish the obligations

and status of Transocean as a responsible party. The State is not herein seeking to recover any of the costs or damages suffered to date as a result of the oil spill.

49.

Louisiana has suffered concrete injury to its natural resources and has incurred and will continue to incur costs related to removal of the oil as well as economic damages associated with the disaster.

50.

The OPA, 33U.S.C. §2701 et seq., was enacted in 1990 in response to the Exxon Valdez spill in Prince William Sound.  Liability under OPA is strict, joint and several.  OPA provides: "Notwithstanding any other provision or rule of law, and subject to the provisions of this chapter, each responsible party for a vessel or a facility from which oil is discharged, or which poses a substantial threat of a discharge of oil, into or upon the navigable waters ..., is liable for the removal costs and damages...." 33 U.S.C. § 2702(a).

51.

The Congressional intention is that OPA would effect compensation to victims, quick and efficient cleanup with minimization of damages to natural resources, and the internalization of the costs of oil spills within the oil industry. *Apex Oil Company Inc. v. United States*, 208 F.Supp.2d 642, 651 (E.D.La. 2002) (citing to S.Rep. No. 94, 101st Cong., 1st Sess. (1989)); 1990 U.S.C.C.A.N. 722.  The Senate Report specifically provides that:

> The Oil Pollution Liability and Compensation Act of 1989 continues to rely on Section 311 of the Clean Water Act as the basic law providing for cleanup authority, for penalties for spills and failure to notify of spills, and, by adopting the standard of liability under section 311 as the standard of liability under this Act [OPA]. That standard of liability has been repeatedly determined to be strict, joint, and several liability. This bill adopts these standards for economic damages, as well as for removal costs and natural resource damages.

*Id.* at 732.

52.

Responsible parties for an offshore facility include the lessee or permittee of the area in which the facility is located or the holder of a right of use and easement granted under applicable state law or the Outer Continental Shelf Lands Act (43 U.S.C. § 1301 *et seq.*) for the area in which the facility is located.  Responsible parties also include any person owning, operating, or demise chartering the vessel. 33 U.S.C. § 2701(32).

53.

Transocean was the owner of the *Deepwater Horizon* rig and as such is a responsible party under OPA.

54.

OPA defines "discharge" broadly to include "any emission (other than natural seepage), intentional or unintentional, and includes, but is not limited to, spilling, leaking, pumping, pouring, emitting, emptying, or dumping." 33 U.S.C. § 2701(7).

55.

"Incident" means "any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil." 33 U.S.C. § 2701(14).

56.

Transocean has cited 33 U.S.C. § 2704(b) and avers it is a "responsible party for any oil discharge that occurs on or above the surface of the water" and is not liable for any "underwater discharges of oil from the well head." (Exhibit C, Letter from Transocean to Coast Guard dated May 3, 2010).

57.

Transocean incorrectly construes its liability under OPA Section 2704(b), to mean that its liability is restricted to surface discharges only.

58.

MODUs is liable for the total of all removal costs plus $75,000,000. 33 U.S.C. § 2704(a)(3).  This limitation of liability does not apply if the incident was caused by gross negligence or willful misconduct of, or the violation of an applicable Federal safety, construction, or operating regulation by, the responsible party.  33 U.S.C. § 2704(c)(1).

59.

In response to the *Deepwater Horizon* incident, BP thus far reports that it has paid $489

million for individual and businesses claims relating to this oil spill.  BP has spent over $8 billion in response to this incident.  (Exhibit I, BP Making It Right Highlights, http://www.bp.com/extendedsectiongenericarticle.do?categoryId=9034427&contentId=7063885 captured on September 10, 2010).  Additional damages and claims will accrue as a result of this incident.  Damages have thus exceeded the liability outlined for tank vessels under 33 U.S.C. § 2704(a)(1).

60.

Under the provisions of OPA, Transocean, as a responsible party, is strictly, jointly, and severally liable for this oil spill.

**COUNT II**

**DECLARATORY RELIEF REGARDING TRANSOCEAN'S
LIABILITY UNDER OSPRA**

61.

The Declaratory Judgment Act allows a federal court to declare the rights and other legal relations of any interested party seeking such declaration in an actual controversy within its jurisdiction.  28 U.S.C. § 2201.

62.

This suit is ripe for adjudication as there exists a real controversy between the State of Louisiana, which has been damaged because of the oil spill, and Transocean.  Although Transocean meets the definition of responsible party under OSPRA, it has publicly denied liability for any of the oil that leaked subsurface from the Macondo Prospect.  This affects Louisiana's ability to recover certain damages and costs under OSPRA from Transocean, a

designated responsible party.  This may also affect Louisiana's ability to conduct an effective and comprehensive natural resource damages assessment process under OSPRA and its implementing regulations.

63.

Louisiana has suffered concrete injury to its natural resources and has incurred and will continue to incur costs related to removal of the oil as well as economic damages associated with the disaster.

64.

OPA makes clear that it does not preempt states from imposing additional requirements or liability for the discharge of oil.  33 U.S.C. §§ 2781(a)(1) and 2781(c)(1).

65.

The Louisiana Legislature recognized Louisiana's unique exposure to oil spills when it enacted OSPRA, La. Rev. Stat.§ 30:2451, *et seq.*; La. Rev. Stat. § 30:2452(A).  In passing OSPRA, the Legislature expressly recognized the constitutional duties of the State of Louisiana to "protect, conserve and replenish the natural resources of [Louisiana]." La. Rev. Stat. § 30:2453(A) (*citing* La. Const'n. Art. IX Sec. 1). Louisiana's constitutional duty of protecting the environment is based on the public trust doctrine which is recognized in the State Constitution. Article IX, Section 1 of the Louisiana Constitution provides:

> The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.

