IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | * | MDL NO.  2179 |
| "*DEEPWATER HORIZON*" in the | * | |
| GULF OF MEXICO, on April 20, 2010 | * | SECTION:  J |
| | * | JUDGE BARBIER |
| **THIS PLEADING APPLIES TO ALL** | * | |
| ***All Cases in Pleading Bundle B3*** | * | MAGISTRATE NO. 1 |
| and 10-2771 | * | MAGISTRATE SHUSHAN |

* * * * * * * * * * * * * * * * * * * * * * *

**MEMORANDUM IN SUPPORT OF MOTION OF DRIL-QUIP, INC. TO
DISMISS MASTER COMPLAINT IN ACCORDANCE WITH
PTO NO. 11 [CASE MANAGEMENT ORDER NO. 1] SECTION III.B(3)
("B3 BUNDLE") PURSUANT TO FED.R.CIV.P. 12(B)(6)**

## I. INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Dril-Quip, Inc. ("Dril-Quip") moves to dismiss all claims alleged against it in Master Complaint B3.[1]  Actually, there are no allegations of any kind against Dril-Quip in the B-3 Master Complaint.  Dril-Quip is required to defend against the allegations in the B-3 Master Complaint only because of the procedural effect of the Rule 14(c) tender in the Transocean Parties' Third-Party Complaint.  Dril-Quip's references herein to "Plaintiffs'/Claimants' claims against" it must be read in light of the anomalous situation in which it is placed by Rule 14(c): to defend against complaints in which it is not named, in which no paragraphs directly address its role in the Macondo project, and in which the allegations and claims that are made are patently irrelevant to it.  Accordingly, each such reference to "Plaintiffs'/Claimants' claims against Dril-Quip" should be read as if it contained the qualifier "by operation of law."

In its Case Management Order, dated October 19, 2010, and clarified in Pre-trial Order No. 25, the Court ordered Plaintiffs to set forth in Master Complaint B3 "all claims, of any type,

---

[1] Dril-Quip submits this memorandum and the motion it support subject to its Motion to Dismiss Third-Party Complaint.

relating to post-explosion clean-up efforts asserted against Defendants not named in the B1 Master Complaint, as well as all claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 20, 2010." PTO No. 25 at ¶ 1.  Plaintiffs expressly designate Master Complaint B3 as a Complaint in Admiralty pursuant to Federal Rule of Civil Procedure 9(h) and assert claims for personal injury and property damage pursuant to the general maritime law, the Oil Pollution Act ("OPA"), and the law of Florida and other states.

Plaintiffs' maritime claims (Negligence, Gross Negligence, Battery, and Nuisance) all fail to state a claim because Plaintiffs do not allege that Dril-Quip controlled any of the operations of the *Deepwater Horizon* that allegedly caused Plaintiffs' injuries.  On the contrary, the allegations make clear that the "BP Defendants" and the "Transocean Defendants"— not Dril-Quip —controlled *all* operations at the Macondo Prospect and on the *Deepwater Horizon*. Plaintiffs also do not allege that Dril-Quip controlled any clean-up efforts or participated in the decision to use chemical dispersants.  Plaintiffs exclude Dril-Quip from the list of "Dispersant Defendants" who (along with the BP Defendants and Nalco Company) allegedly exposed Plaintiffs to harm during the clean-up.  Thus, even if the allegations against satisfied the minimum requirements of Rule 8 (which they do not), the allegations themselves establish as a matter of law that Plaintiffs can state no cognizable claim against Dril-Quip.  Furthermore, Plaintiffs' Nuisance claim is displaced by OPA and should be dismissed for that reason as well.

Plaintiffs' state law claims fail because state law does not apply to this case.  Federal law alone applies to claims arising out of and in connection with oil exploration, development, and extraction operations on the Outer Continental Shelf ("OCS").  Although federal law sometimes borrows state law as surrogate federal law in OCS cases, it does not do so in this case, and even

if it did, it would not borrow Florida law.

Plaintiffs' OPA claim should be stricken from Master Complaint B3 because it duplicates the OPA claim in First Amended Master Complaint B1. The Court's Case Management Order specifically directs that all nongovernmental claims for economic losses should be pleaded in the Master Complaint for Pleading Bundle B1.[2] In addition, Plaintiffs' OPA claim fails because they do not allege that they have satisfied OPA's jurisdictional presentment requirement. For these and other reasons described below, the Court must dismiss Plaintiffs' claims against Dril-Quip in their entirety.

## II.

**RELEVANT FACTUAL ALLEGATIONS IN MASTER COMPLAINT B3**

Plaintiffs allege that "BP leased the *Deepwater Horizon* to drill exploratory wells at the Macondo Prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf off the coast of Louisiana," Mast. Compl. B3 ¶ 79, and that on April 20, 2010, "workers on the *Deepwater Horizon* oil vessel lost control of the Macondo well just after the final cementing work was completed," and the vessel subsequently "caught fire" and "sank," resulting in an oil spill. *Id.* ¶ 80–82.

---

[2] Plaintiffs allege that the factual allegations "pleaded in the Master Complaint for the B1 Pleading Bundle are incorporated into and made part of" Master Complaint B3. Mast. Compl. B3 ¶ 18. On February 9, 2011, Plaintiffs filed their First Amended Master Complaint, Cross-Claim, and Third-Party Complaint for Private Economic Losses in Accordance with PTO No. 11 [CMO No. 1] Section III(B1) ["B1 Bundle"] (Dkt. # 1128). It is not clear whether Plaintiffs intend that the allegations of the Amended B1 Master Complaint are to be incorporated into the B3 Master Complaint. It is also not clear which factual allegations the Plaintiffs intend to control in the event of inconsistency: the allegations of First Amended Master Complaint B1, or the allegations of the un-amended Master Complaint B3. To the extent that the allegations of the Amended B1 Master Complaint are considered part of and incorporated into the allegations of the Master Complaint B3, the arguments presented in the Motion of Defendant, Dril-Quip, Inc. to Dismiss First Amended Complaint, Cross-Claim, and Third-Party Complaint for Private Economic Losses in Accordance with PTO No. 11 [CMO No. 1] Section III (B1) ["B1 Bundle"] Pursuant to Fed. R. Civ. P. 12(b)(6), filed concurrently herewith, are hereby incorporated into this Motion to the extent applicable.

Plaintiffs claim to be "citizens of Florida, Alabama, Mississippi, Louisiana, Texas and other states, who have been exposed to harmful chemicals, odors and emissions during the clean-up following the *Deepwater Horizon* explosion." *Id.* ¶ 21.  Plaintiffs divide themselves into five categories:  (a) The "VoO Plaintiffs," who are boat captains and crew who participated in BP's Vessels of Opportunity Program ("VoO") program; (b) the "Decontamination Plaintiffs," who are workers involved in decontaminating vessels that came into contact with oil and/or chemical dispersants; (c) the "Vessel Plaintiffs," who include vessel captains and crew who were not involved in the VoO program but allegedly were exposed to harmful chemicals, odors, and emissions during post-explosion clean-up activities; (d) the "Onshore Plaintiffs," who are clean-up workers and beach personnel involved in clean-up activities along shorelines and intercoastal and intertidal zones; and (e) the "Resident Plaintiffs," who are individuals who live and work in close proximity to coastal waters.  *Id.*

The Master Complaint divides the Defendants into groups based on their alleged involvement in the incident: (1) The "BP Defendants" and the "Transocean Defendants," who allegedly oversaw the drilling operations on the *Deepwater Horizon* and/or the subsequent clean-up efforts, *see id.* ¶¶ 24–36, 48–53; (2) the "Dispersant Defendants," who allegedly used and applied dispersant chemicals in response to the oil spill, and Nalco Company, the manufacturer of one dispersant, *see id.* ¶¶ 54–70; and (3) Anadarko and MOEX Offshore (and companies alleged to be related to MOEX Offshore) who are alleged to be "non-operational leaseholders" of the Mississippi Canyon Block 252, but are not alleged to have engaged in any conduct that caused harm during either the drilling of the well or the subsequent clean-up efforts.  *See id.* ¶¶ 37–47.  *The Master Complaint does not identify Dril-Quip as a member of any of these groups.*

A.   **Plaintiffs Allege that the "BP Defendants" and the "Transocean Defendants" Oversaw the Drilling and Recovery Operations and Operated the *Deepwater Horizon*.**

Plaintiffs allege that BP "was a holder of a lease granted by the former Minerals Management Service ('MMS') allowing it to perform oil exploration, drilling, and production-related operations" at the Macondo site, in which BP held a 65% interest. *Id.* ¶¶ 24, 46. "As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations." *Id.* ¶ 36.   The Plaintiffs allege that Transocean, "subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems.   Transocean also provided operational support for drilling-related activities on board the *Deepwater Horizon*, as well as onshore supervision and support for those drilling activities at all times relevant to the Oil Spill."   *Id.* ¶ 53.   BP and Transocean are alleged to have "recklessly, willfully and/or wantonly failed to ensure," *first*, "that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout," and *second* "that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico . . . ." *Id.* ¶¶ 160–61.

Plaintiffs further allege that "[i]n the wake of the disaster, BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf States."   *Id.* ¶¶ 4, 94 (emphasis added). They allege that under the so-called VoO program, "BP directed the use of vessels to recover oil coming to the surface of the Gulf of Mexico . . . ." *Id.* ¶ 95; *see also id.* ¶ 96 ("The VoO program is touted by BP as a key component to BP's response to the disaster"). Plaintiffs also allege that "BP coordinates and directs aircraft owned and/or operated

5

by [other named Defendants] that fly out over the Gulf to spot oil slicks and to spray chemical dispersants to oil on the surface of the Gulf." *Id.* ¶ 105.

