**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In re:  Oil Spill by the Oil Rig** **"Deepwater Horizon" in the Gulf** **of Mexico, on April 20, 2010** **This Document Relates to:** ***All Cases in Pleading Bundle C*** (This Document also applies to No. 10-2771) | **MDL No. 2179** **SECTION: J** **JUDGE BARBIER** **MAGISTRATE SUSHAN** |

<u>**OMNIBUS MEMORANDUM IN**</u>
<u>**OPPOSITION TO DEFENDANTS' MOTIONS TO**</u>
<u>**DISMISS CERTAIN BUNDLE C COMPLAINTS SUBMITTED BY THE**</u>
<u>**PLAINTIFFS' STEERING COMMITTEE**</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

LEGAL STANDARDS...........................................................................................................1

LEGAL ARGUMENT .............................................................................................................3

      I.      THE OPA DOES NOT PREEMPT PLAINTIFFS' MARITIME OR
            STATE LAW CLAIMS ..............................................................................3

            A.     The Plain Language of the OPA Expressly Saves (and Does Not
                   Preempt) both State Law and General Maritime Law ...............................6

            B.     The Legislative History Confirms That The OPA Does Not
                   Preempt State Law Or The General Maritime Law ..................................8

            C.     Congress Did Not Intend To Occupy The Field Of Oil Pollution
                   Remedies And Preserving State Law and General Maritime Claims
                   Does Not Conflict With The OPA .........................................................13

      II.     The OPA Does Not Prohibit or Preempt Plaintiffs' Punitive Damage
            Claims .....................................................................................................15

      III.    The Alabama Cities and Mexican States Meet The Causation
            Requirements of the OPA .......................................................................21

      IV.    Plaintiffs' State Law Claims Are Not Preempted by the Clean Water Act..........28

      V.     The General Maritime Law Does Not Preempt Plaintiffs' State Law
            Claims. .....................................................................................................31

      VI.    The Court Should Not Dismiss Plaintiffs' Actions for Lack of Presentment ......33

      VII.   Defendant Halliburton's Rule 12 Motion on the Issue of Responsible Party
            Status is Premature.................................................................................35

      VIII.  The Rule In Robins Dry Dock Does Not Bar Plaintiffs' Economic Loss
            Claims .....................................................................................................37

            A.     Robins Dry Dock Should Not Apply Here .............................................39

CONCLUSION.....................................................................................................................40

## CASES

*Alcoa S.S. Co. v. Charles Ferran & Co.*,
383 F.2d 46 (5th Cir. 1967) ................................................................................ 31

*Altria v. Good*,
129 S. Ct. 538 (2008) ......................................................................................... 4

*American Dredging Co. v. Lambert*,
81 F.3d 127 (11th Cir. 1996) .............................................................................. 32

*Ashcroft v. Iqbal*,
___ U.S. ___, 129 S. Ct. 1937 (2009) ................................................................ 2

*Askew v. Am. Waterways Operators, Inc.*,
411 U.S. 325 (1973) ........................................................................................... 30

*Atl. Sounding Co. v. Townsend*,
129 S. Ct. 2561 (2009) ............................................................................... 5, 15, 16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................ 2, 3

*Berthelot v. Boh Bros. Constr. Co.*,
2006 U.S. Dist. LEXIS 57817 (E.D. La. 2006) .................................................. 2

*Castro v. United States*,
560 F.3d 381 (5th Cir. 2009) .............................................................................. 3

*Clausen v. M/V New Carissa*,
171 F. Supp. 2d 1127 (D. Or. 2001) .................................................................. 20

*Coastal Iron Works, Inc. v. Petty Ray Geophysical*,
783 F.2d 577 (5th Cir. 1986) .............................................................................. 31

*Commonwealth of Puerto Rico v. M/V Emily S*,
1998 AMC 2726 (D.P.R 1998) .......................................................................... 20

*Dalrymple v. Fairchild Aircraft, Inc.*,
575 F. Supp. 2d 790 (S.D. Tex. 2008) ............................................................... 32

*Davis v. U.S.*,
597 F.3d 646 (5th Cir. 2009) .............................................................................. 3

*Exxon Shipping Co. v. Baker*,
554 U.S. 471, 489 (2008) ............................................................................... 5, 30

*Gabarick v. Laurin Mar. (Am), Inc.*,
623 F. Supp. 2d 741 (E.D. La. 2009) ......................................................... 4, 12, 13

*Gabarick v. Laurin Mar. (Am.), Inc.*
No. 10-30148, 2010 U.S. App. LEXIS 26681 (5th Cir. Dec. 30, 2010) .............. 35

*Harris v. Oil Reclaiming Co.*,
94 F. Supp. 2d 1210 (D. Kan. 2000) .................................................................. 36

*Hercules Carriers, Inc. v State of Florida*,
720 F.2d 1201 (11th Cir. 1983), vacated and affirmed by equally divided *en banc* court, 728 F.2d 1359 (11th Cir. 1984) ........................................................ 39

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987) ............................................................................ 27, 28, 29, 30

*Isla Corp v. Sundown Energy LP*,
  No. 06-8645, 2007 WL 1240212 (E.D. La. April 27, 2007) ................................................ 5

*J. Ray McDermott v. Vessel Morning Star*,
  457 F.2d 815 (5th Cir. 1972) ........................................................................................ 31

*Just v. Chambers*,
  312 U.S. 383 (1941) ...................................................................................................... 31

*Lorman v. U.S. Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ........................................................................................... 2

*Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.*,
  959 F.2d 49 (5th Cir. 1999) ........................................................................................... 32

*Martin v. Halliburton*,
  618 F.3d 476 (5th Cir. 2010) ........................................................................................... 3

*Matheny v. Tennessee Valley Auth.*,
  503 F. Supp. 2d 917 (M.D. Tenn. 2007) ........................................................................ 32

*Matrixx Initiatives, Inc. v. Siracusano*,
  __U.S.__, 2011 U.S. LEXIS 2416 (2011) ................................................................... 2, 3

*Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*,
  453 U.S. 1 (1981) .......................................................................................................... 13

*Miles v. Apex Marine Corp.*,
  498 U.S. 19 (1990) ................................................................................... 16, 17, 18, 19

*Morrow v. Marine Max, Inc.*,
  731 F. Supp. 2d 390 (D.N.J. 2010) ............................................................................... 32

*National Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*,
  924 F. Supp. 1436 (E.D.Va. 1996), *aff'd*, 122 F.3d 1062 (4th Cir. 1997) ....................... 4

*Oppenheimer v. Prudential Sec., Inc.*,
  94 F.3d 189 (5th Cir. 1996) ............................................................................................ 1

*Palestina v. Fernandez*,
  701 F.2d 438 (5th Cir. 1983) ........................................................................................ 31

*Persson v. Scotia Prince Cruises, Ltd.*,
  330 F.3d 28 (1st Cir. 2003) .......................................................................................... 31

*Poe v. PPG Industries*,
  782 So. 2d 1168 (La. App. 3rd Cir. 2001) ................................................................. 29, 30

*Robins Dry Dock & Repair Co. v Flint*,
  275 U.S. 303 (1927) .......................................................................................... 37, 38, 39

*Robinson v. Shell Oil*,
  519 U.S. 337 (1997) ........................................................................................................ 7

*Rogers v. Coastal Towing, L.L.C.*,
  723 F. Supp. 2d 929 (E.D. La. 2010) ............................................................................ 32

*Romero v. Int'l Terminal Co.*,
  358 U.S. 373-75 (1959) ................................................................................................ 31

*Silkwood v. Kerr-McGee Corp.*,
  464 U.S. 238 (1984) ........................................................................................................ 7

*Skipperliner Indus., Inc. v. Ray,*
No. 00-C-0730, 2002 WL 32348827 (W.D. Wis. Jan. 31, 2002) .......................................... 32

*TAG/ICIB Services v. Pan American Grain Co.,*
215 F.3d 172 (1st Cir. 2000) ........................................................................................... 32

*Tanglewood E. Homeowners v. Charles-Thomas, Inc.,*
849 F.2d 1568 (5th Cir. 1988) ........................................................................................... 1

*Tanguis v. M/V Westchester,*
153 F. Supp. 2d 859 (E.D. La. 2001) ................................................................................. 6

*Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.,*
975 F.2d 1134 (5th Cir. 1992) ........................................................................................... 2

*U.S. v. Bestfoods,*
524 U.S. 51 (1998) .......................................................................................................... 36

*U.S. v. Bodenger,*
No. 03-0272, 2003 WL 22228517 (E.D. La. Sept. 25, 2003) .............................................. 6

*U.S. v. Egan Marine Corp.,*
No. 08-3160, 2009 WL 855964 (N.D. Ill. March 30, 2009) ............................................... 4

*U.S. v. Locke,*
529 U.S. 89 (2000) ........................................................................................................... 5

*U.S. v. M/V Cosco Busan,*
557 F. Supp. 2d 1058 (N.D.Cal. 2008) ............................................................................. 4

*United States v. Texas,*
507 U.S. 529 (1993) ......................................................................................................... 6

*Unocal Corp. v. U.S.,*
222 F.3d 528 (9th Cir. 2000) .......................................................................................... 35

*Who Dat Yat LLC v. Who Dat? Inc.,*
2011 U.S. Dist. LEXIS 513 (E.D. La. Jan. 4, 2011) ......................................................... 2

*Williams v. Potomac Elec. Power Co.,*
115 F. Supp. 2d 561 (D. Md. 2000) ............................................................................ 33, 34

*Williams v. Wynne,*
533 F.3d 360 (5th Cir. 2008) ........................................................................................... 3

*Wright v. Shell Offshore, Inc.,*
No. 10-2108, 2011 U.S. Dist. LEXIS 16290  (E.D. La. Feb. 17, 2011) ................................ 2

*Wyeth v. Levine,*
129 S. Ct. 1187 (2009) ..................................................................................................... 4

*Yamaha Motor Corp. v. Calhoun,*
516 U.S. 199 (1996) ................................................................................................... 30, 31

## STATUTES

33 United States Code § 1251 ............................................................................................. 38

33 United States Code § 2701(32) ................................................................................. 45, 46

33 United States Code  § 2713 ........................................................................................... 46

33 United States Code § 2718(a) ....................................................................................... 16

33 United States Code § 2702(d)(1)(A) .............................................................................. 45

33 United States Code § 2703(a) ............................................................... 46

33 United States Code § 2703(a)(3) .......................................................... 46

33 United States Code § 2718 ............................................. 14, 18, 23, 28

33 United States Code § 2718(c) ...................................................... 15, 16

33 United States Code § 2743(c)(1) ........................................................ 30

33 United States Code § 2751 ............................................... 14, 23, 30

33 United States Code § 2751(e) ........................................... 14, 31

42 United States Code § 9607(h) ............................................................ 48

42 United States Code § 9601, *et seq.* ................................................... 48

Alabama Code § 6-11-20(a) ................................................................... 16

## OTHER AUTHORITIES

135 Cong. Rec. H7898-H7910 (Nov. 1, 1989) ...................................... 35

135 Cong. Rec. H7954-H7978 (Nov. 2, 1989) ............................... passim

135 Cong. Rec. S9689-S9716 (Aug. 3, 1989). ...................... 23, 34, 35, 36

135 Cong. Rec., E3956-3957 (Nov. 17, 1989) ..................... 20, 33, 34, 35

136 Cong. Rec. H6920-H6949 (daily ed. Aug. 3, 1990) ......................... 21

H.R. Rep. No. 101-241, pt. 1: Committee on Public Works and Transportation, at
    29 (Sept. 13, 1989) ............................................................................ 37

