1            IN THE UNITED STATES DISTRICT COURT FOR

2               THE EASTERN DISTRICT OF LOUISIANA

3                        AT NEW ORLEANS

4

5   IN RE: OIL SPILL BY THE
    OIL RIG *DEEPWATER HORIZON*
6   IN THE GULF OF MEXICO ON
    APRIL 20, 2010
7
                            CIVIL ACTION No. 10-MD-2179 "J"
8                           FRIDAY, APRIL 15, 2011

9

10  THIS DOCUMENT RELATES TO
    ALL ACTIONS
11

12  ************************************************************

13

14    TRANSCRIPT OF DISCOVERY STATUS CONFERENCE PROCEEDINGS

15            BEFORE THE HONORABLE SALLY SHUSHAN

16              UNITED STATES MAGISTRATE JUDGE

17

18

19

20  SUSAN A. ZIELIE, RPR, FCRR
    Official Court Reporter
21  HB 406
    500 Poydras Street
22  New Orleans, Louisiana 70130
    susan_zielie@laed.uscourts.gov
23  504.589.7781

24
    Proceedings Recorded by Computer-aided Stenography.
25

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFFS:        CUNNINGHAM BOUNDS
                                 BY:  ROBERT T. CUNNINGHAM, ESQ.
 3                               1601 Dauphin Street
                                 Mobile, AL 36604
 4

 5    FOR THE FEDERAL           US DEPARTMENT OF JUSTICE
      GOVERNMENT INTERESTS:     TORTS BRANCH, CIVIL DIVISION
 6                              BY:  R. MICHAEL UNDERHILL, ESQ.
                                450 Golden Gate Avenue
 7                              7th Floor, Room 5395
                                San Francisco, CA 94102
 8

 9    FOR THE STATE OF          OFFICE OF THE ATTORNEY GENERAL
      ALABAMA:                  STATE OF ALABAMA
                                BY:  WINFIELD SINCLAIR, ESQ.
10                              501 Washington Avenue
                                Montgomery, AL 36130
11

12    FOR THE STATE OF          HENRY DART, ESQ.
      LOUISIANA:                DAVID POTE, ESQ.
                                Attorney at Law
13                              510 North Jefferson Street
                                Covington, LA 70433
14
                                LAMBERT "JOE" HASSINGER, ESQ.
15                              701 Poydras Street
                                40th Floor
16                              New Orleans, LA 70139

17    FOR THE TRANSOCEAN        FRILOT
      HOLDINGS, LLC,            BY:  KERRY J. MILLER, ESQ.
18    TRANSOCEAN OFFSHORE       1100 POYDRAS STREET
      DEEPWATER DRILLING        NEW ORLEANS, LA 70163
19    INC., AND TRANSOCEAN
      DEEPWATER INC.:
20

21

22

23

24

25
```

```
 1   APPEARANCES CONTINUED:

 2   FOR BP AMERICA INC.,        LISKOW & LEWIS
     BP AMERICA PRODUCTION       BY:  DON K. HAYCRAFT, ESQ.
 3   COMPANY, BP COMPANY         ONE SHELL SQUARE
     NORTH AMERICA INC., BP      701 POYDRAS STREET
 4   CORPORATION NORTH           SUITE 5000
     AMERICA INC., BP            NEW ORLEANS, LA 70139
 5   EXPLORATION & PRODUCTION
     INC., BP HOLDINGS NORTH     KIRKLAND & ELLIS
 6   AMERICA LIMITED, BP         BY:  ANDY LANGAN, ESQ.
     PRODUCTS NORTH AMERICA           ROBERT GASAWAY, ESQ.
 7   INC.:                       300 North Lasalle
                                 Chicago, IL 60654
 8

 9   FOR CAMERON                 STONE PIGMAN WALTHER WITTMAN
     INTERNATIONAL CORP:         BY:  KEITH HALL, ESQ.
10                               546 Carondelet Street
                                 New Orleans, LA 70130
11

12   FOR HALLIBURTON             GODWIN RONQUILLO
     ENERGY SERVICES, INC.:      BY:  DON E. GOODWIN, ESQ.
13                                    JENNY L. MARTINEZ, ESQ.
                                      STEPHANIE MAJOR, ESQ.
14                               1201 Elm Street, Suite 1700
                                 Dallas, TX 75270
15
                                 GODWIN RONQUILLO
16                               BY:  R. ALAN YORK, ESQ.
                                 1331 Lamar, Suite 1665
17                               Houston, TX 77010

18
     FOR ANADARKO PETROLEUM      KUCHLER POLK SCHELL WEINER
19   CORP, ANADARKO E&P             & RICHESON
     COMPANY, LP, MOEX USA       BY:  DEBORAH D. KUCHLER, ESQ.
20   CORP, AND MOEX OFFSHORE     1615 Poydras Street
     2007 LLC:                   New Orleans, LA 70112
21

22   FOR WEATHERFORD US, LP:     JONES WALKER
                                 BY:  RICHARD D. BERTRAM, ESQ.
23                               Place St. Charles
                                 201 St. Charles Avenue
24                               New Orleans, LA 70170

25
```

```
 1    APPEARANCES CONTINUED:

 2    FOR DRILQUIP, INC.:        WARE JACKSON LEE & CHAMBERS
                                 BY:  DENNIS BARROW, JR., ESQ.
 3                               2929 One Allen Center
                                 500 Dallas Street
 4                               Houston, TX 77002

 5
      ALSO PRESENT:              GAVIN FROST, ESQ.
 6                                   For US Dpt. of Interior

 7                               VICTOR ELINS, ESQ.
                                     MDL 2185 Sec.
 8                               BILL STRADLEY
                                     MDL 2185 Sec.
 9

10                               WILLIAM LARGE, ESQ.
                                     For PSE
11                               PAUL STERBCOW, ESQ.
                                     For PSE
12
                                 RYAN BABIUH, ESQ.
13                                   For BP
                                 ANTHONY FITCH, ESQ.
14                                   Anadarko/MOEX

15
      Participating             MIKE UNDERHILL, ESQ.
16       Telephonically:            For DOJ
                                 COREY MAZE, ESQ.
17                                   For State of Alabama

18                               CARMELITE M. BERTAUT, ESQ.
                                     For Cameron
19                               DAVID JONES, ESQ.
                                     For Cameron
20                               MARK COHEN, ESQ.
                                     For DNV
21                               DENISE SCOFIELD, ESQ.
                                     For M-I
22
                                 PATRICK BELGEN, ESQ.
23                                   For K. Paine
                                 STEPHANIE McGUIRE, ESQ.
24                                   For Brett Cocales

25
```

```
 1                NEW ORLEANS, LOUISIANA; FRIDAY, APRIL 15, 2011

 2                         9:30 a.m.

 3                THE COURT:  Good morning, phone

 4      participants, how are you?

 5                PERSON ON TELEPHONE:  Good morning, Your

 6      Honor.  Doing well.

 7                THE COURT:  Well, let's see.  I think I

 8      wanted to start off this morning talking about the

 9      deposition of K. Paine.

10                I don't see that we have Pat on the phone.

11      Pat, are you there?

12                MR. FITCH:  Judge, Tony Fitch.

13                PERSON ON TELEPHONE:  I was asking for the

14      host.

15                THE COURT:  I am the host, yes.  I am the

16      hostess here.

17                PERSON ON TELEPHONE:  Are you expecting

18      Patrick Blegen?

19                THE COURT:  I am.  That's exactly who I was

20      looking for.  Thank you.

21                There's Pat.

22                MR. FITCH:  I sent him last week's schedule.

23                THE COURT:  So you screwed up, huh?

24                Pat, you there?  We'll wait for him.

25                (Pause in Proceedings.)
```

```
 1                    THE COURT:  Pat, is that you?
 2                    MR. BLEGEN:  It is.
 3                    THE COURT:  How you doing?
 4                    MR. BLEGEN:  Good.
 5                    THE COURT:  We've got you at the top of the
 6      agenda so you don't have so suffer through the rest of
 7      the meeting with us.
 8                    MR. BLEGEN:  I appreciate that, and I think
 9      I can shortcut things.  Late last night, Ms. Paine
10      emailed me and said that one of the problems is that she
11      works a 12 hour shift on the weekend, so that meeting
12      with her is a problem.  She was able to move her shift
13      so we can start Monday as planned, which is I think the
14      notice says 8:30.
15                    THE COURT:  That's great.  I think
16      everybody's very grateful for that.  We're hoping it
17      won't take two full days, and I think everybody's going
18      to do everything they can to shorten the time.
19                    MR. BLEGEN:  I appreciate that, and I know
20      she does too.
21                    THE COURT:  Great.  Good luck with it and
22      have fun in New Orleans.  If you send me an email, I'll
23      send you my list of restaurants and that kind of stuff.
24                    MR. BLEGEN:  That would be great, Judge.
25                    I just wanted to let everybody know that I
```

```
 1   have not personally met with Ms. Paine yet.  If
 2   something comes up in our meetings that makes me think
 3   she has to doing something different than agreeing to be
 4   deposed, then I will send an email to the chain that I
 5   now have as soon as possible.
 6                 THE COURT:  Good.  We appreciate that very
 7   much.
 8                 And, Tony, you've provided Pat with the
 9   email distribution list?
10                 MR. FITCH:  I have, Judge, through the
11   distribution list, standard distribution list that was
12   on the email that we exchanged.
13                 MR. BLEGEN:  I believe I have it.
14                 THE COURT:  Great, Pat.  You are in
15   business.  Thank you very much.  Bye-bye.
16                 All right.  Moving right along, just a
17   little note for everybody.  We understand from our
18   systems unit that we are having trouble docketing PDF
19   documents that are submitted to us that are password
20   protected.  And could you all please talk to your staff
21   on letters or attachments not to password protect the
22   PDFs so that our systems unit can load them into the
23   system without having to scan them?  Does anybody know
24   what I'm talking about?  Because I certainly don't.
25                 MR. MILLER:  I know that we ran into filing
```

1    the trial plans.

2              THE COURT:  That's a good reason.  Those all

3    seem to be password protected.  So the clerk's office is

4    scanning them rather than just entering them into the

5    docket directly.  So, if you would just check with your

6    staffs, that's the best hint I can give you.

7              All right.  Let's talk next about custodial

8    production for the London depositions.

9              Andy, I've got your letter, and I think that

10   we're making progress.  I've got one question for you.

11   Which is, on page 2 of your letter, final paragraph, you

12   make the point that a lot of these files, documents from

13   the UK custodian files, have previously been produced.

14   And you're saying 14 days, which I think is good.  I

15   guess my question is, is that 14 days except?  Because

16   I'm seeing where you're talking about getting London

17   contact information for production of the remainder of

18   the files, and I just wanted clarification on that

19   issue.

20              MR. LANGAN:  You're saying for BP?  Our

21   intent, what we intended to convey, is that we want to

22   make custodial file productions for the UK deponents 14

23   days on a rolling basis before they even start.

24              THE COURT:  Correct.

25              MR. LANGAN:  Okay?  And we realize that,

1    with depositions going through the month of June, that

2    14 days may roll into periods in which lead counsel for

3    the PSE and the other parties may actually be in London.

4    And so, in order to accommodate other counsel, we wanted

5    to know, if they're going to have London contact

6    information, we'd try to work with them to get them the

7    stuff, as well as get it to them through an FPT site, as

8    well as send it to their offices in the states.  We're

9    looking for ways to cooperate and make it easier.  In

10   fact, Mr. Roy had raised they're going to have an office

11   in London temporarily.  If there are, after further

12   privilege review, a few extra documents to get produced

13   right before the deps, we're just trying to anticipate

14   the logistics here.

15            THE COURT:  Okay.  But, as I understand it,

16   and I just need clarification, the rule is 14 days, and

17   there might be some straggles that are unanticipated,

18   but the rule is 14 days.

19            MR. LANGAN:  Right.  Yes.  That's what we're

20   going to try to do, absolutely.  And we're happy to call

21   it a roll.

22            THE COURT:  And, PSE, can you live with it?

23            MR. CUNNINGHAM:  Morning, Your Honor.

24   Robert Cunningham for PSE.  We can live with it, Judge.

25   I was just mentioning in response to Andy's letter, for

1    example, Mr. Hayward, we do have some documents that

2    we've already seen but they consist primarily of blast

3    emails that have nothing to do with much of anything.

4    We have not seen, and it seems to me it would already be

5    part of production without asking for the custodial

6    files, a single email that I know of between the upper

7    level management, the people we're going to be deposing

8    the first few weeks in June.  And one would think that

9    in the routine production, for example, we would have

10   emails between the board of directors and management and

11   be able to at least get a running start on all this.

12           We don't have a clue what to expect in terms

13   of numbers of documents while we're in London.  It's

14   going to be a situation where we have to have teams of

15   people who are going through documents, and they're

16   going to have to be doing it in the middle of the night

17   in order to get us ready.

18           And we just want to emphasize that, when

19   they say 14 days, we need all of them at least 14 days,

20   and we would prefer to have at least Mr. Hayward and Mr.

21   Thierens, who are two very, very crucial witnesses first

22   part of June.  We'd really prefer to have them more than

23   14 days.  Because, if our expectation proves to be

24   correct, there are going to be lots and lots and lots of

25   documents that we have to use.

