UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * * | MDL NO. 2179<br><br>SECTION J |
| THIS DOCUMENT RELATES TO: | * | JUDGE CARL J. BARBIER |
| *ALL CASES IN PLEADING BUNDLE SECTION III.B(3)* | * | MAG JUDGE SALLY SHUSHAN |
| * * * * * * * * | | |

**REPLY MEMORANDUM OF INTERNATIONAL AIR RESPONSE, INC. IN SUPPORT OF RULE 12 MOTIONS TO DISMISS**

May It Please the Court:

**The Rule 8 Pleading Standard, When Applied Within
The Context of This Case, Supports the 12(b) Motions As to IAR**

### Introduction

The plaintiffs' response fails to clarify, and in fact, seeks to blur Rule 12 examination of the claims against IAR by repeatedly characterizing the B-3 complaint as a set of claims against a monolithic set of "defendants" or "responder defendants," and suggests that there should be no paring away of defective claims at this stage of the case. Yet this imprecise approach seeks to unilaterally avoid the very scrutiny that *Twombly, Iqbal* and now *Matrixx* requires of the complaint *at this stage*. Even worse, it seeks to obliterate and neuter the *reasons* why the Supreme Court *desires* that defectively pleaded claims be scrutinized early on. The scrutiny is pointed and party-specific, as otherwise, mere prolixity and vagueness in a complaint would itself preclude enforcement of Rule 12 as is required by the Supreme Court. Defendants like IAR would be unfairly oppressed merely by having to defend complex sets of claims like in this case, especially, where claims are included that are not plausible in the specific context in which

they are made. One size does not fit all in either clothes or claims when made generically against multiple parties. The whole point here is that IAR should not have to be oppressed by discovery by being made to wait and seek dismissal of deficient claims by summary judgment, particularly in such a complex case where discovery itself will be oppressive and the schedule is so jammed with parties and issues as to render summary judgments a practical nullity. The opinions in *Twombly* and *Iqbal* would have never been issued had the Court not desired to emphasize that Rule 12 is not mere surplusage, and that a separate and early filtering process exists through Rule 12 by which to *avoid* imposition of the costs of discovery and further motion practice. *Twombly* specifically looked at the need for protection of defendants in antitrust cases from being burdened with the usually burdensome and expensive discovery that goes with allowing vague and implausible claims to proceed anyway.

This same reasoning of *Twombly* applies here, and in spades. Just by letting the case proceed against a small actor like IAR, despite the absence of plausible claims having been articulated against it, under the logic that summary judgment is available after discovery, IAR will be greatly prejudiced, left in the astonishingly complex discovery now ongoing on triple track depositions, facing the threat of financial annihilation while being blown about like a cork on a stormy sea.

Conclusory allegations are not enough. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Plaintiffs have not gainsaid this principle, yet attempt to proceed against IAR based solely on conclusory allegations that are not plausible in the known circumstances presented. The PSC has not overcome the principle that the allegations must be then viewed for plausibility in light of the applicable *law flowing from the specific context of the claim* pleaded. It must be plausible *as against that particular defendant*. If not, the claim must be dismissed *now*.

The context of the actions of IAR alleged cannot be ignored or subjected to fanciful or imaginative expansion or vague homogination. Avoiding the prejudice of holding "swords of Damocles" over the heads of defendants against whom an implausible claim is pleaded is exactly what Rule 12 is designed to accomplish. Here, plaintiffs have pleaded the "response defendants" claims against IAR, admitting its limited role as operating one aircraft that applied dispersants into oil slicks in the open sea. They have to admit that IAR acted solely as part of the remediation efforts for this Spill of National Importance that was specifically anticipated by the Clean Water Act, as well were authorized by the Coast Guard as the On-Scene Coordinator. Plaintiffs admit that the Coast Guard approved of deployment of Corexit® in its role as On-Scene Supervisor, which itself was provided for *by Congress*, yet seek, *with wholly conclusory allegations*, to hold IAR liable for any effects of Corexit® from being on the water or oil as "negligence per se" and then somehow as being grossly negligent or having acted "deliberately" so as to justify punitive damages. Contradicting the language and intent of the Clean Water Act itself, plaintiffs even suggest that use of dispersants in accordance with the required cleanup, and pursuant to the federal over sight required by the CWA, somehow violates the Clean Water Act. Doc. 1815 at p. 35-36. This suggestion, made with no supporting case law, is, on its face, is a preposterous one. These claims IAR seeks to have dismissed.

