# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | ) | |
| "Deepwater Horizon" in the Gulf | ) | MDL No. 2179 |
| of Mexico, on April 20, 2010 | ) | |
| | ) | SECTION J |
| This document relates to: | ) | |
| *All Cases in Pleading Bundle B2* | ) | The Hon. CARL J. BARBIER |
| | ) | |
| | ) | Magistrate Judge SHUSHAN |

# REPLY IN SUPPORT OF MOTION TO DISMISS CONSOLIDATED CLASS ACTION RICO COMPLAINT IN ACCORDANCE WITH PTO NO. 11 [CMO NO. 1] SECTION III(B2) ["B2 BUNDLE"]

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................1

    I.      The RICO Claims Fail For Lack Of Proximate Causation. ...................................1

    II.     The RICO Claims Fail For Lack Of "Racketeering Activity."............................11

        A.     The Complaint Does Not Allege A Scheme To Obtain "Money Or Property" From Plaintiffs....................................................................12

        B.     The Complaint Does Not Allege A Scheme To Obtain "Money Or Property" From The Government. ................................................14

    III.    The RICO Claims Fail For Lack Of "Participation" In An "Enterprise." ............17

    IV.    The RICO Claims Fail For Lack Of A "Pattern."................................................19

    V.     The RICO Claims Fail For Lack Of Injury.........................................................22

    VI.    The RICO Claims Fail For Lack Of A Conspiracy. .............................................23

    VII.   The Florida RICO Claims Fail...........................................................................24

CONCLUSION.....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Dental Ass'n v. Cigna Corp.*,
  605 F.3d 1283 (11th Cir. 2010) ................................................................................................ 24

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006) ................................................................................... 1, 7, 8, 10, 11

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) ........................................................................................................ 23

*Bechtold v. Sprint Nextel Corp.*,
  No. 08-cv-23, 2008 WL 8140103 (S.D. Ill. Oct. 30, 2008) ................................... 17

*Beck v. Prupis*,
  529 U.S. 494 (2000) ........................................................................................................ 24

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................ 23, 24

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2009) ........................................................................................ 4, 5, 6, 7, 9

*Brown v. Cassens Transp. Co.*,
  546 F.3d 347 (6th Cir. 2008) ........................................................................................ 7

*Carpenter v. United States*,
  484 U.S. 19 (1987) ........................................................................................................ 14

*Cleveland v. United States*,
  531 U.S. 12 (2000) ........................................................................................ 11, 14, 15, 16

*Cox v. Administrator U.S. Steel & Carnegie*,
  17 F.3d 1386 (11th Cir. 1994) ........................................................................................ 10

*Dirt Hogs Inc. v. Natural Gas Pipeline Co. of Am.*,
  No. 99-6026, 2000 WL 368411 (10th Cir. Apr. 10, 2000) ................................... 19

*Dow Chem. Co. v. Exxon Corp.*,
  30 F. Supp. 2d 673 (D. Del. 1998) ................................................................................ 8

*H.J. Inc. v. Northwestern Bell Tel. Co.*,
  492 U.S. 229 (1989) ........................................................................................................ 21

*Heller Fin., Inc. v. Grammco Computer Sales, Inc.*,
  71 F.3d 518 (5th Cir. 1996) ........................................................................................ 20

*Hemi Group, LLC v. City of New York*,
  130 S. Ct. 983 (2010) ........................................................................................ 1, 7, 8, 10

*Holmes v. Securities Investor Prot. Corp.*,
  503 U.S. 258 (1992) ........................................................................................................ 2, 11

*In re Taxable Mun. Bond Sec. Litig.*,
　51 F.3d 518 (5th Cir. 1995) ............................................................................................ 22

*International Bhd. of Teamsters v. Carey*,
　297 F. Supp. 2d 706 (S.D.N.Y. 2004) ............................................................................ 21

*Jepson, Inc. v. Makita Corp.*,
　34 F.3d 1321 (7th Cir. 1994) .......................................................................................... 17

*Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp.*,
　192 F. Supp. 2d 519 (M.D. La. 2001) ............................................................................ 10

*McNally v. United States*,
　483 U.S. 350 (1987) ................................................................................................. 15, 16

*Mendoza v. Zirkle Fruit Co.*,
　301 F.3d 1163 (9th Cir. 2002) .......................................................................................... 7

*Oceanic Exploration Co. v. ConocoPhillips*,
　No. H-07-815, 2008 WL 1777003 (S.D. Tex. Apr. 16, 2008),
　*aff'd*, 352 F. App'x 945 (5th Cir. 2009) (*per curiam*) .................................................... 8

*Overnite Transp. Co. v.*
　*Truck Drivers, Oil Drivers, Filling Station & Platform Workers Union Local No. 705*,
　904 F.2d 391 (7th Cir. 1990) .......................................................................................... 18

*Pasquantino v. United States*,
　544 U.S. 349 (2005) ........................................................................................... 11, 12, 15

*Patterson v. Mobil Oil Corp.*,
　335 F.3d 476 (5th Cir. 2003) .......................................................................................... 22

*Procter & Gamble Co. v. Amway Corp.*,
　242 F.3d 539 (5th Cir. 2001) .......................................................................................... 13

*Reed Constr. Data Inc. v. McGraw-Hill Cos.*,
　745 F. Supp. 2d 343 (S.D.N.Y. 2010) ............................................................................ 19

*Rezner v. Bayerische Hypo-Und Vereinsbank AG*,
　630 F.3d 866 (9th Cir. 2010) ............................................................................................ 8

*Rice v. Manley*,
　66 N.Y. 82 (1876) ............................................................................................................ 6

*Salinas v. United States*,
　522 U.S. 52 (1997) ......................................................................................................... 24

*Skilling v. United States*,
　130 S. Ct. 2896 (2010) ................................................................................................... 16

*Strates Shows, Inc. v. Amusements of Am., Inc.*,
　379 F. Supp. 2d 817 (E.D.N.C. 2005) .............................................................................. 8

*Trollinger v. Tyson Foods, Inc.*,
　370 F.3d 602 (6th Cir. 2004) ............................................................................................ 7

*Union Oil Co. of Cal. v. Morton*,
   512 F.2d 743 (9th Cir. 1975) ............................................................................ 16

*United States v. Blumeyer*,
   114 F.3d 758 (8th Cir. 1997) ............................................................................ 13

*United States v. Bruchhausen*,
   977 F.2d 464 (9th Cir. 1992) ............................................................................ 14

*United States v. Christopher*,
   142 F.3d 46 (1st Cir. 1998) .............................................................................. 13

*United States v. Consentino*,
   869 F.2d 301 (7th Cir. 1989) ............................................................................ 13

*United States v. Marino*,
   277 F.3d 11 (1st Cir. 2002) .............................................................................. 18

*United States v. McMillan*,
   600 F.3d 434 (5th Cir. 2010) ................................................................. 11, 12, 13

*United States v. Mittelstaedt*,
   31 F.3d 1208 (2d Cir. 1994) ............................................................................ 15

*United States v. Ratcliff*,
   488 F.3d 639 (5th Cir. 2007) ................................................................. 11, 14, 15

*Williams v. Mohawk Indus., Inc.*,
   465 F.3d 1277 (11th Cir. 2006) (*per curiam*) .................................................. 7

*Williams v. WMX Techs., Inc.*,
   112 F.3d 175 (5th Cir. 1997) ............................................................................ 17

*Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*,
   90 F.3d 118 (5th Cir. 1996) ............................................................................. 20

**Statutes and Rule**

18 U.S.C. § 1961(1) (F) ......................................................................................... 7

18 U.S.C. § 1961(1)(A).......................................................................................... 9

18 U.S.C. § 1962(a) ........................................................................................ 23, 24

18 U.S.C. § 1962(c) .................................................................................... 17, 23, 24

18 U.S.C. § 1964(c) ............................................................................................. 14

28 U.S.C. § 1407(a) ............................................................................................. 25

43 U.S.C. § 1350(c) ............................................................................................. 16

Fed. R. Civ. P. 9(b) ........................................................................................ 16, 17

**INTRODUCTION**

Plaintiffs' response to the motion to dismiss only confirms that they are trying, through a sort of legal alchemy, to transform traditional tort claims into RICO claims. Their incentive is obvious: RICO authorizes the recovery of treble damages and attorneys' fees. But RICO does not swallow up all of tort law, and thus courts (including this one) have not hesitated to dismiss RICO complaints (like this one) that fail to satisfy the statute's rigorous requirements as a matter of law. Plaintiffs' efforts to evade those requirements by substantially amending their RICO Case Statement in response to the motion to dismiss are thus futile: plaintiffs cannot avoid the fact that they—like many others—allege injuries that flow directly from the Gulf oil spill, not from alleged misrepresentations to federal safety regulators. Because plaintiffs' claims are no different in kind than those of anyone else injured by the oil spill, they can recover, if at all, only through the ordinary legal regime that exists for redress of such injuries. They cannot circumvent that regime, and recover treble damages and attorneys' fees, by simply dressing up their tort claims as RICO claims. Thus, far from being a "prototypical civil RICO case," Opp. 1, this is a prototypical tort case masquerading as a RICO case. Accordingly, this Court should dismiss the RICO complaint.

**ARGUMENT**

**I.       The RICO Claims Fail For Lack Of Proximate Causation.**

The key point here is simple and undisputed: plaintiffs cannot state a claim under RICO unless their alleged injuries flow ***directly*** from the defendants' alleged predicate crimes. "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led ***directly*** to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (emphasis added); *see also Hemi Group, LLC v. City of New York*, 130 S. Ct. 983, 991 (2010) (plurality) ("[I]n the RICO context, the focus is on the

*directness* of the relationship between the conduct and the harm.") (emphasis added); *Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 268 (1992) (requiring a "***direct*** relation between the injury asserted and the injurious conduct alleged") (emphasis added).

If RICO's "directness" requirement means anything, it means that the RICO claims at issue here fail as a matter of law. The injuries alleged by plaintiffs flow directly from the oil spill, not from the alleged misrepresentations to federal safety regulators. As defendants have explained, plaintiffs' claims depend on a series of speculative assumptions to link those alleged misrepresentations with the spill:

- If federal safety regulators had known the truth about defendants' safety practices and capacity to respond to an oil spill, then those regulators would have concluded that these were insufficient to meet regulatory standards;

- If federal safety regulators had concluded that defendants' safety practices and capacity to respond to a spill were insufficient to meet regulatory standards, then those regulators would have required defendants to adopt alternative practices;

- If federal safety regulators had required defendants to adopt alternative practices, those practices would have prevented the blowout or lessened the impact of the spill.

Defs.' Mem. in Support of Mot. to Dismiss (Dkt. 1437-1) at 12. Plaintiffs' opposition brief conspicuously fails to respond to these points; rather, plaintiffs simply insist, in wholly conclusory terms, that "[i]n this case the causal link is ***direct***: BP defrauded the regulators into believing appropriate safety measures were in place to prevent and mitigate the effects of a spill; through BP's deceptive and unlawful conduct these measures were not in place, and their absence ***directly*** injured the plaintiffs." Opp. 3 (emphasis added). In other words, plaintiffs simply assume away all of the intervening links in the causal chain between defendants' alleged misrepresentations to government safety regulators and plaintiffs' alleged injuries from the oil spill—an approach that essentially eviscerates the directness requirement.

The basic problem for plaintiffs, which no amount of rhetoric can obscure, is that they cannot establish a ***direct*** causal link between defendants' alleged predicate crimes and their alleged injuries. The predicate crimes alleged here are misrepresentations to government safety regulators, not violations of government safety standards. *See* Compl. ¶ 237; Am. RICO Case Statement 10-13. Plaintiffs' claims thus necessarily depend on what government safety regulators (who have considerable discretion in this area) might have done but for the alleged misrepresentations, and the effectiveness of those hypothetical regulatory actions.

Plaintiffs try to overcome this problem by shifting the focus of the inquiry from the alleged ***misrepresentations*** to government safety regulators to alleged ***noncompliance*** with government safety standards. *See*, *e.g.*, Opp. 1 ("The misrepresented ***safety measures*** were intended to prevent or minimize oil spills; their ***absence*** was a substantial factor in the resulting oil spill that directly, logically and foreseeably caused injury to plaintiffs' business or property.") (emphasis added); *id.* at 14 ("[I]f the ***safety efforts and containment ability*** of BP were as represented, then the injuries to the plaintiffs would have been prevented or mitigated.") (emphasis added); *id.* at 17 ("Had the offshore oil drilling ***safety or and [sic] oil spill containment measures*** been in place as represented, the injury to business or property of plaintiffs would not have occurred.") (emphasis added). But this sleight-of-hand does not work, because noncompliance with government safety standards is not a RICO predicate crime. If anything, plaintiffs' effort to shift the focus of the inquiry only confirms their inability to establish a direct causal link between the alleged misrepresentations to government safety regulators and their alleged injuries from the oil spill. That is the hole at the heart of this RICO case, and it is a hole that plaintiffs cannot fill.[1]

---

[1] Plaintiffs devote several pages of their brief to discussing (1) "but for" causation, and (2) foreseeability. *See* Opp. 17-19. That discussion is puzzling, because plaintiffs do not contend that either ground relieves them of their

Plaintiffs miss the point by asserting that the proximate-causation analysis here is controlled by *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). *See* Opp. 13-14. The issue in that case was whether RICO imposes a first-party reliance requirement even where the underlying predicate crimes do not—*i.e.*, whether a RICO plaintiff alleging mail or wire fraud must prove that he or she relied on those statements (a reliance requirement that the mail and wire fraud statutes themselves concededly do not impose). *See* 553 U.S. at 648-49. Plaintiffs' heavy reliance on *Bridge* is puzzling, because defendants have never argued that the RICO complaint must be dismissed for failure to allege that plaintiffs themselves (as opposed to government safety regulators) relied on the alleged misrepresentations. Rather, as noted above, defendants have argued that the RICO complaint must be dismissed because the alleged misrepresentations to government safety regulators did not *directly* cause plaintiffs' injuries from the oil spill.

Plaintiffs use *Bridge* to set up, and then knock down, a straw-man argument. According to plaintiffs, defendants' position is that misrepresentations made to one party can *never* directly injure another party. *See* Opp. 13 ("BP … attempts to revert back to the notion, rejected in *Bridge*, that first-person reliance is necessary for proximate cause."). Because *Bridge* recognizes that misrepresentations to one party *can* directly injure another party, plaintiffs argue that *Bridge* demolishes defendants' position. The problem with that argument is that defendants do not contend that misrepresentations to one party can *never* directly injure another party. Rather, defendants' position is only that the misrepresentations to government safety regulators that plaintiffs have alleged *in this case* did not directly cause the injuries that plaintiffs have alleged

---

burden to establish a direct causal link between defendants' alleged predicate crimes and their own alleged injuries. Rather, plaintiffs themselves characterize these as *additional* requirements that they must satisfy above and beyond directness. *See id.* at 17. Because plaintiffs cannot satisfy the directness requirement, this additional discussion need not detain this Court.

