# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * | MDL NO. 2179 <br> SECTION J |
| This document relates to: <br> *All cases* | * * * * * * | Honorable CARL J. BARBIER <br> Magistrate Judge SHUSHAN |

**BP DEFENDANTS' MEMORANDUM IN RESPONSE TO TRIAL PLAN BRIEFS FILED BY PSC/TRANSOCEAN/STATE OF ALABAMA, UNITED STATES, ANADARKO/MOEX, CAMERON INTERNATIONAL, DYNAMIC AVIATION GROUP, HALLIBURTON ENERGY SERVICES, INTERNATIONAL AIR RESPONSE, STATE OF LOUISIANA, MARINE SPILL RESPONSE CORP., OBRIEN'S/NRC, AND WEATHERFORD**

# TABLE OF CONTENTS

          **Page**

INTRODUCTION ...........................................................................................................................3

    I.    The Parties' Submissions Confirm That Plaintiffs' Proposal to allocate fault multiple times for the same tort is Arbitrary And Illogical. ............................5

        A.    Plaintiffs Cite No Authority To Support A Separate Allocation Of Fault Based On The Timing Of Damages Caused By The Casualty. ...........5

        B.    Plaintiffs Admit That The Same "Single Note" Of Evidence Determines Alleged Fault Not Only For The April 20 Personal Injuries And Deaths, But For The Economic Losses That Followed. ......................................................................................................8

        C.    Plaintiffs' Attempt To Define The Casualty As Ending After The Explosions And Fire And Other Events On April 20—Excluding The Remaining Two Days Before The *Deepwater Horizon* Sank— Is Arbitrary And Contrary To Transocean's Limitation Petition And The Evidence.......................................................................................9

    II.    The Parties' Submissions Confirm That Plaintiffs' Proposal Is Neither Feasible Nor Fair................................................................................................11

        A.    All Parties Agree That The Court Should Conduct the Trial of Liability Issues in Separate Segments.........................................................12

        B.    Plaintiffs Provide No Evidence Or Argument To Support The Feasibility Of Their Trial Plan, Which Other Parties Reject. .....................13

CONCLUSION..............................................................................................................................18

# INTRODUCTION

As discussed with Magistrate Judge Shushan and Special Master McGovern on April 20, 2011, all parties agree that the trial of this massive multidistrict litigation must occur in multiple segments to allow for necessary fact and expert discovery as well as trial preparation. The United States and most defendants, including BP, also broadly agree that the initial February 2012 trial segment should address the *Deepwater Horizon* marine casualty and the issues relating to Transocean's claims for exoneration or limitation of liability. The parties disagree, however, on the precise scope of the issues to be tried in the first segment. Because BP's proposed trial plan is feasible on the current discovery schedule, complies with the law, and is manageable, it should be adopted by the Court. [1]

*First*, although plaintiffs, Transocean, and the State of Alabama (collectively "plaintiffs"), agree that casualty and limitation issues should be tried beginning in February 2012, plaintiffs would expand the scope of that initial trial segment dramatically by including source control—*i.e.*, all post-April 20, 2010 efforts to cap and contain the Macondo well—and "the amount of oil spilled." (Doc. 1951, Mem. in Supp. of Mot. to Adopt Trial Plan Proposed By PSC, Transocean Limitation Pet'rs, and State of Alabama ("Plfs.' Br."), at 7.) No other party supports plaintiffs' plan, which will almost certainly add over 100 fact witnesses; scores of experts on diverse issues regarding spill planning, the Unified Command structure, individual source control efforts, alternative source control methods, the various means of calculating the amount of oil discharged; and thousands of additional trial exhibits—all of which will only compound discovery and trial manageability difficulties. Plaintiffs do not address these issues, much less explain—in the face of uniform opposition from the United States, BP, and every

---

[1]  BP has modified its proposed trial plan. The revised plan is attached as Exhibit A.

other party—how their vastly expanded trial could be conducted on the current schedule. The answer is that it cannot. As was discussed on April 20, issues can be set for a trial segment only after they have been fully discovered—and the simple fact is that source control discovery from the United States and other parties is just beginning and will not be ready for the February 2012 trial segment.

