# EXHIBIT A

# PART 2

the operation.  The Parties entitled to make an Election under this Article 13.2 are:

(a)   the Participating Parties, and

(b)   the Non-Participating Parties in the original well proposal, if (1) the subsequent Development Operation proposal is made at the well's Objective Depth and is for a Sidetrack or Deepening and (2) Article 16.4 *(Non-Consent Operations to Maintain Contract Area)* was not applicable to the drilling of that Development Well.

The Operator's proposal shall be for one of the following operations:

(a)   conduct Additional Testing, Sidewall Coring, or Logging of the formations encountered prior to setting production casing;

(b)   complete the well at the Objective Depth in the objective zone or formation;

(c)   Sidetrack the well;

(d)   plug back the well and attempt a completion in a shallower zone or formation;

(e)   Deepen the well to a new Objective Depth;

(f)   conduct other operations on the well not listed;

(g)   temporarily abandon the well; or

(h)   permanently plug and abandon the well.

If the Operator fails to submit its proposal to the Participating Parties within twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) after receipt of all logs and test results from a Development Well, then any Participating Party may make a proposal.  In that event, the procedures in this Article 13.2 *(Development Operations at Objective Depth)* shall apply to that proposal, and any reference in this Article 13.2 to the "Operator's proposal" shall include a proposal made by a Participating Party.

90

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054428

### 13.2.1   <u>Response to Operator's Proposal</u>

A Participating Party may, within twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) of its receipt of the Operator's proposal, make a separate proposal (along with an associated AFE and a plan for the operation), except if the proposal is to permanently plug and abandon the well) for one of the operations in Article 13.2 *(Development Operations at Objective Depth)*, and the Operator, immediately after the expiration of the twenty-four (24) hour period for making a separate proposal shall provide the Parties entitled to make an Election with a copy of all separate proposals so made. If no separate proposal is made, the Parties entitled to make an Election shall, within forty-eight (48) hours (inclusive of Saturdays, Sundays, and federal holidays) of its receipt of the Operator's proposal, make an Election on the Operator's proposal (except for a proposal to permanently plug and abandon). If a separate proposal is made, the Parties entitled to make an Election shall make an Election under the procedure in Article 13.2.2 *(Response to Highest Priority Proposal)*. If a proposal to permanently plug and abandon the well is the only operation proposed, then the approval and Cost allocation provisions of Article 13.5 *(Permanent Plugging and Abandonment and Cost Allocation)* shall apply to the proposal. If Article 8.3 *(Second Opportunity to Participate)* or Article 8.4 *(Participation by Fewer Than All Parties)*, or both, apply to an Election, then the response period in those articles shall be twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) instead of forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays). Notwithstanding any contrary provision of this Agreement, if one or more operations are proposed before the distribution of information from the previous approved operation, then the response periods provided above shall not begin until the Parties entitled to make an Election in Article 13.2 *(Development Operations at Objective Depth)* have received the information from the previous approved operation.

### 13.2.2   <u>Response to Highest Priority Proposal</u>

If a separate proposal is made, each Party entitled to make an Election shall, within twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) after its receipt from the Operator of a complete

91

HIGHLY CONFIDENTIAL                                    BP-HZN-2179MDL00054429

copy of all separate proposals, make its Election on the highest priority proposal (except a proposal to permanently plug and abandon the well). Article 13.2(a) has the highest priority, and Article 13.2(h) has the lowest priority. If different depths or locations are proposed for the same type of operation, priority shall be given to the deepest depth.

If the proposal with the highest priority is approved, then the lower priority proposals shall be deemed withdrawn. Once the approved operation is completed, the Parties shall follow the procedure provided in this Article 13.2 *(Development Operations at Objective Depth)* for all other proposals for operations in the well bore until such time as the well is temporarily abandoned or permanently abandoned.

### 13.2.3  Response on Next Highest Priority Proposal

If the proposal with the highest priority is not approved, then the next highest priority proposal shall be deemed the highest priority proposal, and it shall be subject to the approval procedure in Article 13.2.2 *(Response to Highest Priority Proposal)*. This process will continue until a proposal is approved to complete the Development Well, temporarily plug and abandon the Development Well, or permanently plug and abandon a Development Well.

### 13.2.4  Non-Participating Parties in Development Operations at Objective Depth

A Non-Participating Party in a Development Operation conducted on a Development Well after it has reached its Objective Depth [except as provided for in this Article 13.2 *(Development Operations at Objective Depth)*] is subject to Article 16.5.4 *(Non-Consent Development Operations)* and is relieved of the Costs and risks of that Development Operation, except that a Non-Participating Party in that Development Operation remains responsible for its Participating Interest Share of the Costs of plugging and abandoning a Development Well, less and except all Costs of plugging and abandoning associated solely with the subsequent Development Operation in which it was a Non-Participating Party.

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054430

### 13.2.5 Participation in a Sidetrack or Deepening by a Non-Participating Party in a Development Well at Initial Objective Depth

If a Development Well is drilled to its Objective Depth and a Non-Participating Party in that Development Well becomes a Participating Party in an approved Sidetracking or Deepening under Article 13.2 (c) or (e), that former Non-Participating Party shall become an Underinvested Party in an amount equal to its Non-Participating Interest Share of the Costs of that Development Well to its Objective Depth prior to that Sidetracking or Deepening.  The original Participating Parties in a Development Well are Overinvested Parties in that amount.  A former Non-Participating Party in a Development Well that becomes a Participating Party in an approved Sidetracking or Deepening remains a Non-Participating Party in that Development Well to initial Objective Depth until (a) its Underinvestment is eliminated under Article 16.9 *(Settlement of Underinvestments)* and (b) the Hydrocarbon Recoupment recoverable under Article 16.5.4 *(Non-Consent Development Operations)* less the Underinvestment, has been recovered by the original Participating Parties. If a former Non-Participating Party becomes a Participating Party in more than one approved Sidetracking or Deepening in the same Development Well, that former Non-Participating Party shall become an Underinvested Party only with regard to the first Sidetracking or Deepening it approves; however, that Underinvestment shall not be relieved by an Underinvested Party's subsequent participation.

### 13.3 Development Well Proposals That Include Drilling Below the Deepest Producible Reservoir

Any Party may propose a Development Well with an Objective Depth below the Deepest Producible Reservoir, and in response to that well proposal each Party may, in writing, limit its participation in the drilling of that Development Well to the base of the Deepest Producible Reservoir to be penetrated by that Development Well.  A Party who limits its participation in a Development Well to the base of the Deepest Producible Reservoir shall bear its Participating Interest Share of the Cost and risk of drilling that Development Well to the base of the Deepest Producible Reservoir (including abandonment), and it shall be a Non-Participating Party for the Deeper Drilling and shall be subject to Article 16.5.4 *(Non-Consent Development Operations)* in regard to the Deeper Drilling.

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054431

### 13.3.1   Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir

If a Party Electing to limit its participation in a well to the base of the Deepest Producible Reservoir to be penetrated by the well under Article 11.3 *(Appraisal Well Proposals That Include Drilling Below the Deepest Producible Reservoir)* or Article 13.3 *(Development Well Proposals That Include Drilling Below the Deepest Producible Reservoir)* considers the well to be capable of producing at or above the Deepest Producible Reservoir and has notified the Participating Parties down to Objective Depth of its desire to complete the well at or above the Deepest Producible Reservoir, the well will be drilled subject to the following provisions:

(a)   **Multiple Completion:**  If before drilling of the well commences, all Participating Parties in the well agree that multiple well completions are possible and practicable and that those completions will involve (i) a completion at or above the Deepest Producible Reservoir and (ii) a completion below the Deepest Producible Reservoir, the Participating Parties in the Deeper Drilling will bear one hundred percent (100%) of the Costs of drilling the well to an Objective Depth below the Deepest Producible Reservoir that are in excess of the original Costs to drill and complete the well in the Deepest Producible Reservoir.

(b)   **Single Completions:**   If prior to the commencement of the drilling of the well, the Participating Parties do not unanimously agree that multiple well completions are possible, then the first completion shall be at the objective deeper than the Deepest Producible Reservoir.   A Non-Participating Party in the Deeper Drilling is an Overinvested Party in the well in an amount equal to its Participating Interest Share of the Costs of drilling the well to the Deepest Producible Reservoir, and the Participating Parties in the Deeper Drilling on the well are Underinvested Parties for that amount upon the first of the following events to occur:

(i)   the well is not a Producible Well at a depth deeper than the Deepest Producible Reservoir and the well is plugged

**94**

HIGHLY CONFIDENTIAL   BP-HZN-2179MDL00054432

back to a zone at or above the Deepest Producible Reservoir;

(ii)     the well is completed as a Producible Well at a depth deeper than Deepest Producible Reservoir, but Hydrocarbon production from that depth is later depleted prior to Complete Recoupment (in regard to Deeper Drilling) and the well is plugged back to a zone at or above the Deepest Producible Reservoir;

(iii)    the well is completed as a Producible Well at a depth deeper than the Deepest Producible Reservoir and the Participating Parties have achieved Complete Recoupment (in regard to the Deeper Drilling) from Hydrocarbon production from a zone deeper than the Deepest Producible Reservoir;

(iv)    the well is plugged and abandoned prior to an attempted completion at or above the Deepest Producible Reservoir.

The Underinvestment will be depreciated at the rate of one half of one percent (0.5%) per month from the date the Deeper Drilling commences to the date the Non-Participating Party is entitled to share in the Hydrocarbon production from zones deeper than Deepest Producible Reservoir, but that depreciation will not reduce the Underinvestment below seventy-five percent (75%) of the original Underinvestment.

## 13.3.2    Completion Attempts At or Above the Deepest Producible Reservoir

If a Development Well in which Deeper Drilling is conducted is not completed for production below the Deepest Producible Reservoir, then the Participating Parties in that well down to the Deepest Producible Reservoir may use the well for completion in a zone at or above the Deepest Producible Reservoir. The Parties who paid their proportionate share of the drilling Costs to the base of the Deepest Producible Reservoir under Article 13.3 *(Development Well Proposals That Include Drilling Below the Deepest Producible Reservoir)* may

95

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054433

participate in the completion attempt in the zone at or above the Deepest Producible Reservoir. The Participating Parties in the Deeper Drilling operation shall bear the Costs (including plugging back Costs) necessary to place the well in proper condition for its completion in the zone at or above the Deepest Producible Reservoir. If a well drilled below the Deepest Producible Reservoir is damaged to the extent that it is rendered incapable of being completed and produced at or above the Deepest Producible Reservoir, the Participating Parties in the Deeper Drilling are obligated to reimburse the Non-Participating Parties in the Deeper Drilling for their Participating Interest Share of the Costs of drilling the well to the base of the Deepest Producible Reservoir.

### 13.4   Recompletions and Workovers

Any of the Participating Parties in the subsequent Development Operation, Recompletion, or Workover that resulted in the most recent Hydrocarbon production from a Development Well may propose a Recompletion in or Workover of that Development Well. Each Recompletion or Workover, including the permanent plugging and abandonment of a Producible Reservoir, requires approval by Vote of those Participating Parties. A Non-Participating Party in a Recompletion or Workover is subject to Article 16.5.4 *(Non-Consent Development Operations)* and is relieved of the Costs and risks of the Recompletion or Workover but remains responsible for its Participating Interest Share of the Costs of plugging and abandoning the Development Well, less and except any Costs of plugging and abandoning associated solely with a Recompletion or Workover in which it is a Non-Participating Party.

### 13.5   Permanent Plugging and Abandonment and Cost Allocation

The permanent plugging and abandonment of a Development Well that:

(a)   is to be plugged due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth under Article 13.1.4 (b),

(b)   is to be plugged under Article 13.2 *(Development Operations at Objective Depth)*, or

(c)   has been previously temporarily abandoned under Article 13.2 *(Development Operations at Objective Depth)*

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054434

and has not produced Hydrocarbons (other than as a result of Production Testing), requires the approval of the Participating Parties by Vote.  Approval to plug and abandon a Development Well that has produced Hydrocarbons (other than as a result of Production Testing) shall be governed by Article 18.1 *(Abandonment of Wells)*.  If a proposal to plug and abandon a Development Well receives approval by Vote, the approved proposal binds all Parties.  If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon a Development Well, that Participating Party shall be deemed to have approved the plugging and abandonment of that Development Well.  If a rig is on location and a proposal to plug and abandon a Development Well under either Article 13.5 (a) or 13.5 (b) does not receive approval by Vote, and if within twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) after receipt of that proposal no other operation is proposed (and subsequently approved) for the well by a Party entitled to make a proposal, the Operator may nevertheless proceed to plug and abandon the Development Well, and shall give each Participating Party notice of that fact. If the proposal to plug and abandon a Development Well that has not produced Hydrocarbons (other than as a result of Production Testing) does not receive approval by Vote, but the Operator deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nevertheless proceed to plug and abandon that Development Well and shall give each Participating Party notice of that fact.

The Participating Parties in a Development Well proposal shall pay all Costs of plugging and abandoning that Development Well, except all increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 13.2 *(Development Operations at Objective Depth)* or Article 6.2.2 *(Supplemental AFEs)*.  The Participating Parties in that Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to that Non-Consent Operation.

## ARTICLE 14 – FACILITIES AND GATHERING SYSTEMS

### 14.1   Facilities as a Part of Development Plan

The Development Plan shall provide for the installation of all Facilities necessary to handle or service Hydrocarbons produced pursuant to that Development Plan.

97

HIGHLY CONFIDENTIAL    BP-HZN-2179MDL00054435

If the approved Development Plan provides that Hydrocarbon production can most efficiently be processed and handled by Offsite Host Facilities, the Development Plan shall provide for a Development System designed to use Offsite Host Facilities.

## 14.2    Use of Offsite Host Facilities

In the event the approved Development Plan provides that Hydrocarbon production can most efficiently be processed and handled by Offsite Host Facilities, the Participating Parties shall use reasonable efforts to secure a formal "Facilities Use and Production Handling Agreement" from the owners of the Offsite Host Facilities under the terms submitted to the Parties by the Operator under Article 12.4.1 (f) (*Tieback Operations*), but no Participating Party shall have a duty (fiduciary or otherwise) to secure capacity in the Offsite Host Facilities on behalf of any other Participating Party.  However, any capacity secured by that "Facilities Use and Production Handling Agreement" to Offsite Host Facilities shall be shared proportionately by the Participating Parties, who executed the "Facilities Use and Production Handling Agreement," on the basis of their Participating Interest Share in the Development System, unless those Parties agree to a different proportionate share of the capacity.  This Agreement shall govern all operations and activities regarding Hydrocarbon production, which are not specifically addressed in the "Facilities Use and Production Handling Agreement."   This Article 14.2 shall not constitute a limit on a Party's right to install its own facilities under Article 15 (*Disposition of Hydrocarbon Production*).

## 14.3    Use of Development Systems

The Participating Parties in a Development System have priority access to and utilization of the Facilities associated with the Development System in order to operate and develop the Contract Area under an approved Development Plan.

## 14.4    Processing Priorities

The Participating Parties in a Development System jointly own all processing and handling capacity associated with that Development System.  The use of excess processing or handling capacity in that Development System is subject to the following priority of usage:

(a)    First priority to Hydrocarbon production from the Development Phase during which the existing processing Facilities were fabricated and installed;

98

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054436

(b)    Second priority to Hydrocarbon production from a Development Phase during which the existing processing Facilities were not fabricated and installed;

(c)    Third priority to hydrocarbon production from outside the Contract Area that is owned one hundred percent (100%) by all Participating Parties in the Development System in the same percentage as their ownership in that Development System;

(d)    Fourth priority to hydrocarbon production from outside the Contract Area that is owned one hundred percent (100%) by all of the Participating Parties in the Development System but not in the same percentage as their ownership in the Development System;

(e)    Fifth priority to hydrocarbon production from outside the Contract Area that is owned by all Participating Parties in the Development System and a third party;

(f)    Sixth priority to hydrocarbon production from outside the Contract Area that is owned by one or more Participating Parties in the Development System, but not by all of them, and a third party; and

(g)    Seventh priority to hydrocarbon production from outside the Contract Area that is owned one hundred percent (100%) by a third party.

Any hydrocarbon production processing and handling capacity offered to parties under (d), (e), (f), and (g) of this Article 14.4 shall be processed and handled under a "Facilities Use and Production Handling Agreement" unanimously agreed to by the Participating Parties in the Execution AFE for that Development System and, if applicable, the Participating Parties in any additional Facilities which are to be used for the processing or handling of those hydrocarbons.

