## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL by the OIL RIG      MDL NO.  2179
       "DEEPWATER HORIZON"
       in the GULF OF MEXICO,
       on APRIL 20, 2010        SECTION J

THIS PLEADING RELATES TO:

                               JUDGE BARBIER

2:10-CV-02771                  MAG. JUDGE SALLY SUSHAN

### TRANSOCEAN'S MEMORANDUM IN RESPONSE TO THE ST. JOE COMPANY'S *AMICUS CURIAE* MEMORANDUM

**MAY IT PLEASE THE COURT:**

Petitioners in Limitation and Defendants Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, Transocean Deepwater Inc. and Triton Asset Leasing GmbH (collectively "Transocean" or the "Transocean Defendants")[1] submit this response to address the statements made by The St. Joe Company[2] in its *Amicus Curiae* Memorandum ("Memo"). *See* Rec. Doc. No. 1879.  The St. Joe Company takes the position in its Memo that its only claims— Florida common law causes of action—are "sea-to-shore" claims unaffected by maritime law and saved by OPA, 33 U.S.C. §2718, as a special enclave of state law, consistent with its "the

---

[1] The Transocean Defendants in the St. Joe proceeding in Delaware are Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, Transocean Deepwater Inc. and Triton Asset Leasing GmbH.  *See*

[2] In open Court on March 25, 2011 (Rec. Doc. No. 1756) St. Joe requested permission to file an *amicus curiae* brief even though it was a party plaintiff to its suits against Halliburton and M-I pending in the MDL.  It was apparently planning its "midnight dismissals" of the Halliburton and M-I suits two days later which the Court revoked.  *See* Rec. Doc. No. 1981.

347076

1

rules don't apply to me" approach to *Deepwater Horizon* litigation St. Joe is wrong in its Memo as:

1.      Maritime law—not state common law—applies to "sea-to-shore" claims and negates state common law causes of action for "sea-to-shore" pollution on navigable water in connection with a vessel.  *The State of Louisiana v. Ex Rel Guste M/V Testbank*, 752 F.2d 1019 (5th Cir. 1985 *en banc*); *In Re Oil Spill by Amoco Cadiz,* 699 F.2d 909, 913 (7th Cir.) cert. denied, 464 F.2d 909, 913 (7th Cir.) cert. denied, 464 U.S. 864, 104 S. Ct. 196, 78 L. Ed.2d 172 (1983); *In Re Exxon Valdez*, 767 F. Supp. 1509 (D. Alaska 1991).  This body of Maritime law was "saved" by OPA's admiralty savings clause, state common law causes of action like St. Joe says it has.  33 U.S.C. 2751(e)(211).

2.      There were no state common law causes of action for "sea-to-shore" pollution to "save".  The only state law "saved" under OPA's State Law savings clause, 33 U.S.C. §2718(a), are state statutes and regulations that impose standards or requirements that impact maritime commerce.

3.      OPA did not legislatively repeal the Admiralty Extension Act, as *St. Joe* contends. It "saved" it under its Admiralty savings clause..

4.      The case law relied upon by *St. Joe* is inapposite to the issue presented here:

> Does the Admiralty Savings Clause in OPA preserve the supremacy of maritime tort law over state common law claims?

For these reasons, the positions taken by *St. Joe*  in its *amicus curiae* brief should be rejected.

## BACKGROUND

Plaintiff is the St. Joe Company, a large real estate development company which owns approximately 577,000 acres of property in Florida's northwest panhandle.  It is unknown what portions, if any, of St. Joe's land—as opposed to beaches owned by the State of Florida—

347076

sustained any physical injury from oil pollution.  St. Joe's claims are basically the same as those of other private plaintiffs seeking economic damages allegedly caused by the *Deepwater Horizon*/ BP Oil Spill.  *See* Rec. Doc. No. 1981, p. 1.

Most, if not all, of *St. Joe's* claims are for economic loss, absent physical injury to property it owned and are barred by the *Robin's Dry Dock* rule.  *See Robin's Dry Dock & Repair Co. v. Flynt*, 275 U.S. 303, 309 (1927).  The Supreme Court's "unmistakable rule" of *Robin's Dry Dock* has been adopted and applied repeatedly and without qualification by the Fifth Circuit. *See e.g., In Re Taira Lynn Marine Limited No. 5, LLC*, 444 F.3d 371, 377 (5th Cir. 2006); *M/V Testbank, supra*, 752 F.2d at 1032 (to "permit recovery here on state law grounds would undermine the principles we seek to preserve today").

