UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf Of Mexico, on April 20, 2010 | MDL No. 2179 |
|---|---|
| | SECTION: J |
| This Document applies to: *All Cases in Pleading Bundle B1.* | JUDGE BARBIER |
| This Document applies to: No. 10-2771 | MAGISTRATE SHUSHAN |

**REPLY BRIEF IN SUPPORT OF TRANSOCEAN'S RULE 12(b)(6) MOTION TO DISMISS THE FIRST AMENDED B1 MASTER CLAIM IN LIMITATION AND THE FIRST AMENDED B1 MASTER COMPLAINT**

Steven L. Roberts (Texas, No. 17019300)
Rachel Giesber Clingman (Texas, No. 00784125)
Kent C. Sullivan (Texas, No. 19487300)
Teri L. Donaldson (Florida, No. 784310)
SUTHERLAND ASBILL & BRENNAN LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
Email: steven.roberts@sutherland.com, rachel.clingman@sutherland.com, kent.sullivan@sutherland.com, teri.donaldson@sutherland.com

Kerry J. Miller (Louisiana, No. 24562)
FRILOT, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8169
Facsimile: (504) 599-8154
Email: kmiller@frilot.com

-and-

Edwin G. Preis, Jr. (Louisiana, No. 10703)
Edward F. Kohnke, IV (Louisiana, No. 07824)
PREIS & ROY PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70501
Telephone: (337) 237-6062
Facsimile: (337) 237-9129

-and-

601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone: (504) 581-6062
Facsimile: (504) 522-9129
Email: egp@preisroy.com,
efk@preisroy.com

Of Counsel:

John M. Elsley (Texas, No. 0591950)
ROYSTON, RAYZOR, VICKERY & WILLIAMS LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 224-8380
Facsimile: (713) 225-9945
Email: john.elsley@roystonlaw.com

Daniel O. Goforth (Texas, No. 08064000)
GOFORTH GEREN EASTERLING LLP
4900 Woodway, Suite 750
Houston, Texas 77056
Telephone: (713) 650-0022
Facsimile: (713) 650-1669
Email: dangoforth@goforthlaw.com

Brad D. Brian (California, No. 79001)
Allen M. Katz (California, No. 054933)
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 683-5180, (213) 683-4018
Email: brad.brian@mto.com, allen.katz@mto.com

***Counsel for Triton Asset Leasing GmbH., Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc. and Transocean Deepwater Inc.***

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....1

II. OPA PREEMPTS OR DISPLACES PLAINTIFFS' STATE AND GENERAL MARITIME LAW CLAIMS ....4

A. OPA Preempts Plaintiffs' State Common Law Claims ....5

B. Where OPA Applies, It Displaces Plaintiffs' General Maritime Law Claims ....8

C. Whether Arising Under Maritime or State Law, Plaintiffs' Claims for Punitive Damages Must Be Dismissed ....9

III. EVEN IF OPA DOES NOT, THE FEDERAL GENERAL MARITIME LAW PREEMPTS PLAINTIFFS' STATE COMMON LAW CLAIMS ....12

IV. OPA-SPECIFIC ISSUES ....14

A. OPA's Presentment Requirement is Both Jurisdictional And a Mandatory Condition Precedent to Filing Suit ....14

B. Regardless of OPA's Standard of Causation, OPA Requires the Dismissal of All Moratorium Claims ....15

V. *ROBINS DRY DOCK* IS APPLICABLE AND COMPELS DISMISSAL OF ALL CLAIMS FOR PURELY ECONOMIC LOSS ....18

VI. PLAINTIFFS' FRAUD CLAIMS MUST BE DISMISSED ....19

VII. ALL CLAIMS UNDER FLORIDA'S POLLUTANT DISCHARGE PREVENTION AND CONTROL ACT MUST BE DISMISSED ....22

VIII. PLAINTIFFS' DEMANDS FOR DECLARATORY JUDGMENT ARE UNTIMELY, NONJUSTICIABLE AND MOOT ....24

IX. CONCLUSION ....25

CERTIFICATE OF SERVICE ....26

## TABLE OF AUTHORITIES

### CASES

*Am. Dredging Co. v. Miller*,
510 U.S. 443 (1994) .... 14

*Atlantic Sounding Co. v. Townsend*,
129 S. Ct. 2561 (2009) .... 9, 10, 11, 12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .... 20

*Benefiel v. Exxon Corp.*,
959 F.2d 805 (9th Cir. 1992) .... 17

*Borden v. East-European Ins. Co.*,
921 So. 2d 587 (Fla. 2006) .... 23

*Catalyst Old River Hydroelec. LP v. Ingram Barge Co.*,
No. 10-30466, 2011 WL 1449616 (5th Cir. Apr. 15, 2011) .... 18

*CEH Inc. v. F/V Seafarer*,
70 F.3d 694 (1st Cir. 1995) .... 12

*Cf. Cisneros v. Alpine Ridge Grp.*,
508 U.S. 10 (1993) .... 11

*Clausen v. M/V NEW CARISSA*,
171 F. Supp. 2d 1127 (D. Or. 2001) .... 12

*Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*,
447 U.S. 102 n.13 (1980) .... 23

*Curd v. Mosaic Fertilizer, LLC*,
39 So. 3d 1216 (Fla. 2010) .... 22, 23

*Dunlap v. Denison Independent School District*,
2010 U.S. Dist. LEXIS 28495 (E.D. Tex. Mar. 24, 2010) .... 20, 21

*Exxon Shipping Co. v. Baker*,
554 U.S. 471 (2008) .... 9, 10, 11

*Gabarick v. Laurin Maritime (Am.), Inc.*,
643 F. Supp. 741 (E.D. La. 2009) .... 4, 5, 9

*Holmes v. Sec. Investor Protection Corp.*,
503 U.S. 258 (1992) .... 16

*IMTT-Gretna v. Robert E. Lee SS*,
993 F.2d 1193 (5th Cir. 1993) ........ 13

*In re ALEX C Corp.*,
No. 00-12500, 2010 WL 4292328 (D. Mass. Nov. 1, 2010) ........ 11

*In re Taira Lynn Marine Ltd.*,
444 F.3d 371 (5th Cir. 2006) ........ 18

*Isla Corp. v. Sundown Energy, LP*,
CIV.A. 06-8645, 2007 WL 1240212 (E.D. La. April 27, 2007) ........ 6

*Marastro Compania Naviera, S.A. v. Canadian Mar. Carriers, Ltd.*,
959 F.2d 49 (5th Cir. 1992) ........ 13

*Miles v. Apex Marine Corp.*,
498 U.S. 19 (1990) ........ 11, 12

*Mobil Oil Corp. v. Higginbotham*,
436 U.S. 618 (1978) ........ 10

*Nazareth International, Inc. v. J. C. Penney Corp., Inc.*,
2005 U.S. Dist. LEXIS 14473 (N.D. Tex. July 19, 2005) ........ 20, 21

*Powell v. State*,
508 So.2d 1307 (Fla. Dist. Ct. App. 1987) ........ 23

*Proctor v. Vishay Intertech. Inc.*,
584 F.3d 1208 (9th Cir. 2009) ........ 15

*Red Lion Broadcasting Co. v. FCC*,
395 U.S. 367 (1969) ........ 23

*Robins Dry Dock & Repair Co. v. Flint*,
275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927) ........ 18, 19

*Russo v. M/T Dubai Star*,
09-05158, 2010 WL 1753187 (N.D. Cal. Apr. 29, 2010) ........ 15

*Se. Fisheries Ass'n, Inc. v. Dep't of Natural Res.*,
453 So.2d 1351 (Fla. 1984) ........ 23

