UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | : : : : : | MDL NO. 2179<br><br>SECTION:  J<br><br>JUDGE BARBIER |
| **THIS PLEADING APPLIES TO ALL CASES IN PLEADING BUNDLE B1** | : : : | MAG. JUDGE SHUSHAN<br><br>JURY TRIAL DEMANDED |
| **THIS PLEADING APPLIES TO:** **No. 10-2771** | : : : | |

· ·   · ·   · ·   · ·   · ·   · ·   · ·   · ·   · ·   · ·   · ·   · ·   · ·   · ·   · ·   · ·   · ·   · ·   · ·

## REPLY BRIEF OF DEFENDANT CAMERON INTERNATIONAL CORPORATION IN SUPPORT OF ITS MOTION TO DISMISS THE FIRST AMENDED MASTER B1 COMPLAINT

Defendant Cameron International Corporation ("Cameron") respectfully submits this reply brief in support of its consolidated motion to dismiss the operative B1 complaint (Doc. 1128) and in response to the Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss Bundle B1 First Amended Master Complaint, Cross-Claim and Third-Party Complaint (Doc. 1821; hereafter "Omnibus Opposition"), and Plaintiffs' Memorandum of Law in Opposition to Defendants Cameron's and Weatherford's Motion to Dismiss Product Liability Claims (Doc. 1814; hereafter "Product Liability Opposition").

## SUMMARY OF REPLY

1.  The B1 Plaintiffs' oppositions to Cameron's motion to dismiss (Doc. 1395) are staked almost entirely on securing the application of general maritime law to the oil spill claims

in this case. However, the B1 Plaintiffs studiously avoid governing Supreme Court authority on that issue. The Supreme Court has announced and consistently followed the precept that in enacting the Outer Continental Shelf Lands Act ("OCSLA"), Congress "deliberately eschewed the application of admiralty principles to" accidents arising from oil and gas operations on the outer continental shelf. *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 356 (1969); *accord*, *Chevron Oil Co. v. Huson*, 404 U.S. 97, 101 (1971) ("comprehensive admiralty law remedies [do not] apply under" OCSLA); *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 218 (1985) ("the operative assumption underlying the statute [is] that admiralty jurisdiction generally should not be extended to accidents in areas covered by OCSLA").

The Omnibus Opposition likewise attempts to sidestep the most recent Fifth Circuit decision directly on point. That decision rests squarely on the controlling Supreme Court precedent and holds that activities "connected with the development of the Outer Continental Shelf and an installation for the production of resources there . . . are insufficiently connected to traditional maritime activity to support the application of admiralty law." *Texaco Exploration and Production, Inc. v. AmClyde Engineered Products Co., Inc.*, 448 F.3d 760, 771 (5th Cir.), *cert. denied*, 549 U.S. 1053 (2006).

2. The Omnibus Opposition misapplies the test prescribed by the Fifth Circuit in *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990), for determining whether OCSLA or admiralty law governs a particular issue. *See also Grand Isle Shipyard, Inc. v. Seacor Marine, L.L.C.*, 589 F.3d 778, 783-89 & n.9 (5th Cir. 2009) (en banc) (the *PLT* test governs OCSLA choice of law determinations).

i.   The Omnibus Opposition misapplies the first part of the *PLT* test, relating to "situs."   The allegations in the operative B1 Master Complaint conclusively demonstrate that the B1 Plaintiffs' claims of economic losses are predicated on the occurrence of an oil spill at an OCSLA situs.   There would have been no oil spill had there not been fixed structures for the production of oil and gas from the outer continental shelf, namely, casing in the subsoil and equipment attached to the subsoil.   The accident involved a failure to isolate hydrocarbons in the subsoil, and the claims of the B1 plaintiffs are based on oil spilled from fixed structures in the subsoil and on the seabed, not from the *Deepwater Horizon* mobile offshore drilling unit.   The seabed and subsoil of the outer continental shelf constitute the quintessential OCSLA situs.   43 U.S.C. § 1333(a)(1).   Moreover, as the Fifth Circuit has most recently explained, any "structure attached to the seabed" – a phrase that accurately describes not only the casing and other drilling equipment but the *Deepwater Horizon* itself at the time of the spill – is an OCSLA situs.   *Grand Isle*, 589 F.3d at 784.   The OCSLA "situs" requirement is plainly met.

ii.   The Omnibus Opposition also misapplies the second part of the *PLT* test, concerning whether general maritime law applies of its own force.   This issue depends on the character of the injury-causing activities.   In this case, the oil spill was caused by oil and gas development operations in the subsoil that allowed hydrocarbons to be released from the seabed into the Gulf of Mexico.   The B1 plaintiffs allege an oil drilling accident and oil spill, not an accident involving traditional maritime activity.   As the Supreme Court has explained, "exploration and development of the Continental Shelf

are not themselves maritime commerce." *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 422 (1985); *accord*, *AmClyde Engineered Products*, 448 F.3d at 771.  Maritime law does not apply here of its own force.

