# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | |
| of Mexico, on April 20, 2010 | SECTION: J |
| This Document Relates to: No. 2:10-cv-03112-CJB-SS | JUDGE BARBIER |
| | MAGISTRATE SUSHAN |

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## KEY WEST DIVISION

| | |
|---|---|
| **VENUS CHARTERS INC., CAPTAIN KAREN LUKNIS, and CAPTAIN DEBRA BUTLER,** Individually, and on behalf of all others similarly situated**;** | **Civil Action No. No. 4:10-CV-10054- KMM** |
| **Plaintiffs,** | |
| **v.** | |
| **BP P.L.C.; BP AMERICA INC.; BP PRODUCTS NORTH AMERICA INC.; BP AMERICA PRODUCTION COMPANY; BP EXPLORATION & PRODUCTION INC.; ANADARKO PETROLEUM CORPORATION; ANADARKO E&P COMPANY, LP,** | |

|  |  |
|---|---|
| **MOEX OFFSHORE 2007, LLC ; TRANSOCEAN LTD.; TRANSOCEAN DEEPWATER, INC.; TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC.; TRANSOCEAN HOLDINGS, LLC; TRITON ASSET LEASING GmbH; HALLIBURTON ENERGY SERVICES, INC.; CAMERON INTERNATIONAL CORPORATION f/k/a COOPER CAMERON CORPORATION; M-I, LLC; WEATHERFORD INTERNATIONAL, LTD; JOHN AND JANE DOES A-Z; and CORPORATIONS A-Z.** | **AMENDED COMPLAINT – CLASS ACTION JURY TRIAL DEMANDED** |
|          **Defendants.** | |

Plaintiffs and putative Class Representatives, Venus Charters, Inc. ("Venus Charters"), Captain Karen Luknis, and Captain Debra Butler bring this suit individually, and on behalf of all Florida individuals and businesses engaged in "for hire" game, sport fishing, and recreational boating charters and/or related services in the coastal zones, the Gulf of Mexico, the Gulf Stream, and/or the territorial waters of the State of Florida sustaining injury and/or damage as the result of the *Deepwater Horizon* Oil Spill.

## INTRODUCTION

1.      This proposed class action (the "Action") is brought under Rule 23 of the Federal Rules of Civil Procedure for actual, compensatory, and punitive damages arising from the *Deepwater Horizon* oil spill in the Gulf of Mexico (hereinafter the "Oil Spill"). The Oil Spill stemmed from an oil well blowout – a sudden, uncontrolled flow of high-pressure gas, mud and oil that shot up from the deep water oil reservoir on April 20, 2010 – and subsequent resulting catastrophic explosion on the *Deepwater Horizon* ("*Deepwater Horizon*" or "Oil Rig"), a semi-

submersible off-shore drilling rig used in the exploration and production of sub-sea oil wells that was situated approximately 40 miles southeast of the Louisiana coast.

2.       This massive and uncontrolled discharge of oil has polluted the waters and natural resources in the Gulf of Mexico and continues to threaten territorial waters and shores surrounding Florida.  Significant quantities of oil have floated to the ocean's surface; moreover, enormous subsurface plumes of oil have been identified in the deep waters of the Gulf of Mexico.  Defendant BP has admitted that the volume of the Oil Spill may have reach 60,000 barrels (2,500,000 gallons) per day.  Others estimate the volume of the Oil Spill may have reached even greater levels.  This ongoing Oil Spill has grown to massive proportions, and has already damaged the Gulf of Mexico's marine and coastal environments, natural resources, estuarine areas, and commercial fisheries resulting in the injuries and damages sought herein.

3.       As of June 2, 2010 the National Oceanic and Atmospheric Administration had prohibited commercial and recreational fishing in an area covering 88,522 square miles or approximately thirty-seven percent (37%) of the Gulf of Mexico (including waters vital to Plaintiffs' and Class Members' businesses) due to the Oil Spill.

4.       Florida individuals and businesses engaged in "for hire" game, sport fishing, and recreational boating charters and/or related services in the coastal zones, the Gulf of Mexico, the Gulf Stream, and/or the territorial waters of the State of Florida have been and continue to be injured and/or damaged as the result of the *Deepwater Horizon* Oil Spill.

5.       This Action seeks to compensate Florida individuals and businesses engaged in "for hire" game, sport fishing, and recreational boating charters and/or related services in the coastal zones, the Gulf of Mexico, the Gulf Stream, and/or the territorial waters of the State of Florida have been and continue to be injured and/or damaged as the result of the *Deepwater*

*Horizon* Oil Spill, to punish those responsible for the Oil Spill, and to deter this from happening again.

## JURISDICTION/VENUE

6.      Jurisdiction is proper in this Court and under 28 U.S.C. § 1332(a) because complete diversity exists among the parties and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interests and costs.  Jurisdiction is also proper in this Court under 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds the sum or value of five million dollars ($5,000,000.00) exclusive of interests and costs.

7.      Venue is proper in this district under 28 U.S.C. §1391(a)(2).

## PARTIES

1.      Plaintiff Venus Charters is a charter business based out of Key West, Florida that provides "for hire" game, sport fishing, recreational and boating charters and related services. Venus Charters fishes in the Gulf of Mexico and the Gulf Stream for of all types of game, sport, and recreational fishing and boating.  Plaintiff Venus Charters has been operating out of Key West and fishing in the Gulf of Mexico for many years.  Plaintiff Venus Charters leases dock space in Key West, FL.  Plaintiff Venus Charters has suffered cancellations and losses due to a sudden and significant drop in tourism in the Florida Keys as a result of the *Deepwater Horizon* Oil Spill.

2.      Plaintiffs Captain Karen Luknis and Captain Debra Butler reside in Key West, Florida, and have sustained and are sustaining injuries and further damages within this District.

3.      Plaintiff and Class Representatives Venus Charters, Captain Karen Luknis and Captain Debra Butler are referred to herein together as "Plaintiffs."

4.      Defendant BP p.l.c. is an international corporation doing business in the United States with its corporate headquarters at 1 St. James's Square, London, United Kingdom.

4

Defendant BP p.l.c. maintains a corporate office in the United States at 501 Westlake Park Boulevard, Houston, Texas.  Personal jurisdiction over Defendant BP p.l.c. is proper under one or more provisions of Fla. Stat. § 48.193 because BP p.l.c. has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs and proposed Class Members in Florida.

5.      Defendant BP America Inc. is a BP p.l.c.-affiliated entity and a Delaware corporation with its principal place of business in Warrenville, Illinois. Defendant BP America, Inc. is licensed to do and does business in the State of Florida. Personal jurisdiction over Defendant BP America Inc., is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs and proposed Class Members in Florida.

6.      Defendant BP Products North America Inc., is a BP p.l.c.-affiliated business entity and a Maryland corporation with its principal place of business in Houston, Texas. Defendant BP Products of North America Inc. is licensed to do and does business in the State of Florida.  Personal jurisdiction over Defendant BP Products North America Inc. is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs and proposed Class Members in Florida.

7.      Defendant BP America Production Company is a BP p.l.c.-affiliated business entity and a Delaware corporation with its principal place of business in Warrenville, Illinois. Defendant BP America Production Company is licensed to do and does business in the State of Florida. Personal jurisdiction over Defendant BP America Production Company is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs and proposed Class Members in Florida.

8.      Defendant, BP Exploration & Production Inc. is a BP p.l.c.-affiliated business entity and Delaware corporation with its principal place of business in Warrenville, Illinois. Defendant, BP Exploration & Production Inc. is licensed to do and does business in the State of Florida. Personal jurisdiction over Defendant BP Exploration & Production Inc., is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs and proposed Class Members in Florida.

