# IN THE UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | SECTION:  J |
| | * | |
| Applies to:  *All Cases in Pleading* | * | JUDGE BARBIER |
| *Bundle Section III.B(3).* | * | |
| | * | MAGISTRATE SHUSHAN |

* * * * * * * * * * * * * * * * * * *


## NALCO COMPANY, NALCO HOLDINGS LLC, NALCO FINANCE HOLDINGS LLC AND NALCO HOLDING COMPANY'S REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS MASTER COMPLAINT "B3 BUNDLE"


Thomas J. Heiden
Mary Rose Alexander
LATHAM & WATKINS LLP
233 South Wacker Dr.
Suite 5800
Chicago, IL 60606-6401
Phone: (312) 876-7700


April 29, 2011

Case 2:10-md-02179-CJB-DPC   Document 2206   Filed 04/29/11   Page 2 of 32

# TABLE OF CONTENTS

                                                                                              **Page**

I.    INTRODUCTION ................................................................................................................1

II.   LEGAL ARGUMENT ........................................................................................................5

    A.    The B-3 Master Complaint Is Preempted By Federal Law (All Counts) ...............5

    B.    Nalco Is Immune From Suit Pursuant To The CWA And State Law (All
        Counts).....................................................................................................................12

    C.    The Economic Loss Doctrine Bars Portions Of The Master Complaint
        Against Nalco (All Counts) ...................................................................................17

    D.    The Master Complaint Fails To Properly Plead Claims For Negligence
        And Strict Liability Against Nalco (Counts VI & X) ............................................17

    E.    The Florida Plaintiffs Fail To State A Claim Against Nalco For Medical
        Monitoring (Count IX) ..........................................................................................21

    F.    Plaintiffs Are Not Entitled To Punitive Damages (Count XI).............................22

    G.    The Master Complaint Fails To State A Claim For Relief Against Nalco
        Holdings LLC, Nalco Finance Holdings LLC And Nalco Holding
        Company  (All Counts)..........................................................................................22

III.  CONCLUSION.................................................................................................................23

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009) .................................................................... 4, 18, 21

*AT&T Mobility LLC v. Concepcion,*
No. 09-893, 2011 WL 1561956 (U.S. Apr. 27, 2011)............................................ 10

*Bagby Elevator Co. v. Schindler Elevator Corp.,*
609 F.3d 768 (5th Cir. 2010) ................................................................. 19

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................... passim

*Black v. N. Panola Sch. Dist.,*
461 F.3d 584 (5th Cir. 2006) ............................................................ 15, 17, 22

*Burks v. Abbott Labs.,*
Civil No. 08-3414 (JRT/JSM), 2010 WL 1576779 (D. Minn. Apr. 20, 2010)........................ 20

*Caillouet Land Corp. v. Chevron Pipe Line Co.,*
Civil Action No. 06-10533, 2007 U.S. Dist. LEXIS 48364 (E.D. La. July 3, 2007) ............... 16

*Cape Flattery Ltd. v. Titan Maritime LLC,*
607 F. Supp. 2d 1179 (D. Haw. 2009)........................................................ 16

*Carden v. Gen. Motors Corp.,*
509 F.3d 227 (5th Cir. 2007) ................................................................ 5

*David v. Assumption Parish Police Jury,*
No. Civ. A. 02-765, 2003 WL 57039 (E.D. La. Jan. 6, 2003)............................. 17, 22

*Duncan v. Walker,*
533 U.S. 167 (2001) ........................................................................ 14

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
373 U.S. 132 (1963) ......................................................................... 6

*Geier v. Am. Honda Motor Co.,*
529 U.S. 861 (2000) ......................................................................... 9

*Hines v. Davidowitz,*
312 U.S. 52 (1941) ........................................................................ 6, 9

*In re S. Scrap Material Co.*,
    541 F.3d 584 (5th Cir. 2008) ................................................................. 16

*In re: Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
    175 F. Supp. 2d 593 (S.D.N.Y. 2001) .................................................... 10

*In re: Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
    457 F. Supp. 2d 324 (S.D.N.Y. 2006) .................................................... 10

*Kemp v. G.D. Searle & Co.*,
    103 F.3d 405 (5th Cir. 1997) ................................................................. 16

*Kerr v. Phillip Morris USA, Inc.*,
    Cause No. 1:09cv482-LG-RHW, 2010 WL 1177311 (S.D. Miss. Mar. 25, 2010) .................. 20

*Lovelace v. Software Spectrum, Inc.*,
    78 F.3d 1015 (5th Cir. 1996) ................................................................... 7

*Matrixx Initiatives, Inc v. Siracu-Sano*,
    131 S. Ct. 1309 (2011) ......................................................................... 21

*Papasan v. Allain*,
    478 U.S. 265 (1986) ............................................................................. 19

*Romero v. Becken*,
    256 F.3d 349 (5th Cir. 2001) ............................................................ 17, 22

*Smith v. Louisville Ladder Co.*,
    237 F.3d 515 (5th Cir. 2001) ................................................................. 20

*Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) ................................................................. 18

*Steen v. Medtronic, Inc.*,
    Civil Action No. 3:10-CV-936-L, 2010 WL 2573455 (N.D. Tex. June 25, 2010) ............... 18

*TRW, Inc. v. Andrews*,
    534 U.S. 19 (2001) .............................................................................. 14

*Turner v. Murphy Oil USA, Inc.*,
    Civil Action No. 05-4206, 2007 WL 2407310 (E.D. La. Aug. 20, 2007) ...................... 16

*United States v. Conoco*,
    916 F. Supp. 581 (E.D. La. 1996) ............................................................. 9

*United States v. Murphy Exploration & Prod. Co.*,
    939 F. Supp. 489 (E.D. La. 1996) ............................................................. 8

*United States v. Radley,*
   632 F.3d 177 (5th Cir. 2011) ................................................................. 14

*Unocal Corp. v. United States,*
   222 F.3d 528 (9th Cir. 2000) ................................................................. 15

*Williamson v. Mazda Motor of Am., Inc.,*
   Case No. 08-1314, 2011 U.S. LEXIS 1711 (U.S. Feb. 23, 2011) ............................ 5

## STATUTES

33 U.S.C. § 1321 ................................................................................. 13, 14

33 U.S.C. § 1321(c) ................................................................................. 16

33 U.S.C. § 1321(c)(1) ............................................................................... 1

33 U.S.C. § 1321(c)(1)(A) ............................................................................ 6

33 U.S.C. § 1321(c)(4)(A) ..................................................................... passim

33 U.S.C. § 1321(c)(4)(C) ........................................................................... 14

33 U.S.C. § 1321(c)(6) .............................................................................. 14

33 U.S.C. § 1321(d)(2)(F)-(G) .............................................................. 2, 6, 11

33 U.S.C. § 2701 ................................................................................. 13, 14

33 U.S.C. § 2702 .................................................................................... 14

33 U.S.C. § 2702(a) .................................................................................. 14

33 U.S.C. § 2702(b) ............................................................................. 13, 14

33 U.S.C. § 2703(a) .................................................................................. 15

Ala. Code § 6-5-332.2(c) ............................................................................. 15

Fla. Stat. § 376.09(5) ............................................................................... 15

