# EXHIBIT 7

Ex 7
S. Rep. No. 83-411, at 31-41 (1953) ("Report to the Committee Submitted on Behalf of the Attorney General").

Calendar No. 441

| 83D CONGRESS<br>*1st Session* | SENATE | REPORT<br>No. 411 |
|---|---|---|

# OUTER CONTINENTAL SHELF LANDS ACT

## REPORT

TOGETHER WITH

## MINORITY VIEWS

FROM THE

### COMMITTEE ON INTERIOR AND INSULAR AFFAIRS
### SENATE OF THE UNITED STATES

TO ACCOMPANY

## S. 1901

A BILL TO PROVIDE FOR THE JURISDICTION OF THE
UNITED STATES OVER THE SUBMERGED LANDS OF
THE OUTER CONTINENTAL SHELF, AND TO AUTHORIZE
THE SECRETARY OF THE INTERIOR TO LEASE SUCH
LANDS FOR CERTAIN PURPOSES



JUNE 15 (legislative day, JUNE 8), 1953.—Ordered to be printed

UNITED STATES
GOVERNMENT PRINTING OFFICE
26006                                    WASHINGTON : 1953

OUTER CONTINENTAL SHELF LANDS ACT 31

of paragraphs (8), (9) and (10) of subsection (a) of this section, as to royalties and as to the term thereof and of any extensions, renewals, or replacements authorized therein or heretofore authorized by the laws of the State issuing or whose political subdivision or grantee issued such lease, or, if oil or gas was not being produced in paying quantities from such lease on or before December 11, 1950, or if production in paying quantities has ceased since December 11, 1950, of if the primary term of such lease has expired since December 11, 1950, then for a term from the effective date hereof equal to the term remaining unexpired on December 11, 1950, under the provisions of such lease or any extensions, renewals, or replacements authorized therein, or heretofore authorized by the laws of such State, and (2) such regulations as the Secretary may under section 5 of this Act prescribe within 90 days after making his determination that such lease meets the requirements of subsection (a) of this section."

Subsection (c) should be eliminated.

### SECTION 7

The title should read: "Disclaimer and Controversy over Jurisdiction."

The proposed subsection "(a)" should not be included (see Assistant Attorney General Rankin's letter to Acting Chairman Cordon, May 26, 1953, second full paragraph, p. 8, mimeographed copy).

Subsections "(b)" and "(c)" should be renumbered "(a)" and "(b)", respectively.

In line 3, page 20, "and" should be stricken and after "(17 F. R. 5833)," there should be inserted "and December 24, 1952 (18 F. R. 48),".

### SECTION 8

The word "sealed" before "bidding" in subsection (a) should not be added, as proposed (p. 20, line 11).

In subsection (b) "by regulation" should be eliminated, and "at the time" should be substituted for "in advance" (p. 21, lines 1 and 2).

The proposed subsections "(c)" and "(d)" should not be included. Subsections "(c)" and "(d)" should read as follows:

"(c) The Secretary is authorized to grant to the qualified persons offering the highest cash bonuses on a basis of competitive bidding leases of any mineral other than oil and gas in any area of the outer Continental Shelf not then under lease for such mineral upon such royalty, rental, and other terms and conditions as the Secretary may prescribe at the time of offering the area for lease.

"(d) No lease issued under this section shall in any event include uranium, thorium or any other material determined pursuant to paragraph (1) of subsection (b) of section 5 of the Atomic Energy Act of 1946 to be peculiarly essential to the production of fissionable material."

Subsections (h) and (i) should be added as follows:

"(h) The Secretary may cancel any lease obtained by fraud or misrepresentation.

"(i) Any person complaining of the cancellation of a lease by the Secretary may have the Secretary's action reviewed in the United States District Court for the District of Columbia by filing a petition for review within 60 days after the Secretary takes such action."

### SECTION 12

In subsection (b) substitute "any mineral" for "the oil and gas" (p. 24, line 3).

---

DEPARTMENT OF JUSTICE,
*Washington, May 26, 1953.*

Hon. GUY CORDON,
*Acting Chairman, Committee on Interior and Insular Affairs,*
*United States Senate, Washington, D. C.*

DEAR SENATOR CORDON: In compliance with your request to the Attorney General, I submit the following comparison of S. 1901 and H. R. 5134, with comments and suggestions.

In form, H. R. 5134 is an amendment to the Submerged Lands Act, whereas S. 1901 is an independent act. It seems immaterial which form is adopted. (For convenience of citation, the Submerged Lands Act as proposed to be amended by H. R. 5134 is designated herein as "House bill," with section numbers of that act, rather than of H. R. 5134 itself.)

S. Rept. 411, 83–1——5

32          OUTER CONTINENTAL SHELF LANDS ACT

*Definitions*

"Outer Continental Shelf" is defined identically in the 2 bills (S. 1901, sec. 2 (a); House bill, sec. 2 (i)).

"Secretary" is defined as the Secretary of the Interior in both bills (S. 1901, sec. 2 (b); House bill, sec. 2 (j)).

"Mineral lease" is defined by S. 1901, section 2 (c), as any form of authorization to explore for, develop, or produce minerals. The House bill, section 2 (k), defines "lease" as "including any form of authorization for the use, development, or production from lands beneath navigable waters or lands of the outer Continental Shelf and the natural resources therein and thereunder." This definition is grammatically defective, in that it does not specify what is to be used, developed, or produced. The Senate definition is also preferable in that it covers Federal as well as State leases. Reference to lands beneath navigable waters and the outer Continental Shelf is unnecessary in the definition, as the substantive provisions of the bill always specify, as they should for clarity, the particular area to which they relate. Mineral leases apparently are the only kind involved, at least at present, in this area; there may be a question whether it is desirable to define "leases" generally. The meaning of "lessee" seems to be an inevitable corollary of the definition of "lease," and no specific definition of it should be necessary.

