# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | SECTION "J" |
| | * | JUDGE BARBIER |
| This Document Relates to: | * | |
| *All cases in Pleading Bundles B1 and B3*; | * | |
| 10-2771; 10-3815; 10-1540; 10-1502 | * | MAGISTRATE NO. 1 |
| | * | MAGISTRATE SHUSHAN |
| * * * * * * * * * * * * | | |

**OPPOSITION OF DEFENDANTS ANADARKO PETROLEUM CORPORATION AND ANADARKO E&P COMPANY LP TO MOTION OF BP EXPLORATION & PRODUCTION, INC., BP AMERICA, INC., BP AMERICA PRODUCTION COMPANY, <u>AND BP PLC FOR A STAY OF PROCEEDINGS</u>**

<u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ........................................................................................... 1

II.    ARGUMENT ................................................................................................... 5

    A.    The Broad Stay Sought by BP Would Deprive the Non-Operating Defendants of Their Fundamental Right to Defend Against Non-Arbitrable Claims and to Participate in the Court's Allocation of Fault Proceedings ............ 5

        1.    The Arbitration Provisions in the Operating Agreement Do Not Apply to the Claims Asserted Against the Non-Operating Defendants or to the Allocation of Fault by the Court............................. 6

        2.    The Sweeping Restrictions BP Seeks to Impose on the Non-Operating Defendants Would Violate Basic Due Process Rights ............ 9

        3.    *AmClyde* Did Not Address the Right of a Defendant to Litigate Non-Arbitrable Claims............................................................................ 10

        4.    BP's Conduct Belies Its Claim That It Is a Breach of the Operating Agreement for the Parties to Seek Discovery from One Another .......... 12

    B.    The Dispute Raised by BP Is Not Subject to Mandatory Arbitration.................. 14

        1.    Exhibit F to the Operating Agreement Grants the Parties the Option to Bring Suit Concerning Secured Payment Claims.................... 15

        2.    BP's Motion to Stay Is Based on a Dispute Concerning Secured Payment Obligations Under Exhibit F...................................................... 16

        3.    The Rights Granted by Exhibit F Are Entirely Consistent With the "Core of the Benefit of the Bargain" Struck by the Parties to the Operating Agreement............................................................................. 17

    C.    Neither BP America nor BP P.L.C. Are Entitled to a Stay................................. 20

    D.    There Is No Basis for Staying Cross-Claims Asserted by AE&P ...................... 22

III.   CONCLUSION.............................................................................................. 23

**MAY IT PLEASE THE COURT:**

Defendants Anadarko Petroleum Corporation ("APC") and Anadarko E&P Company LP ("AE&P") (together "Anadarko") respectfully submit this memorandum in opposition to the motion of BP Exploration & Production, Inc. ("BP Exploration"), BP America Inc. ("BP America"), BP American Production Company ("BPAP"), and BP p.l.c. (together "BP") for a stay of proceedings ("Motion").[1]

## I.    INTRODUCTION

Over 130,000 plaintiffs have asserted claims against the Non-Operating Defendants and twenty-four other defendants, including BP, for damages associated with the *Deepwater Horizon* Incident.  The defendants, including Anadarko, in turn have asserted claims against each other, seeking to either avoid or allocate their potential liability amongst themselves.[2]   All of these claims involve, in one way or another, BP's role in the Incident, including whether BP was grossly negligent.  In resolving these claims, the Court must first determine liability and then allocate it among those defendants held liable.  The Court will also determine whether BP was grossly negligent.

Relying on an Operating Agreement between BP Exploration, APC and MOEX Offshore

---

[1]     BP's Motion was supported by a Combined Memorandum (1) in Support of BP's Motion for a Stay of Proceedings Between BP and Anadarko and MOEX and (2) in Opposition to Anadarko's and MOEX's Motion to Compel Discovery Responses (the "BP Mem.") [Rec. Doc. 2169-1].

[2]     The cross-claims filed by Anadarko and MOEX Offshore 2007 LLC can be grouped into four categories: (1) cross-claims against defendants other than BP (Claim, Answer and Cross-Claims of MOEX Offshore, Counts 5-21 [Rec. Doc. 420 in Case No. 10-2771]; Claim, Answer and Cross-Claims of Anadarko, Counts 17-53 [Rec. Doc. 338 in Case No. 10-2771]); (2) cross-claims against BP for gross negligence, willful misconduct, or negligence (Anadarko Cross-Claims, Counts 1, 12 (gross negligence/willful misconduct); *id.* Counts 2, 13 (negligence); MOEX Cross-Claims, Counts 3 and 4 (negligence)); (3) cross-claims against BP for declaratory relief under the Operating Agreement (Anadarko Cross-Claims, Counts 7–11, 16; MOEX Cross-Claims, Count 2); and (4) tort and contract claims against BP, including for contribution and indemnity (Anadarko Cross-Claims, Counts 2–6, 13–15; MOEX Cross-Claims, Count 1).

2007 LLC ("MOEX Offshore"), BP seeks to stay "all litigation" between the moving parties and Anadarko, MOEX Offshore, and MOEX USA Corp. pending the completion of a potential future arbitration under the Operating Agreement.  Proposed Order at 1 [Rec. Doc. 2169-9].[3]  While BP does not explain the term  "all litigation," when read together with BP's opposition to the Non-Operating Defendants' motion to compel discovery, it is clear that BP seeks nothing less than an order denying the Non-Operating Defendants any right to be heard in the Phase I Trial on any issue involving BP's liability.  BP Mem. at 24 (asking the Court to "deny Anadarko's and MOEX's motion to compel, and grant a stay of all litigation between BP and Anadarko and MOEX").[4]

The Operating Agreement between BP Exploration and the Non-Operating Defendants cannot alter the due process rights of Anadarko to defend against claims it has been sued on, to allocate liability among the defendants, and to fully participate in the process that will determine those allocations.  Denying Anadarko these rights would render any judgment entered in the limitation proceeding unenforceable against Anadarko.  BP's Motion therefore should be denied.

