1

**UNDER SEAL**

TONY BROCK

JAMES WETHERBEE

POST MEETING NOTES

JULY 21, 2010

CONFIDENTIAL

2

MR. BROCK:  The first question is kind of where do we start.  And I think for me there is an introduction that just talks to, you know, the Horizon coming onto this well, coming in after the Marianas, and its job was to complete the well.  And they'd be successful in drilling the well down to TD.  The total depth of the well was 18,360 feet.  They just logged the well and they were just about to evaluate it and they were actually going to run the long string which was part of the design.  And so just introducing that sequence of events, I think, just gets people up to speed with where they were.

MR. WETHERBEE:  Yeah.

MR. BROCK:  I think there's probably a bit of, you know, who were the crew on the rig at the time.  Well, just a little bit of a paragraph that said BP had six personnel on the rig.  Bob Kaluza had just arrived over from Thunder Horse and was filling in for Ronnie Sepulveda.  Don Vedrin, who had been on the rig for six months, was working nights; Kaluza was days.  A young engineer had been out there supervised the cement job.

So there are two company men, two wellsite leaders out there.  Kaluza was standing in, Vedrin was six months on the rig and then you had other BP personnel.  But basically, you know, the job here was

3

to -- bit of a tight operation.  They had evaluated the
well.  There was very little effective stress between
the pore pressure in the well and the fracture gradient
and, as such, getting the 9 and 7/8ths and seven-inch
liner down was going to be a careful job to ensure that
they didn't incur losses because fundamentally losses at
this stage, one, with a liner in the hole would have
given them a complex and challenging well control
environment if they had lost volume in the hole and they
couldn't get that loss stopped, they could have gas or
hydrocarbons come in from the exposed reservoir sections
that they had just drilled and two is to secure every
chance of getting cement up the backside and maintaining
effective zonal isolation, they needed a stable bottom
to the hole.  So they were being very cautious to ensure
that they didn't put any surge pressures or loads on the
bottom of the well whilst they were running the casing
or through designed cement job to compromise the
integrity of the open hole section.

        So I think there's an introduction of the
rig coming on, there's a piece of -- contextual piece
about what were the challenges in this next series of
operations.

        MR. WETHERBEE:  Okay.

        MR. BROCK:  And just that little bit there

BP-HZN-BLY00141260

4

about, you know, who the people on the rigs so people
just understand their roles.

MR. WETHERBEE:  Yeah.

Is there anything else about the context
as the setup that was unique to Macondo that we want to
say wasn't -- or even if there's something we don't want
to say --

MR. BROCK:  I think, you know, for this
team Macondo was a little bit different because this rig
and this team normally drilled and evaluated exploration
wells, and in the past they have run, you know, these
production casing strings, which a production casing
string is a string of casing that you run prior to
running your production tubing.  So they have run them
in the past but not all the time.  So what was different
here was they were running a production casing string.
And then, also, you know, once they've run the string,
once they got it cemented in place, they'd set the pack
off in the wellhead and they'd set their cement plug and
pressure test it.  Then they were actually going to
suspend this well.

And the suspension process, once they've
done this, completed the suspension process, then really
it was really just going to be a matter of hours before
it was pull the riser and store the riser on the rig and

BP-HZN-BLY00141261

5

then move to the next location.  So if you're looking at a context piece, we were at the end of the well, we were securing the well and we were starting anticipation for our rig move and starting to think ahead to what other things are going to go on when we get to the next location and start the next type of project.

MR. WETHERBEE:  Okay.  Anything about the complexity?  It wasn't especially deep.  We've done this kind of thing before.  And maybe not.  I'm just --

MR. BROCK:  I think there's probably a couple of things that made this a little bit different, and so I'm just going to talk about -- rather than give the outline, I'm just going to talk about the things.  So I think, you know, from a design perspective, we were running a 7-inch, 9 and 7/8ths tapered casing string, and that was not part of the original design, although the principle of running a single long string was in the original design.  It was originally designed to be 9 and 7/8ths, not 7 inch and 9 and 7/8ths.  The reason that we had to go to the tapered string was that because of the pore pressure fell on the well, it required us to set the two contingency strings, and one of those contingency strings was the casing string that we were going to have as our production casing.  So we had to commit that earlier in the well.  And so that

6

necessitated us to find 7-inch equipment.  And so that
was a bit of -- I know the team got after that.  Once
they knew they had to procure this equipment, they went
out to the market and started looking around for this
equipment.  But, you know, it's not easy to get this
equipment just off the -- you know, the market is in
high demand.  They did secure a 7-inch liner of
sufficient grade and weight and quality for BP, but with
that they actually got a limited number.  I think they
got six centralizers that came with that.  They got a
similar float collar to what BP would normally run, and
they got a reamer shoe which is the bottom section of
casing.  So they were able to procure from Nexen the
majority of the equipment.

          But in addition to just procuring the
right equipment -- and, to be honest, six centralizers,
you know, if they had come with 20 centralizers, we
would have taken 20.  It just happened to come with six
and that was what Nexen needed for their job and that's
all they had available to us.  That became an issue
later on.

          But the other issue for us was, you know,
this equivalent circulating density, once you get the
casing on bottom and you ran it very carefully, when you
got it on bottom then you needed to break circulation to

BP-HZN-BLY00141263

7

circulate the mud up from the bottom of the well to two purposes. One was to if you had any gas that had just, you know, kind of through osmosis had just kind of crept into that well, you want to circulate that out before the cement job. But also, two, is if you leave the mud down there for a while, the gel set up and it gets viscous. So you want to break the gels and pump the mud. They did that successfully.

They didn't pump the volumes that they said they were going to pump in the drilling program, but I suspect the reason they didn't do that was really just because they were worried about inducing losses. They did break circulation. They had good circulation. They didn't actually get any losses, but I think there was a little bit of we just got to hedge our bets a little bit here. You know, the mud looks in good shape. We don't see any background gas. Let's go ahead and get the cement down there before we lose the bottom of the hole. We were just concerned about that.

So that was an issue. And in terms of the cement that they had to select, that was a challenge because they were finally balanced here on pore pressure, 14.2, and fracture gradient, so, you know, they needed a cement slurry that they could get down there to give them a reasonable isolation across the

CONFIDENTIAL

8

hydrocarbon zones and also ensure that they didn't fracture the well.

So they actually -- Halliburton, a cement provider, worked up a slurry design for us which was in comparison to previous wells it was a relatively high percentage of nitrogen.  And the reason they needed a high percentage of nitrogen was to give it that lightness so it would be light downhole.  They also used a base oil spacer again which it is used but on rare occasions because it is so light.  But this slurry itself was, you know, they were really focused on reducing the weight of the slurry so that the equivalent circulating density would be within the narrow window of opportunity that they had.  And so a lot of focus was put on that.

