PAUL M. HEBERT LAW CENTER

# LSU LAW

LOUISIANA STATE UNIVERSITY

Center of Continuing Professional Development

*W203 Law Center*
*Baton Rouge,*
*Louisiana 70803-0001*

*Phone: (225)578-5837*
*Fax: (225) 578-5842*
*LSUcle@law.lsu.edu*
*www.LSUcle.org*

# OPA 90 – Searching for the Line

## By

## Professor David W. Robertson
## W. Page Keeton Chair in Tort Law
## University Distinguished Teaching Professor
## University of Texas School of Law, Austin, TX

9th Judge Alvin B. Rubin Conference on
Maritime Personal Injury Law

May 13, 2011

McKernan Law Auditorium
LSU Law Center

All Rights Reserved

# OPA 90:  Searching for the Line

David W. Robertson
University of Texas School of Law
May 1, 2011

TABLE OF CONTENTS

I. INTRODUCTION: THE KEY STATUTORY PROVISIONS ...................................................1

II. THE MACONDO (DEEPWATER HORIZON) OIL SPILL ..............................................4

III. THE PRECISE QUESTION TREATED IN THIS ARTICLE ..........................................5

IV. THE GULF COAST CLAIMS FACILITY, THE GOLDBERG PAPER,
AND THE COMMERCIAL-USE-RIGHT THEORY ...............................................................6

V. A MIDDLE-OF-THE-ROAD INTERPRETATION OF OPA'S ECONOMIC
LOSS PROVISIONS ....................................................................................................9

    A. Deep Background:  Admiralty Jurisdiction and Federal Maritime Law .............10

    B. The Facially Apparent Meaning of Section 2702(b)(2)(E):
    A Factual Causation Interpretation ........................................................12

VI. CONTRASTING THE FACTUAL CAUSATION INTERPRETATION WITH
THE GOLDBERG USE-RIGHT INTERPRETATION:  GOLDBERG'S
"UNIVERSE OF POTENTIAL PURE ECONOMIC LOSS CLAIMANTS" ...........................14

    A. Claims Probably Defeated by Section 2702(b)(2)(E)'s Factual Causation
    Requirement ........................................................................................18

    B. Claims That Should Succeed Under the Factual Causation Interpretation ..........19

    C. Claims Defeated by the Goldberg Interpretation ...................................19

    D. Goldberg Neglects the Ships' Chandler ...............................................21

VII. A PARTIAL ANALYSIS AND EVALUATION OF PROFESSOR GOLDBERG'S USE-RIGHT
PROPOSAL ............................................................................................................21

    A. The Courts' Treatment of Statutes That Are Broadly Analogous to OPA ..........22

    B. OPA's Legislative History:  Nine Key Features ......................................29

    C. Judicial Decisions Interpreting OPA.....................................................34

VIII. CONCLUSION ...................................................................................................39

## OPA 90: SEARCHING FOR THE LINE[**]
David W. Robertson[*]

### I. INTRODUCTION: THE KEY STATUTORY PROVISIONS

When the supertanker *Exxon Valdez* ran aground and ripped itself open in Alaska's coastal waters in March, 1989, spilling an estimated eleven million gallons of crude oil,[1] Congress had been trying for more than a decade to enact comprehensive marine oil spill legislation.[2] The previously unimagined scale and scope of the Valdez tragedy jolted Congress into a more productive mode,[3] and the Oil Pollution Act of 1990 ("OPA") was enacted and signed into law on August 18, 1990.[4]

In their deliberations on the bills that eventually coalesced to become OPA, members of Congress expressed deep dissatisfaction with virtually everything about this country's lack of

---

[**] An early version of this paper was presented at an Oil Spill Symposium at the Mississippi College of Law, Jackson, Miss., on Feb. 18, 2011. A later version, tentatively titled *The Oil Pollution Act's Provisions on Damages for Economic Loss*, is scheduled for publication in a forthcoming issue of the Mississippi College Law Review.

[*] W. Page Keeton Chair in Tort Law and University Distinguished Teaching Professor, University of Texas at Austin. The sole purpose of mentioning my academic affiliation is to identify me. The views expressed here are mine, not those of my university or law school. The analysis presented here has a deep basis in decades of academic study, reflection, and scholarship, but it also reflects work I have recently become engaged in as a consulting expert for the Plaintiffs' Steering Committee in *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010* (MDL No. 2179, E.D. La.) ("Oil Spill Litigation").

[1] See *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 476-78 (2008).

[2] John C.P. Goldberg, *Liability for Economic Loss in Connection with the Deepwater Horizon Spill*, Nov. 22, 2010, at 7 (available at www.gulfcoastclaimsfacility.com.

[3] See *id.* at 6. The *Exxon Valdez* spill was "only the world's fifty-seventh largest." Raffi Khatchadourian, *The Gulf War*, THE NEW YORKER, Mar. 14, 2011, at 39. But in this country the Valdez spill had a unique political impact because it was so "ecologically devastating" (*id.*), and it was the United States' first huge one. Famous larger spills include the thirty-seven million gallons of Kuwaiti crude oil released when the *Torrey Canyon* went aground off Cornwall in 1967, *id.*, and the estimated 120-million-gallon spill caused by the semi-submersible drilling rig *Sedco 135-F* in the Bay of Campeche, Mexico, in June 1979. See *Ixtoc I Oil Spill*, WIKIPEDIA. See also *Sedco, Inc. v. Petroleos Mexicanos Mexican National Oil Co.*, 767 F.2d 1140, 1142 (5th Cir. 1985) (referring to the Ixtoc I spill as "the world's largest"). Oil from the Ixtoc spill reached Texas beaches, but the national political impact of the incident was negligible.

[4] PL 101-380, Aug. 18, 1990, 104 Stat. 484. Title I of the Act, captioned *Oil Pollution Liability and Compensation* (§§ 1001-1020), is codified at 33 U.S.C. §§ 2701-2730. Because most practitioners and lower-court judges seem to find the Title 33 counterparts more easily accessible than the provisions of the Act itself, this Article cites to OPA by using the Title 33 section numbers.

preparedness for disasters like Valdez. One major theme in this outpouring of official grief and anger was the view that the thousands upon thousands of individuals, communities, and businesses whose lives and livelihoods were destroyed, disrupted, or damaged should have had (but often were denied) adequate, fair, and speedy compensation.[5]  Congress believed that such relief should be guaranteed for the victims of all future spills.

OPA addresses these concerns by imposing strict (no-fault) liability on the party or parties responsible for an oil spill.[6]  This strict liability is limited (but only slightly) by a narrowly crafted set of affirmative defenses.[7]  An oil polluter held strictly liable under OPA is potentially protected by a cap on the damages owed,[8] but a claimant can break the cap by showing that the responsible party's gross negligence, willful misconduct, or violation of a Federal safety statute or regulation "proximately caused" the spill.[9]  Victims who are not fully compensated by a responsible party may claim against a federally-administered Oil Spill Liability Trust Fund.[10]

OPA makes polluters (and, when polluters can't or won't pay, the Fund) responsible for removal costs and for a "wide range" of damages.[11]  The OPA provisions with which this paper is centrally concerned are those specifying the types of damages available.  The immediately

---

[5] See *infra* note 56.

[6] 33 U.S.C. § 2702.

[7] 33 U.S.C. § 2703.

[8] 33 U.S.C. § 2704(a).

[9] 33 U.S.C. § 2704(c).

[10] 33 U.S.C. §§ 2701(11), 2712(a)(4).

[11] S.Rep. No. 101-94, at 12 (1990).

relevant statutory provisions are set forth just below. The central focus of this Article is the meaning of the language in bold italics (supplied).

### 33 U.S.C. § 2702. Elements of liability

(a) In general

Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section *that result from such incident*.

(b) Covered removal costs and damages

(1) Removal costs

\* \* \*

(2) Damages

The damages referred to in subsection (a) are the following:

(A) Natural resources

Damages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage, which shall be recoverable by a United States trustee, a State trustee, and Indian tribe trustee, or a foreign trustee.

(B) Real or personal property

Damages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property.

(C) Subsistence use

Damages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources.

(D) Revenues

Damages equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by the Government of the United States, or a political subdivision thereof.

3

(E) Profits and earning capacity

Damages equal to the loss of profits or impairment of earning capacity *due to the injury, destruction, or loss of real property, personal property, or natural resources,* which shall be recoverable by any claimant.

(F) Public services

Damages for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, caused by a discharge of oil, which shall be recoverable by a State, or a political subdivision of a State.

* * *

## II. THE MACONDO (*DEEPWATER HORIZON*) OIL SPILL

Disagreement about the meaning of the above-emphasized language of Sections 2702(a) and 2702(b)(2)(E) is presently at the heart of the litigation[12] stemming from the monstrous Macondo[13] oil well spill into the Gulf of Mexico on April 20, 2010, when the *Deepwater Horizon* drilling rig exploded, burned, and capsized, killing eleven workers, injuring many other workers, and causing oil and gas to begin spewing into the Gulf from the wellhead almost a mile (5000 feet) below the ocean surface.[14]  The flow of oil into the Gulf was not staunched until July 15, 2010.  By then an estimated 200 million gallons of oil (perhaps twenty times as much as the Valdez spill) had entered the Gulf.

The Macondo well is located forty-three miles off the coast of Louisiana and about ninety-eight miles from the coasts of Mississippi and Alabama.  Hundreds of thousands of individuals and businesses in those states, as well as in Florida, Texas, and other states, have

---

[12] See *supra* note *.

[13] "Macondo" was the name that one of the operating companies, presumably BP, gave to the exploratory well. This was also the name of a fictional town in Gabriel Garcia Marquez's novel ONE HUNDRED YEARS OF SOLITUDE. In the novel, the village of Macondo, grown into a city, is eventually wiped off the map by a gigantic windstorm.

[14] The information in this section of this Article is taken from the pleadings on file in the Oil Spill Litigation, *supra* note *.

sustained economic harm and are seeking recompense. Some of these victims—those who owned or leased real or personal property affected by the spill—can invoke subsection B of Section 2702(b)(2). For most of them, though, the crucial provision is Section 2702(b)(2)(E).[15]

### III. THE PRECISE QUESTION TREATED IN THIS ARTICLE

The central question addressed by this Article is the correct interpretation of 33 U.S.C. § 2702(b)(2)(E) (quoted above in Part I). For analyzing this question, the proper starting place is the combined language of subsections 2702(a) and (b)(2)(E). Paraphrased and combined, these provisions look like this:

> <u>Subsection (a)</u>: A party responsible for an oil spill or a substantial threat of an oil spill owes certain categories of damages that "result from" the spill or threat.

> <u>Subsection (b)(2)(E)</u>: Among those categories of recoverable damages are "loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources."

For ease of presentation, it will sometimes be useful to refer to the "loss of profits" and "impairment of earning capacity" covered by subsection (b)(2)(E) as "pure economic loss."[16] In simplified form, the question addressed in this Article is, what must a pure economic loss victim

---

[15] To recover damages under subsection (B) of Section 2702(b)(2), an owner or lessor must trace its damages to "injury to" or "destruction of" its own (leased or owned) property. Under subsection (E), that same claimant (like claimants who did not own or lease any involved property) can recover on showing that the claimant sustained lost profits or impaired earning capacity "due to the injury, destruction or loss" of natural resources or of anyone's property. See *In re Taira Lynn Marine Ltd.*, 444 F.3d 371, 382 (5th Cir 2006) (indicating that property owners could invoke both subsections (B) and (E)); *In re Settoon Towing LLC*, 2009 WL 4730969 at * 3-4 (E.D. La. Dec. 4, 2009) holding that when a spill temporarily prevented the owner of an undamaged offshore platform from using it, the owner had a cause of action under subsection (E)); *Secko Energy, Inc. v. M/V Margaret Chouest*, 820 F. Supp. 1008, 1015 (E.D. La. 1993) (same).

