**LSUcle**

PAUL M. HEBERT LAW CENTER

# LSU LAW

LOUISIANA STATE UNIVERSITY

Center of Continuing Professional Development

*W203 Law Center
Baton Rouge,
Louisiana 70803-0001*

*Phone: (225)578-5837
Fax: (225) 578-5842
LSUcle@law.lsu.edu
www.LSUcle.org*

# OPA 90 – Searching for the Line

## By

## Professor David W. Robertson
## W. Page Keeton Chair in Tort Law
## University Distinguished Teaching Professor
## University of Texas School of Law, Austin, TX

9th Judge Alvin B. Rubin Conference on
Maritime Personal Injury Law

May 13, 2011

McKernan Law Auditorium
LSU Law Center

All Rights Reserved

# OPA 90: Searching for the Line

David W. Robertson
University of Texas School of Law
May 1, 2011

TABLE OF CONTENTS

I. INTRODUCTION: THE KEY STATUTORY PROVISIONS ....................................................1

II. THE MACONDO (DEEPWATER HORIZON) OIL SPILL .................................................4

III. THE PRECISE QUESTION TREATED IN THIS ARTICLE ............................................5

IV. THE GULF COAST CLAIMS FACILITY, THE GOLDBERG PAPER,
AND THE COMMERCIAL-USE-RIGHT THEORY ...........................................................6

V. A MIDDLE-OF-THE-ROAD INTERPRETATION OF OPA'S ECONOMIC
LOSS PROVISIONS ...........................................................................................................9

    A. Deep Background: Admiralty Jurisdiction and Federal Maritime Law ...............10

    B. The Facially Apparent Meaning of Section 2702(b)(2)(E):
    A Factual Causation Interpretation .........................................................................12

VI. CONTRASTING THE FACTUAL CAUSATION INTERPRETATION WITH
THE GOLDBERG USE-RIGHT INTERPRETATION: GOLDBERG'S
"UNIVERSE OF POTENTIAL PURE ECONOMIC LOSS CLAIMANTS" ...............................14

    A. Claims Probably Defeated by Section 2702(b)(2)(E)'s Factual Causation
    Requirement .............................................................................................................18

    B. Claims That Should Succeed Under the Factual Causation Interpretation ..........19

    C. Claims Defeated by the Goldberg Interpretation ..................................................19

    D. Goldberg Neglects the Ships' Chandler .................................................................21

VII. A PARTIAL ANALYSIS AND EVALUATION OF PROFESSOR GOLDBERG'S USE-RIGHT
PROPOSAL ........................................................................................................................21

    A. The Courts' Treatment of Statutes That Are Broadly Analogous to OPA ...........22

    B. OPA's Legislative History: Nine Key Features .....................................................29

    C. Judicial Decisions Interpreting OPA.......................................................................34

VIII. CONCLUSION ............................................................................................................39

# OPA 90: SEARCHING FOR THE LINE[**]
David W. Robertson[*]

## I. INTRODUCTION: THE KEY STATUTORY PROVISIONS

When the supertanker *Exxon Valdez* ran aground and ripped itself open in Alaska's coastal waters in March, 1989, spilling an estimated eleven million gallons of crude oil,[1] Congress had been trying for more than a decade to enact comprehensive marine oil spill legislation.[2] The previously unimagined scale and scope of the Valdez tragedy jolted Congress into a more productive mode,[3] and the Oil Pollution Act of 1990 ("OPA") was enacted and signed into law on August 18, 1990.[4]

In their deliberations on the bills that eventually coalesced to become OPA, members of Congress expressed deep dissatisfaction with virtually everything about this country's lack of

---

[**] An early version of this paper was presented at an Oil Spill Symposium at the Mississippi College of Law, Jackson, Miss., on Feb. 18, 2011. A later version, tentatively titled *The Oil Pollution Act's Provisions on Damages for Economic Loss*, is scheduled for publication in a forthcoming issue of the Mississippi College Law Review.

[*] W. Page Keeton Chair in Tort Law and University Distinguished Teaching Professor, University of Texas at Austin. The sole purpose of mentioning my academic affiliation is to identify me. The views expressed here are mine, not those of my university or law school. The analysis presented here has a deep basis in decades of academic study, reflection, and scholarship, but it also reflects work I have recently become engaged in as a consulting expert for the Plaintiffs' Steering Committee in *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010* (MDL No. 2179, E.D. La.) ("Oil Spill Litigation").

[1] See *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 476-78 (2008).

[2] John C.P. Goldberg, *Liability for Economic Loss in Connection with the Deepwater Horizon Spill*, Nov. 22, 2010, at 7 (available at www.gulfcoastclaimsfacility.com.

[3] See *id.* at 6. The *Exxon Valdez* spill was "only the world's fifty-seventh largest." Raffi Khatchadourian, *The Gulf War*, THE NEW YORKER, Mar. 14, 2011, at 39. But in this country the Valdez spill had a unique political impact because it was so "ecologically devastating" (*id.*), and it was the United States' first huge one. Famous larger spills include the thirty-seven million gallons of Kuwaiti crude oil released when the *Torrey Canyon* went aground off Cornwall in 1967, *id.,* and the estimated 120-million-gallon spill caused by the semi-submersible drilling rig *Sedco 135-F* in the Bay of Campeche, Mexico, in June 1979. See *Ixtoc I Oil Spill*, WIKIPEDIA. See also *Sedco, Inc. v. Petroleos Mexicanos Mexican National Oil Co.*, 767 F.2d 1140, 1142 (5th Cir. 1985) (referring to the Ixtoc I spill as "the world's largest"). Oil from the Ixtoc spill reached Texas beaches, but the national political impact of the incident was negligible.

[4] PL 101-380, Aug. 18, 1990, 104 Stat. 484. Title I of the Act, captioned *Oil Pollution Liability and Compensation* (§§ 1001-1020), is codified at 33 U.S.C. §§ 2701-2730. Because most practitioners and lower-court judges seem to find the Title 33 counterparts more easily accessible than the provisions of the Act itself, this Article cites to OPA by using the Title 33 section numbers.

preparedness for disasters like Valdez.  One major theme in this outpouring of official grief and anger was the view that the thousands upon thousands of individuals, communities, and businesses whose lives and livelihoods were destroyed, disrupted, or damaged should have had (but often were denied) adequate, fair, and speedy compensation.[5]  Congress believed that such relief should be guaranteed for the victims of all future spills.

OPA addresses these concerns by imposing strict (no-fault) liability on the party or parties responsible for an oil spill.[6]  This strict liability is limited (but only slightly) by a narrowly crafted set of affirmative defenses.[7]  An oil polluter held strictly liable under OPA is potentially protected by a cap on the damages owed,[8] but a claimant can break the cap by showing that the responsible party's gross negligence, willful misconduct, or violation of a Federal safety statute or regulation "proximately caused" the spill.[9]  Victims who are not fully compensated by a responsible party may claim against a federally-administered Oil Spill Liability Trust Fund.[10]

OPA makes polluters (and, when polluters can't or won't pay, the Fund) responsible for removal costs and for a "wide range" of damages.[11]  The OPA provisions with which this paper is centrally concerned are those specifying the types of damages available.  The immediately

---

[5] See *infra* note 56.

[6] 33 U.S.C. § 2702.

[7] 33 U.S.C. § 2703.

[8] 33 U.S.C. § 2704(a).

[9] 33 U.S.C. § 2704(c).

[10] 33 U.S.C. §§ 2701(11), 2712(a)(4).

[11] S.Rep. No. 101-94, at 12 (1990).

relevant statutory provisions are set forth just below.  The central focus of this Article is the meaning of the language in bold italics (supplied).

**33 U.S.C. § 2702. Elements of liability**

(a) In general

Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section *that result from such incident*.

(b) Covered removal costs and damages

(1) Removal costs

\* \* \*

(2) Damages

The damages referred to in subsection (a) are the following:

(A) Natural resources

Damages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage, which shall be recoverable by a United States trustee, a State trustee, and Indian tribe trustee, or a foreign trustee.

(B) Real or personal property

Damages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property.

(C) Subsistence use

Damages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources.

(D) Revenues

Damages equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by the Government of the United States, or a political subdivision thereof.

3

(E) Profits and earning capacity

Damages equal to the loss of profits or impairment of earning capacity *due to the injury, destruction, or loss of real property, personal property, or natural resources,* which shall be recoverable by any claimant.

(F) Public services

Damages for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, caused by a discharge of oil, which shall be recoverable by a State, or a political subdivision of a State.

\* \* \*

## II. THE MACONDO (*DEEPWATER HORIZON*) OIL SPILL

Disagreement about the meaning of the above-emphasized language of Sections 2702(a) and 2702(b)(2)(E) is presently at the heart of the litigation[12] stemming from the monstrous Macondo[13] oil well spill into the Gulf of Mexico on April 20, 2010, when the *Deepwater Horizon* drilling rig exploded, burned, and capsized, killing eleven workers, injuring many other workers, and causing oil and gas to begin spewing into the Gulf from the wellhead almost a mile (5000 feet) below the ocean surface.[14]  The flow of oil into the Gulf was not staunched until July 15, 2010.  By then an estimated 200 million gallons of oil (perhaps twenty times as much as the Valdez spill) had entered the Gulf.

The Macondo well is located forty-three miles off the coast of Louisiana and about ninety-eight miles from the coasts of Mississippi and Alabama.  Hundreds of thousands of individuals and businesses in those states, as well as in Florida, Texas, and other states, have

---

[12] See *supra* note \*.

[13] "Macondo" was the name that one of the operating companies, presumably BP, gave to the exploratory well. This was also the name of a fictional town in Gabriel Garcia Marquez's novel ONE HUNDRED YEARS OF SOLITUDE.  In the novel, the village of Macondo, grown into a city, is eventually wiped off the map by a gigantic windstorm.

[14] The information in this section of this Article is taken from the pleadings on file in the Oil Spill Litigation, *supra* note \*.

sustained economic harm and are seeking recompense.  Some of these victims—those who owned or leased real or personal property affected by the spill—can invoke subsection B of Section 2702(b)(2).  For most of them, though, the crucial provision is Section 2702(b)(2)(E).[15]

### III. THE PRECISE QUESTION TREATED IN THIS ARTICLE

The central question addressed by this Article is the correct interpretation of 33 U.S.C. § 2702(b)(2)(E) (quoted above in Part I).  For analyzing this question, the proper starting place is the combined language of subsections 2702(a) and (b)(2)(E).  Paraphrased and combined, these provisions look like this:

Subsection (a):  A party responsible for an oil spill or a substantial threat of an oil spill owes certain categories of damages that "result from" the spill or threat.

Subsection (b)(2)(E):  Among those categories of recoverable damages are "loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources."

For ease of presentation, it will sometimes be useful to refer to the "loss of profits" and "impairment of earning capacity" covered by subsection (b)(2)(E) as "pure economic loss."[16]  In simplified form, the question addressed in this Article is, what must a pure economic loss victim

---

[15] To recover damages under subsection (B) of Section 2702(b)(2), an owner or lessor must trace its damages to "injury to" or "destruction of" its own (leased or owned) property.  Under subsection (E), that same claimant (like claimants who did not own or lease any involved property) can recover on showing that the claimant sustained lost profits or impaired earning capacity "due to the injury, destruction or loss" of natural resources or of anyone's property.  See *In re Taira Lynn Marine Ltd.*, 444 F.3d 371, 382 (5th Cir 2006) (indicating that property owners could invoke both subsections (B) and (E)); *In re Settoon Towing LLC,* 2009 WL 4730969 at * 3-4 (E.D. La. Dec. 4, 2009) holding that when a spill temporarily prevented the owner of an undamaged offshore platform from using it, the owner had a cause of action under subsection (E)); *Secko Energy, Inc. v. M/V Margaret Chouest*, 820 F. Supp. 1008, 1015 (E.D. La. 1993) (same).

[16] Economic losses caused by physical damage to the plaintiff's real or personal property are routinely regarded as recoverable and nonproblematic.  (Such damages are addressed by OPA in 33 U.S.C. § 2702(b)(2)(B).)  The term "pure economic loss" refers to economic losses that do not stem from physical injury to the plaintiff's person or tangible property.  DAVID W. ROBERTSON ET AL, CASES AND MATERIALS ON TORTS 253 (3d ed. 2004).

show in order to establish that his damages "result[ed] from" a spill (or threat) and were "due to the injury, destruction, or loss" of property or natural resources?

## IV. THE GULF COAST CLAIMS FACILITY, THE GOLDBERG PAPER, AND THE COMMERCIAL-USE-RIGHT THEORY

The meaning of 33 U.S.C. § 2702(b)(2)(E) was recently addressed at some length by Harvard Law School Professor John C. P. Goldberg.[17] The circumstances leading to the production of Professor Goldberg's paper are sketched below.[18]

The operator of the Macondo site was BP Exploration and Production, Inc., a subsidiary of BP, plc. The *Deepwater Horizon* was owned by Transocean, Ltd. BP and Transocean have been designated by the Coast Guard as "responsible parties" under OPA.[19] As a responsible party, BP was required by 33 U.S.C. § 2714(b) to set up and advertise a claims procedure.[20] In recognition of that obligation—and by some accounts in response to the blandishments of President Obama[21]—BP created the Gulf Coast Claims Facility (GCCF) and put a famous and well-credentialed attorney/mediator, Kenneth Feinberg, in charge of it.[22]

---

[17] See Goldberg, *supra* note 2.

[18] Much of the information in the two paragraphs just below is taken from the pleadings on file in the Oil Spill Litigation, *supra* note *.

[19] 33 U.S.C. § 2701(32) defines "responsible party" as the vessel or facility from which the spill or threatened spill emanated. Section 2714(a) requires the President (acting through the Coast Guard), upon learning of a spill or threatened spill, to designate and "immediately notify" the party or parties deemed responsible.

[20] 33 U.S.C. § 2714(b)(1) provides that unless the designated responsible party denies the designation, the responsible party "shall advertise the designation and the procedures by which claims may be presented...." Section 2714(b)(2) provides that the advertisement "shall state that a claimant may present a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled and that payment of such a claim shall not preclude recovery for damages not reflected in the paid or settled partial claim."

[21] See, e.g., Goldberg, *supra* note 2, at 4.

[22] The Goldberg paper seems to go out of its way to emphasize that setting up the fund was voluntary on BP's part and that the GCCF and Mr. Feinberg are neutral and independent of BP. See *id.* at 4-6. None of that appears to be true. OPA required BP to set up a settlement procedure and to pay interim claims without insisting on full releases. See *supra* note 20. And the federal judge in charge of the Oil Spill Litigation has ordered the GCCF and Feinberg to cease and desist from claiming independence and neutrality. See *infra* note 24.

The purpose of the GCCF is to settle claims for economic and other losses made against BP. The Facility initially presented itself to the public as "neutral,"[23] but the federal district judge in charge of the Oil Spill Litigation subsequently issued an order directing BP, Feinberg, and the GCCF to "[r]efrain from referring to the GCCF, Ken Feinberg, or [Feinberg's law firm] as 'neutral' or completely 'independent' from BP."[24] The court's order further stated: "It should be clearly disclosed in all communications, whether written or oral, that said parties are acting for and on behalf of BP in fulfilling its statutory obligations as the 'responsible party' under the Oil Pollution Act of 1990."[25]

Mr. Feinberg has a $20 billion settlement fund to work with. This fund is "intended to make whole both private enterprises (for lost earnings) and the states and the federal government (for cleanup costs)."[26] The GCCF is also trying to use the fund to settle personal injury and death claims.[27] Given the tragic physical and emotional consequences of the *Deepwater Horizon* explosion and the apparent magnitude of the Macondo spill's physical, emotional, and economic effects, $20 billion is probably not enough money. According to the *New York Times*, Feinberg—in quest of legal principles that might justify the exclusion of economic-loss claimants from areas of the country remote from the spill and its physical effects—turned to Professor Goldberg for assistance. Here is the *Times* account:

---

[23] See, e.g., *Gulf Coast Claims Facility Protocol for Interim and Final Claims, November 22, 2010,* at p. 2 (stating that "[t]he GCCF is administered by Kenneth R. Feinberg, ('the Claims Administrator'), a neutral fund administrator") (http://www.gulfcoastclaimsfacility.com/proto_4, p. 2).

[24] See Oil Spill Litigation, *supra* note *, *Order and Reasons,* Feb. 2, 2011, pp. 13-14 (available at http://www.laed.uscourts.gov/).

[25] *Id.* at 14.

[26] David Segal, *Should BP's Money Go Where Oil Didn't?,* N.Y. TIMES, Oct. 23, 2010, at ___.

[27] See *Protocol, supra* note 23, at p. 1.

Working outside of the court system, Mr. Feinberg isn't necessarily constrained by [OPA], or state or federal tort law. But to figure out what, if anything, these claimants should be paid, he needs a sense of what would become of them if they slogged through the dockets.

So Mr. Feinberg has quietly hired one of the country's foremost scholars on torts—he declined to provide a name [we now know it is Professor Goldberg]—to write a memorandum about the validity and value of [economic loss] claims.

The memo is due soon, and Mr. Feinberg has no idea what it will say. But it won't serve as a blueprint, he says. It will serve as leverage. If the memo states, for instance, that certain [economic loss] claims are stinkers, Mr. Feinberg could say to claimants, "You'll get nothing in court, but I'll give you 20 cents or 30 cents on the dollar."[28]

About a month after the *Times* article appeared, Professor Goldberg transmitted his report to Mr. Feinberg, who made it publicly available.[29] The Goldberg report does indeed say that some economic loss claims—in fact, a great many of them—are stinkers. In a succinct, clear Executive Summary at the beginning of the paper, Professor Goldberg writes (emphasis supplied):

Under OPA, a person may obtain compensation for economic loss from a party responsible for a spill if she can prove that her loss is "due to" harm to property or resources that "result[s] from" the spill, irrespective of whether she owns that property or those resources. *This statutory language is best understood to allow recovery only by those economic loss claimants who can prove that they have suffered economic loss because a spill has damaged, destroyed, or otherwise rendered physically unavailable to them property or resources that they have a right to put to commercial use.* Thus, if a spill were to deprive commercial fishermen of expected profits by killing fish they ordinarily would catch and sell, or by causing authorities to bar the fishermen from accessing those fish for a period of time, the fishermen would be entitled to recover. By contrast, operators of beach resorts in areas physically unaffected by a spill, but that nonetheless suffer economic loss because of a general downturn in tourism resulting from the spill, are among those who are not entitled to recovery under OPA.[30]

---

[28] New York Times, *supra* note 26, at ___.

[29] See *supra* note 2.

[30] Goldberg, *supra* note 2, at 3.

It will be useful to call the above-emphasized proposal the *commercial use-right requirement*.

In the body of his paper, Goldberg demonstrates that the commercial use-right requirement would be an extraordinarily potent exclusionary tool. Part VI below borrows elements of that demonstration as a way of emphasizing the narrow coverage Section 2702(b)(2)(E) would have in Professor Goldberg's world, and to demonstrate that Congress probably had broader aims for the provision.

## V. A MIDDLE-OF-THE-ROAD INTERPRETATION OF OPA'S ECONOMIC LOSS PROVISIONS[31]

At the end of the day, the intended meaning of 33 U.S.C. § 2702(b)(2)(E) is tolerably apparent.[32] But it may not be apparent at first blush. An informed reading of the statute entails some understanding of the jurisprudential background and some grasp of the legislative history.

---

[31] See *infra* note 54 for argument that the subtitle's "mid-road" characterization is justified.

[32] This Article's claim that the relevant OPA provisions express a clear meaning entails an underlying assumption that the statute was carefully drafted. This assumption rests on generally comfortable ground—Congress worked intensively on the statute for many months, the legislative history is copious, and nobody in Congress can have doubted the critical importance of the legislation.

