IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG      *       MDL NO.  2179
"*DEEPWATER HORIZON*" in the         *
GULF OF MEXICO, on April 20, 2010    *       SECTION:  J
                                     *       JUDGE BARBIER
**THIS PLEADING APPLIES TO**         *
All Cases in Pleading Bundle C and   *       MAGISTRATE NO. 1
Cause No. 10-2771                    *       MAGISTRATE SHUSHAN
* * * * * * * * * * * * * * * * * * * * * * * *

**MEMORANDUM IN SUPPORT OF MOTION OF
DRIL-QUIP, INC. TO DISMISS BUNDLE C COMPLAINTS**

**I. INTRODUCTION**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Dril-Quip, Inc. ("Dril-Quip") moves to dismiss all claims in Bundle C to which it has been joined in issue with by virtue of the Limitation Petitioners' Third-Party Complaint.[1]  Actually, there are no allegations of any kind against Dril-Quip in the C Master Complaint, and to date no government entity has sought relief of any kind from Dril-Quip.  Dril-Quip is required to defend against the allegations in the C Master Complaint and other Bundle C complaints only because of the procedural effect of the Rule 14(c) tender in the Transocean Parties' Third-Party Complaint.   Dril-Quip's references herein to "Plaintiffs'/Claimants' claims against" it must be read in light of the anomalous situation in which it is placed by Rule 14(c): to defend against complaints in which it is not named, in which no paragraphs directly address its role in the Macondo project, and in which the allegations and claims that are made are patently irrelevant to it.  Accordingly, each

---

[1] Dril-Quip submits this memorandum and the motion it supports subject to its Motion to Dismiss the Third-Party Complaint. [Doct. 1902].  While the Motion to Dismiss supported by this Memorandum covers all Bundle C complaints to which Dril-Quip has been joined by the Third-Party Complaint, references herein to "the Complaint" specifically relate to the Bundle C Master Complaint, as it is the most comprehensive of the relevant Bundle C complaints.

such reference to "Plaintiffs'/Claimants' claims against Dril-Quip" should be read as if it contained the qualifier "by operation of law."

In its Case Management Order, dated October 19, 2010, and clarified in Pre-trial Order No. 33, the Court ordered Plaintiffs to set forth in Master Complaint C "claims brought by governmental entities, *inter alia*, loss of resources, loss of tax revenue, property damages, response or restoration costs, and civil penalties." PTO No. 33 at ¶ 1.  Plaintiffs expressly designate Master Complaint C as a Complaint in Admiralty pursuant to Federal Rule of Civil Procedure 9(h) and assert claims for property damage pursuant to the general maritime law, the Oil Pollution Act ("OPA"), and the law of several Gulf states.

All claims against Dril-Quip fail because, even by extrapolating from claims made against similarly situated defendants, Plaintiffs fail to state a claim against Dril-Quip that satisfies Rule 8.

Plaintiffs' maritime claims for negligence and gross negligence fail to state a claim because Plaintiffs do not allege that Dril-Quip controlled any of the operations of the *Deepwater Horizon* that allegedly caused Plaintiffs' injuries.  To the contrary, the allegations make clear that the "BP Defendants" and the "Transocean Defendants"— not Dril-Quip —controlled *all* operations at the Macondo Prospect and on the *Deepwater Horizon*.  Thus, even if the allegations against satisfied the minimum requirements of Rule 8 (which they do not), the allegations themselves establish as a matter of law that Plaintiffs can state no cognizable claim against Dril-Quip.

Plaintiffs' state law claims fail because state law does not apply to this case.  Federal law alone applies to claims arising out of and in connection with oil spills by virtue of the Oil

Pollution Act ("OPA") in connection with oil exploration, development, and extraction operations on the Outer Continental Shelf ("OCS") by virtue of the Outer Continental Shelf Lands Act ("OCSLA").  Although federal law sometimes borrows state law as surrogate federal law in OCS cases, it does not do so in this case.

In addition, Plaintiffs' OPA claim fails because they do not allege that they have satisfied OPA's jurisdictional presentment requirement.  For these and other reasons described below, the Court must dismiss Plaintiffs' claims against Dril-Quip in their entirety.

## II.

## RELEVANT FACTUAL ALLEGATIONS IN MASTER COMPLAINT C

Plaintiffs allege that BP leased the *Deepwater Horizon* to drill exploratory wells at the Macondo Prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf off the coast of Louisiana, *see* Mast. Compl. C ¶¶ 176-77, 189, 191 at 6-7, 11, 12,[2] and that on April 20, 2010, "workers on the *Deepwater Horizon* oil vessel lost control of the Macondo well they had almost completed" … which led to explosions and a fire …, and ultimately the sinking of the vessel and the resulting spill." *Id.* ¶ 215, at 18-19.

Plaintiffs claim to be "local governmental entities … which are not state agencies, in Florida, Alabama, Mississippi, Louisiana and Texas, who have suffered … damages, losses, and/or costs as a result of the oil, spill by the oil rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010." *Id*. ¶175, at 6.

The Master Complaint divides the Defendants into groups based on their alleged

---

[2] Because the C Master Complaint is the third segment of an instrument designated as an answer in limitation, claim in limitation, and complaint, the page numbers begin anew at the start of the complaint segment, but the paragraph numbers continue.

involvement in the incident: BP, Transocean, Halliburton, and M-I are called "Drilling Defendants," because "they were all involved in the drilling, cementing, and other temporary well abandonment activities of the Deepwater Horizon …." *Id*. ¶195 at 13.   Two other defendants, Cameron International Corporation ("Cameron") and Weatherford U.S. LP ("Weatherford") are named on account of their having furnished products and appurtenant services to the Macondo Project. *See id.* ¶196, 197, at 13-14.  Although Plaintiffs do not so label them, Dril-Quip will call these defendants the "Products Defendants" and treat itself as a constructive member of that group.  Other defendants are named because they owned an interest in BP's lease rights. *See id.* ¶¶199-207, at 14-17. *The Master Complaint does not identify Dril-Quip as a member of any of these groups.*

## A. Plaintiffs Allege that the "BP Defendants" and the "Transocean Defendants" Oversaw the Drilling and Recovery Operations and Operated the *Deepwater Horizon*.

Plaintiffs allege that BP "was a leaseholder and the designated operator in the lease granted by the former Minerals Management Service ('MMS') allowing it to perform oil exploration, drilling, and production-related operations" at the Macondo site, in which BP held a 65% interest. *Id*. ¶ 176 at 7. "As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations." *Id*. ¶ 185, at 10.  The Plaintiffs allege that Transocean, "subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems.  Transocean also provided operational support for drilling-related activities on board the *Deepwater Horizon*, as well as onshore supervision and support for those drilling activities at all times relevant to the

Spill."  *Id.* ¶ 191, at 12.  "Defendants" are alleged to have "recklessly, willfully and/or wantonly failed to … ensure," *first*, "that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout," and *second,* "that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico . . . ." *Id*. ¶¶ 493-94, at 96.

**B.     Third-Party Plaintiffs Allege That Dril-Quip was Involved in Providing Wellhead Systems on the Macondo Prospect.**

Dril-Quip allegedly "was involved with providing wellhead systems to the Deepwater Horizon …"[3]  Plaintiffs *do not allege* that Dril-Quip had involvement in, control of, or supervisory authority over, the engineering and design of the Macondo well, the *Deepwater Horizon* and its crew, or the drilling and completion operations.  Plaintiffs also *do not* allege that Dril-Quip had any ownership, contractual, or leasehold interest in the *Deepwater Horizon*. Plaintiffs *do not* allege that Dril-Quip participated in any acts that amounted to reckless, willful, or wanton conduct.

