# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois  60654

| Andrew Langan | | |
|---|---|---|
| To Call Writer Directly: | (312) 862-2000 | Facsimile: |
| (312) 862-2064 | | (312) 862-2200 |
| andrew.langan@kirkland.com | www.kirkland.com | |

May 12, 2011

**VIA E-MAIL**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court
500 Poydras Street, Room B345
New Orleans, LA 70130

> Re:   In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010, MDL No. 2179

Dear Judge Shushan:

The parties have made great progress in producing documents and resolving document-related discovery issues.   We write in response to the PSC's May 11 submission and to address two related issues that have not been resolved:

- The PSC does not have adequate knowledge of what BP has produced.  This has resulted in the PSC making repeated requests to BP for documents and claiming non-production, when in fact BP has produced the documents the PSC has asked about long ago.  A wild goose chase at the behest of the PSC happened this week; another last week; and similar events have happened repeatedly over the past 4+ months.  *See* Part I, *infra*.

- Because the PSC does not have an acceptable knowledge base about what BP has produced, and does not appreciate the role of search terms in the production process, the PSC has also erroneously asserted in its May 11 submission that BP has produced certain documents "late."  While certain rolling productions are inevitable in litigation conducted at the pace of MDL 2179, the PSC's inflated "late documents" analysis is far from accurate.  *See* Part II, *infra*.

The PSC's May 11 analysis of documents that BP has allegedly produced "late" is both out-of-context and highly flawed.  For context, from the PSC alone, BP has responded to 364 Requests for Production, 59 Interrogatories, and 221 Requests for Admission, so far.  Under the parameters established by the Court for discovery leading to an early trial, the PSC has asked that BP produce within a time frame of months what would ordinarily take years, and during the same time that scores of depositions are occurring.  To date, BP has produced 2,045,216 pages of documents, in addition to extensive quantities of data produced natively.  In its production, BP

Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco      Shanghai      Washington, D.C.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 2

has so far produced custodial files for 32 witnesses, more than all of the other parties combined. For custodial deposition productions alone, BP has produced approximately 140,000 documents and over one million pages. This is more than three times the volume of any other party.

**DOCUMENTS PRODUCED FOR DEPOSITION CUSTODIANS ALONE**



As the Court knows, this litigation could have followed the pattern of many other large cases, including other MDLs, and had the parties substantially complete document production before depositions were started. For reasons that BP understands and respects, this Court instead called for an expedited schedule and rolling document productions while launching multi-track depositions at a breakneck pace. Given these ground rules, and given the simultaneous production of witnesses and documents in this case, some production of documents after depositions is inevitable. And even if the PSC's analysis were correct (it is not), the "late" documents would equal a tiny fraction of the documents that BP has produced overall.



## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 3

      As the PSC has recently declared, "from the PSC's perspective, BP is the 'target defendant' and everybody knows it." (5/11/11 Herman letter to Hon. S. Shushan) The PSC has not filed a discovery motion, nor written a discovery letter, targeting any party other than BP. Thus, it is unsurprising that the PSC focuses on alleged "late" documents from BP, while ignoring the comparatively greater percentages of "late" documents by other parties. Using the PSC's flawed methodology, Halliburton has produced 20% percent of its documents late,[1] and Transocean has produced 5% percent of its custodial documents late.[2] Even taking all of the PSC's flawed assertions as true, the percentage of "late" documents produced by BP is lower than Halliburton or Transocean.

      This is no easy business. But the parties and the Court have moved mountains, and the PSC is complaining about specks of dust on one mountain.

      In any event, the PSC's May 11 analysis of BP's "late" documents is fundamentally flawed. The parties' differing positions boil down mainly to the role of search terms, including the PSC's contention in their May 11 submission that "BP's custodial productions should in no way be limited to 'custodian specific search terms.'" To be sure, BP has produced hundreds of thousands of documents not responsive to search terms.[3] But the PSC's position that search drives are not the driver of BP's custodial production process is flatly contradicted by the voluminous record of search term discussions—including at the February 18 hearing where the parties and the Court discussed these issues in detail.

---

[1] For example, for Richard Vargo, Halliburton's 30(b)(6) witness on numerous subjects, the parties received 387 documents received on 3/30/2011, the first day of the deposition. For John Gisclair, the parties received 4,235 documents received on 3/8/2011, six days before the deposition. For Nathaniel Chaisson, the parties received 93 documents on 3/15/2011, the night before the deposition. This production included internal Halliburton communications about the Macondo Well production interval and numerous Opticem Reports in a non-viewable ".adi" file format. For Tim Quirk, the parties received 11 documents and 7 lab files received on 3/20/2011, the night before the deposition. The production included a never-before-seen set of foam stability tests. BP raises these examples not just in an effort to fault Halliburton, but to note that such events are expected in fast moving litigation and to provide perspective.

