

GODWIN RONQUILLO
A Professional Corporation

*Attorneys and Counselors*

Renaissance Tower
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
214.939.4400
800.662.8393
214.760.7332 Fax

GodwinRonquillo.com

DONALD E. GODWIN - SHAREHOLDER
BOARD CERTIFIED - CIVIL TRIAL LAW -
TEXAS BOARD OF LEGAL SPECIALIZATION
DIRECT DIAL:    214.939.4412
DIRECT FAX:    214.939.4803
DGodwin@GodwinRonquillo.com

May 12, 2011

**VIA E-MAIL**

The Honorable Judge Sally Shushan
U.S. District Court
Eastern District of Louisiana
500 Poydras Street, Room C-151
New Orleans, LA 70130

Re:    *In re: Oil Spill by the Oil Rig "Deepwater Horizon",* MDL No. 2179, In the
       Eastern District of Louisiana

Your Honor:

Regarding the deposition of Lamar McKay, BP wants to have its cake and eat it too. After taking the deposition HESI's President of Strategy & Corporate Development, Tim Probert, <u>and</u> receiving additional time to question him, BP wants to prevent HESI, the PSC, and the states from taking the deposition of Lamar McKay, "BP s chief representative in the United States."[1]

**BP's Request for Additional Time to Depose Tim Probert.**    Despite the fact that Mr. Probert had no direct role in the events leading to the April 20, 2010 incident, on April 14, 2011, BP requested an additional 75 minutes to depose him.  BP's justification for the additional time was based upon Mr. Probert's testimony before Congressional Committees.  Specifically, BP argued:

> Mr. Probert was Halliburton's representative before Congressional Committees in May, and described Halliburton's relationship with BP and its role in the planning and operations at the Macondo well. Among other things, Mr. Probert provided testimony on (1) the events of April 20, 2010, (2) Halliburton's cement job at the Macondo well, (3) Halliburton's cement testing, (4) the positive and negative pressure tests, (5) placement of the final cement plug, and (6) well monitoring.  In addition to this knowledge about the Macondo well, Mr. Probert has knowledge of the cementing

---

[1]    *See* Exhibit A, BP Press Release, January 9, 2009.

**GODWIN RONQUILLO PC**

The Honorable Judge Sally Shushan
U.S. District Court, Eastern District of Louisiana
May 12, 2011
Page 2

industry and information on the relationship between BP and
Halliburton.

During Mr. Probert's deposition, BP asked him numerous questions about his post-event
knowledge, his Congressional testimony, HESI's internal investigation, and the BP/HESI
Macondo well contract.

**Lamar McKay's Testimony Before Congress.**  BP argues that Mr. McKay testified
before Congress only in "broad terms" as to the actions BP was taking to respond to the incident.
To the contrary, Mr. McKay testified regarding several other topics including: (1) the events of
April 20, 2010, (2) BP's work at the Macondo well, (3) the positive and negative pressure tests,
and (4) well monitoring.[2]  In addition to this knowledge about the Macondo well, by virtue of his
position at BP, Mr. McKay has personal knowledge of drilling operations in the Gulf of Mexico
and BP's safety culture, policies, and procedures.

Mr. McKay testified before Congressional Committees on at least seven occasions in
May and June 2010.  On May 11, 2010, he provided testimony to the Senate Committee on
Energy and Natural Resources, specifically noting that "there were anomalous pressure test
readings prior to the explosion."[3]  On behalf of BP, he also provided detailed answers to
Congress regarding BP's use of six centralizers, the rig crew, BP's engineering team, the
temporary abandonment procedure used on the well, and the events leading up to the blowout.[4]
In addition to this hearing, McKay testified before the following Congressional committees and
subcommittees about the Macondo well:

- May 12, 2010: House Subcommittee on Oversight and Investigations, Energy and
  Commerce Committee;

- May 17, 2010: Senate Homeland Security and Governmental Affairs Committee;

- May 18, 2010: Senate Commerce, Science, and Transportation Committee;

---

[2] *See* Exhibit B, excerpts of *Review Issues Related to Deepwater Offshore Exploration for Petroleum and the
Accident in the Gulf of Mexico Involving the Offshore Oil Rig Deepwater Horizon.*  Hrg. Before the S. Comm. on
Energy and Natural Resources, 111th Cong., pp. 34-40, 76-87 (May 11, 2010) (statement of Lamar McKay,
President and Chairman, BP America, Inc.).

[3] *See* id.

[4] *See* id. at pp. 76-87.

**GODWIN RONQUILLO PC**

The Honorable Judge Sally Shushan
U.S. District Court, Eastern District of Louisiana
May 12, 2011
Page 3

- May 19, 2010: House Transportation and Infrastructure Committee;

- May 26-27, 2010: House Natural Resources Committee; and

- June 15, 2010: House Energy and Environment Subcommittee.

**Mr. McKay's Position Gives Him Unique Knowledge.** BP argues that the depositions of a company's most high-ranking executives should not go forward unless: (1) those executives possess 'personal or superior knowledge' of relevant events; and (2) there is no less burdensome means of discovery to obtain the relevant information." However, in the cases cited by BP, the executives' affidavits affirmatively established that they had no personal knowledge of the facts of the case.[5] Mr. McKay's testimony before Congress demonstrates his personal knowledge of the facts surrounding the incident. Furthermore, "[f]ederal Courts have permitted the depositions of high level executives when conduct and knowledge at the highest corporate levels of the defendant are relevant in the case."[6]

As Chairman and President of BP America, Inc., Mr. McKay was and is BP's "lead representative" in the U.S. and is "responsible for broad oversight and connectivity across all of BP's U.S. based businesses."[7] According to BP, Mr. McKay has "deep knowledge of BP's U.S. operations."[8] Prior to the incident, Mr. McKay provided Congressional testimony showing his intimate familiarity with drilling operations and technology in the Gulf of Mexico, as well as the "vastly greater resources" then in place "to cope with '"worst case'" discharges".[9] Furthermore, at least one document produced by BP reveals that Mr. McKay may have indeed had "operational responsibility for exploration or drilling in the Gulf of Mexico."[10]

---

[5] *Zoroufie v. Lance, Inc.*, No. 07-2016-B/P, 2008 WL 1767729 at *5, 2008 LEXIS 31384 (W.D. Tenn. April 15, 2008) and *Evans v. Allstate Ins. Co.*, 216 F.R.D. 515, 519 (N.D. Okla. 2003).

[6] *Kimberly-Clark Corp. v. Cont'l Cas. Co.*, 2006 U.S. Dist. LEXIS 86469 (N.D. Tex. 2006); *Travelers Rental Co. v. Ford Motor Co.*, 116 F.R.D. 140 (D. Mass. 1987)(finding that lack of knowledge may be relevant in and of itself).

[7] *See* Exhibit B, p. 37

[8] *See* Exhibit A. .

[9] *See* Exhibit C excerpts of *Offshore Drilling: Industry Perspectives.* Hrg. Before the H. Comm. on Natural Resources, 111th Cong. 17-18 (February 25, 2009).

[10] *See* Exhibit D, BP-HZN-2179MDL00305289, Mr. McKay scheduled a pre-incident meeting about the "Forward Strategy" for the Atlantis, a BP rig in the Gulf of Mexico.

**GODWIN RONQUILLO PC**

The Honorable Judge Sally Shushan
U.S. District Court, Eastern District of Louisiana
May 12, 2011
Page 4


Mr. McKay can testify, as he did before Congress, about the events of April 20, 2010, the safety of BP's deepwater drilling operations, BP's work at the Macondo well, the positive and negative pressure tests, well monitoring, BP's post-incident investigation, and BP's relationship with HESI with respect to U.S. operations.

For all these reasons, Mr. McKay's deposition is absolutely relevant to the event track. Thank you for your time and consideration of this most important matter.


Respectfully submitted,

Donald E. Godwin


cc:     Defense Liaison Counsel            [Via Email]
        Mike Underhill, Esq.               [Via Email]
        Hon. Attorney General Luther Strange   [Via Email]
        Cory Maze          .               [Via Email]
        James Parker Roy, Esq.             [Via Email]
        Stephen J. Herman, Esq.            [Via Email]
        Mike O'Keefe                       [Via Email]
        Robert Cunningham                  [Via Email]
        Andrew Langan                      [Via Email]

# Exhibit A



reports and publications / contacts / BP worldwide    Home

Search: [          ]

About BP | Products and services | Sustainability | Investors | Press | Careers | Gulf of Mexico restoration

You are here:   BP Global   ▶   Press   ▶   Press releases



**Press releases**

Speeches

Features

Images and graphics

Press contacts


▶ What is RSS?

# Lamar McKay To Lead BP America

Release date: 06 January 2009

HOUSTON - Lamar McKay has been appointed Chairman and President of BP America, Inc. and will serve as BP's chief representative in the United States. He will succeed Robert A. (Bob) Malone who has elected to retire after 34 years with the company.

Commenting on the change, BP Chief Executive Officer Tony Hayward said: "Bob Malone has made an extraordinary difference during his tenure at BP America and during his long career with BP. We are a better company because of his ability to connect with the men and women who operate and maintain our facilities and his unflagging commitment to safe operations. All of us at BP appreciate what he has done and wish him well in his next endeavours."

Mr. McKay, a member of the BP p.l.c. Executive Management Team, has led the company's Special Projects Team since early 2008. In that capacity, he played a major role in establishing a new governance model for TNK-BP, BP's Russian joint venture. Prior to that assignment, he served as executive vice president and chief operating officer for BP America and brings deep knowledge of BP's US operations to his new position.

Mr. McKay joined Amoco Production Company as a petroleum engineer in 1980 and later served in a variety of operating and commercial roles. During his career he has led upstream production businesses in the Arkoma Basin, the Gulf of Mexico and the North Sea. After working on the BP-Amoco merger, he led BP's worldwide exploration and production strategy efforts followed by a posting as chief of staff for the company's global exploration and production business. Prior to his first assignment with BP America, he served as group vice president for Russia and Kazakhstan.

Mr. McKay holds a Bachelor of Science degree in petroleum engineering from Mississippi State University. He and his wife Nancy will be based in Houston, where BP business units are involved in oil and gas exploration and production, refining, chemicals, supply and trading, pipeline operations, shipping, and alternative energy. Houston is home to nearly 7,000 BP employees.

**Note to editors:**

A photograph of Lamar McKay is available using the link on the right or from the BP press office

**Further information:**

**Name:** BP press office
**Location:** Houston
**Phone :** +1 281 366 5174

## In this section

▶ BP Receives Approval to Complete Purchase of Exploration and Production Blocks in Brazil

◢ Azerbaijani Parliament Ratifies Shafag-Asiman PSA

▶ BP, The Royal Opera House and the Olympic Museum to bring a Unique Exhibition to London in Celebration of the London 2012 Olympic Games

◢ Arbitral Panel Permits Conditional Completion of BP-Rosneft Share Swap - Subject to Rosneft's Consent and Assignment of Arctic Opportunity to TNK-BP

▶ BP Welcomes Rosneft as New Partner in German Refining Joint Venture

▶ More

### Related links

▶ The board
Our executive and non-executive members of the board

▶ BP America
Find out more about BP America

### Related downloads
Download an image of Lamar McKay

▶ Lamar McKay (jpg, 175KB)

▲ back to top

© 1996-2011 BP p.l.c.

Site Index  |  Legal Notice  |  Privacy Statement

# Exhibit B

S. HRG. 111–653, Pt. 1

# MASSIVE OIL SPILL IN THE GULF OF MEXICO

# HEARING

BEFORE THE

## COMMITTEE ON
## ENERGY AND NATURAL RESOURCES
## UNITED STATES SENATE

ONE HUNDRED ELEVENTH CONGRESS

SECOND SESSION

TO

REVIEW ISSUES RELATED TO DEEPWATER OFFSHORE EXPLORATION FOR PETROLEUM AND THE ACCIDENT IN THE GULF OF MEXICO INVOLVING THE OFFSHORE OIL RIG DEEPWATER HORIZON

MAY 11, 2010



Printed for the use of the
Committee on Energy and Natural Resources

U.S. GOVERNMENT PRINTING OFFICE

61–700 PDF                    WASHINGTON : 2010

For sale by the Superintendent of Documents, U.S. Government Printing Office,
http://bookstore.gpo.gov. For more information, contact the GPO Customer Contact Center,
U.S. Government Printing Office. Phone 202–512–1800, or 866–512–1800 (toll-free). E-mail, gpo@custhelp.com.

**Exhibit "A"**

## COMMITTEE ON ENERGY AND NATURAL RESOURCES

JEFF BINGAMAN, New Mexico, *Chairman*

BYRON L. DORGAN, North Dakota
RON WYDEN, Oregon
TIM JOHNSON, South Dakota
MARY L. LANDRIEU, Louisiana
MARIA CANTWELL, Washington
ROBERT MENENDEZ, New Jersey
BLANCHE L. LINCOLN, Arkansas
BERNARD SANDERS, Vermont
EVAN BAYH, Indiana
DEBBIE STABENOW, Michigan
MARK UDALL, Colorado
JEANNE SHAHEEN, New Hampshire

LISA MURKOWSKI, Alaska
RICHARD BURR, North Carolina
JOHN BARRASSO, Wyoming
SAM BROWNBACK, Kansas
JAMES E. RISCH, Idaho
JOHN McCAIN, Arizona
ROBERT F. BENNETT, Utah
JIM BUNNING, Kentucky
JEFF SESSIONS, Alabama
BOB CORKER, Tennessee

ROBERT M. SIMON, *Staff Director*
SAM E. FOWLER, *Chief Counsel*
McKIE CAMPBELL, *Republican Staff Director*
KAREN K. BILLUPS, *Republican Chief Counsel*

(II)

# CONTENTS

### STATEMENTS

| | Page |
|---|---|
| Beck, F.E., Associate Professor of Petroleum Engineering, Texas A&M University, College Station, TX | 6 |
| Bingaman, Hon. Jeff, U.S. Senator From New Mexico | 1 |
| Danenberger, Elmer P., III, Former Chief, Offshore Regulatory Program, Minerals Management Service, Department of the Interior | 11 |
| McKay, Lamar, President and Chairman, BP America, Inc. | 34 |
| Murkowski, Hon. Lisa, U.S. Senator From Alaska | 4 |
| Newman, Steven, Chief Executive Officer, Transocean Ltd. | 40 |
| Probert, Tim, President, Global Business Lines, and Chief Health, Safety and Environmental Officer, Halliburton | 45 |

### APPENDIX

| | |
|---|---|
| Responses to additional questions | 75 |

34

we need to understand, starting with you, Mr. McKay, and then Mr. Newman, and then Mr. Probert. Go right ahead.

**STATEMENT OF LAMAR MCKAY, PRESIDENT AND CHAIRMAN, BP AMERICA, INC.**

Mr. McKAY. Thank you, Chairman. Chairman Bingaman, Ranking Member Murkowski, members of the committee: My name is Lamar McKay and I am the Chairman and President of BP America.

