# Exhibit F

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3
     IN RE:  OIL SPILL      MDL NO. 2179
 4   BY THE OIL RIG
     "DEEPWATER HORIZON"    SECTION:  J
 5   IN THE GULF OF
     MEXICO, ON APRIL       JUDGE BARBIER
 6   20, 2010               MAG. JUDGE SHUSHAN

 7

 8




14                        VOLUME II

15        Deposition of DAVID C. SIMS, taken
     in the Pan American Life Center, Bayou
16   Room, 11th Floor, 601 Poydras Street, New
     Orleans, Louisiana 70130, on Thursday,
17   April 7, 2011.

18


19   APPEARANCES:

20
          WILLIAMS LAW GROUP, LLC
21        (By:  J. Christopher Zainey, Jr.,
                   Esquire)
22        909 Poydras Street
          Suite 1650
23        New Orleans, Louisiana  70112
               (Attorneys for MDL plaintiffs)
24

25
```

                    **GAUDET KAISER, L.L.C.**
                Board-Certified Court Reporters

1    Goforth and I represent Transocean.  And
2    I've got a couple of hours here plus to
3    talk to you and I would like to begin with
4    saying that as far as I'm concerned, you
5    and I can be best of friends during this
6    conversation, I hope that we are.
7              I want to first ask you about,
8    about the Transocean crew and management
9    that were present on the Macondo well.
10             You are not aware, are you, sir,
11   of any performance concerns with Transocean
12   during the drilling of the Macondo well;
13   correct?
14        A.   What are you referring to?  The
15   HORIZON?
16        Q.   Yes.  I'm sorry.
17        A.   I'm not aware of any.  Not what
18   I would call performance concerns.
19        Q.   All right.  In fact, I think
20   you've said before that the Transocean crew
21   was a good crew; correct, sir?
22        A.   I believe that, yes, sir.
23        Q.   They were skilled?
24        A.   Yeah.
25        Q.   Knowledgeable?

```
 1         A.    To the extent that I knew
 2   everyone there, I didn't know everyone so I
 3   can't say that everyone was knowledgeable.
 4         Q.    Well, let's put it this way:
 5   You trusted the crew?
 6         MS. KARIS:
 7               Object to form.
 8         THE WITNESS:
 9               From what I knew of the rig and
10   I -- in the general sense, yes, I would
11   have trusted the crew.
12   EXAMINATION BY MR. GOFORTH:
13         Q.    Did you know Paul Johnson?
14         A.    Yes, I did.
15         Q.    He was skilled, you trusted him,
16   he was knowledgeable; correct?
17         MS. KARIS:
18               Object to form.
19         THE WITNESS:
20               I know Paul and I had known him
21   for not a long time before.  I had no
22   reason to -- I have no reason to say that
23   he wasn't knowledgeable or skilled.  And I
24   trusted him.
25   EXAMINATION BY MR. GOFORTH:
```

1   Q.   All right.  So to put it a
2   little differently, to your understanding
3   and based upon your experience with Paul
4   Johnson, you viewed him as knowledgeable;
5   correct?
6   A.   From what I knew of Paul in the
7   time that I had known him, I had no reason
8   to think that he wasn't knowledgeable.
9   Q.   You viewed him as skillful,
10  skilled in the performance of his job;
11  correct?
12  A.   At the time I'd known him I had
13  nothing, no reason to have an impression
14  that he was not skilled.
15  Q.   I want to stress, again, because
16  I know Paul Johnson, you trusted him;
17  didn't you?
18  MS. KARIS:
19       Object to form.
20  THE WITNESS:
21       I, I didn't not trust him.  I
22  trusted him --
23  EXAMINATION BY MR. GOFORTH:
24  Q.   Can you answer my question,
25  please, sir?

1      THE WITNESS:
2           I, again, John's
3  characterization, I don't know if the well
4  site or the engineering team leaders were
5  paranoid.
6  EXAMINATION BY MR. GOFORTH:
7      Q.   And you didn't ask anybody
8  either; did you?  Can you answer that?
9      A.   Ask anyone --
10     Q.   Whether that was, what John said
11 was true.  You didn't investigate in any
12 fashion?
13     A.   I responded to John in an e-mail
14 addressing his question and his concerns in
15 the e-mail and I got a response back from
16 him that was positive and that he
17 concurred.
18     Q.   Okay.  Are you aware, sir, of
19 anyone, including in my interest here the
20 Transocean personnel or management that
21 were involved in the Macondo prospect and
22 in connection with the Macondo prospect of
23 deliberately wanting to cause injury to the
24 environment, or to any person?
25     A.   No, sir.

1     Q.    Of acting maliciously or not
2  caring in any way about causing injury to
3  another human, or the environment?
4     A.    No, sir.
5     Q.    Of willfully inflicting harm on
6  any person or on the environment?
7     A.    No, sir.
8     Q.    You were on the DEEPWATER
9  HORIZON on April the 20th when the event,
10 as you referred to it, occurred.
11           Did you witness any Transocean
12 employee or manager deliberately wanting to
13 cause injury to the environment, or any
14 person?
15    A.    No, sir.
16    Q.    Of acting maliciously or not
17 caring about causing injury to another
18 person, or the environment?
19    A.    No, sir.
20    Q.    Of willfully inflicting harm on
21 any person or on the environment?
22    A.    No, sir.
23    Q.    Did you witness any Transocean
24 employee, or anyone, to your knowledge, out
25 there acting in what you would consider to

