

DAVID W. JONES
djones@brsfirm.com

May 23, 2011

Re:   MDL No. 2719; *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010;* In the U.S. District Court, Eastern District of Louisiana

Magistrate Judge Sally Shushan                                                                                                   **By Email**
United States District Courthouse
500 Poydras Street, Room 5345
New Orleans, Louisiana 70130

Dear Judge Shushan:

In advance of the conference scheduled for 2:00 pm today, on behalf of Cameron International Corporation ("Cameron"), I am writing in response to arguments made by Det Norske Veritas (U.S.A.), Inc. at the conference on Friday.

As the Court is well aware, DNV is currently performing testing on the Deepwater Horizon blowout preventer ("BOP") at the request of and under contract with BP Exploration & Production, Inc. ("BP"). DNV is performing that testing under an agreed protocol approved by the Court on April 19.

At the request of BP, Cameron agreed to provide certain materials, documents, and information in connection with BP's testing without insisting on formal written discovery. Additionally, although it had no obligation to do so under the Federal Rules of Civil Procedure,[1] Cameron also agreed to make available an employee on site, if requested by DNV, to provide information in connection with six specific tests indentified in the protocol.

---

[1] The law is clear that a party cannot be compelled to participate in another party's testing. *See*, *e.g.*, 7 Moore's Federal Practice § 34.15 (3d ed. 2011) (noting that "Rule 34(a)(2) allows a party to perform various acts in connection with entry onto property, including observation, testing and photographing. However, the Rule does not authorize the court to order one party to conduct tests requested by the other party."); 10A Federal Procedure § 26:661 (Lawyer's Ed. West 2011) (noting that "a party cannot compel another party to perform the same tests or have the other party ordered to conduct tests that the first party has devised"); *L.H. et al. v Schwarzenegger*, No. 06-2942, 2008 WL 782734 (E.D. Cal. Mar. 20, 2008); *In re Air Crash Disaster at Sioux City, Iowa on July 19, 1989*, No. 89-8082, 1991 WL 147365 (N.D. Ill. July 26, 1991); *Sperberg v. Firestone Tire & Rubber Co.*, 61 F.R.D. 80 (N.D. Ohio 1973); *Sladen v. Girltown, Inc.*, 425 F.2d 24 (7th Cir. 1970).

One Houston Center
1221 McKinney Street, Suite 4500 – Houston, Texas 77010
Telephone 713.951.3700 – Facsimile 713.951.3720
www.brsfirm.com

383.00017/480800

Magistrate Judge Sally Shushan
May 23, 2011
Page 2

      Cameron has complied and continues to comply with its agreement.  Indeed, it continues to comply even though BP has since asserted claims against Cameron seeking to hold it responsible for the entire BP Oil Spill.  (*See* Doc. No. 2064.)  In fact, since being sued by BP, Cameron has responded to well over a dozen additional requests from DNV for information and materials that were not referenced in the court-approved protocol.  It also made arrangements to have an employee on site for five days this past week to provide information in connection with tests that were not among the six specifically identified in the protocol.  Cameron agreed to do this without forcing DNV to come back for permission from the Court.  Unfortunately, no good deed goes unpunished.

      Just as it was grossly behind schedule in performing tests on the BOP for the USCG-BOEMRE Joint Investigation Team,[2] DNV is now behind schedule in performing tests for BP.  Rather than acknowledge its own shortcomings and ask the court for additional time, DNV has attempted to make Cameron its scapegoat.  Its accusations are baseless.

      On Friday, DNV argued that Cameron is responsible for a nine-day slip in schedule.  Specifically, DNV told the Court that the purported delay was caused by two issues:  (1) the delivery of a test stand, and (2) a Cameron employee leaving the site during the week of May 9 and failing to return.  The Court was not given the correct facts.

1.     The Delivery of the Test Stand

      On April 21, a few days after DNV first mobilized to the Michoud test site, I sent a letter to DNV's counsel stating:

> Cameron has a Mark II Control Pod Test Stand that is currently available for shipment to Michoud. If requested,[3] it will take approximately 10 days or more for preparation, transportation, and reassembly. Cameron will need to have the test stand back in its

---

[2] When DNV agreed to perform BOP testing for the JIT, it was supposed to be finished, just as in this case, in two months.  DNV actually worked for five months, but even with that extra time, it still did not complete its assignment.  *See* Apr. 4, 2011 Testimony of DNV Project Manager Neal Thompson, at 82-87 (discussing timing of testing and incomplete tasks and admitting that before his involvement with the JIT testing, he had never "laid eyes on a blowout preventer"), available at http://www.deepwaterinvestigation.com/external/content/document/3043/1073855/1/April%204,%202011-AM.pdf.

