## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  **Oil Spill by the Oil Rig** | : | **MDL No. 2179** |
| **"Deepwater Horizon"** | : | |
| **in the Gulf of Mexico,** | : | **SECTION: J** |
| **on April 20, 2010** | : | |
| | : | |
| **This Document Relates to:** | : | **JUDGE BARBIER** |
| *U.S. v. BP Exploration & Prod. et al.* | : | **MAGISTRATE SHUSHAN** |
| **No. 2:10-cv-04536** | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**PLAINTIFF UNITED STATES' COMBINED MEMORANDUM OF LAW:**

**(1)  IN OPPOSITION TO DEFENDANT ANADARKO E&P COMPANY LP'S MOTION TO DISMISS [Doc. 1861]**

**AND**

**(2)  IN SUPPORT OF UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE LIABILITY OF THE ANADARKO DEFENDANTS**

# TABLE OF CONTENTS

Table of Authorities……………………………………………………………………iv

Table of Exhibits……………………………………………………………………….x

Introduction……………………………………………………………………..1

Factual Background…………………………………………………………………3

Argument…………………………………………………………………………4

    I.   Standards of Review…………………………………………………………....4

        A.  Standard of Review for Rule 12(b)(6)……………….....……………………...4

        B.  Standard of Review for Rule 56…..……………………………………………5

    II.  Liability of the Anadarko Defendants as Lessees under OPA……………………………5

        A.  Statutory Background and Elements of Liability for OPA………………………5

        B.  The Undisputed Facts Show that the Anadarko Defendants are Liable under OPA
           as Lessees…………………………………………………………...………………..7

           1.  The Anadarko Defendants are liable under OPA as lessees………………9

           2.  A E&P's retroactive assignment to APC does not vitiate A E&P's liability
               resulting from the April 20, 2010 Macondo well blowout and subsequent
               oil spill…………………………….............................................................9

           3.  A E&P's argument that OPA and CWA liability are not "lease
               obligations" is not dispositive as to its liability for the Macondo oil spill
               and is incorrect as a matter of law………………………………………12

        C.  If Summary Judgment is Not Granted, A E&P's Motion to Dismiss the OPA
           Claims Should be Denied…………………………………………………..16

III. Liability of the Anadarko Defendants under Section 311(b) of the Clean Water Act……………………………..............................................................17

    A.   Statutory Background and Elements of Liability for the Clean Water Act…….17

    B.   The Undisputed Facts Show that the Anadarko Defendants are Liable as Operators under Section 311(b) of the CWA……………………………………18

        1.  Six of the elements required to show liability under Section 311(b) the Clean Water Act are obvious……………………………………………18

        2.  The "operator" element is established as a matter of law because the Anadarko Defendants were required by statute to maintain all operations within the Lease Area in compliance with regulations intended to protect the environment……………………………………………………………20

    C.   If Summary Judgment is Not Granted, A E&P's Motion to Dismiss Should be Denied Because the Complaint Alleges Sufficient Facts to Support the Conclusion that A E&P is an Owner, Operator and/or Person in Charge Under CWA Section 311(b)(7)………………………………………………………………..25

        1.  The Complaint alleges sufficient facts to support the conclusion that A E&P is an "operator" under CWA Section 311(b)(7)………………...26

        2.  The Complaint alleges sufficient facts to support the conclusion that A E&P is a "person in charge" under CWA Section 311(b)(7)..………..28

        3.  The complaint alleges sufficient facts to support the conclusion that A E&P is an "owner" under CWA Section 311(b)(7)…………………...30

        4.  Dismissal on the pleadings is premature because the evidence may show that the roles of A E&P and APC are intertwined with respect to activities relating to the Macondo Well……………………………………………33

Conclusion……………………………………………………………….…………35

## TABLE OF AUTHORITIES

**CASES**                                                                **PAGE**

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978)……………………………………22

*Amber Res. Co. v. United States*, 538 F.3d 1358 (Fed. Cir. 2008)………………………………15

*Apex Oil Co., Inc. v. United States*, 208 F. Supp. 2d 642 (E.D. La. 2002).............................. 6, 17

*Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937 (2009)................................................... 4, 5, 28, 33

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)................................................... 4, 5, 28, 33

*Boykin v. Keycorp*, 521 F.3d 202 (2d Cir. 2008) ....................................................................... 28

*BP Amoco Chem. Co. v. Sun Oil Co.*, et al., 200 F. Supp. 2d 429 (D. Del. 2002) ...................... 26

*Burlington N. & Santa Fe Ry. Co. v. United States*, --- U.S. ---, 129 S. Ct. 1870 (2009) ........... 18

*Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285 (5th Cir. 2004) .................................. 25

*Chevron, U.S.A., Inc. v. Yost*, 919 F.2d 27 (5th Cir. 1990).......................................................... 20

*Cinel v. Connick*, 15 F.3d 1338 (5th Cir. 1994)......................................................................... 25

*Clean COALition v. TXU Power*, 536 F.3d 469 (5th Cir. 2008) ................................................. 21

*Coy/Superior Team v. BNFL, Inc.*, 174 F. App'x. 901 (6th Cir. 2006)....................................... 11

*Fisher Dev. Co. v. Boise Cascade Corp.*, 37 F.3d 104 (3d Cir. 1994) ....................................... 11

*Fruge v. Parker Drilling Co.*, 337 F.3d 558 (5th Cir. 2003) ....................................................... 23

*Geraghty & Miller, Inc. v. Conoco, Inc.*, 234 F.3d 917 (5th Cir. 2000).......................... 18, 26, 27

*Guilzon v. Comm'r of Internal Revenue*, 985 F. 2d 819 (5th Cir. 1993)...................................... 24

*Hamilton v. Paulson*, 542 F. Supp. 2d 37 (D.D.C. 2008) ............ Statement of Material Facts ("SMF") 5,6

*Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385 (5th Cir. 2002) ................................. 24

*Hatco Corp. v. W.R. Grace & Co. Conn.*, 59 F.3d 400 (3d Cir. 1995)........................................ 11

*Heavin v. Mobil Oil Exploration & Producing Southeast, Inc., et al.*, 913 F.2d 178
(5th Cir. 1990)..................................................................................................... 27

*Hubbard v. United States*, 514 U.S. 695 (1995) ...................................................... 24

*In re Katrina Canal Breaches Litig.*, 495 F.3d 191 (5th Cir. 2007)………………………………..25

*In re Katrina Canal Breaches Consol. Litig.*, 533 F. Supp. 2d 615
(E.D. La. 2008) .................................................................................................. SMF 5

*In re Petition of Settoon Towing LLC*, 722 F. Supp. 2d 710 (E.D. La. 2010) ................... 6, 11, 16

*John S. Boyd Co., Inc. v. Boston Gas Co.*, 992 F.2d 401 (1st Cir. 1993) ..................................... 11

*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987)...................................... 22

*Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453 (5th Cir. 2005)  ....................................... SMF 5

*Liberty Servs, Inc. v. Amoco Prod. Co., et al.*, No. 90-4490, 1991 WL 278673
(E.D. La. Dec. 23, 1991)........................................................................................ 10

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) ...................................................... 5

*Magluta v. Samples*, 256 F.3d 1282 (11th Cir. 2001)................................................................. 35

*Matrixx Initiatives, Inc. v. Siracusano*, --- U.S. ---, 131 S. Ct 1309 (2011) ....... 4, 5, 16, 25, 30, 32

*Mobil Oil Exploration & Producing Southeast v. United States*, 530 U.S. 604
(2000)............................................................................................................... 14, 15

*Noble Energy, Inc. v. Salazar*, No. 09-02013, 2011 WL 996776 (D.D.C. Mar. 22, 2011) .......... 13

*Rice v. Harken Exploration Co.*, 250 F.3d 264 (5th Cir. 2001)…………………………..…..5, 6

*Sierra Club v. Tyson Foods, Inc., et al.*, 299 F. Supp. 2d 693 (W.D. Ky.  2003)............. 20, 21, 31

*Smith Prop. Holdings v. United States*, 311 F. Supp. 2d 69 (D.D.C. 2004) ............................... 6, 7

*Terrebonne v. Blackburn*, 646 F.2d 997 (5th Cir. 1981)  ...................................................... SMF 5

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ................................................................................. 20

*United States v. Apex Oil*, 530 F.2d 1291 (8th Cir. 1976)………………………………………….30

*United States v. Bestfoods*, 524 U.S. 51 (1998) ............................................................... 23, 26, 28

*United States v. Bodenger*, No. 03-272, 2003 WL 22228517 (E.D. La. Sept. 25,  2003) ........ 6, 17

*United States v. Bois D'Arc Operating Corp.*, No. 98-157, 1999 WL 130635
   (E.D. La. Mar. 10, 1999) ....................................................................................................... 6, 7

*United States v. Burlington Res. Oil and Gas Co. L.P.*, No. 05-1395, 2007 WL773716
   (W.D. La. Mar. 9, 2007) ...……………………………………………………………..32

*United States v. Carr*, 880 F2d 1550 (2d Cir. 1989) .............................................................. 29, 30

*United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125
   (5th Cir. 1981) ………………………………………………………………………...5, 17, 24

*United States v. Gulf Park Water Co., Inc.*, 972 F. Supp. 1056 (S.D. Miss. 1997) ...................... 5

*United States v. M/V Big Sam*, 681 F.2d 432 (5th Cir. 1982) ....................................................... 20

*United States v. Mobil Oil*, 464 F.2d 1124 (5th Cir. 1972) ..................................................... 29, 30

*United States v. Tex-Tow, Inc.*, 589 F.2d 1310 (7th Cir. 1978) .................................................... 27

## STATUTES

28 U.S.C. § 2201 ........................................................................................................................... 1

33 U.S.C. § 1321 …………………………………………………………………………...17

33 U.S.C. § 1321(a) …………………………………………………………………………….5

33 U.S.C. § 1321(a)(1) ............................................................................................................... 19

33 U.S.C. § 1321(a)(2) ............................................................................................................... 19

33 U.S.C. § 1321(a)(7)…………………………………………………………………………...18

33 U.S.C. § 1321(a)(11) ............................................................................................................. 18

33 U.S.C. § 1321(b) ........................................................................................................... *passim*

33 U.S.C. § 1321(b)(1) ............................................................................................................... 17

33 U.S.C. § 1321(b)(3) ................................................................................ 5, 17, 18, 19, 20, 28

