**EXHIBIT 8.K**

In Support of

Plaintiff United States' Combined Memorandum of Law: (1) In Opposition to Defendant Anadarko E&P Company LP's Motion to Dismiss [Doc. 1861] and (2) In Support of United States' Motion for Partial Summary Judgment as to the Liability of the Anadarko Defendants

tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account as defined in the most recent COPAS Material Classification Manual, with sufficient detail to perform the physical inventories requested unless directed otherwise by the Non-Operators.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of jointly owned Controllable Material shall be made within six months following the taking of the inventory or receipt of Non-Operator inventory. Charges and credits for overages or shortages will be valued for the Joint Account based on the Condition "B" prices in effect on the date of physical inventory as determined in accordance with Section IV, Paragraph 2.A. and 2.B. unless the inventorying Parties can prove another Material condition applies.

1. **DIRECTED INVENTORIES**

    With an interval of not less than five years, physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators.

    Expenses of directed inventories will be borne by the Joint Account and may include the following:

    A. Audit per diem rate for each inventory person in accordance with the auditor rates recommended by COPAS at the time the inventory is conducted

    The per diem should also be applied to a reasonable number of days for pre-inventory work and for report preparation. The amount of time required for this additional work may vary from inventory to inventory.

    B. Actual travel including Operator-provided transportation and Personal Expenses for the inventory team

    C. Reasonable charges for report typing and processing

    The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Unless otherwise agreed, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. Any anticipated disproportionate costs should be discussed and agreed upon prior to commencement of the inventory.

    When directed inventories are performed, all Parties shall be governed by the results of such inventory.

2. **NON-DIRECTED INVENTORIES**

    A. OPERATOR INVENTORIES

    Periodic physical inventories that are not requested by the Non-Operator may be performed by the Operator at the Operator's discretion. The expenses of conducting such Operator inventories shall not be charged to the Joint Account.

    B. NON-OPERATOR INVENTORIES

    Any Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk with prior notification to the Operator of at least 90 days. Non-Operator inventory findings shall be furnished to the Operator in writing within 90 days of completing the inventory field work.

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001776

C. OTHER INVENTORIES

Other inventories may be taken whenever there is any sale or change of interest. When possible, the selling Party should notify all other owners at least 30 days prior to the anticipated closing date. When there is a change in Operator of the Joint Property, an inventory by the former and new Operator should be taken. The expenses of conducting other inventories shall be charged to the Joint Account in accordance with Section V, Paragraph 1.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

APPENDIX A
Attached to and Made a Part of Exhibit C – Accounting Procedure

<u>AFFILIATES</u>

1) BP Exploration and Production Technology (EPT) Group, or equivalent

Page 17 of 19

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001777

APPENDIX B
Attached to and Made a Part of Exhibit C – Accounting Procedure

EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR

Page 18 of 19

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001778

A.  Operator may, under COPAS Accounting Guideline 25 ("Allocation of Rig Related Expenditures"), charge the Joint Account an allocated portion of any drillship or rig related commissioning and/or modification costs pursuant to the provisions of Section II, Paragraph 6 above, provided such drillship or rig related commissioning and/or modification costs are not included in the drillship or rig rate charged by the drilling contractor. Costs to be charged shall include all commissioning costs charged by the vendor and all costs (both onsite and offsite) incurred by the Operator, contractors or Affiliates to oversee the construction, modification and transportation of a rig including, but not limited to, their salaries and wages, personal expenses and support costs.

B. Operator may charge the Joint Account an allocated portion of the cost of the Onshore Drilling Center (ODC) or equivalent. This center is located offsite of the Joint Property with technology to plan, design, monitor, advise, and control a well or wells on a real time/on-line basis. The center will be used for planning, designing, drilling, re-drilling, side-tracking, or deepening, and/or completing a well, plug-back or work-over operations, plugging and abandonment. This center's costs will be charged pursuant to the provisions of Section II, Paragraph 6. Such charges shall include, but are not limited to, the following: facilities, communications, computers, software, system support, and ODC personnel provided by the Operator, contract services, or Affiliates.

