UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | : | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | : | |
| GULF OF MEXICO, on | : | SECTION:  J |
| APRIL 20, 2010 | : | |
| | : | JUDGE BARBIER |
| **THIS DOCUMENT RELATES TO** | : | MAG. JUDGE SHUSHAN |
| **Pleading Bundle C and No. 10-2771** | : | |
| | : | |
| | : | |

. .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .

## MEMORANDUM OF DEFENDANT CAMERON INTERNATIONAL CORPORATION IN SUPPORT OF ITS MOTION TO DISMISS THE LOCAL GOVERNMENT MASTER COMPLAINT

Defendant Cameron International Corporation ("Cameron") respectfully submits this memorandum in support of its motion to dismiss the claims asserted against Cameron in the Local Government Entity/ Master Voluntary Answer to Complaint and Petition of Triton Asset Leasing GMBH, et al. for Exoneration from or Limitation of Liability (Rule 9(h); Master Voluntary Claim in Limitation (Rule 9(h); and Voluntary Master Complaint, Cross-Claim and Third-Party Complaint (Document 1510: "Complaint").

### SUMMARY OF ARGUMENT

Just as with the other lawsuits in this proceeding that seek relief as a result of the oil spill from the Macondo well, the Complaint filed on behalf of local governments ("Local Governments") is governed by two federal statutes:  the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C.A. §§ 1331-56a, and the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C.A. §§ 2701-20.

1.  OCSLA extends the "laws . . .  of the United States . . . to the subsoil and seabed of the outer Continental Shelf and . . . all artificial islands, and all installations and other

devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom;" federal law is extended to those installations and devices "to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State."  43 U.S.C. § 1333(a)(1).  The only installations or devices excluded from this extension of federal law are "ship[s] or vessel[s]" used "for the transportation of" oil and gas.  *Id.*  This means that when a drilling vessel is not being used for transportation, but instead is latched up and "attached to the seabed" for exploration and development of hydrocarbons in the subsoil, Congress deliberately has provided that federal law governs such oil drilling activity in the same manner as if it were a land-based activity in a federal enclave within a state.

This case arises from oil and gas development activities in the subsoil of the outer continental shelf and an oil spill from installations and devices erected on and attached to the seabed.  It falls squarely within the statutorily defined area of exclusive federal jurisdiction and thus is subject to the exclusive application of federal law.

2.  OPA is the principal federal law made applicable to this case by OSCLA. Under OCSLA, the law of the adjacent state, here Louisiana, is adopted "as the law of the United States," but only to the extent that it is "applicable and not inconsistent" with other federal law. *Id*. § 1333(a)(2)(A).  The Complaint invokes OPA, but only against Defendants other than Cameron; the Complaint seeks recovery from Cameron under general maritime law and the common law and statutes not only of Louisiana but of other states as well.  But as a matter of superseding federal law, neither maritime law nor the law of any state other than Louisiana can apply to the facts of this case.

i.  In enacting OCSLA, Congress determined that offshore drilling rigs on the outer continental shelf are "not themselves to be considered within maritime jurisdiction." *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 365-66 (1969).  Congress amended OCSLA in 1978 to confirm, and make more explicit, that all drilling rigs attached to the seabed fall outside the maritime jurisdiction.  After those amendments, the Supreme Court expressly reiterated that "exploration and development of the Continental Shelf are not themselves maritime commerce."  *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 425 (1985).  Accordingly, as the Fifth Circuit has held, activities "connected with the development of the Outer Continental Shelf and an installation for the production of resources there . . . are insufficiently connected to traditional maritime activity to support the application of admiralty law."  *Texaco Exploration and Production, Inc. v. AmClyde Engineered Products Co., Inc.*, 448 F.3d 760, 771 (5th Cir.), *cert. denied*, 549 U.S. 1053 (2006).  The allegations in this case involve a well blowout from the subsoil of the outer continental shelf resulting in an oil spill into the Gulf of Mexico, released from well appurtenances approximately a mile below the surface of the water.  This is a quintessential OCSLA case, involving as it does an accident on an OCSLA situs resulting from oil exploration and development activities.  Even more so than in *AmClyde*, therefore, "OCSLA does not permit the application of substantive maritime law."  *Id.* at 772.

ii.  By making the subsoil and seabed of the outer continental shelf and all appurtenant devices an area of exclusive federal jurisdiction subject exclusively to federal law, OCSLA explicitly preempts all state law other than the law of the adjacent state adopted as surrogate federal law.  *Rodrigue*, 395 U.S. at 355-58.  The OPA savings clause, 33 U.S.C.

1058806v.1

§ 2718, does not change this result, because it does not limit OCSLA's preemptive effect. *See United States v. Locke*, 529 U.S. 89 (2000).

3.   The Complaint does not assert that Cameron is liable to Local Governments under OPA, for good reason.  Claimants may pursue claims under OPA only against persons designated as "responsible parties," 33 U.S.C. § 2713(c), and it is undisputed that Cameron has not been designated a "responsible party."  *See* Complaint ¶¶ 205-19; 33 U.S.C. § 2702. Consequently, the only body of law potentially available to Local Governments is that of Louisiana, and then only if applicable Louisiana law is "not inconsistent with" OPA.  43 U.S.C. § 1333(a)(2).  The crux of any claim by a Local Government against Cameron, therefore, must rest on a demonstration that application of Louisiana law would not be inconsistent with OPA.

4.   OPA and OCSLA, however, foreclose any claim that could be asserted by Local Governments under Louisiana law.  OPA establishes a comprehensive and exclusive statutory procedure for the assignment of responsibility and payment of compensation for injuries that result from the discharge of oil from, *inter alia*, an outer continental shelf facility like the Macondo well.  33 U.S.C. §§ 2701(22), (25), (32)(C) and 2702(a).  This statutory procedure centers on the designation of defined "responsible parties," *id.* § 2701(32), who are made liable without proof of fault for all the categories of removal costs and damages of the kind claimed by Local Governments in the Complaint, *id.* §§ 2702(a), (b).

OPA further mandates that "all claims . . . shall be presented first to the responsible party." 33 U.S.C. §§ 2713(a).  If a claim is either denied or not paid within 90 days, the claimant may sue "the responsible party."  *Id* § 2713(c).  If that suit does not result in full recovery, the claimant may present a claim for the amount of its uncompensated damages to the

1058806v.1

Oil Liability Trust Fund ("Fund").  *Id*. § 2713(d).  OPA does not authorize claimants to sue persons other than defined "responsible parties" or their statutory "guarantors."  Instead, when a responsible party pays compensation to a claimant, the responsible party becomes subrogated to "all" causes of action "that the claimant has under any other law."  *Id.* § 2715(a).

OPA thereby prescribes a streamlined remedial procedure under which claimants may recover specified removal costs and damages from responsible parties without proving fault, with ultimate financial responsibility to be determined later in subrogation actions brought by the responsible parties against any third parties who may be liable under other law for part or all of the resulting damages.  In this way, OPA prescribes a preclusive remedial process governing the handling of claims against both responsible parties and other potentially liable third parties.

