UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | : : : : : | MDL NO. 2179 SECTION:  J JUDGE BARBIER |
| **THIS DOCUMENT RELATES TO 10-3059, 11-516** | : : : : : | MAG. JUDGE SHUSHAN |

. .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .

## MEMORANDUM IN SUPPORT OF DEFENDANT CAMERON INTERNATIONAL CORPORATION'S MOTION TO DISMISS

Defendant Cameron International Corporation ("Cameron") respectfully submits this memorandum in support of its motion to dismiss the causes of action asserted against it in the State of Louisiana's First Amended Complaint (Doc. 2031: "Complaint").

## SUMMARY OF ARGUMENT

Just as with the other lawsuits in this proceeding that seek relief as a result of the oil spill from the Macondo well, the Complaint of the State of Louisiana ("Louisiana") is governed by two federal statutes:  the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C.A. §§ 1331-56a, and the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C.A. §§ 2701-20.

1.  OCSLA extends the "laws . . .  of the United States . . . to the subsoil and seabed of the outer Continental Shelf and . . . all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom;" federal law is extended to those installations and devices "to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State."  43 U.S.C. § 1333(a)(1).  The only

installations or devices excluded from this extension of federal law are "ship[s] or vessel[s]" used "for the transportation of" oil and gas.  *Id.*  This means that when a drilling vessel is not being used for transportation, but instead is latched up and "attached to the seabed" for exploration and development of hydrocarbons in the subsoil, Congress deliberately has provided that federal law governs such oil drilling activity in the same manner as if it were a land-based activity on a federal enclave within a state.

This case arises from oil and gas development activities in the subsoil of the outer continental shelf and an oil spill from installations and devices erected on and attached to the seabed.  It falls squarely within the statutorily defined area of exclusive federal jurisdiction and thus is subject to the exclusive application of federal law.

2.  OPA is the principal federal law made applicable to this case by OSCLA. Under OCSLA, the law of the adjacent state, here Louisiana, is adopted "as the law of the United States," but only to the extent that it is "applicable and not inconsistent" with other federal law. *Id*. § 1333(a)(2)(A).

3.  Louisiana seeks recovery from Cameron not just under Louisiana law but also under general maritime law.  This case is governed by OCSLA, however, not by maritime law. In enacting OCSLA, Congress determined that offshore drilling rigs on the outer continental shelf are "not themselves to be considered within maritime jurisdiction."  *Rodrigue v. Aetna Casualty & Surety Co*., 395 U.S. 352, 365-66 (1969).  Congress amended OCSLA in 1978 to confirm, and make more explicit, that all drilling rigs attached to the seabed fall outside the maritime jurisdiction.  After those amendments, the Supreme Court expressly reiterated that "exploration and development of the Continental Shelf are not themselves maritime commerce."

*Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 425 (1985).  Accordingly, as the Fifth Circuit has held, activities "connected with the development of the Outer Continental Shelf and an installation for the production of resources there . . . are insufficiently connected to traditional maritime activity to support the application of admiralty law."  *Texaco Exploration and Production, Inc. v. AmClyde Engineered Products Co., Inc.*, 448 F.3d 760, 771 (5th Cir.), *cert. denied*, 549 U.S. 1053 (2006).  The allegations in this case involve a well blowout from the subsoil of the outer continental shelf, resulting in an oil spill into the Gulf of Mexico, released from well appurtenances approximately a mile below the surface of the water.  This is a quintessential OCSLA case, involving as it does an accident on an OCSLA situs resulting from oil exploration and development activities.  Even more so than in *AmClyde*, therefore, "OCSLA does not permit the application of substantive maritime law."  *Id.* at 772.

4.  The Complaint does not assert that Cameron is liable to Louisiana under OPA, for good reason.  Claimants may pursue claims under OPA only against persons designated as "responsible parties," 33 U.S.C. § 2713(c); and it is undisputed that Cameron has not been designated a "responsible party."  *See* Complaint ¶¶ 153-67; 33 U.S.C. § 2702.  The crux of any claim by Louisiana against Cameron, therefore, must rest on a demonstration that application of Louisiana law would not be inconsistent with OPA.

5.  OPA and OCSLA, however, foreclose any claim that could be asserted under Louisiana law.  OPA establishes a comprehensive and exclusive statutory procedure for the assignment of responsibility and payment of compensation for injuries that result from the discharge of oil from, *inter alia*, an outer continental shelf facility like the Macondo well.  33 U.S.C. §§ 2701(22), (25), (32)(C) and 2702(a).  This statutory procedure is premised at its core

1058788v.1

on the designation of defined "responsible parties," *id.* § 2701(32), who are made generally liable without proof of fault for all the categories of removal costs and damages of the kind claimed by Louisiana in its Complaint, *id.* §§ 2702(a), (b).

OPA further mandates that "all claims . . . shall be presented first to the responsible party." 33 U.S.C. §§ 2713(a). If a claim is either denied or not paid within 90 days, the claimant may sue "the responsible party." *Id* § 2713(c). If that suit does not result in full recovery, the claimant may present a claim for the amount of its uncompensated damages to the Oil Liability Trust Fund ("Fund"). *Id.* § 2713(d). OPA does not authorize OPA claimants like Louisiana to sue persons other than defined "responsible parties" or their statutory "guarantors." Instead, when a responsible party pays compensation to a claimant, the responsible party becomes subrogated to "all" causes of action "that the claimant has under any other law." *Id.* § 2715(a).

OPA thereby prescribes a streamlined remedial procedure under which claimants may recover specified removal costs and damages from responsible parties without proving fault, with ultimate financial responsibility to be determined later in subrogation actions brought by the responsible parties against any third parties who may be liable under other law for part or all of the resulting damages. In this way, OPA prescribes a preclusive remedial process governing the handling of claims against both responsible parties and other potentially liable third parties.

By prohibiting the application of adjacent–state law that is inconsistent with federal law, OCSLA forecloses any attempt by an OPA claimant to bypass this streamlined remedial process. Louisiana's pursuit of oil spill claims against Cameron runs directly counter to the deliberate congressional determination that "litigation . . . over liability, defenses, or the

1058788v.1

propriety of claims **should be reserved for subrogation actions** against dischargers."  S. Rep. 101-94, 101st Cong., 1st Sess. 1989, 1990 U.S. Code Cong. & Admin. News 722, 732 (emphasis added).  Consequently, to the extent that Louisiana law would permit Louisiana to pursue oil spill recovery claims directly against Cameron, it is irretrievably inconsistent with OPA and thus cannot be borrowed as surrogate federal law under OCSLA.

