UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL No. 2179  SECTION "J" |
| **THIS PLEADING APPLIES TO ALL CLAIMS AND CASES IN PLEADING BUNDLE C, INCLUDING ALL COMPLAINTS IN THE C BUNDLE NAMING WEATHERFORD AS DEFENDANT** | * * * * * * | JUDGE:  BARBIER  MAGISTRATE:  SHUSHAN |
| **This Pleading also applies to 10-CV-2771, 10-CV-04182, 10-CV-04183, 11-CV-0516, 10-CV-03059, 10-CV-1758, 10-CV-1757, 10-CV-1759, 10-CV-1760, 10-CV-2087, 10-CV-2731, 10-CV-2996, 10-CV-2997** | * * * * * | |
| * * * * * * | * | |

## MEMORANDUM IN SUPPORT OF WEATHERFORD U.S., L.P.'S MOTION TO DISMISS THE LOCAL GOVERNMENT ENTITY'S VOLUNTARY MASTER COMPLAINT, CROSS-CLAIM, THIRD-PARTY COMPLAINT (BUNDLE C) AND THE FIRST AMENDED COMPLAINTS OF THE STATES OF ALABAMA AND LOUISIANA

**MAY IT PLEASE THE COURT:**

Weatherford U.S., L.P. ("Weatherford") submits this Memorandum in Support of its

Motion to Dismiss the Local Government Entity's Voluntary Master Complaint, Cross-Claim,

Third-Party Complaint (Bundle C) and the First Amended Complaints of the States of Alabama and Louisiana under Rules 12(b)(6) and Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth more fully below, all claims asserted by the Plaintiffs against Weatherford should be dismissed.[1]

## I. INTRODUCTION AND FACTUAL BACKGROUND

As has been well documented in these proceedings, on April 20, 2010, a well blowout occurred at the Macondo Well site, and an explosion and fire occurred aboard the semi-submersible drilling vessel *Deepwater Horizon,* a vessel owned and operated by one of several Transocean entities and chartered to one of several BP entities. The explosion and fire resulted in fatalities, personal injuries, and the total loss of the *Deepwater Horizon.*

In accordance with the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701, *et seq.*, the Coast Guard formally designated BP as the "responsible party" for the subsea release of oil, and Transocean as the "responsible party" for the surface release of oil. Weatherford was not designated a "responsible party" nor is Weatherford a guarantor of either the BP or Transocean entities. BP and Transocean published their designation as responsible parties and advertised procedures by which claims could be submitted for consideration and potential resolution. Claim presentment and submission of a claim for certain damages through OPA's claims presentment procedure is a jurisdictional prerequisite which must be satisfied by a plaintiff prior to bringing any lawsuit in court.

---

[1] Pursuant to Paragraph 9 of PTO No. 33 (Rec. Doc. 1549) and Paragraphs 3 and 7 of the Court's Stipulated Order Regarding Pleading Deadlines Concerning the Local Government Entity Master Complaint, Complaints by the States of Alabama and Louisiana and Individual Civil Actions Filed by Local Government Entities (Rec. Doc. 2273), Weatherford files this single Motion to Dismiss the Local Government Entity's Voluntary Master Complaint, Cross-Claim, Third-Party Complaint (Bundle C) and the First Amended Complaints of the States of Alabama and Louisiana, and the arguments raised by Weatherford herein shall be deemed to respond to the common legal and factual issues contained in those individual civil actions filed or to be filed by other local government bodies or entities.

Nonetheless, hundreds of lawsuits have been filed throughout the country seeking to hold various parties liable for the damages sustained as a result of the fire, explosion and resulting oil spill that occurred on April 20, 2010. The majority of the lawsuits filed in federal courts have been transferred and consolidated in these proceedings by orders of the Multi-District Litigation Panel. Certain "pleading bundles" have been established by the Court for purposes of filing master complaints, answers, and any F.R.C.P. 12 motions. According to Case Management Order No. 1, Paragraph III C, one such pleading bundle is the C Bundle, which consists of claims brought by governmental entities (the "Bundle C Plaintiffs") for loss of resources, tax revenues, response costs and civil penalties. Pursuant to Pre-Trial Order 33, local public bodies may voluntarily join or otherwise intervene into the Bundle C Master Complaint or file their own separate individual petitions or complaints. On March 4, 2011, the Bundle C Plaintiffs filed a "Local Government Entity Master Voluntary Answer to Complaint and Petition of Triton Asset Leasing GmbH, et al for Exoneration from or Limitation of Liability (Rule 9(h)), Master Voluntary Claim in Limitation (No. 10-2771) (Rule 9(h)), and Voluntary Master Complaint, Cross-Claim, and Third-Party Complaint" (the "Bundle C Complaint"). (Rec. Doc. 1510). On April 5, 2011, the State of Alabama filed its separate First Amended Complaint (Rec. Doc. 1872); and on April 19, 2011, the State of Louisiana filed its First Amended Complaint (Rec. Doc. 2031) (collectively, the Bundle C Plaintiffs, the State of Alabama, and the State of Louisiana are referred to as the "Government Plaintiffs").

### A.      Claims of the Bundle C Plaintiffs

The Bundle C Plaintiffs allege the following claims against Weatherford related to Weatherford's design and/or manufacture of a float collar used for the Macondo Well Site: negligence under the General Maritime Law and under Florida, Alabama, Mississippi, Louisiana

and Texas law;[2] strict liability for manufacturing and/or design defect under the General Maritime Law and under Louisiana, Alabama, Texas, Mississippi, and Florida law;[3] public nuisance under Florida, Alabama, Mississippi, Louisiana, and Texas law;[4] nuisance under Texas, Alabama, Mississippi, Florida, and Louisiana law;[5] trespass under Florida, Alabama, Mississippi, Louisiana, and Texas law;[6] strict liability pursuant to the Louisiana Oil Spill Prevention and Response Act ("LOSPRA"), La. R.S. 30:2451, *et seq.*;[7] penalties pursuant to La. R.S. 56:40.1, *et seq.* (the "Wildlife Statute");[8] and strict liability pursuant to the Texas Oil Spill Prevention and Response Act of 1991 ("TOSPRA"), Tex. Nat. Res. Code Ann. § 40.001, *et seq.*[9]

Based on the above claims, the Bundle C Plaintiffs seek the following types of damages from Weatherford: "property damage, inconvenience, damages from the closure and pollution of the Gulf water areas, harbors, marinas, boat launches and waterways, including the loss of revenue, which directly depends upon a supply of fish, shrimp, oysters and crabs from the Gulf of Mexico, loss of tax revenue resulting from a decline in tourism and rentals, and damage to, and diminution in value of, property, and costs associated with additional public services, clean-up and removal . . . ."[10] The Bundle C Plaintiffs also allege that they are entitled to damages

---

[2] Bundle C Complaint, Rec. Doc. 1510, ¶¶ 542-85.

