UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG          :    MDL NO. 2179
      "DEEPWATER HORIZON" in the     :
      GULF OF MEXICO, on             :    SECTION:  J
      APRIL 20, 2010                 :
                                     :    JUDGE BARBIER
                                     :    MAG. JUDGE SHUSHAN
**THIS DOCUMENT RELATES TO**             :
**10-4183**                              :
                                     :
                                     :
                                     :

. .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .

**MEMORANDUM IN SUPPORT OF DEFENDANT CAMERON INTERNATIONAL
CORPORATION'S MOTION TO DISMISS**

Defendant Cameron International Corporation ("Cameron") respectfully submits this memorandum in support of its motion to dismiss the causes of action asserted against it in the State of Alabama's First Amended Complaint (Doc. 1872: "Complaint").

**SUMMARY OF ARGUMENT**

Just as with the other lawsuits in this proceeding that seek relief as a result of the oil spill from the Macondo well, the Complaint of the State of Alabama ("Alabama") is governed by two federal statutes:  the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C.A. §§ 1331-56a, and the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C.A. §§ 2701-20.

1.  OCSLA extends the "laws . . .  of the United States . . . to the subsoil and seabed of the outer Continental Shelf and . . . all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom;" federal law is extended to those installations and devices "to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State."  43 U.S.C. § 1333(a)(1).  The only

installations or devices excluded from this extension of federal law are "ship[s] or vessel[s]" being used "for the transportation of" oil and gas. *Id.* This means that when a drilling vessel is not being used for transportation, but instead is latched up and "attached to the seabed" for exploration and development of hydrocarbons in the subsoil, Congress deliberately has provided that federal law governs such oil drilling activity in the same manner as if it were a land-based activity in a federal enclave within a state.

This case arises from oil and gas development activities in the subsoil of the outer continental shelf and an oil spill from installations and devices erected on and attached to the seabed. It falls squarely within the statutorily defined area of exclusive federal jurisdiction and thus is subject to the exclusive application of federal law.

2. OPA is the principal federal law made applicable to this case by OSCLA. Under OCSLA, the law of the adjacent state, here Louisiana, also is adopted "as the law of the United States," but only to the extent that it is "applicable and not inconsistent" with other federal law. *Id.* § 1333(a)(2)(A). Alabama invokes the remedies of OPA only against Defendants other than Cameron, and does not base its claims against Cameron on Louisiana law. Instead, Alabama seeks recovery from Cameron under general maritime law and the common law and statutes of Alabama. But as a matter of superseding federal law, neither maritime law nor the law of Alabama can apply to the facts of this case.

i. In enacting OCSLA, Congress determined that offshore drilling rigs on the outer continental shelf are "not themselves to be considered within maritime jurisdiction." *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 365-66 (1969). Congress then amended OCSLA in 1978 to confirm, and make more explicit, that all drilling rigs attached

1058793v.1

to the seabed fall outside the maritime jurisdiction. After those amendments, the Supreme Court expressly reiterated that "exploration and development of the Continental Shelf are not themselves maritime commerce." *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 425 (1985). Accordingly, as the Fifth Circuit has held, activities "connected with the development of the Outer Continental Shelf and an installation for the production of resources there . . . are insufficiently connected to traditional maritime activity to support the application of admiralty law." *Texaco Exploration and Production, Inc. v. AmClyde Engineered Products Co., Inc.*, 448 F.3d 760, 771 (5th Cir.), *cert. denied*, 549 U.S. 1053 (2006). The allegations in this case involve a well blowout from the subsoil of the outer continental shelf resulting in an oil spill into the Gulf of Mexico released from well appurtenances approximately a mile below the surface of the water. This is a quintessential OCSLA case, involving as it does an accident on an OCSLA situs resulting from oil exploration and development activities. Even more so than in *AmClyde*, therefore, "OCSLA does not permit the application of substantive maritime law." *Id.* at 772.

ii. By making the subsoil and seabed of the outer continental shelf and all appurtenant devices an area of exclusive federal jurisdiction subject exclusively to federal law, OCSLA explicitly preempts all state law other than the law of the adjacent state adopted as surrogate federal law. *Rodrigue*, 395 U.S. at 355-58. The OPA savings clause, 33 U.S.C. § 2718, does not change this result, because it does not limit OCSLA's preemptive effect. *See United States v. Locke*, 529 U.S. 89 (2000). Moreover, even apart from OCSLA the Supreme Court has repeatedly held that the law of an affected state like Alabama cannot be applied to a pollution discharge originating outside the state. *International Paper Co. v.*

1058793v.1

*Ouellette*, 491 U.S. 481, 488 (1987); *Illinois v. Milwaukee*, 406 U.S. 91 (1972); *see Arkansas v. Oklahoma*, 503 U.S. 91, 98-100 (1992).

3.   The Complaint does not assert that Cameron is liable to Alabama under OPA, for good reason.  Claimants may pursue claims under OPA only against persons designated as "responsible parties," 33 U.S.C. § 2713(c), and it is undisputed not only that Cameron has not been designated a "responsible party" but also that OPA provides Alabama with extraordinarily broad rights to recover its oil spill claims against defendants who are OPA-defined "responsible parties" without proof of fault.  *See* Complaint ¶¶ 205-19; 33 U.S.C. § 2702.  Consequently, the only body of law potentially available to Alabama is that of Louisiana, and then only if applicable Louisiana law is "not inconsistent with" OPA.  43 U.S.C. § 1333(a)(2).  The crux of any claim by Alabama against Cameron, therefore, must rest on a demonstration that application of Louisiana law would not be inconsistent with OPA.

4.   OPA and OCSLA, however, foreclose any claim that could be asserted by Alabama under Louisiana law.  OPA establishes a comprehensive and exclusive statutory procedure for the assignment of responsibility and payment of compensation for injuries that result from the discharge of oil from, *inter alia*, an outer continental shelf facility like the Macondo well.  33 U.S.C. §§ 2701(22), (25), (32)(C) and 2702(a).  This statutory procedure centers on the designation of defined "responsible parties," *id.* § 2701(32), who are made liable without proof of fault for all the categories of removal costs and damages of the kind claimed by Alabama in its Complaint, *id.* §§ 2702(a), (b).

OPA further mandates that "all claims . . . shall be presented first to the responsible party."  33 U.S.C. §§ 2713(a).  If a claim is either denied or not paid within 90 days,

1058793v.1

the claimant may sue "the responsible party."  *Id* § 2713(c).  If that suit does not result in full recovery, the claimant may present a claim for the amount of its uncompensated damages to the Oil Spill Liability Trust Fund.  *Id.* § 2713(d).  OPA does not authorize claimants to sue persons other than defined "responsible parties" or their statutory "guarantors."   Instead, when a responsible party pays compensation to a claimant, the responsible party becomes subrogated to "all" causes of action "that the claimant has under any other law."  *Id.* § 2715(a).

OPA thereby prescribes a streamlined remedial procedure under which claimants may recover specified removal costs and damages from responsible parties without proving fault, with ultimate financial responsibility to be determined later in subrogation actions brought by the responsible parties against any third parties who may be liable under other law for part or all of the resulting damages.  In this way, OPA prescribes a preclusive remedial process governing the handling of claims against both responsible parties and other potentially liable third parties.

