**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | : | MDL No. 2179 |
| | : | |
| | : | |
| | : | SECTION: J |
| THIS DOCUMENT RELATES TO: | : | |
| 2:10-CV-04182 | : | JUDGE BARBIER |
| 2:10-CV-04183 | : | |
| 11-CV-0516 | : | MAGISTRATE SHUSHAN |
| 10-CV-03059 | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**BP DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE**
**12(b)(1) AND 12(b)(6) THE FIRST AMENDED COMPLAINTS OF THE STATES OF**
**ALABAMA AND LOUISIANA**

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Andrew B. Bloomer, P.C.
Catherine L. Fitzpatrick
Elizabeth A. Larsen
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200

Robert R. Gasaway
Jeffrey B. Clark
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005-5793
Telephone:      (202) 879-5000
Facsimile:       (202) 879-5200

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana  70139-5099
Telephone:      (504) 581-7979
Facsimile:       (504) 556-4108

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC  20004-2401
Telephone:      (202) 662-5985

*Attorneys for BP*

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ........................................................................................................1

BACKGROUND ........................................................................................................3

STANDARD FOR RELIEF ........................................................................................5

ARGUMENT ..............................................................................................................5

I.      Federal Law Is Exclusive for Claims Arising on the Outer Continental Shelf, and Louisiana's and Alabama's State Law Claims Fail as a Matter of Law. ...........................5

        A.      Because the Spill Occurred on the Outer Continental Shelf, OCSLA Applies and Instructs That the Applicable Law Is Exclusively Federal. ...............5

        B.      The Oil Pollution Act Provides The Exclusive Remedy For Oil Spills On The Outer Continental Shelf. ..................................................................7

        C.      The CWA and the Supreme Court's *Ouellette* Line of Cases Bar *All* State Law Claims. ...................................................................................8

        D.      OPA's Savings Clauses Do Not Preserve Plaintiffs' State Law Claims, Which Are Preempted by OCSLA. ......................................................10

        E.      The States' Maritime Law Claims Are Displaced By OPA. .................12

II.     Alabama and Louisiana Fail to State Claims Under the Oil Pollution Act. ......................14

        A.      Plaintiffs Have Not Satisfied OPA's Claim Presentment Requirement. ..............14

              1.      OPA's Mandatory Presentment Requirement Applies to All Claims and Cannot Be Excused. ....................................................14

              2.      Neither Alabama Nor Louisiana Has Satisfied OPA's Presentment Requirement. ...............................................................18

        B.      Plaintiffs Have No Valid Claims for Declaratory Relief under OPA. ...................19

III.    Plaintiffs' State Law Claims Fail for Additional, Alternative Reasons. ...........................21

        A.      Louisiana's Claims Under the Louisiana Oil Spill Act and Environmental Quality Act Fail as A Matter of Law. ..................................................21

              1.      Louisiana's Claims under the Louisiana Oil Spill Act Impermissibly Mirror Those Available Under OPA. ...............................22

i

**TABLE CONTENTS**
*(continued)*

Page

2.  The Macondo Well Did Not Discharge Oil into Louisiana Waters and Thus there Was No Violation of The Louisiana Environmental Quality Act. ............................................................................22

3.  Louisiana Seeks Penalties Unauthorized by the Louisiana Environmental Quality Act. ..................................................24

4.  Louisiana Cannot Recover Penalties for Alleged Violations of the Compliance Order. ..........................................................29

5.  Louisiana's Civil Penalty Statute Requires Presentment of Response Costs. ............................................................31

B.  Alabama's Claims Under the Water Pollution Control, Solid Wastes Disposal, and Hazardous Waste Disposal Acts Fail As A Matter of Law. ............32

1.  Alabama Cannot Seek Civil Penalties Under the Named Statutes For Claims Occurring On the OCS. ...................................32

2.  The Alabama Water Pollution Control Act Is Inapplicable to the *Deepwater Horizon* Incident. ...........................................34

3.  The Solid Wastes Disposal Act Cannot Apply Because BP's Use of Dispersants Was Authorized and Dispersants Were Applied in Accordance with Their Intended Use. ...............................41

4.  The Alabama Hazardous Wastes Management Act Cannot Apply to Dispersants Which Are Not Solid Wastes. ......................42

C.  Certain of Louisiana's Civil Law Claims Must Be Dismissed for Additional Reasons. ..................................................43

1.  LOSPRA Provides the Exclusive Remedy for Louisiana Oil Spills. .........43

2.  Because Louisiana is Not a Neighbor as a Matter of Law, It Fails to State a Nuisance Claim. ............................................45

3.  Louisiana Fails to State a Claim for Trespass Under Louisiana Law. .....................................................................46

4.  Louisiana Has Failed to State a Strict Liability Claim under Article 2317. ....................................................................47

5.  Because Drilling Operations Do Not Constitute Ultrahazardous Activity under Louisiana Law, Louisiana's Claim for Liability for

**TABLE CONTENTS**
*(continued)*

Page

              Abnormally Dangerous/Ultrahazardous Activity Should Be
Dismissed. .................................................................................................47

6.    Louisiana's Claims for Fraudulent Concealment and Negligent
Misrepresentation Do Not Satisfy the Specificity Required by Rule
12(b)(6). ...................................................................................................49

7.    Louisiana Has Failed to State a Claim for Unjust Enrichment
because the Law Provides it With Other Remedies. ...............................51

8.    Punitive Damages Are Not Available Under Louisiana Law. ..................52

D.    Certain of Alabama's Common Law Claims Must Be Dismissed for
Additional Reasons. ...........................................................................................53

1.    A Discharge To Public Waters Is Not a Private Nuisance Under
Alabama Law. .........................................................................................53

2.    Alabama Has Not Alleged That the BP Defendants Had Actual
Knowledge of the Facts Allegedly Concealed, or How the Alleged
Suppression Induced Alabama to Act. .....................................................54

3.    Alabama Has Not Alleged That the BP Defendants Acted with the
Requisite Intent to Sustain a Claim for Wantonness. ..............................55

4.    Alabama Cannot Bring a Standalone Claim for Punitive Damages
and Maritime Punitive Damages Are Preempted by OPA. .......................56

CONCLUSION ...................................................................................................................56

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abundiz v. Explorer Pipeline Co.*,
   Civ. A. Nos. 300CV2029H, 303CV0508H, 303CV0787H, 2003 WL 23096018
   (N.D. Tex. Nov. 25, 2003) ...................................................................................................... 16

*Agilus Health v. Accor Lodging N. Am.*,
   52 So. 3d 68 (La. 2010) ........................................................................................................... 25

*Aiello v. Town of Brookhaven*,
   136 F. Supp. 2d 81 (E.D.N.Y. 2001) ...................................................................................... 25

*Ainsworth v. Shell Offshore, Inc.*,
   829 F.2d 548 (5th Cir. 1987) .................................................................................................. 48

*Allen v. R. & H Oil and Gas Co.*,
   63 F.3d 1326 (5th Cir. 1995) .................................................................................................. 52

*Am. Tel. & Tel. Co. v. Cent. Office Tel, Inc.*,
   524 U. S. 214 (1998) ............................................................................................................... 12

*Arkansas v. Oklahoma*,
   503 U.S. 91 (1992) ..................................................................................................................... 8

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) .............................................................................................. 2, 5, 55, 56

*AT&T Mobility LLC v. Concepcion*,
   No. 09-893, 2011 WL 1561956 (U.S. Apr. 27, 2011) ............................................................ 12

*Barasich v. Columbia Gulf Transmission Co.*,
   467 F. Supp. 2d 676 (E.D. La. 2006) ............................................................................... 45, 46

*Barasich v. Shell Pipeline Co., LP*,
   Civ. A. Nos. 05-4180, 05-4197, 05-4199, 05-4212, 05-4512, 06-5102,
   2006 WL 3913403
   (E.D. La. Nov. 20, 2006) ................................................................................................... 45, 46

*Barney v. Plaquemines Parish Gov't*,
   22 So. 3d 1117 (La. Ct. App. 4 Cir. 2009) ............................................................................. 46

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) .............................................................................................................. 5, 49

iv

## TABLE OF AUTHORITIES
### *(continued)*

**Page**

*Berthelot v. Boh Bros. Constr. Co., L.L.C.*,
   Civ. A. No. 05-4182, 2006 WL 2256995 (E.D. La. July 19, 2006) ........................................ 15

*Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., Inc.*,
   51 F.3d 235 (11th Cir. 1995) ....................................................................................... passim

*Bourgeois v. DeSoto*,
   280 So.2d 271 (La. Ct. App. 1973) .................................................................................... 50

*Brushwitz v. Ezell*,
   757 So. 2d 423 (Ala. 2000) ....................................................................................... 54, 55

*Byrne v. Nezhat*,
   261 F.3d 1075 (11th Cir. 2001) ....................................................................................... 52

*California v. Kleppe*,
   604 F. 2d 1187 (9th Cir. 1979) ......................................................................................... 9

*Castleberry v. Goldome Credit Corp.*,
   408 F.3d 773 (11th Cir. 2005) ......................................................................................... 54

*Clausen v. M/V NEW CARISSA*,
   171 F. Supp. 2d 1127 (D. Ore. 2001) ............................................................................... 52

*Collins v. Morgan Stanley Dean Witter*,
   224 F.3d 496 (5th Cir. 2000) ........................................................................................... 30

*Conn. Coastal Fishermen's Ass'n v. Remington Arms Co.*,
   989 F.2d 1305 (2d Cir. 1993) ......................................................................................... 42

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
   543 U.S. 157 (2004)......................................................................................................... 11

*Cordiano v. Metacon Gun Club, Inc.*,
   575 F.3d 199 (2d Cir. 2009) ........................................................................................... 42

*Demette v. Falcon Drilling Co.*,
   280 F.3d 492 (5th Cir. 2002) ............................................................................................. 5

*Detillier v. Kenner Reg'l Med. Ctr.*,
   877 So. 2d 100 (La. 2004) ............................................................................................... 27

*Dodd v. Nelda Stephenson Chevrolet, Inc.*,
   626 So. 2d 1288 (Ala. 1993)............................................................................................. 54

**TABLE OF AUTHORITIES**
*(continued)*

Page

*East River S.S. Corp. v. Transamerica Delaval, Inc.*,
    476 U.S. 858 (1986) .................................................................................................. 13

*EEOC v. Arabian Am. Oil Co.*,
    499 U.S. 244 (1991) .................................................................................................. 33

*EP Operating Ltd. P'ship v. Placid Oil Co.*,
    26 F.3d 563 (5th Cir. 1994) ........................................................................................ 6

*Ex parte Old Republic Sur. Co.*,
    733 So.2d 881 (Ala. 1999) ........................................................................................ 33

*Ex parte Watley*,
    708 So. 2d 890 (Ala. 1997) ....................................................................................... 40

*Farwell v. Milliken & Farwell, Inc.*,
    145 So.2d 644 (La. Ct. App. 1963) ............................................................................ 50

*Foley & Lardner, L.L.P. v. Aldar Invs., Inc.*,
    491 F. Supp. 2d 595 (M.D. La. 2007) ........................................................................ 51

*Gabarick v. Laurin Mar. (Am.), Inc.*,
    623 F. Supp. 2d 741 (E.D. La. 2009) .................................................................... 7, 13

*Gabarick v. Laurin Mar. (Am.), Inc.*,
    Civ. A. No. 08-4007,
    2009 WL 102549 (E.D. La. Jan. 12, 2009) ......................................................... 16, 18

*Gates & Fox Co. v. OSHA*,
    790 F.2d 154 (D.C.Cir. 1986) ................................................................................... 36

*Gatlin Oil Co., Inc. v. United States*,
    169 F.3d 207 (4th Cir. 1999) ...................................................................................... 7

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000) .................................................................................................. 11

*General Elec. Co. v. EPA*,
    53 F.3d 1324 (D.C. Cir. 1995) .................................................................................. 26

*Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*,
    589 F.3d 778 (5th Cir. 2009) ...................................................................................... 5

*Gulf Offshore Co. v. Mobil Oil Corp.*,
    453 U.S. 473 (1981) .................................................................................................... 6

**TABLE OF AUTHORITIES**
*(continued)*

Page

*Hallstrom v. Tillamook Cnty.*,
  493 U.S. 20 (1990) ........................................................................................... 17

*Hamker v. Diamond Shamrock Chemical Co.*,
  756 F.2d 392 (5th Cir. 1985) ........................................................................... 25

*Hart v. Allstate Ins. Co.*,
  437 So. 2d 823 (La. 1983) ................................................................................ 27

*Hensley v. Redi-Med of Mandeville*,
  Civ. A. No. 09-47, 2009 WL 2408319 (E.D. La. Aug. 4, 2009) ................................ 5

*Hillsborough County v. Automated Med. Labs., Inc.*,
  471 U.S. 707 (1985) ........................................................................................... 8

*Hogg v. Chevron USA, Inc.*,
  45 So. 3d 991 (La. 2010) ............................................................................ 24, 46

*Hosea v. Langley*,
  No. Civ.A. 04-0605-WS-C, 2006 WL 314454
  (S.D. Ala. Feb. 8, 2006) ................................................................................... 39

*Hufnagel v. Omega Serv. Indus., Inc.*,
  182 F.3d 340 (5th Cir. 1999) ............................................................................. 6

*Hyder v. Quarterman*,
  No. C-07-291, 2007 WL 4300446
  (S.D. Tex. Oct. 10, 2007) ................................................................................. 34

*In re Katrina Canal Breaches Consol. Litig.*,
  647 F. Supp. 2d 644 (E.D. La. 2009) ............................................................... 45

*In re Katrina Canal Breaches Consol. Litig.*,
  No. 05-CV-4182, 2008 WL 4185869
  (E.D. La. Sept. 8, 2008) ................................................................................... 34

*In re Mosley Well Serv., Inc.*,
  Docket No. WC-89-198, WP-89-198,
  1994 WL 773579 (LDEQ Nov. 10, 1994) ......................................................... 27

*In re Pet. of Settoon Towing LLC*,
  Civ. A. No. 07-1263, 2009 WL 4730971
  (E.D. La. Dec. 4, 2009) .................................................................................... 22

**TABLE OF AUTHORITIES**
*(continued)*

Page

*Inabnet v. Exxon Corp.*,
   642 So. 2d 1243 (La. 1994) ................................................................. 45

*Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*,
   476 U.S. 380 (1986) ............................................................................ 6

*Int'l Paper Co. v. Ouellette*,
   479 U.S. 481 (1987) ................................................................... passim

*Johnson v. Colonial Pipeline Co.*,
   830 F. Supp. 309 (E.D. Va. 1993) .............................................. 15, 16, 18

*Joslyn Mfg. Co. v. T.L. James & Co., Inc.*,
   836 F. Supp. 1264 (W.D. La. 1993) ..................................................... 23

*Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs.*,
   527 F.3d 412 (5th Cir. 2008) .............................................................. 49

*Keating v. Contractors Tire Serv., Inc.*,
   428 So. 2d 624 (Ala. 1983) ............................................................... 41

*Kirby v. Field*,
   923 So. 2d 131 (La. Ct. App. 1 Cir. 2005) ............................................ 50

*Kitty Hawk Aircargo, Inc. v. Chao*,
   418 F.3d 453 (5th Cir. 2005) .............................................................. 34

*LaBauve v. Olin Corp.*,
   231 F.R.D. 632 (S.D. Ala. 2005) ........................................................ 40

*Life Ins. Co. of Ga. v. Smith*,
   719 So. 2d 797 (Ala. 1998) ............................................................... 56

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
   594 F.3d 383 (5th Cir. 2010) .............................................................. 49

*Marathon Pipe Line Co. v. LaRoche Indus., Inc.*,
   944 F. Supp. 476, 477 (E.D. La. 1996) ............................................... 15

*Marin v. Exxon Mobil Corp.*,
   48 So. 3d 234 (La. 2010) ................................................................... 25

*Martin v. Scaife*,
   587 So. 2d 995 (Ala. 1991) ............................................................... 41

## TABLE OF AUTHORITIES
### (continued)

Page

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
    453 U.S. 1 (1981) ................................................................................................. 12

*Mobil Oil Corp. v. Higginbotham*,
    436 U.S. 618 (1978) ........................................................................................... 12

*Moon v. Harco Drugs, Inc.*,
    435 So. 2d 218 (Ala. 1983) ................................................................................ 39

*Mosing v. Domas*,
    830 So.2d 967 (La. 2002) ................................................................................... 52

*Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*,
    924 F. Supp. 1436 (E.D. Va. 1996),
    *aff'd* 122 F.3d 1062 (4th Cir. 1997) ................................................................ 13

*No Spray Coalition, Inc. v. City of New York*,
    252 F.3d 148 (2d Cir. 2001) ......................................................................... 41, 42

*North Carolina v. Tennessee Valley Authority*,
    615 F.3d 291 (4th Cir. 2010) .......................................................................... 9, 10

*North Carolina v. TVA*,
    No. 09-1623, 2009 WL 4277306 (4th Cir. Nov. 30, 2009) ............................... 10

*Northwest Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*,
    451 U.S. 77 (1981) ............................................................................................. 12

*NRDC v. EPA*,
    863 F.2d 1420 (9th Cir. 1988) ...................................................................... 24, 35

*Offshore Logistics, Inc. v. Tallentire*,
    477 U.S. 207 (1986) ............................................................................................. 5

*Payton v. Monsanto Company*,
    801 So. 2d 829 (Ala. 2001) ........................................................................... 39, 40

