# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL No. 2179 |
| | | SECTION J |
| | * * | |
| This document relates to: | * | Honorable CARL J. BARBIER |
| 2:10-CV-04182 | * | Magistrate Judge SHUSHAN |
| 2:10-CV-04183 | | |
| 11-CV-0516 | | |
| 10-CV-03059 | | |

## DECLARATION OF ANDREW B. BLOOMER

I, Andrew B. Bloomer, declare as follows:

1.      I am over twenty-one years of age and make this Declaration based on my own personal knowledge.

2.      I am a partner of the law firm of Kirkland & Ellis LLP, and one of the counsel for BP in these proceedings.

3.      I am submitting this Declaration in support of BP's Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) the First Amended Complaints of the States of Alabama and Louisiana.

4.      Attached hereto as Exhibit A is a true and correct copy of the Request for Adjudicatory Hearing submitted to the Louisiana Department of Environmental Quality (the "Department") on June 30, 2010 by BP Exploration and Production Inc. in response to the Consolidated Compliance Order and Notice of Potential Penalty issued by the Department.

5.      Attached hereto as Exhibit B is a true and correct copy of the Agreement to Enter into Dispute Resolution Discussion and to Extend Deadline for Decision on Request for Hearing (the "Dispute Resolution Agreement") executed by the Department and BP Exploration and Production Inc. on or about August 4, 2010.

6.      Attached hereto as Exhibit C is a true and correct copy of the Modification of the Dispute Resolution Agreement executed by the Department and BP Exploration and Production Inc. on or about January 26, 2011.

7.      Attached hereto as Exhibit D is a true and correct copy of the Modification of the Dispute Resolution Agreement executed by the Department and BP Exploration and Production Inc. on or about April 25, 2011.

8.      Attached hereto as Exhibit E is a true and correct copy of the May 12, 2010 Transcript Press Briefing given by officials from various federal agencies, available at http://www.restorethegulf.gov/release/2010/05/18/transcript-press-briefing-may-12 (last visited June 3, 2011).

9.      Attached hereto as Exhibit F is a true and correct copy of Section I.7 (Use of Dispersants) of the United States Coast Guard's January 2011 Incident Specific Preparedness Review Final Report, available at http://www.uscg.mil/foia/docs/DWH/BPDWH.pdf (last visited June 3, 2011).

I make this Declaration under penalties of perjury pursuant to 28 U.S.C. § 1746, and I state that the facts set forth herein are true.

Andrew B. Bloomer
Andrew B. Bloomer

Dated:  June 3, 2011

# EXHIBIT A

STATE OF LOUISIANA
DEPARTMENT OF ENVIRONMENTAL QUALITY

OFFICE OF ENVIRONMENTAL COMPLIANCE

| | | |
|---|---|---|
| IN THE MATTER OF | * | |
| | * | |
| BP EXPLORATION & | * | ENFORCEMENT TRACKING NO. |
| PRODUCTION INC. | * | MM-CN-10-00823 |
| | * | |
| MULTI-PARISH | * | |
| | * | |
| PROCEEDINGS UNDER THE | * | AGENCY INTEREST NO. |
| LOUISIANA ENVIRONMENTAL | * | |
| QUALITY ACT, | * | 170547 |
| La. R.S. 30:2001 ET SEQ. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## REQUEST FOR ADJUDICATORY HEARING

On or about June 1, 2010, BP Exploration and Production, Inc. ("BP") received a copy of the captioned Consolidated Compliance Order and Notice of Potential Penalty (the "CONOPP" or the "Compliance Order") from the Louisiana Department of Environmental Quality ("LDEQ"). BP hereby requests an adjudicatory hearing to review disputed issues of material fact and law arising out of the Consolidated Order and to raise applicable affirmative defenses, which could include those relating to jurisdictional limitations and preemption by other laws. Pursuant to La. R.S. § 30:2050.4(D), this Request describes the provisions of the Consolidated Order on which a hearing is requested and describes the basis for the request. This request is timely filed within 30 days of receipt of the CONOPP.

BP is the lessee on Mississippi Canyon Block 252 ("MC-252") located approximately 50 miles off the coast of Louisiana. On or about April 20, 2010, as a result of the explosion on and

sinking of the Deepwater Horizon, a well located on MC-252 experienced a blow out resulting in discharges of oil from the wellhead into waters of the United States.

BP received service of the CONOPP on June 1, 2010. This request for adjudicatory hearing is timely filed within thirty days after BP's receipt of service of the CONOPP.

BP hereby requests hearing on the following provisions: Findings of Fact paragraphs III(A), III(B), and III(C); Compliance Order paragraphs I, II, III, and IV; and Notice of Potential Penalty paragraphs I, II, III, IV, and V.

With regard to Findings of Fact paragraphs III(A), III(B), and III(C); Compliance Order paragraphs I and II; and Notice of Potential Penalty paragraphs I, II, III, IV, and V, the request is based upon the following grounds: Given the ongoing nature of this incident and BP's continuing compliance actions, the factual and legal conclusions made in the CONOPP are largely premature. Further, the CONOPP fails to provide specific instances of the alleged violations so as to allow BP to respond to the allegations. Accordingly, out of an abundance of caution, BP requests a hearing for review of the allegations in the CONOPP and to ensure that all facts are adequately considered in this enforcement action.

With regard to Compliance Order paragraphs III and IV, the request is based on the fact that BP and LDEQ have jointly developed a schedule for the submission of BP's remediation plan and other written reports. Specifically, as confirmed by LDEQ's letter dated June 18, 2010, BP shall submit reports on its compliance actions, including a report on its response plan, by July 16, 2010. Further, LDEQ has suspended the requirements for submitting comments on a potential penalty, gross revenue information, and economic benefits of noncompliance until further notice. In the meantime, BP has submitted to LDEQ an Interim Report on Response Metrics and will continue to provide updated reports on the status of BP's cleanup efforts.

860335_1.Docx

Although BP requests a hearing for the above-stated reasons, BP is nonetheless actively performing the compliance obligations set forth in the CONOPP. BP's responses to the Deepwater Horizon oil spill are subject to the direction and control of the Federal On-Scene Coordinator (FOSC) and the Unified Command. Subject to that direction, BP is doing everything it can to ensure compliance with the Louisiana water control, waste control, and remediation law. Specifically, BP is currently taking comprehensive measures to stop the flow of oil through the drilling of relief wells and through various oil and gas collection methods at the source of the leak. Further, BP is taking numerous steps to prevent shoreline impacts including the use of skimmers and EPA-approved dispersants as well a coordinated system of shoreline impact analysis and cleanup. Finally, BP is also working to ensure remediation of contaminated media and compliance with waste disposal requirements.

BP is fully committed to cooperating with LDEQ in this matter. BP hopes to resolve the issues set forth in the CONOPP with LDEQ informally and is amenable to executing an informal dispute resolution agreement to postpone the Department's need to grant or deny this request for hearing within the applicable deadline.

New Orleans, Louisiana, this 30th day of June, 2010.

Respectfully submitted,

Robert E. Holden
Greg L. Johnson
Stephen W. Wiegand
LISKOW & LEWIS
50th Floor, One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979

Attorneys for BP Exploration & Production Inc.

860335_1.Docx

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document on all parties to this proceeding, by mailing the same by United States mail/messenger mail, properly addressed and postage prepaid, this 30th day of June, 2010.

860335_1.Docx

# EXHIBIT B

# LISKOW&LEWIS
A Professional Law Corporation

| | | |
|---|---|---|
| One Shell Square | 822 Harding Street | First City Tower |
| 701 Poydras Street, Suite 5000 | Post Office Box 52008 | 1001 Fannin Street, Suite 1800 |
| New Orleans, LA 70139 | Lafayette, LA 70505 | Houston, TX 77002 |
| (504) 581-7979 Main | (337) 232-7424 Main | (713) 651-2900 Main |
| (504) 556-4108 Fax | (337) 267-2399 Fax | (713) 651-2908 Fax |

www.Liskow.com

August 4, 2010                          **Greg L. Johnson**              Direct: (504) 556-4115
                                                                         gljohnson@Liskow.com


**(Via U.S. Mail and Electronic Mail)**
Mr. Christopher Ratcliff
Attorney Supervisor
Louisiana Department of Environmental Quality
Post Office Box 4302
Baton Rouge, LA 70821-4302


Re:    In the Matter of BP Exploration & Production Inc.
       Enforcement Tracking No. MM-CN-10-00823
       Agency Interest No. 170547; Our File:  10451.092

Dear Chris:

Enclosed is the signed Agreement to Enter into Dispute Resolution Discussion and to Extend
Deadline for Decision on Request for Hearing which I have signed on behalf of BP Exploration
and Production, Inc., extending the period to January 31, 2011.  Thank you for your attention to
this.


