# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico on April 20, 2010 | * | SECTION "J" |
| | * | JUDGE BARBIER |
| This Document Relates to: | * | |
| 2:10-CV-4182; | * | |
| 2:10-CV-4183; | * | |
| 2:10-CV-3059; | * | MAGISTRATE NO. 1 |
| 2:11-CV-516. | * | MAGISTRATE SHUSHAN |
| *   *   *   *   *   *   *   *   *   *   *   * | | |

**CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF MOTION OF
DEFENDANTS ANADARKO PETROLEUM CORPORATION AND
ANADARKO E&P COMPANY LP TO DISMISS
THE STATE OF ALABAMA'S FIRST AMENDED COMPLAINT AND
THE STATE OF LOUISIANA'S FIRST AMENDED COMPLAINT
PURSUANT TO FED. R. CIV. P. 12(b)(6) ["PLEADING BUNDLE C"]**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 3

    A.    The Amended Complaints .................................................................... 3

        1.    Alabama's Amended Complaint .................................................. 3

        2.    Louisiana's Amended Complaint ................................................. 3

    B.    The Macondo Prospect Lease ............................................................... 4

    C.    BP E&P is the designated operator of the Macondo Prospect Lease, and Anadarko did not participate in the drilling operations .......................... 5

ARGUMENT ....................................................................................................................... 8

I.    Standard of Review ................................................................................................. 8

II.    The States' General Maritime Claims Fail Because Maritime Law Is Displaced by OPA. ... 9

III.    The States' OPA Claims Fail to State a Claim. ................................................. 12

    A.    Neither State has shown that the presentment requirements of OPA have been met ................................................................................................ 12

        1.    OPA mandates presentment of *all* claims to a responsible party before a claimant, including States, may seek relief in court for those claims. ...... 12

        2.    Requests for "declaratory judgment" do not save the States' OPA claims. ................................................................................................... 18

        3.    The States' Complaints fail to adequately allege facts to support this Court's jurisdiction over their OPA claims. ........................................... 22

B.     Other pleading defects require dismissing the States' OPA claims in part. ......... 26

     1.     Claims for removal costs under OPA must be dismissed. ....................... 26

     2.     The States' OPA claims against AE&P must be dismissed because AE&P did not hold a lease interest in the Macondo Prospect at the time of the discharge. ........................................................................................... 28

IV.     The States Fail to State a Claim under General Maritime Law in Any Event. ................. 31

     A.     Neither Complaint alleges facts that, even if taken as true, would establish Anadarko is liable for negligence or gross negligence under maritime law ......... 31

        1.     Anadarko did not have operational control over any of the activities that allegedly caused the States' harm. ............................................................ 31

        2.     Allegations about Anadarko's rights under the Operating Agreement are insufficient as a matter of law to establish liability for maritime negligence. ................................................................................................ 34

        3.     Alabama's claim for gross negligence must also be dismissed. ............... 38

     B.     Louisiana has failed to state a claim for nuisance under maritime law. .............. 39

        1.     Maritime law does not recognize a claim for public nuisance ................. 39

        2.     Louisiana, as a government entity, cannot bring a claim for private nuisance ................................................................................................... 41

     C.     Louisiana also fails to state a claim for trespass under maritime law .................. 41

V.     State Law is Inapplicable in this Case and, therefore, the State Law Claims Raised by Alabama and Louisiana Fail as a Matter of Law. ................................................................. 43

     A.     Under OCSLA choice-of-law rules, federal law alone applies to this case because the case arises out of and in connection with OCS operations that involve exploration, development, and production of minerals. ....................................... 44

        1.     OCSLA prescribes the choice-of-law rules that apply to the States' claims ...................................................................................................... 44

2.      OPA, as applicable federal statutory law, not maritime or state law, governs the States' claims ............................................................... 47

   a.      State law cannot serve as surrogate federal law in this case because there is applicable federal statutory law ........................................ 48

   b.      Section 1333(a)(2) is not applicable in this case to invoke state law as surrogate federal law under OCSLA. ........................................ 50

   c.      State law is inapplicable, in any event, because it is inconsistent with federal law ............................................................................. 51

3.      Allegations that the injuries occur in state territory do not change the choice-of-law inquiry or its result. ............................................................. 52

B.      In cases involving oil spills originating from the OCS, the law of an affected state is preempted. ........................................................................................ 54

C.      Even if State Law could be adopted under the OCSLA choice of law provisions, individual state law claims against Anadarko nonetheless fail and must be dismissed. ................................................................................................... 58

1.      Louisiana fails to allege sufficient facts to support the claims under Louisiana law. ............................................................................. 59

2.      LOSPRA preempts claims under all other state law ................................. 61

3.      The Louisiana Complaint fails to state a claim under LOSPRA. .............. 62

CONCLUSION ..................................................................................................................... 65

# <u>TABLE OF AUTHORITIES</u>

## FEDERAL CASES

<u>Page</u>

*Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548 (5th Cir. 1987),
    *cert. denied*, 485 U.S. 1034 (1988)......................................................................31, 37

*Alleman v. Omni Energy Services Corp.*, 580 F.3d 280 (5th Cir. 2009) ..........................53

*Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006)...................................................................16

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) .......................................................8, 9, 26, 59, 60

*In re B-727 Aircraft Serial No. 21010*, 272 F.3d 264 (5th Cir. 2001) ..............................21

*Baldwin Metals Co. v. Donovan*, 642 F.2d 768 (5th Cir. 1981) ........................................22

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)..............................................8, 26, 60

*Bennett v. Islamic Republic of Iran*, 618 F.3d 19 (D.C. Cir. 2010)..................................30

*Boca Ciega Hotel, Inc. v. Bouchard Transport Co.*,
    51 F.3d 235 (11th Cir. 1995) ................................................................................13, 51

*Bolivar v. R & H Oil and Gas Co.*, 789 F. Supp. 1374 (S.D. Miss. 1991).......................33

*Burnett v. Stewart Title, Inc. (In re Burnett)*, 635 F.3d 169 (5th Cir. 2011)...............16, 30

*Butler ex rel. Anderson v. Miss-Lou Ambulance Serv., LLC*, No. 07-0924,
    2008 WL 2816845 (W.D. La. July 22, 2008) ...............................................................58

*California v. Sierra Club*, 451 U.S. 287 (1981)................................................................39

*Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370 (5th Cir. 2000) ....................................31

*Cape Flattery Ltd. v. Titan Maritime LLC*,
    607 F. Supp. 2d 1179 (D. Haw. 2009)..........................................................................58

*Carr v. United States*, 130 S. Ct. 2229 (2010).................................................................30

*Causey v. Sewell Cadillac-Chevrolet, Inc.*,
    394 F.3d 285 (5th Cir. 2004) .......................................................................................5

*Cinel v. Connick*, 15 F.3d 1338 (5th Cir. 1994).................................................................5

*City of Milwaukee v. Illinois and Michigan,*
451 U.S. 304 (1981)...........................................................................9, 55

*In re Cleveland Tankers, Inc.,* 791 F. Supp. 669 (E.D. Mich. 1992)...............................28

*Collins v. Morgan Stanley Dean Witter,*
224 F.3d 496 (5th Cir. 2000) .............................................................5, 6

*Conner v. Aerovox, Inc.,* 730 F.2d 835 (1st Cir. 1984)....................................................40

*In re Cooper/T. Smith,* 929 F.2d 1073 (5th Cir. 1991) ....................................................31

*Cowart v. Mediterranean Shipping Co. (USA) Inc.,* No. 09-3572,
2011 WL 601651 (E.D. La. Feb. 15, 2011) ................................................24

*Cox v. City of Dallas,* 256 F.3d 281 (5th Cir. 2001)........................................................39

*Dalrymple v. Fairchild Aircraft, Inc.,*
575 F. Supp. 2d 790 (S.D. Tex. 2008) ......................................................42

*Dant & Russell, Inc. v. Burlington N. R.R. (In re Dant & Russell, Inc.),*
951 F.2d 246 (9th Cir. 1991) ...................................................................17

*Demette v. Falcon Drilling Co.,* 280 F.3d 492 (5th Cir. 2002), *overruled in part
on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC,*
589 F.3d 778 (5th Cir. 2009) ................................................................45, 46, 48

*Diamond Offshore Co. v. A&B Builders, Inc.,* 302 F.3d 531 (5th Cir. 2002) ............46, 51

*Dunham-Price Group, LLC v. Citgo Petroleum Corp.,* No. 2:07CV1019,
2010 WL 1285446 (W.D. La. Mar. 31, 2010) ............................................38

*Duplantis v. Shell Offshore, Inc.,* 948 F.2d 187 (5th Cir. 1991)........................................35

*Dykes v. Maverick Motion Picture Group, LLC,* No. 08-536-JJB-CN,
2011 WL 900276 (M.D. La. Mar. 14, 2011) ..............................................23

*EP Operating LP v. Placid Oil Co.,* 26 F.3d 563 (5th Cir. 1994) ..............................45, 52

*Ferrer v. Chevron Corp.,* 484 F.3d 776 (5th Cir. 2007)...............................................8, 22

*Gaar v. Quirk,* 86 F.3d 451, 453 (5th Cir. 1996)............................................................21

*Gabarick v. Laurin Maritime (Am.) Inc.,*
623 F. Supp. 2d 741 (E.D. La. 2009)..........................................9, 12, 20, 48

*Gabarick v. Laurin Maritime (Am.) Inc.*, No. 08-4007,
   2009 WL 102549 (E.D. La. Jan. 12, 2009) ..................................................14

*Gatlin Oil Co. v. United States*, 169 F.3d 207 (4th Cir. 1999) ...................................20, 48

*Geier v. America Honda Motor Co.*, 529 U.S. 861 (2000)..................................................57

*Grammer v. Patterson Services, Inc.*, 860 F.2d 639 (5th Cir. 1988),
   *cert. denied*, 491 U.S. 906 (1989) ............................................33

*Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*,
   589 F.3d 778 (5th Cir. 2009) ..........................................45, 53

*In re Great Lakes Dredge & Dock Co. LLC*,
   624 F.3d 201 (5th Cir. 2010) ...........................................8, 22

*Gregory v. Mitchell*, 634 F.2d 199 (5th Cir. 1981)..........................................14

*Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473 (1981) .............................................45

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
   484 U.S. 49 (1987) ......................................30

*Hallstrom v. Tillamook County*, 493 U.S. 20 (1989)..................................................14, 15

*Heckler v. Ringer*, 466 U.S. 602 (1984) ...........................................18

*Hershey v. Energy Transfer Partners, L.P.*,
   610 F.3d 239 (5th Cir. 2010) ...........................................8, 60

*Hooper v. Thomas,* No. CIV.A. 01-1730,
   2002 WL 1268399 (E.D. La. June 5, 2002)..................................................14

*Houston Exploration Co. v. Halliburton Energy Services, Inc.*,
   269 F.3d 528 (5th Cir. 2001) ...........................................38

*IMTT-Gretna v. Robert E. Lee S.S.*, 993 F.2d 1193 (5th Cir. 1993)..................................38

*Illinois v. City of Milwaukee*, 406 U.S. 91 (1972) ............................................55

*International Paper Co. v. Ouellette*, 479 U.S. 481 (1987)....................................55, 56, 57

*Ireland v. Shultz*, 829 F.2d 1189 (D.C. Cir. 1987)...........................................20

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
   513 U.S. 527 (1995).........................................53

*Kai Enterprises, L.L.C. v. Boh Brothers Construction Co., L.L.C.*,
731 F. Supp. 2d 568 (E.D. La. 2010) ..........................................................................42

*Kane Enterprises v. MacGregor (USA) Inc.*,
322 F.3d 371 (5th Cir. 2003) ........................................................................................6

*In re Katrina Canal Breaches Litigation*, 495 F.3d 191 (5th Cir. 2007) ...........................6

*Kelley v. Bergamino*, No. 3:08-cv-00887-B,
2009 WL 174131 (N.D. Tex. Jan. 23, 2009) ..............................................................23

*Kingston Shipping Co. v. Roberts*, 667 F.2d 34 (11th Cir. 1982) ....................................38

*Kushindana v. Blue Center, Inc.*, No. 10-00472-FJP-DLD,
2010 WL 4977499 (M.D. La. Oct. 20, 2010) .............................................................23

*Lakes of Gum Cove Hunting & Fishing, LLC v. Weeks Marine, Inc.*,
182 F. Supp. 2d 537 (W.D. La. 2001)....................................................................41, 42

*Landry v. Island Operating Co.*, No. 09-1051,
2009 WL 3241560 (W.D. La. Sept. 30, 2009)............................................................53

*Landry v. Huthnance Drilling Co.*, 889 F.2d 1469 (5th Cir. 1989) ..................................34

*Lane v. Capital Acquisitions & Management Co.*, No. 04-60602CIV,
2006 WL 4590705 (S.D. Fla. Apr. 14, 2006) .............................................................59

*Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019 (5th Cir. 1985) ........38, 39, 40

*Louisiana v. Rowan Cos.*, 728 F. Supp. 2d 896 (S.D. Tex. 2010) ....................................38

*Louisville & Nashville R.R. Co. v. M/V BYULACOMBE*,
597 F.2d 469, 472 (5th Cir. 1979)  .............................................................................38

*Lyrick Studios, Inc. v. Big Idea Products, Inc.*, 420 F.3d 388 (5th Cir. 2005) .................17

*Magluta v. Samples*, 256 F.3d 1282 (11th Cir. 2001)......................................................59

*Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.*,
959 F.2d 49 (5th Cir. 1992) ........................................................................................42

*Marathon Pipe Line Co. v. LaRouche Industries Inc.*,
944 F. Supp. 476 (E.D. La. 1996)...............................................................................13

*Margin v. Sea-Land Servs., Inc.*, 812 F.2d 973, 976 (5th Cir. 1987)...............................23

*Martin v. Pride Offshore Co.*, No.  Civ. A. 97-3754, 1999 WL 4921 (E.D. La. Jan. 6, 1999), *aff'd*, 198 F.3d 241 (5th Cir. 1999)........................................................37

*McCormack v. Noble Drilling Co.*, 608 F.2d 169 (5th Cir. 1979)....................................37

*Medical Center Pharmacy v. Mukasey*, 536 F.3d 383 (5th Cir. 2008) .............................17

*Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1 (1981)................................................................................................19, 40

*Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618 (1978) ..................................................10

*Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604 (2000)..............................................................................................56

*Nase v. Teco Energy, Inc.*, 347 F. Supp. 2d 313 (E.D. La. 2004).....................................45

*National Environmental Foundation v. ABC Rail Corp.*, 926 F.2d 1096 (11th Cir. 1991) ...................................................................................14

*National Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*, 924 F. Supp. 1436 (E.D. Va. 1996), *aff'd*, 122 F.3d 1062 (4th Cir. 1997)........9, 10, 48

*Navarro-Miranda v. Ashcroft*, 330 F.3d 672 (5th Cir. 2003) ...........................................20

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112 (2d Cir. 2010)..........................................................................................51

*In re Nobleman*, 968 F.2d 483 (5th Cir. 1992) ................................................................20

*Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811 (2001)....................10, 11

*North Carolina ex rel. Cooper v. Tenn. Valley Authority*, 615 F.3d 291 (4th Cir. 2010), *pet. for cert. filed*, 79 USLW 3457 (Feb. 2, 2011)....................................................................................................................39

*Nyon Tech. Commercial, Inc. v. Equitable Equip. Co.*, 341 F. Supp. 777 (E.D. La. 1972) ............................................................................42

*Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207 (1986)........................................49, 57

*Okpalobi v. Foster*, 190 F.3d 337 (5th Cir. 1999) ..........................................................19

*Oppen v. Aetna Insurance Co.*, 485 F.2d 252 (9th Cir. 1973) ...........................................54

*Panda Brandywine Corp. v. Potomac Electric Power Co.*,
253 F.3d 865 (5th Cir. 2001) ...............................................................23, 24

*Pierson v. Orlando Reg'l Healthcare System, Inc.*, No. 6:08-cv-466-Orl-28GJK,
2009 WL 2151176 (M.D. Fla. July 13, 2009) ............................................59

*Plotkin v. IP Axess Inc.*, 407 F.3d 690 (5th Cir. 2005) ...................................8, 22

*Port Drum Co. v. Umphrey*, 852 F.2d 148 (5th Cir. 1988)........................................19, 21

*Pro Image Installers, Inc. v. Dillon*, No. 3:08CV273/MCR/MD,
2009 WL 112953 (N.D. Fla. Jan. 15, 2009) ................................................59

*Public Service Commission of Utah v. Wycoff Co.*, 344 U.S. 237 (1952) ........................20

*Quaker State Corp. v. U.S. Coast Guard*, 681 F. Supp. 280 (W.D. Pa. 1988) .................29

*Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237 (2010) .....................................16

*Rice v. Harken Exploration Co.*, 250 F.3d 264 (5th Cir. 2001)...............................27

*Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352 (1969) ...............................47, 48

*Rogers v. Ingolia*, No. 10-30648, 2011 WL 1664201 (5th Cir. May 2, 2011) .................21

*Rogers v. Shell Oil Co.*, No. 92-1040, 1993 WL 30052 (E.D. La. Feb. 3, 1993) .............37

*Ronquille v. MMR Offshore Services, Inc.*, 353 F. Supp. 2d 680 (E.D. La. 2004) ......32, 37

*Rowan Cos., Inc. v. Griffin*, 876 F.2d 26 (5th Cir. 1989) ....................................21, 40, 43

*Russo v. M/T Dubai Star*, No. C 09-05158 SI,
2010 WL 1753187 (N.D. Cal. Apr. 29, 2010) ............................................13

*Sekco Energy, Inc. v. M/V Margaret Chouest*,
820 F. Supp. 1008 (E.D. La. 1993)................................................28, 39, 41

*Shlahtichman v. 1-800 Contacts, Inc.*, 615 F.3d 794 (7th Cir. 2010),
*cert. denied*, 131 S. Ct. 1007 (2011) ........................................................30

*Snyder Oil Corp. v. Samedan Oil Corp.*, 208 F.3d 521 (5th Cir. 2000) ...........................58

*South Port Marine, LLC v. Gulf Oil LP*, 234 F.3d 58 (1st Cir. 2000) ....................9, 11, 48

*Southern Pacific Co. v. Jensen*, 244 U.S. 205 (1917)........................................9

*St. Germaine v. Alamo Motor Lines*, 252 F.2d 10 (5th Cir. 1958) ..................................18

*Taira Lynn Marine Ltd. No. 5 LLC v. Jays Seafood, Inc. (In re Taira Lynn Marine Ltd. No. 5 LLC)*, 444 F.3d 371 (5th Cir. 2006) ................................................38

*Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859 (E.D. La. 2001) ......................9, 10, 48

*Ten Taxpayer Citizens Group v. Cape Wind Associates*, 373 F.3d 183 (1st Cir. 2004)..............................................................................45, 50

*Texaco Exploration & Production, Inc. v. AmClyde Engineered Products Co.*, 448 F.3d 760 (5th Cir. 2006) ..............................................................................46, 53

