UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" IN THE GULF OF | § | |
| MEXICO, OF APRIL 20, 2010 | § | |
| | § | SECTION: J |
| THIS PLEADING APPLIES TO | § | |
| 10-4182, 10-4183 | § | |
| | § | JUDGE BARBIER |
| | § | |
| | § | MAGISTRATE JUDGE SHUSHAN |

## BRIEF IN SUPPORT OF TRANSOCEAN'S RULE 12(b)(6) MOTION TO DISMISS THE STATE OF ALABAMA'S FIRST AMENDED COMPLAINT

TO THE HONORABLE CARL J. BARBIER, United States District Judge:

Petitioners in Limitation and Defendants Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, Transocean Deepwater Inc., and Triton Asset Leasing GmbH (collectively "Transocean") respectfully submit their Brief in Support of Transocean's Rule 12(b)(6) Motion to Dismiss The State of Alabama's First Amended Complaint.

## I.

## INTRODUCTION

The State of Alabama filed a First Amended Complaint, in which it alleges that it suffered damage as a result of the BP Oil Spill. **Dkt. 1872, ¶ 1 at p. 1.** The State of Alabama contends that:

> "Defendants' actions resulted in the blow-out of the Macondo well, caused the explosion, burning and sinking of the *Deepwater Horizon* rig and directly resulted in the release of crude oil and other pollutants into the waters of the Gulf of Mexico and the State of Alabama. These pollutants have damaged, are damaging, and will continue to damage Alabama's coastal environment, communities, property and economic livelihood. Businesses along Alabama's coast and throughout the State continue to suffer from the effects of the Spill, and the loss of tax revenues from these businesses has, is, and will continue to negatively impact the State. . . The State, by and through its Attorney General, brings this enforcement action for a declaratory judgment, to recover the fines and penalties to which the

> State is entitled, as well as for compensatory, punitive and other damages, to the fullest extent allowed by Alabama and federal law."

**Dkt. 1872, ¶¶ 2, 4 at pp. 1-2.**

Like the Bundle B1 and the Bundle C Local Government Master Complaint Plaintiffs, the State of Alabama has chosen to assert an array of identical state common law claims for negligence, gross negligence, nuisance, trespass and fraudulent concealment.  To these state common law claims, the State of Alabama has added general maritime law claims for negligence and gross negligence.  Yet, the damages the State of Alabama seeks to recover are <u>all</u> encompassed by OPA:

(1)   Diminution in value of property—within OPA's § 2702(b)(2)(B) ("Real or personal property");

(2)   Loss of tax revenue, income and/or use—included in OPA's § 2702(b)(2)(D) ("Revenues");

(3)   Cost of response or removal, clean-up, restoration and/or remediation—pursuant to OPA's § 2702(b)(1) ("Removal costs"); and

(4)   Other damages, losses and/or costs as a result of the oil spill—covered by OPA's § 2702(b)(2)(A), (E), (F) ("Natural resources, Profits and earning capacity and Public services").

The State of Alabama alleges it was harmed by the BP Oil Spill, which occurred following the explosions on the *Deepwater Horizon* on April 20, 2010, and its sinking into the Gulf of Mexico, two days later.  **Dkt. 1872, ¶ 1 at p. 1.**  The State of Alabama further alleges that the well from which the oil flowed was located on the Outer Continental Shelf, beyond the territorial jurisdiction of the surrounding States.  **Dkt. 1872, ¶ 8 at p. 3.**  Accordingly, the law governing the State of Alabama's damage claims is exclusively maritime.  As a result, except for their OPA claims, the State of Alabama's First Amended Complaint fails to state any valid damage claims as a matter of law and should be dismissed.  Further, the State's OPA claims must be dismissed for a lack of presentment.

2

## II.

### TRANSOCEAN IS ENTITLED TO DISMISSAL OF THE
### THE STATE OF ALABAMA'S OPA CLAIMS FOR
### FAILURE TO SATISFY OPA'S PRESENTMENT REQUIREMENTS

**A.**     ***The OPA Presentment Requirement is a Mandatory Condition Precedent to Filing Suit Based on OPA.***

Although the State of Alabama referenced its OPA claim on only three pages of its eighty-page First Amended Complaint, **Dkt. 1872 at pp. 46-48,** it admits that "BP Exploration was designated as a 'Responsible Party' by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714." **Dkt. 1872, ¶ 8 at p. 3.**   Furthermore, the State of Alabama's Complaint also acknowledges that "the U.S. Coast Guard named Transocean Holdings as a 'Responsible Party' under the Oil Pollution Act for the surface oil spill resulting from the blowout by the *Deepwater Horizon*."   **Dkt. 1872, ¶ 15 at p. 5.**   As the State of Alabama's First Amended Complaint seeks recovery under OPA, the State must still comply with OPA's presentment requirements.

Specifically, OPA provides that "all claims for removal costs or damages shall be presented first to the responsible party or guarantor of the source designated under § 2713(a) of this title." 33 U.S.C. § 2713(a).  OPA further provides:

> **(c)**     **Election**
>
> If a claim is presented in accordance with subsection (a) of this Section and—
>
>> (1)  each person to whom the claim is presented denies all liability for the claim, or
>>
>> (2)  the claim is not settled by any person by payment within 90 days after the date upon which (A) the claim was presented, or (B) advertising was begun pursuant to section 2714(b) of this title, whichever is later,
>
> ***the claimant may elect to commence an action in court against the responsible party or guarantor. . . .***

33 U.S.C. § 2713(c) (emphasis added).

Based upon the unequivocal language of OPA, presentation of a claim in accordance with Section 2713 has been held to be a "mandatory condition precedent" for commencing an OPA action in court against a responsible party. *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., Inc.*, 51 F.3d 235, 240 (11th Cir. 1995); *Turner v. Murphy Oil U.S.A., Inc.,* CIV.A. 05-4206, 2007 WL 4208986, at *2 (E.D. La. Nov. 21, 2007); *Isla Corp. v. Sundown Energy, LP*, CIV.A. 06-8645, 2007 WL 1240212, at *2 (E.D. La. Apr. 27, 2007); *Abundiz v. Explorer Pipeline Co.,* CIV.A. 300CV2029H, 2003 WL 23096018, at *5 (N.D. Tex. Nov. 25, 2003). As the Eleventh Circuit established in *Boca Ciega*, "the clear text of § 2713 creates a mandatory condition precedent barring all OPA claims unless and until a claimant has presented her claims in compliance with § 2713(a) . . . ." 51 F.3d at 240. Indeed, courts have held that OPA presentment is jurisdictional, such that the failure to comply strictly with OPA's presentment requirement ousts a court of jurisdiction over any OPA claims. *Gabarick v. Laurin Maritime (Am.), Inc.,* 623 F. Supp. 2d 741, 750-51 (E.D. La. 2009); *Marathon Pipe Line Co. v. LaRoche Indus., Inc.,* 944 F. Supp. 476, 477 (E.D. La. 1996); *see also Russo v. M/T DUBAI STAR*, C 09-05158 SI, 2010 WL 1753187, at *2 (N.D. Cal. Apr. 29, 2010); *Johnson v. Colonial Pipeline Co.,* 830 F. Supp. 309, 310-11 (E.D. Va. 1993).

### B.   *The State of Alabama Has Not Complied With OPA's Presentment Requirement.*

The State of Alabama alleges that it has met OPA's presentment requirements:

> The State has satisfied the presentment requirements of 33 U.S.C. §§ 2713(a) and (b). Because the full extent of the State's damages is still unknown, and the State is presently assessing the breadth of its damages, the State may make additional presentments to the Defendants.

4

**Dkt. 1872, ¶ 217 at p. 47**.  These allegations fail to establish that (1) the State of Alabama's claims have been presented to the OPA Responsible Party <u>and</u> (2) either the Responsible Party denied all liability for the claim <u>or</u> the claim was not settled by any person by payment within ninety days after the date of presentment or advertisement.[1]  Further, the State of Alabama fails to allege <u>any</u> presentment as to Transocean for the release of diesel on the surface of the water from the *Deepwater Horizon*.  Accordingly, Transocean is entitled to dismissal of Plaintiffs' OPA claims for failure to satisfy OPA's presentment requirements.

To date, Transocean (and presumably BP) has received only a demand letter, devoid of claim details.  The mere filing of a notice or demand letter without any detail is insufficient to "present" a claim and trigger the ninety-day evaluation and negotiation period.  In order to "present" a claim, a claimant must specify the amount of damages being sought, including a "sum certain," *see* 33 U.S.C. § 2701(3), ***and*** provide evidence and information sufficient for the responsible party, or its representative, to assess whether the alleged loss satisfies OPA's causation requirements and determine whether the amount of alleged damages were actually incurred.  As was held in *Johnson v. Colonial Pipeline Co.,* 830 F. Supp. 309 (E.D. Va. 1993), "the claim presented must inform the responsible party with some precision of the nature and extent of the damages alleged and of the amount of monetary damages claimed."  *Id.* at 311.  Where a claimant makes no effort to describe the nature or extent of the alleged damages, much less explain the basis for claiming that the damages have been sustained, the claimant fails "to state a sum certain for any of the types of damages alleged," and thus does not comply with

---

[1]  The State of Alabama's assertion in paragraph 217 of its First Amended Complaint that "the State has satisfied the presentment requirements" is a mere legal conclusion, which is not accepted as true for purposes of Transocean's Rule 12(b)(6) Motion to Dismiss.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009).  While legal conclusions can provide the framework of a complaint, "they must be supported by factual allegations."  *Id.* at 1950.  If the allegations in a complaint do not raise a claim of entitlement to relief, "this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court."  *Cuvillier v. Taylor,* 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007)).

