UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" IN THE GULF OF | § | |
| MEXICO, OF APRIL 20, 2010 | § | SECTION: J |
| | § | |
| THIS PLEADING APPLIES TO: | § | |
| 2:11-CV-0516 AND 2:10-CV-03059 | § | |
| | § | JUDGE CARL J. BARBIER |
| | § | |
| | § | MAGISTRATE JUDGE SHUSHAN |

## BRIEF IN SUPPORT OF TRANSOCEAN'S RULE 12(b)(6) MOTION TO DISMISS THE STATE OF LOUISIANA'S FIRST AMENDED COMPLAINT

TO THE HONORABLE CARL J. BARBIER, United States District Judge:

Petitioners in Limitation and Defendants Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, Transocean Deepwater Inc. and Triton Asset Leasing GmbH (collectively "Transocean") respectfully submit their Brief in Support of Transocean's Rule 12(b)(6) Motion to Dismiss The State of Louisiana's First Amended Complaint.

## I.

## INTRODUCTION

The State of Louisiana filed a First Amended Complaint in which it alleges that it has suffered damage as a result of the BP Oil Spill.  **Dkt. 2031.**  Like the Bundle B1 and the Bundle C Local Government Master Complaint Plaintiffs, the State of Louisiana has chosen to assert an array of state common law claims for negligence, gross negligence, nuisance, trespass and fraudulent concealment.  To these state common law claims, the State of Louisiana has added general maritime law claims for negligence and gross negligence, and claims under the Louisiana Oil Spill Prevention and Remediation Act (OSPRA).  Yet, the damages the State of Louisiana seeks to recover are encompassed by OPA:

(1)     Diminution in value of property—within by OPA's § 2702(b)(2)(B) ("Real or personal property");

(2)     Loss of tax revenue, income and/or use—included in OPA's § 2702(b)(2)(D) ("Revenues");

(3)     Cost of response or removal, clean-up, restoration and/or remediation—pursuant to by OPA's § 2702(b)(1) ("Removal costs"); and

(4)     Other damages, losses and/or costs as a result of the oil spill—covered by OPA's § 2702(b)(2)(A), (E), (F) ("Natural resources, profit and earning capacity and public services").

The State of Louisiana alleges it was harmed by the BP Oil Spill, which occurred following the explosions on the *Deepwater Horizon* on April 20, 2010, and its sinking into the Gulf of Mexico, two days later.  **Dkt. 2031, ¶ 1 at p. 2.**  The State of Louisiana further alleges that the well from which the oil flowed was located on the Outer Continental Shelf, beyond the territorial jurisdiction of the surrounding States.  ***Id. at ¶ 109 p. 34.***  Accordingly, the law governing the State of Louisiana's damage claims is exclusively maritime.  As a result, except for its OPA claims, the State of Louisiana's First Amended Complaint fails to state any valid damage claims as a matter of law and should be dismissed.  Further, the State's OPA claims must be dismissed for a lack of presentment.

## II.

### TRANSOCEAN IS ENTITLED TO DISMISSAL OF THE THE STATE OF LOUISIANA'S OPA CLAIMS FOR FAILURE TO SATISFY OPA'S PRESENTMENT REQUIREMENTS

**A.**     ***The OPA Presentment Requirement is a Mandatory Condition Precedent to Filing Suit Based on OPA.***

The State of Louisiana has asserted its OPA claims in Counts One and Five of its First Amended Complaint.  **Dkt. 2031 at pp. 48-51, 57-63.**  As the State of Louisiana's First Amended Complaint seeks recovery under OPA, the State of Louisiana must comply with OPA's presentment requirements.

2

Specifically, OPA provides that "all claims for removal costs or damages shall be presented first to the responsible party or guarantor of the source designated under § 2713(a) of this title." 33 U.S.C. § 2713(a).  OPA further provides:

> **(c)    Election**
>
>    If a claim is presented in accordance with subsection (a) of this Section and—
>
> > (1)  each person to whom the claim is presented denies all liability for the claim, or
> >
> > (2)   the claim is not settled by any person by payment within 90 days after the date upon which (A) the claim was presented, or (B) advertising was begun pursuant to section 2714(b) of this title, whichever is later,
>
> > ***the claimant may elect to commence an action in court against the responsible party or guarantor. . . .***

33 U.S.C. § 2713(c) (emphasis added).

Based upon the unequivocal language of OPA, presentment of a claim in accordance with Section 2713 has been held to be a "mandatory condition precedent" for commencing an OPA action in court against a responsible party. *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., Inc.*, 51 F.3d 235, 240 (11th Cir. 1995); *Turner v. Murphy Oil U.S.A., Inc.,* CIV.A. 05-4206, 2007 WL 4208986, at *2 (E.D. La. Nov. 21, 2007); *Isla Corp. v. Sundown Energy, LP*, CIV.A. 06-8645, 2007 WL 1240212, at *2 (E.D. La. Apr. 27, 2007); *Abundiz v. Explorer Pipeline Co.,* CIV.A. 300CV2029H, 2003 WL 23096018, at *5 (N.D. Tex. Nov. 25, 2003).  As the Eleventh Circuit established in *Boca Ciega*, "the clear text of § 2713 creates a mandatory condition precedent barring all OPA claims unless and until a claimant has presented her claims in compliance with § 2713(a) . . . ."  51 F.3d at 240.  Indeed, courts have held that OPA presentment is jurisdictional, such that the failure to comply strictly with OPA's presentment requirement ousts a court of jurisdiction over any OPA claims. *Gabarick v. Laurin Maritime*

*(Am.), Inc.,* 623 F. Supp. 2d 741 (E.D. La. 2009); *Marathon Pipe Line Co. v. LaRoche Indus., Inc.,* 944 F. Supp. 476, 477 (E.D. La. 1996); *see also Russo v. M/T DUBAI STAR*, C 09-05158 SI, 2010 WL 1753187 (N.D. Cal. Apr. 29, 2010); *Johnson v. Colonial Pipeline Co.,* 830 F. Supp. 309, 310-11 (E.D. Va. 1993).

> **B.    The State of Louisiana Has Not Complied With OPA's Presentment Requirement.**

The First Amended Complaint alleges that OPA's presentment requirements do not apply to the states, but that Louisiana has presented some, but not all, of its claims under OPA.  **Dkt. 2031, ¶¶ 143-152, pp. 45-48.**  These allegations fail to establish that (1) the State of Louisiana's claims have been presented to the OPA Responsible Party <u>and</u> (2) either the Responsible Party denied all liability for the claim <u>or</u> the claim was not settled by any person by payment within ninety days of the date of presentment or advertisement.  In fact, the State of Louisiana fails to allege <u>any</u> presentment as to Transocean for the release of diesel on the surface of the water from the *Deepwater Horizon*.  Accordingly, Transocean is entitled to dismissal of Plaintiffs' OPA claims for failure to satisfy OPA's presentment requirements.

Furthermore, the mere filing of a notice or demand letter without any detail is insufficient to "present" a claim and trigger the ninety-day evaluation and negotiation period.  In order to "present" a claim, a Claimant must specify the amount of damages being sought, including a "sum certain," *see* 33 U.S.C. § 2701(3), ***and*** provide evidence and information sufficient for the responsible party, or its representative, to assess whether the alleged loss satisfies OPA's causation requirements and determine whether the amount of alleged damages were actually incurred.  As was held in *Johnson v. Colonial Pipeline Co.,* 830 F.Supp. 309 (E.D. Va. 1993), "the claim presented must inform the responsible party with some precision of the nature and extent of the damages alleged and of the amount of monetary damages claimed.  *Id.* at 311.  Where a claimant makes no effort to describe the nature or extent of the alleged damages, much

less explain the basis for claiming that the damages have been sustained, the claimant fails "to state a sum certain for any of the types of damages alleged", and thus does not comply with OPA's presentment requirement. *Id.*; *see also Gabarick v. Laurin Mar. (AM.), Inc.,* 2009 WL 102549 at *21 (E.D. La. Jan. 12, 2009).

Despite its conclusory allegation that it complied with OPA's presentment requirement, the State, in fact, has not satisfied the presentment requirements of OPA. The State of Louisiana admits that it has additional and unpresented claims. **Dkt. 2031, ¶ 152**. Accordingly, the State of Louisiana's OPA claim should be dismissed.

