UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | § | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE GULF OF | § | |
| MEXICO, OF APRIL 20, 2010 | § | |
| | § | SECTION: J |
| THIS PLEADING APPLIES TO: | § | |
| 10-MD-2179, BUNDLE C | § | |
| AND 10-2771 | § | JUDGE CARL J. BARBIER |
| | § | MAGISTRATE JUDGE SHUSHAN |

## BRIEF IN SUPPORT OF TRANSOCEAN'S RULE 12(b)(6) MOTION TO DISMISS THE LOCAL GOVERNMENT ENTITY C MASTER CLAIM IN LIMITATION AND THE LOCAL GOVERNMENT ENTITY C MASTER COMPLAINT

TO THE HONORABLE CARL J. BARBIER, United States District Judge:

Petitioners in Limitation and Defendants Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, Transocean Deepwater Inc., and Triton Asset Leasing GmbH (collectively "Transocean") respectfully submit their Brief in Support of Transocean's Rule 12(b)(6) Motion to Dismiss the Master Claim in Limitation and Master Complaint, Cross-Claim, And Third Party Complaint For Local Government Entities In Accordance with PTO No.11 [Case Management Order No. 1] Section III.C ["C Bundle"] (the "Master Claim in Limitation" and the "Master Complaint").

## I.

## INTRODUCTION

Plaintiffs in the Local Government Master Complaint (also referred to as "Claimants" in their Master Claim in Limitation) are Local Government Entities in Florida, Alabama, Mississippi, Louisiana and Texas who claim to have suffered damages and removal costs as a result of the BP Oil Spill in the Gulf of Mexico on April 20, 2010. **C, ¶¶ 28 and 178**. Like the Plaintiffs in the Bundle B1 Master Complaint, the Plaintiffs in the Local Government Master Complaint have chosen to assert an array of state common law claims for negligence, gross

negligence, nuisance, trespass and fraudulent concealment.  To these state common law claims, the Plaintiffs have added general maritime law claims for negligence and gross negligence.  Yet, the damages Plaintiffs seek to recover are <u>all</u> encompassed by OPA:

(1)    Diminution in value of property—within OPA's § 2702(b)(2)(B) ("Real or personal property");

(2)    Loss of tax revenue, income and/or use—included in OPA's § 2702(b)(2)(D) ("Revenues");

(3)    Cost of response or removal, clean-up, restoration and/or remediation— pursuant to OPA's § 2702(b)(1) ("Removal costs"); and

(4)    Other damages, losses and/or costs as a result of the oil spill – covered by OPA's § 2702(b)(2)(A), (E), (F) ("Natural resources, Profits and earning capacity and Public services").

The Plaintiffs claim that they were harmed by the BP Oil Spill, which occurred following the explosions on the *Deepwater Horizon* on April 20, 2010, and its sinking into the Gulf of Mexico, two days later.  **C, ¶¶ 34, 178.**  They further claim that the well from which the oil flowed was located on the Outer Continental Shelf, beyond the territorial jurisdiction of the surrounding States.  **C, ¶¶ 29, 179.**  Accordingly, the law governing each of the Plaintiffs' claims is exclusively maritime.  As a result, except for their OPA claims, the Local Government Master Claim in Limitation and Master Complaint fail to state any valid damage claims as a matter of law and should be dismissed.  Furthermore, as to the OPA claims, most, if not all, of these claims must be dismissed for a lack of presentment.

## II.

### TRANSOCEAN IS ENTITLED TO DISMISSAL OF THE MASTER COMPLAINT'S OPA CLAIMS FOR THE PLAINTIFFS' FAILURE TO SATISFY OPA'S PRESENTMENT REQUIREMENTS

**A.**   *The OPA Presentment Requirement is a Mandatory Condition Precedent to Filing Suit Based on OPA.*

Although the Plaintiffs assert their OPA claim on only two pages of their 151-page Master Claim / Complaint, **C, ¶¶ 659-68 at pp. 130-31,** they acknowledge—as they must—that "[t]he Coast Guard has named BP as the responsible party for the downhole release of oil and Transocean as the responsible party for the release of diesel on the surface." **C, ¶ 661 at p. 130**. Like the Bundle B1 Plaintiffs in their Omnibus Memorandum of Law in Opposition to the Defendants' Motions to Dismiss Bundle B1 (hereafter "Omnibus Memorandum"), the  Plaintiffs also must admit that they are not proceeding under OPA against Transocean "for damages (if any) resulting from the release of diesel." **Dkt. 1821, at p. 56 n.26.**  Nevertheless, the Plaintiffs must still comply with OPA's presentment requirements.

Based upon the unequivocal language of OPA, presentment of a claim in accordance with Section 2713 has been held to be a "mandatory condition precedent" for commencing an OPA action in court against a responsible party.  *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., Inc.*, 51 F.3d 235, 240 (11th Cir. 1995); *Turner v. Murphy Oil U.S.A., Inc.,* CIV.A. 05-4206, 2007 WL 4208986, at *2 (E.D. La. Nov. 21, 2007); *Isla Corp. v. Sundown Energy, LP*, CIV.A. 06-8645, 2007 WL 1240212, at *2 (E.D. La. Apr. 27, 2007); *Abundiz v. Explorer Pipeline Co.,* CIV.A. 300CV2029H, 2003 WL 23096018, at *5 (N.D. Tex. Nov. 25, 2003).  As the Eleventh Circuit established in *Boca Ciega*, "the clear text of § 2713 creates a mandatory condition precedent barring all OPA claims unless and until a claimant has presented her claims in compliance with § 2713(a) . . . ."  51 F.3d at 240.   Indeed, courts have held that OPA presentment is jurisdictional, such that failure to comply strictly with OPA's presentment

requirement ousts a court of jurisdiction over any OPA claims. *Gabarick v. Laurin Maritime (Am.), Inc.,* 623 F. Supp. 2d 741, 750-51 (E.D. La. 2009); *Marathon Pipe Line Co. v. LaRoche Indus., Inc.,* 944 F. Supp. 476, 477 (E.D. La. 1996); *see also Russo v. M/T DUBAI STAR*, C 09-05158 SI, 2010 WL 1753187, at *2 (N.D. Cal. Apr. 29, 2010); *Johnson v. Colonial Pipeline Co.,* 830 F. Supp. 309, 310-11 (E.D. Va. 1993).

> **B.      The Master Complaint Fails to Allege Full Satisfaction of OPA's Presentment Requirements.**

The Master Complaint falls short of alleging that the requirements of Section 2713(a) and (c) have been fully satisfied as to BP (and as to Transocean).  The Master Complaint alleges:

> To the extent required by law, and/or by consent or stipulation by BP, Plaintiffs have satisfied, or will have satisfied, all of the administrative requirements of 33 U.S.C. § 2713(a) and (b), as to each and all defendants, by the submission of their claims to the Gulf Coast Claims Facility (the "GCCF") and/or BP and/or its agents or designees.

**C, ¶ 668 at p. 131**.  These allegations fail to establish that (1) the Plaintiffs' claims have been presented to BP <u>and</u> (2) BP has denied all liability for the claim <u>or</u> the claim was not settled by any person (or by BP) by payment within ninety days after the date of presentment or advertisement.[1]  Furthermore, the Master Complaint contains *no* allegations of presentment to Transocean.  Accordingly, Transocean is entitled to dismissal of Plaintiffs' OPA claims for failure to satisfy OPA's presentment requirements.

---

[1]   Transocean does not concede that OPA's presentment requirements have been satisfied, notwithstanding the Plaintiffs' allegations in paragraph 668 of the Master Complaint that BP has consented or stipulated to the Plaintiffs' satisfaction of their OPA presentment requirements.  BP's stipulation or consent may not bind Transocean.  Furthermore, the Plaintiffs' allegations in paragraph 668 of the Master Complaint that "Plaintiffs have satisfied . . . all of the administrative requirements of 33 U.S.C. § 2713(a) and (b), as to each and all defendants" is a mere legal conclusion, which must not be accepted as true for purposes of Transocean's Rule 12(b)(6) Motion to Dismiss.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009).  While legal conclusions can provide the framework of a complaint, "they must be supported by factual allegations." *Id.* at 1950.  If the allegations in a complaint do not raise a claim of entitlement to relief, "this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuvillier v. Taylor,* 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007)).

## III.

## TRANSOCEAN IS ENTITLED TO DISMISSAL OF THE PLAINTIFFS' STATE LAW CLAIMS FOR NEGLIGENCE, GROSS NEGLIGENCE, NUISANCE, TRESPASS AND FRAUDULENT CONCEALMENT ON THE BASIS OF PREEMPTION

**A.**   ***All Claims Arising Out of the BP Oil Spill Are Subject to This Court's Admiralty Jurisdiction.***

The claims arise out of the operations of a semisubmersible drilling rig, the *Deepwater Horizon,* a vessel, which was operating in navigable waters in the Gulf of Mexico, well beyond any state's territorial waters.  For this reason, all claims arising from the BP Oil Spill are subject to this Court's admiralty jurisdiction and accompanying federal maritime law, which displaces and preempts state common law.[2]

Under the U.S. Constitution's Admiralty Clause, the judicial power of the United States extends to "all Cases of admiralty and maritime jurisdiction."  U.S. CONST. Art. III, § 2, cl.1. This is not only a grant of authority to adjudicate, but also a statement that affirms the reception into the United States of a substantive body of admiralty law and implicitly authorizes Congress to pass legislation in this field.  *Norfolk Southern Ry. v. James N. Kirby, Pty. Ltd.,* 543 U.S. 14, 22-23 (2004); *see also*, *e.g.*, *THE LOTTAWANNA*, 88 U.S. 558, 572-78 (1874).  Acting under the Admiralty Clause, Congress vested federal courts with original and exclusive jurisdiction over "admiralty or maritime" matters.  *See* 28 U.S.C. § 1333(1).  In 1948, Congress extended admiralty jurisdiction to "cases of injury or damage, to person or property, caused by a vessel on navigable waters even though the injury or damage is done or consummated on land."  *See* Admiralty Extension Act ("AEA"), 46 U.S.C. § 30101.[3]

---

[2]   If not dismissed, the state common law claims asserted in the Master Complaint as to Transocean remain subject to the limitation injunction, stay, and restraining order entered by the Court (Judge K. Ellison) on June 14, 2010, in C. A. No. 4:10-cv-1721 [after transfer, 10-2771].  *Van Schaeffer v. Tsakos Shipping & Trading, S.A.,* CIV. A. 05-4486, 2006 U.S. Dist. LEXIS 25304, 2006 WL 1192939 (E.D. Pa. May 2, 2006).

[3]   The test for jurisdictional purposes under the AEA is whether the Plaintiffs allege that their injuries were caused

If the location and connection-to-maritime-activity tests are satisfied, admiralty tort jurisdiction exists.[4]  *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 534 (1995).  The *location test* requires the tort to have occurred on navigable waters or, for an injury suffered on land, to have been caused by a vessel on navigable waters.  *Id.* (citing AEA); *see also Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453, 455-56 (5th Cir. 1999).  The *connection-to-maritime-activity test* has two subparts:

> A court, first, must assess the general features of the type of incident involved to determine whether the incident has a ***potentially disruptive impact on maritime commerce***.  Second, a court must determine whether ***the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity***.

