# EXHIBIT A

Gagliano, Jesse  5/11/2011  12:00:00 PM

**1**

1    UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF LOUISIANA

2

3   IN RE: OIL SPILL   )   MDL NO. 2179
   by the OIL RIG,   )

4   DEEPWATER HORIZON in  )   SECTION "J"
   the GULF OF MEXICO,  )

5   April 20, 2010   )   JUDGE BARBIER
              )

6              )   MAG. JUDGE
           )   SHUSHAN

7

8

14         ***************

15          VOLUME 1
      ***************

16

17

      Deposition of JESSE GAGLIANO,

18   taken at Pan-American Building, 601 Poydras
   Street, 11th Floor, New Orleans, Louisiana,

19   70130, on May 11, 2011

20

   APPEARANCES:

21

22   Mr. Tom Thornhill
   Ms. Emily Gebhardt

23   THORNHILL LAW FIRM
   1308 Ninth Street

24   Slidell, Louisiana 70458
   (800) 989-2707

25

**2**

1

    APPEARANCES (continued):

2

3   Mr. Scott R. Bickford
   MARTZELL & BICKFORD

4   338 Lafayette Street
   New Orleans, Louisiana 70130

5   (504) 581-9065

6

7   Mr. Ronnie Penton
   LAW OFFICES OF RONNIE G. PENTON

8   209 Hoppen Place
   Bogalusa, Louisiana 70427

9   (985) 732-5651

10       APPEARING FOR THE
      PLAINTIFFS' STEERING COMMITTEE

11

12   Mr. Philip Chen
   KIRKLAND & ELLIS, LLP

13   333 South Hope Street
   Los Angeles, CA 90071

14   (213) 680-8400

15       APPEARING FOR BP, INC.

16

   Mr. A. Nathaniel Chakeres

17   Mr. Scott Cernich
   U.S. DEPARTMENT OF JUSTICE

18   Civil Division, Torts Branch
   1425 New York Avenue, Northwest, Suite 10100

19   Washington, D.C. 20005

20       APPEARING FOR THE UNITED
      STATES

21

22

23

24

25

**3**

1

    APPEARANCES (continued):

2

3   Ms. Deborah Kuchler
   Ms. Sara Iiums

4   Ms. Janika Polk
   Mr. Lee Ziffer

5   KUCHLER, POLK, SCHELL, WEINER & RICHESON, LLC
   1615 Poydras Street, Suite 1300

6   New Orleans, Louisiana 70112
   (504) 592-0691

7

8   APPEARING FOR ANADARKO PETROLEUM
   COMPANY AND MOEX OFFSHORE 2007,
   LLC

9

10   Mr. Dan Goforth
   GOFORTH GEREN EASTERLING, LLP

11   4900 Woodway, Suite 750
   Houston, Texas 77056

12   (713) 650-0022

13       APPEARING FOR TRANSOCEAN

14

   Mr. Floyd Hartley

15   GODWIN RONQUILLO
   1201 Elm Street, Suite 1700

16   Dallas, Texas 75270-2041
   (214) 939-4412 Fax:  214-939-4803

17

    APPEARING FOR HALLIBURTON

18

19   Mr. Eric J.R. Nichols
   BECK, REDDEN & SECREST

20   515 Congress, Suite 1750
   Austin, Texas 78701

21   (512) 708-1000

22       APPEARING FOR CAMERON

23

24

25

**4**

1

    APPEARANCES (continued):

2

3   Mr. Lambert J. "Joe" Hassinger Jr.
   GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH

4   701 Poydras Street, 40th Floor
   New Orleans, Louisiana 70139

5   (504) 525-6802

6       APPEARING FOR THE STATE OF
      LOUISIANA

7

8   Mr. Eric A. Kuwana
   KATTEN MUCHIN ROSENMAN, LLP

9   2900 K Street NW, Suite 200
   Washington, DC 20007

10   (202) 625-3500

11       APPEARING ON BEHALF OF JESSE
      GAGLIANO

12

13   ALSO PRESENT:

14   Mr. Karl Stiegman, Videographer

15

16   REPORTED BY:

17

    TAMARA CHAPMAN, CSR

18       Certified Court Reporter
      State of Texas

19

20

21

22

23

24

25

Gagliano, Jesse  5/11/2011  12:00:00 PM

289

1　based on my constitutional Fifth Amendment
2　privilege.
3　　　Q.　Did you do anything yourself to
4　ensure or confirm that there was a procedure
5　in place for each test that was performed on
6　the cement slurry?
7　　　MR. HARTLEY:　Object; form.
8　　　A.　I respectfully decline to answer
9　based on my constitutional Fifth Amendment
10　privilege.
11　　　Q.　(BY MR. GOFORTH)  Did you do
12　anything yourself to ensure or confirm that
13　the proper lab procedure was followed for
14　each test?
15　　　A.　I respectfully decline to answer
16　based on my constitutional Fifth Amendment
17　privilege.
18　　　Q.　To your knowledge, did anyone at
19　Halliburton do anything to ensure or confirm
20　that the proper lab procedures were followed
21　for each test?
22　　　A.　I respectfully decline to answer
23　based on my constitutional Fifth Amendment
24　privilege.
25　　　Q.　Did you do anything to ensure or

290

1　confirm that the testing that was performed
2　by Halliburton was conducted in accordance
3　with industry standards for the testing?
4　　　A.　I respectfully decline to answer
5　based on my constitutional Fifth Amendment
6　privilege.
7　　　Q.　To your knowledge, did anyone at
8　Halliburton do anything to confirm or ensure
9　that the testing that was performed was
10　conducted in accordance with industry
11　standards for the testing?
12　　　A.　I respectfully decline to answer
13　based on my constitutional Fifth Amendment
14　privilege.
15　　　Q.　To your knowledge, did anyone at
16　Halliburton do anything to ensure or confirm
17　that the lab tests were -- results were
18　accurately reported?
19　　　MR. HARTLEY:　Object; form.
20　　　A.　I respectfully decline to answer
21　based on my constitutional Fifth Amendment
22　privilege.
23　　　MR. GOFORTH:　Thank you, sir.
24　　　THE VIDEOGRAPHER:　We're going off the
25　record.  It is 3:15.

291

1　　　MR. KUWANA:　Please stay on the record.
2　　　THE VIDEOGRAPHER:　This is Videotape
3　No. 6.
4　　　MR. KUWANA:　Can we stay on the record?
5　　　THE VIDEOGRAPHER:　Oh, sorry.  We're
6　still on the record.  It's 3:15.
7　　　MR. KUWANA:　During the break, the
8　Court Reporter and I had a brief conversation
9　that a few times where the witness said
10　either respectfully or started to say
11　respectively, if there would be any objection
12　that she would put in "respectfully" in those
13　instances where he started to mix up the two
14　words a little bit.
15　　　MR. GOFORTH:　I don't know about that.
16　　　MR. KUWANA:　Yes.
17　　　MR. GOFORTH:　No.  I don't -- have no
18　objection about that.
19　　　MS. KUCHLER:　No objection.
20　　　MR. KUWANA:　There's no objection by
21　the counsel gathered.  Thank you.
22　　　THE VIDEOGRAPHER:　We're going off the
23　record.  It's 3:16.  This is still Videotape
24　No. 6.
25　　　　(Break.)

292

1　　　THE VIDEOGRAPHER:　We're back on the
2　record.  It's 3:26.  This is Videotape No. 6.
3　　　　　EXAMINATION
4　BY MR. CHEN:
5　　　Q.　Good afternoon, Mr. Gagliano.
6　　　A.　Hi.
7　　　Q.　My name is Phillip Chen, and I'm
8　here on behalf of BP.  And I have a few
9　questions for you.
10　　　I'd like to start off where
11　Anadarko and MOEX's counsel left off, if
12　that's okay.
13　　　A.　Okay.
14　　　Q.　Did you know that Anadarko has a
15　25 percent interest in the Macondo well?
16　　　A.　I respectfully decline to answer
17　based on my constitutional Fifth Amendment
18　privilege.
19　　　Q.　Did you know that Mitsui
20　Offshore Exploration has a 10 percent
21　interest in the Macondo well?
22　　　MS. KUCHLER:　Object to form.
23　　　A.　I respectfully decline to answer
24　based on my constitutional Fifth Amendment
25　privilege.

