<pre>
 1                      UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF LOUISIANA
 2

 3   ******************************************************************

 4   IN RE:  OIL SPILL BY THE
     OIL RIG *DEEPWATER HORIZON*
 5   IN THE GULF OF MEXICO ON
     APRIL 20, 2010
 6
                                    CIVIL ACTION NO. 10-MDL-2179 "J"
 7                                  NEW ORLEANS, LOUISIANA
                                    THURSDAY, MAY 26, 2011, 9:30 A.M.
 8

 9   THIS DOCUMENT RELATES TO
     ALL ACTIONS
10
     ******************************************************************
11
                  TRANSCRIPT OF ORAL ARGUMENT PROCEEDINGS
12              HEARD BEFORE THE HONORABLE CARL J. BARBIER
                       UNITED STATES DISTRICT JUDGE
13

14   APPEARANCES:

15   FOR THE PLAINTIFFS'
     LIAISON COUNSEL:          DOMENGEAUX WRIGHT ROY & EDWARDS
16                             BY:   JAMES P. ROY, ESQUIRE
                                     BRIAN C. COLOMB, ESQUIRE
17                                   WILLIAM F. LARGE, ESQUIRE
                               P. O. BOX 3668
18                             556 JEFFERSON STREET
                               LAFAYETTE, LA  70502
19

20                             HERMAN HERMAN KATZ & COTLAR
                               BY:   STEPHEN J. HERMAN, ESQUIRE
21                             820 O'KEEFE AVENUE
                               NEW ORLEANS, LA  70113
22

23   FOR THE PLAINTIFFS:       BREIT DRESCHER IMPREVENTO & WALKER
                               BY:   JEFFREY A. BREIT, ESQUIRE
24                             1000 DOMINION TOWER,
                               999 WATERSIDE DRIVE
25                             NORFOLK, VA  23510
</pre>

```
 1   APPEARANCES CONTINUED:

 2

 3                        LEVIN PAPANTONIO THOMAS MITCHELL
                          RAFFERTY & PROCTOR
 4                        BY:  BRIAN H. BARR, ESQUIRE
                          316 SOUTH BAYLEN STREET, SUITE 600
 5                        PENSACOLA, FL  32502

 6

 7                        CUNNINGHAM BOUNDS
                          BY:  ROBERT T. CUNNINGHAM, ESQUIRE
                          1601 DAUPHIN STREET
 8                        MOBILE, AL  36604

 9

10                        LEWIS, KULLMAN, STERBCOW & ABRAMSON
                          BY:  PAUL M. STERBCOW, ESQUIRE
                          PAN AMERICAN LIFE BUILDING
11                        601 POYDRAS STREET, SUITE 2615
                          NEW ORLEANS, LA  70130

12

13                        LIEFF CABRASER HEIMANN & BERNSTEIN
                          BY:  ELIZABETH J. CABRASER, ESQUIRE
14                        275 BATTERY STREET, 29TH FLOOR
                          SAN FRANCISCO, CA  94111

15

16                        WEITZ & LUXENBERG
                          BY:  ROBIN L. GREENWALD, ESQUIRE
17                        700 BROADWAY
                          NEW YORK CITY, NY  10003

18

19                        COLSON, HICKS, EIDSON, COLSON, MATTHEWS,
                          MARTÍNEZ, GONZALES, KALBAC & KANE
20                        BY:  ERVIN A. GONZALEZ, ESQUIRE
                          255 ALHAMBRA CIRCLE, PENTHOUSE
21                        CORAL GABLES, FL  33134

22

23                        FAYARD & HONEYCUTT
                          BY:  CALVIN C. FAYARD, JR., ESQUIRE
                          519 FLORIDA AVENUE SW
24                        DENHAM SPRINGS, LA  70726

25
```

```
 1   APPEARANCES CONTINUED:

 2

 3                            DEGRAVELLES, PALMINTIER, HOLTHAUS & FRUGE
                             BY:  MICHAEL C. PALMINTIER, ESQUIRE
 4                               JOHN W. DEGRAVELLES, ESQUIRE
                             618 MAIN STREET
 5                           BATON ROUGE, LA  70801

 6

 7                           BEASLEY, ALLEN, CROW, METHVIN,
                             PORTIS & MILES
                             BY:  RHON E. JONES, ESQUIRE
 8                           POST OFFICE BOX 4160
                             MONTGOMERY, AL  36013
 9

10   FOR THE SIERRA CLUB
     AND GULF RESTORATION
11   NETWORK:                WALTZER & WIYGUL
                             BY:  JOEL R. WALTZER, ESQUIRE
12                           3715 WESTBANK EXPRESSWAY, SUITE 13
                             HARVEY, LA  70058
13

14   FOR THE FEDERAL
     GOVERNMENT INTERESTS:   U.S. DEPARTMENT OF JUSTICE
15                           TORTS BRANCH, CIVIL DIVISION
                             BY:  R. MICHAEL UNDERHILL, ESQUIRE
16                               SARAH HIMMELHOCH, ESQUIRE
                             450 GOLDEN GATE AVENUE
17                           7TH FLOOR, ROOM 5395
                             SAN FRANCISCO, CA  94102
18

19   FOR THE UNITED STATES
     OF AMERICA:             ENVIRONMENTAL ENFORCEMENT SECTION
20                           U.S. DEPARTMENT OF JUSTICE
                             BY:  STEVEN O'ROURKE, ESQUIRE
21                           P.O. BOX 7611
                             WASHINGTON, DC  20044
22

23   FOR STATE INTERESTS:    ALABAMA ATTORNEY GENERAL'S OFFICE
                             BY:  LUTHER STRANGE, ESQUIRE
24                               COREY L. MAZE, ESQUIRE
                             500 DEXTER AVENUE
25                           MONTGOMERY, AL  36130
```

```
 1   APPEARANCES CONTINUED:

 2


 3   FOR TRANSOCEAN HOLDINGS
     LLC, TRANSOCEAN
 4   OFFSHORE DEEPWATER
     DRILLING INC., AND
 5   TRANSOCEAN DEEPWATER
     INC.:                       FRILOT
 6                               BY:  KERRY J. MILLER, ESQUIRE
                                      PAUL C. THIBODEAUX, ESQUIRE
 7                               ENERGY CENTRE, 36TH FLOOR
                                 1100 POYDRAS STREET
 8                               NEW ORLEANS, LA  70163

 9
                                 ROYSTON RAYZOR
10                               BY:  JOHN M. ELSLEY, ESQUIRE
                                 PENNZOIL PLACE
11                               711 LOUISIANA STREET, SUITE 500
                                 HOUSTON, TX  77002
12


13
     FOR BP AMERICA INC.,
14   BP AMERICA PRODUCTION
     COMPANY, BP COMPANY
15   NORTH AMERICA INC.,
     BP CORPORATION NORTH
16   AMERICA INC.,
     BP EXPLORATION &
17   PRODUCTION INC.,
     BP HOLDINGS NORTH
18   AMERICA LIMITED,
     BP PRODUCTS NORTH
19   AMERICA INC.:               LISKOW & LEWIS
                                 BY:  R. KEITH JARRETT, ESQUIRE
20                               ONE SHELL SQUARE
                                 701 POYDRAS STREET
21                               SUITE 5000
                                 NEW ORLEANS, LA  70139
22

23                               KIRKLAND & ELLIS
                                 BY:  J. ANDREW LANGAN, ESQUIRE
24                                    RYAN S. BABIUCH, ESQUIRE
                                 300 N. LASALLE
25                               CHICAGO, IL  60654
```

```
 1  APPEARANCES CONTINUED:

 2

 3                           KIRKLAND & ELLIS
                             BY:  ROBERT R. GASAWAY, ESQUIRE
 4                           655 FIFTEENTH STREET, N.W.
                             WASHINGTON, DC  20005
 5

 6                           COVINGTON & BURLING
                             BY:  DAVID B. GOODWIN, ESQUIRE
 7                           ONE FRONT STREET
                             SAN FRANCISCO, CA   04111
 8

 9  FOR CAMERON INTERNATIONAL
    CORPORATION:             STONE PIGMAN WALTHER WITTMANN
10                           BY:  PHILLIP A. WITTMANN, ESQUIRE
                             546 CARONDELET STREET
11                           NEW ORLEANS, LA 70130

12

                             BECK REDDEN & SECREST
13                           BY:  DAVID J. BECK, ESQUIRE
                             ONE HOUSTON CENTER
14                           1221 MCKINNEY STREET, SUITE 4500
                             HOUSTON, TX  77010
15

16  FOR HALLIBURTON
    ENERGY SERVICES, INC.:   GODWIN RONQUILLO
17                           BY:  DONALD E. GODWIN, ESQUIRE
                                  JENNY L. MARTINEZ, ESQUIRE
18                                STEFANIE K. MAJOR, ESQUIRE
                             1201 ELM STREET, SUITE 1700
19                           DALLAS, TX  75270

20
                             GODWIN RONQUILLO
21                           BY:  R. ALAN YORK, ESQUIRE
                                  GAVIN HILL, ESQUIRE
22                           1331 LAMAR, SUITE 1665
                             HOUSTON, TX  77010
23

24

25
```

```
 1   APPEARANCES CONTINUED:

 2


 3   FOR ANADARKO
     PETROLEUM CORPORATION,
 4   ANADARKO E&P COMPANY LP,
     MOEX USA CORPORATION,
 5   AND MOEX OFFSHORE 2007
     LLC:                       KUCHLER POLK SCHELL
 6                              WEINER & RICHESON
                                BY:  DEBORAH D. KUCHLER, ESQUIRE
 7                              1615 POYDRAS STREET, SUITE 1300
                                NEW ORLEANS, LA  70112
 8

 9                              BINGHAM MCCUTCHEN
                                BY:  WARREN A. FITCH, ESQUIRE
10                                   DAVID B. SALMONS, ESQUIRE
                                2020 K STREET, NW
11                              WASHINGTON, DC  20006

12                              BINGHAM MCCUTCHEN
13                              BY:  JAMES J. DRAGNA, ESQUIRE
                                355 SOUTH GRAND AVENUE, SUITE 4400
14                              LOS ANGELES, CA  90071

15

16   FOR M-I L.L.C.:            MORGAN, LEWIS & BOCKIUS
                                BY:  HUGH E. TANNER, ESQUIRE
17                                   DENISE SCOFIELD, ESQUIRE
                                     JAMES B. TARTER, ESQUIRE
18                              1000 LOUISIANA STREET, SUITE 4000
                                HOUSTON, TX  77002
19

20   FOR MARINE SPILL
     RESPONSE CORPORATION:      BLANK ROME
21                              BY:  ALAN M. WEIGEL, ESQUIRE
                                THE CHRYSLER BUILDING
22                              405 LEXINGTON AVENUE
                                NEW YORK, NY  10174
23

24

25
```

```
 1  APPEARANCES CONTINUED:

 2

 3  FOR O'BRIEN'S RESPONSE
    MANAGEMENT, INC.,
 4  SEACOR HOLDINGS, INC.,
    SEACOR OFFSHORE LLC,
 5  SEACOR MARINE, LLC,
    SEACOR WORLDWIDE, INC.,
 6  SEACOR MARINE, INC.,
    SEACOR MARINE
 7  INTERNATIONAL, INC.,
    AND SIEMENS FINANCIAL,
 8  INC.:                    WEIL GOTSHAL & MANGES
                             BY:  MICHAEL J. LYLE, ESQUIRE
 9                           1300 I ST., NW, SUITE 900
                             WASHINGTON, DC  20005
10

11                           WEIL GOTSHAL & MANGES
                             BY:  THEODORE E. TSEKERIDES, ESQUIRE
12                           767 FIFTH AVENUE
                             NEW YORK, NY  10153
13

14  FOR DRIL-QUIP,
    INC.:                    WARE, JACKSON, LEE & CHAMBERS
15                           BY:  DON JACKSON, ESQUIRE
                             2929 ALLEN PARKWAY, 42ND FLOOR
16                           HOUSTON, TX  77019

17

18  FOR NALCO CO.:           LATHAM & WATKINS
                             BY:  MARY ROSE ALEXANDER, ESQUIRE
19                           233 SOUTH WACKER DRIVE, SUITE 5800
                             CHICAGO, IL  60606
20

21  FOR WEATHERFORD U.S.,
    L.P.:                    JONES WALKER
22                           BY:  GLENN G. GOODIER, ESQUIRE
                                  WILLIAM C. BALDWIN, ESQUIRE
23                           PLACE ST. CHARLES
                             201 ST. CHARLES AVENUE
24                           NEW ORLEANS, LA  70170

25
```

```
 1  APPEARANCES CONTINUED:

 2

 3  FOR AIRBORNE SUPPORT
    INTERNATIONAL, INC.:        LABORDE & NEUNER
 4                              BY:  BEN L. MAYEAUX, ESQUIRE
                                ONE PETROLEUM CENTER
 5                              1001 W. PINHOOK RD., SUITE 200
                                LAFAYETTE, LA 70505
 6

 7  DYNAMIC AVIATION
    GROUP, INC:                 GEIGER LABORDE & LAPEROUSE
 8                              BY:  LEO R. McALOON, III, ESQUIRE
                                ONE SHELL SQUARE
 9                              701 POYDRAS STREET, SUITE 4800
                                NEW ORLEANS, LA  70139
10

11  FOR THE CENTER FOR
    BIOLOGICAL DIVERSITY:       LAW OFFICES OF CHARLES M. TEBBUTT
12                              BY:  CHARLIE TEBBUTT, ESQUIRE
                                451 BLAIR BOULEVARD
13                              EUGENE, OR  97402

14

15  FOR THE DEFENDERS
    OF WILDLIFE:                DEFENDERS OF WILDLIFE
16                              BY:  GREGORY BUPPERT, ESQUIRE
                                1130 17TH STREET, N.W.
17                              WASHINGTON, DC 20036-4604

18

19  FOR MDL 2185:               METHOFF LAW FIRM
                                BY:  WILLIAM STRADLEY, ESQUIRE
20                              3450 ONE ALLEN CENTER
                                500 DALLAS STREET
21                              HOUSTON, TX  77002

22

23  SPECIAL MASTER:             PROFESSOR FRANCIS E. MCGOVERN
                                DUKE UNIVERSITY SCHOOL OF LAW
24                              CORNER OF SCIENCE & DRIVES
                                BOX 90362
25                              DURHAM, NC 27708
```

```
1   APPEARANCES CONTINUED:

2

3   OFFICIAL COURT REPORTER:        CATHY PEPPER, CRR, RMR, CCR
                                    CERTIFIED REALTIME REPORTER
4                                   500 POYDRAS STREET, ROOM HB406
                                    NEW ORLEANS, LA   70130
5                                   (504) 589-7779
                                    Cathy_Pepper@laed.uscourts.gov
6

7   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
    PRODUCED BY COMPUTER.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              **I N D E X**

2

3     ITEMS                                            PAGE

4

5     MR. LANGAN.............................................    13

6     **B1, ECONOMIC DAMAGE CLAIMS**...........................    14

7     MR. LANGAN.............................................    31

8     MR. ELSLEY............................................    33

9     MR. SALMONS...........................................    43

10    MR. YORK..............................................    56

11    MR. BECK..............................................    59

12    MR. ROY...............................................    67

13    MR. COLOMB............................................    68

14    MR. BREIT.............................................    70

15    MR. ROY...............................................    79

16    MR. DEGRAVELLES.......................................    80

17    MR. ROY...............................................    88

18    MR. HERMAN............................................    88

19    MR. ROY...............................................    99

20    MS. CABRASER..........................................    99

21    MR. ROY...............................................   106

22    MR. LANGAN............................................   107

23    **B3, RESPONDER RESPONSE CLAIMS**........................   109

24    MS. ALEXANDER.........................................   109

25    MR. LYLE..............................................   114

1  MR. LANGAN........................................... 121

2  MR. WEIGEL........................................... 121

3  MR. ROY.............................................. 126

4  MS. GREENWALD........................................ 126

5  MS. ALEXANDER........................................ 132

6  **D1, CLAIMS FOR INJUNCTIVE OR REGULATORY TYPES OF**    132

7  **RELIEF**...........................................

8  MR. LANGAN........................................... 133

9  MR. ROY.............................................. 134

10 MR. TEBBUTT.......................................... 134

11 MR. GONZALEZ......................................... 135

12 MR. TEBBUTT.......................................... 137

13 MR. BUPPERT.......................................... 137

14 MR. WALTZER.......................................... 139

15 THE COURT............................................ 139

16

17

18

19

20

21

22

23

24

25

1                        P-R-O-C-E-E-D-I-N-G-S

2                     THURSDAY, MAY 25, 2011

3                  M O R N I N G   S E S S I O N

4                     (COURT CALLED TO ORDER)

5

6

7            THE DEPUTY CLERK:  All rise.

8            THE COURT:  Please be seated, everyone.

9                  Is anybody going to need the ELMO for arguments?

10   If not, we'll just turn it off.

11           MR. LANGAN:  Your Honor, we might.

12           THE COURT:  Just leave it on.

13           MR. LANGAN:  Thank you.

14           THE COURT:  All right.  We have a number of motions to

15   dismiss addressed to three different master complaints, as I see

16   it:  B1, which are the economic damage claims; B3, which are the

17   responder response claims; and, the D1, which are claims for

18   injunctive or regulatory types of relief.

19                  The parties have requested -- and I told them I

20   would -- requested to allot the three hours.  Two hours, most of

21   the time, obviously, will be addressed to the B1 bundle issues,

22   two hours for that, one hour for each side; 40 minutes for the

23   B3 bundle, 20 minutes per side; and, 20 minutes for the

24   D1 bundle, 10 minutes per side.

25                  So I think we should just get right into the

1  B1 bundle because that will be the most time consuming, and there

2  may be some spill over into the issues in the other cases, too.

3  So we should deal with that first.

4          MR. LANGAN:  Your Honor, Andy Langan.

5              On B1 --

6          THE COURT:  Excuse me, Mr. Langan.  I had also asked

7  counsel --

8          MR. LANGAN:  Oh, I'm sorry.

9          THE COURT:  No, excuse me.

10             I had also asked counsel last week to identify the

11 most significant issues in some order of priority that they would

12 like to argue this morning so that I could make sure I

13 concentrated on those.  So I've tried to do that, and I'll let

14 you all each take up what you consider.  Of course, I may direct

15 the argument from time to time myself.

16             Mr. Langan.

17         MR. LANGAN:  Your Honor, just as a road map, I will

18 start the B1 argument on behalf of BP, but there are other

19 defendants that will be arguing, as well.  I may, if Your Honor

20 please, try to reserve a little of my 20 minutes for rebuttal, if

21 that's okay.

22         THE COURT:  Sure.

23         MR. LANGAN:  May I hand up a couple of slides I may

24 refer to?

25             So, Your Honor, if it please the Court, with

1    respect to the B1 motion to dismiss that we've brought, I just

2    want to mention at the outset that BP's position is not that

3    every single claim of every single plaintiff needs to be

4    dismissed.  That is not our position.

5           We are here to take a close look at the role of

6    OCSLA and OPA and to get an understanding of what is properly in

7    court and what is not.

8           Because this event occurred on the Outer

9    Continental Shelf, OCSLA applies.  That, plus the

10   Oil Pollution Act, those two statutes are critical to

11   understanding what is properly before the Court and what is not.

12          As you know, Your Honor, BP has accepted

13   responsible party responsibility under OPA.  We've established a

14   claims process, as OPA requires.  So far, we've paid over

15   $4 billion to over 187,000 claimants.

16          That OPA regime has very important legal

17   significance for what claims can be properly brought in federal

18   court and when such claims can be brought.  The key issues I want

19   to talk about today are the governing law and OCSLA and OPA's

20   role and OPA's displacing role in covering the field, and then

21   the presentment requirement.  Then, finally, *Robins Dry Dock*.

22          THE COURT:  From reading the plaintiffs' omnibus

23   response or opposition, I'm not saying you agree on this

24   completely, but the plaintiffs say that General Maritime Law and

25   OPA are the controlling laws here.  Of course, they go on to

1   argue that General Maritime Law can be supplemented by state law.

2           I think the first question is, I'm a little unclear

3   on BP's position.  I think I'm clear on Cameron's position.  But

4   it seems like every other party, the PSC and all the other

5   parties except for Cameron and, perhaps, except for BP,

6   acknowledge that the *Deepwater Horizon* was a vessel --

7           MR. LANGAN:  Yes.

8           THE COURT:  -- within the Court's admiralty and maritime

9   jurisdiction, and, of course, there are a lot of consequences

10  that flow from that.  I wasn't clear if BP takes a different

11  position from that.

12          MR. LANGAN:  Your Honor, it was a vessel on the

13  Outer Continental Shelf.  Our position on the law is very simple.

14  The place to start is, because of OPA's displacing effects, the

15  plaintiffs have no valid maritime claims versus BP as a

16  responsible party.

17          THE COURT:  I just wanted to clarify the starting

18  position here for the argument.

19          MR. LANGAN:  Yes.

20          THE COURT:  So BP is not contesting that the

21  *Deepwater Horizon* was a vessel that the Court has -- your

22  position, if I --

23          MR. LANGAN:  Right.

24          THE COURT:  -- may try to state it so I'll understand

25  the argument, is that while the Court has admiralty jurisdiction,

 1   it also has OCSLA jurisdiction.

 2            MR. LANGAN:  Correct.

 3            THE COURT:  That because there is a special federal

 4   statute called OPA --

 5            MR. LANGAN:  Correct.

 6            THE COURT:  -- that, in this instance, it displaces, I

 7   think is the proper term, not preempts, it displaces the

 8   application of General Maritime Law --

 9            MR. LANGAN:  That is absolutely correct.

10            THE COURT:  -- to these types of claims.

11            MR. LANGAN:  That is right.

12            THE COURT:  Not necessarily all General Maritime Law,

13   because we know we have the Limitation Act and we have the

14   Jones Act claims and those things.

15            MR. LANGAN:  As to economic loss claims against a

16   responsible party like BP, OPA displaces the General Maritime Law

17   versus BP, so they can't bring maritime claims against us because

18   OPA displaces it.

19                 That's just not BP's position, that's what the

20   *Gabarick* case says, that's what the *Tanguis* case says, and that's

21   what *South Port Marine* says; so, in other words, every judge that

22   has ever considered the issue has said just that.

23                 Now, the plaintiffs say those cases are wrong; but,

24   to go their way, you have to ignore every decision on the issue

25   that's been decided by a federal court on it -- *Gabarick*, *Tanguis*

1    and *South Port Marine*.

2         Your Honor, just to elaborate a little bit -- and

3    this is really the point of our first slide -- OPA is a federal

4    statute directly on point, this is an oil spill in the Outer

5    Continental Shelf, and it provides a remedy, so federal common

6    law is displaced.

7         OPA provides a comprehensive set of remedies

8    against responsible parties, like BP, for all forms of economic

9    loss arising from oil spills just like this one.  So when you

10   start with cases like the Supreme Court's *Milwaukee II* case and

11   other cases like that, it is clear that OPA has a displacing

12   effect on all federal maritime claims against a responsible party

13   like BP.

14        Now -- so there is no savings of that.  It just --

15   it's just displacing, and that's it.  That's the point of our

16   second slide, Your Honor.

17        Now, I want to come back to the saving clause in a

18   minute, but our first point really is, and the *Gabarick* case

19   says, and so does *South Port Marine*, that OPA was intended by

20   Congress to supplant the existing admiralty and maritime law for

21   damages covered by OPA.

22        Judge Clement found in the *Tanguis* case that the

23   language of the savings clause says, "except as otherwise

24   provided by this chapter does not mean that OPA does not

25   displace."

1              Your Honor, I also need to mention that as a result

2    of that, that means no punitive damages against a responsible

3    party.  Because OPA is a comprehensive statute providing a

4    comprehensive remedy for economic loss, it doesn't provide for

5    punitive damages.  Every case that's decided that issue has said

6    that.

7              I just want to pause for a second on

8    *Robins Dry Dock*.  I don't want to spend a lot of time on that,

9    but I need to mention it.

10             Even if you don't agree, Your Honor, there is

11   complete displacement by OPA, then the *Robins Dry Dock* doctrine

12   will cause you to dismiss the economic loss claims of virtually

13   every plaintiff in the B1 bundle.

14             As you know, and the Fifth Circuit follows this

15   uniformly, *Robins Dry Dock* prohibits general maritime tort

16   recoveries of economic losses absent physical injury to a

17   proprietary interest.  That's *Taira Lynn Marine*.  The

18   Fifth Circuit calls this a bright-line rule.  It's not just

19   limited to cases where plaintiff is in privity with defendant.

20   CERCLA didn't overrule this.  None of the arguments the

21   plaintiffs advanced have anything to do to take away from this

22   bright-line rule.  *Robins Dry Dock*, even if there is not

23   displacement, will take away any recovery by economic loss.

24             THE COURT:  As I appreciate it, your position, again, as

25   you started out by saying, you're not claiming that your motion

1 would require the dismissal of every claim in the B1 bundle; but,

2 with respect to OPA and *Robins Dry Dock*, I think your argument is

3 that even if OPA does not displace General Maritime Law as it

4 applies to the B1 economic-only damage claims, that

5 *Robins Dry Dock* -- even if General Maritime Law did apply

6 somehow, that *Robins Dry Dock* would come into play and cause the

7 dismissal of not all but the vast majority of the B1 claims, is

8 what you're saying.

9 　　　　MR. LANGAN:  That is our position, Your Honor.

10 　　　　THE COURT:  You admit that there are at least some

11 claims within the B1 bundle that would survive *Robins Dry Dock*.

12 　　　　MR. LANGAN:  Well, possibly.  If they allege, and can

13 allege specifically as to them, physical injury to a proprietary

14 interest.  So it's possible that some might be able to allege

15 that, but the vast majority, with just pure economic loss, will

16 not be able to prove that, and their claims have to be dismissed,

17 even if you don't accept displacement.

18 　　　　Your Honor, I need to turn, in my limited time

19 here, to the question of preemption.

20 　　　　Your Honor, we have --

21 　　　　THE COURT:  As I understand it, you're moving now to

22 whether state law is preempted?

23 　　　　MR. LANGAN:  Yes, Your Honor.

24 　　　　THE COURT:  As I understand it, the defendants argue

25 that it's a different analysis as to whether -- there are,

1    obviously, a number of cases from the U.S. Supreme Court on

2    preemption, questions of whether federal statutes preempt state

3    laws --

4                MR. LANGAN:  Right.

5                THE COURT:  -- but that's a different analysis.

6                MR. LANGAN:  It is.

7                THE COURT:  It seems to be a more stringent analysis --

8    at least, that's your argument -- than your first argument on OPA

9    displacing General Maritime Law.

10               MR. LANGAN:  I don't know if it's more stringent or not.

11   It's analytically different.

12               THE COURT:  When I said *more stringent*, I thought that's

13   what you were inferring or your arguments were inferring -- or

14   somebody was making that suggestion.

15               MR. LANGAN:  They are both dispositive.  So, I mean --

16               THE COURT:  It strikes me that the test for preemption

17   is a little more stringent, but maybe I'm wrong on that.

18               MR. LANGAN:  With respect to preemption, in terms of

19   making clear BP's position, there are actually two independent

20   strings to preempt the state law claims against BP in the

21   B1 bundle.

22                    The first arises out of the Clean Water Act.  It's

23   the *Ouellette* case from the Supreme Court of 1987 and its

24   progeny.

25                    Again, it's important to keep in mind that in its

1  operations at the Macondo well, BP was operating under a federal

2  permit, an NPDES general permit, as was Transocean, a Clean Water

3  Act related permit.  Under the *Ouellette* cases, since this was

4  out on the shelf, outside any state's territory, the

5  Clean Water Act preempts all state law claims that arise from a

6  discharge from this activity on the Outer Continental Shelf, and

7  the plaintiffs cannot bring any state law claims relating to a

8  discharge from this --

9        THE COURT:  Let me ask you this:  Are the defendants

10  arguing that there is preemption because of where the spill

11  occurred?

12        In other words, if this spill had occurred within,

13  say, the territorial waters of Florida, in Tampa Bay, for

14  example, would there have been preemption in that case, or could

15  Florida's laws apply?

16        MR. LANGAN:  Possibly.  Possibly.  But we know in this

17  case, it was on the shelf and outside the territorial waters of

18  any state, and it's really a federal enclave.  So the state of

19  discharge, if you will, is federal, not any state's place of

20  discharge.

21        So as a result of that, we know, we believe, that

22  all state law claims versus BP are preempted under the

23  Clean Water Act regime.

24        Your Honor, separately, OCSLA also preempts the

25  state law claims versus BP because this was an OCSLA situs, so no

1  state law can be applied to discharge for an OCSLA situs.  That's

2  the *Tenn. Gas Pipeline* case, the *EP Operating Ltd.* case.

3           The question is, if state law doesn't apply, what

4  federal law applies?  The answer is, as we talked about before,

5  that's OPA.  As to a responsible party like BP, OPA is a

6  comprehensive statute, and there is no gap.

7           Your Honor, I should talk about the OPA savings

8  clauses for a second because the plaintiffs rely so heavily on

9  them.  One thing we need to be clear, our argument about OPA is

10 not preemption, it's displacement.  We are saying that the

11 Clean Water Act --

12      THE COURT:  I think there are other defendants who are

13 making the argument that OPA itself preempts, but that's not your

14 argument?

15      MR. LANGAN:  That is not BP's argument, no.  They are

16 saying displacement, too, I think.

17           But, in any event, in terms of preempting state

18 law, our source of that is the Clean Water Act and OCSLA.  So,

19 therefore, the OPA savings clause doesn't say anything in terms

20 of state law preemption.

21           Your Honor, I would commend to you the

22 *United States v. Locke* on this, which also construed the OPA

23 savings clause to say that there still was preemption by another

24 federal statute despite the OPA savings clause.  That's from the

25 Supreme Court, the year 2000.  So these OPA savings clauses

1    really have nothing to do with the preemptive powers of the

2    Clean Water Act and OCSLA.

3              Even if they had some effect, I think the

4    plaintiffs are overreading the savings clauses because, for

5    instance, 2718(a)1) merely authorizes things like mini state

6    OPAs.  In other words, a state can pass its kind of own OPA

7    statute.

8              Furthermore, I need to point out that every case

9    that's considered the issue, like *Gabarick* and *South Port Marine*

10   and others, have found that the savings clauses do not save the

11   plaintiffs' claims.

12             Your Honor, that brings me -- and I'll take my last

13   slide down here -- to the question of presentiment.  Because if

14   you follow this as we have argued it, the only possible claim

15   that the plaintiffs have against a responsible party like BP is

16   under OPA, which provides a comprehensive remedy; but, that

17   statutory remedy under 33 U.S.C. 2713 requires a critical

18   two-step process before any plaintiff can bring suit.  It must

19   present the claim to the responsible party, in this case BP and

20   then the GCCF, and it must await denial of the claim or

21   expiration of a 90-day negotiating period.

22             Your Honor, this has to be satisfied before the

23   claimant brings suit.  Before.  There is no discretion here.

24   Dismissal is mandatory if they don't.

25             Again, this is not just BP's position.  That's what

1   Judge Lemelle said in the *Gabarick* case.  That's what the

2   *Boca Ciega* case in the 11th Circuit said in 1995.  That's what

3   Judge Fallon did in *Turner v. Murphy Oil*.  Even in the context of

4   a master complaint, Judge Fallon said absent presentment, the

5   claims have to be dismissed.

6           THE COURT:  Wouldn't we have to engage in a case-by-case

7   analysis of each case, the facts in each case, to do that?  I

8   mean, I could rule -- if I agree with you, I could rule as a

9   matter of law that anybody who hasn't done one, two, three and

10  four will be dismissed --

11          MR. LANGAN:  Right.

12          THE COURT:  -- for failure to comply with the

13  presentment requirements; but, in terms of actually dismissing

14  any particular claims, that would have to be a case-by-case

15  basis.

16          MR. LANGAN:  That's a very good point.

17          THE COURT:  I'm just trying to figure out why we should

18  waste a lot of time or resources trying to go down that road at

19  this time because we have so many other things going on in this

20  case.  None of this is going to affect the limitation trial that

21  starts in February, it seems to me.

22          MR. LANGAN:  Your Honor, I have to disagree.

23          THE COURT:  Okay.

24          MR. LANGAN:  The only claim that any plaintiff has

25  against BP as a responsible party is under OPA.  If they have not

1    invoked the presentment requirement before bringing suit, they

2    should not be in court against BP.

3            We have a claims process they can go to.  But,

4    again, every court that's decided this issue has not said there

5    is discretion here or that you can wait until later.  We need to

6    focus on the plaintiffs' allegations.

7        THE COURT:  I understand, but those other cases weren't

8    MDLs either, where we've got a hundred thousand claims.  I'm

9    looking at the practical side of this right now, nothing else.

10   Even if you're right legally, I'm trying to pick out the

11   practicalities of what you're asking me to do here.  Why don't

12   you tell me precisely what you're asking me to do.

13       MR. LANGAN:  Your Honor, I do want to focus on that, but

14   I guess we have to start with the allegations the plaintiffs

15   made.  In their God-knows-how-many-page complaint, all they talk

16   about in paragraph 689 is this.  They say, quote, "Plaintiffs

17   have satisfied or will have satisfied all the administrative

18   requirements of 33 U.S.C. 2713(a) and (b)," end of quote.

19           So the plaintiffs' allegation to stay in court on

20   OPA is to say the plaintiffs either have or will meet this

21   mandatory requirement.  Now, that's simply not enough.

22           I agree with Your Honor that you have to look at

23   each plaintiff, but I very much disagree that we can sweep that

24   aside and defer it until later.  I mean, they are not supposed to

25   be in court.

1          THE COURT:  What precisely are you suggesting that we do

2     at this time?

3          MR. LANGAN:  Your Honor --

4          THE COURT:  If I agree with you legally, what do you

5     want me to do?

6          MR. LANGAN:  I think Your Honor should enter an order

7     that says that for any plaintiff in the B1 bundle, either the

8     master complaint or the individual complaints, that has not

9     alleged presentment specifically, their claims are dismissed

10    without prejudice.

11         THE COURT:  But the master complaint alleges, at least

12    for numbers of these people, that they have complied.  There may

13    be factual issues as to whether they've properly complied or not.

14              I agree with you that this is something that

15    ordinarily can be dealt with up front in a case; but, where we've

16    got an MDL with a hundred thousand plus claims, I don't want

17    counsel to be distracted, I don't want the Court to be

18    distracted.  It's something that can be dealt with later.

19              Now, it seems like the plaintiffs have a problem.

20    If they are aware that they've got large numbers of claims that

21    have been filed, but people haven't gone through the claims

22    process, they run the risk of having large numbers of those

23    claims dismissed at some point.

24              I could rule as a matter of law what you're asking

25    me to do, but I don't want to go down that road of having to deal

1   case by case with a hundred thousand claims now.  That's the only

2   point I'm making.

3           MR. LANGAN:  Well, Your Honor, I guess I have a couple

4   reactions.  First, in terms of what they have alleged standing

5   here now, they have not alleged presentment.

6           THE COURT:  Well, they've certainly alleged that at

7   least some of the claimants have complied with presentment.

8           MR. LANGAN:  I think, if you'll look at the *Turner v.*

9   *Murphy Oil* case, I think Judge Fallon's decision is pretty clear

10  that that's not going to do the trick.

11          THE COURT:  I don't think they have to prove their case

12  in their pleading.  Is it plausible that some of these people

13  complied with OPA; I think it's probably plausible.  I think

14  you're right that I know there are probably large numbers of them

15  that have not; but, I thought that we had decided early on in

16  this litigation that we would defer any individual claim issues

17  in discovery down beyond this initial claim form and all.  We'd

18  move that down the road and deal with that.

19          I certainly don't have any problem with ruling as a

20  matter of law, if I end up agreeing with you, in terms of what

21  they have to do or what the law is.  Now, whether any individual

22  claimant has technically complied with that is another issue.

23          MR. LANGAN:  Your Honor, a couple of reactions here.

24          I think BP's position has been consistent from the

25  very beginning that we thought that plaintiffs with OPA claims

1    that haven't alleged presentment should not be in court.  I

2    remembering saying that last summer.

3            THE COURT:  Maybe one way to approach this is maybe when

4    I rule on these legal issues, perhaps the parties can meet and

5    confer, and maybe the plaintiffs will agree that maybe they'll

6    have -- maybe you all can agree on a list of people that have

7    clearly not complied.

8            MR. LANGAN:  May I touch on that for a second?

9            THE COURT:  I think you have a variety of issues.  You

10   have people who probably have bypassed the claims process

11   completely and filed suit.  You probably have people who have

12   filed some sort of claims, but you're going to probably take the

13   position they haven't properly presented a claim.  They may take

14   the position they have properly presented a claim.

15           MR. LANGAN:  Right.

16           THE COURT:  There may be factual issues there.  There

17   will undoubtedly be people who have complied and presented claims

18   and waited the 90 days that are now here.

19               I'm troubled by the thought that we have to go down

20   that road at this time.  That's my problem.

21           MR. LANGAN:  I understand.  A couple comments, if I may,

22   Your Honor.

23               We actually started the analysis you're talking

24   about and covered that in our reply brief.  As of the time we

25   filed -- at the time we were able to do the analysis, we had had

1    about 41,000 short forms, or Plaintiff Profile Forms, to analyze.

2            It is our belief, in terms of final presentment,

3    which we think the statute requires -- only 25 of these 45,000

4    had complied with that.  So it's a huge problem for the

5    plaintiffs.

6            Your Honor, I understand your point about the

7    practical issue that we're facing, but I need to take a step back

8    and talk about what the statute provides because it is a

9    condition precedent to filing the case.

10           THE COURT:  I understand that.

11           MR. LANGAN:  It's not convenient for the plaintiffs.  I

12   get that.  But the -- I mean, the statute was passed for a

13   reason.  The presentment requirement was put in for a reason, to

14   allow just the sort of thing that the GCCF is doing, trying to

15   resolve claims before litigation is brought.

16           Now, I understand the Plaintiffs' Steering

17   Committee wants to get into court and, you know, put their stake

18   in the ground, but we're talking about our rights under a federal

19   statute to have presentment before they bring their claims

20   against us.

21           THE COURT:  I understand.

22           MR. LANGAN:  So I think there should be an order from

23   this Court that says, dismissal without prejudice if you haven't

24   alleged presentment.

25           Make no mistake, they have not alleged it.  It's

1    not presentment to say I either have presented or I may some day

2    present.  I mean, there are lots of cases in other contexts that

3    say that sort of allegation in the alternative is not alleging

4    compliance to get into court.  To say that, I've given notice to

5    bring suit or I may some day bring notice to bring suit, no court

6    would say that's an appropriate allegation to get into court.

7            So, in terms of paragraph 689 and what they have

8    actually alleged, it's simply not enough, Your Honor.

9            Your Honor, I know I'm short of time.  I probably

10   should move on to another very important issue on the B1 bundle,

11   and that is the issue of direct causation.

12           It really comes up most importantly with respect to

13   the so-called *moratorium plaintiffs*.  It is our position that the

14   moratorium plaintiffs do not satisfy OPA's causation

15   requirements, that is, a worker who says that they lost wages as

16   a result of the government's moratorium on drilling activity in

17   the Gulf.

18           The plaintiffs agree that the only way such a

19   plaintiff stays in court would be for so-called *but-for*

20   *causation*, that is, if there hadn't been an oil spill this chain

21   of events would never have happened, and the government never

22   would have taken this action.

23           It is our position, and it's extremely important,

24   Your Honor, that but-for causation under OPA is not enough, and

25   direct causation is required.  In support of that position, we

1    offer the language from the statute --

2         THE COURT:  How do you define *direct causation*; is that

3    the same as *proximate causation*?

4         MR. LANGAN:  I don't think you need to make that ruling.

5    It could be, Your Honor, but you don't need to go that far.

6         The language of the statute talks about "resulting

7    from such incident or resulting from the destruction of real

8    property from the incident."  So resulting from and due to, maybe

9    it's proximate cause, maybe it's not; but, here is what we do

10   know, it's not simple but-for causation.

11        If but-for causation were the standard, there would

12   be no end to the number of claims around the country or around

13   the world that people might try to bring under an OPA statute.

14   That's clear from the *Taira Lynn* case, the *Gatlin Oil* case and

15   other cases, as well as the United States Coast Guard.

16        The United States Coast Guard, Your Honor, has

17   taken a look at the very issue, because they have responsibility,

18   as you know, for administering OPA, as well.  They have

19   determined in written decisions that are available publicly and

20   attached to our papers that the moratorium claims are not

21   properly compensable under OPA.

22        Cases like *Taira Lynn* and, especially, the

23   *Gatlin Oil* cases have both rejected but-for causation and adopted

24   Coast Guard --

25        THE COURT:  *Gatlin* is the case where some vandals got

1   into --

2              MR. LANGAN:  I believe so.

3              THE COURT:  -- an oil storage tank and opened the valves

4   and the oil flowed out, there was ignition, and it burned down

5   some property.

6              MR. LANGAN:  Yes.

7              THE COURT:  The question of whether the damage caused by

8   the fire was the result of the oil spill, right?

9              MR. LANGAN:  That is correct.  The Fourth Circuit said,

10  importantly for today's purposes, that claims for indirect

11  damages do not meet the statutory definition of direct causation.

12  It's been cited with approval, that case, by the Fifth Circuit in

13  the *Taira Lynn* case, as well.

14              So, Your Honor, there are other lawyers here that

15  want to talk.  I just wanted to hit the high points, and perhaps

16  I'd have a minute or two on rebuttal.

17              THE COURT:  Thank you very much.

18              I should have said at the outset, of course, I've

19  limited everyone's time on oral argument, but I have read every

20  brief that has been filed.  I can't say that I remember it all as

21  I sit here now.

22              MR. LANGAN:  Your Honor, you did pretty good.

23              THE COURT:  I've read so much that some of it all gets

24  conflated in my mind; but, I've done my best, and I've read

25  everything that's been filed.  Of course, we have the briefs to

1 | go back to.  But, thank you.

2 |        MR. ELSLEY:  Good morning, Your Honor.

3 |        THE COURT:  Good morning.

4 |        MR. ELSLEY:  My name is John Elsley.  I'm here for

5 | Transocean.

6 |        Your Honor, I will try not to repeat any arguments

7 | Mr. Langan made.  I do want to say that Transocean also has filed

8 | a motion seeking dismissal of the claims for which presentment

9 | has not been made.

10 |        As the Court is probably aware, the Coast Guard

11 | designated Transocean as a responsible party, and, to the

12 | extent --

13 |        THE COURT:  Just for the diesel spill, right --

14 |        MR. ELSLEY:  That's correct, Your Honor.

15 |        THE COURT:  -- on the surface of the water?

16 |        MR. ELSLEY:  That's a very good point.  That is correct.

17 |        In the B1 complaint, the B1 plaintiffs say they are

18 | not making a claim against Transocean for the spill of the

19 | diesel.

20 |        THE COURT:  Right.

21 |        MR. ELSLEY:  They are only making a claim for the spill

22 | from the Macondo well.

23 |        The result of that, of course, is with that

24 | statement now made by the B1 plaintiffs in their omnibus

25 | memorandum, which wasn't clear from the original complaint, that

1    puts us in a little bit different of a situation.

2              I do want to say that if, in fact, that changes or

3    they are making a claim against Transocean as a responsible

4    party, the presentment requirement would apply equally to

5    Transocean as it would to BP.

6         THE COURT:  If, to the extent that they or anyone is

7    pursuing a claim against Transocean in this litigation for the

8    major oil spill, not the diesel on top of the water --

9         MR. ELSLEY:  Right.

10        THE COURT:  -- you're not saying they have to make a

11   separate presentment to you beyond what they may have made if

12   they've complied with the presentment to BP and the GCCF and all

13   of that?

14        MR. ELSLEY:  I believe, if they are making a claim

15   against Transocean for the Macondo well spill, and not for the

16   diesel, for which Transocean has not been designated a

17   responsible party, they, of course, still have to present that

18   claim to those responsible parties who have been designated.

19        THE COURT:  Right.

20        MR. ELSLEY:  To the extent they haven't, then their

21   claims would still be subject to dismissal even as to Transocean,

22   but they don't need to make a separate presentment to Transocean.

23        THE COURT:  All right.  Thank you.  Go ahead.

24        MR. ELSLEY:  Mr. Langan also pointed out very well, I

25   think, that OPA is a comprehensive statutory scheme which sets

1    forth six categories of claimants.

2              We also agree with BP that the case law is pretty

3    clear.  OPA displaces -- or you can call it *horizontal preemption*

4    or *preemption*, but the parties generally use *displacement* -- OPA

5    displaces the General Maritime Law for recovery of oil spills, at

6    least for the damages set out in OPA.

7         THE COURT:  I didn't ask Mr. Langan this, so I'll ask

8    you, but it's the same issue.  My understanding of the

9    defendants' argument with respect to OPA and displacement or

10   preemption of other laws is that, if you are correct on that, the

11   consequence of that is that the plaintiffs -- and, again, I have

12   to emphasize we're only talking about the B1 plaintiffs here

13   right now --

14        MR. ELSLEY:  That's right.

15        THE COURT:  -- those plaintiffs whose claims are covered

16   by OPA, your argument is they do not have a claim against anyone

17   other than the designated responsible party; is that your

18   argument?

19        MR. ELSLEY:  That would be correct, yes.

20        THE COURT:  That the way the OPA scheme is set up

21   procedurally is they have to make a claim, present a claim.

22   Then, if they elect, after presentment, to pursue a claim in

23   court against the responsible party, who then either settles or

24   gets a judgment against them, then that party, the responsible

25   party, has subrogation or contribution rights against other

1   parties, Transocean or whoever it has alleged to be partly

2   responsible?

3           MR. ELSLEY:  Precisely, Your Honor.  The way it would go

4   and the way Congress intended it to work is that the injured

5   claimant would file the claim against or present the claim to the

6   responsible party.  The responsible party would either pay it or

7   deny it.  If denied, that party could sue the responsible party.

8   Once that was resolved, the responsible party could then pursue

9   contribution and/or subrogation rights.

10          THE COURT:  All right.  Go ahead.

11          MR. ELSLEY:  I keep repeating, I suppose, Mr. Langan,

12  but we also agree, Your Honor, that if we put aside OPA for the

13  moment and put aside the displacement issue, *Robins Dry Dock*

14  would basically -- as the Court is well aware of that decision,

15  would basically result in the dismissal of virtually every case,

16  every B1 case, because of a lack of physical damage to a

17  proprietary interest.

18          THE COURT:  Well, some courts have recognized -- we

19  didn't talk about -- again, I didn't bring this up with --

20          Okay, now I have a note that Judge Shushan asks

21  everybody to please speak up louder so she can hear.  So

22  Judge Shushan is listening in on us, so watch what we all say.

23          MR. ELSLEY:  I'll try to do that, Your Honor.

24          THE COURT:  -- anyway, again, I didn't address this to

25  Mr. Langan, but you're on the same issue of *Robins Dry Dock* --

1   some courts have, of course, I'm sure you're aware, recognized

2   the so-called *commercial fishermen exception* to *Robins Dry Dock*.

3   The Ninth Circuit in the *Oppen* case --

4              MR. ELSLEY:  Yes, Your Honor.

5              THE COURT:  -- the District Court in the TESTBANK case

6   carved out the commercial fishermen in that case and then

7   dismissed all the other cases under *Robins Dry Dock*.  The case

8   went up to the Fifth Circuit.  Judge Higginbotham wrote an

9   extensive opinion reaffirming the *Robins Dry Dock* principle,

10  pointing out that the other claims were not before the Court;

11  but, I certainly think the Fifth Circuit has never said there is

12  no -- neither the Supreme Court nor the Fifth Circuit have ever

13  ruled that there is no commercial fishermen exception.

14              I've just mentioned two or three, but there are

15  other cases that have recognized that, too.  In fact, there are

16  one or two Louisiana state court cases.  There are a few other

17  cases around the country, the rationale being that commercial

18  fishermen and oystermen, they are more akin to traditional

19  seamen.  They make their livelihood, their livelihood depends on

20  the sea and the fisheries and so forth, so they are entitled to

21  some special protection that somebody more removed, you know, a

22  restaurant onshore or a hotel or condo owner or beachfront owner

23  would not have.  So maybe you could comment on that.

24              MR. ELSLEY:  Your Honor, you're absolutely correct in

25  stating the law in the case authorities.  The Ninth Circuit in

1   *Oppen* did acknowledge that special exception from the

2   *Robins Dry Dock* rule.  The District Court in *TESTBANK* did allow

3   the fishermen claims as an exception.  The Fifth Circuit seemed

4   to say they would decide that another day.

5         I think Your Honor in the *Barasich* case basically,

6   as far as I understand Your Honor's ruling, you did not recognize

7   the fishermen exception except for, I believe, the oysterman.

8         THE COURT:  Well, that's not exactly right.  It's the

9   *Barisich* case.  The *Barisich* case was a land-based oil spill

10  following Hurricane Katrina.

11        After Hurricane Katrina, I handled five or six

12  class actions which dealt with the release of oil and chemicals

13  at several different refineries and other storage facilities down

14  in Plaquemines Parish, south of here, but they were all land

15  based.

16        The issue was that the fishermen didn't -- as I

17  recall, I think I'm right -- that, basically, I dismissed any

18  claims under admiralty law or General Maritime Law because there

19  was no admiralty jurisdiction in that case because there was an

20  oil spill that occurred on land, mostly affected land.  Some of

21  it may have gotten into the water at some place.

22        They were trying to argue sort of an inverse or

23  reverse Admiralty Extension Act, that a spill on land that gets

24  into the water could come under the Admiralty Extension Act.  I

25  said, no, it's got to be caused by a vessel on navigable waters

1    that causes damage on land.

2           But I did comment that the Fifth Circuit and the

3    Supreme Court had never clearly ruled on that.

4          MR. ELSLEY: I stand corrected, Your Honor. Of course,

5    there might be -- as you noted, I think, in that opinion, there

6    might be a different rule for oystermen who actually -- in some

7    states, actually owned the lease and, of course, would have a

8    proprietary interest in the oysters that sat on the lease that

9    might have been impacted by oil.

10         THE COURT: Right. Of course, the fundamental question

11   still is whether the maritime law applies at all here. That's

12   your basic argument.

13         MR. ELSLEY: That's right, Your Honor. That was

14   addressed a little bit earlier. This is an admiralty case. As

15   Your Honor knows, admiralty cases are governed by federal

16   maritime law. It's a very simple statement, but it holds true

17   for this case. Just like the *Exxon Valdez* litigation was an

18   admiralty case, so was the Macondo Well oil spill litigation.

19   This is true, of course, even for claims that occur onshore due

20   to the Admiralty Extension Act.

21          As the Court -- I believe even the plaintiffs have

22   said that the *Grubart* requirements are met here for admiralty

23   jurisdiction. They have said that with admiralty jurisdiction

24   comes the application of maritime law or general admiralty law.

25   They've also said this case is governed by the Oil Pollution Act

1    and the General Maritime Law.  We agree.

2              They've also filed their claims under 9(h).  I

3    suppose it bears mentioning here that a claim for relief within

4    the admiralty jurisdiction, and also within the Court's subject

5    matter jurisdiction on some other grounds such as OCSLA, is

6    acknowledged by 9(h) of the Federal Rules of Civil Procedure.  So

7    we also agree with BP that this case is in the OCSLA

8    jurisdiction, as well, but it's also in the admiralty

9    jurisdiction.

10         THE COURT:  Ordinarily, in that situation, admiralty law

11   would apply, maritime law would apply.

12         MR. ELSLEY:  Precisely, Your Honor.  Under the *PLT* test,

13   the three-part test that the Fifth Circuit uses to determine

14   choice of law in connection with an OCSLA case, if maritime law

15   applies of its own force, that's the second prong, then maritime

16   law controls and is governed.

17              That's our point, Your Honor, in addition to the

18   OCSLA preemption, our additional point about preemption.  If you

19   go back to the *TESTBANK* case, and I realize this is pre-OPA, but

20   if you go back to the *TESTBANK* case and look at that, you'll see

21   that the Court there dismissed state law claims for negligence

22   and nuisance, two of the causes of action that the B1 plaintiffs

23   allege here.  They did it on a simple admiralty preemption

24   analysis, the General Maritime Law is supreme over state law in a

25   maritime tort action involving an oil spill occurring on

1   navigable waters.

2            So we say that the General Maritime Law -- the

3   general maritime preemption doctrine, which is not overruled by

4   OPA because there is a savings clause for admiralty and maritime

5   law under OPA, that admiralty preemption doctrine preempts the

6   state law claims.

7            Prior to OPA, they wouldn't have had those state

8   law claims.  That's what *TESTBANK* said.  That's what the District

9   Court in the *Exxon Valdez* litigation said with respect to causes

10  of action for negligence, nuisance, and --

11       THE COURT:  The plaintiffs in the *Exxon Valdez* case, I

12  know they went through a lot of procedural hoops back and forth,

13  up and down through the Court system, but the class of plaintiffs

14  in the *Exxon Valdez* case, as I appreciate it, were basically

15  commercial fishermen.

16       MR. ELSLEY:  Some were, yes, sir.

17       THE COURT:  So that's another case that recognizes the

18  commercial fishermen.  I hadn't even thought of that.

19            The General Maritime Law would obviously be

20  applicable to at least parts of this case.  You need that because

21  you filed your limitation under the General Maritime Law.

22       MR. ELSLEY:  That's right, Your Honor.  That was

23  filed 9(h).

24       THE COURT:  So your whole argument is that -- I'm trying

25  to understand how any of this -- and this is sort of, I'm getting

1   to a practical question --

2            MR. ELSLEY:  Sure.

3            THE COURT:  -- that I had sort of addressed to

4   Mr. Langan earlier.  Obviously, I've got to rule on these

5   motions, and I will, but do you envision that any of these

6   rulings I make today will in any way affect the trial, the

7   limitation trial that we are planning in February?

8            MR. ELSLEY:  Well, no.  In terms of timing, I don't

9   believe so.

10           THE COURT:  Timing or evidence.  I mean, we are still

11  going to have to have the same trial, right?

12           MR. ELSLEY:  We still have to have the same trial, yes,

13  sir.

14                Your Honor, I've probably been up here longer than

15  I need to be.  I do want to say that we also join in BP's

16  comments about the moratorium damage claimants.  I think the

17  statute is pretty clear.  It must be -- the damage -- or the

18  claim must be due to the injury or destruction of real or

19  personal property or natural resources resulting from the spill.

20  The moratorium claims, it's a simple argument, they result from

21  the moratorium.

22           THE COURT:  What about the VoO claims, the Vessel of

23  Opportunity claims?  Those seem to be more directly related to

24  the spill than the moratorium.

25                I'm not saying whether or not I agree with you on

1   the moratorium claims or not at this point; but, even if I do,

2   doesn't it seem like the VoO claims are more directly, if that's

3   a proper way to phrase it, more directly related to the oil

4   spill?

5           MR. ELSLEY:  I would say there is probably a closer

6   connection, Your Honor.  Now, whether or not -- I don't believe

7   that it would still meet the requirement of due to the oil spill

8   because -- or due to the damage caused by the oil spill because

9   they are really contracting parties throughout there, you know,

10  separate and apart, at least not in -- they weren't damaged

11  directly as a result of the spill.

12          THE COURT:  I'm not talking about the contract claims

13  now.  I'm talking about the other ones that Mr. Herman referred

14  to earlier this morning that apparently some of those vessels

15  claimed property damage or loss of income or whatever, you know.

16          MR. ELSLEY:  Yes, Your Honor.

17          THE COURT:  Okay.

18          MR. ELSLEY:  Thank you, Your Honor.

19          THE COURT:  Thank you.

20          MR. SALMONS:  Good morning, Your Honor.

21          THE COURT:  Good morning.

22          MR. SALMONS:  I'm David Salmons, and I represent the

23  Anadarko entities.

24          THE COURT:  How do you spell your last name?

25          MR. SALMONS:  S-A-L-M-O-N-S.

1          THE COURT:  Thank you, Mr. Salmons.

2          MR. SALMONS:  Thank you.

3               If it please the Court, I would like to first

4   address the motion to dismiss arguments that relate to our

5   client's unique status as nonoperators, and then address those

6   aspects of our choice of law and preemption arguments that differ

7   from those of others.

8               First, Your Honor, under the *Ainsworth* rule, which

9   has been applied by courts to dismiss claims both under federal

10  and state law, all of the tort claims against the nonoperators

11  must be dismissed, whether you resolve the choice of law issues

12  to say state law can apply or not.

13         THE COURT:  The plaintiffs, as I appreciate it, to

14  clarify, have said that they are not alleging any kind of

15  vicarious liability, correct?

16         MR. SALMONS:  That's correct.

17         THE COURT:  So what they are arguing is that Anadarko is

18  itself negligent somehow.

19         MR. SALMONS:  That is their argument.  What they say --

20  if I could take just a moment and just nail this point down.

21         THE COURT:  Sure.

22         MR. SALMONS:  The definition for operational control is

23  very well established.  The Fifth Circuit has said that it's

24  required -- it exists only where the principal has direct

25  supervision over the step-by-step process of accomplishing the

1   work such that the contractor is not entirely free to do the work

2   in his own way.

3              The plaintiffs do not even attempt to say that's

4   satisfied.  What they say is --

5        THE COURT:  Anadarko had no one out on the rig, right?

6   Is that right?

7        MR. SALMONS:  That's correct.  That's correct.

8              I would point out that the operating agreement,

9   which the plaintiffs quote and incorporate into their complaints,

10  makes very clear, it says, "The operator has the exclusive right

11  and duty to conduct or cause to be conducted all activities or

12  operations under this agreement and is an independent contractor,

13  not subject to the control or direction of the nonoperating

14  parties."

15             When you look at that agreement and you compare

16  that with what the Fifth Circuit held in the *Fruge* case, they

17  said that -- and this is a quote -- "where the contract between

18  the parties assigns the independent contractor responsibility for

19  its own activities, the principal does not retain operational

20  control."

21             So, again, the plaintiffs make no attempt to say

22  that the operational control test has been satisfied.  What they

23  try to say is that it's irrelevant, and they try to avoid it by

24  characterizing their claim as being one of a direct duty owed by

25  the nonoperators to notify those on the rig of information that

1    arguably showed the presence of hydrocarbons.

2           THE COURT:  I know we're not trying a motion for summary

3    judgment here, but I'm just trying to understand what role

4    Anadarko did have as a nonoperating partner.

5              Obviously, you had to pay the bill.  You got an

6    invoice every month for 25 percent of the operating costs, I

7    imagine, and then you received 25 percent of the profits at some

8    point.  But, beyond that, what was the role of Anadarko with

9    respect to the development of this well?

10          MR. SALMONS:  Yes, Your Honor, I think perhaps the best

11   way to respond to that question is by pointing to the plaintiffs'

12   allegations in their complaints with regard to Anadarko's role.

13             I think this is very important.  They do not allege

14   any type of actual control on the part of the nonoperators.  That

15   is in stark contrast to what they allege with regard to the

16   drilling defendants, where they do allege they had control over

17   all of the operations.

18             They, in their opposition to our motion to dismiss,

19   concede that our relationship with BP was that of an independent

20   contractor.  They make no allegations and have, we think,

21   conceded that we did not control the conduct of BP or others.

22             What they allege is that we had access to certain

23   well information from the rig, that we had the right to conduct

24   health, safety and environmental inspections --

25          THE COURT:  Is there any allegation that somehow you had

1    access to information that the operators, the operating partners,

2    didn't have?

3              MR. SALMONS:  No.

4              THE COURT:  I can't imagine --

5              MR. SALMONS:  In fact, just the opposite, Your Honor.

6    This is what we think is a fundamental point as to why, even on

7    its own terms, the claimed duty that they assert really makes no

8    sense.

9              They allege that the nonoperators, because they

10   were leaseholders and because they were receiving some well

11   information from the rig that the plaintiffs allege showed that

12   there were hydrocarbons present, they say, therefore, we had a

13   duty to notify the rig of that information.

14             But, of course, the nonoperators knew that the rig

15   already had all of that information, plus a lot more important

16   information than that.  So we think it would have been futile to

17   have done so, and the duty doesn't make sense in its own right.

18             The point I would like to make, though, in regards

19   to their attempt to evade the *Ainsworth* line of cases by

20   characterizing this as a *direct duty*, as opposed to a vicarious

21   one, is that that has been tried before, and it's been

22   consistently rejected.

23             In fact, in *Ainsworth* itself, Your Honor, the

24   Fifth Circuit expressly rejected both a direct liability duty to

25   intercede claim, as well as a vicarious liability claim based on

 1    the absence of operational control.

 2              Judge Vance, in the *Dupre* case, rejected this very

 3    argument that the plaintiffs are making here and specifically

 4    warned that accepting a distinction between vicarious and direct

 5    liability theories in this context, quote, "would amount to an

 6    end run around a large body of Fifth Circuit precedent finding no

 7    operational control despite some knowledge of risk or involvement

 8    with safety issues."  We think that it's clear the law does not

 9    permit these types of claims, and a motion to dismiss is

10    appropriate.

11              I would just address one other point in the attempt

12    to get out from under the *Ainsworth* rule.

13              THE COURT:  You're asking to dismiss all claims against

14    Anadarko?

15              MR. SALMONS:  This argument relates to all the tort

16    claims.  I should have said at the outset, Your Honor, that the

17    arguments I'm going to make today and that we make in our briefs

18    really apply equally to both the B1 and the B3 bundles.

19              B1, the only claims that the plaintiffs have

20    brought against the nonoperators are an OPA claim and a general

21    maritime negligence claim.  This would apply to the maritime

22    negligence claim.

23              In B3, there are some additional maritime and some

24    state tort claims that have been alleged.  This argument would

25    apply to those tort claims, as well.  The reason is because it

1    goes to whether there is any legal duty owed third parties.

2          THE COURT:  So if I agree with your legal argument,

3    basically it would require a dismissal of all noncontract claims

4    against Anadarko; or, have I overstated that?

5          MR. SALMONS:  We would love that.  I think, if I'm going

6    to fulfill my duty to the Court today --

7          THE COURT:  I'm just asking --

8          MR. SALMONS:  -- I should point out that OPA would be

9    the only other one.  The OPA claim, potentially.  This doesn't

10   relate to the OPA.  It's strict liability.

11         THE COURT:  That's right.  Anadarko, or some version of

12   Anadarko, is also a responsible party, right?

13         MR. SALMONS:  Well, that's an issue to be litigated,

14   Your Honor, but that's potentially right.

15         THE COURT:  What's the issue to be litigated?

16         MR. SALMONS:  Well, I think that it just hasn't been

17   something that's been briefed yet, and there is some question

18   that I just wanted to point out as to --

19         THE COURT:  Doesn't OPA say, basically, anybody who is a

20   lease owner --

21         MR. SALMONS:  It does.  I think --

22         THE COURT:  -- is a responsible party?

23         MR. SALMONS:  -- my only hedge here, and I don't want to

24   take time on it, is there's a potential question whether you're

25   talking about a spill that's coming from the rig as opposed to

1   the wellhead and how you resolve the facility there and those

2   issues.

3          But, again, that's not an issue that's been briefed

4   and that we're looking to resolve here today.

5          THE COURT:  Okay.

6          MR. SALMONS:  The plaintiffs do make one last point.

7   They say that in the *Ainsworth* line of cases, the plaintiffs in

8   those cases tended to be rig workers; whereas, their group of

9   plaintiffs is more diffuse and further removed from the

10  operations.

11         We would just make the very common sense point that

12  that can't possibly help them to be further removed from the

13  operations.  If there's no legal duty owed to those closest to

14  the operations, there can't possibly be a legal duty owed to

15  those further down the causal chain.

16         What I would like to do, unless the Court has any

17  further questions about those points, is turn briefly to the

18  OCSLA and choice of law issues that we've presented, and to

19  highlight for Your Honor what we think is some differences in the

20  way in which we suggest the Court should approach this.

21         THE COURT:  All right.

22         MR. SALMONS:  In this regard, I do think that our

23  arguments and Halliburton's arguments are pretty closely aligned.

24         What we recommend, Your Honor, is that these issues

25  are most straightforwardly resolved by a close examination of the

1    text of two provisions of OCSLA, Sections 1333(a)(1) and (a)(2).

2              Subsection (a)(1) creates certain areas involving

3    the OCS that are exclusively controlled by federal law, including

4    any device, in this case, the *Deepwater Horizon*, that is

5    temporarily attached to the seabed of the OCS.

6              Subsection (a)(2) creates limited areas where state

7    law may be applied as surrogate federal law to activities on the

8    OCS if there a gap in federal law and state law is not

9    inconsistent.

10             Most importantly --

11        THE COURT:  You're not arguing that state law is

12   implicated as surrogate federal law under (a)(2), right?

13        MR. SALMONS:  Correct.  In fact, we think that's very

14   clear.  This is the textual point I wanted to focus the Court's

15   attention on for just a moment.

16        THE COURT:  The plaintiffs agree with you on that,

17   apparently.

18        MR. SALMONS:  They do.  I think they missed, though, a

19   very important point, which is that it's the interplay between

20   (a)(1) and (a)(2).  (a)(1) makes things exclusively controlled by

21   federal law, including these temporarily attached vessels.

22   (a)(2) says you can apply state law in some circumstances, but it

23   limits those to fixed platforms and artificial islands, and it

24   omits vessels that are temporarily attached.

25             We think that can only mean one thing, and that's

1   that Congress reached the conclusion that state law was not to be

2   applied to vessels that were temporarily attached to the OCS

3   conducting drilling operations, and that resolves the choice of

4   law issue here.

5           You don't have to get into the various factors and

6   parts of various tests and look at various federal statutes and

7   wonder about preemption and what Congress might have intended.

8   Congress, in OCSLA, spoke to where state law could apply, to

9   activities that are occurring on the Outer Continental Shelf.  It

10  made the considered judgment that where you're dealing with a

11  vessel that's temporarily attached, that's not subject to state

12  law.

13          The plaintiffs' position is because that's

14  excluded, then, therefore, through the guise of maritime law or

15  some other mechanism, they can basically have open season on

16  state law and bring in state law -- without any consideration as

17  to whether it's from an adjacent state or whether it's

18  particularly consistent with the federal regime.

19          It strikes us as passing strange that Congress

20  would have permitted a far broader application of state law to

21  vessels that are temporarily attached than to artificial islands

22  and fixed platforms.  That's quite illogical.

23          The whole point of a lot of these cases from the

24  Supreme Court and the Fifth Circuit is that there is an

25  assumption that Congress made that when you're dealing with fixed

1   platforms and artificial islands, maritime law is often not a

2   very good fit; but, the exact opposite is true when you're

3   dealing with a vessel that's temporarily attached.  There is

4   really no need to incorporate state law because federal law in

5   the form of OPA and then, where it's not inconsistent and not

6   displaced, federal maritime claims provide the rules of decisions

7   that are necessary.

8           The very fact that the plaintiffs have pled both

9   shows that there are federal maritime claims available to them.

10  There is no gap anywhere in the regime for a need to apply state

11  law.  So we think, based on a clear reading of OCSLA's text, you

12  can resolve the question as to whether state law claims can apply

13  here.

14          I would just point out, so Your Honor has a

15  clear -- I think that is the same way Halliburton analyzes these

16  issues, but they can make sure that I'm right about that.

17          In our view, Cameron and BP create some confusion

18  that's unnecessary by misapplying what is one of the elements of

19  the *PLT* test, which is whether maritime law applies of its own

20  force.  Cameron concludes that it doesn't because it just carries

21  over the analysis from fixed platforms and the reasoning in those

22  cases, and we think that's mistaken.  BP, in their reply brief,

23  seems to suggest that maritime law doesn't apply of its own force

24  because OPA displaces it, and that, we think, is not the way the

25  analysis is supposed to work.  It's a much more abstract question

1  based on the *Grubart* test as to whether the activity is

2  inherently maritime.

3          THE COURT:  You need to first determine whether maritime

4  law applies of its own force, and then you decide beyond that

5  whether it's displaced by OPA; that's your argument?

6          MR. SALMONS:  That's correct.

7          THE COURT:  Well, not by OCSLA, by OPA.

8          MR. SALMONS:  Right.  Just so I'm clear -- and I'll

9  conclude with this, unless the Court has any questions that it

10 would like to ask -- this is the analysis we would ask the Court

11 to adopt, that because OCSLA and 1333(a) make activities on

12 vessels like the *Deepwater Horizon* that are temporarily attached

13 exclusively subject to federal law, and because such vessels are

14 excluded from those areas where state law can apply under (a)(2),

15 all of the nonfederal claims that have been brought have to be

16 dismissed.

17          In addition, all of the tort claims, whether they

18 are brought under maritime law or state law, have to be dismissed

19 as to the nonoperating parties because of the *Ainsworth* line of

20 cases and because we had no operational --

21          THE COURT:  Except for the OPA claims --

22          MR. SALMONS:  With OPA, that's correct.

23          THE COURT:  -- which is --

24          MR. SALMONS:  So our view is that with the

25 B1 plaintiffs, the only claim that's available to them is OPA

1   because they are seeking relief that's covered by OPA.  We agree

2   with BP's analysis that presentment is required.

3             I would just add there is case law support for the

4   idea that it's jurisdictional, and I think that's the only reason

5   why the Court might need to address the issues earlier, as

6   opposed to later.

7        THE COURT:  The Supreme Court's never said that it's

8   jurisdictional.  It might have been in the context of another

9   statute, but --

10        MR. SALMONS:  That's correct.

11        THE COURT:  -- similar notice requirement.  They didn't

12   have to decide whether it was jurisdictional or it was just a

13   mandatory condition precedent; but, in any event, you have to do

14   it before you can file suit.

15        MR. SALMONS:  Yes, Your Honor.  There is some case law

16   support not binding on this Court, but there are some additional

17   cases we cite that analyze it that way, and we agree with those.

18        THE COURT:  Right.

19        MR. SALMONS:  So that, then, resolves all the claims.

20   If we are right on those, then all of the claims from the B1 and

21   B3 plaintiffs as they relate to nonoperators must be dismissed.

22             Thank you, Your Honor.

23        THE COURT:  Thank you.

24             Mr. York, there is one hazard of going -- are you

25   supposed to be the last speaker on your side?

1          MR. YORK:  No, Your Honor.  Cameron is going to be the
2     last speaker.
3          THE COURT:  Oh, well, Mr. Beck is in bigger trouble than
4     you then.
5               As you go last, I've heard a lot, and,
6     unfortunately, people have encroached on your time and Mr. Beck's
7     time, so you might have to condense your argument here.
8          MR. YORK:  Your Honor, my first words were actually
9     going to be that one of the joys and disappointments of going
10    last is that often you have nothing left to say; but, you stole
11    my thunder even on that point.
12              So I will try to keep my points very brief.
13    Alan York on behalf of Halliburton.
14         THE COURT:  Go ahead.
15         MR. YORK:  Your Honor, Halliburton's position on the
16    B1 bundles is that we agree with pieces of many other parties'
17    arguments; but, when those pieces are put together, we believe it
18    makes the most cohesive view of the proper application of OCSLA
19    and OPA in this case.
20              We believe and agree that the OPA presentment is a
21    subject matter jurisdiction issue; however, as a nonresponsible
22    party, we recognize that there is no direct presentment issue to
23    us.
24              We agree that under the OPA statute, that the
25    plaintiffs' claims under OPA are to be made directly against a

1    responsible party under the *Gabarick* case, and that, as a

2    nonresponsible party, plaintiffs have no direct OPA claim against

3    us.

4              In addressing the choice of law issue, Mr. Salmons

5    is correct.  Anadarko's position and Halliburton's position are

6    very similar, and that is that we think the Court should look

7    directly to the statute.  By proper application of the two

8    statutory positions under OCSLA, 1331(a)(1) establishes that

9    federal jurisdiction and federal sovereignty attaches because

10   this is an event that occurred on the Outer Continental Shelf.

11   Because of the fact that it was associated with a vessel,

12   maritime law attaches and applies of its own force; and,

13   therefore, maritime law is the applicable law.  However, because

14   the result -- the damages that are sought by plaintiffs are those

15   that are provided for in OPA, OPA then displaces maritime law and

16   becomes the sole remedy.

17             The real issue for Halliburton at this point would

18   probably boil down to the existence or nonexistence of state law

19   claims.  We believe that, as Mr. Salmons pointed out, that is

20   addressed in Section 1333(a)(2), which is the adjacent state law

21   provision, which, in this case, does not cover vessels such as

22   the *Deepwater Horizon*; therefore, there would be no necessity for

23   application of the adjacent state law provision, and, therefore,

24   there would be no state law claims.  Instead, as, again, we've

25   pointed out, OPA would be the exclusive remedy.

1          The last point that I would like to make on the B1

2    claims is that in its reply BP does what we affectionately call

3    *the sacrificial lamb argument* that says responsible parties are

4    protected by OPA, and it's the exclusive remedy as to responsible

5    parties; but, for nonresponsible parties, the plaintiffs should

6    be able to bring any state law claims they want to, and we

7    believe misapplies the *PLT* test in the process of trying to make

8    that argument.

9          As the Court noted a few moments ago, under the

10   *Grubart* analysis and the *PLT* analysis, the proper analysis is

11   that maritime law applies of its own force; and, if OPA later

12   replaces that maritime law, that's not an indication of failure

13   of the *PLT* test.

14         Instead, we believe that the proper procedure and,

15   in fact, the procedure that BP has attempted to avail itself of

16   in this case is that the claims would be against the responsible

17   parties, who would then potentially have statutory contribution

18   rights against other parties alleged to be negligent.

19         So we believe, by taking the different pieces of

20   the different parties' arguments, that we have set out from the

21   beginning in our motion to dismiss briefing, charts the most

22   clear course through the various statutes that apply.

23         The last housekeeping matter that I will point out

24   before I sit down is -- because I will not be rising to speak on

25   the B3 or D1 arguments, but I did want to note a couple of things

1   for the Court, just as a housekeeping matter -- Halliburton was

2   not originally named in the B3 complaint.  Halliburton was only

3   named in the amended B3 complaint which was filed in late March,

4   after this Court had issued an order saying that anyone who had

5   not filed a motion to dismiss on B1 or B3 should do so by May 20.

6            Halliburton has filed its motion to dismiss on B3

7   by the May 20th deadline.  It's obviously not ripe for decision,

8   but we'd refer the Court to our briefs on that issue.

9            With regard to the D1 bundle, likewise, Halliburton

10  was not named as a party in the D1 bundle, has not been amended

11  to be a party in the D1 bundle by the plaintiffs.  The only way

12  that we have any relationship to that is through Transocean's

13  tender of the parties on all of the different claims.

14           We have also filed a 12(b) motion on the D1 bundle

15  pointing out that we're not direct claimants in the plaintiffs'

16  claim and that Transocean has not raised any facts that would

17  show that we have any liability on the D1.  That motion,

18  likewise, is not ripe because it was just filed on May 20th; but,

19  I did want to let the Court know that we have filed those

20  motions.

21           THE COURT:  All right.  Thank you very much, Mr. York.

22           Last, but not least, Mr. Beck.

23       MR. BECK:  Your Honor, there are two words that are

24  absolutely guaranteed to energize an audience, and those words

25  are "in conclusion."  So, in conclusion, let me just make a

1    couple of points, and then I'll sit down.

2            The first point is that any analysis of the

3    applicable law with respect to the B1 master complaint in this

4    case must necessarily begin with what is this case about.

5            Well, we look to the plaintiffs' own B1 master

6    complaint to tell us.  What they say in their complaint is that

7    this is an oil spill case, that the oil spill originated -- their

8    word, not mine -- originated from a well on the Outer Continental

9    Shelf.  They talked about how integral components of the oil well

10   were either attached as fixed structures in the subsoil or they

11   were equipment that were somehow part of those fixed structures.

12           As the Court knows, my client, Cameron,

13   manufactured the BOP in 2001.  Why is this important?  It's

14   important because it tells us that what this case is about is a

15   blowout well that spewed oil into the Gulf of Mexico.  It is not

16   the rig itself.  As Your Honor knows, that's the big bone of

17   contention between us and the plaintiffs in the case.

18           THE COURT:  But isn't the argument that the alleged

19   negligence that occurred on the *Deepwater Horizon* caused or

20   contributed to the oil spill?  Oil didn't start spilling until

21   the rig capsized and broke off the riser pipe, correct, two days

22   later?

23           MR. BECK:  There is no question that people were on the

24   *Deepwater Horizon*; but, again, this is not a personal injury case

25   where somebody is injured on the *Deepwater Horizon*.

1          THE COURT:  I understand.  That's a separate case.

2          MR. BECK:  What we're talking about here is an oil

3    spill.  How did the oil spill begin?  It originated from the well

4    which is part of the seabed, which, in turn, is on the

5    Outer Continental Shelf, which makes OCSLA apply.

6          THE COURT:  But is it any different than if a vessel

7    causes damage on land?  That's covered under the Admiralty

8    Extension Act.

9          MR. BECK:  That is correct, Your Honor.  But, again, if

10   you look at the four United States Supreme Court cases that we've

11   cited which have been consistently followed by the Fifth Circuit

12   Court of Appeals, and particularly in the *Amclyde* case, you will

13   see what the Court's apply is a but-for test, very similar to the

14   test you applied when you denied the State of Louisiana's motion

15   to remand.  The test is, but for the development of oil and gas

16   on the Outer Continental Shelf, would this occurrence -- would

17   this accident have occurred?

18          We respectfully submit that under the facts as

19   alleged by the plaintiffs the answer to the question must be no.

20   So if it was not maritime commerce, in the *Amclyde* case, which

21   dealt with a crane on a fixed platform, if that was not

22   considered to be maritime commerce, we say that our situation is

23   even farther removed from that.

24          THE COURT:  Well, I don't know about that.  You don't

25   have a fixed platform here.  You've got a vessel which is not

 1   even anchored.  As I understand, this thing is held in place by a
 2   global positioning satellite device.
 3                 Am I right about that; that's the way it works?
 4                 The only thing that it was attached to was a
 5   5000-foot-long riser pipe and drill string.  I'm trying to
 6   understand where you're going with your argument, frankly.
 7   Fundamentally, are you arguing that this was not a vessel?
 8            MR. BECK:  That is correct.
 9            THE COURT:  Let me think of the consequences of that
10   argument if you're right.  That means Transocean has no
11   limitation action.  That means there are no Jones Act claims, no
12   905(b) claims, no DOSHA claims.  That would be the consequence if
13   it's not a vessel, right?
14            MR. BECK:  No, sir.  I respectfully disagree with the
15   Court.
16            THE COURT:  Why?
17            MR. BECK:  All we're saying is that under the
18   analysis --
19            THE COURT:  Wait.  Let's not move beyond that question.
20   For Transocean to pursue a limitation action, for people who are
21   killed or injured on the rig to pursue Jones Act claims -- I'm
22   sure some were not Jones Act seamen -- 905(b), DOSHA or whatever,
23   those are all admiralty type claims, right?
24            MR. BECK:  Yes, sir.
25            THE COURT:  All those claims require that there be a

1   vessel.

2          MR. BECK:  Your Honor, we're not saying that maritime

3   law never applies.  I mean, for example, Transocean is entitled

4   to claim limitation under applicable law.

5          THE COURT:  How so if it's not a vessel?  Just explain

6   that to me.

7          MR. BECK:  Well, what we're saying is that if you look

8   at the facts as alleged, and you apply the analysis that the

9   United States Supreme Court and the Fifth Circuit has, what we're

10  saying is that OCSLA independently forecloses the applicability

11  of maritime law to these oil spill claims.  That's our position

12  in this case, and I think most of the defendants in this case

13  agree with the point that OCSLA applies here and exclusively

14  applies federal law.

15         THE COURT:  You're right on that point, but that's a far

16  different argument than what you're making.

17               Cameron appears to be the only party now -- I asked

18  Mr. Langan this, whether this is a vessel or not -- you're the

19  only party that I can appreciate is contesting that.  I'm just

20  trying to understand, if you're right on that argument, what

21  would be the ramifications or legal consequences of that

22  argument?

23         MR. BECK:  I think if we're right on that the

24  consequences with respect to Cameron, who is a nonresponsible

25  party in this case, is that Your Honor would dismiss the B1

1   claims as to Cameron, allow them to proceed against BP, for

2   example, as a responsible party in this case.  BP, in turn, would

3   then pursue subrogation and contribution rights.  That's not a

4   hypothetical occurrence because they've already sued us for

5   subrogation and also for contribution.

6         So the plaintiffs would go forward with their case.

7   The limitation action would go forward.  BP would then be

8   entitled, at some point, to contribution and/or subrogation, if

9   they have made any payments to these plaintiffs in the case.  So

10  the action would go forward.

11        What we're simply saying is that the plaintiffs'

12  economic loss claims cannot go forward against Cameron because

13  OCSLA exclusively applies federal law except in certain

14  situations where there are gaps.  Our position is that OPA then

15  applies, and OPA sets forth this very comprehensive scheme for

16  the payment of claims exactly like the B1 claims, oil spill

17  claims.  They must follow the statute.  If they do, they can

18  recover.  It's a strict liability against the responsible

19  parties.  In particular, BP here is the principal responsible

20  party.  Then BP can then recover against us in the event that

21  we're in any way liable in the case.  So that's what we're

22  saying.

23        THE COURT:  I think I read in your brief that you say

24  this was not a vessel at the time this happened, but it would be

25  a vessel when it was moving?

1       MR. BECK:  We did have a statement like that,

2  Your Honor.

3       THE COURT:  Doesn't that fly right in the face of

4  *Stewart v. Dutra*?

5       MR. BECK:  Your Honor, we respectfully disagree with

6  that.  I mean, if the *Deepwater Horizon* was being moved, then

7  arguably it might be --

8       THE COURT:  So you're saying this thing is a vessel when

9  it's moving, but, once it's drilling, it's not a vessel, then

10 it's a vessel again when it moves.  That's exactly, it seems to

11 me, what the Supreme Court has said you can't do.

12      Seamen and vessels don't float in and out of vessel

13 status or seamen status, and that seems to be where your argument

14 would lead us.

15      MR. BECK:  Your Honor, I think you've captured our

16 argument; but, the difference is that once the *Deepwater Horizon*

17 is stopped, and once the well is drilled, and once it's attached

18 to the seabed, and once there is a riser that's going from the

19 top all the way down to the bottom, once you have these fixed

20 structures at the bottom and we're talking about operations,

21 which is the word the statute uses, the OCSLA, you're talking

22 about operations for oil and gas development, which is what we're

23 talking about here, once that happens, then you're basically not

24 talking about a vessel in the sense that I think Your Honor

25 means.

1          THE COURT:  It sounds like you're making the argument

2   that Judge DeMoss made in his extensive, eloquent dissent in

3   *Demette*, where Judge Higginbotham, in the majority, said you had

4   a jackup rig where the legs were firmly planted into the seabed,

5   and you had a casing crew aboard that was hammering casing into

6   the seabed, and the argument was made that when the vessel was

7   jacked up, the barge part of the deck part being out of the

8   water, the legs being firmly planted in the seabed, they were

9   hammering casing down into the well through the seabed,

10  Judge DeMoss said this can't be a vessel; this looks just like a

11  platform, how can it be a vessel?

12          That's your argument, it sounds like, exactly what

13  Judge -- and I'm not downplaying it.  I'm just saying that

14  argument just didn't prevail, and it seems to me that it's less

15  persuasive now, with the case law that has flowed since then,

16  particular *Stewart v. Dutra*.

17          MR. BECK:  Judge, I hope our argument embraces

18  Judge DeMoss' majority opinion in the *Amclyde* case because that's

19  the one we're relying on.

20          THE COURT:  It's a little different, though.  I'm

21  familiar with the *Amclyde* case.

22          MR. BECK:  Again, he applies, as you know, the but-for

23  test.  We say if you apply that test here, you get the result

24  that we're advocating.

25          THE COURT:  Right, right.

 1          MR. BECK:  So, in conclusion, I'm done.

 2          THE COURT:  It's a very interesting argument, and thank

 3     you very much.

 4          MR. BECK:  Thank you.

 5          THE COURT:  The plaintiffs' side.  Who is going first?

 6          MR. ROY:  Jim Roy for the plaintiffs, Your Honor.  We're

 7     going to divide our time, Your Honor, depending upon how it

 8     flows.  But let me -- before we get started, let me just point

 9     out one thing in response to Mr. Beck's argument.

10               We can point out paragraphs by number in the master

11     complaint of the PSC, but in numerous paragraphs it's made very

12     clear that the BOP is ship's equipment.  So, by virtue of the

13     pleading --

14          THE COURT:  I meant to actually ask Mr. Beck about that,

15     but that's another issue, related issue, as to whether the BOP

16     was part of the vessel's gear or appurtenances or not.

17          MR. ROY:  Right.  We repeatedly make such assertion,

18     directly and indirectly, in our master complaint that it is part

19     of the ship's equipment.  I don't think anybody seriously

20     contests that it was owned by Transocean and part of their

21     equipment.

22          THE COURT:  Okay.

23          MR. ROY:  Your Honor, the first topic we're going to

24     address today is admiralty jurisdiction and OCSLA and the

25     interplay.  Brian Colomb of our firm will take that.

1          MR. COLOMB:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MR. COLOMB:  Brian Colomb.

4          THE COURT:  Let me see if I can direct your argument

5  somewhat.  I read in your memorandum that the plaintiffs believe

6  that this case is controlled by General Maritime Law and OPA,

7  right?

8          MR. COLOMB:  Yes, sir.  Among other things, yes, sir.

9          THE COURT:  I read that somewhere in your memorandum.

10         So I guess you need to spend your time -- most of

11  the defendants agree with you that maritime law would apply of

12  its own force.

13         You dispute whether we have OCSLA jurisdiction or

14  not; do you dispute that?

15         MR. COLOMB:  I don't dispute that we do, Your Honor.  I

16  did read your decision from back in October, the State of

17  Louisiana's motion to remand, and I don't disagree with that.  I

18  think it's dead on.

19         OCSLA, specifically 43 U.S.C. 1349, is a very broad

20  jurisdictional provision --

21         THE COURT:  Right.

22         MR. COLOMB:  -- that covers just about anything that

23  occurs on the shelf and remotely involves exploration.

24         THE COURT:  Under that analysis, the Court would have

25  jurisdiction under admiralty jurisdiction and under OCSLA.

1              Then, you do not make the argument that somehow

2    state law is adopted as surrogate federal law via --

3              MR. COLOMB:  (a)(2)?

4              THE COURT:  -- (a)(2), right?

5              MR. COLOMB:  No, we absolutely do not make that

6    argument.

7              THE COURT:  You can't make that argument because you're

8    contending that General Maritime Law applies of its own force.

9    Under *PLT*, state law doesn't come into play under OCSLA.

10             MR. COLOMB:  That's exactly right, Your Honor.  As you

11   noted earlier, once you have admiralty jurisdiction, you have the

12   application of admiralty law in just about every case, including

13   this one.

14             THE COURT:  Right.  Well, that's certainly the general

15   rule.

16             So the real issue here is how and whether OPA

17   displaces the application of substantive General Maritime Law in

18   the case of the B1 plaintiffs, so that's what I would like you to

19   talk about.

20             MR. COLOMB:  Actually, one of the other folks in my

21   group is going to address that issue.  I was specifically asked

22   to address the admiralty jurisdiction issue.

23             I know Your Honor is intimately familiar --

24             THE COURT:  You're winning on that.  You might want to

25   sit down.

1          MR. COLOMB:  That's exactly what I was going to say,

2     unless you have some specific question.

3          THE COURT:  The first argument I ever made in front of

4     the Louisiana Supreme Court as a very young lawyer, Justice Tate

5     was presiding.  I was the appellant.  I had lost in a trial court

6     and in the Court of Appeals.  I made my argument, and the other

7     side got up and made its argument.  I got up for my five-minute

8     rebuttal, and Justice Tate leaned over and said, "Mr. Barbier,

9     the trouble with some of you young lawyers, you never know when

10    to sit down and shut up when you're ahead."

11          Not that you don't realize --

12          MR. COLOMB:  Judge, I can take a hint.  Thank you.

13          THE COURT:  Who is going to argue about OPA and maritime

14    law and --

15          MR. BREIT:  He's trying to pull me off of it now, Judge.

16    He's changed his mind.

17          MR. ROY:  We've shifted gears, but the next topic is

18    going to be addressed by Jeff, and the topic is loosely defined

19    as what you want to hear.

20          THE COURT:  Go ahead.

21          MR. BREIT:  Jeffrey Breit for the PSC.  If you would ask

22    me to sit down now because you're confident that we're going to

23    win, I will reserve my time.

24          I want to start off, Judge, with Mr. Langan's case

25    that he cited, which, quite frankly, I believe supports our

1   position wholeheartedly.  That's the *Locke* opinion, which is the

2   United States Supreme Court's opinion involving OPA.

3          BP misreads the intent of *Locke*.  What *Locke* stood

4   for was the fact that Title I of OPA is the liability scheme.  It

5   creates the liability scheme.  The two savings clauses which are

6   so important for this Court's determination are in Title I, the

7   liability phase.

8          So what happened in *Locke* was Washington State had

9   created a law having to do with tanker design and equipment.  The

10  U.S. Supreme Court said, no, that was not preserved by OPA.  The

11  things that were preserved in OPA involving state law were those

12  things having to do with the liability sections of Title I of

13  OPA.  That's the holding of the *Locke* case.

14         In this case, we have not only the state law

15  preservations because of liability provisions of OPA in Title I,

16  but also the General Maritime Law sections, which would be just

17  the other section of 2718(a), which is the state law claim.

18  2718(c), which is the General Maritime Law admiralty claims,

19  would also be preserved.

20         The specific language from *Locke* is, "If those

21  Washington statutes had involved liability, as opposed to tanker

22  design, then the state law provisions would have been preserved."

23         So let's address what was really important, which

24  is OPA's intent.  What did the Legislature intend by OPA?  What

25  is important to understand in the legislative intent is that

1    preemption and displacement were a great part of the discussion

2    in Congress, what are we going to do, how is this going to affect

3    other laws that exist?

4            At the time that OPA was written, it was obviously

5    intended to be a helpful statute, to expand rights, because

6    existing remedies at the time of *Valdez* didn't allow for some of

7    the recoveries that Congress eventually thought were important.

8    So it was an expansive statute.

9            The defendants now attempt to use OPA as a shield.

10   To do that, this Court would have to nullify all of the language

11   in the conference reports from the Legislature.

12           I'm just going to point out four of the legislative

13   intents that came from the conference report.  Remembering, we

14   start with *Locke's*, liability provisions, the two savings

15   sections, which involve both savings of state law and savings of

16   General Maritime Law.

17           The conference report said, "This shall not affect

18   admiralty or maritime law with respect to civil actions.  To

19   clarify the house bill, this does not supersede Article III,

20   Section 2, which provides for the basis of admiralty

21   jurisdiction."

22           The conference report said, "The interplay between

23   the savings and the liability sections does in no way change the

24   law unless in specific provisions to the contrary," which there

25   are none.

1                And the conference report says, most importantly,

2    notwithstanding language, which the defendants all rely on in

3    looking at the *Gabarick* decision, "The liability provisions of

4    the act govern the compensation damages, notwithstanding any

5    limitation under existing statutes," and they cite the Limitation

6    Liability Act, "and the requirement of physical damage to the

7    interest of claimants, *Robins Dry Dock*."

8                THE COURT:  Let me ask you this, Mr. Breit.  Is there

9    any case law that supports your argument on this point?

10               MR. BREIT:  Well, Your Honor --

11               THE COURT:  I know there hasn't been a tremendous amount

12   of case law on OPA, but the defendants say every court that has

13   ever decided this has decided it the other way.

14               MR. BREIT:  Well, I believe, obviously, that the *Locke*

15   opinion from the United States Supreme Court on OPA specifically

16   outlines these savings provisions of Title I of OPA, saving state

17   laws as well as General Maritime Law.  Since that time, you have

18   the *Gabarick* decision.

19               THE COURT:  The other side is not arguing that --

20               MR. BREIT:  They are asking for displacement.

21               THE COURT:  Well, they are arguing for displacement with

22   respect to claims that are covered by OPA.  How do you respond to

23   Section 2751(e), which is labeled -- 2751 of OPA says savings

24   provision, (3) is admiralty and maritime law --

25               MR. BREIT:  Second is the jurisdiction and admiralty of

1    the district court.

2        THE COURT:  It says, "Except as otherwise provided in

3    this Act, this Act does not affect:  One, admiralty and maritime

4    law; or, two, the jurisdiction of the United States with respect

5    to admiralty and maritime jurisdiction," saving to suitors,

6    etcetera.

7            The key phrase is "except as otherwise provided in

8    this act."  What is the meaning of that in your view?

9        MR. BREIT:  In my view, the conference language

10   specifically says we're not trying to change that law.  If you

11   look at the language in *Locke*, which talks about what that's

12   intended to imply --

13       THE COURT:  Wouldn't it be worded differently if that

14   was the case?  Some statutes are worded *nothing in this act shall*

15   *affect*, for example.

16       MR. BREIT:  More -- excuse me, Your Honor.  More

17   importantly, I believe, if you look at the case law that has come

18   out since the District Court opinions involving this OPA

19   decision, most importantly being *Baker v. Exxon* and the *Townsend*

20   case with the United States Supreme Court, when you are trying to

21   affect language such as this, General Maritime Law which has long

22   allowed these types of recovery, both cases in the

23   U.S. Supreme Court specifically said that the language must be

24   clear.  We will not accept by silence that we are going to wipe

25   out the common law.  It must be specifically stated in the

1   statute.  Both Justice Thomas said that in *Townsend*, and the

2   Supreme Court said that in *Baker*.

3            To take the argument to its extreme, Your Honor,

4   and I don't think we need to, if OPA was intended to displace

5   General Maritime Law and state law, if BP had been a

6   judgment-proof defendant and had caused this oil spill, we would

7   have no remedy against the other defendants in this room because

8   OPA would require, says the defendants, that we must first go to

9   the defendant who is responsible, and then there could be

10  contribution after that to get their money back from other

11  defendants.

12           Clearly, after the *Exxon Valdez*, with the expansion

13  intended because of the *Valdez*, to expand the rights and

14  remedies, Congress surely could not have meant that all of the

15  plaintiffs in the case would be barred from any recovery unless

16  we had a viable first-level defendant.  That's what would happen

17  if we or the Court were to say that OPA has displaced or

18  preempted state and General Maritime Law.

19           The language that the U.S. Supreme Court used in

20  *Townsend*, while it may be a laudable goal to have uniformity, it

21  does not require the narrowing of the available damages to the

22  lowest common denominator.  Congress is free to say that, but we

23  will not attribute words to Congress that it is not written.

24           So the *Gabarick* case, which didn't address *Baker* at

25  all, came out before *Townsend*.  The U.S. Supreme Court has said

1    that there has been a longstanding tradition, as did the

2    Congressional Record, that where there is federal

3    Clean Water Act, pollution act and oil laws, we do not say that

4    we're going to preempt state laws that may be affected.  That's

5    what the Supreme Court said in *Locke*, that we will not do that.

6           So the other cases -- besides the maritime law

7    language, there is plenty of state law language in the conference

8    reports which goes through item by item of what the conference

9    was trying to do after they got the house bill to make sure that

10   these other remedies and provisions were still allowed to

11   proceed.

12          There could never have been an intent of Congress,

13   with an expansive legislation like this, to wipe out

14   long-standing General Maritime Law remedies against all of these

15   other defendants without specific language.

16          The two most recent U.S. Supreme Court cases have

17   made it very clear.  If you're attempting to do that, you must do

18   so specifically.  Silence won't work and, surely, notwithstanding

19   other language.

20          The cases that have said that OPA has filled the

21   void of oil pollution law have forgotten to look at the purpose

22   of the savings clause for the state law and the General Maritime

23   Law.  What would be the purpose of saving General Maritime Law

24   and the state savings law if there was an intent to fill?

25          THE COURT:  Well, one example is it saves collision

1    damage claims under admiralty law.  It saves Jones Act --

2            MR. BREIT:  Liens.

3            THE COURT:  -- general maritime 905(b) claims, DOSHA

4    claims, maritime liens, I imagine.  I am sure there are others.

5    I'm just --

6            MR. BREIT:  Well, I thought of liens and maritime

7    limitation claims --

8            THE COURT:  Yes.

9            MR. BREIT:  -- as well as collision claims.  But if that

10   was their intent, if that's the only three things that we're

11   going to save -- and maybe there's a fourth that we can't think

12   of as we sit here -- then the Legislature should have

13   specifically said those things are being saved versus silence

14   and/or notwithstanding language that wipes out 150 years worth of

15   General Maritime Law legislation and 17 state statutes that have

16   unlimited caps on oil pollution caused by spills in their

17   waterways.

18           THE COURT:  Spills in their waterways, what you just

19   said is key.  This spill did not occur in any state's waterways,

20   and that's another issue here.

21               It seems to me that some of these statutes preserve

22   the rights of states to, in some instances, apply their own

23   version, mini OPAs, mini Clean Water Act, to spills occurring in

24   their waterway.  Here, it occurred in federal waters, and the

25   allegation is some of it migrated into state waters.

1          Then you get into the issues of the cases that the

2    defendants cite about whether one state can apply its law to

3    another.  There is a case between Illinois and Milwaukee, the

4    *Milwaukee* case.

5          MR. BREIT:  Right.

6          THE COURT:  There is the case from Lake Champlain,

7    New York and Vermont.  Suit was filed in Vermont, but couldn't

8    apply Vermont law to a spill or a source that occurred in

9    New York, even though some of it ended up in Vermont.

10         MR. BREIT:  That's why the General Maritime Law in those

11   situations are most important to be understood that were

12   retained; because, otherwise, as to BP, which is a responsible

13   party, all of these other defendants, without a solid first-level

14   defendant, would walk away.  Clearly, the legislative intent --

15         THE COURT:  Well, there is a remedy, but it wouldn't be

16   probably -- clearly, it wouldn't be satisfactory in this case.

17   There is the fund that you could be going to -- couldn't you go

18   to the fund if you couldn't recover from the responsible party?

19         MR. BREIT:  It depends on whether the Legislature

20   intended that that fund would cover all of the other nonmaritime

21   or other nonoil-producing defendants.  Let's assume it's a

22   nonmaritime --

23         THE COURT:  I think there is something in OPA that talks

24   about that you can proceed against the fund in certain

25   situations, and I think one would be in this scenario.

1          But the fund is itself limited.

2          MR. BREIT:  Limited and inadequate for this situation.

3              If that was the intent of a Legislature trying to

4 write a new law to fix *Exxon Valdez*, clearly they would have said

5 that very specifically, which is why the *Baker* and the *Townsend*

6 language about taking away hundreds of years of common law or

7 General Maritime Law must be specifically stated, as opposed to

8 just putting in a --

9          THE COURT:  As I recall, the history of OPA is that this

10 legislation, some versions of it were being considered for long

11 before *Exxon Valdez*.

12          MR. BREIT:  But it was to remedies --

13          THE COURT:  The *Exxon Valdez* is what brought it

14 together, brought it to enactment.

15          MR. BREIT:  -- and the remedies that were available and

16 were found not to be available at the time that the *Valdez*

17 happened.

18              My time is up, Your Honor, unless you have a

19 question.

20          THE COURT:  Thank you, Mr. Breit.

21          MR. BREIT:  Thank you.

22          MR. ROY:  Your Honor, Johnny deGravelles will address

23 the issue of punitive damages in relation to OPA, if that's all

24 right with you.

25          THE COURT:  All right.

1      MR. DEGRAVELLES:  Good morning, Judge, John deGravelles.

2          Some of what I'm going to talk about is obviously a

3   refinement of what Mr. Breit just talked about, because it's a

4   narrow issue, but it is the issue of the extent to which OPA

5   displaces maritime law.

6      THE COURT:  If OPA displaces maritime law, it displaces

7   punitive damages, right?

8      MR. DEGRAVELLES:  That's correct, Judge.  I can imagine

9   a situation in which --

10     THE COURT:  Well, except -- again, we're only talking

11  about right now the B1 bundle, the economic damage claims.

12  Still, that would be another issue --

13     MR. DEGRAVELLES:  A whole issue with respect --

14     THE COURT:  -- one that would be available to the people

15  on the rig and that casualty and all of that, yes.

16     MR. DEGRAVELLES:  Exactly.  But when you look at just

17  the punitive damage issue, then I think it helps refine some of

18  the things that Mr. Breit was talking about.

19          Specifically, how does Your Honor answer the

20  question of whether OPA displaces, preempts, precludes, whatever

21  words you want to use, keeps the General Maritime Law claim and

22  remedy for punitive damages from happening?  What is the analysis

23  that you need to go through in order to decide that issue?

24          All of the cases that have been relied upon by the

25  defendants either, A, predated *Baker* and *Townsend*, which are the

1    two seminal cases on how you are to decide this issue; or, the

2    two -- I think, two or three cases that came after *Baker* and

3    *Townsend* don't mention *Baker* and *Townsend*.  I'm talking about

4    *Gabarick* and a case called -- one of the cases cited by the

5    defendants is called *In re Alex C*.  They don't even talk about

6    *Baker* and *Townsend*, and *Baker* and *Townsend* is how Your Honor is

7    supposed to answer the question.

8                In that context, Judge, it's important to remember

9    what we had before *Baker* and *Townsend*, and the question of how a

10   federal statute was going to either preempt, displace, or not, a

11   general maritime remedy.

12               Your Honor knows very well the whole *Miles v. Apex*

13   history.  What *Miles* said was we don't look to statutes, really,

14   for the specific intent of the statute.  We looked to the statute

15   by analogy.  We look to the statute for policy guidance.

16               Of course, in that case, it became -- it was a loss

17   of society case and a General Maritime death case for a seaman,

18   but it was expanded by the Fifth Circuit in *Guevara* and all the

19   lower courts to get into the whole area of punitive damages, some

20   cases going so far as to say, under the *Miles* reasoning you don't

21   have punitive damage in General Maritime Law at all.

22               So, in that context, *Baker* comes along.  *Exxon*

23   makes the very understandable argument, see *Miles v. Apex,* see

24   the reasoning that the court used in *Miles v. Apex*.

25   Clean Water Act does not provide for punitive damages; ergo, you

1   shouldn't allow it under the General Maritime Law.

2          What *Baker* did is critical to Your Honor's analysis

3   in this case.  They didn't -- they specifically did not follow

4   the *Miles* rationale.  They asked and answered three questions.

5   One, does the statute -- and this is the language of the court --

6   does the statute speak directly to the issue of whether this

7   common law remedy, General Maritime Law remedy, applies or does

8   not apply?

9          The second thing they said is, looking at the

10  language, but also looking at the history, does the statute's

11  history and language indicate a clear indication to displace the

12  entire field of maritime remedies?

13         The third question they asked was, will applying

14  the general maritime remedy have a frustrating effect on the

15  intention of the statute?

16         What they said in *Baker* with respect to the

17  Clean Water Act was no, no and no.  When you ask those same three

18  questions with respect to OPA, and specifically considering the

19  issue of punitive damage, it is exactly the same result.

20         Does OPA speak directly to the issue of the general

21  maritime punitive damage remedy?  It does not.

22         THE COURT:  Well, except the defendants, I think, would

23  argue that it does in a sense that Congress said if you have --

24  their argument is that OPA certainly was intended, at least

25  partly in response to *Exxon Valdez*, to expand the class or scope

1   of claimants who might be entitled to recover for their economic

2   damages, who were excluded because of *Robins Dry Dock*.  I think

3   that's clear.  That's one of the purposes of OPA.

4          But that was sort of a balancing act.  They

5   expanded the types of claimants who might recover well beyond

6   those who had physical damage to their own property, but, at the

7   same time, they put restrictions.  That's their argument, that it

8   defined what damages are available, it put caps in place, and

9   then it even said that, but if you can prove gross negligence,

10  the caps go away.  So is that not addressing --

11         MR. DEGRAVELLES:  No, it's not, Judge, not in the way

12  that *Baker* said it be must addressed.  Because what *Baker* said is

13  it must speak directly, and simply not mentioning it at all,

14  silence, in other words, is not enough.

15         THE COURT:  It would have to do what?  What would the

16  statute have to say?

17         MR. DEGRAVELLES:  Exactly what DOSHA did in the

18  commercial aviation exception.  It said punitive damages are not

19  allowed.  That goes to the same issue that you raised with

20  respect to the *except as otherwise provided*.  *Except as otherwise*

21  *provided* could mean, as it does if you look at the DOSHA, it

22  could say, these are the damages that are recoverable, but it

23  does not include punitive damages.

24         In fact, that's what *Baker* suggests must happen

25  because we're not going to go back to the old *Miles* days where a

1   statute is silent, and, therefore, from the silence, we're going

2   to somehow infer that that means that that thing about which they

3   are silent, the remedy about which they are silent, is excluded

4   or precluded.

5          That's what *Miles* did.  That's what *Baker* said you

6   don't do.  You've got to speak directly to it.

7          Then, with respect to the second thing, which is

8   the clear indication of Congressional intent to occupy the entire

9   field of pollution remedies, clearly, by the virtue of the

10  statutory language itself, as well as the history of the statute,

11  this is not designed to occupy the entire field.  It has these

12  two savings clauses, including admiralty and maritime

13  jurisdiction, admiralty law, state law, all of which is saved to

14  plaintiffs who might also recover under OPA.

15         A part of the statute which has really not been

16  discussed in any of the arguments, Judge, but I think it's an

17  important one, and it's 2718(c) of OPA.  The title of this

18  section is entitled *Relationship to Other Laws*.  It says,

19  "Nothing in the act shall in any way affect the authority of the

20  United States to impose additional liability or additional

21  requirements relating to the discharge of oil."

22         Now, clearly, that envisions Congressional acts;

23  but, remember that Article III, Section 2 of the Constitution

24  allows the Supreme Court to be a rule maker.  That's, in fact,

25  what the Supreme Court did in *Baker*.  It took the General

1    Maritime Law punitive damage remedy, and it fashioned some

2    limitations on it.  It did it specifically under Article III,

3    Section 2 of the Constitution.

4            So when it says there is nothing in this act that's

5    going to affect the ability of the United States to do something

6    extra, they are not talking just about Congress, they are talking

7    about the United States Supreme Court under Article III,

8    Section 2.

9            You combine that with the specific savings

10   provision with respect to admiralty and admiralty jurisdiction,

11   you combine that with the other savings provision, and what the

12   clear Congressional intent that you gather from that is that

13   Congress did not intend this to be the be all and the end all.

14   It envisioned that there would be simultaneous remedies available

15   to plaintiffs, and you didn't have to choose.  You could pursue

16   OPA, but you could also pursue General Maritime Law remedies,

17   which includes punitive damages.

18           With respect, Judge, to the cases, and I'm just

19   going to spend a second on these cases, that are the ones that

20   are primarily relied upon by the defendants in the punitive

21   damage argument, *South Port*, which is the only Court of Appeal

22   case that deals with this issue at all, First Circuit case,

23   decided before *Baker*, decided before *Townsend*, relies upon *Miles*

24   *v. Apex* which was discredited in *Baker* and *Townsend*.

25           The *Clausen* case is a District Court case from

1    Oregon.  Again, predates *Baker*, predates *Townsend*, doesn't even

2    talk about anything except cites the *South Port* case.

3                The only case that really -- that they've cited on

4    the punitive damage issue that comes after *Baker*, although it was

5    decided before *Townsend*, is *Gabarick*; but, *Gabarick* did not

6    involve the issue of punitive damages.

7                Finally, as I say, the last case is that *In re*

8    *Alex C* case, which is --

9            THE COURT:  I may be conflating some of these cases now,

10   since I've read so many of them, but *Gabarick* was the case,

11   Judge Africk had it, and then Judge Lemelle had it.

12           MR. DEGRAVELLES:  Yes, sir.

13           THE COURT:  It was the oil spill on the

14   Mississippi River, as I recall.

15           MR. DEGRAVELLES:  Yes, sir.

16           THE COURT:  Didn't either Judge Africk or Judge Lemelle

17   say that OPA displaced General Maritime Law?

18           MR. DEGRAVELLES:  It says that broadly, Judge, but if

19   you look --

20           THE COURT:  It didn't talk about specifically punitive

21   damages --

22           MR. DEGRAVELLES:  They did not specifically talk about

23   punitive damages.  If you look at the language of Judge Lemelle,

24   he's talking about items of damage.  He doesn't say that punitive

25   damages are excluded.  In fact, suggested by the language -- in

1  fact, I think the very last paragraph, maybe the last sentence of

2  the opinion before the ruling, talks about damages.  It talks

3  about the decision in terms of damages.

4          THE COURT:  Should I ask him what he meant by that?

5          MR. DEGRAVELLES:  You're at liberty to do it, Judge.

6  You can do it; I can't.

7              But, in any event, in sum, here is where we are.

8  The Supreme Court -- you have this issue about OPA displacement

9  generally, and certainly OPA displacement with respect to

10 punitive damages.  You have two, which is very unusual, back to

11 back, one year after the other, two United States Supreme Court

12 cases that give you the results; but, it also, more importantly,

13 gives you the reasoning that you should follow and the analysis

14 that you should follow in making this decision.

15             If you follow the outline given to you by *Baker*

16 and, to a certain extent, *Townsend*, then the answer is no, it

17 does not displace -- OPA does not displace the punitive damage

18 remedy.  It doesn't displace General Maritime Law at all, but

19 specifically does not displace punitive damages.  It doesn't

20 speak directly to it, there is no clear Congressional intent, and

21 it certainly doesn't have any frustrating effect on the intent of

22 the OPA, which is, like all of these maritime pollution cases, to

23 try to keep the environment pristine, as pristine as we can,

24 especially in South Louisiana, compensate victims, and keep this

25 kind of activity from happening in the future.

1          THE COURT:  All right.  Thank you.

2          MR. ROY:  Your Honor, we had intended to address the

3    Clean Water Act preemption issues as part of our B3 argument; so,

4    unless you want to hear that part now, we would like to save that

5    for during our B3 argument.

6          THE COURT:  That's fine.  Where do you stand on your

7    time?

8          MR. ROY:  We're doing good.

9          THE COURT:  You're doing good.

10          MR. ROY:  We're doing good.

11          We're going to address the moratorium issues next,

12    Your Honor.  Mr. Herman will do that.

13          MR. HERMAN:  Good morning again, Your Honor.

14    Steve Herman for the plaintiffs.

15          I think, at the outset, the plaintiffs would reject

16    a stringent proximate cause standard in any OPA case.  We

17    understand --

18          THE COURT:  Well, Mr. Langan seems to suggest that it

19    doesn't necessarily have to be proximate cause, but it can't just

20    be but-for.  It's got to be something in between, whatever that

21    animal is called.

22          MR. HERMAN:  I think that may be --

23          THE COURT:  I think his point is if it's a simple

24    but-for -- that's the whole point of *Robins Dry Dock* and all, of

25    course, in the whole theory of proximate causation, there has got

1   to be a cutoff point somewhere on liability; otherwise, there is

2   no end.  This case would rebound, bounce around the world in

3   terms of people that could say they were indirectly affected.  So

4   where do we draw the line in this type of case?

5       MR. HERMAN:  Well, we understand that the Court is going

6   to have to draw the line in some cases based on the facts of

7   those specific cases.  We think that that should be done case

8   specific, rather than drawing bright lines.

9       I think that there is a lot of helpful guidance in

10  the treatment that we submitted to the Court as Doc Ref 2394-2,

11  which is a recent paper done by Professor Robertson that kind of,

12  I think, is very helpful on these issues.  He explains -- or

13  helps to try to explain --

14      THE COURT:  It's a shame he didn't show up for the

15  seminar because I would have liked to have listened to him.  I

16  spoke at that same seminar, not on that topic of OPA, though;

17  but, we were waiting to listen to him, Ed Preis and others who

18  were there.

19      MR. HERMAN:  I hope that that's helpful.  We would also

20  direct the Court to the legislative history that we cite at 69 to

21  74 in our opposition.

22      THE COURT:  Excuse me, I've read Professor Robertson's

23  paper.  I don't recall exactly what he said, but I think his

24  argument is sort of -- he's not far from what Mr. Langan -- I

25  mean, he maybe would draw the line in a different place; but,

1    that it's not proximate cause, but it's not simple but-for

2    either.  Right?  Is that what he's arguing --

3            MR. HERMAN:  I think he's arguing for a line that's much

4    closer to but-for than for --

5            THE COURT:  Than to proximate cause.

6            MR. HERMAN:  -- at least a stringent proximate cause,

7    because proximate cause can be applied in different ways.

8            He gives examples in his paper, which I think are

9    helpful, where factual causation, just but-for causation, helps

10   the court to draw the line; and, it wouldn't bounce all around

11   the world, even if you just used factual causation, even if you

12   just used but-for causation.  I think that that's actually

13   illustrated in some of the cases that defendants cite.

14           But what I think is important to note is that,

15   clearly, the intent of OPA was to expand for a liberal causation

16   requirement, whatever that is, closer to factual than a

17   stringent -- certainly closer to factual than *Robins Dry Dock*.

18           THE COURT:  What do you think about the Fourth Circuit

19   case, the fire and -- that case was pretty close.

20           MR. HERMAN:  Well --

21           THE COURT:  Pretty close factually, I mean.

22           MR. HERMAN:  -- I would have to admit that the

23   Fourth Circuit drew the line --

24           THE COURT:  In the wrong place, right?

25           MR. HERMAN:  Those are the Court's words.  I might

1   respectfully echo that.

2          But I think what's interesting, though, is that

3   when that case is picked up in the Fifth Circuit by the

4   *Taira Lynn* case, you have a situation where it's really not what

5   the defendants are arguing with relation to the moratorium.

6          They didn't say that there was a superseding

7   intervening cause.  They didn't even really say that it was a

8   proximate cause issue.  What I get from the *Taira Lynn* case is

9   that what they are saying is, even under direct factual

10  causation, the damages at issue were not caused by an oil -- a

11  discharge of oil on the water.  What the damages were caused by

12  was a shutting down of the bridge because of the allision with

13  the barge.  It wasn't a result of the spill; it was a result of

14  the allision.

15         Somewhat similar to that, although I might have

16  drawn the line in a different place -- I don't think that the

17  Fourth Circuit was saying that the fire was necessarily the

18  result of some superseding or intervening factor -- but you could

19  read that decision to say it wasn't actually caused by the spill,

20  it was caused by release of the vapors, which is arguably a

21  different issue.  We would probably take issue with the

22  Fourth Circuit's decision, but I think that is one helpful way of

23  looking at it.

24         I think it's also interesting to note in the

25  statutory language itself that you're talking about the threat of

1    damage, in addition to damage itself, with respect to at least

2    the first part on damages resulting from.

3              As a pleading matter, we have alleged direct

4    causation, and I think that's at least plausible under

5    *Iqbal/Twombly*.  When you talk about including a legal cause

6    requirement, whatever that is, proximate cause, that's integrally

7    relied to -- tied to the issue of foreseeability.  As we briefed,

8    usually you don't decide foreseeability at the pleadings stage.

9              In addition, we would assert we do not admit that

10   but-for causation is required for moratorium claims.  We would

11   suggest, and I think we've pled, that the moratorium was

12   foreseeable, that the government's action was not a superseding

13   or intervening factor, that the spill was the proximate cause of

14   these damages.

15             We would direct the Court to the *Dunham Price Group*

16   case out of the Western District, 2010, U.S. District Lexis --

17             THE COURT:  That's Judge Minaldi's case, right?

18             MR. HERMAN:  Correct.

19             There was a concrete plant, and it suffered

20   commercial losses after a spill, resulted in the closure of the

21   river.  The Court denied summary judgment and let that go to --

22             THE COURT:  Clearly, a case that would be precluded by

23   *Robins Dry Dock*, if you were looking beyond OPA.

24             MR. HERMAN:  Correct.

25             THE COURT:  But for OPA.

1           MR. HERMAN:  Correct.

2                I talked about *Taira Lynn*.  I would also note that

3      the *Benefiel* -- I'm not sure if I'm pronouncing it right, but the

4      case out of the Ninth Circuit that they cite, that was a case in

5      which the plaintiffs alleged in the complaint that Exxon and the

6      other oil companies had enough oil in their reserves that the

7      price shouldn't have increased.  That's at 959 F.2d at 807.  So

8      it was really a price gouging case, not an economic loss from the

9      oil spill; at least, that's the way the Court looked at it.

10               Finally, when you look at the memorandum decision

11     itself for the moratorium, which has been submitted at

12     Doc 2394-3, it's clear in the reasoning that the moratorium was

13     not just the foreseeable result of the spill, given MMS's

14     statutory duty and responsibility under the Outer Continental

15     Shelf Lands Act, and the substantial threat of a future

16     discharge.

17               In fact, and this is at the bottom of page 5 and

18     the top of page 6, the moratorium was actually imposed as a

19     direct result or due to the damages to the natural resources and

20     other property caused by Macondo oil itself.  That was tying up

21     the available resources, and that was part of the justification

22     for the moratorium.

23               When you have a spill of this magnitude, you expect

24     the government to step in in some way, just like you expect

25     fishing grounds to be closed, just like you expect that there

1   might be a freshwater diversion.

2          THE COURT:  It seems like this is a little more removed

3   under whatever causation test we want to use.  It seems like this

4   is a little more removed than, for example, in the --

5          What's the name of Judge Minaldi's case, again?

6          MR. HERMAN:  The *Dunham Price*?

7          THE COURT:  Yes.

8          -- in that case, where they shut it down --

9   allegedly, in direct response to the spill, they had to shut down

10  and close this waterway.

11         You can certainly see the relationship there and

12  the foreseeability; but, whether that extends to this situation,

13  where it wasn't that they shut down, closed the Gulf of Mexico,

14  they put a moratorium in place.  I guess the argument on the

15  other side would be not because of -- it might be a but-for, but

16  for the spill, but it wasn't a direct cause of the spill, it

17  wasn't directly caused by the spill, because what they were

18  trying to do is put a better -- they weren't trying to clean up

19  anything.  They weren't doing it in direct response to the spill.

20  They were trying to prevent future spills, as I appreciate the

21  purpose of the moratorium.

22         MR. HERMAN:  Yes, Your Honor, that's correct as to part

23  of the purpose; but, part of the purpose was actually tied up in

24  fighting the spill itself and the actual -- that's why focusing

25  on the statutory language *due to damages to natural resources*,

1  that was an integral part of the moratorium because --

2          THE COURT:  Wait.  The moratorium was put in place to

3  respond to the spill, you said, the cleanup?  What did you say?

4          MR. HERMAN:  It's due to the damages that were caused to

5  the natural resources and other damages because the response

6  effort, in dealing with those damages, made it impossible to

7  conduct drilling in the area.

8          It's not like we have some unforeseeable

9  far-reaching thing where on-land drilling in Idaho is being

10 suspended.  We have suspension of deepwater drilling in the

11 Gulf of Mexico, which, I think, is -- we would contend is a

12 foreseeable consequence of an event like this, particularly given

13 MMS's statutory responsibilities.

14         At the very least, we would contend that this is

15 not ripe to be decided at the pleading stage, but should be

16 developed based on the facts.  I think we understand that the

17 Court is going to have to draw the line somewhere using various

18 different tools; but, looking at the legislative history, that

19 line should be, we contend, very expansive.

20         Any further questions --

21         THE COURT:  No.

22         MR. HERMAN:  -- on that issue?

23         THE COURT:  Thank you.

24         MR. HERMAN:  On the issue of presentment, very quickly,

25 Your Honor, we agree with the Court's observations regarding the

1   case management situation.  We, frankly, thought that that was

2   settled in PTO 25.

3          THE COURT:  I asked Mr. Langan this.  I'll ask you

4   directly.  If they are right on the law, the legal issue, how do

5   you suggest we handle this as a practical matter?

6          MR. HERMAN:  I want to answer the Court's question, so,

7   if they are right on the law, I don't think it would be

8   unreasonable at some point in time to put in a process by which

9   we try to determine what claims might be dismissed without

10  prejudice.

11         THE COURT:  I assume you acknowledge that there are

12  probably large numbers of claimants who have not complied with

13  presentment?

14         MR. HERMAN:  I think we would acknowledge that if we

15  were looking at OPA claims in a vacuum against a responsible

16  party, there are probably a number of OPA claims against a

17  responsible party for which presentment needs to be made.

18         THE COURT:  Do you also concede that it's a mandatory

19  condition precedent, in that you can't file the suit and then

20  say, now I'll go comply; you have to comply before you file suit?

21         MR. HERMAN:  I think in a vacuum we would agree with

22  that.  The complicating factor or why we disagree with their

23  argument is that it's focused on the jurisdiction of the Court

24  and --

25         THE COURT:  Well, whether it's jurisdiction or not, it's

1   a condition precedent, seems to be, that's their argument, and

2   you can't just waive it.  I can't just say I'll waive it.  I

3   can't stay the case and let you go comply.  It may, to a

4   layperson, and to some extent to me, not make a lot of sense.

5          The logical thing, to me, would be, just as a

6   practical way to handle it, is if somebody hasn't complied with

7   some exhaustive remedy -- we do this in another context.  We do

8   this sometimes in employment cases or civil rights cases.  They

9   haven't exhausted state remedies.  We can dismiss it without

10  prejudice, or we can stay it and let them go exhaust their

11  remedies and then come back.

12         It doesn't seem like that's feasible in this

13  context, whether it makes sense to us or not.  So I'm just trying

14  to get some help from both sides on how to address this.

15         MR. HERMAN:  Well, what I would suggest, respectfully,

16  the answer is that the Court clearly has jurisdiction, we would

17  submit, over the claims that are in limitation.  The claims have

18  been submitted in the limitation.

19         Now, the defendants are going to argue that not all

20  of those people have a cause of action.  It may turn out at the

21  end of the day that they don't have a cause of action, some of

22  them; but, the Court clearly has jurisdiction to entertain those

23  claims, and those are the claims that are going to be tried next

24  year.

25         In fact, Transocean has crossclaimed and/or 14(c)'d

1    BP, which happens to be the responsible party, in that limitation

2    action.  So we would suggest that even, arguably, in the

3    abstract, there might be some OPA claim against BP for which you

4    should have to make presentment.  That doesn't divest the Court

5    from the jurisdiction to entertain the limitation claim asserted

6    against Transocean and, by extension, either directly or

7    indirectly, against BP.

8              THE COURT:  Well, I'm not sure the other side disagrees

9    with what you just said, but it doesn't answer the question.  If

10   they are right on the law, how should I address that?  What would

11   be your suggestion?

12             MR. HERMAN:  I think our suggestion is that the Court

13   proceed with the trial over these claims and actions over which

14   the Court clearly has jurisdiction.  At some --

15             THE COURT:  Are you suggesting I just not rule on the

16   Rule 12 -- I mean, I've got to rule on the Rule 12 motions --

17   that I rule as a matter of abstract law, as you said, that this

18   is the law, and then we'll decide later who has complied and who

19   has not complied?  I'm just trying to understand.

20             MR. HERMAN:  I think, as a case management practice,

21   that is what I thought we were embarking on when we did CMO 11

22   and 25.  I thought the intent of the Court was to decide issues,

23   similar to, in the case of the limitation trial, the Court's --

24   from what I understand, the trial plan is to decide issues, and

25   it won't be plaintiff specific.

1        It would be an extreme waste, I think, of the

2   parties and judicial resources to try to go through right now

3   claims which may or may not have been presented, A, because that

4   might be a relevant issue in the context of jurisdiction to hear

5   their claim in limitation; and, B, it's likely a moot issue in

6   many cases because the cases, by the time Your Honor gets around

7   to determining whether there has been presentment, will have

8   either been settled, so it will be a moot issue, or presentment

9   will have been made.

10       THE COURT:  Then what do we do?  What do we do if they

11  have made presentment and their case hasn't been dismissed?  Do I

12  have to dismiss, and they come back the next day -- all of this

13  gets to be an exercise in futility at some point.  I'm trying to

14  figure the best practical way to address this.

15       I'll ask you all to continue, beyond the legal

16  issue, to think about how, from a practical case management

17  standpoint, to address this, okay?

18       MR. HERMAN:  Yes, Your Honor.

19       MR. ROY:  Your Honor, we have one other area we're going

20  to address.  Ms. Elizabeth Cabraser is going to address the

21  non-operator liability issue.

22       THE COURT:  Very well.

23       MS. CABRASER:  Thank you, Your Honor.

24  Elizabeth Cabraser for plaintiffs.

25       We wanted to just address briefly the issue of the

1   direct negligence claim against the Anadarko defendants.  We

2   understand that Anadarko defendants agree that as to the OPA

3   claim, one, some or all of the Anadarko entities were co-lessees

4   as of the important dates, so that OPA claim stands at this

5   point.  Under cases like Judge Fleming's decision in *Settoon*,

6   there is factual issues with respect to the dates and the

7   documents, and discovery is ongoing as to that.

8            As to negligence, though, this argument could be

9   characterized as the *Ainsworth* argument, but we think this case

10  is profoundly different and distinct from *Ainsworth* for two

11  reasons.

12           First, as you know, Your Honor, *Ainsworth* involves

13  Shell, as an independent contractor, hired someone to erect an

14  offshore rig.  There were unsafe conditions on the rig, and a

15  worker fell.  Even though Shell had a company man apparently

16  there on the rig, the Fifth Circuit held, analyzing independent

17  contractor law, there was no duty.

18       THE COURT:  We see those cases here routinely.  Either

19  platform cases or vessel cases where the lease owner, lease

20  operator, the oil company usually, they always have a company man

21  out there.  It's often not easy to get past that independent

22  contractor issue, so tell me how this case is different.

23       MS. CABRASER:  That's exactly right, Your Honor.  Those

24  are the routine cases.  They come before this Court and other

25  courts all the time.

1           This case is fundamentally different for two

2   reasons.  First of all, this is not simply a case where an oil

3   rig worker was killed or injured, although many were.  This case

4   goes far beyond those tragedies to foreseeable disasters to

5   business, property, the environment, all of the panoply and

6   categories of claims in the B1 complaint.  Those damages and

7   losses were foreseeable, given the circumstances of the operation

8   of that rig.

9           Secondly, this is not a situation where we're

10  trying to impose vicarious liability for negligence on someone

11  who has hired an independent contractor.  Anadarko was a

12  signatory and member of a joint operating agreement.  There is an

13  operating agreement here.  There are issues about that agreement.

14  There are issues about what it meant.  There is ongoing discovery

15  with Anadarko representatives.  Those depositions are ongoing.

16          But, whatever it meant, it contains not only a lot

17  of the boilerplate that's contained in joint operating agreements

18  in the industry, it contains specific provisions which gave

19  Anadarko rights of control.  Did it have the day-to-day control?

20  No, it did not, but the case law does not require that type of

21  day-to-day control.  It simply requires some control, some

22  modicum of control.

23          Given the facts we had when we alleged our

24  B1 bundle complaint, we knew that there was access, we knew that

25  there was monitoring, we knew that there was realtime data.  Now

1    we're finding out in discovery that there was monitoring daily by

2    an Anadarko drilling engineer and reporting --

3            THE COURT:  What is it that the plaintiffs argue

4    Anadarko could have done or should have done that would have

5    prevented this casualty?

6            MS. CABRASER:  Your Honor, it appears now, under the

7    agreement -- and, again, there are factual issues involved in

8    this -- that Anadarko had, and this is not atypical, it had

9    voting rights, it had authorization rights.

10           For example, Anadarko signed off on temporarily

11   abandoning the rig.  Anadarko was later on consulted about how to

12   kill the well and was involved actively in decisions about what

13   methodologies to use.  Of course, given its 35 percent of the

14   profit interests, its common interest in those methodologies, it

15   voted its interest in working with BP to make that decision.

16   That is an allegation that is included, I think, in paragraph 474

17   of the B1 complaint.

18           So there was a modicum of right to control, more

19   than that, from the operating agreement.  This is not hiring an

20   independent contractor.  This is a joint operating agreement for

21   a 35 percent interest.

22           We also note in Footnote 5 of our Anadarko

23   opposition brief that Anadarko was considering this liability,

24   this percentage liability, and these responsibilities because it

25   provided it wasn't going to indemnify BP in case of gross

1  negligence.  So it knew that it had decision-making rights.  It

2  had control rights.  It had participation rights.  It could have

3  voted no on any of these procedures.  What would have happened

4  had it exercised those rights --

5           THE COURT:  Are you talking about --

6           MS. CABRASER:  -- we don't know.

7           THE COURT:  Are you talking about procedures that

8  occurred at or near, immediately preceding the casualty, or are

9  you talking about something that had gone on in the past?

10           MS. CABRASER:  I think both, Your Honor.  I think when

11  there were decisions to be made about procedures to be used,

12  Anadarko apparently had the right to a say.  That's one reason

13  why it had monitoring and access rights, and that's one reason we

14  assume that it actually was actively monitoring, through a

15  seasoned drilling engineer, what was going on on a daily basis on

16  the rig.

17           THE COURT:  Let me make sure I'm clear.  You're not

18  suggesting, or are you, that some engineer for Anadarko sitting

19  in an office somewhere was monitoring what was going on on the

20  rig and could and should have been alerted and should have called

21  the rig or e-mailed or texted somebody, the BP person on the rig,

22  to say, hey, guys, you've got to do something, this rig is about

23  to explode?  Is that what your argument is?

24           MS. CABRASER:  Well, Your Honor, based on ongoing

25  deposition testimony, that may, indeed, be the situation.

1          THE COURT:  But how would that have a causal connection?

2     I'm just thinking this through.  Did they have better information

3     or different information than the people on the rig had?

4          MS. CABRASER:  They may well have had better

5     information -- they may well have had better advice based on the

6     same information.  We know they had access to the same

7     information.

8               The point is, Your Honor, Anadarko -- these are not

9     passive -- Anadarko is not a passive investor or someone that

10    knows nothing about this business.  They know everything about

11    the business, just likes BP does, and they are agreeing to

12    coventure.  This is a joint venture with BP, we say.

13         THE COURT:  Are you saying they get a vote, they got

14    consulted -- not only consulted, but had a veto power of anything

15    BP decided to do?

16         MS. CABRASER:  Your Honor, I'm not sure if it could be

17    characterized as *a veto power*, but they certainly had the right

18    and the ability to advise, to vote, to instruct.  They had the

19    wherewithal to do it.  They were getting the data to do it.  They

20    had the right person actively involved to do that, that was not

21    only monitoring but reporting, either on a weekly or daily basis,

22    to Anadarko about what was going on out at the rig.

23              I think the point, Your Honor, is causation in this

24    case is extremely complicated and extremely convoluted.  Every

25    defendant has a different story about what caused what and what

1    could have, would have or should have happened.

2              I think the point here at the pleading stage, as

3    we're embarking on discovery, is that there was a right of access

4    and there was a right of control written into the documents, that

5    that right of control could have been exercised and, under

6    negligence law, should have been exercised.

7              If it had been exercised and it didn't make a

8    difference, then that would be a gold-plated defense for

9    Anadarko.  But I don't think it's right to say under negligence

10   law at the pleading stage that you can cut off a claim for

11   negligence when someone is saying, I just didn't do it, I didn't

12   speak up, I didn't not sign off, I didn't give different advice,

13   because looking back on it now, I just think it wouldn't have

14   made a difference.  I think we're entitled as plaintiffs to

15   explore that through discovery.

16             I think, given the fact that the Anadarko

17   defendants are in on OPA, the scope of discovery, as Your Honor

18   earlier observed, is precisely the same.  We're going to have the

19   same trial.  I think, since we're operating under an operating

20   agreement and not the *Ainsworth* independent contractor line of

21   cases, it certainly makes sense to view these claims through the

22   correct prism.

23             I will say this, Your Honor.  There is a line of

24   cases in the Fifth Circuit that's followed in the Fifth Circuit

25   and elsewhere that deal specifically with interpretation of

1  operating agreements, as joint venture, and dealing with

2  obligations that are created by rights of control, even a modicum

3  of rights of control.  Anadarko did not cite those cases.  We did

4  not cite those cases.  I apologize for not doing that.

5          The case that started these analyses is called

6  *Davidson v. Enstar Corp*.  It's at 848 F.2d 574.  It's from the

7  Fifth Circuit in 1987 or 1988, about the same time as *Ainsworth*.

8  We think it puts these claims as they've been pleaded, as they've

9  been elucidated by the operating agreement, and as they will

10  continue to be elucidated by discovery, in a different light.

11          Thank you.

12          THE COURT:  I'll take a look at that.  Thank you very

13  much.

14          MR. ROY:  Your Honor, one other point of clarification.

15  That is, on the issue of presentment, to be clear what the PSC's

16  position is, if, indeed, as Mr. Breit and Mr. DeGravelles have

17  articulated to the Court today and as has been articulated in our

18  papers, there, indeed, is a reserved state law claim or state law

19  claims, as well as maritime claims separate and apart from OPA

20  itself, if, indeed, there are these separate claims preserved

21  that were not taken away by the passage of OPA, then, to the

22  extent those claims do survive and do exist, it is the position

23  of plaintiffs very clearly that no presentment would be required.

24  That's obviously a decision someday, somehow, the Court, I'm

25  sure, will make.

1          That being said, we have nothing else, unless you

2     have questions.

3          THE COURT:  No, I do not.  Thank you.

4          MR. LANGAN:  Your Honor, it seems like a long time ago,

5     but I think I mentioned I might have 90 seconds of rebuttal.

6          THE COURT:  Okay.

7          MR. LANGAN:  The first point of clarification, vessel

8     versus facility, BP's position is that the *Deepwater Horizon*

9     meets the definition of a mobile offshore drilling unit under

10    OPA, 33 U.S.C. §§ 2701-18, which means, and I'm quoting now,

11    "means a vessel other than a self-elevating lift vessel capable

12    of use as an offshore facility."  So it's a vessel and a

13    facility.

14          I think it also meets the definition of an

15    Outer Continental Shelf facility under subsection 25.  So that's

16    our position.

17          THE COURT:  Okay.

18          MR. LANGAN:  Your Honor, with respect to the issue of

19    displacement and Mr. Breit's argument, the *Milwaukee II* case

20    makes it clear that you presume displacement.  You don't need a

21    clear statement.  He was mixing up preemption and displacement.

22    *Milwaukee II* says you presume displacement when you have a

23    comprehensive federal statute.

24          Your Honor, the only thing else I want to offer is

25    that on the proximate cause issue on the VoO claims, which I

1  think is something that came up after I spoke, the VoO claims

2  arise not from the oil spill.  They are not a result of the oil

3  spill.  They are not caused by the oil spill.  If they have a

4  claim at all --

5          THE COURT:  Do you distinguish between the contract VoO

6  cases --

7          MR. LANGAN:  Yes.

8          THE COURT:  -- and the tort VoO cases?

9          MR. LANGAN:  Yes, I certainly do, because the B3 tort

10  claims, response work injury claims, are not subject to OPA,

11  anyway.  So it's not really an OPA causation issue.

12          THE COURT:  True.

13          MR. LANGAN:  But the contract claims don't arise from

14  the oil spill.  They arise from a choice somebody makes to

15  participate in the VoO program.  So there is a causation issue,

16  they don't arise under OPA, and they're not subject to -- they

17  can't prove causation under OPA, under *Twombly* or anything else

18  for the VoO cases.

19          THE COURT:  Well, but they still have a contract claim

20  against you.

21          MR. LANGAN:  Oh, sure.  Oh, sure.  But they are not --

22  they are not properly brought under OPA.

23          THE COURT:  I see.

24              Where are we?

25          MR. LANGAN:  Your Honor, I think the next thing would be

1  to move on to B3.

2          THE COURT:  We're going to have to move things along.

3  We've gone 20 minutes over time on those arguments, which we're

4  going to need to compress the arguments on B3 and D1.

5              Who is going to argue on B3?

6          MR. LANGAN:  The clean-up responders are going to go

7  first on B3.

8          THE COURT:  See, a lot of people are losing interest

9  now, or they are just getting hungry, one of the two, or both.

10         MS. ALEXANDER:  We'll try to wake up the room,

11 Your Honor.  Mary Rose Alexander on behalf of Nalco.  I will be

12 arguing Nalco's motion to dismiss the B3 complaint.

13             I am going to spend my time this morning focusing

14 specifically on preemption and, even more specifically, on

15 conflict preemption and the conflict preemption of plaintiffs'

16 claims under the Clean Water Act and the National Contingency

17 Plan.

18             Plaintiffs allege -- they are all moving around,

19 but they allege in their complaint that the dispersants that were

20 actually used in the Gulf were too toxic, too dangerous to be

21 used in the manner they were used, in the amounts they were used,

22 in the waters they were used.  Indeed, they say too dangerous to

23 be used at all.

24             Yet, under the Clean Water Act, the United States

25 Congress determined that the United States President and his

1  delegates shall determine whether dispersants should be used,

2  which dispersants should be used, how dispersants shall be used,

3  in which amounts dispersants shall be used, and what water

4  dispersants shall be used safely.

5            Why?  Because the President of the United States is

6  required under the Clean Water Act to "marshal the necessary

7  resources to ensure the immediate and effective removal of the

8  oil."  Those are the words of the Clean Water Act.

9            Plaintiffs' allegations directly and specifically

10  conflict and are a roadblock to the Clean Water Act and that

11  federal regulatory regime.

12            THE COURT:  How so?

13            MS. ALEXANDER:  Excuse me?

14            THE COURT:  How so?  How is it a roadblock?

15            MS. ALEXANDER:  They are a specific roadblock,

16  Your Honor, because they directly conflict.  Plaintiffs allege

17  that the dispersants were too toxic, too hazardous, too

18  dangerous, but the Clean Water Act gives the President the

19  specific obligation and mandate to determine if dispersants

20  should be used, where they should be used, how they should be

21  used, the amounts they should be used, and in what waters they

22  can be used safely.

23            It is a specific obstacle, and the words of the

24  Supreme Court for obstacle preemption are helpful here,

25  Your Honor.  "Federal law preempts state law when it stands as an

1   obstacle to the accomplishment and execution of the full purpose

2   and objective of Congress."

3            Here, plaintiffs' claims are founded on the theory

4   that COREXIT is just too dangerous to be used in the amounts it

5   was used in the Gulf, but the President and his delegates, the

6   U.S. EPA and the federal on-scene coordinator, determined that it

7   was not, not too dangerous, not too toxic, not unsafe.

8            THE COURT:  How did he make that decision?  You're

9   talking about Admiral Thad Allen?

10           MS. ALEXANDER:  Yes.  The federal on-scene

11   coordinator --

12           THE COURT:  I don't know Thad Allen.  I don't know

13   anything about his background.  Maybe he's a chemist, for all I

14   know, but I doubt it.

15           How would he make that determination that this was

16   not -- obviously, he's got people working under him, but is he

17   not relying on what your client tells him or discloses to him?

18           MS. ALEXANDER:  Absolutely not, Your Honor.  Under the

19   Clean Water Act, the President's delegates, in this case the

20   federal on-scene coordinator, the U.S. EPA, and the others who

21   were part of the Unified Command, had the mandate to marshal all

22   the resources necessary to immediately and effectively address

23   the spill.

24           As a part of that mandate and as a part of the

25   resources they could marshal were dispersants, and the federal

1   government was to decide whether to use dispersants, which

2   dispersants to use, the amounts of dispersants to use, the

3   water --

4           THE COURT:  How was that determined?  I'm just trying to

5   understand the process here.  I know they are in a situation

6   where they are responding to a catastrophe here, but did somebody

7   with the government, did they test the dispersants?  Had they

8   already done that?  Are these dispersants on some approved list;

9   or, how does that come about?

10          MS. ALEXANDER:  I was just going to say that,

11  Your Honor.  The Clean Water Act requires that the President act

12  consistent with the National Contingency Plan, and the National

13  Contingency Plan sets outs a variety of details regarding the

14  different resources that the President can use, including the

15  dispersants.

16             Under the National Contingency Plan and the

17  Clean Water Act, the United States EPA must have a preapproved

18  list of dispersants.  It's a National Contingency Plan product

19  list.  COREXIT, which was used in the Gulf of Mexico in response

20  to the spill, at the request of the U.S. Coast Guard, the express

21  written request of the U.S. Coast Guard, was on that approved

22  list and has been on that approved list for decades.

23             So the federal on-scene coordinator had at his

24  disposal these resources, including dispersants, that he could

25  decide to use.  He made those decisions based on the products

1    that were already on the National Contingency Plan product list,

2    and he had the ability to make all the decisions.

3                The important fact, Your Honor, is not --

4          THE COURT:  He's making decisions on the scene, but

5    he's -- as I appreciate what was happening, he has to rely on

6    information and recommendations being made to him by people in

7    the industry.  Thad Allen is not an oil and gas industry person.

8    He's an admiral in the Coast Guard.  So who does he rely on to

9    make those decisions?  How does he make that?

10         MS. ALEXANDER:  He relies on the others who are

11   delegated by the President to make these decisions.

12         THE COURT:  Who are?

13         MS. ALEXANDER:  The U.S. EPA, who's decided which

14   products can be put onto the National Contingency Plan product

15   list.  The states who are involved, who had determined prior to

16   this accident that dispersants could be used in the

17   Gulf of Mexico in a response to a spill.  That had already been

18   predecided.

19              There were a number of different things that had

20   been predecided under this federal regulatory scheme to allow for

21   and prepare for a spill like this.  This, then, was a spill of

22   national significance, which put all of the decision-making into

23   the hands of the federal government.

24              The point that we're trying to make, Your Honor, is

25   that the allegations that the plaintiffs make about the product

1    being too dangerous or too toxic, too dangerous to be used at all

2    that they cite in the first page of their complaint, that every

3    single decision was ill conceived, these are the decisions that

4    the Clean Water Act places into the hands of the federal

5    government.

6              That is why the Clean Water Act and the federal

7    pervasive scheme are preempting state law, because if we were to

8    allow state and maritime law to determine that something is

9    illegal and unsafe, that the federal government says the

10   President shall determine are necessary and safe, then the

11   federal regulatory scheme can't work.  It's preempted.

12             THE COURT:  I understand your argument.  Thank you.

13             Do we have anybody else on this side?

14        MR. LYLE:  Good afternoon, Your Honor.  Michael Lyle on

15   behalf of O'Brien's Response Management, Inc., and

16   National Response Corporation, two of the clean-up responder

17   defendants in this case.

18             Your Honor, before the Court are our motions to

19   dismiss under 12(b)(1) and 12(b)(6).  The basis of our motions

20   are thoroughly outlined in the papers that the Court has told us

21   that it read.

22             There is one argument that we wanted to highlight

23   with the time that we have here today, and that is the doctrine

24   of derivative federal immunity.  We wanted to emphasize that one,

25   Your Honor, because that is dispositive of all of the claims

1   against the clean-up responder defendants.

2            The services that O'Brien's provided in the context

3   of clean-up, Your Honor, was to provide personnel who fit into

4   the federal structure that was responding to the clean-up.  NRC

5   provided containment equipment, booms and skimmers that were out

6   on the surface trying to contain the oil and clean it up.

7            As was already pointed out to the Court, this spill

8   was the first ever spill that was designated a spill of national

9   significance.  What that means then, Your Honor, is that a

10  structure is put in place by law, by operation of law -- that was

11  touched on previously -- which says that the National Contingency

12  Plan is activated, but it's activated in a -- I'll describe it as

13  *a plan on steroids*.

14           What happens is the federal government is put in

15  complete control of the clean-up because it's viewed as a spill

16  of such a magnitude, a spill that threatens the public health and

17  the environment in such a way that the federal government needs

18  to be in charge.  That's what happened here in this clean-up.

19  The government was in charge of all aspects.

20           The Unified Command was established, as the Court

21  knows and --

22           THE COURT:  What is it, exactly, that your client is

23  alleged to have done?  You were not like Nalco, selling the

24  dispersants, or were you?

25           MR. LYLE:  No, Your Honor.

1      THE COURT:  What were you doing?  Applying it?

2      MR. LYLE:  We were applying dispersants.  We were

3  providing personnel.  With respect to NRC, we provide skimming

4  equipment and booms; so, all of the boom, the miles of boom that

5  were laid out to contain oil.  We did in situ burning.

6      THE COURT:  So, as you understand the complaint, what is

7  it that they said your client did or did not do that constitutes

8  negligence?

9      MR. LYLE:  They accuse us, Your Honor, of improperly

10  applying dispersants.  They accuse us of, in the process of the

11  services that we were providing, that the boats that were

12  utilized as part of our response efforts, that those personnel

13  were not properly trained; and, as a result of that, they

14  suffered harm because they were exposed to oil and other

15  substances.

16      THE COURT:  The people working on your vessels suffered

17  harm?

18      MR. LYLE:  Vessels that were utilized in the response

19  plan that we were a part of, yes, Your Honor.

20      THE COURT:  So they are employees of your company?

21      MR. LYLE:  No, no, not our employees, but boats that

22  were utilized beyond the services that we provide.

23          So O'Brien's, as part of the federal structure,

24  would receive a command from the Unified Command Center, which

25  would then tell us, send these boats out on this situation, send

1    them out to these locations, have them burn the oil; or, skim

2    these, skim this section.

3              The people that were involved in that are claiming

4    that they were harmed as a result of exposure because they

5    weren't given respirators, they weren't properly trained on how

6    to use dispersants.

7         THE COURT:  Your argument is the federal government is

8    immune, so you're immune, essentially?

9         MR. LYLE:  Correct, Your Honor.  Yes, correct.

10             The immunity that we're talking about is because

11   they were in charge of all aspects of that response, from the

12   selection of the dispersants, as you heard, to where to put the

13   dispersants, to where to put the boom.  All of those things were

14   under the control of the federal government.  As a result of

15   that, we're entitled to the same immunity that they enjoy.

16        THE COURT:  Step by step?  In other words, you say your

17   client was directed precisely to put the boom here, don't put the

18   boom there, spray the chemicals here, don't spray them there;

19   there is no discretion exercised by your client?

20        MR. LYLE:  Daily, Your Honor, the Unified Command issued

21   instructions for every event that was going to take place on that

22   day.  They told us where to go, they told us where to put the

23   boom, they told us what to skim.  So every inch of boom that was

24   laid, every ounce of oil that was skimmed was under the

25   direction, supervision and control of the federal government.

1   Because of that, Your Honor, we're entitled to share derivatively

2   in the immunity that they enjoy.

3           The immunity that they enjoy is found at

4   33 U.S.C. § 1321(j)(8).  "They," I'm talking about the federal

5   government.  It says that the United States Government is not

6   liable for any damages arising from its actions or omissions

7   relating to any response plan required by this section.

8           The authority that we cite to the Court in support

9   of extending that immunity derivatively to us is found in the

10  *World Trade Center* litigation that we discussed in our papers,

11  which was decided by the Second Circuit.  The citation is *In re*

12  *World Trade Center Disaster Site Litigation*, 525 F.3d 969.

13          In the *World Trade Center* case, the facts are

14  remarkably similar to what we have here.  In the *World Trade*

15  *Center* case, after the towers collapsed, contractors,

16  construction contractors were brought in to clean up 14 stories

17  of debris that were left in the crater that was caused after the

18  attack.

19          At first it was a rescue mission, and then it

20  became a clean-up effort, just like what we have in this case,

21  Your Honor.  The contractors brought in equipment, they brought

22  in personnel, they brought in cranes, and they cleaned up the

23  site.

24          The allegations became that the 10,000 workers,

25  response workers, who were working at the site suffered a variety

1  of ailments, including respiratory illnesses, etcetera, because

2  they didn't have respirators and because they were exposed to

3  dust.

4          In that case, the responder defendants were then

5  sued by those 10,000 individuals who were the workers saying that

6  they were negligent in not providing a safe work condition, just

7  like what we have in this case.

8          What the Second Circuit did is it looked at

9  derivative federal immunity in the context of the Stafford Act,

10 which was invoked and was applicable in that incident.  In the

11 Stafford Act situation, the federal government enjoyed

12 discretionary function immunity.  In that kind of context, the

13 federal government is taking a back seat role.  It's providing

14 support, but it wasn't actually controlling the response.

15         Importantly, the contractors were not federal

16 contractors.  They had no contract with the government.  They

17 were not federal government employees.  They weren't federal

18 contractors.  They were independent contractors that were working

19 in collaboration with the City of New York.  The funding for the

20 effort and so on came from the federal government in connection

21 with the Stafford Act.

22         The Second Circuit extended derivatively immunity

23 that the federal government enjoyed under the Stafford Act to the

24 response.  The rationale for it was, if a federal agency orders a

25 private contractor or city agency to implement decisions made by

1   the federal agency in its discretion, we think that the interests

2   of the United States will be directly affected if the contractor

3   or city agency does not follow those orders for fear of

4   liability.

5           So what the Second Circuit said was we need

6   contractors to come.  We need them to come to the aid, we need

7   them to follow the instructions from the federal government, and

8   we need them to act without fear of liability, so we are going to

9   extend derivatively the immunity to them.

10           The same thing as in this case, Your Honor.

11   Actually, it's more compelling in our case because, number one,

12   the federal government was in charge.  Under the Clean Water Act

13   and under the National Contingency Plan, the federal government

14   is in charge, as opposed to the Stafford Act.

15           And, Your Honor, the same rationale applies here.

16   We needed the clean-up responders to come because there was a

17   threat to the public health.  There was a threat to the

18   environment.  They came and they cleaned up, and they needed to

19   be able to do so without fear of liability.  So the rationale

20   applies here in the case for derivative federal immunity,

21   Your Honor.

22           THE COURT:  I understand your argument.  Thank you,

23   Counsel.

24           MR. LYLE:  Thank you.

25           THE COURT:  We have somebody else?  We're really running

```
 1    out of time here.
 2              MR. LANGAN:  Your Honor, Andy Langan.
 3                 BP has briefed the B3 motion to dismiss; but,
 4    unless Your Honor has questions, I'll yield whatever time.
 5              THE COURT:  Thank you, Mr. Langan.
 6              MR. WEIGEL:  Your Honor, Alan Weigel from Marine Spill
 7    Response Corporation.  I will be brief, Your Honor.  I'll just
 8    address a couple of points that haven't been covered yet.
 9                 The first is the issue of savings clauses.  There
10    was a lot of discussion already this morning about U.S. v. Locke,
11    and our position is that U.S. v. Locke is directly on point here
12    and does not -- cannot be relied on by the plaintiffs to preserve
13    their claims against the responder defendants.
14                 The savings clauses only apply, as U.S. v. Locke
15    says, to Title I of OPA.  Title I of OPA is claims against
16    responsible parties.  MSRC and the responders are not responsible
17    parties.  There are no OPA claims against us; and, so, by that
18    logic, the savings clauses cannot be applied to save the
19    plaintiffs' claims against the responders.
20                 The second thing I'll address is the issue of the
21    citizen suit, the Clean Water Act.  The Clean Water Act citizen
22    suits also can't be relied on to preserve the plaintiffs' claims
23    from preemption.
24                 A citizen suit provision allows a citizen to bring
25    a suit against a polluter who violates an effluent standard or
```

1  who discharges oil or hazardous substances.  MSRC and the rest of

2  the responder defendants are not polluters who violated effluent

3  standards, and we didn't discharge hazardous substances.

4          Now, you heard Ms. Alexander talk about how the

5  plaintiffs --

6          THE COURT:  What was your client's role?  What were they

7  doing?

8          MR. WEIGEL:  Marine Spill Response Corporation had a

9  very similar role, although in a different aspect than O'Brien's

10  and National Response Corporation.  We provided vessels that did

11  skimming, that did in situ burning, and we also had control over

12  several subcontractors who operated aircraft who sprayed

13  dispersants.  We also did dispersant applications from some of

14  our vessels.

15          The heart of plaintiffs' claims against us are,

16  first of all, that we used a dispersant that we shouldn't have

17  used.  Ms. Alexander addressed that issue.  We were told to use

18  that dispersant by the federal government.  We had no choice.  We

19  had no discretion.  It was preapproved, predecided.

20          Twenty different federal agencies were involved in

21  the decision-making process to clean up the Gulf the way it was

22  cleaned up.  We were not involved in any of those decisions.  We

23  just implemented them, and we had no discretion to implement them

24  in any other way besides the way we were ordered to do.

25          Let me return now to the Clean Water Act.  The

1    Clean Water Act citizen suit provisions don't provide a basis for

2    a claim against any of the responders.  Aside from the fact that

3    there is a whole series of procedural requirements that the

4    plaintiffs haven't met if they are going to try and cast their

5    complaint as a Clean Water Act citizen suit, it's just illogical

6    to say that on the one hand we're going to hold you -- we're

7    going to try and claim that you're a polluter who discharged a

8    hazardous substance when, in the very same statute, it gives us

9    the obligation to use the chemical that they are saying we

10   discharged as a hazard substance.

11          Same statute, separate sections.  One talks about

12   the discharge of a hazardous substance, but then it talks about

13   the dispersant as an authorized chemical to use.  You can't have

14   one -- you can't bring a suit under one part of the statute when

15   the other part of the statute authorizes the act.  The

16   Clean Water Act doesn't give them -- it's just not a citizen

17   suit, and it doesn't give them the basis to have a citizen suit.

18          The third issue, Your Honor, is the fact that it is

19   true that the citizen suit provision is an express provision in

20   the Clean Water Act for a private cause of action, but that's as

21   far as the Clean Water Act goes.  There is no private cause of

22   action under the Clean Water Act.

23          The Court doesn't have to look any further than its

24   own case law to find that the claims against MSRC and the other

25   responders for damages-related response actions can't be brought

1    by private citizens.  The case I'm referring to is *Sekco Energy*

2    *v. M/V Margaret Chouest*.  In that case, Judge -- I apologize if I

3    mangle the name -- Livaudais.

4            THE COURT:  Livaudais.

5            MR. WEIGEL:  -- Livaudais -- thank you, Your Honor -- he

6    relied on a Supreme Court case, and that's *Middlesex County*

7    *Sewage Authority v. National Sea Clammers*.  There, the

8    Supreme Court held that Congress did not intend that there would

9    be private causes of action under the Clean Water Act.  They

10   don't have an express cause of action under the Clean Water Act

11   because the citizen supervision doesn't apply.

12          The *Sekco Energy v. Margaret Chouest* case is still

13   good law in this circuit, and it's good law to the extent it's

14   persuasive in other circuits everywhere.  It has not been

15   overturned.  So there is no express cause of action, and there is

16   no private cause of action.

17          The last point I'll make, very briefly, Your Honor,

18   is that we believe that the issues of preemption and immunity are

19   dispositive, that you don't have to go any further in this case

20   to find -- to dismiss the B3 complaint against MSRC and the

21   responders if you find for us in either one of those.

22          But, as an alternate argument, we have pointed out

23   to Your Honor that the facts that are pled by the B3 complaint

24   are completely inadequate to support the tort claims that are

25   asserted against us.

1          Each of the tort claims -- and there is five of

2    them that were asserted by the plaintiffs against the responder

3    defendants -- either one of them, there is a fatal flaw in their

4    pleading of each one of those in that in each one of them there

5    is at least one required element that is not pled at all.

6          I'm not going to go through the laundry list.  I

7    think we've addressed this issue in a very detailed fashion in

8    our brief.  We laid out all of the elements of each cause of

9    action.  We explained to Your Honor how -- which element was not

10   met.

11         But let me just give you one example to show you

12   what we believe is how far they have not gone to allege properly

13   what they have to for each cause of action.  Let's just take the

14   battery cause of action.

15         Under battery, under all of the laws that could

16   apply, any state law, if you applied state law, or if there is a

17   maritime cause of action for battery, a battery claim has to show

18   an intent to cause contact.  Now, while they say we intentionally

19   sprayed dispersants -- and there is no dispute about the fact

20   that we intentionally sprayed dispersants; we were ordered to --

21   there is no claim that we intended those dispersants to come in

22   contact with any person.  That makes the battery claim fatally

23   flawed.  It cannot stand.

24         The other claims, nuisance, gross negligence,

25   negligence, and negligence per se, all suffer from the same types

1    of flaws.

2                In conclusion, Your Honor -- I'm the last one to

3    speak on the defendants' side on this -- the responders, I think

4    it can be said that -- there is an old saying that no good deed

5    goes unpunished.  Well, that's exactly where the responders are

6    right now.

7                We came to the Gulf to help clean up the Gulf.  We

8    followed the government's orders to clean up the Gulf.  Now,

9    essentially, plaintiffs want you to second guess all of those

10   decisions and hold us liable for doing what we were asked to do

11   to help.  Again, no good deed goes unpunished.  You have an

12   opportunity, Your Honor, to change that.  Thank you.

13              THE COURT:  Thank you.  I understand your argument.

14              MR. ROY:  Your Honor, Robin Greenwald of the PSC will

15   give our response.  I think we can save five minutes of our

16   allocated time.  If we can, we would like to push that over to

17   the D1.

18              THE COURT:  We're going to have to wrap up in

19   16 minutes, so you can use that time any way you all care to.

20              MS. GREENWALD:  Your Honor, my colleagues now on the D1

21   are going to -- there's going to be tension.  So I live in

22   New York, so I can talk really fast, if that's okay, Your Honor.

23              THE COURT:  Pretend you're before the MDL Panel.  You

24   get two minutes.

25              MS. GREENWALD:  Good afternoon.

1          First of all, the Marine Spill Response point about

2    the Clean Water Act, I'm just going to dispense with that.  We

3    didn't sue them under the Clean Water Act, there is no citizen

4    suit against them under the Clean Water Act, so I'm not sure why

5    that argument was made at all.

6          THE COURT:  Do you agree that the federal government is

7    immune under the Clean Water Act for --

8          MS. GREENWALD:  Your Honor, the federal government is

9    immune under the Clean Water Act for its coordinating effort.

10         Listening to counsel today, one would think, if

11   they hadn't read the newspaper for the last year, that, frankly,

12   the BP entity and the other entities were sitting back waiting

13   with their hands folded, please, government, tell me what to do.

14   That factually couldn't be further from the truth.

15         For example -- I guess I'll move to responder

16   immunity first, then -- none of these contractors had privity of

17   contract with the government.  None of them.  They all worked for

18   BP.  They worked for the polluter.  They worked for the

19   responsible party under OPA.

20         Under OPA, the responsible party never, ever has

21   immunity.  So from where are they deriving immunity?  There is no

22   one from whom they derive immunity.

23         Counsel talked quite a bit about the *World Trade*

24   *Center* case.  In that case, the immunity is derived from the City

25   of New York and the federal government, so all the private

1   contractors, every one of them that counsel talked about, worked

2   for the City of New York.

3            The City of New York and the federal government

4   together were coordinating that disaster because, of course, it

5   was a terrorist attack.  There was no responsible party.  In that

6   case, all of the private contractors had privity of contract with

7   a governmental entity.  Every single solitary case that they

8   relied on *Yearsley*, *Boyle*, *Trevino*, *World Trade*, the Katrina

9   litigation and your case, Your Honor, the *Kadan* case, every

10  single one of those cases where derivative sovereign immunity was

11  applied, every time, the private contractor had a contractual

12  relationship with the government, because without that how could

13  they be ordered to do anything?  I mean, the government doesn't

14  have power over someone with whom they don't have contractual

15  authority.

16           For example --

17           THE COURT:  I don't know if this is their argument, but

18  I guess the government could order BP to do something, and they

19  are like a subcontractor of BP, carrying out the government's

20  instructions.

21           MS. GREENWALD:  Right, but then they can't derive

22  immunity from the federal government because BP, under the

23  Oil Pollution Act, can never -- as the responsible party, there

24  is a specific provision, and it's in our brief so I don't want to

25  waste the Court's time, but under the statute they can never have

1    immunity under any circumstances.

2              Responders can under limited circumstances, but

3    there is exceptions to that.  One, for personal injury, which

4    we -- our B3 cases, personal injury and medical monitoring.

5    Second of all, when there is gross negligence, you cannot have

6    it.

7              But, anyway, if it's derivative immunity, they

8    can't derive it from the polluter.  They can't derive it from BP.

9              For example, NRC is one example.  They were the

10   primary contractor for BP who ordered them to skim up to

11   471,000 barrels of oil per day if there is a worst-case scenario.

12   None of these orders came from the government.  To the extent

13   that's the argument they rely on, there are major disputed

14   questions of fact that cannot be resolved on this motion.

15             Can I quickly move to Clean Water Act preemption?

16   Because I do want -- this is both for B1 and B3, and I think

17   there is a very important distinction that has not been made

18   today.

19             THE COURT:  Okay.

20             MS. GREENWALD:  The *Ouellette* case, which is the basis

21   for so much of the Clean Water Act preemption, as Your Honor

22   noted, there was -- International Paper had a permit under the

23   Clean Water Act to discharge certain chemicals from the effluent

24   of its processing plant into Lake Champlain.  Residents of

25   Vermont, not the permit issuing state, said they had diminution

1    of property value because of the pollution that came from the

2    New York side of Lake Champlain to the Vermont side of

3    Lake Champlain.

4            The Court said under those limited circumstances

5    that the state law of Vermont, and Vermont only, was preempted

6    because of the permit process.  In that case, International Paper

7    had a permit to discharge what they were discharging, and they

8    were not in violation of that permit.

9            Here, on reply -- and I don't want to burden the

10   Court with extra paper, but I did bring a copy because,

11   interestingly, BP did not give this to you, but in its reply

12   brief it talks about general permit 2900000, and it wants the

13   Court to believe that this permit permitted them to spill the oil

14   from the bottom of the ocean of the Macondo well.

15           That is not what this permit is about.  This permit

16   is about the operations of the rig.  It deals with things like

17   incidental discharges of drilling fluid, drill cuttings, dock

18   drainage, produced water from the rig, well treatment fluids,

19   sanitary wastes.  There is not and never has been, ever, in any

20   federal statutory scheme under any environmental statute a permit

21   issued for the discharge of oil from a well, ever.  You cannot

22   get a permit for that, so, therefore, there can't possibly be

23   preemption from a permit that could never and never existed.

24           You asked the hypothetical to Mr. Langan, if the

25   spill had happened in Florida instead of out on the

1    Continental Shelf, would the preemption argument be any

2    different?  He said he wasn't sure.  I'm going to answer no,

3    because there is no permit for the activity here.  This is an

4    activity that is unpermitted, could never be permitted.

5             Just quickly, because I've probably used up too

6    much of my 16 minutes, with respect to defendant Nalco, the

7    case -- again, this is briefed in our brief, Your Honor.  I don't

8    want to take too much time -- but this case is no different than

9    the *MTBE* litigation where the government has a list of approved

10   dispersants, just like in the *MTBE* litigation there was a list of

11   approved oxygenates for gasoline; but, how that is used and the

12   obligation to disclose and warn of the risks of using those

13   chemicals is something that is left for choice.

14            There is nothing here, ever, that says that the

15   government said you must use COREXIT 9500 or that you must have

16   used 9527.  BP made that decision to use it.  In fact, there is

17   quite a bit of evidence that at some point EPA told them to stop

18   using COREXIT 9500 and 9527 because of its toxicity.

19            So there are a lot of facts that are involved in

20   many of the arguments you've heard this morning.  If you have any

21   specific questions, I'll answer them; but, in the interest of D1,

22   I don't want to take up any more time.

23            I'm sorry if I talked too fast, particularly to the

24   court reporter.

25            THE COURT:  No.  You did great.  Thank you.

1          MS. GREENWALD:  Thank you very much.

2          THE COURT:  Just fast enough that I could follow you.

3               Who's up next?

4          MS. ALEXANDER:  Your Honor, could I briefly address the

5    point that counsel made about the *MTBE* case and Nalco's argument?

6          THE COURT:  But you are using up your time on D1.  We're

7    down to nine minutes now, so what do you all want to talk about?

8          MS. ALEXANDER:  Counsel said that this is just like the

9    *MTBE* case, but, Your Honor, it's exactly not like the *MTBE* case.

10              In the *MTBE* case, the Court found that there was no

11   preemption, and the Court held, quote, "The program does not

12   mandate the use of MTBE."  Here, the Clean Water Act mandates

13   that the President shall determine which dispersants shall be

14   used, whether they shall be used, where they shall be used, in

15   what amounts they shall be used, and in what waters they will be

16   used safely.  It's not the province of state or maritime law to

17   challenge the decisions of the President who made the decision

18   that the use of dispersants here was necessary and safe.

19              Nalco had absolutely nothing to do with any of

20   those decisions.

21              Thank you.

22         THE COURT:  Thank you.

23         MR. LANGAN:  Your Honor, D1.  We better getting moving,

24   right?

25         THE COURT:  I think so.

1          MR. LANGAN:  Your Honor, just by way of background here,

2    this is the citizen suit stuff.  For context, we need to

3    remember, I think, Your Honor, that the United States of America

4    is fully engaged in this litigation.  They've brought claims.  BP

5    has answered those claims.

6          THE COURT:  Basically, we're talking about claims for

7    injunctive relief here, right, by citizen groups?

8          MR. LANGAN:  We absolutely are, Your Honor.

9          The point is, is that in terms of the legal

10   arguments we've raised, I just want to give that context because,

11   frankly, the citizen suits are no more than a distraction when

12   the government is already fully engaged.

13         The classic citizen suit situation is when you have

14   an ongoing problem, they give -- the government is not taking any

15   action, the citizens give notice, the 60-day period goes by and

16   there is still the problem, the citizens can come in and try to

17   get it corrected.

18         That is not this situation.  We have a government

19   that's completely engaged, has brought claims, has discussed

20   bringing more claims.  There is an NRD evaluation that's

21   unprecedented in its scope going on.  So there is just no need

22   for this distraction.

23         But, in terms of the legal arguments that we make

24   in our briefs, I just want to highlight a couple.  First of all,

25   in the master complaint under D1, there are claims brought

1  that make causes of action that don't exist.  Citizen suits do

2  not lie to enforce Section 311 of the Clean Water Act, so the

3  second and fifth claims for relief have to go out because there

4  is no such thing as a citizen suit.

5       THE COURT:  Your fundamental argument is that this is

6  all moot because the well has been killed and there is no ongoing

7  violation?

8       MR. LANGAN:  That is also true, Your Honor.

9       THE COURT:  I sensed that's your basic argument.

10       MR. LANGAN:  There is more, but let's focus on this.  I

11  think it's a fact that the Court can take notice of, that the

12  well was sealed on July 15th and permanently killed and declared

13  such in September.

14       THE COURT:  So what is there to enjoin, is the point?

15       MR. LANGAN:  There is nothing to enjoin.

16       THE COURT:  Let me hear from the other side.  Who is

17  going to argue this?

18       MR. ROY:  Charlie Tebbutt, Your Honor.

19       MR. TEBBUTT:  Charlie Tebbutt, Your Honor.

20       THE COURT:  What is there to enjoin?  What do you want

21  me to enjoin here?

22       MR. TEBBUTT:  The activities in the clean-up.  You have

23  equitable relief.  You have injunctive and remedial capabilities.

24       THE COURT:  There is not an ongoing release or anything.

25  Be very precise.  What would you like me to enjoin?  I have a

1    hard time understanding --

2              MR. TEBBUTT:  We will get to that at a later point.

3              THE COURT:  No, no.  Get to it right now.  What should I

4    enjoin?  I'm not trying to make light of this, but what should I

5    enjoin?

6              MR. TEBBUTT:  Nor am I, Your Honor.  The remedial relief

7    here that is critical --

8              THE COURT:  What do you want me to enjoin?

9              MR. TEBBUTT:  -- there are still tens of millions,

10   hundreds of millions of gallons of oil --

11             THE COURT:  What do you want me to enjoin?

12             MR. TEBBUTT:  To enjoin and to remedy the pollution that

13   remains in the Gulf of Mexico.

14             THE COURT:  Isn't that ongoing?  What could I order that

15   would give any relief to what's already ongoing here?

16             MR. TEBBUTT:  Again, that's what I say, it depends on

17   what happens --

18             THE COURT:  The well is dead.

19             MR. TEBBUTT:  The well is potentially dead.

20             THE COURT:  No, it's not potentially dead.  What

21   evidence do you have it's potentially dead?  It's dead.

22                  Now, I think your argument is they could go back

23   and try to redrill in that reservoir, right?

24             MR. GONZALEZ:  Your Honor, if I may assist,

25   Ervin Gonzalez.

1          From a mandatory injunction perspective, the Court

2   can order that clean-up -- appropriate clean-up be issued.  The

3   damage is ongoing until the appropriate clean-up is issued, and

4   that's the problem.  The Court has equitable powers to have a

5   mandatory injunction to require the appropriate type of workup to

6   save the environment, and that's what we're requesting.

7          THE COURT:  How would I know what the appropriate

8   clean-up is that's not already being done?

9          MR. GONZALEZ:  It's not for today, Your Honor.  Today,

10  the pleading --

11         THE COURT:  I hope not because we're about to go to

12  lunch, I can tell you.

13         MR. GONZALEZ:  For today, all the Court needs to look at

14  is did we plead a cause of action?  We have.  What we're

15  requesting is a mandatory injunction --

16         THE COURT:  Mandatory injunction to require what --

17         MR. GONZALEZ:  Order the appropriate --

18         THE COURT:  -- that's not already being done?

19         MR. GONZALEZ:  It is not being done adequately or

20  appropriately, and the environment is suffering and individuals

21  are suffering.

22          Moreover, Your Honor, at the appropriate time,

23  evidentiary hearings can be set forth where the experts can

24  educate the Court, who sits as the legal finder and fact finder

25  on these issues.  That's our position, Your Honor.

1                    Thank you, Your Honor.

2          MR. TEBBUTT:  The mootness question does not come up in

3    this context for that reason.

4          THE COURT:  Thank you.

5          MR. BUPPERT:  Your Honor, my name is Greg Buppert.  I

6    represent Defenders of Wildlife.  I'm in the unusual position of

7    having the last word for the plaintiffs.

8                    We brought the *Endangered Species Act* case.  The

9    purpose of bringing our case, our citizen suit, was a backstop to

10   the government process.  We have no assurance that the damage to

11   the specific species we've identified in that case will be

12   remedied or restored.

13                   These are noncommercial species.  Historically,

14   they have been overlooked, and they are threatened with

15   extinction.  That's the purpose of our case.

16                   In terms of the Court's questions about the well

17   being dead, the ESA, Endangered Species Act, is not linked to a

18   discharge.  It's linked to the take of endangered species.  That

19   means to harm, harass, pursue, wound, shoot, kill, hunt, capture

20   and collect.  We've alleged in our complaint that those effects,

21   that take of endangered species, is ongoing.  Therefore, we've

22   suggested remedial --

23         THE COURT:  Isn't that what the federal government is

24   doing, the state governments are doing?  Isn't that all ongoing?

25   What could you accomplish that they are not accomplishing?

1          It sounds like you're saying, well, they might not
2     do it right; they may not do it the way we would do it.
3          MR. BUPPERT:  Well, Your Honor, we sent our notice to
4     the federal government on May 25.  The federal government filed a
5     complaint, as the Court knows, in December specifically reserving
6     a right to bring an enforcement action under the Endangered
7     Species Act.  It hasn't done so, and it hasn't exercised its
8     right to intervene in our case.
9          The Natural Resource Damage Assessment process
10    involves multiple -- as the Court knows, multiple players.  There
11    is an enormous number of interests all competing for the same
12    settlement proceeds.  We have no assurance at this point whether
13    or not that process will actually restore --
14         THE COURT:  It's pretty speculative right now.  You're
15    surmising that somebody is going to do something you don't like
16    at some point in the future.  That's what this is about, it
17    sounds like.
18         MR. BUPPERT:  Your Honor, we're not surmising that
19    somebody will do something we don't like.  We're surmising that
20    impacts of these species won't be addressed, these specific
21    species, endangered species, listed in our complaint.
22         It's a question of fact, I think, not appropriate
23    for this stage of the litigation, whether or not that process
24    will address those species.
25         Thank you, Your Honor.

1         THE COURT:  Okay.

2         MR. WALTZER:  Your Honor, may I just add a word about

3   the role of the citizen suit?

4         THE COURT:  Thirty seconds.

5         MR. WALTZER:  My name is Joel Waltzer.

6             The roles of all the citizen groups and citizen

7   suits that you have seen is in part as a backstop, but it's also

8   because all of the laws and the case law envision a joint role,

9   partly for the government and partly for citizens with interest,

10  to enforce the environmental laws.

11            I'll just point out to you that it was also the

12  regulatory agencies' role to safeguard against the actual sinking

13  and offshore kind of OCS drilling.

14            So, you know, citizens have a valuable role.  There

15  are many, many cases where we are all envisioned and actually

16  work together to achieve the relief that we seek, either for the

17  endangered species or for the clean-up relief.

18            That's it.  Thank you.

19         THE COURT:  All right.  Thank you, everyone.  We'll take

20  these under advisement.

21            Everyone have a good day.  I hope you have time for

22  lunch before you meet with Judge Shushan.

23         (WHEREUPON, at 12:40 p.m., the proceedings were

24  concluded.)

25                           *    *    *

140

1                      REPORTER'S CERTIFICATE

2

3       I, Cathy Pepper, Certified Realtime Reporter, Registered

4   Merit Reporter, Certified Court Reporter of the State of

5   Louisiana, Official Court Reporter for the United States District

6   Court, Eastern District of Louisiana, do hereby certify that the

7   foregoing is a true and correct transcript, to the best of my

8   ability and understanding, from the record of the proceedings in

9   the above-entitled and numbered matter.

10

11

12                          *s/Cathy Pepper*

13                          Cathy Pepper, CRR, RMR, CCR
                            Certified Realtime Reporter
14                          Official Court Reporter
                            United States District Court
15                          Cathy_Pepper@laed.uscourts.gov

16

17

18

19

20

21

22

23

24

25

**0**

**04111** [1] - 5:7

**1**

**10** [1] - 12:24
**10,000** [2] - 118:24, 119:5
**10-MDL-2179** [1] - 1:6
**1000** [2] - 1:24, 6:18
**10003** [1] - 2:17
**1001** [1] - 8:5
**10153** [1] - 7:12
**10174** [1] - 6:22
**106** [1] - 10:21
**107** [1] - 10:22
**109** [2] - 10:23, 10:24
**11** [1] - 98:21
**1100** [1] - 4:7
**1130** [1] - 8:16
**114** [1] - 10:25
**11th** [1] - 24:2
**12** [2] - 98:16
**12(b** [1] - 59:14
**12(b)(1** [1] - 114:19
**12(b)(6)** [1] - 114:19
**1201** [1] - 5:18
**121** [2] - 11:1, 11:2
**1221** [1] - 5:14
**126** [2] - 11:3, 11:4
**12:40** [1] - 139:23
**13** [2] - 3:12, 10:5
**1300** [2] - 6:7, 7:9
**132** [2] - 11:5, 11:6
**1321(j)(8)** [1] - 118:4
**133** [1] - 11:8
**1331** [1] - 5:22
**1331(a)(1** [1] - 57:8
**1333(a** [1] - 54:11
**1333(a)(1** [1] - 51:1
**1333(a)(2** [1] - 57:20
**134** [2] - 11:9, 11:10
**1349** [1] - 68:19
**135** [1] - 11:11
**137** [2] - 11:12, 11:13
**139** [2] - 11:14, 11:15
**14** [2] - 10:6, 118:16
**14(c)'d** [1] - 97:25
**150** [1] - 77:14
**15th** [1] - 134:12
**16** [2] - 126:19, 131:6
**1601** [1] - 2:7
**1615** [1] - 6:7
**1665** [1] - 5:22
**17** [1] - 77:15
**1700** [1] - 5:18
**17TH** [1] - 8:16

**2**

**187,000** [1] - 14:15
**1987** [2] - 20:23, 106:7
**1988** [1] - 106:7
**1995** [1] - 24:2

**2** [4] - 72:20, 84:23, 85:3, 85:8
**20** [6] - 1:5, 12:23, 13:20, 59:5, 109:3
**200** [1] - 8:5
**2000** [2] - 22:25
**20005** [2] - 5:4, 7:9
**20006** [1] - 6:11
**2001** [1] - 60:13
**20036-4604** [1] - 8:17
**20044** [1] - 3:21
**2007** [1] - 6:5
**201** [1] - 7:23
**2010** [2] - 1:5, 92:16
**2011** [2] - 1:7, 12:2
**2020** [1] - 6:10
**20th** [2] - 59:7, 59:18
**2185** [1] - 8:19
**233** [1] - 7:19
**23510** [1] - 1:25
**2394-2** [1] - 89:10
**2394-3** [1] - 93:12
**25** [8] - 12:2, 29:3, 46:6, 46:7, 96:2, 98:22, 107:15, 138:4
**255** [1] - 2:20
**26** [1] - 1:7
**2615** [1] - 2:11
**2701-18** [1] - 107:10
**2713** [1] - 23:17
**2713(a** [1] - 25:18
**2718(a** [1] - 71:17
**2718(a)1** [1] - 23:5
**2718(c** [2] - 71:18, 84:17
**275** [1] - 2:14
**2751** [1] - 73:23
**2751(e** [1] - 73:23
**27708** [1] - 8:25
**2900000** [1] - 130:12
**2929** [1] - 7:15
**29TH** [1] - 2:14

**3**

**3** [1] - 73:24
**300** [1] - 4:24
**31** [1] - 10:7
**311** [1] - 134:2
**316** [1] - 2:4
**32502** [1] - 2:5

**33** [5] - 10:8, 23:17, 25:18, 107:10, 118:4
**33134** [1] - 2:21
**3450** [1] - 8:20
**35** [2] - 102:13, 102:21
**355** [1] - 6:13
**36013** [1] - 3:8
**36130** [1] - 3:25
**36604** [1] - 2:8
**3668** [1] - 1:17
**36TH** [1] - 4:7
**3715** [1] - 3:12

**4**

**4** [1] - 14:15
**40** [1] - 12:22
**4000** [1] - 6:18
**405** [1] - 6:22
**41,000** [1] - 29:1
**4160** [1] - 3:8
**42ND** [1] - 7:15
**43** [2] - 10:9, 68:19
**4400** [1] - 6:13
**45,000** [1] - 29:3
**450** [1] - 3:16
**4500** [1] - 5:14
**451** [1] - 8:12
**471,000** [1] - 129:11
**474** [1] - 102:16
**4800** [1] - 8:9

**5**

**5** [2] - 93:17, 102:22
**500** [4] - 3:24, 4:11, 8:20, 9:4
**5000** [1] - 4:21
**5000-foot-long** [1] - 62:5
**504** [1] - 9:5
**519** [1] - 2:23
**525** [1] - 118:12
**5395** [1] - 3:17
**546** [1] - 5:10
**556** [1] - 1:18
**56** [1] - 10:10
**574** [1] - 106:6
**5800** [1] - 7:19
**589-7779** [1] - 9:5
**59** [1] - 10:11

**6**

**6** [1] - 93:18
**60-day** [1] - 133:15
**600** [1] - 2:4

**601** [1] - 2:11
**60606** [1] - 7:19
**60654** [1] - 4:25
**618** [1] - 3:4
**655** [1] - 5:4
**67** [1] - 10:12
**68** [1] - 10:13
**689** [2] - 25:16, 30:7
**69** [1] - 89:20

**7**

**70** [1] - 10:14
**700** [1] - 2:17
**70058** [1] - 3:12
**701** [2] - 4:20, 8:9
**70112** [1] - 6:7
**70113** [1] - 1:21
**70130** [3] - 2:11, 5:11, 9:4
**70139** [2] - 4:21, 8:9
**70163** [1] - 4:8
**70170** [1] - 7:24
**70502** [1] - 1:18
**70505** [1] - 8:5
**70726** [1] - 2:24
**70801** [1] - 3:5
**711** [1] - 4:11
**74** [1] - 89:21
**75270** [1] - 5:19
**7611** [1] - 3:21
**767** [1] - 7:12
**77002** [3] - 4:11, 6:18, 8:21
**77010** [2] - 5:14, 5:22
**77019** [1] - 7:16
**79** [1] - 10:15
**7TH** [1] - 3:17

**8**

**80** [1] - 10:16
**807** [1] - 93:7
**820** [1] - 1:21
**848** [1] - 106:6
**88** [2] - 10:17, 10:18

**9**

**9(h** [1] - 40:6
**9(h)** [2] - 40:2, 41:23
**90** [2] - 28:18, 107:5
**90-day** [1] - 23:21
**900** [1] - 7:9
**90071** [1] - 6:14
**90362** [1] - 8:24
**905(b** [3] - 62:12,

**62:22, 77:3**
**94102** [1] - 3:17
**94111** [1] - 2:14
**9500** [2] - 131:15, 131:18
**9527** [2] - 131:16, 131:18
**959** [1] - 93:7
**969** [1] - 118:12
**97402** [1] - 8:13
**99** [2] - 10:19, 10:20
**999** [1] - 1:24
**9:30** [1] - 1:7

**A**

**a)(1** [3] - 51:2, 51:20
**a)(2** [6] - 51:6, 51:12, 51:22, 54:14, 69:3, 69:4
**a)(2)** [1] - 51:1, 51:20
**A.M** [1] - 1:7
**abandoning** [1] - 102:11
**ability** [4] - 85:5, 104:18, 113:2, 140:8
**able** [5] - 19:14, 19:16, 28:25, 58:6, 120:19
**aboard** [1] - 66:5
**above-entitled** [1] - 140:9
**ABRAMSON** [1] - 2:9
**absence** [1] - 48:1
**absent** [2] - 18:16, 24:4
**absolutely** [7] - 16:9, 37:24, 59:24, 69:5, 111:18, 132:19, 133:8
**abstract** [3] - 53:25, 98:3, 98:17
**accept** [2] - 19:17, 74:24
**accepted** [1] - 14:12
**accepting** [1] - 48:4
**access** [6] - 46:22, 47:1, 101:24, 103:13, 104:6, 105:3
**accident** [2] - 61:17, 113:16
**accomplish** [1] - 137:25
**accomplishing** [2] - 44:25, 137:25
**accomplishment** [1] - 111:1
**accuse** [2] - 116:9, 116:10
**achieve** [1] - 139:16

**acknowledge** [4] - 15:6, 38:1, 96:11, 96:14
**acknowledged** [1] - 40:6
**act** [10] - 73:4, 74:8, 74:14, 76:3, 83:4, 84:19, 85:4, 112:11, 120:8, 123:15
**Act** [70] - 14:10, 16:13, 16:14, 20:22, 21:3, 21:5, 21:23, 22:11, 22:18, 23:2, 38:23, 38:24, 39:20, 39:25, 61:8, 62:11, 62:21, 62:22, 73:6, 74:3, 76:3, 77:1, 77:23, 81:25, 82:17, 88:3, 93:15, 109:16, 109:24, 110:6, 110:8, 110:10, 110:18, 111:19, 112:11, 112:17, 114:4, 114:6, 119:9, 119:11, 119:21, 119:23, 120:12, 120:14, 121:21, 122:25, 123:1, 123:5, 123:16, 123:20, 123:21, 123:22, 124:9, 124:10, 127:2, 127:3, 127:4, 127:7, 127:9, 128:23, 129:15, 129:21, 129:23, 132:12, 134:2, 137:8, 137:17, 138:7
**action** [26] - 30:22, 40:22, 40:25, 41:10, 62:11, 62:20, 64:7, 64:10, 92:12, 97:20, 97:21, 98:2, 123:20, 123:22, 124:9, 124:10, 124:15, 124:16, 125:9, 125:13, 125:14, 125:17, 133:15, 134:1, 136:14, 138:6
**ACTION** [1] - 1:6
**actions** [5] - 38:12, 72:18, 98:13, 118:6, 123:25
**ACTIONS** [1] - 1:9
**activated** [2] - 115:12
**actively** [3] - 102:12, 103:14, 104:20
**activities** [6] - 45:11, 45:19, 51:7, 52:9, 54:11, 134:22

**activity** [6] - 21:6, 30:16, 54:1, 87:25, 131:3, 131:4
**acts** [1] - 84:22
**actual** [3] - 46:14, 94:24, 139:12
**add** [2] - 55:3, 139:2
**addition** [4] - 40:17, 54:17, 92:1, 92:9
**additional** [5] - 40:18, 48:23, 55:16, 84:20
**address** [25] - 36:24, 44:4, 44:5, 48:11, 55:5, 67:24, 69:21, 69:22, 71:23, 75:24, 79:22, 88:2, 88:11, 97:14, 98:10, 99:14, 99:17, 99:20, 99:25, 111:22, 121:8, 121:20, 132:4, 138:24
**addressed** [10] - 12:15, 12:21, 39:14, 42:3, 57:20, 70:18, 83:12, 122:17, 125:7, 138:20
**addressing** [2] - 57:4, 83:10
**adequately** [1] - 136:19
**adjacent** [3] - 52:17, 57:20, 57:23
**administering** [1] - 31:18
**administrative** [1] - 25:17
**Admiral** [1] - 111:9
**admiral** [1] - 113:8
**Admiralty** [4] - 38:23, 38:24, 39:20, 61:7
**admiralty** [35] - 15:8, 15:25, 17:20, 38:18, 38:19, 39:14, 39:15, 39:18, 39:22, 39:23, 39:24, 40:4, 40:8, 40:10, 40:23, 41:4, 41:5, 62:23, 67:24, 68:25, 69:11, 69:12, 69:22, 71:18, 72:18, 72:20, 73:24, 73:25, 74:3, 74:5, 77:1, 84:12, 84:13, 85:10
**admit** [3] - 19:10, 90:22, 92:9
**adopt** [1] - 54:11
**adopted** [2] - 31:23, 69:2
**advanced** [1] - 18:21
**advice** [2] - 104:5, 105:12

**advise** [1] - 104:18
**advisement** [1] - 139:20
**advocating** [1] - 66:24
**affect** [9] - 24:20, 42:6, 72:2, 72:17, 74:3, 74:15, 74:21, 84:19, 85:5
**affected** [4] - 38:20, 76:4, 89:3, 120:2
**affectionately** [1] - 58:2
**Africk** [2] - 86:11, 86:16
**afternoon** [2] - 114:14, 126:25
**agencies** [1] - 122:20
**agencies'** [1] - 139:12
**agency** [4] - 119:24, 119:25, 120:1, 120:3
**ago** [2] - 58:9, 107:4
**agree** [27] - 14:23, 18:10, 24:8, 25:22, 26:4, 26:14, 28:5, 28:6, 30:18, 35:2, 36:12, 40:1, 40:7, 42:25, 49:2, 51:16, 55:1, 55:17, 56:16, 56:20, 56:24, 63:13, 68:11, 95:25, 96:21, 100:2, 127:6
**agreeing** [2] - 27:20, 104:11
**agreement** [11] - 45:8, 45:12, 45:15, 101:12, 101:13, 102:7, 102:19, 102:20, 105:20, 106:9
**agreements** [2] - 101:17, 106:1
**ahead** [5] - 34:23, 36:10, 56:14, 70:10, 70:20
**aid** [1] - 120:6
**ailments** [1] - 119:1
**Ainsworth** [11] - 44:8, 47:19, 47:23, 48:12, 50:7, 54:19, 100:9, 100:10, 100:12, 105:20, 106:7
**AIRBORNE** [1] - 8:3
**aircraft** [1] - 122:12
**akin** [1] - 37:18
**AL** [3] - 2:8, 3:8, 3:25
**ALABAMA** [1] - 3:23
**Alan** [2] - 56:13, 121:6
**ALAN** [6] - 5:21, 6:21
**alerted** [1] - 103:20
**Alex** [2] - 81:5, 86:8

**ALEXANDER** [11] - 7:18, 109:10, 110:13, 110:15, 111:10, 111:18, 112:10, 113:10, 113:13, 132:4, 132:8
**Alexander** [3] - 109:11, 122:4, 122:17
**ALEXANDER.............**
**..........................** [2] - 10:24, 11:5
**ALHAMBRA** [1] - 2:20
**aligned** [1] - 50:23
**ALL** [1] - 1:9
**allegation** [6] - 25:19, 30:3, 30:6, 46:25, 77:25, 102:16
**allegations** [7] - 25:6, 25:14, 46:12, 46:20, 110:9, 113:25, 118:24
**allege** [14] - 19:12, 19:13, 19:14, 40:23, 46:13, 46:15, 46:16, 46:22, 47:9, 47:11, 109:18, 109:19, 110:16, 125:12
**alleged** [19] - 26:9, 27:4, 27:5, 27:6, 28:1, 29:24, 29:25, 30:8, 36:1, 48:24, 58:18, 60:18, 61:19, 63:8, 92:3, 93:5, 101:23, 115:23, 137:20
**allegedly** [1] - 94:9
**alleges** [1] - 26:11
**alleging** [2] - 30:3, 44:14
**Allen** [3] - 111:9, 111:12, 113:7
**ALLEN** [3] - 3:6, 7:15, 8:20
**allision** [2] - 91:12, 91:14
**allocated** [1] - 126:16
**allot** [1] - 12:20
**allow** [7] - 29:14, 38:2, 64:1, 72:6, 82:1, 113:20, 114:8
**allowed** [3] - 74:22, 76:10, 83:19
**allows** [2] - 84:24, 121:24
**alternate** [1] - 124:22
**alternative** [1] - 30:3
**Amclyde** [4] - 61:12, 61:20, 66:18, 66:21
**amended** [2] - 59:3,

59:10
**America** [1] - 133:3
**AMERICA** [7] - 3:19, 4:13, 4:14, 4:15, 4:16, 4:18, 4:19
**AMERICAN** [1] - 2:10
**amount** [2] - 48:5, 73:11
**amounts** [6] - 109:21, 110:3, 110:21, 111:4, 112:2, 132:15
**ANADARKO** [2] - 6:3, 6:4
**Anadarko** [30] - 43:23, 44:17, 45:5, 46:4, 46:8, 48:14, 49:4, 49:11, 49:12, 100:1, 100:2, 100:3, 101:11, 101:15, 101:19, 102:2, 102:4, 102:8, 102:10, 102:11, 102:22, 102:23, 103:12, 103:18, 104:8, 104:9, 104:22, 105:9, 105:16, 106:3
**Anadarko's** [2] - 46:12, 57:5
**analogy** [1] - 81:15
**analyses** [1] - 106:5
**analysis** [21] - 19:25, 20:5, 20:7, 24:7, 28:23, 28:25, 40:24, 53:21, 53:25, 54:10, 55:2, 58:10, 60:2, 62:18, 63:8, 68:24, 80:22, 82:2, 87:13
**analytically** [1] - 20:11
**analyze** [2] - 29:1, 55:17
**analyzes** [1] - 53:15
**analyzing** [1] - 100:16
**anchored** [1] - 62:1
**AND** [4] - 3:10, 4:4, 6:5, 7:7
**ANDREW** [1] - 4:23
**Andy** [2] - 13:4, 121:2
**ANGELES** [1] - 6:14
**animal** [1] - 88:21
**answer** [10] - 22:4, 61:19, 80:19, 81:7, 87:16, 96:6, 97:16, 98:9, 131:2, 131:21
**answered** [2] - 82:4, 133:5
**anyway** [3] - 36:24, 108:11, 129:7
**apart** [2] - 43:10, 106:19

**Apex** [4] - 81:12, 81:23, 81:24, 85:24
**apologize** [2] - 106:4, 124:2
**Appeal** [1] - 85:21
**Appeals** [2] - 61:12, 70:6
**APPEARANCES** [9] - 1:14, 2:1, 3:1, 4:1, 5:1, 6:1, 7:1, 8:1, 9:1
**appellant** [1] - 70:5
**applicability** [1] - 63:10
**applicable** [5] - 41:20, 57:13, 60:3, 63:4, 119:10
**application** [8] - 16:8, 39:24, 52:20, 56:18, 57:7, 57:23, 69:12, 69:17
**applications** [1] - 122:13
**applied** [9] - 22:1, 44:9, 51:7, 52:2, 61:14, 90:7, 121:18, 125:16, 128:11
**applies** [19] - 14:9, 19:4, 22:4, 39:11, 40:15, 53:19, 54:4, 57:12, 58:11, 63:3, 63:13, 63:14, 64:13, 64:15, 66:22, 69:8, 82:7, 120:15, 120:20
**apply** [29] - 19:5, 21:15, 22:3, 34:4, 40:11, 44:12, 48:18, 48:21, 48:25, 51:22, 52:8, 53:10, 53:12, 53:23, 54:14, 58:22, 61:5, 61:13, 63:8, 66:23, 68:11, 77:22, 78:2, 78:8, 82:8, 121:14, 124:11, 125:16
**applying** [4] - 82:13, 116:1, 116:2, 116:10
**appreciate** [6] - 18:24, 41:14, 44:13, 63:19, 94:20, 113:5
**approach** [2] - 28:3, 50:20
**appropriate** [9] - 30:6, 48:10, 136:2, 136:3, 136:5, 136:7, 136:17, 136:22, 138:22
**appropriately** [1] - 136:20
**approval** [1] - 32:12
**approved** [5] - 112:8,

112:21, 112:22, 131:9, 131:11
**appurtenances** [1] - 67:16
**APRIL** [1] - 1:5
**area** [3] - 81:19, 95:7, 99:19
**areas** [3] - 51:2, 51:6, 54:14
**arguably** [4] - 46:1, 65:7, 91:20, 98:2
**argue** [10] - 13:12, 15:1, 19:24, 38:22, 70:13, 82:23, 97:19, 102:3, 109:5, 134:17
**argued** [1] - 23:14
**arguing** [11] - 13:19, 21:10, 44:17, 51:11, 62:7, 73:19, 73:21, 90:2, 90:3, 91:5, 109:12
**ARGUMENT** [1] - 1:11
**argument** [79] - 13:15, 13:18, 15:18, 15:25, 19:2, 20:8, 22:9, 22:13, 22:14, 22:15, 32:19, 35:9, 35:16, 35:18, 39:12, 41:24, 42:20, 44:19, 48:3, 48:15, 48:24, 49:2, 54:5, 56:7, 58:3, 58:8, 60:18, 62:6, 62:10, 63:16, 63:20, 63:22, 65:13, 65:16, 66:1, 66:6, 66:12, 66:14, 66:17, 67:2, 67:9, 68:4, 69:1, 69:6, 69:7, 70:3, 70:6, 70:7, 73:9, 75:3, 81:23, 82:24, 83:7, 85:21, 88:3, 88:5, 89:24, 94:14, 96:23, 97:1, 100:8, 100:9, 103:23, 107:19, 114:12, 114:22, 117:7, 120:22, 124:22, 126:13, 127:5, 128:17, 129:13, 131:1, 132:5, 134:5, 134:9, 135:22
**arguments** [18] - 12:9, 18:20, 20:13, 33:6, 44:4, 44:6, 48:17, 50:23, 56:17, 58:20, 58:25, 84:16, 109:3, 109:4, 131:20, 133:10, 133:23
**arise** [5] - 21:5, 108:2, 108:13, 108:14,

108:16
**arises** [1] - 20:22
**arising** [2] - 17:9, 118:6
**Article** [4] - 72:19, 84:23, 85:2, 85:7
**articulated** [2] - 106:17
**artificial** [3] - 51:23, 52:21, 53:1
**aside** [4] - 25:24, 36:12, 36:13, 123:2
**aspect** [1] - 122:9
**aspects** [3] - 44:6, 115:19, 117:11
**assert** [2] - 47:7, 92:9
**asserted** [3] - 98:5, 124:25, 125:2
**assertion** [1] - 67:17
**Assessment** [1] - 138:9
**assigns** [1] - 45:18
**assist** [1] - 135:24
**associated** [1] - 57:11
**assume** [3] - 78:21, 96:11, 103:14
**assumption** [1] - 52:25
**assurance** [2] - 137:10, 138:12
**attached** [12] - 31:20, 51:5, 51:21, 51:24, 52:2, 52:11, 52:21, 53:3, 54:12, 60:10, 62:4, 65:17
**attaches** [2] - 57:9, 57:12
**attack** [2] - 118:18, 128:5
**attempt** [5] - 45:3, 45:21, 47:19, 48:11, 72:9
**attempted** [1] - 58:15
**attempting** [1] - 76:17
**attention** [1] - 51:15
**ATTORNEY** [1] - 3:23
**attribute** [1] - 75:23
**atypical** [1] - 102:8
**audience** [1] - 59:24
**authorities** [1] - 37:25
**authority** [3] - 84:19, 118:8, 128:15
**Authority** [1] - 124:7
**authorization** [1] - 102:9
**authorized** [1] - 123:13
**authorizes** [2] - 23:5, 123:15
**avail** [1] - 58:15

**available** [10] - 31:19, 53:9, 54:25, 75:21, 79:15, 79:16, 80:14, 83:8, 85:14, 93:21
**AVENUE** [8] - 1:21, 2:23, 3:16, 3:24, 6:13, 6:22, 7:12, 7:23
**AVIATION** [1] - 8:7
**aviation** [1] - 83:18
**avoid** [1] - 45:23
**await** [1] - 23:20
**aware** [4] - 26:20, 33:10, 36:14, 37:1

# B

**B1** [38] - 10:6, 12:16, 12:21, 13:1, 13:5, 13:18, 14:1, 18:13, 19:1, 19:4, 19:7, 19:11, 20:21, 26:7, 30:10, 33:17, 33:24, 35:12, 36:16, 40:22, 48:18, 48:19, 54:25, 55:20, 56:16, 58:1, 59:5, 60:3, 60:5, 63:25, 64:16, 69:18, 80:11, 101:6, 101:24, 102:17, 129:16
**B3** [24] - 10:23, 12:16, 12:23, 48:18, 48:23, 55:21, 58:25, 59:2, 59:3, 59:5, 59:6, 88:3, 88:5, 108:9, 109:1, 109:4, 109:5, 109:7, 109:12, 121:3, 124:20, 124:23, 129:4, 129:16
**BABIUCH** [1] - 4:24
**background** [2] - 111:13, 133:1
**backstop** [2] - 137:9, 139:7
**Baker** [23] - 74:19, 75:2, 75:24, 79:5, 80:25, 81:2, 81:3, 81:6, 81:9, 81:22, 82:2, 82:16, 83:12, 83:24, 84:5, 84:25, 85:23, 85:24, 86:1, 86:4, 87:15
**balancing** [1] - 83:4
**BALDWIN** [1] - 7:22
**Barasich** [1] - 38:5
**Barbier** [1] - 70:8
**BARBIER** [1] - 1:12

**barge** [2] - 66:7, 91:13
**Barisich** [2] - 38:9
**BARR** [1] - 2:4
**barred** [1] - 75:15
**barrels** [1] - 129:11
**based** [10] - 38:9, 38:15, 47:25, 53:11, 54:1, 89:6, 95:16, 103:24, 104:5, 112:25
**basic** [2] - 39:12, 134:9
**basis** [8] - 24:15, 72:20, 103:15, 104:21, 114:19, 123:1, 123:17, 129:20
**BATON** [1] - 3:5
**battery** [5] - 125:14, 125:15, 125:17, 125:22
**BATTERY** [1] - 2:14
**Bay** [1] - 21:13
**BAYLEN** [1] - 2:4
**beachfront** [1] - 37:22
**bears** [1] - 40:3
**BEASLEY** [1] - 3:6
**became** [3] - 81:16, 118:20, 118:24
**BECK** [20] - 5:12, 5:13, 59:23, 60:23, 61:2, 61:9, 62:8, 62:14, 62:17, 62:24, 63:2, 63:7, 63:23, 65:1, 65:5, 65:15, 66:17, 66:22, 67:1, 67:4
**Beck** [3] - 56:3, 59:22, 67:14
**Beck's** [2] - 56:6, 67:9
**BECK........................
.................... [1] - 10:11
**becomes** [1] - 57:16
**BEFORE** [1] - 1:12
**begin** [2] - 60:4, 61:3
**beginning** [2] - 27:25, 58:21
**behalf** [4] - 13:18, 56:13, 109:11, 114:15
**belief** [1] - 29:2
**BEN** [1] - 8:4
**Benefiel** [1] - 93:3
**BERNSTEIN** [1] - 2:13
**best** [4] - 32:24, 46:10, 99:14, 140:7
**better** [5] - 94:18, 104:2, 104:4, 104:5, 132:23

**between** [8] - 45:17, 48:4, 51:19, 60:17, 72:22, 78:3, 88:20, 108:5
**beyond** [10] - 27:17, 34:11, 46:8, 54:4, 62:19, 83:5, 92:23, 99:15, 101:4, 116:22
**big** [1] - 60:16
**bigger** [1] - 56:3
**bill** [3] - 46:5, 72:19, 76:9
**billion** [1] - 14:15
**binding** [1] - 55:16
**BINGHAM** [2] - 6:9, 6:12
**BIOLOGICAL** [1] - 8:11
**bit** [5] - 17:2, 34:1, 39:14, 127:23, 131:17
**BLAIR** [1] - 8:12
**BLANK** [1] - 6:20
**blowout** [1] - 60:15
**boats** [3] - 116:11, 116:21, 116:25
**Boca** [1] - 24:2
**BOCKIUS** [1] - 6:16
**body** [1] - 48:6
**boil** [1] - 57:18
**boilerplate** [1] - 101:17
**bone** [1] - 60:16
**boom** [7] - 116:4, 117:13, 117:17, 117:18, 117:23
**booms** [2] - 115:5, 116:4
**BOP** [3] - 60:13, 67:12, 67:15
**bottom** [4] - 65:19, 65:20, 93:17, 130:14
**BOULEVARD** [1] - 8:12
**bounce** [2] - 89:2, 90:10
**BOUNDS** [1] - 2:6
**BOX** [4] - 1:17, 3:8, 3:21, 8:24
**Boyle** [1] - 128:8
**BP** [64] - 4:13, 4:14, 4:14, 4:15, 4:16, 4:17, 4:18, 13:18, 14:12, 15:5, 15:10, 15:15, 15:20, 16:16, 16:17, 17:8, 17:13, 20:20, 21:1, 21:22, 21:25, 22:5, 23:15, 23:19, 24:25, 25:2, 34:5, 34:12, 35:2,

40:7, 46:19, 46:21, 53:17, 53:22, 58:2, 58:15, 64:1, 64:2, 64:7, 64:19, 64:20, 71:3, 75:5, 78:12, 98:1, 98:3, 98:7, 102:15, 102:25, 103:21, 104:11, 104:12, 104:15, 121:3, 127:12, 127:18, 128:18, 128:19, 128:22, 129:8, 129:10, 130:11, 131:16, 133:4
**BP's** [10] - 14:2, 15:3, 16:19, 20:19, 22:15, 23:25, 27:24, 42:15, 55:2, 107:8
**BRANCH** [1] - 3:15
**BREIT** [20] - 1:23, 1:23, 70:15, 70:21, 73:10, 73:14, 73:20, 73:25, 74:9, 74:16, 77:2, 77:6, 77:9, 78:5, 78:10, 78:19, 79:2, 79:12, 79:15, 79:21
**Breit** [6] - 70:21, 73:8, 79:20, 80:3, 80:18, 106:16
**Breit's** [1] - 107:19
**BREIT**............................
............................ [1] -
10:14
**Brian** [2] - 67:25, 68:3
**BRIAN** [2] - 1:16, 2:4
**bridge** [1] - 91:12
**brief** [11] - 28:24, 32:20, 53:22, 56:12, 64:23, 102:23, 121:7, 125:8, 128:24, 130:12, 131:7
**briefed** [5] - 49:17, 50:3, 92:7, 121:3, 131:7
**briefing** [1] - 58:21
**briefly** [4] - 50:17, 99:25, 124:17, 132:4
**briefs** [4] - 32:25, 48:17, 59:8, 133:24
**bright** [3] - 18:18, 18:22, 89:8
**bright-line** [2] - 18:18, 18:22
**bring** [15] - 16:17, 21:7, 23:18, 29:19, 30:5, 31:13, 36:19, 52:16, 58:6, 121:24,

123:14, 130:10, 138:6
**bringing** [3] - 25:1, 133:20, 137:9
**brings** [2] - 23:12, 23:23
**broad** [1] - 68:19
**broader** [1] - 52:20
**broadly** [1] - 86:18
**BROADWAY** [1] - 2:17
**broke** [1] - 60:21
**brought** [19] - 14:1, 14:17, 14:18, 29:15, 48:20, 54:15, 54:18, 79:13, 79:14, 108:22, 118:16, 118:21, 118:22, 123:25, 133:4, 133:19, 133:25, 137:8
**BUILDING** [2] - 2:10, 6:21
**bundle** [16] - 12:21, 12:23, 12:24, 13:1, 18:13, 19:1, 19:11, 20:21, 26:7, 30:10, 59:9, 59:10, 59:11, 59:14, 80:11, 101:24
**bundles** [2] - 48:18, 56:16
**Buppert** [1] - 137:5
**BUPPERT** [4] - 8:16, 137:5, 138:3, 138:18
**BUPPERT**....................
............................ [1] -
11:13
**burden** [1] - 130:9
**BURLING** [1] - 5:6
**burn** [1] - 117:1
**burned** [1] - 32:4
**burning** [2] - 116:5, 122:11
**business** [3] - 101:5, 104:10, 104:11
**but-for** [15] - 30:19, 30:24, 31:10, 31:11, 31:23, 61:13, 66:22, 88:20, 88:24, 90:1, 90:4, 90:9, 90:12, 92:10, 94:15
**BY** [44] - 1:4, 1:16, 1:20, 1:23, 2:4, 2:7, 2:10, 2:13, 2:16, 2:20, 2:23, 3:3, 3:7, 3:11, 3:15, 3:20, 3:23, 4:6, 4:10, 4:19, 4:23, 5:3, 5:6, 5:10, 5:13, 5:17, 5:21, 6:6, 6:9, 6:13, 6:16, 6:21, 7:8, 7:11, 7:15, 7:18,

7:22, 8:4, 8:8, 8:12, 8:16, 8:19, 9:7, 9:7
**bypassed** [1] - 28:10

# C

**CA** [4] - 2:14, 3:17, 5:7, 6:14
**Cabraser** [2] - 99:20, 99:24
**CABRASER** [10] - 2:13, 2:13, 99:23, 100:23, 102:6, 103:6, 103:10, 103:24, 104:4, 104:16
**CABRASER**...............
............................ [1]
- 10:20
**CALLED** [1] - 12:4
**CALVIN** [1] - 2:23
**Cameron** [9] - 15:5, 53:17, 53:20, 56:1, 60:12, 63:17, 63:24, 64:1, 64:12
**CAMERON** [1] - 5:9
**Cameron's** [1] - 15:3
**cannot** [8] - 21:7, 64:12, 121:12, 121:18, 125:23, 129:5, 129:14, 130:21
**capabilities** [1] - 134:23
**capable** [1] - 107:11
**caps** [3] - 77:16, 83:8, 83:10
**capsized** [1] - 60:21
**capture** [1] - 137:19
**captured** [1] - 65:15
**care** [1] - 126:19
**CARL** [1] - 1:12
**CARONDELET** [1] - 5:10
**carries** [1] - 53:20
**carrying** [1] - 128:19
**carved** [1] - 37:6
**case** [186] - 16:20, 17:10, 17:18, 17:22, 18:5, 20:23, 21:14, 21:17, 22:2, 23:8, 23:19, 24:1, 24:2, 24:6, 24:7, 24:14, 24:20, 26:15, 27:1, 27:9, 27:11, 29:9, 31:14, 31:25, 32:12, 32:13, 35:2, 36:15, 36:16, 37:3, 37:5, 37:6, 37:7, 37:25,

38:5, 38:9, 38:19, 39:14, 39:17, 39:18, 39:25, 40:7, 40:14, 40:19, 40:20, 41:11, 41:14, 41:17, 41:20, 45:16, 48:2, 51:4, 55:3, 55:15, 56:19, 57:1, 57:21, 58:16, 60:4, 60:7, 60:14, 60:17, 60:24, 61:1, 61:12, 61:20, 63:12, 63:25, 64:2, 64:6, 64:9, 64:21, 66:15, 66:18, 66:21, 68:6, 69:12, 69:18, 70:24, 71:13, 71:14, 73:9, 73:12, 74:14, 74:17, 74:20, 75:15, 75:24, 78:3, 78:4, 78:6, 78:16, 81:4, 81:16, 81:17, 82:3, 85:22, 85:25, 86:2, 86:3, 86:7, 86:8, 86:10, 88:16, 89:2, 89:4, 89:7, 90:19, 91:3, 91:4, 91:8, 92:16, 92:17, 92:22, 93:4, 93:8, 94:5, 94:8, 96:1, 97:3, 98:20, 98:23, 99:11, 99:16, 100:9, 100:22, 101:1, 101:2, 101:3, 101:20, 102:25, 104:24, 106:5, 107:19, 111:19, 114:17, 118:13, 118:15, 118:20, 119:4, 119:7, 120:10, 120:11, 120:20, 123:24, 124:1, 124:2, 124:6, 124:12, 124:19, 127:24, 128:6, 128:7, 128:9, 129:11, 129:20, 130:6, 131:7, 131:8, 132:5, 132:9, 132:10, 137:8, 137:9, 137:11, 137:15, 138:8, 139:8
**case-by-case** [2] - 24:6, 24:14
**cases** [62] - 13:2, 16:23, 17:10, 17:11, 18:19, 20:1, 21:3, 25:7, 30:2, 31:15, 31:22, 31:23, 37:7, 37:15, 37:16, 37:17, 39:15, 47:19, 50:7, 50:8, 52:23, 53:22, 54:20, 55:17, 61:10,

74:22, 76:6, 76:16, 76:20, 78:1, 80:24, 81:1, 81:2, 81:4, 81:20, 85:18, 85:19, 86:9, 87:12, 87:22, 89:6, 89:7, 90:13, 97:8, 99:6, 100:5, 100:18, 100:19, 100:24, 105:21, 105:24, 106:3, 106:4, 108:6, 108:8, 108:18, 128:10, 129:4, 139:15
**casing** [3] - 66:5, 66:9
**cast** [1] - 123:4
**casualty** [3] - 80:15, 102:5, 103:8
**catastrophe** [1] - 112:6
**categories** [2] - 35:1, 101:6
**CATHY** [1] - 9:3
**Cathy** [2] - 140:3, 140:13
**cathy_Pepper@laed.uscourts.gov** [1] - 9:5
**Cathy_Pepper@laed.uscourts.gov** [1] - 140:15
**causal** [2] - 50:15, 104:1
**causation** [25] - 30:11, 30:14, 30:20, 30:24, 30:25, 31:2, 31:3, 31:10, 31:11, 31:23, 32:11, 88:25, 90:9, 90:11, 90:12, 90:15, 91:10, 92:4, 92:10, 94:3, 104:23, 108:11, 108:15, 108:17
**caused** [16] - 32:7, 38:25, 43:8, 60:19, 75:6, 77:16, 91:10, 91:11, 91:19, 91:20, 93:20, 94:17, 95:4, 104:25, 108:3, 118:17
**causes** [6] - 39:1, 40:22, 41:9, 61:7, 124:9, 134:1
**CCR** [2] - 9:3, 140:13
**Center** [6] - 116:24, 118:10, 118:12, 118:13, 118:15, 127:24
**CENTER** [4] - 5:13, 8:4, 8:11, 8:20
**CENTRE** [1] - 4:7

**CERCLA** [1] - 18:20
**certain** [6] - 46:22, 51:2, 64:13, 78:24, 87:16, 129:23
**certainly** [12] - 27:6, 27:19, 37:11, 69:14, 82:24, 87:9, 87:21, 90:17, 94:11, 104:17, 105:21, 108:9
**CERTIFICATE** [1] - 140:1
**CERTIFIED** [1] - 9:3
**Certified** [3] - 140:3, 140:4, 140:13
**certify** [1] - 140:6
**chain** [2] - 30:20, 50:15
**challenge** [1] - 132:17
**CHAMBERS** [1] - 7:14
**Champlain** [4] - 78:6, 129:24, 130:2, 130:3
**change** [3] - 72:23, 74:10, 126:12
**changed** [1] - 70:16
**changes** [1] - 34:2
**chapter** [1] - 17:24
**characterized** [2] - 100:9, 104:17
**characterizing** [2] - 45:24, 47:20
**charge** [5] - 115:18, 115:19, 117:11, 120:12, 120:14
**CHARLES** [3] - 7:23, 7:23, 8:11
**Charlie** [2] - 134:18, 134:19
**CHARLIE** [1] - 8:12
**charts** [1] - 58:21
**chemical** [2] - 123:9, 123:13
**chemicals** [4] - 38:12, 117:18, 129:23, 131:13
**chemist** [1] - 111:13
**CHICAGO** [2] - 4:25, 7:19
**choice** [9] - 40:14, 44:6, 44:11, 50:18, 52:3, 57:4, 108:14, 122:18, 131:13
**choose** [1] - 85:15
**Chouest** [2] - 124:2, 124:12
**CHRYSLER** [1] - 6:21
**Ciega** [1] - 24:2
**CIRCLE** [1] - 2:20
**Circuit** [35] - 18:14, 18:18, 24:2, 32:9,

32:12, 37:3, 37:8, 37:11, 37:12, 37:25, 38:3, 39:2, 40:13, 44:23, 45:16, 47:24, 48:6, 52:24, 61:11, 63:9, 81:18, 85:22, 90:18, 90:23, 91:3, 91:17, 93:4, 100:16, 105:24, 106:7, 118:11, 119:8, 119:22, 120:5
**circuit** [1] - 124:13
**Circuit's** [1] - 91:22
**circuits** [1] - 124:14
**circumstances** [5] - 51:22, 101:7, 129:1, 129:2, 130:4
**citation** [1] - 118:11
**cite** [10] - 55:17, 73:5, 78:2, 89:20, 90:13, 93:4, 106:3, 106:4, 114:2, 118:8
**cited** [5] - 32:12, 61:11, 70:25, 81:4, 86:3
**cites** [1] - 86:2
**citizen** [21] - 121:21, 121:24, 123:1, 123:5, 123:16, 123:17, 123:19, 124:11, 127:3, 133:2, 133:7, 133:11, 133:13, 134:1, 134:4, 137:9, 139:3, 139:6
**citizens** [5] - 124:1, 133:15, 133:16, 133:19, 139:14
**CITY** [1] - 2:17
**City** [4] - 119:19, 127:24, 128:2, 128:3
**city** [2] - 119:25, 120:3
**CIVIL** [2] - 1:6, 3:15
**civil** [2] - 72:18, 97:8
**Civil** [1] - 40:6
**claim** [52] - 14:3, 19:1, 23:14, 23:19, 23:20, 24:24, 27:16, 27:17, 28:13, 28:14, 33:18, 33:21, 34:3, 34:7, 34:14, 34:18, 35:16, 35:21, 35:22, 36:5, 40:3, 42:18, 45:24, 47:25, 48:20, 48:21, 48:22, 49:9, 54:25, 57:2, 59:16, 63:4, 71:17, 80:21, 98:3, 98:5, 99:5, 100:1, 100:3, 100:4, 105:10, 106:18,

108:4, 108:19, 123:2, 123:7, 125:17, 125:21, 125:22
**claimant** [3] - 23:23, 27:22, 36:5
**claimants** [9] - 14:15, 27:7, 35:1, 42:16, 59:15, 73:7, 83:1, 83:5, 96:12
**claimed** [2] - 43:15, 47:7
**claiming** [2] - 18:25, 117:3
**CLAIMS** [1] - 11:6
**claims** [145] - 12:16, 12:17, 14:14, 14:17, 14:18, 15:15, 16:10, 16:14, 16:15, 16:17, 17:12, 18:12, 19:4, 19:7, 19:11, 19:16, 20:20, 21:5, 21:7, 21:22, 21:25, 23:11, 24:5, 24:14, 25:3, 25:8, 26:9, 26:16, 26:20, 26:21, 26:23, 27:1, 27:25, 28:10, 28:12, 28:17, 29:15, 29:19, 31:12, 31:20, 32:10, 33:8, 34:21, 35:15, 37:10, 38:3, 38:18, 39:19, 40:2, 40:21, 41:6, 41:8, 42:20, 42:22, 42:23, 43:1, 43:2, 43:12, 44:9, 44:10, 48:9, 48:13, 48:16, 48:19, 48:24, 48:25, 49:3, 53:6, 53:9, 53:12, 54:15, 54:17, 54:21, 55:19, 55:20, 56:25, 57:19, 57:24, 58:2, 58:6, 58:16, 59:13, 62:11, 62:12, 62:21, 62:23, 62:25, 63:11, 64:1, 64:12, 64:16, 64:17, 71:18, 73:22, 77:1, 77:3, 77:4, 77:7, 77:9, 80:11, 92:10, 96:9, 96:15, 96:16, 97:17, 97:23, 98:13, 99:3, 101:6, 105:21, 106:8, 106:19, 106:20, 106:22, 107:25, 108:1, 108:10, 108:13, 109:16, 111:3, 114:25, 121:13, 121:15, 121:17, 121:19,

121:22, 122:15, 123:24, 124:24, 125:1, 125:24, 133:4, 133:5, 133:6, 133:19, 133:20, 133:25, 134:3
**CLAIMS...................** .... [1] - 10:23
**CLAIMS...................** ....... [1] - 10:6
**Clammers** [1] - 124:7
**clarification** [2] - 106:14, 107:7
**clarify** [3] - 15:17, 44:14, 72:19
**class** [3] - 38:12, 41:13, 82:25
**classic** [1] - 133:13
**clause** [7] - 17:17, 17:23, 22:19, 22:23, 22:24, 41:4, 76:22
**Clausen** [1] - 85:25
**clauses** [2] - 22:8, 22:25, 23:4, 23:10, 71:5, 84:12, 121:9, 121:14, 121:18
**clean** [21] - 94:18, 109:6, 114:16, 115:1, 115:3, 115:4, 115:6, 115:15, 115:18, 118:16, 118:20, 120:16, 122:21, 126:7, 126:8, 134:22, 136:2, 136:3, 136:8, 139:17
**Clean** [45] - 20:22, 21:2, 21:5, 21:23, 22:11, 22:18, 23:2, 76:3, 77:23, 81:25, 82:17, 88:3, 109:16, 109:24, 110:6, 110:8, 110:10, 110:18, 111:19, 112:11, 112:17, 114:4, 114:6, 120:12, 121:21, 122:25, 123:1, 123:5, 123:16, 123:20, 123:21, 123:22, 124:9, 124:10, 127:2, 127:3, 127:4, 127:7, 127:9, 129:15, 129:21, 129:23, 132:12, 134:2
**clean-up** [15] - 109:6, 114:16, 115:1, 115:3, 115:4, 115:15, 115:18,

118:20, 120:16, 134:22, 136:2, 136:3, 136:8, 139:17
**cleaned** [3] - 118:22, 120:18, 122:22
**cleanup** [1] - 95:3
**clear** [30] - 15:3, 15:10, 17:11, 20:19, 22:9, 27:9, 31:14, 33:25, 35:3, 42:17, 45:10, 48:8, 51:14, 53:11, 53:15, 54:8, 58:22, 67:12, 74:24, 76:17, 82:11, 83:3, 84:8, 85:12, 87:20, 93:12, 103:17, 106:15, 107:20, 107:21
**clearly** [14] - 28:7, 39:3, 75:12, 78:14, 78:16, 79:4, 84:9, 84:22, 90:15, 92:22, 97:16, 97:22, 98:14, 106:23
**Clement** [1] - 17:22
**CLERK** [1] - 12:7
**client** [6] - 60:12, 111:17, 115:22, 116:7, 117:17, 117:19
**client's** [2] - 44:5, 122:6
**close** [5] - 14:5, 50:25, 90:19, 90:21, 94:10
**closed** [2] - 93:25, 94:13
**closely** [1] - 50:23
**closer** [4] - 43:5, 90:4, 90:16, 90:17
**closest** [1] - 50:13
**closure** [1] - 92:20
**CLUB** [1] - 3:10
**CMO** [1] - 98:21
**CO** [1] - 7:18
**co** [1] - 100:3
**co-lessees** [1] - 100:3
**Coast** [7] - 31:15, 31:16, 31:24, 33:10, 112:20, 112:21, 113:8
**cohesive** [1] - 56:18
**collaboration** [1] - 119:19
**collapsed** [1] - 118:15
**colleagues** [1] - 126:20
**collect** [1] - 137:20
**collision** [2] - 76:25, 77:9
**Colomb** [1] - 67:25,

68:3
**COLOMB** [12] - 1:16, 68:1, 68:3, 68:8, 68:15, 68:22, 69:3, 69:5, 69:10, 69:20, 70:1, 70:12
**COLOMB.................. ......................... [1] - 10:13
**COLSON** [2] - 2:19
**combine** [2] - 85:9, 85:11
**coming** [1] - 49:25
**Command** [4] - 111:21, 115:20, 116:24, 117:20
**command** [1] - 116:24
**commend** [1] - 22:21
**comment** [2] - 37:23, 39:2
**comments** [2] - 28:21, 42:16
**commerce** [2] - 61:20, 61:22
**commercial** [8] - 37:2, 37:6, 37:13, 37:17, 41:15, 41:18, 83:18, 92:20
**Committee** [1] - 29:17
**common** [7] - 17:5, 50:11, 74:25, 75:22, 79:6, 82:7, 102:14
**companies** [1] - 93:6
**company** [4] - 100:15, 100:20, 116:20
**COMPANY** [3] - 4:14, 6:4
**compare** [1] - 45:15
**compelling** [1] - 120:11
**compensable** [1] - 31:21
**compensate** [1] - 87:24
**compensation** [1] - 73:4
**competing** [1] - 138:11
**complaint** [28] - 24:4, 25:15, 26:8, 26:11, 33:17, 33:25, 59:2, 59:3, 60:3, 60:6, 67:11, 67:18, 93:5, 101:6, 101:24, 102:17, 109:12, 109:19, 114:2, 116:6, 123:5, 124:20, 124:23, 133:25, 137:20, 138:5, 138:21

**complaints** [4] - 12:15, 26:8, 45:9, 46:12
**complete** [2] - 18:11, 115:15
**completely** [4] - 14:24, 28:11, 124:24, 133:19
**compliance** [1] - 30:4
**complicated** [1] - 104:24
**complicating** [1] - 96:22
**complied** [13] - 26:12, 26:13, 27:7, 27:13, 27:22, 28:7, 28:17, 29:4, 34:12, 96:12, 97:6, 98:18, 98:19
**comply** [4] - 24:12, 96:20, 97:3
**components** [1] - 60:9
**comprehensive** [8] - 17:7, 18:3, 18:4, 22:6, 23:16, 34:25, 64:15, 107:23
**compress** [1] - 109:4
**COMPUTER** [1] - 9:7
**concede** [2] - 46:19, 96:18
**conceded** [1] - 46:21
**conceived** [1] - 114:3
**concentrated** [1] - 13:13
**conclude** [1] - 54:9
**concluded** [1] - 139:24
**concludes** [1] - 53:20
**conclusion** [5] - 52:1, 59:25, 67:1, 126:2
**concrete** [1] - 92:19
**condense** [1] - 56:7
**condition** [5] - 29:9, 55:13, 96:19, 97:1, 119:6
**conditions** [1] - 100:14
**condo** [1] - 37:22
**conduct** [4] - 45:11, 46:21, 46:23, 95:7
**conducted** [1] - 45:11
**conducting** [1] - 52:3
**confer** [1] - 28:5
**conference** [8] - 72:11, 72:13, 72:17, 72:22, 73:1, 74:9, 76:7, 76:8
**confident** [1] - 70:22
**conflated** [1] - 32:24
**conflating** [1] - 86:9
**conflict** [4] - 109:15,

110:10, 110:16
**confusion** [1] - 53:17
**Congress** [19] - 17:20, 36:4, 52:1, 52:7, 52:8, 52:19, 52:25, 72:2, 72:7, 75:14, 75:22, 75:23, 76:12, 82:23, 85:6, 85:13, 109:25, 111:2, 124:8
**Congressional** [5] - 76:2, 84:8, 84:22, 85:12, 87:20
**connection** [4] - 40:14, 43:6, 104:1, 119:20
**consequence** [3] - 35:11, 62:12, 95:12
**consequences** [4] - 15:9, 62:9, 63:21, 63:24
**consider** [1] - 13:14
**consideration** [1] - 52:16
**considered** [5] - 16:22, 23:9, 52:10, 61:22, 79:10
**considering** [2] - 82:18, 102:23
**consistent** [3] - 27:24, 52:18, 112:12
**consistently** [2] - 47:22, 61:11
**constitutes** [1] - 116:7
**Constitution** [2] - 84:23, 85:3
**construction** [1] - 118:16
**construed** [1] - 22:22
**consulted** [3] - 102:11, 104:14
**consuming** [1] - 13:1
**contact** [2] - 125:18, 125:22
**contain** [2] - 115:6, 116:5
**contained** [1] - 101:17
**containment** [1] - 115:5
**contains** [2] - 101:16, 101:18
**contend** [3] - 95:11, 95:14, 95:19
**contending** [1] - 69:8
**contention** [1] - 60:17
**contesting** [2] - 15:20, 63:19
**contests** [1] - 67:20
**context** [14] - 24:3, 48:5, 55:8, 81:8, 81:22, 97:7, 97:13,

99:4, 115:2, 119:9, 119:12, 133:2, 133:10, 137:3
**contexts** [1] - 30:2
**Continental** [12] - 14:9, 15:13, 17:5, 21:6, 52:9, 57:10, 60:8, 61:5, 61:16, 93:14, 107:15, 131:1
**Contingency** [9] - 109:16, 112:12, 112:13, 112:16, 112:18, 113:1, 113:14, 115:11, 120:13
**continue** [2] - 99:15, 106:10
**CONTINUED** [8] - 2:1, 3:1, 4:1, 5:1, 6:1, 7:1, 8:1, 9:1
**contract** [8] - 43:12, 45:17, 108:5, 108:13, 108:19, 119:16, 127:17, 128:6
**contracting** [1] - 43:9
**contractor** [14] - 45:1, 45:12, 45:18, 46:20, 100:13, 100:17, 100:22, 101:11, 102:20, 105:20, 119:25, 120:2, 128:11, 129:10
**contractors** [11] - 118:15, 118:16, 118:21, 119:15, 119:16, 119:18, 120:6, 127:16, 128:1, 128:6
**contractual** [2] - 128:11, 128:14
**contrary** [1] - 72:24
**contrast** [1] - 46:15
**contributed** [1] - 60:20
**contribution** [7] - 35:25, 36:9, 58:17, 64:3, 64:5, 64:8, 75:10
**control** [24] - 44:22, 45:13, 45:20, 45:22, 46:14, 46:16, 46:21, 48:1, 48:7, 101:19, 101:21, 101:22, 102:18, 103:2, 105:4, 105:5, 106:2, 106:3, 115:15, 117:14, 117:25, 122:11
**controlled** [3] - 51:3,

51:20, 68:6
**controlling** [2] - 14:25, 119:14
**controls** [1] - 40:16
**convenient** [1] - 29:11
**convoluted** [1] - 104:24
**coordinating** [2] - 127:9, 128:4
**coordinator** [4] - 111:6, 111:11, 111:20, 112:23
**copy** [1] - 130:10
**CORAL** [1] - 2:21
**COREXIT** [4] - 111:4, 112:19, 131:15, 131:18
**COREY** [1] - 3:24
**CORNER** [1] - 8:24
**Corp** [1] - 106:6
**Corporation** [4] - 114:16, 121:7, 122:8, 122:10
**CORPORATION** [5] - 4:15, 5:9, 6:3, 6:4, 6:20
**correct** [30] - 16:2, 16:5, 16:9, 32:9, 33:14, 33:16, 35:10, 35:19, 37:24, 44:15, 44:16, 45:7, 51:13, 54:6, 54:22, 55:10, 57:5, 60:21, 61:9, 62:8, 80:8, 92:18, 92:24, 93:1, 94:22, 105:22, 117:9, 140:7
**corrected** [2] - 39:4, 133:17
**costs** [1] - 46:6
**COTLAR** [1] - 1:20
**COUNSEL** [1] - 1:15
**counsel** [8] - 13:7, 13:10, 26:17, 127:10, 127:23, 128:1, 132:5, 132:8
**Counsel** [1] - 120:23
**country** [2] - 31:12, 37:17
**County** [1] - 124:6
**couple** [8] - 13:23, 27:3, 27:23, 28:21, 58:25, 60:1, 121:8, 133:24
**course** [18] - 13:14, 14:25, 15:9, 32:18, 32:25, 33:23, 34:17, 37:1, 39:4, 39:7, 39:10, 39:19, 47:14, 58:22, 81:16, 88:25, 102:13, 128:4

**court** [22] - 14:7, 14:18, 16:25, 25:2, 25:4, 25:19, 25:25, 28:1, 29:17, 30:4, 30:5, 30:6, 30:19, 35:23, 37:16, 70:5, 73:12, 74:1, 81:24, 82:5, 90:10, 131:24
**COURT** [266] - 1:1, 9:3, 12:4, 12:8, 12:12, 12:14, 13:6, 13:9, 13:22, 14:22, 15:8, 15:17, 15:20, 15:24, 16:3, 16:6, 16:10, 16:12, 18:24, 19:10, 19:21, 19:24, 20:5, 20:7, 20:12, 20:16, 21:9, 22:12, 24:6, 24:12, 24:17, 24:23, 25:7, 26:1, 26:4, 26:11, 27:6, 27:11, 28:3, 28:9, 28:16, 29:10, 29:21, 31:2, 31:25, 32:3, 32:7, 32:17, 32:23, 33:3, 33:13, 33:15, 33:20, 34:6, 34:10, 34:19, 34:23, 35:7, 35:15, 35:20, 36:10, 36:18, 36:24, 37:5, 38:8, 39:10, 40:10, 41:11, 41:17, 41:24, 42:3, 42:10, 42:22, 43:12, 43:17, 43:19, 43:21, 43:24, 44:1, 44:13, 44:17, 44:21, 45:5, 46:2, 46:25, 47:4, 48:13, 49:2, 49:7, 49:11, 49:15, 49:19, 49:22, 50:5, 50:21, 51:11, 51:16, 54:3, 54:7, 54:21, 54:23, 55:7, 55:11, 55:18, 55:23, 56:3, 56:14, 59:21, 60:18, 61:1, 61:6, 61:24, 62:9, 62:16, 62:19, 62:25, 63:5, 63:15, 64:23, 65:3, 65:8, 66:1, 66:20, 66:25, 67:2, 67:5, 67:14, 67:22, 68:2, 68:4, 68:9, 68:21, 68:24, 69:4, 69:7, 69:14, 69:24, 70:3, 70:13, 70:20, 73:8, 73:11, 73:19, 73:21, 74:2, 74:13, 76:25, 77:3, 77:8, 77:18, 78:6, 78:15, 78:23, 79:9, 79:13, 79:20, 79:25,

80:6, 80:10, 80:14, 82:22, 83:15, 86:9, 86:13, 86:16, 86:20, 87:4, 88:1, 88:6, 88:9, 88:18, 88:23, 89:14, 89:22, 90:5, 90:18, 90:21, 90:24, 92:17, 92:22, 92:25, 94:2, 94:7, 95:2, 95:21, 95:23, 96:3, 96:11, 96:18, 96:25, 98:8, 98:15, 99:10, 99:22, 100:18, 102:3, 103:5, 103:7, 103:17, 104:1, 104:13, 106:12, 107:3, 107:6, 107:17, 108:5, 108:8, 108:12, 108:19, 108:23, 109:2, 109:8, 110:12, 110:14, 111:8, 111:12, 112:4, 113:4, 113:12, 114:12, 115:22, 116:1, 116:6, 116:16, 116:20, 117:7, 117:16, 120:22, 120:25, 121:5, 122:6, 124:4, 126:13, 126:18, 126:23, 127:6, 128:17, 129:19, 131:25, 132:2, 132:6, 132:22, 132:25, 133:6, 134:5, 134:9, 134:14, 134:16, 134:20, 134:24, 135:3, 135:8, 135:11, 135:14, 135:18, 135:20, 136:7, 136:11, 136:16, 136:18, 137:4, 137:23, 138:14, 139:1, 139:4, 139:19
**Court** [106] - 13:25, 14:11, 15:21, 15:25, 20:1, 20:23, 22:25, 26:17, 29:23, 33:10, 36:14, 37:5, 37:10, 37:12, 38:2, 39:3, 39:21, 40:21, 41:9, 41:13, 44:3, 49:6, 50:16, 50:20, 52:24, 54:9, 54:10, 55:5, 55:16, 57:6, 58:9, 59:1, 59:4, 59:8, 59:19, 60:12, 61:10,

61:12, 62:15, 63:9, 65:11, 68:24, 70:4, 70:6, 71:10, 72:10, 73:15, 74:18, 74:20, 74:23, 75:2, 75:17, 75:19, 75:25, 76:5, 76:16, 84:24, 84:25, 85:7, 85:21, 85:25, 87:8, 87:11, 89:5, 89:10, 89:20, 92:15, 92:21, 93:9, 95:17, 96:23, 97:16, 97:22, 98:4, 98:12, 98:14, 98:22, 100:24, 106:17, 106:24, 110:24, 114:18, 114:20, 115:7, 115:20, 118:8, 123:23, 124:6, 124:8, 130:4, 130:10, 130:13, 132:10, 132:11, 134:11, 136:1, 136:4, 136:13, 136:24, 138:5, 138:10, 140:4, 140:5, 140:6, 140:14, 140:14
**Court's** [14] - 15:8, 17:10, 40:4, 51:14, 55:7, 61:13, 71:2, 71:6, 90:25, 95:25, 96:6, 98:23, 128:25, 137:16
**COURT........................ ........................** [1] - 11:15
**courts** [5] - 36:18, 37:1, 44:9, 81:19, 100:25
**coventure** [1] - 104:12
**cover** [2] - 57:21, 78:20
**covered** [7] - 17:21, 28:24, 35:15, 55:1, 61:7, 73:22, 121:8
**covering** [1] - 14:20
**covers** [1] - 68:22
**COVINGTON** [1] - 5:6
**crane** [1] - 61:21
**cranes** [1] - 118:22
**crater** [1] - 118:17
**create** [1] - 53:17
**created** [2] - 71:9, 106:2
**creates** [3] - 51:2, 51:6, 71:5
**crew** [1] - 66:5
**critical** [4] - 14:10, 23:17, 82:2, 135:7

**crossclaimed** [1] - 97:25
**CROW** [1] - 3:6
**CRR** [2] - 9:3, 140:13
**CUNNINGHAM** [2] - 2:6, 2:7
**cut** [1] - 105:10
**cutoff** [1] - 89:1
**cuttings** [1] - 130:17

## D

**D1** [16] - 11:6, 12:17, 12:24, 58:25, 59:9, 59:10, 59:11, 59:14, 59:17, 109:4, 126:17, 126:20, 131:21, 132:6, 132:23, 133:25
**daily** [4] - 102:1, 103:15, 104:21, 117:20
**DALLAS** [2] - 5:19, 8:20
**Damage** [1] - 138:9
**damage** [27] - 12:16, 19:4, 32:7, 36:16, 39:1, 42:16, 42:17, 43:8, 43:15, 61:7, 73:6, 77:1, 80:11, 80:17, 81:21, 82:19, 82:21, 83:6, 85:1, 85:21, 86:4, 86:24, 87:17, 92:1, 136:3, 137:10
**DAMAGE** [1] - 10:6
**damaged** [1] - 43:10
**damages** [39] - 17:21, 18:2, 18:5, 32:11, 35:6, 57:14, 73:4, 75:21, 79:23, 80:7, 80:22, 81:19, 81:25, 83:2, 83:8, 83:18, 83:22, 83:23, 85:17, 86:6, 86:21, 86:23, 86:25, 87:2, 87:3, 87:10, 87:19, 91:10, 91:11, 92:2, 92:14, 93:19, 94:25, 95:4, 95:5, 95:6, 101:6, 118:6, 123:25
**damages-related** [1] - 123:25
**dangerous** [7] - 109:20, 109:22, 110:18, 111:4, 111:7, 114:1
**data** [2] - 101:25, 104:19

**dates** [2] - 100:4, 100:6
**DAUPHIN** [1] - 2:7
**DAVID** [3] - 5:6, 5:13, 6:10
**David** [1] - 43:22
**Davidson** [1] - 106:6
**day-to-day** [2] - 101:19, 101:21
**days** [3] - 28:18, 60:21, 83:25
**DC** [5] - 3:21, 5:4, 6:11, 7:9, 8:17
**dead** [7] - 68:18, 135:18, 135:19, 135:20, 135:21, 137:17
**deadline** [1] - 59:7
**deal** [4] - 13:3, 26:25, 27:18, 105:25
**dealing** [5] - 52:10, 52:25, 53:3, 95:6, 106:1
**deals** [2] - 85:22, 130:16
**dealt** [4] - 26:15, 26:18, 38:12, 61:21
**death** [1] - 81:17
**DEBORAH** [1] - 6:6
**debris** [1] - 118:17
**decades** [1] - 112:22
**December** [1] - 138:5
**decide** [11] - 38:4, 54:4, 55:12, 80:23, 81:1, 92:8, 98:18, 98:22, 98:24, 112:1, 112:25
**decided** [13] - 16:25, 18:5, 25:4, 27:15, 73:13, 85:23, 86:5, 95:15, 104:15, 113:13, 118:11
**decision** [23] - 16:24, 27:9, 36:14, 59:7, 68:16, 73:3, 73:18, 74:19, 87:3, 87:14, 91:19, 91:22, 93:10, 100:5, 102:15, 103:1, 106:24, 111:8, 113:22, 114:3, 122:21, 131:16, 132:17
**decision-making** [3] - 103:1, 113:22, 122:21
**decisions** [15] - 31:19, 53:6, 102:12, 103:11, 112:25, 113:2, 113:4, 113:9, 113:11, 114:3,

119:25, 122:22, 126:10, 132:17, 132:20
**deck** [1] - 66:7
**declared** [1] - 134:12
**deed** [2] - 126:4, 126:11
**Deepwater** [11] - 15:6, 15:21, 51:4, 54:12, 57:22, 60:19, 60:24, 60:25, 65:6, 65:16, 107:8
**DEEPWATER** [3] - 1:4, 4:4, 4:5
**deepwater** [1] - 95:10
**defendant** [7] - 18:19, 75:6, 75:9, 75:16, 78:14, 104:25, 131:6
**defendants** [33] - 13:19, 19:24, 21:9, 22:12, 46:16, 63:12, 68:11, 72:9, 73:2, 73:12, 75:7, 75:8, 75:11, 76:15, 78:2, 78:13, 78:21, 80:25, 81:5, 82:22, 85:20, 90:13, 91:5, 97:19, 100:1, 100:2, 105:17, 114:17, 115:1, 119:4, 121:13, 122:2, 125:3
**defendants'** [2] - 35:9, 126:3
**DEFENDERS** [2] - 8:15, 8:15
**Defenders** [1] - 137:6
**defense** [1] - 105:8
**defer** [2] - 25:24, 27:16
**define** [1] - 31:2
**defined** [2] - 70:18, 83:8
**definition** [4] - 32:11, 44:22, 107:9, 107:14
**deGravelles** [3] - 79:22, 80:1, 106:16
**DEGRAVELLES** [13] - 3:3, 3:4, 80:1, 80:8, 80:13, 80:16, 83:11, 83:17, 86:12, 86:15, 86:18, 86:22, 87:5
**DEGRAVELLES........**
....................... [1] - 10:16
**delegated** [1] - 113:11
**delegates** [3] - 110:1, 111:5, 111:19
**Demette** [1] - 66:3
**DeMoss** [2] - 66:2, 66:10

**DeMoss'** [1] - 66:18
**DENHAM** [1] - 2:24
**denial** [1] - 23:20
**denied** [3] - 36:7, 61:14, 92:21
**DENISE** [1] - 6:17
**denominator** [1] - 75:22
**deny** [1] - 36:7
**DEPARTMENT** [2] - 3:14, 3:20
**deposition** [1] - 103:25
**depositions** [1] - 101:15
**DEPUTY** [1] - 12:7
**derivative** [5] - 114:24, 119:9, 120:20, 128:10, 129:7
**derivatively** [4] - 118:1, 118:9, 119:22, 120:9
**derive** [4] - 127:22, 128:21, 129:8
**derived** [1] - 127:24
**deriving** [1] - 127:21
**describe** [1] - 115:12
**design** [2] - 71:9, 71:22
**designated** [5] - 33:11, 34:16, 34:18, 35:17, 115:8
**designed** [1] - 84:11
**despite** [2] - 22:24, 48:7
**destruction** [2] - 31:7, 42:18
**detailed** [1] - 125:7
**details** [1] - 112:13
**determination** [2] - 71:6, 111:15
**determine** [8] - 40:13, 54:3, 96:9, 110:1, 110:19, 114:8, 114:10, 132:13
**determined** [5] - 31:19, 109:25, 111:6, 112:4, 113:15
**determining** [1] - 99:7
**developed** [1] - 95:16
**development** [3] - 46:9, 61:15, 65:22
**device** [2] - 51:4, 62:2
**DEXTER** [1] - 3:24
**diesel** [4] - 33:13, 33:19, 34:8, 34:16
**differ** [1] - 44:6
**difference** [3] - 65:16, 105:8, 105:14

**differences** [1] - 50:19
**different** [32] - 12:15, 15:10, 19:25, 20:5, 20:11, 34:1, 38:13, 39:6, 58:19, 58:20, 59:13, 61:6, 63:16, 66:20, 89:25, 90:7, 91:16, 91:21, 95:18, 100:10, 100:22, 101:1, 104:3, 104:25, 105:12, 106:10, 112:14, 113:19, 122:9, 122:20, 131:2, 131:8
**differently** [1] - 74:13
**diffuse** [1] - 50:9
**diminution** [1] - 129:25
**direct** [23] - 13:14, 30:11, 30:25, 31:2, 32:11, 44:24, 45:24, 47:20, 47:24, 48:4, 56:22, 57:2, 59:15, 68:4, 89:20, 91:9, 92:3, 92:15, 93:19, 94:9, 94:16, 94:19, 100:1
**directed** [1] - 117:17
**direction** [2] - 45:13, 117:25
**directly** [20] - 17:4, 42:23, 43:2, 43:3, 43:11, 56:25, 57:7, 67:18, 82:6, 82:20, 83:13, 84:6, 87:20, 94:17, 96:4, 98:6, 110:9, 110:16, 120:2, 121:11
**disagree** [6] - 24:22, 25:23, 62:14, 65:5, 68:17, 96:22
**disagrees** [1] - 98:8
**disappointments** [1] - 56:9
**Disaster** [1] - 118:12
**disaster** [1] - 128:4
**disasters** [1] - 101:4
**discharge** [14] - 21:6, 21:8, 21:19, 21:20, 22:1, 84:21, 91:11, 93:16, 122:3, 123:12, 129:23, 130:7, 130:21, 137:18
**discharged** [2] - 123:7, 123:10
**discharges** [2] - 122:1, 130:17
**discharging** [1] - 130:7

**disclose** [1] - 131:12
**discloses** [1] - 111:17
**discovery** [8] - 27:17, 100:7, 101:14, 102:1, 105:3, 105:15, 105:17, 106:10
**discredited** [1] - 85:24
**discretion** [6] - 23:23, 25:5, 117:19, 120:1, 122:19, 122:23
**discretionary** [1] - 119:12
**discussed** [3] - 84:16, 118:10, 133:19
**discussion** [2] - 72:1, 121:10
**dismiss** [15] - 12:15, 14:1, 18:12, 44:4, 44:9, 46:18, 48:9, 48:13, 58:21, 59:5, 59:6, 63:25, 97:9, 99:12, 109:12, 114:19, 121:3, 124:20
**dismissal** [8] - 19:1, 19:7, 23:24, 29:23, 33:8, 34:21, 36:15, 49:3
**dismissed** [15] - 14:4, 19:16, 24:5, 24:10, 26:9, 26:23, 37:7, 38:17, 40:21, 44:11, 54:16, 54:18, 55:21, 96:9, 99:11
**dismissing** [1] - 24:13
**dispense** [1] - 127:2
**dispersant** [4] - 122:13, 122:16, 122:18, 123:13
**dispersants** [31] - 109:19, 110:1, 110:2, 110:3, 110:4, 110:17, 110:19, 111:25, 112:1, 112:2, 112:7, 112:8, 112:15, 112:18, 112:24, 113:16, 115:24, 116:2, 116:10, 117:6, 117:12, 117:13, 122:13, 125:19, 125:20, 125:21, 131:10, 132:13, 132:18
**displace** [9] - 17:25, 19:3, 75:4, 81:10, 82:11, 87:17, 87:18, 87:19
**displaced** [5] - 17:6,

53:6, 54:5, 75:17, 86:17
**displacement** [17] - 18:11, 18:23, 19:17, 22:10, 22:16, 35:4, 35:9, 36:13, 72:1, 73:20, 73:21, 87:8, 87:9, 107:19, 107:20, 107:21, 107:22
**displaces** [13] - 16:6, 16:7, 16:16, 16:18, 35:3, 35:5, 53:24, 57:15, 69:17, 80:5, 80:6, 80:20
**displacing** [5] - 14:20, 15:14, 17:11, 17:15, 20:9
**disposal** [1] - 112:24
**dispositive** [3] - 20:15, 114:25, 124:19
**dispute** [4] - 68:13, 68:14, 68:15, 125:19
**disputed** [1] - 129:13
**dissent** [1] - 66:2
**distinct** [1] - 100:10
**distinction** [2] - 48:4, 129:17
**distinguish** [1] - 108:5
**distracted** [2] - 26:17, 26:18
**distraction** [2] - 133:11, 133:22
**district** [1] - 74:1
**District** [10] - 37:5, 38:2, 41:8, 74:18, 85:25, 92:16, 140:5, 140:6, 140:14
**DISTRICT** [3] - 1:1, 1:1, 1:12
**diversion** [1] - 94:1
**DIVERSITY** [1] - 8:11
**divest** [1] - 98:4
**divide** [1] - 67:7
**DIVISION** [1] - 3:15
**Doc** [2] - 89:10, 93:12
**dock** [1] - 130:17
**Dock** [20] - 14:21, 18:8, 18:11, 18:15, 18:22, 19:2, 19:5, 19:6, 19:11, 36:13, 36:25, 37:2, 37:7, 37:9, 38:2, 73:7, 83:2, 88:24, 90:17, 92:23
**doctrine** [4] - 18:11, 41:3, 41:5, 114:23
**DOCUMENT** [1] - 1:9
**documents** [2] -

100:7, 105:4
**DOMENGEAUX** [1] - 1:15
**DOMINION** [1] - 1:24
**DON** [1] - 7:15
**DONALD** [1] - 5:17
**done** [14] - 24:9, 32:24, 47:17, 67:1, 89:7, 89:11, 102:4, 112:8, 115:23, 136:8, 136:18, 136:19, 138:7
**DOSHA** [5] - 62:12, 62:22, 77:3, 83:17, 83:21
**doubt** [1] - 111:14
**down** [24] - 23:13, 24:18, 26:25, 27:17, 27:18, 28:19, 32:4, 38:13, 41:13, 44:20, 50:15, 57:18, 58:24, 60:1, 65:19, 66:9, 70:10, 70:22, 91:12, 94:8, 94:9, 94:13, 132:7
**downplaying** [1] - 66:13
**DRAGNA** [1] - 6:13
**drainage** [1] - 130:18
**draw** [5] - 89:4, 89:6, 89:25, 90:10, 95:17
**drawing** [1] - 89:8
**drawn** [1] - 91:16
**DRESCHER** [1] - 1:23
**drew** [1] - 90:23
**DRIL** [1] - 7:14
**DRIL-QUIP** [1] - 7:14
**drill** [2] - 62:5, 130:17
**drilled** [1] - 65:17
**drilling** [12] - 30:16, 46:16, 52:3, 65:9, 95:7, 95:9, 95:10, 102:2, 103:15, 107:9, 130:17, 139:13
**DRILLING** [1] - 4:4
**DRIVE** [2] - 1:24, 7:19
**DRIVES** [1] - 8:24
**Dry** [20] - 14:21, 18:8, 18:11, 18:15, 18:22, 19:2, 19:5, 19:6, 19:11, 36:13, 36:25, 37:2, 37:7, 37:9, 38:2, 73:7, 83:2, 88:24, 90:17, 92:23
**due** [8] - 31:8, 39:19, 42:18, 43:7, 43:8, 43:19, 94:25, 95:4
**DUKE** [1] - 8:23
**Dunham** [2] - 92:15,

94:6
**Dupre** [1] - 48:2
**DURHAM** [1] - 8:25
**during** [1] - 88:5
**dust** [1] - 119:3
**Dutra** [2] - 65:4, 66:16
**duty** [13] - 45:11, 45:24, 47:7, 47:13, 47:17, 47:20, 47:24, 49:1, 49:6, 50:13, 50:14, 93:14, 100:17
**DYNAMIC** [1] - 8:7

# E

**E&P** [1] - 6:4
**e-mailed** [1] - 103:21
**early** [1] - 27:15
**Eastern** [1] - 140:6
**EASTERN** [1] - 1:1
**easy** [1] - 100:21
**echo** [1] - 91:1
**economic** [13] - 12:16, 16:15, 17:8, 18:4, 18:12, 18:16, 18:23, 19:4, 19:15, 64:12, 80:11, 83:1, 93:8
**ECONOMIC** [1] - 10:6
**economic-only** [1] - 19:4
**Ed** [1] - 89:17
**educate** [1] - 136:24
**EDWARDS** [1] - 1:15
**effect** [4] - 17:12, 23:3, 82:14, 87:21
**effective** [1] - 110:7
**effectively** [1] - 111:22
**effects** [2] - 15:14, 137:20
**effluent** [3] - 121:25, 122:2, 129:23
**effort** [4] - 95:6, 118:20, 119:20, 127:9
**efforts** [1] - 116:12
**EIDSON** [1] - 2:19
**either** [18] - 25:8, 25:20, 26:7, 30:1, 35:23, 36:6, 60:10, 80:25, 81:10, 86:16, 90:2, 98:6, 99:8, 100:18, 104:21, 124:21, 125:3, 139:16
**elaborate** [1] - 17:2
**elect** [1] - 35:22
**element** [2] - 125:5, 125:9
**elements** [2] - 53:18,

125:8
**elevating** [1] - 107:11
**Elizabeth** [2] - 99:20, 99:24
**ELIZABETH** [1] - 2:13
**ELLIS** [2] - 4:23, 5:3
**ELM** [1] - 5:18
**ELMO** [1] - 12:9
**eloquent** [1] - 66:2
**elsewhere** [1] - 105:25
**Elsley** [1] - 33:4
**ELSLEY** [28] - 4:10, 33:2, 33:4, 33:14, 33:16, 33:21, 34:9, 34:14, 34:20, 34:24, 35:14, 35:19, 36:3, 36:11, 36:23, 37:4, 37:24, 39:4, 39:13, 40:12, 41:16, 41:22, 42:2, 42:8, 42:12, 43:5, 43:16, 43:18
**ELSLEY**..................... ..................... [1] - 10:8
**elucidated** [2] - 106:9, 106:10
**embarking** [2] - 98:21, 105:3
**embraces** [1] - 66:17
**emphasize** [2] - 35:12, 114:24
**employees** [3] - 116:20, 116:21, 119:17
**employment** [1] - 97:8
**enactment** [1] - 79:14
**enclave** [1] - 21:18
**encroached** [1] - 56:6
**end** [7] - 25:18, 27:20, 31:12, 48:6, 85:13, 89:2, 97:21
**Endangered** [3] - 137:8, 137:17, 138:6
**endangered** [4] - 137:18, 137:21, 138:21, 139:17
**ended** [1] - 78:9
**energize** [1] - 59:24
**Energy** [2] - 124:1, 124:12
**ENERGY** [2] - 4:7, 5:16
**enforce** [2] - 134:2, 139:10
**enforcement** [1] - 138:6
**ENFORCEMENT** [1] - 3:19
**engage** [1] - 24:6
**engaged** [3] - 133:4,

133:12, 133:19
**engineer** [3] - 102:2, 103:15, 103:18
**enjoin** [10] - 134:14, 134:15, 134:20, 134:21, 134:25, 135:4, 135:5, 135:8, 135:11, 135:12
**enjoy** [3] - 117:15, 118:2, 118:3
**enjoyed** [2] - 119:11, 119:23
**enormous** [1] - 138:11
**Enstar** [1] - 106:6
**ensure** [1] - 110:7
**enter** [1] - 26:6
**entertain** [2] - 97:22, 98:5
**entire** [3] - 82:12, 84:8, 84:11
**entirely** [1] - 45:1
**entities** [3] - 43:23, 100:3, 127:12
**entitled** [9] - 37:20, 63:3, 64:8, 83:1, 84:18, 105:14, 117:15, 118:1, 140:9
**entity** [2] - 127:12, 128:7
**environment** [6] - 87:23, 101:5, 115:17, 120:18, 136:6, 136:20
**ENVIRONMENTAL** [1] - 3:19
**environmental** [3] - 46:24, 130:20, 139:10
**envision** [2] - 42:5, 139:8
**envisioned** [2] - 85:14, 139:15
**envisions** [1] - 84:22
**EP** [1] - 22:2
**EPA** [5] - 111:6, 111:20, 112:17, 113:13, 131:17
**equally** [2] - 34:4, 48:18
**equipment** [8] - 60:11, 67:12, 67:19, 67:21, 71:9, 115:5, 116:4, 118:21
**equitable** [2] - 134:23, 136:4
**erect** [1] - 100:13
**ergo** [1] - 81:25
**ERVIN** [1] - 2:20
**Ervin** [1] - 135:25
**ESA** [1] - 137:17

**especially** [2] - 31:22, 87:24

**ESQUIRE** [55] - 1:16, 1:16, 1:17, 1:20, 1:23, 2:4, 2:7, 2:10, 2:13, 2:16, 2:20, 2:23, 3:3, 3:4, 3:7, 3:11, 3:15, 3:16, 3:20, 3:23, 3:24, 4:6, 4:6, 4:10, 4:19, 4:23, 4:24, 5:3, 5:6, 5:10, 5:13, 5:17, 5:17, 5:18, 5:21, 5:21, 6:6, 6:9, 6:10, 6:13, 6:16, 6:17, 6:17, 6:21, 7:8, 7:11, 7:15, 7:18, 7:22, 7:22, 8:4, 8:8, 8:12, 8:16, 8:19

**essentially** [2] - 117:8, 126:9

**established** [3] - 14:13, 44:23, 115:20

**establishes** [1] - 57:8

**etcetera** [2] - 74:6, 119:1

**EUGENE** [1] - 8:13

**evade** [1] - 47:19

**evaluation** [1] - 133:20

**event** [8] - 14:8, 22:17, 55:13, 57:10, 64:20, 87:7, 95:12, 117:21

**events** [1] - 30:21

**eventually** [1] - 72:7

**everywhere** [1] - 124:14

**evidence** [3] - 42:10, 131:17, 135:21

**evidentiary** [1] - 136:23

**exact** [1] - 53:2

**exactly** [14] - 38:8, 64:16, 65:10, 66:12, 69:10, 70:1, 80:16, 82:19, 83:17, 89:23, 100:23, 115:22, 126:5, 132:9

**examination** [1] - 50:25

**example** [12] - 21:14, 63:3, 64:2, 74:15, 76:25, 94:4, 102:10, 125:11, 127:15, 128:16, 129:9

**examples** [1] - 90:8

**except** [12] - 15:5, 17:23, 38:7, 54:21, 64:13, 74:7, 80:10, 82:22, 83:20, 86:2

**Except** [1] - 74:2

**exception** [6] - 37:2, 37:13, 38:1, 38:3, 38:7, 83:18

**exceptions** [1] - 129:3

**excluded** [5] - 52:14, 54:14, 83:2, 84:3, 86:25

**exclusive** [3] - 45:10, 57:25, 58:4

**exclusively** [5] - 51:3, 51:20, 54:13, 63:13, 64:13

**excuse** [5] - 13:6, 13:9, 74:16, 89:22, 110:13

**execution** [1] - 111:1

**exercise** [1] - 99:13

**exercised** [6] - 103:4, 105:5, 105:6, 105:7, 117:19, 138:7

**exhaust** [1] - 97:10

**exhausted** [1] - 97:9

**exhaustive** [1] - 97:7

**exist** [3] - 72:3, 106:22, 134:1

**existed** [1] - 130:23

**existence** [1] - 57:18

**existing** [3] - 17:20, 72:6, 73:5

**exists** [1] - 44:24

**expand** [4] - 72:5, 75:13, 82:25, 90:15

**expanded** [2] - 81:18, 83:5

**expansion** [1] - 75:12

**expansive** [3] - 72:8, 76:13, 95:19

**expect** [3] - 93:23, 93:24, 93:25

**experts** [1] - 136:23

**expiration** [1] - 23:21

**explain** [2] - 63:5, 89:13

**explained** [1] - 125:9

**explains** [1] - 89:12

**explode** [1] - 103:23

**EXPLORATION** [1] - 4:16

**exploration** [1] - 68:23

**explore** [1] - 105:15

**exposed** [2] - 116:14, 119:2

**exposure** [1] - 117:4

**express** [4] - 112:20, 123:19, 124:10, 124:15

**expressly** [1] - 47:24

**EXPRESSWAY** [1] - 3:12

**extend** [1] - 120:9

**extended** [1] - 119:22

**extending** [1] - 118:9

**extends** [1] - 94:12

**Extension** [4] - 38:23, 38:24, 39:20, 61:8

**extension** [1] - 98:6

**extensive** [2] - 37:9, 66:2

**extent** [9] - 33:12, 34:6, 34:20, 80:4, 87:16, 97:4, 106:22, 124:13, 129:12

**extinction** [1] - 137:15

**extra** [2] - 85:6, 130:10

**extreme** [2] - 75:3, 99:1

**extremely** [3] - 30:23, 104:24

**Exxon** [12] - 39:17, 41:9, 41:11, 41:14, 74:19, 75:12, 79:4, 79:11, 79:13, 81:22, 82:25, 93:5

## F

**F.2d** [2] - 93:7, 106:6

**F.3d** [1] - 118:12

**face** [1] - 65:3

**facilities** [1] - 38:13

**facility** [5] - 50:1, 107:8, 107:12, 107:13, 107:15

**facing** [1] - 29:7

**fact** [25] - 34:2, 37:15, 47:5, 47:23, 51:13, 53:8, 57:11, 58:15, 71:4, 83:24, 84:24, 86:25, 87:1, 93:17, 97:25, 105:16, 113:3, 123:2, 123:18, 125:19, 129:14, 131:16, 134:11, 136:24, 138:22

**factor** [3] - 91:18, 92:13, 96:22

**factors** [1] - 52:5

**facts** [10] - 24:7, 59:16, 61:18, 63:8, 89:6, 95:16, 101:23, 118:13, 124:23, 131:19

**factual** [9] - 26:13, 28:16, 90:9, 90:11, 90:16, 90:17, 91:9, 100:6, 102:7

**factually** [2] - 90:21, 127:14

**failure** [2] - 24:12, 58:12

**Fallon** [2] - 24:3, 24:4

**Fallon's** [1] - 27:9

**familiar** [2] - 66:21, 69:23

**far** [11] - 14:14, 31:5, 38:6, 52:20, 63:15, 81:20, 89:24, 95:9, 101:4, 123:21, 125:12

**far-reaching** [1] - 95:9

**fashion** [1] - 125:7

**fashioned** [1] - 85:1

**fast** [3] - 126:22, 131:23, 132:2

**fatal** [1] - 125:3

**fatally** [1] - 125:22

**FAYARD** [2] - 2:22, 2:23

**fear** [3] - 120:3, 120:8, 120:19

**feasible** [1] - 97:12

**February** [2] - 24:21, 42:7

**Federal** [2] - 40:6, 110:25

**FEDERAL** [1] - 3:14

**federal** [81] - 14:17, 16:3, 16:25, 17:3, 17:5, 17:12, 20:2, 21:1, 21:18, 21:19, 22:4, 22:24, 29:18, 39:15, 44:9, 51:3, 51:7, 51:8, 51:12, 51:21, 52:6, 52:18, 53:4, 53:6, 53:9, 54:13, 57:9, 63:14, 64:13, 69:2, 76:2, 77:24, 81:10, 107:23, 110:11, 111:6, 111:10, 111:20, 111:25, 112:23, 113:20, 113:23, 114:4, 114:6, 114:9, 114:11, 114:24, 115:4, 115:14, 115:17, 116:23, 117:7, 117:14, 117:25, 118:4, 119:9, 119:11, 119:13, 119:15, 119:17, 119:20, 119:23, 119:24, 120:1, 120:7, 120:12, 120:13, 120:20, 122:18, 122:20, 127:6, 127:8, 127:25,

128:3, 128:22, 130:20, 137:23, 138:4

**fell** [1] - 100:15

**few** [2] - 37:16, 58:9

**field** [4] - 14:20, 82:12, 84:9, 84:11

**FIFTEENTH** [1] - 5:4

**FIFTH** [1] - 7:12

**Fifth** [22] - 18:14, 18:18, 32:12, 37:8, 37:11, 37:12, 38:3, 39:2, 40:13, 44:23, 45:16, 47:24, 48:6, 52:24, 61:11, 63:9, 81:18, 91:3, 100:16, 105:24, 106:7

**fifth** [1] - 134:3

**fighting** [1] - 94:24

**figure** [2] - 24:17, 99:14

**file** [4] - 36:5, 55:14, 96:19, 96:20

**filed** [18] - 26:21, 28:11, 28:12, 28:25, 32:20, 32:25, 33:7, 40:2, 41:21, 41:23, 59:3, 59:5, 59:6, 59:14, 59:18, 59:19, 78:7, 138:4

**filing** [1] - 29:9

**fill** [1] - 76:24

**filled** [1] - 76:20

**final** [1] - 29:2

**finally** [3] - 14:21, 86:7, 93:10

**FINANCIAL** [1] - 7:7

**finder** [2] - 136:24

**fine** [1] - 88:6

**fire** [3] - 32:8, 90:19, 91:17

**FIRM** [1] - 8:19

**firm** [1] - 67:25

**firmly** [2] - 66:4, 66:8

**First** [1] - 85:22

**first** [31] - 13:3, 15:2, 17:3, 17:18, 20:8, 20:22, 27:4, 44:3, 44:8, 54:3, 56:8, 60:2, 67:5, 67:23, 70:3, 75:8, 75:16, 78:13, 92:2, 100:12, 101:2, 107:7, 109:7, 114:2, 115:8, 118:19, 121:9, 122:16, 127:1, 127:16, 133:24

**first-level** [2] - 75:16, 78:13

**fisheries** [1] - 37:20

**fishermen** [9] - 37:2, 37:6, 37:13, 37:18, 38:3, 38:7, 38:16, 41:15, 41:18
**fishing** [1] - 93:25
**fit** [2] - 53:2, 115:3
**FITCH** [1] - 6:9
**five** [4] - 38:11, 70:7, 125:1, 126:15
**five-minute** [1] - 70:7
**fix** [1] - 79:4
**fixed** [9] - 51:23, 52:22, 52:25, 53:21, 60:10, 60:11, 61:21, 61:25, 65:19
**FL** [2] - 2:5, 2:21
**flaw** [1] - 125:3
**flawed** [1] - 125:23
**flaws** [1] - 126:1
**Fleming's** [1] - 100:5
**float** [1] - 65:12
**FLOOR** [4] - 2:14, 3:17, 4:7, 7:15
**Florida** [2] - 21:13, 130:25
**FLORIDA** [1] - 2:23
**Florida's** [1] - 21:15
**flow** [1] - 15:10
**flowed** [2] - 32:4, 66:15
**flows** [1] - 67:8
**fluid** [1] - 130:17
**fluids** [1] - 130:18
**fly** [1] - 65:3
**focus** [4] - 25:6, 25:13, 51:14, 134:10
**focused** [1] - 96:23
**focusing** [2] - 94:24, 109:13
**folded** [1] - 127:13
**folks** [1] - 69:20
**follow** [9] - 23:14, 64:17, 82:3, 87:13, 87:14, 87:15, 120:3, 120:7, 132:2
**followed** [3] - 61:11, 105:24, 126:8
**following** [1] - 38:10
**follows** [1] - 18:14
**Footnote** [1] - 102:22
**FOR** [23] - 1:15, 1:23, 3:10, 3:14, 3:19, 3:23, 4:3, 4:13, 5:9, 5:16, 6:3, 6:16, 6:20, 7:3, 7:14, 7:18, 7:21, 8:3, 8:11, 8:15, 8:19, 11:6
**force** [2] - 40:15, 53:20, 53:23, 54:4, 57:12, 58:11, 68:12,

69:8
**forecloses** [1] - 63:10
**foregoing** [1] - 140:7
**foreseeability** [1] - 92:7, 92:8, 94:12
**foreseeable** [5] - 92:12, 93:13, 95:12, 101:4, 101:7
**forgotten** [1] - 76:21
**form** [2] - 27:17, 53:5
**forms** [1] - 17:8, 29:1
**Forms** [1] - 29:1
**forth** [5] - 35:1, 37:20, 41:12, 64:15, 136:23
**forward** [4] - 64:6, 64:7, 64:10, 64:12
**founded** [1] - 111:3
**four** [3] - 24:10, 61:10, 72:12
**fourth** [1] - 77:11
**Fourth** [5] - 32:9, 90:18, 90:23, 91:17, 91:22
**FRANCIS** [1] - 8:23
**FRANCISCO** [3] - 2:14, 3:17, 5:7
**frankly** [5] - 62:6, 70:25, 96:1, 127:11, 133:11
**free** [2] - 45:1, 75:22
**freshwater** [1] - 94:1
**FRILOT** [1] - 4:5
**front** [2] - 26:15, 70:3
**FRONT** [1] - 5:7
**Fruge** [1] - 45:16
**FRUGE** [1] - 3:3
**frustrating** [2] - 82:14, 87:21
**fulfill** [1] - 49:6
**full** [1] - 111:1
**fully** [2] - 133:4, 133:12
**function** [1] - 119:12
**fund** [5] - 78:17, 78:18, 78:20, 78:24, 79:1
**fundamental** [3] - 39:10, 47:6, 134:5
**fundamentally** [2] - 62:7, 101:1
**funding** [1] - 119:19
**furthermore** [1] - 23:8
**futile** [1] - 47:16
**futility** [1] - 99:13
**future** [4] - 87:25, 93:15, 94:20, 138:16

**G**

**Gabarick** [13] - 16:20, 16:25, 17:18, 23:9, 24:1, 57:1, 73:3, 73:18, 75:24, 81:4, 86:5, 86:10
**GABLES** [1] - 2:21
**gallons** [1] - 135:10
**gap** [3] - 22:6, 51:8, 53:10
**gaps** [1] - 64:14
**gas** [3] - 61:15, 65:22, 113:7
**Gas** [1] - 22:2
**GASAWAY** [1] - 5:3
**gasoline** [1] - 131:11
**GATE** [1] - 3:16
**gather** [1] - 85:12
**Gatlin** [3] - 31:14, 31:23, 31:25
**GAVIN** [1] - 5:21
**GCCF** [3] - 23:20, 29:14, 34:12
**gear** [1] - 67:16
**gears** [1] - 70:17
**GEIGER** [1] - 8:7
**General** [40] - 14:24, 15:1, 16:8, 16:12, 16:16, 19:3, 19:5, 20:9, 35:5, 38:18, 40:1, 40:24, 41:2, 41:19, 41:21, 68:6, 69:8, 69:17, 71:16, 71:18, 72:16, 73:17, 74:21, 75:5, 75:18, 76:14, 76:22, 76:23, 77:15, 78:10, 79:7, 80:21, 81:17, 81:21, 82:1, 82:7, 84:25, 85:16, 86:17, 87:18
**general** [11] - 18:15, 21:2, 39:24, 41:3, 48:20, 69:14, 77:3, 81:11, 82:14, 82:20, 130:12
**GENERAL'S** [1] - 3:23
**generally** [2] - 35:4, 87:9
**given** [9] - 30:4, 87:15, 93:13, 95:12, 101:7, 101:23, 102:13, 105:16, 117:5
**GLENN** [1] - 7:22
**global** [1] - 62:2
**goal** [1] - 75:20
**God** [1] - 25:15
**God-knows-how-many-page** [1] -

25:15
**GODWIN** [3] - 5:16, 5:17, 5:20
**gold** [1] - 105:8
**gold-plated** [1] - 105:8
**GOLDEN** [1] - 3:16
**GONZALES** [1] - 2:19
**Gonzalez** [1] - 135:25
**GONZALEZ** [6] - 2:20, 135:24, 136:9, 136:13, 136:17, 136:19
**GONZALEZ..............
..........................** [1]
- 11:11
**GOODIER** [1] - 7:22
**GOODWIN** [1] - 5:6
**GOTSHAL** [2] - 7:8, 7:11
**gouging** [1] - 93:8
**govern** [1] - 73:4
**governed** [3] - 39:15, 39:25, 40:16
**governing** [1] - 14:19
**government** [45] - 30:21, 93:24, 112:1, 112:7, 113:23, 114:5, 114:9, 115:14, 115:17, 115:19, 117:7, 117:14, 117:25, 118:5, 119:11, 119:13, 119:16, 119:17, 119:20, 119:23, 120:7, 120:12, 120:13, 122:18, 127:6, 127:8, 127:13, 127:17, 127:25, 128:3, 128:12, 128:13, 128:18, 128:22, 129:12, 131:9, 131:15, 133:12, 133:14, 133:18, 137:10, 137:23, 138:4, 139:9
**Government** [1] - 118:5
**GOVERNMENT** [1] - 3:14
**government's** [4] - 30:16, 92:12, 126:8, 128:19
**governmental** [1] - 128:7
**governments** [1] - 137:24
**GRAND** [1] - 6:13
**great** [2] - 72:1, 131:25

**GREENWALD** [7] - 2:16, 126:20, 126:25, 127:8, 128:21, 129:20, 132:1
**Greenwald** [1] - 126:14
**GREENWALD..........
.................................
** [1] - 11:4
**Greg** [1] - 137:5
**GREGORY** [1] - 8:16
**gross** [4] - 83:9, 102:25, 125:24, 129:5
**ground** [1] - 29:18
**grounds** [2] - 40:5, 93:25
**group** [2] - 50:8, 69:21
**GROUP** [1] - 8:7
**Group** [1] - 92:15
**groups** [2] - 133:7, 136:19
**Grubart** [3] - 39:22, 54:1, 58:10
**guaranteed** [1] - 59:24
**Guard** [7] - 31:15, 31:16, 31:24, 33:10, 112:20, 112:21, 113:8
**guess** [7] - 25:14, 27:3, 68:10, 94:14, 126:9, 127:15, 128:18
**Guevara** [1] - 81:18
**guidance** [2] - 81:15, 89:9
**guise** [1] - 52:14
**GULF** [2] - 1:5, 3:10
**Gulf** [13] - 30:17, 60:15, 94:13, 95:11, 109:20, 111:5, 112:19, 113:17, 122:21, 126:7, 126:8, 135:13
**guys** [1] - 103:22

**H**

**HALLIBURTON** [1] - 5:16
**Halliburton** [7] - 53:15, 56:13, 57:17, 59:1, 59:2, 59:6, 59:9
**Halliburton's** [3] - 50:23, 56:15, 57:5
**hammering** [2] - 66:5, 66:9

hand [2] - 13:23, 123:6
handle [2] - 96:5, 97:6
handled [1] - 38:11
hands [3] - 113:23, 114:4, 127:13
harass [1] - 137:19
hard [1] - 135:1
harm [3] - 116:14, 116:17, 137:19
harmed [1] - 117:4
HARVEY [1] - 3:12
hazard [2] - 55:24, 123:10
hazardous [5] - 110:17, 122:1, 122:3, 123:8, 123:12
HB406 [1] - 9:4
health [3] - 46:24, 115:16, 120:17
hear [5] - 36:21, 70:19, 88:4, 99:4, 134:16
heard [4] - 56:5, 117:12, 122:4, 131:20
HEARD [1] - 1:12
hearings [1] - 136:23
heart [1] - 122:15
heavily [1] - 22:8
hedge [1] - 49:23
HEIMANN [1] - 2:13
held [5] - 45:16, 62:1, 100:16, 124:8, 132:11
help [4] - 50:12, 97:14, 126:7, 126:11
helpful [7] - 72:5, 89:9, 89:12, 89:19, 90:9, 91:22, 110:24
helps [3] - 80:17, 89:13, 90:9
hereby [1] - 140:6
HERMAN [27] - 1:20, 1:20, 88:13, 88:22, 89:5, 89:19, 90:3, 90:6, 90:20, 90:22, 90:25, 92:18, 92:24, 93:1, 94:6, 94:22, 95:4, 95:22, 95:24, 96:6, 96:14, 96:21, 97:15, 98:12, 98:20, 99:18
Herman [3] - 43:13, 88:12, 88:14
HERMAN..................
..........................[1] - 10:18
HICKS [1] - 2:19
Higginbotham [2] -

37:8, 66:3
high [1] - 32:15
highlight [3] - 50:19, 114:22, 133:24
HILL [1] - 5:21
HIMMELHOCH [1] - 3:16
hint [1] - 70:12
hired [2] - 100:13, 101:11
hiring [1] - 102:19
historically [1] - 137:13
history [7] - 79:9, 81:13, 82:10, 82:11, 84:10, 89:20, 95:18
hit [1] - 32:15
hold [2] - 123:6, 126:10
holding [1] - 71:13
HOLDINGS [3] - 4:3, 4:17, 7:4
holds [1] - 39:16
HOLTHAUS [1] - 3:3
HONEYCUTT [1] - 2:22
Honor [178] - 12:11, 13:4, 13:17, 13:19, 13:25, 14:12, 15:12, 17:2, 17:16, 18:1, 18:10, 19:9, 19:18, 19:20, 19:23, 21:24, 22:7, 22:21, 23:12, 23:22, 24:22, 25:13, 25:22, 26:3, 26:6, 27:3, 27:23, 28:22, 29:6, 30:8, 30:9, 30:24, 31:5, 31:16, 32:14, 32:22, 33:2, 33:6, 33:14, 36:3, 36:12, 36:23, 37:4, 37:24, 38:5, 39:4, 39:13, 39:15, 40:12, 40:17, 41:22, 42:14, 43:6, 43:16, 43:18, 43:20, 44:8, 46:10, 47:5, 47:23, 48:16, 49:14, 50:19, 50:24, 53:14, 55:15, 55:22, 56:1, 56:8, 56:15, 59:23, 60:16, 61:9, 63:2, 63:25, 65:2, 65:5, 65:15, 65:24, 67:6, 67:7, 67:23, 68:1, 68:15, 69:10, 69:23, 73:10, 74:16, 75:3, 79:18, 79:22, 80:19, 81:6, 81:12, 88:2, 88:12, 88:13, 94:22, 95:25, 99:6,

99:18, 99:19, 99:23, 100:12, 100:23, 102:6, 103:10, 103:24, 104:8, 104:16, 104:23, 105:17, 105:23, 106:14, 107:4, 107:18, 107:24, 108:25, 109:11, 110:16, 110:25, 111:18, 112:11, 113:3, 113:24, 114:14, 114:18, 114:25, 115:3, 115:9, 115:25, 116:9, 116:19, 117:9, 117:20, 118:1, 118:21, 120:10, 120:15, 120:21, 121:2, 121:4, 121:6, 121:7, 123:18, 124:5, 124:17, 124:23, 125:9, 126:2, 126:12, 126:14, 126:20, 126:22, 127:8, 128:9, 129:21, 131:7, 132:4, 132:9, 132:23, 133:1, 133:3, 133:8, 134:8, 134:18, 134:19, 135:6, 135:24, 136:9, 136:22, 136:25, 137:1, 137:5, 138:3, 138:18, 138:25, 139:2
Honor's [2] - 38:6, 82:2
HONORABLE [1] - 1:12
hoops [1] - 41:12
hope [4] - 66:17, 89:19, 136:11, 139:21
HORIZON [1] - 1:4
Horizon [11] - 15:6, 15:21, 51:4, 54:12, 57:22, 60:19, 60:24, 60:25, 65:6, 65:16, 107:8
horizontal [1] - 35:3
hotel [1] - 37:22
hour [1] - 12:22
hours [3] - 12:20, 12:22
house [2] - 72:19, 76:9
housekeeping [2] -

58:23, 59:1
HOUSTON [7] - 4:11, 5:13, 5:14, 5:22, 6:18, 7:16, 8:21
huge [1] - 29:4
HUGH [1] - 6:16
hundred [3] - 25:8, 26:16, 27:1
hundreds [2] - 79:6, 135:10
hungry [1] - 109:9
hunt [1] - 137:19
Hurricane [2] - 38:10, 38:11
hydrocarbons [2] - 46:1, 47:12
hypothetical [2] - 64:4, 130:24

I

Idaho [1] - 95:9
idea [1] - 55:4
identified [1] - 137:11
identify [1] - 13:10
ignition [1] - 32:4
ignore [1] - 16:24
II [3] - 17:10, 107:19, 107:22
III [5] - 8:8, 72:19, 84:23, 85:2, 85:7
IL [2] - 4:25, 7:19
ill [1] - 114:3
illegal [1] - 114:9
Illinois [1] - 78:3
illnesses [1] - 119:1
illogical [2] - 52:22, 123:5
illustrated [1] - 90:13
imagine [4] - 46:7, 47:4, 77:4, 80:8
immediate [1] - 110:7
immediately [2] - 103:8, 111:22
immune [4] - 117:8, 127:7, 127:9
immunity [21] - 114:24, 117:10, 117:15, 118:2, 118:3, 118:9, 119:9, 119:12, 119:22, 120:9, 120:20, 124:18, 127:16, 127:21, 127:22, 127:24, 128:10, 128:22, 129:1, 129:7
impacted [1] - 39:9
impacts [1] - 138:20
implement [2] -

119:25, 122:23
implemented [1] - 122:23
implicated [1] - 51:12
imply [1] - 74:12
important [20] - 14:16, 20:25, 30:10, 30:23, 46:13, 47:15, 51:19, 60:13, 60:14, 71:6, 71:23, 71:25, 72:7, 78:11, 81:8, 84:17, 90:14, 100:4, 113:3, 129:17
importantly [8] - 30:12, 32:10, 51:10, 73:1, 74:17, 74:19, 87:12, 119:15
impose [2] - 84:20, 101:10
imposed [1] - 93:18
impossible [1] - 95:6
IMPREVENTO [1] - 1:23
improperly [1] - 116:9
IN [2] - 1:4, 1:5
inadequate [2] - 79:2, 124:24
INC [17] - 4:4, 4:5, 4:13, 4:15, 4:16, 4:17, 4:19, 5:16, 7:3, 7:4, 7:5, 7:6, 7:7, 7:8, 7:14, 8:3, 8:7
Inc [1] - 114:15
inch [1] - 117:23
incident [3] - 31:7, 31:8, 119:10
incidental [1] - 130:17
include [1] - 83:23
included [1] - 102:16
includes [1] - 85:17
including [8] - 51:3, 51:21, 69:12, 84:12, 92:5, 112:14, 112:24, 119:1
income [1] - 43:15
inconsistent [2] - 51:9, 53:5
incorporate [2] - 45:9, 53:4
increased [1] - 93:7
indeed [5] - 103:25, 106:16, 106:18, 106:20, 109:22
indemnify [1] - 102:25
independent [11] - 20:19, 45:12, 45:18, 46:19, 100:13, 100:16, 100:21, 101:11, 102:20, 105:20, 119:18

**independently** [1] - 63:10
**indicate** [1] - 82:11
**indication** [3] - 58:12, 82:11, 84:8
**indirect** [1] - 32:10
**indirectly** [3] - 67:18, 89:3, 98:7
**individual** [3] - 26:8, 27:16, 27:21
**individuals** [2] - 119:5, 136:20
**industry** [3] - 101:18, 113:7
**infer** [1] - 84:2
**inferring** [2] - 20:13
**information** [13] - 45:25, 46:23, 47:1, 47:11, 47:13, 47:15, 47:16, 104:2, 104:3, 104:5, 104:6, 104:7, 113:6
**inherently** [1] - 54:2
**initial** [1] - 27:17
**injunction** [4] - 136:1, 136:5, 136:15, 136:16
**INJUNCTIVE** [1] - 11:6
**injunctive** [3] - 12:18, 133:7, 134:23
**injured** [4] - 36:4, 60:25, 62:21, 101:3
**injury** [7] - 18:16, 19:13, 42:18, 60:24, 108:10, 129:3, 129:4
**inspections** [1] - 46:24
**instance** [2] - 16:6, 23:5
**instances** [1] - 77:22
**instead** [3] - 57:24, 58:14, 130:25
**instruct** [1] - 104:18
**instructions** [3] - 117:21, 120:7, 128:20
**integral** [2] - 60:9, 95:1
**integrally** [1] - 92:6
**intend** [3] - 71:24, 85:13, 124:8
**intended** [11] - 17:19, 36:4, 52:7, 72:5, 74:12, 75:4, 75:13, 78:20, 82:24, 88:2, 125:21
**intent** [16] - 71:3, 71:24, 71:25, 76:12, 76:24, 77:10, 78:14, 79:3, 81:14, 84:8,

85:12, 87:20, 87:21, 90:15, 98:22, 125:18
**intention** [1] - 82:15
**intentionally** [2] - 125:18, 125:20
**intents** [1] - 72:13
**intercede** [1] - 47:25
**interest** [11] - 18:17, 19:14, 36:17, 39:8, 73:7, 102:14, 102:15, 102:21, 109:8, 131:21, 139:9
**interesting** [3] - 67:2, 91:2, 91:24
**interestingly** [1] - 130:11
**interests** [3] - 102:14, 120:1, 138:11
**INTERESTS** [2] - 3:14, 3:23
**INTERNATIONAL** [3] - 5:9, 7:7, 8:3
**International** [2] - 129:22, 130:6
**interplay** [3] - 51:19, 67:25, 72:22
**interpretation** [1] - 105:25
**intervene** [1] - 138:8
**intervening** [3] - 91:7, 91:18, 92:13
**intimately** [1] - 69:23
**inverse** [1] - 38:22
**investor** [1] - 104:9
**invoice** [1] - 46:6
**invoked** [2] - 25:1, 119:10
**involve** [2] - 72:15, 86:6
**involved** [9] - 71:21, 102:7, 102:12, 104:20, 113:15, 117:3, 122:20, 122:22, 131:19
**involvement** [1] - 48:7
**involves** [5] - 68:23, 100:12, 138:10
**involving** [5] - 40:25, 51:2, 71:2, 71:11, 74:18
**Iqbal/Twombly** [1] - 92:5
**irrelevant** [1] - 45:23
**islands** [3] - 51:23, 52:21, 53:1
**issue** [70] - 16:22, 16:24, 18:5, 23:9, 25:4, 27:22, 29:7, 30:10, 30:11, 31:17, 35:8, 36:13, 36:25,

38:16, 49:13, 49:15, 50:3, 52:4, 56:21, 56:22, 57:4, 57:17, 59:8, 67:15, 69:16, 69:21, 69:22, 77:20, 79:23, 80:4, 80:12, 80:13, 80:17, 80:23, 81:1, 82:6, 82:19, 82:20, 83:19, 85:22, 86:4, 86:6, 87:8, 91:8, 91:10, 91:21, 92:7, 95:22, 95:24, 96:4, 99:4, 99:5, 99:8, 99:16, 99:21, 99:25, 100:22, 106:15, 107:18, 107:25, 108:11, 108:15, 121:9, 121:20, 122:17, 123:18, 125:7
**issued** [4] - 59:4, 117:20, 130:21, 136:2, 136:3
**issues** [28] - 12:21, 13:2, 13:11, 14:18, 26:13, 27:16, 28:4, 28:9, 28:16, 44:11, 48:8, 50:2, 50:18, 50:24, 53:16, 55:5, 78:1, 88:3, 88:11, 89:12, 98:22, 98:24, 100:6, 101:13, 101:14, 102:7, 124:18, 136:25
**issuing** [1] - 129:25
**item** [2] - 76:8
**ITEMS** [1] - 10:3
**items** [1] - 86:24
**itself** [13] - 22:13, 44:18, 47:23, 58:15, 60:16, 79:1, 84:10, 91:25, 92:1, 93:11, 93:20, 94:24, 106:20

## J

**jacked** [1] - 66:7
**JACKSON** [2] - 7:14, 7:15
**jackup** [1] - 66:4
**JAMES** [3] - 1:16, 6:13, 6:17
**JARRETT** [1] - 4:19
**Jeff** [1] - 70:18
**JEFFERSON** [1] - 1:18
**Jeffrey** [1] - 70:21
**JEFFREY** [1] - 1:23
**JENNY** [1] - 5:17

**Jim** [1] - 67:6
**JOEL** [1] - 3:11
**Joel** [1] - 139:5
**JOHN** [2] - 3:4, 4:10
**John** [2] - 33:4, 80:1
**Johnny** [1] - 79:22
**join** [1] - 42:15
**joint** [6] - 101:12, 101:17, 102:20, 104:12, 106:1, 139:8
**JONES** [2] - 3:7, 7:21
**Jones** [5] - 16:14, 62:11, 62:21, 62:22, 77:1
**joys** [1] - 56:9
**JR** [1] - 2:23
**judge** [3] - 16:21, 66:17, 70:12
**Judge** [34] - 17:22, 24:1, 24:3, 24:4, 27:9, 36:20, 36:22, 37:8, 48:2, 66:2, 66:3, 66:10, 66:13, 66:18, 70:15, 70:24, 80:1, 80:8, 81:8, 83:11, 84:16, 85:18, 86:11, 86:16, 86:18, 86:23, 87:5, 92:17, 94:5, 100:5, 124:2, 139:22
**JUDGE** [1] - 1:12
**judgment** [5] - 35:24, 46:3, 52:10, 75:6, 92:21
**judgment-proof** [1] - 75:6
**judicial** [1] - 99:2
**July** [1] - 134:12
**jurisdiction** [31] - 15:9, 15:25, 16:1, 38:19, 39:23, 40:4, 40:5, 40:8, 40:9, 56:21, 57:9, 67:24, 68:13, 68:25, 69:11, 69:22, 72:21, 73:25, 74:4, 74:5, 84:13, 85:10, 96:23, 96:25, 97:16, 97:22, 98:5, 98:14, 99:4
**jurisdictional** [4] - 55:4, 55:8, 55:12, 68:20
**Justice** [2] - 70:4, 70:8, 75:1
**JUSTICE** [2] - 3:14, 3:20
**justification** [1] - 93:21

## K

**Kadan** [1] - 128:9
**KALBAC** [1] - 2:19
**KANE** [1] - 2:19
**Katrina** [3] - 38:10, 38:11, 128:8
**KATZ** [1] - 1:20
**keep** [5] - 20:25, 36:11, 56:12, 87:23, 87:24
**keeps** [1] - 80:21
**KEITH** [1] - 4:19
**KERRY** [1] - 4:6
**key** [3] - 14:18, 74:7, 77:19
**kill** [2] - 102:12, 137:19
**killed** [4] - 62:21, 101:3, 134:6, 134:12
**kind** [6] - 23:6, 44:14, 87:25, 89:11, 119:12, 139:13
**KIRKLAND** [2] - 4:23, 5:3
**knowledge** [1] - 48:7
**knows** [9] - 25:15, 39:15, 60:12, 60:16, 81:12, 104:10, 115:21, 138:5, 138:10
**KUCHLER** [2] - 6:5, 6:6
**KULLMAN** [1] - 2:9

## L

**L.L.C** [1] - 6:16
**L.P** [1] - 7:21
**LA** [14] - 1:18, 1:21, 2:11, 2:24, 3:5, 3:12, 4:8, 4:21, 5:11, 6:7, 7:24, 8:5, 8:9, 9:4
**labeled** [1] - 73:23
**LABORDE** [2] - 8:3, 8:7
**lack** [1] - 36:16
**LAFAYETTE** [2] - 1:18, 8:5
**laid** [3] - 116:5, 117:24, 125:8
**Lake** [4] - 78:6, 129:24, 130:2, 130:3
**LAMAR** [1] - 5:22
**lamb** [1] - 58:3
**land** [8] - 38:9, 38:14, 38:20, 38:23, 39:1, 61:7, 95:9

**land-based** [1] - 38:9
**Lands** [1] - 93:15
**LANGAN** [62] - 4:23,
12:11, 12:13, 13:4,
13:8, 13:17, 13:23,
15:7, 15:12, 15:19,
15:23, 16:2, 16:5,
16:9, 16:11, 16:15,
19:9, 19:12, 19:23,
20:4, 20:6, 20:10,
20:15, 20:18, 21:16,
22:15, 24:11, 24:16,
24:22, 24:24, 25:13,
26:3, 26:6, 27:3,
27:8, 27:23, 28:8,
28:15, 28:21, 29:11,
29:22, 31:4, 32:2,
32:6, 32:9, 32:22,
107:4, 107:7,
107:18, 108:7,
108:9, 108:13,
108:21, 108:25,
109:6, 121:2,
132:23, 133:1,
133:8, 134:8,
134:10, 134:15
**Langan** [16] - 13:4,
13:6, 13:16, 33:7,
34:24, 35:7, 36:11,
36:25, 42:4, 63:18,
88:18, 89:24, 96:3,
121:2, 121:5, 130:24
**Langan's** [1] - 70:24
**LANGAN**..................
.......................... [5] -
10:5, 10:7, 10:22,
11:1, 11:8
**language** [25] - 17:23,
31:1, 31:6, 71:20,
72:10, 73:2, 74:9,
74:11, 74:21, 74:23,
75:19, 76:7, 76:15,
76:19, 77:14, 79:6,
82:5, 82:10, 82:11,
84:10, 86:23, 86:25,
91:25, 94:25
**LAPEROUSE** [1] - 8:7
**LARGE** [1] - 1:17
**large** [5] - 26:20,
26:22, 27:14, 48:6,
96:12
**LASALLE** [1] - 4:24
**last** [19] - 13:10,
23:12, 28:2, 43:24,
50:6, 55:25, 56:2,
56:5, 56:10, 58:1,
58:23, 59:22, 86:7,
87:1, 124:17, 126:2,
127:11, 137:7
**late** [1] - 59:3

**LATHAM** [1] - 7:18
**laudable** [1] - 75:20
**laundry** [1] - 125:6
**LAW** [3] - 8:11, 8:19,
8:23
**law** [155] - 14:19, 15:1,
15:13, 17:6, 17:20,
19:22, 20:20, 21:5,
21:7, 21:22, 21:25,
22:1, 22:3, 22:4,
22:18, 22:20, 24:9,
26:24, 27:20, 27:21,
35:2, 37:25, 38:18,
39:11, 39:16, 39:24,
40:10, 40:11, 40:14,
40:16, 40:21, 40:24,
41:5, 41:6, 41:8,
44:6, 44:10, 44:11,
44:12, 48:8, 50:18,
51:3, 51:7, 51:8,
51:11, 51:12, 51:21,
51:22, 52:1, 52:4,
52:8, 52:12, 52:14,
52:16, 52:20, 53:1,
53:4, 53:11, 53:12,
53:19, 53:23, 54:4,
54:13, 54:14, 54:18,
55:3, 55:15, 57:4,
57:12, 57:13, 57:15,
57:18, 57:20, 57:23,
57:24, 58:6, 58:11,
58:12, 60:3, 63:3,
63:4, 63:11, 63:14,
64:13, 66:15, 68:11,
69:2, 69:9, 69:12,
70:14, 71:9, 71:11,
71:14, 71:17, 71:22,
72:15, 72:18, 72:24,
73:9, 73:12, 73:24,
74:4, 74:10, 74:17,
74:25, 75:5, 76:6,
76:7, 76:21, 76:22,
76:24, 77:1, 78:2,
78:8, 79:4, 79:6,
80:5, 80:6, 82:7,
84:13, 96:4, 96:7,
98:10, 98:17, 98:18,
100:17, 101:20,
105:6, 105:10,
106:18, 110:25,
114:7, 114:8,
115:10, 123:24,
124:13, 125:16,
130:5, 132:16, 139:8
**Law** [39] - 14:24, 15:1,
16:8, 16:12, 16:16,
19:3, 19:5, 20:9,
35:5, 38:18, 40:1,
40:24, 41:2, 41:19,
41:21, 68:6, 69:8,

69:17, 71:16, 71:18,
72:16, 73:17, 74:21,
75:5, 75:18, 76:14,
76:23, 77:15, 78:10,
79:7, 80:21, 81:21,
82:1, 82:7, 85:1,
85:16, 86:17, 87:18
**Laws** [1] - 84:18
**laws** [11] - 14:25, 20:3,
21:15, 35:10, 72:3,
73:17, 76:3, 76:4,
125:15, 139:8,
139:10
**lawyer** [1] - 70:4
**lawyers** [2] - 32:14,
70:9
**layperson** [1] - 97:4
**lead** [1] - 65:14
**leaned** [1] - 70:8
**lease** [5] - 39:7, 39:8,
49:20, 100:19
**leaseholders** [1] -
47:10
**least** [15] - 19:10,
20:8, 26:11, 27:7,
35:6, 41:20, 43:10,
59:22, 82:24, 90:6,
92:1, 92:4, 93:9,
95:14, 125:5
**leave** [1] - 12:12
**LEE** [1] - 7:14
**left** [3] - 56:10, 118:17,
131:13
**legal** [13] - 14:16,
28:4, 49:1, 49:2,
50:13, 50:14, 63:21,
92:5, 96:4, 99:15,
133:9, 133:23,
136:24
**legally** [2] - 25:10,
26:4
**legislation** [3] - 76:13,
77:15, 79:10
**legislative** [5] - 71:25,
72:12, 78:14, 89:20,
95:18
**Legislature** [5] -
71:24, 72:11, 77:12,
78:19, 79:3
**legs** [2] - 66:4, 66:8
**Lemelle** [4] - 24:1,
86:11, 86:16, 86:23
**LEO** [1] - 8:8
**less** [1] - 66:14
**lessees** [1] - 100:3
**level** [2] - 75:16, 78:13
**LEVIN** [1] - 2:3
**LEWIS** [3] - 2:9, 4:19,
6:16
**LEXINGTON** [1] - 6:22

**Lexis** [1] - 92:16
**liability** [25] - 44:15,
47:24, 47:25, 48:5,
49:10, 59:17, 64:18,
71:4, 71:5, 71:7,
71:12, 71:15, 71:21,
72:14, 72:23, 73:3,
84:20, 89:1, 99:21,
101:10, 102:23,
102:24, 120:4,
120:8, 120:19
**Liability** [1] - 73:6
**liable** [3] - 64:21,
118:6, 126:10
**LIAISON** [1] - 1:15
**liberal** [1] - 90:15
**liberty** [1] - 87:5
**lie** [1] - 134:2
**LIEFF** [1] - 2:13
**liens** [3] - 77:2, 77:4,
77:6
**LIFE** [1] - 2:10
**lift** [1] - 107:11
**light** [2] - 106:10,
135:4
**likely** [1] - 99:5
**likewise** [2] - 59:9,
59:18
**Limitation** [2] - 16:13,
73:5
**limitation** [15] - 24:20,
41:21, 42:7, 62:11,
62:20, 63:4, 64:7,
73:5, 77:7, 97:17,
97:18, 98:1, 98:5,
98:23, 99:5
**limitations** [1] - 85:2
**LIMITED** [1] - 4:18
**limited** [8] - 18:19,
19:18, 32:19, 51:6,
79:1, 79:2, 129:2,
130:4
**limits** [1] - 51:23
**line** [16] - 18:18,
18:22, 47:19, 50:7,
54:19, 89:4, 89:6,
89:25, 90:3, 90:10,
90:23, 91:16, 95:17,
95:19, 105:20,
105:23
**lines** [1] - 89:8
**linked** [2] - 137:17,
137:18
**LISKOW** [1] - 4:19
**list** [11] - 28:6, 112:8,
112:18, 112:19,
112:22, 113:1,
113:15, 125:6,
131:9, 131:10
**listed** [1] - 138:21

**listen** [1] - 89:17
**listened** [1] - 89:15
**listening** [2] - 36:22,
127:10
**litigated** [2] - 49:13,
49:15
**Litigation** [1] - 118:12
**litigation** [12] - 27:16,
29:15, 34:7, 39:17,
39:18, 41:9, 118:10,
128:9, 131:9,
131:10, 133:4,
138:23
**Livaudais** [3] - 124:3,
124:4, 124:5
**live** [1] - 126:21
**livelihood** [2] - 37:19
**LLC** [4] - 4:3, 6:5, 7:4,
7:5
**locations** [1] - 117:1
**Locke** [13] - 22:22,
71:1, 71:3, 71:8,
71:13, 71:20, 73:14,
74:11, 76:5, 121:10,
121:11, 121:14
**Locke's** [1] - 72:14
**logic** [1] - 121:18
**logical** [1] - 97:5
**long-standing** [1] -
76:14
**longstanding** [1] -
76:1
**look** [24] - 14:5, 25:22,
27:8, 31:17, 40:20,
45:15, 52:6, 57:6,
60:5, 61:10, 63:7,
74:11, 74:17, 76:21,
80:16, 81:13, 81:15,
83:21, 86:19, 86:23,
93:10, 106:12,
123:23, 136:13
**looked** [3] - 81:14,
93:9, 119:8
**looking** [10] - 25:9,
50:4, 73:3, 82:9,
82:10, 91:23, 92:23,
95:18, 96:15, 105:13
**looks** [1] - 66:10
**loosely** [1] - 70:18
**LOS** [1] - 6:14
**losing** [1] - 109:8
**loss** [10] - 16:15, 17:9,
18:4, 18:12, 18:23,
19:15, 43:15, 64:12,
81:16, 93:8
**losses** [3] - 18:16,
92:20, 101:7
**lost** [2] - 30:15, 70:5
**louder** [1] - 36:21
**Louisiana** [5] - 37:16,

70:4, 87:24, 140:5,
140:6
**LOUISIANA** [4] - 1:1,
1:7, 4:11, 6:18
**Louisiana's** [2] -
61:14, 68:17
**love** [1] - 49:5
**lower** [1] - 81:19
**lowest** [1] - 75:22
**LP** [1] - 6:4
**Ltd** [1] - 22:2
**lunch** [2] - 136:12,
139:22
**LUTHER** [1] - 3:23
**LUXENBERG** [1] -
2:16
**Lyle** [1] - 114:14
**LYLE** [10] - 7:8,
114:14, 115:25,
116:2, 116:9,
116:18, 116:21,
117:9, 117:20,
120:24
**LYLE**.........................
.....................[1] -
10:25
**Lynn** [7] - 18:17,
31:14, 31:22, 32:13,
91:4, 91:8, 93:2

## M

**M/V** [1] - 124:2
**Macondo** [6] - 21:1,
33:22, 34:15, 39:18,
93:20, 130:14
**magnitude** [2] - 93:23,
115:16
**mailed** [1] - 103:21
**MAIN** [1] - 3:4
**major** [2] - 34:8,
129:13
**MAJOR** [1] - 5:18
**majority** [4] - 19:7,
19:15, 66:3, 66:18
**maker** [1] - 84:24
**man** [2] - 100:15,
100:20
**Management** [1] -
114:15
**MANAGEMENT** [1] -
7:3
**management** [3] -
96:1, 98:20, 99:16
**mandate** [4] - 110:19,
111:21, 111:24,
132:12
**mandates** [1] - 132:12
**mandatory** [8] - 23:24,

25:21, 55:13, 96:18,
136:1, 136:5,
136:15, 136:16
**MANGES** [2] - 7:8,
7:11
**mangle** [1] - 124:3
**manner** [1] - 109:21
**manufactured** [1] -
60:13
**map** [1] - 13:17
**March** [1] - 59:3
**Margaret** [2] - 124:2,
124:12
**Marine** [8] - 16:21,
17:1, 17:19, 18:17,
23:9, 121:6, 122:8,
127:1
**MARINE** [4] - 6:20,
7:5, 7:6, 7:6
**maritime** [58] - 15:8,
15:15, 16:17, 17:12,
17:20, 18:15, 39:11,
39:16, 39:24, 40:11,
40:14, 40:15, 40:25,
41:3, 41:4, 48:21,
48:23, 52:14, 53:1,
53:6, 53:9, 53:19,
53:23, 54:2, 54:3,
54:18, 57:12, 57:13,
57:15, 58:11, 58:12,
61:20, 61:22, 63:2,
63:11, 68:11, 70:13,
72:18, 73:24, 74:3,
74:5, 76:6, 77:3,
77:4, 77:6, 80:5,
80:6, 81:11, 82:12,
82:14, 82:21, 84:12,
87:22, 106:19,
114:8, 125:17,
132:16
**Maritime** [40] - 14:24,
15:1, 16:8, 16:12,
16:16, 19:3, 19:5,
20:9, 35:5, 38:18,
40:1, 40:24, 41:2,
41:19, 41:21, 68:6,
69:8, 69:17, 71:16,
71:18, 72:16, 73:17,
74:21, 75:5, 75:18,
76:14, 76:22, 76:23,
77:15, 78:10, 79:7,
80:21, 81:17, 81:21,
82:1, 82:7, 85:1,
85:16, 86:17, 87:18
**marshal** [3] - 110:6,
111:21, 111:25
**MARTINEZ** [1] - 5:17
**MARTÍNEZ** [1] - 2:19
**MARY** [1] - 7:18
**Mary** [1] - 109:11

**MASTER** [1] - 8:23
**master** [9] - 12:15,
24:4, 26:8, 26:11,
60:3, 60:5, 67:10,
67:18, 133:25
**matter** [11] - 24:9,
26:24, 27:20, 40:5,
56:21, 58:23, 59:1,
92:3, 96:5, 98:17,
140:9
**MATTHEWS** [1] - 2:19
**MAY** [2] - 1:7, 12:2
**MAYEAUX** [1] - 8:4
**MAZE** [1] - 3:24
**McALOON** [1] - 8:8
**McCUTCHEN** [2] -
6:9, 6:12
**McGOVERN** [1] - 8:23
**McKINNEY** [1] - 5:14
**MDL** [3] - 8:19, 26:16,
126:23
**MDLs** [1] - 25:8
**mean** [15] - 17:24,
20:15, 24:8, 25:24,
29:12, 30:2, 42:10,
51:25, 63:3, 65:6,
83:21, 89:25, 90:21,
98:16, 128:13
**meaning** [1] - 74:8
**means** [9] - 18:2,
62:10, 62:11, 65:25,
84:2, 107:10,
107:11, 115:9,
137:19
**meant** [5] - 67:14,
75:14, 87:4, 101:14,
101:16
**MECHANICAL** [1] -
9:7
**mechanism** [1] -
52:15
**medical** [1] - 129:4
**meet** [5] - 25:20, 28:4,
32:11, 43:7, 139:22
**meets** [2] - 107:9,
107:14
**member** [1] - 101:12
**memorandum** [4] -
33:25, 68:5, 68:9,
93:10
**mention** [4] - 14:2,
18:1, 18:9, 81:3
**mentioned** [2] - 37:14,
107:5
**mentioning** [2] - 40:3,
83:13
**merely** [1] - 23:5
**Merit** [1] - 140:4
**met** [3] - 39:22, 123:4,
125:10

**methodologies** [2] -
102:13, 102:14
**METHOFF** [1] - 8:19
**METHVIN** [1] - 3:6
**MEXICO** [1] - 1:5
**Mexico** [6] - 60:15,
94:13, 95:11,
112:19, 113:17,
135:13
**MI** [1] - 6:16
**MICHAEL** [3] - 3:3,
3:15, 7:8
**Michael** [1] - 114:14
**Middlesex** [1] - 124:6
**might** [24] - 12:11,
19:14, 31:13, 39:5,
39:6, 39:9, 52:7,
55:5, 55:8, 56:7,
65:7, 69:24, 83:1,
83:5, 84:14, 90:25,
91:15, 94:1, 94:15,
96:9, 98:3, 99:4,
107:5, 138:1
**migrated** [1] - 77:25
**miles** [1] - 116:4
**Miles** [9] - 81:12,
81:13, 81:20, 81:23,
81:24, 82:4, 83:25,
84:5, 85:23
**MILES** [1] - 3:7
**MILLER** [1] - 4:6
**millions** [2] - 135:9,
135:10
**Milwaukee** [5] - 17:10,
78:3, 78:4, 107:19,
107:22
**Minaldi's** [2] - 92:17,
94:5
**mind** [3] - 20:25,
32:24, 70:16
**mine** [1] - 60:8
**mini** [3] - 23:5, 77:23
**minute** [3] - 17:18,
32:16, 70:7
**minutes** [11] - 12:22,
12:23, 12:24, 13:20,
109:3, 126:15,
126:19, 126:24,
131:6, 132:7
**misapplies** [1] - 58:7
**misapplying** [1] -
53:18
**misreads** [1] - 71:3
**missed** [1] - 51:18
**mission** [1] - 118:19
**Mississippi** [1] - 86:14
**mistake** [1] - 29:25
**mistaken** [1] - 53:22
**MITCHELL** [1] - 2:3
**mixing** [1] - 107:21

**MMS's** [2] - 93:13,
95:13
**MOBILE** [1] - 2:8
**mobile** [1] - 107:9
**modicum** [3] - 101:22,
102:18, 106:2
**MOEX** [2] - 6:4, 6:5
**moment** [3] - 36:13,
44:20, 51:15
**moments** [1] - 58:9
**money** [1] - 75:10
**monitoring** [7] -
101:25, 102:1,
103:13, 103:14,
103:19, 104:21,
129:4
**MONTGOMERY** [2] -
3:8, 3:25
**month** [1] - 46:6
**moot** [3] - 99:5, 99:8,
134:6
**mootness** [1] - 137:2
**moratorium** [21] -
30:13, 30:14, 30:16,
31:20, 42:16, 42:20,
42:21, 42:24, 43:1,
88:11, 91:5, 92:10,
92:11, 93:11, 93:12,
93:18, 93:22, 94:14,
94:21, 95:1, 95:2
**moreover** [1] - 136:22
**MORGAN** [1] - 6:16
**morning** [13] - 13:12,
33:2, 33:3, 43:14,
43:20, 43:21, 68:1,
68:2, 80:1, 88:13,
109:13, 121:10,
131:20
**most** [14] - 12:20,
13:1, 13:11, 30:12,
50:25, 51:10, 56:18,
58:21, 63:12, 68:10,
73:1, 74:19, 76:16,
78:11
**mostly** [1] - 38:20
**motion** [17] - 14:1,
18:25, 33:8, 44:4,
46:2, 46:18, 48:9,
58:21, 59:5, 59:6,
59:14, 59:17, 61:14,
68:17, 109:12,
121:3, 129:14
**motions** [6] - 12:14,
42:5, 59:20, 98:16,
114:18, 114:19
**move** [7] - 27:18,
30:10, 62:19, 109:1,
109:2, 127:15,
129:15
**moved** [1] - 65:6

moves [1] - 65:10
moving [5] - 19:21,
64:25, 65:9, 109:18,
132:23
MR [269] - 10:5, 10:7,
10:8, 10:9, 10:10,
10:11, 10:12, 10:13,
10:14, 10:15, 10:16,
10:17, 10:18, 10:19,
10:21, 10:22, 10:25,
11:1, 11:2, 11:3,
11:8, 11:9, 11:10,
11:11, 11:12, 11:13,
11:14, 12:11, 12:13,
13:4, 13:8, 13:17,
13:23, 15:7, 15:12,
15:19, 15:23, 16:2,
16:5, 16:9, 16:11,
16:15, 19:9, 19:12,
19:23, 20:4, 20:6,
20:10, 20:15, 20:18,
21:16, 22:15, 24:11,
24:16, 24:22, 24:24,
25:13, 26:3, 26:6,
27:3, 27:8, 27:23,
28:8, 28:15, 28:21,
29:11, 29:22, 31:4,
32:2, 32:6, 32:9,
32:22, 33:2, 33:4,
33:14, 33:16, 33:21,
34:9, 34:14, 34:20,
34:24, 35:14, 35:19,
36:3, 36:11, 36:23,
37:4, 37:24, 39:4,
39:13, 40:12, 41:16,
41:22, 42:2, 42:8,
42:12, 43:5, 43:16,
43:18, 43:20, 43:22,
43:25, 44:2, 44:16,
44:19, 44:22, 45:7,
46:10, 47:3, 47:5,
48:15, 49:5, 49:8,
49:13, 49:16, 49:21,
49:23, 50:6, 50:22,
51:13, 51:18, 54:6,
54:8, 54:22, 54:24,
55:10, 55:15, 55:19,
56:1, 56:8, 56:15,
59:23, 60:23, 61:2,
61:9, 62:8, 62:14,
62:17, 62:24, 63:2,
63:7, 63:23, 65:1,
65:5, 65:15, 66:17,
66:22, 67:1, 67:4,
67:6, 67:17, 67:23,
68:1, 68:3, 68:8,
68:15, 68:22, 69:3,
69:5, 69:10, 69:20,
70:1, 70:12, 70:15,
70:17, 70:21, 73:10,
73:14, 73:20, 73:25,

74:9, 74:16, 77:2,
77:6, 77:9, 78:5,
78:10, 78:19, 79:2,
79:12, 79:15, 79:22,
80:1, 80:8, 80:16,
83:11, 83:17, 86:12,
86:15, 86:18, 86:22,
87:5, 88:2, 88:8,
88:10, 88:13, 88:22,
89:5, 89:19, 90:3,
90:6, 90:20, 90:22,
90:25, 92:18, 92:24,
93:1, 94:6, 94:22,
95:4, 95:22, 95:24,
96:6, 96:14, 96:21,
97:15, 98:12, 98:20,
99:18, 99:19,
106:14, 107:4,
107:7, 107:18,
108:7, 108:9,
108:13, 108:21,
108:25, 109:6,
114:14, 115:25,
116:2, 116:9,
116:18, 116:21,
117:9, 117:20,
120:24, 121:2,
121:6, 122:8, 124:5,
126:14, 132:23,
133:1, 133:8, 134:8,
134:10, 134:15,
134:18, 134:19,
134:22, 135:2,
135:6, 135:9,
135:12, 135:16,
135:19, 135:24,
136:9, 136:13,
136:17, 137:2,
137:5, 138:3,
138:18, 139:2, 139:5
MS [28] - 10:20, 10:24,
11:4, 11:5, 99:23,
100:23, 102:6,
103:6, 103:10,
103:24, 104:4,
104:16, 109:10,
110:13, 110:15,
111:10, 111:18,
112:10, 113:10,
113:13, 126:20,
126:25, 127:8,
128:21, 129:20,
132:1, 132:4, 132:8
MSRC [4] - 121:16,
122:1, 123:24,
124:20
MTBE [7] - 131:9,
131:10, 132:5,
132:9, 132:10,
132:12
multiple [2] - 138:10

Murphy [2] - 24:3,
27:9
must [20] - 23:18,
23:20, 42:17, 42:18,
44:11, 55:21, 60:4,
61:19, 64:17, 74:23,
74:25, 75:8, 76:17,
79:7, 83:12, 83:13,
83:24, 112:17,
131:15

N

N.W [2] - 5:4, 8:16
nail [1] - 44:20
Nalco [4] - 109:11,
115:23, 131:6,
132:19
NALCO [1] - 7:18
Nalco's [2] - 109:12,
132:5
name [6] - 33:4, 43:24,
94:5, 124:3, 137:5,
139:5
named [3] - 59:2,
59:3, 59:10
narrow [1] - 80:4
narrowing [1] - 75:21
national [2] - 113:22,
115:8
National [12] - 109:16,
112:12, 112:16,
112:18, 113:1,
113:14, 114:16,
115:11, 120:13,
122:10, 124:7
Natural [1] - 138:9
natural [4] - 42:19,
93:19, 94:25, 95:5
navigable [2] - 38:25,
41:1
NC [1] - 8:25
near [1] - 103:8
necessarily [4] -
16:12, 60:4, 88:19,
91:17
necessary [5] - 53:7,
110:6, 111:22,
114:10, 132:18
necessity [1] - 57:22
need [28] - 12:9, 18:1,
18:9, 19:18, 22:9,
23:8, 25:5, 29:7,
31:4, 31:5, 34:22,
41:20, 42:15, 53:4,
53:10, 54:3, 55:5,
68:10, 75:4, 80:23,
107:20, 109:4,
120:5, 120:6, 120:8,

133:2, 133:21
needed [2] - 120:16,
120:18
needs [4] - 14:3,
96:17, 115:17,
136:13
negligence [18] -
40:21, 41:10, 48:21,
48:22, 60:19, 83:9,
100:1, 100:8,
101:10, 103:1,
105:6, 105:9,
105:11, 116:8,
125:24, 125:25,
129:5
negligent [3] - 44:18,
58:18, 119:6
negotiating [1] - 23:21
NETWORK [1] - 3:11
NEUNER [1] - 8:3
never [15] - 30:21,
37:11, 39:3, 55:7,
63:3, 70:9, 76:12,
127:20, 128:23,
128:25, 130:19,
130:23, 131:4
New [8] - 78:7, 78:9,
119:19, 126:22,
127:25, 128:2,
128:3, 130:2
NEW [13] - 1:7, 1:21,
2:11, 2:17, 4:8, 4:21,
5:11, 6:7, 6:22, 7:12,
7:24, 8:9, 9:4
new [1] - 79:4
newspaper [1] -
127:11
next [6] - 70:17, 88:11,
97:23, 99:12,
108:25, 132:3
nine [1] - 132:7
Ninth [3] - 37:3, 37:25,
93:4
NO [1] - 1:6
non [1] - 99:21
non-operator [1] -
99:21
noncommercial [1] -
137:13
noncontract [1] - 49:3
none [6] - 18:20,
24:20, 72:25,
127:16, 127:17,
129:12
nonexistence [1] -
57:18
nonfederal [1] - 54:15
nonmaritime [2] -
78:20, 78:22
nonoil [1] - 78:21

nonoil-producing [1]
- 78:21
nonoperating [3] -
45:13, 46:4, 54:19
nonoperators [8] -
44:5, 44:10, 45:25,
46:14, 47:9, 47:14,
48:20, 55:21
nonresponsible [4] -
56:21, 57:2, 58:5,
63:24
NORFOLK [1] - 1:25
NORTH [4] - 4:15,
4:15, 4:17, 4:18
note [6] - 36:20,
58:25, 90:14, 91:24,
93:2, 102:22
noted [4] - 39:5, 58:9,
69:11, 129:22
Nothing [1] - 84:19
nothing [10] - 23:1,
25:9, 56:10, 74:14,
85:4, 104:10, 107:1,
131:14, 132:19,
134:15
notice [6] - 30:4, 30:5,
55:11, 133:15,
134:11, 138:3
notify [2] - 45:25,
47:13
notwithstanding [4] -
73:2, 73:4, 76:18,
77:14
NPDES [1] - 21:2
NRC [3] - 115:4,
116:3, 129:9
NRD [1] - 133:20
nuisance [3] - 40:22,
41:10, 125:24
nullify [1] - 72:10
number [8] - 12:14,
20:1, 31:12, 67:10,
96:16, 113:19,
120:11, 138:11
numbered [1] - 140:9
numbers [5] - 26:12,
26:20, 26:22, 27:14,
96:12
numerous [1] - 67:11
NW [2] - 6:10, 7:9
NY [3] - 2:17, 6:22,
7:12

O

O'Brien's [4] - 114:15,
115:2, 116:23, 122:9
O'BRIEN'S [1] - 7:3
O'KEEFE [1] - 1:21

O'ROURKE [1] - 3:20
objective [1] - 111:2
obligation [3] -
110:19, 123:9,
131:12
obligations [1] - 106:2
observations [1] -
95:25
observed [1] - 105:18
obstacle [3] - 110:23,
110:24, 111:1
obviously [11] - 12:21,
20:1, 41:19, 42:4,
46:5, 59:7, 72:4,
73:14, 80:2, 106:24,
111:16
occupy [2] - 84:8,
84:11
occur [2] - 39:19,
77:19
occurred [10] - 14:8,
21:11, 21:12, 38:20,
57:10, 60:19, 61:17,
77:24, 78:8, 103:8
occurrence [2] -
61:16, 64:4
occurring [3] - 40:25,
52:9, 77:23
occurs [1] - 68:23
ocean [1] - 130:14
OCS [5] - 51:3, 51:5,
51:8, 52:2, 139:13
OCSLA [30] - 14:6,
14:9, 14:19, 16:1,
21:24, 21:25, 22:1,
22:18, 23:2, 40:5,
40:7, 40:14, 40:18,
50:18, 51:1, 52:8,
54:7, 54:11, 56:18,
57:8, 61:5, 63:10,
63:13, 64:13, 65:21,
67:24, 68:13, 68:19,
68:25, 69:9
OCSLA's [1] - 53:11
October [1] - 68:16
OF [12] - 1:1, 1:5,
1:11, 3:14, 3:19,
3:20, 8:11, 8:15,
8:23, 8:24, 11:6
offer [2] - 31:1, 107:24
office [1] - 103:19
OFFICE [2] - 3:8, 3:23
OFFICES [1] - 8:11
OFFICIAL [1] - 9:3
Official [2] - 140:5,
140:14
offshore [4] - 100:14,
107:9, 107:12,
139:13
OFFSHORE [3] - 4:4,

6:5, 7:4
often [3] - 53:1, 56:10,
100:21
Oil [7] - 14:10, 24:3,
27:9, 31:14, 31:23,
39:25, 128:23
OIL [2] - 1:4, 1:4
oil [59] - 17:4, 17:9,
30:20, 32:3, 32:4,
32:8, 34:8, 35:5,
38:9, 38:12, 38:20,
39:9, 39:18, 40:25,
43:3, 43:7, 43:8,
60:7, 60:9, 60:15,
60:20, 61:2, 61:3,
61:15, 63:11, 64:16,
65:22, 75:6, 76:3,
76:21, 77:16, 84:21,
86:13, 91:10, 91:11,
93:6, 93:9, 93:20,
100:20, 101:2,
108:2, 108:3,
108:14, 110:8,
113:7, 115:6, 116:5,
116:14, 117:1,
117:24, 122:1,
129:11, 130:13,
130:21, 135:10
old [2] - 83:25, 126:4
omissions [1] - 118:6
omits [1] - 51:24
omnibus [2] - 14:22,
33:24
ON [1] - 1:5
on-land [1] - 95:9
on-scene [4] - 111:6,
111:10, 111:20,
112:23
once [9] - 36:8, 65:9,
65:16, 65:17, 65:18,
65:19, 65:23, 69:11
one [57] - 12:22, 17:9,
22:9, 24:9, 28:3,
37:16, 45:5, 45:24,
47:21, 48:11, 49:9,
50:6, 51:25, 53:18,
55:24, 56:9, 66:19,
67:9, 69:13, 69:20,
74:3, 76:25, 78:2,
78:25, 80:14, 81:4,
82:5, 83:3, 84:17,
87:11, 91:22, 99:19,
100:3, 103:12,
103:13, 106:14,
109:9, 114:22,
114:24, 120:11,
123:6, 123:11,
123:14, 124:21,
125:3, 125:4, 125:5,
125:11, 126:2,

127:10, 127:22,
128:1, 128:10,
129:3, 129:9
ONE [6] - 4:20, 5:7,
5:13, 8:4, 8:8, 8:20
ones [2] - 43:13, 85:19
ongoing [12] - 100:7,
101:14, 101:15,
103:24, 133:14,
134:6, 134:24,
135:14, 135:15,
136:3, 137:21,
137:24
onshore [2] - 37:22,
39:19
OPA [139] - 14:6,
14:13, 14:14, 14:16,
14:25, 16:4, 16:16,
16:18, 17:3, 17:7,
17:11, 17:19, 17:21,
17:24, 18:3, 18:11,
19:2, 19:3, 20:8,
22:5, 22:7, 22:9,
22:13, 22:19, 22:22,
22:24, 22:25, 23:6,
23:16, 24:25, 25:20,
27:13, 27:25, 30:24,
31:13, 31:18, 31:21,
34:25, 35:3, 35:4,
35:6, 35:9, 35:16,
35:20, 36:12, 40:19,
41:4, 41:5, 41:7,
48:20, 49:8, 49:9,
49:10, 49:19, 53:5,
53:24, 54:5, 54:7,
54:21, 54:22, 54:25,
55:1, 56:19, 56:20,
56:24, 56:25, 57:2,
57:15, 57:25, 58:4,
58:11, 64:14, 64:15,
68:6, 69:16, 70:13,
71:2, 71:4, 71:10,
71:11, 71:13, 71:15,
71:24, 72:4, 72:9,
73:12, 73:15, 73:16,
73:22, 73:23, 74:18,
75:4, 75:8, 75:17,
76:20, 78:23, 79:9,
79:23, 80:4, 80:6,
80:20, 82:18, 82:20,
82:24, 83:3, 84:14,
84:17, 85:16, 86:17,
87:8, 87:9, 87:17,
87:22, 88:16, 89:16,
90:15, 92:23, 92:25,
96:15, 96:16, 98:3,
100:2, 100:4,
105:17, 106:19,
106:21, 107:10,
108:10, 108:11,

108:16, 108:17,
108:22, 121:15,
121:17, 127:19,
127:20
OPA's [5] - 14:19,
14:20, 15:14, 30:14,
71:24
OPAs [2] - 23:6, 77:23
open [1] - 52:15
opened [1] - 32:3
operated [1] - 122:12
operating [3] - 21:1,
45:8, 46:6, 47:1,
101:12, 101:13,
101:17, 102:19,
102:20, 105:19,
106:1, 106:9
Operating [1] - 22:2
operation [2] - 101:7,
115:10
operational [6] -
44:22, 45:19, 45:22,
48:1, 48:7, 54:20
operations [10] - 21:1,
45:12, 46:17, 50:10,
50:13, 50:14, 52:3,
65:20, 65:22, 130:16
operator [3] - 45:10,
99:21, 100:20
operators [1] - 47:1
opinion [7] - 37:9,
39:5, 66:18, 71:1,
71:2, 73:15, 87:2
opinions [1] - 74:18
Oppen [2] - 37:3, 38:1
Opportunity [1] -
42:23
opportunity [1] -
126:12
opposed [6] - 47:20,
49:25, 55:6, 71:21,
79:7, 120:14
opposite [2] - 47:5,
53:2
opposition [4] - 14:23,
46:18, 89:21, 102:23
OR [2] - 8:13, 11:6
ORAL [1] - 1:11
oral [1] - 32:19
order [9] - 13:11, 26:6,
29:22, 59:4, 80:23,
128:18, 135:14,
136:2, 136:17
ORDER [1] - 12:4
ordered [4] - 122:24,
125:20, 128:13,
129:10
orders [4] - 119:24,
120:3, 126:8, 129:12
ordinarily [2] - 26:15,

40:10
Oregon [1] - 86:1
original [1] - 33:25
originally [1] - 59:2
originated [3] - 60:7,
60:8, 61:3
ORLEANS [10] - 1:7,
1:21, 2:11, 4:8, 4:21,
5:11, 6:7, 7:24, 8:9,
9:4
otherwise [7] - 17:23,
74:2, 74:7, 78:12,
83:20, 89:1
Ouellette [3] - 20:23,
21:3, 129:20
ounce [1] - 117:24
Outer [11] - 14:8,
15:13, 17:4, 21:6,
52:9, 57:10, 60:8,
61:5, 61:16, 93:14,
107:15
outline [1] - 87:15
outlined [1] - 114:20
outlines [1] - 73:16
outs [1] - 112:13
outset [4] - 14:2,
32:18, 48:16, 88:15
outside [2] - 21:4,
21:17
overlooked [1] -
137:14
overreading [1] - 23:4
overrule [1] - 18:20
overruled [1] - 41:3
overstated [1] - 49:4
overturned [1] -
124:15
owed [4] - 45:24, 49:1,
50:13, 50:14
own [17] - 23:6, 40:15,
45:2, 45:19, 47:7,
47:17, 53:19, 53:23,
54:4, 57:12, 58:11,
60:5, 68:12, 69:8,
77:22, 83:6, 123:24
owned [2] - 39:7,
67:20
owner [4] - 37:22,
49:20, 100:19
oxygenates [1] -
131:11
oysterman [1] - 38:7
oystermen [2] - 37:18,
39:6
oysters [1] - 39:8

**P**

p.m [1] - 139:23

**P.O** [1] - 3:21
**page** [4] - 25:15, 93:17, 93:18, 114:2
**PAGE** [1] - 10:3
**paid** [1] - 14:14
**PALMINTIER** [2] - 3:3, 3:3
**PAN** [1] - 2:10
**Panel** [1] - 126:23
**panoply** [1] - 101:5
**PAPANTONIO** [1] - 2:3
**paper** [4] - 89:11, 89:23, 90:8, 130:10
**Paper** [2] - 129:22, 130:6
**papers** [4] - 31:20, 106:18, 114:20, 118:10
**paragraph** [4] - 25:16, 30:7, 87:1, 102:16
**paragraphs** [2] - 67:10, 67:11
**Parish** [1] - 38:14
**PARKWAY** [1] - 7:15
**part** [27] - 40:13, 46:14, 60:11, 61:4, 66:7, 67:16, 67:18, 67:20, 72:1, 84:15, 88:3, 88:4, 92:2, 93:21, 94:22, 94:23, 95:1, 111:21, 111:24, 116:12, 116:19, 116:23, 123:14, 123:15, 139:7
**participate** [1] - 108:15
**participation** [1] - 103:2
**particular** [3] - 24:14, 64:19, 66:16
**particularly** [4] - 52:18, 61:12, 95:12, 131:23
**parties** [22] - 12:19, 15:5, 17:8, 28:4, 34:18, 35:4, 36:1, 43:9, 45:14, 45:18, 49:1, 54:19, 58:3, 58:5, 58:17, 58:18, 59:13, 64:19, 99:2, 121:16, 121:17
**parties'** [2] - 56:16, 58:20
**partly** [4] - 36:1, 82:25, 139:9
**partner** [1] - 46:4
**partners** [1] - 47:1
**parts** [2] - 41:20, 52:6

**party** [43] - 14:13, 15:4, 15:16, 16:16, 17:12, 18:3, 22:5, 23:15, 23:19, 24:25, 33:11, 34:4, 34:17, 35:17, 35:23, 35:24, 35:25, 36:6, 36:7, 36:8, 49:12, 49:22, 56:22, 57:1, 57:2, 59:10, 59:11, 63:17, 63:19, 63:25, 64:2, 64:20, 78:13, 78:18, 96:16, 96:17, 98:1, 127:19, 127:20, 128:5, 128:23
**pass** [1] - 23:6
**passage** [1] - 106:21
**passed** [1] - 29:12
**passing** [1] - 52:19
**passive** [2] - 104:9
**past** [2] - 100:21, 103:9
**PAUL** [2] - 2:10, 4:6
**pause** [1] - 18:7
**pay** [2] - 36:6, 46:5
**payment** [1] - 64:16
**payments** [1] - 64:9
**PENNZOIL** [1] - 4:10
**PENSACOLA** [1] - 2:5
**PENTHOUSE** [1] - 2:20
**people** [20] - 26:12, 26:21, 27:12, 28:6, 28:10, 28:11, 28:17, 31:13, 56:6, 60:23, 62:20, 80:14, 89:3, 97:20, 104:3, 109:8, 111:16, 113:6, 116:16, 117:3
**Pepper** [3] - 140:3, 140:12, 140:13
**PEPPER** [1] - 9:3
**per** [4] - 12:23, 12:24, 125:25, 129:11
**percent** [4] - 46:6, 46:7, 102:13, 102:21
**percentage** [1] - 102:24
**perhaps** [4] - 15:5, 28:4, 32:15, 46:10
**period** [2] - 23:21, 133:15
**permanently** [1] - 134:12
**permit** [17] - 21:2, 21:3, 48:9, 129:22, 129:25, 130:6, 130:7, 130:8, 130:12, 130:13, 130:15, 130:20,

130:22, 130:23, 131:3
**permitted** [3] - 52:20, 130:13, 131:4
**person** [4] - 103:21, 104:20, 113:7, 125:22
**personal** [4] - 42:19, 60:24, 129:3, 129:4
**personnel** [4] - 115:3, 116:3, 116:12, 118:22
**perspective** [1] - 136:1
**persuasive** [2] - 66:15, 124:14
**pervasive** [1] - 114:7
**PETROLEUM** [2] - 6:3, 8:4
**phase** [1] - 71:7
**PHILLIP** [1] - 5:10
**phrase** [2] - 43:3, 74:7
**physical** [4] - 18:16, 19:13, 36:16, 73:6, 83:6
**pick** [1] - 25:10
**picked** [1] - 91:3
**pieces** [3] - 56:16, 56:17, 58:19
**PIGMAN** [1] - 5:9
**PINHOOK** [1] - 8:5
**pipe** [2] - 60:21, 62:5
**Pipeline** [1] - 22:2
**place** [12] - 15:14, 21:19, 38:21, 62:1, 83:8, 89:25, 90:24, 91:16, 94:14, 95:2, 115:10, 117:21
**PLACE** [2] - 4:10, 7:23
**places** [1] - 114:4
**plaintiff** [9] - 14:3, 18:13, 18:19, 23:18, 24:24, 25:23, 26:7, 30:19, 98:25
**Plaintiff** [1] - 29:1
**plaintiffs** [70] - 14:24, 15:15, 16:23, 18:21, 21:7, 22:8, 23:4, 23:15, 25:14, 25:20, 26:19, 27:25, 28:5, 29:5, 29:11, 30:13, 30:14, 30:18, 33:17, 33:24, 35:11, 35:12, 35:15, 39:21, 40:22, 41:11, 41:13, 44:13, 45:3, 45:9, 45:21, 47:11, 48:3, 48:19, 50:6, 50:7, 50:9, 51:16, 53:8, 54:25, 55:21, 57:2, 57:14,

58:5, 59:11, 60:17, 61:19, 64:6, 64:9, 67:6, 68:5, 69:18, 75:15, 84:14, 85:15, 88:14, 88:15, 93:5, 99:24, 102:3, 105:14, 106:23, 109:18, 113:25, 121:12, 122:5, 123:4, 125:2, 126:9, 127:18
**Plaintiffs** [2] - 25:16, 110:16
**PLAINTIFFS** [1] - 1:23
**PLAINTIFFS'** [1] - 1:15
**Plaintiffs'** [1] - 29:16
**plaintiffs'** [17] - 14:22, 23:11, 25:6, 25:19, 46:11, 52:13, 56:25, 59:15, 60:5, 64:11, 67:5, 109:15, 110:9, 111:3, 121:19, 121:22, 122:15
**plan** [4] - 98:24, 115:13, 116:19, 118:7
**Plan** [9] - 109:17, 112:12, 112:13, 112:16, 112:18, 113:1, 113:14, 115:12, 120:13
**planning** [1] - 42:7
**plant** [2] - 92:19, 129:24
**planted** [2] - 66:4, 66:8
**Plaquemines** [1] - 38:14
**plated** [1] - 105:8
**platform** [4] - 61:21, 61:25, 66:11, 100:19
**platforms** [4] - 51:23, 52:22, 53:1, 53:21
**plausible** [3] - 27:12, 27:13, 92:4
**play** [2] - 19:6, 69:9
**players** [1] - 138:10
**plead** [1] - 136:14
**pleaded** [1] - 106:8
**pleading** [8] - 27:12, 67:13, 92:3, 95:15, 105:2, 105:10, 125:4, 136:10
**pleadings** [1] - 92:8
**pled** [4] - 53:8, 92:11, 124:23, 125:5
**plenty** [1] - 76:7
**PLT** [6] - 40:12, 53:19, 58:7, 58:10, 58:13,

69:9
**plus** [3] - 14:9, 26:16, 47:15
**point** [62] - 17:3, 17:4, 17:15, 17:18, 23:8, 24:16, 26:23, 27:2, 29:6, 33:16, 40:17, 40:18, 43:1, 44:20, 45:8, 46:8, 47:6, 47:18, 48:11, 49:8, 49:18, 50:6, 50:11, 51:14, 51:19, 52:23, 56:14, 56:11, 57:17, 58:1, 58:23, 60:2, 63:13, 63:15, 64:8, 67:8, 67:10, 72:12, 73:9, 88:23, 88:24, 89:1, 96:8, 99:13, 100:5, 104:8, 104:23, 105:2, 106:14, 107:7, 113:24, 121:11, 124:17, 127:1, 131:17, 132:5, 133:9, 134:14, 135:2, 138:12, 138:16, 139:11
**pointed** [5] - 34:24, 57:19, 57:25, 115:7, 124:22
**pointing** [3] - 37:10, 46:11, 59:15
**points** [5] - 32:15, 50:17, 56:12, 60:1, 121:8
**policy** [1] - 81:15
**POLK** [1] - 6:5
**polluter** [2] - 121:25, 123:7, 127:18, 129:8
**polluters** [1] - 122:2
**pollution** [7] - 76:3, 76:21, 77:16, 84:9, 87:22, 130:1, 135:12
**Pollution** [3] - 14:10, 39:25, 128:23
**Port** [6] - 16:21, 17:1, 17:19, 23:9, 85:21, 86:2
**PORTIS** [1] - 3:7
**position** [33] - 14:2, 14:4, 15:3, 15:11, 15:13, 15:18, 15:22, 16:19, 18:24, 19:9, 20:19, 23:25, 27:24, 28:13, 28:14, 30:13, 30:23, 30:25, 52:13, 56:15, 57:5, 63:11, 64:14, 71:1, 106:16, 106:22, 107:8, 107:16, 121:11,

136:25, 137:6
**positioning** [1] - 62:2
**positions** [1] - 57:8
**possible** [2] - 19:14, 23:14
**possibly** [6] - 19:12, 21:16, 50:12, 50:14, 130:22
**POST** [1] - 3:8
**potential** [1] - 49:24
**potentially** [6] - 49:9, 49:14, 58:17, 135:19, 135:20, 135:21
**power** [3] - 104:14, 104:17, 128:14
**powers** [2] - 23:1, 136:4
**POYDRAS** [6] - 2:11, 4:7, 4:20, 6:7, 8:9, 9:4
**practical** [7] - 25:9, 29:7, 42:1, 96:5, 97:6, 99:14, 99:16
**practicalities** [1] - 25:11
**practice** [1] - 98:20
**pre** [1] - 40:19
**pre-OPA** [1] - 40:19
**preapproved** [2] - 112:17, 122:19
**precedent** [5] - 29:9, 48:6, 55:13, 96:19, 97:1
**preceding** [1] - 103:8
**precise** [1] - 134:25
**precisely** [6] - 25:12, 26:1, 36:3, 40:12, 105:18, 117:17
**precluded** [2] - 84:4, 92:22
**precludes** [1] - 80:20
**predated** [1] - 80:25
**predates** [2] - 86:1
**predecided** [3] - 113:18, 113:20, 122:19
**preempt** [4] - 20:2, 20:20, 76:4, 81:10
**preempted** [5] - 19:22, 21:22, 75:18, 114:11, 130:5
**preempting** [2] - 22:17, 114:7
**preemption** [33] - 19:19, 20:2, 20:16, 20:18, 21:10, 21:14, 22:10, 22:20, 22:23, 35:3, 35:4, 35:10, 40:18, 40:23, 41:3,

41:5, 44:6, 52:7, 72:1, 88:3, 107:21, 109:14, 109:15, 110:24, 121:23, 124:18, 129:15, 129:21, 130:23, 131:1, 132:11
**preemptive** [1] - 23:1
**preempts** [7] - 16:7, 21:5, 21:24, 22:13, 41:5, 80:20, 110:25
**Preis** [1] - 89:17
**prejudice** [4] - 26:10, 29:23, 96:10, 97:10
**prepare** [1] - 113:21
**presence** [1] - 45:1
**present** [6] - 23:19, 30:2, 34:17, 35:21, 36:5, 47:12
**presented** [6] - 28:13, 28:14, 28:17, 30:1, 50:18, 99:3
**presentiment** [1] - 23:13
**presentment** [31] - 14:21, 24:4, 24:13, 25:1, 26:9, 27:5, 27:7, 28:1, 29:2, 29:13, 29:19, 29:24, 30:1, 33:8, 34:4, 34:11, 34:12, 34:22, 35:22, 55:2, 56:20, 56:22, 95:24, 96:13, 96:17, 98:4, 99:7, 99:8, 99:11, 106:15, 106:23
**preservations** [1] - 71:15
**preserve** [3] - 77:21, 121:12, 121:22
**preserved** [5] - 71:10, 71:11, 71:19, 71:22, 106:20
**President** [10] - 109:25, 110:5, 110:18, 111:5, 112:11, 112:14, 113:11, 114:10, 132:13, 132:17
**President's** [1] - 111:19
**presiding** [1] - 70:5
**presume** [2] - 107:20, 107:22
**pretend** [1] - 126:23
**pretty** [8] - 27:9, 32:22, 35:2, 42:17, 50:23, 90:19, 90:21, 138:14
**prevail** [1] - 66:14

**prevent** [1] - 94:20
**prevented** [1] - 102:5
**previously** [1] - 115:11
**Price** [2] - 92:15, 94:6
**price** [2] - 93:7, 93:8
**primarily** [1] - 85:20
**primary** [1] - 129:10
**principal** [3] - 44:24, 45:19, 64:19
**principle** [1] - 37:9
**priority** [1] - 13:11
**prism** [1] - 105:22
**pristine** [2] - 87:23
**private** [9] - 119:25, 123:20, 123:21, 124:1, 124:9, 124:16, 127:25, 128:6, 128:11
**privity** [3] - 18:19, 127:16, 128:6
**problem** [7] - 26:19, 27:19, 28:20, 29:4, 133:14, 133:16, 136:4
**procedural** [2] - 41:12, 123:3
**procedurally** [1] - 35:21
**Procedure** [1] - 40:6
**procedure** [2] - 58:14, 58:15
**procedures** [3] - 103:3, 103:7, 103:11
**proceed** [4] - 64:1, 76:11, 78:24, 98:13
**proceedings** [2] - 139:23, 140:8
**PROCEEDINGS** [3] - 1:11, 9:7, 12:1
**proceeds** [1] - 138:12
**process** [16] - 14:14, 23:18, 25:3, 26:22, 28:10, 44:25, 58:7, 96:8, 112:5, 116:10, 122:21, 130:6, 137:10, 138:9, 138:13, 138:23
**processing** [1] - 129:24
**PROCTOR** [1] - 2:3
**produced** [1] - 130:18
**PRODUCED** [1] - 9:7
**producing** [1] - 78:21
**product** [4] - 112:18, 113:1, 113:14, 113:25
**PRODUCTION** [2] - 4:14, 4:17
**products** [2] - 112:25,

113:14
**PRODUCTS** [1] - 4:18
**Professor** [2] - 89:11, 89:22
**PROFESSOR** [1] - 8:23
**Profile** [1] - 29:1
**profit** [1] - 102:14
**profits** [1] - 46:7
**profoundly** [1] - 100:10
**progeny** [1] - 20:24
**program** [2] - 108:15, 132:11
**prohibits** [1] - 18:15
**prong** [1] - 40:15
**pronouncing** [1] - 93:3
**proof** [1] - 75:6
**proper** [6] - 16:7, 43:3, 56:18, 57:7, 58:10, 58:14
**properly** [11] - 14:6, 14:11, 14:17, 26:13, 28:13, 28:14, 31:21, 108:22, 116:13, 117:5, 125:12
**property** [8] - 31:8, 32:5, 42:19, 43:15, 83:6, 93:20, 101:5, 130:1
**proprietary** [4] - 18:17, 19:13, 36:17, 39:8
**protected** [1] - 58:4
**protection** [1] - 37:21
**prove** [4] - 19:16, 27:11, 83:9, 108:17
**provide** [7] - 18:4, 53:6, 81:25, 115:3, 116:3, 116:22, 123:1
**provided** [10] - 17:24, 57:15, 74:2, 74:7, 83:20, 83:21, 102:25, 115:2, 115:5, 122:10
**provides** [5] - 17:5, 17:7, 23:16, 29:8, 72:20
**providing** [5] - 18:3, 116:3, 116:11, 119:6, 119:13
**province** [1] - 132:16
**provision** [10] - 57:21, 57:23, 68:20, 73:24, 85:10, 85:11, 121:24, 123:19, 128:24
**provisions** [10] - 51:1, 71:15, 71:22, 72:14,

72:24, 73:3, 73:16, 76:10, 101:18, 123:1
**proximate** [13] - 31:3, 31:9, 88:16, 88:19, 88:25, 90:1, 90:5, 90:6, 90:7, 91:8, 92:6, 92:13, 107:25
**PSC** [4] - 15:4, 67:11, 70:21, 126:14
**PSC's** [1] - 106:15
**PTO** [1] - 96:2
**public** [2] - 115:16, 120:17
**publicly** [1] - 31:19
**pull** [1] - 70:15
**punitive** [24] - 18:2, 18:5, 79:23, 80:7, 80:17, 80:22, 81:19, 81:21, 81:25, 82:19, 82:21, 83:18, 83:23, 85:1, 85:17, 85:20, 86:4, 86:6, 86:20, 86:23, 86:24, 87:10, 87:17, 87:19
**pure** [1] - 19:15
**purpose** [8] - 76:21, 76:23, 94:21, 94:23, 111:1, 137:9, 137:15
**purposes** [2] - 32:10, 83:3
**pursue** [8] - 35:22, 36:8, 62:20, 62:21, 64:3, 85:15, 85:16, 137:19
**pursuing** [1] - 34:7
**push** [1] - 126:16
**put** [20] - 29:13, 29:17, 36:12, 36:13, 56:17, 83:7, 83:8, 94:14, 94:18, 95:2, 96:8, 113:14, 113:22, 115:10, 115:14, 117:12, 117:13, 117:17, 117:22
**puts** [2] - 34:1, 106:8
**putting** [1] - 79:8

**Q**

**questions** [11] - 20:2, 50:17, 54:9, 82:4, 82:18, 95:20, 107:2, 121:4, 129:14, 131:21, 137:16
**quickly** [3] - 95:24, 129:15, 131:5
**QUIP** [1] - 7:14
**quite** [4] - 52:22, 70:25, 127:23,

131:17
**quote** [6] - 25:16, 25:18, 45:9, 45:17, 48:5, 132:11
**quoting** [1] - 107:10

# R

**RAFFERTY** [1] - 2:3
**raised** [3] - 59:16, 83:19, 133:10
**ramifications** [1] - 63:21
**rather** [1] - 89:8
**rationale** [5] - 37:17, 82:4, 119:24, 120:15, 120:19
**RAYZOR** [1] - 4:9
**RD** [1] - 8:5
**RE** [1] - 1:4
**re** [3] - 81:5, 86:7, 118:11
**reached** [1] - 52:1
**reaching** [1] - 95:9
**reactions** [2] - 27:4, 27:23
**read** [12] - 32:19, 32:23, 32:24, 64:23, 68:5, 68:9, 68:16, 86:10, 89:22, 91:19, 114:21, 127:11
**reading** [2] - 14:22, 53:11
**reaffirming** [1] - 37:9
**real** [4] - 31:7, 42:18, 57:17, 69:16
**realize** [2] - 40:19, 70:11
**really** [19] - 17:3, 17:18, 21:18, 23:1, 30:12, 43:9, 47:7, 48:18, 53:4, 71:23, 81:13, 84:15, 86:3, 91:4, 91:7, 93:8, 108:11, 120:25, 126:22
**Realtime** [2] - 140:3, 140:13
**REALTIME** [1] - 9:3
**realtime** [1] - 101:25
**reason** [7] - 29:13, 48:25, 55:4, 103:12, 103:13, 137:3
**reasoning** [5] - 53:21, 81:20, 81:24, 87:13, 93:12
**reasons** [2] - 100:11, 101:2
**rebound** [1] - 89:2

**rebuttal** [4] - 13:20, 32:16, 70:8, 107:5
**receive** [1] - 116:24
**received** [1] - 46:7
**receiving** [1] - 47:10
**recent** [2] - 76:16, 89:11
**recognize** [2] - 38:6, 56:22
**recognized** [3] - 36:18, 37:1, 37:15
**recognizes** [1] - 41:17
**recommend** [1] - 50:24
**recommendations** [1] - 113:6
**record** [1] - 140:8
**Record** [1] - 76:2
**RECORDED** [1] - 9:7
**recover** [6] - 64:18, 64:20, 78:18, 83:1, 83:5, 84:14
**recoverable** [1] - 83:22
**recoveries** [2] - 18:16, 72:7
**recovery** [4] - 18:23, 35:5, 74:22, 75:15
**REDDEN** [1] - 5:12
**redrill** [1] - 135:23
**Ref** [1] - 89:10
**refer** [2] - 13:24, 59:8
**referred** [1] - 43:13
**referring** [1] - 124:1
**refine** [1] - 80:17
**refinement** [1] - 80:3
**refineries** [1] - 38:13
**regard** [4] - 46:12, 46:15, 50:22, 59:9
**regarding** [2] - 95:25, 112:13
**regards** [1] - 47:18
**regime** [5] - 14:16, 21:23, 52:18, 53:10, 110:11
**Registered** [1] - 140:3
**REGULATORY** [1] - 11:6
**regulatory** [5] - 12:18, 110:11, 113:20, 114:11, 139:12
**reject** [1] - 88:15
**rejected** [4] - 31:23, 47:22, 47:24, 48:2
**relate** [3] - 44:4, 49:10, 55:21
**related** [5] - 21:3, 42:23, 43:3, 67:15, 123:25
**RELATES** [1] - 1:9

**relates** [1] - 48:15
**relating** [3] - 21:7, 84:21, 118:7
**relation** [2] - 79:23, 91:5
**relationship** [4] - 46:19, 59:12, 94:11, 128:12
**Relationship** [1] - 84:18
**release** [3] - 38:12, 91:20, 134:24
**relevant** [1] - 99:4
**relied** [7] - 80:24, 85:20, 92:7, 121:12, 121:22, 124:6, 128:8
**relief** [10] - 12:18, 40:3, 55:1, 133:7, 134:3, 134:23, 135:6, 135:15, 139:16, 139:17
**RELIEF**...................... ..............................[1] - 11:7
**relies** [1] - 85:23, 113:10
**rely** [5] - 22:8, 73:2, 113:5, 113:8, 129:13
**relying** [2] - 66:19, 111:17
**remains** [1] - 135:13
**remand** [2] - 61:15, 68:17
**remarkably** [1] - 118:14
**remedial** [3] - 134:23, 135:6, 137:22
**remedied** [1] - 137:12
**remedies** [13] - 17:7, 72:6, 75:14, 76:10, 76:14, 79:12, 79:15, 82:12, 84:9, 85:14, 85:16, 97:9, 97:11
**remedy** [20] - 17:5, 18:4, 23:16, 23:17, 57:16, 57:25, 58:4, 75:7, 78:15, 80:22, 81:11, 82:7, 82:14, 82:21, 84:3, 85:1, 87:18, 97:7, 135:12
**remember** [4] - 32:20, 81:8, 84:23, 133:3
**remembering** [2] - 28:2, 72:13
**remotely** [1] - 68:23
**removal** [1] - 110:7
**removed** [6] - 37:21, 50:9, 50:12, 61:23, 94:2, 94:4
**repeat** [1] - 33:6

**repeatedly** [1] - 67:17
**repeating** [1] - 36:11
**replaces** [1] - 58:12
**reply** [5] - 28:24, 53:22, 58:2, 130:9, 130:11
**report** [4] - 72:13, 72:17, 72:22, 73:1
**Reporter** [6] - 140:3, 140:4, 140:5, 140:13, 140:14
**reporter** [1] - 131:24
**REPORTER** [2] - 9:3, 9:3
**REPORTER'S** [1] - 140:1
**reporting** [2] - 102:2, 104:21
**reports** [2] - 72:11, 76:8
**represent** [2] - 43:22, 137:6
**representatives** [1] - 101:15
**request** [2] - 112:20, 112:21
**requested** [2] - 12:19, 12:20
**requesting** [2] - 136:6, 136:15
**require** [8] - 19:1, 49:3, 62:25, 75:8, 75:21, 101:20, 136:5, 136:16
**required** [8] - 30:25, 44:24, 55:2, 92:10, 106:23, 110:6, 118:7, 125:5
**requirement** [10] - 14:21, 25:1, 25:21, 29:13, 34:4, 43:7, 55:11, 73:6, 90:16, 92:6
**requirements** [6] - 24:13, 25:18, 30:15, 39:22, 84:21, 123:3
**requires** [5] - 14:14, 23:17, 29:3, 101:21, 112:11
**rescue** [1] - 118:19
**reserve** [2] - 13:20, 70:23
**reserved** [1] - 106:18
**reserves** [1] - 93:6
**reserving** [1] - 138:5
**reservoir** [1] - 135:23
**residents** [1] - 129:24
**resolve** [5] - 29:15, 44:11, 50:1, 50:4, 53:12

**resolved** [3] - 36:8, 50:25, 129:14
**resolves** [2] - 52:3, 55:19
**Resource** [1] - 138:9
**resources** [12] - 24:18, 42:19, 93:19, 93:21, 94:25, 95:5, 99:2, 110:7, 111:22, 111:25, 112:14, 112:24
**respect** [25] - 14:1, 19:2, 20:18, 30:12, 35:9, 41:9, 46:9, 60:3, 63:24, 72:18, 73:22, 74:4, 80:13, 82:16, 82:18, 83:20, 84:7, 85:10, 85:18, 87:9, 92:1, 100:6, 107:18, 116:3, 131:6
**respectfully** [5] - 61:18, 62:14, 65:5, 91:1, 97:15
**respirators** [2] - 117:5, 119:2
**respiratory** [1] - 119:1
**respond** [3] - 46:11, 73:22, 95:3
**responder** [8] - 12:17, 114:16, 115:1, 119:4, 121:13, 122:2, 125:2, 127:15
**RESPONDER** [1] - 10:23
**responders** [10] - 109:6, 120:16, 121:16, 121:19, 123:2, 123:25, 124:21, 126:3, 126:5, 129:2
**responding** [2] - 112:6, 115:4
**RESPONSE** [3] - 6:20, 7:3, 10:23
**response** [19] - 12:17, 14:23, 67:9, 82:25, 94:9, 94:19, 95:5, 108:10, 112:19, 113:17, 116:12, 116:18, 117:11, 118:7, 118:25, 119:14, 119:24, 123:25, 126:15
**Response** [6] - 114:15, 114:16, 121:7, 122:8, 122:10, 127:1
**responsibilities** [2] - 95:13, 102:24
**responsibility** [4] -

14:13, 31:17, 45:18, 93:14
**responsible** [43] - 14:13, 15:16, 16:16, 17:8, 17:12, 18:2, 22:5, 23:15, 23:19, 24:25, 33:11, 34:3, 34:17, 34:18, 35:17, 35:23, 35:24, 36:2, 36:6, 36:7, 36:8, 49:12, 49:22, 57:1, 58:3, 58:4, 58:16, 64:2, 64:18, 64:19, 75:9, 78:12, 78:18, 96:15, 96:17, 98:1, 121:16, 127:19, 127:20, 128:5, 128:23
**rest** [1] - 122:1
**restaurant** [1] - 37:22
**RESTORATION** [1] - 3:10
**restore** [1] - 138:13
**restored** [1] - 137:12
**restrictions** [1] - 83:7
**result** [20] - 18:1, 21:21, 30:16, 32:8, 33:23, 36:15, 42:20, 43:11, 57:14, 66:23, 82:19, 91:13, 91:18, 93:13, 93:19, 108:2, 116:13, 117:4, 117:14
**resulted** [1] - 92:20
**resulting** [5] - 31:6, 31:7, 31:8, 42:19, 92:2
**results** [1] - 87:12
**retain** [1] - 45:19
**retained** [1] - 78:12
**return** [1] - 122:25
**reverse** [1] - 38:23
**RHON** [1] - 3:7
**RICHESON** [1] - 6:6
**RIG** [1] - 1:4
**rig** [28] - 45:5, 45:25, 46:23, 47:11, 47:13, 47:14, 49:25, 50:8, 60:16, 60:21, 62:21, 66:4, 80:15, 100:14, 100:16, 101:3, 101:8, 102:11, 103:16, 103:20, 103:21, 103:22, 104:3, 104:22, 130:16, 130:18
**rights** [19] - 29:18, 35:25, 36:9, 58:18, 64:3, 72:5, 75:13, 77:22, 97:8, 101:19,

102:9, 103:1, 103:2, 103:4, 103:13, 106:2, 106:3
**ripe** [3] - 59:7, 59:18, 95:15
**rise** [1] - 12:7
**riser** [3] - 60:21, 62:5, 65:18
**rising** [1] - 58:24
**risk** [2] - 26:22, 48:7
**risks** [1] - 131:12
**river** [1] - 92:21
**River** [1] - 86:14
**RMR** [2] - 9:3, 140:13
**road** [5] - 13:17, 24:18, 26:25, 27:18, 28:20
**roadblock** [3] - 110:10, 110:14, 110:15
**ROBERT** [2] - 2:7, 5:3
**Robertson** [1] - 89:11
**Robertson's** [1] - 89:22
**ROBIN** [1] - 2:16
**Robin** [1] - 126:14
**Robins** [20] - 14:21, 18:8, 18:11, 18:15, 18:22, 19:2, 19:5, 19:6, 19:11, 36:13, 36:25, 37:2, 37:7, 37:9, 38:2, 73:7, 83:2, 88:24, 90:17, 92:23
**role** [13] - 14:5, 14:20, 46:3, 46:8, 46:12, 119:13, 122:6, 122:9, 139:3, 139:8, 139:12, 139:14
**roles** [1] - 139:6
**ROME** [1] - 6:20
**RONQUILLO** [2] - 5:16, 5:20
**ROOM** [2] - 3:17, 9:4
**room** [2] - 75:7, 109:10
**Rose** [1] - 109:11
**ROSE** [1] - 7:18
**ROUGE** [1] - 3:5
**routine** [1] - 100:24
**routinely** [1] - 100:18
**Roy** [1] - 67:6
**ROY** [14] - 1:15, 1:16, 67:6, 67:17, 67:23, 70:17, 79:22, 88:2, 88:8, 88:10, 99:19, 106:14, 126:14, 134:18
**ROY**...........................
.......................... [7] -

10:12, 10:15, 10:17, 10:19, 10:21, 11:3, 11:9
**ROYSTON** [1] - 4:9
**Rule** [2] - 98:16
**rule** [16] - 18:18, 18:22, 24:8, 26:24, 28:4, 38:2, 39:6, 42:4, 44:8, 48:12, 69:15, 84:24, 98:15, 98:16, 98:17
**ruled** [2] - 37:13, 39:3
**rules** [1] - 53:6
**Rules** [1] - 40:6
**ruling** [4] - 27:19, 31:4, 38:6, 87:2
**rulings** [1] - 42:6
**run** [2] - 26:22, 48:6
**running** [1] - 120:25
**RYAN** [1] - 4:24

## S

**S-A-L-M-O-N-S** [1] - 43:25
**s/Cathy** [1] - 140:12
**sacrificial** [1] - 58:3
**safe** [3] - 114:10, 119:6, 132:18
**safeguard** [1] - 139:12
**safely** [3] - 110:4, 110:22, 132:16
**safety** [2] - 46:24, 48:8
**SALMONS** [30] - 6:10, 43:20, 43:22, 43:25, 44:2, 44:16, 44:19, 44:22, 45:7, 46:10, 47:3, 47:5, 48:15, 49:5, 49:8, 49:13, 49:16, 49:21, 49:23, 50:6, 50:22, 51:13, 51:18, 54:6, 54:8, 54:22, 54:24, 55:10, 55:15, 55:19
**Salmons** [4] - 43:22, 44:1, 57:4, 57:19
**SALMONS**................
........................ [1] -
10:9
**SAN** [3] - 2:14, 3:17, 5:7
**sanitary** [1] - 130:19
**SARAH** [1] - 3:16
**sat** [1] - 39:8
**satellite** [1] - 62:2
**satisfactory** [1] - 78:16
**satisfied** [5] - 23:22, 25:17, 45:4, 45:22

**satisfy** [1] - 30:14
**save** [6] - 23:10, 77:11, 88:4, 121:18, 126:15, 136:6
**saved** [2] - 77:13, 84:13
**saves** [2] - 76:25, 77:1
**saving** [4] - 17:17, 73:16, 74:5, 76:23
**savings** [25] - 17:14, 17:23, 22:7, 22:19, 22:23, 22:24, 22:25, 23:4, 23:10, 41:4, 71:5, 72:14, 72:15, 72:23, 73:16, 73:23, 76:22, 76:24, 84:12, 85:9, 85:11, 121:9, 121:14, 121:18
**scenario** [2] - 78:25, 129:11
**scene** [5] - 111:6, 111:10, 111:20, 112:23, 113:4
**SCHELL** [1] - 6:5
**scheme** [9] - 34:25, 35:20, 64:15, 71:4, 71:5, 113:20, 114:7, 114:11, 130:20
**SCHOOL** [1] - 8:23
**SCIENCE** [1] - 8:24
**SCOFIELD** [1] - 6:17
**scope** [5] - 82:25, 105:17, 133:21
**se** [1] - 125:25
**Sea** [1] - 124:7
**sea** [1] - 37:20
**seabed** [7] - 51:5, 61:4, 65:18, 66:4, 66:6, 66:8, 66:9
**SEACOR** [6] - 7:4, 7:4, 7:5, 7:5, 7:6, 7:6
**sealed** [1] - 134:12
**seaman** [1] - 81:17
**seamen** [4] - 37:19, 62:22, 65:12, 65:13
**season** [1] - 52:15
**seasoned** [1] - 103:15
**seat** [1] - 119:13
**seated** [1] - 12:8
**second** [13] - 17:16, 18:7, 22:8, 28:8, 40:15, 73:25, 82:9, 84:7, 85:19, 121:20, 126:9, 129:5, 134:3
**Second** [4] - 118:11, 119:8, 119:22, 120:5
**secondly** [1] - 101:9
**seconds** [2] - 107:5, 139:4
**SECREST** [1] - 5:12

**SECTION** [1] - 3:19
**Section** [7] - 57:20, 72:20, 73:23, 84:23, 85:3, 85:8, 134:2
**section** [4] - 71:17, 84:18, 117:2, 118:7
**sections** [5] - 71:12, 71:16, 72:15, 72:23, 123:11
**Sections** [1] - 51:1
**see** [10] - 12:15, 40:20, 61:13, 68:4, 81:23, 94:11, 100:18, 108:23, 109:8
**seek** [1] - 139:16
**seeking** [2] - 33:8, 55:1
**seem** [3] - 42:23, 43:2, 97:12
**Sekco** [2] - 124:1, 124:12
**selection** [1] - 117:12
**self** [1] - 107:11
**self-elevating** [1] - 107:11
**selling** [1] - 115:23
**seminal** [1] - 81:1
**seminar** [2] - 89:15, 89:16
**send** [2] - 116:25
**sense** [8] - 47:8, 47:17, 50:11, 65:24, 82:23, 97:4, 97:13, 105:21
**sensed** [1] - 134:9
**sent** [1] - 138:3
**sentence** [1] - 87:1
**separate** [7] - 34:11, 34:22, 43:10, 61:1, 106:19, 106:20, 123:11
**separately** [1] - 21:24
**September** [1] - 134:13
**series** [1] - 123:3
**seriously** [1] - 67:19
**services** [3] - 115:2, 116:11, 116:22
**SERVICES** [1] - 5:16
**set** [5] - 17:7, 35:6, 35:20, 58:20, 136:23
**sets** [3] - 34:25, 64:15, 112:13
**settled** [2] - 96:2, 99:8
**settlement** [1] - 138:12
**settles** [1] - 35:23
**Settoon** [1] - 100:5
**several** [2] - 38:13, 122:12

**Sewage** [1] - 124:7
**shall** [13] - 72:17, 74:14, 84:19, 110:1, 110:2, 110:3, 110:4, 114:10, 132:13, 132:14, 132:15
**shame** [1] - 89:14
**share** [1] - 118:1
**shelf** [3] - 21:4, 21:17, 68:23
**Shelf** [12] - 14:9, 15:13, 17:5, 21:6, 52:9, 57:10, 60:9, 61:5, 61:16, 93:15, 107:15, 131:1
**SHELL** [2] - 4:20, 8:8
**Shell** [2] - 100:13, 100:15
**shield** [1] - 72:9
**shifted** [1] - 70:17
**ship's** [2] - 67:12, 67:19
**shoot** [1] - 137:19
**short** [2] - 29:1, 30:9
**show** [4] - 59:17, 89:14, 125:11, 125:17
**showed** [2] - 46:1, 47:11
**shows** [1] - 53:9
**Shushan** [3] - 36:20, 36:22, 139:22
**shut** [4] - 70:10, 94:8, 94:9, 94:13
**shutting** [1] - 91:12
**side** [15] - 12:22, 12:23, 12:24, 25:9, 55:25, 67:5, 70:7, 73:19, 94:15, 98:8, 114:13, 126:3, 130:2, 134:16
**sides** [1] - 97:14
**SIEMENS** [1] - 7:7
**SIERRA** [1] - 3:10
**sign** [1] - 105:12
**signatory** [1] - 101:12
**signed** [1] - 102:10
**significance** [3] - 14:17, 113:22, 115:9
**significant** [1] - 13:11
**silence** [5] - 74:24, 76:18, 77:13, 83:14, 84:1
**silent** [3] - 84:1, 84:3
**similar** [7] - 55:11, 57:6, 61:13, 91:15, 98:23, 118:14, 122:9
**simple** [5] - 15:13, 31:10, 39:16, 40:23, 42:20, 88:23, 90:1

**simply** [6] - 25:21, 30:8, 64:11, 83:13, 101:2, 101:21
**simultaneous** [1] - 85:14
**single** [5] - 14:3, 114:3, 128:7, 128:10
**sinking** [1] - 139:12
**sit** [7] - 32:21, 58:24, 60:1, 69:25, 70:10, 70:22, 77:12
**Site** [1] - 118:12
**site** [2] - 118:23, 118:25
**sits** [1] - 136:24
**sitting** [2] - 103:18, 127:12
**situ** [2] - 116:5, 122:11
**situation** [15] - 34:1, 40:10, 61:22, 79:2, 80:9, 91:4, 94:12, 96:1, 101:9, 103:25, 112:5, 116:25, 119:11, 133:13, 133:18
**situations** [3] - 64:14, 78:11, 78:25
**situs** [2] - 21:25, 22:1
**six** [2] - 35:1, 38:11
**skim** [4] - 117:1, 117:2, 117:23, 129:10
**skimmed** [1] - 117:24
**skimmers** [1] - 115:5
**skimming** [2] - 116:3, 122:11
**slide** [3] - 17:3, 17:16, 23:13
**slides** [1] - 13:23
**so-called** [3] - 30:13, 30:19, 37:2
**society** [1] - 81:17
**sole** [1] - 57:16
**solid** [1] - 78:13
**solitary** [1] - 128:7
**someday** [1] - 106:24
**someone** [5] - 100:13, 101:10, 104:9, 105:11, 128:14
**sometimes** [1] - 97:8
**somewhat** [2] - 68:5, 91:15
**somewhere** [4] - 68:9, 89:1, 95:17, 103:19
**sorry** [2] - 13:8, 131:23
**sort** [8] - 28:12, 29:14, 30:3, 38:22, 41:25, 42:3, 83:4, 89:24
**sought** [1] - 57:14

**sounds** [4] - 66:1, 66:12, 138:1, 138:17
**source** [2] - 22:18, 78:8
**South** [7] - 16:21, 17:1, 17:19, 23:9, 85:21, 86:2, 87:24
**SOUTH** [3] - 2:4, 6:13, 7:19
**south** [1] - 38:14
**sovereign** [1] - 128:10
**sovereignty** [1] - 57:9
**speaker** [2] - 55:25, 56:2
**SPECIAL** [1] - 8:23
**special** [3] - 16:3, 37:21, 38:1
**Species** [3] - 137:8, 137:17, 138:7
**species** [9] - 137:11, 137:13, 137:18, 137:21, 138:20, 138:21, 138:24, 139:17
**specific** [17] - 70:2, 71:20, 72:24, 76:15, 81:14, 85:9, 89:7, 89:8, 98:25, 101:18, 110:15, 110:19, 110:23, 128:24, 131:21, 137:11, 138:20
**specifically** [25] - 19:13, 26:9, 48:3, 68:19, 69:21, 73:15, 74:10, 74:23, 74:25, 76:18, 77:13, 79:5, 79:7, 80:19, 82:3, 82:18, 85:2, 86:20, 86:22, 87:19, 105:25, 109:14, 110:9, 138:5
**speculative** [1] - 138:14
**spell** [1] - 43:24
**spend** [4] - 18:8, 68:10, 85:19, 109:13
**spewed** [1] - 60:15
**Spill** [3] - 121:6, 122:8, 127:1
**SPILL** [2] - 1:4, 6:20
**spill** [64] - 13:2, 17:4, 21:10, 21:12, 30:20, 32:8, 33:13, 33:18, 33:21, 34:8, 34:15, 38:9, 38:20, 38:23, 39:18, 40:25, 42:19, 42:24, 43:4, 43:7, 43:8, 43:11, 49:25, 60:7, 60:20, 61:3,

63:11, 64:16, 75:6, 77:19, 78:8, 86:13, 91:13, 91:19, 92:13, 92:20, 93:9, 93:13, 93:23, 94:9, 94:16, 94:17, 94:19, 94:24, 95:3, 108:2, 108:3, 108:14, 111:23, 112:20, 113:17, 113:21, 115:7, 115:8, 115:15, 115:16, 130:13, 130:25
**spilling** [1] - 60:20
**spills** [6] - 17:9, 35:5, 77:16, 77:18, 77:23, 94:20
**spray** [2] - 117:18
**sprayed** [2] - 122:12, 125:19, 125:20
**SPRINGS** [1] - 2:24
**SQUARE** [2] - 4:20, 8:8
**ST** [3] - 7:9, 7:23, 7:23
**Stafford** [5] - 119:9, 119:11, 119:21, 119:23, 120:14
**stage** [5] - 92:8, 95:15, 105:2, 105:10, 138:23
**stake** [1] - 29:17
**stand** [3] - 39:4, 88:6, 125:23
**standard** [3] - 31:11, 88:16, 121:25
**standards** [1] - 122:3
**standing** [2] - 27:4, 76:14
**standpoint** [1] - 99:17
**stands** [2] - 100:4, 110:25
**stark** [1] - 46:15
**start** [7] - 13:18, 15:14, 17:10, 25:14, 60:20, 70:24, 72:14
**started** [4] - 18:25, 28:23, 67:8, 106:5
**starting** [1] - 15:17
**starts** [1] - 24:21
**state** [76] - 15:1, 15:24, 19:22, 20:2, 20:20, 21:5, 21:7, 21:18, 21:22, 21:25, 22:1, 22:3, 22:17, 22:20, 23:5, 23:6, 37:16, 40:21, 40:24, 41:6, 41:7, 44:10, 44:12, 48:24, 51:6, 51:8, 51:11, 51:22, 52:1, 52:8, 52:11,

52:16, 52:17, 52:20, 53:4, 53:10, 53:12, 54:14, 54:18, 57:18, 57:20, 57:23, 57:24, 58:6, 69:2, 69:9, 71:11, 71:14, 71:17, 71:22, 72:15, 73:16, 75:5, 75:18, 76:4, 76:7, 76:22, 76:24, 77:15, 77:25, 78:2, 84:13, 97:9, 106:18, 110:25, 114:7, 114:8, 125:16, 129:25, 130:5, 132:16, 137:24
**State** [4] - 61:14, 68:16, 71:8, 140:4
**STATE** [1] - 3:23
**state's** [3] - 21:4, 21:19, 77:19
**statement** [4] - 33:24, 39:16, 65:1, 107:21
**States** [22] - 22:22, 31:15, 31:16, 61:10, 63:9, 71:2, 73:15, 74:4, 74:20, 84:20, 85:5, 85:7, 87:11, 109:24, 109:25, 110:5, 112:17, 118:5, 120:2, 133:3, 140:5, 140:14
**STATES** [3] - 1:1, 1:12, 3:19
**states** [3] - 39:7, 77:22, 113:15
**stating** [1] - 37:25
**status** [3] - 44:5, 65:13
**statute** [40] - 16:4, 17:4, 18:3, 22:6, 22:24, 23:7, 29:3, 29:8, 29:12, 29:19, 31:1, 31:6, 31:13, 42:17, 55:9, 56:24, 57:7, 64:17, 65:21, 72:5, 72:8, 75:1, 81:10, 81:14, 81:15, 82:5, 82:6, 82:15, 83:16, 84:1, 84:10, 84:15, 107:23, 123:8, 123:11, 123:14, 123:15, 128:25, 130:20
**statute's** [1] - 82:10
**statutes** [10] - 14:10, 20:2, 52:6, 58:22, 71:21, 73:5, 74:14, 77:15, 77:21, 81:13
**statutory** [11] - 23:17, 32:11, 34:25, 57:8,

58:17, 84:10, 91:25, 93:14, 94:25, 95:13, 130:20
**stay** [3] - 25:19, 97:3, 97:10
**stays** [1] - 30:19
**Steering** [1] - 29:16
**STEFANIE** [1] - 5:18
**STENOGRAPHY** [1] - 9:7
**step** [7] - 23:18, 29:7, 44:25, 93:24, 117:16
**step-by-step** [1] - 44:25
**STEPHEN** [1] - 1:20
**STERBCOW** [2] - 2:9, 2:10
**steroids** [1] - 115:13
**Steve** [1] - 88:14
**STEVEN** [1] - 3:20
**Stewart** [2] - 65:4, 66:16
**still** [13] - 22:23, 34:17, 34:21, 39:11, 42:10, 42:12, 43:7, 76:10, 80:12, 108:19, 124:12, 133:16, 135:9
**stole** [1] - 56:10
**STONE** [1] - 5:9
**stood** [1] - 71:3
**stop** [1] - 131:17
**stopped** [1] - 65:17
**storage** [2] - 32:3, 38:13
**stories** [1] - 118:16
**story** [1] - 104:25
**STRADLEY** [1] - 8:19
**straightforwardly** [1] - 50:25
**STRANGE** [1] - 3:23
**strange** [1] - 52:19
**STREET** [21] - 1:18, 2:4, 2:7, 2:11, 2:14, 3:4, 4:7, 4:11, 4:20, 5:4, 5:7, 5:10, 5:14, 5:18, 6:7, 6:10, 6:18, 8:9, 8:16, 8:20, 9:4
**strict** [2] - 49:10, 64:18
**strikes** [2] - 20:16, 52:19
**string** [1] - 62:5
**stringent** [7] - 20:7, 20:10, 20:12, 20:17, 88:16, 90:6, 90:17
**strings** [1] - 20:20
**structure** [3] - 115:4, 115:10, 116:23
**structures** [3] - 60:10,

60:11, 65:20
**stuff** [1] - 133:2
**subcontractor** [1] - 128:19
**subcontractors** [1] - 122:12
**subject** [8] - 34:21, 40:4, 45:13, 52:11, 54:13, 56:21, 108:10, 108:16
**submit** [2] - 61:18, 97:17
**submitted** [3] - 89:10, 93:11, 97:18
**subrogation** [5] - 35:25, 36:9, 64:3, 64:5, 64:8
**subsection** [3] - 51:2, 51:6, 107:15
**subsoil** [1] - 60:10
**substance** [3] - 123:8, 123:10, 123:12
**substances** [3] - 116:15, 122:1, 122:3
**substantial** [1] - 93:15
**substantive** [1] - 69:17
**sue** [2] - 36:7, 127:3
**sued** [2] - 64:4, 119:5
**suffer** [1] - 125:25
**suffered** [4] - 92:19, 116:14, 116:16, 118:25
**suffering** [2] - 136:20, 136:21
**suggest** [7] - 50:20, 53:23, 88:18, 92:11, 96:5, 97:15, 98:2
**suggested** [2] - 86:25, 137:22
**suggesting** [3] - 26:1, 98:15, 103:18
**suggestion** [3] - 20:14, 98:11, 98:12
**suggests** [1] - 83:24
**suit** [25] - 23:18, 23:23, 25:1, 28:11, 30:5, 55:14, 78:7, 96:19, 96:20, 121:21, 121:24, 121:25, 123:1, 123:5, 123:14, 123:17, 123:19, 127:4, 133:2, 133:13, 134:4, 137:9, 139:3
**SUITE** [15] - 2:4, 2:11, 3:12, 4:11, 4:21, 5:14, 5:18, 5:22, 6:7, 6:13, 6:18, 7:9, 7:19,

8:5, 8:9
**suitors** [1] - 74:5
**suits** [4] - 121:22, 133:11, 134:1, 139:7
**sum** [1] - 87:7
**summary** [2] - 46:2, 92:21
**summer** [1] - 28:2
**supersede** [1] - 72:19
**superseding** [3] - 91:6, 91:18, 92:12
**supervision** [3] - 44:25, 117:25, 124:11
**supplant** [1] - 17:20
**supplemented** [1] - 15:1
**SUPPORT** [1] - 8:3
**support** [6] - 30:25, 55:3, 55:16, 118:8, 119:14, 124:24
**supports** [2] - 70:25, 73:9
**suppose** [2] - 36:11, 40:3
**supposed** [4] - 25:24, 53:25, 55:25, 81:7
**supreme** [1] - 40:24
**Supreme** [30] - 17:10, 20:1, 20:23, 22:25, 37:12, 39:3, 52:24, 55:7, 61:10, 63:9, 65:11, 70:4, 71:2, 71:10, 73:15, 74:20, 74:23, 75:2, 75:19, 75:25, 76:5, 76:16, 84:24, 84:25, 85:7, 87:8, 87:11, 110:24, 124:6, 124:8
**surely** [2] - 75:14, 76:18
**surface** [2] - 33:15, 115:6
**surmising** [3] - 138:15, 138:18, 138:19
**surrogate** [3] - 51:7, 51:12, 69:2
**survive** [2] - 19:11, 106:22
**suspended** [1] - 95:10
**suspension** [1] - 95:10
**SW** [1] - 2:23
**sweep** [1] - 25:23
**system** [1] - 41:13

**T**

**Taira** [7] - 18:17, 31:14, 31:22, 32:13, 91:4, 91:8, 93:2
**talks** [8] - 31:6, 74:11, 78:23, 87:2, 123:11, 123:12, 130:12
**Tampa** [1] - 21:13
**Tanguis** [3] - 16:20, 16:25, 17:22
**tank** [1] - 32:3
**tanker** [2] - 71:9, 71:21
**TANNER** [1] - 6:16
**TARTER** [1] - 6:17
**Tate** [2] - 70:4, 70:8
**Tebbutt** [2] - 134:18, 134:19
**TEBBUTT** [11] - 8:11, 8:12, 134:19, 134:22, 135:2, 135:6, 135:9, 135:12, 135:16, 135:19, 137:2
**TEBBUTT...............**
**.....................** [2] - 11:10, 11:12
**technically** [1] - 27:22
**temporarily** [11] - 51:5, 51:21, 51:24, 52:2, 52:11, 52:21, 53:3, 54:12, 102:10
**tended** [1] - 50:8
**tender** [1] - 59:13
**Tenn** [1] - 22:2
**tens** [1] - 135:9
**tension** [1] - 126:21
**term** [1] - 16:7
**terms** [15] - 20:18, 22:17, 22:19, 24:13, 27:4, 27:20, 29:2, 30:7, 42:8, 47:7, 87:3, 89:3, 133:9, 133:23, 137:16
**territorial** [2] - 21:13, 21:17
**territory** [1] - 21:4
**terrorist** [1] - 128:5
**test** [15] - 20:16, 40:12, 40:13, 45:22, 53:19, 54:1, 58:7, 58:13, 61:13, 61:14, 61:15, 66:23, 94:3, 112:7
**TESTBANK** [5] - 37:5, 38:2, 40:19, 40:20, 41:8
**testimony** [1] - 103:25

**tests** [1] - 52:6
**text** [2] - 51:1, 53:11
**texted** [1] - 103:21
**textual** [1] - 51:14
**Thad** [3] - 111:9, 111:12, 113:7
**THE** [276] - 1:4, 1:5, 1:12, 1:15, 1:23, 3:10, 3:14, 3:19, 6:21, 8:11, 8:15, 11:15, 12:7, 12:8, 12:12, 12:14, 13:6, 13:9, 13:22, 14:22, 15:8, 15:17, 15:20, 15:24, 16:3, 16:6, 16:10, 16:12, 18:24, 19:10, 19:21, 19:24, 20:5, 20:7, 20:12, 20:16, 21:9, 22:12, 24:6, 24:12, 24:17, 24:23, 25:7, 26:1, 26:4, 26:11, 27:6, 27:11, 28:3, 28:9, 28:16, 29:10, 29:21, 31:2, 31:25, 32:3, 32:7, 32:17, 32:23, 33:3, 33:13, 33:15, 33:20, 34:6, 34:10, 34:19, 34:23, 35:7, 35:15, 35:20, 36:10, 36:18, 36:24, 37:5, 38:8, 39:10, 40:10, 41:11, 41:17, 41:24, 42:3, 42:10, 42:22, 43:12, 43:17, 43:19, 43:21, 43:24, 44:1, 44:13, 44:17, 44:21, 45:5, 46:2, 46:25, 47:4, 48:13, 49:2, 49:7, 49:11, 49:15, 49:19, 49:22, 50:5, 50:21, 51:11, 51:16, 54:3, 54:7, 54:21, 54:23, 55:7, 55:11, 55:18, 55:23, 56:3, 56:14, 59:21, 60:18, 61:1, 61:6, 61:24, 62:9, 62:16, 62:19, 62:25, 63:5, 63:15, 64:23, 65:3, 65:8, 66:1, 66:20, 66:25, 67:2, 67:5, 67:14, 67:22, 68:2, 68:4, 68:9, 68:21, 68:24, 69:4, 69:7, 69:14, 69:24, 70:3, 70:13, 70:20, 73:8, 73:11, 73:19, 73:21, 74:2, 74:13, 76:25, 77:3, 77:8, 77:18, 78:6,

78:15, 78:23, 79:9, 79:13, 79:20, 79:25, 80:6, 80:10, 80:14, 82:22, 83:15, 86:9, 86:13, 86:16, 86:20, 87:4, 88:1, 88:6, 88:9, 88:18, 88:23, 89:14, 89:22, 90:5, 90:18, 90:21, 90:24, 92:17, 92:22, 92:25, 94:2, 94:7, 95:2, 95:21, 95:23, 96:3, 96:11, 96:18, 96:25, 98:8, 98:15, 99:10, 99:22, 100:18, 102:3, 103:5, 103:7, 103:17, 104:1, 104:13, 106:12, 107:3, 107:6, 107:17, 108:5, 108:8, 108:12, 108:19, 108:23, 109:2, 109:8, 110:12, 110:14, 111:8, 111:12, 112:4, 113:4, 113:12, 114:12, 115:22, 116:1, 116:6, 116:16, 116:20, 117:7, 117:16, 120:22, 120:25, 121:5, 122:6, 124:4, 126:13, 126:18, 126:23, 127:6, 128:17, 129:19, 131:25, 132:2, 132:6, 132:22, 132:25, 133:6, 134:5, 134:9, 134:14, 134:16, 134:20, 134:24, 135:3, 135:8, 135:11, 135:14, 135:18, 135:20, 136:7, 136:11, 136:16, 136:18, 137:4, 137:23, 138:14, 139:1, 139:4, 139:19

**THEODORE** [1] - 7:11

**theories** [1] - 48:5

**theory** [2] - 88:25, 111:3

**therefore** [9] - 22:19, 47:12, 52:14, 57:13, 57:22, 57:23, 84:1, 130:22, 137:21

**they've** [11] - 26:13, 26:20, 27:6, 34:12,

39:25, 40:2, 64:4, 86:3, 106:8, 133:4

**THIBODEAUX** [1] - 4:6

**thinking** [1] - 104:2

**third** [3] - 49:1, 82:13, 123:18

**thirty** [1] - 139:4

**THIS** [1] - 1:9

**Thomas** [1] - 75:1

**THOMAS** [1] - 2:3

**thoroughly** [1] - 114:20

**thousand** [3] - 25:8, 26:16, 27:1

**threat** [4] - 91:25, 93:15, 120:17

**threatened** [1] - 137:14

**threatens** [1] - 115:16

**three** [9] - 12:15, 12:20, 24:9, 37:14, 40:13, 77:10, 81:2, 82:4, 82:17

**three-part** [1] - 40:13

**throughout** [1] - 43:9

**thunder** [1] - 56:11

**THURSDAY** [2] - 1:7, 12:2

**tied** [2] - 92:7, 94:23

**timing** [2] - 42:8, 42:10

**Title** [7] - 71:4, 71:6, 71:12, 71:15, 73:16, 121:15

**title** [1] - 84:17

**TO** [2] - 1:9, 12:4

**today** [13] - 14:19, 42:6, 48:17, 49:6, 50:4, 67:24, 106:17, 114:23, 127:10, 129:18, 136:9, 136:13

**today's** [1] - 32:10

**together** [4] - 56:17, 79:14, 128:4, 139:16

**took** [1] - 84:25

**tools** [1] - 95:18

**top** [3] - 34:8, 65:19, 93:18

**topic** [4] - 67:23, 70:17, 70:18, 89:16

**torf** [11] - 18:15, 40:25, 44:10, 48:15, 48:24, 48:25, 54:17, 108:8, 108:9, 124:24, 125:1

**TORTS** [1] - 3:15

**touch** [1] - 28:8

**touched** [1] - 115:11

**TOWER** [1] - 1:24

**towers** [1] - 118:15

**Townsend** [16] - 74:19, 75:1, 75:20, 75:25, 79:5, 80:25, 81:3, 81:6, 81:9, 85:23, 85:24, 86:1, 86:5, 87:16

**toxic** [4] - 109:20, 110:17, 111:7, 114:1

**toxicity** [1] - 131:18

**Trade** [6] - 118:10, 118:12, 118:13, 118:14, 127:23, 128:8

**tradition** [1] - 76:1

**traditional** [1] - 37:18

**tragedies** [1] - 101:4

**trained** [2] - 116:13, 117:5

**transcript** [1] - 140:7

**TRANSCRIPT** [2] - 1:11, 9:7

**TRANSOCEAN** [3] - 4:3, 4:3, 4:5

**Transocean** [20] - 21:2, 33:5, 33:7, 33:11, 33:18, 34:3, 34:5, 34:7, 34:15, 34:16, 34:21, 34:22, 36:1, 59:16, 62:10, 62:20, 63:3, 67:20, 97:25, 98:6

**Transocean's** [1] - 59:12

**treatment** [2] - 89:10, 130:18

**tremendous** [1] - 73:11

**Trevino** [1] - 128:8

**trial** [10] - 24:20, 42:6, 42:7, 42:11, 42:12, 70:5, 98:13, 98:23, 98:24, 105:19

**trick** [1] - 27:10

**tried** [3] - 13:13, 47:21, 97:23

**trouble** [2] - 56:3, 70:9

**troubled** [1] - 28:19

**true** [7] - 39:16, 39:19, 53:2, 108:12, 123:19, 134:8, 140:7

**truth** [1] - 127:14

**try** [17] - 13:20, 15:24, 31:13, 33:6, 36:23, 45:23, 56:12, 87:23, 89:13, 96:9, 99:2, 109:10, 123:4, 123:7, 133:16, 135:23

**trying** [27] - 24:17,

24:18, 25:10, 29:14, 38:22, 41:24, 46:2, 46:3, 58:7, 62:5, 63:20, 70:15, 74:10, 74:20, 76:9, 79:3, 94:18, 94:20, 97:13, 98:19, 99:13, 101:10, 112:4, 113:24, 115:6, 135:4

**TSEKERIDES** [1] - 7:11

**turn** [6] - 12:10, 19:18, 50:17, 61:4, 64:2, 97:20

**Turner** [2] - 24:3, 27:8

**twenty** [1] - 122:20

**two** [29] - 12:20, 12:22, 14:10, 20:19, 23:18, 24:9, 32:16, 37:14, 37:16, 40:22, 51:1, 57:7, 59:23, 60:21, 71:5, 72:14, 74:4, 76:16, 81:1, 81:2, 84:12, 87:10, 87:11, 100:10, 101:1, 109:9, 114:16, 126:24

**two-step** [1] - 23:18

**Twombly** [1] - 108:17

**TX** [7] - 4:11, 5:14, 5:19, 5:22, 6:18, 7:16, 8:21

**tying** [1] - 93:20

**type** [5] - 46:14, 62:23, 89:4, 101:20, 136:5

**TYPES** [1] - 11:6

**types** [6] - 12:18, 16:10, 48:9, 74:22, 83:5, 125:25

## U

**U.S** [18] - 3:14, 3:20, 7:21, 20:1, 71:10, 74:23, 75:19, 75:25, 76:16, 92:16, 111:6, 111:20, 112:20, 112:21, 113:13, 121:10, 121:11, 121:14

**U.S.C** [5] - 23:17, 25:18, 68:19, 107:10, 118:4

**unclear** [1] - 15:2

**under** [96] - 14:13, 21:1, 21:3, 21:22, 23:16, 23:17, 24:25, 29:18, 30:24, 31:13, 31:21, 37:7, 38:18, 38:24, 40:2, 40:12,

41:5, 41:21, 44:8, 44:9, 45:12, 48:12, 51:12, 54:14, 54:18, 56:24, 56:25, 57:1, 57:8, 58:9, 61:7, 61:18, 62:17, 63:4, 68:24, 68:25, 69:9, 73:5, 77:1, 81:20, 82:1, 84:14, 85:2, 85:7, 91:9, 92:4, 93:14, 94:3, 100:5, 102:6, 105:5, 105:9, 105:19, 107:9, 107:15, 108:16, 108:17, 108:22, 109:16, 109:24, 110:6, 111:16, 111:18, 112:16, 113:20, 114:19, 117:14, 117:24, 119:23, 120:12, 120:13, 123:14, 123:22, 124:9, 124:10, 125:15, 127:3, 127:4, 127:7, 127:9, 127:19, 127:20, 128:22, 128:25, 129:1, 129:2, 129:22, 130:4, 130:20, 133:25, 138:6, 139:20

**UNDERHILL** [1] - 3:15

**understandable** [1] - 81:23

**understood** [1] - 78:11

**undoubtedly** [1] - 28:17

**unforeseeable** [1] - 95:8

**unfortunately** [1] - 56:6

**Unified** [4] - 111:21, 115:20, 116:24, 117:20

**uniformity** [1] - 75:20

**uniformly** [1] - 18:15

**unique** [1] - 44:5

**unit** [1] - 107:9

**UNITED** [3] - 1:1, 1:12, 3:19

**United** [22] - 22:22, 31:15, 31:16, 61:10, 63:9, 71:2, 73:15, 74:4, 74:20, 84:20, 85:5, 85:7, 87:11, 109:24, 109:25, 110:5, 112:17, 118:5, 120:2, 133:3,

Case 2:10-md-02179-CJB-DPC   Document 2702   Filed 06/08/11   Page 165 of 166
25

140:5, 140:14
**UNIVERSITY** [1] - 8:23
**unless** [9] - 50:16, 54:9, 70:2, 72:24, 75:15, 79:18, 88:4, 107:1, 121:4
**unlimited** [1] - 77:16
**unnecessary** [1] - 53:18
**unpermitted** [1] - 131:4
**unprecedented** [1] - 133:21
**unpunished** [2] - 126:5, 126:11
**unreasonable** [1] - 96:8
**unsafe** [3] - 100:14, 111:7, 114:9
**unusual** [2] - 87:10, 137:6
**up** [56] - 13:14, 13:23, 26:15, 27:20, 30:12, 35:20, 36:19, 36:21, 37:8, 41:13, 42:14, 66:7, 70:7, 70:10, 78:9, 79:18, 89:14, 91:3, 93:20, 94:18, 94:23, 105:12, 107:21, 108:1, 109:6, 109:10, 114:16, 115:1, 115:3, 115:4, 115:6, 115:15, 115:18, 118:16, 118:20, 118:22, 120:16, 120:18, 122:21, 122:22, 126:7, 126:8, 126:18, 129:10, 131:5, 131:22, 132:3, 132:6, 134:22, 136:2, 136:3, 136:8, 137:2, 139:17
**USA** [1] - 6:4
**uses** [2] - 40:13, 65:21
**utilized** [3] - 116:12, 116:18, 116:22

## V

**VA** [1] - 1:25
**vacuum** [2] - 96:15, 96:21
**Valdez** [12] - 39:17, 41:9, 41:11, 41:14, 72:6, 75:12, 75:13, 79:4, 79:11, 79:13, 79:16, 82:25

**valid** [1] - 15:15
**valuable** [1] - 139:14
**value** [1] - 130:1
**valves** [1] - 32:3
**Vance** [1] - 48:2
**vandals** [1] - 31:25
**vapors** [1] - 91:20
**variety** [3] - 28:9, 112:13, 118:25
**various** [5] - 52:5, 52:6, 58:22, 95:17
**vast** [2] - 19:7, 19:15
**venture** [2] - 104:12, 106:1
**Vermont** [8] - 78:7, 78:8, 78:9, 129:25, 130:2, 130:5
**version** [2] - 49:11, 77:23
**versions** [1] - 79:10
**versus** [6] - 15:15, 16:17, 21:22, 21:25, 77:13, 107:8
**Vessel** [1] - 42:22
**vessel** [29] - 15:6, 15:12, 15:21, 38:25, 52:11, 53:3, 57:11, 61:6, 61:25, 62:7, 62:13, 63:1, 63:5, 63:18, 64:24, 64:25, 65:8, 65:9, 65:10, 65:12, 65:24, 66:6, 66:10, 66:11, 100:19, 107:7, 107:11, 107:12
**vessel's** [1] - 67:16
**vessels** [13] - 43:14, 51:21, 51:24, 52:2, 52:21, 54:12, 54:13, 57:21, 65:12, 116:16, 116:18, 122:10, 122:14
**veto** [2] - 104:14, 104:17
**via** [1] - 69:2
**viable** [1] - 75:16
**vicarious** [5] - 44:15, 47:20, 47:25, 48:4, 101:10
**victims** [1] - 87:24
**view** [6] - 53:17, 54:24, 56:18, 74:8, 74:9, 105:21
**viewed** [1] - 115:15
**violated** [1] - 122:2
**violates** [1] - 121:25
**violation** [2] - 130:8, 134:7
**virtually** [2] - 18:12, 36:15

**virtue** [2] - 67:12, 84:9
**void** [1] - 76:21
**VoO** [8] - 42:22, 43:2, 107:25, 108:1, 108:5, 108:8, 108:15, 108:18
**vote** [2] - 104:13, 104:18
**voted** [2] - 102:15, 103:3
**voting** [1] - 102:9

## W

**WACKER** [1] - 7:19
**wages** [1] - 30:15
**wait** [3] - 25:5, 62:19, 95:2
**waited** [1] - 28:18
**waiting** [2] - 89:17, 127:12
**waive** [2] - 97:2
**wake** [1] - 109:10
**walk** [1] - 78:14
**WALKER** [2] - 1:23, 7:21
**WALTHER** [1] - 5:9
**WALTZER** [4] - 3:11, 3:11, 139:2, 139:5
**Waltzer** [1] - 139:5
**WALTZER**................
..................................... [1] -
11:14
**wants** [2] - 29:17, 130:12
**WARE** [1] - 7:14
**warn** [1] - 131:12
**warned** [1] - 48:4
**WARREN** [1] - 6:9
**Washington** [2] - 71:8, 71:21
**WASHINGTON** [5] - 3:21, 5:4, 6:11, 7:9, 8:17
**waste** [3] - 24:18, 99:1, 128:25
**wastes** [1] - 130:19
**watch** [1] - 36:22
**Water** [45] - 20:22, 21:2, 21:5, 21:23, 22:11, 22:18, 23:2, 76:3, 77:23, 81:25, 82:17, 88:3, 109:16, 109:24, 110:6, 110:8, 110:10, 110:18, 111:19, 112:11, 112:17, 114:4, 114:6, 120:12, 121:21,

122:25, 123:1, 123:5, 123:16, 123:20, 123:21, 123:22, 124:9, 124:10, 127:2, 127:3, 127:4, 127:7, 127:9, 129:15, 129:21, 129:23, 132:12, 134:2
**water** [9] - 33:15, 34:8, 38:21, 38:24, 66:8, 91:11, 110:3, 112:3, 130:18
**waters** [9] - 21:13, 21:17, 38:25, 41:1, 77:24, 77:25, 109:22, 110:21, 132:15
**WATERSIDE** [1] - 1:24
**waterway** [2] - 77:24, 94:10
**waterways** [3] - 77:17, 77:18, 77:19
**WATKINS** [1] - 7:18
**ways** [1] - 90:7
**WEATHERFORD** [1] - 7:21
**week** [1] - 13:10
**weekly** [1] - 104:21
**WEIGEL** [4] - 6:21, 121:6, 122:8, 124:5
**Weigel** [1] - 121:6
**WEIGEL**......................
........................ [1] -
11:2
**WEIL** [2] - 7:8, 7:11
**WEINER** [1] - 6:6
**WEITZ** [1] - 2:16
**wellhead** [1] - 50:1
**WESTBANK** [1] - 3:12
**Western** [1] - 92:16
**whereas** [1] - 50:8
**WHEREUPON** [1] - 139:23
**wherewithal** [1] - 104:19
**whole** [8] - 41:24, 52:23, 80:13, 81:12, 81:19, 88:24, 88:25, 123:3
**wholeheartedly** [1] - 71:1
**WILDLIFE** [2] - 8:15
**Wildlife** [1] - 137:6
**WILLIAM** [3] - 1:17, 7:22, 8:19
**win** [1] - 70:23
**winning** [1] - 69:24
**wipe** [2] - 74:24, 76:13
**wipes** [1] - 77:14

**WITTMANN** [2] - 5:9, 5:10
**WIYGUL** [1] - 3:11
**wonder** [2] - 52:7
**word** [4] - 60:8, 65:21, 137:7, 139:2
**worded** [2] - 74:13, 74:14
**words** [13] - 16:21, 21:12, 23:6, 56:8, 59:23, 59:24, 75:23, 80:21, 83:14, 90:25, 110:8, 110:23, 117:16
**worker** [3] - 30:15, 100:15, 101:3
**workers** [4] - 50:8, 118:24, 118:25, 119:5
**works** [1] - 62:3
**workup** [1] - 136:5
**world** [3] - 31:13, 89:2, 90:11
**World** [6] - 118:10, 118:12, 118:13, 118:14, 127:23, 128:8
**WORLDWIDE** [1] - 7:5
**worst** [1] - 129:11
**worst-case** [1] - 129:11
**worth** [1] - 77:14
**wound** [1] - 137:19
**wrap** [1] - 126:18
**WRIGHT** [1] - 1:15
**write** [1] - 79:4
**written** [5] - 31:19, 72:4, 75:23, 105:4, 112:21
**wrote** [1] - 37:8

## Y

**year** [4] - 22:25, 87:11, 97:24, 127:11
**years** [2] - 77:14, 79:6
**Yearsley** [1] - 128:8
**yield** [1] - 121:4
**York** [11] - 55:24, 56:13, 59:21, 78:7, 78:9, 119:19, 126:22, 127:25, 128:2, 128:3, 130:2
**YORK** [7] - 2:17, 5:21, 6:22, 7:12, 56:1, 56:8, 56:15
**YORK**......................
..................... [1] -
10:10

**young** [2] - 70:4, 70:9

**§**

**§** [1] - 118:4
**§§** [1] - 107:10