*UNITED STATES DISTRICT COURT*

*EASTERN DISTRICT OF LOUISIANA*

| | |
|---|---|
| **IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010** | **CIVIL ACTION** |
| | **MDL NUMBER: 2179** |
| | **SECTION "J"** |
| **THIS DOCUMENT RELATES TO:** | **JUDGE BARBIER MAGISTRATE SHUSHAN** |
| **10-3895, 10-3896, 10-3897, 10-4168, 10-4169, 11-58, and All Cases in Pleading Bundle B4** | |

**JOINT MEMORANDUM OF EMERGENCY RESPONDER DEFENDANTS IN SUPPORT OF JOINT MOTION TO DISMISS PURSUANT TO RULES 12(b)(6) & 12(c)**

## I.      INTRODUCTION

The Emergency Responder Defendants[1] are before the Court for no reason other than that they bravely honored the ancient maritime tradition of giving aid to a vessel and mariners in distress.  In the course of rendering aid to the DEEPWATER HORIZON, the Emergency Responder Vessels[2] used their fire monitors to spray water to cool the rig and the area around it,

---

[1] The "Emergency Responder Defendants" are the petitioners in the above-captioned limitation actions, namely Seacor Holdings, Inc., Seacor Offshore LLC, Seacor Marine, LLC, Seacor Worldwide, Inc., Siemens Financial, Inc. (collectively, "Seacor"), Island Ventures II, LLC, Nautical Solutions, LLC, Monica Ann, L.L.C., JNB Operating, L.L.C., and Gulf Offshore Logistics, L.L.C.

[2] The "Emergency Responder Vessels" are marine supply vessels owned by the Emergency Responder Defendants that are the subject of the above-captioned limitation actions, namely the SEACOR VANGUARD, SEACOR LEE, SEACOR WASHINGTON, MONICA ANN, MR. SIDNEY, and JOE GRIFFIN.

facilitate rescue of its crew, and facilitate efforts to address the ongoing emergency.  The Claimants in the above-captioned limitation actions allege, incredibly, that this act of attempted rescue – pumping water onto and around raging rig fires with an unchecked fuel source – was a legal cause of the sinking of the rig and, in turn, the months of pollution from the Macondo Well and the economic losses that allegedly resulted.[3]  Instead of being praised for their efforts in the face of extreme danger, the Emergency Responder Defendants are now mired in this complex and expensive litigation, which will no doubt go on for years, by virtue of the relative few who have filed claims in these limitation actions (a total of 66 claims in the above-captioned limitation actions compared to some 140,000 claims in the Transocean limitation action).[4]

Even if the "well-pleaded" allegations of the claims and the complaint they adopt are accepted as true, as they must be for a Rule 12 motion, the Claimants fail as a matter of law to state a cause of action under any body of law against the Emergency Responder Defendants. This is because, as a matter of law, it was not legally *foreseeable* that the act of spraying water onto and around a burning rig could cause the loss of control of the Macondo Well and, in turn, the far-reaching damages the Claimants allege.  Thus, the Emergency Responder Defendants did not owe the Claimants a legal duty, warranting dismissal of their claims.  With the exception of

---

[3] A summary listing of the 65 claims that are subject to this motion (as noted below in footnote 5, one claim against one of the Emergency Responder Defendants is not subject to this motion) is attached as Exhibit A (with two apparently inadvertent exceptions, each claim was actually filed six times – once in each limitation action).  There are an additional 6 claimants identified in the master answers to the limitation petitions that are also identified as claimants on the dockets despite the fact they have not filed individual claims (Benjamin Naquin, Kristine Polizzi, Rony Polizzi, David Cooper, Leo Damaris, and Rose Manor Hotel).  In an abundance of caution, and to the extent it is necessary, the Emergency Responder Defendants also seek dismissal of these 6 "claimants".

[4] Notably, neither BP, Transocean, nor any other party has made a claim against any of the Emergency Responder Defendants.  This is particularly significant in that Transocean was of course the owner of the rig and, therefore, the entity most directly affected by its sinking.

one unique claim that is not subject to this joint motion (and which was only filed in the SEACOR VANGUARD limitation action), all of the claims that have been filed in the above-captioned limitation actions should therefore be dismissed in their entirety.[5]

Additionally, although the lack of a legal duty means the Court need not reach any other issues, all but three of the Claimants also fail to satisfy the bright line *Robins Dry Dock* rule, establishing that physical damage to property in which one has a proprietary interest is a prerequisite to the recovery of purely economic damages.  On this basis as well, therefore, the bulk of the claims against the Emergency Responder Defendants should be dismissed.