OSPRA applies "in the event that an unauthorized discharge of oil or the substantial threat of an unauthorized discharge of oil to state waters results in injury to natural resources." OSPRA regs. § 101(A).

66.

Responsible parties under OSPRA include "[t]he owner or operator of a vessel or terminal facility from which an unauthorized discharge of oil emanates or threatens to emanate." La. Rev. Stat. § 30:2454(22)(a). Responsible parties also include any person "who causes, allows, or permits an unauthorized discharge of oil or threatened unauthorized discharge of oil." La. Rev. Stat. §30:2454(22)(c).

67.

Transocean was the owner of the *Deepwater Horizon* rig and as such is a responsible party under OSPRA. *See* La. Rev. Stat. § 30:2454(20).

68.

OSPRA defines "discharge of oil" broadly to include "an intentional or unintentional act or omission by which harmful quantities of oil are spilled, leaked, pumped, poured, emitted, or dumped into or on coastal waters of the state or at any place where, unless controlled or removed, they may drain, seep, run, or otherwise enter coastal waters of the state." La. Rev. Stat. § 30:2454(7).

69.

Under the provisions of OSPRA, Transocean, as a responsible party, is strictly, jointly, and severally liable for this oil spill.

## PRAYER FOR RELIEF

WHEREFORE, the State of Louisiana seeks the following relief:

1. A declaratory judgment that Transocean is a responsible party under the Oil Pollution Act for all hydrocarbons discharged from the Macondo well, including underwater discharges of oil from the well head.

2. A declaratory judgment that Transocean, as a responsible party, is jointly, severally, and strictly liable for the spill from the Macondo well in accordance with the Oil Pollution Act.

3. A declaratory judgment that Transocean is a responsible party under the Louisiana Oil Spill Prevention and Response Act for all hydrocarbons discharged from the Macondo well, including underwater discharges of oil from the well head.

4. A declaratory judgment that Transocean, as a responsible party, is jointly, severally, and strictly liable for the spill from the Macondo well in accordance with the Louisiana Oil Spill Prevention and Response Act; and

5. Award Plaintiff's costs incurred in pursuing this action as allowed by law.

Dated this 14th day of September, 2010.

Respectfully submitted,

James D. "Buddy" Caldwell
Louisiana Attorney General

James Trey Phillips
First Assistant Attorney General
Megan K. Terrell
Assistant Attorney General
Section Chief – Environmental

State of Louisiana
P.O. Box 94005
Baton Rouge, Louisiana  70804-9005
Tel: 225- 326-6708
Fax: 225- 326-6797


Kanner & Whiteley, L.L.C.


  /s/ Allan Kanner
Allan Kanner
a.kanner@kanner-law.com
Elizabeth B. Petersen
e.petersen@kanner-law.com
Rebecca J. Davis
r.davis@kanner-law.com
701 Camp Street
New Orleans, Louisiana 70130
Tel: 504-524-5777
Fax: 504-524-5763


Henry Dart, Attorneys at Law P.C.


  /s/ Henry T. Dart
Henry T. Dart, Esq.
hdart@dartlaw.com
Grady J. Flattmann, Esq.
gflattmann@dartlaw.com
510 N. Jefferson St.
Covington, LA 70433
Tel: 985-809-8093
Fax: 985-809-8094


Usry, Weeks, & Matthews, APLC


  /s/ T. Allen Usry
T. Allen Usry, Esq.
ausry@uwmlaw.com
1615 Poydras St., Ste. 12
New Orleans, LA  70112
Tel: 504-592-4600
Fax: 504-592-4641

Special Counsel to the Attorney General

Shows, Cali, Berthelot & Walsh, LLP.


 /s/ E. Wade Shows
E. Wade Shows
ews@scbllp.com
628 St. Louis Street
Baton Rouge, Louisiana 70802
Tel: 225-346-1461
Fax: 225-346-1467

Special Counsel to the Attorney General


Marten Law PLLC


 /s/ Bradley M. Marten
Bradley M. Marten
bmarten@martenlaw.com
Linda R. Larson
llarson@martenlaw.com
Marten Law PLLC
1191 Second Avenue, Suite 2200
Seattle, Washington  98101
Tel: 206-292-2600
Fax: 206-292-2601

Special Counsel to the Attorney General
Pro Hac Vice to be Submitted


Baron & Budd, P.C.

 /s/ J. Burton LeBlanc
J. Burton LeBlanc
bleblanc@baronbudd.com
Thomas Sims
tsims@baronbudd.com
Baron & Budd, P.C.
9015 Bluebonnet Blvd.
Baton Rouge, LA 70810
Phone: 225-927-5441
800-222-2766
Fax: 225-927-5449

Counsel for Louisiana State Natural
Resource Trustees (Louisiana Coastal
Protection and Restoration Authority,

Louisiana Oil Spill Coordinator's Office,
Louisiana Department of Environmental
Quality, Louisiana Department of Wildlife
and Fisheries and Louisiana Department of
Natural Resources)

Pursuant to F.R.C.P. Rule 4(d)(1) each of the following Defendants have been sent, by

U.S. Mail, a Notice of Lawsuit and Request to Waive Service of a Summons:

Triton Asset Leasing GmBH
c/o Managing Director, Robert Bowden
Turmstrasse 30
Zug, ZG 6300 Switzerland, Europe

Transocean Deepwater Drilling Inc.
4 Greenway Plaza
Houston, TX 77046

Transocean Deepwater Inc.
4 Greenway Plaza
Houston, TX 77046

Transocean Holding LLC
c/o President, John H. Briscoe
4 Greenway Plaza, Suite 700
Houston, TX 77046