**B.     Plaintiffs Allege That the "Dispersant Defendants" were Responsible for the Manufacture and Use of Dispersants in the Post-Explosion Clean-up Efforts.**

Plaintiffs allege that twelve defendants – *not including Dril-Quip* – "participated in the post-explosion Oil Spill remediation and response efforts." *Id.* ¶¶ 54-65. These "Dispersant Defendants," along with BP, allegedly "covered approximately 291 square miles of the Gulf with dispersant" chemicals, *id.* ¶ 118, causing Plaintiffs harm by exposing them to dispersants. *Id.* ¶¶ 149-58. Plaintiffs allege that Nalco Co. "is the manufacturer of the chemical dispersants purchased by BP for use in connection with clean-up efforts in response to the Oil Spill" and that "Nalco knew or should have known that its chemical dispersants would be applied beneath the surface of the water, on the surface of the water, and aerially from planes." *Id.* ¶¶ 67, 128. Plaintiffs further allege that the Dispersant Defendants "recklessly, willfully and/or wantonly failed to use reasonably safe dispersant chemicals or other chemicals in their attempts to respond to the Oil Spill, and thereby exacerbated the pollution of the Gulf of Mexico and injury to Plaintiffs." *Id.* ¶ 162.

**C.     Third-Party Plaintiffs Allege That Dril-Quip was Involved in Providing Wellhead Systems on the Macondo Prospect.**

Dril-Quip allegedly "was involved with providing wellhead systems to the Deepwater Horizon …"[3]   Plaintiffs <u>do not allege</u> that Dril-Quip had involvement in, control of, or

---

[3] Third-Party Complaint at ¶19.  As noted above, *supra* note 1, because Plaintiffs had not sued Dril-Quip at the time of Transocean's 14(c) tender, there are actually no allegations of any kind against Dril-Quip in their complaint.  Dril-Quip borrows this sentence from that tender as a point of origin for this Memorandum.

supervisory authority over, the engineering and design of the Macondo well, the *Deepwater Horizon* and its crew, or the drilling and completion operations. Plaintiffs also <u>do not</u> allege that Dril-Quip had any ownership, contractual, or leasehold interest in the *Deepwater Horizon*. Moreover, Plaintiffs <u>do not</u> allege that Dril-Quip had anything to do with the clean-up efforts in response to the oil spill, participated in the VoO program, or had any input into or control over the use of chemical dispersants. Plaintiffs <u>do not</u> allege that Dril-Quip participated in any acts that amounted to reckless, willful, or wanton conduct.

Notwithstanding the fact that Master Complaint B3 contains <u>no allegations</u> tying Dril-Quip to any conduct that allegedly caused Plaintiffs' harm, Plaintiffs assert claims against Dril-Quip under the Oil Pollution Act, 33 U.S.C. § 2701 (*id.* ¶¶ 194–201) and the Florida Pollutant Discharge Prevention and Control Act, FLA.STAT. § 376.011 (2010) (*id.*¶¶ 307–20), and for maritime Negligence (*id.* ¶¶ 219–28), Gross Negligence (*id.* ¶¶ 229–36), Negligence *Per Se* (*id.* ¶¶ 237–42), Nuisance (*id.* ¶¶ 259–71), Battery (*id.* ¶¶ 272–77), and Medical Monitoring under Florida law (*id.* ¶¶ 278–88).[4-]

## III. ARGUMENT

### PLAINTIFFS HAVE NOT PLEADED CLAIMS AGAINST DRIL-QUIP FOR WHICH RELIEF CAN BE GRANTED

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.

---

[4] Plaintiffs also include Class Action Allegations in Master Complaint B3 at ¶¶ 176–93. "Where it is facially apparent from the pleadings that there is no ascertainable class, a district court may dismiss the class allegation on the pleadings." *John v. Nat'l Sec. Fire and Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007). The Court, however, has ordered a stay of all class action motion practice and deadlines. CMO No. 1 at 12. Dril-Quip therefore hereby reserves, and expressly does not waive, any and all arguments that Plaintiffs' Class Action Allegations as set forth in Master Complaint B3 are facially insufficient to state an ascertainable class as a matter of law, until such time as the Court lifts the stay on Class Action motions practice.

Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Cuvillier v. Taylor*, 503 f.3d 397, 401 (5th Cir. 2007); *see also Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (allegations must push claim past "conceivable" to "plausible"). This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555); *see also Hershey v. Energy Transfer Partners*, 610 F.3d 239, 245–46 (5th Cir. 2010) (same).

Rather, to state a claim for relief, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556). These "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555-56. However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Jacobs v. Tempur-Pedic Int'l, Inc.*, ___ F.3d ___, 2010 WL 4880864, *2 (11th Cir. Dec. 2, 2010)(quoting *Iqbal*, 556 U.S. at ___, 129 S. Ct. at 1949). Under the standard set forth in *Twombly*, a complaint must plead "enough fact[s] to raise a reasonable expectation" that a plaintiff has a right to relief. *See* 550 U.S. at 557.

The Complaint pleads no facts tending to show liability, causation or damage that implicate Dril-Quip. Indeed, the Complaint fails to even mention Dril-Quip and does not assert

8

any causes of action directly against Dril-Quip; the only reason Dril-Quip is required to respond to the allegations in the Complaint is because it has been joined to the allegations in the Complaint by operation of Transocean's Third-Party Complaint pursuant to Rule 14(c).

The majority of the Complaint's allegations related to the Defendants are directed at "Defendants," "BP Defendants," or "Dispersant Defendants."[5]   In other paragraphs, the Complaint alleges that certain  Defendants committed specific acts but never alleges that Dril-Quip committed any specific act or identifies the wellhead as a source of problems.  Thus, even in these collective allegations, the Complaint does not allege a single fact that would tend to show that Dril-Quip did anything or failed to do anything that led to Plaintiff's alleged injuries.

Allegations that lump multiple defendants together without specifying which defendant did what do not satisfy the federal pleading standards.  *Cruz v. Cinram Int'l, Inc.*, 574 F. Supp. 2d 1227, 1233 (N.D. Florida 2008); *see also Kester v. Zimmer Holdings, Inc.*, 2010 WL 2696467, at *12 (W.D. Pa. June 16, 2010) (collectively referring to "Defendants" insufficient under *Twombly*).  The Eleventh Circuit has stated "[t]his court has addressed the topic of shotgun pleadings on numerous occasions in the past, often at great length and always with great dismay."  *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1296 n. 9 (11th Cir. 2002).

This case is no different.  Plaintiff's  complaint fails to plead any facts specific to Dril-Quip.  It is thus impossible to ascertain what Dril-Quip did or failed to do that caused Plaintiff's injuries.  The Court should therefore dismiss the Complaint against Dril-Quip for failure to state a claim.

---

[5]*See* p. 4, *supra*.

If the factual allegations do not raise a right to relief "above the speculative level," *Twombly*, 550 U.S. at 555, or if the allegations reveal an insuperable bar to relief, *Jones v. Bock*, 549 U.S. 199, 215 (2007), the claim should be dismissed.  In the latter circumstance, as in this case, the plaintiff "pleads himself out of court by 'admitting all the ingredients of an impenetrable defense.'"  *Barasich v. Shell Pipeline Co.*, No. 05-4180, 2006 WL 3913403, at *2 (E.D. La. Nov. 20, 2006) (Barbier, J.) (internal citations omitted) (granting Rule 12(b)(6) dismissal in part).

### A.    Plaintiffs' Claims Against Dril-Quip Under General Maritime Law Fail.

Plaintiffs designate Master Complaint B3 as a Complaint in Admiralty under Federal Rule of Civil Procedure 9(h) and assert four claims under the general maritime law:  Negligence (Count 3), Gross Negligence (Count 4), Nuisance (Count 7), and Battery (Count 8).[6]  All of these claims fail because Plaintiffs do not allege <u>any</u> facts that, if true, would establish that Dril-Quip owed a legal duty to the Plaintiffs or engaged in conduct that caused them harm.   On the contrary, the facts Plaintiffs allege, even if true, conclusively establish that Dril-Quip is <u>not</u> liable for Plaintiffs' alleged injuries, whether they result from exposure to dispersants or to oil.  Because <u>all</u> of the general maritime claims alleged against Dril-Quip require some sort of negligent conduct and proximate causation, these claims must be dismissed.

### 1.    Plaintiffs Fail to Allege that Dril-Quip Engaged in or had Operational Control Over Any Conduct that Caused the Alleged Harm.

To state a claim for negligence under the general maritime law, "the plaintiff must demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty,

---

[6] Plaintiffs plead three additional claims under state law: Negligence *Per Se* (Count 5); Medical Monitoring under Florida law (Count 9); and violations of the Florida Pollutant Discharge Prevention and Control Act (Count 11), each of which fails for the reasons described in Parts III(C–D), *infra*. Plaintiffs' federal statutory claim under OPA also fails for the reasons described in Part III (B), *infra.*

injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury." *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 211 (5th Cir. 2010) (internal citations and quotations omitted); *see also Becker v. Tidewater, Inc.*, 586 F.3d 358, 367 (5th Cir. 2009) ("Gross negligence . . . has been defined as harm willfully inflicted or caused by gross or wanton negligence") (quoting *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 411 (5th Cir. 1982); *Royal Ins. Co. of Am. v. Southwest Marine*, 194 F.3d 1009, 1015 (9th Cir. 1999) (defining gross negligence under maritime law as "the intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another . . .") (*quoting* BLACK'S LAW DICTIONARY 1185 (4th ed. 1968); RESTATEMENT (SECOND) OF TORTS § 281 (1965) (actor liable for negligence if "the interest invaded is protected against unintentional invasion, and . . . the actor's conduct is a legal cause of the invasion")).