H.R. Rep. No. 101-242, pt. 2: Committee on Merchant Marine and Fisheries
    (Sept. 18, 1989) ....................................................................... 20, 22

H.R. Rep. No. 101-653 (Aug. 1, 1990) .................................... 21, 22, 33

H.R. Rep. No. 99-962 (1986) (Conf. Rep.), as reprinted in 1986 U.S.C.C.A.N.
    3068, 3352 ......................................................................................... 49

S. Rep. No. 101-94: Committee on Environment and Public Works (July 28,
    1989) ............................................................................... 19, 20, 32

S. Rep. No. 94, 101st Cong., 1st Sess. (1989) ....................................... 17

## RULES

Federal Rules of Civil Procedure
    Rule 12 ................................................................................................ 47

Federal Rules of Civil Procedure
    Rule 12(b)(6) ...................................................................................... 12

Federal Rules of Civil Procedure
    Rule 14(c) ........................................................................................... 45

Securities Exchange Act of 1934
    Rule 10b-5 ........................................................................................... 12

## TREATISES

2 Am. Jur. 2d *Admiralty* § 102 (2010) ................................................. 41

*Restatement (Second) of Torts* ............................................................. 43

## INTRODUCTION

Plaintiffs' Steering Committee (the "PSC"), by and through Liaison Counsel, respectfully submits the following Omnibus Memorandum in response to the motions to dismiss certain Bundle C complaints filed by BP Exploration & Production Inc., BP Products North America Inc., BP Corporation North America Inc., BP Company North America Inc., BP America Inc., and BP p.l.c. (collectively, "BP") [Doc 1786], and Halliburton Energy Services, Inc. ("Halliburton") [Docs 1781, 1782, and 1783] (collectively, "Defendants"):

**MAY IT PLEASE THE COURT:**

The Deepwater Horizon was a vessel in navigation that discharged oil into a navigable waterway and, therefore, this case is governed, *inter alia,* by the Oil Pollution Act ("OPA") and general maritime law.  The OPA specifically preserves, and does not preempt, Plaintiffs' general maritime, state, and common law claims.  In addition, because the general maritime law is an incomplete body of law, this Court may look to state and common law to afford Plaintiffs complete and appropriate relief.  Also, Plaintiffs have stated and may maintain claims for punitive damages under the general maritime law.

For these reasons, and for the reasons further provided herein, Defendants' motions to dismiss should be denied.

## LEGAL STANDARDS

When ruling upon a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept as true all well-pleaded allegations and resolve all doubts in favor of the plaintiff. *See Oppenheimer v. Prudential Sec., Inc.,* 94 F.3d 189, 194 (5th Cir. 1996); *Tanglewood E. Homeowners v. Charles-Thomas, Inc.,* 849 F.2d 1568, 1572 (5th Cir. 1988).  "A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the

plaintiff," as this Court noted in *Who Dat Yat LLC v. Who Dat? Inc.*, 2011 U.S. Dist. LEXIS 513, at *16 (E.D. La. Jan. 4, 2011) (quoting *Lorman v. U.S. Unwired, Inc.*, 565 F.3d 228, 232-33 (5th Cir. 2009). "In other words, a motion to dismiss an action for failure to state a claim 'admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts." *Berthelot v. Boh Bros. Constr. Co.,* 2006 U.S. Dist. LEXIS 57817, at *77 (E.D. La. 2006) (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1137 (5th Cir. 1992)).

To defeat a motion to dismiss, a Plaintiff must merely "plead enough facts 'to state a claim to relief that is plausible on its face.'" *Wright v. Shell Offshore, Inc.*, No. 10-2108, 2011 U.S. Dist. LEXIS 16290, at *5-6 (E.D. La. Feb. 17, 2011) (quoting *Ashcroft v. Iqbal*, ___U.S. ___, 129 S.Ct. 1937, 1949 (2009) . This Court has observed that "[a] claim is facially plausible when the plaintiff pleads facts that allow the court to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Wright, 2011 U.S. Dist. LEXIS 16290 at *6 (quoting Iqbal, 129 S. Ct. at 1949

On March 22, 2011, the Supreme Court issued a unanimous decision in *Matrixx Initiatives, Inc. v. Siracusano*, ___ U.S. ___, 2011 U.S. LEXIS 2416 (2011), clarifying the role of a district court in applying the pleading standards of *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and reversed an order of dismissal of a 10b-5 claim. *Matrixx* reaffirms that the factual allegations in a complaint must be taken as true, that there are no "bright line" pleading requirements under *Twombly/Iqbal*, and that the functional test is whether the complaint, taken as a whole, raises "a reasonable expectation that discovery will reveal evidence" that could enable the ultimate trier of fact, weighing contested evidence and opinions and making the allowable inferences, to decide the case for plaintiffs.  2011 U.S. LEXIS 2416, at *34 (citing, *Twombly*, 550 U.S. at 556). *Matrixx*

2

rejects "bright line" standards of specific pleading requirements as dysfunctional, as they "must necessarily be over-inclusive or under-inclusive." *Id.* at \*20. Hence, *Matrixx* recognizes that the ultimate proof of liability elements, such as materiality and causation, require considerations, often complex and nuanced, of source, content, and context that go beyond what can or should be required in a pleading. *See id.*, at \*\*34-38. Reviewing "all the allegations holistically," as *Matrixx* directs, *id.* at \*38, Plaintiffs have stated facially plausible claims that "raise a reasonable expectation that discovery will reveal evidence" to support their claims at trial. *Id.* at \*34 (quoting *Twombly*, 550 U.S. at 556).

Furthermore, "[a] Rule 12(b)(1) motion should be granted only if it appears certain that the plaintiff cannot prove a plausible set of facts that establish subject-matter jurisdiction." *Davis v. U.S.,* 597 F.3d 646, 649 (5th Cir. 2009) (quoting *Castro v. United States,* 560 F.3d 381, 386 (5th Cir. 2009)). "[T]he standard of Rule 12(b)(1) . . . while similar to the standard of Rule 12(b)(6), permits the court to consider a broader range of materials in resolving the motion." *Martin v. Halliburton,* 618 F.3d 476, 481 (5th Cir. 2010) (quoting *Williams v. Wynne,* 533 F.3d 360, 365 n.2 (5th Cir. 2008)).

## LEGAL ARGUMENT

### I.    THE OPA DOES NOT PREEMPT PLAINTIFFS' MARITIME OR STATE LAW CLAIMS.

The Oil Pollution Act of 1990 expressly provides that, "except as otherwise provided in this Act, this Act does **not** affect (1) admiralty and maritime law; or (2) the jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." 33 U.S.C. § 2751(e)  (emphasis supplied).  Although, admittedly, some courts have (with all due respect, erroneously) determined that general maritime law claims might be preempted to the

extent that the damages sought fall within the specifically enumerated provisions of the OPA,[1]

even those decisions recognize that the OPA has no effect on claims for damages or other relief

which are not covered under the OPA.[2]

Indeed, the OPA contains within it a second savings clause, which provides that nothing

within the OPA "shall in any way affect, or be construed to affect, the authority of the United

States ... (1) to impose additional liability or additional requirements; or (2) to impose, or to

determine the amount of, any fine or penalty (whether criminal or civil in nature) for any

violation of law; relating to the discharge, or substantial threat of a discharge of oil."  33 U.S.C.

§ 2718(c); *see, e.g.*, *U.S. v. Egan Marine Corp.*, No. 08-3160, 2009 WL 855964, at *3 (N.D. Ill.

March 30, 2009) (plaintiff may pursue claims under both the OPA and the Rivers and Harbors

Act); *U.S. v. M/V Cosco Busan*, 557 F. Supp. 2d 1058, 1063 (N.D. Cal. 2008) (plaintiff may

pursue claims based on the Clean Water Act and other federal statutes in addition to the OPA,

even when seeking to recover the same damages).

---

[1] The decisions supporting OPA preemption seem to rely heavily upon snippets of legislative history, without giving due deference to the express terms of the OPA itself.  In addition to the express savings provisions contained with 33 U.S.C. §§ 2718 and 2751, the OPA does not expressly purport to provide a "comprehensive" remedial scheme, nor state that the damages provided in § 2702 shall be "exclusive," nor purport to expressly preempt or invalidate any other law or regulation; indeed, the limitation provided in § 2704 (which is not available in the event of gross negligence, violation of a federal Regulation, or failure to provide all reasonable cooperation and assistance) only applies to a "responsible party" and only to those damages provided in § 2702.  Moreover, there is no actual conflict in applying OPA's strict liability regime as to the responsible party, while also providing for additional admiralty, Maritime, federal Statutory and/or state law remedies, where negligent, grossly negligent, wanton or willful conduct is alleged and/or shown. *See generally*, *Wyeth v. Levine*, 129 S. Ct. 1187 (2009) (no FDA preemption of failure-to-warn claims); *Altria v. Good*, 129 S. Ct. 538 (2008) (no FDA or FTC preemption of deceptive trade practices claims); *Baker*, 554 U.S. at 489) ("we see no clear indication of congressional intent to occupy the entire field of pollution remedies").

[2] *See, e.g.*, *Garbarick v. Larin (Am.) Maritime*, 623 F. Supp. 2d 741, 748 (E.D. La. 2009) ("OPA expressly leaves claims not addressed by the Act to general maritime and admiralty law"); *see also, National Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*, 924 F. Supp. 1436, 1447 (E.D. Va. 1996) (Section 2751 "preserves admiralty claims which are not addressed in OPA"), *aff'd*, 122 F.3d 1062 (4th Cir. 1997).

Even *assuming* arguendo that strict liability claims against BP for removal costs and damages were preempted by the OPA, there is neither a basis for the preemption of general maritime law claims for punitive damages under *Exxon v. Baker*[3]—nor for compensatory or punitive damage claims against other parties, such as Transocean, Cameron, or Halliburton, who are not rendered strictly liable to a broad and expansive class of plaintiffs by operation of the OPA.

It is also clear that the OPA does not preempt the available state law claims for punitive damages.[4]   In addition to Section 2718(c),[5] noted above, the OPA expressly provides that nothing within the OPA shall "affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to the discharge of oil or other pollution by oil within such State" or "affect or modify in any way the obligations or liabilities of any person under ... State law, including common law." 33 U.S.C. § 2718(a); *see, e.g.*, *U.S. v. Locke*, 529 U.S. 89, 105-106 (2000) (noting that the OPA was not intended to preempt state law); *Isla Corp v. Sundown Energy LP*, No. 06-8645, 2007 WL 1240212, at *2 (E.D. La. April 27, 2007) ("OPA does not

---

[3] *See Exxon Shipping Co. v. Baker*, 556 U.S. 471, 484-89 (2008) (Clean Water Act does not preempt claim for punitive damages, which is available under the general maritime law); *see also*, *Atl. Sounding Co. v. Townsend*, 129 S. Ct. 2561, 2569 (2009) (recognizing that "punitive damages have long been an available remedy at common law for wanton, willful, or outrageous conduct," and that the remedy "extended to claims arising under federal maritime law").