```
1              THE COURT:  Thank you.
2              MR. LANGAN:  Your Honor, and I respect what
3   Mr. Cunningham has to say on this, but I need to point
4   out a couple things about this.
5              First of all, we have been working
6   diligently to review and sweep the high level board of
7   directors, CEO kind of documents now.
8              But I also need to mention this.  Your Honor
9   issued an order like two or three weeks ago, four weeks
10  ago, that asked the PSE to prioritize their request to
11  BP.  Since that time, we've gotten exactly one request
12  from PSE to prioritize.  It was for Mr. Herman last
13  Saturday telling us to prioritize the source control
14  documents.  Mr. Cunningham is sending us a different
15  message.  And I understand and respect why he's doing
16  that.  But you understand our dilemma.
17             THE COURT:  I do.
18             MR. LANGAN:  Mr. Herman says prioritize
19  source control.  I guess I'm hearing something different
20  now.  So -- and what they're going to say is produce
21  everything now.  Well, the world doesn't work that way.
22  So all I'm saying is I think the parties need to
23  understand that, when we get mixed messages, that makes
24  our lives a little difficult.
25             THE COURT:  It does.  And I guess the
```

1    question being, can we put at the priority list of UK

2    depositions the wish that those two witnesses' custodial

3    files be produced priority, hopefully as soon as

4    possible?  Now, that's a wish list.

5            But, that's the wish list, those are the two

6    witnesses, Mr. Cunningham, that I think you would like;

7    and then you can accept the 14 days for everybody else?

8            MR. CUNNINGHAM:  Yes, Your Honor.

9            MR. LANGAN:  Mr. Thierens and Mr. Hayward, I

10   heard them, and let me work on that.

11           THE COURT:  That would be great.

12           THE CLERK:  Hayward and Thierens are the

13   week of June 6th.  So 14 days is going to be before they

14   leave.

15           THE COURT:  It will be before they leave,

16   but Mr. Cunningham is requesting even sooner than that

17   because he thinks that those are important witnesses and

18   he thinks it's going to be big production and wants

19   additional time to review the documents.

20           MR. CUNNINGHAM:  That's correct, Your Honor.

21           I might also mention -- I've mentioned this

22   to other counsel, we're going to be asking for

23   additional time with Mr. Hayward.  We hope we can work

24   it out with our friends on the other side, but it

25   doesn't sound like it.  So I really don't have to ask

1    until April 29th or before April 29th, but we expect to

2    be asking for additional time with Mr. Hayward and

3    probably with Mr. Thierens, which is another reason we

4    would like to have the production more than 14 days.

5              THE COURT:  Mr. Godwin said he'd be willing

6    to give you some time.

7              MR. CUNNINGHAM:  I've already talked to him,

8    and he already said no.

9              MR. STERBCOW:  I'm working on him, Judge.

10             MR. GODWIN:  You know I'm going to step up

11   and volunteer for that one, Your Honor.

12             THE COURT:  No comment, Don.

13             MR. GODWIN:  I understand, Judge.

14             THE COURT:  All right.  Next up is the

15   request for additional time.  The only request that

16   we've got for the upcoming depositions, and I want to

17   make sure that we're correct, is the request from BP for

18   Anderson, Seriale, Probert and McKay.

19             Did you have one also, Don?

20             MR. GODWIN:  Yes, Your Honor.  May I

21   approach?

22             MS. McGUIRE:  This is Stephanie McGuire.

23   We're part of the individual counsel for Brett Cocales,

24   who is a BP employee.  We need to discuss his depo dates

25   for this next week.

1          THE COURT:  Okay.  We're going to get to

2    scheduling in a minute.  Thank you.

3          MS. McGUIRE:  Thank you, Your Honor.

4          MS. BERTAUT:  Judge, this is Carmelite

5    Bertaut.  And I was not clear listening on the phone

6    whether you're calling for comment on extra deposition

7    time needed for May depositions?

8          THE COURT:  I am getting from BP a request

9    for late April and May deponents, and I had forgotten

10   that Don had asked for an additional deponent as well.

11         MS. BERTAUT:  Judge, we had one, and I

12   apologize for not writing it to you, but I thought we

13   were doing an oral report this morning.

14         THE COURT:  No.

15         MS. BERTAUT:  Our request is relative to --

16   and I'm going to murder the man's name, but the

17   gentleman for BP, he's one of the 30(b)(6) witnesses

18   scheduled for May 3 and 4, Fereidain Abbassion.  We

19   would request an extra 60 minutes with him.  And that

20   request is only through May, Your Honor.

21         THE COURT:  Would you please, Carmelite,

22   give us an email or a letter telling us why you need

23   additional time with the witness, so that anybody who

24   objects can state their objections, and because you can

25   shop it around.

1          MS. BERTAUT:  Thank you.  Will do, Your
2     Honor.
3          THE COURT:  Okay, great.
4          Okay.  And Don, I'm sorry, I did forget that
5     you had given us an additional witness --
6          MR. GODWIN:  Mr. McKay, Your Honor.
7          THE COURT:  Mr. McKay.  And --
8          MR. GODWIN:  I'll tell you my thoughts on
9     that, Judge, briefly.
10          THE COURT:  Certainly.
11          MR. GODWIN:  We did send a notice last
12     evening, Your Honor, that we would like to depose Mr.
13     McKay, and we asked that we be allowed to have 45
14     additional minutes, as we've done with our all witnesses
15     and I believe all counsel are doing as well.
16          I'm going to try to talk between now and the
17     next week to ten days with other lawyers on both sides
18     to see if I can secure the additional time that I'll
19     need with Mr. McKay.  And, if failing that, then we'd
20     come back to the Court probably next Friday.  But I'm
21     going do my best to see if I can get it voluntarily, as
22     we've been able to do with so far with every witness
23     that we've presented.
24          With regard to Mr. McKay, Your Honor, I
25     spoke to Andy about it this morning, and he's going to

1    be thinking about whether they're going to object to his

2    deposition.  I told him that we want the deposition.

3    He's a very, very important witness to Halliburton's

4    defense of case.  Mr. McKay was involved in testifying

5    before numerous -- a number of governmental bodies

6    post-incident on seven or eight occasions.  I've got the

7    details over here, I won't go into it now.

8              But, in terms of his deposition, and I know

9    Andy does not have any dates today because of our having

10   just told him about it yesterday, we would like to take

11   his deposition some time in May, if there are two days

12   that -- and everybody wants to have two days -- or some

13   time in July after we come back.

14             The reason that I need to take his

15   deposition, and I'm going to be in London for that

16   entire five week period approximately where we go June

17   and come back the first week of July, getting all that

18   done.  So I would -- and, if we put him over into July,

19   that's fine with me.  But either May or July, whatever

20   is most convenient for the witness, is what I want to

21   try to work around.  But I also have to do it myself,

22   and I would prefer that they not come back with dates in

23   June.  So that's Mr. McKay.

24             And, Andy and I will try to work on that to

25   reach agreement.  If we can, fine.  If not, we'll bring

1    it up next week or as soon as thereafter as possible.

2              THE COURT:  And we're going do the same,

3    Andy, with your request, is let's shop it around during

4    the week and see how you end up as far as time; okay?

5              MR. LANGAN:  May I address Mr. McKay for

6    just a second?

7              THE COURT:  You certainly may.

8              MR. GODWIN:  We have two other witnesses,

9    Your Honor, that are already set and already calendered,

10   and they're May witnesses that we would like 45 minutes

11   additional time for.  That's John Guide on May 9 and May

12   10.  And he is a very, very critical witness to my

13   client.  He was a wells team leader onshore,

14   on-the-beach person, pretty much in charge of the

15   operation, if you will.  Many people reported up to him

16   about what was going on.  So I'm going to try again to

17   try to secure 45 minutes from some of the other lawyers

18   in the case before asking Your Honor to rule on it.  I

19   just wanted to give you the notice as you've asked us to

20   do.  That's Mr. John Guide from 8, 9 and 10.

21             The last witness, Your Honor, that we're

22   going to need additional time for is Mr. John Wright,

23   and he is on May 12 and 13.  And Mr. John Wright,

24   formerly with Boots & Coots, was the person that was

25   hired by BP to prepare an extensive report about what he

1    saw out there and all the things that happened with

2    regard to the well. He's a well control specialist as

3    well as probably having specialties in other areas. And

4    so we're going to need additional 45 minutes with him,

5    Your Honor, for May 12 and 13. He's already scheduled.

6    And, again, I'm going to endeavor to secure that time

7    from others without having to come back to you.

8          And we will be prepared next Friday to

9    report to you on Mr. McKay, Mr. Wright and Mr. Guide.

10          THE COURT: That's what we'll do with all

11    the witnesses listed this week relative to the witnesses

12    and requests for additional time.

13          CASE MANAGER: Don keeps saying next week,

14    but we don't have a meeting scheduled next week.

15          MR. GODWIN: Whatever it is. I'm not going

16    address that in writing, so whatever the Court needs to

17    bring it up at our next session.

18          THE COURT: Maybe we can tackle some of this

19    by email or a conference call rather than wait for two

20    weeks.

21          MR. GODWIN: Okay, okay.

22          THE COURT: So if you'll work on it. And,

23    anybody else who is looking for additional time, why

24    don't you, next week, when you know what you've got,

25    report back to us via email and let's see if we can't

```
 1    take care of the issues so that we're not leaving that
 2    string hanging.
 3                   MR. GODWIN:  Judge, I'm very pleased to
 4    report that, so far, I've needed additional time, as
 5    have other lawyers, and on every occasion that I've
 6    asked for additional time other lawyers have stepped up
 7    and given it to me either in advance or during the
 8    deposition.
 9                   THE COURT:  Absolutely.
10                   MR. GODWIN:  And the groups work very well
11    together.
12                   I'm also pleased to say that, in terms of
13    working and trying to go quickly, we had a witness, Mr.
14    Victor Martinez, that we started yesterday morning at
15    8:30, he was a two-day witness, we got through yesterday
16    afternoon 4:30ish, in that timeframe, complete.  He's
17    off today.  And so everybody's working diligently to
18    move through these things.
19                   THE COURT:  Absolutely.
20                   MR. GODWIN:  But we often times don't know
21    that we're going to be able to do that until we get
22    there.
23                   THE COURT:  And I don't expect that, and I
24    understand that, Don.  And I agree that everybody is
25    working really well, really hard, and it is amazing to
```

1    us what you guys are capable of accomplishing and

2    agreeing to.

3                MR. GODWIN:  Thank you, Your Honor.

4                THE COURT:  So compliments to everybody.

5                MR. GODWIN:  Thank you, Judge.

6                MR. DART:  Good morning.  Hank Dart for the

7    state of Louisiana.

8                THE COURT:  Andy, I hadn't forgotten you.

9    But Hank was standing.  Like, so, what can I say?

10               MR. DART:  Good morning, Your Honor.  I have

11   a humble suggestion.  Because I have a fear that, with

12   some of these witnesses, especially Mr. Guide, your

13   suggestion of this shopping trip may come back with

14   empty grocery carts.

15               THE COURT:  It might.

16               MR. DART:  Yes.  And I believe the, last

17   time that you issued an order to give BP extra time, you

18   took 15 minutes from Louisiana, 15 -- you took a little

19   bit from everybody.

20               My suggestion is that, oftentimes, the PSE,

21   for example -- and I'm singling them out -- but they

22   don't use all of their allocated time.  And my only hope

23   would be that we could possibly get that 15 minutes back

24   if time by any other party is not used up.  And I've

25   found myself, and I think I'm speaking for Alabama as

1    well -- correct me if I'm wrong -- the states found

2    themselves running out of time on witnesses, and we were

3    called on it.  And we didn't have an opportunity to

4    perhaps get some unused time back.

5              So I would only request that, if you issue

6    another order and take away time from the states, that

7    the order include something to the effect that, if there

8    is unused time, Louisiana might be able to get our

9    precious few 15 minutes back.

10             THE COURT:  All right.  We will certainly

11    consider that.  Thank you.

12             MR. DART:  Thank you, Your Honor.

13             THE COURT:  All right, Andy.

14             MR. LANGAN:  Your Honor, Andy Langan for BP.

15    Just a couple comments on Mr. Lang.

16             I'm sure that we are going to object to his

17    deposition.  This was raised for the first time

18    yesterday.

19             THE COURT:  Absolutely.  And I'm going to

20    give you the opportunity to discuss it.

21             MR. LANGAN:  I appreciate it.

22             I just want to note -- and, again, I don't

23    want to argue it today -- but he was on nobody's

24    priority list.  This is brand-new.

25             THE COURT:  Brand-new.  Not on the master

```
 1   list.
 2                  MR. LANGAN:  And I respect Mr. Godwin very
 3   much, he mentioned that he's testified and all that.  I
 4   guess all that was known back in January and February
 5   when we put together the priority -- that's not news.
 6   And so I don't quite understand what's going on here
 7   about them asking about Mr. McKay, who frankly had no
 8   drilling responsibility in the Gulf of Mexico.  That's
 9   not his function.  So I just want to put a placeholder
10   there that this is coming out of the blue a little bit
11   and we're not necessarily going to role over on this
12   one.
13                  THE COURT:  I understand that, and we're not
14   make anything decisions on that today.
15                  MR. LANGAN:  Thank you, Your Honor.
16                  THE COURT:  Thank you, Andy.
17                  All right.
18                  MR. MILLER:  Your Honor, Kerry Miller.
19                  THE COURT:  They still haven't gotten that
20   mike fixed?
21                  MR. MILLER:  It's too short.
22                  MS. BERTAUT:  Judge, Carmelite Bertaut.  Is
23   it possible to ask the person speaking, the counsel, to
24   speak up?
25                  MR. MILLER:  Kerry Miller on behalf of
```

1   Transocean.  A couple of things.  We have our own

2   additional questions.  I put those in an email.

3                  THE COURT:  I'd rather have them in writing

4   so everybody can see and chew on them before we come

5   into the meetings.  And then you can take your list and

6   shop it.

7                  MR. MILLER:  That makes sense.  And I don't

8   have anybody for April.  They're just May.  So we have a

9   little bit of time to exchange emails, calls, whatever

10  we have to do.

11                 One of the issues that I think Mr. Godwin

12  brought is John Guide, an additional time request.  And

13  I think a number of parties may have additional time

14  requests for him.  Is there any information as to

15  whether or not he's going to actually testify?

16                 Andy, do you know what's the status on that?

17                 MR. LANGAN:  He's scheduled to testify.

18                 THE COURT:  There you go.

19                 MR. MILLER:  I can envision --

20                 MR. GODWIN:  For one or two days, Your

21  Honor.

22                 MR. MILLER:  I can envision talking about a

23  lot of additional time for Mr. Guide, only to find out

24  we're not going to have any time at all with him.  So

25  that's the nature of the question.

1          MR. LANGAN:  All I would say about that is I

2    don't think it's a waste of time to talk about extra

3    time for Mr. Guide.  He has his own counsel, I'm not

4    speaking for him.  But I don't think it's a waste of

5    judicial resources.

6          THE COURT:  Good.  All right.  Let's talk

7    about it.

8          Okay.  Let's talk about May dates on the

9    calender.  And, Mr. Maze, I see that you're not here

10   today.

11         MR. MAZE:  But I'm on the phone and I'm

12   there in spirit.

13         THE COURT:  Counsel want to introduce your

14   colleague to the assembled masses?  Because I understand

15   he's pitch-hitting for you.

16         MR. MAZE:  He is.  And I gave him a pep talk

17   about filling out the calender before he came in this

18   morning.  I'm hoping he's in there.

19         It's Winfield Sinclair, he's an assistant

20   attorney general here at the office of the attorney

21   general.

22         THE COURT:  Mr. Sinclair is here, and he's

23   set up next to the Elmo, I'm pleased to report.

24         MR. MAZE:  Very good.

25         THE COURT:  The first thing I want to talk

1    about with regard to the calendar, guys, is we've got

2    some dates in May, and I'm wondering if we have any

3    witnesses that you guys can volunteer to slide in the

4    first week of May, which is May 2 through 6.

5              MS. McGUIRE:  Your Honor, this is Stephanie

6    McGuire Scott Mullin.  I will use this as a segue.  You

7    were kind enough to reschedule Mr. Cocales's deposition

8    because of a Passover request by Mr. Hilder, my

9    colleague.  After getting the deferment to the week

10   following, we realized that Mr. Cocales's deposition was

11   set to begin the day after Easter.  And Mr. Cocales

12   respectfully -- we'd appreciate if the Court could bump

13   his deposition even a day or two to accommodate the

14   ability so that he can spend that day with his family

15   instead of traveling to New Orleans.  You have dates in

16   May.  I would like that as for another possibility for

17   Mr. Cocales.

18             THE COURT:  Well, when is he currently

19   scheduled, Stephanie?

20             MS. McGUIRE:  I believe he is scheduled to

21   go in on the 25th and the 26th of April.

22             THE COURT:  Of April?

23             MS. McGUIRE:  Yes.

24             THE COURT:  Guys, let's look at the 25th and

25   26th of April.  And I'm going to ask Mr. Cunningham,

 1   would you like to take -- oh, I'm sorry, I'm going to

 2   ask Mr. Sterbcow, would you like to take Mr. Cocales

 3   that first week of May?

 4            So let's look at the May calender, Mr.

 5   Sinclair.

 6            MR. GODWIN:  Can we be heard on that, Judge,

 7   regarding Mr. Cocales?

 8            THE COURT:  Hold on, let's look at the

 9   dates.  There we go.  May 2nd and 3rd looks pretty

10   light.

11            So, Paul, let's get you first.  And then,

12   Don, I'll come around to you.

13            MR. GODWIN:  Thank you, Your Honor.

14            MR. STERBCOW:  Your Honor, I'm taking Mr.

15   Cocales's depositions, and I frankly would leave it

16   where it is.  I understand his concern.  If the Court is

17   inclined to grant him the relief they've asked for.

18   Then, if it has to be moved, I would ask that under no

19   circumstances would it go past May 2nd and 3rd; okay?

20   Because those are dates that I think I can adjust what

21   we're doing on our end and I can take him.  But our

22   first preference would be to leave it where it is.

23            THE COURT:  Thank you.

24            Don.

25            MR. GODWIN:  Briefly, Your Honor.  Thank

```
 1    you.  Your Honor, Don Godwin for Halliburton.
 2              THE COURT:  Speak up so the phone
 3    participants can hear you.
 4              MR. GODWIN:  Yes, Your Honor.
 5              While I certainly appreciate counsel's
 6    desire to schedule Mr. Cocales's deposition on a date
 7    that allows him to have an Easter, we also, many of the
 8    rest of us, want to celebrate Easter as well.  And,
 9    likewise, we would look to think we're going to
10    celebrate Good Friday, but we've been told that we're
11    going to be in a deposition all that day with Mr. Greg
12    Walz.  No one in this room has said anything about
13    rescheduling that.  Because we know what your preference
14    is, and that is to move forward.
15              Those of us that are going to go to London,
16    Your Honor, and be away from our family on July 4, we're
17    going to be away that day.
18              Mr. Cocales was already rescheduled.  He was
19    on April 18 and 19, and at his request we reset it for
20    April 25 and 26, and there was no objection at that
21    point.
22              And we've already got scheduled, Your Honor,
23    for May 2 and 3 Mr. Jonathan Bellow, a BP witness who I
24    need to take, he's an important witness.  And I also
25    have to take, per my client's request, Mr. Cocales.  So
```

1    that's going to double up on me.

2              And of course we've all been operating -- I

3    know counsel for Mr. Cocales may not have been involved

4    inasmuch as of the rest of us, and I respect that -- but

5    we had a working meeting on March 25, and there was an

6    order that said that, once the witness deposition is

7    confirmed, that it would not be rescheduled except for

8    illness of the witness or of the deponent.

9              While I am generally in favor of trying to

10   work with counsel and trying to move things around, it's

11   a little bit late in the game trying to move Mr. Cocales

12   for a second time.  And, yet, I would ask and join Mr.

13   Sterbcow in the request that he be left on for April 25

14   and 26.  But of course I'll respect whatever you say.

15             THE COURT:  Do you have an opinion, Don?

16             MR. GODWIN:  About what, Judge?

17             Well, it's the rule --

18             MR. GODWIN:  Here's my opinion, Judge.  I'll

19   state it this way.  Andy has said often times, and I

20   believe in it, that it's not the good for the

21   goose/gander rule, but in other words the door swings

22   both ways.  I can go by whatever rules anybody wants to

23   set so long as they're going to be uniformly applied.

24   And they have been.

25             But, with regard to Mr. Cocales, we're

```
1    coming up on his deposition here in two weeks; and to
2    reschedule it now would create a hardship, and I request
3    that it not be rescheduled.
4               But, again, regardless of my opinion, if you
5    prefer to reschedule it, we'll make do with it.  Thank
6    you, Your Honor.
7               THE COURT:  Stephanie, because Don Godwin
8    representing Halliburton is scheduled to take the
9    witness that's currently scheduled for the 2nd and the
10   3rd, he's not going to be able to take both at once.  So
11   I think we're going to ask Mr. Cocales to come on in as
12   scheduled.  I'd like to try to accommodate you, but he
13   can't be in two places at one time.
14              MR. LANGAN:  Would it be possible to start
15   it later in the day on Monday, the 25th, as a fallback?
16              THE COURT:  Don, do you have any objection?
17              MR. GODWIN:  It's not at our question.
18              THE COURT:  Where is he coming from,
19   Stephanie?
20              MS. McGUIRE:  He's coming from Houston, Your
21   Honor.
22              THE COURT:  I think it might probably work.
23   We'll try it next time.
24              MR. GODWIN:  Judge, I've got an hour and a
25   quarter with him.  And I'm certainly willing to
```