Plaintiffs suggest that the Supreme Court trilogy on Rule 12 do not give cause to dismiss any of their claims against *any* of the defendants. A look at the cases suggests otherwise, at least as to IAR. *Twombly* says that it must be reasonable to see the claim as leading to liability – not a mere possibility. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). In *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), the Court reiterated that Rule 8 requires "more than an unadorned, the

defendant-unlawfully-harmed-me accusation." 550 S.Ct. at 1949. The Court, of course, required that the Rule 12 review be made in the specific contextual landscape of the claim at issue.

In *Iqbal*, the Court extended the costs rationale of *Twombly* to the protection against "the heavy costs in terms of efficiency and expenditure of valuable time and resources that might otherwise be directed to the proper execution of the work of the Government." 129 S.Ct. at 1953-4. Further, the Court spoke to protecting against evasion or oppression to affirmative defenses available as a matter of law under the claims pleaded, that would occur as a practical matter, by not granting Rule 12 dismissals early on where they should be. 729 S.Ct. at 1593. Given the manner in which the limitation proceeding portends dragging IAR through a devastating discovery and trial gauntlet, the need for early rejection of any defective aspects of the PSC's claims is even *greater* here.

Plaintiffs suggest that the Zicam securities fraud case, *Matrixx Initiatives, Inc. v. Siracusano*, ___ U.S. ___, 2011 WL 977060 (3/22/11), retracted the teeth of *Twombly* (550 U.S. 544) and *Iqbal* (556 U.S., 129 S.Ct. at 154). A look at *Matrix* shows that it turned on the securities fraud issue of whether adverse incident reports for the main product were "material" as a matter of law. *See* slip op. at *8 - *13. The Court found there that *given the specific circumstances and nature of that market* that the specific allegations of withholding negative information while issuing press releases denying a problem raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement." *Id.* at *12. The holding and reasoning in *Matrixx* does not, however, absolve plaintiffs of their having asserted implausible claims *here*, against IAR.

The context of each case in applying *Twombly* is unique. The mere fact that *Matrixx* found a claim was stated there, in itself, offers nothing useful to the Court *here*. Identifying the

4

specific contours of the applicable law is a principle recognized in *Matrixx* that is clearly the first step of the *Twombly* scrutiny process. It is this part of the "holistic process" that drives IAR's particular 12(b) motion.

### The 12(b)(6) Should Be Granted to IAR on the Claim That IAR Is Liable For Alleged Exposures to Dispersants Arising From the Presence of Dispersants in the Water

In the instant case, plaintiffs have pleaded, admitted or the following are properly judicially noticed from the complaint:

- Congress did evince a specific federal interest in oversight and handling of large oil spills (*i.e.*, "spill of national significance") in the Gulf of Mexico in enacting both OPA and the related amendments to the Clean Water Act. *See* 33 U.S.C. § 1321.

- IAR had nothing to do with the selection or approval of use of Corexit® in the response to reduce the chance of oil fouling the shoreline.

- That IAR had nothing to do with oil being present on the water.

- That the MSDS information on Corexit® quoted in the plaintiffs' petition was public information actually known to the Coast Guard, EPA and everyone who actually approved its use in this spill.

- That use of dispersants was specifically listed and intended to be part of Congressionally-required pre-event spill response planning. *See* 33 U.S.C. Part 300, subpart J.