*in this case*.  While misrepresentations to one party *may*, under certain circumstances, directly injure another party, *see Bridge*, 553 U.S. at 657-58, that does not mean that misrepresentations to one party *always* directly injure another party.  It all depends on the nature of the misrepresentations and injury alleged.

Thus, in *Bridge*, the RICO plaintiffs and defendants were both bidders to buy county tax liens at public auctions.  *See id.* at 642.  Often these bids resulted in ties, and in those cases the county awarded the liens to bidders on a "rotational" basis.  *See id.* at 643.  To prevent manipulation of the system, the auction rules prohibited bidders from using agents to bid on their behalf, thereby unfairly multiplying their chances of success.  *See id.*  The plaintiffs in that case alleged that the defendants had surreptitiously and unlawfully used agents to win (and therefore caused plaintiffs and other bidders to lose) a disproportionate number of bids.  *See id.* at 643-44.  "In this way, [plaintiffs] allege, [defendants] deprived them and other bidders of their fair share of liens and the attendant financial benefits."  *Id.* at 644.

The defendants argued in the Supreme Court that they could not be liable under RICO because the plaintiffs (as opposed to the county) did not rely on their misrepresentations.  *See id.* at 648.  The Court rejected that argument, noting that RICO imposes no such first-party reliance requirement.  *See id.* at 647-60.  As relevant here, the Court rejected the argument that first-party reliance was implicit in the requirement of proximate causation.  *See id.* at 653-59.  As the Court explained, proximate causation is analytically distinct from reliance; a plaintiff may be directly injured by a defendant's misrepresentation even if the plaintiff himself did not rely on it.  *See id.* at 656 & n.7 (noting "the long line of cases in which courts have permitted a plaintiff directly injured by a fraudulent misrepresentation to recover even though it was a third party, and not the plaintiff, who relied on the defendant's misrepresentation").  An obvious example is where a

defendant steals a plaintiff's business opportunity by falsely representing to a third party that the plaintiff was no longer interested in the opportunity; the plaintiff is directly injured even though the third party (and not the plaintiff) relied on the misrepresentation.  *See id.* at 656 n.7 (citing *Rice v. Manley*, 66 N.Y. 82 (1876)).

By holding that a RICO plaintiff need not establish first-party reliance on an alleged misrepresentation, *Bridge* did not dilute the requirement of direct causation.  To the contrary, *Bridge* specifically **reaffirmed** that requirement.  *See* 553 U.S. at 654 (discussing RICO's "direct-relation requirement").  The plaintiffs in *Bridge* simply satisfied that requirement by alleging an "injury—the loss of valuable liens" that was "the direct result of [the defendants'] fraud," *id.* at 658: by unlawfully obtaining a disproportionate number of liens for themselves, defendants **directly** deprived plaintiffs and other bidders of a correspondingly disproportionate number, *see id.*  Here, in sharp contrast, it is fanciful to suggest that defendants' alleged misrepresentations to government safety regulators **directly** caused the *Deepwater Horizon* to explode and injure plaintiffs.

*Bridge* underscores that the relevant issue is not to **whom** the alleged misrepresentations were made, but whether those misrepresentations **directly** injured the plaintiff.  While proof of first-party reliance may be **relevant** in assessing direct injury, such relevance does not "transform first-party reliance into an indispensable requisite of proximate causation."  *Id.* at 659; *see also id.* ("[T]he absence of first-party reliance may in some cases tend to show that an injury was not sufficiently direct to satisfy [RICO's] proximate-cause requirement, but it is not in and of itself dispositive.").  The fact that the particular misrepresentations to the government at issue in *Bridge* directly injured the plaintiffs in that case does not mean that misrepresentations to the government **always** satisfy RICO's direct-injury requirement, or that the misrepresentations to

the government at issue **here** directly injured the plaintiffs in this case.  Again, it all depends on the nature of the misrepresentations and injury alleged.[2]

*Bridge*, in short, does not help plaintiffs here, because the asserted link between defendants' alleged misrepresentations to government safety regulators and plaintiffs' alleged injuries from the oil spill is indirect, and depends critically on speculation about the nature and effectiveness of the government's actions in the absence of those misrepresentations.  This case is thus like *Anza* and *Hemi Group*, in which the Court rejected RICO claims based on alleged misrepresentations to the government where, as here, plaintiffs could not establish that those alleged misrepresentations **directly** caused their alleged injuries.  *See Anza*, 547 U.S. at 457-61; *Hemi Group*, 130 S. Ct. at 989-91, 994 (plurality).  Here, as in *Anza* and *Hemi Group*, the government's action (or inaction) in response to the alleged misrepresentations "constitute[s] an intervening cause breaking the chain of causation between [defendants'] misrepresentations and [plaintiffs'] injury."  *Bridge*, 553 U.S. at 659.

Plaintiffs' cursory attempts to distinguish *Anza* and *Hemi Group* are unavailing.  With respect to *Anza*, plaintiffs simply assert that the alleged misrepresentations to the government were "'entirely distinct'" from the plaintiffs' injuries, Opp. 22 (quoting *Anza*, 547 U.S. at 458), whereas here "they are direct cause and effect," *id.*  But the very reason why the alleged

---

[2] Plaintiffs' reliance on a line of RICO cases involving the hiring of illegal immigrants is thus misplaced.  *See* Opp. 21-22 (citing *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277 (11th Cir. 2006) (*per curiam*); *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 614 (6th Cir. 2004); *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002)).  The plaintiffs in those cases were legal workers who claimed that their employers had violated the immigration laws (which is a predicate crime under RICO, *see* 18 U.S.C. § 1961(1)-(F)) by hiring illegal immigrants, and that these predicate crimes directly harmed them by depressing their wages.  The courts in those cases concluded that the plaintiffs had adequately alleged a direct causal link between the predicate crimes and their alleged injuries: "[the defendant's] widespread scheme of knowingly hiring and harboring illegal workers has the purpose and **direct** result of depressing the wages paid to the plaintiffs."  *Williams*, 465 F.3d at 1289 (emphasis added); *see also id.* at 1290 ("[I]t has long been recognized that hiring illegal workers on substandard wage terms depresses the wage scales of legal workers."); *Trollinger*, 370 F.3d at 619; *Mendoza*, 301 F.3d at 1172; *cf. Brown v. Cassens Transp. Co.*, 546 F.3d 347, 351, 357 (6th Cir. 2008) (holding that RICO plaintiffs sufficiently pleaded a direct injury by alleging that defendants committed mail and wire fraud by paying unqualified doctors to give fraudulent medical opinions to deprive the plaintiffs of workers' compensation benefits).  Whether those cases were rightly or wrongly decided in no way establishes that the entirely different causal link alleged by plaintiffs here is "direct."