***Second***, plaintiffs also propose that the Court assess and allocate fault twice, based on the nature and timing of the damages: first, for personal injury/wrongful death claims arising from the explosions and fire on April 20, 2010; and second, for economic losses occurring after April 20. (Plfs.' Br. at 7.) Plaintiffs identify no legal authority and provide no justification for their novel proposal, which is contrary to settled law including the fundamental principle that a tortfeasor is liable for all the consequences proximately caused by its tort. (*See* BP Defs.' Mem. in Supp. of Their Proposed February 2012 Trial Plan ("BP's Br."), at 7-9.)[2] Plaintiffs' trial plan is a case management quagmire and a legal morass.

***Third***, the Magistrate Judge and Special Master pointed out (and asked the parties to address) the fact that the parties specify different dates marking the point at which the *Deepwater Horizon* casualty ended. BP and most other parties define the casualty that will be the focus of the first trial segment to include the explosions and fire on April 20, 2010 and continuing through April 22, 2010, when the *Deepwater Horizon* rig sank and initiated an uncontrolled subsea flow of oil. By contrast, the plaintiffs (joined only by Transocean and Halliburton) define

---

[2] Halliburton and Cameron support plaintiffs' proposal to allocate fault separately for the April 20, 2010 explosions and fire. (*See* Doc. 1953, Halliburton Energy Servs. Inc.'s Br. in Supp. of a Proposed Trail Plan ("Halliburton's Br.") ¶¶ 4-6; Br. of Cameron Int'l Corp. Concerning Planning For Trial Of The Limitations Action ("Cameron's Br."), at 5-6).) Other defendants propose a separate allocation of liability for the B3 defendants. (*See* Doc. 1942, O'Brien's Resp. Mgmt., Inc. and Nat'l Resp. Corp.'s Mem. Concerning February 27, 1012 Trial at 3; Dynamic Aviation Group's Mem. Regarding the Proposed February 27, 2012 Trial Plan, at 2.)

the casualty narrowly and propose an initial allocation of fault that would include only the events of April 20 and exclude the following two days when the rig burned and eventually sank. The line plaintiffs draw is arbitrary, illogical, and inconsistent with the law. It is also contrary to Transocean's own limitation petition, which identifies the voyage for which it seeks limitation to include events up to and including April 22, when the rig sank and was lost. Accordingly, the time period for the February 2012 "event" segment of the trial should extend through April 22.

*Finally*, the Magistrate Judge and Special Master asked the parties to address how to accommodate witnesses who may have knowledge relevant to more than one trial segment. In those instances where the issue is relevant (which will be relatively few), BP believes that a witness's testimony in the first segment should be limited to the issues and claims tried in that segment. There are a limited number of witnesses whose testimony would be necessary in multiple trial segments and the fact that a witness may have knowledge relevant to more than one segment is unavoidable in a trial of this kind. Indeed, plaintiffs' own trial proposal does not obviate or avoid this issue. Regardless, there are a number of case-management tools available to the Court to limit inconvenience, hardship, and duplicative testimony or evidence.

BP's trial plan best addresses the substantive and procedural issues confronting the Court in the trial of this complex and sprawling multidistrict litigation. The Court should adopt BP's proposal.

**I.     THE PARTIES' SUBMISSIONS CONFIRM THAT PLAINTIFFS' PROPOSAL TO ALLOCATE FAULT MULTIPLE TIMES FOR THE SAME TORT IS ARBITRARY AND ILLOGICAL.**

    **A.     Plaintiffs Cite No Authority To Support A Separate Allocation Of Fault Based On The Timing Of Damages Caused By The Casualty.**

If the Court adopts the approach suggested by BP (and almost every other party) of a single admiralty trial with multiple segments, the Court need not decide at this time the issue of

how it will structure fault allocations. To the extent the Court deems it necessary to decide the issue now, however, plaintiffs' proposal for multiple fault allocations is without foundation in the law.