### 14.5   Approval of Additional Facilities

This Article 14.5 shall only apply to Facilities that were not included in an approved Development Plan and are to be utilized for Hydrocarbon production. Any Participating Party in an Execution AFE for a Development System may propose the installation of additional Facilities beyond those specified in the Development Plan associated with that Development System by giving notice to the other Participating Parties (along with an associated AFE), together with

HIGHLY CONFIDENTIAL

information adequate to describe the proposed Facilities.  Except as provided in Article 15.2 *(Facilities to Take In Kind)*, the installation of additional Facilities beyond the scope of a Development Plan requires the approval by Vote of the Participating Parties in the Execution AFE (and all supplemental AFEs) for the Development System that is to receive the additional Facilities.  Upon approval of such a proposal, the Operator shall proceed to install the additional Facilities, provided that, in the judgment of the Operator, the additional Facilities do not interfere with continuing operations on the Contract Area and there is sufficient deck space and buoyancy available to support the proposed additional Facilities. A Non-Participating Party in a proposal for additional Facilities shall be subject to Article 16.5.5 *(Non-Consent Subsequent Production System and Additional Facilities)*. If the Facilities proposal is for a disposal well, that Facilities proposal shall contain the same information provided in a Development Well proposal.

**14.6   <u>Expansion or Modification of Existing Production System</u>**

This Article 14.6 shall only apply to expansions or modifications of a Production System that are to be utilized for activities or operations on the Contract Area. After installation of a Production System described and approved in a Development Plan, any Participating Party in that Production System may propose the expansion or modification of that Production System by written notice (along with its associated AFE) to the other Participating Parties in that Production System.   That proposal requires the approval by Vote of the Participating Parties in that Production System.  If approved, that proposal will be binding on all Participating Parties in that Production System, and the Operator shall commence that expansion or modification at the sole Cost and risk of all of the Participating Parties in that Production System unless otherwise agreed.

**14.7   <u>Additions, Expansion, or Modification of Production System or Facilities for Health, Safety, or Environmental Reasons</u>**

If a proposal for additional Facilities or a proposal for the expansion or modification of a Production System does not receive approval by Vote of the Participating Parties in the Execution AFE (and all supplemental AFEs) for the Development System that is to receive additional Facilities or have its Production System expanded or modified, whichever is applicable, and that proposal is necessary for health, safety, or environmental reasons and has been mandated by governmental authority or judicial process, the Operator may, at its discretion, install those additional Facilities or make those expansions or modifications to

100

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054438

the Production System. If the Operator elects to exercise its discretionary right to make those installations, modifications, or expansions, the Operator shall provide written notice of its decision to each Participating Party in the Execution AFE (and all supplemental AFEs) for the Development System that is to receive additional Facilities or have its Production System expanded or modified, whichever applies.

# ARTICLE 15 – DISPOSITION OF HYDROCARBON PRODUCTION

## 15.1 Duty to Take in Kind

Each Party has the right and duty to take in kind or separately dispose of its share of the Hydrocarbons, excluding (i) Hydrocarbons that are unavoidably lost and (ii) Hydrocarbon production that the Operator uses in production or Development Operations or in preparing and treating Hydrocarbons for marketing or transportation in an Export Pipeline.

## 15.2 Facilities to Take in Kind

Each Participating Party in the Execution AFE for a Development System has the right, at its sole cost and risk, to construct and install facilities on and connect pipelines to the Development System for purposes of taking its share of Hydrocarbon production in kind, provided that, in the judgment of the Operator, the installation and operation of those facilities and pipelines will not unreasonably interfere with continuing operations on the Development System or the Contract Area.

## 15.3 Failure to Take Oil or Condensate in Kind

If a Party fails to take in kind or dispose of its share of the oil or condensate produced from the Contract Area, the Operator may, but is not obligated to, purchase for its own account, sell to others, or otherwise dispose of all or part of that oil or condensate at the same price at which the Operator calculates and pays lessor's royalty on its oil or condensate, or if lessor takes its royalty in kind, sell that oil or condensate to others at the price prevailing in the area for oil or condensate of the same kind, gravity, and quality reasonably obtainable by the Operator under the circumstances, subject to revocation by the non-taking Party upon thirty (30) days written notice to the Operator but shall not take effect until

101

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054439

the Operator's sales contract with a third party terminates. The Operator is not obligated to obtain a price equal to the price at which its oil or condensate is sold. The Operator's right to take in kind or dispose of a non-taking Party's share of the oil or condensate is subject to the non-taking Party's right, at any time and from time to time, to take in kind or dispose of its share of the oil or condensate. All contracts of sale by the Operator for another Party's oil or condensate shall be only for such reasonable periods not to exceed one year. Proceeds of all sales by the Operator under this Article 15.3 shall be paid by the end of the calendar month so that the Parties entitled to those proceeds will be able to make timely payments, without penalty, of lessor's royalty on the oil or condensate, which generated the proceeds.

Unless required by governmental authority or judicial process, no Party shall be forced to share an available market with a non-taking Party.

**15.4   Gas Balancing Provision**

If for any reason a Party fails to take or market its full share of gas as produced, the gas balancing and accounting between the Parties shall be handled under Exhibit "D."

**15.5   Expenses of Delivery in Kind**

All Costs incurred by the Operator in making delivery of a Party's share of Hydrocarbon production or disposing of same shall be borne by that Party.

# ARTICLE 16 – NON-CONSENT OPERATIONS

**16.1   Conduct of Non-Consent Operations**

Any activity or operation that invokes this Article 16 *(Non-Consent Operations)* must be proposed by a Party in good faith, using Cost estimates and Objective Depths that are reasonable for the Contract Area. Non-Consent Operations shall not unreasonably interfere with activities or operations conducted by all Parties, unless the Non-Consent activity or operation will maintain all or a portion of the Contract Area under Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*.

HIGHLY CONFIDENTIAL                                                    BP-HZN-2179MDL00054440

### 16.1.1 **Costs**

The Costs of a Non-Consent Operation shall be borne by the Participating Parties in accordance with their Participating Interest Share in the Non-Consent Operation (unless otherwise agreed by the Participating Parties).  Within ninety (90) days after a Non-Consent Operation has been conducted, the Operator shall furnish all other Parties with either (a) an itemized statement of the Cost of the Non-Consent Operation and an inventory of the pertinent equipment or (b) a detailed statement of monthly billings.  The Operator shall furnish to the Parties a monthly statement showing operating, maintenance, and other expenses attributable to the Non-Consent Operation together with a statement of the quantity of Hydrocarbons produced, and the revenues from the sale of Hydrocarbon production for the preceding month from operations subject to Hydrocarbon Recoupment under this Article 16.   In accounting for the revenues from Non-Consent Operations, Hydrocarbon production need not be separately metered, but may be determined upon the basis of monthly well tests, or as otherwise permitted in the MMS Surface or Subsurface Commingling Approval.  Operating expenses shall be allocated under Article 16.8.3 *(Operating and Maintenance Charges)*.  If a Party takes its share of production in kind under Article 15 *(Disposition of Hydrocarbon Production)*, that Party shall advise the Operator (in writing on or before the tenth day of the month following the month in which the Hydrocarbon production is sold or used off the premises) of the volumes of Hydrocarbons sold or used off the premises and the prices received for those Hydrocarbons so that the Operator may calculate the balance of any Hydrocarbon Recoupment amounts.

To calculate the balance of Hydrocarbon Recoupment each Party, who bears a portion of the Non-Participating Interest Share, shall maintain the balance of the Hydrocarbon Recoupment attributable to the Non-Participating Interest Share borne by that Party and shall advise the Operator and Non-Participating Parties when Complete Recoupment has been reached.

HIGHLY CONFIDENTIAL                                          BP-HZN-2179MDL00054441

### 16.1.2 Multiple Completions

Non-Consent Operations shall not be conducted in a well having multiple completions unless:

    (a)   each of the multiple completions are owned by the same Parties in the same proportion;

    (b)   none of the previous well completions are capable of producing in paying quantities; or

    (c)   the Participating Parties in the well containing the multiple completions unanimously agree to those Non-Consent Operations.

## 16.2 Acreage Forfeiture Provisions

In view of the significantly greater risks associated with the first Exploratory Well and the Execution AFE for the initial Development System, the Participating Parties in the first Exploratory Well or that Execution AFE are entitled to an assignment of all of the right, title, and interest (including operating rights) in the Contract Area of the Non-Participating Parties in that well or AFE as provided below.

### 16.2.1 First Exploratory Well

If a Participating Party proceeds with the timely commencement of the drilling of the first Exploratory Well as a Non-Consent Operation and

    (a)   the first Exploratory Well is drilled to its Objective Depth;

    (b)   the first Exploratory Well is drilled to a depth shallower than its Objective Depth and eighty percent (80%) or more of the total amount of the AFE for that Exploratory Well is expended; or

    (c)   the first Exploratory Well is abandoned under Article 10.1.4 (*AFE Overruns and Substitute Well*) prior to reaching its Objective Depth and prior to the Participating Parties expending at least eighty percent (80%) or more of the AFE for that Exploratory Well, but the Participating Parties timely commence the drilling of a substitute well, and the cumulative Costs of that Exploratory Well and its substitute well equal or exceed eighty percent (80%)

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054442

of the total amount of the AFE for the original first Exploratory Well;

then within thirty (30) days after notice of the occurrence of an event described in clause (a), (b), or (c), a Non-Participating Party in the first Exploratory Well or its substitute well, as applicable, shall execute and deliver an assignment of all of its right, title, and interest in the Contract Area, free of all Lease Burdens as defined in Article 19.1 *(Burdens on Hydrocarbon Production)*, effective on the date actual drilling operations for the well are commenced, to the Participating Parties in the first Exploratory Well or its substitute well, as applicable, with no reimbursement by and at no Cost to those Participating Parties.  If an assignment is made under this Article 16.2.1, then each Participating Party shall accept its Participating Interest Share, as determined under Article 8.4 *(Participation by Fewer Than All Parties)*, of the Non-Participating Party's assigned interest.   The Non-Participating Party's Election or Vote not to participate in the first Exploratory Well shall be deemed a withdrawal under Article 17 *(Withdrawal From Agreement)*, and the Parties shall be subject to Article 17 *(Withdrawal From Agreement)*.   After the satisfaction of Article 16.2.1(a), (b), or (c), a Non-Consent Operation performed in the first Exploratory Well's well bore or its substitute's well bore, as applicable, shall not be subject to this Article 16.2.1 but shall be subject to the Hydrocarbon Recoupment premium provided in Article 16.5.1.1 *(Non-Consent Exploratory Operations at Objective Depth)*, except as provided in Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*.

**16.2.2**   **Execution AFE**

Within thirty (30) days of notice of the timely commencement of the activities or operations associated with the Execution AFE for the initial Development System, a Non-Participating Party in that Execution AFE shall execute and deliver an assignment of all of its right, title, and interest in the Contract Area to the Participating Parties in that Execution AFE, free of all Lease Burdens as defined in Article 19.1 *(Burdens on Hydrocarbon Production)*, effective on the date the construction or acquisition of the initial Development System is

HIGHLY CONFIDENTIAL                              BP-HZN-2179MDL00054443

commenced, with no reimbursement by and at no Cost to those Participating Parties. If an assignment is made under this Article 16.2.2, then each Participating Party shall accept its Participating Interest Share, as determined under Article 8.4 *(Participation by Fewer Than All Parties)*, of the Non-Participating Party's assigned interest. The Non-Participating Party's Election not to participate in the Execution AFE for the initial Development System shall be deemed a withdrawal under Article 17 *(Withdrawal From Agreement)*, and the Parties shall be subject to Article 17 *(Withdrawal From Agreement)*.

### 16.3   <u>Costs and Liabilities of Prior Operations</u>

Subject to Article 6.2.2 (*Supplemental AFEs*), a Non-Participating Party subject to a non-consent provision remains liable for its share of previously incurred Costs and liabilities for activities and operations in which it was a Participating Party, and there shall be no re-allocation of Costs for activities and operations in which it was a Participating Party, except as provided in Article 13.3.1 *(Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir)*.

### 16.4   <u>Non-Consent Operations to Maintain Contract Area</u>

If a proposal is made for

(a)   an activity or operation required under a governmental agency order, notice, regulation, or Lease to maintain all or part of the Contract Area; or

(b)   an activity or operation

     (i)   within the final one hundred eighty (180) days of the primary term of a Lease, and if the Lease is not held by any means and will expire under its own terms, or

     (ii)   within sixty (60) days prior to the deadline for an activity or operation required under an SOO or SOP activity schedule or a unit plan of operation,

and the proposal requires approval by Vote or Election or unanimous agreement and that approval or agreement is not obtained within the applicable response period, then, notwithstanding any contrary provision of Article 8 *(Approvals and Notices)*, the proposed activity or operation shall be deemed to have been approved, and all Parties that Voted or Elected or agreed by written statement to

HIGHLY CONFIDENTIAL                      BP-HZN-2179MDL00054444

participate in the proposed activity or operation may proceed with the proposed activity or operation at their sole Cost and risk. However, before those Parties commence that activity or operation, they shall give written notice to the other Parties of their intention to commence that activity or operation. The other Parties shall have a second opportunity to participate in that activity or operation, under Article 8.3 *(Second Opportunity to Participate),* except that the response period for that second opportunity to participate shall be fifteen (15) days after receipt of that notice.

### 16.4.1   Acreage Forfeiture in the Entire Contract Area

If it is necessary to conduct an activity or operation referred to in Article 16.4 *(Non-Consent Operations to Maintain Contract Area)* in order to maintain the entire Contract Area, then each Non-Participating Party in that activity or operation shall relinquish and permanently assign, effective on the date the operation is commenced, to the Participating Parties one hundred percent (100%) of the Non-Participating Party's Working Interest in the entire Contract Area, including property and equipment acquired under this Agreement, within thirty (30) days of the commencement of that activity or operation. Failure to participate in that activity or operation is deemed a withdrawal, and the Parties will be subject to Article 17 *(Withdrawal From Agreement).*

### 16.4.2   Acreage Forfeiture in a Portion of a Contract Area

If it is necessary to conduct an activity or operation referred to in Article 16.4 *(Non-Consent Operations to Maintain Contract Area)* in order to maintain a portion of the Contract Area, then each Non-Participating Party in that activity or operation shall relinquish and permanently assign, effective on the date the operation is commenced, to the Participating Parties one hundred percent (100%) of the Non-Participating Party's Working Interest in the affected portion of the Contract Area, including property and equipment acquired under this Agreement, within thirty (30) days of the commencement of that activity or operation. That assignment shall be conveyed to the Participating Parties in proportion to their Participating Interest Share in that activity or operation. The Non-Participating Party shall bear all expenses associated with that assignment and shall be subject to Article 17.3.1 *(Prior Expenses),* Article 17.3.2 *(Confidentiality)* and

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054445

Article 17.3.3 (*Emergencies and Force Majeure*) with respect to the assigned acreage. If a Development System does not exist at the time of the forfeiture assignment or if the Non-Participating Party, who forfeited its interest under this Article 16.4, was a Non-Participating Party in the Development System which is located in the non-forfeited portion of the Contract Area, upon MMS approval of that assignment, the assigned acreage shall be expunged from Exhibit "A," and it shall no longer be included in the Contract Area. If that assignment is to two or more Participating Parties in that activity or operation, then (a) the assigned acreage shall be deemed to be governed by an operating agreement incorporating identical provisions as the provisions in this Agreement, except to the extent they are clearly inappropriate, (b) the execution of the operating agreement by those Participating Parties shall be considered a mere formality only, (c) the Operator of the assigned acreage shall promptly prepare that operating agreement, and (d) the Participating Parties shall promptly execute it. If a Development System is located on the non-forfeited portion of the Contract Area and if the Participating Parties in the operation or activity, which were conducted in order to save the forfeited portion of the Contract Area, are Participating Parties in that Development System, the Parties shall amend this Agreement to provide for a separate operational area for the forfeited portion of the Contract Area and a separate operational area for the non-forfeited portion of the Contract Area, and this Agreement shall apply separately to each operational area; provided however, the Participating Parties in the Development System located on the non-forfeited portion of the Contract Area, who participated in the operation or activity, which were conducted in order to save the forfeited portion of the Contract Area, shall have the same priority of access to that Development System as the Parties in the separate operational area for the non-forfeited portion of the Contract Area.

**16.4.3**   **Limitations on Acreage Forfeiture**

Notwithstanding the foregoing, if more than one activity or operation is conducted under Article 16.4 (*Non-Consent Operations to Maintain Contract Area*), any one of which would maintain the entire Contract Area or the affected portion of the Contract Area, a Participating Party in any one of those activities or operations shall not be required to

108

HIGHLY CONFIDENTIAL                    BP-HZN-2179MDL00054446

make an assignment under Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*.

### 16.5   Percentage Hydrocarbon Recoupment for Non-Consent Operations

Except as provided in Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain Contract Area)*, upon the timely commencement of a Non-Consent Operation, each Non-Participating Party's Working Interest and leasehold operating rights in the Non-Consent Operation along with its title to that portion of future Hydrocarbon production provided in this Article 16.5, if any, shall be owned by and vested in each Participating Party in accordance with its Participating Party Interest Share in the Non-Consent Operation under Article 8.4 *(Participation by Fewer Than All Parties)*. A third-party cash contribution made for Confidential Data from a Non-Consent Operation shall be deducted from the Non-Participating Interest Share of the Costs of the well operation or of drilling and completing the well, as applicable, prior to computation of the Hydrocarbon Recoupment amount.