Consistent with maritime law, Florida common law bars recovery of economic losses without physical damage to property owned by the plaintiff.  The Supreme Court of Florida has held that contract principles [are] more appropriate than tort principles for recovering economic loss without accompanying physical injury or property damage to property owned by the plaintiff.  *Casa Clara Condominium Assn. v. Charley Toppino & Sons, Inc.*, 620 So.2d 1244, 1247 (Fla. 1993); *R.A.M. Sourcing Agency, Inc. v. Seaboard Marine, Ltd.*, 995 F. Supp. 1465 (S.D. Fla. 1997) (claims in tort for recovery of damages when no damage to property or person occurred are not allowed).

The St. Joe Company claims to be a large land owner in northwest Florida, but it does not own the beaches where the oil pollution allegedly occurred.  Under Florida law, the State of Florida owns the "lands seaward of mean high water line, including the beaches between the high and low water lines, in trust for the public, for the purposes of bathing, fishing and navigation.  *Walton County v. Stop Beach Renourishment, Inc.*, 998 So.2d 1102, 1109 (Florida

347076

2008).[3]  An "upland" owner of waterfront property like St. Joe says it is " . . . has no rights in navigable waters and sovereign lands that are superior to other members of the public." *Walton County, supra* 998 So.2d at 1111.  Thus, St. Joe may only state a viable in tort against the Transocean defendants to the extent it can allege (and later prove, if possible), that oil caused physical injury to any upland beach property it owns in Florida.

Unlike other plaintiffs, St. Joe has expressly disavowed the application of OPA and has not sued BP or made a claim against the Gulf Coast claims facility, the special claims facility established by BP to pay claims arising out of the oil spill.  Rec. Doc. No. 1981 at fn.1.  In its three separate lawsuits against Transocean, Halliburton and M-I, it has gone to great lengths to assert what it claims are exclusively state common law causes of action under negligence, gross and culpable negligence, and strict liability.  It has declared time and again it seeks no relief under Florida's mini-OPA, the Pollution Discharge Prevention and Removal Act of 1974.[4]  Based upon this limitation by St. Joe, the Transocean defendants have limited their discussion in response to the *amicus curiae* brief to state common law causes of action that St. Joe says were saved" by OPA.[5]

---

[3] A private landowner who commenced an action asserting ownership to waterfront lands has the burden of proving the location of the mean high water line separating its property from that of the State of Florida.  *See St. Joseph Land & Dev. v. Florida State Board of Trustees for the Internal Improvement Trust Fund,* 365 So.2d 1084, 1088(Fla. 1979).

[4] Counsel for St. Joe conceded at oral argument in the case of *The St. Joe Company v. Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, Transocean Deepwater Inc. and Triton Asset Leasing GmbH,* C.A. No. 1:10-cv-968-LPS (D. Del.)that the recent Florida Supreme Court case of *Curd v. Mosaic Fertilizer,* 39 So.3d 1216 (Fl. 2010), held that "common law causes of action under traditional theories of negligence, nuisance and strict liability for economic losses resulting in the spillage and release of pollutants that ultimately migrated into, in that case, Tampa Bay, was (sic) a separate and distinct cause of action from the cause of action otherwise available under the Florida [mini-OPA] statute." *See* Ex. 1 (p. 6).

[5] St. Joe asserts only that the 2718 state law savings clause "saved" and did not create any state common law causes of action.

347076

**LAW AND ARGUMENT**

    1.    **MARITIME LAW—NOT STATE COMMON LAW—APPLIES TO "SEA-TO-SHORE" OIL POLLUTION CLAIMS.**

Maritime law was saved by OPA's Admiralty savings clause:

Except as otherwise provided in this Act, this Act does not affect--

    **(1)**    **admiralty and maritime law; . . .**

    33 U.S.C. 2751(e) (2011) (emphasis added).  This clause must be read in conjunction with state law savings clause.  St. Joe completely ignores this provision—and perhaps did not notice it—in its Memo.

33 U.S.C. §2751 (2010).

St. Joe would have the Court believe that there is a "sea-to-shore" exception to maritime law in which state common law causes of action exist which entitle it to recovery of its economic loss claims against Transocean.  In taking this position, St. Joe pretends the controlling precedent of the *Testbank* case and other major litigation involving oil pollution on navigable waters have no application.

The *M/V Testbank* case involved 12 tons of pentachlorphenol, PCP, spilling into the Mississippi River Gulf Outlet near New Orleans in August 1980.  *See The State of Louisiana v. Ex Rel Guste M/V Testbank*, 752 F.2d 1019 (5th Cir. 1985) (en banc).  The waterway was closed to navigation and all fishing, shrimping and related activities were suspended in the outlet and for several hundred square miles of surrounding marsh and waterways.  *Id*. at 1020.

Dozens of lawsuits ensued seeking recovery of economic losses by shipping interests, marina and boat rental operators, seafood enterprises not engaged in fishing, seafood restaurants and other shore-side businesses based upon "an assortment of liability theories, including maritime tort, private actions pursuant to various sections of the Rivers and Harbors Appropriations Act of 1899 and rights of action under Louisiana law . . . ."  *Id.* at 1021.