*South Port Marine, LLC v. Gulf Oil Ltd. Partnership*,
234 F.3d 58 (1st Cir. 2000) ........ 11, 12

*St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*
No. 10-cv-968, 2011 WL 915300 (D. Del. Mar. 15, 2011) ........ 7

*State of La. ex rel. Guste v. M/V Testbank*,
752 F.2d 1019 (5th Cir. 1984).......................................................................... 5, 13, 18, 19

*Tanguis v. M/V WESTCHESTER*,
153 F. Supp. 2d 859 (E.D. La. 2001) ....................................................................................... 6

*U.S. v.* Bodenger,
2003 U.S. Dist. LEXIS 16987 (E.D. La. Sept. 25, 2003) ......................................................... 6

*United States ex rel Grubbs v. Ravikumar Kanneganti*,
565 F.3d 180 (5th Cir. 2009)............................................................................................. 19, 21

*United States v. Locke*,
529 U.S. 89 (2000) ................................................................................................................... 6

*Weinstein v. Islamic Repub. of Iran*,
609 F.3d 43 (2d Cir. 2010) ..................................................................................................... 11

*Western Union Telegraph Co. v. Call Publ'g Co.*,
181 U.S. 92 (1901) ................................................................................................................... 7

*Yamaha Motor Corp. v. Calhoun*,
516 U.S. 199 (1996) ......................................................................................................... 13, 14

**STATUTES**

15 U.S.C. § 15.......................................................................................................................... 16

33 U.S.C. § 1321(o) ................................................................................................................... 10

33 U.S.C. § 2701(14) ................................................................................................................. 16

33 U.S.C. § 2702............................................................................................................... 6, 9, 15

33 U.S.C. § 2702(a) .............................................................................................................. 9, 16

33 U.S.C. § 2702(b) ................................................................................................................... 10

33 U.S.C. § 2702(b)(2)(E) ......................................................................................................... 17

33 U.S.C. § 2702(d)(1)(A)............................................................................................................ 3

33 U.S.C. § 2703(a)(3)................................................................................................................. 3

33 U.S.C. § 2709.......................................................................................................................... 3

33 U.S.C. § 2710.......................................................................................................................... 3

33 U.S.C. § 2713........................................................................................................................ 24

33 U.S.C. § 2713(a) ........................................................................................................ 15

33 U.S.C. § 2717 .............................................................................................................. 4

33 U.S.C. § 2718 .......................................................................................................... 5, 6

33 U.S.C. § 2718(a)(1) ........................................................................................... 5, 6, 7, 8

33 U.S.C. § 2718(a)(2) ................................................................................................. 5, 8

33 U.S.C. § 2718(c) .......................................................................................................... 8

33 U.S.C. § 2751 .......................................................................................................... 8, 9

33 U.S.C. § 2751(e) ........................................................................................................ 10

46 U.S.C. § 183 ................................................................................................................. 8

FLA. STAT. § 376.021(3)(a) ................................................................................................ 23

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf Of Mexico, on April 20, 2010

This Document applies to:
*All Cases in Pleading Bundle B1.*

This Document applies to:
No. 10-2771

MDL No. 2179

SECTION: J

JUDGE BARBIER

MAGISTRATE SUSHAN

**REPLY BRIEF IN SUPPORT OF TRANSOCEAN'S RULE 12(b)(6) MOTION TO DISMISS THE FIRST AMENDED B1 MASTER CLAIM IN LIMITATION AND THE FIRST AMENDED B1 MASTER COMPLAINT**

TO THE HONORABLE CARL J. BARBIER, United States District Judge:

Petitioners in Limitation and Defendants Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, Transocean Deepwater Inc., and Triton Asset Leasing GmbH (collectively "Transocean") respectfully submit their Reply Brief in Support of Transocean's Rule 12(b)(6) Motion to Dismiss the First Amended B1 Master Claim in Limitation and the First Amended B1 Master Complaint.[1]

## I.

## INTRODUCTION

The first two sentences of the one-page introduction to the B1 Plaintiffs' Omnibus Memorandum begin by observing:

> The vast majority of the issues raised in Defendants' Motions to Dismiss involve questions of applicable substantive law. Because the *Deepwater Horizon* was a vessel in navigation that discharged oil into a navigable waterway, this case is governed by the Oil Pollution Act ("OPA") and general maritime law.

[1] This Brief is intended as a reply to the Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss Bundle B1 First Amended Master Complaint, Cross-Claim, and Third-Party Complaint (hereinafter referred to as "Omnibus Memorandum"), **Dkt. 1821 and 1822**, and Plaintiffs' Memorandum of Law In Opposition to Motion to Dismiss Plaintiffs' Fraud Claims (hereinafter "Plaintiffs' Memorandum"), **Dkt. 1808**.

**OM at 17**. Transocean agrees, and the B1 Plaintiffs have answered their own question by acknowledging that the case is governed by OPA and the general maritime law. **OM at 17, 26, and 30**.

The next short passage from the introduction to the B1 Plaintiffs' Omnibus Memorandum focuses upon the areas of disagreement between Transocean and Plaintiffs:

> The OPA specifically preserves, and does not preempt, Plaintiffs' general maritime, state and common-law claims. In addition, because the general maritime law is an incomplete body of law, this Court may look to state and common-law to afford Plaintiffs' complete and appropriate relief. For example, Plaintiffs have stated and may maintain claims for strict products liability, for punitive damages under the general maritime law, and for damages and attorneys' fees under the Florida Pollutant Discharge Prevention and Control Act.

**OM at 17**. The foregoing allegations are simply incompatible with existing law: (1) prior to the enactment of OPA, the Fifth Circuit held that state common-law causes of action for negligence, nuisance and trespass are displaced by the general maritime law because the application of state common law to oil spills occurring on navigable waters would impair the uniformity and simplicity of the federal admiralty law; (2) OPA did not create any state common-law causes of action for negligence, nuisance, and trespass; (3) OPA preserved to the states only a narrowly defined authority to enact mini-OPAs; and (4) by the express holding of the First Circuit, and other district courts, including this Court, claims for punitive damages in oil spill cases were preempted following OPA's passage in 1990.

The B1 Plaintiffs acknowledge that Transocean Holdings had been designated the Responsible Party only for the release of diesel on the surface of the water.[2] By their Omnibus Memorandum, they now make clear that they "are not proceeding under OPA against

---

[2] This acknowledgment also appears in the Bundle C Master Complaint, **Dkt. 1510 ¶ 661**, and in the State of Alabama's First Amended Complaint, **Dkt. 1872 ¶ 207**, also filed against Transocean.

Transocean for damages (if any) resulting from the release of diesel." **OM at 56 n.26**. Because the B1 Plaintiffs make no claim against Transocean for the release of diesel on the surface of the water—and presumably, no other claimants will either, due to the location of and the minimal quantity of diesel spilled—it now becomes apparent that Transocean is not liable to the B1 Plaintiffs under OPA.

This new acknowledgment by the B1 Plaintiffs highlights why it is imperative that Plaintiffs follow the policies and procedures that Congress established in OPA. OPA Plaintiffs must present their claims to BP for the downhole release of oil from the Macondo well. If BP settles the claims, litigation will be unnecessary. In the unlikely event their claims are not resolved by BP, only then may they file suit against BP.[3] If, and when, BP settles the claims, then BP might attempt to pursue Transocean for contribution under OPA and under the terms of the Drilling Contract.[4] This is the very process that Congress intended parties to follow in the wake of an oil spill which still allows BP to pursue other Defendants as either third-party responsible parties under § 2702(d)(1)(A)[5], or for contribution under § 2709.[6] This was the

---

3 Billions of dollars have already been paid by BP in direct settlements and, no doubt, if the claims process is allowed to proceed as intended, only a minority of claims will remain to be resolved in the courts.