3.   OCSLA governs the B1 claims and in turn, OCSLA requires application of OPA to claims based on the discharge of oil into navigable waters. 43 U.S.C. § 1333(a); 33 U.S.C. § 2702.  OCSLA identifies the seabed and subsoil of the outer continental shelf as "an area of exclusive Federal jurisdiction" and thereby preempts the application of state law as such. 43 U.S.C. § 1333(a)(1).  Plaintiffs seek to invoke OPA's state-law savings clause, 33 U.S.C. § 2718(a), but that clause does not curb OCSLA's independent preemptive reach.  OCSLA does adopt the law of the adjacent state as supplementary surrogate federal law, but only to the extent that such state law is "not inconsistent with" other federal law.  *Id.*, § 1333(a)(2)(A).  Premature enforcement of remedies under Louisiana law against persons other than "responsible parties" under OPA is inconsistent with OPA's mandatory and comprehensive remedial scheme and thus is barred by OCSLA; under OCSLA, those remedies can only be pursued in connection with OPA's provisions for contribution or subrogation.  See 33 U.S.C. §§ 2709, 2715.

4.   The Product Liability Opposition relies principally upon the general maritime law of product liability, but "OCSLA does not permit the application of substantive maritime law."  *AmClyde Engineered Products,* 448 F.3d at 772.  In the alternative, the B1 Plaintiffs attempt to invoke Louisiana law, but even at this date they are unable to articulate a valid claim under the Louisiana Products Liability Act.   Moreover, as the B1 Plaintiffs themselves effectively concede, virtually all of the B1 plaintiffs' claims are foreclosed by the "economic loss" doctrine under Louisiana law.  *See* Omnibus Opposition, p. 95.

1054658v.1

**REPLY TO OPPOSITION**

Cameron's basic position in this case is set forth in Memorandum of Defendant Cameron International Corporation in Support of Its Motion to Dismiss the First Amended Master Complaint, Cross-Claim, and Third-Party Complaint for Private Economic Losses ("B1 Bundle") For Failure to State a Claim (Doc. 1395-1, hereafter "Cameron Br.") and can be briefly summarized here.

This oil spill case arises from the activities of "exploring for, developing, or producing resources" from "the subsoil and seabed of the outer Continental Shelf," 43 U.S.C. § 1333(a)(1), *i.e.*, activities explicitly encompassed by OSCLA.  As such, the case is governed by OCSLA and not by general maritime law.  Both controlling Supreme Court precedent and the *PLT* test deployed by the Fifth Circuit as a synthesis of that precedent confirm and mandate this conclusion.

OCSLA establishes "an area of exclusive Federal jurisdiction" and thereby pre-empts enforcement of state law as such.  43 U.S.C. § 1333(a)(1).  It is undisputed that in this area of exclusive federal jurisdiction OPA is the governing federal statute respecting oil spills. OCSLA permits federal statutes such as OPA to be supplemented by the law of the adjacent state, adopted as surrogate federal law, but only to the extent that such state law is not inconsistent with the federal law.  Premature enforcement of the law of the adjacent state, here Louisiana, against persons other than "responsible parties" under OPA would disrupt, conflict with, and thereby be inconsistent with OPA's elaborate and carefully articulated remedial scheme.  Accordingly, OCSLA does not sanction the adoption and enforcement of Louisiana law with respect to the oil spill in this case in conflict with the comprehensive remedial scheme

1054658v.1

established in OPA.  Louisiana law will become applicable by reason of OCSLA, but only in the context of suits for contribution or subrogation under OPA.  Accordingly, the B1 economic loss claimants have no valid cause of action against Cameron for oil spill damages.  The claims against Cameron in the B1 Master Complaint should be dismissed.

It is important to add in this context that OCSLA pre-emption of the B1 Plaintiffs' economic loss claims against Cameron does not relieve Cameron of any potential liability for the oil spill.  OPA contains subrogation and contribution provisions for potential recovery by persons ("responsible parties") who themselves may be liable for compensating economic loss claimants, and BP and Transocean have already filed cross-actions seeking recovery from Cameron under those provisions.  Document 2064, Counts V, ¶¶ 88-92, and VII, ¶¶ 98-103 (BP); Document 2068, Count V, ¶¶ 84-85 (Transocean).  The point here is that the express OPA remedies of contribution and subrogation are the exclusive remedial provisions potentially applicable to Cameron in the circumstances of this case.