9.      Defendants BP America Inc., BP Products North America Inc., BP America Production Company, and BP Exploration & Production Inc. are wholly owned subsidiaries of the global parent corporation, BP p.l.c., and are referred to herein collectively as "BP."

10.     BP is a holder of a lease granted by the Minerals Management Service ("MMS"), a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the oil and gas drilling rights.  BP, along with Defendants Anadarko, Anadarko LP, and MOEX, was the holder of the Mississippi Canyon Block 252 lease, allowing it to drill for oil and perform oil-production related operations at the Macondo prospect lease where the Oil Spill originated. On April 20, 2010, Defendant BP was an operator of the *Deepwater Horizon*.

11.     Defendant Anadarko Petroleum Corporation ("Anadarko") is a Delaware corporation with its principal place of business in The Woodlands, Texas.  Defendant Anadarko is an oil and gas exploration and production company that owns a 2.5% stake in the Macondo prospect lease where the Oil Spill originated.  Personal jurisdiction over Defendant Anadarko is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs and proposed Class Members in Florida.

6

12. Defendant Anadarko E&P Company LP ("Anadarko LP") is a Delaware limited partnership with its principal place of business in The Woodlands, Texas. Defendant Anadarko is an oil and gas exploration and production company that owns a 22.5% stake in the Macondo prospect lease where the Oil Spill originated. Personal jurisdiction over Defendant Anadarko is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs and proposed Class Members in Florida.

19. Together, Defendants BP, Anadarko, Anadarko LP, and MOEX are the holders of a lease granted by the MMS, which allows for oil exploration, drilling, and production related operations on the Macondo prospect.

13. Defendants BP, Anadarko, Anadarko LP, MOEX, Transocean, Halliburton, M-I, and Weatherford are collectively referred to herein as the "Drilling Defendants."

14. Defendant Transocean Ltd. is a Swiss corporation. Defendant Transocean Ltd. maintains substantial U.S. offices at 4 Greenway Plaza, Houston, Texas 77046. Defendant Transocean Ltd. is an owner, managing owner, owner *pro hac vice,* and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon*'s offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. Personal jurisdiction over Defendant Transocean Ltd. is proper under one or more provisions of Fla. Stat. § 48.193 because Transocean Ltd. has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs and proposed Class Members in Florida.

15. Defendant Transocean Deepwater, Inc. is a Transocean Ltd.-affiliated entity and a Delaware corporation with its principle place of business in Houston, Texas. Defendant Transocean Deepwater, Inc. is an owner, managing owner, owner *pro hac vice,* and/or operator

of the *Deepwater Horizon* and participated in the *Deepwater Horizon*'s offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated.  Personal jurisdiction over Defendant Transocean Deepwater, Inc. is proper under one or more provisions of Fla. Stat. § 48.193 because it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs and proposed Class Members in Florida.

16.     Defendant Transocean Offshore Deepwater Drilling, Inc. is a Transocean Ltd.-affiliated entity and a Delaware corporation with its principle place of business in Houston, Texas.  Defendant Transocean Offshore Deepwater Drilling, Inc. is an owner, managing owner, owner *pro hac vice,* and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon*'s offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated.  Personal jurisdiction over Defendant Transocean Offshore Deepwater Drilling, Inc. is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs and proposed Class Members in Florida.

17.     Defendant Transocean Holdings, LLC is a Transocean Ltd.-affiliated entity and a Delaware limited liability company with its principle place of business in Houston, Texas.  Defendant Transocean Holdings, LLC is an owner, managing owner, owner *pro hac vice,* and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon*'s offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated.  Personal jurisdiction over Defendant Transocean Holdings, LLC. is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs and proposed Class Members in Florida.

18.     Defendant Triton Asset Leasing GmbH, is a Transocean Ltd.-affiliated entity and is a Swiss limited liability company with its principle place of business in Zug, Switzerland. Defendant Triton Asset Leasing GmbH is an owner, managing owner, owner *pro hac vice,* and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon*'s offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated.   Personal jurisdiction over Defendant Triton Asset Leasing GmbH. is proper under one or more provisions of Fla. Stat. § 48.193 because it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs and proposed Class Members in Florida.

19.     Defendants Transocean Ltd., Transocean Deepwater, Inc., Transocean Offshore Deepwater Drilling, Inc, Transocean Holdings, LLC, and Triton Asset Leasing GmbH are hereinafter referred to collectively as "Transocean."   Upon information and belief, Transocean was operating, participating in, and providing employees, equipment, and operational support for drilling-related activities at the off-shore site of the *Deepwater Horizon*, as well as onshore activities and support the at all times relevant to the Oil Spill.

20.     Defendant Halliburton Energy Services, Inc. ("Halliburton') is a Delaware corporation with its principal place of business in, Houston, Texas. Defendant Halliburton is licensed to do and does business in the State of Florida.  Defendant Halliburton was engaged in drilling-related operations and support for the *Deepwater Horizon* both on and offshore. Personal jurisdiction over Defendant Halliburton is proper under one or more provisions of Fla. Stat. § 48.193 because it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs and proposed Class Members in Florida.

21.     Defendant M-I, LLC ("M-I") is a Delaware limited liability company with its principal place of business in Wilmington, Delaware.  Defendant M-I is also known as "M-I

SWACO."  It supplies drilling and completion fluids and additives to oil and gas companies, providing pressure control, rig instrumentation, and drilling waste management products and services.  M-I provided the drilling fluids, or "mud," for the well where the blowout and subsequent Oil Spill occurred.  Personal jurisdiction over Defendant M-I is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs and proposed Class Members in Florida.

22.    Defendant Weatherford International, Ltd. ("Weatherford") is a Swiss Corporation and maintains its principal place of business in Houston, Texas. Defendant Weatherford was involved with the casing process for the *Deepwater Horizon* well that suffered the blowout that subsequently leading to the Oil Spill.  Personal jurisdiction over Defendant Weatherford is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs and proposed Class Members in Florida.

23.    Defendants BP, Anadarko, MOEX, Transocean, Halliburton, M-I, and Weatherford are collectively referred to herein as the "Drilling Defendants."

24.    Cameron International Corporation f/k/a Cooper Cameron Corporation ("Cameron") is a Delaware corporation with its principle place of business in Houston, Texas. Defendant Cameron is registered to do and does do business in the State of Florida.  Defendant Cameron manufactured, designed, supplied, installed and/or maintained a sub-sea device known as a blowout preventer ("BOP") installed and deployed at the wellhead at the location of the initial incident involving the *Deepwater Horizon* that failed to operate at the time of the initial blowout, was improperly designed, not appropriate for the intended environment of use and/or possessed product defects. Personal jurisdiction over Defendant Cameron is proper under one or

more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs and proposed Class Members in Florida.

25.     Defendants John and Jane Does A-Z are persons or entities whose identities and/or proper corporate names are currently unknown.  All allegations and claims asserted herein against the "Drilling Defendants" are incorporated by reference against John and Jane Does A through Z.  If necessary and appropriate, said John Does A through Z will be identified by proper name and joined in this action under the Federal Rules of Civil Procedure when such identities are discovered.

26.     Defendants Corporations A-Z are corporations or companies whose identities and/or proper corporate names are currently unknown.  All allegations and claims asserted herein against the "Drilling Defendants" are incorporated by reference against Defendants Corporations A-Z.  If necessary and appropriate, said Defendant Corporations A-Z be identified by proper name and joined in this action under the Federal Rules of Civil Procedure when such identities are discovered.

## FACTUAL ALLEGATIONS

### The *Deepwater Horizon*

27.     The *Deepwater Horizon* was a $560,000,000.00 ultra-deepwater, dynamically-positioned semi-submersible oil drilling rig built by Hyundai Heavy Industries Co., Ltd. of South Korea.