La. Rev. Stat. Ann. § 30:2466B ...................................................................... 15

Miss. Code Ann. § 49-18-5 ........................................................................... 15

Tex. Nat. Res. Code Ann. § 40.104(b) ................................................................ 15

**OTHER AUTHORITIES**

*Black's Law Dictionary* 1062 (8th ed. 2004)................................................................................. 19

**RULES**

Fed. R. Civ. P.  12(b)(6)......................................................................................................... 1

Defendants Nalco Company ("Nalco"), Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company (collectively, the "Nalco Entities") respectfully state as follows in further support of their Motion to Dismiss the Master Complaint "B3 Bundle" (Rec. No. 1409) ("Motion") pursuant to Federal Rule of Civil Procedure 12(b)(6):[1]

## I.     INTRODUCTION

In their Omnibus Memorandum in Opposition to Motions to Dismiss Bundle B3 Master Complaint (Rec. Doc. 1815) ("Opposition"), Plaintiffs explicitly or implicitly admit the fundamental premises of the Nalco Entities' Motion.  Plaintiffs admit that:

- Nalco did not cause the blowout or explosion on the *Deepwater Horizon*.  Nalco did not cause the resulting oil spill (the "Spill").  Nalco had absolutely nothing to do with these events.

- Pursuant to a long-established federal regulatory scheme – promulgated in the Clean Water Act ("CWA") (as amended by the Oil Pollution Act ("OPA")) and the National Contingency Plan ("NCP") – the Gulf Coast Regional Response Teams ("RRTs"), which included representatives of the States of Louisiana, Texas, Alabama, Mississippi and Florida, had pre-approved the use of dispersants, like COREXIT®, in the Gulf.

- Pursuant to that same federal scheme, the United States Environmental Protection Agency ("USEPA") (with authority delegated by the United States President) pre-listed COREXIT® on the NCP Product List.

- Pursuant to that same federal scheme, the President of the United States is mandated to "ensure effective and immediate removal of a discharge" in a manner consistent with the NCP and the Area Contingency Plan ("ACP").  33 U.S.C. § 1321(c)(1).  In exercising that mandate, the President "shall" prepare and publish an NCP, including a schedule

---

[1]      Pursuant to Pre-Trial Order No. 25, Nalco's Motion to Dismiss is deemed to be a motion to dismiss all claims pending against Nalco in this multi-district litigation proceeding, including: *Ezell v. BP, plc, et al.*, Case No. 10-cv-01920; *Harris, et al. v. BP, plc, et al.*, Case No. 10-cv-02078; *Wright, et al. v. BP, plc, et al.*, Case No. 10-cv-03263; *Capt Ander, Inc. v. BP, plc, et al.*, Case No. 10-cv-04205; *Petitjean, et al. v. BP, plc, et al.*, Case No. 10-cv-04201; *Monroe v. BP, plc, et al.*, Case No. 10-cv-04194; *Hill v. BP, plc, et al.*, Case No. 10-cv-04193; *Hudley v. BP, plc, et al.*, Case No 10-cv-04200; *Trehern v. BP, plc, et al.*, Case No. 10-cv-04213; *Brooks v. Tidewater Marine, L.L.C., et al.*, Case No. 11-cv-00365; *Best v. BP, plc, et al.*, Case No. 11-cv-00772; *Pearson v. BP Exploration & Prod., et al.*, Case No. 11-cv-00863; *Black v. BP Exploration & Prod., et al.*, Case No. 11-cv-00867; *Irelan v. BP Am., Inc., et al.*, Case No. 11-cv-00881; *Coco v. BP, plc, et al.*, Case No. 11-cv-00946; *Alexander, et al. v. BP Exploration & Prod., et al.*, Case No. 11-cv-00951; and any and all claims identified as being part of the B3 Bundle. (Pre-Trial Order No. 25 ¶ 5, Rec. No. 983.)

identifying (a) dispersants that may be used, (b) the waters in which such dispersants may be used, (c) the procedures and techniques for dispersing the oil, and (d) the quantities of such dispersants that can be used safely in such waters. *Id.* § 1321(d)(2)(F)-(G).

- In response to the April 20, 2010 Spill, the President's delegates decided to use dispersants in the Gulf of Mexico consistent with the NCP and the RRTs' dispersant policies. They decided how and where and when to use dispersants. They decided for how long to use dispersants. They decided the quantities of dispersants that could be used safely in those waters. They made these decisions every day for months as they were mandated to do by federal law.

- Nalco – on the other hand – did not make any of those decisions. Nor do Plaintiffs allege that Nalco did. Nalco did not decide to use dispersants in the Gulf. Nalco did not decide to use COREXIT®. Nalco did not decide where to use dispersants. Nalco did not decide when to use dispersants. Nalco did not decide in what quantities to use dispersants. Nalco did not decide for how long dispersants should be used.

- The United States asked Nalco to supply its product because "chemical dispersants are essential to the oil spill response and clean-up effort," as an "invaluable benefit to this country . . . in a time of great national need." (July 12, 2010 FOSC Letter (Exh. A to Nalco's Mem. in Supp.).)

None of this is in dispute. Moreover, in response to the Nalco Entities' Motion, Plaintiffs filed their First Amended Master Complaint "B3 Bundle" (Rec. No. 1805-1) ("Amended Complaint"), voluntarily dismissing certain Nalco Entities in their entirety and certain claims against Nalco. Specifically, Plaintiffs dismissed:

- All claims against Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company, none of whom are named in the Amended Complaint.

- All claims against the Nalco Entities for economic loss including damages under the OPA, lost profits under tort law, loss of earning capacity and damage to real and/or personal property. (Amended Compl. ¶ 197.)

- All claims against the Nalco Entities for gross negligence, negligence *per se*, nuisance and battery. (*Id.* ¶¶ 250-263, 280-298 (excluding Chemical Manufacturer Defendants from such Counts).)

- Their strict liability claim under the Florida Pollutant Discharge Prevention and Control Act.

Having admitted the fundamental premises of Nalco's Motion and having been forced to

dismiss the bulk of their claims, Plaintiffs are left with very little in opposition to Nalco's Motion. Indeed, Plaintiffs spend much of their response arguing that responders should nonetheless be held accountable for their actions in conducting response activities. (Opp. at 2.) Yet, as Plaintiffs must admit, none of these arguments have any applicability to Nalco who had no involvement in any response activities or decisions other than to supply a product specifically requested by the government. As set forth in detail below, even the limited arguments Plaintiffs make as to Nalco fall far short.

*First,* having admitted that the delegates of the President of the United States – and not Nalco – decided to use Nalco's product in the amounts, quantities and locations deemed safe for the Gulf of Mexico and the President's delegates did so pursuant to the mandates required of them by federal law, Plaintiffs try to remake Nalco's preemption claims and then simply recite hornbook conflict preemption law and argue that Nalco has not demonstrated "impossibility." Nalco's preemption argument is not premised (as Plaintiffs wish) solely on the fact that COREXIT® was pre-approved on the NCP Product List or actually selected for use in response to the Spill, but on the entire pervasive federal scheme of the CWA and NCP. The federal scheme, which Plaintiffs barely acknowledge, is premised on the availability of responders and response products, like dispersants. The federal scheme places all decisions necessary to respond to an oil spill in the hands of the President or his delegates. Plaintiffs' complaint flies in the face of this federal scheme by challenging its very premise and the decisions the President was mandated to make. It is a clear obstacle to the accomplishment and execution of this pervasive federal scheme.