"Person" is defined by S. 1901, section 2 (d), in the same way as by section 2 (h) of the present Submerged Lands Act. Being an amendment of the latter act, the House bill needs no new corresponding definition.

"Mineral Leasing Act" is defined by section 2 (l) of the House bill. S. 1901 does not refer to that act, and contains no such definition. It should be added if the Senate adopts the provisions of the House bill, or others referring to the Mineral Leasing Act.

*General provisions*

H. R. 5134, section 2, repeals section 11 (separability) of the Submerged Lands Act, and substitutes an identical section 21. S. 1901, section 12, is identical (except for provisions applicable only to the present Submerged Lands Act, and unnecessary in a separate act).

H. R. 5134, section 2, repeals section 10 of the Submerged Lands Act (revoking Executive Order No. 10426 as to lands beneath navigable waters) and substitutes section 19, revoking that order in toto (S. 1901, sec. 11, is identical with sec. 19 of the House bill).

H. R. 5134, section 2, repeals section 9 of the Submerged Lands Act (reserving Federal rights in the outer Continental Shelf), and substitutes sections 9–18, providing for leasing and exchange of leases in that area. S. 1901, being a separate act, not inconsistent with the Submerged Lands Act, needs no repealing provision; it makes corresponding, but different, provisions for leasing and exchange of leases, discussed below.

S. 1901, section 3, declares that the subsoil and seabed of the outer Continental Shelf are subject to the control of the United States, but that the overlying waters retain their character as high seas, and the right to their free and unimpeded navigation and the navigational servitude shall not be affected. Similar provisions are made by section 9 (a) of the House bill. Reference to the navigational servitude should be deleted. That is a right of the Federal Government in navigable waters of the United States; as these are not waters of the United States, the servitude does not exist here. Reference to it is only confusing, and seems to conflict with the declaration that control over the waters is not asserted.

*Jurisdiction*

Section 9 (a) of the House bill makes a blanket provision that Federal laws shall apply to the entire area of the outer Continental Shelf. This is not sufficiently specific, in that it does not indicate what applicability is intended to be given to Federal laws which by their terms apply only to specified places that would not in terms include the outer Continental Shelf. For example, laws relating to national parks, or to public buildings, would not be understood as being extended to the entire seabed of the Continental Shelf. However, it is not clear whether that group of criminal laws applicable to the "special maritime and territorial jurisdiction of the United States", as defined in 18 U. S. C. section 7, would be so extended; the outer Continental Shelf seems not to be within the literal definition of that special jurisdiction, yet those laws probably should be made applicable. Some other Federal laws could not be given full applicability without some specific provision; for example, the Longshoremen's and Harbor

OUTER CONTINENTAL SHELF LANDS ACT          33

Workers' Act by its terms applies only to maritime workers, and so even though extended territorially to this area probably would not apply to most workmen found there.   Section 9 (a) of the House bill gives the Secretary power to make regulations for the area; this would enable him to clarify these situations by regulation, and makes the provisions adequate, to the extent that it is considered sufficient for the applicable law to be found in regulations rather than in statutes.

Section 9 (a) of the House bill further provides that coastal States may extend their laws, other than tax laws, over the outer Continental Shelf within their projected boundaries as determined by the Secretary, so far as such laws are not inconsistent with Federal laws and regulations, and that the Secretary shall reimburse the States for reasonable costs of administering their laws so extended. This is objectionable on several grounds.   It raises a serious constitutional question of delegation of legislative power.   This is a Federal area, outside State boundaries, and to give the States a sort of extraterritorial jurisdiction over it is unnecessary and undesirable.   The situation is not comparable to that of federally owned areas within a State, as to which State law has some measure of applicability.   Particularly in view of the intermingling of national and international rights in the area, it is important that the Federal Government, which has the responsibility for handling foreign relations, have the exclusive control of law making and law enforcement there.

S. 1901 presents a different approach to the problem of providing a body of law. Section 4 (a) provides that acts and offenses on structures (other than vessels) shall be governed by the law applicable to vessels of the United States on the high seas.   This clearly specifies, as the House bill does not, the manner in which Federal law is to apply, and insofar as it relates to Federal law it is satisfactory, although it should probably be broadened to include the seabed and subsoil as well as structures.   Where structures are owned by persons or corporations, this would make applicable the law of the domiciliary State of the owner, to the extent that it did not conflict with Federal law.   This constitutes a delegation of Federal legislative power to a State, and raises the same constitutional queston mentioned above with respect to adjoining coastal States.   However, the provision may well be left as it is in that respect.   Even if the courts hold it inoperative to adopt State law, that should not impair its effectiveness to adopt those Federal laws applicable to American ships on the high seas.

In addition to this blanket adoption of laws applicable to American vessels on the high seas, S. 1901, section 4 (c) through (4) (i), makes specific provision for the application, with modifications in some instances, of Federal laws relating to workmen's compensation, mortgage recordation, labor relations, fair labor standards, immigration, and importation and exportation of goods.

S. 1901, section 4 (c), making the Longshoremen's and Harbor Workers' Compensation Act applicable to employment in exploration or development of resources of the outer Continental Shelf is explicit and adequate.