In addition to seeking an unconstitutionally overbroad restriction on Anadarko's rights, BP's Motion suffers from an even more fundamental failure: namely, the sole dispute that BP claims triggers mandatory arbitration under the Operating Agreement is not subject to mandatory arbitration by the express terms of that Agreement.  For that reason too, the Motion should be

---

[3]     BP is the designated "Operator" under the Operating Agreement, in control of the drilling operations conducted by the Deepwater Horizon.  APC and MOEX Offshore were designated Non-Operating Parties under the Operating Agreement and sometimes are collectively referred to herein as the "Non-Operating Defendants."

[4]     The Non-Operating Defendants' motion to compel production from BP is currently pending before Magistrate Shushan.  Should BP prevail on its position that the Non-Operating Defendants are not entitled to take any discovery of BP, such a ruling, when combined with BP's motion to stay, would prohibit the Non-Operating Defendants from pursuing any cross-claims against any of the BP entities and from obtaining any discovery from those entities, even where such discovery is relevant—indeed, essential—to their defenses and to the allocation of fault.

denied.  Finally, BP has failed to carry its burden of demonstrating why a stay should extend to Anadarko's cross-claims against other entities such as BP America, BPAP, and BP p.l.c., or why it should apply to any of the cross-claims brought by AE&P.

## II.
## ARGUMENT

**A.     The Broad Stay Sought by BP Would Deprive Anadarko of Its Fundamental Right to Defend Against Non-Arbitrable Claims and to Participate in the Court's Allocation of Fault Proceedings.**

BP's Motion, styled as a request for a stay of proceedings between BP and the Non-Operating Defendants, in fact seeks extraordinarily broad relief.  If granted, the Motion would not only stay all of the cross-claims filed by Anadarko, but would also prohibit Anadarko from gathering and presenting at trial evidence that is directly relevant to non-arbitrable claims and defenses, including the proportional degree of fault on the part of all defendants, not just those of BP's choosing.  BP's purpose is clear: it seeks to prevent Anadarko from defending against the scores of private and governmental claims it faces, and from exercising its right to prove its own proportional degree of fault in comparison to all other defendants, including BP.  Neither the arbitration provisions of the Operating Agreement, nor those contained in the Federal Arbitration Act ("FAA"), support such an overly broad, indiscriminate restriction on the rights of defendants facing multiple multimillion dollar judgments of individual liability.

This Court has scheduled a trial for February 2012 to determine, among other things, the liability of all defendants for the blowout and sinking of the rig.  If one or more of the defendants are found liable, the Court will then allocate responsibility among the defendants.  The Phase I Trial also will address the question of BP's gross negligence.  Given the scope of the Phase I Trial, Anadarko has no choice but to defend itself against the claims asserted against it by the

plaintiffs and the other defendants.  This defense necessarily includes seeking to allocate any liability and loss established to other parties, including, most notably, BP.

If granted, BP's Motion would deny Anadarko the ability to participate in litigating the most important issues that are likely to be raised in the limitation action: the extent of BP's liability for the spill and the issue of its gross negligence.  Such an order would be a denial of due process, rendering unenforceable any judgment entered by this Court in that proceeding.  S*ee generally Aetna Ins. Co. v. Hartshorn*, 477 F.2d 97, 100 (5th Cir. 1973) ("The Due Process clause of the Fifth Amendment . . . guarantee[s] . . . adequate notice and opportunity to be heard or to defend").  Moreover, the unenforceability of any allocation of liability shares as between Anadarko and BP would imperil the enforceability of any liability share assigned to any party because the sizes of all defendants' shares are interdependent.

In short, the possibility that some liabilities created in the limitation action might later be the subject of allocation under the Operating Agreement does not make that agreement applicable to the initial determination of those liabilities.  Accordingly, the only proper result—indeed the only constitutional result—is for this Court to allow Anadarko the same opportunity to defend itself in the limitation action as every other defendant.

>    1.    **The Arbitration Provisions in the Operating Agreement Do Not Apply to The Claims Asserted Against Anadarko or to the Court's Allocation of Fault Determination.**

Although BP bases its Motion on the arbitration provisions of the Operating Agreement, its papers avoid any mention of the dispositive language of the Operating Agreement.  That language expressly limits the right to arbitration to certain claims and disputes that are "between" parties entitled to invoke the agreement's provisions.  Operating Agreement, Ex. H, § I.A.

In this action, however, Anadarko faces the potential of multiple judgments of liability and damages in actions brought by approximately 130,000 plaintiffs, as well as by the United

States, several states, multiple local governments, at least three foreign state governments, and the plaintiffs-in-cross-claim.[5]   In addition, Anadarko has asserted cross-claims against co-defendants <u>other</u> <u>than</u> <u>BP</u>, including claims for affirmative recovery and contribution and indemnity.  *See* Claim, Answer and Cross-Claims of Anadarko, Counts 17-53 [Rec. Doc. 338 in Case No. 10-2771].

None of the foregoing claims and cross-claims triggers any rights under the arbitration provisions of the Operating Agreement for the simple reason that none of them is "between" parties entitled to invoke the agreement's provisions.  *Id.*  Yet BP claims that the FAA deprives Anadarko of the right to take discovery on and to defend themselves against the claims asserted against it, and from obtaining discovery from BP needed to pursue non-arbitrable cross-claims against defendants other than BP.  That is not correct.  Any such future arbitration under the Operating Agreement would not—and could not—determine whether and to what extent Anadarko is liable to the claimants in these proceedings, nor would it decide the liability of defendants other than BP against whom Anadarko has asserted claims.