So that with the slightly different string design that came with a certain number of limited centralizers, those were the kind of focus areas for the engineers when they're actually trying to put this program together.

MR. WETHERBEE:  And the significance of the base oil spacer?

MR. BROCK:  So the significance of the base oil spacer is when you pump cement and you've got a pseudo oil-based mud, you don't want to have the mud and

BP-HZN-BLY00141265

9

the cement mixing together because what that will do is
it contaminates the cement, and it means the cement
either may get contaminated to the extent that it won't
go off at all and never set because it's just too high a
percentage of contaminants or it will actually be
contaminated that it may -- you may want it to set in 72
hours, but it won't set for 105 hours.  So it makes it
very unreliable in terms of that.

      So to negate that, you pump a spacer
between your mud and your cement.  Now, normally what
you do is you'd pump, you know, mud, a viscous mud pill
or something, some sort of pill, but because they wanted
to reduce the hydrostatic, they used a base oil which is
very light.  Now, the issue is if you can imagine
pumping a 14.1 pseudo oil-based mud and putting behind
it, pushing it up with kind of, I don't know, 10 pounds,
8 pounds light oil, it's quite easy that that oil is
just going to go straight up through or it's going to go
behind because you've got 16-1 cement behind it.  It's
just going to go through the two fluids.  They're much
heavier and much denser than it is.  So in terms of
effect of spacer, I'd argue it's probably not a very
effective spacer, and it's not a practice that's widely
used in the oil field or seen to be a good practice.  It
may have been a necessity in this case, but it added

BP-HZN-BLY00141266

10

another degree of risk into the overall, not just the

formula of the nitrified cement but the overall problem

with fluids that we pumped down the well.

          MR. WETHERBEE:  Do we know why they chose

the base oil?

          MR. BROCK:  Just really because it was

lighter than anything else.  If you remember, you pumped

in a casing, you pump up the annulus.  The annulus is

very small.

          MR. WETHERBEE:  Yes.

          MR. BROCK:  So you're looking at six

barrels of space.  And I can't remember how much we

pumped, but that's quite a hydrostatic head.  So that's

why they pumped it, to reduce the hydrostatic head and

offset the weight of the cement.

          MR. WETHERBEE:  Yeah.  Could they have

chosen another kind of spacer that had less risk but

still was light and wouldn't go through or...

          MR. BROCK:  I think the question isn't so

much about the spacer.  So the question is is, you know,

you used the spacer because you need to reduce the

hydrostatic head to compensate for the weight of cement.

And if you kind of sat back and looked at it, could you

have looked at a simpler cement slurry to achieve the

same outcome.  You know, we kind of very much went to

CONFIDENTIAL

the nitrified cement.  You know, our understanding is
the percentage of nitrogen we needed to retain in this
was at the very high end of its normal envelope.  We
needed to put base oil in there.  You had cap cement and
tail cement which were different densities.  So you've
got, you know, four different fluid compositions to get
this hydrostatic balance to add a cap and a tail to
allow this nitrogen to be trapped in this cement that
crossed the reservoir.  And in the benefit of hindsight
could you have just used one slurry formulation, a light
slurry, that the other people have that is available and
just kept your job really simple.  That would be a
debate, so not necessarily just a spacer but did you
need that more, not overly complex but more
sophisticated cement slurries to achieve the same.
Could you have chosen something else?

        In any event, looking back, you know, we
focused a lot on circulating density, we focused a lot
on the setting time of cement because you need to
understand how long do you have before this cement is
going to go off and set.  And we focused a lot of time
on the compressive strength of the cement, so how hard
is it going to be at a given time.  And when you look
back and you look at the tests that we've done, you
know, there was very little kind of work seems to be

done to test the stability of a nitrified cement job

with these percentages of nitrogen.  There doesn't seem

to be any extensive testing done.  And at the extreme

end of the envelope, you'd ask why weren't we doing a

lot of tests to prove stability because if it's not

stable, the nitrogen will fall out of the cement as it

pumps downhole and you don't have a good cement job and

there's a risk that the nitrogen itself will contaminate

the rest of the slurry and, in effect, you'll have a

really bad mess.  You'll have contaminated cement

downhole.  It won't give you an effective zonal

isolation.  And so when we look at the results, there's

that aspect is the reality of the cement was very low.

You know, I think it was on   the parameters I'm not

sure.  Kent will tell you what that is.  But, you know,

we did a measurement of two, and we were supposed to

have in excess of nine.  It's something that would have

drawn your attention to it straightaway, and it didn't

seem to draw any attention.

          There were characteristics of the slurry

that you would have expected to see such as, you know, a

fluid loss agent, so as it goes from a liquid to a

solid.  The fluid loss is to kind of retain the

hydrostatic of the fluid as it transitions.  There was

no fluid loss additive in this slurry at all, which is

13

amazing because you would think that would be one of the
fundamental characteristics that would be in the slurry.
So we got -- a defoamer was blended into the dry mix of
the cement itself and we're trying to foam a cement
slurry and we've got a defoamer in there.  So these are,
you know, issues that if one had done some analysis, one
would have expected the cement provider, Halliburton, to
have brought those to the attention of BP.

          MR. WETHERBEE:  Right.

          MR. BROCK:  At the end of the day the only
concerns that Halliburton raised with BP are Jesse
Galliano raised with BP was really concerns about
adequacy of centralization because the OPTIsend program
had advised that we running insufficient centralizers
and that there was a chance of gas break-out because of
the limited number of centralizers we were running.  And
we very much accept that.  The team who were doing the
job, you know, that was brought to their attention, and
they did consider that.

          And on the back of that Greg Waltz, who's
the engineering wells team leader, mobilized an
additional 15 centralizers to the rig.  You know, he
mobilized them to the rig.  They got out to the rig in
sufficient time.  I think there's testimony from the
company man and others on the rig at the time that says

CONFIDENTIAL

14

they remember them coming off the helicopter.
Unfortunately when they got to the rig and they were
described back to the time as both centralizers, both
personnel on the rig and the personnel in time thought
they were centralizers that were similar in design to
those that had been recently used on the Atlantis
project and that had failed when running in hole and
they had come apart in hole and they caused a lot of
well problems by coming apart. And I'm not fully
familiar with all the problems, but there was some
genuine concerns over the integrity of these
centralizers. And, as such, when the team thought those
were the centralizers that they got on board, they made
a decision that even with the evidence and the
information they had from Halliburton that they weren't
going to run them because they felt there's a greater
threat that they could get hung up running the hole and
have the casing potentially across the BOPs. And so
they made a decision not to run these additional
centralizers. And their intent was that they'd actually
evaluate the quality of the cement job at the end, and
if it was poor, they would perforate the casing and
squeeze and achieve zonal isolation in a remedial sense.
So they were aware of the risks. They thought they had
the wrong equipment out there, and, as such, they made

BP-HZN-BLY00141271

15

the decision.