[16] Economic losses caused by physical damage to the plaintiff's real or personal property are routinely regarded as recoverable and nonproblematic. (Such damages are addressed by OPA in 33 U.S.C. § 2702(b)(2)(B).) The term "pure economic loss" refers to economic losses that do not stem from physical injury to the plaintiff's person or tangible property. DAVID W. ROBERTSON ET AL, CASES AND MATERIALS ON TORTS 253 (3d ed. 2004).

show in order to establish that his damages "result[ed] from" a spill (or threat) and were "due to the injury, destruction, or loss" of property or natural resources?

## IV. THE GULF COAST CLAIMS FACILITY, THE GOLDBERG PAPER, AND THE COMMERCIAL-USE-RIGHT THEORY

The meaning of 33 U.S.C. § 2702(b)(2)(E) was recently addressed at some length by Harvard Law School Professor John C. P. Goldberg.[17]  The circumstances leading to the production of Professor Goldberg's paper are sketched below.[18]

The operator of the Macondo site was BP Exploration and Production, Inc., a subsidiary of BP, plc.  The *Deepwater Horizon* was owned by Transocean, Ltd.  BP and Transocean have been designated by the Coast Guard as "responsible parties" under OPA.[19]  As a responsible party, BP was required by 33 U.S.C. § 2714(b) to set up and advertise a claims procedure.[20]  In recognition of that obligation—and by some accounts in response to the blandishments of President Obama[21]—BP created the Gulf Coast Claims Facility (GCCF) and put a famous and well-credentialed attorney/mediator, Kenneth Feinberg, in charge of it.[22]

---

[17] See Goldberg, *supra* note 2.

[18] Much of the information in the two paragraphs just below is taken from the pleadings on file in the Oil Spill Litigation, *supra* note *.

[19] 33 U.S.C. § 2701(32) defines "responsible party" as the vessel or facility from which the spill or threatened spill emanated.  Section 2714(a) requires the President (acting through the Coast Guard), upon learning of a spill or threatened spill, to designate and "immediately notify" the party or parties deemed responsible.

[20] 33 U.S.C. § 2714(b)(1) provides that unless the designated responsible party denies the designation, the responsible party "shall advertise the designation and the procedures by which claims may be presented...."  Section 2714(b)(2) provides that the advertisement "shall state that a claimant may present a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled and that payment of such a claim shall not preclude recovery for damages not reflected in the paid or settled partial claim."

[21] See, e.g., Goldberg, *supra* note 2, at 4.

[22] The Goldberg paper seems to go out of its way to emphasize that setting up the fund was voluntary on BP's part and that the GCCF and Mr. Feinberg are neutral and independent of BP. See *id.* at 4-6.  None of that appears to be true.  OPA required BP to set up a settlement procedure and to pay interim claims without insisting on full releases. See *supra* note 20.  And the federal judge in charge of the Oil Spill Litigation has ordered the GCCF and Feinberg to cease and desist from claiming independence and neutrality. See *infra* note 24.

The purpose of the GCCF is to settle claims for economic and other losses made against BP. The Facility initially presented itself to the public as "neutral,"[23] but the federal district judge in charge of the Oil Spill Litigation subsequently issued an order directing BP, Feinberg, and the GCCF to "[r]efrain from referring to the GCCF, Ken Feinberg, or [Feinberg's law firm] as 'neutral' or completely 'independent' from BP."[24] The court's order further stated: "It should be clearly disclosed in all communications, whether written or oral, that said parties are acting for and on behalf of BP in fulfilling its statutory obligations as the 'responsible party' under the Oil Pollution Act of 1990."[25]

Mr. Feinberg has a $20 billion settlement fund to work with. This fund is "intended to make whole both private enterprises (for lost earnings) and the states and the federal government (for cleanup costs)."[26] The GCCF is also trying to use the fund to settle personal injury and death claims.[27] Given the tragic physical and emotional consequences of the *Deepwater Horizon* explosion and the apparent magnitude of the Macondo spill's physical, emotional, and economic effects, $20 billion is probably not enough money. According to the *New York Times*, Feinberg—in quest of legal principles that might justify the exclusion of economic-loss claimants from areas of the country remote from the spill and its physical effects—turned to Professor Goldberg for assistance. Here is the *Times* account:

---

[23] See, e.g., *Gulf Coast Claims Facility Protocol for Interim and Final Claims, November 22, 2010,* at p. 2 (stating that "[t]he GCCF is administered by Kenneth R. Feinberg, ('the Claims Administrator'), a neutral fund administrator") (http://www.gulfcoastclaimsfacility.com/proto_4, p. 2).

[24] See Oil Spill Litigation, *supra* note *, *Order and Reasons,* Feb. 2, 2011, pp. 13-14 (available at http://www.laed.uscourts.gov/).

[25] *Id.* at 14.

[26] David Segal, *Should BP's Money Go Where Oil Didn't?,* N.Y. TIMES, Oct. 23, 2010, at ___.

[27] See *Protocol, supra* note 23, at p. 1.

Working outside of the court system, Mr. Feinberg isn't necessarily constrained by [OPA], or state or federal tort law. But to figure out what, if anything, these claimants should be paid, he needs a sense of what would become of them if they slogged through the dockets.

So Mr. Feinberg has quietly hired one of the country's foremost scholars on torts—he declined to provide a name [we now know it is Professor Goldberg]—to write a memorandum about the validity and value of [economic loss] claims.

The memo is due soon, and Mr. Feinberg has no idea what it will say. But it won't serve as a blueprint, he says. It will serve as leverage. If the memo states, for instance, that certain [economic loss] claims are stinkers, Mr. Feinberg could say to claimants, "You'll get nothing in court, but I'll give you 20 cents or 30 cents on the dollar."[28]

About a month after the *Times* article appeared, Professor Goldberg transmitted his report to Mr. Feinberg, who made it publicly available.[29] The Goldberg report does indeed say that some economic loss claims—in fact, a great many of them—are stinkers. In a succinct, clear Executive Summary at the beginning of the paper, Professor Goldberg writes (emphasis supplied):

Under OPA, a person may obtain compensation for economic loss from a party responsible for a spill if she can prove that her loss is "due to" harm to property or resources that "result[s] from" the spill, irrespective of whether she owns that property or those resources. *This statutory language is best understood to allow recovery only by those economic loss claimants who can prove that they have suffered economic loss because a spill has damaged, destroyed, or otherwise rendered physically unavailable to them property or resources that they have a right to put to commercial use.* Thus, if a spill were to deprive commercial fishermen of expected profits by killing fish they ordinarily would catch and sell, or by causing authorities to bar the fishermen from accessing those fish for a period of time, the fishermen would be entitled to recover. By contrast, operators of beach resorts in areas physically unaffected by a spill, but that nonetheless suffer economic loss because of a general downturn in tourism resulting from the spill, are among those who are not entitled to recovery under OPA.[30]

---

[28] New York Times, *supra* note 26, at ___.

[29] See *supra* note 2.

[30] Goldberg, *supra* note 2, at 3.

It will be useful to call the above-emphasized proposal the *commercial use-right requirement*.

In the body of his paper, Goldberg demonstrates that the commercial use-right requirement would be an extraordinarily potent exclusionary tool. Part VI below borrows elements of that demonstration as a way of emphasizing the narrow coverage Section 2702(b)(2)(E) would have in Professor Goldberg's world, and to demonstrate that Congress probably had broader aims for the provision.

## V. A MIDDLE-OF-THE-ROAD INTERPRETATION OF OPA'S ECONOMIC LOSS PROVISIONS[31]

At the end of the day, the intended meaning of 33 U.S.C. § 2702(b)(2)(E) is tolerably apparent.[32] But it may not be apparent at first blush. An informed reading of the statute entails some understanding of the jurisprudential background and some grasp of the legislative history.

---

[31] See *infra* note 54 for argument that the subtitle's "mid-road" characterization is justified.

[32] This Article's claim that the relevant OPA provisions express a clear meaning entails an underlying assumption that the statute was carefully drafted. This assumption rests on generally comfortable ground—Congress worked intensively on the statute for many months, the legislative history is copious, and nobody in Congress can have doubted the critical importance of the legislation.

But the assumption of clear draftsmanship is not entirely free from doubt. Two irritating anomalies are apparent in some of the statute's key language. First, Section 2701(5)–defining the term *damages* as used throughout the statute—states that the term "means damages specified in section 2702(b) ... and includes the cost of assessing these damages." Section 2702(b)(2)(A)—providing for the recovery by governmental trustees of damages for injury to natural resources—repeats that these damages "includ[e] the reasonable costs of assessing the damage." But the ensuing subsections of § 2702(b)(2)—subsections (B) through (F)—use the term *damages* without saying anything about damage-assessment costs. So, is the subsection (A) language about assessment costs a redundancy? Or does that language imply that no assessment costs are allowed by the ensuing subsections (B) through (F)? The correct answer is probably redundancy, but Congress should have tried harder to avoid creating such a puzzle.

Second, subsection (A) of Section 2702(b)(2) provides for recovery by governmental trustees of damages for "injury to, destruction of, loss of, or *loss of use* of, natural resources" (emphasis supplied), whereas subsection (D) (providing for recovery by governmental entities of damages for lost revenues and taxes) and subsection (E) (the core economic-loss provision that is the central focus of this Article) use a formulation—"injury, destruction, or loss of real property, personal property, or natural resources"—that omits the loss-of-use phrase. Does the inclusion of "loss of use" in subsection (A) and the omission of "loss of use" in subsections (D) and (E) mean that a loss of use of natural resources is not compensable under (D) and (E)? It certainly could mean that. See *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citation and internal quotation marks omitted).

Applying the *Russello* canon to the disparity between subsection (A) (on the one hand) and (D) and (E) (on the other) would yield strange results. Section 2702(a) imposes liability for the "damages specified in subsection (b) ... that result from ...the substantial threat of a discharge of oil," yet if we treat the omission of "loss of use" from

## A. Deep Background: Admiralty Jurisdiction and Federal Maritime Law

Article III, Section 2 of the Constitution brings "all cases of admiralty and maritime jurisdiction" under the authority of the federal courts and Congress, and it subjects these cases to federal-law governance.[33]   In general, the following simplified statement of the matter holds true: Admiralty cases are governed by federal maritime law.[34]   The *Exxon Valdez* litigation was an admiralty (and thus federal maritime) case, and so is the Macondo Oil Spill Litigation.

Federal maritime law includes two tortfeasor-friendly doctrines that can provide great comfort to a marine oil-pollution defendant.  The first is the right of a shipowner to limit its liability to the value of the vessel (measured after the accident) if the shipowner can show that the damages sought by the accident victims came about "without the privity or knowledge" of the shipowner.[35] The second—variously referred to as the *Robins Dry Dock* rule or the *Testbank*

---

subsections (b)(2)(D) and (E) as purposive, those subsections might often, perhaps generally, deny recovery in threatened discharge cases. Moreover, the *Russello* canon would also raise difficulties with the application of subsection (C) of section 2702(b)(2) in threat cases. Subsection (C) allows the recovery of "damages for loss of subsistence use of natural resources" but seemingly only when "natural resources ... have been injured, destroyed, or lost." Here too, reading subsection (A) to cover a broader range of situations than the ensuing subsection produces a potential anomaly in threat cases.