But the assumption of clear draftsmanship is not entirely free from doubt. Two irritating anomalies are apparent in some of the statute's key language. <u>First</u>, Section 2701(5)–defining the term *damages* as used throughout the statute—states that the term "means damages specified in section 2702(b) ... and includes the cost of assessing these damages." Section 2702(b)(2)(A)—providing for the recovery by governmental trustees of damages for injury to natural resources—repeats that these damages "includ[e] the reasonable costs of assessing the damage." But the ensuing subsections of § 2702(b)(2)—subsections (B) through (F)—use the term *damages* without saying anything about damage-assessment costs. So, is the subsection (A) language about assessment costs a redundancy? Or does that language imply that no assessment costs are allowed by the ensuing subsections (B) through (F)? The correct answer is probably redundancy, but Congress should have tried harder to avoid creating such a puzzle.

<u>Second</u>, subsection (A) of Section 2702(b)(2) provides for recovery by governmental trustees of damages for "injury to, destruction of, loss of, or *loss of use* of, natural resources" (emphasis supplied), whereas subsection (D) (providing for recovery by governmental entities of damages for lost revenues and taxes) and subsection (E) (the core economic-loss provision that is the central focus of this Article) use a formulation—"injury, destruction, or loss of real property, personal property, or natural resources"—that omits the loss-of-use phrase. Does the inclusion of "loss of use" in subsection (A) and the omission of "loss of use" in subsections (D) and (E) mean that a loss of use of natural resources is not compensable under (D) and (E)? It certainly could mean that. See *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citation and internal quotation marks omitted).

Applying the *Russello* canon to the disparity between subsection (A) (on the one hand) and (D) and (E) (on the other) would yield strange results. Section 2702(a) imposes liability for the "damages specified in subsection (b) ... that result from ...the substantial threat of a discharge of oil," yet if we treat the omission of "loss of use" from

## A. Deep Background: Admiralty Jurisdiction and Federal Maritime Law

Article III, Section 2 of the Constitution brings "all cases of admiralty and maritime jurisdiction" under the authority of the federal courts and Congress, and it subjects these cases to federal-law governance.[33]   In general, the following simplified statement of the matter holds true: Admiralty cases are governed by federal maritime law.[34]   The *Exxon Valdez* litigation was an admiralty (and thus federal maritime) case, and so is the Macondo Oil Spill Litigation.

Federal maritime law includes two tortfeasor-friendly doctrines that can provide great comfort to a marine oil-pollution defendant.  The first is the right of a shipowner to limit its liability to the value of the vessel (measured after the accident) if the shipowner can show that the damages sought by the accident victims came about "without the privity or knowledge" of the shipowner.[35]  The second—variously referred to as the *Robins Dry Dock* rule or the *Testbank*

---

subsections (b)(2)(D) and (E) as purposive, those subsections might often, perhaps generally, deny recovery in threatened discharge cases. Moreover, the *Russello* canon would also raise difficulties with the application of subsection (C) of section 2702(b)(2) in threat cases. Subsection (C) allows the recovery of "damages for loss of subsistence use of natural resources" but seemingly only when "natural resources ... have been injured, destroyed, or lost." Here too, reading subsection (A) to cover a broader range of situations than the ensuing subsection produces a potential anomaly in threat cases.

    Professor Goldberg argues persuasively that the subsection (E) term "loss" should be read to include loss of use. See Goldberg, supra note 2, at 19-20 n. 40 (arguing that fishermen who cannot fish because of a threat-caused embargo have suffered a loss of natural resources within the meaning of subsection (E)). I agree with Goldberg on this point—and I think we need to accept the same argument on behalf of subsistence fishermen who invoke subsection (C)—but we have to realize that here again (as with the damages-assessment puzzle) reaching the desired resolution requires treating a portion of Section 2702(b)(2)(A) as redundant.

[33] See generally DAVID W. ROBERTSON, ADMIRALTY AND FEDERALISM (1970).

[34] Federal maritime law emanates from the federal courts and from Congress. See *Panama R. Co. v. Johnson*, 264 U.S. 375, 386 (1924) (explaining that the constitutional grant of "admiralty and maritime jurisdiction" to the federal judicial power enables both the federal courts and Congress to provide admiralty and maritime governance and stating that "there is no room for doubt that the power of Congress extends to the entire subject and permits of the exercise of a wide discretion.") Court-made federal maritime law is often called "general maritime law" (*id.*); it is "federal common law." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 483 (2008). In modern times, congressional authority over the admiralty and maritime field has arguably become preeminent. See *Miles v. Apex Marine Corp.*, 498 U.S. 19, 36 (1990) (stating that "[m]aritime tort law is now dominated by federal statute").

[35] 46 U.S.C. § 30505(b).

rule[36]—often prevents economic-loss victims from recovering damages unless they can show that they owned or leased property that was physically damaged in the accident that caused their economic losses.[37]

For cases falling within its scope, OPA nullifies both the shipowners' limited-liability doctrine and the *Robins/Testbank* doctrine. 33 U.S.C. § 2702(a) states that the strict liability it imposes on oil polluters is "[n]otwithstanding any other provision of law," and the August 1, 1990, Conference Report explaining the bill that was enacted into law and signed by President George H. W. Bush on August 18 states (emphasis supplied):

> Liability under this Act is established notwithstanding any other provision or rule of law. This means that the liability provisions of this Act would govern compensation for removal costs and damages *notwithstanding* any limitations under existing statutes such as the act of March 3, 1851 (46 U.S.C. 183),[38] or under *existing requirements that physical damage to the proprietary interest of the claimant be shown.*[39]

Moreover, Section 2702(b)(2)(E) provides that economic loss damages "shall be recoverable by any claimant," and the Conference Report explains (emphasis supplied):

> Subsection (b)(2)(E) provides that any claimant may recover for loss of profits or impairment of earning capacity resulting from injury to property or natural resources. The claimant *need not be the owner of the damaged property or resources to recover for lost profits or income.*[40]

---

[36] See *Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1020-21 (5th Cir. 1985) (en banc) (citing *Robins Dry Dock v. Flint*, 275 U.S. 303 (1927), for the proposition that "physical damage to a proprietary interest [is] a prerequisite to recovery for economic loss in cases of unintentional maritime tort").

[37] *Testbank* could be read to establish a more defendant-friendly rule that would require an economic-loss plaintiff to show that the damages sought were caused by (rather than merely being accompanied by) physical damage to the plaintiff's person or property. Subsequent Fifth Circuit decisions indicate that the less demanding (accompanied by) requirement stated in the text is the correct reading. See *In re Taira Lynn Marine Ltd.*, 444 F.3d 371, 376 (5th Cir. 2006) (stating that *Testbank* barred claims "for economic losses unaccompanied by damage to a proprietary interest"); *Lloyd's Leasing Ltd. v. Conoco*, 868 F.2d 1447, 1450-51 (5th Cir. 1989) (separate opinion by Judge Higginbotham, the author of the en banc opinion in *Testbank*, eschewing the causal-connection-requirement interpretation of *Testbank*). Judge Higginbotham's opinion in *Lloyd's Leasing* is analyzed in David W. Robertson, *An American Perspective on Negligence Law*, in MARKESINIS AND DEAKIN'S TORT LAW 283, 300-02 (6th ed. 2008).

[38] This is the Shipowners' Limited Liability Act, presently codified at 46 U.S.C. § 30505.

[39] H.R. Conf. Rep. 101-653, 101st Cong., 2d Sess. 1990, 1990 U.S.C.C.A.N. 779, 781, 1990 WL 132747 at * 3.

[40] *Id.*, 1990 WL 132747 at * 4.

rule[36]—often prevents economic-loss victims from recovering damages unless they can show that they owned or leased property that was physically damaged in the accident that caused their economic losses.[37]

For cases falling within its scope, OPA nullifies both the shipowners' limited-liability doctrine and the *Robins/Testbank* doctrine. 33 U.S.C. § 2702(a) states that the strict liability it imposes on oil polluters is "[n]otwithstanding any other provision of law," and the August 1, 1990, Conference Report explaining the bill that was enacted into law and signed by President George H. W. Bush on August 18 states (emphasis supplied):

> Liability under this Act is established notwithstanding any other provision or rule of law. This means that the liability provisions of this Act would govern compensation for removal costs and damages *notwithstanding* any limitations under existing statutes such as the act of March 3, 1851 (46 U.S.C. 183),[38] or under *existing requirements that physical damage to the proprietary interest of the claimant be shown.*[39]

Moreover, Section 2702(b)(2)(E) provides that economic loss damages "shall be recoverable by any claimant," and the Conference Report explains (emphasis supplied):

> Subsection (b)(2)(E) provides that any claimant may recover for loss of profits or impairment of earning capacity resulting from injury to property or natural resources. The claimant *need not be the owner of the damaged property or resources to recover for lost profits or income.*[40]

---

[36] See *Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1020-21 (5th Cir. 1985) (en banc) (citing *Robins Dry Dock v. Flint*, 275 U.S. 303 (1927), for the proposition that "physical damage to a proprietary interest [is] a prerequisite to recovery for economic loss in cases of unintentional maritime tort").

[37] *Testbank* could be read to establish a more defendant-friendly rule that would require an economic-loss plaintiff to show that the damages sought were caused by (rather than merely being accompanied by) physical damage to the plaintiff's person or property. Subsequent Fifth Circuit decisions indicate that the less demanding (accompanied by) requirement stated in the text is the correct reading. See *In re Taira Lynn Marine Ltd.*, 444 F.3d 371, 376 (5th Cir. 2006) (stating that *Testbank* barred claims "for economic losses unaccompanied by damage to a proprietary interest"); *Lloyd's Leasing Ltd. v. Conoco*, 868 F.2d 1447, 1450-51 (5th Cir. 1989) (separate opinion by Judge Higginbotham, the author of the en banc opinion in *Testbank*, eschewing the causal-connection-requirement interpretation of *Testbank*). Judge Higginbotham's opinion in *Lloyd's Leasing* is analyzed in David W. Robertson, *An American Perspective on Negligence Law*, in MARKESINIS AND DEAKIN'S TORT LAW 283, 300-02 (6th ed. 2008).

[38] This is the Shipowners' Limited Liability Act, presently codified at 46 U.S.C. § 30505.

[39] H.R. Conf. Rep. 101-653, 101st Cong., 2d Sess. 1990, 1990 U.S.C.C.A.N. 779, 781, 1990 WL 132747 at * 3.

[40] *Id.*, 1990 WL 132747 at * 4.

This much really seems undebatable: Congress wanted to make sure that marine oil polluters could not use these two major maritime-law defensive doctrines as a shield against OPA liability.[41]

## B. The Facially Apparent Meaning of Section 2702(b)(2)(E): A Factual Causation Interpretation

As we saw in Part III above, 33 U.S.C. §§ 2702(a) and 2702(b)(2)(E) have to be read together. Taken together, they say that an economic-loss victim who invokes subsection (b)(2)(E) must show that his damages "result[ed] from" the spill and were "due to" the injury, destruction, or loss of tangible[42] property or natural resources.

---

[41] This footnote belabors the obvious—that the *Robins/Testbank* rule is expunged from OPA cases. It does so because the major thrust of Professor Goldberg's proposed interpretation of 33 U.S.C. §§ 2702(a) and (b)(2)(E)—his commercial use-right requirement, treated *supra* at note 30 and *infra* in Parts VI-C and VII—is to preserve as much of the *Robins/Testbank* jurisprudence as possible.

Cases holding or stating that OPA nullifies the *Robins/Testbank* rule include *In re Taira Lynn Marine Limited Number 5, LLC*, 444 F.3d 371, 382 (5th Cir. 2006); *In re Exxon Valdez*, 270 F.3d 1215, 1252-53 (9th Cir. 2001); *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 631 (1st Cir. 1994); *Dunham-Price Group, L.L.C. v. Citgo Petroleum Corp.*, 2010 WL 1285446 at * 2 (W.D. La. March 31, 2010); *In re Settoon Towing LLC*, 2009 WL 4730969 at * 4 (E.D. La. Dec. 4, 2009); *In re Nautilus Motor Tanker Co.*, 900 F. Supp. 697, 702 (D. N.J. 1995); *Sekco Energy, Inc. v. M/V Margaret Chouest*, 820 F. Supp. 1008, 1014-15 (E.D. La. 1993); *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 768-69 (Alaska 1999). In *FGDI, LLC v. M/V Lorelay*, 193 Fed. Appx. 853, 2006 WL 2351835 at * 1 (11th Cir. 2006), an OPA defendant conceded that it owed damages to a claimant who could not have qualified for recovery under the *Robins/Testbank* regime.

The commentators agree that OPA ousts the *Robins/Testbank* rule. See Steven R. Swanson, *OPA 90 + 10:* The Oil Pollution Act 1990 After Ten Years, 32 J. MAR. L. & COM. 135, 150-52 (2001); Lawrence I. Kiern, *Liability, Compensation, and Financial Responsibility Under the Oil Pollution Act of 1990: A Review of the First Decade*, 24 TUL. MAR. L.J. 481, 531-32 (2000); Keith B. LeTourneau & Wesley T. Welmaker, *The Oil Pollution Act of 1990: Federal Judicial Interpretation Through the End of the Millennium*, 12 U.S.F. MAR. L.J. 147, 200-02 (2000); Francis J. Gonynor, *Six Years Before the Mast: The Evolution of the Oil Pollution Act of 1990*, 9 U.S.F. MAR. L.J. 105, 126-27 (1996); Cynthia M. Wilkinson, L. Pittman, & Rebecca F. Dye, *Slick Work: An Analysis of the Oil Pollution Act of 1990*, 12 J. ENERGY, NAT. RESOURCES & ENVTL. L. 181, 264 (1992); Gregg L. McMurdy, Comment, *An Overview of OPA 1990 and Its Relationship to Other Laws*, 5 U.S.F. MAR. L.J. 423, 427-30 (1993); Cameron H. Totten, Note, *Recovery for Economic Loss Under Robins Dry Dock and the Oil Pollution Act of 1990*, 18 TUL. MAR. L.J. 167, 171-73 (1993); Daniel Kopec & H. Philip Peterson, Note, *Crude Legislation: Liability and Compensation Under the Oil Pollution Act of 1990*, 23 RUTGERS L.J.497, 623-24 (1992).

[42] *Sekco*, *supra* note 41, suggests that "[f]uture earnings derived from drilling on the Outer Continental Shelf [might] constitute property" within the meaning of subsection (E). 820 F. Supp. at 1015. However, it is hard to imagine administering the statute without the tangibility criterion.

The statutory terms "result from" (subsection 2702(a)) and "due to" (subsection 2702(b)(2)(E)) are not specialized legal terms; they are English-language synonyms for the term "caused by."[43] Professor Goldberg's entire proposal rests on an asserted major difference between the meanings of the OPA terms "result from" and "due to." But the asserted difference is imaginary. Indeed, the August 1, 1990. Conference Report explaining the bill that was enacted into law[43a] summarizes Section 2702(b)(2)(E)—Goldberg's pivotal "due to" provision—as follows (emphasis supplied): "Subsection (b)(2)(E) provides that any claimant may recover for loss of profits or impairment of earning capacity *resulting from* [the statutory term is "due to"] injury to property or natural resources." The significance of the Conference Report's phrasing of subsection (E) is huge: The Report expresses subsection (E)'s "due to" requirement by using the term "resulting from." Here we have an authoritative indication by Congress that the Section 2702(b)(2)(E) term "due to" has the same meaning as the Section 2702(a) term "result from." This by itself substantially refutes the Goldberg proposal.

Plainly enough, in the statute as in the English language, "result from" and "due to" are synonyms for "caused by."[44] In the English language, the term "caused by" normally refers to

---

[43] See AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 403 (1981) (defining "due to" as "caused by"); 510 (in a list of synonyms for "follow," stating that "*result* refers to an event that is discernibly caused by a prior event or events"); 1109 (defining the verb "result" as "to occur or exist as a consequence of a particular cause," and referring to the list of synonyms for "follow"); *id.* (defining "resultant as "issuing or following as a consequence or result"). See also *Gross v. FBL Financial Services, Inc.*, 129 S.Ct. 2343, 2350 (2009) (determining the meaning of the statutory term "because of" by referring to an ordinary dictionary and to considerations of "ordinary meaning" and "common talk").

[43a] See *supra* note 39.

[44] 33 U.S.C. § 2702 uses the causation-related terms "result from" (subsection a), "resulting from" (subsection b(2)(B), "due to" (subsections b(2)(D) and b(2)(E), and "caused by" (subsection b(2)(F)). I can find nothing in the statute's text, jurisprudential background, or legislative history that even hints that different meanings were intended. Arguably Congress would have done better to strive for uniform use of the everyday term "caused by" in lieu of the synonyms. Cf. *supra* note 32 (questioning other aspects of the draftsmanship that went into OPA).

factual causation,[45] not to what Professor Goldberg calls "proximate cause."[46]  On their face, Sections 2702(a) and 2702(b)(2)(E) in combination require an economic-loss claimant to establish that the defendant's spill was a factual cause of injury, destruction, or loss of tangible property or natural resources that in turn was a factual cause of the claimant's damages—nothing more and nothing less.  Because the prevailing, default test for factual causation in Anglo-American tort law is the but-for test,[47] we can be fairly precise about the evident meaning of Sections 2702(a) and 2702(b)(2)(E) for an economic-loss claimant:  The claimant is required to show that if the spill had not brought about the injury, destruction, or loss of tangible property or natural resources, the damages complained of probably would not have been sustained.[48]

## VI. CONTRASTING THE FACTUAL CAUSATION INTERPRETATION WITH THE GOLDBERG USE-RIGHT INTERPRETATION: GOLDBERG'S "UNIVERSE OF POTENTIAL PURE ECONOMIC LOSS CLAIMANTS"

For illustrating the possible ranges of meaning of the "due to" language in Section 2702(b)(2)(E), Professor Goldberg has provided an admirable tool.  Positing a large Gulf of Mexico oil spill—something on the order of the BP-Macondo spill, a spill with widespread effects including a great deal of physical damage to natural resources and to property—Goldberg presents a realistically imagined sixteen-item sketch of a "Universe of Potential Pure Economic

---

[45] See AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 214 (1981) (defining the noun "cause" to mean "that which produces an effect, result, or consequence" and the verb "cause" to mean "make happen").

[46] Goldberg, supra note 2, at 20 & n. 41.

[47] See RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 26 and cmt. b (2010). See also Gross v. FBL Financial Services, Inc., 129 S.Ct. 2343, 2350 (2009) (stating that "in common talk, the phrase 'based on' indicates a but-for causal relationship and thus a necessary logical condition, and ... the statutory phrase 'based on' has the same meaning as the phrase 'because of'") (citation and internal quotation marks omitted).

[48] Some imprecision is brought into the factual causation inquiry by the uncertain meaning of the statutory term "loss," which OPA does not define. As we saw supra note 32. Professor Goldberg makes a plausible argument that Section 2702(b)(2)(E)'s term "loss" can sometimes mean loss of use. See Goldberg, supra note 2, at 19-20 n. 40.

Loss Claimants."[49]   With two modifications, this sketch is reproduced below.   (The modifications are adding the numbers and inserting hypothetical claimant # 2.)