Notwithstanding the fact that Master Complaint C contains *no allegations* tying Dril-Quip to any conduct that allegedly caused Plaintiffs' harm, Plaintiffs assert claims under the Oil Pollution Act, 33 U.S.C. § 2701 (*id.* ¶¶ 575-85),[4] and the Florida Pollutant Discharge Prevention

---

[3] Third-Party Complaint at ¶19.  As noted above, *supra* at 1 & n.1, because Plaintiffs had not sued Dril-Quip at the time of Transocean's 14(c) tender, there are actually no allegations of any kind against Dril-Quip in their complaint.  Dril-Quip borrows this sentence from that tender as a point of origin for this Memorandum.

[4]These claims are asserted only against BP, Transocean, Anadarko, Anadarko E & P, and MOEX.

and Control Act, FLA.STAT. § 376.011 (2010)[5] (*id.*¶¶ 627-42), and for maritime Negligence (*id.* ¶¶ 480-523), Gross Negligence (*id.* ¶¶ 524-33),[6] Manufacturing/Design Defect (*id.* ¶¶ 534-74),[7] Nuisance (*id.* ¶¶ 594-600),[8] Trespass (*id.* ¶¶ 601-66),[9] Fraudulent Concealment (*id.* ¶¶ 607-26),[10] strict liability under LOSPRA and TOSPRA, and for punitive damages and declaratory relief.[11]

## III. ARGUMENT

### PLAINTIFFS HAVE NOT PLEADED CLAIMS AGAINST DRIL-QUIP FOR WHICH RELIEF CAN BE GRANTED

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Cuvillier*

---

[5] These claims are asserted only against BP and Transocean.

[6] These claims are asserted only against the "Drilling Defendants" (BP, Transocean, Halliburton, and M-I, see ¶ 195 at 13) and Cameron.

[7] These claims are asserted only against Cameron and Weatherford.  Because Dril-Quip supplied the wellhead, it will address these claims.

[8] These claims are asserted against Drilling Defendants, Cameron and Weatherford.  Dril-Quip will respond.  *See* note 7, *supra*.

[9] *See* note 8, *supra*.

[10] These claims are asserted only against BP, Transocean and Halliburton.  Dril-Quip will not respond.

[11] Plaintiffs also include Class Action Allegations in Master Complaint C at ¶¶ 176–93.  "Where it is facially apparent from the pleadings that there is no ascertainable class, a district court may dismiss the class allegation on the pleadings." *John v. Nat'l Sec. Fire and Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007). The Court, however, has ordered a stay of all class action motion practice and deadlines.  CMO No. 1 at 12.  Dril-Quip therefore hereby reserves, and expressly does not waive, any and all arguments that Plaintiffs' Class Action Allegations as set forth in Master Complaint C are facially insufficient to state an ascertainable class as a matter of law, until such time as the Court lifts the stay on Class Action motions practice.

*v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007); *see also Sinaltrainal v. Coca-Cola Co*., 578 F.3d 1252, 1261 (11th Cir. 2009) (allegations must push claim past "conceivable" to "plausible"). This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555); *see also Hershey v. Energy Transfer Partners*, 610 F.3d 239, 245–46 (5th Cir. 2010) (same). Those "conclusory statements" must be disregarded altogether. *Iqbal*, 129 S.Ct. at 1950; *see also* Adam N. Steinman, *The Pleading Problem*, 62 Stan. L. Rev. 1293, 1314 (2010).

Rather, to state a claim for relief, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556). These "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555-56. However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Jacobs v. Tempur-Pedic Int'l, Inc.,* 626 F.3d 1327, 1333 (11th Cir. Dec. 2, 2010)(quoting *Iqbal,* 556 U.S. at ___, 129 S. Ct. at 1949). Under the standard set forth in *Twombly*, a complaint must plead "enough fact[s] to raise a reasonable expectation" that a plaintiff has a right to relief. *See* 550 U.S. at 557.

The Complaint pleads no facts tending to show liability, causation or damage that implicate Dril-Quip.  Indeed, the Complaint fails to even mention Dril-Quip and does not assert any causes of action directly against Dril-Quip; by contrast, Plaintiffs allege both facts and law in support of their claims against Cameron and Weatherford.  *See* C Mast. Complaint ¶¶ 534-73 at 105-12.  The only reason Dril-Quip is required to respond to the allegations in the Complaint is because it has been joined to the allegations in the Complaint by operation of Transocean's Third-Party Complaint pursuant to Rule 14(c).  Unlike the usual Rule 14(c) tender situation, none of the facts alleged against the named Product Defendants fit the situation of Dril-Quip, a "blind tendered" defendant.  The allegations against Cameron and Weatherford focus on the failures of those companies' products to act as barriers to hydrocarbon flow into the well and up the riser.  No similar allegations can be constructively applied to Dril-Quip because its equipment is not intended to perform such a function.

The majority of the Complaint's allegations related to the Defendants are directed at "Defendants," or "Drilling Defendants."[12]  In other paragraphs, the Complaint alleges that certain  Defendants committed specific acts but never alleges that Dril-Quip committed any specific act or identifies the wellhead as a source of problems.  Thus, even in these collective allegations, the Complaint does not allege a single fact that would tend to show that Dril-Quip did anything or failed to do anything that led to Plaintiffs' alleged injuries.

Allegations that lump multiple defendants together without specifying which defendant did what do not satisfy the federal pleading standards.  *Cruz v. Cinram Int'l, Inc.*, 574 F. Supp. 2d 1227, 1233 (N.D. Florida 2008); *see also Kester v. Zimmer Holdings, Inc.*, 2010 WL 2696467, at *12 (W.D. Pa. June 16, 2010) (collectively referring to "Defendants" insufficient

under *Twombly*).  The Eleventh Circuit has stated "[t]his court has addressed the topic of shotgun pleadings on numerous occasions in the past, often at great length and always with great dismay."  *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1296 n. 9 (11th Cir. 2002).  This case is no different.  Plaintiffs' complaint fails to plead any facts specific to Dril-Quip.  It is thus impossible to ascertain what Dril-Quip did or failed to do that caused Plaintiff's injuries.  The Court should therefore dismiss the Complaint against Dril-Quip for failure to state a claim because the factual allegations do not raise a right to relief against Dril-Quip "above the speculative level."  *Twombly*, 550 U.S. at 555.

Further, if the allegations of a complaint reveal an insuperable bar to relief, *Jones v. Bock*, 549 U.S. 199, 215 (2007), the claim should be dismissed.  In the latter circumstance, as in this case, the plaintiff "pleads himself out of court by 'admitting all the ingredients of an impenetrable defense.'"  *Barasich v. Shell Pipeline Co*., No. 05-4180, 2006 WL 3913403, at *2 (E.D. La. Nov. 20, 2006) (Barbier, J.) (internal citations omitted) (granting Rule 12(b)(6) dismissal in part).

## A.    Plaintiffs' Claims Against Dril-Quip Under General Maritime Law Fail.

Plaintiffs designate Master Complaint C as a Complaint in Admiralty under Federal Rule of Civil Procedure 9(h) and assert four claims under the general maritime law:  Negligence (Count I.A), Gross Negligence (Count I.B), and Manufacturer/Design Defect (Counts I.C. & D.).[13]  All of these claims fail because Plaintiffs do not allege *any* facts that, if true, would

---

[12]*See* p. 4, *supra*.