[2] Ironically, the PSC has produced more "late" documents than any other entity. The PSC was ordered to produce documents in one instance only, in connection with Texas City. On February 25, the PSC was ordered to produce those Texas City documents by March 7. *See* Pre-Trial Order No. 29. In fact, no documents were produced until April 29, 52 days after the deadline.

[3] BP produced over 500,000 pages of documents, and large volumes of data in native format, before search terms were formulated and run.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 4

Beginning in November 2010, the parties carefully negotiated search criteria on a custodian-by-custodian and request-by-request basis. The negotiated search criteria chart—clearly setting forth which search terms and date ranges should be paired with which custodians—was submitted to the Court and the parties on February 16. As discussed below, at the February 18 conference, the parties and the Court discussed that this chart would drive the custodial deposition process, including that certain search terms would be used for certain witnesses' deponent productions. The PSC's position on search terms—expressed in its May 11 letter but not advanced by the PSC at the February 18 conference—comes many months after these issues were thoroughly vetted in this Court.

A revised version of the search term chart—also showing custodians paired with search terms—was submitted to the PSC on March 29, 2011. This chart made plain which searches would be run, and which would not, against the deponents' custodial files. Since BP sent that version of the search criteria, the PSC has not made a single suggested addition or correction; the PSC has not asked that any deponent needed to be added to any of the 60+ searches or that any of the searches needed adjustments in date ranges or search terms.

For the above reasons, discussed in more detail below, BP urges that there is no justification at this late date for fundamentally reworking the existing search term process, which was the product of many months of labor and hearings before this Court, and which has worked successfully in allowing over 30 BP depositions to proceed.

**I.     The PSC Repeatedly Requests from BP Documents That Have Already Been Produced.**

The PSC has repeatedly made complaints about documents allegedly "missing" from BP's production. With each complaint, the PSC has been wrong. Three specific examples-addressing five different categories of documents-follow:

**Example 1.** In an e-mail dated January 21, 2011, entitled BP "**responsive documents missing from production**," the PSC incorrectly claimed that various categories of documents had not been produced. These included the following:

- **BP's Well Control Manual** which was produced in July 2010, over six months before the PSC's e-mail incorrectly asserting that it was "missing." (Ex. 1, 1/24/11 Kavanaugh e-mail to Large)

- **BP's Drilling and Well Operations Policy (BPA-D-001)** which was produced on January 10, 2011, over a week before the PSC's e-mail incorrectly asserted that it was "missing." *Id.*

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 5

Having tracked the documents the PSC incorrectly claimed to be "missing," BP asked the PSC two questions:

- Would you please let us know what steps plaintiffs are taking to check for documents already in plaintiffs' possession before asking BP about them? (The time it takes BP to run down these issues is time that could also be spent producing new documents to the PSC.)

- Have plaintiffs actually reviewed all the documents in BP's production? *Id.*

The PSC has never adequately answered these questions. Instead, the PSC has continued to request that BP find documents that BP had produced long ago.

**Example 2.** The same pattern was repeated in advance of Mr. Bellow's deposition in late April. On April 27, the PSC asserted that it could not "find" documents that BP has produced in November 2010:

- **BP Pore Pressure Fracture Gradient ("PPFG") Reports.** The PSC indicated on April 27, 2010 that it could "find only 12" PPFG Reports. Upon investigation, BP found that it had produced 21 PPFG reports to the PSC on November 15, 2010, over five months before the PSC's e-mail. The PSC could have found these documents just as easily.

- **BP Daily Geology Reports**. The PSC also claimed that it could find "fewer than 12" Daily Geology Reports produced by BP. In fact, BP had produced 74 Daily Geology Reports, again on November 15, 2010.

That same day, BP explained that these documents had been produced long ago: "All the daily PPFG Reports for the MC 252#1 Macondo well and all the Daily Geological Reports for the MC #252 Macondo well were produced to the PSC on November 15, 2010 in the MDL 2179 litigation in response to Plaintiffs' Omnibus Discovery Requests on All Defendants." (Ex. 2, 4/27/11 Langan e-mail to Sterbcow)

**Example 3.** On May 9, 2011, the PSC wrote to BP: "Guide testified that the MoC all have attachments such as tests, power points, etc. We may have both the MoC and the attachments *but they were not produced as one and we have no way of knowing what docs were attached to a given MoC*." This assertion was incorrect. The MoC discussed at Mr. Guide's deposition was dated April 15, 2010. BP produced the April 15, 2010 MoC, with attachments, on November 15, 2010. (Ex. 3, 5/10/11 Langan e-mail to Sterbcow) Although BP

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 6

tracked down this information at the PSC's request, the PSC could have (and should have) located it just as easily.