We have experienced a tragic series of events. 3 weeks ago tonight, 11 people were lost in an explosion and a fire aboard the Transocean Deepwater Horizon and 17 others were injured. My deepest sympathies go out to the families and friends who have suffered such a terrible loss and to those in the Gulf Coast communities whose lives and livelihoods are being impacted.

Over the last few days I've seen the response firsthand and talked with the men and women on the front line. There is a deep and steadfast resolve to do all we humanly can to stop the leak, contain the spill, and to minimize the damage suffered by the environment and the people of the Gulf Coast.

As a responsible party under the Oil Pollution Act, we will carry out our responsibilities to mitigate the environmental and economic impacts of this incident. Our efforts are part of a unified command that was established within hours of the accident and provides a structure for our work with Departments of Homeland Security and Interior, as well as Defense, Energy, OSHA, and other Federal agencies, as well as affected State and local governments and Transocean.

We are grateful for the involvement of President Obama and members of his Cabinet and for the leadership, direction, and resources they have provided. We are also grateful to the Governors, Congressional members, State agencies, and local communities of Mississippi, Alabama, Louisiana, Texas, and Florida.

I want to underscore that the global resources of BP are committed to this effort and have been from the outset. Nothing is being spared. Everyone understands the enormity of what lies ahead and is working to deliver an effective response at the wellhead, on the water, and at the shoreline.

Before I describe our round-the-clock efforts to respond to this series of events, I want to reiterate our commitment to find out what happened. Figuring out what happened and why it happened is a complex process. We are cooperating with the joint investigation by the Departments of Homeland Security and Interior and investigations by Congress. In addition, BP has commissioned an internal investigation whose results we plan to share so we can all learn from these terrible events.

I want to be clear. It's inappropriate to draw any conclusion before all the facts are known. As we speak, our investigation team is locating and analyzing data, interviewing available witnesses, and reviewing and assessing evidence. Today I think it's important to give you and the American public an idea of the questions we are asking. There are really two key sets of questions here and we're actively exploring both of them. First, what caused the explosion and fire on board Transocean's Deepwater Horizon rig? Sec-

35

ond, why did Transocean's blowout preventer, the key fail-safe mechanism, fail to shut in the well and release the rig?

With respect to the first question, the key issue we are examining is how hydrocarbons could have entered the wellbore. BP as the leaseholder and the operator of the well hired Transocean to drill that well. Transocean as owner and operator of the Deepwater Horizon drilling rig had responsibility for the safety of drilling operations. We don't know yet precisely what happened on the night of April 20, but what we do know is that there were anomalous pressure test readings prior to the explosion. These could have raised concerns about well control prior to the operation to replace mud with seawater in the well, in preparation for setting of the cement plug.

Through our investigation we hope to learn more about what happened and what was done in the hours before the explosion. Apart from looking at the causes of the explosion, we are also examining why the blowout preventer, the BOP as it is called, did not work as the ultimate fail- safe to seal the well and prevent an oil spill. Clearly the BOP remains a critical piece of equipment throughout all operations to ensure well control up until the time the well is sealed with a cement plug and is temporarily abandoned.

We will continue full speed ahead with our investigation, keeping all lines of inquiry open, until we find out what happened and why. At the same time, we are fully engaged in efforts to respond to these events. Our subsea efforts to stop the flow of oil and secure the well involve four parallel and concurrent strategies. Activating the BOP would be the preferred course since it would stop or diminish the flow at the source. Unfortunately, this has proved unsuccessful so far.

We are working on a containment system which will place large enclosures or containment chambers atop the leaks and conduct flow to a ship at the surface. There have been technical challenges, however. Engineers are now working to see if these challenges can be overcome.

We have begun to drill the first of two relief wells designed to intercept and permanently secure the original well. We began drilling the first relief well on May 2 and expect to begin drilling the second relief well later this week. This operation could take approximately 3 months.

A fourth effort, known as a "top kill," uses a tube to inject a mixture of multi-sized particles directly into the blowout preventers to cap the well. It's a proven industry technique and it's been used worldwide, but never in 5,000 feet of water.

On the open water a fleet of about 300 response vessels has been mobilized and about one million feet of boom is now in place, with more than a million more feet available. We ar also attacking the spill area with Coast Guard-approved biodegradable dispersants, which are being applied from planes and boats. We have also developed and tested a technique to apply dispersant at the leak point on the seabed. The EPA is carefully analyzing options for this technique's further use.

To protect the shoreline, we are implementing what the U.S. Coast Guard has called the most massive shoreline protection effort

36

ever mounted. 13 staging areas are in place and over 4,000 volunteers have already been trained.

We recognize that there are both environmental and economic impacts. BP will play all necessary cleanup costs and is committed to paying legitimate claims for other loss and damages caused by the spill.

Tragic and unforeseen as this accident was, we must not lose sight of why BP and other energy companies are operating in the offshore, including the Gulf of Mexico. The Gulf provides one in four barrels of oil produced in the United States, a resource our economy requires. BP and the entire energy industry are under no illusions about the challenge we face. We know that we will be judged by our response to this crisis. We intend to do everything in our power to bring this well under control, to mitigate the environmental impact of the spill, and to address economic claims in a responsible manner. No resource available to this company will be spared. I can assure you that we and the entire industry will learn from this terrible event and emerge from it stronger and safer.

Thank you for the opportunity to appear before you today. I'd be happy to answer your questions.

[The prepared statement of Mr. McKay follows:]

PREPARED STATEMENT OF LAMAR MCKAY[1], CHAIRMAN & PRESIDENT, BP AMERICA, INC.

Chairman Bingaman, Ranking Member Murkowski, members of the committee, I am Lamar McKay, Chairman and President of BP America.

We have all experienced a tragic series of events.

I want to be clear from the outset that we will not rest until the well is under control. As a responsible party under the Oil Pollution Act, we will carry out our responsibilities to mitigate the environmental and economic impacts of this incident.

We—and, indeed, the entire energy sector as a whole—are determined to understand what happened, why it happened, take the learnings from this incident, and make the changes necessary to make our company and our industry stronger and safer. We understand that the world is watching and that we and our industry colleagues will be judged by how we respond to these events.

Three weeks ago tonight, eleven people were lost in an explosion and fire aboard the Transocean Deepwater Horizon drilling rig, and seventeen others were injured. My deepest sympathies go out to the families and friends who have suffered such a terrible loss and to those in Gulf Coast communities whose lives and livelihoods are being impacted.

This was a horrendous accident. We are all devastated by this. It has profoundly touched our employees, their families, our partners, customers, those in the surrounding areas and those in government with whom we are working. There has been tremendous shock that such an accident could have happened, and great sorrow for the lives lost and the injuries sustained. The safety of our employees and our contractors and the safety of the environment are always our first priorities.

Even as we absorb the human dimensions of this tragedy, I want to underscore our intense determination to do everything humanly possible to minimize the environmental and economic impacts of the resulting oil spill on the Gulf Coast. From the outset, the global resources of BP have been engaged. Nothing is being spared. We are fully committed to the response.

And from the beginning, we have never been alone. On the night of the accident, the Coast Guard helped rescue the 115 survivors from the rig. The list of casualties could easily have been longer without the professionalism and dedication of the Coast Guard.

---

[1] The data described throughout this testimony is accurate to the best of my knowledge as of 8am Monday, May 10, 2010, when this testimony was submitted. The information that we have continues to develop as our response to the incident continues.

37

Even before the Transocean Deepwater Horizon sank on the morning of April 22nd, a Unified Command structure was established, as provided by federal regulations. Currently led by the National Incident Commander, Admiral Thad Allen, the Unified Command provides a structure for BP's work with the Coast Guard, the Minerals Management Service and Transocean, among others.

Immediately following the explosion, in coordination with the Unified Command, BP began mobilizing oil spill response resources including skimmers, storage barges, tugs, aircraft, dispersant, and open-water and near shore boom.

Working together with federal and state governments under the umbrella of the Unified Command, BP's team of operational and technical experts is coordinating with many agencies, organizations and companies. These include the Departments of Energy, Interior, Homeland Security and Defense, National Oceanic and Atmospheric Administration (NOAA), US Fish & Wildlife Service (USFW), National Marine Fisheries Service (NMFS), EPA, OSHA, Gulf Coast state environmental and wildlife agencies, the Marine Spill Response Corporation (an oil spill response consortium), as well as numerous state, city, parish and county agencies.

As Coast Guard Rear Admiral Mary Landry noted on April 28: "BP is being appropriately forward leaning in bringing all the resources to bear to control this spill."

The industry as a whole has responded in full support. Among the resources that have been made available:

- Drilling and technical experts who are helping determine solutions to stopping the spill and mitigating its impact, including specialists in the areas of subsea wells, environmental science and emergency response;
- Technical advice on blowout preventers, dispersant application, well construction and containment options;
- Additional drilling rigs to serve as staging areas for equipment and responders, more remotely operated vehicles (ROVs) for deep underwater work, barges, support vessels and additional aircraft, as well as training and working space for the Unified Command.

*The actions we're taking*

As Chairman and President of BP America, I am part of an executive team that reports directly to our Global CEO, Tony Hayward. I am BP's lead representative in the US and am responsible for broad oversight and connectivity across all of our US-based businesses.

BP itself has committed tremendous global resources to the effort. Among many other tasks, they are helping to train and organize the more than 10,000 citizen volunteers who have come forward to offer their services.

Indeed, we have received a great many offers of help and assistance. The outpouring of support from government, industry, businesses and private citizens has truly been humbling and inspiring. It is remarkable to watch people come together in crisis.

Our efforts are focused on two overarching goals:

- Stopping the flow of oil; and
- Minimizing the impact on the environment.

*Subsea efforts to secure the well*

Our subsea efforts to stop the flow of oil and secure the well have involved four concurrent strategies:

- Working to activate the blow-out preventer (BOP) on the well using submersible ROVs. This would be the preferred course of action, since it would stop or diminish the flow at the source on the ocean floor. Unfortunately, this effort has so far not proved successful.
- Work continues on a subsea oil recovery plan using a containment system, placing large enclosures or containment chambers atop the leaks and conducting flow from the ocean floor to a ship at the surface through a pipe. As we anticipated, however, there have been technical challenges. This system has never been used before at 5,000 feet. Engineers are now working to see if these challenges can be overcome.
- We have begun to drill the first of two relief wells to permanently secure the well. These wells are designed to intercept the original MC252 #1 well. Once this is accomplished, a specialized heavy fluid will be injected into the well bore to stop the flow of oil and allow work to be carried out to permanently cap the existing well. On Sunday, May 2nd, we began drilling the first of these wells. A second drillship will mobilize to the area to begin the second relief well later this week. This relief well operation could take approximately three months.

38

- A fourth effort is known as a "top kill." It is a proven industry technique for capping wells and has been used worldwide, but never in 5000 feet of water. It uses a tube to inject a mixture of multi-sized particles directly into the blow-out preventer. The attempt to do this could take two or three weeks to accomplish.

We have succeeded in stopping the flow from one of the three existing leak points on the damaged well. While this may not affect the overall flow rate, it should reduce the complexity of the situation to be dealt with on the seabed.

*Attacking the spill*

We are attacking the spill on two fronts: in the open water and on the shoreline, through the activation of our pre-approved spill response plans.

- On the water On the open water, we have mobilized a fleet of 294 response vessels, including skimmers, storage barges, tugs, and other vessels. The Hoss barge, the world's largest skimming vessel, has been onsite since April 25. In addition, there are 15, 210-foot Marine Spill Response Corporation Oil Spill Response Vessels, which each have the capacity to collect, separate, and store 4000 barrels of oil. To date, over 97,000 barrels of oil and water mix have been recovered.

Also on the open water, we are attacking the spill area with Coast Guardapproved biodegradable dispersants, which are being applied from both planes and boats. Dispersants are soap-like products which help the oil to break up and disperse in the water, which, in turn, helps speed natural degradation.

Thirty-seven aircraft, both fixed-wing and helicopters, are now supporting the response effort. Over 444,000 gallons of dispersant have been applied on the surface and more than 180,000 gallons are available. Typically, about 2,100 gallons of dispersant is needed to treat 1,000 barrels of oil.

To ensure that adequate supplies of dispersant will be available for surface and subsea application, the manufacturer has stepped up the manufacturing process, and existing supplies are being sourced from all over the world. The cooperation of industry partners has been superb and that is deeply, deeply appreciated.

We have also developed and tested a technique to apply dispersant at the leak point on the seabed. As far as we are aware, this is the first documented attempt to apply dispersant at the source. Early evidence suggests that the test has been impactful, and we are working with NOAA, EPA, and other agencies to refine and improve the technique. EPA is carefully monitoring the impact of dispersant and is analyzing its potential impact on the environment and options for possible future use.

*Actions to protect the shoreline*

Near the shoreline, we are implementing with great urgency oil spill response contingency plans to protect sensitive areas. According to the Coast Guard, the result is the most massive shoreline protection effort ever mounted.

To ensure rapid implementation of state contingency plans, we announced last week that we would make available grants of $25 million to Louisiana, Mississippi, Alabama, and Florida.

To date, we have about one million feet of boom deployed in an effort to contain the spill and protect the coastal shoreline, and another 1.3 million feet are available. The Department of Defense is helping to airlift boom to wherever it is needed across the Gulf coast.

Incident Command Posts have been or are being established at:

- Alabama: Mobile;
- Florida: St. Petersburg;
- Louisiana: Robert and Houma.

Thirteen staging areas are also in place to help protect the shoreline:

- Alabama: Theodore, Orange Beach and Dauphin Island;
- Florida: Panama City and Pensacola.
- Louisiana: Grand Isle, Venice, Shell Beach, Slidell, Cocodrie;
- Mississippi: Pascagoula, Biloxi and Pass Christian;

Highly mobile, shallow draft skimmers are also staged along the coast ready to attack the oil where it approaches the shoreline.

Wildlife clean-up stations are being mobilized, and pre-impact baseline assessment and beach clean-up will be carried out where possible. Rapid response teams are ready to deploy to any affected areas to assess the type and quantity of oiling, so the most effective cleaning strategies can be applied.

39

A toll-free number has been established to report oiled or injured wildlife, and the public is being urged not to attempt to help injured or oiled animals, but to report any sightings via the toll-free number.

Contingency plans for waste management to prevent secondary contamination are also being implemented.

Over 10,000 personnel are now engaged in the response, including shoreline defense and community outreach.

Additional resources, both people and equipment, continue to arrive for staging throughout the Gulf states in preparation for deployment should they be needed.

*Communication, community outreach, & engaging volunteers*

We are also making every effort to keep the public and government officials informed of what is happening.

BP executives have regularly briefed the President's Cabinet and National Security Council team, members of Congress, the governors and attorneys general of the Gulf Coast states, and many local officials.