```
 1   be a negligent fashion?
 2        A.    No, sir.
 3        Q.    Of performing their work in what
 4   you would consider to be a negligent
 5   fashion?
 6        A.    No, sir.
 7        Q.    To your understanding, was there
 8   any conduct or action on the behalf of the
 9   Transocean crew or management that caused
10   this event?
11        MS. KARIS:
12             Object to form.
13        THE WITNESS:
14             I'm sorry, could you repeat
15   that?
16        MR. GOFORTH:
17             Yes, sir.
18   EXAMINATION BY MR. GOFORTH:
19        Q.    Was there any conduct, action by
20   or on the part of Transocean or its
21   management, its crew or its management that
22   caused this event?
23        MS. KARIS:
24             Object to form.
25        THE WITNESS:
```

1            As I -- I can't answer that
2    because I don't know what everyone did out
3    there and I'm just not up, I wasn't a part
4    of every single operation and everything
5    that went on that day.
6    EXAMINATION BY MR. GOFORTH:
7       Q.   Okay.  Now, but to the extent
8    that you, that you know, David Sims at this
9    point in time, I take it that you don't
10   know of anything that Transocean personnel
11   or management did that caused this
12   incident, or event?
13      A.   To the extent that I was
14   involved in and out there on the rig that
15   day, I don't know of, of anything.
16      Q.   Okay.  All right.  Let me back
17   up a little bit about some of the, a couple
18   of the cement questions.
19           Would you expect that cement
20   testing would be discussed in the morning
21   meetings?
22      MR. GODWIN:
23           Object to the form.
24      THE WITNESS:
25           There are a lot of conversations

```
 1        THE WITNESS:
 2             The reason I'm pausing is I'm
 3   trying to think of conversations I had on
 4   the rig and whether they were related to
 5   any of these, any of these issues and to --
 6   right now, I can't recall having
 7   conversations with anyone about those
 8   particular issues.
 9   EXAMINATION BY MR. GOFORTH:
10        Q.   Okay.  You say to Mr. Guide, we
11   have to accept some level of last-minute
12   changes.  Is that correct?
13        A.   That is what I said, yes, sir.
14        Q.   Okay.  What last-minute changes
15   were you referring to?
16        A.   I was generalizing the
17   discussions that had gone on over recent,
18   recent days about centralizers, about
19   casing, about things that typically go on
20   at the end of a well when there's a lot of
21   activity, a lot of, a lot of things coming
22   and going.
23        Q.   Actually you could have taken
24   more time and more carefully analyzed each
25   of those decisions; could you not, sir?
```

1        MS. KARIS:
2              Object to the form.
3        THE WITNESS:
4              Which decisions are you
5   referring to?
6   EXAMINATION BY MR. GOFORTH:
7        Q.   The centralizer decision.  You
8   could have taken more time to run up
9   additional Opti-Cem™ reports; couldn't you,
10  sir?
11       MR. GODWIN:
12             Object to the form.
13       THE WITNESS:
14             Not -- I personally didn't run
15  Opti-Cem™ reports and I don't know how much
16  time was, was taken so I can't really, I
17  can't really say whether I could have taken
18  more or should have taken more time.
19  EXAMINATION BY MR. GOFORTH:
20       Q.   Okay.  All right.
21       THE VIDEOGRAPHER:
22             We're going off the record at
23  2:09.  This is the end of Tape 5.
24             (Off the record.)
25       THE VIDEOGRAPHER:

1           We're back on the record at
2  2:29, this is the beginning of Tape 6.
3  EXAMINATION BY MR. GOFORTH:
4      Q.   Mr. Sims, back to the point that
5  I was trying to make, at least the
6  discussion that we were having.
7           Before the break I had, if you
8  will recall, I had asked you if more time
9  could be taken for various of these, these
10 undertakings, these changes that were made.
11 For example, the number of centralizers.
12          That -- the time could have been
13 extended so as to, as to get additional
14 Opti-Cem™ reports or tests from Halliburton
15 with regard to the number of centralizers
16 that might be necessary; correct?
17     A.   I think, generally, you could,
18 you could apply that to lots of things.  In
19 this case, not knowing what the
20 conversations that were had and that went
21 into the decision I, I can't, I can't say
22 that should have taken more time.
23     Q.   Could more time have been taken?
24 In other words, did you know of anything
25 that was happening that made it absolutely