[3] During the conference on Friday, DNV pondered aloud why the phrase "if requested" was included in the letter.  The phrase was included because three days earlier, at a meeting at USCG offices at Michoud, DNV investigator Gary Kenney told me and a Cameron employee that DNV did not yet know what it intended to do about the test stand since Cameron did not have the critical riser receptacle as noted in the letter.

facilities by approximately May 23. Please note that Cameron does not have a riser receptacle for use with the test stand.[4]

The next day, I received a voice mail from DNV's investigator (Gary Kenney) informing me that DNV had secured a riser receptacle from the Deepwater Nautilus and asking where it should be shipped for use with the test stand. That day, I responded in a letter to counsel for DNV stating that the receptacle should be sent to Cameron's facility in Houston.

On April 28, I received word that the receptacle had been received and that it had been confirmed to be the correct part. That day, I instructed that the stand should be prepared for shipment.[5]

In my letter of April 21, I stated that it would take "approximately 10 days or more" to get the test stand to Michoud. My words were carefully chosen because I had been informed that it might take less then 10 days, or it might take more than 10 days. It ultimately took more than 10 days – not because of anything to do with Cameron, but because Cameron had to custom-order hoses from a third-party to outfit the stand. I explained that to counsel for DNV in an email at 2:00 pm on May 6.

At the conference on Friday, DNV represented to the Court that receiving this news was a "crippling blow," suggesting that the news had delayed the scheduled testing. That is simply not the case. My email was in response to an earlier email from counsel which included a memo from DNV stating on page 3 that "DNV plans to start those tests of the Control Pods on May 16." The test stand arrived on May 16.

Therefore, whatever the reason DNV decided to begin testing the control pods on May 16, it had nothing to do with learning that hoses from a third-party would delay shipment of the control pod test stand. It was not a crippling blow; it was not a blow at all. Before receiving the email referencing the hoses, DNV wanted to start testing with the stand on May 16. DNV received the test stand on May 16,[6] and the pod testing was completed within the week. Significantly, Cameron was present and provided

---

[4] Unless otherwise noted, copies of the documents referenced herein were provided to the Court on Friday.

[5] On Friday, DNV stated that the receptacle was delivered to Cameron on April 25. As of writing this letter, I have not confirmed whether that is correct. I can confirm, however, that I learned of the receipt on April 28.

[6] On Friday, DNV represented to the Court that it was not aware that the stand was coming on May 16, "it just showed up." That is incorrect. Cameron has provided the Court with two emails from counsel for DNV referencing May 16 as the delivery date for the stand. *See* email from M. Cohen at May 9, 2011, 7:46 pm; email from M. Cohen at May 13, 2011, 10:51 am. In addition, Alex Roberts, the Cameron attorney who has been at Michoud, told Mr. Kenney in person on May 12 that the test stand would arrive on May 16. It appears that DNV has forgotten that Mr. Roberts was on-site on May 12. *See* discussion below.

information concerning the operation of a Portable Electronic Test Unit ("PETU") during that testing from Tuesday through Saturday *even though its attendance was not required under the protocol*.[7]

2.      Cameron Employee On-Site During the Week of May 9.

The Court will recall that the approved testing protocol contemplated the attendance of Cameron personnel on site during six specific tests. However, the protocol specifically recognized that Cameron personnel would only be in attendance if DNV (1) determined it was necessary and (2) actually made a request, using its best efforts to give Cameron seven days notice.[8]

Prior to Friday, May 6, DNV never made a request for Cameron personnel to appear on site. Nevertheless, on that day, DNV prepared a memorandum complaining about the fact that Cameron was not present. The email from counsel forwarding the memorandum demanded Cameron's "immediate help" at Michoud. In an email response at 2:00 pm on May 6, I noted, "DNV is making this request on less than seven days notice. Consistent with Cameron's agreement to use best efforts to fulfill such a request on less than seven days; notice, a service hand will be at the site on Monday morning."