33 U.S.C. § 1321(b)(5) ................................................................................... 28

33 U.S.C. § 1321(b)(7) ................................................... 23, 24, 25, 26, 33, 35

33 U.S.C. §1321(b)(7)(A)…………………………………………………2, 17, 18

33 U.S.C. § 1362(7) ................................................................................. 19, 20

33 U.S.C. § 1362(8)…………………………………………………………...19

33 U.S.C. § 2701 *et seq.* ................................................................................. 1

33 U.S.C. § 2701…………………………………………………………… 2

33 U.S.C. § 2701(7) ................................................................................... 7, 8

33 U.S.C. § 2701(8)…………………………………………………………8

33 U.S.C. § 2701(9) ....................................................................................... 9

33 U.S.C. § 2701(16) ..................................................................................... 7

33 U.S.C. § 2701(21) ..................................................................................... 8

33 U.S.C. § 2701(22) ..................................................................................... 9

33 U.S.C. § 2701(23) ..................................................................................... 8

33 U.S.C. § 2701(32)(C) ........................................................................... 7, 9

33 U.S.C. § 2701(35) ..................................................................................... 8

33 U.S.C. § 2702 ........................................................................................... 2

33 U.S.C. § 2702(a) ....................................................................... 6, 8, 9, 35

33 U.S.C. § 2710(b) ................................................................................ 10, 11

42 U.S.C. § 9603 ..................................................................................... 28, 29

42 U.S.C. § 9603(a)…………………………………………………………...29

42 U.S.C. § 9607(e) ..................................................................................... 11

43 U.S.C. § 1331 *et seq*...…………………………………………………………………17

43 U.S.C. § 1332(6) ................................................................................ 21

43 U.S.C. § 1337(e) ................................................................................. 9

43 U.S.C. § 1348(b) ...................................................... 2, 21, 22, 23, 35, 36

**FEDERAL RULES**

Fed. R. Civ. P. 12(b)(6)…....…………………………………………………...4, 13

Fed. R. Civ. P. 30(b)(6)........................................................................ 33, 34

Fed. R. Civ. P. 56(a) ............................................................................ 5, 25

Fed. R. Evid. 201(b), (f)......................................................................... 7

**FEDERAL REGULATIONS AND ADMINISTRATIVE MATERIALS**

30 C.F.R. § 250.101 ............................................................................. 15

30 C.F.R. § 250.105 ............................................................................. 23

30 C.F.R. § 250.106 ............................................................................. 15

30 C.F.R.§ 250.143(b)…………….…...…………………………………………22

30 C.F.R. § 250.146 ............................................................................. 22

30 C.F.R. § 250.300(a)......................................................................... 21

30 C.F.R. § 250.401 ............................................................................. 21

30 C.F.R. § 256.62(a)....................................................................... 10, 11

30 C.F.R. § 256.62(c)........................................................................... 12

30 C.F.R. § 256.62(d) ..................................................................... 12, 13, 14

30 C.F.R. § 256.62(e)........................................................................... 12

30 C.F.R. § 256.62(f)………………………………………………………………………12

30 C.F.R. § 256.64(a)(6)…………………………………………………………………13

30 C.F.R. § 256.64(h)(1)…………………………………………………………………23

33 C.F.R. § 2.20……………………………………………………………………...8

33 C.F.R. § 2.30 ................................................................................................ 8

40 C.F.R. § 110.3 ............................................................................................ 20

62 Fed. Reg. 27,948 (May 22, 1997) ..................................................... 13, 23

Dep't of Interior, Sec. Order No. 3302………………………………………………3

Proclamation No. 5030, 48 Fed. Reg. 10,605 (Mar. 10, 1983)........................ 8

## OTHER MATERIALS

Merriam-Webster's Collegiate Dictionary (10th ed. 1999)……………………………...18

S. Rep. No. 101-94, *as reprinted in* 1990 U.S.C.C.A.N. 722.........................……………………6

## TABLE OF EXHIBITS

Exhibit 1:      Declaration of Ann H. Glazner

Exhibit 2:      Oil and Gas Lease of Submerged Lands under OCSLA,
                OCS-G 32306, Block 252, Mississippi Canyon ("MC 252")

Exhibit 3:      Assignment of Record Title Interest Conveying 22.5% Interest
                in MC 252 to Anadarko E&P Company LP

Exhibit 4:      Assignment of Record Title Interest Conveying 2.5% Interest in
                MC 252 to Anadarko Petroleum Corp.

Exhibit 5:      Designation of Operator Form for Anadarko E&P Company LP

Exhibit 6:      Designation of Operator Form for Anadarko Petroleum Corp.

Exhibit 7:      Assignment of Record Title Interest Conveying 22.5% Interest in
                MC 252 to Anadarko Petroleum Corporation

Exhibit 8:      Operating Agreement for the Macondo Well ("Joint Operating Agreement")

Exhibit 9:      Report to the President, January 2011, National Commission on the BP
                Deepwater Horizon Oil Spill and Offshore Drilling (excerpts)

Exhibit 10:     Declaration of David J. Trocquet

Exhibit 11:     MMS Well Activity Report for MC 252 (10/6 to 10/10/09)

Exhibit 12:     MMS Well Activity Report for MC 252 (2/28 to 3/6/10)

Exhibit 13:     MMS Well Activity Report for MC 252 (3/21 to 3/27/10)

Exhibit 14:     NASA Satellite Image of the Gulf of Mexico on April 25, 2010

Exhibit 15:     NASA Satellite Image of the Gulf of Mexico on May 25, 2010

Exhibit 16:     NASA Satellite Image of the Gulf of Mexico on April 25, 2010

Exhibit 17:     National Geographic Images of the Gulf of Mexico Oil Spill

Exhibit 18:     O'Donnell Dep. (May 5, 2011) 33:16-34:3

Exhibit 19:     [Pending Motion to File Under Seal]

x

## INTRODUCTION

In the matter of *United States of America v. BP Exploration and Production, Inc., et al.*, No. 10-4536, there are two Claims for Relief in the Complaint:  **(1)** the First Claim for Relief seeks civil penalties under Section 311(b) of the Clean Water Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1321(b); **(2)** the Second Claim for Relief seeks a declaratory judgment of liability under the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

One defendant in that case, Anadarko E&P Company LP ("A E&P"), has filed a Motion [Doc. 1861 in MDL 2179] to dismiss the Complaint, while the other defendants have filed answers.  As shown herein, the Complaint states valid Claims for Relief as to Defendant A E&P under these two statutes, so the Motion to Dismiss should be denied.

Indeed, liability under OPA and the CWA is so straightforward here that the Court – rather than dismissing the Complaint – should enter summary judgment in favor of the United States, not only against A E&P but also against its affiliate corporation Anadarko Petroleum Corporation ("APC") (collectively, the "Anadarko Defendants").  The undisputed material facts show that:

- on April 20, 2010, the Anadarko Defendants were leaseholders of Mississippi Canyon Block 252, where the Macondo Well was being drilled by the Deepwater Horizon; and

- on April 20, 2010, the Macondo Well blew out, and oil then flowed from the well into the waters of the Gulf of Mexico and continued to flow into the Gulf of Mexico for months.

These two sets of facts alone suffice to establish liability under both the Clean Water Act and OPA, because the elements of liability are few, liability is strict, and defenses are limited.

The United States accordingly moves for partial summary judgment as to the liability of the Anadarko Defendants on the Second Claim for Relief as "lessees" under OPA, 33 U.S.C. §§ 2701-2702.  As to OPA liability, A E&P tries to create a liability loophole:  on April 20, 2010 – the very day of the Macondo Well blowout that caused an explosion and fire that killed 11 men aboard the Deepwater Horizon – A E&P submitted a reassignment of its lease to the Minerals Management Service ("MMS") for approval.  A E&P now seeks to evade liability on this basis.  A E&P is wrong that this assignment obviates its liability under OPA.  Once liability exists in these circumstances, as a matter of law it cannot be conveyed away.  Moreover, A E&P, as a lessee at the time of the spill, was bound by federal law to maintain operations on the leasehold so as to prevent discharges and environmental harm.  Outer Continental Shelf Lands Act ("OCLSA"), 43 U.S.C. § 1348(b).

The United States also moves for partial summary judgment as to the liability of the Anadarko Defendants on the First Claim for Relief as "operators" of the Macondo Well under Section 311(b) of the Clean Water Act.  33 U.S.C. § 1321(b).[1]  As to CWA liability, the same legal duty under OCSLA to "*maintain operations*" on the leasehold in a manner that prevents spills also makes these defendants "*operators*" of the Macondo Well under the CWA.

---

[1]  The Clean Water Act provides for three separate bases for liability: "owner," "operator" or "person in charge" of a facility or vessel from which there is a discharge of oil.  33 U.S.C. § 1321(b)(7)(A).  With respect to the defendants APC and A E&P, the United States alleges in its Complaint liability of defendants based on all three theories.  (United States' Complaint ("Compl.") ¶ 72.)  At this time, the United States is only moving for summary judgment under the Clean Water Act based on the "operator" theory of liability set forth in Part III.B. below.  The United States reserves all its other rights, including its rights to bring a subsequent motion for summary judgment against these defendants pursuant to the "owner," "person in charge," and other theories of "operator" liability, as well as a motion for summary judgment against other defendants.

2

Defendants are liable as a matter of law, so partial summary judgment is appropriate at this time.  However, even if the Court declines to enter summary judgment, A E&P's Motion to Dismiss must still be denied because the Complaint alleges sufficient facts to support both Claims for Relief.

## FACTUAL BACKGROUND

Citations to the evidence, and more details, are provided in the Statement of Undisputed Material Facts ("SMF"), but the basic facts concerning the liability of the two Anadarko co-lessees are not genuinely in dispute and are truly quite simple:

- June 1, 2008:  Effective date of BP Exploration & Production's ("BP") Lease for Mississippi Canyon Block 252 ("MC 252") from the Minerals Management Service ("MMS").[2]

- December 17, 2009:   BP assigned APC a 2.5% record title interest in the Lease.  BP assigned A E&P a 22.5% record title interest in the Lease.  APC and A E&P executed a Lease Exchange Agreement and ratified a Joint Operating Agreement.  On this date, BP and APC also entered into a Well Participation Agreement for the Macondo Well at MC 252.

- February 23, 2010:  MMS approved the lease assignments from BP to APC and A E&P.

- Prior to April 20, 2010:  The rig *Deepwater Horizon* continued drilling the Macondo Well, and the wellhead, casing, tubular and other components were installed.

- April 20, 2010:  There was a blowout of the Macondo Well, and fires and explosions on the Deepwater Horizon.  On the same date, APC submitted a reassignment of A E&P's 22.5% interest in the Lease for MMS approval, and on April 21, 2010, MMS stamped the assignment received.

- Following the blowout, oil was discharged from the Macondo Well, and continued to flow into the waters of the Gulf of Mexico.