C. Operator may charge the Joint Account an allocated portion of the cost of the Advanced Collaborative Environment Onshore Communication Facility (ACE), or equivalent, for communicating with field operations and optimizing well performance and reducing field operating expenses on a real time/online basis. This center's costs will be charged pursuant to the provisions of Section II, Paragraph 6 and COPAS Model Form Interpretation 44 (Field Computer and Communication Systems). Such charges shall include, but are not limited, to the following: facilities, communications, computers, software, system support, and ACE personnel provided by the Operator, contract services, or Affiliates.

D. Operator may charge the Joint Account an allocated portion of the cost of the Preservation and Maintenance Facility (PMF), or equivalent. This facility will be used to secure, preserve and maintain Gulf of Mexico non-warehouse materials for drilling and completions, wells, operations and subsea projects. The facility's costs will be charged pursuant to the provisions of Section II, Paragraph 6.

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001779

EXHIBIT "D"

Gas Balancing Agreement

Attached to and made a part of that certain Operating Agreement dated October 1, 2009 by and between BP Exploration & Production Inc., as Operator, and MOEX Offshore 2007 LLC, as Non-Operator

By signing the Joint Operating Agreement, to which this Exhibit "D" is attached, it is the intent of each Party to be bound by the terms and conditions of this Gas Balancing Agreement.

## GAS BALANCING AGREEMENT ("AGREEMENT")

**1. DEFINITIONS:** The following definitions shall apply to this gas balancing agreement (the "Agreement"):

**1.01 "Arms Length Agreement"** shall mean any gas sales agreement with an unaffiliated purchaser or any gas sales agreement with an affiliated purchaser where the sales price represents market value in the Balancing Area.

**1.02 "Balancing Area"** shall mean all of the acreage and depths subject to the Joint Operating Agreement.

**1.03 "Full Share of Current Production"** shall mean the Percentage Interest of each Party in the Gas actually produced from the Balancing Area during each month.

**1.04 "Gas"** shall mean all hydrocarbons produced or producible from the Balancing Area, whether from a well classified as an oil well or gas well by the regulatory agency having jurisdiction in such matters, which are or may be made available for sale or separate disposition by the Parties, excluding oil, condensate and other liquids recovered by field equipment operated for the joint account. "Gas" does not include gas used in joint operations, such as for fuel, recycling or reinjection, or which is vented or lost prior to its sale or delivery from the Balancing Area.

**1.05 "Joint Operating Agreement"** shall mean the offshore operating agreement to which this Exhibit "D" is attached and made a part.

**1.06 "Makeup Gas"** shall mean any Gas taken by an Underproduced Party from the Balancing Area in excess of its Full Share of Current Production, whether pursuant to Section 3.3 or Section 4.1.

**1.07 "Mcf"** shall mean one thousand cubic feet. A cubic foot of Gas shall mean the volume of gas contained in one cubic foot of space at sixty degrees

Gas Balancing Agreement                     Page 1 of 11

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001780

Fahrenheit, 14.73 pounds per square inch absolute (PSIA) and having a specific gravity of 1.00.

1.08 **"MMBtu"** shall mean one million British Thermal Units. A British Thermal Unit shall mean the quantity of heat required to raise one pound avoirdupois of pure water from 58.5 degrees Fahrenheit to 59.5 degrees Fahrenheit at a constant pressure of 14.73 pounds per square inch absolute.

1.09 **"Operator"** shall mean the individual or entity designated under the terms of the Joint Operating Agreement or, in the event this Agreement is not employed in connection with an operating agreement, the individual or entity designated as the operator of the well(s) located in the Balancing Area.

1.10 **"Overproduced Party"** shall mean any Party having taken a greater quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.11 **"Overproduction"** shall mean the cumulative quantity of Gas taken by a Party in excess of its Percentage Interest in the cumulative quantity of Gas produced from the Balancing Area.