By prohibiting the application of adjacent-state law that is inconsistent with other federal law," OCSLA forecloses any attempt by a claimant to bypass this streamlined remedial process.  Direct pursuit of oil spill claims against third parties runs directly counter to the deliberate congressional determination that "litigation . . . over liability, defenses, or the propriety of claims **should be reserved for subrogation actions** against dischargers."  S. Rep. 101-94, 101st Cong., 1st Sess. 1989, 1990 U.S. Code Cong. & Admin. News 722, 732 (emphasis added).  Consequently, to the extent that Louisiana remedial law would permit Local Governments to pursue oil spill claims directly against Cameron, it is irretrievably inconsistent with OPA and thus cannot be borrowed as surrogate federal law under OCSLA.

5. In any event, even if Louisiana law were applicable, which it is not, the Complaint still fails to state a valid claim against Cameron.  Local Governments cite a number of Louisiana statutes, but only one need be discussed here:  the recovery of oil spill claims under

Louisiana law is governed by the Louisiana Oil Spill Prevention and Response Act ("LOSPRA"), which precludes recovery by Local Governments in this litigation and excludes liability under any other Louisiana law.

LOSPRA sets forth a remedial scheme patterned somewhat after OPA. It establishes a state Contingency Fund from which the state and its agencies can seek compensation for removal costs and damages resulting from unauthorized discharges of oil, but only after they have exhausted all federal remedies, including remedies under OPA; this remedy is exclusive under Louisiana law, expressly superseding any other provisions of state law. L.S.A. R.S. §§ 30:2488.C., 30:2491.A. The coordinator of the Contingency Fund, "on behalf of the state of Louisiana," may seek reimbursement from the persons responsible for the unauthorized discharge of oil, but neither the state itself nor any other governmental agency has standing to do so on its own. *Id*. § 30:2489.B. In this way LOSPRA, similarly to OPA, provides a streamlined remedial procedure by which Louisiana governmental entities may recover removal costs and damages; in doing so, however, LOSPRA overrides any state law that otherwise would have conferred a cause of action against responsible parties or other potentially liable third parties such as Cameron.

6. The Court should not hesitate to dismiss the Local Government claims against Cameron. To the extent that their claims are valid under OPA, Local Governments have recovered and will recover from BP and perhaps other designated responsible parties without proof of fault. To the extent that they remain uncompensated, they may seek reimbursement from available public funds.

1058806v.1

Moreover, because BP and others have already cross-claimed against Cameron under OPA's subrogation provision for recovery of payments of past and future oil spill claims, Cameron will not escape litigation over its legal responsibility, if any, and will not escape any validly imposed liability, including liability based on past or future payment of Local Government claims.  Nor will Cameron necessarily escape litigation by the Contingency Fund over its responsibility under LOSPRA, if any, and will not escape any validly imposed liability, including liability based on payments made by that Fund.  Dismissal of the Complaint's superfluous and redundant claims against Cameron complies with OCSLA and OPA, serves the ends of efficient judicial administration, and is both fair and just.

## ARGUMENT

### The Complaint Should Be Dismissed For Failure To State A Claim Against Cameron For Which Relief Can Be Granted.

**A. This Case Falls Within The Area Of Exclusive Federal Jurisdiction Defined By OCSLA.**

OCSLA pronounces that "the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control and power of disposition."  43 U.S.C. § 1332(1), quoted as originally enacted in *Rodrigue*, 395 U.S. at 356 & n.2.  The "outer" continental shelf was (and still is) defined generally as the continental shelf lying seaward of the coastal states' three-mile marginal belt.  43 U.S.C. § 1331(a).

OCSLA further serves "to define a body of law applicable" to oil and gas activities on the outer continental shelf.  *Rodrigue*, 395 U.S. at 356.  As originally enacted, the statute extended federal law to the outer continental shelf and, in particular, to oil and gas development activities from "artificial islands and fixed structures."  43 U.S.C. § 1333(a)(1).  To

7

1058806v.1

the extent applicable and not inconsistent with federal law, the law of the adjacent state was adopted as surrogate federal law also applicable to those same activities.  43 U.S.C. § 1333(a)(2).

OCSLA was amended in 1978.  Following those amendments, its key provisions governing the application of federal law read as follows:

> (1)    The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a state.

> (2) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary [of Interior] now in effect or hereafter adopted, the civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf, . . .

43 U.S.C. § 1333(a).  The only vessels excluded from OCSLA, therefore, are those actually transporting resources.

As can be seen, when OCSLA was amended in 1978 Congress rewrote subsection (a)(1), changing "fixed structures" to "all installations and other devices permanently or temporarily attached to the seabed," while leaving subsection (a)(2) unchanged.  H. CONF. REP. NO. 95-1471, 95th Cong., 2nd Sess., 1978 U.S. Code Cong. & Admin. News 1674, 1679-80.  The congressional conferees took care to explain that the change in subsection (a)(1) was "technical and perfecting and is meant to restate and clarify and not change existing law."  *Id.* at 1679.   In other words, the phrases "artificial islands" and "fixed structures," which had been used in the

1058806v.1

original version of subsection (a)(1) and remained in subsection (a)(2) after the 1978 amendments, were understood to embrace all offshore drilling devices or installations permanently or temporarily attached to the seabed for the purpose of oil and gas development from the subsoil of the outer continental shelf. *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 496-98 (5th Cir. 2002). Subsection (a)(2) was left as is, out of concern that repetitive clarification would be misconstrued as a substantive change. H. CONF. REP. NO. 95-1474, 1978 U.S. Code Cong. & Admin. News at 1680.

The 1978 legislative history elaborates upon the meaning and significance of this clarifying amendment. "Federal law is to be applicable to all activities on all devices in contact with the seabed for exploration, development, and production." H. CONF. REP. NO. 95-1471, 1978 U.S. Code Cong. & Admin. News at 1679. "Federal law is, therefore, to be applicable to activities on drilling ships, semi-submersible drilling rigs, and other water-craft, when they are connected to the seabed by drillstring, pipes or other appurtenances, on the OCS for exploration, development, or production purposes." H. REP. NO. 95-590, 95th Cong., 1st Sess., 1978 U.S. Code Cong. & Admin. News 1450, 1534. A crucial test for applying OCSLA, therefore, is whether the activities in question involved exploration, development, or production equipment that was connected to the seabed.

This case unquestionably passes that test. The oil development project at the heart of this case, as this Court already has determined, is subject to federal jurisdiction by reason of OCSLA. *See* Document # 470 (order denying State of Louisiana motion to remand).

1058806v.1

The Complaint confirms in many particulars that this case falls within the exclusive federal jurisdiction defined by OCSLA.