6.  In any event, even if Louisiana law were applicable, which it is not, the Complaint still fails to state a valid claim against Cameron. Louisiana cites a number of Louisiana statutes, but only one need be discussed here:  the state's recovery of oil spill claims under Louisiana law is exclusively governed by the Louisiana Oil Spill Prevention and Response Act ("LOSPRA"). LOSPRA, however, precludes recovery by Louisiana in this litigation and excludes liability under any other Louisiana law.

LOSPRA sets forth a remedial scheme patterned somewhat after OPA.  It establishes a state Contingency Fund from which the state and its agencies can seek compensation for removal costs and damages resulting from unauthorized discharges of oil, but only after they have exhausted all federal remedies, including remedies under OPA; this remedy is exclusive under Louisiana law, expressly superseding any other provisions of state law. L.S.A. R.S. §§ 30:2488.C., 30:2491.A.  The coordinator of the Contingency Fund, "on behalf of the state of Louisiana," may seek reimbursement from the persons responsible for the unauthorized discharge of oil, but neither the state itself nor any other governmental agency has standing to do so on its own.  *Id*. § 30:2489.B.  In this way LOSPRA, similarly to OPA, provides a streamlined remedial procedure by which Louisiana governmental entities may recover removal costs and damages; in doing so, however, LOSPRA overrides any state law that otherwise would have

1058788v.1

conferred a cause of action against responsible parties or other potentially liable third parties such as Cameron.

7.  The Court should not hesitate to dismiss Louisiana's claims against Cameron. To the extent that its claims under OPA are valid, Louisiana has recovered and will recover from BP and perhaps other designated responsible parties without proof of fault.  To the extent that it remains uncompensated, Louisiana may seek recovery from its own Contingency Fund under LOSPRA.

Moreover, because BP and others have already cross-claimed against Cameron under OPA's subrogation provision for recovery of their payments of past and future oil spill claims, Cameron will not escape litigation over its legal responsibility, if any, and will not escape any validly imposed liability, including liability based on past or future payment of Louisiana's claims.  Nor will Cameron necessarily escape litigation by the Contingency Fund over its responsibility under LOSPRA, if any, and will not escape any validly imposed liability, including liability based on payments made by that Fund.  Dismissal of the Complaint's superfluous and redundant claims against Cameron complies with OCSLA and OPA, serves the ends of efficient judicial administration, and is both fair and just.

## ARGUMENT

### The Complaint Should Be Dismissed For Failure To State A Claim Against Cameron For Which Relief Can Be Granted.

**A. This Case Falls Within The Area Of Exclusive Federal Jurisdiction Defined By OCSLA.**

In 1953, Congress enacted OCSLA, declaring that "the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control

1058788v.1

and power of disposition."  43 U.S.C. § 1332(1), quoted as originally enacted in *Rodrigue*, 395

U.S. at 356 & n.2.  OCSLA further serves "to define a body of law applicable" to oil and gas

activities on the outer continental shelf.  *Rodrigue*, 395 U.S. at 356.  As originally enacted, the

statute extended federal law to the outer continental shelf and, in particular, to oil and gas

development activities from "artificial islands and fixed structures."  43 U.S.C. § 1333(a)(1).  To

the extent applicable and not inconsistent with federal law, the law of the adjacent state was

adopted as surrogate federal law also applicable to those same activities.  43 U.S.C. § 1333(a)(2).

OCSLA was amended in 1978.  Following those amendments, its key provisions

read as follows:

> (1)     The Constitution and laws and civil and political jurisdiction of the
> United States are extended to the subsoil and seabed of the outer Continental
> Shelf and to all artificial islands, and all installations and other devices
> permanently or temporarily attached to the seabed, which may be erected
> thereon for the purpose of exploring for, developing or producing resources
> therefrom, or any such installation or other device (other than a ship or vessel)
> for the purpose of transporting such resources, to the same extent as if the
> outer Continental Shelf were an area of exclusive Federal jurisdiction located
> within a state.
>
> (2) To the extent that they are applicable and not inconsistent with this
> subchapter or with other Federal laws and regulations of the Secretary [of
> Interior] now in effect or hereafter adopted, the civil and criminal laws of each
> adjacent State .  .  . are declared to be the law of the United States for that
> portion of the subsoil and seabed of the outer Continental Shelf, and artificial
> islands and fixed structures erected thereon, which would be within the area of
> the State if its boundaries were extended seaward to the outer margin of the
> outer Continental Shelf, . . .

43 U.S.C. § 1333(a).  The only "vessels" excluded from the coverage of OCSLA, therefore, were

those involved in transporting produced resources.

As can be seen, when OCSLA was amended in 1978 Congress rewrote subsection

(a)(1), changing "fixed structures" to "all installations and other devices permanently or

temporarily attached to the seabed," while leaving subsection (a)(2) unchanged.  H. CONF. REP. No. 95-1474, 95th Cong., 2nd Sess., 1978 U.S. Code Cong. & Admin. News 1674, 1679-80.  The congressional conferees took care to explain that the change in (a)(1) was "technical and perfecting and is meant to restate and clarify and not change existing law."  *Id.* at 1679.  In other words, the phrases "artificial islands" and "fixed structures," which had been used in the original version of subsection (a)(1) and remained in subsection (a)(2) after the 1978 amendments, were understood to embrace all offshore drilling devices or installations permanently or temporarily attached to the seabed for the purpose of oil and gas development from the subsoil of the outer continental shelf.  *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 496-98 (5th Cir. 2002). Subsection (a)(2) was left as is, out of concern that repetitive clarification would be misconstrued as a substantive change.  H. CONF. REP. No. 95-1474, 1978 U.S. Code Cong. & Admin. News at 1680.