[3] Bundle C Complaint, Rec. Doc. 1510, ¶¶ 640-58.

[4] Bundle C Complaint, Rec. Doc. 1510, ¶¶ 670-77.

[5] Bundle C Complaint, Rec. Doc. 1510, ¶¶ 678-84.

[6] Bundle C Complaint, Rec. Doc. 1510, ¶¶ 685-90.

[7] Bundle C Complaint, Rec. Doc. 1510, ¶¶ 727-34.

[8] Bundle C Complaint, Rec. Doc. 1510, ¶¶ 735-37.

[9] Bundle C Complaint, Rec. Doc. 1510, ¶¶ 738-46.

[10] Bundle C Complaint, Rec. Doc. 1510, ¶¶ 585, 657; *see also* Bundle C Complaint, ¶¶ 676, 683, 689.

from Weatherford under LOSPRA and TOSPRA for damage to and economic loss resulting from destruction of immovable and movable property, as well as damages for increased costs of public services.[11]   Additionally, the Bundle C Plaintiffs seek relief from Weatherford under La. R.S. §§ 56:40.2-3 for alleged damages to "each fish, each wild bird, each wild quadruped, and other wildlife and aquatic life."[12]

**B.      Claims of the State of Louisiana**

In its separate First Amended Complaint, the State of Louisiana alleges two claims against Weatherford: recovery of response action costs under the Louisiana Environmental Quality Act, La. R.S. 30:2025 (the "LEQA");[13] and strict products liability under the General Maritime Law related to a Weatherford-manufactured float collar.[14]   The State of Louisiana further seeks to recover the following items of damages from Weatherford:

a. "damage to, loss of, or destruction of its natural resources, real and personal property, industry, and economy";

b. "substantial costs and expenses responding to this disaster and providing increased and additional public services";

c. "revenues from taxes, rents, royalties, and fees due to the injury to, loss of, or destruction of, its real property, personal property, and natural resources;"

d. "loss of use and enjoyment of property";

e. "diminution in the value of property";

f. "removal and restoration costs";

g. "economic losses"; and

---

[11] Bundle C Complaint, Rec. Doc. 1510, ¶¶ 732-33, 742-46.

[12] Bundle C Complaint, Rec. Doc. 1510, ¶¶ 736-37.

[13] La. 1st Am. Compl., Rec. Doc. 2031, ¶¶ 190-94.

[14] La. 1st Am. Compl., Rec. Doc. 2031, ¶¶ 270-92.

h. "other consequential and incidental damages."[15]

## C.  Claims of the State of Alabama

In it separate First Amended Complaint, the State of Alabama alleges the following claims against Weatherford: negligence under the General Maritime Law related to the design, manufacture and supply of the float collar;[16] strict liability for manufacturing and/or design defect under the General Maritime Law;[17] public nuisance under Alabama law;[18] private nuisance under Alabama law;[19] trespass under Alabama law;[20] liability under the Alabama Extended Manufacturer's Liability Doctrine;[21] Civil Penalties under the Alabama Environmental Management Act (the "AEMA"), Alabama Water Pollution Control Act (the "AWPCA"), Alabama Air Pollution Control Act (the "AAPCA"),  Alabama Hazardous Wastes Management Act (the "AHWMA"), and Alabama Solid Waste Disposal Act (the "ASWDA");[22] damages under the Alabama Water Pollution Control Act;[23] negligence under Alabama law;[24] and wantonness under Alabama law.[25]

---

[15] La. 1st Am. Compl., Rec. Doc. 2031, ¶ 291.

[16] Al. 1st Am. Compl., Rec. Doc. 1872, ¶¶ 97, 126-28.

[17] Al. 1st Am. Compl., Rec. Doc. 1872, ¶¶ 169-85.

[18] Al. 1st Am. Compl., Rec. Doc. 1872, ¶¶ 220-26.

[19] Al. 1st Am. Compl., Rec. Doc. 1872, ¶¶ 227-32.

[20] Al. 1st Am. Compl., Rec. Doc. 1872, ¶¶ 233-38.

[21] Al. 1st Am. Compl., Rec. Doc. 1872, ¶¶ 247-55.

[22] Al. 1st Am. Compl., Rec. Doc. 1872, ¶¶ 282-302, 309-27.

[23] Al. 1st Am. Compl., Rec. Doc. 1872, ¶¶ 303-08.

[24] Al. 1st Am. Compl., Rec. Doc. 1872, ¶¶ 328-38.

[25] Al. 1st Am. Compl., Rec. Doc. 1872, ¶¶ 339-45.

Based on the above claims, the State of Alabama seeks to recover the following damages from Weatherford:

a. Past, present, and future damages for harm to, and contamination of, waters properties, estuaries, sea beds, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources;

b. Past, present, and future damages for physical injury to, and destruction of, State resources and property (both real and personal) located in and around the Gulf of Mexico and adjoining waters and estuaries, including, but not limited to, Dauphin Island, the Port of Mobile, Weeks Bay, Gulf State Park, and the beaches of Baldwin and Mobile Counties;

c. Past, present, and future economic losses resulting from injury to, or destruction of, State property;

d. Past, present, and future lost State revenues from taxes, royalties, rents, fees, licenses, or net profit shares;

e. Past, present, and future costs expended by the State to assess, monitor, abate, remediate, and/or clean contaminated State waters, land, and property;

f. Past, present, and future costs expended by the State for providing increased or additional public services to address the oil disaster and protect human health and the environment;

g. Past, present, and future damages associated with the long-term stigma of the oil disaster, including the loss of use of State property, taxes, revenues, and other income;

h. Past, present, and future lost revenue and human-use opportunities associated with various natural resources in the Gulf region, including but not limited to fishing, swimming, beach-going, and viewing of birds and wildlife;

i. Past, present, and future costs expended by the State for employment compensation claims or workers compensation claims related to the oil disaster; [and]

j. Passive use losses as measured by contingent valuation methods;[26]

---

[26] Al. 1st Am. Compl., Rec. Doc. 1872, ¶ 135.