By prohibiting the application of adjacent–state law that is inconsistent with federal law, OCSLA forecloses any attempt by a claimant to bypass this streamlined remedial process.  Direct pursuit of oil spill claims against third parties like Cameron runs directly counter to the deliberate congressional determination that "litigation . . . over liability, defenses, or the propriety of claims **should be reserved for subrogation actions** against dischargers."  S. Rep. 101-94, 101st Cong., 1st Sess. 1989, 1990 U.S. Code Cong. & Admin. News 722, 732 (emphasis added).  Consequently, to the extent that Louisiana remedial law would permit Alabama to pursue claims against Cameron, it is irretrievably inconsistent with OPA and thus cannot be borrowed as surrogate federal law under OCSLA.

5.  In any event, in this case it is not necessary to consider the possible application of Louisiana law. Alabama has deliberately staked its claims against Cameron exclusively on maritime and Alabama law and makes no effort to state any claim under Louisiana law.

6.  The Court should not hesitate to dismiss Alabama's claims against Cameron. To the extent that its claims under OPA are valid, Alabama has recovered and will recover from BP and perhaps other designated responsible parties without proof of fault.

Moreover, because BP and others have already cross-claimed against Cameron under OPA's subrogation provision for recovery of their payments of past and future oil spill claims, Cameron will not escape litigation over its legal responsibility, if any, and will not escape any validly imposed liability, including liability based on past or future payment of Alabama's claims.  Dismissal of the superfluous and redundant Alabama claims against Cameron complies with OCSLA and OPA, serves the ends of efficient judicial administration, and is both fair and just.

## ARGUMENT

### The Complaint Should Be Dismissed For Failure To State
### A Claim Against Cameron For Which Relief Can Be Granted.

**A. This Case Falls Within The Area Of Exclusive Federal Jurisdiction Defined By OCSLA.**

OCSLA is the legislative outgrowth of executive and judicial orders and rulings affirming national sovereignty over coastal waters and the outer continental shelf.  *See Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 479 n. 7 (1981).  Alabama's claims against Cameron must be analyzed in light of that judicial and legislative history, which decisively rejects state sovereignty over resource development activities on the outer continental shelf.

1058793v.1

In Presidential Proclamation 2667, issued on September 8, 1945, President Truman asserted the sovereignty of the United States over the natural resources of the subsoil and seabed of the entire continental shelf off the nation's coast.  To implement this proclamation, the United States brought original actions against the coastal states in the Supreme Court, now known as the Tidelands Cases, to establish the national government's authority, power, and control over the continental shelf.  *See, e.g.*, *United States v. California*, 332 U.S. 19 (1947). The states responded by asserting sovereignty over marginal belts of the shelf lying immediately seaward of their coasts, but the Supreme Court rejected these states claims.  *See Gulf Offshore*, 453 U.S. at 479 n.7 (citing cases).  In the *California* case, for example, where the state had asserted sovereignty over a marginal three-mile belt off its coast, the Supreme Court held "that the Federal Government rather than the state has paramount rights in and power over [the three-mile] belt, an incident to which is full dominion over the resources of the soil under that water area, including oil." 332 U.S. at 38-39.

In response, Congress enacted the Submerged Lands Act in 1953.  That legislation in effect quitclaimed to the coastal states a three-mile marginal belt lying seaward of the coast, 43 U.S.C. § 1311 (*see* definition of covered lands in 43 U.S.C. § 1301(a)), but reaffirmed the sovereignty of the United States and its control over resources lying seaward of the three-mile belt, *id*. § 1302.  In addition, Congress enacted OCSLA, declaring that "the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control and power of disposition."  43 U.S.C. § 1332(1), quoted as originally enacted in *Rodrigue*, 395 U.S. at 356 & n.2.  The "outer" continental shelf was (and still is)

1058793v.1

defined generally as the continental shelf lying seaward of the coastal states' three-mile marginal belt.  43 U.S.C. § 1331(a).

OCSLA further serves "to define a body of law applicable" to oil and gas activities on the outer continental shelf.  *Rodrigue*, 395 U.S. at 356.  As originally enacted, the statute extended federal law to the outer continental shelf and, in particular, to oil and gas development activities from "artificial islands and fixed structures."  43 U.S.C. § 1333(a)(1).  To the extent applicable and not inconsistent with federal law, the law of the adjacent state was adopted as surrogate federal law also applicable to those same activities.  43 U.S.C. § 1333(a)(2).

OCSLA was amended in 1978.  Following those amendments, its key provisions read as follows:

> (1)    The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a state.

> (2) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary [of Interior] now in effect or hereafter adopted, the civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf, . . .

43 U.S.C. § 1333(a).  The only "vessels" excluded from the coverage of OCSLA, therefore, were those involved in transporting produced resources.

1058793v.1

As can be seen, when OCSLA was amended in 1978, Congress rewrote subsection (a)(1), changing "fixed structures" to "all installations and other devices permanently or temporarily attached to the seabed," while leaving subsection (a)(2) unchanged.   H. CONF. REP. NO. 95-1474, 95th Cong., 2nd Sess., 1978 U.S. Code Cong. & Admin. News 1674, 1679-80. The congressional conferees took care to explain that the change in (a)(1) was "technical and perfecting and is meant to restate and clarify and not change existing law."   *Id.* at 1679.   In other words, the phrases "artificial islands" and "fixed structures," which had been used in the original version of subsection (a)(1) and remained in subsection (a)(2) after the 1978 amendments, were understood to include all offshore drilling devices or installations permanently or temporarily attached to the seabed for the purpose of oil and gas development from the subsoil of the outer continental shelf.   *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 496-98 (5th Cir. 2002). Subsection (a)(2) was left as is, out of concern that repetitive clarification would be misconstrued as a substantive change.   H. CONF. REP. NO. 95-1474, 1978 U.S. Code Cong. & Admin. News at 1680.

The 1978 legislative history elaborates upon the meaning and significance of this clarifying amendment.   "Federal law is to be applicable to all activities on all devices in contact with the seabed for exploration, development, and production."   H. CONF. REP. NO. 95-1474, 1978 U.S. Code Cong. & Admin. News at 1679.   "Federal law is, therefore, to be applicable to activities on drilling ships, semi-submersible drilling rigs, and other water-craft, when they are connected to the seabed by drillstring, pipes or other appurtenances, on the OCS for exploration, development, or production purposes."   H. REP. NO. 95-590, 95th Cong., 1st Sess., 1978 U.S. Code Cong. & Admin. News 1450, 1534.   A crucial test for applying OCSLA, therefore, is

1058793v.1

whether the activities in question involved exploration, development, or production equipment that was in contact with the seabed.

This case unquestionably passes that test. The oil development project at the heart of this case, as this Court already has determined, is subject to federal jurisdiction by reason of OCSLA. *See* Document # 470 (order denying State of Louisiana motion to remand). Although at certain points it seems deliberately constructed to avoid conceding the issue, Alabama's Complaint confirms in many particulars that this case falls within the exclusive federal jurisdiction defined by OCSLA and thus requires the exclusive application of federal law.