*Perkins v. F.I.E. Corp.*,
    762 F. 2d 1250 (5th Cir. 1985) .......................................................................... 48

*Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P.*,
    No. 08 CIV. 10578 (RJS),
    2010 WL 1257326 (S.D.N.Y. March 12, 2010) ............................................... 20

**TABLE OF AUTHORITIES**
*(continued)*

Page

*Ray v. City of Chicago*,
　629 F.3d 660 (7th Cir. 2011),
　*pet. for cert. filed*, 79 USLW 3649 (May 4, 2011) ................................................ 30

*Regus Mgmt. Group, LLC, v. Int'l Bus. Mach. Corp.*,
　CIV. A. No. 3:07-CV-1799-B,
　2008 WL 2434245 (N.D. Tex. Jun 17, 2008) ........................................ 20

*Ricard v. State*,
　382 So.2d 190 (La. Ct. App. 1980) ........................................................ 52

*Rice v. Harken Exploration Co.*,
　89 F. Supp. 2d 820 (N.D. Tex. 1999) ....................................................... 7

*Riggs v. Opelousas Gen. Hosp. Trust Auth.*,
　997 So. 2d 814 (La. Ct. App. 3 Cir. 2008) ........................................... 47

*Russell Corp. v. Sullivan*,
　790 So. 2d 940 (Ala. 2001) .................................................................... 53

*Salazar v. Freeport Overseas Serv. Co.*,
　Civ. A. No. 99-1210, 2000 WL 1099391
　(E.D. La. Aug. 3, 2000) ......................................................................... 33

*Sanford v. Louisiana*,
　228 Fed. Appx. 492 (5th Cir. 2007) ..................................................... 2, 5

*Satellite Broad. Co. v. FCC*,
　824 F.2d 1 (D.C.Cir. 1987 ..................................................................... 38

*Scritchfield v. Mutual of Omaha Ins. Co.*,
　341 F. Supp. 2d 675 (E.D. Tex. 2004) .................................................. 20

*South Port Marine, LLC v. Gulf Oil Ltd. P'ship*,
　234 F.3d 58 (1st Cir. 2000) ................................................................... 13

*State v. Jebsen S. (U.K.) Ltd.*,
　377 So. 2d 940 (Ala. 1979) .................................................................... 38

*Suire v. Lafayette City-Parish Consol. Gov't*,
　907 So. 2d 37 (La. 2005) ................................................................... 47, 48

*Systems Eng'g and Sec., Inc. v. Science & Eng'g Ass'n, Inc.*,
　962 So.2d 1089 (La. Ct. App. 4 Cir. 2007) ........................................... 49

**TABLE OF AUTHORITIES**
*(continued)*

Page

*Tanguis v. M/V Westchester*,
153 F. Supp. 2d 859 (E.D. La. 2001) ................................................................ 7, 12

*Targa Midstream Servs. Ltd. P'ship v. K-Sea Transp. Partners, L.P.*,
No. Civ.A. G-05-629, 2006 WL 2520914 (S.D. Tex. Apr. 20, 2006) ...................... 7

*Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*,
87 F.3d 150 (5th Cir. 1996) ................................................................................ 6

*Tennessee Gas Pipeline v. Houston Cas. Ins. Co.*,
87 F.3d 150 (5th Cir. 1996) ................................................................................ 5

*Terre Aux Boeufs Land Co., Inc. v. J.R. Gray Barge Co.*,
803 So. 2d 86 (La. Ct. App. 4 Cir. 2001) .......................................................... 46

*Tex. & Pac. R. Co. v. Abilene Cotton Oil Co.*,
204 U. S. 426 (1907) ......................................................................................... 12

*Tolbert v. Tolbert*,
903 So. 2d 103 (Ala. 2004) ................................................................................ 55

*TS&C Invs., LLC v. BEUSA Energy, Inc.*,
637 F. Supp. 2d 370 (W.D. La. 2009) ............................................................... 45

*Turner v. Murphy Oil USA, Inc.*,
Civ. A. No. 05-4206, 2007 WL 4208986 (E.D. La. Nov. 21, 2007) .................... 15

*TVA v. Whitman*,
336 F. 3d 1236 (11th Cir. 2003) ........................................................................ 31

*Unimobil 84, Inc. v. Spurney*,
797 F.2d 214 (5th Cir. 1986) ............................................................................. 49

*Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*,
895 F.2d 1043 (5th Cir. 1990) ............................................................................. 6

*United States v. 14.02 Acres of Land More or Less in Fresno County*,
547 F.3d 943 (9th Cir. 2008) ............................................................................. 30

*United States v. 150 Acres of Land*,
204 F.3d 698 (6th Cir. 2000) ............................................................................. 23

*United States v. CDMG Realty Co.*,
96 F.3d 706 (3d Cir. 1996) ................................................................................ 23

## TABLE OF AUTHORITIES
### *(continued)*

**Page**

*United States v. Dixie Carriers, Inc.*,
   627 F.2d 736 (5th Cir. 1980) ................................................................. 12

*United States v. States of Louisiana, Texas, Mississippi, Alabama, and Florida*,
   364 U.S. 502 (1960)......................................................................... 24, 35

*United States. v. Manzo*,
   Civ. A. No. 97-289 (MLC),
   2007 WL 1038593 (D.N.J. Mar. 30, 2007)............................................ 20

*Walters v. Medsouth Record Mgmt., LLC*,
   38 So. 3d 243 (La. 2010) ........................................................................ 51

*Watermeier v. Mansueto*,
   562 So.2d 920 (La. Ct. App. 1990)......................................................... 51

*Williams v. WMX Techs., Inc.*,
   112 F.3d 175 (5th Cir. 1977) ........................................................... 49, 50

*Wilson v. Amoco Corp.*,
   33 F. Supp. 2d 969 (D. Wyo. 1998)........................................................ 25

**Statutes**

1979 La. Acts 449 ...................................................................................... 27

1986 La. Acts 942 ...................................................................................... 27

1989 La. Acts 484 ...................................................................................... 28

1990 La. Acts 249 ...................................................................................... 28

33 U.S.C. § 1321 ......................................................................................... 4

33 U.S.C. § 1362(8) .................................................................................. 24

33 U.S.C. § 2701(3) .............................................................................. 14, 15

33 U.S.C. § 2701(32) ................................................................................ 44

33 U.S.C. § 2702(a) .............................................................................. 1, 13

33 U.S.C. § 2702(b) .................................................................................. 13

33 U.S.C. § 2702(b)(2)(D)........................................................................ 1, 4

# TABLE OF AUTHORITIES
## *(continued)*

**Page**

33 U.S.C. § 2706(d)(1) .......................................................................................... 22

33 U.S.C. § 2713(a) ....................................................................................... 14, 17

33 U.S.C. § 2713(a)-(c) ........................................................................................ 14

33 U.S.C. § 2713(b)(1) ......................................................................................... 17

33 U.S.C. § 2717(f) .............................................................................................. 20

33 U.S.C. § 2717(f)(2) .......................................................................................... 22

33 U.S.C. § 2718(a)(1) .................................................................................... 10, 22

33 U.S.C. § 2718(c) .............................................................................................. 22

33 U.S.C. § 2718(c)(1) .................................................................................... 10, 22

33 U.S.C. §§ 2702(b)(2)(A), (B), (D), (F) ........................................................... 22

42 U.S.C. § 7627 .................................................................................................... 9

42 U.S.C. § 7627(a)(1) ........................................................................................... 9

42 U.S.C. § 9613(g)(2) ......................................................................................... 20

43 U.S.C. § 1312 ............................................................................................ 24, 35

43 U.S.C. § 1333 .......................................................................................... 1, 4, 5

43 U.S.C. § 1334(a)(8) ........................................................................................... 9

Ala. Code § 22-22-1(b)(2) .............................................................................. 34, 37

Ala. Code § 22-22-1(b)(8) .................................................................................... 34

Ala. Code § 22-22-9(i)(4) ..................................................................................... 40

Ala. Code § 22-22A-5(18) .............................................................................. 32, 38

Ala. Code § 22-27-2(32) ....................................................................................... 41

Ala. Code 1975 § 6-5-121 ..................................................................................... 53

Ala. Code. § 22-30-3(5)(b) ................................................................................... 43

# TABLE OF AUTHORITIES
## (continued)

Page

La. Civ. Code art. 2298 ........................................................................................... 51

La. Civ. Code art. 2317 ........................................................................................... 47

La. Civ. Code art. 2317.1 ......................................................................................... 47

La. Civ. Code. art. 667 ............................................................................................. 47

La. Rev. Stat. § 30:2025(E) ..................................................................................... 27

La. Rev. Stat. § 30:2025(E)(1)(a) ...................................................................... 26, 31

La. Rev. Stat. § 30:2050.3 ....................................................................................... 31

La. Rev. Stat. § 30:2050.3(D) .................................................................................. 31

La. Rev. Stat. § 30:2050.4(H)(1) ............................................................................. 31

La. Rev. Stat. § 30:2050.5 ....................................................................................... 31

La. Rev. Stat. § 30:2454(22) .................................................................................... 43

La. Rev. Stat. § 30:2454(22)(c) ............................................................................... 44

La. Rev. Stat. § 30:2454(5)(a), (b) .......................................................................... 44

La. Rev. Stat. § 30:2479 ........................................................................................... 44

La. Rev. Stat. § 30:2480(G) ..................................................................................... 43

La. Rev. Stat. § 30:2491(A) ................................................................................ 43, 44

La. Rev. Stat. § 30:2496 ...................................................................................... 43, 44

La. Rev. Stat. Ann. § 30:2004(10) ........................................................................... 23

La. Rev. Stat. Ann. § 30:2073(7) ............................................................................. 24

La. Rev. Stat. Ann. § 30:2075 .................................................................................. 22

**Other Authorities**

135 Cong. Rec. H7965 (daily ed. Nov. 2, 1989) ....................................................... 14

Dan B. Dobbs, THE LAW OF TORTS § 53 (2001) .................................................. 46, 47

**TABLE OF AUTHORITIES**
*(continued)*

**Page**

Sutherland Statutory Construction
(7th ed. § 59:1) .................................................................................................. 27

**Rules**

Fed. R. Civ. P. 9(b) ........................................................................................... 49

**Regulations**

Ala. Admin. Code r. 335-6-10-.01(2) ............................................................... 37

Ala. Admin. Code r. 335-6-10-.06 .................................................................... 37

Ala. Admin. Code r. 335-6-11.01(2) ................................................................. 36

Ala. Admin. Code r. 335-6-11.01(3) ................................................................. 36

Louisiana Administrative Code 43:XXIX.115(A) ............................................. 43

## INTRODUCTION

The plaintiffs – the States of Louisiana and Alabama – allege that they were harmed by the oil spill following the explosions on the Deepwater Horizon on April 20, 2010, and its sinking into the Gulf of Mexico two days later.[1]  Plaintiffs' complaints also allege that the well from which the oil flowed was located on the Outer Continental Shelf (sometimes referred to as "OCS"), beyond the territorial jurisdiction of Alabama and Louisiana.[2]  Those two facts establish that the law governing each state's claims is exclusively federal and that the Oil Pollution Act of 1990 ("OPA") provides the exclusive remedy.[3]  *See, e.g.*, 33 U.S.C. § 2702(a); 43 U.S.C. § 1333.  As a result, plaintiffs' complaints fail to state any valid claims as a matter of law and should be dismissed.

*First*, federal law preempts plaintiffs' state law claims, which must be dismissed as a matter of law.  Under the Outer Continental Shelf Lands Act ("OCSLA"), federal law is exclusive for claims arising from drilling for oil and other mineral exploration and development activities on the OCS.  *See* 43 U.S.C. § 1333.  For oil spills, the Oil Pollution Act establishes a comprehensive liability and remedial scheme that includes the claims for natural resource damages and lost tax and other revenue that plaintiffs allege in their complaints.  *See* 33 U.S.C. § 2702(b)(2)(D).  Hence there are no gaps in federal law and no place under OCSLA for borrowed state law.  And because state law never applies of its own force under OCSLA, there are no applicable state law claims to "save" under OPA's savings clauses.

---

[1]   *See, e.g.*, Ala. First Am. Compl. ¶ 1; La. First Am. Compl. ¶ 4.

[2]   *See, e.g.*, Ala. First Am. Compl. ¶ 38; La. First Am. Compl. ¶¶ 1, 88.

[3]   In this brief we sometimes use short form references for various statutes discussed throughout the brief as follows:  Outer Continental Shelf Lands Act ("OCSLA"), Oil Pollution Act of 1990 ("OPA"), Clean Water Act ("CWA") and, to promote clarity, we sometimes repeat their full titles.

**Second**, according to the Supreme Court, a State has no authority, under common law or otherwise, to regulate pollution that originated from a source outside its territory, even if the effects of the pollution are felt within the State. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987). In cases arising in a federal enclave such as the OCS, water pollution is instead governed solely by federal law, including OPA and the Clean Water Act ("CWA"). (*See also* Doc. No. 1440, BP's Mot. to Dismiss the First Am. Master Compl. for the B1 Bundle, § III.C.)[4]

**Third**, Louisiana's and Alabama's allegations fail to establish that they have complied with OPA's requirement that, before filing suit, plaintiffs must first "present" their claims to the responsible party to give the parties an opportunity to settle the claims and avoid litigation. 33 U.S.C. § 2713(a); see 135 Cong. Rec. H7965 (daily ed. Nov. 2, 1989). Plaintiffs' bare conclusory allegations that they have complied are insufficient to save their claims. *Sanford v. Louisiana*, 228 Fed. Appx. 492, 492-93 (5th Cir. 2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1951 (2009); *see also Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., Inc.*, 51 F.3d 235, 240 (11th Cir. 1995). Furthermore, the plain language of the statute requires plaintiffs to indentify the precise amount and basis for their claims with sufficient specificity to enable the responsible party to evaluate the claims and decide whether they should be paid and in what amount. The plain language of the statute also makes clear that state government plaintiffs are not excused from the presentment requirement: the pre-suit "presentment" requirement of § 2713(a) applies to "all claims," unless excluded by one of the exceptions specified in § 2713(b). One such exception to the presentment requirement, which does not apply in this case, is for a state governor's claims for removal costs submitted to the Oil Spill Liability Trust Fund administered

---

[4] For purposes of this motion, and consistent with the Court's instructions, BP incorporates and relies upon certain arguments more fully presented in Doc. No. 1440, BP's Motion to Dismiss the First Amended Master Complaint for the B1 Bundle ("BP's B1 Bundle Mot.").

by the National Pollution Funds Center.  Given that Congress expressly excludes such claims from the presentment requirement, it makes no sense to conclude—without any textual support—that Congress also meant to exclude from presentment a State's claims for either damages or removal costs when sought not from the Fund but from the responsible party in court.

**Fourth,** even if Louisiana's and Alabama's state law claims were not preempted by federal law, most would require dismissal by this Court for additional, independent reasons.  Put simply, neither State satisfies the threshold requirements for enforcement (and assessment of civil penalties) under its environmental statutory regime, principally because these statutes cannot be read to apply to the passive migration of oil via ocean currents from a source located some fifty miles offshore, in federal waters.  Moreover, the astronomical statutory penalties sought by Louisiana in particular violate basic principles of statutory interpretation.  Finally, both States at the very least fail to allege necessary elements of certain of their common and civil law claims, and, in some instances, assert claims that are not recognized in their respective jurisdictions.

## BACKGROUND

### 1.  BP's Government Claims Process.

The United States Coast Guard designated BP Exploration & Production Inc. as a "responsible party" under OPA shortly after the *Deepwater Horizon* incident.  (*See, e.g.*, Ala. First Am. Compl. ¶ 8; La. First Am. Compl. ¶ 201.)[5]   Following this designation, BP

---

[5]   "BP" or the "BP Defendants" refers to the BP entities that are moving to dismiss the respective complaints filed by Alabama and Louisiana.  The BP entities currently moving to dismiss Alabama's First Amended Complaint are BP Exploration & Production Inc. and BP p.l.c.  The BP entities currently moving to dismiss Louisiana's First Amended Complaint are BP Exploration & Production Inc., BP Corporation North America Inc., BP America Inc., and BP America Production Company.

Footnote continued on next page

Exploration & Production established the extra-judicial claims procedure required by OPA. It advertised that process and began accepting claims from both private and governmental entities. Although BP later transitioned private claims to the Gulf Coast Claims Facility, BP continues to manage governmental claims. (*See, e.g.*, La. First Am. Compl. ¶ 143 (alleging that "the State has directly presented BP with its claims").) Since late April 2010, BP has had in place a large-scale operation for efficiently evaluating and paying OPA claims presented by government entities. (*See* Doc. No. 2312-3, BP's B1 Bundle Reply Ex. 3, Declaration of Geir Robinson (providing background on the BP Government Claims Process).)[6] As of May 9, 2011, BP had processed almost 800 claims from more than 115 different governmental entities, and paid over $1.25 billon to governmental claimants. Of this amount, almost $580 million has been paid to state and local governmental claimants, and the remainder to the U.S. Coast Guard. (*Id.* Robinson Decl. ¶ 22.)