Yours very truly,

Greg L. Johnson

GLJ:ddt
Enclosure


903533_1



## AGREEMENT TO ENTER INTO DISPUTE RESOLUTION DISCUSSION AND
## TO EXTEND DEADLINE FOR DECISION ON REQUEST FOR HEARING

The Department of Environmental Quality (DEQ) and BP Exploration and Production, Inc. (Respondent) hereby agree to enter into dispute resolution discussions to attempt to resolve any and all issues raised by Respondent's June 30, 2010 request for an adjudicatory hearing regarding the Consolidated Compliance Order and Notice of Potential Penalty, Tracking No. MM-CN-10-00823, Agency Interest No. 170547, issued by DEQ against Respondent on May 31, 2010.

The parties further agree that these dispute resolution discussions shall be concluded by January 31, 2011. The parties, by modification to this Agreement, may extend the time period for dispute resolution discussion up to a year from the date of this Agreement. The date of this Agreement shall be the latest date noted below.

Either party may withdraw from the dispute resolution process by sending a written notice of withdrawal to the other party, via certified mail, return receipt requested.

The parties further agree that the deadline for the Secretary of DEQ to grant or deny Respondent's hearing request is extended until the thirtieth day following either:
- the above-mentioned date for concluding the dispute resolution discussions
- the date either party withdraws from the dispute resolution process
- the 365th day following the date of this agreement

whichever occurs first.

This dispute resolution agreement relates to Findings of Fact Sections III(A), III(B), and III(C); Compliance Order Sections I, II, III, and IV; and Notice of Potential Penalty Sections I, II, III, IV, and V of the enforcement action. All other Findings of Fact and Order sections are not disputed and are deemed final.

Each undersigned representative of the parties certifies that he/she is fully authorized to enter into the terms and conditions of this Agreement and to bind the party he/she represents to this Agreement.

This Agreement is executed in duplicate original.

Louisiana Department of
Environmental Quality

By: _Christopher O. Ratcliff_

Title: _attorney supervisor_

Date: _7/29/10_

BP Exploration and Production, Inc.

By: _[signature]_

Title: _Attorney For BP Exploration and Production Inc._

Date: _8/4/2010_

# EXHIBIT C

# LISKOW&LEWIS

A Professional Law Corporation

| | | |
|---|---|---|
| One Shell Square | 822 Harding Street | First City Tower |
| 701 Poydras Street, Suite 5000 | Post Office Box 52008 | 1001 Fannin Street, Suite 1800 |
| New Orleans, LA 70139 | Lafayette, LA 70505 | Houston, TX 77002 |
| (504) 581-7979 Main | (337) 232-7424 Main | (713) 651-2900 Main |
| (504) 556-4108 Fax | (337) 267-2399 Fax | (713) 651-2908 Fax |

www.Liskow.com

January 26, 2011                              **Robert E. Holden**                    Direct: (504) 556-4130
                                                                                         reholden@Liskow.com

**(Via Electronic Mail)**
Mr. Christopher Ratcliff
Attorney Supervisor
Louisiana Department of Environmental Quality
Post Office Box 4302
Baton Rouge, LA 70821-4302

Re:     In the Matter of BP Exploration & Production Inc.
          Enforcement Tracking No. MM-CN-10-00823
          Agency Interest No. 170547; Our File:  10451.092

Dear Chris:

Enclosed is the signed Modification of Agreement to Enter into Dispute Resolution Discussion
and to Extend Deadline for Decision on Request for Hearing which I have signed on behalf of
BP Exploration and Production, Inc., extending the period to April 30, 2011.  Thank you for
your attention to this.

Very truly yours,

Robert E. Holden

REH:ddt
Enclosure

967286_1

## MODIFICATION OF AGREEMENT TO ENTER INTO DISPUTE RESOLUTION DISCUSSION AND TO EXTEND DEADLINE FOR DECISION ON REQUEST FOR HEARING

The Department of Environmental Quality (DEQ) and BP Exploration and Production, Inc. (Respondent) agreed on August 4, 2010 to enter into dispute resolution discussions to attempt to resolve any and all issues raised by Respondent's request for an adjudicatory hearing regarding the Consolidated Compliance Order & Notice of Potential Penalty, Enforcement No. MM-CN-10-00823, Agency Interest No. 170547, issued by DEQ against Respondent on May 31, 2010.

The parties hereby further agree that these dispute resolution discussions shall be extended and shall be concluded by **April 30, 2011.** The parties, by modification to this Agreement, may extend the time period for dispute resolution discussion up to a year from the date of the original Agreement. The date of this Agreement shall be the latest date noted below.

Either party may withdraw from the dispute resolution process by sending a written notice of withdrawal to the other party, via certified mail, return receipt requested.

The parties further agree that the deadline for the Secretary of DEQ to grant or deny Respondent's hearing request is extended until the thirtieth day following either:
- the above-mentioned date for concluding the dispute resolution discussions
- the date either party withdraws from the dispute resolution process
- the 365th day following the date of the original Agreement

whichever comes first.

This dispute resolution agreement relates to Findings of Fact, Sections III(A), III(B), and III(C); Compliance Order Sections I, II, III, and IV; and Notice of Potential Penalty Sections I, II, III, IV, and V of the enforcement action. All other Findings of Fact and Order sections are not disputed and are deemed final.

Each undersigned representative of the parties certifies that he/she is fully authorized to enter into the terms and conditions of this Agreement and to bind the party he/she represents to this Agreement.

This Agreement is executed in duplicate original.

**Louisiana Department of**
**Environmental Quality**

By: _Christopher C. Ratliff_

Title: _attorney supervisor_

Date: _1/25/11_

**BP Exploration and Production, Inc.**

By: _Robert E. Holden_

Title: _Attorney for BP_

Date: _1 | 26 | 2011_

# EXHIBIT D

# LISKOW&LEWIS
A Professional Law Corporation

| | | |
|---|---|---|
| One Shell Square | 822 Harding Street | First City Tower |
| 701 Poydras Street, Suite 5000 | Post Office Box 52008 | 1001 Fannin Street, Suite 1800 |
| New Orleans, LA 70139 | Lafayette, LA 70505 | Houston, TX 77002 |
| (504) 581-7979 Main | (337) 232-7424 Main | (713) 651-2900 Main |
| (504) 556-4108 Fax | (337) 267-2399 Fax | (713) 651-2908 Fax |

www.Liskow.com

April 25, 2011                               **Robert E. Holden**                Direct: (504) 556-4130
                                                                                reholden@Liskow.com

**(Via Facsimile (225) 219-4068)**
Ms. Dwana King
Mr. Christopher Ratcliff
Louisiana Department of Environmental Quality
Post Office Box 4302
Baton Rouge, LA 70821-4302

Re:     In the Matter of BP Exploration & Production Inc.
        Enforcement Tracking No. MM-CN-10-00823
        Agency Interest No. 170547; Our File:  10451.092

Dear Dwana and Chris:

Enclosed is the signed Modification of Agreement to Enter into Dispute Resolution Discussion
and to Extend Deadline for Decision on Request for Hearing which I have signed on behalf of
BP Exploration and Production, Inc., extending the period to August 4, 2011.  Thank you for
your attention to this.