*Thibodeaux v. Vamos Oil & Gas Co.*, No. Civ. A. 03-1883, 2005 WL 3019773 (W.D. La. Nov. 10, 2005) .........................................................................................34

*Thomas v. Burlington Resources Oil & Gas Co.*, No. Civ. A. 99-3904, 2000 WL 1528082 (E.D. La. Oct. 13, 2000) .........................................................31, 37

*Toussaint v. Chevron Phillips Chemical Co.*, Civil Action No. 03-3481, 2006 WL 2349465 (E.D. La. Aug. 11, 2006) ..............................................................45

*Transcontinental Gas Pipe Line Corp. v. Mobile Drilling Barge or Vessel Mr. Charlie*, 294 F. Supp. 1025 (E.D. La. 1968), *aff'd in relevant part and rev'd in part on other grounds*, 424 F.2d 684 (5th Cir.), *cert. denied*, 400 U.S. 832 (1970)................................................................................................33

*Turner v. Murphy Oil USA, Inc.*, No. 05-4206, 2007 WL 4208986 (E.D. La. Nov. 21, 2007) ............................................................13

*Union Oil Co. v. Oppen*, 501 F.2d 558 (9th Cir. 1974) ....................................................54

*Union Petroleum Corp. v. United States*, 651 F.2d 734 (Ct. Cl. 1981) ............................29

*Union Texas Petroleum Corp. v. PLT Engineering Inc.*, 895 F.2d 1043 (5th Cir. 1990) ..............................................................................48, 53

*United States v. M/V Cosco Busan, LR/IMO Ship. No. 9231743*, 557 F. Supp. 2d 1058 (N.D. Cal. 2008) ....................................................................15

*United Teacher Associates Insurance Co. v. Union Labor Life Insurance Co.*, 414 F.3d 558 (5th Cir. 2005) ....................................................................................21

*Volvo GM Heavy Truck Corp. v. U.S. Department of Labor*, 118 F.3d 205 (4th Cir. 1997) ....................................................................................18

*Washington Terminal Co. v. Boswell*, 124 F.2d 235 (D.C. Cir. 1941) ..............................20

*Williamette Iron Bridge Co. v. Hatch*, 125 U.S. 1 (1888) ..................................40

*Wooten v. Pumpkin Air, Inc.*, 869 F.2d 848 (5th Cir. 1989)................................46

## STATE CASES

*Brown v. ANA Insurance Group*, 994 So. 2d 1265 (La. 2008)..........................................58

*Guillory v. Conoco, Inc.*, 521 So. 2d 1220 (La. App. 3d Cir. 1988), *writ denied*,
    526 So.2d 801 (La. 1988) .........................................................................33

*International Paper Co., Inc. v. Hilton*, 966 So. 2d 545 (La. 2007)..................................64

*Trevino v. Lightning Laydown, Inc.*, 782 S.W.2d 946 (Tex. App. 1990) ..........................38

## FEDERAL STATUTES

16 U.S.C. §§1451-1465 ...........................................................................................56

28 U.S.C. §2201...............................................................................................1, 22

28 U.S.C. §2201-2202 ...........................................................................................18

33 U.S.C. §1321(d)(2) ...........................................................................................27

33 U.S.C. §1321(f)...............................................................................................27

33 U.S.C. §1321(j)...............................................................................................27

33 U.S.C. §§2701-2762 .............................................................................................3

33 U.S.C. §2701(4) ...............................................................................................15

33 U.S.C. §2701(16) ...............................................................................................29

33 U.S.C. §2701(20) ...............................................................................................62

33 U.S.C. §2701(27) ...............................................................................................15

33 U.S.C. §2701(32) ...........................................................................................28, 30

33 U.S.C. §2702...............................................................................................10, 12

33 U.S.C. §2702(a) .........................................................................................28, 29, 49

33 U.S.C. §2702(b) .................................................................................................28

33 U.S.C. §2702(b)(1) ...................................................................................10, 26, 27

33 U.S.C. §2702(b)(2) ......................................................................10, 24, 28, 49, 62

33 U.S.C. §2706(d)(3) ............................................................................................62

33 U.S.C. §2706(d)(3) ............................................................................................62

33 U.S.C. §2713 ...............................................................................................21, 62

33 U.S.C. §2713(a) .......................................................................12, 15, 16, 22, 51

33 U.S.C. §2713(b) .............................................................................................16, 22

33 U.S.C. §2713(c) .............................................................................................12, 15

33 U.S.C. §2717(f) ..................................................................................................17

33 U.S.C. §2717(f)(2) ............................................................1, 15, 16, 18, 19, 20, 21, 26

33 U.S.C. §2718 .......................................................................................................49

33 U.S.C. §2718(a) ..................................................................................................58

33 U.S.C. §2718(c) ..................................................................................................55

33 U.S.C. §2751 .......................................................................................................11

42 U.S.C. §1983 .......................................................................................................19

42 U.S.C. §9607(a)(2) ..............................................................................................30

42 U.S.C. §9613(g)(2) ..............................................................................................17

42 U.S.C. §6972(a)(1) ..............................................................................................30

43 U.S.C. §1331(a) ..................................................................................................45

43 U.S.C. §1331(a)(1) ..............................................................................................50

43 U.S.C. §1333(a) .............................................................................................47, 48

43 U.S.C. §1333(a)(2) ..............................................................................................58

43 U.S.C. §1349(b)(1) ........................................................................................44

Fed. R. Civ. P. 8(a)(2)........................................................................................59

Fed. R. Civ. P. 12(b)(6).......................................................................................1

## STATE STATUTES

Ala. Code §6-11-20(b)(3) (2010)........................................................................58

Ala. Admin. Code R. 400-2-8-.03(1)..................................................................27

La. Rev. Stat. Ann. §§30:2451, *et seq* ...............................................................1

La. Rev. Stat. Ann. §30:2453..............................................................................61

La. Rev. Stat. Ann. §30:2454(7)..........................................................................63

La. Rev. Stat. Ann. §30:2454(22)........................................................................64

La. Rev. Stat. Ann. §30:2464(B) .........................................................................27

La. Rev. Stat. Ann. §30:2491..............................................................................61

La. Rev. Stat. Ann. §30:2491(A).....................................................................61, 62

La. Rev. Stat. Ann. §30:2491(B)..........................................................................61

La. Rev. Stat. Ann. §30:2496..............................................................................61

La. Rev. Stat. Ann. §§56:40.1, *et seq* ...............................................................61

## LEGISLATIVE HISTORY

135 Cong. Rec. H7954-02 (daily ed. Nov. 2, 1989) .........................................13

H.R. Rep. No. 95-590 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 1450..................51, 53

H.R. Rep. No. 101-242, pt. 2, (1989) ...............................................................13

H.R. Rep. No. 101-653 (1990)...........................................................................11

S. Rep. No. 101-94 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 722................................50

## MISCELLANEOUS

1-XI Benedict on Admiralty § 171 ...................................................................................41

Restatement (Second) of Torts §165 (1965)....................................................................42

Restatement (Second) of Torts §§409-29 .......................................................................43

Restatement (Second) of Torts §414 (1965)....................................................................35

Restatement (Second) of Torts §821B (1979) .................................................................39

Restatement (Second) of Torts §821D (1979) .................................................................41

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Anadarko Petroleum Corporation ("APC") and Anadarko E&P Company LP ("AE&P") (collectively referred to as "Anadarko")[1] respectfully move to dismiss the First Amended Complaint ("Alabama Complaint") of the State of Alabama ("Alabama") and the First Amended Complaint ("Louisiana Complaint") of the State of Louisiana ("Louisiana").[2]  Both Alabama and Louisiana (collectively referred to herein as "the States") bring certain claims under the Oil Pollution Act of 1990 ("OPA"), general maritime law, and state law for damages, removal costs and civil penalties.  Both also seek declaratory judgment under the federal Declaratory Judgment Act, 28 U.S.C. §2201, and under 33 U.S.C. §2717(f)(2) of OPA for a declaration that Anadarko is liable for costs and damages as a responsible party under OPA.  Louisiana also brings a Declaratory Judgment Act claim for a declaration that Anadarko is liable for costs and damages under the Louisiana Oil Spill Prevention and Response Act ("LOSPRA"), La. Rev. Stat. Ann. §§ 30:2451, *et seq.*  Pursuant to Federal Rule of Civil Procedure 12(b)(6), Anadarko moves to dismiss all counts of Alabama's and Louisiana's Complaints as alleged against Anadarko.

This case involves the tragic events that occurred aboard the *Deepwater Horizon* in the Gulf of Mexico while it was conducting oil and gas activities on the Outer Continental Shelf ("OCS") and the aftermath that followed.  As has been stated previously in responses to the Master Complaints filed by B1 and B3 plaintiffs and by local government entities, the oil and gas

---

[1]     Simply for ease, this Motion refers to APC and AE&P together as "Anadarko."  Each is an independent and distinct corporate entity, and by using this shorthand, movants do not suggest or acknowledge otherwise.

[2]     Pursuant to the Stipulated Order Regarding Pleading Deadlines Concerning the Local Government Entity Master Complaint, Complaints by the State of Alabama and Louisiana and Individual Civil Actions Filed by Local Government Entities, dated May 6, 2011 [Doc. 2273], a consolidated brief is being filed in support of Anadarko's motions to dismiss the amended complaints by Alabama and Louisiana.

activities at issue occurred on the portion of the OCS that is under exclusive federal jurisdiction. As such, based on the operation of the Outer Continental Shelf Lands Act ("OCSLA"), claims seeking to redress the alleged harms are governed by federal law even if the harms occurred within state jurisdictional lands or waters.  Although in some OCS cases the district court is to apply maritime law or may borrow state law as surrogate federal law, it cannot do so here, because there is a comprehensive federal statute that applies -- OPA.  The general maritime and state statutory and common law claims against Anadarko, therefore, must be dismissed.

While OPA is the only available recourse for Alabama and Louisiana, the OPA claims also must be dismissed because neither State has adequately alleged that OPA's presentment requirement has been satisfied with respect to its claims.  Even setting aside the failure to comply with the presentment requirements, both States also have failed to adequately allege they have grounds for a claim to recover removal costs under OPA.  In addition, Alabama's and Louisiana's OPA claims against AE&P fail as a matter of law because, as Alabama admits in its Complaint (¶31) [Doc. 1872], AE&P terminated its lease interests *as of April 1, 2010*, and therefore was not a leaseholder of the area of the Macondo Prospect at the time of the discharge of oil.  AE&P, therefore, cannot be a responsible party under OPA.

Even if, under OCSLA, maritime law was not displaced by OPA, the States' claims under general maritime law for negligence, gross negligence and wantonness must fail because Anadarko cannot be held liable for the acts of an independent contractor, such as BP Exploration & Production ("BP E&P").  The general maritime law claims for nuisance and trespass raised by Louisiana are also not cognizable causes of action.

Finally, state law in this case is not implicated because it can not be incorporated as surrogate federal law under OCSLA.  The *Deepwater Horizon* was temporarily attached to the

seabed floor at the time of the incident, and under OCSLA state law can only become surrogate federal law in the case of permanent structures.  Moreover, the state law invoked here is inconsistent with federal law, and, thus, would be preempted.  Because of the conflicts between the state laws and the federal laws that govern activities on the OCS, state law cannot apply.

In short, each of the claims brought by Alabama and Louisiana must be dismissed as a matter of law.

## FACTUAL BACKGROUND

### A.    The Amended Complaints

#### 1.    Alabama's Amended Complaint

Alabama's Complaint asserts four categories of claims against Anadarko:  (1) claims for damages and removal costs under general maritime law for negligence and gross negligence (Causes of Action I.A., I.B.); (2) claims for damages and removal costs under OPA, 33 U.S.C. §§2701-2762 (Cause of Action II); (3) claims for penalties under various Alabama statutes (State law claims for relief III.H., III.I., III.J., III.K., III.L., III.M.); and (4) claims for damages and removal costs under state common law for negligence and wantonness (State law claims for relief III.M., III.N.).[3]

#### 2.    Louisiana's Amended Complaint

As with Alabama's Complaint, Louisiana's Complaint similarly asserts four categories of claims against Anadarko:  (1) claims seeking to hold Anadarko liable for costs and damages as a responsible party under OPA (Counts I, V); (2) claims for damages and removal costs under general maritime law for negligence, nuisance and trespass (Counts VII, VIII and IX); (3) a claim for penalties under the Louisiana Environmental Quality Act ("LEQA") for unauthorized

---

[3]    The Alabama Amended Complaint lists Section III.M. twice.  It does not name Anadarko in any other claim, including under the request for punitive damages.

discharges (Count III); and (4) claims for damages and removal costs under state law, including

LOSPRA (Counts II, VI), LEQA (Count IV), and state law negligence, nuisance, trespass, strict

liability and unjust enrichment (Counts XI, XII, XIII, XIV, XV, XXIII).[4]

**B.     The Macondo Prospect Lease**

At their heart, the claims in the Alabama and Louisiana Complaints against Anadarko

stem solely from the fact that Anadarko may have shared or shares a leasehold interest in the

Macondo Prospect Area where the *Deepwater Horizon* was conducting drilling operations.

There are no specific allegations that Anadarko participated in any way with respect to the

drilling operations that were being conducted aboard the *Deepwater Horizon* pursuant to the

Macondo Prospect lease by BP E&P, its affiliates and its contractors.

BP E&P obtained Lease OCS-G32306 from the Minerals Management Service

("MMS"),[5] pertaining to Block 252, Mississippi Canyon, located in the Gulf of Mexico.  Ala.

Compl. ¶38 [Doc. 1872]; La Compl. ¶38 [Doc. 2031].  This lease became effective June 1, 2008,

and the leased area is referred to as the Macondo Prospect.  Ala. Compl. ¶38 [Doc. 1872]; La.

Compl. ¶38 [Doc. 2031].  Upon obtaining the lease, BP E&P moved forward with its exploration

activities on the Macondo Prospect.  Ala. Compl. ¶42 [Doc. 1872]; La. Compl. ¶¶40-41 [Doc.

2031].  This included BP E&P (and its affiliates) contracting with the Transocean Defendants to

begin drilling an exploratory well at and within the Macondo Prospect.  Ala. Compl. ¶15 [Doc.

1872]; La. Compl. ¶¶41-42 [Doc. 2031].

---

[4]      The Louisiana Amended Complaint does not name Anadarko in any other claim,
including under the request for punitive damages.

[5]      In June of 2010, the Minerals Management Service ("MMS") was renamed BOEMRE by
Secretary     Salazar     through     Secretarial     Order     No.     3302     (available     at
http://www.doi.gov/deepwaterhorizon/loader.cfm?csModule=security/getfile&PageID=35872).
Because the actions at issue herein were taken at the time by the MMS, for convenience we refer
to the agency by its former name.

Effective October 1, 2009, BP E&P and MOEX Offshore 2007 LLC ("MOEX Offshore") entered into the Macondo Prospect Offshore Deepwater Operating Agreement ("Operating Agreement").  Ala. Compl. ¶31 [Doc. 1872]; *see also* La. Compl. ¶39 [Doc. 2031].  On December 17, 2009, BP E&P, Anadarko, and MOEX Offshore "executed a 'Joinder' of the Operating Agreement" and, as alleged in the Complaint, subsequently, "held the following ownership percentages in the Macondo Prospect:  BP Exploration, 65%; MOEX Offshore, 10%; Anadarko E&P, 22.5%; and Anadarko [Petroleum Corporation], 2.5%."  Ala. Compl. ¶31 [Doc. 1872]; *see also* La. Compl. ¶39 [Doc. 2031].  However, "effective April 1, 2010, record title interest in the Macondo prospect was held as follows:  BP Exploration, 65%; MOEX Offshore, 10%; and Anadarko [Petroleum Corporation], 25%."  Ala. Compl. ¶31 [Doc. 1872] (citing "MMS's website").[6]  The tragic events onboard the *Deepwater Horizon* occurred late in the evening of April 20, 2010.  Ala. Compl. ¶1 [Doc. 1872]; *see also* La. Compl. ¶4 [Doc. 2031].

### C.   BP E&P is the designated operator of the Macondo Prospect Lease, and Anadarko did not participate in the drilling operations

Both Alabama and Louisiana refer to certain rights and obligations under the Operating Agreement as the apparent source of Anadarko's alleged liability.[7]  The Operating Agreement

---

[6]    This information can be obtained at the following MMS website and a printout of this page is attached as Exhibit 1:  BOEMRE, *Serial Register Page*, Lease No. G32306, *available at* http://www.gomr.boemre.gov/homepg/fastfacts/serialregister/srmaster.asp  (enter  G32306  into text box next to "Lease Number;" click "Submit Query" button) (referred to as "BOEMRE Lease Search Results").  *See Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the] claim.") (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000)); *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) ("In deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record.") (citation omitted).

[7]    The Operating Agreement is attached as Exhibit A to the Non-Operating Defendants' Motion to Dismiss the Master Complaint for Pleading Bundle B1 [Doc. 1414], and relevant portions were included as Exhibit C to Anadarko's Motion to Dismiss the Local Government Master Complaint [Doc. 2218].  Both Alabama and Louisiana's Complaints repeatedly discuss

BP E&P and Anadarko entered into governs the operations of the contracted area.  Pursuant to the Operating Agreement, however, *BP E&P* was the designated operator that had full authority to conduct the operations under the lease:

> Except as otherwise provided, the Operator has the exclusive right and duty to conduct (or cause to be conducted) all activities or operations under this Agreement.  In performing services under this Agreement for the Non-Operating Parties, the ***Operator is an independent contractor, not subject to the control or direction of Non-Operating Parties***, except as provided in Article 8.2 *(Voting and Election Procedures)* or Article 8.5 *(Approved by Unanimous Agreement)*.

Operating Agreement, Arts. 5.1, 2.49, 4.1 (emphasis added).  Non-Operating Parties, such as Anadarko, are those parties other than the Operator.  *Id.* Art. 2.43.

The  Non-Operating  Parties  under  the  Operating  Agreement  (*i.e.*, Anadarko)  had  no control  over,  or  authority  to  control,  the  drilling  operations  that  resulted  in  the  Deepwater Horizon incident.  Both the Alabama and the Louisiana Complaints concede this.  For example, Alabama's Complaint alleges:  "At all times relevant herein, the *Deepwater Horizon* was owned by Transocean and leased to BP for drilling exploratory wells at the Macondo Prospect site," pursuant to a drilling contract.  Ala. Compl. ¶44 [Doc. 1872].  It further alleges that "BP, Transocean, Halliburton, and M-I are collectively referred to herein as the 'Drilling Defendants,' as they were all involved in the drilling, cementing, and/or other temporary well abandonment activities of the *Deepwater Horizon*, and thus their actions caused and/or contributed to the Spill."  Ala. Compl. ¶21 [Doc. 1872].  The Alabama Complaint is replete with allegations

---

the Operating Agreement, and the contractual rights and obligations of Anadarko are central to the claims against them.  *See, e.g.*, Ala. Compl. ¶¶31, 129, 145 [Doc. 1872]; La. Compl. ¶¶39, 104, 105 [Doc. 2031].  As such, the Court may consider it in ruling on this motion to dismiss. *See Collins*, 224 F.3d at 498–99; *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007); *Kane Enters. v. MacGregor (USA) Inc*., 322 F.3d 371, 374 (5th Cir. 2003) ("[T]he court may review the documents attached to the motion to dismiss, e.g., the contracts in issue here, where the complaint refers to the documents and they are central to the claim").

against the Drilling Defendants and their actions that "caused and/or contributed to the Spill." Ala. Compl. ¶21 [Doc. 1872].