OPA's presentment requirement. *Id.*; *see also Gabarick v. Laurin Mar. (AM.), Inc.,* 2009 WL 102549 at *21 (E.D. La. Jan. 12, 2009).

Despite the conclusory allegations that the State complied with OPA's presentment requirements, the State has not, in fact, satisfied the presentment requirements of OPA. The State of Alabama admits that "the full extent of the State's damages is still unknown" and "the State is presently assessing the breadth of its damages," and foreshadows that the State will make "additional presentments" to the defendants though the State failed to make even a sufficient first presentment. Accordingly, the State of Alabama's OPA Claim should be dismissed.

## III.

### TRANSOCEAN IS ENTITLED TO DISMISSAL OF ALL THE STATE OF ALABAMA'S CLAIMS FOR NEGLIGENCE, NUISANCE, TRESPASS, AND FRAUDULENT CONCEALMENT ON THE BASIS OF PREEMPTION

**A.** *All Claims Arising Out of the BP Oil Spill Are Subject to This Court's Admiralty Jurisdiction.*

The State of Alabama's claims arise out of the operations of a semisubmersible drilling rig, the *Deepwater Horizon,* a vessel, which was operating in navigable waters in the Gulf of Mexico, well beyond any state's territorial waters. For this reason, all claims arising from the BP Oil Spill are subject to this Court's admiralty jurisdiction and accompanying federal maritime law, which displaces and preempts state common law. [2]

Under the U.S. Constitution's Admiralty Clause, the judicial power of the United States extends to "all Cases of admiralty and maritime jurisdiction." U.S. CONST. Art. III, § 2, cl.1. This is not only a grant of authority to adjudicate, but also a statement that affirms the reception into the United States of a substantive body of admiralty law and implicitly authorizes Congress

---

[2]  If not dismissed, the state common law claims asserted in the State of Alabama's Complaint as to Transocean remain subject to the limitation injunction, stay, and restraining order entered by the Court (Judge K. Ellison) on June 14, 2010, in C. A. No. 4:10-cv-1721 [after transfer, 10-2771]. *Van Schaeffer v. Tsakos Shipping & Trading, S.A.,* CIV. A. 05-4486, 2006 U.S. Dist. LEXIS 25304, 2006 WL 1192939 (E.D. Pa. May 2, 2006).

to pass legislation in this field.  *Norfolk Southern Ry. v. James N. Kirby, Pty. Ltd.,* 543 U.S. 14, 22-23 (2004); *see also THE LOTTAWANNA*, 88 U.S. 558, 572-78 (1874).  Acting under the Admiralty Clause, Congress vested federal courts with original and exclusive jurisdiction over "admiralty or maritime" matters.  *See* 28 U.S.C. § 1333(1).  In 1948, Congress extended admiralty jurisdiction to "cases of injury or damage, to person or property, caused by a vessel on navigable waters even though the injury or damage is done or consummated on land."  *See* Admiralty Extension Act ("AEA"), 46 U.S.C. § 30101.[3]

If the location and connection-to-maritime-activity tests are satisfied, admiralty tort jurisdiction exists.[4]  *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 534 (1995).  The *location test* requires the tort to have occurred on navigable waters or, for an injury suffered on land, to have been caused by a vessel on navigable waters.  *Id.* (citing AEA); *see also Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453, 455-56 (5th Cir. 1999).  The *connection-to-maritime-activity test* has two subparts:

> A court, first, must assess the general features of the type of incident involved to determine whether the incident has a ***potentially disruptive impact on maritime commerce***.  Second, a court must determine whether ***the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity***.

*Grubart*, 513 U.S. at 534 (emphasis added; internal citations and quotation marks omitted); *see also, e.g., Texaco Exploration & Prod. Inc. v. AmClyde Engineered Prods. Co.*, 448 F.3d 760, 770-71 (5th Cir. 2006); *Strong v. B.P. Exploration & Prod., Inc.,* 440 F.3d 665, 669 (5th Cir.

---

[3]   The test for jurisdictional purposes under the AEA is whether the Plaintiffs allege that their injuries were caused by a vessel on navigable waters.  In the State of Alabama's Complaint, it is alleged that:  "On April 20, 2010, a blow-out, explosion and multiple fires occurred aboard the mobile offshore drilling rig *Deepwater Horizon*, resulting in the sinking of the *Deepwater Horizon* and an oil spill in the Gulf of Mexico (the "Spill") and has caused, is causing, and will continue to cause, damage to the State of Alabama."  **Dkt. 1872, ¶ 1 at p. 1.**  These allegations satisfy the AEA's jurisdictional test.  The Transocean Defendants do not concede, however, that the BP Oil Spill was caused by the *Deepwater Horizon*.

[4]   The AEA serves as an independent basis for admiralty jurisdiction, even if the connection to maritime activity and location tests are not satisfied.  *Tagliere v. Harrah's Illinois Corp.*, 445 F.3d 1012 (7th Cir. 2006).

2006). "The key inquiry is whether the allegedly tortious activity is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand." *Strong,* 440 F.3d at 669 (citations and internal quotation marks omitted).

There can be no legitimate dispute that this Court has admiralty jurisdiction over the State of Alabama's claims. First, the *Deepwater Horizon* was a semisubmersible drilling rig. Courts have held that this type of rig is a vessel for general maritime law purposes. *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 495-97 (2005); *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1314 n.5 (5th Cir. 1986); *see also* 1 U.S.C. § 3. And, the Gulf of Mexico is a navigable body of water. Accordingly, the location test is met because the State's claims arise from alleged injuries involving a vessel (*Deepwater Horizon*) on navigable water (Gulf of Mexico).

Second, applying *Grubart*, *supra*, the connection-to-maritime activity test is met despite the fact that the State of Alabama's Claims may involve injuries on land. Specifically, the BP Oil Spill had the potential to, and did in fact, disrupt maritime commerce in the Gulf of Mexico and unquestionably bears a substantial relationship to a traditional maritime activity—a casualty involving an explosion, fire, and subsequent sinking of a vessel. *Grubart,* 513 U.S. at 528, 539 ("damage by a vessel in navigable water to an underwater structure" had "a potentially disruptive impact on maritime commerce" because the incident "could lead to restrictions in the navigational use of the waterway" and to "disruption of the watercourse itself"); *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 669, 674 (1982) (admiralty jurisdiction over claims arising from "operation of a vessel on navigable waters. . . ."); *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 269-70 (1972).

**B.**     *Admiralty Jurisdiction Requires the Application of Federal Admiralty Law.*

"It is well-settled that the invocation of federal admiralty jurisdiction results in the application of federal admiralty law rather than state law."   *State of La. ex rel. Guste v M/V TESTBANK*, 752 F.2d 1019, 1031-32 (5th Cir. 1985) (en banc), *cert. denied,* 477 U.S. 903 (1986) (citations omitted).   *See, e.g.*, *Norfolk Southern Ry.,* 543 U.S. at 14, 22-23; *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986); *Kossick v. United Fruit Co.,* 365 U.S. 731, 738-39 (1961); *Freeport Sulphur Co. v. S.S. HERMOS,* 526 F.2d 300, 302 n.2 (5th Cir. 1976).   Within its sphere of operation, the maritime law of the United States is supreme, and the states are without power to disrupt it:

> [T]he "saving to suitors" clause allows state courts to entertain *in personam* maritime causes of action, but in such cases the extent to which state law may be used to remedy maritime injuries is constrained by a so-called "reverse-*Erie*" doctrine which requires that the substantive remedies afforded by the States conform to governing federal maritime standards.

*Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 222-23 (1986).

The Supreme Court laid the foundation of the supremacy of admiralty law over state law in a series of cases more than ninety years ago.   *See Knickerbocker Ice Co. v. Stewart,* 253 U.S. 149, 160 (1920); *Chelentis v. Luckenbach S.S. Co.,* 247 U.S. 372, 382 (1918); *S. Pac. Co. v. Jensen,* 244 U.S. 205, 217-18 (1917).   Although the broad pronouncements of those early cases have been often hedged and qualified, *see, e.g.*, *Romero v. Int'l Terminal Operating Co.,* 358 U.S. 354, 373-75 (1959), their core meaning remains: "If there is any sense at all in making maritime law a federal subject, then there must be some limit set to the power of the states to interfere in the field of its working."   GRANT GILMORE & CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY § 1-17, at 48 (2d ed. 1975).   Generally stated, the Supremacy Clause analysis in the maritime law context is this: "Although state law may supplement maritime law where maritime law is silent, or where a local matter is at issue, state law may not be applied where it would

conflict with maritime law." *Coastal Iron Works, Inc. v. Petty Ray Geophysical,* 783 F.2d 577, 582 (5th Cir. 1986) (citations omitted).  Put another way, while state law occasionally may be used to fill the gaps in an incomplete and less than perfect maritime system, state law may <u>never</u> be employed to contravene an act of Congress, to prejudice the characteristic features of the maritime law, or to disrupt the harmony maritime law strives to bring to international and interstate relations. *J. Ray McDermott v. The VESSEL MORNING STAR,* 457 F.2d 815, 818 (5th Cir. 1972) (en banc), *cert. denied,* 409 U.S. 948 (1972).