## III.

### TRANSOCEAN IS ENTITLED TO DISMISSAL OF ALL THE STATE OF LOUISIANA'S CLAIMS FOR NEGLIGENCE, NUISANCE, TRESPASS, FRAUDULENT CONCEALMENT AND UNJUST ENRICHMENT ON THE BASIS OF PREEMPTION

**A.      *All Claims Arising Out of the BP Oil Spill Are Subject to This Court's Admiralty Jurisdiction.***

The State of Louisiana's claims arise out of the operations of a semisubmersible drilling rig, the *Deepwater Horizon,* a vessel, which was operating in navigable waters in the Gulf of Mexico, well beyond any state's territorial waters. For this reason, all claims arising from the BP Oil Spill are subject to this Court's admiralty jurisdiction and accompanying federal maritime law, which displaces and preempts state common law.[1]

Under the U.S. Constitution's Admiralty Clause, the judicial power of the United States extends to "all Cases of admiralty and maritime jurisdiction." U.S. CONST. Art. III, § 2, cl.1. This is not only a grant of authority to adjudicate, but also a statement that affirms the reception into the United States of a substantive body of admiralty law and implicitly authorizes Congress

---

[1] If not dismissed, the state common law claims asserted in the State of Louisiana's Complaint as to Transocean remain subject to the limitation injunction, stay, and restraining order entered by the Court (Judge K. Ellison) on June 14, 2010, in C. A. No. 4:10-cv-1721 [after transfer, 10-2771]. *Van Schaeffer v. Tsakos Shipping & Trading, S.A.,* CIV. A. 05-4486, 2006 U.S. Dist. LEXIS 25304, 2006 WL 1192939 (E.D. Pa. May 2, 2006).

to pass legislation in this field. *Norfolk Southern Ry. v. James N. Kirby, Pty. Ltd.*, 543 U.S. 14, 22-23 (2004). *See*, *e.g.*, *THE LOTTAWANNA*, 88 U.S. 558, 572-78 (1874). Acting under the Admiralty Clause, Congress vested federal courts with original and exclusive jurisdiction over "admiralty or maritime" matters. *See* 28 U.S.C. § 1333(1). In 1948, Congress extended admiralty jurisdiction to "cases of injury or damage, to person or property, caused by a vessel on navigable waters even though the injury or damage is done or consummated on land." *See* Admiralty Extension Act ("AEA"), 46 U.S.C. § 30101.[2]

If the location and connection-to-maritime-activity tests are satisfied, admiralty tort jurisdiction exists.[3] *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995). The *location test* requires the tort to have occurred on navigable waters or, for an injury suffered on land, to have been caused by a vessel on navigable waters. *Id.* (citing AEA); *see also Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453, 455-56 (5th Cir. 1999). The *connection-to-maritime-activity test* has two subparts:

> A court, first, must assess the general features of the type of incident involved to determine whether the incident has a ***potentially disruptive impact on maritime commerce***. Second, a court must determine whether ***the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity***.

*Grubart*, 513 U.S. at 534 (emphasis added; internal citations and quotation marks omitted); *see also, e.g., Texaco Exploration & Prod. Inc. v. AmClyde Engineered Prods. Co.*, 448 F.3d 760, 770-71 (5th Cir. 2006); *Strong v. B.P. Exploration & Prod., Inc.,* 440 F.3d 665, 669 (5th Cir.

---

[2]   The test for jurisdictional purposes under the AEA is whether the Plaintiffs allege that their injuries were caused by a vessel on navigable waters. In the State of Louisiana's Complaint, it is alleged that: "This civil action arises from the blowout that occurred as the mobile offshore drilling unit ("MODU") *Deepwater Horizon* was performing temporary abandonment procedures on the Macondo well on April 20, 2010, catching the rig on fire and causing the rig to sink on April 22, 2010." **Dkt. 2031, §4 p.3.** These allegations satisfy the AEA's jurisdictional test. The Transocean Defendants do not concede, however, that the BP Oil Spill was caused by the *Deepwater Horizon*.

[3]   The AEA serves as an independent basis for admiralty jurisdiction, even if the connection to maritime activity and location tests are not satisfied. *Tagliere v. Harrah's Illinois Corp.*, 445 F.3d 1012 (7th Cir. 2006).

2006). "The key inquiry is whether the allegedly tortious activity is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand." *Strong,* 440 F.3d at 669 (citations and internal quotation marks omitted).

There can be no legitimate dispute that this Court has admiralty jurisdiction over the State of Louisiana's Claims.  First, the *Deepwater Horizon* was a semisubmersible drilling rig.  Courts have held this type of rig to be a vessel for general maritime law purposes.  *Stewart v. Dutra Constr. Co.*, 543 U.S. 481 (2005); *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1314 n.5 (5th Cir. 1986); *see also* 1 U.S.C. § 3.  And, the Gulf of Mexico is a navigable body of water. Accordingly, the location test is met because the State's claims arise from alleged injuries involving a vessel (*Deepwater Horizon*) on navigable water (Gulf of Mexico).

Second, applying *Grubart*, *supra*, the connection-to-maritime activity test is met despite the fact that the State of Louisiana's Claims may involve injuries on land.  Specifically, the BP Oil Spill had the potential to, and did in fact, disrupt maritime commerce in the Gulf of Mexico and unquestionably bears a substantial relationship to a traditional maritime activity—a casualty involving an explosion, fire, and subsequent sinking of a vessel.  *Grubart,* 513 U.S. at 528, 539 ("damage by a vessel in navigable water to an underwater structure" had "a potentially disruptive impact on maritime commerce" because the incident "could lead to restrictions in the navigational use of the waterway" and to "disruption of the watercourse itself"); *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 669, 674 (1982) (admiralty jurisdiction over claims arising from "operation of a vessel on navigable waters. . . ."); *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 269-70 (1972).

**B.      *Admiralty Jurisdiction Requires the Application of Federal Admiralty Law.***

"It is well-settled that the invocation of federal admiralty jurisdiction results in the application of federal admiralty law rather than state law." *State of La. ex rel. Guste v M/V TESTBANK*, 752 F.2d 1019, 1031-32 (5th Cir. 1985) (en banc), *cert. denied,* 477 U.S. 903 (1986) (citations omitted). *See, e.g.*, *Norfolk Southern Ry.*, 543 U.S. at 22-23; *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986); *Kossick v. United Fruit Co.,* 365 U.S. 731, 738-39 (1961); *Freeport Sulphur Co. v. S.S. HERMOS,* 526 F.2d 300, 302 n.2 (5th Cir. 1976). Within its sphere of operation, the maritime law of the United States is supreme, and the states are without power to disrupt it:

> [T]he "saving to suitors" clause allows state courts to entertain *in personam* maritime causes of action, but in such cases the extent to which state law may be used to remedy maritime injuries is constrained by a so-called "reverse-*Erie*" doctrine which requires that the substantive remedies afforded by the States conform to governing federal maritime standards.

*Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 222-23 (1986).

The Supreme Court laid the foundation of the supremacy of admiralty law over state law in a series of cases more than ninety years ago. *See Knickerbocker Ice Co. v. Stewart,* 253 U.S. 149, 169 (1920); *Chelentis v. Luckenbach S.S. Co.,* 247 U.S. 372, 382 (1918); *S. Pac. Co. v. Jensen,* 244 U.S. 205, 217-18 (1917). Although the broad pronouncements of those early cases have been often hedged and qualified, *see, e.g.*, *Romero v. Int'l Terminal Operating Co.,* 358 U.S. 354, 373-75 (1959), their core meaning remains: "If there is any sense at all in making maritime law a federal subject, then there must be some limit set to the power of the states to interfere in the field of its working." GRANT GILMORE & CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY § 1-17, at 48 (2d ed. 1975). Generally stated, the Supremacy Clause analysis in the maritime law context is this: "Although state law may supplement maritime law where maritime law is silent, or where a local matter is at issue, state law may not be applied where it would

conflict with maritime law." *Coastal Iron Works, Inc. v. Petty Ray Geophysical,* 783 F.2d 577, 582 (5th Cir. 1986) (citations omitted).  Put another way, while state law occasionally may be used to fill the gaps in an incomplete and less than perfect maritime system, state law may <u>never</u> be employed to contravene an act of Congress, to prejudice the characteristic features of the maritime law, or to disrupt the harmony maritime law strives to bring to international and interstate relations. *J. Ray McDermott v. The VESSEL MORNING STAR,* 457 F.2d 815, 818 (5th Cir. 1972) (en banc), *cert. denied*, 409 U.S. 948 (1972).

**C.    OPA is Comprehensive in Scope in Providing Remedies for the State's Oil Spill Damages.**

Admiralty law is characterized by both federal statutory law and judicially-created general maritime law.[4]  Congress has spoken comprehensively in the admiralty law field of oil pollution damages by enacting OPA.  *See, e.g.*, S. REP. NO. 101-94, *reprinted in* 1990 U.S.C.C.A.N. 722, 730 (OPA "creates a single federal law providing clean-up authority, penalties and liability for oil pollution").  And, the courts have routinely recognized the comprehensive nature of OPA by OPA's provision of broad remedies for persons damaged as a result of a maritime pollution incident.  *See, e.g.*, *Tanguis v. M/V WESTCHESTER*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001) ("OPA 'represents Congress' attempt to provide a comprehensive frame work in the area of marine oil pollution'"); *Targa Midstream Servs. Ltd. P'Ship v. K-FC Transp. Partners, L.P.,* No. Civ. A. G-05629, 2006 WL 2520914, at *2 (S.D. Tex. Apr. 20,

---

[4]    General maritime law is "subject to the paramount authority of Congress."  *New Jersey v. New York,* 283 U.S. 336, 348 (1931).  In the case of conflict between the two, it is the statutory law that prevails.  *Miles v. Apex Marine Corp.*, 498 U.S. 19, 31-33 (1990).  Furthermore, congressional legislation preempts the general maritime law "if it speaks directly to the question at issue."  *Barnes v. Andover Co., L.P.*, 900 F.2d 630 (3d Cir. 1990) (*en banc*); *see also*, *In Re Air Disaster Near Honolulu, Hawaii*, 792 F. Supp. 1541 (N.D. Cal. 1990). Thus, admiralty recognizes "horizontal" preemption of the federal maritime common law by federal statutory law.  Accordingly, when Congress speaks, especially when it speaks comprehensively, it may displace pre-existing general maritime law.  *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 314 (1981); *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1 (1981).  Indeed, there is a presumption of displacement when a new federal statute is adopted to control a particular subject area.  *City of Milwaukee, supra,* at 314.