*Grubart*, 513 U.S. at 534 (emphasis added; internal citations and quotation marks omitted).

There can be no legitimate dispute that this Court has admiralty jurisdiction over the claims.  First, the *Deepwater Horizon* was a semisubmersible drilling rig.  Courts have held that this type of rig is a vessel for general maritime law purposes.  *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 495-97 (2005); *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1314 n.5 (5th Cir. 1986); *see also* 1 U.S.C. § 3.  And, the Gulf of Mexico is a navigable body of water.  Accordingly, the location test is met because all claims arise from alleged injuries involving a vessel (*Deepwater Horizon*) on navigable water (Gulf of Mexico).

Second, applying *Grubart*, *supra*, the connection-to-maritime activity test is met, despite the fact that the claims may involve injuries on land.  Specifically, the BP Oil Spill had the potential to, and did in fact, disrupt maritime commerce in the Gulf of Mexico and

---

by a vessel on navigable waters.  In the C Master Claim in Limitation, the Plaintiffs are alleged to have suffered property losses, economic damages and/or other costs "as a result of the oil spill by the oil rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010."  **C, ¶ 28 at pp. 8-9.**  These allegations satisfy the AEA's jurisdictional test.  The Transocean Defendants do not concede, however, that the BP Oil Spill was caused by the *Deepwater Horizon*.

[4]    The AEA serves as an independent basis for admiralty jurisdiction, even if the connection to maritime activity and location tests are not satisfied.  *Tagliere v. Harrah's Illinois Corp.*, 445 F.3d 1012, 1014-15 (7th Cir. 2006).

unquestionably bears a substantial relationship to a traditional maritime activity—a casualty involving an explosion, fire, and subsequent sinking of a vessel. *Grubart,* 513 U.S. at 528, 539 ("damage by a vessel in navigable water to an underwater structure" had "a potentially disruptive impact on maritime commerce" because the incident "could lead to restrictions in the navigational use of the waterway" and to "disruption of the watercourse itself"); *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 669, 674 (1982) (admiralty jurisdiction over claims arising from "operation of a vessel on navigable waters"); *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 269-70 (1972).

**B.      *The Plaintiffs Must Concede That Admiralty Jurisdiction is Incontestable***

In their Omnibus Memorandum, the Bundle B1 Plaintiffs conceded that, "[o]n the basis of the Supreme Court's *Grubart* decision, admiralty jurisdiction is incontestable here." **Dkt. 1821 at p. 26.**[5] Accordingly, the Plaintiffs must also concede that admiralty jurisdiction exists. Indeed, not only on the cover page of their Master Claim / Complaint, but also in the body of the document, the Plaintiffs admit that their claims "are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and [Plaintiffs] hereby designate this case as an admiralty or maritime case . . . ." **C, ¶ 27 at p. 8**.

**C.      *Admiralty Jurisdiction Requires the Application of Federal Admiralty Law.***

"It is well-settled that the invocation of federal admiralty jurisdiction results in the application of federal admiralty law rather than state law." *State of La. ex rel. Guste v M/V TESTBANK*, 752 F.2d 1019, 1031-32 (5th Cir. 1985) (en banc), *cert. denied*, 477 U.S. 903 (1986) (citations omitted). *See, e.g.*, *Norfolk Southern Ry.,* 543 U.S. at 14, 22-23; *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986); *Kossick v. United Fruit Co.,* 365 U.S. 731, 738-39 (1961); *Freeport Sulphur Co. v. S.S. HERMOS,* 526 F.2d 300, 302 n.2 (5th Cir.

---

[5]     The B1 Plaintiffs have acknowledged that admiralty jurisdiction's (1) location requirement; (2) its "potential disruption" requirement; and (3) the "substantial relationship" requirement are all met, accordingly, "the Court's jurisdiction is founded (at least in part) upon admiralty jurisdiction." **Dkt. 1821 at pp. 27-30**.

1976).  Within its sphere of operation, the maritime law of the United States is supreme, and the states are without power to disrupt it:

> [T]he "saving to suitors" clause allows state courts to entertain *in personam* maritime causes of action, but in such cases the extent to which state law may be used to remedy maritime injuries is constrained by a so-called "reverse-*Erie*" doctrine which requires that the substantive remedies afforded by the States conform to governing federal maritime standards.

*Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 222-23 (1986).

The Supreme Court laid the foundation of the supremacy of admiralty law over state law in a series of cases more than ninety years ago.  *See Knickerbocker Ice Co. v. Stewart,* 253 U.S. 149, 160 (1920); *Chelentis v. Luckenbach S.S. Co.,* 247 U.S. 372, 382 (1918); *S. Pac. Co. v. Jensen,* 244 U.S. 205, 217-18 (1917).  Although the broad pronouncements of those early cases have been hedged and qualified, *see, e.g.*, *Romero v. Int'l Terminal Operating Co.,* 358 U.S. 354, 373-75 (1959), their core meaning remains: "If there is any sense at all in making maritime law a federal subject, then there must be some limit set to the power of the states to interfere in the field of its working."  GRANT GILMORE & CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY § 1-17, at 48 (2d ed. 1975).  Generally stated, the Supremacy Clause analysis in the maritime law context is this: "Although state law may supplement maritime law where maritime law is silent, or where a local matter is at issue, state law may not be applied where it would conflict with maritime law."  *Coastal Iron Works, Inc. v. Petty Ray Geophysical,* 783 F.2d 577, 582 (5th Cir. 1986) (citations omitted).

**D.**     **_The Claimants Must Concede that Federal Maritime Law is Applicable to Their Claims_**

In their Omnibus Memorandum, the Bundle B1 Plaintiffs leave no doubt that they believe that federal maritime law is applicable to their claims, because they state in no uncertain terms: "**FEDERAL MARITIME LAW IS APPLICABLE TO PLAINTIFFS' CLAIMS." Dkt. 1821 at p. 21**.  Of necessity, the Plaintiffs must make the same concession.  Thus, for the same

reason federal maritime time law applies to the Bundle B1 Plaintiffs' claims, there can be no legitimate dispute that federal maritime law applies to the Plaintiffs' claims.

**E.      *OPA is Comprehensive in Scope in Providing Remedies for the Plaintiffs' Oil Spill Damages.***

Admiralty law is characterized by both federal statutory law and judicially created general maritime law.[6]  Congress has spoken comprehensively in the admiralty law field of oil pollution damages by enacting OPA.  *See, e.g.*, S. REP. NO. 101-94, *reprinted in* 1990 U.S.C.C.A.N. 722, 730 (OPA "creates a single federal law providing clean-up authority, penalties and liability for oil pollution").  And, courts have routinely recognized the comprehensive nature of OPA based on OPA's provision of broad remedies for persons damaged as a result of a maritime pollution incident.  *See, e.g.*, *Tanguis v. M/V WESTCHESTER*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001) ("OPA 'represents Congress' attempt to provide a comprehensive frame work in the area of marine oil pollution'"); *Targa Midstream Servs. Ltd. P'Ship v. K-FC Transp. Partners, L.P.,* No. Civ. A. G-05629, 2006 WL 2520914, at *2 (S.D. Tex. Apr. 20, 2006) ("OPA created a stricter and more comprehensive liability scheme for oil spill pollution than had existed under prior legislation. . . ."); *see also Gatlin Oil Co. v. United States,* 169 F.3d 207, 209 (4th Cir. 1999) (Congress enacted OPA to provide a "prompt, federally-coordinated response to oil spills in navigable waters of the United States and to compensate innocent victims").

---

[6]     General maritime law is "subject to the paramount authority of Congress."  *New Jersey v. New York*, 283 U.S. 336, 348 (1931).  In the case of conflict between the two, it is the statutory law that prevails.  *Miles v. Apex Marine Corp.*, 498 U.S. 19, 31-33 (1990).  Furthermore, congressional legislation preempts the general maritime law "if it speaks directly to the question at issue."  *Barnes v. Andover Co., L.P.*, 900 F.2d 630, 637 (3d Cir. 1990) (*en banc*); *see also In Re Air Disaster Near Honolulu, Hawaii*, 792 F. Supp. 1541, 1551 (N.D. Cal. 1990).  Thus, admiralty recognizes "horizontal" preemption of the federal maritime common law by federal statutory law.  Accordingly, when Congress speaks, especially when it speaks comprehensively, it may displace pre-existing general maritime law.  *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 314 (1981).  Indeed, there is a presumption of displacement when a new federal statute is adopted to control a particular subject area.  *Id.* at 314.

It is, therefore, of no surprise that courts have found OPA to displace other laws.[7]  *S. Port Marine LLC v. Gulf Oil Ltd. P'Ship*, 234 F.3d 58, 65-66 (1st Cir. 2000).  In *South Port*, the court held that punitive damages were not available under OPA because "Congress's very specific treatment of oil pollution in OPA, which does not provide for punitive damages, supplanted general admiralty and maritime law, which has traditionally provided for the general availability of punitive damages for reckless conduct."  *Id.* at 65.  In a similar fashion, courts have agreed that OPA displaces the general maritime law, and the general maritime law preempts state common law, *supra* III.D*, where OPA provides a remedy.  *Tanguis*, 153 F. Supp. 2d at 867; *Gabarick,* 623 F. Supp. 2d at 750-51; *see also Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.,* 924 F. Supp. 1436, 1447 (E.D. Va. 1996), *aff'd,* 122 F.3d 1062  (4th Cir. 1997), *cert. denied,* 523 U.S. 1021 (1998); *Seaboats, Inc. v. Alex C Corp.,* Nos. Civ. A. 01-1284-DPW, 2003 WL 203078, at *11 (D. Mass. Jan. 30, 2003).

No matter how artfully pleaded, the Plaintiffs' claims are cognizable under OPA, as they seek relief for precisely the types of damages Congress enumerated in OPA's Section 2702(b)(2).  Pursuant to OPA, the Plaintiffs may recover a broad range of damages from a Responsible Party, including:

> **(A)     Natural resources**
>
> Damages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage, which shall be recoverable by a United States trustee, a State trustee, an Indian tribe trustee, or a foreign trustee.
>
> **(B)     Real or personal property**

---

[7]     Transocean generally uses the term "preemption" or "displacement" in the context of a choice of law principle whereby federal maritime law is supreme and state law remedies that conflict with maritime law are not legally cognizable for a plaintiff in the event of such a conflict.  *See, e.g.*, *Lauritzen v. Larsen*, 345 U.S. 571 (1953); *American Dredging Co. v. Miller*, 510 U.S. 443 (1994).  In this regard, Section 2718(a) of OPA does not save common law claims that were not viable due to a conflict with maritime law before and after enactment of OPA.

Damages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property.

**(C)     Subsistence use**

Damages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources.

**(D)     Revenues**

Damages equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by the Government of the United States, a State, or a political subdivision thereof.

**(E)     Profits and earning capacity**

Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant.

**(F)     Public services**

Damages for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, caused by a discharge of oil, which shall be recoverable by a State, or a political subdivision of a State.