293

1    Q.    (BY MR. CHEN)  Are you aware of
2  the relationship between BP and Anadarko and
3  MOEX as working interest owners of the well?
4    A.    I respectfully decline to answer
5  based on my constitutional Fifth Amendment
6  privilege.
7    Q.    Anadarko and MOEX, as the
8  working interest owners, had access to all of
9  the engineering information on this well;
10  isn't that true?
11    MS. KUCHLER:  Objection; form.
12    A.    I respectfully decline to answer
13  based on my constitutional Fifth Amendment
14  privilege.
15    Q.    (BY MR. CHEN)  And Anadarko and
16  MOEX could have requested any information
17  about this well that they wanted from BP;
18  isn't that correct?
19    MS. KUCHLER:  Object to the form.
20    A.    I respectfully decline to answer
21  based on my constitutional Fifth Amendment
22  privilege.
23    Q.    (BY MR. CHEN)  And based on your
24  experience, don't you believe that Anadarko
25  and MOEX should have requested more

294

1  information about the Macondo well?
2    MS. KUCHLER:  Object to form.
3    A.    I respectfully decline to answer
4  based on my constitutional Fifth Amendment
5  privilege.
6    Q.    (BY MR. CHEN)  Because Anadarko
7  and MOEX had all the same information about
8  the Macondo well that BP had, they should
9  have taken all the same actions that BP
10  should have taken with regard to this well?
11    MS. KUCHLER:  Objection; form.
12    A.    I respectfully decline to answer
13  based on my constitutional Fifth Amendment
14  privilege.
15    Q.    (BY MR. CHEN)  Now,
16  Mr. Gagliano, you're not a drilling engineer,
17  are you?
18    A.    I respectfully decline to answer
19  based on my constitutional Fifth Amendment
20  privilege.
21    Q.    You've never been employed as a
22  drilling engineer?
23    A.    I respectfully decline to answer
24  based on my constitutional Fifth Amendment
25  privilege.

295

1    Q.    Likewise, you've never worked
2  for an operator; isn't that true?
3    A.    I respectfully decline to answer
4  based on my constitutional Fifth Amendment
5  privilege.
6    Q.    Actually, let me be more clear.
7  You've never been employed by an operator as
8  an employee?
9    A.    I respectfully decline to answer
10  based on my constitutional Fifth Amendment
11  privilege.
12    Q.    So when you -- so when you were
13  providing testimony as to what the drilling
14  engineers should do, you actually don't have
15  a basis for saying what they shouldn't be
16  doing; isn't that true?
17    MR. HARTLEY:  Object; form.
18    MS. KUCHLER:  Object to form.
19    A.    I respectfully decline to answer
20  based on my constitutional Fifth Amendment
21  privilege.
22    Q.    (BY MR. CHEN)  And when you were
23  asked about what the operator, BP, should do,
24  you actually don't have a basis for any
25  opinions on what the operator should do;

296

1  isn't that correct?
2    MS. KUCHLER:  Object to form.
3    MR. HARTLEY:  Object; form.
4    A.    I respectfully decline to answer
5  based on my constitutional Fifth Amendment
6  privilege.
7    Q.    (BY MR. CHEN)  Now, there was a
8  lot of questioning about whether or not this
9  incident could have been avoided if more
10  centralizers were used.  Do you recall that?
11    A.    I respectfully decline to answer
12  based on my constitutional Fifth Amendment
13  privilege.
14    Q.    Don't you agree that
15  centralization would, if anything, help with
16  channeling in the annulus?
17    MR. HARTLEY:  Object; form.
18    A.    I respectfully decline to answer
19  based on my constitutional Fifth Amendment
20  privilege.
21    Q.    (BY MR. CHEN)  You don't need to
22  centralize anything for the cement in the --
23  in the casing to have a good -- to have a
24  good fill; isn't that correct?
25    MS. KUCHLER:  Objection; form.

# EXHIBIT B

1                      IMPORTANT NOTICE

2              You have requested an unedited,

3  noncertified transcript.  This rough-draft

4  transcript has been requested in the form of

5  either a realtime hookup to your computer or

6  an ASCII file delivered after the close of

7  proceedings.

8              This Certified Court Reporter

9  makes no representations regarding the

10  accuracy and completeness of said realtime

11  transcript.  This draft is unedited and may

12  contain untranslated or mistranslated text,

13  misspelled proper names and/or nonsensical

14  word combinations.  This will be corrected on

15  the final certified transcript.

16              This rough-draft transcript is

17  provided only for the purpose of augmenting

18  counsel's notes and may not be cited in any

19  court proceeding or distributed to any other

20  parties.

21      THE VIDEOGRAPHER:

22              This is the continuation

23  videotaped deposition of Robert Quitzau.

24  Today's date is May the 26th, 2011.  We're

25  now on the record.  It's 8:28.

1    EXAMINATION BY MR. DAVID:

2         Q.    Good morning, immaterial

3    Mr. Quitzau, I'm Jeffrey David I'm with the

4    law firm of Kirkland and Ellis.  As you may

5    know, we represent BP in this matter.  I have

6    about an hour and 15 minutes.  I don't know

7    if we will take the entire time.

8    Hopefully -- or at least on to the next

9    examination.

10              Mr. Fineman went through several

11   different topics yesterday and I'm sorry if I

12   go through and repeat some.  I want to

13   develop them further.  The first won't is

14   your responsibilities on the Macondo well.

15   And I believe you testified yesterday that

16   you took over as the drilling engineer for

17   the Macondo well for Anadarko on or about

18   March 18th; is that correct?

19        A.    That's correct.

20        Q.    And from whom did you take over

21   that role?

22        A.    Josh Nichols.

23        Q.    And whom did you report to?

24        A.    Mike Pfister.

25        Q.    And when you took over this role

1    from Mr. Nichols, did Mr. Pfister tell you

2    what your responsibilities were?

3         A.    Mr. Pfister told me to take over

4    the responsibilities from job and to talk to

5    job and continue to do what job did.  So I

6    talked to job and did so.

7         Q.    So you never received any

8    explicit direction from Mr. Pfister as to

9    what your role would be?

10        A.    That's correct.

11        Q.    How did Mr. Nichols describe the

12   role?

13        A.    Mr. Nichols described his role as

14   giving a morning update, a short morning

15   update in the morning drilling meetings that

16   we have on the weekdays and to keep up, to be

17   ready to provide answers to the asset team.

18   And those were mainly related to whether or

19   not the well would reach the geological

20   objectives.

21        Q.    I believe yesterday you said that

22   your duties included in one part tracking the

23   progress of the well and in the second part

24   is reporting on a well to various employees

25   of Anadarko, is that correct?

 1          A.     The two functions would be to

 2   give the update in the morning meeting and

 3   then to provide updates as needed on whether

 4   or not we could reach -- whether or not the

 5   well could reach geological objectives to the

 6   asset team.

 7          Q.     And were you familiar with these

 8   rolls and duties, I guess, from your previous

 9   experience at Anadarko?

10          A.     No, I wasn't.

11          Q.     How did --

12          A.     May I correct that?  The role of

13   reporting in the morning meeting, the 30

14   second update, I was familiar with that, but

15   the actual interface with the team, I was

16   not.

17          Q.     So did did the interface with the

18   team differ from your previous

19   responsibilities?

20          A.     My previous responsibilities as

21   drilling engineer were with wells that

22   Anadarko operated and in that function, I

23   would deal with various vendors and various

24   experts within the Anadarko -- Anadarko

25   vendor system, working with an entire team of

1    people to put together a well plan.

2        Q.    Could you briefly describe your

3    duties, I guess, Anadarko was an operator of

4    the well?

5        A.    We would form -- we would get the

6    well objectives from the geology group and

7    asset team, we would put together a well

8    design, casing plan pore pressure analysis,

9    and all the various vendors would come

10   together and contribute practices and

11   procedures, materials and equipment that

12   would contribute to the well design.

13       Q.    And in that role, when you were

14   drilling engineer and Anadarko was the

15   operator of the well, who would tell you what

16   your responsibilities were?

17       A.    I answered to Mike Pfister and he

18   would advise me or tell me what those

19   responsibilities would be.

20       Q.    So it was Mike Pfister in your

21   role when Anadarko was a nonoperater of the

22   Macondo well and Mike Pfister when your role

23   as a drilling engineer when Anadarko was an

24   operator of the well?

25       A.    Can you restate the question or

1    repeat the question?

2        Q.    You always reported to Mike

3    Pfister when you were at Anadarko?

4        A.    Yes.

5        Q.    Now, in your role as a drilling

6    engineer on the Macondo well, did you use any

7    of the skills that you established and used

8    in your role -- your previous rolls at

9    Anadarko?

10        A.    Yes.

11        Q.    And what were they?

12        A.    Giving the morning meeting

13    updates, 30 seconds, would require a quick

14    review of morning reports and then speaking

15    before the group and then with regard to

16    tracking the progress towards the geological

17    objective, again, simply reading morning

18    reports, identifying where midweight

19    increases occurred and throwing that into my

20    updates and any time there would be shoe

21    tests, I would look at those and put those

22    into the updates as well.

23        Q.    And would you also examine the

24    design of the well at all?

25        A.    No.

1        Q.     How -- how would you qualify the
2    design of the well, what is included in the
3    design of the well?
4        MS. WILMS:
5             Object to form.
6        THE WITNESS:
7             The design of the well would
8    include a very large number of things, the
9    hole size selection, interface with the
10   completion engineers to make sure that the
11   proper geological objectives and asset team
12   objectives were achieved.  Deepwater, there
13   are generally annular pressure build up
14   analyses run, confirming and making insure
15   that all of the components in the well have
16   enough integrity to hold the loads, putting
17   together procedures for drilling the well.
18   That's what I can think of right now.
19       Q.     Would the design of the well
20   include everything from the beginning of the
21   well from spud all the way through either
22   permanent abandonment or temporary
23   abandonment?
24       A.     Yes.
25       Q.     And what is your understanding of

1    temporary abandonment procedures?

2         A.     Temporary abandonment would be to

3    leave the well in a state that it could be

4    reentered for various reasons.