Similarly, the Claimants' claims against the Emergency Responder Defendants under OPA fail as a matter of law because the Claimants simply cannot sue the Emergency Responder Defendants as "responsible parties" under OPA.  Finally, although the Court need not reach the issue, the Claimants' general maritime law claims should also be dismissed because OPA displaces general maritime law claims in this context.[6]

---

[5] At this time, Seacor is not moving to dismiss the Jones Act personal injury claim filed by DuWayne Mason, a member of the crew of the SEACOR VANGUARD.  *See* MDL No. 2179, Rec. Doc. 1941.  Mr. Mason's claim is for alleged vessel negligence for bringing the VANGUARD in proximity to the burning rig, allegedly resulting in smoke inhalation.  Although Seacor submits that Mr. Mason's claim is subject to the exoneration/limitation petition for the VANGUARD, Seacor is not moving to dismiss that claim at this time because it is not based on the theories of fault articulated in the *Robin* complaint. See *infra*, note 7.

[6] Although the Emergency Responder Defendants also believe that the "Good Samaritan" statute, 46 U.S.C. § 2303(c), bars the Claimants' claims, they recognize that, unlike the dispositive arguments set forth in this joint motion, the applicability of that statute likely cannot be resolved on a Rule 12 motion. Accordingly, the Emergency Responder Defendants are not invoking the protection of the Good Samaritan statute at this time, but reserve all of their rights in this regard.

3

## II.     BACKGROUND

When the DEEPWATER HORIZON exploded and caught fire on April 20, 2010, the six Emergency Responder Vessels were miles away, either in port or working at locations totally unrelated to the Macondo Well.  Upon hearing the rig's desperate radio calls for help and that some members of the rig crew were unaccounted for, several of the Emergency Responder Vessels raced to the scene, guided by the glow on the horizon from the inferno on the rig.  In some cases, the vessels came so close to the burning rig looking for survivors and attempting to cool the rig that equipment on the vessels melted from the intense fires raging out of control. Some of the Emergency Responder Vessels at times sprayed water onto the rig at the direction of others, hoping that by doing so they might slow the progress of the fires or cool an area of the rig sufficiently that it might be possible for anyone to escape who might still be aboard.  Tragically, the efforts of the Emergency Responder Vessels could not prevent the inevitable sinking of the rig, doomed as it was given the incredible physical damage it suffered in the explosions and the uncontrollable conflagration that ensued due to the unchecked fuel source that continued to feed the fires.

## III.     PROCEDURAL HISTORY AND POSTURE

All of the claims subject to this joint motion were filed in the Emergency Responder Defendants' limitation actions and adopt the allegations of the *Robin* complaint which was filed by Terry G. Robin and a dozen other named plaintiffs on behalf of three putative classes against the Emergency Responder Defendants (and others who were subsequently dismissed

4

voluntarily).[7]  The named plaintiffs in *Robin* sought to represent the following putative classes: (1) landowners suffering damages or economic losses; (2) commercial fisherman, shrimpers, charter boat operators, and/or businesses incurring economic losses as a result of the oil spill, and (3) individuals employed in the oil services industry who suffered economic losses as a result of the spill.[8]  The *Robin* complaint asserted three causes of action against the Emergency Responder Defendants for damages related to the oil spill:  (1) general maritime law negligence; (2) a claim under the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701, *et seq.*, and (3) Louisiana state law negligence (apparently seeking application of state law through the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, *et seq.*).[9]

The *Robin* complaint premised its claims on two allegations of fault against the Emergency Responder Defendants.  First, the *Robin* complaint alleged that the Emergency Responder Defendants were negligent for "pouring enormous amounts of water on, and into, the vessel," causing the rig to become inundated with water and eventually to sink.[10]  The sinking of the rig, the complaint alleged, caused the pipe "connected to the wellhead" to collapse and to fall to the sea floor.  Although the complaint is not entirely clear, it appears also to allege that had the

---

[7]  *See Terry G. Robin, et al. v. Seacor Marine, L.L.C., et al.*, Civil Action No. 2:10-cv-01986 (E.D. La. filed July 14, 2010).

[8]  *See* paragraph XXXI of the *Robin* complaint.

[9]  *See* paragraphs XXVII – XXIX of the *Robin* complaint.  The *Robin* complaint's suggestion that Article 8.1 of the 1989 International Convention on Salvage imposed a duty on the Emergency Responder Defendants is misplaced.  *See* paragraph XXVII of the *Robin* complaint.  The duty referenced in Article 8.1 of the Convention is owed only to "the owner of the vessel" and, regardless, Article 3 makes clear that the Convention does not apply to "fixed or floating platforms or to mobile offshore drilling units when such platforms or units are on location and engaged in the exploration, exploitation or production of sea-bed mineral resources."  *See* International Convention on Salvage, Apr. 28, 1989, U.N.T.S. No. 33479. Moreover, no court has ever held that the Convention is even enforceable in American courts.

[10]  *See* paragraphs XIII and XV of the *Robin* complaint.