Similarly, and assuming *arguendo* that they are actionable under general maritime law, claims for battery and nuisance require the plaintiff to plead that the defendant took some action that caused the alleged harm.  According to the Second Restatement of Torts, causation is an element of both public nuisance and battery. *See* RESTATEMENT (SECOND) OF TORTS § 822 cmt. a (subject to exceptions that do not apply in this case, "the tort law of public nuisance is consistent with" the private nuisance causation requirement); *id.* § 13 ("An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results"); *see also Nissan Motor Corp. v. Maryland Shipbuilding and Drydock Co.*, 544 F. Supp. 1104, 1120 n.17 (D. Md. 1982) (noting Plaintiffs cannot recover under a theory of nuisance under maritime law without proving "fault on the part of defendant") (citing RESTATEMENT (SECOND) OF TORTS §

11

822); *cf. Baggett v. Richardson*, 342 F. Supp. 1024, 1027 (E.D. La. 1972) (adopting state law for maritime assault and battery claim in part because "the areas of tort law dealing with assault and battery and *respondeat superior* apparently are uniformly treated throughout the fifty states…").[7]

Because Plaintiffs' general maritime law claims require them to plead some breach of duty or other act by the defendants that caused their harm, the Court must focus on Master Complaint B3's specific factual allegations about or that could conceivably apply to Dril-Quip. As explained below, those allegations fail to set forth <u>any allegations</u> that Dril-Quip did <u>anything</u> that amounted to a breach of duty or otherwise caused the harm alleged to have arisen from Plaintiffs' exposure to dispersants or oil. Indeed, the Plaintiffs' own allegations, if true, establish that the other Defendants, and not Dril-Quip, are responsible for either the clean-up efforts or the drilling operations alleged to have caused the oil spill. Plaintiffs' maritime claims against Dril-

---

[7] Although Plaintiffs bring Master Complaint B3 in admiralty and assert claims under general maritime law, breach of duty and causation are required elements under any potentially applicable law. *See Meany v. Meany*, 639 So. 2d 229, 233 (La. 1994) ("The four elements of negligence include duty, breach, a causal relationship between the defendant's alleged negligent act and the plaintiff's injuries (which includes both cause in fact and legal cause), and damages") (internal citations omitted); *Qore, Inc. v. Bradford Bldg. Co.*, 25 So. 3d 1116, 1123 (Ala. 2009) (same); *Nabors Drilling USA, Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009) (same); *Watson Quality Ford, Inc. v. Casanova*, 999 So. 2d 830, 835 (Miss. 2008) (same); *Florida Dep't of Corr. v. Abril*, 969 So. 2d 201, 204 (Fla. 2007) (same); *see also Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 24–25 (Tex. 1995) (both gross negligence and negligence require evidence of a breach of duty and evidence of proximate cause); *Ambrose v. New Orleans Police Ambulatory. Serv.*, 639 So.2d 216, 220 (La. 1994) (gross negligence requires elements of proximate cause and duty). Likewise, the common law theories of battery and nuisance in any of the potentially applicable states require proof of causation on the part of the defendants. *See, e.g.*, *Aramark Uniform and Apparel v. Easton*, 894 So. 2d 20, 23 (Fla. 2005) (nuisance claims "require[] proof that the defendant caused the pollution resulting in the damages"); *Ex parte Atmore Community Hosp.*, 719 So. 2d 1190, 1193–94 (Ala. 1998) (citing RESTATEMENT (SECOND) OF TORTS § 18 in battery case); *Jamail v. Stoneledge Condo. Owners Ass'n*, 970 S.W.2d 673, 676 (Tex. App. 1998) (quoting RESTATEMENT § 822); *Leaf River Forest Prods., Inc. v. Ferguson*, 662 So. 2d 648, 662 (Miss. 1995) (quoting RESTATEMENT § 822); *Caudle v. Betts*, 512 So. 2d. 389, 391 (La. 1987) ("A harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact, is a battery") (internal citations omitted); RESTATEMENT (SECOND) OF TORTS § 13 ("An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results").

Quip must therefore be dismissed.

> **a.** **Plaintiffs' allegations establish that Dril-Quip took no part in the post-explosion clean-up efforts or the use of dispersants**.

Pursuant to this Court's order, Master Complaint B3 encompasses "all claims related to post-explosion clean-up efforts." *See* PTO No. 11 [CMO No. 1] at 3. To this end, Plaintiffs' allegations center on the alleged health problems and other damages suffered by individuals engaged in cleanup efforts organized by or in conjunction with BP, including the VoO program. *See* Mast. Compl. B3 ¶¶ 21(a–c), 94–104. Master Complaint B3, however, lacks any allegation that Dril-Quip was in any way responsible for these clean-up efforts. On the contrary, Plaintiffs allege that "[i]n the wake of the disaster, <u>BP</u> began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf States." *Id.* ¶¶ 4, 94 (emphasis added). Similarly, under the VoO program, "<u>BP</u> directed the use of vessels to recover oil coming to the surface of the Gulf of Mexico . . . ." *Id.* ¶ 95 (emphasis added); *see also id.* ¶ 96 ("The VoO program is touted by <u>BP</u> as a key component to <u>BP's response</u> to the disaster") (emphasis added).

Likewise, many of the facts and claims set forth in Master Complaint B3 address the use of chemical dispersants in the Gulf of Mexico. *See, e.g.*, *id.* ¶¶ 105–28, 149–58. Again, Plaintiffs do not allege that Dril-Quip participated in the use of these dispersants. Dril-Quip is not named among the "Dispersant Defendants" in Master Complaint B3, *id.* ¶¶ 54–65, nor is it alleged to have any connection to the manufacturer of the dispersants identified in Master Complaint B3. *Id.* ¶ 67. Plaintiffs specifically allege that <u>BP</u>, and <u>not</u> Dril-Quip, "began implementing a disaster response plan . . . to disperse oil in the water using Nalco's chemical dispersants." *Id.* ¶ 94; *see also id.* ¶ 108 ("<u>BP</u> began subsea and aerial application of chemical dispersants manufactured by Defendant Nalco to the resulting oil slicks and sheens on the surface of the Gulf") (emphasis

13

added); *id.* ¶ 109 ("The Coast Guard's Federal On Site Coordinator . . . must approve <u>BP's</u> <u>requests</u> to use chemical dispersants") (emphasis added).

In sum, the allegations in Master Complaint B3 establish as a matter of law that Dril-Quip did not have anything to do with—and certainly had no authority to control—the post-explosion clean-up efforts. According to the Plaintiffs' own allegations, Dril-Quip took no part in the VoO program, and the Plaintiffs exclude Dril-Quip from the defendants alleged to have manufactured or used the dispersants. On the basis of the Plaintiffs' own pleadings, then, Dril-Quip is not liable under any general maritime theory for harms caused by the use of dispersants or other clean-up efforts.

> **b.    Plaintiffs' allegations establish that Dril-Quip is not liable under the general maritime law for the explosion on the *Deepwater Horizon* and the resulting oil spill.**

In addition to the claims arising from the application of dispersants and BP's other clean-up efforts, Master Complaint B3 alleges that Plaintiffs were exposed to oil that flowed into the Gulf of Mexico following the explosion and sinking of the *Deepwater Horizon. See* Mast. Compl. B3 ¶¶ 22–23, 143–48, 175.  As with the use of dispersants, Plaintiffs' allegations establish that BP and Transocean were responsible for the drilling operations at the Macondo site, and Dril-Quip therefore cannot be held directly liable for any breach of duty or harm arising from the explosion on the *Deepwater Horizon* or the resulting oil spill.

The duty to prevent harm resulting from oil and gas operations arises as a consequence of operational control over the activity. *See, e.g.*, *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550 (5th Cir. 1987), *cert. denied*, 485 U.S. 1034 (1988). It is also settled that where a principal contracts with an independent contractor to conduct oil and gas operations but retains no operational control, the principal neither assumes nor owes any duty to protect others from the contractor's negligence.

14

*Thomas v. Burlington Res. Oil & Gas Co.*, No. 99-3904, 2000 WL 1528082, at *2 (E.D. La. Oct. 13, 2000) (Barbier, J.); *Hawkins v. Evans Cooperage Co.*, 766 F.2d 904, 909 (5th Cir. 1985) (a principal was not liable because it did not exercise control over the independent contractor and had no duty to discover and remedy hazards the contractor created); *McCormack v. Noble Drilling Corp.*, 608 F.2d 169, 174–75 (5th Cir. 1979) (holding that the principal of an oil drilling operation owed no duty to ensure that independent contractors performed safely, even though the principal's company man on the rig was aware of their operations, because the principal had no control over the contractor); *Ronquille v. MMR Offshore Servs., Inc.*, 353 F. Supp. 2d 680, 682 (E.D. La. 2004) (the presence of a company representative on an oil platform with knowledge of the rig's operations "is insufficient to create a duty; therefore, the law does not support the imposition of liability for any failure to intercede"); *Toussaint v. Chevron Phillips Chem. Co.*, No. 03-3481, 2006 WL 2349465, at *2 (E.D. La. Aug. 11, 2006) ("[T]he right to inspect or comment is insufficient to subject a principal to liability for a contractor's negligence") (citation omitted).

Master Complaint B3 does not contain any allegation that Dril-Quip possessed or exercised any control over the drilling or operations at the Macondo site.   Plaintiffs recognize this fact throughout Master Complaint B3, expressly alleging that "[a]s a lease operator of the Macondo prospect site, <u>BP was responsible for</u> . . . engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations." Master Compl. B3  ¶ 36 (emphasis added); *see id* ¶ 53 ("At all times relevant to the Oil Spill, Transocean, <u>subject to BP's inspection and approval</u>, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems") (emphasis added).