[4] For example, an Alabama plaintiff may seek state punitive damages in order to deter Defendants' willful, reckless, and otherwise reprehensible conduct allow the award of punitive damages upon proof of such conduct, motivation, or intent and such an award of punitive damages is appropriate if Plaintiffs can show by "clear and convincing evidence" that the Defendants "consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." Ala. Code, § 6-11-20(a)

[5] "Nothing in this chapter shall in any way affect, or be construed to affect, the authority of ... any State or political subdivision thereof (1) to impose additional liability or additional requirements; or (2) to impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law; relating to the discharge, or substantial threat of a discharge of oil." 33 U.S.C. § 2718(c).

preempt Plaintiff's state law claims"); *U.S. v. Bodenger*, No. 03-0272, 2003 WL 22228517, at *3 (E.D. La. Sept. 25, 2003) ("OPA's savings provisions expressly preserve state authority to impose additional liability"); *Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859, 863 (E.D. La. 2001) (the OPA does not preempt state law in the area of oil spill liability and compensation).

That the OPA would act as a shield to insulate persons or entities that would have been otherwise liable for compensatory and/or punitive damages under existing law seems incomprehensible given the purpose and intent of the OPA.  As noted in *Bodenger*, the OPA was passed by Congress in response to then-existing federal and state laws that were deemed to provide inadequate remedies, and to present substantial barriers to victims' recoveries such as legal defenses, corporate forms, and burdens of proof unfairly favoring those responsible for the spills.  "Congress' intent is manifest, that the new law would effect compensation for victims, quick and efficient cleanup with minimization of damages to natural resources, and the internalization of the costs of oil spills within the oil industry."  *Bodenger*, 2003 WL 22228517, at *3 (citing S. Rep. No. 94, 101st Cong., 1st Sess. (1989); 1990 U.S.C. 722).

Taking Defendants' argument to its logical extension, for example, the general damage claims of a Jones Act seaman would have to be dismissed, pending the presentment of his economic loss claims to BP under the OPA.  This is certainly not what Congress could have intended.  For these reasons, and for the reasons further outlined below, neither general maritime law claims nor state law claims are preempted by the OPA.

### A.    The Plain Language of the OPA Expressly Saves (and Does Not Preempt) both State Law and General Maritime Law.

In order for a statute to abrogate a common law principle, the statute must speak directly to the question addressed by the common law.  *See Baker*, 554 U.S. at 489 (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)).  Federal statutes are typically found to preempt state

law only where:  (1) Congress evidences an intent to occupy a given field; (2) it is impossible to apply both laws without direct conflicts, or the state law interferes with the purposes and objectives of Congress.  *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984); *see also Baker*, 554 U.S. at 489 (applying a similar test to determine if a federal statute displaces general maritime law).

The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."  *Robinson v. Shell Oil*, 519 U.S. 337, 340 (1997).   Inquiry into statutory history is inappropriate if the statutory language is unambiguous and "the statutory scheme is coherent and consistent."  *Id*.  The plain language of the OPA expressly provides that it does not preempt the imposition of additional liabilities under state law, including common law:

> Relationship to other law
>
> (a) Preservation of State authorities; Solid Waste Disposal Act. Nothing in this Act or the Act of March 3, 1851 shall—
>     (1) affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to—
>         (A) the discharge of oil or other pollution by oil within such State; or
>         (B) any removal activities in connection with such a discharge; or
>     (2) affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) or State law, including common law.

33 U.S.C. § 2718.  Section 2718 also provides that nothing in the OPA should be construed to affect the ability of the United States or any state to impose additional liability or civil penalties for any violation of the law relating to the discharge of oil:

> (c) Additional requirements and liabilities; penalties. Nothing in this Act, the Act of March 3, 1851 (46 U.S.C. 183 et seq.), or section 9509 of the Internal Revenue Code of 1986 (26 U.S.C.

> 9509), shall in any way affect, or be construed to affect, the authority of the United States or any State or political subdivision thereof—
>
> > (1) to impose additional liability or additional requirements; or
> > (2) to impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law; relating to the discharge, or substantial threat of a discharge, of oil.

*Id.*  Moreover, the OPA expressly provides that admiralty and maritime laws are not affected except as otherwise provided in the act:

> Savings provisions
>
> (e) Admiralty and maritime law. Except as otherwise provided in this Act, this Act does not affect—
>
> > (1) admiralty and maritime law; or
> > (2) the jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

*Id.* at § 2751.  Examining the plain language of the OPA explicitly demonstrates that Congress did not intend to occupy the field of recovery for oil spills.  The statute, on its face, states that "this Act does not affect admiralty and maritime law . . . saving to suitors in all cases all other remedies to which they are otherwise entitled."  *Id.*

### B.    The Legislative History Confirms That The OPA Does Not Preempt State Law Or The General Maritime Law.

Although the plain language of the OPA does not warrant resorting to the statute's legislative history, the legislative history of the OPA lays to rest any lingering doubt as to whether the OPA preempts any state law or maritime law.  Indeed, whether the OPA would preempt state law was one of the more debated issues during the bill's drafting, with a clear Congressional declaration against preemption.

Congress vigorously debated whether the OPA would preempt state law.[6]  In fact, the House and the Senate's inability to reach an agreement on preemption prevented earlier versions of the bill from passing.  The principal argument in favor of preemption was that "[t]he whole idea of a Federal oil spill legislation is to have one coordinated and one comprehensive legislation, not a patchwork of State and Federal laws which have turned out to be inadequate." *See, e.g*., 135 Cong. Rec. H7954-H7978, at H7977 (Nov. 2, 1989) (statement of Rep. Frenzel). Proponents of preemption also argued that small businesses that transport oil would not be able to operate if faced with state laws allowing unlimited liability.

Opponents of preemption responded that oil companies had operated for years in the 17 states that allowed unlimited liability, and there was no evidence to suggest that the OPA would serve as an additional deterrent to irresponsible conduct.[7]  Opponents of preemption also made the point that the bill should not preempt state law because, *inter alia*, stricter state standards would ensure that victims are compensated fully for their injuries and would enhance clean-up efforts.[8]

---

[6]  S. Rep. No. 101-94: Committee on Environment and Public Works, at 17 (July 28, 1989) ("Preemption has been discussed by the members of the Committee more than any other single issue."); *see infra* notes 2-10.

[7] S. Rep. No. 101-94: Committee on Environment and Public Works, at 7 (July 28, 1989)  ("It is sometimes argued that liability must be limited in order for the owner or operator to afford reasonably priced insurance coverage.  Some arguments are so extreme as to suggest that tankship companies and offshore producers would not operate in an atmosphere of 'unlimited' risk.  But these claims are totally unfounded.  Even in the 17 States without liability limits, oil shipping and producing companies are not refusing to do business.  None of the testimony received by the Committee contained evidence that any shipper or producer has avoided these 17 States or has chosen to quit the business.").

[8] S. Rep. No. 101-94: Committee on Environment and Public Works, at 7 (July 28, 1989) ("Of the 24 States with oil spill liability and compensation laws, 17 of them have liability without specified limits.  This is based on two widely accepted principles: a polluter should pay in full for the costs of oil pollution caused by that polluter; and, a victim should be fully compensated."); *see also* 135 Cong. Rec. H7954-H7978, at H7975 (Nov. 2, 1989); S. Rep. No.

*Footnote continued on next page*

In further arguing against preemption, members of Congress noted that preemption would "violate[] a longstanding tradition that Federal environmental laws should not preempt state laws.  For this reason, the Clean Water Act does not preempt; the Superfund law does not preempt; and Federal oil pollution laws—including those governing outer Continental Shelf, the trans-Alaska pipeline and deepwater ports do not preempt."  H.R. Rep. No. 101-242, pt. 2: Committee on Merchant Marine and Fisheries, at 150 (Sept. 18, 1989).[9]

In the end, the preemption opponents prevailed: both houses passed bills that did not preempt state law claims.  The Conference Report summarized that "Section 106 of the Senate amendment and section 1018 of the House bill are generally similar provisions preserving the authority of any State to impose its own requirements or standards with respect to discharges of oil within that State."  H.R. Rep. No. 101-653, at 121 (Aug. 1, 1990) (Conf. Rep.).   The Conferees "agreed to preserve the right of States to establish their own liability and compensation systems," providing to coastal states "the freedom to impose standards that reflect the importance of the resources at risk."  136 Cong. Rec. H6920-H6949, at H6934 (daily ed. Aug. 3, 1990) (statement of Rep. Lowey).  Thus, the history shows that Congress carefully

---

*Footnote continued from previous page*

101-94: Committee on Environment and Public Works, at 7 (July 28, 1989); H.R. Rep. No. 101-242, pt. 2: Committee on Merchant Marine and Fisheries, at 150 (Sept. 18, 1989).

[9] *See also* S. Rep. No. 101-94: Committee on Environment and Public Works, at 6 (July 28, 1989) (noting that "[m]ore stringent State laws are specifically preserved in the Clean Water Act," the Deepwater Port Act, title III of the Outer Continental Lands Act Amendments of 1978, and the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (the toxic chemical "Superfund" law) and its amendments); 135 Cong. Rec., E3956-3957, at E3956 (Nov. 17, 1989) (remarks by Rep. Unsoeld) ("The bill passed by the House sets out a single federal standard of liability as necessary minimum.  This is the same approach taken in the Clean Air Act, Clean Water Act, Superfund, and even the four existing federal oil spill laws that we are attempting to consolidate here today.  None of these federal laws, however, preempts the authority of a State to impose stricter standards.  Federal law does not prohibit States from requiring cleaner water, cleaner air, or safer hazardous waste disposal.  Why should the policy be different for oil pollution?").

considered whether or not to preempt state law, and that Congress ultimately rejected such preemption.

Although the legislative history underlying the OPA's preservation of maritime laws is less voluminous, it still leads to the conclusion that maritime law is not preempted. The Conference Report explains that the Senate bill had "no savings provision regarding admiralty and maritime laws or jurisdiction," but the House bill clarified that it did "not affect admiralty and maritime law or the jurisdiction of the District Courts of the United States with respect to civil actions under admiralty and maritime jurisdiction, saving to suitors in all cases other remedies to which they are otherwise entitled." H.R. Rep. No. 101-653, at 159 (Aug. 1, 1990) (Conf. Rep.).[10]   The Conference Report explained that "[t]his section is intended to clarify that the House bill does not supersede [Article III, clause 2, which provides the basis for admiralty and maritime law], nor does it change the jurisdiction of the District Courts" in these actions. H.R. Rep. No. 101-653, at 159 (Aug. 1, 1990) (Conf. Rep.).[11]

---

[10] The House Committee Report contains similar statements:

> This section clarifies that this Act does not affect admiralty and maritime law or the jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction, saving to suitors in all cases other remedies to which they are otherwise entitled. Article III, clause 2, of the Constitution creates the admiralty and maritime law of the United States. This section is intended to clarify that this Act does not supercede [sic] that law, nor does it change the jurisdiction of the district courts under section 1333 of Title 28, United States Code (the codified section of the Judiciary Act of 1789). It is not the intent of the Committee on this Act or change the jurisdiction in incidents that are within the admiralty and maritime laws of the United States.

H.R. Rep. No. 101-242, pt. 2: Committee on Merchant Marine and Fisheries, at 93 (Sept. 18, 1989).

[11] The Conference also noted that "[i]t is not the intent of the Conferees to change the jurisdiction in incidents that are within the admiralty and maritime laws of the United States. The Conferees wish to promote uniformity regarding these laws." H.R. Rep. No. 101-653, at 159 (Aug. 1, 1990) (Conf. Rep.).