```
1    accommodate the witness as long as by the end of Tuesday
2    I can get my hour and a quarter in.  If he wants to
3    start noon or Tuesday, that's fine with me.  Other
4    lawyers have an idea how much time they need.  I usually
5    go late in the day on Monday or early in the Tuesday.
6    If I get my hour and a quarter without asking for any
7    additional time, then I'm fine with the witness starting
8    later, if that works for everybody else.
9              MS. McGUIRE:  There are a lot of moving
10   parts to this litigation, most of which that we don't
11   know about because we're only a witness.
12             THE COURT:  You lucky dog, you.
13             MS. McGUIRE:  So, I mean, I understand
14   everybody's concern.  But, if the option is going later
15   or traveling, I mean, quite frankly, I think the witness
16   would prefer to go ahead and travel on Easter, rather
17   than try to bus later it on Monday.  Because, even
18   traveling from Houston, that makes it a very long day
19   for everyone.
20             THE COURT:  Right, exactly.  So let's go
21   ahead and scheduled it, Stephanie.  We'd like to try to
22   accommodate his request, but we could accommodate it to
23   start a little bit later; but, if he'd rather just go
24   ahead and get Monday and Tuesday done, we'll do it.
25   Okay?
```

```
 1               MS. McGUIRE:  Thank you, Your Honor.  I
 2   appreciate it.
 3               THE COURT:  No problem at all.
 4               So do we have any other witnesses that we
 5   could put in May 2 through 6?  Let me give you the dates
 6   we're looking for.  May 2 through 6, May 18th and 20th.
 7   May 24 and 27.  And May 30 and 31 are still available.
 8   So we're -- they're not?
 9               MR. YORK:  Not May 30th, I don't think.  I
10   think we'd scheduled that as Memorial Day.
11               THE COURT:  Oh, we did intentionally.  So we
12   should probably put an X there.
13               Thank you, Mr. Sinclair.  Corey would have
14   done a bigger X.
15               MR. SINCLAIR:  Yes, Your Honor, he certainly
16   would have.
17               MR. CUNNINGHAM:  Your Honor, we have one we
18   can suggest for the 2nd that would be a one-day 30(b)(6)
19   deposition, and it connects to the Wild Well report that
20   we're due to give today.
21               And that report is that we were supposed to
22   receive documents this past week.  We haven't.  There
23   seems to be a lack of enthusiasm for going forward
24   without being forced to do so.  So we would propose that
25   we go ahead and notice the Wild Well document 30(b)(6)
```

```
 1    for the 2nd.
 2              THE COURT:  And that's fine.  Do you
 3    actually need to book time?  In other words, you expect
 4    them to come and do it on the record?
 5              MR. CUNNINGHAM:  You know, we don't know.
 6    We were hoping to get cooperation and not have to do
 7    that.  But, if Your Honor will recall, we had it set
 8    previously.
 9              THE COURT:  I do recall.
10              MR. CUNNINGHAM:  Got it passed at their
11    request, and we're just ready to tee it up.
12              THE COURT:  Let's tee it up, and we will put
13    that down for the 2nd.  Although, I don't think that's a
14    real depo.  I mean, you might need to go on the record
15    for a few minutes, but it's -- we'll put it down as a
16    placeholder and you'll use that day.
17              MR. LANGAN:  Your Honor, Andy Langan for BP.
18    Focused on the dates you've identified and looking at my
19    notes, one of our 30(b)(6) deponents, Mr. Mazella, who
20    is on the top of page 4 of Your Honor's April 11th
21    order.  By the way, I think it's M-A-Z-E-L-L-A.
22              THE COURT:  Okay.
23              MR. LANGAN:  May 24.
24              THE COURT:  Okay.  Good.
25              MR. LANGAN:  For those, he's got three or
```

1    four topics.  He has two topics and portions of two

2    others.  One day is enough.

3                    MR. MILLER:  What's his first name?

4                    MR. LANGAN:  Mark Mazella, and he's on the

5    Court's already.  I'll have other dates for other

6    things; but, responding to your question, that's doable.

7                    THE COURT:  Great.  So we'll go ahead and

8    put Mr. Mazella in for the 24th.

9                    MR. LANGAN:  May 24, Your Honor.

10                   THE COURT:  Right.  May 24th.  I'm sorry.

11   Great.

12                   Any other volunteers?  And, if not, think

13   ahead and see if you can identify people that we might

14   slide in for those other dates.

15                   Next up, we want to talk to the PSE about

16   whether or not they've concluded that Oceaneering's

17   deposition will not be required.

18                   MR. CUNNINGHAM:  We have concluded that,

19   Your Honor.

20                   THE COURT:  Take it off the list, kids.

21   That's great.

22                   We didn't set it, but it was on the hit

23   parade.  So it's now off the hit parade.

24                   And then we were looking for the Wild Well

25   Control, and I think we just covered that.  All right.

```
 1                    And, Mr. Cunningham, is that purely -- we
 2       know you're going to go ahead and do the 30(b)(6) and do
 3       the production at the same time?
 4                    MR. CUNNINGHAM:  We want to do a document
 5       production deposition, look at the documents and then
 6       notice, depending on whether or not we need to and who
 7       we need to.  We just don't know because we don't have a
 8       document.
 9                    THE COURT:  I see.  So would you notice the
10       30(b)(6) at a later date after getting the documents?
11                    MR. CUNNINGHAM:  Yes.
12                    THE COURT:  So why don't you look at those
13       later dates in May as potentially the date that you
14       would take a 30(b)(6) if you decide you need it.
15                    MR. CUNNINGHAM:  It looks like the 31st
16       maybe?
17                    THE COURT:  Yeah.  And we can just put it
18       down as tentative date for Wild Well, 30(b)(6).  Okay.
19                    MR. CUNNINGHAM:  That's fine.  Thank you.
20                    MR. YORK:  One day or two days?
21                    THE COURT:  I assume that's going to be a
22       one day.
23                    MR. CUNNINGHAM:  I think we can safely call
24       it a one day now.
25                    THE COURT:  Okay.  Andy, I think you're up
```

1    next.

2                    MR. LANGAN:  Yes, Your Honor.  I do have

3    some additional information on the overall topic of the

4    BP 30(b)(6) notice.

5                    First of all, a date for Mr. Dennis Johnson

6    on topic 28.  June 23rd in New Orleans.  Dennis Johnson.

7    June 23rd in New Orleans.

8                    THE COURT:  All right.  Let's take a look.

9    Boy, is that a busy day.  Mr. Sterbcow's on vacation

10   that whole week.

11                   June 23rd, and that's going to be Dennis

12   Johnson.

13                   MR. LANGAN:  Right.  On one 30(b)(6) topic.

14                   THE COURT:  On one 30(b)(6) topic.  Okay.

15                   MR. LANGAN:  I've already mentioned Mr.

16   Mazella.

17                   THE COURT:  Hold on, let's wait for Mr.

18   Sinclair.  He's not quite as fast as Mr. Maze.

19                   Okay, Andy.

20                   MS. KUCHLER:  Before we go on, Judge, on the

21   logistics of June 23rd.

22                   THE COURT:  Are you getting heartburn?

23                   MS. KUCHLER:  We really are getting

24   heartburn.  Is there any way Mr. Johnson can do it on

25   the 24th?  Just because resources and rooms and court

1    reporters.

2                    MR. LANGAN:  That's the date I have.  I'll

3    check my email before I leave and see if I have

4    alternatives.  Why don't we keep going, but I understand

5    counsel's points.

6                    THE COURT:  Let's put down a question mark

7    until we can confirm availability maybe the next day.

8                    MR. LANGAN:  I have a couple of additional

9    names to cover, some additional topics.

10                   THE COURT:  Go ahead.

11                   MR. LANGAN:  Topics 21 and 35 will be

12   handled by Graham Vinson, V-I-N-S-O-N I think.  He may

13   be referred to Vincent, but it's really Vinson.  I don't

14   have a date for Mr. Vinson, but we're working on that.

15                   In addition, Mr. Sprague, John Sprague, will

16   handle our topics No. 1, topic No. 3 and a portion of

17   topic 17.

18                   Topic 17 is well control or well design.

19   And, actually, as we dig into this, we think several

20   witnesses will be required for various aspects, the

21   casing, et cetera.  So Mr. Sprague can handle 1, 3 and

22   part of 17.  And he is available.  He's already been

23   deposed two days as a fact witness.  He's available

24   April 28th to handle these topics.  It's already the

25   29th, but I know that's a status conference and maybe

```
 1    people would rather do it on the 28th.
 2                THE COURT:  Does everybody agree, most
 3    especially Mr. Cunningham, that we should take Mr.
 4    Sprague on those topics on the 28th of April?
 5                MR. LANGAN:  Or the 29th.
 6                THE COURT:  Or the 29th if you want to do it
 7    along with the status conference.
 8                MR. CUNNINGHAM:  We'll work that out on the
 9    28th, Your Honor.
10                THE COURT:  Okay.  So he's on the 28th.
11    That's great.
12                MR. LANGAN:  In New Orleans.
13                THE COURT:  In New Orleans.
14                MR. LANGAN:  Okay.  Your Honor, that brings
15    me to part B.  I still have some topics that I'm still
16    trying to run down.
17                And I also want to report that, in response
18    to the PSE's request, we did make a filing formalizing
19    the designations that we had made as of a couple days
20    ago this week.  And we will amend and supplement that.
21                THE COURT:  Good.  Thank you.
22                Now, what about Mr. Kennelly, no dates for
23    him yet?
24                MR. LANGAN:  Daryl Kellingray?
25                THE COURT:  I've got --
```

```
 1                    MR. LANGAN:  No. 83?
 2                    THE COURT:  This doesn't have a number on
 3       it.
 4                    MR. LANGAN:  I do have dates.
 5                    THE COURT:  You do?
 6                    MR. LANGAN:  Yes.
 7                    MR. YORK:  Page 3, Andy.
 8                    MR. LANGAN:  I do not have a date for Mr.
 9       Kennelly.  Working on that.
10                    THE COURT:  Okay.
11                    MR. LANGAN:  I'm now down to the UK deps.
12       I've got a couple things here.
13                    Mr. Kellingray, in the UK, we can mark down
14       June 20 and 21.
15                    THE COURT:  All right.
16                    MR. LANGAN:  That's a London dep, June 20
17       and 21.  K-E-L-L-I-N, gray, G-R-A-Y.
18                    THE COURT:  And that's London, good.
19                    MR. LANGAN:  All right.
20                    And now Ian Little -- and these are
21       tentative for sure --
22                    THE COURT:  Okay.
23                    MR. LANGAN:  13, 14 of June.
24                    THE COURT:  13, 14, okay.  So, that's Ian
25       Little, and that will be tentative.
```

1           MR. LANGAN:  Right.

2               And, Your Honor, I have one request to

3   modify a previously scheduled date for a UK witness, and

4   I can explain.  Mr. Paul Tooms is currently scheduled

5   for the 13th and 14th of June.  He has personal counsel.

6   I am told that personal counsel's son's high school

7   graduation in the states is June 12th.  And, therefore,

8   with the Court's indulgence, the request has been made

9   through me to change that to June 16 and 17 for Mr.

10  Tooms.

11              THE COURT:  All right.  Let's hear from Mr.

12  Cunningham.

13              MR. CUNNINGHAM:  I think you'd better hear

14  from Mr. Sterbcow.

15              THE COURT:  Let's hear from Mr. Sterbcow.

16              MR. STERBCOW:  Boy.  Your Honor, I'm taking

17  Mr. Tooms, and I'm scheduled to fly home on the 15th.

18  But, if I have to accommodate a high school graduation,

19  I'm sure Mr. Langan will pay my extra airfare and it

20  will okay.

21              THE COURT:  Yeah, to extend the airfare,

22  hotel, meals.

23              MR. STERBCOW:  It's all good.

24              THE COURT:  Theater tickets.  Anything else?

25              MR. STERBCOW:  If he won't do it, Mr. Godwin

```
 1   will.  I mean, if we have to do it, we have to do it.
 2              MR. LANGAN:  Could the record reflect that
 3   there is laughter and jocularity?
 4              (Laughter.)
 5              THE COURT:  Well, the audiotape will reflect
 6   it, Mr. Langan.
 7              Would you prefer to see if the witness could
 8   do it, for instance, the week prior?
 9              MR. STERBCOW:  I was going suggest that, if
10   we could, if that's an option.
11              THE COURT:  Andy, look, here's the deal.  If
12   we have to do --
13              MR. STERBCOW:  Wait, Your Honor.  If Hayward
14   is the week prior, we can't do that.  Because I'm doing
15   that one, too.
16              THE COURT:  No, you can't do that, that is
17   correct.
18              MR. STERBCOW:  I'll adjust.
19              THE COURT:  Okay.  Don't check, Andy.  We're
20   going to go ahead and do him on -- what dates were
21   suggested?
22              MR. LANGAN:  June 16 and 17.
23              THE COURT:  Paul, would you rather do 15,
24   16?  Maybe we could compromise on that.
25              MR. STERBCOW:  Absolutely, if we could, yes.
```

1    If we can't, we can't.

2              MR. LANGAN:  I will ask.  My suggestion

3    would be, I know he can do 16 and 17.

4              THE COURT:  Right.  Let's put him down 16,

5    17.  And see if he could accommodate a date earlier so

6    Paul can go ahead and go home.

7              MR. STERBCOW:  Okay.

8              THE COURT:  All right.  Great.

9              MR. LANGAN:  Going down your order, Your

10   Honor, couple things.  First of all, with respect to CSI

11   and topic No. 5, we are meeting and conferring about the

12   scope of topic 5.  I've had some productive

13   conversations with Mr. Fitch, Mr. York and others.  So

14   that continues.

15             THE COURT:  Good.

16             MR. LANGAN:  Secondly, on No. 145, Stress

17   Engineering, we can strike the tentative and put in

18   confirmed for June 2nd and 3rd.

19             Your Honor will recall, this is a 30(b)(6)

20   of Stress.  There are witnesses for three topics, three

21   reports, and the idea was to do three over two days.

22             THE COURT:  Correct.

23             MR. LANGAN:  Your Honor, on Vector

24   Magnetics, No. 192, we have been pushing their outside

25   counsel.  But I'm sorry to report I don't have a date.

```
 1    But it is something we've been pushing hard.

 2              So I guess that brings us to Mr. Mogford.

 3    Your Honor, we have been in touch with Mr. Mogford.  We

 4    do have two dates, June 7th and 8th.  Which I know are

 5    busy.  I know Mr. Hayward and all that.  But Mr.

 6    Mogford's also busy, and he's a man we don't control.

 7    But we asked him to reserve June 7th and 8th in London

 8    for his deposition.

 9              Your Honor, I should also mention, we had a

10    conversation I know in the past on the record about

11    compensation.  And little bit of sticker shock, for us

12    at least.  He apparently is taking the position that his

13    out-of-pocket for missing work could have been as much

14    as 5,000 pounds a day.

15              MR. MILLER:  What does he do?

16              MR. LANGAN:  Which I believe, under the

17    conversion, is less than $10,000, but not much.

18              THE COURT:  Slightly less than $10,000.

19              MR. LANGAN:  Full transparency, he's not a

20    man we control.  We can talk about it.

21              THE COURT:  Let me ask you what the

22    gentleman does for a living, do you know?

23              MR. LANGAN:  He's a consultant.

24              THE COURT:  Let me help Mr. Sinclair out.

25    His name is John Mogford M-O-G-F-O-R-D.  And he's June 7
```

```
 1   and 8.
 2              MR. GODWIN:  Will he work for less later in
 3   the month, Your Honor?  That's three on both of those
 4   days.
 5              MR. SINCLAIR:  He may want more.
 6              THE COURT:  Maybe he'll want more.
 7              Do you think, Andy, we could give him
 8   another pass at a different day later?
 9              MR. LANGAN:  Possibly.
10              THE COURT:  I'm thinking, I'm looking, and
11   maybe we could go for 15, 16.
12              MR. LANGAN:  I believe he may have had
13   availability very late in June.  I'm happy to look at
14   that.
15              THE COURT:  Let's revisit.  We'll leave him
16   down tentatively June 7 and 8.  And I frankly don't know
17   what to say about his compensation.
18              Mr. Godwin, have you got a comment on that?
19              MR. GODWIN:  Not on the compensation.  I
20   have some comments on it, but you asked me to keep my
21   opinion to myself.
22              But, in terms of scheduling his depo, Judge,
23   just to make it more practical for maybe everybody, on
24   the week of June 27, we only have one depo per day in
25   London for that entire week.
```