- That the Coast Guard exercised the very power given by Congress to it to oversee and control the specific responses to a Spill of National Significance, approved use of Corexit® as part of the response both sub-sea and on the surfaces. Admitted in PSC Oppos. Brief at p. 6.

- IAR's involvement in applying Corexit® was on the open sea and was approved in that endeavor by Coast Guard in its Congressionally-appointed role as On-Scene Coordinator of the response to *this* spill.

These facts are established before the Court for the purpose of the 12(b) motion by virtue of the contextual allegations of the B-3 bundle master complaint and the face of the federal laws implicated by those allegations. They are extremely important to the critical threshold task of "separating the wheat from the chaff" *as to IAR*, who is *not* properly treated if allowed to be cast

5

as part of some monolithic amalgam of all defendants or even be considered the same as all of the "responder" defendants. Its specific role, as pleaded, is extremely narrow and the most limited of all defendants, and who presents in a context here which fully supports dismissal of several claims made against IAR all pursuant to Rule 12(b)(6).

Putting aside for the moment the issue of medical monitoring claims, which will be addressed separately, the upshot of the foregoing is that there <u>obviously</u> has been pleaded no claim upon which relief may be granted *against IAR* which complies with *Twombly's* reasonable basis threshold as to:

1. IAR being liable for punitive damages;

2. IAR being liable for negligence, negligence "per se," and/or strict liability for any damages for injuries alleged to result from Corexit® exposure to persons and to its presence *in the water*, because that dispersant was there as part of the Coast Guard-approved response to the ongoing spill;[1]

3. IAR being liable for failure to warn VoO or other response vessels and crews on the sea, given that IAR had no alleged or actual coordination, management or oversight of the response assets, and those who did were, as alleged, aware of the same information as to the properties of Corexit®;

4. IAR being liable for gross negligence on *any* claims made it against it [if any particular plaintiffs provided specific allegations establishing *knowing* and *direct* spraying of Corexit® onto their bodies,[2] this, and *only* this, might escape a Rule 12 challenge. No other fact context of a claim could plausibly suggest discovery establishing gross negligence on the part of IAR.];

5. IAR being liable for cleanup costs as a "polluter" under the CWA.

---

[1] This is to be distinguished from any alleged purposeful spraying of Corexit® directly upon the skin of a person known by IAR to be located at the time on the sea beneath the flight path of a *spraying* aircraft.

[2] As matters now stand, no particular plaintiff has properly alleged any such scenario involving IAR. It is merely possible that much could be pleaded in the future, which falls short of the *Twombly* threshold. It is not possible for IAR to be held liable for gross negligence or deliberate indifference as to any claims arising from the mere presence of Corexit® in the water or mixed with oil due its having been applied to the oil slicks.

### (1) Derivative Immunity

PSC admits that the government is entitled to immunity pursuant to the express provision in the CWA, 33 U.S.C. § 1321(j)(8) for "its actions and omissions relating to any response plan required by [the CWA]." Doc. 1815, at p. 23. PSC admits that the plan approved by the government included use of dispersants, and that the On-Scene Coordinator after April 20, 2010 approved aerial-applied and sub-sea dispersants. It then argues that "case-specific" factual analysis is necessary, making no claim appropriate for a 12(b) disposition.

Given IAR's limited involvement as merely one who executed the decision to use Corexit® applied aerially to oil slicks at sea in accordance with the approvals of the government, several claims and categories of claims *are* appropriate for a 12(b)(6) dismissal, *at least as to IAR*.

The "carve-out" pointed out by the PSC to the express exemption provision of the CWA (for personal injury) does not eliminate at all the concept of derivative immunity; nor does it affect at all the conflict preemption doctrine in its applicability to the issue of whether tort liability under maritime (or state) law will be recognized and allowed against someone like IAR for doing exactly what the government approved of both as to anticipatory response to a spill using Corexit®, but also where the On-Scene Coordinator specifically approved its use during and for *this* spill.