predicate crimes were "entirely distinct" from the alleged injuries in *Anza* is precisely the reason why they are entirely distinct here: they are separated by multiple links in the causal chain, so that the requirement of ***direct*** causation is not satisfied.  *See Anza*, 547 U.S. at 457-58.  Similarly, plaintiffs assert that the attenuated chain of causation in *Hemi Group* is "a far cry from the direct causal chain in this case."  Opp. 23.  Once again, however, the plaintiffs in *Hemi Group* could not satisfy RICO's direct-injury requirement for the same reason as plaintiffs here: the alleged injuries did not flow ***directly*** from the alleged predicate crimes, but were separated by multiple links in the causal chain.  *See Hemi Group,* 130 S. Ct. at 985 (plurality) ("Because the [plaintiff's] causation theory requires the Court to move well beyond the first step, that theory cannot satisfy RICO's direct relationship requirement.").  Here too, "the conduct directly causing the harm"—the oil spill—is distinct from the conduct giving rise to the alleged fraud—the alleged misrepresentations to government safety regulators.[3]

Plaintiffs further miss the point by asserting that "BP mistakenly equates 'directness' with the notion that there can be but one cause of an injury and one victim (supposedly the Government)."  Opp. 19; *see also id.* at 13 ("BP's interpretation of 'direct injury' improperly suggests that there is only one viable cause and one viable victim for any violation.").  That assertion is incorrect.  There are undoubtedly situations where injuries have multiple causes and where wrongdoing has multiple victims, and defendants have never argued otherwise.  But none of that has any bearing here.  The point here, as noted above, is that plaintiffs must establish that

---

[3] Plaintiffs are similarly unable to distinguish the lower-court cases cited by defendants for the proposition that a plaintiff cannot establish a direct causal link between a defendant's alleged predicate crimes and its own alleged injuries where, as here, intervening causal elements separate the crimes from the injuries.  Plaintiffs leave many of those cases wholly unanswered.  *See, e.g.*, *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 873-74 (9th Cir. 2010); *Strates Shows, Inc. v. Amusements of Am., Inc.*, 379 F. Supp. 2d 817, 829-30 (E.D.N.C. 2005); *Dow Chem. Co. v. Exxon Corp.*, 30 F. Supp. 2d 673, 696 (D. Del. 1998).  Plaintiffs leave other cases effectively unanswered.  *See, e.g.*, Opp. 23 (asserting that *Oceanic Exploration Co. v. ConocoPhillips*, No. H-07-815, 2008 WL 1777003 (S.D. Tex. Apr. 16, 2008), *aff'd*, 352 F. App'x 945, 951 (5th Cir. 2009) (*per curiam*)), "was simply a case of bad facts").

defendants' alleged predicate crimes *directly* caused their alleged injuries, and they cannot do so in light of multiple intervening links in the causal chain.

Plaintiffs thus err by asserting that "BP's argument would do away with civil RICO entirely, because RICO is premised on criminal predicate acts," and crimes by definition are offenses against the government. Opp. 13-14; *see also id.* at 20 ("[B]y logical extension BP's argument would eliminate all of civil RICO" because "by BP's logic it is always the government that is 'directly' harmed" by crimes). This is yet another straw-man argument, because defendants are arguing nothing of the sort, not even "by logical extension." Opp. 20. There are certainly RICO predicate crimes that directly injure private parties in their business or property—robbery and arson are obvious examples. *See* 18 U.S.C. § 1961(1)(A). Even misrepresentations to the government may directly injure private parties, as *Bridge* underscores, *see* 553 U.S. at 656-57 & n.7—for example, if a bidder for a government contract falsely represents to the government that a competitor has withdrawn its bid. But, once again, the fact that misrepresentations to the government *may*, under certain circumstances, directly injure private parties does not mean that misrepresentations to the government *always* directly injure private parties. Plaintiffs here cannot establish RICO proximate causation not because the alleged predicate crimes involve misrepresentations to the government, but because those alleged misrepresentations did not *directly* cause plaintiffs' injuries from the oil spill.

Nor can plaintiffs evade RICO's direct-injury requirement by recharacterizing it as a mere "substantial factor" requirement. Opp. 19 (asserting that, in assessing directness here, "the inquiry is simply one asking whether BP was a 'substantial factor' in causing plaintiffs' injuries"). Neither of the two cases on which plaintiffs base their "substantial factor" theory define RICO's direct-injury requirement by reference to "substantial factor" causation, and

indeed both of those cases long predate the Supreme Court's decisions in *Anza* and *Hemi Group*. *See* Opp. 18 (citing *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir. 1994), and *Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp.*, 192 F. Supp. 2d 519, 544 (M.D. La. 2001)).   Asking whether a defendant's alleged predicate crimes were merely a "substantial factor" in causing the plaintiff's alleged injuries is a far cry from asking whether those crimes ***directly*** caused those injuries—and the latter, not the former, is the relevant legal inquiry.   *See*, *e.g.*, *Anza*, 553 U.S. at 461; *Hemi Group*, 130 S. Ct. at 991 (plurality).   Plaintiffs tellingly provide no support for their attempt to water down the direct-injury requirement into a substantial-factor requirement.

Plaintiffs also stray far into legally irrelevant territory by asserting "the Government's injuries are secondary to the injuries suffered by plaintiffs" because the Government's alleged injuries from the oil spill "pale in comparison" to plaintiffs' alleged injuries from the spill.   Opp. 20.   The issue here has nothing to do with the ***extent*** of plaintiffs' alleged injuries from the oil spill; rather, the point here is only that defendants' alleged misrepresentations to government safety regulators did not ***directly*** cause those injuries, if the word "directly" is to have any meaning at all.

Finally, plaintiffs assert that they satisfy RICO's direct-injury requirement because (1) their alleged injuries from the oil spill are "non-duplicative" of the government's injuries, *see* Opp. 20; (2) the government's pending lawsuit against defendants relating to the spill "cannot be expected to vindicate plaintiffs' interests in enforcement of the RICO laws and recoveries of [*sic*] injuries stemming from RICO violations," *id.* at 20-21; and (3) "[t]here is no more immediate RICO victim stepping forward, nor could one step forward to recover for plaintiffs' injuries," *id.* at 21.   Again, plaintiffs miss the point.   These are among the justifications that the Supreme

Court cited for adopting the direct-injury requirement in the first place, *see, e.g.*, *Anza*, 547 U.S. at 459-60; *Holmes*, 503 U.S. at 269-70, but the Court has never suggested that the application of that requirement in every given case depends on consideration of those justifications.   In any event, plaintiffs are once again conflating two distinct injuries: (1) injury from the alleged misrepresentations, which directly affects the government and which the government is perfectly capable of redressing, and (2) injury from the oil spill.   Because plaintiffs are alleging injury from the oil spill, they cannot establish a direct causal link between the alleged predicate crimes and their alleged injuries.

## II.        The RICO Claims Fail For Lack Of "Racketeering Activity."

Once again, the problem for plaintiffs is that defendants' alleged noncompliance with federal safety standards is not a predicate crime under RICO, so plaintiffs strain to allege predicate crimes—mail and wire fraud—that simply do not fit their underlying case about the oil spill.   Plaintiffs acknowledge that the alleged mail and wire fraud here consists of alleged misrepresentations to federal safety regulators.   *See, e.g.*, Am. RICO Case Statement 8 ("The pattern of racketeering engaged in by BP consists of numerous acts of mail and wire fraud … all related to the scheme to defraud federal regulators regarding the safety of offshore drilling operations.").   As defendants explained in their motion to dismiss, however, the federal mail and wire fraud statutes do not encompass ***any and every*** misrepresentation made by mail or wire. Rather, as relevant here, the misrepresentation must be one that seeks to obtain "'money or property' in the victim's hands."   *Pasquantino v. United States*, 544 U.S. 349, 355 (2005) (brackets omitted; quoting *Cleveland v. United States*, 531 U.S. 12, 26 (2000)); *see also United States v. McMillan*, 600 F.3d 434, 448 (5th Cir. 2010) ("[T]he object of a mail fraud scheme must be money or property in the hands of the victims."); *United States v. Ratcliff*, 488 F.3d 639, 645 (5th Cir. 2007) ("[W]e must look to whether the alleged scheme is one to deprive the

11

[victim] of money or property through misrepresentations, thereby wronging the [victim's] property rights.").