Plaintiffs' brief does not reveal the purported legal basis for their proposed multiple fault allocations, let alone provide legal authority supporting their novel approach. Nor do they attempt to show how their proposal is consistent with comparative fault principles or furthers the policies underlying those principles. Indeed, the issue of multiple fault allocations is not even mentioned in the "Law and Argument" portion of plaintiffs' brief. But it is hardly surprising that legal support is missing; plaintiffs' proposal is contrary to settled doctrines of proximate cause and related doctrines such as foreseeability, avoidable consequences, and intervening and superseding cause. (*See* BP's Mem. in Support of Proposed Trial Plan at 7-9; *see also*, *e.g.*, *In re Signal Int'l LLC*, 579 F.3d 478, 491 (5th Cir. 2009) ("'The test [of foreseeability] is whether the harm that does occur is within *the scope of danger* created by the defendant's negligent conduct.'") (quoting 3 Stuart M. Speiser *et al.*, THE AMERICAN LAW OF TORTS, at 71) (alteration by the court).

For example, according to plaintiffs, the proposed second fault allocation "will include evidence relating to the First Fault Allocation, and also take into account *any aggravating effects of negligence, gross negligence and/or willful misconduct of Defendants before or after April 20 relating to the post-April 20 efforts to cap the well (i.e. source control).*" (Plfs.' Br. at 5) (emphasis added). But the "aggravating effects" of subsequent conduct (whether tortious or not) do not create a new tort or warrant a separate fault allocation unless the subsequent conduct is entirely unforeseeable and independent. *See* T. Schoenbaum, 1 Admiralty & Mar. Law § 5-3 (to be a superseding cause "(1) the intervening force must bring about a harm that is different in

6

kind from that which would otherwise have resulted from the actor's negligence; (2) the intervening force must not be a normal result of the original actor's negligence"). Rather, subsequent conduct is properly assessed along with proximate cause in determining the scope of a party's liability, without which there can be no allocation of fault. (*See* BP's Mem. at 7-9; T. Schoenbaum, 1 Admiralty & Mar. Law § 5-3).

Plaintiffs' proposal also ignores that in admiralty, "complete apportionment between the negligent parties, based on their respective degrees of fault, is the proper method for calculating and awarding damages." *Texas E. Transmission Corp. v. McMoRan Offshore Exploration Co.*, 877 F.2d 1214, 1221 (5th Cir. 1989); *see also* T. Schoenbaum § 5-4 ("If there is admiralty jurisdiction, the substantive and legal rights of the parties are determined by federal maritime law, not state law") (citing *Lowe v. Ingalls Shipbuilding*, 723 F.2d 1173 (5th Cir.1984)). At issue is the parties' relative fault, not the form of damages that results.[3] There is simply no principled basis for dividing the harm in this case and allocating fault for anything other than all the harm proximately resulting from the single maritime casualty that involved not only the loss of the rig but the initiation of the flow of oil.

Additionally, plaintiffs' planned fault allocations would, at best, be provisional and subject to reexamination. This is because under plaintiffs' reasoning, there would be no basis for limiting the fault analysis to the two allocations they currently request; plaintiffs could later request a third allocation, or a fourth, fifth or sixth, depending only on plaintiffs' and

---

[3] In some states, a defendant may be jointly and severally liable for economic damages, and severally liable for noneconomic damages. *See* Restatement (Third) Apportionment of Liability § E18. But that distinction does not apply in admiralty, which retains pure joint and several liability. T. Schoenbaum § 5-4.

Transocean's trial and settlement strategy — with each focusing on an ever narrower range of conduct.[4]

Finally, the cases cited by plaintiffs do not help them. Neither *Turner v. Murphy Oil USA, Inc.* nor any of the other cases upon which they rely involved or had anything to do with multiple allocations of fault for a tort. *See Turner v. Murphy Oil USA, Inc.*, No. 05-CV-04206, Dkt. #257, Order and Reasons at 5-7 (E.D. La. March 3, 2006) (ordering bifurcation of proposed jury trial between liability/general causation and damages/specific causation); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 837 (E.D. La. 2007) (noting same).