#### 16.5.1   Non-Consent Exploratory Operations down to Objective Depth in the First Exploratory Well

Since the Participating Parties in the first Exploratory Well are entitled to an assignment of all of the right, title, and interest (including operating rights) in the Contract Area of the Non-Participating Parties in that well as provided in Article 16.2.1 *(First Exploratory Well)*, there is no Hydrocarbon Recoupment for Non-Consent Exploratory Operations conducted in the first Exploratory Well down to its Objective Depth.

#### 16.5.1.1   Non-Consent Exploratory Operations at Objective Depth

The Hydrocarbon Recoupment amount for all non-consent Exploratory Operations conducted after the first Exploratory Well has reached its Objective Depth, be they non-consent Exploratory Wells other than the first Exploratory Well or operations conducted subsequent to an Exploratory Well, including the first Exploratory Well reaching its Objective Depth, is the Non-Participating Interest Share of the Costs of that Non-consent Operation multiplied by eight hundred percent (800%).

109

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054447

### 16.5.2   Non-Consent Appraisal Operations

The Hydrocarbon Recoupment amount for all Appraisal Operations conducted as Non-Consent Operations is the Non-Participating Interest Share of the Costs of the Appraisal Operation multiplied by six hundred percent (600%).

### 16.5.3   Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, or Enhanced Recovery Project Team AFEs

If a Non-Participating Party in a Proprietary Geophysical Operation pursuant to Exhibit "L", Feasibility AFE, Define AFE, Long Lead Development System AFE, Post-Production Project Team AFE, or Enhanced Recovery Project Team AFE takes, or is deemed to have taken, the steps set forth in Article 16.9 *(Settlement of Underinvestments)*, that Party is an Underinvested Party in an amount equal to two hundred percent (200%) of the amount it would have paid had it participated in that activity, operation, or AFE until the Underinvestment is eliminated under Article 16.9 *(Settlement of Underinvestments)*.   If a Non-Participating Party in a Selection AFE takes, or is deemed to have taken, the steps set forth in Article 16.9 *(Settlement of Underinvestments)*, that Party is an Underinvested Party in an amount equal to two hundred percent (200%) of the amount that the it would have paid had it participated in that AFE until the Underinvestment is eliminated under Article 16.9 *(Settlement of Underinvestments)*.

### 16.5.4   Non-Consent Development Operations

The Hydrocarbon Recoupment amount for all Development Operations conducted as Non-Consent Operations is the Non-Participating Interest Share of the Costs of the Development Operation multiplied by four hundred percent (400%).

### 16.5.5   Non-Consent Subsequent Development System and Additional Facilities

The Hydrocarbon Recoupment amount for a non-consent Execution AFE for a subsequent Development System or additional Facilities not

HIGHLY CONFIDENTIAL   BP-HZN-2179MDL00054448

included in an Execution AFE is the Non-Participating Interest Share of the Cost incurred with respect to that Execution AFE or those additional Facilities not included in an Execution AFE multiplied by three hundred percent (300%).

**16.5.6**   **Additional Hydrocarbon Recoupment**

In addition to the percentage Hydrocarbon Recoupment for the various Non-Consent Operations set forth above, the Participating Parties are entitled to recoup:

(a)   one hundred percent (100%) of the Non-Participating Interest Share of the Cost of using an existing Development System that is needed to serve a Production System or Facilities installed as a Non-Consent Operation, in which the Non-Participating Party has a Participating Interest; plus

(b)   one hundred percent (100%) of the Non-Participating Interest Share of the Cost of operating expenses, maintenance Costs, royalties, and severance, gathering, and production taxes and other governmental fees based on production.

**16.5.7**   **Hydrocarbon Recoupment From Production**

Hydrocarbon Recoupment for a Non-Consent Operation shall be made from the Hydrocarbon production as follows:

**16.5.7.1** **Non-Consent   Exploratory   Operations,   Non-Consent Appraisal  Operations,  and  Non-Consent  Development Operations  That  Discover  or  Extend  a  Producible Reservoir**

For

(a)   an Exploratory Operation,

(b)   an Appraisal Operation, or

(c)   a Development Operation,

that is conducted as a Non-Consent Operation and discovers a new Producible Reservoir or extends an existing Producible

111

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054449

Reservoir (as the Producible Reservoirs existed at the time the Development Operation was proposed), each Non-Participating Party shall satisfy Hydrocarbon Recoupment from

(i) one hundred percent (100%) of its Non-Participating Interest Share of all Hydrocarbons produced and saved from the Non-Consent Operation, if the Non-Consent Operation results in Hydrocarbon production, and

(ii) fifty percent (50%) of its Participating Interest Share of all Hydrocarbons produced and saved from operations conducted after the Non-Consent Operation that result in Hydrocarbon production from the same Producible Reservoir discovered or extended by the Non-Consent Operation.

### 16.5.7.2 Non-Consent Development Operations in an Existing Producible Reservoir

If a Development Operation is conducted as a Non-Consent Operation and does not discover a new Producible Reservoir and also does not extend an existing Producible Reservoir (as the Producible Reservoirs existed at the time the Development Operation was proposed), each Non-Participating Party shall satisfy Hydrocarbon Recoupment from one hundred percent (100%) of its Non-Participating Interest Share of Hydrocarbons produced and saved from the Non-Consent Operation, if the Non-Consent Operation results in Hydrocarbon production.

### 16.5.7.3 Non-Consent Subsequent Development Systems

If the construction and installation of a subsequent Development System is conducted as a Non-Consent Operation, each Non-Participating Party shall satisfy Hydrocarbon Recoupment from:

(a) one hundred percent (100%) of its Non-Participating Interest Share or its Participating Interest Share

112

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054450

(whichever applies) of Hydrocarbons produced and saved from all Development Operations that are conducted from that subsequent Development System, and

(b)   one hundred percent (100%) of its Non-Participating Interest Share or its Participating Interest Share (whichever applies) of Hydrocarbons produced and saved from all wells that benefit from injection or disposal wells drilled and/or operated from that subsequent Development System.

## 16.6   Restoration of Interests to Non-Participating Party

Except as provided in Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain Contract Area)*, a Non-Participating Party's Working Interest and leasehold operating rights revert to the Non-Participating Party, effective at 7:00 a.m. of the day after the occurrence of the first of the following events:

(a)   the well bore of the Non-Consent Operation is not a Producible Well on the date the permanent plugging and abandonment of the well concludes;

(b)   Hydrocarbon production recouped under Article 16.5.7 *(Hydrocarbon Recoupment From Production)* as result of a Non-Consent Operation ceases prior to Complete Recoupment;

(c)   the Participating Parties Sidetrack or Deepen an Exploratory Well, Appraisal Well, or Development Well and that well does not qualify as a Producible Well; or

(d)   upon Complete Recoupment.

However, only upon Complete Recoupment does a former Non-Participating Party become a Participating Party in the Non-Consent Operation.

### 16.6.1   Dry Hole Reversion

If a Non-Consent Operation, other than a Non-Consent Operation under Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain Contract Area)*, results in an event provided in

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054451

Article 16.6 (a) or (b) and a Non-Participating Party's Working Interest and leasehold operating rights revert back to the Non-Participating Party, all well equipment in place as a result of that Non-Consent Operation and all Development Systems fabricated and installed as a result of that Non-Consent Operation and rights to future Hydrocarbon production from a Producible Reservoir discovered or extended by that Non-Consent Operation as described in Article 16.5.7 *(Hydrocarbon Recoupment From Production)* remain vested in the Participating Parties. Any salvage value in excess of Complete Recoupment will be credited to all Parties according to their Working Interest and without regard to their participation status.

**16.6.2   Sidetracking or Deepening a Non-Consent Well**

If a Non-Participating Party participates in a Sidetracking or Deepening as provided in Article 10.2.5 *(Participation in Sidetrack or Deepening by a Non-Participating Party in an Exploratory Well at Initial Objective Depth)*, Article 11.2.5 *(Participation in Sidetrack or Deepening by a Non-Participating Party in an Appraisal Well at Initial Objective Depth)*, or Article 13.2.5 *(Participation in Sidetrack or Deepening by a Non-Participating Party in a Development Well at Initial Objective Depth)*, and if the Participating Parties have recouped the Cost of the original well down to its Objective Depth at the time the Sidetrack or Deepening is approved by Election, then the Non-Participating Party shall not be an Underinvested Party in the Sidetracking or Deepening of that well, and the Participating Parties in the original well shall achieve Complete Recoupment under Article 16.5.7.1 *(Non-Consent Exploratory Operations, Non-Consent Appraisal Operations, and Non-Consent Development Operations That Discover or Extend a Producible Reservoir)* or Article 16.5.7.2 *(Non-Consent Development Operations in an Existing Producible Reservoir)*, whichever applies.

**16.7   Operations From a Subsequent Non-Consent Development System**

A Party who Elected not to participate in a subsequent Development System may participate in Development Operations from that subsequent Development System. If that Non-Participating Party participates in such a Development Operation, then the Non-Participating Party shall make to the Operator a lump sum payment of any remaining Hydrocarbon Recoupment and Underinvestment

HIGHLY CONFIDENTIAL                                      BP-HZN-2179MDL00054452

under Article 16 *(Non-Consent Operations)* for which it is still liable. The Operator shall then distribute to the Participating Parties in the subsequent Development System their Participating Interest Share of the payment. Upon that payment, the Non-Participating Party will become an owner and a Participating Party in the subsequent Development System.

**16.8   Allocation of Development System Costs to Non-Consent Operations**

In the event a well is drilled from or produced through a Production System or is produced through Facilities whose Participating Parties are different from the Participating Parties in that well or if the Participating Parties' Participating Interest Shares in that Production System or Facilities are different from their Participating Interest Shares in that well, the rights of the Participating Parties in that well and the Costs to use the Production System or Facilities for that well shall be determined as follows:

**16.8.1   Investment Charges**

(a)   The Participating Parties in that well shall pay to the Operator a one-time slot usage fee for the use of a slot on the Production System equal to two percent (2%) of the Cost of the Production System; provided, however, each Non-Participating Party's share of the slot usage fee shall be included in the calculation of any Hydrocarbon recoupment to which it is subject as a result of the Non-Consent Operation's utilizing that slot. Within fifteen (15) days of its receipt of that fee, the Operator shall distribute to the Participating Parties in the Production System their Participating Interest Share of that payment. For purposes of calculating the slot usage fee, the total Cost of the Production System shall be reduced by (0.41667%) per month, commencing on the date the Production System was installed and continuing every month thereafter until the month actual drilling operations on that well is commenced; however, the total Cost of the Production System shall not be reduced by more than twenty-five percent (25%) of the total Production System's costs. The Cost of additions to the Production System shall be reduced in the same manner commencing the first month after the addition is installed.

HIGHLY CONFIDENTIAL                                                                    BP-HZN-2179MDL00054453

If that well is abandoned, having never produced Hydrocarbons, the right of the Participating Parties in that well to use the Production System slot through which the well was drilled shall terminate unless those Parties commence drilling a substitute well for the abandoned well through the same slot within ninety (90) days of the abandonment.   If that substitute well is abandoned, having never produced Hydrocarbons, the right of the Participating Parties in that well to use the Production System slot through which the well was drilled shall terminate.

The slot usage fee shall not apply to a slot deemed to be "surplus."  A slot may be deemed surplus only by the unanimous agreement of the owners of the Production System.

(b)   The Participating Parties in that well shall pay to the owners of the Facilities a sum equal to that portion of the total Cost of those Facilities that the throughput volume of the Non-Consent Operation bears to the total design throughput volume of the Facilities.  Throughput volume shall be estimated by the Operator in barrels produced per day (5.8 mcf of gas determined at a pressure of 14.73 pounds per square inch atmospheric and a temperature of sixty (60) degrees Fahrenheit equaling one barrel of oil and one barrel of water equaling one barrel of oil), using an average daily volume of the first three months of Hydrocarbon and water production from the Non-Consent Operation.   For purposes of calculating the Facilities usage fee, the total Cost of the Facilities shall be reduced by (0.41667%) per month, commencing from the date when the Facilities were installed and continuing every month thereafter until the first month during which production from the Non-Consent Operation commences, but the total Cost of the Facilities shall not be reduced more than twenty-five percent (25%) of the total Facilities' Cost.   If a modification, expansion, or addition to the Facilities is made after commencing first production and before connection of the Non-Consent Operation to the Facilities, the Facilities investment shall be reduced in the same manner described above, from the month in which the Facilities modification, expansion, or addition is

HIGHLY CONFIDENTIAL                    BP-HZN-2179MDL00054454

completed until the first month during which production from the
Non-Consent Operation is commenced.

### 16.8.2 Payments

Payment of a usage fee shall not be deemed to be a purchase by the
Participating Parties of an additional interest in the Production System
or Facilities.  Payments under Article 16.8.1 *(Investment Charges)* shall
be due and payable on commencement of initial production from the
Non-Consent Operation.

### 16.8.3 Operating and Maintenance Charges

The Participating Parties in a well drilled as a Non-Consent Operation
shall pay all Costs necessary to connect the well to the Production
System.  The Costs of operating and maintaining the Facilities and the
Production System shall be allocated equally among all active
completions served.   Subsea Production System operating and
maintenance Costs shall be allocated equally among all subsea well
completions served by the Subsea Production system.  Operating and
maintenance Costs for the Facilities shall be allocated to each well
served in the proportion that the volume throughput of the well bears
to the total volume throughput of all wells handled by the Facilities.

### 16.9 Settlement of Underinvestments

A Non-Participating Party shall become an Underinvested Party and become
liable for settling an Underinvestment if it (a) makes a revised Election or Vote to
become a Participating Party in an AFE, activity, or operation in which it originally
Elected or Voted not to participate, (b) Elects to participate (i) in the Sidetracking
or Deepening of a wellbore in which it did not participate to Objective Depth or
(ii) in a Sidetracking or Deepening thereafter, (c) Elects to participate in a
Development Plan after a Major Modification of that plan has been approved, or
(d) Elects to participate in Development Operations from a subsequent
Development System in which it did not participate.  A Non-Participating Party in
a Selection AFE, who elects to participate in the Define AFE, which follows it,
shall automatically be deemed to have submitted to the Operator a written
statement memorializing its subsequent Election to (a) participate in that
Selection AFE, in which it originally Elected not to participate, and (b) become an
Underinvested Party in regard to that AFE.  A Non-Participating Party in a Define

117

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054455

AFE, who elects to participate in the Execution AFE, which follows it, shall automatically be deemed to have submitted to the Operator a written statement memorializing its subsequent Election to (a) participate in the Define AFE in which it originally Elected not to participate and (b) become an Underinvested Party in regard to that AFE.   A Non-Participating Party in a Long Lead Development System AFE, who elects to participate in the activity or operation for which the long lead item in the Long Lead Development System AFE was procured, shall automatically be deemed to have submitted to the Operator a written statement memorializing its subsequent Election to (a) participate in that Long Lead Development System AFE, in which it originally Elected not to participate, and (b) become an Underinvested Party in regard to that AFE. Except as provided in Article 16.9.1 *(Cash Settlement of Underinvestment)*, an Underinvested Party shall settle its Underinvestment through Disproportionate Spending.   The Underinvested Party shall be responsible for and pay one hundred percent (100%) of the Overinvested Parties' share of the Costs (or if there are two or more Underinvested Parties, a proportion of those Costs based on each Party's Underinvestment) in subsequent activities or operations or AFEs under this Agreement in which that Underinvested Party and one or more Overinvested Parties participate until the amount of the Underinvestment is eliminated, except under Article 13.3.1 *(Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir)* the Underinvested Party shall be responsible for and pay one hundred percent (100%) of the Overinvested Parties' share of the Costs (or if there are two or more Underinvested Parties, a proportion of those Costs based on each Party's Underinvestment) in subsequent activities or operations or AFEs within the Contract Area in which one or more Overinvested Parties participate until the amount of the Underinvestment is eliminated.

**16.9.1    Cash Settlement of Underinvestment**

If the Parties do not plan or propose further activities or operations under this Agreement (for which Costs would be allocated to the elimination of an Underinvestment), the Underinvested Party shall pay the Overinvested Parties the remaining Underinvestment amount in cash under Exhibit "C."  If Disproportionate Spending in the Contract Area does not eliminate an Underinvestment within two (2) years after the date the Underinvestment is incurred, or upon final accounting and settlement under this Agreement, or before the Underinvested Party

118

HIGHLY CONFIDENTIAL                    BP-HZN-2179MDL00054456

withdraws from the Contract Area under Article 17 *(Withdrawal From Agreement)*, whichever comes first, the Underinvested Party shall pay the Overinvested Parties the remaining Underinvestment in cash under Article 17 *(Withdrawal From Agreement)* and Exhibit "C."