347076

Like St. Joe, the plaintiffs in *M/V Testbank* argued that their economic loss claims were recoverable as state law causes of action.  Applying the Admiralty Extension Act, the *en banc* court in *Testbank* held:

> While our maritime decisions are informed by common law developments in the state courts, there is no requirement, as in diversity cases, that state law be adopted.  Indeed, the federal interest in protecting maritime commerce is often best served by the establishment of uniform rules of conduct.  We believe that such is the case here.  The *Robins* rule has proved to be a workable and useful tool in our maritime jurisprudence.  To permit recovery here on state law grounds would undermine the principles we seek to preserve today.  Accordingly, we decline to adopt to plaintiffs' state law claims as theories of recovery.

*Id*. at 1032.  The *Testbank* decision is still the controlling law in this Circuit and state law tort causes of action—under Louisiana or the laws of any other state—are negated, ousted or preempted by the conflicts of law principles in *M/V Testbank* the same today as they were in over two decades ago when *M/V Testbank* was rendered.

Shortly after the *Exxon Valdez* oil spill, local businesses in the area of the spill, such as boat charterers and fishing lodges, brought common law causes of action in tort under Alaska law for their economic losses caused by the spill.  The court in *In Re Exxon Valdez*, 767 F.Supp. 1509 (D. Alaska 1991), held that maritime law negated all state law tort claims, other than plaintiff's claims based upon a state pollution statute (similar to a "mini-OPA").

In reaching its decision, the court in the *Exxon Valdez* case, supra, reasoned:

> " . . . The [*Exxon Valdez*] oil spill is a maritime tort subject to admiralty jurisdiction.  The factual development of the claims will probably establish that the claims of the sports fisherman, kayakers and fish tenders, who are targeted by Alyeska's motion, are for damages which occurred in or on navigable waters.
>
> However, a large portion of the claims are for damages that occurred on land, such as the claims of shore-side businesses [like St. Joe] and fish processors.  Historically, damages to the shore or to shore facilities were not cognizable in admiralty.  *Askew*

> *American Waterways Operators, Inc.,* 411 U.S. 325, 340, 93 S.Ct. 1590, 1599, 36 L.Ed. 2d 280 (1973).  **In 1948, Congress remedied that inequity by enacting the Admiralty Extension Act.  46 U.S.C. § 740 . . . .** [Emphasis added.]
>
> \*              \*              \*
>
> Oil spills from vessels on navigable waters have consistently been held to be maritime torts by other courts.  *See In Re Oil Spill v. Amoco Cadiz*, 699 F.2d 909, 913 (7th Cir.) cert. denied.  464 U.S. 864, 104 S.Ct. 196, 78 L.Ed 2d 172 (1983).  Citations omitted.
>
> \*              \*              \*
>
> At least as to the claims for damages from the *Exxon Valdez* oil spill which occurred in or on navigable waters, it does not matter that plaintiffs characterize their claims in terms of state law; federal maritime law is controlling. . . . In order to preserve uniformity, maritime law must be applied to torts cognizable under admiralty jurisdiction regardless of how plaintiffs characterize the tort under common-law.   Uniformity is the justification for exclusive federal admiralty jurisdiction . . . As to claims for shore-side damages caused by the oil spill from the *Exxon Valdez*, the issue of applicable law is more complex . . . The court concludes that general maritime law, including the rule in *Robins Dry Dock*, applies to the tort claims pleaded in this case, except for those based on a theory of strict liability [under the Trans-Alaska Pipeline Authorization Act ("TAPAA"), 43 U.S.C. § 1651-1655, which provides for strict liability for oil spills [and the State of Alaska law AS 46.03.822 that also provides for strict liability for any oil spills, including spills of oil that has been transported through the Trans-Alaska pipeline [such as the oil being carried by the *Exxon Valdez*].  *See* multiple citations to the *Exxon Valdez* case.

Just like in the *Testbank* case, the court in the *Exxon Valdez* held that maritime law embodied in the *Robins Dry Dock* doctrine applied to the exclusion of the state common law claims, without any "sea-to-shore" exception.

When Congress enacted OPA in 1990, it was certainly aware of the *Robins Dry Dock* doctrine and the supremacy of maritime tort law.  It provided a statutory basis for recovery of

347076

certain economic losses caused by an oil spill in OPA 1990, 33 U.S.C. § 2701, *et seq.* , and then enacted a maritime law savings clause:

Except as otherwise provided in this Act, this Act does not affect--

**(1)     admiralty and maritime law; . . .**

33 U.S.C. 2751(e) (2011) (emphasis added).

This clause must be read in conjunction with state law savings clause.  St. Joe completely ignores this provision—and perhaps did not notice it—in its Memo.