4 It will come as no surprise to the Court that the Drilling Contract between Transocean and BP proceeds with great detail to spell out which party—BP or Transocean—is responsible for the downhole release of oil from the Macondo well. In this case, it is BP. BP and Transocean are sophisticated, contracting companies that routinely provide carefully drafted indemnification agreements for pollution liability, a circumstance that Congress not only acknowledged but approved by the express language of OPA. 33 U.S.C. § 2710. And, in their Drilling Contract, Transocean and BP agreed that pollution from the Macondo well would be BP's responsibility, regardless of the cause of that pollution.

5 Section 2702(d)(1)(A) provides: "Except as provided in subparagraph (B), in any case in which a responsible party establishes that a discharge or threat of a discharge and the resulting removal costs and damages were caused solely by an act or omission of one or more third parties described in section 2703(a)(3) of this title (or solely by such an act or omission in combination with an act of God or an act of war), the third party or parties shall be treated as the responsible party or parties for purposes of determining liability under this subchapter." Transocean cannot be a third-party responsible party under 33 U.S.C. § 2702(d)(1)(A) because it has a contractual relationship with BP, the Responsible Party. Thus, BP might pursue Transocean for contribution under § 2709, quoted in Footnote 7, *infra*.

6 Section 2709 provides: "A person may bring a civil action for contribution against any other person who is liable or potentially liable under this chapter or another law. The action shall be brought in accordance with

precise holding of Judge Lemelle in *Gabarick v. Laurin Maritime (Am.), Inc*., 643 F. Supp. 741 (E.D. La. 2009), where he observed: "Claimants should pursue claims covered under OPA only against the Responsible Party and in accordance with the procedures established by OPA. Then, the Responsible Party can take action to recover from Third-Parties." *Id.* at 750.

## II.

## OPA PREEMPTS OR DISPLACES PLAINTIFFS' STATE AND GENERAL MARITIME LAW CLAIMS

In an oil pollution case such as this one, the hierarchy of potentially applicable substantive laws consists of OPA, or federal statutory law, at the top, followed by federal general maritime law, and finally the state mini-OPAs. As discussed in Transocean's brief, except for the application of the mini-OPAs, the lower level law may be preempted or displaced by the law at a level above it. **Dkt. 1390-1, at 11 *et seq***. Plaintiffs' opposition to OPA's preemptive effect seems to rest on what Plaintiffs refer to as the "plain language" of that statute's savings clauses—only one of which is actually a savings clause—as well as some choice selections from OPA's legislative history concerning preemption, all of which was limited to the state mini-OPAs.[7]

---

§ 2717 of this title." BP's potential contribution claims against Transocean would be subject to the arbitration provision in the Drilling Contract.

7 The B1 Plaintiffs go to some lengths to select pieces from OPA's voluminous legislative history and case law referencing the legislative history to support the sweeping proposition that OPA does not preempt **any** state law. **OM at 34–41**. As noted below, however, Transocean agrees that OPA's plain language, as enacted, recites that it does not preempt the preexisting or later-imposed state mini-OPAs. But neither the plain language of OPA as enacted, nor Plaintiffs' selected quotations from its legislative history, support the argument that **no** state law—i.e., including the common law—is preempted by OPA. In fact, the focus of the preemption debates can be seen to revolve around federalism-type arguments in which the treatment of the existing and proposed state statutory oil spill regimes formed a set-piece for the question of state versus federal legislative authority on this issue. Specifically, would the states with unlimited liability statutes have to defer to the single federal statute's limitations on liability? Treatment of state common-law actions and remedies was never at issue in the debates. OPA's vast legislative history cannot be read so broadly as to cover state common law when the intent was, as Plaintiffs argue, to allow states to retain and impose additional liability under their own statutory regimes. In fact, the B1 Plaintiffs seem to understand the difficulties in relying on legislative history by their own attempt to explain a recent case that found OPA's legislative history actually supported preemption: "Plaintiffs respectfully suggest that the *Gabarick* court may have been presented with an incomplete or selective

### A. OPA Preempts Plaintiffs' State Common-Law Claims

With regard to state law preemption by OPA, a close reading of the clause cited by Plaintiffs shows that Plaintiffs' reliance is misplaced. State law is treated in 33 U.S.C. § 2718 ("Relationship to other law"), in which only subsection (a) (and subsection (c), discussed below) is relevant ("Preservation of State authorities; Solid Waste Disposal Act"). Subsection (a) is further divided into two sections, the first authorizing state mini-OPAs, *id.* § 2718(a)(1), and the second confirming that OPA does not affect or modify the Solid Waste Disposal Act or similar state laws, *id.* § 2718(a)(2). Plaintiffs argue that subsection (a) expressly provides that state law is not preempted. It certainly does, but only one of the relevant sections uses the word preemption—the mini-OPA section in (a)(1). The Solid Waste Disposal Act and state law section in (a)(2) declares only that a defendant's "obligations or liabilities" arising under them are not "affect[ed] or modif[ied]" by OPA. This choice of words between subsection (a)'s sub-parts shows that Congress carefully considered, and then selected, the appropriate words and their destinations, making clear its congressional intent that OPA did not preempt mini-OPAs, and did not modify or affect the SWDA or similar laws, statutory or common, related to the subject of solid waste. Thus, Plaintiffs' purported plain language argument from § 2718 does not support their non-preemption interpretation.

None of the cases cited by Plaintiffs involve the supremacy of general maritime law that ousts state common law as in *Testbank*. Nor do the cases the B1 Plaintiffs cite support their interpretation. With the exception of *Isla Corp. v. Sundown Energy, LP*, CIV.A. 06-8645, 2007

legislative history." **OM at 40** (referencing *Gabarick, supra*, 623 F. Supp. 2d 741). Transocean respectfully suggests that it is Plaintiffs here who rely too heavily upon, and therefore misconstrue, OPA's legislative history, by cherry picking generic references to "state law." These passing references were referring to state legislation, not state common law.

WL 1240212 (E.D. La. April 27, 2007)[8] the cases they cite actually support Transocean's interpretation. *United States v. Locke*, 529 U.S. 89, 105–106 (2000), held that "[t]he evident purpose of the saving clauses [subsections (a) and (c) of § 2718] is to preserve state laws which, rather than imposing substantive regulation of a vessel's primary conduct, establish liability rules and financial requirements relating to oil spills." In *Locke*, the Supreme Court held that a Washington state law that went beyond that narrow scope was preempted. *Id.* at 106 ("We think it quite unlikely that Congress would use a means so indirect as [§ 2718] of OPA to upset the settled division of authority by allowing States to impose additional unique substantive regulation on the at-sea conduct of vessels. We decline to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law."). Similarly, *Tanguis v. M/V WESTCHESTER*, 153 F. Supp. 2d 859, 863 (E.D. La. 2001), a case that held only that OPA cases are removable, does include a statement that "OPA explicitly does not preempt state law in the area of oil spill liability and compensation." But the court there said this only to support the principle that concurrent state and federal jurisdiction does not evidence intent of a statutory <u>prohibition</u> of removal. Importantly, the opinion notes the courts' concurrent state and federal jurisdiction over "state and federal claims for *removal costs or damages*," *id.* at 864 (emphasis added), exactly what § 2702 of OPA covers and exactly what § 2718(a)(1) permits the state mini-OPAs to address. Finally, *U.S. v. Bodenger*, 2003 U.S. Dist. LEXIS 16987 (E.D. La. Sept. 25, 2003) contains only a single sentence on § 2718, and that single sentence makes no mention of state common law.