Finally, even in the unlikely event that Louisiana law could be applied as surrogate federal law to the claims asserted by the B1 Plaintiffs, the B1 Master Complaint still must be dismissed because the B1 plaintiffs have not alleged valid claims under the Louisiana Products Liability Act.  Virtually all of the B1 plaintiffs' claims also fail under the "economic loss" doctrine applied under Louisiana law.

## I.  GENERAL MARITIME LAW DOES NOT APPLY HERE

The B1 Plaintiffs' entire case rests upon the faulty premise that questions of liability here must be resolved under general maritime law.  That premise is refuted by a large body of Supreme Court and Fifth Circuit case law.  Maritime law plays no role in the B1 plaintiffs' claims.  Instead, this litigation is governed by OCSLA, which leaves no room for the application of maritime law under the facts as alleged by the B1 Plaintiffs themselves.

### A.  Controlling Supreme Court Precedent Directs That This Case Is Governed by OCSLA and Not by General Maritime Law

In its initial supporting brief, Cameron discussed at some length the Supreme Court precedent governing choice of law under OCSLA and the limited reach of maritime law in connection with activities both on the outer continental shelf and elsewhere.  Cameron Br., pp. 2-3, 6-21.  The abiding principle underlying that body of Supreme Court jurisprudence is that Congress affirmatively rejected the application of general maritime law to oil and gas operations on the outer continental shelf.  *Rodrigue*, 395 U.S. at 356 (Congress "deliberately eschewed the application of admiralty principles to" accidents arising from oil and gas operations on the outer continental shelf); *Chevron Oil*, 404 U.S. at 101 ("comprehensive admiralty law remedies [do not] apply under" OCSLA); *Herb's Welding,* 470 U.S. at 422 ("exploration and development of the Continental Shelf are not themselves maritime commerce"); *Offshore Logistics*, 477 U.S. at 218 ("the operative assumption underlying the statute [is] that admiralty jurisdiction generally should not be extended to accidents in areas covered by OCSLA").  These decisions lead inexorably to the conclusion that OCSLA rather than general maritime law governs the B1 Plaintiffs' economic loss claims against Cameron.  *See also AmClyde Engineered Products*, 448 F.3d at 771.

1054658v.1

The B1 Plaintiffs make almost no effort to come to terms with these decisions of the Supreme Court, trying only to brush them aside as involving "personal injuries that occurred on fixed locations."  Omnibus Opposition, p. 29.  That is a distinction that makes no difference.  An oil spill emanating from the seabed is precisely and explicitly covered by OCSLA and, if anything, has even less to do with traditional maritime activity than the situations in *Rodrigue* and its progeny.  The Supreme Court has repeatedly held that maritime law does not apply to oil and gas operations on the outer continental shelf, and there is no factual or legal basis for departing from those holdings here.

**B. The B1 Plaintiffs Misapply the *PLT* Test**

This case, involving oil and gas operations on the outer continental shelf, easily satisfies the *PLT* test for application of OCSLA rather than general maritime law.  *See* Cameron Br., pp. 18-21.  Plaintiffs misapply the *PLT* test in arguing the contrary.

1.      Cameron and the B1 Plaintiffs agree that the first part of the three-part *PLT* test concerns whether the accident in question occurred on an OCSLA situs.  *Compare* Cameron Br., p. 18 (citing *PLT* and *Grand Isle*) *with* Omnibus Opposition, p. 23.  The B1 Plaintiffs argue that because the *Deepwater Horizon* mobile offshore drilling unit was a vessel, it could not also be an OCSLA situs.  Omnibus Opposition, pp. 24-25.  That argument both misses the point and is wrong as a matter of law.

The B1 Plaintiffs miss the point, because it is the Macondo well together with its fixed structures, not the *Deepwater Horizon*, that constitutes the OCSLA situs relevant to their claims of economic loss.  It is undisputed and indisputable that the Macondo well is situated on an outer continental shelf lease and that the wellhead and its related fixed structures – casing

affixed in the subsoil and wellhead and well control equipment affixed at the seabed – were where the accidental release of hydrocarbons took place and where the oil spill originated.  The seabed, subsoil, and related fixed structures are explicitly included within the area of exclusive federal jurisdiction established by OCSLA, *see* 43 U.S.C. § 1333(a), and thus unquestionably constitute an OCSLA situs.