28.     The *Deepwater Horizon* was delivered to Defendant Transocean in February 2001.

29.     At times relevant herein, the *Deepwater Horizon* was owned by Transocean but leased to Defendant BP for a term continuing through September 2013.

30.     Defendant BP leased the *Deepwater Horizon* to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252 ("Macondo"), a location on the outer continental shelf in the Gulf of Mexico.  As part of its agreement with Defendant BP, Defendant Transocean provided employees, contractors, and other officials who assisted Defendants BP, Anadarko, and MOEX in their oil exploration and production activities at the Macondo prospect.

31.     As a mobile offshore drilling unit, the *Deepwater Horizon* was utilized by the Drilling Defendants for, *inter alia*, drilling sub-sea wells for oil exploration and production in areas of depth in excess of 5,000 feet of water.

## The Process of Ultra-Deepwater Offshore Drilling

32.     The process of ultra-deepwater offshore drilling generally involves several steps. First, seismic and/or magnetic surveys are undertaken to locate "traps," rock formations that may contain significant deposits of oil, natural gas, or other hydrocarbons.

33.     Upon locating a "trap," oil rigs such as the *Deepwater Horizon* are normally positioned to drill the oil well at the site of the wellhead and prepare it for a production platform to move into place to recover crude oil.

34.     Once an oil rig such as the *Deepwater Horizon* has been properly positioned, a wide-diameter hole is normally drilled into the seabed, generally to a depth of about 300 to 400 feet.  This hole is known as a "pilot hole."

35.     Once drilled, the pilot hole is "cased." "Casing" is a specific type of pipe used below the seabed for oil extraction.

36.     The combination of drilling the pilot hole and casing is known as "spudding in."

37.     The casing initially lowered into the pilot hole generally anchors a device known as the blowout preventer, or "BOP."

38.     The BOP is an assembly of hydraulically operated valves that sense pressure. It is designed to prevent a blowout from reaching an oil rig. Its valves are mounted in a direction perpendicular to the anticipated flow of oil. The BOP is equipped with a series of different "rams" which can be utilized to close off the well in various situations, depending on the presence or absence of the drill stem or casing in the shaft. The BOP on this well was a 53-foot-tall steel framed stack weighing 450 tons.

39.     BOP devices generally close within 30 seconds of activation. Normally, a BOP's rams can be manually activated from the drill rig. Likewise, BOPs generally feature a deadman's switch, which is intended to activate the device's rams if electrical and/or hydraulic connections to the oil rig are severed.

40.     BOP devices are also normally able to be activated by using remotely operated vehicles, or "ROVs", at the wellhead.

41.     The BOP is positioned atop the wellhead by attaching successive pieces of pipe know as "marine riser" and then placing in on the seafloor.

42.     Once on the seafloor, the BOP is fastened to the wellhead using ROVs.

43.     Once the BOP is properly positioned and secured, the drill stem and any additional casing is then normally lowered down inside the marine riser and through the BOP.

44.     Normally, as the drill stem is passed through the marine riser and BOP, drilling fluid known as "mud" is pumped down the center of the drill pipe.  This "mud," a thick mixture of barite, water, clay, and chemicals, cools the drill bit and suspends and carries drilled rock fragments to the surface as it flows upwards outside of the drill stem but inside the marine riser.

45.     Mud is normally designed and formulated so that its density matches the ambient fluid and gas pressure conditions of the rock formations being drilled.  This keeps the upward pressure of the oil and gas in those formations counterbalanced.

46.     Normally, once an oil, natural gas, or other hydrocarbon reservoir is reached by the drilling apparatus, casing is extended into it.  This casing is then "capped" with a plug of cement.

47.     A cementing contractor then normally places a temporary second cement plug in the shaft below the BOP.

48.     Assuming the integrity of the well holds, and proper testing and analysis confirms the safety of cementing, casing, and other drilling activities previously undertaken, the riser is then disconnected from the BOP, and a permanent oil production platform is put into place.

### The Events Preceding the Oil Spill

49.     In the weeks and months before the Oil Spill, the Drilling Defendants were engaged in exploring and drilling the Macondo prospect onboard and below the *Deepwater Horizon*.

50.     These operations were experiencing delays.  These delays prompted BP to order the other Drilling Defendants to increase the rate of drilling.

51.     Upon information and belief, BP insisted that the Drilling Defendants increase the rate of drilling to expedite the placement of a permanent oil rig at the site to begin production. This emphasis on speed over safety led to errors and omissions by the Drilling Defendants, which in turn caused and/or contributed to the initial explosion and subsequent Oil Spill.

52.     Approximately four weeks before the blowout and onset of the Oil Spill, the Drilling Defendants became aware of damage to the *Deepwater Horizon's* BOP.  This included

the intrusion of the drill pipe into the BOP, damaging the BOP's annular seal, a rubber gasket vital to the proper functioning of the device.

53.     As a result of this failure, foreign materials including chunks of rubber broken away from the annular seal floated to the surface of the *Deepwater Horizon* and were observed by Defendants BP and Transocean, and upon information and belief, other Defendants herein..

54.     In response to the discovery of pieces of the annular seal and other evidence in the drilling fluid, Defendants BP and Transocean failed to act to prevent or mitigate risk of the Oil Spill.  The other Drilling Defendants were also aware of this discovery, and similarly failed to report this information to outside sources. One or more of the Drilling Defendants acted unreasonably by ignoring this evidence and continuing drilling operations.

55.     In conjunction with their knowledge of the failure of the annular seal on the BOP device, Defendants BP and Transocean were also aware of inoperability of the pods used to control the BOP so that it could seal the oil well in the event of a blowout.  Upon information and belief, Defendants BP and Transocean were aware of failures in the BOP's battery system and power source.

56.     The Drilling Defendants knew or should have known that the threat of blowouts increases as drilling depths increase. The Drilling Defendants were drilling in 5,000 feet of water and to a total depth in excess 18,000 feet below the sea floor.  Some sources indicate that the *Deepwater Horizon* may have been drilling in excess of its permitted depth.

57.     The Drilling Defendants were also aware that ultra-deepwater drilling increases the risk and manifestation of product defects in the *Deepwater Horizon's* most critical blowout safety mechanism, the BOP.

58.     The Drilling Defendants were aware of the risk of the BOP failing at the great depths in which the *Deepwater Horizon* was operating, yet neither the Drilling Defendants nor Defendant Cameron installed a backup BOP activation system or a backup BOP, nor provided adequate warnings, instructions, or guidelines on permissible uses, modifications, and applications of the BOP.

59.     A 2004 study by Federal regulators showed that BOPs may not function in deep-water drilling environments because of the increased force needed to pinch and cut the stronger pipes used in deep-water drilling.  Only 3 of 74 rigs studied in 2004 had BOPs strong enough to squeeze off and cut the pipe at the water pressures present at the equipment's maximum depth. "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a Blowout," the study said.  Moreover, the study singled out Defendant Cameron, the manufacturer of the *Deepwater Horizon's* BOP, for relying on faulty calculations to determine the necessary strength for its BOP equipment to function properly at ultra-deepwater depths.

60.     Defendants BP, Transocean, and Cameron could have ensured that a BOP and/or back-up BOP with sufficient strength for deepwater drilling were installed on the *Deepwater Horizon*, but did not do so.

61.     Defendants BP, Transocean, and Cameron could have installed a back-up trigger to activate the BOP in the event that the main trigger failed to activate.

62.     In fact, federal regulators at the MMS communicated to one or more of the Drilling Defendants in 2000 that MMS considered a backup BOP activation system to be "an essential component of a deepwater drilling system."