Moreover, where, as here, an obstacle exists to the execution of a pervasive federal scheme, "impossibility" need not be demonstrated. Nevertheless, Nalco did in fact demonstrate

the impossibility of COREXIT® being "unreasonably dangerous" and "defective" under maritime or state law while at the same time it was mandated and directed for use in the Gulf of Mexico in a manner and quantity deemed *safe* by the President's delegates. (Nalco's Mem. in Supp. at 4, 16-21, Rec. No. 1409-1.)

*Second*, under 33 U.S.C. § 1321(c)(4)(A) and the laws of the Gulf Coast states, Nalco cannot be held liable for damages resulting from its participation in the Spill response, other than for personal injury damages or damages arising from gross negligence or willful misconduct. Negligence alone is not actionable.  Plaintiffs cite no authority to support their argument that Nalco is not entitled to the immunity expressly conferred on responders by 33 U.S.C. § 1321(c)(4)(A).  Further, their baseless and strained interpretation of that provision conflicts with well-established principles of statutory interpretation.  Section 1321(c)(4)(A) applies to Nalco and Nalco did not engage in any conduct outside of that for which it is immune.  And, of course, Plaintiffs offer no comment on the devastating impact should this unequivocal immunity be denied its intended protection – no responders would respond to the government at "a time of great national need."

*Third*, Plaintiffs fail to satisfy the federal pleading standard set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).  Under that standard (which has not been changed by recent Supreme Court jurisprudence as Plaintiffs suggest), a complaint must be dismissed if it fails to plead facts sufficient to allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.  The Amended Complaint fails to raise a reasonable inference that COREXIT® was defectively designed, or that Nalco was negligent or grossly negligent in its manufacture, marketing, sale or distribution of COREXIT® and thus, Plaintiffs' negligence and

4

strict liability claims must be dismissed.

*Fourth*, under either maritime law or applicable state law, Plaintiffs cannot recover medical monitoring damages. Thus, Plaintiffs' medical monitoring claim must be dismissed.

*Fifth*, punitive damages are unavailable under maritime law and Plaintiffs have no independent cause of action for punitive damages. By failing to address the availability of punitive damages in their Opposition, Plaintiffs have waived this claim.[2]

For these numerous independent reasons, discussed in more detail below and in Nalco's Memorandum, the Amended Complaint does not and cannot assert a claim upon which relief can be granted against the Nalco Entities. It should be dismissed in its entirety as a matter of law.

## II.     LEGAL ARGUMENT

### A.     The B-3 Master Complaint Is Preempted By Federal Law (All Counts)

In addition to admitting the fundamental underpinnings of Nalco's preemption claim, Plaintiffs do not dispute the important principles of conflict preemption. Plaintiffs do not dispute that "[u]nder the Supremacy Clause, federal law will preempt state law when Congressional intent to preempt may be inferred from the existence of a pervasive federal regulatory scheme, or when state law conflicts with federal law or its purposes." (Nalco's Mem. in Supp. at 15 (quoting *Carden v. Gen. Motors Corp.*, 509 F.3d 227, 230 (5th Cir. 2007), *overruled in part by Williamson v. Mazda Motor of Am., Inc.*, Case No. 08-1314, 2011 U.S. LEXIS 1711 (U.S. Feb. 23, 2011)).) Nor do they dispute that conflict preemption exists "where, as here, a party cannot

---

[2]     Plaintiffs significantly altered their punitive damages claim when they filed the Amended Complaint. In allowing Plaintiffs to amend their complaint, the Court stated that "an answer or other response to the original B3 Master Complaint . . . shall also be deemed to answer or otherwise respond to the First Amended B3 Master Complaint." (Mar. 30, 2011 Order (Rec. Doc. 1811).) The arguments set forth in the Memorandum in Support of Nalco's Motion to Dismiss apply with equal force to the claims in the Amended Complaint. In the event that all claims are not dismissed, Nalco preserves all of its rights with respect to the new "Twelfth Claim for Relief" that was added via the Amended Complaint after the instant motion to dismiss was filed.

comply with both state/maritime and federal law *or* if the state/maritime law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (*Id.* at 16 (citing *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963); *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (emphasis supplied).)  Indeed, Plaintiffs rely on the very same seminal decisions as does Nalco.  (*Compare* Nalco's Mem. in Supp. at 16, *with* Opp. at 5-6.)  From there, however, Plaintiffs twist the law and the facts in an uncompelling attempt to prevent the inevitable preemption of all of their state and maritime claims.  Plaintiffs are wrong.

Plaintiffs contend that Nalco has not demonstrated "impossibility."  (Opp. at 5.)  Yet, there are two separate standards available to demonstrate conflict preemption – the "obstacle" standard and the "impossibility" standard.  *See, e.g.*, *Fla. Lime & Avocado Growers*, 373 U.S. at 142-43; *Hines*, 312 U.S. at 67.  Plaintiffs focus almost entirely on the "impossibility" standard as they have virtually no response to the clear "obstacle" their state and maritime claims pose to the accomplishment of the objectives of the CWA and the NCP.  Plaintiffs' claims are founded on the theory that COREXIT® is too dangerous to have been used in the Gulf on the Spill, while the USEPA and the Federal On-Scene Coordinator ("FOSC") decided that it was not.  The President was expressly required to "ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge, of oil" in accordance with the NCP and ACP.  *See* 33 U.S.C. § 1321(c)(1)(A).  Under the NCP, such actions *shall* include identifying dispersants that may be used, the waters in which such dispersants may be used, the procedures and techniques for dispersing the oil, and the quantities of such dispersants that can be used safely in such waters.  *Id.* § 1321(d)(2)(F)-(G).  Maritime and state law cannot declare these mandatory federal decisions unlawful.

Nalco's preemption claim is not limited (as Plaintiffs wish) to the undisputed fact that its

product was pre-approved by the USEPA as a dispersant for use in response to an oil spill like this. That same federal statutory scheme covers the entire "product cycle" of the use of dispersants to mitigate an oil spill. Indeed, each aspect of that CWA/NCP federal scheme is challenged by Plaintiffs' allegations. In the face of this mandatory federal law, it cannot be unlawful under maritime or state law to: (a) supply a pre-listed product, (b) at the direction of the U.S. Coast Guard ("USCG"), (c) for use in the Gulf, (d) at locations directed by the FOSC, (e) through procedures and techniques directed by federal and state agencies, and (f) in quantities determined by the FOSC and federal and state agencies as safe in such waters. Plaintiffs' claims are a clear obstacle to the implementation of the CWA and the NCP.

Plaintiffs' response to Nalco's obstacle-based conflict preemption argument is to suggest that Nalco relies on facts outside of the pleadings. (Opp. at 8.) Courts may, of course, consider facts not specifically alleged in the complaint when considering a 12(b)(6) motion. *See, e.g.*, *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996) (in ruling on a motion to dismiss, court may consider, in addition to facts alleged in the pleadings, "matters of which [it] may take judicial notice"); Nalco's Mem. in Supp. at 2 n.2 (citing cases).