S. 1901, section 4 (d) makes the Ship Mortgage Act applicable to structures, subject to such regulations as the Secretary of Commerce may establish.   The reference should be to the Secretary of the Treasury, in view of Reorganization Plan No. 3 of 1946 (sec. 102, 60 Stat. 1097), substituting the Commissioner of Customs for the Secretary of Commerce with respect to this act, and Reorganization Plan No. 26 of 1950 (sec. 1, 64 Stat. 1280), substituting the Secretary of the Treasury for all officers of the Treasury Department (of whom the Commissioner of Customs is one).   A provision for liens and recording is highly desirable, but the Ship Mortgage Act is so peculiarly adapted to the special problems of liens on ships that there may be a serious doubt whether its application to these structures will be altogether satisfactory.   However, it will probably be reasonably workable, and consideration of a more satisfactory expedient may well be deferred until experience has developed the problems to be met.   It might be desirable, however, to broaden this subsection so as to apply to the outer Continental Shelf as a whole; in that way it could provide for recordation of liens on leaseholds where no structure has yet been built.

S. 1901, sections 4 (e) through 4 (i), should be similarly broadened to cover the entire outer Continental Shelf, and not merely structures thereon.

S. 1901, section 4 (k), contains a very desirable provision that specific reference to the application of certain laws does not imply that others are not applicable.

S. 1901, section 4 (j), gives the Coast Guard authority to establish and enforce safety regulations.   This is desirable, but might be broadened to include specifically authority to enforce all other laws and regulations applicable to the area. ◁

S. 1901, section 4 (b), provides for jurisdiction and venue in Federal district courts for controversies arising in connection with operations on the outer Con-

34                    OUTER CONTINENTAL SHELF LANDS ACT

tinental Shelf, or involving rights there.   Section 13 of the House bill makes a
similar provision, but only as to proceedings involving a lease or rights under a
lease on the outer Continental Shelf.   The broader form of the Senate version is
preferable, but might itself be broadened to include all causes of action arising on
the outer Continental Shelf or structures thereon.

S. 1901, section 5, authorizes the Secretary to make regulations relating to
leasing and conservation.   Section 9 (a) of the House bill authorizes the Secretary
to make regulations for the area, without limitation as to their subject matter.
The latter provision is preferable, as there may be a need for various regulations
not directly relating to leases or conservation.

*Confirmation of State leases*

Both bills protect the rights of lessees under existing leases, but with various
differences, some minor and some very important (S. 1901, sec. 6; House bill,
sec. 11).

· Section 11 (a) of the House bill requires the Secretary to issue exchange leases,
with provision for interim operation under existing leases.   S. 1901, section 6 (b),
provides that State leases which meet the specified requirements shall remain in
effect.   The provision for exchange leases is preferable from an administrative
point of view, and has the advantage of permitting inclusion of new terms and
conditions desired by the Secretary.

Both bills apply to leases issued, without fraud, before December 21, 1948
(the date on which the Louisiana and Texas cases were begun), and in effect
on June 5, 1950 (the date of the decisions in those cases) (House bill, sec. 11 (a);
S. 1901, sec. 6 (a)(2)).   The Senate bill also covers leases issued with the ap-
proval of the Secretary and in effect on the effective date of the act, without
restriction as to date of issuance.   The latter appears to be a fair and reason-
able provision.   The language of the House bill in this respect, "which would
have been in force and effect * * * had the State issuing such lease had such
paramount rights" etc., is technically more correct than that of S. 1901, "which
was * * * in force and effect" etc.   However, the words "except as modified
as to additional royalties provided later in this section" should be omitted from
the first sentence of section 11 (a) of the House bill.   That phrase of course re-
lates to the exchange lease, but is there made part of an enumeration of the
conditions which the original lease must meet in order to qualify for exchange.
It has no relevancy to those conditions, and if given any effect would make all
leases ineligible for exchange.   Both bills provide for review, by the District
Court for the District of Columbia, of a determination by the Secretary that a
lease is not qualified for continuance or exchange (House bill, sec. 11 (a); S. 1901,
sec. 6 (e)).   Such provision is desirable.

The other conditions which a lease must meet to qualify for continuance under
S. 1901 are largely different from those prescribed by H. R. 5134 for exchange.
S. 1901, section 6 (1) requires filing of the lease or a copy with the Secretary
within 90 days from the effective date of the act, or further time fixed by the
Secretary.   The House bill allows 6 months, or such further time as the Secre-
tary allows, from the effective date of the act (sec. 11 (b)(i)), or 6 months from
determination in interpleader that the area involved is part of the outer Con-
tinental Shelf (sec. 18 (a)(3)).   Six months seems not too liberal a time limit,
although there is no real objection to the 90-day limit, especially in view of the
Secretary's authority to extend it.   The provision relative to interpleader is
appropriate, if an interpleader procedure is adopted; but it should be required
that the interpleader proceedings be begun within the time allowed for filing a
lease or application for exchange, in order to toll the time for such filing.

S. 1901, section 6 (a) (3), and section 11 (b) (v) of the House bill make similar
requirements as to filing evidence that the original lease was in effect as required
by the act.