Article 22.5 of the Operating Agreement provides, in relevant part, that any uninsured liability for claims or costs involving activities or operations under the Agreement "shall be borne by each Party in proportion to its Participating Interest Share [25% and 10% for APC and MOEX Offshore, respectively] . . . <u>except that</u> when liability results from the <u>gross negligence or</u>

---

[5]   The claims have been asserted in (a) the individual personal injury complaints in Pleading Bundle A; (b) the Amended Master Complaints in Pleading Bundles B1 and B3; (c) the individual complaints in Pleading Bundle C, including the United States' complaint; (d) the Voluntary Local Government Entity Master Complaint and long form local government complaints; (e) the limitation action, in which the Non-Operating Defendants have been tendered to all claimants; and (f) the cross-claims for negligence/gross negligence/willful misconduct, contribution, indemnity, and subrogation brought against the Non-Operating Defendants by Halliburton, Transocean, Cameron, Dril-Quip, and the Marine Spill Response Corporation.

willful misconduct of a Party, that Party shall be solely responsible for liability resulting from its gross negligence or willful misconduct." Operating Agreement, Art. 22.5 (emphasis added).

The amount of any "uninsured liability" under the Operating Agreement will not be known until the liability and allocation of fault proceedings conducted by the Court in these proceedings are concluded and individual cases are brought to final judgment in the courts in which they originated. *See generally United States v. Reliable Transfer Co.*, 421 U.S. 397, 409 (1975) (requiring court to determine defendants' proportional degrees of fault). That allocation of fault, which applies to <u>all</u> defendants, is entirely outside the reach of the Operating Agreement's arbitration provisions.

An arbitration of the parties' rights and obligations under Article 22.5 would, at most, determine whether any adverse judgments entered in this case are covered by contractual cost-sharing obligations of the parties to the Operating Agreement. The stay BP seeks would put Anadarko in the unfair position of arbitrating how to divide responsibility for a judgment that was entered without Anadarko having the opportunity to prove that the amount of the judgment should have been reduced based on the proportional fault of other parties.[6]

The allocation of fault determination by this Court requires Anadarko to develop and present evidence concerning the following types of factors: (1) whether a defendant's conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct and whether other courses of conduct were available; (4) the comparative capacities of the actors; and (5) any extenuating circumstances that might have caused the actor to proceed in haste, without proper

---

[6]    A stay also would require Anadarko to oppose collection efforts of the plaintiffs on judgments entered without ever having had the opportunity to present its defenses or to mitigate its damages in the allocation proceedings.

thought.  *See, e.g.*, *Simon v. United States*, 51 F. Supp. 2d 739, 747 (W.D. La. 1999); *Watson v. State Farm & Cas. Ins. Co.*, 469 So. 2d 967, 974 (La. 1985); *Fontenot v. Southwestern Offshore Corp.*, 787 So. 2d 588, 591 (La. Ct. App.), *writ denied*, 799 So. 2d 504 (La. 2001); *see also* 33 U.S.C. § 1321(b)(8) (including as factors for the determination of penalties under the Clean Water Act "the degree of culpability involved," and "any other matters as justice may require").

BP's Motion mistakenly contends that evidence concerning these factors, which are integral to the allocation determination, somehow are not relevant to the Phase 1 Trial.  *See, e.g.*, BP Mem. at 6 (claiming that discovery of issues concerning BP's culpability and whether BP was "under time and money pressures" will not protect Anadarko from plaintiffs' claims).  To the contrary, this type of evidence will be directly relevant to the Court's allocation determination.  Because Anadarko has the same rights as all other parties to take discovery on and present evidence at trial concerning these allocation of fault factors, BP's Motion should be denied.

### 2.     The Sweeping Restrictions BP Seeks to Impose on Anadarko Would Violate Basic Due Process Rights.

Anadarko does not have the role of an "empty chair" in this case, unencumbered by allocation of fault determinations made in its absence.  It faces the risk of thousands of adverse individual judgments on the claims brought against it.  By seeking to deprive Anadarko of its right to participate in this Court's fault determinations, BP would leave Anadarko to face a judgment in excess of Anadarko's actual proportional share of fault without having had the opportunity to defend itself—a clear violation of due process of law.  *See generally Hartshorn*, 477 F.2d at 100 ("[The claimant] is entitled to its day in court, which it has never had.  This means it is entitled to try to prove up and to argue the merits of its claim, after notice and opportunity to be heard"); *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991) (when a

court order approves a settlement "intended to preclude further litigation by [non-settling defendants], due process requires that their interests be adequately represented") (citation omitted); *Newton v. A.C. & S., Inc.*, 918 F.2d 1121, 1128 (3d Cir. 1990) (due process requires that an order imposing fines proportionally on all defendants' counsel include an opportunity to be heard on issue of fault); *cf. In re Masters Mates & Pilots Pension Plan and IRAP Litig.*, 957 F.2d 1020, 1031 (2d Cir. 1992) ("third party participation in an evidentiary fairness hearing and court approval of the settlement bar are necessary to protect the due process rights of third parties").

BP claims that any efforts by the Non-Operating Defendants to prove that BP was at fault "can only increase [the Non-Operating Defendants'] exposure to liability to the Plaintiffs, since [the Non-Operating Defendants] are contractually obligated under the [Operating Agreement] to pay their working-interest share of Macondo-related liability." BP Mem. at 6–7. As an initial matter, this argument not only presumes that BP's interpretation of the Operating Agreement is correct, but also that BP will not be found to have been grossly negligent.