Now, the fact is is that the centralizers that had been sent to the rig were not the Atlantis centralizers. The investigation follow-up showed us that these were, in fact, centralizers that had been run on the Thunder Horse project, and they had been proven to have mechanical integrity required for the Macondo well and had been tested and proven. And they would have been adequate for the Macondo well. But, unfortunately, that information didn't get through to the personnel on the rig and didn't get through to the personnel in time, particularly the wells team leader who was making the decision, and, as such, the decision they made, unfortunately, was poorly informed.

But, with that, they ran the casing in the ground, and it went well. As I said, they did limited circulated bottoms up. I think they limited the bottoms up. Normally they done a full case in volume, but I think they limited it just because they were worried about pushing the bottom out of the well. They also, as you recall, you know, when they were trying to set the float collars because they run the casing and they have these internal valves in the casing, and the reason they run the casing with the valves open is so that they allow fluid to naturally come into the casing as they

BP-HZN-BLY00141272

run it.  And what that does is it minimizes the surge pressure.  Again, this is a pretty common practice in the Gulf of Mexico for the environment we were in.  But when you get the case in the bottom, you want to actually set these one-way flapper valves so that after you do your cement job, these flapper valves will shut, and the imbalance between the greater hydrostatic in the annulus and the hydrostatic in the casing would normally see a U-tube effect and these valves would actually shut and stop that U-tube from occurring.  So they hold the back pressure of the annulus so that the cement can set rather than U-tubing back into the casing.

So the activity to -- once they got to bottom, they tried to break circulation.  They couldn't break circulation.  And I think it was it took them -- I saw a document that it took them nine attempts, and I think they went from, you know, 500 psi up to 3100 psi before eventually it appears that we cleared whatever blockage there was in the casing and then allowed us to circulate.  The reason I say it cleared the blockage in the casing is we don't know at this time whether the blockage was in the float collar, which was at the top end of the shoe track with the valves in it, or whether the blockage was actually at the reamer shoe at the bottom of the casing.  We just don't know.  But whatever

17

way, it was blocked.  And when we actually cleared the
blockage, you know, the blockage could have been when we
ran the hole, we ran into some solid cuttings and they
just blocked up the ports at the bottom of the reamer
shoe or they could have blocked the circulating sleeve
for the float collar.  So any of those things could have
occurred.  But, anyway, when we actually pumped through
it, we got the blockage cleared.  Through that process
they were in communication with Weatherford to ensure
that we weren't going to exceed any of the design
parameters for the float collars.  Through consultation
back to time they were satisfied that they were in
compliance with the standards and the design of the
material.  So that was good.

       But, in effect, in the investigation we
looked back, it's not clear to us that we actually
created the right differential pressure across the float
collar subsequent to clearing the blockage that would
have pushed out the setting sleeve and allowed these
flapper valves to close.  That may have been the case,
but we're concerned that we didn't have flow rates in
excess of 7 barrels per minute, which is the required
flow rate.  There's no recording of us having 7 barrels
per minute, but actually, you know, when you actually
had that surge through the system and the blockage

CONFIDENTIAL

BP-HZN-BLY00141274

18

cleared, you could have exceeded 7 barrels per minute

instantaneously so that could be enough to shift the

sleeve.

But, either way, got that blockage

cleared, started circulation.  I think they curtailed

the circulation because they were worried about losses

in the well, and they subsequently then went ahead with

the cement job, mixed the cement on the surface.  You

know, they pretty much pumped everything as they

expected.  They pumped the cement to the bottom.  We

don't see any variation in pump rate, so, you know, it

was continuous pumping rate.  They pumped the cement to

bottom through the course of the cement job and it

doesn't appear that we had any losses, but the

investigation team monitored the active pits.  There was

a lot of change in between the Halliburton unit

displacing, the rig floor displacing with rig pumps, a

lot of movement back and forth, but we've checked the

pit site.  We can't see any major indications of losses

during the cement job.  And so the conclusion that the

team offshore made that they had no losses during the

job is a reasonable assumption to make.  So they got the

cement around.  And actually when they got the cement

around, they drew the conclusion that they had 100 psi

of lift pressure and, as such, deemed that they had

BP-HZN-BLY00141275

19

sufficient lift pressure to justify a cement in the annulus and they called the job a good one.

Again, and with the benefit of looking at this job, we don't believe the method that they used to determine that height of cement was particularly accurate. It's a very low number. You know, our recommendation is that you would slow the pumps down just before the cement got to the bottom of the casing and subsequently -- and you'd record your pressures. You'd subsequently when the cement was just about all the way through the casing and about to just finish going around in the annulus, you'd slow down again to something in the order of a quarter of a barrel per minute, again to see if you could get an accurate determination of that lift pressure. We don't have any evidence to suggest that's what they did. They just pumped at full barrels per minute. So, as such, the conclusion that we had lift pressure, that lift pressure indicated a positive cement behind the casing, you know, it just feels there's no -- there's just been no case of great confidence in that method of determination given the small volume of cement and the small differential pressures involved.

MR. WETHERBEE: Is the concept -- do I have it correctly, if you slow down and you get a more

BP-HZN-BLY00141276

20

accurate measurement of the differential pressure and then if you slow down again, you get another more accurate measure, but if you don't, if you keep the flow on, you're not exactly sure what you're reading?

MR. BROCK:  So the issue you have is -- so what you're trying to do by slowing the pumps down is you're trying to minimize your friction loss associated with pumping.  So if you slow down your pumps, you got the lowest possible.  Now, you do it at the beginning so you see what it's like to just push that hydrostatic head of mud up the annulus.  Then the second time you do it, which is when the cement just gets around the corner, out the shoe and up the annulus, is you do it again to kind of see what's the difference.  So you have the same very slow pump rate and you seem to have very low friction losses, so then you have -- what you see the difference between the two is end result and hydrostatic.  You'll still have some element of friction loss in there because the viscosity of the mud is going to be different from the viscosity of the cement, so it won't be absolutely accurate, but it will be a reasonable indication.

MR. WETHERBEE:  And that, of course -- so then the conclusion -- not the conclusion -- but what you get from that information is an estimate of the

CONFIDENTIAL

21

height of the cement?

          MR. BROCK:  Yeah, because the differential

pressure is going to be the difference between the

hydrostatic cement -- the hydrostatic height of cement

versus the equivalent hydrostatic height of mud.  And so

when you get that, you can then determine how much

cement you have.

          MR. WETHERBEE:  And this method is

already -- this is more of a question -- already has a

higher degree of difficulty because the cement is light?