    Professor Goldberg argues persuasively that the subsection (E) term "loss" should be read to include loss of use. See Goldberg, supra note 2, at 19-20 n. 40 (arguing that fishermen who cannot fish because of a threat-caused embargo have suffered a loss of natural resources within the meaning of subsection (E)). I agree with Goldberg on this point—and I think we need to accept the same argument on behalf of subsistence fishermen who invoke subsection (C)—but we have to realize that here again (as with the damages-assessment puzzle) reaching the desired resolution requires treating a portion of Section 2702(b)(2)(A) as redundant.

[33] See generally DAVID W. ROBERTSON, ADMIRALTY AND FEDERALISM (1970).

[34] Federal maritime law emanates from the federal courts and from Congress. See *Panama R. Co. v. Johnson*, 264 U.S. 375, 386 (1924) (explaining that the constitutional grant of "admiralty and maritime jurisdiction" to the federal judicial power enables both the federal courts and Congress to provide admiralty and maritime governance and stating that "there is no room for doubt that the power of Congress extends to the entire subject and permits of the exercise of a wide discretion.") Court-made federal maritime law is often called "general maritime law" (*id.*); it is "federal common law." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 483 (2008). In modern times, congressional authority over the admiralty and maritime field has arguably become preeminent. See *Miles v. Apex Marine Corp.*, 498 U.S. 19, 36 (1990) (stating that "[m]aritime tort law is now dominated by federal statute").

[35] 46 U.S.C. § 30505(b).

rule[36]—often prevents economic-loss victims from recovering damages unless they can show that they owned or leased property that was physically damaged in the accident that caused their economic losses.[37]

For cases falling within its scope, OPA nullifies both the shipowners' limited-liability doctrine and the *Robins/Testbank* doctrine. 33 U.S.C. § 2702(a) states that the strict liability it imposes on oil polluters is "[n]otwithstanding any other provision of law," and the August 1, 1990, Conference Report explaining the bill that was enacted into law and signed by President George H. W. Bush on August 18 states (emphasis supplied):

> Liability under this Act is established notwithstanding any other provision or rule of law. This means that the liability provisions of this Act would govern compensation for removal costs and damages *notwithstanding* any limitations under existing statutes such as the act of March 3, 1851 (46 U.S.C. 183),[38] or under *existing requirements that physical damage to the proprietary interest of the claimant be shown.*[39]

Moreover, Section 2702(b)(2)(E) provides that economic loss damages "shall be recoverable by any claimant," and the Conference Report explains (emphasis supplied):

> Subsection (b)(2)(E) provides that any claimant may recover for loss of profits or impairment of earning capacity resulting from injury to property or natural resources. The claimant *need not be the owner of the damaged property or resources to recover for lost profits or income.*[40]

---

[36] See *Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1020-21 (5th Cir. 1985) (en banc) (citing *Robins Dry Dock v. Flint*, 275 U.S. 303 (1927), for the proposition that "physical damage to a proprietary interest [is] a prerequisite to recovery for economic loss in cases of unintentional maritime tort").

[37] *Testbank* could be read to establish a more defendant-friendly rule that would require an economic-loss plaintiff to show that the damages sought were caused by (rather than merely being accompanied by) physical damage to the plaintiff's person or property. Subsequent Fifth Circuit decisions indicate that the less demanding (accompanied by) requirement stated in the text is the correct reading. See *In re Taira Lynn Marine Ltd.*, 444 F.3d 371, 376 (5th Cir. 2006) (stating that *Testbank* barred claims "for economic losses unaccompanied by damage to a proprietary interest"); *Lloyd's Leasing Ltd. v. Conoco*, 868 F.2d 1447, 1450-51 (5th Cir. 1989) (separate opinion by Judge Higginbotham, the author of the en banc opinion in *Testbank*, eschewing the causal-connection-requirement interpretation of *Testbank*). Judge Higginbotham's opinion in *Lloyd's Leasing* is analyzed in David W. Robertson, *An American Perspective on Negligence Law*, in MARKESINIS AND DEAKIN'S TORT LAW 283, 300-02 (6th ed. 2008).

[38] This is the Shipowners' Limited Liability Act, presently codified at 46 U.S.C. § 30505.

[39] H.R. Conf. Rep. 101-653, 101st Cong., 2d Sess. 1990, 1990 U.S.C.C.A.N. 779, 781, 1990 WL 132747 at * 3.

[40] *Id.*, 1990 WL 132747 at * 4.

rule[36]—often prevents economic-loss victims from recovering damages unless they can show that they owned or leased property that was physically damaged in the accident that caused their economic losses.[37]

For cases falling within its scope, OPA nullifies both the shipowners' limited-liability doctrine and the *Robins/Testbank* doctrine. 33 U.S.C. § 2702(a) states that the strict liability it imposes on oil polluters is "[n]otwithstanding any other provision of law," and the August 1, 1990, Conference Report explaining the bill that was enacted into law and signed by President George H. W. Bush on August 18 states (emphasis supplied):

> Liability under this Act is established notwithstanding any other provision or rule of law. This means that the liability provisions of this Act would govern compensation for removal costs and damages *notwithstanding* any limitations under existing statutes such as the act of March 3, 1851 (46 U.S.C. 183),[38] or under *existing requirements that physical damage to the proprietary interest of the claimant be shown.*[39]

Moreover, Section 2702(b)(2)(E) provides that economic loss damages "shall be recoverable by any claimant," and the Conference Report explains (emphasis supplied):

> Subsection (b)(2)(E) provides that any claimant may recover for loss of profits or impairment of earning capacity resulting from injury to property or natural resources. The claimant *need not be the owner of the damaged property or resources to recover for lost profits or income.*[40]

---

[36] See *Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1020-21 (5th Cir. 1985) (en banc) (citing *Robins Dry Dock v. Flint*, 275 U.S. 303 (1927), for the proposition that "physical damage to a proprietary interest [is] a prerequisite to recovery for economic loss in cases of unintentional maritime tort").

[37] *Testbank* could be read to establish a more defendant-friendly rule that would require an economic-loss plaintiff to show that the damages sought were caused by (rather than merely being accompanied by) physical damage to the plaintiff's person or property. Subsequent Fifth Circuit decisions indicate that the less demanding (accompanied by) requirement stated in the text is the correct reading. See *In re Taira Lynn Marine Ltd.*, 444 F.3d 371, 376 (5th Cir. 2006) (stating that *Testbank* barred claims "for economic losses unaccompanied by damage to a proprietary interest"); *Lloyd's Leasing Ltd. v. Conoco*, 868 F.2d 1447, 1450-51 (5th Cir. 1989) (separate opinion by Judge Higginbotham, the author of the en banc opinion in *Testbank*, eschewing the causal-connection-requirement interpretation of *Testbank*). Judge Higginbotham's opinion in *Lloyd's Leasing* is analyzed in David W. Robertson, *An American Perspective on Negligence Law*, in MARKESINIS AND DEAKIN'S TORT LAW 283, 300-02 (6th ed. 2008).

[38] This is the Shipowners' Limited Liability Act, presently codified at 46 U.S.C. § 30505.

[39] H.R. Conf. Rep. 101-653, 101st Cong., 2d Sess. 1990, 1990 U.S.C.C.A.N. 779, 781, 1990 WL 132747 at * 3.

[40] *Id.*, 1990 WL 132747 at * 4.

This much really seems undebatable: Congress wanted to make sure that marine oil polluters could not use these two major maritime-law defensive doctrines as a shield against OPA liability.[41]

## B. The Facially Apparent Meaning of Section 2702(b)(2)(E): A Factual Causation Interpretation

As we saw in Part III above, 33 U.S.C. §§ 2702(a) and 2702(b)(2)(E) have to be read together. Taken together, they say that an economic-loss victim who invokes subsection (b)(2)(E) must show that his damages "result[ed] from" the spill and were "due to" the injury, destruction, or loss of tangible[42] property or natural resources.

---

[41] This footnote belabors the obvious—that the *Robins/Testbank* rule is expunged from OPA cases. It does so because the major thrust of Professor Goldberg's proposed interpretation of 33 U.S.C. §§ 2702(a) and (b)(2)(E)—his commercial use-right requirement, treated *supra* at note 30 and *infra* in Parts VI-C and VII—is to preserve as much of the *Robins/Testbank* jurisprudence as possible.

Cases holding or stating that OPA nullifies the *Robins/Testbank* rule include *In re Taira Lynn Marine Limited Number 5, LLC*, 444 F.3d 371, 382 (5th Cir. 2006); *In re Exxon Valdez*, 270 F.3d 1215, 1252-53 (9th Cir. 2001); *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 631 (1st Cir. 1994); *Dunham-Price Group, L.L.C. v. Citgo Petroleum Corp.*, 2010 WL 1285446 at * 2 (W.D. La. March 31, 2010); *In re Settoon Towing LLC*, 2009 WL 4730969 at * 4 (E.D. La. Dec. 4, 2009); *In re Nautilus Motor Tanker Co.*, 900 F. Supp. 697, 702 (D. N.J. 1995); *Sekco Energy, Inc. v. M/V Margaret Chouest*, 820 F. Supp. 1008, 1014-15 (E.D. La. 1993); *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 768-69 (Alaska 1999). In *FGDI, LLC v. M/V Lorelay*, 193 Fed. Appx. 853, 2006 WL 2351835 at * 1 (11th Cir. 2006), an OPA defendant conceded that it owed damages to a claimant who could not have qualified for recovery under the *Robins/Testbank* regime.

The commentators agree that OPA ousts the *Robins/Testbank* rule. See Steven R. Swanson, *OPA 90 + 10:* *The Oil Pollution Act of 1990 After Ten Years*, 32 J. MAR. L. & COM. 135, 150-52 (2001); Lawrence I. Kiern, *Liability, Compensation, and Financial Responsibility Under the Oil Pollution Act of 1990: A Review of the First Decade*, 24 TUL. MAR. L.J. 481, 531-32 (2000); Keith B. LeTourneau & Wesley T. Welmaker, *The Oil Pollution Act of 1990: Federal Judicial Interpretation Through the End of the Millennium*, 12 U.S.F. MAR. L.J. 147, 200-02 (2000); Francis J. Gonynor, *Six Years Before the Mast: The Evolution of the Oil Pollution Act of 1990*, 9 U.S.F. MAR. L.J. 105, 126-27 (1996); Cynthia M. Wilkinson, L. Pittman, & Rebecca F. Dye, *Slick Work: An Analysis of the Oil Pollution Act of 1990*, 12 J. ENERGY, NAT. RESOURCES & ENVTL. L. 181, 264 (1992); Gregg L. McMurdy, Comment, *An Overview of OPA 1990 and Its Relationship to Other Laws*, 5 U.S.F. MAR. L.J. 423, 427-30 (1993); Cameron H. Totten, Note, *Recovery for Economic Loss Under Robins Dry Dock and the Oil Pollution Act of 1990*, 18 TUL. MAR. L.J. 167, 171-73 (1993); Daniel Kopec & H. Philip Peterson, Note, *Crude Legislation: Liability and Compensation Under the Oil Pollution Act of 1990*, 23 RUTGERS L.J.497, 623-24 (1992).

[42] *Sekco, supra* note 41, suggests that "'[f]uture earnings derived from drilling on the Outer Continental Shelf [might] constitute property" within the meaning of subsection (E). 820 F. Supp. at 1015. However, it is hard to imagine administering the statute without the tangibility criterion.