Note that the sketch moves from cases that seem intuitively to entail direct and immediate causation in the direction of (intuitively) increasingly remote causation.  Note also that we are assuming that all of these claimants can prove what they allege.  As Professor Goldberg astutely observes, "there is no particular reason to think that claimants more closely connected to the spill in time and space will, as a class, be in a better position to offer [sufficient evidence to support their allegations respecting damages and factual causation], or that claimants [further] removed from the spill will be less well-positioned to offer such evidence."[50]

Professor Goldberg's "Universe of Potential Pure Economic Loss Claimants," augmented by the addition of claimant # 2, is the following:

> 1. *C* is a commercial fisherman who relies for his business on fisheries in the Gulf of Mexico. *C* claims that oil from a spill for which Oil Co. is responsible has polluted the waters in which he fishes, and that he has been and will be unable to fish for a period of time, resulting in lost profits.
>
> 2. *CH* is a man who makes his living supplying bait, tackle, other necessary supplies, maintenance, and repairs to the vessels of *C* and other fishermen like *C*. (In older maritime terminology, people like *CH* were sometimes referred to as "ships' chandlers."[51]) *CH* claims that when the Oil Co. spill prevented *C* and the others from fishing, *CH*'s business dried up.
>
> 3. *H* owns and operates a beachfront hotel in the Gulf area. Oil from the Oil Co. spill has not reached the beachfront that is owned by *H* and reserved for use by guests at *H*'s hotel. However, oil has been found in the immediate vicinity of *H*'s hotel, including in waters that *H*'s guests frequently use, and neighboring beaches that *H*'s guests routinely visit. *H* claims to have suffered a loss of business because tourists, in light of the effects of the spill on the immediate area in which his hotel is situated, have decided to vacation elsewhere.

---

[49] *Id.* at 12-14.

[50] *Id.* at 15.

[51] See, e.g., *Puget Sound Stevedoring Co. v. Tax Commission*, 302 U.S. 90, 94 (1937) (referring to the furnisher of loading/unloading services to a vessel as "similar ... to ... a ship's chandler").

4. *E* is an employee at *H*'s hotel.  Because the hotel has lost business, its managers have reduced staff hours by 25%, as a result of which *E* has suffered and will suffer a 25% reduction in his wages for a certain period.

5. *B* owns a barge that is used to haul equipment and supplies up and down a small navigable river that runs to the Gulf.  Oil from the spill reaches the river, threatening migratory birds that live there.  Authorities close the river to boat traffic for three weeks to permit clean-up.  *B* is unable to operate his barge during this time and seeks recovery of profits he would have made.

6. *R* operates a dockside restaurant located in a Gulf seaport.  Its regular customers are dockworkers, fishermen, and others whose jobs are connected with maritime commerce. *R* claims that, because of the spill, the restaurant has lost profits because many of the restaurant's regular customers have not been frequenting it.

7. *A* is a real estate agent whose listings are made up primarily of beachfront properties in an area of the Gulf that has been contaminated by the spill.  She claims that the market for property sales and rentals has collapsed because of the spill, depriving her of commissions she otherwise would have made.

8. *W* is a woodworker who owns a small furniture store located three miles inland in a town that relies on beach tourism as a major source of revenue.  *W* claims that, because some of the town's beaches have been polluted by the spill, orders for his furniture are down and that he has lost profits as a result.

9. *O* owns a beachfront inn located on the Gulf.  No oil from the spill has come within 100 miles of the waters or the stretch of coastline on which the inn sits, and, at that location, the spill has had no other discernible adverse physical effects (such as noxious odors).  However, given prevailing currents and winds, government officials and scientists have concluded that oil might reach those waters and beaches within a month. *O* claims to have suffered cancelled reservations and lost profits because of the credible threat of oil pollution to the water and beaches adjacent to the inn.

10. *F* owns and operates a fireworks store that is situated along the main interstate highway that leads to a set of Gulf beaches, 150 miles north of those beaches.  *F* relies on tourists traveling to and from the beaches for much of his business.  *F* claims to have lost profits because of reduced tourist traffic resulting from the Oil Co. spill.

11. *T* runs a tour boat that takes passengers along scenic Gulf shoreline.  No oil from the spill has come, or threatened to come, within 400 miles of the area in which *T*'s tours take place.  *T* claims that, because of popular misimpressions about the scope of the spill, the spill has depressed tourism in the entire Gulf region, in turn causing *T* to lose business and profits.

12. *D* owns an amusement park in a land-locked portion of central Florida. Many of *D*'s patrons are families that combine a trip to *D*'s park with a beach vacation on Florida's Atlantic Coast, which was never at risk of suffering pollution because of the spill. *D* claims that consumer unease about traveling to Florida because of the spill has caused *D* to suffer lost profits.

13. *N* owns and operates a resort in Nevada. Each year for the past decade, an association of Gulf-area fishermen has held its annual meeting at *N*'s facility. *N* claims that the spill's economic effects have caused the association to cancel its plans to hold their convention at *N*'s facility, in turn causing *N* lost profits.

14. *M*, a company incorporated and operated in Hartford, Connecticut, imports snorkeling equipment manufactured in China. *M* claims that, because of the spill, snorkeling equipment sales are down, resulting in lost profits.

15. *S* runs a seafood restaurant in Phoenix, Arizona. Although the seafood it serves is not from the Gulf, *S* claims that it has lost profits because of general consumer fears about contaminated seafood caused by the spill.

16. *G* owns a gas station in Boise, Idaho that sells Oil Co.-brand gasoline. Although *G* owns and operates the station as an independent franchise, his station becomes the target of a boycott by a local environmental group demanding greater corporate accountability. *G* claims lost income resulting from the boycott.

17. *L* runs a catering company based in New York City, which is also the location of Oil Co.'s U.S. headquarters. *L* claims that a substantial portion of her profits had previously come from catering events at Oil Co. headquarters, but that she has lost revenues because Oil Co. has substantially cut back on catered events in the aftermath of the spill.

Among the significant features of the foregoing "Universe" is its remarkable verisimilitude. None of the hypothesized claimants is difficult to imagine; none makes a silly or far-fetched argument; assuming they can prove what they allege, all of the claimants have suffered economic losses as a result of the spill. And Professor Goldberg demonstrates that Congress could conceivably have made all of these claimants eligible: If OPA had been enacted as it stands except without the "due to" clause in § 2702(b)(2)(E), "it would entail liability for all lost profits and impaired earning capacity resulting from a discharge."[52] Moreover, Goldberg notes, there is a theoretically possible interpretation of the "due to" clause that would also

---

[52] Goldberg, *supra* note 2, at 17.

probably bestow eligibility on the entire "Universe": If "due to" were to be "read to set a threshold for economic loss liability that treats the fact of *any* harm to *any* property or natural resources as a trigger for the recovery of economic losses by any claimant,"[53] then here again all of the claimants in Goldberg's "Universe" would seem to be eligible for recovery.

But neither Goldberg nor I think that the entire "Universe" is eligible.[54] The subsections below indicate the exclusionary effects of the factual causation interpretation of § 2702(b)(2)(E) and of the Goldberg user-right proposal.

## A. Claims Probably Defeated by Section 2702(b)(2)(E)'s Factual Causation Requirement

The factual causation interpretation that seems to emerge naturally from the statute's language—a but-for connection between spill-produced "injury, destruction, or loss" of property or natural resources and the claimed-for economic losses—probably entitles the defendant Oil Co. to a matter-of-law ruling against claimants 16 (the boycotted Boise gas station) and 17 (the New York caterer). It seems unlikely that the existence of "injury, destruction, or loss" of resources or property played any causal role in producing these damages. Both the boycott and the catering cut-back would probably have occurred as a result of the reputational effects of the spill, regardless of whether the spill had actually produced any "injury, destruction, or loss" of anything physical.

Claimants 11 through 15—geographically-remote tour boat operator, notional Disney World, Nevada resort, Connecticut snorkel seller, Arizona restaurant—are also likely losers

---

[53] *Id.* at 18 (Goldberg's emphasis).

[54] The factual causation interpretation of Section 2702(b)(2)(E) excludes a number of classes of claimants who would be entitled to recover under either of Professor Goldberg's two imaginary statutes (one without the "due to" language and one with "due to" defined to mean "accompanied by"). On the other hand, the factual causation interpretation includes a number of classes of claimants who would be excluded by Professor Goldberg's proposed use-right requirement. Hence, it is accurate to call the factual causation interpretation a middle-of-the-road viewpoint.

under the factual causation interpretation of § 2702(b)(2)(E). The factual causation question in each case would be whether the lost customers would have stayed away if somehow the massive ugly spill had not yet been shown to have caused the "injury, destruction, or loss" of anything physical. In some of these cases the claimant might conceivably reach the trier of fact with the assertion that the spill's reputation would not alone have sufficed to turn away the customers. But these all look more like skittish-customer situations, in which the customer behavior constituting the economic losses came about by reason of the spill's ugly reputation without regard to its actual ugly effects.

## B. Claims That Should Succeed Under the Factual Causation Interpretation

Cases 1 through 10 all involve claimants with highly plausible assertions that the losses in question would not have occurred if the spill had caused no "injury, destruction, or loss" of natural resources or property. Many of these claimants ought to be entitled to a matter-of-law ruling to that effect. For example, the barge operator in case # 5 would probably not have been prevented from using the waterway if the spill had not polluted the river to the extent necessary to threaten bird life.

## C. Claims Defeated by the Goldberg Interpretation

Professor Goldberg says that his commercial-use-right doctrine would clearly validate only claims 1, 3, and 4 (fishermen with polluted fishing grounds, beachfront hotel surrounded by oil, and the hotel's employee).[55] Claimant 5 (the barge operator), Goldberg says, has a fairly good argument but also some problems:

---

[55] See Goldberg, *supra* note 2, at 40. It is not clear how the hotel has a use right, much less the hotel employee. Professor Goldberg merely asserts that they do, providing no explanation.

*B* [the barge owner] is not among those specifically mentioned in legislative history as entitled to recover.[56] Moreover, one could argue that access to navigable waters is a right generally enjoyed by the public rather than the particular right of persons whose business happens to require use of navigable waters.[57] That fact ... could distinguish B's claim from that of, for example, commercial fishermen who possess a license to catch and sell fish.[58]

---

[56] Here Professor Goldberg is taking an overly narrow view of the legislative history. OPA's legislative history is shot through with general statements indicative of congressional intent to authorize recovery of "a broad class of damages"(___ CONG. REC. E842, daily ed. March 16, 1989, statement of Rep. Jones). See also S. Rep. 101-94, 101st Cong., 1st Sess. 1989, 1990 U.S.C.C.A.N. 722, 1989 WL 22505 at * 12 ("These provisions are intended to provide compensation for a wide range of injuries and are not so narrowly focused as to prevent victims of an oil spill from receiving reasonable compensation."); ___ CONG. REC. H7894 (daily ed. Nov. 1, 1989, statement of Rep. Quillen) ("full, fair, and swift compensation for everyone injured by oilspills;" "residents of States will be fully compensated for all economic damages"); ___ CONG. REC. H7955 (daily ed. Nov. 2, 1989, statement of Rep. Jones ("an unlimited amount of recovery from the Federal fund for all those who are injured by an oilspill"); *id.* at H7959 (statement of Rep. Tauzin) ("ensure that all victims are fully compensated"); *id.* at H7964 (statement of Rep. Hammerschmidt) ("ensure that all justified claims for compensation are satisfied"); *id.* at H7969 (statement of Rep. Dyson) ("assurances that damages arising from spills will be completely compensated"); ___ CONG. REC. H8140 (daily ed. Nov. 8, 1989) (statement of Rep. Shumway) ("fund is designed to fully compensate all victims"); ___ CONG. REC. H336 (daily ed. Feb. 7, 1990) (statement of Rep. Carper) ("ensure that those people or those businesses that are damaged by these spills are fairly and adequately compensated"); ___ CONG. REC. S7753 (daily ed. June 12, 1990) (statement of Sen. Miller) ("ensure the fullest possible compensation of oilspill victims"); ___ CONG. REG. H6260 (daily ed. Aug. 1, 1990) (Joint Explanatory Statement of the Committee of Conference) (polluters are "jointly, severally, and strictly liable for removal costs and for a wide range of damages").

Classes of claimants specifically mentioned as entitled to protection included not only fishermen and beachfront hotel owners but also fish "processing plant employees" and "those who work at the companies depending on the fisheries" ( ___ CONG. REC. E1237, daily ed. Apr. 13, 1989, statement of Rep. Miller); "an employee at a coastal motel" ( ___ CONG. REC. H7900, daily ed. Nov. 1, 1989, statement of Rep. Jones); "restaurant operators" (135 CONG. REC. H8263, statement of Rep. Studds); "fishermen and others whose livelihood depended on the once-pristine waters") (*id.* H8271, statement of Rep. Slaughter); "local communities and private citizens that have to live with the oil fouled waters" (*id.* 7969, Nov. 2, 1989, statement of Rep. Dyson); "poor people in Alaska who have lost their jobs, their livelihood, their homes, and the beautiful area in which they live" (*id.* S9863, Aug. 3, 1989, statement of Sen. Metzenbaum); "those who depend on clean waters and coastlines for their livelihood" (*id.* S9921, Aug. 3, 1989, statement of Sen. Biden); "shell fishermen and related businesses" ( ___ CONG. REC. E2110, JUNE 22, 1990, statement of Rep. Schneider); "shell fishermen and dealers and processors, ... beach concessionaires, and so forth" (36 CONG. REC. E2109-10, 1990 WL 85028, daily ed. June 21, 1990, statement of Rep. Schneider); "and *bait and tackle store owners*" (*id.*, emphasis supplied). The concluding reference to "bait and tackle store owners" presumably includes the ship's chandler that Professor Goldberg's proposal would preclude from economic-loss recovery under OPA. See *infra* Part VI-D.

[57] Here Professor Goldberg seems to be suggesting, without directly saying so, that Congress may have wanted to import limitations from the jurisprudence of public nuisance into the OPA remedy. See, e.g., Denise E. Antolini, *Modernizing Public Nuisance: Solving the Paradox of the Special Injury Rule*, 28 ECOL. L.Q. 755 (2001); William L. Prosser, *Private Action for Public Nuisance*, 52 VA. L. REV. 997 (1966). Reviewing the legislative history of OPA leaves the strong impression that Congress could hardly have had any such intention. See, e.g., *supra* note 56. Nor does Professor Goldberg point to any statutory language that would support bringing limitations from the common law of public nuisance into OPA.

[58] Goldberg, *supra* note 2, at 40.

As for the rest of those on his list, Goldberg thinks his commercial use-right requirement would probably exclude claimants 6 through 8 (although "it could conceivably be appropriate to interpret OPA generously to permit these claims"[59]) and would certainly exclude claimants 9 through 17.

## D. Goldberg Neglects the Ships' Chandler

Professor Goldberg's paper does not deal with claimant 2, *CH*, the ships' chandler whose pre-spill livelihood came from servicing and supplying fishing boats.  The logic of Goldberg's commercial use-right requirement would exclude this man; it is hard to see how the chandler could plausibly argue that in earning his living in good times he established (in Goldberg's terms) a "right to put [the ocean or its fish] to commercial use."[60]  (Moreover, if somehow *CH* could establish that he had a commercial-use-right in the ocean or the fish, then probably so could *CH*'s employees and suppliers, whereupon the exclusion power of the use-right tool would be lost.)  Yet the legislative history suggests that Congress pretty clearly wanted to include *CH* (see, e.g., the reference to bait and tackle stores in footnote 56), and intuitively *CH* seems almost as close to being in the most obviously deserving class of claimants as the fishermen themselves. Perhaps this is why Professor Goldberg simply left the chandler out of his imagined "Universe." By all rights *CH* ought to prevail but Goldberg's commercial use-right tool will not allow it— and if it did it would lose much of its exclusionary power.

## VII. A PARTIAL ANALYSIS AND EVALUATION OF PROFESSOR GOLDBERG'S USE-RIGHT PROPOSAL

The Goldberg paper purports to find support for the proposed commercial-use-right requirement in OPA's language, courts' treatment of analogous statutes, "the common law

---

[59] *Id.* at 42.

[60] *Id.* at 3.

regimes from which OPA departs, [OPA's] legislative history, judicial decisions interpreting OPA, and policy considerations."[61]  We have already seen that the crucial statutory-language claim is highly dubious.[62] Now we need to evaluate some of Goldberg's other putative sources of support.

## A. The Courts' Treatment of Statutes that are Broadly Analogous to OPA

Professor Goldberg repeatedly proclaims that his use-right proposal does not entail reading anything into OPA that Congress did not put there. But he seems to give away a big part of that game by urging in support of his reading of OPA that it is "commonplace" for courts to read proximate-cause limits into statutory cause-in-fact language.[63]

The data Goldberg offers in support of his "commonplace" assertion cannot bear the weight. He first treats two cases that arose under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).[64]  Neither case imposed a proximate cause or user-right limit of the sort that Professor Goldberg contends for in his paper. The relevant CERCLA provision in both cases was 42 U.S.C. § 9607(a)(4)(C), which provides in pertinent part for the recovery of "damages for injury to, destruction of, or loss of natural resources ... resulting from [the] release [of oil or a hazardous substance]." The U.S. Department of the Interior issued a regulation interpreting that provision to exclude recovery for harm to "biological resources" when the claimed harm consisted of "biological responses that are caused predominately by other environmental factors such as disturbance, nutrition, trauma, or weather. The biological

---

[61] Goldberg, *supra* note 2, at 25.

[62] See *supra* Part V-B.

[63] Goldberg, *supra* note 2, at 20.

[64] Comprehensive Environmental Response, Compensation, and Liability Act of 1980 and Superfund Amendments and Reauthorization Act of 1986, codified as amended at 42 U.S.C. §§ 9601-9675 (2002). For Goldberg's treatment of the two CERCLA cases, see Goldberg, *supra* note 2, at 21 & nn. 44-45.

response must be a commonly documented response resulting from exposure to oil or hazardous substances."[65] In *Ohio v. U.S. Dep't of Interior*, the court upheld the validity of the regulation, noting that the regulation did not address "the causal link between the defendant's acts and the substance release" but only "the causal link between the substance release and the biological injuries alleged to have resulted from it."[66]

*United States v. Montrose Chemical Corp.* was a cryptic decision ordering CERCLA plaintiffs to replead and stating that "plaintiffs must show that a defendant's release of a hazardous substance was the sole or substantially contributing cause of each alleged injury to natural resources."[67] The *Montrose* court did not cite the regulation but was apparently paraphrasing it. (In *In re National Gypsum* the court refused to follow the *Montrose* dictum because the *Montrose* court "cited no authority for that proposition."[68])

There is no analysis of any sort in *Montrose*. In *Ohio v. Dep't of Interior* the court discussed CERCLA's language and particular legislative history at length before concluding that the regulation was valid.[69] OPA's language[70] and legislative history are dramatically different from CERCLA's.[71] Moreover, while there are no federal regulations treating OPA's economic

---

[65] 43 C.F.R. § 11.62(f)(2)(i).

[66] 880 F.2d 432, 471 n. 54 (D.C. Cir. 1989).

[67] 1991 WL 183147 at * 1 (C.D. Cal. March 29, 1991).

[68] 1992 WL 426464 at * 5 (Bkrtcy. N.D. Tex. June 24, 1992).

[69] See 880 F.2d at 469-472.

[70] OPA explicitly displaces the *Robins/Testbank* rule (see *supra* note 41); CERCLA does not.