[13] Plaintiffs plead additional claims under state law, each of which fails for the reasons described in Parts III(C–D), *infra*. Plaintiffs' federal statutory claim under OPA also fails for the reasons described in Part III (B), *infra*.

establish that Dril-Quip owed a legal duty to the Plaintiffs or engaged in conduct that caused them harm.  On the contrary, the facts Plaintiffs allege, even if true, conclusively establish that Dril-Quip is *not* liable for Plaintiffs' alleged injuries.  Because *all* of the general maritime claims alleged against Dril-Quip require some sort of negligent conduct and proximate causation, these claims must be dismissed.

**1. Plaintiffs Fail to Allege that Dril-Quip Engaged in or had Operational Control Over Any Conduct that Caused the Alleged Harm**.

To state a claim for negligence under the general maritime law, "the plaintiff must demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury." *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 211 (5th Cir. 2010) (internal citations and quotations omitted); *see also Becker v. Tidewater, Inc.*, 586 F.3d 358, 367 (5th Cir. 2009) ("Gross negligence . . . has been defined as harm willfully inflicted or caused by gross or wanton negligence") (quoting *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 411 (5th Cir. 1982)); *Royal Ins. Co. of Am. v. Southwest Marine*, 194 F.3d 1009, 1015 (9th Cir. 1999) (defining gross negligence under maritime law as "the intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another . . .") (*quoting* BLACK'S LAW DICTIONARY 1185 (4th ed. 1968); RESTATEMENT (SECOND) OF TORTS § 281 (1965) (actor liable for negligence if "the interest invaded is protected against unintentional invasion, and . . . the actor's conduct is a legal cause of the invasion")).[14]

_____

[14] Although Plaintiffs bring Master Complaint C in admiralty and assert claims under general maritime law, breach of duty and causation are required elements under any potentially applicable law. *See Meany v. Meany*, 639 So. 2d 229, 233 (La. 1994) ("The four elements of negligence include duty,

Because Plaintiffs' general maritime law claims require them to plead some breach of duty or other act by the defendants that caused their harm, the Court must focus on Master Complaint C's specific factual allegations about or that could conceivably apply to Dril-Quip. As explained below, those allegations fail to set forth *any allegations* that Dril-Quip did *anything* that amounted to a breach of duty or otherwise caused the harm alleged to have arisen from Plaintiffs' exposure to dispersants or oil.  Indeed, the Plaintiffs' own allegations, if true, establish that the other Defendants, and not Dril-Quip, are responsible for the drilling operations alleged to have caused the oil spill.   Plaintiffs' maritime claims against Dril-Quip must therefore be dismissed.

> **2.     Plaintiffs' allegations establish that Dril-Quip is not liable under the general maritime law for the explosion on the *Deepwater Horizon* and the resulting oil spill.**

Master Complaint C alleges that Plaintiffs were exposed to oil that flowed into the Gulf

---

breach, a causal relationship between the defendant's alleged negligent act and the plaintiff's injuries (which includes both cause in fact and legal cause), and damages") (internal citations omitted); *Qore, Inc. v. Bradford Bldg. Co.*, 25 So. 3d 1116, 1123 (Ala. 2009) (same); *Nabors Drilling USA, Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009) (same); *Watson Quality Ford, Inc. v. Casanova*, 999 So. 2d 830, 835 (Miss. 2008) (same); *Florida Dep't of Corr. v. Abril*, 969 So. 2d 201, 204 (Fla. 2007) (same); *see also Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 24–25 (Tex. 1995) (both gross negligence and negligence require evidence of a breach of duty and evidence of proximate cause); *Ambrose v. New Orleans Police Ambulatory. Serv.*, 639 So.2d 216, 220 (La. 1994) (gross negligence requires elements of proximate cause and duty).  Likewise, the common law theories of battery and nuisance in any of the potentially applicable states require proof of causation on the part of the defendants.  *See, e.g.*, *Aramark Uniform and Apparel v. Easton*, 894 So. 2d 20, 23 (Fla. 2005) (nuisance claims "require[] proof that the defendant caused the pollution resulting in the damages"); *Ex parte Atmore Community Hosp.*, 719 So. 2d 1190, 1193–94 (Ala. 1998) (citing RESTATEMENT (SECOND) OF TORTS § 18 in battery case); *Jamail v. Stoneledge Condo. Owners Ass'n*, 970 S.W.2d 673, 676 (Tex. App. 1998) (quoting RESTATEMENT § 822); *Leaf River Forest Prods., Inc. v. Ferguson*, 662 So. 2d 648, 662 (Miss. 1995) (quoting RESTATEMENT § 822); *Caudle v. Betts*, 512 So. 2d. 389, 391 (La. 1987) ("A harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact, is a battery") (internal citations omitted); RESTATEMENT (SECOND) OF TORTS § 13 ("An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results").

of Mexico following the explosion and sinking of the *Deepwater Horizon*. *See* Mast. Compl. C

¶¶ 439-454 at 83-85.  Plaintiffs' allegations establish that BP and Transocean were responsible

for the drilling operations at the Macondo site, and Dril-Quip therefore cannot be held directly

liable for any breach of duty or harm arising from the explosion on the *Deepwater Horizon* or the

resulting oil spill.

The duty to prevent harm resulting from oil and gas operations arises as a consequence of

operational control over the activity. *See, e.g.*, *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548,

550 (5th Cir. 1987), *cert. denied*, 485 U.S. 1034 (1988). It is also settled that where a principal

contracts with an independent contractor to conduct oil and gas operations but retains no

operational control, the principal neither assumes nor owes any duty to protect others from the

contractor's negligence.  *Thomas v. Burlington Res. Oil & Gas Co.*, No. 99-3904, 2000 WL

1528082, at *2 (E.D. La. Oct. 13, 2000) (Barbier, J.); *Hawkins v. Evans Cooperage Co.*, 766

F.2d 904, 909 (5th Cir. 1985) (a principal was not liable because it did not exercise control over

the independent contractor and had no duty to discover and remedy hazards the contractor

created); *McCormack v. Noble Drilling Corp.*, 608 F.2d 169, 174–75 (5th Cir. 1979) (holding

that the principal of an oil drilling operation owed no duty to ensure that independent contractors

performed safely, even though the principal's company man on the rig was aware of their

operations, because the principal had no control over the contractor); *Ronquille v. MMR Offshore

Servs., Inc.*, 353 F. Supp. 2d 680, 682 (E.D. La. 2004) (the presence of a company representative

on an oil platform with knowledge of the rig's operations "is insufficient to create a duty;

therefore, the law does not support the imposition of liability for any failure to intercede");

*Toussaint v. Chevron Phillips Chem. Co.*, No. 03-3481, 2006 WL 2349465, at *2 (E.D. La. Aug.

11, 2006) ("[T]he right to inspect or comment is insufficient to subject a principal to liability for a contractor's negligence") (citation omitted).

Master Complaint C does not contain any allegation that Dril-Quip possessed or exercised any control over the drilling or operations at the Macondo site.  Plaintiffs recognize this fact throughout Master Complaint C, expressly alleging that "[a]s a lease operator of the Macondo prospect site, *BP was responsible for . . .* engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations." Master Compl. C ¶ 185 at 10 (emphasis added); *see id.* ¶ 191 at 12 ("At all times relevant to the Oil Spill, Transocean, *subject to BP's inspection and approval*, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems") (emphasis added).

In light of the Plaintiffs' explicit allegations that BP and Transocean were responsible for the drilling operations, the Plaintiffs' general maritime claims against Dril-Quip must be dismissed.  *See Jones v. Bock*, 549 U.S. 199, 215 (2007). Absent any power to control BP or its contractors, Dril-Quip owed no duty to Plaintiffs and did not cause them any harm.