These three examples covering five separate sets of documents—which are not exhaustive—illustrate a recurring phenomenon. It is easy for any party to rattle off a document request, whether in an e-mail or in a request for production. But no responding party should be forced to search for documents that have already been produced where the requesting party could do the work just as easily, particularly where the requesting party cannot show that it has been diligent in determining whether it already has received the documents.

The PSC's wild goose chases have resulted in BP repeatedly having to track down for the PSC documents that BP has already produced long ago, distracting resources from the many other important tasks BP counsel needs to address in these proceedings.

This problem has now persisted for over four months. As a remedy, BP respectfully requests that, in the event of future document requests by the PSC (whether by e-mail or by formal RFP), the PSC be required to certify simply that it has reviewed BP's existing production, and that it has determined that BP has not produced the requested documents. This certification would not be onerous, but it would make the discovery process much more efficient.

### II.     The PSC's "Late Documents" Analysis Is Fundamentally Flawed

The Court has correctly pointed out that it is challenging for the parties to produce witnesses and documents simultaneously. And, as BP has explained herein and in prior submissions and in conferences with the Court, it is inevitable that custodial documents will be produced after witnesses' depositions. This is true for three reasons:

- First, as explained in BP's February 14 e-mail to the Court, BP employs a quality control process to identify any documents that were initially coded as privileged but that BP has determined nonetheless should be produced out of an abundance of caution. BP wants to verify that documents reviewed by its contract attorneys are indeed privileged before such documents are produced with redactions or withheld. The benefits of this process were demonstrated when the Court, upon viewing a random sample of BP's privileged documents *in camera*, observed: "I was very impressed at the surgical redaction of the documents. I didn't find anything that had been redacted that I thought was not privileged, so I was really pleased with that. On the documents that had been withheld, I didn't find any documents that I found were privileged and should have been produced." (Ex. 4, 4/8/11 Tr. at 10:4-11:7) This quality control process resulted in documents being produced after following those quality assurance steps.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 7

- Second, as also explained in BP's February 14 e-mail, BP sometimes encounters technical processing and production complications from time to time that may not be resolved prior to a deposition, including things like password protected and encrypted files. As deponents have been identified further in advance of depositions, BP has been better able to work through these technical nuances in advance.

- Third, as explained in BP's April 21 submission to the Court and herein, documents from a deponents' custodial file may not be responsive to the negotiated search criteria for that custodian, but may be produced in the future for other reasons, including that they are responsive to the global search criteria or the search criteria for a different custodian.[4] See also Order on 4/29/11 Working Group Conference, ECF No. 2253, at 9. Specific examples are discussed below, with respect to Mr. Bodek. This phenomenon will continue as the parties continue to produce documents.

While there are several reasons for production of documents after depositions, BP has sought to accelerate production as much as possible: (i) by adding more attorneys to review the documents initially and to perform quality control; (ii) by moving up the quality control process so that documents moved off the privilege logs can be produced in advance of depositions as much as possible; and (iii) by collecting, reviewing, and producing documents sooner, when deponents are identified with sufficient lead time. All of these measures have been implemented.

**The PSC's May 11 Analysis**

Given the evidence cited above that the PSC does not have command about what documents BP has in fact produced, it is no surprise that the claims of "late documents" similarly lack substance. Indeed, the PSC's May 11 estimates of the documents that BP has produced "late" are grossly misstated as a result of stark flaws in the PSC's analysis discussed below. BP's responses to the PSC's arguments fit into two categories: (A) the PSC's analysis of "late documents" produced for non-Internal Investigation Team (IIT) deponents from March 2011 to the present; and (B) the PSC's analysis of "late documents" produced for IIT deponents in January and February.