On the ground, in the states and local communities, we are working with numerous organizations such as fishing associations, local businesses, parks, wildlife and environmental organizations, educational institutions, medical and emergency establishments, local media, and the general public.

BP is leading volunteer efforts in preparation for shoreline clean-up. We have and will continue to help recruit and deploy volunteers, many of whom are being compensated for their efforts, to affected areas. More than 14,000 calls from volunteers offering their help have been received and over 4,000 volunteers have been trained thus far.

Volunteer activities at this time are focused on clearing the beaches of existing debris and placing protective boom along the shoreline. Our "adopt a boom" program is proving very successful in engaging local fishermen in the response. More than 600 fishing vessels are signed up to deploy boom and assist with the response.

There are five BP community-outreach sites engaging, training, and preparing volunteers:

- Alabama: Mobile;
- Florida: Pensacola;
- Louisiana: Venice
- Mississippi: Pascagoula and Biloxi.

A phone line has been established for potential volunteers to register their interest in assisting the response effort.

*Coping with economic impacts*

We recognize that beyond the environmental impacts there are also economic impacts on the people of the Gulf Coast states. BP will pay all necessary clean up costs and is committed to paying legitimate claims for other loss and damages caused by the spill.

We have put in place a BP Claims Process. All claimants are being directed to a toll-free number and a website and will be assigned to experienced adjusters who will assist them in making their claim.

As an alternative, claimants can visit one of BP's Community Outreach Centers or claims centers.

The process is being expedited to make immediate payments to those who have experienced a loss of income, while the overall claim is more fully evaluated. As of today, we have paid out approximately $3.5 million.

*Commitment to investigate what happened*

BP is one of the lease holders and the operator of this exploration well. As operator, BP hired Transocean to conduct the well drilling operations. Transocean owned the Deepwater Horizon drilling rig and its equipment, including the blowout preventer.

The questions we all want answered are: What happened on the seabed and aboard the Deepwater Horizon and why did these things happen?

A full answer to those questions will have to await the outcome of a joint investigation by the Departments of Homeland Security and Interior, investigation by Congress, and an independent internal investigation that BP is conducting.

BP's investigation into the cause of this accident is being led by a senior BP executive from outside the affected business. The team has more than 40 people. The investigation is ongoing and has not yet reached conclusions about incident cause. We intend to share the results of our findings so that our industry and our regulators can benefit from the lessons learned.

Investigations take time, of course, in order to ensure that the root cause of the failure is fully understood. But let me give you an idea of the questions that BP and the entire energy industry, are asking:

- What caused the explosion and fire?
- And why did the blowout preventer fail?

Only seven of the 126 onboard the Deepwater Horizon were BP employees, so we have only some of the story, but we are working to piece together what happened from meticulous review of the records of rig operations that we have as well as information from those witnesses to whom we have access.

We are looking at our own actions and those of our contractors, as is the Marine Board. We are looking at why the blowout preventer did not work because that was to be the fail-safe in case of an accident. The blowout preventer is a 450-ton piece of equipment that sits on top of the wellhead during drilling operations. It contains valves that can be closed remotely if pressure causes fluids such as oil or natural gas to enter the well and threaten the drilling rig. By closing this valve, the drilling crew can regain control of the well.

Blowout preventers are used on every oil and gas well drilled in the world today. They are carefully and deliberately designed with multiple levels of redundancy and are regularly tested. If they don't pass the test, they are not used.

The systems are intended to fail-closed and be fail-safe; sadly and for reasons we do not yet understand, in this case, they were not. Transocean's blowout preventer failed to operate.

All of us urgently want to understand how this vital piece of equipment and its built-in redundancy systems failed and what measures are required to prevent this from ever happening again. In this endeavor, you will have the full support of BP as well as, I am sure, the rest of the industry.

*Energy policy remains critical*

Tragic and unforeseen as this accident was, we must not lose sight of why BP and other energy companies are operating in the offshore, including the Gulf of Mexico. The Gulf is one of the world's great energy producing basins, providing one in four barrels of oil produced in the United States. That is a resource that powers America and the world every day, one our economy requires.

*Conclusion*

But before we can think about the future, we have to deal with the immediate challenge of today.

BP is under no illusions about the seriousness of the situation we face. In the last three weeks, the eyes of the world have been upon us. President Obama and members of his Cabinet have visited the Gulf region and made clear their expectations of BP and our industry. So have members of Congress, as well as the general public.

We intend to do everything within our power to bring this well under control, to mitigate the environmental impact of the spill and to address economic claims in a responsible manner.

Any organization can show the world its best side when things are going well. It is in adversity that we truly see what they are made of.

We know that we will be judged by our response to this crisis. No resource available to this company will be spared. I can assure you that we and the entire industry will learn from this terrible event, and emerge from it stronger, smarter and safer.

The CHAIRMAN. Thank you.
Mr. Newman, go right ahead.

## STATEMENT OF STEVEN NEWMAN, CHIEF EXECUTIVE OFFICER, TRANSOCEAN, LTD

Mr. NEWMAN. Chairman Bingaman, Ranking Member Murkowski, and other members of the committee: I want to thank you for the opportunity to speak with you today. My name is Steven Newman and I am the chief executive officer of Transocean Limited. Transocean is the leading offshore drilling contractor, with more than 18,000 employees worldwide. I am a petroleum engineer by training and I have spent years working with and on drilling rigs. I have worked at Transocean for more than 15 years and I am

# APPENDIX

## RESPONSES TO ADDITIONAL QUESTIONS

_____

### RESPONSES OF F.E. BECK TO QUESTIONS FROM SENATOR MURKOWSKI

*Question 1.* Can you describe your perspective in terms of your observations of the regulatory environment and technological improvements for offshore oil and gas over the years? Specifically, do you observe that industry and government have been taking their safety and environmental responsibilities more seriously, less seriously, or about the same as OCS development has expanded into the deepwater?

Answer. Although I am not involved in the offshore business, my observation is that safety and environmental concerns for deepwater are taken very seriously by the vast majority of operators and service companies. Development of technologies for deepwater have far outpaced developments for OCS and onshore environments. However, in light of the Deepwater Horizon disaster, I cannot help but think that the abilities of regulatory agencies have not kept pace with the technological developments associated with deepwater. I believe there needs to be an expanded skill set and training matrix developed for regulators so that they will be able to properly monitor and approve deepwater operation plans.

*Question 2.* In the event of a large natural gas "bubble" hitting the rig, are you aware of or would you favor requiring mechanisms to be available where gas sensors and alarms could trigger an automatic shutoff of any potential spark or flame source?

Answer. Using gas sensors in a "smart" manner to prevent an explosion seems to me a very good idea. The "smart" part will need to recognize that shutting down power at the wrong time can create many other problems on the rig and potentially in the wellbore itself, so it would be necessary to make sure the automatic shutoff would only occur in a true emergency. In the normal course of drilling a well there are numerous instances of gas being brought to surface that are not emergency situations, so these normal occurrences would need to be built into the "smart" system. All-in-all I like the concept.

*Question 3.* Can you describe the level to which the Deepwater Horizon is in a situation where it is dependent on its BOP to avoid catastrophic blowouts perhaps more than other rigs in shallower waters?

Answer. Actually, I consider deepwater drilling to be less risky in terms of blowouts than OCS, or shallow water, operations. This is because the BOP's are on the seafloor, and when correct designs and procedures are in place, the gas and pressures are kept well away from the rig and personnel. I think it is critical that everyone understands that blowout preventer systems as designed today will never be able to overcome poor well design or faulty operational decision making. The blowout preventers fit into an overall well design. Drilling engineers, and regulators, must understand how the BOP's are intended to be used as a well control tool. I think that blowout preventer systems in a subsea or deepwater environment are much more critical as a means to protect the environment. As we have seen on the Deepwater Horizon, there are limited subsea intervention methods for capping a subsea blowout. On OCS operations there are many more tools, methods, and techniques developed for controlling a blowout once it has occurred. It is obvious that we need to develop new methods for intervention.

### RESPONSE OF F.E. BECK TO QUESTION FROM SENATOR LINCOLN

*Question 1.* In media reports following this disaster, I keep reading over and over again that certain devices and technologies being discussed to stop the leak have never been used in water this deep. Do you believe the depth of water presents more challenges in containing the leak? Do you believe more testing, research and technologies are needed to ensure the safety of deepwater and ultra-deep water drilling?

76

Answer. There are very few proven technologies for capping a subsea blowout, partially because there have been so few blowouts in this environment, but also because the deepwater environment is very difficult to mimic in a controlled manner, so proving technology is very difficult. There definitely needs to be a concerted effort made to develop and test equipment, new technology, and procedures in a realistically simulated deepwater environment. Industry, government, and academia need to join in a consortium to create a research and testing facility and think tank so that new and improved tools and processes can be developed to allow continued safe and reliable development of deepwater resources.

————

WilmerHale,
Washington, DC, June 11, 2010.

Hon. Jeff Bingaman,
Chairman, Committee on Energy and Natural Resources, U.S. Senate, Dirksen Senate Building, Washington DC.

Re: Response to Chairman Bingaman's Correspondence Dated May 17, 2010, to Mr. Lamar McKay, Chairman and President of BP America, Inc.

Dear Chairman Bingaman: I am writing on behalf of BP America, Inc. (BP) in response to your May 17, 2010 correspondence to Mr. Lamar McKay, its Chairman and President, in which you and your colleagues requested responses to certain questions for the record in connection with the U.S. Senate Energy and Natural Resources Committee's examination of the incident in the Gulf of Mexico involving the Deepwater Horizon oil rig. As part of BP's commitment to provide information responsive to the Committee's requests in a timely manner, we are providing the following responses to questions of the Committee, which are highlighted below, including the documents identified by the Bates range [BP-HZN-SNR00016959 to BP-HZN-SNR00019314]. To provide responsive information in a timely fashion, BP has endeavored to collect information and documents from some of the sources likely to have relevant data and best able to provide it within the timeframe set out by the Committee. This information supplements BP's earlier production to the Committee on June 3, 2010 and represents current understandings of these matters.

Included in this production are the following documents responsive to the Committee's requests (b), (c), (d) and certain subparts of (f), respectively, from your May 17 letter: (1) additional correspondence between BP employees and the Minerals Management Service (MMS) related to the Macondo well [BP-HZN-SNR00016988 to -89; BP-HZN-SNR00016991 to -995; BP-HZN-SNR00017392 to -94; and BP-HZN-SNR00018153 to -75]; (2) documents relating to the risk of an accidental release of oil or gas at the Deepwater Horizon drilling rig or other offshore deepwater drilling facilities; (3) additional reports of daily activity on the Deepwater Horizon [BP-HZN-SNR00017395 to -8152]; and (4) well program documents [BPHZN-SNR00016959 to -87; BP-HZN-SNR00016990; BP-HZN-SNR00016996 to -7391; and BP-HZN-SNR00018176 to -80]. In addition, this production includes documents responsive to elements of the document requests embedded in the Chairman's several questions herein.

Responses of Lamar McKay to Questions From Senator Bingaman

Question 1. Please list all types of data from the Deepwater Horizon operation now in BP's possession, and whether each item of data has been made available without limitation to the Federal Government investigators, and identify those investigators.

Answer. If the data has not been made available without limitation, please state the extent and nature of any limitation. Please describe the means by which data was transferred from the rig to BP data collection facilities off of the rig. BP currently possesses the following information recorded or measured by sensors on or from the Deepwater Horizon for the Deepwater Horizon Mississippi Canyon 252 Well #1 (MC252 #1) drilling operation. Except as noted, these data have not been provided to any federal investigator. BP understands the request as seeking data of the types listed and, on that basis, believes the listing below is accurate. However, reviews are continuing and BP will supplement this response as appropriate.

(a) Wellbore data
• Wireline logs and evaluation data.—This data for the Deepwater Horizon was provided to BP by the contractor on a CD after the April 20 incident.
• Mud logs.—The Deepwater Horizon mud logs were provided to BP on a CD by the contractor after the April 20 incident.

• Logging While Drilling/Monitoring While Drilling (LWD/MWD) logs.—The Deepwater Horizon LWD/MWD logs were provided to BP by the contractor on a CD after the April 20 incident.

• Wellbore Surveys.—The Deepwater Horizon surveys were provided to BP on a CD by the contractor after the April 20 incident.

(b) Surface Data—(rig sensors that capture parameters such as flow-in, flow-out, pit volume and pressures). This information is real-time data that is provided to BP via an internet site established by the contractor and on ASCII files supplied by the contractor. This data was provided to the Marine Board Investigation (MBI) Panel, on May 8 and May 21, 2010.

(c) Computer Analyzed Makeup Of Casing String Connections.—This information is believed to have been provided to BP by the contractor to BP after the April 20 incident.

(d) Blowout Preventer (BOP) Digital Test Data.—This data for the Deepwater Horizon was provided electronically to BP by the contractor.

(e) Cement Pumping Data Report Data.—This data was provided to BP by the contractor after the April 20 incident.

*Question 2.* Please list all contacts with and witness statements from eyewitnesses to the Deepwater Horizon operation including but not limited to the crew present on the rig at the time of the explosion. Please state whether these statements and witnesses have been made available to the Federal government investigators without limitation, and identify those investigators. If they have not, please state the extent and nature of any limitation.

Answer. The following BP employees were eyewitnesses to the incident and present on the scene at the time of the April 20 Deepwater Horizon incident: (a) Shane Albers, (b) Robert Kaluza, (c) Lee Lambert, (d) Patrick O'Bryan, (e) David Sims, (f) Brad Tippetts, and (g) Donald Vidrine. Each of these witnesses provided a witness statement to United States Coast Guard personnel following the April 20 incident. Messrs. Vidrine and Kaluza also prepared a written statement shortly after the April 20 incident. BP understands that employees of other companies also provided statements to the Coast Guard. Pursuant to a confidentiality order issued by the Coast Guard, BP is prohibited from distributing this information.

*Question 3.* Please describe BP's data and document retention policy as it relates to material relevant to the Deepwater Horizon Macondo well operation. Please state when the last data from the Deepwater Horizon was received by BP.

Answer. Since the Deepwater Horizon incident occurred on April 20, 2010, BP has taken steps to preserve documents that are potentially relevant to the Macondo well operation, the April 20 incident, and the subsequent discharge of hydrocarbons into the Gulf of Mexico. For example, BP has sent a Legal Hold Order to over 3,500 BP employees identified as possible custodians of potentially relevant documents. The Legal Hold Order directs recipients to preserve all potentially relevant documents, including those relating to the April 20 incident; the response to that incident, including investigation, containment and clean-up efforts; any damages resulting from the incident; the exploration of, and drilling operations at, Mississippi Canyon Block 252, where the Macondo well is located; and the Deepwater Horizon rig and equipment, including their design, safety features, maintenance and operation; among many other matters. The Legal Hold Order explains that the "documents" that must be preserved include all potentially relevant electronically stored information (including electronic mail, and other electronic databases or files, such as Word, Excel, and PowerPoint), paper documents, video and other recordings, and physical objects, among other things. The Legal Hold Order instructs that all potentially relevant documents must be preserved, and calls for the immediate suspension of any document retention policies that could cause any such documents to be discarded or no longer retained.