```
 1    necessary that everything proceed in such a
 2    protracted -- I mean, such a small amount
 3    of time?
 4         MS. KARIS:
 5              Object to form.
 6         THE WITNESS:
 7              Again, I'm not sure I would
 8    characterize it as what you just said
 9    there.  But you could -- nothing that I
10    know of that would have precluded them from
11    taking more time if they felt they needed
12    to take more time.
13    EXAMINATION BY MR. GOFORTH:
14         Q.   Were you personally, you didn't,
15    you didn't want to take additional time
16    because you were concerned about ensuring
17    that the DEEPWATER HORIZON could move on to
18    other wells, the Nile and the Kaskida
19    wells; weren't you, sir?
20         A.   I don't agree with that
21    characterization.
22         Q.   Okay.  Those were the planned
23    next steps with the downhole -- excuse
24    me -- for the DEEPWATER HORIZON; correct?
25         A.   As I recall, Nile and Kaskida
```

```
 1    were the next two, yeah.
 2         Q.    And you did spend some time
 3    e-mailing back and forth with a fellow
 4    named Dale Marshall, perhaps, and others
 5    trying to schedule the DEEPWATER HORIZON
 6    once it was complete at the Macondo site;
 7    isn't that correct?
 8         A.    There was -- yes, possible or
 9    e-mail conversations between Dale and I
10    about, about the next well, I believe
11    was -- actually this was about Kaskida that
12    we talked about.
13         Q.    Also about the Nile well.  In
14    fact, I think that you sent out an e-mail
15    or something of that sort in which you said
16    we need to -- what we're going to do is
17    since we won't be having, so as to avoid
18    rig downtime, we'll squeeze in the Nile
19    before we go to the Kaskida.  That might
20    take us some more time but hopefully we can
21    get some more time from the MMS; correct?
22         A.    I'm not sure which e-mail you're
23    referring to.
24         Q.    Let me ask you just the
25    question.
```

```
 1                  Was that something that you were
 2      trying to schedule?
 3           A.     I'm sorry, could you repeat
 4      that, the question?  I apologize.
 5           Q.     All right.  You had time limits
 6      on both the Nile and the Kaskida, the
 7      Kaskida to spud and the Nile for
 8      abandonment; is that right?
 9           A.     Nile had a, a deadline set by
10      the MMS and we also had a, had a date that
11      we were, that we were looking at for
12      Kaskida.  It was a 180-day clause to drill
13      which we had, I believe, a letter
14      requesting an extension to that was mailed
15      right after, right after April 20th, I
16      believe.
17           Q.     Okay.  However, prior to
18      April 20th, you were concerned about
19      getting those both done?  You had the Nile
20      that you had to get done and then you had
21      the Kaskida that you had to do and I
22      believe that one was before July 2nd.  They
23      might have been about the same time that
24      they had to be accomplished.
25                  And so what you ultimately
```

```
 1    decided was well, we can squeeze in the
 2    Nile right after we leave the Macondo,
 3    maybe we can get that done in a period of
 4    time before we have to move to the Kaskida
 5    and that will give us time to then take
 6    care of the Kaskida.
 7              All of this was designed and
 8    trying to be scheduled by you to avoid rig
 9    downtime; wasn't it?
10         MS. KARIS:
11              Object to form.
12    EXAMINATION BY MR. GOFORTH:
13         Q.   And also to meet MMS
14    requirements?
15         A.   The scheduling was done to, to
16    be able to go whenever Macondo finished.
17    The planning was designed to try to be able
18    to go to Nile, if I remember correctly.
19         Q.   Yes, sir.
20         A.   And then with an extension to
21    our, to our spud date on Kaskida, we
22    believed that given that Nile would take
23    approximately whatever time we had planned,
24    if we took that time, that we would then be
25    able to get to Kaskida and spud that well
```