However, when the Cameron employee (William LeNormand) and a Cameron attorney (Alex Roberts) arrived at the test site around 9:00 am,[9] they met with Mr. Kenney, who told them that he did not know they were coming and that they were not doing any tests that day for which they needed Cameron in attendance. Mr. LeNormand and Mr. Roberts then sat the in the shed until after lunch when

---

[7] The Court will recall that Cameron's participation during the operation of the PETU during the JIT testing was an extremely contentious issue. Cameron was requested by DNV (then working as a subcontractor of one federal agency) to operate a PETU, but it was subsequently criticized by another agency for doing so. Later, to enable testing to go forward, Cameron reluctantly agreed to be present during operation of the PETU, but only if all members of the technical working group and agencies involved signed off. This history was well-known to DNV. Nevertheless, on Friday, DNV had the gall to criticize Cameron for insisting that all parties sign off on its involvement before proceeding, *voluntarily*, to help DNV out of a jam.

[8] The protocol provides: "To the extent these protocols call for the attendance at the testing site of experienced and qualified OEM technical personnel for purposes of providing information to DNV during the testing process, as specified in Paragraphs II(c)(iii), II(d)(iii), II(g)(iii), III(c)(iii), VIII(c) and XIV(b) below, it is understood (1) that such *requests* (like many other determinations) are appropriate only if they have been determined to be necessary by DNV it its sole and unfettered discretion, and (2) that DNV will use best efforts to make such *requests* seven (7) in advance, recognizing that such advanced notice will not always be practical. Conversely, the OEM (Cameron International Corporation) will use best efforts to fulfill such *requests* made on less than seven (7) days notice, but cannot guarantee that fulfilling these short notice *requests* will be possible." (Emphasis added).

[9] On Friday, DNV complained because the Cameron employee did not have security clearance to enter NASA when they arrived around 8:00 am, noting "We burned a lot of time and energy scrambling to get that sorted out." That "lot of time and energy" was an hour or less.

Mr. Roberts sought out DNV employee, Steve Schroeder, to see if DNV had questions. Mr. Schroeder then proceeded to flip though the protocol and pose general questions. He admitted (1) that DNV was not prepared to discuss the tests with Cameron, and (2) that they had not been told Cameron would be present that day.

DNV, of course, did not discuss this interaction with Cameron on May 9 in its Friday presentation to the Court. Instead, DNV stated:

> He [Mr. LeNormand] came back the next morning, which is Tuesday, the 10th. Mr. Kenney eventually went to the technician and the lawyer and said, look, we're not going to keep you here if we don't need you. We understand you didn't intend to stay every day, but we are concerned that we're going to need you later in the week, and we'll ask you please come back Thursday or Friday. They leave. Which is fine. ***But they never come back***. We don't see them again until Monday the 16th -- sorry, we don't see them the 16th, when the test stand arrives. That's right. They are not there at all." (Emphasis added.)

That was a flagrant misrepresentation. DNV was correct when it said that Mr. Kenney told "the technician and the lawyer" on Tuesday that Cameron's presence would again be needed on Thursday. But that is where the truth ends.

During the referenced Tuesday afternoon conversation, Mr. Roberts told Mr. Kenney that both he and Mr. LeNormand would be leaving New Orleans, and he asked Mr. Kenney to call on Wednesday if Cameron's presence was not needed on Thursday. Mr. Roberts then got on a plane and flew back to Houston. Mr. LeNormand (who drove from his home east of Houston to New Orleans) left for Cameron's facility in Berwick, Louisiana.

Mr. Kenney did not call on Wednesday. Therefore, Mr. Roberts got back on a plane and met Mr. LeNormand at Michoud on Thursday morning. *When they arrived on site, however, they were informed that the activities for which DNV wanted Cameron in attendance would not be occurring until the following week at the earliest, that Cameron was not needed on site, and that they could leave*. Thus, contrary to DNV's representations to the Court of Friday, *Cameron came back as requested, and it was a wasted trip*.[10]

Plainly, therefore, it was patently false for DNV to suggest that the slip in schedule had anything to do with Cameron personnel leaving the site. It was also incorrect for DNV to suggest to the Court that delivery of the test stand was the reason for a purported slip in schedule. As I noted in my May 9 letter to counsel when DNV first started to shift blame, Cameron "can understand the desire to blame

---

[10] Copies of Mr. Roberts' airline confirmation (showing his arrival in New Orleans on Thurs., May 12 at 7:20 am and his original planned departure on Sat., May 14 at 7:45 pm) and his amended confirmation (showing his return on May 12) are enclosed.