---

[2]  On June 18, 2010, MMS was renamed the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE).  Dep't of Interior, Sec. Order No. 3302, *available at* http://www.doi.gov/deepwaterhorizon/loader.cfm?csModule=security/getfile&PageID=35872.

- April 28, 2010:  MMS approved the assignment from A E&P to APC.  Once MMS approved the assignment, the agreement between the parties indicated that it would be effective as of April 1, 2010.

- July 15, 2010: The Macondo Well was capped.

## ARGUMENT

I.    STANDARDS OF REVIEW

    A.    <u>Standard of Review for Rule 12(b)(6)</u>

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the sufficiency of the pleadings under Rule 8, which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  The Supreme Court has held that a complaint need not include "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009) (Rule 8 does not require "detailed factual allegations") (quoting *Twombly*, 550 U.S. at 555).  A complaint states a claim that is plausible on its face where it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable . . . ." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).  "Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" sufficient to prove a claim.  *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, --- U.S. ---, 131 S. Ct. 1309, 1323 (2011).

The plausibility analysis called for by *Twombly* and *Iqbal*, and recently affirmed in *Matrixx Initiatives*, is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 129 S. Ct at 1950.  Factual allegations must be

taken as true and reviewed "as a whole." *Matrixx Initiatives*, 131 S. Ct. at 1323; *see also*

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (relying on the *Twombly/Iqbal*

standard, and reiterating that "courts must . . . accept all factual allegations in the complaint as

true" and "draw all reasonable inferences in the plaintiff's favor").

      B.    Standard of Review for Rule 56

Summary judgment is appropriate where the Court is satisfied "that there is no genuine

issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). Summary judgment is especially appropriate for OPA and Clean Water Act

liability determinations because OPA and CWA impose strict liability. *See, e.g., United States v.*

*Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1127-28 (5th Cir. 1981) (affirming

summary judgment decision and recognizing strict liability and no defenses in civil penalty

action for violation of Section 311(b)(3)); *United States v. Gulf Park Water Co., Inc.*, 972 F.

Supp. 1056, 1060 (S.D. Miss. 1997) (granting summary judgment on Section 301(a) liability

and noting "[s]ummary judgment is particularly appropriate in a CWA case because Congress

provided for streamlined and straightforward enforcement"). Here, there is no genuine dispute

as to the material facts that render the Anadarko Defendants liable as responsible parties under

OPA, and as operators under the Clean Water Act, and the United States accordingly moves for

partial summary judgment as to those two bases for liability.

II.    LIABILITY OF THE ANADARKO DEFENDANTS AS LESSEES UNDER OPA

      A.    Statutory Background and Elements of Liability for OPA

Congress enacted OPA in response to the *Exxon Valdez* oil spill in Prince William Sound,

Alaska, and intended the law to "provide quick and efficient cleanup of oil spills, compensate

victims of such spills, and internalize the costs of spills within the petroleum industry." *Rice v.*

*Harken Exploration Co.*, 250 F.3d 264, 266 (5th Cir. 2001) (citing S. Rep. No. 101-94, *as reprinted in* 1990 U.S.C.C.A.N. 722, 723).  OPA contemplates the possibility of more than one responsible party, and courts have held that the standard of liability in such circumstances is "strict, joint and several . . . ."  *Apex Oil Co., Inc. v. United States*, 208 F. Supp. 2d 642, 654 (E.D. La. 2002) (quoting S. Rep. No. 101-94, at 11 (1989), *as reprinted in* 1990 U.S.C.C.A.N. 722, 732-33, which states that OPA adopts CWA Section 311's standard for liability of dischargers and "[t]hat standard of liability has been determined repeatedly to be strict, joint and several liability"); *In re Petition of Settoon Towing LLC*, 722 F. Supp.  2d 710, 714 (E.D. La. 2010) (same); *Smith Prop. Holdings v. United States*, 311 F. Supp. 2d 69, 81 (D.D.C. 2004) (quoting *United States v. Bois D'Arc Operating Corp.*, No. 98-157, 1999 WL 130635, at *3 (E.D. La. Mar. 10, 1999) ("OPA does not limit the number of responsible parties" and "Congress made certain that more than one entity could be held accountable for the costs of pollution stemming from oil discharges.")); *United States v. Bodenger*, No. 03-272, 2003 WL 22228517, at *2 (E.D. La. Sept. 25,  2003).

Liability for purposes of OPA is triggered by a discharge, or substantial threat of a discharge, of oil from a vessel or facility:

> Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.

33 U.S.C. § 2702(a).  Accordingly, in a case involving an actual discharge, OPA liability accrues to a "responsible party" when the oil discharge commences.  Thus, for the Macondo Well, the

discharge resulting from the April 20, 2010 blowout is the key reference point.  *See* SMF ¶¶ 12-13.

Courts have construed the definition of "responsible party" broadly, consistent with the Congressional intent through OPA to strengthen the requirements of statutes addressing oil spill cleanup.  *See Smith Prop. Holdings*, 311 F. Supp. 2d at 81 (remarking upon OPA's "broad definition of responsible party" and affirming that more than one entity could be held accountable for an oil spill discharge) (citations omitted); *Bois d'Arc*, 1999 WL 130635, at *4 ("The legislative history of OPA is consistent with and comports with a broad definition of responsible party . . . .").

 For discharges from offshore facilities, a "responsible party" for purposes of liability includes "the lessee or permittee of the area in which the facility is located."  33 U.S.C. § 2701(32)(C).  "Lessee," in turn, is defined as "a person holding a leasehold interest in an oil or gas lease . . . on submerged lands of the Outer Continental Shelf, granted or maintained under applicable State law or the Outer Continental Shelf Lands Act (43 U.S.C. 1331 et seq.)."  33 U.S.C. § 2701(16).

B.  The Undisputed Facts Show that the Anadarko Defendants are Liable under OPA as Lessees

The Court can take judicial notice of the underlying facts concerning the elements of OPA liability common to these lessees.[3]  First, there was a discharge as defined in OPA resulting from the April 20, 2010 well blowout.  SMF ¶ 13.  OPA Section 1001(7), 33 U.S.C. § 2701(7), defines "discharge" to mean "any emission (other than natural seepage), intentional or

---

[3] *See* Fed. R. Evid. 201(b), (f) and SMF 5-6 (discussing admissibility of evidence cited and standards for judicial notice).

7

unintentional, and includes, but is not limited to, spilling, leaking, pumping, pouring, emitting, emptying, or dumping."

Second, that discharge was of oil, as defined in OPA.  SMF ¶¶ 13-15.  OPA Section 1001(23), defines "oil" to mean "oil of any kind or in any form, including petroleum . . . and oil mixed with [other] wastes . . . ."  33 U.S.C. § 2701(23).  Third, oil was discharged "into or upon the navigable waters or adjoining shorelines or the exclusive economic zone . . . ."  33 U.S.C. § 2702(a).[4]  SMF ¶ 15.  Under OPA, the United States need only show that oil was discharged to one of these three locations, but here the oil reached all three.  Oil was discharged from the Macondo Well, approximately 50 miles from the Mississippi River delta, within the 200 mile limit of the exclusive economic zone, and also spread into and upon navigable waters[5] and adjoining shorelines.  SMF ¶ 15.

Fourth, this discharge emanated from the Macondo Well.  SMF ¶¶ 13, 15.  The portions of the Macondo Well comprised of the wellhead and the casings and other components below the sea floor in the wellbore constitute an "offshore facility" under OPA.  SMF ¶¶ 10, 11 (describing installation of the well).  OPA Section 1001(9), 33 U.S.C. § 2701(9), defines "facility" to mean

---

[4]  OPA defines "exclusive economic zone" to mean "the zone established by Presidential Proclamation Numbered 5030, dated March 10, 1983 . . . ." 33 U.S.C. § 2701(8).  Proclamation 5030 "proclaim[s] the sovereign rights and jurisdiction of the United States of America . . . within an Exclusive Economic Zone [EEZ]" and provides that the EEZ "is a zone contiguous to the territorial sea . . . [and] extends to a distance 200 nautical miles from the baseline from which the breadth of the territorial sea is measured." Proclamation No. 5030, 48 Fed. Reg. 10,605, 10605 (Mar. 10, 1983).  *See also* 33 C.F.R. § 2.30.  The territorial sea baseline normally is the mean low water line along the coast of the United States.  33 C.F.R. § 2.20.

[5]  "'[N]avigable waters' means the waters of the United States, including the territorial sea."  33 U.S.C. § 2701(21).  "'[T]erritorial seas' means the belt of the seas measured from the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters, and extending seaward a distance of 3 miles."  33 U.S.C. § 2701(35).

"any structure, group of structures, equipment, or device (other than a vessel) which is used for one or more of the following purposes:  exploring for, drilling for, producing… oil."  OPA Section 1001(22), 33 U.S.C. § 2701(22), further defines "offshore facility" to mean "any facility of any kind located in, on, or under any of the navigable waters of the United States, and any facility of any kind which is subject to the jurisdiction of the United States . . . other than a vessel or a public vessel."

1.   The Anadarko Defendants are liable under OPA as lessees.

APC and A E&P were lessees at the time of the discharge resulting from the blowout that occurred on April 20, 2010.  SMF ¶¶ 2, 4, 7, 8.  As lessees, these defendants are responsible parties as defined in OPA Section 1001(32)(C), 33 U.S.C. § 2701(32)(C), and as responsible parties they are liable under OPA.  OPA Section 1002(a), 33 U.S.C. § 2702(a).   Therefore, the United States' motion for summary judgment seeking to hold the Anadarko Defendants liable under OPA should be granted.

2.   A E&P's retroactive assignment to APC does not vitiate A E&P's liability resulting from the April 20, 2010 Macondo well blowout and subsequent oil spill.

Only defendant A E&P moves to dismiss the Complaint as to it, based upon its agreement with APC that its last-minute reassignment of its 22.5% leasehold interest would be retroactively effective to April 1, 2010.  Its arguments are unavailing.

 As noted above, OPA defines "lessee" by reference to OCSLA and points to the OCSLA legal regime to answer the question of who holds a leasehold interest.  OCSLA expressly states that "[n]o lease issued under this subchapter may be sold, exchanged, assigned, or otherwise transferred except with the approval of the Secretary."  43 U.S.C. § 1337(e).  In accordance with the statute, the regulations provide that an assignment of an OCS lease or interest in a lease

9

pursuant to the OCSLA is ineffective unless it is approved by the Regional Director of the

Minerals Management Service (MMS) (now, the Bureau of Ocean Energy Management,

Regulation and Enforcement (BOEMRE)).  30 C.F.R. § 256.62(a) ("MMS may approve the

assignment . . . of the ownership of the record title to a lease . . . only if . . . [t]he Regional

Director approves the assignment.").  *See also Liberty Servs., Inc. v. Amoco Prod. Co., et al.*, No.