1.12 **"Party"** shall mean those individuals or entities subject to this Agreement, and their respective heirs, successors, transferees and assigns.

1.13 **"Percentage Interest"** shall mean the percentage or decimal interest of each Party in the Gas produced from the Balancing Area pursuant to the Joint Operating Agreement.

1.14 **"Royalty"** shall mean payments based on production of Gas from the Balancing Area to all owners of royalties.

1.15 **"Underproduced Party"** shall mean any Party having taken a lesser quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.16 **"Underproduction"** shall mean the deficiency between the cumulative quantity of Gas taken by a Party and its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.17 **"Winter Period"** shall mean the months October, November and December in one calendar year and the months of January, February and March in the succeeding calendar year.

2.  **BALANCING AREA**

2.1 If this Agreement covers more than one Balancing Area, it shall be applied as if each Balancing Area were covered by separate but identical agreements. All

CONFIDENTIAL                                           APC-HEC1-000001781

ACCESS RESTRICTED

balancing hereunder shall be on the basis of Gas taken from the Balancing Area measured in MMBtus.

2.2  In the event that all or part of the Gas deliverable from a Balancing Area is or becomes subject to one or more maximum lawful prices, any Gas not subject to price controls shall be considered as produced from a single Balancing Area, Gas subject to each maximum lawful price category shall be considered produced from a separate Balancing Area, and each Party shall receive its proportionate share of Gas from each Balancing Area (each price category).

3. **RIGHT OF PARTIES TO TAKE GAS**

3.1  Each Party desiring to take Gas will notify the Operator of the volumes nominated, the name of the transporting pipeline and the pipeline contract number (if available) and meter station relating to such delivery, sufficiently in advance for the Operator, acting with reasonable diligence, to meet all nomination and other requirements. Operator is authorized to deliver the volumes so nominated and confirmed (if confirmation is required) to the transporting pipeline in accordance with the terms of this Agreement and the transportation agreement governing those volumes (provided Operator is advised in writing of the relevant terms of said transportation agreement).

3.2  Each Party shall make a reasonable, good faith effort to take its Full Share of Current Production each month to the extent that such production is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production.

3.3  When a Party fails for any reason to take its Full Share of Current Production (as such Share may be reduced by the right of the other Parties to make up for Underproduction as provided herein), the other Parties shall be entitled to take any Gas that such Party fails to take. To the extent practicable, such Gas shall be made available initially to each Underproduced Party in the proportion that its Percentage Interest in the Balancing Area bears to the total Percentage Interest of all Underproduced Parties desiring to take such Gas. If all such Gas is not taken by the Underproduced Parties, the portion not taken shall then be made available to the other Parties in the proportion that their respective Percentage Interest in the Balancing Area bears to the total Percentage Interest of such Parties.

3.4  All Gas taken by a Party in accordance with the provisions of this Agreement, regardless of whether such Party is underproduced or overproduced, shall be regarded as Gas taken for its own account with title thereto being in such taking Party, provided however overriding royalties, production payments or similar burdens on interests shall be paid by each Party based on its entitlements, and not on actual takes.

CONFIDENTIAL                              APC-HEC1-000001782

ACCESS RESTRICTED

3.5  Notwithstanding the provisions of Section 3.3, no Overproduced Party shall be entitled in any month to take any Gas in excess of three hundred percent (300%) of its Percentage Interest of the Balancing Area's then current Maximum Monthly Availability; provided, however, that this limitation shall not apply to the extent that it would preclude production that is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production. "Maximum Monthly Availability" shall mean the maximum average monthly rate of production at which Gas can be delivered from the Balancing Area, as determined by the Operator, considering the maximum efficient well rate for each well within the Balancing Area, the maximum allowable(s) set by the appropriate regulatory agency, mode of operation, production facility capabilities and pipeline pressures.