According to the Complaint, the oil spill "originated" from a location on the outer continental shelf in the Gulf of Mexico subject to a federal lease.  Complaint, ¶¶ 179, 29.  "On April 20, 2010, at approximately 9:45 CST, a well blowout caused explosions on the Deepwater Horizon, . . ., igniting a raging, gas-fueled fire."  *Id.* ¶ 164.  "After burning for two days," the drilling unit "sank to the sea floor."  *Id.*  "As the Deepwater Horizon tipped into the sea, the long riser pipe connecting the vessel to the wellhead on the seafloor bent and broke, leaving the pipe leaking oil out of its now-open end as well as through two breaks along its length.   An emergency valve, installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, causing the blown out well to spew oil into the Gulf waters."  *Id.* ¶ 165; *see also* ¶ 60.  In particular, after April 22, 2010, the oil spilled from the "open end" of the marine riser pipe and in two other locations along the riser after the riser had broken free from the drilling unit but was still attached to the wellhead.  *Id.* ¶ 447.  In other words, the spilled oil was released from the "blown out well" through the marine riser on the seafloor that remained connected to the wellhead, not from the drilling unit whose connection to the well had by this time been severed.  As the Complaint explains, "stop[ping] the flow of oil and gas into the Gulf waters" entailed "efforts to kill the Macondo well," not efforts involving the sunken rig.  *Id.* ¶ 455.

Furthermore, the oil spill occurred when "Drilling Defendants . . . lost control of the subsea oil well they had almost completed" and "equipment failed to stop oil . . . from blowing out of the well."  *Id.* ¶ 227.  The Complaint attributes the blowout in part to "the failure of mechanical and cement barriers to seal off the well against the influx of highly pressured

1058806v.1

hydrocarbons from the reservoirs surrounding the bottom of the well." *Id.* ¶ 228.  The "subsea BOP also failed to seal the well and stop the flow of hydrocarbons." *Id.*  The pertinent accident alleged in the Complaint, therefore, involved a well affixed in the subsoil on the outer continental shelf, barriers at the bottom of that well in the subsoil, and the blowout preventer ("BOP") and other integral components of the well, all affixed on the seabed of the outer continental shelf.

The Complaint then makes clear in detail that each of the allegedly failed barriers in the well and the BOP and other equipment at the seabed integrated into the Macondo well were "fixed structures erected" in "the subsoil" and on the "seabed of the outer Continental Shelf" for the purpose of developing oil and gas resources – facilities expressly designated as falling within the area of exclusive federal jurisdiction established by OCSLA.

Thus, the Complaint alleges a faulty "casing system" for the well.  Complaint ¶¶ 38, 277-91.  Casing is steel "pipe lining the well" bore as it is drilled; each section of casing is "secured" to the sides of the bore "with a cement plug." *Id.* ¶¶ 233, 239.  Casing is therefore a "fixed structure" erected in the subsoil within the meaning of OCSLA.

The Complaint further alleges a "faulty cementing job" that "failed to form a seal at the casing nearest the hydrocarbon reservoir" at the bottom of the well. *Id.* ¶¶ 42, 43.  Cementing indisputably involves a fixed structure of cement attached to the casing lining the well in the subsoil.

The Complaint further alleges a failure to install "a casing hanger lockdown sleeve, which ties down the top of a well." *Id.* ¶¶ 45, 331-33.  The top of the well, of course, is a "wellhead," a fixed structure "on the sea floor." *Id.* ¶ 62.

The Complaint alleges a failure of the BOP to stop the flow of oil from the well. *Id.* ¶¶ 62-87, 384-418.  The BOP was "installed at the wellhead on the seafloor."  *Id.* ¶ 62.  In particular, the BOP is "positioned and secured" at the wellhead in that it is anchored to the seafloor by the first section of casing.  *Id.* ¶¶ 234, 236.  The allegations pertain to "the BOP on the Macondo wellhead."  *Id.*  ¶ 409.  The BOP is an integral component that made the well a "fixed structure" in the subsoil and on the seabed of the outer Continental Shelf.

The Complaint's allegations all locate the oil spill at the well.  Neither the Complaint nor any party has ever suggested that spilled oil impacting Local Governments was released from the *Deepwater Horizon*.  The Complaint's theories of liability (other than OPA) all rely on allegations that the spill was caused or contributed to by human or equipment errors in the well drilling process, not any errors in traditional maritime activity.  It is evident that the case as a whole and the claims against Cameron in particular involve oil and gas development activities in the subsoil and fixed structures erected in the subsoil and on the seabed of the outer continental shelf, as described in and governed by OCSLA.  The Complaint alleges, in short, an archetypal OCSLA case.

**B.  Under OCSLA, The Bodies Of Law Actually Or Potentially Governing This Case Are OPA And The Law Of Louisiana; Neither General Maritime Law Nor The Law Of Any State Other Than Louisiana Applies.**

OCSLA extends the "laws . . . of the United States . . . to the subsoil and seabed of the outer Continental Shelf."  43 U.S.C. § 1333(a)(1).  This means, of course, that OPA, like all other federal laws, is extended to cover the area of exclusive federal jurisdiction defined by OCSLA.   In turn, OPA provides a comprehensive regime assigning liability and providing

remedies with respect to claims arising from the discharge of oil "into or upon the navigable waters or adjoining shorelines."  33 U.S.C. § 2702(a).  OPA squarely governs this case.

In enacting OCSLA, Congress was aware that existing federal law was not fully comprehensive and that it would be expedient to use "state law . . . to fill federal voids." *Rodrigue*, 395 U.S. at 358.  OCSLA therefore provides that "[t]o the extent that they are applicable and not inconsistent with . . . other Federal laws . . . the civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf . . . which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf."  43 U.S.C. § 1333(a)(2).

In this case Louisiana is the pertinent "adjacent State" within the meaning of OCSLA.  The Macondo well is located "on the Outer Continental Shelf 48 miles off the coast of Louisiana."  Complaint ¶ 241.  Under Federal Rule of Evidence 201(b) and (d), the Court may take judicial notice from the NOAA map attached as Exhibit A that, in the language of 43 U.S.C. § 1333(a)(2), the Macondo well "would be within the area of [Louisiana] if its boundaries were extended seaward to the outer margin of the outer Continental Shelf."  *See also Snyder Oil Co. v. Samedan Oil Co.*, 208 F.3d 521 (5th Cir. 2000).

In resolving the issues raised by the Complaint, therefore, the Court must look first to OPA and then, to the extent that it is not inconsistent with OPA or other federal law, the law of Louisiana.  Yet the Complaint asserts claims against Cameron sounding in negligence, gross negligence, and product liability under general maritime law, Complaint ¶¶ 542-616; nuisance, and trespass claims under unspecified state law, Complaint ¶¶ 670-90; and the Texas

1058806v.1

oil spill statute, Complaint ¶¶ 738-757.  Those claims are not viable.  Neither maritime law nor the law of any state other than Louisiana (adopted as surrogate federal law under OCSLA) applies to the Local Government claims against Cameron in the circumstances of this case.

**1.  General Maritime Law Does Not Apply.**

Although the lower federal courts have sometimes struggled with this issue, the Supreme Court has long made it known that OCSLA, where it applies, preempts general maritime law.  Indeed, even before OCSLA's enactment the Court "specifically held that drilling platforms are not within admiralty jurisdiction." *Rodrigue*, 395 U.S. at 360, citing *Phoenix Construction Co. v. The Steamer Poughkeepsie*, 212 U.S 558 (1908).  In enacting OCSLA, "Congress assumed that the admiralty law would not apply unless Congress made it apply, and then Congress decided not to make it apply." *Id*. at 361.  The Supreme Court reiterated this conclusion in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 101 (1971):  "comprehensive admiralty law remedies [do not] apply under § 1333(a)(1)."