The 1978 legislative history elaborates upon the meaning and significance of this clarifying amendment.  "Federal law is to be applicable to all activities on all devices in contact with the seabed for exploration, development, and production."  H. CONF. REP. No. 95-1474, 1978 U.S. Code Cong. & Admin. News at 1679.  "Federal law is, therefore, to be applicable to activities on drilling ships, semi-submersible drilling rigs, and other water-craft, when they are connected to the seabed by drillstring, pipes or other appurtenances, on the OCS for exploration, development, or production purposes."  H. REP. No. 95-590, 95th Cong., 1st Sess., 1978 U.S. Code Cong. & Admin. News 1450, 1534.  A crucial test for applying OCSLA, therefore, is whether the activities in question involved exploration, development, or production equipment that was in contact with the seabed.

1058788v.1

This case unquestionably passes that test.  The oil development project at the heart of this case, as this Court already has determined, is subject to federal jurisdiction by reason of OCSLA.  *See* Document # 470 (order denying State of Louisiana motion to remand). Louisiana's Complaint confirms in many particulars both that this case falls within the exclusive federal jurisdiction defined by OCSLA and that the case requires the exclusive application of federal law as prescribed by OCSLA.

At its core, Louisiana's Complaint addresses temporary abandonment of the "Macondo well," a blowout of the well arising from these oil and gas development activities, resulting in explosions, fires, and an oil spill – an "unauthorized discharged of oil, gas and other pollutants ***from the wellhead***."  Complaint ¶ 4 (emphasis added). The spilled oil flowed "***out of the well***." *Id.* ¶ 110 (emphasis added).

The oil and gas drilling activities were being undertaken to develop resources pursuant to a federal outer continental shelf lease.  *Id.* ¶ 38.  The well was being drilled approximately a mile below the surface of the water, and the dangers of drilling allegedly increased as the well was drilled deeper into the subsea. *Id.* ¶ 54.

The Complaint alleges multiple violations of federal regulations governing oil drilling and development on the outer continental shelf.  *See id.* ¶¶ 55, 107, 108.  In particular, the Complaint alleges that BP continued drilling the Macondo well in violation of federal regulations after detecting evidence of hydraulic leaks from the blowout preventer ("BOP") attached to the wellhead.  *Id.* ¶¶ 78.

The Complaint alleges a "flawed casing design" for the well ¶ 57; the use of an inadequate number of centralizers to cement the well for abandonment, ¶ 58; the failure to

1058788v.1

circulate drilling mud "bottoms up" through the well before cementing, ¶ 59; the use of unstable cement slurry, ¶ 60; the use of a unique cement slurry design despite poor test results, ¶ 61; the use of "an improper base oil spacer mix" to cement the well, ¶ 62; the failure to read accurately the results of an abnormal negative pressure test to verify the adequacy of the cement job in the well, ¶ 64; the failure to conduct a "cement bond log," ¶ 65; the failure to install a "casing hanger lockdown sleeve" to protect against a well blowout, ¶ 66; and the failure to detect "warning signs of well flow," ¶ 68; *see also id.* ¶ 389a-l (allegations of reckless drilling operations).

The Complaint alleges that these "actions or inactions constitute[d] violations of federal regulations" governing oil and gas drilling on the outer continental shelf. *Id.* ¶ 107. There were, the Complaint charges, multiple "failures to observe and/or comply with federal regulations and industry standards" pertaining to "drilling operations." *Id.* ¶ 108.

These numerous alleged well control failures during drilling operations led to the uncontrolled flow of hydrocarbons onto the rig floor, resulting in explosions, fires and, ultimately, the unconstrained discharge of oil. *Id.* §§ 69-71. The oil spill occurred, therefore, in the course of operations of the kind specifically identified as "development" in OCSLA, *i.e.*, "activities which take place following discovery of minerals in paying quantities, including . . . drilling . . . and which are for the purpose of ultimately producing the minerals discovered." 43 U.S.C. § 1331(l).

The Complaint's allegations all locate the oil spill at the well. Neither the Complaint nor any party has ever suggested that oil reaching Louisiana had been released from the sunken *Deepwater Horizon*. The Complaint's theories of liability (other than OPA) all rely on allegations that the spill was caused or contributed to by human or equipment errors in the

1058788v.1

well drilling process, not any errors in traditional maritime activity.  It is evident that the case as a whole and the claims against Cameron in particular involve oil and gas development activities in the subsoil and fixed structures erected in the subsoil and on the seabed of the outer continental shelf, as described in and governed by OCSLA.  The Louisiana Complaint alleges, in short, an archetypal OCSLA case.

## B.  Under OCSLA, The Bodies Of Law Actually Or Potentially Governing This Case Are OPA And the Law Of Louisiana; General Maritime Law Does Not Apply.

OCSLA extends the "laws . . . of the United States . . . to the subsoil and seabed of the outer Continental Shelf." 43 U.S.C. § 1333(a)(1).  This means, of course, that OPA, like all other federal laws, is extended to cover the area of exclusive federal jurisdiction defined by OCSLA.  In turn, OPA provides a comprehensive regime assigning liability and providing remedies with respect to claims arising from the discharge of oil "into or upon the navigable waters or adjoining shorelines." 33 U.S.C. § 2702(a).  Under the terms of OCSLA and OPA, OPA squarely governs this case.

In enacting OCSLA, Congress was aware that existing federal law was not fully comprehensive in all respects and that it would be expedient to use "state law . . . to fill federal voids." *Rodrigue*, 395 U.S. at 358.  OCSLA therefore provides that "[t]o the extent that they are applicable and not inconsistent with . . . other Federal laws . . . the civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf . . . which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf." 43 U.S.C. § 1333(a)(2).  In this case Louisiana is the pertinent "adjacent State" within the meaning of OCSLA.

1058788v.1

11

In resolving the issues raised by Louisiana's Complaint, therefore, the Court must look first to OPA and then, to the extent that it is not inconsistent with OPA or other federal law, to the law of Louisiana.   Yet the Complaint asserts claims against Cameron sounding in negligence, nuisance, and product liability under general maritime law, ¶¶ 239-90.   Those claims are not viable.   Maritime law does not apply to Louisiana's claims against Cameron in the circumstances of this case.