## II.   LAW AND ARGUMENT

For the reasons that follow, the Government Plaintiffs have no claims against Weatherford because OPA provides the exclusive remedy for the damages sought by the Government Plaintiffs; and OPA does not provide a right of action against a third party like Weatherford.  Specifically, the Government Plaintiffs cannot seek OPA-enumerated damages, including civil penalties, under non-OPA causes of action pursuant to either the General Maritime Law or state law.

Further, to the extent that the Government Plaintiffs' claims against Weatherford are not displaced by OPA, the Government Plaintiffs' claims are governed by either the General Maritime Law or Louisiana law.  Therefore, the Government Plaintiffs have no claims against Weatherford under the laws of Texas, Mississippi, Alabama, or Florida, regardless of the theory of liability.  Moreover, under both Louisiana law and the General Maritime Law, the economic loss rule bars the recovery by the Government Plaintiffs of purely economic loss.

### A.   Legal Standard for Dismissal under Rule 12(b)(6) and Rule 12(c) of the Federal Rules of Civil Procedure

The standard for deciding a motion for judgment on the pleadings under F.R.C.P. 12(c) is the same as the standard for a motion to dismiss for failure to state a claim under F.R.C.P. 12(b)(6).  *Doe v. Myspace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).  To survive a motion for judgment on the pleadings, the factual allegations in the Bundle C Complaint and the First Amended Complaints of the States of Alabama and Louisiana "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007).  The pleading must contain "enough facts to state a claim for relief that is plausible on its face." *Id.* at 570, 127 S. Ct. at 1974; *see also Hoover v. Florida Hydro, Inc.*, 2009 WL

1380619, at *2-*3 (E.D. La. May 14, 2009); *Nungesser v. New York Life Insur. & Annuity Corp.*, 2009 WL 537199, at *1 (E.D. La. Mar. 3, 2009); *Sullivan v. Monsanto Co.*, 2009 WL 43202, at *1 (E.D. La. Jan. 7, 2009).   Moreover, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Fernandez-Montes v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir. 1993).

### B.   OPA Provides the Sole Remedy for the Government Plaintiffs

#### 1.   *OPA Establishes an Exclusive Federal Cause of Action for Damages Arising out of a Marine Oil Spill*

OPA is the exclusive remedy for any public or private claimant seeking recovery for "covered damages" as defined by OPA in 33 U.S.C. §2702(b)(2)(A)-(F).   Section 2702(a) provides: "*Notwithstanding any other provision or rule of law*, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from said incident." (emphasis added).

Section 2702(b) provides:

(b) Covered removal costs and damages

(1) Removal costs

The removal costs referred to in subsection (a) of this section are--

(A) all removal costs incurred by the United States, a State, or an Indian tribe under subsection (c), (d), (e), or (l) of section 1321 of this title under the Intervention on the High Seas Act (33 U.S.C. 1471 et seq.), or under State law; and

(B) any removal costs incurred by any person for acts taken by the person which are consistent with the National Contingency Plan.

(2) Damages

The damages referred to in subsection (a) of this section are the following:

(A)  Natural Resources

Damages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage, which shall be recoverable by a United States trustee, a State trustee, an Indian tribe trustee, or a foreign trustee.

(B)  Real or personal property

Damages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property.

(C)  Subsistence use

Damages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources.

(D)  Revenues

damages equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by the Government of the United States, a State, or a political subdivision thereof.

(E)  Profits and earning capacity

Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant.

(F)  Public services

Damages for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, caused by a discharge of oil, which shall be recoverable by a State, or a political subdivision of a State.

OPA specifically defines "natural resources" as including "land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the exclusive economic zone), any State or local government or Indian tribe, or any foreign government." 33 U.S.C. § 2701(20).

OPA does not provide for recovery of damages for bodily injury or for recovery of certain property damages traditionally recognized under the General Maritime Law but not enumerated under OPA, including collision damages (hull damage, loss of vessel, wreck removal, and the like).

It is well recognized that when Congress comprehensively legislates in an area, it preempts the federal common law and General Maritime Law in that area, e.g. water pollution. *See Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 11, 101 S. Ct. 2615, 2621-22 (1981) (Federal Water Pollution Control Act, as amended, fully preempted federal common law of nuisance in area of ocean pollution); *Conner v. Aerovox, Inc.*, 730 F.2d 835, 840-841 (1st Cir. 1984) (General Maritime Law tort claims preempted by Federal Water Pollution Control Act). OPA is even more comprehensive in the field of oil pollution than the Federal Water Pollution Act is in the field of water pollution.

The legislative history also supports the view that OPA establishes an entirely new federal cause of action. As the Court in *Tanguis* noted, "OPA 'represents Congress' attempt to provide a comprehensive framework in the area of marine oil pollution.'" *Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001) (citing *Rice v. Harken Exploration Co.*, 89 F. Supp. 2d 820, 822 (N.D. Tex. 1999)). The Senate Report also states that "OPA 'creates a single federal law providing clean up authority, penalties, and liability for oil

pollution.'" *Id.* at 867 (citing S. REP. NO. 101-94, U.S. Code Cong. & Admin. News 1990, pp. 722, 730). Thus, the legislative history makes clear Congress' desire to create "an entirely new cause of action." *Id.*

Indeed, the Senate found that "the Nation need[ed] . . . a package of complementary international, national, and State laws that will adequately compensate victims of oil spills, provide quick, efficient cleanup, minimize damage to fisheries, wildlife and other natural resources and internalize those costs within the oil industry and its transportation sector" to replace the inadequate and "fragmented collection of Federal and State laws" in existence prior to OPA. S. REP. NO. 101-94, U.S. Code Cong. & Admin. News 1990, pp. 722, 723. The legislative history makes clear Congress' intent to create an entirely new OPA cause of action. As such, the exclusive remedy of the Government Plaintiffs herein for OPA "covered damages," as defined in 33 U.S.C. §2702(b)(2)(A)-(F), lies in OPA, not in some other source of law.