At its core, Alabama's Complaint addresses oil drilling and completion activities permitted by a federal oil lease covering hydrocarbon reservoirs in the subsoil of the outer continental shelf known as the "Macondo" prospect, "where the spill originated." Complaint ¶ 8. That site lies "on the Outer Continental Shelf 48 miles off the coast of Louisiana." *Id.* ¶ 38. The "Drilling Defendants" were "conducting drilling operations in excess of 18,000 feet deep" into the subsoil of the "Northern Gulf of Mexico." *Id.* ¶ 46. The Complaint alleges a "disaster at the Macondo well." *Id.* ¶ 65.

Fundamentally, the Complaint alleges an accident arising from "temporary well abandonment activities" by the Drilling Defendants – the named BP, Transocean, Halliburton and M-I defendants – whose "actions caused and/or contributed to the Spill." *Id.* ¶ 21. The fundamental duty alleged by the Complaint is a "duty to exercise reasonable care while participating in drilling operations" in order "to ensure that a blowout and subsequent oil spill did not occur as a result of such operations." *Id.* ¶ 101. Secondarily, the Complaint alleges a duty of care with respect to spill response in the event "crude oil discharged in the event of a blowout."

1058793v.1

The spill at issue allegedly occurred, therefore, in the course of operations of the kind specifically identified as "development" in OCSLA, i.e., "activities which take place following discovery of minerals in paying quantities, including . . . drilling . . . and which are for the purpose of ultimately producing the minerals discovered."  43 U.S.C. § 1331(l).

The Complaint confirms this focus on oil drilling and development activities in many particulars.  The Drilling Defendants allegedly "made reckless decisions about well design, cementing, and well integrity testing" during the temporary abandonment process.  Complaint ¶ 49.  Those decisions involved allegedly improper design and metal for the well casing, ¶¶ 50-51; potential failure of a "float collar installed on the final section of casing;" ¶ 52; allegedly faulty circulation of mud within the well, ¶ 54; a failure to "secure the wellhead," ¶ 55; allegedly faulty cementing at the bottom of the well, ¶ 56; and alleged mistakes related to the well's blowout preventer ("BOP"), ¶¶ 57-64.  Cementing took place at the "bottom of the casing pipe."  *Id.* ¶ 191.  The BOP was "installed at the Macondo wellhead," ¶ 22, was allegedly intended to cut "off the flow of oil at the wellhead," ¶ 151, and was therefore "retrieved from the sea floor" for ongoing investigations, ¶ 65.  The Complaint alleges additional errors made in the temporary well abandonment process.  *Id.* ¶ 68.

The Complaint summarizes its allegations by claiming that all Defendants "failed to take measures to prevent damage to the State" resulting from the "dangers of deep water drilling" at the Macondo Well.  *Id.* ¶¶ 70, 101.  The Complaint then alleges the particular involvement of each Defendant in drilling operations that is alleged to have caused damage to Alabama.  *Id.* ¶¶ 110, 112, 137-44 (Transocean Defendants); ¶¶ 112-15, 137-44 (BP Defendants); ¶¶ 116-18, 137-44, 137-44, 186-204 (Halliburton); ¶¶ 119-21 (M-I); ¶¶ 122-25,

1058793v.1

148-68 (Cameron); ¶¶ 126-28, 169-85 (Weatherford).  The Anadarko and MOEX defendants were sued solely because of their alleged knowledge "of the potentially disastrous conditions at the well site." *Id.* ¶ 129.

The Complaint, of course, alleges damage to Alabama's interests resulting from the oil spill. Complaint ¶¶ 79-93, 135.  Additional allegations in the Complaint repeatedly confirm that, as alleged in paragraph 8, the Macondo well was "where the spill originated."  The Complaint alleges that "dispersants were employed both on the surface and at the wellhead 5,000 feet below the surface," and criticizes the "[m]ixing [of] the dispersants with the oil at the wellhead."  *Id.*  The Complaint alleges that the appropriate "blowout response" was to "kill the well." *Id.* ¶ 130.  The Complaint repeatedly refers to a well "blowout and subsequent oil spill" or to a failure to minimize a blowout from the well as having contributed to the spill.  *Id.* ¶¶ 102, 139, 159, 177, 195.

The Complaint's allegations all locate the oil spill at the well.  Neither the Complaint nor any party has ever suggested that oil reaching Alabama had been released from the sunken *Deepwater Horizon*.  The Complaint's theories of liability (other than OPA) all rely on allegations that the spill was caused or contributed to by human or equipment errors in the well drilling process, not any errors in traditional maritime activity.  It is evident that the case as a whole and the claims against Cameron in particular involve oil and gas development activities in the subsoil and fixed structures erected in the subsoil and on the seabed of the outer continental shelf, as described in and governed by OCSLA.  The Complaint alleges, in short, an archetypal OCSLA case.

**B.  Under OCSLA, The Bodies Of Law Actually Or Potentially Governing This Case Are OPA And The Law Of Louisiana; Neither General Maritime Law Nor The Law Of Any State Other Than Louisiana Applies.**

OCSLA extends the "laws . . . of the United States . . . to the subsoil and seabed of the outer Continental Shelf."  43 U.S.C. § 1333(a)(1).  This means, of course, that OPA, like all other federal laws, is extended to cover the area of exclusive federal jurisdiction defined by OCSLA.  In turn, OPA provides a comprehensive regime assigning liability and providing remedies with respect to claims arising from the discharge of oil "into or upon the navigable waters or adjoining shorelines."  33 U.S.C. § 2702(a).  Under the terms of OCSLA and OPA, OPA squarely governs this case.

In enacting OCSLA, Congress was aware that existing federal law was not fully comprehensive and that it would be expedient to use "state law . . . to fill federal voids." *Rodrigue*, 395 U.S. at 358.  OCSLA therefore provides that "[t]o the extent that they are applicable and not inconsistent with . . . other Federal laws . . . the civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf . . . which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf."  43 U.S.C. § 1333(a)(2).

In this case Louisiana is the pertinent "adjacent State" within the meaning of OCSLA.  The Macondo well is located "on the Outer Continental Shelf 48 miles off the coast of Louisiana."  Complaint ¶ 38.  Under Federal Rule of Evidence 201(b) and (d), the Court may take judicial notice from the NOAA map attached as Exhibit A that, in the language of 43 U.S.C. § 1333(a)(2), the Macondo well "would be within the area of [Louisiana] if its boundaries were

1058793v.1

extended seaward to the outer margin of the outer Continental Shelf." *See also Snyder Oil Co. v. Samedan Oil Co.*, 208 F.3d 521 (5th Cir. 2000).

In resolving the issues raised by Alabama, therefore, the Court must look first to OPA and then, to the extent that it is not inconsistent with OPA or other federal law, the law of Louisiana. Yet the Complaint asserts claims against Cameron sounding in negligence, gross negligence, and product liability under general maritime law, ¶¶ 94-168; in negligence, nuisance, and trespass claims under the common law of Alabama, ¶¶ 220-246; and in statutory claims under the environmental laws of Alabama, ¶¶ 282-327. Those claims are not viable. Neither maritime law nor the law of any state other than Louisiana (adopted as surrogate federal law under OCSLA) applies to Alabama's claims against Cameron in the circumstances of this case.