## 2.   **The Statutory Backdrop.**

Three federal statutes are central to plaintiffs' claims alleging damages due to the *Deepwater Horizon* oil spill. *First*, OCSLA makes federal law exclusive for claims arising from drilling for oil and other mineral exploration and development activities on the OCS. *See* 43 U.S.C. § 1333. *Second*, OPA establishes a comprehensive liability and remedial scheme for oil spill damages, including governmental claims for natural resource damages and lost tax and other revenue. *See* 33 U.S.C. § 2702(b)(2)(D). *Third*, the CWA preempts application of state law when the source of the pollution is outside any State's territorial waters. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987); *see also* 33 U.S.C. § 1321.

---

Footnote continued from previous page

[6]   *See also* www.bp.com/governmentclaims (lasted visited June 3, 2011).

## STANDARD FOR RELIEF

Plaintiffs' claims are legally insufficient and should be dismissed under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Under either Rule, the standard is the same: a claim must be dismissed unless the plaintiff's complaint alleges "a plausible set of facts to support [its] claim."  *Hensley v. Redi-Med of Mandeville*, Civ. A. No. 09-47, 2009 WL 2408319, at *2 (E.D. La. Aug. 4, 2009) (Barbier, J.) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). The Supreme Court and Fifth Circuit have made clear that conclusory allegations are not presumed true and, to survive dismissal, the required elements of the claim must instead be supported by proper factual allegations that make plaintiffs' entitlement to relief not merely conceivable, but plausible.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950-51 (2009); *Sanford v. Louisiana*, 228 Fed. Appx. 492, 492-93 (5th Cir. 2007); *Hensley*, 2009 WL 2408319, at *2.

## ARGUMENT

I.  **FEDERAL LAW IS EXCLUSIVE FOR CLAIMS ARISING ON THE OUTER CONTINENTAL SHELF, AND LOUISIANA'S AND ALABAMA'S STATE LAW CLAIMS FAIL AS A MATTER OF LAW.**

A.  **Because the Spill Occurred on the Outer Continental Shelf, OCSLA Applies and Instructs That the Applicable Law Is Exclusively Federal.**

Under the Outer Continental Shelf Lands Act, federal law is the exclusive remedy for claims arising from drilling for oil or other mineral exploration or development activities on the OCS.[7]  *See* 43 U.S.C. § 1333.[8] State law is expressly preempted; it never applies of its own force

---

[7]  For the Court's convenience, BP has attached as Exhibit 1 a chart designating which arguments in this memorandum apply to which counts of the States' complaints.

[8]  *See also Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 217 (1986) ("The intent behind OCSLA was to treat the artificial structures covered by the Act as upland islands or as federal enclaves within a landlocked State."); *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 498 (5th Cir. 2002) (holding that "a device temporarily attached to the seabed, which was erected on the Outer Continental Shelf for the purpose of drilling for oil" fell within the scope of section 1333(a)(1)), *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009) (*en banc*); *Tennessee Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d

Footnote continued on next page

to claims arising from such activities.  *See id.*; *see also Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 153 (5th Cir. 1996) (OCSLA establishes "national authority over the [Outer Continental Shelf] at the expense of both foreign governments and the governments of the individual states.").  Because federal law is exclusive on the OCS, plaintiffs' claims under Alabama and Louisiana law are preempted by OCSLA and should be dismissed.  (*See* La. First Am. Compl. Counts 11-15, 22-23; Ala. First Am. Compl. Count III.)[9]

Although the law under OCSLA is exclusively federal, its content may be borrowed from the law of the adjacent State.  But the adjacent State's law may apply (if at all) (i) only indirectly as *surrogate federal law* and (ii) only *if necessary to fill a gap in federal law*.  *See Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 480-81 (1981); *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1052 (5th Cir. 1990) ("Any other result here would frustrate the Congressional purpose that the [Outer Continental Shelf] be treated as an area of exclusive federal jurisdiction within the state where state law will apply to fill in the gaps in the federal law."); *see also Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 349 (5th Cir. 1999); *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 566 (5th Cir. 1994).  Notably, there is no role whatsoever for the law of a State that is *not adjacent* to the relevant location on the OCS and, hence, Alabama's claims under state law (Count III) fail for this additional reason.

---

Footnote continued from previous page

    150, 153 (5th Cir. 1996) (OCSLA "makes federal law exclusive in its regulation of the [Outer Continental Shelf] . . . .").  (*See generally* BP's B1 Bundle Mot. at 7-9.)

[9]    Preemption is typically thought to occur when state law could apply, but has been ***ousted*** by superseding federal law.  *See, e.g., Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 U.S. 380, 396 (1986).  But to the extent state law attempts to create duties of care **beyond territorial state limits** to govern Shelf conduct, state law simply cannot apply unless Congress takes affirmative steps to permit it to apply (which it has not done as to OPA-covered claims against BP).  Hence, the effect of OCSLA and the fact that the *Deepwater Horizon* incident occurred beyond all state boundaries make the application of state law far more implausible than in the ordinary preemption case.  For simplicity, however, we nonetheless refer to the effect OCSLA has on any claim for state law to apply to BP's Shelf activities as "preemption."

### B.     The Oil Pollution Act Provides The Exclusive Remedy For Oil Spills On The Outer Continental Shelf.

Congress enacted OPA "to create a single Federal law providing cleanup authority, penalties, and liability for oil pollution."  S. Rep. 101-94 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722, 730; *see Gabarick v. Laurin Mar. (Am.), Inc.*, 623 F. Supp. 2d 741, 750 (E.D. La. 2009).  As courts have repeatedly recognized, OPA provides an expansive, comprehensive, and inclusive system to address oil pollution.   *See, e.g.*, *Gabarick*, 623 F. Supp. 2d at 744 (OPA is "comprehensive legislation to address oil spill liability and compensation."); *Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001) ("OPA represents Congress' attempt to provide a comprehensive framework in the area of marine oil pollution."); *Targa Midstream Servs. Ltd. P'ship v. K-Sea Transp. Partners, L.P.*, No. Civ.A. G-05-629, 2006 WL 2520914, *2 (S.D. Tex. Apr. 20, 2006) ("OPA created a stricter and more comprehensive liability scheme for oil spill pollution than had existed under prior legislation . . . ."); *Rice v. Harken Exploration Co*., 89 F. Supp. 2d 820, 822 (N.D. Tex. 1999) (similar); *cf. Gatlin Oil Co., Inc. v. United State*s, 169 F.3d 207, 209 (4th Cir. 1999) (Congress enacted OPA to provide a "prompt, federally-coordinated response to oil spills in navigable waters of the United States and to compensate innocent victims").  (*See also* B1 Bundle Mot. at 9-11, § III.C.)

Given OPA's comprehensive liability and remedial scheme, there are no gaps in federal law to fill under OCSLA.  OPA itself supplies the federal law.  As a result, there is no role, even indirectly as surrogate ***federal*** law, for the law of Louisiana (or any State) to play as to responsible parties so designated under OPA.[10]

---

[10]    Nor is there a gap to fill with respect to the federal penalty regime on the Outer Continental Shelf.  The Clean Water Act provides the comprehensive penalty regime applicable to oil discharges on the OCS.  Indeed, the United States has brought an action against BP seeking penalties under the Clean Water Act.  *United States v.*

Footnote continued on next page

### C.   The CWA and the Supreme Court's *Ouellette* Line of Cases Bar *All* State Law Claims.

Alabama and Louisiana may not impose pollution liability under their own laws because the source of the oil spill is outside both States' territorial boundaries.  As the Supreme Court has held, a State has no authority to regulate—through its common law or otherwise—water or air pollution whose source is outside its territory, even if the effects of such pollution are felt within the State.  *See*, *e.g.*, *Ouellette*, 479 U.S. 481, 494 (1987) (holding that the CWA "precludes a court from applying the law of an affected State against an out-of-state [water pollution] source" and noting that "[a]fter examining the [CWA] as a whole, its purposes and its history, we are convinced that if affected States were allowed to impose separate discharge standards on a single point source, the inevitable result would be a serious interference with the achievement of the 'full purposes and objectives of Congress.'") (quoting *Hillsborough County v. Automated Med. Labs., Inc.,* 471 U.S. 707, 713 (1985))); *Arkansas v. Oklahoma*, 503 U.S. 91, 100 n.6 (1992) ("The affected State may try to persuade the federal government or the source state to increase effluent requirements, but *ultimately possesses no statutory authority to compel that result, even when its waters are adversely affected by out-of-state pollution*.") (emphasis in original) (approvingly quoting Brief of the United States as Amicus Curiae, October Term 1986, No. 85-1233, p. 19).

Where, as here, the source of the pollution is the Outer Continental Shelf—a federal enclave—pollution control is exclusively a matter of federal law, including the CWA and OPA, which are designed to fit together as a coherent whole.  Liability rules imposed by an impacted

---

Footnote continued from previous page

*BP Exploration & Production Inc.*, No. 10-cv-04536 (E.D. La.).  Accordingly, Louisiana's claims for penalties under the Louisiana Environmental Quality Act must also be dismissed.

State impermissibly interfere with the federal scheme, "upsetting the balance of public and private interests so carefully addressed by the [Clean Water] Act." *Ouellette*, 479 U.S. at 494. Accordingly, all of plaintiffs' state law claims relating to water pollution allegations, whether statutory or civil or common law claims, are barred and must be dismissed. (*See* B1 Bundle Mot. Part III.B for further discussion of preemption and the Clean Water Act.)[11]

For similar reasons, Alabama's claim under the Alabama Air Pollution Control Act ("AAPCA") (Count III.K) is precluded by the federal Clean Air Act regime. As the Fourth Circuit recently explained in *North Carolina v. TVA*, 615 F.3d 291, 306-307 (4th Cir. 2010), the Supreme Court's holding in *Ouellette* is "equally applicable" to a case involving a State's attempts to impose its own air pollution standards to an out-of-state source of pollutants.[12] "[A]

---

[11]  Alabama's claims under its Hazardous Wastes Management and Solid Waste Disposal Acts to regulate oil discharges as forms of solid or hazardous waste placed in water must also be dismissed as attempts to regulate out-of-state water pollution. As with Alabama's other claims, imposing liability under these Acts would lead to the result squarely rejected by the Supreme Court in *Ouellette*: permitting non-source states to "do indirectly what they could not do directly—regulate the conduct of out-of-state sources." *Ouellette*, 479 U.S. at 495.

[12]  For the portion of the OCS where the Macondo Well was located, the Department of the Interior has authority to regulate air pollution:

> (b) Requirements for other offshore areas. For portions of the United States Gulf Coast Outer Continental Shelf that are adjacent to the States not covered by subsection (a) of this section which are Texas, Louisiana, Mississippi, and Alabama, the Secretary shall consult with the Administrator to assure coordination of air pollution control regulation for Outer Continental Shelf emissions and emissions in adjacent onshore areas.

42 U.S.C. § 7627; *see also California v. Kleppe*, 604 F. 2d 1187 (9th Cir. 1979) (confirming the Department of the Interior's authority to regulate air quality on the OCS prior to the 1990 Clean Air Act amendments).

Similarly, OCSLA directs the Department of the Interior to prescribe regulations "for compliance with the national ambient air quality standards pursuant to the Clean Air Act (42 U.S.C. 7401 et seq.), to the extent that authorized activities on the Shelf "significantly affect the air quality of any State." 43 U.S.C. § 1334(a)(8). Other parts of the OCS are subject to direct regulation by the Environmental Protection Agency. *See* 42 U.S.C. § 7627(a)(1). As to these other parts of the Shelf, the adjoining State's environmental standards explicitly apply to some shelf activities within a certain distance of shore. *Id.* ("For such sources located within 25 miles of the seaward boundary of such States, such requirements shall be the same as would be applicable if the source were located in the corresponding onshore area, and shall include, but not be limited to, State and local requirements for emission

Footnote continued on next page

'court must apply the law of the State in which the point source is located.'"  *Id.*  The district court's decision "applying [non-source state] law extraterritorially" violated the principles of *Ouellette*, and hence the Fourth Circuit ordered that North Carolina's case be dismissed.  The *TVA* decision applies here and bars any claim under the Alabama Air Pollution Control Act.

Indeed, Alabama's attempt to impose its law on an out-of-state source of pollution is contrary to its own position in *North Carolina v. TVA*.  Alabama intervened in that case to oppose North Carolina's attempts to enforce its own state law on plants located in Alabama, invoking *Ouellette*'s "well-established" rule that a reviewing court "'must apply the law of the State in which the point source is located.'"  *North Carolina v. TVA*, No. 09-1623, Final Br. of Intervenor State of Alabama, 2009 WL 4277306, at 35 (4th Cir. Nov. 30, 2009).  Alabama likewise opposed the application of non-source law for a "perhaps even more fundamental reason: it is flatly contrary to one of the basic tenets of our federal system—namely that States may not legislate or regulate beyond their borders."  *Id.* at 39; *see also supra* n. 9.

### D.     OPA's Savings Clauses Do Not Preserve Plaintiffs' State Law Claims, Which Are Preempted by OCSLA.

Louisiana seeks to rely on OPA's savings clauses to assert state law claims, alleging that "***OPA*** does not preempt states from imposing additional requirements or liability for the discharge of oil.  33 U.S.C. §§ 2718(a)(1) and 2718(c)(1)."  (La. First Am. Compl. ¶ 173 (emphasis added).)  This misses the point: under OCSLA, state law never applies of its own force on the OCS and thus there are no applicable state law claims to "save" under OPA's

---

Footnote continued from previous page

controls, emission limitations, offsets, permitting, monitoring, testing, and reporting.").  There is no comparable importation of state law for the part of the Shelf where the Macondo well was located, which was "approximately fifty miles off Louisiana's coast."  (La. First Am. Compl. ¶ 1; *see* Ala. First Am. Compl. ¶ 38 (alleging well is "*located on the Outer Continental Shelf* 48 miles off the coast of Louisiana") (emphasis added).)

savings clause.  Put differently, OPA's savings clauses neither create a state claim where none exists nor revive state claims that are preempted by other laws.  *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 166-67 (2004) (holding that CERCLA's savings clause did not itself create any cause of action; its sole purpose was to preserve existing remedies).

Furthermore, *Ouellette* held that a savings clause framed in terms of "nothing in this section" was, by its own terms and basic common sense, limited to preemption caused only by that particular section of the statute.  *See* 479 U.S. at 493 (the clause "does not purport to preclude pre-emption of state law by other provisions of the Act").  The same analysis applies to OPA's savings clauses, which are by their terms limited to OPA preemption (or in some cases to saving against preemption by the Limitation Act of 1851).  In addition, unless savings clauses explicitly state otherwise, they do not prevent the ordinary operation of conflict preemption as found in cases such as *Ouellette*.  *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000).  It would be quite a feat for one federal statute (OPA), by silence, to strip other federal statutes (the CWA and OCSLA) of the preemption necessary for their operation.  Where, as here, Congress expressly limited a savings clause to save only those claims that would otherwise be preempted by a defined statute, it could not possibly have intended (without any indication in the text) that the same narrow savings clause could save claims that are expressly preempted ***by an entirely different and preexisting federal statute***.  To conclude otherwise would be even more illogical than interpreting a statute's savings clause to save claims that the statute itself preempts—reasoning the Supreme Court flatly rejected just weeks ago in *AT&T Mobility LLC v. Concepcion*:

> "***Although § 2's saving clause preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives***. . . . As we have said, a federal statute's saving clause 'cannot in reason be construed as [allowing] a

common law right, the continued existence of which would be absolutely inconsistent with the provisions of the act.  In other words, the act cannot be held to destroy itself.'"

No. 09-893, 2011 WL 1561956, at *7 (U.S. Apr. 27, 2011) (*citing Am. Tel. & Tel. Co. v. Cent. Office Tel, Inc.*, 524 U. S. 214, 227–228 (1998) (quoting *Tex. & Pac. R. Co. v. Abilene Cotton Oil Co.*, 204 U. S. 426, 446 (1907)) (internal citations omitted) (emphasis added).

### E.    The States' Maritime Law Claims Are Displaced By OPA.

According to the Supreme Court, federal common law—including maritime law—must give way when Congress has enacted legislation covering a subject previously controlled by the common law.  *See*, *e.g.*, *Northwest Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 96 (1981) ("Even in admiralty, . . . where the federal judiciary's lawmaking power may well be at its strongest, it is our duty to respect the will of Congress."); *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 21-22 (1981) (CWA displaces federal common law of nuisance in the area of ocean pollution).  Federal courts have ruled that maritime law is displaced by such statutes as the CWA, *see United States v. Dixie Carriers, Inc.*, 627 F.2d 736, 738 (5th Cir. 1980), the Death on the High Seas Act, *see Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978), and the Equal Pay Act and Title VII of the Civil Rights Act of 1964, *see Northwest Airlines*, 451 U.S. at 95-97.

Every federal court that has addressed the issue has come to the same conclusion with respect to OPA: OPA displaces preexisting, judge-made maritime claims.  *See Tanguis*, 153 F. Supp. 2d at 867 ("This new scheme [OPA] includes new remedies, which, in many respects, preempt traditional maritime remedies.").  As one district court explained:

"OPA clearly preempts maritime law as to recovery of cleanup *expenses and the cost of compensating injured person*s.  A Court exercising its admiralty jurisdiction will apply the general maritime law only in the absence of a relevant federal statute. . . .  In this case, OPA provides [plaintiff] with a remedy against

> [defendant]; it, therefore, preempts the general maritime law as to recovery of cleanup expenses and the cost of compensating third parties."

*Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*, 924 F. Supp. 1436, 1447 (E.D. Va. 1996), *aff'd* 122 F.3d 1062 (4th Cir. 1997) (citing *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986)) (emphasis added); *see also Gabarick*, 623 F. Supp. 2d at 750-51 (holding with respect to maritime claims that "all claims that are recoverable under OPA," that is, those covered damages enumerated in 33 U.S.C. § 2702, "are preempted by OPA"); *South Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65-66 (1st Cir. 2000) (Congress intended for OPA "to supplant the existing general admiralty and maritime law.").

Under this settled authority, OPA displaces precisely the sort of maritime claims plaintiffs seek to bring against the BP Defendants here. (La. First Am. Compl. Counts V, VII, VIII, IX; Ala. First Am. Compl. Counts I.) The Act provides the sole federal remedy for claimants seeking recovery for damages and/or cleanup costs resulting from an oil spill, *see* 33 U.S.C. § 2702(a) (establishing damages and cleanup cost remedies "[n]otwithstanding any other provision or rule of law"), and sets forth a "comprehensive list of recoverable damages including: [1] removal costs; damage to [2] natural resources and [3] real or personal property; [4] loss of subsistence use of natural resources; [5] loss of government revenues, [6] lost profits and earning capacity; and [7] costs of increased or additional public services occasioned by the unlawful act." *South Port Marine*, 234 F.3d at 64 (citing 33 U.S.C. § 2702(b)). Because these are the very same damages sought in plaintiffs' maritime law claims, those claims are displaced. (La. First Am. Compl. ¶¶ 247, 257, 268; Ala. First Am. Compl. ¶¶ 135, 147.)

## II.     Alabama and Louisiana Fail to State Claims Under the Oil Pollution Act.

### A.     Plaintiffs Have Not Satisfied OPA's Claim Presentment Requirement.

#### 1.     OPA's Mandatory Presentment Requirement Applies to All Claims and Cannot Be Excused.

The States have failed to satisfy OPA's mandatory presentment requirement and hence their claims for damages and removal costs under OPA must be dismissed.  A principal purpose of OPA's comprehensive system to address oil pollution is to encourage out-of-court resolution of claims.  *See* 33 U.S.C. § 2713(a); *see* 135 Cong. Rec. H7965 (daily ed. Nov. 2, 1989) ("The system of liability and compensation provided for in the bill . . . is intended to allow for quick and complete payment of reasonable claims without resort to cumbersome litigation.").  To that end, the Act obligates certain designated "responsible parties" to pay specified cleanup costs and damages "that result from" the incident, and requires that "all claims" for such costs and damages "*shall be presented first to the responsible party*" for payment.  33 U.S.C. § 2713(a)-(c) (emphasis added).  "Claim" is defined as "a request, made in writing for a *sum certain*, for compensation for damages or removal costs resulting from an incident."  *Id.* § 2701(3) (emphasis added).  Under OPA, a lawsuit may be initiated only after a claim is "presented" in accordance with § 2713(a) and (i) the responsible party denies all liability for the claim or (ii) the claim is not settled within 90 days.  *Id.* § 2713(c).  (*See also* BP's B1 Mot. Part II.A.)

OPA's statutory presentment requirement is no mere formality.  Just the opposite—it is a jurisdictional defect that may not be excused by a court.  It also defeats an OPA claim on the merits.  A district court may not entertain damages claims "unless and until a claimant has presented her claims in compliance with §2713(a)."  *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., Inc.*, 51 F.3d 235, 240 (11th Cir. 1995).  For this reason, courts in this district and elsewhere routinely dismiss OPA claims under both Fed. R. Civ. P. 12(b)(1) and 12(b)(6) if the plaintiffs

have not complied with Section 2713's presentment requirements.  *See id.*, 51 F.3d at 240 (holding that "the district court was correct when it granted [defendant's] motions to dismiss for lack of subject matter jurisdiction"); *Berthelot v. Boh Bros. Constr. Co., L.L.C.*, Civ. A. No. 05-4182, 2006 WL 2256995, at *6 (E.D. La. July 19, 2006) (finding that OPA allegations could not provide a basis for federal jurisdiction because plaintiffs had failed to follow the OPA presentment requirement); *Marathon Pipe Line Co. v. LaRoche Indus., In*c., 944 F. Supp. 476, 477 (E.D. La. 1996) ("The Court agrees that § 2713's presentation requirement is jurisdictional and mandates dismissal when that provision is applicable and not complied with by the claimant"); *Johnson v. Colonial Pipeline Co.*, 830 F. Supp. 309, 311 (E.D. Va. 1993) (dismissing OPA claims for lack of federal question jurisdiction); *cf. Turner v. Murphy Oil USA, Inc.*, Civ. A. No. 05-4206, 2007 WL 4208986, at *2 (E.D. La. Nov. 21, 2007) (granting a 12(b)(6) motion to dismiss OPA claims because plaintiffs failed to follow presentment requirement).

To satisfy OPA's presentment requirement, claimants must submit a written claim specifying both the ***amount of damages sought*** (referred to in the statute as a "sum certain," *see* 33 U.S.C. § 2701(3)), and provide evidence and ***information sufficient for BP to assess*** whether (i) the alleged loss satisfies OPA's causation requirements and (ii) the claimant incurred the amount of damages alleged.  *See Johnson*, 830 F. Supp. at 311; *Turner*, 2007 WL 4208986, at *2.[13]  As Judge Fallon has explained, "If the claim does not have the *necessary specificity*, the responsible party will be unable to make a[n] informed offer of settlement."  *Turner*, 2007 WL 4208986, at *2 (granting motion to dismiss) (emphasis added).  Claims lacking specificity do not

---

[13]   Louisiana concedes that these requirements apply.  (*See* La. Mem. of Law in Interest in and Opp. to Defs.' Pending Mots. to Dismiss, Doc. No. 1993 ("A 'sum certain' for each type of damages and evidence to support each claim is generally required.") (citing *Johnson*, 830 F. Supp. at 311).)

provide the meaningful pre-suit settlement opportunity required by the Act and thus are legally deficient:

> "[T]he purpose of OPA's claim presentation requirement is to enable the parties to negotiate, if possible, a settlement of potential claims resulting from an oil spill without having to resort to litigation. . . .  In order to accomplish this purpose, ***the claim presented must inform the responsible party with some precision of the nature and extent of the damages alleged and of the amount of monetary damages claimed.***  Otherwise, the responsible party will be unable to make an informed offer of its own, unable to engage in meaningful substantive negotiations, and thus unable to settle the matter by agreeing to a final amount. Instead …the 90-day period will be spent trying to obtain basic information rather than actually negotiating a settlement."

*Johnson*, 830 F. Supp. at 311 (dismissing OPA claims) (emphasis added).

Courts have rigorously applied these requirements in granting motions to dismiss for failure to present.  In *Johnson*, the plaintiffs submitted a letter purporting to present an OPA claim.  The court held that the letter was "plainly inadequate" under the statute because plaintiffs had made "no effort to describe the nature or extent of the[ir] alleged damages, much less to explain the basis for claiming that these damages have been sustained," and also "fail[ed] to state a sum certain for any of the types of damages alleged."  *Id.*  Likewise, in *Gabarick*, this Court ruled that an invoice submitted by plaintiff did not satisfy OPA's "statutory requirements for a proper claim" because the plaintiff "has not described the manner in which the oil spill impacted it, nor has it cited evidence in support of its purported claim."  *Gabarick v. Laurin Mar. (Am.), Inc.*, Civ. A. No. 08-4007, 2009 WL 102549, at *2 (E.D. La. Jan. 12, 2009) (granting motions to dismiss); *see also Abundiz v. Explorer Pipeline Co.*, Civ. A. Nos. 300CV2029H, 303CV0508H, 303CV0787H, 2003 WL 23096018, at *3-5 (N.D. Tex. Nov. 25, 2003) (holding that plaintiff failed to comply with presentment requirement because it did not establish the amount in dispute; spreadsheets and letter were ambiguous and lacked the necessary specificity).

Louisiana suggests that "government claims should not and do not require presentment before proceeding to litigation." (La. First Am. Compl. ¶ 144.) It offers no basis or support for this conclusion, which is contrary to the plain language of OPA's mandatory presentment requirement: "Except as provided in subsection (b) of this section, *all claims for removal costs or damages* shall be presented first to the responsible party or guarantor of the source designated under 2714(a) of this title." 33 U.S.C. § 2713(a) (emphasis added). Under subsection (b), claimants may under limited circumstances apply to the *Oil Spill Liability Trust Fund* for removal costs and damages without first presenting their claims to the responsible party. (For example, state governors do not have to present their claims to the responsible party when they seek removal costs from the Fund. 33 U.S.C. § 2713(b)(1)(C).)[14] Other than the subsection (b) exceptions—none of which apply—"*all claims* for removal costs or damages shall be presented first to the responsible party." 33 U.S.C. § 2713(a). The statute provides no exception for states seeking removal costs or damages from responsible parties and hence Louisiana and Alabama are subject to, and have failed to meet, OPA's presentment requirement. *See Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 25-26, 31 (1990) ("'the starting point for interpreting a statute is the language of the statute itself," and "[t]he language of this provision could not be clearer"); *Boca Ciega*, 51 F.3d at 235, 239 (*Hallstrom*'s construction of a "similar" notice provision was instructive on why there was no justification in "departing from the plain meaning" of OPA's mandatory presentment provision); *see also* BP's Reply in Support of its Motion to Dismiss the B1 Bundle Complaint, Part II.B.

---

[14] Subsection (b) provides that: "Claims for removal costs or damages may be presented first to the Fund – (A) if the President has advertised or otherwise notified claimants in accordance with section 2714(c) of this title; (B) by a responsible party who may assert a claim under section 2708 of this title; (C) by the Governor of a State for removal costs incurred by the State; or (D) by a United States claimant in a case where a foreign offshore unit has discharged oil causing damage for which the Fund is liable under section 2712(a) of this title." 33 U.S.C. § 2713(b)(1).

2.      Neither Alabama Nor Louisiana Has Satisfied OPA's Presentment Requirement.

Alabama's bare (and only) allegation that it "has satisfied the presentment requirements of 33 U.S.C. §§ 2713(a) and (b)" is wholly insufficient under OPA.  (Ala. First Am. Compl. ¶ 217.)  This conclusory allegation fails to show that Alabama has submitted a definite amount or informed BP of "the precise nature" of the damages claimed, and therefore does not satisfy the Act's presentment requirement.  *See, e.g., Johnson*, 830 F. Supp. at 311; *Gabarick*, 2009 WL 102549, at *2.

Louisiana's allegations are equally unavailing.  Louisiana alleges that "it has been regularly presenting to (and negotiating with) BP a variety of the State's claims since the first days following the spill."  (La. First Am. Compl. ¶ 143.)  It further alleges that it "has directly presented BP with its claims . . . and has worked diligently to present and resolve those claims that it could prior to filing this Complaint."  (*Id.*; *see also id.* ¶ 144 (listing general categories of alleged claims).)  According to Louisiana, "[s]ome of the State's presented claims have been paid by BP, but many claims have been rejected by BP due to the State's refusal to accept unreasonable conditions, while other claims have been subjected by BP to circular rejections and perpetual reservations due to impossible documentation requirements, although such are unnecessary to establish proof of legitimate claims."  (*Id.* ¶ 151.)

These allegations do not establish presentment under OPA.  Louisiana's allegations are longer than Alabama's but equally conclusory.  Louisiana does not allege that it has requested specific amounts, let alone for claims it alleges have been rejected, or that it provided sufficient information to allow BP to analyze its claims and make a meaningful settlement offer, as

required by the statute.  Indeed, with one possible exception, Louisiana does not identify the alleged costs or damages for any of its purported claims.[15]

Louisiana's dissatisfaction with the requirement is of no moment.  (*Id.* ¶ 144.)  Courts have no authority to excuse a party's lack of presentment under OPA for this or any other purported reason.  As the Eleventh Circuit noted in *Boca Ciega*, "If Appellants perceive a policy shortcoming caused by OPA's claims presentation requirement, that shortcoming arises as a result of the balance struck by Congress, and is properly remedied by congressional action."  51 F.3d at 239 (internal citation and quotation marks omitted).[16]  Louisiana and Alabama are required to comply with the plain terms of OPA's presentment requirement, including the specification of a sum certain for any and all claims.  The States have not done so and their OPA claims should therefore be dismissed.

### B.    Plaintiffs Have No Valid Claims for Declaratory Relief under OPA.

Both States seek a declaratory judgment under OPA.  Alabama seeks a declaratory judgment that the BP Defendants are "without limitation" "liable for removal costs and damages."  (Ala. First Am. Compl. ¶ 218.)  Louisiana similarly seeks a declaration that the BP Defendants are responsible parties under OPA and have unlimited liability under that Act for the

---

[15]   The only presentment allegations that Louisiana makes with *any* level of detail involve a proposal Louisiana submitted to BP for a 20-year "Seafood Sampling and Assurance program," which BP funded in part although not in the full amount Louisiana requested.  (*Id.* ¶¶ 145-50.)  BP and Louisiana have stipulated that litigation related to this particular claim be stayed, and the Court has entered an order approving that stipulation.  (May 27, 2011 Order, Doc. No. 2549.)  Besides this isolated claim that the parties have agreed to stay, Louisiana has not made any non-conclusory allegations that it has presented claims to BP with the required specificity.

[16]   Louisiana also alleges that "[t]he GCCF and presentment processes created thereunder explicitly do not apply to the State or other public/governmental entities."  (La. First Am. Compl. ¶ 143.)  While it is true that the GCCF does not accept government claims, that is because such claims were never transferred to the GCCF and BP continues to process all such claims.  (*See* B1 Bundle Reply at 16 & Ex. 3 (Declaration of Geir Robinson).)  Thus, this allegation does nothing to excuse Louisiana's failure to present.

State's removal costs and damages.  (La. First Am. Compl. ¶¶ 166-67.)  Neither claim states a viable cause of action.

*First*, the declaratory judgment described in OPA is available only if the States have an otherwise valid and proper OPA action for monetary relief.  *See* 33 U.S.C. § 2717(f) ("*In any such action described in this subsection*, the court shall enter a declaratory judgment on liability for removal costs or damages that will be binding on any subsequent action or actions to recover further removal costs or damages.") (emphasis added).[17]  Here, because the States have failed to fulfill the mandatory presentment requirement, they have no valid OPA cause of action and thus are not entitled to a declaratory judgment under 33 U.S.C. § 2717(f).  *Cf. United States. v. Manzo*, Civ. A. No. 97-289 (MLC), 2007 WL 1038593, at *2 (D.N.J. Mar. 30, 2007) ("In a ***successful cost recovery action*** under CERCLA, 'the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages.'") (citing identical declaratory judgment language in 42 U.S.C. § 9613(g)(2)) (emphasis added).

*Second*, the declaratory relief that plaintiffs seek is unnecessary.  As this Court is well aware, BP has already accepted its role as a responsible party under OPA.  It has fulfilled that role by advertising OPA claims procedures, setting up a $20 billion escrow fund to pay

---

[17]    To the extent that either State is seeking declaratory relief other than through 33 U.S.C. § 2717(f), such relief is not permissible.  A party cannot bring a declaratory judgment claim where it has also asserted a coercive claim under the same theory or for the same relief.  In such circumstances, the declaratory claim is duplicative of the coercive claim and should be dismissed.  *See, e.g.*, *Regus Mgmt. Group, LLC, v. Int'l Bus. Mach. Corp*., CIV. A. No. 3:07-CV-1799-B, 2008 WL 2434245, at *2 (N.D. Tex. Jun 17, 2008) ("In the Federal Rule of Civil Procedure 12(b)(6) context, courts regularly reject declaratory judgment claims that seek resolution of matters that will already be resolved as part of the claims in the lawsuit."); *Scritchfield v. Mutual of Omaha Ins. Co*., 341 F. Supp. 2d 675, 682 (E.D. Tex. 2004) (dismissing plaintiffs' declaratory judgment claims because "[p]laintiffs would get nothing from a declaratory judgement [sic] that they would not get from prevailing on their breach of contract claims"); *Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P.*, No. 08 CIV. 10578 (RJS), 2010 WL 1257326, at *11 (S.D.N.Y. March 12, 2010) ("[C]ourts have found declaratory judgment to be inappropriate where a party has already invoked its right to a coercive remedy.").

legitimate OPA claims, and has thus far paid out over $4 billion in claims through the GCCF and its own claims process.[18]  Moreover, BP has already waived the limitation of liability provisions contained in OPA, as Louisiana acknowledges.   (*See* La. First Am. Compl. ¶ 202 (citing Statement of BP Exploration & Production Inc. re Applicability of Limit of Liability Under Oil Pollution Act of 1990 (10/18/10) (Rec. Doc. 559); Order re: Applicability of Limit of Liability Under Oil Pollution Act of 1990 to BP Exploration & Production Inc. (and its affiliates) (12/23/10) (Rec. Doc. 925).)  Thus, there is no need for the declaratory relief sought by the States.

## III.   PLAINTIFFS' STATE LAW CLAIMS FAIL FOR ADDITIONAL, ALTERNATIVE REASONS.

Plaintiffs' state law claims are not only barred as a matter of law by OCSLA, OPA, and the CWA, but many of these claims should independently be dismissed because they fail to state plausible claims for relief.

### A.   Louisiana's Claims Under the Louisiana Oil Spill Act and Environmental Quality Act Fail as A Matter of Law.

Counts II and VI of Louisiana's First Amended Complaint assert claims for declaratory judgment, costs and damages under LOSPRA, while Counts III and IV seek civil penalties and response action costs for violations of the Louisiana Environmental Quality Act ("LEQA"). Counts II and VI are duplicative of Louisiana's OPA claim, while Counts III and IV seek penalties to which Louisiana is not entitled as a matter of law.