Very truly yours,

Robert E. Holden

REH:ddt
Enclosure

967286_1

## MODIFICATION OF AGREEMENT TO ENTER INTO DISPUTE RESOLUTION DISCUSSION AND TO EXTEND DEADLINE FOR DECISION ON REQUEST FOR HEARING

The Department of Environmental Quality (DEQ) and BP Exploration and Production, Inc. (Respondent) agreed on August 4, 2010 to enter into dispute resolution discussions to attempt to resolve any and all issues raised by Respondent's request for an adjudicatory hearing regarding the Consolidated Compliance Order & Notice of Potential Penalty, Enforcement No. MM-CN-10-00823, Agency Interest No. 170547, issued by DEQ against Respondent on May 31, 2010.

The parties hereby further agree that these dispute resolution discussions shall be extended and shall be concluded by **August 4, 2011**. The parties, by modification to this Agreement, may extend the time period for dispute resolution discussion up to a year from the date of the original Agreement. The date of this Agreement shall be the latest date noted below.

Either party may withdraw from the dispute resolution process by sending a written notice of withdrawal to the other party, via certified mail, return receipt requested.

The parties further agree that the deadline for the Secretary of DEQ to grant or deny Respondent's hearing request is extended until the thirtieth day following either:
- the above-mentioned date for concluding the dispute resolution discussions
- the date either party withdraws from the dispute resolution process
- the 365th day following the date of the original Agreement

whichever comes first.

This dispute resolution agreement relates to Findings of Fact, Sections III(A), III(B), and III(C); Compliance Order Sections I, II, III, and IV; and Notice of Potential Penalty Sections I, II, III, IV, and V of the enforcement action. All other Findings of Fact and Order sections are not disputed and are deemed final.

Each undersigned representative of the parties certifies that he/she is fully authorized to enter into the terms and conditions of this Agreement and to bind the party he/she represents to this Agreement.

This Agreement is executed in duplicate original.

**Louisiana Department of**
**Environmental Quality**

By: _Debra Kelly_

Title: _Attorney_

Date: _4-20-11_

**BP Exploration and Production, Inc.**

By: _Robert E Helm_

Title: _Attorney for BP_

Date: _4/25/2011_

# EXHIBIT E

*An Official Website of the United States Government*

Follow us:   Join Mailing List | About Us | Contact Us | Site Map

Search

Home › Transcript Press Briefing May 12

## Transcript Press Briefing May 12

May 18, 2010 | 8:00:00 PM EDT

0
tweets

tweet

OPERATOR: Thank you all for standing by and welcome to today's conference call. At this time, your lines have been placed on listen-only for today's conference. During the question-and-answer portion of our call, you will be limited to one question. Once again, you must limit your questions to only one at this time. The conference is also being recorded. If you have any objections, you may disconnect at this time. I will now turn the conference over to Adora Andy. Ma'am, you may proceed.

ADORA ANDY: Good afternoon. My name's Adora Andy. I'm a press secretary for the Environmental Protection Agency. Thank you for joining us for this press conference call to discuss dispersants. On the call today are, from the Environmental Protection Agency, Administrator Lisa P. Jackson; Paul Anastas, the assistant administrator of EPA's Office of Research and Development; Dana Tulis, the acting director of EPA's Office of Emergency Management.

From the National Oceanic and Atmospheric Administrator, we have Dr. Jane Lubchenco, undersecretary of commerce in oceans and atmosphere and Dr. Dave - or excuse me, and Dave Westerholm, director of NOAA's Office of Response and Restoration. Administrator Jackson will begin with brief remarks and Dr. Lubchenco will give brief remarks and we'll open it up for questions. Right now, I'll turn it over to Administrator Jackson.

LISA JACKSON: Thank you, Adora, and thank you all for joining us. Last night, I returned from my second trip to the Gulf Coast. I met with local community members, government officials and local scientists. What I can tell you from those visits is that we continue to face an extraordinary challenge. Oil is rushing into the Gulf at depths we can't easily access. We are working with BP and convening our best minds to try and find creative solutions.

We have mobilized on multiple fronts, from the drilling of the relief wells to controlled burnings to the further attempts to contain the leaks. This is an all-hands-on-deck challenge and people are working 24 hours a day, 7 days a week. We are here today to talk specifically about one of the weapons in our arsenal - the use of dispersants. Dispersants are chemicals that help break up the oil with the goal of preventing damage in the water and mitigating the potential impact of landfall.

At current, BP has been authorized by EPA and the Coast Guard to use dispersants on the surface of the spill. That came with specific conditions to protect the environment and the health of residents in affected areas. This is an approach we are familiar with and a strategy we have turned to because, one, we know that when they are used on the surface, dispersants biodegrade much more rapidly than oil, and two, dispersing the oil will help reduce the amount and the intensity of oil that reaches the shores and fragile wetlands, an urgent priority at this time.

As I said, BP is authorized to use dispersant on the surface of the water. EPA is constantly monitoring air quality in the area and keeping local authorities updated on any safety concerns. If you have any doubts about that monitoring, consider that I just returned from my second visit to the Gulf Coast and spent plenty of time breathing the air there myself. So I'm particularly interested in the air monitoring data. And you can find that air monitoring data that we're collecting. It's posted, as it becomes available, on www.epa.gov/bpspill.

BP has also been authorized to test the effectiveness of dispersants used below the surface. They believe that the sub-surface use of dispersants could mitigate the impact of the spill without increasing the impact on human health and the environment. That said, that would be an unprecedented use of dispersants. That is why EPA has not authorized the full-scale underwater use of dispersants at this time. Instead, we are rigorously testing their effectiveness.

So far, BP has initiated three tests. For those tests, EPA and the Coast Guard set limits on the time and the volume of use. The first two tests were inconclusive and we are awaiting the results of the third test. Let me be clear that no use of dispersants underwater is authorized until the test results have shown them first to be effective. We absolutely must be aggressive in tackling this spill, and at the same time, we will take absolute care to ensure that any efforts we take are not just substituting one challenge for another.

The effects of underwater dispersant used on the environment are still widely unknown. If it is determined to reduce the consequences of the spills and BP is authorized to continue its use, EPA and our federal partners will require regular analysis of water and air quality. In fact, we are working to establish third-party monitoring to ensure we're getting all the information we can. We reserve the right to halt the use of sub-surface dispersants if any negative impacts on the environment are seen to outweigh the benefits.

Dispersants are not the silver bullet. They are used to move us towards the lesser of two difficult environmental outcomes. Until we find a way to stem the flow of oil, we must continue to take any responsible action that will mitigate the impact of the spill. And that is what we are doing. I'd now like to turn it over to my colleague, and an invaluable partner in this effort for certain, Dr. Jane Lubchenco.

JANE LUBCHENCO: Thanks, Lisa. And let me just say on behalf of the 12,800 employees at NOAA how much we greatly value our close working relationship with you and with everyone at EPA as we respond to this crisis. Since the early hours of this incident, NOAA has been all hands on deck in support of the federal response to the BP oil spill. I've personally been to the Gulf region twice since the initial explosion, and quite a few of our NOAA folks have been deployed to that region.

As the nation's leading scientific resource for oil spills, NOAA has been on the scene of the Deepwater Horizon incident from the start, providing coordinated scientific weather and biological response services, both on the scene and remotely, to federal, state and local organizations. NOAA has satellites in space, planes in the air, boats on the water and scientists in the field informing the federal response. I think it's fair to say that our response has been immediate and sustained. It's also been strategic and scientific.

And of course, when an oil spill occurs, there are no good outcomes. Dispersant use is one of the several tools that may be employed individually or in combination to minimize consequences of an oil spill. Their use is a tradeoff decision based on a belief that, if used properly, they would result in less overall environmental impact. Dispersants reduce the impact of oil on shorelines, sensitive habitats, birds, mammals and other wildlife. They allow for the rapid treatment of large areas. And they break up the sheen of oil into smaller components, which allows them to dissipate into the water and degrade more rapidly.

NOAA continues to work closely with the EPA and other federal partners to determine the most effective and appropriate use of dispersants. NOAA's scientific support coordinators are working as part of the unified command, and advise on when and where dispersants should be used. This oil spill is unprecedented and dynamic. As situations change and as we gain new information, we need to continually re-evaluate our response strategy, actions and planning. NOAA stands shoulder-to-shoulder to Gulf communities during these challenging times.