The same is true for Louisiana's Complaint.  The Louisiana Complaint alleges that the Transocean Defendants owned and operated both drilling rigs used for drilling at the Macondo Prospect.  La. Compl. ¶¶41-42 [Doc. 2031].  The drilling operations by these rigs, according to the Louisiana Complaint, were being conducted pursuant to "one or more contractual agreements between BP E&P and Transocean."  La. Compl. ¶41 [Doc. 2031].  At the time of the incident, the *Deepwater Horizon* was owned and operated by the Transocean Defendants.  La. Compl. ¶42 [Doc. 2031].  The Louisiana Complaint further states that all of BP E&P's "drilling and completion operations were directed and controlled by BP p.l.c."  La. Compl. ¶50 [Doc. 2031]. Louisiana similarly contends that defendants BP E&P, Transocean, M-I and Halliburton all took actions as part of the drilling operations.  *See, e.g.,* La. Compl. ¶¶44-45, 57-65, 67 [Doc. 2031].

On the other hand, there are no specific allegations that Anadarko owned, undertook any operations, or had any authority over the *Deepwater Horizon*, nor can any be credibly made. Indeed, in its Complaint, Alabama acknowledges that "BP was the *sole lease operator* of the *Deepwater Horizon*," and that "Anadarko [Petroleum Corporation], Anadarko E&P, and MOEX were considered *non-operational leaseholders.*"  Ala. Compl. ¶31 [Doc. 1872] (emphasis added); *see also* La. Compl. ¶39 [Doc. 2031].

Rather, the only allegations against Anadarko in either Complaint relate merely to rights to monitor the actions of BP E&P.  This includes the allegation in Alabama's Complaint that Anadarko "had access" to data transmitted on April 20, 2010, and "knew or should have known of the red flags indicating a leak in the well in sufficient time to avert the disaster."  Ala. Compl. ¶31 [Doc. 1872].  Alabama's Complaint similarly alleges that Anadarko had "negotiated for and

obtained the right to be privy to Health, Safety, and Environmental ('HSE') information, conduct HSE inspections, and call HSE meetings," and, thus, "it was incumbent on [them] to perform the important check and balance role."[8]  Ala. Compl. ¶129 [Doc. 1872].  Louisiana's Complaint refers to these same asserted rights.  La. Compl. ¶¶102, 104-105 [Doc. 2031].

Despite these asserted rights, and assuming any of them could be invoked or were sufficient to identify the "red flags," the Operating Agreement also made clear that BP E&P was "an independent contractor, *not subject to the control or direction of Non-Operating Parties*." Operating Agreement, Arts. 5.1, 2.49, 4.1 (emphasis added).

## ARGUMENT

### I.   Standard of Review.

"To avoid dismissal [under Rule 12(b)(6)], 'a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts, however, "do not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'"  *Id.* (quoting *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)).

This pleading requirement "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555); *see also Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 245–46 (5th Cir. 2010) ("A court should not accept 'threadbare recitals of a cause of action's

---

[8]       The Alabama Complaint also makes a vague reference to BP "conferring with its lease partners Anadarko and MOEX" regarding killing the well.  Ala. Compl. at ¶130 [Doc. 1872].

elements, supported by mere conclusory statements,' which 'do not permit the court to infer more than the mere possibility of misconduct.'"") (quoting *Iqbal*, 129 S. Ct. at 1949-50).

## II.     The States' General Maritime Claims Fail Because Maritime Law Is Displaced by OPA.

Both Alabama and Louisiana attempt to invoke maritime law to recover damages and removal costs that are recoverable under OPA.  Maritime law is federal common law governing maritime actions, but, as such, it applies only in the absence of an applicable federal statute.  *City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 314 (1981).  As is the case generally with federal common law, where a federal statute applies, the statute displaces maritime law.  *S. Pac. Co. v. Jensen*, 244 U.S. 205, 215 (1917) ("[I]n the absence of some controlling statute, the general maritime law, as accepted by the Federal courts, constitutes part of our national law, applicable to matters within the admiralty and maritime jurisdiction.").  In this case, OPA provides remedies for the damages and costs Alabama and Louisiana allege, and displaces federal common law.  Therefore, the States cannot resort to general maritime law, and must seek any recovery for the damages alleged under OPA.

Courts uniformly hold that Congress intended the OPA to be the exclusive federal law governing oil spills, displacing maritime causes of action, including requests for punitive damages.  *S. Port Marine, LLC v. Gulf Oil LP*, 234 F.3d 58, 65–66 (1st Cir. 2000).  "OPA clearly preempts maritime law as to recovery of cleanup expenses and the cost of compensating injured persons" from an oil spill.  *Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atl. Corp.*, 924 F. Supp 1436, 1447 (E.D. Va. 1996), *aff'd*, 122 F.3d 1062 (4th Cir. 1997); *see also Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001) (holding that OPA "includes new remedies, which, in many respects, preempt traditional maritime remedies") (citation omitted); *Gabarick v. Laurin Mar. (Am.) Inc.*, 623 F. Supp. 2d 741, 750–51 (E.D. La. 2009) (holding that

all general maritime law claims that are recoverable under OPA, and specifically those covered damages enumerated in 33 U.S.C. § 2702, are preempted by OPA).  Where a federal statute squarely addresses an issue or provides a remedy, duplicative or supplemental remedies under the general maritime law are *automatically* displaced.  *See Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 817 (2001) ("[E]ven in admiralty, 'we have no authority to substitute our views for those expressed by Congress in a duly enacted statute' … when a statute resolves a particular issue, we have held that the general maritime law must comply with that resolution.") (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 626 (1978)).

OPA provides a private right of action for recovery of economic losses resulting from injuries to natural resources, real or personal property, subsistence use, loss of revenues, profits and earning capacity, and costs associated with additional public services, where those losses result from an oil spill in navigable waters.  33 U.S.C. §2702(b)(2)(A)-(F).  It also allows for recovery of removal costs incurred.  *Id.* §2702(b)(1).  OPA therefore supersedes maritime claims for the same types of injuries.  *Nat'l Shipping Co. of Saudi Arabia*, 924 F. Supp. at 1447 ("OPA clearly preempts maritime law as to recovery of cleanup expenses and the cost of compensating injured persons" from an oil spill).  Here, although with little specificity, both Alabama and Louisiana indicate they are seeking numerous types of damages and costs, all of which are clearly covered by OPA, including removal costs, natural resources damages, property damage and related economic loss, loss of revenues, and costs associated with additional public services. *See* Ala. Compl. ¶135 [Doc. 1872]; La. Compl. ¶247, 257, 268 [Doc. 2031].  Thus, OPA is the only possible recourse for these covered removal costs and damages.  This same analysis applies to each claim brought under maritime law, including negligence (both States), gross negligence (Alabama only), trespass (Louisiana only), or nuisance (Louisiana only).

It is unclear, however, if Alabama in fact asserts a claim for gross negligence against Anadarko. Alabama includes allegations against Anadarko based on a failure to warn and a purported conference with BP on well kill activities after the blowout under its claim for "gross negligence and willful misconduct" (Count I.B.). Ala. Compl. ¶¶145-146 [Doc. 1872]. But, its gross negligence claim only alleges that the acts "*of the Drilling Defendants and Cameron* directly and proximately caused damage to the State." *Id.* at ¶147 (emphasis added). In any event, this asserted maritime law claim for gross negligence seeks the exact same damages allowed under OPA -- "damages to natural resources and State properties, lost tax and other revenues, and direct and indirect costs associated with oil spill response actions." *Id.* While Alabama purports to also seek punitive damages, such damages are not available under OPA. *S. Port Marine, LLC*, 234 F.3d at 65–66 (holding that punitive damages were not available under OPA because "Congress's very specific treatment of oil pollution in the OPA, which does not provide for punitive damages, supplanted general admiralty and maritime law, which has traditionally provided for the general availability of punitive damages for reckless conduct").

Although OPA includes a savings provision related to admiralty and maritime law, this does not save the States' general maritime claims. OPA provides that, "[e]xcept as otherwise provided in this Act, this Act does not affect . . . admiralty and maritime law." 33 U.S.C. §2751. In other words, "there is no change in current law *unless there is a specific provision to the contrary*." H.R. REP. NO. 101-653, at 159 (1990) (Conf. Rep.) (emphasis added). The current and longstanding law is that maritime remedies are automatically displaced by an on-point federal statute. *See Norfolk Shipbuilding & Drydock Corp.*, 532 U.S. at 817. Nothing in the OPA savings clause changes this principle. Indeed, every court that has ever considered the issue has held that OPA preempts traditional maritime remedies. *See Tanguis*, 153 F. Supp. 2d at

867-68 ("the first subsection of the admiralty and maritime savings clause recognizes that certain maritime remedies are preempted by OPA"); *see also id.* at 867 (stating that OPA "includes new remedies, which, in many respects, preempt traditional maritime remedies"); *Gabarick*, 623 F. Supp. 2d at 750-51 (holding specifically that covered damages enumerated in 33 U.S.C. §2702 are displaced by OPA). Accordingly, because OPA displaces maritime negligence claims for covered damages and removal costs arising out of oil pollution, the States' maritime claims against Anadarko must be dismissed.

**III.    The States' OPA Claims Fail to State a Claim.**

> **A.    Neither State has shown that the presentment requirements of OPA have been met.**

Both States bring claims under OPA, and seek declaratory relief as to Anadarko's liability under OPA for certain damages and removal costs. Neither Complaint, however, provides sufficient allegations that the presentment requirements of OPA have been met.

> **1.    OPA mandates presentment of *all* claims to a responsible party before a claimant, including States, may seek relief in court for those claims.**

Congress could not have been clearer in requiring that all OPA claimants attempt to settle their claims with responsible parties *before* heading to court. OPA requires that "all claims for removal costs or damages *shall* be presented *first* to the responsible party … of the source designated under section 2714(a) of this title." 33 U.S.C. §2713(a) (emphases added). Only after presenting a claim, and only after a responsible party either denies liability or does not settle, "may [the claimant] elect to commence an action in court against the responsible party." 33 U.S.C. §2713(c). If a claimant fails to comply with this presentment requirement, the claimant has not satisfied congressionally mandated prerequisites to filing suit, and any claims by the claimant against the responsible party must be dismissed.

The presentment requirements were included to promote settlement. Because Congress wanted to avoid delays in compensation, which can result from slow and costly litigation, OPA mandates that lawsuits are appropriate only "where attempts to reach a settlement with the responsible party . . . were unsuccessful." H.R. REP. NO. 101-242, pt. 2, at 66-67 (1989).[9] The presentment requirement reflects a legislative compromise "to temper the Act's increased liability with a congressional desire to encourage settlement and avoid litigation." *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*, 51 F.3d 235, 238-39 (11th Cir. 1995) (citing legislative history of OPA). This central congressional purpose—the fundamental premise of OPA—cannot be ignored.

Accordingly, courts consistently hold that OPA's presentment requirement "mandates dismissal when … not complied with by the claimant." *Marathon Pipe Line Co. v. LaRouche Indus. Inc.*, 944 F. Supp. 476, 477 (E.D. La. 1996) ; *see also Russo v. M/T Dubai Star*, No. C 09-05158 SI, 2010 WL 1753187, at *2–3 (N.D. Cal. Apr. 29, 2010) (collecting cases). Whether analyzed as a requirement for jurisdiction or not, "the clear text of §2713 creates a mandatory condition precedent barring all OPA claims unless and until a claimant has presented her claims . . .." *Boca Ciega Hotel, Inc.*, 51 F.3d at 240; *see also Turner v. Murphy Oil USA, Inc.*, No. 05-4206, 2007 WL 4208986, at *2 (E.D. La. Nov. 21, 2007) (presentment provision is a "'mandatory condition precedent'" to bringing a suit under OPA) (quoting *Boca Ciega Hotel Inc.*, 51 F.3d at 240).

---

[9]    *See also* 135 CONG. REC. H7954-02 at *H7965 (daily ed. Nov. 2, 1989) (statement of Rep. Hammerschmidt) (OPA is "intended to allow for quick and complete payment of reasonable claims without resort to cumbersome litigation"); *id.* at *H7962 (statement of Rep. Lent) ("The thrust of [OPA] is to eliminate, to the extent possible, the need for an injured person to seek recourse through the litigation process . . .."); *id.* at *H7955 (statement of Rep. Jones) ("We do not want claimants to have to wait years upon years to recover their losses while lawsuits drag on in the courts").

This Court has ruled that dismissal, not some lesser remedy, is the proper course when a party files an OPA claim in court before presenting it to a responsible party. *Gabarick v. Laurin Maritime (Am.) Inc.*, No. 08-4007, 2009 WL 102549, at *3 (E.D. La. Jan. 12, 2009) (dismissing OPA claims for failure to comply with OPA's presentment requirement and denying plaintiff's request for a stay in lieu of dismissal).  A dismissal is in keeping with the principle that jurisdictional defects, including failures to comply with mandatory pre-filing requirements like the OPA presentment requirement, cannot be cured in the midst of litigation.  *Hallstrom v. Tillamook County*, 493 U.S. 20, 26-27, 32-33 (1989) (holding under analogous notice provisions of the Resource Conservation and Recovery Act that failure to comply with a 60-day notice provision necessitates dismissal, even after trial on the merits, and that a district court cannot stay the case to await compliance); *Nat'l Envtl. Found. v. ABC Rail Corp.*, 926 F.2d 1096, 1097–98 (11th Cir. 1991) ("If a plaintiff fails to comply with [the notice requirement of the Clean Water Act] where it is applicable, the district court is required to dismiss the action."); *Gregory v. Mitchell*, 634 F.2d 199, 203–04 (5th Cir. 1981) (holding that "[t]he requirement of exhaustion of administrative review is a jurisdictional requisite to the filing of an action under the FTCA" and that the failure to exhaust cannot be cured by a stay of the case until the requirement is met); *Hooper v. Thomas*, No. CIV.A. 01-1730, 2002 WL 1268399, at *1 (E.D. La. June 5, 2002) (holding that the "federal court's power to adjudicate a claim brought under the Federal Tort Claims Act depends solely on whether the claimant has previously complied" with the mandatory notice requirement and that a "stay pending exhaustion cannot cure a jurisdictional defect which was present when the suit was filed").

In its Complaint, Louisiana baldly contends, without any support whatsoever, that "Government claims should not and do not require presentment before proceeding to litigation."

La. Compl. ¶143 [Doc. 2031].  But, the statute provides "*all* claims for removal costs or damages shall be presented first to the responsible party or guarantor of the source designated . . .."  33 U.S.C. §2713(a) (emphasis added).  As the Supreme Court has repeatedly noted, "'the starting point for interpreting a statute is the language of the statute itself," and here "[t]he language of this provision could not be clearer."  *Hallstrom*, 493 U.S. at 25-26 (citation omitted).  While 33 U.S.C. §2713(b) allows claims "by the Governor of a State for removal costs incurred by that State" to "first" present *to the Fund*, this does not eliminate the requirement to first present to the designated responsible party prior to commencing an action *in court* under 33 U.S.C. §2713(c).[10] Section 2713(c) of OPA provides that a claimant may commence an action in court against the responsible party or guarantor only after "each person to whom the claim is presented denies all liability for the claim," or "the claim is not settled by any person by payment within 90 days" after the date the claim was presented.  33 U.S.C. §2713(c).  Neither Complaint adequately alleges that these pre-suit requirements have been satisfied so as to authorize their alleged OPA claims.  Indeed, Louisiana "acknowledges that these claims [under OPA] are not currently ripe for adjudication."  La. Compl. ¶196 [Doc. 2031].  Congress gave no room for such claims, establishing a mandatory procedure before a claimant can run to court.

Although one district court has held that OPA does not require a State to present a claim for removal costs to a responsible party before filing a lawsuit in court, that district court ignored the plain language of OPA Section 2713(a).  *United States v. M/V Cosco Busan, LR/IMO Ship. No. 9231743*, 557 F. Supp. 2d 1058, 1060-63 (N.D. Cal. 2008).  In doing so, the court looked to Section 2717(f)(2) of OPA, which provides the statute of limitations to bring actions seeking removal costs under Section 2702(b)(1).  33 U.S.C. §2717(f)(2).  In that section of OPA, the

---

[10]    OPA defines "claimant" as "any person or government who presents a claim for compensation under this subchapter," and "person" to include States.  33 U.S.C. §2701(4), (27).

statute provides that "[e]xcept as otherwise provided in this paragraph, an action may be commenced under this subchapter for recovery of removal costs at any time after such costs have been incurred."  *Id.*  This sentence, however, cannot be read in isolation, and cannot read out of the statute the clear presentment requirements of Section 2713(a).  This is particularly true where Section 2717(f)(2) does not refer to *jurisdiction*, and is removed from Section 2713(a).  *See Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1244 (2010) (statutory provisions do not create jurisdictional requirements when they are "separate" from the statute's jurisdictional provisions) (discussing *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006)).  The inclusion of this sentence in Section 2717(f)(2) cannot be read to eliminate the jurisdictional presentment requirements in Section 2713(a).

In fact, relying on this provision in Section 2717(f)(2) to allow persons to avoid the presentment requirements would render terms in section 2713(a) superfluous, which is contrary to fundamental canons of statutory construction.  *Burnett v. Stewart Title, Inc. (In re Burnett)*, 635 F.3d 169, 172-73 (5th Cir. 2011).  Section 2713(a) clearly states that "all claims *for removal costs* or damages" must be presented first to the responsible party.  33 U.S.C. §2713(a) (emphasis added).  While the district court in *Busan* ignored that private parties may also seek removal costs, that court's reading would render the inclusion of the phrase "for removal costs" in the presentment requirements of Section 2713(c) superfluous, as nothing in Section 2717(f)(2) distinguishes government claims from private party claims.  Indeed, Section 2713 itself provides the only exceptions to the pre-suit presentment requirement, for certain claims where the claimant may go to the Oil Spill Liability Trust Fund first (including certain instances for States seeking recovery of removal costs).  33 U.S.C. §2713(a), (b).  The erroneous reading of the statute by the district court in *Busan* would create exceptions not otherwise provided in the

statute.  *See Medical Center Pharmacy v. Mukasey*, 536 F.3d 383, 405-06 (5th Cir. 2008) (rejecting request to find "implicit" exemption under statute "wholly apart from the narrow, conditional, and explicit exceptions enumerated" as it would make those explicit, conditional exceptions superfluous); *Lyrick Studios, Inc. v. Big Idea Prods., Inc.*, 420 F.3d 388, 396 (5th Cir. 2005) (declining to "add an exception to the statute" and finding writing requirement to show transfer of copyright was not met by internal memorandum).