**C.     OPA is Comprehensive in Scope in Providing Remedies for Alabama's Oil Spill Damages.**

Admiralty law is characterized by both federal statutory law and judicially-created general maritime law.[5]  Congress has spoken comprehensively in the admiralty law field of oil pollution damages by enacting OPA.  *See, e.g.,* S. REP. NO. 101-94, *reprinted in* 1990 U.S.C.C.A.N. 722, 730 (OPA "creates a single federal law providing clean-up authority, penalties and liability for oil pollution").  And, the courts have routinely recognized the comprehensive nature of OPA based on OPA's provision of broad remedies for persons damaged as a result of a maritime pollution incident.  *See, e.g., Tanguis v. M/V WESTCHESTER*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001) ("OPA 'represents Congress' attempt to provide a comprehensive frame work in the area of marine oil pollution'"); *Targa Midstream Servs. Ltd. P'Ship v. K-FC Transp. Partners, L.P.,* No. Civ. A. G-05629, 2006 WL 2520914, at *2 (S.D.

---

[5]    General maritime law is "subject to the paramount authority of Congress." *New Jersey v. New York,* 283 U.S. 336, 348 (1931).  In the case of conflict between the two, it is the statutory law that prevails.  *Miles v. Apex Marine Corp.*, 498 U.S. 19, 31-33 (1990).  Furthermore, congressional legislation preempts the general maritime law "if it speaks directly to the question at issue." *Barnes v. Andover Co., L.P.*, 900 F.2d 630 (3d Cir. 1990) (*en banc*); *see also, In Re Air Disaster Near Honolulu, Hawaii,* 792 F. Supp. 1541 (N.D. Cal. 1990).  Thus, admiralty recognizes "horizontal" preemption of the federal maritime common law by federal statutory law.  Accordingly, when Congress speaks, especially when it speaks comprehensively, it may displace pre-existing general maritime law.  *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 314 (1981); *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1 (1981).  Indeed, there is a presumption of displacement when a new federal statute is adopted to control a particular subject area.  *City of Milwaukee, supra,* at 314.

Tex. Apr. 20, 2006) ("OPA created a stricter and more comprehensive liability scheme for oil spill pollution than had existed under prior legislation. . . ."); *see also Gatlin Oil Co. v. United States,* 169 F.3d 207, 209 (4th Cir. 1999) (Congress enacted OPA to provide a "prompt, federally-coordinated response to oil spills in navigable waters of the United States and to compensate innocent victims").

It is, therefore, of no surprise that courts have found OPA to displace other laws.[6] *S. Port Marine LLC v. Gulf Oil Ltd. P'Ship,* 234 F.3d 58, 65-66 (1st Cir. 2000). In *South Port*, the court held that punitive damages were not available under OPA because "Congress's very specific treatment of oil pollution in OPA, which does not provide for punitive damages, supplanted general admiralty and maritime law, which has traditionally provided for the general availability of punitive damages for reckless conduct." *Id.* at 65. In a similar fashion, other courts have agreed that OPA displaces general maritime law, and general maritime law preempts state common law, *infra* III.D*,* where OPA provides a remedy. *Tanguis*, 153 F. Supp. 2d at 867; *Gabarick,* 623 F. Supp. 2d at 750-51; *Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.,* 924 F. Supp. 1436, 1447 (E.D. Va. 1996), *aff'd,* 122 F.3d 1062 (4th Cir. 1997), *cert. denied,* 523 U.S. 1021 (1998); *Seaboats, Inc. v. Alex C Corp.,* Nos. Civ. A. 01-1284-DPW, 2003 WL 203078, at *11 (D. Mass. Jan. 30, 2003).

No matter how artfully pleaded, the State of Alabama's claims are cognizable under OPA, as it seeks relief for precisely the types of damages Congress enumerated in OPA's Section 2702(b)(2). Pursuant to OPA, the State may recover a broad range of damages from a Responsible Party, including:

---

[6]   Transocean generally uses the term "preemption" or "displacement" in the context of a choice of law principle whereby federal maritime law is supreme and state law remedies that conflict with maritime law are not legally cognizable for a plaintiff in the event of such a conflict. *See, e.g.*, *Lauritzen v. Larsen,* 345 U.S. 571 (1953); *American Dredging Co. v. Miller,* 510 U.S. 443 (1994). In this regard, Section 2718(a) of OPA does not save common law claims that were not viable due to a conflict with maritime law before and after enactment of OPA.

**(A)      Natural resources**

Damages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage, which shall be recoverable by a United States trustee, a State trustee, an Indian tribe trustee, or a foreign trustee.

**(B)      Real or personal property**

Damages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property.

**(C)      Subsistence use**

Damages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources.

**(D)      Revenues**

Damages equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by the Government of the United States, a State, or a political subdivision thereof.

**(E)      Profits and earning capacity**

Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant.

**(F)      Public services**

Damages for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, caused by a discharge of oil, which shall be recoverable by a State, or a political subdivision of a State.

33 U.S.C. § 2702(b)(2).

     The State of Alabama's First Amended Complaint seeks recovery for what it describes as

"environmental damages" and "economic damages."   The State describes its environmental

damages as "past, present, and future harm to, and contamination of, the State's waters, property, estuaries, seabeds, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources." **Dkt. 1872, ¶ 82 at p. 21.**  It further alleges that there is a wide variety of valuable fish species that "have been and will continue to be harmed by the Spill" and, as sunken and dispersed oil resurfaces, "additional harm to marine ecosystems will occur and continue." **Dkt. 1872, ¶ 84 at pp. 21-22.**

The State of Alabama describes its "economic damages" as "a loss of income for individuals and entities in Alabama" that "has, is, and will continue to result in a loss of revenue for the State."  The State of Alabama further alleges a decrease in Gulf-related tourism, **Dkt. 1872, ¶ 86 at p. 22**, and economic damage, "as a result of the Moratorium issued by the MMS." **Dkt. 1872, ¶ 87 at p. 22**.

Each of these categories of damages is covered and provided for under OPA's Section 2702(b)(2)(A)-(F).  Thus, OPA displaces general maritime law, and general maritime law preempts state common law, *infra* III.C, leaving only a narrowly defined authority for states to enact mini-OPAs or similar legislation.

**D.      General Maritime Common Law Would Preempt All State Common Law Claims Even If OPA Had Not Been Enacted.**[7]

General maritime law applies to the BP Oil Spill, *supra* III.B, and preempts the Plaintiffs' state common law claims even absent the comprehensive scheme set forth in OPA.  In *State of Louisiana ex rel. Guste v M/V TESTBANK,* the *en banc* Fifth Circuit ruled that federal maritime law preempts state common law claims for negligence and public nuisance in maritime vessel pollution cases.  752 F.2d 1019, 1031-32 (5th Cir. 1984), *cert. denied,* 477 U.S. 903 (1986).  In

---

[7]      To the extent not preempted by OPA, any general maritime common law claims asserted in the State of Alabama's First Amended Complaint against Transocean remain subject to the Limitation injunction, stay, and restraining order entered by the Court (Judge K. Ellison) on June 14, 2010, in C. A. No. 4:10-cv-1721 [after transfer, 10-2771].  *United States v. BIG SAM,* 681 F.2d 432 (5th Cir. 1982).

*TESTBANK*, containers aboard a vessel spilled more than twelve tons of pentachlorophenol in the Mississippi River Gulf Outlet, which is located entirely within the territorial waters of Louisiana.   Certain claimants alleged, among other things, liability under Louisiana state negligence and public nuisance law.  *Id.*   The *en banc* Fifth Circuit held that such state claims were foreclosed under the rule of *Robins Dry Dock,* a decision that precludes damages for economic loss resulting from the defendant's negligence absent physical harm to person or to property in which the plaintiff has a proprietary interest.  *Id.* (discussing *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 308-09 (1927)).   In so doing, the *en banc* Fifth Circuit reasoned:

> While our maritime decisions are informed by common law developments in the state courts, there is no requirement, as in diversity cases, that state law be adopted.  Indeed the federal interest in protecting maritime commerce is often best served by the establishment of uniform rules of conduct.  We believe that such is the case here. . . .  To permit recovery here on state law grounds would undermine the principles we seek to preserve today. ***Accordingly, we decline to adopt plaintiffs' state law claims as theories of recovery.***

*TESTBANK*, 752 F.2d at 1032 (emphasis added).  Furthermore, although the specific holding in *TESTBANK* addressed only state law claims based on negligence and nuisance, in *Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.,* the Fifth Circuit ruled that federal law applied to a trespass claim, in a matter falling within the court's admiralty and maritime jurisdiction. 959 F.2d 49, 53 (5th Cir. 1992).   The *Marastro* Court ruled that a federal court sitting in admiralty necessarily should borrow from a variety of sources of federal law "rather than state law which would 'impair the uniformity and simplicity which is a basic principle of the federal admiralty law. . . .'"  *Id.* (quoting *Nissan Motor Corp. v. Md. Shipbuilding,* 544 F. Supp. 1104, 1111 (D. Md. 1982), and citing *Byrd v. Byrd*, 657 F.2d 615, 617-618 (4th Cir. 1981)).   According to the *Marastro* Court, federal general common law "should control to

14

determine the law of maritime trespass, in order to promote uniformity in general maritime law." *Id.* at 53.