2006) ("OPA created a stricter and more comprehensive liability scheme for oil spill pollution than had existed under prior legislation. . . ."); *see also Gatlin Oil Co. v. United States,* 169 F.3d 207, 209 (4th Cir. 1999) (Congress enacted OPA to provide a "prompt, federally-coordinated response to oil spills in navigable waters of the United States and to compensate innocent victims").

It is, therefore, of no surprise that courts have found OPA to displace other laws.[5] *S. Port Marine LLC v. Gulf Oil Ltd. P'Ship*, 234 F.3d 58, 65-66 (1st Cir. 2000). In *South Port*, the court held that punitive damages were not available under OPA because "Congress's very specific treatment of oil pollution in OPA, which does not provide for punitive damages, supplanted general admiralty and maritime law, which has traditionally provided for the general availability of punitive damages for reckless conduct." *Id.* at 65. In a similar fashion, other courts have agreed that OPA displaces general maritime law, and general maritime law preempts state common law, *see infra* III.D, where OPA provides a remedy. *Tanguis*, 153 F. Supp. 2d at 867; *Gabarick,* 623 F. Supp. 2d at 750-51; *Seaboats, Inc. v. Alex C Corp.,* Nos. Civ. A. 01-1284-DPW, 2003 WL 203078, at *11 (D. Mass. Jan. 30, 2003); *Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.,* 924 F. Supp. 1436, 1447 (E.D. Va. 1996), *aff'd,* 122 F.3d 1062 (4th Cir. 1997), *cert. denied,* 523 U.S. 1021 (1998).

No matter how artfully pleaded, the State of Louisiana's claims are cognizable under OPA, as it seeks relief for precisely the types of damages Congress enumerated in OPA's Section 2702(b)(2). Pursuant to OPA, the State may recover a broad range of damages from a Responsible Party, including:

---

[5]   Transocean generally uses the term "preemption" or "displacement" in the context of a choice of law principle whereby federal maritime law is supreme and state law remedies that conflict with maritime law are not legally cognizable for a plaintiff in the event of such a conflict. *See, e.g.*, *Lauritzen v. Larsen,* 345 U.S. 571 (1953); *American Dredging Co. v. Miller,* 510 U.S. 443 (1994). In this regard, Section 2718(a) of OPA does not save common law claims that were not viable due to a conflict with maritime law before and after enactment of OPA.

**(A)     Natural resources**

Damages for injury to, destruction of, loss of, or loss of use of,
natural resources, including the reasonable costs of assessing the
damage, which shall be recoverable by a United States trustee, a
State trustee, an Indian tribe trustee, or a foreign trustee.

**(B)     Real or personal property**

Damages for injury to, or economic losses resulting from
destruction of, real or personal property, which shall be
recoverable by a claimant who owns or leases that property.

**(C)     Subsistence use**

Damages for loss of subsistence use of natural resources, which
shall be recoverable by any claimant who so uses natural resources
which have been injured, destroyed, or lost, without regard to the
ownership or management of the resources.

**(D)     Revenues**

Damages equal to the net loss of taxes, royalties, rents, fees, or net
profit shares due to the injury, destruction, or loss of real property,
personal property, or natural resources, which shall be recoverable
by the Government of the United States, a State, or a political
subdivision thereof.

**(E)     Profits and earning capacity**

Damages equal to the loss of profits or impairment of earning
capacity due to the injury, destruction, or loss of real property,
personal property, or natural resources, which shall be recoverable
by any claimant.

**(F)     Public services**

Damages for net costs of providing increased or additional public
services during or after removal activities, including protection
from fire, safety, or health hazards, caused by a discharge of oil,
which shall be recoverable by a State, or a political subdivision of
a State.

33 U.S.C. § 2702(b)(2).

The State of Louisiana describes it's damages to include damages to its, "citizens, waters, marshes, wetlands, shoreline, ecology, economy, tourism, fisheries, and wildlife . . . ." **Dkt. 2031, ¶ 1 p. 2.**)  Virtually all of these categories of damages are covered and provided for under OPA's Section 2702(b)(2)(A)-(F).  Thus, OPA displaces general maritime law, and general maritime law preempts state common law, *infra* III.C, leaving only a narrowly defined authority for states to enact mini-OPAs or similar legislation.

**D.**   ***General Maritime Common Law Would Preempt All State Common Law Claims Even If OPA Had Not Been Enacted.***[6]

General maritime law applies to the BP Oil Spill, *supra* III.B, and preempts the Plaintiffs' state common law claims even absent the comprehensive scheme set forth in OPA.  In *State of Louisiana ex rel. Guste v M/V TESTBANK,* the *en banc* Fifth Circuit ruled that federal maritime law preempts state common law claims for negligence and public nuisance in maritime vessel pollution cases.  752 F.2d 1019, 1031-32 (5th Cir. 1984), *cert. denied,* 477 U.S. 903 (1986).  In *TESTBANK,* containers aboard a vessel spilled more than twelve tons of pentachlorophenol in the Mississippi River Gulf Outlet, which is located entirely within the territorial waters of Louisiana.   Certain claimants alleged, among other things, liability under Louisiana state negligence and public nuisance law.  *Id.*  The *en banc* Fifth Circuit held that such state claims were foreclosed under the rule of *Robins Dry Dock,* a decision that precludes damages for economic loss resulting from the defendant's negligence absent physical harm to person or to property in which the plaintiff has a proprietary interest.  *Id.* (discussing *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 308-09 (1927)).   In so doing, the *en banc* Fifth Circuit reasoned:

---

[6]   To the extent not preempted by OPA, any general maritime common law claims asserted in the State of Louisiana's First Amended Complaint against Transocean remain subject to the Limitation injunction, stay, and restraining order entered by the Court (Judge K. Ellison) on June 14, 2010, in C. A. No. 4:10-cv-1721 [after transfer, 10-2771].  *United States v. BIG SAM*, 681 F.2d 432 (5th Cir. 1982).

> While our maritime decisions are informed by common law developments in the state courts, there is no requirement, as in diversity cases, that state law be adopted.  Indeed the federal interest in protecting maritime commerce is often best served by the establishment of uniform rules of conduct.  We believe that such is the case here. . . .  To permit recovery here on state law grounds would undermine the principles we seek to preserve today. ***Accordingly, we decline to adopt plaintiffs' state law claims as theories of recovery.***

*TESTBANK*, 752 F.2d at 1032 (emphasis added).  Furthermore, although the specific holding in *TESTBANK* addressed only state law claims based on negligence and nuisance, in *Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.,* the Fifth Circuit ruled that federal law applied to a trespass claim, in a matter falling within the court's admiralty and maritime jurisdiction. 959 F.2d 49, 53 (5th Cir. 1992).  The *Marastro* Court ruled that a federal court sitting in admiralty necessarily should borrow from a variety of sources of federal law "rather than state law which would 'impair the uniformity and simplicity which is a basic principle of the federal admiralty law . . . .'"  *Id.* (quoting *Nissan Motor Corp. v. Md. Shipbuilding,* 544 F. Supp. 1104, 1111 (D. Md. 1982), and citing *Byrd v. Byrd*, 657 F.2d 615, 617-18 (4th Cir. 1981)).  According to the *Marastro* Court, federal general common law "should control to determine the law of maritime trespass, in order to promote uniformity in general maritime law."  *Id.* at 53.

Because of the controlling *en banc* Fifth Circuit decision in *TESTBANK* and the Fifth Circuit's later decision in *Marastro*, the State of Louisiana's claims for negligence, gross negligence, nuisance, and trespass are preempted and must be dismissed.  But further, dismissal of all of these state claims, and any state claims based upon fraudulent concealment or unjust enrichment, is also warranted under the distinctive features of admiralty preemption.

Under the admiralty preemption doctrine, to determine when state law may supplement general maritime law, federal courts sitting in admiralty consider several factors.  *See, e.g.*, *Exxon Corp. v. CHICK KAM CHOO*, 817 F.2d 307, 316-18 (5th Cir. 1987), *rev'd on other grounds,* 486 U.S. 140 (1988).  *CHICK KAM CHOO* identified five factors that inform maritime

preemption analysis.  Four of the five factors are operative here:  (1) state law is not preempted when it contains a detailed scheme to fill a gap in maritime law; (2) state law is not preempted when the law regulates behavior in which the state has an especially strong interest via its "police power"; (3) maritime law preempts state law whenever a uniform rule will facilitate maritime regulation; and (4) maritime law preempts state law when the state law impinges on international or interstate relations.  *Id.* at 316-19.