33 U.S.C. § 2702(b)(2).  The Plaintiffs identify themselves as Local Government Entities in Florida, Alabama, Mississippi, Louisiana and Texas.  Their Master Claim / Complaint seeks to recover damages identified to fall within four categories:

(1)     Damage, destruction, or diminution in value of property;
(2)     Loss of tax revenue, income and/or use;
(3)     Costs of response, removal, clean-up, restoration and/or remediation; and
(4)     Other damages, losses or costs as a result of the oil spill....

**C, ¶¶ 8 and 178**.  Each of these categories of damages is covered and provided for under OPA's Section 2702(b)(2)(A)-(F).

Thus, OPA displaces general maritime law, and general maritime law preempts state common law, *supra* III.A-E, leaving only a narrowly defined authority for states to enact mini-OPAs or similar solid waste laws.

F.     ***General Maritime Common Law Would Preempt All State Common Law Claims Even If OPA Had Not Been Enacted.*** [8]

General maritime law applies to the BP Oil Spill, *supra* III.C, and preempts the Plaintiffs' state common law claims for negligence, nuisance, trespass and fraudulent concealment even absent the comprehensive scheme set forth in OPA.  In *State of Louisiana ex rel. Guste v M/V TESTBANK,* the *en banc* Fifth Circuit ruled that federal maritime law preempts state common law claims for negligence and public nuisance in maritime vessel pollution cases.  752 F.2d 1019, 1031-32 (5th Cir. 1984), *cert. denied,* 477 U.S. 903 (1986).  In *TESTBANK,* containers aboard a vessel spilled more than twelve tons of pentachlorophenol in the Mississippi River Gulf Outlet, which is located entirely within the territorial waters of Louisiana.  Certain claimants alleged, among other things, liability under Louisiana state negligence and public nuisance law. *Id.*  The *en banc* Fifth Circuit held that such state claims were foreclosed under the rule of *Robins Dry Dock,* a decision that precludes damages for economic loss resulting from the defendant's negligence absent physical harm to person or to property in which the plaintiff has a proprietary interest.  *Id.* (discussing *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 308-09 (1927)).  In so doing, the *en banc* Fifth Circuit reasoned:

> While our maritime decisions are informed by common law developments in the state courts, there is no requirement, as in diversity cases, that state law be adopted.  Indeed the federal interest in protecting maritime commerce is often best served by the establishment of uniform rules of conduct.  We believe that such is the case here. . . .  To permit recovery here on state law grounds would undermine the principles we seek to preserve today.  ***Accordingly, we decline to adopt plaintiffs' state law claims as theories of recovery.***

---

[8]    To the extent not preempted by OPA, any general maritime common law claims asserted in the Master Complaint against Transocean remain subject to the Limitation injunction, stay, and restraining order entered by the Court (Judge K. Ellison) on June 14, 2010, in C. A. No. 4:10-cv-1721 [after transfer, 10-2771].  *United States v. BIG SAM*, 681 F.2d 432 (5th Cir. 1982).

*TESTBANK*, 752 F.2d at 1032 (emphasis added).  Furthermore, although the specific holding in *TESTBANK* addressed only state law claims based on negligence and nuisance, in *Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.*, the Fifth Circuit ruled that federal law applied to a trespass claim in a matter falling within the court's admiralty and maritime jurisdiction. 959 F.2d 49, 53 (5th Cir. 1992).  The *Marastro* Court ruled that a federal court sitting in admiralty necessarily should borrow from a variety of sources of federal law "rather than state law which would 'impair the uniformity and simplicity which is a basic principle of the federal admiralty law . . . .'"  *Id.* (quoting *Nissan Motor Corp. v. Md. Shipbuilding,* 544 F. Supp. 1104, 1111 (D. Md. 1982), and citing *Byrd v. Byrd*, 657 F.2d 615, 617-618 (4th Cir. 1981)).  According to the *Marastro* Court, federal general common law "should control to determine the law of maritime trespass, in order to promote uniformity in general maritime law." *Id.* at 53.

Because of the controlling *en banc* Fifth Circuit decision in *TESTBANK* and the Fifth Circuit's later decision in *Marastro*, the Plaintiffs' state common law claims for negligence, gross negligence, nuisance, and trespass are preempted and must be dismissed.  But further, dismissal of all of these state claims, and any state claims based upon fraudulent concealment, is also warranted under the distinctive features of admiralty preemption.

Under the admiralty preemption doctrine, to determine when state law may supplement general maritime law, federal courts sitting in admiralty consider several factors.  *See, e.g.*, *Exxon Corp. v. CHICK KAM CHOO*, 817 F.2d 307, 316-18 (5th Cir. 1987), *rev'd on other grounds,* 486 U.S. 140 (1988).  *CHICK KAM CHOO* identified five factors that inform maritime preemption analysis.  Four of the five factors are operative here: (1) state law is not preempted when it contains a detailed scheme to fill a gap in maritime law; (2) state law is not preempted when the law regulates behavior in which the state has an especially strong interest via its "police

13

power"; (3) maritime law preempts state law whenever a uniform rule will facilitate maritime regulation; and (4) maritime law preempts state law when the state law impinges on international or interstate relations.  *Id.* at 316-19.

Applying the *CHICK KAM CHOO* factors to this case, the Local Government Master Claim in Limitation and Master Complaint cannot use state common law to displace substantive maritime law.  First, by reason of well-entrenched maritime comparative fault,[9] economic loss,[10] and indemnity and contribution doctrines,[11] it cannot be suggested that state common law negligence, gross negligence, nuisance, trespass, and fraudulent concealment principles provide detailed distinctions that are absent from or of little concern to federal maritime law.  Of course, the states have a legitimate interest in protecting their coastlines and their economies related to fishing and similar industries.  But, as set forth above, the Fifth Circuit has recognized that the general maritime law should be applied to claims for pollution damage caused by vessels operating on navigable waterways.  *TESTBANK*, 752 F.2d at 1032; s*ee, e.g.*, *IMTT-Gretna v. ROBERT E. LEE SS*, 993 F.2d 1193, 1195 (5th Cir. 1993), *supplemented by* 999 F.2d 105 (5th Cir. 1993); s*ee also In re Taira Lynn Marine Ltd.,* No. 5, LLC, 444 F.3d 371, 377 (5th Cir. 2006).[12]

If the Plaintiffs were allowed to supplant clearly applicable substantive law—general maritime law—with state law claims, Transocean would be subjected to claims under Alabama, Florida, Texas, Louisiana, Mississippi, and other states that each apply their own set of laws. Such would be counter to uniformity principles that general maritime law seeks and would

---

[9]    *See generally United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975); *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406 (1953).

[10]   *See generally Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927).

[11]   *See generally Cooper Stevedoring Co. v. Fritz Kopke, Inc.*, 417 U.S. 106 (1974).

[12]   *See, e.g., State of Md. Dep't. of Natural Res. v. Kellum,* 51 F.3d 1220, 1221 (4th Cir. 1995) (holding that Maryland statute imposing strict liability for damages to oyster bar was preempted by federal maritime law).

subject Transocean to a variety of legal regimes that are wholly inconsistent with entrenched maritime legal doctrines, including limitations on damages under *Robins Dry Dock* and, depending upon the state, maritime comparative fault and indemnity and contribution principles.[13]

**G.     This Court Has Exclusive Jurisdiction Over the Claims Under OCSLA and, Under OCSLA, Federal Law Preempts All State Claims.**

In the Master Claim / Complaint, there is no specific mention of the Outer Continental Shelf and Lands Act ("OCSLA"); however, Plaintiffs acknowledge that the BP Oil Spill arises out of "oil exploration, drilling and production-related operations in Mississippi Canyon Block 252, the location known as 'Macondo' where the Spill originated."  **C, ¶ 179.**  Therefore, notwithstanding the Master Complaint's lack of any explicit reference to OCSLA, all claims are subject to OCSLA.[14]  That is because OCSLA declares that "the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition . . . ."  43 U.S.C. § 1332(1).  OCSLA thus establishes "national authority over the OCS at the expense of both foreign governments and the governments of the individual states."  *Tenn. Gas Pipeline v. Houston Cas. Ins. Co.,* 87 F.3d 150, 153 (5th Cir. 1996).  Stated another way, "OCSLA's jurisdictional grant is broad, and the Act covers a wide

---

[13]   *TESTBANK*, 752 F.2d at 1032.  For example, in *Norfolk & Portsmouth Belt Line R. Co. v. M/V MARLIN*, 2:08-CV 134, 2009 WL 1974298 (E.D. Va. Apr. 3, 2009), a vessel went outside the navigation channel and allided with a railroad bridge.  The Eastern District of Virginia found that applying state law would "upset uniformity principles within maritime law because it would require a different calculation of damages depending upon the location of the allision or the property affected."  *Id.* at *4.  Similarly, allowing the Plaintiffs to supplement their claims with state common law as to this incident would create an unharmonious situation in which a different outcome could arise in each state where oil allegedly washed ashore.

[14]   Courts have previously held that the failure to refer specifically to OCSLA does not transform a federal claim over which federal courts have jurisdiction into a state law claim.  *See, e.g.*, *Fields v. Pool Offshore, Inc.,* No. Civ. A. 97-3170, 1997 WL 767634, at *3 (E.D. La. Dec. 8, 1997) ("The fact that plaintiff's state court petition did not invoke jurisdiction under OCSLA is not dispositive . . ."); *White v. Chevron, USA, Inc.,* CIV. A. No. 90-113, 1990 WL 28167, at *1 (E.D. La. Mar. 14, 1990) ("Although in this case, the plaintiffs did not plead OCSLA in their state court petition but only alleged state causes of action, the statute and the jurisprudence clearly demonstrate that because this action arose on the outer continental shelf, the plaintiffs' exclusive remedy is pursuant to OSCLA.").

range of activity occurring beyond the territorial waters of the states on the outer continental shelf of the United States." *Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co.,* 448 F.3d 760, 768 (5th Cir. 2006) (citations and internal quotation marks omitted).

When OCSLA applies, it "makes federal law exclusive in its regulation of the OCS . . . ." *Tenn. Gas Pipeline,* 87 F.3d at 153; *see also Gulf Offshore,* 453 U.S. at 480-81. To fill any "gaps" in federal legal coverage, OCSLA provides that the applicable law of the adjacent state may be applied as "surrogate federal law," but <u>only</u> to the extent state law is not "inconsistent . . . with other Federal laws . . . now in effect or hereafter adopted . . . ." 43 U.S.C. § 1333(a)(2)(A); *Gulf Offshore,* 453 U.S. at 480-81; *see also Hufnagel v. Omega Serv. Indus., Inc.,* 182 F.3d 340, 349 (5th Cir. 1999); *EP Operating Ltd. P'ship,* 26 F.3d at 566; *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.,* 895 F.2d 1043, 1052 (5th Cir. 1990) (hereinafter "*PLT*") ("Any other result here would frustrate the Congressional purpose that the OCS be treated as an area of exclusive federal jurisdiction within the state where state law will apply to fill in the gaps in the federal law.")[15]

The Fifth Circuit has adopted a three-part test to answer the question of when, if ever, state law may be applied to shelf activities. *PLT*, 895 F.2d at 1047. Under the *PLT* test, for state law to apply as "surrogate" federal law, three preconditions must be met: (1) the controversy

---

[15]  In amending OCSLA to expand its coverage in 1978, the House Select Committee on the Outer Continental Shelf observed in its report that:

> It is thus made clear that **Federal** law is to be applicable to all activities on all devices in contact with the seabed for exploration, development, and production. The committee intends that **Federal law is, therefore, to be applicable to** activities on drilling ships, **semi-submersible drilling rigs**, and other watercraft, when they are connected to the seabed by drillstring, pipes, or other appurtenances, on the OCS for exploration, development, or production purposes.