5         Q.     Okay.  And did you monitor the

6    Macondo well as it was going through the

7    temporary abandonment process?

8         A.     What do you mean by monitor?

9         Q.     I believe you stated before that

10   you would as part of your tracking, you would

11   monitor the well.  Did you do similar

12   tracking when the well was going through the

13   temporary abandonment process?

14        A.     My tracking of progress tracked

15   the process through the geological objectives

16   and after that, I did not track progress.  So

17   I did not track progress or monitor during

18   the abandonment -- temporary abandonment.

19        Q.     Okay.  And about what date did

20   you stop tracking progress?

21        A.     I don't know the exact date, but

22   when wireline logs were finished being run

23   through the objective, that -- at that point,

24   I would consider the well to have met the

25   geological objectives.

1    Q.    So would it be fair to say on or
2  about April 14th?
3    A.    That's approximate.
4    Q.    Okay.  And after -- after your
5  tracking, would anyone at Anadarko take over
6  that role of tracking the progress of the
7  well?
8    A.    No one took over the role of
9  tracking the progress.
10    Q.    So would anyone else log onto
11  WellSpace to track the progress of the well?
12    A.    When I say track the progress of
13  the well, I'm meaning track the drilling
14  progress of the well and what the others
15  would do as far as logging on, I don't know.
16    Q.    Okay.  So what -- so besides
17  tracking the drilling progress, what -- what
18  would other people do at Anadarko to monitor
19  the Macondo well?
20    MS. WILMS:
21        Object to form.
22    THE WITNESS:
23        Geoscientists would perhaps
24  toolpusher to down loan logging data to the
25  logging zone would be one possibility.

     1          Q.      Is there think one at Anadarko
     2   who is responsibility it was to monitor the
     3   Macondo well after you stopped monitoring the
     4   drilling activities on the Macondo well?
     5          A.      From a drilling standpoint, I'm
     6   not aware of anybody else who would continue
     7   monitoring the activities on the well.
     8          Q.      From a geological standpoint?
     9          A.      I don't know that for sure, but I
    10   suspect the geologists would be continued to
    11   monitor -- they might continue to monitor,
    12   again, downloading log -- formation
    13   evaluation files and things like that.
    14          Q.      Anyone else at Anadarko?
    15          A.      There could be more.  I can't
    16   think of who else it would be.  Perhaps
    17   different people on the project team.  As I
    18   testified earlier, there are several groups
    19   and they have files that they keep as a
    20   matter of record, so, they might be accessing
    21   WellSpace, for example, to download reports
    22   for --
    23          Q.      Would you access WellSpace after
    24   you stopped monitoring the drilling progress
    25   of the well?

        1          A.      Yes.

        2          Q.      Why would you do that?

        3          A.      To continue -- while the drilling

        4   progress is finished, I still continued to

        5   make 30 second updates in the morning

        6   meetings, so, in preparation for that, I

        7   would download a reports sufficient to make

        8   those updates and and then continually, as

        9   the asset team continues to have questions, I

       10   would try to be prepared to answer those

       11   questions.

       12          Q.      I believe yesterday you spoke

       13   about your preparation for the morning

       14   meetings.  I think you said that you would

       15   check WellSpace, InSite Anywhere, e-mails,

       16   calls, records that you had to prepare for

       17   these morning meetings, is that correct?

       18          MS. WILMS:

       19                  Object to form.

       20          THE WITNESS:

       21                  For morning meetings, it was

       22   predominantly downloading information from

       23   WellSpace, which would include drilling

       24   operating reports, mudlogging reports and

       25   possibly pore pressure frac gradient reports

```
 1   and possibly geological reports.
 2        Q.     In your 30 second presentations,
 3   what would you include?
 4        MS. WILMS:
 5             Object to form.
 6        THE WITNESS:
 7             It would be a simple summary of
 8   the activity on the rig since my last report
 9   to the group.  Is.
10        Q.     And what would those summaries
11   include?
12        A.     The major activities that were
13   conducted.
14        Q.     So what type -- for example, what
15   type of major activities?
16        MS. WILMS:
17             Object to form.
18        THE WITNESS:
19             Drilling, casing running, BOP
20   testing, generally what took up time during
21   the day.
22   EXAMINATION BY MR. DAVID:
23        Q.     And so this would primarily be
24   based on the daily operations reports?
25        A.     Yes.
```

1    Q.    And when would you look at the
2  daily geological reports or the pp/fg
3  reports?
4    A.    My normal routine or meetings at
5  7:30, so my normal are routine when I first
6  get in, anywhere from 6:to 7:to look at
7  reports so that I could get an understanding
8  of what happened on the rig since my last
9  update and my hopes would be that I would
10  have the drilling operating reports and that
11  would give me what I need and if those didn't
12  come in that morning, I would look at the mud
13  log report or geological report or pore
14  pressure frac gradient report to get an idea
15  of what happened on the rig.
16    Q.    So you would only look -- would
17  it be fair to say you would only look at the
18  daily geological report, mudlogging reports,
19  of or the pp/fg reports if the daily
20  operations report hadn't posted yet?
21    MS. WILMS:
22        Object to form.
23    THE WITNESS:
24        For the purpose of giving
25  morning updates, that's correct so as I

1    prepared well plan updates as is described in
2    my e-mails, that might take place at other
3    times during the day and so the pore pressure
4    frac gradient report, for example, might have
5    information that would be relative to a well
6    plan update.
7         Q.    Why did you have these meetings
8    Monday through Friday?
9         MS. WILMS:
10             Object to form.
11        THE WITNESS:
12             It's a standard Anadarko
13   approximate drilling practice, I don't know
14   what their reasoning is.
15   EXAMINATION BY MR. DAVID:
16        Q.    Would you present on any other
17   wells besides Macondo?
18        A.    If I'm the drilling engineer for
19   a well that is currently operating, I would
20   present an update on the well that I'm
21   following.
22        Q.    In the period of March 18th
23   through April 20th, would you present on any
24   other well besides the Macondo well?
25        A.    Yes, yes, I would.

1      Q.     Which wells did you present on?

2      A.     There's a well called Green

3  Canyon 608, A-8, sidetrack on ST01.

4      Q.     Is that all one well?

5      A.     One well, yes.  There might have

6  been another well, I don't remember if it was

7  in that time period.  Another Green Canyon

8  well, I don't remember the name of it.

9      Q.     And was Anadarko an operator of

10  the Green Canyon well?

11      A.     Yes.

12      Q.     Were there any nonoperators of

13  the Green Canyon well?

14      A.     That 608 well, my understanding

15  is that it's 100 percent Anadarko.  I could

16  be wrong about that.

17      Q.     So were you the primary drilling

18  engineer on the Green Canyon well?

19      A.     Question, and, again, Josh

20  Nichols had that well and when he left, I

21  took over near the end of the well.  I was

22  the primary drilling engineer during that

23  time period.

24      Q.     And in the morning meetings, from

25  the period of March 18th through April 20th,

```
1    did you report on any -- any other topics
2    besides the Macondo well and the Green Canyon
3    well?
4         MS. WILMS:
5              Or wells, just to clarify.
6         THE WITNESS:
7              To the extent that the other
8    well occurred in that time period, I would
9    report on any well that I was a drilling
10   engineer on.
11   EXAMINATION BY MR. DAVID:
12        Q.    So besides the Green Canyon well
13   and the Macondo well, there may have been
14   other wells?
15        A.    I described two Green Canyon
16   wells.
17        Q.    I'm sorry?
18        A.    The 608 well that I gave you,
19   yes, I was clearly the engineer during that
20   period.  There was another Green Canyon well
21   that I took over for a short period.  It was
22   a MODU operated well, and I don't remember
23   the exact dates when -- that was like about
24   ten days, 2 weeks and I don't remember the
25   exact dates of that.  If that occurred during
```

1    that time, I would at various times be

2    reporting to two different Anadarko wells.

3         Q.    And for that other well, were you

4    the -- was Anadarko the operator of that

5    well?

6         A.    Yes.

7         Q.    And were you the primary drilling

8    engineer of the well?

9         A.    Yes.

10        Q.    Have you ever been a drilling

11   engineer for Anadarko operated well where

12   there has been a nonoperater involved?

13        A.    Yes, I have.

14        Q.    And what did you expect out of

15   that nonoperater?

16        A.    When you say expect, do you mean

17   what do I expect them to contribute or what

18   do I expect them to ask.

19        Q.    How about we take it in two

20   parts.  First, what do you expect them to

21   contribute?

22        A.    I don't expect them to contribute

23   anything.

24        Q.    So when you say contribute, do

25   you mean finances, do you mean knowledge, do

1    you mean --

2         A.    I'm speaking with reference to

3    the drilling practices.  That's all I'm

4    talking about here is the actual drilling

5    practices that I'm involved in.

6         Q.    Okay.

7         A.    From a project standpoint, you

8    know, the non -- the nonoperater participants

9    contribute much to the project and that's all

10   outside my scope of work.

11        Q.    So for the nonoperating drilling

12   engineer, on you -- sorry, on you interact

13   with a nonoperating drilling engineer?

14        A.    If they would like to interact,

15   then I would interact with them.

16        Q.    Okay.  And would you expect them

17   to ask questions?