PD.5196363.1

rig not sunk, then the fires on the rig somehow could have been put out, the riser pipe leading to the wellhead would not have collapsed, the blow-out preventer would have performed properly, and the massive oil spill would not have occurred.[11]

The second allegation of fault against the Emergency Responder Defendants in the *Robin* complaint is that they failed to use their dynamic positioning (DP) systems "to stabilize and maintain Deepwater Horizon's precise position."[12]  While the complaint does not allege how the Emergency Responder Vessels could or should have maintained the DEEPWATER HORIZON's position, the only inference that can be made is that the Emergency Responder Defendants allegedly should have transferred crew members from their vessels to the burning DEEPWATER HORIZON in order to secure towing lines and then, acting in spontaneous concert, maneuvered around the rig, pulling in opposing directions in order to hold its burning carcass precisely in place.  The legal implications of such a ridiculous and implausible theory of fault are discussed below.

In any case, the filing of the *Robin* complaint made it necessary for each of the Emergency Responder Defendants to file in this Court Petitions for Exoneration From or Limitation of Liability.  Six such petitions were filed.[13]  In connection with the limitation

---

[11] *See* paragraphs XIII – XVI of the *Robin* complaint.

[12] *See* paragraph XXI of the *Robin* complaint.  A dynamic positioning system is a computer controlled navigation and station-keeping system designed to maintain automatically a vessel's position and heading by using its own propellers and thrusters.  Position reference sensors, combined with wind sensors, motion sensors and gyro compasses provide information to the computer pertaining to the vessel's position and the magnitude and direction of environmental forces affecting its position.

[13] Since Seacor received notice of the *Robin* complaint and the theories of recovery alleged therein, it elected in an abundance of caution also to file a limitation petition on behalf of the SEACOR LEE, even though the LEE was not implicated in the *Robin* lawsuit, because it participated in some of the activities at issue.

PD.5196363.1

petitions, the Court enjoined the prosecution of the *Robin* complaint and ordered that all claims against any of the Emergency Responder Defendants be filed in their respective limitation actions on or before April 20, 2011, the one year anniversary of the rig explosion and the same date by which claims in the Transocean limitation action were to be filed.[14]

By the April 20 deadline, 66 claims were filed on behalf of a variety of Claimants in each of the six limitation actions commenced by the Emergency Responder Defendants.  These include claims on behalf of area restaurants (20), casino employees (15), marinas and bait shops (7), air conditioning and heating contractors/carpenters (5), property owners or rental businesses (14), two personal injuries (in addition to the Jones Act claim referred to above), a roller skating rink, a fireworks stand, and the Rummel High School Alumni Association, which allegedly lost the opportunity to host a fishing tournament fund raiser.[15]  Each of these Claimants (except the Jones Act seaman) also apparently filed claims in the Transocean limitation action to recover their full provable damages from Transocean (or the other parties, including BP, against which Transocean made a Rule 14(c) tender).  In other words, the Claimants in these proceedings will not, of course, be without a prospective remedy against others if this joint motion to dismiss is granted.

This information about the nature of the claims against the Emergency Responder Defendants brings the Court's foreseeability analysis into clear focus:  the principal question

---

[14] On April 12, 2011, shortly before the April 20 monition date, the Court denied the *Robin* plaintiffs' motion seeking authority to use a "short-form claim" in the Emergency Responder Defendants' limitation actions.  *See* MDL No. 2179, Rec. Doc. 1914.  In doing so, the Court reasoned that "actions must be taken to insure that claims are filed in, and only in, the intended Limitation Action."

[15] As noted above, a summary listing of the 65 claims that are subject to this motion is attached as Exhibit A.

presented by this joint motion is whether it was foreseeable that spraying water onto a burning rig to try to delay its incineration and rescue its crew could cause the remote damages allegedly suffered by the Claimants as a result of the loss of control of the Macondo well.   Recent precedent from the Fifth Circuit involving another tragedy – Hurricane Katrina – makes this an easy question to answer and compels granting this joint motion to dismiss.

## IV.    LEGAL STANDARD

This joint motion to dismiss is brought pursuant to both Rule 12(b)(6) (failure to state a claim upon which relief can be granted) and Rule 12(c) (for judgment on the pleadings).   A motion under Rule 12(c) for failure to state a claim is subject to the same standards as a motion to dismiss under Rule 12(b)(6).[16]   To avoid dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'"[17]   In order to be considered plausible, the complaint's factual allegations must be sufficient to raise a right to relief above the speculative level.[18]   The Court should accept all "well-pleaded" facts as true and construe the complaint in the light most favorable to the plaintiff.   Since the Supreme Court's 2007 decision in *Bell Atlantic Corp. v. Twombly*, though, it is not necessary for the moving party to show that, beyond a doubt, the plaintiffs can prove no set of facts to support a claim that would entitle them to relief.[19]

---

[16] *See In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 209-10 (5th Cir. 2010); *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008); *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 n. 8 (5th Cir. 2002).