In light of the Plaintiffs' explicit allegations that BP and Transocean were responsible for the

15

drilling operations, the Plaintiffs' general maritime claims against Dril-Quip must be dismissed.  *See Jones v. Bock*, 549 U.S. 199, 215 (2007). Absent any power to control BP or its contractors, Dril-Quip owed no duty to Plaintiffs and did not cause them any harm. The factual allegations in Master Complaint B3 are insufficient to state any plausible claim against Dril-Quip for negligence, gross negligence, nuisance, or battery. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

     **c.**     **Plaintiff Fails to State a Negligence Claim Against Dril-Quip**

     Even if Plaintiff's claim under Count II were not deficient under the *Twombly-Iqbal* pleading standard, it would not state a claim under maritime or Florida negligence law against Dril-Quip because the alleged harm to Plaintiff was too thinly connected to Dril-Quip's activities to create a duty to Plaintiff.  *See In re Great Lakes Dredge & Dock Co*., 624 F.3d 201, 211-13 (5th Cir. 2010)(connection between river dredging and collapse of New Orleans levees too attenuated to be foreseeable); *Lloyd's Leasing Ltd. v. Conoco*, 868 F.2d 1417, 1448-49 (5th Cir. 1989)(type of onshore damage from oil spill 70 miles away alleged by plaintiff not reasonably foreseeable as matter of law); *Consolidated Aluminum Corp. v. C.F. Bean Corp*., 833 F.2d 65, 67 (5th Cir. 1987)(insufficient connection between dredging that ruptured gas pipeline and damages at aluminum processing plan from gas supply interruption to extend duty from dredging company to plant)(maritime law); *Jennings v. BIC Corp*., 181 F.3d 1250, 1257 (11th Cir. 1999)(child's *purchase* and misuse of cigarette lighter beyond reasonable scope of risk to create a duty on part of manufacturer)(Florida law).  The *Lloyd's Leasing* case especially militates against the existence of a duty here because of its review of the foreseeable consequences of an oil spill.  *See* 868 F.2d at 1449.

2.     **Plaintiffs' Nuisance Claim Also Fails Because it is Barred by Federal Maritime Law and OPA.**

Plaintiffs' nuisance claim also fails because federal maritime law does not recognize a claim for nuisance.  Even if it did, Plaintiffs' claim would be displaced by OPA, which provides the exclusive federal remedy for damages to real property that are recoverable under a nuisance theory.

Nuisance has been called the "ill-defined omnibus tort of last resort."  *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 301–02 (4th Cir. 2010). Many courts have determined that maritime law simply does not recognize the kind of public nuisance claim that Plaintiffs assert. *See Sekco Energy, Inc. v. M/V Margaret Chouest*, 820 F. Supp. 1008, 1014 (E.D. La. 1991) ("we decline to create a cause of action" for public nuisance); *see also Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1030 n.13 (5th Cir. 1985) (en banc) (denying plaintiffs' nuisance claim because of the economic loss doctrine and recognizing that the Supreme Court has "apparently foreclosed" a "federal cause of action for public nuisance caused by the obstruction of navigable waterways").[8]

Even if the general maritime law recognized a claim for public nuisance, OPA displaces it. Plaintiffs' nuisance claim is based upon alleged property damage and economic losses.  For example, Plaintiffs allege that "[p]rior to the *Deepwater Horizon* disaster, Plaintiffs enjoyed the use of the Gulf

---

[8] Even if such a were recognized under federal maritime law, public nuisance claims require an allegation that the plaintiff "suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference." RESTATEMENT (SECOND) OF TORTS § 821C(1). Plaintiffs allege only that they have been "exposed to harmful chemicals . . . at levels, amounts, and under conditions different from the general public."  Mast. Compl. B3 ¶¶ 263–64.  In other words, they allege damages different in <u>degree</u> rather than in <u>kind</u>, which is insufficient to establish a specialized injury. *See* RESTATEMENT (SECOND) OF TORTS § 821C cmt. b ("It is not enough that [a plaintiff] has suffered the same kind of harm or interference but to a greater extent or degree [than the general public]"); *In re The Exxon Valdez*, 104 F.3d 1196, 1198 (9th Cir. 1997) (rejecting public nuisance claim even though "oil spill may have affected [Plaintiffs] Alaska Natives more severely than other members of the public . . . .").

of Mexico for fishing, boating, and other economic and recreational pursuits, including residing on

the Gulf of Mexico" and that "[s]ince the disaster, Plaintiffs have been unable to fish or boat, and

many have lost their livelihoods." Mast. Compl. B3 ¶¶ 261–62 (emphases added). These allegations

describe the loss of profits, earning capacity, and use of natural resources. Each of these damages is

covered by OPA. *See* 33 U.S.C. § 2702(b)(2)(A), (E).

OPA is the exclusive federal remedy for any claimant seeking recovery for covered damages.

The "will of Congress" is dominant in admiralty. *Northwest Airlines, Inc. v. Transp. Workers Union*

*of Am., AFL-CIO*, 451 U.S. 77, 96 (1981). Accordingly, comprehensive legislation like OPA

displaces federal common law and general maritime law in that same area. *See Middlesex County*

*Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 11 (l981) (Federal Water Pollution Control

Act, as amended, fully preempts federal common law of nuisance in area of ocean pollution); *Conner*

*v. Aerovox, Inc.*, 730 F.2d 835, 840–41 (lst Cir. 1984) (Federal Water Pollution Control Act preempts

general maritime law tort claims); *United States v. Dixie Carriers, Inc.*, 627 F.2d 736, 740–42 (5th

Cir. 1980) (Federal Water Pollution Control Act provides the exclusive legal remedy for the

government to recover its oil spill cleanup costs). "[W]hen Congress addresses a question previously

governed by a decision rested on federal common law the need for such an unusual exercise of

lawmaking by federal courts disappears." *City of Milwaukee v. Illinois*, 451 U.S. 304, 314 (1981)

(holding that the Clean Water Act displaces the federal common law of interstate water pollution).

As the legislative history makes clear,[9] Congress passed OPA to occupy the field of

economic damages caused by marine oil pollution. Courts uniformly have held that "Congress

---

[9] Legislative history also supports the view that OPA establishes an exclusive federal cause of
action displacing federal maritime law. As the court in *Tanguis* noted, "OPA 'represents Congress's
attempt to provide a comprehensive framework in the area of marine oil pollution.'" *Tanguis v. M/V*
*Westchester*, 153 F. Supp. 2d 859, 867 (E.D. La 2001) (*citing Rice v. Harken Exploration Co.*, 89 F.
Supp. 2d 820, 822 (N.D. Tex. 1999)). The Senate Report also states that "OPA 'creates a single Federal
law providing cleanup authority, penalties, and liability for oil pollution.'" *Tanguis*, 153 F. Supp. 2d at
867 (citing S. REP.NO. 101-94, at 9 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722, 730) (emphasis added).

18

intended the OPA to be the exclusive federal law governing oil spills." *South Port Marine, LLC v. Gulf Oil LP*, 234 F.3d 58, 65–66 (1st Cir. 2000) (punitive damages are not available under OPA because "Congress's very specific treatment of oil pollution in the OPA, which does not provide for punitive damages, supplanted general admiralty and maritime law, which has traditionally provided for the general availability of punitive damages for reckless conduct"); *see also Gabarick v. Laurin Mar. (Am.) Inc.*, 623 F. Supp. 2d 741, 750–51 (E.D. La. 2009) (all general maritime law claims that are recoverable under OPA, and specifically those covered damages enumerated in 33 U.S.C. § 2702, are preempted by OPA); *Tanguis*, 153 F. Supp. 2d at 867 ("This new scheme includes new remedies, which, in many respects, preempt traditional maritime remedies"); *Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atl. Corp.*, 924 F. Supp 1436, 1447 (E.D. Va. 1996), *aff'd*, 122 F.3d 1062 (4th Cir. 1997) ("Because OPA provides a comprehensive scheme for the recovery of oil spill clean-up costs and compensation of those injured by oil spills, the general maritime law does not apply to recovery of these types of damages"); *In re Alex C Corp.*, No. 01-12184-DPW, 2003 WL 203078, at *11 (D. Mass. Jan. 30, 2003) (dismissing claims under maritime contribution law and maritime law indemnity where OPA has provided for recovery of those damages).  Because maritime law does not recognize a claim for public nuisance and, even if it did, OPA would displace it, Plaintiffs' nuisance claim must be dismissed.

**B.     Plaintiffs Fail to State a Claim Against Dril-Quip Under the Oil Pollution Act.**

OPA's pre-suit presentment requirement states: "all claims for removal costs or damages <u>shall be</u> presented first to the responsible party . . . of the source designated under section [2714(a) of this title]." 33 U.S.C. § 2713(a) (emphasis added).  If such a claim is presented and the responsible party denies all liability, or if the claim is not settled within 90 days, the claimant may elect to commence an action in court against the responsible party.  33 U.S.C. § 2713(c).

Plaintiffs allege that "[t]o the extent required by law, Plaintiffs <u>have satisfied, or will have</u>

19

satisfied, all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), as to each and all of the defendants, by the submission of their claims to the Gulf Coast Claims Facility (the 'GCCF'), and/or BP, and/or its agents or designees." Mast. Compl. B3 at ¶ 200 (emphasis added).  On its face, Plaintiffs' allegation fails to satisfy the mandatory presentment requirement of OPA, and Plaintiffs' OPA claim, therefore, should be dismissed for failure to state a claim. Because the Court lacks jurisdiction over claims that have not first been presented, this defect cannot be cured by the tardy presentation of Plaintiffs' claims mid-course in litigation.

Simply put, "the clear text of § 2713 creates a mandatory condition precedent barring all OPA claims unless and until a claimant has presented her claims . . . ."  *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*, 51 F.3d 235, 240 (11th Cir. 1995). This presentation requirement "is jurisdictional and mandates dismissal when [the presentment provision] is . . . not complied with by the claimant." *Marathon Pipe Line Co. v. LaRouche Indus. Inc.*, 944 F. Supp. 476, 477 (E.D. La. 1996); *see also Gabarick v. Laurin Mar. (Am.) Inc.*, No. 08-4007, 2009 WL 102549, at *3 (E.D. La. Jan. 12, 2009) (dismissing OPA claims for failing to comply with OPA's presentment requirement and denying plaintiff's request for a stay in lieu of dismissal); *Turner v. Murphy Oil USA, Inc.*, No. 05-4206, 2007 WL 4208986, at *2 (E.D. La. Nov. 21, 2007) (presentment provision is a "'mandatory condition precedent'" to bringing a suit under OPA) (quoting *Boca Ciega*, 51 F.3d at 240); *Russo v. M/T Dubai Star*, No. C 09-05158 SI, 2010 WL 1753187, at *2– 3 (N.D. Cal. Apr. 29, 2010) (collecting cases holding that OPA's presentation requirement is jurisdictional and mandates dismissal for failure to comply).