The Conference adopted the House's savings provision "with an amendment clarifying that the provision was subject to the provisions of the substitute."  H.R. Rep. No. 101-653, at 159 (Aug. 1, 1990) (Conf. Rep.).   Notably, the Conference Report explained the interplay between the Savings Provision and the liability imposed in Section 1002 (the Section that provides the elements that must exist for a responsible party to be liable for damages) by noting that Section 1002 "establishes liability notwithstanding any other provision or rule of law . . . . Therefore, there is no change in current law *unless there is a specific provision to the contrary*." H.R. Rep. No. 101-653, at 159 (Aug. 1, 1990) (Conf. Rep.) (emphasis added).[12]

Finally, the legislative history offers two additional arguments against preemption of maritime law: *first*, members of Congress compared the OPA to other federal laws and indicated that it should not have more of a preemptive effect than other federal laws; and *second*, Congress indicated that "[n]othing in this Act shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to discharges of oil."  135 Cong. Rec. S9689-S9716, at S9683 (Aug. 3, 1989).

It is true that, despite the plain statutory language and the unambiguous legislative history of the OPA, one decision in this District reflects a different interpretation.   *See Gabarick v. Laurin Mar. (Am), Inc.*, 623 F. Supp. 2d 741 (E.D. La. 2009).  Plaintiffs respectfully suggest that the *Gabarick* court may have been presented with an incomplete or selective legislative history. As noted, at one point in the OPA drafting process it was suggested that the OPA stand as "a single Federal law regarding liability for oil pollution."  *Id.* at 748.  But Congress ultimately

---

[12] The Conference Report further explained that "notwithstanding any other provision or rule of the law . . . means that the liability provisions of this Act would govern compensation for removal costs and damages notwithstanding any limitations under existing statutes such as the act of March 3, 1851 (46 U.S.C. 183), or under existing requirements that physical damage to the proprietary interest of the claimant be shown."  H.R. Rep. No. 101-653, at 103 (Aug. 1, 1990) (Conf. Rep.).

rejected that position, expressly preserving both state law *and* maritime law claims for victims of oil spills.  33 U.S.C. §§ 2718 and 2751.

The *Gabarick* court cited the Supreme Court's decision in *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1 (1981), in which "the Supreme Court recognized the preemption of Federal Common Law and general maritime law by Congress's comprehensive legislation in the area of water pollution."  623 F. Supp. 2d at 747.  In *National Sea Clammers Ass'n,* however, the Supreme Court evaluated the Federal Water Pollution Control Act and concluded that "[i]n the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate."  453 U.S. at 15.  But since then the Supreme Court has suggested that its holding in *National Sea Clammers* turned on the plaintiff's attempt to use the state common law of nuisance to impose a different (conflicting) regulatory scheme than that imposed by the Water Pollution Control Act.  *See Baker*, 554 U.S. at 489 n.7 (concluding that *Baker* plaintiff's "private claims for economic injury do not threaten similar *interference* with federal regulatory goals with respect to 'water,' 'shorelines,' or 'natural resources'" as the plaintiffs' nuisance claims in *National Sea Clammers* had done) (emphasis added).  Indeed, the *Baker* decision holds that the Clean Water Act did not preempt admiralty and maritime law's provision of punitive damages.  Similarly, maritime claims would not frustrate the remedial scheme of the OPA.

### C.   Congress Did Not Intend To Occupy The Field Of Oil Pollution Remedies And Preserving State Law and General Maritime Claims Does Not Conflict With The OPA.

The OPA simply does not preempt state law remedies or the general maritime law.  Defendants' argument that the OPA is so comprehensive that Congress intended it to occupy the field and thus preempt general maritime law and state law remedies, is misplaced.  Indeed, it ignores the plain language of the statute that saves remedies under the general maritime law and

state law.[13]  Defendants simply cannot show a "clear indication of congressional intent to occupy the entire field of [oil spill] remedies."  *Baker*, 554 U.S. at 489 (alterations in original).  Neither the text of the OPA nor the legislative history indicates such an intent.

Furthermore, allowing state law and general maritime law to apply has no frustrating effect, the presence of which would require preemption.  A clear purpose of the OPA is undoubtedly to protect the waters, shores, and natural resources at risk from damage from oil pollution.  Thus, allowing, for example, punitive damages to be recovered in an oil pollution case would not have a "frustrating effect" on the remedial scheme of the OPA.  Indeed, it has long been accepted that the laudable goal of punitive damages is "retribution and deterring harmful conduct."  *Baker*, 554 U.S. at 492.  Punitive damage awards in cases governed by general maritime law do not frustrate, but rather further, the goal of protecting our natural resources from the kind of devastation that unfolds in the wake of a major (and avoidable) oil spill by deterring companies from making decisions that result in the type of devastation evidenced in this case.

Both Defendants support their preemption argument by citing an Eastern District of Louisiana case.  (*See e.g.*, HESI Mot. to Dismiss, Doc. 1784 at 14 (filed March 28, 2011); *see also* BP Mot. To Dismiss, Doc. 1786-1 at 15 n. 10 (filed March 28, 2011))  *Tanguis*, 153 F. Supp. 2d at 867 is cited for the proposition that the "'OPA 'represents Congress' attempt to provide a comprehensive frame work in the area of marine oil pollution.'"  (*Id.*)  *Tanguis*,

---

[13] This argument must be rejected for the same reasons the Court refused to find that the CWA preempted common law claims in *Baker*.  If the OPA was intended to occupy the field, then personal injury claims would also be preempted because OPA does not expressly provide damages for personal injury or punitive damages.  Clearly, the court cannot conclude that OPA, by its silence, was intended to eliminate oil companies' common law duties to refrain from injuring private persons or insulate them from punitive damages for gross negligence or willful misconduct.  *Baker*, 554 U.S. at 488-89 ("But we find it hard to conclude that a statute [the CWA] expressly geared to protecting 'water,' 'shorelines,' and 'natural resources' was intended to eliminate *sub silentio* oil companies' common law duties to refrain from injuring the bodies and livelihood of private individuals").

however, dealt simply with the question of removal. Importantly, the *Tanguis* court stated further that "the first subsection of the admiralty and maritime savings clause recognizes that certain maritime remedies are preempted by the OPA, *while others survive*." 153 F. Supp. 2d at 867 (emphasis added). At most, *Tanguis* stands for the proposition that remedies provided in the OPA are exclusive only as to the OPA's covered remedies and, beyond that, the OPA saves general maritime and state law remedies. *Id.*

In short, the OPA does not preempt state law or general maritime law compensatory and punitive remedies, because: (1) the statute is unambiguous on its face; (2) the legislative history does not demonstrate any congressional intent to occupy the entire field of oil pollution law; and (3) there is no frustration of the OPA's purpose by allowing these supplemental remedies.

## II.    The OPA Does Not Prohibit or Preempt Plaintiffs' Punitive Damage Claims.

Halliburton argues that punitive damages are not recoverable, *inter alia*, because the OPA does not permit and otherwise preempts such an award. Of course, the OPA is silent on the recoverability of punitive damages. However, it does not prohibit them and, therefore, they survive as permitted under the general maritime law and state law that is saved by the OPA, as discussed above.

In two recent cases, the Supreme Court has considered whether federal statutes have abrogated the availability of punitive damages under general maritime law. *See Baker*, 554 U.S. 471; *see also Atl. Sounding Co. v. Townsend,* 129 S. Ct. 2561 (2009). In *Baker*, a unanimous Supreme Court held that the Clean Water Act did not disallow an award of punitive damages under general maritime law. In finding there was no preemption of punitive damages, the Court held that:

> [a]l in all, we see no clear indication of congressional intent to occupy the entire field of pollution remedies, *see, e.g., United States v. Texas*, 507 U.S. 529, 534 (1993) ("In order to abrogate a

> common-law principle, the statute must speak directly to the
> question addressed by the common law" (internal quotation marks
> omitted)); nor for that matter do we perceive that punitive damages
> for private harms will have any frustrating effect on the [Clean
> Water Act] remedial scheme, which would point to preemption.

*Baker*, 554 U.S. at 488-89.  Accordingly, the Supreme Court refused to find that the statute abrogated the firmly established availability of maritime punitive damages.  *Id.*

In *Townsend,* the Supreme Court considered whether the Jones Act or the Supreme Court's prior decision in *Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990), precluded the recovery of punitive damages under general maritime law for an employer's failure to pay an injured seaman's maintenance and cure.  The Supreme Court discussed the historical availability of punitive damages for seamen and noted that the plaintiff is entitled to pursue punitive damages unless the plain language of the Jones Act evidences the clear intent of Congress to depart from the common law.  *Townsend*, 129 at 2569.  The Supreme Court found that the Jones Act is a remedial statute intended to enlarge the protection of seamen, not narrow it.  *Id*. at 2570. Further, nothing in the language of the Jones Act or any of the Supreme Court's decisions applying it indicated that it interfered with the common law maintenance and cure action or the availability of punitive damages.  *Id.*  Therefore, the Supreme Court held that neither *Miles* nor the Jones Act interfered with recovery of punitive damages under general maritime law for an employer's refusal to pay maintenance and cure.

Defendant Halliburton relies on *South Port Marine, LLC v. Gulf Oil Ltd. P'ship,* 234 F.3d 58 (1st Cir. 2000) to support its argument that punitive damages are preempted by the OPA. Although *South Port Marine* is the only federal appellate court case to address this issue, it was decided before the Supreme Court's decisions in *Baker* and *Townshend* and, as a result, erroneously concludes that the OPA displaces the availability of punitive damages under general maritime law based upon an outdated (and, respectfully, mistaken) reading of *Miles*.

16

In *South Port Marine*, the defendants caused a gasoline spill into Portland Harbor during the transfer of gasoline from onshore tanks to a tank barge, which damaged the Styrofoam flotation of the plaintiff's floating docks, causing them to sink.  The United States Court of Appeals for the First Circuit affirmed the district court's holding that general maritime law punitive damages are not recoverable under the OPA.  *South Port Marine*, 234 F.3d at 65-66. Although the First Circuit acknowledged that the OPA does not expressly preempt the recovery of punitive damages, it found that Congress intended the OPA to supplant general maritime law, including punitive damages, with regard to oil pollution.  *Id*.  In reaching this conclusion, the First Circuit stressed that the "OPA sets forth a comprehensive list of recoverable damages," which do not include punitive damages.  *Id.*[14]

The First Circuit's holding in *South Port Marine* misunderstands the implications and rationales of *Miles*.  *Miles* examined the damages recoverable under *preexisting* wrongful death statutes—the Jones Act and DOHSA—to determine the scope of recovery allowable under the general maritime wrongful death action.  *Miles* sought to mirror the recovery under the gap filling general maritime action to the statutes that inspired it.  *Id.*  Generally, the rationale behind *Miles* was twofold:  (1) a common law cause of action (i.e., general maritime wrongful death) created to fill an unintentional gap in preexisting statutory law to provide uniformity in admiralty law should not provide remedies inconsistent with the statutory framework; and (2) common law liability for harm without fault should not provide greater compensation than preexisting

---

[14] Additionally, the First Circuit emphasized the absence of any cases or commentary suggesting that punitive damages under general maritime law survived the enactment of OPA.  *South Port Marine*, 234 F.3d at 65.  The court found this lack of authority to be "a strong indication that Congress intended the OPA to be the sole federal law applicable in this area of maritime pollution."  *Id.*  However, there was a complete lack of authority suggesting that the availability of punitive damages under maritime law was displaced by the OPA.  The lack of cases and scholarly commentary discussing this issue most likely results from the plain language in the OPA preserving general maritime law.

statutory liability for identical harm as a result of negligence—that is, more expansive recovery without fault would be inconsistent with the judgment of Congress expressed in the preexisting statutory actions.  *Id.*  *South Port Marine* is unpersuasive as its decision is contrary to both prongs of the *Miles'* rationale.