```
 1              THE COURT:  That's true.
 2              MR. GODWIN:  And so, rather than doing a
 3    three day, three depo day for June 7 and 8, perhaps we
 4    can look, if the witness is available, for some time
 5    during the week of June 27th through that week.
 6              THE COURT:  Good comment.
 7              MR. GODWIN:  That's just a suggestion.
 8              MR. LANGAN:  We'll look at that, Your Honor.
 9              THE COURT:  Thought it was a good comment
10    until Mr. Cunningham walked up right behind that.
11              MR. CUNNINGHAM:  We'd much prefer that.
12    This man was the global head of safety for BP, and he's
13    going to be an important witness.
14              MR. GODWIN:  We agree with that, Judge.
15              MR. LANGAN:  He was long gone before April
16    20, 2010.
17              THE COURT:  I see.  So, if we could perhaps
18    see if he's available that week, we'll take it from
19    there.  But we'll keep him down on the 7th and 8th in
20    case.
21              MR. LANGAN:  Your Honor, going over to the
22    top of the page of 5, No. 29, Mr. Skidmore, May 12 and
23    13, scratch the tentative.  Confirmed.
24              THE COURT:  Great.
25              MR. LANGAN:  And, Your Honor, the only other
```

1    thing I have to report by way of an update is that,

2    again on 146, Mr. Cargot, we don't control him.  We have

3    been working with counsel, Mr. Russo and others.  We

4    don't know if we're going to be able to get him, and all

5    we have is a last known address.

6              I'm still working on Haynie and McKay.  I

7    don't know if McKay is going to be the 11th and 12th of

8    May, I just don't know.

9              THE COURT:  Okay.  So we're still tentative

10   there.

11             Wonderful.  Thank you.  That's an A.

12             MR. LANGAN:  Thank you, Your Honor.

13             At some point, I'd like to make my

14   Transocean speech, if you'll indulge me.

15             THE COURT:  No.  Because we're moving to

16   Transocean right now.  And Kerry was going to come up to

17   the podium, and we're going to work on that.  That's

18   next up.

19             We've got a list of those witnesses.  Mike,

20   I thought you'd given them out.  I'm sorry.

21             MR. FITCH:  Judge, Tony Fitch.  While that

22   list is being distributed, you referred to the

23   compensation issue, and I suggest that we do need at

24   some point to discuss the mechanism for that.  Because

25   the compensation issue starts clicking in this Monday

1   morning with Ms. Paine.

2           THE COURT:  What we had I thought decided

3   was that, if someone takes off from work and has a loss

4   of income as a result of that, we agreed that that would

5   be compensated.  And I'm assuming Ms. Paine's bill for

6   that is what I would call a little bit more reasonable

7   than the number we heard today.

8           MR. FITCH:  In fact, it's not clear to me

9   that she is missing work on this particular Monday.  I

10  do agree, I think that's what we have agreed on on the

11  substance.  And that seems to be reflected in one of

12  your prior orders.

13          I was addressing rather the mechanics for

14  actually getting that done.  Something I think it just

15  needs to be arranged between on a management level

16  between us and PSE.

17          THE COURT:  Yeah.  I think that's right.  I

18  think that's right.  And let's maybe what we want to do

19  -- and, Tony, if you wouldn't mind taking the lead on it

20  -- is gathering a list of those persons who have

21  requested that they be reimbursed, and we can then start

22  thinking about whether the request is reasonable; and,

23  if it's reasonable, the mechanism for contributing to it

24  and who is going to cut the check.

25          MR. FITCH:  I had feelings of high hopes

1   about leaving here without any more homework -- could be

2   dashed.

3           THE COURT:  You stood up, you know.

4           MR. LANGAN:  Andy Langan.  On the logistics

5   of actual compensation, should it be reasonable and

6   should it be approved, I guess our working assumption

7   has been the PSE would take half and the private

8   defendants would take half.

9           THE COURT:  I think Mr. Cunningham wants to

10  comment.

11          MR. CUNNINGHAM:  Our assumption was that it

12  would be based on the relative net worth of each party.

13  Sorry.

14          (Laughter.)

15          MR. GODWIN:  If that's insurance, Your

16  Honor, the PSE would take 80 percent.

17          (Laughter.)

18          MR. LANGAN:  I guess the defendants can

19  handle our half with ease.  In terms of logistics and

20  administration of it, that's not a problem.

21          THE COURT:  It just seems to me that

22  somebody volunteers to take the lead and cut the check

23  and then seek reimbursement from the other guy.

24          MR. LANGAN:  The defense can work that out.

25  I think we just need to know what is our half.  Is it 50

1    percent, is that our share?

2                THE COURT:  We'll let Mr. Cunningham tell

3    us.

4                MR. CUNNINGHAM:  We can talk with them about

5    it.  We ought to be able to work it out.

6                MR. LANGAN:  We're happy to have the states

7    and the USA step in.

8                MR. SINCLAIR:  Your Honor, I'm pretty sure,

9    based on the net worth, we're in good shape, we won't

10   have to contribute anything.  The alternative, I'd point

11   out, the states don't have the option to print their own

12   money.  That was decided in 1865 in a case of known

13   precedence in jurisdiction.

14               THE COURT:  You all talk about how it's

15   going to be split.  But who wants to take the lead on

16   cutting the checks once the split is taken?

17               MR. LANGAN:  Your Honor, the defendants have

18   a mechanism in place for things like court reporters.

19   And so it's just not an issue.  We just need to know how

20   much.

21               THE COURT:  Great.  Good, good, good.

22               All right.  Kerry, you'd better take the

23   podium.  They're after you.  You now have to perform.

24               MR. MILLER:  It really looks that way.

25               THE COURT:  You've got a page of names that

```
 1    we really need to work through at this point.
 2              MR. MILLER:  I guess, let's start from the
 3    top, as they say; right?
 4              THE COURT:  Exactly.
 5              MR. MILLER:  We have a number of different
 6    categories here.  Let me try and identify what they are.
 7              Fleytas, you know, that status hasn't
 8    changed.
 9              THE COURT:  No, it hasn't.  And what it
10    seems to me we're going need to do there is, if she
11    files a claim, the PSE should go ahead and re-notice her
12    deposition, and we'll take it from there.
13              Next up is Mr. Kuchta.
14              MR. MILLER:  And, by the way, for Fleytas
15    and a number of these others, there are completely
16    outside of Transocean's control.  They are controlled by
17    the personal injury counsel.  Transocean is as
18    interested as anyone, as any party, in taking these
19    individual's depositions, possibly for other purposes or
20    for slightly different purposes.  But we're in the same
21    boat as BP and the PSE with some of these witnesses.
22              THE COURT:  Okay.  Now, with regard to
23    Kuchta, have we gotten with Kyle and gotten any dates
24    from him?
25              MR. GODWIN:  Don Godwin from Halliburton.
```

```
1   We issued the notice to Captain Kuchta.  And we as late
2   as yesterday placed another call at his office and left
3   a message on his voice mails.  When we finish today,
4   we'll call the him yet again.
5               THE COURT:  Great.  And, if there's a
6   problem, why don't you leave word for Mr. Schonekas to
7   call me?
8               MR. GODWIN:  We will.  In the past, he's
9   been cooperative and reasonable to work with.
10              THE COURT:  Good.  All right.
11              Eddy Redd.
12              MR. MILLER:  He is in a different category.
13  He's PSE on I guess what we now call source control.
14  He's a gentleman who is no longer with the company.  He
15  works now in Russia.  He's gone radio silent.  We've
16  been trying to get him -- we want to leave him on the
17  list.  But we had a conversation with Paul I guess
18  yesterday, and we hopefully have at least a partial
19  solution to that situation.
20              THE COURT:  Good.  All right.
21              MR. MILLER:  While Mr. Redd is probably the
22  most qualified -- don't want to call him a Transocean
23  deponent because he's no longer an employee, but
24  certainly from Transocean's prospective, on source
25  control efforts.  There are other people within the
```

```
 1    company that can also give testimony on source control.
 2              We identified a man with Paul yesterday.  I
 3    want to call him James Cameron, but he's a director of
 4    the Titanic.  I think it may be David Cameron.
 5              MR. FITCH:  He's the prime minister.
 6              (Laughter.)
 7              MR. MILLER:  He's less -- he really wants to
 8    give the deposition.
 9              THE COURT:  So are we taking Dave Cameron in
10    London?
11              MR. MILLER:  Actually, we are.  He is
12    located in -- Your Honor, particularly since the
13    moratorium, a lot of our rig-based folks are scattered
14    all over the world.
15              THE COURT:  We know.
16              MR. MILLER:  He is in Aberdeen.  But we're
17    willing to bring him to London on a date that's
18    convenient with the London schedules.
19              THE COURT:  Good.
20              MR. MILLER:  So Paul had identified a couple
21    of dates for us where they have some time, and we will
22    endeavor to bring him from Scotland to London while the
23    folks are there.  And he would be a source control
24    witness.
25              THE COURT:  That works good.  Okay.
```

```
 1              Okay.
 2              MR. MILLER:  But we're going to leave Redd
 3    on.  We've given them the identity of his employer.
 4    We're sending emails, leaving voice mails.  Look, I
 5    mean, I know, you know, London, Moscow, what's the
 6    difference?  I know it's a considerable --
 7              THE COURT:  Paul has never been to Moscow.
 8              MR. MILLER:  It may be --
 9              MR. STERBCOW:  We'd rather not go.
10              MR. MILLER:  -- we'll leave him on the list.
11    And, if he can come from Moscow to London, great.  But,
12    for right now, it's been very hard to get a hold of him,
13    and you might need a man in Russia, is the way it looks.
14    Maybe BP has one of those, I don't.
15              THE COURT:  Mr. Bertone has private counsel.
16    And I think that what we probably have to do is, if he
17    files a claim on or before April 20th, let's go ahead
18    and notice his deposition.  If he doesn't file a claim,
19    then it seems to me we notice his deposition.  I believe
20    he's in Houston, and BP and Halliburton are going to
21    have to go over and get him.  Okay?  And I assume we're
22    going to have motions on that as well.
23              MR. MILLER:  Your Honor, I think the same
24    holds true from Bertone all the way down to Watson.  I
25    think they're all in the same category.
```

```
 1                    THE COURT:  I agree with you.
 2                    MR. MILLER:  They may have a different
 3     lawyer, but I think the lawyer's in the same category.
 4                    THE COURT:  And different requesting
 5     parties.  And so, the requesting party, please check the
 6     claim docket.  If by the 20th, they've filed, take one
 7     course of action; if by the 20th, they haven't filed,
 8     take the other course of action.  But let's go ahead and
 9     get those depositions rolling.  To the extent that you
10     can coordinate -- yeah, Mike?
11                    CASE MANAGER:  Some of them have already
12     filed suits.
13                    THE COURT:  So of them have filed suits.
14     Would you all like to know the ones that have?
15                    MR. MILLER:  And they are in the MDL.
16                    CASE MANAGER:  Yes.  Brown is in.
17                    THE COURT:  Brown is in the MDL.
18                    CASE MANAGER:  Brown is a plaintiff in
19     Kleppinger vs. Transocean, 20-3168.  I can send out an
20     email with the ones that have filed suit.
21                    Bill Johnson.
22                    THE COURT:  Bill Johnson is a plaintiff in
23     10-4427.
24                    CASE MANAGER:  Dustin Johnson is a plaintiff
25     in Kritzer.
```

1            THE COURT:  Which is 10-4427.

2            CASE MANAGER:  Patrick Morgan, 160, is a

3    plaintiff in Morgan vs. Transocean, 11-364.

4            THE COURT:  And Sandell is a plaintiff in

5    10-3169.

6            Seriale, it's S-E-R-I-A-L, is a plaintiff in

7    11-262.

8            Taylor is a plaintiff in 11-261.

9            Watson is a plaintiff in 10-4427.

10           That's all we have.

11           But, if they filed, let's go ahead and the

12   requesting party take that course of action.  You want

13   to go ahead and get them teed up.

14           If you all want me to repeat anybody, if you

15   didn't catch it, let me know.  And Mike will send out an

16   email with that info as well.

17           MR. GODWIN:  Your Honor, as I understand it,

18   you're suggesting, those of that us that have asked for

19   those witnesses, to contact the attorneys for a set of

20   dates and report back?

21           THE COURT:  Report back.  And, if you get

22   dates, circulate the dates to everybody.

23           MR. GODWIN:  We will.

24           THE COURT:  And issue the notice.

25           MR. GODWIN:  Thank you, Judge.

```
 1                 THE COURT:  Thank you.
 2                 Okay, so that brings us down to Wheeler.
 3                 MR. MILLER:  He may be in a different
 4      category.  While he does have a personal injury claim,
 5      and his counsel -- I know Your Honor has met with his
 6      counsel.  I don't think that this is confidential
 7      information, but there's a mediation scheduled for
 8      Wednesday with his counsel.  I don't know if it's going
 9      to be successful or not.  I know the parties are still
10      fairly far apart on his claim.  But this may be -- I
11      would not put his counsel in the same category as maybe
12      some of the others.  Maybe I'm wrong on that, but that's
13      just my feeling.  So it may be that Mr. Wheeler may be
14      amenable to something, particularly if his mediation
15      goes away on Wednesday.  So maybe we can follow up on
16      that one.
17                 THE COURT:  Fair enough.
18                 Then we have Mr. Williams who is represented
19      by Mr. Stervcow.  And I know BP has been in touch with
20      you, so we'll pass that for the time being.
21                 And then we have witnesses that were not on
22      the master list originally, which have all been
23      requested by BP.
24                 MR. MILLER:  Your Honor, I think there's one
25      clarification to that.  I think that's generally
```

1    correct, with the exception of Arnaud Bobillier.  I

2    think he was a PSE request as opposed to BP on source

3    control.  And I think the arrangement is that Mr.

4    Cameron, who we talked about earlier, not the prime

5    minister but the other David Cameron, would be the

6    response to PSE's request, at least for now, for source

7    control witnesses.  So I think we can take Mr. Bobillier

8    off.

9              THE COURT:  Bobillier's coming off.  All

10   right.  Fabulous.

11             MR. MILLER:  The rest, you are correct, are

12   new requests from BP.  We got those about eight days

13   ago.

14             What we'd like to do with those, Your Honor,

15   is set them all up when we have time in July.  Mark them

16   as tentative.  These folks are spread all over the

17   world.  I'll go back and try and confirm dates.  They

18   all have -- they don't have personal injury claims, but

19   they all have individual counsel.  And so I've been

20   working with their individual counsel, I can give you

21   the names.  The names of the individual counsel are Mike

22   Walsh --

23             THE COURT:  That's for -- let's go through

24   it.  It's for Boughton B-O-U-G-H-T-O-N.

25             MR. MILLER:  Yeah, I don't have the name of

```
 1    Jeff's individual counsel yet.  I'm sorry.
 2              Let me give you the names of the individual
 3    counsel that I have.  For Jonathan Keeton, his
 4    individual counsel is Matt Hennessy.
 5              THE COURT:  Matt Hennessy, okay.
 6              MR. MILLER:  For Jim McWhorter -- I don't
 7    know why he's not on this list.
 8              MS. KUCHLER:  158.  He's up at the top in
 9    the middle.
10              MR. MILLER:  I'm sorry.  Okay, right.  He is
11    wrong, he does not have a personal injury claim.
12    McWhorter doesn't.  But Mike Walsh -- so he should go
13    down.
14              THE COURT:  Okay.
15              MR. MILLER:  His personal counsel is Mike
16    Walsh, as indicated.  Individual counsel as opposed to
17    personal injury counsel.
18              Jimmy Moore is Tim Johnson.
19              Ray Odenwald is Mike Walsh.
20              Wyman Wheeler again is Mike Walsh, but we
21    talked about him.
22              At any rate, what I'd like to do is get them
23    scheduled.  I mean, I've been in contact with Mr. Walsh
24    and Mr. Johnson.  And given the date of the request and
25    the issues, the things that are going on in June, I
```

```
 1    think the game plan is put them down in July.
 2              MR. LANGAN:  We strongly object to that.
 3              THE COURT:  Yeah, I understand.  And I knew
 4    where you were coming from.
 5              I guess my one request would be, on these
 6    witnesses, these five that have been recently added by
 7    BP, could we possibly see if we could slot them into
 8    those May dates that are available?
 9              MR. MILLER:  I can check specifically.  But
10    I would like to remind Andy of the swinging door analogy
11    he used earlier about we're not just bringing up someone
12    up this week, not January, not in February.  These
13    witnesses have been known for a long time, well-known in
14    January and February, and they came up last Wednesday
15    afternoon.  Okay?  So I don't really want to hear the
16    speech because we're going to talk about swinging doors.
17              MR. LANGAN:  May I be heard, Your Honor?
18              THE COURT:  You want to comment on the
19    swinging door?
20              MR. LANGAN:  I do.  Here are some facts.
21    May I have the microphone?
22              MR. MILLER:  Absolutely.  Don't let the door
23    hit you.
24              MR. LANGAN:  The facts are these.  So far in
25    the case, 19 BP depositions have been completed.  Four
```

 1    Transocean depositions have been completed.

 2              As of today, in addition to the 19 BP

 3    depositions completed, 37 are scheduled.  Nine

 4    Transocean depositions are scheduled.

 5              So, it's the score is 56 to 13 in terms of

 6    depositions, either scheduled or completed.  It's a

 7    complete imbalance, it's just totally unfair.  And

 8    something's got to be done about it.  And I'm afraid it

 9    starts with you.  July, come on.

10              THE COURT:  Okay.  I'm with you --

11              MS. BERTAUT:  Your Honor --

12              THE COURT:  Who is that?

13              MS. BERTAUT:  Carmelite Bertaut.  If I can

14    weigh in on this swinging door analogy while we're here

15    a minute.

16              We had raised with Transocean moving ten

17    Transocean witnesses, who were listed back in February

18    by Cameron but were not identified as priority

19    witnesses.  And, Your Honor, with all due respect, we

20    had understood priority witnesses at that time to be

21    people whose deposition were needed for the expert

22    witness report designations.  We now are understanding

23    the Court is asking us to come forward with any witness

24    who would be needed for the February 2012 trial.  And

25    so, these ten witnesses who had been on the master list

1    but were not designated priority, we are now asking TO

2    to work with us.  And they are -- these are not rig

3    workers, Your Honor.  These are for the most part folks

4    that date back to the purchase of the BOP.

5            And I just don't know where we stand on

6    that.  And, again, I don't -- at this point, we are

7    coming forward, because, as we understand it, the door

8    is closing.  Maybe it's not a swinging door, but it's

9    going to be a slamming door soon.  So we are asking for

10   BP to work with us on these, and I'm not sure where we

11   are on that.

12           THE COURT:  Carmelite, I am not sure I

13   understand where you get the impression that the

14   priority list has changed.  If indeed you don't need

15   these witnesses for the basis of an expert opinion, I

16   don't think that that has changed.

17           Does anybody disagree with me; that we can

18   be taking fact witness depositions beyond the cutoff

19   date of the end of July if they're not required for

20   issuance of expert opinion?  So that's number one.

21           And I don't see anybody here, Carmelite,

22   that disagrees that I don't think that has changed.

23           MS. BERTAUT:  Well, Your Honor, that's fine.

24   And we don't need them for July 31.  But we do need them

25   before the February trial date.