PSC seeks to steer clear of the shoals of the *Yearsley* derivative immunity that clearly applies to non-government entities, like IAR, who help the government accomplish its desired and specific goals. IAR, under the pleaded claim, was a contractor hired solely to *carry out* the decision of the On-Scene Coordinator to use dispersants to mitigate damage to the shore and

environment. The acts complained of "fell within the scope of the government directives." Thus, these requirements of *Yearsley*, 309 U.S. at 21, are satisfied.

While *Doyle*, cited by PSC, dealt only with a subset of the government contractor defense applicable to *manufacturers*, and thus its specific requisites do not apply to IAR, it still articulates an important qualifier that supports IAR's 12(b)(6) dismissal – that holding IAR liable generally for any injuries allegedly caused by the presence of Corexit® on the water or oil into which it was applied will "frustrate specific objectives of federal legislation." 487 U.S. at 507. What more disruptive to accomplishing the spill *response* that Congress demanded through the CWA than to have *federal* maritime law be crafted to hold the contractors like IAR subject to claims set forth in the B-3 complaint, for which they are first liable *to defend,* and potentially be bankrupted by having to pay damages for any alleged injury caused by merely having executed that part of the approved response plan involving aerial application of dispersants to on-sea oil slicks?

No one will participate again with such a sword of Damocles hanging over his head. This directly frustrates the express Congressional policy that (1) the government oversee response efforts necessitated by Spills of National Importance, and (2) that the government decisions as to the response be carried out, and done expeditiously, without fear of retroactive or strict liability. Decisions made as approved by the On-Scene Coordinator are to be accomplished – with government immunity against after-the-fact second guessing for which the legal system is so famous. Why else would the government be given a broad immunity? IAR is entitled to share it under the *pleaded* circumstances.

PSC cites the FTCA discretionary function test as precluding a dismissal here for need for fact development. Yet this is not the FTCA, whose standard for discretionary function is

inappropriate to engraft onto a much different CWA scheme as the PSC suggests. *See* Doc. 1815, at p. 32. The CWA, for Spills of National Importance, chose to favor decision making over hind-sight perfection and related recriminations. OPA, of course, imposes liability for the economic damage the oil causes on the defined set of Responsible Parties, a consideration that is part of the definition here of the governmental interests for purposes of derived protection for non-Responsible Parties like IAR, who merely execute the decisions approved by the federal coordinator.

### (2) No Cause of Action Exists Here to Hold IAR Liable for General Exposure to Oil and Corexit®

Plaintiffs fail to state a factual basis, within the stated and well-known context of *this* case, of liability of IAR arising from its having applied Corexit® on the oil found *on the seas*. IAR specifically made this challenge in its 12(b) (Doc. 1404 at p. 15), and plaintiffs' opposition fails to rebut IAR's position. PSC admits (*see* pet. at ¶ 92 and ¶ 109) that the Coast Guard "supervises and coordinates response actions" as part of its duty to implement OPA, and approved BP's use of chemical dispersants." Finally, PSC fails to gainsay or rebut that the Federal On-Scene Coordinator "directs all response actions" and "is the ultimate authority." *See* fn. 18, p. 20 and p. 9 of IAR's opening brief. Nor do plaintiffs gainsay that the Coast Guard gave specific approvals for use of Corexit® as a dispersant, and only contests that the Government *required* use of Corexit®, a distinction of no moment as to the merits of IAR's motion. Since plaintiffs do not allege and do not and cannot contest that IAR did *not* make any *decisions* to select Corexit® for use as part of the Response, in the context of an admitted Spill of National Significance whose response was overseen by the Coast Guard as desired and directed by Congress, the complaint fails to *plausibly* establish a basis for liability *of IAR* here for any claim for liability, much less gross negligence or recklessness or deliberate indifference,

arising from Corexit® being on or in the oil/water post-spill, as part of a response modality that was decided upon by others, including the Coast Guard On-Scene Coordinator. That claim, including for both punitive and compensatory damages based on use of Corexit® as a dispersant should thus be dismissed as to IAR.