The complaint here fails to state a claim of mail or wire fraud as a matter of law because it does not, and cannot, allege any misrepresentations made to obtain "'money or property' in the victim's hands." *Pasquantino*, 544 U.S. at 355. Indeed, neither the complaint, nor the original RICO Case Statement, nor the amended RICO Case Statement, nor plaintiffs' opposition to the motion to dismiss specifies ***who*** plaintiffs believe is the "victim" of the alleged misrepresentations, or ***what*** "money or property" defendants sought to take from that victim. That lack of clarity is no accident: defendants' alleged misrepresentations to federal safety regulators cannot be characterized as a scheme to obtain "money or property in the victim's hands," *id.*, ***regardless*** of whether plaintiffs or the government is characterized as the "victim."

### A. The Complaint Does Not Allege A Scheme To Obtain "Money Or Property" From Plaintiffs.

Plaintiffs devote much of their argument to defending the proposition that, as a matter of law, misrepresentations made to one person may fall within the scope of the mail and wire statutes even if they seek to obtain "money or property" from another person. *See* Opp. 27-31. That proposition, however, misses the point. Although a person may indeed be the "victim" of a scheme of mail or wire fraud even if the misrepresentations were made to someone else, *see, e.g.*, *McMillan*, 600 F.3d at 449-50, the misrepresentations still must seek to deprive the victim of "money or property." Thus, even characterizing plaintiffs as the "victims" of the scheme alleged here, the allegations still fail to establish mail or wire fraud as a matter of law because the complaint does not, and cannot, allege that defendants made misrepresentations to federal safety regulators to obtain money or property from ***plaintiffs'*** hands.

Plaintiffs do not seriously contest this point.  To the contrary, their theory is that "BP engaged in this unlawful conduct **to cut its safety expenses** for offshore drilling and spill containment, **to eliminate the expense of delay** caused by proper safety measures for offshore drilling and spill containment, and thereby **to obtain more oil and profits**."  Opp. 1 (emphasis added); *see also* Compl. ¶ 5 (alleging that defendants made misrepresentations "to save money and time at the expense of safety"); *id.* ¶ 233 (alleging that defendants misrepresented to federal regulators that they "would safely conduct oil operations and … could respond to and contain any environmental incident").  Plaintiffs' theory, in other words, is not that defendants sought to take any "money or property" from ***plaintiffs'*** hands, but that defendants cut corners on safety to save their ***own*** money, and thereby triggered the oil spill that injured plaintiffs.  *See, e.g.*, Compl. ¶ 5 ("The policy was profits over safety.").  There is not one allegation in the complaint that defendants lied to government safety regulators to obtain money or property from the plaintiffs' hands.  That simple point distinguishes all of the cases on which plaintiffs rely for the proposition that the mail and wire fraud statutes encompass misrepresentations made to one person for the sake of obtaining money or property from someone else.  *See*, *e.g.*, Opp. 27-29 (citing *McMillan*, 600 F.3d at 449; *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 565 (5th Cir. 2001); *United States v. Christopher*, 142 F.3d 46, 52-54 (1st Cir. 1998); *United States v. Blumeyer*, 114 F.3d 758, 767-68 (8th Cir. 1997); *United States v. Consentino*, 869 F.2d 301, 307 (7th Cir. 1989)).

The closest plaintiffs come to making an argument on this score is to assert that, "[w]hen BP saved money by avoiding necessary safety measures through its fraud, it necessarily ***shifted its risk*** directly onto the plaintiffs and their businesses."  Opp. 31 (emphasis added).  But shifting the "risk" of an accident to someone else is not the same thing as taking "money or property"

13

from that person's hands.  Plaintiffs identify no case in the long history of the federal mail and wire statutes remotely suggesting that the "risk" of an accident qualifies as money or property; to the contrary, courts construing those statutes have squarely rejected such "ethereal" notions of money or property.  *Carpenter v. United States*, 484 U.S. 19, 25 (1987); *see also United States v. Bruchhausen*, 977 F.2d 464, 467 (9th Cir. 1992).

Nor can plaintiffs salvage their case with the related assertion that "the purpose of the mail and wire fraud schemes carried out by BP was to obtain oil and profits ***at the expense of*** the plaintiffs."  Opp. 25 (emphasis added); *see also id.* at 28, 30 (same).  A scheme to obtain money or property ***at the expense of*** someone else is not the same thing as a scheme to obtain money or property ***from*** someone else, and the mail and wire fraud statutes cover only the latter.  *See, e.g.*, *Cleveland*, 531 U.S. at 26; *Ratcliff*, 488 F.3d at 645-46.  In short, plaintiffs allege that they were harmed by the ***consequences*** of defendants' fraudulent scheme, not that their own "money or property" was the ***target*** of that scheme.

### B.     The Complaint Does Not Allege A Scheme To Obtain "Money Or Property" From The Government.

Plaintiffs are no more successful in trying to paint the ***government*** as the "victim" of the alleged scheme.  Even assuming *arguendo* that plaintiffs could base a civil RICO claim on alleged mail and wire fraud that sought to deprive ***someone else*** of "money or property," *but see* 18 U.S.C. § 1964(c) (civil RICO plaintiff must be injured "in ***his*** business or property") (emphasis added), defendants' alleged misrepresentations to federal safety regulators also fail to establish a scheme to take "money or property" out of the ***government***'s hands.  Plaintiffs concede, as they must, that the safety permits and approvals that defendants allegedly obtained under false pretenses are not "money or property" in the government's hands within the meaning of the mail or wire fraud statutes.  *See* Opp. 25 (citing *Cleveland*, 531 U.S. 12).  To the contrary,

as noted above, plaintiffs' theory is that defendants cut corners on safety and lied to federal safety regulators to save their ***own*** money.

At one point in their brief, plaintiffs assert in passing that they "have alleged that BP's false representations to regulatory agencies were designed to obtain money and property—***valuable oil rights*** and savings on safety expenditures." Opp. 29 (emphasis added). Plaintiffs provide no citation for that assertion, and indeed none of the predicate acts alleged in the complaint involves misrepresentations to federal safety regulators to obtain "valuable oil rights." Although plaintiffs responded to the motion to dismiss by amending their RICO Case Statement and alleging new predicate crimes, even now they do not contend that defendants committed mail or wire fraud to obtain the Macondo lease itself. Unlike *Pasquantino*, 544 U.S. at 355*,* the complaint does not allege that the scheme sought to deprive the Government of "an entitlement to collect money from" defendants, or otherwise to inflict economic injury on the Government, *see Cleveland*, 531 U.S. at 22; *McNally v. United States*, 483 U.S. 350, 360-61 (1987); *Ratcliff*, 488 F.3d at 645; *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994). That approach is hardly surprising, since this is not a case about defrauding the Government, but instead about injuring plaintiffs as a result of the oil spill.