Accordingly, to the extent the Court decides to address the issue at all at this stage, plaintiffs' proposal for multiple fault allocations is contrary to law and should be rejected.

**B.     Plaintiffs Admit That The Same "Single Note" Of Evidence Determines Alleged Fault Not Only For The April 20 Personal Injuries And Deaths, But For The Economic Losses That Followed.**

Plaintiffs do not offer reasons for or attempt to justify their proposed multiple fault allocations. To the contrary, plaintiffs assert that the evidence for both is the *same*:

- "The proposed Joint Trial Plan is not limited to the blowout and explosion which occurred on April 20, 2010, but will involve evidence, findings of fact, and fault determinations regarding post April 20, 2010 events such as source control and the amount of oil discharged. *These facts and issues are common to, and indeed inexorably intertwined with, facts leading up to and including the blowout and explosion* . . ." (Plfs.' Br. at 7) (emphasis added.)

---

[4]   As other defendants have pointed out, plaintiffs' trial plan raises numerous legal issues, such as whether, under the Supreme Court's decision in *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998), the economic loss claims that were not brought in the Eastern District of Louisiana could properly be tried as part of the limitation trial. (*See* Halliburton's Br. at 5)  Likewise, plaintiffs' assertion that their plan provides a method "to determine once, with common evidence, liabilities related to maritime claims for economic losses and OPA" is in tension with the rule that OPA claims are not subject to Limitation of Liability. (*See* Plfs.' Br. at 5; Br. of Cameron Int'l Corp. Concerning Planning For Trial Of The Limitations Action, "Cameron's Br." at 5-6)  BP's plan raises none of these concerns.

8

- "***The failure to kill or otherwise control the well after April 20th*** is not only the result of ***the explosion and the blowout itself***, but also: (1) ***post-April 20 acts or omissions***; and (2) ***pre-April 20 fault*** in failing to reasonably prepare for the potential catastrophe at hand." (*Id.* at 6.)

According to plaintiffs and Transocean, casualty and source control must be tried together because these issues can be determined from a "***single note of evidence***" (an original phrase of the PSC's creation, without basis in the law).[5] Thus, plaintiffs assert that:

> "***The same 'single note' of related evidence which forms the basis for these personal injury claims***, most of which—if not all—will be settled by the time this case goes to trial in ten months, ***is also the same basis for tens, if not hundreds, of thousands of property damage and economic loss claims which will be pending before this Court as of the April 20, 2011 Monition Date***." (*Id.* at 3; *see also id.* at 2, 4, 22, 24.)

Indeed, contrary to plaintiffs' plan to apportion liability and fault first for personal injuries/wrongful deaths occurring on April 20 and then for economic loss damages arising after April 20, plaintiffs admit that "***a bright line cannot be drawn for general liability arising from the event, post-event, or both.***" (Plfs.' Br. at 7) (emphasis added.) As plaintiffs' admissions show, there is no basis for their plan to arbitrarily divide the tort and separately allocate fault based upon the timing of the damages.

    **C.**     **Plaintiffs' Attempt To Define The Casualty As Ending After The Explosions And Fire And Other Events On April 20—Excluding The Remaining Two Days Before The *Deepwater Horizon* Sank—Is Arbitrary And Contrary To Transocean's Limitation Petition And The Evidence.**

As the Magistrate Judge and Special Master observed, the parties, in their April 13 trial plan filings, use different dates to mark the end of the marine casualty. Most parties agree that the casualty occurred on April 20, 2010 and continued through April 22, 2010, when the *Deepwater Horizon* sank, breaking the riser and initiating an uncontrolled subsea flow of oil. As

---

[5]   Plaintiffs and Transocean propose a separate trial to address clean up issues. (*See* Plfs.' Br., Ex. A ¶ 10)

9

plaintiffs apparently now see it, the marine casualty ended not with the loss of the *Deepwater Horizon* on April 22, 2010, but two days earlier, when the explosions and fire began. Thus, according to plaintiffs (joined by Transocean and Halliburton), liability and fault for the marine casualty should be limited to the personal injury and wrongful death claims arising from the first day's events. (Plfs.' Br. at 1-2; Halliburton Br., ¶¶ 5-7.)