# ARTICLE 17 – WITHDRAWAL FROM AGREEMENT

## 17.1  Right to Withdraw

Subject to this Article 17.1, any Party may withdraw from this Agreement (the "Withdrawing Party") by giving prior written notice to all other Parties stating its decision to withdraw ("the withdrawal notice"). The withdrawal notice shall specify an effective date of withdrawal that is at least sixty (60) days, but not more than ninety (90) days, after the date of the withdrawal notice. Within thirty (30) days of receipt of the withdrawal notice, the other Parties may join in the withdrawal by giving written notice of that fact to the Operator ("written notice to join in the withdrawal") and upon giving written notice to join in the withdrawal are "Other Withdrawing Parties." The withdrawal notice and the written notice to join in the withdrawal are unconditional and irrevocable offers by the Withdrawing Party and the Other Withdrawing Parties to convey to the Parties who do not join in the withdrawal ("the Remaining Parties") the Withdrawing Party's and the Other Withdrawing Parties' entire Working Interest in all of the Leases, Hydrocarbon production, and other property and equipment owned under this Agreement.

## 17.2  Response to Withdrawal Notice

Failure to respond to a withdrawal notice is deemed a decision not to join in the withdrawal.

### 17.2.1  Unanimous Withdrawal

If all the other Parties join in the withdrawal,

(a)  no assignment of Working Interests shall take place;

(b)  subject to Article 18.4 *(Abandonment Operations Required by Governmental Authority)*, no further operations may be conducted under this Agreement unless agreed to by all Parties;

119

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054457

(c)    the Parties shall abandon all activities and operations within the Contract Area and relinquish all of their Working Interests to the MMS within fifteen (15) days of the conclusion of the thirty (30) day joining period; and

(d)    notwithstanding anything to the contrary in Article 18 *(Abandonment and Salvage)*, the Operator shall:

      (i)    furnish all Parties a detailed abandonment plan, if applicable, and a detailed cost estimate for the abandonment within sixty (60) days after the conclusion of the thirty (30) day joining period; and

      (ii)    cease operations and begin to permanently plug and abandon all wells and remove all Production Systems and Facilities in accordance with the abandonment plan.

### 17.2.2   No Additional Withdrawing Parties

If none of the other Parties join in the withdrawal, then the Remaining Parties must accept an assignment of their Participating Interest Share of the Withdrawing Party's Working Interest.

### 17.2.3   Acceptance of the Withdrawing Parties' Interests

If one or more but not all of the other Parties join in the withdrawal and become Other Withdrawing Parties, then within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) of the conclusion of the thirty (30) day joining period, each of the Remaining Parties shall submit to the Operator a written rejection or acceptance of its Participating Interest Share of the Withdrawing Party's and Other Withdrawing Parties' Working Interest.  Failure to make that written rejection or acceptance shall be deemed a written acceptance.  If the Remaining Parties are unable to select a successor Operator, if applicable, or if a Remaining Party submits a written rejection and the other Remaining Parties do not agree to accept one hundred percent (100%) of the Withdrawing Party's and Other Withdrawing Parties' Working Interest within thirty (30) days of the conclusion of the forty-eight (48) hour period to submit a written rejection or acceptance, the

HIGHLY CONFIDENTIAL

Remaining Parties will be deemed to have joined in the withdrawal, and Article 17.2.1 *(Unanimous Withdrawal)* will apply.

### 17.2.4    Effects of Withdrawal

Except as otherwise provided in this Agreement, after giving a withdrawal notice or a written notice to join in the withdrawal, the Withdrawing Party and Other Withdrawing Parties are not entitled to approve or participate in any activity or operation in the Contract Area, other than those activities or operations for which they retain a financial responsibility.  The Withdrawing Party and Other Withdrawing Parties shall take all necessary steps to accomplish their withdrawal by the effective date referred to in Article 17.1 *(Right to Withdraw)* and shall execute and deliver to the Remaining Parties all necessary instruments to assign their Working Interest to the Remaining Parties.  A Withdrawing Party and Other Withdrawing Parties shall bear all expenses associated with their withdrawal and the transfer of their Working Interest.

## 17.3   Limitation Upon and Conditions of Withdrawal

### 17.3.1    Prior Expenses

The Withdrawing Party and Other Withdrawing Parties remain liable for their remaining Underinvestments and their Participating Interest Share of the Costs of activities, operations, rentals, royalties, taxes, damages, Hydrocarbon imbalances, or other liability or expense accruing or relating to (i) obligations existing as of the effective date of the withdrawal, (ii) activities or operations conducted before the effective date of the withdrawal, (iii) activities or operations approved by the Withdrawing Party and Other Withdrawing Parties before the effective date of the withdrawal, or (iv) activities or operations commenced by the Operator under one of its discretionary powers under this Agreement before the effective date of the withdrawal.  Before the effective date of the withdrawal, the Operator shall render a statement to the Withdrawing Party and Other Withdrawing Parties for (1) their respective shares of all identifiable Costs under this Article 17.3.1 and (2) their respective Participating Interest Shares of the estimated current Costs of plugging and abandoning all wells and removing all Production Systems, Facilities, and other materiel and equipment

121

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054459

serving the Contract Area, less their respective Participating Interest Shares of the estimated salvage value of the assets at the time of abandonment, as approved by Vote. This statement of expenses, Costs, and salvage value shall be prepared by the Operator under Exhibit "C." Before withdrawing, the Withdrawing Party and Other Withdrawing Parties shall either pay the Operator, for the benefit of the Remaining Parties, the amounts allocated to them in the statement or provide security satisfactory to the Remaining Parties for all obligations and liabilities they have incurred and all obligations and liabilities attributable to them before the effective date of the withdrawal. All liens, charges, and other encumbrances, including but not limited to overriding royalties, net profits interest, and production payments, which the Withdrawing Party and Other Withdrawing Parties placed (or caused to be placed) on their Working Interest shall be fully satisfied or released prior to the effective date of its withdrawal (unless the Remaining Parties are willing to accept the Working Interest subject to those liens, charges, and other encumbrances).

**17.3.2** **Confidentiality**

The Withdrawing Party and Other Withdrawing Parties will continue to be bound by the confidentiality provisions of Article 7 *(Confidentiality of Data)* after the effective date of the withdrawal but will have no further access to technical information relating to activities or operations under this Agreement. The Withdrawing Party and Other Withdrawing Parties are not required to return to the Remaining Parties Confidential Data acquired prior to the effective date of the withdrawal.

**17.3.3** **Emergencies and Force Majeure**

No Party may withdraw during a Force Majeure or emergency that poses a threat to life, safety, property, or the environment but may withdraw from this Agreement after termination of the Force Majeure or emergency. The Withdrawing Party and Other Withdrawing Parties remain liable for their share of all Costs and liabilities arising from the Force Majeure or emergency, including but not limited to the drilling of relief wells, containment and cleanup of oil spills and pollution, and all Costs of debris removal made necessary by the Force Majeure or emergency.

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054460

# ARTICLE 18 – ABANDONMENT AND SALVAGE

## 18.1   Abandonment of Wells

Any Participating Party may propose the permanent plugging and abandonment of a well that has produced Hydrocarbons (other than as a result of Production Testing) by notifying the other Participating Parties.  Any Participating Party that fails to respond within the applicable response period shall be deemed to have approved the permanent plugging and abandonment of the well.   If the permanent plugging and abandonment proposal is unanimously agreed to by the Participating Parties in that well, the well shall be permanently plugged and abandoned under the applicable regulations at the Cost and risk of the Participating Parties.  If the Participating Parties do not unanimously agree to permanently plug and abandon the well, the Operator shall prepare an estimate of the Costs of the permanent plugging and abandonment of the well less the estimated salvage value of the well, as determined under Exhibit "C," and the Participating Party desiring to permanently plug and abandon the well shall pay the Operator, for the benefit of the non-abandoning Participating Parties, its share of that estimate within thirty (30) days of its receipt of the estimate.  If an abandoning Participating Party's respective share of the estimated salvage value is greater than its share of the estimated Costs of the permanent plugging and abandonment, the Operator, on behalf of the non-abandoning Participating Parties, shall pay to the abandoning Participating Party a sum equal to the deficiency within thirty (30) days of the abandoning Participating Party's receipt of the estimate.  Each Participating Party desiring to abandon a well shall assign to each non-abandoning Participating Party in that well a portion of its Working Interest in that well and the equipment therein and the Hydrocarbon production therefrom equal to the non-abandoning Party's Participating Interests in that well divided by the entire Participating Interests of the non-abandoning Parties in that well.  That assignment shall be effective as of the date of the abandoning Party's response to the well abandonment proposal.   The abandoning Party shall assume and be liable for all obligations pertaining to that well, except liability for payments under this Article 18.1, prior to the effective date of its assignment to the non-abandoning Parties. The abandoning Party shall not assume and be liable for any obligations pertaining to that well, except liability for payments under this Article 18.1, as of the effective date of its assignment to the non-abandoning Parties.

123

HIGHLY CONFIDENTIAL                                                BP-HZN-2179MDL00054461

## 18.2   <u>Abandonment of Equipment</u>

Any Participating Party in a Production System or Facilities or an enhanced recovery and/or pressure maintenance program described in Article 12.11 *(Enhanced Recovery and/or Pressure Maintenance Program Proposals)* (the "Equipment") may propose the abandonment and disposition of that Equipment.  If that proposal is unanimously agreed to by the Participating Parties, the Operator shall abandon and dispose of that Equipment at the Cost and risk of the Participating Parties.  If a Participating Party fails to respond within the applicable response period, that Participating Party shall be deemed to have approved the abandonment and disposal of the Equipment.  If all Participating Parties do not approve abandoning and disposing of the Equipment, the Operator shall prepare an estimate of the Costs of abandonment, removal, site clearance, and disposition of the Equipment, less the estimated salvage value of the Equipment, as determined under Exhibit "C," and the Participating Party desiring to abandon and dispose of the Equipment shall pay the Operator, for the benefit of the non-abandoning Participating Parties, its share of that estimate within thirty (30) days of its receipt of the estimate.  If an abandoning Participating Party's respective share of the estimated salvage value is greater than its share of the estimated costs, the Operator, on behalf of the non-abandoning Participating Parties, shall pay to the abandoning Participating Party a sum equal to the surplus within thirty (30) days of the abandoning Participating Party's receipt of the estimate.  Each Participating Party desiring to abandon the Equipment shall assign to each non-abandoning Participating Party in the Equipment a portion of its Working Interest in the Equipment equal to the non-abandoning Party's Participating Interests in the Equipment divided by the entire Participating Interests of the non-abandoning Parties in the Equipment.  That assignment shall be effective as of the date of the abandoning Party's response to the Equipment abandonment proposal.  The abandoning Party shall assume and be liable for all obligations pertaining to the Equipment, except liability for payments under this Article 18.2, prior to the effective date of its assignment to the non-abandoning Parties.  The abandoning Party shall not assume and be liable for any obligations pertaining to the Equipment, except liability for payments under this Article 18.2, as of the effective date of its assignment to the non-abandoning Parties.

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054462

### 18.3   Disposal of Surplus Materiel

The Operator may classify materiel acquired under this Agreement as surplus when the Operator deems it is no longer needed in present or foreseeable activities or operations.  The Operator shall determine the value and Cost of disposing of the materiel under Exhibit "C."  If the materiel is classified as junk or if the value, less the Cost of disposal, is less than or equal to five hundred thousand dollars ($500,000.00), the Operator may dispose of the surplus materiel in a manner it deems appropriate.  If the value, less the Cost of disposal of the surplus materiel, is greater than five hundred thousand dollars ($500,000.00), the Operator shall give written notice thereof to the Parties owning the materiel, and the surplus materiel shall be disposed of in accordance with the method of disposal approved by the Parties owning the materiel. Proceeds from the sale or transfer of surplus materiel shall be promptly credited to each Party in proportion to its ownership of the materiel at the time of the retirement or disposition of the materiel.

### 18.4   Abandonment Operations Required by Governmental Authority

The Operator shall conduct the abandonment and removal of any Equipment [as defined in Article 18.2 *(Abandonment of Equipment)*] required by a governmental authority, and the Costs, risks, and net proceeds of that abandonment and removal will be shared by the Participating Parties in that Equipment [as defined in Article 18.2 *(Abandonment of Equipment)*] according to their Participating Interest Share.

## ARTICLE 19 – RENTALS, ROYALTIES, AND MINIMUM ROYALTIES

### 19.1   Burdens on Hydrocarbon Production

If a Party has previously created or hereafter creates an overriding royalty, production payment, carried or reversionary working interest, net profits interest, mortgage, lien, security interest, or other type of burden on Hydrocarbon production, including, but not limited to, agreements affecting the marketing, processing, or transportation of Hydrocarbon Production, other than the lessor's royalty stipulated in a Lease (a "Lease Burden"), the Party creating the Lease Burden shall assume and bear all liabilities and obligations of the Lease Burden regardless of that Party's participation status and notwithstanding an assignment

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054463

under this Agreement of all or part of that Party's Working Interest to another party. The Party creating the Lease Burden shall indemnify, release, defend, and hold all other Parties harmless from all claims and demands for payment asserted by the owners of the Lease Burden.

### 19.1.1   Subsequently Created Lease Burdens

Notwithstanding any contrary provision of this Agreement, if a Party, after executing this Agreement, creates a Lease Burden, that Lease Burden shall be made specifically subject to this Agreement.  If the Party owning the Working Interest from which a Lease Burden is created (a) fails to pay when due its share of Costs, (b) withdraws from this Agreement, or (c) Elects to abandon a well under Article 18.1 *(Abandonment of Wells)*, then the beneficiary of the Lease Burden will be chargeable with Costs equal to its fractional interest in gross production and the security rights created in Exhibit "F" will be applicable against that Lease Burden.  The Operator has the right to enforce the security rights (and all other rights granted under this Agreement) against the beneficiary of a Lease Burden for the purpose of collecting Costs chargeable to the Lease Burden.  The rights of the beneficiary of a Lease Burden are subordinate to the rights of the Parties granted by Exhibit "F."

## 19.2   Payment of Rentals and Royalties

The Operator shall make all rental payments for the Leases on behalf of the Parties.  The Operator shall use reasonable care to make proper and timely payment of the rental payments, all minimum royalties, and all other similar payments accruing under the Leases.  Upon receipt of proper evidence of those payments and the Operator's invoice for its proportionate share of those payments, each Non-Operating Party shall reimburse the Operator for the Non-Operating Party's Working Interest share of those payments.  In the event the Operator fails to make proper payment of a rental, minimum royalty, or other similar payment accruing under a Lease through mistake or oversight where that payment is required to continue that Lease in force and effect, the Operator will not be liable to the other Parties for any resulting damages or any loss that results from the non-payment, unless that non-payment is due to the gross negligence or willful misconduct of the Operator. The loss of a Lease or interest therein that results from the Operator's failure to pay, or the Operator's

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054464

erroneous payment of, a rental, minimum royalty, or other similar payments is a joint loss, and there will be no readjustment of Working Interests as a consequence thereof. For production delivered in-kind by the Operator to a Non-Operating Party or to a third party for the account of a Non-Operating Party, the Non-Operating Party shall provide the Operator with information about the proceeds or value of the production in order for the Operator to make payments of all minimum royalties due.

### 19.2.1   Non-Participation in Payments

If a Party notifies the other Parties, in writing at least sixty (60) days before the date the payment is due of its intention not to pay its share of a rental, minimum royalty, or other similar payment, that Party shall be deemed to have given a withdrawal notice under Article 17 *(Withdrawal From Agreement)*, and must withdraw from the entire Contract Area, not just the Lease on which the payment is due. Upon this occurrence, the Operator shall make the payment solely for the benefit of the Remaining Parties, as defined in Article 17 *(Withdrawal From Agreement)*, and the Remaining Parties shall reimburse the Operator for their respective shares of the payment, based on the procedures in Article 17.2 *(Response to Withdrawal Notice)*.

### 19.2.2   Royalty Payments

Each Party shall pay or cause to be paid all royalty and other amounts payable, which are based on its share of Hydrocarbon production. Adjustments to those payments shall be made among the Parties in accordance with Exhibit "D" (Gas Balancing Agreement). When the Participating Parties are recouping their Costs from a Non-Consent Operation and an applicable premium under Article 16.5 *(Percentage Hydrocarbon Recoupment for Non-Consent Operations)*, each of the Participating Parties shall pay or cause to be paid the Lease royalty on the portion of the Hydrocarbon Recoupment to which it is entitled.

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054465

# ARTICLE 20 – TAXES

## 20.1   Internal Revenue Provision

Notwithstanding any provision in this Agreement to the effect that the rights and liabilities of the Parties are several, not joint or collective, and that the Agreement and the activities and operations under this Agreement do not constitute a partnership under state law, each Party elects to be excluded from the application of all or any part of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, as amended, or similar provisions of applicable state laws, regardless of whether for federal income tax purposes this Agreement and the activities and operations under this Agreement are regarded as a partnership.