The intent of the Admiralty savings clause in OPA was to preserve the existing state of maritime law upon enactment of OPA 1990, as reflected in the *Testbank* and *Exxon Valdez* cases where a plaintiff, like St. Joe, had elected not to obtain relief under OPA.  St. Joe has no answer in its Memo for *Testbank/Exxon Valdez* case law and the Admiralty savings clause, other than to declare that "Transoceans's pre-emption arguments defy logic and ignore precedent" as discussed on pages 13-15 of its Memo.  Such "name-calling" is neither persuasive nor binding authority in the face of *Testbank, Exxon Valdez* and the Admiralty savings clause of OPA.

**2.     THE "STATE LAW" SAVED UNDER OPA'S STATE LAW SAVINGS CLAUSE, 33 U.S.C. § 2718 (a) ARE STATUTES AND REGULATIONS—NOT COMMON LAW CAUSES OF ACTION BY PRIVATE LITIGANT LIKE ST. JOE**

Congress did not "save" state common law causes of action negated in an oil spill subject to Maritime law, but it did preserve the right of the States to enact statutes and regulations that went beyond OPA.

In its Memo on pages 4-5, St. Joe cleverly glosses over what **state law** Congress was referring to in the statutory language and legislative history of the State Law savings clause, §2718(A).  Congress was concerned in §2718 with "saving" the authority of state and local governments to pass statutes and regulations with respect to oil pollution, and said absolutely

nothing in its legislative history about "saving" any common law causes of action as St. Joe represents to the Court.  Close examination of the language of §2718(a) and its statutory history reveals that the 2718(a) state law  "saving" clause was intended, as a matter of federalism, to protect the state and local government's right to enact **state law** in the form of statutes and regulations that **exceeded** the "liability and requirements" imposed in OPA.

The text of 2718(a) states:

> Nothing in this act [OPA] or the [Limitation ] Act of March 3, 1851 shall

> (1) affect or be construed or interpreted as preempting the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to (a) the discharge of oil or other pollution by oil within such State; or (b) any removal activities in connection with such a discharge; or

> (2)  affect or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under the Solid Waste Disposal Act (42 U.S.C. § 6901, *et seq.*) n/k/a RCRA, or state law, including common law.

*See* 33 U.S.C. § 2718(a)(1) and (2).  Section 2718 (a) deals with oil pollution in paragraph (1)and the right of States and municipalities to impose "additional liability or requirements."  In paragraph (2) of the statute Congress "saved" the obligations or liabilities that exist with respect to solid waste disposal under what is now RCRA, 42 U.S.C. § 6901, *et seq.*State Law or common law dealing with solid waste disposal.  The "dangling" language at the end of paragraph (2) that says "including common law" only relates to the "obligations or liabilities" of a person under RCRA, its state law equivalent or common law obligations dealing with solid waste disposal that existed when OPA was enacted in 1990.  By no means of "legal acrobatics" can the three words "including common law" be read or applied to anything other than solid waste disposal "obligations or liabilities" or to any way modify paragraph (1) of 2718(a).

The statutory language **imposing any additional liability or requirements** in paragraph (1) of 2718 is a term of art that is derived from the legislative history of OPA and the Supreme Court decisions in *United States v. Locke,* 529 U.S. 89, 120 S.Ct. 1135, 146 L.Ed. 2d 69 (2000) and *Askew v. The American Waterways Operators*, 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed 2d 280 (1973).

In the Senate report on OPA, S. Rep. 101-94, the purpose of 2718(a) to save the right of the States and local governments to enact **State laws**, *i.e.,* statutes and regulations, is clear:

> Historically, the Committee on Environment and Public Works has protected the rights of States to impose more restrictive requirements or liability, particularly in the area of oil pollution law.  More stringent State laws are specifically preserved in both the Clean Water Act (for clean-up of spills of oil) and the Deepwater Port Act and title 3 of the Outer Continental Shelf Lands Act Amendments of 1978 (for clean-up and damages caused by spills of oil).  Other environmental statutes, including the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (the toxic chemical "super fund" law) and amendment to it (the 1986 "super fund" amendments and re-authorization act) contain similar protections.
>
> **To date, 24 States have enacted comprehensive oil pollution laws covering clean-up and damages and many have established compensation funds.**  Some have included hazardous substances as well.  **This legislation, as reported by the committee would permit such State laws to continue and would not preclude enactment of new state laws.**
>
> The theory behind the committee action is that the Federal statute is designed to provide basic protection for the environment and victims damaged by spills of oil.  Any State wishing to impose a greater degree of protection for its own resources and citizens is entitled to do so.  On the other hand, the State might feel adequately protected by the Federal statute **and therefore choose not to enact additional State law**.  In any event, the committee chose not impose, arbitrarily, the constraints of the federal regime on the States, while at the same time preempting their rights to their own laws.