---

[8] Respectfully, it is to be noted that the motion to dismiss filed in *Isla Corp.* was nowhere near as exhaustive as the motions to dismiss filed in this case, and did not even brief all the issues relevant to preemption. *See* 2007 WL 758599 (motion to dismiss).

The Delaware district court decision in *St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*,[9] is flawed in failing to distinguish between paragraphs (a)(1) and (a)(2) of § 2718. In reading paragraph (a)(1), which relates to a state's authority to create OPA-like laws regarding discharge and removal, the Delaware court held: "This clause draws no distinction between a State exercising this authority via state common law or a state statutory regime. . . . This provision, therefore, makes clear that, in addition to the preservation of state authority to impose liability above and beyond OPA, any liability existing prior to OPA under State law, including common law, is not altered either." 2001 WL 915300, at *7. Respectfully, that decision overlooks a key verb in paragraph (a)(1) that marks its referenced content as distinct in type from that of paragraph (a)(2): "Nothing in this Act . . . shall (1) affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from ***imposing*** any additional liability or requirements with respect to . . . discharge . . . or . . . removal. . . ." 33 U.S.C. § 2718 (a)(1) (emphasis added). The common law is not "imposed" by a state, but exists wholly apart from the positive enactments and creations of a legislature.[10] Furthermore,

---

[9] No. 10-cv-968, 2011 WL 915300 (D. Del. Mar. 15, 2011).

[10] The Supreme Court has observed:

> What is the common law? According to Kent: "The common law includes those principles, usages and rules of action applicable to the government and security of person and property, which do not rest for their authority upon any express and positive declaration of the will of the legislature." 1 Kent, Com. 471. As Blackstone says: "Whence it is that in our law the goodness of a custom depends upon its having been used time out of mind; or, in the solemnity of our legal phrase, time whereof the memory of man runneth not to the contrary. This it is that gives it its weight and authority; and of this nature are the maxims and customs which compose the common law, or *lex non scripta*, of this Kingdom. This unwritten, or common, law is properly distinguishable into three kinds: 1. General customs; which are the universal rule of the whole kingdom, and form the common law, in its stricter and more usual signification." 1 Blackstone, Com. 67. In Black's Law Dictionary, page 232, it is thus defined: "As distinguished from law created by the enactment of legislatures, the common law comprises the body of those principles and rules of action relating to the government and security of persons and property, which derive their authority solely from usages and customs of immemorial antiquity, or from the judgments and decrees of the courts recognizing, affirming and enforcing such usages and customs; and, in this sense, particularly the ancient unwritten law of England."

*Western Union Telegraph Co. v. Call Publ'g Co.*, 181 U.S. 92, 101–02 (1901).

paragraph (a)(1) does not refer at all to the common law, where the "imposing" language appears.[11] The reference to "common law" occurs only in paragraph (a)(2). The Delaware court overlooked this distinction and thus read (a)(1) and (a)(2) together. This misstep caused the court to conclude that OPA did not "preempt[] . . . State . . . impos[itions]," *see* § 2718(a)(1), or "State . . . common law," *id.* § 2718(a)(2), although the word preempt only occurs in (a)(1). Moreover, if the subsections of § 2718(a) are not in some way distinct, why are they separate and why do they have the separate subheadings "Preservation of State authorities" and "Solid Waste Disposal Act"? Only Transocean's interpretation of the plain language of § 2718(a) respects the meaning of every word and the structural divisions of the section and its subparts.

**B. Where OPA Applies, It Displaces Plaintiffs' General Maritime Law Claims**

The other provision on which Plaintiffs rely is § 2751 ("Savings provisions"), in which only paragraph (e)(1) is relevant ("Admiralty and maritime law"). This section is in the last of OPA's three titles. (It is immediately noteworthy that "State law" is not among the list of 'saved' laws.) Subsection (e) reads in relevant part:

> **(e) Admiralty and maritime law**
> Except as otherwise provided in this Act, this Act does not affect—
>
> (1) admiralty and maritime law[.]

---

[11] Similar "imposing" language appears in subsection (c), which provides:

> **(c) Additional requirements and liabilities; penalties**
>
> Nothing in this chapter, the Act of March 3, 1851 (46 U.S.C. § 183 *et seq.*), or section 9509 of Title 26, shall in any way affect, or be construed to affect, the authority of the United States or any State or political subdivision thereof –
>
> (1) to ***impose*** additional liability or additional requirements; or
>
> (2) to ***impose***, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law;

relating to the discharge, or substantial threat of a discharge, of oil. 33 U.S.C. § 2718(c) (emphasis added).

33 U.S.C. § 2751(e)(1). The first four operative words of the subsection, however, limit its applicability. With "Except as otherwise provided," Congress acknowledged that, to the extent OPA applies—i.e., to marine oil pollution damage claims—the general maritime law does not. As Judge Lemelle observed in *Gabarick v. Laurin Maritime (Am.), Inc.*, 623 F. Supp. 2d 741, 750–51 (E.D. La. 2009), "All claims that are recoverable under OPA, specifically those covered damages enumerated in 33 U.S.C. § 2702, are preempted by OPA."

### C. Whether Arising Under Maritime or State Law, Plaintiffs' Claims for Punitive Damages Must Be Dismissed

In arguing that OPA does not prohibit or preempt their punitive damages claims, the B1 Plaintiffs rely on *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008), and *Atlantic Sounding Co. v. Townsend*, 129 S. Ct. 2561 (2009). **OM at 44**. Neither of these cases supports Plaintiffs' punitive damages claims.

*Townsend* is a maintenance and cure case. The case stands for the proposition that when the general maritime cause of action and remedy existed prior to a federal statute, ***and the federal statute does not address the general maritime cause of action/remedy***, the cause of action and its remedy continue to exist except as modified by the statute. There, because Congress had not modified the traditional understanding regarding the punitive damages remedy in admiralty—i.e., the Jones Act does not address maintenance and cure, which is a creature apart from negligence—the Court held that punitive "damages for the willful and wanton disregard of the maintenance and cure obligation should remain available in the appropriate case as a matter of general maritime law." *Townsend*, 129 S. Ct. at 2575.

The rule in *Townsend* warrants dismissal here. OPA specifically forecloses all but six exclusive classes of damages, *see* 33 U.S.C. § 2702(a) ("Notwithstanding any other provision or rule of law, . . . each responsible party . . . is liable for the . . . damages specified in subsection

(b). . . ."), and punitive damages is not among them, *id.* § 2702(b). Thus, Plaintiffs' argument that this Court ought to read a new class of damages into the considered, comprehensive remedial scheme of OPA must be rejected. *See Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978) ("There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted. In the area covered by the statute, it would be no more appropriate to prescribe a different measure of damages than to prescribe a different statute of limitations, or a different class of beneficiaries."). *Townsend* does not assist Plaintiffs' punitive damages argument.