The B1 Plaintiffs try to draw attention away from this obvious fact by treating the *Deepwater Horizon* as the supposed situs.  Omnibus Opposition, p. 24.  But that is an obvious red herring.  There is no allegation of an oil spill from the drilling rig.  The oil spilled from the Macondo well, and in particular from fixed structures attached to the subsoil and seabed within the meaning of 43 U.S.C. § 1333(a)(2)(A).  The B1 Plaintiffs' own factual allegations make this clear.

The relevant allegations of the operative First Amended Master Complaint, Cross-Claim, and Third-Party Complaint for Private Economic Losses in Accordance with PTO No. 11 [CMO No. 1] Section III(B1) ("B1 Bundle") (Doc. 1128; hereafter "B1 Master Complaint) warrant close attention in this context.  According to the B1 Plaintiffs, the oil spill "originated" from a location on the outer continental shelf in the Gulf of Mexico subject to a federal lease. B1 Master Complaint, ¶¶ 210, 29.  "On April 20, 2010, at approximately 9:45 CST, a well blowout caused explosions on the Deepwater Horizon, . . ., igniting a raging, gas-fueled fire.  *Id.* ¶ 198. "After burning for two days," the drilling unit "sank to the sea floor."  *Id.* "As the Deepwater Horizon tipped into the sea, the long riser pipe connecting the vessel to the wellhead on the seafloor bent and broke, leaving the pipe leaking oil out of its now-open end as well as through two breaks along its length.  An emergency valve, installed on the wellhead for just such a

disaster, failed to seal the wellhead as it should have, causing the blown out well to spew oil into the Gulf waters." *Id.* ¶ 199; *see also* ¶ 60. In particular, after April 22, 2010, the oil spilled from the "open end" of the marine riser pipe and in two other locations along the riser after the riser was disconnected from the drilling unit but still attached to the wellhead. *Id.* ¶ 478. In other words, the spilled oil was released from the "blown out well" through the marine riser that remained connected to the wellhead, not from the drilling unit whose connection to the well had by this time been severed.

The oil spill occurred when "Drilling Defendants . . . lost control of the subsea oil well they had almost completed" and "equipment failed to stop oil . . . from blowing out of the well." *Id.* ¶ 258. The B1 Master Complaint attributes the blowout to "the failure of mechanical and cement barriers to seal off the well against the influx of highly pressured hydrocarbons from the reservoirs surrounding the bottom of the well." *Id.* ¶ 259. The "subsea BOP also failed to seal the well and stop the flow of hydrocarbons." *Id.* The pertinent accident alleged in the B1 Master Complaint, therefore, involved a well in the subsoil on the OCS, barriers at the bottom of that well in the OCS subsoil, and the blowout preventer ("BOP") and other integral components of the well on the seabed of the OCS.

As the B1 Plaintiffs necessarily concede, any "structure attached to the seabed" constitutes an OCSLA situs. *Grand Isle*, 589 F.3d at 784, quoted in Omnibus Opposition, p. 24. The B1 Master Complaint proceeds further to make clear in detail that each of the failed barriers, and the BOP and other equipment affixed as integral components of the well at the seabed were "fixed structures erected" in "the subsoil" and on the "seabed of the outer Continental Shelf" for

1054658v.1

the purpose of developing oil and gas resources – structures expressly designated as falling within the area of exclusive federal jurisdiction established by OCSLA.

Thus, the B1 Plaintiffs allege a faulty "casing system" for the well. B1 Master Complaint ¶¶ 38, 308-22. Casing is steel "pipe lining the well" bore as it is drilled; each section of casing is "secured" to the sides of the bore "with a cement plug." *Id.* ¶¶ 264, 270. Casing is therefore a "fixed structure" erected in the subsoil within the meaning of OCSLA.

The B1 Plaintiffs further allege a "faulty cementing job" that "failed to form a seal at the casing nearest the hydrocarbon reservoir" at the bottom of the well. *Id.* ¶¶ 42, 43. Cementing indisputably involves a fixed structure of cement attached to the casing lining the well in the subsoil.

The B1 Plaintiffs also allege a failure to install "a casing hanger lockdown sleeve, which ties down the top of a well." *Id.* ¶¶ 45, 362-64. The top of the well, of course, is a "wellhead," a fixed structure "on the sea floor." *Id.* ¶ 62.