63.     Despite this notice, and although the backup trigger is a common drill-rig requirement in other oil producing nations, including other areas where the Defendant BP operates, the *Deepwater Horizon* was not equipped with this backup remote BOP trigger.

64.     The *Deepwater Horizon* was also not equipped with a second BOP, as are many newer oil rigs.  Rather, the *Deepwater Horizon* only had one BOP installed, leaving the well especially vulnerable to a blowout and subsequent oil spill.

65.     The Drilling Defendants also knew or should have known that ultra-deepwater drilling carried significant safety and environmental risks.

66.     Prior to the *Deepwater Horizon* Oil Spill, one or more of the Drilling Defendants also knew that improving safety performance during offshore drilling operations was necessary.  For example, prior to the Oil Spill, Mr. Steven L. Newman, chief executive of Defendant Transocean, admitted that "we have to improve our safety performance."

67.     In a 2007 study, the MMS expressed concerns that oil rig blowouts can be caused by ineffective and/or improper cementing work.  Although the study noted that the overall risk of blowouts has been declining, it suggested that blowouts related to cementing work continued with some regularity, and most frequently in the Gulf of Mexico.

68.     According to the 2007 study, cementing problems were associated with 18 of 39 blowouts that occurred between 1992 and 2006, and in 18 of the 70 blowouts that occurred from 1971 to 1991.  Nearly all of the blowouts examined occurred in the Gulf of Mexico.

69.     The Drilling Defendants knew or should have known that careless, ineffective, negligent, or reckless cementing work caused an August 2009 blowout in the Timor Sea.  During that incident, which shares similarities with the *Deepwater Horizon* Oil Spill, oil leaked from the Timor Sea site for ten weeks, causing damage over 200 miles from the well site.

70.     According to the *Associated Press*, MMS has implicated the cementing process as faulty or ineffective 34 times since 1978.

71.     In the days immediately prior to the onset of the Oil Spill, BP made a series of unusual, rapid-fire requests to modify operational permits regarding the *Deepwater Horizon*. These requests were approved in an extremely expeditious fashion, one being "reviewed" and "approved" within five minutes.

72.     On April 14, 2010, one of these modifications included Defendant BP asking MMS if it could use a so-called "one-pipe" method, rather than a "two pipe" method to reach the oil and gas reservoir below the *Deepwater Horizon*.   According to *The New York Times*, Defendant BP concluded that the one-pipe option was the "best economic case" despite having "some risk" of leaving an open path for gas to travel up outside the well.   The two-pipe method, according to some experts, is "more or less the gold standard," especially for high-pressure wells such as the one below the *Deepwater Horizon*.

73.     Upon information and belief, the two-pipe method was the safer option because it would have provided an extra layer of protection against gas traveling up the outside of the well to the surface.   However, the one-pipe method was easier and faster by about 7 days, saving Defendant BP nearly $7 million.

74.     As noted in a May 25, 2010 memorandum authored by Congressmen Henry A. Waxman and Bart Stupak, Members of the House of Representatives' Committee on Energy and Commerce, in the hours and minutes immediately preceding the onset of the Oil Spill, the Drilling Defendants were faced with clear signs that serious problems with the rig's operations were developing and manifesting.

75.     For example, as early as 5:05 p.m., almost 5 hours before the explosion, one or more of the Drilling Defendants observed an unexpected loss of fluid in the riser pipe, suggesting that there were leaks in the annular preventer in the BOP.

76.     Moreover, two hours before the explosion, during efforts to begin negative pressure testing, the system gained 15 barrels of liquid instead of the 5 barrels that were expected, leading too one or more of the Drilling Defendants to become aware of the possibility that there was an "influx from the well."

77.     The Drilling Defendants conducted this negative pressure testing initially on the drill pipe rather than the kill line, even though the drill plan specified that it would be done on the kill line. The line was opened and pressure on the kill line was bled to 0 psi, while pressure on the drill pipe remained at 1400 psi. Officials from Defendant BP have admitted that this was a "fundamental mistake" as this difference in psi was an "indicator of a very large abnormality." Nevertheless, after anomalous results, the negative pressure testing was conducted on the kill line and ultimately accepted by the Drilling Defendants.

78.     Approximately 51 minutes before the explosion that began the Oil Spill, one or more of the Drilling Defendants knew or should have known that more fluid had begun flowing out of the well than was being pumped in.  This was a clear indication to one or more of the Drilling Defendants of serious problems with the drilling operation.

79.     Approximately 41 minutes before the explosion that began the Oil Spill, one or more of the Drilling Defendants was aware that although the pump was shut down for a "sheen" test, the well continued to flow instead of stopping.  Moreover, at this time one or more of the Drilling Defendants knew or should have known that the drill pipe pressure also unexpectedly increased.  These were additional, clear indicators of problems with the drilling operation.

80.     Approximately 18 minutes before the explosion that began the Oil Spill, one or more of the Drilling Defendants observed abnormal pressures and mud returns, and the pump was abruptly shut down.   This was a further, clear indicator to the Drilling Defendants of problems with the drilling operation immediately prior to the explosion and Oil Spill.

81.     Data presented by Defendant BP to the United States House of Representatives' Committee on Energy and Commerce suggests that the crew may have attempted mechanical interventions at that point to control the pressure, but soon after, the blow-out occurred, reservoir pressures became unstable resulting in massive quantities of flammable gases shooting to the surface resulting in the tragic and devastating explosion on board the *Deepwater Horizon*.

### The Explosion and Oil Spill

82.     On or about April 20, 2010, at approximately 9:45 p.m. CST, a series of explosions occurred on the *Deepwater Horizon*. These explosions ensued due the release of reservoir pressure and a blowout, which funneled flammable gases into the oil rig.   These explosions killed eleven (11) crew members, and injured many more.   Two days following the initial explosions, the remnants of the *Deepwater Horizon* sank to the ocean floor.

83.     Shortly before the explosions aboard the *Deepwater Horizon*, employees, agents, and/or contractors of one or more of the Drilling Defendants were participating in drilling-related activities, including cementing and mudding, to seal and plug the wellhead.   Cementing is intended to, among other things, hold back the flow of oil and hydrocarbons from the well bore. Cementing and mudding are delicate activities, and each carries the risk of a blowout if not performed properly.   Improper or ineffective cementing work and/or mudding operations performed by one or more of the Drilling Defendants was a cause or contributing factor to the Oil Spill.

84.     Almost immediately following the explosion, oil began to discharge into the Gulf of Mexico from a depth of 5,000 feet below the *Deepwater Horizon*.

85.     Before the Oil Spill, the *Deepwater Horizon* had been connected to the wellhead at the seafloor by a 5,000 foot pipe called a "riser."   As the *Deepwater Horizon* sank to the seafloor, it pulled the riser down with it, buckling and eventually breaking the riser.  This riser was connected to a well casing that ultimately linked the *Deepwater Horizon* to an oil field located thousands of feet below the ocean floor.

86.     While crude was believed to be discharged before the *Deepwater Horizon* finally sank on April 22, 2010, the rate of discharge is believed to have increased once the *Deepwater Horizon* sank to the ocean floor.  Oil is now (as of the time this Action was filed) flowing out from the open end of the riser in at least two places.  The Drilling Defendants permitted, allowed, and failed to properly monitor and inspect pressure levels in the riser and the BOP valves.

87.     Defendant Cameron designed and manufactured the *Deepwater Horizon's* BOP device.  Defendant Cameron failed to effectively design the BOP, install a backup activation system for the BOP, or provide adequate warnings, instructions, and guidelines on permissible uses, modifications, and applications of the BOP.  Additionally, upon information and belief, the BOP may not appropriate for this intended environment of use, as it built with only one set of shear-rams when it should have had two such rams.  The failure of Defendant Cameron's BOP was a cause or contributing factor to the Oil Spill.