Plaintiffs also say that the mandatory federal scheme somehow contradicts the allegations in their Amended Complaint. (Opp. at 8.) This proves Nalco's point. It does not matter if the President's delegates made bad decisions (in the event, contrary to the judicially-noticed facts, they did make bad decisions, which Nalco contends they did not) in deciding the amounts, location and manner that dispersants should be applied in response to the Spill. Nor does it matter if the USEPA (contrary to those same judicially-noticed facts) made a bad decision in listing COREXIT® on the NCP Product List. What matters is that under the CWA and NCP, the President and his delegates were given the sole authority – indeed, mandate – to make these

decisions to respond to an oil spill of national significance like this one.[3]  If the President and his delegates made bad decisions, such decisions are the prerogative of the federal legislative scheme and they are not to be challenged under state and maritime law (much less against someone who was not the decision maker).  If the Plaintiffs' allegations "contradict" the mandates of the federal statute, they are an obstacle to the accomplishment and execution of the CWA, and thus preempted.

Similarly, Plaintiffs poke fun at Nalco's claim that responders will simply not respond to future disasters if the President's decisions under the CWA are ultimately subject to challenge under state or maritime law.  (Opp. at 8-9.)  They claim that such considerations are "meritless." (*Id.* at 9.)  Plaintiffs are wrong.  This is not a joking matter but a very real and serious concern further demonstrating the obstacle presented to the CWA/NCP scheme presented by Plaintiffs' flawed allegations.  The fundamental purpose of the CWA, as amended by OPA, is to ensure that the United States is prepared to respond to a national oil spill disaster.  *See United States v. Murphy Exploration & Prod. Co.*, 939 F. Supp. 489, 491 n.2 (E.D. La. 1996) ("The OPA amended, expanded and strengthened the requirements of pre-existing statutes that addressed oil spill cleanup, liability, and compensation. . . . [and] amended the [CWA] to expand the oversight

---

[3]     Admiral Thad Allen, the National Incident Commander, made clear that the FOSC evaluated and approved each application of dispersants during the Spill response:

> It's not a decision by BP on whether or not to use dispersants.  ***It's a decision by the [FOSC] whether to approve the incident commander's recommendation to use dispersants*** once they've been located by surveillance aircraft and has [sic] an opportunity to use them.  It's a very disciplined doctrinal process on how this works.  In the end it may be executed by BP through a contractor.  ***But these are all decisions made by the [FOSC] because that's where the responsibility rests.***

(Transcript, Press Briefing by National Incident Commander Admiral Thad Allen 2 (Aug. 1, 2010), http://www.restorethegulf.gov/release/2010/08/01/transcript-press-briefing-national-incident-commander-admiral-thad-allen-0) (emphasis supplied) (Exh. G to Nalco's Mem. in Supp.).)

and cleanup responsibilities of the federal government.") (quoting *United States v. Conoco*, 916 F. Supp. 581, 585 (E.D. La. 1996)). It is critical to the implementation and execution of this goal to have in place responders and response products available to the President in a time of national need. Congress' intent is not "meritless." Plaintiffs' allegations, on the other hand, threaten the very existence of the federal scheme.

Plaintiffs attempt to distinguish *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000). (Opp. at 7-8.) Plaintiffs are wrong. In *Geier*, the plaintiff alleged that her car, while equipped with manual shoulder and lap belts, was defective under state law because it was not equipped with airbags. Honda, however, had complied with the Federal Motor Vehicle Safety Standard promulgated by the Department of Transportation under the authority of the National Traffic and Motor Vehicle Safety Act of 1966 requiring auto manufacturers to equip some but not all of their 1987 vehicles with passive restraints. The Supreme Court held that the state law claim was preempted because it "stood 'as an obstacle to the accomplishment and execution of' the important means-related federal objectives [allowing a gradual passive restraint phase-in] that we have just discussed." *Geier*, 529 U.S. at 881 (quoting *Hines*, 312 U.S. at 67). According to Plaintiffs, this case is different because Plaintiffs are not seeking to dictate the use of a specific dispersant like the state law claim in *Geier* sought to impose the use of airbags. But the Plaintiffs are seeking to dictate different choices than those made by the President pursuant to the pervasive federal scheme of the CWA and the NCP. Like the state law claim in *Geier*, the Plaintiffs want to alter the federal scheme. They want to second guess the President's decision. They want to ignore that it is the President who "shall" decide to use dispersants, which dispersants, in which manner, in which waters and in quantities that are safe for such waters. Plaintiffs' claims – just like the state law claim in *Geier* – are a clear "obstacle" to the

9

implementation of the mandatory requirements of the CWA and the NCP.

Just this week the Supreme Court reaffirmed that where a state rule would frustrate the purpose of a federal statutory scheme, the state rule must yield. *See AT&T Mobility LLC v. Concepcion*, No. 09-893, 2011 WL 1561956 (U.S. Apr. 27, 2011). In *Concepcion*, the Court applied conflict preemption principles and held that Section 2 of the Federal Arbitration Act ("FAA") preempted a California rule that conditioned the enforceability of arbitration agreements on the availability of classwide arbitration procedures. The Court reasoned that because the California rule disfavored arbitration, it "[stood] as an obstacle to the accomplishment and execution of" the FAA's goal of promoting arbitration. *Id.* at *13 (quoting *Hines*, 312 U.S. at 67). Further, the Court held that Section 2's saving clause did not "suggest[] an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives." *Id.* at *7. As in *Conception*, Plaintiffs' claims frustrate Congress' determination. They stand as an "obstacle to the accomplishment and execution of" the CWA and NCP. *Id.* at *13.

This case is not similar to the lower court MTBE decisions upon which Plaintiffs rely. (Opp. at 7.) In those cases, the courts focused on the fact that the Clean Air Act did not dictate the selection of MTBE as an oxygenate in gasoline and therefore tort claims arising from the selection of MTBE were not an obstacle to the implementation of the Clean Air Act. *See In re: Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 457 F. Supp. 2d 324, 327, 337 (S.D.N.Y. 2006) (noting that USEPA "did not mandate the use of any one oxygenate" in reformulated gasoline and that the Clean Air Act "contains no language mandating that defendants have a choice among oxygenates"); *In re: Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 615 (S.D.N.Y. 2001) (explaining that the reformulated

gasoline program set forth in the Clean Air Act "does not mandate the use of MTBE"). In the CWA and the NCP, Congress did not dictate the choice of COREXIT® for use in the response to the Spill, but it did delegate all decisions related to the Spill response to the President and his delegates. According to the NCP, the President "shall" identify the dispersants that may be used, the waters in which such dispersants may be used, the procedures and techniques for dispersing the oil and the quantities of such dispersants that can be used safely in such waters. 33 U.S.C. § 1321(d)(2)(F)-(G). Unlike the gasoline manufacturers (who made the decisions to use MTBE, in what quantities, locations and manners), the federal government was required to make all of the decisions regarding the use of dispersants in response to the Spill. Nalco had no role whatsoever in these decisions that were made on a daily basis by the President and his delegates. Indeed, each application of dispersants was conducted under the FOSC's direction. (*See* Transcript, Press Briefing by National Incident Commander Admiral Thad Allen 2 (Exh. G to Nalco's Mem. in Supp.).) Nalco simply answered the call to provide its product in a "time of great national need." (July 12, 2010 FOSC Letter (Exh. A to Nalco's Mem. in Supp.).)[4]