Section 11 (b) (iii) of the House bill requires, as a condition precedent to ex-
change, that the lessee pay to the United States all sums due to the original lessor
after June 5, 1950 (the date of decision of the Louisiana and Texas cases), not
already paid to the lessor or to the Secretary.   Section 11 (a) provides that the
exchange lease shall provide for payment to the United States of the same rentals,
royalties, and other payments as were provided for by the original lease, plus
an additional royalty equal to "any severance tax charged by an abutting State."
·The provision for additional royalty is important, as it prevents a windfall to
lessees through their being relieved of State severance taxes which presumably
were taken into consideration in fixing the terms of the original leases.   However,
it might be preferable to refer to "any severance tax imposed by the State issuing,

OUTER CONTINENTAL SHELF LANDS ACT      35

or whose grantee issued, the lease." The provision does not specify whether the State tax referred to is to be that in effect when the original lease was executed, when the exchange lease is issued, or as it may be from time to time. This should be made specific; probably the date of the exchange lease is the most desirable.

S. 1901, section 6 (a) (4), prescribes as a condition for continuance in effect of a State lease that the lessee shall pay to the Secretary all sums due and unpaid under the lease between June 5, 1950, and the effective date of the act, and all sums due thereafter. This does not impose any obligation on the lessee to make such payments, but only makes them a prerequisite to continuance of his lease. The issuance of an exchange lease, obligating the lessee to pay the United States according to its terms, as provided by the House bill, is preferable; and it is particularly important to provide for additional payments equal to the State severance tax.

S. 1901, section 6 (a) (5), requires the lessee to certify that the lease shall remain subject to the same overriding royalty obligations existing on the effective date of the act. This is believed to be a desirable provision. Section 11 (b) (ii) of the House bill requires a similar statement to be included in an application for an exchange lease, but does not specify a critical date. The date of issuance of the exchange lease should probably be specified, in that case.

S. 1901, section 6 (a) (7), requires leases issued on or after June 23, 1947 (the date of decision of the California case), to have been issued upon competitive bidding, to qualify for continuance. The House bill has no corresponding provision. This requirement seems appropriate but not essential.

S. 1901, section 6 (a) (8), requires that the lessee consent to pay a royalty of 12½ percent in cases where the lease as originally issued requires less. The House bill makes no corresponding requirement. Conceivably, this requirement could work hardship on a lessee who paid a very high cash bonus for his lease, in consideration of a very low royalty, but in practice it is believed that no difficulty will arise.

S. 1901, section 6 (a) (9), requires that if a lease will not terminate within 5 years from the effective date of the act, in the absence of drilling or production, the lessee must file a consent to such termination within 5 years. The House bill has no corresponding provision. The requirement seems reasonable and desirable.

S. 1901, section 6 (a) (10), and the House bill, section 11 (b) (iv), require such surety bond and compliance with such other requirements as the Secretary may impose to protect the interests of the United States. This is desirable.

S. 1901, section 6 (b), provides that the lessee under a qualifying lease may continue operations for the full term thereof, or if oil or gas was not being produced on or before December 11, 1950 (the date of the decrees in the Louisiana and Texas cases), then for a term from the effective date of the act equal to the term remaining unexpored on December 11, 1950; together with extensions authorized by the lease or heretofore authorized by State law. The House bill, section 11 (a), makes a similar provision as to the term of exchange leases, applicable also to any lease of which the primary term has expired since December 11, 1950. These provisions are designed to protect lessees against forfeitures due to suspension of operation as a result of the Supreme Court decrees. The Senate version appears adequate for that purpose.

Section 11 (a) of the House bill provides that exchange leases shall be, in other respects, for the same term, upon the same area, and for the same payments as the original lease, and upon such additional terms as the Secretary may prescribe, consistent with the act. S. 1901 has no such provision for additional terms, since it does not provide for new leases. As stated above, this is one reason why the exchange procedure is preferable.

Section 11 (c) of the House bill provides that where a State lease covers areas both within and without the outer Continental Shelf, the exchange provisions apply only to the area within the outer Continental Shelf. This is a highly desirable provision which is lacking from the Senate bill, and should be added. However, under the Senate procedure for continuance of operations under the original lease, it presumably would take the form of proration of payments, with consents as to increase of royalty and reduction of term made applicable only to the portion of the lease area within the outer Continental Shelf. The complications that this would involve are another cogent reason for preferring the exchange lease procedure.

S. 1901, section 6 (c) vests in the Secretary such powers of supervision and control as the lessor may have by law or under terms of the lease. This may give the Secretary different powers as to different leases or areas, which will be confusing, and may raise a question of delegation of legislative power if the State law is changed. Under the exchange lease procedure of the House bill, no such pro-

vision is made or needed, as it is implicit that the Secretary will have the same control over exchange leases as over new leases.  Again, the exchange procedure is preferable.

S. 1901, section 6 (d), preserves claims of the United States arising out of operations before the effective date of the act.  Section 15 of the House bill, on the other hand, waives such claims arising before June 5, 1950 (date of the decision in the Louisiana and Texas cases), except where there was fraud in securing or operating under the lease.  However, these provisions probably are similar in effect, since in the Louisiana and Texas cases accounting was ordered only for production after June 5, 1950, so it appears that claims arising after that date are the only ones the United States can enforce in any event.

*New leasing*

Both the Senate and House bills authorize the Secretary to make new oil and gas leases.  The House bill establishes a permanent procedure, with detailed provisions (House bill, sec. 10); the Senate bill is designed only to meet "the present emergency" and imposes a minimum of restrictions on the complete discretion of the Secretary (S. 1901, sec. 8).  It is believed that a permanent procedure is preferable, the practice of limiting the Secretary's discretion as to leasing procedure and lease provisions follows the precedent of the Mineral Leasing Act, and is not objectionable.

Both bills are permissive only, which is desirable (S. 1901, sec. 8 (a); House bill, sec. 10 (a)).