BP also ignores Article 22.5 of the Operating Agreement, which provides in bold capitalized letters:

> **UNDER NO CIRCUMSTANCES WILL A PARTY BE LIABLE TO ANOTHER PARTY FOR PUNITIVE DAMAGES, CONSEQUENTIAL, INDIRECT, UNFORSEEN [sic], LOSS OF PROFIT, OR OTHER INDIRECT OR PENALTY DAMAGES EITHER IN LAW OR EQUITY.**

Operating Agreement, Art. 22.5. As the quoted language demonstrates, BP is incorrect when it claims that Anadarko will be forced to contribute to any and all damages awarded against BP.

In any event, BP's argument that Anadarko has no interest in the proportional degree of fault allocated against it ignores that the Phase I Trial will include an allocation of fault as to <u>all</u> defendants. That determination necessarily is dependent on the individual allocation attributed

to each defendant.  BP's Motion jeopardizes the integrity of the allocation of fault not just as to Anadarko, but as to all defendants, an essential part of the judgment ultimately to be entered in the case.

As shown above, although BP may wish it were not so, certain claims, defenses and issues <u>must</u> be tried in this case and are beyond the scope of the arbitration provisions of the Operating Agreement.  At a bare minimum, this requires that Anadarko be permitted to have full discovery and litigation rights with respect to its defenses, the allocation of fault determination, and the pursuit of its affirmative claims against defendants other than BP.

BP nevertheless claims that Anadarko's cross-claims against BP must be stayed because they either overlap with or are identical to the foregoing issues—which definitely are <u>not</u> subject to arbitration—and which, as a matter of due process, Anadarko must be allowed to pursue in discovery and at trial.  At bottom, BP's Motion seeks to elevate form over substance by holding that Anadarko's due process rights, and the Court's jurisdiction, exist only if the issues to be tried in the Phase 1 Trial go by the name of "defenses and allocation determinations," but vanish if are labeled as a "cross-claim."  BP's theory, if adopted, only would confuse and interfere with the trial of this complex, multi-party case, infecting it with error so prejudicial that a retrial surely will be required.  *See, e.g.*, *Horseshoe Entm't v. Lepinski*, 923 So.2d 929, 934 (La. Ct. App. 2006) ("Court proceedings will not be stayed simply because a party claims that an arbitration proceeding involving other parties concerns the same issues and conduct"); *In re Complaint of Murmansk Shipping Co.*, Nos. Civ. A. 00-2354; 00-2910, 2001 WL 1456866, at *3 (E.D. La. Nov. 14, 2001) (arbitration and limitation can proceed simultaneously even if inefficient and duplicative).

### 3.   *AmClyde* Did Not Address the Right of a Defendant to Litigate Non-Arbitrable Claims.

BP's argument that Anadarko seeks to "override" or "nullify" the policies of the FAA is specious and turns the law on its head.  BP Mem. at 16.  The FAA cannot be used "to stretch a contractual clause beyond the scope intended by the parties or authorize an arbiter to disregard or modify the plain and unambiguous provisions of the agreement."  *Smith v. Transp. Workers Union of Am., AFL-CIO Air Transp. Local 556*, 374 F.3d 372, 375 (5th Cir. 2004) (internal quotation marks omitted).  Because the claims of the plaintiffs and the plaintiffs-in-cross-claim against Anadarko are not the subject of <u>any</u> arbitration agreement, BP's self-serving interpretations of the policies underlying the FAA have no bearing upon its discovery obligations.[7]

*Texaco Exploration and Production Co. v. AmClyde Engineered Products Co., Inc.*, 243 F.3d 906 (5th Cir. 2001), heavily relied upon by BP, does not stand for the proposition that the FAA restricts the rights of defendants who have no arbitration agreement with plaintiffs from fully defending against those plaintiffs' claims, including by proving their comparative degree of fault, if any.  *AmClyde* arose out of an accident that occurred during the construction of a Texaco oil and gas production facility in the Gulf of Mexico.  *Id.* at 908.  Texaco brought suit in federal court against AmClyde, the manufacturer of a crane that failed during the accident.  *Id.*  The crane was owned and operated by McDermott. *Id.*  Because of a mandatory arbitration clause between Texaco and McDermott, Texaco did not name McDermott as a party to the federal

---

[7]     The cases cited by BP on this point all involved only bilateral litigation between parties with an arbitration agreement.  *See Thomas O'Connor & Co., Inc. v. Ins. Co. of N. Am.*, 697 F. Supp. 563, 564, 566 (D. Mass. 1988); *Corpman v. Prudential-Bache Sec., Inc.*, 907 F.2d 29 (3d Cir. 1990) (per curiam); *Suarez-Valdez v. Shearson Lehman/Am. Express, Inc.*, 858 F.2d 648 (11th Cir. 1988); *Burlington N. Joint Protective Board v. Burlington N. R.R. Co.*, 822 F.2d 810, 811 (8th Cir. 1987); *H.K. Porter Co., Inc. v. Local 37, United Steelworkers of Am.*, 400 F.2d 691, 692–93 (4th Cir. 1968).  These cases therefore provide no basis for limiting the Non-Operating Defendants' discovery into the merits of and defenses against the <u>plaintiffs'</u> claims.

action.  *Id.*  Over Texaco's objection, AmClyde tendered McDermott <u>to Texaco</u> as a third-party defendant under Fed. R. Civ. P. 14(c).  *Id.* at 908, 910.  The Fifth Circuit held that AmClyde could not use Rule 14(c) to tender McDermott to Texaco in violation of the Texaco-McDermott arbitration agreement.  *Id.* at 910.  In so holding, the Court expressly distinguished cases in which a Rule 14(c) defendant was tendered to a party with whom it had no arbitration agreement.  *Id.* at 910–11.