          MR. BROCK:  Well, the issue we have here

is that, you know, when you kind of do kind of a static

balance, the difference is 100 psi, something in that

order of magnitude.  But because you've got that low

window of effective stress between a fracture pressure

and pore pressure, you're trying to stay above -- you're

trying to stay at 14.2 but not go below -- yeah, so

you're trying to stay at 14.2, but you don't want to

exceed 14.5.  So you got .3 pounds per gallon to play

with.  So there's not a lot of difference in what was in

the annulus and what was in the casing, so you've got a

very low difference in hydrostatic pressure.  So is that

reliable means of determining the quality of the cement

behind your casing?

          MR. WETHERBEE:  What's the difference

22

between that and another job that would be easier to do? You'd have different cement and...

MR. BROCK:  I think that doing another job, one, so you're pumping 50 barrels of cement, more or less, around here, so it's a small volume.  And actually 50 barrels and a 9 and 7/8ths inch casing that's tapered over to 7-inch casing, you know, it's a small volume to go down this size of casing and then around the backside.  So if you've got contamination, you know, you get a lot -- a little bit of contamination can go a long way.  So you're worried about that first and foremost.  And two is that most cement jobs you're pumping hundreds of barrels of cement, you know, so your differential pressure is in the order of hundreds of psi, not 21 or 80 or 100.  You know, you have much bigger numbers to work with.  And also, too, is when you finish your cement job, you know, your hydrostatic differential is much greater than your friction losses. So because you've got higher volumes and much greater height of cement, you've got bigger numbers to work with, so it gives you a higher degree of confidence.  In this case you have very small numbers to work with.

MR. WETHERBEE:  So I understand, the volume of the annulus is less here, but the height, I guess, is what matters.  Why was this height so much

CONFIDENTIAL

BP-HZN-BLY00141279

23

lower than...

                MR. BROCK:  Right.  Because you're

working -- because you knew you were going to have

losses at 14.5, and you knew you had to maintain 14.2

which was the equipment pressure, right.  So you had .3

PPG is the window you had to work in.

                Now, if you thought you were in a

different regime, so say you were in a 14.5 fracture

gradient but your reservoir pressure was just

11.6 pounds per gallon, then you've got between 11.6 and

14.5 is the weight of your cement.  So you can weight up

your cement.  You've got a lot of space here.  You can

weight up your cement and really get a good, heavy dense

cement down there without worrying about fracturing, but

it would be way in excess of what the mud weight would

be inside your casing.  So you'd have -- even for the

same volume of cement, you'd have a much higher weighted

cement, and it would give you a bigger differential

pressure, one that was more reliable.

                MR. WETHERBEE:  And so in this case, we

didn't have that situation; we had less margin?

                MR. BROCK:  Because we had that little

small margin to work with.

                MR. WETHERBEE:  Little window which means

we need to have lighter cement.  But we're still going

BP-HZN-BLY00141280

24

to go to 500 feet above the pay zone, so the height --

I'm not making the connection on why the height would be

different.

        MR. BROCK: Well, I think the -- so the

height doesn't make a difference. It's just the height

relative to the weight --

        MR. WETHERBEE: Okay.

        MR. BROCK: -- gives you a small

differential. So H stays the same.

        MR. WETHERBEE: Yeah.

        MR. BROCK: So your casing strength. So

the height of the cement stays the same. So this is the

same. And the height of the cement here was 500 feet

above the shallowest hydrocarbon zone, and that was to

meet the MMS requirements. So the H is there. So the

kind of density is the height times the weight. So it's

PPG. So if you've got -- you know, the differential PPG

is .3 or if it's, you know, kind of 2, you can see the

difference here of -- you got a thousand foot. This can

be a lot denser where you -- and this frac pressure is

14.5 is you're going to lose mud at 14, 14.2, you're

going to kick. So you've just got a really low window

gate to push mud between. The height is going to be the

same either way. It's just going to be much lighter in

this case than it will in this case.

CONFIDENTIAL

25

MR. WETHERBEE:  And, therefore, harder to
get an accurate estimate of the height?

MR. BROCK:  Correct.  Harder because --
what you start to do is the numbers are going to be much
smaller, and then you actually have -- much smaller and
then just to think about the accuracy of the gauges and
the machines you're using to measure those heights.  And
also, too, is when you've got a much bigger
differential, the differential pressure is much greater
than the friction loss.  In this case the friction loss
is much higher than differential.

MR. WETHERBEE:  Yeah.

MR. BROCK:  This is the sort of stuff Kent
will give you absolute minute detail on.

MR. WETHERBEE:  All right.  So pump the
cement.  And then we decided not to do the CBL?

MR. BROCK:  Yeah.

MR. WETHERBEE:  We used this method of
lift pressure, probably less accurate.

What comes next in the story?

MR. BROCK:  There's a couple of bits for
us.  I think one is, you know, there's questions about,
you know, this is a long string, but I think the long
string design is robust.

MR. WETHERBEE:  Yeah.

BP-HZN-BLY00141282

26

MR. BROCK:  It was compliant with BP design standards.  I mean, there were a couple of dispensations, you know, where it didn't exactly meet the casing design policy, but that's not unreasonable in this environment.  You know, but in principle it kind of met BP design policy, and where it didn't the right dispensations were put in place with the right people. So the design was robust admitting, though, this -- when they got to the bottom this was a particularly challenging cement job.  So when you kind of look at it you kind of look at, you know, a high percentage of and, too, some concerns raised through just the composition of the slurry and its rheology and its properties.  You know, it's kind of a last minute job here.  A lot of stuff is being run last minute in OPTIsend.  We're still waiting on the final slurry run because we asked to extend the time setting time, so we asked for more retardant to be added.  I still haven't seen that yet from Halliburton.  So, you know, a kind of the edge of the envelope slurry, a small slurry, high vol -- big casing, low volume.

Didn't run all the centralizers we'd like to because we thought we had the wrong ones out there. And then when we got at the bottom, you know, we didn't have losses, and, you know, the guys had built a pretty

BP-HZN-BLY00141283

27

good decision tree, although the decision tree was based
on meeting MMS requirements.  And when you look at it
and you compare it with BP's ETP for zonal isolation,
you know, you'd ask two questions.  One, you're
accepting at 500 foot above hydrocarbons.  I understand
that is an MMS requirement.  And that in itself, you
know, BP's requirement is that if you're not going to
use a proven method to determine top of cement that you
should pump a thousand foot of cement above the
perimeter zones, and you should also case -- sorry --
you should also centralize the casing a hundred foot
above the perimeter zone as well.  And that's just to
make sure you minimize channeling and you get good zonal
isolation.  We didn't do this, and we didn't pump a
thousand foot.  Now, I understand why we didn't pump a
thousand foot because they were worried that if they'd
pump a thousand foot they'd get cement into the next
casing shoe.  And we've had a lot of issues in the Gulf
of Mexico with -- for production casing annulus pressure
buildup.  And that's really where in the production mode
thermal expansion of gases actually can cause collapse
loads in the annulus of production casing.  And that's a
pretty well-known phenomena.  And they were trying to
design this string for that in mind so they were trying
to leave the shoe of the last casing shoe 9 and 7/8ths,

28

they were trying to leave that shoe free to formation so if they got any annulus pressure buildup then they'd have leak off at that shoe and they'd maintain integrity for the longer term life of the well.