The statutory terms "result from" (subsection 2702(a)) and "due to" (subsection 2702(b)(2)(E)) are not specialized legal terms; they are English-language synonyms for the term "caused by."[43] Professor Goldberg's entire proposal rests on an asserted major difference between the meanings of the OPA terms "result from" and "due to." But the asserted difference is imaginary. Indeed, the August 1, 1990, Conference Report explaining the bill that was enacted into law[43a] summarizes Section 2702(b)(2)(E)—Goldberg's pivotal "due to" provision—as follows (emphasis supplied): "Subsection (b)(2)(E) provides that any claimant may recover for loss of profits or impairment of earning capacity *resulting from* [the statutory term is "due to"] injury to property or natural resources." The significance of the Conference Report's phrasing of subsection (E) is huge: The Report expresses subsection (E)'s "due to" requirement by using the term "resulting from." Here we have an authoritative indication by Congress that the Section 2702(b)(2)(E) term "due to" has the same meaning as the Section 2702(a) term "result from." This by itself substantially refutes the Goldberg proposal.

Plainly enough, in the statute as in the English language, "result from" and "due to" are synonyms for "caused by."[44] In the English language, the term "caused by" normally refers to

---

[43] See AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 403 (1981) (defining "due to" as "caused by"); 510 (in a list of synonyms for "follow," stating that "*result* refers to an event that is discernibly caused by a prior event or events"); 1109 (defining the verb "result" as "to occur or exist as a consequence of a particular cause," and referring to the list of synonyms for "follow"); *id.* (defining "resultant as "issuing or following as a consequence or result"). See also *Gross v. FBL Financial Services, Inc.*, 129 S.Ct. 2343, 2350 (2009) (determining the meaning of the statutory term "because of" by referring to an ordinary dictionary and to considerations of "ordinary meaning" and "common talk").

[43a] See *supra* note 39.

[44] 33 U.S.C. § 2702 uses the causation-related terms "result from" (subsection a), "resulting from" (subsection b(2)(B), "due to" (subsections b(2)(D) and b(2)(E), and "caused by" (subsection b(2)(F)). I can find nothing in the statute's text, jurisprudential background, or legislative history that even hints that different meanings were intended. Arguably Congress would have done better to strive for uniform use of the everyday term "caused by" in lieu of the synonyms. Cf. *supra* note 32 (questioning other aspects of the draftsmanship that went into OPA).

factual causation,[45] not to what Professor Goldberg calls "proximate cause."[46]  On their face, Sections 2702(a) and 2702(b)(2)(E) in combination require an economic-loss claimant to establish that the defendant's spill was a factual cause of injury, destruction, or loss of tangible property or natural resources that in turn was a factual cause of the claimant's damages—nothing more and nothing less.  Because the prevailing, default test for factual causation in Anglo-American tort law is the but-for test,[47] we can be fairly precise about the evident meaning of Sections 2702(a) and 2702(b)(2)(E) for an economic-loss claimant:  The claimant is required to show that if the spill had not brought about the injury, destruction, or loss of tangible property or natural resources, the damages complained of probably would not have been sustained.[48]

## VI. CONTRASTING THE FACTUAL CAUSATION INTERPRETATION WITH THE GOLDBERG USE-RIGHT INTERPRETATION:  GOLDBERG'S "UNIVERSE OF POTENTIAL PURE ECONOMIC LOSS CLAIMANTS"

For illustrating the possible ranges of meaning of the "due to" language in Section 2702(b)(2)(E), Professor Goldberg has provided an admirable tool.  Positing a large Gulf of Mexico oil spill—something on the order of the BP-Macondo spill, a spill with widespread effects including a great deal of physical damage to natural resources and to property—Goldberg presents a realistically imagined sixteen-item sketch of a "Universe of Potential Pure Economic

---

[45] See AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 214 (1981) (defining the noun "cause" to mean "that which produces an effect, result, or consequence" and the verb "cause" to mean "make happen").

[46] Goldberg, *supra* note 2, at 20 & n. 41.

[47] See RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 26 and cmt. b (2010). See also *Gross v. FBL Financial Services, Inc.*, 129 S.Ct. 2343, 2350 (2009) (stating that "in common talk, the phrase 'based on' indicates a but-for causal relationship and thus a necessary logical condition, and ... the statutory phrase 'based on' has the same meaning as the phrase 'because of'") (citation and internal quotation marks omitted).

[48] Some imprecision is brought into the factual causation inquiry by the uncertain meaning of the statutory term "loss," which OPA does not define. As we saw *supra* note 32. Professor Goldberg makes a plausible argument that Section 2702(b)(2)(E)'s term "loss" can sometimes mean loss of use. See Goldberg, *supra* note 2, at 19-20 n. 40.

14

Loss Claimants."[49]   With two modifications, this sketch is reproduced below.   (The modifications are adding the numbers and inserting hypothetical claimant # 2.)

Note that the sketch moves from cases that seem intuitively to entail direct and immediate causation in the direction of (intuitively) increasingly remote causation. Note also that we are assuming that all of these claimants can prove what they allege. As Professor Goldberg astutely observes, "there is no particular reason to think that claimants more closely connected to the spill in time and space will, as a class, be in a better position to offer [sufficient evidence to support their allegations respecting damages and factual causation], or that claimants [further] removed from the spill will be less well-positioned to offer such evidence."[50]

Professor Goldberg's "Universe of Potential Pure Economic Loss Claimants," augmented by the addition of claimant # 2, is the following:

> 1. C is a commercial fisherman who relies for his business on fisheries in the Gulf of Mexico. C claims that oil from a spill for which Oil Co. is responsible has polluted the waters in which he fishes, and that he has been and will be unable to fish for a period of time, resulting in lost profits.

> 2. CH is a man who makes his living supplying bait, tackle, other necessary supplies, maintenance, and repairs to the vessels of C and other fishermen like C. (In older maritime terminology, people like CH were sometimes referred to as "ships' chandlers."[51]) CH claims that when the Oil Co. spill prevented C and the others from fishing, CH's business dried up.

> 3. H owns and operates a beachfront hotel in the Gulf area. Oil from the Oil Co. spill has not reached the beachfront that is owned by H and reserved for use by guests at H's hotel. However, oil has been found in the immediate vicinity of H's hotel, including in waters that H's guests frequently use, and neighboring beaches that H's guests routinely visit. H claims to have suffered a loss of business because tourists, in light of the effects of the spill on the immediate area in which his hotel is situated, have decided to vacation elsewhere.

---

[49] Id. at 12-14.

[50] Id. at 15.

[51] See, e.g., Puget Sound Stevedoring Co. v. Tax Commission, 302 U.S. 90, 94 (1937) (referring to the furnisher of loading/unloading services to a vessel as "similar ... to ... a ship's chandler").

4. $E$ is an employee at $H$'s hotel. Because the hotel has lost business, its managers have reduced staff hours by 25%, as a result of which $E$ has suffered and will suffer a 25% reduction in his wages for a certain period.

5. $B$ owns a barge that is used to haul equipment and supplies up and down a small navigable river that runs to the Gulf. Oil from the spill reaches the river, threatening migratory birds that live there. Authorities close the river to boat traffic for three weeks to permit clean-up. $B$ is unable to operate his barge during this time and seeks recovery of profits he would have made.

6. $R$ operates a dockside restaurant located in a Gulf seaport. Its regular customers are dockworkers, fishermen, and others whose jobs are connected with maritime commerce. $R$ claims that, because of the spill, the restaurant has lost profits because many of the restaurant's regular customers have not been frequenting it.

7. $A$ is a real estate agent whose listings are made up primarily of beachfront properties in an area of the Gulf that has been contaminated by the spill. She claims that the market for property sales and rentals has collapsed because of the spill, depriving her of commissions she otherwise would have made.

8. $W$ is a woodworker who owns a small furniture store located three miles inland in a town that relies on beach tourism as a major source of revenue. $W$ claims that, because some of the town's beaches have been polluted by the spill, orders for his furniture are down and that he has lost profits as a result.

9. $O$ owns a beachfront inn located on the Gulf. No oil from the spill has come within 100 miles of the waters or the stretch of coastline on which the inn sits, and, at that location, the spill has had no other discernible adverse physical effects (such as noxious odors). However, given prevailing currents and winds, government officials and scientists have concluded that oil might reach those waters and beaches within a month. $O$ claims to have suffered cancelled reservations and lost profits because of the credible threat of oil pollution to the water and beaches adjacent to the inn.

10. $F$ owns and operates a fireworks store that is situated along the main interstate highway that leads to a set of Gulf beaches, 150 miles north of those beaches. $F$ relies on tourists traveling to and from the beaches for much of his business. $F$ claims to have lost profits because of reduced tourist traffic resulting from the Oil Co. spill.

11. $T$ runs a tour boat that takes passengers along scenic Gulf shoreline. No oil from the spill has come, or threatened to come, within 400 miles of the area in which $T$'s tours take place. $T$ claims that, because of popular misimpressions about the scope of the spill, the spill has depressed tourism in the entire Gulf region, in turn causing $T$ to lose business and profits.

12. *D* owns an amusement park in a land-locked portion of central Florida. Many of *D*'s patrons are families that combine a trip to *D*'s park with a beach vacation on Florida's Atlantic Coast, which was never at risk of suffering pollution because of the spill. *D* claims that consumer unease about traveling to Florida because of the spill has caused *D* to suffer lost profits.

13. *N* owns and operates a resort in Nevada. Each year for the past decade, an association of Gulf-area fishermen has held its annual meeting at *N*'s facility. *N* claims that the spill's economic effects have caused the association to cancel its plans to hold their convention at *N*'s facility, in turn causing *N* lost profits.

14. *M*, a company incorporated and operated in Hartford, Connecticut, imports snorkeling equipment manufactured in China. *M* claims that, because of the spill, snorkeling equipment sales are down, resulting in lost profits.

15. *S* runs a seafood restaurant in Phoenix, Arizona. Although the seafood it serves is not from the Gulf, *S* claims that it has lost profits because of general consumer fears about contaminated seafood caused by the spill.

16. *G* owns a gas station in Boise, Idaho that sells Oil Co.-brand gasoline. Although *G* owns and operates the station as an independent franchise, his station becomes the target of a boycott by a local environmental group demanding greater corporate accountability. *G* claims lost income resulting from the boycott.

17. *L* runs a catering company based in New York City, which is also the location of Oil Co.'s U.S. headquarters. *L* claims that a substantial portion of her profits had previously come from catering events at Oil Co. headquarters, but that she has lost revenues because Oil Co. has substantially cut back on catered events in the aftermath of the spill.

Among the significant features of the foregoing "Universe" is its remarkable verisimilitude. None of the hypothesized claimants is difficult to imagine; none makes a silly or far-fetched argument; assuming they can prove what they allege, all of the claimants have suffered economic losses as a result of the spill. And Professor Goldberg demonstrates that Congress could conceivably have made all of these claimants eligible: If OPA had been enacted as it stands except without the "due to" clause in § 2702(b)(2)(E), "it would entail liability for all lost profits and impaired earning capacity resulting from a discharge."[52] Moreover, Goldberg notes, there is a theoretically possible interpretation of the "due to" clause that would also

---

[52] Goldberg, *supra* note 2, at 17.

probably bestow eligibility on the entire "Universe": If "due to" were to be "read to set a threshold for economic loss liability that treats the fact of *any* harm to *any* property or natural resources as a trigger for the recovery of economic losses by any claimant,"[53] then here again all of the claimants in Goldberg's "Universe" would seem to be eligible for recovery.

But neither Goldberg nor I think that the entire "Universe" is eligible.[54]  The subsections below indicate the exclusionary effects of the factual causation interpretation of § 2702(b)(2)(E) and of the Goldberg user-right proposal.

## A. Claims Probably Defeated by Section 2702(b)(2)(E)'s Factual Causation Requirement

The factual causation interpretation that seems to emerge naturally from the statute's language—a but-for connection between spill-produced "injury, destruction, or loss" of property or natural resources and the claimed-for economic losses—probably entitles the defendant Oil Co. to a matter-of-law ruling against claimants 16 (the boycotted Boise gas station) and 17 (the New York caterer).  It seems unlikely that the existence of "injury, destruction, or loss" of resources or property played any causal role in producing these damages.  Both the boycott and the catering cut-back would probably have occurred as a result of the reputational effects of the spill, regardless of whether the spill had actually produced any "injury, destruction, or loss" of anything physical.