[71] Indeed, the legislative histories are *opposites* in an important sense. An early version of a bill culminating in CERCLA included a provision that tort law's normal "cause in fact or proximate cause" requirements would *not* apply in CERCLA cases; Congress took that out of the bill. 880 F.3d at 471. An early version of a bill culminating in OPA provided that economic-loss plaintiffs *would* have to prove "proximate cause;" Congress took that out of the bill. See *infra* Part VII-D.

loss provisions, the Commerce Department (National Oceanic and Atmospheric Administration, NOAA) has issued regulations on the damages for harm to natural resources made available by OPA, 33 U.S.C. § 2702(b)(2)(A), and these are markedly more liberal than the Interior Department's CERCLA regulations.[72] And the language of the regulation at stake in *Ohio v. Dep't of Interior*—as well as the language from the court's opinion quoted two paragraphs above—may suggest that the primary issue the court was focused on was factual, not proximate, causation.[73]

Professor Goldberg's other data set ostensibly supporting his claim that courts routinely read statutory cause-in-fact language to include proximate cause limitations comprises four cases decided under the Trans-Alaska Pipeline Authorization Act (TAPAA).[74] The relevant TAPAA

---

[72] The Commerce Department (NOAA) regulations on OPA-provided damages for harm to natural resources are at 15 C.F.R. §§ 990.10-990.66. Section 990.10 declares that OPA's purpose "is to make the environment and public whole for injuries to natural resources and services." Section 990.13 establishes a rebuttable presumption that damages assessments made by governmental trustees—these are the only proper plaintiffs in cases seeking damages under 33 U.S.C. § 2702(b)(2)(A)—are correct. Section 990.14(a)(1) calls for "full restoration." Section 990.20(a) supersedes the CERCLA regulations in relevant part. Section 990.25 says that claims for damages to natural resources can be settled only if the settlement is adequate "to restore, replace, rehabilitate, or acquire the equivalent of the injured natural resources and services." Section 990.27 gives the trustees wide latitude on assessment procedures. Section 990.30 defines *injury* to mean "an observable or measurable adverse change in a natural resource or impairment of a natural resource service. Injury may occur directly or indirectly to a natural resource or service." Section 990.51 gives the trustees wide latitude in determining and assessing the existence and extent of injury to resources. Section 990.53(c)(2) calls for full compensation for the interim loss of natural resources and services pending recovery.

NOAA interprets its regulations to "authorize[] recovery of what are known as nonuse or 'passive' losses, the value individuals place upon the existence of natural resources, even if they never plan to make active use of them. In the case of the National Seashore, for example, people who have never used the beach may nevertheless value its existence. To assess this value, researchers employ a survey technique known as 'contingent valuation,' in which they create a hypothetical market and ask people—survey respondents—how much they would pay to preserve or protect a given resource." *General Electric Co. v. U.S. Dep't of Commerce*, 128 F.3d 767, 772 (D.C. Cir. 1997). The *General Electric* court held that the availability of "passive value" damages was a valid interpretation of OPA.

[73] Cf. *East Texas Theatres, Inc. v. Rutledge*, 453 S.W. 2d 466, 467 (Tex. 1970) (labeling the question whether defendant's conduct was responsible for plaintiff's being struck by a thrown whiskey bottle an issue of "proximate cause" and the question whether the impact with the bottle produced plaintiff's chronic headaches a "causal connection" issue). The court explained that it used the term "proximate cause" to mean cause-in-fact. See *id.* at 468.

[74] Trans-Alaska Pipeline Authorization Act of 1973, codified as amended at 43 U.S.C. §§ 1651-1656 (2000). The four relevant TAPAA cases are treated in Goldberg, *supra* note 2, at 21-22 & nn. 47, 48, and 50. In his note 49,

provision in these cases was 43 U.S.C. § 1653(c)(1)—this provision was repealed as part of the OPA-enacting legislation[75]—which stated:

> Notwithstanding the provisions of any other law, if oil that has been transported through the trans-Alaska pipeline is loaded on a vessel at the terminal facilities of the pipeline, the owner and operator of the vessel (jointly and severally) and the Trans-Alaska Pipeline Liability Fund ... shall be strictly liable without regard to fault in accordance with the provisions of this subsection for all damages, including clean-up costs, sustained by any person or entity, public or private, including residents of Canada, as the result of discharges of oil from such vessel.

The court in *In re Glacier Bay* stated that the "plain language of Section 1653(c) is that *all* provable damages sustained by any person as a result of a TAPS[76] oil spill are compensable and are not limited by established maritime law."[77]  The court then held that the claims of fish tenders, fish spotters, fish processors, and other shoreside businesses were valid under the TAPAA provision. The *Glacier Bay* case is thus antithetical to Professor Goldberg's claim that proximate cause limitations have routinely been read into TAPAA. (Moreover. in upholding the claims of fish processors and shoreside businesses the case speaks fairly loudly against any sort of use-right limit).  Professor Goldberg states that the Ninth Circuit "subsequently rejected" *Glacier Bay*, but that's wrong; the Ninth Circuit case he cites did not even mention *Glacier Bay*, and the KeyCite citator shows no negative history on *Glacier Bay.*[78]

Professor Goldberg can find a bit of support in the other three TAPAA cases, but not that much. The district court in *In re Exxon Valdez* said in a footnote that the TAPAA Congress "did

---

Goldberg cites an irrelevant case, *Heppner v. Alyeska Pipeline Service Co.*, 665 F.2d 868 (9th Cir. 1981), which involved a pipeline construction accident, a car wreck, and a TAPAA provision having nothing to do with oil spills.

[75] See PL 101-380, 104 Stat. 484, § 8102(a)(1) (Aug. 18, 1990).

[76] This is an acronym for Trans-Alaska Pipeline System. See 746 F. Supp. at 1382 & n. 1.

[77] *In re Glacier Bay*, 746 F. Supp. 1379, 1386 (D. Alaska 1990) (emphasis supplied).

[78] Three negative entries turn up on the WestLaw KeyCite citator, but all involved an irrelevant point of federal civil procedure.

not abrogate all notions of proximate cause,"[79] but whatever such "notions" the court thought applicable were lenient enough to lead the court to conclude that a dealer in refrigeration units and a taxidermist had TAPAA claims that should not be dismissed. The district court in *Slaven v. BP America, Inc.* cited no authority and provided no reasoning for its statement that, while "TAPAA does not have a proximate cause requirement," it "is beyond dispute that ... the common law requirement of proximate cause is implicitly incorporated."[80] The *Slaven* court did not seem to use "the common law requirement of proximate cause" against any TAPAA claimant in that case, and in fact it explicitly held that "the bright-line rule of *Robins* is not a necessary component of the proximate cause concept."[81] (Here, as with *Glacier Bay,* the court seemed averse to Goldberg's proposed use-right requirement.) In *Benefiel v. Exxon Corp.*[82] the Ninth Circuit thought that the efforts of California consumers to tie gasoline price increases (imposed by California refineries) to the Exxon Valdez spill in Alaska were ridiculous; the court claimed support in TAPAA's legislative history for the availability of a proximate-cause-based "remote and derivative" analysis to throw the gasoline-price claims out.[83]

Summing up the TAPAA cases: They do not seem to help Professor Goldberg very much, because several of them imply resistance to a use-right limitation, and none of them used any kind of proximate cause limitation to defeat any even half-way credible claimant. More importantly, they show that TAPAA and OPA are very different with respect to both their relevant language and their legislative histories. TAPAA included no two-step factual causation

---

[79] *In re Exxon Valdez*, 1993 WL 787392 at * 3 n. 15 (D. Alaska Dec. 23, 1993).

[80] *Slaven v. BP America, Inc.*, 786 F. Supp. 853, 858 (C.D. Cal. 1992).

[81] *Id.* at 859.

[82] 959 F.2d 805 (9th Cir. 1992).

[83] *Id.* at 807-08.

requirement of the sort that Congress built into OPA, perhaps thereby inclining the courts to look outside the statute for needed controls  And TAPAA's legislative history respecting its effect on the *Robins/Testbank* rule was equivocal,[84] whereas OPA's is crystal clear;[85] this meant that the TAPAA courts might conceivably have been more receptive to some kind of use-right requirement than would be appropriate under OPA (but the TAPAA courts still resisted it).

It bears emphasis that, even if Professor Goldberg could convince us that there is some kind of judicial pattern of reading statutory cause-in-fact language to include proximate cause limitations, *and* that this pattern should be carried into OPA despite OPA's seemingly carefully crafted two-step factual causation requirement, this would still provide no basis at all for the use-right limitation that is the heart of Goldberg's argument.[86] We saw in Part V-A above that the OPA Congress intended to rip the *Robins/Testbank* rule out of the law of OPA cases, root and branch.  The user-right requirement would be nothing more (or less) than a slightly flabby, slightly blurry version of *Robins/Testbank*.

---

[84] In *Benefiel*, the court punted on whether *Robins/Testbank* was displaced by TAPAA. See 959 F.2d at 807. And in *Slaven* the court said the relevant legislative history was "ambiguous." 786 F. Supp. at 858.

[85] See *supra* Part V-A; *supra* note 56; *infra* Part VII-B.

[86] Professor Goldberg seems to acknowledge that the RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 29 (2010) sets forth the normal meaning of proximate cause as a "filter" that screens out "harms that are so haphazardly caused as to not count as the realization of one of the risks that rendered the actor's conduct careless." Goldberg, *supra* note 2, at 20 n. 41. See also *id.* at 22 n. 49 (explaining that the proximate cause filter works in strict liability cases by limiting liability to "those harms that amount to the realization of the risks of the activity that lead the law to regard the activity as appropriately subject to a rule of strict liability.") This has been the sophisticated understanding of proximate cause for decades. See, e.g., *Union Oil Co. v. Oppen*, 501 F.2d 558, 568 (9th Cir. 1974) (quoting *Dillon v. Legg*, 441 P.2d 912 (Cal. 1968) for the proposition that "defendant owes a duty, in the sense of a potential liability for damages, only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous, and hence negligent, in the first instance.")

Professor Goldberg's use-right requirement does not fit at all well into the inherently flexible and case-specific common-law proximate cause concept. See the opinion of Judge Learned Hand in *Sinram v. Pennsylvania R. Co.*, 61 F.2d 767, 771 (2d Cir. 1932) (extolling the inherent flexibility of the common law's approach to proximate cause and stating that the only alternative would be "a manual, mythically prolix, and fantastically impractical."). Professor Goldberg's use-right requirement—together with his occasional inclinations to abandon it (see Goldberg, *supra* note 2, at 33, 40 & n. 92, 41-42)—sometimes has the look of a mythically prolix manual.

## B. OPA's Legislative History:  Nine Key Factors

The Goldberg paper's short section treating OPA's legislative history makes only one significant point:  that members of Congress, the House Conference Report, and a Senate Report repeatedly instanced commercial fishermen and beachfront property owners as the most obvious beneficiaries of Section 2702(b)(2)(E).[87]  But we have already seen that the Senate Report also said the provision was meant to compensate "a wide range of injuries" and that many members of Congress enumerated a number of other types of beneficiaries, including seafood "dealers and processors, bait and tackle store owners, beach concessionaires, and so forth."[88]

Moreover, there are nine features of the legislative history—features that Professor Goldberg's paper largely ignores[89]—that, taken in the aggregate, seem devastating to the Goldberg interpretation of Section 2702(b)(2)(E).  In thinking about these nine features, we should keep in mind the heart of Professor Goldberg's paper:  It purports to find in the "due to" clause of Section 2702(b)(2)(E) a "proximate cause"[90] limit requiring economic loss claimants "to prove that they have suffered economic loss because a spill has damaged, destroyed or otherwise rendered physically unavailable to them property or resources that they have a right to put to commercial use."[91]

First, Section 2702(b)(2)(E) includes no explicit use-right limitation.  But section 2702(b)(2)(C) does; it requires a subsistence-use claimant to show that he "uses natural resources

---

[87] See *id.* at 33-34.

[88] *Supra* note 56.

[89] But see *infra* notes 101 and 111.

[90] Goldberg, *supra* note 2, at 20.

[91] *Id.* at 3.

which have been injured, destroyed, or lost." The first of two powerful statutory-construction

canons set forth in *Russello v. United States* is this:

> Where Congress includes particular language in one section of a statute but omits it in
> another section of the same Act, it is generally presumed that Congress acts intentionally
> and purposely in the disparate inclusion or exclusion.[92]

At an otherwise unrelated point in his paper, Professor Goldberg insists that the *Russello* canon is

not applicable "where provisions in the same statute are distinctively formulated,"[93] but it is hard

to see how he could so characterize subsections C and E of Section 2702(b)(2). Indeed,

Goldberg explicitly acknowledges that subsections C and E are "counterpart[s]."[94] It thus seems

obvious that the first *Russello* canon speaks powerfully against reading a use-right limitation into

Section 2702(b)(2)(E).

Second, three of the bills that eventually coalesced to become OPA include explicit use-

right limitations in their economic loss provisions.[95] As the bills made their way through the

---

[92] 464 U.S. 16, 23 (1983) (citation and internal quotation marks omitted). See also *Hardt v. Reliance Standard Life Ins. Co.*, 130 S.Ct. 2149, 2156 (2010) (holding that because 29 U.S.C. § 1132(g)(2) has an explicit "prevailing party" limit on court-awarded attorneys' fees in ERISA cases whereas 29 U.S.C. § 1132(g)(1) does not, reading a "prevailing party" limit into the latter provision would "more closely resemble[] inventing a statute than interpreting one") (citation and internal quotation marks omitted). Under the *Hardt* analysis, Professor Goldberg's reading of a user-right limit into OPA Section 2702(b)(2)(E) amounts to inventing a statute.

[93] Goldberg, *supra* note 2, at 21 n. 42. See also *infra* at note 101-102.

[94] Goldberg, *supra* note 2, at 34.

[95] As introduced by the House Merchant Marine and Fisheries Committee on March 16, 1989, H.R. 1465 provided in § 102(a)(2)(B)(v) for "Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant who derives at least 25 percent of his or her earnings from the activities which utilize such property or natural resources, or, if such activities are seasonal in nature, 25 percent of his or her earnings during the applicable season." As introduced by the House Public Works and Transportation Committee on May 11, 1989, H.R. 2325 provided in § 102(a)(3)(D) for "Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of natural resources, which shall be recoverable by any claimant who derives at least 25 per centum of his or her earnings from the activities which utilize such natural resources, or, if such activities are seasonal in nature, 25 per centum of his or her earnings during the applicable season." On July 27, 1989, H.R. 3027 (supported by the House Committee on Science, Space, and Technology) was introduced; § 102(a)(2)(B)(v) provided for "Damages equal to the loss of profits or impairment of earning capacity (based on prior profits and earnings) due to the injury, destruction, or loss of real property, personal property, or natural resources. Such damages shall be recoverable by any claimant who derives at least 25 percent of his or her earnings from the

legislative process, the use-right limitations were deleted; no explanation has been found.[96]

*Russello*'s second statutory-construction canon is the following:

> Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended.[97]

This is a second heavy strike against reading a use-right limitation into Section 2702(b)(2)(E).

Third, OPA's predecessor legislation included a use-right limit. Title III of the Outer Continental Shelf Lands Act Amendments of 1978[98] provided for the recovery of pollution-caused economic-loss damages "due to injury to, or destruction of, real or personal property or natural resources ... if the claimant derives at least 25 per centum of his earnings from activities which utilize the property or natural resource."[99] OPA repealed these provisions,[100] replacing them with Section 2702(b)(2)(E). Here is the third strike against reading a use-right limitation into Section 2702(b)(2)(E). It seems very plain that the OPA Congress did not want a use-right limit.

Fourth, neither Section 2702(a) nor Section 2702(b)(2)(E) includes any mention of "proximate cause." But Section 2704(c)(1)—specifying types of conduct that will expose a polluter to liability for damages above the OPA damages caps—requires the spill in question to

---

activities which utilize such property or natural resources, or, if such activities are seasonal in nature, 25 percent of his or her earnings during the applicable season."

[96] H.R. Rep. 101-241, Part 1 (to accompany H.R. 3027) was issued on Sept. 13, 1989, showing the use-right limitation still in that bill. Part 2 of that Report, issued on Sept. 18, 1989, shows the use-right limitation still in that bill. But on October 13, 1989, H.R. 3394 was introduced and explained as a composite bill, designed to merge the others. *Section 1002(b)(2)(E) of that bill has the language that was enacted as OPA Section 1002((b)(2)(E), 33 U.S.C. § 2702(b)(2)(E)—language shorn of any version of a use-right requirement.*

[97] 464 U.S. at 23-24.

[98] PL 99-372, Sept. 18, 1978, 92 Stat. 629.

[99] *Id.*, §§ 303(a)(2)(E) and 303(b)(4).

[100] See PL 101-380, § 2004 (Aug. 18, 1990).

be "proximately caused" by such conduct. This shows that Congress knew how to say "proximate cause" when it wanted to require that. Here again, the disparate formulation of two related sections of the same statute calls for the application of the first *Russello* canon, which teaches that Congress presumptively meant to require a showing of proximate cause for cap-breaking purposes but not for the imposition of liability. Applying that presumption here would make complete sense: Congress evidently decided that polluters deserve the protection of a proximate cause requirement when being sued for damages above the cap but not for basic liability-imposing purposes.

Professor Goldberg tries to answer this fourth point with a badly flawed footnote that completely mischaracterizes the essence of Section 2704(c)(1). Goldberg erroneously says that "Section 2704(c)(1) employs the phrase 'proximately caused' in specifying the limited circumstances in which a responsible party can disclaim liability for damages,"[101] whereas the section has the completely opposite thrust of specifying conduct that will expose a responsible party to additional liability above the damages caps. This surprising mistake robs the remainder of Professor Goldberg's footnote of intelligibility: When Goldberg says that the first *Russello* canon should not apply to the difference between Sections 2702 and 2704 because the two sections are "formulated in a fundamentally different manner" from one another,[102] he is talking about an imaginary Section 2704(c)(1), not the one actually on the books.

Fifth, the second *Russello* canon—that Congress's deletion of limiting language in a bill before enacting the bill justifies presuming that the limitation was not intended—applies to the proximate cause point in much the same way as to the use-right point. Several of the early

---

[101] Goldberg, *supra* note 2, at 20 n. 42.

[102] *Id.* at 21 n. 42.

31

versions of the bills that became OPA included language requiring parties seeking pollution damages to show proximate causation.[103]   As was true respecting the use-right language, the proximate cause language was also deleted as the bills made their way toward passage.[104] Therefore, *Russello* counsels us to conclude that the OPA Congress did not want to require claimants seeking economic-loss damages to meet a proximate cause requirement.

Sixth, OPA's predecessor legislation included an explicit proximate cause limit. Title III of the Outer Continental Shelf Lands Act Amendments of 1978[105] provided for the recovery of pollution-caused damages that were "proximately caused by the discharge of oil from an offshore facility or vessel."[106]  OPA repealed this provision,[107] replacing it with Section 2702(a). So here again, the second *Russello* canon calls for the presumption that the OPA Congress did not intend a proximate cause limit to be read into its economic-loss provisions.

Seventh, all of the House of Representatives bills that coalesced into OPA included direct-causation requirements.[108]  The bill that passed the House of Representatives included

---

[103] See H.R. 3027, July 27, 1989, § 102(a) (1) (limiting recoverable damages to those "which are proximately caused by" a spill or substantial threat of a spill); H.R. 1465 as presented in H. Rep. 101-242, Part 1 (Sept. 18, 1989), § 102(a)(1) (same).

[104] H.R. 3394, the composite bill introduced on Oct. 3, 1989, included no explicit proximate cause requirement in its liability-imposing and economic-loss provisions.  Nor did the version of H.R. 1465 that passed the House of Representatives in November, 1989. Nor, of course, does the enacted law.

[105] PL 99-372, Sept. 18, 1978, 92 Stat. 629.

[106] *Id.* § 301(15).

[107] See PL 101-380, § 2004 (Aug. 18, 1990).