### 3.     Plaintiff Fails to State a Negligence Claim Against Dril-Quip

Even if Plaintiff's claim under Count II were not deficient under the *Twombly-Iqbal* pleading standard, it would not state a claim under maritime or Florida negligence law against Dril-Quip because the alleged harm to Plaintiff was too thinly connected to Dril-Quip's activities to create a duty to Plaintiff.  *See In re Great Lakes Dredge & Dock Co*., 624 F.3d 201, 211-13 (5th Cir. 2010)(connection between river dredging and collapse of New Orleans levees too attenuated to be foreseeable); *Lloyd's Leasing Ltd. v. Conoco*, 868 F.2d 1417, 1448-49 (5th Cir.

1989)(type of onshore damage from oil spill 70 miles away alleged by plaintiff not reasonably foreseeable as matter of law); *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987)(insufficient connection between dredging that ruptured gas pipeline and damages at aluminum processing plan from gas supply interruption to extend duty from dredging company to plant)(maritime law); *Jennings v. BIC Corp.*, 181 F.3d 1250, 1257 (11th Cir. 1999)(child's *purchase* and misuse of cigarette lighter beyond reasonable scope of risk to create a duty on part of manufacturer)(Florida law). The *Lloyd's Leasing* case especially militates against the existence of a duty here because of its review of the foreseeable consequences of an oil spill. *See* 868 F.2d at 1449.

### 4.     Plaintiff Design/Manufacturer Defect Claims Fail Because No Factual Allegations Suggest the Failure of Dril-Quip's Product.

Plaintiffs allege facts in support of their claims against Cameron and Weatherford. *See* Mast. Complaint C ¶¶s 534-51 at 105-08; *id*. ¶¶ 556-67 at 110-11. These facts include certain details about the design and manufacture of the BOP and the float collar and allege that those assemblies failed to perform. *See id*. ¶ 539 at 106, ¶¶ 561-62 at 110. By contrast, Plaintiffs allege no facts that suggest or even in any way implicate failure of the wellhead furnished by Dril-Quip. Accordingly, Plaintiffs have failed to state a claim for design or manufacturer defect against Dril-Quip. *See Funk v. Stryker Corp.*, 631 F.3d 777, 782 (5th Cir. 2011) (suggesting post-*Iqbal* minimum requirements for pleading such claims).

### B.     Plaintiffs Fail to State a Claim Against Dril-Quip Under the Oil Pollution Act.

OPA's pre-suit presentment requirement states: "all claims for removal costs or damages <u>shall be</u> presented first to the responsible party . . . of the source designated under section [2714(a) of this title]." 33 U.S.C. § 2713(a) (emphasis added). If such a claim is presented and

the responsible party denies all liability, or if the claim is not settled within 90 days, the claimant may elect to commence an action in court against the responsible party.  33 U.S.C. § 2713(c).

Plaintiffs allege that "[t]o the extent required by law, Plaintiffs *have satisfied, or will have satisfied,* all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), as to each and all of the defendants, by the submission of their claims to the Gulf Coast Claims Facility (the 'GCCF'), and/or BP, and/or its agents or designees." Mast. Compl. C at ¶ 585 (emphasis added). On its face, Plaintiffs' allegation fails to satisfy the mandatory presentment requirement of OPA, and Plaintiffs' OPA claim, therefore, should be dismissed for failure to state a claim. Because the Court lacks jurisdiction over claims that have not first been presented, this defect cannot be cured by the tardy presentation of Plaintiffs' claims mid-course in litigation.

Simply put, "the clear text of § 2713 creates a mandatory condition precedent barring all OPA claims unless and until a claimant has presented her claims . . . ." *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*, 51 F.3d 235, 240 (11th Cir. 1995). This presentation requirement "is jurisdictional and mandates dismissal when [the presentment provision] is . . . not complied with by the claimant." *Marathon Pipe Line Co. v. LaRouche Indus. Inc.*, 944 F. Supp. 476, 477 (E.D. La. 1996); *see also Gabarick v. Laurin Mar. (Am.) Inc.*, No. 08-4007, 2009 WL 102549, at *3 (E.D. La. Jan. 12, 2009) (dismissing OPA claims for failing to comply with OPA's presentment requirement and denying plaintiff's request for a stay in lieu of dismissal); *Turner v. Murphy Oil USA, Inc.*, No. 05-4206, 2007 WL 4208986, at *2 (E.D. La. Nov. 21, 2007) (presentment provision is a "'mandatory condition precedent'" to bringing a suit under OPA) (quoting *Boca Ciega*, 51 F.3d at 240); *Russo v. M/T Dubai Star*, No. C 09-05158 SI, 2010 WL 1753187, at *2–3 (N.D. Cal. Apr. 29, 2010) (collecting cases holding that OPA's presentation requirement is jurisdictional and mandates dismissal for failure to comply).

15

Plaintiffs cannot cure this jurisdictional flaw by providing the requisite presentment in the midst of ongoing litigation. *See Hallstrom v. Tillamook County*, 493 U.S. 20, 33 (1989) (plaintiffs' failure to comply with a statutory 60-day notice provision is a failure to satisfy a condition precedent to maintaining a suit and necessitates dismissal of the case; district court cannot stay the case to permit plaintiffs to comply with the notice requirement); *see also Nat'l Envtl. Found. v. ABC Rail Corp.*, 926 F.2d 1096, 1097–98 (11th Cir. 1991); *Gregory v. Mitchell*, 634 F.2d 199, 203–04 (5th Cir. 1981); *Hooper v. Thomas*, No. 01-1730, 2002 WL 1268399, at *1 (E.D. La. June 5, 2002) (same).

By failing to comply with OPA's requirement that all claimants present a claim to the responsible party for settlement consideration *before* filing a lawsuit, Plaintiffs undermine one of the principal purposes of the Act. The presentation requirement reflected Congress's belief that lawsuits against parties are appropriate only "where attempts to reach a settlement with the responsible party . . . were unsuccessful." H.R. REP.NO. 101-242, pt. 2, at 66 (1989). Legislative debate on the bill highlighted the goal of avoiding litigation as a key objective of the Act. *See, e.g.,* 135 CONG.REC. H7954-02 (daily ed. Nov. 2, 1989) (statement of Rep. Hammerschmidt), 135 Cong. Rec H7954-02, at *H7965 (Westlaw) (OPA is "intended to allow for quick and complete payment of reasonable claims without resort to cumbersome litigation"). The claims presentation provision reflected a compromise "to temper the Act's increased liability with a congressional desire to encourage settlement and avoid litigation." *Boca Ciega*, 51 F.3d at 238–39 (citing legislative history of the Act). To achieve that essential congressional objective, dismissal is required.

Accordingly, Plaintiffs' OPA claim against Dril-Quip must be dismissed for failure to state a claim because Plaintiffs did not sufficiently allege the requisite element of presentment of

their claims prior to filing suit.  Although some of the individual plaintiffs may have complied with the OPA presentment requirement, others have not.  Any individual plaintiff that has failed to fully comply with OPA can re-file only after properly presenting a claim and awaiting either rejection of his claim or expiration of the 90-day statutory period. *See Gabarick*, 2009 WL 102549, at *3.

**C.   Plaintiffs' State Law Claims Must Be Dismissed Because State Law Does Not Apply to this Case.**

Plaintiffs assert several claims against Dril-Quip under state law.  State law, however, does not apply to this action; federal law alone applies to claims arising out of and in connection with oil exploration, development, and extraction operations on the Outer Continental Shelf ("OCS").  Although federal law sometimes borrows state law as surrogate federal law in OCS cases, it does not do so in this case.  Because Plaintiffs' state law claims are based on substantive laws that do not apply, they must be dismissed.