---

[4] As explained in BP's April 21 submission, the search criteria negotiations concluded after search criteria needed to first be employed for identify documents for deponent custodial productions. (Ex. 7) As a result, searches for deponent custodial productions have differed from each other over time and differed from the ultimately agreed search criteria because of the following: (1) the PSC modified certain date ranges; (2) the PSC added certain custodians; and (3) there were certain RFPs (e.g., RFPs 19 and 76) for which the PSC did not propose any custodians, meaning BP had to add them.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 8


### A.      Documents Produced in March 2011 and Beyond for Non-Internal Investigation Team Deponents

Since early April, the PSC has been asserting that BP produced certain non-IIT documents "late." In support of this conclusion, the PSC has provided BP with a series of "late" document spreadsheets. As BP has pointed out flaws in the PSC's analysis, the PSC's analysis has shifted. But the most fundamental flaws still persist. The central defect in the PSC's analysis centers on the use of search criteria.

As the Court is aware, BP and the PSC negotiated search terms, date ranges, and custodians for BP's productions. This process lasted from November 8, 2010 (when the Court ordered such negotiations) through well into March 2011. The PSC's initial proposal was not a single set of terms, but rather a different sent of terms for certain of its 300+ Requests for production. During the negotiations, the PSC took the position that the parties were not required to agree on date ranges or custodians. BP respectfully disagreed with the PSC's position, and the issue was extensively briefed and argued before the Court. At the February 18, 2011 conference, the Court agreed with BP's position that the parties should reach agreement on search terms, date ranges, and custodians:

> THE COURT: We had a sort of dispute, but an amicable one, with regard to the provisions of Pretrial Order Number 16 and whether or not we needed to reach agreement on the provisions of Paragraph 13 regarding search terms, date ranges, et cetera. I sort of did anticipate that agreement would be reached, but what I hope to do today is reach agreement, so we'll put that behind us and we'll move forward. (Ex. 5, 2/18/11 Tr. 5:11-18)

With the Court's guidance, the parties proceeded in February and March to complete their negotiations of search terms, date ranges, and custodians. These efforts were successful. Following these negotiations, BP circulated its search criteria list (including date ranges and custodians) to the PSC on March 29, and to defense counsel and government liaison counsel on April 4. No party provided further comments on the negotiated list of search criteria.

### i.      BP and the Court Made Clear At The February 18 Conference And Elsewhere That Search Terms For Each Custodian Would Drive BP's Custodial Deposition Productions.

The PSC now contends—five months into depositions—that custodial productions are not driven by the negotiated search terms. The PSC's position ignores the parties' long history of search term discussions among themselves and with this Court.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 9

BP's position has consistently been that it absolutely necessary to use search criteria to guide its production. It would not be practicable generally, and certainly not possible here given the accelerated pace of discovery, to review every single deponents' document and subjectively make a determination if that document was responsive to any of the PSC's 300+ Requests for Production. As set forth in BP's letter to Your Honor on February 16, 2011, that is precisely why the Sedona Principles state that it is "advisable, if not necessary" to use technological means such as search criteria "when dealing with large amounts of electronic data."

At the February 18 conference and elsewhere, BP and the Court made clear that the search terms for each custodian would drive that custodian's production. Indeed, the Court specifically urged BP to move forward with custodial productions based on Exhibit E to BP's February 16 submission to the Court, which set forth search terms for numerous other BP deponents (Exhibit E to BP's February 16 submission, Exhibit 6 hereto):

> BP's COUNSEL: Understood, Your Honor. And one other comment I would just like to make quickly is, until we reach final agreement, because we are doing ongoing production, we would like to proceed with what is set forth in our Exhibit E.
>
> THE COURT: Please. Not only may you, but please do.
>
> BP's COUNSEL: We will do that, Your Honor. (Ex. 5 37:9-15)
>
> . . .
>
> BP's COUNSEL: We're running a new search. All of the parameters of the search are laid out in our Exhibit E in my letter.
>
> THE COURT: I'm with you. So that's how we're going to proceed. Now, guys, the sooner we can agree to dates and the sooner you all can -- Bill, and the sooner you all can supplement the custodial list, the sooner Mark can get going on this new run.
>
> BP's COUNSEL: Although, Your Honor, again, to be clear, because -- because things are moving, we're going to get started with **Exhibit E now**; and, then to the extent -- you know, **for the depositions that are coming up**. And then, to the extent there are changes, we will modify the process to the extent it's agreed or Your Honor orders. *Id.* 64:2-16

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 10

Counsel for PSC was present at the February 18 hearing and did not argue that the custodial productions for depositions should not be driven by the negotiated search term chart.