Based on presently available information, the surface data from the Deepwater Horizon was transmitted continuously by the contractor, including on April 20, to a website to which BP had access that disclosed real-time data of certain parameters, and stopped being transmitted at 21:49 CT on the night of April 20, which is the last data received from the Deepwater Horizon.

*Question 4.* Please describe the number of BP company employees at the rig site at the time of the explosion as well as their job title and function, education, and years of experience working offshore. Also please state the number and job titles of all BP employees involved in the well planning team for the Macondo well, including the original and all subsequent well plans. Please include information for each employee as follows: job title, education, and years of experience.

Answer.

78

(a) The following BP employees were on the Deepwater Horizon at the time of the April 20 incident:

1. Shane Albers. Mr. Albers' job title is Subsea Project Engineer Challenger. Mr. Albers' job function is focused on delivery of subsea tie-back projects to new or existing hosts. Mr. Albers holds a Bachelor of Science in Mechanical Engineering and a Bachelor of Business Administration in Finance, Economics, and General Business from Texas Tech University, earned in 2009. Mr. Albers has 1 year of experience working offshore.

2. Robert Kaluza. Mr. Kaluza's job title is Well Site Leader. Well Site Leaders are stationed on the rig site to evaluate whether the well is constructed to BP design specifications. Mr. Kaluza holds a Bachelor of Science in Business Administration and Finance from University of North Dakota, earned in 1973. He also has a Masters of Business Administration from the University of Alaska, earned in 1986, and a Bachelor of Science in Petroleum Engineering from the University of Alaska, earned in 1995. Mr. Kaluza has 35 years of experience in the oil and gas industry and over 8 years as a Well Site Leader, including nearly 2 years of offshore deepwater working experience.

3. Conward Lee Lambert. Mr. Lambert's job title is Well Site Leader Trainee. Mr. Lambert's job function is to develop the necessary skills and competency needed to work as a deepwater Well Site Leader. Mr. Lambert holds a Bachelor of Business Administration in Computer Information Systems from Texas State University, earned in 2002. Mr. Lambert has 2 years of experience as a Well Site Leader, and 6 months of offshore drilling training experience.

4. Patrick O'Bryan. Dr. O'Bryan's job title is Vice President for Drilling and Completions in the Gulf of Mexico. Mr. O'Bryan's job function is to manage drilling and completions for BP's Gulf of Mexico business. Mr. O'Bryan holds a PhD in Petroleum Engineering from Louisiana State University, earned in 1988, a Master of Science in Petroleum Engineering from Louisiana State University, earned in 1985, and a Bachelor of Science in Petroleum Engineering from Mississippi State University, earned in 1983. Mr. O'Bryan has 22 years of experience in the oil and gas industry including over 5 years of deepwater drilling experience.

5. David Sims. Mr. Sims' job title is Operations Manager for Exploration & Appraisal in the Gulf of Mexico. Currently, Mr. Sims' responsibilities include managing operations for the relief well being drilled by Transocean's DDIII rig, and previously, for exploration and appraisal in the Gulf of Mexico. Mr. Sims holds a Bachelor of Science in Mechanical Engineering from Texas A&M University, earned in 1982. Mr. Sims has 28 years of experience in the oil and gas industry, including 4 years of deepwater drilling experience.

6. Brad Tippetts. Mr. Tippetts' job title is Subsea Wells Engineer Challenger. Mr. Tippetts' job function is to plan and oversee all activities that fall under the category of wellhead conversion for exploration/appraisal wells to development well. Mr. Tippetts holds a Bachelor of Science from University of Utah, earned in 2006 and has 3 years of experience working offshore.

7. Donald Vidrine. Mr. Vidrine's job title is Well Site Leader. Well Site Leaders are stationed on the rig site to evaluate whether the well is constructed to BP design specifications. Mr. Vidrine holds a Bachelor of Science in Agronomy from McNeese University, earned in 1970. Mr. Vidrine has 32 years of experience as a Well Site Leader, including 25 years of experience working offshore.

b. Numerous BP employees provided input and guidance in the planning, design, and/or execution of the MC252 #1 well. To date we have identified the following as individuals who provided such input and/or guidance:

1. David Sims. Identified above.

2. Mark Hafle. Mr. Hafle's job title is Senior Drilling Engineer. Mr. Hafle holds a Bachelor of Science in Petroleum Engineering from Marietta College. He has 23 years of experience in the oil and gas industry, all working for BP. He has 17 years of experience in deepwater drilling.

3. Brett Cocales. Mr. Cocales' job title is Senior Drilling Engineer. Mr. Cocales holds a Bachelor of Science in Petroleum Engineering from Montana Tech, earned in 1986 and a MBA from University of Montana earned in 1989. He has 24 years of experience in the oil and gas industry, including nearly 10 years in deepwater drilling.

4. John Guide. Mr. Guide's job title is Wells Team Leader. Mr. Guide holds a Bachelor of Science in Chemical Engineering from the University of Pitts-

burgh, earned in 1980. He has 30 years of experience in the oil and gas industry, including 10 years in deepwater drilling.

5. Ian Little. Mr. Little's title is Vice President of Drilling and Completions for North Africa. Mr. Little holds a Bachelor of Science in Civil Engineering from University of Strathclyde (Glasgow, Scotland), earned in 1981. He has 28 years of experience in the oil and gas industry, including 8 years of deepwater experience in West of Shetlands (UKCS), Egypt, and the Gulf of Mexico.

6. Donald Vidrine. Identified above

7. Robert Kaluza. Identified above

8. Ronald Sepulvado. Mr. R. Sepulvado's job title is Well Site Leader. He has a Bachelor of Science in Agricultural Business from Louisiana State University, earned in 1971. He has 33 years of experience as a Well Site Leader, all in offshore drilling.

9. Murry Sepulvado. Mr. M. Sepulvado's job title and function is Well Site Leader. He has 32 years experience as a Well Site Leader, all in offshore drilling.

10. Gregg Walz. Mr. Walz's title is Drilling Engineering Team Leader, Gulf of Mexico Exploration & Appraisal. Mr. Walz holds a Bachelor of Science in Petroleum Engineering from New Mexico Institute of Mining and Technology, earned in 1980. He has 30 years of experience, including 14 years of experience in offshore drilling of which 6 have been in deepwater.

11. Brian Morel. Mr. Morel's job title is Drilling Engineer. Mr. Morel holds a Bachelor of Science in Mechanical Engineering from Rice University, earned in 2005. He has 5 years of experience in the oil and gas industry, including 2 years experience in deepwater drilling.

*Question 5.* Were there any incentives or bonus programs available for your company employees or employees of any of your contractors in effect at the time of the Deepwater Horizon accident? If so, please describe the terms on which bonuses or incentives were available.

Answer. BP had no incentives or bonus programs for any of the employees of any of the contractors for the Deepwater Horizon.

Further, BP had no incentives or bonus programs for any BP employees directly related to the Deepwater Horizon. BP employees, including the BP employees who worked on the Deepwater Horizon, are eligible for participation in the Variable Pay Program (VPP), which creates the opportunity to receive additional compensation beyond the employee's base salary. The amount of the variable pay award depends on the combination of the employee's performance based on individual objectives set at the beginning of each year and the performance of the employee's Strategic Performance Unit (SPU) during the year. BP's Gulf of Mexico (GoM) operations is the SPU for BP's employees involved with the Deepwater Horizon. The variable pay award for such BP employees is based on the overall performance of the Gulf of Mexico SPU as a whole, and not on the performance of any individual drilling operation.

*Question 6.* Please state whether there was any active monitoring in the Macondo well of the annulus (using downhole sensors) in the 20 hours preceding the accident? Were there any sensors in the borehole? If so, please provide that data. Please also state whether it is included in the data listed in response to Question #1.

Answer. Based on information presently available, during the 20 hours immediately preceding the April 20 incident, all active monitoring was conducted using sensors at the surface, and not with downhole sensors.

*Question 7.* Please state whether it is your intention to acquire downhole data during the relief well drilling process, and if so state the purposes for which you intend to use the data. Include in your answer whether it is your intention to use such data to analyze the integrity of the bottomhole or to get a better understanding of the competence of the cement within the production liner and in the annulus. Include in your answer whether HR2D seismic data has been or will be acquired. Do you have or will you obtain any data indicating any changes to the subsurface, both in terms of the existing Macondo well and the geology surrounding the well following the well blowout?

Answer. BP has acquired high resolution two dimensional (HR2D) seismic data during the relief well drilling process. The purpose of collecting this data is to determine the presence of shallow hazards to support the relief well drilling program and casing design. These data were produced to this Committee on June 3, 2010 [BP-HZN-SNR00000007 to -010]. In addition, BP currently intends to collect downhole data in compliance with MMS requirements, as well as any other data necessary to complete the drilling of the relief wells, including but not limited to the following:

(a) MWD/LWD logging data. Monitoring while drilling and logging while drilling data includes subsurface lithology, directional surveys, wellbore pressures and temperatures, and drillstring dynamics of the relief well while drilling. The purpose of collecting this data is to ensure the relief well achieves the objective of intersecting the MC 252 #1 well and to comply with regulatory requirements.

(b) Drill cuttings from the 22" shoe to total depth (TD). The purpose of collecting this data is to allow for comparison of the cuttings from the original well to aid in determining the interval being drilled and to comply with regulatory requirements.

(c) Mud Samples from the 22" shoe to TD. The purpose of collecting this data is to allow for geochemical analysis to check for any potential oil from the original well.

(d) Base oil samples from the 22" shoe to TD. The purpose of collecting this data is to allow for geochemical analysis to check for any potential oil from the original well.

(e) Magnetic Ranging data. The relative position of the relief well with respect to the MC 252 #1 well will be determined using magnetic measurements.

The primary purpose of collecting the data described above is to enable the relief well's intersection with the MC 252 #1 well and for pumping operations to stop the flow of the MC 252 #1 well and prevent further flow. The collection of this data is not specifically intended to analyze the condition of the bottomhole and/or quality of the cementing related to the MC 252 #1 wellbore. Some of the data collected, specifically the mud and base oil samples, may provide some indication of changes to the subsurface, but it is not being collected solely or primarily for this purpose. BP may collect additional data in the future.

*Question 8.* Please provide a complete description of the activities that were occurring on the rig within the last 12 hours of operation prior to the accident, and complete copies of any documents or data in your possession that reflect those activities. Include in your answer information on the activities of each employee and whether there were any visitors on the rig at the time. If so, what were the purposes of their visit?

Answer. Investigations into the Deepwater Horizon incident are ongoing. That said, BP is producing a copy of a presentation developed by the team that is conducting BP's nonprivileged, internal investigation, which includes a timeline of events covering certain activities during the last 12 hours of operations [BP-HSN-SNR00018985 to -9032]. As noted in the presentation itself, not all information contained therein has been verified, and its perspectives are subject to further review in light of additional information or analysis. BP is also producing the cement test reports referred to in response to the Chairman's question No. 1. Documents reflecting activities during the last 12 hours prior to the accident also are included among those produced to this Committee on June 3, 2010.

BP employees Patrick O'Bryan and David Sims were visiting the Deepwater Horizon at the time of the incident for a scheduled leadership visit.

*Question 9.* Please state your current understanding of the timing and possible causes of this accident, and whether you believe it was a sudden catastrophic failure or whether there were warning signs in advance of the explosion. If you believe there were warning signs, please state what they were and why they were not acted upon. Include copies of any and all data and documents in your possession relevant to your answer.

Answer. Investigations into the Deepwater Horizon incident are ongoing, including BP's nonprivileged, internal investigation intended to address the topics posed by this question. That said, we are producing a copy of the presentation made by BP's internal investigation team (referred to in the response to the Chairman's question No. 8) which tentatively provides information relevant to your inquiry. Not all information contained within the presentation has been verified, and its preliminary perspectives are subject to review in light of additional information or analysis. BP's investigation is continuing into the timing and possible causes of the incident and the actions of those persons on the Deepwater Horizon prior to the April 20 incident.

Other documents responsive to this request include: (a) the technical data described in response to the Chairman's question No. 1; and (b) the documents produced to this Committee on June 3, 2010 detailing well construction details and daily operations on the Deepwater Horizon in the period prior to the incident.

*Question 10.* You have testified that there were anomalous pressure readings on the well in advance of the explosion. Please provide specific information about these pressure readings, when they were obtained, and what you believe they indicate, including any information they provide to you regarding the possible causes of the ex-

81

plosion. Please provide copies of any and all documents in your possession relevant to these pressure readings.

Answer. BP's non-privileged, internal investigation into the activities and events of the April 20 incident is continuing. Based on information presently available, there were pressure readings on the MC252 #1 well prior to the April 20 incident that on post-incident review appear anomalous. BP's current understanding of these pressure readings is outlined in the presentation being produced with this letter (referred to in the response to the Chairman's question No. 8). As noted in the presentation itself, not all information contained therein has been verified, and the preliminary perspectives it reflects are subject to review in light of additional information or analysis. BP's investigation as to the potential connection, if any, between these pressure readings and factors that may have contributed to the April 20 incident is continuing.

Other documents responsive to this request include the data (including surface data) described in response to the Chairman's question No. 1.

*Question 11.* Please state how the decision was made regarding the number of centralizers to be used in this well, and whether you believe the number used is industry best practice. Were there changes made to the original well plan and casing program that reduced the number of centralizers? If so, please state whether you believe that was adequate to maintain the integrity of the casing and cement program. Please provide any and all data and documentation regarding the decision on the number of centralizers to be used. BP's non-privileged, internal investigation into the April 20 incident is continuing.

Answer. BP's present understanding is that the number of centralizers used with the MC252 #1 well was selected based on the judgment and experience of the drilling team who were involved with the well design and execution and their understanding of the characteristics of the MC252 #1 well. For the 9-7/8" x 7" production casing, early plans called for six centralizers. As the cementing design iterations progressed, the number of centralizers varied. Six centralizers were run and believed in the judgment and experience of the drilling team to be adequate to maintain integrity of the casing and cement program. We are producing with this letter documents responsive to the assessment of the number of centralizers used.

*Question 12.* Questions have been raised about the timing of removing drilling mud from the Macondo well and replacing it with seawater during the plugging and abandonment process. Please state the point at which this operation began, whether this aspect of the operation was performed in accordance with your instructions to the rig operator, and whether there were changes in these plans during the course of the well operation. Please state whether any employee of any company involved in the rig operation expressed opinions on this subject or disagreed with any aspect of the operation directed by BP as the well operator. Please provide any and all data and documents relevant to this operation including the original and any modified plans for the plugging and abandonment operation.