```
 1    within the time that we were asking the MMS
 2    to grant us the extension for.
 3         Q.    Okay.  So that took some
 4    scheduling on your part?  That's what you
 5    spent some time doing?
 6         A.    Yes, sir.
 7         Q.    And it also served to avoid rig
 8    downtime?
 9         A.    I don't know if rig downtime was
10    a, was a concern, an issue.
11         Q.    It served to avoid rig downtime,
12    whether it was the issue or not; correct?
13         MS. KARIS:
14              Object to form.
15         THE WITNESS:
16              I don't, I don't believe that
17    it, rig downtime was a, was an issue.
18    EXAMINATION BY MR. GOFORTH:
19         Q.    I didn't ask you whether it was
20    an issue.  Please listen to my question.
21              Did it serve on that schedule to
22    avoid the necessity of having extended rig
23    downtime?
24         A.    The decisions made around
25    scheduling for Nile and Kaskida, in my
```

```
 1   recollection, did not have anything to do
 2   with avoiding rig downtime.  It was
 3   simply --
 4          MR. GOFORTH:
 5                Object as nonresponsive.
 6          MS. KARIS:
 7                Please finish your answer.
 8          THE WITNESS:
 9                I actually thought I answered
10   the question.  I'm sorry.
11   EXAMINATION BY MR. GOFORTH:
12        Q.   I asked you if it avoided
13   downtime, period.  I didn't ask you if you
14   were concerned about it, you considered it,
15   you thought about it, you called home about
16   it, nothing.  I just said it served to
17   avoid rig downtime; right?
18          MS. KARIS:
19                Object the to form.
20          THE WITNESS:
21                And my answer is I don't believe
22   that was the objective.
23   EXAMINATION BY MR. GOFORTH:
24        Q.   You never say that in writing,
25   Mr. Sims.  Let me show you an e-mail from
```

```
 1   you dated April the 9th, 2010 at 8:13 a.m.
 2   And I would like for you to -- the last
 3   page there.  And I would like for you to
 4   look at flow line cleanout preservation.
 5        MS. KARIS:
 6             Can you identify that page so we
 7   can pull it up.
 8        MR. GOFORTH:
 9             00003012, that's MDL.
10   EXAMINATION BY MR. GOFORTH:
11        Q.   You see your name, David Sims,
12   on the bottom of that page; do you not,
13   sir?
14        A.   Yes, sir.
15        Q.   And about two lines down, in the
16   last full paragraph, paragraph beginning
17   with concluding, you say, the uncertainty
18   of both the completion of Macondo and the
19   delivery of the wellhead equipment mandate
20   that we maintain a short duration operation
21   to prevent the DEEPWATER HORIZON from
22   incurring standby costs while waiting for
23   the Kaskida wellhead equipment to be
24   delivered.
25             Does that refresh your
```

Suggested line for Running Header
Case 2:10-md-02179-CJB-DPC   Document 2470-6   Filed 05/20/11   Page 20 of 20
563

```
 1    recollection, sir?
 2         MS. KARIS:
 3              Object to form.
 4    EXAMINATION BY MR. GOFORTH:
 5         Q.   Did I read that correctly, sir?
 6         A.   Yes, you did.
 7         Q.   Thank you.  Now, let me turn to
 8    another point here, sir.
 9              I want to talk to you a moment
10    about Mr. Gagliano.  Were you aware that
11    the BP Macondo engineers had issue with
12    Jesse Gagliano's competency?
13         MR. GODWIN:
14              Object to form.
15         THE WITNESS:
16              Prior to, or --
17    EXAMINATION BY MR. GOFORTH:
18         Q.   Yes, sir.  Prior to April 20th.
19         A.   I had heard over some time
20    comments related to, related to Jesse.
21         MR. GODWIN:
22              Object to form.
23    EXAMINATION BY MR. GOFORTH:
24         Q.   In fact, several BP engineering
25    team members, including Mr. Guide, had
```

**GAUDET KAISER, L.L.C.**
Board-Certified Court Reporters