Magistrate Judge Sally Shushan
May 23, 2011
Page 6

others for DNV's inability to complete the undertaking it agreed to perform for BP. However, Cameron is not and will not be the reason for any DNV shortcomings."

At today's conference, we will be prepared to discuss and correct the record with respect to each of the other interactions DNV referenced on Friday (those which DNV did not attribute to a slip in schedule). However, we believed that DNV's incorrect statements concerning the reason for the purported nine-day delay needed a prompt response in writing.

Thank you for your consideration.

Very truly yours,

David W. Jones

| | |
|---|---|
| **From:** | Southwest Airlines [SouthwestAirlines@luv.southwest.com] |
| **Sent:** | Wednesday, May 11, 2011 2:05 PM |
| **To:** | Alex Roberts |
| **Subject:** | Air Confirmation ROBERTS/ALEX - W8RMRL |



**ROBERTS/ALEX**

Confirmation Date: May 11, 2011
Confirmation Number: W8RMRL

### Passenger Information

| Passenger(s) | Account Number | Ticket # | Expiration[1] | Estimated Points Earned |
|---|---|---|---|---|
| ROBERTS/ALEX | | 5262173463324 | May 10, 2012 | 4298 |

[1] All travel involving funds from this Confirmation Number must be completed by the expiration date.

Rapid Rewards points earned are only estimates. Visit your (MySouthwest, Southwest.com or Rapid Rewards) account for the most accurate totals - including A-List & A-List Preferred bonus points.

### Itinerary

**Depart:** HOUSTON HOBBY TO NEW ORLEANS LA   *( Travel Time: 1 hrs 0 mins )*

| Date | Flight | Flight Information |
|---|---|---|
| Thu May 12 | 2622 | Depart HOUSTON HOBBY (HOU) at 06:20 AM<br>Arrive in NEW ORLEANS LA (MSY) at 07:20 AM |

**Return:** NEW ORLEANS LA TO HOUSTON HOBBY   *( Travel Time: 1 hrs 10 mins )*

| Date | Flight | Flight Information |
|---|---|---|
| Sat May 14 | 744 | Depart NEW ORLEANS LA (MSY) at 7:45 PM<br>Arrive in HOUSTON HOBBY (HOU) at 8:55 PM |

### Cost and Payment Summary

| | |
|---|---|
| Base Fare | $360.00 |
| +Excise Taxes | $27.00 |
| **Advertised Fare** | **$387.00** |
| + Segment Fee | $7.40 |
| + Passenger Facility Charge | $7.50 |
| + Security Fee[2] | $5.00 |
| **Total Payment** | **$406.90** |

1

| | |
|---|---|
| **From:** | Southwest Airlines [SouthwestAirlines@luv.southwest.com] |
| **Sent:** | Thursday, May 12, 2011 9:45 AM |
| **To:** | Alex Roberts |
| **Subject:** | Air Confirmation ROBERTS/ALEX - W8RMRL |



**ROBERTS/ALEX**

Confirmation Date: May 11, 2011
Confirmation Number: W8RMRL

### Passenger Information

| Passenger(s) | Account Number | Ticket # | Expiration[1] | Estimated Points Earned |
|---|---|---|---|---|
| ROBERTS/ALEX | | 5262173646496 | May 10, 2012 | 1860 |

[1] All travel involving funds from this Confirmation Number must be completed by the expiration date.

### Itinerary

**Depart:** NEW ORLEANS LA TO HOUSTON HOBBY   *( Travel Time: 1 hrs 10 mins )*

| Date | Flight | Flight Information |
|---|---|---|
| Thu May 12 | 155 | Depart NEW ORLEANS LA (MSY) at 1:00 PM<br>Arrive in HOUSTON HOBBY (HOU) at 2:10 PM |

### Cost and Payment Summary

| | |
|---|---|
| Base Fare | $173.03 |
| +Excise Taxes | $12.97 |
| **Advertised Fare** | **$186.00** |
| + Segment Fee | $3.70 |
| + Passenger Facility Charge | $4.50 |
| + Security Fee[2] | $2.50 |
| **Total Payment** | **$196.70** |

**Current Payment(s):**
  May 11, 2011        Ticket Exchange                    $196.70
  REFUND ON May 12, 2011 TO Amer Express XXXXXXXXXXX1001 $15.00

**Exchange Detail:**
  May 11, 2011   From ticket # 5262173463324 to ticket # 5262173646496

[2] Security Fee is the government-imposed September 11th Security Fee.

### Fare Rule(s)

1