90-4490, 1991 WL 278673, at *6 (E.D. La. Dec. 23, 1991) (reasoning that because a lessee's

assignment to another party had not been approved by MMS, the lessee was "still deemed to

possess" its interest in the lease and retained its lease obligations).  On the date that the discharge

resulting from the April 20, 2010 well blowout commenced, the MMS Regional Director (or a

designee) had not yet approved the lease assignment between A E&P and APC.  SMF ¶¶ 7, 8.

As the assignment was not approved until April 28, A E&P was a lessee on the day the discharge

commenced and OPA liability accrued.

A E&P's argument that it avoids OPA liability though a retroactively-effective lease

assignment contravenes Section 2710(b) of OPA, which states:

> No indemnification, hold harmless, or similar agreement or conveyance shall be
> effective to transfer liability imposed under this Act from a responsible party or
> from any person who may be liable for an incident under this Act to any other
> person.

33 U.S.C. § 2710(b).  In this section, Congress decided as a policy matter that accrued OPA

liabilities are non-delegable, requiring responsible parties to shoulder the burden for incidents

that occurred on their watch.  As with post-incident hold harmless agreements or conveyances

purporting to transfer liability, a retroactive lease assignment cannot change one's status as a

responsible party under OPA.[6]  *Settoon Towing*, 722 F. Supp. 2d at 714 (relying on § 2710(b) to

hold that a retroactive lease assignment did not change responsible party's status under OPA).  In

*Settoon Towing*, a lessee, Alpine, assigned its interest in a state-granted lease effective to a date

prior to when a barge struck a well, causing an oil spill.  *Id.* at 711-12.  The state, the lessor (as

the lease area was within the state's territorial waters), approved the lease assignment eleven

months after the incident.  *Id.* at 712.  Relying on Section 2710, the court held that "Alpine may

contract with [its assignee] for indemnity, and pursue those rights between themselves, but

Alpine cannot under OPA transfer its liability as a responsible party."  722 F. Supp. 2d at 714.[7]

---

[6]  This conclusion is consistent with cases decided under the Comprehensive Environmental Response,
Compensation, and Liability Act (CERCLA), which contains a provision virtually identical to OPA
Section 2710 and similarly prohibits indemnification or similar agreements or conveyances to transfer
liability for a release or threatened release of hazardous substances.  42 U.S.C. § 9607(e).  Courts have
interpreted this provision in CERCLA as prohibiting a party who is responsible for cleanup costs to
escape liability vis-a-vis the federal government, although parties may still contractually allocate the costs
of environmental clean up among themselves.  *Coy/Superior Team v. BNFL, Inc.*, 174 F. App'x. 901, 908
(6th Cir. 2006); *Hatco Corp. v. W.R. Grace & Co. Conn.*, 59 F.3d 400, 404 (3d Cir. 1995) (private
agreements to indemnify or hold harmless "cannot nullify a party's underlying CERCLA liability,"
although they are effective to shift the ultimate financial loss); *Fisher Dev. Co. v. Boise Cascade Corp.*,
37 F.3d 104, 107 (3d Cir. 1994); *John S. Boyd Co., Inc. v. Boston Gas Co.*, 992 F.2d 401, 405 (1st Cir.
1993) ("[A] party cannot escape liability by means of a contract with another party" but parties "can
allocate ultimate responsibility among themselves by contract.").  Accordingly, while parties may shift
the financial burden among themselves, they cannot disclaim their status as responsible parties for
purposes of liability to the United States.

[7]  A E&P argues that *Settoon Towing* is materially distinguishable because in *Settoon Towing* the parties'
execution of the transfer of the lease occurred nine months after the incident, whereas the document
between A E&P and APC assigning the lease interest appears (on its face) to have been signed on April
15, 2010, before the explosion of the *Deepwater Horizon*.  (See A E& P Mem. 13-14.)  This is
unpersuasive.  The date when the parties execute a lease interest transfer does not complete the
assignment.  The OCSLA regulations state unequivocally that a transfer is effective "only if . . . [t]he
Regional Director approves the Assignment."  30 C.F.R. § 256.62(a).  In both *Settoon Towing* and this
case, the lease assignment had not been approved by the relevant lessor, and thus was not effectuated
when OPA liability accrued.

Accordingly, the retroactive transfer of the record title interest from A E&P to APC had no bearing on A E&P's OPA liabilities, which accrued in connection with the discharge resulting from the well blowout on April 20, 2010, before the date that MMS approved the lease assignment and effectuated the transfer.

### 3. A E&P's argument that OPA and CWA liability are not "lease obligations" is not dispositive of its liability for the Macondo oil spill and is incorrect as a matter of law.

Like OPA, OCSLA regulations expressly prohibit a lessee from using a retroactive assignment to escape obligations it accrued under the lease or regulations. Although the OCSLA regulations allow for retroactive effective dates, see 30 C.F.R. § 256.62(c),[8] they expressly extend duties on assignors of lessees beyond the effective date of a lease transfer. 30 C.F.R. § 256.62(d). These regulations make assignors "liable for all obligations that accrue under [the assignor's] lease before the date that the Regional Director approves [the assignor's] request for assignment of the record title in the lease." *Id.*[9]  *See also id.* § 256.62(f) (providing that if assignor's assignee or a subsequent assignee fails to perform any obligation under the lease or regulations in this chapter, "the Regional Director may require [the assignor] to bring the lease

---

[8]  30 C.F.R. § 256.62(c) provides that the assignment is effective on the first day of the month following the Regional Director's approval, unless the parties request, and the agency agrees to, an earlier effective date. The default effective date, the first day of the month following the Regional Director's approval, is the day following the due date for royalties on oil and gas produced during the month preceding the month in which the Regional Director approves the assignment. Through the retroactive effective date, the regulations allow the parties to apply the terms of the lease retroactively to the assignee so that royalties can be paid by the assignee for periods after the retroactive effective date, even though some of the production on which the royalty is due will have occurred before the Regional Director's approval and the default effective date.

[9]  By contrast, lease obligations that accrue "*after* the date that the Regional Director approves the governing assignment" are the responsibility of the assignee, not the assignor. 30 C.F.R. § 256.62(e) (emphasis added).

into compliance to the extent that the obligation accrued before the Regional Director approved the assignment of [the assignor's] interest in the lease."); *id.* § 256.64(a)(6) ("You do not gain a release from any accrued obligation under your lease or the regulations in this chapter by assigning your record title interest in the lease.").

Where a lease has been terminated or rescinded, lessees remain responsible to the United States for fulfilling accrued OCSLA regulatory obligations. *See Noble Energy, Inc. v. Salazar*, No. 02013, 2011 WL 996776 (D.D.C. Mar. 22, 2011) (holding that lessee's duty under OCSLA to permanently plug and abandon an undeveloped exploratory offshore well was not discharged by the government's material breach of the lease). OCSLA regulations thus reinforce that a lessee cannot avoid an accrued obligation merely by assigning its interest to another party. *See also* 62 Fed. Reg. 27,948, 27,953 (May 22, 1997) (In the preamble for a rule amending requirements applicable to lessees under OCSLA regulations, confirming that "[a]n assignor cannot escape its liability for an obligation by requesting an effective date for its assignment that predates the obligation.").

A E&P argues that neither OPA nor CWA liability is a "lease obligation" that extends beyond the effective date of an assignment under 30 C.F.R. § 256.62(d) because that regulation does not cover obligations that may arise under statutes other than OCSLA. (A E&P Memorandum of Law in Support of Motion of Defendant Anadarko E&P Company LP to Dismiss the Complaint of the United States Pursuant to Federal Rule of Civil Procedure 12(b)(6) ("A E&P Mem.") 27-28.) But as discussed *supra*, the retroactive effective date permitted by the OCSLA regulations does not inform whether A E&P is a responsible party under OPA here because MMS had not approved the lease transfer before the date of the discharge and A E&P thus was a "lessee" during the operative period. Accordingly, neither the effective date of the

13

assignment nor the meaning of an accrued "lease obligation" under Section 256.62(d) is relevant in this instance to determining A E&P's liability under OPA for the Macondo oil spill.

Even so, A E&P's assertion that neither OPA nor CWA liability is a "lease obligation" is contrary to the terms of the MC 252 lease and case precedent construing those terms.  The lease terms provide that A E&P, as a lessee, is "subject to OCSLA, all regulations implemented pursuant to that Act," and "*all other applicable statutes and regulations*."  Ex. 2 to United States' Memorandum 2 (Oil and Gas Lease of Submerged Lands under OCSLA, OCS-G 32306, Block 252, Mississippi Canyon, at Sec. 1).  OPA and CWA, which impose legal requirements and obligations related to the prevention of, response to, and compensation for, oil spills on the OCS, constitute "other applicable statutes" whose requirements are incorporated into a federal lease for oil and gas exploration, drilling and development rights.

Two cases construing this identical provision, "other applicable statutes and regulations," which is also found in Section 1 of the MC 252 Lease, found that applicable environmental laws in force at the time those leases were approved were incorporated into the lease.  In *Mobil Oil Exploration & Producing Southeast v. United States*, 530 U.S. 604 (U.S. 2000), the Supreme Court reasoned that this same "catch-all" provision incorporated other applicable statutes, like the Coastal Zone Management Act ("CZMA"), in force as of the lease's effective date, but not amendments to such statutes or regulations enacted *after* the lease's effective date.  *Id.* at 615-16.  Pursuant to the CZMA and OCSLA, lessees are required to submit certain documentation and certifications in connection with their application for an exploratory well drilling permit.  After the lease at issue in *Mobil* became effective, Congress enacted legislation which created new requirements for approval of the lessee's exploration plan, and the court held that the government's application of these new statutory requirements repudiated the contract.  *Id.* at

14

618.  However, in its analysis the court assumed that applicable statutory requirements for exploration plans in force at the time of the leases' effective date had been incorporated into the OCS lease.  *Id.* at 615-16; *see also Amber Res. Co. v. United States*, 538 F.3d 1358 (Fed. Cir. 2008) (concluding that the amendments to the CZMA which created more onerous obligations than those in effect at the time the leases became effective were not incorporated into the OCS lease, but assuming that the terms of the statute in operation at the time of the leases' effective date had been incorporated).