3.6  In the event that a Party fails to make arrangements to take its Full Share of Current Production required to be produced to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production, the Operator may sell any part of such Party's full share of Current Production that such Party fails to take for the account of such Party and render to such Party, on a current basis, the full proceeds of the sale less any third party compression, treating, gathering or transportation costs incurred directly in connection with the sale of such Full Share of Current Production. In making the sale contemplated herein, the Operator shall be obligated only to obtain such price and conditions for the sale as are reasonable under the circumstances and shall not be obligated to share any of its markets. Any such sale by Operator under the terms hereof shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of ninety (90) days. Notwithstanding the provisions of Article 3.4, Gas sold by Operator for a Party under the provisions hereof shall be deemed to be Gas taken for the account of such Party.

4.  **IN-KIND BALANCING**

4.1  Effective the first day of any calendar month following at least thirty (30) days' prior written notice to the Operator, any Underproduced Party may begin taking, in addition to its Full Share of Current Production and any Makeup Gas taken pursuant to Section 3.3 of this Agreement, a share of current production determined by multiplying fifty percent (50%) of the Full Shares of Current Production of all Overproduced Parties by a fraction, the numerator of which is the Percentage Interest of such Underproduced Party and the denominator of which is the total of the Percentage Interests of all Underproduced Parties desiring to take Makeup Gas. In no event will an Overproduced Party be required to provide more than fifty percent (50%) of its Full Share of Current Production for Makeup Gas. The Operator will promptly notify all Overproduced Parties of the election of an Underproduced Party to begin taking Makeup Gas.

CONFIDENTIAL                                                              APC-HEC1-000001783

ACCESS RESTRICTED

4.2   Notwithstanding the provisions of Section 4.1, no Overproduced Party will be required to provide more than twenty-five percent (25%) of its Full Share of Current Production for Makeup Gas during the Winter Period.

4.3   Notwithstanding any other provision of this Agreement, but subject to Article 7, at such time and for so long as Operator, or (insofar as concerns production by the Operator) any Underproduced Party, determines in good faith that an Overproduced Party has produced all of its share of the ultimately recoverable reserves in the Balancing Area, such Overproduced Party may be required to make available for Makeup Gas, upon the demand of the Operator or any Underproduced Party, up to one hundred percent (100%) of such Overproduced Party's Full Share of Current Production until such time as recoverable reserves are actually equal to zero, or the Underproduced Party is in balance, whichever occurs first.

5.   **STATEMENT OF GAS BALANCES**

5.1   The Operator will maintain appropriate accounting on a monthly and cumulative basis of the volumes of Gas that each Party is entitled to receive and the volumes of Gas actually taken or sold for each Party's account expressed in MMBtu's. Within thirty (30) days after the month of production, the Operator will furnish a statement for such month showing (1) each Party's Full Share of Current Production, (2) the total volume of Gas actually taken or sold for each Party's account, (3) the difference between the volume taken by each and that Party's Full Share of Current Production, (4) the Overproduction or Underproduction of each Party, and (5) other data as recommended by the provisions of the Council of Petroleum Accountants Societies Bulletin No. 24, as amended or supplemented hereafter. Each Party disposing of Gas in any month, to the extent required, shall furnish or cause to be furnished to the Operator by the last day of each calendar month a statement showing the total volume of Gas from the Balancing Area sold by such Party or taken in kind for its own account during the preceding calendar month ("Volume Data"), and Operator shall be entitled to rely and act upon the Volume Data for all purposes under this Agreement. A Party shall not utilize any Volume Data for any purpose other than implementing the terms of this Agreement.

5.2   If any Party fails to provide the Volume Data required herein for four (4) consecutive production months, the Operator, or where the Operator has failed to provide Volume Data, another Party, may audit the production and Gas sales and transportation volumes of the non-reporting Party in connection with the Balancing Area to obtain the Volume Data. Such audit shall be conducted only after reasonable notice and during normal business hours in the office of the Party whose records are being audited. All costs associated with such audit will be charged to the account of the Party failing to provide the Volume Data.