The decision in *Rodrigue* was based on "careful scrutiny" of OCSLA's legislative history.  395 U.S. at 363.  This history revealed that Congress had considered at length what body of law should govern the facilities described in the statute and had concluded that "maritime law was inapposite." *Id*.  Congress chose instead to borrow the law of the adjacent state, in part because of "the close relationship between the workers on the island and the adjacent States." *Id*.  Congress intended the law of the adjacent state "to be used when Federal statutes or regulations of the Secretary of the Interior are inapplicable." *Id*. at 357-58.  It was not necessary even to mention maritime law in this context, for it was understood that the exploration and production facilities identified in OCSLA "were not themselves to be considered

within maritime jurisdiction."  *Id*. at 366.  Following the precept that "[e]ven in admiralty . . . where the federal judiciary's lawmaking power may well be at its strongest, it is our duty to respect the will of Congress," *Northwest Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 96 (1981), the Court, ever since its decision in *Rodrigue*, has steadfastly refused to permit maritime law to encroach upon the area of exclusive federal jurisdiction defined by OCSLA.

      The accident in *Rodrigue* occurred on "fixed structures" in the nature of "artificial island drilling rigs located on the outer Continental Shelf," and the Court concluded that OCSLA "deliberately eschewed the application of admiralty principles to these novel structures."  395 U.S. at 352, 355.  The facts in *Chevron Oil* were similar.  404 U.S. at 98-99.  Both *Rodrigue* and *Chevron Oil* were decided before OCSLA was amended in 1978 to clarify that the phrase "fixed structures" refers to "all installations and other devices permanently or temporarily attached to the seabed."  But this amendment had no substantive significance; it did not open the door for the intrusion of general maritime law into the OCSLA domain.  The amendment made no change in "the operative assumption underlying the statute:  that admiralty jurisdiction generally should not be extended to accidents in areas covered by OCSLA."  *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 218 (1985).

      Furthermore, as later decisions demonstrated, the inapplicability of general maritime law stems not only from the physical connection between drilling structures and the seabed – a connection high-lighted by the statute both before and after its amendment – but also, and independently, from the non-maritime nature of the activities of "exploring for, developing, or producing resources" that lie at the heart of the area of "exclusive Federal jurisdiction" that

1058806v.1

OCSLA defines.  43 U.S.C. § 1333(a)(1).  A case in point is *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 421 (1985), where the Court explicitly disapproved the lower court's erroneous determination that "offshore drilling is maritime commerce."  The Court reiterated the reasoning of *Phoenix* ("drilling platforms [are] not even suggestive of traditional maritime affairs") and reaffirmed its earlier determination in *Rodrigue* that "exploration and development of the Continental Shelf are not themselves maritime commerce."  *Id*. at 422, 425.

The Supreme Court discussed the proper reach of maritime law outside the OCSLA context in *Sisson v. Ruby*, 497 U.S. 358 (1990), and *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995).  The availability of maritime law, the Court explained, depends on satisfying "conditions both of location and of connection with maritime activity."  *Grubart,* 513 U.S. at 534.  The requirement that both such conditions be met further emphasizes the unavailability of maritime law in cases like this.  Cases involving "devices permanently or temporarily attached to the seabed, . . . erected thereon for the purpose of exploring for, developing or producing resources," 33 U.S.C. § 1333(a)(1), do not satisfy either condition, let alone both conditions, identified in *Grubart* and thus plainly do not implicate maritime law.  They do not satisfy the condition of location, because Congress "deliberately eschewed the application of admiralty principles to these novel structures."  *Rodrigue*, 395 U.S. at 355.  Neither do they satisfy the condition of connection with maritime activity.  That condition is met only "if the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity," *Grubart*, 513 U.S. at 534, and as the Court has repeatedly stated, "exploration and development of the Continental Shelf are not

1058806v.1

themselves maritime commerce." *Herb's Welding*, 470 U.S. at 425. General maritime law simply does not apply in archetypal OCSLA cases such as this.

Subsequent decisions of the federal appellate courts further confirm this conclusion. In *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990), the Fifth Circuit sought to synthesize Supreme Court precedent into a three-part test, where it looked to (1) whether the controversy arose on a situs covered by OCSLA, (2) whether maritime law applied of its own force, and (3) whether state law was consistent with federal law. *See also Grand Isle Shipyard, Inc. v. Seacor Marine, L.L.C.*, 589 F.3d 778, 783-89 & n.9 (5th Cir. 2009) (en banc). It is apparent that the first two parts of this test derive from the conditions of location and connection identified in *Sisson* and *Grubart*.

*PLT Engineering* involved the construction of a gathering line on the seabed of the outer continental shelf, an OCSLA situs. The court understood that *Rodrigue* "precludes the application of maritime law except in those cases where the subject matter of the controversy bears [a] significant relationship to traditional maritime activities." *Id.* at 1048, quoting *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1231 (5th Cir. 1985). The court determined that the "significant relationship" test had not been met:

> While some maritime operations were undoubtedly contemplated, the principal obligation of PLT and the subcontractors was to build the gathering line and connect it to the platform and the transmission line. These activities are not traditionally maritime. Rather they are the subjects of oil and gas exploration and production.

*Id.* at 1049.

The Fifth Circuit's more recent decision in *Texaco Exploration and Production, Inc. v. AmClyde Engineered Products Co.*, 448 F.3d 760 (5th Cir.), *cert. denied*, 549 U.S. 1053

1058806v.1

(2006), is similar.  That case involved an accident that occurred during construction of a tower for a drilling rig.  Because the accident happened on a vessel that was not itself attached to the seabed, the parties apparently assumed that maritime law governed.  The court determined, however, that it would "not rely upon the parties' bare conclusion that substantive maritime law applies because OCSLA provides its own choice of law rules."  *Id.* at 772.  The court closely analyzed the facts in light of the relevant authorities and concluded that maritime law did not apply.  With respect to location, the court noted that although the accident may have occurred on a vessel, "the claims are inextricably linked to the construction of a platform permanently fixed to the Shelf for the purposes of development and would not have arisen but for such development."  *Id.* at 774.  With respect to connection, the court determined that activities "connected with the development of the Outer Continental Shelf and an installation for the production of resources there . . . are insufficiently connected to traditional maritime activity to support the application of admiralty law."  *Id*. at 771.  In these circumstances, the court concluded that "OCSLA does not permit the application of substantive maritime law."  *Id*. at 772.  In particular, the court noted that the involvement of a vessel "in the accident and other elements of maritime activity that precede or surround the compliant tower's construction on the Shelf are insufficient to support either admiralty jurisdiction or the application of substantive maritime law."  *Id.* at 775.

If general maritime law did not apply in *AmClyde*, and it did not, *a fortiori* it does not apply here.