The Supreme Court has long made it known that OCSLA, where it applies, preempts general maritime law.   Even before OCSLA's enactment the Court "specifically held that drilling platforms are not within admiralty jurisdiction."  *Rodrigue*, 395 U.S. at 360, citing *Phoenix Construction Co. v. The Steamer Poughkeepsie,* 212 U.S 558 (1908).   As the Court said in *Rodrigue*, in enacting OCSLA "Congress assumed that the admiralty law would not apply unless Congress made it apply, and then Congress decided not to make it apply."   395 U.S. at 361.   The Supreme Court bluntly and forcefully repeated in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 101 (1971), that "comprehensive admiralty law remedies [do not] apply under § 1333(a)(1)."

The decision in *Rodrigue* was based on "careful scrutiny" of OCSLA's legislative history.   395 U.S. at 363.   This history revealed that Congress had considered at length what body of law should govern the facilities described in the statute and had concluded that "maritime law was inapposite."  *Id*.   Congress chose instead to borrow the law of the adjacent state, in part because of "the close relationship between the workers on the island and the adjacent States."  *Id*.   Congress intended the law of the adjacent state "to be used when Federal statutes or regulations of the Secretary of the Interior are inapplicable."  *Id*. at 357-58.   It was not necessary even to mention maritime law in this context, for it was understood that the

exploration and production facilities identified in OCSLA "were not themselves to be considered within maritime jurisdiction."  *Id*. at 366.  Following the precept that "[e]ven in admiralty . . . where the federal judiciary's lawmaking power may well be at its strongest, it is our duty to respect the will of Congress," *Northwest Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 96 (1981), the Court, ever since its decision in *Rodrigue*, has steadfastly refused to permit maritime law to encroach upon the area of exclusive federal jurisdiction defined by OCSLA.

The accident in *Rodrigue* occurred on "fixed structures" in the nature of "artificial island drilling rigs located on the outer Continental Shelf," and the Court concluded that OCSLA "deliberately eschewed the application of admiralty principles to these novel structures."  395 U.S. at 352, 355.  The facts in *Chevron Oil* were similar.  404 U.S. at 98-99.  Both *Rodrigue* and *Chevron Oil* were decided before OCSLA was amended in 1978 to clarify that the phrase "fixed structures" refers to "all installations and other devices permanently or temporarily attached to the seabed."  But as explained above, this amendment had no substantive significance; it did not open the door for the intrusion of general maritime law into the OCSLA domain.  As the Court noted after the 1978 amendments, there has always been a key "operative assumption underlying the statute: that admiralty jurisdiction generally should not be extended to accidents in areas covered by OCSLA."  *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 218 (1985).

Furthermore, as later decisions demonstrated, the inapplicability of general maritime law stems not only from the physical connection between drilling structures and the seabed – a connection high-lighted by the statute both before and after its amendment – but also, and independently, from the non-maritime nature of the activities of "exploring for, developing,

1058788v.1

or producing resources" that lie at the heart of the area of "exclusive Federal jurisdiction" that OCSLA defines.  43 U.S.C. § 1333(a)(1).  A case in point is *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 421 (1985), where the Court explicitly disapproved the lower court's erroneous determination that "offshore drilling is maritime commerce."  The Court reiterated the reasoning of *Phoenix* ("drilling platforms [are] not even suggestive of traditional maritime affairs") and reaffirmed its earlier determination in *Rodrigue* that "exploration and development of the Continental Shelf are not themselves maritime commerce."  *Id*. at 422, 425.

The Supreme Court discussed the proper reach of maritime law outside the OCSLA context in *Sisson v. Ruby*, 497 U.S. 358 (1990), and *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995).  The availability of maritime law, the Court explained, depends on satisfying "conditions both of location and of connection with maritime activity."  *Grubart,* 513 U.S. at 534.  The requirement that both such conditions be met further emphasizes the unavailability of maritime law in cases like this.  Cases involving "devices permanently or temporarily attached to the seabed, . . . erected thereon for the purpose of exploring for, developing or producing resources," 33 U.S.C. § 1333(a)(1), do not satisfy either condition, let alone both conditions, identified in *Grubart* and thus plainly do not implicate maritime law.  They do not satisfy the condition of location, because Congress "deliberately eschewed the application of admiralty principles to these novel structures."  *Rodrigue*, 395 U.S. at 355.  Neither do they satisfy the condition of connection with maritime activity.  That condition is met only "if the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity," *Grubart*, 513 U.S. at 534, and as the Court has repeatedly stated, "exploration and development of the Continental Shelf are not

1058788v.1

themselves maritime commerce." *Herb's Welding*, 470 U.S. at 425. General maritime law simply does not apply in archetypal OCSLA cases such as this.

Subsequent decisions of the federal appellate courts further confirm this conclusion. In *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990), the Fifth Circuit sought to synthesize Supreme Court precedent into a three-part test, asking (1) whether the controversy arose on a situs covered by OCSLA, (2) whether maritime law applied of its own force, and (3) whether state law was consistent with federal law. *See also Grand Isle Shipyard, Inc. v. Seacor Marine, L.L.C.*, 589 F.3d 778, 783-89 & n.9 (5th Cir. 2009) (en banc). It is apparent that the first two parts of this test derive from the conditions of location and connection identified in *Sisson* and *Grubart*.

*PLT Engineering* involved the construction of a gathering line on the seabed of the outer continental shelf, an OCSLA situs. The court understood that *Rodrigue* "precludes the application of maritime law except in those cases where the subject matter of the controversy bears [a] significant relationship to traditional maritime activities." *Id.* at 1048, quoting *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1231 (5th Cir. 1985). The court determined that the "significant relationship" test had not been met:

> While some maritime operations were undoubtedly contemplated, the principal obligation of PLT and the subcontractors was to build the gathering line and connect it to the platform and the transmission line. These activities are not traditionally maritime. Rather they are the subjects of oil and gas exploration and production.

*Id.* at 1049.