In finding that OPA precludes recovery of the damages enumerated in 33 U.S.C. §2702(b)(2)(A)-(F) in a claim under the General Maritime Law, Judge Lemelle in *Gabarick v. Laurin Maritime (America) Inc.*, 623 F. Supp. 2d 741 (E.D. La. 2009), recognized that the central inquiry should focus not on plaintiffs' characterization of the claims at issue, but on the damages sought by plaintiffs and whether or not those damages are specifically covered by OPA. *Id.* at 746 ("Claimants often cloud the issue at bar by arguing that OPA does not preempt General Maritime Law claims rather than focusing on preemption solely of the damages specifically covered by OPA.").

In reaching his decision on the preemptive effect of OPA, Judge Lemelle noted that the plain language of OPA supported the Court's decision:

> The Act [OPA] applies to the damages listed in §2702, which also specifically references its exclusive nature with respect to other provisions of law: *"Notwithstanding any other provision or rule of law,* and subject to the provisions of this Act ..." 33 U.S.C. §2702(a). The Act also uses the absolute words "all" and "shall," stating that "*all* claims for ... damages *shall* be presented first to the responsible party," and allows for suit after exhaustion of the claims process as outlined in §2713(c). 33 U.S.C. §2713 (emphasis added). Hence, the plain language of the statute indicates its mandatory and exclusive nature with respect to its covered damages.

*Id.*

33 U.S.C. §2702(b)(2) sets forth the list of damages recoverable under OPA. Those damages are enumerated above. As courts have routinely recognized, this statutory scheme is "comprehensive legislation." While OPA allows the States to legislate "additional liability or requirements" for oil discharges and removal, the clear import to be drawn from the statutory text and legislative history of OPA, including 33 U.S.C. §2718, is that plaintiffs may not raise state law tort or statutory claims to recover those damages enumerated under OPA. To allow such a reading, would effectively abrogate OPA in its entirety. There is no alternative basis upon which to seek the damages enumerated under the provisions of OPA.

### 2.      *The Statutory Text of OPA is Mandatory Rather than Permissive*

The exclusive scheme of OPA is mandatory, and requires the dismissal of all claims against Weatherford by the Government Plaintiffs. OPA requires that claims for damage must first be presented to the responsible party. 33 U.S.C. § 2713(a). The statute could not be clearer. Section 2713(a) is captioned "Presentation" and states: "Except as provided in subsection (b) of this section, all claims for removal costs or damages shall be presented first to the responsible party or guarantor of the source designated under section 2714(a) of this title."[27] If the claim is

---

[27] 2713(b) is inapplicable to this case as it deals with presentation to the Oil Spill Liability Trust Fund.

presented and the responsible party denies all liability or the claim is not settled within 90 days

of presentment, then the claimant may elect to file suit in federal court, but only against the

responsible party.   33 U.S.C. §2313(c).   OPA does not provide a cause of action against a

contributing third party like Weatherford.

Case law and OPA's legislative history reflect that the purpose of OPA's notice

requirement and claim presentment procedure is to promote settlement and to avoid litigation:

> The purpose of the claim presentation procedure is to promote settlement and avoid litigation. Congress believed that lawsuits against parties are appropriate only "where attempts to reach a settlement with the responsible party . . . were unsuccessful." H.R. Rep. No. 242, 101st Cong., 1st Sess., pt. 2, at 66 (1989). It therefore mandated a 90-day period in which the parties would attempt to resolve monetary disputes arising from oil spills prior to commencing litigation. The hope was to avoid costly and cumbersome litigation. See 135 Cong. Rec. at H 7962, 7965 (statements of Rep. Hammerschmidt and Rep. Lent).
>
> In this case, plaintiffs have not complied with the presentation requirement of OPA. They filed this suit on April 2, 1993 without having first presented a claim to Colonial. Thereafter, apparently realizing their failure to comply, plaintiffs sent a letter to Colonial on April 7, 1993, which purports to present an OPA claim. However, the April 7 letter fails to cure the jurisdictional defect for two reasons.
>
> First, Colonial has not denied all liability under OPA and 90 days have not passed since the claim was presented. At least one of these events must occur before an OPA action may proceed.

*Johnson v. Colonial Pipeline Co.*, 830 F.Supp. 309, 310-11 (E.D. Va. 1993); *see also Gabarick*

*v. Laurin Maritime (America) Inc.*, 623 F.Supp.2d 741, 747 (E.D. La. 2009) ("[T]he legislative

intent of OPA was to encourage settlement and reduce litigation in oil spill cases.").

In *Gabarick*, Judge Lemelle dismissed OPA claims against a third party whose vessel

was involved in a collision which resulted in an oil spill. Judge Lemelle noted that OPA's

statutory scheme contemplated that all claims must be pursued against the "responsible party"

and granted the third party's motion to dismiss. *Gabarick,* 623 F.Supp. 2d at 750-51.   Like the third party in *Gabarick,* Weatherford is not an OPA "responsible party" whereas BP and Transocean have been designated "responsible parties."   Weatherford is merely a third party and cannot be sued by the Government Plaintiffs under OPA.

Despite OPA's mandatory liability scheme, the Government Plaintiffs allege multiple theories of recovery against Weatherford and seek property damage, economic losses, natural resource damages, removal and response costs, loss of revenue, and increased costs of public services as a result of an oil spill.   They also seek natural resource damages and removal costs caged in the form of civil penalties.   Regardless of how these damages are described or titled, all of these alleged damages are clearly encompassed within OPA and can be sought only against the designated responsible parties.   Allowing the Government Plaintiffs to pursue damage claims against the designated responsible parties *and* third parties such as Weatherford runs afoul of the clear intent of OPA (i.e. to promote settlement, as well as efficiency and uniformity in claims resolution, while also avoiding voluminous litigation as the parties are faced herein).   Therefore, all claims by the Government Plaintiffs should be dismissed.[28]

### 3.   *Displacement of Specific Claims by OPA*

As noted above, OPA provides the sole remedy for the damages sought by the Government Plaintiffs herein.   Weatherford addresses in turn the specific claims for damages under LOSPRA, the Wildlife Statute, the LEQA, and the AWPCA, all of which are displaced by OPA.[29]

---

[28] As discussed below, OPA does not provide for the recovery of punitive damages. *South Port Marine, LLC v. Gulf Oil Ltd.,* 234 F.2d 58, 65-66 (1st Cir. 2000).  Therefore, all claims for punitive damages under OPA should be dismissed with prejudice.

[29] As discussed *infra*, the claims for civil penalties by the State of Alabama are precluded under the Outer Continental Shelf Lands Act, 33 U.S.C. § 1333(a)(2).