### 1. **General Maritime Law Does Not Apply.**

Given Alabama's invocation of general maritime law in its amended Complaint, Cameron must again explain why general maritime law does not apply.

The Supreme Court has long made it known that OCSLA, where it applies, preempts general maritime law. Even before OCSLA's enactment the Court "specifically held that drilling platforms are not within admiralty jurisdiction." *Rodrigue*, 395 U.S. at 360, citing *Phoenix Construction Co. v. The Steamer Poughkeepsie,* 212 U.S 558 (1908). As the Court said in *Rodrigue*, "Congress assumed that the admiralty law would not apply unless Congress made it apply, and then Congress decided not to make it apply." 395 U.S. at 361. The Supreme Court bluntly reiterated this conclusion in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 101 (1971): "comprehensive admiralty law remedies [do not] apply under § 1333(a)(1)."

1058793v.1

14

The decision in *Rodrigue* was based on "careful scrutiny" of OCSLA's legislative history.  395 U.S. at 363.  This history revealed that Congress had considered at length what body of law should govern the facilities described in the statute and had concluded that "maritime law was inapposite."  *Id*.  Congress chose instead to borrow the law of the adjacent state, in part because of "the close relationship between the workers on the island and the adjacent States."  *Id*.  Congress intended the law of the adjacent state "to be used when Federal statutes or regulations of the Secretary of the Interior are inapplicable."  *Id*. at 357-58.  It was not necessary even to mention maritime law in this context, for it was understood that the exploration and production facilities identified in OCSLA "were not themselves to be considered within maritime jurisdiction."  *Id*. at 366.  Following the precept that "[e]ven in admiralty . . . where the federal judiciary's lawmaking power may well be at its strongest, it is our duty to respect the will of Congress," *Northwest Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 96 (1981), the Court, ever since its decision in *Rodrigue*, has steadfastly refused to permit maritime law to encroach upon the area of exclusive federal jurisdiction defined by OCSLA.

The accident in *Rodrigue* occurred on "fixed structures" in the nature of "artificial island drilling rigs located on the outer Continental Shelf," and the Court concluded that OCSLA "deliberately eschewed the application of admiralty principles to these novel structures."  395 U.S. at 352, 355.  The facts in *Chevron Oil* were similar.  404 U.S. at 98-99.  Both *Rodrigue* and *Chevron Oil* were decided before OCSLA was amended in 1978 to clarify that the phrase "fixed structures" refers to "all installations and other devices permanently or temporarily attached to the seabed."  But as explained above, this amendment had no substantive significance; it did not

1058793v.1

open the door for the intrusion of general maritime law into the OCSLA domain. The amendment made no change in the "operative assumption underlying the statute: that admiralty jurisdiction generally should not be extended to accidents in areas covered by OCSLA." *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 218 (1985).

Furthermore, as later decisions have demonstrated, the inapplicability of general maritime law stems not only from the physical connection between drilling structures and the seabed – a connection high-lighted by the statute both before and after its amendment – but also, and independently, from the non-maritime nature of the activities of "exploring for, developing, or producing resources" that lie at the heart of the area of "exclusive Federal jurisdiction" that OCSLA defines. 43 U.S.C. § 1333(a)(1). A case in point is *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 421 (1985), where the Court explicitly disapproved the lower court's erroneous determination that "offshore drilling is maritime commerce." The Court reiterated the reasoning of *Phoenix* ("drilling platforms [are] not even suggestive of traditional maritime affairs") and reaffirmed its earlier determination in *Rodrigue* that "exploration and development of the Continental Shelf are not themselves maritime commerce." *Id*. at 422, 425.

The Supreme Court discussed the proper reach of maritime law outside the OCSLA context in *Sisson v. Ruby*, 497 U.S. 358 (1990), and *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995). The availability of maritime law, the Court explained, depends on satisfying "conditions both of location and of connection with maritime activity." *Grubart,* 513 U.S. at 534. The requirement that both such conditions be met further emphasizes the unavailability of maritime law in cases like this. Cases involving "devices permanently or temporarily attached to the seabed, . . . erected thereon for the purpose of

exploring for, developing or producing resources," 33 U.S.C. § 1333(a)(1), do not satisfy either condition, let alone both conditions, identified in *Grubart* and thus plainly do not implicate maritime law.  They do not satisfy the condition of location, because Congress "deliberately eschewed the application of admiralty principles to these novel structures." *Rodrigue*, 395 U.S. at 355.  Neither do they satisfy the condition of connection with maritime activity.  That condition is met only "if the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity," *Grubart*, 513 U.S. at 534, and as the Court has repeatedly stated, "exploration and development of the Continental Shelf are not themselves maritime commerce." *Herb's Welding*, 470 U.S. at 425.  General maritime law simply does not apply in archetypal OCSLA cases such as this.

Subsequent decisions of the federal appellate courts further confirm this conclusion.  In *Union Texas Petroleum Corp. v. PLT Engineering, Inc*., 895 F.2d 1043, 1047 (5th Cir. 1990), the Fifth Circuit sought to synthesize Supreme Court precedent into a three-part test, asking (1) whether the controversy arose on a situs covered by OCSLA, (2) whether maritime law applied of its own force, and (3) whether state law was consistent with federal law. *See also Grand Isle Shipyard, Inc. v. Seacor Marine, L.L.C*., 589 F.3d 778, 783-89 & n.9 (5th Cir. 2009) (en banc).  It is apparent that the first two parts of this test derive from the conditions of location and connection identified in *Sisson* and *Grubart*.

*PLT Engineering* involved the construction of a gathering line on the seabed of the outer continental shelf, an OCSLA situs.  The court understood that *Rodrigue* "precludes the application of maritime law except in those cases where the subject matter of the controversy bears [a] significant relationship to traditional maritime activities." *Id*. at 1048, quoting *Laredo*

*Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1231 (5th Cir. 1985).  The court

determined that the "significant relationship" test had not been met:

> While some maritime operations were undoubtedly contemplated, the
> principal obligation of PLT and the subcontractors was to build the
> gathering line and connect it to the platform and the transmission line.
> These activities are not traditionally maritime.  Rather they are the
> subjects of oil and gas exploration and production.

*Id*. at 1049.