---

[18]   *See* http://www.gulfcoastclaimsfacility.com/GCCF_Overall_Status_Report.pdf (last visited June 3, 2011).

1.    Louisiana's Claims under the Louisiana Oil Spill Act Impermissibly
Mirror Those Available Under OPA.

OPA Section 2718 states that OPA does not affect a state's authority "to impos[e]

*additional* liability or requirements with respect to – (A) the discharge of oil or other pollution

by oil *within such State*; or (B) any removal activities in connection *with such a discharge*."  33

U.S.C. § 2718(a)(1), (c)(1) (emphasis added); *see also* 33 U.S.C. § 2718(c).  The relief Louisiana

seeks, however, is not "additional" liability under Section 2718 but rather the very same relief

available under OPA: a declaration and damages for alleged injuries to natural resources,

property, revenues and public services.  (*See* La. First Am. Compl. ¶¶ 168-80, 233-36.)  *See also*

33 U.S.C. §§ 2702(b)(2)(A), (B), (D), (F), 2706(d)(1) and 2717(f)(2).  Section 2718 does not

apply to this blatant end run around OPA and Counts II and IV, which "mirror" and seek the

same relief as in Louisiana's OPA claim, should be dismissed.  *See In re Pet. of Settoon Towing*

*LLC*, Civ. A. No. 07-1263, 2009 WL 4730971, at *3 (E.D. La. Dec. 4, 2009) (citing Section

2718(c) as the basis for disallowing United States' damage claims where claims "mirror those

included in OPA").  Also, there has been no discharge of oil within Louisiana state waters, hence

OPA Section 2718(a) is inapplicable by its own terms.

2.    The Macondo Well Did Not Discharge Oil into Louisiana Waters and
Thus there Was No Violation of The Louisiana Environmental Quality
Act.

The Louisiana Environmental Quality Act prohibits persons from conducting, except

according to department regulations, "any activity which results in the *discharge* of any

substance *into the waters of the state*."  *See* La. Rev. Stat. Ann. § 30:2075 (emphasis added).

Louisiana cannot establish a violation of the Environmental Compliance Act because the

*Deepwater Horizon* incident was not a "discharge" within the meaning of the Act.  "Discharge"

is defined under the Louisiana Environmental Quality Act as "the placing, releasing, spilling,

percolating, draining, pumping, leaking, seeping, emitting, or other escaping of pollutants into the air, waters, subsurface water, or ground as the result of a prior act or omission." *Id.* § 30:2004(10).  These are all direct actions by some regulated party.  In this case, oil from the Macondo well was not ***placed, released, spilled, or percolated*** "into the waters" of Louisiana; rather, as Louisiana itself acknowledges, the oil migrated to those waters beginning some ten days after the explosion occurred.  (*See* La. First Am. Compl. ¶ 112.)

Courts interpreting analogous statutes have held that the definition of "discharged" cannot be stretched to encompass such passive migration of pollution.  For example, courts evaluating these types of terms in the CERCLA context have concluded that they should be interpreted in their "active" sense.  *See, e.g.*, *United States v. 150 Acres of Land*, 204 F.3d 698, 706 (6th Cir. 2000) (stating that potentially passive terms in definition of "disposal" under CERCLA "should be interpreted actively" because "disposal" is "defined primarily in terms of active words such as injection, deposit, and placing"); *United States v. CDMG Realty Co.*, 96 F.3d 706, 714 (3d Cir. 1996) (noting that while the terms "leaking" and "spilling" "may not require affirmative human conduct, neither word denotes the gradual spreading of contamination alleged"); *Joslyn Mfg. Co. v. T.L. James & Co., Inc.*, 836 F. Supp. 1264, 1270 (W.D. La. 1993) (holding that the leaching of hazardous materials caused by rainfall did not constitute "disposal").  Because the oil at issue here was discharged into U.S. waters above the Outer Continental Shelf and not into Louisiana waters, the oil was not "discharged" as required under the Louisiana Environmental Quality Act.

Moreover, Louisiana cannot enforce its pollution laws in the waters above the Outer Continental Shelf where the Macondo Well is located.  Although Louisiana's statutory definition

of "waters of the state" purports to include the "Gulf of Mexico,"[19] federal law limits a state's inclusion of coastal waters within its territory to only three miles off the shore. *See* 43 U.S.C. § 1312 (Submerged Lands Act providing that seaward boundary of each state may be extended three geographical miles distant from its coast line); *United States v. States of Louisiana, Texas, Mississippi, Alabama, and Florida*, 364 U.S. 502, 503 (1960); 33 U.S.C. § 1362(8) (Clean Water Act defining "territorial seas" as "the belt of seas extending three miles from the coast"); *NRDC v. EPA*, 863 F.2d 1420, 1436 (9th Cir. 1988) (Clean Water Act "effectively limits exercise of state water pollution regulation to three miles"; "[t]he legislative history of the Act indicates that Congress consciously defined the term 'territorial seas' to make clear the jurisdictional limits of [the Act], and its relationship to other statutes."); *see also* Part I.C., *supra.*

### 3. Louisiana Seeks Penalties Unauthorized by the Louisiana Environmental Quality Act.

Louisiana asks the Court to impose penalties well beyond those authorized by the Louisiana Environmental Quality Act.  First, Section 2025 of the Act authorizes penalties of not more than $32,500 "for each day of violation."  Here, the alleged violation—the release of oil— ended at the latest in July 2010 when the Macondo well was capped.  Louisiana characterizes the incident as continuing (*see* La. First Am. Comp. ¶ 187), but according to the Louisiana Supreme Court, the continuing effects of a violation do not establish a continuing violation.  *See Hogg v. Chevron USA, Inc.*, 45 So. 3d 991, 1006 (La. 2010) (rejecting argument that continued migration of gasoline was a continuing trespass when the leaking tanks had been removed ten years earlier; the continuing presence of the gasoline in the soil was "simply the continued ill effect of the

---

[19] "Waters of the state" is defined as "both the surface and underground waters within the state of Louisiana including all rivers, streams, lakes, groundwaters, and all other water courses and waters within the confines of the state, and all bordering waters and the Gulf of Mexico,"  La. Rev. Stat. Ann. § 30:2073(7).

original tortious incident."); *see also Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 254-55 (La. 2010) (rejecting plaintiffs' claims that migration of oilfield waste from unlined pits was a continuing tort and holding that the continued presence of the waste was the "continuation of the harm caused by the previous, but terminated conduct, and falls under the category of 'progressively worsening damages,' not damage-causing conduct").

Similarly, in *Hamker v. Diamond Shamrock Chemical Co.*, 756 F.2d 392 (5th Cir. 1985), the Fifth Circuit affirmed dismissal of the plaintiffs' complaint, rejecting the argument that oil remaining in the groundwater presented a continuing tort, holding that the complaint alleged "facts constituting only one 'discharge' from the defendant's pipe," not a continuing discharge, and that "[m]ere continuing residual effects resulting from a discharge are not equivalent to a continuing discharge." *Id.* at 397.[20]   In this case, the well was capped in July 2010.  As in *Hogg*, *Marin* and *Diamond Shamrock*, there is no continuing violation but rather, at most, "continuing residual effects."

Further, under Louisiana's interpretation of the Louisiana Environmental Quality Act, it would be nearly impossible to determine the point at which the alleged violations would cease and the per day penalty would no longer be due.  How much oil has to remain in state waters for there to be a violation?  Is a single molecule sufficient?  Penalty statutes may not be interpreted in a manner that makes them unworkable and impermissibly vague.  Just the opposite: Louisiana courts have held that laws must be construed in a manner that produces a "reasonable" result. *See, e.g.*, *Agilus Health v. Accor Lodging N. Am.*, 52 So. 3d 68, 77 (La. 2010).  An interpretation

---

[20]   *See also Aiello v. Town of Brookhaven*, 136 F. Supp. 2d 81, 121 (E.D.N.Y. 2001) (holding CWA does not allow citizen suit against a past polluter "for the ongoing migrating leachate plume"); *Wilson v. Amoco Corp.*, 33 F. Supp. 2d 969, 975-76 (D. Wyo. 1998) (concluding "that migration of residual contamination from previous releases does not constitute an ongoing discharge").

providing for violations that continue without any further conduct of the alleged violator and without any ascertainable end-point is plainly unreasonable.  Such an interpretation would also raise serious due process concerns under the fair notice doctrine.  *See, e.g., General Elec. Co. v. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995) ("In the absence of notice — for example, where the regulation is not sufficiently clear to warn a party about what is expected of it — an agency may not deprive a party of property by imposing civil or criminal liability.").  Here, the Louisiana statute is not remotely clear that it imposes $1 million per-day penalties (indeed, the contrary interpretation is clear), and as far as we are aware this is the first time state officials have asserted that it does.

Additionally, Louisiana's request for a per day additional penalty of $1 million is contrary to the plain language of the Louisiana Environmental Quality Act.  The Act expressly authorizes penalties of up to $32,500 per day of violation, and, under certain circumstances, an additional penalty of up to one million dollars.  In contrast to the $32,500 penalty, there is no suggestion that the $1 million additional penalty is separately imposed for every day the violation continues:

> "Any person found to be in violation of any requirement of this Subtitle may be liable for a civil penalty . . . of not more than the cost to the state of any response action made necessary by such violation which is not voluntarily paid by the violator, and ***a penalty of not more than thirty-two thousand five hundred dollars <u>for each day of violation</u>***.  However, when any such violation is done intentionally, willfully, or knowingly, or results in a discharge or disposal which causes irreparable or severe damage to the environment or if the substance discharged is one which endangers human life or health, such person ***may be liable for an additional penalty of not more than one million dollars***."

La. Rev. Stat. § 30:2025(E)(1)(a) (emphasis added).  The language of the statute is plain.  Had the Legislature intended that an additional, far more substantial, penalty be assessed for ***each day*** of a violation, it could and would have said so, exactly as it did in the first sentence with regard

to the maximum $32,500 daily penalty.   The fact that the Legislature specified a daily assessment for one and not the other demonstrates that the additional penalty is a one-time penalty.  When, as here, the law is clear and unambiguous and its application does not lead to absurd consequences, it shall be applied as written, and no further interpretation may be made in search of the intent of the legislature.  *See Detillier v. Kenner Reg'l Med. Ctr.*, 877 So. 2d 100, 103 (La. 2004); *see also Hart v. Allstate Ins. Co.*, 437 So. 2d 823, 827-28 (La. 1983) (holding that penal statutes must be strictly construed and environmental statutes are considered penal where a violation of the statute "could result in the assessment of a civil penalty."); *In re Mosley Well Serv., Inc.*, Docket No. WC-89-198, WP-89-198, 1994 WL 773579, at *11 (LDEQ Nov. 10, 1994) (applying this rule of statutory construction in LDEQ enforcement action with respect to the assessment of civil penalties under La. Rev. Stat. § 30:2025(E)).[21]

Even so, a review of the legislative history of the additional penalty provision further discredits the State's theory, which Louisiana appears to have devised for this case.  The original version of the civil penalty provision as enacted in 1979 did not provide for any additional penalty, but only for a penalty of not more than $10,000 per day.  1979 La. Acts 449.  In 1986, the Legislature amended the penalty provision to add a penalty "*of not more than one million dollars or the cost of any cleanup made necessary by such violation* and a penalty of not more than twenty-five thousand dollars for each day of violation."  1986 La. Acts 942 (emphasis added).

In 1989, the penalty provision was further amended to provide that in addition to the $25,000 per day penalty, "when any such violation results in a discharge or disposal which

---

[21]   A statute is "penal" if "the primary purpose of [the] statute is expressly enforceable by fine, imprisonment, or similar punishment."  Sutherland Statutory Construction (7th ed. § 59:1).

causes irreparable or severe damage to the environment or if the substance discharged is one which endangers human life or health, ***such person may be liable for an additional penalty of not more than one million dollars***."  1989 La. Acts 484 (emphasis added).  The legislative history of the 1989 amendment indicates that the legislature at that time viewed the $1 million penalty in the 1986 version of the statute as ***a cap on the recovery of unpaid remediation costs***.[22] Nothing in the legislative history suggests that the legislature intended the $1 million "additional penalty" to be assessed on a per day basis.

Finally, in 1990, the Legislature amended the penalty provision to expand the circumstances in which the additional penalty could be assessed to include violations committed "intentionally, willfully or knowingly."  1990 La. Acts 249.  Although the 1990 amendment did not specifically amend the $1 million reference, the House proceedings concerning Bill 1376, upon which 1990 version was based, are telling.  When the House discussed Bill 1376 at the May 17, 1990 meeting, Rep. Roach, one of the bill's authors, characterized the $1 million penalty as a "lump sum amount."[23]

Given the plain language of LEQA and its legislative history, the Court should reject Louisiana's effort to collect daily penalties of more than 30 times what the Legislature has authorized and provided constitutional fair notice of to regulated parties.

---

[22]  Specifically, the minutes of the House Committee on Natural Resources meeting on Senate Bill No. 384, upon which the 1989 enactment was based, state: "The bill removes the $1,000,000 ***cap on the penalty*** of the cost of the cleanup, but provides that a $1,000,000 additional penalty can be assessed if a substance discharged is one which endangers human life or health."  House Committee on Natural Resources, Minutes of June 7, 1989 Meeting, at 7 (emphasis added).

[23]  Q:  What are the civil penalties?  ***So much a day***, or?

A:  No, well the civil penalty is a ***lump sum amount***.  It's a significant one of not more than a million dollars.  So you can pretty well get their attention.

Audio Transcript of May 17, 1990 Meeting of Louisiana House of Representatives (emphasis added).

4.    Louisiana Cannot Recover Penalties for Alleged Violations of the Compliance Order.

In addition to the daily penalties under Section 30:2025(E)(1)(a), Louisiana also seeks a $50,000 daily penalty for purported violations of a Consolidated Compliance Order and Notice of Potential Penalty that was issued by the Louisiana Department of Environmental Quality on May 31, 2010, while BP was working with the Unified Area Command to cap the well and respond to the effects of the oil spill.  (*See* La. First Am. Compl. ¶¶ 186, 188.)[24]  Louisiana's claim for penalties in connection with the Compliance Order fails for several reasons.

*First*, the Compliance Order was issued unlawfully, and in direct contravention of the authority of the Unified Area Command under the National Contingency Plan to comprehensively address the response to this oil spill.  The NCP does not authorize States to issue orders in the midst of a response directing a responsible party to take actions relating to the conduct of the response.  Although BP, in the interest of cooperation with government regulators, provided detailed reports and information,[25] the fact remains that any authority the Louisiana Department of Environmental Quality had to issue the Compliance Order was preempted by the provisions of OPA, the CWA, and the National Contingency Plan.

---

[24]    The Compliance Order notified BP that it was required to:

(1)  Immediately take any and all measures necessary to eliminate the unauthorized discharge of oil and other pollutants into waters and property located in the State of Louisiana;
(2)  Immediately take any and all steps necessary to remediate all oil contaminated media to the extent practicable;
(3)  Immediately submit to LDEQ a plan that describes actions to be taken to eliminate the discharge and remediate the impacted waters;
(4)  Take any and all steps necessary to meet and maintain compliance with the Louisiana Environmental Quality Act, Water Quality, and Solid Waste Regulations; and
(5)  Submit a written report to LDEQ within 30 days that includes a detailed description of the circumstances surrounding the cited violations and actions taken or to be taken to achieve compliance.

[25]    BP met with LDEQ on June 8 and July 12, 2010 to provide details concerning the response.  Further, BP provided several written reports itemizing its response activities, including a June 18, 2010 report summarizing response metrics; a June 24, 2010 written report summarizing alternative response technologies; and a July 30, 2010 written report in response to the Compliance Order.

*Second*, Louisiana does not allege just how BP has violated the Compliance Order.  The State simply asserts that the BP Defendants violated the Order because "[t]he presence of oil, gas and other pollutants in Louisiana coastal waters continues to this day."  (La. First Am. Compl. ¶ 187.)  But such events do not violate any provision of the Order.  The Compliance Order does not require BP to remove all presence of oil, gas and other pollutants from the state.  Instead, the Order directs the BP Defendants to "remediate all oil contaminated media ***to the extent practicable***," an express acknowledgement that it was not feasible to remove immediately every trace of the contaminants.  Louisiana's complaint does not allege what BP did not do that the State believes it should have done, nor does it identify any instance in which BP failed to comply with directions from the Unified Area Command—even though the Department of Environmental Quality was itself an active member of the Unified Area Command.

*Third*, on June 10, 2010, BP filed a timely request for hearing.[26]  (*See* Ex. 2, Decl. of Andrew B. Bloomer, Tab A.)[27]  The Department has neither granted nor denied BP's request for hearing.[28]  Under the Louisiana Environmental Quality Act, the obligations imposed by a compliance order "are enforceable when the order . . . becomes a final enforcement action."  La.

---

[26]   The requested hearing was for Items 1-4 of the Order.  In response to Item 5, BP submitted three separate written reports to the Department.  (*See* notes 24-25, *supra*.)