And as we continue to work closely with our partners at EPA and all of the rest of the federal agencies in responding to this spill, as President Obama said when he visited the Gulf, quite, "We're going to do everything in our power to protect our natural resources, compensate those who have been harmed, rebuild what has been damaged and help this region persevere, like it has done so many times before," end quote. Thank you.

MS. ANDY: Thank you, Administrator Jackson and Administrator Lubchenco. At this time, we'll open the line for questions and we'll certainly take as many as time will allow. Jill, could you go ahead and open up the line?

OPERATOR: Certainly. At this time, if you would like to ask a question, please press *1. Please be sure to record your name and affiliation to ask your question. And please limit your question to one per person. Once again, it is *1 and please record your name and affiliation and limit yourself to one question. Please stand by. (Pause.) Our first question comes from David Mattingly with CNN. Sir, your line is open.

Q: Thank you for taking my call. I'm really curious about quantity here. With this dispersant, what percentage of the oil - or the hydrocarbons - actually evaporate on the surface, and then what percentage of them sink to the bottom and remain in the environment?

MS. JACKSON: David, this is Lisa Jackson. The long-term - (inaudible) - of dispersants is one of the questions, especially when it comes to subsea application, that has some answers, but not as many as we would like. Let me first make sure we all understand how dispersants work. When they're applied from the surface, they're applied on a slick with specialized equipment. They're applied in a plume.

They form a foam or a cloud of oil droplets just below the surface of the water that mixes vertically and horizontally into the water column. And obviously, that means you have some pretty rapid dilution. And the increase in surface area, combined with chemical action, makes for an ability for bacterial and microscopic action to happen. So I don't believe that dispersants have much, if any, impact on the volatility of the oil at the surface. The oil will volatilize as it weathers at the surface, as it goes on. If we have any other science on that -

MS. LUBCHENCO: This is Jane Lubchenco. I do want to emphasize something that Administrator Jackson said. The question implied that there was oil that was ending up on the seafloor bottom, and that's not what happens with dispersants. The plume that is formed with dispersant use ends up in the water column, and then it's degraded more rapidly than would be the case if it went remaining at the surface. So it's not a case where we're simply transferring oil from the surface to the seafloor.

OPERATOR: Thank you. Our next question comes from Bettina Boxer with the L.A. Times. Your line is open.

Q: Could you please tell me how much dispersant was released sub-surface and in what way the tests have, so far, been inconclusive?

MS. JACKSON: The total amount released in the three tests conducted so far is 28,709 gallons. This is Lisa Jackson. And the inconclusive is - some of it is a matter of logistics. The very first test, there were some concerns with being able to get information - data at the same time as the dispersants were being applied. There has been some logistical issues.

The good news is that this last test, I think NOAA has done a wonderful job of getting good data that we're in the process of reviewing. We have some additional sampling results that will be gotten from Louisiana State University, from their lab.

OPERATOR: Thank you. Our next question is from Debbie Charles with Reuters. Your line is open.

Q: Thank you for taking my question. I have a question about the wildlife that's being reported dead. I guess people are reporting that dolphins or turtles and other wildlife are showing up dead. Do you have any - first of all, is that true? Have you seen that? And does it have any relationship to dispersants or to the oil?

DAVE WESTERHOLM: Yes, this is Dave Westerholm. If I understood your question, you're looking at the reports of the oiled wildlife versus that which might have been dispersed oil on the wildlife. At this point, there have been a number of turtles that have been stranded. They've gone to labs for further testing. There is no evidence that we've found thus far from an external view that they were oiled and the internal necropsy of the animals will determine whether or not they were actually - died as a result of oil exposure.

But in that case, most of the wildlife and animals you're talking about - birds, turtles, mammals - are really coated by surface oil and not the dispersed oil, which is out clearly at the deep-well injection site and right around that - fresh oil that's emanating from the holes in the riser pipe.

OPERATOR: Our next question comes from Jason Dearen with the Associated Press. Your line is open.

Q: Hi. Thanks for taking my question. This is for Dr. Lubchenco or Mr. Westerholm. There are a number of reefs in the area near the spill: the Pinnacles reef system and a number of other ones moving east towards Florida that could be affected since there's so many dispersants being used on the oil and it's going into the water column.

I wonder if you could a little bit about - we're talking about a tradeoff with the oil not reaching the shore, from using so much dispersants. But then it does go into the water column and there are a lot of sensitive habitats and reef systems down there. I'm wondering if you could expand on that and talk a little bit about these reefs that are in harm's way.

MS. LUBCHENCO: Jason, this is Jane Lubchenco. The monitoring that we are doing will enable us to get a better handle on what habitats will be affected, if they are. Anything that we would say at this point is speculation. There are a diversity of types of habitats in the Gulf. Many of them are very important in support of a variety of wildlife and fisheries.

At this point, many of them are at risk of being affected but we don't have any direct way to know exactly which ones or in what amount. I think it's important to note that the dispersants that are being used are one-tenth to one-hundredth the level of toxicity of oil. So part of the tradeoff that we are using in making this calculation is to make a decision to use less toxic substances with the idea of - (inaudible, background noise) - the impact.

OPERATOR: Thank you. Our next question is from Sheila Grissett with Times-Picayune. I'm sorry for the mispronunciation, ma'am, but your line is open.

Q: Thanks. It's Times-Picayune in New Orleans. I think probably all of us working on this story are inundated with e-mails, phone calls and messages from the manufacturers of products that they claim are more effective and less toxic and even are already on the EPA's list. Can you please talk about why you're using these particular dispersants and not using less toxic dispersants and also comment, please, on whether there is one on the EPA's list that has proven in laboratory tests to be, apparently, almost 100 percent effective? Thank you.

MS. JACKSON: It's Lisa Jackson from EPA. I'll go first and then I'll put it out to others who might want to comment as well. I just want to say for the record I knew it was Times-Picayune.

Q: (Chuckles.) Thanks.

MS. JACKSON: The approved list of dispersants is - there's an approved list that is part of the Louisiana plan and obviously logistics and stockpiles and the ability of the responsible party to pull that material together I'm sure has a lot to do with the ones that they choose to use. They had a supply; they had a supplier and our regulatory responsibilities say that if it's on the list and they want to use it, then they are preauthorized, if you will, to do so.

All I'll say about the other e-mails and I'm sure you're getting them and we're all getting them and they're by well-meaning people, I'm sure for the most part, who are trying to help. Some might be entrepreneurs but that's great too, is that this process of getting on the list requires toxicity testing, review by both the states that would be impacted as well as by federal agencies and there are others besides the two that are - and the Department of Commerce and those that are represented here, along with EPA.

So that decision just cannot be made lightly. Toxicity testing and review is not something that can be done quickly and on the fly although I know that there are lots of people who would like to offer alternatives to the dispersants that have already been pre-approved for use.

MR. WESTERHOLM: This is Dave Westerholm. I would just like to add one point to that because I think this may be an important point for everybody out there who has an idea. Adm. Allen, the national incident commander, has said he does not want to leave any stone unturned. The unified command down in that area stood up what's called the RT's ARTES system - the Alternative Response and, I believe, Technical Evaluation System, if I've got the acronym correct. There's a number on our website and on the Deepwater Horizon website for people to call in with any idea, not just on dispersants.

Now, obviously, as Administrator Jackson pointed out, dispersants have to go through approval process but for any alternative technology that might be of benefit, there's an evaluation team of federal scientists as well as industry and academic experts that has been put together to look at these ideas.

OPERATOR: Thank you. Our next question is from Juliet Eilperin with The Washington Post.

Q: Hi there. I was wondering if you could provide, following up on what Administrator Jackson just said, what exactly you're testing right now, if you can describe what exactly you're looking for as you look at the effects to the water column, and give any kind of ballpark of how much testing or how much time you think it would take to be confident that this can be used at a broad scale of sea without negative environmental impact. Thank you.

(Audio break, cross talk.)

MS. JACKSON: Juliet, it's Lisa Jackson. Sorry. What I was saying, real quickly, is that I'll start but I think several people in the room will want to add, particularly NOAA because they're doing a lot of the actual fieldwork themselves. The questions around the subsea dispersants have - the primary question is, is it effective? Is it as effective or reasonably effective? Otherwise, it doesn't make sense for us to introduce a new technique into the response - a new tool into the kit, if you will.