Moreover, the sentence in 33 U.S.C. §2717(f) relied on by the *Busan* court to read out the clear presentment requirement can be read properly so that no provision of the Act is rendered meaningless.  The plain intent of the sentence allowing actions for recovery of removal costs to be brought "at any time after such costs have been incurred" does not eliminate the presentment requirements, but imposes an *additional* requirement that claims for removal costs be brought *only after a person has actually incurred some costs*.  This reading is consistent with how courts have read similar language in Section 113(g)(2) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").  *See Dant & Russell, Inc. v. Burlington N. R.R. (In re Dant & Russell, Inc.)*, 951 F.2d 246, 249-250 (9th Cir. 1991) (finding similar provision in CERCLA, 42 U.S.C. §9613(g)(2), "envision[s] that, before suing, CERCLA plaintiffs will spend some money responding to an environmental hazard").  Requiring a State (or private person) to incur costs before suing a responsible party, instead of just litigating over hypothetical costs, is consistent with requiring the State to present its claim to the responsible party before suing, and with general requirements to have a ripe, rather than hypothetical, claim.  As such, the *Busan* case is wrongly decided and should not be followed here.  The States must establish that they have satisfied the presentment requirements for each OPA claim (*i.e.,* each incurred cost and

each asserted damage) before those claims may be pursued in Court.  Having failed to do so here, the OPA claims must be dismissed.

### 2. Requests for "declaratory judgment" do not save the States' OPA claims.

Louisiana's main claim under OPA appears to be one for declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§2201-2202, and OPA, 33 U.S.C. §2717(f)(2).  While Louisiana also purports to bring a claim under OPA, it asserts the claims are "forward looking" for long-term impacts brought "in an abundance of caution."  La. Compl. ¶196 [Doc. 2031].  Alabama seeks similar declaratory relief, Ala. Compl. ¶218 [Doc. 1872], and contends it "may make additional presentments to the Defendants."  Ala. Compl. ¶217 [Doc. 1872].  Regardless of the vehicle for the States' claims, the OPA presentment requirement applies to "all claims."  The failure by the States to present each of their claimed costs before filing their Complaints mandates that their OPA claims be dismissed, including requests for declaratory judgment.

A plaintiff cannot bypass mandatory or jurisdictional pre-filing requirements, like presentment, simply by styling an OPA claim as one for declaratory judgment or by also seeking declaratory relief under the Declaratory Judgment Act.  *See, e.g.*, *Heckler v. Ringer*, 466 U.S. 602, 621 (1984) (a party cannot "bypass the exhaustion requirements of the Medicare Act by simply bringing declaratory judgment actions in federal court . . .."); *Volvo GM Heavy Truck Corp. v. U.S. Dep't of Labor*, 118 F.3d 205, 210 (4th Cir. 1997) (holding a declaratory judgment claim to "be subject to the APA's exhaustion requirement"); *see also St. Germaine v. Alamo Motor Lines*, 252 F.2d 10, 13-14 (5th Cir. 1958) (holding, in response to the contention that Declaratory Judgment Act "is much broader in its scope and coverage" than the Interstate Commerce Act, that plaintiffs "cannot sustain an action aimed at obtaining a declaration of their rights under that Act until they have at least exhausted its administrative provisions").  The

Declaratory Judgment Act is a purely procedural statute, creating additional remedies for claims courts can already hear. *See Port Drum Co. v. Umphrey*, 852 F.2d 148, 151 (5th Cir. 1988); *see also Okpalobi v. Foster*, 190 F.3d 337, 347 (5th Cir. 1999) ("The purpose of the Declaratory Judgment Act is to afford added remedy to one who is uncertain of his rights and who desires early adjudication thereof without having to wait until his adversary should decide to sue and to act at his peril in the interim."). In Count I, Louisiana seeks a declaration of Anadarko's liability under OPA. That claim is an OPA claim, just one for declaratory relief. Because, as explained above, courts cannot adjudicate OPA claims before they are presented to a responsible party, Louisiana likewise cannot use the Declaratory Judgment Act to litigate OPA rights and liabilities before presenting its claim to a responsible party in an effort to avoid OPA's presentment requirement.

In fact, Louisiana (and Alabama) cannot use the Declaratory Judgment Act at all. Within its reticulated remedial provisions, OPA specifically delineates the circumstances in which declaratory relief is available for OPA claimants, and it does not allow claimants to obtain declaratory relief outside of or apart from "any such action described in this subsection." 33 U.S.C. § 2717(f)(2) ("In any such action described in this subsection, the court shall enter a declaratory judgment on liability for removal costs or damages that will be binding on any subsequent action or actions to recover further removal costs or damages."). Both the great detail of OPA's remedial scheme and the specific provision for declaratory relief demonstrate that Congress meant for OPA to displace other declaratory remedies generally available under federal law. *Cf. Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n.*, 453 U.S. 1, 20-21 (1981) (holding that the Federal Water Pollution Control Act could not be enforced via private actions brought under 42 U.S.C. § 1983 because the "express remedies" in the Act were

"sufficiently comprehensive" and even included "two citizen-suit provisions" redundant with § 1983. That OPA's remedial provisions are preeminent is hardly a novel conclusion: courts hold that OPA displaces traditional maritime remedies because Congress intended for OPA to be the single, comprehensive federal scheme for all cases alleging harms covered by OPA. *See e.g.*, *Gabarick*, 623 F. Supp. 2d at 750–51 (general maritime law claims are displaced by OPA); *Gatlin Oil Co. v. United States*, 169 F.3d 207, 209 (4th Cir. 1999) (Congress enacted OPA to provide a "prompt, federally-coordinated response to oil spills in navigable waters of the United States and to compensate innocent victims"). This conclusion is further supported by the explicit requirement that the claimant have incurred some removal costs prior to bringing suit. 33 U.S.C. §2717(f)(2).

The Declaratory Judgment Act, a general provision for declaratory relief, is not exempt from the "fundamental rule of statutory interpretation" that "specific provisions trump general provisions." *Navarro-Miranda v. Ashcroft*, 330 F.3d 672, 676 (5th Cir. 2003) (citing *In re Nobleman*, 968 F.2d 483, 487 (5th Cir. 1992)). "The primary purpose of the Declaratory Judgments *[sic]* Act is to give relief in situations in which it was not previously available, *not to displace existing and, particularly, special remedies devised for peculiar situations.*" *Wash. Terminal Co. v. Boswell*, 124 F.2d 235, 249 (D.C. Cir. 1941) (emphasis added) (holding that Declaratory Judgment Act was displaced by the Railway Labor Act); *see Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 246 (1952) ("[T]he declaratory judgment procedure will not . . . be used as a substitute for statutory methods of review."); *cf. Ireland v. Shultz*, 829 F.2d 1189, 1192-93 & n.5 (D.C. Cir. 1987) (holding that a court can "pierce" a declaratory judgment claim and determine that it is, at bottom, a claim for money damages governed by other acts). Section 2717(f)(2), OPA's specific declaratory judgment provision, trumps the general remedies

afforded by the Declaratory Judgment Act to the extent the latter would allow OPA claimants to obtain declaratory relief when OPA would not allow it.

Accordingly, Section 2717(f)(2) is the *only* means available for Louisiana (and Alabama) to obtain a declaration of Anadarko's alleged OPA liability, and it requires presentment as a condition for obtaining declaratory relief under OPA.   Section 2717(f)(2) provides for declaratory relief only as an additional *remedy* in properly filed actions that seek money damages, and those actions cannot be litigated in court before presentment to a responsible party. *See* 33 U.S.C. §§ 2713, 2717(f)(2).   Thus, with respect to these claims, OPA provides for declaratory relief *only* after removal costs have been incurred and *only* after the presentment requirements have been met.   Failure to first present each of their claims to a responsible party precludes the States from obtaining a declaration of the Anadarko's OPA liability under Section 2717(f)(2).

Even if the Declaratory Judgment Act were not displaced by Section 2717(f)(2), and even if the Court had jurisdiction over Louisiana's freestanding declaratory judgment claim despite Louisiana's failure to allege presentment, the Court should still dismiss it.   As an initial matter, the Declaratory Judgment Act "does not provide a federal court with an independent basis for exercising subject-matter jurisdiction." *In re B-727 Aircraft Serial No. 21010*, 272 F.3d 264, 270 (5th Cir. 2001) (citing *Gaar v. Quirk*, 86 F.3d 451, 453 (5th Cir. 1996)); *see also Rogers v. Ingolia*, No. 10-30648, 2011 WL 1664201, at *5 (5th Cir. May 2, 2011); *Port Drum Co. v. Umphrey*, 852 F.2d 148, 151 (5th Cir. 1988).   In addition, the Court is not required to decide a declaratory judgment action. *See Rowan Cos., Inc. v. Griffin*, 876 F.2d 26, 28 (5th Cir. 1989); *see also United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 569 (5th Cir. 2005) (a "district court's decision to grant or deny declaratory relief is reviewed for an abuse

of discretion because 28 U.S.C. § 2201 says that a district court 'may' declare the rights and other legal relations of any interested parties."). Exercising that discretion, the Court should dismiss Louisiana's declaratory judgment claim. Because Louisiana has other avenues for relief, its "need for a declaratory judgment is slight." *Baldwin Metals Co. v. Donovan*, 642 F.2d 768, 775 n.17 (5th Cir. 1981). Moreover, given Congress's intent to encourage out-of-court settlement of claims related to oil spills, the public interest favors dismissing any effort to skirt that intent through the Declaratory Judgment Act. *See id.* ("a declaratory judgment would not be in the public interest" if it would "jeopardize" or "delay" congressionally favored means of dispute resolution). Having thus far failed to satisfy the requirements to bring their OPA claims in court, any attempts to bring a "declaratory judgment" claim also must be dismissed.

      **3.**      **The States' Complaints fail to adequately allege facts to support this Court's jurisdiction over their OPA claims.**

As outlined above, presentment is required by statute, whether considered jurisdictional or a mandatory condition precedent. As such, the States cannot rely on mere conclusory statements; in ruling on a motion to dismiss, courts "do not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'" *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d at 210 (quoting *Ferrer*, 484 F.3d at 780 (quoting *Plotkin*, 407 F.3d at 696)). Alabama's mere statement that it "has satisfied the presentment requirements of 33 U.S.C. §§2713(a) and (b)" is a legal conclusion with no factual basis to support it. Ala. Compl. ¶217 [Doc. 1872]. As such, the conclusory statement is wholly insufficient to adequately allege this requirement has been met.

Even if considered an issue of fact, determining whether the States have satisfied the presentment requirements is necessary for this Court to assert its jurisdiction and, thus, the facts in support of such an allegation constitute jurisdictional facts. As plaintiffs, the States bear the

burden of proof regarding jurisdictional facts, and both States have failed to do so here.  The

party seeking to invoke the court's jurisdiction must still establish a prima facie case for

jurisdiction.  *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868-69 (5th

Cir. 2001).   When assessing jurisdictional allegations, the court is not required to "credit

conclusory allegations."  *Id*. at 869; *see also Margin v. Sea-Land Servs., Inc.*, 812 F.2d 973, 976

(5th Cir. 1987) ("The basis for federal subject matter jurisdiction must affirmatively appear in

the pleadings of the party seeking to invoke jurisdiction. . . . If the defendant challenges the

plaintiff's jurisdictional allegations, the plaintiff has the burden to prove jurisdiction.") (citations

omitted); *Kushindana v. Blue Center, Inc.*, No. 10-00472-FJP-DLD, 2010 WL 4977499, at *1

(M.D. La. Oct. 20, 2010), *report and recommendation adopted by* 2010 WL 4977110 (M.D. La.

Dec. 2, 2010) ("The party invoking the court's jurisdiction bears the burden of 'alleg(ing) with

sufficient particularity the facts creating jurisdiction' and of 'support(ing) the allegation' if

challenged. . . . Conclusory allegations are insufficient to establish jurisdiction.") (citations

omitted) (alterations in original).   The court cannot allow factual development of conclusory

allegations in a complaint "to confer subject matter jurisdiction where none was adequately

alleged in the first instance."  *Margin*, 812 F.2d at 977.  Alabama's conclusory allegation is

devoid of any facts whatsoever, and thus is insufficient to find that it has met the presentment

requirements of OPA.[11]

---

[11]      Courts have dismissed claims for lack of jurisdiction based on a complaint's mere
conclusory allegations.  *See Dykes v. Maverick Motion Picture Group, LLC*, No. 08-536-JJB-
CN, 2011 WL 900276, at *7 (M.D. La. Mar. 14, 2011) (finding mere recitation of factors to
consider in assessing whether to pierce corporate veil "without providing even a modicum of
specific facts" to be "conclusory allegations" insufficient to survive motion to dismiss for lack
for personal jurisdiction) (citation omitted); *Kelley v. Bergamino*, No. 3:08-cv-00887-B, 2009
WL 174131, at *4 (N.D. Tex. Jan. 23, 2009) (finding mere conclusory allegations that court had
diversity jurisdiction was insufficient "without supporting the allegation with the necessary facts,
even when all allegations in the Complaint are taken as true for the sake of the jurisdictional

Although Louisiana attempts to provide additional gloss on its purported compliance with OPA's presentment requirements, the allegations in its Complaint titled "Presentment Procedure and Presentment by the State of Louisiana" similarly make legal conclusions with no factual basis. La. Compl. ¶¶143-152 [Doc. 2031]. As such, those allegations are likewise insufficient for this Court to conclude that OPA's presentment requirements have been met. In fact, the factual allegations make clear that the presentment requirements *have not been met* for the claims Louisiana tries to bring in court, because BP has accepted responsibility, and, in fact, has already settled certain claims with Louisiana. While Louisiana gives an example of a "Seafood Sampling and Assurance program" as an alleged unsettled claim,[12] Louisiana also admits that it has "accepted funding for a $78 million Seafood Testing, Marketing, and Tourism Program." La. Compl. ¶150 [Doc. 2130]. Thus, it appears Louisiana has already presented to BP and settled any such claim. It cannot now bring a claim for these same damages, even if recoverable under OPA, in court.[13] That it may have additional costs or damages is insufficient to avoid the presentment requirements of OPA.

---

analysis") (citation omitted); *see also Cowart v. Mediterranean Shipping Co. (USA) Inc.*, No. 09-3572, 2011 WL 601651, at *1 (E.D. La. Feb. 15, 2011) ("[U]nsubstantiated conclusory allegations are insufficient to establish personal jurisdiction.") (citing *Panda Brandywine Corp.*, 253 F.3d at 868).

[12]     Anadarko questions whether such a program is even a form of "covered" damages under OPA. 33 U.S.C. §2702(b)(2). Although the Louisiana Complaint contends the proposal was made to BP "in an effort to facilitate the protection of the State's seafood industry and mitigate the damage to Louisiana's economy and the welfare of its citizens," such purported mitigation appears no where in the list of damages recoverable under OPA. La. Compl. ¶145 [Doc. 2031].

[13]     Louisiana also contends that "[s]ome of the State's presented claims have been paid by BP." La. Compl. ¶151 [Doc. 2031]. Without more information, even Louisiana's own allegations establish that the presentment requirements have not been met by Louisiana. Its OPA claims are, therefore, premature, and Louisiana cannot invoke this Court's jurisdiction, even "in an abundance of caution." La. Compl. ¶196 [Doc. 2031].

Moreover, BP has provided evidence that, contrary to Louisiana's conclusory allegations, Louisiana has not complied with the presentment requirements.[14]  In the BP Defendants' Reply Memorandum In Support Of BP Defendants' Motion To Dismiss Pursuant To Fed. R. Civ. P. 12(B)(1) And Fed. R. Civ. P. 12(B)(6) The First Amended Master Complaint, Cross-Claim, And Third-Party Complaint For Private Economic Losses In Accordance With PTO No. 11 [CMO No. 1] Section III.B1 ["B1 Bundle"] And In Response To State Of Louisiana's Memorandum Of Law In Interest In And Opposition To Defendants' Pending Motions To Dismiss at 17 (hereinafter referred to as "BP Reply to Louisiana") [Doc. 2312], BP stated, referencing a submitted affidavit:

> BP has in place a fulsome process for evaluating OPA claims presented by government entities. To date, 155 government entities have submitted almost 800 OPA claims directly to BP, and BP has paid over $1.25 billion to governmental claimants — almost $580 million to state and local governments and the remainder to the U.S. Coast Guard.  *As Louisiana is well aware from meetings with BP, BP stands ready to consider Louisiana's OPA claims once Louisiana complies with its OPA obligations and presents them to BP*. (Ex. 3, Robinson Decl.)

(Emphasis added).  BP indicated, for example, that "the Louisiana Department of Wildlife and Fisheries agreed to accept an interim payment on a revenue claim, and signed an interim release."  BP Reply to Louisiana, Ex. 3, Robinson Decl. at ¶15 [Doc. 2312].  In addition to being conclusory, here the Court cannot accept Louisiana's allegations that it satisfied the presentment requirements as true, because Louisiana's unsupported claims are contradicted by affidavit evidence.  As such, the Court must find that the presentment requirements have not been met, and must dismiss the OPA claims.

---

[14]    As explained above, even if the Court considers this a factual issue, it is a jurisdictional fact on which Louisiana has the burden of proof.

**B.    Other Pleading Defects Require Dismissing the States' OPA Claims In Part.**

**1.    Claims for removal costs under OPA must be dismissed.**

Both States assert that "[p]ursuant to Section 2702(b)(1) of the OPA, the State is entitled to all removal costs it has incurred, or will incur, as a result of the Spill."  Ala. Compl. ¶212 [Doc. 1872]; *see also* La. Compl. ¶¶160, 205 [Doc. 2031] ("Louisiana has incurred, and will continue to incur, removal costs related to the unauthorized discharge or threat of discharge of oil, gas and other pollutants and costs related to preventing, mitigating and minimizing oil pollution which has impaired or threatens to impair Louisiana's waters, coast line, and natural resources").  Setting aside whether the States' have properly presented their claims for such costs under OPA, *see supra* Section III.A.1. and 3., these conclusory allegations are insufficient to support a claim for removal costs under OPA.

First, as described above, OPA requires that a claimant actually have incurred removal costs prior to bringing suit.  Generally "an action may be commenced under this subchapter [oil pollution liability and compensation] for recovery of removal costs at any time *after such costs have been incurred.*"  33 U.S.C. § 2717(f)(2) (emphasis added).  The mere "formulaic recitation" that the State is entitled to recover removal costs "will not do.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555).  There are simply no allegations of actions taken by Louisiana or Alabama in response to the oil spill that resulted in the incurrence of "removal costs" under OPA.