Because of the controlling *en banc* Fifth Circuit decision in *TESTBANK* and the Fifth Circuit's later decision in *Marastro*, the State of Alabama's state common law claims for negligence, gross negligence, nuisance, and trespass are preempted and must be dismissed. But further, dismissal of all of these state claims, and any state claims based upon fraudulent concealment, is also warranted under the distinctive features of admiralty preemption.

Under the admiralty preemption doctrine, to determine when state law may supplement general maritime law, federal courts sitting in admiralty consider several factors. *See, e.g.*, *Exxon Corp. v. CHICK KAM CHOO*, 817 F.2d 307, 316-18 (5th Cir. 1987), *rev'd on other grounds,* 486 U.S. 140 (1988). *CHICK KAM CHOO* identified five factors that inform maritime preemption analysis. Four of the five factors are operative here: (1) state law is not preempted when it contains a detailed scheme to fill a gap in maritime law; (2) state law is not preempted when the law regulates behavior in which the state has an especially strong interest via its "police power"; (3) maritime law preempts state law whenever a uniform rule will facilitate maritime regulation; and (4) maritime law preempts state law when the state law impinges on international or interstate relations. *Id.* at 316-19.

Applying the *CHICK KAM CHOO* factors to this case, the State of Alabama cannot use state common law to displace substantive maritime law. First, by reason of well-entrenched maritime comparative fault,[8] economic loss,[9] and indemnity and contribution doctrines,[10] it cannot be suggested that state common law negligence, gross negligence, nuisance, trespass, and

---

[8]   *See generally United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975); *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406 (1953).

[9]   *See generally Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927).

[10]   *See generally Cooper Stevedoring Co. v. Fritz Kopke, Inc.*, 417 U.S. 106 (1974).

fraudulent concealment principles provide detailed distinctions that are absent from or of little concern to federal maritime law.  Of course, the states have a legitimate interest in protecting their coastlines and their economies related to fishing and similar industries.  But, as set forth above, the Fifth Circuit has recognized that the general maritime law should be applied to claims for pollution damage caused by vessels operating on navigable waterways. *TESTBANK*, 752 F.2d at 1032; s*ee, e.g.*, *IMTT-Gretna v. ROBERT E. LEE SS*, 993 F.2d 1193, 1195 (5th Cir. 1993), *supplemented by* 999 F.2d 105 (5th Cir. 1993); s*ee also In re Taira Lynn Marine Ltd.,* No. 5, LLC, 444 F.3d 371, 377 (5th Cir. 2006).

More significantly, given the *en banc* Fifth Circuit's decision in *TESTBANK*, the State cannot genuinely contend that displacement of general maritime law with state land-based torts of negligence, gross negligence, public and private nuisance, trespass, and fraudulent concealment would not conflict with the characteristic features of maritime law and defeat its desired uniformity.  If the State of Alabama were allowed to supplant clearly applicable substantive law—the general maritime law—with state common law claims, then Transocean would be subjected to claims under Alabama, Florida, Texas, Louisiana, Mississippi, and other states that each apply their own set of laws.  Such would be counter to uniformity principles that general maritime law seeks and would subject Transocean to a variety of legal regimes that are wholly inconsistent with entrenched maritime legal doctrines, including limitations on damages under *Robins Dry Dock*, and, depending upon the state, maritime comparative fault and indemnity and contribution principles.[11]  Applying a variety of Gulf state common laws to the BP Oil Spill would displace important components of the maritime tort regime and defeat the

---

[11]  *See, e.g., State of Md. Dep't. of Natural Res. v. Kellum,* 51 F.3d 1220, 1221 (4th Cir. 1995) (holding that Maryland statute imposing strict liability for damages to oyster bar was preempted by federal maritime law).

objective of uniformity.[12]  Thus, federal general maritime law preempts the State of Alabama's common law claims.  For this additional reason, Plaintiffs' claims under state common law must be dismissed with prejudice.

**E.     This Court Has Exclusive Jurisdiction Over the State's Claims Under OCSLA and, Under OCSLA, Federal Law Preempts All State Claims.**

In the State of Alabama's First Amended Complaint, there is no specific mention of OCSLA; however, the State acknowledges that the BP Oil Spill arises out of "oil exploration, drilling and production-related operations in Mississippi Canyon Block 252, the location known as 'Macondo' where the Spill originated." **Dkt. 1872, ¶ 8 at p. 3.**  Therefore, notwithstanding the Complaint's lack of any explicit reference to OCSLA, all claims are still subject to OCSLA[13] because it declares that "the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition . . . ."  43 U.S.C. § 1332(1).  OCSLA thus establishes "national authority over the OCS at the expense of both foreign governments and the governments of the individual states."  *Tenn. Gas Pipeline v. Houston Cas. Ins. Co.,* 87 F.3d 150, 153 (5th Cir. 1996).  Stated another way,

---

[12]  *TESTBANK*, 752 F.2d at 1032.  For example, in *Norfolk & Portsmouth Belt Line R. Co. v. M/V MARLIN,* 2:08-CV 134, 2009 WL 1974298 (E.D. Va. Apr. 3, 2009), a vessel went outside the navigation channel and allided with a railroad bridge.  The Eastern District of Virginia found that applying state law would "upset uniformity principles within maritime law because it would require a different calculation of damages depending upon the location of the allision or the property affected."  *Id.* at *4.  Similarly, allowing the State of Alabama to supplement its claims with state common law as to this incident would create an unharmonious situation in which a different outcome could arise in each state where oil allegedly washed ashore.

[13]  Courts have previously held that the failure to refer specifically to OCSLA does not transform a federal claim over which federal courts have jurisdiction into a state law claim.  *See, e.g., Fields v. Pool Offshore, Inc.,* No. Civ. A. 97-3170, 1997 WL 767634, at *3 (E.D. La. Dec. 8, 1997) ("The fact that plaintiff's state court petition did not invoke jurisdiction under OCSLA is not dispositive . . ."); *White v. Chevron, USA, Inc.,* CIV. A. No. 90-113, 1990 WL 28167, at *1 (E.D. La. Mar. 14, 1990) ("Although in this case, the plaintiffs did not plead OCSLA in their state court petition but only alleged state causes of action, the statute and the jurisprudence clearly demonstrate that because this action arose on the outer continental shelf, the plaintiffs' exclusive remedy is pursuant to OSCLA."); *see also Cameron Offshore Boats, Inc. v. Alpine Ocean Seismic Surveys,* 862 F. Supp. 1578, 1584 (W.D. La. 1994) (court had jurisdiction although "petition does not specifically refer to OCSLA").  It is, therefore, irrelevant that the State bases its claims on state common law.  Nor would it be relevant if the State sought to circumvent OCSLA by asserting that it will never at any time in the future plead any claim or cause of action arising under any federal law.  The Fifth Circuit has found OCSLA jurisdiction even when the plaintiff "admits forthrightly that it attempted to craft its lawsuit to avoid federal removal jurisdiction."  *Tenn. Gas Pipeline v. Houston Cas. Ins. Co*., 87 F.3d 150, 152 (5th Cir. 1996).  The State cannot avoid the force of OCSLA through clever pleading or omission of any reference to OCSLA.

"OCSLA's jurisdictional grant is broad, and the Act covers a wide range of activity occurring beyond the territorial waters of the states on the outer continental shelf of the United States." *Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co.,* 448 F.3d 760, 768 (5th Cir. 2006) (citations and internal quotations omitted).

The purposes of OCSLA are many, and embrace not only development and production of mineral resources on the Shelf, but also (i) protection of the environment, including wildlife; (ii) consideration of the interests and input of affected states and local governments; and (iii) harmonization of OCSLA with the operations of the Oil Pollution Act of 1990, which established the Oil Spill Liability Trust Fund. Specifically, OCSLA is intended to:

> * * *
>
> (2)      preserve, protect, and develop oil and natural gas resources in the Outer Continental Shelf in a manner which is consistent with the need (A) to make such resources available to meet the Nation's energy needs as rapidly as possible, (B) to balance orderly energy resource development with protection of the human, marine, and coastal environments, (C) to insure the public a fair and equitable return on the resources of the Outer Continental Shelf, and (D) to preserve and maintain free enterprise competition;
>
> * * *
>
> (4)      provide States, and through States, local governments, which are impacted by Outer Continental Shelf oil and gas exploration, development, and production with comprehensive assistance in order to anticipate and plan for such impact, and thereby to assure adequate protection of the human environment;
>
> * * *
>
> (8)      *establish an oil spill liability fund* to pay for the prompt removal of any oil spilled or discharged as a result of activities on the Outer Continental Shelf and for any damages to *public or private interests* caused by such spills or discharges;
>
> * * *

43 U.S.C. § 1802 (emphasis added).

18

National authority over the OCS is exercised in two interconnected ways.  First, OCSLA "makes federal law exclusive in its regulation of the OCS," except where substantial gaps exist in the coverage of federal law.  *Tenn. Gas Pipeline,* 87 F.3d at 153; *see also* 43 U.S.C. § 1333; *Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 480-81 (1981).  Second, OCSLA grants federal district courts broad jurisdiction to decide *any* dispute "arising out of, or in connection with" operations conducted on the OCS:

> [T]he district courts of the United States shall have jurisdiction of cases and controversies arising out of or in connection with (A) **any** operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals. . . .