Applying the *CHICK KAM CHOO* factors to this case, Louisiana's First Amended Complaint cannot use state common law to displace substantive maritime law.  First, by reason of well-entrenched maritime comparative fault,[7] economic loss,[8] and indemnity and contribution doctrines,[9] it cannot be suggested that state common law negligence, gross negligence, nuisance, trespass, fraudulent concealment, and unjust enrichment principles provide detailed distinctions that are absent from or of little concern to federal maritime law.  Of course, the states have a legitimate interest in protecting their coastlines and their economies related to fishing and similar industries.  But, as set forth above, the Fifth Circuit has recognized that the general maritime law should be applied to claims for pollution damage caused by vessels operating on navigable waterways. *TESTBANK*, 752 F.2d at 1032; s*ee, e.g.*, *IMTT-Gretna v. ROBERT E. LEE SS*, 993 F.2d 1193, 1195 (5th Cir. 1993), *supplemented by* 999 F.2d 105 (5th Cir. 1993); s*ee also In re Taira Lynn Marine Ltd.,* No. 5, LLC, 444 F.3d 371, 377 (5th Cir. 2006).

More significantly, given the *en banc* Fifth Circuit's decision in *TESTBANK*, the State cannot genuinely contend that displacement of general maritime law with state land-based torts of negligence, gross negligence, public and private nuisance, trespass, fraudulent concealment,

---

[7]    *See generally United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975); *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406 (1953).

[8]    *See generally Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927).

[9]    *See generally Cooper Stevedoring Co. v. Fritz Kopke, Inc.*, 417 U.S. 106 (1974).

and unjust enrichment would not conflict with the characteristic features of maritime law and defeat its desired uniformity.   If the State of Louisiana were allowed to supplant clearly applicable substantive law—the general maritime law—with state common law claims, then Transocean would be subjected to claims under Alabama, Florida, Texas, Louisiana, Mississippi, and other states that each apply their own set of laws.   Such would be counter to uniformity principles that general maritime law seeks and would subject Transocean to a variety of legal regimes that are wholly inconsistent with entrenched maritime legal doctrines, such as limitations on damages under *Robins Dry Dock*, and, depending upon the state, maritime comparative fault and indemnity and contribution principles.[10]   Applying a variety of Gulf state common laws to the BP Oil Spill would displace important components of the maritime tort regime and defeat the objective of uniformity.[11]   Thus, federal general maritime law preempts the State of Louisiana's claims of negligence (Count XI), nuisance (Count XII), trespass (Count XIII), strict liability (Count XIV), abnormally dangerous activity (Count XV), fraudulent concealment (Count XXII), unjust enrichment (Count XXIII), and punitive damages (Count XXIV).   Accordingly, for this additional reason, the State's claims must be dismissed with prejudice.

**E.    This Court Has Exclusive Jurisdiction Over the State's Claims Under OCSLA and, Under OCSLA, Federal Law Preempts All State Claims.**

The State of Louisiana's First Amended Complaint references OCSLA at ¶ 88, p. 27. The State appears to concede that OCSLA applies to this case.   OCSLA declares that "the

---

[10]    *See, e.g., State of Md. Dep't. of Natural Res. v. Kellum,* 51 F.3d 1220, 1221 (4th Cir. 1995) (holding that Maryland statute imposing strict liability for damages to oyster bar was preempted by federal maritime law).

[11]    *TESTBANK*, 752 F.2d at 1032.  For example, in *Norfolk & Portsmouth Belt Line R. Co. v. M/V MARLIN*, 2:08-CV 134, 2009 WL 1974298 (E.D. Va. Apr. 3, 2009), a vessel went outside the navigation channel and allided with a railroad bridge.  The Eastern District of Virginia found that applying state law would "upset uniformity principles within maritime law because it would require a different calculation of damages depending upon the location of the allision or the property affected."  *Id*. at *4.  Similarly, allowing the B1 Bundle Economic Loss Plaintiffs to supplement their claims with state common law as to the *Deepwater Horizon* incident would create an unharmonious situation in which a different outcome could arise in each state where oil allegedly washed ashore.

subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition . . . ." 43 U.S.C. § 1332(1). OCSLA thus establishes "national authority over the OCS at the expense of both foreign governments and the governments of the individual states." *Tenn. Gas Pipeline v. Houston Cas. Ins. Co.,* 87 F.3d 150, 153 (5th Cir. 1996). Stated another way, "OCSLA's jurisdictional grant is broad, and the Act covers a wide range of activity occurring beyond the territorial waters of the states on the outer continental shelf of the United States." *Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co.,* 448 F.3d 760, 768 (5th Cir. 2006) (citations and internal quotation marks omitted).

The purposes of OCSLA are many, and embrace not only development and production of mineral resources on the Shelf, but also (i) protection of the environment, including wildlife, (ii) consideration of the interests and input of affected states and local governments, and (iii) harmonization of OCSLA with the operations of the Oil Pollution Act of 1990, which established the Oil Spill Liability Trust Fund. Specifically, OCSLA is intended to:

> * * *
>
> (2)     preserve, protect, and develop oil and natural gas resources in the Outer Continental Shelf in a manner which is consistent with the need (A) to make such resources available to meet the Nation's energy needs as rapidly as possible, (B) to balance orderly energy resource development with protection of the human, marine, and coastal environments, (C) to insure the public a fair and equitable return on the resources of the Outer Continental Shelf, and (D) to preserve and maintain free enterprise competition;
>
> * * *
>
> (4)     provide States, and through States, local governments, which are impacted by Outer Continental Shelf oil and gas exploration, development, and production with comprehensive assistance in order to anticipate and plan for such impact, and thereby to assure adequate protection of the human environment;

\* \* \*

(8)    *establish an oil spill liability fund* to pay for the prompt
removal of any oil spilled or discharged as a result of activities
on the Outer Continental Shelf and for any damages to *public or
private interests* caused by such spills or discharges;

\* \* \*

43 U.S.C. § 1802 (emphasis added).

National authority over the OCS is exercised in two interconnected ways.  First, OCSLA

"makes federal law exclusive in its regulation of the OCS . . . ," except where substantial gaps

exist in the coverage of federal law.  *Tenn. Gas Pipeline,* 87 F.3d at 153; *see also* 43 U.S.C. §

1333; *Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 480-81 (1981).   Second, OCSLA

grants  federal  district  courts  broad  jurisdiction  to  decide  *any*  dispute  "arising  out  of,  or  in

connection with" operations conducted on the OCS:

[T]he district courts of the United States shall have jurisdiction of
cases and controversies arising out of or in connection with
(A) *any* operation conducted on the outer Continental Shelf
which involves exploration, development, or production of the
minerals, of the subsoil and seabed of the outer Continental Shelf,
or which involves rights to such minerals. . . .

43 U.S.C. § 1349(b)(1) (emphasis added); s*ee also EP Operating Ltd. P'ship v. Placid,* 26 F.3d

563,  569  (5th  Cir.  1994)  ("[B]road  reading  of  the  jurisdictional  grant  of  section  1349  is

supported by the expansive substantive reach of the OCSLA.");  *Tenn. Gas Pipeline*, 87 F.3d at

154  (OCSLA's jurisdictional grant is "very broad").   Precisely because the jurisdictional grant of

OCSLA  is  so  "broad,"  the  Fifth  Circuit  has  recognized  that  "the  Act  covers  a  wide  range  of

activity  occurring  beyond  the  territorial  waters  of  the  States  on  the  Outer  Continental  Shelf."

*Texaco  Exploration  &  Prod.  Inc.,*  448  F.3d  at  768  (citations  and  quotations  omitted);  *see  also*

*Walsh v. Seagull Energy Corp.*, 836 F. Supp. 411, 417 (S.D. Tex. 1993) (observing that there can

be "no dispute" that the "jurisdictional grant of OSCLA is ***more broad*** than [the coverage of OCSLA under section 1333(a)(1)]" (emphasis added)).

In deciding whether OCSLA's broad jurisdictional grant of federal authority gives a court jurisdiction, the courts routinely perform a two-part analysis.  This Court previously performed the two-part inquiry in an action filed by the State of Louisiana in this MDL.  *See In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on the April 20, 2010*, 2:10-md-02179, Rec. Doc. 470 (E.D. La. Oct. 6, 2010).  In that action, the State of Louisiana filed suit against various BP entities for economic losses associated with the BP Oil Spill.  BP removed the action, and the State filed a motion to remand.  BP opposed, arguing that Section 1349 of OCSLA clearly supported the Court's original subject matter jurisdiction and, therefore, removal.  In considering whether OCSLA's broad jurisdictional grant applied to the BP Oil Spill, this Court ruled that Section 1349 of OCSLA vested this Court with original jurisdiction.  Specifically, this Court held:

> Defendants were exploring and producing minerals, namely oil, from the Outer Continental Shelf.  It is these activities that allegedly caused the April 20, 2010 explosion and the resulting oil spill.  For these reasons, this Court finds that Defendants' activities should be classified as an "operation conducted on the Outer Continental Shelf, which involved the exploration and production of minerals."  Therefore, Defendants were conducting an operation as defined under § 1349.
>
> *   *   *   *
>
> These facts clearly satisfy the "but-for" test because the oil and other contaminants would not have entered into the State of Louisiana's territorial waters "but for" Defendants' drilling and exploration operation.  Accordingly, it is clear that original jurisdiction rests with this Court pursuant to § 1349(b)(1).