H. R. REP. NO. 95-590, at 128 (1977) (emphasis added), *reprinted in* 1978 U.S.C.C.A.N. 1450, 1534.

must arise on a situs covered by OCSLA, (2) federal maritime law must not apply of its own force, and (3) the state law must not be inconsistent with federal law.  *Id.*; s*ee, e.g.*, *Gardes Directional Drilling v. U.S. Turnkey Exploration,* 98 F.3d 860, 864-65 (5th Cir. 1996).

For the reasons set forth previously, *supra* III.E, OPA, a federal law, applies of its own force to the claims and controls to the exclusion of state common law.  There is thus no "gap" in federal legal coverage to fill with state law.[16]  To the extent OPA is not the Plaintiffs' exclusive remedy, general maritime law controls, to the exclusion of state common law.  There is still no "gap" in federal legal coverage to fill in with state law.  It, therefore, follows that state common law may not apply as "surrogate federal law" to the BP Oil Spill, as federal law (either OPA or general maritime law) preempts state common law.  Accordingly, all state common law claims must be dismissed pursuant to Rule 12(b)(6).

### H.   The Claimants Must Concede that OCSLA Applies and, Because OCSLA Applies, the State Common Law May Not Apply Where Maritime Law Applies Of Its Own Force

In their Omnibus Memorandum, the Bundle B1 Plaintiffs have conceded that "the *Deepwater Horizon* disaster and resulting oil spill (the 'Spill') took place on the Outer Continental Shelf of the United States."  **Dkt. 1821 at p. 21**.  As a result, OCSLA judicial jurisdiction exists under Section 1349(B)(1), **Dkt. 1821 at p. 22**.  The Bundle B1 Plaintiffs further have alluded that, under the Fifth Circuit's *PLT* test, state law may not apply as surrogate federal law under OCSLA, because maritime law applies "of its own force".  **Dkt. 1821 at pp. 23-25**.  The Claimants must likewise concede that, under OCSLA, maritime law—not state law—applies.

### I.   OPA's Section 2718(a) Neither Creates Nor Saves Any State Common Law Claims.

---

[16]   OCSLA may borrow the "applicable" and not inconsistent laws of an adjacent state as "surrogate" federal law.  "Applicable," according to the Fifth Circuit, must be read as "necessity to fill a significant void or gap."  *Le Sassier v. Chevron USA, Inc.*, 776 F.2d 506, 509 (5th Cir. 1985).  If a federal statutory scheme gives rise to a remedy, federal law applies to the exclusion of state law.  *Id.*  OPA is a federal law which provides a remedy to oil spill victims.  Thus, OPA eliminates any such "gap" in federal legal coverage for the Plaintiffs' claims.  *See, supra* III-D, referring to the broad range of damages recoverable from a responsible party under OPA.

OPA's Section 2718(a)(1) preserves the authority "of any State or political subdivision" to enact mini-OPAs to impose "additional liability" with respect to "the discharge of oil . . . within such State."  This narrowly crafted provision states:

### § 2718.  Relationship to other law

**(a)**     **Preservation of State authorities; Solid Waste Disposal Act**

Nothing in this chapter or the Act of March 3, 1851 shall—

(1)     affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to—

(A)     the discharge of oil or other pollution by oil within such State; or

(B)     any removal activities in connection with such a discharge; or

(2)     affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) or State law, including common law.

33 U.S.C. § 2718(a).  Section 2718(a) does not save the Master Complaint state common law claims from preemption.

OPA governs the discharge of oil from both onshore facilities and offshore facilities.  Congress, therefore, was mindful of the states' interests of regulating facilities sitting within a state's borders.  Section 2718 makes perfect sense when understood in this context.  Section 2718 cannot be read to abrogate general maritime law, as Section 2718(a)(2) does not disturb the long-standing and established admiralty preemption of state common law claims.  In fact, OPA contains an actual "savings provision," but this savings provision is located in OPA's subchapter III.  In Section 2751(e)(1), OPA provides:

**(e)      Admiralty and maritime law**

Except as otherwise provided in this chapter, this chapter does not affect—

(1)      admiralty and maritime law;

33 U.S.C. § 2751(e)(1).

Further, by its own explicit terms, Section 2718(a) provides that "[n]othing in this chapter [OPA] or the Act of March 3, 1851 [the Shipowners' Limitation of Liability Act] shall – (2) affect, or be construed or interpreted to affect or modify. . . State law, including common law."  33 U.S.C. § 2718(a)(2) (bracketed expressions added).  General maritime law is neither OPA nor the Shipowners' Limitation of Liability Act, to which Section 2718(a) refers.  As set forth previously, general maritime law applies to the claims because these claims arise from the explosion and sinking of a semisubmersible drilling rig, the *Deepwater Horizon*, a vessel operating in the navigable waters of the United States.  And, general maritime law prohibits application of state common law under the admiralty preemption doctrine.

Section 2718(a), which appears under the subtitle "Preservation of State authorities," preserves to the states the right to pass mini-OPA legislation.  It does not create new state law, nor does it permit the application of state law to claims that arise squarely within admiralty's jurisdiction, particularly when the state laws are otherwise in conflict with maritime law.[17]  The import of OPA's actual savings clause relating to admiralty and maritime law is clear:  OPA "does not affect – (1) admiralty and maritime law . . . ."  And, admiralty and maritime law is clear:  State law may never apply when it conflicts with admiralty law.

---

[17]    The Fifth Circuit has repeatedly recognized that the general maritime law should be applied to claims for pollution damage caused by vessels operating on navigable water and has, on numerous occasions, specifically declined to apply state common law when it conflicts with maritime law, specifically with respect to the subject of compensating oil spill victims.  *TESTBANK, supra,* 752 F.2d at 1032; *ROBERT E. LEE SS, supra,* 993 F.2d 1193; *In re Taira Lynn Marine Ltd.,* No. 5, *supra,* 444 F.3d 371, 377.

Moreover, Section 2718(a)(2) does not save state common law claims from OCSLA preemption.  By its own explicit terms, Section 2718(a) provides that nothing in OPA or in the Limitation of Liability Act shall affect or modify state law, including common law that existed at the time of OPA's enactment.  OCSLA is neither OPA nor the Shipowners' Limitation of Liability Act, to which Section 2718(a) refers.  OCSLA, which applies to this blowout arising from shelf drilling activities, applies federal maritime law, preempting application of state common law.

Judge Edith Brown Clement's opinion in *Muse v. Freeport McMoran, Inc.,* CIV. A. 91-4247, 1992 U.S. Dist. LEXIS 13397, 1992 WL 233771 (E.D. La. Aug. 28, 1992), is instructive in this respect, although it did not deal with OPA's Section 2718(a)(2).  In *Muse,* Judge Clement addressed a party's assertion of state tort claims in a matter falling within the court's maritime jurisdiction.  Recognizing that, in an area in which a state's regulatory or "police" power was involved, state law may legitimately apply, the court nevertheless ruled that Louisiana Civil Code Articles 2315 to 2318 "do not represent a detailed statutory scheme or an exercise of the State's police power.  Instead, they embody Louisiana's fundamental tort law principles."  *Muse,* at *2.  Based on this reasoning, Judge Clement dismissed all state law claims.  *Id.*

As in *Muse*, the various Gulf states' laws of negligence, gross negligence, nuisance, trespass, and fraudulent concealment do not represent a detailed statutory scheme—they represent general tort principles, an area preempted by maritime law.  Accordingly, such state law claims did not exist at the time OPA was enacted, OPA did not create any state common law claims, and none of them were saved by Section 2718(a)(2).

## IV.

## THE PLAINTIFFS' CLAIMS FOR "FRAUDULENT CONCEALMENT" MUST BE DISMISSED

The Master Claim / Complaint fails to state a claim for "fraudulent concealment" under Federal Rules of Civil Procedure 9(b) and 12(b)(6).  The Master Claim / Complaint seeks to recover against Transocean for its alleged "fraudulent concealment of material facts concerning the Spill."  **C, ¶ 692, at p. 136.**  Plaintiffs allege that Transocean "misrepresented and concealed" the safety record and condition of the *Deepwater Horizon* and various components of the vessel. **C, ¶¶ 704-06.**  According to Plaintiffs, this "induced Plaintiffs to act or to refrain from acting to protect their property, businesses, livelihoods and income."  **C, ¶ 708.**

### A.      *The Plaintiffs' Pleading Lacks the Particularity Required by Rule 9(b).*

Plaintiffs' pleadings in support of their "fraudulent concealment" claim do not meet the heightened requirements of Federal Rule of Civil Procedure 9(b), which states that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b).  The Fifth Circuit interprets Rule 9(b) strictly, requiring the plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 206-07 (5th Cir. 2009), *cert. denied*, 130 S. Ct. 199 (2009) (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997)).  In cases alleging an omission of facts, Rule 9(b) requires the claimant "to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading." *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006) (quoting *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 381 (5th Cir. 2004)).  A plaintiff must also allege facts showing that a defendant had a duty to disclose the omitted facts.  *Carroll*, 470 F.3d at 1174.

Here, the Plaintiffs' allegations do not provide the time, place, or contents of any misrepresentation by Transocean, nor do the allegations connect any particular statement to an individual speaker with regard to the condition of the *Deepwater Horizon* or its components. With regard to Transocean's alleged concealment of material facts, Plaintiffs' pleading fails to indicate "the place in which the omissions should have appeared."  *See Riley*, 355 F.3d at 381. They allege no facts showing when, if ever, it was incumbent upon Transocean, which never had any dealings or a relationship with the Plaintiffs, to disclose any information to them at all, nor how Transocean should have done so.  *See Carroll*, 470 F.3d at 1174.  As a result, Plaintiffs' pleading in support of their fraudulent concealment claim falls short of the kind and degree of particularity required by Rule 9(b) and the Fifth Circuit's interpretation thereof.  Because the Plaintiffs failed to satisfy Rule 9(b), their claim for fraudulent concealment must be dismissed.

**B.** **The Plaintiffs Have Failed to State a Claim Under Any Potentially Applicable State Law.**

As set forth below, the Plaintiffs' allegations also fail to state a cognizable claim under the laws of Louisiana, Texas, Mississippi, Alabama, or Florida.

**1.** **The Plaintiffs' Allegations Fail to State a Claim Under Louisiana Law**

The Louisiana Civil Code defines fraud as follows:

> Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other.  Fraud may result from silence or inaction.