18        A.    From time to time, I with expect

19   them to ask questions.

20        Q.    And why would you expect them to

21   ask questions?

22        A.    Typically, they would be

23   responding to questions from their asset team

24   and they would contact me to forward those

25   questions on.

```
 1          Q.      What types of questions would
 2    they ask?
 3          A.
 4          MS. WILMS:
 5                  Object to form.
 6          THE WITNESS:
 7                  It could be a very wide range of
 8    questions.  For example, if there were some
 9    drilling troubles, stuck pipe or parted
10    casing.  They might call to inquire what's
11    going on.
12    EXAMINATION BY MR. DAVID:
13          Q.      Any other types of questions?
14          MS. WILMS:
15                  Object to form.
16    EXAMINATION BY MR. DAVID:
17          Q.      Mud weight, casing, anything that
18    would normally be an on operation report,
19    pp/fg report?
20          A.      Things like formation evaluation,
21    questions, they might call to ask about that.
22    In other words, the asset team says, can they
23    run this log or cut this core, the drilling
24    person might call me and just find out what
25    our plans are and what our concerns might be.
```

1          Q.    Would you expect the nonoperating

2    drilling engineer to make any suggestions?

3          MS. WILMS:

4                Object to form.

5          THE WITNESS:

6                I would not expect that.  I

7    wouldn't expect it, but they -- sometimes

8    they do.

9          Q.    Okay -- sorry, go ahead, sir.

10         A.    Again, what do you mean by

11    expect?  In other words, I'm not expecting

12    them to do it, but when there's trouble, then

13    they probably will and do.

14         Q.    How about this, I will rephrase

15    it slightly.  Do you view it as the

16    nonoperating drilling engineer's role and

17    responsibility to make suggestions?

18         A.    I do not.

19         Q.    How do you know what the role and

20    responsibility would be for the nonoperating

21    drilling engineer?

22         A.    It he just what I understand.

23         Q.    And how did you come to

24    understand that?

25         A.    Over the years, that seems to be

1    the norm.

2         Q.    So based on your experience

3    before your work at Anadarko and your work at

4    Anadarko, you've come to define the role and

5    responsibility of a nonoperating drilling

6    engineer?

7         MS. WILMS:

8              Object to form.

9         THE WITNESS:

10             Based on all that experience, I

11   define the role of an operating engineer and

12   with that understanding, that defines the

13   role of a nonoperating -- in other words, how

14   I see the nonoperating engineers, is based on

15   my long experience as an operating engineer,

16   I know what they do when they ask questions,

17   that's how over the years, I've gained my

18   understanding of that role.

19        Q.    Of the operating engineer?

20        A.    My experience as an operating

21   engineer and through that experience, I

22   understand how the nonoperating engineers

23   have been involved or not involved.

24        Q.    So no one at Anadarko, when you

25   were working on Anadarko operated wells would

1    tell you what the role and responsibility was

2    for the nonoperating drilling engineer?

3         A.    I don't recall anybody telling me

4    that.

5         Q.    Now, coming back to the

6    monitoring of the well, I believe you

7    satisfied that you would had at daily

8    operations reports pp/fg reports, daily

9    geological reports, daily mud reports.  Would

10   you look at anything else?

11        MS. WILMS:

12              Object to form.

13        THE WITNESS:

14              Did you say mud log reports?

15   EXAMINATION BY MR. DAVID:

16        Q.    Mud log reports, yes.  Anything

17   else?

18        A.    It's possible.  I don't recall

19   all the different things that are on

20   WellSpace.

21        Q.    But would you say it's your

22   responsibility to look at anything that was

23   posted on WellSpace?

24        A.    It is not my responsibility to

25   look at anything that's on WellSpace.

1      Q.      What is it your responsibility to

2  look at on WellSpace?

3      A.      My responsibility is to get

4  whatever information I can, to give the

5  update in the morning meeting, or whatever I

6  think I need to track the progress of the

7  well towards the geological objective.

8      Q.      So in addition to the daily

9  operations reports, the pp/fg reports, the

10  daily geological reports, the mudlogging

11  reports, what else would you look at from a

12  wire -- sorry, from WellSpace to prepare for

13  your morning meetings?

14      MS. WILMS:

15           Object to form.

16      THE WITNESS:

17           There might have been other

18  things, but those are the main ones, I can't

19  recall anything.

20  EXAMINATION BY MR. DAVID:

21      Q.      Would you look at wireline logs?

22      A.      I don't recall looking at

23  wireline logs to prepare for the morning

24  meeting.

25      Q.      Would you look at MWDs or LWDs?

1          A.      As we drilled -- as BP drilled

2    through the objective, I would and did look

3    at formation evaluation LWD logs to see what

4    the pay zones looked like and there might

5    have been 1 or 2 meetings in there when I

6    looked at this prior to the morning meeting.

7          Q.      And why would you look at the pay

8    zones?

9          A.      Just to understand what we're

10   drilling or what BP is drilling.

11         Q.      Okay.  Why is that important?

12         A.      The asset team is very, very

13   interested in that and I wanted to be

14   prepared to respond to any questions that

15   they might have.  They're very excited during

16   that time, so I want to be prepared to deal

17   with any requests that they might have.

18         Q.      And how often would they ask you,

19   the asset team, how often would the asset

20   team ask you for updates on the well?

21         MS. WILMS:

22              Object to form.

23         THE WITNESS:

24              I guess through the history of

25   this well, they asked several times.  It

1    wasn't regular.  I don't recall the exact

2    number.

3    EXAMINATION BY MR. DAVID:

4         Q.    Is it every day?

5         A.    It was not every day.

6         Q.    How many times a week would you

7    say?

8         A.    Again, I can recall 3 or 4 times

9    during the course of my involvement and I

10   couldn't quantify it in times per week.

11        Q.    That's in addition to the morning

12   meetings, correct?

13        A.    That's correct.

14        Q.    Did it increase in frequency as

15   you approached TD?

16        MS. WILMS:

17             Object to form.

18        THE WITNESS:

19             Again, I don't remember the

20   exact frequency and timing of the few e-mails

21   that -- however many e-mails they submitted

22   judge.

23   EXAMINATION BY MR. DAVID:

24        Q.    Would you say it became more

25   frequent as you approached TD?

1          MS. WILMS:

2                 Object to form.

3          THE WITNESS:

4                 I can't remember the exact

5     frequencies.  The requests for few enough in

6     number over the time period, I couldn't

7     quantify the fact frequencies.

8     EXAMINATION BY MR. DAVID:

9          Q.     Would you ever report without a

10    request?

11         A.     It's possible that I reported

12    without a request.

13         Q.     Would you view it your duty to --

14    owe role and responsibility to report without

15    a request?

16         A.     I would not view it as my duty.

17         Q.     Okay.  Now, when you're looking

18    at the -- we'll take the daily operations

19    reports.  When you're looking at the daily

20    operations reports, what are you specifically

21    looking at?

22         A.     There's no general rule, but

23    typically, I would look at the 24-hour

24    summary and then skim through the operating

25    steps on the morning report where they

1    describe the operations and the exact time

2    range those operations were conducted.  I

3    would skim through that fairly quickly and I

4    might look at the -- there's a block in there

5    on mud properties, which would include mud

6    weights, so, I would generally look at that.

7    At the very end of the report, there is a --

8    similar operating steps from midnight to

9    5:a.m., I would look at that to see what they

10   had done from midnight to 5:00 a.m.

11        Q.    When you were looking at what

12   they had done is there any specific action

13   you're looking at in particular?

14        MS. WILMS:

15             Object to form.

16        THE WITNESS:

17             No, just to get a feel for what

18   they're doing during that day and what the

19   bulk of the time was spent on during the day

20   and then with regard to updates, the one

21   thing that would be specific would be any

22   changes in mud weights so. If I could see

23   where they changed the mud weight, what

24   depth, I would look for that.

25   EXAMINATION BY MR. DAVID:

1          Q.      Why are you interest in mud

2     waits?

3          A.      I would put it into my well plan

4     update.

5          Q.      We'll get to the well plan

6     update, we will discuss that.  Would you look

7     at anything besides mud weight in particular?

8          A.      Again, as I described earlier,

9     the shoe test, I would capture that, look for

10    that. Spell that out very clearly and I would

11    look at that just to see what they recorded

12    as their shoe test.

13         Q.      Would you look at LOTs or FITs?

14         A.      That's a shoe test.

15         Q.      That's a shoe test, okay.  Were

16    you responsible for looking at -- I think

17    it's pel graph reports?

18         A.      Can you satisfy that before?

19         Q.      Pel graph, P-E-L-G-R-A-F?

20         A.      I'm not familiar with that term.

21         Q.      Did you view it as your

22    responsibility to also review the analysis of

23    the pay zone?

24         A.      What do you mean by the analysis

25    of the pay zone?

1      Q.      My understanding after the pay

2    zone is hit, there's an analysis done on the

3    hydrocarbons that are released from that pay

4    zone and that would be shared with Anadarko.

5    Would it be your responsibility to review

6    those reports?