[17] *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (emphasis added) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[18] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[19] *Id.* at 562-63.

8

The plausibility standard requires factual allegations sufficient to raise more than a suspicion of a legally cognizable right of action.[20]  In other words, a claim has facial plausibility only when the plaintiff pleads facts sufficient to allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  It follows that, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief'."[21]

## V.    ARGUMENT

### A.    The Emergency Responder Defendants Did Not Owe the Claimants a Legal Duty Because the Alleged Harm Was Not Foreseeable

Assuming for the sake of argument that the general maritime law and Louisiana state law are even available to the Claimants in this case,[22] claims under either body of law fail as a matter of law because the Emergency Responder Defendants did not owe the Claimants a legal duty.  The Claimants' alleged harm is simply too attenuated and was not foreseeable as a matter of law.

By adopting the allegations of the *Robin* complaint, the Claimants effectively allege two distinct theories of negligence on the part of the Emergency Responder Defendants:  (1) that they pumped water on and into the rig, causing it to sink and resulting in the loss of well control and pollution that otherwise would not have occurred; and (2) that they failed to use the vessels' dynamic positioning systems to hold the rig in place while the rig fires were somehow extinguished and the flow of oil stopped.  As a matter of law, neither of these speculative

---

[20] *Id.* at 555.

[21] *Iqbal*, 129 S.Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

[22] For purposes of this joint motion, the Court need not reach those issues because the duty/foreseeability issue is dispositive and compels dismissal.  Nevertheless, in Section V.D, *infra*, the Emergency Responder Defendants explain why the general maritime law is not even available to the Claimants in this context.

PD.5196363.1

theories meets the foreseeability test as applied by the Fifth Circuit in *In re Great Lakes Dredge & Dock Co. LLC*.[23]   Additionally, the second theory fails because the facts on which it is based are not remotely plausible on their face.

*Great Lakes* involved claims by Hurricane Katrina flood victims against the owners and operators of dredging vessels along the Mississippi River Gulf Outlet (MRGO).   The vessel owners filed petitions seeking exoneration from or, alternatively, limitation of liability.   The allegation against the limitation petitioners was that they had negligently performed dredging operations resulting in the erosion of protective wetlands which, in turn, contributed to the failure of levees and ultimately lead to the flooding of the claimants' properties.   The limitation petitioners moved for entry of judgment on the pleadings pursuant to Rule 12(c).   Finding that the devastation caused by the flooding that followed Hurricane Katrina was not a foreseeable result of the allegedly negligent dredging performed by any of the dredging companies, the district court granted the Rule 12 motions and dismissed the case.   The Fifth Circuit affirmed.

The Fifth Circuit began its analysis of the foreseeability issue by noting that the case was governed by maritime law because the claims related to conduct of the limitation petitioners on navigable waterways.   The Fifth Circuit went on to explain that, in order to state a claim for relief under maritime law, the plaintiff must demonstrate:  (1) that there was a duty owed by the defendant to the plaintiff; (2) breach of that duty; (3) injury sustained by the plaintiff; and (4) a causal connection between the defendant's conduct and the plaintiff's injury.[24]

---

[23] 624 F.3d 201 (5th Cir. 2010).

[24] *Id.* at 211; *see also Canal Barge Co. v. Troco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000).  Louisiana negligence law applies the same principles.  *See, e.g.*, *Pitre v. Opelousas Gen. Hosp.*, 530 So. 2d 1151, 1157–58 (La. 1988) ("[E]ach person owes a duty to take reasonable care to avoid acts or omissions which he can reasonably foresee would be likely to injure a present or future member of society unless there is

Determination of whether there is a duty owed by the defendant to the plaintiff in the first instance involves a number of factors, "most notably the foreseeability of the harm suffered by the complaining party."[25]  If the claimed damages sustained as a result of the alleged negligence of the Emergency Responder Defendants were not foreseeable, then the Emergency Responder Defendants owed no duty to the Claimants and are not liable <u>as a matter of law</u>.[26]  In short, questions as to the scope of an alleged tortfeasor's duty of reasonable care are not to be resolved by the trier of fact but by the Court.[27]

The Fifth Circuit's analysis of the foreseeability issue in *Great Lakes* is dispositive of the joint motion in these cases and is therefore worthy of quoting at length:

> In the context of maritime torts, we have considered harm to be a foreseeable consequence of an act or omission
>
> > if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a *probable* result of the act or omission, considering the interplay of natural forces and likely human intervention.

---

some justification or valid explanation for its exclusion."); *Dupre & Son Floor Covering, Inc. v. City of Iota*, 2010 WL 1779655, at *3 (La. 3rd Cir. 2010) ("Whether a defendant's conduct constitutes the legal cause of injury results from inquiring into whether the injury was foreseeable and whether there is a natural ease of association between the conduct and the harm.").