Plaintiffs cannot cure this jurisdictional flaw by providing the requisite presentment in the midst of ongoing litigation.  *See Hallstrom v. Tillamook County*, 493 U.S. 20, 33 (1989) (holding that plaintiffs' failure to comply with a statutory 60-day notice provision is a failure to satisfy a condition precedent to maintaining a suit and necessitates dismissal of the case, and that the district court cannot stay the case to permit plaintiffs to comply with the notice requirement); *Nat'l Envtl. Found.*

20

*v. ABC Rail Corp.*, 926 F.2d 1096, 1097–98 (11th Cir. 1991) ("If a plaintiff fails to comply with [the notice requirement of the Clean Water Act] where it is applicable, the district court is required to dismiss the action"); *Gregory v. Mitchell*, 634 F.2d 199, 203–04 (5th Cir. 1981) (holding that "[t]he requirement of exhaustion of administrative review is a jurisdictional requisite to the filing of an action under the FTCA" and that the failure to exhaust cannot be cured by a stay of the case until the requirement is met); *Hooper v. Thomas*, No. 01-1730, 2002 WL 1268399, at *1 (E.D. La. June 5, 2002) (holding that the "federal court's power to adjudicate a claim brought under the Federal Tort Claims Act depends solely on whether the claimant has previously complied" with the mandatory notice requirement and that a "stay pending exhaustion cannot cure a jurisdictional defect which was present when the suit was filed").

By failing to comply with OPA's requirement that all claimants present a claim to the responsible party for settlement consideration <u>before</u> filing a lawsuit, Plaintiffs undermine one of the principal purposes of the Act. The presentation requirement reflected Congress's belief that lawsuits against parties are appropriate only "where attempts to reach a settlement with the responsible party . . . were unsuccessful." H.R. REP. NO. 101-242, pt. 2, at 66 (1989). Legislative debate on the bill highlighted the goal of avoiding litigation as a key objective of the Act. *See* 135 CONG.REC. H7954-02 (daily ed. Nov. 2, 1989) (statement of Rep. Hammerschmidt), 135 Cong. Rec H7954-02, at *H7965 (Westlaw) (OPA is "intended to allow for quick and complete payment of reasonable claims without resort to cumbersome litigation"); *id.* at *H7962 (statement of Rep. Lent) ("The thrust of [OPA] is to eliminate, to the extent possible, the need for an injured person to seek recourse through the litigation process . . . ."); *id.* at *H7955 (statement of Rep. Jones) ("We do not want claimants to have to wait years upon years to recover their losses while lawsuits drag on in the courts"). The claims presentation provision reflected a compromise "to temper the Act's increased liability with a congressional desire to encourage settlement and avoid litigation." *Boca Ciega*, 51 F.3d at 238–39 (citing legislative history of the Act). To achieve that essential congressional objective, dismissal is

21

required.

Accordingly, Plaintiffs' OPA claim against Dril-Quip must be dismissed for failure to state a claim because Plaintiffs did not sufficiently allege the requisite element of presentment of their claims prior to filing suit.  Although some of the individual plaintiffs may have complied with the OPA presentment requirement, others have not.  Any individual plaintiff that has failed to fully comply with OPA can re-file only after properly presenting a claim and awaiting either rejection of his claim or expiration of the 90-day statutory period. *See Gabarick*, 2009 WL 102549, at *3.

### D.   Plaintiffs' State Law Claims Must Be Dismissed Because State Law Does Not Apply to this Case.

Plaintiffs assert three claims against Dril-Quip under state law: Florida Medical Monitoring (Count 9), Strict Liability Pursuant to the Florida Pollutant Discharge Prevention and Control Act ("FPDPCA") (Count 11), and Negligence *Per Se* pursuant to various states' laws (Count 5).  State law, however, does not apply to this action; federal law alone applies to claims arising out of and in connection with oil exploration, development, and extraction operations on the Outer Continental Shelf ("OCS").  Although federal law sometimes borrows state law as surrogate federal law in OCS cases, it does not do so in this case, and even if it did, it would not borrow Florida law. Plaintiffs can assert a medical monitoring claim for exposure to hazardous chemicals <u>only</u> under federal maritime law and a claim for property damage <u>only</u> under OPA. Because Plaintiffs' state law claims are based on substantive laws that do not apply, they must be dismissed.

### 1.   Federal Law Applies Exclusively Under the Outer Continental Shelf Lands Act.

Plaintiffs allege that this case arises out of, or in connection with, operations conducted on the outer Continental Shelf ("OCS") involving the exploration and production of oil from the subsoil and seabed of the outer Continental Shelf. *Cf.* 43 U.S.C. § 1349(b)(1)(A) (granting U.S. district courts jurisdiction of cases "arising out of, or in connection with . . . any operation conducted on the

22

outer Continental Shelf . . .). This Court has already held that the Outer Continental Shelf Lands Act ("OCSLA") gives it jurisdiction over cases arising from the *Deepwater Horizon* incident, *see* Order Denying State of Louisiana's Motion to Remand, Case No. 10-cv-1758 [Dkt. # 471] (E.D. La. Oct. 6, 2010), and Plaintiffs themselves invoke this Court's jurisdiction under OCSLA, *see* Mast. Compl. B3 ¶ 72, alleging harms arising from operations on the OCS. *See, e.g.*, *id.* ¶¶ 79, 82, 109, 315. Because the controversy is thus "inextricably linked" to resource exploration and development on the OCS "and would not have arisen but for such development," *Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co.*, 448 F.3d 760, 774 (5th Cir. 2006), OCSLA confers federal jurisdiction and also supplies comprehensive choice-of-law rules codified in Section 1333 of the Act. *See EP Operating LP v. Placid Oil Co.*, 26 F.3d 563, 569 & n.14 (5th Cir. 1994) ("the most consistent reading of the statute instructs that the jurisdictional grant of section 1349 should be read co-extensively with the substantive reach of section 1333"); *Toussaint v. Chevron Phillips Chem. Co.*, 2006 WL 2349465, at *2 (E.D. La. Aug. 11, 2006) (when a "case arises in connection with a mineral production operation on the Outer Continental Shelf[,] it falls within the scope of OCSLA," and Section 1333 "in turn" applies).

The question of which substantive law governs the Plaintiffs' claims is answered solely by Section 1333 of OCSLA. Other choice-of-law rules, such as those of the forum state or maritime choice-of-law rules, are irrelevant. *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 482 n.8 (1981) (OCSLA "supersede[s] the normal choice-of-law rules that the forum would apply"); *Wooten v. Pumpkin Air, Inc.*, 869 F.2d 848, 852 (5th Cir. 1989) (rejecting the *renvoi* argument that Section 1333 adopts the choice-of-law rules of the state adjacent to an OCSLA situs). Even if Plaintiffs alleged they were exposed or injured in state territorial waters (they have not), they could not avoid Section 1333(a)'s choice-of-law rules, which apply "coextensively" with Section 1349, *EP*

23

*Operating*, 26 F.3d at 569 & n.14, and are in place because Congress intended to have federal law govern all cases involving "activities" occurring on the OCS. *See* H.R. REP.NO. 95-590, at 128 (1977), *reprinted in* 1978 U.S.C.C.A.N. 1450, 1534.[10]  Dril-Quip is aware of no case under Section 1349 where a court used choice-of-law rules other than those Congress prescribed in Section 1333.

OCSLA's choice-of-law rules are straightforward: "Federal law is 'exclusive' in its regulation of this area, and [therefore] state law is adopted only as surrogate federal law," *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 357 (1969), and "then only when no inconsistent federal law applied." *Id.* at 358. According to Section 1333(a), then, the substance of the adjacent state's law may apply (as "surrogate federal law") in an OCSLA case, but only if: (a) the controversy arises on a situs covered by OCSLA; (b) substantive maritime law does not apply of its own force; and (c) state law is not inconsistent with federal law.  *Union Texas Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990); *see Demette v. Falcon Drilling Co.*, 280 F.3d 492, 499 (5th Cir. 2002), *overruled in part on other grounds by Grand Isle Shipyard Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 782–83 (5th Cir. 2009) ("Since the incident occurred on the OCS beyond the territorial waters of Louisiana, the only way state law could have operated was by incorporation into federal law under OCSLA").[11]  Otherwise, federal law, not supplemented by state law, is all that applies.  Because

---

[10]The House Report states: "Section 203—Laws Applicable to Outer Continental Shelf[:] . . . It is thus made clear that Federal Law is to be applicable to <u>all activities</u> on all devices in contact with the seabed for exploration, development, and production.  The Committee intends that Federal Law is, therefore, to be applicable to <u>activities</u> on drilling ships, semi-submersible drilling rigs, and other watercraft, when they are connected to the seabed by drillstring, pipes, or other appurtenances, on the OCS for exploration, development, or production purposes."  H.R. REP.NO. 95-590, at 128, 1978 U.S.C.C.A.N. at 1534 (emphasis added).

[12] *Grand Isle* holds that, for tort actions under OCSLA, the situs of a claim is the location where the controversy arises.  *See Grand Isle*, 598 F.3d at 784.  For contract actions, the situs of a claim is the location where the majority of work under the contract is to be performed. *Id.* at 787. In so holding, the Fifth Circuit overruled prior decisions (like *Demette*) insofar as they applied the tort situs analysis to contract claims.  However, *Demette*'s other holdings remain good law. *Id.*

24

Plaintiffs' claims are all governed by either maritime law or some other federal law (like OPA), Plaintiffs cannot state a cause of action under state law.