First, *South Port Marine* creates the very sort of anomalies in maritime law that the Supreme Court sought to eliminate in *Miles*.  The First Circuit acknowledged that Congress did not intend the OPA to bar the imposition of additional liability under state law.  *Id.* at 65.  It could hardly find otherwise given the unambiguous language of 33 U.S.C. § 2718, which expressly provides that it does not preempt the imposition of additional liabilities under state law, including the common law.  Testing the *South Port Marine* interpretation demonstrates that it fails to provide a fair or consistent application of law.  For example, its interpretation results in punitive damages being available under state law when reckless conduct results in an oil discharge from a fixed platform (adjacent state law would apply under the OCSLA choice-of-law provision).  However, it *does not* permit the recovery of maritime punitive damages when the same reckless conduct results in an oil discharge from a drilling ship or floating platform (the OCSLA choice-of-law provision applies federal maritime law).  Similarly, punitive damages *would* be recoverable for the reckless discharge of oil from a drilling vessel within the first three miles of territorial waters in the Gulf of Mexico (where OCSLA does not apply).  However, punitive damages *would not* be recovered where the same conduct causes a discharge of oil from the same drilling vessel four miles from the coast.  This interpretation would create the same disunity in maritime law that the Supreme Court sought to eliminate in *Miles*.  Such strange anomalies might be tolerable if Congress had expressly intended them, but nothing in the text of the OPA or the rationale of *Miles* supports such an intent.

*South Port Marine* is also unsupported by the second rationale of *Miles*. In *Miles,* the Supreme Court refused to allow broader damages under the strict liability common law cause of action than were available under the fault based statutes that preexisted and inspired the common law. *Miles*, 498 U.S at 37. The OPA creates statutory liability *without fault* for oil spills, but the damages are capped unless fault is established. Thus, the preexisting common law punitive damages remedy is available, but only after a showing of willful misconduct. There is nothing anomalous or inconsistent with Congress creating strict liability for oil spills but capping liability to less than would be recoverable under general maritime law for willful misconduct. Properly understood, the Supreme Court's reasoning in *Miles* firmly supports the availability of punitive damages under general maritime law, despite the presence of an OPA claim.

Furthermore, *South Port Marine* completely fails to explain how the plain language of the OPA does not preserve the availability of punitive damages under general maritime law. The OPA expressly provides that admiralty and maritime law is not affected except as otherwise provided in the Act. *See* 33 U.S.C. § 2751. The plaintiff in *South Port Marine* properly asserted that this provision preserved all maritime law that did not conflict with the OPA. However, because the First Circuit mistakenly believed that *Miles* mandated the unavailability of punitive damages, the court never addressed why the plain language of Section 2751 did not preserve punitive damage claims. As previously explained, and as the Supreme Court, eight years after *South Port Marine*, subsequently reconfirmed, in order for a statute to abrogate the common law, it must speak directly to the issue addressed by the common law. *See Baker*, 554 U.S. at 486. Nothing in the OPA's plain language expressly forecloses the availability of punitive damages under general maritime law. The OPA expressly contemplates recovery of damages beyond the cap provided by § 2704 when gross negligence and willful misconduct is established. Either the

OPA created such a cause of action or it intends recovery for such conduct to be governed by state and maritime substantive law. In either case, the recovery of punitive damages is consistent with the OPA. *See* 33 U.S.C. § 2743(c)(1); *see also Commonwealth of Puerto Rico v. M/V Emily S*, 1998 AMC 2726 (D.P.R 1998) (general maritime law *in rem* remedy is available under the OPA which expressly preserves admiralty and maritime law). Thus, it is clear that *South Port Marine* is not persuasive authority here.[15]

Halliburton argues that the Court should follow those cases that recognize a more limited preemptive effect of the OPA. *See e.g., Gabarick*, 623 F. Supp. 2d at 746 (holding that "the plain language of the statute indicates its mandatory and exclusive nature *with respect to its covered damages*") (emphasis added). This argument is unavailing because claims for punitive damages under the general maritime law are not enumerated among the "covered damages" and are, therefore, preserved by the savings clause. *See* 33 U.S.C. § 2751(e).

In sum, the OPA does not preempt general maritime law, state law, or punitive damages. The plain language of the statute and its legislative history provide no indication that Congress intended to occupy the field in this regard. Finally, allowing these remedies does not frustrate the purposes of the OPA. Accordingly, Defendants' motion for dismissal based on the preemptive effects of the OPA must be denied.

---

[15] Halliburton points to one other federal court case for the proposition that the OPA preempts punitive damages. *See Clausen v. M/V New Carissa,* 171 F. Supp. 2d 1127 (D. Or. 2001). However, this case relies on *South Port Marine*, which has already been shown to be erroneous, and which pre-dates *Baker*. Second, the portion of the opinion that addresses this issue is *dicta* and not persuasive. *Clausen,* 171 F. Supp. 2d at 1134 (noting "[e]ven if *South Port* is incorrect in its analysis of this issue, I fail to see any prejudice to plaintiffs in this case because their evidence for punitive damages in their general maritime claim would be the same as the proof offered on the state law claim. While the federal standard for punitive damages is lower than that under Oregon law, (i.e., preponderance of the evidence proving conduct that is malicious or in reckless disregard of a plaintiff's rights), plaintiffs' evidence is insufficient to put the issue before a jury").

**III.    The Alabama Cities and Mexican States Meet The Causation Requirements of the OPA.**

BP asserts that the Alabama Cities and Mexican States are geographically remote and that any harm they sustained was not proximately caused by the Spill.  [BP Memo In Support of Mot. to Dismiss (Doc. 1786-1), p. 10].  It cites no authority, however, establishing a limit on the OPA's geographical reach.

As a pleading matter, the extent to which these governmental entities incurred response costs or suffered loss of tax revenue or other damages recoverable under the OPA is not appropriate for decision on a Rule 12 motion.[16]

As a legal matter, moreover, the causation standard under the OPA is clearly more relaxed than traditional concepts of "legal" or "proximate" cause.  The statutory terms "result from"[17] and "due to"[18] are not specialized legal terms; they are English-language synonyms for the term "caused by."[19]  As used in ordinary English, "caused by" normally refers to factual causation,[20] not the typically more stringent standard of "proximate" cause.  The prevailing default test for factual causation is the but-for test,[21] which is clearly satisfied in this case.

---

[16] *See, e.g.,* 57A Am.Jur.2d *Negligence* §602. ("Generally, the determination of whether an intervening act was foreseeable or could have been reasonably anticipated is a question of fact for the jury or trier of fact.").

[17] 33 U.S.C. §2702(a).

[18] 33 U.S.C. §2702(b)(2)(E).  Plaintiffs refer herein to 33 U.S.C. §2702 as OPA's "Damages Provision" herein, (particularly §2702(a) and §2702(b)(2)(E)).

[19] *See* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1981) at 403 (defining "due to" as "caused by"); 510 (in a list of synonyms for "follow," stating that "*result* refers to an event that is discernibly caused by a prior event or events); 1109 (defining "result" as "to occur or exist as a consequence of a particular cause," and referring to the list of synonyms for "follow"); *id.* (defining "resultant as "issuing or following as a consequence or result").

[20] *See id.* at 214 (defining the noun "cause" to mean "that which produces an effect, result, or consequence" and the verb "cause" to mean "make happen").

[21] *See* RESTATEMENT (THIRD) OF TORTS:  LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 26 and cmt. b (2010).

Notably, the text of the statute permits recovery for damages resulting from the mere "*threat*" of an oil spill. 33 U.S.C. §2702(a).  This statutory language is significant in this context because it confirms an intent to extend the right of recovery for real and tangible response costs, loss of tax revenue or other losses which might be incurred even in the absence of direct physical damage.

The legislative history additionally demonstrates that during the drafting of the OPA, Congress considered and rejected language that would have imposed stricter causation standards, and specifically referred to broad classes of individuals who had been affected by oil spills.  BP's narrow interpretation of the OPA's causation standard is further undermined by Congress's intent that the OPA serve the broad remedial purpose of compensating parties affected by oil spills without extensive litigation.

The OPA provides that "each responsible party … is liable for … damages … *that result from*" an oil spill, including damages "for injury to, or economic losses *resulting from* destruction of, real or personal property," and for lost profits "*due* to the injury, destruction, or loss of real property, personal property, or natural resources" (the "Damages Provision"). 33 U.S.C. § 2702 (emphasis added).   The OPA offers no guidance regarding what causal standard applies in considering whether damages "result from" an oil spill or are "due to" injury to property or resources.[22]

---

[22] By including "result from" and "due to" in the Damages Provision, Congress likely intended that some degree of causation must be shown but did not prescribe a technical, restitutive, or draconian one.  Statements in the legislative history surrounding the drafting of the OPA support this conclusion.  For example, the Senate Report on the Senate's proposed bill explained that "the Fund must require some evidence of loss and the establishment of a causal connection with oil pollution."  S. Rep. No. 101-94: Committee on Environment and Public Works, at 10 (July 28, 1989).  Members of the House of Representatives echoed this statement, noting that the Act's system of liability was designed to "ensure[] payment for all justifiable costs and damages."  135 Cong. Rec. H7954-H7978, at H7964 (Nov. 2, 1989) (statement of Rep. Hammerschmidt).

The legislative history, however, suggests that members of Congress intended to enact an OPA with a broad damages provision, and supports the conclusion that individuals and businesses that rely on the waters and shores that experienced economic losses as a result of the Spill satisfy the OPA's causation requirements.

First, the history indicates that Congress considered and intentionally rejected arguably more restrictive causation standards for OPA damages.  As the OPA's Damages Provision evolved during the drafting process, at least four different causation standards, each of which was arguably more restrictive than the causation language ultimately enacted in the OPA, were considered and rejected by Congress.[23]   The final version of the OPA provided that "each responsible party … is liable for … damages … *that result from*" an oil spill, including damages for lost profits "*due* to the injury, destruction, or loss of real property, personal property, or natural resources."  H.R. Rep. No. 101-653, at 103 (Aug. 1, 1990) (Conf. Rep.) (emphasis added).[24]   Congress' consideration and rejection of earlier causation language that was more restrictive and were certainly more specific, including "directly result from" and "proximate

_____

[23] Specifically, S. 686 required that the responsible party that "causes the incurrence of removal costs, shall be liable for . . . all damages for economic loss or loss of natural resources *resulting from* such a discharge;" H.R. 1465, as proposed, required that the damages "*arise out of or directly result from*" the oil spill; H.R. 3027 specified that damages must be *proximately caused* by the oil spill; and H.R. 1465, as adopted by the House, provided that responsible parties were "jointly, severally, and strictly liable for the removal costs and damages specified in subsection (b) that *directly result from* such incident."  H.R. 1465 (Nov. 15, 1989) (emphasis added).  The history does not explain why the various causation standards were chosen in each instance.

[24] The history explains that "Subsection . . . (b)(2)(E) provides that any claimant may recover for loss of profits or impairment of earning capacity *resulting from* injury to property or natural resources."  H.R. Rep. No. 101-653, at 103 (Aug. 1, 1990) (Conf. Rep.) (emphasis added).  The history also clarified Congress' intent to abrogate the common law's requirement that a claimant have a proprietary interest in damaged property to recover damages, by specifying that "[t]he claimant need not be the owner of the damaged property or resources to recover for lost profits or income.  For example, a fisherman may recover lost income due to damaged fisheries resources, even though the fisherman does not own those resources."  *Id.*

cause" language, arguably suggests that Congress must have intended that the Damages Provision it enacted in the OPA would apply a more liberal causation requirement.