```
 1              THE COURT:  Oh, I understand that.
 2              MS. BERTAUT:  I misunderstood the Court's
 3   direction then, and that's my apology.  And as long as
 4   it's understood that there is no slamming door as July
 5   31 for these fact witnesses, I think we're good then.
 6              THE COURT:  That's fine.  And if you'll just
 7   give Kerry an email with those ten witnesses letting him
 8   know that they're not priority as we've defined it.  He
 9   can start lining up dates perhaps in August.  But, as
10   you know, I'm trying to keep July open to do our cleanup
11   necessary for priority witnesses.
12              MR. MILLER:  Yeah, I got the email the other
13   day.
14              MS. BERTAUT:  We will follow up with Kerry.
15              THE COURT:  And Kerry does say he has the
16   list, so he's working on it.
17              MR. MILLER:  A lot of them are RB Falcon.
18   The initial reaction we got from my folks are we don't
19   know who these folks are.
20              MS. BERTAUT:  I couldn't hear Kerry.
21              MR. MILLER:  As you know, they were RB
22   falcon employees back in 2000.  And so the initial
23   response I got when you circulated your list to the
24   folks who work on depositions is they're not working
25   with the company anymore and they really don't know who
```

these people are.  And this is coming from lawyers who

have worked with Transocean for a number of years.  So

some may be dead, some may be not around.  So it may be

an effort because these are RB Falcon employees.

THE COURT:  Right.  And you just got it on

your radar.

MS. BERTAUT:  I appreciate that, Kerry.

And, as I said, I just wanted to get it on

the record.  But I'm happy to hear that this is not

something that we need to worry about occurring prior to

July 31.  I appreciate that.

MR. MILLER:  Your Honor, back to Andy's

point on the swinging doors, I guess we're focused on

about five witnesses at the bottom here.

THE COURT:  Right.

MR. MILLER:  Fleytas, Hackney, Keeton,

Mansfield, Odenwald, and then back to McWhorter, I

guess.  So it's six.

THE COURT:  Right.

MR. MILLER:  That I do have some control

over.  Although, these were, as I mentioned, only

requested eight days ago.

THE COURT:  Right.

MR. MILLER:  And weren't on the priority

list.

```
 1              I got your May openings.  I'll see what I
 2   can do.
 3              The one who I know may have a problem and
 4   may need to go in late July is Mr. Keeton, because he is
 5   in Ghana.  So we're going to have to get him to come
 6   back from Ghana.
 7              THE COURT:  But he might be happy to come
 8   back from Ghana.
 9              MR. MILLER:  Might be happy.  But I'm going
10   to need something from the Court saying that he can come
11   back from Ghana, because that's where he is now.
12              THE COURT:  No problem.
13              And, if you'll look at those May dates,
14   maybe we can slide a few of those witnesses in, that
15   would be really helpful.  One, we're going to be using
16   our time wisely; and, two, Andy won't have to stand
17   up --
18              MR. MILLER:  Okay.  But understand, if you
19   want to put them all down with July with tentative
20   indications today, we can do that.  The only request is
21   that Mr. Keeton come at the end, and he's probably going
22   to have to stay there given the fact that he did respond
23   to me directly about the situation.
24              THE COURT:  Why don't we do that?
25              Mr. Sinclair, let's look at July for -- the
```

```
 1    man's name is Jonathan Keeton, K-E-E-T-O-N.  And why
 2    don't we put him down for -- Kerry, do you feel like
 3    27th, 28th?
 4              MR. MILLER:  Just at any time in that last
 5    week, and we'll try to get him back for that.
 6              THE COURT:  Jonathan Keeton.
 7              And why don't we revisit the other five by
 8    email, Kerry, after you've had a chance to check the May
 9    calenders with them.  All right.
10              And, by the way, Mr. Maze, Mr. Sinclair has
11    done an excellent job in your absence.
12              MR. MAZE:  I intend to be back at the next
13    hearing so I don't lose my job.
14              MR. LANGAN:  Your Honor, Andy Langan again.
15    Before we leave page 5, I just got an email.  Mr. David
16    McKay is going to be May 11th and 12th, rather than June
17    27th and 28th.  So that's No. 110, Mr. McKay from DNV,
18    for May 11th and 12th.
19              THE COURT:  Hold on.  Let's get Mr. Sinclair
20    to jump in with us.
21              So, okay, Mr. Sinclair, want to go to May --
22              MR. SINCLAIR:  10th and 11th.
23              THE COURT:  Confirmed, no longer tentative.
24              MR. SINCLAIR:  Tentative would be the
25    question marks; right?
```

```
 1              THE COURT:  So the question marks come off.
 2              MR. SINCLAIR:  Right.
 3              THE COURT:  That is now confirmed.  So
 4    that's great.
 5              And did we have him down confirmed on other
 6    dates, Andy?
 7              MR. LANGAN:  June 27th and 28th, but that's
 8    not correct.
 9              THE COURT:  Are they on June 27, 28?
10    Because, if they are, we want to take them off.
11              No.  Mr. McKay is not down.
12              Okay.  So we're up-to-date.  Great.
13              Any other emails coming in, Andy?
14              MR. LANGAN:  That was it.
15              THE COURT:  Okay.  Carmelite, we wanted a
16    report, please, on your efforts to schedule Dril-Quip.
17              MS. BERTAUT:  I wasn't scheduling Dril-Quip.
18              CASE MANAGER:  Halliburton was scheduling.
19              THE COURT:  I'm sorry, you're right.
20    Halliburton.
21              Mr. Godwin?
22              MR. GODWIN:  On Dril-Quip, Your Honor?
23              THE COURT:  Yes, sir.
24              MR. GODWIN:  Yeah.  Don Goodwin here for
25    Halliburton.  That depo is scheduled, as Your Honor
```

```
 1    knows, for May 26 and 27.  And we're talking to
 2    Dril-Quip's lawyer to finalize matters well in advance
 3    of that day.  But it is already set, as I understand it.
 4                 THE COURT:  Okay.  May 26.
 5                 MR. GODWIN:  Mr. Dennis Barrow is here for
 6    Dril-Quip, Your Honor, and I think he can address that
 7    as well.
 8                 MR. BARROW:  That's right.  That's set for
 9    26th and 27th.  We are representing Gary Purdue is our
10    corporate representative.  We have one discovery and one
11    final 30(b)(6) topic, and suspect we'll have it worked
12    out next week.
13                 THE COURT:  Great.  We don't have a next
14    week; so, if you have all have worked it out, send an
15    email with everybody for the final 30(b)(6) notice.
16                 And then Don -- never mind.  We passed on
17    Neal Adams.  No.  Today is Neal Adams.  Have you got
18    anything on him?
19                 MR. GODWIN:  We're continuing to talk, Andy
20    and I are, about Mr. Neal Adams.  And, for the time
21    being, that's just in discussions, if you will.
22                 Correct, Andy?
23                 MR. LANGAN:  Your Honor, we can table this
24    one.
25                 MR. GODWIN:  Also, Your Honor, not that it's
```

```
 1   here listed.  From talking to Andy, we're also going to
 2   table Dr. Ravi.  So Dr. Ravi and Adams, Neal, are two we
 3   are continuing to discuss with Andy.
 4               THE COURT:  Great.
 5               Next up, we were looking to see if we could
 6   get Jeremy Byrd on an earlier date.  That was our hope.
 7               MR. FITCH:  Your Honor, Tony Fitch for
 8   Anadarko and MOEX.  He is not available on any of those
 9   May dates that you've identified earlier.  He is
10   available -- excuse me, if I may step away from the
11   podium?
12               THE COURT:  Sure, absolutely.
13               MR. FITCH:  He's available on May 25, but
14   that's a pretty heavy date already.
15               THE COURT:  Well, let's ask Mr. Cunningham
16   and Mr. Sterbcow, would they rather have him in July or
17   would they rather have him in May?
18               MR. FITCH:  He's on one 30(b)(6) topic about
19   financial information.
20               MR. CUNNINGHAM:  I think, given May already,
21   that we'd just as soon --
22               MR. FITCH:  Just leave it there?
23               THE COURT:  Just keep it in July.
24               MR. CUNNINGHAM:  We are looking at whether
25   or not we need all of the various deponents from MOEX.
```

```
1              THE COURT:  So we're going keep that as the
2    July 13th date.  Thank you, Tony, for checking.
3              MR. FITCH:  Judge, Randy Smith is on my
4    schedule.  I'm going to go ahead and serve that
5    deposition notice over the weekend if to one else has
6    anything else to add.
7              THE COURT:  Does anyone else have anything
8    else to add?  Going, going, gone.
9              Thank you, Tony.
10             Do we have any information on the
11   procurement department designee for Nexen?
12             MR. FITCH:  I actually -- Tony Fitch for
13   Anadarko/MOEX.  I actually have a name.  The name is
14   Darryl Smith.
15             THE COURT:  Darryl Smith will be the
16   designee, and he's currently scheduled for May 23rd.  So
17   that puts us in good shape there.  Okay.
18             We had M-I Swaco.  We were looking to see if
19   we could take Mr. Smith on the 15th, 16th or 17th of
20   June.
21             MS. SCOFIELD:  Your Honor, this is Denise
22   Scofield for M-I.  It was my understanding that the
23   request for Mr. Smith had been withdrawn.
24             THE COURT:  Is that true, gentlemen?  I just
25   am not aware of it.
```

```
 1              MR. LANGAN:  Your Honor, a week ago, we
 2   confirmed that BP no longer wanted Mr. Smith's
 3   deposition.  But I believe counsel for Halliburton stood
 4   up and said we do.
 5              THE COURT:  I think that's right.  And I'm
 6   sorry that that was a misunderstanding.
 7              MS. SCOFIELD:  Your Honor, I think that and
 8   I'll call Mr. Godwin to talk through this.  I think he
 9   may have an understanding that Mr. Smith at issue is a
10   different individual than his impression.
11              THE COURT:  Okay.  Why don't you call Don or
12   Alan and talk that through.
13              If indeed it is the same individual they're
14   looking for, we were hoping to move him forward from
15   July 20, 21 to either June 15, 16 or 17.
16              MS. SCOFIELD:  And I'm happy to look at that
17   for you.
18              THE COURT:  Great.  No problem.  We'll pass
19   that for the week.  No problem.  Thank you.
20              All right.  Let's talk about Weatherford.
21   Have we gotten ourselves agreement on the notice?
22              MR. BURTRAM:  Your Honor, Richard Burtram
23   for Weatherford.  I believe the notice is still being
24   discussed to work through some issues.  I'm not involved
25   in those discussions, but that is the status.  It is
```

1    being discussed.  We've given a tentative date on the

2    schedule already.

3              THE COURT:  All right.  Thank you so much.

4              Next up on my hit parade is the letter from

5    Phil Whitman relative to the scope of the DNV

6    deposition.  And, as I read it, the request is that the

7    DNV deposition, which is currently scheduled for --

8              MS. BERTAUT:  For June 21 to 22, Your Honor.

9              THE COURT:  Be limited to pre-April 20th

10   matters.  And that DNV would be deposed at a later date

11   relative to post-April 20th matters.

12             I'll tell you what my gut reaction is, and

13   then I'd like to hear from everybody else.  My gut

14   reaction is that DNV is more akin to not a litigation

15   expert consultant but just an expert consultant, and

16   that many of the parties are going to want DNV's

17   opinions in anticipation of preparing their own expert

18   reports.  And that was kind of how I was viewing DNV and

19   the scope of its deposition.

20             If I am wrong, or if you all disagree, I'd

21   like to hear from you.

22             MS. BERTAUT:  Your Honor, I will address

23   that first.

24             THE COURT:  I think you did, Carmelite.

25   We've got the letter.

1          So what I'm asking everybody else to do

2    is --

3               MS. BERTAUT:  That's fine.

4               THE COURT:  -- is let me hear what their

5    reaction to your letter is.

6               MR. CUNNINGHAM:  We agree with Your Honor's

7    gut reaction.

8               THE COURT:  So PSE believes that the scope

9    should encompass all of the inspections and opinions

10   formulated.

11              MR. GODWIN:  Halliburton agrees as well,

12   Judge.

13              THE COURT:  Okay.

14              MR. LANGAN:  As does BP, Your Honor.  Andy

15   Langan.

16              THE COURT:  Okay.  Anybody else want to

17   chime in?

18              MR. COHEN:  Your Honor, this is Mark Cohen

19   for DNV.  We simply want to do this once, if we can,

20   instead of twice.

21              THE COURT:  Okay.  All right.

22              MS. BERTAUT:  Your Honor, may I address the

23   Court's observation?  Which was, frankly, the first time

24   I'm hearing it.

25              THE COURT:  Okay, sure.

```
 1              MS. BERTAUT:  First of all, with respect to

 2   the testing that is the subject on the current protocol,

 3   that is a testing requested by a party in the

 4   litigation, that would be BP.  So, if anything, as of

 5   the current time, is in fact litigation driven by a

 6   party in the current litigation.  That's my first

 7   understanding about the work that we're talking about

 8   DNV doing.

 9              Secondly, I think, given the situation, it

10   is somewhat artificial to refer to the pre-April, and

11   that's going to be confusing, but it's artificial to

12   refer to the prior DNV report as not being prepared by

13   an expert in litigation, because clearly this was an

14   expert retained by a party in other litigation, to wit

15   the MDL.  so I think that it's a little bit missing the

16   mark to consider that the work that was done in January,

17   February, March, the work that was done -- and it's a

18   subject of their March 25 report -- is not in fact

19   litigation opinion derived solely because of litigation.

20   Albeit, I will agree that it was not necessarily the

21   litigation of the MDL; it was the litigation of the MDI.

22              But, in any event, Your Honor, what we are

23   faced with is, as of currently, the second report that

24   we expect out of DNV is not due by court order until

25   June 15th.  We are aware that there is a protocol under
```

1    consideration as we speak that is many pages long just

2    for the testing that's to be done.  And the parties are

3    going to need some time to review those findings.

4              The way this deposition is currently set up,

5    we have six days from when the report may -- could be

6    produced, consistent with Judge Barbier's opinion or

7    order, and then we're going to be sitting for a 30(b)(6)

8    deposition.

9              You know, Your Honor, with respect to the

10   standing orders from the CMO, the custodial files, the

11   parties are entitled to ten days for custodial file

12   material.  And I would suggest to you that this is much

13   more complicated information than the typical fact

14   witness's custodial file.  And so the scheduling of this

15   deposition for June 21 and 22 is, if in fact the Court

16   is going to allow unfettered testimony and include work

17   that wasn't even begun yet, Your Honor, then I would

18   suggest that that's not in keeping with the CMO order

19   that calls for ten days.

20             And, you know, Your Honor, every time we're

21   here before you, we hear some problem associated with

22   the distribution of file material.  Indeed, I think we

23   started today off about the PSE requiring more than -- I

24   think it's 14 days to get materials for the London

25   witnesses.  What we are talking about in terms of the

```
 1    DNV test is extremely complicated information.  I
 2    understand, for example, the DNV is yet to produce
 3    everything related to the pre-March 25th testing.  So,
 4    if it's the Court's pleasure that we are to take this
 5    deposition of this expert as much as three months, four
 6    months ahead of the expert witness disclosure period --
 7    expert deposition disclosure, then I would ask that at a
 8    minimum we reset the deposition to allow an adequate
 9    time for DNV to complete its work and for DNV to
10    distribute to the 20 or so stakeholders in this
11    litigation all of the background calculations and
12    information on which they rely.
13              THE COURT:  Okay.  Thank you.
14              MR. HAYCRAFT:  If I might address, Don
15    Haycraft for BP.
16              Ms. Bertaut makes an error, and I want to
17    correct the record.  DNV is not being retained by BP or
18    paid as a litigation expert.  They are a testing company
19    that's going to be doing protocols.  And at the mutual
20    -- under the auspices of the Court and for the mutual
21    benefit of all the parties with their analyses, test
22    results, photographs, results being produce on a rolling
23    basis continuously through the eight week period.  And
24    so there will not be a report at the end on June the
25    15th.  Rather, the testing results will be provided to
```

1   all the parties to this MDL as they are prepared by DNV.

2   So I just want to make the record clear so that that

3   statement doesn't go unchallenged.

4           MS. BERTAUT:  Your Honor, if I may, I

5   apologize if Don wasn't finished, but this testing is

6   not being done at Cameron's request.  Let me be very

7   clear.  And I think we actually filed papers when BP's

8   motion for additional testing was submitted indicating

9   as such.

10          And, if the record is less than clear on

11  that, let me clarify that.  This is not at Cameron's

12  request.  So, frankly, I don't think it's appropriate to

13  say that it's being done for the benefit of all the

14  parties.  Because Cameron, at least, as one of the

15  parties, doesn't see a benefit for this testing.

16          THE COURT:  Okay.  Let me ask this question.

17  Does anybody, including counsel for DNV, see a benefit

18  in moving the two day deposition into July?

19          MR COHEN:  Your Honor, Mark Cohen for DNV.

20  I believe, but I would have to check back, that for some

21  people that wasn't as advantageous.  For others it was

22  neutral.  I believe -- again, I would have to check back

23  that this was in fact a proposal we made.

24          And I would second what -- just for

25  information and so the record is clear -- would second

1   what BP's counsel said a few moments ago, DNV is not

2   going to produce a report at the conclusion of the

3   present testing.  It will be issuing -- it plans to

4   issue data on a rolling basis per the Court's order.

5   And it will issue -- it plans to issue an assembly of

6   that data including photographs and videos at the

7   conclusion of the process.  But there will be no report

8   or supplementary report issued.  There will be no

9   addendum issued as a result of this testing to the prior

10  reporting.  And the present data that's going to be

11  issued will be just that, it will be assemblies of data.

12  No opinions.

13          So the parties are intended to use it as

14  they wish; but, beyond that, counsel shouldn't be

15  disappointed when they see what's coming out.

16          THE COURT:  Okay, and I appreciate --

17          MS. BERTAUT:  Just to be clear, Cameron

18  anticipates that it's data, but that has had to be

19  reviewed by experts other than the litigation lawyers,

20  and we need time built into the schedule for that.

21          And I again remind the Court that the

22  typical production period is ten days and that we are --

23  have situations where counsel for the PSE have requested

24  more than ten days because of logistical issues

25  connected with the materials.  And we would suggest that

1    Cameron does need that time to review in advance of what

2    sounds like that slamming door I was talking about and

3    the fact that DNV may be -- may only appear once for

4    this.

5              THE COURT:  I think will appear only once.

6    I think it's once and only once, unless good cause is

7    shown.

8              And, I guess, Mr. Cohen, thank you for

9    clarification.  I do think that was helpful.

10             And if you would check to see whether these

11   witnesses are available perhaps in early to mid-July, we

12   can take that up at our next conference, which is two

13   weeks from today.

14             If they are available, would you be so kind

15   as to circulate their availability to all counsel, so

16   that we can consider the dates?

17             MR. COHEN:  It would be my pleasure, Your

18   Honor.  Thank you.

19             MS. BERTAUT:  Your Honor, may I ask one

20   other refinement here, especially from what I understand

21   has been some difficulties and obtaining the underlying

22   data and work done to date?  I wonder if we could impose

23   from the DNV that they have produced all underlying

24   materials in accordance with the CMOs that are in place?

25             MR. COHEN:  Your Honor, may I speak to that

```
 1    briefly?