As for the *potential* of their actually being direct-sprayed claimants, it is not plausible that the existing, generalized, allegations could establish such liability. Even the opposition brief indiscriminately lapses time and time again into generically describing all defendants as if they were identical. The only possible claims against IAR would be individual claims wherein a unique place, time and circumstances would exist and be so pleaded. Indeed, no specific person says he was directly sprayed by IAR, and given its role limited by both time, date and location of spraying, it is *impossible* that IAR could be liable to all or even more than a handful of potential plaintiffs. Thus, the failure to establish facts pertaining to a single claimant is thus also fatal as to any potential direct spraying plaintiff. Unlike the general response claims, as to which amendment would be futile as to IAR's right to dismissal, IAR has no problem with plaintiffs amending to plead as many specific claims (with date, time, location and specifics of the exposure volume) of *direct* Corexit® spraying onto humans, with facts supporting claims of knowledge by IAR of such plaintiffs' being present. As matters stand, Rule 8 is not satisfied, and it would be extremely prejudicial, not to mention improper, for IAR to be required to defend, based on the generic allegations of the master complaint.

The PSC comes on strong in suggesting that "negligence per se" claim as including everyone within its scope. Yet it provides not one set of facts that would plausibly allow (1) the recognition of such a doctrine in maritime law applicable to a limited responder like IAR, especially given the admitted facts outlined above. When the contingency plans *required* by

Congress *include* use of dispersants applied to floating oil slicks, and the On-Scene Coordinator having approved aerial and sub-sea application to the Macondo well spill in particular, how can there be a *plausible* claim against IAR for negligence per se? PSC's suggestion that such aerial application of dispersants itself constitutes a "discharge of a pollutant" (Doc. 1815 at p. 42) prohibited by the CWA is not plausible at all. Indeed, it is directly contradicted by the CWA's express policy, *applicable to oil spills* that there *be* a planned and actual response, and that use of dispersants were to be part of the contingency plan. Thus, the "negligence *per se*" claims against IAR are wholly implausible and must be dismissed along with those for negligence, gross negligence and for punitive damages.

### The Lump-Sum Medical Monitoring Claim Under Florida Law Should be Rejected As a Matter of Law

*Miles v. Apex Marine Corp.*, 498 U.S. 19, 29, 111 S.Ct. 371 (1990), restricted the scope of damages allowed to a seaman arising out of his wrongful death in order to ensure uniformity of maritime law with Congressionally-suggested Jones Act remedies. Just because a person is a mariner or is injured on the sea does not entitle him or her to cherry-pick the most liberal rights of recovery on each item sought recovered or made the subject of a claim. In particular, looking to law of a given state which maximizes recoveries or expands causes of action is no panacea. On this issue, the Fifth Circuit in *Scarborough v. Clemco Industries, Inc.*, 391 F.3d 660, 666-667 (5th Cir. 2004), specifically rejected the same argument which plaintiffs posit at page 13 of their opposition, *i.e.*, that the holding and reasoning in *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 116 S.Ct. 619 (1996), allows the use of state law to high-seas injuries as against *non-employer* defendants. Moreover, even would *Yamaha* apply, it would require that the *Louisiana* law, precluding medical monitoring claims of those plaintiffs who are Louisiana citizens. The same would go for citizens of Alabama, Mississippi and Texas.

*Scarborough*'s holding should end the ability of plaintiffs to argue here for application of Florida state law to any water-based plaintiff, much less all plaintiffs. Moreover, no particular plaintiffs alleged they were injured in Florida territorial waters, and most were from Louisiana, thus also eliminating the factual congruity of the instant case with *Yamaha*. The Court should first look to the closely related FELA-based decision on the issue of medical monitoring. *Yamaha* is of no support.