For this reason, the Government's "Statement of Interest" has no bearing on the resolution of this motion. The Government argues, implausibly, that alleged misrepresentations made to government safety regulators ***can*** involve a deprivation of the government's "money or property" under the mail and wire fraud statutes. *See* U.S. Statement of Interest (Dkt. 1779), at 12.[4]  But that argument has no bearing here because, as noted above, plaintiffs' theory is that

---

[4] The Government's theory is implausible because it would convert virtually ***every*** alleged regulatory violation into a deprivation of "money or property." The Government simply defines the relevant "scheme" at a very high level of generality, and seeks to subsume misrepresentations that do not directly seek to obtain "money or property" within that overarching "scheme." That approach would effectively overrule not only *Cleveland*, but also virtually

defendants made misrepresentations to government safety regulators to save its ***own*** money, not to take "money or property" from the ***government***'s hands.  The Government's main point in filing the Statement of Interest appears to be to admonish this Court to "refrain from holding that requests for regulatory permits and approvals for access to oil on a federal lease can ***never*** constitute claims for government property for purposes of the wire and mail fraud statutes."  *Id.* at 13 (emphasis added).  But this Court need not make any such broad holding to resolve this case, and indeed defendants have not asked this Court to make any such holding.[5]  For present purposes, it suffices to hold that ***the complaint in this case*** fails to allege cognizable violations of the mail and wire fraud statutes.

Finally, plaintiffs contend that they have satisfied their duty under Rule 9(b) to plead fraud with particularity, even though they have lumped together all three defendants as "BP"

---

every other case in which the Supreme Court has limited the scope of the mail and wire fraud statutes, including *Skilling v. United States*, 130 S. Ct. 2896 (2010), and *McNally*, 483 U.S. 350, since the misrepresentations at issue in all of those cases could always be characterized, at a high level of generality, as merely part of an overall scheme that sought to obtain money or property.

[5] The Government curiously devotes the bulk of its brief to rebutting an argument that defendants have never made in this case: that the original grant of an oil lease "transfer[s] *all* of the government's interests in the property," so that by definition the lessee could not thereafter take "money or property" from the Government.  U.S. Statement of Interest, at 10 (emphasis added).  The point here is far more limited: the alleged misrepresentations to federal safety regulators ***at issue here*** did not deprive the Government of "money or property" within the meaning of the mail and wire fraud statutes.  As noted in the text, *Cleveland* established that regulatory permits and approvals are not the government's "money or property."  While the Government owns the Outer Continental Shelf, it also has important regulatory interests there, and the Government's property interest does not extinguish its regulatory interest.  *See, e.g.*, *Union Oil Co. of Cal. v. Morton*, 512 F.2d 743, 747 (9th Cir. 1975) (noting the Government's "***extensive, continuing regulation*** of the oil companies' day to day drilling operations" on the Outer Continental Shelf) (emphasis added); *see also id.* ("Congress intended to exercise both proprietary powers of a landowner ***and the police powers of a legislature*** in regulating leases of publicly owned resources.") (emphasis added).  Indeed, the Government does not contend otherwise; it simply makes the unremarkable point that its "interests in ***regulating*** the activities of OCS lessees stem ***not only*** from its regulatory powers ***but also*** from its own ownership interests in the OCS and the oil contained within it."  U.S. Statement of Interest, at 6 (emphasis added).  Needless to say, the Government may and often does act in a regulatory capacity even on property that it owns, whether those regulations involve speed limits in national parks or safety measures for offshore drilling.  Plaintiffs here have clearly alleged that the Government was acting in its regulatory, not proprietary, capacity, by regulating the safety of offshore oil drilling.  *See, e.g.*, Compl. ¶ 175 ("BP's desultory approach to its responsibilities regarding the Deepwater Horizon Macondo well was in direct violation of federal regulations ***intended to maintain public safety***.") (emphasis added).  Those allegations are supported by the fact that the Government can impose ***criminal*** penalties for violations of these safety provisions, *see* 43 U.S.C. § 1350(c), which underscores that these provisions are regulatory—not proprietary—in nature, *see, e.g.*, *Cleveland*, 531 U.S. at 21, 24-25.

without drawing any distinction between them.  In this regard, plaintiffs cite *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1329 (7th Cir. 1994), for the proposition that the Rule "is relaxed where, as here, the defendants in question are all part of the same corporate entity."  Opp. 31.  But *Jepson* does not support that proposition; to the contrary, it reaffirms that "when the complaint accuses multiple defendants of participating in the scheme to defraud, the plaintiffs must take care to identify which of them was responsible for the individual acts of fraud."  34 F.3d at 1328; *see also id.* ("These details are mandated not only by Rule 9(b), but by the very nature of a RICO claim.").  The court then "assume[d]" without deciding that the plaintiffs' failure to satisfy that requirement "could be overlooked" because "even with the benefit of these assumptions," the complaint in that case still failed to satisfy Rule 9(b).  *Id.* at 1329.  *Jepson* thus does not relieve plaintiffs of their obligation to satisfy the "who" element of Rule 9(b).  *See, e.g.*, *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997) ("[W]e apply [Rule 9(b)] with force, without apology.").[6]

## III.      The RICO Claims Fail For Lack Of "Participation" In An "Enterprise."

Yet another hole in the complaint is the absence of facts establishing the requisite nexus between the alleged predicate crimes and the alleged "enterprise."  As defendants noted in their motion to dismiss, this nexus requirement flows from the statutory language requiring a RICO plaintiff to establish that the defendant "participate[d]" in the "enterprise" "through" a pattern of racketeering, 18 U.S.C. § 1962(c)—*i.e.*, the plaintiff must prove that the defendant "was able to commit the predicate acts by means of, by consequence of, by reason of, by the agency of, or by the instrumentality of [its] association with the enterprise."  *United States v. Marino*, 277 F.3d

---

[6] Plaintiffs' reliance on *Bechtold v. Sprint Nextel Corp.*, No. 08-cv-23, 2008 WL 8140103 (S.D. Ill. Oct. 30, 2008), is similarly misplaced.  That unpublished decision, like plaintiffs themselves, incorrectly relies on *Jepson*'s "assumptions" as though they were its holding.  *See id.* at *4.  In light of that fundamental error, it is unsurprising that no other court has cited *Bechtold* for this proposition.

11, 27 (1st Cir. 2002).  Although plaintiffs acknowledge this requirement, *see* Opp. 32, their allegations (even in the substantially amended RICO Case Statement filed in response to the motion to dismiss) fail to satisfy it as a matter of law.

 *First*, plaintiffs' continued recitation of allegations that BP and Transocean have a long-standing commercial relationship, including drilling operations with the *Deepwater Horizon* rig, does nothing to demonstrate the required nexus between defendants' alleged misrepresentations to government safety regulators and the alleged BP-Transocean enterprise-in-fact.  Plaintiffs thus miss the point by insisting that "BP and Transocean have worked together for years on deep-sea oil well projects" and that, "for years[,] BP has been Transocean's largest customer."  Opp. 32; *see also, e.g.*, Am. RICO Case Statement 8-10 (adding various new allegations concerning defendants' contracting relationship with Transocean since 2000).  Alleging facts concerning the commercial relationship among the purported enterprise members is not the same as alleging facts showing that the predicate crimes were committed "through" the enterprise.  "What matter are the means the [enterprise] relationship provides the defendant to accomplish [the alleged] unlawful acts.  Since here there are none alleged, the complaint is properly dismissed for failure to state a claim."  *Overnite Transp. Co. v. Truck Drivers, Oil Drivers, Filling Station & Platform Workers Union Local No. 705*, 904 F.2d 391, 394 (7th Cir. 1990).