Plaintiffs' proposal is arbitrary. The fire that began on the first day continued to burn for two more days, fueled by oil from the well, until the *Deepwater Horizon* sank. It makes no more sense to isolate the events of the first day and try them separately from everything else (with a separate allocation of fault), than it would to segregate and separately try the events of the second day, or the first half of the second day. The meaningless distinction plaintiffs (and Transocean) propose is aimed not at separating the events and evidence into logical and manageable segments, but at transforming a single tort into many, with the boundaries gerrymandered to minimize the range of consequences that can be connected to Transocean's negligence and misconduct. Proximate cause, however, cannot be determined by such arbitrary distinctions. The plain facts are that the fire and explosions on the *Deepwater Horizon* led directly to the oil spill.

Furthermore, Transocean's limitation petition seeks to shield it from a much broader range of liability—not just for the personal injury and wrongful death claims occurring on the first day of the casualty. For example, in its petition, Transocean contests liability for "any and all losses and damages, if any, ***which occurred during the voyage in question, including,*** without limitation, any claims asserted under the Oil Pollution Act, 33 U.S.C. § 2701, et seq. ***for hydrocarbons emanating from the sea floor.***" (*See* Cplt. and Pet. for Limitation of Liability, at ¶ 9)  *Id.* ¶ 20; *see also id.* ¶ 19 (claims will greatly exceed the "value of Petitioners' interest in the

MODU *Deepwater Horizon* immediately after the events in question and at the time of the termination of the voyage, and her then pending freight.")  Similarly, the Limitation Action cannot be decided without considering events after the first day because Transocean must prove the "'value of the interest of such owner in such vessel'" meaning **"the value at the termination of the voyage"** as well as "freight monies earned by the vessel owner during the voyage." *See* T. Schoenbaum § 15.5; Supp. R. F(2) (complaint must state "the value of the vessel at the close of the voyage or, in case of wreck, the value of her wreckage, strippings, or proceeds, if any").  According to Transocean's affidavit submitted to the Court to establish the value of its interest (and the amount of security required under Supplemental Rule F), the "voyage" ended on ***April 22, 2010.***  (Affidavit with Respect to Pending Freight (Kathleen McAllister) at 1; s*ee also* Affidavit of Value (S. Douglas Devoy) at 2 ("the fair market value of such vessel on an as is where is basis immediately after the termination of the voyage ending on April 22, 2010, with the sinking of the vessel was $0.00.")  Accordingly, the Court should clarify in its trial plan order that the initial "event" segment of the trial continues through April 22, just as Transocean has alleged.

## II. THE PARTIES' SUBMISSIONS CONFIRM THAT PLAINTIFFS' PROPOSAL IS NEITHER FEASIBLE NOR FAIR.

In its opening brief, BP showed that trying all of the issues proposed by plaintiffs in the initial segment would be unworkable, unmanageable, and unfair.  A February 2012 trial segment consisting of the casualty, exoneration/limitation issues, source control, spill response, and oil spill volume would simply involve too many fact and expert witnesses, too many exhibits, and too much discovery to be completed in the available time.  Despite conceding the "daunting" case management issues inherent in "this unique and complicated matter," plaintiffs provide no solution for these problems; indeed, their trial plan and brief entirely ignore them.  (Plfs.' Br. at

17) Moreover, every party—including plaintiffs, Transocean, and the State of Alabama—admit that trying liability issues in separate segments is necessary and indispensable to a fair and efficient trial. Ignoring the real management difficulties, as plaintiffs do, just postpones their resolution.