## 20.2   Other Taxes and Assessments

The Operator shall file all tax returns and reports required by law and pay all applicable taxes [other than income or other taxes provided in Article 20.2.2 *(Production and Severance Taxes)*] and assessments levied with respect to activities and operations conducted under this Agreement.  The Parties shall promptly furnish the Operator with copies of all notices, assessments, and statements received pertaining to taxes to be paid by the Operator.  The Operator will charge each Party its Working Interest share of all taxes and assessments paid [other than income or other taxes provided in Article 20.2.2 *(Production and Severance Taxes)*] and, upon written request from a Non-Operating Party, provide copies of all tax returns, reports, tax statements, and receipts for the taxes.  The Operator shall not allow any taxes to become delinquent unless unanimously agreed to by the Parties.

### 20.2.1   Property Taxes

The Operator shall render for ad valorem property tax purposes all personal property and/or real property covered by this Agreement as may be subject to that taxation and shall pay those property taxes for the benefit of each Party.  The Operator shall timely and diligently protest a valuation of the Leases for tax purposes it deems unreasonable.  Pending final determination of the valuation of the Leases for tax purposes, unless unanimously agreed to by the Parties to the contrary under Article 20.2 *(Other Taxes and Assessments)*, the Operator shall, on or before the due date, pay under protest taxes on

128

Exhibit A
Page 139

HIGHLY CONFIDENTIAL                    BP-HZN-2179MDL00054466

the Leases at the assessed value of the Leases.  If upon final determination, additional taxes are due or if interest or a penalty has accrued as a result of the protest, the Operator shall pay the taxes, interest, and penalty and shall charge each Party its Working Interest share of the taxes, interest, and penalty under Exhibit "C."

### 20.2.2   Production and Severance Taxes

Each Party shall pay, or cause to be paid, all production, excise, severance, and other similar taxes due on its share of Hydrocarbon production.  Each Party shall, upon a written request from the Operator, provide evidence that those taxes have been paid.

# ARTICLE 21 – INSURANCE AND BONDS

### 21.1   Insurance

The Operator shall provide and maintain the insurance coverage specified in Exhibit "B" and charge those Costs to the Joint Account.  No other insurance shall be carried for the benefit of the Parties under this Agreement unless otherwise agreed by the Parties.

### 21.2   Bonds

The Costs of those bonds or financial guarantees acquired exclusively for the conduct of activities and operations under this Agreement shall be charged to the Joint Account, including an amount equivalent to the reasonable cost of that bond or financial guarantee if the Operator provides that bond or guarantee itself and does not engage a third party to do so.  The Operator shall require all contractors to obtain and maintain all bonds required by an applicable law, regulation, or rule.

# ARTICLE 22 – LIABILITY, CLAIMS, AND LAWSUITS

### 22.1   Individual Obligations

The obligations, duties, and liabilities of the Parties under this Agreement are several and not joint or collective, and, except as otherwise provided in Article 20 *(Taxes)*, nothing in this Agreement shall be construed to create a partnership, joint venture, association, or other form of business entity recognizable in law for

HIGHLY CONFIDENTIAL                                    BP-HZN-2179MDL00054467

any purpose.  In their relations with each other under this Agreement, the Parties are not fiduciaries, but rather are free to act at arm's length in accordance with their own respective interests.

## 22.2   Notice of Claim or Lawsuit

If, on account of a matter involving activities or operations under this Agreement, or affecting the Leases or the Contract Area, a claim is made against a Party, or if a party outside of this Agreement files a lawsuit against a Party, or if a Party files a lawsuit, or if a Party receives notice of a material administrative or judicial hearing or other proceeding, that Party shall give written notice of the claim, lawsuit, hearing, or proceeding ("Claim") to the other Parties as soon as reasonably practicable.

## 22.3   Settlements

The Operator may settle a Claim, or multiple Claims, arising out of the same incident, involving activities or operations under this Agreement or affecting the Leases or the Contract Area, if the aggregate expenditure does not exceed five hundred thousand dollars ($500,000.00) and if the payment is in complete settlement of these Claims.  If the amount required for settlement exceeds this amount, the Parties shall determine the further handling of the Claims under Article 22.4 (*Defense of Claims and Lawsuits*).

## 22.4   Defense of Claims and Lawsuits

The Operator shall supervise the handling, conduct, and prosecution of all Claims involving activities or operations under this Agreement or affecting the Leases or the Contract Area.  Claims may be settled in excess of the amount specified in Article 22.3 (*Settlements)* if the settlement is approved by Vote of the Participating Parties in the activity or operation out of which the Claim arose, but a Party may independently settle a Claim or the portion of a Claim which is attributable to its Participating Interest Share alone as long as that settlement does not directly and adversely affect the interest or rights of the other Participating Parties.  No charge shall be made for services performed by the staff attorneys of a Party, but all other expenses incurred by the Operator in the prosecution or defense of Claims for the Parties, together with the amount paid to discharge a final judgment, are Costs and shall be paid by the Parties in proportion to their Participating Interest Share in the activity or operation out of which the Claim arose.  The employment of outside counsel, but not the

130

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054468

selection of that counsel, requires approval by Vote of the Participating Parties in the activity or operation out of which the Claim arose.  If the use of outside counsel is approved, the fees and expenses incurred as a result thereof shall be charged to the Parties in proportion to their Participating Interest Share in the activity or operation out of which that Claim arose.  Each Party has the right to hire its own outside counsel at its sole cost with respect to its own defense.

**22.5   Liability for Damages**

Unless specifically provided otherwise in this Agreement, liability for losses, damages, Costs, expenses, or Claims involving activities or operations under this Agreement or affecting the Leases or the Contract Area which are not covered by or in excess of the insurance carried for the Joint Account shall be borne by each Party in proportion to its Participating Interest Share in the activity or operation out of which that liability arises, except that when liability results from the gross negligence or willful misconduct of a Party, that Party shall be solely responsible for liability resulting from its gross negligence or willful misconduct. **UNDER NO CIRCUMSTANCES WILL A PARTY BE LIABLE TO ANOTHER PARTY FOR PUNITIVE DAMAGES, CONSEQUENTIAL, INDIRECT, UNFORSEEN, LOSS OF PROFIT, OR OTHER INDIRECT OR PENALTY DAMAGES EITHER IN LAW OR EQUITY.**

**22.6   Indemnification for Non-Consent Operations**

**TO THE EXTENT ALLOWED BY LAW, THE PARTICIPATING PARTIES WILL HOLD THE NON-PARTICIPATING PARTIES (AND THEIR AFFILIATES, AGENTS, INSURERS, DIRECTORS, OFFICERS, AND EMPLOYEES) HARMLESS AND RELEASE, DEFEND, AND INDEMNIFY THEM AGAINST ALL CLAIMS, DEMANDS, LIABILITIES, REGULATORY DECREES, AND LIENS FOR ENVIRONMENTAL POLLUTION AND PROPERTY DAMAGE OR PERSONAL INJURY, INCLUDING SICKNESS AND DEATH, CAUSED BY OR OTHERWISE ARISING OUT OF NON-CONSENT OPERATIONS, AND ANY LOSS AND COST SUFFERED BY A NON-PARTICIPATING PARTY AS AN INCIDENT THEREOF, EXCEPT WHERE THAT LOSS OR COST RESULTS FROM THE SOLE, CONCURRENT, OR JOINT NEGLIGENCE, FAULT, OR STRICT LIABILITY OF THAT NON-PARTICIPATING PARTY, IN WHICH CASE EACH PARTY SHALL PAY OR CONTRIBUTE TO THE SETTLEMENT OR SATISFACTION OF JUDGMENT IN THE PROPORTION THAT ITS NEGLIGENCE, FAULT, OR STRICT LIABILITY CAUSED OR CONTRIBUTED**

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054469

TO THE INCIDENT. IF AN INDEMNITY IN THIS AGREEMENT IS DETERMINED TO VIOLATE LAW OR PUBLIC POLICY, THAT INDEMNITY SHALL THEN BE ENFORCEABLE ONLY TO THE MAXIMUM EXTENT ALLOWED BY LAW.

**22.7   Damage to Reservoir and Loss of Reserves**

NOTWITHSTANDING ANY CONTRARY PROVISION OF THIS AGREEMENT, NO PARTY IS LIABLE TO ANY OTHER PARTY FOR DAMAGE TO A RESERVOIR OR LOSS OF HYDROCARBONS, EXCEPT IF THAT DAMAGE OR LOSS ARISES FROM A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, NOR DOES A PARTY INDEMNIFY ANY OTHER PARTY FOR THAT DAMAGE OR LOSS.

**22.8   Non-Essential Personnel**

UNLESS OTHERWISE MUTUALLY AGREED BY THE PARTIES IN WRITING, IN THE EVENT A PARTY REQUESTS TRANSPORTATION OR ACCESS TO ANY DRILLING RIG, PRODUCTION SYSTEM, VESSEL, OR OTHER FACILITY USED FOR ACTIVITIES OR OPERATIONS UNDER THIS AGREEMENT FOR ANY PERSON WHO IS NOT EMPLOYED BY, CONTRACTED BY, OR REPRESENTING SUCH PARTY IN CONNECTION WITH AN ACTIVITY OR OPERATION CONDUCTED PURSUANT TO THIS AGREEMENT, OTHER THAN GOVERNMENTAL OFFICIALS OR REPRESENTATIVES OF GOVERNMENTAL OR REGULATORY AGENCIES ("NON-ESSENTIAL PERSONNEL"), THE PARTY REQUESTING SUCH TRANSPORTATION OR ACCESS AGREES TO PROTECT, INDEMNIFY, RELEASE, DEFEND, AND HOLD HARMLESS THE OTHER PARTIES AND THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, AGENTS, CONTRACTORS, SUBCONTRACTORS, INVITEES, INSURERS, AND REPRESENTATIVES FROM AND AGAINST ALL CLAIMS, DEMANDS, CAUSES OF ACTION, JUDGMENTS, LIABILITIES, CONTRACTUAL LIABILITIES, AND OTHER COSTS (INCLUDING, WITHOUT LIMITATION, COURT COSTS, INTEREST, PENALTIES, LITIGATION EXPENSES, AND REASONABLE ATTORNEYS' FEES) FOR DAMAGE TO, DESTRUCTION OR LOSS OF PROPERTY, AND FOR PERSONAL INJURY OR DEATH OF PERSONS, AND FOR DAMAGE OR HARM TO THE ENVIRONMENT (INCLUDING WITHOUT LIMITATION, SPILL RESPONSE, ENVIRONMENTAL POLLUTION AND CONTAMINATION AND CLEAN-UP COSTS) ARISING

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054470

**OUT OF OR RELATED IN ANY WAY TO THE NEGLIGENCE, FAULT, OR LIABILITY WITHOUT FAULT OF THE NON-ESSENTIAL PERSONNEL BROUGHT BY OR ON BEHALF OF ANY PARTY WHOMSOEVER (INCLUDING, WITHOUT LIMITATION, ALL THIRD PARTIES AND GOVERNMENTAL AGENCIES), WITHOUT REGARD TO THE CAUSES THEREOF, INCLUDING PRE-EXISTING CONDITIONS, THE UNSEAWORTHINESS OF ANY VESSEL, THE STRICT LIABILITY, NEGLIGENCE, OR OTHER FAULT OF ANY PARTY, REGARDLESS OF WHETHER THE NEGLIGENCE BE SOLE, JOINT, OR CONCURRENT, ACTIVE OR PASSIVE, EXCEPT IF CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE PARTY SO INDEMNIFIED AND PROTECTED.**

**22.9   Dispute Resolution Procedure**

Any claim, controversy, or dispute arising out of, relating to, or in connection with this Agreement or an activity or operation conducted under this Agreement shall be resolved under the Dispute Resolution Procedure in Exhibit "H" to this Agreement.

# ARTICLE 23 – CONTRIBUTIONS

**23.1   Contributions from Third Parties**

A "Contribution" means a bottom hole cash contribution, dry hole cash contribution, or acreage contribution from third parties as consideration for data from wells or well operations on the Contract Area.  This Article 23 does not apply to the following:

(a)   Trades of Confidential Data for other similar geophysical, geological, geochemical, drilling, or engineering data from third parties.  Those trades of Confidential Data are subject to Article 7.2.1 *(Trades of Confidential Data)*;

(b)   Contributions received as consideration for entering into a contract for the sale of Hydrocarbon production, as proceeds of loans, or as proceeds of other financial arrangements:

HIGHLY CONFIDENTIAL

(c)  A farmout of all or a portion of a Party's Working Interest, which is subject to Article 24 *(Transfer of Interest and Preferential Right to Purchase)*.

**23.2  Methods of Obtaining Contributions**

The Operator shall negotiate all Contributions on behalf of the Participating Parties in the well or well operation.  A Contribution may be obtained in the following ways:

(a)  Any Participating Party in a well or well operation may propose that the Participating Parties in that well or well operation seek a Contribution from a third party towards that well or well operation.

(b)  If a Participating Party in a well or well operation receives a Contribution offer for that well or well operation from a third party, that Party shall notify all other Participating Parties in that well or well operation of the terms of that offer within five (5) days of its receipt of that offer.

**23.3  Counteroffers**

If a third party makes a Contribution counteroffer to the Participating Parties' Contribution offer, or if a Participating Party proposes to make a Contribution counteroffer to a third party Contribution offer, the Operator shall submit the Contribution counteroffer to the other Participating Parties.

**23.4  Approval of Contributions**

A Contribution proposal, a Contribution counteroffer to a third party Contribution offer, an acceptance of a Contribution offer from a third party, or a Contribution counteroffer from a third party requires the unanimous agreement of the Participating Parties in the well or well operation affected by the Contribution. Within fifteen (15) days of their receipt of a notice of a Contribution proposal, Contribution offer, or Contribution counteroffer, those Participating Parties shall respond to the Operator.

**23.5  Cash Contributions**

If a bottom hole or dry hole cash Contribution is offered and accepted, that cash Contribution shall be paid to the Operator, and the Operator shall credit the amount of the cash Contribution against the Costs of that well or well operation to each Participating Party in proportion to its Participating Interest Share.

134

Exhibit A
Page 145

HIGHLY CONFIDENTIAL          BP-HZN-2179MDL00054472

**23.6   Acreage Contributions**

Any acreage Contribution, which is offered and accepted under this Article 23 *(Contributions)*, shall be conveyed to the Participating Parties in the well or well operation in proportion to their Participating Interest Share therein.  The leases or portions of leases included in the acreage Contribution shall not be added to Exhibit "A" or included in the Contract Area.

**23.6.1   Two or More Parties Own One Hundred Percent of the Acreage Contribution**

If two or more Parties participate in the acreage Contribution and the conveyances to effectuate it, and if, after the conveyances are approved by the MMS, those Parties own one hundred percent (100%) of the ownership interest in the contributed acreage, then (a) the contributed acreage shall be deemed to be governed by an operating agreement incorporating identical provisions as the provisions in this Agreement, except to the extent they are clearly inappropriate, (b) the execution of the operating agreement by the Parties participating in the acreage Contribution shall be considered a mere formality only, (c) the designated operator shall promptly prepare the operating agreement, and (d) the Parties participating in the acreage Contribution shall promptly execute the operating agreement once it is prepared.

**23.6.2   Two or More Parties Own Less Than One Hundred Percent of the Acreage Contribution**

If two or more Parties participate in the acreage Contribution and the conveyances to effectuate it, and if, after the conveyances are approved by the MMS, those Parties own less than one hundred percent (100%) of the ownership interest in the contributed acreage, then those Parties shall use reasonable efforts to negotiate and execute with the other Working Interest owners in the contributed acreage an operating agreement covering the contributed acreage, which is as close in form to this Agreement as possible.

HIGHLY CONFIDENTIAL                                     BP-HZN-2179MDL00054473

## ARTICLE 24 – TRANSFER OF INTEREST AND PREFERENTIAL RIGHT TO PURCHASE

### 24.1   Transfer of Interest

Except as provided in 24.1.1 *(Exceptions to Transfer Notice)*, a Transfer of Interest shall be preceded by written notice to the Operator and the other Parties ("the transfer notice"). Any Transfer of Interest shall be made to a party financially capable of assuming the corresponding obligations under this Agreement. No Transfer of Interest shall release a Party from its obligations and liabilities under this Agreement, which are incurred prior to the effective date of that Transfer of Interest, or from debts or obligations incurred prior to the effective date of that Transfer of Interest, except to the extent expressly assumed by the transferee, and the security rights under Article 6.3 *(Security Rights)* shall continue to burden the Working Interest transferred and to secure the payment of any retained obligations and liabilities.  Once a Transfer of Interest becomes effective under Article 24.1.2 *(Effective Date of Transfer of Interest)*, the transferor shall not be responsible for any obligations, debts, or liabilities under this Agreement, which are incurred by the Parties on or after the effective date of that Transfer of Interest.