S. Rep. No. 101-94, at *6 (1989) (Emphasis added).

In expressing its intent about "State law," Congress is speaking of legislative acts that result in statutes, ordinances or regulations by the individual states and subdivisions thereof, not common law causes of action.[6]  In enacting the State law savings clause, Congress was reserving basic principles of federalism and "saving" the legislative rights of States and their political subdivisions to enact oil pollution liability laws that —like other federal environmental laws— allow States to impose additional liability or requirements beyond the basic protections of OPA—without ever in any way suggesting that it was concerned about state common law causes of action by private citizens who were damaged by oil pollution.

Nowhere in the legislative history of OPA is there any explanation of Congress' intention in the use of the language "including common law" in reference to the Solid Waste Disposal Act. The only reference in the legislative history to common law is the following statement:

> Section 106 of the Senate amendment and section 1018 of the House bill are generally similar provisions preserving the authority of any State to impose its own requirements or standards with respect to discharges of oil within that State.  Both provisions preserve the authority of any State to establish or maintain funds for cleanup or compensation purposes and to collect any fees or penalties imposed under State law.  Both provisions also authorize States to enforce the financial responsibility requirements of this Act on their own navigable waters.

---

[6] The only other clear expression of the relationship between OPA and state law in the legislative history of OPA is contained in a section entitled "State Laws and Programs" that provides:

> Section 106 of the reported bill [2718(a)] expressly preserves the authority of any State to impose its own requirements or standards with respect to discharges of oil within such State.  Also, expressly preserved is State's authority to establish or maintain funds for clean-up or compensation purposes and collection such fees or penalties as they may establish.  The Committee has confronted preemption during its previous consideration of oil spill legislation.

> Preemption has been discussed by members of the Committee more than any other single issue.  S. 686 does not embrace any preemption of State oil spill liability laws, State oil spill funds, or State fees, taxes or penalties used to contribute to such funds.  The long-standing policy in environmental laws of not preempting State authority and recognizing the rights of States to determine for themselves the best way in which to protect their citizens, is clearly affirmed in S. 686.

*See* S. Rep. No. 101-94, at *17 (1989).

347076

The Conference substitute blends the provisions of the House and Senate bills, and adds a new subsection (d) pertaining to the liability of Federal employees.

Thus, subsection (a) of section 1018 of the substitute states explicitly that nothing in the substitute, or the Act of March 3, 1851 (the Limitation of Liability Act), shall affect in any way the authority of a State or local government to impose additional liability or other requirements with respect to oil pollution or to the discharge of oil within the State or with respect to any removal activities in connection with such a discharge. The subsection also makes it clear that nothing in this substitute or in the Limitation of Liability Act shall affect in any way the obligations or liabilities of any person under the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) or State or common law. (Emphasis added).

*See* H.R. Conf. Rep. No. 101-653, pp. 121-22 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 799-800.

Under every basic tenet of statutory interpretation, the language "including common law" at the end of 2718(a)(2) is intended to read *in pari materia* the provisions of the "savings" clause with respect to solid hazardous waste [which, by definition, oil is not]. Whatever the intent of Congress was in adding the phrase "including common law" in the 2718(a)(2) savings provision, it was not to create state common law causes of action for oil pollution "saved" and governed by Maritime law.

Transocean's reading of the OPA "State law" savings clause is supported by the Supreme Court decisions in *Askew* and *Locke*, both of which involve the balancing of federal and state interests in oil spill legislation and regulation.

In *Askew*, the Supreme Court considered the constitutionality of the Florida Oil Spill Prevention and Pollution Control Act and whether it invaded a regulatory area preempted by the Federal Water Quality Improvement Act of 1970, 33 U.S.C. A. § 11-6-1, *et seq.* (the "Federal Act"). The Supreme Court found that there was no preemption of the States' police power to

enact legislation or regulation of oil spillages that impacted Florida's interests or concerns for

"sea-to-shore" pollution:

> We find no constitutional or statutory impediment to permitting Florida, in the present setting of this case, to establish any **requirement or liability** concerning the impact of oil spillages on Florida's interest or concerns.  To rule as the District Court has done is to allow federal admiralty jurisdiction to swallow most of the police power of the States over oil spillage—an insidious form of pollution of vast concern to every coastal city or port and to all the estuaries on which the life of the ocean and the lives of the coastal people are greatly dependent.

> It is clear at the outset that the Federal Act does not preclude, but in fact allow State regulation. . . . (2)  Nothing in this section shall be construed as preempting any state or political subdivision thereof from imposing **any requirement or liability** with respect to the discharge of oil into any waters within such State. . . .