*Baker*, too, is an application of the principle subsequently relied on to decide *Townsend*: does a later-enacted federal statute modify the previously available maritime judicial remedies? In that appeal of the 1989 *Exxon Valdez* disaster litigation, the Supreme Court concluded that the Clean Water Act did not—as Exxon had argued—preempt the punitive damages otherwise available to plaintiffs under the general maritime law. The Supreme Court devoted only two paragraphs to its analysis of the merits of Exxon's CWA preemption argument (apparently believing Exxon had waived it). The language of the CWA simply did not support preemption. Exxon relied on an argument that the CWA's *savings clause* was to be read exclusively so as to preempt maritime punitive damages for oil spills, 33 U.S.C. § 1321(o), an argument the Court did not take seriously. *Baker*, 554 U.S. at 488.[12] The language of the CWA that did not support preemption in *Baker* serves as a helpful contrast to the preemptive/exclusive language of OPA in this case. In OPA, the very first words of its principal operative section (it sets forth the elements of liability and available damages) are "[n]otwithstanding any other provision or rule of law," and then the statute proceeds to set forth the damages recoverable for oil pollution, without

[12] Plaintiffs make a similar savings-clause argument about 33 U.S.C. § 2751(e). The first sentence of that subsection, however, imposes the limit "Except as otherwise provided in this Act. . . ." Admiralty and maritime remedies are therefore saved except as otherwise provided, such as in § 2702's exclusive remedies.

including punitive damages. A clearer statement of OPA's exclusivity with regard to the available remedies under its regime is hard to imagine.[13] *Baker*'s CWA analysis does not support Plaintiffs' quest for punitive damages under OPA.

Finally, because Plaintiffs acknowledge that it is the only federal appellate case on point, they seek to distinguish *South Port Marine, LLC v. Gulf Oil Ltd. Partnership*, 234 F.3d 58 (1st Cir. 2000). There, the First Circuit held that "Congress intended the enactment of OPA to supplant the existing general admiralty and maritime law, which allowed punitive damages under certain circumstances in the area of oil pollution." *Id.* at 65. Among Plaintiffs' chief complaints with *South Port Marine* is that it was decided before *Townsend* (2009) and *Baker* (2008), which Plaintiffs argue corrected an "outdated" reading of *Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990). **OM at 44**. But courts sitting in admiralty continue to apply the logic and statutory interpretation of *South Port Marine* even after *Baker* and *Townsend*. *See, e.g., In re ALEX C Corp.*, No. 00-12500, 2010 WL 4292328, at *9 n.18 (D. Mass. Nov. 1, 2010). As shown above, not only is the Supreme Court's post-*Miles* jurisprudence wholly consonant with *South Port Marine*'s interpretation of OPA as preclusive of maritime punitive damages claims, it actually compels that conclusion.

The B1 Plaintiffs also attempt to restrict the application of *Miles* to cases in which a later-created judicial maritime cause of action is limited to the rights and obligations of a preexisting maritime statute covering the same subject. **OM at 46–47**. But the uniformity principle cuts both ways. As the court in *South Port Marine* noted, it matters not whether Congress or the

---

[13] *Cf. Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) ("As we have noted previously in construing statutes, the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section. Likewise, the Courts of Appeals generally have interpreted 'similar notwithstanding' language to supersede all other laws, stating that a clearer statement is difficult to imagine." (internal citation, quotations omitted)); *cf. also Weinstein v. Islamic Repub. of Iran*, 609 F.3d 43, 53–54 (2d Cir. 2010) (holding that a statute that begins with "[n]otwithstanding any other provision of law" abrogates an earlier treaty on the same subject).

admiralty courts are the first to recognize an action or remedy; rather than priority in time, what matters to a court is whether Congress has spoken directly and whether there is a subject-matter overlap. *See* 234 F.3d at 66 ("As we indicated in *CEH* [*Inc. v. F/V Seafarer*], 70 F.3d 694 (1st Cir. 1995), *Miles* dictates deference to congressional judgment 'where, at the very least, there is an overlap between statutory and decisional law.'").[14] Here, OPA is the sole law governing maritime oil pollution—Congress has spoken comprehensively and "directly" to the issue. The first sentence of its operative section is a "[n]otwithstanding" clause, which courts understand as sweeping away traditional maritime law remedies in favor of OPA's remedies.

In sum, OPA preempts or displaces any general maritime law allowance of punitive damages to remedy oil pollution. As one district court observed:

> It is unreasonable to read the statute [OPA] as authorizing punitive damages when Congress considered the additional 'gross negligence' standard as a means for making the responsible party liable for all actual damages, and allowing a merely negligent responsible party to limit its liability and, for all practical purposes, receive the unbargained-for benefit of excess insurance from the government.

*Clausen v. M/V NEW CARISSA*, 171 F. Supp. 2d 1127, 1133 n.4 (D. Or. 2001).

## III.

## EVEN IF OPA DOES NOT, THE FEDERAL GENERAL MARITIME LAW PREEMPTS PLANTIFFS' STATE COMMON LAW CLAIMS

The B1 Plaintiffs respond to Transocean's argument for dismissal of the state common law claims by setting forth the following principle, purportedly a summary of the law: "In other

---

[14] For another example, *Townsend*, too, respects the principle from *South Port Marine*: there, the preexisting action (maintenance and cure) and its remedies (punitive damages) were judicial creatures and, once the Jones Act was deemed not to touch upon maintenance and cure, there was no parallel statutory regime to look to for guidance as to the scope or availability of the action or its remedies. But the Jones Act of 1920 came long after the judicial recognition of the maintenance and cure obligation. If Plaintiffs' reading of *Miles* were correct, the Supreme Court could simply have observed this fact and held that no uniformity was necessary. But the Supreme Court held that since no later-enacted statute had modified the general maritime law, punitive damages remained available for willful violations of the duty of maintenance and cure.

words, state law supplements maritime law where maritime law is silent." **OM at 53–54**. Transocean does not necessarily disagree, but Plaintiffs' summary restates only half of the rule and quickly moves away from the other half. Plaintiffs attempt to establish that state law may preempt—or, as they say, supplement—general maritime law any time the maritime law differs from a particular state cause of action or remedy. From the B1 Omnibus Memorandum, they argue: "If this Court were to find that attorneys' fees were unavailable under the general maritime law, for example, attorneys' fees would nevertheless be available" if provided for under some state's law. **OM at 55**. That suggestion is incorrect. "To allow state law to supply a remedy when one is denied in admiralty would only serve to circumvent the maritime law's jurisdiction." *IMTT-Gretna v. Robert E. Lee SS*, 993 F.2d 1193, 1195 (5th Cir. 1993). As Transocean set forth in its motion to dismiss, the other half of the rule is that the state law proposed as a "supplement" to the federal maritime law may not conflict with, and thereby violate the uniformity and simplicity of, the federal maritime law that has developed over the centuries. **Dkt. 1390-1 at 14–17** (citing *State of La. ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1032 (5th Cir. 1984) (en banc) (declining to allow state law to give a remedy for certain economic losses denied under the general maritime law), and *Marastro Compania Naviera, S.A. v. Canadian Mar. Carriers, Ltd.*, 959 F.2d 49, 53 (5th Cir. 1992) (declining to allow state trespass law to supplement the general maritime law)). Thus, when the well-considered maritime law denies a particular cause of action or remedy across the board, Plaintiffs cannot preempt (or supplement) the maritime law with a conflicting state law.