The B1 Plaintiffs allege a failure of the BOP to stop the flow of oil from the well. *Id.* ¶¶ 62-87, 415-54. The BOP was "installed at the wellhead on the seafloor." *Id.* ¶ 62. In particular, the BOP is "positioned and secured" at the wellhead in that it is anchored to the seafloor by the first section of casing. *Id.* ¶¶ 265, 267. The allegations pertain to "the BOP on the wellhead." *Id.* ¶ 440. The BOP is an integral component that made the well a "fixed structure" in the subsoil and on the seabed of the outer Continental Shelf.

In short, on the issue of OCSLA situs, the B1 Plaintiffs are defeated by their own allegations.

The B1 Plaintiffs are also wrong as a matter of law in arguing that the *Deepwater Horizon*'s character as a vessel for maritime law purposes makes any difference. Omnibus Opposition, p. 24. Whereas OCSLA limits its coverage of transport devices to any "device (other than a ship or vessel) for the purpose of transporting [oil and gas]," it applies to all "devices permanently or temporarily attached to the seabed" for the purpose of oil development, without any such exception for vessels. 43 U.S.C. § 1333(a)(1). This necessarily means that when a drilling vessel is attached to the subsoil and seabed by drilling devices, it is an OCSLA situs.

Although they now suggest otherwise (while citing no basis for doing so), *see* Omnibus Opposition at p. 24, the B1 Plaintiffs' own factual allegations demonstrate that the *Deepwater Horizon* drilling unit was, in the language of OCSLA, "attached to the seabed." A "pipe called a 'marine riser' connects the wellhead to the drilling" unit, B1 Master Complaint ¶ 267; on April 20, 2010, the drilling unit "had been connected to the wellhead to the seafloor by [the] 5,000 foot marine riser pipe," *id.* ¶ 478; this "long riser pipe" was "connecting" the drilling unit to the wellhead until April 22, 2010, and it was only when abandonment procedures were completed that workers acted to "disconnect" the drilling unit "from the well," *id.* ¶¶ 199, 271. Thus the drilling unit was a "device . . . temporarily attached to the seabed" within the meaning of OCSLA, 43 U.S.C. § 1333(a)(1), and thus itself was an OCSLA situs.

But the *Deepwater Horizon* drilling unit is not the pertinent OCSLA situs of the oil spill that forms the basis for the B1 Plaintiffs' claims of economic loss. It is the Macondo well, not the drilling unit, that constitutes the OCSLA situs under the allegations of the B1 Master Complaint. The oil spill emanated from a "subsea oil well": "highly pressurized

1054658v.1

hydrocarbons leaked into the well," and appurtenant "emergency equipment failed to stop the oil and gas from blowing out of the well." *Id.* ¶ 258.  A subsea oil well and its integrated equipment unquestionably constitute an OCSLA situs.  The first part of the *PTL* test is plainly met.

2.     The second part of the *PLT* test asks whether general maritime law applies of its own force.  *PLT Engineering*, 895 F.2d at 1047.  The parties deeply disagree over how this part of the test is to be applied.  Cameron has shown that controlling Supreme Court and Fifth Circuit precedent delimits the range of maritime law and squarely establishes the inapplicability of maritime law to offshore oil and gas operations.  Cameron Br., pp. 10-16.  The B1 Plaintiffs fail to address these governing authorities in any meaningful way.

The pertinent Supreme Court and Fifth Circuit authorities may be summarized in a nutshell:  even as to conduct occurring in a maritime location and not at an OCSLA situs and, indeed, even as to conduct having a potentially disruptive impact on maritime commerce, general maritime law can apply of its own force only "if the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity."  *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995).   Mineral exploration and development generally, and in particular on the outer continental shelf, does not bear the necessary "substantial relationship to traditional maritime activity."  To the contrary, the Supreme Court repeatedly has held that exploration and development "are not themselves maritime commerce."  *Herb's Welding*, 470 U.S. at 421.

The Fifth Circuit has properly followed the Supreme Court's lead, holding that "oil and gas exploration and production" are "not traditionally maritime," *PLT*, 895 F.2d at 1049, and, even more explicitly, that activities "connected with the development of the Outer Continental

Shelf . . . are insufficiently connected to traditional maritime activity to support the application of admiralty law." *AmClyde Engineered Products*, 448 F.3d at 771.  These authorities make crystal clear that maritime law did not and could not apply of its own force to this case.