88.     The Drilling Defendants knew or should have known of the dangers associated with ultra-deepwater drilling and failed to take appropriate measures to prevent damage to Plaintiffs, the Class, and marine, coastal, and estuarine areas of Mississippi and the Gulf Coast.

89.     Moreover, additional safety mechanisms, technologies, and precautions were known and available to one or more of the Drilling Defendants and/or Defendant Cameron but the Drilling Defendants elected not to employ them on the *Deepwater Horizon*.

**Defendant BP Misrepresents its Oil-Spill Response Capabilities**

90.     After the onset of the Oil Spill, Defendants BP and Transocean attempted to downplay and conceal the severity of the Oil Spill in the press.  In this regard, their initial estimate was that following the blowout and Oil Spill, the well was discharging 1,000 barrels of crude oil per day.

91.     However, on or about April 28, 2010, ROVs exploring the wreckage of the *Deepwater Horizon* discovered kinks in rig's sunken, broken riser.  At this point, BP indicated that oil might be leaking at a rate of as much as 5,000 barrels (or 210,000 gallons) of oil discharged per day.

92.     On May 4, 2010, BP executives admitted to members of Congress that the rate of the Oil Spill leak could reach 60,000 barrels, or 2,500,000 gallons, per day.

93.     As of the date this Action was filed, an oil slick with a range of thousands of miles had formed and could be seen from space.  Additionally, thick, voluminous plumes of oil have been identified in deep waters within the Gulf of Mexico.  The Oil Spill caused this slick and these plumes to form.  Oil is washing ashore in the Gulf of Mexico and damaging marine animals' coastal habits.

94.     On February 23, 2009, Defendant BP submitted a document entitled "Initial Exploration Plan Mississippi Canyon Block 252" ("Exploration Plan") to the MMS.  In the Exploration plan, Defendant BP evaluated the potential environmental impact of a blowout at an ultra-deepwater oil well.  It also described its ability to respond to a blowout resulting from an oil

spill.  Additionally, Defendant BP made misrepresentations about its capability to respond to a blowout in the Exploration Plan.

95.     In describing the impact a blowout and subsequent spill could have on essential fish habitats, Defendant BP indicated the following:

> In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of BP's Regional Oil Spill Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill.

96.     Likewise, Defendant BP stated in its February 23, 2009 Exploration Plan that it was "unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities," and that "due to the distance to shore (48 miles (77 km)) and the response capabilities that would be implemented, no significant adverse impacts are expected."

97.     On May 17, 2010, U.S. Senators Barbara Boxer, Ben Cardin, Frank Lautenberg, Kirsten Gillibrand, Bernie Sanders, Amy Klobuchar, Tom Carper, and Jeff Merkely contacted U.S. Attorney General Eric Holder to specifically request that the U.S. Department of Justice "open an inquiry into whether British Petroleum (BP) made false and misleading statements to the federal government regarding its ability to respond to oil spills in the Gulf of Mexico."

98.     On May 17, 2010, Senators Boxer, Cardin, Lautenberg, Gillibrand, Sanders, Klobuchar, Carper and Merkely, in a letter to Attorney General Holder noted:

> In the wake of the Deepwater Horizon oil spill, it does not in any way appear that there was 'proven equipment and technology' to respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico. Much of the response and implementation of spill control technologies appears to be taking place on an ad hoc basis.

99.     Defendant BP has admitted that it had no proven or tested techniques available to deal with a blowout like that seen onboard the *Deepwater Horizon* when it explained on May 10, 2010 that "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

100.    Moreover, Defendant BP p.l.c.'s chief executive officer, Anthony Hayward ("Hayward"), further admitted that Defendant BP was unprepared for an event like the Oil Spill when he stated on May 12, 2010 that it was "probably true" that Defendant BP was unprepared for an emergency of this magnitude.

101.    Defendant BP has stymied efforts to gauge the scope of the disaster on land and at sea.  *The New York Times* reported on May 16, 2010 that "BP has resisted entreaties from scientists that they be allowed to use sophisticated instruments at the ocean floor that would give a far more accurate picture of how much oil is really gushing from the well."

102.    Furthermore, reports have surfaced that the oil companies, such as the Drilling Defendants, were in some instances authored their own inspection reports for the MMS, which were then rubber-stamped.  As such, even if the Drilling Defendants were in compliance with MMS regulations, that compliance lacks credibility and cannot establish the propriety of the Drilling Defendants' actions.

103.    As of the date of the filing of this Action, the Drilling Defendants have been unable to stop the discharge of oil into the Gulf of Mexico, and failed to mitigate the damages in this case.

## The Economic Impact

104.    The Oil Spill has and continues to impact the Gulf Coast's and Florida's shorelines, threatening Plaintiffs' livelihood and business operations.  Preliminary economic

projections on the impact to the Gulf of Mexico's fishing industry alone estimate that damages could be in the billions of dollars.

105.    As of June 2, 2010, federal officials have banned fishing activities in areas of the Gulf of Mexico vital to Plaintiffs' and the Class Members' businesses.  At the time of the filing of this Complaint, 88,522 sq mi (229,270 sq km), or approximately 37% of the Gulf of Mexico, has been closed due to the Oil Spill.

106.    Landfall of the oil along the Gulf Coast has and will continue to severely damage the delicate wetland and intertidal zones, including those that line the coast of Florida, where fish, shellfish, and crustaceans breed, spawn, and mature, and where much of Plaintiffs' and the Class Members' charter fishing business is transacted.

107.    The oil that is being released is extremely hazardous to marine life in the Gulf of Mexico and the Gulf Coast States' waters.  It is especially hazardous to marine life at the bottom of the food chain, including creatures such as plankton, shrimp, and crabs.  These species are plentiful in and around the areas where Plaintiffs and the Class Members regularly conduct their charter fishing operations.

108.    These plankton, shrimp, and other marine creatures are vital to entire marine ecosystem, and the damaged sustained by these tiny marine creatures threatens the entire marine the species regularly sought by anglers who retain charter fishing businesses such as those operated by the Plaintiffs and the Class Members.

109.    Additionally, due to all the size and nature of the spreading Oil Spill and sub-sea oil plumes, and potential customers' legitimate fears about "booking" advance charter fishing trips and given the toxic effects of the oil and chemicals to people, aquatic life forms, and the Gulf Coast States' waters, there have been and will continue to be further fishing charter

cancelations and economic losses.  In this regard, press reports have noted that oil has begun to hit the shores on Florida, including Key West.  Fishermen and coastal communities are already experiencing a significant loss of current and future income because of public concern that Florida's beaches and/or territorial waters are tainted by the Oil Spill or will be in the near future.

110.    Damage to these vital natural resources and habitats and the threat that the oil will soon reach Florida's shores will continue to damage Plaintiffs and the Class because they are reliant upon access to these areas and fisheries in the coastal zones, the Gulf of Mexico, the Gulf Stream, and/or the territorial waters of the State of Florida in order to conduct their businesses.

111.    Moreover, chemical dispersants used by one or more of the Drilling Defendants have been reported to be negatively impacting the health and safety of those assisting in the clean up of the Oil Spill.  The potential lasting toxic effects of these chemicals could further endanger the ability of inshore charter fishermen to operate their businesses in the Gulf of Mexico and surrounding Gulf Coast State waters.