Even if Plaintiffs' claims did not present an "obstacle" to the CWA's federal regulatory scheme (which they clearly do), it is, in fact, "impossible" for the President of the United States to have complete decision making authority in response to the Spill if such decisions violate state law by mandating the use of an "unreasonably dangerous" and "defective" product as Plaintiffs

---

[4]      The Amended Complaint alleges that the USEPA directed BP to change to a different chemical dispersant. The USEPA also, however, agreed with BP that no less toxic dispersant was available to adequately respond to the Spill. (Press Release, USEPA, EPA Releases First Round of Toxicity Testing Data for Eight Oil Dispersants (June 30, 2010),
http://yosemite.epa.gov/opa/admpress.nsf/d0cf6618525a9efb85257359003fb69d/2b73ee902b54e4f58525 7752006591fd!OpenDocument (stating that USEPA test results indicate that the eight oil dispersants tested, including Corexit 9500A, have roughly the same toxicity) (Exh. A hereto).) Nevertheless, it is the scheme itself – and not whether it resulted in the selection of COREXIT® or some other dispersant – that is threatened by Plaintiffs' allegations.

allege.  (Amended Compl. ¶¶ 208, 272, 311, 315, 319.)  Plaintiffs complain of each mandatory

decision that "shall" be made by the President under the CWA – Plaintiffs challenge the

selection of COREXIT®, the use of dispersants in the Gulf of Mexico, the waters in which

COREXIT® was used, the quantities of COREXIT® used and the methods for using

COREXIT®.  These are all decisions vested in the President under the CWA and NCP.  The

question is not whether it was "physically impossible to use a less toxic chemical dispersant" as

Plaintiffs suggest.  (Opp. at 5.)  The question is whether it was impossible for Nalco to comply

with the CWA – by supplying its pre-approved product at the request of the USCG in a "time of

great national need" (July 12, 2010 FOSC Letter (Exh. A to Nalco's Mem. in Supp.)) – and

state/maritime law, which according to Plaintiffs, Nalco somehow violated by virtue of the

President's decisions.  Plaintiffs cite no case to support their self-created "impossibility"

standard and there is none.

The bottom line is that – as Plaintiffs admit – Nalco did nothing more than supply a

product at the request of the United States in a "time of great national need," a product pre-

approved by the USEPA.  That product was then used in the locations, manner and the amounts

deemed safe as decided by the President, his delegates and the States whose laws Nalco allegedly

violated.  Plaintiffs' state and maritime law claims are preempted by the pervasive federal

scheme of the CWA and NCP followed in response to the Spill.  Plaintiffs' Amended Complaint

should be dismissed in its entirety as to the Nalco Entities.

**B.     Nalco Is Immune From Suit Pursuant To The CWA And State Law (All Counts)**

The CWA provides persons and entities responding to an oil spill with immunity for

"damages which result from actions taken or omitted to be taken in the course of rendering care,

assistance, or advice consistent with the National Contingency Plan or as otherwise directed by

the President relating to" an oil discharge.  33 U.S.C. § 1321(c)(4)(A).  In their Opposition,

Plaintiffs make the dubious assertion that § 1321(c)(4)(A) does not apply to bar their claims

against Nalco because those claims are not for damages resulting from actions taken to address

an oil spill.  (Opp. at 35.)  Plaintiffs are wrong.  This untenable claim is contravened by the

allegations in the Amended Complaint, which make clear that Plaintiffs' claims against Nalco

are based on their alleged exposure to COREXIT®.  (Amended Compl. ¶¶ 22, 148, 154, 157-

160, 192-193, 267, 275-276, 278, 313, 321-322, 326.)  Nalco provided COREXIT®, a product

that the USEPA previously approved and listed on the NCP Product List, at the request of the

federal government.  The FOSC expressly asked Nalco and its suppliers to "assist" the United

States by make COREXIT® during "a time of great national need."  (July 12, 2010 FOSC Letter

(Exh. A to Nalco's Mem. in Supp.).)  Clearly the "assistance" Nalco rendered was both

"consistent with the [NCP]" and "directed by the President" through his delegates.  33 U.S.C.

§ 1321(c)(4)(A).

　　Plaintiffs also argue that the "damages" for which § 1321(c)(4)(A) provides immunity are

limited by the definition of "damages" set forth in the OPA, 33 U.S.C. § 2702(b).  (Opp. at 36.)

Plaintiffs then conclude that because the damages they seek to recover are not among the

damages enumerated in § 2702(b), § 1321(c)(4)(A)'s responder immunity does not apply to bar

their claims.  Plaintiffs are wrong.  As an initial matter, Plaintiffs cite no case law in support of

this strained interpretation.  Further, their argument is doubly flawed.  *First*, Plaintiffs reason that

because the liability standard under the OPA, 33 U.S.C. § 2701, is the same standard established

by 33 U.S.C. § 1321, "damages" under § 1321 must mean the same thing as "damages" under

§ 2702(b).  As Plaintiffs point out, however, where Congress intended terms to have the same

meaning in § 1321 and the OPA, it clearly expressed that intention.  (*Id.* (noting that the

13

definitions of "removal costs" and "removal" under 33 U.S.C. § 2701 "are identical to those in

[CWA § 1321] "")); *see also* 33 U.S.C. § 1321(c)(6) (stating that "[f]or the purposes of this

subsection, the term 'responsible party' has the meaning given that term under section 1001 of

the [OPA]"). Congress could have but did not choose to define "damages" under § 1321 by

reference to or as defined in § 2702(b). Plaintiffs fail to provide any persuasive reason to

conclude that the provision in the CWA expressly providing responders with immunity against

claims for "damages" is limited to the OPA's definition of "damages" for which responsible

parties are liable.

> *Second*, Plaintiffs' interpretation of § 1321(c)(4)(A) is undermined by the fact that

§ 1321(c)(4)(C) makes responsible parties "liable for any removal costs ***and damages*** that

another person is relieved of under subparagraph (A)" (emphasis supplied). Interpreting

"damages" in subparagraph (A) to mean only the precise "damages" enumerated in § 2702(b)

renders § 1321(c)(4)(C) superfluous since, under § 2702, responsible parties are already liable

for the "damages" enumerated in § 2701. *See id.* § 2702(a) ("[E]ach responsible party . . . is

liable for the removal costs and damages specified in subsection (b) of this section . . . .").

Plaintiffs' interpretation of § 1321(c)(4)(A) runs counter to the well-established rule that courts

are to interpret statutes so as to avoid rendering any provision superfluous. *See TRW, Inc. v.

Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a

statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence,

or word shall be superfluous, void, or insignificant.'") (*quoting Duncan v. Walker*, 533 U.S. 167,

174 (2001)); *United States v. Radley*, 632 F.3d 177, 182 (5th Cir. 2011) (same). By its plain

terms, § 1321(c)(4)(A) renders Nalco exempt from liability for damages resulting from its

participation in the Spill response.[5]

Although the responder immunity set forth in § 1321(c)(4)(A) applies to Nalco, as Nalco acknowledged in its Memorandum, Plaintiffs' claims are not barred by § 1321(c)(4)(A) to the extent Plaintiffs seek to recover damages for personal injury or resulting from gross negligence or willful misconduct.  (Nalco's Mem. in Supp. at 21.)  Contrary to Plaintiffs' assertion, the cases they cite in their Opposition do not preclude dismissal of such claims where a complaint fails to satisfy the federal pleading standard.  For example, *Unocal Corp. v. United States*, 222 F.3d 528 (9th Cir. 2000) does not stand for the proposition that whether § 1321(c)(4)(A) applies to Nalco is "grounded in issues of fact that require adjudication."  (Opp. at 37.)  In *Unocal*, the court held that in order to avoid liability as a "responsible party," an owner/operator must satisfy 33 U.S.C. § 2703(a), which provides that a "responsible party" may establish a complete defense to liability "if it can establish, by a preponderance of the evidence, that . . . the discharge was caused solely by the act or omission of a third party" and the owner/operator exercised due care in operating the pipeline.  *Id*. at 534-36.  The court observed that the plain language of § 2703(a) requires an owner/operator to carry its "burden at trial" of establishing that a third party was responsible for the discharge in order to escape the strict liability the OPA imposes on responsible parties.  *Id*. at 535-36.  The case did not involve a motion to dismiss and the court did not hold or even suggest in dicta that determining an entity's status as a responder is a fact-specific inquiry.  Nalco's entitlement to responder immunity does not depend on a fact-specific

---

[5]     Alabama, Florida, Louisiana, Mississippi and Texas have provisions similar to § 1321(c)(4)(A) that provide immunity to responders, like Nalco, who provide assistance consistent with the NCP or at the direction or request of federal or state officials.  *See* Ala. Code § 6-5-332.2(c); Fla. Stat. § 376.09(5); La. Rev. Stat. Ann. § 30:2466B; Miss. Code Ann. § 49-18-5; Tex. Nat. Res. Code Ann. § 40.104(b).  Plaintiffs do not contest the application of these provisions to Nalco and, for the reasons set forth in Nalco's Memorandum, Nalco is immune under these state responder immunity statutes.  (Nalco's Mem. in Supp. at 22.); *see also Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (plaintiff abandoned claim by failing to defend it in response to motion to dismiss).

inquiry but on a straightforward reading of § 1321(c)(4)(A), and thus, can be determined on a motion to dismiss. *See, e.g., In re S. Scrap Material Co.*, 541 F.3d 584, 587 (5th Cir. 2008) (statutory interpretation is a question of law) (citing *Kemp v. G.D. Searle & Co.*, 103 F.3d 405, 407 (5th Cir. 1997)).

Plaintiffs' reliance on *Cape Flattery Ltd. v. Titan Maritime LLC*, 607 F. Supp. 2d 1179 (D. Haw. 2009), is similarly misplaced.  In that case, the court considered whether the plaintiff's indemnity and contribution claims against the defendant fell within the scope of an arbitration clause in the parties' contract.  *Id.* at 1189.  The court noted that the defendant was a responder under § 1321(c), and thus, in order to prevail on its contribution claim, the plaintiff would have to prove the defendant was grossly negligent.  *Id.*  Although the court recited the elements of a gross negligence claim, the court did not address whether the plaintiff alleged facts sufficient to state a claim for relief.  Rather, the court analyzed whether or not the duty the defendant allegedly breached arose from the parties' agreement, making it subject to the agreement's arbitration clause.  *Id.*  The court held that the duty did not arise from the agreement and thus, the plaintiff's claims were not subject to arbitration.  *Id.* at 1190-92.

In *Caillouet Land Corp. v. Chevron Pipe Line Co.*, Civil Action No. 06-10533, 2007 U.S. Dist. LEXIS 48364 (E.D. La. July 3, 2007) and *Turner v. Murphy Oil USA, Inc.*, Civil Action No. 05-4206, 2007 WL 2407310 (E.D. La. Aug. 20, 2007), the courts analyzed whether the plaintiffs had pleaded sufficient facts to sustain their claims against responder defendants.  Neither case supports the proposition that a complaint that, like the Amended Complaint, fails to plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" can survive a motion to dismiss.  *Twombly*, 550 U.S. at 555.  As set forth *infra* Section II(D), even if Plaintiffs' personal injury and gross negligence claims were not preempted (which

16

they are), Plaintiffs have failed to plead facts sufficient to support their claims against Nalco and their claims should be dismissed on that alternate basis.[6]

### C.   The Economic Loss Doctrine Bars Portions Of The Master Complaint Against Nalco (All Counts)

In its Memorandum, Nalco argued that Plaintiffs' claims for pure economic losses were barred by the economic loss doctrine.  (Nalco's Mem. in Supp. at 23-25.)  Plaintiffs' Amended Complaint clarifies that Plaintiffs do not seek to recover from Nalco damages under the OPA or tort law for lost profits, loss of earning capacity, or damages for real and/or personal property.  (Amended Compl. ¶ 197.)  Because Plaintiffs have abandoned their claims for pure economic losses from Nalco, the motion to dismiss as to these claims should be granted.  *See Black*, 461 at 588 n.1; *Romero v. Becken*, 256 F.3d 349, 354 n.2 (5th Cir. 2001); *David v. Assumption Parish Police Jury*, No. Civ. A. 02-765, 2003 WL 57039, at *8 (E.D. La. Jan. 6, 2003).[7]

### D.   The Master Complaint Fails To Properly Plead Claims For Negligence And Strict Liability Against Nalco (Counts VI & X)[8]

Under well-established federal pleading standards, to defeat Nalco's motion to dismiss, Plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face."

---

[6]     In their Amended Complaint, Plaintiffs expressly state that they do not assert claims for damage to real or personal property, lost profits or lost earning capacity against Nalco.  (Amended Compl. at 3 n.1, ¶ 197.)  However, the negligence and strict liability claims against Nalco state that Plaintiffs seek damages for "diminution of the value of their real and/or personal property, loss of income, loss of consortium and/or emotional distress."  (*Id.* ¶¶ 278, 326.)  To the extent Plaintiffs continue to press claims to recover these alleged damages, Nalco has immunity pursuant to § 1321(c)(4)(A).

[7]     In their Opposition, Plaintiffs assert that the economic loss doctrine does not bar their nuisance claim.  (Opp. at 18-20.)  This argument does not implicate Nalco since Plaintiffs' Amended Complaint makes clear that Plaintiffs do not assert a nuisance claim against Nalco.  (Amended Compl. ¶¶ 280-292.)

[8]     In its Memorandum, Nalco argued that Plaintiffs failed to properly plead claims for gross negligence, negligence, negligence *per se*, nuisance, battery and strict liability.  (Nalco's Mem. in Supp. at 25-35.)  Plaintiffs' Amended Complaint drops Plaintiffs' gross negligence, negligence *per se*, nuisance and battery claims against Nalco.  (Amended Compl. ¶¶ 250-263, 280-298.)  Further, the Amended Complaint drops the Florida Pollutant Discharge Prevention and Control Act cause of action.  Plaintiffs have abandoned these claims by excluding them from the Amended Complaint and failing to respond to Nalco's arguments for dismissal.  Thus, the motion to dismiss these claims should be granted.  *See Black*, 461 F.3d at 588 n.1; *Romero*, 256 F.3d at 354 n.2; *David*, 2003 WL 57039, at *8.