Both bills provide for issuance of leases upon the highest cash bonus bid of a qualified person (S. 1901, sec. 8 (a); House bill, sec. 10 (a)).  However, it is believed that serious consideration might well be given to permitting alternatively, competitive royalty bidding, with minimum royalty fixed by the act and by the Secretary.

Both bills provide for terms of 5 years, and as long thereafter as drilling or paying production continues (S. 1901, sec. 8 (b) (2); House bill, sec. 10 (c), 10 (d), 10 (e)).  Both bills fix a minimum royalty of $12\frac{1}{2}$ percent (S. 1901, sec. 8 (b) (3); House bill, sec. 10 (d)).  These provisions seem satisfactory.

The Senate bill gives the Secretary discretion as to other lease terms (S. 1901, sec. 8 (b) (4)) and as to the size and shape of leased areas (S. 1901, sec. 8 (b) (1)).  The House bill fixes maximum sizes of leasing units and requires them to be reasonably compact in form (House bill, sec. 10 (b)), provides against forfeiture for cessation of production if reworking commences within 90 days or, during the primary term, if rental payments or reworking are resumed by the next rental date after 90 days (sec. 10 (d)), and requires leases to provide for skillful and diligent operation (sec. 10 (c)), delay rentals of at least $1 an acre after the first year (sec. 10 (d)), and minimum royalty of at least $1 an acre after discovery of oil or gas (sec. 10 (d)).  Those provisions are not objectionable.  The House bill gives the Secretary discretion as to other lease terms (sec. 10 (h)).

The House bill makes detailed provisions for leasing procedures, which are not objectionable (sec. 10 (a)).  S. 1901 has no corresponding provisions.

The House bill permits the Secretary to refuse leases to aliens whose nation denies similar privileges to Americans, and to cancel leases where such ownership arises, subject to a 2-year grace period where it arises by inheritance or judgement.  It forbids control of leases by combinations in restraint of trade (sec. 10 (i)).  S. 1901 has no corresponding provisions.  These provisions are not objectionable.

The House bill permits the Secretary to cancel leases obtained by fraud (sec. 10 (j)), and also permits cancellation, on 20 days' notice, for default (sec 10 (f)), reviewable in either case by the District Court for the District of Columbia (sec. 10 (f)).  Such provisions are desirable, and should be added to S. 1901.

The House bill provides that where a lease or interest therein is owned or controlled in violation of the act, the Secretary may cancel the lease or forfeit the interest, or compel disposal of it in a court proceeding (sec. 10 (f)).  This provision should be clarified; it leaves doubt whether the Secretary has discretion to cancel entire leases where only an interest in itis held in violation of the act; and because of the arrangement of the paragraph leaves a serious doubt as to whether such cancellation or forfeiture is included in the provision for judicial review.  Probably the Secretary should be allowed to cancel or forfeit only the offending interests, and the provision for judicial review should be made applicable.  With those modifications, it would be desirable to add such provision to S. 1901.

The House bill permits the Secretary to use facilities of adjacent States and their leasing agencies (sec 10 (h)).  Even though only permissive, such provision

is undesirable. As already stated, it is the view of the administration that the outer Continental Shelf is a Federal area and should remain subject to purely Federal control in all respects. S. 1901 has no corresponding provision.

The House bill adopts certain provisions of the Mineral Leasing Act, so far as not inconsistent with the terms of the act (sec. 10 (g)). This is not objectionable. S. 1901 has no corresponding provision. The sections of the Mineral Leasing Act adopted by the House bill are section 17 (30 U. S. C. sec. 226): Lease of oil or gas-lands; royalties and annual rentals; drainage agreements; section 17b (30 U. S. C. sec. 226e): Cooperative or unit plans; regulation; approval of contracts; prevention of waste; section 28 (30 U. S. C. sec. 185): Rights-of-way for pipelines; section 30 (30 U. S. C. sec. 187): Assignment or subletting of leases; relinquishment of rights under leases; conditions in leases as to operation of mines, wells, and so forth; section 30a (30 U. S. C. sec. 187a): Same, oil or gas leases; partial assignments; section 30b (30 U. S. C. sec. 187b): Same, oil or gas leases; written relinquishment of rights; release of obligations; section 32 (30 U. S. C. sec. 189): Rules and regulations; rights of States not affected; section 36 (30 U. S. C. sec. 192): Payment of royalties in oil or gas; sale of such oil or gas; and section 39 (U. S. C. sec. 209): Waiver, suspension or reduction of rentals or royalties; extension of lease on suspension of operations.

The House bill authorizes delegation and subdelegation of the Secretary's authority (sec. 10 (h)). This is unnecessary, in view of section 2 of Reorganization Plan No. 3 of 1950 (64 Stat. 1262), permitting the Secretary to provide for performance of any of his functions by any other officer, agency, or employee of the Department. S. 1901 has no corresponding provision.

S. 1901 (sec. 8 (d)) provides that the Secretary's issuance of a lease, or his refusal to certify that the United States does not claim a particular area pursuant to section 7, shall not prejudice the ultimate adjudication of whether the area is part of the outer Continental Shelf. This is a desirable provision, but the reference to section 7 is confusing, since that section makes no provision for such certification. Probably such a provision should be added there. The House bill has no corresponding provision.

*Scrip and Mineral Leasing Act applicants.*

The House bill specifically rejects claims arising otherwise than under the act (i. e., claims under the Mineral Leasing Act or based on any land scrip) (sec. 9 (b)). This conforms to the recommendation of the Department of Justice as to the Submerged Lands Act; but in that act the recommendation was not followed, and rights of such claimants were preserved (but not confirmed). There may be a question whether the two bills should not be uniform in that regard, as a matter of policy. S. 1901 has no provision on the subject.