Of course, that <u>is</u> the case here.  The plaintiffs and the plaintiffs-in-cross-claim have directly asserted claims against Anadarko, and Transocean has tendered Anadarko to <u>the claimants</u> in the Limitations Action, not to BP.  None of those myriad claims involve parties who can invoke the arbitration provisions of the Operating Agreement with respect to such claims, which was the determinative—and the only—basis for the Fifth Circuit's ruling in *AmClyde*.[8] *See also The Shipping Corp. of India, Ltd. v. The American Bureau of Shipping*, No. 84 Civ. 1920, 1989 WL 97821 (S.D.N.Y. Aug. 17, 1989) (an outside party cannot use Rule 14(c) to override an arbitration agreement previously reached between a plaintiff and a third-party defendant).  *See generally E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 290, 297 (2002) (because the EEOC, like the MDL plaintiffs, was not a party to any arbitration agreement, it was free to pursue damages claims against an employer on behalf of a former employee even though the former employee was bound by arbitration agreement).

---

[8]     This case also does not implicate the policy concerns referenced in *AmClyde*.  Unlike the litigants in that case, Anadarko was not brought into this case as a result of any gamesmanship or collusion with the Plaintiffs.  To the contrary, Anadarko faces massive potential exposure from approximately 130,000 claimants and must be permitted to mount a full and fair defense to those claims.

11

**4. BP's Conduct Belies Its Claim That It Is a Breach of the Operating Agreement for the Parties to Seek Discovery from One Another.**

It is far too late for BP to claim that litigating gross negligence and proportional fault is exclusively reserved for future arbitrations under the Operating Agreement.  BP has used the discovery process in this case to gather evidence against defendants such as Transocean, Halliburton, and M-I Swaco in an effort to shift responsibility to them for the plaintiffs' alleged injuries.  In addition, despite its current attempt to impose unilateral restrictions on the discovery rights of the Non-Operating Defendants, BP also has served document requests seeking the following information about Anadarko:

> 42. Please produce all documents discussing, reflecting or relating to communications between Halliburton and Anadarko discussing, reflecting or relating to the Macondo well.

The BP Parties' Second Request for Production of Documents to Halliburton, filed April 3, 2011, at 13 (emphasis added).

More recently, on May 11, 2011, BP participated in the deposition of Mr. Jesse Gagliano, a Halliburton employee.  The transcript of that deposition was not yet prepared as of the date of this filing.  Counsel in attendance, however, can confirm that BP asked Mr. Gagliano in substance the following questions:

- Did you know that Anadarko has a 25 % interest in Macondo Well and that Mitsui had a 10% interest?

- Are you aware of the relationship between by BP and Anadarko and MOEX as working interest owners in the well?

- Isn't it true that as working interest owners Anadarko and MOEX had access to all the engineering information on the well?

- You agree that Anadarko and MOEX could and should have requested any information they wanted about this well from BP?

- Because Anadarko and MOEX had the same information about the well as BP they should have taken the same actions as BP should have taken?

Notwithstanding these deposition questions, BP's Motion makes the extraordinary assertion that it is a breach of the Operating Agreement for the parties to the Operating Agreement to take any discovery that might be used against one another, and that the "issue of what Anadarko or MOEX knew about BP's operation is a classic example of the kind of proof for which discovery is <u>not</u> needed: evidence of what they knew is uniquely within the custody and control of Anadarko and MOEX themselves." BP Mem. at 22 (emphasis in original).

BP has participated in discovery concerning the parties to Operating Agreement in other ways as well. On February 16, 2011—months after BP was on notice of a dispute with the Non-Operating Defendants under the Operating Agreement—BP identified six employees or representatives of the Non-Operating Defendants or their affiliates in a document entitled "BP Parties' List of Potential Priority Deponents." *See* Opening Memo., Ex. D, at 14, 17 [Rec. Doc. 1965-5]. In addition, the fact that BP previously has responded to discovery requests propounded by the Anadarko is entirely inconsistent with its current, self-serving interpretation that the Operating Agreement's arbitration provisions limit Anadarko to a "maximum of ten document requests, and [no] depositions." BP Mem. at 19.[9] BP should not be allowed to, on the one hand, take discovery in this case for use against Anadarko while, on the other hand, attempting to deprive Anadarko of basic due process rights with pious declarations of fidelity to the FAA.

In conclusion, because Anadarko has interests at stake in these proceedings that are independent of any claims that later might be arbitrated under the Operating Agreement, BP's

---

[9]     According to Transocean's Motion for a protective order [Rec. Doc. 2261-1], BP has claimed that Transocean has waived its right to arbitration under its contract with BP America (to which the Non-Operating Defendants are not a party) by virtue of engaging in far less litigation conduct than has BP. BP has not yet filed its response to Transocean's Motion, so it is not yet clear whether BP's legal theory means that it, too, has waived the right to arbitration.

Motion should be denied.  In all events, the Court should not enter any order restricting the right of Anadarko to actively defend against the claims of the plaintiffs and plaintiffs-in-cross-claims, or to participate in the allocation process that is required to establish its proportional share of fault in relation to all other defendants, including BP.