They also put -- designed in burst disks at the 16-inch casing as a similar mitigation. And then there's an argument that you could have pumped more cement but even with that you then would have exceeded the fracture gradient and, as such, you may have wanted to pump more cement but you'd have losses. So a difficult situation, but neither centralization required to meet the BP requirement nor the methodology of determining a successful top of cement met the ETP as it was written. Now, the ETP itself is a little bit ambiguous. It's not particularly well written to define identification and testing of barriers prior to suspension of wells in the annulus, but I think the intent is that we have two proven barriers one way or another. And the question here is we didn't have a means of effectively proving the cement. Another caveat: Did we get together and do a risk assessment. It's not evident that we did a rigorous risk assessment just looking at the information that we had either after setting the cement or actually after the negative test when we would normally have kind of sat down and said do

BP-HZN-BLY00141285

we know enough about this to allow us to suspend the
well here in a few hours.

MR. WETHERBEE:  All right.

MR. BROCK:  So after the cement test was
done, our cement was put on bottom.  The next operation
was to hole back with the case -- with the cementing
tools.  They did that.  They ran back in the hole.
Prior to running the hole, they closed the blind shear
rams.  And we did a good test on the casing.  We did a
pressure test on the casing, 500 and 2500 psi.  That was
a good test.

The test itself:  Tested the shoe, tested
the casing, tested the seal assembly.  We actually set
the seal assembly first.  Then we went in and did the
testing.  Setting the seal assembly, set it, got it in
place.  Setting the seal assembly went textbook.  The
procedure for exploration wells is we set the seal
assembly and then subsequently come back in and set the
lock ring.  And we had set the seal assembly.  It had
pressure tested very well.  There was no abnormalities
in that setting procedure whatsoever.  And we were
planning after we did the negative test to come in and
set the lock ring on that seal assembly.  It was a place
without a lock ring which was pretty standard practice
for the drill quick wellhead system, although in our

production strings they normally run an integral lock ring with the seal assembly.  It's just different configurations that make a difference.

They did the pressure test.  That was good.  The pressure test was good.  They would have tested the seal assembly casing.  They would have tested the shoe.  Admittedly, 2,500 psi, we had a wiper plug down there, people talk about whether, you know, did we get a good test in the casing.  Well, we did get a good test on the casing, but you may well have been testing the wiper plug as opposed to the shoe track where you had your kind of Class H cement.  That's just the wiper plug is good for 5,000 psi, so you probably tested that plug as opposed to testing the integrity of the shoe track and such.

After that test they ran in hole to I guess 8,000.  I can't remember the exact depth, but, you know, kind of into that kind of depth.  And then they actually proceeded to line up to do the negative test, which was their procedure.  And part of that was to, you know, displace the pseudo oil-based mud with seawater, which, again, is just standard practice.  As you get to suspend the well, you got to take the pseudo oil-based mud out, displace the top of the well and displace the riser to seawater.

CONFIDENTIAL

BP-HZN-BLY00141287

As an interface between that, they had some high visc material in the pits.  These were lost-circulation pills.  And they got a recommendation from MI in time to commingle these pills and then use them as an effective spacer.  So you can imagine you're displacing 14.1 pseudo oil-based mud with seawater.  It would be really ineffective if you tried to pump one after the other because your seawater would just cut straight through your pseudo oil-based mud and give you a lot of contamination.  So they pumped this pill, and I guess pill 450 barrels.  You know, it doesn't really make a huge difference how big the pill is.  It just needs to be big enough to be effective.  In terms of pill size, yeah, you'd normally pump 200, 250 barrels, in that order, maybe a little bit less.  But, you know, there's no inherent risk of actually pumping this volume of pill.  It's really just as a matter of using what you have available to you.  After it's being pumped through, it's a water-based fluid.  It would -- you know, was what was contaminated would be disposed of so a nonissue.

But they displaced this.  But the issue for us here is -- in the investigation is the intent was to pump this viscous pill, displace it with seawater to well above the BOP.  And once it was well above the BOP,

then the idea was to shut the upper annular and then
have the well -- it was then displaced to seawater, the
kill and choke lines would be displaced to seawater, and
then we do our negative test.

The fact is is that through the
investigation we've reviewed the MI procedures.  We've
reviewed the stroke contours on the rig that we got back
from the various mud logs.  It looks like there was a
mistake.  Although, the instructions look very clear
from MI, it looks as though there was some confusion by
whoever was actually doing the pumping, whether it was
the AD or the driller on the rig floor.  They seemed to
have got the messages mixed, and, as such, they
underdisplaced the pill.  And the determination of the
investigation team is that by mistake the pill was
inadvertently left across, straddled the BOP.

We don't believe that at the time where
they were actually closing the annular and conducting
the negative tests that the drill crew nor the BP
wellsite leader were aware that the pill was there.  I
think everybody thought the pill was a thousand foot up
in the riser.  So we're doing the negative test, and
normal practice in this rig was they used to do their
negative test, which really is a draw-down on the well
to simulate the well being open to seawater hydrostatic,

BP-HZN-BLY00141289

33

i.e., the BOP is being removed, is to simulate that
condition so the positive test is basically there to
test the internal integrity of the casing.  The negative
test is to test that the casing can withstand a lower
effective density inside the casing with regards to the
back pressure which will be either heavy mud or
hydrocarbons from the reservoir.  So it was really just
to test the integrity of the casing from pressure behind
the casing itself with the well pressure inside from
disconnected BOP.  And we normally do it down the drill
pipe or they normally do it down the drill pipe in this
rig.  And, as such, the Transocean crew lined up to do
it on the drill pipe, closed up the annular and prepared
to do that test which is, you know, just to basically
displace the seawater and monitor for flow.

            In the course of that initially they bled
off 50 barrels.  They weren't quite sure where that
50 barrels came from, but they realized in the process
that it was likely that the annular was not sealing.  So
they upped the regulator pressure on the annular, the
closing pressure on the annular, got a tight seal on the
annular, and they actually filled up the riser again
just to offset.