Claimants 11 through 15—geographically-remote tour boat operator, notional Disney World, Nevada resort, Connecticut snorkel seller, Arizona restaurant—are also likely losers

---

[53] *Id.* at 18 (Goldberg's emphasis).

[54] The factual causation interpretation of Section 2702(b)(2)(E) excludes a number of classes of claimants who would be entitled to recover under either of Professor Goldberg's two imaginary statutes (one without the "due to" language and one with "due to" defined to mean "accompanied by").  On the other hand, the factual causation interpretation includes a number of classes of claimants who would be excluded by Professor Goldberg's proposed use-right requirement.  Hence, it is accurate to call the factual causation interpretation a middle-of-the-road viewpoint.

under the factual causation interpretation of § 2702(b)(2)(E). The factual causation question in each case would be whether the lost customers would have stayed away if somehow the massive ugly spill had not yet been shown to have caused the "injury, destruction, or loss" of anything physical. In some of these cases the claimant might conceivably reach the trier of fact with the assertion that the spill's reputation would not alone have sufficed to turn away the customers. But these all look more like skittish-customer situations, in which the customer behavior constituting the economic losses came about by reason of the spill's ugly reputation without regard to its actual ugly effects.

## B. Claims That Should Succeed Under the Factual Causation Interpretation

Cases 1 through 10 all involve claimants with highly plausible assertions that the losses in question would not have occurred if the spill had caused no "injury, destruction, or loss" of natural resources or property. Many of these claimants ought to be entitled to a matter-of-law ruling to that effect. For example, the barge operator in case # 5 would probably not have been prevented from using the waterway if the spill had not polluted the river to the extent necessary to threaten bird life.

## C. Claims Defeated by the Goldberg Interpretation

Professor Goldberg says that his commercial-use-right doctrine would clearly validate only claims 1, 3, and 4 (fishermen with polluted fishing grounds, beachfront hotel surrounded by oil, and the hotel's employee).[55]   Claimant 5 (the barge operator), Goldberg says, has a fairly good argument but also some problems:

---

[55] See Goldberg, *supra* note 2, at 40. It is not clear how the hotel has a use right, much less the hotel employee. Professor Goldberg merely asserts that they do, providing no explanation.

*B* [the barge owner] is not among those specifically mentioned in legislative history as entitled to recover.[56] Moreover, one could argue that access to navigable waters is a right generally enjoyed by the public rather than the particular right of persons whose business happens to require use of navigable waters.[57] That fact ... could distinguish B's claim from that of, for example, commercial fishermen who possess a license to catch and sell fish.[58]

---

[56] Here Professor Goldberg is taking an overly narrow view of the legislative history. OPA's legislative history is shot through with general statements indicative of congressional intent to authorize recovery of "a broad class of damages"(___ CONG. REC. E842, daily ed. March 16, 1989, statement of Rep. Jones). See also S. Rep. 101-94, 101st Cong., 1st Sess. 1989, 1990 U.S.C.C.A.N. 722, 1989 WL 22505 at * 12 ("These provisions are intended to provide compensation for a wide range of injuries and are not so narrowly focused as to prevent victims of an oil spill from receiving reasonable compensation."); ___ CONG. REC. H7894 (daily ed. Nov. 1, 1989, statement of Rep. Quillen) ("full, fair, and swift compensation for everyone injured by oilspills;" "residents of States will be fully compensated for all economic damages"); ___ CONG. REC. H7955 (daily ed. Nov. 2, 1989, statement of Rep. Jones ("an unlimited amount of recovery from the Federal fund for all those who are injured by an oilspill"); *id.* at H7959 (statement of Rep. Tauzin) ("ensure that all victims are fully compensated"); *id.* at H7964 (statement of Rep. Hammerschmidt) ("ensure that all justified claims for compensation are satisfied"); *id.* at H7969 (statement of Rep. Dyson) ("assurances that damages arising from spills will be completely compensated"); ___ CONG. REC. H8140 (daily ed. Nov. 8, 1989) (statement of Rep. Shumway) ("fund is designed to fully compensate all victims"); ___ CONG. REC. H336 (daily ed. Feb. 7, 1990) (statement of Rep. Carper) ("ensure that those people or those businesses that are damaged by these spills are fairly and adequately compensated"); ___ CONG. REC. S7753 (daily ed. June 12, 1990) (statement of Sen. Miller) ("ensure the fullest possible compensation of oilspill victims"); ___ CONG. REG. H6260 (daily ed. Aug. 1, 1990) (Joint Explanatory Statement of the Committee of Conference) (polluters are "jointly, severally, and strictly liable for removal costs and for a wide range of damages").

Classes of claimants specifically mentioned as entitled to protection included not only fishermen and beachfront hotel owners but also fish "processing plant employees" and "those who work at the companies depending on the fisheries" ( ___ CONG. REC. E1237, daily ed. Apr. 13, 1989, statement of Rep. Miller); "an employee at a coastal motel" (___ CONG. REC. H7900, daily ed. Nov. 1, 1989, statement of Rep. Jones); "restaurant operators" (135 CONG. REC. H8263, statement of Rep. Studds); "fishermen and others whose livelihood depended on the once-pristine waters") (*id.* H8271, statement of Rep. Slaughter); "local communities and private citizens that have to live with the oil fouled waters" (*id.* 7969, Nov. 2, 1989, statement of Rep. Dyson); "poor people in Alaska who have lost their jobs, their livelihood, their homes, and the beautiful area in which they live" (*id.* S9863, Aug. 3, 1989, statement of Sen. Metzenbaum); "those who depend on clean waters and coastlines for their livelihood" (*id.* S9921, Aug. 3, 1989, statement of Sen. Biden); "shell fishermen and related businesses" (___ CONG. REC. E2110, JUNE 22, 1990, statement of Rep. Schneider); "shell fishermen and dealers and processors, ... beach concessionaires, and so forth" (36 CONG. REC. E2109-10, 1990 WL 85028, daily ed. June 21, 1990, statement of Rep. Schneider); "and *bait and tackle store owners*" (*id.*, emphasis supplied). The concluding reference to "bait and tackle store owners" presumably includes the ship's chandler that Professor Goldberg's proposal would preclude from economic-loss recovery under OPA. See *infra* Part VI-D.

[57] Here Professor Goldberg seems to be suggesting, without directly saying so, that Congress may have wanted to import limitations from the jurisprudence of public nuisance into the OPA remedy. See, e.g., Denise E. Antolini, *Modernizing Public Nuisance: Solving the Paradox of the Special Injury Rule*, 28 ECOL. L.Q. 755 (2001); William L. Prosser, *Private Action for Public Nuisance*, 52 VA. L. REV. 997 (1966). Reviewing the legislative history of OPA leaves the strong impression that Congress could hardly have had any such intention. See, e.g., *supra* note 56. Nor does Professor Goldberg point to any statutory language that would support bringing limitations from the common law of public nuisance into OPA.

[58] Goldberg, *supra* note 2, at 40.

As for the rest of those on his list, Goldberg thinks his commercial use-right requirement would probably exclude claimants 6 through 8 (although "it could conceivably be appropriate to interpret OPA generously to permit these claims"[59]) and would certainly exclude claimants 9 through 17.

## D. Goldberg Neglects the Ships' Chandler

Professor Goldberg's paper does not deal with claimant 2, *CH*, the ships' chandler whose pre-spill livelihood came from servicing and supplying fishing boats. The logic of Goldberg's commercial use-right requirement would exclude this man; it is hard to see how the chandler could plausibly argue that in earning his living in good times he established (in Goldberg's terms) a "right to put [the ocean or its fish] to commercial use."[60] (Moreover, if somehow *CH* could establish that he had a commercial-use-right in the ocean or the fish, then probably so could *CH*'s employees and suppliers, whereupon the exclusion power of the use-right tool would be lost.) Yet the legislative history suggests that Congress pretty clearly wanted to include *CH* (see, e.g., the reference to bait and tackle stores in footnote 56), and intuitively *CH* seems almost as close to being in the most obviously deserving class of claimants as the fishermen themselves. Perhaps this is why Professor Goldberg simply left the chandler out of his imagined "Universe." By all rights *CH* ought to prevail but Goldberg's commercial use-right tool will not allow it— and if it did it would lose much of its exclusionary power.

## VII. A PARTIAL ANALYSIS AND EVALUATION OF PROFESSOR GOLDBERG'S USE-RIGHT PROPOSAL

The Goldberg paper purports to find support for the proposed commercial-use-right requirement in OPA's language, courts' treatment of analogous statutes, "the common law

---

[59] *Id.* at 42.

[60] *Id.* at 3.

regimes from which OPA departs, [OPA's] legislative history, judicial decisions interpreting OPA, and policy considerations."[61]   We have already seen that the crucial statutory-language claim is highly dubious.[62] Now we need to evaluate some of Goldberg's other putative sources of support.

## A. The Courts' Treatment of Statutes that are Broadly Analogous to OPA

Professor Goldberg repeatedly proclaims that his use-right proposal does not entail reading anything into OPA that Congress did not put there. But he seems to give away a big part of that game by urging in support of his reading of OPA that it is "commonplace" for courts to read proximate-cause limits into statutory cause-in-fact language.[63]

The data Goldberg offers in support of his "commonplace" assertion cannot bear the weight. He first treats two cases that arose under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).[64]  Neither case imposed a proximate cause or user-right limit of the sort that Professor Goldberg contends for in his paper. The relevant CERCLA provision in both cases was 42 U.S.C. § 9607(a)(4)(C), which provides in pertinent part for the recovery of "damages for injury to, destruction of, or loss of natural resources ... resulting from [the] release [of oil or a hazardous substance]." The U.S. Department of the Interior issued a regulation interpreting that provision to exclude recovery for harm to "biological resources" when the claimed harm consisted of "biological responses that are caused predominately by other environmental factors such as disturbance, nutrition, trauma, or weather. The biological

---

[61] Goldberg, *supra* note 2, at 25.

[62] See *supra* Part V-B.

[63] Goldberg, *supra*  note 2, at 20.

[64] Comprehensive Environmental Response, Compensation, and Liability Act of 1980 and Superfund Amendments and Reauthorization Act of 1986, codified as amended at 42 U.S.C. §§ 9601-9675 (2002).  For Goldberg's treatment of the two CERCLA cases, see Goldberg, *supra* note 2, at 21 & nn. 44-45.

response must be a commonly documented response resulting from exposure to oil or hazardous substances."[65] In *Ohio v. U.S. Dep't of Interior*, the court upheld the validity of the regulation, noting that the regulation did not address "the causal link between the defendant's acts and the substance release" but only "the causal link between the substance release and the biological injuries alleged to have resulted from it."[66]

*United States v. Montrose Chemical Corp.* was a cryptic decision ordering CERCLA plaintiffs to replead and stating that "plaintiffs must show that a defendant's release of a hazardous substance was the sole or substantially contributing cause of each alleged injury to natural resources."[67] The *Montrose* court did not cite the regulation but was apparently paraphrasing it. (In *In re National Gypsum* the court refused to follow the *Montrose* dictum because the *Montrose* court "cited no authority for that proposition."[68])

There is no analysis of any sort in *Montrose*. In *Ohio v. Dep't of Interior* the court discussed CERCLA's language and particular legislative history at length before concluding that the regulation was valid.[69] OPA's language[70] and legislative history are dramatically different from CERCLA's.[71] Moreover, while there are no federal regulations treating OPA's economic

---

[65] 43 C.F.R. § 11.62(f)(2)(i).