[108] See the March 16, 1989, version of H.R. 1465, § 102(a) (limiting recoverable damages to those "that arise out of or directly result from" a spill or substantial threat of a spill); H.R. 2325 (May 11, 1989), § 102(a) (limiting recoverable damages to those "that arise out of or directly result from such discharge or threat of discharge"); H.R. 3027 (July 17, 1989), § 102(a)(1) (limiting recoverable removal costs to those "which arise out or directly result from" a spill or substantial threat of a spill); H.R. 3394 (Oct. 3, 1989), § 1002(a)(1) (limiting recoverable removal costs and damages to those "that directly result from" a spill or substantial threat of a spill).

such a limit.[109]   But (without any discoverable explanation) the directness requirement was

deleted from the bill that emerged from the House-Senate conference and was signed into law.[110]

Here once again the second *Russello* canon requires a strong presumption that the OPA Congress

intended that for purposes of recovering economic-loss damages, the only causation requirement

should be factual causation.[111]

Eighth, OPA's predecessor legislation included a direct-causation requirement.  Title III

of the Outer Continental Shelf Lands Act Amendments of 1978[112] provided for the recovery of

pollution-related damages "by any person suffering any direct and actual injury proximately

caused by the discharge of oil from an offshore facility or vessel."[113]   OPA repealed this

provision,[114] replacing it with Section 2702(a), which contains no "directness" or "proximate

cause" language.  Here we have yet another application of the second *Russello* canon.

Ninth, as we saw in Part V-B above, Goldberg's insistence that the OPA terms

"result[ing] from" (Section 2702(a)) and "due to" (Section 2702(b)(2)(E)) have different

meanings is flatly contradicted by the House Conference Report, which in its provision-by-

provision analysis of the House-passed bill stated:   "Subsection (b)(2)(E) provides that any

claimant may recover for loss of profits or impairment of earning capacity ***resulting from*** [the

---

[109] See H.R. 1465 (Nov. 15, 1989), § 1002(a)(1) (limiting recoverable removal costs and damages to those "that directly result from" a spill or substantial threat of a spill).

[110] See H.R. CONF. REP. NO. 101-653 (Aug. 1, 1990) (presenting § 1002(a) of H.R. 1465 as providing for liability for removal costs and damages "that result from" a spill or substantial threat of a spill.  The language is identical to the enacted Section 2702(a).

[111] Professor Goldberg acknowledges the deletion of the "directness" requirement from the final bill, but he argues that his reading of Section 2702(b)(2)(E)'s "due to clause" as an "explicit[]" limitation going beyond "actual causation" should trump the *Russello* canon.  Goldberg, *supra* note 2, at 17 n. 36.

[112] PL 99-372, Sept. 18, 1978, 92 Stat. 629.

[113] *Id.* § 301(15).

[114] See PL 101-380, § 2004 (Aug. 18, 1990).

statutory term is "due to"] injury to property or natural resources."[115] Here we have an authoritative statement by Congress that "resulting from" and "due to" are synonyms. It is hard to resist calling this the final nail in the coffin for Goldberg's use-right reading of subsection (b)(2)(E).

## C. Judicial Decisions Interpreting OPA

Professor Goldberg's paper presents seven decisions that have involved the OPA provisions of relevance here.[116] Economic-loss claimants prevailed in four of these, and Goldberg does not question these results.[117] *Dunham-Price Group, LLC v. Citgo Petroleum Corp.*[118] is especially instructive. An oil spill from Citgo's refinery into the Calcasieu River caused the Coast Guard to order a temporary closure of twenty-two miles of the river, which interfered with the business operations of Dunham's concrete facility "located several miles upriver from Citgo's refinery and upriver from the zone closed by the Coast Guard."[119] Citgo

---

[115] H.R. CONF. REP. NO. 101-653, at 104 (1990).

[116] See Goldberg, *supra* note 2, at 17 n. 36; *id.* at 34-35.

[117] Goldberg discusses these four cases *id.* at 34-35 & n. 85. In *FGDI, LLC v. M/V Lorelay*, 193 Fed. Appx. 853, 2006 WL 2351835 (11th Cir. 2006), the operators of a vessel that spilled oil while berthed in the Port of Mobile conceded liability under OPA to the operator of a grain elevator that could not use its loading berth while the area was being cleaned. As is explained *supra* note 15, *Settoon* and *Sekco* held that owners of undamaged property (like claimants who owned no spill-involved property) have causes of actions under Section 2702(b)(2)(E). *Dunham-Price* is discussed in the text immediately following this footnote signal.

At 35 & n. 83, Professor Goldberg takes an unwarranted liberty with the *Sekco* opinion; he claims that in a passage at 820 F. Supp. 1012 "the court emphasized [that] defendant's interference with the plaintiff's right to operate its [undamaged] platform is exactly the sort of interference-with-use-rights that Section 2702(b)(2)(E) addresses." This claim distorts *Secko*; the cited passage did not address OPA at all but was the *Sekco* court's tentative recognition that interference with a property owner's "right of use" might properly be viewed as harm to a proprietary interest for purposes of the *Robins/Testbank* rule. When the *Sekco* court eventually turned its attention to OPA, *id.* at 1014-15, it said the platform owner had no claims under subsections (B) and (C) of Section 2702(b)(2) but *did* have a viable claim under subsection (E) because "Plaintiff alleges that the Isopar M spill caused a loss of future production revenues. Future earnings derived from drilling on the Outer Continental Shelf constitute property, but whether that property be real or personal is irrelevant; in either case, plaintiff can recover for loss of profits. Given the language of subsection (E), the Court cannot say as a matter of law that plaintiff has no cause of action here." *Id.* at 1015.

[118] 2010 WL 1285446 (W.D. La. March 31, 2010).

[119] *Id.* at * 1.

34

responded to Dunham's claim for damages under Section 2702(b)(2)(E) by moving for summary judgment and making the following argument:

> Citgo argues that under [Section 2702(b)(2)(E)], a plaintiff must prove that his injuries are directly "due to" property damage resulting from an oil discharge. Citgo further argues that Dunham Price's damages are due to the closure of the Calcasieu Ship Channel and not attributable to a physical injury to property or natural resources.[120]

Note that Citgo was making a proximate cause/physical injury argument closely resembling Professor Goldberg's proposed reading of Section 2702(b)(2)(E). Dunham responded to Citgo's argument by directing the court's attention to Section 2702(b)(2)(E)'s actual language, "insist[ing] that the statute does not mention or require a direct causal link between a claimant's economic losses and damages to property or natural resources."[121]

The *Dunham-Price* court accepted Dunham's statutory-language argument. The court denied Citgo's summary judgment motion and expressed its disagreement with Citgo's proximate cause argument as follows:

> The Calcasieu River meets OPA's definition of a natural resource [quoting 33 U.S.C. § 2701(20)]. Citgo has admitted that its discharge of oil into the Calcasieu River polluted a navigable water of the United States and damaged the personal property of owners along the Calcasieu River. Moreover, the Coast Guard issued a community advisory, notifying the public of the spill and the subsequent closure of the Calcasieu River. Dunham Price has submitted evidence demonstrating genuine issues of material fact, so it will be for the trier of fact to determine whether Dunham Price's economic losses are due to Citgo's oil spill.[122]

It will be noted that there is nothing particularly remarkable about the facts, arguments, and judicial reasoning in *Dunham-Price*. The remarkable thing about the case is the court's rejection of a nearly-identical version of Professor Goldberg's central argument.

---

[120] *Id.* at * 2.

[121] *Id.*

[122] *Id.* at * 3.

The Goldberg paper treats three decisions with results adverse to OPA claimants.  As Professor Goldberg comes close to acknowledging,[123] two of them are pretty clearly wrong.  The widely-criticized[124] decision in *In re Cleveland Tankers, Inc.* denied recovery to plaintiffs making claims under Section 2702(b)(2)(E) because they failed to "allege 'injury, destruction, or loss' to *their* property."[125]  This is flatly wrong, as is shown by the provision itself ("recoverable by any claimant") and by the language of the House Conference Report quoted *supra* at notes 39-40.[126]

*Gatlin Oil Co. v. United States*[127] seems almost as clearly wrong.  Gatlin owned seven above-ground fuel storage tanks that were jammed open by vandals, causing oil to spill into ditches leading to navigable waters as well as a fire (ignited by the oil's vapors) that destroyed a large part of Gatlin's property.  One member of the Fourth Circuit panel agreed with the trial judge that the fire damage was compensable under OPA Sections 2702(a) and 2702(b)(2)(B) because (in the language of Section 2702(a)) the fire damage "result[ed] from" the spill incident.[128]  But the two-judge Fourth Circuit majority disagreed, holding that the fire damage

---

[123] See *infra* notes 126 and 130.

[124] See *In re Taira Lynn Marine Ltd.*, 444 F.3d 371, 382 (5th Cir. 2006) (citing *Cleveland Tankers* as contrary to prevailing views, including the Fifth Circuit's own, on the meaning of Section 2702(b)(2)(E); *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 631 n. 6 (1st Cir. 1994) (criticizing *Cleveland Tankers* for ignoring the fact that OPA "override[s]" the *Robins/Testbank* rule); *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 769 n. 75 (Alaska 1999) (criticizing *Cleveland Tankers* for failing to recognize that OPA provides for the recovery of economic damages); Francis J. Gonynor, *Six Years Before the Mast: The Evolution of the Oil Pollution Act of 1990*, 9 U.S.F. MAR. L.J. 105, 127 (1996) (stating that *Cleveland Tankers* "interpreted OPA in a novel way").

[125] 791 F. Supp. 669, 678 (E.D. Mich. 1992) (emphasis supplied).

[126] Goldberg, *supra* note 2, at 35 n. 81, cites *Cleveland Tankers* as interpreting OPA Section 2702(b)(2)(E) more narrowly than Goldberg thinks proper.  At 40 n. 92 Professor Goldberg suggests that maybe the *Cleveland Tankers* plaintiffs—who were complaining of the blockage of a channel they used for transporting goods—lost the case because they did not have licenses to use the waterway.

[127] 169 F.3d 207 (4th Cir. 1999).

[128] See *id.* at 215 (Niemeyer, J., dissenting, stating that "[t]he statutory [2702(a)] test—whether fire damage 'resulted from' the discharge of oil that threatened to pollute navigable waters—was ... satisfied.").

was not compensable "because the evidence did not establish that the fire caused the discharge of oil into navigable waters or posed a substantial threat to do so."[129]  It must be respectfully said that this reasoning makes no sense, and Professor Goldberg does not pretend that it does:  He says that the majority's reasoning was "somewhat obscure[]."[130]

The case that Professor Goldberg makes the most of[131] is *In re Taira Lynn Marine Ltd.*[132] but the case does not seem particularly instructive on any of the matters in contention here.  The *Taira* plaintiffs sought business-interruption and similar economic damages brought about by the mandatory evacuation of their areas of operation that was necessitated when a barge ran into a bridge and discharged its cargo—"a gaseous mixture of propylene/propane"—into the air.[133]  Nothing was spilled into the water or onto the shoreline.  Because the OPA damages provisions are limited to situations in which "oil is discharged, or [there is a] substantial threat of a discharge of oil, *into or upon the navigable waters* or adjoining shorelines or the exclusive economic zone,"[134] *Taira* was fairly clearly not an OPA case.  As was explained by the court in *Dunham-Price, supra* at note 118:

> The Fifth Circuit found that OPA claims are limited to damages resulting "from a discharge of oil or from a substantial threat of a discharge of oil into navigable waters or the adjacent shoreline.  *Taira Lynn Marine*, 444 F.3d at 383 (quoting *Gatlin v. United States*, 169 F.3d 207, 211 (4th Cir. 1999)).  Although OPA did not apply to the discharge of gaseous cargo, the court considered it applicable for the sake of argument.  *Id.*[135]

---

[129] *Id.* at 212.

[130] Goldberg, *supra* note 2, at 17 n. 36.

[131] See *id.* at 35 n. 81, 40 n. 92.

[132] 444 F.3d 371 (5th Cir. 2006).

[133] *Id.* at 376.

[134] 33 U.S.C. § 2702(a) (emphasis supplied).

[135] *Dunham-Price*, 2010 WL 1285446 at * 2 n. 6.

In its "for the sake of argument" discussion of OPA, the *Taira* court characterized Section 2702(b)(2)(E) as "allowing a plaintiff to recover for economic losses resulting from damage to another's property"[136] and went on to state that the provision would not afford relief to the plaintiffs because they "have not raised an issue of fact as to whether their economic losses are due to damage to [anyone's] property resulting from the discharge of the gas."[137]   The plaintiffs should have been arguing that the discharge of the gas polluted the air (which OPA includes within its expansive definition of "natural resources"[138]) and thus constituted "injury, destruction, or loss of ... natural resources" within the meaning of Section 2702(b)(2)(E).  But if that point was made, the Fifth Circuit completely ignored it.

Thus, for one looking to *Taira* for lessons about the meaning of Section 2702(b)(2)(E), the returns (to borrow an apt Goldberg phrase) seem "vanishingly small."[139]   The court indicated that OPA did not apply, but that if it did, the part of Section 2702(b)(2)(E) allowing a claimant to recover economic losses for damage to someone else's property would not help plaintiffs who had no evidence that the oil (or oil-based chemical) spill had damaged anyone's property.  The case is no help at all on the sphere of application of the portion of Section 2702(b)(2)(E)—surely the more important portion—providing for economic damages flowing from injury to the environment.

---

[136] 444 F.3d at 382.

[137] *Id.* at 383.

[138] See 33 U.S.C. § 2701(20).

[139] See Goldberg, *supra* note 2, at 19 (arguing that the probability of an oil spill that causes economic loss but no physical damage to anything is "theoretical but vanishingly small").

## VIII. CONCLUSION

The commercial-use-right proposal of the Goldberg paper is at war with OPA's language and legislative history.  One of the handful of judicial decisions addressing the relevant OPA provisions has rejected an argument fairly closely resembling the Goldberg proposal.  Moreover, the Goldberg proposal seems somewhat vulnerable to criticism on policy and coherence grounds.  The impressive plausibility of the Goldberg paper stems entirely from the author's remarkable analytical and rhetorical skills.  If at the end of the day it emerges that a legal craftsman of Professor Goldberg's high degree of proficiency cannot sell a conceptual product, it is probably safe to assume that the product itself is seriously flawed.



THE SECRETARY OF THE INTERIOR

WASHINGTON

**JUL 1 2 2010**

## DECISION MEMORANDUM

TO:     Michael R. Bromwich
Director, Bureau of Ocean Energy Management, Regulation and
Enforcement

FROM:    Secretary   *Ken Salazar*

SUBJECT:   Decision memorandum regarding the suspension of certain offshore
permitting and drilling activities on the Outer Continental Shelf

## I.    INTRODUCTION

As Secretary of the Department of the Interior (Department), I take seriously the
Department's ongoing obligation, prescribed by the Outer Continental Shelf Lands Act
(OCSLA), to ensure that drilling activity undertaken on the Nation's Outer Continental
Shelf (OCS) is conducted in a manner that is safe for workers, coastal communities, and
the environment. *See* 43 U.S.C. §§ 1332(6), 1334(a), 1347 and 1348; 30 C.F.R. §
250.106. Applicable regulations provide that the Bureau of Ocean Energy Management,
Regulation and Enforcement may order suspensions of operations when activities "pose a
threat of serious, irreparable, or immediate harm or damage" to human or animal "life,
property, any mineral deposit or the marine, coastal, or human environment" or "[w]hen
necessary for the installation of safety or environmental protection equipment." 30
C.F.R. §§ 250.172(b)-(c). Pursuant to these authorities, this decision memorandum
directs you, as Director of BOEM, to direct the suspension of certain offshore permitting
and drilling activities on the OCS, as set forth in Section VI of this memorandum.

## II.    SUMMARY

Pursuant to 30 C.F.R. § 250.172(b)-(c), and with certain exceptions explained below, I
have determined that BOEM shall direct the suspension of the drilling of wells using
subsea blowout preventers (BOPs) or surface BOPs on a floating facility. I have also
determined that BOEM shall cease the approval of pending and future applications for
permits to drill wells using subsea BOPs or surface BOPs on a floating facility. These
directives and suspensions shall apply in the Gulf of Mexico and the Pacific regions
through November 30, 2010, subject to modification if I determine that the significant
threats to life, property, and the environment set forth in this memorandum have been
sufficiently addressed. The exceptions and other details of my decision are set forth in
Section VI below.

This suspension is required to mitigate a clear threat that additional deepwater drilling poses of serious, irreparable, or immediate harm to life, to property, or to the marine, coastal, or human environment. I have concluded, based on an extensive record, that this temporary pause in deepwater drilling will provide time for a number of important steps toward addressing this threat and improving the safety of drilling operations, including the following:

> (1) the collection and analysis of key evidence regarding the potential causes of the April 20, 2010, explosion and sinking of the *Deepwater Horizon* offshore drilling rig, which caused the deaths of 11 workers and the subsequent and ongoing release of millions of barrels of oil in the Gulf of Mexico (collectively referred to as the "BP Oil Spill"), and further efforts to determine the root causes of the accident, which can be considered and assessed in the context of new safety measures that I have directed BOEM to implement;

> (2) the assessment of wild well intervention and blowout containment resources – which are not currently available to handle a blowout such as the one that has defied containment since April 20, 2010 – to determine the strategies and methods by which they can be made more readily available should another blowout occur; and

> (3) the submission of evidence by operators demonstrating that they have the ability to respond effectively to a potential oil spill in the Gulf, given the unprecedented commitment of available oil spill response resources that are now being dedicated to the BP Oil Spill.

The BP Oil Spill is a dynamic situation, and new information is made available every day about the risks associated with deepwater drilling on the OCS, including: (1) systemic drilling and workplace safety issues, (2) the inadequacies of a variety of attempted wild well intervention and blowout containment strategies, and (3) the shortcomings of current oil spill response plans and resources. Recent events also have made clear that there are systemic problems that apply across different types of deepwater drilling, including, but not limited to, problems with BOPs, a lack of viable deepwater wild well intervention and blowout containment strategies and capabilities, and inadequacies in oil spill response plans and resources, particularly in light of the ongoing response to the BP Oil Spill. All of these factors are relevant to and form the basis for my decision.

In addition, suspending these particular operations until November 30, 2010, is necessary to provide time for you to submit a report to me no later than October 31, 2010 as a result of additional public outreach and information gathering and to allow me sufficient time to review and analyze your report, potentially conduct additional outreach, and make a determination as to whether additional action must be taken, including the potential for a modification to the scope or duration of this suspension decision. The November 30 date will also allow BOEM and the Department to develop the interim rules required to address the safety issues that have recently come to light. Some of these interim rules are expected to be issued within 120 days of the issuance of the May 27, 2010, Departmental

report entitled "Increased Safety Measures for Energy Development on the Outer Continental Shelf" (Safety Report), and additional time will be required after these rulemaking actions are completed for operators to implement the new requirements established by those rules. The Atlantic hurricane season also runs from June 1, 2010 until November 30, 2010, which is another reason for the duration of the suspension until this date. The November 30 end date also takes into account the expected killing or containment of the Macondo well, which is anticipated to occur by approximately mid-August 2010, and which may have an effect on the availability of spill containment and response capabilities for potential use in response to other incidents. Finally, the November 30 date accounts for the requirement that certain Technical Workgroups, established as part of the Government's response to the BP Oil Spill, provide recommendations to improve OCS drilling operations within 180 days of the issuance of the Safety Report.

In reaching this decision, I am aware that the suspension of deepwater drilling over the next few months will have a serious, negative impact on rig workers and those who support them. I also am aware that, as a general matter, the safety record for deepwater drilling has been good. Nevertheless, I am reminded daily that deepwater drilling accidents can have and in the case of the BP Oil Spill do have a profound, devastating impact on the economic and environmental health of an entire region. References to the track record for the deepwater drilling industry are of limited relevance, given that deepwater drilling is a relatively young and still-evolving enterprise (having only begun in earnest in the late 1990s), particularly given the reality that a devastating accident has, in fact, occurred, with the full dimensions and consequences of that accident still unfolding before us.