**1.   Federal Law Applies Exclusively Under the Outer Continental Shelf Lands Act.**

Plaintiffs allege that this case arises out of, or in connection with, operations conducted on the outer Continental Shelf ("OCS") involving the exploration and production of oil from the subsoil and seabed of the outer Continental Shelf. *Cf.* 43 U.S.C. § 1349(b)(1)(A) (granting U.S. district courts jurisdiction of cases "arising out of, or in connection with . . . any operation conducted on the outer Continental Shelf . . .). This Court has already held that the Outer Continental Shelf Lands Act ("OCSLA") gives it jurisdiction over cases arising from the *Deepwater Horizon* incident, *see* Order Denying State of Louisiana's Motion to Remand, Case No. 10-cv-1758 [Dkt. # 471] (E.D. La. Oct. 6, 2010).  Because the controversy is "inextricably linked" to resource exploration and development on the OCS "and would not have arisen but for

17

such development," *Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co.*, 448 F.3d 760, 774 (5th Cir. 2006), OCSLA confers federal jurisdiction and also supplies comprehensive choice-of-law rules codified in Section 1333 of the Act.  *See EP Operating LP v. Placid Oil Co.*, 26 F.3d 563, 569 & n.14 (5th Cir. 1994) ("the most consistent reading of the statute instructs that the jurisdictional grant of section 1349 should be read coextensively with the substantive reach of section 1333"); *Toussaint v. Chevron Phillips Chem. Co.*, 2006 WL 2349465, at *2 (E.D. La. Aug. 11, 2006) (when a "case arises in connection with a mineral production operation on the Outer Continental Shelf[,] it falls within the scope of OCSLA," and Section 1333 "in turn" applies).

The question of which substantive law governs the Plaintiffs' claims is answered solely by Section 1333 of OCSLA. Other choice-of-law rules, such as those of the forum state or maritime choice-of-law rules, are irrelevant.  *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 482 n.8 (1981) (OCSLA "supersede[s] the normal choice-of-law rules that the forum would apply"); *Wooten v. Pumpkin Air, Inc.*, 869 F.2d 848, 852 (5th Cir. 1989) (rejecting the *renvoi* argument that Section 1333 adopts the choice-of-law rules of the state adjacent to an OCSLA situs). Even if Plaintiffs alleged they were exposed or injured in state territorial waters (they have not), they could not avoid Section 1333(a)'s choice-of-law rules, which apply "coextensively" with Section 1349, *EP Operating*, 26 F.3d at 569 & n.14, and are in place because Congress intended to have federal law govern all cases involving "activities" occurring on the OCS. *See* H.R. REP.NO. 95-590, at 128 (1977), *reprinted in* 1978 U.S.C.C.A.N. 1450, 1534.[15]  Dril-Quip

---

[15]The House Report states: "Section 203—Laws Applicable to Outer Continental Shelf[:] . . . It is thus made clear that Federal Law is to be applicable to *all activities* on all devices in contact with the seabed for exploration, development, and production.  The Committee intends that Federal Law is, therefore, to be applicable to *activities* on drilling ships, semi-submersible drilling rigs, and other watercraft, when they are connected to the seabed by drillstring, pipes, or other appurtenances, on the

is aware of no case under Section 1349 where a court used choice-of-law rules other than those Congress prescribed in Section 1333.

OCSLA's rule is straightforward: "Federal law is 'exclusive' in its regulation of this area, and [therefore] state law is adopted only as surrogate federal law," *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 357 (1969), and "then only when no inconsistent federal law applied." *Id.* at 358. According to Section 1333(a), then, the substance of the adjacent state's law may apply (as "surrogate federal law") in an OCSLA case, but only if: (a) the controversy arises on a situs covered by OCSLA; (b) substantive maritime law does not apply of its own force; and (c) state law is not inconsistent with federal law. *Union Texas Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990); *see Demette v. Falcon Drilling Co.*, 280 F.3d 492, 499 (5th Cir. 2002), *overruled in part on other grounds by Grand Isle Shipyard Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 782–83 (5th Cir. 2009) ("Since the incident occurred on the OCS beyond the territorial waters of Louisiana, the only way state law could have operated was by incorporation into federal law under OCSLA").[16] Otherwise, federal law, not supplemented by state law, is all that applies. Because Plaintiffs' claims are all governed by either maritime law or some other federal law (like OPA), Plaintiffs cannot state a cause of action under state law.

### 2.      Plaintiffs' Florida Pollutant Discharge Prevention and Control Act Claim

---

OCS for exploration, development, or production purposes."   H.R. REP.NO. 95-590, at 128, 1978 U.S.C.C.A.N. at 1534 (emphasis added).

[12] *Grand Isle* holds that, for tort actions under OCSLA, the situs of a claim is the location where the controversy arises. *See Grand Isle*, 598 F.3d at 784. For contract actions, the situs of a claim is the location where the majority of work under the contract is to be performed. *Id.* at 787. In so holding, the Fifth Circuit overruled prior decisions (like *Demette*) insofar as they applied the tort situs analysis to contract claims. However, *Demette*'s other holdings remain good law. *Id.*

**Must Be Dismissed.**

As Plaintiffs' FPDPCA allegations in Count III. E. essentially replicate their OPA allegations in Count II, Plaintiffs cannot contest that OPA provides relief essentially identical to that which they seek under the FPDPCA. In both Counts, Plaintiffs seek to recover for "damage to their real and/or personal property as a result of the explosion and spill . . . ." Mast. Compl. C ¶¶ 581, 637. The statutory causes of action track each other closely. *Compare* FLA.STAT. §§ 376.205, 376.121 (2010), *with* 33 U.S.C. §§ 2702(a), (b)(2). Because OPA is directly on point, it applies exclusively to Plaintiffs' property damage claims for two reasons: first, because OPA leaves no gaps to be filled through the OCSLA choice-of-law rules in Section 1333(a); second, because the comprehensive federal scheme for regulating activity on the OCS, including pollution flowing from the OCS, preempts the law of affected states.[17]

> **a.    OCSLA requires the exclusive application of OPA to claims for property damages and economic losses arising from oil spills originating on the OCS.**

OPA governs economic loss claims in oil-pollution cases governed by federal or maritime law. *See Gabarick v. Laurin Mar. (Am.) Inc.*, 623 F. Supp. 2d 741, 750–51 (E.D. La. 2009) (general maritime law claims are displaced by OPA); *Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001) (OPA "includes new remedies, which . . . preempt traditional maritime remedies"). It leaves no gaps that OCSLA could use state law to fill.

---

[17]In their FPDPCA claim, Plaintiffs allege only that BP, Transocean, Anadarko and MOEX are "responsible parties" and that therefore [they] are liable under the Florida Act for all damages resulting from the Oil Spill. Mast. Compl. C ¶ 634. With respect to Dril-Quip, Plaintiffs merely lump it together with other Defendants in the conclusory allegation that "Defendants had a statutory duty to Plaintiffs to maintain and operate the Deepwater Horizon and the Macondo well, and/or to conduct post-Oil Spill remedial efforts so as to not create or sustain hazardous conditions due to the discharge of pollutants." *Id.* ¶ 628. Thus, even if Florida law applies, which it does not, Plaintiffs fail to plead an essential element of an FPDPCA claim against Dril-Quip.