As Exhibit E and all of BP's subsequent search term charts (including the one BP provided to the PSC on March 29) make clear, not all search terms were run for all custodians. For example, Mr. Bodek (discussed below as an example for illustrative purposes) is listed as a custodian for the search terms for RFP 14 (relating to scheduling) and many others, but is not listed as a custodian for RFP 22 (relating to estimates of oil flow). As discussed at the February 18 hearing:

> THE COURT: The only thing we need to discuss, then, are the custodial files for the nonevent custodians?
>
> PSC COUNSEL: That's correct, kind of the request-by-request proposal that you see in the [search term] spreadsheet.
>
> THE COURT: Right. So let's talk about, first, the custodial production for the events. Do we think we're proceeding apace, and there is no real problem with getting the **custodial files for those people whose depositions are going to be scheduled**, and a rolling production for those whose depositions aren't going to be scheduled?
>
> BP'S COUNSEL: That's correct, Your Honor. We will prioritize, obviously, the people of the -- the production for the people who are scheduled for deposition. I wouldn't quite say no problem. I mean, it is going to be a challenging process because we have quite a lot going on, and I think Your Honor can appreciate. We will prioritize the deposition folks. In fact, I think that a lot of them are listed as incident custodians. I'd have to check to make sure it's every one, but I think that a lot of the initial depositions are incident custodian folks.
>
> PSC'S COUNSEL: That's correct.
>
> THE COURT: So there is a lot of overlap?
>
> BP'S COUNSEL: There is a lot of overlap. **So if you looked at the chart [Exhibit E], you would then look for the -- you look at the requests by which the incident custodians[5] are listed and the search terms by those incident**

---

[5]   Mr. Bodek is one of the custodians that the PSC and BP referred to as the "Incident Custodians."

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 11

> **custodians and run those search terms for those dates, and that would generate the universe for the data to review**. (Ex. 5 10:8-11:4)

BP's February 16 submission (which attached the search term chart discussed at the February 18 conference) stated:

> Following those meet-and-confer conferences, BP has set forth in letters (and repeats here, see Exhibit E, 2/11/11 e-mail) its approach to search criteria and custodial productions for depositions.  This approach sets forth in detail the search terms, custodians, and date ranges that BP will apply to the user-generated data in the active space of BP users' laptops and/or desktop computers for the productions in this case going forward.  If no agreement on these parameters can be reached before the conference with Your Honor, **BP respectfully submits that the proper approach is not for BP to proceed "at its own risk."  Rather, if the PSC has any issues with the approach that BP has described in detail, BP respectfully submits that now is the time to raise them so that they can be addressed by Your Honor**; otherwise, BP will move forward with the approach outlined in this letter and the attached exhibits.  (Ex. 6)

During the February 18 hearing, the PSC's counsel raised no objection to the use of the search term chart to "generate the universe of data" to review for the "custodial files for those people whose depositions are going to be scheduled," as discussed in detail at the February 18 hearing.  (Ex. 5) Nor did the PSC raise an objection to BP's search term chart circulated on March 29.  *See id.*  Since March, BP's certification has stated that is made "based on a good faith and reasonable search in accordance with their February 16, 2011 submission to Magistrate Judge Shushan and the February 18, 2011 hearing."  (E.g. Ex. 7, 4/1/11 Langan Certification Letter to Herman).  Furthermore, the transmittal letters for BP's productions have stated that for volumes that include deponent custodial files, those custodial "materials are being provided pursuant to searches of ESI consistent with the BP Parties' letter to Magistrate Judge Shushan of February 16, 2011, the hearing before Magistrate Judge Shushan on February 18, 2011, and the parties' negotiations concerning appropriate search criteria."   (E.g. Ex. 8, 4/1/11 Langan Transmittal Letter to Herman)   *The PSC raised no questions about this particular certification or transmittal letter language until this Tuesday, May 10  at the earliest.*

In its May 11 submission, the PSC contends:

> [t]he PSC has inquired about the precise meaning of 'in accordance with their February 16, 2011 submission ... and February 18, 2011 hearing...,' as used in BP's certification letters.  However, we have yet to receive a clear response.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 12

The PSC's "inquiry" about BP's certification language was made two days ago, on Tuesday, May 10, 2011. (Ex. 9, 5/10/11 Large e-mail to Nomellini (9:25 am))  Two hours later, and before BP could respond, the PSC announced that it was done meeting and conferring and wanted to file something with the Court. (Ex. 10, 5/10/11 Large e-mail to Nomellini (11:25 am))  In light of this timing, the PSC's suggestion that "we have yet to receive a clear response" to a question asked for the first time on May 10 is opportunistic at best and misleading at worst.  In any event, BP's February 16 submission and the transcript of the February 18 conference speak for themselves.