Answer. BP's non-privileged, internal investigation into the activities and events of the April 20 incident are continuing and includes an analysis of the topics posed by this question. That said, based on presently available information, the removal of drilling mud and replacement with seawater on April 20, in preparation for temporary abandonment, began at approximately 16:00 CST. Based on information known to date, and its understanding of the facts, BP is not aware that any of its employees expressed disagreement regarding removal of drilling mud and replacement with seawater for MC252 #1 in preparation for temporary abandonment.

BP is producing a copy of the draft presentation developed by the team that is conducting BP's internal investigation (referred to in the response to the Chairman question no. 8). A copy of the Temporary Abandonment Permit approved by MMS on April 16, 2010 for the temporary abandonment of the Macondo MC 252 #1 well bore, which sets out the procedure approved by MMS for the temporary abandonment of the well, and related documents were produced to this Committee on June 3, 2010 [BP-HZN-SNR00000011—BP-HZN-SNR00000994]. Other documents responsive to this request include the data (including surface data) described in response to the Chairman's question No. 1.

*Question 13.* Some have suggested that the absence of an acoustic trigger device on the blowout preventer on this rig is a significant factor in the BOP's failure. Please state your view of this, including whether you think the BOP was triggered and failed to operate properly or whether there was a failure of the trigger mechanism itself. Please provide copies of any and all data and documents relevant to your response.

Answer. BP's investigation is continuing, and no determination has been made yet as to whether the absence of an acoustic backup control system was a significant factor with respect to the Deepwater Horizon BOP's performance.

82

The purpose of an acoustic backup control system is to provide back up operation of critical BOP functions in an emergency. Although the Deepwater Horizon did not have an acoustic backup control system, the Deepwater Horizon was equipped with multiple emergency systems: (1) an Emergency Disconnect System (EDS), (2) an automatic mode function (AMF), or "deadman," which activates when all hydraulic and electrical power is lost, and (3) ROV intervention capability. If a rig is equipped with multiple emergency systems, such as the Deepwater Horizon, an additional acoustic backup control system may be disadvantageous because it adds complexity to the hardware on the BOP stack.

BP is continuing its investigation and has not yet determined whether the BOP rams activated and closed either during the April 20 incident or subsequently.

*Question 14.* Testimony was received to the effect that the shear ram of the blow-out preventer was known to be unable to cut through certain material in the well, including tool joints and possibly other debris. Please state your view of this. If this is the case, explain how in your view a blowout preventer can be considered a fail-safe mechanism? Were there other mechanisms on this blowout preventer that you believe would have overcome this problem? Are there other technologies not used on this blowout preventer but available that may have overcome this problem?

Answer. The 5-1/2" drillpipe tube that was across the BOP stack at the time of the incident was capable of being sheared and sealed by the blind shear rams. It is known that the blind shear ram cannot shear the tool joint of the 5-1/2" drillpipe, and it is the responsibility of the drilling contractor, which operates the drill pipe and in this case was Transocean, to know the location of the tool joints in the BOP during all operations. In the event that the blind shear rams need to be shut and there are non-shearable components across the BOP stack, Transocean has procedures to drop the components into the well and allow the blind shear ram to be closed. There are no other mechanisms available on the BOP stack for the Deepwater Horizon that would shear the drillpipe tool joint. BP is aware that at least one manufacturer is developing shear ram technology that can shear through the tool joint for certain sizes of drillpipe, but such technology is not yet commercially available.

RESPONSES OF LAMAR MCKAY TO QUESTIONS FROM SENATOR MURKOWSKI

*Question 1.* Your testimony on the response efforts reflects that evacuated workers were all debriefed on the incident as soon as was possible. Please talk about who was conducting these debriefings, whether they knew the right questions to ask, and what mechanisms your company and the Unified Command had in place to transmit any timely and useful information back to the team working to contain the leak.

Answer. Individuals who were on the Deepwater Horizon rig were debriefed concerning the April 20 incident by the U.S. Coast Guard. The Coast Guard personnel responsible for debriefing these witnesses would be the most knowledgeable concerning the specific nature of the questions asked, and any transmission of information contained in the statements to the larger Unified Command.

*Question 2.* Can you describe the process for applying dispersants to oil at the leak source—how is it done and have initial attempts been encouraging?

Answer. The U.S. Environmental Protection Agency (EPA) and the U.S. Coast Guard have authorized BP to use dispersants underwater at the source of the Deepwater Horizon leak. Authorization followed a series of trials with ongoing sampling and monitoring of dispersant effectiveness and water column effects with Coast, Guard, EPA and other agency supervision. BP is currently applying liquid dispersant (Corexit 9500) at the wellhead at the rate of approximately 10,080 gallons/day, pursuant to a June 8, 2010 subsea dispersant application plan and approval. BP is using ROV's to apply the dispersant to the escaping oil at the source.

EPA has stated that, "[p]reliminary testing results indicate that subsurface use of the dispersant is effective at reducing the amount of oil from reaching the surface." EPA has also said that "what the monitoring data indicates so far is that the underwater use of dispersants is effective at breaking up the oil and, to this point, does not seem to have had any significant impacts on aquatic life. Using the dispersant underwater at the source of the leak also requires far less dispersant to be applied." [May 24, 2010 Press Release by EPA and Coast Guard].

All dispersant use is performed under the supervision of the EPA and the Coast Guard. The current plan requires BP gradually to reduce the amount of dispersants used at the site. As more oil is captured in the riser, less dispersant is needed to treat oil in the water column. EPA maintains a website dedicated to this topic which contains further details and documentation regarding the use of dispersants in con-

83

nection with the incident, the associated ongoing monitoring required by EPA, and detailed monitoring.[1]

*Question 3.* Law requires the responsible party to advertise how to claim compensation for losses due to a spill. Can you describe this process for the committee and viewers?

Answer. BP Exploration & Production Inc. (BPXP) has been designated as a "responsible party" under OPA and, when addressing claims, will be guided by the statute and implementing U.S. Coast Guard regulations and guidance. BPXP will abide by the statutory and regulatory guidance, and our intent is to be efficient, practical, and fair. Under OPA, claimants may recover for the following categories of costs and damages caused by an oil spill: removal costs, property damage, subsistence use of natural resources, net lost government revenue due to injury, destruction or loss of property or natural resources, lost profits and earnings due to injury, destruction or loss of property or natural resources, and net costs of providing increased or additional public services.

As directed by Congress under OPA, BPXP will evaluate a claim in the first instance. BPXP has hired ESIS, Inc. (ESIS)—a known leader in the field—to assist in the handling of claims. ESIS is part of the ACE Group of Companies, headed by ACE Limited. The ESIS Claims team assisting BPXP has extensive experience with claims, including injury, environmental and property damage claims. BPXP will work with ESIS, the Coast Guard and other relevant stakeholders as necessary in making decisions regarding specific claims. After the first month, claimants will continue to receive any future payments electronically. The check for the advance payment will be mailed or can be picked up at the nearest BP Claims Center, the location of which will be communicated to the claimant. Alternative arrangements can be made if these methods of check delivery are not feasible.

BP has established claims offices for the Deepwater Horizon incident along the Gulf Coast in Alabama, Florida, Louisiana, and Mississippi, with office hours from 8 a.m. to 7 p.m. each day. A complete listing of BP claims office locations is available to the public on the www.deepwaterhorizonreponse.com website.

*Question 4.* BP appears to be actively directing funds towards the containment, response, and compensation efforts underway and we've heard the company's statements about how it expects to exceed the $75 million strict liability cap under the Oil Pollution Act. Since the cap is expected to be exceeded, does that indicate the cap should potentially be raised?

Answer. In regard to the economic damages cap of $75 million contained in the Oil Pollution Act (OPA), BP has stated that it is prepared to pay above $75 million on these claims and will not seek reimbursement from the U.S. Government or the Oil Spill Liability Trust Fund. More generally, the OPA is applicable to a wide variety of activities involving exploration, production, transport and handling of oil. BP does not have a position at this time concerning changes that might be made to that federal authority.

*Question 5.* Would BP anticipate a raise in this strict liability cap to limit its ability to partner with and do business with Independent exploration and production

Answer. BP has not assessed whether raising the economic liability cap under the OPA would limit its ability to do business with independent exploration and production firms. BP would expect to participate in the public discourse in connection with any future legislative proposals.

*Question 6.* As I understand it there are 10,000 personnel employed on containment and response efforts with 2,500 volunteers. Can you describe any positive developments in terms of innovative response that the collective minds have come up with?

Answer. Since the start of the MC252 spill, BP has received thousands of suggestions from the public describing potential ways to stop the flow of oil and gas or to contain the spill on and off the Gulf coast shoreline. Over 40,000 ideas had been submitted up until the end of May. Since the beginning of June, the number of suggestions coming in has increased—with BP's Houston Call Center now receiving, on average, 5,000 suggestions a day. These suggestions have come in from across the world. The suggestions have come in from a variety of people, ranging from general members of the public to oil industry professionals. The suggestions also have come in from those speaking many different languages, ranging from Arabic to Russian. Anyone with an idea for BP's team is encouraged to submit it using the Alternative Response Technology (ART) online form located at http://www.horizonedocs.com/artform.php.

This form is a valuable tool in helping the team to see quickly the potential of the idea because it collects a list of the materials, equipment, and skills required

---

[1] http://www.epa.gov/bpspill/dispersants.html

for the idea to work. After the caller completes and submits the form, 30 technical and operational personnel review its technical feasibility and application and classify it as one of three categories:

- Not possible or feasible under these conditions;
- Already considered or planned for; or
- Feasible.

So far, over 7,000 ideas have been reviewed by BP technical and operational personnel. Currently, over 250 ideas have been advanced to a higher-level review in order to determine which ones fill an operational need and may require testing in the field.

- One such idea, submitted by Clean Beach Technologies, is a solution that is designed to mechanically separate oil from sand. A sample taken from an oiled beach in Louisiana was lab tested to verify this solution's efficacy. It appears that this solution may be feasible, so it is being prepared for field testing.
- Another idea, presented by Ocean Therapy Solutions, offers centrifuge equipment technology that can effectively separate oil from water within an oil spill scenario. This idea is also undergoing field tests.
- Other information being evaluated includes methods to combat the oil saturated in the sargassum, or seaweed, along the Gulf Coast. BP is currently looking for technologies that might be viable in this regard.

To ensure each idea received is reviewed in a timely manner, BP now has expanded its internal team and has linked up with a new working group. The working group has been set up by the U.S. Coast Guard. The Interagency Alternative Technology Assessment Program (IATAP) workgroup was announced in Washington on Friday, June 4th and includes representatives from the Minerals Management Service (MMS), the National Oceanic and Atmospheric Administration (NOAA), the Environmental Protection Agency (EPA), the United States Army Corps of Engineers (USACE), United States Department of Agriculture (USDA), and the Maritime Administration (MARAD).

RESPONSES OF LAMAR McKAY TO QUESTIONS FROM SENATOR MENENDEZ

*Question 1.* Should BP be drilling in places and at depths at which it is evidently not equipped to stop an oil spill once one has begun?

Answer. The circumstances of the Deepwater Horizon spill are extremely unique. The cause of the April 20 incident is the subject of BP's non-privileged, internal investigation, but, preliminarily, it appears that it resulted from a series of unexpected and unusual events. More than 40,000 wells have been drilled in the Gulf of Mexico and the incident on April 20 is the first event of its kind. Because the investigations of the incident are ongoing, it is premature to draw any conclusions about causes, but BP expects those investigations and review of the sub-sea interventions to be highly instructive concerning appropriate sub-sea intervention capability. The lessons learned will be incorporated into future planning and training.

*Question 2.* BP's lease at Deepwater Horizon received a categorical exclusion from the NEPA process last year. Why would this rig not require the oversight and regulation mandated under our country's most important environmental regulation? How could such an inherently dangerous activity not undergo thorough environmental review?

Answer. The MC252 well did undergo thorough prior environmental review under the National Environmental Policy Act (NEPA). The Council on Environmental Quality (CEQ) detailed the standard review steps followed for this well in a recent Federal Register notice:

Under the Outer Continental Shelf Lands Act, MMS has implemented a process for oil and gas development consisting of the following stages: (1) Preparing a nationwide 5-year oil and gas development program, (2) planning for and holding a specific lease sale, (3) approving a company's exploration plan, and (4) approving a company's development and production plan. MMS is required to apply NEPA during each of these stages, beginning with the initial planning of outer continental shelf leasing and ending with a decision on a specific well. The sequence of NEPA analyses is informed by the CEQ Regulations Implementing the Procedural Requirements of the National Environmental Policy Act, 40 CFR parts 1500-1508 . . . Specifically, 40 CFR 1502.20, discusses "tiering," a strategy used to avoid repetitive discussions of the same topics, and to prevent unnecessary duplication of work by reviewers, as the NEPA reviews progress from a broad program to a site specific action.

85

In the case of the Gulf of Mexico leases, MMS prepared several tiered NEPA analyses. Environmental Impact Statements (EIS), the most intensive level of analysis, were prepared at two decision points. First, in April 2007, MMS prepared a broad "programmatic" EIS on the Outer Continental Shelf Oil and Gas Leasing Program for 2007-2012. Also, in April 2007, MMS prepared an EIS for the Gulf of Mexico OCS Oil and Gas Lease Sales in the Western and Central Planning Areas, the "multi-sale" EIS. In October 2007, MMS completed another NEPA analysis, an Environmental Assessment (EA), under the multi-sale EIS, for Central Gulf of Mexico Lease Sale 206. This is the sale in which the lease was issued for the location that includes the Deepwater Horizon well. MMS previously approved BP's development operations based on a programmatic EA that MMS prepared in December 2002. Finally, for the Deepwater Horizon well, MMS applied its existing Categorical Exclusion Review (CER) process prior to the decision to approve the Exploration Plan that included the drilling of the Deepwater Horizon well. The Categorical Exclusion used by MMS for Deepwater Horizon was established more than 20 years ago.

75, Fed. Reg. 29996 (May 28, 2010). BP understands that the CEQ is now conducting a review of NEPA policies, practices, and procedures for the Minerals Management Service.

*Question 3.* BP likes to say that it is moving "Beyond Petroleum." What percent of your company's global capital expenditures in each of the last five years was spent on researching, exploring, and producing fossil fuels, and what percent was spent on those same activities for renewable fuels and renewable energy?

Answer. Since 2005, BP has invested approximately $4 billion in alternative energy, with activity focused on advanced biofuels, wind, solar power, and carbon capture and storage. From 2005 until 2009, BP's most recent reporting date, capital expenditures on activities related to exploration and production of oil and natural gas resources were approximately $73.85 billion.

*Question 4.* In a regional oil spill response plan BP filed, the company said it was capable of handling a spill of up 300,000 gallons per day, which might be more than what is currently spilling in the Gulf of Mexico. Yet BP is evidently incapable of responding properly to the current spill. Why was the oil spill response plan insufficient to handle the blowout? What lessons do you draw from this failure?