Like the CZMA, which was "incorporated" by Section 1 of the lease at issue, OPA and CWA impose substantial requirements on lessees and provide for the environmental protection of the OCS.  In addition, the liability provisions of OPA and CWA that are the subject of this litigation were enacted well before June 1, 2008, when this lease was issued.  Thus, these statutes are incorporated into the MC 252 Lease, and A E&P is bound to fulfill its responsibilities under OPA and CWA in contract as well as in law.[10]

In short, just as with APC, Plaintiff United States has established the prima facie elements of liability as to A E&P, which was a leaseholder at the time of the discharge and therefore a responsible party under OPA.  There is no genuine dispute as to the underlying facts concerning A E&P's assumption of 22.5% of the record title interest in the lease, and of MMS'

---

[10]  Making the lease "subject to" OPA and CWA is also consistent with the mandate of the Secretary of the Interior that those performing operations under an OCS lease do so in an environmentally-protective manner.  *See, e.g.*, 30 C.F.R. § 250.101 ("Under the Secretary's authority, the Director [of MMS] requires that all operations . . . [c]onform to sound conservation practice to preserve, protect, and develop mineral resources of the OCS to . . . [b]alance orderly energy resource development with protection of the human, marine, and coastal environments."); 30 C.F.R. § 250.106 ("The Director will regulate all operations under a lease . . . to . . . [p]revent damage to or waste of any natural resource, property, or the environment . . . .").

approval on April 28, 2010 of A E&P's reassignment of that interest to APC.  Accordingly,

partial summary judgment regarding A E&P's liability under OPA is appropriate at this time.

   C.   If Summary Judgment is not Granted, A E&P's Motion to Dismiss the OPA Claims
        Should be Denied

   Even if the Court denies the motion seeking summary judgment for OPA liability, it

should not grant A E&P's motion to dismiss.  The United States' Complaint alleges that on April

20, 2010, and continuing until at least April 28, 2010, A E&P held a 22.5% interest in the Lease.

(Compl. ¶ 33.)  For purposes of this motion to dismiss, this allegation must be accepted as true,

*Matrixx Initiatives*, 131 S. Ct. at 1322.

   In support of its motion to dismiss, A E&P claims that it executed the reassignment to

APC on April 15, 2010, *prior* to the Macondo well blowout, and suggest that this fact

distinguishes this case from *Settoon Towing*, 722 F. Supp. 2d 710, where the parties executed the

assignments nine months *after* the discharge.  (*See* A E&P Mem. 13-14.)  However, it does not

appear that the A E&P lease assignment form was actually transmitted to MMS until April 20,

2010, see Ex. 7 to United States' Memorandum (Assignment of Record Title Interest Conveying

22.5% Interest in MC 252 to APC), the date of the blowout.  Obviously the date of the

submission and the date of the explosion are close in time and raise a host of questions.  These

circumstances do not provide a solid basis for dismissal of the United States' claim.  In addition,

as discussed at Part III.C.4, *infra*, early discovery suggests that the roles of A E&P and APC with

respect to the Macondo Well seem to be intertwined, and Plaintiff's claims as to Defendant A

E&P should not be dismissed on any ground until the relationship between the two Anadarko

Defendants is more fully understood.

16

III.   LIABILITY OF THE ANADARKO DEFENDANTS UNDER SECTION 311(b) OF
      THE CLEAN WATER ACT

A.   Statutory Background and Elements of Liability for the Clean Water Act

In enacting Section 311(b) of the Clean Water Act, Congress made the "unequivocal

declaration," *United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1127 (5th Cir.

1981), that:

> [I]t is the policy of the United States that there should be no discharges of oil . . . into or
> upon the navigable waters of the United States, adjoining shorelines, or into or upon the
> waters of the contiguous zone, or in connection with activities under the Outer
> Continental Shelf Lands Act [43 U.S.C. §1331 et seq.] . . . .

33 U.S.C. § 1321(b)(1).  Section 311(b)(3) thus prohibits, *inter alia*, the "discharge of oil . . . into

or upon the navigable waters of the United States, adjoining shorelines, . . . or in connection with

activities under the Outer Continental Shelf Lands Act [43 U.S.C. § 1331 et seq.] . . . in such

quantities as may be harmful as determined by the President . . . ."  33 U.S.C. § 1321(b)(3).

Section 311(b)(3) imposes a strict, or "absolute," liability standard on polluters.  *Coastal States*,

643 F.2d at 1127.  Strict liability is appropriate given that "[t]he purpose of the [Clean Water

Act] and of section 1321 [of 33 U.S.C., *i.e.*, Section 311 of the CWA] is to achieve the result of

clean water as well as to deter conduct causing spills."  *Id.* at 1128.  *See also Apex Oil*, 208 F.

Supp. 2d at 654 (quoting S. Rep. 101-94, at 11 (1989), *as reprinted in* 1990 U.S.C.C.A.N. 732-

33, which states that CWA Section 311's "standard of liability has been determined repeatedly to

be strict, joint and several liability"); *Bodenger*, 2003 WL 22228517, at *2 (same).

Section 311(b)(7)(A) of the Act mandates that "[a]ny person who is the owner, operator,

or person in charge of any . . . offshore facility from which oil . . . is discharged in violation of

17

paragraph (3), shall be subject to a civil penalty . . . ."  33 U.S.C. § 1321(b)(7)(A).[11]  Thus, to

establish liability for civil penalties for violation of Section 311(b)(3) of the Act, the United

States needs to show that each defendant is:  (1) a "person" who is (2) an "owner, operator, or

person in charge" of (3) an "offshore facility" from which (4) "oil" (5) is "discharged" (6) into or

upon the "navigable waters of the United States,  adjoining shorelines, . . . or . . . in connection

with activities under the Outer Continental Shelf Lands Act . . . " (7) in a quantity "as may be

harmful as determined by the President."  33 U.S.C. § 1321(b)(3) & (b)(7)(A).

        B.      The Undisputed Facts Show that the Anadarko Defendants are Liable as
              Operators under Section 311(b) the Clean Water Act

            1.    Six of the elements required to show liability under Section 311(b) are
                  obvious.

There is no dispute as to the elements of liability under CWA Section 311(b).  First, each

defendant is a corporation and therefore is a "person" under the Clean Water Act.[12]  SMF ¶¶ 16,

17.  Second, the Macondo Well constituted an "offshore facility," which the Clean Water Act

defines to mean "any facility of any kind located in, on, or under, any of the navigable waters of

the United States, and any facility of any kind which is subject to the jurisdiction of the United

States and is located in, on, or under any other waters, other than a vessel or a public vessel."  33

U.S.C. § 1321(a)(11).  "Facility" is not defined in the CWA, but the dictionary definition of the

term is broad and extends to "something (as a hospital) that is built, installed, or established to

serve a particular purpose."  Merriam-Webster's Collegiate Dictionary 416 (10th ed. 1999).  The

---

[11]  "[A] facility may have more than one operator." *Geraghty & Miller, Inc. v. Conoco, Inc*., 234 F.3d
917, 928 (5th Cir. 2000), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. United
States*,   --- U.S. ---, 129 S. Ct. 1870 (2009) (construing similar language in CERCLA).

[12]  The CWA defines "person" to include corporations.  33 U.S.C. § 1321(a)(7).

wellhead, casings and tubulars constituting the Macondo Well were installed on or before April 20, 2010, SMF ¶¶ 10-11, and plainly fall within the broad definition of "offshore facility."

Third, oil was discharged within the meaning of the CWA from the Macondo Well as a result of the well blowout on April 20, 2010.  SMF ¶ 13.   Section 311(a)(1) defines oil broadly to mean "oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil."  33 U.S.C. § 1321(a)(1).  Fourth, a "discharge" within the meaning of the CWA occurred when oil "spill[ed], leak[ed], pump[ed], pour[ed], emitt[ed], empt[ied] or dump[ed]" out of the Macondo Well into the Gulf of Mexico. 33 U.S.C. § 1321(a)(2).  SMF ¶ 13.  Fifth, oil was discharged into or upon the "navigable waters of the United States, adjoining shorelines, . . . or . . . in connection with activities under the Outer Continental Shelf Lands Act . . . ."  33 U.S.C. § 1321(b)(3).  SMF ¶ 15.  While any one of these three locations or circumstances triggers liability, each of these is indisputably satisfied here. The Macondo Well was located on the Outer Continental Shelf approximately 50 miles from the Mississippi River delta, and the lease under which oil exploration activities were being conducted was issued pursuant to OCSLA.  SMF ¶ 15.   Thus, oil was discharged "in connection with activities under [OCSLA]" and also spread into and upon navigable waters[13] and adjoining shorelines.  SMF ¶¶ 10, 12-15.

Sixth, the discharge of oil was in a quantity "as may be harmful" within the meaning of Section 311(b)(3) of the Act, 33 U.S.C. § 1321(b)(3).  SMF ¶¶ 14-15.  Pursuant to its authority

---

[13]  As in OPA, the Clean Water Act defines "navigable waters" to mean "the waters of the United States, including the territorial seas" and in turn defines "territorial seas" to mean "the belt of the seas measured from the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters, and extending seaward a distance of three miles."  33 U.S.C. § 1362(7), (8).

under the Act, EPA has promulgated regulations that define quantities of oil that "may be harmful" to include quantities that "[c]ause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines."  40 C.F.R. § 110.3.  *See Chevron, U.S.A., Inc. v. Yost*, 919 F.2d 27, 30-31 (5th Cir. 1990) (upholding EPA's "sheen" test).   Although the precise amount of oil discharged will be determined at a later phase of this litigation, the court can take judicial notice that the amount discharged far exceeded a mere "sheen" and therefore oil was discharged in "harmful quantities" within the meaning of the CWA.  SMF ¶¶ 14-15 (including links to photographs documenting extensive oil slicks).

> 2. The "operator" element is established as a matter of law because the Anadarko Defendants were required by statute to maintain all operations within the Lease Area in compliance with regulations intended to protect the environment.

Thus, the remaining element of liability involves whether each of the defendants was, during the time of the discharge, an "owner, operator or person in charge."  Those categories are three separate concepts that, for purposes of determining liability under the CWA, must be analyzed separately.  *United States v. M/V Big Sam*, 681 F.2d 432, 438-39 (5th Cir. 1982) (recognizing pre-OPA intent of the CWA to provide an effective remedy through strict liability for recovering cleanup costs from oil spills, and concluding that the United States could sue the owner or operator or both); *see also Sierra Club, Inc. v. Tyson Foods, Inc., et al.*, 299 F. Supp. 2d 693, 716 (W.D. Ky.  2003) (declining to define person in charge to always include owner or operator).  Treatment of any of the terms as synonymous would render them superfluous, contrary to proper statutory construction.  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void or

20

insignificant.") (internal quotations omitted); *Clean COALition v. TXU Power*, 536 F.3d 469, 477 n.10 (5th Cir. 2008) (declining to adopt interpretation of one section of the Clean Air Act because it would render superfluous another section of the Act).