6.   **PAYMENTS ON PRODUCTION**

Gas Balancing Agreement

Page 5 of 11

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001784

6.1   Each Party taking Gas shall pay or cause to be paid all production and severance taxes due on all volumes of Gas actually taken by such Party. For income tax purposes the Parties shall report income on all sales made pursuant to this Agreement in accordance with Treasury Regulation Section 1.761-2(d)(3) ("the cumulative gas balancing method").

6.2   Each Party shall pay or cause to be paid Royalty due with respect to Royalty owners to whom it is accountable based on the volume of Gas actually taken for its account, provided however overriding royalties, production payments or similar burdens on interests shall be paid by each Party based on its entitlements, and not on actual takes.

6.3   In the event that the United States Department of Interior requires that Royalty payments be made on any other basis than that provided for in this Section 6, each Party agrees to make such Royalty payments accordingly, commencing on the effective date required by such governmental authority, and the method provided for herein shall be thereby superseded.

7.   **CASH SETTLEMENTS**

7.1   Upon the earlier of the plugging and abandonment of the last producing interval in the Balancing Area, the termination of the Joint Operating Agreement, the termination of any pooling or unit agreement covering the Balancing Area, or at any time no Gas is taken from the Balancing Area for a period of twelve (12) consecutive months, any Party may give written notice calling for cash settlement of the Gas production imbalances among the Parties. Such notice shall be given to all Parties in the Balancing Area.

7.2   Within sixty (60) days after the notice calling for cash settlement under Section 7.1, the Operator will distribute to each Party a Final Gas Settlement Statement detailing the quantity of Overproduction owed by each Overproduced Party to each Underproduced Party and identifying the month to which such Overproduction is attributed, pursuant to the methodology set out in Section 7.4.

7.3   Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will pay the cash settlement it owes as a result of being an Overproduced Party to the Operator. The Operator will pay to each Underproduced Party entitled to settlement the cash settlement it is owed as a result of being an Underproduced Party, accompanied by appropriate accounting detail.

7.4   The amount of the cash settlement the Overproduced Party must pay shall be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the Gas taken from time to time by the Overproduced Party in excess of the Overproduced Party's Share of Current Production. Any Makeup

CONFIDENTIAL                                        APC-HEC1-000001785

ACCESS RESTRICTED

Gas taken by the Underproduced Party prior to monetary settlement hereunder will be applied to offset Overproduction chronologically in the order of accrual.

7.5   The values used for calculating the cash settlement under Section 7.1 will be based on the proceeds received for the sale of the Gas by the Overproduced Party calculated at the Balancing Area, under an Arm's Length Agreement, after deducting any production or severance taxes paid and any Royalty actually paid by the Overproduced Party to an Underproduced Party's Royalty owner(s), to the extent said payment amounted to a discharge of said Underproduced Party's Royalty obligation, as well as any actual third party marketing, compression, treating, gathering or transportation costs reasonably incurred directly in connection with the sale of the Overproduction.

7.6   To the extent the Overproduced Party did not sell Overproduction under an Arm's Length Agreement, the cash settlement will be based on the weighted average price received by the Overproduced Party for any gas sold from the Balancing Area under Arm's Length Agreements during the months to which such Overproduction is attributed. In the event that no sales under Arm's Length Agreements were made during any such month, the cash settlement for such month will be based on the "Inside F.E.R.C.'s Gas Market Report" (the "Report") monthly index price published for the applicable geographic area during such month in a mutually acceptable pricing bulletin. If such Report ceases to be published or discontinues to quote the above referenced price, then from the last month published until termination of production, the price of the Overproduction for this period of time shall be equal to the proceeds actually received by the Overproduced Party for sales during the month(s) of Overproduction. The cash settlement shall be based on the number of MMBTU's of the Overproduction and shall be accompanied by a statement showing volumes, BTU adjustments, and prices for each month of accrued Overproduction. In the event the Underproduced Party has taken less than twenty percent (20%) of its proportionate share of cumulative Gas available for sale at cessation of production, the Overproduced Party(ies) shall be obligated to settle on only ninety percent (90%) of the Index price or the proceeds received for Gas removed from the leases(s) or unit(s), whichever is applicable. The cash settlement shall be less any Royalties, production taxes, severance taxes, and other reasonable costs associated with the transportation previously paid on the Overproduction by the Overproduced Party, and also net of any outstanding amounts related to the lease(s) or unit(s) which are owed by the Underproduced Party to the Overproduced Party.