(1) *Situs.*  The accidental discharge of oil on which the Complaint is based occurred at a situs explicitly identified in OCSLA.  The Macondo well and its well control

18

1058806v.1

equipment from which the oil discharged were indisputably "fixed structures" that were "attached" to the "subsoil" and "seabed" within the meaning of OCSLA.  The Macondo well in the subsoil was "where the oil spill originated."  Complaint ¶ 179.

(2) *Activities.*  The oil spill occurred, moreover, in the course of activities – oil and gas exploration and development operations – that have repeatedly been held to have no substantial relationship to traditional maritime activity.  The facts here do not satisfy either, let alone both, of the *Grubart* conditions of location and of connection with maritime activity.  To the extent that the Complaint relies on general maritime law, therefore, it fails to state a claim against Cameron for which relief can be granted.

To be sure, *Grubart* recognized that the condition of connection with maritime activity has a second component – "whether the incident has a potentially disruptive impact on maritime commerce," 513 U.S. at 534 – that concededly was met in this case.  But that does not change the result here, for three independent reasons.  *First*, the fundamental meaning of *Rodrigue* is that OCSLA has identified and carved out a domain in which maritime law has no application; Congress determined that structures attached to the seabed for the purpose of exploration and development, "though surrounded by the high seas, were not themselves to be considered within the maritime jurisdiction."  395 U.S. at 365-66.  *Second*, disruption of maritime commerce is only suggestive, not determinative, of maritime jurisdiction; for example, the negligent demolition of a bridge during highway construction may disrupt navigation but nonetheless raise no issue of maritime law.  In determining the applicability of maritime law the core inquiry is whether the activity in question had a "substantial relationship" with "traditional maritime activity," *Sisson*, 497 U.S. at 365, and that inquiry here must be answered in the

1058806v.1

negative.  *See, e.g., Herb's Welding*, 470 U.S. at 422 ("drilling platforms [are] not even suggestive of traditional maritime affairs").  *Third*, where maritime commerce is disrupted by a discharge of oil into or upon navigable waters, Congress has chosen a different, non-maritime, means of resolving controversy; the "very specific treatment of oil pollution in the OPA . . . supplanted general admiralty and maritime law."  *South Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65-66 (1st Cir. 2000) ("Congress intended the OPA to be the exclusive law governing oil spills").  *Accord, Gabarick v. Laurin Maritime (America) Inc.*, 623 F.Supp.2d 741, 746 (E.D. La. 2009); *Clausen v. M/V New Carissa*, 171 F.Supp.2d 1127, 1133 (D. Or. 2001); *Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp*, 924 F.Supp. 1436, 1447 (E.D. Va.), *aff'd w/o published opinion*, 122 F.3d 1064 (4th Cir. 1997), *cert. denied*, 523 U.S. 1021 (1998).

Congress has twice concluded that maritime law should not apply to specified accidents in federal waters; first in OCSLA for oil development activity on the outer Continental Shelf, and then in OPA for oil spills in navigable waters.  This case, involving an oil spill in navigable waters from oil development activities on the outer continental shelf, is doubly not a maritime case.

## 2.  <u>The Laws of States Other Than Louisiana Do Not Apply.</u>

For certain claims, the Complaint invokes the common law or statutes of states other than Louisiana. But OCSLA bars recourse to the law of those other states.  Oil and gas development on the outer continental shelf is subject to exclusive federal jurisdiction under OCSLA, and federal law alone (including, however, the potential borrowing of the law of the adjacent state as surrogate federal law) governs claims arising from the discharge of oil from the

subsoil and seabed of the outer continental shelf and the installations and structures thereon.  43 U.S.C. § 1333(a); *Gulf Offshore Co. v. Mobil Oil Corp*, 453 U.S. 473, 480-81(1981); *Chevron v. Huson*, 404 U.S. at 101-05; *Rodrigue*, 395 U.S. at 355 ("federal law, supplemented by state law of the adjacent State, is to be applied to these artificial islands as though they were federal enclaves in an upland State").  The statute leaves no room in this case for application of any state law other than that of Louisiana.

It makes no difference that the discharged oil may have reached another state's shores.  It has long been understood that the law of an impacted state does not govern interstate oil pollution, even when the pollution migrates into state waters and onto state land.  *Illinois v. Milwaukee*, 406 U.S. 91 (1972) (*Milwaukee I*); *see also International Paper Co. v. Ouellette*, 491 U.S. 481, 488 (1987) ("the implicit corollary of [*Milwaukee I*] was that state common law was pre-empted").  Instead, "regulation of interstate water pollution is a matter of federal, not state law."  *Ouellette*, 491 U.S. at 488, citing *Milwaukee I*, 406 U.S. at 102 n.3.  As a legislative implementation of these general principles and as a matter of the Supremacy Clause of the constitution, OCSLA specifically provides that federal law– including the possibility of borrowing Louisiana law as surrogate federal law – is applicable in the circumstances of this case, and other state law is not.

Similarly, it is well settled that OCSLA "supersede[s] the normal choice of law rules that the forum would apply."  *Gulf Offshore*, 453 U.S. at 482 n.8, citing *Chevron v. Huson*, 404 U.S. 97 at 102-03.  Choice of law is governed by OCSLA, and its choice of law provision calls only for the potential application of the law of the adjacent state borrowed as surrogate

federal law; OCSLA does not permit the application or borrowing of the law of any other state. 43 U.S.C. § 1333(a)(2).

The OPA savings clause, 33 U.S.C. § 2718, does not alter this conclusion.  The savings clause provides that OPA itself does not preempt various state laws, but preemption here is prescribed not by OPA but by OCLSA.  Section 2718 does not disturb the exclusivity of federal law mandated by OCSLA.  This is made clear both by the statutory text and by the Supreme court's definitive construction and application of that text in *United States v. Locke*, 529 U.S. 89 (2000).

The OPA savings clause contains three subsections.  Subsection (a) provides that "nothing in this chapter," and also nothing in the maritime Limitation of Liability Act, precludes states from imposing additional liability.   33 U.S.C. § 2718(a).  Similarly, subsection (b) provides that "nothing in this chapter," and nothing in a specified provision of the federal tax code, precludes the creation of state compensation funds; and subsection (c) provides that "nothing in this chapter," the maritime Limitation of Liability Act, or the same provision of the tax code, bars either the states or the federal government from imposing additional liability or fines or penalties.  *Id*. §§ 2718(b), (c).  By its terms, therefore, section 2718 limits the preclusive reach only of OPA, the maritime Limitation of Liability Act, and a specific provision of the tax code; it does not speak to OCSLA or purport to curb OCSLA's preemptive force.  Section 2718 does preserve the operation of certain state laws with respect to discharges originating "within" state territorial waters; but it leaves the outer continental shelf, which Congress has expressly determined to be an "exclusive Federal jurisdiction," 43 U.S.C. § 1333(a)(1), subject solely to

federal law in the manner prescribed by OCSLA.  The OPA savings clause does not resuscitate state law that OCSLA has preempted.