The Fifth Circuit's more recent decision in *Texaco Exploration and Production, Inc. v. AmClyde Engineered Products Co.*, 448 F.3d 760 (5th Cir.), *cert. denied*, 549 U.S. 1053

1058788v.1

15

(2006), is similar.  That case involved an accident that occurred during construction of a tower for a drilling rig.  Because the accident happened on a vessel that was not itself attached to the seabed, the parties apparently assumed that maritime law governed.  The court determined, however, that it would "not rely upon the parties' bare conclusion that substantive maritime law applies because OCSLA provides its own choice of law rules."  *Id.* at 772.  The court closely analyzed the facts in light of the relevant authorities and concluded that maritime law did not apply.  With respect to location, the court noted that although the accident may have occurred on a vessel "the claims are inextricably linked to the construction of a platform permanently fixed to the Shelf for the purposes of development and would not have arisen but for such development." *Id.* at 774.  With respect to connection, the court determined that activities "connected with the development of the Outer Continental Shelf and an installation for the production of resources there . . . are insufficiently connected to traditional maritime activity to support the application of admiralty law."  *Id.* at 771.  In these circumstances, the court concluded that "OCSLA does not permit the application of substantive maritime law."  *Id.* at 772.  In particular, the court noted that the involvement of a vessel "in the accident and other elements of maritime activity that precede or surround the compliant tower's construction on the Shelf are insufficient to support either admiralty jurisdiction or the application of substantive maritime law."  *Id.* at 775.

   If general maritime law did not apply in *AmClyde*, and it did not, *a fortiori* it does not apply here.

   (1) *Situs*.  The accidental discharge of oil on which the Louisiana claims are based occurred at a situs explicitly identified in OCSLA.  The Macondo well from which the oil spilled was indisputably a "fixed structure" that was "attached" to the "subsoil" and "seabed" within the

meaning of OCSLA.  The oil was spilled "from the wellhead" of the Macondo well.  Complaint ¶ 4.  The situs test is indisputably met.

(2) *Activities.*  The oil spill occurred, moreover, as the result of activities – oil and gas exploration and development operations – that have repeatedly been held to have no substantial relationship to traditional maritime activity.  Accordingly, the facts here do not satisfy either, let alone both, of the *Grubart* conditions of location and of connection with maritime activity.

To be sure, *Grubart* recognized that the condition of connection with maritime activity has a second component – "whether the incident has a potentially disruptive impact on maritime commerce," 513 U.S. at 534 – that concededly was met in this case.  But that general consideration does not change the result in the OCSLA context.  *First*, the fundamental meaning of *Rodrigue* is that OCSLA has identified and carved out a domain in which maritime law has no application; Congress determined that structures attached to the seabed for the purpose of exploration and development, "though surrounded by the high seas, were not themselves to be considered within the maritime jurisdiction."  395 U.S. at 365-66.  *Second*, disruption of maritime commerce is only suggestive, not determinative, of maritime jurisdiction; for example, the negligent demolition of a bridge during highway construction may disrupt navigation but nonetheless raise no issue of maritime law.  In determining the applicability of maritime law the core inquiry is whether the activity in question had a "substantial relationship" with "traditional maritime activity," *Sisson*, 497 U.S. at 365, and that inquiry here must be answered in the negative.  *See, e.g., Herb's Welding*, 470 U.S. at 422 ("drilling platforms [are] not even suggestive of traditional maritime affairs").  *Third*, where maritime commerce is disrupted by a

discharge of oil into or upon navigable waters, Congress has chosen a different, non-maritime, means of resolving controversy; the "very specific treatment of oil pollution in the OPA . . . supplanted general admiralty and maritime law." *South Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65-66 (1st Cir. 2000) ("Congress intended the OPA to be the exclusive law governing oil spills"). *Accord, Gabarick v. Laurin Maritime (America) Inc.*, 623 F.Supp.2d 741, 746 (E.D. La. 2009); *Clausen v. M/V New Carissa*, 171 F.Supp.2d 1127, 1133 (D. Or. 2001); *Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp*, 924 F.Supp. 1436, 1447 (E.D. Va.), *aff'd w/o published opinion*, 122 F.3d 1064 (4th Cir. 1997), *cert. denied*, 523 U.S. 1021 (1998).

Congress has twice concluded that maritime law should not apply to specified accidents in federal waters; first in OCSLA for oil development activity on the outer Continental Shelf, and then in OPA for oil spills in navigable waters. This case, involving an oil spill in navigable waters from oil development activities on the outer continental shelf, is doubly not a maritime case.

## C. **Louisiana Makes No Claim Against Cameron Under OPA Because It Has None.**

Louisiana understandably, and correctly, has chosen not to assert a cause of action against Cameron based upon OPA. OPA makes only the "responsible party" liable for removal costs and damages, and it authorizes suit only against "the responsible party or guarantor." 33 U.S.C. § 2702(a), 2713 (c). The term "responsible party" is defined as, "[i]n the case of a vessel, any person owning, operating, or demise chartering the vessel" and, "[i]n the case of an offshore facility . . . the lessee or permittee of the area in which the facility is located or the holder of a right of use and easement." *Id*. § 2701(32)(A), (C). The responsible parties in this case are

1058788v.1

18

Macondo prospect lessees BP, Anadarko, and MOEX, and *Deepwater Horizon* owner or operator Transocean, each of whom has been identified as a responsible party by the federal government. *See* Complaint ¶159. It is undisputed that Cameron is not a responsible party under the statute. Nor is Cameron a "guarantor," *i.e.*, "any person . . . who provides evidence of financial responsibility for a responsible party," 33 U.S.C. § 2701(13), and no one contends otherwise.

In short, OPA confers causes of action only against statutorily designated responsible parties and guarantors. It does not provide Louisiana with a cause of action against Cameron in this case, and Louisiana quite properly has refrained from asserting such a claim.

**D.   Taken Together, OPA And OCSLA Foreclose Any Claims Against Cameron Under Louisiana Law.**

Although OCSLA provides for the adoption of Louisiana law as surrogate federal law for certain purposes in this case, 43 U.S.C. § 1333(a)(2)(A), Louisiana law applies only to fill "gaps in the federal law" – in other words, to provide governing law "when Federal statutes or regulations of the Secretary of the Interior are inapplicable." *Rodrigue*, 395 U.S. at 357-58. OCSLA does not allow the application of Louisiana law if and to the extent such law would be inconsistent with OPA or other federal law. Permitting Louisiana to prosecute oil spill claims against persons, like Cameron, who are not statutorily designated responsible parties would be inconsistent with OPA's comprehensive and preclusive remedial provisions. Consequently, OCSLA does not authorize the use of Louisiana law to allow such claims.