The Bundle C Plaintiffs seek to assess liability against Weatherford for property damage and public service costs under LOSPRA.  They also seek to recover under the Wildlife Statute for the killing of fish, wild birds, wild quadrupeds, and other wildlife and aquatic life.[30] Additionally, the State of Louisiana seeks to recover response costs under the LEQA.[31]  Finally, the State of Alabama seeks removal costs, natural resource damages, and punitive damages pursuant to the AWPCA.[32]

OPA specifically provides for the recovery of property damage, public service costs, and removal costs, but only against the responsible party and not Weatherford.  *See* 33 U.S.C. § 2702(b).  Moreover, OPA provides for recovery of "injury to, destruction of, loss of, or loss of use of, natural resources," which include "fish, wildlife, . . . water, . . . and other such resources." *Id.* at §§ 2702(b)(2)(A), 2701(20).  The property damage and public service costs sought by the Bundle C Plaintiffs are clearly enumerated damages under OPA.  Similarly, the damages and "civil penalties" sought by the Bundle C Plaintiffs under the Wildlife Statute are clearly encompassed within the definition of "natural resources" under OPA.[33]  *Id.*  Further, the response costs sought by the State of Louisiana under the LEQA are clearly enumerated damages under OPA.  *See* 33 U.S.C. § 2702(b).  Likewise, the removal costs and natural resource damages sought by the State of Alabama are clearly enumerated damages under OPA.  *Id.*  The State of Alabama's claim for punitive damages under the AWPCA is also displaced by OPA, which does not provide for punitive damages as discussed *infra*.  No matter how the Bundle C Plaintiffs and

---

[30] Bundle C Complaint, Rec. Doc. 1510, ¶¶ 727-37.

[31] La. 1st Am. Compl., Rec. Doc. 2031, ¶¶ 190-94.

[32] Al. 1st Am. Compl., Rec. Doc. 1872, ¶¶ 282-327.

[33] Furthermore, the State of Louisiana is already seeking these natural resource damages under OPA and LOSPRA, but not against Weatherford.  (Rec. Doc 2031, ¶¶195-238).  The Bundle C Plaintiffs do not have standing under the Wildlife Statute and are not authorized to recover this category of damage again.  *La. R.S. 56:40.1, et seq.*

the State of Louisiana couch their claims, the claims are for OPA-enumerated damages; and OPA displaces recovery of these damages under state law.[34]   Accordingly, the claims for damages under LOSPRA, the Wildlife Act, and the LEQA should be dismissed with prejudice.

Moreover, LOSPRA does not provide a cause of action for the Government Plaintiffs. As is set forth in the statute itself, LOSPRA establishes an administrative scheme that provides for the recovery of defined damages only by the Louisiana oil spill coordinator and no one else. La. R.S. 30:2489.[35]   Accordingly, the Bundle C Plaintiffs' claims under LOSPRA must be dismissed.

### C.   Section 2718 Does Not Preserve State Law Claims for OPA-Covered Damages

The Government Plaintiffs' claims are not preserved by OPA's savings provision, Section 2718(a).  Section 2718(a) provides in pertinent part:

(a) Preservation of State authorities; Solid Waste Disposal Act

Nothing in this Act or the Act of March 3, 1851 shall--

(1) affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to—

(A) the discharge of oil or other pollution by oil within such State; or

(B) any removal activities in connection with such a discharge; or

(2) affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) or State law, including common law.

---

[34] In further support of this argument, pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, Weatherford hereby adopts and fully incorporates the arguments set forth by Anadarko Petroleum Corporation and Anadarko E&P Company LP (collectively, "Anadarko") in Anadarko's Memorandum in Support of its Motion to Dismiss, Rec. Doc. 2218-1, pp. 31-34.

[35] In further support of this argument regarding the Government Plaintiffs' lack of a claim under LOSPRA, pursuant Rule 10(c) of the Federal Rules of Civil Procedure, Weatherford hereby adopts and fully incorporates the arguments set forth by M-I in its Memorandum in Support of its Motion to Dismiss, Rec. Doc. 2224-1, pp. 21-23.

33 U.S.C. § 2718(a). Additionally, Section 2718(c) provides in pertinent part:

(c) Additional requirements and liabilities; penalties

Nothing in this Act, the Act of March 3, 1851 (46 U.S.C. 183 et seq.), or section 9509 of Title 26, shall in any way affect, or be construed to affect, the authority of the United States or any State or political subdivision thereof—

(1) to impose additional liability or additional requirements; or

(2) to impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law;

relating to the discharge, or substantial threat of a discharge, of oil.

33 U.S.C. § 2718(c).

Section 2718 merely preserves the states' authority to enact legislation in the form of "mini-OPAs" to provide for liability in addition to the damages enumerated under OPA. The intent of Congress regarding the limited purpose of OPA's savings provision is clear. The Senate Report expressed the following with respect to Section 2718:

Section 106 of the reported bill explicitly preserves the authority of any State to impose its own requirements or standards with respect to discharges of oil within such State. Also explicitly preserved is State's authority to establish or maintain funds for cleanup or compensation purposes and collect such fees or penalties as they may establish.

\*\*\*

Preemption has been discussed by the members of the Committee more than any other single issue. **S. 686 does not embrace any preemption of State oil spill liability laws, State oil spill funds, or State fees, taxes, or penalties used to contribute to such funds.** The long-standing policy in environmental laws of not preempting State authority and recognizing the rights of States to determine for themselves the best way in which to protect their citizens, is clearly affirmed in S. 686.

S. Rp. 101-94, p. 739, S. Rep. No. 94, 101st Cong., 1st Sess. 1989, 1990 U.S. Code Cong. & Admin. News 722, 1989 WL 225005 (Leg. Hist.) (emphasis added).

The Senate Report goes on to state:

> Historically, the Committee on Environment and Public Works has protected the rights of States to impose more restrictive requirements or liability, particularly in the area of oil pollution law.  More stringent State laws are specifically preserved in both the Clean Water Act (for clean-up of spills of oil) and the Deepwater Port Act and title 3 of the Outer Continental Shelf Lands Act Amendments of 1978 (for clean-up and damages caused by spills of oil).  Other environmental statutes, including the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (the toxic chemical "super fund" law) and amendment to it (the 1986 "super fund" amendments and reauthorization act) contain similar protections.