The Fifth Circuit's more recent decision in *Texaco Exploration and Production,*

*Inc. v. AmClyde Engineered Products Co.*, 448 F.3d 760 (5th Cir.), *cert. denied*, 549 U.S. 1053

(2006), is similar.  That case involved an accident that occurred during construction of a tower

for a drilling rig.  Because the accident happened on a vessel that was not itself attached to the

seabed, the parties apparently assumed that maritime law governed.  The court determined,

however, that it would "not rely upon the parties' bare conclusion that substantive maritime law

applies because OCSLA provides its own choice of law rules."  *Id.* at 772.  The court closely

analyzed the facts in light of the relevant authorities and concluded that maritime law did not

apply.  With respect to location, the court noted that although the accident may have occurred on

a vessel, "the claims are inextricably linked to the construction of a platform permanently fixed

to the Shelf for the purposes of development and would not have arisen but for such

development."  *Id.* at 774.  With respect to connection, the court determined that activities

"connected with the development of the Outer Continental Shelf and an installation for the

production of resources there . . . are insufficiently connected to traditional maritime activity to

support the application of admiralty law."  Id. at 771.  In these circumstances, the court

concluded that "OCSLA does not permit the application of substantive maritime law."  *Id.* at

1058793v.1

772.  In particular, the court noted that the involvement of a vessel "in the accident and other elements of maritime activity that precede or surround the compliant tower's construction on the Shelf are insufficient to support either admiralty jurisdiction or the application of substantive maritime law."  *Id.* at 775.

If general maritime law did not apply in *AmClyde*, and it did not, *a fortiori* it does not apply here.

(1) *Situs.*  The accidental discharge of oil on which the Alabama claims are based occurred at a situs explicitly identified in OCSLA.  The Macondo well from which the oil spilled was indisputably a "fixed structure" that was "attached" to the "subsoil" and "seabed" within the meaning of OCSLA.  The "oil spill originated" from the Macondo well in the OCS subsoil and flowed out of the well's integrated devices on the OCS seabed.  Complaint ¶ 8.  The situs test is indisputably met.

(2) *Activities.*  The oil spill occurred, moreover, as the result of activities – oil and gas exploration and development operations – that have repeatedly been held to have no substantial relationship to traditional maritime activity.  The facts here do not satisfy either, let alone both, of the *Grubart* conditions of location and of connection with maritime activity.  To the extent that Alabama relies on general maritime law, therefore, it has failed to state a claim against Cameron for which relief can be granted.

To be sure, *Grubart* recognized that the condition of connection with maritime activity has a second component – "whether the incident has a potentially disruptive impact on maritime commerce," 513 U.S. at 534 – that concededly was met in this case.  But that general consideration does not change the result in the OCSLA context.  *First*, the fundamental meaning

of *Rodrigue* is that OCSLA has identified and carved out a domain in which maritime law has no application; Congress determined that structures attached to the seabed for the purpose of exploration and development, "though surrounded by the high seas, were not themselves to be considered within the maritime jurisdiction."   395 U.S. at 365-66.   *Second*, disruption of maritime commerce is only suggestive, not determinative, of maritime jurisdiction; for example, the negligent demolition of a bridge during highway construction may disrupt navigation but nonetheless raise no issue of maritime law.  In determining the applicability of maritime law the core inquiry is whether the activity in question had a "substantial relationship" with "traditional maritime activity," *Sisson*, 497 U.S. at 365, and that inquiry here must be answered in the negative.   *See, e.g., Herb's Welding*, 470 U.S. at 422 ("drilling platforms [are] not even suggestive of traditional maritime affairs").   *Third*, where maritime commerce is disrupted by a discharge of oil into or upon navigable waters, Congress has chosen a different, non-maritime, means of resolving controversy; the "very specific treatment of oil pollution in the OPA . . . supplanted general admiralty and maritime law."   *South Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65-66 (1st Cir. 2000) ("Congress intended the OPA to be the exclusive law governing oil spills").   *Accord, Gabarick v. Laurin Maritime (America) Inc.*, 623 F.Supp.2d 741, 746 (E.D. La. 2009); *Clausen v. M/V New Carissa*, 171 F.Supp.2d 1127, 1133 (D. Or. 2001); *Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp*, 924 F.Supp. 1436, 1447 (E.D. Va.), *aff'd w/o published opinion*, 122 F.3d 1064 (4th Cir. 1997), *cert. denied*, 523 U.S. 1021 (1998).

Congress has twice concluded that maritime law should not apply to specified accidents in federal waters; first in OCSLA for oil development activity on the outer Continental

1058793v.1

Shelf, and then in OPA for oil spills in navigable waters.  This case, involving an oil spill in navigable waters from oil development activities on the outer continental shelf, is doubly not a maritime case.

### 2.   The Laws Of States Other Than Louisiana Do Not Apply.

Perhaps understandably, Alabama invokes its own law as a fallback to general maritime law, presumably on the ground that oil from the spill physically reached coastal property, or alternatively, that under appropriate choice of law rules the law of Alabama rather than Louisiana should control.  But under OCSLA, Alabama law cannot be invoked.  Oil and gas development on the outer continental shelf is subject to exclusive federal jurisdiction under OCSLA, and federal law alone (including, however, the law of the adjacent state borrowed as surrogate federal law) governs claims arising from the discharge of oil from the subsoil and seabed of the outer continental shelf and the installations and structures thereon.  43 U.S.C. § 1333(a); *Gulf Offshore Co. v. Mobil Oil Corp*, 453 U.S. 473, 480-81(1981); *Chevron v. Huson*, 404 U.S. at 101-05; *Rodrigue*, 395 U.S. at 355 ("federal law is 'exclusive,'" so that "state law is adopted only as surrogate federal law").  The statute leaves no room in this case for application of Alabama law.

It makes no difference that the spilled oil may have reached Alabama's waters or soil.  It has long been understood that the law of an impacted state does not govern interstate oil pollution, even when the pollution migrates into state waters and onto state land.  *Illinois v. Milwaukee*, 406 U.S. 91 (1972); *see also International Paper Co. v. Ouellette*, 491 U.S. 481, 488 (1987) ("the implicit corollary of [*Milwaukee I*] was that state common law was pre-empted").  Instead, "regulation of interstate water pollution is a matter of federal, not state law." *Ouellette*,

1058793v.1

491 U.S. at 488, citing *Milwaukee I*, 406 U.S. at 102 n.3; *see also Arkansas v. Oklahoma*, 503 U.S. 91, 99-100 (1992) (citing *Illinois v. Milwaukee* and quoting *Ouellette*, 491 U.S. at 487, for the proposition that under existing federal law, "the only state law applicable to an interstate discharge is 'the law of the State in which the point source is located'").   As a legislative implementation of these general principles, and as a matter of the Supremacy Clause of the Constitution, OCSLA specifically provides that only federal law – including the possibility of borrowing Louisiana law as surrogate federal law – is applicable in the circumstances of this case.  Alabama law is not.

Similarly, it is well settled that OCSLA "supersede[s] the normal choice of law rules that the forum would apply."  *Gulf Offshore*, 453 U.S. at 482 n.8, citing *Chevron v. Huson*, 404 U.S. 97 at 102-03.  Choice of law is governed by OCSLA, and its choice of law provision calls only for the potential application of the law of the adjacent state borrowed as surrogate federal law; OCSLA does not permit the application or borrowing of the law of any other state. 43 U.S.C. § 1333(a)(2).

The OPA savings clause, 33 U.S.C. § 2718, does not alter this conclusion.  The savings clause provides that OPA itself does not preempt various state laws, but preemption here is prescribed not by OPA but by OCLSA.  Section 2718 does not disturb the exclusivity of federal law mandated by OCSLA.  This is made clear both by the statutory text and by the Supreme court's definitive construction and application of that text in *United States v. Locke*, 529 U.S. 89 (2000).