[27]   The Court may take judicial notice of governmental administrative records and proceedings.  *See, e.g.,* Ray *v. City of Chicago*, 629 F.3d 660, 665 (7th Cir. 2011) ("[I]t is well established that district courts may take judicial notice of certain documents—including records of administrative actions—when deciding motions to dismiss."), *pet. for cert. filed*, 79 USLW 3649 (May 4, 2011); *United States v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 955 (9th Cir. 2008) ("Judicial notice is appropriate for records and 'reports of administrative bodies.'") (citation omitted) .  In addition, "'[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [its] claim.'"  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (citations omitted).

[28]   The parties entered into an informal dispute resolution agreement, which has been extended multiple times, and is now currently effective until August 4, 2011.  (Ex. 2, Bloomer Decl., Tabs B-D.)  The agreement delays the deadline by which the LDEQ must grant or deny BP's request for hearing.

Rev. Stat. §§ 30:2050.3, 30:2050.5.   A timely request for a hearing on a compliance order prevents the obligations imposed by the order from becoming a "final" action. *Id.* Under the Act, the Compliance Order only becomes a final enforcement action if no request for an adjudicatory hearing is filed within the specified period. *Id.* § 30:2050.3(D). Finally, when a request for adjudicatory hearing relates only to a provision of the compliance order or the penalty assessment, "the secretary may order compliance or may assess a penalty as to those provisions *on which a hearing was not requested*." *Id.* § 30:2050.4(H)(1) (emphasis added).

BP's timely request for a hearing means that there has been no final compliance order for the BP Defendants to violate.   Accordingly, Louisiana cannot assess the $50,000 per day in penalties dating back to May 31, 2010, and its claim for such penalties should be dismissed. *See TVA v. Whitman*, 336 F. 3d 1236, 1239-40 (11th Cir. 2003) (reasoning that until an EPA administrative compliance order becomes final, the respondent is "free to ignore [the compliance order] without risking the imposition of penalties for noncompliance with its terms"), *cert. denied sub nom. Leavitt v. TVA*, 541 U.S. 1030 (2004).

5.   Louisiana's Civil Penalty Statute Requires Presentment of Response Costs.

In another attempt to go beyond the statutory penalties authorized by the Louisiana Environmental Quality Act, Louisiana asks this Court to award "response action costs"[29] for allegedly unpaid response costs, pursuant to Section 2025.   (La. First. Am. Compl. ¶¶ 192-94.) Section 2025(E)(1)(a) authorizes payment of response action costs by a violator as follows:

---

[29]   The statute does not define "response action costs."   To the extent that these costs are the same as "removal costs" under OPA, (1) they are duplicative of those costs and may not be awarded by the Court as detailed in Section II above, and (2) they are preempted because they interfere with the finely wrought and statutorily-mandated presentment process, as detailed in Section I above.   A state statutory provision that allows the State to recover penalties in the amount of removal costs *that have not been presented to the responsible parties as required by OPA* presents a clear case of conflict preemption.

31

"Any person found to be in violation of any requirement of this Subtitle may be liable for a civil penalty, to be assessed by the secretary, the assistant secretary of the office of environmental compliance, or the court, *of not more than the cost to the state of any response action made necessary by such violation which is not voluntarily paid by the violator*, and a penalty of not more than thirty-two thousand five hundred dollars for each day of violation."

(Emphasis added). Thus, the Act contemplates a presentment process through which the alleged violator will either voluntarily pay the purported response action costs, or not. That is, it is not enough that Louisiana incurred response action costs that remain unpaid—which is all Louisiana alleges in its Complaint. Rather, the costs must have been made known to the alleged violators, who must have declined to pay the costs "voluntarily." Louisiana does not allege that it has given the BP Defendants an opportunity to examine the claim and refuse payment, as the statute requires. Moreover, Louisiana cannot use this provision to ask the Court to find the BP Defendants liable for *future* response action costs (*see* La. First Am. Compl. ¶ 193), as future costs have not yet been presented to the BP Defendants for an opportunity to pay them voluntarily. Accordingly, the Court should dismiss Count IV.

### B. Alabama's Claims Under the Water Pollution Control, Solid Wastes Disposal, and Hazardous Waste Disposal Acts Fail As A Matter of Law.

Alabama's statutory claims for penalties must be dismissed as an impermissible attempt to penalize conduct occurring outside of its territorial boundaries. Moreover, as set forth below, additional alternative grounds exist for dismissal of these claims.

### 1. Alabama Cannot Seek Civil Penalties Under the Named Statutes For Claims Occurring On the OCS.

Alabama seeks to impose penalties for alleged violations of its Water Pollution Control, Air Pollution Control, Solid Wastes Disposal, and Hazardous Waste Disposal Acts.[30] Although

---

[30] The Alabama Environmental Management Act ("AEMA") does not contain any substantive rules or standards that form the basis of a claim for penalties. Rather, the AEMA authorizes civil actions to recover penalties for

Footnote continued on next page

Alabama may seek civil penalties for violations occurring within its territorial boundaries, none of the statutes provides for similar enforcement beyond those boundaries. As this Court has held, a State may not enforce its laws beyond its territorial limits absent explicit authority in the statute to do so. *See Salazar v. Freeport Overseas Serv. Co.*, Civ. A. No. 99-1210, 2000 WL 1099391, at *2 (E.D. La. Aug. 3, 2000) (Feldman, J.) ("[E]xtraterritorial effect cannot be given to state statutes unless expressly provided by the statute itself.") (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 259 (1991)); *see also Ex parte Old Republic Sur. Co.*, 733 So. 2d 881, 884 (Ala. 1999) ("[I]n order to have [an] extraterritorial effect, a statute must explicitly provide for that effect.").

Alabama's state statutory claims are premised on allegations that the BP Defendants discharged oil, dispersants, and unspecified other substances into the Gulf of Mexico, resulting in the presence of various contaminants in the land, water, and outdoor atmosphere of the state, in violation of the enumerated acts. (*See* Ala. First Am. Compl. ¶¶ 296-300, 302, 305, 308, 315, 321, 327.) These allegations of actions far outside of Alabama's boundaries establish that Alabama cannot impose penalties based on the alleged conduct. The *Deepwater Horizon* explosion and the leaking wellhead were more than fifty miles offshore, and dispersants were applied no fewer than three nautical miles offshore. (Ex. 2, Bloomer Decl. Tab E (May 12, 2010 Press Briefing Transcript, available at http://www.restorethegulf.gov/release/2010/05/18/ transcript-press-briefing-may-12 (last visited June 3, 2011)) (officials from federal agencies confirming that dispersants were used no closer than three miles to shore); *id.* Tab F (Section 1.7 (Use of Dispersants) of the United States Coast Guard's January 2011 Incident Specific

---

Footnote continued from previous page

violations of Alabama's environmental statutes. Ala. Code § 22-22A-5(18)(b). The imposition of penalties, therefore, requires a finding that one of these statutes has been violated.

Preparedness Review Final Report at 40, available at http://www.uscg.mil/foia/docs/DWH/ BPDWH.pdf (last visited June 3, 2011)) (noting that Regional Response Teams had pre-authorized the use of dispersants when used at least three miles from shore and that use of dispersants was conducted in accordance with these guidelines).)[31]   Accordingly, none of the Alabama statutes are applicable.

    2. <u>The Alabama Water Pollution Control Act Is Inapplicable to the <i>Deepwater Horizon</i> Incident.</u>

      a. Continuing migration of oil is not a "discharge" under the AWPCA.

Even assuming that Alabama could reach into the Gulf of Mexico to impose civil penalties—which it cannot—migration of oil into state waters is not a "discharge" within the meaning of the discharge prohibition, for the same reasons that migration of oil into Louisiana waters is not a prohibited "discharge" in Louisiana.   (*See* Section III.A.2, *supra*.)   Alabama defines "discharge" as "[t]he addition, introduction, leaking, spilling or emitting of any sewage, industrial waste, pollutant or other wastes into waters of the state."   Ala. Code § 22-22-1(b)(8). Passive migration is not included in the definition of "discharge."   As noted above, courts in the CERCLA context have interpreted similar language to exclude passive migration.   (*See* Section III.A.2, *supra*.)[32]   Moreover, as with Louisiana, the part of the Gulf of Mexico lying beyond the three-mile jurisdictional limit is not part of the "waters of the state" under Alabama law.   *See* Ala. Code § 22-22-1(b)(2) (defining "waters of the state" as "[a]ll waters of any river, stream,

---

[31] This Court may take judicial notice of governmental websites.  *See Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005); *Hyder v. Quarterman*, No. C-07-291, 2007 WL 4300446, at *3 (S.D. Tex. Oct. 10, 2007) ("The Fifth Circuit has determined that courts may take judicial notice of governmental websites.") (citing cases); *In re Katrina Canal Breaches Consol. Litig.*, No. 05-CV-4182, 2008 WL 4185869, at *2 (E.D. La. Sept. 8, 2008) (taking judicial notice of content on public websites for the purpose of a motion to dismiss).

[32] To BP's knowledge, no court has construed the term "discharge" under Alabama law to include passive migration into state waters.

watercourse, pond, lake, coastal, ground or surface water, wholly or partially within the state, natural or artificial."); 43 U.S.C. § 1312 (Submerged Lands Act); *States of Louisiana, Texas, Mississippi*, 364 U.S. at 503 (interpreting Submerged Lands Act); *NRDC v. EPA*, 863 F.2d at 1436 (noting that Clean Water Act "effectively limits exercise of state water pollution regulation to three miles"); cases cited in Section I.C, *supra.*

> b.  Alabama cannot multiply penalties by arbitrarily subdividing its waters into segments and attaching a civil penalty for each segment.

Alabama, like Louisiana, has advanced a novel theory in an effort to dramatically multiply the penalties it is authorized to recover.  According to Alabama, every time oil reached a separate segment of state water, a separate violation occurred.  In effect, Alabama seeks to pile up the penalties by counting each one of dozens of administrative subdivisions of state waters as a separate "water of the state" for penalty purposes.  This Court should reject Alabama's unprecedented assertion of its penalty authority.

Alabama's division of its waters for this purpose is unsupported by law.  Alabama provides what it asserts to be a list of "separate and distinct coastal waters of state for purposes of the AWPCA and its rules, regulations, and standards."  (Ala. First Am. Compl. ¶ 293.) However, Alabama provides no citation supporting the proposition that these divisions apply to liability issues arising under the AWPCA.  Instead, the purpose of the list appears to be purely to act as a ***water use classification*** system.  *See* Ala. Admin. Code r. 335-6-11.  Furthermore, Alabama fails to justify the list, which seems at war with itself.[33]

---

[33]  Alabama's characterization of the waters as "separate and distinct" is contradicted by the list itself.  Alabama lists three different sections of Mobile Bay (*see* Ala. First Am. Compl. ¶ 293(c)-(e)), including one that includes both a specific description and "all other portions of Mobile Bay" (*id.* ¶ 293(d)).  The state also divides the Mobile River into two segments (*see id.* ¶ 293(a),(b)), divides Portersville Bay into two segments (*id.* ¶ 293(g),(h)), divides the Bon Secour River into two segments (*id.* ¶ 293(i),(*l*)), and includes a general catchall category of "coastal waters of the Gulf of Mexico" (*id.* ¶ 293(j)).

Alabama's novel attempt to increase its penalties should be rejected.  *First*, the purpose of the use classification system is not to define the "waters of the state for purposes of the AWPCA and its rules, regulations, and standards," *see* Ala. First Am. Compl. ¶ 293, but instead to "apply water quality criteria adopted for particular uses based on existing utilization, uses reasonably expected in the future, and those uses not now possible because of correctable pollution but which could be made if the effects of pollution were controlled or eliminated." Ala. Admin. Code r. 335-6-11.01(2).  As its very name implies, the use classification system supports particular *uses*; it does not define *waters*.

*Second*, the use classification of waters, especially when employed by the state for this non-intended purpose, is arbitrary.  The use classification is not subject to formal rulemaking; instead, "[t]hose use classifications presently included in the standards are **reviewed informally** by the Department's staff as the need arises, and the entire standards package, to include the use classifications, receives a formal review at least once each three years."  *Id.* r. 335-6-11.01(3) (emphasis added).  To make matters worse, Alabama claims here that it may add "other such waters of the State as shall be determined."  (Ala. First Am. Compl. ¶ 296.)  Alabama apparently does not acknowledge *any* constraints that would bind the state in such line-drawing.[34]  Such a regulatory list, if used to support a claim of civil liability, where such a list can be changed at will without prior notice to regulated parties, readily flunks the U.S. Constitution's fair notice doctrine.  *See Gates & Fox Co. v. OSHA*, 790 F.2d 154, 156 (D.C. Cir. 1986) (Scalia, J.) (agencies must provide "fair warning of the conduct [regulatory action] prohibits or requires" before "penal sanctions" can be applied).

---

[34]   Taken to its logical conclusion, Alabama could multiply state waters indefinitely, completely eviscerating any limits on its penalty-setting authority.

*Third*, Alabama ignores the plain language of the statute. The Act defines "waters" using the collective term "all": "*All* waters of any river, stream, watercourse, pond, lake, coastal, ground or surface water, wholly or partially within the state, natural or artificial." Ala. Code § 22-22-1(b)(2) (emphasis added)). Alabama then takes the prohibition on discharge into "any *waters* of the state" (which must be read to include the collective term "all" from the statutory definition) and transforms it into a prohibition on unpermitted discharge into any *individual* water segment as defined for use classification purposes.[35] Alabama law does not, for example, prohibit a discharge into "Mobile Bay from its mouth to the Spanish River" and separately prohibit a discharge into "Mobile Bay from west of a line drawn due south from the western shore of Chacaloochee Bay (Lat. 304047.3/Long. 08755944.2) to a point due east of the mouth of Dog River (Lat. 303353.2/Long. 0880515.3)." (Ala. First Am. Compl. ¶ 293(b & c).) Instead, Alabama law prohibits an unpermitted discharge into the waters of the state generally.[36]

*Fourth*, the arbitrary and self-serving nature of Alabama's subdivision theory becomes even more obvious in light of Alabama's argument that "[e]ach and every time that a discharge . . . resulted in new or increased pollution in a water of the state, . . . it violated [the] minimum standards" for Alabama water quality and constitutes a separate violation for each water segment. (*Id.* ¶ 302.) As Alabama acknowledges, the "minimum standards" apply to "all state waters," not separately to each use classification subdivision. (*Id.* ¶ 301 (quoting Ala. Admin. Code r. 335-6-10-.06).) There is no authority that allows the state to subdivide a minimum

---

[35] *See also* Ala. Admin. Code r. 335-6-10-.01(2) ("Water quality criteria . . . provide the basis for standards of quality for State waters *and portions thereof*.") (emphasis added)..

[36] To be sure, *separate discharges* are *separate violations*, but not because the particular body of water, however administratively or geographically classified, is different. There is a separate violation because the statute prohibits each separate discharge.

standard, tie it to particular parts of water bodies however the state sees fit, and then assess a penalty per part of water body rather than for a violation of the standard as a whole.

If Alabama is permitted to subdivide its waters for penalty purposes, with no constraints on its line-drawing, it could set and multiply penalties at will, even after an event has occurred. This sort of unlimited state authority introduces serious problems of prior notice, because the regulated community has no way of predicting or even reliably estimating civil penalties in advance. To the extent that doubts remain regarding the application of these penalties, they must be resolved in favor of the defendants. *See, e.g.*, *State v. Jebsen S. (U.K.) Ltd.*, 377 So. 2d 940 (Ala. 1979) (holding that damages sought under civil penalty provision for violation of Water Quality Improvement Act were "penal in nature. It is axiomatic that penal statutes are to be strictly construed in favor of the persons sought to be subjected to their operation."); *see also Satellite Broad. Co. v. FCC*, 824 F.2d 1, 3 (D.C. Cir. 1987) ("Traditional concepts of due process incorporated into administrative law preclude an agency from penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule.").

      c.    Alabama cannot seek penalties for alleged violations after the discharge from the Macondo well stopped.

Like Louisiana, Alabama repeatedly characterizes the release of oil from the Macondo well as "continuing" in nature (*see, e.g.*, Ala. First Am. Compl. ¶¶ 223, 237, 280, 287, 300, 308 and 337), thereby amounting to a continuing violation of the AWPCA (*see id.* ¶¶ 300, 308). Alabama, like Louisiana, confuses ***continuing effects*** of an alleged violation with a ***continuing violation***. While Section 22-22A-5(18)(c) of the Alabama Environmental Management Act authorizes imposition of penalties "for each day of violation" of the substantive environmental statutes, in this case, the alleged violation—a release of oil—ended in July 2010, when the Macondo well was capped. Any ***effects*** of the release after that time do not constitute a

continuing violation.  This appears, again, to be theory developed for this case, in an effort to expand Alabama's penalty authority far beyond what the state legislature intended.