So those include visual observations from the surface; it includes data that NOAA can see that look at issues of changes in particle size within the water column. They're also taking an initial look at dissolved oxygen as a first look at whether or not this is having an impact throughout the water column. Of course, they're looking - there will be actual chemical testing and that's over at LSU labs, as I understand it.

The only thing I want to point out is that if dispersants - subsea use of dispersants is used as a tool over time in a more regular manner, already on the EPA website - the EPA.gov/bpspill - is a testing protocol that NOAA and EPA and other agencies have worked through to govern what I would say is more than that.

It's meant to be a "go/no-go" kind of testing protocol. Are we finding things, as we use this method, that we believe we should stop and take a breath and pause or maybe stop entirely? We thought that was very important given that as we've said here, this is quite novel. But I'll turn this over to others to give you a little bit more granularity on the testing.

DANA TULIS: This is Dana Tulis. What the administrator said was - is right on and we have continued not only - what we're calling it is an "adaptive monitoring approach." So as we learn more about the science, we do take the prerogative to continue to have additional reporting requirements.

At this point, once this goes and if this goes full-scale, we will require also biological testing. It's a 24-hour-turnaround test and we have very conservative indicators right now where we'd be looking at things like the dissolved oxygen and those fish deaths. And before anything - when I say "conservative," it means that immediately, if we meet a very conservative trigger, we would take a decision back to all the sister agencies, immediately evaluate the data and determine whether or not we need to shut down before anything would actually happen with the - on the environment.

MS. LUBCHENCO: Let me just add to that - this is Jane Lubchenco - that the sampling that we're doing, that complements what EPA is doing. It includes surface imaging, both with satellites and with planes as well as water samples, to look at physical and chemical properties; we're using barometry; measuring temperature and salinity; dissolved oxygen; particle size analysis; a variety of other chemical and physical properties and then also some biological sampling as well. So it's fairly comprehensive, both in situ as well as above the surface.

OPERATOR: Thank you. Our next question is from Elisabeth Rosenthal with The New York Times. Your line is open, ma'am.

Q: Yes, thank you very much. I wanted to hear a little bit more about the reports of animals and dead animals being found on the beaches. There were some reports this morning of some dolphins. Do we have any sense of whether there are an abnormally high number of animals for this time of year? Have any of the autopsies been done yet? Do you have any sense in which dispersants or oil might be implicated? Any concerns on that front?

MS. LUBCHENCO: This is Jane Lubchenco. I think we don't have definitive information for most of the individuals that have been found. It's not unusual to see a large number of stranded turtles this year. As they've indicated earlier, for the turtles, there has been no evidence - external evidence - of oiling. But we won't know until the necropsies are performed what the actual cause of death was. For the marine mammals, I think we also are still in the discovery phase of this and we await results to be able to say something more definitive.

OPERATOR: Thank you. Our next question is from Lee Bowman with Scripps Media. Your line is open, sir.

Q: Hi. Thank you. I wanted to return, just for a moment, to the question raised by the Times-Picayune. We've talked to several of these folks who actually have products that are on the list - not novel people with innovative ideas but things that have, actually have been tested and put on the list - who are saying, our products are markedly more effective, have been rated more effective on your list for Louisiana crude, and their contention is that they may in fact have less toxic side effects.

So it's not a question of logistics so much as it is a question of quality. I'm wondering, if this becomes a product that is used over many months until other steps can be made, does it become an issue of a superior product needing to be considered in the interest of safety and efficiency?

MS. JACKSON: Hi. It's Lisa Jackson. The other concern is also, obviously, availability and availability in volume. I mean, we have already - I think it's been acknowledged in the press already - exceeded volumes that have been used in other spills in this country. We're using an awful lot of dispersant. So the other thing is, obviously this is going on longer than one might have known on day three or four, that we would be still dealing with this fresh oil, constant release of oil. So we're seeing a need to continue to disperse the new amounts of oil that are coming out.

So we are happy to have that conversation with BP about checking again on stockpiles of dispersant and what's available in sufficient quantities to really be used, given that as you've heard, at the surface already, we're talking over 400,000 gallons used already and in the sub-surface, if we were to use it, it may actually be a lesser rate of dispersion, which would be a good thing - less introduced into the system - but it would still be significant quantities that have to be stockpiled and brought and available.

OPERATOR: Thank you. Our next question is from Mark Guarino with Christian Science Monitor. Your line is open, sir.

Q: Hi. Thanks for taking my question. I want to find out what exactly - what are the dispersants being used? What are those dispersants being used, the 400,000 gallons by BP, and what are - can you talk to the chemicals that are in those dispersants being used? What's at hand right now and what's inside those dispersants?

MS. JACKSON: It's Lisa Jackson. The two that have been used today are Corexit 9527 and Corexit 9500. If you want to see information on the constituents of those dispersants, they are available on the EPA website. I believe the MSDS sheets are on the joint information command website. The EPA website, again, is www.epa.gov/bpspill. Look for the "Dispersant" button - tab on the EPA website.

It is a fact that some of the constituents are considered business confidential information. EPA does have access to that information but is not able to publish it and I have had people question whether we look at all the constituents when we look at toxicity and when we look at our monitoring plans. I can assure you that we do. We are looking at those that are publicly known as well as those that are confidential in determining how best to monitor air and water.

OPERATOR: Thank you. Our next question is from Anita Lee with Sun Herald.

Q: Yes. I was wondering on the two types of dispersants, the 9527A and then the 9500A. They do contain different things. Are they being used interchangeably or is one used in some circumstances and the other in the other? How is that working?

MS. TULIS: Really - this is Dana Tulis, EPA - really all of the lists on the product list, as the administrator of EPA said earlier, they are similar in - they're all approved and either of them can be used. There's a balance of what's available in terms of use. Earlier on, 9527 was used and they did run out of the product. At this point, 9500 is being used. It's more stockpiled; 9527 was just found. So really, what we're talking about is just very, very large volumes and being able to get those volumes that are needed out into the area that's affected.

OPERATOR: Thank you. Our next question is from Tom Philphott with Grist Magazine. Your line is open.

Q: Hi. I would like to drill down a little bit on the ingredients in the two dispersants being used. I know that in 9500, a major ingredient is called 2-butoxyethanol and looking at the Haz -Map of it right now, it seems to suggest that it's pretty toxic at low concentration. So if you could talk to that. The second part of my question is, could you also talk through the question of supply?

As I understood it, as of a couple weeks ago already, you guys had about a third of the global supply of dispersants down there in the Gulf. The situation seems to not be ending any time soon. Dispersants seem to be a key part of the strategy for controlling it. How much dispersants are there in the world and are you going to run out before all is said and done? And what are the implications of running out?

(Audio break.)

MS. JACKSON: - to the question. Paul Anastas, our head of - EPA's head of the office of research and development is on the phone. Paul, would you like to talk a little bit about the chemical constituents?

PAUL ANASTAS: Yes. Thank you. You are correct that one of the dispersing agents does have 2-butoxyethanol but I think you may have confused the number. The Corexit 9527 does contain 2-butoxyethanol; the Corexit 9500 does not. The Corexit 9527 has been around since the '80s, and over time, the dispersing agents have become both more and more effective and also more environmentally friendly.

The 9500 has removed the butoxyethanol and is using other substances for solvating the dispersant, which obviates the need for the use of the butoxyethanol. So the 9527 was being used originally but due to supply, the 9500 is now being used at the current time.

MS. JACKSON: It's Lisa Jackson again. As far as whether or not we're going to have a limiting factor in terms of the stockpile, we're told by operations at BP - and I believe the Coast Guard has confirmed this - that that is not a limiting factor at the time, that they are arranging for a sufficient stockpile of crude dispersant in order to keep using them.

OPERATOR: Thank you. Our next question is from Phil Keating with Fox News. Your line is open.

Q: All right. Thanks, everybody. Regarding the third test of the subsea dispersants, last week I believe I recall it was abandoned because of the environmental concern and the inconclusive data. Then on Monday, it was announced that they were conducting this third test.