Second, both Complaints fail on their face because they do not allege the States have complied with all conditions required for recovery of OPA removal costs.  That is, neither Alabama nor Louisiana provide ***any*** allegations that their alleged responses were consistent with their authority to conduct any such actions pursuant to State law or that such costs were incurred consistent with the National Contingency Plan ("NCP").

26

States may recover removal costs under OPA in two circumstances. OPA allows States to recover removal costs incurred by a State under State law. 33 U.S.C. §2702(b)(1)(A). OPA also allows persons, which includes States, to recover removal costs "for acts taken by the person which are consistent with the National Contingency Plan." 33 U.S.C. § 2702(b)(1)(B); *see also Rice v. Harken Exploration Co.*, 250 F.3d 264, 267 n.1 (5th Cir. 2001) (finding removal costs recoverable under 33 U.S.C. §2702(b)(1)(B) only "if they are consistent with the National Contingency Plan"). Persons who take actions of their own accord may exacerbate or counter the overall response plan (which here was conducted and overseen by the federal government).[15] The Complaints of Alabama and Louisiana, however, do not provide any allegations that the response actions were taken pursuant to state law or were consistent with the NCP.[16] As such, both States' claims for OPA removal costs must be dismissed.[17]

---

[15] Here, compliance with the NCP is required in either case. The Clean Water Act requires compliance with the NCP with respect to cleanup of oil spills by the federal government, *see* 33 U.S.C. §1321(f), (j), and the U.S. Coast Guard has served as the federal on-scene coordinator for the Deepwater Horizon spill. *See, e.g.,* La. Rev. Stat. Ann. §30:2464(B) (requiring State, where "the unauthorized discharge of oil is subject to the national contingency plan," to "act in accordance with the national contingency plan as is practicable under the circumstances and cooperate with the federal on-scene coordinator or other federal agency or official exercising authority under the national contingency plan"); Ala. Admin. Code R. 400-2-8-.03(1) ("Upon failure of the operator to control and remove the pollutant, the Supervisor shall have the right to accomplish the control and removal of the pollutant *in accordance with any established contingency plan* for combating oil spills or by other means at the cost of the operator. Such action shall not relieve the operator of any responsibility as provided herein.") (emphasis added). "'The purpose of the Plan is to 'provide for efficient, coordinated, and effective action to minimize damage from oil and hazardous substance discharges . . ..'" *Rice*, 250 F.3d at 267 n.1 (quoting 33 U.S.C. §1321(d)(2)).

[16] In its prayer for relief, Louisiana requests an award of "unpaid response action costs in the amount of at least $342,612," La. Compl. at 109 [Doc. 2031]. But, the Complaint lacks any allegations of the authority under which these actions were taken, what actions were actually taken to incur these costs, and whether a claim for these costs was presented to BP and not settled.

[17] Although none of the claims for damages are pled with any specificity, Anadarko notes that Louisiana also seeks to recover for loss of subsistence use. La. Compl. ¶¶159, 217 [Doc. 2031]. But, damages for loss of subsistence use is only recoverable "by any claimant who so

2.     **The States' OPA claims against AE&P must be dismissed because AE&P did not hold a lease interest in the Macondo Prospect at the time of the discharge.**

OPA provides that "each responsible party for a vessel or a facility from which oil is discharged" is liable for the removal costs and certain damages.  33 U.S.C. § 2702(a), (b).  The definition of "responsible party" for an offshore facility includes "the lessee or permittee of the area in which the facility is located."  33 U.S.C. §2701(32).

Alabama contends that AE&P "held a leasehold interest in a lease granted by the MMS for Block 252, Mississippi Canyon (the 'Macondo lease'), an oil lease on lands beneath navigable waters, before and/or at the time of the Spill," and thus liable as a lessee under OPA.[18] Ala. Compl. ¶209 [Doc. 1872].  Although the basis of Louisiana's OPA claim against AE&P is unclear on the face of the Complaint, Louisiana alleges AE&P is liable under OPA "[a]s a result of the various contractual and other agreements alleged and identified herein."  La. Compl. ¶159 [Doc. 2031].  The "agreements alleged and identified" are those that Louisiana alleges gave Anadarko (collectively) a 25% stake in the Macondo Prospect lease.  La. Compl. ¶39 [Doc. 2031].[19]  Yet at all material times, as a matter of law, AE&P was *not* a leaseholder of the Macondo Prospect.  The States, therefore, fail to state a claim against AE&P under OPA.

---

uses natural resources which have been injured, destroyed, or lost, *without regard to the ownership or management of the resources*."  33 U.S.C. §2702(b)(2)(C) (emphasis added). Louisiana is not a claimant "who so uses natural resources."  *Id.*; *see Sekco Energy, Inc. v. M/V Margaret Chouest*, 820 F. Supp. 1008, 1015 (E.D. La. 1993) (Subsistence "use 'relates to use of a natural resource, such as water, to obtain the minimum necessities for life.'") (quoting *In re Cleveland Tankers, Inc.*, 791 F. Supp. 669, 678 (E.D. Mich. 1992)).

[18]     Alabama alleges that the well and drilling vessel (the *Deepwater Horizon*) were offshore facilities.  Ala. Compl. ¶209 [Doc. 1872].  While Anadarko does not concede what constitutes an "offshore facility" in this case, the Court need not resolve this issue for purposes of this motion.

[19]     A party also may be liable under OPA if it owns or operates a vessel that discharges oil. *See* 33 U.S.C. § 2701(32).  For purposes of OPA liability, Louisiana does not allege that APC or AE&P owned or operated the *Deepwater Horizon*; instead, Louisiana explicitly alleges that the "Transocean Defendants" owned and operated the *Deepwater Horizon*.  *See* La. Compl. ¶42

Under OPA, "lessee" is defined as "a person *holding* a leasehold interest in an oil or gas lease … on submerged lands of the Outer Continental Shelf, granted or maintained under applicable State law or the Outer Continental Shelf Lands Act (43 U.S.C. 1331 et seq.)." 33 U.S.C. §2701(16) (emphasis added). Because OPA liability stems from the discharge of oil from a vessel or facility, the relevant time frame for purposes of determining liability for the *Deepwater Horizon* incident starts the evening of April 20, 2010. *See* 33 U.S.C. §2702(a) (basing liability on connection to facility "from which oil is discharged"); *see also Quaker State Corp. v. U.S. Coast Guard*, 681 F. Supp. 280, 285 (W.D. Pa. 1988) (finding present tense under CWA indicated that relevant time frame for purposes of establishing liability was time of discovery of discharge); *Union Petroleum Corp. v. United States*, 651 F.2d 734, 744-45 (Ct. Cl. 1981) (addressing pre-OPA cleanup of oil discharges under CWA and finding liability based on "time of the discharge").

As a matter of law, AE&P was not a lessee at the time of the Deepwater Horizon incident and the resulting oil discharge. The United States approved and in public records still acknowledges that AE&P no longer held a leasehold interest in the Macondo Prospect lease as of April 1, 2010. BOEMRE Lease Search Results (Ex. 1). Indeed, Alabama recognizes as much. Ala. Compl. ¶31 [Doc. 1872]. AE&P therefore is not a responsible party for the *Deepwater Horizon* spill under OPA.

Although Alabama refers to Anadarko holding a leasehold interest "*before* and/or at the time of the Spill," OPA does not confer liability on former lessees, such as AE&P, unless a facility has been abandoned. Ala. Compl. ¶209 [Doc. 1872]. The present tense language in the

---

[Doc. 2031]; *see also* La. Compl. ¶18 [Doc. 2031] ("BP America Production Company was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the Deepwater Horizon vessel.").

statute does not extend liability to lessees prior to a discharge or to any past holders of a leasehold interest. *See Carr v. United States*, 130 S. Ct. 2229, 2236 (2010) ("Consistent with normal usage, we have frequently looked to Congress' choice of verb tense to ascertain a statute's temporal reach.") (citations omitted).[20]   Where Congress has sought to impose liability on a party's past status, it has done so expressly.  *See* 42 U.S.C. §9607(a)(2) (imposing, under CERCLA, former owner/operator liability on persons who "owned or operated" facility at time of a disposal); 42 U.S.C. §6972(a)(1)(B) (extending certain liability under Resource Conservation and Recovery Act to, among others, "past or present owner or operator").  Such is not the case in OPA.  Rather, under OPA, former lessees are responsible parties only in "the case of an *abandoned* . . . offshore facility."  33 U.S.C. §2701(32)(F) (emphasis added).  If former lessees were generally liable as responsible parties for discharges occurring after they ceased to be lessees, this provision would be superfluous, violating the cardinal rule that statutes not be read "to render portions of it inconsistent or devoid of meaning."  *In re Burnett*, 635 F.3d at 172 (internal quotation marks and citation omitted).  Because neither State alleges abandonment, AE&P cannot be deemed a responsible party for the *Deepwater Horizon* oil spill.[21]

---

[20]      *See also Bennett v. Islamic Republic of Iran,* 618 F.3d 19, 25 (D.C. Cir. 2010) ("Where 'Congress could have phrased its requirement in language that looked to the past . . . but . . . did not choose this readily available option,' the 'most natural reading' is to construe the statute in the present (or present and future) tense.") (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57 (1987)) (Garland, concurring); *Shlahtichman v. 1-800 Contacts, Inc.*, 615 F.3d 794, 802 (7th Cir. 2010), *cert. denied*, 131 S. Ct. 1007 (2011) (declining to extend liability under Fair and Accurate Credit Transactions Act beyond "unambiguous language of the statute").

[21]      Although state law is inapplicable in this case, as further explained below, for these same reasons any claims under state law against AE&P based on its alleged status as a lessee must also be dismissed.

**IV.     The States Fail to State a Claim under General Maritime Law in Any Event.**

Both Alabama and Louisiana seek to bring tort claims against Anadarko under general maritime law.  Alabama alleges claims for negligence and gross negligence (Causes of Action I.A., I.B.), while Louisiana alleges claims for negligence, public and private nuisance, and trespass (Counts VII, VIII, IX).  Even if OPA does not displace maritime law in this case, which, as explained in Section II, *supra*, it does, each of these claims is easily dismissed.

**A.     Neither Complaint alleges facts that, even if taken as true, would establish Anadarko is liable for negligence or gross negligence under maritime law.**

"To establish maritime negligence, a plaintiff must 'demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury.'"  *Canal Barge Co. v. Torco Oil Co*., 220 F.3d 370, 376 (5th Cir. 2000) (quoting *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991)).  The allegations make clear that, as a matter of law, Anadarko is not liable for the States' alleged injuries.  Thus, their maritime negligence claims must be dismissed.

**1.     Anadarko did not have operational control over any of the activities that allegedly caused the States' harm.**

The States' Complaints do not allege that Anadarko had a right *to control* the operations of BP or any other defendant, which is fatal to their maritime negligence claims.  Only entities with operational control have a duty to prevent harm from oil and gas operations.  *See, e.g.*, *Ainsworth v. Shell Offshore, Inc*., 829 F.2d 548, 550 (5th Cir. 1987), *cert. denied*, 485 U.S. 1034 (1988).  A principal neither assumes nor owes any duty to protect others from the negligence of an independent contractor.  *Thomas v. Burlington Res. Oil & Gas Co.*, No. Civ. A. 99-3904, 2000 WL 1528082, at *2 (E.D. La. Oct. 13, 2000) (Barbier, J.).[22]  Both States allege that

---

[22]     *See also* Mem. of Law in Support of Mot. of Defs. Anadarko Petroleum Corp., Anadarko E&P Co. LP, MOEX Offshore 2007 LLC, and MOEX USA Corp. to Dismiss First Am. Mast.

Anadarko is or was, at most, a minority non-operational leaseholder of the Macondo Prospect that entered into an operating agreement with BP.  *See* Ala. Compl. ¶31 [Doc. 1872]; La. Compl. ¶39 [Doc. 2031].  Indeed, allegations in both Complaints establish that Anadarko *lacked* the requisite operational control, recognizing that BP was the "designated operator" for the Macondo Prospect lease.  Ala. Compl. ¶8 [Doc. 1872]; *see also* La. Compl. ¶39 [Doc. 2031].  Put simply, the States do not, and cannot, allege that Anadarko had supervision or control over the activities aboard the *Deepwater Horizon* to support such liability.

Moreover, the Operating Agreement, on which the States extensively rely, conclusively demonstrates that BP is an independent contractor with sole authority to conduct operations on the leased property.  *See, supra* n.7.  The Operating Agreement confirms that "BP Exploration & Production Inc." is the "Operator" with respect to the oil and gas activities authorized at the Macondo Prospect.  *See* Operating Agreement, Art. 4.1.  As Operator, BP E&P "has the *exclusive right* and duty to conduct (or cause to be conducted) *all activities or operations* under this Agreement."  *Id.* at Art. 5.1. (emphasis added).  In performing services under the agreement, BP is an "independent contractor, not subject to the control or direction of Non-Operating Parties . . .."  *Id.* (emphasis added).  Thus, the States' contention that Anadarko owed any duty to them or had a duty to intercede in BP E&P's or its contractors' operations fails.[23]  Anadarko simply

_____

Compl., Cross-Claim, and Third-Party Compl. for Private Economic Losses in Accordance with PTO No. 11 [CMO No. 1] Section III (B1)["B1 Bundle"] Pursuant to Fed. R. Civ. P. 12(B)(6), at 18-20 [Doc. 1414-1] (hereinafter "Non-Operating Defendants' MTD Mast. B1 Compl."). Although Anadarko did not have a company man present on the *Deepwater Horizon*, nor is it alleged that it did, this Court has even found that the presence of a company representative on an oil platform with knowledge of rig's operations "is insufficient to create a duty; therefore, the law does not support the imposition of liability for any failure to intercede."  *Ronquille v. MMR Offshore Servs., Inc.*, 353 F. Supp. 2d 680, 682 (E.D. La. 2004).

[23]     Neither Alabama nor Louisiana alleges that Anadarko is vicariously liable as principals of or joint venture partners with BP, and neither pleads a vicarious liability theory against Anadarko.  In any event, the Complaints' allegations and the Operating Agreement establish that

did not have the operational control required to establish maritime negligence.  *See Guillory v. Conoco, Inc.*, 521 So.2d 1220, 1223 (La. App. 3d Cir. 1988), *writ denied*, 526 So.2d 801 (La. 1988); *Grammer v. Patterson Servs., Inc*., 860 F.2d 639, 644 (5th Cir. 1988), *cert. denied*, 491 U.S. 906 (1989).

Mere possession of a non-operational interest in a lease is inadequate to give rise to a duty to third parties such as the States, to establish that Anadarko breached any duty, or to show that Anadarko caused the alleged injuries.  Indeed, the allegation that Anadarko is a "non-operational leaseholde[r]" negates any inference that Anadarko conducted the operations that caused the alleged harms.  Indeed, Louisiana contends that BP p.l.c. had ultimate control over BP E&P's operations, not Anadarko.  La. Compl. ¶50 [Doc. 2031].  The marked absence of specific allegations about Anadarko's conduct contrasts sharply with the extensive allegations about the conduct of BP, Transocean, Halliburton and M-I.  *See, e.g.,* Ala. Compl. ¶¶43-54, 58-67 [Doc. 1872]; La. Compl. ¶¶44-45, 57-65, 67 [Doc. 2031].  Because Anadarko did not conduct or control any of the operations that allegedly caused the States' harms, it is not liable as a matter of law.

---

Anadarko is not vicariously liable for any actions or omissions by BP, because Anadarko is not alleged to have (and does not have) any right to control BP's operations.  *See, e.g.*, *Transcon. Gas Pipe Line Corp. v. Mobile Drilling Barge or Vessel Mr. Charlie*, 294 F. Supp. 1025, 1031 (E.D. La. 1968) (no indirect liability under maritime law for non-operating co-owners of oil and gas lease where designated operator, but not non-operators, was negligent), *aff'd in relevant part and rev'd in part on other grounds*, 424 F.2d 684 (5th Cir.), *cert. denied*, 400 U.S. 832 (1970); *Bolivar v. R & H Oil and Gas Co.*, 789 F. Supp. 1374, 1381–82 (S.D. Miss. 1991) (collecting cases for proposition that non-operating investor who has no right to control oil and gas operations may not be held vicariously liable as joint venturer).

2.     **Allegations about Anadarko's rights under the Operating Agreement are insufficient as a matter of law to establish liability for maritime negligence.**

While acknowledging that BP E&P was the designated operator for the Macondo Prospect lease, both States refer to certain rights that Anadarko allegedly had under the Operating Agreement to claim Anadarko had the opportunity to review and assess what was occurring aboard the *Deepwater Horizon* on April 20, 2010, and to take action to warn the crew and the States.  These alleged rights include rights to conduct inspections of the *Deepwater Horizon*, to receive and access information, to suggest proposed well plans, and to have meetings with BP.  *See* Ala. Compl. ¶¶31, 129-130 [Doc. 1872]; La. Compl. ¶¶102-104 [Doc. 2031]. Even assuming these allegations are true, however, the maritime negligence claims still fail as a matter of law because none of the alleged rights provide for operational control.

Based on these alleged rights under the Operating Agreement, Alabama refers to Anadarko's failure to play its "check and balance" role, Ala. Compl. ¶129 [Doc. 1872], while Louisiana refers to Anadarko's "fail[ure] to properly exercise their rights or obligations under the operating agreement which caused, in part, the Incident," La. Compl. ¶105 [Doc. 2031].  But, the "rights" under the Operating Agreement are merely rights granted to Anadarko to monitor the operations conducted by BP and its contractors, not to exercise authority over operations or control activities.  Courts have determined such rights are insufficient to support liability for actions conducted by an independent contractor such as BP.  *See Thibodeaux v. Vamos Oil & Gas Co.*, No. Civ. A. 03-1883, 2005 WL 3019773, at *1 (W.D. La. Nov. 10, 2005) (The "reservation of the right to monitor contractor safety does not give rise to operational control so as to make the principal liable for the contractor's actions") (citations omitted); *Landry v. Huthnance Drilling Co.*, 889 F.2d 1469, 1471 (5th Cir. 1989) (holding under the general maritime law that "a general right to order the work stopped or resumed, to inspect its progress

or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations or deviations" is "not enough" to give rise to liability) (citing Restatement (Second) of Torts § 414 cmt. c (1965)); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 193 (5th Cir. 1991) (applying Louisiana law) ("The fact that a principal takes an active interest in the safety of the employees of its independent contractor does not, in and of itself, constitute direct operational control" and therefore does not lead to any liability of the principal); *see also* Non-Operating Defendants' MTD Mast. B1 Compl. at 21–26 [Doc. 1414-1].

While Alabama refers to Anadarko's alleged right of access to "Halliburton/Sperry Sun INSITE real time data" under the Operating Agreement, this general reference is similarly inadequate.[24]   Ala. Compl. ¶¶31, 98 [Doc. 1872].   Based on this access, Alabama contends that Anadarko "knew or should have known of the red flags indicating a leak in the well in sufficient time to avert the disaster," and should have warned the drilling crew.   Ala. Compl. ¶¶31, 98 [Doc. 1872].   But Alabama's Complaint does not, and cannot, explain how access by Anadarko to data—even in real time—can give rise to liability, was sufficient to raise red flags to Anadarko, or establishes a duty to warn the *Deepwater Horizon* crew.