43 U.S.C. § 1349(b)(1) (emphasis added); s*ee also EP Operating Ltd. P'ship v. Placid,* 26 F.3d 563, 569 (5th Cir. 1994) ("[B]road reading of the jurisdictional grant of section 1349 is supported by the expansive substantive reach of the OCSLA."); *Tenn. Gas Pipeline*, 87 F.3d at 154 (OCSLA's jurisdictional grant is "very broad").  Precisely because the jurisdictional grant of OCSLA is so "broad," the Fifth Circuit has recognized that "the Act covers a wide range of activity occurring beyond the territorial waters of the States on the Outer Continental Shelf." *Texaco Exploration & Prod. Inc.,* 448 F.3d at 768 (citations and quotations omitted); *see also Walsh v. Seagull Energy Corp.*, 836 F. Supp. 411, 417 (S.D. Tex. 1993) (observing that there can be "no dispute" that the "jurisdictional grant of OSCLA is **more broad** than [the coverage of OCSLA under section 1333(a)(1)]" (emphasis added)).

In deciding whether OCSLA's broad jurisdictional grant of federal authority gives a court jurisdiction, the courts routinely perform a two-part analysis.  This Court previously performed the two-part inquiry in an action filed by the State of Louisiana in this MDL.  *See In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on the April 20, 2010,* 2:10-md-02179, Rec. Doc. 470 (E.D. La. Oct. 6, 2010).  In that action, the State of Louisiana filed suit

against various BP entities for economic losses associated with the BP Oil Spill.  BP removed

the action, and the State filed a motion to remand.  BP opposed, arguing that Section 1349 of

OCSLA clearly supported the Court's original subject matter jurisdiction and, therefore,

removal.  In considering whether OCSLA's broad jurisdictional grant applied to the BP Oil Spill,

this Court ruled that Section 1349 of OCSLA vested this Court with original jurisdiction.

Specifically, this Court held:

> Defendants were exploring and producing minerals, namely oil,
> from the Outer Continental Shelf.  It is these activities that
> allegedly caused the April 20, 2010 explosion and the resulting oil
> spill.  For these reasons, this Court finds that Defendants' activities
> should be classified as an "operation conducted on the Outer
> Continental Shelf, which involved the exploration and production
> of minerals."  Therefore, Defendants were conducting an operation
> as defined under § 1349.
>
> * * * *
>
> These facts clearly satisfy the "but-for" test because the oil and
> other contaminants would not have entered into the State of
> Louisiana's territorial waters "but for" Defendants' drilling and
> exploration operation.  Accordingly, it is clear that original
> jurisdiction rests with this Court pursuant to § 1349(b)(1).

*Id.* at *5-8.

The Northern District of Florida also has held that OCSLA's broad jurisdictional grant

applies to economic loss claims arising from the BP Oil Spill: "As a matter of plain English,

§ 1349(b)(1) provides federal jurisdiction over the Plaintiff's claim, because the claim arises out

of, and is connected with, the *Deepwater Horizon*'s oil-related operations on the Continental

Shelf.  ***That begins and ends the proper analysis of the jurisdictional issue as presented in this***

***case.***"  *See Phillips v. BP PLC*, 4:10-cv-00259-RH-WCS, Rec. Doc. 19 (N.D. Fla. Aug. 17,

2010) (emphasis added).

When OCSLA applies, it "makes federal law exclusive in its regulation of the OCS . . . ."

*Tenn. Gas Pipeline*, 87 F.3d at 153; *see also Gulf Offshore*, 453 U.S. at 480-81.  To fill any

"gaps" in federal legal coverage, OCSLA provides that the applicable law of the adjacent state may be applied as "surrogate federal law," but <u>only</u> to the extent state law is not "inconsistent . . . with other Federal laws . . . now in effect or hereafter adopted . . . ."  43 U.S.C. § 1333(a)(2)(A); *Gulf Offshore,* 453 U.S. at 480-81; *see also Hufnagel v. Omega Serv. Indus., Inc.,* 182 F.3d 340, 349 (5th Cir. 1999); *EP Operating Ltd. P'ship,* 26 F.3d at 566; *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1052 (5th Cir. 1990) (hereinafter "*PLT*") ("Any other result here would frustrate the Congressional purpose that the OCS be treated as an area of exclusive federal jurisdiction within the state where state law will apply to fill in the gaps in the federal law.")[14]

The Fifth Circuit has adopted a three-part test to answer the question of when, if ever, state law may be applied to shelf activities.  *PLT*, 895 F.2d at 1047.  Under the *PLT* test, for state law to apply as "surrogate" federal law, three preconditions must be met: (1) the controversy must arise on a situs covered by OCSLA, (2) federal maritime law must not apply of its own force, and (3) the state law must not be inconsistent with federal law.  *Id.*; *see, e.g.*, *Gardes Directional Drilling v. U.S. Turnkey Exploration,* 98 F.3d 860, 864-65 (5th Cir. 1996).

For the reasons set forth previously, *supra* III.C, OPA, a federal law, applies of its own force to the State's claims and controls to the exclusion of state common law.  There is thus no

---

[14]  In amending OCSLA to expand its coverage in 1978, the House Select Committee on the Outer Continental Shelf observed in its report that:

> It is thus made clear that **Federal** law is to be applicable to all activities on all devices in contact with the seabed for exploration, development, and production. The committee intends that **Federal law is, therefore, to be applicable to** activities on drilling ships, **semi-submersible drilling rigs**, and other watercraft, when they are connected to the seabed by drillstring, pipes, or other appurtenances, on the OCS for exploration, development, or production purposes.

H. R. Rep. No. 95-590, at 128 (1977) (emphasis added), *reprinted in* 1978 U.S.C.C.A.N. 1450, 1534.

"gap" in federal legal coverage to fill with state law.[15]  And, to the extent OPA is not the State's exclusive remedy, general maritime law controls, to the exclusion of state common law.  There is still no "gap" in federal legal coverage to fill in with state law.  It, therefore, follows that state common law may not apply as "surrogate federal law" to the BP Oil Spill, as federal law (either OPA or general maritime law) preempts state common law.  Accordingly, all the state common law claims must be dismissed pursuant to Rule 12(b)(6).

### F.    *OPA's Section 2718(a) Neither Creates Nor Saves Any State Common Law Claims.*

OPA's Section 2718(a)(1) preserves the authority "of any State or political subdivision" to enact mini-OPAs to impose "additional liability" with respect to "the discharge of oil . . . within such State . . . ."  This narrowly crafted provision states:

### § 2718.  Relationship to other law

**(a)     Preservation of State authorities; Solid Waste Disposal Act**

Nothing in this chapter or the Act of March 3, 1851 shall—

(1)     affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to—

(A)     the discharge of oil or other pollution by oil within such State; or

(B)     any removal activities in connection with such a discharge; or

(2)     affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) or State law, including common law.

---

[15]     OCSLA may borrow the "applicable" and not inconsistent laws of an adjacent state as "surrogate" federal law.  "Applicable," according to the Fifth Circuit, must be read as "necessity to fill a significant void or gap."  *Le Sassier v. Chevron USA, Inc.*, 776 F.2d 506, 509 (5th Cir. 1985).  If a federal statutory scheme gives rise to a remedy, federal law applies to the exclusion of state law.  *Id.*  OPA is a federal law which provides a remedy to oil spill victims.  Thus, OPA eliminates any such "gap" in federal legal coverage for the State's claims.  *See, supra,* III.C, referring to the broad range of damages recoverable from a responsible party under OPA.

33 U.S.C. § 2718(a).  Section 2718(a) does not save Alabama's state common law claims from preemption.

OPA governs the discharge of oil from both onshore facilities and offshore facilities. Congress therefore was mindful of the states' interests of regulating facilities sitting within a state's borders.  Section 2718 makes perfect sense when understood in this context.  Section 2718 cannot be read to abrogate general maritime law, as Section 2718(a)(2) does not disturb the long-standing and established admiralty preemption of state common law claims.  In fact, OPA contains an actual "savings provision," but this savings provision is located in OPA's subchapter III.  In Section 2751(e)(1), OPA provides:

> **(e)     Admiralty and maritime law**
>
> Except as otherwise provided in this chapter, this chapter does not affect—
>
> (1)     admiralty and maritime law;

33 U.S.C. § 2751(e)(1).

Further, by its own explicit terms, Section 2718(a) provides that "[n]othing in this chapter [OPA] or the Act of March 3, 1851 [the Shipowners' Limitation of Liability Act] shall – (2) affect, or be construed or interpreted to affect or modify . . . State law, including common law."  33 U.S.C. § 2718(a)(2) (bracketed expressions added).  General maritime law is neither OPA nor the Shipowners' Limitation of Liability Act, to which Section 2718(a) refers.  As set forth previously, *see supra* III.D, general maritime law applies to the State of Alabama's claims because they arise from the explosion and sinking of a semisubmersible drilling rig, the *Deepwater Horizon*, a vessel operating in the navigable waters of the United States.  And, general maritime law prohibits application of state common law under the admiralty preemption doctrine.