*Id.* at *5-8.

The Northern District of Florida also has held that OCSLA's broad jurisdictional grant applies to economic loss claims arising from the BP Oil Spill: "As a matter of plain English,

§ 1349(b)(1) provides federal jurisdiction over the Plaintiff's claim, because the claim arises out of, and is connected with, the Deepwater Horizon's oil-related operations on the Continental Shelf. ***That begins and ends the proper analysis of the jurisdictional issue as presented in this case.***" *See Phillips v. BP PLC*, 4:10-cv-00259-RH-WCS, Rec. Doc. 19 (N.D. Fla. Aug. 17, 2010) (emphasis added).

When OCSLA applies, it "makes federal law exclusive in its regulation of the OCS. . . ." *Tenn. Gas Pipeline,* 87 F.3d at 153; *see also Gulf Offshore,* 453 U.S. at 480-81. To fill any "gaps" in federal legal coverage, OCSLA provides that the applicable law of the adjacent state may be applied as "surrogate federal law," but <u>only</u> to the extent state law is not "inconsistent . . . with other Federal laws . . . now in effect or hereafter adopted . . . ." 43 U.S.C. § 1333(a)(2)(A); *Gulf Offshore,* 453 U.S. at 480-81; *see also Hufnagel v. Omega Serv. Indus., Inc.,* 182 F.3d 340, 349 (5th Cir. 1999); *EP Operating Ltd. P'ship,* 26 F.3d at 566; *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1052 (5th Cir. 1990) (hereinafter "*PLT*") ("Any other result here would frustrate the Congressional purpose that the OCS be treated as an area of exclusive federal jurisdiction within the state where state law will apply to fill in the gaps in the federal law.")[12]

The Fifth Circuit has adopted a three-part test to answer the question of when, if ever, state law may be applied to shelf activities. *PLT*, 895 F.2d at 1047. Under the *PLT* test, for state

---

[12]   In amending OCSLA to expand its coverage in 1978, the House Select Committee on the Outer Continental Shelf observed in its report that:

> It is thus made clear that ***Federal*** law is to be applicable to all activities on all devices in contact with the seabed for exploration, development, and production. The committee intends that ***Federal law is, therefore, to be applicable to*** activities on drilling ships, ***semi-submersible drilling rigs***, and other watercraft, when they are connected to the seabed by drillstring, pipes, or other appurtenances, on the OCS for exploration, development, or production purposes.

H. R. REP. NO. 95-590, at 128 (1977) (emphasis added), *reprinted in* 1978 U.S.C.C.A.N. 1450, 1534.

law to apply as "surrogate" federal law, three preconditions must be met: (1) the controversy must arise on a situs covered by OCSLA, (2) federal maritime law must not apply of its own force, and (3) the state law must not be inconsistent with federal law. *Id.*; *see, e.g.*, *Gardes Directional Drilling v. U.S. Turnkey Exploration,* 98 F.3d 860, 864-65 (5th Cir. 1996).

For the reasons set forth previously, *supra* III.D, OPA, a federal law, applies of its own force to the State's claims and controls to the exclusion of state common law. There is thus no "gap" in federal legal coverage to fill with state law.[13] And, to the extent OPA is not the State's exclusive remedy, general maritime law controls, to the exclusion of state common law. There is still no "gap" in federal legal coverage to fill in with state law. It therefore follows that state common law may not apply as "surrogate federal law" to the BP Oil Spill, as federal law (either OPA or general maritime law) preempts state common law. Accordingly, all the state common law claims must be dismissed pursuant to Rule 12(b)(6).

**F.      *OPA's Section 2718(a) Neither Creates Nor Saves Any State Common Law Claims.***

OPA's Section 2718(a)(1) preserves the authority "of any State or political subdivision" to enact mini-OPAs to impose "additional liability" with respect to "the discharge of oil . . . within such State . . . ." This narrowly crafted provision states:

**§ 2718.  Relationship to other law**

**(a)      Preservation of State authorities; Solid Waste Disposal Act**

Nothing in this chapter or the Act of March 3, 1851 shall—

(1)      affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from

---

[13]      OCSLA may borrow the "applicable" and not inconsistent laws of an adjacent state as "surrogate" federal law. "Applicable," according to the Fifth Circuit, must be read as "necessity to fill a significant void or gap." *Le Sassier v. Chevron USA, Inc.*, 776 F.2d 506, 509 (5th Cir. 1985). If a federal statutory scheme gives rise to a remedy, federal law applies to the exclusion of state law. *Id.* OPA is a federal law which provides a remedy to oil spill victims. Thus, OPA eliminates any such "gap" in federal legal coverage for the State's claims. *See, supra,* III.C, referring to the broad range of damages recoverable from a responsible party under OPA.

> imposing any additional liability or requirements with respect to—
>
> (A)     the discharge of oil or other pollution by oil within such State; or
>
> (B)     any removal activities in connection with such a discharge; or
>
> (2)     affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) or State law, including common law.

33 U.S.C. § 2718(a).  Section 2718(a) does not save the Louisiana state common law claims from preemption.

OPA governs the discharge of oil from both onshore facilities and offshore facilities. Congress therefore was mindful of the states' interests of regulating facilities sitting within a state's borders.  Section 2718 makes perfect sense when understood in this context.  Section 2718 cannot be read to abrogate general maritime law, as Section 2718(a)(2) does not disturb the long-standing and established admiralty preemption of state common law claims.  In fact, OPA contains an actual "savings provision," but this savings provision is located in OPA's subchapter III.  In § 2751(e)(1), OPA provides:

> **(e)     Admiralty and maritime law**
>
> Except as otherwise provided in this chapter, this chapter does not affect—
>
> (1)     admiralty and maritime law;

33 U.S.C. § 2751(e)(1).

Further, by its own explicit terms, Section 2718(a) provides that "[n]othing in this chapter [OPA] or the Act of March 3, 1851 [the Shipowners' Limitation of Liability Act] shall – (2) affect, or be construed or interpreted to affect or modify. . . State law, including common law."  33 U.S.C. § 2718(a)(2) (bracketed expressions added).  General maritime law is neither

OPA nor the Shipowners' Limitation of Liability Act, to which Section 2718(a) refers.   As set forth previously, *see supra* III.D, the general maritime law applies to the Louisiana claims because these claims arise from the explosion and sinking of a semisubmersible drilling rig, the *Deepwater Horizon*, a vessel operating in the navigable waters of the United States.   And, general maritime law prohibits application of state common law under the admiralty preemption doctrine.

Section 2718(a), which appears under the subtitle "Preservation of State authorities," preserves to the states the right to pass mini-OPA legislation.   It does not create any new state law, nor does it permit the application of state law to claims that arise squarely within admiralty's jurisdiction, particularly when the state laws are otherwise in conflict with maritime law.[14]   The import of OPA's actual savings clause relating to admiralty and maritime law is clear:   OPA "does not affect – (1) admiralty and maritime law. . . ."   And, admiralty and maritime law is clear:  State law may never apply when it conflicts with admiralty law.

Moreover, Section 2718(a)(2) does not save state common law claims from OCSLA preemption.   By its own explicit terms, Section 2718(a) provides that nothing in OPA or in the Limitation of Liability Act shall affect or modify state law, including common law that existed at the time of OPA's enactment.   OCSLA is neither OPA nor the Shipowners' Limitation of Liability Act, to which Section 2718(a) refers.   OCSLA, which applies to this blowout arising from shelf drilling activities, applies federal maritime law, preempting application of state common law.

---

[14]   The Fifth Circuit has repeatedly recognized that the general maritime law should be applied to claims for pollution damage caused by vessels operating on navigable water and has, on numerous occasions, specifically declined to apply state common law when it conflicts with maritime law, specifically with respect to the subject of compensating oil spill victims.  *TESTBANK, supra*, 752 F.2d at 1032; *ROBERT E. LEE SS, supra*, 993 F.2d 1193; *In re Taira Lynn Marine Ltd.,* No. 5, *supra*, 444 F.3d 371, 377.