LA. CIV. CODE ANN. ART. 1953.  To find fraud from silence or suppression of the truth, there must exist a duty to speak or to disclose information.  *Pioneer Valley Hosp., Inc. v. Elmwood Partners, L.L.C.*, 01-453 (La. App. 5 Cir. 10/17/01); 800 So. 2d 932, 937.  A legal duty to disclose exists only if there is privity of contract or a fiduciary relationship between the parties.  *Id.*; *McLachlan v. New York Life Ins. Co.*, 488 F.3d 624, 628 (5th Cir. 2007) (citing *Nat'l Union*

*Fire Ins. Co. of Pittsburgh, Pa. v. Cagle*, 68 F.3d 905, 910 (5th Cir. 1995)).  Because there is no fiduciary duty or contract between Transocean and any Plaintiff, and Plaintiffs do not allege any, the Plaintiffs cannot state a claim for "fraudulent concealment" against Transocean under Louisiana law.  Plaintiffs have also failed to allege any facts showing the intent of Transocean to "obtain an unjust advantage" or "to cause a loss or inconvenience" to them.  Intent is an essential element of a fraud claim.  *See Sun Drilling Prods. Corp. v. Rayborn*, 2000-1884 (La. App. 4 Cir. 10/3/01); 798 So. 2d 1141, 1152, *writ denied*, 2001-2939 (La. 1/25/02); 807 So. 2d 840.  Accordingly, under Louisiana law, Plaintiffs' fraudulent concealment claims must be dismissed.

## 2.    The Plaintiffs' Allegations Fail to State a Claim Under Texas Law

To state a claim of fraud by misrepresentation under Texas law, a plaintiff must sufficiently allege (1) a misrepresentation that (2) the speaker knew to be false or made recklessly (3) with the intention to induce the plaintiff's reliance, followed by (4) actual and justifiable reliance (5) causing injury.  *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001).  Fraudulent concealment or nondisclosure is a subcategory of fraud that occurs when a party with a duty to disclose a material fact fails to disclose that fact.  *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997).  "Generally, no duty of disclosure arises without evidence of a confidential or fiduciary relationship," and Plaintiffs allege no such relationship in the instant case.  *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998).  Outside of such a relationship, Texas courts have recognized a duty to disclose under certain circumstances only between parties to a business transaction or relationship.  *See Bradford v. Vento*, 48 S.W.3d 749, 755-56 (Tex. 2001).  Plaintiffs do not allege any commercial relationship or transaction with Transocean that could impose a duty on Transocean to disclose anything to Plaintiffs.  In addition, Plaintiffs fail to allege any intent of Transocean to induce Plaintiffs' reliance on any alleged misrepresentations or omissions.  *See United Teacher Assocs.*

*Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 567-68 (5th Cir. 2005) ("Courts in Texas have consistently held that fraud by nondisclosure or concealment requires proof of all of the elements of fraud by affirmative misrepresentation, including fraudulent intent."). As a result, Plaintiffs have failed to state a claim for fraud or fraudulent concealment under Texas law. Therefore, Plaintiffs' claims of fraudulent concealment under Texas law must be dismissed.

### 3.   The Plaintiffs' Allegations Fail to State a Claim Under Mississippi Law

In order to state a claim for common law fraud in Mississippi, a plaintiff must allege: (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) reliance upon its truth, (8) a right to rely on the representation, and (9) an injury proximately caused by the reliance on the representation. *Mabus v. St. James Episcopal Church*, 884 So. 2d 747, 762 (Miss. 2004). The omission or concealment of material facts can constitute a misrepresentation, but, in such a case, the plaintiff must demonstrate that the defendant "took some action, affirmative in nature, which was designed or intended to prevent and which did prevent the discovery of the facts giving rise to the fraud claim." *Rankin v. Brokman*, 502 So. 2d 644, 646 (Miss. 1987). In this case, Plaintiffs' allegations fail to state a claim for fraud under Mississippi law because they fail to plead any affirmative act of concealment or fraudulent intent by Transocean with regard to any alleged misrepresentation or omission or any reliance by the Plaintiffs. Therefore, Plaintiffs' claims of fraudulent concealment under Mississippi law must be dismissed.

### 4.   The Plaintiffs' Allegations Fail to State a Claim Under Alabama Law

To state a cause of action for "fraud by suppression" as provided in the Alabama Code, a plaintiff must establish: (1) that the defendant had a duty to disclose material facts, (2) that the

defendant concealed or failed to disclose those facts, (3) that the concealment induced the plaintiff to act, and (4) that the plaintiff's action resulted in harm to the plaintiff. *Hughes v. Hertz Corp.*, 670 So. 2d 882, 887 (Ala. 1995) (citing *Interstate Truck Leasing, Inc. v. Bender*, 608 So. 2d 716 (Ala. 1992); ALA. CODE 1975, § 6-5-102).  The related causes of action of "deceit" and "fraudulent deceit" under Sections 6-5-104 and 6-5-105 of the Alabama Code result "from either a willful or a reckless misrepresentation or a suppression of material facts with an intent to mislead." *Hughes*, 670 So. 2d at 888.  For each of these causes of action, mere silence is not fraudulent in the absence of a duty to disclose.  A duty to disclose may arise from the particular circumstances of the case, a confidential relationship, or a request for information. *Id.* at 887-88.  When "parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose information arises when the information is not requested." *Mason v. Chrysler Corp.*, 653 So. 2d 951, 954-55 (Ala. 1995).  Here, Plaintiffs allege no relationship with Transocean or any request for information that could support a duty to disclose under Alabama law.  In addition, Plaintiffs fail to plead that Transocean intended to mislead them with the alleged misrepresentations and omissions. *See Hughes*, 670 So. 2d at 888.  Accordingly, Plaintiffs fail to state a claim for fraudulent suppression, deceit, and fraudulent deceit under the Alabama Code.

### 5.     The Plaintiffs' Allegations Fail to State a Claim Under Florida Law

To state a cause of action for fraud under Florida law, a party must allege: (1) a false statement concerning a material fact, (2) the representor's knowledge that the representation is false, (3) an intention that the representation induce another to act on it, and (4) consequent injury by the party acting in reliance on the representation. *Mettler, Inc. v. Ellen Tracy, Inc.*, 648 So. 2d 253, 255 (Fla. Dist. Ct. App. 1994).  A defendant's knowing concealment or nondisclosure of a material fact may support an action for fraud when there is a duty to disclose,

which arises when there is a fiduciary or other relation of trust or confidence between the two parties.  *See Don Slack Ins., Inc. v. Fidelity & Cas. Co. of N.Y.*, 385 So. 2d 1061, 1064 (Fla. Dist. Ct. App. 1980).  If no such relationship exists, Florida courts recognize a duty to disclose only in the context of a commercial transaction, when a party voluntarily undertakes to disclose information.  *Friedman v. Am. Guardian Warranty Servs., Inc.*, 837 So. 2d 1165, 1166 (Fla. Dist. Ct. App. 2003).  Because Plaintiffs fail to allege any relationship or business transaction with Transocean, they have failed to state a fraud claim under Florida law as well.

## V.

### TO THE EXTENT THAT THEY HAVE NOT SUSTAINED PHYSICAL DAMAGE TO A PROPRIETARY INTEREST, THE PLAINTIFFS' FEDERAL MARITIME AND STATE LAW CLAIMS ARE BARRED BY THE *ROBINS DRY DOCK* RULE

The Master Claim / Complaint alleges that Plaintiffs are Local Government entities and officials, such as cities, towns, counties, villages, parishes, municipalities, special districts, school boards, sheriffs, district attorneys, public boards, institutions, departments, commissions, districts, corporations, agencies, authorities, and any agencies or subdivisions of any of these, and other local public or governmental bodies of any kind which are not state agencies.  **C, ¶¶ 28 and 178.**  To the extent that the Plaintiffs comprising these broad categories have not sustained physical damage to a proprietary interest, maritime and state law bar those claims under the *Robins Dry Dock* rule or its "economic loss" state equivalent and should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

### A.    *Maritime Law Bars the Plaintiffs' Claims Under Robins Dry Dock.*

*Robins Dry Dock & Repair Co. v. Flint* precludes recovery for economic loss in general maritime law tort claims absent physical injury to a proprietary interest.  275 U.S. 303, 309 (1927).  The Supreme Court's "unmistakable" rule of *Robins Dry Dock* has been adopted and applied repeatedly and without qualification by the Fifth Circuit.  *See, e.g., In re Taira Lynn*

*Marine Ltd. No. 5, LLC*, 444 F.3d  at 377 ("It is unmistakable that the law of this circuit does not allow recovery of purely economic claims absent physical injury to a proprietary interest in a maritime negligence suit"); *State of La. ex rel. Guste v. M/V TESTBANK,* 524 F. Supp. at 1173 ("having reexamined the history and central purpose of the doctrine of *Robins Dry Dock* as developed in this circuit, we remain committed to its teaching"); *Reserve Mooring Inc. v. Am. Commercial Barge Line*, *LLC,* 251 F.3d 1069, 1071 (5th Cir. 2001) (denying a mooring facility's claims for lost income against barge that sank during unloading, and holding circuit "had not retreated from *TESTBANK*'s physical injury requirement"); *see also Blue Gulf Seafood, Inc. v. TransTexas Gas Corp.*, 24 F. Supp. 2d 732, 734 (S.D. Tex. 1998) (denying economic claims of Louisiana oyster farmers leasing oyster beds in Texas, finding farmers suffered no property damage, as Texas laws limit proprietary interest in seabed to Texas corporations); *In re Settoon Towing LLC*, CIV. A. 07-1263, 2009 WL 4730969, at *3 (E.D. La. Dec. 4, 2009) (denying oil production company's claim for economic losses for inability to access platform during oil spill cleanup, citing *Robins Dry Dock*).

The Eleventh Circuit has also recognized and "abided by" *Robins Dry Dock*.  *See Kingston Shipping Co., Inc. v. Roberts*, 667 F.2d 34, 35 (11th Cir. 1982) (applying *Robins Dry Dock* to affirm dismissal of economic claims of vessels blocked in channel for twenty six days); *Miller Indus. v. Caterpillar Tractor Co*., 733 F.2d 813, 818-19 (11th Cir. 1984).

Even if the Plaintiffs' state common law claims were not preempted, however, their claims are barred under the common law of the States of Louisiana, Texas, Mississippi, and Alabama, *infra* V.B-E.

**B.**     ***Louisiana Law Bars the Plaintiffs' Claims Under Its Economic Loss Rule***.

Louisiana jurisprudence or civilian law adopts the policy determinations made in *Robins Dry Dock.  See Dempster v. Louis Eymard Towing Co., Inc.,* 503 So. 2d 99, 102 (La. Ct. App.