7         MS. WILMS:

8                 Object to form.

9         THE WITNESS:

10                No, it would not.

11   EXAMINATION BY MR. DAVID:

12        Q.      Whose responsibility would it be?

13        MS. WILMS:

14                Object to form.

15        THE WITNESS:

16                I don't know for sure, but

17   likely the exploration geologist would look

18   at that add the petro physicist would look at

19   that.

20   EXAMINATION BY MR. DAVID:

21        Q.      He and when you're looking at the

22   shoe test and the mud weight, if there had

23   been a shoe test or change in mud weight,

24   would you also look at the pp/fg reports?

25        MS. WILMS:

```
 1                     Object to form.
 2          THE WITNESS:
 3                     I looked at pp/fg reports any
 4   time I was interested in pore pressure, mud
 5   weight and -- any indication of the formation
 6   fracture -- formation fracture weakness,
 7   which would include a shoe test as well, yes.
 8   EXAMINATION BY MR. DAVID:
 9          Q.     How often would you look at the
10   pp/fg reports?
11          A.     As needed.  Sometimes they didn't
12   come in or weren't -- there wasn't one
13   submitted, but they would contain relevant
14   information to what I just described.
15          Q.     So that sometimes they didn't
16   come in or weren't submitted, you -- on
17   WellSpace, you always had the necessary
18   documents to do your job, correct?
19          MR. HEBERT:
20                     Object to form.
21          THE WITNESS:
22                     No, that's not correct.
23   EXAMINATION BY MR. DAVID:
24          Q.     What were you missing from
25   WellSpace?
```

1          A.      Occasionally the daily operating

2    reports would not come in at the time that I

3    needed them.

4          Q.      I think you referenced that

5    yesterday, around April 18th, you said that

6    perhaps you were missing some daily

7    operations reports.  That's after April 14th,

8    though, right?  You had stopped monitoring

9    the well at that point?

10          A.      I did say that around the exact

11    date, I'd have to go back and look at the

12    WellSpace log.  There were other times when

13    the daily operating report would not come in,

14    I don't remember the dates.  In those cases,

15    as I described earlier, I would go to the mud

16    log reports or geological report.

17          Q.      And those reports eventually were

18    posted to WellSpace?

19          A.      I recall they were eventually

20    posted to WellSpace.

21          Q.      When they were posted to

22    WellSpace, did you review those documents?

23          A.      My practice was, as many other

24    functions was to keep a record in our

25    standard well file, electronic well file so

1    that I would download the reports that came

2    in late, but that does not necessarily mean I

3    would look at them.  I reviewed them.

4         Q.    When you downloaded them and

5    posted them, when you did review them, did

6    that change your view or opinion on the

7    progress of the Macondo well?

8         MS. WILMS:

9              Object to form.

10        THE WITNESS:

11             I don't recall.  I don't recall

12   that happening.

13   EXAMINATION BY MR. DAVID:

14        Q.    When you would download the daily

15   operations reports, why would you not look at

16   some of them?

17        MS. WILMS:

18             Object to form.

19        THE WITNESS:

20             If I got enough information off

21   the mud log report or other reports, that's

22   all I needed.

23   EXAMINATION BY MR. DAVID:

24        Q.    So you viewed it as sufficient to

25   look at the mud log report or the pp/fg

1    reports or daily geological reports that were

2    posted?

3         A.    That would depend on the

4    operations that were conducted on the well.

5         Q.    And if they were- what operations

6    would not be -- sorry, what would the

7    daily -- the daily geological reports, the

8    pp/fg and mudlogging reports provide that --

9    or not provide that you would need for a

10   particular operation?

11        MS. WILMS:

12              Object to form.

13        THE WITNESS:

14              I think I would need to

15   understand the operation to understand that

16   question you're interested in.

17   EXAMINATION BY MR. DAVID:

18        Q.    What type of operations would not

19   be included in the daily geological or pp/fg

20   or mudlogging reports?

21        MS. WILMS:

22              Object to form.

23        THE WITNESS:

24              S. The pp/fg and mud log reports

25   and geological reports would just be a very

1    short summary on the hour of the 24-hour

2    summary on the daily operating report, so, to

3    the extent that I would be interested in

4    clarifying the operating steps, then I would

5    have to go to the daily operating report and

6    I don't recall any specific operations that

7    would necessity that I do that:I just can't

8    think of any.

9         Q.    But when you- about you needed to

10   you did and could review the daily operation

11   also reports from WellSpace?

12        MS. WILMS:

13             Object to form.

14        THE WITNESS:  As I said, sometimes when

15   I needed them as for my morning meeting, they

16   weren't available, so, I relied on other

17   meetings.  I could -- eventually, they would

18   be in there if I needed them.  If I needed

19   them at a later time.

20   EXAMINATION BY MR. DAVID:

21        Q.    Do you ever monitor the Macondo

22   well for the safety of the operations on the

23   well?

24        A.    I did not.

25        Q.    Did you view it as your role and

```
 1    responsibility to do so?
 2           A.     I did not.
 3           Q.     Did you ever receive any
 4    instruction from anyone at Anadarko to Monday
 5    authorize the Macondo well for safety?
 6           A.     I did not.
 7           Q.     Did you think that that should be
 8    part of your job?
 9           A.     I did not.
10           Q.     Did you ever review anything in
11    your role as the drilling engineer for
12    Macondo well that alerted you to safety
13    concerns on the Macondo well?
14           A.     Can you repeat the question?
15           Q.     During during the course of -- as
16    the drilling engineer for the Macondo well,
17    during the course of your review, material,
18    as you track the drilling on the Macondo
19    well, did you see anything that cowed you
20    concern about the safety of the operations on
21    the Macondo well?
22           MS. WILMS:
23                  Object to form.  Go ahead.
24           THE WITNESS:
25                  I did not.
```

```
 1    EXAMINATION BY MR. DAVID:

 2         Q.     In the course of your monitoring

 3    the Macondo well, did you track the cementing

 4    of any shoes or -- of any shoes?

 5         A.     My tracking would be simply to

 6    acknowledge or be aware that the cementing

 7    had occurred.  I didn't get into any detailed

 8    evaluation of the cementing process.

 9         Q.     Were you ever or did you ever

10    become aware of what type of cement was used

11    on the Macondo well?  This is before

12    April 20th.

13         A.     So when I'm reading the drilling

14    operations report, I would see simply that

15    cement job was pumped and there might be a

16    detailed list of additives, I wouldn't read

17    that.  I might see the density, but that

18    would be about it.

19         Q.     Did you see anything in the --

20    strike that.

21              Would you ever note cementing in

22    your morning meetings?

23         A.     Simply to say that they conducted

24    a cementing operation, would you be the limit

25    of my reporting.
```

1          Q.     I would like you to now open up

2     your binder and look at what was previously

3     marked as 1598.  And it was yesterday in the

4     PSC, I think Tab 1 for those who are looking

5     at it on CD?

6          A.     Can you say the number again?

7          Q.     1598?

8          A.     I don't see any 1598.

9     MS. WILMS:

10               Are you looking at tab numbers.

11     It was previously marked 15098:  We don't see

12     any 15s.

13         MR. DAVID:

14               We'll skip over that and come

15     back to it later.

16     EXAMINATION BY MR. DAVID:

17         Q.     Go to 2624?

18         MS. FLICKINGER:

19               What tab?

20         MR. DAVID:

21               Tab from PSC Tab 4.

22         MS. WILMS:

23               That's the one.

24     EXAMINATION BY MR. DAVID:

25         Q.     I'm also going to reference at

1    the same time, just for ease.  I think it was

2    DOJ's Tab 18 and that was marked as 2653.

3         MS. WILMS:

4              I have a copy of 1598 if you

5    want it.

6    EXAMINATION BY MR. DAVID:

7         Q.    All right, so, which I believe

8    you discussed this document yesterday, is

9    that correct?

10        A.    That's correct.

11        Q.    What is this document?

12        A.    This is a series of e-mails in

13   which on Derek Folger is asking for an update

14   and job is introducing me to him and asking

15   me to provider recollect (provider recollect

16   with that update.

17        Q.    And if you scroll all the way to

18   the last page.  What is that document?

19        A.    This is a plot pore pressure frac

20   gradient, mud weights and casing setting

21   depths, actual, and potential future casing

22   setting depths.

23        Q.    Is that what you referred to

24   earlier as the well plan update?