[25] *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987).

[26] Compare the statement of the Fifth Circuit in *Great Lakes*: "[I]f the injuries suffered allegedly as a result of the Limitation Petitioners' negligent dredging were not foreseeable, the Limitation Petitioners owed no duty to the Claimants and are not liable as a matter of law." *Great Lakes*, 624 F.3d at 211.

[27] "Determination of the tortfeasors' duty is a question of law and thus a function of the court . . ." *Great Lakes*, 624 F.3d at 211 (quoting *Mississippi Dep't of Transp. v. Signal Int'l LLC*, 579 F.3d 478, 490 (5th Cir. 2009)).  Again, the same is true under Louisiana state law.  *See Millet v. Treasure Chest Casino, L.L.C.*, 788 So. 2d 713 (La. App. 5 Cir. 5/30/01) (affirming trial court's granting of defendants' peremptory exception of no cause of action dismissing negligence claim on the ground that defendants did not owe plaintiff a duty because the alleged harm was not foreseeable).

PD.5196363.1

[*Consol. Aluminum*, 833 F.2d at 68.]  To show that the individual Limitation Petitioners are liable in the instant case, the Claimants would have to show that each Limitation Petitioner reasonably should have foreseen that the sequence of events leading to their damages – the amplification of the storm surge during Hurricane Katrina, the failure of the levee systems, and the subsequent flooding of Orleans and St. Bernard Parishes – would be a *probable* result of its negligent acts and the marginal erosion to the wetlands caused thereby. *See Consol. Aluminum*, 833 F.2d at 68 (harm is not foreseeable unless it "might have been anticipated by a reasonably thoughtful person, as a *probable* result of the act or omission") (emphasis added); *Republic of France v. United States*, 290 F. 2d 395, 401 (5th Cir. 1961) (a defendant must have "knowledge of a danger, not merely possible, but probable") (quoting *Dalehite v. United States*, 346 U.S. 15, 42 (1953)).[28]

Applied to the particular facts of this case, this test means that the Claimants in the Emergency Responder Defendants' limitation actions must show that each Emergency Responder Defendant should have reasonably foreseen that the acts of (1) spraying water onto and around a burning rig and (2) failing to put a member of the boat crew onto the burning rig to secure a tow line would *probably*, not just possibly, result directly and sequentially in the sinking of the rig, the apparent failure of the blow-out preventer, the loss of well control, and then an inability to stop the flow of millions of barrels of oil for months, eventually causing damage to Claimants located tens or hundreds of miles away and with no direct connection at all to the DEEPWATER HORIZON or even, in most cases, to the Gulf of Mexico.  As a matter of law, the Claimants cannot make this showing.

Over one half of the claims filed against the Emergency Responder Defendants are by casino employees (alleging economic losses from business supposedly lost from offshore workers and fishermen), or by New Orleans restaurants (alleging seafood was less plentiful and

---

[28] *Great Lakes*, 624 F.3d at 211-12. (emphasis in original).

more expensive), or by air conditioning/heating contractors and carpenters (alleging a decrease in the amount of their work for reasons that, frankly, are unclear).  It simply cannot be said with any seriousness or plausibility that when the captains of the Emergency Responder Vessels were working desperately to save lives and to respond to the ongoing emergency, all in the midst of a raging inferno and the greatest maritime disaster in the history of the Gulf of Mexico, they could have reasonably foreseen at that moment that anything they did or did not do would *probably* cause the types of damage the Claimants now allege.

Other decisions of the Fifth Circuit make it clear that the test of foreseeability is not satisfied – and cannot be satisfied – in this case.  In *Consolidated Aluminum*, for example, the plaintiff sued to recover for physical damage caused to its manufacturing facilities and the attendant economic loss due to the disruption of its supply of natural gas when a dredge operating several miles away negligently ruptured a natural gas pipeline.  The court concluded as a matter of law that the defendant could not have reasonably anticipated that its alleged failure to follow safe dredging practices would likely result in physical damage to the equipment and work-in-progress at the plaintiff's plant located miles away.  The court explained:

> The harm was not of a general sort expected to follow from the failure to dredge carefully in proximity to a gas pipeline.  Injury to property and persons from the escaping gas, or from a fire which might have ensued, would be examples of consequences that would be foreseeable.  The damages sustained by [the owner of the pipeline] obviously were foreseeable.  But the damage arising from the loss of natural gas supply, in turn causing the shut down of electric turbines, in turn causing a loss of electric power vital to the aluminum reduction process, with the ultimate result being substantial damage to equipment and product-in-progress, goes beyond the pale of general harm which reasonably might have been anticipated by negligent dredgers.[29]

---

[29] *Consol.  Aluminum*, 833 F.2d at 68.