### 2. Plaintiffs' Florida Medical Monitoring Claim and State Law Negligence Per Se Claim Must Be Dismissed.

Applying OCSLA's choice of law rules, Plaintiffs' Florida law medical monitoring claim against Dril-Quip must be dismissed because substantive maritime law supplies the only medical monitoring remedy available. Plaintiffs expressly designate Master Complaint B3 as a Complaint in Admiralty under Federal Rule of Civil Procedure 9(h) and so concede that substantive maritime law applies to this case. *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 533–34, 545 (1995) ("With admiralty jurisdiction comes the application of substantive admiralty law") (citations and quotation marks omitted). Furthermore, Plaintiffs expressly plead a duplicative claim for medical monitoring <u>under the maritime law</u>, conceding that maritime law provides a remedy for the relief they seek. Mast. Compl. B3 ¶ 202–18. They do <u>not</u>, however, name Dril-Quip in that count. *See* Mast. Compl.  ¶¶ 202–18. Finally, Plaintiffs complain about exposure to harmful chemicals that were released from <u>vessels</u> into the navigable waters in connection with the clean-up of an oceanic oil spill originating from operations on the OCS.  This constitutes a claim under maritime law.  *See Grubart*, 513 U.S. at 533–34. Because state law cannot apply in an OCSLA case when maritime law applies of its own force, Plaintiffs' Florida medical monitoring claim against Dril-Quip is not cognizable. *See Cont'l Oil Co. v. London S.S. Owners' Mut. Ins. Ass'n*, 417 F.2d 1030, 1034 (5th Cir. 1969) (application of Louisiana law to case arising on the OCS was neither "needed [n]or permitted" because "there was a fully effective maritime right and remedy").[12]

---

[12] Even if state law could be applied to this case, as opposed to maritime law, it would not be the law of Florida because Louisiana is the "adjacent state" for purposes of the application of state law as surrogate federal law. *See* 43 U.S.C. §1333(a)(2)(A); *see also Snyder Oil Corp. v. Samedan Oil Corp.*, 208 F.3d 521 (5th Cir. 2000). Under Louisiana law, if it applied, Plaintiffs' medical monitoring claim would fail. *See* LA.CIV.CODE ANN. art. 2315(B) (2010) ("Damages do not include costs for future medical treatment, services, surveillance, or procedures of any kind unless such treatment, services,

The Court also must dismiss Plaintiffs' claim that Dril-Quip's alleged violations of federal and state statutes "constitute negligence *per se* under Louisiana, Texas, Mississippi, Alabama and Florida law." Mast. Compl. B3 ¶ 240. Because federal law applies exclusively in this case, and Plaintiffs have no resort to any state's law through OCSLA, Plaintiffs' Negligence *Per Se* claims under state law fail and should be dismissed.

### 3. Plaintiffs' Florida Pollutant Discharge Prevention and Control Act Claim Must Be Dismissed.

As Plaintiffs' FPDPCA allegations in Count Eleven essentially replicate their OPA allegations in Count One, Plaintiffs cannot contest that OPA provides relief essentially identical to that which they seek under the FPDPCA. In both Counts, Plaintiffs seek to recover for "damage to their real and/or personal property as a result of the post-explosion clean-up activity . . . ." Mast. Compl. B3 ¶¶ 197, 316. The statutory causes of action track each other closely. *Compare* FLA.STAT. §§ 376.205, 376.121 (2010), *with* 33 U.S.C. §§ 2702(a), (b)(2). Because OPA is directly on point, it applies exclusively to Plaintiffs' property damage claims for two reasons: first, because OPA leaves no gaps to be filled through the OCSLA choice-of-law rules in Section 1333(a); second, because the comprehensive federal scheme for regulating activity on the OCS, including pollution flowing from the OCS, preempts the law of affected states.[13]

---

surveillance, or procedures are directly related to a manifest physical or mental injury or disease").

[13]In their FPDPCA claim, Plaintiffs allege only that "[t]he Coast Guard has named BP as the responsible party for the downhole release of oil, and Transocean as the responsible party for the release of diesel on the surface," and that therefore, "BP and Transocean are liable under the Florida Act for all damages" resulting from the Oil Spill. Mast. Compl. B3 ¶ 313. With respect to Dril-Quip, Plaintiffs merely lump it together with other Defendants in the conclusory allegation that "Defendants had a statutory duty to Plaintiffs to maintain and operate the Deepwater Horizon and the Macondo well, and/or to conduct post-Oil Spill remedial efforts so as to not create or sustain hazardous conditions due to the discharge of pollutants." *Id.* ¶ 309. Thus, even if Florida law applies, which it does not, Plaintiffs fail to plead an essential element of an FPDPCA claim against Dril-Quip.

26

a. **OCSLA requires the exclusive application of OPA to claims for property damages and economic losses arising from oil spills originating on the OCS.**

OPA governs economic loss claims in oil-pollution cases governed by federal or maritime law. *See Gabarick v. Laurin Mar. (Am.) Inc.*, 623 F. Supp. 2d 741, 750–51 (E.D. La. 2009) (general maritime law claims are displaced by OPA); *Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001) (OPA "includes new remedies, which . . . preempt traditional maritime remedies"). It leaves no gaps that OCSLA could use state law to fill.

OPA's savings clause does not rescue Plaintiffs' FPDPCA claim from dismissal.  Unlike cases involving oil spills in state territorial waters, in which Plaintiffs can plead one as an alternative remedy to the other, OPA and the FPDPCA are not mere alternatives in this case. Under the choice-of-law rules in OCSLA's Section 1333(a), it is <u>only</u> OPA—neither the FPDPCA applying of its own force nor the FPDPCA applying as surrogate federal law—that provides the substantive rules of decision for claims arising out of oil spills originating from operations on the OCS. Because it is OCSLA—not OPA—that precludes applying state law, OPA's savings clause, which limits only the preemptive effect of OPA itself, does not allow state law to be applied in this case. *See* 33 U.S.C. § 2718; *cf. Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 223–27 (1986) (holding that the savings clause in the Death on the High Seas Act does "not implicitly sanction the operation of state wrongful death statutes on the high seas," where states have no power, but only "preserve[s] the state courts' jurisdiction to provide wrongful death remedies under state law for fatalities <u>on territorial waters</u>") (emphasis added); *Ten Taxpayer Citizens Group v. Cape Wind Assocs.*, 373 F.3d 183, 193–97 (1st Cir. 2004) (rejecting the argument that a federal statute recognizing state power over specific activities overrides OCSLA's displacement of state law on the OCS).[14]

---

[14]When enacting OPA, Congress foresaw this very result.  Senators Chaffee, Lieberman, Graham, and Durenberger objected that an early draft of OPA was ill-suited to OCS oil spills because it capped liability for clean-up costs.  S. REP.NO. 101-94, at 26 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722, 748. In a statement on the bill, which had a savings clause like that which was enacted into law, the Senators noted that states lacked authority to impose additional liability above the cap because OCS facilities "are

**b.  Federal law preempts the Florida statute here.**

Even if OCSLA did not require exclusive application of federal law to this case, the combined effect of OPA and OCSLA preempts application of the FPDPCA.  Precedents holding that federal law preempts application of an affected state's law to interstate <u>water pollution</u> originating from non-OCS sources require the similar conclusion that federal law preempts an affected state's law to <u>oil spills</u> originating from OCS sources.

"[R]egulation of interstate water pollution is a matter of federal, not state, law . . . ." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 488 (1987) (citations omitted).  Since Congress's enactment of extensive legislation in the area (through, for instance, the Clean Water Act), federal statutes have displaced the *ad hoc* federal common law remedy that previously supplied the substantive rules of decision. *See City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981). With federal statutory law firmly in place, "it is clear that the only state suits that remain available are those specifically preserved by" the new federal statutes. *Ouellette*, 479 U.S. at 492.

In *Ouellette*, the Supreme Court held that the Clean Water Act, in light of its text, purposes, and history, and <u>notwithstanding its savings clause</u>, does not "preserve the right to bring suit under the law of any affected State."  *Id.* at 493. Applying the law of an affected state to pollution originating in another state would seriously undermine, and stand as an obstacle to the full implementation of, the methods by which the Clean Water Act regulates interstate water pollution. *Id.* at 494–97 (explaining how applying an affected state's law would circumvent the Act, which gives regulatory authority only to EPA and source states and which defines a narrow role for affected states). Because of those federal-state conflicts, together with the likelihood of state-state conflicts,

outside the 3 mile limit, and therefore are not subject to state laws."  *Id.* at 27, 1990 U.S.C.C.A.N. at 749. Congress resolved the Senators' objection by eliminating the OPA cap on clean-up liability, not by giving states authority to impose additional liability with respect to OCS oil spills.

the Court ultimately held that the Act's savings clause preserves only claims brought under the law of a source state. *Id.* at 497–500; *see id.* at 495 ("An interpretation of the saving clause that preserved actions brought under an affected State's law would disrupt this balance of interests").[15]

That reasoning also requires that OPA's savings clause be interpreted to foreclose application of the FPDPCA in this case. Applying the FPDPCA to an oil spill originating on the OCS would frustrate Congress's methods for regulating OCS operations and would lead to problems of conflicting multistate regulation.    Through OCSLA and the Coastal Zone Management Act ("CZMA"), 16 U.S.C. §§ 1451–1464, the federal government extensively regulates exploration and drilling operations on the OCS for their potential environmental impacts.  *See Mobil Oil Exploration & Producing SE, Inc. v. United States*, 530 U.S. 604, 609– 10 (2000) (summarizing the four pillars of the comprehensive regime).  Just as in *Ouellette*, applying the law of an affected state to discharges from OCS operations would circumvent this careful scheme, which specifically assigns a largely advisory role to affected states: "The inevitable result of" applying an affected state's law "would be that . . . States could do indirectly what they could not do directly—regulate the conduct of" OCS operations. *Ouellette*, 479 U.S. at 495. Applying the law of an affected state also would "undermine the important goals of efficiency and predictability," for "application of numerous States' laws would only exacerbate the vagueness and resulting uncertainty." *Id.* at 496. Also, as in *Ouellette*, the savings clauses in the relevant federal statutes (*e.g.*, 16 U.S.C. § 1456(e) (CZMA); 33 U.S.C. § 2718 (OPA); 43 U.S.C. § 1349(a)(6) (OCSLA)) do not obviate resort to ordinary conflict preemption principles. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869–74 (2000) (citing *Ouellette*, 479 U.S.); *cf. Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 230 (1986) ("[I]t is hardly conceivable

---

[15]The Clean Water Act's preservation of source state law is inapplicable here because Plaintiffs have pleaded that the oil that harmed them was discharged not from a state, but from a federal enclave on the OCS. Mast. Compl. B3 ¶¶ 72, 79, 82.

that Congress," through a mere savings clause, "could have intended that these diverse state statutes could be applied to remedy maritime torts occurring the world over").