Second, Congress specifically referred to broad classes of individuals who had been affected by oil spills.  The legislative history contains nothing indicating that Congress intended to limit the reach of the Damages Provision to a particular category of claimant.  Moreover, Congress appears to have considered perception/stigma-related losses (e.g., the reduction in the price of a non-contaminated fish because of a public perception that it is unsafe to eat) as a potential damage claim.  During the OPA drafting, members of Congress took note of the broad classes of entities and individuals who had been affected by the *Exxon Valdez* oil spill, suggesting that Congress intended that these parties be compensated for their damages.[25] Congress further indicated its intent that the Damages Provision apply to more obvious classes of individuals and entities, including fishermen and the fishing industry;[26] beachfront property and

---

[25] Specifically, Congress observed the impact of the *Exxon Valdez* spill and other spills on: (1) local residents and communities; (2) parties who lost their jobs, livelihoods, homes, and local environment because of a spill; and (3) parties who depend on clean water and clean coastlines for their livelihoods.  *See* 135 Cong. Rec. S9689-S9716, at S9904 (Aug. 3, 1989) (statement of Sen. Murkowski) ("It is difficult to put into words the impact that this spill has had on the environment inside and outside Prince William Sound and on the lives of the local residents..");  135 Cong. Rec. H7954-H7978, at H7969 (Nov. 2, 1989) (statement of Rep. Dyson) ("But the consequences of a spill, for the States, local communities and private citizens that have to live with the oil fouled waters, can't be so easily measured.  A major spill can devastate the lives and the livelihoods of those who must live with the consequences of such a disaster.");  135 Cong. Rec. S9689-S9716, at S9863 (Aug. 3, 1989) (statement of Sen. Metzenbaum) ("The poverty problem has to do with those poor people in Alaska who have lost their jobs, their livelihood, their homes, and the beautiful areas in which they live.");  135 Cong. Rec. S9689-S9716, at S9863 (Aug. 3, 1989) (statement of Sen. Metzenbaum) ("The poverty problem has to do with those poor people in Alaska who have lost their jobs, their livelihood, their homes, and the beautiful areas in which they live.");  H.R. 1465, 101st Cong., E3956-3957, at E3956 (Nov. 17, 1989) (remarks by Rep. Unsoeld) ("…these disasters scar our shorelines and create havoc for marine ecosystems and for those who depend on clean water and coastlines for their livelihood.").

[26] H.R. Rep. No. 101-653, at 103 (Aug. 1, 1990) (Conf. Rep.) ("[A] fisherman may recover lost income due to damaged fisheries resources, even though the fisherman does not own those
*Footnote continued on next page*

business owners;[27] and the tourism industry.[28]   Congress also appears to have considered

compensation of losses resulting from perception/stigma-related problems.  For example, during

the *Exxon Valdez* spill hearings, Representative Don Young of Alaska asked Exxon Chairman

L.G. Rawl how Exxon would treat a price reduction in fish from Prince William Sound based on

---

*Footnote continued from previous page*

resources."); H.R. 1465, 101st Cong., at E2110 (June 22, 1990) (remarks by Rep. Schneider) ("H.R. 1465 would have also required the owners [of the World Prodigy, a vessel that caused an oil spill,] to adequately compensate those losses due to the oilspill, including those incurred by shell fishermen and dealers and processors, bait and tackle store owners, beach concessionaires, and so forth.  This compensation would have been complete and quickly paid, and would have covered all damages to natural resources.").

[27] 135 Cong. Rec. H7954-H7978, at H7966 (Nov. 2, 1989) (statement of Rep. Stangeland) ("For many individuals and business owners along the coast, time is money."); 135 Cong. Rec. H7954-H7978, at H7962 (Nov. 2, 1989) (statement of Rep. Ortiz) ("[I]t guarantees that . . . beachfront property owners will be compensated promptly and in full for any oil spill damages they might suffer."); 135 Cong. Rec. H7954-H7978, at H7956 (Nov. 2, 1989) (statement of Rep. Studds) ("The Nation should focus first on oilspill prevention and cleanup, but we must not lose sight of liability and compensation issues either. The polluter should pay and the victim should receive full compensation for direct, proven damages. This includes governmental cleanup costs, natural resource damages, and economic damages to third parties such as fishermen and beachfront property owners.  And when the polluter cannot or will not pay, a federal fund should be available for prompt, adequate compensation to oilspill victims without having to endure endless and costly litigation.  Our bill follows these important principles."); H.R. 1465, 101st Cong., at E2110 (June 22, 1990) (remarks by Rep. Schneider) ("H.R. 1465 would have also required the owners [of the World Prodigy vessel that caused an oil spill] to adequately compensate those losses due to the oilspill, including . . . beach concessionaires, and so forth.  This compensation would have been complete and quickly paid, and would have covered all damages to natural resources.").

[28] *See* 135 Cong. Rec. S9689-S9716, at S9922 (Aug. 3, 1989) (statement of Sen. Kerry) ("Mr. President, it will take several years and perhaps decades to completely understand the impact of the spill in Alaska. What will the economic impact of lost tourism, the impact to the fisheries and the livelihood of the fishermen really be?"); 135 Cong. Rec. H7898-H7910, at H7900 (Nov. 1, 1989) (statement of Rep. Jones) ("Finally, subsection (b)(2)(E) allows recovery for loss of earnings due to injury to property or natural resources.  The claimant need not be the owner of the property or resources to bring the claim for lost earnings, as required by common law.  This means, for example, that an employee at a coastal motel may have standing to make a claim for damages even though the employee owns no property which has been injured as a result of an oil spill.").

a perception that it might contaminated.[29]  Members of Congress further noted that a broad class of parties would be injured if a spill similar to the *Exxon Valdez* occurred in an area more densely populated than Alaska.[30]

Finally, BP's narrow interpretation of the OPA is further undermined by Congress' intent that the OPA serve the broad remedial purpose of compensating parties affected by oil spills without extensive litigation.   Congress intended that the OPA provide swift and just compensation to individuals who were affected by an oil spill without debate regarding whether those claims have been properly brought.  The legislative history demonstrates that "[t]he Fund is to provide compensation for damage claims fully and promptly."  S. Rep. No. 101-94: Committee on Environment and Public Works, at 10 (July 28, 1989) (emphasis added). Consequently, "[w]hile the Fund must require some evidence of loss and the establishment of a causal connection with oil pollution, *it should not routinely contest or delay the settlement of damage claims[, and] ... litigation or lengthy adjudicatory proceedings over liability, defenses, or the propriety of claims should be reserved for subrogation actions against dischargers*." S. Rep. No. 101-94: Committee on Environment and Public Works, at 10 (July 28, 1989)

---

[29] H.R. Rep. No. 101-242, pt. 2:  Committee on Merchant Marine and Fisheries (Sept. 18, 1989). Rawl responded to Young's question:  "I understand what you are saying, but when you get into things like remote damages, and so forth, if they are valid claims, they will be paid," suggesting that it might have considered such a claim in some circumstances.  *Id*. at 75 (statements of L.G. Rawl, Chairman of Exxon).

[30] For example, Representative Hutto observed that "[t]he economy of the State of Florida depends heavily on the tourism industry.  Aside from the obvious environmental devastation which would result from an oil spill off our coast, tourism is also directly tied to the world's most beautiful beaches."  135 Cong. Rec. H7954-H7978, at H7971 (Nov. 2, 1989) (statement of Rep. Hutto).  Similarly, Senator Stevens of Alaska cautioned that "if such a spill, God forbid, would happen ... along Cape Cod,  ... the thousands of communities that are along the east coast of the United States between the Canadian border and New York, all could be affected by one supertanker spill."  135 Cong. Rec. S9689-S9716 at S9700 (Aug. 3, 1989) (statement of Sen. Stevens).

(emphasis added).  Thus, Congress expressed its intent that damages claims be paid quickly and that lengthy litigation be reserved only for subrogation claims.

Additional statements in the history further support that the OPA was intended to provide prompt and full compensation to those individuals who suffered damage from an oil spill.  For example, it "provides for compensation to individuals and entities which suffer economic damage due to a spill."   H.R. Rep. No. 101-241, pt. 1: Committee on Public Works and Transportation, at 29 (Sept. 13, 1989); *see also* H.R. Rep. No. 101-242, pt. 2: Committee on Merchant Marine and Fisheries, at 34 (Sept. 18, 1989) ("It will guarantee that those suffering economic loss as the result of an oil spill from a vessel or facility will be quickly and fairly compensated for the loss, whether or not the spiller accepts liability or admits negligence in connection with the discharge of oil."); S. Rep. No. 101-94: Committee on Environment and Public Works, at 12 (July 28, 1989) ("*These provisions are intended to provide compensation for a wide range of injuries and are not so narrowly focused as to prevent victims of an oil spill from receiving reasonable compensation*.  For example, economic damages include both loss of use and loss of subsistence use of natural resources.  Under this provision, fishermen, for example, would not only receive the equivalent of unemployment compensation, but would also receive compensation to prevent loss of a boat.  Lost wages are of limited value if the means of earning the wages, such as a boat, go uncompensated.") (emphasis added); 135 Cong. Rec. H7954-H7978 at H7964 (Nov. 2, 1989) (statement of Rep. Hammerschmidt) ("In developing this bill, we have attempted to provide a system of liability that ensures payment for all justifiable costs and damages.  If a spill directly causes a quantifiable injury, the person injured will be entitled to compensation.").

Therefore, BP's description of the OPA's causation standard is narrower than either the statutory language or the legislative history suggest.  Also, the cases it cites address the issue of proximate cause, but do not involve the OPA, and they are therefore not persuasive here in light of the OPA's legislative history.  Congress considered and rejected language that would have imposed stricter causation standards for the OPA, and specifically referred to broad classes of individuals who had been affected by oil spills, to further its intent that the OPA serve the broad remedial purpose of entitling and enabling all those affected by oil spills to receive full compensation without the pitfalls of litigating a hypertechnical or restrictive causation requirement.

## IV.   Plaintiffs' State Law Claims Are Not Preempted by the Clean Water Act.

Defendant BP, relying on *Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987), argues that in addition to the OPA preempting plaintiffs' claims, the Clean Water Act, 33 U.S.C. § 1251, *et. seq.* (the "CWA") also preempts state law claims in connection with oil spills.  This argument is misplaced, as *Ouellette*, involved litigation over regulated discharges of pollutants, and that case is limited to that context.  The OPA, in contrast to the CWA permit provision at issue in *Ouellette*, never allows for oil spills into navigable waters.

*Ouellette* involved the CWA's permit system that allows regulated entities to discharge pollutants into navigable waters provided they have a government-issued permit—a National Pollution Discharge Elimination System ("NPDES") permit—to do so.[31]  Under the statute, only a source state—that is the state in which the polluting facility resides—is allowed to issue a CWA permit if EPA has delegated the permit program.  In essence, because, by its very nature, the CWA NPDES permit scheme allows industry to discharge pollutants into water bodies that

_____

[31] The permit is issued by the federal EPA unless the EPA has authorized the state to assume its role under the CWA for permit issuance to the regulated community within the state.

flow from one state to another, Congress provided greater rights to "source" states—the state in which regulated entity resides—than the neighboring state potentially affected by the pollution. Under the scheme, the source state may impose its own, more stringent standards on the regulated community than EPA does, but it gives no such rights to neighboring states. *Ouellette*, 479 U.S. at 495. The Supreme Court held that, under such circumstances, the state law of a neighboring state of the pollution source is preempted by the permit scheme of the CWA.