 2                 THE COURT:  Certainly.

 3                 MR. COHEN:  Your Honor, DNV is not a party

 4    to this litigation.  And, to the extent that DNV has a

 5    contractural obligations to the joint investigation

 6    team, to the Department of the Interior of the United

 7    States, DNV is certainly to do its duty, carry out its

 8    contractural obligations.  Likewise, DNV will do its

 9    duty to the Court and the litigants in response to the

10    subpoenas, we've tried to be cooperative.

11                 As far as issuing certifications, et cetera,

12    that seems to be well beyond the purview of anything

13    DNV's required to do in the litigation.  And we would

14    respectfully decline the invitation.

15                 MS. BERTAUT:  Your Honor, this presents

16    somewhat of a problem.  We just want to make certain

17    that in this one-time deposition we have available to us

18    an adequate time all of the underlying data.  And I

19    don't how that can exactly be worked out, Your Honor,

20    but I don't think it's an unreasonable request.  We'd

21    ask the Court to assist us in that regard.

22                 THE COURT:  I'm not sure that what I heard

23    Mr. Cohen say is that you're not getting all of the

24    data.  And let's ask for a further clarification on

25    that.
```

1           MR. COHEN:  Your Honor, this is Mark Cohen.

2    Counsel is of course welcome to call me up and explain

3    what is on her mind, what she feels she doesn't have.  I

4    will confess that this is only my second attendance at

5    these sessions, yesterday was my first.  This is

6    principally on account of a contractural issue before

7    the Court, and so I'm not clear what counsel thinks she

8    does not or her client does not have.  But she's welcome

9    to call us.

10           THE COURT:  Yeah.  Please --

11           MS. BERTAUT:  Your Honor, I'll be happy to

12   follow-up with counsel.  I'm talking about prospectively

13   as well as the situation currently.

14           THE COURT:  I understand.  And it's my

15   understanding, just so everybody understands my

16   understanding, that DNV has produced all testing data

17   for testing that has been done so far, and that the

18   protocol calls for DNV to produce all data from the

19   testing that is being scheduled now.

20           MR. COHEN:  Your Honor, this is Mark Cohen.

21   Yes, with regard to the proposed -- well, the proposed

22   contract that we're seeking the Court's approval of, DNV

23   would in fact be required on a rolling basis to upload

24   photographs, videotape and testing data as promptly as

25   reasonably possible to a central dissemination point.

```
 1    The customer in this instance, BP, is seeking an expert
 2    service to handle that, so that issues that may have
 3    arisen previously concerning timely and swift production
 4    of the data downloading of the data can be avoided.  And
 5    I think that's very well in hand.
 6              As far as what came before, of course, in
 7    the work that DNV did for the joint investigation team,
 8    Department of Interior and US Coast Guard, the report is
 9    public record.  And there was a request I believe for
10    certain information regarding various calculations and
11    whatnot that the DNV did that came through the joint
12    investigation team, and DNV's responding to those.  And
13    I know the parties in interest there will have an
14    opportunity to have all of that data.
15              Beyond that, I have no information.  But I
16    think that covers the waterfront.
17              THE COURT:  That was my impression.
18              But, Carmelite, if you will please call and
19    touch base if you need further clarification.
20              MS. BERTAUT:  Absolutely, Your Honor.
21              THE COURT:  But my impression is all data is
22    being produced.
23              Okay.  And then last but not least, I was
24    going to cover the BOP protocol issue.  Do we need to
25    take a brief break before we get into that?  Or is it a
```

1    fairly quick issue?

2              MR. HAYCRAFT:  I don't know about fairly

3    quick.

4              MR. LANGAN:  Your Honor, Andy Langan.  I'm

5    not sure all counsel needs to stay for it.

6              THE COURT:  That's exactly right.

7              MR. LANGAN:  We don't object to that.

8              THE COURT:  I agree, I don't think everybody

9    needs to stay here for it either.

10              MS. KUCHLER:  Before we get to BOP, I had

11    two other issues quickly.

12              THE COURT:  I'm sorry, did I miss something?

13              MS. KUCHLER:  No, ma'am.  But I just want to

14    know, on the April calender, K. Paine is listed as an

15    Anadarko witness.  She does not work for Anadarko.  My

16    understanding is that she works for Quadril.  We had

17    requested her deposition, and somehow we got listed as

18    her employer.  Just so everybody knows, she is not

19    employed with us, and has never been as far as I know.

20              Then I had a question for the April 29th

21    status conference.  Are we taking a break from the

22    depositions that are running over into Friday?  Because

23    several of us, I'm sure Mr. Godwin is in this situation,

24    we're going to be taking the CSI deposition of Fred

25    Savins's on the 28th and 29th, and we also need to be at

1    the status conference.

2                    THE COURT:  Well --

3                    MS. KUCHLER:  So I would respectfully

4    request that we start the Savins's deposition after --

5    at least after the status conference with Judge Barbier

6    concludes, so we can at least, on our time, we can split

7    up the status conference with you and still do it

8    effectively.  But we can't -- some of us would have to

9    be in both places.

10                    THE COURT:  Is there any objection to that,

11   guys?

12                    MR. LANGAN:  Your Honor, Andy Langan for BP.

13   I think Mr. Savins is a stakeholder here.

14                    THE COURT:  Look, I hear you.  Can we

15   contact him and see if there's a problem?  It looks to

16   me like the deposition wouldn't start -- well, maybe

17   what you could do, Deb, is start at 8:30, get 45 minutes

18   under your belt.

19                    MS. KUCHLER:  Judge Barbier usually requests

20   liaison counsel in his chambers at 8:30, before the 9:30

21   conference.  So it looks like the earliest we could

22   count on Mr. Savins's deposition that day is 11 or

23   11:30.

24                    THE COURT:  Okay.  Let me ask you all

25   something.  Would you all like me to contact Judge

1   Barbier to see if he could start earlier that day?

2            I think Don Godwin is saying yes.

3            MS. KUCHLER:  He looks like he's in thought.

4            I'm actually thinking it might be better if

5   we can do it later in the day, but that imposes on

6   out-of-town counsel who are trying to get home for the

7   quick weekend.  We're willing to do whatever, but it's

8   that Don and I need to be at Savins's deposition and at

9   the conference with the judge.

10           MR. GODWIN:  That's right, Judge.  And, if

11  it works better for Judge Barbier to start earlier

12  latter, my preference is to start later.  Judge Barbier

13  normally likes to start at 8:30.  We have a conference

14  with liaison counsel.  And, when we're through, we could

15  go back and continue with Mr. Savins at that time.

16  Would be my suggestion, to start later rather than

17  earlier.

18           THE COURT:  Start the deposition later?

19           MR. GODWIN:  Yes, Your Honor.  On that

20  Friday.

21           THE COURT:  And it wouldn't help you to have

22  Judge Barbier move his conferences up?

23           MR. GODWIN:  Well, if he would move his

24  conference up to say -- his status conference, to 8:30

25  or 9 o'clock, and not have an earlier meeting.  Or have

```
 1    us come over at 7:30.
 2              THE COURT:  That's what I'm thinking.
 3              MR. GODWIN:  Maybe we could come over at
 4    7:30 and meet with him in his chambers.  That would work
 5    for us.
 6              THE COURT:  We'll go ahead and ask him
 7    whether he can do that or not, okay?
 8              MR. GODWIN:  Thank you, Judge.
 9              One other thing I was going to bring up by
10    way of a reminder is that you were going to ask Judge
11    Barbier about June 3rd.
12              THE COURT:  I did, and I haven't heard back.
13    But I did do it.  I don't think there's going to be a
14    problem, it's just picking a date.  And I think it might
15    be that Thursday.
16              How does that look for you guys as far as --
17    it doesn't look too good; does it.
18              MR. GODWIN:  On the 2nd, Judge?
19              THE COURT:  No.  Thursday, the 28th.  No,
20    I'm sorry.  Could we look at the May calender?  I'm
21    looking at the April calender.  I'm sorry.
22              Thursday the 26th looks terrible for you
23    guys.
24              MR. GODWIN:  May, Judge, looks much better.
25              THE COURT:  I think Judge Barbier is
```

1 planning on being out of town that day.  That's what's

2 holding up the response.

3     MR. GODWIN:  How about, as a suggestion

4 only, how about Wednesday, May 25?

5     THE COURT:  We will try for that.  Perhaps

6 the 24th.

7     MR. GODWIN:  Those days are good, Your

8 Honor.  Thank you, Judge.

9     THE COURT:  So the issue has been raised,

10 but there's silence at the other end.

11     MR. LANGAN:  Your Honor, Andy Langan for BP.

12 I have two -- before we get to the BOP thing -- two

13 other items that I would like to raise.

14     I haven't heard from the United States on

15 the phone.  Is anyone from the DOJ on the phone?

16     THE COURT:  DOJ, are you on the phone?

17     MR. UNDERHILL:  I've been listening and

18 keeping quiet, Your Honor.

19     THE COURT:  Thank you, Mike.

20     MR. LANGAN:  Mr. Underhill, it's good to

21 hear your voice.

22     MR. UNDERHILL:  You don't have to say that.

23     MR. LANGAN:  Your Honor, we filed a motion

24 yesterday -- it may be a Judge Barbier issue.  We

25 thought we'd flag it here and you could run interference

1    with us.

2              THE COURT:  So far, I didn't do so well on

3    moving the status conference.

4              MR. LANGAN:  This one may be easier.

5              BP received the department's complaint, th

6    United State's complaint on April 4th.  As a result of

7    that, by operation of the federal rules, our obligation

8    was to bring third-party actions is Monday, April 18th.

9    We asked for a two-day extension of that, from April

10   18th to April 20th, to put us sort of on the same

11   schedule.  We filed a motion yesterday.  The government

12   has not objected to this, but nor have they said they

13   agree.  So we're just kind of hoping to bring that to

14   closure.  Otherwise, we have to -- we're going to be on

15   different schedules.  So we respectfully make that

16   request.  If you could run interference with Judge

17   Barbier's chambers or Mike could weigh in on this.

18             THE COURT:  Would you like to me start with

19   Mr. Underhill?

20             MR. LANGAN:  That would be helpful.

21             THE COURT:  Mr. Underhill.

22             MR. UNDERHILL:  Judge --

23             THE COURT:  Mike, how do you feel about

24   that?

25             MR. UNDERHILL:  You know, my colleague Ron

```
1    Gasaway gave me the question, Your Honor.  And I put it
2    to my people.  And, frankly, it probably didn't go to
3    the top of their in-box.  I don't think this is a big
4    deal.
5              THE COURT:  I don't either.
6              MR. UNDERHILL:  If I could just wait
7    probably until next week.  Let me ping my people and get
8    back to Andy.
9              MR. LANGAN:  The deadline is Monday.
10             THE COURT:  The deadline is Monday.
11             MR. UNDERHILL:  I'm sorry.  I will --
12             MR. MILLER:  He'll let you know on Tuesday,
13   Andy.
14             (Laughter.)
15             MR. UNDERHILL:  Executive decision time
16   here.  No, no objection.
17             THE COURT:  Good.  I didn't think there
18   would be.  And I think it's non-controversial.
19             MR. LANGAN:  I have hard copies of that,
20   Your Honor, if we could move that along.
21             THE COURT:  I saw it on the docket
22   yesterday, and we will try to run interference on it.
23             MR. LANGAN:  So, again, not to put you on
24   the spot, is that something we can kind of count on?
25             THE COURT:  Yes.
```

1           MR. UNDERHILL:  Let me add, I'm not going to

2    say what the discussions were, but there were some

3    representations made to me by Rob Gasaway, and I accept

4    them at face value.  So, based upon our discussions, I

5    have no objection, and I've already stated that on the

6    record.

7           MR. LANGAN:  We appreciate that, and we

8    stand behind what Mr. Gasaway and Mr. Underhill will

9    talk about.  So that's fine.

10          Your Honor, the other thing is that, no

11   action required now, but I just wanted you to know that

12   our document team has looked at your order which talks

13   about what needs to happen by May 27th in terms of our

14   document production.  And we understand.  I may come

15   back to you at some point and sort of outline for you

16   what our plans are in that regard, just so everybody has

17   a heads-up, here's what BP's doing, we're trying to

18   apply the search terms.  So, if there are any issues, we

19   want to be transparent and have them out there.  So I

20   just today wanted to let you know and let Mr. Sterbcow

21   and Mr. Cunningham and the parties know that the burden

22   upon us is pretty big about document production.  We're

23   doing the best we can, and we just want to make sure we

24   continue to be up-front with everyone about that.  So

25   that's it.  That's all I wanted to say.

```
 1                    THE COURT:  Great.
 2                    MR. LANGAN:  Thank you.
 3                    THE COURT:  Anybody else?  Before we turn
 4      our attention to the BOP protocol?
 5                    I'm going to go ahead and let's take a five
 6      or so minute break.  Anybody who doesn't need to be here
 7      for that, see you later.  Anybody who does need to be,
 8      come on back in about five minutes.
 9                    (Proceedings in Recess.)
10                    MS. BERTAUT:  Judge, we'd like to patch
11      David Jones in.
12                    THE COURT:  Okay, go ahead.
13                    MS. BERTAUT:  Although I dialed this number,
14      I need to find it on my phone.  It might be quicker,
15      frankly, if I could ask the Court to just tell us,
16      unless you need me to search for it on the Blackberry.
17                    THE COURT:  Does anybody have the number
18      with them?
19                    MS. BERTAUT:  I have it.
20                    David, can you hear me?  Hello?
21                    It's 888-684-88 -- I'm going try to paste it
22      and send it in an email.
23                    (Pause in Proceedings.)
24                    MS. BERTAUT:  Your Honor, my apologies.  We
25      are assuming that BP has some issues with the written
```

1    protocol.

2              THE COURT:  I'm not assuming anything.

3              MS. BERTAUT:  Okay.  Well, if so, that's a

4    David Jones issue.  Let me make sure that Mr. Jones is

5    on the line.

6              THE COURT:  Okay.  We'll hold on.  Is it

7    protocol related?

8              MR. STERBCOW:  One is and one isn't.

9              I forgot raise one issue.  Briefly.  I just

10   want to bring it to your attention, not for argument or

11   any other reason.

12             Mr. Godwin and I have been going back and

13   forth for a week now on Halliburton document production.

14   And we always have wonderful conversations, I enjoy

15   talking to Don.  He's going to take me to lunch, dinner.

16             THE COURT:  But it's going to be a big bill.

17             MR. STERBCOW:  It always is.

18             I wanted you to know, it's an ongoing

19   process.  We're having trouble with -- often times, we

20   have trouble obtaining it from the remote site.  We get

21   things late.  I'm getting feedback, we have a couple of

22   lawyers designated to take settlement related

23   depositions, they're starting to holler at me more and

24   more.  So I wanted to let you know that it may come to

25   the point that we have to come talk to you about this.

```
 1    But, if history is any guide, we're going to have to get

 2    past it and work it out.  I just don't want us to be in

 3    a position where we get too far behind the 8-ball and we

 4    have to start talking about bringing people back.

 5              THE COURT:  Fair enough.  Why don't you all

 6    have your conversation; and, if there's any inkling of

 7    an issue, let me know, and we'll just take it up by

 8    phone.

 9              MR. STERBCOW:  Last thing, Judge, just

10    because this will allow me to leave.  This is BOP

11    protocol.

12              PSE is aware of things going on, and the

13    only thing we ask is that we have a representative for

14    the testing guidelines.

15              THE COURT:  That was taken care of

16    yesterday.

17              MR. STERBCOW:  And, if there are any

18    changes, please cc us and let us know.

19              THE COURT:  That was taken care of

20    yesterday.

21              MR. STERBCOW:  Anything else that happens

22    today, we're fine.