### **Buckley Provides Guidance**

It is incumbent on the Court sitting in admiralty to not only respect but to fully implement both the letter and spirit of the "uniformity principle" discussed in *Miles* and *Scarborough* in light of the Supreme Court's ruling in *Metro-North Commuter Railroad v. Buckley*, 521 U.S. 424 (1997).

*Buckley* decided whether the FELA would include within its remedies allowance of recovery of a sum to cover the future medical monitoring of a worker who was exposed to asbestos but who had no present physical injury manifestations. FELA, as the Court knows, is applicable to seamen via the Jones Act, and thus the ruling in *Buckley* is extremely relevant to the issue, here, of whether the Court should engraft into maritime law Florida law that is wholly contradictory not only to the considered judgment of the vast majority of states who have addressed the issue, and to modern trends, but also the federal common law as was held by the U.S. Supreme Court in *Buckley*.

Plaintiffs attempt to sidestep the obvious implication here of *Buckley* by pointing out that the Jones Act is "in addition to" maintenance and cure, thus supposedly distinguishing itself from FELA. Maritime law already has maintenance and cure for seamen *as against their employers* – whose duty of special solace is toward seamen under their control is long

recognized, but which still does not result in an "anything goes" attitude of either Congress or the courts in terms of legal remedies. The "cure" in maintenance and cure is the right to receive medical services necessary to treat injuries illnesses to maximum cure. *E.g., Holmes v. J. Ray McDermott & Co.*, 734 F.2d 1110 (5th Cir. 1984); *Pelotto v. L & N Towing Co.*, 604 F.2d 396, 400 (5th Cir. 1979). But, as plaintiffs admit, the claims here are not currently against the plaintiffs' vessel employers (*e.g.*, owners of the VoO boats). Thus, they occupy a *less*-protected position than that of a seaman *vis-à-vis* his employer. Even seamen do not get from their employers rights to get lump sum medical monitoring recoveries. They get *treatment for actual, manifested, injuries* on an as needed basis, until maximum cure. *Id.* So why should plaintiffs here be entitled to *more*?

Plaintiffs ask this Court, by denying the Rule 12(b)(6) dismissal of the Florida-law medical monitoring claims, to recognize the right of every plaintiff to seek an unusual right to a lump sum recovery for medical monitoring based solely upon alleged exposure, and with no actual physical manifestation or disease or syndrome. The modern view of medical monitoring as a stand-alone claim which predominates today across the country, and which governs the rights of *virtually all* of the citizens allegedly affected by this spill (*i.e.*, Louisiana, Mississippi, Texas and Alabama) *rejects* hypothetical and broad tort-based medical monitoring claims that seek lump awards for medical monitoring of those who do not have physical manifestations or disease diagnoses that individually require specific tests as part of treatment. If the legislatures or courts of Louisiana, Texas, Mississippi and Alabama reject a separate medical monitoring cause of action, and whose citizens probably comprise 99%, if not the entirety, of the claimants, why should this Court push an inapplicable and outlier Florida statute into being part of the general maritime law?

Physical injury and/or disease diagnosis with individualized need is required for sailors seeking "cure," and under the laws of the great preponderance of the states, as well as under the FELA. This approach is reasonable and should be the *least* of the thresholds imposed in maritime law for <u>including</u> tests as part of any medical care costs that are recoverable.

IAR suggests that medical monitoring as a separate cause of action in favor of persons with no demonstrable physical manifestation of disease or injury <u>not</u> be recognized and that the issue of medical treatment be treated as it has for time immemorial - what *treatment* is necessary as a result of the proven tort, determined on a case by case basis, based on each person's diagnosis of disease, *i.e.*, physical manifestation of a process that is reasonably susceptible to treatment recognized by established medicine.