 *Second*, and relatedly, plaintiffs cannot satisfy the nexus requirement by arguing that defendants could not have conducted offshore drilling operations with the *Deepwater Horizon* without Transocean's "assistance … and/or complicity."  Opp. 33-34.  Once again, that argument tries to shift the focus of the inquiry away from the predicate crimes alleged here—misrepresentations to government safety regulators—to alleged noncompliance with government safety standards in the conduct of drilling operations.  Whatever the merits of plaintiffs'

18

argument that defendants could not have conducted **drilling operations** on the *Deepwater Horizon* rig without Transocean's involvement, plaintiffs do not (and cannot) contend that defendants could not have made **misrepresentations** to government safety regulators about the conduct of those operations without Transocean's involvement.  Thus, plaintiffs again miss the point by alleging that Transocean (1) "had a duty under the regulations to conduct the enterprise's offshore drilling operations and oil spill containment measures according to MMS safety regulations," and (2) "could have halted the projects for lack of safety or reported the misrepresentations and omissions to the regulators at any time during the drilling job."  Opp. 33-34.  These allegations have no bearing on how **defendants** used the alleged BP-Transocean enterprise-in-fact to make misrepresentations to government safety regulators.  Because plaintiffs' RICO claims are based on alleged misrepresentations to government safety regulators, not the conduct of drilling operations, these allegations are entirely beside the point.[7]

## IV.      The RICO Claims Fail For Lack Of A "Pattern."

Plaintiffs try to bolster their "pattern" arguments, like their "nexus" arguments, with new factual allegations, *see* Opp. 34-36, Am. RICO Case Statement 8-15, but once again those new allegations are unavailing.  In particular, plaintiffs have alleged two new predicate crimes of mail and wire fraud—one that allegedly took place in 2004 and the other in 2007—in an effort to establish a "closed" pattern of racketeering.  But these new allegations add nothing, and cannot save plaintiffs' RICO claims.

---

[7] For the same reason, plaintiffs also fail to allege an "enterprise" distinct from BP itself.  *See* Defs.' Mem. 29-33.  Notably, plaintiffs make no attempt to distinguish—or even address—the cases cited by defendants for the proposition that the failure to allege a nexus between the purported association-in-fact enterprise and the alleged predicate acts can result in dismissal for failure to allege an "enterprise" distinct from the defendant itself.  *See Dirt Hogs Inc. v. Natural Gas Pipeline Co. of Am.*, No. 99-6026, 2000 WL 368411, at *3 (10th Cir. Apr. 10, 2000); *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 745 F. Supp. 2d 343, 351-52 (S.D.N.Y. 2010).

The first new allegation involves an alleged agreement between defendants and Transocean in October 2004 to equip the *Deepwater Horizon* with a single blind sheer ram.  *See* Am. RICO Case Statement 10-11.  But that agreement itself was not a misrepresentation to anyone, and plaintiffs do not allege that defendants made that agreement or misrepresented it to anyone as part of the alleged "scheme to deceive regulators."  *Id.* at 11.  Apparently in search of an alleged misrepresentation, plaintiffs allege that, on November 19, 2009, a BP executive lied about the implications of having a single blind sheer ram by "misrepresent[ing] … that BP had the … technology for redundant systems and controls" in testimony before a Senate committee. *Id.*  Even if that live testimony could somehow be deemed mail or wire fraud—which it cannot— the date of the allegedly fraudulent communication (November 2009) falls within the same 14-month period as plaintiffs' original predicate acts—a period that does not "extend[] over a substantial period of time" sufficient to constitute a "closed" pattern of racketeering.  *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996); *see also* Defs.' Mem. 34-36.  If anything, plaintiffs' strained efforts to turn the November 2009 testimony into an October 2004 predicate crime only underscores the weakness of their position.

Plaintiffs' other new alleged predicate crime—a submission to federal safety regulators in April 2007—cannot extend the alleged "pattern" for the same reason that the alleged fraudulent submission to federal safety regulators in December 2000 cannot do so: these communications simply are not sufficiently "related" to the purported pattern of fraudulent communications regarding drilling at the Macondo well.  *See* Defs.' Mem. 35-36; *see generally Heller Fin., Inc. v. Grammco Computer Sales, Inc.*, 71 F.3d 518, 524 (5th Cir. 1996) (predicate acts not sufficiently related cannot be considered to establish a pattern of racketeering activity).  Plaintiffs concede that the April 2007 submission "related to BP's use of Transocean's *Discoverer*

20

*Enterprise* rig in Thunderhorse drilling operations that started production in 1999."  Am. RICO Case Statement 11.  Other than asserting that those drilling operations also took place in the Gulf of Mexico, plaintiffs fail to plead facts showing any connection between communications to the Government concerning the Thunderhorse drilling operations and the other alleged communications to the Government concerning drilling at the Macondo well.  Thus, plaintiffs still allege only racketeering activity covering, at most, 14 months, and even plaintiffs concede that the Fifth Circuit has never found a "closed" pattern of less than 20-21 months.  *See* Opp. 36 n.62.

Plaintiffs likewise fail, despite the amendments to their RICO Case Statement, to plead facts plausibly indicating an "open" pattern of racketeering.  As the Supreme Court has explained, establishing an "open" pattern requires pleading facts indicating a "***specific*** threat of repetition extending indefinitely into the future."  *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 242 (1989) (emphasis added).[8]  Plaintiffs fail to plead such facts here, instead simply speculating that defendants' past wrongdoing will continue into the future, *see* Opp. 36-37, notwithstanding an entire revamping of the relevant federal regulatory scheme and the intense public scrutiny that has materialized over the last year.  Such unvarnished speculation "cannot support a reasonable inference that [the alleged enterprise] … posed a ***specific*** threat of future criminal activity," *International Bhd. of Teamsters v. Carey*, 297 F. Supp. 2d 706, 716 (S.D.N.Y. 2004) (emphasis added); were the law otherwise, RICO's "pattern" requirement would be a dead letter, because plaintiffs could always speculate that defendants will persist in wrongdoing.

---

[8] The requirement that plaintiffs must allege a "specific" threat of repetition also refutes plaintiffs' invocation of the so-called "usual rules regarding the continuation of a conspiracy once it begins."  Opp. 35 n.60.  Plaintiffs cite no case supporting any such presumption for RICO predicate acts—the case plaintiffs cite is simply a criminal drug case—and indeed such a presumption would almost always result in finding an "open" pattern, despite the Supreme Court's holding to the contrary.

V.        **The RICO Claims Fail For Lack Of Injury.**

The motion to dismiss made two simple points with respect to RICO injury, and plaintiffs do not respond to either one.   ***First***, the motion to dismiss explained that an ***unrealized*** diminution in property value is not sufficiently concrete and conclusive to qualify as a cognizable RICO injury, and hence plaintiffs' RICO claims should be dismissed to the extent they seek to recover for such an injury.   *See* Defs.' Mem. 39-41; *see also* Compl. ¶ 8 (named plaintiff Rinke seeks to recover for "diminution in value of his condominium property abutting the Gulf of Mexico").   ***Second***, the motion to dismiss explained that the complaint fails to meet minimum pleading standards to the extent plaintiffs allege "loss" or "damage" to their property without pleading any facts describing such "loss" or "damage."   *See* Defs.' Mem. 41-42; *see also* Compl. ¶ 8 (named plaintiff Rinke seeks to recover for unspecified "loss" and "damage" to his penthouse condominium, in addition to unrealized loss of property value).