> A. **All Parties Agree That The Court Should Conduct the Trial of Liability Issues in Separate Segments.**

Every party that has submitted a trial plan brief proposes phasing liability—including plaintiffs themselves. For example, the United States proposes a trial plan where the first segment or phase would cover certain events through April 22, 2010 (primarily the casualty), the second segment would concern issues such as source control and amount of oil discharged, while subsequent segments would address issues including spill response actions. (U.S. Br. at 2) The State of Louisiana generally supports the United States' plan, contending that the February 2012 trial should concern only "evidence regarding the rig and drilling operations leading up to the sinking of the *Deepwater Horizon* on April 22, 2010," with other issues being tried in subsequent phases. (Louisiana Br. at 2-3) The other defendants (besides Transocean, which has aligned with the plaintiffs) likewise agree with phasing liability issues and limiting the first phase primarily to casualty issues. (*E.g.*, Halliburton Br. at 1; Cameron Br. at 1-2; Anadarko & MOEX Br. at 1-2)

Plaintiffs also propose phasing liability issues. Although plaintiffs originally circulated a draft trial plan that appeared to call for trying all liability issues beginning in February 2012, the proposal they filed with the Court on April 13, 2011 provides that the "Trial will not include dispersant issues, or other clean-up issues (*e.g. in situ* burning, or use of boom, etc.), which would be reserved for the B3 Trial (or other proceedings)." (Plfs.' Br., Ex. A ¶ 10) Like the casualty, source control, and amount of oil discharged from the well, spill response involves an

12

extensive category of issues going to the liability of defendants. The fact that plaintiffs propose not to try spill response issues as part of the February 2012 proceedings is an admission that liability issues need to be phased. Thus, with all parties in agreement on this score, the question is not *whether* liability should be phased, but *how* liability should be phased or placed into segments.

> **B. Plaintiffs Provide No Evidence Or Argument To Support The Feasibility Of Their Trial Plan, Which Other Parties Reject.**

As for how the litigation should be phased, nearly all parties agree that the first trial segment should concern the casualty itself—"the event—and issues of exoneration/limitation. There is agreement that other categories of issues, such as source control and amount of oil discharged, should be tried in subsequent segments. This is the position of the United States and the State of Louisiana, who are plaintiffs in the litigation, as well as all defendants except Transocean. (U.S. Br. at 2; Louisiana Br. at 2-3; Halliburton Br. at 1; Cameron Br. at 1-2; Anadarko & MOEX Br. at 1-2) This broad consensus is amply supported by the realities of this massive multidistrict litigation.[6]

As BP noted in its opening brief, a trial addressing the casualty and exoneration/limitation issues alone will result in one of the most complex admiralty proceedings in history, likely involving more than one hundred fact witnesses, scores of experts, and thousands of exhibits. (*E.g.*, BP Br. at 10-12) In addition to plaintiffs, this phase will involve 9 groups of defendants, each with its own interests, goals, and right to present evidence and cross-

---

[6] If the Court decides to conduct a single trial with a record that remains open until conclusion, that would suggest that all parties including the responder defendants are present at the trial. Depending on their specific roles, many responders would have little to say or present at the initial "event" segment regarding events through the explosion and fire. Accordingly, the Court should consider case management tools whereby, for example, the number of counsel attending or participating would be limited and/or the responders would participate through a designated representative during the initial segment when most or all responder-related issues are not relevant.

examine witnesses. Preparing for this phase by February 2012, and trying these core issues within a three to fourth month period, will strain the case management resources of the Court and the parties to their utmost.[7]

Adding in source control and the amount of oil discharged would push the February 2012 trial past the breaking point. Source control and spill volume issues will likely involve over 100 fact witnesses; experts on diverse issues such as spill planning, the Unified Command structure, individual source control efforts, alternative source control methods, the various methods for calculating the amount of oil discharged; and thousands of additional exhibits. (*See generally* BP Br. at 14-19) Trying the casualty, exoneration/limitation, as well as source control and spill volume issues would almost certainly double the length and complexity of the February 2012 trial. Instead, BP proposes to have source control and perhaps closely related issues such as amount/volume/flow rate of oil discharged, the geographic reach of the oil, and response efforts tried in the second segment, after an appropriate period of discovery and trial recess.