### 24.1.1   Exceptions to Transfer Notice

Notwithstanding any contrary provision of this Agreement, the transfer notice is not required when a Party proposes to mortgage, pledge, hypothecate, or grant a security interest in all or a portion of its Working Interest (including Assignments of Hydrocarbon production executed as further security for the debt secured by that security device); any Production Systems, Facilities, or equipment; or when any interest is conveyed in accordance with Articles 16 *(Non-Consent Operations)*, 17 *(Withdrawal From Agreement)*, and 18 *(Abandonment and Salvage)*.  However, an encumbrance arising from the financing transaction shall be expressly made subject and subordinated to this Agreement.

### 24.1.2   Effective Date of Transfer of Interest

The effective date of a Transfer of Interest shall be at least sixty (60) days, but not more than one hundred eighty (180) days, after the date of the receipt of the transfer notice.  A Transfer of Interest, other than

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054474

those provided in Article 17.1 (*Right to Withdrawal*) and Article 24.1.1 (*Exceptions to Transfer Notice*), is effective and shall be binding upon the Parties at the latest date of occurrence of all of the following: (i) the transferor or transferee provides all remaining Parties with a photocopy of a fully executed Transfer of Interest and an executed MMS Form 1123, "Designation of Operator," and an "Application for Certification of Oil Spill Responsibility" form and (ii) evidence of receipt of all necessary approvals by the MMS. The Parties shall promptly undertake all reasonable actions necessary to secure those approvals and shall execute and deliver all documents necessary to effectuate that Transfer of Interest. All costs attributable to a Transfer of Interest are the sole obligation of the assigning Party.

### 24.1.3   Minimum Transfer of Interest

Except as otherwise provided in this Agreement, a Transfer of Interest shall cover an undivided Working Interest in the entire Contract Area. Prior to the approval of the Execution AFE for the initial Development System, no Transfer of Interest shall be made that is not at least an undivided ten percent (10%) Working Interest, unless the Parties unanimously agree to a different minimum Transfer of Interest. After the Execution AFE Election on the initial Development System, a Transfer of Interest to a third party shall be limited to a minimum Working Interest of ten percent (10%), unless the Parties unanimously agree to a different minimum Transfer of Interest.

### 24.1.4   Form of Transfer of Interest

Any Transfer of Interest shall incorporate provisions that the Transfer of Interest is subordinate to and made expressly subject to this Agreement and provide for the assumption by the assignee of the performance of all of the assigning Party's obligations under this Agreement. Any Transfer of Interest not in compliance with this provision is voidable by the non-assigning Parties.

### 24.1.5   Warranty

Any Transfer of Interest, vesting, or relinquishment of Working Interest between the Parties under this Agreement shall be made without warranty of title.

HIGHLY CONFIDENTIAL                                                 BP-HZN-2179MDL00054475

**24.2   Preferential Right to Purchase**

Any Transfer of Interest shall be subject to the following provisions:

**24.2.1   Notice of Proposed Transfer of Interest**

The transfer notice shall provide full information about the proposed Transfer of Interest, including, but not limited to, the name and address of the prospective assignee (who must be ready, willing, and able to acquire the interest and deliver the stated consideration therefor), the full consideration for the Transfer of Interest, and all other terms of the offer.

In the case of a package sale of oil and gas interests that includes all or part of the assigning Party's Working Interest, or if the proposed Transfer of Interest is structured as a like-kind exchange, the Working Interest that is subject to the Transfer of Interest shall be separately valued and the transfer notice shall state the monetary value attributed to the Working Interest by that prospective assignee.   Article 24.2 *(Preferential Right to Purchase)* shall apply only to the Working Interest that is subject to the Transfer of Interest.

**24.2.2   Exercise of Preferential Right to Purchase**

Within sixty (60) days from receipt of the transfer notice, each non-assigning Party may exercise its preferential right to purchase its Participating Interest Share of the Working Interest offered (on the same terms and conditions, or on equivalent terms for a non-cash transaction as stated in the notice) without reservations or conditions by written notice of that fact to all of the Parties.  If a non-assigning Party does not exercise its preferential right to purchase its Participating Interest Share of the Working Interest offered and the non-assigning Parties, who wish to exercise their preferential right to purchase, do not agree to pay the full consideration for the Transfer of Interest and accept all of the other terms of the third party offer within fifteen (15) days of the sixty (60) day period in which the non-assigning Parties may exercise their preferential right to purchase, the assigning Party shall be free to complete the proposed conveyance on the terms disclosed in the notice.  If the other non-assigning Parties agree to pay the full consideration for the Transfer of Interest and accept all of the

HIGHLY CONFIDENTIAL                                            BP-HZN-2179MDL00054476

other terms of the third party offer, the assigning Party shall transfer the Working Interest to the non-assigning Parties who exercised their preferential right to purchase under this Article 24 *(Transfer of Interest and Preferential Right to Purchase)*.  The Transfer of Interest shall be concluded within a reasonable time, but no later ninety (90) days after the applicable period in which the non-assigning Parties may exercise their preferential right to purchase.

### 24.2.3   <u>Transfer of Interest Not Affected by the Preferential Right to Purchase</u>

Article 24.2 *(Preferential Right to Purchase)* shall not apply when a Party proposes to:

(a)   mortgage, pledge, hypothecate, or grant a security interest in all or a portion of its Working Interest (including assignments of Hydrocarbon production executed as further security for the debt secured by that security device), or

(b)   grant an overriding royalty, a net profits interest, or a production payment, or

(c)   dispose of its Working Interest by:

    (i)   merger, reorganization, or consolidation;

    (ii)   a Transfer of Interest of all or substantially all of a Party's exploration and production properties in the Gulf of Mexico;

    (iii)   a Transfer of Interest to an Affiliate, provided that there is included in the Transfer of Interest a provision that if for any reason the assignee ceases to be an Affiliate of the Transferring Party within one (1) year after Transfer of Interest, those rights shall be immediately reassigned to the original Party before the assignee ceases to be an Affiliate, and that all rights of the assignee in the Contract Area shall terminate if the re-assignment does not take place; or

139

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054477

(iv)     a Transfer of Interest pursuant to Articles 16 *(Non-Consent Operations)*, 17 *(Withdrawal From Agreement)*, and/or 18 *(abandonment and Salvage)*.

**24.2.4    Completion of Transfer of Interest**

If the proposed Transfer of Interest is not executed and filed of record with the MMS within one-hundred fifty (150) days after receipt of the transfer notice by the non-assigning Parties, or if the terms of the proposed Transfer of Interest conveyance are materially altered, the proposed Transfer of Interest shall be deemed withdrawn, and the Working Interest included in the proposed Transfer of Interest shall again be governed by this Article 24.2 *(Preferential Right to Purchase)*.

# ARTICLE 25 – FORCE MAJEURE

**25.1    Force Majeure**

If a Party is unable, wholly or in part because of a Force Majeure, to carry out its obligations under this Agreement, other than the obligation to make money payments, that Party shall give the other Parties prompt written notice of the Force Majeure with full particulars about it.  Effective upon the date notice is given, the obligations of the Party, so far as they are affected by the Force Majeure, shall be suspended during, but no longer than, the continuance of the Force Majeure.  Time is of the essence in the performance of this Agreement, and every reasonable effort will be made by the Party to avoid delay or suspension of any work or acts to be performed under this Agreement.  The requirement that the Force Majeure be remedied with all reasonable dispatch shall not require a Party to settle strikes or other labor difficulties.

# ARTICLE 26 – ADMINISTRATIVE PROVISIONS

**26.1    Term**

This Agreement shall remain in effect so long as a Lease remains in effect and thereafter until (a) all wells have been abandoned and plugged or turned over to the Parties owning an interest in the Lease on which the wells are located; (b) all Production Systems, Facilities, and equipment have been disposed by the

140

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054478

Operator in accordance Article 18 (*Abandonment and Salvage*); (c) all Claims as defined in Article 22 (*Liability, Claims, and Lawsuits*) have been settled or otherwise disposed of; and (d) there has been a final accounting and settlement. In accordance with Article 4.5 (*Selection of Successor Operator*), this Agreement will also terminate if no Party is willing to become Operator, effective after all conditions in clauses (a) through (d) above have been completed. Termination of this Agreement shall not relieve a Party of a liability or obligation accrued or incurred before termination and is without prejudice to all continuing confidentiality obligations or other obligations in this Agreement.

**26.2  Waiver**

A term, provision, covenant, representation, warranty, or condition of this Agreement may be waived only by written instrument executed by the Party waiving compliance. The failure or delay of a Party in the enforcement or exercise of the rights granted under this Agreement shall not constitute a waiver of said rights nor shall it be considered as a basis for estoppel. Time is of the essence in the performance of this Agreement, and all time limits shall be strictly construed and enforced.

**26.3  Waiver of Right to Partition**

Each Party waives the right to bring an action for partition of its interest in the Contract Area, Production System, Facilities, and equipment held under this Agreement, and covenants that during the existence of this Agreement it shall not resort at any time to an action at law or in equity to partition any or all of the Leases and lands or personal property subject to this Agreement.

**26.4  Compliance With Laws and Regulations**

This Agreement, and all activities or operations conducted by the Parties under this Agreement, are expressly subject to, and shall comply with, all laws, orders, rules, and regulations of all federal, state, and local governmental authorities having jurisdiction over the Contract Area. No Party shall suffer a forfeiture or be liable in damages for failure to comply with any of the provisions of this Agreement if such compliance is prevented by or if such failure results from compliance with any applicable law, order, rule, or regulation.

**26.4.1  Applicable Law**

**THIS AGREEMENT AND THE RELATIONSHIP OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY AND**

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054479

**INTERPRETED UNDER FEDERAL LAWS AND LAWS OF THE STATE OF LOUISIANA, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD OTHERWISE REFER THE MATTER TO THE LAWS OF ANOTHER JURISDICTION.**

### 26.4.2   Severance of Invalid Provisions

If, for any reason and for so long as, a clause or provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid, unenforceable, or unconscionable under a present or future law (or interpretation thereof), the remainder of this Agreement will not be affected by that illegality or invalidity.  An illegal or invalid provision will be deemed severed from this Agreement, as if this Agreement had been executed without the illegal or invalid provision.  The surviving provisions of this Agreement will remain in full force and effect unless the removal of the illegal or invalid provision destroys the legitimate purposes of this Agreement, in which event this Agreement shall be null and void.

### 26.4.3   Fair and Equal Employment

Each of the Parties is an Equal Opportunity Employer, and the equal opportunity provisions of 30 CFR 270 and 41 CFR 60-1 are incorporated in this Agreement by reference.  The affirmative action clauses concerning disabled veterans and veterans of the Vietnam era (41 CFR 60-250) and the affirmative action clauses concerning employment of the handicapped (41 CFR 60-741) are also incorporated in this Agreement by reference.  In performing work under this Agreement, the Parties shall comply with (and the Operator shall require each independent contractor to comply with) the governmental requirements in Exhibit "E" that pertain to non-segregated facilities.

## 26.5   Construction and Interpretation of this Agreement

### 26.5.1   Headings for Convenience

Except for the definition headings in Article 2 *(Definitions)*, all the table of contents, captions, numbering sequences, and paragraph headings in this Agreement are inserted for convenience only and do not define, expand, or limit the scope, meaning, or intent of this Agreement.

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054480

### 26.5.2 Article References

Except as otherwise provided in this Agreement, each reference to an article of this Agreement includes all of the referenced article and its sub-articles.

### 26.5.3 Gender and Number

The use of pronouns in whatever gender or number is a proper reference to the Parties to this Agreement though the Parties may be individuals, business entities, or groups thereof. Reference in this Agreement to the singular of a noun or pronoun includes the plural and vice versa.

### 26.5.4 Joint Preparation

This Agreement shall be deemed for all purposes to have been prepared through the joint efforts of the Parties and shall not be construed for or against one Party or the other as a result of the preparation, submittal, drafting, execution, or other event of negotiation hereof.

### 26.5.5 Integrated Agreement

This Agreement contains the final and entire agreement of the Parties for the matters covered by this Agreement and, as such, supersedes all prior written or oral communications and agreements, less and except the following: that certain Lease Exchange Agreement among BP and MOEX dated effective October 1, 2009 ("LEA"). If there is a conflict between this Agreement and the LEA, the LEA will prevail. This Agreement may not be modified or changed except by written amendment signed by the Parties.

### 26.5.6 Binding Effect

To the extent it is assignable, this Agreement shall bind and inure to the benefit of the Parties and their respective successors and assigns, and shall constitute a covenant running with the land comprising the Contract Area. This Agreement does not benefit or create any rights in a person or entity that is not a Party to this Agreement.

Exhibit A
Page 154

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054481

### 26.5.7   Further Assurances

Each Party will take all actions necessary and will sign all documents necessary to implement this Agreement.   Except as otherwise provided in this Agreement, within (30) days after their receipt of a valid written request for those documents from a Party, all other Parties shall prepare and execute the documents.

### 26.5.8   Duplicate Counterpart Execution

This Agreement may be executed by signing the original or a counterpart.  If this Agreement is executed in duplicate counterparts, all counterparts taken together shall have the same effect as if all Parties had signed the same agreement. No Party shall be bound to this Agreement until all Parties have executed a counterpart or the original of this Agreement.  This Agreement may also be ratified by a separate instrument that refers to this Agreement and adopts by reference all provisions of this Agreement.  A ratification shall have the same effect as an execution of this Agreement.

### 26.5.9   Currency

Any amounts due or payable under this Agreement shall be paid in United States currency.

### 26.5.10   Future References

A reference to a Party includes such Party's successors and assigns and, in the case of governmental bodies, persons succeeding to their respective functions and capacities.

## 26.6   Restricted Bidding

If more than one Party is ever on the list of restricted joint bidders for OCS lease sales, as issued by the MMS under 30 CFR 256.44, as amended, the Parties shall comply with all statutes and regulations regarding restricted joint bidders on the OCS.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

144

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054482

**IN WITNESS WHEREOF,** each Party, through its duly authorized agent or representative, has executed this Agreement as of the Effective Date.

WITNESSES:

**BP Exploration & Production Inc.**

_____
Signature

O. Kirk Wardlaw
Printed Name

Attorney-in-Fact
Title

WITNESSES:

**MOEX Offshore 2007 LLC**

_____
Signature

Naoki Ishii
Printed Name

President
Title

**145**

Exhibit A
Page 156

HIGHLY CONFIDENTIAL

EXHIBIT "A"

Attached to and made a part of that certain Operating Agreement dated October 1,
2009 by and between BP Exploration & Production Inc., as Operator, and MOEX
Offshore 2007 LLC, as Non-Operator

## WORKING INTEREST OF THE PARTIES, OPERATOR AND REPRESENTATIVES

I.   **Contract Area:**

| Area | Block | Date Acquired | OCS-G | Acres | Royalty |
|------|-------|---------------|-------|-------|---------|
| Mississippi Canyon | 252 | 6/1/08 | 32306 | 5,760 | 18.75% |

II.   **Working Interest of the Parties**

| | |
|---|---|
| BP Exploration & Production Inc. | 90% |
| MOEX Offshore 2007 LLC | 10% |

III.   **Operator**

BP Exploration & Production Inc.

IV.   **Addresses**

**Names of Representatives**

BP Exploration & Production Inc.          Kemper Howe
200 WestLake Park Blvd
Houston, TX 77079
Facsimile: (281) 366-7569

MOEX Offshore 2007 LLC                    Naoki Ishii
9 Greenway Plaza, Suite 1220
Houston, TX 77046
Facsimilie: (713) 532-8510

Page 1 of 1

HIGHLY CONFIDENTIAL                                    BP-HZN-2179MDL00054484

**EXHIBIT "B"**

**OFFSHORE INSURANCE PROVISIONS**

Attached to and made a part of that certain Operating Agreement dated October
1, 2009 by and between BP Exploration & Production Inc., as Operator, and
MOEX Offshore 2007 LLC, as Non-Operator

## I.  WORKERS COMPENSATION & EMPLOYERS LIABILITY INSURANCE

Operator will carry Workers Compensation insurance in compliance with all State
and Federal Regulations in the jurisdiction where any of the work under this
agreement shall be performed, including the following special coverage
extensions:

1. U.S. Longshoremen and Harbor Workers' Act and Outer Continental Shelf
   Lands Act coverage.

2. Employers' Liability including claims arising out of Maritime operations
   including coverage for benefits and damages under the Jones Act with
   limits of at least $1,000,000 per accident and per disease, aggregate.

3. "In Rem" endorsement providing that a claim "In Rem" shall be treated as a
   claim against the Operator.

4. Waiver of Subrogation endorsement which waives the insurers rights of
   subrogation against all of the Parties to this agreement.

Premiums for the insurance above specified shall be charged to the Joint
Account.    Provided, however, that if the Operator either self-insures or
effectively self-insures, the Operator shall charge to the joint account, in lieu of
any premiums for such insurance, an amount not to exceed the workers
compensation manual rates times the payroll.  Claims under Operator's self-
insurance program shall not be charged to the joint account.