> According to the Conference Report, any State would be free to provide requirements and penalties similar to those imposed by this section for additional requirements and penalties.   These, however, would be separate and independent from those imposed by this section [the Federal Act] and would be enforced by the states through its courts.  [Emphasis added.] [cites]

*Askew American Waterways Operators, Inc.,* 411 U.S. 325, 329 (1973).  Just as in OPA, §

2718(a)(1), Congress was found to have preserved the right of the States to enact legislation or

regulation, *i.e.* to impose additional liability or for requirements, as provided for in the savings

clause of a federal environmental act.

    After determining federal preemption did not exist between the Federal Act and the

Florida statute, the Supreme Court defined the balance of the dispute:  "The issue comes down to

whether a State constitutionally may exercise its police power respecting maritime activities

concurrently with the federal government."  *Id*. at 337.  In answering this question, the Court

made the following statement that St. Joe employs as the basis for its "sea-to-shore" state law

exception to Maritime law:

347076

Historically, damages to the shore or to shore facilities were not cognizable in admiralty.

\*       \*       \*

On June 19, 1948, Congress enacted the Admiralty Extension Act, 46 U.S.C. § 740.

\*       \*       \*

The Admiralty Extension Act has survived constitutional attack in the lower courts and was applied without question by this Court in *Gutierrez v. Waterman SS Corp.*, 373 U.S. 206, 83 S. Ct. 1185, 10 L.Ed 297.  **The court recognized in *Victory Carriers,* however, that the act may "intrude on an area that has heretofore been reserved for state law."**  *Id.,* 404 U.S. at 212, 92 S. Ct. at 425.

It cautioned that under these circumstances, we should proceed with caution in construing constitutional and statutory provisions dealing with the jurisdiction of the federal courts.  While Congress has extended admiralty jurisdiction beyond the boundaries contemplated by the framers, it hardly follows from the constitutionality of that extension that we must sanctify the federal courts with exclusive jurisdiction to the exclusion of powers traditionally within the competence of the States.  One can read the history of the Admiralty Extension Act without finding any clear indication that Congress intended that sea-to-shore injuries be exclusively triable in federal courts.

Even though Congress has acted in the admiralty area **State regulation is permissible, absent a clear conflict with federal law.**

*Id.* at 341.  It follows, *a fortiori* that sea-to-shore pollution—historically within the reach of the police power of the States—is not silently taken away from the States by the Admiralty Extension Act, which does not purport to supply the exclusive remedy.   *See The State of Louisiana v. Ex Rel Guste M/V Testbank*, 752 F.2d 1019 (5th Cir. 1985 *en banc*); *In Re Oil Spill by Amoco Cadiz,* 699 F.2d 909, 913 (7th Cir.) cert. denied, 464 F.2d 909, 913 (7th Cir.) cert. denied, 464 U.S. 864, 104 S. Ct. 196, 78 L. Ed.2d 172 (1983); *In Re Exxon Valdez*, 767 F. Supp. 1509 (D. Alaska 1991).

Thus, in the context of the Florida Oil Spill Prevention and Pollution Control Act—not State common law causes of action—the Supreme Court upheld the police power of the States to enact "mini-OPA" statutes.  Nowhere in the *Askew* decision did the Supreme Court mention state common law causes of action, contrary to the statements made by St. Joe.

In the *Locke* case, the Supreme Court again addressed questions of federalism involving the States' right to enact pollution legislation and regulation that impacted maritime commerce. The *Locke* case involved a suit by a trade association of oil tanker operators that sought to declare unconstitutional regulations enacted by the State of Washington to provide "best achievable protection" practices to prevent oil spills in its state territorial waters.  In finding the state regulations to be unconstitutional, the Supreme Court reviewed the savings clauses found in OPA and stated:

> The evident purpose of this savings clause [2718] is to preserve state laws which, rather than imposing substantive regulation of a vessel's primary conduct, establish liability rules and financial requirements relating to oil spills.
>
> \*                 \*                 \*
>
> The savings clauses, in parallel manner, permit States to impose liability or requirements "relating to the discharge, or substantial threat of a discharge of oil."  § 2718(c)
>
> \*                 \*                 \*
>
> The savings clauses are found in Title I of OPA, captioned Oil Pollution Liability and Compensation and creating a liability scheme for oil pollution.  …  Placement of the savings clauses in Title I of OPA suggests that **Congress intended to preserve state laws of a scope similar to the matters contained in Title I of OPA, not all state laws similar to the matters covered by the whole of OPA or to the whole subject of maritime oil transport.** The evident purpose of the savings clauses is to preserve state laws which, rather than imposing substantive regulation of a vessel's primary conduct, establish liability rules and financial requirements relating to oil spills.