Had the B1 Plaintiffs brought state common-law claims for negligence, gross negligence, nuisance, fraudulent concealment, and trespass, and the general maritime law provided no equivalent bases of recovery, their citation to *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 206 (1996), might be appropriate. The Supreme Court there was faced with irregularities in the

patchwork of state and federal judicial and legislative approaches to wrongful death actions and remedies. It ultimately allowed a state-law wrongful-death remedy to supplement the Calhoun family's wrongful death claims for their twelve-year old daughter who had died using a Yamaha watercraft. Under Yamaha's maritime law sword-and-shield argument, the Calhouns would not have been entitled to seamen's wrongful death remedies, yet state-law remedies would have been preempted by the case law providing for the seamen's remedies; they would be in the odd situation of recovering only their daughter's funeral expenses. But this is not a maritime wrongful death case, and Plaintiffs certainly cannot argue that they are in the precarious situation of the Calhoun family. The context is all-important. In fact, the *Yamaha* court acknowledged that "[w]hen Congress has prescribed a comprehensive tort recovery regime to be uniformly applied, there is, we have generally recognized, no cause for enlargement of the damages statutorily provided." *Id.* at 215–216. In *Yamaha*, Congress had not prescribed remedies for the wrongful deaths of non-seafarers in territorial waters. Here, Congress has spoken with the passage of OPA, and has provided Plaintiffs with a full range of recoverable damages.[15]

## IV.

## OPA-SPECIFIC ISSUES

The B1 Plaintiffs' Response raises miscellaneous issues that arise under OPA, two of which are relevant to Transocean. **OM at 56–74**.

### A. OPA's Presentment Requirement Is Both Jurisdictional and a Mandatory Condition Precedent to Filing Suit

The B1 Plaintiffs attempt to argue that such plaintiff-specific grounds for dismissal as non-compliance with OPA's presentment requirement are not properly the subject of a motion to

15 The Supreme Court observed in *Yamaha* that "[i]t would be idle to pretend that the line separating permissible from impermissible state regulation is readily discernible in our admiralty jurisprudence." *Yamaha*, 516 U.S. at 210 n.8 (citing *Am. Dredging Co. v. Miller*, 510 U.S. 443, 452 (1994)). On the other hand, "in several contexts, [the Supreme Court has] recognized that vindication of maritime policies demanded uniform adherence to a federal rule of decision, with no leeway for variation or supplementation by state law." *Id.* at 210.

dismiss. **OM at 57**. But this mischaracterizes Transocean's motion to dismiss. Transocean seeks only the legal determination that presentment under OPA is a mandatory condition precedent to a court's exercise of subject matter jurisdiction over OPA claims against Transocean. Plaintiffs' defense is that, because a factual, plaintiff-by-plaintiff determination cannot be had, the motion to dismiss should be denied. The Court's PTOs do not expressly, nor even as construed by Plaintiffs,[16] authorize such a broad defense to the motions to dismiss. It is not possible that any court's order, even when consented to by the parties, could insulate even temporarily any claim that is not for whatever reason within that court's subject matter jurisdiction. *See, e.g.*, *Russo v. M/T Dubai Star*, 09-05158, 2010 WL 1753187, at *3 n.3 (N.D. Cal. Apr. 29, 2010) ("OPA's rules relate to the Court's subject matter jurisdiction and are therefore not subject to waiver." (citing *Proctor v. Vishay Intertech. Inc.*, 584 F.3d 1208, 1219 (9th Cir. 2009)). Any claim that has not been timely and properly presented must, therefore, be dismissed. *See* 33 U.S.C. § 2713(a) ("shall be presented first to the responsible party"), (c) ("If a claim is presented in accordance with subsection (a) . . . the claimant may elect to commence an action"). Insofar as motions to dismiss are precisely the vehicle by which to challenge a lack of subject matter jurisdiction under the Federal Rules of Civil Procedure, Plaintiffs' dilatory argument must fail, and the offending claims must be dismissed.

### B. Regardless of OPA's Standard of Causation, OPA Requires the Dismissal of All Moratorium Claims

The OPA causation standard is set forth in § 2702:

> **(a) In general**
> Notwithstanding any other provision or rule of law, . . . each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is

[16] *See* **OM at 57 n.28** (". . . Plaintiffs *interpret* the Court's direction . . .") (emphasis added).

> liable for the removal costs and damages specified in subsection (b) of this section that ***result from such incident***.

33 U.S.C. § 2702(a) (emphasis added). "For the purposes of this Act, the term . . . incident" is defined in the previous section as:

> any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, ***resulting in*** the discharge or substantial threat of discharge of oil[.]

*Id.* § 2701(14) (emphasis added). Plaintiffs argue that the standard for causation under OPA is something less than proximate cause, though they do not say exactly what it is. They suggest that perhaps a "but-for" standard might be appropriate. **OM at 68**. Regardless of the standard settled upon under OPA's "resulting in" the discharge of oil language, under any standard the moratorium plaintiffs' claims are simply too remote, falling on the other side of the line that this Court will invariably have to draw. As the Supreme Court has noted:

> In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would set society on edge and fill the courts with endless litigation. As we put it in the antitrust context, "An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but despite the broad wording of § 4 [of the Clayton Act, 15 U.S.C. § 15,] there is a point beyond which the wrongdoer should not be held liable."

*Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 266 n.10 (1992) (internal quotation, citations omitted) (rejecting but-for interpretation of statute awarding damages to person injured "by reason of a violation" of RICO, noting the "very unlikelihood that Congress meant to allow all factually injured plaintiffs to recover," instead requiring showing of proximate causation).

OPA's language plainly requires that the damages must result from "an incident" and defines "incident" as an occurrence or series of occurrences "resulting in the discharge of oil." And yet, Plaintiffs' alleged moratorium damages were not caused by the discharge of oil but were caused by the moratorium. The moratorium was directed against offshore drilling, and resulted from a study deciding whether additional safety precautions and technologies were necessary prior to restarting offshore drilling. *See generally Hornbeck Offshore Servs., L.L.C. v. Salazar*, 696 F. Supp. 2d 627 (E.D. La. 2010) (discussing "the federal government's imposition of a general moratorium on deepwater drilling for oil in the Gulf of Mexico"). Of course the moratorium does not exist in a historical vacuum. But Plaintiffs cannot elevate a historical connection into legal causation to which liability attaches under OPA. For the purposes of bringing a claim under OPA—which is what the moratorium plaintiffs allege—the moratorium Claimants' damages must result from the discharge of oil. The moratorium plaintiffs' claimed damages are not in fact damages due to the injury, destruction, or loss of real property, personal property, or natural resources resulting from the discharge of oil. *See* 33 U.S.C. § 2702(b)(2)(E).

Lastly, the B1 Plaintiffs attempt to characterize Transocean's Motion to Dismiss as involving a factual dispute over causation, which they contend is inappropriate. But as the Ninth Circuit held in *Benefiel v. Exxon Corp.*, 959 F.2d 805, 808 (9th Cir. 1992), "[w]hile proximate or legal causation normally presents an issue for the trier of fact to resolve, both California and federal law recognize that where causation can't reasonably be established under the facts alleged by a Plaintiff, the question of proximate cause is one for the court. . . . Because the facts Plaintiffs here alleged present such a case, the complaint was properly dismissed." *Id.*

## V.

## *ROBINS DRY DOCK* IS APPLICABLE AND COMPELS DISMISSAL OF ALL CLAIMS FOR PURELY ECONOMIC LOSS

The B1 Plaintiffs admit that they "seek recovery for the torts committed by Defendants that . . . caused direct, albeit economic, harm." **OM at 76**. Understanding the effect of such an admission, they advance three arguments why *Robins Dry Dock* and its progeny ought not to apply in this litigation and foreclose these claims.