The authorities cited by the B1 Plaintiffs are not to the contrary.  Making the manifestly incorrect claim that it "is invariably true" that general maritime law applies "[i]n OCSLA litigation," Omnibus Opposition, p. 25, the B1 Plaintiffs rest their case principally on *Strong v. BP Exploration & Production, Inc.*, 440 F.3d 665, 670 (5th Cir. 2006).  But the facts and reasoning of that case support Cameron instead.  The plaintiff in *Strong* had been injured while moving tools and equipment on a lifeboat.  *Id*. at 667.  The Fifth Circuit noted that the "key inquiry is whether the allegedly tortious activity is 'so closely related to activity subject to maritime law that the reasons for applying special maritime admiralty rules would apply in the suit at hand.'" *Id*. at 669, quoting *Grubart*, 513 U.S. at 539-40.  Because admiralty has long imposed a duty of care with respect to work-space on a vessel, the court concluded that "by asserting that his injury was caused by the cluttered unsafe conditions of the lifeboat deck, Strong has stated a maritime tort claim." *Id*. at 670.  In contrast, the oil spill in this case stemmed not from traditional maritime concerns and activities but from an accident in the course of well development or completion.

The more analogous template for this case is not *Strong* but *Amclyde Engineered Products*, where the accident "would not have occurred but for the development of the Outer Continental Shelf" and "traditional maritime transportation was complete at the time of the [accident]."  448 F.3d at 769.  Here, even more so than in *Amclyde*, there was "nothing inherently maritime about the alleged causes of" the accident, because oil and gas development

is not "maritime commerce."   *Id.* at 774-75, citing *Rodrigue*, 395 U.S. at 360, and *Herb's Welding*, 470 U.S. at 425.   Although both here and in *Amclyde* a vessel was involved "in the accident and other elements of maritime activity" preceded the accident, the claims in each case were and are "governed by OCSLA and not by maritime law."   448 F.3d at 775.   Apart from *Strong*, Plaintiffs unjustifiably rely on a hodgepodge of inapplicable general quotations from decisions that do not in fact take issue with the proposition, announced in *PLT* and applied anew in *Amclyde*, that oil and gas exploration and production are not traditional maritime activities.

Plaintiffs pin their hopes on the notion that "one maritime tortfeasor is enough," arguing that at least defendant Transocean, operator of the *Deepwater Horizon*, "was engaged in traditional maritime activity."   Omnibus Opposition, pp. 27-28.   To be sure, operation of the *Deepwater Horizon* involved traditional maritime transportation when it was being moved from well site to well site.   But the allegations in this case are not directed at that maritime function of the rig.

At the time of the accident, the *Deepwater Horizon* was not engaged in maritime transportation.   It was attached to the seabed via a marine riser pipe and fully engaged in the decidedly non-maritime activity of oil and gas development.   B1 Master Complaint ¶¶ 60, 199, 271, 478.   Plaintiffs' claims against Transocean are predicated on allegedly tortious handling of an oil well during completion operations, not the maritime handling of the drilling unit as a transport device.   *Id.* ¶ 36-87.   Moreover, Plaintiffs classify the Transocean parties as "***Drilling Defendants***" along with BP and Halliburton.   *Id.* ¶ 229.   Transocean was one of the "Drilling Defendants" that "lost control of the subsea oil well" and thereby caused the oil spill.   *Id.* ¶ 258. Transocean was one of the Defendants that "could have prevented this catastrophe by using

deepwater drilling best practices." *Id.* ¶ 210.  The allegations of wrongdoing by the Transocean parties as "Drilling Defendants" relate to faulty decisions during attempted completion of the Macondo well, faulty maintenance of drilling equipment, and faulty systems for controlling gas releases during well blowouts, not maritime transport operations, systems, or equipment.  *Id.* ¶¶ 303-477, 580, 583-91, 629-636, 750-64.  As the Fifth Circuit held in *Amclyde*, the conduct of some maritime activity before or surrounding the actual tortious event does not transform oil and gas development itself into maritime activity.

In short, general maritime law does not apply of its own force to the oil and gas development activities that led to the oil spill in this case: the second part of the *PTL* test also is met.

Plaintiffs have now sought leave to supplement their opposition to Cameron's motion, citing contracts between Cameron and Transocean that contain provisions making admiralty law applicable.  Document 2121.  But these contracts are immaterial to OCSLA choice of law.  First, the Fifth Circuit in *Grand Isle* held that different rules govern OCSLA choice of law in contract and tort cases: whereas the choice of law in a tort case depends on the situs of the accident, 589 F.3d at 784, a "focus-of-the-contract test" is used to determine situs in a contract dispute, *id.* at 786-88.[1]  Second, the Fifth Circuit in *Amclyde* reiterated that a contractual "choice

---

[1]     Moreover, the Fifth Circuit held in *Grand Isle* that if a contract case involves a "maritime contract," then "the situs question need not be answered" at all.  *Id.* at 789 n.9.  As evidenced by the choice of law provisions cited by Plaintiffs, it should be uncontested that for the separate and distinct purposes of contract disputes, the Cameron contracts to supply equipment for the *Deepwater Horizon* and to repair that equipment are maritime contracts for which the situs question need not be addressed.  *See Todd Shipyards Corp. v. Turbine Service, Inc.*, 674 F.2d 401, 412 (5th Cir. 1982).