112.    The Oil Spill, and subsequent inability to stop the discharge of crude oil into the Gulf of Mexico, has caused and will continue to cause a direct and proximate loss of revenue and/or loss of earning capacity to Plaintiffs and the Class including but not limited to the fact that they:

> a.    Cannot access significant areas of the coastal waters of the State of Florida and/or Gulf of Mexico waters to engage in sport fishing, and recreational boating charters and/or related services; and
>
> b.    Have experienced and are experiencing significant business interruption due to cancellations of fishing, and recreational boating charters and/or related services.

## CLASS ALLEGATIONS

113.    Plaintiffs bring this Action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all Florida individuals businesses engaged in "for hire" game, sport fishing, and recreational boating charters and/or related services in the coastal zones, the Gulf of Mexico, the Gulf Stream, and/or the territorial waters of the State of Florida sustaining injury and/or damage as the result of the *Deepwater Horizon* Oil Spill.

114.    Excluded from the Class are the Defendants, their subsidiaries, affiliates, officers, directors and employees, members of their immediate families, their officers', directors' and employees' immediate families and their legal representatives, heirs, successors or assigns and any entity in which any of the foregoing has a controlling interest.

115.    The members of the Class are so numerous and dispersed that joinder of all members is impracticable.

116.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.

117.    Plaintiffs' claims are typical of the claims of the members of the Class as they and members of the Class sustained damages arising out of the acts or omissions of one or more Defendants.

118.    Plaintiffs will fairly and adequately protect the interests of members of the Class. Plaintiffs' claims are not antagonistic to the interests of the Class and there are no conflicts between Plaintiffs' claims and the Class's claims.

119.     Plaintiffs have retained counsel competent and experienced in both class actions and environmental contamination litigation.

27

## CLASS DEFINITION

120.    Plaintiffs bring this Action on behalf of themselves and all others similarly situated, who are members of the following Class:

> All Florida individuals businesses engaged in "for hire" game, sport fishing, and recreational boating charters and/or related services in the coastal zones, the Gulf of Mexico, the Gulf Stream, and/or the territorial waters of the State of Florida sustaining injury and/or damage as the result of the *Deepwater Horizon* Oil Spill.

121.    A class action lawsuit is appropriate in this matter as follows:

a.    **Numerosity**.    The proposed class is so numerous that joinder is impractical.  There are hundreds if not thousands of Florida individuals and businesses "for hire" in game, sport fishing, and recreational boating charters and/or related services in the coastal zones, the Gulf of Mexico, the Gulf Stream, and/or the territorial waters of the State of Florida sustaining injury and/or damage as the result of the *Deepwater Horizon* Oil Spill.   The disposition of the claims asserted herein through this class action will be more efficient and will benefit the parties and the Court.

b.    **Commonality**.   There is a well-defined community of interest in that the questions of law and fact common to the class predominate over questions affecting only individual class members. Such questions include but are not limited to the following:

i.    whether an Oil Spill resulting from explosions aboard the *Deepwater Horizon* occurred;

ii.    whether one or more of the Defendants caused and/or contributed to causing the Oil Spill;

iii.    whether oil from the Oil Spill  has harmed aquatic life;

iv.    whether one or more of the Defendants' conduct was negligent;

v.    whether one or more Defendants' conduct has created a private nuisance;

vi.    whether one or more Defendants' conduct has created a public nuisance;

    vii.      whether, and to what extent, the Drilling Defendants engaged in abnormally dangerous, ultra-hazardous activities for which they are strictly liable;

   viii.      whether the Drilling Defendants caused damages due a discharge or other pollution such that they are strictly liable to Plaintiff and the Class Members;

    ix.      whether the BOP aboard the *Deepwater Horizon* was defective in design or manufacture and was unreasonably dangerous;

     x.      whether the Drilling Defendants collectively and/or individually owed a duty to Plaintiff and the proposed Class to maintain the *Deepwater Horizon* and/or to conduct drilling operations in a manner so as to prevent the discharge and/or substantial threat of discharge of oil into or upon the Gulf of Mexico and/or the shores of Mississippi;

    xi.      whether Plaintiff and the proposed class members were injured by the Defendants' acts or omissions;

    xii.      whether the Plaintiff and proposed class members have suffered economic damages due to the Oil Spill; and

   xiii.      whether one or more of the Defendants acted with actual malice or in a gross negligently manner that evinces willfulness, wantonness, or recklessness.

    c.      **Typicality**.  Plaintiffs' claims are typical of those of the Class.  Plaintiffs and the Class have suffered similar harm as a result of one or more of the Defendants' actions, and one or more Defendants have engaged in a common course of conduct giving rise to the claims of Plaintiffs and all proposed Class members, and these claims are based on the same legal theories and interests.

    d.      **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs' interests do not conflict with the interests of the Class.  Plaintiffs has retained competent and experienced counsel in complex class actions, mass torts, and environmental contamination litigation.

e.     **Superiority.**  A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual litigation of the claims of all Class members is impracticable. The court system would be overwhelmed if every member of the proposed class was required to file a separate action.  Further, individual litigation presents a potential for inconsistent or contradictory judgments and the prospect of a race for the courthouse and an equitable allocation of recovery among those with equally meritorious claims. Individual litigation increases the expenses and delay to all parties and the court system in resolving the legal and factual issues common to all claims related to the conduct alleged herein. By contrast, a class action presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

f.     The various claims asserted can be certified under the provisions of Rule 23(b)(3) of the Federal Rules of Civil Procedure.

### COUNT I
### NEGLIGENCE
### (Against the Drilling Defendants)

122.   Plaintiffs repeat, reallege and make a part hereof each and every allegation contained in the preceding sections of this Action and incorporate same by reference as though fully set forth herein.

123.   All times material hereto, one or more of the Drilling Defendants were participating in drilling operations onboard the *Deepwater Horizon* in the Gulf of Mexico.  At all times material hereto, the Drilling Defendants were under a duty to utilize reasonable care in undertaking and carrying out their collective and respective activities onboard the *Deepwater Horizon*.

124.    At all times material hereto the *Deepwater Horizon* was owned, navigated, manned, possessed, managed, controlled, chartered and/or operated by Defendants BP, Transocean, Anadarko, and/or MOEX.

125.    All times material hereto, Defendant Halliburton responsible for cementing the well that was the subject of the Oil Spill, and further was engaged in testing, analysis, and monitoring of the aforementioned well.

126.    At all times material hereto, Defendant M-I was providing the drilling fluids or "mud" for the drilling operations onboard the *Deepwater Horizon*, and was responsible for mud drilling, composition, and monitoring.

127.    At all times material hereto, Defendant Weatherford was responsible for overseeing the casing process onboard the *Deepwater Horizon*.

128.    The Drilling Defendants were under a duty to exercise reasonable care while participating in drilling operations to ensure that an Oil Spill and subsequent discharge of oil did not occur.

129.    The Drilling Defendants were under a duty  to exercise reasonable care to ensure that if crude oil discharged in the event of a blowout, that it would be contained and/or stopped within the immediate vicinity of the *Deepwater Horizon* in an expeditious manner.

130.    The Drilling Defendants knew or should have known that the acts and omissions described herein could result in damage to Plaintiffs and the Class

131.    The Drilling Defendants, respectively and collectively, failed to exercise reasonable care while participating in drilling operations, and thereby breached duties owed to Plaintiffs and the Class.

132.    The Drilling Defendants, respectively and collectively, failed to exercise reasonable care while participating in drilling operations to ensure that a blowout and subsequent Oil Spill did not occur, and thereby breached duties owed to Plaintiffs and the Class.

133.    The Drilling Defendants, respectively and collectively, failed to exercise reasonable care to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout, and thereby breached duties owed to Plaintiffs and the Class.

134.    The Drilling Defendants, respectively and collectively, failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico, and thereby breached duties owed to Plaintiffs and the Class.