*Twombly*, 550 U.S. at 570.  That is, the complaint must allege sufficient facts to allow the court to "draw the reasonable inference that [Nalco] is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949.  Courts will not "strain to find inferences favorable to the plaintiffs" or "accept conclusory allegations, unwarranted deductions or legal conclusions."  *Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (quotation omitted).  In their Amended Complaint, Plaintiffs allege only "labels and conclusions" and "formulaic recitation[s] of the elements of" their negligence and strict liability claims against Nalco, rendering their claims insufficient as a matter of law.  *Twombly*, 550 U.S. at 555.

As set forth in Nalco's Memorandum, in addition to the fact that all of their claims are preempted (and Nalco is immune from most of their claims), Plaintiffs utterly fail to support their bare allegation that Nalco was negligent with respect to its manufacture, marketing, sale or distribution of COREXIT®.  (Nalco's Mem. in Supp. at 29-30.)  This deficiency is fatal to their negligence claim.  *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").  Plaintiffs' defective design negligence claim and strict products liability claim likewise fail as Plaintiffs have not identified a design defect in COREXIT®, relying instead on the inflammatory but conclusory claim that COREXIT® is "toxic."  *See Steen v. Medtronic, Inc.*, Civil Action No. 3:10-CV-936-L, 2010 WL 2573455, at *2 (N.D. Tex. June 25, 2010) (dismissing strict products liability claim where plaintiff made "no factual allegations showing *how* the pacemaker was 'defectively designed and unreasonably dangerous'" and simply "allege[d] in conclusory fashion that the pacemaker's defective design caused it to dislodge and cause [his] injuries"); *see also* Nalco's Mem. in Supp. at 33-34 (citing cases).  In their Opposition, Plaintiffs purport to identify allegations that "more than adequately satisf[y] *Iqbal/Twombly*."  (Opp. at 46 (citing B3 Master Compl. ¶¶ 66-67, 126-127).)  Yet, the

paragraphs from the original B3 Master Complaint on which they rely contain the unremarkable

allegation that Nalco manufactured dispersants used in the Spill response. Plaintiffs have failed

to allege facts that raise their entitlement to relief "above a speculative level," and their

negligence and maritime strict liability claims must be dismissed. *Twombly*, 550 U.S. at 555.

Although Plaintiffs' Amended Complaint does not name Nalco as a defendant to

Plaintiffs' gross negligence claim, Counts VI and X include the conclusory statement that "Nalco

had actual and/or constructive knowledge of the facts and circumstances relative to the

dispersants that caused or contributed to Plaintiffs' injuries, and its actions and inactions were . .

. grossly negligent, reckless, willful and/or wanton." (Amended Compl. ¶¶ 277, 325.) This

assertion, lacking any alleged factual support in the Complaint, is patently insufficient to plead

gross negligence, recklessness, willfulness and/or wantonness. *See Papasan v. Allain*, 478 U.S.

265, 286 (1986) (explaining that a court considering a motion to dismiss is "not bound to accept

as true a legal conclusion couched as a factual allegation"). Gross negligence requires evidence

of a conscious disregard "of a legal duty and of the consequences to another party." *Black's Law*

*Dictionary* 1062 (8th ed. 2004). Although Plaintiffs identify duties other Defendants supposedly

breached, (*see, e.g.*, Amended Compl. ¶¶ 243-244, 252-254), Plaintiffs fail to identify any duty

Nalco owed them.

In addition, Plaintiffs fail to allege any facts suggesting that Nalco "acted with conscious

indifference to [their] rights despite being aware of an extreme risk that it was causing

[Plaintiffs] harm." *Bagby Elevator Co. v. Schindler Elevator Corp.*, 609 F.3d 768, 773 (5th Cir.

2010). Plaintiffs assert that "Defendants recklessly, willfully and/or wantonly failed to use

reasonably safe dispersant chemicals or other chemicals" in the Spill response, (Amended

Compl. ¶ 184), but do not allege that Nalco decided what dispersant would be used on the Spill,

nor could they since Nalco did not make that decision. The Amended Complaint also makes the baseless assertion that "Nalco knew or should have known that its chemical dispersants would be applied beneath the surface of the water, on the surface of the water, and aerially from planes." (*Id.* ¶ 144.) The Complaint alleges that Plaintiffs working on Vessels of Opportunity were prevented from wearing respirators and were not warned of aerial spraying performed in their vicinity, (*id.* ¶¶ 150, 152, 156-158), and assert that Nalco knew or should have known "about the . . . unreasonably dangerous conditions that dispersants would present to Plaintiffs who were not properly equipped with protective gear." (*Id.* ¶¶ 272, 319.) Yet, the Amended Complaint fails to provide any reason to believe Nalco knew where COREXIT® would be dispersed, how it would be dispersed, or who might be exposed to COREXIT®. It had no such involvement in any of those decisions.

Plaintiffs' putative state law strict liability claims also fail as the Amended Complaint (like the original Complaint) omits required elements of a strict liability design defect claim under state law. *See Smith v. Louisville Ladder Co.*, 237 F.3d 515, 518 (5th Cir. 2001) (noting that Texas law provides that a safer design alternative is one that is economically and technologically feasible); *Burks v. Abbott Labs.*, Civil No. 08-3414 (JRT/JSM), 2010 WL 1576779, at *5 (D. Minn. Apr. 20, 2010) (motion to dismiss granted where complaint failed to describe burden of adopting alternative design or adverse effect of alternative design) (Louisiana law); *Kerr v. Phillip Morris USA, Inc.*, Cause No. 1:09cv482-LG-RHW, 2010 WL 1177311, at *2 (S.D. Miss. Mar. 25, 2010) (claim dismissed where plaintiff failed to allege product failed to function as expected) (Mississippi law). The Amended Complaint is utterly void of any allegations regarding the burdens of adopting an alternative design, the existence of economically and technologically feasible design alternatives, or COREXIT®'s failure to

perform as expected.  For these additional reasons, Plaintiffs' state law strict liability claims should be dismissed.

Finally, in their Opposition, Plaintiffs argue that a recent Supreme Court decision, *Matrixx Initiatives, Inc v. Siracu-Sano*, 131 S. Ct. 1309 (2011), "ma[kes] clear that the pleadings in the instant Complaint are well-pleaded." (Opp. at 45.)  Plaintiffs are wrong.  *Matrixx* involved a putative class action in which the Court analyzed pleading standards for materiality and scienter in the securities laws context.  Plaintiffs were shareholders who alleged that Matrixx's failure to disclose consumer reports of adverse reactions resulting from the use of its product constituted fraud under federal securities laws.  Matrixx moved to dismiss the complaint on the grounds that the plaintiffs had failed to allege that the incidents were statistically significant.  In its opinion, the Supreme Court rejected statistical significance as a bright-line standard for materiality or scienter.  *Id.* at 1314, 1324-25.