*Revenues*

Both bills provide that payments for the period beginning June 5, 1950 (date of the decision in the Louisiana and Texas cases, and from which accounting was ordered therein), shall be deposited in the Treasury (S. 1901, sec. 9; House bill, sec. 12). The Senate bill specifically provides that they are to be credited to miscellaneous receipts. Such provision is desirable, particularly in view of the fact that payments heretofore received have been held in a special fund, under the Secretary's notice of December 11, 1950 (15 H. R. 8835), as amended. It may be qualified, however, by the suggestion made below regarding refunds.

*Refunds*

The House bill (sec. 14) provides for refund of overpayments made to the United States, as determined by the Secretary, on application filed within 2 years of issuance of the lease or of the payment. Such provision is desirable, but it seems that the time for applying for refund should run from the date of payment in every case; it is not clear under what circumstances the present provision intends the time to run from the issuance of the lease, or why it should be so computed in any case. Appropriations will be necessary for payment of refunds, unless some provision is made for a special fund under the control of the Secretary. A fund of appropriate size might be established for that purpose, from moneys now held or hereafter received from leases, with provision that maintenance of the fund at the designated amount should be a first charge on all receipts under the act, and only receipts in excess of the amount so needed should be credited to miscellaneous receipts.

*Interpleader and jurisdictional disputes*

S. 1901 (sec. 7) authorizes the Secretary, with the concurrence of the Attorney General, to enter into agreements for operations pending settlement of a dispute

**38**          OUTER CONTINENTAL SHELF LANDS ACT

as to whether an area is part of the outer Continental Shelf. The provision is a desirable one. It confirms the authority for interim operations given by the Secretary's notice of December 11, 1950 (15 F. R. 8835), as amended January 26, 1951 (16 F. R. 953), and supplemented February 2, 1951 (16 F. R. 1203), March 5, 1951 (16 F. R. 2195), April 23, 1951 (16 F. R. 3623), June 25, 1951 (16 F. R. 6204), August 22, 1951 (16 F. R. 8720), October 24, 1951 (16 F. R. 10998), and December 21, 1951 (17 F. R. 43). It seems that to this list of supplementary orders should be added those of March 25, 1952 (17 F. R. 2821), June 26, 1952 (17 F. R. 5833), and December 24, 1952 (18 F. R. 48).

The House bill does not contain a similar provision. Instead it permits a lessee to file with the Secretary a certificate that an unadjudicated doubt exists as to whether a lease area is within the outer Continental Shelf, or as to who is entitled to payments under a lease; and the lessee may then interplead in the District Court for the District of Columbia, the United States and, if the State consents, the State, and make his payments into court until the dispute is determined (sec. 18 (a) (1)). This provision is unacceptable. It requires the United States to litigate as to such particular areas, and at such times, as lessees determine. It does not require the States to enter such litigation, and is entirely silent as to what shall happen if the State does not consent. It is understood that the State consent which lessees particularly hope to invoke under this provision is the consent given by Louisiana to suits against the State mineral board. Apparently referred to is the provision that "The board shall be a body corporate, with its domicile at the State capitol, may sue and be sued * * *" (La. Rev. Stats. 1950, sec. 30:121). Certainly this is not a consent to suit in the District of Columbia and probably it is not a consent to suit in other than the courts of the State (*Great Northern Ins. Co.* v. *Read*, 322 U. S. 47, 54 (1944)). Thus, it appears that the proposed provision as it stands would not give to lessees the practical advantages which they hope for; and the Department of Justice is vigorously and unalterably opposed to broadening the provision so as to consent to suit in State courts or even in Federal district courts within the various States. The provision should be rejected as undesirable and unworkable.

Alternatively, the House bill permits the lessee, after filing the certificate with the Secretary, to continue making his payments to the State or its grantee as provided in the lease, until there is an adjudication that the United States is entitled to them. The State or its grantee is then required to account for payments so received (sec. 18 (a) (2)). This apparently leaves it to the United States to seek adjudication when and where it chooses. In that respect the provision would be desirable; but there may be doubt as to the ability of the United States to require the States to account in this way.

The House bill further provides that a lessee may apply for an exchange lease within 6 months after an adjudication that his lease area is part of the outer Continental Shelf (sec. 18 (a) (3)). As pointed out above, this should be modified so that time for applying for an exchange lease will not be tolled except by filing of a suit, whether interpleader under section 18 (a) (1) or other, under section 18 (a) (2), within the time provided for making application for an exchange lease.

If either the provisions of section 18 (a) (1) or 18 (a) (2) of the House bill, or both, are adopted, two points should be noticed respecting the subjects of doubt which may be certified to the Secretary. Point (ii), "as to whom", should be "as to whom", etc.; to avoid that rather awkard wording, it would be possible to substitute "regarding whom" or "as to who is entitled to the rentals, royalties, or other sums payable under such lease." Point (iii), "as to the validity of the claims of the State * * * to the area" etc., is not clear. If it means a doubt as to whether the area is within the outer Continental Shelf, it duplicates point (i) and should be omitted for that reason. If it does not mean that, it should be omitted as meaningless as no State has or has had a right to issue leases on the outer Continental Shelf.