**B.      The Dispute Raised by BP Is Not Subject to Mandatory Arbitration.**

BP's Motion is premised on the argument that the dispute raised by Anadarko's cross-claims against BP Exploration is subject to mandatory arbitration.  To the contrary, however, under the Operating Agreement, any party with the right to arbitrate the claim that BP seeks to stay also was given the <u>option</u>—but not the <u>obligation</u>—to bring suit on the claim.  Because Anadarko properly exercised its option to bring suit concerning the payment dispute, BP's Motion should be denied in its entirety.  *See Summit Packaging Sys., Inc. v. Kenyon & Kenyon*, 273 F.3d 9, 12 (1st Cir. 2001) (stating that "a party cannot be forced to arbitrate against its will if the arbitration clause permits, but does not require, arbitration"); *Ellsworth, LeBlanc & Ellsworth, Inc. v. Strategic Outsourcing, Inc.*, No. Civ. A. 03-0613, 2003 WL 21783304, at *5 (E.D. La. July 30, 2003) (holding that an optional arbitration agreement was not void as a suspensive condition under Louisiana law and enforcing party's exercise of its option to arbitrate).  *See generally Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57 (1995) ("[T]he FAA's arbitration policy does not operate without regard to the wishes of the contracting parties").

**1.      Exhibit F to the Operating Agreement Grants Anadarko the Option to Bring Suit or Arbitrate Its Dispute with BP Concerning Secured Payment Claims.**

Exhibit F contains reciprocal grants of mortgages and security interests to and from BP Exploration and the Non-Operating Defendants.  The mortgage and security interests secure the parties' "complete and timely <u>performance</u> of and <u>payment</u>" of "all <u>obligations</u> and indebtedness

of every kind and nature," whether then owed or "hereafter arising, pursuant to this Agreement." Ex. F, § 6.3.a.(iii) (emphasis added).

The dispute that BP claims is subject to mandatory arbitration falls squarely within the secured payment disputes described in Exhibit F.  BP acknowledges that the dispute concerns whether Anadarko is obligated to pay Joint Interest Bills ("JIBs") issued by BP to APC for costs incurred as a result of the *Deepwater Horizon* Incident.  In BP's words: "BP claims that, under the [Operating Agreement], Anadarko and MOEX must pay their proportional shares of the JIBs. In response, both Anadarko and MOEX have brought claims seeking to avoid this contractual obligation based on BP's alleged gross negligence or other conduct."  BP Mem. at 10; *see also id.* at 3 ("Anadarko and MOEX have refused to pay those JIBs"); *id.* at 6 (cross-claims seek to prove that "BP's alleged 'gross negligence' relieves [the Non-Operating Defendants] of their legal obligations to pay for their share of the incident-related costs and liabilities, an issue that is subject to contractual arbitration").

Exhibit F grants the parties to the Operating Agreement the right to bring suit on a dispute concerning an alleged default of the payment obligations secured by Exhibit F.  For example, Exhibit F provides that the "bringing of a suit and the obtaining of a judgment by any Party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the security rights granted herein."  Ex. F, § 6.3.c (emphasis added).  Exhibit F also secures the recovery of "court costs," an additional indication that the filing of a lawsuit is contemplated.  Ex. F, § 6.3.a.(iii)(C) (emphasis added).

Other provisions in Exhibit F expressly grant rights and remedies that unequivocally create alternative remedies to the arbitration provisions of Exhibit H to the Operating Agreement. For example, § 6.3.c of Exhibit F provides (emphasis added):

> In addition to any other remedy afforded by law, each Party shall have, and is hereby given and vested with, the power and authority to [1] foreclose the lien . . . [and] [2] exercise all rights of a secured party under the Uniform Commercial Code as adopted by the state in which the Contract Area is located or such other states as such Party may deem appropriate.

In accordance with Exhibit F, Anadarko has the right to "bring[] suit" concerning its payment dispute with BP Exploration.  Exhibit F explicitly grants the parties the right to "exercise all rights of a secured party under the Uniform Commercial Code . . . ." Ex. F, § 6.3.c. The Uniform Commercial Code, like Louisiana law, grants a secured party the right to "reduce a claim to judgment, foreclose, execute upon, or otherwise enforce the claim, security interest, or agricultural lien by any available judicial procedure."  LA. REV. STAT. ANN. § 10:9-601(a)(1) (2010) (emphasis added).

"Any available judicial procedure" obviously includes Anadarko's claim for a declaratory judgment that BP Exploration has failed to honor its obligation under Article 22.5 to be "solely responsible" for the costs it contends are owed by Anadarko, *see, e.g.*, Anadarko Cross-Claims, Count X [Rec. Doc. 338 in Case No. 10-2771], particularly where BP has, at the very least, committed an anticipatory breach of those obligations by claiming that Anadarko has "forfeited [its] own rights under the Operating Agreement" by refusing to pay costs caused by BP's gross negligence.  Notice of Dispute at 4–5.  The payment dispute between BP Exploration and Anadarko therefore is not subject to mandatory arbitration.

### 2. The Rights Granted by Exhibit F Are Entirely Consistent with the Text and Purpose of the Operating Agreement.

Other provisions of the Operating Agreement provide compelling additional support for the conclusion that Exhibit F grants a limited option to sue on secured payment claims.  Article 6.3 of the Operating Agreement provides that the terms of Exhibit F are "incorporated into this Agreement by reference."  BP relies heavily on the provisions of Exhibit H for its argument that

16

arbitration is mandatory.  Unlike Exhibit F, however, the terms of Exhibit H are not incorporated into the body of the Operating Agreement.  *See* Article 22.9.[10]  This is significant, because Article 3.1 provides that: "If any provision of an Exhibit conflicts with any provision of the body of this Agreement, the provision of the body of this Agreement shall prevail . . ." (emphasis added).  Thus, to the extent that Exhibit H conflicts with Exhibit F, the terms of Exhibit F— "incorporated into [the Operating Agreement] by reference"—must control.  Operating Agreement, Art. 6.3.