            (Telephonic interruption)

            MR. BROCK:  So they were getting lined up

BP-HZN-BLY00141290

34

on the drill pipe.  They had figured out that the
annular was leaking.  They upped the pressure.  They got
a seal.

        MR. WETHERBEE:  Let me ask you just for my
information:  When they bled out 50 barrels, you do
think the annular probably was leaking?

        MR. BROCK:  Yeah, one of the tests they
did is they were trying to figure out where did this
50 barrels come from because you're now starting to put
this drawdown on the well and your concern should be,
holy moly, I should not be getting -- when you put the
drawdown on you should get a couple of barrels back just
as the casing relaxes, but you shouldn't be getting
50 barrels back.  So what they did is they looked
down -- from the rig floor they looked down into the
riser, and they saw that the level in the riser had
dropped.

        MR. WETHERBEE:  Okay.

        MR. BROCK:  And that's how they
ascertained that the bag was leaking.

        MR. WETHERBEE:  All right.  I got you.  So
we don't think we had an influx yet?

        MR. BROCK:  No, we didn't.  We were pretty
sure that was the mud bypassing the annular.  And that's
pretty common, too, because, if you remember, you

CONFIDENTIAL

actually had seawater down one line, but you had this

pseudo oil-based mud and this pill which is heavier than

the other.  So that would be very natural for -- if the

annular wasn't leaking for any pressure that you see in

your drill pipe would have come from the higher material

in the riser, higher weight material in the riser.

MR. WETHERBEE:  Yeah.  All right.

MR. BROCK:  So they started to do the test

on the drill pipe, and Bob Kaluza, the BP wellsite

leader, came up to the floor.  I think it was either

Kaluza or Don Vedrin who were just -- they were just

handing over at this period in late afternoon.  And you

got all the facts on that.

MR. WETHERBEE:  Yep.

MR. BROCK:  But one of them ascertained

this is, well, actually the permit.  The MMS permit says

that we should be doing this test on the kill line.  And

it's neither here nor there whether you do it in the

kill line or the drill line.  It's the same type of

test.  It's the same pressures you're using.  But to be

precise with the -- to meet the letter of the law in

terms of the permit, the drill company man said stop the

test on the drill pipe and then get our system switched

over so we can do it in the kill line.  So they did

that.  And I think there was a little bit of discussion

back and forth because people were just upset that they
were changing halfway through a partially-completed test
and they like to do it a certain way and there was lots
of references that different people did it different
ways.  But in effect it's the same test, and they wanted
to follow the letter of the requirement for the MMS.
Incidentally, the negative test I believe is not an MMS
requirement but we put it in our permit as a requirement
for BP so that's why we did it.

So they line up in the kill line, and they
were getting balance back and forth in the kill line.
They were concerned about trap pressure.  But
effectively they got the kill line lined up and they
felt they were satisfied that it was open and they
monitored the kill line for 30 minutes and the kill line
stayed at zero pressure for 30 minutes.  However, the
drill pipe, which is the other side of the U-tube, was
recording 1400 psi, and when they discussed the
difference between the two, the difference was described
by, let's say, personnel on the rig as a bladder effect,
some phenomena where you get this imbalance.  But it was
discounted as being of any great significance.

The investigation team looked into this,
and we believe that, one, you know, we don't believe
there's any credence to arguing there's a bladder effect

or any other phenomena.  You know, there should have

been -- if there's 1400 psi in the drill pipe, there

should have been 1400 psi on the kill line.  And we

believe that 1400 psi was an indication that we hadn't

got integrity and that we were in communication with one

of the sounds in the open hole section.

            And why do we not read it on the kill

line?  Well, it would have been a number of events.  The

valve could have be shut on the kill line so that they

actually inadvertently had a valve closed, and they

weren't actually reading any pressure from the well;

two, that the viscous pill that we had inadvertently or

that had been inadvertently left across the BOP had --

when we were bleeding down pressures had come inside the

kill line and actually blocked up the kill line itself;

or, even more simply, just this material was very

viscous and the very fact that it was in annulus meant

that pressure communication between the well and the

kill monitor was blocked by this very viscous material.

It just didn't transmit the pressure.  So any one of

those three could have led to zero on the drill -- on

the kill line as opposed to the 1400 on the drill line.

            But we have three hours to do this test, a

lot of debate over what the particular circumstances

were, and at the end of the day all parties, you know,

38

Transocean, BP, concluded that the test was good when,
in fact, it wasn't.  And, as such, they kind of opened
up the annular and started to continue to circulate the
seawater into the well and circulate the pill and the
pseudo oil-based mud to surface.

            MR. WETHERBEE:  Okay.  So now they go into
thinking that they've just demonstrated integrity of the
well, and they go in to do other operations which we
would expect them to do?

            MR. BROCK:  Yeah.  So I'll talk about
that.  Let me -- Steve is leaving at 4:00?

            MR. WETHERBEE:  Oh, yeah.

            MR. BROCK:  You probably -- this piece
here will be really good to get Steve's views on

            MR. WETHERBEE:  Okay.

            MR. BROCK:  -- before he goes, but let me
give you my ten minutes worth first.

            So at this stage, as we said earlier, you
know, the guys were actually -- this was the last kind
of -- the negative test was the last significant
operation before setting a cement plug and then testing
that cement plug and then subsequently coming out of the
well.  We set the seal assembly, set up cement plug, set
the seal assembly, disconnect the riser and pull the
riser in the location.  But in that there was a lot of

BP-HZN-BLY00141295

39

work going on.  I mean, all through the day, you know,
people were backloading equipment onto the Bankston
supply vessel.  They were transferring mud because you
displace all this mud out of the well, they were
displacing the mud back onto the pits in the rig, and
then they were actually, you know, transferring the mud
from the pits onto the boat itself.  We don't believe at
any stage that they were directly going from the well
straight to the boat, but we think they were moving
pits, they were cleaning pits on the rig.  They were
cleaning -- during the negative test they were actually
cleaning the trip tank which is a small accurate tank on
the -- by the rig floor.  It gives the driller a chance
to accurately monitor the well.  So a lot of work on
that which was SIMOPS.

        So they were doing, you know, they were
cleaning pits.  They were preparing materials for
backload.  You know, they were bleeding riser tensions
down.  They were stripping mud pumps, doing work on the
mud pump systems.  Don't know exactly, but a lot of care
and maintenance work now that we've finished drilling
the well.  You know, circulating the seawater was a
relatively straightforward activity.  You would expect
either a drilling or AD to be on the rig floor just
monitoring events there while everybody else was about

CONFIDENTIAL

40

doing other ancillary work, you know, or getting ready
for the next phase of the operation which was to do the
cement plug and set the seal assembly.  So a lot of
SIMOPS going on around about on the rig itself.