[66] 880 F.2d 432, 471 n. 54 (D.C. Cir. 1989).

[67] 1991 WL 183147 at * 1 (C.D. Cal. March 29, 1991).

[68] 1992 WL 426464 at * 5 (Bkrtcy. N.D. Tex. June 24, 1992).

[69] See 880 F.2d at 469-472.

[70] OPA explicitly displaces the *Robins/Testbank* rule (see *supra* note 41); CERCLA does not.

[71] Indeed, the legislative histories are *opposites* in an important sense. An early version of a bill culminating in CERCLA included a provision that tort law's normal "cause in fact or proximate cause" requirements would *not* apply in CERCLA cases; Congress took that out of the bill. 880 F.3d at 471. An early version of a bill culminating in OPA provided that economic-loss plaintiffs *would* have to prove "proximate cause;" Congress took that out of the bill. See *infra* Part VII-D.

loss provisions, the Commerce Department (National Oceanic and Atmospheric Administration, NOAA) has issued regulations on the damages for harm to natural resources made available by OPA, 33 U.S.C. § 2702(b)(2)(A), and these are markedly more liberal than the Interior Department's CERCLA regulations.[72]  And the language of the regulation at stake in *Ohio v. Dep't of Interior*—as well as the language from the court's opinion quoted two paragraphs above—may suggest that the primary issue the court was focused on was factual, not proximate, causation.[73]

Professor Goldberg's other data set ostensibly supporting his claim that courts routinely read statutory cause-in-fact language to include proximate cause limitations comprises four cases decided under the Trans-Alaska Pipeline Authorization Act (TAPAA).[74]  The relevant TAPAA

---

[72] The Commerce Department (NOAA) regulations on OPA-provided damages for harm to natural resources are at 15 C.F.R. §§ 990.10-990.66. Section 990.10 declares that OPA's purpose "is to make the environment and public whole for injuries to natural resources and services."  Section 990.13 establishes a rebuttable presumption that damages assessments made by governmental trustees—these are the only proper plaintiffs in cases seeking damages under 33 U.S.C. § 2702(b)(2)(A)—are correct. Section 990.14(a)(1) calls for "full restoration." Section 990.20(a) supersedes the CERCLA regulations in relevant part.  Section 990.25 says that claims for damages to natural resources can be settled only if the settlement is adequate "to restore, replace, rehabilitate, or acquire the equivalent of the injured natural resources and services."  Section 990.27 gives the trustees wide latitude on assessment procedures.   Section 990.30 defines *injury* to mean "an observable or measurable adverse change in a natural resource or impairment of a natural resource service. Injury may occur directly or indirectly to a natural resource or service."  Section 990.51 gives the trustees wide latitude in determining and assessing the existence and extent of injury to resources.  Section 990.53(c)(2) calls for full compensation for the interim loss of natural resources and services pending recovery.
     NOAA interprets its regulations to "authorize[] recovery of what are known as nonuse or 'passive' losses, the value individuals place upon the existence of natural resources, even if they never plan to make active use of them. In the case of the National Seashore, for example, people who have never used the beach may nevertheless value its existence. To assess this value, researchers employ a survey technique known as 'contingent valuation,' in which they create a hypothetical market and ask people—survey respondents—how much they would pay to preserve or protect a given resource." *General Electric Co. v. U.S. Dep't of Commerce*, 128 F.3d 767, 772 (D.C. Cir. 1997).  The *General Electric* court held that the availability of "passive value" damages was a valid interpretation of OPA.

[73] Cf. *East Texas Theatres, Inc. v. Rutledge*, 453 S.W. 2d 466, 467 (Tex. 1970) (labeling the question whether defendant's conduct was responsible for plaintiff's being struck by a thrown whiskey bottle an issue of "proximate cause" and the question whether the impact with the bottle produced plaintiff's chronic headaches a "causal connection" issue). The court explained that it used the term "proximate cause" to mean cause-in-fact. See *id.* at 468.

[74] Trans-Alaska Pipeline Authorization Act of 1973, codified as amended at 43 U.S.C. §§ 1651-1656 (2000). The four relevant TAPAA cases are treated in Goldberg, *supra* note 2, at 21-22 & nn. 47, 48, and 50. In his note 49,

provision in these cases was 43 U.S.C. § 1653(c)(1)—this provision was repealed as part of the OPA-enacting legislation[75]—which stated:

> Notwithstanding the provisions of any other law, if oil that has been transported through the trans-Alaska pipeline is loaded on a vessel at the terminal facilities of the pipeline, the owner and operator of the vessel (jointly and severally) and the Trans-Alaska Pipeline Liability Fund ... shall be strictly liable without regard to fault in accordance with the provisions of this subsection for all damages, including clean-up costs, sustained by any person or entity, public or private, including residents of Canada, as the result of discharges of oil from such vessel.

The court in *In re Glacier Bay* stated that the "plain language of Section 1653(c) is that *all* provable damages sustained by any person as a result of a TAPS[76] oil spill are compensable and are not limited by established maritime law."[77]   The court then held that the claims of fish tenders, fish spotters, fish processors, and other shoreside businesses were valid under the TAPAA provision. The *Glacier Bay* case is thus antithetical to Professor Goldberg's claim that proximate cause limitations have routinely been read into TAPAA. (Moreover. in upholding the claims of fish processors and shoreside businesses the case speaks fairly loudly against any sort of use-right limit). Professor Goldberg states that the Ninth Circuit "subsequently rejected" *Glacier Bay*, but that's wrong; the Ninth Circuit case he cites did not even mention *Glacier Bay*, and the KeyCite citator shows no negative history on *Glacier Bay.*[78]

Professor Goldberg can find a bit of support in the other three TAPAA cases, but not that much. The district court in *In re Exxon Valdez* said in a footnote that the TAPAA Congress "did

---

Goldberg cites an irrelevant case, *Heppner v. Alyeska Pipeline Service Co.*, 665 F.2d 868 (9th Cir. 1981), which involved a pipeline construction accident, a car wreck, and a TAPAA provision having nothing to do with oil spills.

[75] See PL 101-380, 104 Stat. 484, § 8102(a)(1) (Aug. 18, 1990).

[76] This is an acronym for Trans-Alaska Pipeline System. See 746 F. Supp. at 1382 & n. 1.

[77] *In re Glacier Bay*, 746 F. Supp. 1379, 1386 (D. Alaska 1990) (emphasis supplied).

[78] Three negative entries turn up on the WestLaw KeyCite citator, but all involved an irrelevant point of federal civil procedure.

not abrogate all notions of proximate cause,"[79] but whatever such "notions" the court thought applicable were lenient enough to lead the court to conclude that a dealer in refrigeration units and a taxidermist had TAPAA claims that should not be dismissed. The district court in *Slaven v. BP America, Inc.* cited no authority and provided no reasoning for its statement that, while "TAPAA does not have a proximate cause requirement," it "is beyond dispute that ... the common law requirement of proximate cause is implicitly incorporated."[80] The *Slaven* court did not seem to use "the common law requirement of proximate cause" against any TAPAA claimant in that case, and in fact it explicitly held that "the bright-line rule of *Robins* is not a necessary component of the proximate cause concept."[81] (Here, as with *Glacier Bay,* the court seemed averse to Goldberg's proposed use-right requirement.) In *Benefiel v. Exxon Corp.*[82] the Ninth Circuit thought that the efforts of California consumers to tie gasoline price increases (imposed by California refineries) to the Exxon Valdez spill in Alaska were ridiculous; the court claimed support in TAPAA's legislative history for the availability of a proximate-cause-based "remote and derivative" analysis to throw the gasoline-price claims out.[83]

Summing up the TAPAA cases: They do not seem to help Professor Goldberg very much, because several of them imply resistance to a use-right limitation, and none of them used any kind of proximate cause limitation to defeat any even half-way credible claimant. More importantly, they show that TAPAA and OPA are very different with respect to both their relevant language and their legislative histories. TAPAA included no two-step factual causation

---

[79] *In re Exxon Valdez,* 1993 WL 787392 at * 3 n. 15 (D. Alaska Dec. 23, 1993).

[80] *Slaven v. BP America, Inc.,* 786 F. Supp. 853, 858 (C.D. Cal. 1992).

[81] *Id.* at 859.

[82] 959 F.2d 805 (9th Cir. 1992).

[83] *Id.* at 807-08.

requirement of the sort that Congress built into OPA, perhaps thereby inclining the courts to look

outside the statute for needed controls  And TAPAA's legislative history respecting its effect on

the *Robins/Testbank* rule was equivocal,[84] whereas OPA's is crystal clear;[85] this meant that the

TAPAA courts might conceivably have been more receptive to some kind of use-right

requirement than would be appropriate under OPA (but the TAPAA courts still resisted it).

It bears emphasis that, even if Professor Goldberg could convince us that there is some

kind of judicial pattern of reading statutory cause-in-fact language to include proximate cause

limitations, *and* that this pattern should be carried into OPA despite OPA's seemingly carefully

crafted two-step factual causation requirement, this would still provide no basis at all for the use-

right limitation that is the heart of Goldberg's argument.[86] We saw in Part V-A above that the

OPA Congress intended to rip the *Robins/Testbank* rule out of the law of OPA cases, root and

branch.  The user-right requirement would be nothing more (or less) than a slightly flabby,

slightly blurry version of *Robins/Testbank*.

---

[84] In *Benefiel*, the court punted on whether *Robins/Testbank* was displaced by TAPAA. See 959 F.2d at 807. And in *Slaven* the court said the relevant legislative history was "ambiguous."  786 F. Supp. at 858.

[85] See *supra* Part V-A; *supra* note 56; *infra* Part VII-B.

[86] Professor Goldberg seems to acknowledge that the RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 29 (2010) sets forth the normal meaning of proximate cause as a "filter" that screens out "harms that are so haphazardly caused as to not count as the realization of one of the risks that rendered the actor's conduct careless." Goldberg, *supra* note 2, at 20 n. 41. See also *id.* at 22 n. 49 (explaining that the proximate cause filter works in strict liability cases by limiting liability to "those harms that amount to the realization of the risks of the activity that lead the law to regard the activity as appropriately subject to a rule of strict liability.")  This has been the sophisticated understanding of proximate cause for decades. See, e.g., *Union Oil Co. v. Oppen*, 501 F.2d 558, 568 (9th Cir. 1974) (quoting *Dillon v. Legg*, 441 P.2d 912 (Cal. 1968) for the proposition that "defendant owes a duty, in the sense of a potential liability for damages, only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous, and hence negligent, in the first instance.")
    Professor Goldberg's use-right requirement does not fit at all well into the inherently flexible and case-specific common-law proximate cause concept.  See the opinion of Judge Learned Hand in *Sinram v. Pennsylvania R. Co.*, 61 F.2d 767, 771 (2d Cir. 1932) (extolling the inherent flexibility of the common law's approach to proximate cause and stating that the only alternative would be "a manual, mythically prolix, and fantastically impractical.").  Professor Goldberg's use-right requirement—together with his occasional inclinations to abandon it (see Goldberg, *supra* note 2, at 33, 40 & n. 92, 41-42)—sometimes has the look of a mythically prolix manual.