With regard to the first basis for my decision – the need to ensure that adequate safety measures are in place to address the risks of deepwater drilling – it is imperative that we have additional information about the causes of the BP Oil Spill and implement safety measures to address the risks associated with those causes. I note that several investigations and reviews to identify the root causes of the disaster are underway, including a joint BOEM/U.S. Coast Guard investigation, a review by the National Academy of Engineering (NAE), and on-going Congressional inquiries. Also, the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (Presidential Commission) is beginning its deliberations. I have been collecting information from some of these sources, and I will continue to do so as their deliberations proceed, so that I can make a more fully informed judgment regarding the safety of deepwater drilling. In that regard, I note that because the Macondo well still has not been contained, it is not yet possible to review key physical evidence that should help determine what caused the accident – the BOP that apparently failed remains on the seabed. In short, a threat exists, and we are in the midst of determining the full nature and extent of that threat. This is not to say that the Department intends to suspend drilling until all investigations have been completed, but additional time is critical to get the preliminary results of ongoing investigations to better inform our decisionmaking and longer term rulemaking throughout this process. Although some have suggested that the BP Oil Spill represents an anomalous situation and that it would therefore be

inappropriate to suspend other deepwater drilling activities, we simply do not know if the BP situation is unique. With regard to the performance of blowout prevention equipment, for example, it is noteworthy that there are only a small number of major manufacturers of the BOPs that are used by drilling contractors. Also, testing that has been required for the BOPs on the new relief wells has identified unexpected performance problems with those BOPs. This evidence suggests that the problems that lie at the heart of the BP Oil Spill are not unique to the *Deepwater Horizon* and Macondo well.

Second, this temporary pause in deepwater drilling will give industry time to take concerted action toward the development of more effective blowout containment strategies and capabilities for deepwater operations. The oil industry has limited capability to stop an uncontrolled blowout of an oil well in deepwater. BP's inability, after more than 80 days, to contain the Macondo blowout and spill provides continuing evidence that BP – and the rest of the industry, which has been cooperating with BP in its efforts to contain the on-going spill – had not prepared to contain a blowout in the deepwater environment. In Congressional testimony, industry executives have admitted that the industry is unprepared to stop deepwater oil well blowouts effectively, and that many of the containment methods attempted with respect to the Macondo blowout have been improvised and were untested. Although industry has begun to organize efforts to address strategies and options for subsea well control and blowout containment, much work remains to be done to develop effective containment and response options as well as to achieve an appropriate level of preparedness in the event of another deepwater wild well.[1]  It may not be necessary or appropriate to wait for the full build-out of this capability before resuming deepwater drilling, but it is reasonable, before new deepwater drilling activities recommence, to require industry to develop workable plans to address a blowout in a more timely and effective manner than has been the case with the BP Oil Spill.

The third key reason for my decision is that the unprecedented deployment of spill response equipment and cleanup crews to address the massive BP Oil Spill raises serious legal and practical questions about whether other deepwater operators would be able to employ adequate quantities of skimmers, boom, and other oil spill response resources to address another spill if it occurs.[2]  Simply put, there may be insufficient resources

---

[1]      *See* API submissions regarding "Enhanced Industry Capability for Offshore Operations" and "Joint Industry Task Force to Address Subsea Well Control and Oil Spill Response", July 6, 2010. The JITF document states that "The Joint Industry Task Force on Subsea Well Control and Containment has been formed to review current subsea well control preparedness and response options to determine their efficacy throughout all offshore operations." This task force "will review intervention and containment at the seafloor" and "will focus on other well control procedures including well shut in, kill methods, as well as subsea containment and collection methods" (emphasis in original).

[2]      Shallow water spills tend to be more confined and easier to address, if only because of the smaller geographic area affected by the spill. For example, with respect to the BP Oil Spill, it has been estimated that each molecule of oil can take as much as three hours to reach the surface, thereby creating conditions that allow for the spill to spread over a large geographic area. *See, e.g.,* David A. Fahrenthold and Juliet Eilperin, "Depth of Oil Spill Obscures Impact," (15 May 2010) ("[T]his oil is flowing out nearly a mile underwater, and takes, by one estimate, three hours to reach the surface.").

available to respond should another deepwater spill occur while the BP Oil Spill containment and clean-up efforts are at their peak. Before deepwater drilling activity resumes, oil spill response plans need to be reviewed under the changed circumstances presented by the BP Oil Spill to determine whether sufficient spill response resources are available to address another deepwater spill event.

Each of these three factors provides a strong, independent rationale for pushing the "pause" button on the drilling of new deepwater wells in the Gulf of Mexico. I do not believe that this stoppage, however, should continue for an indefinite period. I have identified November 30, 2010, as the end-date for the suspensions because it represents the period of time needed to address the three serious issues of deepwater drilling safety, blowout containment capabilities, and oil spill response capacity. I acknowledge a continuing sense of urgency in addressing these issues. For that reason, I am directing you, as the Director of BOEM, to engage in an active, public outreach effort in the weeks ahead on these issues with industry, academic experts, the public and other interested parties. I further direct you to issue a report to me no later than October 31, 2010 that contains your findings and recommendations as a result of your outreach efforts and any other information you have acquired in the interim. As discussed in Section VI of this memorandum, November 30 is an appropriate end date for this suspension. However, I reserve my statutory and regulatory authority to issue a new decision or to modify this decision based on new information that addresses, to my satisfaction, the need to ensure that particular deepwater drilling practices can be conducted safely.

## III.    BACKGROUND

This directive is based on my authority under OCSLA to ensure safe operations on the OCS, my consideration of materials in the decision file, including the documents summarized in Attachment 1 and significant information that has developed since the imposition of the original suspension, as well as my consideration of the following types of information that I have acquired through my own personal and extensive involvement in this matter:

(1) my review with you of potential options to ensure safe drilling operations on the OCS;

(2) the daily morning meeting updates over the last 2 months that I have convened with United States' officials and BP to review and oversee the multiple work streams to contain the blowout of the Macondo well;

(3) my review of the daily Unified Command Report submitted by BP at my direction and the direction of the National Incident Command Center on the numerous work streams associated with the blowout of the Macondo well;

(4) my review of the multiple daily Departmental oil spill incident reports since the blowout of the Macondo well detailing matters relating to the blowout, impacts to

ecological resources, including state and Federal sensitive wildlife areas and refuges and state and national parks;

(5) my multiple visits to the area, including overflights of the Gulf of Mexico and the site of the *Deepwater Horizon* incident, which have allowed me to see first-hand the condition of the oil spill in the Gulf of Mexico and the impacts on the coastal environment and economy, including impacts on sensitive ecological, historical and restoration areas such as national wildlife refuges and national parks;

(6) the legal authorities under the OCSLA and implementing regulations concerning safety and environmental protection, including the legislative history of OCSLA's 1978 amendments enacted in the wake of the 1969 Santa Barbara blowout and oil spill; and

(7) my participation in the preparation of the Safety Report, which responded to the President's directive to report within 30 days, "what, if any, additional precautions and technologies should be required to improve the safety of oil and gas exploration and production operations on the outer continental shelf."[3]

## The May 28, 2010, Suspension and Subsequent Judicial Action

The OCSLA authorizes the promulgation of regulations for the "suspension or temporary prohibition of any operation or activity, including production, pursuant to any lease or permit . . . if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, . . . or to the marine, coastal, or human environment . . . ." 43 U.S.C. § 1334(a)(1).  The BOEM regulations provide that the agency may order suspensions of operations when activities "pose a threat of serious, irreparable, or immediate harm or damage" to human or animal life, property, any mineral deposit, or the marine, coastal, or human environment as described in Section 1334(a)(1) above or "[w]hen necessary for the installation of safety or environmental protection equipment."  30 C.F.R. §§ 250.172(b)-(c).

On May 28, 2010, I directed the Minerals Management Service, now BOEM, to exercise its authority under OCSLA and its implementing regulations to suspend certain deepwater drilling activities.  Accordingly, BOEM issued a Notice to Lessees and Operators (NTL) suspending permitting and drilling operations in the Gulf of Mexico and the Pacific region for operations in water depths greater than 500 feet for a period of 6 months.  The 6-month duration of the May 28, 2010, suspension was intended, among other things, to minimize the possibility of another catastrophic event, particularly while we are still responding to the BP Oil Spill; to ensure that operators similarly situated to *Deepwater Horizon* were operating in a safe manner; to take into account the expected timeline for killing the Macondo well; and to provide adequate time to obtain information

---

[3]      Department of the Interior, *Increased Safety Measures for Energy Development on the Outer Continental Shelf* at 1 (May 27, 2010) (Safety Report).

from on-going investigations of the disaster and to develop regulations addressing the safety-related issues described in the Safety Report.

On June 7, 2010, certain providers of support services to offshore oil and gas operations in the Gulf of Mexico filed a lawsuit in the Federal District Court for the Eastern District of Louisiana seeking to invalidate the May 28, 2010, suspension (*Hornbeck* litigation). On June 22, 2010, the Court preliminarily enjoined enforcement of the suspension. The Department of the Interior appealed the Court's decision and requested that the U.S. Court of Appeals for the Fifth Circuit stay the injunction pending appeal. On July 8, 2010, the Fifth Circuit denied the stay motion on the grounds that the Department had not shown irreparable harm because there was no indication that the drilling activities subject to the suspension were likely to resume, but invited the Government to seek emergency relief if such activities had resumed or were imminent.

While we are complying with the Court's injunction in the *Hornbeck* litigation, as Secretary of the Interior, I have an ongoing obligation under OCSLA to manage the OCS in a safe and environmentally sound manner. As such, we have continued to review data and information concerning management of the OCS, and as a result of this continuing review, have further identified facts and risks associated with deepwater drilling that are addressed here.

## IV.   IDENTIFIED RISKS TO CONTINUED DRILLING IN DEEPWATER

The OCSLA requires that operations on the OCS be conducted in a "safe manner . . . using technology, precautions, and techniques sufficient to prevent or minimize the likelihood of blowouts, loss of well control, fires, spillages, physical obstruction to other users of the waters or subsoil and seabed, or other occurrences which may cause damage to the environment or to property, or endanger life or health." 43 U.S.C. § 1332(6). The following categories of risks related to deepwater drilling activities must be addressed to ensure fulfillment of the requirements of this law: (1) the current status of drilling and workplace safety and the implementation of safety measures; (2) the current status of well control and spill containment capabilities; and (3) the current status of spill response capabilities.

### A.   Certain Drilling Activities and Conditions Involve Heightened Safety Risks

While all offshore drilling for oil and gas involves various risks, including the risk of equipment or systems failure, human error, and other occurrences that could threaten the safety of workers and endanger the environment, certain equipment and drilling conditions undertaken in the deepwater environment carry heightened risks of producing an event such as the BP Oil Spill.[4]

---

[4]     These conclusions are based on a memorandum prepared in consultation with senior BOEM staff who have engineering expertise and experience. *See* Memorandum from Walter Cruickshank, Deputy Director of BOEM (June 30, 2010) (Safety Report).

### 1.   Equipment – Blowout Preventers

Because of their essential role in the existing systems for preventing oil spills resulting from blowouts, it is critical that BOPs be as reliable and effective as possible. The statistical infrequency of deepwater blowouts accounts for only one of the factors that must be considered in evaluating whether it currently is safe to proceed with deepwater drilling in the OCS. Also relevant to the risk analysis are the catastrophic consequences – in terms of the health and safety of workers, effects on the regional and national economies, and damage to the environment – of an uncontrollable blowout and spill, regardless of the probability of such an event.

- Subsea BOPs. The control system for subsea BOPs is much more complex than the control system for a surface BOP, and subsea BOPs require regular testing to ensure that they will respond properly on demand. Also significant is the fact that subsea BOPs are less accessible to intervention, requiring the use of remotely operated vehicles (ROVs) to intervene, and that they are difficult to repair while attached to the wellhead. Their placement in deepwater also vastly complicates containment efforts in the event of an uncontrolled blowout – in a nutshell, the ability to contain a deepwater spill effectively and quickly when a subsea BOP stack fails does not exist.

- Surface BOPs on floating facilities. The operations of surface BOPs are not subject to all of the complicating factors associated with subsea BOPs, and they are more accessible for repair and intervention. However, surface BOPs that are placed on floating facilities (as opposed to jack-up rigs) present other significant risks. The high-pressure riser and casing from the seafloor to the rig can be exposed to dynamic stresses. A failure of a high-pressure riser due to these stresses can lead to uncontrolled flow below the surface BOP system located on the floating facility. Well operations from a floating platform with a surface BOP stack and a high pressure riser (through the water column) are higher risk operations than drilling from a jack-up rig or a fixed platform. The single high pressure riser (or in some cases, a dual riser system) used by floating platforms are subject to environmental forces such as vortex induced vibration (VIV) that make them more susceptible to stress fatigue. Jack-up rigs and fixed production platforms have more casing strings tied back to the surface of the rig or platform, which provide additional external support for the pressured casing. Also, because these tied back casing strings are used in shallower water operations with a shorter water column, they are less exposed to current induced stress.

The failure of the *Deepwater Horizon*'s subsea BOP to stop flow from the Macondo well underscores the risks associated with BOP failures in deepwater, although at this time the precise reasons for the *Deepwater Horizon* BOP's failure are not known. Indeed, as discussed above, the lack of knowledge about the root cause in and of itself poses a present and unacceptable risk to the extent that we have no guarantee that operators would not be engaging in the very same activity that led to the BP Oil Spill.

It is clear that the apparent performance problem with the *Deepwater Horizon's* BOP is not an isolated incident. Performance problems have also been identified in recent weeks with the BOPs on the relief wells that BP is drilling. The problems have been uncovered during new testing requirements that were imposed on the relief wells after the BP Oil Spill, thus providing more evidence that prior testing requirements were inadequate.[5] It is unlikely that these problems are unique to BP. The BOPs are manufactured by a very small number of companies, and BOPs used across the industry tend to employ standardized components.

## 2.    Factors That Correlate to Deepwater

Drilling that takes place in the deepwater environment poses more significant risks than drilling in shallow waters. The primary risk factors turn on the type of equipment that must be used in deeper water. More specifically, beyond approximately 500 feet in depth, floating facilities – rather than "jack-up" rigs – typically are used.[6] For purposes of this decision, I am defining "deepwater drilling" with reference to the type of blowout prevention equipment used in deepwater drilling operations, rather than to a specific water depth even though, as a practical matter, 500 feet of depth is the typical trigger for needing to use floating drilling facilities.[7]

In addition to the heightened risks associated with the use of floating rigs and platforms, deepwater wells can be very productive and have flow potentials that can be 5 to 10 times higher than shallow water wells. These characteristics have been fully demonstrated by the Macondo well. Accordingly, operators' worst-case discharge scenarios typically anticipate larger releases from deepwater wells.

---

[5]      Pursuant to NTL No. 2010-N05, we are seeking re-certifications from operators on their subsea BOP stacks and independent third party verifications that the BOP stack is designed for specific equipment and for the specific well design. We also will be imposing new secondary control requirements, remote operated vehicle capacity requirements, new testing requirements, and new reporting requirements, as well as new blind shear ram redundancy requirements. These measures apply to each operator and demonstrate the lack of sufficient safety measures shared by all operators using such BOPs.

[6]      In my May 28 suspension decision, I used a 500-foot water depth delineation as part of the description of the suspension. This 500-foot delineation served as a shorthand proxy for the risks associated with using subsea BOPs or surface BOPs on floating facilities. To avoid any possible confusion over the use of the proxy, I have chosen to make this new suspension decision in reference to the types of blowout prevention equipment used in deepwater operations, rather than in reference to the functionally equivalent concept of water depth.

[7]      A number of different water depths have been used to define "deepwater" on the OCS, and they generally have a basis in how technologies change with depth. These delineations have included: (1) 500 feet to reflect the change in drilling rigs from bottom founded jack-up rigs to floating rigs; (2) 200 meters (656 feet) in the Deep Water Royalty Relief Act of 1995, which varied royalty terms in water depths greater than 200 meters to reflect the greater cost of drilling in those depths; (3) 400 meters (1312 feet) and 800 meters (1968 feet) in BOEM regulations (30 C.F.R. § 256.37(a)(3)), which allow for setting the initial term of the lease based on water depth to reflect the greater time necessary to explore tracts in deep water; and (4) 1000 feet to reflect the change in development scenarios from bottom-founded to floating production facilities.

Also, over-pressured formations (defined as formations with pressures that exceed the normal pressure expected at a given depth) present special challenges in the deepwater drilling environment. Addressing over-pressured formations in deepwater drilling operations is more complex than in shallow water operations. In general, deepwater wells have more casing/liner strings, leaving less annular space between the casing and hole diameter. This makes cementing the hole more difficult. Higher than normal pressure formations further complicate the operation.

Finally, the BP Oil Spill response has demonstrated that water depth, pressure, and temperature are major factors affecting the ability of well control crews to bring deepwater blowouts under control. Complications associated with responding to a deepwater blowout include inaccessibility of the well, methane hydrate formation at lower seafloor water temperatures, longer times needed to move ROVs and equipment from the surface to the work zone, and the need to work with larger and less available support equipment due to the greater water pressure.[8]

## B.    Drilling and Workplace Safety

There is ample evidence that there is a need to temporarily pause certain drilling activity to allow for the installation of safety and environmental protection equipment. 30 C.F.R. § 250.172(c). As detailed in the Safety Report, substantial improvement in the industry's safety practices and procedures relating to offshore drilling, particularly with respect to deepwater drilling conducted from floating rigs and production facilities, is necessary.[9] While some of the drilling safety recommendations contained in the Safety Report are being implemented through industry compliance with NTL No. 2010-N05,[10] the Safety Report also describes regulatory gaps and other shortcomings in the Bureau's current regulatory scheme for offshore drilling. Some of the Safety Report's recommendations for filling regulatory gaps will be accomplished through a subsequent rulemaking, which BOEM plans to issue within 120 days from the issuance of the May 27, 2010, Safety Report. The Safety Report also anticipates that technical workgroups will be formed, and that they will provide recommendations within 180 days. Thus, only the NTL No. 2010-N05 safety measures will be implemented in the near term. Furthermore, fulfillment of NTL No. 2010-N05's requirements will not completely address all of the identified safety

---

[8]    *See*, Memorandum by Dr. Marcia McNutt, Director of the United States Geological Survey, regarding "USGS Support for Macondo Well Control and Containment; Observations Regarding Technical Problems with Deepwater Efforts," June 27, 2010.

[9]    *See also*, BP, Blowout Preventer Testing Memorandum, presented at the Hearing on "Inquiry into the Deepwater Horizon Gulf Coast Oil Spill" (May 12, 2010) (stating that "[s]hort and long term actions are required to improve subsea BOP stack testing, reliability and intervention"); API, "Joint Industry task Force to Address Subsea Well Control and Oil Spill Response" (July 6, 2010).

[10]    NTL No. 2010-N05, National Notice to Lessees and Operators of Federal Oil and Gas Leases, Outer Continental Shelf (OCS): Increased Safety Measures for Energy Development on the OCS (June 8, 2010).

concerns, and more time will be needed for rulemaking and assessment of the technical workgroups' recommendations. The November 30, 2010, date also allows time for the technical workgroups to provide an opportunity for them to provide input. I will ask these workgroups to provide me with interim progress reports, as necessary.

The BOEM is also considering further safety-related requirements relating to, for example, blind shear ram redundancy requirements and the establishment of deepwater well-control guidelines. In addition, I have requested that the Safety Oversight Board, chaired by Assistant Secretary for Land and Minerals Management, Wilma Lewis, provide input regarding inspections and other safety and enforcement-related issues by August 15, 2010, based on preliminary findings of the BOEM/United States Coast Guard (USCG) Joint Investigation and other information gathered by the Safety Oversight Board.