OPA's savings clause does not rescue Plaintiffs' FPDPCA claim from dismissal.  Unlike cases involving oil spills in state territorial waters, in which Plaintiffs can plead one as an alternative remedy to the other, OPA and the FPDPCA are not mere alternatives in this case. Under the choice-of-law rules in OCSLA's Section 1333(a), it is *only* OPA—neither the FPDPCA applying of its own force nor the FPDPCA applying as surrogate federal law—that provides the substantive rules of decision for claims arising out of oil spills originating from operations on the OCS. Because it is OCSLA—not OPA—that precludes applying state law, OPA's savings clause, which limits only the preemptive effect of OPA itself, does not allow state law to be applied in this case. *See* 33 U.S.C. § 2718; *cf. Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 223–27 (1986) (holding that the savings clause in the Death on the High Seas Act does "not implicitly sanction the operation of state wrongful death statutes on the high seas," where states have no power, but only "preserve[s] the state courts' jurisdiction to provide wrongful death remedies under state law for fatalities *on territorial waters*") (emphasis added); *Ten Taxpayer Citizens Group v. Cape Wind Assocs.*, 373 F.3d 183, 193–97 (1st Cir. 2004) (rejecting the argument that a federal statute recognizing state power over specific activities overrides OCSLA's displacement of state law on the OCS).[18]

### b.   Federal law preempts the Florida statute here.

---

[18]When enacting OPA, Congress foresaw this very result.  Senators Chaffee, Lieberman, Graham, and Durenberger objected that an early draft of OPA was ill-suited to OCS oil spills because it capped liability for clean-up costs.  S. REP.NO. 101-94, at 26 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722, 748. In a statement on the bill, which had a savings clause like that which was enacted into law, the Senators noted that states lacked authority to impose additional liability above the cap because OCS facilities "are outside the 3 mile limit, and therefore are not subject to state laws."  *Id.* at 27, 1990 U.S.C.C.A.N. at 749. Congress resolved the Senators' objection by eliminating the OPA cap on clean-up liability, not by giving states authority to impose additional liability with respect to OCS oil spills.

Even if OCSLA did not require exclusive application of federal law to this case, the combined effect of OPA and OCSLA preempts application of the FPDPCA.  Precedents holding that federal law preempts application of an affected state's law to interstate *water pollution* originating from non-OCS sources require the similar conclusion that federal law preempts an affected state's law to *oil spills* originating from OCS sources.

"[R]egulation of interstate water pollution is a matter of federal, not state, law . . . ." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 488 (1987) (citations omitted).  Since Congress's enactment of extensive legislation in the area (through, for instance, the Clean Water Act), federal statutes have displaced the *ad hoc* federal common law remedy that previously supplied the substantive rules of decision. *See City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981). With federal statutory law firmly in place, "it is clear that the only state suits that remain available are those specifically preserved by" the new federal statutes. *Ouellette*, 479 U.S. at 492.

In *Ouellette*, the Supreme Court held that the Clean Water Act, in light of its text, purposes, and history, and *notwithstanding its savings clause*, does not "preserve the right to bring suit under the law of any affected State." *Id.* at 493. Applying the law of an affected state to pollution originating in another state would seriously undermine, and stand as an obstacle to the full implementation of, the methods by which the Clean Water Act regulates interstate water pollution. *Id.* at 494–97 (explaining how applying an affected state's law would circumvent the Act, which gives regulatory authority only to EPA and source states and which defines a narrow role for affected states). Because of those federal-state conflicts, together with the likelihood of state-state conflicts, the Court ultimately held that the Act's savings clause preserves only claims brought under the law of a source state. *Id.* at 497–500; *see id.* at 495 ("An interpretation of the

saving clause that preserved actions brought under an affected State's law would disrupt this balance of interests").[19]

That reasoning also requires that OPA's savings clause be interpreted to foreclose application of the FPDPCA in this case. Applying the FPDPCA to an oil spill originating on the OCS would frustrate Congress's methods for regulating OCS operations and would lead to problems of conflicting multistate regulation.   Through OCSLA and the Coastal Zone Management Act ("CZMA"), 16 U.S.C. §§ 1451–1464, the federal government extensively regulates exploration and drilling operations on the OCS for their potential environmental impacts.  *See Mobil Oil Exploration & Producing SE, Inc. v. United States*, 530 U.S. 604, 609–10 (2000) (summarizing the four pillars of the comprehensive regime).   Just as in *Ouellette*, applying the law of an affected state to discharges from OCS operations would circumvent this careful scheme, which specifically assigns a largely advisory role to affected states: "The inevitable result of" applying an affected state's law "would be that . . . States could do indirectly what they could not do directly—regulate the conduct of" OCS operations. *Ouellette*, 479 U.S. at 495. Applying the law of an affected state also would "undermine the important goals of efficiency and predictability," for "application of numerous States' laws would only exacerbate the vagueness and resulting uncertainty." *Id.* at 496. Also, as in *Ouellette*, the savings clauses in the relevant federal statutes (*e.g.*, 16 U.S.C. § 1456(e) (CZMA); 33 U.S.C. § 2718 (OPA); 43 U.S.C. § 1349(a)(6) (OCSLA)) do not obviate resort to ordinary conflict preemption principles. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869–74 (2000) (citing *Ouellette*, 479 U.S.); *cf.*

---

[19]The Clean Water Act's preservation of source state law is inapplicable here because Plaintiffs have pleaded that the oil that harmed them was discharged not from a state, but from a federal enclave on the OCS. Mast. Compl. C ¶ 229 at 23.

*Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 230 (1986) ("[I]t is hardly conceivable that Congress," through a mere savings clause, "could have intended that these diverse state statutes could be applied to remedy maritime torts occurring the world over").

*Askew v. Am. Waterways Operators, Inc*., 411 U.S. 325 (1973), does not require a contrary result. There, considering a limited preemption question, the Supreme Court upheld an earlier and more limited version of the FPDPCA, which by its own terms applied only to oil pollution discharged in State territorial waters. *Id.* at 327–38. The Court held that there was "no collision" between the FPDPCA and the federal Water Quality Improvement Act (earlier legislation on which the Clean Water Act expanded) because that federal Act was "concerned only with actual cleanup costs incurred by the Federal Government" as a result of an oil spill, and did not address the clean-up costs or other costs incurred by States for damages resulting from injury to their citizens and natural resources. *Id.* at 333–34, 335–36. The Court also held that federal maritime law did not prohibit Florida from so legislating. *Id.* at 337–44. The Court reserved the question of whether the FPDPCA unconstitutionally "conflict[ed] with any federal Act." *Id.* at 343.

Because the then-extant FPDPCA expressly applied only to discharges within Florida territorial waters, the *Askew* Court did not consider whether any federal statute preempted the application of the FPDPCA to *interstate* oil spills or to oil spills resulting from operations on the OCS, which are the circumstances alleged here.  With the passage of the Clean Water Act and OPA, Congress broadly expanded federal regulation of interstate oil pollution to areas conflicting with the FPDPCA, including clean-up costs and other costs incurred by States for damages to their citizens and natural resources.  Furthermore, OCSLA governs all operations on

the OCS to the exclusion of state law and applies to oil spills and other environmental harms resulting from those operations. The Clean Water Act, OCSLA, and OPA were not at issue in *Askew*; they are what now preempts the substantive laws of states affected by oil spills originating on the OCS, including the FPDPCA.

**D.     Even If State Law Could Apply to Plaintiffs' State Law Claims as Asserted, Those Claims Must Be Dismissed.**

   **1.     Plaintiffs Fail to State a Claim For Nuisance.**

Plaintiffs allege that Drilling Defendants and Product Defendants, as a result of their negligent conduct on the rig, created both a public and private nuisance.  Compl. ¶¶ 586-606. Louisiana law recognizes a distinction between a public nuisance, which "annoys the public generally or invades its rights," and a private nuisance, in which "an individual, or class of individuals, sustains as such, a special injury as distinguished from the sustained by the public." *State ex rel. Dema Realty Co. v. McDonald*, 121 So. 613, 615 (La. 1929).  As a practical matter, however, the elements of the two causes of action are the same.  *Id.*  ("[T]here is no difference in principle between a condition which is called a private, and one which is called a public, nuisance; the constituents of both being the same."), *see also Sadler v. Int'l Paper Co.*, No. 09-cv-1254, 2010 WL 5125505, at *6 (W.D. La. Sept. 29, 2010), *modified on other grounds*, 2010 WL 5125502 (W.D. La. Dec. 9, 2010) ("the elements of both nuisance theories [are] identical"). Plaintiffs' allegations under both nuisance counts are also materially identical.