Finally, BP's use of the parties' negotiated search terms has not prejudiced the PSC.  To the contrary, it has ensured a more comprehensive production.  BP has far produced more per deposition custodian, on average, than either Halliburton or Transocean:

| Party | Average Number of Custodial Documents Produced Per Deponent |
|---|---|
| BP | 4,368 |
| Halliburton | 1,893 |
| Transocean | 1,656 |

**The Negotiated Search Term Chart**

Why does it matter that not all search terms were run for all custodians?  As one example, RFP 22 asks BP to "produce any documents relating to any calculations or estimates of the amount of oil spilled in the Gulf of Mexico."  To use the example of recent deponent Bodek, Mr. Bodek had no role in estimating flow rate, and thus was not listed as a custodian for RFP 22.  This means that a document which contains RFP 22 search terms and on which Mr. Bodek was copied would not have been produced before Mr. Bodek's deposition.  However, there are many other custodians listed for RFP 22, and RFP 22 documents were produced after Mr. Bodek's deposition and in connection with the global search term process.  While Mr. Bodek is a custodian of some of those documents, those documents are not "late" for Mr. Bodek's deposition because they were not responsive to the search criteria negotiated by the parties for him.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 13

      How does this play out with actual documents? On May 4, the PSC asserted that at least 146 of Mr. Bodek's custodial documents had been produced "late." (Ex. 11, Large e-mail to Nomellini) On the same day, BP identified examples of documents not responsive to the negotiated Bodek search terms and further asked the PSC for examples that were responsive. BP reiterated that request on May 9. On May 10, the PSC responded, providing what purported to be 11 Bodek documents that were responsive to search terms, and were thus "late." Counsel had the following e-mail exchange:

> BP COUNSEL: You indicate you have identified "many" documents from Mr. Bodek's files that were responsive to search terms and were received late. We look forward to seeing the results of your analysis of Mr. Bodek's files, so that we can discuss it with you.
>
> . . . .
>
> PSC COUNSEL: I have listed below eleven counter-examples for Bodek allowing for your position:
>
> BP-HZN-2179MDL01200023
> BP-HZN-2179MDL01200307
> BP-HZN-2179MDL01208057
> BP-HZN-2179MDL01209081
> BP-HZN-2179MDL01209145
> BP-HZN-2179MDL01210355
> BP-HZN-2179MDL01212469
> BP-HZN-2179MDL01213079
> BP-HZN-2179MDL01215268
> BP-HZN-2179MDL01215636
> BP-HZN-2179MDL01215670

(Ex. 10)

      These 11 example documents provided by the PSC are highly illustrative. Not a single one of them is responsive to the custodial search terms for Mr. Bodek. Exhibit 12 shows in yellow the RFP's for which Mr. Bodek is listed as a custodian. Exhibit 13 shows in orange the search terms and date ranges run for these RFP's. BP has confirmed that none of the negotiated Bodek search terms and date ranges yield the examples cited by the PSC above, which are therefore erroneously included in the PSC's "late documents" analysis.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 14


Why were these Bodek documents produced when they were, after Mr. Bodek's deposition?  The reason is that the documents are responsive to the search terms for RFP 22 and 28.  (See exhibit 13, showing RFP 22's search terms and exhibit 14, consisting of the 11 Bodek examples cited by the PSC, which have had their relevant search terms highlighted.)  Mr. Bodek is not listed as a custodian for RFP 22 and RFP 28 in the search term chart.  However, the parties are using RFP 22 and 28 searches as a part of their global search term production.  But there was nothing remotely "late" about these documents:  they were not responsive to the search criteria negotiated for Mr. Bodek and laid out in detail.

The table below analyzes the 11 "examples" of allegedly "late" Bodek documents cited by the PSC:

| Doc ID'd by PSC on 5/10 as Responsive to Search Terms | Bodek Search Terms Hit? | Global RFP hit (document or parent) |
|---|---|---|
| BP-HZN-2179MDL01200023 | NO | 28 |
| BP-HZN-2179MDL01200307 | NO | 28 |
| BP-HZN-2179MDL01208057 | NO | 28 |
| BP-HZN-2179MDL01209081 | NO | 22 |
| BP-HZN-2179MDL01209145 | NO | 28 |
| BP-HZN-2179MDL01210355 | NO | 28 |
| BP-HZN-2179MDL01212469 | NO | 22, 28 |
| BP-HZN-2179MDL01213079 | NO | 28 |
| BP-HZN-2179MDL01215268 | NO | 28 |
| BP-HZN-2179MDL01215636 | NO | 28 |
| BP-HZN-2179MDL01215670 | NO | 28 |