Answer. BP has a comprehensive oil spill response plan (OSRP) that was most recently reviewed and approved by the Mineral Management Service in June 2009. The worst case scenario anticipated by the OSRP is 250,000 barrels a day for 30 days. In connection with this event, the OSRP was implemented and BP was able to draw on and deploy an inventory of boom, dispersant, skimmers and other equipment to respond to the spill. Upon notification, resources from Marine Spill Response Corporation (MSRC) and National Response Corporation (NRC) (among others) were activated and mobilized to the scene. The OSRP has been the foundation from which the Coast Guard, other government agencies and BP have directed the response across the Gulf on the surface, in the subsea environment, and at the shore line. However, the type of failure here is unprecedented and has complicated the response effort. The investigations of the incident are ongoing, and it is premature to draw any conclusions about causes or relative effectiveness. When the leak is brought under control and investigations are complete, BP expects to share with governmental authorities, the industry and others any lessons learned, and it will certainly incorporate them into future planning and training.

*Question 5.* Recent news reports reveal that, based on the videotape of oil spilling from the seabed that BP released, numerous scientists believe that far more oil is spilling out than earlier estimates suggested. Does BP have other video or technical data that it has not yet made publicly available that would help independent experts determine the extent of the spill and what caused it? If so, do you pledge to make these resources available to the public so that independent experts can determine what went wrong?

Answer. BP has made video footage and other data information available to a range of stakeholders, including the U.S. Coast Guard, Minerals Management Service, National Oceanic and Atmospheric Administration, U.S. Environmental Protection Agency, U.S. Department of Homeland Security, U.S. Department of the Interior, U.S. Fish & Wildlife Service, National Park Service, U.S. Department of State, U.S. Geologic Survey, Centers for Disease Control, and the Occupational Health and Safety Administration, Members of Congress, and the public through live streaming video. In addition, the federal government created a Flow Rate Technical Group (FRTG), comprised of members of the scientific community and government agencies, to provide further specificity on the flow rate. Consistent with its stated com-

86

mitment to transparency and cooperation, BP has provided the FRTG with data showing release points and amounts of oil and gas currently being collected on the surface, as well as subsea video of the oil release to assist with FRTG's efforts. BP will continue to contribute its resources to contain the oil spill and understand the rate of oil release and its implications.

RESPONSES OF LAMAR McKAY TO QUESTIONS FROM SENATOR LINCOLN

*Question 1.* In media reports following this disaster, I keep reading over and over again that certain devices and technologies being discussed to stop the leak have never been used in water this deep. Do you believe the depth of water presents more challenges in containing the leak? Do you believe more testing, research and technologies are needed to ensure the safety of deepwater and ultra-deep water drilling?

Answer. The depth of the water (in this case, nearly a mile) does present certain challenges, but it is important to note that the particular circumstances that led to the April 20 incident and that have impacted containment response efforts are unique.

BP has committed up to $500 million to an open research program studying the impact of the Deepwater Horizon incident and the associated response actions on the marine and shoreline environment of the Gulf of Mexico. The key questions to be addressed by this 10-year research program reflect discussions with the US government and academic scientists. BP will fund research to examine topics including technology improvements to detect oil, dispersed oil, and dispersant on the seabed, in the water column, and on the surface; improved remediation technology to address the impact of oil accidently released to the ocean; the behavior of oil, dispersed oil and dispersant on the seabed, in the water column, on the surface, and on the shoreline; and the impacts of oil, dispersed oil, and dispersant on the biota of the seabed, the water column, the surface, and the shoreline.

*Question 2.* As the responsible party, BP has assumed liability for the damages resulting from this accident. What is BP doing to ensure that in the response and cleanup efforts, taxpayers don't end up footing the bill for this disaster?

Answer. As a responsible party under the Oil Pollution Act (OPA), BPXP is carrying out its responsibilities to mitigate the environmental and economic impacts of this incident. Its efforts are part of a unified command that was established within hours of the accident, and that provides a structure for its work with the Departments of Homeland Security and Interior, other federal agencies, and state and local governments. BP is committed to working with President Obama and members of his Cabinet, the governors, relevant state agencies and local communities of the affected Gulf States, and Congressional members. Everyone at BP fully understands the enormous nature of what lies ahead and is working to deliver an effective response at the wellhead, on the water, and on the shoreline.

Pursuant to the OPA, BP is paying all necessary cleanup costs and is committed to paying all legitimate claims for other loss and damages caused by the spill. BP is expediting interim payments to individuals and small-business owners whose livelihoods have been affected. As of June 8, BP had received over 39,000 claims and paid over $53 million. As BP has indicated, it believes the claims related to this event will exceed the economic damages cap set out in the OPA. BP is prepared to pay amounts above the statutory limit and will not seek reimbursement from the U.S. Government or the Oil Spill Liability Trust Fund.

Pursuant to OPA and other laws, as of June 8, 2010, BP also has paid $45 million to federal and state trustees, to enable them to engage in the pre-assessment and initial assessment of potential injuries to natural resources in the Gulf. The parties are working together in a cooperative manner to develop and implement further studies to evaluate the potential effects of this incident on natural resources.

*Question 3.* In your testimony, you state that blowout preventers are used on every oil and gas well today, and are supposed to be "fail safe." Clearly, as you indicated, that was not the case on the Deepwater Horizon rig, and BP is looking at why the blowout preventer did not work.

Answer. The functioning of the blowout preventer (BOP), and specifically why it did not function as expected on the Deepwater Horizon, is the subject of BP's ongoing non-privileged, internal investigation.

*Question 4.* What was BP's contingency plan should a blowout preventer fail and a leak take place? Do you believe that a remote-control shutoff device would have made a difference in this accident? Do you believe that MMS should review their decision not to require remote shutoff switches and make them mandatory as they do in Norway and Brazil?

Answer. BP's investigation is continuing, and no determination has been made yet as to whether the absence of an acoustic backup control system was a significant factor with respect to the Deepwater Horizon BOP's performance.

The purpose of an acoustic backup control system is to provide back up operation of critical BOP functions in an emergency. Although the Deepwater Horizon did not have an acoustic backup control system, the Deepwater Horizon was equipped with multiple emergency systems: (1) an Emergency Disconnect System (EDS), (2) an automatic mode function (AMF), or "deadman", which activates when all hydraulic and electrical power is lost, and (3) ROV intervention capability. If a rig is equipped with multiple emergency systems, such as the Deepwater Horizon, an additional acoustic backup control system may be disadvantageous because it adds complexity to the hardware on the BOP stack.

BP is continuing its investigation and has not yet determined whether the BOP rams activated and closed either during the April 20 incident or subsequently.

RESPONSES OF LAMAR MCKAY TO QUESTIONS FROM SENATOR SESSIONS

*Question 1.* What is BP's safety record with offshore drilling in the Gulf of Mexico and worldwide? Have you had any other incidents when you have subcontracted with Transocean?

Answer. BP's Drilling and Completions operations safety performance is at or better than industry (as measured by the International Association of Drilling Contractors voluntary survey) for both Gulf of Mexico and worldwide operations. In 2009, BP experienced 14 recordable incidents including 2 that resulted in Lost Time Incidents (LTIs) in our drilling and completion operations in the Gulf of Mexico. One of the LTIs and 7 of the recordables occurred on Transocean drilling rigs. These 14 incidents result in a LTI frequency of 0.12 and a Recordable Injury Frequency (RIF) of 0.82 for BP 2009 Drilling & Completion activity in the Gulf of Mexico. According to the International Association of Drilling Contractors website, a voluntary reporting mechanism for companies, the average 2009 US Waters Lost Time Incidents frequency rate was 0.20 and the Recordable Injury Frequency was 0.87.

BP's 2009 worldwide Drilling & Completions Lost Time Incident rate was 0.09 and the RIF rate was 0.67. According to IADC, global industry rates in 2009 were 0.37 and 1.92 for LTI and total Recordable rates, respectively. On Transocean rigs in 2009, BP experienced a total of 4 lost time incidents and 15 recordable incidents globally. There was one fatality in 2009 that occurred on a rig in Azerbaijan operated by a Joint Venture company, Caspian Drilling Company, which Transocean provided rig management services. Transocean are no longer involved in this operation.

There have been two incidents involving Transocean's Deepwater Horizon drilling rig since January 2005, both of which occurred in 2007 and one of which resulted in a fine. One of the two incidents involved a Notice of Violation assessed by the U.S. Coast Guard in April 2007 in connection with the accidental release of 10-12 gallons of synthetic base mud into the Gulf of Mexico. A $250 fine was imposed for this incident.

The second incident occurred in March 2007. MMS issued an Incident of Noncompliance (INC) after concluding that a pressure washer located on the rig floor had no external ground wire. Rescission of the INC was requested because the equipment in question was maintained and operated in accordance with all applicable safety codes and regulations. On July 17, 2007, MMS approved the rescission request and removed the INC from its database. No fine was imposed in connection with this incident.

*Question 2.* What is/was the role of BP in drilling this particular well? Is there a BP employee on the rig overseeing the subcontractors? Was BP responsible for all the drilling requirements (Ex. the depth of the well, where to drill, the mud mixture, cement mixture, when to remove the mud, when to place the cement plug in place)?

Answer. The roles and responsibilities of BP in drilling this well are governed by the 1998 drilling contract between BP America Production Co. and Transocean Holdings LLC.[2] A summary interpretation of these roles and responsibilities is provided below, in accordance with BP's current understanding and interpretation of the contract. BP reserves the right to amend or supplement this response upon fur-

---

[2]The original contract was between Vastar Resources, Inc. and R&B Falcon Drilling Co. The contracting parties became BP America Production Co. and Transocean Holdings LLC through acquisition and assignments.

# Exhibit C

# OFFSHORE DRILLING: INDUSTRY PERSPECTIVES

## OVERSIGHT HEARING

BEFORE THE

## COMMITTEE ON NATURAL RESOURCES
## U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED ELEVENTH CONGRESS

FIRST SESSION

Wednesday, February 25, 2009

### Serial No. 111-4

Printed for the use of the Committee on Natural Resources

Available via the World Wide Web: http://www.gpoaccess.gov/congress/index.html
or
Committee address: http://resourcescommittee.house.gov

U.S. GOVERNMENT PRINTING OFFICE

47-608 PDF                    WASHINGTON : 2009

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

## EXHIBIT "B"

COMMITTEE ON NATURAL RESOURCES

NICK J. RAHALL, II, West Virginia, *Chairman*
DOC HASTINGS, Washington, *Ranking Republican Member*

Dale E. Kildee, Michigan
Eni F.H. Faleomavaega, American Samoa
Neil Abercrombie, Hawaii
Frank Pallone, Jr., New Jersey
Grace F. Napolitano, California
Rush D. Holt, New Jersey
Raúl M. Grijalva, Arizona
Madeleine Z. Bordallo, Guam
Jim Costa, California
Dan Boren, Oklahoma
Gregorio Sablan, Northern Marianas
Martin T. Heinrich, New Mexico
George Miller, California
Edward J. Markey, Massachusetts
Peter A. DeFazio, Oregon
Maurice D. Hinchey, New York
Donna M. Christensen, Virgin Islands
Diana DeGette, Colorado
Ron Kind, Wisconsin
Lois Capps, California
Jay Inslee, Washington
Joe Baca, California
Stephanie Herseth Sandlin, South Dakota
John P. Sarbanes, Maryland
Carol Shea-Porter, New Hampshire
Niki Tsongas, Massachusetts
Frank Kratovil, Jr., Maryland
Pedro R. Pierluisi, Puerto Rico

Don Young, Alaska
Elton Gallegly, California
John J. Duncan, Jr., Tennessee
Jeff Flake, Arizona
Henry E. Brown, Jr., South Carolina
Cathy McMorris Rodgers, Washington
Louie Gohmert, Texas
Rob Bishop, Utah
Bill Shuster, Pennsylvania
Doug Lamborn, Colorado
Adrian Smith, Nebraska
Robert J. Wittman, Virginia
Paul C. Broun, Georgia
John Fleming, Louisiana
Mike Coffman, Colorado
Jason Chaffetz, Utah
Cynthia M. Lummis, Wyoming
Tom McClintock, California
Bill Cassidy, Louisiana

James H. Zoia, *Chief of Staff*
Rick Healy, *Chief Counsel*
Todd Young, *Republican Chief of Staff*
Lisa Pittman, *Republican Chief Counsel*

(II)

# CONTENTS

|  | Page |
|---|---|
| Hearing held on Wednesday, February 25, 2009 ................................................... | 1 |
| Statement of Members: | |
| Capps, Hon. Lois, a Representative in Congress from the State of California, Prepared statement of ............................................................... | 83 |
| Hastings, Hon. Doc, a Representative in Congress from the State of Washington ........................................................................................................... | 3 |
| Prepared statement of ............................................................................... | 4 |
| Rahall, Hon. Nick J., II, a Representative in Congress from the State of West Virginia ............................................................................................... | 1 |
| Prepared statement of ............................................................................... | 2 |
| Statement of Witnesses: | |
| Cejka, Tim, President, ExxonMobil Exploration Company ........................... | 31 |
| Prepared statement of ............................................................................... | 32 |
| Harbert, Karen A., President & CEO, Institute for 21st Century Energy, U.S. Chamber of Commerce ........................................................................... | 40 |
| Prepared statement of ............................................................................... | 42 |
| Luquette, Gary P., President, Chevron North America Exploration and Production Company ....................................................................................... | 33 |
| Prepared statement of ............................................................................... | 34 |
| McKay, Lamar, Chairman and President, BP America, Inc. ........................ | 13 |
| Prepared statement of ............................................................................... | 15 |
| Nichols, J. Larry, Chairman and Chief Executive Officer, Devon Energy Corporation, on behalf of the American Petroleum Institute .................... | 22 |
| Prepared statement of ............................................................................... | 23 |
| Odum, Marvin E., President, Shell Oil Company ........................................ | 6 |
| Prepared statement of ............................................................................... | 7 |
| Additional materials supplied: | |
| Engler, Hon. John, President and CEO, National Association of Manufacturers, Letter submitted for the record ........................................ | 84 |

13

and litigation—that currently hinder exploration in the Alaska OCS. The same issues will arise if and when other OCS areas are opened. It is imperative that we address them now and address President Obama's goal of making government work.

**Key Policies Going Forward**

Shell believes that there remains enormous energy potential on the OCS. Developing those resources can have a substantial impact on the U.S. economy and jobs, energy security, federal revenues and coastal states and communities. Properly expanding our oil and gas development on the OCS requires policy that:

- Recognizes the resource potential and impact on the U.S. economic recovery.
- Provides access to new areas on the OCS.
- Provides adequate environmental and community safeguards.
- Extends OCS revenue sharing beyond the four Gulf of Mexico coastal states.