A E&P in its Motion to Dismiss argues that it cannot be an "operator" within the meaning of the CWA because of its contractual arrangements with BP.  However, this argument ignores the express statutory obligation imposed on the lessees under Outer Continental Shelf Lands Act ("OCSLA") – an obligation that the lessees cannot contract away.  OCSLA provides:

> b) Duties of holders of lease or permit
>> It shall be the duty of any holder of a lease or permit under this subchapter to–
>> . . .
>> (2) maintain all operations within such lease area or within the area covered by such permit in compliance with regulations intended to protect persons, property, and the environment on the outer Continental Shelf. . . .

43 U.S.C. § 1348(b)[14]; *see also* 43 U.S.C. § 1332(6) ("[O]perations in the outer Continental Shelf should be conducted in a safe manner by well-trained personnel using technology, precautions, and techniques sufficient to prevent or minimize the likelihood of blowouts, loss of well control, fires, spillages, physical obstruction to other users of the waters or subsoil and seabed, or other occurrences which may cause damage to the environment or to property, or endanger life or health.").[15]

---

[14]  This same obligation is reiterated in the lease between the United States and the lessees for the Macondo area.  See Ex. 2 to United States' Memorandum (Oil and Gas Lease of Submerged Lands under the Outer Continental Shelf Lands Act, Serial No. OCS-G 32306, at Sec. 12).

[15]  The OCSLA regulations contain a number of provisions obligating lessees to avoid discharges and other harm to the environment.  *See, e.g.*, 30 C.F.R. § 250.300(a) ("[T]he lessee shall take measures to prevent unauthorized discharge of pollutants into the offshore waters."); *id.* § 250.401 (requiring lessees to "take necessary precautions to keep wells under control at all times").

Given that each of the Anadarko Defendants was a "holder of a lease,"[16] each had an explicit statutory duty to "maintain all operations within [the] lease area . . . in compliance with regulations intended to protect . . . the environment on the outer Continental Shelf." 43 U.S.C. § 1348(b). Thus, the defendants cannot avoid liability as "operators" under the CWA based on their failure to comply with that duty. Furthermore, the duty imposed by OCSLA cannot be contracted away. As the Supreme Court has stated:

> '[T]he police power[] is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals. . . .' 'One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. . . .'

*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 503-04 (1987) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241-42 (1978) and cases cited therein).

This precept is reinforced by the regulations promulgated under OCSLA. While the regulations provide that a lessee may designate an "operator to act on your behalf and to fulfill your obligations under the Act, the lease, and [applicable] regulations," 30 C.F.R. § 250.143(b), those regulations expressly provide that co-lessees "are jointly and severally responsible" for fulfilling the obligations imposed by the regulations and the statute. *Id.* § 250.146.[17]

---

[16] As discussed *supra* at Part II.B.2, A E&P was a lease holder on April 20, 2010, as MMS had not yet approved the lease assignment.

[17] As more fully set forth, this regulation provides:

> Who is responsible for fulfilling leasehold obligations?
>
> (a) When you are not the sole lessee, *you and your co-lessee(s) are jointly and severally responsible for fulfilling your obligations* under the provisions of 30 CFR parts 250 through 282, unless otherwise provided in these regulations.

As the Department of the Interior has stated:

> While parties to a contract may agree to limit liability, neither Congress nor the Secretary ever agreed to limit the liabilities of OCS lessees for operational obligations.

62 Fed. Reg. 27,948, 27,950 (May 22, 1997); *Fruge v. Parker Drilling Co.*, 337 F.3d 558, 562-64 & n.5 (5th Cir. 2003) (quoting the foregoing and stating that the "regulations govern the parties' joint and several liabilities vis-a-vis the Government").[18]

Given OCSLA's express directive that leaseholders "maintain all operations . . . in compliance with regulations intended to protect . . . the environment on the outer Continental Shelf," 43 U.S.C. 1348(b), each of the defendants qualifies as an "operator" for purposes of Clean Water Act liability under Section 311(b)(7), 33 U.S.C. § 1321(b)(7).

Unlike the situation presented in *United States v. Bestfoods*, 524 U.S. 51, 66 (1998), the court need not "rue the uselessness" of the circular definition of "operator," nor examine the

---

(b) If your designated operator fails to fulfill any of your obligations under 30 CFR parts 250 through 282, *the Regional Supervisor may require you or any or all of your co-lessees to fulfill those obligations or other operational obligations under the Act*, the lease, or the regulations.

(c) Whenever the regulations in 30 CFR parts 250 through 282 require the lessee to meet a requirement or perform an action, *the lessee, operator (if one has been designated), and the person actually performing the activity to which the requirement applies are jointly and severally responsible for complying with the regulation*.

30 C.F.R. § 250.146 (emphases added). *See also id.* § 256.64(h)(1) ("You are jointly and severally liable for the performance of each nonmonetary obligation under the lease and under the regulations in this chapter with each prior lessee and with each operating rights owner holding an interest at the time the obligation accrued. . . . ."). "You" is defined in the regulations to include "a lessee," 30 C.F.R. § 250.105, which is defined to include the MMS-approved lease assignee, such as APC and A E&P, whose interest in the Lease for MC 252 was assigned from BP.

[18] In fact, the MMS Designation of Operator Forms, in which A E&P and APC designated BP as the operator for the MC 252 Lease, make clear that such a designation "does not relieve the lessee of responsibility for compliance with the terms of the lease, laws, and regulations applicable to the area." Exs. 5 & 6 to United States' Memorandum (designation of operator forms for MC 252 Lease).

particular facts regarding the lessees' actions under their contracts to determine whether they actually "manage[d], directe[d] or conduct[ed] operations specifically related to pollution . . . ." *Id.* at 66.  Instead, the obligation to maintain all operations in compliance with regulations intended to prevent pollution is placed squarely on co-lessees by OCSLA and, therefore, each Anadarko Defendant is an operator within the meaning of the Clean Water Act.

As the Fifth Circuit has stated, "[i]n the absence of ambiguity, our inquiry ends with the text [of the statute] itself."  *Hamilton v. United Healthcare of La., Inc*., 310 F.3d 385, 391 (5th Cir. 2002).  "[A]bsent any indication that doing so would frustrate Congress's clear intention or yield patent absurdity, our obligation is to apply the statute as Congress wrote it."  *Id.* at 392 (quoting *Hubbard v. United States*, 514 U.S. 695, 703 (1995)).

Stated even more simply, "[c]lear statutory language is dispositive." *Guilzon v. Comm'r of Internal Revenue*, 985 F. 2d 819, 823 n.11 (5th Cir. 1993).  Because OCSLA's mandate is clear that a co-lessee must "maintain all operations within [the] lease area . . . in compliance with regulations intended to protect persons, property, and the environment," each co-lessee is an "operator" within the meaning of Section 311(b) of the Clean Water Act, 33 U.S.C. § 1321(b).

The imposition of liability upon the Anadarko Defendants under Section 311(b) of the CWA squares precisely with the objectives of the statute.  As the Fifth Circuit succinctly put it:

> The intendment of the statute is clear:  Congress places a major part of the financial burden for achieving and maintaining clean water upon those who would profit by the use of our navigable waters and adjacent areas, and who pollute same.

*Coastal States*, 643 F.2d at 1128.  Thus, there is no genuine dispute as to the material facts, and each Anadarko Defendant is liable as an operator under Section 311(b)(7) of the CWA, 33

U.S.C. § 1321(b)(7), by virtue of the statutory scheme under which each assumed its leasehold interests.[19]

C.    If Summary Judgment is Not Granted, A E&P's Motion to Dismiss Should be Denied Because the Complaint Alleges Sufficient Facts to Support the Conclusion that A E&P is an Owner, Operator and/or Person In Charge Under CWA Section 311(b)(7)

Even if the court does not grant summary judgment as to defendant A E&P's liability, the United States' complaint is well-founded and should not be dismissed.  The Complaint properly sets forth specific factual allegations sufficient to support the United States' claims that Defendant A E&P is liable as an owner, operator and/or person in charge of the offshore facility and therefore liable under CWA Section 311(b)(7), 33 U.S.C. § 1321(b)(7).  For purposes of this Motion to Dismiss, each of those allegations must be treated as true.  *Matrixx Initiatives*, 131 S. Ct. at 1322.  The standards for pleading each category of liability are met and the United States' CWA claim against Defendant A E&P should not be dismissed. [20]

---

[19]  Even if the Court declines to find that the Anadarko Defendants are operators as a matter of law under the theory presented here, it should still enter partial summary judgment in favor of the United States regarding the other six elements of CWA liability, as permitted by Fed. R. Civ. P. 56(a), and enable the United States to present fact-dependent theories of liability at a later date.

[20]  Defendant correctly notes that a defendant may attach documents that are referred to in the complaint and that are central to Plaintiffs' claims (and therefore are considered part of the complaint).  *In re Katrina Canal Breaches Litig*., 495 F. 3d 191, 205 (5th Cir. 2007);  *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004).  There also is some authority that certain documents from the public record also may be attached in support of a motion to dismiss.  *See Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994).

Here, however, A E&P has selectively appended only some documents, and even appended only portions of key documents.  For example, the copy of the Joint Operating Agreement attached by A E&P is incomplete, and inexplicably cuts off in the middle of Article 6, which discusses joint expenditures made pursuant to the Agreement.  (A E&P Mem., Ex. 6.)  None of the Operating Agreement Exhibits are attached, although, as explained *infra* at Part III.C.3, they are relevant to the United States' allegations regarding CWA "owner" liability.  Defendant also includes some of the materials submitted to MMS in February 2010 in connection with the Lease Assignment, (A E&P Mem., Ex. 4), but excludes certain materials that were referenced therein and part of the same submission, such as the form designating BP

1.      The Complaint alleges sufficient facts to support the conclusion that A
        E&P is an "operator" under CWA Section 311(b)(7).

First, the United States contends that Defendant A E&P is liable as an operator as a matter of law under the CWA Section 311(b)(7), 33 U.S.C. § 1321(b)(7), by virtue of its interest in the Lease and the unique statutory scheme under OCSLA, but, even if the fact-bound standards set forth in *United States v. Bestfoods, et al.*, 524 U.S. 51 (1998), are deemed to apply, the Complaint states a valid claim for operator liability.  In *Bestfoods*, the Supreme Court articulated the general test of when an entity may be held directly liable as an "operator" for purposes of CERCLA:

> [A]n operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility.  To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

524 U.S. at 66-67.  Determining operator liability under this standard is a fact-intensive process. *See, e.g.*, *BP Amoco Chem. Co. v. Sun Oil Co., et al.*, 200 F. Supp. 2d 429, 435 (D. Del. 2002) (in reconsidering decision to dismiss plaintiffs' CERCLA claim for operator liability under the *Bestfoods* standards, the court found it would be prudent instead to rule in context of a summary judgment motion, where there would be a "fully developed factual record").  And, as stated above, there can be multiple operators at a facility.  *Geraghty & Miller*, 234 F.3d at 928.