7.7   Interest compounded at the rate specified in Exhibit "C" of the Joint Operating Agreement or the maximum lawful rate of interest applicable to the Balancing Area, whichever is less, will accrue for all amounts due under Section 7.1, beginning the first day following the date payment is due pursuant to Section 7.3. Such interest shall be borne by the Operator or any Overproduced Party in

Gas Balancing Agreement

Page 7 of 11

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001786

the proportion that their respective delays beyond the deadlines set out in Sections 7.2 and 7.3 contributed to the accrual of the interest.

**7.8** In lieu of the cash settlement required by Section 7.3, an Overproduced Party may deliver to the Underproduced Party an offer to settle its Overproduction in-kind and at such rates, quantities, time and sources as may be agreed upon by the Underproduced Party. If the Parties are unable to agree upon the manner in which such in-kind settlement gas will be furnished, within sixty (60) days after the Overproduced Party's offer to settle in-kind, which period may be extended by agreement of said Parties, the Overproduced Party shall make a cash settlement as provided in Section 7.3. The making of an in-kind settlement offer under this Section will not delay the accrual of interest on the cash settlement should the Parties fail to reach agreement on an in-kind settlement.

8. **OPERATING COSTS**

   Nothing in this Agreement shall change or affect any Party's obligation to pay its proportionate share of all costs and liabilities incurred in operations on or in connection with the Balancing Area, as its share thereof is set forth in the Joint Operating Agreement, irrespective of whether any Party is at any time selling and using Gas or whether such sales or use are in proportion to its Percentage Interest in the Balancing Area.

9. **LIQUIDS**

   The Parties shall share proportionately in and own all liquid hydrocarbons recovered with Gas by field equipment operated for the joint account in accordance with their Percentage Interests in the Balancing Area.

10. **AUDIT RIGHTS**

    Notwithstanding any provision in this Agreement or any other agreement between the Parties, and further notwithstanding any termination or cancellation of this Agreement, for a period of two (2) years from the end of the calendar year in which any information to be furnished under Section 5 or 7 is supplied, any Party shall have the right to audit the records of any other Party regarding the quantity of Gas, including, but not limited to, information regarding Btu-content. Any Underproduced Party shall have the right for a period of two (2) years from the end of the calendar year in which any cash settlement is received pursuant to Section 7 to audit the records of any Overproduced Party as to all matters concerning Gas values, including, but not limited to, information regarding prices and disposition of Gas from the Balancing Area. Any such audit shall be conducted in accordance with the audit provisions of Exhibit "C" of the Joint Operating Agreement. Each Party agrees to maintain records as to the volumes and prices of Gas sold each month and the volumes of Gas used in its own operations, along with the Royalty paid on any such Gas used by a Party in its own operations. The audit rights

CONFIDENTIAL                                                        APC-HEC1-000001787

ACCESS RESTRICTED

provided for in this Section 10 shall be in addition to those provided for in Section 5.2 of this Agreement.

11. **MISCELLANEOUS**

11.1   As between the Parties, in the event of any conflict between the provisions of this Agreement and the provisions of any gas sales contract, the provisions of this Agreement shall govern.

11.2   Each Party agrees to defend, indemnify and hold harmless all other Parties from and against any and all liability, losses, costs, damages and claims ("Losses") arising out of any claims, which may be asserted by any third party which now or hereafter stands in a contractual relationship with such indemnifying Party and which arise out of the operation of this Agreement or any activities of such indemnifying Party under the provisions of this Agreement, and does further agree to save the other Parties harmless from all Losses sustained or incurred in connection therewith.