This reading of the statute is confirmed by the Supreme Court's analysis of a similar savings clause in *Ouellette* and also by its definitive ruling with respect to section 2718 in *Locke*.  The decision in *Ouellette* demonstrates that statutory savings clauses like section 2718 must be strictly construed:  the Court held that a savings clause in the Clean Water Act providing that "[n]othing in this section" preempts state law "does not purport to preclude pre-emption of state law by other provisions of the Act."  479 U.S. at 493.

By the same token, a savings clause like OPA § 2718, providing that "nothing in this chapter" preempts state law, does not preclude preemption of state law by other federal statutes, specifically including OCSLA.  This was, in essence, the holding in *Locke*.  In that case, the state of Washington argued that section 2718 had the effect of depriving the Port and Waterways Safety Act of preemptive effect.  The Supreme Court explicitly rejected that argument, holding that the savings clause means only what it says and nothing more, *i.e.*, that only "nothing ***in this chapter***" is preemptive, and therefore "the pre-emptive effect of the [Port and Waterways Safety Act] and regulations promulgated under it are not affected by OPA."  529 U.S. at 107.  It follows in this case that the preemptive effect of OCSLA, like the preemptive effect of the Port and Waterways Safety Act in *Locke*, is not affected by the OPA savings clause.  OCSLA applies here in accordance with its terms, foreclosing both the application of state law of its own force and the use of state conflict of law rules.  It follows that, to the extent that the Local Government common law or product liability causes of action are based on the law of a state other than Louisiana, they fail to state a claim for which relief can be granted.

## C.  The Complaint Asserts No Cause of Action Against Cameron Under OPA.

The Complaint does not assert a cause of action against Cameron based upon OPA.  There is good reason for this.  OPA makes only the "responsible party" liable for removal costs and damages, and it authorizes suit only against "the responsible party or guarantor."  33 U.S.C. § 2702(a), 2713 (c).  The term "responsible party" is defined as, "[i]n the case of a vessel, any person owning, operating, or demise chartering the vessel" and, "[i]n the case of an offshore facility . . . the lessee or permittee of the area in which the facility is located or the holder of a right of use and easement."  *Id.* § 2701(32)(A), (C).  The responsible parties in this case are Macondo prospect lessees BP, Anadarko, and MOEX, and *Deepwater Horizon* owner or operator Transocean, each of whom has been identified as a responsible party by the federal government.  *See* Complaint ¶¶ 661, 662.  It is undisputed that Cameron is not a responsible party under the statute.  Nor is Cameron a "guarantor," *i.e.*, "any person . . . who provides evidence of financial responsibility for a responsible party," 33 U.S.C. § 2701(13), and no one contends otherwise.

In short, OPA confers causes of action only against statutorily designated responsible parties and guarantors.  It does not create a cause of action against Cameron in this case, and the Local Governments quite properly have refrained from asserting such a claim.

## D.  Taken Together, OPA And OCSLA Foreclose The Claims Against Cameron Under Louisiana Law.

Although OCSLA provides for the adoption of Louisiana law as surrogate federal law for certain purposes in this case, 43 U.S.C. § 1333(a)(2)(A), Louisiana law applies only to fill "gaps in the federal law" – in other words, to provide governing law "when Federal statutes or regulations of the Secretary of the Interior are inapplicable."  *Rodrigue*, 395 U.S. at 357-58.

1058806v.1

24

OCSLA does not allow the application of Louisiana law if and to the extent such law would be inconsistent with OPA or other federal law.  Because permitting Local Governments to prosecute oil spill claims against persons, like Cameron, who are not statutorily designated responsible parties would conflict, and thereby be inconsistent, with OPA's comprehensive and preclusive remedial provisions, Louisiana remedial law purporting to authorize such suits may not be borowed as surrogate federal law under OCSLA.

**1. OPA Establishes A Comprehensive And Preclusive Remedial Process For The Resolution Of Claims Arising From The Discharge Of Oil In The Area Of Exclusive Federal Jurisdiction Defined by OCSLA.**

OPA was enacted in the wake of the *Exxon Valdez* oil spill to provide a coherent set of federal rules to affix responsibility and provide compensation for injuries resulting from oil discharges "into or upon the navigable waters or adjoining shorelines or the exclusive economic zone."  33 U.S.C. § 2702(a).  OPA is therefore one of the federal laws – indeed, the principal federal law – that OCSLA extends to activities relating to oil development facilities attached to the subsoil and seabed of the outer continental shelf.  43 U.S.C. § 1333(a)(1).

OPA prescribes a streamlined, comprehensive, and exclusive remedial process pursuant to which designated responsible parties compensate claimants for the amount of their verifiable damages without requiring proof of fault.  Ultimate financial responsibility is then determined in separate litigation between the responsible parties who have paid compensation and any third parties who may be liable under other federal law, including law borrowed from the adjacent state, for having caused the discharge of oil.

The OPA remedial process focuses, first and foremost, on the statutorily designated responsible parties.  OPA makes these responsible parties liable, without proof of

fault, for prescribed costs and damages: "Notwithstanding any other provision or rule of law, and subject to the provisions of this chapter, each responsible party for a vessel or a facility from which oil is discharged, . . . into or upon the navigable waters . . . is liable for [specified] removal costs and damages . . . that result from such incident." *Id.* § 2702(a). There are six such categories of removal costs and damages caused by an oil spill for which the responsible parties are liable, including damages for injury to public natural resources, economic loss for damage to public property, economic loss for loss of public revenues, and increased costs of public services. *Id.* § 2702(b). The Complaint contends that Local Governments are entitled to recover their damages from the oil spill under these provisions. Complaint ¶¶ 659-669.

OPA sets forth an administrative claims procedure that claimants must follow before bringing suit: "all claims for removal costs or damages shall be presented first to the responsible party or guarantor" (or, alternatively, to the Fund established pursuant to 26 U.S.C. § 9509). 33 U.S.C. § 2713(a) and 2701(11). If the claim is not paid within 90 days, "the claimant may elect to commence an action in court against the responsible party or guarantor or to present the claim to the Fund." *Id.* § 2713(c). Such lawsuits must be brought within three years. *Id.* § 2717(f)(1). In the event of litigation, the responsible party is entitled to assert only very narrowly circumscribed statutory defenses – specifically, that the discharge was "caused solely by" an act of God, an act of war, or certain independent acts of third parties. *Id.* § 2703. The responsible party also may assert statutory limits on liability, *id.* § 2704, but BP, indisputably the principal responsible party here, has waived those limits. *See* Document # 559.

Once the responsible party or guarantor or the Fund "pays compensation pursuant to this chapter to any claimant for removal costs or damages," whether pursuant to the

1058806v.1

administrative claims procedure or litigation, the person paying such compensation "shall be subrogated to all rights, claims, and causes of action that the claimant has under any other law." 33 U.S.C. § 2715(a).  Actions on such subrogated claims must be brought within three years after payment of compensation.  *Id.* § 2717(f)(4).