1058788v.1

1. **OPA Establishes A Comprehensive And Preclusive Remedial Process For The Resolution Of Claims Arising From The Discharge Of Oil In The Area Of Exclusive Federal Jurisdiction Defined by OCSLA.**

OPA was enacted in the wake of the *Exxon Valdez* oil spill to provide a coherent set of federal rules to affix responsibility and provide compensation for injuries resulting from oil discharges "into or upon the navigable waters or adjoining shorelines or the exclusive economic zone." 33 U.S.C. § 2702(a). OPA is therefore one of the federal laws – indeed, the principal federal law – that OCSLA extends to activities relating to oil development facilities attached to the subsoil and seabed of the outer continental shelf. 43 U.S.C. § 1333(a)(1).

OPA prescribes a streamlined, comprehensive, and exclusive remedial process pursuant to which designated responsible parties compensate claimants for the amount of their verifiable damages without requiring proof of fault. Ultimate financial responsibility is then determined in separate litigation between the responsible parties who have paid compensation and any third parties who may be liable under other federal law, including law borrowed from the adjacent state, for having caused the discharge of oil.

The OPA remedial process focuses, first and foremost, on the statutorily designated responsible parties. OPA makes these responsible parties liable, without proof of fault, for prescribed costs and damages: "Notwithstanding any other provision or rule of law, and subject to the provisions of this chapter, each responsible party for a vessel or a facility from which oil is discharged, . . . into or upon the navigable waters . . . is liable for [specified] removal costs and damages . . . that result from such incident." *Id*. § 2702(a).

There are six such categories of removal costs and damages for which the defined "responsible parties" are liable without proof of fault. *Id*. § 2702(b). Three of the six explicitly

1058788v.1

permit recovery by a state trustee, § 2702(b)(2)(A) ("natural resource" damage), or "by a State," §§ 2702(b)(2)(D) ("net loss" of specified public revenues) and 2702(b)(2)(F) ("net costs" of increased public services).  To the extent that Louisiana owns other real or personal property damaged by the spill, it may recover under subsection 2702(b)(2)(B).  Louisiana contends that it is entitled to recover its alleged damages from the oil spill under these provisions.  Complaint ¶¶ 161-66.

OPA sets forth an administrative claims procedure that claimants must follow before bringing suit: "all claims for removal costs or damages shall be presented first to the responsible party or guarantor" (or, alternatively, to the Oil Spill Liability Trust Fund ("Fund") established pursuant to 26 U.S.C. § 9509).  33 U.S.C. § 2713(a) and 2701(11).  Louisiana alleges that it has met and will continue to meet the presentment requirements.  Complaint ¶ 144.

If the claim is not paid within 90 days, "the claimant may elect to commence an action in court against the responsible party or guarantor or to present the claim to the Fund."  *Id*. § 2713(c).  Such lawsuits must be brought within three years.  *Id*. § 2717(f)(1).  In the event of litigation, the responsible party is entitled to assert only very narrowly circumscribed statutory defenses – specifically, that the discharge was "caused solely by" an act of God, an act of war, or certain independent acts of third parties.  *Id*. § 2703.  The responsible party also may assert statutory limits on liability, *id*. § 2704, but BP, indisputably the principal responsible party here, has waived those limits.  *See* Document # 559.

Once the responsible party or guarantor or the Fund "pays compensation pursuant to this chapter to any claimant for removal costs or damages," whether pursuant to the administrative claims procedure or litigation, the person paying such compensation "shall be

subrogated to all rights, claims, and causes of action that the claimant has under any other law." 33 U.S.C. § 2715(a).  Actions on such subrogated claims must be brought within three years after payment of compensation.  *Id.* § 2717(f)(4).  BP has brought such a subrogation claim against Cameron, seeking recovery based on past and future payments to Louisiana and other claimants. Document 2064.

OPA does not authorize claimants to sue persons other than statutory responsible parties.  Instead, OPA interposes the responsible party between the claimant and any such third parties.  "If the responsible party alleges that the discharge . . . was caused solely by the act or omission of a third party, the responsible party . . . shall pay removal costs and damages to any claimant; and shall be entitled to subrogation to all rights of . . . the claimant to recover [from the third party the amount of] removal costs or damages . . . [so] paid."  33 U.S.C. § 2702(d)(1)(B). If the third party is alleged to be only partially and not solely liable, the responsible party remains fully liable to the claimant but may bring a civil action for contribution against the third party.  *Id.* § 2709.  Any such claim for contribution must be brought within three years after entry of judgment or court-approved settlement establishing the responsible party's liability to the claimant.  *Id.* at § 2717(f)(3).

This comprehensive and carefully crafted remedial structure is straightforward and unambiguous: responsible parties are subject, for all practical purposes, to strict liability and must pay compensation to claimants who can prove that they incurred removal costs or damages covered by OPA.  Then, in separate litigation, the responsible parties may sue potentially liable third parties under other law to recover all or some of the compensation they paid to claimants.

This statutory scheme does not allow claimants to pursue competing litigation against persons, like Cameron, who are not statutorily designated responsible parties.

The OPA legislative history confirms this understanding of the statute and makes clear that Congress deliberately chose to establish an exclusive statutory remedial procedure for the resolution of claims arising out of discharges of oil on the outer continental shelf.  OPA was consciously designed "to create a single Federal law providing cleanup authority, penalties, and liability for oil pollution."  S. REP. 101-94, 101st Cong., 1st Sess. 1989 ("S. REP."), 1990 U.S. CODE CONG. & ADMIN. NEWS 722, 730.  "[F]ollowing enactment, liability and compensation for oil pollution removal costs and damages caused by a discharge from a vessel or facility (as defined in this [bill]) will be determined in accordance with this [legislation]."  CONF. REP. 101-653, 101st Cong., 2nd Sess. 1990 ("CONF. REP."), 1990 U.S.C.C.A.N. 779, 802, repeating the language of S. REP., 1990 U.S.C.C.A.N. at 746-47.  "Wherever possible, the burden is to be on the discharger to first bear the costs of removal and provide compensation for any damages."  S. REP. at 732.  In particular, and most tellingly, the Senate Report admonishes that "litigation or lengthy adjudicatory proceedings over liability, defenses, or the propriety of claims **should be reserved for subrogation actions** against dischargers."  *Id.* (emphasis supplied). This means that the liability of third parties like Cameron is to be adjudicated not in litigation brought directly by claimants but in subrogation actions brought by responsible parties after they have satisfied the claimants' demands for specified recovery compensable under OPA.