> To date, 24 States have enacted comprehensive oil pollution laws covering clean-up and damages and many have established compensation funds.  Some have included hazardous substances as well.  **This legislation, as reported by the committee would permit such State laws to continue and would not preclude enactment of new state laws.**

> The theory behind the committee action is that the Federal statute is designed to provide basic protection for the environment and victims damaged by spills of oil.  Any State wishing to impose a greater degree of protection for its own resources and citizens is entitled to do so. On the other hand, the State might feel adequately protected by the Federal statute and therefore choose not to enact additional State law.  In any event, the committee chose not impose, arbitrarily, the constraints of the federal regime on the States, while at the same time preempting their rights to their own laws.

*Id.* at 727-28 (emphasis added); *see also Nat'l Shipping Co.*, 924 F. Supp. at 1448 ("The savings clause was added to allow the states to enact legislation protecting their citizens and their resources to a greater extent than the protection offered by OPA.  It was meant to allow the states to go beyond the basic protection of the federal law.").

Similarly, the discussions in the House Report regarding OPA's preemption of state law were limited to whether OPA should preempt a narrow set of existing and future "state oil pollution liability and compensation laws."  H.R. 101-242, pt. 2, p. 150 (Sept. 18, 1989). Congress never intended to allow all state law claims to survive OPA's enactment; rather, the focus of Section 2718 was those existing and future mini-OPA statutes pertaining to oil pollution liability and compensation.  No where in any of the legislative history does it provide that OPA

allows the Government Plaintiffs to seek OPA-enumerated damages under state law theories of negligence, gross negligence, products liability, nuisance, or trespass. Similarly, as set forth above, OPA does not allow the Government Plaintiffs to seek OPA-enumerated damages under LOSPRA, the Wildlife Statute, the LEQA, and the AWPCA.

This interpretation of the Section 2718 is further supported by the Supreme Court's decision in *U.S. v. Locke*, 529 U.S. 89, 120 S. Ct. 1135, 146 L. Ed. 2d 69 (2000):

> Placement of the savings clauses in Title I of OPA suggests that Congress intended to preserve state laws of a scope similar to the matters contained in Title I of OPA, not all state laws similar to the matters covered by the whole of OPA or to the whole subject of maritime oil transport. **The evident purpose of the saving clauses is to preserve state laws which, rather than imposing substantive regulation of a vessel's primary conduct, establish liability rules and financial requirements relating to oil spills.**

*Id.* at 105. (emphasis added).

In this case, the Bundle C Plaintiffs seek damages under LOSPRA; however, as noted above, LOSPRA does not provide a cause of action for the Bundle C Plaintiffs. Moreover, neither the State of Louisiana nor the State of Alabama have asserted a claim under any mini-OPA against Weatherford. Section 2718 does not preserve the specific state law claims asserted by the States of Alabama and Louisiana against Weatherford. Therefore, all state law claims asserted by the Government Plaintiffs should be dismissed.

**D.    OPA Does Not Allow Punitive Damages**

As noted above, OPA is exclusive and mandatory; and OPA does not provide for the recovery of punitive damages. The only federal appellate court to consider the issue of whether punitive damages are available under OPA has affirmatively held that punitive damages are not recoverable under OPA. *South Port Marine, LLC v. Gulf Oil Ltd.*, 234 F.2d 58, 65-66 (1st Cir. 2000). There is no separate cause of action for punitive damages; rather, they "must relate to some separate cause of action which permits recovery of punitive damages." *Id.* at 64.

{N2303156.3}

Since OPA is the exclusive remedy for the damages sought by the Government Plaintiffs, punitive damages are not recoverable.

The recent Supreme Court cases of *Atlantic Sounding Co. v. Townsend*, 129 S. Ct. 2561 (2009), and *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 128 S. Ct. 2605 (2008), do not support the availability of punitive damages for the Government Plaintiffs.   The *Baker* case dealt with punitive damages under the Clean Water Act, which preceded the enactment of OPA.   554 U.S. at 484-89, 128 S. Ct. at 2616-19.   The *Baker* holding was premised on a lack of congressional intent in the Clean Water Act to occupy the entire field of pollution remedies.   *Id.* at 488-89, 128 S. Ct. at 2618-19.   As noted above, OPA created a new federal cause of action, which is significantly more comprehensive in the field of marine oil pollution than any prior remedial scheme, including the Clean Water Act.   Unlike the Clean Water Act, OPA is intended to be the sole federal law applicable in the area of marine oil pollution.   *See South Port Marine, LLC*, 234 F.3d at 65-66.   Accordingly, the Supreme Court's holding in *Baker* is inapposite.   Moreover, *Atlantic Sounding* simply stands for the proposition that punitive damages are available for the willful and wanton failure to pay maintenance and cure.   129 S. Ct. at 2574.   Its holding cannot be extended to allow for punitive damages under OPA in the case of a marine oil spill.

Finally, the availability of punitive damages under OPA would have a frustrating effect on OPA's remedial scheme.   The First Circuit in *South Port* expressly rejected the argument that "OPA should be construed more liberally because it was enacted for the purposes of benefiting the victims of oil pollution and punishing its perpetrators."   *Id.* at 66.   As noted by the First Circuit, "it would be naïve to adopt so simpleminded a view of congressional policymaking."   *Id.* Congress undertook a delicate balancing effort when enacting OPA by providing for strict liability for oil discharges and both civil and criminal penalties but "declin[ing] to impose

punitive damages." *Id.* To allow punitive damages while also providing strict liability and civil fines would frustrate the inherent balancing undertaken by Congress in OPA. Any change in OPA's remedial scheme is better directed to the legislature as opposed to this Court.

**E.      Although OPA's Preemptive Effect Warrants Dismissal of All the Government Plaintiffs' Claims against Weatherford, in Any Event the Outer Continental Shelf Lands Act Precludes Application of Texas, Mississippi, Alabama, and Florida Law**

As noted above, OPA displaces all of the claims in the Bundle C Complaint and the First Amended Complaints of Alabama and Louisiana against Weatherford. In the absence of OPA, the Outer Continental Shelf Lands Act ("OCSLA") provides the pertinent choice of law analysis for the substantive law to apply to the claims. *See* 33 U.S.C. § 1333(a)(2). Under OCSLA's choice of law provision and the Fifth Circuit's interpretation of same, the law of the adjacent state, Louisiana, may apply to the Government Plaintiffs' claim only if the General Maritime Law does not apply of its own force.