The OPA savings clause contains three subsections.  Subsection (a) provides that "nothing in this chapter," and also nothing in the maritime Limitation of Liability Act, precludes

1058793v.1

states from imposing additional liability.   33 U.S.C. § 2718(a).   Similarly, subsection (b) provides that "nothing in this chapter," and nothing in a specified provision of the federal tax code, precludes the creation of state compensation funds; and subsection (c) provides that "nothing in this chapter," the maritime Limitation of Liability Act, or the same provision of the tax code, bars either the states or the federal government from imposing additional liability or fines or penalties.   *Id*. §§ 2718(b), (c).   By its terms, therefore, section 2718 limits the preclusive reach only of OPA, the maritime Limitation of Liability Act, and a specific provision of the tax code; it does not speak to OCSLA or purport to curb OCSLA's preemptive force.   Section 2718 does preserve the operation of certain state laws with respect to discharges originating "within" state territorial waters; but it leaves the outer continental shelf, which Congress has expressly determined to be an "exclusive Federal jurisdiction," 43 U.S.C. § 1333(a)(1), subject solely to federal law in the manner prescribed by OCSLA. Of course, in cases outside the reach of OCSLA the OPA savings clause is fully operative.   But the savings clause does not resuscitate state law that OCSLA has preempted.

This reading of the statute is confirmed by the Supreme Court's analysis of a similar savings clause in *Ouellette* and also by its definitive ruling with respect to section 2718 in *Locke*.   The decision in *Ouellette* demonstrates that statutory savings clauses like section 2718 must be strictly construed:   the Court addressed a savings clause in the Clean Water Act providing that "[n]othing in this section" preempts state law; it held that this broad savings clause "does not purport to preclude pre-emption of state law by other provisions of the Act."   479 U.S. at 493.

1058793v.1

By the same token, a savings clause like OPA § 2718, providing that "nothing in this chapter" preempts state law, does not preclude preemption of state law by other federal statutes, specifically including OCSLA.  This was, in essence, the holding in *Locke*.  In that case, the state of Washington argued that section 2718 had the effect of depriving the Port and Waterways Safety Act of preemptive effect.  The Supreme Court explicitly rejected that argument, holding that the savings clause means only what it says and nothing more, *i.e.*, that only "nothing **in this chapter**" is preemptive, and therefore "the pre-emptive effect of the [Port and Waterways Safety Act] and regulations promulgated under it are not affected by OPA."  529 U.S. at 107.  It follows in this case that the preemptive affect of OCSLA, like the Port and Waterways Safety Act in *Locke*, is not affected by the OPA savings clause.

OCSLA applies here in accordance with its terms, foreclosing both the application of state law of its own force and the use of state conflict of law rules to invoke state law other than that of the adjacent state adopted as surrogate federal law.  It follows that, to the extent the Complaint rests on Alabama law, it fails to state a claim for which relief can be granted.

## C. **Alabama Makes No Claim Against Cameron Under OPA Because It Has None**

Alabama has understandably, and correctly, chosen not to assert a cause of action against Cameron based upon OPA.  OPA makes only the "responsible party" liable for removal costs and damages, and it authorizes suit only against "the responsible party or guarantor."  33 U.S.C. § 2702(a), 2713 (c).  The term "responsible party" is defined as, "[i]n the case of a vessel, any person owning, operating, or demise chartering the vessel" and, "[i]n the case of an offshore facility . . . the lessee or permittee of the area in which the facility is located or the holder of a right of use and easement."  *Id*. § 2701(32)(A), (C).  The responsible parties in this case are

1058793v.1

Macondo prospect lessees BP, Anadarko, and MOEX, and *Deepwater Horizon* owner or operator Transocean, each of whom has been identified as a responsible party by the federal government.  *See* Complaint ¶¶ 208, 209.  It is undisputed that Cameron is not a responsible party under the statute.  Nor is Cameron a "guarantor," *i.e.*, "any person . . . who provides evidence of financial responsibility for a responsible party," 33 U.S.C. § 2701(13), and no one contends otherwise.

In short, OPA confers causes of action only against statutorily designated responsible parties and guarantors.  It does not provide Alabama with a cause of action against Cameron, and Alabama quite properly has refrained from asserting such a claim.

**D.  Taken Together, OPA And OCSLA Foreclose Any Claims Against Cameron Under Louisiana Law**

Although OCSLA provides for the adoption of Louisiana law as surrogate federal law for certain purposes in this case, 43 U.S.C. § 1333(a)(2)(A), Louisiana law applies only to fill "gaps in the federal law" – in other words, to provide governing law "when Federal statutes or regulations of the Secretary of the Interior are inapplicable."  *Rodriguez*, 395 U.S. at 357-58.  OCSLA does not allow the application of Louisiana law if and to the extent such law would be inconsistent with OPA or other federal law.  Because permitting Alabama to prosecute its oil spill claims against persons, like Cameron, who are not statutorily designated responsible parties would conflict with, and thereby be inconsistent with, OPA's comprehensive and preclusive remedial provisions, any state law purporting to authorize such suits may not be borrowed as surrogate federal law under OCSLA.

1.   **OPA Establishes A Comprehensive And Preclusive Remedial Process For The Resolution Of Claims Arising From The Discharge Of Oil In The Area Of Exclusive Federal Jurisdiction Defined by OCSLA**

OPA was enacted in the wake of the *Exxon Valdez* oil spill to provide a coherent set of federal rules to affix responsibility and provide compensation for injuries resulting from oil discharges "into or upon the navigable waters or adjoining shorelines or the exclusive economic zone."  33 U.S.C. § 2702(a).  OPA is therefore one of the federal laws – indeed, the principal federal law – that OCSLA extends to activities relating to oil development facilities attached to the subsoil and seabed of the outer continental shelf.  43 U.S.C. § 1333(a)(1).

OPA prescribes a streamlined, comprehensive, and exclusive remedial process pursuant to which designated responsible parties compensate claimants for the amount of their verifiable damages without requiring proof of fault.  Ultimate financial responsibility is then determined in separate litigation between the responsible parties who have paid compensation and any third parties who may be liable under other federal law, including law borrowed from the adjacent state, for having caused the discharge of oil.

The OPA remedial process focuses, first and foremost, on the statutorily designated responsible parties.  OPA makes these responsible parties liable, without proof of fault, for prescribed costs and damages: "Notwithstanding any other provision or rule of law, and subject to the provisions of this chapter, each responsible party for a vessel or a facility from which oil is discharged, . . . into or upon the navigable waters . . . is liable for [specified] removal costs and damages . . . that result from such incident."  *Id.* § 2702(a).

There are six such categories of removal costs and damages for which the defined "responsible parties" are liable without proof of fault.  *Id.* § 2702(b).  Three of the six explicitly

1058793v.1

permit recovery by a state trustee, § 2702(b)(2)(A) ("natural resource" damage), or "by a State," §§ 2702(b)(2)(D) ("net loss" of specified public revenues) and 2702(b)(2)(F) ("net costs" of increased public services).   To the extent that Alabama owns other real or personal property damaged by the spill, it may recover under subsection 2702(b)(2)(B).   Indeed, Alabama contends that it is entitled to recover its alleged damages from the oil spill under these provisions. Complaint ¶¶ 205-19.