Alabama case law supports this conclusion.  For example, in *Payton v. Monsanto Company*, 801 So. 2d 829 (Ala. 2001), the Alabama Supreme Court considered the issue of continuing violations in the context of a statute of limitations argument.  Plaintiffs alleged that defendant continued to discharge pollutants into area lakes and creeks as of the filing of the complaint.  *See id.* at 836.  Defendant, on the other hand, argued that the limitations period began to run seven years earlier, when plaintiffs had filed a separate action for the same sort of pollution against another company, on the basis that plaintiffs were by that time aware of the contamination.  *See id.*  In concluding that plaintiffs' allegations of multiple wrongful acts were sufficient to withstand summary judgment, the court emphasized that plaintiffs had specifically alleged that Monsanto continued to discharge pollutants into the waterways at the time of the filing of the complaint.  *See id.* at 836.  In making this distinction, the court noted that "Alabama law does not recognize a continuing tort in instances where there has been ***a single act followed by multiple consequences***."  *Id.* at 835 (emphasis added).[37]   That case, however, the court found that because defendant "offered no evidence contradicting the allegations . . . that wrongful conduct continues," plaintiffs' claim could survive summary judgment.  *Id.*; *see also, e.g.*, *Hosea v. Langley*, No. Civ.A. 04-0605-WS-C, 2006 WL 314454 at *17 (S.D. Ala. Feb. 8, 2006) ("[T]he continuous tort doctrine is not available where a single act is followed by multiple

---

[37]   In so noting, the court addressed its prior decision in *Moon v. Harco Drugs, Inc.*, 435 So. 2d 218, 220 (Ala. 1983), in which the court discussed "a defendant's [liability for] repeated wrongs to [a] plaintiff."  *Payton*, 801 So. 2d at 835 n.2.  The *Payton* court acknowledged the *Moon* court's "illustrations" of a continuing offense included "when a plaintiff landowner seeks damages for the contamination of a well or stream" but noted that "the three cases cited to support this proposition ***involve repetitive acts or ongoing wrongdoing***; *Howell v. City of Dothan* . . . (***ongoing discharge*** of sewage); *Employers Insurance Co. of Alabama v. Rives* . . . (opinion refers to repetitive acts); *Alabama Fuel & Iron Co. v. Vaughn* . . . (damage resulting from the ongoing operations of a coal mine)."  *Id.* (emphasis added).

consequences, but rather requires "repetitive acts or ongoing wrongdoing." (citing *Payton*, 801 So. 2d at 835 & n.2)); *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 656 (S.D. Ala. 2005) (citing *Payton* and finding no continuing discharge where "there has been no evidence that defendants are ***presently releasing*** appreciable quantities of mercury or other hazardous substances offsite in a manner that might contaminate plaintiff['s] property") (emphasis added).

The Macondo well was capped in July 2010.  Unlike in *Payton*, there is no continuing violation, only, at most, "a single act followed by multiple consequences."  Further, as with Louisiana's interpretation of the Louisiana Environmental Quality Act, Alabama's construction of the AWPCA provides no insight as to when these allegedly "continuing" violations would terminate.  (*See* Section III.A.3, *supra*.)  An interpretation of the statute that contemplates violations that continuing indefinitely, absent any act or omission by the BP Defendants and with no end in sight, runs counter to the established principle that statutes must be construed in a manner that produces a "reasonable" outcome.  *See, e.g.*, *Ex parte Watley*, 708 So. 2d 890, 893 (Ala. 1997) ("It has been called a golden rule of statutory interpretation that unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result.") (citations omitted).

> d.     The public nuisance provisions of the AWPCA do not provide a basis for a suit for penalties.

The AWPCA does ***not*** authorize the state to seek civil penalties related to the "public nuisance" provisions.  Instead, the statute only authorizes the Alabama Department of Environmental Management to seek injunctive relief.  *See* Ala. Code § 22-22-9(i)(4) ("Any and all pollution is hereby declared to be a public nuisance and, if it creates, or is about to create, a

health hazard, shall be subject to ***immediate control*** of the commission ***by order or injunction***.")
(emphasis added).  Accordingly, any such claim by Alabama must be dismissed.

> e.     Alabama cannot recover damages under both the AWPCA's
> damages provision and common law.

Finally, Alabama cannot recover damages under both the statutory damages provision
and common law.  Alabama law clearly prohibits double recovery.  *See, e.g.*, *Martin v. Scaife*,
587 So. 2d 995, 997 (Ala. 1991) ("[A] claimant is not entitled to a double recovery, unless, of
course, the circumstances show an agreement to the contrary or there has been a waiver." (citing
*Keating v. Contractors Tire Serv., Inc.*, 428 So. 2d 624 (Ala. 1983)).

> 3.     The Solid Wastes Disposal Act Cannot Apply Because BP's Use of
> Dispersants Was Authorized and Dispersants Were Applied in Accordance
> with Their Intended Use.

The use of dispersants by the BP Defendants during the incident response was, as a
matter of law, not a violation of the ASWDA.  *First*, such use was fully authorized by the
Unified Area Command (Alabama does not contend otherwise), and any effort to penalize it
under state law is preempted by OPA and the National Contingency Plan.  *Second*, under state
law, "solid wastes" are defined under the ASWDA to include "any other ***discarded*** materials . . .
including solid, semisolid or contained gaseous material," Ala. Code § 22-27-2(32) (emphasis
added).  But a substance that is applied to the environment in accordance with its normal
intended use is not "discarded."  For example, in *No Spray Coalition, Inc. v. City of New York*,
252 F.3d 148, 149 (2d Cir. 2001), the Second Circuit affirmed the district court's ruling that New
York City's spraying of insecticides did not constitute a disposal of a solid waste in a manner
that rendered it "discarded material."  Rather, the court held, "material is not discarded until after
it has served its intended purpose"; therefore, "pesticides are not being 'discarded' when sprayed
into the air with the design of effecting their intended purpose: reaching and killing mosquitoes

and their larvae." *Id.* at 150 (citing *Conn. Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1316 (2d Cir. 1993)).   Similarly, in *Cordiano v. Metacon Gun Club, Inc.*, the Second Circuit held that munitions materials remaining on a shooting range property are not "discarded materials" where they result from "normal, intended use of lead shot at a shooting range."   575 F.3d 199, 208 (2d Cir. 2009).   Rather, the court noted that materials that "come to rest on land . . . as a result of their proper and expected use" are not "discarded material" subject to regulation as solid waste.   *Id.* at 207-08 (citations omitted).

This is precisely the case here.   The BP Defendants employed dispersants as part of the spill response for the very purpose for which those materials are intended: to break down oil released from the Macondo well into small droplets that more easily disperse in the water column, making it less likely that the oil will form a surface slick, which can contaminate shoreline habitats and wildlife on the surface of the water or at the shoreline.   Alabama does ***not*** allege that the BP Defendants employed these dispersants other than for their normal, intended use.[38]

4.   The Alabama Hazardous Wastes Management Act Cannot Apply to Dispersants Which Are Not Solid Wastes.

In another effort to artificially inflate the penalties available to it, Alabama alleges as Count III.L that, in addition to being a solid waste subject to regulation under the ASWDA, "some or all of the chemical dispersants" used in the spill response "constitute hazardous waste under" the Alabama Hazardous Wastes Management Act ("AHWMA"), and the Defendants

---

[38]   Alabama alleges, without elaboration, that the BP Defendants "use[ed] dangerous chemical dispersants of an incorrect nature, type and amount."   (Ala. First Am. Compl. ¶ 332aa.)   Accepting this allegation as true, however, only amounts to a claim that the BP Defendants could have used different and/or fewer dispersants, not that they used the dispersants for a purpose other than to disperse oil.

"have disposed of such hazardous waste into and on the land and water of the State in violation of the AHWMA."  (Ala. First Am. Compl. ¶ 321.)

The AHWMA defines hazardous waste as "[a] solid waste, or combination of solid wastes, which, because of its quantity, concentration or physical, chemical or infection characteristics may pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported or disposed of, or otherwise managed."  Ala. Code. § 22-30-3(5)(b).  Thus, by definition, material cannot be "hazardous waste" if it is not "solid waste."  Because the dispersants at issue were not "discarded materials," but, rather, came to rest in the Gulf of Mexico as a result of their normal, expected use, they are not solid waste and, therefore, not hazardous waste subject to regulation under the AHWMA.[39]

### C.    Certain of Louisiana's Civil Law Claims Must Be Dismissed for Additional Reasons.

#### 1.    LOSPRA Provides the Exclusive Remedy for Louisiana Oil Spills.

By its terms, LOSPRA is "the **exclusive authority** on oil spill prevention, response, removal, and the limitations of liability" under Louisiana law, and its provisions broadly apply to any "responsible party" as well as "potentially responsible party" for an oil spill.  La. Rev. Stat. §§ 30:2496, 30:2454(22) (emphasis added), § 30:2480(G); *see also* LAC 43:XXIX.115(A).  LOSPRA also expressly supersedes other causes of action conflicting with that Act.  *See* La. Rev. Stat. § 30:2491(A) ("When applicable, the limitations of liability and immunities provided in [LOSPRA] shall be exclusive and shall supersede any other liability provisions provided by

---

[39]    Alabama's assertion that, according to material safety data sheets for one of the dispersants, the product "**could** meet the criteria of a hazardous waste" under RCRA *if* the product becomes a waste (Ala. First Am. Compl. ¶ 75 (emphasis added)), is unavailing.  At most, this allegation merely supports the idea that dispersants **could** be deemed hazardous waste if, in the first instance, they are determined to be "discarded" rather than used for their intended purpose.  As set forth in Section III.B.3, *supra*, however, Alabama cannot, and has not, alleged that dispersants were used for any purpose other than the dispersion of oil.

any other applicable state law.").  Louisiana's state law claims for negligence, nuisance, trespass, strict liability, abnormally dangerous and ultrahazardous activity, fraudulent concealment and negligent misrepresentation, unjust enrichment, and punitive damages are based on alleged losses from property contamination.  (*See* La. First Am. Compl. ¶¶ 293-327, 368-91.)  Because LOSPRA applies to "damages for injury to, destruction of, or loss of natural resources" and "damages for injury to, or economic loss resulting from destruction of, immovable or corporeal movable property," Louisiana's state law claims are inconsistent with LOSPRA.  *See* La. Rev. Stat. § 30:2454(5)(a), (b).  This is a critical feature of LOSPRA because without the liability limitations and caps, LOSPRA could not operate properly.  *See id.* § 30:2479 (establishing detailed caps on damages and removal costs attributable to responsible parties).

A "responsible party" is defined under LOSPRA to include "[a]ny other person . . . who causes, allows, or permits an unauthorized discharge of oil or threatened unauthorized discharge of oil."  La. Rev. Stat. § 30:2454(22)(c) (emphasis added).  This "catch-all" does not exist under OPA.  *See* 33 U.S.C. § 2701(32) (defining OPA responsible parties only as certain owners, operators and lessees).  It is LOSPRA's encompassment of *any* party that may have had a causal role in a spill that may fill any gaps in OPA.  As to the BP Defendants—an OPA "responsible party"—there is no such gap.

LOSPRA provides that "[t]he provisions of this Chapter shall supersede . . . any conflicting laws of this state."  La. Rev. Stat. § 30:2491(A); *see also id.* § 30:2496.  LOSPRA's exclusive remedies bar is fully applicable to the state law claims being pursued here by Louisiana against the BP Defendants.  Accordingly, Louisiana's state law claims are preempted by LOSPRA as a matter of Louisiana law.

2.      Because Louisiana is Not a Neighbor as a Matter of Law, It Fails to State a
         Nuisance Claim.

As this Court has recognized, "nuisance," as defined in Louisiana Civil Code articles 667-669, is "limited to the obligations proprietors owe to their neighbors," and a plaintiff thus cannot "be a party whose property is physically remote and not adjacent to Defendants' property." *Barasich v. Shell Pipeline Co., LP*, Civ. A. Nos. 05-4180, 05-4197, 05-4199, 05-4212, 05-4512, 06-5102, 2006 WL 3913403, at *8 (E.D. La. Nov. 20, 2006) (Barbier, J.); *see also Barasich v. Columbia Gulf Transmission Co.*, 467 F. Supp. 2d 676, 690 (E.D. La. 2006) (Vance, J.) ("Plaintiffs' Article 667 claim fails because they do not demonstrate that the 'neighbor' referred to in Article 667 could be a party whose property is physically remote from that of defendants").  According to the Louisiana Supreme Court, liability under article 667 arises only "when activity by one party holding a right to immovable property has caused damages to a party holding a right to a neighboring property." *Inabnet v. Exxon Corp.*, 642 So. 2d 1243, 1251-52 (La. 1994).

The oil spill occurred on the Outer Continental Shelf some fifty miles from Louisiana's coast and well outside of Louisiana's territorial waters, and only entered those waters as a result of the "migration of oil."  (La. First Am. Compl. ¶ 304.)  Because Louisiana cannot demonstrate it is a "neighbor" under these circumstances, it cannot state a claim for nuisance under Louisiana law.  *See TS&C Invs., LLC v. BEUSA Energy, Inc.*, 637 F. Supp. 2d 370, 381-84 (W.D. La. 2009) (dismissing Article 667 claim on ground "neighbor" requirement not met in putative class action alleging damages against companies involved in placement and drilling of an oil well after an oil well blowout caused closure of interstate highway where named plaintiffs were located twenty miles from the well blowout site); *In re Katrina Canal Breaches Consol. Litig.*, 647 F. Supp. 2d 644, 734 (E.D. La. 2009) (Duval, J.) (concluding that plaintiffs located at least 3 miles

away from levee breach and the Mississippi River Gulf Outlet navigational channel were not "neighbors" under Article 667); *Barasich*, 2006 WL 3913403 at *8 (dismissing Article 667 claim on ground "neighbor" requirement not met by plaintiffs who fished commercially in waters where oil migrated after rupture of defendant's crude oil pipeline that traversed a levee); *Barasich*, 467 F. Supp. 2d at 690-91 (dismissing article 667 claim on ground that "neighbor" requirement not met where plaintiffs were inland property owners alleging that defendant oil and gas companies' dredging of canals through Louisiana marshlands contributed to the destructive impact of Hurricanes Katrina and Rita to inland communities).

3.   <u>Louisiana Fails to State a Claim for Trespass Under Louisiana Law.</u>

Louisiana has failed to plead the requisite intent to state a valid trespass claim.  One of the elements of trespass under Louisiana law is intent to enter the property of another.  *Terre Aux Boeufs Land Co., Inc. v. J.R. Gray Barge Co.*, 803 So. 2d 86, 95 (La. Ct. App. 4 Cir. 2001) (elements of trespass are: (1) intent to enter property that belongs to another; and (2) physical entrance onto the land of another); *see, e.g.*, *id.* at 95 ("[C]ivil trespass is generally considered to be an intentional tort, requiring proof that the defendant took some intentional action that resulted in harm to the plaintiff."); *Barney v. Plaquemines Parish Gov't*, 22 So. 3d 1117, 1118-19 (La. Ct. App. 4 Cir. 2009).  Although this Court in 2006 stated that "intent may not always be required," *Barasich*, 2006 WL 3913403 at *2, the Louisiana Supreme Court recently confirmed that trespass is an "intentional tort."  *See Hogg*, 45 So. 3d at 1002 n.11.

In this case, Louisiana alleges that trespass occurred due to the "continuing migration [of oil] on and around the State's properties."  (La. First Am. Compl. ¶ 311.)  Such continuing migration does not satisfy the intent requirement.  *See* Section III.A.2, *supra*; *see also Hogg*, 45 So. 3d at 1002 n.11 (noting without deciding the issue that a cause of action concerning migration of a substance more properly lies in nuisance due to the lack of intent); Dan B. Dobbs,

THE LAW OF TORTS § 53, at 107 (2001) ("Nuisance or negligence rather than trespass is definitely the approach courts take when liquids percolate underground to enter the plaintiff's land beneath the surface.") (quoted in *Hogg*, 45 So. 3d at 1002 n.11).

      4.    <u>Louisiana Has Failed to State a Strict Liability Claim under Article 2317.</u>

Louisiana has failed to state a claim for strict liability under Louisiana Civil Code Article 2317 (Count XIV).   Article 2317 provides that a party can be held liable for "the damage occasioned by . . . the things which we have in our custody," but expressly states that this general liability "is to be understood with the following modifications."  La. Civ. Code art. 2317.  Article 2317.1 subsequently modifies Article 2317 accordingly:

> "The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care."

*Id.* art. 2317.1.  Thus, Article 2317.1 establishes a negligence standard for Article 2317.  *See Riggs v. Opelousas Gen. Hosp. Trust Auth.*, 997 So. 2d 814, 817 (La. Ct. App. 3 Cir. 2008).  As a result, Louisiana's strict liability claim should be dismissed.

      5.    <u>Because Drilling Operations Do Not Constitute Ultrahazardous Activity under Louisiana Law, Louisiana's Claim for Liability for Abnormally Dangerous/Ultrahazardous Activity Should Be Dismissed.</u>

Louisiana Civil Code article 667 states that "the proprietor is answerable for damages without regard to his knowledge or his exercise of reasonable care, if the damage is caused by an ultrahazardous activity."   La. Civ. Code. art. 667.  The article further specifies that "[a]n ultrahazardous activity as used in this Article is strictly limited to pile driving or blasting with explosives."  *Id.*  The Supreme Court of Louisiana has confirmed that "[a]ny other activities besides the two the article specifically lists are not ultrahazardous for purposes of article 667."  *See Suire v. Lafayette City-Parish Consol. Gov't*, 907 So. 2d 37, 49 (La. 2005).  Thus, to qualify

for the absolute liability standard in Article 667, the plaintiff must show that the activity is either "pile driving" or "blasting with explosives."  *See id.*

Louisiana alleges that "Defendants' drilling operation is an abnormally dangerous and ultrahazardous activity."  (La. First Am. Compl. ¶ 325.)  Because drilling operations are not listed under Article 667, drilling operations are not ultrahazardous for purposes of that article. *See Suire*, 907 So. 2d at 49.  Moreover, the Fifth Circuit has concluded that "drilling operations are not ultrahazardous."  *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550 (5th Cir. 1987). Because drilling operations are not ultrahazardous activities as a matter of law, the State of Louisiana's claim for liability for abnormally dangerous/ultrahazardous activity should be dismissed.