Did the failure of the underwater dome on Saturday play a role in that, in that suddenly it was clear 85 percent or thereabouts of the oil was not going to be collected for another further extended period of time and that maybe this measure of doing the subsea application suddenly had a little more urgency?

MS. JACKSON: Mr. Keating, hi. It's Lisa Jackson from EPA. I don't think you have accurate information with respect to the testing and so then you're drawing erroneous conclusions potentially. The second test was conducted. There was, when the contain - the coffer dam was being deployed, there was some need to - logistically, to bring all hands on deck - and when I say "hands," I mean robots because there are not people down there deploying it.

So there was a period of time when the ROVs were not available for other work. But that is not - those two decisions are absolutely not related. The test was done; there were some logistics in getting sample results but then the third test was envisioned. I imagine it's true that if the coffer dam had been successful, we would have a much smaller amount, potentially, to be worried about.

But there has always been a desire to test subsea dispersant use because again, I repeat, it is a tool in the toolkit. The other tools, things like in situ burning, things like skimming, things like aerial dispersant are weather- and time-dependent. There is some independence to the idea that subsea dispersing could be done during non-daylight hours and with some independence from surface weather conditions.

So it has been something that has been in our conscience (sic) from fairly early on. There's also some belief that you can use less dispersant if you use it in the subsea than you need to apply at the surface. We also know that research shows that dispersant is most effective on younger oil and so obviously the oil is pretty young when it comes out in the subsea.

OPERATOR: Thank you. Our next question is from Ben Raines with Press Register in Mobile, Alabama. Your line is open.

Q: Thank you. I was talking to Dr. Stone over at LSU today and he said that Alabama and Mississippi are almost certain to see some sort of slick coming ashore within the week, maybe diluted. I'm wondering, how close to shore are you all considering using dispersants and whether we're talking even inside the barrier islands?

MS. JACKSON: It's Lisa Jackson. I'll turn it over to Dana in a minute just to give some detail. Obviously, the subsea dispersant is being used at the point of the leak in the tests that have been done, and so I assume you mean on the surface - the aerial application. The plan under which the use of aerial dispersants was approved prohibits any application within three miles of shore.

That being said, the Coast Guard has been looking for dispersant use as close to the new oil - the thick, new oil that's coming out of the ground - as possible. So in general, because this rig - the former rig - was located so far off shore, we're talking about distances significantly greater than three miles. There's been nowhere near three miles. I think it's probably an order of magnitude - more like 30 miles.

MS. TULIS: Right, so - this is Dana Tulis - so in addition to the - we do not go closer than three miles to the shore regardless although, as the administrator said, what we're trying to do is get at the source which is much further out anyway. There's also a depth of no further down than 10 meters. So if it's shallower than 10 meters, we can't have effective distribution of dispersants in the sub-surface and we can't then apply it.

OPERATOR: Thank you. Our next question is from Andy Segal with CNN. Your line is open.

Q: Yes, hi. I had a question about the standards that you use for approving dispersant. It doesn't sound that all dispersants are created equal. So my question is, who made the standards? Did the industry have a role in the standards? Do you think you need to revisit the standards so that you're not using a dispersant like 9527 when you could be using 9500? Why are they using the one that has the toxic chemical in it when there's another one around that doesn't? Thank you.

MS. JACKSON: Hi, this is Lisa Jackson. The process for approving dispersant, which obviously happens outside of normal emergency response operations, requires the companies to submit - that make dispersant, not the companies who use it, but the companies who manufacture it - to submit to EPA toxicity data and the results of tests that they do on the material for which they are looking for approval. That information is reviewed by EPA against a number of criteria and decisions are made based on looking at how those tests compare to criteria that EPA has. I'm happy to give you some more information on that but you don't want me personally to do that.

What I'll say is that there are many other considerations, I think, that go into looking at the list of available, approved dispersants and then deciding which one actually gets used. Those decisions are made between the suppliers and the responsible party who is required by law to take action on responding to the spill that they're responsible for.

So the idea of a pre-approved list came out of the concept that we didn't want to be in the field trying to decide what to use and where it might be used and where best to use it. We're doing that in the case of the subsea dispersant because we don't have a pre-approval for that. It is a novel technique. But the idea of aerial application of dispersant being used - a common tool in the toolkit - is well-accepted. It was before this. The only difference here is that the aerial extent and the amount and the ongoing nature of the response - it's been effective, but it means that we're using large quantities of it.

OPERATOR: Thank you. Our next question comes from Jeff Young, with PRI's "Living on Earth." Your line is open.

Q: Hi. First, a quick word of thanks: I think this has been very helpful. If the flow of oil can't be stopped for some time, how long do you foresee using dispersants at the level that you're using them? Is there some point at which the total volume used becomes problematic? And is there any precedent you can look to for guidance on using dispersants at this kind of volume?

MS. JACKSON: Lisa Jackson again. Dispersants have certainly been applied to much smaller spills off the coasts of the U.S., and certainly off the Louisiana and Texas coasts over the last 15 years. In terms of precedents, there was a well blowout near Veracruz, Mexico in 1979. Between 1 million and 2.5 million gallons of mostly Corexit products were applied over a five-month period on that oil discharge. That was the IXTOC-I well blowout near Veracruz, Mexico in 1979.

Australia, last year, 50,000 - 50,000 gallons of dispersants were used on the oil platform spill. And in the United Kingdom, dispersants are considered first line of defense because they have high seas and rugged coastlines. In 1996, 118,000 gallons of dispersants were used on the 20 million-gallon Sea Empress oil spill in Wales. So that's just a brief history of some - history of dispersant use.

I think it is fair to say that, when it comes to these volumes, we're in uncharted waters, to use a bad pun. And you know, every spill is different, and one of the tasks of the federal on-scene coordinator, the national response team, which EPA chairs, the national incident commander that the president has now put in charge of this is to try to constantly be adapting our sampling and our management strategy to look to the issues of the day.

We're certainly aware that we're running up a large gallonage (sic) of use, here, but again, we're looking at a continued release and an all-hands-on-deck effort to try to minimize the likelihood that this stuff hits those very fragile wetlands and marshes and those very valuable and much-beloved shorelines along the Gulf Coast region.

MS. ANDY: Jill, it's Adora. We can probably take just two more questions.

OPERATOR: Okay. Our next question will be from Paul Quinlan with Greenwire.

Q: Thanks for taking my question. Just two very basic questions: Do you know how much - of the total gallons that have been put out, how much is 9500 versus how much is 9527? And then how much more is on order at this point from Nalco or from whoever else you might be trying to obtain it from?

MS. JACKSON: We'll probably need to defer to the Coast Guard Operational Command on gallonages used of each one. We had heard roughly 50/50, but we can't confirm that, so we're a little uncomfortable giving you - this is Lisa Jackson, sorry - giving you numbers. The data we had, as of May 10th, is that there were another 805,000 gallons ordered and there were already 500,000 gallons staged.

Obviously, if you recall, we planned for the absolute worst and we hope for the best. So the hope would be that we're not going to have to use all that. But those are approximate levels of what's already been ordered. I can't confirm that it's all from - the Corexit product - but we'll try to get you a little bit more information on that. I cannot confirm, sorry, that it's all Corexit, but I do know that those are total dispersant volumes.

OPERATOR: Our next question comes from Natasha Loader with the Economist. Ma'am, your line is open.

Q: Oh, hi. Can you hear me? When you do a scientific test properly, it's supposed to be conclusive, either way. Would I be correct in saying that your first two tests of the undersea dispersants - there was some kind of sampling issue? And if that is correct, has the third test resolved this? And if it's not correct, what did go wrong with the first two tests?

MS. JACKSON: Lisa Jackson. I think it would be fair to say that the first two tests had varying degrees of logistical difficulty in getting the samples, getting them at the right time, getting them to the lab in a timely manner and getting the results back. And they were not done in a way that allowed us to get the kind of data that we already know we'll be able to look at for this third test.

So again, the good news is that we know samples are at the LSU laboratory, but we also have a fairly good database of raw information and data that NOAA collected that scientists are right now poring over and trying to correlate in order to make a recommendation. I don't know if anyone wants to add anything to that.