---

[24]   Alabama's allegations in support of its claim for negligence under maritime law are almost verbatim those asserted in the Voluntary Master Complaint, Cross-Claim, and Third-Party Complaint for Local Governmental Entities (PTO No. 11 [CMO No. 1] Section III(C) ["C Bundle"]) [Doc. 1510] (hereinafter "Master Local Government Complaint"), which Anadarko has also moved to dismiss [Doc. 2218].   *See, e.g.,* Ala. Compl. ¶98 [Doc. 1872]; Mast. Local Govt. Compl. at ¶546 [Doc. 1510].   This includes the vague allegation that unidentified engineers offered BP unspecified advice on a procedure to stop the well blowout, *which BP* "chose to ignore" after "conferring" with Anadarko.   *Compare* Ala. Compl. ¶130, *with* Mast. Local Govt. Compl. at ¶ 455 [Doc. 1510].   As with the Master Local Government Complaint, the Complaint lacks any allegations about the nature or timing of the alleged advice, or how it could possibly support a claim for negligence against Anadarko absent the authority to control.   Even assuming it to be true for purposes of this motion, at most the allegation is merely another assertion that Anadarko had access to certain information about BP E&P's operations.

The conclusory allegations that Anadarko "knew or should have known" how to interpret "real time feed data" and breached their alleged duties to provide timely warning to the *Deepwater Horizon* crew so that they could "take evasive action" are not only unsupported by factual allegations, they are patently implausible. Ala. Compl. ¶98 [Doc. 1872]. Regardless, an allegation of mere access to information is insufficient to establish that off-rig observers, without knowledge of contemporaneous operations on a rig, could have interpreted the available data and concluded that hydrocarbons had entered the well.[25] The Alabama Complaint does not assert, even if Anadarko were monitoring the data (which is not alleged), that the information available was sufficient to have allowed any of Anadarko's off-rig personnel to conclude that a blowout was imminent. Critically, however, the Complaint does not allege that Anadarko had authority to direct the crew of the *Deepwater Horizon* to "take evasive action."

Louisiana's allegations fare no better. Louisiana simply refers to these alleged rights without identifying what information was made available to Anadarko with respect to the events of April 20, 2010. La. Compl. ¶104 [Doc. 2031]. As is the case with Alabama, at best Louisiana appears to contend that Anadarko's rights to certain information under the Operating Agreement "placed Anadarko . . . in the position of being able to oversee all of the operations at the Macondo Well and to intervene to prevent the Incident from occurring." La. Compl. ¶¶104-105. While Louisiana alleges that Anadarko was "aware of design choices for the well," this does not rise to the level of having any control over those choices. La. Compl. ¶103 [Doc. 2031]. Indeed, many parties could be "aware" of these design choices, including the government. These allegations, therefore, do not rise to the level of operational control, and are insufficient to

---

[25]    Indeed, the crew on the *Deepwater Horizon* was aware of the same information allegedly available to Anadarko. But unlike the actual operators, Anadarko was not aware of the events occurring aboard the *Deepwater Horizon* at the time.

impose a duty to act on Anadarko with respect to potential harms to third parties.  Nothing in the Operating Agreement gives Anadarko authority to control BP's activities.

Based upon alleged access to information, both States attempt to impose on Anadarko a duty to intercede in the operations of an independent contractor (BP) and unrelated parties (Transocean and Halliburton) over whom Anadarko is not alleged to have any right, authority, or ability to control.  That notion contravenes settled law.  Controlling law in this Circuit, and the general rule in oil-and-gas tort cases, is that where, as here, a principal contracts with an independent contractor to conduct oil and gas operations but retains no operational control, the principal neither assumes nor owes any duty to protect others from hazards caused by the contractor.  *See Ronquille*, 353 F. Supp. 2d at 682 (holding that no duty existed where principal did not direct or perform the activities) (citation omitted); *Thomas*, 2000 WL 1528082, at *1–2 (holding that an independent contractor's injured employee was not owed a duty by the principal where the contractor created the hazard) (citations omitted); *Martin v. Pride Offshore Co.*, No. Civ. A. 97-3754, 1999 WL 4921, at *3 (E.D. La. Jan. 6, 1999), *aff'd*, 198 F.3d 241 (5th Cir. 1999) ("A principal has operational control over an independent contractor when the principal retains the right of supervision such that 'the contractor is not entirely free to do the work his own way'") (quoting *McCormack v. Noble Drilling Co.*, 608 F.2d 169, 175 n.9 (5th Cir. 1979)) (other citations omitted); *see also* Non-Operating Defendants' MTD Mast. B1 Compl. at 25–26 [Doc. 1414-1].

Without operational control, "[a] principal has no duty . . . to intercede when an independent contractor's actions have created a dangerous situation."  *Rogers v. Shell Oil Co.*, No. 92-1040, 1993 WL 30052, at *2 (E.D. La. Feb. 3, 1993) (citing *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548 (5th Cir. 1987)).  Thus, the allegations in the Complaints are insufficient as a

matter of law to state a claim for negligence.  Accordingly, the general maritime negligence claims against Anadarko must be dismissed.[26]

### 3.    Alabama's claim for gross negligence must also be dismissed.

Alabama also asserts a claim for gross negligence under maritime law, raising the same allegations it purports support its claim for negligence.  Ala. Compl. ¶¶145-146 [Doc. 1872]. But, "gross negligence is substantially and appreciabl[y] higher in magnitude than ordinary negligence."  *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 532 (5th Cir. 2001) (citation omitted).  In fact, "one's conduct cannot be grossly negligent without being negligent."  *Trevino v. Lightning Laydown, Inc.*, 782 S.W.2d 946, 949 (Tex. App. 1990). Thus, for the same reasons Anadarko is not liable for negligence under maritime law, it cannot be liable for gross negligence.

---

[26]    Moreover, Louisiana has made no allegations of the specific damage it has suffered.  *See Louisiana v. Rowan Cos.*, 728 F. Supp. 2d 896, 903-04 (S.D. Tex. 2010) (finding, in granting defendant's summary judgment motion, "[g]eneral and conclusory statements about the harm that pollution causes are insufficient to establish the particular harm that Louisiana suffered") (citations omitted).  Further, although both Complaints make vague references to lands owned by the State, to the extent the States seek recovery for economic losses without physical injury to a proprietary interest, their claims must fail.  "It is unmistakable that the law of this circuit does not allow recovery of purely economic claims absent physical injury to a proprietary interest in a maritime negligence suit."  *Taira Lynn Marine Ltd. No. 5 LLC* v. *Jays Seafood, Inc. (In re Taira Lynn Marine Ltd. No. 5 LLC)*, 444 F.3d 371, 377 (5th Cir. 2006); *see also IMTT-Gretna v. Robert E. Lee S.S.*, 993 F.2d 1193, 1195 (5th Cir. 1993); *Dunham-Price Group, LLC v. Citgo Petroleum Corp.*, No. 2:07CV1019, 2010 WL 1285446, at *3 (W.D. La. Mar. 31, 2010); *cf. Kingston Shipping Co. v. Roberts*, 667 F.2d 34, 35 (11th Cir. 1982) ("'Whatever the wisdom of the traditional rule of nonliability for negligent acts causing economic loss, *Robins* reflects the state of law in this circuit'") (quoting *Louisville & Nashville R.R. Co. v. M/V BYULACOMBE*, 597 F.2d 469, 472 (5th Cir. 1979)) (other citations omitted).  The economic loss rule is a "bright line" rule, without exceptions based upon foreseeability or any other particularized concern. *Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019, 1032 (5th Cir. 1985) (en banc) ("Denying recovery for pure economic losses is a pragmatic limitation on the doctrine of foreseeability, a limitation we find to be both workable and useful").

**B.     Louisiana has failed to state a claim for nuisance under maritime law.**

Louisiana has asserted a claim for public and private nuisance under general maritime law (Count VIII).  The claim for nuisance alleges that "[a]s a result of the explosion on the *Deepwater Horizon*, oil, hydrocarbons, and dispersant chemicals invaded and continue to invade the State's real and personal properties and natural resources and have resulted in both public and private nuisances for which Defendants are responsible."  La. Compl. ¶251 [Doc. 2031].  Louisiana's claim fails, however, because under federal maritime law there is no cognizable claim for public nuisance and, in any event, such claim is preempted by federal statutory law.  Moreover, Louisiana, as a public entity, cannot bring a claim for private nuisance.

**1.     Maritime law does not recognize a claim for public nuisance.**

Louisiana cannot assert a claim for public nuisance under maritime law.   "[P]ublic nuisance is an all-purpose tort that encompasses a truly eclectic range of activities" and is, in other words, "an ill-defined omnibus tort of last resort."  *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 301–02 (4th Cir. 2010), *pet. for cert. filed*, 79 USLW 3457 (Feb. 2, 2011).  Defined generally, "public nuisance is an unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B(1) (1979); *see Cox v. City of Dallas*, 256 F.3d 281, 289 (5th Cir. 2001) ("In determining whether conduct amounts to a public nuisance, courts consider, *inter alia*, whether the conduct involves a significant interference with public health, safety, peace, comfort, or convenience").  Courts have found, however, that no cause of action for public nuisance exists under maritime law.  *TESTBANK*, 752 F.2d at 1030 n.13 (concluding that the Supreme Court foreclosed a federal cause of action for public nuisance claims); *Sekco Energy, Inc.*, 820 F. Supp. at 1014  (rejecting public nuisance claim under maritime law against party who allegedly polluted a navigable waterway with oil because the court "searched in vain for case law which recognizes a federal cause of action for public

nuisance."); *see also California v. Sierra Club*, 451 U.S. 287, 295 (1981) (finding "no federal common law 'which prohibits obstructions and nuisances in navigable'" waters) (quoting *Williamette Iron Bridge Co. v. Hatch*, 125 U.S. 1, 8 (1888)).

Even if the Court could find a maritime claim for public nuisance, such a claim would be preempted by federal statutory law in this case.  In *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n ("Sea Clammers"),* the Supreme Court has dismissed common-law nuisance claims for ocean pollution because "the federal common law of nuisance in the area of water pollution is entirely pre-empted by the more comprehensive scope of the FWPCA [(Federal Water Pollution Control Act)]."  453 U.S. at 21-22.  Likewise, the First Circuit has held that "'the federal common law of nuisance in the area of water pollution is entirely pre-empted by the more comprehensive scope of the FWPCA,'" and that *Sea Clammers* encompassed "all federal *judge-made* law of nuisance whether maritime or general federal law." *Conner v. Aerovox, Inc.*, 730 F.2d 835, 842 (1st Cir. 1984) (quoting *Nat'l Sea Clammers Ass'n*, 453 U.S. at 22) (emphasis in original).  Because maritime law is federal common law, an action for public nuisance is not permitted.  *TESTBANK*, 752 F.2d at 1030 n.13.

In any event, Louisiana has not alleged any nonconclusory conduct by Anadarko that *caused* the alleged public nuisance.  Nor has Louisiana adequately alleged that "it suffered significant harm different in kind from the general public.  Louisiana's assertion that pollution is inherently harmful does not reach the particular damages threshold that common law public nuisance requires."  *Rowan Cos.*, 728 F. Supp. 2d at 905.  As such, Louisiana has not stated, and cannot state, a claim against Anadarko for its abatement.

2.      **Louisiana, as a government entity, cannot bring a claim for private nuisance.**

Louisiana also purports to seek recovery based on private nuisance under maritime law. The Restatement (Second) of Torts defines private nuisance as "a nontrespassory invasion of another's interest in the private use and enjoyment of land."  Restatement (Second) of Torts §821D (1979).  "By private use is meant a use of land that a person is privileged to make as an individual, and not as a member of the public."  *Id.* at cmt. c.  Logically, a public entity is incapable of the "private use and enjoyment of land."  Accordingly, Louisiana, as a public entity, cannot state a claim for private nuisance.

Furthermore, as is the case for public nuisance claims, it is doubtful that maritime law recognizes private nuisance as viable cause of action.  *See Sekco Energy, Inc.*, 820 F. Supp. at 1013.  Assuming, arguendo, that a claim for private nuisance is cognizable under maritime law, Louisiana would have to establish that Anadarko "intended to interfere with the use and enjoyment of the [State's] maritime interest."  *Id.* (citation omitted).  Louisiana has not so alleged.

C.      **Louisiana also fails to state a claim for trespass under maritime law.**

Louisiana also cannot maintain a claim for trespass under maritime law.  "[A]dmiralty has traditionally not been concerned with furnishing remedies for trespassers."  1-XI Benedict on Admiralty § 171 n.54; *see also Lakes of Gum Cove Hunting & Fishing, LLC v. Weeks Marine, Inc.*, 182 F. Supp. 2d 537, 545 (W.D. La. 2001) ("No rule of trespass to land exists in maritime law.").  To the extent trespass is considered an appropriate claim under maritime law, however, the Louisiana Complaint fails to allege a trespass claim against Anadarko.

Although Anadarko believes federal common law of trespass is not appropriate in the maritime context, particularly where, as with the nuisance claims, federal statutory law directly

addresses interstate pollution, courts in the Fifth Circuit "may borrow from a variety of sources in establishing common law admiralty rules to govern maritime liability where deemed appropriate." *Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.*, 959 F.2d 49, 53 (5th Cir. 1992) (citation omitted). The Fifth Circuit has held "that general common law and in particular the Restatement (Second) of Torts should control to determine the law of maritime trespass, in order to promote uniformity in general maritime law." *Id.*; *see also Kai Enters., L.L.C. v. Boh Bros. Constr. Co., L.L.C.*, 731 F. Supp. 2d 568, 573 n.25 (E.D. La. 2010) (relying on *Marastro*, 959 F.2d at 53); *Dalrymple v. Fairchild Aircraft, Inc.*, 575 F. Supp. 2d 790, 796 (S.D. Tex. 2008) (relying on *Marastro*, 959 F.2d at 53, for the proposition that the Restatement principles are relevant with respect to maritime trespass). *Cf. Nyon Tech. Commercial, Inc. v. Equitable Equip. Co.*, 341 F. Supp. 777, 778 (E.D. La. 1972) (recognizing a vessel's trespass upon another party's wharf as "a maritime tort") (citations omitted). Under the Restatement, Louisiana's trespass claim must fail.

With respect to trespass, the Restatement (Second) of Torts states, in relevant part:

> One who recklessly or negligently, or as a result of an abnormally dangerous activity . . . *causes a* thing or third person so to enter is subject to liability to the possessor if, but only if, . . . the presence of the thing . . . upon the land causes harm to the land, to the possessor, or to a thing or a third person in whose security the possessor has a legally protected interest.

Restatement (Second) of Torts §165 (1965) (emphasis added). Thus, in order to state a claim for trespass against Anadarko for the entry of oil onto state lands, Louisiana was required to allege that Anadarko "cause[d]" the oil to enter those lands. *Id.* Louisiana plainly has not alleged non-conclusory conduct by Anadarko that caused oil to enter state lands. Moreover, even if a failure to act can even constitute trespass, the same reasons that a person cannot be held liable for the actions of its independent contractor under a theory of negligence, should apply here. *See Lakes*

*of Gum Cove Hunting & Fishing, LLC*, 182 F. Supp. 2d at 548 ("one who hires an independent contractor is generally not vicariously liable for its torts") (citing Restatement (Second) of Torts §§409-29).  As with the nuisance and negligence claims, Louisiana's lack of specific allegations regarding its damages is also fatal to its trespass claims.  *See Rowan Cos.*, 728 F. Supp. 2d at 905-06 (granting offshore drilling defendant's motion for summary judgment on trespass claim where "[o]ther than arguing that water pollution is harmful, Louisiana [did] not provide any specific evidence of the actual environmental impact of [defendant's] pollution").  As such, Louisiana has not stated a claim for trespass under maritime law.

**V.      State Law is Inapplicable in this Case and, therefore, the State Law Claims Raised by Alabama and Louisiana Fail as a Matter of Law.**

Both Alabama and Louisiana assert several claims under state law.  Alabama seeks penalties against Anadarko for alleged violations of several Alabama statutes (Causes of Action III.H., III.I., III.J., III.K., III.L., III.M.) and claims for damages and removal costs under state common law for negligence and wantonness (State law claims for relief III.M., III.N.). Louisiana seeks damages and removal costs under LOSPRA (direct claim and claim for declaratory judgment) (Counts II and VI) and civil penalties for violations of the Louisiana Environmental Quality Act, including response action costs (Counts III and IV).  Louisiana also seeks damages and costs under state law claims of negligence, nuisance, trespass, strict liability, ultrahazardous activity, and unjust enrichment (Counts XI, XII, XIII, XIV, XV, XXIII).  But state law is not applicable in this case pursuant to OCSLA.  Because federal law exclusively governs these actions, each of these state law claims must be dismissed.

A.    **Under OCSLA choice-of-law rules, federal law alone applies to this case because the case arises out of and in connection with OCS operations that involve exploration, development, and production of minerals.**

Both States plead claims against Anadarko under state law, yet taking their factual allegations as true, state law cannot apply to this case.  Federal law alone applies to claims arising out of and in connection with oil exploration, development, and extraction operations on the OCS.  Although federal law sometimes borrows state law as surrogate federal law, it does not borrow the state laws the States seek to invoke because OPA applies and leaves no gaps for state law to fill.  This result holds true regardless of the allegations that operations on the OCS have had harmful effects in Alabama's or Louisiana's territorial waters or on their territorial lands.  Moreover, just as in cases involving interstate water pollution, federal law preempts the law of allegedly affected states in cases involving pollution flowing from the OCS.

1.    **OCSLA prescribes the choice-of-law rules that apply to the States' claims.**

Through OCSLA, Congress has given federal courts broad jurisdiction over all "cases and controversies arising out of, or in connection with any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals . . .."  43 U.S.C. §1349(b)(1)(A).  As this Court has already held, OCSLA gives the Court jurisdiction over Louisiana's case, and the same finding applies to Alabama's Complaint.  *See* Order, Case No. 10-cv-1758 (E.D. La. Oct. 6, 2010) [Doc. 470].  As the Court recognized, but for "exploring and producing minerals, namely oil, from the outer Continental Shelf," "the April 20, 2010 explosion and the resulting oil spill" would not have caused Louisiana or Alabama the harms they allege.  *Id.* at 7.  For those reasons, the States' claims satisfy the two-part test for determining OCSLA jurisdiction.  *See id.* at 6-8.  (discussing the "operation" and causation

requirements for OCSLA jurisdiction laid out in *EP Operating LP v. Placid Oil Co.*, 26 F.3d 563, 568-69 (5th Cir. 1994)); *see also Nase v. Teco Energy, Inc.*, 347 F. Supp. 2d 313, 317 (E.D. La. 2004) (OCSLA confers jurisdiction when events occur on the OCS and "arise out of or relate to mineral production") (citing 43 U.S.C. §1331(a)).