Section 2718(a), which appears under the subtitle "Preservation of State authorities," preserves to the states the right to pass mini-OPA legislation. It does not create any new state law, nor does it permit the application of state law to claims that arise squarely within admiralty's jurisdiction, particularly when the state laws are otherwise in conflict with maritime law.[16] The import of OPA's actual savings clause relating to admiralty and maritime law is clear: OPA "does not affect – (1) admiralty and maritime law. . . ." And, admiralty and maritime law is clear: State law may never apply when it conflicts with admiralty law.

Moreover, Section 2718(a)(2) does not save state common law claims from OCSLA preemption. By its own explicit terms, Section 2718(a) provides that nothing in OPA or in the Limitation of Liability Act shall affect or modify state law, including common law that existed at the time of OPA's enactment. OCSLA is neither OPA nor the Shipowners' Limitation of Liability Act, to which Section 2718(a) refers. OCSLA, which applies to this blowout arising from shelf drilling activities, applies federal maritime law, preempting application of state common law.

Judge Edith Brown Clement's opinion in *Muse v. Freeport McMoran, Inc.,* CIV. A. 91-4247, 1992 U.S. Dist. LEXIS 13397, 1992 WL 233771 (E.D. La. Aug. 28, 1992), is instructive in this respect, although it did not deal with OPA's Section 2718(a)(2). In *Muse,* Judge Clement addressed a party's assertion of state tort claims in a matter falling within the court's maritime jurisdiction. Recognizing that, in an area in which a state's regulatory or "police" power was involved, state law may legitimately apply, the court nevertheless ruled that Louisiana Civil Code Articles 2315 to 2318 "do not represent a detailed statutory scheme or an exercise of the

---

[16]   The Fifth Circuit has repeatedly recognized that the general maritime law should be applied to claims for pollution damage caused by vessels operating on navigable water and has, on numerous occasions, specifically declined to apply state common law when it conflicts with maritime law, specifically with respect to the subject of compensating oil spill victims. *TESTBANK, supra,* 752 F.2d at 1032; *ROBERT E. LEE SS, supra*, 993 F.2d 1193; *In re Taira Lynn Marine Ltd.,* No. 5, *supra,* 444 F.3d 371, 377.

State's police power.  Instead, they embody Louisiana's fundamental tort law principles." *Muse,*

at *2.  Following from that reasoning, Judge Clement dismissed all state law claims.  *Id.*

As in *Muse*, Alabama's common law of negligence, gross negligence, nuisance, trespass,

and fraudulent concealment do not represent a detailed statutory scheme—they represent general

tort principles, an area preempted by maritime law.  Accordingly, such state common law claims

did not exist at the time OPA was enacted, OPA did not create any state common law claims, and

none of them were saved by Section 2718(a)(2).

## IV.

### THE STATE OF ALABAMA'S CLAIMS FOR "FRAUDULENT CONCEALMENT" MUST BE DISMISSED

The State's First Amended Complaint fails to state a claim for "fraudulent concealment"

under Federal Rules of Civil Procedure 9(b) and 12(b)(6).  The State of Alabama seeks to

recover against Transocean for its alleged "fraudulent concealment or suppression of material

facts concerning the Spill."  **Dkt. 1872, ¶ 265 at p. 54.**  The State alleges that Transocean

"misrepresented and concealed" the safety record and condition of the *Deepwater Horizon* and

various components of the vessel.  **Dkt. 1872, ¶¶ 704-06.**  According to the State, this "induced

the State to act or to refrain from acting to protect its property, the environment, economy of the

State, businesses, livelihoods and income."  **Dkt. 1872, ¶ 279 at p. 57.**

*A.*     *The State of Alabama's Pleading Lacks the Particularity Required by Rule 9(b).*

The State's pleadings in support of its "fraudulent concealment" claim do not meet the

heightened requirements of Federal Rule of Civil Procedure 9(b), which states that "in alleging

fraud or mistake, a party must state with particularity the circumstances constituting fraud or

mistake." FED. R. CIV. P. 9(b).  The Fifth Circuit interprets Rule 9(b) strictly, requiring the

plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when

and where the statements were made, and explain why the statements were fraudulent." *Flaherty*

*& Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 206-07 (5th Cir. 2009),

*cert. denied*, 130 S. Ct. 199 (2009) (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177

(5th Cir. 1997)).  In cases alleging an omission of facts, Rule 9(b) requires the claimant "to plead

the type of facts omitted, the place in which the omissions should have appeared, and the way in

which the omitted facts made the representations misleading." *Carroll v. Fort James Corp.*, 470

F.3d 1171, 1174 (5th Cir. 2006) (quoting *United States ex rel. Riley v. St. Luke's Episcopal*

*Hosp.*, 355 F.3d 370, 381 (5th Cir. 2004)).   A plaintiff must also allege facts showing that a

defendant had a duty to disclose the omitted facts.  *Carroll*, 470 F.3d at 1174.

    Here, the State's allegations do not provide the time, place, or contents of any

misrepresentation by Transocean, nor do the allegations connect any particular statement to an

individual speaker with regard to the condition of the *Deepwater Horizon* or its components.

With regard to Transocean's alleged concealment of material facts, the State's pleading fails to

indicate "the place in which the omissions should have appeared."  *See Riley*, 355 F.3d at 381. It

alleges no facts showing when, if ever, it was incumbent upon Transocean to disclose any

information to the State at all, nor how Transocean should have done so.  *See Carroll*, 470 F.3d

at 1174.  As a result, the State's pleading in support of its fraudulent concealment claim falls

short of the nature and degree of particularity required by Rule 9(b) and the Fifth Circuit's

interpretation thereof.   Because the State failed to satisfy Rule 9(b), its claim for fraudulent

concealment must be dismissed.

**B.    *The State of Alabama Has Failed to State a Claim Under Alabama State Law.***

    The State's allegations also fail to state a cognizable claim under the laws of Alabama.

To state a cause of action for "fraud by suppression" as provided in the Alabama Code, a

plaintiff must establish that: (1) the defendant had a duty to disclose material facts, (2) the

defendant concealed or failed to disclose those facts, (3) the concealment induced the plaintiff to

act, and (4) the plaintiff's action resulted in harm to the plaintiff. *Hughes v. Hertz Corp.*, 670 So. 2d 882, 887 (Ala. 1995) (citing *Interstate Truck Leasing, Inc. v. Bender*, 608 So. 2d 716 (Ala. 1992); ALA. CODE 1975, § 6-5-102).   The related causes of action of "deceit" and "fraudulent deceit" under §§ 6-5-104 and 6-5-105 of the Alabama Code result "from either a willful or a reckless misrepresentation or a suppression of material facts with an intent to mislead." *Hughes*, 670 So. 2d at 888.   For each of these causes of action, mere silence is not fraudulent in the absence of a duty to disclose.  A duty to disclose may arise from the particular circumstances of the case, a confidential relationship, or a request for information. *Hughes*, 670 So. 2d at 887-88. When "parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose information arises when the information is not requested." *Mason v. Chrysler Corp.*, 653 So. 2d 951, 954-55 (Ala. 1995).   Here, the State alleges no relationship with Transocean or any request for information that could support a duty to disclose under Alabama law.  In addition, the State fails to plead that Transocean intended to mislead them with the alleged misrepresentations and omissions. *See Hughes*, 670 So. 2d at 888. Accordingly, the State of Alabama's First Amended Complaint fails to state a claim for fraudulent suppression, deceit, and fraudulent deceit under the Alabama Code.

**V.**

### TO THE EXTENT THAT ITS DAMAGE CLAIMS DO NOT FLOW DIRECTLY FROM PHYSICAL DAMAGE TO A PROPRIETARY INTEREST, THE STATE'S FEDERAL MARITIME AND STATE LAW CLAIMS ARE BARRED BY THE *ROBINS DRY DOCK* RULE

To the extent that the State of Alabama asserts claims for damages that do not directly flow from physical damage to a proprietary interest, maritime and Alabama state law bar such damages under the *Robins Dry Dock* rule; therefore, the State's claims asserting these damages should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  In *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.,* 71 F.3d 198 (5th Cir. 1995), the Fifth Circuit

considered whether economic damages must have some direct tie to a plaintiff's specific physical loss or damage, or whether the *Robins Dry Dock / TESTBANK* principle simply required a showing of damage to some proprietary interest in order to open the door to recovery for all purely economic damages that were foreseeable from the initial tort. For recovery, the court held it was not enough to simply meet the requirement of showing physical damage to a proprietary interest in order to open the door to all foreseeable economic consequences. *Id.* at 203. Instead, the Fifth Circuit denied recovery of economic losses which did not directly flow from physical damage to a claimant's proprietary interest. *Id.* Therefore, to the extent that its damage claims do not flow directly from physical damage to a proprietary interest, the State's federal maritime and state law claims are barred by the *Robins Dry Dock* rule, *infra* V.A-B.