Judge Edith Brown Clement's opinion in *Muse v. Freeport McMoran, Inc.,* CIV. A. 91-4247, 1992 U.S. Dist. LEXIS 13397, 1992 WL 233771 (E.D. La. Aug. 28, 1992), is instructive in this respect, although it did not deal with OPA's Section 2718(a)(2).  In *Muse,* Judge Clement addressed a party's assertion of state tort claims in a matter falling within the court's maritime jurisdiction.  Recognizing that, in an area in which a state's regulatory or "police" power was involved, state law may legitimately apply, the Court nevertheless ruled that Louisiana Civil Code Articles 2315 to 2318 "do not represent a detailed statutory scheme or an exercise of the State's police power.  Instead, they embody Louisiana's fundamental tort law principles." *Muse,* at *2.  Following from that reasoning, Judge Clement dismissed all state law claims. *Id.*

As in *Muse*, Louisiana's law of negligence, gross negligence, nuisance, trespass, fraudulent concealment, unjust enrichment, strict liability, and abnormally dangerous activity do not represent a detailed statutory scheme—they represent general tort principles, an area preempted by maritime law.  Thus, such state law claims did not exist at the time OPA was enacted, OPA did not create any state common law claims, and none of them were saved by Section 2718(a)(2).

## IV.

### TO THE EXTENT THAT ITS DAMAGE CLAIMS DO NOT FLOW DIRECTLY FROM PHYSICAL DAMAGE TO A PROPRIETARY INTEREST, THE STATE'S FEDERAL MARITIME AND STATE LAW CLAIMS ARE BARRED BY THE *ROBINS DRY DOCK* RULE

To the extent that the State of Louisiana asserts claims for damages that do not directly flow from physical damage to a proprietary interest, maritime and Louisiana state law bar such damages under the *Robins Dry Dock* rule, and, therefore, the State's claims asserting these damages should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  In *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.,* 71 F.3d 198 (5th Cir. 1995), the Fifth Circuit considered whether economic damages must have some direct tie to a plaintiff's specific

physical loss or damage, or whether the *Robins Dry Dock / TESTBANK* principle simply required a showing of damage to some proprietary interest in order to open the door to recovery for all purely economic damages that were foreseeable from the initial tort. For recovery, the court held it was not enough to simply meet the requirement of showing physical damage to a proprietary interest in order to open the door to all foreseeable economic consequences. *Id.* at 203. Instead, the Fifth Circuit denied recovery of economic losses which did not directly flow from physical damage to a claimant's proprietary interest. *Id.* Therefore, to the extent that its damage claims do not flow directly from physical damage to a proprietary interest, the State's federal maritime and state law claims are barred by the *Robins Dry Dock* rule, *infra* V.A-B.

A.    ***Maritime Law Bars the State's Claims Under Robins Dry Dock.***

*Robins Dry Dock & Repair Co. v. Flint* precludes recovery for economic loss in general maritime law tort claims absent physical injury to a proprietary interest. 275 U.S. 303, 309 (1927). The Supreme Court's "unmistakable" rule of *Robins Dry Dock* has been adopted and applied repeatedly and without qualification by the Fifth Circuit. *See, e.g.*, *In re Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d at 377 ("It is unmistakable that the law of this circuit does not allow recovery of purely economic claims absent physical injury to a proprietary interest in a maritime negligence suit"); *State of La. ex rel. Guste v. M/V TESTBANK,* 524 F. Supp. at 1173 ("having reexamined the history and central purpose of the doctrine of *Robins Dry Dock* as developed in this circuit, we remain committed to its teaching"); *Reserve Mooring Inc. v. Am. Commercial Barge Line*, *LLC,* 251 F.3d 1069, 1071 (5th Cir. 2001) (denying a mooring facility's claims for lost income against barge that sank during unloading, and holding circuit "had not retreated from *TESTBANK*'s physical injury requirement"); *see also Blue Gulf Seafood, Inc. v. TransTexas Gas Corp.*, 24 F. Supp. 2d 732, 734 (S.D. Tex. 1998) (denying economic claims of Louisiana oyster farmers leasing oyster beds in Texas, finding farmers suffered no property

damage, as Texas laws limit proprietary interest in seabed to Texas corporations); *In re Settoon Towing LLC*, CIV. A. 07-1263, 2009 WL 4730969, at *3 (E.D. La. Dec. 4, 2009) (denying oil production company's claim for economic losses for inability to access platform during oil spill cleanup, citing *Robins Dry Dock*).

The Eleventh Circuit has also recognized and "abided by" *Robins Dry Dock*. *See Kingston Shipping Co., Inc. v. Roberts*, 667 F.2d 34, 35 (11th Cir. 1982) (applying *Robins Dry Dock* to affirm dismissal of economic claims of vessels blocked in channel for twenty six days); *Miller Indus. v. Caterpillar Tractor Co.*, 733 F.2d 813, 818-19 (11th Cir. 1984).

Because the State's tort claims are barred by the well-founded and unmistakable federal maritime rule of *Robins Dry Dock*, the State may not recover for these same claims under state law. To maintain its uniformity, maritime law preempts state law when the latter is contradictory to maritime law's purpose. *IMTT-Gretna v. Robert E. Lee SS*, 993 F.2d 1193 (5th Cir. 1993) ("To allow state law to supply a remedy when one is denied in admiralty would serve only to circumvent the maritime law's jurisdiction"), *supplemented by*, 999 F.2d 105 (5th Cir. 1993); *see also In re Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d at 377 (holding claims were barred under maritime law without evidence that economic losses resulted from physical damage, and all claimants were denied recovery under state law); *Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d at 1032 (to "permit recovery here on state law grounds would undermine the principles we seek to preserve today").

## B.   *Louisiana Law Bars the State's Claim Under Its Economic Loss Rule*

Louisiana jurisprudence or civilian law adopts the policy determinations made in *Robins Dry Dock*. *See Dempster v. Louis Eymard Towing Co., Inc.,* 503 So. 2d 99, 102 (La. Ct. App. 1987) (citing *TESTBANK* for the "general rule in maritime law" requiring physical damage to a proprietary loss as a prerequisite to recovery for economic loss). Looking to moral, social, and

economic considerations, the Louisiana Supreme Court has recognized that the duty to not injure another's property would not extend beyond the property owner, and would not extend to a third person simply in contract with the property owner, because "the list of possible victims and the extent of economic damages might be expanded indefinitely."  *PPG Indus., Inc. v. Bean Dredging,* 447 So. 2d 1058, 1059-62 (La. 1984) (noting "[m]ost cases have cited *Robins Dry Dock*" to deny recovery for indirect economic losses caused by negligent injury to property that interferes with contractual relations "without analyzing the problem"); *see also Phillips v. G&H Seed Co.,* 2008-934 (La. App. 3 Cir. 4/8/09); 10 So. 3d 339, 342-45, *reh'g denied* (June 3, 2009), *writ denied*, 2009-1504 (La. 10/30/09); 21 So. 3d 284, *reconsideration not considered,* 2009-1504 (La. 1/8/10); 24 So. 3d 871 (dismissing economic damages brought by purchasers of crawfish against seed provider, after commercial crawfish farm crop was damaged by defective rice seed, as purchasers had no proprietary interest in crop); *TS & C Inv., L.L.C. v. Beusa Energy, Inc.*, 637 F. Supp. 2d 370, 374-75 (W.D. La. 2009) (citing *Robins Dry Dock* in predicting that Louisiana Supreme Court would hold economic loss rule bars local business owners from recovering purely economic damages on state law tort claims against oil company).

Even as to commercial fishermen, Louisiana state law bars recovery of purely economic damages without accompanying physical damage to a proprietary interest.  *See Dempster,* 503 So. 2d at 101-02 (finding plaintiffs had no proprietary interest in fish in state waters, and therefore had no future loss of fish); *La. Seafood Mgmt. Council v. La. Wildlife & Fisheries Comm'n*, 1997-1367 (La. 5/19/98), 715 So. 2d 387, 392 (holding Louisiana Civil Code establishes that the "lack of any property interest in the fish in the waters is well-settled, statutorily and judicially"); *La. Crawfish Producers Ass'n-West v. Amerada Hess Corp.*, 2005-1156 (La. App. 3 Cir. 7/12/06); 935 So. 2d 380, 384-85 (affirming dismissal of commercial crawfishermens' purely economic claims on basis of *Robins Dry Dock*); *Barasich v. Shell*

*Pipeline Co., LP*, CIV.A. 05-4180, 2006 WL 3913403, at *6-7 (E.D. La. Nov. 20, 2006) (denying commercial fishermens' federal and state law claims because they suffered no physical damage and had no proprietary interest in fish in state waters); *LaBauve v. La. Wildlife & Fisheries Comm'n,* 444 F. Supp. 1370, 1378 (E.D. La. 1978) (dismissing commercial fishermen claims for lost wages, because the fish "at large in state waters are the property of the state").

## V.

### LOUISIANA'S OSPRA PROVIDES THE EXCLUSIVE STATE LAW REMEDY FOR DISCHARGES OF OIL

The first section of OSPRA states:

> § 30:2496.  Exclusive authority:
>
> > The provisions of this Chapter shall be the exclusive authority on oil spill prevention, response, removal, and the limitations of liability.

OSPRA also provides in pertinent part:

> § 30:2491. Exclusive remedies:
>
> > A. When applicable, the limitation of liability and immunities provided in this Chapter shall be exclusive and shall supercede any other liability provision provided by any other applicable state law.  The provisions of this Chapter shall supercede, but not repeal, any conflicting law of the state . . . .