1987) (citing *TESTBANK* for the "general rule in maritime law" requiring physical damage to a proprietary loss as a prerequisite to recovery for economic loss).  Looking to moral, social, and economic considerations, the Louisiana Supreme Court has recognized that the duty to not injure another's property would not extend beyond the property owner, and would not extend to a third person simply in contract with the property owner because "the list of possible victims and the extent of economic damages might be expanded indefinitely."  *PPG Indus., Inc. v. Bean Dredging,* 447 So. 2d 1058, 1059-62 (La. 1984) (noting "[m]ost cases have cited *Robins Dry Dock*" to deny recovery for indirect economic losses caused by negligent injury to property that interferes with contractual relations, "without analyzing the problem"); *see also Phillips v. G&H Seed Co.,* 2008-934 (La. App. 3 Cir. 4/8/09); 10 So. 3d 339, 342-45, *reh'g denied* (June 3, 2009), *writ denied,* 2009-1504 (La. 10/30/09); 21 So. 3d 284, *reconsideration not considered,* 2009-1504 (La. 1/8/10); 24 So. 3d 871 (dismissing economic damages brought by purchasers of crawfish against seed provider, after commercial crawfish farm crop was damaged by defective rice seed, as purchasers had no proprietary interest in crop); *TS & C Inv., L.L.C. v. Beusa Energy, Inc.*, 637 F. Supp. 2d 370, 374-75 (W.D. La. 2009) (citing *Robins Dry Dock* in predicting that Louisiana Supreme Court would hold economic loss rule bars local business owners from recovering purely economic damages on state law tort claims against oil company).

Even as to commercial fishermen, Louisiana state law bars recovery of purely economic damages without accompanying physical damage to a proprietary interest.  *See Dempster,* 503 So. 2d at 101-02 (finding plaintiffs had no proprietary interest in fish in state waters, and therefore had no future loss of fish); *La. Seafood Mgmt. Council v. La. Wildlife & Fisheries Comm'n*, 1997-1367 (La. 5/19/98), 715 So. 2d 387, 392 (holding Louisiana Civil Code establishes that the "lack of any property interest in the fish in the waters is well-settled, statutorily and judicially"); *La. Crawfish Producers Ass'n-West v. Amerada Hess Corp.*, 2005-

1156 (La. App. 3 Cir. 7/12/06); 935 So. 2d 380, 384-85 (affirming dismissal of commercial crawfishermens' purely economic claims on basis of *Robins Dry Dock*); *LaBauve v. La. Wildlife & Fisheries Comm'n,* 444 F. Supp. 1370, 1378 (E.D. La. 1978) (dismissing commercial fishermen claims for lost wages, because the fish "at large in state waters are the property of the state"); *Barasich v. Shell Pipeline Co., LP*, CIV.A. 05-4180, 2006 WL 3913403, at *6-7 (E.D. La. Nov. 20, 2006) (denying commercial fishermen's' federal and state law claims because they suffered no physical damage and had no proprietary interest in fish in state waters).

**C.**      ***Texas Law Bars the Plaintiffs' Claims Under Its Economic Loss Rule.***

Consistent with federal maritime law, Texas common law requires damage to property or physical injury before economic loss may be recovered. *Coastal Conduit & Ditching, Inc. v. Noram Energy Corp.*, 29 S.W.3d 282, 287-89 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (finding Texas law bars recovery of economic damages in a negligence case when parties are contractual strangers and there is no claim for damages to property, as the foreseeability of economic loss "is a standard that sweeps too broadly. . . portending liability that is socially harmful in its potential scope and uncertainty").

Citing *TESTBANK*, Texas courts have recognized that the economic loss doctrine applies to negligence actions, barring damages resulting solely from economic harm. *Express One Int'l, Inc. v. Steinbeck*, 53 S.W.3d 895, 898-99 (Tex. App.—Dallas 2001, no pet.) (requiring a party to plead and prove personal injury or property damages, versus mere economic harm); *Trans-Gulf Corp. v. Performance Aircraft Servs., Inc.*, 82 S.W.3d 691, 695 (Tex. App.—Eastland 2002, no pet.) (citing the economic loss rule to dismiss a duty in tort when the only injury claimed is one for economic damages); *Rodriquez v. Carson,* 519 S.W.2d 214, 215-16 (Tex. App.—Amarillo 1975, *writ ref'd n.r.e*) (dismissing economic claims of driver who had no injuries and no vested interest in truck); *Zurich Am. Ins. Co. v. Hughes,* 11-05-00044-CV, 2006 WL 1914689, at *2

(Tex. App.—Eastland July 13, 2006, pet. denied) (explaining benefits of economic loss rule, including rule's ability to limit duty owed when a tortfeasor's action damages several others); *Dana Corp. v. Microtherm, Inc.*, 13-05-00281 CV 2010 WL 196939, at *27-28 (Tex. App.—Corpus Christi Jan. 21, 2010, pet. filed) (denying action for loss of value of patents against supplier of defective products, as no actual physical injury or property damages were suffered).

Texas common law makes no exception for commercial fishermen alleging economic losses without proof of property damage or physical injury.

**D.      *Mississippi Law Bars the Plaintiffs' Claims Under Its Economic Loss Rule*.**

Mississippi state law does not permit recovery for mere economic damages in a negligence action without personal injury or property damage.  *Adcock v. S. Austin Marine, Inc.*, CIVA 208 CV 263 KS-MTP, 2009 WL 3633335, at *4-5 (S.D. Miss. Oct. 30, 2009).   The Mississippi economic loss doctrine has evolved through products liability common law.  *See State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 736 So. 2d 384, 386-88 (Miss. Ct. App. 1999) (holding economic loss doctrine barred economic damages and recovery for defective product in products liability law, noting "case of first impression as our supreme court has never addressed the question of applying the economic loss doctrine") (citing *Lee v. Gen. Motors Corp.*, 950 F. Supp. 170, 172-73 (S.D. Miss. 1996) (making an "*Erie* guess" state supreme court would agree "overwhelming weight of authority holds that there can be no recovery in tort" for purchasers of vehicles who had not suffered personal injury and alleged only economic damages)); *see also E. Miss. Elec. Power Ass'n v. Porcelain Prod. Co.,* 729 F. Supp. 512, 517-18 (S.D. Miss. 1990) (holding economic loss doctrine barred negligence action for defective electricity insulators, as only damages claimed were insulators and economic damages of diminished value and cost of removal and replacement).   And, expanding the rule to negligence actions, federal courts in Mississippi have again made an *Erie* prediction that the Mississippi Supreme Court would find

the economic loss doctrine precludes recovery in tort for purely economic loss, when there is no injury, damage, or defective product. *Adcock v. S. Austin Marine, Inc.*, at \*4-5 (holding boat purchaser could not recover economic losses of tax, title, and registration fees for purchase of wrong model boat, and although no controlling state precedence, state supreme court would hold plaintiff had no remedy for economic damages in sale).

As to the availability of a common law exception for commercial fishermen, a Mississippi statute holds proprietary rights to seafood to be the property of the state:

> All seafoods existing or living in waters within the territorial jurisdiction of the State of Mississippi not held in private ownership legally acquired . . . shall be, continue, and remain the property of the State of Mississippi, to be held in trust for the people thereof until title thereto shall be legally divested in the manner and form hereinafter authorized, and the same shall be under the exclusive control of the commission until the right of private ownership shall vest therein as hereinafter provided.

MISS. CODE. ANN. § 49-15-5 (West 2010); *see Parks v. Simpson*, 137 So. 2d 136, 138-39 (Miss. 1962) (denying claims for ownership of oyster shells on seabed, and acknowledging "an unbroken line" of 100 years of decisions declaring the state of Mississippi to be the owner of the lands in the beds of all its shores, inlets, and adjacent to the islands, and therefore owner of the oyster shells); *Ex parte Fritz*, 38 So. 722, 723 (Miss. 1905) (finding Mississippi common law clearly establishes that a state resident cannot own the fish in the state waters, "even if he owned the bed of the entire lake and all its waters," as fish are "ferae naturae" and incapable of absolute ownership).

**E.      *Alabama Law Bars the Plaintiffs' Claims Under Its Economic Loss Rule.***

As in Mississippi, the Alabama common law doctrine of economic loss grew from products liability claims. *Lloyd Wood Coal Co. v. Clark Equip. Co.*, 543 So. 2d 671, 674 (Ala. 1989) (adopting the economic loss rule, finding claims for damage to a defective product would not stand in tort but in contract, and "[o]f course, an action in tort would have arisen had there

31

been personal injury or damage to property other than the product itself"); *Harris Moran Seed Co., Inc. v. Phillips*, 949 So. 2d 916, 931-33 (Ala. Civ. App. 2006) (affirming trial court's dismissal of tort claims based on economic loss doctrine after defective product caused damage only to the product itself).

Federal courts sitting in Alabama have upheld *Robins Dry Dock*, barring claims for purely economic damages without accompanying property damage. *Louisville & Nashville R.R. Co. v. Arrow Transp. Co*., 170 F. Supp. 597, 599-600 (N.D. Ala. 1959) (citing *Robins Dry Dock* in holding railroad company could not sustain claims in admiralty or common law for loss of use of damaged bridge, as company held no possessory interest in bridge other than "a right of user," which the Alabama Supreme Court had referred to as in the nature of an easement); *see also Louisville & Nashville R.R. Co. v. M/*V BAYOU LACOMBE, 597 F.2d 469, 473-74 (5th Cir. 1979) (denying claims for pure economic loss, concluding that even if Alabama contract law determined railroad company retained property interest in contract, it had retained no aspects of ownership that would justify recovery for property damage, as company did not maintain bridge or pay for repairs).   Alabama common law makes no exception for commercial fishermen alleging economic for losses without proof of property damage or physical injury.

In summary, to the extent that they have not sustained physical damage to a proprietary interest, the Plaintiffs' general maritime law claims are barred by the *Robins Dry Dock* rule. And, to the extent that they have not sustained physical damage to a proprietary interest, the Plaintiffs' state law claims are barred by the respective state laws of Louisiana, Texas, Mississippi, and Alabama.

## VI.

### THE LOUISIANA MINI-OPA STATUTE PROVIDES THE EXCLUSIVE STATE LAW REMEDY FOR DISCHARGES OF OIL

The Louisiana mini-OPA statute provides in pertinent part:

§ 30:2491. Exclusive remedies:

A.    When applicable, the limitation of liability and immunities provided in this Chapter shall be exclusive and shall supercede any other liability provision provided by any other applicable state law.   The provisions of this Chapter shall supercede, but not repeal, any conflicting law of the states . . .

The limitations of liability are set forth in Section 30:2479.   To the extent that the Plaintiffs seek remedies under the laws of Louisiana, other than the remedies available under Louisiana's mini-OPA statute, those claims must be dismissed pursuant to Section 30:2491.

**VII.**

**PLAINTIFFS' CLAIMS UNDER THE FLORIDA, LOUISIANA, AND TEXAS MINI-OPA STATUTES MUST BE DISMISSED**

The Plaintiffs allege in their Master Complaint claims under the mini-OPA statutes passed respectively by the States of Florida, Louisiana, and Texas.  **C, ¶¶ 711-46**.  Even assuming for the sake of argument that state law might apply, it would not be the law of Florida or Texas because Louisiana is the "adjacent state" whose law would apply as surrogate federal law under OCSLA.  *See* 43 U.S.C. § 1333(a)(2)(A).