25        A.    That is.

1        Q.     How off would you create -- these
2    well plan updates?
3        A.     As needed.  And I don't have an
4    exact frequency on that.
5        Q.     As needed, you would be requested
6    to do that?
7        A.     I would track and follow the well
8    as it drilled and if mud weight changes or
9    leakoff test were taken I would just date and
10   if someone asked for an update, I would also
11   revisit and update the plot.
12       Q.     So if there were changes in mud
13   weight or then you would update your plot?
14       A.     Thereco be multiple changes of
15   update during the times that I would look at
16   this.  I didn't necessarily go and update
17   every time the mud weights were changed, so
18   if there were many mud weight change, when I
19   look at it in the morning, I might update
20   that, but there is no standard time for
21   format or updates.
22       Q.     How would you decide when to
23   update?
24       MS. WILMS:
25               Object to form.

```
1          THE WITNESS:

2                    Again, I don't know that there's

3    any general decision process, but when I

4    would look at the morning reports, if I saw

5    that there were multiple updates, I might go

6    ahead and add those updates to the plot.

7          Q.     I believe yesterday you described

8    how you would create these and could you tell

9    me again how would you create these plots?

10         A.     The pore pressure frac gradient

11   mud weight, the smooth dark curves, I cook

12   those from a BP PowerPoint presentation that

13   I cot, from the information that Josh Nichols

14   provided me, which I believe to be a predrill

15   estimate and the the step was solid lines

16   would -- are the actual mud weights that I

17   recorded for the original well and for the

18   bypass well, and the solid lines on the right

19   with the triangle representing shoes would be

20   the actual casing setting depths that

21   occurred in the well.

22         Q.     And let's talk about that

23   PowerPoint for Mr. Nichols.  I do remember

24   what the title of that presentation was

25   called?
```

```
 1            A.      I do not.
 2            Q.      Was there a date on that
 3   presentation?
 4            A.      I don't recall.
 5            Q.      Where did you find the
 6   presentation?
 7            A.      It was in the records that Josh
 8   Nichols passed on to me.
 9            Q.      So in the box of documents that
10   you referred to yesterday?
11            A.      Yes.
12            Q.      Do you know if there is an
13   electronic version of that document?
14            A.      I don't know.
15            Q.      Do you still have access to that
16   box of document?
17            A.      I do not.
18            Q.      Where is the it now?
19            A.      I believe that was given to our
20   legal group and let me clarify, they may have
21   since given some of those documents back to
22   my, but I don't know if that four point was
23   in the presentation, anything that they
24   returned to me.
25            Q.      How did you use the PowerPoint
```

1    presentation to generate that graph?

2         A.    I manually selected data points

3    digitly off the plot and plugged those into

4    neigh model.

5         Q.    So would it be fair to say that

6    you approximated the location of the lines

7    for your plot for the presentation?

8         MS. WILMS:

9              Object to form.

10        THE WITNESS:

11             That would be fair to say.

12        Q.    And to be clear, which lines did

13   you use from the power point presentation?

14        A.    Pore pressure, mud weight, frac

15   gradient.

16        Q.    Why would you create these plots?

17        MS. WILMS:

18             Object to form.

19        THE WITNESS:

20             This is the way that I can

21   visualize and describe progress towards the

22   geological objective.

23   EXAMINATION BY MR. DAVID:

24        Q.    Okay.  And how would this

25   describe how you're progressing to the

1    geological objective?

2         A.     This describes the relationship

3    between the mud weight and the fracture

4    gradient and gives idea as to an -- an

5    approximate idea of whether or not the well

6    can reach the ye logical objectives.

7         Q.     How would you determine from this

8    graph, whether or not the well can reach the

9    geological objectives?

10        A.     As I described yesterday, it's

11   automated, it's not an exact predicting tool,

12   but it gives a generality of how far can be

13   drilled before the mud weight approached the

14   previous shoe strength with some margin of --

15   some margin below that strength.

16        Q.     Why would you provide these plots

17   to others?

18        A.     This would give some idea of the

19   chances of reaching the geological objectives

20   that they were interested in.

21        Q.     And would they be the ail to read

22   these plots?

23        A.     I sent it to them and they would

24   often thank me for them, I assume that I meat

25   their needs.

1        Q.      When was the last time you
2    created one of these plots?
3        A.      I don't recall the exact date.
4        Q.      We're looking now at PSC 1591,
5    tab A.
6        Q.      Do you remember this document
7    from yesterday, Mr. Quitzau?
8        A.      Yes, I do.
9        Q.      Scroll down or page down to --
10   it's going to be the third page and the
11   fourth page, I think.  Ending in bathe number
12   1042 and 1043?
13       A.      (Complying).
14       Q.      And when -- I believe yesterday
15   you discussed that these were the types of
16   documents that you would expect to find on a
17   WellSpace, is that correct?
18       MS. WILMS:
19              Object to the form.
20       THE WITNESS:
21              Can you restate the question or
22   repeat the question.
23   EXAMINATION BY MR. DAVID:
24       Q.      How about this:  Would you expect
25   to receive these documents as a drilling

1  engineer as a -- pardon me, would you expect

2  to receive these documents from the operator

3  of the well?

4       MS. WILMS:

5            Object to form.

6       THE WITNESS:

7            As a drilling engineer, I

8  wouldn't know whether to expect some of these

9  documents or not.

10      Q.    Which documents would you use as

11  a drilling engineer?

12      A.    In my function as a nonoperater,

13  the mud log reports, I see the word drilling

14  prognosis, well history, and permit to drill.

15  I might use those, although to be honest, I

16  was not aware that those were in there.

17      Q.    Would there -- I seas I also

18  believe you testified that you would use from

19  time to time the MWD and LWD?

20      A.    Let's see what that sayings.

21      Q.    Is that right?

22      A.    Let's see, MWD, LWD, field prints

23  and final prints.

24      Q.    And wireline logs as well?

25      A.    An I might expect to use those.

```
 1    I don't know that I actually did on this
 2    well.
 3         Q.    And did you ever receive copies
 4    of any filings with the MMS?
 5         A.    I don't recall if I did.
 6         Q.    But you may have received copies
 7    of filings to the MMS?
 8    MS. WILMS:
 9              Object to the form.
10    THE WITNESS:
11              I don't recall.
12    EXAMINATION BY MR. DAVID:
13         Q.    You don't recall if you may have?
14         A.    I don't.
15    MS. WILMS:
16              Object to form.
17    THE WITNESS:
18              I don't recall receiving them,
19    any documents from MMS.
20    EXAMINATION BY MR. DAVID:
21         Q.    Would you expect to receive
22    copies of ZMMS filings?
23    MS. WILMS:
24              Object the form.
25    THE WITNESS:
```

1          I wouldn't necessarily expect
2     that.
3     EXAMINATION BY MR. DAVID:
4          Q.     In your previous experience as
5     a -- when Anadarko has been an operator,
6     there's been a relationship with a
7     nonoperater, would you have ever provided the
8     nonoperater with MMS filings?
9          A.     I don't recall doing that.
10          Q.     Would you -- was it your
11     responsibility to provide MMS filings to the
12     nonoperater of the well?
13          MS. WILMS:
14               Object to form.
15          THE WITNESS:
16               It was not.
17     EXAMINATION BY MR. DAVID:
18          Q.     Let's turn to -- it was marked
19     yesterday always Exhibit 2630, PSC Tab 13
20     from yesterday.
21          A.     (Complying) had.
22          MR. DAVID:
23               How are we doing with time?
24          THE VIDEOGRAPHER:
25               You got ten minutes.

```
 1    EXAMINATION BY MR. DAVID:

 2         Q.    Do you remember this document

 3    from yesterday, Mr. Quitzau?

 4         A.    Yes, I do.

 5         Q.    Would you scroll down to the very

 6    last page, ending in 2158?

 7         A.    Yes.

 8         Q.    Could you tell me what this

 9    e-mail is.

10         A.    Which e-mail?

11         Q.    The last e-mail, I guess, on the

12    page.

13         A.    This is an e-mail to Bobby Bodek

14    asking for an update on the Macondo well.

15         Q.    And would you read the very last

16    sentence from you?

17         A.    Is there any consideration to

18    reducing the mud weight to 14.3-pound per

19    gallon.

20         Q.    I believe yet you stated that you

21    were asking this question as a suggestion

22    about mud weight, is that correct?

23         MS. WILMS:

24              Object to form.

25         THE WITNESS:
```

```
 1                    I said this was a -- a
 2   suggestion to consider reducing the mud
 3   weight.
 4         Q.    Did you ever make any other
 5   suggestions to Mr. Bodek?
 6         A.    I don't recall any other
 7   suggestions.
 8         Q.    When would you have made
 9   suggestions to Mr. Mow deck?
10         MS. WILMS:
11                    Object to form.
12         THE WITNESS:
13                    Generally, I wouldn't.
14   EXAMINATION BY MR. DAVID:
15         Q.    But you you did in this case?
16         A.    That's correct.
17         Q.    Why did you choose to make a
18   suggestion to Mr. Bodek in this case?
19         A.    In this case, itself just trying
20   to him out based -- owe they were dealing
21   with ballooning issues and we had had some
22   experience with ballooning issues in Anadarko
23   operations and I offered some comments to
24   that effect.
25         Q.    I think it's going to be the --
```

1    it's on both pages, 2157 and 2158?

2         A.    Okay.

3         Q.    Could you tell me what the e-mail

4    is this expand 2157 and 2158?

5         A.    It's called Macondo update and

6    it's a recap of a phone call with Bobby

7    Bodek.

8         Q.    And could you then turn to the

9    top of Page 2158?

10        Q.    Are you there?

11        A.    Yes.

12        Q.    And could you read allowed the

13   third paragraph?

14        A.    Starting with operationally?

15        Q.    Yes.

16        A.    Operationally, I agree with their

17   plan to pull out of the hole POH, replace the

18   equipment, how they're dealing with the mud

19   losses and keeping the mud weight at

20   14.3-pound per gallon if possible.  The big

21   question of whether or not we are through the

22   M 55 is for you to answer.

23        Q.    And why did you operationally

24   agree with the plan to pull out of hole --

25   replace the equipment, the weigh they were

1    dealing with the mud losses and keeping the

2    mud weight at 14.3 pounds per gallon?