This test of foreseeability was again applied by the Fifth Circuit to dismiss a claim as a matter of law in *Lloyd's Leasing Ltd. v. Conoco*, where the plaintiffs were the owners of property seventy miles from the site of an oil spill who sued after oil washed ashore and was tracked onto their properties from the beach by vacationers.  The court held that the harm suffered by the plaintiffs was not foreseeable since most of the area where the oil might plausibly have washed ashore was undeveloped and the defendant had no reason to anticipate the oil would wash ashore in a heavily populated area and then be tracked into businesses and homes.[30]

The common thread of *Consolidated Aluminum* and *Lloyd's Leasing* was described by the court in *Great Lakes*:

> In each case, this court found the causal connection between the alleged negligence and the resulting harm to be too attenuated to be foreseeable as a matter of law.  To be foreseeable, the harm alleged must bear some proximate relationship with the negligent conduct such that it can reasonably be said to be within the "scope of the risk" created by that conduct.[31]

The Fifth Circuit concluded its foreseeability analysis in *Great Lake*s with language that is controlling of the issues now before this Court:  "No reasonable dredger could have anticipated that its negligence would make the difference between the levee systems holding or failing in the event of a hurricane."[32]

In this case, no reasonable boat captain could have anticipated that spraying water onto a burning rig or failing somehow to attach a tow line to that rig would result in the loss of control of the Macondo Well, the release of millions of barrels of oil, and the "worst environmental

---

[30] *Lloyd's Leasing Ltd. v. Conoco*, 868 F.2d 1447, 1449-50 (5th Cir. 1989).

[31] *Great Lakes*, 624 F.3d at 212.

[32] *Id.* at 213.

PD.5196363.1

disaster America has ever faced."[33]

In sum, the Claimants' alleged damages were not a foreseeable consequence of the Emergency Responder Defendants' discrete role, limited activities, and supposed faults. As the alleged harm was not reasonably foreseeable, there was no legal duty owed to the Claimants and their claims fail as a matter of law.[34]

### B.    The *Robins Dry Dock* Rule Provides Another Basis for Dismissal

Although all of the claims subject to this joint motion should be dismissed because the Emergency Responder Vessels did not owe the Claimants a legal duty, the maritime and state-law negligence claims of all but three Claimants also fail as a matter of law pursuant to the *Robins Dry Dock* rule.[35] In *Robins Dry Dock v. Flint*,[36] the Supreme Court applied to a maritime tort claim a legal principle that by 1927 was already settled in the common law of both the United States and England. That rule denied a plaintiff recovery for economic loss if that loss resulted from physical damage to property in which he had no proprietary interest. Stated

---

[33] President Barack Obama, "Remarks by the President to the Nation on the BP Oil Spill" (June 15, 2010). (Transcript available at http://www.whitehouse.gov/the-press-office/remarks-president-nation-bp-oil-spill.)

[34] The court in *Great Lakes* also found that the claims should be dismissed because plaintiffs' group liability theory – like the one proposed by the Claimants here – could not sustain a claim as it "lacked sufficient factual allegations to state a claim against any individual dredger." 624 F.3d at 214. This is yet another basis for dismissal of Claimants' claims against the Emergency Responder Defendants. And the result would be the same even under state law. *See Barasich v. Columbia Gulf Transmission Co.*, 467 F. Supp. 2d 676, 694-95 (E.D. La. 2006) (rejecting group liability under Louisiana law).

[35] *See Robins Dry Dock v. Flint*, 275 U.S. 303 (1927). Again, this assumes that the general maritime law and Louisiana state law are even available to the Claimants – issues that the Court need not address. The Emergency Responder Defendants recognize that there is a possible exception to the *Robins Dry Dock* rule for commercial fishermen and oystermen, and there is one such claim in this case, that being the one asserted on behalf of Terry G. Robin. The Emergency Responder Defendants also acknowledge that the *Robins Dry Dock* rule does not apply to the two non-employee personal injury claimants, Aiman Abdel and Rafael Lopez, who allege to have been injured during the clean-up, not the explosion.

[36] 275 U.S. 303 (1927).

PD.5196363.1

differently, purely economic damages cannot be recovered in the absence of physical damage to property in which one has a proprietary interest.