*Askew v. Am. Waterways Operators, Inc.*, 411 U.S. 325 (1973), does not require a contrary result. There, considering a limited preemption question, the Supreme Court upheld an earlier and more limited version of the FPDPCA, which by its own terms applied only to oil pollution discharged in State territorial waters. *Id.* at 327–38. The Court held that there was "no collision" between the FPDPCA and the federal Water Quality Improvement Act (earlier legislation on which the Clean Water Act expanded) because that federal Act was "concerned only with actual cleanup costs incurred by the Federal Government" as a result of an oil spill, and did not address the clean-up costs or other costs incurred by States for damages resulting from injury to their citizens and natural resources. *Id.* at 333–34, 335–36. The Court also held that federal maritime law did not prohibit Florida from so legislating. *Id.* at 337–44. The Court reserved the question of whether the FPDPCA unconstitutionally "conflict[ed] with any federal Act." *Id.* at 343.

Because the then-extant FPDPCA expressly applied only to discharges within Florida territorial waters, the *Askew* Court did not consider whether any federal statute preempted the application of the FPDPCA to <u>interstate</u> oil spills or to oil spills resulting from operations on the OCS, which are the circumstances alleged here. With the passage of the Clean Water Act and OPA, Congress broadly expanded federal regulation of interstate oil pollution to areas conflicting with the FPDPCA, including clean-up costs and other costs incurred by States for damages to their citizens and natural resources. Furthermore, OCSLA governs all operations on the OCS to the exclusion of state law and applies to oil spills and other environmental harms resulting from those operations. The Clean Water Act, OCSLA, and OPA were not at issue in *Askew*; they are what now preempts the substantive laws of states affected by oil spills originating on the OCS, including the FPDPCA.

30

E.     **Even If State Law Could Apply to Plaintiffs' State Law Claims as Asserted, Those Claims Must Be Dismissed.**

   1.   **Even If Florida Law Was Not Preempted, The Florida Pollutant Discharge Prevention Control Act Does Not Apply Here And Must Be Dismissed**

Even if Florida law is not preempted by OCSLA and the CWA, Plaintiffs' Florida Pollutant Discharge Prevention And Control Act (PDPCA) claim (Count III.D) would still lack merit. Plaintiffs' PDPCA claim is based upon alleged damages from the flow of pollution into Florida's territory. Plaintiffs admit that "[t]he immediate discharge from the Spill occurred into waters *outside* the territorial limits of Florida," but maintain that "lands and waters within the territorial limits of Florida have been directly affected by the discharge and are reasonably expected to continue to be so affected." (B1 Compl., ¶742 (emphasis added).) This indirect effect is insufficient to ground the claim on the Florida PDPCA.

*First,* the *Deepwater Horizon situs* lies far outside Florida's territorial waters and is not subject to the State's jurisdiction.   *United States* v. *Florida,* 425 U.S. 791, 792 (1976) (per curiam); *United States* v. *Louisiana,* 363 U.S. 121, 129 (1960). The United States, not Florida, holds jurisdiction over the MC252 *situs.*

*Second,* applying the PDPCA to an incident outside of Florida's territorial waters would be an unconstitutional extraterritorial application of state law to regulate interstate commerce. Interstate commerce, including the discovery, production, and transportation of oil in federal waters, is governed by Congress. *See* U.S. Const. art. I, § 8, cI. 3. "[T]he Commerce Clause ... precludes the application of a state statute to commerce that takes place wholly outside of the state's borders, whether or not the commerce has effects within the state." *Healy* v. *Beer Inst., Inc.,* 491 U.S. 324, 336 (1989). The PDPCA is intended to regulate "[t]he transfer of pollutants between vessels, ... between offshore facilities and vessels" because it "is a hazardous undertaking," Fla. Stat. § 376.021 (3)(a) (expressing legislative intent), and uses the state's police power to empower the state Department of Environmental Protection to "[ d]eal with the hazards and threats of danger." *Id.* § 376.021(4)(a).  By contrast, the manner in which Plaintiffs seek to apply the PDPCA aims precisely to regulate interstate commerce that takes place outside Florida's

31

borders based solely on an effect felt within its borders. Plaintiffs admit the Macondo well is located and the discharge occurred "outside the territorial limits of Florida" but attempt to invoke Florida law on the basis of effects within Florida's boundaries. (Bl Compl., ¶742) Applying the PDPCA in this manner would have the practical effect of regulating commerce outside Florida because it would permit the regulation of and imposition of liability for pollution taking place wholly outside the state's waters. This "practical effect" violates the Commerce Clause. *Healy*, 491 U.S. at 336.[16]

*Third*, by its own terms, the PDPCA does not apply.  A responsible party is "liable to any affected person for all damages as defined in s. 376.031." Fla. Stat. § 376.12(5). In turn, "damages" are defined as "the documented extent of any destruction to or loss of any real or personal property ... *as the direct result of the discharge* of a pollutant." *Id.* § 376.031(5) (emphasis added). Plaintiffs themselves recognize that their damages must be limited only to damages that occur as a direct result of the discharge. *(See* BI Compl. , ¶ 744.) But the only allegation concerning that damage states that "certain Plaintiffs and Florida Subclass Members have sustained damage to their personal property *as a result of the post-Spill cleanup activity"* (Bl Compl. ¶ 743) (emphasis added), not the discharge itself. Under the parallel OPA statute, a claimant cannot recover unless the property damage is a direct result of the discharge. *In re Taira Lynn,* 444 F.3d at 380.[31] Whether or not Plaintiffs have a separate cause of action for alleged damage from the cleanup, it is not the proper subject of Florida's PDPCA. Applying the Florida PDPCA would require this Court to "go beyond the first step" of the chain of causation. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983).  By its terms, the PDPCA only remedies damage arising as the direct result of a discharge; the damage Plaintiffs claim is too attenuated to be remediable.

---

[16]If the Court holds that OCSLA and/or *Ouellette* preemption bar Plaintiffs' PDPCA claim, it is unnecessary to reach the issue of whether Plaintiffs' application of the PDPCA would violate the Commerce Clause. "The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." *Ashwander v. TVA,* 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) (quoted in *United States v. Underwood,* 597 F.3d 661,665 (5th Cir. 2010)).

Moreover, as noted above, only "responsible parties" as defined by the FPDCA are liable to injured parties for damages. Fla. Stat. Ann. §376.125. The FPDCA limits "responsible parties" to parties that own, lease, or operate drilling or transport vessels, facilities, or pipelines. Fla. Stat. Ann. §376.031(20). The Complaint does not allege that Dril-Quip owned, leased, or operated a drilling vessel, facility, or pipeline. The Court should therefore dismiss Plaintiff's FPDCA claim.

## 2. Plaintiffs Fail to State a Claim for Medical Monitoring Even Under Florida Law.

The Supreme Court of Florida has not yet ruled on whether Florida law recognizes a cause of action for medical monitoring.[17] In *Petito v. A.M. Robins Co.*, 750 So.2d 103 (Fla. Dist. Ct. App. 2000), *rev. denied*, 780 So.2d 912 (Fla. 2001), the Court of Appeals for the Third District held that "under certain prescribed circumstances, Florida does recognize a cause of action for future expenses for medical diagnosis" despite the absence of physical injury, *id.* at 105, and that "a trial court may use its equitable powers to create and supervise a fund for medical monitoring purposes." *Id.* at 106. To establish the right to such relief under *Petito*, a plaintiff must prove the following:

> (1) exposure greater than normal background levels; (2) to a proven hazardous substance; (3) caused by the defendant's negligence; (4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the

---

[17] "'[F]ederal courts are bound by decisions of a state's intermediate appellate courts unless there is persuasive evidence that the highest state court would rule otherwise.'" *Bravo v. United States*, 577 F.3d 1324, 1325 (11th Cir. 2009) (per curiam) (quoting *King v. Order of United Commercial Travelers of Am.*, 333 U.S. 153, 158 (1948)). Although one intermediate appellate court of Florida has recognized a cause of action for medical monitoring in the absence of present physical injury, there is persuasive evidence that the Florida Supreme Court will follow other states' highest courts that have declined to recognize such a claim. *See supra* note 12; s*ee also Trimble v. Asarco Inc.*, 232 F.3d 946, 962–63 (8th Cir. 2000) (Nebraska); *Parker v. Brush Wellman, Inc.*, 377 F. Supp. 2d 1290, 1296, 1302 (N.D. Ga. 2005); *Duncan v. Northwest Airlines, Inc.*, 203 F.R.D. 601, 607–09 (W.D. Wash. 2001); *Thompson v. Am. Tobacco Co.*, 189 F.R.D. 544, 552 (D. Minn. 1999); *Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1400, 1410 (W.D. Mo. 1994); *Carroll v. Litton Sys. Inc.*, No. B-C-88-253, 1990 WL 312969, at *51 (W.D.N.C. Oct. 29, 1990); *Lowe v. Philip Morris USA, Inc.*, 183 P.3d 181, 187 (Or. 2008); *Henry v. Dow Chem. Co.*, 701 N.W.2d 684, 686 (Mich. 2005); *Wood v. Wyeth-Ayerst Labs.*, 82 S.W.3d 849, 857 (Ky. 2002); *Badillo v. Am. Brands, Inc.*, 16 P.3d 435, 440–41 (Nev. 2001); *Kelley v. Cowesett Hills Assocs.*, 768 A.2d 425, 430 (R.I. 2001); *Mergenthaler v. Asbestos Corp. of Am.*, 480 A.2d 647, 651 (Del. 1984).

disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

*Id.* at 106–07.