In *Ouellette*, defendant International Paper Company ("IPC") had a facility on Lake Champlain and a validly issued CWA permit from the State of New York to discharge pollutants into the lake. Citizens in Vermont, across the lake from IPC on the Vermont side, brought a nuisance action against IPC for nuisance under Vermont state law, seeking damages for diminution of their home values. The Supreme Court found that application of the Vermont nuisance law against IPC was an obstacle to the full implementation of the CWA because it would allow the plaintiffs to "circumvent the NPDES permit system, thereby upsetting the balance of public and private interests so carefully addressed by the Act.". 479 U.S. at 494. The Supreme Court explained as follows:

> An interpretation of the saving clause that preserved actions brought under an affected State's law would disrupt this balance of interests. If a New York source were liable for violations of Vermont law, that law could effectively override both the permit requirements and the policy choices made by the source State. The affected State's nuisance laws would subject the point source to the threat of legal and equitable penalties if the permit standards were less stringent than those imposed by the affected State. Such penalties would compel the source to adopt different control standards and a different compliance schedule from those approved by the EPA, even though the affected State had not engaged in the same weighing of the costs and benefits.

*Id.* at 495. The Supreme Court made clear that the Vermont residents were not left without a remedy: "The saving clause specifically preserves other state actions, and therefore nothing in

the Act bars aggrieved individuals from bringing a nuisance claim pursuant to the law of the source State – in that case, New York nuisance law. *Id.* at 497.

Defendant BP overstates the holding in *Ouellette*. The Supreme Court did not hold that the CWA preempts state law entirely. Rather, the Supreme Court explained that the Act "precludes only those suits that may require standards of effluent control that are incompatible with those established by the procedures set forth in the Act." 479 U.S. at 497. Thus, while the Supreme Court did not allow the suit to proceed under Vermont state law, it found that an action under New York law would not frustrate the goals of the CWA.

Instructively, a Louisiana appellate court previously held that the CWA did not preempt commercial fishermen's claims for punitive damages under the general maritime law. *Poe v. PPG Industries*, 782 So. 2d 1168 (La. App. 3rd Cir. 2001). The fishermen claimed that PPG's plant discharged toxic chemicals that contaminated their fishing area and sought compensatory and punitive damages. *Id.* at 1171. PPG argued that *Ouellette* compelled a holding that the Clean Water Act (and OPA and CERCLA) preempted the claim for punitive damages. The *Poe* court found that the Supreme Court precedent decisions only involved "remedies in nuisance actions for the intended release of pollutants into public waterways." *Id.* at 1177 (citation omitted). Those are simply different from cases that do not concern the release of pollutants in waterways but instead arise from "alleged negligence causing an accidental oil spill by a tanker." *Id.*

Moreover, the Supreme Court recently distinguished the facts giving rise to litigation after the Exxon Valdez spill from those giving rise to the *Ouellette* opinion:

> In this respect, this case differs from two invoked by Exxon, *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, . . . and *Milwaukee v. Illinois*, . . . where plaintiffs' common law nuisance claims amounted to arguments for effluent-discharge

> standards different from those provided by the CWA. Here,
> Baker's private claims for economic injury do not threaten similar
> interference with federal regulatory goals with respect to "water,"
> "shorelines," or "natural resources."

*Baker*, 554 U.S. at 489 (citations omitted).   Thus, it is clear that *Oullette* does not require

preemption in this context, and the Defendants argument that the CWA preempts plaintiffs

claims is wholly unpersuasive.

**V.    The General Maritime Law Does Not Preempt Plaintiffs' State Law Claims.[32]**

Defendant Halliburton argues that Plaintiffs' claims arise under the Court's admiralty

jurisdiction and, therefore, cannot arise under both state law and admiralty law.  (HESI Mot. to

Dismiss at 7.)  It is well-established, however, that the exercise of admiralty jurisdiction does not

result in the automatic displacement of state law.  *See Yamaha Motor Corp. v. Calhoun,* 516 U.S.

199, 206 (1996); *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 545

(1995).  In the situation where neither statutory nor judicially created maritime principles answer

a specific legal issue, state law is applied provided it does not *directly* conflict with the principles

of federal maritime law nor frustrate the policy interest of having national uniformity in maritime

actions.  *Askew v. Am. Waterways Operators, Inc.,* 411 U.S. 325, 341 (1973) (citing *Romero v.*

*Int'l Terminal Co.,* 358 U.S. 373-75, 378 n. 42 (1959); *Just v. Chambers,* 312 U.S. 383, 391

(1941); *Coastal Iron Works, Inc. v. Petty Ray Geophysical,* 783 F.2d 577, 582 (5th Cir. 1986);

*Palestina v. Fernandez*, 701 F.2d 438, 439 (5th Cir. 1983); *Alcoa S.S. Co. v. Charles Ferran &*

*Co.,* 383 F.2d 46, 50 (5th Cir. 1967); 2 Am. Jur. 2d *Admiralty* § 102 (2010).  In other words,

state law supplements maritime law where maritime law is silent.  *Yamaha,* 516 U.S. at 206;

---

[32] Plaintiffs take no position, in response to the Motions to Dismiss the Bundle C Complaint(s),
as to what law might be applicable where a plaintiff alleges a jurisdictional basis other than the
admiralty or maritime jurisdiction of the Court.

*Coastal Iron Works*, 783 F.2d at 582; *Persson v. Scotia Prince Cruises, Ltd.*, 330 F.3d 28, 32 (1st Cir. 2003).

The U.S. Supreme Court followed the approach of "supplementing" general maritime law with state law in *Yamaha*.  In that case, a non-seaman girl was killed in a collision with a vessel in territorial waters off Puerto Rico while using a jet ski for recreational purposes.  *See id.* at 202.  Her parents then brought suit against the jet ski's manufacturer under Pennsylvania's wrongful death and survival statutes.  *Id.*  The Supreme Court considered the argument that federal maritime law completely displaced state wrongful death law, but rejected it.  The Supreme Court first noted that when "Congress has prescribed a comprehensive tort recovery regime to be uniformly applied, there is, we have generally recognized, no cause for enlargement of the damages statutorily provided."  *Id.* at 215.  The Supreme Court continued, however, to find that Congress had only prescribed remedies for the wrongful deaths in territorial waters of those who were engaged in maritime trade.  *See id.* 202, 215.  As a result, the Supreme Court preserved the application of state statutes to deaths of non-seafarers within territorial waters.  *See id.* at 215.

In the wake of *Yamaha,* federal courts routinely apply state laws in admiralty cases when those state laws "fill gaps" or provide relief that otherwise would not be available under admiralty law.  *See, e.g., Coastal Iron Works, Inc.*, 783 F.2d at 582; *J. Ray McDermott v. Vessel Morning Star*, 457 F.2d 815, 818 (5th Cir. 1972) (*en banc*); *Rogers v. Coastal Towing, L.L.C.*, 723 F. Supp. 2d 929, 933 (E.D. La. 2010); *TAG/ICIB Services v. Pan American Grain Co.,* 215 F.3d 172, 177 (1st Cir. 2000); *American Dredging Co. v. Lambert,* 81 F.3d 127, 130-31 (11th Cir. 1996); *Morrow v. Marine Max, Inc.*, 731 F. Supp. 2d 390, 394 (D.N.J. 2010); *Matheny v. Tennessee Valley Auth.*, 503 F. Supp. 2d 917, 923 (M.D. Tenn. 2007).  For instance, "state law may supplement the measure of damages while maritime law provides the substantive law."

*Skipperliner Indus., Inc. v. Ray*, No. 00-C-0730, 2002 WL 32348827, at *14 (W.D. Wis. Jan. 31, 2002).

Moreover, to promote uniformity in the general maritime law, admiralty courts may also look to, and borrow from, general common law.  *Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.,* 959 F.2d 49, 53 (5th Cir. 1999).  The Fifth Circuit frequently relies on the *Restatement (Second) of Torts* for statements of common law principles relevant to admiralty cases.  *Dalrymple v. Fairchild Aircraft, Inc.,* 575 F. Supp. 2d 790, 796 (S.D. Tex. 2008) (citing *Marastro,* 959 F.2d at 53).  Thus, for example, the Court could borrow common law principles as set forth in the Restatement to preserve Plaintiffs' common law claims.  Accordingly, the general maritime law does not preempt or displace the Plaintiffs' state law claims.

**VI.**    The Court Should Not Dismiss Plaintiffs' Actions for Lack of Presentment.

In their motions to dismiss, the Defendants assert that this Court lacks jurisdiction over Plaintiffs' claims because Plaintiffs have failed to "present" their claims to a "responsible party" pursuant to the OPA pre-suit claims process.  (*See* BP Mot. to Dismiss Bundle C at 7-9; HESI. Mot. to Dismiss at 16-17).  In particular, Defendants argue that this Court cannot exercise subject matter jurisdiction over the Plaintiffs' claims because: (1) Plaintiffs were required to present their claims through the OPA-mandated claims process; and (2) the OPA presentment requirement is a mandatory condition precedent to filing suit based on the OPA, which Plaintiffs have failed to satisfy.  (*See id.*) .

First, Plaintiffs need not make OPA presentment for their non-OPA claims against the Defendants.  Thus, to the extent Defendants' motions to dismiss could be construed to contend that Plaintiffs should have presented non-OPA claims through the OPA-mandated claims process, this Court should reject such arguments. *See, e.g., Williams v. Potomac Elec. Power Co.*, 115 F. Supp. 2d 561, 565 & n.3 (D. Md. 2000) ("OPA does not preempt . . . state common law

actions . . . [a]nd there is, in consequence, no requirement for the presentment of claims under OPA prior to commencing suit."); *see also,* 33 U.S.C. § 2751(e)(2) (preserving the admiralty and maritime jurisdiction of the U.S. District Courts).

Furthermore, as the OPA requires one presentment for losses from the Spill, there is no need to present separately to the other OPA Defendants.  This is particularly true where, as here, one responsible party has established or acceded to a presentment mechanism, which BP did affirmatively and publicly via the GCCF.  (*See, e.g.*, Doc. 594-1 ("Haycraft Letter")).  It would be cumbersome, duplicative, and wasteful — in short, contrary to the intended function of the OPA, to require a plaintiff to repeat presentment to each and every defendant who has or may be determined to be a responsible party.  This Court is well aware of the magnitude of Deepwater Horizon presentment infrastructure.  Defense counsel reports regularly on the GCCF claims statistics at the monthly MDL status conferences.  As the media recently reported, BP now pays the GCCF Administrator, Ken Feinberg, over $1 million every month to run it.  Nothing in the statute, its legislative history, or the case law interpreting it supports the notion that an expensive and time-consuming presentment system be replicated, at duplicative expense and concomitant delay and confusion, for each of the defendants involved in a single pollution disaster.

As much to the point, BP is the only defendant that has established a claims process for the receipt, evaluation, and payment of claims, as is required by the OPA.  *See* 33 U.S.C. § 2705(a) ("The responsible party shall establish a procedure for the payment or settlement of claims for interim, short-term damages."); 33 U.S.C. § 2714(b)(1) (providing that a responsible party must advertise the claims presentment process).  To the extent that this Court might reason that presentment should be made to each individual party, a defendant should not be allowed to violate the OPA and then use its own violation as a means to contest this Court's jurisdiction.