23              THE COURT:  You're behind the curve.

24              MR. GODWIN:  Your Honor, may I approach?

25              THE COURT:  Sure, Don.
```

```
1                    (Discussion held off the record.)
2                    THE COURT:  Do we have David on the line?
3                    PERSON ON TELEPHONE:  We do.  I apologize.
4                    THE COURT:  No problem.
5                    MR. GASAWAY:  Good morning.  I want to
6     commend my friend, Don Haycraft, who gave me for my
7     presentation a color-coded folder to match your new
8     technology.
9                    THE COURT:  Isn't that nice?
10                   MR. LANGAN:  Your Honor, I'd like to
11    introduce our colleague from my law firm, Mr. Gasaway,
12    who has been spending --
13                   MS. BERTAUT:  Your Honor, I don't know --
14                   MR. LANGAN:  This is Andy Langan.  I want to
15    introduce our colleague, Rob Gasaway, who is here with
16    us.  Your Honor, I just wanted to introduce him.
17                   THE COURT:  Welcome, David.  I've got a nice
18    list of places to go, things to do, all of that.  Just
19    email, I'll send it back to you.  I just sent Tony one.
20                   Did you get it, Tony?
21                   MR. FITCH:  I just received it.  Thank you.
22                   THE COURT:  Let's get going on -- this is
23    the BOP testing?
24                   MR. GASAWAY:  Yes.  Let me break it down.
25    I'd like to start with the practical and then the
```

1    contractual and then the protocols are last.

2              In the practical category, you heard a lot

3    of discussion on the phone the other day.  There was lot

4    of discussion yesterday.  Here's what BP is doing and

5    sort of how BP envisions the process going forward.

6              This is, as the Court's order says,

7    court-ordered testing, quote:  Under the auspices of the

8    Court being conducted by DNV.  And I'm talking about the

9    contractual provisions that protect that.  But,

10   practically, where we are is we're trying to aid that in

11   whatever way can happen.

12             I want to say that, number one, as we

13   discussed yesterday, we've been talking with KPMG, who

14   is an IT vendor.  KPMG has relationships with BP, it has

15   a relationship with Kirkland & Ellis.  We've asked them

16   to check conflicts.  I'm sure that they have

17   relationships with multiple parties here.  But if

18   anybody has any problem with KPMG acting in the role

19   that we cited, getting the data testing out quickly,

20   they need to raise their hands very quickly.

21             THE COURT:  So let's put that on the agenda,

22   guys.  Everybody please check with your clients; and, if

23   there is any problem with that consultant coordinating

24   IT and communications coming out of the BOP testing,

25   speak now or forever hold your peace.

```
 1              MR. GASAWAY:  Thank you, Your Honor.
 2              And then, just along related lines, for
 3   purposes of notification to everybody, DNV has asked for
 4   particular support from a particular individual at BP
 5   who has expertise in actually how you physically lift
 6   and reposition the BOP.  That's a Mr. Jake Reidenboch,
 7   who actually did the plan for putting it where it is
 8   now.
 9              THE COURT:  Let's spell Reidenboch.
10              MR. GASAWAY:  R-E-I-D-E-B-E-N-B-OC-H.
11              So we would anticipate -- I know we've
12   talked about hands-on, et cetera.  Obviously, he doesn't
13   hook up the cabling.  But he would be doing the drawings
14   for actually moving the BOP as necessary as directed by
15   DNV.
16              So, again, I just want everybody to know
17   that DNV has made that request.  We've contacted Mr.
18   Reidenboch, he's available and will be performing that
19   role.
20              The third thing I wanted to say then goes
21   directly to the case.  You heard, because this is
22   court-ordered testing and it's being conduct under DMV's
23   auspices by KPMG, what we'd like to do is put some
24   additional third party project coordination/project
25   interface capability in place.  Because, every time we
```

```
1    talk about this, people talk about can we have notice,
2    how is this going to work, how are we going to be
3    coordinated.  So I just want to let the Court know we're
4    already reaching out to see if people who are expert in
5    project coordination among multi-parties, you know, who
6    needs to have notice, who needs to have access, what
7    tools do we need, et cetera, we're going to hopefully
8    talk to DNV and get some additional capability in place
9    there, like we're talking about with Mr. Reidenboch and
10   KPMG.
11            And, again, if anybody has any problem with
12   that, which they shouldn't because it's going to be for
13   the benefit of all parties, I just would like to throw
14   that out there in the room.  This is all moving very
15   fast.
16            THE COURT:  Good.
17            MR. GASAWAY:  So now let's talk about the
18   contract.
19            THE COURT:  Speak up just a little bit so
20   you make sure that everybody on the phone hears you.
21            MR. GASAWAY:  Talk about the contract.  That
22   was distributed, as this Court knows, shortly before the
23   hearing last night.  I've had a couple of conversations
24   on minor, minor details with Mr. Cohen that are not
25   substantial at all.  I have not heard any feedback on
```

1    the contract or any objections to the contract.

2            I just want to put on record a couple of the

3    key provisions, because time has been short and

4    sometimes people complain about it.  Just so everybody

5    knows how this is supposed to work.

6            It does make absolutely clear, in conformity

7    with the Court's order, that the testing is being done

8    under the Court's auspices, and the DNV is in control.

9    And I would encourage each and every party to the

10   litigation to read, if nothing else, paragraph 19 of the

11   contract which is entitled DNV Discretion and Control.

12   And it says, quote, unquote:  DNV shall have sole and

13   unfettered discretion with regard to this testing.

14           It says that:  In interpreting any provision

15   of the contract that bears on the technical side, the

16   testing side as opposed to the business side, they will

17   get deference even in interpreting the contract against

18   BP.  It says that they will take advice not from BP but

19   only from a working group on which all parties are

20   represented.

21           And it further says that they don't have to

22   explain or document to anybody why they chose one thing

23   rather than another thing.

24           So the contract -- and this has been

25   something that DNV insisted on, the government insisted

1  on it, and BP enthusiastically supports, makes

2  absolutely clear that we're in no better position than

3  any other litigant when it comes to how a wrench is

4  turned or how testing is done.  I just want to make that

5  clear.

6           Now, there's a related provision, given the

7  discussion this morning, that I want to point

8  everybody's attention to, and that's No. 12.  And that

9  talks about testimony.  And it makes clear that the only

10 testimony that we expect from DNV arising out of this

11 testing on behalf of BP would be as a fact witness.  So

12 if there were, you know, did you do this or did you do

13 that, you know, what was the discussion leading up to

14 that, we are not going to call DNV for any purpose as an

15 expert witness.  They are not an expert witness for BP

16 in this litigation.  They are conducting testing under

17 the auspices of the Court, with this great degree of

18 discussion that's described in paragraph 19.

19          And that's, again, all that is unchanged

20 from the version of the contract that went out late

21 yesterday afternoon.  We've heard no objection to any of

22 that.

23          So I'll pause there and then we'll go into

24 the protocols.

25               THE COURT:  Okay, good.  All right.

1          Anyone on the phone have any comments with

2    regard to what we've just covered?

3               (No response.)

4               THE COURT:  Moving right along.

5               MR. GASAWAY:  Okay.  Moving right along to

6    the protocol.

7               As far as I know, Cameron is the only one

8    that has any issues with the protocol.  Before we get

9    into the Cameron issue and see if we could work those

10   through, what I thought I'd do is -- I understand

11   Transocean doesn't, but Kerry is still here, and I would

12   -- I know Mike has been in contact with his experts.  So

13   I'd just ask if there's any other issues in the room.

14              THE COURT:  Okay.  Let's get a statement

15   from Kerry on behalf of Transocean.  Then, Mike, I'll

16   turn to you.

17              MR. MILLER:  Kerry Miller on behalf of

18   Transocean, Your Honor.  I reported to Rob Gasaway and

19   Don Haycraft at the beginning of the conference that in

20   response to the latest protocol that was circulated

21   about 10 o'clock last night by Don.  It was a red-line

22   version, that we had our experts take a look at it.  And

23   Transocean has no objections to that version of the BOP

24   testing protocol.

25              THE COURT:  Great.  Thank you.

1              Mike Underhill.

2              MR. UNDERHILL:  Hi, Judge.  No objection to

3    where we are so far.  What we were talking about

4    off-line, when Carmelite was calling, before the Court

5    came back on, was that in as far as with moving forward

6    with the actual testing, this morning's a good example,

7    I got an email from Heather, sort of like:  Oh, my God,

8    this is actually starting on Monday.  And I think what

9    we need to figure out is a way that BP -- and I think

10   this is Rob's and BP's, on their nickle -- to get out to

11   the parties as soon as is absolutely possible what's

12   expected to go forward on a daily or a weekly basis.

13   Because I found out, round-about through Heather, that

14   Monday, through the week, a whole bunch of protocols and

15   testing is supposed to start.  And I've got an expert in

16   Thailand, lucky guy, and other experts scattered around

17   the country.  And just mobilizing on that short notice

18   is difficult.  We'll do our best for this week; but,

19   moving forward, I think we need to figure out a better

20   system.  I know Jimmy Williams had made the point last

21   night on behalf of the PSE that he's got the same need.

22   And I'm sure that Jimmy isn't even in the same loop that

23   I got notice of testing going forward.  So I don't

24   necessarily have a suggestion how to do it, but I think

25   that Rob and his team might figure out a way to try to

1    satisfy the parties' needs.  Because it's a pretty

2    important and complex thing, to get all this working

3    together.

4              THE COURT:  Right.  Okay.

5              Rob, you want to comment on that?

6              MR. GASAWAY:  That was the third-party

7    resource that I was talking about.  I think we're going

8    to have to put that in play.  I want to make BP the

9    funder and provider of that.  But, again, this is a DNV

10   show.

11             And, to the extent that this testing goes

12   forward, what I'm going to try to do is give DNV

13   resources, like what we've talked about, in every

14   different way, and tell folks that the place for them to

15   go is, for legal questions, DNV's counsel, Mr. Cohen.

16   Or, for obviously the technical working group questions,

17   for Mr. Kenny.

18             But Mike's absolutely right, we're going,

19   and we recognize that just like we've tried to get --

20   everything fell in the place from the facility agreement

21   and et cetera, we're going to try to put this in place.

22             THE COURT:  I know you don't want to

23   interject yourself into this; but, to the extent that

24   you need to, why don't you see what you can do to give

25   everybody the heads-up on what's happening this week

1    before you can get that third-party contractor lined up

2    and ready to roll?  So that everybody can have a little

3    bit of a preview of where you're going this week.  Not

4    you, DNV.

5              MR. GASAWAY:  Thank you, Your Honor.  We

6    will.

7              THE COURT:  Great.  That would be helpful.

8              MR. UNDERHILL:  Can I make one more

9    suggestion, if I could?  And just sort of pass it on to

10   Rob, might be the easiest way to do it.

11             THE COURT:  Sure.  Go ahead.

12             MR. UNDERHILL:  Rob, I don't know what the

13   facilities are out like out there.  I've done my best to

14   stay away from the issue.  Some of these, like with next

15   week, it might be possible, just from the logistics of I

16   think of all the other parties, if there's conference

17   call abilities, to do some of the groundwork on the

18   talking part of it, it might be nice to be able to try

19   to set that up for people, that, despite all their best

20   intentions, just physically can't get there by Monday.

21   So, if that's possible, it would sure probably help

22   everybody.

23             MR. GASAWAY:  No sweat.  We'll make sure

24   that there's conference calling available for important

25   meetings for people who can't attend.

```
 1              MR. UNDERHILL:  Appreciate it.

 2              THE COURT:  Good.  Okay.  Anything else,

 3    Mike, that you might add as far as logistics,

 4    coordinating, all that good stuff?

 5              MR. UNDERHILL:  I can only pass on what I

 6    note from Heather, was that they're now aware of it, and

 7    let's just say they're scrambling to do whatever they

 8    need to do in trying to get this set up for Monday.  So

 9    they're doing their best.

10              THE COURT:  And she understands that each

11    party will have a representative probably every day, and

12    it may not be the same representative.  So she's aware

13    of that and ready to try to work that out?

14              MR. UNDERHILL:  I believe so.  The only one

15    I gave her a heads-up -- in fact, I copied Jenny

16    Williamson on the same email to Heather -- was they're

17    saying work me out, cut me out of that loop.

18              If anybody else -- I think most of the

19    people that are going to be there probably have been

20    through the JIT process.  If they haven't, if they

21    haven't watched one of these, contact me and I can send

22    them on to Heather and I can make sure that that all

23    gets done.  And, if somebody drops the ball, I'll take

24    the hit, rather than my client.

25              THE COURT:  No, I think that's fine.
```

1          So let's be clear that if anybody has

2    representatives who'll be attending or might be

3    attending during this testing phase who has not been

4    through the JIT security check, please contact Mike to

5    get further instructions on how to get them authorized

6    to enter the site.  Okay.

7          MR. GASAWAY:  All right.  Protocols, Your

8    Honor?

9          THE COURT:  Protocol.

10          MR. GASAWAY:  Here's where I think we are.

11   I think we've got a little bit of a battle of form

12   situation going on.  David and I talked after the

13   hearing yesterday, and I tried to incorporate the

14   suggestions that I was aware of based on that

15   conversation.  Sent out a document, as Kerry described,

16   9 o'clock or so last night.  Dave was obviously in

17   consultation with his team, and we got a document back

18   maybe, you know, later on that night, maybe midnight or

19   so.

20          So I think, unfortunately, we have some

21   issues, but I think hopefully we can work them out right

22   here on the spot.

23          Let me divide them into two.  Those issues

24   that have been addressed, albeit with different

25   language, slightly differently in our document that has

1    not been signed off on all the parties -- and let me see

2    if I can convince Mr. Jones that we've adequately

3    addressed his issue.  And I'll do something like we did

4    with Mr. Underhill, I'll make additional representation

5    beyond the text.

6             These two issues have to do with what we

7    were talking about yesterday about that level two

8    support from Cameron.  And he has language in there that

9    suggests that the request should come seven days in

10   advance, which is obviously absolutely reasonable.  We'd

11   love to do it and we plan on trying to do it.  I can

12   almost guarantee you that there are going to be

13   situations between now and June 15th where we're not

14   going to be able to make the seven days.  But I'm

15   saying on the record now, in retaining the logistics

16   support, the coordination support we're talking about,

17   we are absolutely going to direct them that wherever

18   possible --

19             THE COURT:  Excuse me, guys.

20             Whoever is on the cellphone, could you all

21   mute it so that we don't get the feedback from you?  It

22   would be helpful.  Thank you.

23             Go ahead, I'm sorry.

24             MR. GASAWAY:  Wherever possible, we're going

25   to say give Cameron or any other party that's being made

1    a special request of at least seven days notice.  And

2    they were talking a little bit about weekly meetings and

3    so forth, we endorse that process.

4              THE COURT:  Okay.

5              MR. GASAWAY:  The other difference I saw in

6    the text was Mr. Cameron's text makes it clear that this

7    additional level two support would only be provided if

8    DNV asked for it.  And, as I just talked about with

9    respect to paragraph 19, that's absolutely 100 percent

10   correct, BP has no ability under this agreement to

11   request this.  And I want to make that absolutely clear.

12   BP is no differently situated than any other member of

13   the working group.  We could ask DNV to request it,

14   Transocean could ask, Cameron could ask, the PSE could

15   ask.  But it would always be in DNV's discretion.

16   That's made clear in the draft that I saw from Mr.

17   Jones.

18              But the problem I have in calling that out

19   in certain instances is, you know, the negative

20   implication, well, does that mean that there's less

21   discretion on DNV.  So I was hoping to assure Mr. Jones

22   that we fully agree that this level two support would

23   only be at the request of DNV.  And of course his

24   technical representative would be free to tell DNV if

25   there were a less burdensome way to do it, and if DNV

```
 1    were convinced, BP would have no ability to say anything
 2    different.
 3                    THE COURT:  Okay.  David, do those
 4    clarifications help you?
 5                    MR. JONES:  I'm not sure, Judge.
 6                    And let me say, I didn't get a draft last
 7    night at 9 o'clock, which is really why I sent out the
 8    draft that I did much later, going from the previous
 9    draft that I had earlier in the day.  So I'm not --
10    right now, I don't have the specific language that they
11    may have included or changed to be speaking from, so I'm
12    at a little bit of a disadvantage.
13                    But to comment on the two points, I
14    understand that there's going to be an effort to give us
15    seven days notice where possible.  But it needs to be
16    clear in whatever language that we ultimately agree on
17    that if we give -- if we get less than seven days, there
18    may not be a Cameron person out there and available to
19    do this test or available to provide information.
20                    What I don't want to have happen is for
21    someone to call me up and say:  Look, we understand
22    we're supposed to give and under usual circumstances
23    notice, but we need to do this tomorrow and you got to
24    get someone out here.  And, we just can't do it, and
25    then someone's back here saying:  Well, this was a
```

1    court-approved protocol, Cameron, you have to do it.

2            So, as long as everybody understands that,

3    and the language is clear that they're going to try to

4    have seven days; but, if they can't give seven days,

5    well then, there is a chance that we won't be able to

6    get the right people there, and that everybody

7    understands it, I don't think I have a problem with

8    that.

9            And then, on the second point, just calling

10   out that this will be at DNV's request, I would like to

11   keep it in these paragraphs.  I think there are five

12   paragraphs in total that address this heightened level

13   of assistance.  And the OEM, Cameron, is the only one

14   that has these types of references in the document, so I

15   don't think that there's -- I think it's very clear by

16   putting that DNV language:  This is at the request of

17   DNV, in each those paragraphs.  I don't think it

18   minimizes any other provision in the agreement.  These

19   are the ones that are specifically -- the paragraphs

20   that are specifically directed to Cameron's involvement.

21           THE COURT:  Okay.  Let's back up and hear

22   what Rob has to say.

23           Rob, do you agree to the qualifications that

24   David has put on the seven days; that everybody agrees

25   that if it's less than seven days there is a possibility