IAR obviously touched a nerve in terming the Florida law approach to medical monitoring an "outlier," but the description is accurate. The PSC cites decisions from four states that allow the claim to proceed based on proofs of substantial exposure, but not necessarily physical manifestation of a related disease process as an additional essential element. These do represent a minority position among the states which have addressed the issue, with some 15 of a total of about 20 having gone the other way, similar to and for the persuasive reasons articulated by the U.S. Supreme Court in *Buckley*.[3] For the PSC's strident denial of "outlier" status of the Florida statute it seeks to be cherry-picked into general maritime law, *Buckley* would have to be an outlier itself, which review of the case law shows it to be entirely mainstream.

Many state legislatives (including Louisiana's) and most courts addressing the issue under the common law, have rejected medical monitoring claims of persons exposed to some toxic agent but who have no "clinically demonstrable presence of the substance in their bodies or

---

[3] Also, as the court in *Norwood v. Raytheon Co.*, 414 F.Supp.2d 659, 667 (W.D. Tex. 2006), the modern "trend" is to reject this cause of action.

a clinical diagnosis of a disease process caused by the exposure – *i.e.* "physical manifestation." *See, e.g., Edwards v. State ex rel. Dept. of Health & Hospitals for SE Louisiana State Hospital at Mandeville, La.*, 2000-2420 (La. App. 1 Cir. 12/18/01), 804 So.2d 886, 887, *writ denied sub nom, Edwards v. State ex rel. Dept. of Health & Hospitals for SE Louisiana*, 2002-0318 (La. 4/26/02), 814 So.2d 557 (damages do not include costs for future medical treatment, services, surveillance or procedures of any kind unless such treatment, services, surveillance or procedures are directly related to a manifest physical or mental injury or disease); *Paz v. Brush Engineered Materials, Inc.*, 949 So.2d 1, 3 (Miss. 1/4/07) (creating a medical monitoring action would be contrary to Mississippi common law); *Hinton ex rel. Hinton v. Monsanto Co.*, 813 So.2d 827, 829 (Ala. 9/14/01) (Alabama law has long required a manifest, present injury before a plaintiff may recover in tort); *Henry v. Dow Chemical Co.*, 473 Mich. 63, 701 N.W.2d 684 (Mich. 7/13/05) (without physical injury, there can be no valid negligence claim); *Badillo v. American Brands, Inc.*, 117 Nev. 34, 44, 16 P.3d 435, 441 (2001) (holding that Nevada common law does not recognize a cause of action for medical monitoring); *Wood v. Wyeth-Ayerst Laboratories, Div. of American Home Products*, 82 S.W.3d 849, 859 (Ky. 2002) ("Thus, having weighed the few potential benefits against the many almost certain problems of medical monitoring, we are convinced that this Court has little reason to allow such a remedy without a showing of present physical injury"); *Trimble v. Asarco, Inc.*, 232 F.3d 946, 963 (8th Cir. 2000) (indicating that Nebraska law does not recognize either a cause of action for medical monitoring or a remedy involving the creation of a medical monitoring fund); *Duncan v. Northwest Airlines, Inc.*, 203 F.R.D. 601, 608-09 (W.D. Wash. 2001) (there can be no claim for medical monitoring without actual physical injury under Washington law); *Johnson v. Abbott Laboratories*, 2004 WL3245947 (Ind. Cir. Ct. 12/31/04) (Indiana does not recognize medical monitoring as a cause