With respect to the first point, plaintiffs broadly argue that a diminution in property value, like lost profits, is cognizable injury under state law.   *See* Opp. 41-43.   But the authorities on which they rely involve either (1) a ***realized*** diminution in property value or ***actual*** lost profits, whereas the motion relates to ***unrealized*** diminution in property value and ***future*** lost profits, or (2) ***state*** law, whereas the question whether an injury is sufficiently "concrete" and "conclusive" to qualify as RICO injury is a matter of ***federal*** law.   *Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 492 n.16 (5th Cir. 2003); *In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d 518, 523 (5th Cir. 1995).   Here, plaintiff Rinke does not allege that he has sold his condominium, and thus cannot establish a concrete and conclusive injury cognizable under RICO.

With respect to the second point, plaintiffs argue that the complaint gave defendants "fair notice" of the injuries alleged, and cite as an example their allegation that plaintiffs Roland and Barbara Hingle, commercial shrimpers, lost earnings as a result of the oil spill.   Opp. 44.   Again,

that argument is unresponsive.  The Hingles allege ***not only*** lost earnings as a result of the spill, ***but also*** unspecified loss of "property."  Compl. ¶ 10.  Similarly, plaintiff Rinke alleges ***not only*** diminution in value of his penthouse condominium, ***but also*** unspecified "loss" of and "damage" to his property.   It is these conclusory, wholly undeveloped allegations regarding loss to "property"—not the allegations regarding lost earnings—that defendants seek to dismiss.  Rather than trying to cure these deficiencies, plaintiffs simply dig in their heels and insist that their complaint gave "fair notice" of their alleged injuries across the board.  They are wrong as a matter of law, and the complaint must be dismissed to the extent it fails to provide defendants "fair notice" of the injuries alleged.  *See, e.g.*, *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

## VI.        The RICO Claims Fail For Lack Of A Conspiracy.

Once again, the motion to dismiss made two simple points with respect to conspiracy, and once again plaintiffs fail to respond to either one.  ***First***, the motion to dismiss explained that the complaint fails to plead any facts regarding the crux of any conspiracy—an ***agreement*** between the alleged conspirators.  *See* Defs.' Mem. 43-45.   ***Second***, the motion to dismiss explained that plaintiffs' allegations of a conspiracy fall along with the substantive provisions that are the object of the alleged conspiracies, so that plaintiffs' inability to establish a violation of either § 1962(c) or § 1962(a) precludes them from establishing a conspiracy to violate either provision.  *See id.* at 45-47.

With respect to the first point, plaintiffs insist that they have pleaded "multiple allegations showing that BP and Transocean often worked together to deceive the federal regulators, and that Transocean's agreement was necessary to effect the scheme."  Opp. 4.  But (even as fleshed out in their Amended RICO Case Statement) the facts alleged by plaintiffs are as consistent with an ordinary business relationship as with an unlawful conspiracy.  If the facts

23

alleged here support a conspiracy claim as a matter of law, then ***any*** business relationship supports a conspiracy claim as a matter of law.  In the absence of any facts giving rise to an inference of an unlawful agreement, the conspiracy claims must be dismissed.  *See*, *e.g.*, *Twombly*, 550 U.S. at 557; *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1294-96 (11th Cir. 2010).

With respect to the second point, plaintiffs argue that, "contrary to BP's argument, the conspiracy to violate § 1962(a) does not fall without an ***allegation*** of a substantive § 1962(a) violation."  Opp. 48 (emphasis added; citing *Beck v. Prupis*, 529 U.S. 494, 506 n.10 (2000)).  But defendants did not argue that plaintiffs' § 1962(a) conspiracy claim fails because plaintiffs failed to ***allege*** a § 1962(a) violation; rather, defendants argued that plaintiffs' § 1962(a) conspiracy claim fails because "plaintiffs ***cannot state a claim*** under § 1962(a) as a matter of law."  Defs.' Mem. 46 (emphasis added).  In other words, the problem here is not one of pleading, but of substance.  Tellingly, plaintiffs fail to identify any facts in their complaint or RICO Case Statement that would state a claim under § 1962(a).  Accordingly, their claim of a conspiracy to violate § 1962(a), like their claim of a conspiracy to violate § 1962(c), falls in light of their inability to establish "an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense."  *Salinas v. United States*, 522 U.S. 52, 65 (1997).

## VII.        The Florida RICO Claims Fail.

Finally, the motion to dismiss made two simple points with respect to the Florida RICO statute, and plaintiffs do not dispute either one.  ***First***, the motion to dismiss explained that the Florida RICO claims fall along with the federal RICO claims.  *See* Defs.' Mem. 46-47.  ***Second***, the motion to dismiss explained that the Florida RICO claims must be dismissed to the extent that plaintiffs claim to have been injured outside of Florida.  *See id.* at 47-48.

With respect to the first point, plaintiffs do not dispute that the requirements of the Florida RICO statute are, in all respects relevant here, materially indistinguishable from the requirements of the federal statute.  *See* Opp. 49.  In particular, plaintiffs do not contend that any of their Florida RICO claims would survive even if their federal RICO claims did not.  Accordingly, it follows that if defendants are right that plaintiffs' federal RICO claims must be dismissed, their Florida RICO claims must be dismissed too.  *See* Defs.' Mem. 46-47.

With respect to the second point, plaintiffs do not dispute that the Florida RICO statute does not apply extraterritorially to persons alleging injury outside of Florida, so that "some plaintiffs" concededly "do not have a claim under the Florida RICO statutes."  Opp. 49.  But plaintiffs have brought three counts alleging violations of the Florida RICO statute on behalf of ***all*** named plaintiffs (***including*** those injured outside of Florida), *see* Compl. ¶¶ 252-69, as well as a putative class of "[a]ll individuals and entities residing or owning property ***in the United States***" injured by the oil spill, *id.* ¶ 216 (emphasis added).  It goes without saying that these claims must be dismissed here and now.  *See* 28 U.S.C. § 1407(a) (requiring the remand of any action consolidated for pretrial proceedings through the MDL process at "the conclusion of such pretrial proceedings … ***unless*** it shall have been previously terminated.") (emphasis added).

## CONCLUSION

At the end of the day, this is a tort suit alleging injuries from the oil spill, just like thousands of other tort suits now consolidated before this Court.  The only difference is that plaintiffs here have attempted to dress up this tort suit in criminal garb, and seek treble damages and attorneys' fees under RICO.  For the foregoing reasons, as well as those set forth in the memorandum in support of the motion to dismiss, that attempt fails as a matter of law, and this Court should dismiss the RICO complaint.

April 25, 2011

Respectfully submitted,

*/s/ Don K. Haycraft*

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA   70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL   60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Christopher Landau, P.C.
Jennifer K. Hardy
Peter A. Farrell
Mark E. Champoux
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC   20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC   20004-2401
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

**Attorneys for BP p.l.c., BP America Production Company
and BP Exploration & Production Company**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 25th day of April, 2011.

*/s/ Don K. Haycraft*
Don K. Haycraft