Source control issues themselves require extensive discovery, particularly from the United States. One of BP's defenses will be that its source control operations were directed by and conducted under the Unified Area Command of the U.S. Coast Guard Federal On-Scene Coordinator and other government agencies. *See Boyle v. United Technologies Corp.*, 487 U.S. 500, 512 (1988) (government supplier entitled to immunity where supplier conformed to precise specifications approved by United States and warned government of any risk known only to

---

[7] Plaintiffs' submission does not attempt to justify its proposed order of proof, which is contrary to the order traditionally used in limitation actions whereby the claimants first present their evidence of negligence or unseaworthiness, followed by the vessel owner's evidence of exoneration or its lack of knowledge or privity, with the third-party defendants presenting their evidence last. 27-708 MOORE'S FEDERAL PRACTICE CIVIL § 708.07; *see also Farrell Lines Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976); T. Schoenbaum, 2 ADMIRALTY & MAR. LAW § 15-5. BP's plan reflects this settled order of proof. (*See* BP's Proposed PTO, Ex. A ¶ 10)

supplier).  BP has initiated discovery of the United States on these topics, but that discovery is in the very early stages.  BP has a due process right to conduct discovery to support this defense, which involves both depositions of government employees as well as written discovery.  The United States has stated that it will face "enormous burdens … in the production of large quantities of documents or witnesses on the two issues" of source control and amount of oil discharged, and contends that source control issues should be tried in a second phase separate from casualty issues.  (U.S. Br. at 8-9)  BP's own discovery burden likewise will be extensive, as searches for just one of plaintiffs' source control requests has yielded over 140,000 documents.  Thus, plaintiffs' claims that source control discovery will not be burdensome is belied by the facts.  (Plfs.' Br. at 15-16)  Plaintiffs also overlook the substantial additional expert witness work necessary to prepare the source control and spill volume issues for trial.  (*Id.*)  While the parties have worked diligently under Magistrate Judge Shushan's direction toward completing discovery for the casualty phase of the trial, there are months of multi-track fact depositions still ahead just for that phase; the reality is that a similar dedicated effort, over a period of months, will be necessary to get the source control phase ready for trial.

   Despite the overwhelming case management problems presented by trying to simultaneously litigate casualty, source control, and spill volume issues, plaintiffs' brief is devoid of any explanation as to how they plan to conduct such a trial.  They provide no road map for how to complete the necessary discovery or how such a massive trial could be managed.  Faced with such obvious difficulties, remaining silent and hoping to sort out the trial structure later is not a viable plan.  By itself, plaintiffs' failure to justify their trial plan or explain how it is feasible should lead to its rejection.

Plaintiffs make two arguments, neither of which can support trying source control and spill volume issues in February 2012. The first is that plaintiffs claim they have let other parties know of their intent to try source control issues starting in February 2012. (Plfs.' Br. at 7-15) But BP and the other parties never acquiesced to plaintiffs' trial plan, and indeed have consistently opposed it. Moreover, plaintiffs' alleged notice does nothing to resolve the burden, complexity, and confusion that would be caused by trying both casualty and source control/spill volume issues simultaneously. Nor does it resolve the substantial discovery required to prepare those claims for trial. See MANUAL FOR COMPLEX LITIGATION § 11.631 (4th ed. 2004) ("Consolidation is…inappropriate where its principal effect will be to magnify unnecessarily the dimensions of the litigation.").

Plaintiffs' second assertion is that a phased trial plan will involve overlapping witnesses and issues. (Plfs.' Br. at 6-7, 22-23)[8] To begin with, plaintiffs' claim is hollow, as their own trial plan presents the same issue. Plaintiffs do not intend to try spill response issues as part of the February 2012 trial, but instead leave those liability issues to be resolved in some future phase of the litigation—despite their admission that pre- and post-April 20, 2010 events are "inexorably intertwined" with one another. (Plfs.' Br. at 7 & Ex. A ¶ 10) Yet source control and spill response—which were being conducted simultaneously during the months after the incident—have overlapping witnesses and evidence. Each activity directly impacted the other and the lines between the two categories of issues are less distinct than between the casualty and source control issues. As plaintiffs do not object to trying source control and spill response

---

[8] In fact, plaintiffs' list of witnesses who supposedly have knowledge about both pre-spill and post-spill activities (Plfs.' Br. 6 n.9) demonstrates no such thing. Many of the listed witnesses, such as Messrs. Hayward and Wells, had no direct involvement in pre-April 20 Macondo operations.