Except as provided above, Operator shall not be obligated to obtain or cause to
be carried insurance for the benefit of the joint account.  Operator shall not
obtain or cause to be carried for the benefit of the joint account, control of well
or seepage and pollution insurance nor insurance against the hazards of fire,
windstorm, explosion, blowout, cratering, reservoir damage, or insurance other
than specified above.

HIGHLY CONFIDENTIAL                                                    BP-HZN-2179MDL00054485

## II. **INSURANCE NOT CHARGED TO THE JOINT ACCOUNT**

At all times while the Joint Operating Agreement is in effect, each party to the Agreement shall insure or self-insure for their share of any liabilities assumed under the Joint Operating Agreement.   The cost of these insurance or self-insurance programs shall be the individual responsibilities of each of the parties and none of the cost associated with these programs shall be charged to the Joint Account.  Each party shall insure or self-insure the following coverage for the minimum limits stated.

1. Commercial General Liability Insurance covering all of the Parties operations, including their offshore operations, and including contractual liability coverage with combined single limits of at least $10,000,000 per occurrence and in the annual aggregate.   This limit can be achieved through any combination of primary and excess liability policies.

2. Automobile Liability covering all owned, non-owned and leased vehicles with combined single limits of at least $1,000,000 per occurrence and in the annual aggregate.

3. Pollution Liability insurance covering offshore oil pollution with limits of at least $10,000,000 per occurrence.

4. Control of Well and Seepage and Pollution insurance with limits of at least $10,000,000 per occurrence or participation in Oil Insurance Limited.

5.  Non-owned aviation liability insurance in the amount of $1,000,000 per occurrence covering liability arising out of any leased aircraft used in the connection with the work to be performed under the Joint Operating Agreement.

All of the above coverages shall be endorsed to waive the insurers' rights of subrogation against Operator and all other Parties to the Agreement and all parties shall waive rights of recovery against all other Parties, subject to indemnities provided elsewhere in this agreement. Any Party to the Agreement, at the request of any other Party to the Agreement, shall advise all of the other Parties to the Joint Operating Agreement as to whether it will insure or self-insure the above mentioned coverages.  If Insurance is purchased, upon request, a Party will provide all other Parties to the Joint Operating Agreement with a certificate of insurance evidencing that all of the above insurance and special insuring provisions are in place.

In the event a Party elects to self-insure all or part of the above requirements, and if any of the other Parties to the Joint Operating Agreement believe or have

Macondo OA Exhibit "B"
insurance

HIGHLY CONFIDENTIAL                                                  BP-HZN-2179MDL00054486

a concern that the Party does not have the financial capability to meet its obligations under such self-insurance programs, any Party to the Agreement may request any other Party to provide proof of its ability to self-insure these risks. Proof will consist of independently audited financial statements demonstrating Net Worth and assets in the United States in an amount at least equal to six (6) times the amount of the above required insurance that the Party elects to self-insure. If the self-insuring Party is unable to meet that test, the other Parties to the Agreement may, but are not required to do so, purchase any or all of the insurance that the Party elected to self-insure. The cost of said insurance shall be for the individual account of the Party on whose behalf the insurance was purchased.

## III. CONTRACTOR'S INSURANCE

Operator (including any Party conducting Non-Consent Operations) shall use its commercially reasonable efforts to require each contractor who performs work in furtherance of or on behalf of the Joint Operating Agreement to carry the following insurance :.

1. Workers' Compensation and Employers' Liability insurance in accordance with all State and Federal Regulations in the jurisdiction where the work is to be performed, including if applicable, coverage for U.S. Longshoremen and Harbor Workers' Act, and Outer Continental Shelf Lands Act. The limit for Employer's Liability shall be not less than $1,000,000 per accident, $1,000,000 per disease, per employee and $1,000,000 per disease, aggregate.

2. Commercial General Liability insurance and/or Excess Liability insurance, including contractual liability, with combined single limits of not less than $10,000,000 per occurrence and in the aggregate for injuries to or death of persons and damage to property.

3. Automobile Liability insurance covering all owned, non-owned and hired vehicles with combined single limits of at least $1,000,000 per accident for injuries to or death of persons and damage to property.

4. Protection and Indemnity Insurance - in the event watercraft is used by the Contractor, contractor shall carry or require owners of such watercraft to carry Protection and Indemnity Insurance in the amount of not less than the market value of the vessel or $5,000,000, whichever is greater.

5. Aircraft Liability Insurance - if Contractor's operations require it to use aircraft, Contractor shall carry or require the owners of such aircraft to

Macondo OA Exhibit "B"
Insurance

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054487

carry aircraft liability insurance with a combined single limit of $5,000,000 per passenger seat or $25,000,000, whichever is greater.

6. Contractor's Pollution Liability Insurance - if applicable, Contractor shall maintain in force for the duration of this Contract Contractor's pollution liability insurance (on an occurrence basis) applicable to bodily injury and property damage, including loss of use of the damaged property or of property that has not been physically injured or destroyed; cleanup costs; defense, including costs and expenses incurred in the investigation, defense, or settlement of claims; all in connection with any pollution condition caused loss arising from the contractor's covered operations. Coverage shall be with minimum limits of $5,000,000. Such coverage will include BP as an Insured.

6. Any other insurance that Operator deems necessary.

To the greatest extent allowed by law, all of the insurance carried by Contractors pursuant to Sections 1 through 6 above shall contain endorsements waiving the insured's rights of subrogation against Operator and all other Parties to the Agreement, where applicable and Operator itself shall waive rights of recovery.

Operator shall make commercially reasonable efforts to obtain all of the above required insurance and special insuring provisions. Operator shall also make commercially reasonable efforts to obtain endorsements naming the Operator and any Party, Co-Owner or Joint Venturer as an Additional Insured on the policies of insurance where appropriate. However, Operator shall not be liable, unless in the event of gross negligence or willful misconduct, to non-operators or to their parent companies, subsidiaries or any affiliated companies for failure to do any of the above. It is recognized in the industry that there are certain contractors and service companies whose services are necessary to operations contemplated by the Parties, who as a matter of their policy refuse contractually to indemnify working interest owners or to carry any insurance indemnifying Working Interest owners. As to those entities, Operator may waive any requirement of contractual indemnity or any or all of the insurance or special insurance provisions required above.

## IV. **NOTICE**

Operator shall promptly notify Non-operators of any loss, damage or claim not covered by the insurance obtained hereunder for the joint account. All losses which are not covered and all losses in excess of insurance coverage shall be borne by the Parties in accordance with the terms of the Joint Operating Agreement under which said operations are being conducted by the Parties.

Macondo OA Exhibit "B"
Insurance

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054488

## EXHIBIT "C"

Attached to and made a part of that certain Operating Agreement dated October 1, 2009 by and between BP Exploration & Production Inc., as Operator, and MOEX Offshore 2007 LLC, as Non-Operator

# ACCOUNTING PROCEDURE
# PROJECT TEAM
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

**1. DEFINITIONS**

All terms used in this Accounting Procedure, if not otherwise defined in the Agreement to which this Accounting Procedure is attached, shall have the following meaning:

"Affiliate" shall mean, with respect to any Party, any separate legal entity directly or indirectly controlling, controlled by, or under common control with such Party, unless otherwise defined in the Agreement to which this Accounting Procedure is attached.   For the purposes of this agreement, Affiliates shall include those listed in Appendix A to this Exhibit C.

"Controllable Material" shall mean Material that at the time of acquisition or disposition by the Joint Account is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of the Operator's field employees and/or contract labor directly employed on the Joint Property in the conduct of Joint Operations.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties.

"Joint Operations" shall mean activities required to handle operating conditions and problems for the exploration, appraisal, development, production, protection, maintenance, abandonment, and restoration of the Joint Property.

"Joint Property" shall mean the real and personal property subject to the Agreement to which this Accounting Procedure is attached. For operations involving subsea or remote structures, the phrase "on the Joint Property" may include a platform, surface production facility, remote facility, or floating production storage facility, which is the surface location from which Joint Operations are conducted, even if such location is not owned by the Joint Account.

"Material" shall mean personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

"Non-Operators" shall mean the Parties to this Agreement other than the Operator.

"Offshore Facilities" shall mean platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.

"Operator" shall mean the Party designated to conduct the Joint Operations.

"Parties" shall mean legal entities signatory to the Agreement or their successors or assigns to which this Accounting Procedure is attached.

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054489

"Personal Expenses" shall mean reimbursed costs for travel, temporary living, relocation, and other expenses of Operator's employees, as well as similar expenses incurred by a Non-Operator or any Party's Affiliate for personnel assigned to a Project Team.

"Project Team" shall mean employees of the Parties, Affiliates, or contractors assigned to perform work and/or studies as authorized under the terms of the Agreement.

"Shore Base Facilities" shall mean onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions benefiting the Joint Property.

"Technical Employees" shall mean personnel having special and specific engineering, geoscience, or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

## 2. STATEMENTS AND BILLINGS

A. The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. In lieu of detailed descriptions, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

B. Non-Operators shall bill the Operator, on a monthly basis, in accordance with the provisions contained herein, for the salaries, wages, payroll burden, and Personal Expenses, if any, of its employees assigned to the Project Team. In a like manner, the Non-Operator shall bill the Operator for such expenses of the Non-Operator's Affiliate employees and/or contractor employees retained by the Non-Operator who are assigned to the Project Team. The Operator shall reimburse the Non-Operators in accordance with Section I, Paragraph 3.B. For the purposes of Paragraphs 3, 4, and 5 of this Section I, the Non-Operator's costs shall be considered a Joint Account.

C. The Operator or Non-Operators may make available to the Parties any statements and bills required under Section I.2 and/or Section I.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator or Non-Operator shall provide the Parties instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator or Non-Operator notifies the Parties that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission.

## 3. ADVANCES AND PAYMENTS BY THE PARTIES

A. If gross expenditures for the Joint Account are expected to exceed $50,000 in the next succeeding month's operations, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for such month's operations. Unless otherwise provided in the Agreement, any billing for such advance shall be payable within 30 days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the excess to subsequent month's billings or advances, unless a refund is specifically requested.

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054490

B. Except as provided below, each Party shall pay its proportionate share of all bills in full within thirty (30) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%) per annum. Interest shall begin accruing on the first day of the month in which the payment was due.

[X]  Electronic Fund Transfer (optional)

C. Payments by Parties for monthly cash advances and billings shall be made by Electronic Fund Transfer (EFT) or Automated Clearing House (ACH) transaction.

## 4.  ADJUSTMENTS

A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements (including payout status statements) rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after 24 months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto requesting review for adjustment.

B. All adjustments initiated by the billing Parties except those described in (1) through (4) below are limited to the 24-month period following the end of the calendar year in which the original charge appeared or should have appeared on the billing Party's Joint Account statement or payout status statement. Adjustments made beyond the 24-month period are limited to the following:

  (1)  a physical inventory of Controllable Material as provided for in Section V,
  (2)  an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Party relating to another property,
  (3)  a government/regulatory audit, and/or
  (4)  working interest ownership adjustments

## 5.  EXPENDITURE AUDITS

A. A Non-Operator, upon notice in writing to the Operator and other Non-Operators including any non-participating Parties, shall have the right to audit the Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit. The lead audit company's audit report shall be issued within ninety (90) days after completion of the audit testing and analysis but no later than  ninety (90) days after the end of the calendar year in which the

HIGHLY CONFIDENTIAL

audit was commenced; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Paragraph 4.A above. All claims shall be supported with sufficient documentation. Failure to issue the report within the prescribed time or to take specific written exception within the twenty-four (24) month period will preclude the Non-Operator from taking exception to any charge billed within the time period audited.

A timely filed audit report or any timely submitted response thereto shall suspend the running of any applicable statute of limitations regarding claims made in the audit report. While any audit claim is being resolved, the applicable statute of limitations will be suspended; however, the failure to comply with the deadlines provided herein shall cause the statute to commence running again.

B. The Operator shall allow or deny all exceptions in writing to an audit report within one hundred eighty (180) days after receipt of such report. Denied exceptions should be accompanied by a substantive response.

C. The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt.

The Operator or any audit participant may call an audit resolution meeting for the purpose of resolving audit issues/exceptions that are outstanding at least fifteen (15) months after the date of the audit report. The meeting will require one month's written notice to the Operator and all audit participants, a mutually agreed upon time and location, and attendance by representatives of the Operator and audit participants with authority to resolve such outstanding audit issues.

The lead audit company will coordinate the response and positions of the audit participants throughout the audit resolution process.   Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. An audit resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting can be discussed at subsequent meetings until each such issue is resolved.

E. This Accounting Procedure contemplates Non-Operators may incur Project Team expenditures that are subsequently billed to the Operator and charged to the Joint Account pursuant to Section I, Paragraph 2.B. Accordingly, such Non-Operators are required to maintain auditable records supporting such charges. Regarding such charges, the Operator and/or any other Non-Operators are hereby provided the same rights and obligations as set forth in Section I, Paragraphs 5.A. through 5.D., as pertain to the Non-Operators in audit of the Joint Account. Conversely in such situation, the Non-Operator being audited is hereby provided the same rights and obligations as set forth in Section I, Paragraphs 5.A. through 5.D. for the Operator.

## 6. APPROVAL BY PARTIES

Where an approval or other agreement of the Parties is expressly required under other sections of this Accounting Procedure, the Operator shall notify all Parties of the proposal.

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, an affirmative vote of  two (2) or more Parties having a combined participating interest of at least fifty-one percent (51%) shall be controlling.

HIGHLY CONFIDENTIAL                                                    BP-HZN-2179MDL00054492

For the purpose of administering the voting procedures of this Paragraph 6, if two or more Parties to this Agreement are Affiliates of each other, such Affiliated Parties shall be treated as a vote by a single Party having the combined interest of the Affiliated Parties.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

**1.  RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations

**2.  LABOR**

A.  Salaries and Wages including Incentive Compensation Programs, as set forth in COPAS Model Form Interpretation 37, for personnel serving the Joint Property shall be chargeable in accordance with the following provisions.

(1)  Project Team

All salaries and wages of employees of the Operator and Non-Operator, including seconded employees, assigned to or providing services for the Project Team on a full-time or part-time basis shall be considered a direct cost and shall be charged to the Joint Account. Such employees shall include, but are not limited to, personnel who are directly engaged in project management, evaluation, design, construction, and installation activities, such as, project managers, superintendents, technical managers, engineers, inspectors, environmentalists, technologists, engineering assistants, technicians, draftsmen, engineering clerks, secretaries, construction representatives, purchasing representatives, material expediters, financial support and other technical professional and support personnel performing services for the Project Team, regardless of location. Part-time Project Team personnel specifically assigned to the Project Team shall be charged to the Joint Account, based on actual days worked, only when such time involves at least one full-day equivalent per month that is devoted to the project. Employees not assigned to the Project Team but working under the direction of the Project Team shall be charged to the Joint Account based on actual days worked, only when such time involves at least one full-day equivalent per month. Contractor and Affiliate charges for personnel assigned to the Project Team are chargeable pursuant to Section II, Paragraphs 5 and 7.

(2)  Other Operations—Non-Project Team

The following salaries and wages shall be charged for employees:

(a)  Salaries and wages of the Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations

(b)  Salaries and wages of the Operator's employees directly employed on Shore Base Facilities or other Offshore Facilities serving the Joint Property if such costs are not charged under Paragraph 6 of this Section II

(c)  Salaries of First Level Supervisors

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054493

    (d) Salaries and wages of Technical Employees directly employed on the Joint Property in the conduct of Joint Operations, or on Offshore Facilities serving the Joint Property, if such charges are excluded from the Overhead rates and/or

    (e) Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B. Cost of holiday, vacation, sickness and disability benefits, and other customary allowances paid to personnel to the extent their salaries and wages are chargeable to the Joint Account under Paragraph 2.A of this Section II, excluding severance payments or other termination allowances. Such costs under this Paragraph 2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2.A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's or Non-Operators' cost experience, as appropriate.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to costs chargeable to the Joint Account under Paragraphs 2.A and 2.B of this Section II

D. Personal Expenses, other than relocation costs, of personnel whose salaries and wages are chargeable to the Joint Account under Paragraph 2.A of this Section II

Relocation costs, consistent with the employer's established policy, are chargeable to the extent their salaries and wages are chargeable, in accordance with the following:

    (1) For personnel transferred and assigned to a Project Team for a minimum of 12 consecutive months

        [X] shall be charged to the Joint Account

        For those assigned for less than 12 consecutive months shall not be chargeable unless agreed to by the Parties.

    (2) For Operator's field employees and/or First Level Supervisors

        [X] shall be charged to the Joint Account

        Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party shall not be chargeable to the Joint Account.

E. Training costs shall be chargeable as specified in COPAS Model Form Interpretation 35 and as provided in Section II, Paragraph 13. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session for personnel to the extent their salaries and wages are chargeable under Paragraph 2.A of this Section II.