347076

15

> The clauses may preserve a State's ability to enact laws of a scope similar to Title 1 of OPA [creating a liability scheme for oil pollution] but do not extend to subjects addressed in the titles of the act or other acts.  Limiting the savings clauses as we have determined respects the established federal-state balance in matters of maritime commerce between the subjects as to which the States retain concurrent powers and those over which federal authority displaces State control.
>
> *               *               *
>
> We decline to give broad effect to savings clauses where doing so would upset the careful regulatory scheme established by federal law.

*United States v. Locke,* 529 U.S. 89, 105-106 (2000).The *Locke* court balanced the rights of the States to legislate in areas that impacted maritime commerce, including potential "sea-to-shore" pollution, and held that the States did not have the power to enact the statutes or regulations that were at issue in *Locke*.

Once again, the Supreme Court said absolutely nothing about state common law causes of action by private litigants involved with oil pollution liability governed by maritime law.

Several courts that have considered the *Locke* Court's holding have interpreted OPA to "save from pre-emption only those State laws having to do with liability and compensation regarding an oil spill"—i.e., "mini-OPA's."  *In re Bluewater Network*, 234 F.3d 1305, 1311; *see also National Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*, 924 F. Supp. 1436, 1448 (E.D. Va. 1996) (holding that OPA pre-empts state common law causes of action, even against third-parties).

Such a limited interpretation of OPA's savings clause is consistent with Congress' intent in enacting that provision.  As the court in *Moran* observed, "[t]he savings clause was added to allow the states to enact legislation protecting their citizens and their resources to a greater extent than the protection offered by OPA.  *See National Shipping Co. of Saudi Arabia,* 924 F. Supp. at

1448.  It was meant to allow states to go beyond the basic protection of the federal law." *Id*.  In this same vein, the savings provision was **not** intended to preserve pure state common law causes of action, which became irrelevant in the face of OPA's comprehensive scheme governing oil spill liability and cleanup.

Neither the text of OPA §2718(a) nor its legislative history support the proposition by St. Joe that state common law causes of action were saved by the OPA §2718(a).  State Law savings clause of §2718(a) was to preserve the rights of the States to exercise their police power by enacting legislation and regulation of oil pollution that came from "sea-to-shore."   This interpretation is supported by OPA's legislative history and by the Supreme Court decisions in *Askew* and *Locke* that concern the important national policy matters involving pollution legislation—without any mention whatsoever of state common law causes of action governed by maritime law.

### 3.    OPA DID NOT LEGISLATIVELY REPEAL THE ADMIRALTY EXTENSION ACT, AS ST. JOE CONTENDS.  IT "SAVED" IT UNDER ITS ADMIRALTY SAVINGS CLAUSE.

Contrary to what St. Joe says, Congress was unmistakable in its intention to preserve admiralty law that is not inconsistent with OPA.  Section 2751 of Title 33 provides that the Act does not "affect … admiralty and maritime law" except as otherwise provided therein.  There is absolutely no indication anywhere in OPA—and St. Joe. has cited none—that Congress intended to or did repeal the Admiralty Extension Act, 46 U.S.C. § 743, *et seq*.  The Admiralty Extension Act has become a cornerstone of admiralty law jurisdiction, and such an tacit repeal of the Extension Act by OPA would be inconsistent both with basic principles of statutory interpretation as well as with the text of Section 2751.

To that end, jurisdiction under the Admiralty Extension Act is not inconsistent with OPA.  Indeed, the entire purpose of OPA was to provide for a comprehensive scheme of federal

347076

legislation to govern oil spills; bringing individual claims under the arm's reach of the federal courts through the Extension Act is consistent with that purpose: the multitude of cases often resulting from an oil spill can be more efficiently litigated in one forum, with clear governing principles of substantive federal law in OPA.  Likewise, had Congress intended to overrule the decades-old Extension Act to take jurisdiction *away* from the federal courts, then it would have been more explicit in doing so in OPA.

> **4.    THE CASE LAW RELIED UPON BY *ST. JOE* IS INAPPOSITE TO THE ISSUE PRESENTED HERE:**
>
> **DOES THE ADMIRALTY SAVINGS CLAUSE IN OPA PRESERVE THE SUPREMACY OF MARITIME TORT LAW OVER STATE COMMON LAW CLAIMS**?

The cases cited in footnote 11 of St. Joe's *Amicus Curiae* brief demonstrate its fundamental misunderstanding of Transocean's argument: Transocean does not claim that OPA preempts State Law, only that general maritime law did for non-OPA claims before OPA was enacted and that OPA does not change this.  Careful scrutiny of St. Joe's citations shows how wrong on the law it is:

- In *Russo v. M/T Dubai star*, 09-15158, 2010 WL 1753187 (N.D. Cal. 4/29/10), the plaintiffs were commercial fisherman who sought damages under state law from an interruption in fishing activities caused by an oil spill in the San Francisco Bay.  Although the court found that the OPA presentment requirement did not apply to plaintiffs' state law claims, the matter did not involve the type of "sea to shore" pollution that St. Joe says may be governed by the states; the oil spill in *Russo* occurred within the California borders, in the San Francisco Bay. *Id.* at * 1406.  Although the court held that OPA does not preempt state law nuisance claims in that context, <u>it did not consider whether the general maritime</u>

<u>law d</u>oes.  And, to the extent that the court impliedly found that such claims are not preempted by the general maritime law and are preserved by OPA, it was wrong.