First, they state that *Robins Dry Dock* and *Testbank* were possibly overruled by CERCLA in 1986. The Fifth Circuit recently reversed a denial of a motion for summary judgment on purely economic loss claims brought pursuant to CERCLA by business plaintiffs after a toxic spill. *See In re Taira Lynn Marine Ltd.*, 444 F.3d 371, 381–82 (5th Cir. 2006). The court applied *Testbank* to reach its decision and made no mention of its having been overruled. Of course, this is because *Robins Dry Dock* and its progeny are still good law.[17]

Second, Plaintiffs urge the Court to follow the concurring opinion from an evenly-divided *en banc* Eleventh Circuit (and apply *Robins Dry Dock* only to those plaintiffs in privity with the defendant so as to permit more recovery to a broader class of plaintiffs). However persuasive Judge Clark's concurrence might appear to Plaintiffs, both the *en banc* Fifth Circuit and the *en banc* Eleventh Circuit have considered—and rejected—precisely this proposal as an unworkable standard.

Finally, Plaintiffs ask the Court to be among the first in the nation to recognize a commercial fisherman exception to the rule announced by the Supreme Court in *Robins Dry*

---

[17] In fact, the Fifth Circuit continues to apply the rule of *Robins Dry Dock* it adopted in *Testbank*, doing so once again just this month. The court would not have gone to such lengths in its careful analysis under the economic loss rule if, indeed, such a rule no longer existed. *See Catalyst Old River Hydroelec. LP v. Ingram Barge Co.*, No. 10-30466, 2011 WL 1449616, at *2 (5th Cir. Apr. 15, 2011) ("[I]t is well settled under the general maritime law that there can be no recovery for economic loss absent physical damage to or an invasion of a proprietary interest. *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927); *Testbank*, 752 F.2d 1019.")

*Dock*. Regardless of the foregoing arguments—whether *Robins Dry Dock* has been overruled statutorily, whether it ought to be limited to its facts, or whether this Court ought to carve from it an exception—as briefed at length by Transocean and others, the relevant state common-law economic loss rules will still stand in Plaintiffs' way, commercial fishermen or not. **Dkt. 1390-1 at 35 *et seq***. And, if Plaintiffs' arguments in their Response are accepted as true, and the various states' laws do not prohibit recovery for purely economic loss while the general maritime law does, this presents a textbook example of preemption by the federal general maritime law. The internal conflict and lack of uniformity in Gulf maritime law that would be engendered by such a varied, state-by-state application of laws to the BP Oil Spill claims would alter aspects of maritime law far beyond the single issue of recoverability of damages.[18]

**VI.**

**PLAINTIFFS' FRAUD CLAIMS MUST BE DISMISSED**

The B1 Plaintiffs cite *United States ex rel Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 188 (5th Cir. 2009), for the proposition that the Rule 9(b) "time, place, contents and identity" standard is not a straitjacket. Instead, they offer that Rule 9(b) is "context specific and flexible. . . ." *Id.* It is true that *Grubbs* contains those statements, but *Grubbs* also holds that courts are to apply Rule 9(b) to fraud complaints with "bite" and "without apology." *Id.* at 185. "Rule 9(b) serves as a tool to weed out meritless fraud claims sooner than later." *Id.*

The B1 Plaintiffs acknowledge that, in all of the Gulf state and under the general maritime law, Plaintiffs must show the same basic elements: (1) the materiality of the fraudulent statement; (2) the defendant's intent to deceive; (3) the plaintiff's reliance; and (4) that the injury resulted from that reliance. **PM at 9**. Taking the last two elements as an example, it is not even

---

18 *Cf. Testbank*, 752 F.2d at 1029 (discussing the insurance aspects of its decision). For this and other reasons, *Testbank* held that state laws were preempted by the maritime economic loss rule. *Id.* at 1031–32 ("Indeed the federal interest in protecting maritime commerce is often best served by the establishment of uniform rules of conduct. We believe that such is the case here.").

conceivable—much less plausible—that any of Transocean's alleged misrepresentations or omissions were in any way relied upon by any of the B1 Plaintiffs or that their damages resulted from their reliance. Plaintiffs are Commercial Fishermen, Processing and Distributing Plaintiffs, Recreational Business Plaintiffs, Recreation Plaintiffs, Plant and Dock Worker Plaintiffs, Real Property Plaintiffs, Property/Tourism Plaintiffs, and Banking/Retail Business Plaintiffs, among others, who had no direct or indirect dealings with Transocean with regard to any of the alleged misrepresentations or omissions that their Master Complaint recites.

The B1 Plaintiffs focus upon one single allegation from their Master Complaint that they contend is sufficient to meet the 9(b) pleading standard for reliance:

> Defendants Halliburton, BP, and Transocean failed to disclose or concealed the foregoing material facts, ***and their failure to do so induced Plaintiffs to act or to refrain from acting to protect their property, businesses, livelihoods and income***.

**B1 ¶ 729** (emphasis added). The B1 Plaintiffs' allegation—that Transocean's failure to disclose "induced Plaintiffs to act or to refrain from acting to protect their property, businesses, livelihoods and income"—is a mere conclusion which does not meet the *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) standard. They do not say what actions they took in response to which misrepresentations or omitted facts, nor do they allege what action they might have taken to protect their property, businesses, livelihoods, and income.

Concerning reliance and damages, the B1 Plaintiffs assert that "a single sentence containing such an allegation is sufficient to meet a plaintiff's obligations under Rule 9(b) so long as it is plausible in light of the specifically alleged misrepresentations and omissions." **PM at 12**. They cite for this proposition *Dunlap v. Denison Independent School District*, 2010 U.S. Dist. LEXIS 28495, at *17 (E.D. Tex. Mar. 24, 2010), *Nazareth International, Inc. v. J. C. Penney Corp., Inc.*, 2005 U.S. Dist. LEXIS 14473, at *20–21 (N.D. Tex. July 19, 2005), and

*Grubbs*, 565 F.3d at 189. In *Dunlap*, the court dismissed plaintiffs' fraud claim for failure to meet the 9(b) standard. It found that the plaintiff sufficiently alleged "reliance" for purposes of a separate cause of action for promissory estoppel, but the *Dunlap* plaintiff connected the defendant's representation to specific actions she took in response to the defendant's representation.[19] In *Nazareth*, the plaintiff and the defendant were parties to a Trading Partner Agreement ("TPA") and, based upon specific statements made by the defendant, the plaintiff entered into "a series of wholesale contracts after the TPA." *Id.* at 18–20. *Grubbs*, also cited by the B1 Plaintiffs, makes it clear that a Plaintiff must show <u>how</u> he relied on the misrepresentation to his detriment because "common law fraud's elements of reliance and damages are intertwined. . . ." *Id.* at 189.

Plaintiffs acknowledge the weakness of their reliance allegation by referring to it as only "indirect" reliance. **OM at 13 n.13**. Indirect reliance might exist and might support a fraud claim in some cases, but this is not the theory Plaintiffs advocated. The proposition Plaintiffs wish to establish is that Transocean fraudulently omitted something from "the MMS, the press, response teams, scientists, and investigators," and that all members of the broad class of B1 Plaintiffs (1) may somehow inject themselves into the relationship, if any, between Transocean and those entities and, even beyond that, (2) may actually claim a legally protectable interest in or flowing from any such relationship. Both logical steps Plaintiffs wish to take are legally insupportable under any theory of tort law. If Plaintiffs' argument were accepted, all the world, no matter how far removed from the causal chain, would be able to claim justifiable, detrimental reliance despite the nonexistence of any connection or legal relationship between the fraudulent actor and an injured party.

---

19 "In Plaintiff's Complaint, she claims that she accepted the transfer from an administrative position to a teacher's aide and performed all requirements of the new position 'with the anticipation she would received [sic] another position within the school district.'" *Id.* at 16–17.