1054658v.1

of law provision is of no moment" in any event "because the parties' choice of law will not trump the choice of laws scheme provided by Congress in OCSLA."  448 F.3d at 772 (citations omitted).  Plaintiffs' attempt to rely on contract provisions in this tort case is therefore precluded by both *Amclyde* and *Grand Isle*.  Most importantly, the contracts from 1999 and 2000 cannot and do not change the fact that the oil spill in April 2010 alleged in the B1 Complaint originated from the Macondo well on the floor of the Gulf of Mexico.  Likewise, those contracts cannot and do not change the fact that the oil spill was the result of oil and gas development activities, not traditional maritime activities.  Those contracts simply have no bearing on the application of the *PLT* test in this case.

Accordingly, this case is governed not by maritime law but by federal law prescribed by OCSLA.  The applicable federal law, of course, is OPA, which governs claims arising from the discharge of oil into navigable waters.  33 U.S.C. § 2702.  The B1 Plaintiffs seek to draw comfort from OPA's maritime savings clause, 33 U.S.C. § 2751(e).  Omnibus Opposition, pp. 30-31.  That clause, however, provides only that OPA itself "does not affect" maritime law.  That limited provision obviously does not enlarge the reach of general maritime law; it does not give rise to rights under maritime law where, as here, maritime law does not apply as a consequence of OCSLA.

## II. OCSLA AND OPA PREEMPT THE B1 CLAIMS AGAINST CAMERON

It is well established, and beyond serious debate, that OCSLA establishes an "area of exclusive Federal jurisdiction" in which all state law as such is preempted.  *See* Cameron Br., pp. 21-22.  This result is not changed or affected by OPA's savings clause, 33 U.S.C. § 2718; that savings clause does not require or permit the application of state law otherwise preempted

by OCSLA or some other federal statute.  *See* Cameron Br., pp. 22-24.  Indeed, in an oil spill case such as this the Supreme Court's multistate pollution cases would require the application of federal law to the exclusion of state law in any event.  *Id.*, p. 22.  Although the B1 Plaintiffs argue that OPA on its own does not preempt state law claims, Omnibus Opposition, pp. 30-50, that the Clean Water Act does not preempt state law claims, *id.*, pp. 50-53; and that maritime law does not preempt state law claims, *id.* pp. 53-56, they do not contend, nor could they, that OCSLA has no such preemptive effect.  They do not contend that state law, as such, survives OCSLA in the context of an oil spill on the outer continental shelf.  OCSLA preemption of state law is simply a given in this case.

Cameron has shown, moreover, that OCSLA does not permit the adoption of Louisiana law as surrogate federal law because allowing remedies under Louisiana law ***for economic loss claims*** would be "inconsistent with" the comprehensive remedial structure of OPA.  Cameron Br., pp. 25-33.  The B1 Plaintiffs do not even acknowledge, much less refute, this showing.  Their failure even to attempt to do so is critical and dispositive.

The B1 Plaintiffs contend that they are entitled to recover their alleged economic losses from other defendants who are statutory "responsible parties" under OPA. If so, then they have no need or any legitimate reason also to recover from Cameron.  But that is not all.  To the extent that they do recover from a responsible party under OPA, then that party will be subrogated to their claims under OPA.   33 U.S.C. § 2715(a).   This streamlined remedial procedure, which OPA mandates, is both efficient and fair.  It allows all economic loss claimants to recover their proved damages; and it affords the responsible parties who pay those damages an opportunity to recover from Cameron if they can show that Cameron indeed is liable under

Louisiana law as made applicable by OCSLA.  The B1 Plaintiffs do not in fact argue to the contrary.

Consequently, the B1 Plaintiffs have failed to offer any reason whatsoever for denying Cameron's motion for dismissal without prejudice.  This Court should not hesitate to follow the lead of Judge LeMelle in *Gabarick v. Laurin Maritime (America) Inc.,* 623 F.Supp.2d 741 (E.D. La. 2009), and dismiss the claims of the B1 Plaintiffs against Cameron without prejudice to the assertion of claims for contribution or subrogation claims under the provisions of OPA that specifically allow such claims.