135.    One or more of the Drilling Defendants were in violation of federal and/or state statutes and/or regulations.

136.    The blowout and subsequent Oil Spill was caused by one or more of the Drilling Defendants and has resulted in an economic and ecological disaster that has directly and proximately caused injuries and damages to Plaintiffs and the Class.

137.    Prior to the blowout and Oil Spill, one or more of the Drilling Defendants had actual and/or constructive knowledge of the facts and circumstances leading to the Oil Spill. One or more of the Drilling Defendants knew or should have known of no less than three flow indicators from the *Deepwater Horizon*'s well in the hours and minutes before the explosion and Oil Spill, all of which were clear evidence of significant problems with the rig's drilling operations.  The Drilling Defendant's actions and inactions were grossly negligent, reckless, willful, and/or wanton.

138.    Plaintiffs and the Class are entitled to a judgment that one or more Drilling Defendants are jointly and severally liable to Plaintiffs and the Class for damages suffered as a result of one or more of the Drilling Defendants' negligence, gross negligence, recklessness, willfulness or wantonness.  Plaintiffs and the Class should be compensated for damages in an amount to be determined by the trier of fact, including punitive damages for the Drilling Defendants' conduct.

**COUNT II**
**NEGLIGENCE *PER SE***
**(Against the Drilling Defendants)**

139.    Plaintiffs repeat, reallege and make a part hereof each and every allegation contained in the preceding sections of this Action and incorporate same by reference as though fully set forth herein.

140.     The Drilling Defendants' conduct with regard to the manufacture, maintenance, and/or participation of drilling operations and oil rigs such as the *Deepwater Horizon* is governed by numerous state and federal laws, and permits issued under the authority of these laws.

141.    These laws and permits create statutory standards that are intended to protect and benefit Plaintiffs and the Class, among others.  One or more of the Drilling Defendants' violated these statutory standards.  Such violations constitute negligence *per se* under Florida law.

142. The Drilling Defendants' violations of these statutory standards proximately caused Plaintiffs' and the Class Members' injuries, warranting compensatory and punitive damages.

143.  The Drilling Defendants had actual and/or constructive knowledge of the facts and circumstances leading to and causing this incident, which in turn caused Plaintiffs' and the Class Members' injuries, and their actions and inactions were grossly negligent, reckless, willful, and/or wanton.

144. Plaintiffs and the Class are entitled to a judgment finding the Drilling Defendants liable to Plaintiffs and the Class for damages suffered as a result of Defendants' negligence *per se* and awarding Plaintiffs and the Class adequate compensation in an amount to be determined by the trier of fact, including punitive damages for Defendants' conduct.

## COUNT III
## STRICT LIABILITY PURSUANT TO FLORIDA STATUTES § 376.313
## (Against the Drilling Defendants)

145. Plaintiffs repeat, reallege and make a part hereof each and every allegation contained in the preceding sections of this Action and incorporate same by reference as though fully set forth herein.

146. At all relevant times, one or more of the Drilling Defendants owned, operated and/or maintained the mobile offshore drilling unit *Deepwater Horizon* which caught on fire and exploded on April 20, 2010. Following the explosion and fire, the *Deepwater Horizon* sunk resulting in the continuous discharge of crude oil from the well upon which the rig had been performing completion operations.

147. At all relevant times, one or more of the Drilling Defendants had a statutory duty to Plaintiffs and the Class to maintain and operate the *Deepwater Horizon* so as to not create or continue hazardous conditions due to the discharge or pollutants as defined by Florida Statute § 376.301(10), §376.301(11) and § 376.301(13).

148. At all times, one or more of the Drilling Defendants breached their statutory duty to the Plaintiffs and the Class by discharging, or allowing to be discharged, crude oil into and upon the Gulf of Mexico and allowing massive oil spill to migrate into in the coastal zones, the Gulf of Mexico, the Gulf Stream, and/or the territorial waters of the State of Florida,  which are

used and enjoyed by Plaintiffs and the Class, in violation of Florida Statutes § 376.313(3),

Florida Statutes, which provides:

> …nothing contained in ss. 376.30-376.317 prohibits any person from bringing a cause of action in a court of competent jurisdiction for all damages resulting from a discharge or other condition of pollution covered by ss. 376.30-376.317. Nothing in this chapter shall prohibit or diminish a party's right to contribution from other parties jointly or severally liable for a prohibited discharge of pollutants of hazardous substances or other pollution conditions. Except as otherwise provided in subsection (4) or subsection (5), in any such suit, it is not necessary for such person to plead or prove the fact of the prohibited discharge or other pollutive condition and that it has occurred.

149.     As a direct and proximate result of one or more of the Drilling Defendants' breach(es) of these statutory duties to the Plaintiffs and the Class, the Oil Spill originating from the *Deepwater Horizon* has resulted in catastrophic injuries to the coastal zones, the Gulf of Mexico, the Gulf Stream, and/or the territorial waters of the State of Florida which are used and enjoyed by Plaintiffs and the Class Members for various income generating endeavors.

150.     As a direct and proximate result of the acts and omissions of one or more of the Drilling Defendants, Plaintiffs and the Class have suffered injuries and damages.

151.     One or more of the Drilling Defendants are strictly liable for the above damage which resulted directly from their violation of Florida Statutes § 376.313(3), including for punitive damages to punish and deter the Drilling Defendants' conduct.

**COUNT IV**
**STRICT LIABILITY FOR ABNORMALLY DANGEROUS,**
**ULTRAHAZARDOUS ACTIVITIES**
**(Against the Drilling Defendants)**

152.     Plaintiffs repeat, reallege and make a part hereof each and every allegation contained in the preceding sections of this Action and incorporate same by reference as though fully set forth herein.

35

153.    Upon information and belief, the Drilling Defendants participated in ultra-deepwater drilling operations at the site of the *Deepwater Horizon*.

154.    The Drilling Defendants' operations at the site of the *Deepwater Horizon* were abnormally dangerous activities because:

   a.    it involved ultra-deepwater drilling for oil, an activity that in and of itself is abnormally dangerous;

   b.    it involved the retrieval, handling, and extraction of oil, an explosive, flammable, and toxic substance;

   c.    it involved the retrieval, handling, and extraction of oil, an explosive, flammable and toxic substance within one of the world's largest commercial fisheries;

   d.    it resulted in an explosion killing eleven individuals, injuring several others, and resulted in the discharge of untold amounts of crude oil into the Gulf of Mexico;

   e.    it created a high degree of risk of harm to Plaintiff and the Class, among others;

   f.    it created the likelihood that the harm caused by the Drilling Defendants' drilling operations would be great due to the explosive, carcinogenic, toxic, and sundry other deleterious properties of oil; and

   g.    in such other particulars as the evidence may show.

155.    The risks associated with the Drilling Defendants' operations and activities required that such drilling be carried on at their peril, rather than at the expense of the innocent Plaintiffs and the Class who suffered harm as a result of the drilling operation.

156.    The Drilling Defendants' activities, to wit, conducting ultra-deepwater oil exploration, and its consequences, the pollution of the Gulf of Mexico and the waters of the Gulf of Mexico, are inappropriate for the location utilized and uncommon for the area.

157.    Any value of the Drilling Defendants' operation to the relevant Florida communities was and is outweighed by the abnormal risk of, and the actual and continuing manifestation of, the harm suffered by Plaintiffs, the Class, and others within the state of Florida.

158.    At all times relevant to this action, one or more of the Drilling Defendants were in control of *Deepwater Horizon* and its related drilling operations, as well as its personnel.

159.    The magnitude of the risk of the Drilling Defendants' operations created an abnormal, ultra hazardous risk of physical harm to the coastal zones, the Gulf of Mexico, the Gulf Stream, and/or the territorial waters of the State of Florida one which has and is continuing to be realized as a direct and proximate result of the Oil Spill.