Unlike the defendant in *Matrixx*, Nalco does not urge this Court to adopt a new "bright-line" pleading rule.  Rather, Plaintiffs' claims fail under the well-established pleading standards set forth in *Twombly* and *Iqbal*.  Because the allegations in the Amended Complaint fail to raise a reasonable inference that COREXIT® was defectively designed, or that Nalco was negligent in its manufacture, marketing, sale or distribution of COREXIT®, Plaintiffs' negligence and strict liability claims against Nalco should be dismissed.  *See Iqbal*, 129 S. Ct. at 1949.

### E.    The Florida Plaintiffs Fail To State A Claim Against Nalco For Medical Monitoring (Count IX)

Florida Plaintiffs' medical monitoring claim fails because, as set forth in the BP Defendants' Reply, Florida law does not apply to this dispute.  (BP Defendants' Reply § III(B).) Either general maritime law or the law of the state in which this Court sits applies to Plaintiffs' request for medical monitoring.  (*Id.*)  Because medical monitoring for unmanifested injuries is

unavailable under either maritime law or Louisiana state law, Florida Plaintiffs' medical monitoring claim must be dismissed.

**F.      Plaintiffs Are Not Entitled To Punitive Damages (Count XI)**

In their Amended Complaint, Plaintiffs seek punitive damages based on Nalco's alleged reckless, willful and/or wanton design and use of chemical dispersants.  (Amended Compl. ¶¶ 348, 351.)  As set forth *supra* Section II(D), Nalco played no role in the use of chemical dispersants, nor do Plaintiffs allege that Nalco was involved in the use of dispersants.  In addition, the Amended Complaint fails adequately to plead gross negligence, willfulness and/or wantonness.  Thus, Plaintiffs fail to state a claim for punitive damages against Nalco.  Further, as set forth in Nalco's Memorandum, punitive damages are unavailable under general maritime law and Plaintiffs have no freestanding claim for punitive damages.  (Nalco's Mem. in Supp. at 36 (incorporating arguments in the BP Defendants' Motion to Dismiss §§ VII-VIII).)  In their Opposition, Plaintiffs utterly fail to address the availability of punitive damages.  Thus, they have abandoned their punitive damages claim and Count XI should be stricken. *See Black*, 461 F.3d at 588 n.1; *Romero*, 256 F.3d at 354 n. 2.

**G.      The Master Complaint Fails To State A Claim For Relief Against Nalco Holdings LLC, Nalco Finance Holdings LLC And Nalco Holding Company (All Counts)**

In their Amended Complaint, Plaintiffs do not name Nalco Holdings LLC, Nalco Finance Holdings LLC or Nalco Holding Company.  Because Plaintiffs no longer seek to recover from these Defendants, their motion to dismiss should be granted. *See Black*, 461 F.3d at 588 n.1; *Romero*, 256 F.3d at 354 n.2; *David*, 2003 WL 57039, at *8.

### III.   CONCLUSION

For all of these independent and alternative reasons, the Amended Complaint should be dismissed in its entirety as to Nalco.

Dated:  April 29, 2011                    Respectfully submitted,

By: /s/ Thomas J. Heiden
Thomas J. Heiden (IL # 6281563)
(thomas.heiden@lw.com)
Mary Rose Alexander (IL # 6205313)
(mary.rose.alexander@lw.com)
LATHAM & WATKINS LLP
233 South Wacker Dr., Suite 5800
Chicago, IL 60606-6401
Phone: (312) 876-7700
Facsimile: (312) 993-9767

*Attorneys for Nalco Company, Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing NALCO COMPANY, NALCO HOLDINGS LLC, NALCO FINANCE HOLDINGS LLC AND NALCO HOLDING COMPANY'S REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS MASTER COMPLAINT "B3 BUNDLE" has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 29th day of April, 2011.

/s/ Thomas J. Heiden
Thomas J. Heiden (IL # 6281563)
(thomas.heiden@lw.com)
Mary Rose Alexander (IL # 6205313)
(mary.rose.alexander@lw.com)
LATHAM & WATKINS LLP
233 South Wacker Dr.
Suite 5800
Chicago, IL 60606-6401
Phone: (312) 876-7700
Facsimile: (312) 993-9767

*Attorneys for Nalco Company, Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company*

# EXHIBIT A

# EPA Releases First Round of Toxicity Testing Data for Eight Oil Dispersants

Release date: 06/30/2010

Contact Information: press@epa.gov

**WASHINGTON** —The U.S. Environmental Protection Agency today released peer reviewed results from the first round of its own independent toxicity testing on eight oil dispersants. EPA conducted testing to ensure that decisions about ongoing dispersant use in the Gulf of Mexico continue to be grounded in the best available science.

EPA's results indicated that none of the eight dispersants tested, including the product in use in the gulf, displayed biologically significant endocrine disrupting activity. While the dispersant products alone – not mixed with oil - have roughly the same impact on aquatic life, JD-2000 and Corexit 9500 were generally less toxic to small fish and JD-2000 and SAF-RON GOLD were least toxic to mysid shrimp. While this is important information to have, additional testing is needed to further inform the use of dispersants.

"EPA is performing independent tests to determine the potential impacts of various dispersants. We will continue to conduct additional research before providing a final recommendation, " said EPA Administrator Lisa P. Jackson. "We want to ensure that every tool is available to mitigate the impact of the BP spill and protect our fragile wetlands. But we continue to direct BP to use dispersants responsibly and in as limited an amount as possible."

EPA continues to carefully monitor BP's use of dispersant in the Gulf. Dispersants are generally less toxic than oil and can prevent some oil from impacting sensitive areas along the Gulf Coast. EPA believes BP should use as little dispersant as necessary and, on May 23, Administrator Jackson and then-Federal On-Scene Coordinator Rear Admiral Mary Landry directed BP to reduce dispersant usage by 75 percent from peak usage. EPA and the Coast Guard formalized that order in a directive to BP on May 26. Over the next month BP reduced dispersant use 68 percent from that peak.

Before directing BP to ramp down dispersant use, EPA directed BP to analyze potential alternative dispersants for toxicity and effectiveness. BP reported to EPA that they were unable to find a dispersant that is less toxic than Corexit 9500, the product currently in use. Following that, EPA began its own scientific testing of eight dispersant products on the National Contingency Plan Product Schedule (NCP-PS). Those dispersant products are: Dispersit SPC 1000, Nokomis 3-F4, Nokomis 3-AA, ZI-400, SAF-RON Gold, Sea Brat #4, Corexit 9500 A and JD 2000. Today's results represent the first stage of that effort.

EPA tested these eight products for endocrine disrupting activity and potential impacts on small fish and mysid shrimp. The testing found:

- None of the eight dispersants tested displayed biologically significant endocrine disrupting activity.
- While all eight dispersants alone – not mixed with oil – showed roughly the same effects, JD-2000 and Corexit 9500 proved to be the least toxic to small fish, and JD-2000 and SAF-RON GOLD were the least toxic to the mysid shrimp.

The next phase of EPA's testing will assess the acute toxicity of multiple concentrations of Louisiana Sweet Crude Oil alone and combinations of Louisiana Sweet Crude Oil with each of the eight dispersants for two test species.

To view the first round of test results please visit: http://www.epa.gov/bpspill/dispersants-testing.html

Receive our News Releases Automatically by Email

Search This Collection | Search All Collections