Section 18 (b) of the House bill permits lessees to intervene in any suit between the United States and a State to determine jurisdiction over a lease area, and to make their payments into court pending determination of the suit. It would be preferable to permit payment into court, without actual intervention, as it will be undesirable to have numerous parties entitled to participate in the conduct of such litigation, as ordinary interveners would be. With that modification, the provision is a reasonable one.

As pointed out above, S. 1901, section 7, does not contain the provision, referred to in section 8 (d), for certification by the Secretary that the United States does not claim a lease area. Probably such provision should be added.

*Explorations*

The House bill (sec. 17) recognizes the right of any person, subject to applicable provisions of law, and of Federal agencies, to conduct geological and geophysical explorations that do not interfere with or endanger actual operations under any lease issued pursuant to the act. Such provision may be desirable, but might well be conditioned on securing a permit from the Secretary (in the case of private persons), rather than leaving it to the individual, as this seems to do, to decide what will interfere with or endanger operations. S. 1901 has no corresponding provision.

*Rights reserved to the United States*

S. 1901 (sec. 10 (a)) provides that the President may withdraw and reserve unleased areas for Federal use in the interest of national security. This provision is unnecessary, since leasing is not mandatory in any case; and it is undesirable, in that it may imply that it constitutes the only permissible reason for refusing to lease. It should be omitted, or at least the final phrase, "for the use of the United States in the interest of national security," should be deleted. The House bill has no corresponding provision.

S. 1901 (sec. 10 (b)) gives the United States the right of first refusal to purchase any oil or gas produced, at market price, in time of war or when the President prescribes. Section 16 (a) (i) of the House bill gives a right of first refusal to purchase, in time of war or when the President or Congress so prescribes. It does not mention market price, but its practical effect is probably not materially different in that respect. Such provision is desirable; the House version, being slightly less restrictive, is probably preferable from the Government's point of view.

S. 1901 (sec. 10 (c)) authorizes the Secretary, on recommendation of the Secretary of Defense, to suspend operations or terminate leases during a state of war or national emergency declared by Congress or the President after the effective date of the act, with payment of just compensation. The House bill provides that in time of war or when necessary for national defense, and the President or Congress so prescribes, the United States may terminate leases, becoming owner of improvements and liable to pay just compensation determined as in condemnation (sec. 16 (a) (ii)) or it may suspend operations, thereby suspending payments by the lessee, extending the lease correspondingly, and becoming liable for just compensation, sec. 16 (a) (iii)). The somewhat more specific and less restrictive terms of the House version are probably preferable.

The House bill also permits the Secretary of Defense, with the approval of the President, to designate areas needed for defense, where no explorations or operations may be conducted without the approval of the Secretary of Defense; with provision for suspension of payments, extension of terms, and payment of just compensation where this interferes with operations under a lease (sec. 16 (b)). This is a desirable provision. S. 1901 has no corresponding provision.

*Helium*

The House bill reserves to the United States the right to extract helium from all gas produced (sec. 16 (c)). This is a desirable provision. S. 1901 has no corresponding provision.

*Naval petroleum reserve*

Both bills revoke Executive Order No. 10426 (S. 1901, sec. 11; House bill, sec. 19). This is necessary.

*Appropriations*

The House bill includes an authorization for appropriations (sec. 20). This is a desirable provision, but of course is lacking from S. 1901.

In addition to the foregoing, the following comments may be made with respect to suggestions advanced by representatives of certain oil companies:

*Enforcement of regulations*

It seems desirable to add to S. 1901, section 5 (or to the House bill, sec. 10 (f)), provision that violation of applicable laws or regulations of the Secretary shall be punishable as a misdemeanor, and shall not be ground for cancellation of a lease unless continued or repeated after specified notice to comply. This would assist enforcement, in cases where the Secretary did not want to invoke the stringent remedy of cancellation, and would protect the lessees from highly punitive forfeitures for minor infractions.

40          OUTER CONTINENTAL SHELF LANDS ACT

*Liability for past operations*

The oil companies are particularly concerned that claims based on operations before June 5, 1950, be waived as provided by section 15 (a) of the House bill. For certainty, S. 1901, section 6 (d), should so provide. As indicated above, the Supreme Court has declined to enforce earlier claims against the States, and the lessees should not be held to a greater liability.

*Pipelines*

The oil companies suggest that provision be made for authorization of pipelines by the Secretary, and for their operation and regulation as common carriers. This is desirable, and could be accomplished by adopting the provisions of section 28 of the Mineral Leasing Act (30 U. S. C. sec. 185) as provided by section 10 (g) of the House bill, plus specific provision that such lines should be operated as common carriers, and be subject to regulation as interstate pipelines under part I of the Interstate Commerce Act (49 U. S. C. secs. 1–27) as to oil lines and under the Natural Gas Act (15 U. S. C. secs. 717–717w) as to gas lines. Such gas lines would apparently be "interstate" within the terms of the Natural Gas Act without specific provision; but oil lines would not be, within the terms of the Interstate Commerce Act. For certainty, specific provision should be made for the applicability of both acts. Because of the problems of location, it might be desirable to provide for a right of way wider than the 50 feet allowed by section 28 of the Mineral Leasing Act (30 U. S. C. sec. 185). That is primarily a question for the Department of the Interior.

*Mineral Leasing Act*

The oil companies are particularly anxious that sections 17 (b), 30 (a), 30 (b), 36, and 39 of the Mineral Leasing Act (30 U. S. C. secs. 226e, 187a, 187b, 192, and 209) be adopted for this area. As discussed above, with respect to section 10g of the House bill, adopting those and certain other provisions of the Mineral Leasing Act, this seems reasonable and appropriate.