Adopting BP Exploration's interpretation of the Operating Agreement would make mere surplusage out of provisions in Exhibit F that refer to the "bringing of a suit," the "obtaining of a judgment," collecting "court costs," seeking "consequential damages," and "exercis[ing] all rights of a secured party under the Uniform Commercial Code."  *See generally Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 377 (5th Cir. 2002) (denying motion to compel arbitration and noting that courts "must 'honor the presumption that parties to a contract intend every clause to have some effect'") (citation omitted); *Boh Bros. Constr. Co., L.L.C. v. State ex rel. Dept. of Transp. and Dev.*, 9 So.3d 982, 985 (La. Ct. App. 2009) ("[E]very provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.  Moreover, in the interpretation of contracts, the specific controls the general") (internal quotations and citations omitted).[11]

---

[10]     Article 22.9 provides:  "Any claim, controversy, or dispute arising out of, relating to, or in connecting with this Agreement or an activity or operation conducted under this Agreement shall be resolved under the Dispute Resolution Procedure in Exhibit 'H' to this Agreement."  Unlike Article 6.3 (which incorporates Exhibit F into the Operating Agreement by reference), Article 22.9 does not incorporate Exhibit H into the body of the Operating Agreement.

[11]     The right to bring suit under Exhibit F cannot be explained away as a right in aid of enforcing an arbitral award.  Exhibit H to the Operating Agreement independently grants the right to bring judicial actions to enforce arbitration awards.  *See* Exhibit H, §§ I.A.(ii), II.K.(iii).

Such a result is particularly inappropriate when an agreement was, as here, executed by sophisticated commercial entities who are presumed to understand the obligations and duties to which they agree to be bound.  Moreover, the unique nature of secured obligations granted in Exhibit F justified the parties' decision to agree to an optional judicial alternative to arbitration to protect the priority of and to enforce those security interests.  It is entirely reasonable for sophisticated commercial parties to reserve the discretion to determine whether, depending upon all of the facts and circumstances surrounding a dispute about secured payment obligations, an arbitration proceeding which did not permit "resort to court remedies" was a sufficient means to protect and enforce valuable security interests.  *See* Operating Agreement, Ex. H, § I.A.(i).[12]

Nor is there anything unusual about sophisticated parties agreeing to a provision that makes arbitration optional rather than mandatory.  Similar provisions routinely have been enforced under the FAA.  In *Independent Oil Workers v. Mobil Oil Corp.*, for example, the Third Circuit reversed a stay pending arbitration on the grounds that the arbitration clause at issue was optional, not mandatory.  441 F.2d 651, 654 (3d Cir. 1971).  The court held that the agreement at issue contained "an 'escape' clause which nullifies the mandatory terms of the earlier language and makes arbitration optional."  *Id.*; *see also BCS Ins. Co. v. Wellmark, Inc.*, 410 F.3d 349, 351 (7th Cir. 2005) (affirming the denial of a motion to compel arbitration where an insurance policy granted a right to arbitrate "at the option of the insured," who instead had elected litigation); *Summit Packaging*, 273 F.3d at 12–13 (contract provided that any dispute "'will be submitted to arbitration . . . or . . . to the Courts of the State of New York . . . .'"); *Digital Control Inc. v.*

---

[12]        Indeed, BP Exploration has claimed that the payment obligations secured by Exhibit F go "to the core of the benefit of the bargain of risk-sharing that is the fundamental purpose of the common industry practice of joint ownership and operating agreements."  Notice of Dispute at 4 (emphasis added); *see also id.* at 4–5 (payment defaults are such a "grave breach" that defaulting parties actually "forfeit their own rights under the Operating Agreement").  Given BP's views, it is not surprising that, in the context of an oil exploration contract, BP agreed that the parties should have an option to sue to protect secured payment obligations.

*Radiodetection Corp.*, 294 F. Supp. 2d 1199, 1205 (W.D. Wash. 2003) (holding that plaintiff's patent infringement claim was exempt from mandatory arbitration under the parties' license agreement, which allowed the option to litigate or arbitrate certain claims); *Air China Ltd. v. Li*, No. 07 Civ. 11128(LTS)(DFE), 2008 WL 754450, at *2 (S.D.N.Y. Mar. 17, 2008) (rights to elect arbitration or litigation "do not conflict, but rather, complement one another").  *See generally Waffle House*, 534 U.S. at 293 ("The FAA directs courts to place arbitration agreements on equal footing with other contracts, but it does not require parties to arbitrate when they have not agreed to do so.") (citation and internal quotation marks omitted).

Exhibit F narrowly delineates the right to elect litigation or arbitration to a specific category of disputes concerning secured payment obligations.  The option to sue does not apply, for example, to defaults of any of the numerous other performance obligations imposed by the Operating Agreement, nor would it apply to claims against affiliates asserting veil-piercing or alter ego legal theories that go beyond the limited scope of Exhibit F.  In this case, however, because BP seeks to stay a dispute involving secured payment obligations that is exempted from mandatory arbitration under the terms of Exhibit F, BP's Motion should be denied.

## C.   Neither BP America nor BP P.L.C. is Entitled to a Stay.

According to BP, the stay it seeks should extend to cross-claims asserted by Anadarko against three affiliates of BP Exploration: BP America, BPAP, and BP p.l.c. (the "BP Affiliates").  BP asserts that Anadarko's cross-claims against the BP Affiliates are made "without differentiation" from its claims against BP Exploration and that the "potential liability" of the BP Affiliates to Anadarko would be "derivative of" any liability on the part of BP Exploration.  BP Mem. at 12.