And that kind of -- you know, through the
course of this, you know, you kind of -- you've got --
you know, for us we look back at the data, you know.  We
feel shortly after the bottoms up that we saw a number
of indications whereby, you know, the well was in an
abnormal state and indications were that we're taking a
kick.  You know, we saw a kind of pressure buildup in
the drill string when we slowed down the pumps which was
not characteristic to slow down the pumps and expecting
drill pipe pressure to decrease.  We saw it increase.
We saw volumes coming out of the well were greater than
volumes going in and subsequently seeing drill pipe up
again.  I haven't got the exact times and dates.  I
mean, we've got all that recorded.

But, you know, 51 minutes before the
explosion there were clear indicators that you would
expect to be very visible on the driller's panel on the
rig floor through the Transocean monitoring system.
But, additionally, you'd also have expected to see
similar information available in the vary same mud
logger's unit as well, and you would have expected just

BP-HZN-BLY00141297

for people to notice these abnormal conditions and make
some notification.  As it is, you know, there's an
eyewitness account that the chief engineer was on the
rig floor at about 21:31.  He witnessed the night tool
pusher, Anderson, talking to the driller, Cevette, and
they were talking about abnormal pressure or conditions
in the well.  And he asked them -- he went up there to
see when they were going to do the cement job, and they
said, well, it might be a little while yet because we
may have to circulate bottoms up here.  So it appears at
21:31 that they had recognized some abnormalities.

However, looking back at the pressures and
the charts recovered from Sperry Sun mud logs data, that
conversation happening at 21:31, there's no evidence to
us that we took any action to shut the well in until
probably about 10, 15 minutes later whenever a series of
phone calls were made to personnel on the rig notifying
them that there was mud flow coming at the rig floor and
that they were taking actions to close the annular and
to line the return system up to the diverter mud-gas
separator system.  And, in fact, they were going to use
the mud-gas separator as a means of controlling flow
from the well.  From our analysis, it appears that
annular preventer may well have been closing moments
before the first explosion and there's a sharp pressure

42

spike literally just moments before the explosion that
suggests that maybe the annular affected the seal or
also there's evidence that the upper variable rams may
have been closed and that may have given us an effective
seal in the annulus itself.

Eyewitness accounts tell us that the close
button for the annular was evident on the control panel,
BOP control panel on the bridge.  There was no
indication that the upper VBRs had been closed, but
subsequent ROV inspection and intervention workdays
later advised that when they tried to close the upper
variable rams that the system needed little or no fluid
suggesting that the upper variable rams were already
closed.  And as much as this would have actually sealed
the annulus, we believe that gas had already broken into
the annular or into the riser and migrated up the
annulus or migrated up the riser and created a massive
gas plume at the rig.  It overwhelmed the mud-gas
separator system causing gas to vent and leak around the
rig floor and the rig area, and, in particular, you
know, it may have found ingress into the air intakes to
the generators.  It may have caused the generator
systems to go into overdrive and then fail.  We don't
know.  I mean, there was a lot of working on the rig.
This gas would have quickly found areas that were known

43

hazardous, safe, and, as such, we don't know what other
ignition sources that they may have found that resulted
in at least one, if not two, explosions.  Eyewitness
accounts recall a smaller explosion followed by a larger
explosion and fire.

MR. WETHERBEE:  So, I mean, that was
really good.  That was like gold.  So I decided not to
do the outline and just kind of listen because it was
really valuable.  Thinking about the outline, I would
then probably talk about -- we would then obviously go
into the BOP things.

MR. BROCK:  Yeah.  So let me talk about
the BOP because, you know, what we just talked about
there was actions you'd expect the driller or the
personnel on the rig floor, the driller and the tool
pusher -- the driller and the tool pusher, they called
down.  They advised Ed Zelles, senior toolpusher.  They
called personnel to different areas of the rig to
support response.  They called Don Vedrin, or Ed Zelles
called Don Vedrin.  So, you know, there was a series of
calls that went out just notifying people that we had
this well control event and that they were responding to
it.  Beyond that, you know, we have no further accounts
on the rig floor of what occurred.

What we can say, though, is that

BP-HZN-BLY00141300

44

individuals mustered, you know, the OIM, the master, BP
visiting VIPs with the subsea engineer and others
mustered onto the bridge of the rig, and during that
muster they were aware that one light on the panel was
on that looks like it was the lower annular was on which
indicated it had been shut.  There were other accounts
of lights were flashing, but we can't substantiate what
that actually means.  But there was a clear direction to
fire the emergency disconnect sequence.  We believe that
Chris Pleasant fired that function or tried to activate
that function by pressing the button on the control
panel on the bridge.  And there's other accounts that
other individuals had subsequently advised fire and shut
fire, the EDS.

          There's also discussions about whether
people had the authority to shut the EDS or who would
make that decision or do we need to do further decision
and there was some discussion between the master, the
OIM about that and it's well documented through witness
statements.  But, in effect, we're pretty sure that
attempts were made to fire the emergency disconnect
sequence, the EDS, after the second explosion.  There's
accounts that says that lights came on, they flashed.
Accounts came on to say that there was no stroke
indicators.  It's our belief that although they made

BP-HZN-BLY00141301

attempts to fire the EDS system that either through the first or second explosion the communication between the control panel on the bridge and the central computer unit for the BOP, which would subsequently relay the message down to the subsea stack, we believe that that system was damaged and was ineffective and, as such, did not communicate the instruction to fire the emergency disconnect sequence.  That sequence would have fired off the high pressure blind shear rams to close, and it would have subsequently fired off a message to disconnect the lower marine riser package.  And that would have separated the rig from the well itself with the blind shears supposedly sealing in in the well.

There was no evidence.  We went through ROV inspection.  There is no evidence that the blind shears fired at this time, and there was no evidence that the lower marine riser package had partially or had attempted to disconnect from the well or from the BOP.

Through sequence of events, you know, what happened next, well, it's unclear to us, but the next function you would expect to operate would be the auto mode function/dead man system.  This system is designed to operate in the event of a catastrophic failure of your riser where the BOP loses hydraulic communication, electrical communication and communication between the

46

yellow and blue pods, the two control pods for the BOP.
If these three conditions are satisfied, then the blue
and the yellow pods will then get a signal to fire the
high pressure blind shear rams.  Again, you know, just
through -- you know, either after the explosions or
actually when the rig sank, we're pretty sure that these
three conditions were satisfied, but, again, on the ROV
inspection there is no evidence to suggest that the
blind shear rams were activated.  And that causes some
concern for us and it's an area of inquiry into the
investigation and I'll come back to that in a second.