## B. OPA's Legislative History:  Nine Key Factors

The Goldberg paper's short section treating OPA's legislative history makes only one significant point:  that members of Congress, the House Conference Report, and a Senate Report repeatedly instanced commercial fishermen and beachfront property owners as the most obvious beneficiaries of Section 2702(b)(2)(E).[87]  But we have already seen that the Senate Report also said the provision was meant to compensate "a wide range of injuries" and that many members of Congress enumerated a number of other types of beneficiaries, including seafood "dealers and processors, bait and tackle store owners, beach concessionaires, and so forth."[88]

Moreover, there are nine features of the legislative history—features that Professor Goldberg's paper largely ignores[89]—that, taken in the aggregate, seem devastating to the Goldberg interpretation of Section 2702(b)(2)(E).  In thinking about these nine features, we should keep in mind the heart of Professor Goldberg's paper:  It purports to find in the "due to" clause of Section 2702(b)(2)(E) a "proximate cause"[90] limit requiring economic loss claimants "to prove that they have suffered economic loss because a spill has damaged, destroyed or otherwise rendered physically unavailable to them property or resources that they have a right to put to commercial use."[91]

First, Section 2702(b)(2)(E) includes no explicit use-right limitation.  But section 2702(b)(2)(C) does; it requires a subsistence-use claimant to show that he "uses natural resources

---

[87] See *id.* at 33-34.

[88] *Supra* note 56.

[89] But see *infra* notes 101 and 111.

[90] Goldberg, *supra* note 2, at 20.

[91] *Id.* at 3.

which have been injured, destroyed, or lost." The first of two powerful statutory-construction

canons set forth in *Russello v. United States* is this:

> Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.[92]

At an otherwise unrelated point in his paper, Professor Goldberg insists that the *Russello* canon is

not applicable "where provisions in the same statute are distinctively formulated,"[93] but it is hard

to see how he could so characterize subsections C and E of Section 2702(b)(2). Indeed,

Goldberg explicitly acknowledges that subsections C and E are "counterpart[s]."[94] It thus seems

obvious that the first *Russello* canon speaks powerfully against reading a use-right limitation into

Section 2702(b)(2)(E).

    Second, three of the bills that eventually coalesced to become OPA include explicit use-

right limitations in their economic loss provisions.[95] As the bills made their way through the

---

[92] 464 U.S. 16, 23 (1983) (citation and internal quotation marks omitted). *See also Hardt v. Reliance Standard Life Ins. Co.*, 130 S.Ct. 2149, 2156 (2010) (holding that because 29 U.S.C. § 1132(g)(2) has an explicit "prevailing party" limit on court-awarded attorneys' fees in ERISA cases whereas 29 U.S.C. § 1132(g)(1) does not, reading a "prevailing party" limit into the latter provision would "more closely resemble[] inventing a statute than interpreting one") (citation and internal quotation marks omitted). Under the *Hardt* analysis, Professor Goldberg's reading of a user-right limit into OPA Section 2702(b)(2)(E) amounts to inventing a statute.

[93] Goldberg, *supra* note 2, at 21 n. 42. *See also infra* at note 101-102.

[94] Goldberg, *supra* note 2, at 34.

[95] As introduced by the House Merchant Marine and Fisheries Committee on March 16, 1989, H.R. 1465 provided in § 102(a)(2)(B)(v) for "Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant who derives at least 25 percent of his or her earnings from the activities which utilize such property or natural resources, or, if such activities are seasonal in nature, 25 percent of his or her earnings during the applicable season." As introduced by the House Public Works and Transportation Committee on May 11, 1989, H.R. 2325 provided in § 102(a)(3)(D) for "Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of natural resources, which shall be recoverable by any claimant who derives at least 25 per centum of his or her earnings from the activities which utilize such natural resources, or, if such activities are seasonal in nature, 25 per centum of his or her earnings during the applicable season." On July 27, 1989, H.R. 3027 (supported by the House Committee on Science, Space, and Technology) was introduced; § 102(a)(2)(B)(v) provided for "Damages equal to the loss of profits or impairment of earning capacity (based on prior profits and earnings) due to the injury, destruction, or loss of real property, personal property, or natural resources. Such damages shall be recoverable by any claimant who derives at least 25 percent of his or her earnings from the

legislative process, the use-right limitations were deleted; no explanation has been found.[96]

*Russello*'s second statutory-construction canon is the following:

> Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended.[97]

This is a second heavy strike against reading a use-right limitation into Section 2702(b)(2)(E).

Third, OPA's predecessor legislation included a use-right limit. Title III of the Outer Continental Shelf Lands Act Amendments of 1978[98] provided for the recovery of pollution-caused economic-loss damages "due to injury to, or destruction of, real or personal property or natural resources ... if the claimant derives at least 25 per centum of his earnings from activities which utilize the property or natural resource."[99] OPA repealed these provisions,[100] replacing them with Section 2702(b)(2)(E). Here is the third strike against reading a use-right limitation into Section 2702(b)(2)(E). It seems very plain that the OPA Congress did not want a use-right limit.

Fourth, neither Section 2702(a) nor Section 2702(b)(2)(E) includes any mention of "proximate cause." But Section 2704(c)(1)—specifying types of conduct that will expose a polluter to liability for damages above the OPA damages caps—requires the spill in question to

---

activities which utilize such property or natural resources, or, if such activities are seasonal in nature, 25 percent of his or her earnings during the applicable season."

[96] H.R. Rep. 101-241, Part 1 (to accompany H.R. 3027) was issued on Sept. 13, 1989, showing the use-right limitation still in that bill. Part 2 of that Report, issued on Sept. 18, 1989, shows the use-right limitation still in that bill. But on October 13, 1989, H.R. 3394 was introduced and explained as a composite bill, designed to merge the others. *Section 1002(b)(2)(E) of that bill has the language that was enacted as OPA Section 1002((b)(2)(E), 33 U.S.C. § 2702(b)(2)(E)—language shorn of any version of a use-right requirement.*

[97] 464 U.S. at 23-24.

[98] PL 99-372, Sept. 18, 1978, 92 Stat. 629.

[99] *Id.*, §§ 303(a)(2)(E) and 303(b)(4).

[100] See PL 101-380, § 2004 (Aug. 18, 1990).

be "proximately caused" by such conduct.   This shows that Congress knew how to say "proximate cause" when it wanted to require that.  Here again, the disparate formulation of two related sections of the same statute calls for the application of the first *Russello* canon, which teaches that Congress presumptively meant to require a showing of proximate cause for cap-breaking purposes but not for the imposition of liability.  Applying that presumption here would make complete sense:  Congress evidently decided that polluters deserve the protection of a proximate cause requirement when being sued for damages above the cap but not for basic liability-imposing purposes.

Professor Goldberg tries to answer this fourth point with a badly flawed footnote that completely mischaracterizes the essence of Section 2704(c)(1).  Goldberg erroneously says that "Section 2704(c)(1) employs the phrase 'proximately caused' in specifying the limited circumstances in which a responsible party can disclaim liability for damages,"[101] whereas the section has the completely opposite thrust of specifying conduct that will expose a responsible party to additional liability above the damages caps.  This surprising mistake robs the remainder of Professor Goldberg's footnote of intelligibility:  When Goldberg says that the first *Russello* canon should not apply to the difference between Sections 2702 and 2704 because the two sections are "formulated in a fundamentally different manner" from one another,[102] he is talking about an imaginary Section 2704(c)(1), not the one actually on the books.

Fifth, the second *Russello* canon—that Congress's deletion of limiting language in a bill before enacting the bill justifies presuming that the limitation was not intended—applies to the proximate cause point in much the same way as to the use-right point.  Several of the early

---

[101] Goldberg, *supra* note 2, at 20 n. 42.

[102] *Id.* at 21 n. 42.

versions of the bills that became OPA included language requiring parties seeking pollution damages to show proximate causation.[103]   As was true respecting the use-right language, the proximate cause language was also deleted as the bills made their way toward passage.[104] Therefore, *Russello* counsels us to conclude that the OPA Congress did not want to require claimants seeking economic-loss damages to meet a proximate cause requirement.

Sixth, OPA's predecessor legislation included an explicit proximate cause limit. Title III of the Outer Continental Shelf Lands Act Amendments of 1978[105] provided for the recovery of pollution-caused damages that were "proximately caused by the discharge of oil from an offshore facility or vessel."[106]  OPA repealed this provision,[107] replacing it with Section 2702(a). So here again, the second *Russello* canon calls for the presumption that the OPA Congress did not intend a proximate cause limit to be read into its economic-loss provisions.

Seventh, all of the House of Representatives bills that coalesced into OPA included direct-causation requirements.[108]  The bill that passed the House of Representatives included

---

[103] See H.R. 3027, July 27, 1989, § 102(a) (1) (limiting recoverable damages to those "which are proximately caused by" a spill or substantial threat of a spill); H.R. 1465 as presented in H. Rep. 101-242, Part 1 (Sept. 18, 1989), § 102(a)(1) (same).

[104] H.R. 3394, the composite bill introduced on Oct. 3, 1989, included no explicit proximate cause requirement in its liability-imposing and economic-loss provisions.  Nor did the version of H.R. 1465 that passed the House of Representatives in November, 1989. Nor, of course, does the enacted law.

[105] PL 99-372, Sept. 18, 1978, 92 Stat. 629.

[106] *Id.* § 301(15).

[107] See PL 101-380, § 2004 (Aug. 18, 1990).

[108] See the March 16, 1989, version of H.R. 1465, § 102(a) (limiting recoverable damages to those "that arise out of or directly result from" a spill or substantial threat of a spill; H.R. 2325 (May 11, 1989), § 102(a) (limiting recoverable damages to those "that arise out of or directly result from such discharge or threat of discharge"); H.R. 3027 (July 17, 1989), § 102(a)(1) (limiting recoverable removal costs to those "which arise out or directly result from" a spill or substantial threat of a spill); H.R. 3394 (Oct. 3, 1989), § 1002(a)(1) (limiting recoverable removal costs and damages to those "that directly result from" a spill or substantial threat of a spill).

such a limit.[109]  But (without any discoverable explanation) the directness requirement was deleted from the bill that emerged from the House-Senate conference and was signed into law.[110] Here once again the second *Russello* canon requires a strong presumption that the OPA Congress intended that for purposes of recovering economic-loss damages, the only causation requirement should be factual causation.[111]

Eighth, OPA's predecessor legislation included a direct-causation requirement.  Title III of the Outer Continental Shelf Lands Act Amendments of 1978[112] provided for the recovery of pollution-related damages "by any person suffering any direct and actual injury proximately caused by the discharge of oil from an offshore facility or vessel."[113]  OPA repealed this provision,[114] replacing it with Section 2702(a), which contains no "directness" or "proximate cause" language.  Here we have yet another application of the second *Russello* canon.

Ninth, as we saw in Part V-B above, Goldberg's insistence that the OPA terms "result[ing] from" (Section 2702(a)) and "due to" (Section 2702(b)(2)(E)) have different meanings is flatly contradicted by the House Conference Report, which in its provision-by-provision analysis of the House-passed bill stated:  "Subsection (b)(2)(E) provides that any claimant may recover for loss of profits or impairment of earning capacity *resulting from* [the

---

[109] See H.R. 1465 (Nov. 15, 1989), § 1002(a)(1) (limiting recoverable removal costs and damages to those "that directly result from" a spill or substantial threat of a spill).

[110] See H.R. CONF. REP. NO. 101-653 (Aug. 1, 1990) (presenting § 1002(a) of H.R. 1465 as providing for liability for removal costs and damages "that result from" a spill or substantial threat of a spill.  The language is identical to the enacted Section 2702(a).

[111] Professor Goldberg acknowledges the deletion of the "directness" requirement from the final bill, but he argues that his reading of Section 2702(b)(2)(E)'s "due to clause" as an "explicit[]" limitation going beyond "actual causation" should trump the *Russello* canon.  Goldberg, *supra* note 2, at 17 n. 36.

[112] PL 99-372, Sept. 18, 1978, 92 Stat. 629.

[113] *Id.* § 301(15).