Given this dynamic, on-going review of measures that are being considered to improve the safety of deepwater drilling, I cannot conclude at this time that deepwater drilling can move forward in a safe and environmentally sound manner. I note, in that regard, that the root cause of the BP Oil Spill has not yet been identified. I will be receiving additional information about the risk factors associated with deepwater drilling based on the many investigations that are now underway, including the investigation that my Department is actively engaged in with the USCG. Even if these investigations are not fully complete by November 30, 2010, we will by that time have the benefit of a great deal of additional information about the BP Oil Spill. To the extent additional information or changes in circumstances require specific modifications to this decision or a new decision, I will provide the basis for any such decision.[11]

The fact that the industry has a track record of relatively few accidents, and that the inspections of current deepwater rigs have uncovered only limited infractions, does not change the present risks or my conclusion. It is true that 27 of the 29 rigs in the Gulf of Mexico inspected by BOEM after the BP Oil Spill had no infractions. *See* MMS Deepwater Drilling Rig Inspection Report. It also is true that the *Deepwater Horizon* rig passed its most recent inspections prior to the explosion.[12] These facts provide very limited assurance, however, regarding the safety of deepwater drilling. The reality is that the BP Oil Spill disaster occurred, regardless of prior inspection results, and regardless of the prior accident history of the *Deepwater Horizon* and other, similar rigs. And, as discussed above, new evidence has emerged that suggests that the deepwater drilling industry may face some industry-wide risks (*e.g.*, with regard to BOPs) that should be addressed before new deepwater drilling goes forward. Until the Department can

---

[11]     Industry executives have acknowledged the relevance of the on-going investigations to determinations about deepwater drilling safety. *See e.g.*, Written Testimony of Steve Newman, Subcommittee on Oversight and Investigations, Hearing on "Inquiry into the Deepwater Horizon Gulf Coast Oil Spill" (May 12, 2010) ("Until we fully understand what happened on April 20, we cannot determine with certainty how best to prevent such tragedies in the future.").

[12]     BOEM Information Memorandum for the Secretary Re: Inspection History of Deepwater Horizon (May 15, 2010).

implement rules to address newly-identified deepwater drilling concerns, rig-by-rig compliance reviews conducted under the current regime cannot ensure safety.

In this regard, it is noteworthy that in establishing a "threat of serious, irreparable, or immediate harm or damage" to life or property or to demonstrate a need for "installation of safety or environmental protection equipment", 30 C.F.R. § 250.172(b)-(c), there is no requirement that "systematic noncompliance" must be demonstrated. The current regulatory regime for offshore operations is not sufficient to ensure safety and environmental protection, there is a need to bolster and improve safety measures. Testimony before the BOEM/USCG Joint Investigation by MMS inspectors has indicated that BOP inspection and testing requirements should be strengthened, a conclusion that my Safety Report also has endorsed. Simply put, there is an ample record supporting my conclusion that existing oversight mechanisms, including compliance with NTL No 2010-N05, are not, by themselves, adequate to prevent a catastrophic blowout and major spill.

### C.      Attention Must Be Devoted to Post-Blowout Containment Strategies and Capabilities

The BOEM regulations require those seeking to engage in offshore drilling to have an adequate response plan in the event of a catastrophe.[13]  Specifically, the regulations require that an emergency response action plan include "methods to ensure the containment and recovery equipment as well as response personnel are mobilized and deployed at the response site." 30 C.F.R. § 254.23(g)(5).  Lessees must also certify in writing that it has the capability to respond "to the maximum extent practicable, to a worst case discharge or a substantial threat of a discharge." 30 C.F.R. § 254.2(b).[14]

BP's inability, after more than 80 days, to contain the Macondo blowout and spill – despite the cooperation of other major oil companies – provides continuing evidence of industry's limited capability to stop an uncontrolled blowout of an oil well in deepwater. I have witnessed on a daily basis the results of inadequate equipment and planning to contain a deepwater blowout. This conclusion is chronicled by a long litany of failed or only partially successful attempt to contain the leak, even as hundreds of thousands of additional barrels of oil and large volumes of gas continue to pollute the Gulf of Mexico. Immediately after the accident, ROVs made many unsuccessful attempts to close the BOP's rams via "hot stabbing." Multiple attempts were made over many days on virtually all of the types of rams included in the BOP stack – all to no avail. Next a containment dome was lowered over the well, but the failure to anticipate the formation of hydrates in the deepwater environment led to its failure as hydrates formed quickly, making the dome buoyant, and virtually uncontrollable. After that, a hastily-engineered

---

[13]      See, e.g., 30 C.F.R. §§ 254.1(a); 254.23; §254.30; §254.2.

[14]      In the same vein, BOEM issued NTL No. 2010-N06 which requires all operators and lessees to provide a worst case discharge scenario, including all assumptions regarding well design, reservoir characteristics, and the daily discharge rate possible from the uncontrolled blowout portion of their worst case discharge scenario. This information is particularly relevant going forward.

"riser insertion tool" was installed at the end of the riser, providing limited containment, while the "kink" in the riser near the wellhead continued to fail and emerged as a major additional leak.

The rest of the story has been chronicled in the public eye: a multiple-week construction effort was undertaken to prepare a long-distance hook-up for a "top kill" operation, using heavy drilling mud. The top kill failed. Priorities then shifted back to containment, with efforts made to execute a "clean" cut of the riser near the top of the BOP stack and install a fitted cap over the riser. A more crude cut was accomplished and an ill-fitting "top hat" was installed. In the succeeding weeks, additional containment options have been pursued, with BP scrambling to identify ships and other equipment to undertake a large containment effort. All of these efforts have been greatly complicated by the lack of precise information regarding the size of the uncontained flow, and the fact that BP has not had the equipment available to measure the flow, either directly, or through the installation of pressure measurement equipment.

In Congressional testimony, industry executives have admitted that industry is unprepared to effectively stop deepwater oil well blowouts, and that many of the containment methods attempted with respect to the Macondo blowout have been improvised and were untested.[15] The BOEM's daily incident reports chronicle the multiple unsuccessful or partially successful attempts to contain the Macondo well blowout.

Although industry has begun to organize efforts to address strategies and options for subsea well control and blowout containment, much work remains to be done in order to develop viable containment and response options as well as to achieve an appropriate level of preparedness in the event of another deepwater blowout.[16] . It may not be necessary or appropriate to wait for the full build-out of this capability before resuming deepwater drilling, but it is reasonable to require industry to develop a plan to address a blowout in a more timely and effective manner than has been the case with the BP Oil Spill before new deepwater drilling activities recommence.[17]

---

[15]   *See*, McNutt Memo. *See also, e.g..*, Testimony of Rex Tillerson, Hearing on "Drilling Down on America's Energy Future: Safety, Security and Clean Energy," Subcommittee on Energy and Environment (June 15, 2010). *See also* Written Testimony of Lamar McKay, Chairman and President of BP America, Senate Environment and Public Works Committee, Economic and Environmental Impacts of the Recent Oil Spill in the Gulf of Mexico (May 11, 2010).

[16]   *See* API submissions regarding "Enhanced Industry Capability for Offshore Operations" and "Joint Industry Task Force to Address Subsea Well Control and Oil Spill Response", July 6, 2010.

[17]   The Department has also issued NTL No. 2010-N06, which directs operators and lessees to provide additional information in their exploration and development plans regarding addressing a blowout scenario involving a well that is expected to have high volumes of liquid hydrocarbons, the availability of a rig to drill a relief well, and the likelihood that surface intervention would be able to stop a blowout, among other things. This directive is consistent with BOEM's regulatory authority and will provide important information relevant to the evaluation of each operator's capacity to contain a blowout.

D.     **Limited Spill Response Resources Are Available to Battle Another Deepwater Spill**

The BOEM's regulations require that all owners and operators must have a spill response plan that demonstrates the ability to "respond quickly and effectively" whenever oil is discharged from their facility. 30 C.F.R. § 254.1(a). The regulations also require that an owner and operator must be able to take "all appropriate actions necessary to immediately abate the source of a spill and remove any spills of oil." 30 C.F.R. § 254.5(c).

The *Deepwater Horizon* incident has demonstrated the inadequacy of response plans, and steps must be considered to ensure that those engaged in drilling offshore are complying with current regulations. The current situation also poses a serious question as to whether industry is in compliance with existing regulatory requirements. The BP Oil Spill response effort has revealed major deficiencies with respect to the adequacy and functionality of the equipment that was staged and deployed in connection with attempts to contain the spill; the adequacy of the applicable Offshore Spill Response Plan (OSRP) components and their implementation; and the expertise and training of personnel involved in the BP Oil Spill containment efforts.

This is not a question of a specific operator's record, but a measure of the adequacy of the entire industry's containment plans and capacity to address major spills in the deepwater environment. BP was not the only operator drilling with inadequate plans. The House Subcommittee on Energy and Environment reviewed the preparedness plans of five major oil companies and concluded that they were no better prepared to deal with a major oil spill than BP, and if a major blowout had occurred at another operator's well, they would not have been any more prepared to respond.[18]

The unprecedented deployment of spill response equipment and cleanup crews to the vicinity of the Macondo well and regional shorelines in response to the BP Oil Spill raises serious concerns about the industry's and the Government's current ability to respond in a meaningful way to another deepwater spill.[19]  There are insufficient resources currently available to respond should another deepwater spill occur while the BP Oil Spill containment and clean-up effort is ongoing. As an industry executive recently testified before Congress, "[regional response] plans look the same because in

---

[18]     Transcript of Hearing on "Drilling Down on America's Energy Future: Safety, Security and Clean Energy," Subcommittee on Energy and Environment (June 15, 2010); Opening Statement of Rep. Henry A. Waxman, Subcommittee on Energy and Environment, Drilling Down on America's Energy Future: Safety, Security and Clean Energy (June 15, 2010); Opening Statement of Rep. Edward J. Markey, Subcommittee on Energy and Environment, Drilling Down on America's Energy Future: Safety, Security and Clean Energy, (June 15, 2010); Opening Statement of Rep. Bart Stupak, Subcommittee on Energy and Environment, Drilling Down on America's Energy Future: Safety, Security and Clean Energy, (June 15, 2010).

[19]     Shallow water spills tend to be more confined and easier to address, if only because of the smaller geographic area affected by the spill.

fact they call upon the same resources to respond."[20] As late as March 2010, BP had submitted its report on cleanup capacity projecting the capacity to skim and remove 491,721 barrels of oil per day.  As of July 5, 2010, their skimming operations have averaged less than 900 barrels per day equivalent.[21]

The BP Oil Spill alone is taxing these shared response resources to the limit.  Industry executives have testified and stated repeatedly that they already have offered all available resources to the BP Oil Spill.[22]  U.S. military and foreign resources are being utilized in the response effort.[23]  The USCG has determined that the number of oil spill response vessels currently skimming oil is inadequate to recover the oil released from the BP Oil Spill, and additional skimming vessels are being ordered and manufactured to aid with the response.[24]  Despite these efforts, the USCG recently determined that "There are simply not enough U.S. [oil spill response vehicles] capable of skimming oil available to keep up with the pace at which oil flows from the [Macondo] well."[25]  Accordingly, the USCG and the Environmental Protection Agency (EPA) amended their oil spill response time requirements to allow certain commercial and military vessels normally required to be available for spills in other regions to be deployed in support of the BP Oil Spill response.[26]  In a June 28, 2010, meeting between Department officials and representatives from the drilling industry, the industry was unable to provide assurances that resources exist that would be available to address a second oil spill.

Finally, as concerns about the recent Tropical Storm Alex system in the Gulf of Mexico demonstrate, clean-up operations during hurricane season are subject to multiple weather-

---

[20]   Testimony by ExxonMobil CEO and Chairman Mr. Tillerson before the House Subcommittee on Energy and Environment, June 15, 2010.

[21]   Kindy Kimberly, Recovery Effort Falls Short of BP's Promises, The Washington Post, (July 6, 2010).

[22]   See, e.g., Testimony by BP, ExxonMobil, Chevron, and ConocoPhillips executives before the House Subcommittee on Energy and Environment Hearing, June 15, 2010.

[23]   Admiral Thad Allen, June 25, 10, and 1, 2010 briefings; Daily Administration updates on Deepwater Horizon response, June 28, 2010.

[24]   Memorandum from BP Deepwater Horizon Oil Spill Federal On-Scene Coordinator Rear Admiral Watson to National Incident Command (June 16, 2010); Admiral Thad Allen, June 25, 2010 briefing and June 18, 2010 briefing. See also 33 CFR 154, 155 & 40 CFR 112, Temporary Suspension of Certain Oil Spill Response Time Requirements to Support Deepwater Horizon Oil Spill of National Significance Response, 75 Fed. Reg. 37712, 37714 (June 30, 2010).

[25]   June 16, 2010 Memorandum from Rear Admiral Watson to the National Incident Command.

[26]   See "Temporary Suspension of Certain Oil Spill Response Time Requirements to Support Deepwater Horizon Oil Spill of National Significance Response." 75 Fed. Reg. 37712, 37714 (June 30, 2010).

related complications, difficulties, and delay.[27]  For example, while Alex took a path
away from the Macondo site, ocean conditions generated by the storm still necessitated
that all 510 skimmers responding to the BP Oil Spill be temporarily recalled to shore.[28]
Moreover, the storm surge from a hurricane or other significant storm could distribute oil
over a wider area and carry the oil into the coastline and inland areas.[29]   The Atlantic
hurricane season, which includes the Gulf of Mexico, runs from June 1, 2010  until
November 30, 2010.[30]

Therefore, under the present conditions, there are serious concerns about whether
operators have the capacity to mount a prompt and effective containment and clean-up
effort in the event of another significant deepwater spill, whatever its probability.  Before
deepwater drilling activity resumes, it is prudent – and necessary to ensure operators have
adequate response plans as required by BOEM regulations – and for companies to work
with BOEM, the USCG, and other authorities, to determine when adequate spill response
resources are available to address a future deepwater spill event.

### E.    Economic Impacts

The OCSLA does not require that I conduct a balancing of harms analysis in connection
with the suspension of drilling operations. The statute requires only that I conclude that
there is a threat of serious or irreparable harm to life, property, or the marine, coastal, or
human environment. *Compare* 43 U.S.C. § 1334(a)(1) *with* 43 U.S.C. § 1334(a)(2)(i)-
(iii). *See also* H.R. Rep. 95-590, at 132 (1977). Nevertheless, there are those that suggest
that such a balancing of harms may be appropriate.  Even if I had to engage in a
balancing of the economic effects both of the BP Oil Spill and of the suspension of
drilling operations, I would conclude that a temporary suspension of drilling operations is
warranted.

I have reviewed the materials submitted by the State of Louisiana expressing its concerns
over the economic effects of a temporary suspension of drilling operations, as well as the
submissions made by the plaintiffs and *amici* in the *Hornbeck* litigation on the predicted
economic effects of a temporary suspension of drilling operations. Even accepting their
assessment of the economic impact of a suspension, I conclude that it is outweighed by
economic impact of another catastrophic event like the blowout at the Macondo well, if

---

27      Admiral Thad Allen, June 25, 2010 Briefing (stating that a storm would have a "very negative
effect" on containment efforts because it will require breaking production and getting production units to a
safe locale.  *See also* Admiral Thad Allen, June 26, 2010 Briefing and  28, 2010 Briefing (stating that if
evacuation is required as a result of a tropical storm, the containment effort would be delayed by about 14
days).

28      "Waves from Storm Hinder Spill Effort," New York Times, June 30, 2010, citing statements by
Coast Guard Rear Adm. Paul F. Zukunft.

29      Admiral Thad Allen June 28 Briefing; NOAA Hurricane Factsheet,
http://www.deepwaterhorizonresponse.com/posted/2931/NOAA_fact_sheet_on_hurricanes_and_oil_spills.
572167.pdf.

30      NOAA National Hurricane Center at http://www.nhc.noaa.gov/.

one were to occur. It is self-evident that the economic and environmental costs of the current spill, which even now has not been brought under control, outweighs the economic impacts of a temporary suspension of drilling activities, especially since production operations in the Gulf continue. The need to prevent another such occurrence fully supports the brief suspension – for approximately four and a half months until November 30, 2010 – of drilling activities, even on the assumption that I am required to take into account the economic impact of the suspension.

There is no question that a suspension of deepwater drilling will have a significant, negative economic impact on direct and indirect employment in the oil and gas industry, as well as other secondary economic consequences. These economic impacts must be considered against the backdrop of the substantial economic effects associated with the on-going BP Oil Spill and the potential economic damage that would be caused by another deepwater accident under the current circumstances. Therefore, while the economic effects of any drilling suspension – in terms of employment, spending, energy production, and government revenues – are and will be significant, another accident or oil spill would exacerbate the BP Oil Spill's effects on the economy and deal an unacceptable blow to the industry and the environment.

## V.    OPTIONS CONSIDERED BUT REJECTED

### A.    No suspensions of drilling.

Under this option, the Department would allow drilling to go forward under the workplace and drilling safety, blowout containment, and oil spill response conditions that currently exist. Compliance with the safety requirements of NTL No. 2010-N05 would still be required, but all previously permitted drilling activity, including deepwater exploratory drilling, could resume prior to any additional rulemaking or completion of the reviews of the *Deepwater Horizon* incident.

I have rejected this option because it would allow deepwater drilling operations with known safety risks – *i.e.,* operations that pose risks and involve the use of subsea BOPs or surface BOPs on floating facilities – to proceed before I can have confidence that all necessary safety measures have been implemented. While NTL 2010-N05 increases the level of safety for deepwater drilling, it does not implement all of the safety measures recommended in the Safety Report, and I cannot be sufficiently confident that compliance with the Safety NTL is sufficient to mitigate the threats posed by deepwater drilling before we know more about the exact causes of the BP Oil Spill. This option would allow deepwater drilling to go forward while the Macondo well remains uncontrolled and before tailored strategies and measures for containing deepwater blowouts and spills have been developed and implemented. Finally, I do not believe it would be prudent or responsible to allow deepwater drilling operations to proceed while available oil spill response capacity, particularly in the Gulf of Mexico region, is occupied with responding to the BP Oil Spill.

### B.   Moratorium on drilling, but with defined criteria for relief from suspensions.

Under this option a drilling moratorium would prohibit deepwater drilling, but provide opportunities for an early exit from the moratorium for certain lower-risk deepwater drilling activities based on the satisfaction of specified requirements relating to the three topics discussed above: workplace and drilling safety, blowout containment, and oil spill response capacity. This option would allow time for the implementation of additional safety measures, the development of strategies for deepwater blowout containment, and the BP Oil Spill response to continue while reducing the risk of a second significant spill event. It also would provide operators with framework and guidance for relief from the moratorium. Further, though anticipation of an early exit from the moratorium may not prove sufficient to keep the entire current fleet in the Gulf of Mexico, it may potentially maintain some deepwater drilling presence in the Gulf of Mexico.

Unfortunately, I cannot take this approach at this time because there remain too many unanswered questions about specific workplace and drilling safety measures that may be needed to ensure safe deepwater drilling, strategies and alternatives for the containment of deepwater blowouts, and the status of oil spill response capacity and where the gaps in the current regulation on those matters lie. For this reason, I have directed you to aid in the effort to gain a more full understanding of the risks of deepwater drilling and the current shortcomings of containment and cleanup capacity by conducting public meetings and outreach to gather, on an expedited basis, additional information to augment the results of ongoing studies and investigations. I am hopeful that the exercise that you will engage in will provide the type of additional information to define the criteria for relief from suspensions. I have asked you to report to me the results of your findings and recommendations no later than October 31, 2010. We must have a firm understanding of the fundamental issues bearing on whether drilling in deepwater can proceed safely prior to allowing it to proceed at all, and for this reason I rejected this option.