Under Louisiana law, only a "neighbor" can bring a suit for nuisance.  LA. CIV. CODE ANN. art. 667.  By Plaintiffs' own admission, Dril-Quip and the *Deepwater Horizon* were at least 48 miles aware from the closest Bundle C plaintiff.  Compl. ¶ 229.  This is insufficient to

permit recovery for nuisance under Louisiana law.   In *In re Katrina Canal Breaches Consolidated Litigation*, this Court, applying Louisiana law, held that a distance of three miles between the plaintiffs and defendants was "too attenuated" to support a claim for nuisance.  647 F. Supp. 2d 644, 734 (E.D. La. 2009).  Because a distance of three miles from the alleged source of the nuisance is too great to support relief for nuisance, this Court can hold as a matter of law that Dril-Quip – located at least 48 miles from any Plaintiff – cannot be liable for either public or private nuisance under Louisiana law.  *See TS & C Invs. LLC v. Beusa Energy Inc*., 344 F. App'x 907, 908-09 (5th Cir. 2009) (affirming dismissal of a Louisiana nuisance claim on the grounds that the plaintiffs were 20 miles away from the defendant oil producer).

Moreover, the Texas nuisance statute cited by Plaintiffs, Tex. Civ. Prac. & Rem. Code § 135.002, grants only the right to abate those "common nuisances," most of which pertain to criminal vice, set forth in § 125.0015.  Suits to abate public nuisances may be brought by persons like Plaintiffs, *see id*. at § 125.064, but the statute limits "public nuisance" to criminal gang activity and the places such gangs congregate.  *See id*. at §§ 125.062-063.  Thus, Texas statutory nuisance law does not apply to this case.

### 2.    Plaintiffs Fail to State A Claim for Trespass.

Plaintiffs next allege that Drilling Defendants and Product Defendants discharged oil knowing that it would "invade" their property and allow contaminants and noxious odors to migrate onto Plaintiffs' property.  Compl. ¶¶ 601-06.  Plaintiffs allege further that those defendants engaged in this behavior "outrageous[ly] and malicious[ly]" with "willful, reckless and wanton" disregard for their rights.  *Id*. 606.  Plaintiffs seek compensatory and punitive damages.  However, any Plaintiffs who were not the owners of real property that was "invaded" by oil have failed to allege a cognizable claim for trespass under Louisiana law.

In Louisiana, "[a] trespass occurs when there is an unlawful physical invasion of the property or possession of another." *Bourquard v. L.O. Ausauma Enters., Inc*., 52 So. 3d 248, 251 (La. Ct. App. 2010) (internal quotation omitted).[20]   Thus, any Plaintiff not suffering an actual physical invasion of their property has not pleaded a cognizable trespass claim.  Moreover, only property owners may recover for trespass in Louisiana.  *See, e.g., LaRue v. Crown Zellerbach Corp.*, 512 So. 862, 863 (La. Ct. App. 1987).  Thus, the only Plaintiffs who could even potentially recover for trespass are those that own property upon which oil was present.  To the extent the Plaintiffs bring a trespass claim regarding property they do not own or upon which oil did not invade, the Complaint should be dismissed.

Further, some Gulf states only recognize civil trespass where intent is present.  *See, e.g., An Attorney v. Mississippi State Bar Ass'n.*, 481 So. 2d 297, 299 (Miss. 1985).  Plaintiffs do not allege any intentional conduct that would be ascribed to Dril-Quip.  Moreover, even those states that do not require intent speak in terms of causing or permitting a thing to cross the boundaries of the premises.  *See, e.g., Watson v. Brazos Elec. Pwr. Co-Oop, Inc.,* 918 S.W.2d 639, 646 (Tex. App. – Waco 1996, writ denied).  As previously noted, see Section III.A. 1. & 2., *supra*, at 9-13, without some control over operations on *Deepwater Horizon*, it is impossible for Dril-Quip to have "caused or permitted" the alleged encroachment.  Accordingly, Plaintiffs trespass claims must fail.

### 3.       Plaintiffs Fail to Plead Valid Claims Under State Oil Pollution Statutes.

---

[20] This is the case in each of the Gulf Coast states.  *See Donald v. Amoco Prod. Co*., 735 So. 2d 161, 169 (Miss. 1999); *Borland v. Sanders Lead Co*., 369 So. 2d 523, 527 (Ala. 1979); *Petroleum Prods. Corp. v. Clark,* 248 So. 2d 196, 198-99 (Fla. Dist. Ct. App. 1971); *City of Arlington v. City of Fort Worth*, 873 S.W.2d 765, 769 (Tex. App. – Fort Worth 1994) (citing *Gregg v. Delhi-Taylor Oil Corp*., 344 S.W.2d 411, 416 (Tex. 1961)).  Thus, to the extent that these states' trespass laws could apply, the claims of all non-property owners must be dismissed as well.

Plaintiffs also assert claims under Florida, Louisiana and Texas statutes that are state analogues to the federal OPA.  Even if federal statutes do not preempt state law, Plaintiffs fail to properly plead a claim under these statutes.

### a.      Plaintiffs Fail to Plead a Valid Claim Under PDCPA.

Even if Florida law is not preempted by OCSLA and the CWA, Plaintiffs' Florida Pollutant Discharge Prevention And Control Act (PDPCA) claim (Count III.D) would still lack merit. Plaintiffs' PDPCA claim is based upon alleged damages from the flow of pollution into Florida's territory. Plaintiffs admit that "[t]he immediate discharge from the Spill occurred into waters *outside* the territorial limits of Florida," but maintain that "lands and waters within the territorial limits of Florida have been directly affected by the discharge and are reasonably expected to continue to be so affected." (C Compl., ¶641 (emphasis added).) This indirect effect is insufficient to ground the claim on the Florida PDPCA.

*First,* the *Deepwater Horizon situs* lies far outside Florida's territorial waters and is not subject to the State's jurisdiction.   *United States* v. *Florida,* 425 U.S. 791, 792 (1976) (per curiam); *United States* v. *Louisiana,* 363 U.S. 121, 129 (1960). The United States, not Florida, holds jurisdiction over the MC252 *situs.*

*Second,* applying the PDPCA to an incident outside of Florida's territorial waters would be an unconstitutional extraterritorial application of state law to regulate interstate commerce. Interstate commerce, including the discovery, production, and transportation of oil in federal waters, is governed by Congress. *See* U.S. Const. art. I, § 8, cI. 3. "[T]he Commerce Clause ... precludes the application of a state statute to commerce that takes place wholly outside of the state's borders, whether or not the commerce has effects within the state." *Healy* v. *Beer Inst.,*

28

*Inc.,* 491 U.S. 324, 336 (1989).  The PDPCA is intended to regulate "[t]he transfer of pollutants between vessels, ... between offshore facilities and vessels" because it "is a hazardous undertaking," Fla. Stat. § 376.021 (3)(a) (expressing legislative intent), and uses the state's police power to empower the state Department of Environmental Protection to "[ d]eal with the hazards and threats of danger." *Id.* § 376.021(4)(a).   By contrast, Plaintiffs admit the Macondo well is located and the discharge occurred "outside the territorial limits of Florida" but attempt to invoke Florida law on the basis of effects within Florida's boundaries. (Bl Compl., ¶742) Applying the PDPCA in this manner would have the practical effect of regulating commerce outside Florida because it would permit the regulation of and imposition of liability for pollution taking place wholly outside the state's waters. This "practical effect" violates the Commerce Clause. *Healy,* 491 U.S. at 336.[21]