In its May 11 submission, the PSC now contends the 11 Bodek documents above are "responsive to the search terms for RFP 88 and RFP 90."  This incorrect assertion is also illustrative.  As the chart provided to the PSC on March 29 makes clear, the search terms for RFP 88 and RFP 90 ("preventor," *etc*.) only apply to documents dated through "April 20, 2010."  The

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 15


11 Bodek documents are all dated after April 20, 2010, and thus are not responsive "responsive to the search terms for RFP 88 and RFP 90" as the PSC claims. Instead, for the period after April 20, the chart provided to the PSC on March 29 specifically states that BP will employ a "reasonable search"—not the search terms ("preventor," *etc*). (Ex. 15, 3/29/11 Nomellini e-mail to Irpino)  But only one of the 11 Bodek examples cited by the PSC would be produced in response to a "reasonable search" under RFP 88 and 90.  With one exception discussed below, none of these 11 documents constitute either: (i) "studies of effective operation of blowout preventers in offshore drilling operations" (what BP agreed to conduct a reasonable search for in response to RFP 88) or (ii) "reports and presentations concerning cementing the production interval of the Macondo Well" (what BP agreed to conduct a reasonable search for in response to RFP 90).

The one noteworthy exception from the PSC's 11 Bodek examples is BP-HZN-2179MDL01200307, a Technical Memo relating to cementing the production interval.  That document is responsive to a reasonable search under RFP 90 (cementing of the production interval).  And indeed on March 13, one month before the Bodek deposition, BP produced that same Technical Memo as BP-HZN-2179MDL00703781.  The only difference between the two documents is the format and the Bates label. (Compare Ex. 16 with Ex. 17)

In sum, the only one of the 11 Bodek examples cited by the PSC that BP even arguably had an obligation to produce before the Bodek deposition was indeed produced one month before that deposition.  But the PSC apparently did not know that it had the document.  And that is precisely the problem, and why certification by the PSC is necessary.

**"Many Other Examples"**

Each time BP demonstrates that specific "late" documents were not late, the PSC claims (as it did on May 6) that it has many other examples.  But when the PSC provides those many other examples (as it did with the 11 Bodek documents on May 10), they have been without merit.  The parties have accomplished much together.  BP respectfully submits that the parties are at their best when they work cooperatively to produce documents (and confer when there are issues), rather than seeking to create flawed analyses of "late" or "missing" documents.

**The Four Examples Raised By the PSC In Its May 11 Letter**

The PSC raises four new examples in its letter to the Court of May 11.  Three of the four examples relate to IIT depositions on or before February 10 (and thus are a red herring as discussed in Section II.B below).

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 16

The fourth document cited in the May 11 letter (the Walz handwritten journal for March and April 2010) was produced the night before his deposition. This document was already discussed at the April 29 hearing before this Court; it is a recycled example. The Walz journal consists principally of handwritten notes that were not properly scanned by BP's vendor. BP has taken steps with its vendor to prevent this from occurring in the future. Although this is the one specific example raised by the PSC that is not entirely erroneous, the fact is that the document was produced before Mr. Walz' two-day deposition, and that Mr. Walz was questioned about it extensively.

Thus, no prejudice has been shown from any of the allegedly "late" documents, other than to BP from having to track down that documents were not "missing" or "late."

**Even Setting Aside the Search Term Problem, Many of these Allegedly "Late" Documents Had Been Produced Long Before The Custodians' Deposition And Before the Certification Date.**

The PSC's analysis also suffers from a secondary problem. Setting aside the fact that hundreds of documents are not responsive to search terms for the right custodians, many other documents are simply not "late." As discussed above, the Technical Memo that the PSC claims was produced "late" for Mr. Bodek's deposition was in fact produced well in advance of the deposition.[6] As Exhibit 18 shows, the same is true for scores of other documents: even setting aside the search term issue, the PSC had the same documents before the relevant deposition, just with a different bates label. (Ex. 18, Table of Duplicate Documents). As an example of one these scores of documents, compare exhibit 19, which was produced before Mr. Corser's deposition, to exhibit 20, which was produced after Mr. Corser's deposition. Although the PSC claims the latter document is "late"; there is no difference between the two documents other than the Bates label. Exhibit 23 contains only the first 100 examples of this sort among the PSC's "late" document analysis that BP could find; BP has not the time to review all of the allegedly late documents identified by the PSC.

As these scores of examples show, the PSC's "late" documents chart crunches several numbers, but does not concern itself with the substance behind those numbers, including the many documents that had already been produced. Again, the PSC did not appreciate that it already had these scores of documents.