According to the U.S. Minerals Management Service, there are 466 trillion cubic feet of natural gas and more than 96 billion barrels of oil yet to be discovered on the Outer Continental Shelf, including Alaska. To put that in perspective, that is enough natural gas to heat 100 million homes for 60 years and enough oil to fuel 85 million cars for 35 years. If we are going to utilize this resource and make it work for the American people, we need for government to take action.

Until last year, most offshore areas in the U.S. were restricted by Congressional withdrawal. Given the sustained high energy demand in the U.S. and globally, access to these resources under the long-respected government lease planning program is imperative. While I believe that much can be accomplished through that process, other issues like the need to address the regulatory system and its vulnerability to litigation requires more scrutiny.

Shell would like to work with Congress and regulatory agencies to enable proper exploration and development in the OCS in areas including:

- Marine Sanctuaries and No-Go Areas
- Ecosystem Based Management
- OCS Revenue Sharing
- State's Rights Issues

I would like to emphasize that states and communities adjacent to offshore development will have infrastructure needs such as roads, housing and schools for workers and their families, enhanced sea port and air terminal facilities, greater demands for basic public services and other expenses common to economic growth. For that reason we encourage Congress to extend the revenue sharing made available to four Gulf of Mexico states through the Gulf of Mexico Energy Security Act to other states and coastal communities that have oil and gas leasing off their coasts. Providing revenue sharing to states and local communities with future oil and gas production off their coasts would not take money out of the federal treasury. It would bring new money into the federal treasury and provide an incentive for states and local communities to support such activities.

We encourage a healthy discussion of these issues through the 5-Year Planning process and through informative hearings like those that are being held in this Committee. Ultimately, the government needs to decide what areas need to be made available for leasing and under what conditions. Those decisions need to be based on science and we need to act quickly and decisively so that we can begin developing these new energy sources that will enable us to meet the energy challenge and create new jobs and revenues for the American people.

For too many years the energy and environmental debate has been framed as an "either-or" and "us-against-them" proposition. It is wrong to frame the OCS issue in this way. It is not a trade-off between energy and economic value versus the environment. It is counter-productive to pose it as these false choices. We need to come together around the facts, reject the myths and move forward on solutions that will fuel the economic growth.

[NOTE: The Popular Science magazine article entitled "The World's Deepest Oil Well" has been retained in the Committee's official files.]

————

The CHAIRMAN. Thank you, Mr. Odum. Mr. McKay?

## STATEMENT OF LAMAR McKAY, CHAIRMAN AND PRESIDENT, BP AMERICA

Mr. McKAY. Chairman Rahall, Ranking Member Hastings, Members of the Committee, good morning. My name is Lamar McKay, and I represent more than 33,000 people working for BP in the

14

United States. BP is the country's leading producer of oil and nat-
ural gas, and the largest investor in U.S. energy development. Our
more than 13,000 service stations, most of them locally owned and
operated, are a familiar part of the American landscape.

We are here today to support an important part of America's
energy plan: opening the Outer Continental Shelf, opening that
shelf for evaluation and exploration. This strategic policy decision
will allow the industry to invest tens of billions of dollars to create
jobs for the American people, to diversify and expand the nation's
energy supply, to generate new revenues for Federal and state gov-
ernments, and do it while preserving the natural environment that
we all enjoy.

We also understand the desire for greater efforts toward effi-
ciency and energy conservation, for higher mileage automobiles,
and the need to develop low-carbon fuel for transportation. BP sup-
ports these efforts. We were the first energy company to recognize
the need to tackle climate change, and we are active in the effort
to meet the world's growing demand for sustainable, environ-
mentally responsible energy.

In alternatives, we are investing $8 billion over 10 years in solar,
wind and biofuels development. At the same time, we must face
certain realities. When the current economic downturn ends, the
nation's energy demands will increase once more. Even with major
investments in efficiency and new energy sources, the Energy De-
partment projects the U.S. will rely on fossil fuels for its primary
energy needs for decades to come.

Where will those fuels come from? As domestic U.S. energy pro-
duction has lagged in recent years, oil imports have risen. We now
depend on imported oil for about 65 percent of America's needs. Al-
most alone among the producing nations of the world, the U.S. has
heretofore decided not to fully develop its domestic hydrocarbon en-
dowment. A commitment by Congress to such development is one
of the surest ways of diversifying, securing and enhancing the na-
tion's energy supply.

Some of the most potentially promising areas for exploration lie
off our shores in the OCS. Estimates of the amount of oil and nat-
ural gas recoverable from closed areas vary. The Interior Depart-
ment estimates that there may be as many as 30 billion barrels of
oil-equivalent recoverable reserves utilizing today's technology.
There might be more. There might be less. We can't know unless
we evaluate and explore.

Conducting low-density seismic surveys and evaluations of the
entire OCS is an indispensable first step to identifying areas that
might be suitable for eventual production. This will allow more fo-
cused, higher-density seismic surveys to be carried out in the most
promising areas. We also support revenue sharing with coastal
states. Such arrangements have been put in place recently in Lou-
isiana, Texas, Mississippi and Alabama.

Opening up new areas would also benefit the Nation as a whole.
Royalties from onshore and offshore energy production to Federal
and state governments, as well as American Indian tribes, totaled
$23.4 billion in 2008. Given similar oil prices, those numbers would
likely increase significantly if the OCS were opened for further de-

15

velopment. It would also create a substantial number of good-paying American jobs.

We know that 21,000 jobs in Louisiana, with a payroll of $1.2 billion, depend directly on OCS oil and gas production offshore that state's Gulf Coast. Many more jobs, of course, are indirectly tied to such activity. BP supports an all-of-the-above energy strategy with investments across the board in fossil fuels, as well as low-carbon alternatives, but limiting or taxing one form of energy production while subsidizing another is unlikely to result in a net gain for the nation's energy supply.

BP is serious about bringing new sources of oil and gas to the U.S. market. We are also serious about building a sustainable, profitable, renewable energy business, one capable of delivering the clean, affordable energy consumers want. My company is ready to work to address the energy and environmental needs of this nation through a bipartisan and comprehensive energy policy. Thank you.

[The prepared statement of Mr. McKay follows:]

### Statement of Lamar McKay, Chairman & President, BP America

My name is Lamar McKay and I am the Chairman and President of BP America.

BP appreciates the opportunity to appear before this panel and present our views on exploring for potential new sources of oil and natural gas in areas of the federal Outer Continental Shelf (OCS). The needs of our country require that we explore for new domestic sources of energy that are secure and reliable in good times and in tough times.

I represent the 33,000 employees at BP working in the United States. We are not only the largest oil and gas producer in the United States, but also the company that invests in the most diverse energy portfolio in the industry. Since 2004, we have invested more than $34 billion in the U.S. to increase existing energy sources, extend energy supplies and develop new low-carbon technologies.

BP's investments stretch from the Gulf of Mexico to the North Slope of Alaska and from the East Coast to the Midwest and the West Coast. Our over 13,000 service stations—most of them locally owned and operated—are a familiar part of the American landscape.

The company's major spending programs also touch every major segment of the energy industry, from exploration and production of oil and natural gas through refining and distribution of fuel products, as well as renewables.

By heavily investing in a diverse range of energy sources—from traditional oil and natural gas production to renewable energy including biofuels, solar, wind and hydrogen power—BP is helping meet America's energy needs today while moving towards a more secure energy future.

In 2008, BP's U.S. production of liquid hydrocarbons was 538,000 bpd, about 10 percent of U.S. domestic production and the largest of any single producer. Our gas production was over 2 Bcfd.

BP's solar business has been in operation for over 30 years and last year had sales of 162 MW globally. This represents an increase of 29% over 2007 and expectations are there will be significant growth through 2009.

We are major investors in wind generation and have amassed a land portfolio capable of potentially supporting up to 20,000 megawatts (MW) of wind generation, one of the largest positions in the country. As of year-end 2008, BP and its partners had 1,000 MW of wind generation on-line and expect to have an installed capacity of approximately 2,000 MW of wind power by the end of 2010.

We are one of the largest blenders and marketers of biofuels in the nation. Last year, BP blended over 1 billion gallons of ethanol with gasoline. We are underwriting cutting-edge research—investing more than $500 million over the next 10 years—in the search for a new generation of biofuels. We believe these will contain more energy, have less impact on the environment, and will not reduce the supply or increase the cost of food.

Overall, we support an energy policy that promotes the development of both traditional and non-traditional sources of energy, as well as conservation and efficiency. At the same time, our approach has been shaped by some stark realities about America's energy outlook.

16

## Stark Realities

The relatively low oil and gasoline prices American consumers are now enjoying masks the fact that our country faces tremendous energy challenges. Years of contradictory public policies, poor market dynamics and company decisions have combined to limit access to resources, discourage development and constrain new investment. No company or industry on its own is large enough or powerful enough to change the conditions that brought us here. But energy companies, policymakers and consumers together have roles to play in creating a new energy future for our country.

This relationship must be shaped by the recognition that the U.S. economy needs both to better conserve energy and to produce more energy of every type to meet future growth. We need to invest in conventional oil and gas. We also need to invest in renewables to begin the transition to a lower-carbon future. However, we must all understand that this future is many years away and that these new energy sources will not make a large contribution to total U.S. energy supply for many years.

This view is reflected in a 2007 study issued by The National Petroleum Council—Facing the Hard Truths About Energy. I have integrated its observations and conclusions below and added emphasis as necessary:

> *There is no single, easy solution to the global challenges ahead. Given the massive scale of the global energy system and the long lead-times necessary to make material changes, actions must be initiated now and sustained over the long term. Over the next 25 years, the U.S. and the world face hard truths about the global energy future:*
> - *Coal, oil, and natural gas will remain indispensable to meeting total projected energy demand growth.*
> - *The world is not running out of energy resources, but there are accumulating risks to continuing expansion of oil and natural gas production from the conventional sources relied upon historically. These risks create significant challenges to meeting projected total energy demand.*
> - *To mitigate these risks, expansion of all economic energy sources will be required, including coal, nuclear, biomass, other renewables, and unconventional oil and natural gas. Each of these sources faces significant challenges including safety, environmental, political, or economic hurdles, and imposes infrastructure requirements for development and delivery.*

The benign energy environment we are now experiencing may not last. Growth in the demand for energy will resume when our economy starts growing again. The U.S. Energy Information Administration (EIA) projects that energy demand will increase 11 percent by 2030. If anticipated U.S. needs are combined with those of the rest of the world, at growth rates of three percent, EIA projects that a 35 percent expansion in global oil production will be needed. That equates to an additional 30 million barrels of oil every day.

Finding that oil will be neither simple nor cheap. The era of "easy oil" may be over. New supplies are harder to find, more difficult and more expensive to extract, and are often located in politically unstable parts of the world. Wherever they come from, bringing new supplies to fuel our homes, businesses and transportation needs will require the investment of hundreds of billions of dollars.

Let me take the opportunity to put to rest a major energy myth, namely that there is no more energy to be found here in the US.

In fact, the United States is a sleeping giant when it comes to energy.
- We have a 100-year supply of coal. There is little doubt that, with "clean coal" and carbon capture technology, we could be using a lot more coal in the coming decades to heat our homes and recharge our electric cars.
- We have huge deposits of oil shale in many of our Western states.
- We have the potential to generate much more safe, clean, reliable electricity via nuclear energy than we are doing today.

But until technologies such as clean coal, carbon capture and renewable sources can come on line in a major way, far and away the greatest potential source of new domestic energy supply is the oil and natural gas that lies off our shores.

Here in the US, we have deliberately constrained our own supply by limiting access to promising areas for leasing, exploration and development. American domestic oil production has fallen by around 4 million barrels per day since 1985. At the same time, demand has risen by roughly similar amounts, so the gap must be filled by imports.

And when world demand rises—as it did recently, particularly in China and India—it makes those imports more expensive. That accounts in part for the dramatic rise in oil prices we experienced last summer.

17

A more secure and reliable source of energy closer to home is also essential to our country's long-term economic and energy well-being. As we have seen repeatedly since the first oil shock in 1973, wildly spiking and plunging oil prices kill jobs. Energy drives economic growth but few businesses—as we are seeing now—are willing to make investments in an atmosphere of great uncertainty.

The slowing of investment—the number of operating U.S. oil rigs has fallen to 1399, the lowest number since July 2005—presents a real risk to our economy. Prices could rise once again when the recovery occurs because investment may not be sufficient to offset the natural decline in the resource base. The challenge for all of us is to not allow this cyclical decline to create a structural loss in capacity. We must continue to invest in new technology and infrastructure development at the bottom of the cycle to provide continued access to supplies.

Areas of the OCS that have historically been off-limits to exploration can and should play a substantial role in closing this supply gap as well as securing our economic future. It is not the entire answer to the energy challenge we face, by any means, but the U.S. can't fashion an answer to its energy challenge without it.

A Department of the Interior study estimates the amount of oil to be found in areas that have been off-limits to exploration at 17.8 billion barrels. That's equal to 30 years of U.S. imports from Saudi Arabia. The same study put natural gas reserves at 76 trillion cubic feet, or enough to meet America's requirements for over 10 years.

These are DOI estimates. There could be more. There could also be less. We can't know unless we are given the opportunity to lease and explore.

The journey from access to production is a long one. A tremendous amount of preparation as well as infrastructure, both onshore and offshore, is required for successful development.

That's why we support a thoughtful and deliberate approach to this issue. As a first step, we propose the acquisition of new regional 2D seismic data in the OCS in order to identify the most prospective regions. From there, closely spaced 2D or 3D seismic data can be acquired to identify the best prospects in each area. Such surveys are costly and complex to plan and implement, but vastly increase the information content. This "virtual drilling" protects the environment by providing greater accuracy in mapping deposits and reduces the need for drilling exploratory wells.BP In the Gulf of Mexico

The track record of BP and the industry generally in the Western and Central Gulf of Mexico (GOM) demonstrates that when areas are opened, they can be leased, explored and developed to the highest environmental and operational standards in the world.

Our investments in the Gulf of Mexico are a remarkable American success story. Since 1985, oil production from the deepwater Gulf has increased 15-fold, from 58,000 to 870,000 barrels per day, or more than one in six barrels of oil produced in the US. It's also more than all the oil the U.S. imported on an average day from Angola, Indonesia, Kuwait, Libya, and Russia combined in 2007.[1]

We operate in water depths that exceed 1 1/2 miles—more than six Empire State Buildings stacked one on top of another—and well depths as great as 30,000 ft— the normal cruising altitude of a commercial passenger jet.

Further, we have had to cope with operating temperatures and pressures greater than any we have ever experienced. For example, a typical military fighter jet is capable of operating in an 8 G environment, while oil and gas drilling tools regularly experience forces in excess of 200 Gs. Despite these challenges, industry responded to government encouragement to invest, explore and develop the deepwater resource base.

The dramatic rise in deep-water production in the GOM also demonstrates an elemental truth about our business: the more we know, the more we can produce. As knowledge and technology advances, deposits once thought to be beyond reach or uneconomical to extract eventually become viable.