---

as the operator for the lease prospect, which contains language clarifying and qualifying the scope of that designation (A E&P Mem., Ex. 4, at 2), and a Well Participation Agreement among Anadarko Petroleum Corporation, BP and Kerr-McGee that is referenced in the materials transmitted to MMS.  Thus, A E&P's attachments do not form a strong record from which to dismiss Plaintiff's claims.

The Complaint first recites facts supporting the significant input and influence the co-lessees held under the Joint Operating Agreement ("JOA").[21]  It further expressly alleges that Defendant A E&P is liable, along with each of the other Defendants (except QBE Underwriting Ltd., Lloyd's Syndicate 1036) for, *inter alia*, a number of violations of applicable environmental regulations and for the ultimate loss of well control.[22]  The basis for these allegations is grounded in Defendant A E&P's involvement in the "polluting enterprise," *United States v. Tex-Tow, Inc.*, 589 F.2d 1310, 1313-14 (7th Cir. 1978), created by the JOA, the Lease Exchange Agreement, its acts and omissions, and the overall course of dealings among the Defendants. [23]  Finally, the

---

[21]  (Compl. ¶ 35.) ("[T]he JOA required that BP obtain the approval of the Anadarko Defendants . . . to proceed with nondiscretionary operations in connection with the Lease . . . . The JOA also provided for the sharing" of profits and losses.); (Compl. ¶ 36.) ("The JOA required BP to provide the Anadarko Defendants . . . with detailed technical information regarding exploration . . . . the Anadarko Defendants . . . received detailed technical information regarding operations" including "access to real time data from the rig."); (Compl. ¶ 37.) ("The JOA was and is an enforceable contract, and provided the Anadarko Defendants . . . with a mechanism to object to, prevent, control, address, and/or abate discharges or health and safety issues in connection with the Lease.").

[22]  These include (1) the failure to control the well, including use of best available and safest drilling technology and to minimize the potential for the Macondo Well to flow and kick, (Compl. ¶¶ 48-51); (2) failure to maintain equipment and materials, including but not limited to, the BOP stack, that were available and necessary to ensure the safety and protection of personnel, equipment, natural resources and the environment, (Compl. ¶ 53); and failure to comply with a panoply of other federal regulations. (Compl. ¶ 54.)

[23]  Although A E&P argues that the terms of the JOA provide that A E&P had "no right to control BP's activities" and that BP is an "independent contractor," (A E&P Mem. 25.), it is premature to dismiss Plaintiff's Complaint against A E&P on the pleadings alone.  Even where agreements of this nature are relevant to determining liability, courts have looked to the evidentiary record regarding implementation of the agreement to determine the actual relationship among the parties.  *See e.g.*, *Heavin v. Mobil Oil Exploration & Producing Southeast, Inc., et al.*, 913 F.2d 178, 180 (5th Cir. 1990) (in tort suit for injuries sustained on offshore platform where question concerned scope of immunity granted to participants in a joint venture under a federal statute, considering not only operating agreement, but also evidence in summary judgment record as to the actual relationship among the parties to the agreement).  For example, discovery may show that Defendants acted outside the scope of the contractual terms of the agreements, or provide evidence as to how contradictory provisions in the agreements were reconciled or interpreted by the parties.  Information as to the implementation of the agreements is "particularly within [the defendant's] knowledge and control," and it is not necessary for the United States, at this stage, to plead

Complaint alleges that "each Defendant . . . caused and/or contributed to the Deepwater Horizon Spill by failing to assure well control of the Macondo Well through, *inter alia*:  actions, corporate actions, and/or corporate practices of disregarding federal regulations, as evidenced by various safety and other audits of *Deepwater Horizon*, reflecting the known failure, prior to the Deepwater Horizon Spill, to properly design, install, maintain, repair, and operate equipment intended to prevent personal injury, loss of life, harm to the environment, and disasters like the Deepwater Horizon Spill."  (Compl. ¶ 55.)

The Complaint therefore does allege a sufficient factual basis for CWA operator liability, even if the standards in *Bestfoods* are used.  *Bestfoods* recognizes, moreover, that a defendant additionally may be an operator through its involvement with decisions about environmental compliance.  Given the foregoing allegations, the Complaint states a valid Claim for Relief and should not be dismissed.

       2.   The Complaint alleges sufficient facts to support the conclusion that A E&P is a "person in charge" under CWA Section 311(b)(7).

The Complaint properly sets forth factual allegations supporting the claim that A E&P is a person in charge.  Although Section 311 does not define the term "person in charge," the same term is used in Section 311(b)(5), 33 U.S.C. § 1321(b)(5), which requires reporting of unlawful discharges,[24] and in Section 103 of the Comprehensive Environmental Response, Compensation,

---

more "specific facts" under the standard set forth in *Iqbal/Twombly*.  *See Boykin v. Keycorp*, 521 F.3d 202, 215 (2d Cir. 2008).

[24]  Section 311(b)(5) provides that "[a]ny person in charge of a vessel or of an onshore facility or an offshore facility shall, as soon as he has knowledge of any discharge of oil or a hazardous substance from such vessel or facility in violation of [CWA 311(b)(3)], immediately notify the appropriate agency of the United States Government of such discharge…."  The Section continues on to state that such person's failure to provide notice may subject him to criminal penalties or imprisonment.  33 U.S.C. § 1321(b)(5).

and Liability Act ("CERCLA"), 42 U.S.C. § 9603.[25]  The Fifth Circuit in *United States v. Mobil Oil*, 464 F.2d 1124, 1127 (5th Cir. 1972), looked to three factors in concluding that an owner-operator was also a "person-in-charge":

> The owner-operator of a vessel or a facility has the capacity to make timely discovery of oil discharges.  The owner-operator has power to direct the activities of persons who control the mechanisms causing the pollution.  The owner-operator has the capacity to prevent and abate damage.  Accordingly, the owner-operator of a facility governed by the [Clean Water Act], such as the Mobil facility here, must be regarded as a "person in charge" of the facility for the purposes of [the predecessor to Section 311(b)(5)].

In sum, a "person in charge" includes one who (1) has the capacity to make timely discovery of oil discharges; (2) the power to direct the activities of persons who control the mechanisms causing the pollution; and (3) the capacity to prevent and abate damage.  *Mobil Oil*, 464 F.2d at 1127.

The Complaint alleges that the joint operating agreement ("JOA") required BP to obtain approval from the Anadarko Defendants for "nondiscretionary operations in connection with the Lease" through seeking their authorization for expenditures or their election or vote to participate in the next stage of operations.  (Compl. ¶ 35.)  It alleges that the Anadarko Defendants were provided with detailed technical information and received "real time" data regarding operations conducted pursuant to the Lease and the JOA.  (Compl. ¶ 36.)  Plaintiff further alleges that the JOA was an enforceable contract and provided A E&P with a mechanism to object to, prevent, control, address and/or abate discharges or health and safety issues in connection with the Lease. (Compl. ¶ 37.)  Moreover, many of the allegations in the Complaint that are relevant to operator

---

[25] CERCLA Section 103 is modeled on the reporting requirements of Section 311(b)(5), *United States v. Carr*, 880 F.2d 1550, 1552-54 (2d Cir. 1989), and therefore interpretation of either statutory provision is relevant to the other.  CERCLA Section 103 provides that "[a]ny person in charge of a vessel or an offshore or an onshore facility shall, as soon as he has knowledge of any release (other than a federally permitted release) of a hazardous substance from such vessel or facility in quantities equal to or greater than those determined pursuant to [CERCLA Section 102 reportable quantities], immediately notify the National Response Center established under the Clean Water Act of such release."  42 U.S.C. § 9603(a).

liability are also relevant to A E&P's status as a person in charge. (Compl. ¶¶ 48-51.) For purposes of this Motion to Dismiss, the foregoing allegations must be accepted as true, *Matrixx Initiatives*, 131 S. Ct. at 1322, and therefore the factual basis for the three-part test in *Mobil* and its progeny is properly set forth in the Complaint.

A E&P argues that it was not a "person in charge" of the offshore facility and that the Complaint has no factual support for that claim. It attempts to conflate operator liability with liability as a person in charge, and implies that a person in charge is typically a natural person. (A E& P Mem. 26-27.) The Fifth Circuit and other courts considering liability under Section 311(b) as a person in charge, however, have held that corporations can be persons in charge. *See Mobil Oil*, 464 F.2d at 1127; *United States v. Apex Oil Co.*, 530 F.2d 1291, 1292-94 (8th Cir. 1976). There can be multiple persons in charge at a facility and it is not necessary to show that a person exercised sole control over the facility. *Carr*, 880 F.2d at 1555 (upholding jury instruction in criminal case). Liability extends to any person who is responsible for the operation of a facility, even where that person is not in the "*best* position" to detect, prevent or abate a release. *Tyson Food*, 299 F. Supp. 2d at 719 (emphasis in original). And, while owners and operators frequently qualify as persons in charge, a person in charge is not always an owner or operator as it depends on the nature and degree of control the person has over the facility. *Id*. at 716.

   3. <u>The Complaint alleges sufficient facts to support the conclusion that A E&P is an "owner" under CWA Section 311(b)(7).</u>

Finally, Plaintiff United States properly pleads that A E&P is liable as an owner of an offshore facility. Plaintiff's focus is on the specific jointly owned equipment and materials that it alleges comprise an "offshore facility" at issue in this claim, not on the geographic area of the

Macondo Prospect.[26]  The Complaint properly sets forth the United States' claim and, among

other things, alleges that:

> The JOA provided for the prompt invoicing by BP of costs incurred under the
> JOA and prompt payment of their agreed-upon share by the Anadarko
> Defendants. . . including . . . the costs of the well casing and wellhead and other
> materials purchased by BP.

(Compl. ¶ 37.)  Thus, Plaintiff alleges that A E&P acquired joint ownership of the well casing

and wellhead – an offshore facility at issue in this claim – through its purchase of its

proportionate share of the cement, casing, wellhead and related materials used to construct the

portions of the Macondo Well below the blow-out preventer.