11.3   Except as otherwise provided in this Agreement, Operator is authorized to administer the provisions of this Agreement, but shall have no liability to the other Parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder, except such as may result from Operator's gross negligence or willful misconduct. Operator shall not be liable to any Underproduced Party for the failure of any Overproduced Party (other than Operator) to pay any amounts owed pursuant to the terms hereof. Nothing herein shall be construed to deny any Party the right, from time to time, upon reasonable advance notice in writing to the Operator, to produce and take or deliver to its purchaser the full well stream for a reasonable period to meet the deliverability test required by its purchaser.

11.4   This Agreement shall remain in full force and effect for as long as the Joint Operating Agreement shall remain in force and effect as to the Balancing Area, and thereafter until the Gas accounts between the Parties are settled in full, and shall inure to the benefit of and be binding upon the Parties, and their respective heirs, successors, legal representatives and assigns, if any. The Parties agree to give notice of the existence of this Agreement to any successor in interest of any such Party and to provide that any such successor shall be bound by this Agreement, and shall further make any transfer of any interest subject to the Joint Operating Agreement, or any part thereof, also subject to the terms of this Agreement.

11.5   Unless the context clearly indicates otherwise, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001788

**11.6** This Agreement shall bind the Parties in accordance with the provisions hereof, and nothing herein shall be construed or interpreted as creating any rights in any person or entity not a Party hereto, or as being a stipulation in favor of any such person or entity.

**11.7** In the event Internal Revenue Service regulations require a uniform method of computing taxable income by all Parties, each Party agrees to compute and report income to the Internal Revenue Service based on the quantity of Gas taken for its account in accordance with such regulations, insofar as same relate to sales method tax computations.

## 12. ASSIGNMENT AND RIGHTS UPON ASSIGNMENT

**12.1** Subject to the provisions of Section 12.2, if any Party assigns (including any sale, exchange or other transfer) any of its working interest in the Balancing Area when such Party is an Underproduced or Overproduced Party, the assignment or other act of transfer shall, insofar as the Parties are concerned, include all interest of the assigning or transferring Party in the Gas, all rights to receive or obligations to provide or take Makeup Gas and all rights to receive or obligations to make any monetary payment which may ultimately be due hereunder, as applicable. Operator and each of the other Parties shall thereafter treat the assignment accordingly, and the assigning or transferring Party shall look solely to its assignee or other transferee for any interest in the Gas or monetary payment that such Party may have or to which it may be entitled, and shall cause its assignee or other transferee to assume its obligations hereunder.

**12.2** In the event an Overproduced Party intends to sell, assign, exchange or otherwise transfer any of its interest in a Balancing Area, such Overproduced Party shall notify in writing the other working interest owners who are Parties in such Balancing Area of such fact at least sixty (60) days prior to closing the transaction. Thereafter, any Underproduced Party has the right to a cash settlement as a condition precedent to the assignment of the Overproducing Party's assignment of its interests in the Balancing Area. To exercise this right, the Underproduced Party may demand from such Overproduced Party in writing, within thirty (30) days after receipt of the Overproduced Party's notice, a cash settlement of its Underproduction from the Balancing Area. If more than one Underproduced Party demands a cash settlement, such settlements must be made with all Underproduced Parties proportionately based on the relative imbalances of the Underproduced Parties. The Operator shall be notified of any such demand and of any cash settlement pursuant to this Section 12, and the Overproduction and Underproduction of each Party shall be adjusted accordingly. Any cash settlement pursuant to this Section 12 shall be paid by the Overproduced Party on or before the earlier to occur (i) of sixty (60) days after receipt of the Underproduced Party's demand or (ii) at the closing of the transaction in which the Overproduced Party sells, assigns, exchanges or otherwise transfers its interest in a Balancing Area on the same basis as otherwise set forth in Sections 7.4 through 7.6, and, to the

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001789

extent any interest is due, shall bear interest at the rate set forth in Section 7.7. Any Underproduced Party accepting a cash settlement from an Overproduced Party shall thereby indemnify and hold the Overproduced Party harmless against any causes of action, claims, losses or other actions which may be claimed by any third party with respect to the Underproduced Party's Underproduction on which the cash settlement is based, provided that this indemnity shall not relieve the Overproduced Party from obligations associated with its failure to make payment of taxes or royalties on the Underproduced Party's Underproduction, except to the extent of cash which is owed to the royalty owner or other party entitled thereto but which is paid to the Underproduced Party.