OPA does not authorize claimants to sue persons other than statutory responsible parties.  Instead, OPA interposes the responsible party between the claimant and any such third parties.  "If the responsible party alleges that the discharge . . . was caused solely by the act or omission of a third party, the responsible party . . . shall pay removal costs and damages to any claimant; and shall be entitled to subrogation to all rights of . . . the claimant to recover [from the third party the amount of] removal costs or damages . . . [so] paid."  33 U.S.C. § 2702(d)(1)(B). If the third party is alleged to be only partially and not solely liable, the responsible party remains fully liable to the claimant but may bring a civil action for contribution against the third party.  *Id.* § 2709.  Any such claim for contribution must be brought within three years after entry of judgment or court-approved settlement establishing the responsible party's liability to the claimant.  *Id.* at § 2717(f)(3).

This comprehensive and carefully crafted remedial structure is straightforward and unambiguous: responsible parties are subject, for all practical purposes, to strict liability and must pay compensation to claimants who can prove that they incurred removal costs or damages covered by OPA.  Then, in separate litigation, the responsible parties may sue potentially liable third parties under other law to recover all or some of the compensation they paid to claimants. This statutory scheme does not allow claimants to pursue competing litigation against persons, like Cameron, who are not statutorily designated responsible parties.

1058806v.1

27

The OPA legislative history confirms this understanding of the statute and makes clear that Congress deliberately chose to establish an exclusive statutory remedial procedure for the resolution of claims arising out of discharges of oil on the outer continental shelf.  OPA was consciously designed "to create a single Federal law providing cleanup authority, penalties, and liability for oil pollution."  S. REP. 101-94, 101st Cong., 1st Sess. 1989 ("S. REP."), 1990 U.S. CODE CONG. & ADMIN. NEWS 722, 730.  "[F]ollowing enactment, liability and compensation for oil pollution removal costs and damages caused by a discharge from a vessel or facility (as defined in this [bill]) will be determined in accordance with this [legislation]."  CONF. REP. 101-653, 101st Cong., 2nd Sess. 1990 ("CONF. REP."), 1990 U.S.C.C.A.N. 779, 802, repeating the language of S. REP., 1990 U.S.C.C.A.N. at 746-47.  "Wherever possible, the burden is to be on the discharger to first bear the costs of removal and provide compensation for any damages."  S. REP. at 732.  In particular, and most tellingly, the Senate Report admonishes that "litigation or lengthy adjudicatory proceedings over liability, defenses, or the propriety of claims **should be reserved for subrogation actions** against dischargers."  *Id*. (emphasis added)*.*  This means that the liability of third parties like Cameron is to be adjudicated not in litigation brought directly by claimants but in subrogation actions brought by responsible parties after they have satisfied the claimants' demands for specified recovery compensable under OPA.

## 2.  Direct Pursuit of Oil Spill Claims Against Third Persons Like Cameron Is Inconsistent With OPA.

Congress plainly understood and intended that OPA mandates payment by statutorily designated responsible parties without the need for complex and burdensome litigation over liability and leaves more problematic issues under other law, including law adopted as surrogate federal law under OCSLA, for resolution in separate subrogation or

1058806v.1

contribution actions initiated by the responsible parties.  Congress left no room for lawsuits seeking to bypass this carefully crafted remedial procedure.  Neither the statutory text nor the legislative history allows claimants like Local Governments to pursue litigation directly against third parties who, like Cameron, are not responsible parties under the statute.

The litigation of oil spill claims against third parties like Cameron is plainly inconsistent with the comprehensive remedial scheme established by OPA.  Such litigation in competition with subrogation suits would unquestionably "interfere with the methods by which" OPA "was designed" to achieve the stated goals of Congress.  *Ouellette*, 471 U.S. at 491-92. Such litigation against Cameron would likewise directly undermine the litigation-saving efficiencies that Congress intended to achieve when it imposed strict liability "first" on responsible parties "[n]otwithstanding any other provision or rule of law," 33 U.S.C. § 2702(a), and provided that more complex issues arising under other law were to be resolved in subrogation or contribution actions brought by the responsible parties, *id.* §§ 2715(a), 2709.

OPA's language and history reflect "a congressional desire to encourage settlement and avoid litigation."  *Boca Ciega Hotel, Inc. v. Bouchard Transportation Co.*, 51 F.3d 235, 238-39 (11th Cir. 1995); *Gabarick v. Laurin Maritime (America) Inc.*, 623 F. Supp.2d 741, 747-48 (E.D. La. 2009).  The proliferation of multiple-party litigation that would follow from allowing claimants to pursue two tracks of litigation -- one against responsible parties for relief under OPA, and a second seeking the same relief against other parties under other law— runs directly counter to that congressional desire.  This Court is witness to the myriad oil spill lawsuits filed by literally tens of thousands of claimants within the first months after the accident – lawsuits brought, moreover, without regard to the statutory requirement that claims first be

presented administratively.   33 U.S.C. § 2713(a).   This chaotic mass of multi-party lawsuits asserting multiple legal theories can be rationally managed only by following the streamlined procedure prescribed by OPA, *i.e.*, by ignoring everything other than the resolution of the statutory claims filed against responsible parties under OPA.   Allowing claimants to sue persons other than responsible parties is inconsistent with OPA at the most fundamental level; it results in a massive proliferation of litigation in direct contravention of the congressional purpose of simplifying and streamlining the procedure for determining financial responsibility for oil spills and ensuring prompt payment of claims.   This wastes scarce judicial resources and threatens to produce different and conflicting rulings on both liability and damages.

Litigation of claims against both responsible parties and third parties directly would make a hash of the OPA remedial process, and especially of its provisions for subrogation and contribution. OPA explicitly contemplates that responsible parties will pay compensation to claimants first, after which they may bring subrogation actions against potentially liable third parties asserting "all" of the satisfied claimants' "causes of action."  Permitting claimants to interject themselves into this process by prosecuting cases against third parties would raise unnecessary doubts about which defendant, the responsible party or the third party, is to be deemed primarily liable – that is, about who must pay what and when – and could wholly confound, disrupt, and undermine the subrogation procedure.

Responsible parties cannot be subrogated to "all claims and causes of action" if those claims already have been satisfied, and claimants plainly are not entitled to recover twice, once from responsible parties under OPA and a second time from third parties under other law. OPA resolves this apparent dilemma by making the responsible party primarily liable and

1058806v.1

leaving third parties subject only to subrogation actions or suits for contribution.  Permitting

claimants to pursue litigation against both responsible parties and third parties would conflict

with the carefully orchestrated step-by-step claim procedure deliberately fashioned by Congress.

As the Supreme Court said with respect to a similar issue in *Ouellette*, "it would be extraordinary

for Congress, after devising a" comprehensive remedial scheme for providing relief for offshore

oil spills, "to tolerate common-law suits that have the potential to undermine" that remedial

scheme.  479 U.S. at 497.  State law purporting to allow the assertion of claims against both

statutorily designated responsible parties and other persons like Cameron undermines the

comprehensive remedial process prescribed by OPA; such state law is literally inconsistent with

OPA and thus cannot be applied as surrogate federal law under OCSLA, which permits the

adoption only of state law that is "not inconsistent with" other federal law such as OPA.  43

U.S.C. § 1333(a)(2).