**2. Pursuit of Oil Spill Claims Against Third Persons Like Cameron Under Louisiana Law Is Inconsistent With OPA.**

Congress plainly understood and intended that OPA mandates payment by statutorily designated responsible parties without the need for complex and burdensome

1058788v.1

litigation over liability, and that OPA requires the resolution of more problematic issues under other law, including law adopted as surrogate federal law under OCSLA, in separate subrogation or contribution actions initiated by the responsible parties.  Congress left no room for lawsuits seeking to bypass this carefully crafted remedial procedure.  Neither the statutory text nor the legislative history allows claimants like Louisiana to pursue litigation against both responsible parties and third parties who, like Cameron, are not responsible parties under the statute.

The litigation of oil spill claims against third parties like Cameron is plainly inconsistent with the comprehensive remedial scheme established by OPA.  Such litigation in competition with subrogation litigation would unquestionably "interfere with the methods by which" OPA "was designed" to achieve the stated goals of Congress.  *Ouellette*, 471 U.S. at 491-92.  Such litigation against Cameron would likewise directly undermine the litigation-saving efficiencies that Congress intended to achieve when it imposed strict liability "first" on responsible parties "[n]otwithstanding any other provision or rule of law," 33 U.S.C. § 2702(a), and provided that more complex issues arising under other law were to be resolved in subrogation or contribution actions brought by the responsible parties, *id.* §§ 2715(a), 2709.

OPA's language and history unquestionably reflect "a congressional desire to encourage settlement and avoid litigation."  *Boca Ciega Hotel, Inc. v. Bouchard Transportation Co.*, 51 F.3d 235, 238-39 (11th Cir. 1995); *Gabarick*, 623 F. Supp.2d at 747-48.  The proliferation of multiple-party litigation that would follow from allowing claimants to pursue two tracks of litigation -- one against responsible parties for relief under OPA, and a second seeking the same relief against other parties under other law—runs directly counter to that congressional desire.  This Court is witness to the myriad oil spill lawsuits filed by literally tens of thousands of

1058788v.1

claimants within the first months after the accident – lawsuits brought, moreover, without regard to the statutory requirement that claims first be presented administratively.  33 U.S.C. § 2713(a). This chaotic mass of multi-party lawsuits asserting multiple legal theories can be rationally managed only by following the streamlined procedure prescribed by OPA, *i.e.*, by ignoring everything other than the resolution of the statutory claims filed against responsible parties under OPA.  Allowing claimants to sue persons other than responsible parties is inconsistent with OPA at the most fundamental level; it results in a massive proliferation of litigation in direct contravention of the congressional purpose of simplifying and streamlining the procedure for determining financial responsibility for oil spills and ensuring prompt payment of claims.  This wastes scarce judicial resources and threatens to produce different and conflicting rulings on both liability and damages.

Litigation of claims directly against both responsible parties and third parties who are not statutorily designated as responsible parties would make a hash of the OPA remedial process, and especially of its provisions for subrogation and contribution.  OPA explicitly contemplates that responsible parties will pay compensation to claimants first, after which they may bring subrogation actions against potentially liable third parties asserting "all" of the satisfied claimants' "causes of action."  Permitting claimants to interject themselves into this process by prosecuting cases against third parties would raise unnecessary doubts about which defendant, the responsible party or the third party, is to be deemed primarily liable – that is, about who must pay what and when – and could wholly confound, disrupt, and undermine the subrogation procedure.

Responsible parties cannot be subrogated to "all claims and causes of action" if those claims already have been satisfied, and claimants plainly are not entitled to recover twice, once from responsible parties under OPA and a second time from third parties under other law. OPA resolves this apparent dilemma by making the responsible party primarily liable and leaving third parties subject only to subrogation actions or suits for contribution. Permitting claimants to pursue litigation against both responsible parties and third parties would conflict with the carefully orchestrated step-by-step claim procedure deliberately fashioned by Congress. As the Supreme Court said with respect to a similar issue in *Ouellette*, "it would be extraordinary for Congress, after devising a [comprehensive remedial scheme for providing relief for offshore oil spills] to tolerate common-law suits that have the potential to undermine [that remedial scheme]".  479 U.S. at 497.

Louisiana law purporting to allow the assertion of oil spill claims against persons who are not OPA-designated responsible parties undermines the comprehensive remedial process that OPA establishes and prescribes.  Application of Louisiana law to Louisiana's claims against Cameron is therefore irremediably "inconsistent with" OPA and for that reason may not be adopted as surrogate federal law under OCSLA. 43 U.S.C. § 1333(a)(2).

### 3. <u>The Appropriate Remedy Is Dismissal Without Prejudice.</u>

In a thorough and well-reasoned decision, Judge Lemelle specifically concluded from the structure of OPA and its legislative history that claimants "should pursue claims covered under OPA *only* against the responsible party."  *Gabarick*, 623 F. Supp.2d at 750 (emphasis added).  Judge Lemelle thereupon dismissed, without prejudice, "all claims covered

1058788v.1

under 33 U.S.C. § 2702" asserted against defendants who were not statutorily designated responsible parties. *Id.* at 751. This Court should do the same.

Dismissal without prejudice would be fair to all parties and would not impair Louisiana's legitimate interest in securing prompt and full compensation. If the responsible parties satisfy Louisiana's allowable claims, as OPA contemplates they will, Louisiana will be spared any need to expend resources in litigation with Cameron and other third parties. The responsible parties then will be subrogated to all the claims dismissed here without prejudice and may continue to proceed against Cameron. 33 U.S.C. § 2715(a). On the other hand, in the extremely unlikely event that the OPA remedial process does not fully compensate Louisiana for all recovery due under OPA, then Louisiana may present its unpaid claims to the Fund. *Id.* § 2713(d). In that event, the Fund would bear ultimate responsibility for all removal costs and damages not "caused by the gross negligence or willful misconduct of [the] claimant," *id.* § 2712(b), and upon payment would also become subrogated to all of Louisiana's causes of action, *id.* § 2715(a). Under either scenario, dismissal without prejudice would pave the way for an orderly determination of Louisiana's claims and Cameron's liability, if any.