Accordingly, to the extent that OPA does not fully displace the Government Plaintiffs' claims, there are only two possible sources of law which may apply to the Government Plaintiffs' claims: the General Maritime Law or Louisiana law. Under both regimes, the Government Plaintiffs may not seek pure economic damages without physical damage to property in which the plaintiff has a propriety interest; and all claims for purely economic loss by the Government Plaintiffs must therefore be dismissed with prejudice. Moreover, since OCLSA precludes the application of Texas, Mississippi, Alabama, and Florida law to the Government Plaintiffs' claims, all claims under those laws, whether statutory or otherwise, should be similarly dismissed with prejudice.

1.  *Unless the General Maritime Law Applies of Its Own Force, OCSLA's Choice of Law Provision Requires the Application of Louisiana Law to the Government Plaintiffs' Claims*

Congress enacted OCSLA to extend the federal government's control over "the subsoil and seabed of the Outer Continental Shelf, and artificial islands and fixed structures" erected thereon.  43 U.S.C. § 1333(a)(2)(A).  OCSLA provides a broad jurisdictional grant for federal district courts:

> [T]he district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the materials, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals . . . .

43 U.S.C. § 1349(b)(1).  By Order dated October 6, 2010, this Court ruled that the Macondo blowout gives rise to subject matter jurisdiction under OCSLA.  *See In re Oil Spill by the Oil Rig "DEEPWATER HORIZON" in the Gulf of Mexico*, MDL No. 2179, 2010 WL 3943451, at *3 (E.D. La. Oct. 6, 2010).  Therefore, if OPA does not fully displace the Government Plaintiffs' claims, OCSLA, through its choice of law provision, determines the substantive law to be applied to the claims of the Government Plaintiffs arising out of the blowout.

In pertinent part, OCSLA provides as follows:

(a)(1) The Constitution and laws and civil and political jurisdiction of the United States are hereby extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State . . . .

* * *

(2)(A) To the extent that they are applicable and not inconsistent with this Act or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State now in effect or here-

after adopted, amended, or repealed are hereby declared to be the law of the United States for that portion of the sub-soil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf . . . .

43 U.S.C. § 1333(a)(1), 1333(a)(2)(A).

Under Section 1333(a)(1), OCSLA extends the laws of the United States seaward onto certain structures on the Outer Continental Shelf and provides the geographical limit of OCSLA's reach.   43 U.S.C. § 1333(a)(1).   Within the area covered by OCSLA, Section 1333(2)(A) dictates that federal law controls but the law of the adjacent State is adopted as surrogate federal law to the extent that it is not inconsistent with applicable federal laws or regulations. 43 U.S.C. § 1333(a)(2)(A).

In *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990), the Fifth Circuit stated that to determine whether OCSLA requires state law to be applied as surrogate federal law, the following three criteria must be met: (1) the controversy must arise on a situs that is covered by OCSLA; (2) federal maritime law must not apply of its own force; and (3) state law must not be inconsistent with federal law.   The Fifth Circuit has applied this three-factor test regardless of whether the underlying action lies in tort or contract.   *See Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co.*, 448 F.3d 760, 2006 A.M.C. 1297 (5th Cir. 2006); *PLT*, 895 F.2d at 1047.

In this case, OCSLA and the *PLT* Test dictate that either the General Maritime Law or the law of the adjacent state, here Louisiana, apply to the claims in the Bundle C Complaint and the First Amended Complaints of the States of Alabama and Louisiana.

## 2. *OCSLA Precludes the Application of Any State Law Other than Louisiana Law*

To the extent that Louisiana law applies to the Government Plaintiffs' claims, OCSLA requires the substantive application of Louisiana law to their claims without any consideration of Louisiana's choice of law principles. The Fifth Circuit has noted that "[i]n tort cases, the Supreme Court has given us clear directions to directly adopt the adjacent state's law rather than to adopt that state's conflict rules." *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 788 n.7 (5th Cir. 2009). The U.S. Supreme Court has stated that "[s]ince the federal court is not, then, applying the law of *another* forum in the usual sense, ordinary conflict of law principles have no relevance." *Chevron Oil Co. v. Huson*, 404 U.S. 97, 102-03, 92 S. Ct. 349, 349, 30 L. Ed. 2d 296 (1971) (emphasis in original); *see also Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 101 S. Ct. 2870, 69 L. Ed. 2d 784 (1981) ("OCSLA does supercede the normal choice of law rules that the forum would apply."). Moreover, in *Wooten v. Pumpkin Air, Inc.*, 869 F.2d 848 (5th Cir. 1991), the Fifth Circuit held that OCSLA mandated that the applicable substantive law be that of the adjacent state, and did not permit the application of the adjacent state's choice-of-law rules to determine the applicable substantive law.

Therefore, under *Wooten*, if the law of Louisiana is applicable under OCSLA to the Government Plaintiffs' claims, Louisiana law applies as the substantive law to the claims to the exclusion of any other state's law. Accordingly, all claims asserted against Weatherford under state laws other than Louisiana law, including the claims by the State of Alabama for civil penalties, should be dismissed with prejudice.

Further, all of the Government Plaintiffs' state law claims are preempted in their entirety by the Clean Water Act under *International Paper Co. v. Ouellette*, 479 U.S. 481, 107 S. Ct. 805, 107 S. Ct. 805 (1987), and its progeny. The source of the Government Plaintiffs' alleged

damage is the Macondo Well site, which is located on the Outer Continental Shelf and beyond the territorial waters of any state. Therefore, the coastal states are not "source" states under the Clean Water Act; and as "affected states," Louisiana, Texas, Alabama, Florida, and Mississippi cannot apply their own laws to the discharge of pollution on the Outer Continental Shelf. *See id.* at 487 ("We hold that when a court considers a state-law claim concerning interstate water pollution that is subject to the CWA, the court must apply the law of the State in which the point source is located.").

Finally, the State of Alabama has failed to plead a viable claim for civil penalties under any Alabama statute. The State of Alabama is not entitled to seek double, triple, or even quadruple recovery for the same alleged violation(s) under four separate statutes (the AWPCA, the AAPCA, the AHWMA, and the ASWDA). Additionally, the State of Alabama failed to comply with certain venue provisions under the statutes and lacks standing to bring claims for penalties under the statutes alleged. *See* Ala. Code §§ 22-22A-1, *et seq.*, 22-22-1, *et seq.*, 22-27-1, *et seq.*, 22-28-1, *et seq.*, 22-30-1, *et seq.* For these reasons, the claims for civil penalties under Alabama law should be dismissed.