OPA sets forth an administrative claims procedure that claimants must follow before bringing suit: "all claims for removal costs or damages shall be presented first to the responsible party or guarantor" (or, alternatively, to the Oil Spill Liability Trust Fund ("Fund") established pursuant to 26 U.S.C. § 9509).   33 U.S.C. § 2713(a) and 2701(11).   Alabama alleges that it has met and will continue to meet the presentment requirements.   Complaint ¶ 217.

If the claim is not paid within 90 days, "the claimant may elect to commence an action in court against the responsible party or guarantor or to present the claim to the Fund."  *Id.* § 2713(c).   Such lawsuits must be brought within three years.  *Id.* § 2717(f)(1).   In the event of litigation, the responsible party is entitled to assert only very narrowly circumscribed statutory defenses – specifically, that the discharge was "caused solely by" an act of God, an act of war, or certain independent acts of third parties.   *Id.* § 2703.   The responsible party also may assert statutory limits on liability, *id.* § 2704, but BP, indisputably the principal responsible party here, has waived those limits.  *See* Document # 559.

Once the responsible party or guarantor or the Fund "pays compensation pursuant to this chapter to any claimant for removal costs or damages," whether pursuant to the administrative claims procedure or litigation, the person paying such compensation "shall be

1058793v.1

subrogated to all rights, claims, and causes of action that the claimant has under any other law." 33 U.S.C. § 2715(a).  Actions on such subrogated claims must be brought within three years after payment of compensation.  *Id.* § 2717(f)(4).  BP has brought such a subrogation claim against Cameron, seeking recovery based on past and future payments to Alabama and other claimants. Document 2064.

OPA does not authorize claimants to sue persons other than statutory responsible parties.  Instead, OPA interposes the responsible party between the claimant and any such third parties.  "If the responsible party alleges that the discharge . . . was caused solely by the act or omission of a third party, the responsible party . . . shall pay removal costs and damages to any claimant; and shall be entitled to subrogation to all rights of . . . the claimant to recover [from the third party the amount of] removal costs or damages . . . [so] paid."  33 U.S.C. § 2702(d)(1)(B). If the third party is alleged to be only partially and not solely liable, the responsible party remains fully liable to the claimant but may bring a civil action for contribution against the third party.  *Id.* § 2709.  Any such claim for contribution must be brought within three years after entry of judgment or court-approved settlement establishing the responsible party's liability to the claimant.  *Id.* at § 2717(f)(3).

This comprehensive and carefully crafted remedial structure is straightforward and unambiguous: responsible parties are subject, for all practical purposes, to strict liability and must pay compensation to claimants who can prove that they incurred removal costs or damages covered by OPA.  Then, in separate litigation, the responsible parties may sue potentially liable third parties under other law to recover all or some of the compensation they paid to claimants.

1058793v.1

This statutory scheme does not allow claimants to pursue competing litigation against persons, like Cameron, who are not statutorily designated responsible parties.

The OPA legislative history confirms this understanding of the statute and makes clear that Congress deliberately chose to establish an exclusive statutory remedial procedure for the resolution of claims arising out of discharges of oil on the outer continental shelf.  OPA was consciously designed "to create a single Federal law providing cleanup authority, penalties, and liability for oil pollution."  S. REP. 101-94, 101st Cong., 1st Sess. 1989 ("S. REP."), 1990 U.S. CODE CONG. & ADMIN. NEWS 722, 730.  "[F]ollowing enactment, liability and compensation for oil pollution removal costs and damages caused by a discharge from a vessel or facility (as defined in this [bill]) will be determined in accordance with this [legislation]."  CONF. REP. 101-653, 101st Cong., 2nd Sess. 1990 ("CONF. REP."), 1990 U.S.C.C.A.N. 779, 802, repeating the language of S. REP., 1990 U.S.C.C.A.N. at 746-47.  "Wherever possible, the burden is to be on the discharger to first bear the costs of removal and provide compensation for any damages."  S. REP. at 732.  In particular, and most tellingly, the Senate Report admonishes that "litigation or lengthy adjudicatory proceedings over liability, defenses, or the propriety of claims **should be reserved for subrogation actions** against dischargers."  *Id.* (emphasis supplied).  This means that the liability of third parties like Cameron is to be adjudicated not in litigation brought directly by claimants but in subrogation actions brought by responsible parties after they have satisfied the claimants' demands for specified recovery compensable under OPA.

## 2.  Pursuit of Oil Spill Claims Against Third Persons Like Cameron Is Inconsistent With OPA.

Congress plainly understood and intended that OPA mandates payment by statutorily designated responsible parties first, without the need for complex and burdensome

1058793v.1

litigation over liability, and that OPA requires the resolution of more problematic issues under other law, including law adopted as surrogate federal law under OCSLA, in separate subrogation or contribution actions initiated by the responsible parties.  Congress left no room for lawsuits seeking to bypass this carefully crafted remedial procedure.  Neither the statutory text nor the legislative history allows claimants like Alabama to pursue litigation against both responsible parties and third parties who, like Cameron, are not responsible parties under the statute.

The litigation of oil spill claims against third parties like Cameron is plainly inconsistent with the comprehensive remedial scheme established by OPA.  Such litigation in competition with subrogation litigation would unquestionably "interfere with the methods by which" OPA "was designed" to achieve the stated goals of Congress.  *Ouellette*, 471 U.S. at 491-92.  Such litigation against Cameron would likewise directly undermine the litigation-saving efficiencies that Congress intended to achieve when it imposed strict liability "first" on responsible parties "[n]otwithstanding any other provision or rule of law," 33 U.S.C. § 2702(a), and provided that more complex issues arising under other law were to be resolved in subrogation or contribution actions brought by the responsible parties, *id.* §§ 2715(a), 2709.

OPA's language and history unquestionably reflect "a congressional desire to encourage settlement and avoid litigation."  *Boca Ciega Hotel, Inc. v. Bouchard Transportation Co.*, 51 F.3d 235, 238-39 (11th Cir. 1995); *Gabarick v. Laurin Maritime (America) Inc.*, 623 F. Supp.2d 741, 747-48 (E.D. La. 2009).  The proliferation of multiple-party litigation that would follow from allowing claimants to pursue two tracks of litigation -- one against responsible parties for relief under OPA, and a second seeking the same relief against other parties under other law—runs directly counter to that congressional desire.  This Court is witness to the myriad

oil spill lawsuits filed by literally tens of thousands of claimants within the first months after the accident – lawsuits brought, moreover, without regard to the statutory requirement that claims first be presented administratively.   33 U.S.C. § 2713(a).   This chaotic mass of multi-party lawsuits asserting multiple legal theories can be rationally managed only by following the streamlined procedure prescribed by OPA, *i.e.*, by ignoring everything other than the resolution of the statutory claims filed against responsible parties under OPA.   Allowing claimants to sue persons other than responsible parties is inconsistent with OPA at the most fundamental level; it results in a massive proliferation of litigation in direct contravention of the congressional purpose of simplifying and streamlining the procedure for determining financial responsibility for oil spills and ensuring prompt payment of claims.   This wastes scarce judicial resources and threatens to produce different and conflicting rulings on both liability and damages.