Finally, even if this Court were inclined to reconsider whether drilling operations are ultrahazardous, Louisiana applies the wrong standard for that purpose.  The factors listed in the Amended Complaint are based on the factors in the Restatement (Second) of Torts.  (*See* La. First Am. Compl. ¶ 325.)  However, the Fifth Circuit has expressly precluded invoking the Restatement factors for ultrahazardous activities in Louisiana.  *See Perkins v. F.I.E. Corp.*, 762 F. 2d 1250, 1264 (5th Cir. 1985) ("We therefore conclude that neither the 'factors passage' of *Langlois* nor the factors enumerated in the Restatement (Second) of Torts §§ 519-520 (1977) comprise the Louisiana doctrine of ultrahazardous activities.").  In Louisiana, when determining whether an activity is ultrahazardous for purposes of a cause of action for absolute liability, the only relevant factor is whether the activity is listed in Article 667.  *See Suire*, 907 So. 2d at 48-49.  Because the State of Louisiana's claim for liability for abnormally dangerous/ultrahazardous activity is not predicated on the appropriate analysis, it should be dismissed.

6.   Louisiana's Claims for Fraudulent Concealment and Negligent Misrepresentation Do Not Satisfy the Specificity Required by Rule 12(b)(6).

Louisiana's "fraudulent concealment" and negligent misrepresentation claim (Count XXII) must be dismissed because Louisiana did not plead necessary elements of these claims.[40] Fraudulent misrepresentation is "essentially an allegation of fraud." *Unimobil 84, Inc. v. Spurney*, 797 F.2d 214, 217 (5th Cir. 1986) (citation omitted).   The elements are: (1) a misrepresentation of material fact, (2) made with the intent to deceive, (3) causing justifiable reliance with resulting injury.  *See Systems Eng'g and Sec., Inc. v. Science & Eng'g Ass'n, Inc.*, 962 So. 2d 1089, 1091 (La. Ct. App. 4 Cir. 2007).   To prevail on a negligent misrepresentation claim under Louisiana law: (1) there must be a legal duty on the part of the defendant to supply correct information; (2) there must be a breach of that duty, whether by omission or affirmative misrepresentation; and (3) the breach must have caused damage to the plaintiff based on the plaintiff's reasonable reliance on the misrepresentation.  *See Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs.*, 527 F.3d 412, 418 (5th Cir. 2008).

Louisiana has not alleged with the requisite specificity of Fed. R. Civ. P. 12(b)(6) or 9(b) that the BP Defendants made any fraudulent statements or omissions or negligent misrepresentations.[41]   Instead, Louisiana merely asserts in general terms that the BP Defendants

---

[40]   The BP Defendants analyze the "fraudulent concealment" claim as one for "fraudulent misrepresentation" because there is no cause of action for "fraudulent concealment" under Louisiana law.

[41]   *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) ("[A]s the claims sound in fraud and negligent misrepresentation, Appellants must plead the misrepresentations with particularity under Fed. Rule Civ. Proc. 9(b)."); *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1977) (Rule 9(b) requires Plaintiffs to "[1] specify the statements contended to be fraudulent, [2] identify the speaker, [3] state when and [4] where the statements were made, and [5] explain why the statements were fraudulent") (citations omitted); *see also Twombly*, 550 U.S. at 555 (under Rule 12(b)(6), "[f]actual allegations must be enough to raise a right to relief above the speculative level").

"attempted to downplay and conceal the severity of the spill" and "did not provide complete and timely announcements and warnings about the severity, forecast, and trajectory of the Spill." (La. First Am. Compl. ¶ 374.)  But general allegations of this nature do not suffice to state a claim.  *See Williams v. WMX Techs., Inc.*, 112 F.3d 175, 180 (5th Cir. 1997) (dismissing claim where excerpts reprinted in complaint "do not quote a defendant, they merely say that the defendants were widely quoted or paraphrase previous statements.").[42]

Moreover, Louisiana's complaint is devoid of any factual allegations regarding an "intent to deceive" by the BP Defendants, a prerequisite of any fraud claim.  *See Farwell v. Milliken & Farwell, Inc.*, 145 So. 2d 644, 648 (La. Ct. App. 1963) ("In the instant case the necessary essential of an intent to defraud cannot be imputed from the alleged misdeeds alone if we disregard the conclusions of the pleader.  There are no facts alleged tending to show artifices, maneuvers and other external manifestations of the will which could show an intent to defraud."); *Bourgeois v. DeSoto*, 280 So. 2d 271, 275 (La. Ct. App. 1973), *reh'g on other grounds* (noting "[i]ntent is an essential element of fraud," and pointing to plaintiff's failure to allege intent) (citation omitted); *Kirby v. Field*, 923 So. 2d 131, 136 (La. Ct. App. 1 Cir. 2005) (holding petition deficient for failing to allege facts purportedly constituting fraud, including element of intent).  For example, Louisiana quotes BP's projection regarding the amount of oil it could skim and remove each day.  (*See* La. First Am. Compl. ¶ 373.)  This allegation, however, does not suggest any intent to deceive, only that the BP Defendants turned out to be incorrect

---

[42]   Louisiana's other allegations cannot give rise to a fraudulent misrepresentation claim.  Louisiana alleges that BP "overstated its ability to handle a blowout" in its Exploration Plan, which states an oil spill was "unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses" (La. First Am. Compl. ¶ 371), but the State does not allege that statement was false when it was made.  Likewise, BP's statement that techniques to contain the flow of oil involve "significant uncertainties because they have not been tested in these conditions before" (*id.* ¶ 372), does not demonstrate that the statement that "impacts" were "unlikely" was false.  Louisiana, accordingly, has failed to allege the misrepresentation of material fact" required under Louisiana law.

about certain of their capabilities.  *See Watermeier v. Mansueto*, 562 So. 2d 920, 923 (La. Ct.

App. 1990) ("While a cause of action for intentional fraudulent misrepresentation as to past or

present facts exists in Louisiana, an action for fraud cannot be predicated on . . . statements as

to future events."); *see also Foley & Lardner, L.L.P. v. Aldar Invs., Inc.*, 491 F. Supp. 2d 595,

604 (M.D. La. 2007) (noting that "a fraud claim based on . . . statements as to future events will

not satisfy the justifiable reliance requirement").

> 7.    <u>Louisiana Has Failed to State a Claim for Unjust Enrichment because the
> Law Provides it With Other Remedies.</u>

Louisiana's unjust enrichment claim (Count XXIII) must be dismissed for failure to state

a claim.  Louisiana Civil Code article 2298 provides that "[a] person who has been enriched

without cause at the expense of another person is bound to compensate that person."  La. Civ.

Code art. 2298.  The article further states, however, that this remedy is "subsidiary and shall not

be available if the law provides another remedy for the impoverishment or declares a contrary

rule."  *Id.*  The unjust enrichment remedy therefore is "only applicable to fill a gap in the law

where no express remedy is provided."  *Walters v. Medsouth Record Mgmt., LLC*, 38 So. 3d 243,

244 (La. 2010) (citation omitted).

In this case, as discussed above, Louisiana has another remedy under OPA, or where an

OCSLA gap exists, under LOSPRA.  Accordingly, Louisiana cannot state a claim for unjust

enrichment.  *See Walters*, 38 So. 3d at 244 ("Because the law provided plaintiff with another

remedy, we find he has failed to state a cause of action in unjust enrichment.").

8.    Punitive Damages Are Not Available Under Louisiana Law.

In Count XXIV, Louisiana seeks punitive damages under "common law."[43]   Louisiana is a civil law jurisdiction rather than a common law one.  *See, e.g.*, *Ricard v. State*, 382 So. 2d 190, 193 (La. Ct. App. 1980) (noting that Louisiana "has never embraced the common law" and has "retained [its] civil law heritage").   Moreover, "[u]nder Louisiana law, exemplary or other 'penalty' damages are not allowable unless expressly authorized by statute."  *See, e.g.*, *Mosing v. Domas*, 830 So. 2d 967, 973 (La. 2002); *see also Ricard*, 382 So. 2d at 193 (noting that "settled law of Louisiana" is that punitive damages "are not allowed in civil cases unless specifically provided for") (citation omitted).   Louisiana Civil Code article 2315.1, the prior basis under Louisiana law for punitive damages for the type of incident at issue here, was repealed in 1996.  *See* Historical and Statutory Notes, La. Civ. Code. art. 2315.1.   Accordingly, to the extent Louisiana is seeking punitive damages under Louisiana law, that claim must be dismissed.

In addition, to the extent Count XXIV alleges a freestanding claim for punitive damages, it is patently meritless and must be dismissed, because no such claim exists.  *Byrne v. Nezhat*, 261 F.3d 1075, 1093 n.34 (11th Cir. 2001) ("We note that a prayer for punitive damages is not an independent cause of action."); *Allen v. R. & H Oil and Gas Co.*, 63 F.3d 1326, 1333 (5th Cir. 1995) ("[A] claim for punitive damages is not by itself an independent tort.").

---

[43]   Louisiana also seeks punitive damages under maritime law.  (*See* La. First Am. Compl. ¶ 387.)  That claim fails because OPA displaces maritime claims for punitive damages, as explained in BP's Mem. In Support Of [Its] Mot. To Dismiss … The First Am. Master Compl. … For Private Economic Losses …["B1 Bundle"] at 45-48.  *See, e.g., Clausen v. M/V NEW CARISSA*, 171 F. Supp. 2d 1127, 1133 (D. Ore. 2001) (holding that OPA has precluded an award of punitive damages under any general maritime or admiralty law theory for any claim for which the OPA could provide relief).

**D.**     **Certain of Alabama's Common Law Claims Must Be Dismissed for Additional Reasons.**

1.     A Discharge To Public Waters Is Not a Private Nuisance Under Alabama Law.

In Alabama, "[n]uisances are **either** public **or** private."  Ala. Code 1975 § 6-5-121 (emphasis added).  A private nuisance claim arises only when the property interests of "one or a few individuals" have been injured.  *Id.* § 6-5-121; *see also, e.g.*, *Russell Corp. v. Sullivan*, 790 So. 2d 940, 951 (Ala. 2001).  In contrast, a public nuisance is defined as "'one which damages all persons who come within the sphere of its operation.'"  *Russell Corp.*, 790 So. 2d at 951 (quoting Ala. Code 1975 § 6-5-121).  Thus, the Supreme Court of Alabama has recognized that the discharge of pollutants into public water constitutes a public, rather than a private, nuisance. *Russell Corp.*, 790 So. 2d at 952 (citations omitted).

Noting that "[t]he distinction between a private nuisance and a public nuisance is an important one," the Supreme Court of Alabama held that a discharge into a public water of the State could not constitute a private nuisance in *Russell Corporation v. Sullivan*.  *Id.* at 951-53. The plaintiffs in that case brought a claim for private nuisance based upon the defendants' alleged discharge of pollutants into Lake Martin, a public body of water.  *See id.* at 942-43. Finding that the alleged nuisance affected "anyone who would want to use and enjoy Lake Martin, not just those who live on its bank," *id.* at 953, the court held that "[a]ny nuisance caused by the discharge of contaminated wastewater into Lake Martin is a public, not a private, nuisance." *Id.* at 953.

Alabama has alleged that the BP Defendants have caused an invasion that has interfered with the use and enjoyment of waters, properties, and resources of the state.  (*See* Ala. First Am. Compl. ¶ 228.)  As with the plaintiffs' claims in *Russell Corporation*, Alabama has not alleged any valid claim for private nuisance.  Because its allegations involve only an interference with

the use and enjoyment of public waters and property, the state's private nuisance claim against the BP Defendants should be dismissed.

        2.      <u>Alabama Has Not Alleged That the BP Defendants Had Actual Knowledge of the Facts Allegedly Concealed, or How the Alleged Suppression Induced Alabama to Act.</u>

Alabama must allege with particularity the following elements to state a claim for fraudulent suppression of material facts against the BP Defendants: "(1) a duty on [the BP Defendants] to disclose a material fact; (2) concealment or nondisclosure of that fact; (3) inducement of the [Alabama] to act; and (4) action by the [Alabama] to address injury." *Brushwitz v. Ezell*, 757 So. 2d 423, 431 (Ala. 2000); *see also Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 787 (11th Cir. 2005). Alabama must also allege that BP had knowledge of the material fact at the time it was concealed. *See, e.g.*, *Brushwitz*, 757 So. 2d at 432 ("One can be liable for suppression only of a fact of which one has knowledge.") (quoting *Dodd v. Nelda Stephenson Chevrolet, Inc.*, 626 So. 2d 1288, 1292 (Ala. 1993)).

Alabama has alleged that the BP Defendants concealed several material facts both before and after the *Deepwater Horizon* explosion, including: "the severity of the Spill" (Ala. First Am. Compl. ¶ 266); the "forecast and trajectory of the Spill" (*id.* ¶ 267); and "[BP's] capabilities to respond to the Spill" (*id.* ¶ 268). However, Alabama has alleged no facts demonstrating that the BP Defendants had knowledge of those facts at the time they were allegedly concealed. In the absence of such an allegation, there can be no claim for suppression of those facts.

Alabama does allege that "BP was aware . . . that Halliburton's testing had revealed that the concrete foam [used at the Macondo well] was unstable." (*Id.* ¶ 275.) However, Alabama does not indicate with specificity how that alleged suppression of a material fact (or any of the other alleged suppressions) induced it either to act or not act. Instead, Alabama simply recites that an alleged failure to disclose material facts "induced the State to act or to refrain from acting

54

to protect its property." (*Id.* ¶ 279.)  This bare recital of one of the elements of a fraudulent suppression cause of action is not sufficient to state a valid fraud claim.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Because the complaint does not state with particularity how the alleged suppression of a material fact induced Alabama either to act or not act, Alabama's claim for fraudulent suppression against the BP Defendants should be dismissed.

### 3. Alabama Has Not Alleged That the BP Defendants Acted with the Requisite Intent to Sustain a Claim for Wantonness.

Alabama law recognizes that a claim for wantonness is not simply a heightened claim for negligence.  Rather, a claim for wantonness can be maintained only if a plaintiff shows that the "defendant, with reckless indifference to the consequences, ***consciously and intentionally did some wrongful act*** or omitted some known duty." *Brushwitz*, 757 So. 2d at 432-33 (emphasis added); *see also Tolbert v. Tolbert*, 903 So. 2d 103 at 115 (Ala. 2004) at 115 ("wantonness" requires "a purpose or design, a conscious or intentional act. . . . [It] imports premeditation, or knowledge and consciousness that the injury is likely to result from the act done or from the omission to act . . . . ") (citations omitted).

Alabama does not, however, allege facts demonstrating that BP acted with knowledge and consciousness that an injury to Alabama likely would result.   It instead alleged simply that the BP Defendants "knew or should have known that their willful, wanton, and/or reckless conduct would result in the oil disaster." (Ala. First Am. Compl. ¶ 342.)  An allegation of what BP allegedly "should have known" falls short of the actual knowledge, premeditation, and intentional wrongdoing necessary to state a claim. *See Brushwitz*, 757 So. 2d at 432; *see also Tolbert v. Tolbert*, 903 So. 2d 103, 115 (Ala. 2004).  Furthermore, even if Alabama properly alleged that BP actually ***knew*** the conduct would result in the spill (rather than "knew or should have known"), such an assertion just recites an element of the claim.  It is not sufficient to

establish the intent element required for a claim of wantonness. *See Iqbal*, 129 S. Ct. at 1951 ("conclusory" allegations that defendant "'knew of, condoned, and willfully and maliciously agreed to subject' [plaintiff] to harsh conditions of confinement" not entitled to presumption of truth). Because the state has not alleged facts plausibly supporting an essential element of wantonness, the claim must be dismissed.

   4.   <u>Alabama Cannot Bring a Standalone Claim for Punitive Damages and Maritime Punitive Damages Are Preempted by OPA</u>.

Alabama seeks an award of punitive damages in Count IV of its First Amended Complaint. As discussed above, to the extent Alabama alleges a freestanding claim for punitive damages, it is must be dismissed, because no such claim exists. (*See* Section III.C.8, *supra*.) *See also Life Ins. Co. of Ga. v. Smith,* 719 So. 2d 797, 806 (Ala. 1998) ("We now require, therefore, that a jury's verdict specifically award either compensatory damages or nominal damages in order for an award of punitive damages to be upheld."). In addition, to the extent that Alabama seeks punitive damages under maritime law, OPA precludes such damages. (*See* n. 43, *supra*.)

## CONCLUSION

For the reasons set forth herein, the BP Defendants respectfully request that this Court dismiss the claims asserted in the First Amended Complaints of Louisiana and Alabama.

Respectfully submitted,


/s/ Don K. Haycraft
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana  70139-5099
Telephone:      (504) 581-7979
Facsimile:      (504) 556-4108

and

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Andrew B. Bloomer, P.C.
Catherine L. Fitzpatrick
Elizabeth A. Larsen
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200


Robert R. Gasaway
Jeffrey B. Clark
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005-5793
Telephone:      (202) 879-5000
Facsimile:      (202) 879-5200


Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC  20004-2401
Telephone:      (202) 662-5985

***Attorneys for BP***

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 3rd day of June, 2011.

<u>/s/ Don K. Haycraft</u>
Don K. Haycraft