MS. TULIS: And as well as, the other complication was the going down to the 5,000 feet. And so what was done is, samples were taken at depths further up, up to 1500 feet. And so that enabled us to be able to get more data at different depths, as well. But it was logistically difficult at the 5,000 feet.

OPERATOR: Our next question comes from Kevin Gallagher with L.A. radio network news. One moment.

Q: (Inaudible) - seafood coming from the Gulf right now?

OPERATOR: Mr. Gallagher, I apologize. Could you repeat your question, please?

Q: My question is, the Corexit products that are being used - are they the same Corexit products that the British have banned for potential threat to humans and to animal life. And for Ms. Jackson, would you eat seafood coming from the Gulf right now?

MS. JACKSON: I had seafood yesterday in New Orleans. And yes, if it's coming from a place and it's being caught from those areas where NOAA or the state have not banned it or it's not being illegally gotten, I would certainly eat it and I would enjoy it. As to your other question, I can't answer it, so I'll ask if anyone knows which products Britain has banned.

MR. WESTERHOLM: This is Dave Westerholm. I'm not sure which ones they've banned, but there are a number of previous Corexit products that EPA no longer allows on their current list. So the list continues to get updated. I think we would have to check on that. But my guess would be that the ones that EPA no longer allows to be used are the same ones that British people are no longer allowed to use.

MS. ANDY: All right, Jill, thank you very much, and thank you to our participants on this call.

OPERATOR: That does conclude today's conference call. We thank you all for participating. You may now disconnect and have a great afternoon.

(END)

**Home**

**Task Force**
About Task Force
Joint Info Center
Education Resources
Federal Partners
Recovery Plan
Investigation
Response
State and Local

**Assistance**
File a Claim
Other Assistance
Small Business

**Health & Safety**
Boating
Drinking Water
Health Matters
Mental Health
Seafood Safety
Workers and Volunteers

**Fish & Wildlife**
Birds
Fish
Turtles
Other Wildlife
Fish & Wildlife Reports

**Environment**
Air
Beaches
Coral
Waste
Water

**News**
Press Releases
Response Updates
Transcripts & Docs
Events
Features
FOIA Library
Maps & Data
Multimedia

Follow us:

Cambodian | Croatian | Español | Français | Korean | Kreyòl ayisyen | Lao | Russian | Thai | Vietnamese

Site Map | Site Notices & Plug-Ins

# EXHIBIT F

# BP DEEPWATER HORIZON OIL SPILL

## Incident Specific Preparedness Review (ISPR)





# FINAL REPORT
## January 2011

## I.7    USE OF DISPERSANTS

**Observations:**

- Prior to the Deepwater Horizon incident, Regional Response Team (RRT) VI had pre-authorized the use of dispersants for oil spill response operations for its area of responsibility. This pre-authorization covers the use of any dispersant on the National Product Schedule and may be used in waters greater than 10 meters deep and at least 3 miles from shore. RRT IV has the same general pre-authorization for dispersant use, but excludes certain geographic areas from dispersant use.



- The pre-authorizations for both RRTs did not address any limit on the volume of dispersants that might be used nor did they consider the potential use of subsea injection of dispersants.

- Prior to the incident, the Environmental Protection Agency (EPA), Department of the Interior (DOI), Department of Commerce (DOC) and the affected States concurred with the pre-authorizations established by the RRTs.

- A considerable amount of science, research, and documentation has been conducted on dispersants over the last 30 years. However, this information was not provided to Senior Federal officials or the public during the response to the Deepwater Horizon incident. This information, mostly presented in scientific terms, is not easily available from a single source.

- Dispersants listed on the National Products Schedule were used extensively to enhance the natural biodegradation of the oil during the response and to control hydrocarbon vapors at the surface above the release site.

- Dispersants were effective on surface oil to reduce shoreline impacts and provide safety for response workers on the surface fleet.

- The use of dispersants for this incident was conducted in accordance with the RRT VI Federal On-Scene Coordinator (FOSC) Dispersant Pre-Approval Guidelines and Checklist.

- A monitoring program for the effectiveness of surface-applied dispersants began in tandem with their application. Special Monitoring of Applied Response Technologies (SMART) protocols were implemented in accordance with prescribed procedures. Three tiers of monitoring occurred—visual, direct detection with fluorometry, and analytical confirmation.

- A subsea dispersed oil monitoring program was developed during the incident because existing monitoring protocols were not designed for subsurface dispersant application. A Subsea Monitoring Unit was established at the Unified Area Command (UAC) to implement this program.

- Even though pre-authorization of dispersant use was provided by RRT VI and implemented by the FOSC, public perception was that this response tool was merely adding another toxic substance to the environment. This perception, expressed by both the media and elected

officials, as well as the unprecedented volume of dispersants used, appear to have caused the Federal Government to intervene and impose control protocols for the use of dispersants for the remainder of the response.

- Subpart J of the National Contingency Plan (NCP), which provides the testing regime for dispersants, was criticized because test protocols did not include chronic testing, testing of indigenous species, or take into account specific oil types in combination with specific dispersant types and specific water bodies.

- Sampling indicated high dispersant efficacy and low dispersant and dispersed oil toxicity. However, the long-term environmental effects of dispersed oil in the deep sea are unknown.

- Re-evaluation and testing directed by EPA in consultation with the National Incident Commander created delays in oil dispersion operations that may have allowed more oil to impact inshore areas. However, the volume of dispersants being used, the unique application of dispersants at the well head, concerns over monitoring programs and the adequacy of the testing regime under the NCP Product Schedule, justified additional testing which served to ameliorate these concerns.

- The FOSC appropriately retained the authority to approve dispersants as a safety tool for controlling volatile organic compounds (VOCs) at the surface above the release site.

- Initially senior Federal officials and others attempting to address media inquiries had little or no knowledge or experience about the use of dispersants as a key response tool and were only partially educated on the benefits, risks, and efficiencies of dispersants.

- The volume of dispersants and the novel application at the wellhead, neither of which were anticipated in the RRT VI pre-authorization, caused confusion among decision makers as to authorities, and chain of command regarding decisions that fall outside established doctrine.

**Discussion:**

Dispersants are a response tool that uses chemical action to diffuse oil into the water column. Dispersants are used to reduce the impact of oil on shorelines, to reduce the impact on birds and mammals on the water surface, and to promote the biodegradation of oil in the water column.

The NCP outlines the process and procedures for use of dispersants and other chemical response agents. Use of dispersants and other chemical agents for oil spill response is based on meeting  certain testing requirements for toxicity, efficacy, and effectiveness. Dispersants and other chemical agents successfully meeting the standards are listed in accordance with Subpart J of the NCP. A dispersant may not be used if it is not listed on the NCP Product Schedule.

There is currently no single comprehensive national policy for dispersant use. Each RRT is allowed to make the determination as to whether dispersants should be "pre-authorized," including the locations and conditions under which dispersants may be used. Some RRTs have established robust pre-authorization protocols for dispersants, while others do not pre-authorize dispersant use, leaving dispersant use decisions to be made at the time of an incident.

If a pre-authorization protocol is established by an RRT, the FOSC is vested with the authority to approve the use of the dispersants, subject to the conditions established by the pre-authorization. If a pre-authorization is not in place, the FOSC must gain approval from the EPA and the affected State and consult with the DOC and the DOI prior to the use of dispersants.

The decision to use dispersants is based on the concept of "net environmental benefit." Dispersant application rates, meteorology, sea states, environmentally sensitive areas, efficacy, fisheries, water quality, and numerous other factors are considered in determining if a net environmental benefit exists. Ideally, these determinations are made during planning for oil spill response. In the past, the Coast Guard has used a Consensus Ecological Risk Assessment (CERA) to determine net environmental benefit.

A recent change to Federal regulations requires that vessel response plan holders provide for the use of dispersants when they are operating in areas where dispersant use has been pre-authorized.

When the decision is made to use dispersants, an Oil Spill Removal Organization (OSRO) or other specialized contractor carries out application. Dispersant effectiveness is monitored by Federal agencies using SMART protocols, including visual observation with on-water teams conducting real-time, water column monitoring.