Recognizing that claims associated with the operations occurring on the Macondo Prospect fall under the jurisdictional grant of OCSLA Section 1349, this Court also must look to the choice-of-law provisions of OCSLA.  OCSLA "provides comprehensive choice-of-law rules . . . to a wide range of activity occurring beyond the territorial waters of the states on the outer continental shelf of the United States." *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 495 (5th Cir. 2002), *overruled in part on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 782–83 (5th Cir. 2009).[27]  These choice of law rules, which are codified in Section 1333(a) of the Act, apply to all cases that fall within OCSLA's jurisdictional grant in Section 1349, even where the plaintiffs seek to invoke the court's jurisdiction under other provisions.  *EP Operating*, 26 F.3d at 569 & n.14; *see Toussaint v. Chevron Phillips Chem. Co.*, Civil Action No. 03-3481, 2006 WL 2349465, at *2 (E.D. La. Aug. 11, 2006) (when a "case arises in connection with a mineral production operation on the Outer Continental Shelf[,] it falls within the scope of OCSLA," and Section 1333 "in turn" applies); *see also Ten Taxpayer Citizens Group v. Cape Wind Assocs.*, 373 F.3d 183, 192–93 (1st Cir. 2004) (Section 1333 applies even when Section 1349 does not).  Other choice-of-law rules, such as those of the forum state or maritime choice-of-law rules, are irrelevant.  *See Gulf Offshore Co. v. Mobil Oil Corp.*,

---

[27]     *Grand Isle* holds that, for tort actions under OCSLA, the situs of a claim is the location where the controversy arises.  *See Grand Isle*, 598 F.3d at 784.  For contract actions, the situs of a claim is the location where the majority of work under the contract is to be performed.  *Id.* at 787.  In so holding, the Fifth Circuit overruled prior decisions (like *Demette*) insofar as they applied the tort situs analysis to contract claims.  However, *Demette*'s other holdings remain good law.  *Id.*

453 U.S. 473, 482 n.8 (1981) (OCSLA "supersede[s] the normal choice-of-law rules that the forum would apply"); *see also Wooten v. Pumpkin Air, Inc.*, 869 F.2d 848, 850-52 (5th Cir. 1989) (rejecting argument that Section 1333 adopts choice-of-law rules of the state adjacent to an OCSLA situs).

The Complaints raise claims that arose on an OCSLA situs and fall within OCSLA jurisdiction, and, therefore, the choice-of-law rules in Section 1333(a) apply.  The States allege that their cases are premised on the discharge of oil that resulted from OCS drilling operations conducted by the *Deepwater Horizon*.  La. Compl. ¶1 [Doc. 2031]; Ala. Compl. ¶1 [Doc. 1872].  At the time of these drilling operations, the *Deepwater Horizon* was attached to the seafloor.  As alleged, therefore, the controversy arose on an OCSLA situs:  the OCS and devices (like vessels) exploring, developing, or producing OCS resources.  *See Demette*, 280 F.3d at 497; *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 544-45 (5th Cir. 2002) recognizing that a semi-submersible drilling vessel is an OCSLA situs under Section 1333(a)(1) when it is temporarily attached to the OCS for purposes of exploring for resources), *overruled in part on other grounds by Grand Isle*, 589 F.3d at 782–83.  The controversy is "inextricably linked" to resource exploration and development on the OCS "and would not have arisen but for such development."  *Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co.*, 448 F.3d 760, 774 (5th Cir. 2006).  As such, this case falls squarely within Section 1333(a), and this Court must apply Section 1333(a)'s choice-of-law rules.  As explained further below, under these choice-of-law rules, state law cannot apply to this case.

2.    **OPA, as applicable federal statutory law, not maritime or state law, governs the States' claims.**

As described above, to determine which substantive laws govern the States' claims, this Court must look to Section 1333(a) of OCSLA.  Section 1333(a) of OCSLA provides, in relevant part:

> (1)    The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State:  *Provided, however*, That mineral leases on the outer Continental Shelf shall be maintained or issued only under the provisions of this subchapter.

> (2)(A) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf, and the President shall determine and publish in the Federal Register such projected lines extending seaward and defining each such area.  All of such applicable laws shall be administered and enforced by the appropriate officers and courts of the United States. State taxation laws shall not apply to the outer Continental Shelf.

43 U.S.C. §1333(a).    After considering several choice-of-law options and recognizing "substantial doubt whether state law and jurisdiction could or should be extended," *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 364 (1969), Congress determined that "federal law is 'exclusive' in its regulation of this area, and that state law is adopted only as surrogate federal

law." *Id.* at 357; *see also Union Texas Petroleum Corp. v. PLT Eng'g Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990); *Demette*, 280 F.3d at 499 ("Since the incident occurred on the OCS beyond the territorial waters of Louisiana, the only way state law could have operated was by incorporation into federal law under OCSLA"). State law only applies as surrogate federal law, however, by operation of OCSLA's second substantive law provision, 43 U.S.C. §1333(a)(2), and "then only when no inconsistent federal law applied." *Rodrigue*, 395 U.S. at 358. Therefore, state law is inapplicable in this case. First, state law cannot serve as surrogate federal law in this case because the *Deepwater Horizon* was only "temporarily attached to the seabed," and this case is governed by Section 1333(a)(1). So Section 1333(a)(2) is never implicated here. Even if Section 1333(a)(2) were implicated, there is applicable federal statutory law in OPA and the Clean Water Act, and state law would be inconsistent and could not serve as surrogate federal law.

> **a.      State law cannot serve as surrogate federal law in this case because there is applicable federal statutory law.**

While federal law may be in the form, first, of federal statutory law, and then, if no federal statutory law, federal maritime law, here OPA applies whether or not the States' claims are deemed maritime. OPA is Congress's comprehensive and reticulated liability scheme for all cases governed by federal or maritime law alleging damages covered by OPA. *See Gabarick*, 623 F. Supp. 2d at 750–51; *Tanguis*, 153 F. Supp. 2d at 867 (OPA "includes new remedies, which . . . preempt traditional maritime remedies") (citation omitted); *S. Port Marine, LLC*, 234 F.3d at 65-66 ("Congress's very specific treatment of oil pollution in the OPA . . . supplanted general admiralty and maritime law . . .."); *Gatlin Oil*, 169 F.3d at 209; *Nat'l Shipping Co. of Saudi Arabia*, 924 F. Supp. at 1447 ("OPA clearly preempts maritime law as to recovery of cleanup expenses and the cost of compensating injured persons"). OPA, therefore, applies in this

case, and the question of whether there is a "gap" for state law to fill is never reached.  The States then cannot bring claims under state law.

OPA provides the same type of relief that the States are seeking under state law.  Under OPA, "each responsible party for a vessel or a facility from which oil is discharged … into or upon the navigable waters or adjoining shorelines . . . is liable for the removal costs and damages," including damages to natural resources, damages to real or personal property and associated economic losses, loss of taxes, revenues, profits, and increased costs of public services.  33 U.S.C. §§2702(a), (b)(2)(A–F).  Both States are seeking these same damages under state law.  Ala. Compl. ¶¶337, 343 [Doc. 1872]; La. Compl. ¶¶172, 194, 223, 300, 307, 315, 322, 327, 385 [Doc. 2031].  Because OPA is comprehensive and was meant to apply by itself, there is no gap that OCSLA would use state law to fill.

State law therefore cannot be the basis for either State's claims.  Unlike cases involving oil spills in state territorial waters, in this case OPA and state law are not alternatives, such that the States could choose to plead one or the other.  In accordance with the choice-of-law rules in Section 1333(a) of OCSLA, OPA alone—not state law applying of its own force or applying as surrogate federal law—provides the substantive rules for claims arising out of oil spills originating from operations on the OCS.  Because it is OCSLA—not OPA—that precludes application of state law, OPA's savings clause, which limits only the preemptive effect of OPA itself, does not allow state law to be applied in this case.  *See* 33 U.S.C. §2718; *cf. Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 223–27 (1986) (holding that the savings clause in the Death on the High Seas Act does "not implicitly sanction the operation of state wrongful death statutes on the high seas," where states have no power, but only "preserve[s] the state courts' jurisdiction to provide wrongful death remedies under state law for fatalities *on territorial*

*waters*") (emphasis added); *Ten Taxpayer Citizens Group*, 373 F.3d at 193–97 (rejecting the argument that a federal statute recognizing state power over specific activities overrides OCSLA's displacement of state law on the OCS).[28]   The state law claims raised by both Alabama and Louisiana must be dismissed.

>   **b.**   **Section 1333(a)(2) is not applicable in this case to invoke state law as surrogate federal law under OCSLA.**

State law is inapplicable in any event pursuant to Section 1333(a)(2) of OSCLA.  Section 1333(a)(2) governs when state law may be used as surrogate federal law.  That section, however, does not permit the application of state law as surrogate federal law for an incident involving the *Deepwater Horizon*, because it was only *temporarily* attached to the OCS during the relevant events and Section 1333(a)(1) controls.  *See* Reply to PSC Omnibus Opp'ns to Mot. to Dismiss Mast. Compl. B1 and B3 at 6–7 [Doc. 2208].  As such, Section 1333(a)(2) cannot be invoked to use state law as surrogate federal law in this case.

Because at the time of the relevant oil and gas activities the *Deepwater Horizon* was "temporarily attached to the [OCS] seabed . . . for the purpose of exploring for, developing, or producing resources therefrom . . .," 43 U.S.C. §1333(a)(1), the Court's analysis must stop at Section 1333(a)(1).  OCSLA's legislative history and Fifth Circuit precedent confirm that a semi-submersible drilling rig like the *Deepwater Horizon*, though always a vessel, is also an OCSLA situs under Section 1333(a)(1) whenever "temporarily attached to the seabed [of the

---

[28]   When enacting OPA, Congress foresaw this very result.  Senators Chaffee, Lieberman, Graham, and Durenberger objected that an early draft of OPA was ill-suited to OCS oil spills because it would have capped liability for cleanup costs.  S. REP. NO. 101-94, at 26 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 722, 748.  In a statement on the bill, which had a savings clause like that which was ultimately enacted into law, the Senators noted that states could not impose additional liability for cleanup costs above the cap because OCS facilities "are outside the 3 mile limit, and therefore are not subject to state laws." *Id.* at 27, 1990 U.S.C.C.A.N. at 749.  Congress responded to the Senators' objection by eliminating the cap on cleanup liability—not by giving states authority over OCS oil spills.

OCS]."  H.R. REP. NO. 95-590, at 128 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 1450, 1534.[29]

At the time of the activities or events giving rise to all of the States' alleged injuries, the

Deepwater Horizon was a situs covered by Section 1333(a)(1) to which federal law alone

applies, to the total exclusion of state law.

**c.      State law is inapplicable, in any event, because it is inconsistent with federal law.**

Even if one can look to state law under Section 1333(a)(2), the state laws invoked by the

States are inapplicable because they are inconsistent with OPA.  As outlined above, the States

are seeking the same removal costs and damages under state law as they are seeking under OPA.

But, these state law claims do not require presentment.  OPA requires presentment in 33 U.S.C.

§2713(a), and this presentment requirement reflects a legislative compromise "to temper the

Act's increased liability with a congressional desire to encourage settlement and avoid

litigation."  *Boca Ciega Hotel, Inc.*, 51 F.3d at 238-39 (citing legislative history of the Act).

Courts have found that when state law would "circumvent the settlement scheme" established by

federal statute regarding the same costs and damages, the state law conflicts with federal law for

purposes of preemption.  *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112,

138-39 (2d Cir. 2010).  While not a preemption analysis of OPA, and thus notwithstanding

OPA's savings clause, this same finding can be applied to OCSLA's choice-of-law provisions.

Allowing claims for the same costs and damages to be brought under state law allows parties to

---

[29]      The House Report for the 1978 amendments to OCSLA states:  "It is thus made clear that Federal Law is to be applicable to all activities on all devices in contact with the seabed for exploration, development, and production.  The Committee intends that Federal Law is, therefore, to be applicable to activities on drilling ships, *semi-submersible drilling rigs, and other watercraft, when they are connected to the seabed by drillstring, pipes, or other appurtenances, on the OCS for exploration, development, or production purposes*."  H.R. REP. NO. 95-590, at 128 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 1450, 1534 (emphasis added); *see also Diamond Offshore Co.*, 302 F.3d at 542–43, *overruled in part on other grounds by Grand Isle*, 589 F.3d at 782–83.

avoid this presentment requirement, thereby undermining the carefully laid out scheme of OPA. State law, therefore, is "inconsistent" with federal law (*i.e.,* OPA) and cannot be applied through OCSLA Section 1333(a)(2) choice of law provisions, even if that section were applicable here.

Moreover, owing to OPA's comprehensiveness, there is no gap for state law to fill.  The States, in fact, bring claims that duplicate OPA and that seek relief essentially identical to that which they can obtain through OPA.  The allegations under (a) negligence (Louisiana and Alabama), (b) wantonness (Alabama only), and (c) trespass, nuisance, strict liability, ultrahazardous activity and unjust enrichment (Louisiana only) essentially replicate their OPA allegations.  In its OPA and state claims, Alabama seeks to recover purported removal costs, damages to real and personal property, loss of tax revenue, and costs of providing additional public services.  *Compare* Ala. Compl. ¶¶337, 343 [Doc. 1872].  The same is true for Louisiana. La. Compl. ¶¶172, 194, 223, 300, 307, 315, 322, 327, 385 [Doc. 2031].   Even Louisiana's purported claim for "response action costs" under the Louisiana Environmental Quality Act ("LEQA") (Count IV) seeks removal costs that are covered under OPA.  As such, the state law claims must be dismissed.

### 3. Allegations that the injuries occur in state territory do not change the choice-of-law inquiry or its result.

To escape the consequences of OCSLA and OPA, the States may argue that their alleged injuries did not (or will not) occur until oil from operations on the OCS migrated (or will migrate) by wind and wave into territorial waters and onto land.  *See, e.g.,* La. Compl. ¶311 ("[t]he continuing migration on and around the State's properties of the oil spill *originated in the Gulf of Mexico and resulted from Defendants' deep water well operations ...*") [Doc. 2031] (emphasis added).  Such assertions, however, do not overcome Section 1333(a)'s choice-of-law rules.  *See EP Operating LP*, 26 F.3d at 569 & n.14.

Allegations that injuries occurred within a State's territory do not change the "situs" of the controversy under Section 1333 of OCSLA.  *See Union Texas Petroleum Corp*, 895 F.2d at 1047.  An OCSLA situs is the "situs of a controversy" as long as the alleged tortious *activity* occurred on the OCSLA situs, even if the alleged *injury* occurred elsewhere.  *See Alleman v. Omni Energy Servs. Corp.*, 580 F.3d 280, 286 (5th Cir. 2009) (accidents occurring on a fixed platform are not governed by maritime law merely because an injury begun by activities on the platform was consummated at sea); *Texaco Exploration & Prod., Inc.*, 448 F.3d at 773 (federal statutory law supplemented with state law applies when harms occur on fixed platforms and when harms "aris[e] directly from" them); *see also Grand Isle*, 589 F.3d at 787–88 (in a contract case, an OCSLA situs is situs of controversy if it is where majority of *activity* contemplated by contract is to occur); *cf. Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 532 (1995) (The Extension of Admiralty Jurisdiction Act "invest[s] admiralty with jurisdiction over 'all cases' where the injury was caused by a ship or other vessel on navigable water, even if such injury occurred on land.").  The same legislative history quoted above, *supra* n.29, also confirms Congress's intent to have federal law apply to "activities" on OCSLA situses.  H.R. REP. NO. 95-590, at 128 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 1450, 1534.[30]  A holding that injury, not activity, determines the situs of the controversy would have the opposite effect.  In this case, the alleged injuries are directly tied to operations on the OCS.  *Cf. Landry v. Island Operating Co.*, No. 09-1051, 2009 WL 3241560, at *3 (W.D. La. Sept. 30, 2009) (finding

---

[30]     The House Report states: "Section 203—Laws Applicable to Outer Continental Shelf[:] . . . It is thus made clear that Federal Law is to be applicable to *all activities* on all devices in contact with the seabed for exploration, development, and production.  The Committee intends that Federal Law is, therefore, to be applicable to *activities* on drilling ships, semi-submersible drilling rigs, and other watercraft, when they are connected to the seabed by drillstring, pipes, or other appurtenances, on the OCS for exploration, development, or production purposes."  H.R. REP. NO. 95-590, at 128, 1978 U.S.C.C.A.N. at 1534 (emphasis added).

"[t]he manner in which plaintiff allegedly sustained injury simply bears too indirect and attenuated a relationship to any 'operation' on the OCS for defendants to be allowed to invoke OCSLA").  Thus, this case's geographic center of gravity is on the OCS, regardless of where the States allegedly suffered or will suffer injury.

Even if the place of injury was one factor to consider in determining the situs of this controversy, it should not be dispositive.  *See Union Oil Co. v. Oppen*, 501 F.2d 558, 561 (9th Cir. 1974) (applying OCSLA and concluding "that admiralty law [could be] exclusively applicable to the present controversy" where large amounts of oil escaped from OCS, which currents carried into Santa Barbara harbor, where the oil damaged boats, the livelihood of fisherman, and the local environment).  Although stating that the "locus of a tort is the place where injury takes effect," *Oppen v. Aetna Ins. Co*., 485 F.2d 252, 256 (9th Cir. 1973), the Ninth Circuit rejected use of state law to an oil spill originating from the OCS that flowed into California waters, because it found that state standards either were not met or were duplicative. *See id.* at 259 ("Even assuming that the California statutes providing a remedy for nuisance were intended to apply to injuries occurring within the navigable waters, and that . . . such application would be constitutional, it would not help the plaintiffs in the present case.").  Because the States merely seek to recover duplicative costs and damages of those covered under OPA, this Court should not look to state law, and the state law claims must be dismissed.

**B.      In cases involving oil spills originating from the OCS, the law of an affected state is preempted.**

Any effort by the States to have the Court apply their own law based on the location of the injury, either by ignoring the choice-of-law rules in Section 1333 or through Section 1333's situs-of-the-controversy requirement, would also fail because interstate pollution is governed solely by the laws applicable to the source of the pollution, which here is exclusive federal law.

*See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 487 (1987) (holding that, when considering state law claims involving interstate water pollution covered by Clean Water Act, "the court must apply the law of the State in which the point source is located").   Because federal law alone governs, the States' claims, including those for civil penalties, fail notwithstanding OPA's savings clause in 33 U.S.C. §2718(c), which provides that OPA does not affect the State's ability to impose *additional* liability or civil penalties.   This OPA savings clause is simply inapplicable to this case.