## A.    *Maritime Law Bars the State's Claims Under Robins Dry Dock*.

*Robins Dry Dock & Repair Co. v. Flint* precludes recovery for economic loss in general maritime law tort claims absent physical injury to a proprietary interest. 275 U.S. 303, 309 (1927). The Supreme Court's "unmistakable" rule of *Robins Dry Dock* has been adopted and applied repeatedly and without qualification by the Fifth Circuit. *See, e.g.*, *In re Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d at 377 ("It is unmistakable that the law of this circuit does not allow recovery of purely economic claims absent physical injury to a proprietary interest in a maritime negligence suit"); *State of La. ex rel. Guste v. M/V TESTBANK,* 524 F. Supp. at 1173 ("having reexamined the history and central purpose of the doctrine of *Robins Dry Dock* as developed in this circuit, we remain committed to its teaching"); *Reserve Mooring Inc. v. Am. Commercial Barge Line*, *LLC,* 251 F.3d 1069, 1071 (5th Cir. 2001) (denying a mooring facility's claims for lost income against barge that sank during unloading, and holding circuit "had not retreated from *TESTBANK*'s physical injury requirement"); *see also Blue Gulf Seafood, Inc. v. TransTexas Gas Corp.*, 24 F. Supp. 2d 732, 734 (S.D. Tex. 1998) (denying economic claims of

Louisiana oyster farmers leasing oyster beds in Texas, finding farmers suffered no property damage, as Texas laws limit proprietary interest in seabed to Texas corporations); *In re Settoon Towing LLC*, CIV. A. 07-1263, 2009 WL 4730969, at \*3 (E.D. La. Dec. 4, 2009) (denying oil production company's claim for economic losses for inability to access platform during oil spill cleanup, citing *Robins Dry Dock*).

The Eleventh Circuit has also recognized and "abided by" *Robins Dry Dock*. *See Kingston Shipping Co., Inc. v. Roberts*, 667 F.2d 34, 35 (11th Cir. 1982) (applying *Robins Dry Dock* to affirm dismissal of economic claims of vessels blocked in channel for twenty six days); *Miller Indus. v. Caterpillar Tractor Co.*, 733 F.2d 813, 818-19 (11th Cir. 1984).

Because the State's tort claims are barred by the well-founded and unmistakable federal maritime rule of *Robins Dry Dock*, the State may not recover for these same claims under state law. To maintain its uniformity, maritime law preempts state law when the latter is contradictory to maritime law's purpose. *IMTT-Gretna v. Robert E. Lee SS*, 993 F.2d 1193, 1195 (5th Cir. 1993) ("To allow state law to supply a remedy when one is denied in admiralty would serve only to circumvent the maritime law's jurisdiction"), *supplemented by*, 999 F.2d 105 (5th Cir. 1993); *see also In re Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d at 377 (holding claims were barred under maritime law without evidence that economic losses resulted from physical damage, and all claimants were denied recovery under state law); *Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d at 1032 (to "permit recovery here on state law grounds would undermine the principles we seek to preserve today").

**B.      *Alabama Law Bars the State's Claim Under Its Economic Loss Rule***

Alabama's state common law claims are equally precluded under Alabama law. The Alabama common law doctrine of economic loss grew from products liability claims. *Lloyd Wood Coal Co. v. Clark Equip. Co.*, 543 So. 2d 671, 674 (Ala. 1989) (adopting the economic

loss rule, finding claims for damage to a defective product would not stand in tort but in contract, and "[o]f course, an action in tort would have arisen had there been personal injury or damage to property other than the product itself"); *Harris Moran Seed Co., Inc. v. Phillips*, 949 So. 2d 916, 931-33 (Ala. Civ. App. 2006) (affirming trial court's dismissal of tort claims based on economic loss doctrine after defective product caused damage only to the product itself).

Federal courts sitting in Alabama have upheld *Robins Dry Dock*, barring claims for purely economic damages without accompanying property damage. *Louisville & Nashville R.R. Co. v. Arrow Transp. Co*., 170 F. Supp. 597, 599-600 (N.D. Ala. 1959) (citing *Robins Dry Dock* in holding railroad company could not sustain claims in admiralty or common law for loss of use of damaged bridge, as company held no possessory interest in bridge other than "a right of user," which the Alabama Supreme Court had referred to as in the nature of an easement); *see also Louisville & Nashville R.R. Co. v. M/*V BAYOU LACOMBE, 597 F.2d 469, 473-74 (5th Cir. 1979) (denying claims for pure economic loss, concluding that even if Alabama contract law determined railroad company retained property interest in contract, it had retained no aspects of ownership that would justify recovery for property damage, as company did not maintain bridge or pay for repairs). Alabama common law makes no exception for commercial fishermen alleging economic for losses without proof of property damage or physical injury.

## VI.

### PLAINTIFFS' CLAIMS UNDER ALABAMA'S ENVIRONMENTAL STATUTES MUST BE DISMISSED

Alabama alleges that the Defendants violated the Alabama Water Pollution Control Act, the Alabama Air Pollution Control Act, the Alabama Hazardous Wastes Management Act and the Alabama Solid Waste Disposal Act. The State seeks civil penalties under each of these environmental statutes. All of the Claims must be dismissed for the reasons set forth previously, *supra* II and III. OPA is the comprehensive remedy available, and Alabama has not satisfied the

presentment requirements of OPA.  Further, OCSLA jurisdiction applies, and Alabama is not the

adjacent state for purposes of filling gaps, if any, under OCSLA.  While OPA's Section 2718(a)

may have preserved Alabama's statutory environmental claims for discharges of oil at facilities

sitting within a state's borders or territorial waters, OPA could not have "preserved" what

OCSLA had already claimed as exclusively federal—that is, activities on the OCS.  For such

activities, OCSLA may borrow only the applicable, and not inconsistent, laws of an "adjacent"

state as surrogate federal law.  *Supra*, p. 22 note 15.

## VII.

### THE STATE OF ALABAMA'S CLAIMS FOR PUNITIVE DAMAGES MUST BE DISMISSED[17]

In its First Amended Complaint, the State includes a claim for "Punitive Damages"

separate from their claims for negligence, gross negligence, nuisance, and trespass.  **Dkt. 1872,**

**¶¶ 346-368 at p. 4.**  Punitive damages are not recoverable under OPA.

The Oil Pollution Act of 1990 does not specifically address the availability of punitive

damages as a remedy.  The leading case on the issue is the First Circuit's decision in *S. Port*

*Marine, LLC v. Gulf Oil Ltd. Partnership,* which held that punitive damages are not recoverable

under OPA.  234 F.3d 58, 64-66 (1st Cir. 2000).  The basis for that decision was the lack of any

statutory authority under OPA to support an award of punitive damages.  In so doing, the First

Circuit held that OPA supplanted general maritime law in this area:

> This case, however, presents an entirely different issue, namely,
> whether Congress's very specific treatment of oil pollution in the
> OPA, which does not provide for punitive damages, supplanted
> general admiralty and maritime law, which has traditionally
> provided for the general availability of punitive damages for
> reckless conduct.  This question has largely been decided for us by

---

[17]   To the extent not preempted by OPA, any general maritime common law claims for punitive damages asserted in the State of Alabama's First Amended Complaint against Transocean remain subject to the Limitation injunction, stay, and restraining order entered by the Court (Judge K. Ellison) on June 14, 2010, in C. A. No. 4:10-cv-1721 [after transfer, 10-2771].  *United States v. BIG SAM*, 681 F.2d 432 (5th Cir. 1982).

> the Supreme Court in *Miles v. Apex Marine,* 498 U.S. 19, 111 S.
> Ct. 317, 112 L.Ed.2d 275 (1990), in which the Court declined to
> supplement damage provisions of the Death on the High Seas Act,
> 46 App. U.S.C. § 762 [subsequently recodified at 46 U.S.C.
> § 30303]. The Court refused to allow recovery for loss of society
> when such damages were not provided in the statute, reasoning
> that "in an 'area covered by statute, it would be no more
> appropriate to prescribe a different measure of damage than to
> prescribe a different statute of limitations, or a different class of
> beneficiaries.'" *See Miles,* 498 U.S. at 31, 111 S. Ct. 317 (quoting
> *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 625, 98 S. Ct.
> 2010, 56 L.Ed. 2d 581 (1978)). As we indicated in *CEH,* 70 F.3d
> 694 (1st Cir. 1995), *Miles* dictates deference to congressional
> judgment "where, at the very least, there is an overlap between
> statutory and decisional law." *Id.* at 701. Such is obviously the
> case here.

*Id.* at 65-66.

The *South Port Marine* decision subsequently has been followed by an Oregon district court in *Clausen v. M/V NEW CARISSA*, 171 F. Supp. 2d 1127 (D. Or. 2001), and by this Court in *Isla Corp. v. Sundown Energy, LP*, CIV. A. 06-8645, 2007 WL 1240212 (E.D. La. Apr. 27, 2007). The holdings of this Court and the Oregon district court are sound: "Congress intended OPA defendants not to be subject to punitive damages for any property damage claim under federal law arising out of an oil spill." *Clausen,* 171 F. Supp. at 1134.[18] Indeed, "no case or commentator has suggested that the availability of punitive damages under general admiralty and maritime law survived the enactment of the OPA." *S. Port Marine, LLC,* 234 F.3d at 65. As the Ninth Circuit explained, "[s]ometimes punitive damages are allowable, sometimes they are not . . . punitive damages are not available under the Oil Pollution Act." *In re Exxon Valdez,* 270 F.3d 1215, 1226 n.14 (9th Cir. 2001) (*citing S. Port Marine, LLC,* 234 F.3d at 65). Accordingly, all punitive damage claims should be dismissed with prejudice.