The limitations of liability are set forth in § 30:2479.  To the extent that the State seeks remedies under the laws of Louisiana other than the remedies available under Louisiana's OSPRA, those claims must be dismissed pursuant to §§ 30:249 and 30:2491.  OSPRA, therefore, precludes the State of Louisiana's claims asserted in Counts III, XI, XII, XIII, XIV, XV, XXII, XXIII, and XXIV.  Notably, OSPRA does not provide for exemplary or punitive damages.  Under Louisiana's Civil Code, punitive damages may not be awarded unless specifically authorized by statute.  LA. CIV. CODE. ART. 2315(2010).  Because OSPRA provides the exclusive state law remedy for oil spills, punitive damages may not be awarded under Louisiana law.

# VI.

## PLAINTIFFS' CLAIMS UNDER LOUISIANA'S OSPRA MUST BE DISMISSED

OSPRA was designed to "support and complement" OPA.  LA. REV. STAT. § 30:2453.

Consistent with the limited scope of OSPRA, it created an Oil Spill Contingency Fund.  Claims

to that fund, however, may not be made without first exhausting all federal remedies.  LA. REV.

STAT. § 30:2488(C)(1).  Unlike the federal OPA, and unlike the Florida mini-OPA, Louisiana's

OSPRA does <u>not</u> contain any language expressly making responsible parties liable to any

affected person for damages.  On the contrary, OSPRA appears to contemplate only two causes

of action: (1) an action by the State of Louisiana's designated oil spill coordinator on behalf of

the State of Louisiana and its trustees to seek reimbursement for payments made by the

Louisiana Oil Spill Contingency Fund, LA. REV. STAT. § 30:2489 and (2) an action by the

Louisiana Department of Wildlife and Fisheries to recover penalties for the value of injured

wildlife, which is referenced in LA. REV. STAT. § 30:2491, but actually arises under LA. REV.

STAT. § 56:40.1.

As to the first cause of action, the State of Louisiana's designated on scene coordinator is

not a named plaintiff in this case.  Further, Louisiana has not alleged that any payments have

been made by the Louisiana Oil Spill Contingency Fund.  For this reason, Louisiana does not

seek reimbursement to the Louisiana Oil Spill Contingency Fund; therefore, no cause of action

has been stated under LA. REV. STAT. § 30:2489.

As to the second possible cause of action, LA. REV. STAT. § 56:40.1 expressly provides:

> A person who kills, catches, takes, possesses, or injures any fish, wild birds, wild
> quadrupeds, and other wildlife and aquatic life in violation of this Title, or a
> regulation adopted pursuant to this Title, or a federal statute or regulation
> governing fish and wildlife, or who, through the violation of any other state or
> federal law or regulation, kills or injures any fish, wild birds, wild quadrupeds,
> and other wildlife and aquatic life, is liable to the state for the value of each fish,
> wild bird, wild quadruped, and other wildlife and aquatic life, unlawfully killed,
> caught, taken, possessed, or injured.

LA. REV. STAT. § 56:40.4.   The Louisiana Department of Wildlife and Fisheries assesses any civil penalties and gives written notice of "the alleged violation and of the value of such injured or destroyed wildlife or aquatic life." LA. REV. STAT. § 56:40.3.   If a civil suit is instituted to recover such penalties, then only "the attorney for the department, attorney general, or the district attorney of the parish in which the violation occurred may bring a civil suit under this Subpart in the name of the state." LA. REV. STAT. § 56:40.4.   Any recovery of civil penalties "shall be immediately deposited to the Conservation Fund of the Department of Wildlife and Fisheries and credited to the enforcement emergency situation response account within the fund." LA. REV. STAT. § 56:40.9.   While the State of Louisiana has designated a trustee and is participating in the assessment of natural resource damages, Louisiana has not yet alleged a cause of action under LA. REV. STAT. § 56:40.4.

In sum, OSPRA requires the exhaustion of federal OPA remedies before any claim may be made to the Oil Spill Liability Trust Fund.   LA. REV. STAT. § 30:2488(C).   Further, while OSPRA includes a definition of responsible party,[15] it is the designated on scene coordinator who is empowered to pursue responsible parties to "recover for the use of the fund." LA. REV. STAT. § 30:2489(B).   Only if the fund pays claims may the designated on scene coordinator seek reimbursement to the fund by responsible parties.   In this case, Louisiana has not alleged any payments from the Oil Spill Liability Trust Fund; therefore, Louisiana's claims under OSPRA, set forth in Counts II, IV, and VI, are not ripe and must be dismissed.

---

[15]    The mere inclusion of the definition of responsible party is no substitute for a cause of action.  Under Louisiana law, implied causes of action are not favored.  *Billeaud v. Assoc. of Retarded Citizens of Evangeline*, 56 So.2d 1020, 1024 (La. Ct. App. 3 Cir. 1990); *Int'l. Harvester Credit Corp. v. Seale*, 518 So.2d. 1039, 1041 (La. 1988).

## VII.

## THE STATE OF LOUISIANA'S CLAIMS FOR PUNITIVE DAMAGES MUST BE DISMISSED[16]

In its First Amended Complaint, the State includes a claim for "Punitive Damages" separate from their claims for negligence, gross negligence, nuisance, and trespass. **Dkt. 2031, ¶¶ 386-391 at pp. 103-106.** Punitive damages are not recoverable under OPA.[17]

The Oil Pollution Act of 1990 does not specifically address the availability of punitive damages as a remedy. The leading case on the issue is the First Circuit's decision in *S. Port Marine, LLC v. Gulf Oil Ltd. Partnership,* which held that punitive damages are not recoverable under OPA. 234 F.3d 58, 64-66 (1st Cir. 2000). The basis for that decision was the lack of any statutory authority under OPA to support an award of punitive damages. In so doing, the First Circuit held that OPA supplanted general maritime law in this area:

> This case, however, presents an entirely different issue, namely, whether Congress's very specific treatment of oil pollution in the OPA, which does not provide for punitive damages, supplanted general admiralty and maritime law, which has traditionally provided for the general availability of punitive damages for reckless conduct. This question has largely been decided for us by the Supreme Court in *Miles v. Apex Marine,* 498 U.S. 19, 111 S. Ct. 317, 112 L.Ed.2d 275 (1990), in which the Court declined to supplement damage provisions of the Death on the High Seas Act, 46 App. U.S.C. § 762 [subsequently recodified at 46 U.S.C. § 30303]. The Court refused to allow recovery for loss of society when such damages were not provided in the statute, reasoning that "in an 'area covered by statute, it would be no more appropriate to prescribe a different measure of damage than to prescribe a different statute of limitations, or a different class of beneficiaries.'" *See Miles,* 498 U.S. at 31, 111 S. Ct. 317 (quoting *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 625, 98 S. Ct. 2010, 56 L.Ed. 2d 581 (1978)). As we indicated in *CEH,* 70 F.3d 694 (1st Cir. 1995), *Miles* dictates deference to congressional

---

[16]   To the extent not preempted by OPA, any general maritime common law claims for punitive damages asserted in the State of Louisiana's First Amended Complaint against Transocean remain subject to the Limitation injunction, stay, and restraining order entered by the Court (Judge K. Ellison) on June 14, 2010, in C. A. No. 4:10-cv-1721 [after transfer, 10-2771]. *United States v. BIG SAM,* 681 F.2d 432 (5th Cir. 1982).

[17]   Punitive damages are also not recoverable under the laws of Louisiana. *Supra*, VI.

judgment "where, at the very least, there is an overlap between statutory and decisional law." *Id.* at 701. Such is obviously the case here.

*Id.* at 65-66.

The *South Port Marine* decision subsequently has been followed by an Oregon district court in *Clausen v. M/V NEW CARISSA*, 171 F. Supp. 2d 1127 (D. Or. 2001), and by this Court in *Isla Corp. v. Sundown Energy, LP*, CIV. A. 06-8645, 2007 WL 1240212 (E.D. La. Apr. 27, 2007). The holdings of this Court and the Oregon district court are sound: "Congress intended OPA defendants not to be subject to punitive damages for any property damage claim under federal law arising out of an oil spill." *Clausen,* 171 F. Supp. at 1134.[18] Indeed, "no case or commentator has suggested that the availability of punitive damages under general admiralty and maritime law survived the enactment of the OPA." *S. Port Marine, LLC,* 234 F.3d at 65. As the Ninth Circuit explained, "[s]ometimes punitive damages are allowable, sometimes they are not . . . punitive damages are not available under the Oil Pollution Act." *In re Exxon Valdez,* 270 F.3d 1215, 1226 n.14 (9th Cir. 2001) (*citing S. Port Marine, LLC,* 234 F.3d at 65). Accordingly, all punitive damage claims should be dismissed with prejudice.