**A.**    *Claims Under the Florida Mini-OPA Statute by Plaintiffs Outside of Florida Must Be Dismissed*

The Plaintiffs' claim under the Florida mini-OPA statute is preceded by the heading "**Florida Subclass Members v. BP and Transocean**," but it is alleged that "Defendants are strictly liable to Plaintiffs and Florida Subclass Members under the Act, § 376.205." **C, ¶719.** Because the Plaintiffs "reallege each and every allegation set forth in all preceding paragraphs" in support of their Florida mini-OPA claim, **C, ¶711**, these allegations include all previously identified "Plaintiffs."   "Plaintiffs," as described in the Master Complaint, are:

local government entities or officials, including cities, towns, counties, villages, parishes, municipalities, special districts, school boards, sheriffs, district attorneys, public boards, institutions, departments, commissions, districts,

corporations, agencies, authorities, and any agencies or subdivisions of any of these, and other local public or governmental bodies of any kind which are not state agencies, in Florida, Alabama, Mississippi, Louisiana and Texas.

**C, ¶ 178.**  However, the Florida mini-OPA statute, by its own terms and as a matter of law, only provides relief for owners of property affected by a prohibited discharge within the territorial waters of Florida.  *See* Fla. Stat. § 376.205 (providing a cause of action for damages resulting from "pollution" by a "responsible party"); § 376.031(17) (defining "pollution" as the presence of pollutants in the "waters of the state"); § 376.12(1) (stating that a responsible party is liable for discharges that "take place within state boundaries."); *see also Askew*, 411 U.S. at 327. Accordingly, to the extent that the Plaintiffs' claim under the Florida mini-OPA statute is asserted by local government entities or officials residing outside of Florida, the claim must be dismissed.

**B.**    ***Plaintiffs' Claim under the Louisiana Mini-OPA Statute Must Be Dismissed***

Louisiana Subclass Members allege a claim under the Louisiana mini-OPA statute seeking recovery from Transocean for alleged property damage and costs associated with increased public services resulting from the BP Oil Spill.  Louisiana's mini-OPA statute was designed to "support and complement" OPA.  LA. REV. STAT. § 30:2453.  Louisiana's statute creates an Oil Spill Contingency Fund, but claims to that fund may not be made without first exhausting all federal remedies.  LA. REV. STAT. § 30:2488(C)(1).  Unlike the federal OPA, Louisiana's mini-OPA statute does not contain any language expressly making responsible parties liable to any affected person for damages.  To the contrary, the Louisiana mini-OPA appears to create only two causes of action.

The two causes of action contemplated by the Louisiana mini-OPA statute are: (1) an action by the State of Louisiana's designated oil spill coordinator, on behalf of the State of Louisiana and its trustees, to seek reimbursement for payments made by the Louisiana Oil Spill

Contingency Fund, LA. REV. STAT. § 30:2489, and (2) an action by the Louisiana Department of Wildlife and Fisheries to recover penalties for the value of injured wildlife, which is referenced in LA. REV. STAT. § 30:2491, but actually arises under LA. REV. STAT. § 56:40.1.  As to the first cause of action, the Plaintiffs identified as Louisiana Subclass Members do not include the State of Louisiana's designated coordinator.  Further, these Subclass Members are not seeking reimbursement to the Louisiana Oil Spill Contingency Fund.  Therefore, no cause of action has been stated under  LA. REV. STAT. § 30:2489.

As to the second possible cause of action, Louisiana Subclass Members allege that Defendants are "liable for the killing of fish, wild birds, wild quadrupeds, and other wildlife and aquatic life, in violation of LA. REV. STAT. § 56:40.1." **C, ¶ 735.**  However, that statute expressly provides that any such liability is only to the State of Louisiana:

> A person who kills, catches, takes, possesses, or injures any fish, wild birds, wild quadrupeds, and other wildlife and aquatic life in violation of this Title, or a regulation adopted pursuant to this Title, or a federal statute or regulation governing fish and wildlife, or who, through the violation of any other state or federal law or regulation, kills or injures any fish, wild birds, wild quadrupeds, and other wildlife and aquatic life, **is liable to the state** for the value of each fish, wild bird, wild quadruped, and other wildlife and aquatic life, unlawfully killed, caught, taken, possessed, or injured.

LA. REV. STAT. § 56:40.4.   The Louisiana Department of Wildlife and Fisheries, not local government entities such as Plaintiffs, assesses any civil penalties and gives written notice of "the alleged violation and of the value of such injured or destroyed wildlife or aquatic life." LA. REV. STAT. § 56:40.3.   If a civil suit is instituted to recover such penalties, then only "the attorney for the department, attorney general, or the district attorney of the parish in which the violation occurred may bring a civil suit under this Subpart **in the name of the state."** LA. REV. STAT. § 56:40.4.   Any recovery of civil penalties "shall be immediately deposited to the Conservation Fund of the Department of Wildlife and Fisheries and credited to the enforcement emergency situation response account within the fund."  LA. REV. STAT. § 56:40.9.

Here, Plaintiffs have not alleged that they are seeking to recover civil penalties assessed by the Louisiana Department of Wildlife and Fisheries in the name of the State of Louisiana. Plaintiffs, as defined in the Master Complaint, do not include the State of Louisiana or any other state agency.  **C, ¶178**.  Accordingly, Plaintiffs' claim for the value of wildlife allegedly lost as a result of the BP Oil Spill must be dismissed.

**C.**     ***Plaintiffs' Claim under the Texas Mini-OPA Statute Must Be Dismissed Because the Statute Does Not Provide a Cause of Action***

Texas Subclass Members seek compensation for certain damages defined in the Texas mini-OPA statute, **C, ¶¶ 742-44**, but the compensation provided by the statute is not recoverable in a civil lawsuit.  The Texas mini-OPA statute was not enacted to provide for the recovery of damages through litigation.  Rather, the statute was enacted to

> exercise the police power of the state to protect its coastal waters and adjacent shorelines by conferring upon the Commissioner of the General Land Office the power to:
>
> (1)     prevent spills and discharges of oil by requiring and monitoring preventive measures and response planning;
>
> (2)     provide for prompt response to abate and contain spills and discharges of oil and ensure the removal and cleanup of pollution from such spills and discharges;  and
>
> (3)     administer a fund to provide for funding these activities and to guarantee the prompt payment of certain reasonable claims resulting from spills and discharges of oil.

TEX. NAT. RES. CODE § 40.002(c) (emphasis added).  The fund was established to "provide immediately available compensation for response costs incurred and damages suffered as a result of an unauthorized discharge."  TEX. NAT. RES. CODE § 40.151(a); TEX. ADMIN. CODE, Rule § 19.53(a).  The statute's intent is "to simplify resolution of liability issues by creating procedures conducive to settlement and adjustment of claims in as orderly, efficient, and timely a manner as possible." TEX. ADMIN. CODE, Rule § 19.53(a).

The "damages" alleged by Texas Subclass Members are those recoverable through a specific claims process enumerated in the Texas mini-OPA statute.  A claim for "damages" or "response costs" as defined in the statute must be in writing and must affirm, among other things, that "the same claim is not being pursued through any other claim, suit, settlement, or proceeding." TEX. ADMIN. CODE, Rule § 19.53(e).  The claim must first be presented to the designated responsible person. TEX. NAT. RES. CODE § 40.159; TEX. ADMIN. CODE, Rule § 19.53(b).  If the responsible person fails to reasonably respond within a specified period of time of up to ninety days, the claimant may then present the claim to the Texas General Land Office ("GLO") for compensation from the fund. TEX. ADMIN. CODE, Rule § 19.53(b).  This claims process does not allow for a claimant to first attempt litigation:  All claims must be presented to the GLO "within 180 days from the date the claim is first eligible to be filed with the GLO." TEX. ADMIN. CODE, Rule § 19.53(d); TEX. NAT. RES. CODE § 40.159(c).

The Texas mini-OPA statute does not create an independent cause of action for claimants directly against the covered polluters. *See Avitts v. Amoco Prod. Co.*, 840 F. Supp. 1116, 1121 (S.D. Tex. 1994), *rev'd on other grounds*, 53 F.3d 690 (5th Cir. 1995).  As a result, Plaintiffs' claim under the Texas mini-OPA statute must be dismissed.

## VII.

## THE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES MUST BE DISMISSED[18]

In their Master Claim in Limitation, the Claimants include a claim for "Punitive Damages" separate from their claims for negligence, gross negligence, nuisance, and trespass. **C, ¶¶ 160-63.**  Similarly, in their Master Complaint, the Plaintiffs include a separate claim for

---

[18]   To the extent not preempted by OPA, any general maritime law claims for punitive damages asserted in the C Master Complaint against Transocean remain subject to the Limitation injunction, stay, and restraining order entered by the Court (Judge K. Ellison) on June 14, 2010, in C. A. No. 4:10-cv-1721 [after transfer, 10-2771]. *United States v. BIG SAM*, 681 F.2d 432 (5th Cir. 1982).

"Punitive Damages Under All Claims."  **C, ¶¶ 747-68.**[19]  Punitive damages are not recoverable under OPA.

The Oil Pollution Act of 1990 does not specifically address the availability of punitive damages as a remedy.  The leading case on the issue is the First Circuit's decision in *S. Port Marine, LLC v. Gulf Oil Ltd. Partnership,* which held that punitive damages are not recoverable under OPA.  234 F.3d 58, 64-66 (1st Cir. 2000).  The basis for that decision was the lack of any statutory authority under OPA to support an award of punitive damages.  In so doing, the First Circuit held that OPA supplanted general maritime law in this area:

> This case, however, presents an entirely different issue, namely, whether Congress's very specific treatment of oil pollution in the OPA, which does not provide for punitive damages, supplanted general admiralty and maritime law, which has traditionally provided for the general availability of punitive damages for reckless conduct.  This question has largely been decided for us by the Supreme Court in *Miles v. Apex Marine,* 498 U.S. 19, 111 S. Ct. 317, 112 L.Ed.2d 275 (1990), in which the Court declined to supplement damage provisions of the Death on the High Seas Act, 46 App. U.S.C. § 762 [subsequently recodified at 46 U.S.C. § 30303].  The Court refused to allow recovery for loss of society when such damages were not provided in the statute, reasoning that "in an 'area covered by statute, it would be no more appropriate to prescribe a different measure of damage than to prescribe a different statute of limitations, or a different class of beneficiaries.'" *See Miles,* 498 U.S. at 31, 111 S. Ct. 317 (quoting *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 625, 98 S. Ct. 2010, 56 L.Ed. 2d 581 (1978)).  As we indicated in *CEH,* 70 F.3d 694 (1st Cir. 1995), *Miles* dictates deference to congressional judgment "where, at the very least, there is an overlap between statutory and decisional law."  *Id.* at 701.  Such is obviously the case here.

*Id.* at 65-66.

---

[19]  At the outset, it should be noted that punitive damages do not constitute a separate cause of action, but instead constitute a <u>remedy</u> available for tortious or otherwise unlawful acts.  The only cause of action alleged in either the Master Claim in Limitation or the Master Complaint that might permit recovery of punitive damages is the count of gross negligence and willful misconduct.  Any claims for punitive damage based upon negligence, nuisance, trespass, or fraudulent concealment must therefore be dismissed.