3        A.    Basically after listing to what

4    Bobby had to say, I was passing on to the

5    asset team, that I agree with the BP plans.

6        Q.    Was this based on your previous

7    experience as a drilling engineer on your

8    previous Anadarko wells?

9        MS. WILMS:

10              Object to form.

11       THE WITNESS:

12              Yes.  I'm sorry, can you repeat

13   the question?  Based on Anadarko wells?

14       MR. DAVID:

15              Your previous Anadarko wells.

16       THE WITNESS:

17              Yes.

18   EXAMINATION BY MR. DAVID:

19       Q.    The last sentence, is the bilge

20   question of whether or not we are through M

21   55 is for you to answer.  Why is that a yes

22   for the recipients of this e-mail?

23       A.    At that point in the well, the

24   asset team was concerned about whether or not

25   the geological objectives had be achieved, in

 1    my discussion with Bobby Bodek, he referenced

 2    a discussion on the sands, the objective

 3    sands, and I simply point out to the asset

 4    team that I'm not qualified or I'm not -- I

 5    don't understand what the geological

 6    objectives are, how they're physically

 7    described to worry about, I can't predict

 8    which sand is which --

 9         Q.    You would not view it as your

10    role or responsibility to decide that?

11         A.    To decide?

12         Q.    Whether they were through the M

13    55?

14         A.    That's correct.

15         Q.

16         MR. DAVID:

17              I think we need to go off for

18    right now so he can change the tape.

19         THE VIDEOGRAPHER:

20              We're going off the record at

21    9's 9:24.  This is the end of videotape No.

22    One.

23              (Whereupon, a brief recess was

24    taken.)

25         THE VIDEOGRAPHER:

```
 1                    We're back on the record.  This
 2    is the beginning of videotape No. Two.  9's
 3    9:37.
 4    EXAMINATION BY MR. DAVID:
 5         Q.    I just have a couple more topics
 6    to cover and then we will be done.  For any
 7    other decisions, operational decisions that
 8    were made on the Macondo well, did you agree
 9    with them?
10         MS. WILMS:
11                    Object to form.
12         THE WITNESS:
13                    I'm not aware of all the
14    operational decision that were made on the
15    well.
16         Q.    From?
17    EXAMINATION BY MR. DAVID:
18         Q.    From March 18th, through the time
19    you stopped monitoring the well, did you
20    agrees with you a the operational decisions
21    on the well?
22         MS. WILMS:
23                    Object to form.
24         THE WITNESS:
25                    There were numerous decisions
```

```
 1   I'm not aware of all them and I didn't have
 2   any disagreements of the ones I might have
 3   been aware of.
 4   EXAMINATION BY MR. DAVID:
 5       Q.     If you did have disagreements
 6   with the way the well was operating did you
 7   feel free to contact Mr. Bodek or anyone else
 8   at BP?
 9       MS. WILMS:
10              Object to form.
11       THE WITNESS:
12              Any contact with BP in that
13   regard, I would consult the asset team before
14   communicating.  Any further communications.
15   EXAMINATION BY MR. DAVID:
16       Q.     But Anadarko could contact BP if
17   it did disagree with any operational
18   decisions?
19       MS. WILMS:
20              Object to form.
21       THE WITNESS:
22              Our position was that we were
23   not in any kind of decision-making role so,
24   we didn't really --
25   EXAMINATION BY MR. DAVID:
```

1          Q.     It's not exactly my question.  My

2    question is slightly different.  Anadarko

3    could contact BP if it did disagree with any

4    of the operational decisions, right?

5          MS. WILMS:

6               Object to form.

7          THE WITNESS:

8               Anadarko had open lines of

9    communication and could contact BP at any

10   time.

11   EXAMINATION BY MR. DAVID:

12         Q.     Okay.  And for instance, if you

13   did have a suggestion for a different ray to

14   operate the well, you could contact BP,

15   correct?

16         MS. WILMS:

17              Object to form.

18         THE WITNESS:

19              As I said, Anadarko could

20   contact BP at any time through the existing

21   channel also.

22   EXAMINATION BY MR. DAVID:

23         Q.     So one of the times you could

24   contact bp is your e-mail to Mr. Bodek about

25   the 14.3 mud weight, correct?

1          A.      That was a suggestion to consider

2    and that is an example of putting forth

3    communication to BP.

4          Q.      Turn to Tab 20 of the PSC, it's

5    going to be 1592, so you might not even have

6    it in that binder?

7          MS. WILMS:

8                  No, we don't.

9                  Do you have 1592 handy?

10         MR. DAVID:

11                 Let's go to Dave exhibit while

12   you're trying to find that.

13   EXAMINATION BY MR. DAVID:

14         Q.      2634, that is PSC Tab 17?

15         A.      Okay.

16         Q.      That should have a Bates stamp at

17   the bottom ending in 7463, is that correct?

18         A.      That's correct.

19         Q.      All right, could you look at the

20   bottom e-mail on the 7463, it's an e-mail

21   from you to Alan O'Donnell, Don Peyton,

22   Dennis McDaniel?

23         A.      Yes.

24         Q.      And could you tell me what this

25   e-mail was about?

1        A.      This is a response to Alan

2   O'Donnell's request as to whether or not the

3   production casing would be a liner or a full

4   string of seven-inch.

5        Q.      And could you read the very first

6   paragraph from your e-mail to response to

7   Alan on 77463?

8        A.      It would be a liner and it would

9   probably be run back up into the 11 and 7/8th

10  inch.  The seven-inch liner top would be at

11  plus or minus 14,500 feet.  I don't know this

12  for sure, but I have heard some rumors from

13  vendors it makes sense.

14       Q.      How did you decide that it makes

15  sense?

16       A.      I described this yesterday.  The

17  seven-inch liner hanger that I -- the top of

18  the liner that I reference here would have a

19  liner hanger and if the liner, the small

20  seven-inch liner is hung in the larger

21  diameter, 11 and 7/8s, there's a lot of space

22  there that would allow the equipment that's

23  used for the liner top to be very strong,

24  that as opposed to putting that liner top in

25  the 97/8ths liner which has less space and

1    there by the equipment would have to be be
2    smaller an weaker.
3         Q.    Why were you making observations
4    about the liner?
5         A.    I'm responding to Alan's request-
6    owe hills e-mail is asking is it a liner or a
7    full string of seven-inch and I'm just
8    clarifying the geometry of what I expected
9    would be run in the well.
10        Q.    And Hugh would this information
11   have been used for your purpose?
12        MS. WILMS:
13             Object to form.
14        THE WITNESS:
15             This information was not for my
16   purpose.  This was for -- my purpose in that
17   it was to respond to Alan O'Donnell and
18   clarify their requests regarding the
19   production casing.
20        Q.    Do you know why Mr. O'Donnell was
21   request willing the information?
22        MS. WILMS:
23             Object to form.
24        THE WITNESS:
25             There were a series of e-mails

1    back and forth from the asset team to

2    describe what the production casing would

3    look like.  My understanding from those

4    e-mails is that they were interested in

5    tubing -- tubing flow predictions and I

6    really don't know much more than that.

7    EXAMINATION BY MR. DAVID:

8         Q.    Did Mr. O'Donnell ask you if it

9    makes sense to use the seven-inch liner?

10        MS. WILMS:

11              Object to form.

12        THE WITNESS:

13              He did not.

14   EXAMINATION BY MR. DAVID:

15        Q.    Why did you say it makes sense?

16        MS. WILMS:

17              Object to form.

18        THE WITNESS:

19              It makes sense refers to setting

20   the seven-inch liner top in the 11 and 7/8th.

21        Q.    So the operational decision of

22   setting the seven-inch liner top makes sense?

23        MS. WILMS:

24              Object to form.

25        THE WITNESS:

1                    Can you say that question again?

2     EXAMINATION BY MR. DAVID:

3          Q.     Yes.   The operational decision of

4     setting the seven-inch liner top makes sense?

5          MS. WILMS:

6                    Object to form.

7          THE WITNESS:

8                    A liner top that is -- when a

9     liner is run and set, it is set.   So, yeah,

10    that makes sense.

11         Q.     Not exactly my question.   My

12    question is:   The -- in your mind, the

13    decision to set the seven-inch liner makes

14    sense, correct?

15         MS. WILMS:

16                   Object to form.

17         THE WITNESS:

18                   It makes sense -- I'm clarifying

19    Alan O'Donnell's question.   He wants to

20    know -- he's implying in or stating in his

21    e-mail that a full string of seven-inch,

22    meaning the seven-inch is going all the way

23    back to the mud line and I'm telling him, it

24    starts here, that the seven inch is probably

25    only going to go back up to some distance in

1    the well and not back to surface so, that's

2    what makes sense as opposed to going all the

3    way back to the surface.

4         Q.    So the -- to clarify, the makes

5    sense refers to what exactly?

6         A.    The fact that the seven-inch

7    within the context of my e-mail would not go

8    all the way back to the mud line.

9         Q.    So it makes sense that the

10   seven-inch would not -- seven-inch liner

11   would not go all the way back up to the mud

12   line?

13        A.    It makes sense that the

14   seven-inch casing would not go all the way

15   back up to the mud line.