The bright line rule of *Robins Dry Dock* has been consistently applied in this circuit, most notably in *State of Louisiana v. M/V TESTBANK*[37] in which the court *en banc* reconfirmed its commitment to the *Robins Dry Dock* rule against an argument it should be abandoned as outdated.  *TESTBANK* involved a collision in the Mississippi River causing a PCP spill and the closure of the Mississippi River Gulf Outlet for several weeks.  Claims for economic loss were asserted by many of the same types of claimants involved in this case – marina and boat rental operators, wholesale and retail seafood enterprises, seafood restaurants, tackle and bait shops and recreational fishermen.  In rejecting those claims, the court wrote in conclusion:

> [H]aving reexamined the history and central purpose of the doctrine of *Robins Dry Dock* as developed in this circuit, we remain committed to its teaching.  Denying recovery for pure economic losses is a pragmatic limitation on the doctrine of forseeability, a limitation we find to be both workable and useful.  Nor do we find persuasive plaintiffs' arguments that their economic losses are recoverable under a public nuisance theory, as damages for violation of federal statutes, or under state law.[38]

Subsequent Fifth Circuit jurisprudence has not wavered from the *Robins Dry Dock/TESTBANK* rule,[39] and Louisiana state law applies the same principles.[40]  Accordingly, in the event that the

---

[37] 752 F.2d 1019 (5th Cir. 1985); *see also Geyser Aluminum & Chemical Corp. v. Marshland Dredging, Inc.*, 455 F.2d 957 (5th Cir. 1972); *Dick Myers Towing Service, Inc. v. United States*, 577 F.2d 1023 (5th Cir. 1978); *Louisville & Nashville R.R. Co. v. M/V BAYOU LACOMBE*, 597 F.2d 469 (5th Cir. 1979).

[38] *TESTBANK*, 752 F.2d at 1032.  The court also noted that the *Robins Dry Dock* rule was consistent with state law in Louisiana, Texas, Georgia, Florida, Alabama, and Mississippi.  *Id.* at 1027.

[39] *See Catalyst Old River Hydroelectric Ltd. Partnership v. Ingram Barge Co*., 639 F. 3d 207, 209 (5th Cir. 2011); *Reserve Mooring Inc. v. American Commercial Barge Line, LLC*, 251 F. 3d 1069, 1070 (5th Cir. 2001); *Corpus Christi Oil & Gas Co. v Zapata Gulf Marine Corp*., 71 F. 3d 198, 200 (5th Cir. 1995).

[40] *See La. Crawfish Producers Ass'n-West v. Amerada Hess Corp.*, 935 So. 2d 380, 382–83 (La. App. 3

Court reaches the *Robins Dry Dock* issue – and it need not – the maritime and state-law negligence claims of all but three Claimants should also be dismissed because they allege economic losses only, without a corresponding physical injury to property in which the Claimants have a proprietary interest.

### C.    Claimants' OPA Claims Fail As a Matter of Law

In addition to maritime and state-law negligence claims, the *Robin* complaint purports to assert a cause of action against the Emergency Responder Defendants under § 2702 of OPA. OPA is a strict liability statute that holds "each responsible party for a vessel or facility from which oil was discharged . . . into or upon the navigable waters or adjoining shorelines or the exclusive economic zone . . . liable for the removal costs and damages . . . that result from such incident." [41]   The term "responsible party" means one from whose vessel or facility the oil was discharged and who is designated by the Coast Guard as being responsible for the cleanup.  The term does not include third parties such as the Emergency Responder Defendants, even though the Claimants allege they are "responsible" for the spill, because the oil did not emanate from

---

Cir. 2006) (applying general maritime law precedent to bar state-law claims for economic damages by commercial crawfish fishermen); *TS&C Investments v. Beusa Energy, Inc.*, 637 F. Supp. 2d 370, 380-81 (W.D. La. 2009) (relying on the *La. Crawfish* case to make an "*Erie* guess" that Louisiana's economic loss rule would apply to bar state-law claims for economic losses even in the non-maritime context).

[41] 33 U.S.C. § 2702(a). "Damages" include natural resource damages, real or personal property damages, damages for loss of subsistence use of natural resources, lost revenues, loss of profits or impairment of earning capacity, damages for the net costs of providing increased or additional public services during or after removal activities, and the costs of assessing such damages.  *See* 33 U.S.C. §§ 2701(5), 2702(b)(2). "Incident" means "any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities or any combination thereof, resulting in the discharge or substantial threat of discharge of oil."  33 U.S.C. § 2701(14).

their vessels and they were not designated as such by the Coast Guard.[42]   Accordingly, the Claimants cannot sue the Emergency Responder Defendants as "responsible parties" under OPA and all Claimants' OPA claims must be dismissed.