Plaintiffs fall far short of stating a claim on which relief in the form of a medical monitoring fund may be granted.  <u>First</u>, Plaintiffs fail to allege the third *Petito* element: that Dril-Quip's negligence caused any of the Plaintiffs' alleged exposure to harmful chemicals.  *See* Part III.A.1, *supra*.  <u>Second</u>, Plaintiffs' allegations of the Resident Plaintiffs' exposure to hazardous compounds present in crude oil are also plainly inadequate.  Plaintiffs allege in a conclusory fashion that "due to the proximity of their homes and schools to the Gulf of Mexico, and the actions and omissions by Defendants, [Resident Plaintiffs] have been exposed to oil, dispersants, and other harmful chemicals" and are "subjected to fumes and odors from the oil and dispersants."  Mast. Compl. B3 ¶¶ 139, 141. The allegation of "exposure," as the term is used here, gives no basis for Dril-Quip to understand how Resident Plaintiffs were exposed to the alleged harmful chemicals or whether Plaintiffs' alleged adverse health effects result from exposure to crude oil or the dispersants used by BP and the Dispersant Defendants. Similarly conclusory allegations were held inadequate to state a medical monitoring claim in *Jacobs v. Osmose, Inc.*, No. 01-944-CIV, 2002 WL 34241682, at *3 (S.D. Fla. Jan. 3, 2002) (dismissing plaintiffs' medical monitoring claim alleging that a product called Treated Wood contained hazardous substances and that plaintiff's deck was made of Treated Wood because the complaint "does not adequately provide the defendants with sufficient notice of how the plaintiff was exposed to the allegedly hazardous substances"). *See also Player v. Motiva Enters.*, 2006 WL 166452, at *9 (D.N.J. 2006) (concluding that medical monitoring damages were not available to plaintiffs who sought to recover costs of medical monitoring resulting from contamination of drinking water on their property) (citing *Theer v. Philip Carey Co.*, 628 A.2d 724, 733 (N.J. 1993)). Nor do Plaintiffs sufficiently allege that "medical surveillance is required because the exposure caused a distinctive increased risk of future injury." *Theer*, 628 A.2d at 733.

Plaintiffs also fail to plead any nonconclusory allegation that any monitoring regime is reasonably necessary. The Complaint states, "[t]he method and means for diagnosing Plaintiffs' potential medical problems are well accepted in the medical and scientific community and will be of great benefit to Plaintiffs by preventing or minimizing health problems that Plaintiffs may encounter as a result of the Oil Spill and from dispersants used to attempt to clean the Oil Spill." Mast. Compl. B3 ¶ 285.  Not only do Plaintiffs completely fail to allege what medical monitoring procedure they seek, there are no factual allegations to support the reasonableness of ordering any court-supervised medical monitoring program for all plaintiffs in the Florida Subclass. This expansive form of relief goes far beyond anything the *Petito* court contemplated when it recognized this limited cause of action and further supports dismissing Plaintiffs' claim against Dril-Quip.

## 2.   Plaintiffs Fail to State a Claim of Negligence *Per Se* Under Any Potentially Applicable Law.

Under either federal or state law, Plaintiffs' allegations of Negligence *Per Se* are insufficient to state a claim for relief.  To state a claim for Negligence *Per Se*, plaintiffs must identify a "violation of a statute which is intended to protect the class of persons to which [the plaintiffs] belong[] against the risk of the type of harm which has in fact occurred."  *Marshall v. Isthmian Lines, Inc*., 334 F.2d 131, 134 (5th Cir. 1964) (maritime law).  With only slight variation under state law, the "[f]ive elements of a . . . .negligence *per se* claim are the following: (1) a violation of . . . [a statute or] regulations, (2) the plaintiff's membership in the class of intended beneficiaries of the [statute or] regulations, (3) an injury of a type against which the [statute or] regulations are designed to protect, (4) the unexcused nature of the [statutory or] regulatory violation, and (5) causation."  *Smith v. Trans-World Drilling Co*., 772 F.2d 157, 160 (5th Cir. 1985) (citations omitted); *Marshall*, 334 F.2d at 134; *see also Cook's Pest Control, Inc. v. Rebar*, 28 So. 3d 716, 726 (Ala. 2009); *Ambrosio v. Carter's Shooting Ctr., Inc.*, 20 S.W.3d 262, 265 (Tex. App. 2000); *Moses v. Mosley*, 146 So. 2d 263, 267 (La. Ct. App. 1962).

As noted above, Plaintiffs' Negligence *Per Se* claim fails because Master Complaint B3 does not set forth any <u>factual</u> allegations to support the conclusory assertion that Dril-Quip was among the Defendants who participated in "the manufacture, maintenance and/or operation of drilling operations and oil vessels such as the *Deepwater Horizon*," caused "the release of hazardous and toxic chemicals into the environment," or took part in "the application of dispersants and other hazardous chemicals . . . ." *Id.* ¶¶ 238–39.

Master Complaint B3 refers to unnamed "numerous state and federal laws and permits issued under the authority of these laws." Mast. Compl. B3 ¶ 238.  Plaintiffs, however, must specifically identify a statute or regulation that Dril-Quip allegedly violated. *See Parker Bldg. Servs. Co. v. Lightsey*, 925 So. 2d 927, 931 (Ala. 2005); *see also Gates v. W.R. Grace & Co.*, No. 8:08-cv-2560-T-27TBM, 2009 WL 1455316, at *3 (M.D. Fla. May 21, 2009) (dismissing a claim of negligence *per se* where the plaintiff alleged only that the defendants "violated various Federal, state and local environmental laws and regulations") (internal citation and quotation marks omitted); *Anchundia v. Northeast Util. Servs. Co.*, No. CV 07-4446(AKT), 2010 WL 2400154, at *5 (E.D.N.Y. June 11, 2010) ("Where plaintiff fails to identify the statute upon which the [negligence *per se*] claim is based, it is impossible to determine if the plaintiff was in a class sought to be protected by the statute or whether the injury suffered by the plaintiff was the type of injury the statute was designed to prevent. It is also impossible to assess whether the defendant breached a duty imposed by statute"); *Holler v. Cinemark USA, Inc.*, 185 F. Supp. 2d 1242, 1243–44 (D. Kan. 2002) ("Notice pleading requirements suggest that plaintiff must plead the specific statute on which he bases his claim for negligence per se").  Plaintiffs fail to offer the requisite modicum of specificity in their vague allegations that "[o]ne or more of Defendants violated these statutory and regulatory standards."  Mast. Compl. B3 ¶ 239.

The conclusory allegations that Defendants violated the Clean Water Act and OPA also fail

36

to set forth a plausible basis for the Plaintiffs' Negligence *Per Se* claim. The Clean Water Act does not give rise to a private right of action. *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 14–15 (1981). When Congress does not "create a private right of action" for a statute, "any alleged violation of that statute by defendant cannot provide a basis for a negligence per se claim." *Miller v. E.I. Du Pont de Nemours & Co.*, 880 F. Supp. 474, 480 (S.D. Miss. 1994); *see Rodriguez v. Am. Cyanamid Co.*, 858 F. Supp. 127, 129 (D. Ariz. 1994) ("Courts considering whether to recognize negligence per se based on violation of broad environmental and public health statutes and regulations . . . have approached this issue by determining whether, in enacting the statute, the legislature intended to create a private right of action").

OPA also cannot serve as a basis for Plaintiffs' claim of Negligence *Per Se*. Allowing plaintiffs to recast claims covered by OPA under state or federal negligence law would frustrate the intent of Congress for "OPA to be the exclusive federal law governing oil spills." *South Port Marine, LLC v. Gulf Oil LP*, 234 F.3d 58, 65–66 (1st Cir. 2000). Through creative pleading, Plaintiffs are trying to avoid the presentment requirement of OPA, *see* 33 U.S.C. § 2713(a), and to seek damages not provided by the statute, such as punitive damages. *See South Port Marine*, 234 F.3d at 65–66. And, to the extent that Plaintiffs' claims are not for damages covered by OPA, the Court should not use the general maritime law to expand OPA's substantive liability provisions to cover claims not included within OPA's reach by Congress.

## IV.
## CONCLUSION

For the foregoing reasons, Plaintiffs' claims in Master Complaint B3 against Dril-Quip, Inc. should be dismissed in their entirety.

37

Date:   April 22, 2011

Respectfully submitted,

**WARE, JACKSON, LEE & CHAMBERS, LLP**

BY:  _/s/ C. Dennis Barrow, Jr._____
         Don Jackson
         Texas Bar No. 10476000
         Fed ID No. 6915
         C. Dennis Barrow, Jr.
         Texas Bar No. 00796169
         Fed ID No. 20624
         2929 Allen Parkway, 42nd Floor
         Houston, TX 77019
         Phone :  (713) 659-6400
         Fax    :  (713) 659-6262
         Counsel for Defendant, Dril-Quip, Inc.

## CERTIFICATE OF SERVICE

     I certify that the above and foregoing document will be served on all counsel by electronically uploading the same to LexisNexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 22nd day of April, 2011.

                /s/ C. Dennis Barrow, Jr._____
                C. Dennis Barrow, Jr.