34

Moreover, Plaintiffs have no obligation to make OPA presentment to pursue general maritime law or state law claims.  *See, e.g., Williams*, 115 F. Supp. 2d 561, 565 & n.3.  This is true, Plaintiffs suggest, with respect to general maritime law or state law claims against the OPA-designated responsible party, but, in any event, is certainly true with respect to maritime actions against third parties such as Halliburton. *See* 33 U.S.C. § 2751(e)(2). Taking such an argument to its logical conclusion, the general damage claims of a Jones Act seaman would have to be dismissed pending the presentment of his economic loss claims to BP under the OPA.  This is neither what Congress intended, nor could it have been intended that general maritime law or state law claims subject to Limitation - which must be asserted on or before the April 20, 2011 Monition Date - be first presented to BP.[33]

**VII.**    **Defendant Halliburton's Rule 12 Motion on the Issue of Responsible Party Status is Premature.**

Halliburton argues that any remedy the Plaintiffs may have only exists against the designated responsible party or parties and not against Halliburton.  (HESI Mot. To Dismiss at 18).  Regardless of whether they meet the definition of "responsible party" under 33 U.S.C.A. § 2701(32), under the facts of this case, the acts or omissions of Halliburton caused the Spill. *See* 33 U.S.C. § 2702(d)(1)(A).  Under the unequivocal terms of § 2702(d)(1)(A), any third party whose act or omission caused the discharge of oil "shall be treated as the responsible party."  33 U.S.C. § 2702(d)(1)(A).  Here, Halliburton *could* ultimately "become the responsible part[ies]" and be liable to "all claimants."  *See, e.g.*, *Gabarick v. Laurin Mar. (Am.), Inc.* No. 10-30148, 2010 U.S. App. LEXIS 26681, at *8-10 (5th Cir. Dec. 30, 2010) (unpublished) (reversing grant

---

[33]  Indeed, Defendants consented to a procedure by which Plaintiffs' Claims in Limitation (including tendered claims under Rule 14(c) against BP) could be filed together with OPA and other claims. *See* PTOs 24 and 25.

of partial summary judgment because facts were too undeveloped to conclusively assign fault to any of the parties for purposes of OPA liability).

BP, Transocean, Anadarko Petroleum Corp., Anadarko E&P, LP, and MOEX Offshore 2007 LLC have been designated as responsible parties by the U.S. Coast Guard, not because they have been found liable for causing injury to Plaintiffs, but to provide claimants with an expeditious avenue for recovery of the relief afforded by the OPA.  33 U.S.C. § 2713.  The OPA, at the same time, "provides the responsible party with a complete defense to liability" if it can prove, through litigation, that a third party was the sole cause of the oil spill.  *Gabarick,* 2010 U.S. App. LEXIS 26681, at *7 (citing 33 U.S.C. § 2703(a)(3)).  The designated responsible party has no way to raise the defense of liability, except through litigation.

In holding that summary judgment was premature, the *Gabarick* court stated that if the § 2703(a) defense is proven, "liability under the OPA shifts to the third party at fault for the spill, and the third party becomes the responsible party and is liable to *all claimants* under the OPA." *Id.* at *8 (emphasis added); *see also Unocal Corp. v. U.S.*, 222 F.3d 528, 534 (9th Cir. 2000) (holding that "[o]nce the responsible party establishes these three factors, the third party who caused the spill officially becomes a "responsible party," and the owner/operator no longer bears any liability for the spill.  33 U.S.C. § 2702(d)(1)(A)").

Therefore, until there is a *judicial determination* concerning the liability of the responsible party (or parties), it would be improper to fully and finally dismiss, with prejudice, any third party not designated as a "responsible party" by the government, so long as there is a colorable claim that such party might later be found liable for the Spill**.**

Furthermore, with respect to vessels, the OPA provides that a responsible party is "any person owning, operating or demise chartering the vessel."  § 2701(32).  However, the OPA

does not define the term "operator."  To determine whether a person or entity qualifies as an "operator" under the OPA, the analysis in *U.S. v. Bestfoods*, 524 U.S. 51 (1998) is instructive.[34] In *Bestfoods*, the Supreme Court stated that liability should attach to an operator "regardless of whether that person is the facility's owner, the owner's parent corporation *or business partner*, or even a saboteur who sneaks into the facility at night to discharge poisons out of malice."  *Id.* at 65 (emphasis added).  Further, the Supreme Court held that "an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility."  *Id.* at 66.  In the context of "environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."  *Id.* at 66-67. This broad definition of the term "operator" establishes that a Rule 12 Motion to Dismiss is premature.  For instance, material issues of fact still remain as to whether Defendant Halliburton was an "operator" where it managed and conducted operations having to do with the cement job or other aspects of the drilling operation.  In short, at this stage of the litigation, these claims should survive and, accordingly, the Defendant's motion in this regard should be denied.

**VIII.**   The Rule In *Robins Dry Dock* Does Not Bar Plaintiffs' Economic Loss Claims.

The rule in *Robins Dry Dock & Repair Co. v Flint*, 275 U.S. 303 (1927) is ordinarily interpreted to stand for the proposition that no duty is owed under the general maritime law of negligence to a plaintiff that suffers only economic loss as a result of the alleged wrongful act, absent personal injury or damage to physical property in which the plaintiff has some proprietary

---

[34] *Bestfoods* has been recognized as applicable in OPA cases.  *See U.S. v. Viking Resources, Inc.*, 607 F. Supp. 2d 808, 822 (S.D. Tex. 2009); *see also Harris v. Oil Reclaiming Co.*, 94 F. Supp. 2d 1210, 1213 (D. Kan. 2000).

interest.  *See also State ex rel Guste v. M/V TESTBANK,* 752 F.2d 1019 (5th Cir. 1985) (*en banc*).

Yet, with respect to OPA claims, it is clear that *Robins Dry Dock* and *TESTBANK* do not apply.  "Any claimant" may sue under the OPA for loss of profits or impairment of earning capacity due to the injury, destruction or loss of real property, personal property or natural resources. 33 U.S.C. ¶ 2702; *see, e.g.,* 33 C.F.R. 136.231(a) ("The claimant need *not* be the owner of the damaged property or resources to recover for lost profits or income") (emphasis added).[35]

Moreover, it could be argued that the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA" (also known as "The Superfund Act"), 42 U.S.C. § 9601, *et seq.*) was amended just after *TESTBANK* in 1986 to overrule *TESTBANK* and *Robins Dry Dock*.  The amendment provided as follows:

> *The owner or operator of a vessel shall be liable* in accordance with this section, *under maritime tort law,* and as provided under section 9614 of this title *notwithstanding* any provision of the Act of March 3, 1851 (46 U.S.C. 183ff)[which is "The Limitation of Liability Act"] or *the absence of any physical damage to the proprietary interest of the claimant*.

42 U.S.C. § 9607(h) (emphasis added).

Some commentators have suggested that these statutory amendments were intended to alter not only claims brought under the Superfund Act, but claims brought under the general maritime law.  The current version of Section 9607(h) was part of Amendment 671, introduced as part of the Superfund Amendments and Reauthorization Act of 1986.  The relevant part of the Amendment provides: "Section 107(h) of the Comprehensive Environmental Response,

---

[35] *See also,* 33 U.S.C. §2702(a) (responsible party liable for damages resulting from the mere "*threat*" of an oil spill) (emphasis supplied).

Compensation, and Liability Act of 1980 is amended by inserting 'under maritime tort law,' after 'with this section' and by inserting before the period 'or the absence of any physical damage to the proprietary interest of the claimant.'"  Pub. L. No. 99-499, 94 Stat. 2767 (October 17, 1986).  The House Report issued on October 3, 1986 explained as follows concerning the Amendment: "Section 107 of CERCLA is amended to clarify that a vessel owner would be liable in accordance with section 107 under maritime tort law and that physical damage to the proprietary interest of the claimant is not required as a condition of liability."  H.R. Rep. No. 99-962, at 56 (1986) (Conf. Rep.), as reprinted in 1986 U.S.C.C.A.N. 3068, 3352.

One commentator indicated that these legislative pronouncements were intended to implicitly overrule *Robins Dry Dock* and *TESTBANK,* stating:

> The subsection can be understood to mean that the requirement of physical injury to a proprietary interest and the Limitation of Liability Act are inapplicable in three situations:  (1) actions brought under section 9607 of CERCLA, namely the Act's liability provisions; (2) *actions brought under the general maritime law*; and (3) actions brought under state law pursuant to the authority of section 9614 of CERCLA.

S. Olssen, *Recovery for the Lost Use of Water Resources: M/V TESTBANK on the Rocks?*, 67 Tul. L. Rev. 271, 300 (1992) (emphasis added).  No court, to Plaintiffs' knowledge, has specifically addressed this issue and held to the contrary.

### A.    *Robins Dry Dock* Should Not Apply Here.

Unlike the situation presented in *Robins Dry Dock*, Plaintiffs here do not complain that a party in contractual privity with them was injured by the acts of Defendants, which in turn caused their damage.  Instead, Plaintiffs seek recovery for the torts committed by Defendants that has caused direct, albeit economic, harm.  As Judge Clark explained in his special concurrence in *Hercules Carriers, Inc. v State of Florida*, 720 F.2d 1201, 1203 (11th Cir. 1983), vacated and affirmed by equally divided *en banc* court*, 728 F.2d 1359 (11th Cir. 1984), *Robins Dry Dock*

should be construed to apply only in cases where the plaintiff is damaged because of injury to a party in privity with the plaintiff.  Judge Clark's well-reasoned concurrence accurately defined the appropriate limits of *Robins Dry Dock*, and he strongly advocated that the Eleventh Circuit should clarify the law and properly limit *Robins Dry Dock*.  He succeeded in having the court consider the issue *en banc*, but came up one vote short, with the entire court being evenly split on the issue.  *Id.*   The facts here make a far more compelling case for confining *Robins Dry Dock* to its original boundaries, in which case the doctrine would not apply.  Accordingly, the Defendants motion in this regard should be denied.

## CONCLUSION

For the above and foregoing reasons, and for the reasons stated in Plaintiffs' separate Oppositions, Defendants' Motions to Dismiss Plaintiffs' Bundle C Complaints  should be denied.

This 24th day of April, 2011.

Respectfully submitted,


_____/s/ Stephen J. Herman_____          _____/s/ James Parkerson Roy_____
Stephen J. Herman, La. Bar No. 23129          James Parkerson Roy, La. Bar No. 11511
HERMAN HERMAN KATZ & COTLAR          DOMENGEAUX WRIGHT ROY
LLP                                                                      & EDWARDS LLC
820 O'Keefe Avenue                                        556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113                      Lafayette, Louisiana 70501
Telephone: (504) 581-4892                            Telephone: (337) 233-3033
Fax No. (504) 569-6024                                 Fax No. (337) 233-2796
E-Mail: sherman@hhkc.com                          E-Mail: jimr@wrightroy.com
*Plaintiffs' Liaison Counsel MDL 2179*          *Plaintiffs' Liaison Counsel MDL 2179*

## PLAINTIFFS' STEERING COMMITTEE

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT DRESCHER IMPREVENTO &
WALKER, P.C.
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

Of Counsel:
JOSHUA S. WHITLEY
BILLIE H. LEETH
STEVEN E. FINEMAN
ANNIKA K. MARTIN
JASON L. LICHTMAN
BRIAN COLOMB
DAVID BAGWELL
JAMES GARNER
ABAGAIL GAUNT
STEPHEN MURRAY, JR.
JOHNNY DEGRAVELLES
NEALE DEGRAVELLES
LARRY BERMAN
TOM SIMS
JULIA LEMENSE
DEBORAH WATERS
GARY MASON
KEVIN DEAN
*On Brief*

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that the above and foregoing Opposition has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on <u>April</u> <u>24</u>, <u>2011</u>.

_____ /s/ Stephen J Herman and James Parkerson Roy

43