```
1    that Cameron won't be able to respond with the
2    specifically qualified personnel?
3              MR. GASAWAY:  No. I think I have a
4    fundamentally different understanding than he does.  I
5    think that Cameron has agreed, and it's been
6    incorporated in the court order, that they would provide
7    the same degree of support that they provided before.
8              And I understand that we're, you know, sort
9    of dancing on a fine qualification here.  But I do want
10   to say that the misunderstanding that I don't want to
11   leave on the record is that, if we don't have seven days
12   notice, they have no obligation to cooperate whatsoever.
13             I think, if we give them a shorter notice, I
14   think they obviously have every ability to say:  Look,
15   I'm sorry, all of our techs are on a rig, I can't leave
16   a customer hanging, I can't get anybody there.
17             But, if it is the case that the Maytag
18   repairman is hanging around in Burwick, Louisiana, and
19   it's just a matter of him driving up to Michoud, yes, I
20   am going to say that you can't just stand on your
21   rights.  And that's why I don't want to put the seven
22   days in there, and that's why I do want to just leave it
23   with this colloquy.
24             I understand that they have a
25   customer-driven business, and I understand that these
```

1    are highly qualified people.  That's why we want them.

2    And I understand that they need to schedule these people

3    and put them offshore.

4           But all I'm saying is that, if it should

5    somehow happen, that it wouldn't be an undue burden,

6    even though it's less than seven days, absolutely, I

7    think that's what they agreed to when they signed off on

8    the order.  So, with that qualification, I'm fine.

9           THE COURT:  David, go ahead.

10          MR. JONES:  Judge, I think Mr. Gasaway has a

11   very fundamentally different view of what Cameron has

12   agreed to do in connection with this testing.  And,

13   remember, this is BP's motion, this was BP's desire to

14   do this testing.  And, to be frank, there really is no

15   obligation under the federal rules to compel a party to

16   do exactly what they're asking us to do.

17          And I think Cameron has recognized that, in

18   our position as OEM, we have some information that will

19   assist this process, and we're willing provide it.  And

20   I don't think it's unreasonable that we get a certain

21   amount of notice and we get a certain amount of

22   protections in place to make sure that we can get the

23   right people in the right place at the right time.

24          THE COURT:  I hear you, David.  But, look,

25   with the compact schedule that we have and with the

1   particular specialized knowledge that your technicians

2   have, it seems to me that at least a best efforts kind

3   of thing, we can't guarantee seven days; we'll just all

4   know that best efforts on DNV's part will be used to

5   give seven days notice.  But let's just assume that

6   there's five days' notice, and they request a

7   technician, well, obviously, if he's offshore and he

8   wants to get in, I totally agree that that is something

9   that's not going to happen.  But if he is available, and

10  it's less than seven days, it can seem to me best

11  efforts would cause Cameron to say:  Fine, we'll send

12  him in.

13            MR. JONES:  And I don't really have a

14  problem with best efforts, provided that it's both ways.

15  That DNV uses their best efforts to give us seven days;

16  and, if it's less than seven days, we will use our best

17  efforts to get someone there.  I don't have a problem

18  with that.

19            THE COURT:  Great.

20            MR. JONES:  But I would like to have a time

21  period in this protocol rather than just some -- a

22  little vague, well, we'll try to give you seven days,

23  that's not specifically stated in the document.

24            THE COURT:  I haven't seen your language,

25  David.  What is your language?

1          MR. JONES:  My language said:  If requested

2     by DNV, OEM technical personnel should be in attendance

3     onsite for purposes of providing information to DNV

4     regarding whatever the particular task was.  It says:

5     DNV shall give the OEM at least seven days' notice and

6     OEM technical personnel are requested to be on-site.

7          So if we were to modify that second sentence

8     to say:  DNV shall use its best efforts to give OEM at

9     least seven days' notice, that's fine, provided that we

10    then add a sentence that says:  If it is less than seven

11    days, Cameron or OEM will use its best efforts to get

12    the personnel on-site as requested.  Something along

13    those lines.

14         MR. GASAWAY:  I'm fine with that.  We have

15    the word reasonable.  And, just to move the MDL along, I

16    think this colloquy in front of you is enough.  We agree

17    to that.  But if Your Honor wants to amend and

18    recirculate, we're happy to do it.  Whatever.

19         THE COURT:  I'm happy to go with our

20    understanding, and what you can do is modify the

21    contract accordingly.  But I think we've got a deal on

22    that issue.

23         MR. GASAWAY:  Okay.

24         THE COURT:  Okay?

25         MR. GASAWAY:  And then so I guess --

1          THE COURT:  The other issue was -- David,

2    you raised a second issue that I wasn't sure I was clear

3    on.  What was the second issue?

4          MR. GASAWAY:  Just our understanding that

5    it's DNV that has to request this additional --

6          THE COURT:  Yeah.  And, David, I wasn't sure

7    I understood your response.  Can you try me again?

8          MR. JONES:  Sure.  It was just simply that

9    we had received this request for information and

10   materials yesterday afternoon, and I just wanted the

11   protocol to reflect that, first, the information and

12   materials DNV is requesting from the OEM to perform the

13   tasks that are outlined in the protocol are identified,

14   and I had put them in as an Appendix B so that we knew

15   specifically what we're talking about.  Because there

16   are various references throughout the document of the

17   information, and I didn't want it to be some open-ended

18   request for information.  I wanted to know specifically

19   what we were being asked to give.

20          And then the second was, and the language

21   that I had put in my draft was:  That the OEM will use

22   its best efforts to identify and/or before May 2, 2011

23   the information and materials on Appendix B that it will

24   and will not provide to DMV.  And this goes back to the

25   question of identifying things that either don't exist

1    or we can't provide; or, if there are particularly

2    sensitive confidentiality concerns, that we can address

3    those with the Court or otherwise to make sure that the

4    information that's being requested here is actually

5    information that will drive this testing forward.

6              So those were my additions to the end of the

7    protocol with respect to the request for materials and

8    information.

9              THE COURT:  Okay.  And, Rob, you want to

10   talk about that?

11             MR. GASAWAY:  Yeah.  These are two different

12   issues, just to be clear.  So, in terms of the DNV part

13   of the test, we want to make absolutely clear, this is

14   all DNV, and we're just kind of being the conduit and

15   paper distributor.  So, to the extent that Cameron wants

16   to go to the DNV and say:  You've got a long list on

17   this attachment and it turns out you don't need it or

18   you can get it some place else, obviously they can do

19   that and we're agreeing with it.

20             The thing that we're worried about here was,

21   thinking about the two parts of this conversation that

22   we had, we started out by saying we're starting out on

23   Monday, the 18th, and we've got to crash, we've got to

24   get coordinated, we've got to make sure the right tools

25   are there, give notice to everybody, Mike's going to

1   step in there and help out.

2           Yet, the May 2nd date that we saw in the

3   document, we'll get back to you on May 2nd and tell you

4   which of these things we can and cannot do, and I just

5   don't see how that marries with all of the rest of the

6   discussions that we've been having this morning.

7           THE COURT:  Let me ask you about that,

8   David.  My ears did perk up when I heard May 2nd.  Is

9   there a reason for the delay?  Is there something

10  particular that's preventing review of the list and

11  responding sooner?

12          MR. JONES:  No.  The May 2nd was picked out

13  because I think it took us two weeks from the starting

14  of the test.  This is, for all intense and purposes, a

15  document request.  And I didn't -- I wasn't going to

16  stand and say:  I need 30 days to respond to this under

17  the federal rules.  But I do think I need some time to

18  get with my folks -- and I've already passed this on to

19  the appropriate people -- but to be able to say this

20  does exist or this doesn't exist or we can't get it and

21  this is why and or these are materials that we don't

22  think you need and here's why.  And I just do need a

23  little bit of time to do it.

24          This information will not, and all of these

25  materials, will not be sitting at Michoud on Monday.

```
 1    That is impossible.
 2               THE COURT:  Everybody understands that.  No,
 3    no.  I'm with you.
 4               MR. JONES:  And so all I was trying to do by
 5    saying the 2nd, I think it was just two weeks, which I
 6    thought was a reasonable amount of time.  If we need to
 7    shorten that, that's fine.  But that was the date that I
 8    threw out there for discussion purposes, and we're
 9    having the discussion now.
10               THE COURT:  Right.  We are.  And no problem.
11               Why don't we do this.  Why don't we agree
12    that you all are going to make your review as soon as
13    possible; and, if you get information, to provide it on
14    a rolling basis.  So, if you look at an item and you
15    find that it is available, you know, you go ahead and
16    make arrangements and let everybody know arrangements
17    are being made.
18               If you look at an item and you know it's
19    unavailable -- and I think we spoke about a couple
20    yesterday that you believe are unavailable -- go ahead
21    and let's get it out there for DNV to think about what
22    else they can do.
23               Then, last but not least, do you think that
24    there's any possibility we could move the date up to,
25    for instance, close of business on Monday, the 25th,
```

1    which would be a week into the protocol, but having

2    responses on a rolling basis prior to that?

3              MR. JONES:  That's fine, as long as there's

4    some best efforts language in there.  I don't want to be

5    after the 25th on a particular item of information and

6    have someone come back and yell at me saying that I've

7    violated a court protocol.

8              THE COURT:  No.  We'll be glad to insert

9    best efforts.  We're all working under pressure, and we

10   all understand the pressure that this is putting on

11   Cameron.  So that will be fine.

12             MR. JONES:  Okay.

13             MR. GASAWAY:  So, David, in reviewing your

14   draft -- and, again, I'm sorry we didn't have a chance

15   to talk off-line -- I think the only other issue that I

16   saw in there that we haven't talked about this morning

17   is in the nature of what we're talking about here,

18   disclosure of information that's within your purview.

19   And that's the test No. 10 that has to do with the

20   portable electronic testing units that are obviously

21   proprietary to Cameron.  As I understand it, the group

22   in a meeting that you were at, that I was unable to

23   attend, you know, this was discussed, and we had the

24   language in there that said:  Disclose the description

25   and capability of these PETUs that were used for various

1    tests.

2              And, just for Your Honor's information, I

3    don't know if you're looking at the red-line version

4    that we sent around last night?

5              THE COURT:  No, I'm not.  I don't think that

6    was shared with me.

7              MR. GASAWAY:  I'm sorry.  Maybe that was

8    just for counsel.

9              It should be on page 18 or so.

10             THE COURT:  It's part 10?

11             MR. GASAWAY:  Yes.

12             THE COURT:  Yeah, I got it.

13             MR. GASAWAY:  So analysis and determination

14   of comparison and inconsistency of the PTE units used.

15             The DMV report, to make a long story short,

16   took an important issue of this selenoid 103, and they

17   did some tests using Cameron equipment, and they get

18   what they said was inconclusive results.  And there's

19   been a lot of focus on this selenoid 103 ever since it

20   was called in the internal investigation report by BP.

21   And there was also some testing done prior when the

22   control pods containing the selenoids were brought up

23   over the summer and tested out out in the water.

24             And what we're trying to do is just look at

25   this universe of tests and say:  Why did we get what DNV

1    described -- and other parties may differ from that

2    description -- but DNV described it as inconclusive.

3    And one of the thoughts was to look at the actual

4    Cameron testing equipment that was used at the various

5    times for the various solenoids.

6           So this is not -- I want to be clear, maybe

7    this can help Mr. Jones -- this is not something where

8    we're asking them to sort of be hands-on or do more

9    testing or Cameron to take over and opine on the reason.

10   All we're asking them to do is just disclose information

11   about the proprietary information about the PETUs of the

12   OEM.  That's what the issue is.

13          And I know Mr. Jones has a concern about it,

14   but I thought I'd tee it up.

15          THE COURT:  All right.  Good.

16          Let's hear, David, what your position is on

17   this provision.

18          MR. JONES:  I think this is pretty easy,

19   Your Honor.  Our main concern was, with this provision,

20   was again really the placement of it and talking about

21   the specific language that Cameron will have to do most

22   of this investigation.  Which again suggests that this

23   is our testing as opposed to someone else's.

24          I think we resolve this if we take this

25   provision out of the agreement and put what is currently

1    identified as Section 10-B, the procedure, the two

2    pieces of information that they're asking for, move that

3    to DNV's request, if it is DNV who's requesting it, and

4    put it in and make that part of the request for

5    information and materials.  And we can provide that as

6    we provide the other information and materials that's

7    requested in this document.

8              MR. GASAWAY:  That's fine, David.  And,

9    since you're be cooperative, I'll even strike the

10   sentence that you don't like:  Cameron will do most of

11   this.  We'll have one sentence describing the tests, and

12   we'll strike the procedure, if you like, and put that in

13   the appendix.

14             MR. JONES:  Yeah, I think that works.

15             MR. GASAWAY:  All right.

16             THE COURT:  Anything else that we need to

17   cover?

18             MR. JONES:  The only other issue and the

19   only other thing we took out of the protocols, Your

20   Honor, was just a sentence at the very beginning of the

21   protocol about Cameron procedures including disassembly,

22   assembly, testing procedures, schematics, drawings

23   should be reviewed in developing the final procedures

24   for implementation.  And we struck that simply as

25   unnecessary; and, again, because I didn't want it to

1  create the impression that this is Cameron testing.  And

2  I don't believe it's necessary.  And so I would ask that

3  that be removed from the protocol.  There's various

4  requests for information, so it's apparent that people

5  are going to be looking at that type of documentation,

6  but I just did not like it at the beginning and the

7  impression that I felt that it left.

8            MR. GASAWAY:  I'm fine with that.  I'm a

9  little -- I mean, two concerns.

10            I mean, one, I'm glad that the concern here

11  isn't on the availability of information.  Which, when I

12  saw the red line, I was concerned with.  So I just want

13  to make that clear, David, that the concern here is just

14  with the impression it's leaving, not with the idea that

15  this information should be made available to DNV and the

16  technical working group.

17            MR. JONES:  No, that's not the issue.  It's

18  just the impression that I felt that it created as

19  putting this thing as frankly the first sentence in the

20  protocol.

21            MR. GASAWAY:  Okay.  Then here's what we'll

22  do, is we'll take it out of the protocol, again, to move

23  this forward.

24            But the reason I think it was in here was,

25  as we're talking about the coordination issue that you

1    and Mr. Underhill and others were talking about, what we

2    would like to do is tell the experts who are coming, you

3    know, you've got some summer reading before fall term

4    ends.  And sort of, for a lot of different tests, we

5    just wanted everybody to know that these protocols are

6    going to be interpreted and implemented against a

7    background of obviously the equipment manufacturers.

8            So, as long as you don't have the problem

9    that that is kind of an inaccurate statement of what

10    people should be doing, and we're free do that, I don't

11    think it needs to be in the protocols.

12            MR. JONES:  Okay.

13            THE COURT:  And I assume all of this is

14    listed on the appendix?

15            MR. GASAWAY:  So let's make that clear on

16    the appendix.  This is something else.

17            THE COURT:  Make it clear on the appendix.

18            MR. GASAWAY:  Exactly.  Good idea.  Right.

19            THE COURT:  DNV wants access to this.

20            MR. GASAWAY:  Right.

21            THE COURT:  And David has no problem with

22    that, so we'll just add it to the list.

23            MR. GASAWAY:  Okay, Your Honor.  That's an

24    excellent suggestion.  Thank you.

25            THE COURT:  David, is that okay with you?

1              MR. JONES:  I think so.

2              THE COURT:  Look, all of this obviously is

3    under a protective order.  It's to be used for no reason

4    other than this litigation.  If you need further

5    assurances with regard to that, let's talk about it.

6              MR. JONES:  Okay.  Well, I guess what I

7    envision here is some modifications to the protocol and

8    actually including this Appendix B.  And it sounds like,

9    based on this conversation, we're there.  If not totally

10   there, we're within inches.  And I'd like the

11   opportunity to look over it one more time to say either

12   yea or nay; and, if I have issues, address them with

13   Rob.  But I think we'll be able to work them out.

14             THE COURT:  I do, too.  I think it's been a

15   helpful discussion, and I think we're there.  But, if

16   we're not, I agree that it's inches.

17             So, all systems go.

18             MR. GASAWAY:  Can I make one procedural

19   suggestion?

20             THE COURT:  Sure.

21             MR. GASAWAY:  I do think that BP is going to

22   want an official order out of the Court approving the

23   contract and approving the protocols in conformity of

24   what was contemplated on the March 25th order.  So what

25   I would suggest going forward is a couple of tracks.

1          Number one, we understand the logistical

2    need to get the word out in an APB, and our team will be

3    working on that.  Ms. Heller is also here.

4          THE COURT:  I think we have a verbal

5    contract, how about that?

6          MR. GASAWAY:  Okay.

7          And then the second thing I'd like to do is

8    finalize these documents and maybe present an order to

9    the Court on Monday to say here's the final final, and

10   there's attachments, there's multi-layers.  And just so

11   we all know what we're talking about.

12         THE COURT:  I think that's fine.  And I do

13   think we can proceed.

14         And, David, unless you disagree, I think we

15   can proceed with the understanding that we have a verbal

16   contract, subject to working out any final written

17   contract details.

18         MR. JONES:  Yeah, okay.

19         THE COURT:  Okay?

20         I think that's it.  Unless anybody else has

21   anything they want to say.

22         MR. COHEN:  This is Mark Cohen.  Thank you

23   for that last comment.  I will share that with my

24   clients and assure them that we are acting under the

25   Court's auspices, and we'll move forward as quickly as

```
1    we can.

2                 THE COURT:  Absolutely.  I appreciate it.

3    We're starting on Monday.  Off we go.

4                 MR. COHEN:  Thank you, Judge.

5                 THE COURT:  Thank you, Mark.  Appreciate it.

6                 MR. LANGAN:  Thank you, Your Honor.

7                 THE COURT:  Bye, guys.

8                 (12:20 p.m., Proceedings Concluded.)

9

10

11                         CERTIFICATE

12

13

14

            I, Susan A. Zielie, Official Court Reporter, do
15   hereby certify that the foregoing transcript is correct.

16

17

                       /S/ SUSAN A. ZIELIE, RPR, FCRR
18                     _____
                         Susan A. Zielie, RPR, FCRR
19

20

21

22

23

24

25
```