15

of action); *Thomas v. FAG Bearings Corp., Inc.*, 846 F.Supp. 1400, 1410 (W.D. Mo. 1994) (entitlement to the costs of future medical monitoring requires plaintiff to prove actual present injury and an increased risk of future harm); *In re Prempro*, 230 F.R.D. 555, 569 (E.D. Ark. 2005) (Arkansas has rejected medical monitoring as a cause of action and questions its availability as a remedy); *Lowe v. Philip Morris USA, Inc.*, 142 P.3d 1079, 1091 (Or. Ct. Ap. 2006), *aff'd*, 344 Or. 403, 183 P.3d 181 (2008) (current harm required to establish liability in negligence under Oregon law for medical monitoring); *Baker v. Westinghouse Elec. Corp.*, 70 F.3 951, 952 (7th Cir. 1995) (upholding dismissal of action for medical monitoring in Indiana district court); *Burton v. R. J. Reynolds Tobacco Co.*, 884 F.Supp. 1515, 1523 (D. Kan. 1995) (the court finds that plaintiff's "medical monitoring" claim does not properly state a separate claim); *Carroll v. Litton Sys., Inc.*, 1990 WL 312969 (W.D. N.C. 10/29/90) (this court should not recognize a common law claim for the costs of medical monitoring); *Purjet v. Hess Oil Virgin Islands Corp.*, 1986 WL 1200 (D. Virgin Islands 1/8/86) (actual injury is an indispensable element of a tort cause of action); *Ball v. Joy Technologies, Inc.*, 958 F.2d 36, 38 (4th Cir. 1991) (applying law of Virginia; the mere exposure of the plaintiffs to toxic chemicals does not provide the requisite physical injury to entitle the plaintiffs to recover for their emotional distress); *Rosmer v. Pfizer, Inc.*, 2001 WL 34010613 (D. S.C. 3/30/01) (South Carolina has not recognized a cause of action for medical monitoring). *See also, e.g., Abersio v. Consolidated Edison Co. of New York, Inc.*, 656 N.Y.S. 2d 371, 238 A.D. 2d 454 (N.Y. Sup. Ct. App. Div 1997) (reversing jury verdict).

Plaintiffs' claim that Florida law applies to on-sea exposures should be dismissed as a matter of law. In so ruling, the Court should find that where maritime law applies, that there is no separate cause of action for medical monitoring, and like for FELA and cure, there must be an

actual illness or injury with manifest symptoms. Recovery for medical care should be limited to the cost of treatment to that which has been proved to be medically necessary and useful to achieve maximal medical cure.

### Conclusion

IAR respectfully suggests that it is extremely important in this proceeding to *not* allow implausible claims to proceed and further complicate what is already a too complicated, too expensive and extremely threatening proceeding. IAR occupies a very narrow and limited position in the claims as they are pleaded. Applying the applicable standard of Rule 12 as is outlined above, the generic claims pleaded that are not plausible *as to IAR in the specific and known context of this case* should be identified and dismissed. They are, at the least:

1. IAR being liable for punitive damages;

2. IAR being liable for negligence, negligence "per se," and/or strict liability for any damages for injuries alleged to result from Corexit® exposure to persons and to its presence *in the water*, because that dispersant was there as part of the Coast Guard-approved response to the ongoing spill;[4]

3. IAR being liable for failure to warn VoO or other response vessels and crews on the sea, given that IAR had no alleged or actual coordination, management or oversight of the response assets, and those who did were, as alleged, aware of the same information as to the properties of Corexit®;

4. IAR being liable for gross negligence on *any* claims made it against it;

---

[4] This is to be distinguished from any alleged purposeful spraying of Corexit® directly upon the skin of a person who was known by IAR to be located at the time on the sea beneath the flight path of a *spraying* aircraft.

5. IAR being liable for cleanup costs as a "polluter" under the CWA.

Respectfully, submitted,

*/s/ Darrell K. Cherry*
DARRELL K. CHERRY (#4036 T.A.)
MARC J. YELLIN (#13741)
Deutsch, Kerrigan & Stiles, L.L.P.
755 Magazine St.
New Orleans, LA 70130
Telephone: (504) 581-5141
Email: dcherry@dkslaw.com
       myellin@dkslaw.com
*Attorneys for International Air Response, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Reply Memorandum of International Air Response, Inc. in Support of Rule 12 Motions to Dismiss has been served on All Counsel by electronically uploading the same to LexisNexis File & Serve in accordance with Pretrial order No. 12, and that the foregoing was electronically filed with the Clerk of Court for the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 25th day of April, 2011.

*/s/ Darrell K. Cherry*
DARRELL K. CHERRY

1976316_1.DOC