16

issues separately, they have no valid objection to trying casualty and source control issues separately.

Moreover, plaintiffs' claim that phasing liability would require multiple adjudications of the same issues simply is incorrect. As do most parties, BP proposes a single admiralty trial of a single marine casualty, conducted in multiple segments. Those segments are based on logical divisions of the various issues that the Court must decide as part of the litigation. Thus, while BP's first segment would address a variety of core liability issues (*see* BP Br. at 10-11), those issues are distinct from those regarding source control. For example, the first phase would consider issues such as why the well began flowing, the propriety of well control actions, whether the *Deepwater Horizon* was properly maintained, and why the blowout preventer failed to stop the flow of oil from the well. By contrast, the segment involving source control would involve the adequacy of BP's spill response plan, the operation of the Unified Command, the source control methods considered or used, possible alternative source control methods, and how to measure the volume of the spill. There simply is no overlap between the two categories of issues and thus no risk of re-adjudication or varying factual findings.

Plaintiffs also claim that the same witnesses may have evidence relevant to both the casualty as well as source control and spill volume issues, but this likewise is no basis for combining the two categories of issues into an unmanageable and unfair February 2012 trial. BP agrees that for such witnesses (relatively few in number), depositions can and should cover all such topics—this is not at all unusual. As for the trial, this concern, to the extent real and not imagined, can be addressed by having witnesses who testify in each segment discuss only information relevant to that segment; by using testimony provided at deposition in lieu of live

17

testimony; or by employing other case management techniques to address these issues.[9] The significance of this concern, which arises in many large, complex cases that must be tried in different phases, pales in comparison to the difficulties and confusion that would be caused by attempting to try both the casualty as well as source control and spill volume issues in a single phase.[10]

## CONCLUSION

All parties recognize that the trial in the massive and complex multidistrict litigation must be conducted in phases. BP's trial plan resolves significant issues through a process and trial that are manageable on the current schedule. Plaintiffs' proposal, which is rejected by the other parties, is unworkable, unmanageable, and unfair. The Court should implement BP's trial plan.

---

[9] The Court has other case management tools at its disposal to avoid unnecessary, duplicative or cumulative evidence in what all parties agree should be a "single trial" with various issues "reserved" for subsequent phases or segments. (*See* Plfs'. Br. at 1, 5 n.7) For example, the evidentiary record in a preceding phase of trial can be used or adopted in a subsequent phase or phases. *See, e.g., Hays v. Louisiana*, 936 F. Supp. 360, 366-67 (W.D. La. 1996) ("An extensive record had been developed previously, and all parties to this latest hearing agreed to adopt the prior record in the current proceedings.").

[10] Plaintiffs also imply that BP caused the trial to be delayed for five months beyond the original October 2011 trial date. This is incorrect. As the Court knows, Halliburton, Cameron, Anadarko, and MOEX jointly moved on October 1, 2010 to postpone the trial based on, among other things, ongoing testing of the blowout preventer and extensions of pleading and discovery deadlines. (Mem. in Support of Joint Motion for Extension of Trial Date filed October 1, 2010 at. 2.) BP did not take a position with respect to the requested relief, which the Court granted. (10/6/10 Order Granting Extension of Trial Date, at 1-2.)

Date: April 26, 2011

Respectfully submitted,

/s/ Don K. Haycraft
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Andrew B. Bloomer, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

***Attorneys for BP Exploration & Production Inc. and BP America Production Company***

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 26th day of April, 2011.

/s/ Don K. Haycraft
Don K. Haycraft