In addition, third party fees for instructors, books, tuition and training facility costs are chargeable to the Joint Account. Operator developed training shall be charged at Operator's cost. An Operator owned training facility shall be charged in accordance with Section II, Paragraph 6.

HIGHLY CONFIDENTIAL

F.  Cost of established plans for employees' benefits as described in COPAS Model Form Interpretation 27, determined by applying the employee benefits limitation percentage most recently recommended by COPAS to the chargeable salaries and wages.

G.  Award payments to employees, in accordance with COPAS Model Form Interpretation 49 ("Awards to Employees and Contractors"), or as agreed to by the Parties, for personnel whose salaries and wages are chargeable under Section II.2.A

## 3.  MATERIAL

Materials purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV. Only such Materials shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

## 4.  TRANSPORTATION

Transportation of Operator's, Non-Operator's, Affiliate's or contractor's personnel, and Material necessary for the Joint Operations but subject to the following limitations:

A.  If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest supply store where like Material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B.  If surplus Material is moved to the Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest supply store where like Material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties unless agreed to by the Parties.

C.  In the application of Paragraphs 4.A. and 4.B. above, the option to equalize or charge actual trucking cost is available when the actual charge is less than the amount most recently recommended by COPAS, excluding accessorial charges, as set forth in COPAS Model Form Interpretation 38.

## 5.  SERVICES

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations and provided by sources other than the Parties, except for contract services, equipment, and utilities covered by the Section III overhead provisions, Paragraph 7 of this Section II, or excluded under Paragraph 9 of this Section II. Notwithstanding anything herein to the contrary, the cost of contract personnel assigned to the Project Team or working at the direction of the Project Team are directly chargeable to the Joint Account, regardless of their location.

Award payments to contractors, in accordance with COPAS Model Form Interpretation 49 ("Awards to Employees and Contractors"), or as agreed to by the Parties.

## 6.  EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows and / or as indicated in Appendix B to this Exhibit C:

HIGHLY CONFIDENTIAL                                              BP-HZN-2179MDL00054495

A. Equipment and facilities owned by the Operator shall be charged to the Joint Account at the average prevailing commercial rate for such equipment. If an average commercial rate is used to bill the Joint Account, the Operator shall adequately document and support such rate and shall periodically review and update the rate and the supporting documentation.

B. In lieu of charges in Paragraph 6.A. above, or if a prevailing commercial rate is not available, equipment and facilities owned by the Operator will be charged to the Joint Account at the Operator's actual cost. Such costs shall be limited to expenses that would be chargeable pursuant to this Section II if such equipment and facilities were jointly owned, depreciation using straight line depreciation method, and interest on investment (less gross accumulated depreciation) not to exceed 10% per annum. In addition, for platforms, subsea production systems, fiber optics systems, and production handling facilities, the rate may include an element of the estimated cost of abandonment, reclamation, and dismantlement. Depreciation shall not be charged when the equipment and facilities investment have been fully depreciated. Charges shall not exceed the average prevailing commercial rate, if available.

C. When applicable for Operator-owned or leased motor vehicles, the Operator shall use rates published by the Petroleum Motor Transport Association or such other organization recognized by COPAS as the official source of such rates. When such rates are not available, the Operator shall comply with the provisions of Paragraph 6.A. or 6.B. above.

## 7. AFFILIATES

Affiliate Materials, facilities, and services provided for the Joint Operations shall be chargeable to the Joint Account as herein provided.

A. An Affiliate of the Operator or Non-Operator working at the request of a Project Team or supplying a service in furtherance of the work of the Project Team shall be chargeable to the Joint Account at the rate and / or amount that the Affiliate customarily charges the Operator or Non-Operator for its services.

B. If the Operator's or a Non-Operator's Affiliate provides Materials, facilities, or services for operations not under the direction of a Project Team, such charges shall be considered third-party services as provided in Paragraph 5 of this Section II.

C. The Parties agree that Affiliate records relating to Materials, facilities or services provided by an Affiliate are not subject to and will not be made available for audit. However, if Affiliate charges are based on rates, the audit of the Affiliate charges shall be limited to verification that the units or basis to which the rates were applied are correct. Upon request by any Party, the Operator or Non-Operator shall furnish a certificate by the Party's independent accounting firm confirming that rates or amounts charged by an Affiliate reflect actual cost and do not include any element of profit.

## 8. DAMAGES AND LOSSES TO JOINT PROPERTY

All costs or expenses necessary for the repair or replacement of Joint Property resulting because of damages or losses incurred, except to the extent such damages or losses result from a Party's gross negligence or willful misconduct, in which case such Party shall be solely liable.

## 9. LEGAL EXPENSE

The Operator may not charge for services of the Operator's legal staff or fees and expenses of outside attorneys unless approved by the Parties, except that title examinations and curative

HIGHLY CONFIDENTIAL    BP-HZN-2179MDL00054496

work shall be chargeable, unless otherwise provided for in the Agreement. Other types of legal expense, other than attorney fees, such as recording fees and handling, settling, or otherwise discharging litigation, claims, and liens necessary to protect or recover the Joint Property shall be chargeable.

## 10. TAXES AND PERMITS

All taxes and permits of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to Parties will be made in accordance with the tax value generated by each Party's working interest.

## 11. INSURANCE

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its workers' compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. Such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

## 12. COMMUNICATIONS

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including fiber optic, satellite, radio and microwave facilities, between the Joint Property and the Operator's offices directly responsible for field operations in accordance with the provisions of COPAS Model Form Interpretation 44. In the event communication facilities or systems serving the Joint Property are Operator or Affiliate-owned, charges to the Joint Account shall be made as provided in Section II, Paragraph 6 or 7 as applicable.

## 13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY

A. Ecological and Environmental costs incurred

[X]  for the benefit of the Joint Property

resulting from laws, rules, regulations, or orders for archaeological and geophysical surveys relative to identification and protection of cultural resources and/or other environmental or ecological surveys as may be required by the Minerals Management Service or other regulatory authority. Also, costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable laws and regulations are chargeable. Ecological and environmental costs incurred by the Operator as deemed by the Operator to be appropriate for prudent operations are also chargeable to the extent such costs directly benefit Joint Operations. Also, ecological and environmental costs incurred in planning, exploration, appraisal and development operations are chargeable when included in an approved AFE.

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054497

B.  Safety costs incurred

   **[X]**  for the benefit of the Joint Property
   to conduct and/or implement safe operational practices/guidelines as a result of laws, rules, regulations, or orders or as recommended for voluntary compliance. Examples are the requirements mandated by the Occupational Safety and Hazards Act (OSHA), Safety and Environmental Management Program (SEMP), Process Safety Management (PSM), and/or requirements which may be mandated/recommended by similar programs or by other current or successor regulatory agencies. Safety costs incurred by the Operator as deemed by the Operator to be appropriate for prudent operations are also chargeable to the extent such costs directly benefit Joint Operations.

C.  Environmental, ecological, and safety training costs for personnel whose time would otherwise be chargeable under Paragraph 13.A or B above, regardless of whether training is mandated by statute or regulatory agency, is chargeable to the Joint Account.

In the event of a conflict between the provisions of this Paragraph 13 and Section III, Paragraphs i. and ii. the following election shall prevail:

   **[X]**  Section II, Paragraph 13

## 14.  ABANDONMENT AND RECLAMATION

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by governmental, regulatory, or judicial authority

### III.  OVERHEAD

As compensation for administrative, management, office services and warehousing costs, the Operator shall charge the Joint Account in accordance with this Section III.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of offices and salaries or wages plus applicable burdens and expenses of personnel, except those costs identified as directly chargeable under Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, purchasing, accounting, administrative or clerical duties, or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in this Section III unless directly chargeable under Section II or such costs are agreed to by the Parties as a direct charge to the Joint Account. Costs of functions which solely benefit the Operator are not recoverable from the Joint Account.

i.  Except as otherwise provided in Paragraphs 1 and 3 of this Section III, the salaries, wages, related payroll burden and Personal Expenses of Technical Employees, and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property in the conduct of Joint Operations

   ~~shall be covered by the overhead rates~~
   **[XX]**  shall not be covered by the overhead rates because they are to be charged directly to the Joint Account

ii.  Except as otherwise provided in Paragraphs 1 and 3 of this Section III, the salaries, wages, related payroll burden and Personal Expenses of Technical Employees provided by Operator or its Affiliates, and/or costs of professional consultant services and contract

HIGHLY CONFIDENTIAL

services of technical personnel either temporarily or permanently assigned to and directly employed in:

    A.  Any phase of any Exploration, Appraisal and / or  Development operations, which shall include, but not be limited to, drilling, re-drilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole, permitting, engineering, feasibility studies, geoscience, seismic, planning and water current work or studies for the benefit of the Joint Property,

            ~~shall be covered by the overhead rates~~
[XX]   shall not be covered by the overhead rates because they are to be charged directly to the Joint Account

    B.  Production operations, which are all operations other than Exploration, Appraisal, and Development operations and those covered by Section III.3 (Overhead - Major Construction and Catastrophe),

[XX]   shall be covered by the overhead rates
      ~~shall not be covered by the overhead rates because they are to be charged directly to the Joint Account~~

## 1.  OVERHEAD—PROJECT TEAM

To compensate the Parties for overhead costs incurred to support a Project Team involved in activities other than major construction and catastrophe, the Parties shall charge Project Team Overhead.  The costs compensated by the Project Team Overhead include, but shall not be limited, the following:  all personnel not directly chargeable to the Joint Account but who provide services to the Project Team, and all equipment and supplies not directly chargeable to the Joint Account under Section II, Paragraph 6 or 7.

The overhead recovery shall be made pursuant to the following:

**X**  The Operator shall charge a rate of Four Percent (4%) of the total cost of a Project Team involved in activities other than major construction and catastrophe

## 2.  OVERHEAD—DEVELOPMENT AND OPERATING

As compensation for overhead in connection with drilling and producing operations not covered by other provisions of this Section III, Operator shall charge on a Percentage Basis

A. OVERHEAD—PERCENTAGE BASIS
   (1)  Operator shall charge the Joint Account at the following rates:

     (a)  Development Operations Rate of Four Percent (4%) of the cost of development of the Joint Property exclusive of costs provided under Section II, Paragraph 9 and all salvage credits.
     (b)  Operating and Maintenance Rate of Thirteen Percent (13%) of the cost of operating the Joint Property exclusive of costs provided under Section II, Paragraphs 1 and 9; all salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes and any other taxes and assessments that are levied,

HIGHLY CONFIDENTIAL                                        BP-HZN-2179MDL00054499

pse

assessed, and paid upon the mineral interest in and to the Joint Property, and overhead charges provided under Section III, Paragraph 2.A(1)(a).

(2) Application of Overhead—Percentage Basis shall be as follows:

(a) Development Operations rate set forth in Section III, Paragraph 2.A(1)(a) shall be applied to all costs in connection with

[1] drilling, redrilling, plugging back, Sidetracking, or Deepening of a well,
[2] Workover operations or waterflood or other secondary or tertiary Hydrocarbon recovery operations requiring a period of 15 consecutive work days or more on a well
[3] preliminary expenditures necessary in preparation for drilling a well or conducting subsequent operations after a well has reached its Objective Depth,
[4] expenditures incurred in temporarily or permanently abandoning a well when a well is not completed as a producer, and
[5] original construction or installation of fixed assets, expansion of fixed assets, and any other project clearly discernible as a fixed asset except Major Construction as defined in Section III, Paragraph 3 or any Project Team expenses and overhead.

(b) Operating and Maintenance rate set forth in Section II, 2.A(1)(b) shall be applied to all other costs in connection with Joint Operations except those subject to Section III Paragraphs 1, 2.A(1)(a), and 3.

## 3. OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE

Major Construction is defined as any project requiring an AFE, under the terms of the Agreement to which this Accounting Procedure is attached, for the construction and installation of fixed assets; the expansion of fixed assets; or the abandonment of fixed assets and any associated reclamation required for the exploration, development, and operation of the Joint Property, including any activity or operation conducted under Articles 12 or 14 of the Agreement.

Catastrophe is defined as a calamitous event bringing damage, loss, or destruction resulting from a single occurrence requiring an AFE to restore the Joint Property to the equivalent condition that existed prior to the event causing the damage.

To compensate the Operator for overhead costs incurred in connection with Major Construction and Catastrophes, the Operator shall charge the Joint Account for overhead based on the following rates:

A. If the Operator charges, to a Project Team AFE, the engineering, design, and drafting costs associated with a Major Construction or Catastrophe project AFE, the overhead assessment shall be four percent (4%) of total project costs.

B. If the Operator charges the engineering, design, and drafting costs related to a Major Construction or Catastrophe project AFE, the overhead assessment shall be four Percent (4%) of the total project costs.

For calculating Major Construction overhead, the cost of drilling and workover wells shall be excluded. For calculating Catastrophe overhead the cost of drilling relief wells, substitute wells, or conducting other well operations resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by insurance recoveries. Overhead assessed under the Major Construction and Catastrophe provisions shall be in lieu of all other overhead provisions. In the event of any conflict between the provisions of this paragraph and

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054500

the provisions of Section II, Paragraphs 2 and 5, the provisions of this paragraph shall govern. Total project costs shall exclude Project Team costs if recorded to a separate Project Team AFE and overhead is charged on Project Team costs pursuant to Section III, Paragraph 1.

**4. AFFILIATE CHARGES INCLUDED**

All costs billed for Affiliates under Section II, Paragraph 7 will be included in total costs for calculating Overhead in this Section III.

**5. AMENDMENT OF RATES**

The Overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I, Paragraph 6.

## IV.   MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator normally provides all Material for use in the conduct of Joint Operations but does not warrant the Material furnished. Except as otherwise provided in Section IV, Paragraph 4.A., Material may be supplied by Non-Operators at the Operator's option.

**1. DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. A direct purchase is determined to occur when an agreement is made between an Operator and a third party for the acquisition of Materials for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the vendor until usage, is considered a direct purchase. If Material is found to be defective or is returned to the vendor for any other reason, credit shall be passed to the Joint Account when adjustments have been received by the Operator from the manufacturer, distributor, or agent.

**2. TRANSFERS**

A transfer is determined to occur when the Operator furnishes Material from its storage facility or from another operated property. Additionally, the Operator has assumed liability for the storage costs and changes in value and has previously secured and held title to the transferred Material. Similarly, the removal of Material from a Joint Property to the Operator's facility or to another operated property is also considered a transfer. Material that is moved from the Joint Property to a temporary storage location pending disposition may remain charged to the Joint Account and is not considered a transfer.

A.  PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of transfer. Transfers of new Material will be priced using one of the following new Material bases:

(1)  Published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS)

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054501

The HPMs and the associated date of published price to which they should be applied will be published by COPAS periodically.

(a) For oil country tubulars and line pipe, the published price shall be based upon eastern mill (Houston for special end) carload base prices effective as of date of movement, plus transportation cost as defined in Section IV, Paragraph 2.B.

(b) For other Material, the published price shall be the published list price in effect at date of movement, as listed by a supply store nearest the Joint Property (where like Material is normally available) or point of manufacture, plus transportation costs as defined in Section IV, Paragraph 2.B.

(2) A price quotation that reflects a current realistic acquisition cost may be obtained from a supplier/manufacturer.

(3) Historical purchase price may be used, providing it reflects a current realistic acquisition cost on date of movement. Sufficient documentation should be available to Non-Operators for purposes of verifying Material transfer valuation.

(4) As agreed to by the Parties

When higher than specification grade or size tubulars from the Operator's inventory are used on the Joint Property in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars.

B. FREIGHT

Transportation costs should be added to the Material transfer price based on one of the following:

(1) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the railway receiving point nearest the Joint Property based on the carload weight basis as recommended by COPAS MFI 38 and COPAS Interpretations in effect at the time of the transfer.

(2) Transportation costs for special mill items shall be calculated from that mill's shipping point to the railway receiving point nearest the Joint Property. For transportation costs from other than eastern mills, the 30,000-pound Specialized Motor Carriers interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the Specialized Motor Carriers rate per weight of tubing transferred to the railway receiving point nearest the Joint Property.

(3) Transportation costs for special end tubular goods shall be calculated using the 30,000-pound Specialized Motor Carriers interstate truck rate from Houston, Texas to the railway receiving point nearest the Joint Property.

(4) Transportation costs for Material other than that described in Section IV, Paragraphs 2.B (1) through (3), if applicable, shall be calculated from the supply store or point of manufacture, whichever is appropriate, to the railway receiving point nearest the Joint Property.

C. CONDITION

(1) Condition "A"—New and unused Material in sound and serviceable condition shall be charged at 100% of the price as determined in Section IV, Paragraphs 2.A. and 2.B. Material transferred from the Joint Property that was not placed in service shall be

HIGHLY CONFIDENTIAL     BP-HZN-2179MDL00054502