- As in *Russo,* the oil spill involved in the *In re Spray II K/S*, 1996 WL 451315, *6 (D. N.J. Aug. 5, 1996) case occurred entirely within state borders.  There, the court found that OPA displaces the Shipowner's Limitation of Liability Act, 46 U.S.C. §§ 181 et seq., *with respect to claims under OPA*.  The court, however, did not make a ruling on what (federal or state) claims, if any, the plaintiff in that case had in addition to OPA.  And, as in *Russo,* the court did not even mention the interplay of OPA/maritime law and state law.  Instead, the court held that, because of the limited nature of non-OPA claims being asserted by plaintiffs, as a matter of judicial economy it would not allow the limitation action to proceed.

- The court in *In the Matter of MetLife Capital Corp.*, 132 F.3d 818, 821 (1st Cir. 1997), held that OPA supersedes the Limitation of Liability Act, with respect to "claims arising under the OPA (for pollution removal costs and damages) . . . ." The holding thus has absolutely not application in this case, where St. Joe has expressly disavowed any OPA claims.  And the quotation of a treatise in the case that St. Joe cites in its brief is taken out of context and is inapposite to the facts of the *Metlife* case (which involve OPA claims).

- In *Isla Corp. v. Sundown Energy, LP,* 2007 WL 1240212, *2 (E.D. La. Apr. 27, 2007), Plaintiffs' property was damaged when an oil tank was ruptured in Hurricane Katrina and caused oil to pollute the surrounding areas.  Plaintiffs sought damages under OPA and state law, and the court held that the plaintiff's

347076

state law claims were not preempted by OPA.   Nowhere in the court's short opinion, however, did it consider the maritime law's preemption of state law remedies.   (And general maritime law would not have applied in the *Isla Corporation* case, as the incident did not occur in navigable waters.)

- Finally, St. Joe's citation to *Williams v. Potomac Elect. Power Co.*, 115 F. Supp. 2d 561, 564-65 (D. Md. 2000), again misses the point.  Transocean argues not that OPA (directly) preempts state law remedies, only that the maritime law expressed in *Testbank* and *Exxon Valdez* does and nothing in OPA was intended to change this result for state law claims.  The oil spill in *Williams* had nothing to do with a vessel and therefore maritime law did not apply.

Respectfully submitted,

By:    /s/ Steven L. Roberts
Steven L. Roberts (Texas, No. 17019300)
Rachel Giesber Clingman (Texas, No. 00784125)
Kent C. Sullivan (Texas, No. 19487300)
Teri L. Donaldson (Florida, No. 784310)
Sutherland Asbill & Brennan LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
Email: steven.roberts@sutherland.com,
rachel.clingman@sutherland.com,
kent.sullivan@sutherland.com,
teri.donaldson@sutherland.com

By:    /s/ Kerry J. Miller
Kerry J. Miller (Louisiana, No. 24562)
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8169
Facsimile: (504) 599-8154
Email: kmiller@frilot.com
-and-

By:    /s/ Edwin G. Preis, Jr.
Edwin G. Preis, Jr. (Louisiana, No. 10703)
Edward F. Kohnke, IV (Louisiana, No. 07824)
Preis & Roy PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70501
Telephone: (337) 237-6062
Facsimile: (337) 237-9129
-and-
601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone: (504) 581-6062
Facsimile: (504) 522-9129
Email: egp@preisroy.com, efk@preisroy.com

Of Counsel:

John M. Elsley (Texas, No. 0591950)
Royston, Rayzor, Vickery & Williams LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 224-8380
Facsimile: (713) 225-9945
Email: john.elsley@roystonlaw.com

Daniel O. Goforth (Texas, No. 08064000)
Goforth Geren Easterling LLP
4900 Woodway, Suite 750
Houston, Texas 77056
Telephone: (713) 650-0022
Facsimile: (713) 650-1669
Email: dangoforth@goforthlaw.com

Brad D. Brian (California, No. 79001)
Allen M. Katz (California, No. 054933)
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 683-5180, (213) 683-4018
Email: brad.brian@mto.com, allen.katz@mto.com

*Counsel for Triton Asset Leasing GmbH.,
Transocean Holdings LLC, Transocean
Offshore Deepwater Drilling Inc. and
Transocean Deepwater Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, on April 28, 2010.

/s/  Kerry J. Miller