## VII.

## ALL CLAIMS UNDER FLORIDA'S POLLUTANT DISCHARGE PREVENTION AND CONTROL ACT MUST BE DISMISSED

First, Transocean has moved for dismissal of any claims brought against it by individuals not residing in or owning property in Florida under the Florida Pollutant Discharge Prevention and Control Act. Plaintiffs appear to continue to propose that any person whatsoever—whether classed as a "Florida Subclass Member" or as a generic B1 Plaintiff—has standing to sue Transocean under the Florida statute, without there being any nexus whatsoever to the state of Florida. *See* **OM at 84** ("*any person*"). Plaintiffs attempt to rely on *Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216 (Fla. 2010), as support for the extension of one state's laws to an out-of-state defendant by a huge assortment of out-of-state claimants. Immediately, however, that case is distinguishable from the BP Oil Spill litigation: the defendant in that case was a Florida LLC, and the discharge of pollutants in that case occurred from a land-based facility outside of Tampa, Florida into Tampa Bay. *Id.* at 1218. In the instant litigation, however, the B1 Plaintiffs who are neither Florida domiciliaries nor proprietors have no connection whatsoever to the State of Florida. Plaintiffs do not offer any other arguments that would support their interpretation of the statute and not simultaneously violate settled choice-of-law principles and deprive Transocean of its Due Process rights.

Second, Plaintiffs argue that the plain language of the Florida Act permits it to apply to pollution that migrates into the state's waters when the discharge occurred in the EEZ. This is plainly contrary to the statute's own statement of purpose, however. In section 376.021, governing "Legislative intent with respect to pollution of coastal waters and lands," the only purpose identified for the application of the law is to address a single stated concern: "The transfer of pollutants between vessels, between onshore facilities and vessels, between offshore

facilities and vessels, and between terminal facilities within the jurisdiction of the state and state waters is a hazardous undertaking." FLA. STAT. § 376.021(3)(a). The entire section is geared toward preserving the natural condition of the Florida coast against the hazards of "transfer, storage, and transportation" of pollutants, and nothing more.

This is the legislative intent of the Florida Legislature. It is not merely the opinion of a lone legislator, or some committee, voted on by no one, but is instead the collective statutory intent of the entirety of Florida's representative government. "A cardinal rule of statutory construction requires that, ***unless otherwise defined or limited by manifest legislative intent***, statutory language is to be given its plain and ordinary meaning." *Powell v. State*, 508 So.2d 1307, 1310 (Fla. Dist. Ct. App. 1987) (emphasis added) (citing *Se. Fisheries Ass'n, Inc. v. Dep't of Natural Res.*, 453 So.2d 1351 (Fla. 1984));[20] *see also Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980) ("Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." (quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380–81 (1969))).

If even a subsequent legislative clarification is entitled to great weight when construing a statute, the Florida Legislature's contemporaneous, codified statement of intent in enacting the law ought to govern the boundaries of that law's application. Plaintiffs would stretch the law beyond Florida's "manifest legislative intent" and, far beyond the statute's "plain and ordinary meaning," seek to apply the Florida PDPCA to cover situations such as the BP Oil Spill which occurred fifty miles off the coast of Louisiana, not Florida. That is a situation the statute was neither intended nor designed to cover. This is because the Florida Legislature likely recognized

---

20 *See also Curd*, 39 So. 3d at 1220 ("When construing a statute, we strive to effectuate the Legislature's intent. *See, e.g.*, *Borden v. East-European Ins. Co.*, 921 So. 2d 587, 595 (Fla. 2006) ('We endeavor to construe statutes to effectuate the intent of the Legislature.'); *State v. J.M.*, 824 So. 2d 105, 109 (Fla. 2002) (noting that legislative intent is the polestar that guides a court's statutory construction analysis). To determine that intent, we look first to the statute's plain language. *See Borden*, 921 So.2d at 595.").

it would be venturing into unconstitutional territory by attempting to regulate and punish activities occurring entirely outside its jurisdiction.

## VIII.

## PLAINTIFFS' DEMANDS FOR DECLARATORY JUDGMENT ARE UNTIMELY, NONJUSTICIABLE AND MOOT

The B1 Plaintiffs' demands for declaratory judgment regarding the effect of the release provisions of BP's settlements must be dismissed. BP's motion to dismiss characterizes the declaratory relief claims exactly: "attempts to impede settlement of OPA claims." **Dkt. 1440-1 at 48**. No more charitable construction can be given to Plaintiffs' demands. If Plaintiffs succeeded in obtaining a declaration that "any settlement provisions that purport, directly or indirectly, to release or to affect the calculation of punitive damages . . . are ineffective as contrary to law, equity and public policy," **OM at 97,** under hornbook law those settlements would be just as void when entered into, or *ab initio*, as they would be at any time in the future. When the very structure of OPA encourages settlement,[21] there is no reason to litigate this issue now, at the outset of proceedings, prior to a finding of punitive-worthy conduct—***if any***—rather than once liability has been allocated and all categories of damages—***if any***—have been totaled and awarded and are no longer purely speculative. BP has characterized the B1 Plaintiffs' demands in the only way possible.

Moreover, as Transocean pointed out in its motion and again in this reply, Plaintiffs are not entitled to punitive damages under any possible substantive law. The question of punitive damages becomes, therefore, entirely academic. For these reasons, the B1 claims for declaratory relief must be dismissed.

---

[21] *See generally* 33 U.S.C. § 2713 ("Claims procedure").

## IX.

## CONCLUSION

The B1 Plaintiffs' Claims should be dismissed, for the reasons stated in Transocean's Motion, its Brief in support of its Motion, and this Reply Brief.

Respectfully submitted,

By: /s/ Steven L. Roberts
Steven L. Roberts (Texas, No. 17019300)
Rachel Giesber Clingman (Texas, No. 00784125)
Kent C. Sullivan (Texas, No. 19487300)
Teri L. Donaldson (Florida, No. 784310)
Sutherland Asbill & Brennan LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
Email: steven.roberts@sutherland.com, rachel.clingman@sutherland.com, kent.sullivan@sutherland.com, teri.donaldson@sutherland.com

By: /s/ Kerry J. Miller
Kerry J. Miller (Louisiana, No. 24562)
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8169
Facsimile: (504) 599-8154
Email: kmiller@frilot.com
-and-

By: /s/ Edwin G. Preis, Jr.
Edwin G. Preis, Jr. (Louisiana, No. 10703)
Edward F. Kohnke, IV (Louisiana, No. 07824)
Preis & Roy PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70501
Telephone: (337) 237-6062
Facsimile: (337) 237-9129

-and-

601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone: (504) 581-6062
Facsimile: (504) 522-9129
Email: egp@preisroy.com, efk@preisroy.com

Of Counsel:

John M. Elsley (Texas, No. 0591950)
Royston, Rayzor, Vickery & Williams LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 224-8380
Facsimile: (713) 225-9945
Email: john.elsley@roystonlaw.com

Daniel O. Goforth (Texas, No. 08064000)
Goforth Geren Easterling LLP
4900 Woodway, Suite 750
Houston, Texas 77056
Telephone: (713) 650-0022
Facsimile: (713) 650-1669
Email: dangoforth@goforthlaw.com

Brad D. Brian (California, No. 79001)
Allen M. Katz (California, No. 054933)
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 683-5180, (213) 683-4018
Email: brad.brian@mto.com, allen.katz@mto.com

***Counsel for Triton Asset Leasing GmbH., Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc. and Transocean Deepwater Inc.***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 28th day of April, 2011, I electronically transmitted a PDF version of this document to the Clerk of Court, using the CM/ECF System, for filing and for transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

/s/ Kerry J. Miller