### III. THE B1 MASTER COMPLAINT FAILS TO STATE A VALID CLAIM AGAINST CAMERON UNDER LOUISIANA LAW IN ANY EVENT

If Louisiana law were applicable to the B1 Plaintiffs' claims against Cameron, and for the reasons just discussed it is not, the Louisiana Products Liability Act would provide the exclusive avenue of relief against Cameron as a product manufacturer, and the B1 Plaintiffs have failed to allege facts sufficient to support a claim under any provision of that Act.  Cameron Br., pp. 33-38.  The B1 Plaintiffs do not attempt to rebut this showing.  Instead, they assert that a mere "reference to the LPLA," along with wholly conclusory platitudes about product liability, "are sufficient to support a claim under the LPLA."  Product Liability Opposition, p. 4.  This bald assertion is unavailing as a matter of law.  It does not overcome the B1 Plaintiffs' failure to allege facts sufficient to support a viable claim under the Louisiana Act.

Rather than address the merits of Cameron's argument, the B1 Plaintiffs criticize Cameron for drawing support from cases decided on summary judgment rather than at the pleading stage.  Product Liability Opposition, p. 3.  They miss the point. If a defendant is entitled to summary judgment as a matter of law when a plaintiff fails to ***offer proof*** of an essential

element of a cause of action, and of course that is the nature of summary judgment, then *a fortiori* a defendant is entitled to judgment on the pleadings when a plaintiff fails even to **allege** an essential element of a cause of action.

One further procedural point should be made about the B1 pleading.  The B1 Plaintiffs acknowledge the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. ___ (2009), concerning the adequacy of pleadings under the Federal Rules, and the Court's reaffirmation of those decisions last month in *Matrixx Initiatives, Inc. v. Siracusano,* ___U.S. ___,  2011 U.S. LEXIS 2416 (2011).  Omnibus Opposition, p. 19.  The wholly conclusory allegations of the B1 Master Complaint against Cameron fall woefully short of the detailed allegations found to suffice in *Matrixx Initiatives*. But that is neither here nor there.  The B1 Master Complaint fails even to state the elements of a viable claim under the Louisiana Act and thus would not have met the more relaxed (and now superseded) pleading standards of *Conley v. Gibson*, 355 U.S. 41 (1957).

Finally, Plaintiffs correctly acknowledge that "courts have denied recovery to plaintiffs for purely economic losses stemming from damages to property they do not own." Omnibus Opposition, p. 95; *see* Cameron Br., pp. 38-39.  Plaintiffs, however, point out that claims of oyster fishermen that operate on state leases satisfy the Louisiana rule when there is physical damage to the leased property.  Omnibus Opposition, p. 95.  Cameron does not dispute that point, having already acknowledged that a "very few" of the B1 Complaints satisfy the Louisiana rule.  Cameron Br., p. 39.

By contrast, the claims for private economic loss without any allegation of physical harm to owned property in the pleadings listed on Exhibits C and D to Cameron's brief

do not satisfy the economic loss rule.  And the claims that do satisfy the economic loss rule are subject to dismissal for the other reasons explained by Cameron in this and its original supporting brief.

## IV. CONCLUSION

Cameron's motion to dismiss the allegations against it in the B1 Master Complaint should be granted, either with or without prejudice.

Respectfully submitted,


David J. Beck, T.A.
    dbeck@brsfirm.com
Joe W. Redden, Jr.
    jredden@brsfirm.com
David W. Jones
    djones@brsfirm.com
Geoffrey Gannaway
    ggannaway@brsfirm.com

BECK, REDDEN & SECREST, L.L.P.
One Houston Center
1221 Mckinney, Suite 4500
Houston, TX  77010-2010
713-951-3700
713-951-3720 (fax)

/s/ Phillip A. Wittmann
Phillip A. Wittmann, 13625
    pwittman@stonepigman.com
Carmelite S. Bertaut, 3054
    cbertaut@stonepigman.com
Keith B. Hall, 24444
    khall@stonepigman.com
Jared Davidson, 32419
    jdavidson@stonepigman.com

STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
504-581-3200
504-581-3361 (fax)

**ATTORNEYS FOR CAMERON INTERNATIONAL CORPORATION**

1054658v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Reply Memorandum of Defendant Cameron International Corporation in Support of its Motion to Dismiss the B1 Master Complaint has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 29th day of April, 2011.


*/s/ Phillip A. Wittmann*

1054658v.1