160.    The ultra-deepwater drilling was carried on by the Drilling Defendants for their own benefit, and it created a risk to Plaintiffs and the Class that was not a usual risk reasonably anticipated by Plaintiffs and the Class nor is it activity that is usual to the their lives or businesses.

161.    As a direct and proximate result of the acts and omissions of one or more of the Drilling Defendants, Plaintiffs and the Class have suffered injuries and damages.

162.    One or more of the Drilling Defendants are strictly liable for the above damage which resulted directly from their engaging in an abnormally dangerous and/or ultra-hazardous activity, including for punitive damages to punish and deter the Drilling Defendants' conduct.

## COUNT V
## PRIVATE NUISANCE
### (Against The Drilling Defendants)

163.    Plaintiffs repeat, reallege and make a part hereof each and every allegation contained in the preceding sections of this Action and incorporate same by reference as though fully set forth herein.

164.    Plaintiffs, and the Class, has among other legitimate interests, an interest in using and enjoying the coastal zones, the Gulf of Mexico, the Gulf Stream, and/or the territorial waters of the State of Florida to conduct "for hire" game, sport fishing, and recreational boating charters businesses.

37

165.    The combined effects of one or more of the Drilling Defendants' actions and/or inactions resulting in the Oil Spill has unreasonably interfered with Plaintiffs' and the Class's interest in using and enjoying the coastal zones, the Gulf of Mexico, the Gulf Stream, and/or the territorial waters of the State of Florida to conduct "for hire" game, sport fishing, and recreational boating charters businesses.

166.    The combined effects of one or more of the Drilling Defendants' actions and/or inactions resulting in the Oil Spill has unreasonably interfered with and invaded Plaintiffs' and the Class's ability to engage in "for hire" game, sport fishing, and recreational boating charters businesses in the coastal zones, the Gulf of Mexico, the Gulf Stream, and/or the territorial waters of the State of Florida.

167.    The Oil Spill caused by one or more of the Drilling Defendants constitutes a private nuisance that has caused and will continue to cause injury to Plaintiffs and the Class, including monetary losses to Plaintiffs and the Class by depriving them of the ability to, among other things, engage in "for hire" game, sport fishing, and recreational boating charters businesses.

168.  One or more of the Drilling Defendants had actual and/or constructive knowledge of facts and circumstances prior to the Oil Spill that could have prevented the Oil Spill.

169.  One or more of the Drilling Defendants acted in an intentional and unreasonable, and/or negligent, grossly negligent, reckless, willful, and wanton manner in creating the private nuisance described herein.

170. Alternatively, the private nuisance described herein is the result abnormally dangerous activities of one or more of the Drilling Defendants.

171.    One or more of the Defendants are liable to Plaintiffs and the Class for injuries, and actual, special, and punitive damages sustained as the direct and proximate result of the private nuisance.

**COUNT VI**
**STRICT LIABILITY FOR PRODUCT DEFECT**
**(Against Defendant Cameron)**

172.    Plaintiffs repeat, reallege and make a part hereof each and every allegation contained in the preceding sections of this Action and incorporate same by reference as though fully set forth herein.

173.    At all times relevant hereto, Defendant Cameron was in the business of designing, manufacturing, marketing, selling, and/or distributing the BOP device(s) and system(s) used in connection with the drilling operations onboard the *Deepwater Horizon*.

174.    Defendant Cameron sold and delivered the BOP device(s) and system(s) at the *Deepwater Horizon* to Defendant Transocean in 2001.

175.    The BOP device(s) and system(s) on the *Deepwater Horizon* supplied by Defendant Cameron failed to operate as intended, if at all, and thus proximately caused and contributed to the blowout and subsequent Oil Spill.

176.    Defendant Cameron's BOP device(s) and system(s) on the *Deepwater Horizon* site were defectively designed and/or manufactured such that they did not operate as intended to prevent or minimize blowouts, which caused and or contributed to the Oil Spill.

177.    As a result of the defect(s), a massive discharge of oil has emanated from the *Deepwater Horizon* site and has and will continue to injure Plaintiffs and the Class.

178.    Upon information and belief, at the time the BOP device(s) and system(s) used at the *Deepwater Horizon* site left Defendant Cameron's control, they were in a defective condition

unreasonably dangerous to Plaintiffs and the Class in that they were designed and manufactured with over 260 known defects and failure modes, including but not limited to:

h.      Inadequate, faulty, nonfunctioning and defective battery systems;

i.      Inadequate, faulty, nonfunctioning and defective dead man switches and related wiring;

j.      The absence of acoustic triggers;

k.      Inadequate, faulty, nonfunctioning and defective emergency disconnect systems (EDS);

l.      Improperly sealed, leaky hydraulic systems;

m.      Improperly designed, manufactured, and installed annular seals;

n.      Insufficiently robust shear rams;

o.      Insufficient warnings, instructions, and guidelines on permissible, foreseeable uses and modifications to the BOP and its component parts;

p.      Insufficient testing and design verification of the BOP and its component parts to ensure the shearing capability of the ram and other functioning of the BOP during reasonably foreseeable uses; and

q.      In such other particulars as the evidence may show.

179.    Upon information and belief, at the time the BOP device(s) and system(s) used at the *Deepwater Horizon* site left Defendant Cameron's control, Defendant Cameron knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

180.    Upon information and belief, at the time the BOP device(s) and system(s) used at the *Deepwater Horizon* site left Defendant Cameron's control, feasible design alternatives existed which would have to a reasonable probability prevented the harm suffered by Plaintiffs and the Class without impairing the utility, usefulness, practicality or desirability of the BOPs.

181.    Upon information and belief, at all relevant times the BOP device(s) and system(s) used on the *Deepwater Horizon* site were used in an intended and/or reasonably foreseeable manner.

182.    Plaintiffs and the Class were foreseeable bystanders and victims of the manifestation of the defects in the *Deepwater Horizon*'s BOP device.

183.    The Defendant Cameron had actual and/or constructive knowledge of the facts and circumstances relative to the BOP which caused or contributed to this incident, which in turn caused Plaintiffs' and the Class Members' injuries, and its actions and inactions were grossly negligent, reckless, willful, and/or wanton.

184.    As a result of the defect(s) in Defendant Cameron's product, Plaintiffs and the Class Members are entitled to a judgment finding Defendant Cameron liable to Plaintiffs and the Class for damages suffered in an amount to be determined by the trier of fact, including but not limited to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, for themselves, and on behalf of all others similarly situated, demand judgment against Defendants, jointly and severally, as follows:

A.    an order certifying the class for the purpose of going forward with any one or all of the causes of action alleged herein; appointing Plaintiffs as the class representatives; and appointing undersigned counsel as counsel for the class;

B.    economic and compensatory damages in the amounts to be determined at trial,

C.    punitive damages in an amount sufficient to punish the Defendants' for their conduct;

D.    pre-judgment and post-judgment interest at the maximum rate allowable by law;

E.    attorney's fees and costs of litigation;

F.      such other and further relief available under all applicable state and federal laws

and any relief the Court deems just and appropriate;

**<u>JURY TRIAL DEMANDED</u>**

Plaintiffs demand trial by jury.

Respectfully submitted,

Dated:  April 20, 2011                              /s/ Kevin R. Dean
                                                   MOTLEY RICE LLC
                                                   Kevin R. Dean (*admitted pro hac vice*)
                                                   28 Bridgeside Blvd.
                                                   Mount Pleasant, SC  29464
                                                   Pho:  (843) 216-9000
                                                   Fax:  (843) 216-9450
                                                   kdean@motleyrice.com

                                                   *Attorneys for Plaintiffs*