*Sulfur and other minerals*

Where a State lease relates to minerals other than oil or gas, continued exploitation of the same minerals is provided for by S. 1901 (sec. 6 (b)), permitting operation under the State lease, and by the House bill (sec. 11 (a)) providing for exchange leases covering "the same natural resources." However, under both bills new leasing is limited to oil and gas (S. 1901, sec. 8 (a); House bill, sec. 10 (a)). The oil companies urge that new leasing be permitted for other minerals, particularly sulfur, which apparently is often found in connection with the same salt-dome formations as oil and gas. The desirability of this, and the provisions appropriate to effectuate it, seem primarily questions for the Department of the Interior.

*Leasing procedures*

The oil companies prefer to have statutory specification of leasing procedures, particularly 30 days' publication of notice of proposed sale of leases, as provided by section 10 (a) of the House bill, rather than leaving the subject to the discretion of the Secretary, as under S. 1901, section 8. The requirements of the House bill in this respect appear reasonable; and while they constitute a restriction on the Secretary, they are also a protection to him, as compliance with the statutory requirements will preclude any challenge to the reasonableness of his procedures. There seems to be no objection to their adoption.

*Definition of "State law"*

Both bills require that a State lease, to qualify for continuance or exchange, shall have been validly issued and in effect under the law of the State (S. 1901, sec. 6 (a) (2), 6 (a) (3), 6 (b); House bill, sec. 11 (a), 11 (b)). Technically, no lease on the outer Continental Shelf has been validly issued or in effect under State law, since State law has no applicability to that area. This is taken care of by the House bill at the first point where it makes such reference, by use of the phrase, "the laws of the State issuing such lease had the State issuing such lease had such paramount rights in and dominion over the outer Continental Shelf as it assumed it had when it issued the lease" (sec. 11 (a)). However, that phrase is not repeated at subsequent points in the section, and to do so would be unduly cumbersome. S. 1901 has no corresponding qualifying phrase at any point. There seems to be much merit in the suggestion of the oil companies that there be added to the definitions (S. 1901, sec. 2: Submerged Lands Act, sec. 2) a provision that the "law of a State," when used with reference to leases issued by the

State or its grantee covering land of the outer Continental Shelf, shall be understood to mean the law of the State as it would have been if the State had had jurisdiction over the area so purported to be leased. However, care should be taken to restrict the definition to that particular subject; to define "State law" in that way for all purposes might extend the scope of State workmen's compensation laws, under S. 1901, section 4 (c), beyond what is intended, or could produce difficulty in constructing the second paragraph of section 9 (a) of the House bill.

Sincerely yours,

J. LEE RANKIN,
*Assistant Attorney General, Office of Legal Counsel.*

---

TEXT OF THE PREPARED STATEMENT PRESENTED ON MAY 28, 1953, TO THE COMMITTEE BY JACK B. TATE, DEPUTY LEGAL ADVISER TO THE SECRETARY OF STATE

Mr. Chairman, members of the committee, my name is Jack B. Tate. I am the Deputy Legal Adviser of the Department of State. I appear at the request of the committee to testify about the foreign relations aspects of S. 1901.

The international problems arising from the discovery and exploitation of the resources of the Continental Shelf are for the most part new problems. Some of our problems are still hypothetical, problems which have not yet arisen in practice. Thus, I do not come here with ready answers to all of the possible questions which may come up. I propose to set forth in general terms the conclusions and suggestions which represent the experience of the Department up to the present date in this field of international relations.

The practical importance of the Continental Shelf principle is that it furnishes the basis for utilization by the contiguous State of the resources, especially oil, in the submerged lands beyond the limit of territorial waters. The undisputed claim by this Nation of the right to the exclusive exercise of jurisdiction and control over such resources accomplishes this purpose.

The assertion of jurisdiction and control in accordance with the President's 1945 proclamation is believed to be preferable to an assertion of sovereignty. Sovereignty, traditionally an absolute concept, might be regarded as affecting the freedom of the waters and the airspace above the seabed and subsoil despite the disclaimers to the contrary.

Claims to sovereignty over the waters and airspace above the Continental Shelf, extending as far as 200 miles from the coast, have in fact been made by a number of nations. This Government opposes such claims. They constitute in its view unwarranted extensions of the Continental Shelf principle and violations of the principle of freedom of the seas traditionally supported by the United States.

The exercise of jurisdiction and control permits full utilization of the resources of the Continental Shelf without casting doubt on our continued support of the principle of freedom of the seas. We consider it important, in dealing with the resources of the Continental Shelf, to make this point clear.

The character as high seas of the waters above the Continental Shelf remains unaffected by the assertion or exercise of jurisdiction and control over its resources. And consequently rights to free navigation and fishing in such waters also remain unaffected.

In order to reduce to a minimum the interference with navigation and fishing which may result from the presence in the waters of structures erected for the exploitation of the resources of the shelf adequate warning signals or other devices should be placed on or near the structures.

As there is need to exercise a certain amount of control around the structures, for purposes such as safety the control should be limited to such purposes and not be made a pretext for claiming extensive rights of jurisdiction around these structures similar to those normally exercised in territorial waters.

Extension of the laws of the contiguous territory to the area of exploration and exploitation of the Continental Shelf should be limited to the structures erected in the high seas and to the seabed and subsoil, and should not apply to the waters themselves.

This outlines the principles which have guided the Department in its handling of the international aspects of the Continental Shelf question. We believe that the domestic problems of exploitation of the resources of the Continental Shelf should be resolved within this framework.