Although none of the BP Affiliates is a party to the Operating Agreement or its arbitration provisions, the Fifth Circuit has recognized that non-signatories may be entitled to

assert rights under an arbitration agreement "(1) when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against a non-signatory; or (2) when the signatory raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more signatories to the contract." *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 398 (5th Cir. 2006). "[E]quity does not allow a party to 'seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory.'" *Id.* (quoting *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000)).

BP has failed to demonstrate that either of the *Brown* factors applies to the cross-claims asserted against the BP Affiliates. *See Grigson*, 210 F.3d at 527 ("equitable estoppel is much more readily applicable when the case presents both independent bases . . ."). This is <u>not</u> a case in which a claimant has alleged that a parent of a party to an arbitration agreement is liable under alter ego or veil-piercing theories for alleged breaches of a contract containing an arbitration clause. Were that the case, BP's attempt to extend to the BP Affiliates the benefits of the Operating Agreement's arbitration provisions might have merit. *See id.* at 528 ("a signatory to that agreement cannot . . . 'have it both ways': it cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory") (citations omitted).

But here, Anadarko's cross-claims against the BP Affiliates are not based on the Operating Agreement. Nor are they "substantially interdependent upon" the claims asserted against BP Exploration, the only BP entity that is a party to the Operating Agreement. To the

contrary, Anadarko's cross-claims clearly allege that the claims against BP America arise out of its obligations under the Drilling Contract it entered into with Transocean, to which the Non-Operating Defendants are not a party. *See* Claim, Answer and Cross-Claims of Third-Party Defendants Anadarko Petroleum Corporation and Anadarko E&P Company LP at 6 ("BP America selected, supervised, and controlled the acts of Third-Party Defendants-in-Cross-Claim Transocean as the owner and operator of the drilling rig to be used at the Macondo Well site.") (emphasis added). BP p.l.c. is alleged to have been a participant in the cap and containment activities that occurred after the blowout and oil spill. *See, e.g.*, First Amend. Mast. Compl. ¶¶ 505, 519 [Rec. Doc. 1128]]. Its liability is not dependent upon any alleged breach of the Operating Agreement. BPAP is not even named as a defendant in Anadarko's cross-claims, and BP provides no indication as to how it might be entitled to invoke arbitration rights under the Operating Agreement.

In this case, Anadarko's cross-claims against the BP Affiliates are not based on any alleged violations of the Operating Agreement by BP Exploration or any of its affiliates. Rather, the specific cross-claims are based on BP America's own conduct and obligations under its Drilling Contract with Transocean—to which Anadarko was not a party—and the potential liability of BP p.l.c. is based on its own conduct in connection with cap and containment efforts, not on any alter ego or similar theories of relief. Under these circumstances, BP has failed to carry its burden of showing that a stay of any kind should be granted in favor of the BP Affiliates.

**D.    There Is No Basis for Staying Cross-Claims Asserted by AE&P.**

BP also has no basis for seeking a stay of the cross-claims asserted by AE&P against BP. As of April 1, 2010—weeks before the blowout occurred, and in accordance with the parties' long-held plan and agreement—AE&P transferred to APC all of its interests in the Leases

governed by the Operating Agreement.  *See* Assignment of Record Title Interest-MMS-150 OCS-G 32306, Mississippi Canyon 252 [Rec. Doc. 2218-2].  BP has acknowledged that AE&P no longer has any obligations under the Operating Agreement.  All of the Joint Interest Bills relating to pre-incident activities were submitted by BP only to APC and MOEX Offshore, not AE&P, and all of those costs were paid only by APC and MOEX Offshore.  Further, not one of the Joint Interest Bills submitted by BP since the blowout occurred on April 20, 2010 has been sent by BP to AE&P.  BP's conduct confirms that AE&P is not obligated to pay BP any portion of those Joint Interest Bills and further establishes that AE&P is not bound by the arbitration provisions of the Operating Agreement.  Because AE&P nevertheless faces the same number of claims as APC and MOEX Offshore, it has every right to defend itself against those claims and to assert cross-claims on its own behalf.

## III.
## CONCLUSION

For the foregoing reasons, the Motion of BP Exploration & Production, Inc., BP America Inc., BP America Production Company, and BP p.l.c. for a stay of proceedings should be denied.

Respectfully submitted,

DATED: May 12, 2011    BINGHAM McCUTCHEN, LLP

/s/ *Ky E. Kirby*
Ky E. Kirby
ky.kirby@bingham.com
David B. Salmons
david.salmons@bingham.com
Michael B. Wigmore
michael.wigmore@bingham.com
2020 K Street, NW
Washington, DC 20006-1806
Telephone (202) 373-6000
Facsimile (202) 373-6001

James J. Dragna
jim.dragna@bingham.com
Bingham McCutchen LLP
355 South Grand Avenue
Suite 4400
Los Angeles, California 90071-3106
Telephone (213) 680-6436
Facsimile (213) 680-8636

David M. Balabanian
david.balabanian@bingham.com
Three Embarcadero Center
San Francisco, CA 94111-4067
Telephone (415) 393-2170
Facsimile (415) 393-2286

KUCHLER POLK SCHELL
WEINER & RICHESON, LLC

Deborah D. Kuchler, T.A. (La. Bar No. 17013)
dkuchler@kuchlerpolk.com
Janika Polk (La. Bar No. 27608)
jpolk@kuchlerpolk.com
Robert Guidry (La. Bar No. 28064)
rguidry@kuchlerpolk.com
1615 Poydras Street, Suite 1300
New Orleans, LA  70112
Tel:  (504) 592-0691
Fax:  (504) 592-0696

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, pursuant to Pre-trial Order No. 12, I have caused the foregoing to be served on all counsel via the Lexis Nexis File & Serve system, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, who will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on May 12, 2011.


_____/s/ *Ky E. Kirby*_____
Ky E. Kirby