Later on with the ROV on the seabed, the
team tried to simulate the disconnection of the lower
marine riser package, and that would have then
subsequently kicked in an auto shear feature.  The auto
shear feature again is a mechanical device.  It's got no
electronic parts.  It's just a mechanical device that is
tripped whenever the low marine riser package
disconnects from the BOP.  And if the emergency sequence
has not been activated, the automatic feature here is
that somebody has inadvertently disconnected the LMRP
from the BOP and so a mechanical device trips the high
pressure shear rams and they are activated to shut in
and seal the BOP.

As part of our inquiry we got a chance to

Case 2:10-md-02179-CJB-DPC   Document 2393-1   Filed 05/16/11   Page 47 of 52

examine both the recovery of yellow and blue pods.  The
inquiry we did actually suggested to us that critical
solenoids in the yellow pod were defective and, as such,
at the time of the incident we believe that they were
defective and, as such, would have meant that the
ability to function the dead man on the yellow pod would
have been ineffective.

Similarly, we recently recovered the blue
pod.  We carried out a full inspection of the blue pod.
And in that inspection we identified that critical
batteries in the system that are needed to make the
function active were, in fact, dead.  We've done some
analysis on this, and it's highly probable that given
the voltage available in the batteries at this time of
inspection that the batteries back on the 20th of April
were also quite likely or very probable that they had
insufficient charge to have activated the dead man
system on the blue pod.

In addition to that, we've carried out a
number -- the ROV identified a number of leaks on the
BOP, leaks on the upper annular, leaks on the ST locks
on the blind shear and two other leaks on the system
itself.  We've done detailed hydraulic modeling and
analysis, and through that hydraulic modeling and
analysis we've concluded that these leaks when the

CONFIDENTIAL

BP-HZN-BLY00141304

48

system was connected to the rig and had available
hydraulic horsepower from the rig meant in this
particular case whilst they were supported by hydraulic
fluid and pressure from surface, these leaks were
immaterial.  However, in the mode whereby the system is
disconnected from the rig and is wholly dependent upon
the subsea accumulator system that in the event of
activation of the blind shear systems the leak on the ST
locks would have at the time of activation of the blind
shear rams through the subsea accumulator or auto
function -- sorry.  Let me go back one.  The function of
the blind shear rams either through the auto shear
mechanism simulation or through the AMF function is not
likely to have been able to cut pipe because the leak
rate was sufficient to have bled off pressure.  That
meant suboptimal pressures were available to drive the
closure of the blind shear and, as such, it's likely
that some attempt to shear would be made, but it would
not have been effective in completely shearing the pipe
and sealing the well.

          Overall from the analysis of maintenance
records, from analysis of the recovered parts of the
BOP, the pods, we don't have an impression that this BOP
was particularly well maintained.  Given that it's a
piece of safety critical equipment, we would have

CONFIDENTIAL

49

expected to see a more consistent rigorous maintenance

campaign program for this component, and that was not

evident from the work we've done to date.

Additionally, the ROV work identified

quite a number of undocumented changes to the hydraulic

control systems on the BOP.  We believe that a lot of

these changes were made without the oversight of the

original manufacturer, and, as such, we don't believe

that the MOC process used by Transocean, you know, was

adequate in terms of documenting changes, in terms of

getting third-party signoff or completing essential

acceptance testing for the changes was adequate given

the nature of the equipment that these changes were

being completed on, these changes were being made to.

So we have concerns about that.

I mean, a lot of this work on the BOP, you

know, we've done from, you know, inspection as we can do

observations from the ROV and from available drawings

that we've made -- be made available to us either

through the drilling operations team at BP or through

documents we've got through from Transocean.  We don't

have a comprehensive set of documents of as-built

diagrams, and, as such, one of the strong

recommendations through this is once the BOP is

recovered that, you know, further inspection is done to

just really proof out the actual modifications and then complete further analysis on the hydraulic modeling system failures, et cetera.  That needs to be done once we get it recovered.

In addition to that one of the key things that needs to be preserved are the accumulator bottles themselves where we can ascertain what the available pressures and volumes would have been subsea, and so those systems should not be bled down before the BOP is recovered.  They should be preserved as an accurate means of determining just what available fluids were available subsea.

MR. WETHERBEE:  I'm trying to think. Closing out this section, just back to an outline kind of a deal, we'll also have conclusions, recommendations, long-term, short-term, that kind of thing.

MR. BROCK:  So hydrocarbons and surface. So as we said, the driller noticed at 21:31 that there were some abnormalities in the well.  We believe that, you know, around 15 minutes later, you know, we were seeing mud come back on the rig floor and then actually seeing, you know, excessive fluids and gas kind of come up to the rig.  And our understanding is from the eyewitness accounts and reports that the driller, tool pusher lined up the returns fluids to the mud-gas

BP-HZN-BLY00141307

separator system, so they shut the diverter and lined up

on the mud-gas separator system and, as such, diverted

the flow from the well into the degasser which in itself

is not a high capacity vessel nor is it a high pressure

rated vessel.  And it quickly became overwhelmed, and

gas was vented out of the vent systems.  But these vent

systems had a series of goosenecks on them, so they

vented gas back down onto the rig floor areas, areas

adjacent directly with the rig floor.  And the systems

failed themselves.  You know, we just had -- slip joint

failed, pressure relief valves are likely to have

failed.  So the system itself was overwhelmed as a

result of diverting through the mud-gas separator

system.

          One of the areas that we're looking into,

we've looked into in the investigation is that the

alternative, if we had recognized that there was an

ongoing well-control vent, you would have expected first

and foremost, one, crew to have responded much more

quickly to the signs that they picked up on the rig

floor, particularly at 21:31; you'd have expected rams

to be closed a lot quicker; and as the influx got to

surface and you started to see kind of gas breakout

which resulted in mud, jets of mud releasing from

different components, you would have expected to see a

CONFIDENTIAL

system of this high rate, high volume be diverted to the
primary diverter system which is two 14-inch overboard
lines.  On our early understanding at this stage, if we
diverted to these overboard lines we could actually have
safely diverted the majority, if not all, of the fluids
overboard and created a broader window for rig crew to
respond to the event and possibly a different way with
possibly a different outcome.

        MR. WETHERBEE:  Very good.

        MR. BROCK:  So we've got the cement, we've
got the casing, we've got the negative test, we've got
the well monitoring, we've got the kick response, we've
got the surface system ignition, we have the emergency
BOPs and the ROVs.  So it really is just about building
around those.

        MR. WETHERBEE:  Yeah.

        MR. BROCK:  You've got the well status.
You've got recent operations.  And then, you know,
conclusions, recommendations.

        MR. WETHERBEE:  Yeah.

        MR. BROCK:  That's what I'm thinking is
your layout, is the intro, your failure model, your
causal effects, conclusions, recommendations.

        MR. WETHERBEE:  Yeah.

CONFIDENTIAL