[114] See PL 101-380, § 2004 (Aug. 18, 1990).

statutory term is "due to"] injury to property or natural resources."[115]   Here we have an authoritative statement by Congress that "resulting from" and "due to" are synonyms. It is hard to resist calling this the final nail in the coffin for Goldberg's use-right reading of subsection (b)(2)(E).

## C. Judicial Decisions Interpreting OPA

Professor Goldberg's paper presents seven decisions that have involved the OPA provisions of relevance here.[116]   Economic-loss claimants prevailed in four of these, and Goldberg does not question these results.[117]   *Dunham-Price Group, LLC v. Citgo Petroleum Corp.*[118] is especially instructive.  An oil spill from Citgo's refinery into the Calcasieu River caused the Coast Guard to order a temporary closure of twenty-two miles of the river, which interfered with the business operations of Dunham's concrete facility "located several miles upriver from Citgo's refinery and upriver from the zone closed by the Coast Guard."[119]   Citgo

---

[115] H.R. CONF. REP. NO. 101-653, at 104 (1990).

[116] See Goldberg, *supra* note 2, at 17 n. 36; *id.* at 34-35.

[117] Goldberg discusses these four cases *id.* at 34-35 & n. 85.  In *FGDI, LLC v. M/V Lorelay*, 193 Fed. Appx. 853, 2006 WL 2351835 (11th Cir. 2006), the operators of a vessel that spilled oil while berthed in the Port of Mobile conceded liability under OPA to the operator of a grain elevator that could not use its loading berth while the area was being cleaned. As is explained *supra* note 15, *Settoon* and *Sekco* held that owners of undamaged property (like claimants who owned no spill-involved property) have causes of actions under Section 2702(b)(2)(E). *Dunham-Price* is discussed in the text immediately following this footnote signal.
    At 35 & n. 83, Professor Goldberg takes an unwarranted liberty with the *Sekco* opinion; he claims that in a passage at 820 F. Supp. 1012 "the court emphasized [that] defendant's interference with the plaintiff's right to operate its [undamaged] platform is exactly the sort of interference-with-use-rights that Section 2702(b)(2)(E) addresses."  This claim distorts *Secko*; the cited passage did not address OPA at all but was the *Sekco* court's tentative recognition that interference with a property owner's "right of use" might properly be viewed as harm to a proprietary interest for purposes of the *Robins/Testbank* rule. When the *Sekco* court eventually turned its attention to OPA, *id.* at 1014-15, it said the platform owner had no claims under subsections (B) and (C) of Section 2702(b)(2) but *did* have a viable claim under subsection (E) because "Plaintiff alleges that the Isopar M spill caused a loss of future production revenues. Future earnings derived from drilling on the Outer Continental Shelf constitute property, but whether that property be real or personal is irrelevant; in either case, plaintiff can recover for loss of profits. Given the language of subsection (E), the Court cannot say as a matter of law that plaintiff has no cause of action here." *Id.* at 1015.

[118] 2010 WL 1285446 (W.D. La. March 31, 2010).

[119] *Id.* at * 1.

34

responded to Dunham's claim for damages under Section 2702(b)(2)(E) by moving for summary judgment and making the following argument:

> Citgo argues that under [Section 2702(b)(2)(E)], a plaintiff must prove that his injuries are directly "due to" property damage resulting from an oil discharge. Citgo further argues that Dunham Price's damages are due to the closure of the Calcasieu Ship Channel and not attributable to a physical injury to property or natural resources.[120]

Note that Citgo was making a proximate cause/physical injury argument closely resembling Professor Goldberg's proposed reading of Section 2702(b)(2)(E). Dunham responded to Citgo's argument by directing the court's attention to Section 2702(b)(2)(E)'s actual language, "insist[ing] that the statute does not mention or require a direct causal link between a claimant's economic losses and damages to property or natural resources."[121]

The *Dunham-Price* court accepted Dunham's statutory-language argument. The court denied Citgo's summary judgment motion and expressed its disagreement with Citgo's proximate cause argument as follows:

> The Calcasieu River meets OPA's definition of a natural resource [quoting 33 U.S.C. § 2701(20)]. Citgo has admitted that its discharge of oil into the Calcasieu River polluted a navigable water of the United States and damaged the personal property of owners along the Calcasieu River. Moreover, the Coast Guard issued a community advisory, notifying the public of the spill and the subsequent closure of the Calcasieu River. Dunham Price has submitted evidence demonstrating genuine issues of material fact, so it will be for the trier of fact to determine whether Dunham Price's economic losses are due to Citgo's oil spill.[122]

It will be noted that there is nothing particularly remarkable about the facts, arguments, and judicial reasoning in *Dunham-Price*. The remarkable thing about the case is the court's rejection of a nearly-identical version of Professor Goldberg's central argument.

---

[120] *Id.* at * 2.

[121] *Id.*

[122] *Id.* at * 3.

The Goldberg paper treats three decisions with results adverse to OPA claimants. As Professor Goldberg comes close to acknowledging,[123] two of them are pretty clearly wrong. The widely-criticized[124] decision in *In re Cleveland Tankers, Inc.* denied recovery to plaintiffs making claims under Section 2702(b)(2)(E) because they failed to "allege 'injury, destruction, or loss' to *their* property."[125]   This is flatly wrong, as is shown by the provision itself ("recoverable by any claimant") and by the language of the House Conference Report quoted *supra* at notes 39-40.[126]

*Gatlin Oil Co. v. United States*[127] seems almost as clearly wrong.   Gatlin owned seven above-ground fuel storage tanks that were jammed open by vandals, causing oil to spill into ditches leading to navigable waters as well as a fire (ignited by the oil's vapors) that destroyed a large part of Gatlin's property.   One member of the Fourth Circuit panel agreed with the trial judge that the fire damage was compensable under OPA Sections 2702(a) and 2702(b)(2)(B) because (in the language of Section 2702(a)) the fire damage "result[ed] from" the spill incident.[128]   But the two-judge Fourth Circuit majority disagreed, holding that the fire damage

---

[123] See *infra* notes 126 and 130.

[124] See *In re Taira Lynn Marine Ltd.*, 444 F.3d 371, 382 (5th Cir. 2006) (citing *Cleveland Tankers* as contrary to prevailing views, including the Fifth Circuit's own, on the meaning of Section 2702(b)(2)(E); *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 631 n. 6 (1st Cir. 1994) (criticizing *Cleveland Tankers* for ignoring the fact that OPA "override[s]" the *Robins/Testbank* rule); *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 769 n. 75 (Alaska 1999) (criticizing *Cleveland Tankers* for failing to recognize that OPA provides for the recovery of economic damages); Francis J. Gonynor, *Six Years Before the Mast: The Evolution of the Oil Pollution Act of 1990*, 9 U.S.F. MAR. L.J. 105, 127 (1996) (stating that *Cleveland Tankers* "interpreted OPA in a novel way").

[125] 791 F. Supp. 669, 678 (E.D. Mich. 1992) (emphasis supplied).

[126] Goldberg, *supra* note 2, at 35 n. 81, cites *Cleveland Tankers* as interpreting OPA Section 2702(b)(2)(E) more narrowly than Goldberg thinks proper.   At 40 n. 92 Professor Goldberg suggests that maybe the *Cleveland Tankers* plaintiffs—who were complaining of the blockage of a channel they used for transporting goods—lost the case because they did not have licenses to use the waterway.

[127] 169 F.3d 207 (4th Cir. 1999).

[128] See *id.* at 215 (Niemeyer, J., dissenting, stating that "[t]he statutory [2702(a)] test—whether fire damage 'resulted from' the discharge of oil that threatened to pollute navigable waters—was ... satisfied.").

was not compensable "because the evidence did not establish that the fire caused the discharge of oil into navigable waters or posed a substantial threat to do so."[129] It must be respectfully said that this reasoning makes no sense, and Professor Goldberg does not pretend that it does: He says that the majority's reasoning was "somewhat obscure[]."[130]

The case that Professor Goldberg makes the most of[131] is *In re Taira Lynn Marine Ltd.*[132] but the case does not seem particularly instructive on any of the matters in contention here. The *Taira* plaintiffs sought business-interruption and similar economic damages brought about by the mandatory evacuation of their areas of operation that was necessitated when a barge ran into a bridge and discharged its cargo—"a gaseous mixture of propylene/propane"—into the air.[133] Nothing was spilled into the water or onto the shoreline. Because the OPA damages provisions are limited to situations in which "oil is discharged, or [there is a] substantial threat of a discharge of oil, *into or upon the navigable waters* or adjoining shorelines or the exclusive economic zone,"[134] *Taira* was fairly clearly not an OPA case. As was explained by the court in *Dunham-Price, supra* at note 118:

> The Fifth Circuit found that OPA claims are limited to damages resulting "from a discharge of oil or from a substantial threat of a discharge of oil into navigable waters or the adjacent shoreline. *Taira Lynn Marine,* 444 F.3d at 383 (quoting *Gatlin v. United States,* 169 F.3d 207, 211 (4th Cir. 1999)). Although OPA did not apply to the discharge of gaseous cargo, the court considered it applicable for the sake of argument. *Id.*[135]

---

[129] *Id.* at 212.

[130] Goldberg, *supra* note 2, at 17 n. 36.

[131] See *id.* at 35 n. 81, 40 n. 92.

[132] 444 F.3d 371 (5th Cir. 2006).

[133] *Id.* at 376.

[134] 33 U.S.C. § 2702(a) (emphasis supplied).

[135] *Dunham-Price,* 2010 WL 1285446 at * 2 n. 6.

37

In its "for the sake of argument" discussion of OPA, the *Taira* court characterized Section 2702(b)(2)(E) as "allowing a plaintiff to recover for economic losses resulting from damage to another's property"[136] and went on to state that the provision would not afford relief to the plaintiffs because they "have not raised an issue of fact as to whether their economic losses are due to damage to [anyone's] property resulting from the discharge of the gas."[137] The plaintiffs should have been arguing that the discharge of the gas polluted the air (which OPA includes within its expansive definition of "natural resources"[138]) and thus constituted "injury, destruction, or loss of ... natural resources" within the meaning of Section 2702(b)(2)(E). But if that point was made, the Fifth Circuit completely ignored it.

Thus, for one looking to *Taira* for lessons about the meaning of Section 2702(b)(2)(E), the returns (to borrow an apt Goldberg phrase) seem "vanishingly small."[139] The court indicated that OPA did not apply, but that if it did, the part of Section 2702(b)(2)(E) allowing a claimant to recover economic losses for damage to someone else's property would not help plaintiffs who had no evidence that the oil (or oil-based chemical) spill had damaged anyone's property. The case is no help at all on the sphere of application of the portion of Section 2702(b)(2)(E)—surely the more important portion—providing for economic damages flowing from injury to the environment.

---

[136] 444 F.3d at 382.

[137] *Id.* at 383.

[138] See 33 U.S.C. § 2701(20).

[139] See Goldberg, *supra* note 2, at 19 (arguing that the probability of an oil spill that causes economic loss but no physical damage to anything is "theoretical but vanishingly small").

## VIII. CONCLUSION

The commercial-use-right proposal of the Goldberg paper is at war with OPA's language and legislative history. One of the handful of judicial decisions addressing the relevant OPA provisions has rejected an argument fairly closely resembling the Goldberg proposal. Moreover, the Goldberg proposal seems somewhat vulnerable to criticism on policy and coherence grounds. The impressive plausibility of the Goldberg paper stems entirely from the author's remarkable analytical and rhetorical skills. If at the end of the day it emerges that a legal craftsman of Professor Goldberg's high degree of proficiency cannot sell a conceptual product, it is probably safe to assume that the product itself is seriously flawed.