### C.   Adopt recommendations from industry representatives regarding suspensions.

Representatives from the oil and gas industry have offered various proposals that would allow industry to resume or continue certain drilling operations that they characterize as presenting a relatively low risk after the implementation of certain safety measures. The types of drilling that the proposals would permit, subject only to compliance with NTL No. 2010-N05, include: wells that are abandoned before reaching producing zones, disposal wells, development wells to known reservoirs, and delineation wells.

Although these types of drilling operations are characterized as "lower risk," they still pose an unacceptable level of risk at this time. Further, as discussed above, I have asked you to gather additional information about whether any such activities should be permitted prior to the expiration of any suspensions. The BP Oil Spill demonstrates the true magnitude of the risk that exists in what was considered a controllable environment. In light of the vulnerable status of the Gulf of Mexico and a desire to implement the

correct regulatory scheme that will be capable of supporting safe drilling on the OCS for the longer term, we must exercise caution. While my decision presented below does allow for some activities to continue based on our understanding of risks, responsible oversight and implementation of my duties under OCSLA require that I have more information about even relatively lower risk drilling activity before allowing any additional activity to go forward, particularly while the Macondo well remains uncontrolled and operators may be in non-compliance with regulations relating to oil spill response due to, among other things, inadequate spill response plans. Nevertheless, as I continue to receive the additional information I have requested, I will continue to review this option.

## VI.    DECISION

### A.    Affected Operators

For the reasons discussed above and pursuant to the provisions of OSCLA, including 43 U.S.C. § 1334(a)(1), and 30 C.F.R. § 250.172(b)-(c), and with certain exceptions set forth below, I am directing BOEM to direct the suspension of any authorized drilling of wells using subsea BOPs or surface BOPs on a floating facility. I further direct BOEM to cease the approval of pending and future applications for permits to drill wells using subsea BOPs or surface BOPs on a floating facility. These suspensions shall apply in the Gulf of Mexico and the Pacific regions through November 30, 2010, subject to modification if I determine that the significant threats to life, property, and the environment set forth in this memorandum have been sufficiently addressed. These suspensions do not apply to production activities; drilling operations that are necessary to conduct emergency activities, such as the drilling operations related to the ongoing BP Oil Spill; drilling operations necessary for completions or workovers (where surface BOP stacks are installed, they must be utilized during these operations); abandonment or intervention operations; or waterflood, gas injection, or disposal wells. BOEM shall order any current drilling operations covered by this decision to proceed to the next safe opportunity to secure the well and take all necessary steps to cease operations and temporarily abandon or close the well. Pursuant to 30 CFR § 250.168(a), BOEM may direct a suspension for all or any part of a lease or unit area. Depending on the "nature of the suspended activity" the suspension is either of operations or production. 30 C.F.R.§ 250.168(b). In this case, BOEM will be suspending certain activity involving certain operations and will issue individual suspension letters to that effect.

My interpretation of OCSLA and its implementing regulations finds ample support in the legislative history of the statute. *See* Pub. L. No. 95-372, 92 Stat. 629 (1978); H.R. Rep. No. 95-590, at 55, 74 (1977); S. Rep. No. 95-284, at 43 (1977). Congress added 43 U.S.C. § 1334(a)(1) "to put some 'flesh on the bones'" of OCSLA by providing the Department with clear authority to suspend operations when there is a "threat" of "serious or irreparable" harm to the "marine, coastal, or human environment."

## B.    Duration of the Suspension

The basis for the November 30, 2010, end-date has been discussed throughout this memorandum.  The duration of the suspension is the time needed to ascertain what is necessary to improve the safety of operations in the OCS and adequate containment and response capabilities.  The time provided by the suspensions allows for the acquisition and development of additional information on the risks of deepwater drilling operations and the needed equipment and procedures to reduce those risks to an acceptable level.  In addition to the third-party commissions and investigations referenced earlier, a number of which may provide valuable information before November 30, 2010, the Department is undertaking its own investigations that will yield vital information on safety measures during the next several months.  For example, the Department's Outer Continental Shelf Safety Oversight Board, established by Secretarial Order will provide recommendations regarding interim measures that may enhance OCS safety and recommendations for improving and strengthening the Department's overall management, regulation and oversight of OCS operations. The Oversight Board will complete its report by August 15, 2010.  Moreover, additional information development by the several investigations assigned to examine the causes of the *Deepwater Horizon* disaster, as well as the results of your public outreach efforts discussed in this memorandum, will be informative.  With regard to your public outreach efforts, which I address in the next section, I will receive a report from you no later than October 31, 2010, containing your recommendations and analysis of any new information that you have received.  In your discretion, I welcome the submission of preliminary input regarding the issues underlying this memorandum. I look forward to receiving the information that you are collecting through your review, which I will consider in determining whether additional action must be taken, including the potential for a modification to the scope or duration of this suspension decision.

The duration until November 30 also is designed to allow time for the killing or containment of the Macondo well, which is expected to be accomplished by approximately mid-August 2010, and which may have an effect on spill containment and response capabilities for potential use on other wells.  Another important factor that explains the November 30 date is that the Atlantic hurricane season, which includes the Gulf of Mexico, runs from June 1 until November 30.  As discussed herein, the ability to conduct containment activities and oil spill response can be compromised by hurricane storms. During this time of year, as we have already seen this year, the ability to contain and respond to a spill is often compromised by weather conditions.

Lastly, suspending these particular operations until November 30 will allow BOEM and the Department to develop the interim rules required to address the safety issues that have recently come to light.  Some of these interim rules are expected to be issued within 120 days of the issuance of the Safety Report, and additional time will be required after these rulemaking actions are completed for operators to implement the new requirements established by those rules.  Other rules will have a longer development or implementation timeline, and I will determine whether their implementation is essential before suspended operations may resume.  Finally, the November 30 date accounts for the requirement that certain Technical Workgroups established as part of the government's response to the BP

Oil Spill provide recommendations to improve OCS drilling operations within 180 days of the issuance of the Safety Report.

Based on what we know now and what we expect to learn in the next several months, November 30 is a reasonable end date for this suspension decision. However, I reserve my statutory right to issue a new suspension order which will be justified based on the circumstances that exist at the time and will contain a definitive end date.

### C.    Potential Lifting of Suspension

The suspension could be lifted earlier than November 30, 2010, if BOEM assures me that the safety, containment and response issues that have created the need for a suspension have been resolved, or if those three issues are addressed to a degree that can be determined upon further study to ensure an acceptable margin of safety. If the results of the various investigations reveal significant unexpected risks, however, my duties under OCSLA could require me to extend the duration of the suspensions.

As noted above, I will continue to solicit and review information relevant to this matter, and I will remain open to potentially adjusting the suspension period based on additional information and analysis. In that regard, I direct you to conduct public meetings and outreach to gather additional information, on an expedited basis, on the primary issues that I have identified as raising the most significant risks regarding the resumption of deepwater drilling. You will be focusing on the following:

> a.    Drilling and workplace safety requirements as outlined in the Safety Report and a timeline for the implementation of such safety requirements and others that may be necessary to ensure safe drilling practices;

> b.    Well intervention and blowout containment technology and methodology designed to effectively address and expeditiously contain any blowouts that could occur;

> c.    A review of additional and necessary oil spill response plans for offshore drilling and production facilities, and an evaluation of industry capacity to address a worst case discharge scenario under 30 CFR part 254.

I further direct you to issue a report to me no later than October 31, 2010, that contains your findings and recommendations as a result of your outreach efforts and any other information you have acquired in the interim. This information gathering will be critical to addressing the serious risks presented by oil and gas drilling activities in deepwater environments. This additional information potentially could provide the basis for identifying conditions for resumption of drilling activities if certain conditions are met, and/or the identification of any oil and gas drilling activities that might be allowed prior to the expiration of the suspensions based on the relative level of risk associated with those activities.

## VII.   IMPLEMENTATION

Consistent with the above discussion and decisions, this memorandum replaces and supersedes the memorandum dated May 28, 2010, entitled "Suspension of Outer Continental Shelf (OCS) Drilling of New Deepwater Wells." NTL No. 2010-N04, which was used to implement the decision made in the May 28, 2010, memorandum and is hereby rescinded. I direct you to withdraw the suspension letters issued under NTL No. 2010-N04, and I direct you to issue new suspensions and to cease the approval of pending and future applications for permits to drill consistent with this decision, for all operations described in this decision. To provide certainty to affected operators, please issue the suspension orders promptly.

ATTACHMENT 1

Date:   July 12, 2010
Summary of Decision File

The following is a non-exhaustive summary of documents and information included in the Decision File:

**30-Day Safety Report and Supporting Documents:** The Department of the Interior's May 27, 2010, Report entitled "Increased Safety Measures for Energy Development on the Outer Continental Shelf" (Safety Report), including, but not limited to, the following documents from the record that formed the basis for that report:

- The April 27, 2010, Memorandum from Wilma Lewis to the Secretary entitled, "Immediate Response Measures Pending Investigation of the BP oil spill;"
- Notes from Department of the Interior Meetings with Various Experts and Industry / NGO representatives;
- The API Joint Industry Task Force Recommendations;
- The "Fact Sheet Notebook" summarizing the events of the BP oil spill;
- Correspondence from various petroleum companies in response to the Secretary's request for recommendations;
- Comments and Recommendations from experts affiliated with the National Academy of Engineering;
- MMS Studies (Cited in Table 3 of the Safety Report).

**Information Provided by BOEM Internal Experts:**  Information obtained from consultation with BOEM internal experts, including experts from BOEM's Gulf of Mexico Region.  The BOEM experts provided comments regarding the risks inherent in certain offshore drilling equipment, water depth, and various drilling activities, as well as the adequacy of current response plans and containment resources.  They also suggested various options for addressing the risks of deepwater drilling.

**Information Provided by Industry Representatives:** Information provided in meetings between officials of the Department of the Interior and representatives of the drilling industry, including but not limited to:

- A June 21, 2010, meeting between the Secretary and industry consultants, in which the consultants made a PowerPoint presentation that discussed, among other things, claimed risks associated with suspension of drilling, suggested methods for reducing these claimed risks, and a proposal to allow drilling to resume in certain categories of wells;

- A June 28, 2010, meeting between Department officials and operators and rig owners currently operating in Federal waters in the Gulf of Mexico. Suggestions provided by various industry operators with regard to the resumption of drilling operations in the Gulf of Mexico, including suggestions for well design, operation procedures, rig equipment, safety and training risk management and well control system certification and maintenance.

**Daily Incident Reports:** Information contained in the daily reports from the site of the BP oil spill issued since the spill, including but not limited to:

- BOEM's Offshore Incident Report Daily Updates;

- U.S. Department of the Interior, Office of Emergency Management Emergency Daily Situation Reports;

- U.S. Department of the Interior, Office of Emergency Management Spot Reports.

**Briefings by National Incident Commander**: Information provided by Admiral Thad Allen in daily briefings from the National Incident Command Center.

**Macondo Well Intervention and Containment Efforts**: Information related to specific well control and containment efforts for the Macondo well blowout, as well as testing and performance difficulties encountered with the BOPs being used for the two relief wells being drilled to intercept and kill the Macondo well.

**Oil Spill Regional Response Plans:** The provisions of the Gulf of Mexico regional response plans of BP, Chevron, Conoco Phillips, ExxonMobil, and Shell.

**Congressional Hearing Testimony**: Information from Congressional testimony related to the BP oil spill, including testimony regarding the possible causes of the spill, the efforts to contain the spill, the environmental and economic impacts of the spill, the economic consequences of a possible moratorium on deep-sea drilling, the adequacy of current preparedness plans in responding to a similar incident, and the availability of resources to respond to another spill.  The BOEM conducted a comprehensive review of transcripts, written testimony, and related documents from the following hearings:

- House Committee On Energy and Commerce, Subcommittee On Oversight and Investigations, *Inquiry into the Deepwater Horizon Gulf Coast Oil Spill* (May 12, 2010)

- House Committee on Transportation and Infrastructure, *Hearing on Deep Horizon Oil Spill Prevention and Response Measures and Natural Resource Impacts* (May 19, 2010)

- House Committee on Natural Resources, *Hearing on The Outer Continental Shelf Oil and Gas Strategy and Implications of the Deepwater Horizon Rig Explosion* (May 26, 2010)

- House Committee on Natural Resources, *Hearing on Outer Continental Shelf Oil and Gas Strategy and Implications of the Deepwater Horizon Rig Explosion* (May 27, 2010) House Committee on Energy and Commerce, Subcommittee on Energy and Environment, *Hearing on Response Efforts to the Gulf Coast Oil Spill* (May 27, 2010)

- House Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, *Hearing on the Local Impact of the Deepwater Horizon Oil Spill* (June 7, 2010)

- House Committee on Energy and Environment, *Hearing on Beneath the Surface of the BP Spill: What's Happening Now, What's Needed Next* (June 9, 2010)

- House Committee on Energy and Commerce, Subcommittee on Energy and the Environment, *Hearing on The BP Oil Spill: Human Exposure and Environmental Fate* (June 10, 2010)

- House Committee on Natural Resources, Subcommittee on Insular Affairs, Oceans and Wildlife, *Oversight Hearing on Our Natural Resources at Risk: The Short and Long Term Impacts of the Deepwater Horizon Oil Spill* (June 10, 2010)

- House Committee on Energy and Commerce, Subcommittee on Energy and Environment, *Hearing on Drilling Down on America's Energy Future, Safety Security and Clean Energy* (June 15, 2010)

- House Committee on Natural Resources, Subcommittee on Insular Affairs, Oceans and Wildlife, *Hearing on Ocean Science and Data Limits in a Time of Crisis: Do NOAA and Fish and Wildlife Service Have the Resources to Respond?* (June 15, 2010)

- House Committee on Energy and Commerce, Subcommittee on Health, *Hearing on Health Impacts of the Deepwater Horizon Oil Spill* (June 16, 2010)

- House Committee on Energy and Commerce, Subcommittee on Oversight and Investigation, *The Role of BP in the Deepwater Horizon Explosion and Oil Spill* (June 17, 2010)

- House Committee on Education and Labor, *Hearing on Worker Health and Safety Standards Related to the Oil Industry, Oil Rigs and Drilling* (June 23, 2010)

- House Committee on Natural Resources Hearing, *Hearing on State Planning for Offshore Energy Development: Standards for Preparedness* (June 24, 2010)

- Senate Committee on Commerce, Science and Transportation Hearing (May 18, 2010)

- Senate Committee on Energy and Natural Resources Hearing (May 11, 2010)

- Senate Committee on Environment and Public Works, *Hearing on Economic and Environmental Impacts of the Recent Oil Spill in the Gulf of Mexico* (May 11, 2010)

- Senate Committee on Homeland Security and Governmental Affairs, *Hearing on the Gulf Coast Catastrophe: Assessing the Nation's Response to the Deepwater Horizon Oil Spill* (May 17, 2010)

- Senate Committee on Commerce, Science and Technology, *Hearing on Potential Impacts of the Deepwater Horizon Oil Spill on Marine and Coastal Ecosystems* (May 18, 2010)

- Senate Committee on Environment and Public Works, *Hearing on Federal Response to the Recent Oil Spill in the Gulf of Mexico* (May 18, 2010)

- Senate Committee on Energy and Natural Resources Hearing (May 25, 2010)

- Senate Committee on Environment and Public Works, *Legislative Hearing on S. 3305, The Big Oil Bailout Prevention Liability Act of 2010* (June 9, 2010)

- Senate Committee on Homeland Security and Governmental Affairs, Subcommittee on State, *Hearing on Local and Private Sector Preparedness and Integration* (June 10, 2010)

- Senate Committee on Health, Education, Labor and Pensions, *Hearing on the Deepwater Horizon Oil Spill* (June 15, 2010)

- Senate Committee on Small Business Hearing (June 17, 2010)

- Senate Committee on Energy and Natural Resources Hearing (June 24, 2010)

**Information Provided by the U.S. Coast Guard:** Information provided by the U.S. Coast Guard relating to the BP Oil Spill and oil spill statistics and information in relation to the 1979 Cameche oil spill in Corpus Christi, Texas.

**Documents Related to the Joint Investigation of the BP Oil Spill**: Information provided during the public hearings in the joint Coast Guard - BOEM investigation of the causes of the BP oil spill, including but not limited to:

- Transcripts from USCG/BOEM Joint Investigation Public Hearings of May 11 – May 12, 2010;

- Transcripts from USCG/BOEM Joint Investigation Public Hearings of May 26 – May 29, 2010;

- Documents that have been made available in the course of the joint investigation.

**Notices to Lessees and Operators (NTLs):** A review of information contained in, and provided pursuant to, the following Notices to Lessees and Operators of Federal Oil and Gas Leases in the Outer-Continental Shelf:

- NTL No. 2010-N05: Increased Safety Measures for Energy Development on the OCS (effective June 8, 2010); and

- NTL No. 2010-N06: Information Requirements for Exploration Plans, Development and Production Plans, and Development Operations Coordination Documents on the OCS (effective June 18, 2010).

**Economic Impact Analysis:** Public records and internal memoranda analyzing the economic effects of a six-month suspension in deepwater drilling in the Gulf of Mexico, as well as the economic impacts of the oil spill on the local economy.

**Hornbeck Litigation Materials**: Court rulings, briefs, motions, declarations and other materials submitted in connection with the Hornbeck litigation, including but not limited to:

- The June 22, 2010, U.S. District Court Order and Reasons granting Motion for Preliminary Injunction

- The June 22, 2010, U.S. District Court Order Prohibiting US from Enforcing the Moratorium

- The July 7, 2010, Fifth Circuit Court Order Denying Motion to Stay Pending Appeal

**July 10, 2010 Memorandum from BOEM Director Michael Bromwich to Secretary Ken Salazar:**  Memo from BOEM Director Michael Bromwich to Secretary Salazar entitled: "Options regarding the potential suspension of certain offshore drilling activities and permitting on the Outer Continental Shelf."

**Other Information Regarding Deepwater Drilling or the BP Oil Spill** including, but not limited to:

- Wood MacKenzie: *Deepwater Horizon* tragedy: near-term and long-term implications in deepwater Gulf of Mexico;

- Preliminary results of various investigations into the causes of the BP oil spill, including BP's own interim investigation briefings;

- The Joint Industry Task Force Recommendations to Improve Offshore Safety of Drilling & Completion Operations;

- Memorandum: The Department of the Interior and MMS's Economic Analysis of the 6-Month Moratorium (June 14, 2010);

- Memorandum from Dr. Marcia McNutt, Director of the United States Geological Survey regarding "USGS Support for Macondo Well Control and Containment: Observations Regarding Technical Problems with Deepwater Efforts" (June 28, 2010);

- MMS Economic Impact Assessment: Effects of Drilling Pause for 6 Months (June 10, 2010);

- Letter from Louisiana Governor Bobby Jindal to the President and the Secretary of the Interior, June 2, 2010, summarizing LA Department of Economic Development's analysis of employment impacts;

- Memorandum from BP Oil Spill Federal On-Scene Coordinator Rear Admiral Watson to National Incident Command (June 16, 2010);

- "Temporary Suspension of Certain Oil Spill Response Time Requirements to Support Deepwater Horizon Oil Spill of National Significance Response." 33 CFR 154, 155 and 40 CFR 112. (Sent to the Federal Register on June 28, 2010);

- Memorandum summarizing the activities of the Joint Industry Task Force to Address Subsea Well Control and Oil Spill Response;

- Memorandum entitled "Enhanced Industry Capability for Offshore Operations" summarizing improvements in regulatory, safety and response capabilities in the Gulf of Mexico;

- Memorandum from Solicitor Hilary Tompkins entitled "Overview of Blowout Causes;"

- Memorandum from BOEM Deputy Director Walter Cruickshank to Tommy Beaudreau entitled, "Relative Risk of Drilling Activities."