*Third,* by its own terms, the PDPCA does not apply.  A responsible party is "liable to any affected person for all damages as defined in s. 376.031." Fla. Stat. § 376.12(5). In turn, "damages" are defined as "the documented extent of any destruction to or loss of any real or personal property ... *as the direct result of the discharge* of a pollutant." *Id.* § 376.031(5) (emphasis added). Plaintiffs themselves recognize that their damages must be limited only to damages that occur as a direct result of the discharge. *(See* C Compl. , ¶ 637.) But the only allegation concerning that damage states that "Florida Subclass Members are entitled to damages for the destruction to or loss of any real or personal property" (Bl Compl. ¶ 639) (emphasis

---

[21]If the Court holds that OCSLA and/or *Ouellette* preemption bar Plaintiffs' PDPCA claim, it is unnecessary to reach the issue of whether Plaintiffs' application of the PDPCA would violate the Commerce Clause. "The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." *Ashwander v. TVA,* 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) (quoted in *United States v. Underwood,* 597 F.3d 661,665 (5th Cir. 2010)).

added), without tying the loss to the discharge itself.  This is insufficient.  Under the parallel OPA statute, a claimant cannot recover unless the property damage is a direct result of the discharge. *In re Taira Lynn,* 444 F.3d at 380.[31]  Applying the Florida PDPCA would require this Court to "go beyond the first step" of the chain of causation. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 534 (1983).  Whether or not Plaintiffs have a separate cause of action for alleged damage from the cleanup, it is not the proper subject of Florida's PDPCA. By its terms, the PDPCA only remedies damage arising as the direct result of a discharge; the damage Plaintiffs claim is too attenuated to be remediable.

Moreover, as noted above, only "responsible parties" as defined by the FPDCA are liable to injured parties for damages.  Fla. Stat. Ann. §376.125.  The FPDCA limits "responsible parties" to parties that own, lease, or operate drilling or transport vessels, facilities, or pipelines. Fla. Stat. Ann. §376.031(20).  The Complaint does not allege that Dril-Quip owned, leased, or operated a drilling vessel, facility, or pipeline.  The Court should therefore dismiss Plaintiff's FPDCA claim.

**b.       Plaintiffs Fail to Plead A Claim Under LOSPRA.**

The Louisiana subclass asserts a claim under the Louisiana Oil Spill Prevention and Response Act, Lᴀ. R.S. 30:2451, *et seq.* ("LOSPRA").  Compl. ¶¶ 643-50.  Because Plaintiffs lack standing and their claims are not ripe, they may not recover under LOSPRA.

LOSPRA creates a state fund that can be used to pay for damages caused by an oil spill. *See* § 2483.  If a political subdivision of Louisiana wishes to obtain recovery for its oil spill-related damages from the fund, it must comply with the statute's procedures.  *See* § 2484(9) (If a "political subdivision seek[s] an appropriation from the fund [it] must notify the coordinator in writing before submitting the appropriation request to the legislature.").  It is only the state-wide

Coordinator who – after the fund has paid money – is granted power by LOSPRA to pursue reimbursement from the responsible persons.  § 2489(B).  LOSPRA does not create a cause of action for anyone except the Coordinator.

Even if local government entities had filed a claim with the fund, their claims are not ripe.  LOSPRA provides that the fund may be tapped *only after* federal remedies are exhausted.  Damages may be awarded "provided that such are not recoverable under the federal Oil Pollution Act of 1990 . . . and the claimant has exhausted all federal remedies."  *Id.* § 2488(C) (footnote omitted).  Here, no local government entity alleges that it has exhausted its federal remedies under OPA.

In addition, even if local government entities had filed a claim with the state fund, and even if they had exhausted all other federal remedies, no recovery is available for lost taxes or damages to natural resources, which may be recovered only by the State of Louisiana, not political subdivisions.  *See* § 2454(5)(a), (c).  Because the State of Louisiana has not joined the Complaint, Plaintiffs cannot recover the lost tax revenue and natural resources damages they seek under LOSPRA.

> **c.**    **Plaintiffs Fail to Plead A Claim Under TOSPRA.**

The Texas subclass asserts a claim under the Texas Oil Spill Prevention and Response Act of 1991, TEX. NAT. RES. CODE ANN. § 40.001, *et. seq.* ("TOSPRA"). Compl. ¶¶ 651-59.

But TOSPRA does not apply to the Deepwater Horizon oil spill.  First, TOSPRA governs only discharges of oil from vessels and discharges of oil from terminal facilities.  TEX. NAT. RES. CODE ANN. § 40.202(a-b).  The C complaint does not allege either type of discharge.

Further, TOSPRA defines a "[d]ischarge of oil" as an "intentional or unintentional act or omission by which harmful quantities of oil are spilled, leaked, pumped, emitted, or dumped *into*

31

*or on coastal waters or at a place adjacent to coastal waters where*, unless controlled or removed, an imminent threat of pollution to coastal waters exists." *Id.* § 40.003(8) (emphasis added); *see also* Michael P. Donaldson, *The Texas Response to Oil Pollution: Which Law to Apply*, 25 ST. MARY'S L.J. 533, 579 (1994) ("The reach of TOSPRA against responsible parties extends only to the coastal waters of Texas.").  The Deepwater Horizon oil spill occurred far outside Texas coastal waters, and it was not "adjacent" to the coastal waters nearest point. Indeed, as explained above, the location of the *Deepwater Horizon* is "adjacent" to Louisiana, not Texas.

But even if TOSPRA applied to the *Deepwater Horizon* oil spill, the statute creates a cause of action only for the State of Texas itself (brought on its behalf by the Texas attorney general), not for local municipalities within Texas.  *See* TEX. NAT. RES. CODE ANN. § 40.255(b). Except for the State of Texas, TOSPRA claimant obtains compensation through an administrative scheme, by filing a claim with the designated responsible party, filing a claim with the federal oil spill fund, and filing a claim with the Texas oil spill fund.  *See id.* § 40.159. Then, if the state fund has to pay for damages, the state fund may pursue a cause of action against the responsible party to reimburse the payment it made.  *Id.* § 40.255(b).  Under TOSPRA, municipalities have administrative remedies, but only the State of Texas can sue.

## IV.
## CONCLUSION

For the foregoing reasons, the claims in Bundle C to which Dril-Quip has been in issue with by virtue of the Limitation Petitioners' Third-Party Complaint should be dismissed in their entirety.

Date:   May 20, 2011

Respectfully submitted,

**WARE, JACKSON, LEE & CHAMBERS, LLP**


BY:  _/s/ C. Dennis Barrow, Jr._____
       Don Jackson
       Texas Bar No. 10476000
       Fed ID No. 6915
       C. Dennis Barrow, Jr.
       Texas Bar No. 00796169
       Fed ID No. 20624
       2929 Allen Parkway, 42nd Floor
       Houston, TX 77019
       Phone :  (713) 659-6400
       Fax    :  (713) 659-6262
       Counsel for Defendant, Dril-Quip, Inc.


## CERTIFICATE OF SERVICE

I certify that the above and foregoing document will be served on all counsel by electronically uploading the same to LexisNexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 20th day of May, 2011.


       /s/ C. Dennis Barrow, Jr._____
       C. Dennis Barrow, Jr.