---

[6]  BP's vendor does not necessarily exclude a document from the production if it has the same text as another document, due to technical nuances associated with gathering documents from different sources.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 17

**B.     Documents Produced in February and March 2011 For Internal Investigation Deponents.**

Twelve of the deponents raised in the PSC's "late documents analysis" are Internal Investigation Team custodians. All but one of these custodians were deposed in January or Feburary. These are the custodians with by far the highest number of allegedly "late" documents: *e.g.,* Robinson (1254), Corser (1111), and Wetherbee (1242).[7]  The PSC's chart shows that more recent custodians have signficantly fewer "late" documents, even under the PSC's flawed analysis.

The January and February IIT depositions were unique in several respects. Pretrial Order No. 17 (fn. 3) provides that "the parties shall work cooperatively to schedule the depositions of witnesses who may have document intensive depositions, including custodial files, later in the deposition schedule." At the conference with Magistrate Judge Shushan on November 15 that led to the issuance of Pretrial Order No. 17, the PSC acknowledged that it faced risks with proceeding with early depositions before substantial completion of document productions: "…there's risk to both parties. This happens in every litigation. We face the risk of deposing a critical witness too early without all the documents, that's just a calculus we have to make…." (Ex. 21, 11/15/10 Tr. 30)  In response, the Court then asked the PSC's counsel "[a]re you-all going to start with the more minor witnesses so the production can catch up with the deposition schedule?" (*Id.*) And without committing the PSC, Mr. Herman answered "We'll have that discussion, and I'm not really the person in charge, but what I think my thinking would be is that we try to find some witnesses who we think will be key but their testimony **won't be necessarily document intensive**, be more, what did they see, what did they hear. And we'll try to identify some of these witnesses first." (*Id.*) (emphasis added)

With these Court directives in mind, during the parties' meet and confer on December 10, 2010, BP advised the PSC representatives that there might be document production issues with the IIT deponents if the PSC pressed ahead (despite PTO 17 fn. 3) with premature depositions of BP deponents with extensive custodial files. BP further advised that the PSC might have decisions to make about proceeding to depose at the early stages witnesses with large custodial files, with all parties aware of the presumption against any re-deposing such witnesses later,

---

[7]  While the PSC claims that its chart "is slightly more conservative, and only includes volumes which were received after the deposition, or so close to it as to make review logistically impossible," the PSC uses a broad definition of "logistically impossible." For example, the Corser deposition was February 10th. The example cited by plaintiffs in their letter—BP-HZN-BLY 00139882—was produced on February 4th, one day after certification and six days before Mr. Corser's deposition.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 18

absent a strong showing of good cause (in the words, of the Court, cause such as the later production of "highly relevant" documents (Ex. 21, 11/15/10 Tr. 27)).

Nonetheless, BP moved rapidly to produce documents for these first IIT deponents in January and February. Notwithstanding BP's warnings about proceeding with early depositions before documents were produced, the PSC chose to put the IIT deponents first because "their testimony won't be necessarily document intensive, be more, what did they see, what did they hear." (Ex. 21). In light of this history, any argument that those IIT deponents should now be called back now for re-deposition is baseless and clearly the "good cause" standard for recall of PTO 17 has not been met.

*****

BP will continue to produce as many documents as possible as early as possible, consistent with the search terms negotiated by the parties. But it is critical that the process not continue to be derailed by the PSC's requests for documents that BP has produced long ago. BP's proposal that the PSC certify review of past BP productions is a reasonable solution.

While the PSC's "late" documents analysis is fundamentally flawed and the PSC's numbers are grossly misstated, BP's goal is the same as the PSC's: to produce documents as early as possible, guided by the search criteria negotiated by the parties and by the parties' fruitful meet and confer process. To that end, BP will continue to look for possible ways to improve its process, including as outlined above, and will attempt to meet and confer with the PSC early and often.

BP would be pleased to respond to any questions the Court has about this submission at the Court's convenience.

Sincerely,

J. Andrew Langan, P.C.


cc: Plaintiffs Liaison Counsel
      Defense Liaison Counsel

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 19

      Mike Underhill
      Hon. Attorney General Luther Strange
      Cory Maze
      Donald E. Godwin
      James P. Roy
      Stephen J. Herman
      Mike O'Keefe
      Robert Cunningham
      Ronald S. Kravitz
      Jeroen van Kwawegen
      Wilber H. Boies
      Mark C. Molumphy
      Laurie L. Largent
      Julie Reiser
      Lori G. Feldman