**Diligent Development of Leases**

I'd like to address an issue that has received a great deal of attention by some in Washington. The notion that the industry does not diligently develop the oil and gas leases it currently holds. For BP, this misperception is troubling as the leases we hold represent the future potential for oil and gas production—that is our business.

Companies spend millions to acquire leases with very little knowledge of their resource potential. I wish it were not so, but every lease does not contain oil and natural gas in commercial quantities. But, in order to determine that, we undertake

---

[1] EIA, "US Imports By Country of Origin," Annual Thousand Barrels per Day.

18

extensive geologic evaluations that extend over many years. It is through this proc-
ess that we develop the understanding, confidence and technology to drill and de-
velop a resource. The chart on page 18 graphically displays this lease maturation
process overlaid by a typical development timeline.

The dollars we invest in this process are similar to venture capital for our com-
pany. We have an obligation to not only our shareholders but also to the U.S. to
spend them wisely.

I am sure you would agree that all agricultural lands are not created equal—that
is the expectation you can get the same yield of corn in the Arizona desert as you
can in the heartland of the Midwest. So it goes with oil and gas leases. As the U.S.
Department of Interior points out, a lease does not guarantee the discovery of oil
and gas. Well success rates for onshore leases are about 10% for new areas. While
success rates on deepwater offshore leases are about 20%.

The industry has had great success in the 15% of the OCS that is currently avail-
able for development. Since 1995, more than 750 new exploration wells have been
drilled, yielding over 100 announced discoveries, much of which used technologies
only dreamed of as little as two decades ago. As a result of these efforts, 7 of the
top 20 U.S. oil fields are in the deep water of the Federal OCS. Since 1995, natural
gas and oil produced from the deepwater have expanded by 620 and 535 percent,
respectively.

By evaluating the potential of the remaining 85% and undertaking responsible de-
velopment, we believe this success can be replicated.

**The Role of Technology**

The energy industry isn't usually classified as a high-tech business, but it truly
is. This technology has been instrumental in protecting the environment. Today's
offshore oil drilling technology bears about as much resemblance to what was avail-
able in the 1960s as a rotary dial telephone does to an iPhone.

I have already mentioned improved seismic imaging, which allows us to locate
and map deep oil and gas deposits with vastly greater accuracy and less environ-
mental disturbance per barrel of oil produced. But there is much more.

For example:
- With directional and extended reach drilling, we can connect multiple wells to
  a single platform located miles offshore, thus reducing or even eliminating the
  visual "footprint" of permanent energy operations;
- All offshore wells have downhole flow control valves that shut down the well
  automatically if damage to the surface valves is detected;
- Blowout preventer (BOP) technology has improved tremendously since early off-
  shore drilling in the 1960's, and includes redundant systems and controls.
- New and improved well control techniques maintain constant control of the
  fluids in the well. Sensors continually monitor the subsurface and sea bed con-
  ditions for sudden changes in well pressure.
- We run emergency drills regularly, and all of our platforms have contingency
  plans that identify procedures, response equipment and key personnel needed
  for coping with oil outside containment. Also, since Congress passed the Oil Pol-
  lution Act of 1990, vastly greater resources are now in place to cope with "worst
  case" discharges.

The amount of oil introduced into the marine environment by oil and gas oper-
ations has fallen dramatically since the early 1970s. In fact, between 1991 and 1999,
35 times more oil was introduced into North American waters by recreational boat-
ers than by offshore oil operations.[2]

A study by the National Academy of Sciences found that, worldwide, the amount
of oil introduced into the marine environment had fallen by 80 percent. Offshore oil
production accounted for just four percent of that total, even as such production in-
creased 204 percent in the same period.

Looking specifically at the OCS, around 1.4 million barrels of oil per day are
pumped from the OCS. According to MMS data, since 1980, less than .001 percent,
or one one-thousandth of one percent, has escaped containment.

Loss of oil from tankers has also become far less likely than in earlier decades,
thanks to the advent of double-hulls and other safety measures. Nevertheless, be-
tween 1971 and 2000, more oil was released into U.S. waters as a result of tanker
operations (45 percent) than from OCS drilling (two percent). In the absence of in-
creased domestic production, the U.S. will have little choice but to increase the
amount of oil it receives from other sources via tankers.

---

[2] Oil in the Sea III, Committee on Oil in the Sea: Inputs, Fates, and Effects, National Re-
search Council; Table 2-2 Average, Annual Releases (1990-1999) of Petroleum by Source (in
thousands of tonne).

19

For those who continue to question the safety of offshore energy operations, I can only point to our record in the GOM. Hurricanes Katrina, Rita, Ike and Gustav caused serious damage to oil rigs and pipelines throughout the area and shut many of them down for a time. But our personnel and safety systems were up to the challenge. There were no instances of significant oil leakage or spills.

Our technology will only improve as we go forward. At the same time, it makes strategic sense to diversify our offshore production activities away from areas subject to regular severe weather events such as the GOM. When domestic supply comes from a variety of areas, geographically speaking, those vulnerabilities can be minimized or reduced significantly.

**The Role of Policy**

As we look to the future, the U.S. investment climate remains challenging. Government policy can both be a vital enabler of new development or an unfortunate impediment to much needed investment. Over the last several years, numerous efforts have unnecessarily burdened viable and critical infrastructure projects; promising development areas remain out of reach; existing manufacturing operations have been challenged in their efforts to upgrade and expand; and new taxes have been proposed that will discourage future energy resource development. Furthermore, these stumbling blocks exist across the energy profile, and are not just confined to oil and gas activities.

*Support for Renewables*

Emblematic of these gaps are policy discussions concerning how to support and fund the development of new energy resources like wind, solar and biofuels. Not surprisingly, policymakers and consumers generally support efforts that promote the development of renewable energy. As reflected in our investment portfolio, BP concurs with this sentiment. However, there is significant divergence of opinion regarding the question of how to fund the necessary financial incentives.

BP supports transitional incentives for wind, solar, and biofuels. They are an important part of why the U.S. has been so successful in developing its renewable energy sector, but we cannot support taxes that discourage efforts to bring on other much needed energy sources (oil and gas production). This is not a recipe for increasing America's total energy production.

*Biofuels*

Similar policy concerns exist in the area of biofuels. EISA of 2007 created significant opportunities to develop and grow the contribution of biofuels to the transportation fuels market. BP believes that biofuels may be able to attain penetration rates of 20% or more by 2030 thus playing a significant role in meeting future transportation needs. However, the legislation has created challenges that could in the end create market distortions, supply disruptions and higher consumer prices if not adequately addressed.

The implementation timetable of the RFS program is very aggressive, creating a risk to delivery of fuel in sufficient quantities to the markets where it is needed. Congress, while mandating biofuels blending, did not adequately assess whether the market was prepared to accommodate the huge storage, transportation and delivery infrastructure requirements necessary to get the product to the consumer. In addition, given the recent economic downturn and reduction in gasoline demand, mandated blending levels are expected to outstrip the ability of the market to absorb the volumes as early as 2010, potentially threatening the integrity of the program.

BP supports accelerating research to test, evaluate and approve the use of higher biofuel blends. Further, we support efforts to transition incentives away from first generation biofuels to support the research, development and deployment of advanced non-food feedstocks, conversion technologies and fuel molecules. Similarly, policymakers should explore how trade policy can be improved to stimulate greater worldwide biofuels production and supply options for the US.

*Climate policy*

Our nation faces difficult choices as we take steps to foster economic growth, ensure our nation's energy security and protect the environment. Chief among these environmental concerns is that of global climate change.

BP has long advocated for the creation of a single, mandatory U.S. greenhouse gas emissions registry and a market-based price for carbon. Market-based programs deliver the greatest and fastest reductions at the least cost. Just as important, they create a level playing field, meaning that everyone must be part of the solution and first movers aren't placed at competitive disadvantage.

The fact that Congress has not yet addressed national climate policy has not deterred some from trying to impose requirements as if a national policy existed.

20

During the last Congress, legislation was adopted to discourage development of Canadian oil sands—the single largest oil resource base outside of Saudi Arabia. Additionally, a bill was introduced to prevent the U.S. from utilizing its world leading resource position in coal for power generation. Similarly, efforts continue to either allow or encourage state or local jurisdictions to try and impose $CO_2$ reduction targets on individual projects in order to make them uncompetitive and further discourage resource development.

Why do I mention these examples? They clearly represent efforts to limit energy development opportunities that would enhance U.S. energy security, economic development and environmental protection. And, in the absence of a national climate policy, these approaches will proliferate and likely result in a piecemeal regulatory approach that will stifle investment of all kinds.

We believe Congress needs to adopt a national climate policy that establishes a price for carbon. This policy mechanism will allow companies to make better investment decisions and consumers more informed behavioral choices. To do otherwise stifles the very technology breakthroughs and developments Congress supports.

*Energy Security*

Over the years, U.S. policy has, in effect, encouraged oil and gas providers to look beyond the U.S. border to meet growing U.S. energy demands, yet policymakers often question our reliance on foreign oil imports. Policymakers have also implored OPEC to produce and develop its own oil resources in order to reduce crude oil prices in the US.

The U.S. should strive to more fully develop its own resource base—to make a greater contribution to world oil supply—otherwise we will increasingly rely on imported energy to meet the needs of our growing economy.

The U.S. experience in the deepwater Gulf of Mexico is instructive in evaluating the role of policy. The development of the deepwater GOM was no accident or coincidence. Positive federal policies, including the Deepwater Royalty Relief Act of 1995, were instrumental in bringing the deepwater GOM online. Since its passage, GOM deepwater production has increased 15-fold to nearly 900,000 barrels/day.

**Federal and State Governments Will Benefit**

Increasing access to the OCS represents a potential highlight on the energy horizon—enabling job creation, generating much needed revenues for local, state and federal governments, improving the nation's energy security, reducing the transfer of wealth and expanding the manufacturing sector.

Our industry directly employs 1.8 million Americans, with at least another four million indirect jobs supporting the industry. And these are good-paying jobs. Oil and natural gas exploration and production wages in 2006 were more than double the national average.[3] These employees are covered by comprehensive health care for which the industry pays billions. America lost nearly 600,000 jobs last month alone. We can and need to keep America's energy industry working to deliver energy security for all of us.

Royalties paid to the federal government by our industry are among its largest single sources of revenue. In FY 2008, the Interior Department disbursed to the federal government, state treasuries and American Indian tribes a record $23.4 billion from both onshore and offshore energy production, including over $10 billion in bonus bids alone to acquire leases. These revenues, of course, benefit all Americans.

On the state level, BP believes that a revenue sharing program, similar to that which is now in place under the Gulf of Mexico Energy Security Act of 2006 for Louisiana and other Gulf Coast energy producing states, is fundamental to the success of a long term OCS leasing and development program.

Last November, the MMS announced it was disbursing $2.59 billion to 35 states as their share of federal revenues collected from energy production within their borders, including oil and gas drilling off their shores. Alabama received $15.8 million; Texas $21.6 million; Louisiana $49.5 million, and California $103.4 million.

Virginia, by contrast, received just $227,154.44; Florida and South Carolina did far less well than that, receiving just $6,298 and $277.50 respectively. North Carolina received nothing. At a time when states are facing record budget shortfalls, these are revenues that could be augmented significantly under an expanded OCS access program.[4]

---

[3] Numbers drawn from Energizing America: Facts for Addressing Energy Policy, p. 30; API, 1/18/09.

[4] "Interior's Minerals Management Service Disburses Record $23.4 Billion in FY 2008," press release, DOI, 11/20/08.

21

We believe that coastal economies at the local, state and regional level will see significant, positive benefits from increased OCS access. While it is impossible to know with precision, we can examine the experience of other states. In Louisiana, for instance, 21,000 jobs with an estimated payroll of $1.2 billion depend directly on oil and gas production on the OCS.[5]

An appropriately structured revenue sharing program designed to benefit coastal communities should provide funds to help mitigate any real or perceived impacts from development. With proper planning, these communities, working with industry and government, can learn and benefit from past experiences and best practices from other jurisdictions.

According to an ICF International study, developing America's domestic oil and natural gas resources in areas where leasing has been prohibited could generate a total of more than $1.7 trillion in government revenue, create over 160,000 new jobs and significantly boost domestic petroleum production.

The ICF study also suggests that opening offshore and onshore areas would lift U.S. crude oil production by as much as two million barrels per day in 2030, offsetting nearly a fifth of the nation's imports. Natural gas production could increase by 5.34 billion cubic feet per day, or the equivalent of 61 percent of the expected natural gas imports in 2030.

**Time Frames and the Need for Informed Choices**

It has been said that allowing increased oil and gas exploration off America's shores isn't worth it, since it will take years before any newly discovered energy starts reaching American consumers. The same can be said for new wind projects as well, however. The reality is that energy projects of scale require significant lead-time to plan, permit, litigate, procure and construct.

One of the things you learn quickly in the energy business is that nothing happens quickly. Ours is an industry that has no choice but to take the long view. Oil used to heat Americans' homes and power their automobiles today is available as the result of decisions taken by policymakers and business leaders years or even decades ago. The sooner we start, the sooner the American people will start seeing the benefits.

The United States has one of the world's most restrictive policies when it comes to accessing resources on its Outer Continental Shelf. In an increasingly globalized world economy, this serves only to increase dependence of the US—and increasingly places our energy future in the hands of others. In recent years, we have witnessed American officials requesting oil producing nations to boost output for our benefit.

There are no silver bullets or magic formulas when it comes to energy. Our nation requires a comprehensive "all-of-the-above" approach to energy.

We must be realistic. Exploration alone will not solve our energy dilemma. Likewise, conservation and efficiency efforts without increased production are a recipe for ongoing scarcity and economic decline.

Until we can bring new, renewable energy sources online in a big way in the decades to come, safe, environmentally-conscious oil and gas production off our shores holds the best prospect for providing our nation's economy with the growing and secure energy supply it needs.

BP stands ready to work with Congress to develop the policy measures necessary to make this happen.



The CHAIRMAN. Mr. Nichols?

---

[5] Louisiana Mid-Continent Oil and Gas Association website.

# Exhibit D

From: McKay, Lamar
Sent: Thu Apr 08 14:17:34 2010
To: Lynch, John E Jr. (Jack); Nitcher, Eric L; Miller, Brian W; Nagel, David C; Todd, Simon P; Dupree, James H; Grant, James R
Cc: Awawdeh, Shirley J; Jacobs, Yolanda; Davis, Cory G; DuPuis, Sheryl S; Nicoletti, Alma J; Smith, Laura J
Subject: MMS / Atlantis Forward Strategy Call today (Lunch will be provided)
Importance: Normal

When: Thursday, April 08, 2010 12:00 PM-1:00 PM (GMT-06:00) Central Time (US & Canada).
Where: 15.150 (Lamar's Office)
Note: The GMT offset above does not reflect daylight saving time adjustments.
*~*~*~*~*~*~*~*~*

**EXHIBIT "C"**

CONFIDENTIAL