The JOA corroborates that the components of the Macondo well were jointly owned and

financed through a Joint Account funded by the co-lessees according to their proportionate

shares.[27]  In other words, the actual financial arrangements make clear that property under the

---

[26]  Defendant A E&P argues that its "limited and temporary leasehold interests" are insufficient to
constitute ownership for purposes of Clean Water Act liability.  (A E&P Mem. 20-22.)  For purposes of A
E&P's motion to dismiss however, the Court need not decide whether ownership liability arises from
such lease interests.  As explained *infra*, the United States' Complaint asserts that A E&P is an owner by
virtue of its alleged payment under the JOA for components of the Macondo well.

[27]  The JOA, in full, is attached as Exhibit 8 to the United States' Memorandum.  Exhibit 8 to the United
States' Memorandum is the complete operating agreement with all of its exhibits.  The Bates numbers of
the United States' Exhibit 8 continue those in Exhibit 6 of A E&P's Memorandum.

Under the JOA, BP "shall pay all Costs of all activities and operations under this Agreement, and each
Participating Party shall reimburse the Operator in proportion to its Participating Interest Share for the
Costs of these activities and operations.  All charges, credits, and accounting for expenditures shall be
made under Exhibit 'C' [of the JOA]."  JOA, Art. 6.1.  Exhibit C among other things sets up a Joint
Account, defined to mean "the account showing the charges paid and credits received in the conduct of
the Joint Operations that are to be shared by the Parties."  Ex. C to JOA.  Joint Operations are defined to
mean "activities required to handle operating conditions and problems for the exploration, appraisal,
development, production, protection, maintenance, abandonment, and restoration of the Joint Property."
*Id.*  Exhibit C provides that BP as Operator may charge the Joint Account with various charges, including
Materials used on the Joint Property.  *Id.* at 2.  Joint Property is defined to mean the "real and personal
property subject to the [JOA]" and further to include facilities from which Joint Operations are conducted
"even if such location is not owned by the Joint Account."  *Id.* at 1.

JOA is held jointly, and that therefore those co-lessees who pay their proportionate share – or have their proportionate share paid on their behalf – are joint owners of the property.

Defendant points to the Lease Exchange Agreement and its definition of "BP Property" assigned to A E&P and APC, which purports to carve out "tangible personal property, which includes the tubulars and the wellhead" for the Macondo Well, to contend that A E&P does not hold title to the offshore facility and therefore cannot be an "owner" for purposes of CWA liability.  (A E&P Mem. 19.)  While the Lease Exchange Agreement may delineate the parties' respective property interests at the time that agreement is executed and approved, subsequent events and dealings – such as actual payment for components installed in the well after the transfer from BP – may effectively alter these interests.

Defendant's claim that A E&P never took legal title to the well, its casing, or wellhead is contradicted by the facts as alleged in the Complaint which, for purposes of this Motion, must be accepted as true.  *Matrixx Initiatives*, 131 S. Ct. at 1322.  The authority cited by Defendant, (A E&P Mem. 21), is not to the contrary:  assuming that Defendant A E&P is an owner of a proportional share of the Joint Property, including the well, casings and wellhead, by virtue of its payments into the Joint Account, it – together with the other parties to the JOA – enjoys "direct, immediate, and exclusive authority over [it]" and "may use, enjoy, and dispose of it within the limits and under the conditions established by law."  La. C.C. 477 (cited in *United States v. Burlington Res. Oil and Gas Co. L.P.*, No. 05-1395, 2007 WL 773716, at *4 (W.D. La. Mar. 9, 2007)).

The United States should be able to take discovery into the parties' actual course of dealings under the JOA, including the financial arrangements, to determine which parties owned the well head, casings, and other equipment.  The United States has pled sufficient facts to state a

claim that is plausible on its face and that "raise[s] a reasonable expectation that discovery will reveal evidence" to support its claims at trial, *Twombly*, 550 U.S. at 556, and therefore its claim under the CWA that Defendant A E&P is liable as an owner should not be dismissed.

In sum, Plaintiffs' claims that A E&P is an owner, operator or person in charge within the meaning of CWA Section 311(b)(7), 33 U.S.C. § 1321(b)(7) are supported by specific, non-conclusory factual allegations that readily meet the standards enunciated by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), and *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct 1309 (2011). Defendant's arguments to the contrary are unavailing and should be rejected.

4. Dismissal on the pleadings is premature because the evidence may show that the roles of A E&P and APC are intertwined with respect to activities relating to the Macondo Well.

Defendant A E&P further contends that Plaintiff United States' Claims against it should be dismissed because there are insufficient factual allegations against it individually. (A E&P Mem. 16-17.) Even the Anadarko witnesses, however – including a corporate designee under Fed. R. Civ. P. 30(b)(6) – indicated that the two corporations are intertwined with respect to activities relating to the Macondo Well. Here the evidence is likely to show that APC effectively stands in the shoes of A E&P, and therefore should be responsible for the full 25% interest in the Lease from the time BP assigned its interest in the Lease to the Anadarko entities. The United States believes it is important to preserve the full 25% share for the Anadarko entities, the greater share (22.5%) of which was held by A E&P, at least on paper, during the drilling, construction and other operations leading up to the Macondo well blow-out. Plaintiff's claims as to

Defendant Anadarko E&P should not be dismissed on any ground until the relationship between the two Anadarko Defendants is more fully explained by the Defendants.

For example, virtually all of the important corporate documents have been signed by APC employees who signed for both APC and A E&P.[28]  Alan O'Donnell, Asset Manager for the Eastern Gulf of Mexico for Anadarko Petroleum Corporation who admitted to acting on behalf of A E&P, could not describe that entity's business functions:

> Q.    Do you know what Anadarko E&P is?
> A.    Specifically I don't know all of the subsidiaries of Anadarko and what their functions are.  I know – I work for Anadarko Drilling Corporation, so I know there are other subsidiaries that the company owns.
> Q.    Okay.  As far as you know, have you ever acted on behalf of Anadarko E&P?
> A.    Not specifically.  I know that I have signed AFEs before under Anadarko E&P, but I can't tell you exactly which ones.

O'Donnell Dep., 33:16-34:3.  Another Anadarko 30(b)(6) witness similarly could not identify A E&P's independent functions with respect to the Macondo Well.  See *Ex Parte* Motion to File Under Seal an Exhibit to the United States' Combined Memorandum of Law. [29]

Defendant thus seeks to impose a heavy burden on Plaintiff, by requiring it to plead specific facts individually against one Anadarko company that even other Anadarko witnesses are unable to provide.  It further argues that Plaintiff's allegations in ¶¶ 48-56 of the Complaint are insufficient because they do not parse through precisely what acts or omissions caused the

---

[28]  *See, e.g.*, A E&P Mem., Ex. 3 (Lease Exchange Agreement) and Ex. 5 (forms supporting A E&P's April 2010 assignment to APC).

[29] The United States has moved to attach the excerpts from this deposition testimony as a sealed appendix per Paragraphs 4 and 8 of MDL No. 2179 Pre-Trial Order # 13 (Order Protecting Confidentiality), which mandate that until a fourteen-day time period after receipt of an official deposition transcript has passed, the deposition testimony shall be treated as "highly confidential."

blow-out of the Macondo Well and the resulting tragedy, nor do they identify with specificity which defendant is responsible for which acts or omissions. In support, Defendant A E&P cites an Eleventh Circuit case, *Magluta v. Samples*, 256 F.3d 1282 (11th Cir. 2001). That case, which has not been followed widely outside the Eleventh Circuit, involved *Bivens* claims brought, apparently pro se, during pre-trial detention by an individual ultimately acquitted of drug trafficking. The claims involved heightened standards of pleading given that the defendants might have been entitled to qualified immunity, but fell far short of even basic notions of pleading. *Id*. at 1284 (referring to "shot gun" complaint with "innumerable pages of rambling irrelevancies"). Here, in contrast, the United States' Complaint provides enough facts to "raise a reasonable expectation that discovery will reveal evidence" sufficient to prove a claim, *Twombly*, 550 U.S. at 556, and should not be dismissed on this ground, particularly where the relationship between Defendants A E&P and APC is not fully understood, and where the challenge of determining the cause or causes of the explosion for which defendants are accountable has resulted in multiple private and government investigations and extensive discovery to ensure that a catastrophe like this does not happen again.

## CONCLUSION

In sum, Plaintiff moves for partial summary judgment as to the liability of Defendants APC and A E&P on grounds that each of them is liable under OPA 1002(a), 33 U.S.C. § 2702(a), based on their status as lessees at the time of a discharge of oil into the Gulf of Mexico from the Macondo Well, and under CWA Section 311(b)(7), 33 U.S.C. § 1321(b)(7), based on their status as operators under the CWA by virtue of the mandate set forth in OCSLA that they "maintain all operations within [the] lease area . . . in compliance with regulations intended to protect persons, property, and the environment on the outer Continental Shelf. . . ." 43 U.S.C §

35

1348(b).  Plaintiff United States further opposes Defendant A E&P's Motion to Dismiss because the United States' Complaint is supported by specific, non-conclusory factual allegations that, for purposes of a motion to dismiss, must be accepted as true.  Moreover, where the evidence may show that the roles of A E&P and APC are substantially intertwined with respect to activities relating to the Macondo Well, the Complaint should not be dismissed merely because it does not plead all of its allegations separately with respect to the liabilities of each.

For the reasons stated herein, Plaintiff United States' motion for partial summary judgment as to the liability of Defendants APC and A E&P under OPA and the CWA should be granted, and Defendant A E&P's Motion to Dismiss Plaintiff United States' Complaint should be denied.


Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

JAMES NICOLL
Senior Counsel
NANCY FLICKINGER
Senior Attorney
SARAH HIMMELHOCH
Senior Litigation Counsel
DEANNA CHANG
SCOTT CERNICH
A. NATHANIEL CHAKERES
JUDY HARVEY
MATT LEOPOLD
Trial Attorneys


/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice

TONY WEST
Assistant Attorney General
Civil Division

PETER F. FROST
Director, Torts Branch, Civil Division
  Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
MICHELLE DELEMARRE
SHARON SHUTLER
JESSICA SULLIVAN
JESSICA MCCLELLAN
DAVID PFEFFER
Trial Attorneys


/s/ R. Michael Underhill
R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice

P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-514-2779
Facsimile: 202-514-2583
E-mail: steve.o'rourke@usdoj.gov

JIM LETTEN
United States Attorney
SHARON SMITH
Assistant United States Attorney
Eastern District of Louisiana
Hale Boggs Federal Building
500 Poydras Street, Ste. B-210
New Orleans, LA 70130

7-5395 Federal Bldg, Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone: 415-436-6648
Facsimile: 415-436-6632
E-mail: mike.underhill@usdoj.gov

Attorneys for the UNITED STATES OF AMERICA