**12.3** The provisions of this Section 12 shall not be applicable in the event any Party mortgages its interest or disposes of its interest by merger, reorganization, consolidation or sale of all or substantially all of its assets to a subsidiary or parent company, or to any company in which any parent or subsidiary of such Party owns a majority of the stock of such company.

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001790

EXHIBIT "E"

## NONDISCRIMINATION CLAUSE

Attached to and made a part of that certain Operating Agreement dated October 1, 2009 by and between BP Exploration & Production Inc., as Operator, and MOEX Offshore 2007 LLC, as Non-Operator

During the performance of this Agreement, the "contractor" (meaning and referring separately to each party hereto), agrees, unless exempt therefrom to comply with all provisions of Executive Order 11246 which are incorporated herein by reference, and (a) if contractor has more than 50 employees or contracts with another party hereto in excess of $10,000, contractor must file Standard Form 100 (EEO-1), (b) if contractor has 50 or more employees and a contract of $50,000 or more, contractor is required to develop a written "Affirmative Action Compliance Program" for each of its establishments according to the Rules and Regulations published by the United States Department of Labor in 41 CFR, Chapter 60. Further, contractor hereby certifies that it does not now and will not maintain any facilities provided for its employees in a segregated manner or permit its employees to perform their services at any location under its control where segregated facilities are maintained, as such segregated facilities are defined in Title 41, Chapter 60-1.8, Code of Federal Regulations, revised as of January 1, 1969, unless exempt therefrom. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion or national origin because of habit, local custom or otherwise. Contractor further warrants that no other law, regulation or ordinance of the United States, or any state, or any governmental authority or agency has been violated in the manufacture, procurement or sale of any good furnished, work performed or service rendered pursuant to this contract.

Unless exempt by rules, regulations or orders of the United States Secretary of Labor, issued pursuant to Section 204 of Executive Order 11246, dated September 24, 1965, during the performance of this contract, the contractor agrees as follows:

"(1)    The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin. The contractor will take affirmative action to ensure that applicants are employed and that employees are treated during employment, without regard to their race, color, religion, sex or national original. Such action shall include, but not be limited to, the following: Employment, upgrading, demotion, transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause."

"(2)    The contractor will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin."

"(3)    The contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under Section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment."

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001791

"(4) The contractor will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations and relevant orders of the Secretary of Labor."

"(5) The contractor will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigating to ascertain compliance with such rules, regulations and orders."

"(6) In the event of the contractor's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be canceled, terminated or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, or by rule, regulation or order of the Secretary of Labor, or as otherwise provided by law."

"(7) The contractor will include the provisions of paragraph (1) through (8) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, that in the event the contractor becomes involved in, or is result of such direction by the contracting agency, the contractor may request the United States to enter into such litigation to protect the interests of the United States."

"(8) Contractor agrees and covenants that none of its employees or employees of its subcontractors who provided services pursuant to this contract are unauthorized aliens, as defined in the Immigration, Reform and Control Act of 1986."

"(9) Contractor further agrees that (except where it has obtained identical certifications from proposed subcontractors) prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES. A Certification of Nonsegregated Facilities, as required by the May 9, 1967, order on Elimination of Segregated Facilities, by the Secretary of Labor (32 Fed. Reg. 7439, May 19, 1967), must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semiannually or annually). (1968 MAR.) (Note: The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.)"

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001792