### 3.  The Appropriate Remedy Is Dismissal Without Prejudice.

In a thorough and well-reasoned decision, Judge Lemelle specifically concluded

from the structure of OPA and its legislative history that claimants "should pursue claims

covered under OPA ***only*** against the responsible party." *Gabarick v. Laurin Maritime (America)*

*Inc.*, 623 F. Supp.2d 741, 750 (E.D. La. 2009) (emphasis added).  Judge Lemelle thereupon

dismissed, without prejudice, "all claims covered under 33 U.S.C. § 2702" asserted against

defendants who were not statutorily designated responsible parties.  *Id.* at 751.  This Court

should do the same.

Dismissal without prejudice would be fair to all parties and would not impair the

local governments' legitimate interest in securing prompt and full compensation.    If the

responsible parties satisfy the Local Governments' allowable claims, as OPA contemplates they will, Local Governments will be spared any need to expend resources in litigation with Cameron and other third parties.   The responsible parties then will be subrogated to all the claims dismissed here without prejudice and may proceed against Cameron under OPA's contribution and subrogation provisions.   Documents 2064 (BP Cross-claim Against Cameron); 2068 (Transocean's Cross-Claims).   On the other hand, in the extremely unlikely event that the OPA remedial process does not fully compensate Local Governments for all recovery due under OPA, due to the responsible parties' insolvency or for other reasons, then Local Governments may present their unpaid claims to the Fund.   *Id*. § 2713(d).   In that event, the Fund would bear ultimate responsibility for all removal costs and damages not "caused by the gross negligence or willful misconduct of [the] claimant," *id*. § 2712(b), and upon payment would also become subrogated to "all" of the Local Governments' causes of action, *id*. § 2715(a).   Under either scenario, dismissal without prejudice would pave the way for an orderly determination of the Local Governments' claims and Cameron's liability, if any.

## E.  The Local Governments' Claims Are Not, In Any Event, Viable Under Louisiana Law.

For the foregoing reasons, the Court should dismiss all claims grounded in Louisiana law; but if the Court does not do so, it will need to address those claims on their merits.   Local Governments cite a number of Louisiana statutes but rely first and foremost on LOSPRA.   Complaint Count II, ¶¶ 728.34.   LOSPRA, however, precludes recovery by Local Governments in this litigation and excludes liability under any other Louisiana law.

LOSPRA was enacted in 1991 to supplement the federal remedies provided by the then newly-enacted OPA.   It establishes an Oil Spill Contingency Fund ("Contingency Fund")

1058806v.1

that "shall be liable for . . . [a]ll proven, reasonable damages and removal costs incurred by state agencies or local governing authorities . . . [as a result of the] unauthorized discharge of oil," but only if such damages and costs "are not recoverable under [OPA] and the claimant has exhausted all federal remedies." L.S.A. R.S. § 30:2488.C. In turn, the Contingency Fund's coordinator is directed to pursue reimbursement, "on behalf of the state of Louisiana," "from persons responsible for the unauthorized discharge or otherwise liable, or from the federal Oil Spill Liability Trust Fund." *Id*. § 30:2489.B. If the persons thereby made liable to the Contingency Fund have statutorily recognized defenses, they nevertheless must "pay all removal costs and damages," but they then become subrogated to the Contingency Fund's own "rights or cause of action." *Id*. § 30:2482. LOSPRA is intended to provide the "[e]xclusive [state] remedies" for the unauthorized discharge of oil; its provisions "supersede any other liability provisions provided by any other applicable state law . . . [and] any conflicting laws of this state." *Id*. § 30:2491. In particular, LOSPRA supersedes the right, which Local Governments seek to invoke, to recover for loss of wildlife under L.S.A. R.S. § 56.40.1 et seq., by limiting enforcement of that right to the Louisiana Department of Wildlife and Fisheries. L.S.A. R.S. § 30:2491.B.

The effect of LOSPRA, as applied to this litigation, is clear: Local Governments must first exhaust their remedies under OPA, including litigation against the OPA-designated responsible parties and, if necessary, against the federal Fund; then if, but only if, valid claims remain unsatisfied, Louisiana Local Governments may recover from the Contingency Fund; non-Louisiana Local Governments simply have no rights under LOSPRA at all. These LOSPRA remedies are exclusive as a matter of Louisiana law; the Contingency Fund may seek reimbursement from responsible persons, but neither the state itself nor any other state agency,

1058806v.1

including Local Governments, has standing, as a matter of Louisiana law, to proceed separately against the persons allegedly responsible for the unauthorized discharge.  In this way LOSPRA, similarly to OPA, provides a streamlined remedial procedure by which Louisiana governmental entities may recover removal costs and damages; in doing so, however, LOSPRA overrides any state law that otherwise would have granted those or any other governmental entities a cause of action against responsible parties or other potentially liable third parties.

Under LOSPRA, Local Governments do not at present even have a ripe claim against the Contingency Fund.  It is undisputed that they have not "exhausted all federal remedies," a prerequisite for recovery under LOSPRA.  In short, at this juncture Local Governments have no cause of action under Louisiana law against anyone in connection with the oil spill at issue in this case – not the Contingency Fund, not the statutorily designated responsible parties, and certainly not Cameron.

Finally, and purely as a precautionary matter, Cameron incorporates by reference the arguments for dismissal of oil spill claims under Louisiana law that it made in Documents 1152, 1395, and 2191 (its reply brief in support of dismissal of the B1 Master Complaint), as additional grounds for dismissal of the Local Government Complaint.

## CONCLUSION

The Local Governments' claims against Cameron sounding in general maritime law or based on the law of states other than Louisiana should be dismissed with prejudice because those laws do not apply here.  Local Governments' claims against Cameron under Louisiana law also should be dismissed with prejudice, because LOSPRA precludes such claims. Otherwise, their claims against Cameron under Louisiana law should be dismissed without

1058806v.1

prejudice to the right, if any, of persons making payments under OPA to assert those claims in subrogation or for contribution; Local Governments' prosecution of those claims in this litigation is inconsistent with the comprehensive and preclusive remedial scheme prescribed by OPA and thus is barred by OCSLA.

<table>
<tr><td>

David J. Beck, T.A.
    dbeck@brsfirm.com
Joe W. Redden, Jr.
    jredden@brsfirm.com
David W. Jones
    djones@brsfirm.com
Geoffrey Gannaway
    ggannaway@brsfirm.com

BECK, REDDEN & SECREST, L.L.P.
One Houston Center
1221 McKinney, Suite 4500
Houston, TX  77010-2010
713-951-3700
713-951-3720 (fax)

</td><td>

*/s/ Phillip A. Wittmann*
Phillip A. Wittmann, 13625
    pwittman@stonepigman.com
Carmelite M. Bertaut, 3054
    cbertaut@stonepigman.com
Keith B. Hall, 24444
    khall@stonepigman.com
Jared Davidson, 32419
    jdavidson@stonepigman.com

STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
504-581-3200
504-581-3361 (fax)

**ATTORNEYS FOR CAMERON
INTERNATIONAL CORPORATION**

</td></tr>
</table>

1058806v.1

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Memorandum in Support of Defendant Cameron International Corporation's Motion to Dismiss has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 3rd day of June, 2011.

*/s/ Phillip A. Wittmann*

1058806v.1