1058788v.1

**E.  LOSPRA Forecloses Recovery Under Louisiana Law.**

For the foregoing reasons, the Court should dismiss all claims grounded in Louisiana law; but if the Court does not do so, it will need to address those claims on their merits.  Louisiana cites a number of Louisiana statutes but relies first and foremost on LOSPRA. Complaint Count II, ¶¶ 168-80.  LOSPRA, however, precludes recovery by Louisiana in this litigation and excludes liability under any other Louisiana law.

LOSPRA was enacted in 1991 to supplement the federal remedies provided by the then newly-enacted OPA.  It establishes an Oil Spill Contingency Fund ("Contingency Fund") that "shall be liable for . . . [a]ll proven, reasonable damages and removal costs incurred by state agencies or local governing authorities . . . [as a result of the] unauthorized discharge of oil," but only if such damages and costs "are not recoverable under [OPA] and the claimant has exhausted all federal remedies."  L.S.A. R.S. § 30:2488.C.  In turn, the Contingency Fund's coordinator is directed to pursue reimbursement, "on behalf of the state of Louisiana," "from persons responsible for the unauthorized discharge or otherwise liable, or from the federal Oil Spill Liability Trust Fund."  *Id*. § 30:2489.B.  If the persons thereby made liable to the Contingency Fund have statutorily recognized defenses, they nevertheless must "pay all removal costs and damages," but they then become subrogated to the Contingency Fund's own "rights or cause of action."  *Id*. § 30:2482.  LOSPRA is intended to provide the "[e]xclusive [state] remedies" for the unauthorized discharge of oil; its provisions "supersede any other liability provisions provided by any other applicable state law . . . [and] any conflicting laws of this state." *Id*. § 30:2491.

The effect of LOSPRA, as applied to this litigation, is clear:  Louisiana must first exhaust its remedies under OPA, including litigation against the OPA-designated responsible

1058788v.1

parties and, if necessary, against the federal Fund; then if, but only if, valid claims remain unsatisfied, Louisiana may recover from the Contingency Fund.  These remedies are exclusive as a matter of Louisiana law; the Contingency Fund may seek reimbursement from responsible persons, but neither the state itself nor any other state agency has standing, as a matter of Louisiana law, to proceed separately against the persons allegedly responsible for the unauthorized discharge.   In this way LOSPRA, similarly to OPA, provides a streamlined remedial procedure by which Louisiana may recover removal costs and damages; in doing so, however, LOSPRA overrides any state law that otherwise would have conferred upon Louisiana a cause of action against responsible parties or other potentially liable third parties.

Under LOSPRA, Louisiana does not at present even have a ripe claim against the Contingency Fund.   Although Louisiana alleges that its damages and response costs are recoverable under OPA, Complaint ¶¶ 161-66, it acknowledges that it has just begun the process of presenting its claims under that statute.  *See id*. ¶¶ 143-52.   Louisiana plainly has not "exhausted all federal remedies," a prerequisite for recovery under LOSPRA.  In short, at this juncture Louisiana has no cause of action under Louisiana law against anyone in connection with the oil spill at issue in this case – not the Contingency Fund, not the statutorily designated responsible parties, and certainly not Cameron.

Finally, and purely as a precautionary matter, Cameron incorporates by reference the arguments for dismissal of oil spill claims under Louisiana law that it made in Documents 1152, 1395, and 2191 (its reply brief in support of dismissal of the B1 Master Complaint), which demonstrate further grounds for dismissal of Louisiana's Complaint.

## CONCLUSION

According to the BP website, BP has already paid millions of dollars in claims to the State of Louisiana.  It appears that all Louisiana's legitimate claims may be paid without any need for further litigation on its part.  If they are not, Louisiana can sue BP and the other responsible parties or submit a claim to the federal Fund.  BP has sued Cameron under OPA's subrogation provision to recover some of the claim payments it already has made, and it has sought a declaratory judgment that Cameron will be liable to reimburse it for additional payments made in the future.  If Louisiana does not fully recover from BP and other statutorily responsible parties or the Fund under OPA, it then will have an opportunity to recover from the Contingency Fund, and if it does the coordinator of the Contingency Fund can pursue the responsible parties, who then will be subrogated to that Fund's causes of action.  In light of these considerations, Louisiana's present claims against Cameron are superfluous and redundant.

Louisiana's claims against Cameron sounding in general maritime law should be dismissed with prejudice because that law does not apply here.  Louisiana's claims against Cameron under Louisiana law also should be dismissed with prejudice, because LOSPRA precludes such claims.  Otherwise, Louisiana's claims against Cameron under Louisiana law should be dismissed without prejudice to the right, if any, of persons making payments under OPA to assert those claims in subrogation or for contribution; Louisiana's prosecution of those claims in this litigation is inconsistent with the comprehensive and preclusive remedial scheme prescribed by OPA and thus is barred by OCSLA.

David J. Beck, T.A.
    dbeck@brsfirm.com
Joe W. Redden, Jr.
    jredden@brsfirm.com
David W. Jones
    djones@brsfirm.com
Geoffrey Gannaway
    ggannaway@brsfirm.com

BECK, REDDEN & SECREST, L.L.P.
One Houston Center
1221 McKinney, Suite 4500
Houston, TX  77010-2010
713-951-3700
713-951-3720 (fax)

*/s/ Phillip A. Wittmann*
Phillip A. Wittmann, 13625
    pwittman@stonepigman.com
Carmelite M. Bertaut, 3054
    cbertaut@stonepigman.com
Keith B. Hall, 24444
    khall@stonepigman.com
Jared Davidson, 32419
    jdavidson@stonepigman.com

STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
504-581-3200
504-581-3361 (fax)

**ATTORNEYS FOR CAMERON INTERNATIONAL CORPORATION**

1058788v.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Memorandum in Support of Defendant Cameron International Corporation's Motion to Dismiss has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 3rd day of June, 2011.

*/s/ Phillip A. Wittmann*

1058788v.1