**F.    If the General Maritime Law Applies, the Government Plaintiffs'
Claims Are Similarly Barred under the Economic Loss Rule**

If the Government Plaintiffs state claims cognizable in admiralty, as noted *supra*, OPA preempts the General Maritime Law and bars any claim against Weatherford under the General Maritime Law. *Gabarick v. Laurin Maritime (America) Inc.*, 623 F. Supp. 2d 741, 746 (E.D. La. 2009). Moreover, it is well-settled that a claim for purely economic loss is not cognizable under the General Maritime Law unless the claimant has a proprietary interest in the property damaged. *See Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927); *Reserve Mooring Inc. v. Amer. Commercial Barge Line, LLC*, 251 F.3d 1069 (5th Cir. 2001)

("[P]hysical injury to a proprietary interest is a prerequisite to recovery of economic damages in cases of unintentional maritime torts."); *Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019, 1029 (5th Cir. 1985) (en banc), *cert. denied*, 477 U.S. 903 (1986) (providing a "bright line" rule that allows plaintiffs to recover economic losses only where the plaintiff has suffered physical injury to a proprietary interest.); *see also Barasich v. Shell Pipeline Co.*, Nos. 05-4180, 05-4197, 05-4199, 05-4212, 05-4512, 06-5102, 2006 WL 3913403, at *6 (E.D. La. Nov. 20, 2006) (discussing the seminal case of *Robins Dry Dock*, which "stands for the broad proposition that a plaintiff is barred from recovering for economic loss resulting from physical damage to property in which he has no proprietary interest.").

Accordingly, the General Maritime Law bars the recovery by all the Government Plaintiffs with the exception of those who have alleged physical damage to property in which they have a proprietary interest.

### G.   Louisiana Law Does Not Provide for the Recovery of Purely Economic Loss

If Louisiana law applies to the Government Plaintiffs' claims, Louisiana law precludes the Government Plaintiffs from recovering purely economic damages in the absence of physical damage to property in which the particular plaintiff has a proprietary interest. *See Barasich*, 2006 WL 3913403, at *7 (dismissing the claims of commercial fishermen, other than oyster fishermen, for purely economic damage under Louisiana law because "there is no property right or ownership of the fish in the state's waters."); *see also La. Crawfish Producers Ass'n-West v. Amerada Hess Corp.*, No. 2005-1156, at *2-*7 (La. App. 3 Cir. 7/12/2006), 935 So. 2d 380, 382-85 (affirming the dismissal of Louisiana state law claims for purely economic loss as a result of alleged damage to an aquatic ecosystem because the plaintiffs lacked a proprietary interest in the waters and crawfish sought to be caught); *Dempster v. Louis Eymard Towing Co.*, 503 So. 2d

99 (La. App. 5 Cir. 1987), *writ denied*, 505 So. 2d 1136 (La. 1987) (affirming the dismissal of claims for loss of a fishing site and economic loss because the fishermen had "no proprietary interest in the fishing site or in anticipated fish caught in the future."); *TS&C Investments, L.L.C. v. Beusa Energy, Inc.*, 637 F. Supp. 2d 370 (W.D. La. 2009), *affirmed*, 344 Fed. Appx. 907 (5th Cir. 2009) (Unpublished) (dismissing all claims for purely economic loss under Louisiana law because the plaintiffs lacked "a proprietary interest in any property that was damaged and have not alleged injuries either to themselves or to their property."). This principle extends to claims regardless of whether they are grounded in negligence or products liability. *See Phillips v. G&H Seed Co.*, 08-934, at *7 (La. App. 3 Cir. 4/8/09), 10 So. 3d 339, 344-45 (holding that customers of crawfish farmers whose stock was damaged by seed treatment had no claim for economic loss under a products liability theory because the customers had no proprietary interest in the crawfish).

Considering the above, all of the Government Plaintiffs' claims against Weatherford for purely economic loss should be dismissed with prejudice.

## III.   CONCLUSION

The Government Plaintiffs fail to state a claim against Weatherford upon which relief may be granted. OPA is exclusive and mandatory. The Government Plaintiffs cannot seek damages from Weatherford under non-OPA theories of liability, including both General Maritime Law and state law, when all of the damages sought by the Government Plaintiffs are clearly enumerated damages under OPA. OPA's savings clause, Section 2718, does not preserve the state law claims asserted by the Government Plaintiffs. Moreover, OPA does not provide for the recovery of punitive damages. Therefore, all claims against Weatherford should be dismissed with prejudice.

{N2303156.3}

Even in the absence of OPA, OCSLA dictates that only two sources of law may potentially apply to the Government Plaintiffs' claims: the General Maritime Law or Louisiana law. Therefore, the laws of Texas, Mississippi, Alabama, and Florida cannot apply to the Government Plaintiffs' claims; and all claims under Texas, Mississippi, Alabama, and Florida must be dismissed with prejudice. Furthermore, neither the General Maritime Law nor Louisiana law permits the Government Plaintiffs to seek pure economic damages without physical damage to property in which the plaintiff has a propriety interest. Accordingly, all claims by the Government Plaintiffs for purely economic damage should be dismissed with prejudice.

This 3rd day of June, 2011.

Respectfully submitted:

/s/ *Glenn G. Goodier*
GLENN G. GOODIER (#06130)
RICHARD D. BERTRAM (#17881)
LANCE M. SANNINO (#29409)
Jones, Walker, Waechter, Poitevent,
  Carrère & Denègre, L.L.P.
201 St. Charles Avenue. 48th Floor
New Orleans, Louisiana  70170-5100
Telephone:    (504) 582-8174
Facsimile:    (504) 589-8174

MICHAEL G. LEMOINE, T.A. (#8308)
GARY J. RUSSO (#10828)
DOUGLAS C. LONGMAN, JR. (#8719)
Jones, Walker, Waechter, Poitevent,
  Carrère & Denègre, L.L.P.
600 Jefferson Street, Suite 1600
Lafayette, , Louisiana  70501-5100
Telephone:     (337) 262-9024

*Counsel for Weatherford U.S., L.P.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2011, the above and foregoing has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with the Court's Pretrial Order No. 12, on November 1, 2010.

*/s/  Glenn G. Goodier*