Litigation of claims against both responsible parties and third parties directly would make a hash of the OPA remedial process, and especially of its provisions for subrogation and contribution.   OPA explicitly contemplates that responsible parties will pay compensation to claimants first, after which they may bring subrogation actions against potentially liable third parties asserting "all" of the satisfied claimants' "causes of action."   Permitting claimants to interject themselves into this process by prosecuting cases against third parties would raise unnecessary doubts about which defendant, the responsible party or the third party, is to be deemed primarily liable – that is, about who must pay what and when – and could wholly confound, disrupt, and undermine the subrogation procedure.

Responsible parties cannot be subrogated to "all claims and causes of action" if those claims already have been satisfied, and claimants plainly are not entitled to recover twice,

once from responsible parties under OPA and a second time from third parties under other law. OPA resolves this apparent dilemma by making the responsible party primarily liable and leaving third parties subject only to subrogation actions or suits for contribution.  Permitting claimants to pursue litigation against both responsible parties and third parties would conflict with the carefully orchestrated step-by-step claim procedure deliberately fashioned by Congress. As the Supreme Court said with respect to a similar issue in *Ouellette*, "it would be extraordinary for Congress, after devising a" comprehensive remedial scheme for providing relief for offshore oil spills, "to tolerate common-law suits that have the potential to undermine" that remedial scheme.  479 U.S. at 497.

Once from responsible parties under OPA and a second time from third parties under other law. State law purporting to allow the assertion of oil spill claims against third parties undermines the comprehensive remedial process prescribed by OPA; any such state law is literally "inconsistent with" OPA and therefore cannot be applied as surrogate federal law under OCSLA.  43 U.S.C. § 1333(a)(2).

1058793v.1

32

### 3.  The Appropriate Remedy Is Dismissal Without Prejudice.

In a thorough and well-reasoned decision, Judge Lemelle specifically concluded from the structure of OPA and its legislative history that claimants "should pursue claims covered under OPA *only* against the responsible party."  *Gabarick v. Laurin Maritime (America) Inc.*, 623 F. Supp.2d 741, 750 (E.D. La. 2009) (emphasis added).  Judge Lemelle thereupon dismissed, without prejudice, "all claims covered under 33 U.S.C. § 2702" asserted against defendants who were not statutorily designated responsible parties.  *Id.* at 751.  This Court should do the same.

Dismissal without prejudice would be fair to all parties and would not impair Alabama's legitimate interest in securing prompt and full compensation.  If the responsible parties satisfy Alabama's allowable claims, as OPA contemplates they will, Alabama will be spared any need to expend resources in litigation with Cameron and other third parties.  The responsible parties then will be subrogated to all the claims dismissed here without prejudice and may continue to proceed against Cameron.  33 U.S.C. § 2715(a).  On the other hand, in the extremely unlikely event that the OPA remedial process does not fully compensate Alabama for all recovery due under OPA, then Alabama may present its unpaid claims to the Fund.  *Id*. § 2713(d).  In that event, the Fund would bear ultimate responsibility for all removal costs and damages not "caused by the gross negligence or willful misconduct of [the] claimant," *id*. § 2712(b), and upon payment would also become subrogated to "all" of Alabama's causes of action, *id*. § 2715(a).  Under either scenario, dismissal without prejudice would pave the way for an orderly determination of Alabama's claims and Cameron's liability, if any.

1058793v.1

**E.  Alabama Rejects Reliance on Louisiana Law.**

In the unlikely event that the Court does not dismiss Alabama's claims against Cameron without prejudice to future subrogation or contribution claims, then the Court would otherwise have to address Alabama's claims on their underlying merits.   However, because Alabama has deliberately chosen not to invoke Louisiana law, it is not necessary for the Court to consider how Louisiana law might apply to Alabama's factual allegations and legal claims.

Alabama filed its First Amended Complaint (Document 1872) on April 5, 2011. By that time, it had long been clear that Cameron would move to dismiss oil spill claims on the ground that neither general maritime law nor any state law other than that of Louisiana could apply under OCSLA.  Cameron had moved to dismiss the B1 Master Complaint on that ground. Document 1395.  Even earlier, Cameron had moved to dismiss the claims of certain Alabama municipalities on that same ground.  Document 1152.  Of course, Alabama was not obligated to accede to Cameron's position.   But if it ever intended to rely on Louisiana law as surrogate federal law under OCSLA, it should have preserved such a claim in its amended complaint. Having deliberately chosen not to do so, Alabama should now be taken at its word.   The potential application of Louisiana law is simply not an issue raised by Alabama's Complaint.

Merely as a precaution, however, Cameron incorporates by reference the arguments for dismissal of oil spill claims under Louisiana law that it made in Documents 1152, 1395, and 2191 (its reply brief in support of dismissal of the B1 Master Complaint), and the arguments made concurrently in its briefs supporting dismissal of the Local Government and Louisiana claims (Docs. 2636 and 2637) as additional grounds for dismissal of Alabama's Complaint.

1058793v.1

34

## CONCLUSION

According to the BP website, BP has already paid millions of dollars in claims to the State of Alabama.  As noted, BP has already sued Cameron under OPA's subrogation provision to recover some of those claim payments and seeks a declaratory judgment that Cameron will be liable to reimburse BP for further payments made in the future. Alabama's claims against Cameron are redundant and superfluous.

Alabama's claims against Cameron sounding in general maritime law or Alabama common or statutory law should be dismissed with prejudice, because those bodies of law do not furnish a remedy under the facts alleged in the Complaint.  The Complaint cannot reasonably be construed as asserting claims under Louisiana law, but if it did assert such claims they should be dismissed without prejudice to the ability of designated responsible parties under OPA to assert such claims in actions for subrogation or contribution as permitted by that statute.

Respectfully submitted,

David J. Beck, T.A.
    dbeck@brsfirm.com
Joe W. Redden, Jr.
    jredden@brsfirm.com
David W. Jones
    djones@brsfirm.com
Geoffrey Gannaway
    ggannaway@brsfirm.com

BECK, REDDEN & SECREST, L.L.P.
One Houston Center
1221 McKinney, Suite 4500
Houston, TX  77010-2010
713-951-3700
713-951-3720 (fax)

/s/ Phillip A. Wittmann
Phillip A. Wittmann, 13625
    pwittman@stonepigman.com
Carmelite M. Bertaut, 3054
    cbertaut@stonepigman.com
Keith B. Hall, 24444
    khall@stonepigman.com
Jared Davidson, 32419
    jdavidson@stonepigman.com

STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
504-581-3200
504-581-3361 (fax)

**ATTORNEYS FOR CAMERON INTERNATIONAL CORPORATION**

1058793v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum In Support of Defendant Cameron International Corporation's Motion to Dismiss has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 3rd day of June, 2011.

*/s/ Phillip A. Wittmann*

1058793v.1