Prior to the Deepwater Horizon incident, RRT VI had pre-authorized use of dispersants for oil spill response. This pre-authorization covers the use of any dispersant on the NCP Product Schedule and its use in waters deeper than 10 meters and at least 3 miles from shore.

Under the terms of the RRT VI dispersant pre-authorization protocols, the FOSC is required to notify the RRT of an intent to initiate dispersant operations as soon as practicable and to conduct a test application. If the test application is successful and operational results are positive, no further RRT approval is required for operational use during the incident. The procedures required for dispersant use decisions were followed during this incident.

The RRT VI dispersant pre-authorization includes both aerial and vessel application, but does not address the potential for use in a subsea application. The pre-approval protocols do not establish a limit on the volume of dispersants that may be used. An expedited approval process for use of dispersants that may fall outside the parameters of pre-authorization is also provided by RRT VI.

Even though pre-authorization of dispersant use was approved by RRT VI and implemented by the FOSC, over time, several concerns developed. These concerns involved the increasing volume of dispersants being used, the extended duration of dispersant application, the novel use of subsea injection of dispersants at the wellhead, and the potential toxicity of both the dispersants and the dispersed oil. These concerns caused the EPA to question the continued use of dispersants. Ultimately, the EPA issued Directives establishing limitations for surface and subsurface applications, and additional toxicity testing was conducted. A dispersant use plan was required from BP that required them to develop a means of determining subsea dispersant effectiveness, a robust sampling and monitoring program to track dispersed oil in the water column, a method to assess toxicity, and operational procedures for subsea injection. This did not affect the existing authority of the FOSC to use dispersants when deemed necessary to protect response workers from VOCs in the vicinity of the release.

Approximately 1 million gallons of dispersants were used on the surface and 770,000 gallons were used at the wellhead during this incident. This represented an unprecedented amount of dispersants used in an oil spill response.

Aerial application of dispersants required specialized aircraft and trained observers, and challenged both logistics and communications systems. Fixed wing aircraft were most appropriate due to the distances offshore. Specialized aircraft equipped with GPS tracking capabilities and calibrated spray systems were employed. Extensive coordination was required between field units and the Operations Section in the Houma Incident Command Post to eliminate overlap among surface skimming operations, in situ burning, or well site/source control efforts. Because of the coordinated operation and aircraft monitoring, the response organization was able to refute reports of people, boats, and homes being sprayed with dispersants.

Despite the successful application of subsea dispersants in this incident, neither the Government nor industry was fully prepared to address critical issues of the fate and effect of dispersants introduced at great ocean depths. There were no operational protocols or scientific information available to assist decision makers in using this response option.

Despite many years of experience in the use of dispersants, the lack of current science regarding the fate and effect of dispersed oil and its toxicity hindered the ability of responders and agency officials to adequately address these public concerns. Notwithstanding these concerns, the use of dispersants in this incident was largely successful in limiting the amount of oil that reached sensitive shoreline environments and promoting worker safety near the well site.

However, the total impact of dispersed oil from this incident remains unclear. For several reasons, the Deepwater Horizon incident will serve as a catalyst to drive further toxicity testing and updating of test protocols. It will also encourage further evaluation of the effectiveness of subsea dispersant use, promote the expanded use of ecological risk assessments for determining net environmental benefits of dispersant use, and trigger more periodic reviews of the pre-authorization of the use of dispersants as a viable oil spill response option.

**Lessons Learned:**

- The volume of dispersants used and their novel application at the wellhead needs to be addressed in RRT pre-authorizations, when appropriate, to assist in avoiding controversy in the future.

- Pre-authorization of dispersant use is critical to rapid deployment of this spill countermeasure. Rapid deployment of dispersant resources is, in turn, critical to the successful use of dispersants.

- Training, field exercises, and field experience are necessary to maintain proficiency of spotters, logistical and operational coordinators, pilots, and SMART teams.

- SMART monitoring is a suitable protocol to evaluate dispersant effectiveness. However, its application in an offshore environment, including coordination with spray aircraft, remains a challenge. The new fluorometer was successful.

- Aircraft are superior to vessels as platforms to locate suitable patches of oil for dispersant application aircraft.

- The mix of aircraft (e.g., BT-67, DC-3, King Air, C-130) used during the Deepwater Horizon incident provided a good complement of capabilities to cover various sizes of slicks at various distances from shore.

- Many promising technologies to determine oil spill thickness are available, but all have issues of timeliness, coverage area, or sufficient detail to adequately support dispersant operations.

- Recent upgrades and investments by industry in dispersant application equipment and training enhanced the effectiveness of dispersants for the Deepwater Horizon incident.

- Complex, large-scale dispersant operations require a cooperative partnership among industry, OSROs, and Government; e.g., United States Air Force, Coast Guard.

- Subsea dispersant application proved to be effective; however, the conditions under which it can be used and the volume of dispersants required need to be further studied.

- In areas where subsea dispersant application may be considered, pre-authorizations by RRTs need to specify the method and volumes that may be used.

- In the absence of pre-authorization subsea applications, EPA Directives provided controls, but also posed problems for meeting daily operational objectives.

- The environmental and economic tradeoffs between offshore and inshore and shoreline impacts need to be understood and considered when developing pre-authorization plans.

- There needs to be a rigorous sampling and monitoring program if dispersants are applied in subsea environments.

- The lack of current toxicity data, outdated test protocols, and ineffective risk messaging on dispersants prevented the response organization from conveying to the public the risks associated with dispersant use and its effectiveness in an offshore environment.

- RRTs need to continually review and update dispersant policies for their area of responsibility (AOR) to ensure they can make informed decisions regarding the pre-authorized use of dispersants.

**Recommendations:**

1. The Coast Guard should request that the National Academy of Sciences update their 2005 study "Oil Spill Dispersants: Efficacy and Effects" on the application of dispersants in light of lessons learned from the Deepwater Horizon incident, including a determination of the effectiveness and net environmental benefits of subsea dispersant application.

2. The Coast Guard should request that the EPA update Subpart J of the NCP to address chronic testing, testing of indigenous species, and testing of specific oil types in combination with specific dispersant types with specific water bodies and set appropriate temporal, spatial, and volumetric standards.

3. The Coast Guard should request that the National Response Team (NRT) provide national guidance on pre-authorizations for dispersant use, including the potential for subsea dispersant use, application methods, volume limitations, and an expedited approval process within the Incident Command System

4. The Coast Guard and EPA should clarify NCP provisions regarding Federal Agency roles and responsibilities in using dispersants as a response option.

5.  In areas where dispersants are pre-authorized, the Coast Guard should require plan holders to include use of dispersants as a response option, and include the necessary resources to detect oil and conduct dispersant operations using personnel trained and qualified in the application of dispersants.

6.  The Coast Guard should engage EPA and the National Oceanic and Atmospheric Administration (NOAA) to continue to enhance SMART monitoring technologies and protocols in offshore environments.

7.  The Coast Guard should engage EPA and NOAA to undertake more research and development to better determine oil slick thickness.

8.  The Coast Guard should seek ways to encourage additional investments in dispersant application equipment and training by industry.

9.  The Coast Guard should engage NOAA, and other agencies as appropriate, to develop programs to monitor and track large dispersed oil plumes.

10. The Coast Guard should fully fund and use the CERA process to inform RRTs of the environmental and economic tradeoffs of dispersant use.

11. The Coast Guard should request that the NRT develop a comprehensive system for educating the public and senior officials on dispersants as a response tool, and act as a clearinghouse for new or updated dispersant science and technology.

12. The Coast Guard should ensure that response training course curricula include the use of dispersants as a response tool, including the potential net environmental benefits and the current state of science regarding dispersants.

13. The Coast Guard should ensure that training and exercise programs include key potential participants (e.g., OSROs, industry, Coast Guard, EPA, and Department of Defense components) in dispersant operations including monitoring in the offshore environment to improve performance of spotters, pilots, aircraft spray systems, logistics, communication, and coordination.

14. The Coast Guard should request that the NRT perform an intensive analysis of all aspects of dispersant use during the Deepwater Horizon incident. This analysis would be used to develop national standards and guidelines that can be used by RRTs to update the dispersant guidelines in their AOR.