The harms alleged by both States in this case stem from interstate pollution, the source of which is the OCS.   Federal common law governs interstate pollution, unless Congress enacts an applicable statute displacing it.   *See generally Illinois v. City of Milwaukee*, 406 U.S. 91 (1972). When federal statutory law is enacted that displaces federal common law, state law cannot apply unless the federal statutes make room for it, and the mere fact that the federal laws contain savings clauses is not sufficient to draw that inference.   *City of Milwaukee*, 451 U.S. at 317; *Ouellette*, 479 U.S. at 492.   Where interstate pollution originating from outside a State results in harms within that State, federal law preempts applying the affected State's law (that is, the State where an injury allegedly occurs).   Likewise, federal law also preempts applying an affected State's law to claims arising out of oil spills originating from OCS sources, far outside the reach of any State's jurisdiction.   As such, neither Louisiana or Alabama can invoke state law to address interstate pollution resulting from the *Deepwater Horizon* incident, which occurred on the OCS.

The Supreme Court has prohibited an affected state from applying its law to interstate pollution originating from outside the state's territory.   "[R]egulation of interstate water pollution is a matter of federal, not state, law . . .."   *Ouellette*, 479 U.S. at 488.   Applying the law of an

affected state to pollution originating in another state would seriously undermine, and stand as an obstacle to the full implementation of, the methods by which the Clean Water Act regulates interstate water pollution.  *Id.* at 494–97.  Thus, the Supreme Court held that the Clean Water Act, in light of its text, purposes, and history, and *notwithstanding its savings clause*, does not "preserve the right to bring suit under the law of any affected State."  *Id.* at 493; *see also id.* at 494 ("Because we do not believe Congress intended to undermine this carefully drawn statute through a general saving clause, we conclude that the CWA precludes a court from applying the law of an affected State against an out-of-state source.").  This same analysis must apply to interstate pollution stemming from the OCS in areas under federal jurisdiction, which is governed by a myriad of federal laws.

The justification for applying only federal law to interstate pollution is even stronger in the case, as here, where the pollution originated from a federal enclave:  the OCS.  Applying the law of affected states to claims arising out of an oil spill emanating from the OCS would frustrate several federal statutes that regulate OCS mineral extraction operations for their actual and potential environmental consequences.  Through OCSLA and the Coastal Zone Management Act ("CZMA"), 16 U.S.C. §§ 1451–1465, for example, the federal government extensively regulates exploration and drilling operations on the OCS for their environmental impacts.  *See Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604, 609-10 (2000) (summarizing the four pillars of the comprehensive regime).  Applying the law of affected states to discharges from OCS operations would circumvent this careful scheme, which specifically assigns a largely advisory role to affected states: "The inevitable result of" applying an affected state's law "would be that . . . States could do indirectly what they could not do directly—regulate the conduct of" OCS operations.  *Ouellette*, 479 U.S. at 495.  Applying the law of an

affected state also would "undermine the important goals of efficiency and predictability," because "application of numerous States' laws would only exacerbate the vagueness and resulting uncertainty." *Id.* at 496.  The same holds true for oil pollution covered under the Clean Water Act and OPA, and for activities regulated by OCSLA.

The savings clause in OPA, 33 U.S.C. §2718, does not preserve the States' right to seek recovery under state law, including claims for civil penalties.  A savings clause does not save state law that conflicts with federal law.  *Oullette*, 479 U.S. at 491-93; *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869–74 (2000) (citation omitted); *cf. Offshore Logistics, Inc.*, 477 U.S. at 230 ("[I]t is hardly conceivable that Congress," through a mere savings clause, "could have intended that these diverse state statutes could be applied to remedy maritime torts occurring the world over.").  OPA's savings clause, moreover, is textually limited to OPA itself and cannot save state law that conflicts with other federal laws like OCSLA, CZMA, or the Clean Water Act.  No other savings clause would help the States' cause, either.  For instance, although the Supreme Court ultimately held that the Clean Water Act's savings clause preserves claims brought under the law of a *source state*, *Oullette*, 479 U.S. at 497–500, the preservation of source state law is inapplicable here because the oil that allegedly harmed the States was not discharged from a state, but from a federal enclave on the OCS where federal law applies exclusively.[31]  Thus, in this instance, regardless of where the injury occurs state law is preempted by federal law.

Because of Section 1333 and comprehensive federal regulation of the environmental impacts of OCS operations, neither State can seek to impose liability under state law, not even

---

[31]     The Clean Water Act's preservation of source-state law is inapplicable here because Louisiana has pleaded that the oil was discharged not from within a State, but from a federal enclave—a well on the OCS.

recovery for penalties *under state law*.  Only federal law can apply.  Accordingly, all of the state-law claims must be dismissed because the substantive law upon which they rely is not available.

Furthermore, by its plain language, OPA saves only state law remedies that might otherwise be available; it does not open up new areas to state remedies where none previously existed.  *See* 33 U.S.C. § 2718(a) (OPA does not "affect . . . the authority of any State . . . from imposing any additional liabilities . . . or affect . . . in any way the obligations or liabilities of any person under . . . State law, including common law").  Here, the activities occurring on the OCS were governed and regulated by federal law exclusively.  Thus, OPA's savings clause saves nothing here, because there is no valid application of state law to be saved in this context.

### C.   Even if State Law could be adopted under the OCSLA choice of law provisions, individual state law claims against Anadarko nonetheless fail and must be dismissed.

Even if state law could be applied to this case, it would not be the law of Alabama because Louisiana is the "adjacent state" for purposes of the application of state law as surrogate federal law.  *See* 43 U.S.C. §1333(a)(2)(A); *see also Snyder Oil Corp. v. Samedan Oil Corp.*, 208 F.3d 521 (5th Cir. 2000).  While Alabama seeks damages, costs and penalties under a myriad of state statutes and state common law, Alabama cannot bring claims under Alabama law in any case.  The claims for costs, damages, and even penalties, then, must be dismissed.[32]

---

[32]   Given the intent of Congress to apply one comprehensive set of laws to activities occurring on the OCS, Alabama should not be allowed to circumvent OCSLA's choice of law rules.  For example, gross negligence is addressed under OPA, and Alabama should not be allowed to bring a state law claim, seeking the same damages, based on wantonness.  Indeed, wantonness is not a distinct tort under maritime or Louisiana law.  *See Cape Flattery Ltd. v. Titan Mar. LLC*, 607 F. Supp. 2d 1179, 1189 (D. Haw. 2009) (maritime law); *Brown v. ANA Ins. Group*, 994 So. 2d 1265, 1269 n.7 (La. 2008); *Butler ex rel. Anderson v. Miss-Lou Ambulance Serv., LLC*, No. 07-0924, 2008 WL 2816845, at *5 (W.D. La. July 22, 2008).  Even under Alabama law, Alabama has not set forth any allegations to support a plausible inference that Anadarko acted, or failed to act, with a "reckless or conscious disregard of the rights or safety of others."  Ala. Code § 6-11-20(b)(3) (2010).

Although Louisiana does bring claims under Louisiana law, even *if* Louisiana law was adopted here as the law of the adjacent state, the state law claims still must be dismissed.

### 1. Louisiana fails to allege sufficient facts to support the claims under Louisiana law.

Federal Rule of Civil Procedure 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). To state a claim for relief, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citation omitted). General, undifferentiated allegations fail to satisfy the notice pleading requirement of Rule 8, and require dismissal for that reason alone. *See Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) (dismissing complaint where there was no differentiation between defendants, geographic and temporal realities made complaint factually impossible, and all defendants were named in each count); *Pro Image Installers, Inc. v. Dillon*, No. 3:08CV273/MCR/MD, 2009 WL 112953, at *2 (N.D. Fla. Jan. 15, 2009) (dismissing complaint where claims were alleged against multiple defendants with very little in each count to distinguish between the separate defendants); *Lane v. Capital Acquisitions & Mgmt. Co.*, No. 04-60602CIV, 2006 WL 4590705, at *5 (S.D. Fla. Apr. 14, 2006) ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, the Lane's Complaint fails to satisfy the minimum standard of Rule 8."). Louisiana's Complaint is replete with conclusory allegations merely asserting the elements of liability under each statute and against "Defendants" without referring to any particular entity or alleging any facts. *See, e.g.*, La. Compl. ¶¶177, 185, 194, 230, 296, 304, 311, 318-319, 325, 383 [Doc. 2031]. Hiding behind the catchall term "Defendants" does "not provide fair notice to each Defendant of their alleged wrongdoing or role in the alleged wrongdoing," a key goal of Rule 8. *Pierson v. Orlando Reg'l*

*Healthcare Sys., Inc.*, No. 6:08-cv-466-Orl-28GJK, 2009 WL 2151176, at *1 (M.D. Fla. July 13, 2009).

The only specific allegations against Anadarko in its Complaint, again, refer only to its leasehold interest in the Macondo Prospect and its alleged rights to certain information under the Operating Agreement.  For the same reasons these allegations are insufficient to maintain claims under maritime law, the state law claims for negligence, nuisance, trespass, strict liability, ultrahazardous activity, and unjust enrichment must also be dismissed.

The Louisiana Complaint also alleges claims under LOSPRA for costs and damages and seeks penalties and costs under the Louisiana Environmental Quality Act.  But it makes mere conclusory allegations in support of each claim.  After outlining the purported legal requirements of establishing a LOSPRA claim, the Complaint merely asserts that "BP, Anadarko, MOEX, and Transocean Defendants were each owners and/or operators of the Macondo Well and the *Deepwater Horizon* rig and as such are responsible parties under OSPRA," and that "each caused, allowed or permitted the unauthorized discharge of oil from the Macondo Well and *Deepwater Horizon* rig."  La. Compl. ¶¶176-177 [Doc. 2031].  Similarly, for its claims under the Louisiana Environmental Quality Act, Louisiana merely asserts that "Defendants caused and/or allowed the unauthorized discharge of oil, gas and other pollutants."  La. Compl. ¶185 [Doc. 2031].  Those allegations are inadequate as a matter of law.  Proper pleading "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citing *Twombly*, 550 U.S. at 555); *see also Hershey*, 610 F.3d at 245–46 (same).  As there are no

60

factual allegations to support each element of these claims against Anadarko, on these grounds alone, the claims under Louisiana law must be dismissed.

### 2. LOSPRA preempts claims under all other state law.

Even assuming Louisiana law could be adopted, the only claims that could survive are those under LOSPRA. The Louisiana Complaint purports to assert claims under the Louisiana Environmental Quality Act, negligence, nuisance, trespass, strict liability, ultrahazardous activity, and unjust enrichment (Counts III, IV, XI, XII, XIII, XIV, XV, XXIII). But, LOSPRA expressly provides that it is "exclusive and shall supersede *any other liability* provisions provided by any other applicable state law." LA. REV. STAT. ANN. §30:2491(A) (emphasis added); *see also* LA. REV. STAT. ANN. § 30:2496 ("The provisions of this Chapter shall be the exclusive authority on oil spill prevention, response, removal, and the limitations of liability"). LOSPRA further provides that the provisions of that Chapter "shall supersede, but not repeal, *any* conflicting laws of this state." LA. REV. STAT. ANN. § 30:2491 (emphasis added). Thus, the state preemptive effect of LOSPRA is comprehensive and bars all other state law claims, whether for damages or civil penalties.[33]

Moreover, LOSPRA provides that "[a]ny conflicting applicable federal statute shall take precedence over this Chapter." LA. REV. STAT. ANN. §30:2491(A); *see also* LA. REV. STAT. ANN. §30:2453 ("The legislature declares that it is the intent of this Chapter to support and complement [OPA] and other federal law, specifically those provisions relating to the national contingency plan for cleanup of oil spills and discharges, including provisions relating to the responsibilities of state agencies designated as natural resources trustees. This legislature intends

---

[33]     The only exception to this broad preemption is that penalties may still be sought by the Louisiana Department of Wildlife & Fisheries under the Wildlife and Fisheries statute (LA. REV. STAT. ANN. §§ 56:40.1, *et seq.*). LA. REV. STAT. ANN. § 30:2491(B).

this Chapter to be interpreted and implemented in a manner consistent with federal law").  The penalties for response costs that Louisiana seeks under the Louisiana Environmental Quality Act and the costs and damages it seeks under common law and the Civil Code are also recoverable under OPA.  In particular, for natural resources damages, OPA allows such recovery only by a United States trustee, a State trustee, an Indian tribe trustee, or a foreign trustee.  33 U.S.C. §2702(b)(2)(A); *see also* 33 U.S.C. § 2701(20) (defining "natural resources" to include, among other things, fish and wildlife).  OPA also outlines specific procedures for assessment, recovery, and disbursement of natural resources damages.  33 U.S.C. §2706.  OPA bars double recovery for natural resource damages.  *Id.* §2706(d)(3).  Allowing recovery of natural resource damages through state statutes or common law would be inconsistent and conflicts with the recovery of natural resources damages under OPA.

Although Louisiana also seeks removal costs and damages for injury to property, including economic losses, and public services costs, these claims are similarly covered by OPA.  LOSPRA provisions are inconsistent with the required procedures under OPA, including the presentment requirement.  33 U.S.C. § 2713.  As such, OPA similarly "take[s] precedence" over LOSPRA.  LA. REV. STAT. ANN. § 30:2491(A).  Thus, even if the Court could look to Louisiana law as the law of the adjacent state under OCSLA, the state law claims still fail.

### 3.    The Louisiana Complaint fails to state a claim under LOSPRA.

As noted above, the Louisiana Complaint contains only conclusory allegations in support of its LOSPRA claim.  The Complaint further fails to make necessary allegations about causation.  It alleges certain other facts and repeatedly refers to the Operating Agreement, which only confirms Anadarko could not have intervened to prevent the spill.  As a result, the LOSPRA claims must be dismissed.

Although LOSPRA does not define "cause," "allow," or "permit," as those terms are used in the definition of "responsible party," even the common definitions of those words most favorable to the Louisiana plaintiffs demonstrate that a responsible party must, at a minimum, be in a position to *intervene* to prevent the unauthorized discharge.[34]  Based on the allegations in the Louisiana Complaint, it appears that Louisiana alleges that Anadarko was legally in a position to intervene based on its purported rights to access and information pursuant to the Operating Agreement.  But, as discussed above, BP E&P was an independent contractor in charge of conducting the oil and gas operations at the Macondo Prospect, and the general rule is that the principal neither assumes nor owes any duty to protect others from hazards caused by a contractor.  *See, supra,* Section IV.A.  Furthermore, Louisiana's Complaint does *not* allege that Anadarko had any operational control of or supervisory authority over the *Deepwater Horizon*, drilling operations, or BP's cleanup activities.  Louisiana acknowledges that BP E&P was the designated operator, and further alleges that BP p.l.c., which the Complaint does not allege had any relation to Anadarko, controlled BP E&P's operations.  La. Compl. ¶¶39, 50 [Doc. 2031].  The allegations assert only that Anadarko was, at most, a minority, non-operational leaseholder of the Macondo Prospect.  *See* La. Compl. ¶39.  Indeed, a discharge is defined under LOSPRA to include "an intentional or unintentional act or omission."  La. Rev. Stat. Ann. §30:2454(7).  There is no act that Anadarko took or could have taken to change the events of April 20, 2010.  Thus, even if it had certain rights as a non-operator under the Operating Agreement, Anadarko

---

[34]    *See* "Allow," Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/allow (last visited Mar. 28, 2011) ("to forbear or neglect to restrain or prevent"); "Permit," Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/permit (last visited Mar. 28, 2011) ("to make possible"); "Cause," Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/cause (last visited Apr. 7, 2011) ("to serve as a cause or occasion of").

was not legally in a position to intervene in BP E&P's operational activities and, therefore, could not have caused or allowed the discharge.

Anadarko also was not in a *practical* position to intervene.  The Louisiana Complaint alleges only that Anadarko had some access rights and rights to certain information.  But access to information—even a real-time data feed—cannot give rise to liability or a duty to warn.  *See, supra* Section IV.A.2.  Based on the Complaint's allegations, only BP and its contractors could possibly have been in a position, legally or practically, to "cause," "allow," or "permit" any unauthorized discharge to occur.

Louisiana also makes a general and undifferentiated allegation that "BP, Anadarko, MOEX, and Transocean Defendants were each owners and/or operators of the Macondo Well and the *Deepwater Horizon* rig."  La. Compl. ¶176. [Doc. 2031].  But, LOSPRA imposes ownership and operator liability only on the owner or operator of a "vessel" or "terminal facility."  *See id.* at ¶175 [Doc. 2031]; *see also* LA. REV. STAT. ANN. § 30:2454(22)(a) (defining a "responsible party" as "[t]he owner or operator of a *vessel or terminal facility* from which an unauthorized discharge of oil emanates . . ..") (emphasis added).  While not identifying the vessel or terminal facility Anadarko is purported to have owned or operated, the Louisiana Complaint merely alleges that Anadarko held a leasehold interest in the Macondo Prospect.  Louisiana cannot base its LOSPRA claim against Anadarko on alleged prior or existing interests in the Macondo Prospect lease, because LOSPRA does not impose liability on mere lessees.  *See* LA. REV. STAT. ANN. § 30:2454(22); *see also Int'l Paper Co., Inc. v. Hilton*, 966 So. 2d 545, 558–59 (La. 2007) ("[T]he settled doctrine of statutory construction . . . dictates that when the legislature specifically enumerates a series of things, the legislature's omission of other items . . . is deemed intentional") (internal citations and quotation marks omitted).  Unlike OPA, which specifically

lists certain holders of a lease interest to be responsible parties, LOSPRA provides for no such liability.  Thus, the LOSPRA claims, whether in the form of seeking declaratory judgment or a direct claim, must be dismissed.

## CONCLUSION

For the foregoing reasons, the claims in the Alabama and Louisiana Amended Complaints against Anadarko Petroleum Corporation and Anadarko E&P Company LP must be dismissed in their entirety.

Dated:  June 3, 2011                             Respectfully submitted,

BINGHAM McCUTCHEN, LLP

/s/ *James J. Dragna*
James J. Dragna
jim.dragna@bingham.com
Bingham McCutchen LLP
355 South Grand Avenue
Suite 4400
Los Angeles, California 90071-3106
Telephone (213) 680-6436
Facsimile (213) 680-8636

Ky E. Kirby
ky.kirby@bingham.com
Michael B. Wigmore
michael.wigmore@bingham.com
Sandra P. Franco
s.franco@bingham.com
Randall M. Levine
randall.levine@bingham.com
2020 K Street, NW
Washington, DC 20006-1806
Telephone (202) 373-6000
Facsimile (202) 373-6001

KUCHLER POLK SCHELL
WEINER & RICHESON, LLC

Deborah D. Kuchler, T.A. (La. Bar No. 17013)
dkuchler@kuchlerpolk.com
Janika Polk (La. Bar No. 27608)
jpolk@kuchlerpolk.com
Robert Guidry (La. Bar No. 28064)
rguidry@kuchlerpolk.com
1615 Poydras Street, Suite 1300
New Orleans, LA  70112
Tel:  (504) 592-0691
Fax:  (504) 592-0696

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, pursuant to Pre-trial Order No. 12, I have caused the foregoing to be served on all counsel via the Lexis Nexis File & Serve system, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, who will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on June 3, 2011.


_____/s/ *James J. Dragna*_____
James J. Dragna


A/74297961.2