---

[18]   *See also S. Port Marine LLC v. Gulf Oil L.P.,* 234 F.3d at 64: "OPA sets forth a comprehensive list of recoverable damages, including removal costs, damage to natural resources and real or personal property; loss of subsistence use of natural resources; loss of government revenues; lost profits and earning capacity; and costs of increased or additional public services occasioned by the unlawful act. Absent from that list of recoverable damages is any mention of punitive damages."

## VIII.

### ALL MORATORIUM DAMAGE CLAIMS MUST BE DISMISSED

The State of Alabama alleges that it has sustained "further economic damage as a result of the Moratorium issued by the MMS."  **Dkt. 1872, ¶ 87.**  OPA, however, only allows for the recovery of "damages" that result from an "incident."  33 U.S.C. § 2702(a).  "[I]ncident" is defined as any occurrence or series of occurrences having the same origin "resulting in the discharge or substantial threat of discharge of oil."  33 U.S.C. § 3701(14).  A responsible party may be liable under OPA only if the Plaintiffs' damages "were caused by the pollution incident," *i.e.*, the discharge or threatened discharge of oil.  *Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d at 383.  As the alleged damages were not caused by the discharge of oil, but rather resulted from the moratorium, a superseding unforeseeable cause, the State may not recover for moratorium-related damages as a matter of law under OPA, or under any other laws, state or federal. Furthermore, under OPA, the "damages" must also result from "the discharge of oil".  *In re Settoon Towing LLC*, CIV. A. 07-1263, 2009 WL 4730969, at *4.  "Damages" are defined as "damages specified in section 2702(b)."  33 U.S.C. § 2701(5).  The State of Alabama's moratorium "damages" are not in fact damages due to the injury, destruction, or loss of real property, personal property, or natural resources resulting from the discharge of oil, as required by OPA's Section 2702(b)(2)(E), but are in fact damages resulting from the moratorium. Accordingly, these claims should be dismissed.

## IX.

### ALL STIGMA DAMAGE CLAIMS MUST BE DISMISSED

The State of Alabama alleges that the "[t]he image and attractiveness of Alabama's coastline and coastline communities for development, tourism, and other purposes have suffered, are suffering, and will continue to suffer because of the known impact of the Spill, as well as the

uncertainty that will exist for years over the ongoing impact of the Spill on the Gulf of Mexico, the Gulf's natural resources, and Alabama's coastal resources and communities." **Dkt. 1872 at ¶ 3.** The State further alleges that its compensatory damages include: "Past, present, and future damages associated with the ***long-term stigma*** of the oil disaster, including the loss of use of State property, taxes, royalties, license fees, revenues and other income." **Dkt. 1872 at ¶ 92, subpart g** (emphasis added). "Stigma" damages are too remote to be recovered under general maritime law or OPA.

### A.    Stigma Damages Are Too Remote Under the General Maritime Law

Under common law, there is a well-established requirement of proximate cause. Proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged . . . a link that is 'too remote'. . . is insufficient." *Hemi Grp., LLC v. City of New York,* _____ U.S. ____, 130 S. Ct. 983, 989 (2010) (citations omitted). As the Supreme Court has explained:

> In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would have society on edge and fill the courts with endless litigation.

*Holmes v. SCC. Investor Protection Corp.,* 503 U.S. 258, 266 n.10 (1992) (internal quotations and citations omitted). In *Holmes,* the Supreme Court further reasoned:

> At bottom, the notion of proximate cause reflects "ideas of what justice demands, or of what is administratively possible and convenient." Accordingly, among the many shapes this concept took in common-law, was a demand for some direct relation between the injury asserted and the injurious conduct alleged. Thus, a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover.

*Id.* at 268-68 (internal citations omitted).

Stigma damages have been held to be too remote under general maritime law to permit recovery, because general maritime law imparts a requirement of proximate cause for the recovery of oil spill damages. *In Re: The EXXON VALDEZ*, 270 F.3d 1215, 1253 (9th Cir. 2001). In *EXXON VALDEZ*, the Ninth Circuit held that the district court had properly granted summary judgment against persons claiming stigma damages because "[e]ven without *Robins Dry Dock* these groups' damages were too remote." *Id.* Similarly, here, the State's claim for stigma damages is simply too remote to permit recovery under general maritime law.

### B.     Stigma Damages Are Too Remote Under OPA

Absent express language to the contrary, statutes, such as OPA, contain a proximate cause requirement: "[I]t has always been the practice of common-law courts (and probably of all courts, under all legal systems) to require as a condition of recovery, unless the legislature specifically prescribes otherwise, that the injury had been proximately caused by the offending conduct." *Id.* at 287 (Scalia, J., concurring). In OPA, Congress did not provide otherwise.

The OPA causation standard is set forth in OPA Section 2702:

> **(a)     In general**
>
> Notwithstanding any other provision or rule of law, and subject to the provisions of this chapter, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon, the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) that ***result from such incident***.

33 U.S.C. § 2702(a) (emphasis added). "For purposes of this Act, the term . . . incident" is defined in the previous section as:

> Any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, ***resulting in*** the discharge or substantial threat of discharge of oil[.]

*Id.* § 2702(14) (emphasis added).

This is not a mere "but-for" standard.  To the contrary, this is a standard that requires that the "discharge of oil" result in, or cause, the damages complained of—a proximate cause standard.  Indeed, it has been held that virtually identical "results from" language in the Trans-Atlantic Pipeline Authorization Act of 1993 ("TAPAA") established a proximate cause requirement—not merely a but-for requirement.  In *Benefiel v. Exxon Corp.,* 959 F.2d 805, 807 (9th Cir. 1992), the Ninth Circuit held that, under TAPAA, nearly identical language imposing liability upon a vessel owner for damages "sustained . . . as a ***result of discharges*** of oil from such vessel," included proximate cause as an element of the claim.  In *Benefiel*, the Ninth Circuit dismissed for lack of proximate causation the claims of geographically remote claimants alleging high gas prices as a result of the *EXXON VALDEZ* spill.  Thus, Californians who claimed that their gasoline cost more as a result of the *EXXON VALDEZ* oil spill were barred from recovery because of the "remote and derivative damages" they claimed, and lack of proximate cause, as a matter of law.  The court reasoned: "[W]e are confident that Congress in enacting TAPAA did not intend to abrogate all principles of proximate cause.  The Act provides for strict liability for damages that are the 'result of discharges.'" *Id.*

OPA similarly contains a proximate cause standard by mandating that the removal costs and damages result from an incident, which OPA defines as any occurrence or series of occurrences resulting in the discharge of oil.  The State of Alabama's stigma damages do not flow from the discharge of oil or the threat of discharge of oil.  The State's stigma damages, therefore, should be dismissed.

## X.

## CONCLUSION

For the reasons set forth above and in the accompanying motion, Transocean respectfully requests that its Rule 12(6) Motion to Dismiss the State of Alabama's First Amended Complaint be granted.

Respectfully submitted,

By:____/s/ Steven L. Roberts_____
Steven L. Roberts (Texas, No. 17019300)
Rachel Giesber Clingman (Texas, No. 00784125)
Kent C. Sullivan (Texas, No. 19487300)
Teri L. Donaldson (Florida, No. 784310)
Sutherland Asbill & Brennan LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
Email: steven.roberts@sutherland.com,
rachel.clingman@sutherland.com,
kent.sullivan@sutherland.com,
teri.donaldson@sutherland.com

By:____/s/ Kerry J. Miller_____
Kerry J. Miller (Louisiana, No. 24562)
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8169
Facsimile: (504) 599-8154
Email: kmiller@frilot.com

-and-

/s/ Edwin G. Preis, Jr._____
Edwin G. Preis, Jr. (Louisiana, No. 10703)
Edward F. Kohnke, IV (Louisiana, No. 07824)
Preis & Roy PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70501
Telephone: (337) 237-6062
Facsimile: (337) 237-9129

-and-

601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone: (504) 581-6062
Facsimile: (504) 522-9129
Email: egp@preisroy.com, efk@preisroy.com

Of Counsel:
Brad D. Brian (California, No. 79001)
Allen M. Katz (California, No. 054933)
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
Office:  (213) 683-9100
Facsimile:  (213) 683-5180, (213) 683-4018
E-Mail:  brad.brian@mto.com, allen.katz@mto.com

Daniel O. Goforth (Texas, No. 08064000)
Goforth Geren Easterling LLP
4900 Woodway, Suite 750
Houston, TX 77056
Office:  (713) 650-0022
Facsimile:  (713) 650-1669
E-Mail:  dangoforth@goforthlaw.com

John M. Elsley (Texas, No. 0591950)
Royston, Rayzor, Vickery & Williams LLP
711 Louisiana Street, Suite 500
Houston, TX 77002
Office:  (713) 224-8380
Facsimile:  (713) 225-9945
E-Mail:  john.elsley@roystonlaw.com

Blane Crutchfield (Alabama, No. CRUTB4243)
Hand Arendall, LLC
11 North Water Street, Suite 30200
Mobile, Alabama
Office:  (251) 694-6241
Facsimile:  (251) 544-1611
E-Mail:  bcrutchfield@handarendall.com

**_Counsel for Transocean_**


## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2011, I electronically filed the foregoing with the Court's

CM/ECF system and/or by using the LexisNexis File & Serve, in accordance with Pretrial Order

No. 12 which will send a notice of filing to all counsel accepting electronic notice.


/s/ Kerry J.  Miller