## VIII.

## ALL MORATORIUM DAMAGE CLAIMS MUST BE DISMISSED

The State of Louisiana's alleges that it has sustained further economic damage as a result of the Moratorium issued by the MMS. **Dkt. 203, ¶¶ 134-136, p. 42.** OPA, however, only allows for the recovery of "damages" that result from an "incident." 33 U.S.C. § 2702(a). "[I]ncident" is defined as any occurrence or series of occurrences having the same origin

---

[18] *See also S. Port Marine LLC v. Gulf Oil L.P.,* 234 F.3d at 64: "OPA sets forth a comprehensive list of recoverable damages, including removal costs, damage to natural resources and real or personal property; loss of subsistence use of natural resources; loss of government revenues; lost profits and earning capacity; and costs of increased or additional public services occasioned by the unlawful act. Absent from that list of recoverable damages is any mention of punitive damages."

"resulting in the discharge or substantial threat of discharge of oil."  33 U.S.C. § 3701(14).  A responsible party may be liable under OPA only if the Plaintiffs' damages "were caused by the pollution incident," *i.e.*, the discharge or threatened discharge of oil.  *Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d at 383.  As the alleged State's Moratorium damages were not caused by the discharge of oil, but rather resulted from the Moratorium, a superseding unforeseeable cause,  the State may not recover Moratorium-related damages as a matter of law under OPA or under any other laws, state or federal.  Furthermore, under OPA, the "damages" must also result from "the discharge of oil".  *In re Settoon Towing LLC*, CIV. A. 07-1263, 2009 WL 4730969, at *4. "Damages" are defined as "damages specified in section 2702(b)."  33 U.S.C. § 2701(5).  The State of Louisiana's Moratorium "damages" are not in fact damages due to the injury, destruction, or loss of real property, personal property, or natural resources resulting from the discharge of oil, as required by OPA's Section 2702(b)(2)(E), but are in fact damages resulting from the Moratorium.  Accordingly, these claims should be dismissed.

## IX.

## ALL STIGMA DAMAGE CLAIMS MUST BE DISMISSED

The State of Louisiana's First Amended Complaint alleges "injuries to the Louisiana brand and similar impacts to the State's earning capacity . . . ."  **Dkt. 2031, ¶ 142, p. 44**. **"**Stigma" damages are too remote to be recovered under general maritime law or OPA.

### A.    Stigma Damages Are Too Remote Under the General Maritime Law

Under common law, there is a well-established requirement of proximate cause. Proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged . . . a link that is 'too remote'. . . is insufficient."  *Hemi Grp., LLC v. City of New York,* _____ U.S. ____, 130 S. Ct. 983, 989 (2010) (citations omitted).  As the Supreme Court has explained:

> In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event back to the dawn of human events, and beyond.  But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would have society on edge and fill the courts with endless litigation.

*Holmes v. SCC. Investor Protection Corp.,* 503 U.S. 258, 266 n.10 (1992) (internal quotations and citations omitted).  In *Holmes,* the Supreme Court further reasoned:

> At bottom, the notion of proximate cause reflects "ideas of what justice demands, or of what is administratively possible and convenient."  Accordingly, among the many shapes this concept took in common-law, was a demand for some direct relation between the injury asserted and the injurious conduct alleged.  Thus, a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover.

*Id.* at 268-68 (internal citations omitted).

Stigma damages have been held to be too remote under general maritime law to permit recovery, because general maritime law imparts a requirement of proximate cause for the recovery of oil spill damages.  *In Re: The EXXON VALDEZ*, 270 F.3d 1215, 1253 (9th Cir. 2001).  In *EXXON VALDEZ*, the Ninth Circuit held that the district court had properly granted summary judgment against persons claiming stigma damages because "[e]ven without *Robins Dry Dock* these groups' damages were too remote."  *Id.*  Similarly, here, the State's claim for stigma damages is simply too remote to permit recovery under general maritime law.

### B.    Stigma Damages Are Too Remote Under OPA

Absent express language to the contrary, statutes, such as OPA, contain a proximate cause requirement:  "[I]t has always been the practice of common-law courts (and probably of all courts, under all legal systems) to require as a condition of recovery, unless the legislature specifically prescribes otherwise, that the injury had been proximately caused by the offending conduct."  *Id.* at 287 (Scalia, J., concurring).  In OPA, Congress did not provide otherwise.

The OPA causation standard is set forth in OPA Section 2702:

> **(a)    In general**
>
> Notwithstanding any other provision or rule of law, and subject to the provisions of this chapter, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon, the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) that *result from such incident*.

33 U.S.C. § 2702(a) (emphasis added).   "For purposes of this Act, the term . . . incident" is defined in the previous section as:

> Any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, *resulting in* the discharge or substantial threat of discharge of oil[.]

*Id.* § 2702(14) (emphasis added).

This is not a mere "but-for" standard.  To the contrary, this is a standard that requires that the "discharge of oil" result in, or cause, the damages complained of—a proximate cause standard.  Indeed, it has been held that virtually identical "results from" language in the Trans-Atlantic Pipeline Authorization Act of 1993 ("TAPAA") established a proximate cause requirement—not merely a but-for requirement.  In *Benefiel v. Exxon Corp.,* 959 F.2d 805, 807 (9th Cir. 1992), the Ninth Circuit held that, under TAPAA, nearly identical language imposing liability upon a vessel owner for damages "sustained . . . as a *result of discharges* of oil from such vessel," included proximate cause as an element of the claim.  In *Benefiel*, the Ninth Circuit dismissed for lack of proximate causation the claims of geographically remote claimants alleging high gas prices as a result of the *EXXON VALDEZ* spill.  Thus, Californians who claimed that their gasoline cost more as a result of the *EXXON VALDEZ* oil spill were barred from recovery because of the "remote and derivative damages" they claimed, and lack of proximate cause, as a matter of law.  The court reasoned: "[W]e are confident that Congress in

enacting TAPAA did not intend to abrogate all principles of proximate cause. The Act provides for strict liability for damages that are the 'result of discharges.'" *Id.*

OPA similarly contains a proximate cause standard by mandating that the removal costs and damages result from an incident, which OPA defines as any occurrence or series of occurrences resulting in the discharge of oil. The State of Louisiana's stigma damages do not flow from the discharge of oil or the threat of discharge of oil. The State's stigma damages, therefore, should be dismissed.

## X.

## CONCLUSION

For the reasons set forth above and in the accompanying motion, Transocean respectfully requests that its Rule 12(6) Motion to Dismiss the State of Louisiana's First Amended Complaint be granted.

Respectfully submitted,

<table>
<tr><td>

By:   /s/ Steven L. Roberts<br>
Steven L. Roberts (Texas, No. 17019300)<br>
Rachel Giesber Clingman (Texas, No. 00784125)<br>
Kent C. Sullivan (Texas, No. 19487300)<br>
Teri L. Donaldson (Florida, No. 784310)<br>
Sutherland Asbill & Brennan LLP<br>
1001 Fannin Street, Suite 3700<br>
Houston, Texas 77002<br>
Telephone: (713) 470-6100<br>
Facsimile: (713) 654-1301<br>
Email: steven.roberts@sutherland.com,<br>
rachel.clingman@sutherland.com,<br>
kent.sullivan@sutherland.com,<br>
teri.donaldson@sutherland.com

</td><td>

By:   /s/ Kerry J. Miller<br>
Kerry J. Miller (Louisiana, No. 24562)<br>
Frilot, L.L.C.<br>
1100 Poydras Street, Suite 3700<br>
New Orleans, Louisiana 70163<br>
Telephone: (504) 599-8169<br>
Facsimile: (504) 599-8154<br>
Email: kmiller@frilot.com<br>
<br>
-and-<br>
<br>
/s/ Edwin G. Preis, Jr.<br>
Edwin G. Preis, Jr. (Louisiana, No. 10703)<br>
Edward F. Kohnke, IV (Louisiana, No. 07824)<br>
Preis & Roy PLC<br>
102 Versailles Boulevard, Suite 400<br>
Lafayette, Louisiana 70501<br>
Telephone: (337) 237-6062<br>
Facsimile: (337) 237-9129<br>
<br>
-and-

</td></tr>
</table>

601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone: (504) 581-6062
Facsimile: (504) 522-9129
Email: egp@preisroy.com, efk@preisroy.com

Of Counsel:
Brad D. Brian (California, No. 79001)
Allen M. Katz (California, No. 054933)
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
Office:  (213) 683-9100
Facsimile:  (213) 683-5180, (213) 683-4018
E-Mail:  brad.brian@mto.com, allen.katz@mto.com

Daniel O. Goforth (Texas, No. 08064000)
Goforth Geren Easterling LLP
4900 Woodway, Suite 750
Houston, TX 77056
Office:  (713) 650-0022
Facsimile:  (713) 650-1669
E-Mail:  dangoforth@goforthlaw.com

John M. Elsley (Texas, No. 0591950)
Royston, Rayzor, Vickery & Williams LLP
711 Louisiana Street, Suite 500
Houston, TX 77002
Office:  (713) 224-8380
Facsimile:  (713) 225-9945
E-Mail:  john.elsley@roystonlaw.com

*Counsel for Transocean*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2011, I electronically filed the foregoing with the Court's

CM/ECF system and/or by using the LexisNexis File & Serve, in accordance with Pretrial Order

No. 12 which will send a notice of filing to all counsel accepting electronic notice.


/s/ Kerry J.  Miller