The *South Port Marine* decision subsequently has been followed by an Oregon district court in *Clausen v. M/V NEW CARISSA*, 171 F. Supp. 2d 1127, 1133 (D. Or. 2001), and by this Court in *Isla Corp. v. Sundown Energy, LP*, CIV. A. 06-8645, 2007 WL 1240212 (E.D. La. Apr. 27, 2007).   The holdings of this Court and the Oregon district court are sound: "Congress intended OPA defendants not to be subject to punitive damages for any property damage claim under federal law arising out of an oil spill." *Clausen,* 171 F. Supp. at 1134.[20]   Indeed, "no case or commentator has suggested that the availability of punitive damages under general admiralty and maritime law survived the enactment of the OPA." *S. Port Marine, LLC,* 234 F.3d at 65.   As the Ninth Circuit explained, "[s]ometimes punitive damages are allowable, sometimes they are not . . . punitive damages are not available under the Oil Pollution Act." *In re Exxon Valdez,* 270 F.3d 1215, 1226 n.14 (9th Cir. 2001) (*citing S. Port Marine, LLC,* 234 F.3d at 65).   Accordingly, all punitive damage claims should be dismissed with prejudice.

## VIII.

### THE PLAINTIFFS' CLAIMS FOR DECLARATORY RELIEF MUST BE DISMISSED[21]

In their Master Complaint, Plaintiffs include a count for "Declaratory Relief: Punitive Damages" and allege that they have a legitimate and legally protected interest in punishment and deterrence of reprehensible and harmful conduct and, as a result, "seek a judicial declaration against Defendants and in favor of the class that any settlement provisions that purport, directly or indirectly, to release or to affect the calculation of punitive damages without a judicial

---

[20]   *See also S. Port Marine LLC v. Gulf Oil L.P.,* 234 F.3d at 64: "OPA sets forth a comprehensive list of recoverable damages, including removal costs, damage to natural resources and real or personal property; loss of subsistence use of natural resources; loss of government revenues; lost profits and earning capacity; and costs of increased or additional public services occasioned by the unlawful act.  Absent from that list of recoverable damages is any mention of punitive damages."

[21]   If not dismissed, the Plaintiffs' claims for declaratory relief asserted in the First Amended B1 Master Complaint against Transocean are subject to the Limitation injunction, stay, and restraining order entered by the Court (Judge K. Ellison) on June 14, 2010, in C.A. No. 4:10-cv-1721 [after transfer, 10-2771].  *United States v. BIG SAM,* 681 F.2d 432 (5th Cir. 1983).

determination of fairness, adequacy, and reasonableness are ineffective as contrary to law, equity and public policy." **C, ¶ 769.** These allegations are tied solely to "settlement provisions," which may release or affect the calculation of punitive damages. Thus, it follows that the extent to which the Plaintiffs are entitled to declaratory relief depends upon the threshold question of whether the Plaintiffs have alleged <u>any</u> cause of action against Transocean that would support the recovery of punitive damages. They have not, for the reasons stated in VII, *supra*.

## IX.

### ALL MORATORIUM DAMAGE CLAIMS MUST BE DISMISSED

The Plaintiffs allege that they have "suffered losses and damage as a result of the six-month deepwater drilling moratorium issued by the United States Department of Interior on May 28, 2010." **C, ¶ 490.** OPA, however, only allows for the recovery of "damages" that result from an "incident." 33 U.S.C. § 2702(a). "[I]ncident" is defined as any occurrence or series of occurrences having the same origin "resulting in the discharge or substantial threat of discharge of oil." 33 U.S.C. § 3701(14). A responsible party may thus be liable under OPA only if the Plaintiffs' damages "were caused by the pollution incident," *i.e.*, the discharge or threatened discharge of oil. *Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d at 383. As the alleged damages were not caused by the discharge of oil, but rather resulted from the moratorium, a superseding and unforeseeable event, Plaintiffs may not recover as a matter of law under OPA, or under any other laws, state or federal.

Furthermore, under OPA, the "damages" must also result from "the discharge of oil." *In re Settoon Towing LLC*, *supra,* CIV. A. 07-1263, 2009 WL 4730969, at *4. "Damages" are defined as "damages specified in section 2702(b)." 33 U.S.C. § 2701(5). Plaintiffs' "damages" are not in fact damages due to the injury, destruction, or loss of real property, personal property, or natural resources resulting from the discharge of oil, as required by OPA's Section

2702(b)(2)(E), but are in fact damages resulting from the moratorium.  Accordingly, their claims should be dismissed.

## X.

## ALL VoO CLAIMS MUST BE DISMISSED

For the same reason that all moratorium damage claims must be dismissed, all VoO related claims must also be dismissed.  As the Master Complaint acknowledges, the damages sustained by the VoO Plaintiffs did not result from the pollution incident, but in fact, the VoO vessels "sustained substantial physical damage as a result of their participation in the [VoO] program." **C, ¶ 484.**

## XI.

## TO THE EXTENT THAT THE LOCAL GOVERNMENT ENTITIES ARE GEOGRAPHICALLY REMOTE, THEIR DAMAGES COULD NOT HAVE BEEN PROXIMATELY CAUSED BY THE BP OIL SPILL, AND ALL GEOGRAPHICALLY REMOTE CLAIMS MUST THEREFORE BE DISMISSED.

Under common law, there is a well-established requirement of proximate cause.  Proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged . . . . a link that is 'too remote'. . . is insufficient." *Hemi Grp., LLC v. City of New York,* _____ U.S. ____, 130 S. Ct. 983, 989 (2010) (citations omitted).  As the Supreme Court has explained:

> In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event back to the dawn of human events, and beyond.  But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would society on edge and fill the courts with endless litigation.

*Holmes v. SCC. Investor Protection Corp.,* 503 U.S. 258, 266 n.10 (1992) (internal quotation, citations omitted).  In *Holmes,* the Supreme Court further reasoned:

> At bottom, the notion of proximate cause reflects "ideas of what justice demands, or of what is administratively possible and

> convenient."   Accordingly, among the many shapes this concept took in common-law, was a demand for some direct relation between the injury asserted and the injurious conduct alleged. Thus, a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover.

*Id.* at 268-68 (internal citations omitted).

In statutes, there is also a proximate cause requirement, absent express language to the contrary:  "[I]t has always been the practice of common-law courts (and probably of all courts, under all legal systems) to require as a condition of recovery, unless the legislature specifically prescribes otherwise, that the injury had been proximately caused by the offending conduct."  *Id.* at 287 (Scalia, J., concurring).  In OPA, Congress did not provide otherwise.  The OPA causation standard is set forth in Section 2702:

> **(a)     In general**
>
> Notwithstanding any other provision or rule of law, and subject to the provisions of this chapter, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon, the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) that **result from such incident**.

33 U.S.C. § 2702(a) (emphasis added).   "For purposes of this Act, the term  .  .  .  incident" is defined in the previous section as:

> Any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, **resulting in** the discharge or substantial threat of discharge of oil[.]

*Id.* § 2702(14) (emphasis added).  This is not a mere "but-for" standard.  To the contrary, this is a standard that requires that the "discharge of oil" result in, or cause, the damages complained of—a proximate cause standard.  Indeed, it has been held that virtually identical "results from" language in the Trans-Atlantic Pipeline Authorization Act of 1993 ("TAPAA") established a

proximate cause requirement—not merely a but-for requirement.  As the Ninth Circuit held in *Benefiel v. Exxon Corp.,* 959 F.2d 805, 807 (9th Cir. 1992), a nearly identical statute imposing liability upon a vessel owner for damages "sustained . . . ***as a result of*** discharges of oil from such vessel", included proximate cause as an element of the claim.  In *Benefiel*, the Ninth Circuit dismissed, for lack of proximate causation, claims of geographically remote claimants alleging high gas prices which they claimed were caused by the *Exxon Valdez* spill.  The court reasoned: "[W]e are confident that Congress in enacting TAPAA did not intend to abrogate all principles of proximate cause.  The Act provides for strict liability for damages that are the 'result of discharges.'" *Id.*

Similarly, here, the claims of the geographically remote Local Government Entity Claimants should be dismissed.  *See, e.g.*, *Ballard Shipping Co. v. Beach Shell Fish*, 32 F.3d 623, 630 (1st Cir. 1994) (Rhode Island mini-OPA statute extending liability for "loss of income . . . ***as a result of*** damage to the natural resources" held to have incorporated tort limitations of foreseeability and proximate cause).

## XII.

## CONCLUSION

For the reasons set forth above and in the accompanying motion, Transocean respectfully requests that its Rule 12(6) Motion to Dismiss the Local Government Entity C Master Claim in Limitation and the Local Government Entity C Master Complaint be granted.

Respectfully submitted,

By:  /s/ Steven L. Roberts
Steven L. Roberts (Texas, No. 17019300)
Rachel Giesber Clingman (Texas, No. 00784125)
Kent C. Sullivan (Texas, No. 19487300)
Teri L. Donaldson (Florida, No. 784310)
Sutherland Asbill & Brennan LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
Email: steven.roberts@sutherland.com,
rachel.clingman@sutherland.com,
kent.sullivan@sutherland.com,
teri.donaldson@sutherland.com

By:  /s/ Kerry J. Miller
Kerry J. Miller (Louisiana, No. 24562)
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8169
Facsimile: (504) 599-8154
Email: kmiller@frilot.com
-and-

/s/ Edwin G. Preis, Jr.
Edwin G. Preis, Jr. (Louisiana, No. 10703)
Edward F. Kohnke, IV (Louisiana, No. 07824)
Preis & Roy PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70501
Telephone: (337) 237-6062
Facsimile: (337) 237-9129

-and-

601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone: (504) 581-6062
Facsimile: (504) 522-9129
Email: egp@preisroy.com, efk@preisroy.com

Of Counsel:
Brad D.  Brian (California, No.  79001)
Allen M.  Katz (California, No.  054933)
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
Office:  (213) 683-9100
Telefax:  (213) 683-5180, (213) 683-4018
E-Mail:  brad.brian@mto.com, allen.katz@mto.com

Daniel O.  Goforth (Texas, No.  08064000)
Goforth Geren Easterling LLP
4900 Woodway, Suite 750
Houston, TX 77056
Office:  (713) 650-0022
Telefax:  (713) 650-1669
E-Mail:  dangoforth@goforthlaw.com

John M.  Elsley (Texas, No.  0591950)
Royston, Rayzor, Vickery & Williams LLP
711 Louisiana Street, Suite 500
Houston, TX 77002
Office:  (713) 224-8380
Telefax:  (713) 225-9945
E-Mail:  john.elsley@roystonlaw.com

**_Counsel for Transocean_**

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2011, I electronically filed the foregoing with the Court's

CM/ECF system and/or by using the LexisNexis File & Serve, in accordance with Pretrial Order

No.  12 which will send a notice of filing to all counsel accepting electronic notice.

/s/  Kerry J. Miller