16        Q.    Why does that make sense?

17        A.    That makes sense because the size

18   of the tubulars in the well would allow

19   larger production casing to be run than

20   seven-inch.

21        Q.    Okay.  So it was based on the

22   tubulars?

23        A.    It's based on the size of the

24   tubulars in the shallow portions of the well,

25   the ID of the internal diameter of the

1    tubulars.

2          Q.    It makes sense to use the

3    seven-inch liner top in light of the

4    tubulars?

5          A.    It makes sense to have seven-inch

6    casing in the bottom of the well and larger

7    casing for production casing in the top of

8    the well and Alan's note implies that he

9    thought the seven-inch might be going all the

10   way to the surface, so, he was trying to

11   clarify that.

12         Q.    So it makes sense to use the

13   seven-inch liner in light of the tubulars

14   that were being used?

15         MS. WILMS:

16              Object to form.

17         THE WITNESS:

18              I don't understand that

19   question.

20   EXAMINATION BY MR. DAVID:

21         Q.    Okay.  So I will break it up.  It

22   made sense to use the seven-inch liner top,

23   correct?

24         A.    It made sense to have seven-inch

25   casing in the bottom portion of the well for

1    the production casing.

2         Q.    Okay.  And so you agreed with --

3    you agreed with the decision to use the

4    seven-inch liner top?

5         MS. WILMS:

6              Object to form.

7         THE WITNESS:

8              What I'm agreeing to is the size

9    of the seven-inch casing.  I'm reporting that

10   it's a liner with a line her top and when

11   it's a liner, it necessarily has to have a

12   liner top.  That's an assumption I'm making

13   based on my previous e-mails and

14   correspondence with Bobby Bodek.

15        Q.    So through your correspondence

16   with Mr. Bodek, did you gain an appreciation

17   that it would make sense to use the

18   seven-inch liner top?

19        MS. WILMS:

20             Object to the form.

21        THE WITNESS:

22             The term you keep using doesn't

23   quite make sense to me.  Through my

24   discussion was Bobby Bodek, my understanding

25   is that seven-inch casing would be run in the

1   bottom part of the well across the productive

2   interval and my understanding was also that

3   that seven-inch would be run as a liner.

4   EXAMINATION BY MR. DAVID:

5        Q.    So we'll go back.  What term was

6   I using that you didn't understand?

7        A.    You keep referring to liner top

8   and I think of it as just a liner.

9        Q.    I'm stating what you have in your

10  e-mail, seven-inch liner top.  Should I be

11  referring to it as something else than the

12  seven-inch liner top that you have written in

13  your e-mail?

14       A.    I'd have to revisit all your

15  questions to get a grasp of what you're after

16  that.  I said earlier, what made sense is

17  that the liner top would be in the 11 and 67

18              eighth as opposed to the 9 and

19  7/8th casing.  That's what makes sense.

20       Q.    Okay.

21       A.    And the parallel issue is that

22  the seven-inch is a liner and does not go all

23  the way back to surface.

24       Q.    So it makes sense to use the

25  liner top in that situation?

```
 1            MS. WILMS:

 2                 Object to form.  Witness the

 3      witness said what makes since lots of times.

 4      EXAMINATION BY MR. DAVID:

 5            Q.    In your communication with Bobby

 6      Bodek, did you ever share that you agreed

 7      with the decision to set the liner top in the

 8      11 and 7/8?

 9            A.    Difficult not.

10            Q.    Okay.  Why didn't you?

11            MS. WILMS:

12                 Object to form.

13            THE WITNESS:

14                 I assume that BP was in charge

15      of that decision and they would set the liner

16      top where they wanted to.

17      EXAMINATION BY MR. DAVID:

18            Q.    And did you discuss the setting

19      the liner top in a call with Mr. Bodek or via

20      e-mail?

21            A.    So, again, I never discussed the

22      setting of the liner top, just from drilling

23      parlance, I discussed setting a liner.  It's

24      always going to have a liner top.  Our

25      discussions were set ago liner and running a
```

1    tieback and these e-mails were predominantly

2    whether the line remember was a seven inched

3    or 7 and 5 eighth and 7 and 3 quarter.  And

4    clarifying what size of production casing

5    would go back to surface and that was Alan's

6    note S he implied that seven-inch was going

7    back to surface, so that's what this note was

8    to clarify.

9    EXAMINATION BY MR. DAVID:

10          Q.    Can we look at 1592, have you

11   been able to look at that?

12          MS. WILMS:

13                Were you ever an able to find

14   it?  Do you know what number.

15          MR. DAVID:

16                It was Tab 20 for the PSC.

17   EXAMINATION BY MR. DAVID:

18          Q.    We don't need the exhibit, it's

19   okay, I believe yesterday, this exhibit

20   discussed the meeting or addressed the

21   meeting where Anadarko was considering the

22   drilling deeper of the Macondo well.  Does

23   that refresh your recollection of the

24   document?

25          A.    Yes.

```
 1            Q.      In this meeting, do you recall, I
 2    think you said that there were three topics
 3    that were discussed; is that correct?
 4            A.      I don't recall listing three
 5    documents.  Can you refresh my memory?
 6            Q.      Three topics?
 7            A.      Three topics.
 8            Q.      And itch I think the three topics
 9    were whether to drill deeper, whether to
10    temporary abandon the well and not drill deep
11    other or temporary abandon the well and have
12    another well drilled.  Does that refresh your
13    recollection?
14            A.      That refreshes my recollection.
15            Q.      Okay.  You recall in more detail
16    what was discussed at that meeting?
17            A.      I do not.
18            Q.      Did you ever discuss drilling
19    deeper the Macondo well after that meeting?
20            A.      I don't recall discussing any
21    drilling deeper after that meeting.
22            Q.      Do you know if anyone from
23    Anadarko ever contacted BP about drilling
24    deeper?
25            MS. WILMS:
```

1              Object to form.

2         THE WITNESS:

3              I know that eventually Anadarko

4    sent some sort of correspondence basically

5    agreeing to BP terminating the well at the

6    depth that they were at at that time.

7    Agreeing with BP's decision to terminate the

8    drilling depth.

9    EXAMINATION BY MR. DAVID:

10        Q.     Slightly different question.  Do

11   you know whether Anadarko ever communicated

12   its desire to drill or -- strike that.

13             Do you know if Anadarko ever

14   communicated with BP about drilling the

15   Macondo well deeper?

16        MS. WILMS:

17             Object to form.

18        THE WITNESS:

19             I understand that there were

20   discussions about the possibility of drilling

21   deeper.  That's the limit of my

22   understanding.  I wasn't involved in any of

23   those discussions.

24   EXAMINATION BY MR. DAVID:

25        Q.     Do you know why those discussions

1    were held?

2          A.    I do not.

3          Q.    Do you think the Macondo well

4    should have been drilled deeper?

5          MS. WILMS:

6                Object to form.

7          THE WITNESS:

8                Deeper than it was?

9    EXAMINATION BY MR. DAVID:

10         Q.    Yes.

11         A.    I don't have an opinion on that.

12         Q.    Do you know why -- do you know if

13   Anadarko was concerned about calling TD at

14   that particular depth?

15         MS. WILMS:

16                Object to form.

17         THE WITNESS:

18                I understand that Anadarko

19   finally agreed with the decision to -- BP's

20   decision to call TD at that depth.

21   EXAMINATION BY MR. DAVID:

22         Q.    And before it agreed to with

23   decision to call TD at that depth, what

24   prevented it from agreeing?

25         MS. WILMS:

1                Object to form.

2          THE WITNESS:

3                Can you restate that question

4    again or say it again?

5    EXAMINATION BY MR. DAVID:

6          Q.    Why didn't Anadarko initial live

7    agree to TD at that depth?

8          MS. WILMS:

9                Object to form.

10         THE WITNESS:

11               In my limited involvement, they

12   were trying to understand he possibly

13   alternatives and they just -- just over a few

14   days, I think there was a weekend in there,

15   they were considering alternatives.

16   EXAMINATION BY MR. DAVID:

17         Q.    Okay.  Do you know why B

18   performed called TD at that depth?

19         MS. WILMS:

20               Object to form.

21         THE WITNESS:

22               That's their decision.  They

23   sent a note to the affect this they were

24   calling TD and listed some reasons, I don't

25   recall those reasons.

1         Q.      Do you recall those reasons

2    related to safety?

3         A.      I believe the decision to reach

4    TD was -- had already been made and then they

5    sent the notice and there was a comment about

6    safety and I don't remember exactly the exact

7    text that was in that e-mail.

8         Q.      But you recall that Anadarko

9    eventually agreed to call TD at that depth?

10        A.      We agreed with BP's decision to

11   call TD.

12        MR. DAVID:

13             All right, I have no other

14   questions.  Thank you very much, Mr. Quitzau.

15        THE VIDEOGRAPHER:

16             We're going off the record.

17   It's 9:55.  This is videotape No. Two.

18

19             (Whereupon, a brief recess was

20   taken.)

21        THE VIDEOGRAPHER:

22             We're back on the record.  This

23   is still videotape No. Two.  It's 10 o'clock.

24   EXAMINATION BY MR. HEBERT:

25        Q.      Good morning Mr. Quitzau, I'm