**D.     Alternatively, Claimants' General Maritime Law Claims Fail as a Matter of Law Because They Are Displaced by OPA**

Because the Emergency Responder Defendants did not owe the Claimants a legal duty as a matter of law, and for the various other reasons set forth above, the Court need not address the legal question of whether the general maritime law is even available to the Claimants.  That said, if the Court does reach that issue, the fact is that OPA displaces the general maritime law with respect to pollution-related claims such that the Claimants' maritime negligence claims should also be dismissed in their entirety on this alternative ground.[43]

OPA's admiralty and maritime savings provision states:  "*Except as otherwise provided in this chapter*, this chapter does not affect . . . admiralty and maritime law."  33 U.S.C. § 2751(e) (emphasis added).  As numerous defendants have argued in pending motions to dismiss the B1 Bundle Master Complaint, OPA displaces general maritime law claims against non-responsible parties for damages that are otherwise recoverable from the responsible party.  OPA generally requires all claims for damages to first be presented to the responsible party.  *See* 33 U.S.C. § 2713(a).  If a responsible party either denies liability for a claim or fails to settle a claim within 90 days, the claimant may then elect to "commence an action in court against the

---

[42] Following the spill, BP accepted its designation as a "responsible party" under OPA and announced that it would pay legitimate claims for damages.  Transocean, MOEX, and Anadarko have also been designated responsible parties for the spill.

[43] As the First Circuit noted in *South Port Marine*, this is an issue of "displacement" and not "preemption," and it "does not present any of the federalism concerns normally associated with that word," because the issue is "OPA's effect on preexisting *federal* law."  *South Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65 (1st Cir. 2000) (emphasis in original).

18

responsible party" or present the claim to the Oil Spill Liability Trust Fund.  *See* 33 U.S.C. § 2713(c).

Thus, on its face and by its very structure, OPA precludes general maritime law claims against third parties, such as the Emergency Responder Defendants, for damages of the type recoverable under OPA.[44]  Indeed, just last year, Judge Lemelle held that "[c]laimants should pursue claims covered under OPA only against the responsible party and in accordance with the procedures established by OPA. . . .  [A]ll actions of claimants that allege damages which are covered by OPA would first go through the OPA claim process *prior to any suit against any party*."[45]

## VI.    CONCLUSION

For the foregoing reasons, the Emergency Responder Defendants respectfully request that the Court dismiss with prejudice each of the 65 claims identified in Exhibit A that have been filed in the above-captioned limitation actions.

---

[44] *See, e.g.*, *Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001) ("The Court finds that OPA establishes an entirely new, federal cause of action for oil spills.  First, and most important, this conclusion is based on the text of the statute read as a whole.  Although traditional maritime remedies for oil spills pre-date OPA, OPA creates a new, *comprehensive federal scheme* for the recovery of oil spill cleanup costs and the compensation of those injured by such spills.  This new scheme includes new remedies, which, in many respects, preempt traditional maritime remedies.") (internal citations omitted) (emphasis added); *Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*, 924 F. Supp. 1436, 1447 (E.D. Va. 1996) (holding that "OPA clearly preempts maritime law as to recovery of cleanup expenses and the cost of compensating injured persons" and "only preserves admiralty claims which are not addressed in OPA, such as [a] claim for . . . collision damages").

[45] *Gabarick v. Laurin Maritime (America) Inc.*, 623 F. Supp. 741, 750-51 (E.D. La. 2009) (emphasis added).

Respectfully submitted,


/s/ *Gary A. Hemphill*
Gary A. Hemphill, T.A. (#6768)
Hugh Ramsay Straub (#12525)
**PHELPS DUNBAR LLP**
Canal Place
365 Canal Street • Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: (504) 566-1311
Telecopier: (504) 568-9130

Michael J. Lyle (DC Bar #475078, IL Bar #6199227)
**WEIL, GOTSHAL & MANGES LLP**
1300 Eye Street, NW, Suite 900
Washington, DC 20005
Telephone:  (202) 682-7157
Facsimile:  (202) 857-0940

Theodore E. Tsekerides (NY Bar #2609642)
Jeremy T. Grabill (NY Bar #4501755)
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8218
Facsimile: (212) 310-8007

*Attorneys for Seacor Holdings, Inc., Seacor Offshore LLC,
Seacor Marine LLC, Seacor Worldwide, Inc., and Siemens
Financial, Inc.*

/s/ *Robert P. McCleskey*
Robert P. McCleskey, Jr. (#9151)
Raymond T. Waid (#31351)
**PHELPS DUNBAR LLP**
Canal Place
365 Canal Street • Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: (504) 566-1311
Telecopier: (504) 568-9130

*Attorneys for Island Ventures II, LLC and Nautical
Solutions, LLC*


/s/ *William J. Riviere*
William J. Riviere, T.A. (#20593)
**PHELPS DUNBAR LLP**
Canal Place
365 Canal Street • Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: (504) 566-1311
Telecopier: (504) 568-9130

*Attorneys for Monica Ann, L.L.C., JNB Operating, L.L.C.,
and Gulf Offshore Logistics, L.L.C.*

21

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Joint Memorandum of Emergency Responder Defendants in Support of Joint Motion to Dismiss Pursuant to Rules 12(b)(6) & 12(c) has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 8th day of June, 2011.


*/s/ Gary A. Hemphill*
GARY A. HEMPHILL
HUGH RAMSAY STRAUB

PD.5196363.1